## IMPORTANT

*If you are in any doubt about this prospectus, you should obtain independent professional advice.*



# China National Building Material Company Limited*
# 中國建材股份有限公司

*(a joint stock limited company incorporated in the People's Republic of China with limited liability)*

## GLOBAL OFFERING

|  |  |
|---|---|
| *Number of H Shares offered pursuant to the Global Offering* | **654,214,000 (subject to adjustment and the Over-allotment Option)** |
| *Number of Public Offer Shares* | **65,422,000 (subject to adjustment)** |
| *Number of International Placing Shares* | **588,792,000 (including 59,474,000 Sale H Shares) (subject to adjustment and the Over-allotment Option)** |
| *Maximum offer price* | **HK$2.75 per H Share payable in full on application in Hong Kong dollars, subject to refund, plus 1% brokerage, SFC transaction levy of 0.005% and Stock Exchange trading fee of 0.005%** |
| *Nominal value* | **RMB 1.00 each** |
| *Stock code* | **3323** |

### Sole Global Coordinator, Bookrunner, Sponsor and Lead Manager



The Stock Exchange of Hong Kong Limited and Hong Kong Securities Clearing Company Limited take no responsibility for the contents of this prospectus, make no representation as to its accuracy or completeness and expressly disclaim any liability whatsoever for any loss howsoever arising from or in reliance upon the whole or any part of the contents of this prospectus.

A copy of this prospectus, having attached thereto the documents specified in the paragraph entitled "Documents Delivered to the Registrar of Companies" in Appendix IX to this prospectus, has been registered by the Registrar of Companies in Hong Kong as required by Section 342C of the Companies Ordinance (Chapter 32 of the Laws of Hong Kong). The Securities and Futures Commission and the Registrar of Companies in Hong Kong take no responsibility for the contents of this prospectus or any other document referred to above.

The Offer Price is expected to be fixed by agreement between the Global Coordinator, on behalf of the Underwriters, the Selling Shareholders and the Company on the Price Determination Date. The Price Determination Date is expected to be on or around Thursday, March 16, 2006 and, in any event, not later than Tuesday, March 21, 2006. The Offer Price will be not more than HK$2.75 and is currently expected to be not less than HK$2.30 unless otherwise announced. Investors applying for Public Offer Shares must pay, on application, the maximum offer price of HK$2.75 for each H Share together with a brokerage of 1%, SFC transaction levy of 0.005% and Stock Exchange trading fee of 0.005%.

The Global Coordinator, on behalf of the Underwriters, may, with the consent of the Company (on behalf of itself and the Selling Shareholders), reduce the indicative Offer Price range (which is HK$2.30 to HK$2.75 per H Share) and/or the number of Offer Shares below that stated in this prospectus at any time on or prior to the morning of the last day for lodging applications under the Hong Kong Public Offering. In such a case, notices of the reduction in the indicative offer price range and/or the number of Offer Shares will be published in the South China Morning Post and the Hong Kong Economic Times not later than the morning of the day which is the last day for lodging applications under the Hong Kong Public Offering. If applications for Public Offer Shares have been submitted prior to the day which is the last day for lodging applications under the Hong Kong Public Offering, then even if the offer price range and/or the number of Offer Shares is so reduced such applications cannot be subsequently withdrawn. If, for any reason, the Offer Price is not agreed between the Company (on behalf of itself and the Selling Shareholders) and the Global Coordinator, on behalf of the Underwriters, the Global Offering (including the Hong Kong Public Offering) will not proceed.

The Company is incorporated, and its businesses are located, in the PRC. Potential investors should be aware of the differences in the legal, economic, and financial systems between the mainland of the PRC and Hong Kong and that there are different risk factors relating to making an investment in PRC-incorporated companies. Potential investors should also be aware that the regulatory framework in the PRC is different from the regulatory framework in Hong Kong and should take into consideration the different market nature of the Shares of the Company. Such differences and risk factors are set out in the sections entitled "Risk Factors" and "Appendix VI — Summary of Principal PRC Legal and Regulatory Provisions" and "Appendix VII — Summary of Articles of Association." Investors should also be aware that the companies and securities regulatory framework in the PRC to which the Group is subject has only recently been introduced.

The obligations of the Hong Kong Underwriters under the Hong Kong Underwriting Agreement to subscribe for, and to procure applicants for the subscription for, the Public Offer Shares, are subject to termination by the Global Coordinator (on behalf of the Hong Kong Underwriters) if certain grounds arise at any time prior to 8:00 a.m. on the day that trading in the Offer Shares commences on the Stock Exchange. Such grounds are set out in the section entitled "Underwriting — Underwriting Arrangements and Expenses — Hong Kong Public Offering — Hong Kong Underwriting Agreement — Grounds for termination" in this prospectus. It is important that you refer to that section for further details.

The Offer Shares have not been and will not be registered under the U.S. Securities Act or any state securities laws of the United States. The Offer Shares are being offered only (1) to qualified institutional buyers in the United States in reliance on Rule 144A under the U.S. Securities Act or (2) outside the United States in reliance on Regulation S under the U.S. Securities Act.

\* For identification only

C: 6/5/15-6/7/15
Exhibit 3



March 13, 2006

ALRMH-CNBM00000001

# EXPECTED TIMETABLE[1]

Application lists open[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11:45 a.m. on Thursday, March 16, 2006

Latest time to lodge **white** and **yellow** Application Forms . . . . .12:00 noon on Thursday, March 16, 2006

Latest time to give **electronic application instructions**
  to HKSCC[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12:00 noon on Thursday, March 16, 2006

Application lists close . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12:00 noon on Thursday, March 16, 2006

Expected Price Determination Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Thursday, March 16, 2006

Announcement of the Offer Price, the indication of level of interest
  in the International Placing, the results of applications in the
  Hong Kong Public Offering and the basis of allotment of the
  Public Offer Shares to be published in the *South China*
  *Morning Post* and *Hong Kong Economic Times* on or before . . . . . . . . . . Wednesday, March 22, 2006

Despatch of refund cheques on or before[4] . . . . . . . . . . . . . . . . . . . . . . . . Wednesday, March 22, 2006

Despatch of H Share certificates on or before[4] . . . . . . . . . . . . . . . . . . . . . Wednesday, March 22, 2006

Dealings in H Shares on the Stock Exchange expected to commence on . . . . .Thursday, March 23, 2006

——————
*Notes:*

(1)   All times refer to Hong Kong local time, except as otherwise stated. Details of the structure of the Global Offering, including its conditions, are set out in the section entitled "*Structure of the Global Offering.*"

(2)   If there is a "black" rainstorm warning or a tropical cyclone warning signal number 8 or above in force at any time between 9:00 a.m. and 12:00 noon on Thursday, March 16, 2006, the application lists will not open on that day. Further information is set out in the paragraph headed "*Effect of Bad Weather on the Opening of the Application Lists*" in the section entitled "*How to Apply for Public Offer Shares.*"

(3)   Applicants who apply by giving electronic application instructions to HKSCC should refer to the section entitled "*How to Apply for Public Offer Shares — Applying by Giving Electronic Application Instructions to HKSCC.*"

(4)   Refund cheques will be issued, without interest, in respect of wholly or partially unsuccessful applications and also in respect of successful applications in the event that the Offer Price is less than the initial offer price per H Share paid on application. Applicants for 1,000,000 Public Offer Shares or more and who have indicated in their Application Forms that they wish to collect refund cheques and H Share certificates (as relevant) personally from the H Share Registrar may collect refund cheques (where applicable) and H Share certificates (where applicable) from the H Share Registrar from 9:00 a.m. to 1:00 p.m. on Wednesday, March 22, 2006 or any other date notified by the Company in the newspapers as the date of despatch of H Share certificates/refund cheques. Individual applicants who opt for personal collection must not authorize any other person to make their collection on their behalf. Applicants being corporations which opt for personal collection must attend by their authorized representatives, each bearing a letter of authorization from such corporation stamped with the corporation's chop. Both individuals and authorized representatives (if applicable) must produce, at the time of collection, evidence of identity acceptable to the H Share Registrar. Uncollected H Share certificates and refund cheques will be despatched by ordinary post at the applicants' own risk to the addresses specified in the relevant Application Forms promptly thereafter. Further information is set out in the section entitled "*How to Apply for Public Offer Shares — Applying by Using a White or Yellow Application Form.*"

**H Share certificates will only become valid certificates of title provided that, no later than 8:00 a.m. on Thursday, March 23, 2006 the Hong Kong Public Offering has become unconditional in all respects and the right of termination described in the section entitled "*Underwriting — Underwriting Arrangements and Expenses — Hong Kong Public Offering — Hong Kong Underwriting Agreement — Grounds for termination*" has not been exercised.**

— i —

ALRMH-CNBM00000002

# CONTENTS

*You should rely only on the information contained in this prospectus and the Application Forms to make your investment decision. The Company has not authorized anyone to provide you with information that is different from what is contained in this prospectus. Any information or representation not made in this prospectus must not be relied on by you as having been authorized by the Company, the Global Coordinator, the Sponsor, the Underwriters, any of their respective directors or any other person or party involved in the Global Offering.*

**Page**

Expected Timetable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   i

Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   ii

Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

Risk Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   34

Exemptions from the Companies Ordinance and Waivers from
    Compliance with the Listing Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   55

Information about this Prospectus and the Global Offering . . . . . . . . . . . . . . . . . . . . . . .   57

Directors, Supervisors and Parties Involved in the Global Offering . . . . . . . . . . . . . . . . . .   65

Corporate Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   70

Industry Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   72

History, Reorganization and Group Structure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   85

Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   98

Relationship with Parent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   153

Connected Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   159

Directors, Supervisors, Senior Management and Employees . . . . . . . . . . . . . . . . . . . . . . .   187

Substantial Shareholders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   201

Share Capital . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   202

Financial Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   203

Future Plans and Use of Proceeds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   280

Underwriting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   282

Structure of the Global Offering . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   290

How to Apply for Public Offer Shares . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   297

— ii —

ALRMH-CNBM00000003

# CONTENTS

Page

**Appendix I** — **Accountants' Report** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-1

**Appendix II** — **Pro Forma Financial Information** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-1

**Appendix III** — **Profit Estimate** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-1

**Appendix IV** — **Property Valuation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . IV-1

**Appendix V** — **Taxation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . V-1

**Appendix VI** — **Summary of Principal PRC Legal and Regulatory Provisions** . . . . . . . . VI-1

**Appendix VII** — **Summary of Articles of Association** . . . . . . . . . . . . . . . . . . . . . . . . . . . . VII-1

**Appendix VIII** — **Statutory and General Information** . . . . . . . . . . . . . . . . . . . . . . . . . . . . .VIII-1

**Appendix IX** — **Documents Delivered to the Registrar of Companies and Available for Inspection** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . IX-1

ALRMH-CNBM00000004

# SUMMARY

*This summary aims to give you an overview of the information contained in this prospectus. Because this is a summary, it does not contain all the information that may be important to you. You should read the whole document before you decide to invest in the H Shares. There are risks associated with any investment. Some of the particular risks in investing in the H Shares are set out in the section entitled "Risk Factors." You should read that section carefully before you decide to invest in the H Shares.*

**Overview**

We are a leading PRC building materials company with significant operations in the cement, lightweight building materials, glass fiber and FRP products and engineering services business segments. Our total revenue was RMB 2,898.1 million in 2004 and RMB 3,334.4 million for the nine months ended September 30, 2005, and our profit attributable to equity holders of the Company for the same periods was RMB 193.1 million and RMB 223.9 million, respectively. We focus on creating long-term corporate value by developing, managing, acquiring and, to a lesser degree, investing in businesses in the building materials industry in the PRC. Our vision is to become a world-class building materials producer. In terms of market positions, we are:

- the largest cement producer in the Huaihai Economic Zone of the PRC in terms of production capacity and sales volume in 2004;

- the largest gypsum board producer in the PRC, with a combined market share of approximately 50.6% in terms of sales volume among PRC producers having annual gypsum board sales of at least RMB 5 million, based on gypsum boards sold by BNBM and Taihe in 2004;

- the largest glass fiber producer in Asia in terms of production capacity in 2004 through China Fiberglass, an associate of the Company;

- one of the largest glass fiber mats producers in the PRC in terms of production capacity in 2004;

- the second largest FRP pipes and tanks producer in the PRC in terms of production volume and sales volume in 2004; and

- the engineering firm that designed and/or constructed approximately 50% of the float glass production lines in the PRC.

ALRMH-CNBM00000005

# SUMMARY

The table below summarizes our business segments and the major operating entities in each business segment:

| Business segments | Key products and services | Major operating entities[1] | Direct and indirect equity interests attributable to the Company |
|---|---|---|---|
| Cement . . . . . . . . . . . . . . . . . | Cement | China United | 96.07% |
| Lightweight building materials. . . | Dry wall and ceiling systems | BNBM | 60.33% |
| Glass fiber and FRP products . . . | Glass fiber | China Fiberglass | 40.17% |
| | Glass fiber mats and FRP pipes and tanks | China Composites | 86.24%[2] |
| Engineering services . . . . . . . . | Design and EPC services: float glass production lines and NSP cement production lines | China Triumph | 91.00% |

_____

*Notes:*

(1)   Each is a direct subsidiary of ours, other than China Fiberglass, which is an associate. See "*Business — Glass Fiber and FRP Products Segment — Glass Fiber.*" Unless otherwise indicated, the reference to our operating results in the glass fiber and FRP products segment does not include those of China Fiberglass.

(2)   Includes a 77% equity interest held directly by the Company and a 23% equity interest held by China Fiberglass.

The following table sets out, for the periods indicated, the amount and percentage of our total revenue of each of our four business segments:

| | For the year ended December 31, | | | | | | For the nine months ended September 30, | | | |
| | 2002 | | 2003 | | 2004 | | 2004 | | 2005 | |
| | Revenue | % of total | Revenue | % of total | Revenue | % of total | Revenue | % of total | Revenue | % of total |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | (unaudited) | | | |
| | | | | (RMB in millions, except for percentages) | | | | | | |
| Cement. . . . . . . . . . | 560.4 | 33.7 | 611.7 | 33.2 | 778.8 | 26.9 | 533.4 | 27.3 | 889.2 | 26.7 |
| Lightweight building materials . . . . . . . | 1,021.2 | 61.5 | 1,027.9 | 55.7 | 1,482.6 | 51.1 | 1,002.1 | 51.2 | 1,676.9 | 50.3 |
| Glass fiber and FRP products. . . . . . . | 0.9 | 0.0 | 75.1 | 4.0 | 261.3 | 9.0 | 201.6 | 10.3 | 223.9 | 6.7 |
| Engineering services. . . | 79.0 | 4.8 | 145.5 | 7.9 | 465.9 | 16.1 | 295.4 | 15.1 | 592.7 | 17.7 |
| Consolidation adjustment and eliminations . . . | 0.0 | 0.0 | (15.0) | (0.8) | (90.5) | (3.1) | (76.4) | (3.9) | (48.3) | (1.4) |
| Total . . . . . . . . . | 1,661.5 | 100.0 | 1,845.2 | 100.0 | 2,898.1 | 100.0 | 1,956.1 | 100.0 | 3,334.4 | 100.0 |

ALRMH-CNBM00000006

# SUMMARY

The following table sets out, for the periods indicated, the amount and percentage of our total operating profit of each of our four business segments:

| | For the year ended December 31, | | | | | | For the nine months ended September 30, | | | |
| | 2002 | | 2003 | | 2004 | | 2004 | | 2005 | |
| | Operating profit | % of total | Operating profit | % of total | Operating profit | % of total | Operating profit | % of total | Operating profit | % of total |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | | (unaudited) | | | |
| | (RMB in millions, except for percentages) | | | | | | | | | |
| Cement. . . . . . . . . | 38.5 | 24.1 | 48.5 | 34.6 | 125.9 | 42.5 | 83.5 | 50.8 | 139.0 | 38.6 |
| Lightweight building materials . . . . . . . | 113.4 | 71.0 | 76.1 | 54.2 | 98.2 | 33.1 | 52.5 | 32.0 | 124.0 | 34.4 |
| Glass fiber and FRP products. . . . . . . . | (7.1) | (4.5) | 0.7 | 0.5 | 23.8 | 8.0 | 15.0 | 9.2 | 47.5 | 13.2 |
| Engineering services. . . | 15.0 | 9.4 | 14.9 | 10.7 | 57.4 | 19.4 | 19.1 | 11.6 | 58.7 | 16.3 |
| Company[1]. . . . . . . . | — | — | — | — | — | — | — | — | (6.0)[1] | (1.6) |
| Consolidation adjustment and eliminations . . . | 0.0 | 0.0 | 0.1 | 0.0 | (8.8) | (3.0) | (5.9) | (3.6) | (3.1) | (0.9) |
| Total . . . . . . . . . | 159.8 | 100.0 | 140.3 | 100.0 | 296.5 | 100.0 | 164.2 | 100.0 | 360.1 | 100.0 |

Note:

(1)   Consists of administrative expenses incurred by the Company following its establishment in March 2005.

*Cement.* We are a major cement producer in the PRC. We operate five clinker and cement plants with nine production lines in Shandong, Jiangsu, Henan and Hebei provinces. We operated three production lines with an aggregate annual capacity of 3.3 million tonnes throughout 2004 and operated a newly constructed production line with an annual capacity of 1.2 million tonnes from October to December 2004, producing approximately 3.7 million tonnes of cement in the aggregate in the same year. We acquired three additional cement production lines in early 2005 with an aggregate annual capacity of 2.4 million tonnes and we commenced production on two other newly constructed production lines in July 2005 with an aggregate annual capacity of 4.0 million tonnes. As a result, our aggregate annual cement production capacity reached nearly 11.0 million tonnes as at September 30, 2005. Assuming our production lines currently under construction will be completed and ready to commence production on schedule, we expect that our aggregate annual cement production capacity will increase to approximately 13.4 million tonnes by the end of 2006 and to approximately 15.8 million tonnes in the second quarter of 2007. We had the largest aggregate cement production capacity as at the end of 2004 and the largest cement sales volume for the year in the Huaihai Economic Zone. The Huaihai Economic Zone spans 20 municipalities in four provinces. It housed approximately 9.4% of the nation's population and recorded a GDP growth rate that was significantly higher than the national average in 2004. See "*Business — Cement Segment — Production — Planned Expansion.*"

ALRMH-CNBM00000007

## SUMMARY

*Lightweight building materials.* The Company's direct subsidiary in the lightweight building materials segment, BNBM, constructed its first gypsum board production line in the early 1980s, and has since developed into a leading supplier of integrated dry wall and ceiling systems in the PRC, providing customers with a wide variety of gypsum boards and related products, including acoustical ceiling panels and lightweight metal frames. In 2004, BNBM sold approximately 41.7 million square meters of gypsum boards, 5.2 million square meters of acoustical ceiling panels and 23,561 tonnes of lightweight metal frames. According to the Quantitative Economics and Audit Society of China Building Materials, BNBM had, approximately a 12.7% share of the PRC gypsum board market in 2004 in terms of sales volume among the PRC producers with annual gypsum board sales of at least RMB 5 million. BNBM's position in the PRC gypsum board market has been enhanced by its acquisition of a 42% equity interest in Taihe in April 2005. As measured by sales volume in 2004, Taihe had a market share of approximately 37.9% among the PRC producers with annual gypsum board sales of at least RMB 5 million. It also had the largest gypsum board production capacity in the PRC immediately prior to being acquired by us. As BNBM has gained long-term control of Taihe's board of directors in connection with the acquisition, Taihe became a subsidiary consolidated with BNBM. Similarly, BNBM's position in the PRC acoustical ceiling panels market has been enhanced by its acquisition of a 75% equity interest in Tianfeng in March 2005. Tianfeng was a major producer of acoustical ceiling panels in the Yangtze River Delta area.

*Glass fiber and FRP products.* Our business in the glass fiber and FRP products segment is conducted through the Company's associate, China Fiberglass, and the Company's subsidiary, China Composites. The primary business of China Fiberglass is manufacturing glass fiber and the primary business of China Composites is manufacturing glass fiber mats and FRP pipes and tanks. According to the China Fiber Glass Industry Association, China Fiberglass, in which the Company has an equity interest of 40.17%, was Asia's largest manufacturer of glass fiber in terms of production capacity in 2004. Its output in 2004 accounted for approximately 13.5% and 22.8% of the output of glass fiber in Asia and China, respectively. According to the China FRP Industry Association, China Composites was the second largest FRP pipes and tanks manufacturer in the PRC. It accounted for approximately 5.0% of the PRC's total sales volume in FRP pipes and tanks in 2004, compared to approximately 9.0% and 4.5% by China's largest and third largest manufacturers, respectively. According to the China Fiber Glass Industry Association, China Composites was also one of China's largest glass fiber mats manufacturers in terms of production capacity and the largest glass fiber mats exporter in 2004, accounting for approximately 49.8% of the country's total output and approximately 66.5% of the country's total exports in 2004.

*Engineering services.* We are an international engineering design and EPC (engineering, procurement and construction) services provider in domestic and overseas glass and cement industries. We are also the only PRC engineering firm in the building materials industry that has been named one of the top 200 international design firms by *Engineering News-Record*, an American trade magazine in the construction industry, for three consecutive years since 2002. We are licensed by the relevant PRC government authorities to provide engineering services using the China float glass technology. We have been involved in the design and/or construction of approximately 50% of the float glass production lines in the PRC. In overseas glass industries, we are an active EPC services provider to turn-key production line projects.

ALRMH-CNBM00000008

# SUMMARY

## Operating Principles

Our aspiration is to build a corporate culture focusing on continuous improvement of our long-term enterprise value. We strive to achieve satisfactory returns to our shareholders. In addition, we also aim to align and satisfy the commercial interests of our other key constituents — management, employees and customers — and the interests of the community in social well-being, environmental protection and resource conservation in order to achieve long-term and sustainable growth. To that end, we are governed by the following principles:

- We focus on building our core competence as a leading manufacturer of quality building materials, complemented by engineering services capabilities.

- We manage potential risks in the PRC's volatile market environment by operating in different business segments and serving different customer bases.

- We emphasize management, operational and financial control of our business segments.

- We integrate operations across different business segments by cultivating a uniform corporate culture and implementing strict control procedures at each business segment.

## Competitive Strengths

The following summarizes our competitive strengths in each of our business segments:

### *Cement Segment*

- We are the market leader in the Huaihai Economic Zone.

- We have access to rich deposits of high quality limestone.

- We are well positioned to benefit from a consolidating cement industry in the PRC.

Please refer to the section entitled "*Business — Cement Segment — Competitive Strengths*" for a detailed discussion of these competitive strengths.

### *Lightweight Building Materials Segment*

- We control a substantial market share and we have well-recognized brands and product quality in the PRC gypsum board market.

- We have a broad product mix in lightweight building materials and an ability to provide integrated dry wall and ceiling systems.

- BNBM has achieved high efficiency and low cost in gypsum board production.

ALRMH-CNBM00000009

---

# SUMMARY

---

Please refer to the section entitled "*Business — Lightweight Building Materials Segment — Competitive Strengths*" for a detailed discussion of these competitive strengths.

### Glass Fiber and FRP Products Segment

- We have strong market positions in our core products.

- The Company's associate, China Fiberglass, is one of the most experienced glass fiber producers in the PRC.

Please refer to the section entitled "*Business — Glass Fiber and FRP Products Segment — Competitive Strengths*" for a detailed discussion of these competitive strengths.

### Engineering Services Segment

- We have a large pool of engineering talent and have a strong ability to market and commercialize our technical innovations.

- We are a leading glass engineering services provider to the PRC glass industry.

- We have a strong presence in overseas float glass engineering markets.

Please refer to the section entitled "*Business — Engineering Services Segment — Competitive Strengths*" for a detailed discussion of these competitive strengths.

## Corporate Strategies

The following summarizes our corporate strategies:

### Cement Segment

- Strengthen our market-leading position in the Huaihai Economic Zone through expansion.

- Realize cost savings by creating synergies through further management integration and centralization and technological advancement.

- Develop bulk sales and enter into related product areas.

- Continue to execute our low-cost expansion strategy through acquiring cement assets in the Huaihai Economic Zone and other selected markets.

Please refer to the section entitled "*Business — Cement Segment — Corporate Strategy*" for a detailed discussion of these corporate strategies.

ALRMH-CNBM00000010

# SUMMARY

*Lightweight Building Materials Segment*

- Strengthen our market position through our synergy with Taihe.

- Streamline the organizational structure of BNBM.

- Expand customer base by developing new applications for residential structures.

Please refer to the section entitled "*Business — Lightweight Building Materials Segment — Corporate Strategy*" for a detailed discussion of these corporate strategies.

*Glass Fiber and FRP Products Segment*

- Improve our product mix by increasing sales of high value-added products.

- Enhance our product development, product quality and customer service to strengthen our market position.

- Expand our production capacity and increase our domestic market share in glass fiber mats.

Please refer to the section entitled "*Business — Glass Fiber and FRP Products Segment — Corporate Strategy*" for a detailed discussion of these corporate strategies.

*Engineering Services Segment*

- Enhance our capabilities for technical innovations.

- Maintain leading position in the domestic market and increase our share of overseas markets.

- Enter into core equipment development and manufacturing.

Please refer to the section entitled "*Business — Engineering Services Segment — Corporate Strategy*" for a detailed discussion of these development strategies.

**Reasons for the Global Offering and Use of Proceeds**

The listing of the H Shares will increase the Company's exposure to international investors and extend its financing avenues to international capital markets. The Directors also expect that the levels of accountability and transparency to which the Company will be subject after the Global Offering will lead to improved corporate governance and increased investor confidence in the Company.

ALRMH-CNBM00000011

# SUMMARY

The listing expenses in relation to the Global Offering will be borne by the Company and the Selling Shareholders in proportion to the number of Offer Shares to be issued by the Company and the number of Sale H Shares to be sold by the Selling Shareholders. The net proceeds of the Global Offering accruing to the Company (after deduction of underwriting fees and estimated expenses payable by the Company in relation to the Global Offering, assuming the Over-allotment Option is not exercised) are estimated to be approximately HK$1,258 million, assuming an Offer Price of HK$2.30 per H Share, or approximately HK$1,516 million, assuming an Offer Price of HK$2.75 per H Share (or, if the Over-allotment Option is exercised in full, such net proceeds are estimated to be approximately HK$1,456 million, assuming an Offer Price of HK$2.30 per H Share, or approximately HK$1,753 million, assuming an Offer Price of HK$2.75 per H Share). The Company currently intends to use all the net proceeds from the Global Offering for the following purposes:

(i)   up to approximately HK$350 million for a clinker production line (including approximately HK$150 million for equipment and approximately HK$100 million for engineering and construction, with the remaining being used for other costs) for Qingzhou with a daily clinker production capacity of 6,000 tonnes, which is expected to be completed by the end of 2006;

(ii)   up to approximately HK$250 million for a clinker production line (including approximately HK$110 million for equipment and approximately HK$75 million for engineering and construction, with the remaining being used for other costs) for Nanyang with a daily clinker production capacity of 6,000 tonnes, which is expected to be completed in the second quarter of 2007;

(iii)   up to approximately HK$140 million for a gypsum board production line with an annual production capacity of 50 million square meters, which is expected to commence operations in the second half of 2006;

(iv)   up to approximately HK$150 million for a glass fiber reinforced cement board production line with an annual production capacity of 1.8 million square meters, which is expected to commence operations in the second half of 2006;

(v)   up to approximately HK$50 million for a glass fiber mat production line with an annual production capacity of 70 million square meters for Zhongxin Tianma, which is expected to commence commercial production in the first quarter of 2006;

(vi)   up to approximately HK$40 million for the phase I of a cement grinding station for Fuyang Julong with an annual production capacity of 750,000 tonnes, which is expected to be completed in the second quarter of 2006;

(vii)   up to approximately HK$25 million for the phase I of a cement grinding station for Suqian Julong with an annual production capacity of 750,000 tonnes, which is expected to be completed in the second quarter of 2006;

(viii)   repayment of outstanding bank borrowings due in August 2006 totaling approximately RMB 100 million which were utilized by our cement segment to finance working capital and have an interest rate of 5.58% per annum; and

ALRMH-CNBM00000012

## SUMMARY

(ix) the remainder for (1) repayment of a portion of the Company's outstanding short-term working capital loans in the aggregate amount of up to approximately RMB 620 million which carry interest rates ranging from 4.7% to 5.6% per annum, including loans in the aggregate amount up to approximately RMB 320 million for the Company at the corporate level, RMB 80 million for China Composites and RMB 220 million for China United and (2) working capital purposes, but not more than 10% of the total net proceeds accruing to the Company will be used for working capital purposes.

Assuming that the Over-allotment Option is exercised in full, the additional net proceeds of approximately HK$198 million, assuming an Offer Price of HK$2.30 per H Share, or approximately HK$237 million, assuming an Offer Price of HK$2.75 per H Share, will be applied for (1) repayment of a further portion of the Company's outstanding short-term working capital loans which carry interest rates ranging from 4.7% to 5.6% per annum and (2) working capital purposes, but not more than 10% of the total net proceeds accruing to the Company will be used for working capital purposes.

To the extent that the net proceeds from the Global Offering to the Company are not immediately applied for the above purposes, our Directors presently intend that the amount will be placed on short-term deposits with banks or financial institutions.

The net proceeds from the sale of the Sale H Shares by the Selling Shareholders in the Global Offering (after deducting underwriting fees and estimated expenses payable by the Selling Shareholders in connection with the Global Offering and assuming the Over-allotment Option is not exercised) are estimated to be approximately HK$126 million, assuming an Offer Price of HK$2.30 per H Share, or approximately HK$152 million, assuming an Offer Price of HK$2.75 per H Share. If the Over-allotment Option is exercised in full, such net proceeds are estimated to be approximately HK$146 million, assuming an Offer Price of HK$2.30 per H Share, or approximately HK$175 million, assuming an Offer Price of HK$2.75 per H Share. The Company will not receive any of such proceeds. In accordance with relevant PRC laws and regulations, the Selling Shareholders will be required to contribute the net proceeds they receive from the Global Offering to the National Social Security Fund.

In accordance with the PRC accounting rules applicable to joint stock limited companies, the net proceeds from the Global Offering received by the Company in a currency other than Renminbi will be converted and accounted for in the Company's consolidated financial statements at the PBOC Rate in effect at the time when the net proceeds are received.

Assuming an Offer Price of HK$2.525 per Offer Share (being the mid-point of the stated offer price range of HK$2.30 to HK$2.75 per Offer Share), the aggregate commissions and fees, together with Stock Exchange listing fees, SFC transaction levy and Stock Exchange trading fee, legal and other professional fees, printing and other expenses relating to the Global Offering, are estimated to amount in aggregate to approximately HK$126 million (assuming the Over-allotment Option is not exercised) in total. Such commissions, fees and expenses are payable by the Company as to HK$115 million and the Selling Shareholders as to HK$11 million, being in proportion to the amount of Offer Shares sold by the Company and the Selling Shareholders in the Global Offering. In addition, the Company may in its sole discretion pay to the Global Coordinator an incentive fee.

ALRMH-CNBM00000013

# SUMMARY

**Risk Factors**

The Directors consider that there are certain risks and considerations relating to the Group, the building materials industry in the PRC, the PRC in general and the Global Offering. These risk factors are set out under the section entitled "*Risk Factors*" in this prospectus and can be summarized as follows:

*Risks Relating to the Group*

- We may not be able to obtain external financing in time or on terms acceptable to us for our capital expenditures and other corporate needs, which could limit our ability to grow our business.

- We had net current liabilities that could adversely affect our business, results of operations and/or financial condition.

- The construction of our production facilities may not be completed in the time frame or at the cost levels originally anticipated and, as a result, we may not be able to realize our expected production capacity increases or the full economic benefits.

- Any acquisitions or strategic investments that we undertake could be difficult to integrate, which may adversely affect our operations.

- Our operations may be disrupted by a failure in our facilities which could adversely affect our business, financial condition and/or results of operations.

- Our products or services may fail to perform as expected or contain defects, and these failures or defects, and any negative publicity resulted therfrom, could result in lower sales and could subject us to claims from purchasers or users of our products.

- Our insurance coverage may not be sufficient to cover the risks related to our operations and losses.

- Our failure to adequately protect our intellectual property rights or any infringement claims against us brought by third parties may have a material adverse effect on our business, financial condition and/or results of operations.

- Our operations depend on the stability of our core personnel; if we fail to retain or otherwise lose the services of our core team members or fail to recruit well-qualified and experienced new team members, our business operations may be adversely affected.

- Our diverse business scope may cause us difficulty in obtaining adequate managerial and operational resources and strain our financial resources, restricting our ability to successfully grow our business.

- Changes in tax incentives or government grants may adversely affect our business, results of operations and/or financial condition.

- As we do not control some of the associates in which we have investments, we may not have the ability to cause them to take all the actions that we believe would be most beneficial to us.

ALRMH-CNBM00000014

## SUMMARY

- Some of the Company's subsidiaries and associates are public companies listed in the PRC; our inability to cause them to take certain actions may adversely affect our results of operations and financial condition.

- The historical financial information included in this prospectus may not be an accurate indication of what our financial condition and/or results of operations would have been under the Group's current organizational structure.

- The Company's direct or indirect equity interests in its publicly-listed subsidiaries or associates in the PRC are subject to the recent securities reform in the PRC.

- Failure by Parent Group to fulfill its obligations to us may have a material adverse effect on our business operations, growth prospects and profitability.

- The interests of Parent, the Company's controlling shareholder, may differ from those of the Company's other shareholders, and Parent could cause us to make decisions that may not be in the best interests of the other shareholders.

- Inspections, examinations, inquiries or audits by PRC regulatory authorities may result in fines, other penalties or actions that could adversely affect our reputation.

- We have not obtained formal title certificates to some of the properties we occupy.

- The Company depends on distributions from its subsidiaries and associates to pay dividends.

*Risks Relating to the Building Materials Industry in the PRC*

- Our business is dependent on the level of activity in the construction industry.

- Changes in government policies could have an adverse effect on our cement segment.

- Our results of operations may vary throughout the year as a result of seasonal demand for our products.

- Our business, financial condition and results of operations may be adversely affected by abnormal climatic conditions.

- Our operations rely on a continuous power supply and the ready availability of utilities and any shortages or interruptions could disrupt our operations and increase our expenses.

- Increases in energy and fuel costs could have a material adverse effect on our business, financial condition and results of operations.

- Our business operations may be materially adversely affected by environmental regulations.

ALRMH-CNBM00000015

# SUMMARY

*Risks Relating to the PRC*

- The PRC's economic, political and social conditions, as well as government policies, could affect our business.

- Changes in foreign exchange regulations may adversely affect the Group's results of operations.

- Fluctuations in the value of Renminbi may have a material adverse effect on your investment.

- Interpretation of PRC laws and regulations involves uncertainty.

- We cannot guarantee the accuracy of facts and statistics derived from PRC official government publications with respect to the PRC, the PRC economy and the PRC building materials industry contained in this prospectus, and investors should not place undue reliance on them.

- The outbreak of epidemics may have a material adverse effect on our business, financial condition and results of operations.

*Risks Relating to the Global Offering*

- Holders of the H Shares may not be able to enforce their rights as successfully as shareholders in the PRC.

- It may be difficult to effect service of process upon the Company or the Directors, Supervisors or officers who reside in the PRC, or to enforce against it or any of them in the PRC any judgments obtained from non-PRC courts.

- Holders of H Shares may be subject to PRC taxation.

- There has been no prior public market for the H Shares; the liquidity and market price of the H Shares may be volatile, and the Offer Price for H Shares may not be indicative of prices that will prevail in the trading market.

- Future sales, disposals or other transfers of a substantial number of our Shares by our current shareholders in public markets could adversely affect the prevailing market price of our H Shares.

- Existing Shareholders' interests in the Company may be diluted as a result of future equity fundraising.

- Because the Offer Price is higher than the net tangible book value per Share, you will experience immediate dilution in the book value of the Shares purchased by you.

- Forward-looking information may prove inaccurate.

- The Company's payment of dividends depends on certain factors; there is no assurance that dividends will be distributed in any particular form or at all.

- You should read the entire prospectus carefully and we strongly caution you not to place any reliance on any information contained in press articles or other media.

ALRMH-CNBM00000016

# SUMMARY

## Results of Operations

The total revenue of the Company for the years ended December 31, 2002, 2003 and 2004 and for the nine months ended September 30, 2005, was RMB 1,661.5 million, RMB 1,845.2 million, RMB 2,898.1 million and RMB 3,334.4 million, respectively. For the same periods, the Company's profit attributable to equity holders of the Company was RMB 99.2 million, RMB 111.7 million, RMB 193.1 million and RMB 223.9 million, respectively.

The following table, which summarizes our consolidated results of operations for the years ended December 31, 2002, 2003, 2004, and for the nine months ended September 31, 2005, is extracted from the *Accountants' Report* set out in Appendix I to this prospectus.

| | Year ended December 31, | | | Nine months ended September 30, | |
|---|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2004 | 2005 |
| | | | | (unaudited) | |
| | (RMB in millions) | | | | |
| Revenue | 1,661.5 | 1,845.2 | 2,898.1 | 1,956.1 | 3,334.4 |
| Cost of sales | (1,290.3) | (1,426.8) | (2,343.3) | (1,593.9) | (2,733.0) |
| Gross profit | 371.2 | 418.4 | 554.8 | 362.2 | 601.4 |
| Other income | 79.5 | 81.2 | 151.3 | 100.7 | 177.5 |
| Selling and distribution costs | (126.5) | (146.5) | (188.1) | (138.0) | (207.3) |
| Administrative and other expenses | (164.4) | (212.8) | (221.5) | (160.7) | (211.5) |
| Operating profit | 159.8 | 140.3 | 296.5 | 164.2 | 360.1 |
| Share of profit of associates | 40.3 | 70.0 | 96.7 | 46.7 | 71.5 |
| Finance costs | (53.3) | (58.2) | (98.8) | (75.4) | (104.7) |
| Profit on partial disposals | 0 | 1.3 | 0 | 0 | 0 |
| Profit on disposal of a subsidiary | 0 | 0 | 0 | 0 | 27.3 |
| Income tax expense | (2.3) | (9.1) | (25.0) | (10.2) | (39.6) |
| Profit for the year/period | 144.5 | 144.3 | 269.4 | 125.3 | 314.6 |
| Attributable to: | | | | | |
| Equity holders of the Company | 99.2 | 111.7 | 193.1 | 91.4 | 223.9 |
| Minority interests | 45.3 | 32.6 | 76.3 | 33.9 | 90.7 |
| | 144.5 | 144.3 | 269.4 | 125.3 | 314.6 |
| Distributions to equity holders of the Company[1] | 22.8 | 136.4 | 27.8 | 27.8 | 135.6 |
| Earnings per Share - basic (RMB)[2] | 0.07 | 0.08 | 0.14 | 0.07 | 0.16 |

---

*Notes:*

(1)   Distributions consisted of declared dividends and deemed distributions. For a discussion on declared dividends, see "*Financial Information — Dividends*." The Company incurred deemed distributions in the amount of RMB5.5 million, RMB115.6 million, nil, nil and nil, respectively, for the years ended December 31, 2002, 2003, 2004 and the nine months ended September 30, 2004 and 2005. See Note 12 of "*Appendix I — Accountants' Report*" for details.

(2)   The calculations of basic earnings per Share are based on the profit attributable to equity holders of the Company of each period and on the weighted average number of 1,387,110,000 Shares for each of 2002, 2003, 2004 and the nine months ended September 30, 2004 and 1,387,555,238 Shares for the nine months ended September 30, 2005, as if the Reorganization had been completed on January 1, 2002.

— 13 —

ALRMH-CNBM00000017

# SUMMARY

The following table, which summarizes our consolidated financial condition as at December 31, 2002, 2003 and 2004 and as at September 30, 2005, is extracted from the *Accountants' Report* set out in Appendix I to this prospectus.

| | As at December 31, | | | As at September 30, |
|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** |
| | (RMB in millions) | | | |
| Non-current assets . . . . . . . . . . . . . . . . . . . . . . | 2,215.4 | 2,613.1 | 4,438.3 | 6,287.5 |
| Current assets . . . . . . . . . . . . . . . . . . . . . . . . . | 1,716.4 | 2,280.5 | 2,513.2 | 3,372.0 |
| Net current assets (liabilities) . . . . . . . . . . . . . . | 453.8 | 536.7 | (225.0) | (1,858.9) |
| Net assets. . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,557.7 | 2,662.4 | 2,966.0 | 3,250.6 |
| Equity attributable to equity holders of the Company . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,657.1 | 1,681.1 | 1,888.6 | 1,985.0 |

## The Latest Financial Period Reported on by the Reporting Accountants Required under the Listing Rules and the Companies Ordinance

Rule 4.04(1) of the Listing Rules requires that the accountants' report of the Company include our consolidated results in respect of each of the three financial years immediately preceding the issue of this prospectus.

Under section 342(1)(b) of the Companies Ordinance, the Company is required to, among other things, state in this prospectus the matters specified in Part I of the Third Schedule to the Companies Ordinance and set forth in this prospectus the reports specified in Part II of the Third Schedule to the Companies Ordinance. Paragraph 27 of Part I of the Third Schedule to the Companies Ordinance requires that a statement as to the gross trading income or sales turnover (as may be appropriate) of the Company, during each of the three financial years immediately preceding the issue of this prospectus, including an explanation of the method used for the computation of such income or turnover and a reasonable breakdown between the more important trading activities, shall be included in this prospectus. Paragraph 31 of Part II of the Third Schedule to the Companies Ordinance requires this prospectus to include a report by the auditors of the Company with respect to the profits and losses and assets and liabilities in respect of each of the three financial years immediately preceding the issue of this prospectus.

The *Accountants' Report* set out in Appendix I to this prospectus includes the audited financial statements of the Company for the three years ended December 31, 2004 and the nine months ended September 30, 2005 but not the audited financial statements of the Company (including the requisite statements as to its gross trading income or sales turnover) for the full financial year ended December 31, 2005 as required under Rule 4.04 of the Listing Rules and paragraphs 27 of Part I and 31 of Part II of the Third Schedule of the Companies Ordinance. As this prospectus is issued on March 13, 2006, our Directors believe that it will be unduly burdensome to include in it audited financial statements of the Company for the full financial year ended December 31, 2005.

ALRMH-CNBM00000018

# SUMMARY

In the circumstances, an application has been made to the SFC for a certificate of exemption from strict compliance with paragraphs 27 and 31 of the Third Schedule to the Companies Ordinance in relation to the inclusion of the accountants' report for the full financial year ended December 31, 2005 in this prospectus on the ground that it would be unduly burdensome for our Company to do so, and a certificate of exemption from such strict compliance has been granted by the SFC.

An application has also been made to the Stock Exchange for a waiver from strict compliance with Rule 4.04(1) of the Listing Rules in relation to the inclusion of the accountants' report for the full financial year ended December 31, 2005 in this prospectus. The Stock Exchange has granted to us such a waiver on the condition that the Listing Date should be on or before March 31, 2006.

The Directors confirm that they have performed sufficient due diligence on the Group to ensure that, up to the date of this Prospectus, there has been no material adverse change in our financial position or prospects since September 30, 2005 and there is no event since September 30, 2005 which would materially affect the information shown in the *Accountants' Report* set out in Appendix I to this prospectus.

## Dividends

The Company was converted into a joint stock limited company on March 28, 2005. Prior to such conversion, CNBM Equipment did not declare or pay any dividend for the years ended December 31, 2002, 2003 and 2004. The dividends reflected on our audited consolidated financial statements for the years ended December 31, 2002, 2003 and 2004 in the amount of approximately RMB 17.3 million, RMB 20.8 million and RMB 27.8 million, respectively, represented the amount of dividends declared and paid by BNBM, which became a subsidiary of the Company as a result of the Reorganization. BNBM is a public company listed in the PRC. Neither the Company nor CNBM Equipment received any such dividends, which were declared and paid prior to September 30, 2004. See "*History, Reorganization and Group Structure*."

In accordance with the "Provisional Regulations Relating to Corporate Reorganization of Enterprises and Related Management of State-owned Capital and Financial Treatment" issued by the Ministry of Finance, the Company is required to make a distribution to Parent and BNBMG, its shareholders prior to the conversion of the Company, in an amount equal to the profit attributable to equity holders of the Company generated during the period from October 1, 2004 to March 27, 2005, the date immediately prior to the conversion of the Company into a joint stock limited company, from the business and operations contributed to the Group by Parent and BNBMG, respectively, pursuant to the Reorganization. The Company has declared a dividend in an aggregate amount of RMB 135.6 million to Parent and BNBMG in respect of this period, of which RMB 57.3 million payable to Parent was settled through eliminating the receivable of the same amount due from Parent, and the remainder was paid on March 3, 2006.

For the period between March 28, 2005 and December 31, 2005, our Board currently intends to recommend a final dividend of no less than 30% of the distributable profits during the period. However, the final determination to pay such dividends will be made at the discretion of our Board of directors and will be based upon our earnings, cash flow, financial condition and capital requirements, and any other conditions that the Board may deem relevant. The payment of dividends may be limited by legal restrictions and by financing agreements that we may enter into in the future and to the restrictions set out in the section headed "*Financial Information — Dividends*."

ALRMH-CNBM00000019

# SUMMARY

## Profit Estimate for the Year Ended December 31, 2005

Estimated profit attributable to equity holders of the Company[1]  . . . . . . .not less than RMB 350 million

(HK$338 million)[4]

Estimated earnings per Share:
   (a) Pro forma fully diluted[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .RMB 0.18 (HK$0.17)[4]
   (b) Weighted average[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .RMB 0.25 (HK$0.24)[4]

_____

*Notes:*

(1)   The bases on which the above profit estimate has been prepared are set out in Appendix III to this prospectus.

(2)   The calculation of the estimated earnings per Share on a pro forma fully diluted basis is based on the estimated profit attributable to equity holders of the Company for the year ended December 31, 2005, assuming that the Company had been listed since January 1, 2005 and a total of 1,982,500,000 Shares were in issue during the entire year. This calculation assumes that the Over-allotment Option will not be exercised and the H Shares issued pursuant to the Global Offering were issued on January 1, 2005.

(3)   The calculation of the estimated earnings per Share on a weighted average basis is based on the estimated profit attributable to equity holders of the Company for the year ended December 31, 2005 and a weighted average number of 1,387,760,000 Shares issued and outstanding during the year. This calculation assumes that the Over-allotment Option will not be exercised and the Shares issued pursuant to the Global Offering will be issued on Thursday, March 23, 2006.

(4)   The estimated profit figure and estimated earnings per Share figure are converted into Hong Kong dollars at the rate of HK$ 1.00 to RMB 1.036, based on the PBOC Rate prevailing on March 2, 2006.

## Offer Statistics

|  | Based on an offer price per H Share of HK$2.30 | Based on an offer price per H Share of HK$2.75 |
|---|---|---|
| Market capitalization[1] . . . . . . . . . . . . . . . . . . . . . . | HK$ 4,560 million | HK$ 5,452 million |
| Prospective price/earnings multiple: |  |  |
|   (a) Pro Forma fully diluted basis[2] . . . . . . . . . . . | 13.50 times | 16.14 times |
|   (b) Weighted average[3] . . . . . . . . . . . . . . . . . . . . | 9.45 times | 11.30 times |
| Adjusted net tangible asset value per Share[4]  . . . . . | HK$1.56 | HK$1.69 |

_____

*Notes:*

(1)   The calculation of market capitalization is based on 1,982,500,000 Shares expected to be in issue following the Global Offering, assuming that the Over-allotment Option is not exercised.

(2)   The calculation of the prospective price/earnings multiple on a pro forma fully diluted basis is based on the estimated earnings per Share on a pro forma fully diluted basis at the respective offer prices of HK$ 2.30 and HK$ 2.75 per H Share assuming that the Over-allotment Option is not exercised.

(3)   The calculation of the prospective price/earnings multiple on a weighted average basis is based on the above estimated earnings per Share on a weighted average basis at the respective offer prices of HK$ 2.30 and HK$ 2.75 per H Share assuming that the Over-allotment Option is not exercised.

(4)   The adjusted net tangible asset value per Share is based on 1,982,500,000 Shares expected to be in issue following the Global Offering (assuming no exercise of the Over-allotment Option) and the respective offer prices of HK$ 2.30 and HK$ 2.75 per H Share.

ALRMH-CNBM00000020

## DEFINITIONS

In this prospectus, unless the context otherwise requires, the following terms shall have the meanings set out below.

"A shares"                                ordinary shares denominated in RMB of companies listed on a stock exchange in the PRC

"allocation"                              allocation of state-owned assets, meaning the allocation of the whole or part of the state-owned assets among different holders of state-owned assets in the course of reformation of management structure, adjustment of the organization structure, or assets restructuring of the enterprise

"Aobao Chemical"                          山東奧寶化工集團有限公司 (Shandong Aobao Chemical Group Company Limited), a limited liability company incorporated on June 28, 1999 under the laws of the PRC, which has a 25% equity interest in Weifang Aotai

"Application Form(s)"                      white application form(s) and yellow application form(s), or where the context so requires, any of them

"Articles of Association" or "Articles"   the articles of association of the Company, which became effective on May 22, 2005, and as amended from time to time

"associates"                              has the meaning ascribed thereto under the Listing Rules

"Average Realized Sales Price"            with respect to a product, equal to the quotient of the total sales revenue divided by the related total sales volume for a specific period

"Beijing B&Q"                             北京百安居裝飾建材有限公司 (Beijing B&Q Decoration & Building Materials Co., Ltd.), a limited liability company incorporated on October 15, 2003 under the laws of the PRC in which BND holds a 17% equity interest

"Beijing Chemical"                        北京化二股份有限公司 (Beijing Chemical Company Limited), a joint stock limited company incorporated on June 6, 1997 under the laws of the PRC which has a 45% equity interest in BNBM Plastic

"Beijing Triumph"                         北京凱盛建研建材工程設計有限責任公司 (China Triumph Beijing Co., Ltd.), a limited liability company incorporated on February 16, 2004 under the laws of the PRC and an associate of the Company, in which China Triumph holds a 50% equity interest

ALRMH-CNBM00000021

# DEFINITIONS

"Bengbu Triumph"

蚌埠凱盛工程技術有限公司 (China Triumph Bengbu Engineering and Technology Company Limited), a limited liability company incorporated on July 21, 2004 under the laws of the PRC and a subsidiary of the Company, in which China Triumph directly and indirectly holds an 85.92% equity interest

"BNBM"

北新集團建材股份有限公司 (Beijing New Building Material Company Limited), a joint stock limited company incorporated on May 30, 1997 under the laws of the PRC and a subsidiary of the Company, in which the Company holds a 60.33% equity interest. Its A shares are listed on the Shenzhen Stock Exchange

"BNBMG"

北新建材(集團)有限公司 (Beijing New Building Material (Group) Company Limited), a limited liability company incorporated on August 4, 1984 under the laws of the PRC and a wholly-owned subsidiary of Parent. BNBMG directly holds a 59.11% equity interest in the Company immediately prior to the Global Offering and is a Promoter

"BNBM Homes"

北新房屋有限公司 (BNBM Homes Company Limited), a limited liability company incorporated on December 27, 2002 under the laws of the PRC and a subsidiary of the Company, in which BNBM holds a 64% equity interest

"BNBM Plastic"

北新建塑有限公司 (BNBM Building Plastic Company Limited), a limited liability company incorporated on December 11, 1998 under the laws of the PRC and a subsidiary of the Company, in which BNBM has a 55% equity interest

"BNBM PNG"

北新巴布亞新畿內亞有限公司 (BNBM PNG Limited), a company incorporated on June 12, 1992 under the laws of Papua New Guinea and a subsidiary of the Company, which is wholly-owned by BND

"BND"

北新物流有限公司 (BND Co., Limited), a limited liability company incorporated on January 8, 2001 under the laws of the PRC and a subsidiary of the Company, in which BNBM holds an 80% equity interest

"BND Decoration"

深圳北新裝飾設計工程有限公司 (BND Decoration Company Limited), a limited liability company incorporated on November 18, 1999 under the laws of the PRC and a subsidiary of the Company, in which BND has a 93% equity interest

"Board"

the board of Directors

ALRMH-CNBM00000022

## DEFINITIONS

"Building Materials Academy"

中國建築材料科學研究院 (China Building Materials Academy), a research institute established on May 24, 1954 under the laws of the PRC and a wholly-owned subsidiary of Parent. It directly holds a 0.05% equity interest in the Company immediately prior to the Global Offering and is a Promotor

"Business Day"

means a day that is not a Saturday, Sunday or public holiday in Hong Kong

"CAGR"

compound annual growth rate

"CCASS"

the Central Clearing and Settlement System established and operated by HKSCC

"CCASS Broker Participant"

a person admitted to participate in CCASS as a broker participant

"CCASS Custodian Participant"

a person admitted to participate in CCASS as a custodian participant

"CCASS Investor Participant"

a person admitted to participate in CCASS as an investor participant who may be an individual or joint individuals or a corporation

"CCASS Participant"

a CCASS Broker Participant, a CCASS Custodian Participant or a CCASS Investor Participant

"Chenlong Decoration"

北京北新晨龍裝飾工程有限公司 (Beijing Haidian Chenlong Decoration Company Limited), a limited liability company established on January 22, 1988 under the laws of the PRC and a subsidiary of the Company, in which BNBM holds a 99% equity interest

"China" or "PRC"

the People's Republic of China. Except where the context requires, geographical references in this prospectus to China or the PRC exclude Hong Kong, Macau and Taiwan

"China Composites"

中國複合材料集團有限公司 (China Composites Group Corporation Limited), a limited liability company established on June 28, 1988 under the laws of the PRC and a subsidiary of the Company, in which the Company directly and indirectly holds an 86.24% equity interest, and includes, except where the context otherwise requires, all of its subsidiaries

"China Fiberglass"

中國玻纖股份有限公司 (China Fiberglass Company Limited), a joint stock limited company incorporated on April 16, 1997 under the laws of the PRC and an associate of the Company, in which the Company directly holds a 40.17% equity interest, and includes, except where the context otherwise requires, all of its subsidiaries. Its A shares are listed on the Shanghai Stock Exchange

— 19 —

ALRMH-CNBM00000023

---

## DEFINITIONS

| | |
|---|---|
| "China Triumph" | 中國凱盛國際工程有限公司 (China Triumph International Engineering Company Limited), a limited liability company established on December 28, 1991 under the laws of the PRC and a subsidiary of the Company, in which the Company directly holds a 91% equity interest, and includes, except where the context otherwise requires, all of its subsidiaries |
| "China United" | 中國聯合水泥有限責任公司 (China United Cement Company Limited), a limited liability company established on September 29, 1992 under the laws of the PRC and a subsidiary of the Company, in which the Company directly and indirectly holds a 96.07% equity interest, and includes, except where the context otherwise requires, all of its subsidiaries |
| "Cinda" | 中國信達資產管理公司 (China Cinda Asset Management Corporation), an asset management company established on January 4, 1999 under the laws of the PRC that holds a 5.25% equity interest in the Company immediately prior to the Global Offering and is a Promoter |
| "CNBM Equipment" | 中國建築材料及設備進出口公司 (China National Building Material and Equipment Import and Export Company), a state-owned enterprise established on June 24, 1985 prior to its conversion into the Company under the laws of the PRC |
| "CNBM Trading" | 中建材集團進出口公司 (China National Building Material Import and Export Company), a state-owned enterprise established on February 8, 1994 under the laws of the PRC and a wholly-owned subsidiary of Parent. CNBM Trading directly holds a 9.06% equity interest in the Company immediately prior to the Global Offering and is a Promoter |
| "CNG" | compressed natural gas |
| "Companies Ordinance" | the Companies Ordinance (Chapter 32 of the Laws of Hong Kong), as amended, supplemented or otherwise modified from time to time |
| "Company" | 中國建材股份有限公司 (China National Building Material Company Limited), a joint stock limited company incorporated on March 28, 2005 under the laws of the PRC |
| "Company Law" | 中華人民共和國公司法 (the Company Law of the PRC), as enacted by the Standing Committee of the Eighth NPC on December 29, 1993 and effective on July 1, 1994, as amended, supplemented or otherwise modified from time to time |

ALRMH-CNBM00000024

# DEFINITIONS

| | |
|---|---|
| "controlling shareholder" | has the meaning ascribed thereto under the Listing Rules |
| "Controlling Shareholders" | collectively, Parent, BNBMG, the Building Materials Academy and CNBM Trading |
| "CSRC" | 中國證券監督管理委員會 (China Securities Regulatory Commission) |
| "Director(s)" | the directors of the Company |
| "Domestic Shares" | ordinary shares in the capital of the Company, with a nominal value of RMB 1.00 each, which are subscribed for and credited as fully paid up in Renminbi by PRC nationals and/or PRC incorporated entities |
| "EPC" | turn-key project services that include engineering, procurement and construction |
| "FRP" | fiberglass reinforced plastics |
| "Fuyang Julong" | 中聯巨龍水泥(阜陽)有限公司 (Zhonglian Julong Cement (Fuyang) Company Limited), a limited liability company incorporated on December 23, 2004 under the laws of the PRC and a subsidiary of the Company, in which Huaihai has a 90% equity interest |
| "Global Coordinator" | the global coordinator of the listing of the H Shares on the Stock Exchange, being Morgan Stanley |
| "Global Offering" | the Hong Kong Public Offering and the International Placing |
| "Group", "we" and "us" | the Company and, except where the context otherwise requires, all its subsidiaries |
| "H Share Registrar" | Tricor Investor Services Limited |
| "H Shares" | overseas listed foreign shares in the ordinary share capital of the Company, with a nominal value of RMB 1.00 each, which are subscribed for and traded in HK dollars and for which applications have been made for the grant of listing, and permission to deal in, on the Stock Exchange |
| "Hangzhou Institute" | 中國新型建築材料工業杭州設計研究院 (China New Building Materials Industry Hangzhou Design and Research Institute), a state-owned enterprise established on October 8, 1993 under the laws of the PRC, which is a wholly-owned subsidiary of Parent |

ALRMH-CNBM00000025

# DEFINITIONS

| | |
|---|---|
| "Hefei Institute" | 合肥水泥研究設計院 (Hefei Cement Research and Design Institute), a state-owned enterprise established on April 14, 1990 under the laws of the PRC, which is a wholly-owned subsidiary of Parent |
| "Hengzhijiu Trade" | 山東恒之久商貿有限公司 (Shandong Hengzhijiu Commercial Trade Company Limited), a limited liability company incorporated under the laws of the PRC which holds a 29.0% equity interest in Hengjiu Concrete |
| "Hengjiu Concrete" | 山東魯宏恒久混凝土工程有限公司 (Shandong Luhong Hengjiu Concrete Company Limited), a limited liability company incorporated on September 8, 2003 under the laws of the PRC and a subsidiary of the Company, in which Luhong has a 54.3% equity interest |
| "Heze Company" | 山東荷澤魯宏水泥有限公司 (Shandong Heze Luhong Cement Company Limited), a limited liability company incorporated on September 5, 2002 under the laws of the PRC and a subsidiary of the Company, in which Luhong has a 94.46% equity interest |
| "Heze Concrete" | 山東荷澤魯宏混凝土工程有限公司 (Shandong Heze Luhong Concrete Company Limited), a limited liability company incorporated on July 14, 2004 under the laws of the PRC, in which Luhong directly and indirectly has a 98.62% equity interest |
| "HK$" or "HK dollars" | Hong Kong dollars, the lawful currency of Hong Kong |
| "HKSCC" | Hong Kong Securities Clearing Company Limited |
| "HKSCC Nominees" | HKSCC Nominees Limited |
| "Hong Kong" or "HK" | the Hong Kong Special Administrative Region of the PRC |
| "Hong Kong Public Offering" | the offering by the Company of initially 65,422,000 H Shares for subscription by the public in Hong Kong (subject to adjustment as described in the section headed "Structure of the Global Offering" of this prospectus) for cash at the Offer Price and on the terms and conditions described in this prospectus and the Application Forms |
| "Hong Kong Underwriters" | the underwriters of the Hong Kong Public Offering listed in the section "*Underwriting — Hong Kong Underwriters*" |

ALRMH-CNBM00000026

---

# DEFINITIONS

"Hong Kong Underwriting Agreement"     the underwriting agreement dated March 10, 2006 relating to the Hong Kong Public Offering entered into by the Company, the Controlling Shareholders, the Global Coordinator and the Hong Kong Underwriters

"Huaihai"     中聯巨龍淮海水泥有限公司 (China United Julong Huaihai Cement Company Limited), a limited liability company incorporated on September 29, 2004 under the laws of the PRC and a subsidiary of the Company, in which China United has an 88.79% equity interest, and, except where the context otherwise requires, all of its subsidiaries

"Huaihai Economic Zone"     as identified by the National Bureau of Statistics of China, Huaihai Economic Zone is an area of approximately 178,100 square kilometers covering 20 municipalities (地級市) located in southern Shandong, northern Jiangsu, eastern Henan and northern Anhui

"Hubei Taishan"     湖北泰山建材有限公司 (Hubei Taishan Building Material Company Limited), a limited liability company incorporated on August 28, 2003 under the laws of the PRC and a subsidiary of the Company, in which Taihe has a 95% equity interest

"IFRS"     International Financial Reporting Standards

"Independent Third Party(ies)"     person(s) or company(ies) which is (are) independent of the Directors, Supervisors, Promoters, controlling shareholder, substantial shareholder and the chief executive (such terms as defined in the Listing Rules) of the Company and its subsidiaries

"International Placing"     the conditional placing of 588,792,000 H Shares by the Company and the Selling Shareholders outside the United States (including to professional investors in Hong Kong and excluding retail investors in Hong Kong) in reliance on Regulation S, and in the United States to QIBs in reliance on Rule 144A as further described in the section entitled "*Structure of the Global Offering*"

"International Placing Shares"     the H Shares offered pursuant to the International Placing

"International Underwriters"     the underwriters of the International Placing who are expected to enter into the International Underwriting Agreement as purchasers to underwrite the International Placing

— 23 —

ALRMH-CNBM00000027

## DEFINITIONS

| | |
|---|---|
| "International Underwriting Agreement" | the international underwriting agreement relating to the International Placing which is expected to be entered into by, amongst others, the Company, the Selling Shareholders, the Global Coordinator and the International Underwriters on or around Thursday, March 16, 2006 |
| "Japan TOLI" | 東理株式會社 (TOLI Co., Ltd.), a Japanese company incorporated on December 1, 1919 under the laws of Japan, which has a 30% equity interest in Liberty TOLI |
| "Jiangyin Taishan" | 江陰泰山石膏建材有限公司 (Jiangyin Taishan Gypsum Building Material Company Limited), a limited liability company incorporated on April 21, 2004 under the laws of the PRC in which Taihe has a 67.5% equity interest |
| "JM International" | 約翰斯‧曼威爾國際有限公司 (Johns Manville International Inc.), a Netherlands company incorporated on December 23, 1988 under the laws of the Netherlands, which holds a 25% equity interest in Zhongxin Tianma |
| "Julong Cement" | 江蘇巨龍水泥集團有限公司 (Jiangsu Julong Cement Group Company Limited), a limited liability company established on August 14, 1992 under the laws of the PRC, which is a subsidiary of Parent and was a former subsidiary of China United prior to the Reorganization |
| "Jushi Group" | 巨石集團有限公司 (Jushi Group Company Limited), a limited liability company incorporated on June 28, 2001 under the laws of the PRC and a subsidiary of China Fiberglass, in which China Fiberglass has a 59.90% direct equity interest |
| "Latest Practicable Date" | March 6, 2006 |
| "Lianyungang Julong" | 中聯巨龍水泥(連雲港)有限公司 (Zhonglian Julong Cement (Lianyungang) Company Limited), a limited liability company incorporated on May 25, 2004 under the laws of the PRC and a subsidiary of the Company, in which Huaihai has a 90% equity interest |
| "Liberty Group" | 麗寶第集團公司 (Liberty Group Company), a company established on July 26, 1990 under the laws of the PRC, which has a 20% equity interest in Zhongfu Liberty |
| "Liberty TOLI" | 常州麗寶第東理建材有限公司 (Changzhou Liberty TOLI Building Material Company Limited), a limited liability company incorporated on May 4, 1993 under the laws of the PRC and a subsidiary of the Company, in which Zhongfu Liberty has a 60% equity interest |

ALRMH-CNBM00000028

## DEFINITIONS

| | |
|---|---|
| "Listing Date" | Thursday, March 23, 2006, the date on which the H Shares are listed on the Stock Exchange |
| "Listing Rules" | the Rules Governing the Listing of Securities on The Stock Exchange of Hong Kong Limited as amended from time to time |
| "Luhong" | 中聯魯宏水泥有限責任公司 (China United Luhong Cement Company Limited), a limited liability company incorporated on September 28, 2004 under the laws of the PRC and a subsidiary of the Company, in which China United has an 80.34% equity interest and, except where the context otherwise requires, all of its subsidiaries |
| "Lunan Cement" | 山東魯南水泥有限公司 (Shandong Lunan Cement Company Limited), a limited liability company incorporated on September 17, 1999 under the laws of the PRC, which is a subsidiary of Parent and was a former subsidiary of China United prior to the Reorganization |
| "Macau" | the Macau Special Administrative Region of the PRC |
| "Mandatory Provisions" | 到境外上市公司章程必備條款 (the Mandatory Provisions for Articles of Association of Companies to be Listed Overseas) (as amended and supplemented from time to time), for inclusion in the articles of association of companies incorporated in the PRC to be listed overseas, which were promulgated by the former Securities Commission of the State Council and the former State Commission for Restructuring the Economic Systems of the PRC on August 27, 1994, as amended, supplemented or otherwise modified from time to time |
| "Ministry of Finance" | 中華人民共和國財政部 (the PRC Ministry of Finance) |
| "MOFTEC" | 中華人民共和國對外貿易經濟合作部 (the PRC Ministry of Foreign Trade and Economic Co-operation), which has been merged into the PRC Ministry of Commerce in 2003 |
| "Morgan Stanley" | Morgan Stanley Dean Witter Asia Limited, licensed to conduct type one (dealing in securities), type four (advising on securities) and type six (advising on corporate finance) regulated activities under the SFO |

ALRMH-CNBM00000029

# DEFINITIONS

| | |
|---|---|
| "Nanjing Triumph" | 南京凱盛水泥技術工程有限公司 (China Triumph Nanjing Cement Technological Engineering Company Limited), a limited liability company incorporated on December 26, 2001 under the laws of the PRC and a subsidiary of the Company, in which China Triumph holds a 51.15% equity interest |
| "Nanyang" | 中國聯合水泥有限責任公司南陽分公司 (China United Nanyang Company), a branch of China United, which was established on September 23, 2004 under the laws of the PRC |
| "Nanyang Hangtian" | 南陽航天水泥廠 (Nanyang Hangtian Cement Plant), a state-owned enterprise established on January 1, 1987 under the laws of the PRC, which is a subsidiary of Parent and was a former subsidiary of China United prior to the Reorganization |
| "National Social Security Fund" | 中華人民共和國全國社會保障基金理事會 (the National Council for Social Security Fund of the PRC) |
| "NDRC" | 中華人民共和國國家發展和改革委員會 (the National Development and Reform Commission) |
| "NPC" or "National People's Congress" | 全國人民代表大會 (the National People's Congress) |
| "NSP" | new suspension preheater dry process |
| "NSP Cement" | cement produced using the clinker manufactured by the new suspension preheater dry process |
| "NTMEC" | 南京凱勝機電設備安裝有限公司 (Nanjing Triumph Machinery and Equipment Installation Company Limited), a limited liability company incorporated on March 31, 2005 under the laws of the PRC, in which Nanjing Triumph has a 51% direct equity interest |
| "Offer Price" | the final price per H Share in Hong Kong dollars (exclusive of brokerage, SFC transaction levy and the Stock Exchange trading fee) at which the H Shares are to be subscribed for and issued pursuant to the Global Offering, to be determined as further described in the section entitled "*Structure of the Global Offering — Pricing of the Global Offering*" in this prospectus |
| "Offer Shares" | the Public Offer Shares and the International Placing Shares together, where relevant, with any additional H Shares issued pursuant to the exercise of the Over-allotment Option |

ALRMH-CNBM00000030

# DEFINITIONS

| | |
|---|---|
| "Over-allotment Option" | the option to be granted by the Company and the Selling Shareholders to the Global Coordinator on behalf of the International Underwriters exercisable by the Global Coordinator pursuant to the International Underwriting Agreement, to be exercisable at any time from the day on which trading of the H Shares commences on the Stock Exchange until 30 days after the last day for the lodging of applications under the Hong Kong Public Offering, to require the Company to allot and issue up to an aggregate of 89,200,000 additional H Shares, and the Selling Shareholders to sell up to 8,920,000 additional Sale H Shares, in aggregate representing approximately 15% of the initial Offer Shares, at the same price per H Share under the International Placing solely to cover over-allocations in the International Placing, if any |
| "Parent" | 中國建築材料集團公司 (China National Building Material Group Corporation), a state-owned enterprise established on January 3, 1984 under the laws of the PRC, which directly and indirectly holds a 94.75% equity interest in the Company immediately prior to the Global Offering and is a Promoter |
| "Parent Group" | collectively, Parent and its subsidiaries (excluding the Group) |
| "PBOC" | 中國人民銀行 (the People's Bank of China), the central bank of the PRC |
| "PBOC Rate" | the exchange rate for foreign exchange transactions set daily by the PBOC based on the previous day's China interbank foreign exchange market rate and with reference to current exchange rates on the world financial markets |
| "Pizhou Taihe" | 邳州泰和建材有限責任公司 (Pizhou Taihe Building Material Company Limited), a limited liability company incorporated on April 25, 2002 under the laws of the PRC, in which Taihe has a 95% equity interest |
| "PRC GAAP" | the generally accepted accounting policies of the PRC |
| "Price Determination Date" | the date, expected to be on or around Thursday, March 16, 2006 but no later than Tuesday, March 21, 2006, on which the Offer Price is fixed for the purpose of the Global Offering |
| "Promoters" | the initial promoters of the Company, being Parent, BNBMG, Cinda, the Building Materials Academy and CNBM Trading |

ALRMH-CNBM00000031

# DEFINITIONS

| | |
|---|---|
| "Public Offer Shares" | the H Shares offered for subscription pursuant to the Hong Kong Public Offering |
| "PVC" | polyvinyl chloride |
| "QIBs" | Qualified institutional buyers within the meaning of Rule 144A |
| "Qingdao Company" | 青島魯宏水泥有限公司 (Qingdao Luhong Cement Company Limited), a limited liability company incorporated on November 19, 2003 under the laws of the PRC and a subsidiary of the Company, in which Qingzhou has an 89% equity interest |
| "Qingzhou" | 青州中聯魯宏水泥有限公司 (China United Qingzhou Luhong Cement Company Limited), a limited liability company incorporated on February 20, 2004 under the laws of the PRC and a subsidiary of the Company, in which China United directly and indirectly holds a 96.07% equity interest, and, except where the context otherwise requires, its subsidiaries |
| "Qinhuangdao Institute" | 秦皇島玻璃工業研究設計院 (Qinhuangdao Glass Industry Research Institute), a state-owned enterprise established on October 14, 1992 under the laws of the PRC, which is a wholly-owned subsidiary of Parent |
| "Qinhuangdao Taishan" | 秦皇島泰山建材有限責任公司 (Qinhuangdao Taishan Building Material Company Limited), a limited liability company incorporated on April 30, 2002 under the laws of the PRC and a subsidiary of the Company, in which Taihe has a 70% equity interest |
| "Regulation S" | Regulation S under the U.S. Securities Act |
| "Reorganization" | the reorganization of assets and liabilities of the Company and Parent and their respective subsidiaries and associates pursuant to a reorganization agreement dated March 7, 2006, which is more particularly described in the section entitled "*History, Reorganization and Group Structure*" of this prospectus and the section entitled "*I. Further Information about the Company — 4. Corporate Reorganization and Subsequent Shareholding Changes*" in Appendix VIII, "*Statutory and General Information*" to this prospectus |
| "RMB" or "Renminbi" | Renminbi yuan, the lawful currency of the PRC |
| "Rule 144A" | Rule 144A under the U.S. Securities Act |

ALRMH-CNBM00000032

---

## DEFINITIONS

| | |
|---|---|
| "SAFE" | 中國國家外匯管理局 (the PRC State Administration of Foreign Exchange), the PRC Government agency responsible for matters relating to foreign exchange administration |
| "Sale H Shares" | the 59,474,000 H Shares to be converted from an equal number of Domestic Shares with a nominal value of RMB1.00 each held by the Selling Shareholders to be offered for sale by the Selling Shareholders as part of the Global Offering at the Offer Price, subject to any adjustment as mentioned in the section headed "*Structure of the Global Offering*" in this prospectus and, where relevant, any additional H Shares which may be sold pursuant to the exercise of the Over-allotment Option, and references to "Sale H Shares" shall include, where the context requires, the Domestic Shares from which the Sale H Shares are converted |
| "Sallmanns" | Sallmanns (Far East) Ltd., professional surveyors and property valuers |
| "SASAC" | 國務院國有資產監督管理委員會 (the State-owned Assets Supervision and Administration Commission of the State Council) |
| "Selling Shareholders" | collectively, Parent, BNBMG, Cinda, the Building Materials Academy and CNBM Trading, except to the extent and only in the context of the Sale H Shares, collectively, Parent, BNBMG, Cinda, the Building Materials Academy and CNBM Trading holding the Sale H Shares as registered holders on behalf of the National Social Security Fund, as further described in the section headed "*Structure of the Global Offering — The Selling Shareholders*" |
| "SETC" | 中華人民共和國國家經濟貿易委員會 (the PRC State Economic and Trade Commission) |
| "SFC" | the Securities and Futures Commission of Hong Kong |
| "SFO" | the Securities and Futures Ordinance (Chapter 571 of the Laws of Hong Kong), as amended, supplemented or otherwise modified from time to time |
| "Share(s)" | ordinary shares of the Company with a nominal value of RMB 1.00 each, comprising both Domestic Shares and H Shares |
| "Shareholder(s)" | holder(s) of the Share(s) |

ALRMH-CNBM00000033

---

**DEFINITIONS**

---

| | |
|---|---|
| "Shenzhen B&Q" | 深圳百安居裝飾建材有限公司 (Shenzhen B&Q Decoration & Building Materials Company Limited), a limited liability company incorporated on March 8, 2002 under the laws of the PRC and an associate of the Company, in which BND has a 35% equity interest |
| "Shenzhen Triumph" | 深圳市凱盛科技工程有限公司 (CTIEC Shenzhen Scieno-tech Engineering Company Limited), a limited liability company incorporated on April 8, 2002 under the laws of the PRC and a subsidiary of the Company, in which China Triumph holds a 55% equity interest |
| "Shizhongqu" | 棗莊市市中區國有資產經營有限公司 (Zaozhuang Shizhongqu State-owned Asset Management Company Limited), a limited liability company incorporated on April 19, 2002 under the laws of the PRC and an Independent Third Party |
| "Special Regulations" | 國務院關於股份有限公司境外募集股份及上市的特別規定 (the Special Regulations of the State Council on the Overseas Offer and Listing of Shares by Joint Stock Limited Companies), promulgated by the State Council on August 4, 1994, as amended, supplemented or otherwise modified from time to time |
| "Sponsor" | the sponsor of the listing of the H Shares on the Stock Exchange, being Morgan Stanley |
| "sq.m." or "m$^2$" | square meters |
| "State," "state," "PRC Government" or "PRC government" | the government of the PRC including all political subdivisions (including provincial, municipal and other regional or local government entities) and instrumentalities thereof |
| "State Council" | 中華人民共和國國務院 (the State Council of the PRC) |
| "Stock Exchange" | The Stock Exchange of Hong Kong Limited |
| "Supervisors" | the members of the supervisory committee of the Company |
| "Suqian Julong" | 中聯巨龍水泥(宿遷)有限公司 (Zhonglian Julong Cement (Suqian) Company Limited), a limited liability company incorporated on December 16, 2004 under the laws of the PRC and a subsidiary of the Company, in which Huaihai has a 90% equity interest |

ALRMH-CNBM00000034

# DEFINITIONS

| | |
|---|---|
| "Taihe" | 山東泰和東新股份有限公司 (Shandong Taihe Dongxin Company Limited), a joint stock limited company incorporated on June 24, 1998 under the laws of the PRC and a subsidiary of the Company, in which BNBM has a 42% equity interest |
| "Taihe Group" | Taihe and/or its subsidiaries |
| "Taili Jewellery" | 泰安泰立珠寶有限公司 (Taian Taili Jewellery Company Limited), a limited liability company incorporated on August 24, 1998 under the laws of the PRC and a subsidiary of the Company, in which Taihe has a 70% equity interest |
| "Tianfeng" | 蘇州天豐新型建材有限責任公司 (Suzhou Tianfeng New Building Material Company Limited), a limited liability company incorporated on May 28, 2002 under the laws of the PRC and a subsidiary of the Company, in which BNBM has a 75% equity interest |
| "Tianma Group" | 常州天馬集團有限公司 (Changzhou Tianma Group Company Limited), a limited liability company incorporated on June 30, 1980 under the laws of the PRC, which has a 35% equity interest in Zhongxin Tianma |
| "Track Record Period" | the three years ended December 31, 2004 and the nine months ended September 30, 2005 |
| "Underwriters" | collectively, the Hong Kong Underwriters and the International Underwriters |
| "Underwriting Agreements" | collectively, the Hong Kong Underwriting Agreement and the International Underwriting Agreement |
| "United States" or "U.S." | the United States of America |
| "U.S. Exchange Act" | the United States Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder |
| "U.S. Securities Act" | the United States Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder |
| "U.S.$" or "U.S. dollars" | United States dollars, the lawful currency of the United States |
| "VAT" | value added tax |

ALRMH-CNBM00000035

## DEFINITIONS

| | |
|---|---|
| "Weifang Aotai" | 濰坊奧泰石膏有限公司 (Weifang Aotai Gypsum Company Limited), a limited liability company incorporated on August 7, 2004 under the laws of the PRC and a subsidiary of the Company, in which Taihe holds a 75% equity interest |
| "Weihai Marine" | 威海玻璃鋼漁船開發有限責任公司 (Shandong Weihai Marine Co., Ltd.), a limited liability company incorporated on April 30, 1997 under the laws of the PRC, which was subsequently renamed as Zhongfu Xigang |
| "Xinlei" | 邢台鑫磊建材(集團)股份有限公司 (Xingtai Xinlei Building Material (Group) Co., Ltd.), a joint stock limited company incorporated on December 31, 1996 under the laws of the PRC, which is a subsidiary of Parent and a former subsidiary of China United prior to the Reorganization |
| "Xuzhou Fasite" | 徐州法斯特建材有限責任公司 (Xuzhou Fasite Building Material Company Limited), a limited liability company incorporated on September 30, 2003 under the laws of the PRC and a subsidiary of the Company, in which Taihe directly and indirectly has an 99% equity interest |
| "Yaohua" | 上海耀華皮爾金頓玻璃股份有限公司 (Shanghai Yaohua Pilkington Glass Co., Ltd.), a joint stock limited company incorporated on November 23, 1993 under the laws of the PRC and an associate of the Company, in which China Composites has a 16.26% equity interest |
| "Zaozhuang Luhong" | 棗莊中聯魯宏水泥有限公司 (Zaozhuang China United Luhong Cement Co., Ltd), a limited liability company established on October 24, 2003 under the laws of the PRC and a subsidiary of the Company, in which China United directly and indirectly has a 91.74% equity interest |
| "Zhongfu Lianzhong" | 連雲港中復連翠複合材料集團有限公司 (Lianyungang Zhongfu Lianzhong Composite Material Group Company Limited), a limited liability company incorporated on October 26, 1989 under the laws of the PRC and a subsidiary of the Company, in which China Composites has a 94.5% equity interest |
| "Zhongfu Liberty" | 常州中復麗寶第複合材料有限公司 (Changzhou China Composites Liberty Company Limited), a limited liability company incorporated on December 18, 2003 under the laws of the PRC and a subsidiary of the Company, in which China Composites has an 80% equity interest |

ALRMH-CNBM00000036

---

# DEFINITIONS

---

"Zhongfu Xigang"

威海中復西港船艇有限公司 (Weihai China Composites Xigang Boat Company Limited), a limited liability company incorporated on April 30, 1997 under the laws of the PRC and a subsidiary of the Company, in which China Composites has a 51% equity interest

"Zhongxin Tianma"

常州中新天馬玻璃纖維製品有限公司 (Changzhou China Composites Tianma Fiberglass Products Company Limited), a limited liability company incorporated on December 11, 1995 under the laws of the PRC and a subsidiary of the Company, in which China Composites has a 40% equity interest and, except where the context otherwise requires, all of its subsidiaries

"Ziyan"

邢台中聯子岩水泥有限公司 (Xingtai China United Ziyan Company Limited), a limited liability company incorporated on March 28, 2005 under the laws of the PRC and a subsidiary of the Company, in which China United has a 67.71% equity interest

For the purpose of illustration only and unless otherwise specified in this prospectus, amounts denominated in RMB have been translated into HK$ at the PBOC Rate of RMB 1.036 = HK$1.00, being the PBOC Rate at the closing on March 2, 2006. No representation is made that the RMB amounts could have been, or could be, converted into HK$ or vice versa at such rates or at any other rate on such date or on any other date.

Unless expressly stated or the context requires, all data in this prospectus is as at the date of this prospectus.

For the purposes of this prospectus, we describe a cement production line by its daily clinker capacity and, unless otherwise indicated, convert the daily clinker capacity to an annual cement production capacity by assuming that each tonne of clinker produces 1.3 tonnes of cement and that the production line operates 310 days a year.

For the purposes of this prospectus, we present the production capacity of a gypsum board production line on the basis of the standard gypsum boards that are 9.5 millimeter thick.

For the purposes of this prospectus, unless the context otherwise requires, references to "2002," "2003" and "2004" refer to the Company's financial year ended December 31 of such year.

Unless otherwise specified, all references to any shareholdings in the Company assume no exercise of the Over-allotment Option.

ALRMH-CNBM00000037

# RISK FACTORS

*You should carefully consider all of the information in this prospectus including the risks and uncertainties described below before making an investment in the H Shares. You should pay particular attention to the fact that the Company is a PRC company and is governed by a legal and regulatory environment which in some respects may differ from that which prevails in other countries. The business of the Group could be materially adversely affected by any of these risks. The trading price of the H Shares could decline due to any of these risks, and you may lose all or part of your investment. For more information concerning the PRC and certain related matters discussed below, please refer to Appendix VI "Summary of Principal PRC Legal and Regulatory Provisions."*

**Risks Relating to the Group**

***We may not be able to obtain external financing in time or on terms acceptable to us for our capital expenditures and other corporate needs, which could limit our ability to grow our business.***

Our ability to increase our revenues, net income and cash flows depends upon continued capital spending. We may also need further funding for debt service, working capital, capital expenditure, potential acquisitions, technology upgrades and other corporate requirements. Our ability to obtain external financing in the future and the cost of such financing are subject to a variety of uncertainties, including:

- our ability to obtain the PRC government approvals required to access domestic or international financing or to undertake any project involving significant capital investment;

- our results of operations, financial conditions and cash flows;

- the performance of each business segment in which we operate;

- the condition of financial markets; and

- potential changes in the monetary policy of the PRC government with respect to bank interest rates and lending practices.

As at September 30, 2005, we had total borrowings of RMB 4,185.3 million, representing a debt-to-asset ratio of 43.3%, which is calculated by dividing our consolidated borrowings by our total consolidated assets. Given the degree of our financial leverage, any adverse change in our cash flows from operating activities could weaken our financial condition, which may adversely affect our ability to obtain external financing or credit in time or on terms acceptable to us and, as a result, our business, results of operations and/or financial condition may be adversely affected.

***We had net current liabilities that could adversely affect our business, results of operations and/or financial condition.***

We had net current liabilities of RMB 225.0 million as at December 31, 2004 and RMB 1,859.0 million as at September 30, 2005. Our net current liabilities position was primarily attributable to our increasing use of short-term loans to finance our increasing working capital requirements and some of our capital expenditures and acquisitions in order to achieve a lower cost of capital by taking advantage of the lower

— 34 —

ALRMH-CNBM00000038

# RISK FACTORS

interest rates applicable to short-term loans compared with long-term loans. As at September 30, 2005, the total outstanding amount of our borrowing due within one year was RMB 3,011.4 million. Historically, we managed a significant portion of our short-term loans by rolling them over on an annual basis. As at March 6, 2006, we had obtained agreements from relevant creditors to renew a number of our outstanding short-term loans, respectively, for a year upon maturity, in an aggregate amount of approximately RMB 2,057.3 million.

Our net current liabilities position exposes us to liquidity risk. Our future liquidity and the repayment of our outstanding debt obligations when they become due will primarily depend on our ability to maintain adequate cash inflows from operating activities and our ability to obtain adequate external financing. The net cash generated by our operating activities was RMB 83.5 million for the nine months ended September 30, 2005, which reflected the adverse impact of a one-time increase in our trade and other receivables in the amount of RMB 140.9 million arising from the sale of our E-HOME stores. We had a number of unused credit facilities in the aggregate amount of approximately RMB 598.0 million as at September 30, 2005 and RMB 778.0 million as at December 31, 2005. Our future cash flows from operating activities could be adversely affected by many factors beyond our control, including the demand and price fluctuations in the building materials market and the cost of the fuel and power. Our ability to obtain additional external financing will depend on a number of factors including the economic and industrial policies of the PRC government, our future financial strength and our relationships with the lenders. We may not have sufficient future cash flows or obtain additional external financing in time or on terms acceptable to us and, as a result, we may not be able to refinance our short-term loans as they become due.

***The construction of our production facilities may not be completed in the time frame or at the cost levels originally anticipated and, as a result, we may not be able to realize our expected production capacity increases or the full economic benefits.***

We are constructing and plan to construct a number of production facilities for our cement, lightweight building materials and glass fiber and FRP products segments. Details of our plans for the construction of production lines are set out in "*Future Plans and Use of Proceeds*" in this prospectus.

The time involved in the construction of the above production facilities could be adversely affected by our failure to receive any regulatory approval or to obtain sufficient funding, by technical difficulties, by human or other resource constraints, or for other reasons. Moreover, these projects may exceed the cost levels originally anticipated. If our plans for constructing new production facilities experience delays or even cancellations, or if the start-up period for any of the new production facilities turns out to be substantially longer than we expected or the production capacity of any of the new production facilities fails to reach the originally designed levels, or if the costs involved in the construction of any of the new production facilities substantially exceed our original plans, we may not be able to attain the desired production capacity or obtain the intended economic benefits, such as economies of scale, in full or in a timely manner, which may adversely affect our business, results of operations and/or financial condition.

ALRMH-CNBM00000039

# RISK FACTORS

*Any acquisitions or strategic investments that we undertake could be difficult to integrate, which may adversely affect our operations.*

We have in the past (including pursuant to the Reorganization) acquired and may in the future acquire other businesses. Acquisitions involve numerous risks, including potential difficulties in assimilation of operations and personnel of the acquired business, diversion of management's attention from other business concerns and risks associated with entering into new markets of the acquired businesses. In addition, acquisitions may result in the incurrence and/or inheritance of debt or other liabilities and the amortization of expenses related to goodwill and other intangible assets. We cannot assure you that we will be successful in realizing all of the anticipated benefits in the acquisitions that we have made or may make in the future. Failure to resolve these risks or realize these benefits may adversely affect our results of operations and/or financial condition.

*Our operations may be disrupted by a failure in our facilities which could adversely affect our business, financial condition and/or results of operations.*

Our manufacturing operations, as well as our engineering services and trading operations, could be disrupted for reasons beyond our control. The cause of disruptions may include extreme weather conditions, fire, natural catastrophes, raw material supply disruptions, equipment and system failures, labor force shortages, workforce actions or environmental issues. Any significant disruption to our operations could adversely affect our ability to make and sell products or deliver services, which could have a material adverse effect on our business, financial condition and results of operations. In addition, due to the nature of our business and despite compliance with requisite safety requirements and standards, our operations are subject to operating risks associated with building materials plants, including the related storage and transportation of raw materials, products and wastes. These hazards include storage tank leaks and ruptures, explosions, discharges or releases of hazardous substances, manual handling, exposure to dust and malfunctioning of mobile equipment and manufacturing machinery. These operating risks may cause personal injury and property damage and could result in the imposition of civil and/or criminal penalties. The occurrence of any of these events could have a material adverse effect on the productivity and profitability of a particular manufacturing facility and on our business, financial condition and/or results of operations.

*Our products or services may fail to perform as expected or contain defects, and these failures or defects, and any negative publicity resulted therefrom, could result in lower sales and could subject us to claims from purchasers or users of our products.*

We sell products with a variety of specifications and formulations. Our products must conform to tests and contractual specifications and meet certain requirements imposed by the PRC government. If we fail to meet or conform to these requirements and specifications or if any of our products fails to perform as expected or if any of our products contain defects, such failure or defects and any negative publicity resulting therefrom could result in lower sales of these or our other products and could subject us to claims from purchasers or users of these products, either of which could have a material adverse effect on our business, financial condition and/or results of operations.

— 36 —

ALRMH-CNBM00000040

# RISK FACTORS

Our engineering services segment engages in a variety of engineering design, equipment procurement and EPC projects. These engineering projects may contain defects or fail to complete in time, meet their design parameters or perform as expected, and such defects or failures and any negative publicity resulting therefrom could result in lower sales in our engineering services segment and may subject us to claims from customers, either of which could have a material adverse effect on our business, financial condition and/or results of operations.

***Our insurance coverage may not be sufficient to cover the risks related to our operations and losses.***

We may experience major accidents in the course of our operations, which may cause significant losses or damage. Such accidents, and the consequences resulting from them, may not be covered adequately, or at all, by the insurance policies we carry. In accordance with customary practice in the PRC, we do not carry any business interruption insurance or third-party liability insurance for losses or damage arising from accidents on our properties or relating to our operations other than those relating to our vehicles. In addition, as a result of market conditions, premiums and deductibles for our existing insurance policies can increase substantially and, in some instances, our existing insurance may become unavailable or available only for reduced amounts of coverage. Losses and damage arising from accidents on our properties or relating to our operations other than those relating to our vehicles may have a material adverse effect on our business, financial condition and/or results of operations if such losses or damage are not fully insured.

***Our failure to adequately protect our intellectual property rights or any infringement claims against us brought by third parties may have a material adverse effect on our business, financial condition and/or results of operations.***

We rely on trademarks and copyrights to protect our brands, as well as patents to protect our proprietary technology and know-how used to manufacture and produce a number of our products. These intellectual property rights may not be sufficient to protect our competitive positions. Some of our intellectual property rights may be invalid or be challenged as being invalid or unenforceable, and we may incur significant costs defending them, which may harm our business, financial condition and/or results of operations. Third parties may claim that our procedures or processes have infringed their proprietary rights. Defending or otherwise dealing with any infringement claim, whether with or without merit, could be time-consuming, result in costly litigation or damages, undermine the exclusivity and value of our brands, reduce sales and/or require us to enter into royalty or licensing agreements that may not be on acceptable terms.

***Our operations depend on the stability of our core personnel; if we fail to retain or otherwise lose the services of our core team members or fail to recruit well-qualified and experienced new team members, our business operations may be adversely affected.***

The success of our operations depends to a large extent on the expertise and experience of our core team, which consists of the Directors, senior management and key technical and research personnel. Information regarding the Directors and senior management is set out in "*Directors, Supervisors, Senior Management and Employees*" in this prospectus. Whether we are able to retain members of our existing core team and recruit additional well-qualified and experienced personnel is one of the key factors that may affect our sustained development.

— 37 —

ALRMH-CNBM00000041

## RISK FACTORS

In order to attract, retain and motivate key managerial and technical personnel, we have established incentive programs, details of which are set out in "*Directors, Supervisors, Senior Management and Employees*" in this prospectus. We expect that our and our competitors' demand for senior management and technical personnel will continue to grow. There can be no assurance that we will not encounter difficulties in retaining and attracting key personnel in the future. We are not insured against the detrimental effects to our business resulting from the loss or dismissal of key personnel. If any of the Directors or senior management ceases to participate in our management, or if we fail to retain or attract certain key personnel, the operations and growth of our business could be adversely affected.

***Our diverse business scope may cause us difficulty in obtaining adequate managerial and operational resources and strain our financial resources, restricting our ability to successfully grow our business.***

We operate in diverse areas of the building materials business. The diversity of our businesses may place significant strain on our managerial and operational resources. Our future operating results to a large extent depend on our management's ability to maintain effective control over a large and diversified enterprise. In addition, we will also need to continue to improve our operational and financial systems and our managerial controls and procedures to keep pace with our growth. We will have to maintain close coordination among our logistical, technical, accounting, finance, marketing and sales personnel. Management of our growth will require, among other things:

- continued development of management and financial controls within the existing businesses and establishment of controls in newly acquired businesses; and

- the ability to integrate new acquisitions into our existing operations.

Inability to manage successfully our diverse businesses and our growth could have a material adverse effect on our business, financial condition and/or results of operations.

***Changes in tax incentives or government grants may adversely affect our business, results of operations and/or financial condition.***

The Company, and certain of its subsidiaries and associates, including BNBM, China United, China Fiberglass, China Composites and China Triumph, are currently entitled to preferential tax treatment or government grants. There can be no assurance that such treatment or grants will not be abated or revoked, or that the Company and its subsidiaries or associates, upon the expiration of the current preferential treatment or grant periods, will be entitled to other tax incentives or government grants. Details of the preferential treatment and government grants are set out in the section headed "*Financial Information — Management's Discussion and Analysis of Financial Condition and Results of Operations — Factors Affecting Results of Operations — Income Tax Expense*" in this prospectus.

ALRMH-CNBM00000042

# RISK FACTORS

***As we do not control some of the associates in which we have investments, we may not have the ability to cause them to take all the actions that we believe would be most beneficial to us.***

We have, and expect to have in the future, interests in associates in connection with our business operations. The Company directly holds a 40.17% equity interest in China Fiberglass and is the single largest shareholder of China Fiberglass. Four of the six non-independent directors on China Fiberglass's nine-member board, including the chairman, were nominated by the Company. Share of profit of associates attributable to China Fiberglass accounted for approximately 5.9%, 23.4%, 17.3% and 16.0% of our profit attributable to equity holders of the Company in 2002, 2003, 2004 and for the nine months ended September 30, 2005, respectively. Through its majority-owned subsidiaries, the Company holds minority equity interests in Yaohua, Shenzhen B&Q and other companies. Share of profit of associates attributable to these investments accounted for approximately 23.8%, 30.4%, 23.5% and 11.4% of our profit for the year/period in 2002, 2003, 2004 and for the nine months ended September 30, 2005, respectively. See "*Financial Information — Management's Discussion and Analysis of Financial Condition and Results of Operations — Description of Selected Income Statement Line Items — Share of Profit of Associates*" for a description of our major associates and their contribution to our results of operations. Our minority ownership interests in these associates do not provide us with a majority control of their actions. As a result, our ability to influence or control these businesses depends on a number of factors, including being able to reach an agreement with the other shareholders with respect to special governance rights and/or the ability to nominate and appoint directors and other members of the senior management. Our participation in the management of some of these associates may not give us the ability to prevent them from engaging in activities or pursuing strategic objectives that conflict with our own interests or strategic objectives.

***Some of the Company's subsidiaries and associates are public companies listed in the PRC; our inability to cause them to take certain actions may adversely affect our results of operations and financial condition.***

The Company's lightweight building materials subsidiary, BNBM, is a public company listed on the Shenzhen Stock Exchange. The Company's associate conducting our glass fiber business, China Fiberglass, is a public company listed on the Shanghai Stock Exchange. Public companies in the PRC must comply with a number of rules and regulations concerning protection of the interests of their public and minority shareholders. According to the listing rules of the Shenzhen and Shanghai Stock Exchanges, major connected transactions of a public company are required to be approved by its shareholders voting by poll with all connected parties abstaining from voting. If the Company (or its other subsidiaries) enter into transactions with either BNBM or China Fiberglass in the future, including forming joint ventures with BNBM for investing some of the proceeds from the Global Offering and the other projects set out in "*Future Plans and Use of Proceeds*" in this prospectus, we will be required to obtain the approvals of the other shareholders or waivers from compliance granted by the relevant stock exchange as such transactions will be regarded as connected transactions under the listing rules of the relevant stock exchange. Our failure to obtain the required approvals from the other shareholders or the necessary waivers from the relevant stock exchange with respect to such transactions or other similar transactions could adversely affect our results of operations.

ALRMH-CNBM00000043

# RISK FACTORS

*The historical financial information included in this prospectus may not be an accurate indication of what our financial condition and/or results of operations would have been under the Group's current organizational structure.*

The Company was converted into a joint stock limited company from CNBM Equipment on March 28, 2005. A majority of our current businesses, operations, assets and liabilities were either transferred to CNBM Equipment from Parent as a part of the Reorganization or were acquired by us from Parent Group or unrelated third parties after the Reorganization. Our limited history of operating the Group's businesses under its current organizational structure may impact your ability to evaluate our business and prospects. The historical financial information for the years ended December 31, 2002, 2003 and 2004 and the nine months ended September 30, 2004 and 2005 included in this prospectus may not be indicative of what our financial condition and/or our results of operations would have been had we been operating our business under the Group's current organizational structure for the periods presented.

*The Company's direct or indirect equity interests in its publicly-listed subsidiaries or associates in the PRC are subject to the recent securities reform in the PRC.*

The Company currently holds equity interests directly or indirectly in three public companies listed in the PRC, namely, BNBM, China Fiberglass and Yaohua. As with most other public companies listed in the PRC, these companies had a "split share" structure during the Track Record Period, whereby in addition to freely tradable shares denominated in RMB, or "A shares," listed on the PRC stock exchanges, these companies had also issued non-tradable shares. All of the Company's equity interests in BNBM and China Fiberglass are held in the form of non-tradable shares. All of the Company's equity interests in Yaohua were held in the form of non-tradable shares during the Track Record Period.

On September 4, 2005, the CSRC issued "Administrative Measures on the Split Share Structure Reform of Listed Companies," permitting companies listed in the PRC to eliminate the transfer restrictions placed on their non-tradable shares through a consideration arrangement that balances the interests of holders of non-tradable shares and those of holders of A shares (the "Conversion Scheme"). In accordance with such measures, holders of at least two-thirds of a listed company's non-tradable shares shall have the power to propose and then negotiate a Conversion Scheme with holders of A shares. The Conversion Scheme is then subject to the approval of two-thirds majority of the holders of A shares participating in the vote, two-thirds majority of all shareholders participating in the vote and, in the case of BNBM and China Fiberglass, the SASAC.

The consideration arrangements under the Conversion Schemes proposed or implemented to date have been primarily in the form of share transfers from holders of non-tradable shares to holders of A shares, and in certain cases supplemented or substituted by other considerations, including, without limitation, payments in cash, issuances of warrants, cancellation of outstanding non-tradable shares, promises of asset injections into listed companies by holders of non-tradable shares, or a combination of the above.

The Company currently holds a 60.33% equity interest, while holders of A shares have a 39.67% equity interest, in BNBM. As at September 30, 2005, BNBM had a net asset value of RMB 1,396.3 million, of which the Group's share of interest amounted to RMB 842.4 million. For the nine months ended September 30, 2005, BNBM generated a net profit of RMB 84.0 million, of which RMB 50.7 million was attributable to the

ALRMH-CNBM00000044

## RISK FACTORS

Group. The Company currently has no plan to propose a Conversion Scheme with respect to BNBM prior to the Global Offering. If the Company were to propose a Conversion Scheme with respect to BNBM following the Global Offering, the Company's equity interest in BNBM and/or the Company's asset value may be reduced as a result of the consideration arrangement involved in the Conversion Scheme. If the proposed Conversion Scheme involves only the transfer of non-tradable shares from the Company to holders of A shares of BNBM, the Company's equity interest in BNBM will be reduced. As a result, the Company will incur a one-time disposal charge in the net asset value of BNBM and a recurring reduction of BNBM's income attributable to equity holders of the Company, both in proportion to the non-tradable shares transferred from the Company to the holders of A shares of BNBM. If the Conversion Scheme involves only payment of cash by the Company to the holders of A shares of BNBM, the Company's equity interest in BNBM will not be affected, but the net asset value of the Company will be reduced by the amount of cash paid to the holders of A shares of BNBM. If the Conversion Scheme involves both the transfer of non-tradable shares and the payment of cash the Company will be subject to a combined effect discussed above. It is currently the intention of the Company that it will not propose any Conversion Scheme pursuant to which the Company will not be able to maintain its controlling position in BNBM.

The Company currently holds a 40.17% equity interest, while holders of A shares have a 33.33% equity interest and certain other shareholders hold a 26.50% non-tradable equity interest, in China Fiberglass. As at September 30, 2005, China Fiberglass had a net asset value of RMB 691.0 million, of which the Group's share of interest amounted to RMB 277.6 million. For the nine months ended September 30, 2005, China Fiberglass generated a net profit of RMB 89.0 million, of which RMB 35.8 million was attributable to the Group. The Company currently has no plan to propose a Conversion Scheme with respect to China Fiberglass prior to the Global Offering. If the Company were to propose a Conversion Scheme with respect to China Fiberglass following the Global Offering, the Company's equity interest in China Fiberglass and/or the Company's asset value may be reduced as a result of the consideration arrangement involved in the Conversion Scheme. If the proposed Conversion Scheme involves only the transfer of non-tradable shares from holders of non-tradable shares to holders of A shares of China Fiberglass, the Company's equity interest in China Fiberglass will be reduced. As a result, the Company will incur a one-time disposal charge in its share of the net asset value of China Fiberglass and a recurring reduction of its share of profit of associates from China Fiberglass, both in proportion to the non-tradable shares transferred from the Company to the holders of A shares of China Fiberglass. If the Conversion Scheme involves only a payment of cash by the holders of non-tradable shares to the holders of A shares of China Fiberglass, the Company's equity interest in China Fiberglass will not be affected, but the net asset value of the Company will be reduced by the amount of cash paid by the Company to the holders of A shares of China Fiberglass. If the Conversion Scheme involves both the transfer of non-tradable shares and the payment of cash, the Company will be subject to a combined effect discussed above.

In the event that either BNBM or China Fiberglass implements a Conversion Scheme following the Global Offering that requires holders of non-tradable shares to pay a consideration in excess of two non-tradable shares for every ten A shares, Parent has agreed to be responsible for the excess consideration payable by the Company.

— 41 —

ALRMH-CNBM00000045

# RISK FACTORS

China Composites held a 16.83% equity interest in the form of non-tradable shares in Yaohua, including a 0.13% equity interest held in the form of a special type of publicly purchased non-tradable shares, during the Track Record Period. The shareholders of Yaohua recently approved and Yaohua implemented a Conversion Scheme whereby each holder of A shares in Yaohua was entitled to receive from holders of non-tradable shares (excluding the special type of public purchased non-tradable shares) of Yaohua 3.5 existing non-tradable shares in respect of every ten existing A shares held, and following which all the non-tradable shares were converted to A shares. The implementation of this Conversion Scheme reduced the Company's total equity interests in Yaohua to approximately 16.26%. As at September 30, 2005, Yaohua had a net asset value of RMB 1,868.3 million, of which the Group's share of interest amounted to RMB 242.1 million. For the nine months ended September 30, 2005, Yaohua generated a net profit of RMB 101.4 million, of which RMB 13.1 million was attributable to the Group.

We cannot assure you that the implementation of any such Conversion Scheme by any of the Company's subsidiaries or associates listed in the PRC will not have a material adverse effect on our results of operations and financial condition.

***Failure by Parent Group to fulfill its obligations to us may have a material adverse effect on our business operations, growth prospects and profitability.***

In connection with the Reorganization, Parent Group has entered into certain arrangements with us, including, among others, a non-competition agreement, a reorganization agreement, a number of indemnification undertakings and a number of connected transaction agreements.

As stated in "*Connected Transactions*", we have relied, and will continue to rely, on the connected transaction agreements with Parent Group for the supply of minerals and other production-related resources and certain components and materials, various social and ancillary services, as well as trademark and patent licenses. Business arrangements with Parent Group are important to our production and operations. If, for any reason, one or more of these arrangements between the Group and Parent Group were to be terminated or changes unfavorable to us were to be made to the terms of these arrangements, such as a significant increase in price, our business and operating results may be adversely affected as we may not be able to replace timely with another source on comparable terms or at all.

Under the non-competition agreement, Parent Group (i) agreed that except for the Retained Businesses described under "*Relationship with Parent — Competition — Retained Businesses,*" it will not compete with our core businesses, and (ii) granted us options and pre-emptive rights to acquire the Retained Businesses and certain future businesses from Parent Group.

Under the reorganization agreement, the indemnification undertaking and certain guarantees, Parent Group agreed to indemnify us for losses and expenses arising from certain matters as set out in "*Financial Information — Management's Discussion and Analysis of Financial Condition and Results of Operations — Indebtedness — Contingent Liabilities*" and guaranteed certain of our liabilities as set out in "*Relationship with Parent — Independence from Parent Group — Financial Independence.*" Failure by Parent Group to fulfill its obligations under any of these arrangements may have a material adverse effect on our business operations, growth prospects and profitability.

ALRMH-CNBM00000046

# RISK FACTORS

***The interests of Parent, the Company's controlling shareholder, may differ from those of the Company's other shareholders, and Parent could cause us to make decisions that may not be in the best interests of the other shareholders.***

Parent is a controlling shareholder of the Company. Upon completion of the Global Offering, Parent will hold 63.49% (assuming that the Over-allotment Option is not exercised) of the Company's total share capital. As a result, Parent will effectively be able to control the composition of the Board and, through the Board, exercise a significant influence over our management and corporate decisions. In addition, some of the Directors, Supervisors and members of our senior management also serve as directors, supervisors and senior executives at Parent. Subject to the Company's Articles of Association and applicable laws and regulations, including the Listing Rules, Parent may, so long as it holds more than 50% of the Shares, be able to determine the timing and amount of the Company's dividend payments and other major transactions. Parent may also be able to prevent us from taking actions or exercising our rights under agreements to which we are a party, including the agreements we entered into with Parent in connection with the Reorganization. Parent could prevent or delay transactions that might be desirable to the Company's other Shareholders, such as takeovers or changes in our control or management. Any such activity undertaken by Parent could have an adverse impact on our business or the interests of the Company's other Shareholders.

***Inspections, examinations, inquiries or audits by PRC regulatory authorities may result in fines, other penalties or actions that could adversely affect our reputation.***

We and Parent Group are subject to various periodic inspections, examinations, inquiries and audits by PRC regulatory authorities in accordance with applicable PRC laws and regulations. We cannot assure you that future inspections, examinations and audits by PRC regulatory authorities will not materially adversely affect, or result in fines, other penalties or actions that could materially adversely affect our business, results of operations and/or financial condition. In addition, our reputation may be adversely affected if we are fined or otherwise penalized.

In addition, while Parent Group has undertaken to us that it will indemnify us against any claims and losses incurred in connection with or arising from businesses, assets and liabilities transferred to us as a result of the Reorganization, see " *— Failure by Parent Group to fulfill its obligations to us may have a material adverse effect on our business operations, growth prospects and profitability,*" we cannot assure you that our corporate image, the reputation and credibility of our management or the prices of our Shares would not be adversely affected by the announcement and/or any negative outcome of any future inspections, examinations, inquiries or audits by PRC regulatory authorities in respect of Parent Group.

***We have not obtained formal title certificates to some of the properties we occupy.***

We currently own 74 parcels of land and lease 21 parcels of land in the PRC and Papua New Guinea, with a total area of approximately 5,362,123 sq.m., for our business operations. We also own 603 buildings or units and lease 38 buildings or units in the PRC, Papua New Guinea and the U.S., with an aggregate gross floor area of approximately 903,949 sq.m., for our business operations.

We lack transferrable title certificates to two parcels of owned land and the lessors lack formal title certificates to 16 parcels of leased land, the aggregate area of which is 308,061 sq.m., representing 5.75% of the total area of land that we currently own or lease. While we lack the transferrable title certificate, we have a non-transferrable allocated land title certificate for one parcel of owned land and may validly occupy

— 43 —

ALRMH-CNBM00000047

---

## RISK FACTORS

---

and use such land for production purposes. We are not currently using the other parcel of owned land to which we lack a transferable title certificate. Of the 16 parcels of leased land, the lessor of one allocated parcel that we lease lacks a proper title certificate. We have requested the lessor to obtain proper legal title and the lessor has undertaken to indemnify the related losses suffered by us. The remaining 15 parcels of land that we currently lease for production uses are collective land, which is not permitted to be used for industrial purposes. We have either reached agreements with the relevant lessors to take necessary actions to convert such land to industrial uses or we will relocate our facilities on such land.

We lack formal title certificates to 89 owned buildings or units with a total gross floor area of approximately 99,268 sq.m., representing 11.5% of the total gross floor area of buildings or units that we currently own. Among these 89 properties, we have ceased to use five properties and we are taking necessary actions to obtain title certificates to 15 owned buildings or units. The remaining 69 owned buildings or units are located on leased land and as a result we will not be able to rectify their title defects. According to our PRC legal counsel, we have legal rights to occupy and use these 69 buildings and units for production purposes despite the title defects. In addition, one of the buildings that we currently lease lacks proper legal title, but it is not being used for production purposes.

We cannot guarantee that we will be able to correct all the defects in our ownership or usage rights in the properties that we currently own or lease. Our rights as owner or lessee and/or occupier of these properties may be adversely affected as a result of the absence of formal title certificates, and we may be subject to lawsuits or other actions taken against us and/or lose our right to continue to operate on these properties.

Parent Group has agreed to indemnify us for any loss (including any consequential loss) and expenses that we may suffer from these title defects, see "— *Failure by Parent Group to fulfill its obligations to us may have a material adverse effect on our business operations, growth prospects and profitability.*"

### *The Company depends on distributions from its subsidiaries and associates to pay dividends.*

The Company's ability to pay dividends is dependent on the earnings of its subsidiaries and associates and their distribution of funds to the Company. The ability of these subsidiaries and associates to make distributions to the Company is subject to applicable legal and other restrictions, including the amount of distributable earnings, cash flow conditions, restrictions contained in the articles of association of such companies and the relevant joint venture and shareholders' arrangements, the applicable companies law and other arrangements. These restrictions could reduce the amount of distributions that the Company receives from its subsidiaries and associates, which in turn would restrict the Company's ability to pay dividends to its shareholders.

### Risks Relating to the Building Materials Industry in the PRC

### *Our business is dependent on the level of activity in the construction industry.*

Demand for our cement and lightweight building materials products depends on the level of activity in the construction industry in the PRC. The construction industry in a given geographic market is directly affected by the level of residential and commercial construction and the level of infrastructure spending. The construction industry is also sensitive to general economic conditions, including factors such as mortgage and

ALRMH-CNBM00000048

## RISK FACTORS

other interest rates, inflation, unemployment, demographic trends, gross domestic product growth and consumer confidence, and a downturn in economic activity may lead to a recession in the construction industry. The PRC Government adjusts its monetary and economic policies from time to time to prevent and curtail the overheating of the national and local economies, and such monetary and economic policies may affect the construction industry in the PRC. Because of these and other factors, our results of operations and/or financial condition could be adversely affected by a downturn in construction activity in the PRC or in any of the regional markets in which we operate.

*Changes in government policies could have an adverse effect on our cement segment.*

The results of our cement operations may fluctuate significantly from period to period in the future due to a number of factors, including PRC government policies. We serve a large number of industries and customers, and the level of their demand for our cement products and services may vary significantly over time as a result of factors beyond our control, including changes in PRC government policies applicable to the industries in which we and our customers operate. Any renegotiation or termination of contracts by our customers due to government policies or non-approval of the underlying projects may adversely affect the results of our operations.

While the current policies of the PRC government in respect of the domestic cement industry are generally market-oriented, the PRC government still closely monitors the development of the cement industry and may from time to time regulate the industry by issuing and implementing new policies. Since April 2004, the PRC government has introduced a series of macro-economic control measures to slow down the growth of the PRC economy. For example, according to a notice issued by the State Council in April 2004, cement companies investing in new fixed-asset cement projects will have to fund from their internal resources 35% (instead of the previous 20%) or more of the total cost of investment, which reduces the flexibility for such companies to expand their operations. In addition, projects involving significant capital investment are subject to approval or filing requirements at different levels of the PRC government. Delay or failure in securing the relevant PRC government approvals as well as any adverse change in government policies may result in the need for a significant adjustment to our current or future development plans, which may adversely affect our profitability and growth prospects. We cannot assure you that the policies adopted by the PRC government will not adversely affect our business and/or future development.

*Our results of operations may vary throughout the year as a result of seasonal demand for our products.*

Demand for some of our construction-related products is seasonal because climatic conditions affect the level of activity in the construction industry. We usually experience a reduction in sales of cement and lightweight building materials during the first quarter of the calendar year, reflecting the lower level of construction activity during the winter and the Lunar New Year holiday period in the PRC.

*Our business, financial condition and results of operations may be adversely affected by abnormal climatic conditions.*

Adverse climatic conditions, such as cold weather, snow and heavy or sustained rainfall, affect the level of construction activity and result in a reduction in demand for our products. Climatic conditions that are unusually severe or intense, occur at abnormal times or last longer than usual in our major geographic markets, especially during peak construction periods, could have a material adverse effect on our business, financial condition and/or results of operations.

— 45 —

ALRMH-CNBM00000049

# RISK FACTORS

*Our operations rely on a continuous power supply and the ready availability of utilities and any shortages or interruptions could disrupt our operations and increase our expenses.*

The manufacture of our products relies on a continuous and uninterrupted supply of electric power, water and natural gas, as well as water, waste and emissions discharge facilities. Any shortage, interruption or discharge curtailment could significantly disrupt our operations and increase our expenses. We do not have backup generators or alternate sources of power to support our production in the event of a blackout. In addition, our insurance coverage does not extend to any damages resulting from interruption in our power supply. Any interruption in our ability to continue operations at our facilities could damage our reputation, harm our ability to retain existing customers or obtain new customers and could result in revenue loss, any of which could have a material adverse effect on our business, financial condition and/or results of operations.

*Increases in energy and fuel costs could have a material adverse effect on our business, financial condition and results of operations.*

Energy is a significant cost in our cement segment. Costs of fuel and power accounted for approximately 53.2%, 47.5%, 56.4% and 61.8% of the total cost of sales of our cement segment in 2002, 2003, 2004 and for the nine months ended September 30, 2005, respectively. The price of coal had increased significantly during the Track Record Period. Any increase or material fluctuation in energy and fuel costs could have a material adverse effect on our business, financial condition and/or results of operations. For a detailed discussion of our energy costs, see "*Business — Energy Supply*."

*Our business operations may be materially adversely affected by environmental regulations.*

We are subject to extensive and increasingly stringent environmental protection laws and regulations in the PRC. At present, these laws and regulations:

- impose fees for the discharge of pollutants and waste substances;
- require the establishment of reserves for land reclamation and rehabilitation;
- impose fines for environmental violations; and
- authorize the relevant governmental body to apply to the people's court to compulsorily close any facility that fails to comply with administrative orders requiring it to correct or stop operations causing environmental damage.

Our cement, lightweight building materials and glass fiber and FRP products segments produce gaseous emissions, waste water and solid waste materials. Currently, the PRC government is moving towards more rigorous enforcement of environmental laws and regulations and the adoption of more stringent environmental standards. Our budgeted spending for environmental regulatory compliance for future years may not be sufficient and we may need to allocate additional funds for such purpose. If we fail to comply with current or future environmental laws and regulations, we may have difficulties in completing new production facilities and/or be required to pay penalties or take corrective actions, any of which may have a material adverse effect on our results of operations and/or financial condition. See "*Business — Environmental Matters.*"

ALRMH-CNBM00000050

# RISK FACTORS

**Risks Relating to the PRC**

Substantially all of the Group's assets are located in the PRC and the majority of the Group's revenue is sourced from the PRC. Accordingly, the Group's results of operations, financial position and prospects are subject, to a significant degree, to the economic, political and legal development of the PRC.

*The PRC's economic, political and social conditions, as well as government policies, could affect our business.*

The PRC economy differs from the economies of most developed countries in many respects, including:

- the extent of government involvement;
- the level of development;
- the growth rate;
- the control of foreign exchange; and
- the allocation of resources.

While the PRC economy has experienced significant growth in the past 25 years, growth has been uneven, both geographically and among different sectors of the economy. The PRC government has implemented various measures to encourage economic growth and guide the allocation of resources. Some of the economic reforms and macro-economic policies and measures implemented by the PRC government, even if aimed at benefiting the overall economy of the PRC, may adversely affect our operating results and/or financial condition. Such policies may include, for example, changes in the monetary policy of the PRC government or in tax regulations.

The PRC economy has transitioned from a planned economy to a more market-oriented economy and is continuing to do so. However, the PRC government continues to play a significant role in regulating industrial development by imposing industrial policies. It also exercises significant control over economic growth in the PRC through the allocation of resources, controlling payment of foreign currency-denominated obligations, setting monetary policy and providing preferential treatment to particular industries or companies.

A large majority of our revenue is dependent on the PRC market. Accordingly, our future performance and growth are dependent upon the overall health of the PRC economy. If there is any significant slowdown, or decline in the growth of the PRC economy, or any change in the PRC's economic, political and social conditions, as well as government policies, our business, financial condition and results of operations may be adversely affected.

*Changes in foreign exchange regulations may adversely affect the Group's results of operations.*

The Group's revenue is mostly in Renminbi, which is supplemented by foreign currencies for our overseas products sales and engineering services. Conversion of Renminbi into any other currency is under strict government regulation in the PRC. The current foreign exchange regulatory scheme in the PRC provides for more relaxed foreign exchange controls for current account transactions, including trade- and service-related foreign-exchange transactions and payments of dividends. Under the existing foreign

ALRMH-CNBM00000051

# RISK FACTORS

exchange regulations in the PRC, following completion of the Global Offering, the Company will be able to pay dividends in foreign currencies without prior approval from SAFE, subject to compliance with certain procedural requirements. However, there is no assurance that the above foreign policies regarding payment of dividends in foreign currencies will continue in the future.

***Fluctuations in the value of Renminbi may have a material adverse effect on your investment.***

The value of the Renminbi against the U.S. dollar and other currencies may fluctuate and is affected by, among other things, changes in China's political and economic conditions. The conversion of the Renminbi into foreign currencies, including U.S. dollars, has been based on rates set by the PBOC. On July 21, 2005, the PRC government changed its policy of pegging the value of the Renminbi to the U.S. dollars. Under the new policy, the Renminbi is permitted to fluctuate within a narrow and managed band against a basket of foreign currencies. This change in policy has resulted in a slight appreciation of the Renminbi against the U.S. dollar recently. Any significant revaluation of the Renminbi may materially and adversely affect our cash flows, revenues, earnings and financial position, and the value of, and any dividends payable on, the H Shares in foreign currency terms. For example, an appreciation of the Renminbi against the U.S. dollar would make any new Renminbi-denominated investments or expenditures more costly to us, to the extent that we need to convert U.S. dollars into Renminbi for such purposes.

***Interpretation of PRC laws and regulations involves uncertainty.***

The Group is incorporated under the laws of the PRC. As substantially all of the Group's businesses are conducted in the PRC, its operations are governed principally by PRC laws and regulations. The PRC legal system is based on written statutes, and prior court decisions can only be cited as reference. Since 1979, the PRC government has promulgated laws and regulations in relation to economic matters such as foreign investment, corporate organization and governance, commerce, taxation and trade, with a view to developing a comprehensive system of commercial laws. However, due to the fact that these laws and regulations have not been fully developed, and because of the limited volume of published cases and their non-binding nature, interpretation of PRC laws and regulations involves a degree of uncertainty.

On October 27, 2005, the Securities Law and the Company Law of the PRC were both amended, each becoming effective on January 1, 2006. The newly amended Company Law contains certain changes, including but not limited to changes in respect of shareholders' meeting procedures, restrictions on transfer of shares held by promoters and senior management and non-allocation of statutory welfare fund. Neither CSRC nor any of the other relevant bodies of the PRC government has issued any rules, regulations or measures implementing these new laws. We cannot assure you that the Company will not be required to amend its Articles of Association or take any other actions pursuant to these amended laws, nor can we predict with any accuracy at present the changes that may be required or any other actions that may need to be taken.

ALRMH-CNBM00000052

# RISK FACTORS

***We cannot guarantee the accuracy of facts and statistics derived from PRC official government publications with respect to the PRC, the PRC economy and the PRC building materials industry contained in this prospectus, and investors should not place undue reliance on them.***

Certain facts and statistics relating to the PRC, the PRC economy and the PRC building materials industry and building materials technology set out in the sections headed "*Summary,*" "*Industry Overview,*" "*Business*" and "*Financial Information*" in this prospectus are derived from various PRC official government publications. However, we cannot guarantee the quality or reliability of such source materials. While the Directors have taken reasonable care in the reproduction of the information, they have not been prepared or independently verified by us, the Selling Shareholders, the Global Coordinator, the Sponsor or the Underwriters or any of our or their respective affiliates or advisors and, therefore, we make no representation as to the accuracy or completeness of such facts and statistics, which are derived from PRC official government publications and may not be consistent with other information compiled within or outside the PRC. Due to possibly flawed or ineffective collection methods or discrepancies between published information and market practice and other problems, the statistics herein that are from PRC official government publications may be inaccurate, incomplete or may not be comparable to statistics produced for other economies and should not be unduly relied upon. Further, there is no assurance that the facts and statistics derived from the PRC official government publications contained in this prospectus are stated or compiled on the same basis or with the same degree of accuracy as may be the case elsewhere. In all cases, investors should give consideration as to how much weight or importance they should attach to or place on such facts or statistics.

***The outbreak of epidemics may have a material adverse effect on our business, financial condition and results of operations.***

Certain areas of the PRC are susceptible to epidemics. An outbreak of any epidemics in the PRC, such as Severe Acute Respiratory Syndrome or avian flu, might result in material disruptions to the operations of the Group, which in turn would adversely affect its results of operations and financial condition.

**Risks Relating to the Global Offering**

***Holders of the H Shares may not be able to enforce their rights as successfully as shareholders in the PRC.***

As a PRC company offering and listing its H Shares outside the PRC, the Company is subject to the Special Regulations and the Mandatory Provisions. Upon the listing of the H Shares on the Stock Exchange, the Listing Rules will become the principal basis for protection of shareholders' rights. The Listing Rules contain particular standards of conduct, fairness and disclosure for the Company, its Directors and its controlling shareholders. So far as the Company is aware, the PRC has not published any case report that involves a request by a holder of H shares of a PRC company to exercise his or her rights under any constitutional document of any joint stock company with limited liability, the Company Law or any regulatory provisions of the PRC or Hong Kong applicable to PRC joint stock limited companies.

The legal framework to which the Company is subject is materially different from the Hong Kong Companies Ordinance in certain areas, including the protection of minority shareholders. In addition, the mechanisms for enforcement of rights under the corporate governance framework to which the Company is subject are also relatively undeveloped and untested.

— 49 —

ALRMH-CNBM00000053

# RISK FACTORS

The Company will be subject to the Listing Rules and the Hong Kong Codes on Takeovers and Mergers and Share Repurchases upon the listing of the H Shares on the Stock Exchange. The holders of H Shares will not be able to bring actions on the basis of violations of the Listing Rules and must rely on the Stock Exchange to enforce its rules. The Hong Kong Codes on Takeovers and Mergers and Share Repurchases do not have the force of law in the PRC and only provide standards of acceptable commercial conduct for takeover and merger transactions and share repurchases in Hong Kong.

China has not entered into treaties providing for the reciprocal recognition and enforcement of judgments of courts with countries such as the United States, the United Kingdom and Japan, and therefore enforcement in the PRC of judgments of a court in these jurisdictions may be difficult or impossible. The Articles of Association of the Company and the Listing Rules provide that most disputes between holders of the H Shares and the Company, its Directors, Supervisors, officers or holders of Domestic Shares arising out of its Articles of Association or the Company Law and related regulations concerning its affairs, such as transfer of its H Shares, are to be resolved through arbitration. On June 21, 1999, an arrangement was made between Hong Kong and the PRC for the reciprocal enforcement of arbitral awards. This arrangement was approved by the Supreme Court of the PRC and the Hong Kong Legislative Council and became effective on February 1, 2000. The arrangement was made in accordance with the spirit of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards 1958. Under the arrangement, awards that are made by the PRC arbitral authorities recognized under the Arbitration Ordinance of Hong Kong can be enforced in Hong Kong, while awards made by Hong Kong arbitral authorities are also enforceable in the PRC. However, so far as the Company is aware, no action has been brought in the PRC by a holder of H Shares to enforce an arbitral award made by the PRC arbitral authorities or the Hong Kong arbitral authorities, and there are uncertainties as to the outcome of any action brought in the PRC to enforce an arbitral award made in favor of a shareholder.

***It may be difficult to effect service of process upon the Company or the Directors, Supervisors or officers who reside in the PRC, or to enforce against it or any of them in the PRC any judgments obtained from non-PRC courts.***

Except for one Supervisor who is a citizen of the United States, all of the Directors, Supervisors and officers are citizens of the PRC and reside within the PRC. Substantially all of our assets and substantially all of the assets of the Directors, Supervisors and officers (other than the Supervisor who is a citizen of the United States) are located within the PRC. The PRC has not entered into any treaty providing for the reciprocal recognition and enforcement of judgments of courts with the United States, the United Kingdom, Japan and many other countries. Therefore, it may not be possible for investors to effect service of process upon the Company or those persons in the PRC or to enforce against it or any of them in the PRC any judgment obtained from a non-PRC court. In addition, recognition and enforcement in the PRC of the judgment of a court of any other jurisdiction in relation to any matter not subject to a binding arbitration provision may be difficult or impossible.

ALRMH-CNBM00000054

# RISK FACTORS

***Holders of H Shares may be subject to PRC taxation.***

Under current PRC tax laws, regulations and rulings, dividends paid by the Company to holders of H Shares outside the PRC are currently exempted from PRC income tax. In addition, gains realized by holders of H Shares upon the sale or other disposition of H Shares are currently exempted from PRC income tax. If the exemptions are withdrawn in the future, holders of H Shares may be required to pay PRC income tax, or the Company may be required to withhold such tax from dividend payments. Such PRC income tax or withholding tax on dividends would be imposed at the current rate of 20%, unless there is an applicable tax treaty between the PRC and the jurisdiction in which an overseas holder of H Shares resides which reduces or exempts the relevant tax. See "*Appendix V — Taxation*."

***There has been no prior public market for the H Shares; the liquidity and market price of the H Shares may be volatile, and the Offer Price for H Shares may not be indicative of prices that will prevail in the trading market.***

Prior to the Global Offering, there has been no public market for the H Shares. The initial issue price range to the public for the H Shares was the result of negotiations between the Company and the Global Coordinator on behalf of the Underwriters, and the Offer Price may differ significantly from the market price for the H Shares following the Global Offering. The Company has applied to list and deal in the H Shares on the Stock Exchange. There is no assurance that the Global Offering will result in the development of an active, liquid public trading market for the H Shares. In addition, the price and trading volumes of the H Shares may be volatile. Factors such as variations in the Company's revenues, earnings and cash flows or any other developments of the Company may affect the volume and price at which the H Shares will be traded. The Offer Price for H Shares will be determined by negotiations between the Company and the Global Coordinator (on behalf of the Underwriters) and may not be indicative of prices that will prevail in the trading market and may bear no relationship to the market price for H Shares after the Global Offering. Investors may not be able to resell their shares at the Offer Price or a higher price. Volatility in the price of the Shares may be caused by factors beyond our control and may be unrelated to the results of our operations.

***Future sales, disposals or other transfers of a substantial number of our Shares by our current shareholders in public markets could adversely affect the prevailing market price of our H Shares.***

Future sales, disposals or other transfers of a substantial number of our Shares by our current shareholders in public markets, or any prospects or possibilities of such sales, disposals or other transfers, as to or against which the holders of H Shares may or may not have a right to vote or veto, could adversely impact the market price of our H Shares and our ability to raise equity capital in the future at a time and price that we deem appropriate. The Shares held by our Selling Shareholders are subject to certain lock-up undertakings for periods up to 12 months after the date on which trading in our H Shares commences on the Stock Exchange, details of which are set forth in the section entitled "*Underwriting — Underwriting Arrangements and Expenses — Hong Kong Public Offering — Undertakings.*" We cannot give any assurance that our Controlling Shareholders will not sell, dispose of or otherwise transfer any Shares they may own now or in the future at the completion of the applicable lock-up periods.

ALRMH-CNBM00000055

# RISK FACTORS

*Existing shareholders' interests in the Company may be diluted as a result of future equity fundraising.*

We may need to raise additional funds in the future to finance new developments relating to our existing operations or new acquisitions. If additional funds are raised through the issuance of new equity or equity-linked securities other than on a pro rata basis to the Company's existing Shareholders, the percentage ownership of the Company's Shareholders may be diluted, and such securities may have preferred rights, options and pre-emptive rights senior to H Shares.

*Because the Offer Price is higher than the net tangible book value per Share, you will experience immediate dilution in the book value of the Shares purchased by you.*

The Offer Price will be higher than the net tangible book value per Share of the outstanding Shares issued to Parent and other Promoters. Therefore, purchasers of the H Shares in the Global Offering will experience an immediate dilution in pro forma combined net tangible book value of HK$0.84 per H Share, assuming the mid-point Offer Price of HK$2.525, and Parent and other Promoters will receive an increase in the net tangible book value per Share of their Shares.

*Forward-looking information may prove inaccurate.*

This prospectus contains certain forward-looking statements and information relating to the Company, that are based on the beliefs of its management as well as assumptions made by and information currently available to its management. When used in this document, the words "may," "will," "intend," "plan," "continue," "anticipate," "believe," "expect," "going forward" and similar expressions, as they relate to the Company or its management, are intended to identify forward-looking statements. We have made forward-looking statements with respect to, among others:

- our prospects;
- our business plans, goals and development strategies;
- the development trends of the building materials industry and market prospects;
- our dividend distribution plans; and
- any capital expenditure plans, particularly plans enhancing our production capacity.

These statements are forward-looking and reflect our current expectations. They are based on the beliefs of our management and are subject to a number of risks and uncertainties out of our control, including, but not limited to, changes in the economic and political environment in the Asian region, technological development and changes in the market.

Furthermore, these forward-looking statements merely reflect our current view with respect to future events. The information contained in the forward-looking statements may prove to be inaccurate as a result of a number of factors, including, without limitation, the risk factors set out in this section in this prospectus and the following:

- the effects of competition on the demand for and the prices of our products;
- the development of new products or technologies affecting our current and future business;
- changes in political, economic, legal and social conditions in the PRC, including the PRC government's specific policies with respect to foreign investment in the building materials industry, economic growth, inflation, foreign exchange and the availability of credit; and

— 52 —

ALRMH-CNBM00000056

# RISK FACTORS

- changes in population growth and GDP growth and the impact of those changes on the demand for our products.

Subject to the requirements of applicable laws, rules, regulations and our on-going disclosure obligations pursuant to the Listing Rules (including pursuant to Rule 13.09 thereof), we do not have any obligation to update or otherwise revise the forward-looking statements in this prospectus. Because of these risks, uncertainties or assumptions, the forward-looking events and circumstances discussed in this prospectus might not occur in the way we expect, or at all. Accordingly, you should not place undue reliance on any forward-looking information.

***The Company's payment of dividends depends on certain factors; there is no assurance that dividends will be distributed in any particular form or at all.***

The Company was converted into a joint stock limited company on March 28, 2005. Prior to its conversion, CNBM Equipment did not declare or pay any dividend for the years ended December 31, 2002, 2003 and 2004. The dividends reflected on our audited consolidated financial statements for the years ended December 31, 2002, 2003 and 2004 in the amount of approximately RMB 17.3 million, RMB 20.8 million and RMB 27.8 million, respectively, represented the amount of dividends declared and paid by BNBM which became a subsidiary of ours as a result of the Reorganization. BNBM is a public company listed in the PRC. Neither the Company nor CNBM Equipment received any such dividends, which were declared and paid prior to September 30, 2004. See "*History, Reorganization and Group Structure*." In addition, pursuant to the requirements of "Provisional Regulations Relating to Corporate Reorganization of Enterprises and Related Management of State-owned Capital and Financial Treatment" issued by the Ministry of Finance, the Company declared a dividend in an aggregate amount of RMB135.6 million in respect of the period from October 1, 2004 to March 27, 2005 to Parent and BNBMG, the shareholders of the Company at the time. See "*Financial Information — Dividends*."

Notwithstanding our dividend policy upon listing as detailed in "*Financial Information*" in this prospectus, there is no assurance that dividends will be distributed in any particular form or at all. The dividends set forth in the paragraph above were dividends paid by BNBM prior to the transfer of Parent's equity interest in BNBM to us as a part of the Reorganization or a one-time dividend mandated by government regulations in connection with the Reorganization and they are not indicative of our future dividend payment. Whether dividends will be distributed and the amount to be distributed, if any, will depend on factors such as our profitability, financial condition, business development requirements, future prospects and cash requirements. In addition, under PRC law and upon the listing of the H Shares on the Stock Exchange, the Company may only pay dividends out of distributable reserves as determined under PRC GAAP or IFRS, whichever is lower. See "*Financial Information — Dividends*" and "*Financial Information — Distributable Reserves*" in this prospectus. As a result, the Company may not have sufficient or any profits to enable it to make dividend distributions in the future, including in respect of periods during which our financial statements indicate that our operations have been profitable.

ALRMH-CNBM00000057

# RISK FACTORS

*You should read the entire prospectus carefully and we strongly caution you not to place any reliance on any information contained in press articles or other media.*

There has been media coverage regarding the Group and the Global Offering which includes certain profit forecast or other forward-looking statements about the Group (the "Information") that is not directly attributable to statements made by us. Press articles which have contained the Information are the Ming Pao (March 1 2006), South China Morning Post (March 1 2006), Apple Daily (March 2 and 7, 2006), Sing Tao Daily (March 7, 2006), the Sun (March 3 and 7, 2006), Hong Kong Economic Journal (March 7, 2006) and The Standard (March 1 and 7, 2006) (collectively the "Press Articles"). We wish to emphasise to potential investors that we do not accept any responsibility for the accuracy or completeness of any of the Press Articles or other media and that such Press Articles or other media were not prepared or approved by us. We make no representation as to appropriateness, accuracy, completeness or reliability of any of the Information, or of any assumptions underlying such Information, included in or referred to by any of the Press Articles or the media. To the extent that any of the Information is inconsistent with, or conflicts with, the information contained in this prospectus, we disclaim it. Accordingly, prospective investors should not rely on any such Information.

ALRMH-CNBM00000058

# EXEMPTIONS FROM THE COMPANIES ORDINANCE AND WAIVERS FROM COMPLIANCE WITH THE LISTING RULES

**Connected Transactions**

Members of the Group have entered and are expected to enter into certain transactions, which would constitute non-exempt continuing connected transactions of the Company under the Listing Rules after the Listing. The Company has applied to the Stock Exchange for a waiver from strict compliance with the shareholders' approval and/or announcement requirements set out in Chapter 14A of the Listing Rules for such non-exempt continuing connected transactions. Further details of such waivers are set out in the section headed "*Connected Transactions*" in this prospectus.

**Management Presence in Hong Kong**

According to Rule 8.12 and Rule 19A.15 of the Listing Rules, an issuer must have a sufficient management presence in Hong Kong with at least two of the issuer's executive directors ordinarily residing in Hong Kong. The Company has applied to the Stock Exchange for, and the Stock Exchange has granted, a waiver from strict compliance with Rule 8.12 and Rule 19A.15 of the Listing Rules which require the Company to have a sufficient management presence in Hong Kong. Further details of such a waiver are set out in the section headed "*Directors, Supervisors, Senior Management and Employees*" in this prospectus.

**Company Secretary**

Mr. Chang Zhangli, the Company's company secretary, does not possess the relevant qualification required under Rule 8.17 of the Listing Rules. The Company has appointed, and will continue to do so for a minimum period of three years after the Listing Date, Ms. Susan Lo Yee Har, to act as an assistant to Mr. Chang to ensure that Mr. Chang would be able to acquire the necessary experience in order to satisfy the requirements of Rule 8.17(3) of the Listing Rules. The Company has applied to the Stock Exchange for, and the Stock Exchange has granted, a waiver from strict compliance with the requirements under Rule 8.17 and Rule 19A.16 of the Listing Rules in connection with Mr. Chang's appointment as the Company's company secretary for a period of three years on the condition that Ms. Susan Lo is appointed as an assistant to Mr. Chang as described in the waiver application. Further details of such a waiver are set out in the section head "*Directors, Supervisors, Senior Management and Employees*" in this prospectus.

**The Latest Financial Period Reported on by the Reporting Accountants Required under the Listing Rules and the Companies Ordinance**

Rule 4.04(1) of the Listing Rules requires that the accountants' report of the Company include our combined results in respect of each of the three financial years immediately preceding the issue of this prospectus.

Under section 342(1)(b) of the Companies Ordinance, the Company is required to, among other things, state in this prospectus the matters specified in Part I of the Third Schedule to the Companies Ordinance and set forth in this prospectus the reports specified in Part II of the Third Schedule to the Companies Ordinance. Paragraph 27 of Part I of the Third Schedule to the Companies Ordinance requires that a statement as to the gross trading income or sales turnover (as may be appropriate) of the Company, during each of the three financial years immediately preceding the issue of this prospectus, including an explanation of the method used for the computation of such income or turnover and a reasonable breakdown between the more

— 55 —

# EXEMPTIONS FROM THE COMPANIES ORDINANCE AND WAIVERS FROM COMPLIANCE WITH THE LISTING RULES

important trading activities, shall be included in this prospectus. Paragraph 31 of Part II of the Third Schedule to the Companies Ordinance requires this prospectus to include a report by the auditors of the Company with respect to the profits and losses and assets and liabilities in respect of each of the three financial years immediately preceding the issue of this prospectus.

The *Accountants' Report* set out in Appendix I to this prospectus includes the audited financial statements of the Company for the three years ended December 31, 2004 and the nine months ended September 30, 2005 but not the audited financial statements of the Company (including the requisite statements as to its gross trading income or sales turnover) for the full financial year ended December 31, 2005 as required under Rule 4.04 of the Listing Rules and paragraphs 27 of Part I and 31 of Part II of the Third Schedule of the Companies Ordinance. As this prospectus is issued on March 13, 2006, our Directors believe that it will be unduly burdensome to include in it audited financial statements of the Company for the full financial year ended December 31, 2005.

In the circumstances, an application has been made to the SFC for a certificate of exemption from strict compliance with paragraphs 27 and 31 of the Third Schedule to the Companies Ordinance in relation to the inclusion of the accountants' report for the full financial year ended December 31, 2005 in this prospectus on the ground that it would be unduly burdensome for our company to do so, and a certificate of exemption from such strict compliance has been granted by the SFC.

An application has also been made to the Stock Exchange for a waiver from strict compliance with Rule 4.04(1) of the Listing Rules in relation to the inclusion of the accountants' report for the full financial year ended December 31, 2005 in this prospectus. The Stock Exchange has granted to us such a waiver on the condition that the Listing Date should be on or before March 31, 2006.

The Directors confirm that they have performed sufficient due diligence on the Group to ensure that, up to the date of this prospectus, there has been no material adverse change in our financial position or prospects since September 30, 2005 and there is no event since September 30, 2005 which would materially affect the information shown in the *Accountants' Report* set out in Appendix I to this prospectus.

ALRMH-CNBM00000060

## INFORMATION ABOUT THIS PROSPECTUS AND THE GLOBAL OFFERING

**Directors' Responsibility for the Contents of this Prospectus**

This prospectus contains particulars given in compliance with the Companies Ordinance, the Securities and Futures (Stock Market Listing) Rules of Hong Kong (as amended) and the Listing Rules for the purpose of giving information to the public with regard to the Company. The Directors collectively and individually accept full responsibility for the accuracy of the information contained in this prospectus and confirm, having made all reasonable enquiries, that to the best of their knowledge and belief, there are no other facts the omission of which would make any statement in this prospectus misleading.

**CSRC Approval**

The CSRC has given its approval for the Global Offering and the making of applications to list the H Shares on the Stock Exchange. In giving such approval, the CSRC accepts no responsibility for the financial soundness of the Company nor the accuracy of any of the statements made or opinions expressed in this prospectus or in the Application Forms.

**Underwriting**

This prospectus is published solely in connection with the Hong Kong Public Offering which forms part of the Global Offering. For applicants under the Hong Kong Public Offering, this prospectus and the Application Forms set out the terms and conditions of the Hong Kong Public Offering.

The listing of the H Shares on the Stock Exchange is sponsored by the Sponsor. The Hong Kong Public Offering is fully underwritten by the Hong Kong Underwriters under the terms of the Hong Kong Underwriting Agreement and is subject to the Company and the Global Coordinator (on behalf of the Underwriters) agreeing on the Offer Price. The Global Offering is managed by the Global Coordinator.

If, for any reason, the Offer Price is not agreed between the Company, the Selling Shareholders and the Global Coordinator (on behalf of the Underwriters) the Global Offering will not proceed. For full information about the Underwriters and the underwriting arrangements, see "*Underwriting*."

**Restrictions on Sale of H Shares**

Each person acquiring the Public Offer Shares under the Hong Kong Public Offering will be required to, or be deemed by his acquisition of H Shares to, confirm that he is aware of the restrictions on offers of the Offer Shares described in this prospectus.

No action has been taken to permit an offering of the Public Offer Shares or the distribution of this prospectus in any jurisdiction other than Hong Kong. Accordingly, this prospectus may not be used for the purpose of, and does not constitute, an offer or invitation in any jurisdiction or in any circumstances in which such an offer or invitation is not authorized or to any person to whom it is unlawful to make such an offer or invitation.

ALRMH-CNBM00000061

## INFORMATION ABOUT THIS PROSPECTUS AND THE GLOBAL OFFERING

*United States*

The Offer Shares have not been and will not be registered under the U.S. Securities Act, and may not be offered or sold within the United States except in reliance on an exemption from registration under the U.S. Securities Act.

The Offer Shares are being offered and sold outside the United States in reliance on Regulation S and within the United States to QIBs in reliance on Rule 144A.

In addition, until 40 days after the later of the commencement of the Global Offering and the completion of the distribution of the Offer Shares, an offer or sale of Offer Shares within the United States by a dealer (whether or not participating in the global offering) may violate the registration requirements of the U.S. Securities Act if such offer or sale is made otherwise than in accordance with Rule 144A or pursuant to another exemption from registration under the U.S. Securities Act.

The Offer Shares have not been approved or disapproved by the U.S. Securities and Exchange Commission, any state securities commission in the United States or any other U.S. regulatory authority, nor have any of the foregoing authorities passed upon or endorsed the merits of the Global Offering or the accuracy of this prospectus or the circular relating to the International Placing. Any representation to the contrary is a criminal offense in the United States.

*Canada*

The distribution of Offer Shares in Canada may be made only on a private placement basis exempt from the requirement that we and the Selling Shareholder prepare and file a prospectus with the securities regulatory authorities in each province where trades of our H Shares are made. Any resale of the Offer Shares in Canada must be made under applicable securities laws which will vary depending on the relevant jurisdiction, and which may require resales to be made under available statutory registration and prospectus exemptions or under a discretionary exemption granted by the applicable Canadian securities regulatory authority. Purchasers are advised to seek legal advice prior to any resale of Offer Shares.

*European Economic Area*

This prospectus has been prepared on the basis that all offers of Offer Shares will be made pursuant to an exemption under the Prospectus Directive (2003/71/EC), as implemented in member states of the European Economic Area ("EEA"), from the requirement to produce a prospectus for offers of Offer Shares. Accordingly any person making or intending to make any offer within the EEA of Offer Shares which are the subject of the placement contemplated in this prospectus should only do so in circumstances in which no obligation arises for the Company or any of the Underwriters to produce a prospectus for such offer. Neither the Company nor the Underwriters have authorised, nor do they authorise, the making of any offer of Offer Shares through any financial intermediary, other than offers made by Underwriters which constitute the final placement of Offer Shares contemplated in this prospectus.

ALRMH-CNBM00000062

## INFORMATION ABOUT THIS PROSPECTUS AND THE GLOBAL OFFERING

### *United Kingdom*

This prospectus has not been approved by an authorized person in the United Kingdom and has not been registered with the Registrar of Companies in the United Kingdom. The Offer Shares have not been offered or sold and, prior to the expiry of a period of six months from the latest date of the issue of the Offer Shares, the Offer Shares may not be offered or sold, to any persons in the United Kingdom except to persons whose ordinary activities involve them in acquiring, holding, managing or disposing of investments (as principal or agent) for the purposes of their businesses, or otherwise in circumstances which have not resulted and will not result in an offer to the public in the United Kingdom within the meaning of the Public Offers of Securities Regulations 1995. All applicable provisions of the Financial Services and Markets Act 2000 (the "FSMA") have been complied with in respect of anything done in relation to the Offer Shares in, from or otherwise involving the United Kingdom. No person may communicate or cause to be communicated any invitation or inducement to engage in investment activity (within the meaning of section 21 of the FSMA) received by such person in connection with the issue or sale of the Offer Shares except in circumstances in which section 21(1) of the FSMA does not apply to the Company.

### *Japan*

The Offer Shares have not been and will not be registered under the Securities and Exchange Law of Japan. Accordingly, the Offer Shares may not be offered or sold, directly or indirectly, in Japan or to or for the benefit of any resident of Japan, except pursuant to an exemption from the registration requirements of, otherwise in compliance with, the Securities and Exchange Law of Japan, and otherwise in compliance with any other applicable requirements of Japanese law. As used in this paragraph, a "resident of Japan" means any person residing in Japan, any corporation or other entity organized under the laws of Japan except for its branches or other offices located outside Japan and, with respect to any corporation or other legal entity organized under a law other than Japanese law, its branches and offices located in Japan.

### *Singapore*

This prospectus has not been registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this prospectus and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of the Offer Shares, may not be circulated or distributed, nor may the Offer Shares be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Singapore other than (i) to an institutional investor under Section 274 of the Securities and Futures Act, Chapter 289 of Singapore (the "SFA"), (ii) to a relevant person pursuant to Section 275(1), or any person pursuant to Section 275(1A), and in accordance with the conditions, specified in Section 275 of the SFA, or (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

Where the Offer Shares are subscribed or purchased under Section 275 by a relevant person which is:

(a) a corporation (which is not an accredited investor) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or

(b) a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary is an accredited investor,

— 59 —

ALRMH-CNBM00000063

## INFORMATION ABOUT THIS PROSPECTUS AND THE GLOBAL OFFERING

shares, debentures and units of shares and debentures of that corporation or the beneficiaries' rights and interest in that trust shall not be transferable for six months after that corporation or that trust has acquired our H Shares under Section 275 except:

(i) to an institutional investor (for corporations, under Section 274 of the SFA) or to a relevant person defined in Section 275(2) of the SFA, or to any person pursuant to an offer that is made on terms that such shares, debentures and units of shares and debentures of that corporation or such rights and interest in that trust are acquired at a consideration of not less than S$200,000 (or its equivalent in a foreign currency) for each transaction, whether such amount is to be paid for in cash or by exchange of securities or other assets, and further for corporations, in accordance with the conditions specified in Section 275 of the SFA;

(ii) where no consideration is given for the transfer; or

(iii) where the transfer is by operation of law.

### *PRC*

This prospectus does not constitute a public offer of the Offer Shares, whether by way of sale or subscription, in the PRC. The Offer Shares are not being offered and may not be offered or sold directly or indirectly in the PRC to or for the benefit of, legal or natural persons of the PRC. According to the laws and regulatory requirements of the PRC, the Offer Shares shall only be offered or sold to natural or legal persons in Taiwan, Hong Kong or Macau or any country other than the PRC by means of this prospectus or otherwise.

### *Netherlands*

The Offer Shares may not be offered in the Netherlands other than (i) to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities, (ii) to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year, (2) a total balance sheet of more than €43,000,000 and (3) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts, (iii) to any legal entity which and any natural person who has asked to be considered as a professional market party and is registered pursuant to the Dutch Exemption Regulation (Vrijstellingregeling Wte 1995), and (iv) in any other circumstances which do not require the publication of a prospectus pursuant to the Dutch Exemption Regulation.

### *France*

No offer or sale of the Offer Shares is being made, directly or indirectly, to the public in France and only qualified investors (Investisseurs Qualifiés) as defined in and in accordance with Article L.411-2 of the French Code Monetairé et Financier, as amended, and Decree no. 98-880 dated 1 October 1998, as amended, acting for their own account, are eligible to accept the offering relating to our H Shares. Neither this prospectus nor any other offering material relating to the global offering has been or shall be distributed to the public in France. This prospectus has not been submitted to the clearance of the Autorité des marchés financiers.

— 60 —

ALRMH-CNBM00000064

## INFORMATION ABOUT THIS PROSPECTUS AND THE GLOBAL OFFERING

*Italy*

The offering of the Offer Shares has not been registered with the Commissione Nazionale per le Societa e la Borsa ("CONSOB"), in accordance with Italian securities legislation. Accordingly, the Offer Shares may not be offered, sold or delivered, and copies of this prospectus or any other document relating to the Offer Shares may not be distributed in the Republic of Italy unless such offer, sale or delivery of H Shares or distribution of copies of this prospectus or other documents relating to the Offer Shares in the Republic of Italy is:

- made by investment firms (as defined by Legislative Decree No. 58 of February 24, 1998) ("*Legislative Decree No. 58*"), banks and financial companies enrolled in the special register provided for by article 107 of Legislative Decree no. 385 of September 1, 1993, to the extent duly authorized to engage in the placement and/or underwriting of financial instruments in Italy in accordance with the relevant provisions of Legislative Decree No. 58;

- made only to professional investors pursuant to article 30, paragraph 2 and article 100 of Legislative Decree No. 58 and as defined in articles 25 and 31(2) of CONSOB Regulation no. 11522 of July 1, 1998, as amended; and

- in compliance with any other applicable requirement or limitation which may be imposed by CONSOB or the Bank of Italy or any other Italian regulatory authority.

**Application for Listing on the Stock Exchange**

The Company has applied to the Listing Committee of the Stock Exchange for the granting of the listing of, and permission to deal in, the Offer Shares to be issued and sold pursuant to the Global Offering (including the additional H Shares which may be issued or sold pursuant to the exercise of the Over-allotment Option). Save as disclosed in this prospectus, no part of the share or loan capital of the Company is listed on or dealt in on any other stock exchange and no such listing or permission to list is being or proposed to be sought in the near future.

**Hong Kong H Share Register and Stamp Duty**

All H Shares issued pursuant to applications made in the Hong Kong Public Offering will be registered on the Company's H Share register of members to be maintained in Hong Kong. The Company's principal register of members will be maintained by the Company at No. A-11 Sanlihe Road, Haidian District, Beijing, PRC, its registered address in the PRC.

Dealings in H Shares registered in the H Share register of the Company will be subject to Hong Kong stamp duty. Please refer to the section entitled "*Stamp Duty — Hong Kong Stamp Duty*" in Appendix V to this prospectus.

ALRMH-CNBM00000065

## INFORMATION ABOUT THIS PROSPECTUS AND THE GLOBAL OFFERING

**Professional Tax Advice Recommended**

Potential investors in the Global Offering are recommended to consult their professional advisors if they are in any doubt as to the taxation implications of subscribing for, purchasing, holding and dealing in the H Shares. None of the Company, the Selling Shareholders, the Global Coordinator, the Sponsor, the Underwriters, any of their respective directors or any other person or party involved in the Global Offering accepts responsibility for any tax effects on, or liabilities of, any person resulting from the subscription, purchase, holding or disposition of H Shares.

**Registration of Subscription, Purchase and Transfer of H Shares**

The Company has instructed Tricor Investor Services Limited, its Hong Kong H Share registrar, and Tricor Investor Services Limited has agreed, not to register the subscription, purchase or transfer of any H Shares in the name of any particular holder unless and until the holder delivers a signed form to the H Share registrar in respect of those H Shares bearing statements to the effect that the holder:

1. agrees with the Company and each shareholder of the Company, and the Company agrees with each shareholder, to observe and comply with the Company Law, the Special Regulations and the Articles of Association;

2. agrees with the Company, each shareholder, Director, Supervisor, manager and officer of the Company, and the Company acting for itself and for each Director, Supervisor, manager and officer of the Company agrees with each shareholder, to refer all differences and claims arising from the Articles of Association or any rights or obligations conferred or imposed by the Company Law or other relevant laws and administrative regulations concerning the affairs of the Company to arbitration in accordance with the Articles of Association, and any reference to arbitration shall be deemed to authorize the arbitration tribunal to conduct hearings in open session and to publish its award, which shall be final and conclusive;

3. agrees with the Company and each shareholder of the Company that H Shares are freely transferable by the holders thereof; and

4. authorizes the Company to enter into a contract on his behalf with each Director, Supervisor, manager and officer of the Company whereby such Director, Supervisor, manager or officer undertakes to observe and comply with their obligations to shareholders as stipulated in the Articles of Association.

**Over-allotment, Stabilization and Over-allocation**

Stabilization is a practice used by underwriters in some markets to facilitate the distribution of securities. To stabilize, the underwriters may bid for, or purchase, the newly issued securities in the secondary market, during a specified period of time, to retard and, if possible, prevent a decline in the market price of the securities below the offer price. In Hong Kong, the price at which stabilization is effected is not permitted to exceed the offer price.

— 62 —

## INFORMATION ABOUT THIS PROSPECTUS AND THE GLOBAL OFFERING

In connection with the Global Offering, Morgan Stanley, as stabilizing manager, or any person acting for it, on behalf of the Underwriters, may over-allocate or effect transactions with a view to stabilizing or maintaining the market price of the H Shares at a level higher than that which might otherwise prevail for a limited period after the issue date. Such transactions may be effected in all jurisdictions where it is permissible to do so, in each case in compliance with all applicable laws and regulatory requirements. However, there is no obligation on Morgan Stanley, its affiliates or any person acting for it to do this. Such stabilization, if commenced, will be conducted at the absolute discretion of Morgan Stanley, its affiliates or any person acting for it and may be discontinued at any time, and must be brought to an end after a limited period. The number of H Shares that may be over-allocated will not be greater than the number of H Shares which may be issued and sold upon exercise of the Over-allotment Option, being 98,120,000 H Shares, which is approximately 15% of the H Shares initially available under the Global Offering.

Morgan Stanley or any person acting for it may take all or any of the following stabilizing actions in Hong Kong during the stabilization period:

(i)   purchase, or agree to purchase, any of the H Shares or offer or attempt to do so for the sole purpose of preventing or minimizing any reduction in the market price of the H Shares;

(ii)   in connection with any action described in paragraph (i) above:

    (A)  (1)   over-allocate the H Shares; or

        (2)   sell or agree to sell the H Shares so as to establish a short position in them,

        for the sole purpose of preventing or minimizing any reduction in the market price of the H Shares;

    (B)   exercise the Over-allotment Option and purchase or subscribe for or agree to purchase or subscribe for the H Shares in order to close out any position established under paragraph (A) above;

    (C)   sell or agree to sell any of the H Shares acquired by it in the course of the stabilizing action referred to in paragraph (i) above in order to liquidate any position that has been established by such action; or

    (D)   offer or attempt to do anything as described in paragraphs (ii)(A)(2), (ii)(B) or (ii)(C) above.

Morgan Stanley, or any person acting for it may, in connection with the stabilizing action, maintain a long position in the H Shares, and there is no certainty as to the extent to which and the time period for which it will maintain such a position. Investors should note the possible impact of any liquidation of the long position by Morgan Stanley or any person acting for it, which may include a decline in the market price of the H Shares.

— 63 —

ALRMH-CNBM00000067

## INFORMATION ABOUT THIS PROSPECTUS AND THE GLOBAL OFFERING

Stabilization cannot be used to support the price of the H Shares for longer than the stabilization period, which begins on the day on which trading of the H Shares commences on the Stock Exchange and ends on the thirtieth day after the last day for lodging of applications under the Hong Kong Public Offering. The stabilization period is expected to expire on April 15, 2006. After this date, when no further stabilizing action may be taken, demand for the H Shares, and therefore the market price, could fall.

Any stabilizing action taken by Morgan Stanley, or any person acting for it, may not necessarily result in the market price of the H Shares staying at or above the Offer Price either during or after the stabilization period. Stabilizing bids or market purchases effected in the course of the stabilization action may be made at any price at or below the Offer Price and can therefore be done at a price below the price the investor has paid in acquiring the H Shares.

In connection with the Global Offering, the Global Coordinator may over-allocate up to and not more than an aggregate of 98,120,000 additional H Shares and cover such over-allocations by exercising the Over-allotment Option or by making purchases in the secondary market at prices that do not exceed the Offer Price or through stock borrowing arrangements from holder(s) of H Shares or a combination of these means. The maximum number of H Shares that the Global Coordinator may borrow in aggregate under any such stock borrowing arrangements would be 98,120,000 H Shares (being the maximum number of H Shares to be issued upon full exercise of the Over-allotment Option).

### Procedure for Application for Public Offer Shares

The procedure for applying for Public Offer Shares is set out in the section entitled "*How to Apply for Public Offer Shares*" and on the relevant Application Forms.

### Structure of the Global Offering

Details of the structure of each of the Hong Kong Public Offering and the International Placing, including its conditions, are set out in the section entitled "*Structure of the Global Offering*" in this prospectus.

ALRMH-CNBM00000068

## DIRECTORS, SUPERVISORS AND PARTIES INVOLVED IN THE GLOBAL OFFERING

### SELLING SHAREHOLDERS

|  | Address |
|---|---|
| Parent | No. 2 Zizhuyuan South Road<br>Haidian District, Beijing |
| BNBMG | No. A-11 Sanlihe Road<br>Haidian District, Beijing |
| CNBM Trading | No. 11 Sanlihe Road<br>Haidian District, Beijing |
| Building Material Academy | No. 1 Guanzhuang Dongli<br>Chaoyang District, Beijing |
| Cinda | Donghuan Square<br>29 Dongzhong Street<br>Dongcheng District, Beijing |

### DIRECTORS

| Name | Address | Nationality |
|---|---|---|
| *Executive Directors* | | |
| Song Zhiping (宋志平) | No. 802, Unit 2, Building 2<br>Guoxing Park<br>No. 20 Shouti South Road<br>Haidian District, Beijing | PRC |
| Cao Jianglin (曹江林) | No. 6, Unit 2, Building 10<br>BNBM Park<br>No. 39 Jiancaicheng West Road<br>Xisanqi, Haidian District, Beijing | PRC |
| Li Yimin (李誼民) | No. 8, Unit 2, Building 12<br>BNBM Park<br>No. 39 Jiancaicheng West Road<br>Haidian District, Beijing | PRC |
| *Non-Executive Directors* | | |
| Cui Lijun (崔麗君) | No. 5, Unit 2, Building 10<br>BNBM Park<br>No. 39 Jiancaicheng West Road<br>Haidian District, Beijing | PRC |

ALRMH-CNBM00000069

## DIRECTORS, SUPERVISORS AND PARTIES INVOLVED IN THE GLOBAL OFFERING

| Name | Address | Nationality |
|------|---------|-------------|
| Huang Anzhong (黃安中) | No. 701, Unit 5<br>Building 1<br>Enjili Park, Haidian District<br>Beijing | PRC |
| Zuo Fenggao (左鳳高) | No. 501, Unit 1, Building 6<br>No. 48 Tiantan East Lane<br>Chongwen District, Beijing | PRC |

*Independent Non-Executive Directors*

| Name | Address | Nationality |
|------|---------|-------------|
| Zhang Renwei (張人為) | No. 802, Unit 1<br>Building 25, Minwang Park<br>Dongcheng District, Beijing | PRC |
| Zhou Daojiong (周道炯) | No. 6102, Court 20<br>Yinzha Hutong<br>Dongcheng District, Beijing | PRC |
| Chi Haibin (遲海濱) | Room 501, Building 18<br>No. 9 Yuyuantan South Road<br>Haidian District, Beijing | PRC |
| Lau Ko Yuen, Tom (劉高原) | 95 Kadoorie Avenue<br>Kowloon, Hong Kong | PRC |

*Supervisors*

| Name | Address | Nationality |
|------|---------|-------------|
| Shen Anqin (申安秦) | No. 362, Building 19<br>Baijiazhuang East Lane<br>Chaoyang District, Beijing | PRC |
| Zhou Guoping (周國萍) | Room 5, Flat 2, Building 8<br>No. 4 Zizhuyuan South Road<br>Haidian District, Beijing | PRC |
| Bao Wenchun (包文春) | Flat 205, Building A<br>No. 80 Anwai Street<br>Dongcheng District, Beijing | PRC |
| Cui Shuhong (崔淑紅) | 1003, Building 3, Fengshang Mingju<br>Wanliu, Haidian District, Beijing | PRC |
| Zhang Zhaomin (張兆民) | 301, Flat 4<br>Building 28, Xinghua West Lane A<br>Yanshan Yingfeng, Fangshan District<br>Beijing | PRC |
| Liu Chijin (劉持金) | Dynasty Garden, Shunyi<br>Beijing | United States of America |

ALRMH-CNBM00000070

## DIRECTORS, SUPERVISORS AND PARTIES INVOLVED IN THE GLOBAL OFFERING

**PARTIES INVOLVED IN THE GLOBAL OFFERING**

**Global Coordinator, Bookrunner, Lead Manager of the Hong Kong Public Offering and Sponsor**

*Lead Manager:*

Morgan Stanley Dean Witter Asia Limited
30th Floor, Three Exchange Square
Central, Hong Kong

*Co-Lead Managers:*

China International Capital
Corporation (Hong Kong) Limited
Suite 2307, 23rd Floor
One International Finance Centre
1 Harbour View Street
Central, Hong Kong

Daiwa Securities SMBC
Hong Kong Limited
Level 26, One Pacific Place
88 Queensway
Hong Kong

*Co-Managers:*

BCOM Securities Company Limited
3rd Floor
Far East Consortium Building
121 Des Voeux Road Central
Central, Hong Kong

China Merchants Securities (HK) Co. Limited
48 Floor, One Exchange Square
Central, Hong Kong

First Shanghai Securities Limited
19/F., Wing On House
71 Des Voeux Road Central
Central, Hong Kong

Guotai Junan Securities (Hong Kong) Limited
27th Floor, Low Block
Grand Millennium Plaza
181 Queen's Road Central
Hong Kong

ALRMH-CNBM00000071

## DIRECTORS, SUPERVISORS AND PARTIES INVOLVED IN THE GLOBAL OFFERING

|  |  |
|---|---|
|  | Prudential Brokerage Limited |
|  | 9/F., World-Wide House |
|  | 19 Des Voeux Road Central |
|  | Central, Hong Kong |

**PRC Financial Advisor to
the Company's Reorganization**

China Galaxy Securities Company Limited
Tower C
Corporate Square
35 Finance Street
Beijing
PRC

**Auditors and Reporting Accountants**

Deloitte Touche Tohmatsu
Certified Public Accountants
26th Floor, Wing On Centre
111 Connaught Road Central
Hong Kong

**Legal Advisers to the Company**

*as to Hong Kong law:*
Slaughter and May
47th Floor, Jardine House
One Connaught Place
Central
Hong Kong

*as to U.S. law:*
Davis Polk & Wardwell
18th Floor, The Hong Kong Club Building
3A Chater Road
Central
Hong Kong

*as to PRC law:*
Jingtian & Gongcheng Law Office
15th Floor, Union Plaza
20 Chaoyangmenwai Dajie
Beijing 100020
PRC

**Legal Advisers to the Underwriters**

*as to Hong Kong and U.S. law:*
Linklaters
10th Floor, Alexandra House
Chater Road
Central
Hong Kong

— 68 —

ALRMH-CNBM00000072

## DIRECTORS, SUPERVISORS AND PARTIES INVOLVED IN THE GLOBAL OFFERING

|  | *as to PRC law:* |
|--|--|
|  | Haiwen & Partners |
|  | Room 1711 Beijing Silver Tower |
|  | 2 Dong San Huan North Road |
|  | Beijing 100027 |
|  | PRC |

**Property Valuer**

Sallmanns (Far East) Ltd.
22/F, Siu On Centre
No. 188 Lockhart Road, Wai Chai
Hong Kong

**Receiving Banker**

Bank of Communications Co., Ltd., Hong Kong Branch
20 Pedder Street, Central
Hong Kong

Bank of China (Hong Kong) Limited
1 Garden Road
Hong Kong

ALRMH-CNBM00000073

# CORPORATE INFORMATION

| | |
|---|---|
| **Registered Office** | No. A-11 Sanlihe Road<br>Haidian District<br>Beijing<br>People's Republic of China |
| **Principal Place of Business in the PRC** | No. A-11 Sanlihe Road<br>Haidian District<br>Beijing<br>People's Republic of China |
| **Place of Business in Hong Kong** | Level 28<br>Three Pacific Place<br>1 Queen's Road East<br>Hong Kong |
| **Joint Company Secretaries** | Chang Zhangli (常張利)<br>Lo Yee Har Susan (盧綺霞) (ACS, ACIS) |
| **Authorized Representatives** | Song Zhiping (宋志平)<br>No. 802, Unit 2, Building 2<br>Guoxing Park, No. 20 Shouti South Road<br>Haidian District<br>Beijing<br>People's Republic of China<br><br>Chang Zhangli (常張利)<br>No. 4, Unit 2, Building 8<br>BNBM Park, No. 39 Jiancaicheng West Road<br>Xisanqi, Haidian District<br>Beijing<br>People's Republic of China |
| **Alternate Authorized Representative** | Lo Yee Har Susan (盧綺霞) (ACS, ACIS)<br>Flat E, 31/F, Block 9<br>South Horizons<br>Apleichau<br>Hong Kong |
| **Audit Committee** | Chi Haibin (遲海濱) *(Chairman)*<br>Zhou Daojiong (周道炯)<br>Cui Lijun (崔麗君) |
| **Remuneration Committee** | Zhang Renwei (張人為) *(Chairman)*<br>Zhou Daojiong (周道炯)<br>Song Zhiping (宋志平) |

ALRMH-CNBM00000074

# CORPORATE INFORMATION

**Hong Kong H Share Registrar**

Tricor Investor Services Limited
26/F, Tesbury Centre
28 Queen's Road East
Wanchai
Hong Kong

**Principal Bankers**

China Construction Bank
Beijing Branch
Entry 4, Building No. 28
Xuanwumen West Street
Beijing
People's Republic of China

Bank of Communications
Beijing Branch
No. 33 Jinrong Street
Xicheng District
Beijing
People's Republic of China

Shanghai Pudong Development Bank
Beijing Branch
No. 68, Dongsi Shitiao
Dongcheng District
Beijing
People's Republic of China

**Qualified Accountant**

Pei Hongyan (裴鴻雁) (ACCA)

**Compliance Adviser**

Anglo Chinese Corporate Finance, Limited
40th Floor, Two Exchange Square
8 Connaught Place
Central
Hong Kong

ALRMH-CNBM00000075

# INDUSTRY OVERVIEW

*This section contains certain information that has been derived from various PRC official government publications. This information has not been independently verified by the Company, the Selling Shareholders, the Global Coordinator, the Sponsor or the Underwriters or any of their respective affiliates or advisors. The information may not be consistent with other information compiled within or outside the PRC.*

## OVERVIEW

The PRC economy has grown rapidly since the PRC government introduced economic reforms in the late 1970s. From 1995 to 2004, China's GDP increased from approximately RMB 6,079.4 billion to approximately RMB 15,987.8 billion, representing a CAGR of approximately 11.3%, making China one of the fastest growing economies in the world. During the period between 2000 and 2004, the growth of China's infrastructure, renovation and real estate development sectors was particularly robust as the year-on-year increase in investment activities in these sectors had exceeded that of the GDP by significant margins for the same period. Corresponding to the strong growth in these sectors, the growth in sales of building materials in China also outstripped GDP growth during the same period. The following table sets out the GDP of China, the investments in China's infrastructure, renovation and real estate development sectors and sales of building materials in China and their year-on-year change in percentage terms for the periods indicated.

| | GDP | | Infrastructure | | Renovation | | Real Estate Development | | Building Materials | |
|---|---|---|---|---|---|---|---|---|---|---|
| | GDP | % | Investment | % | Investment | % | Investment | % | Sales | % |
| | RMB (in billions) | | RMB (in billions) | | RMB (in billions) | | RMB (in billions) | | RMB (in billions) | |
| 1998 . . . | 8,440.2 | 7.8 | 1,191.6 | 20.2 | 451.7 | 15.2 | 361.4 | 13.7 | 251.8 | (16.7) |
| 1999 . . . | 8,967.7 | 7.6 | 1,245.5 | 4.5 | 448.5 | (0.7) | 410.3 | 13.5 | 270.3 | 7.3 |
| 2000 . . . | 9,921.5 | 8.4 | 1,342.7 | 7.8 | 510.8 | 13.9 | 498.4 | 21.5 | 294.2 | 8.8 |
| 2001 . . . | 10,965.5 | 8.3 | 1,482.0 | 10.4 | 592.4 | 16.0 | 634.4 | 27.3 | 317.0 | 7.7 |
| 2002 . . . | 12,033.3 | 9.1 | 1,766.7 | 19.2 | 675.1 | 14.0 | 779.1 | 22.8 | 364.5 | 15.0 |
| 2003 . . . | 13,582.3 | 10.0 | 2,290.9 | 29.7 | 862.5 | 27.8 | 1,015.4 | 30.3 | 457.6 | 25.5 |
| 2004 . . | 15,987.8 | 10.1 | N/A | N/A | N/A | N/A | 1,315.8 | 29.6 | 603.0 | 31.8 |

*Sources: China Statistical Yearbook (2004) and China Statistical Yearbook (2005), National Bureau of Statistics of China.*
*Almanac of China Building Materials Industry, Quantitative Economics and Audit Society of China Building Materials (中國建材數量經濟監理學會). The revised national GDP information published by the National Bureau of Statistics of China following a nationwide general economic survey.*

Since April 2004, in order to prevent China's economy from overexpansion and to achieve balanced and sustainable economic growth, the PRC government has taken measures to control money supply, credit availability and fixed assets investment. In addition, the PRC government has also implemented administrative measures to directly regulate specific industrial sectors in the PRC, including, among others, the real estate development industry and the cement industry. These macroeconomic control and administrative measures have led to a downturn in China's building materials industry. However, one of the

ALRMH-CNBM00000076

## INDUSTRY OVERVIEW

long- term objectives of these control measures, as stated by the PRC government, is to expedite and promote structural changes and consolidation in regulated industries and improve the competitiveness of mid-sized and large-sized enterprises in order to curtail malicious competition and wasteful use of energy and other natural resources.

### CEMENT

China's annual cement production and consumption have led the world since 1985, spurred primarily by domestic infrastructure projects and real estate developments. According to *China Building Materials Daily* (中國建材報), total national cement production reached approximately 970 million tonnes in 2004, approximately 99% of which was consumed in the domestic market, representing over 45% of the world's consumption.

Cement prices in the PRC are market driven and are primarily determined by supply and demand in regional markets. Cement prices in certain more economically developed areas of the PRC, particularly the Yangtze River Delta, reached a peak in the first quarter of 2004 but quickly plunged in the following three quarters after the implementation of the macroeconomic control and administrative measures in April 2004. Cement prices in certain economically less developed but rapidly growing areas in the PRC, such as the Huaihai Economic Zone, are less volatile as compared to those in the Yangtze River Delta. The chart below sets out the quarter-on-quarter changes in average cement prices for 42.5-grade cement (see "*Business — Cement Segment — Products*") in the PRC, Yangtze River Delta and Huaihai Economic Zone, for the periods indicated:



*Source: Quantitative Economics and Audit Society of China Building Materials.*

### Cement Production Process

Cement is produced primarily from limestone, clay and certain additives. On an NSP cement production line, the raw materials, primarily limestone and clay, are dried and ground into a powder form which is called a raw meal. The raw meal is homogenized in a blending silo, which is then preheated and disintegrated. It is then calcined in a rotary kiln and converted into an interim substance called clinker by physical forces and chemical reactions at a temperature between 1,450 and 1,750 degrees Celsius. In contrast, the raw meal on a vertical kiln production line is mixed with coal and fed directly into a stationary vertical kiln without

ALRMH-CNBM00000077

---

## INDUSTRY OVERVIEW

---

preheating and disintegrating. The vertical kiln also calcines the raw meal and turns it into clinker at a lower temperature of between 1,300 and 1,450 degrees Celsius. After being air cooled, clinker is then mixed with gypsum and other additives and ground into cement at grinding facilities. The finished product is stored in cement silos before being transported to purchasers in bulk or packed bags.

In certain circumstances, the grinding facilities of a cement producer are physically separated from the clinker production line. These grinding facilities are sometimes located in or near the cement sales market to utilize locally available additives and to reduce the total transportation cost.

Based on the types of additives, such as fly ash and blast furnace slags, and their amounts added to the clinker, varying grades of cement of different physical characteristics can be produced. Depending on the amount of additives added, a tonne of clinker can generally produce between 1.1 and 1.5 tonnes of cement. As such, the production capacity of a production line is not only a function of its clinker capacity but also a function of the amount and type of additive added during the cement grinding process. In addition, the grinding capacity of a production line and the length of the annual production period also affect the annual output of a production line. For the purposes of this prospectus, we describe a cement production line by its daily clinker capacity and, unless otherwise indicated, convert the daily clinker capacity to annual cement production capacity by assuming that each tonne of clinker produces 1.3 tonnes of cement and that the production line operates 310 days a year.

### PRC Cement Industry

China's cement industry exhibits characteristics described in the following paragraphs.

### *Accelerated Consolidation in a Highly Fragmented Industry*

China's cement industry is highly fragmented, encompassing, according to the China Cement Association (中國水泥協會), over 5,000 cement producers. The average annual cement production capacity of all cement producers in the PRC was 180,000 tonnes in 2004, which was less than one-fourth of the global average outside the PRC. According to *China Cement* (中國水泥), the ten largest PRC cement producers had an aggregate annual capacity of approximately 120 million tonnes, representing approximately 12.8% of the national total in 2004. In comparison, the seven largest non-PRC cement companies in the world commanded more than 40% of the cement sales in the world, excluding the PRC, in the same year.

Large-scale NSP production lines that have a daily clinker production capacity of at least 2,000 tonnes, particularly those with a capacity of at least 4,000 tonnes, are generally energy-efficient and labor-efficient to operate. Since November 2003, the PRC government has provided policy support to the construction of NSP production lines with a daily clinker capacity of at least 4,000 tonnes and as a result, the number of such production lines increased from 19 as at the end of 2002 to 67 as at the end of 2004.

Large-scale NSP production lines are capital-intensive to build. Moreover, the macroeconomic control and administrative measures undertaken by the PRC government since April 2004 have increased the equity capital required for new cement production lines from 20% to 35%. Now, only those cement producers with sufficient financial resources are capable of constructing new large-scale production lines. As a result, there

ALRMH-CNBM00000078

## INDUSTRY OVERVIEW

has been an accelerated consolidation in the PRC's cement industry. While there was only one PRC cement enterprise with an annual NSP cement capacity of at least 10 million tonnes from 2000 to 2003, there were five more in 2004. The aggregate market share of the top ten PRC cement enterprises, as measured by their production capacity, increased from approximately 10.5% in 2003 to approximately 12.8% in 2004.

### *Rapid Structural Change*

In the past when most of the key equipment had to be imported, NSP production lines required heavy capital investment, resulting in substantially greater depreciation costs than those of the vertical kilns. As a result, vertical kilns dominated the PRC cement industry. Prior to 2000, over 75% of China's cement production capacity was attributable to vertical kilns while the NSP production process accounted for less than 20%. Although the increase in the production capacity of NSP cement has accelerated in recent years, vertical kilns remained active due to a tremendous increase in the national demand for cement. In 2004, vertical kilns produced approximately 576 million tonnes of cement in the PRC, representing approximately 59% of the national output as compared to 315 million tonnes and 32% produced by the NSP process.

As compared to vertical kilns, NSP technology generally produces cement that is more reliable, stable and durable. Market demand for higher-quality NSP cement has been increasing. The market prices for NSP cement on average exceed those of vertical kiln cement by approximately RMB 10 to 15 per tonne since 2003, according to the China Cement Association. In addition, the capital investment required in constructing NSP production lines in the PRC has decreased in recent years as the manufacturing of most of the production line equipment has become domestic. We believe that as a result of the decreased capital requirement and increased coal and electricity prices in the PRC, the more energy-efficient NSP production process has become cost competitive against its vertical kiln counterpart. More importantly, the PRC government has promulgated industrial policies prohibiting the construction of any new vertical kiln production lines, which, combined with the market forces, may lead to the gradual phasing out of existing vertical kiln production lines in the PRC and their replacement by NSP production lines.

Investment in NSP technology increased substantially during the two-year period from 2003 to 2004. According to data from the China Cement Association, 127 newly constructed NSP production lines went into production in 2003, with an average daily clinker production capacity of approximately 2,050 tonnes each. In 2004, 143 newly constructed NSP production lines went into production, with an average daily clinker production capacity of approximately 2,930 tonnes each. Total output of NSP cement in the PRC reached approximately 315 million tonnes in 2004, representing approximately 32% of the national output and an increase of approximately 67% over 2003. In such an increasingly competitive market environment, a number of small-to-mid-sized cement plants have encountered difficulties. According to *China Building Materials Daily*, over 1,800 small-to-mid-sized cement plants ceased or reduced operations in 2004, representing a reduction of over 45 million tonnes in annual cement production capacity.

ALRMH-CNBM00000079

## INDUSTRY OVERVIEW

The table below sets out, for each year indicated, information relating to the output and production capacity of NSP cement in the PRC:

| | Total cement production | Year-on-year total cement production growth | Year-end NSP cement production capacity | Year-on-year NSP cement production capacity growth |
|---|---|---|---|---|
| | (in million tonnes) | % | (in million tonnes) | % |
| 1998 . . . . . . . . . . . . . . . . . | 536.0 | 4.7 | 55.8 | 8.4 |
| 1999 . . . . . . . . . . . . . . . . . | 573.0 | 6.9 | 60.2 | 7.8 |
| 2000 . . . . . . . . . . . . . . . . . | 597.0 | 4.2 | 66.2 | 10.1 |
| 2001 . . . . . . . . . . . . . . . . . | 664.0 | 11.2 | 82.6 | 24.7 |
| 2002 . . . . . . . . . . . . . . . . . | 725.0 | 9.2 | 118.0 | 42.8 |
| 2003 . . . . . . . . . . . . . . . . . | 862.0 | 18.9 | 198.9 | 68.6 |
| 2004 . . . . . . . . . . . . . . . . . | 970.0 | 12.5 | 328.8 | 65.3 |

*Source:   China Cement Association*

### Localized Markets

Cement is a bulk commodity and transportation costs for both raw materials and finished products are large components in the product's cost structure. According to the China Building Material Industry Association (中國建築材料工業協會), cement plants are generally situated in close proximity to limestone deposits and cement products are generally sold within a 300 kilometer radius of the plants . As a result, cement prices are affected by local market conditions. In certain cities that are more economically developed, such as those in the Yangtze River Delta, there was a higher level of construction activity and a higher demand for cement than the national average, which resulted in a higher volume of cement shipped from further distances. These combined factors have caused the cement prices in these markets to be higher and more volatile than the national average. In comparison, cement prices are generally more stable in regions that are less economically-developed, such as the Huaihai Economic Zone.

### Growth in Bulk Sales

In most developed countries, bulk sales constitute approximately 60% or more of the cement sold. Bulk sale cement is transported in bulk to commercial concrete mixing stations, therefore more economical and more sanitary in an urban environment than cement sold in bags. We estimate that the cost of packing bags on average accounts for at least 5% of the cost of sales of NSP cement in the PRC. By eliminating packing bags, bulk sale cement provides cost savings to both cement producers and their customers.

There has also been an increase in the number of commercial concrete mixing stations in the PRC in recent years. As at the end of 2004, there were 2,189 commercial concrete mixing stations in the PRC with an annual production capacity of approximately 593 million cubic meters, representing an increase of approximately 34% over 2003, according to the China Building Material Industry Association. In cities that experienced rapid economic growth, such as Beijing, Shanghai and Tianjin, 70% to 90% of the concrete consumed was produced by commercial concrete mixing stations that used bulk sale cement during 2004, according to *China Bulk Cement* (中國散裝水泥). However, the percentage of cement sold through bulk sales remained low in many small- or mid-sized municipalities. Consequently, only approximately 33.4% of

— 76 —

---

## INDUSTRY OVERVIEW

---

cement sales in the PRC were attributable to bulk sales in 2004. The PRC government has issued industrial policies to encourage bulk sale cement and has promulgated rules forbidding on-site concrete mixing in all major provincial capitals and coastal cities from 2004, and will extend the prohibition to all cities from 2006. It is thus anticipated that commercial concrete mixing stations and bulk sale cement will continue to grow in the PRC in the near future.

### LIGHTWEIGHT BUILDING MATERIALS

Lightweight building materials, as the term is used in this prospectus, primarily refers to gypsum boards and related products, including acoustical ceiling panels, lightweight metal frames and other related products. These products are the components of integrated dry wall and ceiling systems. In contrast to traditional building materials, the production of lightweight building materials is less energy intensive and more environmentally friendly. If a single layer of double-sided gypsum board is used to construct a square meter of wall, three kilograms of coal would be required to produce the required gypsum boards. In comparison, if clay bricks are used, four to twelve kilograms of coal would be required. The PRC government has been promoting the use of lightweight building materials in commercial and residential construction since the 1990s. In 2000, the PRC government issued new regulations prohibiting the use of solid clay bricks in 170 cities after June 30, 2003. In 2004, the PRC Ministry of Construction has also been actively promoting new types of residences that are conducive to environmental protection and the conservation of energy, water, land and raw materials.

### Gypsum Boards

According to the China Association of Decorative Building Materials (中國建築裝飾裝修材料協會), gypsum boards are often used in non-weight-loading dry walls or as ceiling panels in developed countries because of their many favorable characteristics, including high strength-to-weight ratio, water and fire resistance, sound absorbance, good appearance, ease of installation and suitability for mass production.

Gypsum boards are widely used in the world as a building material. The United States produces approximately three billion square meters of gypsum boards each year, consumes approximately ten square meters per capita and uses approximately four square meters for each square meter of construction area. Japan and Canada produce approximately 600 million and 300 million square meters of gypsum boards each year and their per capita consumption is approximately five square meters and ten square meters, respectively. The per capita consumption of gypsum boards in each of France, Great Britain and Germany is approximately three square meters. In contrast, the annual production of gypsum boards in the PRC was over 400 million square meters in 2004 and the per capita consumption of gypsum boards in the PRC was only 0.3 square meters.

Gypsum board production lines were introduced into the PRC more than 20 years ago. Annual production and consumption of gypsum boards in the PRC reached 451.8 million and 434.1 million square meters, respectively, in 2004. According to the China Association of Decorative Building Materials, the PRC's annual demand for gypsum boards for new structures and for renovations may reach 900 million square meters and 100 million square meters, respectively, by 2010. Most gypsum boards consumed in the PRC are used in the construction of office buildings and hotels. An estimated 20% to 30% of gypsum boards consumed in the PRC were used in residential structures, as compared with over 50% in the United States. According to the China Association of Decorative Building Materials, residential use of gypsum boards is expected to increase in the future.

ALRMH-CNBM00000081

## INDUSTRY OVERVIEW

The price of gypsum board in the domestic market went through a depressed phase in the late 1990s due to price competition from foreign-invested producers. The price of gypsum board has remained relatively stable since the beginning of 2000.

Producers that had annual sales of at least RMB 5 million accounted for approximately 75.8% of China's gypsum board sales in 2004. Based on the analysis of the China Association of Decorative Building Materials, such producers fell into two broad categories prior to April 28, 2005, the date on which we acquired a 42% equity interest in Taihe. The first category consisted of BNBM and three other gypsum board producers that had world-class foreign investors, primarily European building materials companies. These first category producers generally produced gypsum boards of superior physical characteristics, including higher durability and better dimensional consistency and stability. According to the China Association of Decorative Building Materials, these gypsum boards were high-end products that commanded the highest prices in the PRC. BNBM's market share, at 36.0%, was the largest amongst producers in this category in 2004. As a domestic gypsum board producer and one of the first PRC companies to introduce the production and application of gypsum boards in the PRC more than 20 years ago, BNBM has developed production capabilities that is on par with those producers with foreign investment in the PRC, according to the China Association of Decorative Building Materials. BNBM has extensive experience in operating large-scale gypsum board production lines with an annual production capacity of at least 20 million square meters. In addition, BNBM is capable of producing acoustical ceiling panels, lightweight metal frames and other related products, providing customers with a wide variety of dry wall and ceiling products.

The second category of producers generally produced only gypsum boards. These producers operated small-scale product lines with a production capacity of several million square meters with a few exceptions. Taking advantage of their low capital investment and low production costs, these small producers have expanded quickly by establishing plants in areas that are close to the market and are rich in raw materials. Gypsum boards produced by producers in this second category satisfy the needs of mid-tier customers with their competitive pricing. Taihe's market share, at 58.4%, was the largest amongst producers in this category in 2004. Taihe currently operates 18 production lines, six of which have an annual production capacity of 20 million square meters or more. According to *China Building Materials Daily* and the China Association of Decorative Building Materials, Taihe was also the largest producer of gypsum boards in the PRC in terms of production capacity at the time it was acquired by BNBM on April 28, 2005.

The general trend in PRC gypsum board industry is to increasingly focus on the development of large-scale production lines over the ones of small-scale. Some domestic producers have constructed a number of large-scale production lines with an annual production capacity of 20 million square meters or more since the beginning of 2002. In 2004, the PRC government issued regulations prohibiting construction of gypsum board production lines with an annual production capacity below four million square meters, and imposed further restrictions on the construction of those with an annual production capacity below 20 million square meters.

— 78 —

ALRMH-CNBM00000082

## INDUSTRY OVERVIEW

The table below sets out certain information regarding PRC gypsum board producers with annual gypsum board sales of at least RMB 5 million in 2004:

| Category | Producer | Total production line capacities[1] | Primary production locations | Average price range[2] | Sales volume | National market share[4] |
|---|---|---|---|---|---|---|
| | | sq.m. (in millions) | | RMB per sq.m. | sq.m. (in millions) | % |
| 1st Category. . . | BNBM | 45.0 | Beijing | 6.8-8.5 | 41.7[3] | 12.7 |
| | Producers with foreign investment | 100.0 | Shanghai, Tianjin, Anhui and Guangdong | | 74.0 | 22.5 |
| 2nd Category . . | Taihe | 155.0 | Tai'an and others | 4.8-6.5 | 124.6 | 37.9 |
| | Other producers | 225.0 | across the PRC | | 88.6 | 26.9 |

*Sources:   China Association of Decorative Building Materials and Quantitative Economics and Audit Society of China Building Materials, except for the sales volume of BNBM and Taihe, which are derived from the Company's own data.*

*Notes:*

(1)   For the purposes of this prospectus, gypsum board production capacities are stated on the basis of standard gypsum boards that are 9.5 millimeter thick. Production volume and sales volume are stated on an actual basis.

(2)   Market prices included VAT and freight.

(3)   If converted into an amount of standard gypsum boards that are 9.5 millimeter thick, 46.1 million sq.m.

(4)   Percentage is based on PRC gypsum board producers with annual gypsum board sales of at least RMB 5 million in 2004.

**Other Related Products**

Acoustical ceiling panels are generally used in structures such as office buildings, concert halls, convention centers, educational facilities and hotels, where sound quality is an important concern. The total amount of acoustical ceiling panels sold among all PRC producers increased rapidly from approximately 35 million square meters in 2002 to approximately 61 million square meters in 2004.

Producers of acoustical ceiling panels in the PRC can be categorized according to the nature of their production facilities. There were three high-end producers, including BNBM, that operated advanced imported production equipment. They primarily produced quality products that were sold at a unit price of between RMB 20 and RMB 30 per square meter. In 2004, the aggregate market share of these high-end producers, as measured by sales volume, was approximately 41.0%. Our "Dragon" brand acoustical ceiling panels commanded approximately a 20.2% share of the high-end market in 2004 as measured by sales volume. The mid-tier producers, including Tianfeng, which we acquired in March 2005, primarily operated domestic equipment and produced products of lower quality as compared with those of the high-end producers. The mid-tier products were generally sold at a unit price between RMB 10 and RMB 20 per square

— 79 —

ALRMH-CNBM00000083

## INDUSTRY OVERVIEW

meter. In 2004, the aggregate market share of these mid-tier producers, as measured by sales volume, was approximately 32.8%. Tianfeng commanded approximately a 30.5% share of the mid-tier market as measured by sales volume. The remaining PRC acoustical ceiling panels market was occupied by low-end workshop producers that operated small-scale production lines and sold acoustical ceiling panels, the quality of which could not meet the standards set by the PRC government, at less than RMB 10 per square meter.

Lightweight metal frames primarily provide structural support for various lightweight wall boards or ceiling boards. According to the China Association of Decorative Building Materials, market demand for lightweight metal frames is generally in line with the demand for such wall boards and ceiling boards. Also according to the China Association of Decorative Building Materials, installation of one square meter of gypsum boards requires approximately two kilograms of lightweight metal frames. In 2004, the total sales volume of lightweight metal frames in the PRC was approximately 600,000 tonnes. The manufacture of lightweight metal frames grew together with the lightweight wall board and ceiling board industry in the PRC. In the mid-80s, there were fewer than ten producers of lightweight metal frames in the PRC, with an aggregate sales volume of less than 2,000 tonnes per year. However, with the growth of the gypsum board industry, the number of lightweight metal frame producers has also increased.

As compared to gypsum boards, the manufacture of lightweight metal frames is a relatively simple process that has a lower entry barrier. For this reason, there is a large number of small-scale lightweight metal frame producers in the PRC operating from many different localities. These small-scale producers have a very large aggregate sales volume. Their sales are primarily restricted to local markets and their products are generally sold at lower prices. On the other hand, there are a few large-scale producers in the PRC, including BNBM and the producers with foreign investments who produce higher quality lightweight metal frames. Quality of lightweight metal frames is critical to the construction quality of dry walls and ceilings. Therefore, products from these large producers are generally sold at higher prices.

### GLASS FIBER AND FRP PRODUCTS

Our glass fiber and FRP products segment primarily produces glass fiber, glass fiber mats and FRP pipes and tanks.

### Glass Fiber

Glass fiber is a base material for the manufacturing of FRP products. According to the China Fiber Glass Industry Association (中國玻璃纖維工業協會), glass fiber are widely used in ship building, automobile, construction, electronics, electric, consumer products, houseware, office products, chemicals, metallurgical, environmental and defense industries. The PRC is currently the second largest glass fiber producing country in the world. China's glass fiber industry experienced an output growth from 180,000 tonnes in 1999 to 652,500 tonnes in 2004, representing a CAGR of approximately 29.4%.

There are over 200 glass fiber manufacturers in the PRC, a large majority of which are small-scale producers with an annual glass fiber production capacity of no more than 1,000 tonnes. In recent years, the production capacity in the PRC glass fiber industry became rapidly concentrated into the hands of a few manufacturers. According to *China Building Materials Daily*, there were over 10 Chinese enterprises in the glass fiber and related products industry with a profit of at least RMB 10 million in 2004, the top 10 of which had a total profit of RMB 549.3 million, representing 52.8% of total profit of the industry.

ALRMH-CNBM00000084

## INDUSTRY OVERVIEW

Since 2002, the glass fiber production facilities invested by these major producers were primarily direct-melt furnace（池窯拉絲）production lines. Direct-melt furnace is a modern glass fiber production technology that applies a simpler process to produce more consistent products at lower cost, higher productivity, less energy consumption and larger scales as compared to other traditional methods. Production lines in the PRC utilizing such technology produced approximately 412,000 tonnes of glass fiber in 2004, representing approximately 63.1% of the total national glass fiber output and an increase of approximately 52.6% from 2003. According to the China Fiber Glass Industry Association, there were 11 manufacturers with an annual direct-melt furnace production capacity of at least 10,000 tonnes as at the end of 2004.

According to the China Fiber Glass Industry Association, glass fiber exported from China increased from US$100 million in 1999 to US$639 million in 2004, representing a CAGR of approximately 44.9%.

The chart below sets out the average price of glass fiber for the periods indicated indexed to the average price of glass fiber for January 2003:



Source:   *China Fiber Glass Industry Association*

### Glass Fiber Mats

Glass fiber mats are widely used in many industries due to their dimensional stability, corrosion-resistance and anti-aging performance. According to the China Fiber Glass Industry Association, they can be used as a substrate in many products including SBS (styrene-butadiene-styrene) and APP (aperiodic polypropylene) modified asphalt felts, PVC plastic flooring, buried anti-corrosion pipes for oil and gas transportation, lead acid battery separators, carpet tiles, copper clad laminates, wall covering, ceilings and FRP surfacing reinforcements. In addition, glass fiber mats may also be laminated with aluminum foil, rock wool boards and acoustical ceiling panels to produce decorative, sound-absorbent and heat insulation materials.

World demand for glass fiber mats exceeded five billion square meters in 2000. The China Fiber Glass Industry Association estimated that, the global demand for glass fiber mats would be at least seven billion square meters in 2005. Glass fiber mats were first produced in the PRC in 1990. At the end of 2004, there were eight major glass fiber mat producers in the PRC, each with an annual production capacity of at least two million square meters and together they had an aggregate production capacity of approximately 200 million square meters.

ALRMH-CNBM00000085

# INDUSTRY OVERVIEW

## FRP Products

FRP products are widely used in construction, public infrastructure projects, transportation, electric, electronics, shipbuilding, entertainment goods and sporting goods. Their favorable characteristics include good corrosion resistance, high strength-to-weight ratio, low maintenance requirements and long life span as compared to metallic materials. The PRC was the second largest FRP-producing country in the world in 2004, according to the China FRP Industry Association (中國玻璃鋼工業協會). In 2004, over 3,000 manufacturers in aggregate produced over one million tonnes of FRP products in China.

According to the China FRP Industry Association, future growth areas for FRP products include usage in the manufacturing of FRP doors and windows, gas desulphurization equipment, municipal and petrochemical pipes and tanks, ship, automobile and rail vehicle bodies, fan blades for windmill-powered generators, pipes for nuclear power stations and composite respiratory tanks.

## ENGINEERING SERVICES

Engineering services to the glass industry and the cement industry have developed in the PRC, partly as a response to market opportunities arising from the increasing levels of domestic and foreign investment in the glass and cement industries and partly as a result of the development of homegrown glass and cement production technologies in the PRC.

## Sheet Glass Production Technology

Sheet glass can be produced by traditional sheet process or the float process. The float glass process generally produces sheet glass that has consistent appearance, thickness and surface flatness and that is suitable as a base material for further processing into automobile or mirror glass. According to the China Architectural and Industrial Glass Association (中國建築玻璃與工業玻璃協會), there are three major systems of float glass technology in the world, namely, the U.K. Pilkington technology, the U.S. PPG technology and the China float glass technology. Developed in the 1970s, the China float glass technology is approaching the levels of the other two float glass technologies following years of development, as evidenced by the fact that certain PRC engineering firms using the China float glass technology have been able to design and construct production lines that are capable of manufacturing float glass meeting the Japanese Industrial Standard (JIS R 3.02-1996). Some PRC engineering firms have been actively promoting the China float glass technology in international markets since the end of the 1980s.

The China float glass technology was developed by a number of state-operated research and design institutes with the support of the PRC government. Beginning in 1999, some of these institutes were revamped into market-oriented for-profit engineering companies as part of the PRC government's reform program, while others remained in the national science and technology research system. These engineering companies and the state-operated institutes compete in the glass engineering market in the PRC. In 1994, the relevant PRC government authorities enacted regulations requiring that each firm and/or institute that intends to provide engineering services based on the China float glass technology obtain permission from the relevant government authority. We were one of the first three firms and/or research institutes to receive such permission, in 1994.

ALRMH-CNBM00000086

# INDUSTRY OVERVIEW

**PRC Glass Industry**

According to the China Building Material Industry Association, China is the largest sheet glass producing country in the world in terms of glass output. It produced approximately 15 million tonnes of sheet glass in 2004, representing approximately a 20.5% increase from 2003. *China Building Materials Daily* reported that the supply and demand of sheet glass had reached an equilibrium in the PRC in 2004 while the future growth in demand had shifted to processed glass, such as safety glass and energy-efficient insulating glass.

In 2004, over 80% of the sheet glass produced in the PRC was manufactured using the float process. In 2004, 25 float glass production lines started operation, increasing the national total to 123. The aggregate national float glass production capacity increased from 10.6 million tonnes as at the end of 2003 to 14.2 million tonnes as at the end of 2004. According to *China Building Materials Daily* and the China Architectural and Industrial Glass Association, it is estimated that China had approximately 150 float glass production lines at the end of 2005. Moreover, due to an increase in production costs, including increases in costs for soda ash, coal and transportation, the cost of sales for sheet glass had increased by between 8% and 10% in 2004, substantially reducing the profit margin of PRC glass producers.

According to one of the world's largest float glass producers, the global demand for sheet glass in 2004 was approximately 38 million tonnes, of which approximately 23 million tonnes were high quality float glass, and 10 million tonnes were lower quality float glass produced mainly in the PRC. The demand for float glass was primarily driven by activity in the automobile and construction industries. Sheet glass is relatively expensive to transport and is generally sold within a small radius of the production facility. In certain developing regions of the world, the demand for float glass exceeded that of the production capacity in 2004. The table below sets out, in percentage terms, the global float glass demand and capacity in 2004 by regions:

| Region | Float glass demand | Float glass capacity |
|---|---|---|
| | (%) | |
| PRC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 34 | 34 |
| Europe . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 24 | 26 |
| North America . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15 | 16 |
| South America . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 | 0 |
| Africa . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2 | 0 |
| South East Asia . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8 | 1 |
| West Asia . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5 | 1 |
| Russia/CIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5 | 2 |
| Other (Japan/Oceania etc.) . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 | 20 |

*Source:  Http://www.pilkington.com*

— 83 —

ALRMH-CNBM00000087

# INDUSTRY OVERVIEW

**Engineer Services to Cement Industry**

Engineering services to the cement industry focus on the design and construction of NSP production lines. The cement industry in the PRC is experiencing a structural shift from vertical kilns to NSP process. NSP process was originally introduced into the PRC in the early 1980s. Prior to the development of NSP technology in the PRC, the design of and the equipment for NSP production lines were mostly dependent on imports and thus resulted in intensive capital requirements for new NSP production lines. With the development of NSP technology in the PRC, particularly the development of NSP equipment manufacturing capability and NSP design capability, the capital investment required for the construction of a new NSP production line has been substantially reduced, and the number of NSP production lines in the PRC has grown rapidly in recent years.

ALRMH-CNBM00000088

# HISTORY, REORGANIZATION AND GROUP STRUCTURE

**History**

Before the establishment of the Company as a joint stock limited company on March 28, 2005, our cement, lightweight building materials, glass fiber and FRP products and engineering services businesses were conducted by Parent through its subsidiaries. Parent is a state-owned enterprise under the direct supervision and administration of SASAC. Parent, formerly known as China National New Building Material Company (中國新型建築材料公司), was established as the holding company of the building materials businesses of the PRC government in 1984.

*Cement*

*China United*

China United, being the holding company of our cement business, was converted from China National New Building Material Import and Export Company (中國新型建築材料進出口公司), a state-owned enterprise established in January 1985, to a limited liability company, in June 1999. Upon completion of the conversion, Parent directly and indirectly held the entire equity interest in China United.

Prior to the Reorganization, China United conducted its cement operations, including our current NSP cement operations, primarily through Lunan Cement, Julong Cement and Nanyang Hangtian. Lunan Cement Plant (魯南水泥廠), a cement plant established by the PRC Government in 1993, was acquired by Parent Group and underwent a debt restructuring arrangement in 1999. Lunan Cement Plant's assets were injected into China United in 1999 and in the same year, Lunan Cement Plant was converted into Lunan Cement whereby its equity interests were held by China United and Shandong International Trust Investment Company Limited (山東省國際信托投資有限公司) as to 74.78% and 25.22%, respectively. In May 2000, an additional 5.56% equity interest in Lunan Cement was allocated to China United, thereby increasing its equity interest to 80.34%.

Julong Cement was a limited liability company converted in 1996 from Huaihai Cement Plant (淮海水泥廠), a cement plant established by the PRC Government in 1979. Julong Cement's 73.8% equity interest was allocated by the PRC Government to Parent in April 2002 and by Parent to China United in July 2002.

Nanyang Hangtian was established in 1987. Its entire equity interest was allocated by the PRC Government to Parent in 1999 and by Parent to China United in May 2001. In 2003, Nanyang Hangtian established a branch factory in Zhenping for the production of cement using NSP technology.

In 2004, a subsidiary of China United, Qingzhou, was established to operate Parent's cement business in Qingzhou, Shandong. Our new cement plant in Qingzhou is still under construction and is scheduled for completion by the end of 2006.

ALRMH-CNBM00000089

## HISTORY, REORGANIZATION AND GROUP STRUCTURE

In April 2005, China United acquired Shizhongqu's 30% equity interest in Zaozhuang Luhong at a consideration of RMB9 million and contributed RMB20 million to its capital. As a result, China United obtained a 58% equity interest in Zaozhuang Luhong.

On April 20, 2005, China United and Xinlei entered into a debt restructuring agreement for the transfer of Xinlei's 67.71% equity interest in Ziyan to China United to set off Xinlei's indebtedness of approximately RMB 33 million to China United. The set off amount was determined by reference to the net asset value of Ziyan as at 31 March 2005.

After acquiring a majority interest in each of Ziyan and Zaozhuang Luhong, China United's cement operations were expanded to Xingtai, Hebei and Zaozhuang, Shandong. Immediately before the Reorganization, China United was directly and indirectly owned as to 100% by Parent and principally managed by Mr. Cui Xingtai (崔星太), Mr. Zhang Jindong (張金棟), Mr. Song Zhiping (宋志平), Mr. Tian Ye (田野), Mr. Xing Ning (邢寧) and Mr. Guo Yiming (郭一鳴).

*Other Investments of Parent*

In 2001 and 2002, Parent transferred to China United by way of allocation at nil consideration its minority equity interests in certain cement operations, including Guangxi Yufeng Cement Group Company Limited (廣西魚峰水泥集團有限公司), Hubei Baoshi Group Guanghua Cement Company Limited (湖北寶石集團光華水泥有限公司), Guangxi Hongshuihe Cement Company Limited (廣西紅水河水泥股份有限公司), Hunan Shaofeng Cement Group Company Limited (湖南韶峰水泥集團有限公司), Gansu Qilianshan Building Material Holding Company Limited (甘肅祁連山建材控股有限公司), Sichuan Jinsha Cement Company Limited (四川金沙水泥股份有限公司), Inner Mongolia Wulan Cement Company Limited (內蒙古烏蘭水泥有限公司), Henan Yunan Cement Company Limited (河南豫南水泥有限責任公司) and Heilongjiang Haolianghe Cement Company Limited (黑龍江浩良河水泥有限責任公司). Parent's equity interest in each of the above companies was less than 20%.

### Lightweight Building Materials

We operate our lightweight building materials business through BNBM, a company whose A shares have been listed on the Shenzhen Stock Exchange since 1997. Prior to the Reorganization, BNBM was a subsidiary of BNBMG, a wholly-owned subsidiary of Parent. The history of BNBMG can be traced back to the establishment of Beijing New Building Materials Testing Factory (北京新型建築材料試驗廠) in 1977. With the approval of SETC and the State Building Material Industry Bureau in 1995, the factory was converted into BNBMG. Immediately before the Reorganization, BNBM was owned as to 60.33% by BNBMG and the remainder by the public. It was principally managed by Mr. Cao Jianglin (曹江林) (who has managed BNBM as a director from April 2001 to the present and is also an executive Director and president of the Company, the chairman of BND, BNBM Homes and BNBM, a director of China Composites and China Triumph), Mr. Wang Bing (王兵) (who has managed BNBM as a general manager from February 2004 to the present and is also a director of Tianfeng, China United and Taihe), Mr. Lu Jinshan (盧金山) (who has managed BNBM as a director from June 1997 to the present and is also the vice chairman of BNBM and a director of BND), Mr. Zhou Huan (周桓) (who has managed BNBM as a deputy general manager from June 1997 to the present), Mr. He Jingjing (何晶晶) (who has managed BNBM as a chief engineer from November 2001 to the

ALRMH-CNBM00000090

## HISTORY, REORGANIZATION AND GROUP STRUCTURE

present and deputy general manager from 2004 to the present), Mr. Li Yimin (李誼民) (who managed BNBM between May 1997 and February 2004 and is also an executive Director and vice president of the Company) and Mr. Bao Wenchun (包文春) (who managed BNBM between May 1997 and October 2004, and is also a Supervisor of the Company).

In 2001, BND was founded by BNBM, China National Building Material and Equipment Import and Export Zhujiang Company (中國建築材料及設備進出口珠江公司), BNBMG and Shenzhen Zhujiang Building Material Enterprise Company (深圳珠江建材實業公司), to operate our international trading business and retail distribution business.

In 2002, BNBM entered into a joint venture, BNBM Homes, with BNBMG, Nippon Steel Corporation, Toyota Motor Corporation and Mitsubishi Corporation for developing the business of prefabricated homes. BNBM currently has a 64% equity interest in BNBM Homes.

In 2005, BNBM further expanded its gypsum boards and acoustical ceiling panels businesses.

On February 25, 2005, BNBM entered into a share transfer agreement for acquiring a 50% and a 25% equity interest in Tianfeng from Yan Yu and Zhang Zhonghua, respectively, for a total consideration of RMB 22 million. The consideration was determined by reference to the net asset value attributable to such equity interest as at October 31, 2004.

On March 19, 2005, BNBM entered into a share subscription agreement for, among other things, the subscription of 65,362,500 shares, representing 42% of the registered capital of Taihe upon completion of the share subscription. The subscription price paid by BNBM was approximately RMB 117.65 million, which was determined by reference to the net asset value of Taihe as at March 31, 2005.

### *Glass Fiber and FRP Products*

#### *China Fiberglass*

China Fiberglass is the holding company of our glass fiber business. It was formerly named China National Chemical Building Material Company Limited (中國化學建材股份有限公司), a joint stock limited company established by Parent, Zhejiang Tongxiang Zhenshi Company Limited (浙江桐鄉振石股份有限公司), Zhejiang Yonglian Group Company (浙江永聯集團公司) and CNBM Equipment as promoters. Its A shares have been listed on the Shanghai Stock Exchange since April 1999.

China Fiberglass operates its business primarily through Jushi Group, a sino-foreign equity joint venture established by China National Chemical Building Material Company Limited, the staff shareholding union of Jushi Group and Surest Finance Limited in June 2001.

Immediately before the Reorganization, China Fiberglass was principally managed by Mr. Cao Jianglin (曹江林), Mr. Zhang Yuqiang (張毓強), Mr. Chen Lei (陳雷), Mr. Jia Jianjun (賈建軍) and Mr. Chen Tieshen (陳鐵身).

ALRMH-CNBM00000091

## HISTORY, REORGANIZATION AND GROUP STRUCTURE

*China Composites*

China Composites is the holding company of our FRP products business. It was formerly named China National Inorganic Non-Metal Material Technology Enterprise Company (中國無機非金屬材料科技實業公司). China National Inorganic Non-Metal Material Technology Enterprise Company was established in June 1988 as an enterprise under the State Building Materials Industry Bureau and was one of the parties to a merger in 1996 that resulted in the formation of China Composites (formerly named China National Inorganic Non-Metal Material Technology Corporation (中國無機非金屬材料科技實業總公司) and China National Inorganic Non-Metal Technology Group Company (中國無機材料科技實業集團公司). In 1999, China Composites was separated from the State Building Materials Industry Bureau and transferred to Parent by way of allocation at nil consideration. Immediately before the Reorganization, China Composites was principally managed by Mr. Zhang Dingjin (張定金) and Mr. Xue Jirui (薛繼瑞).

We operate our FRP pipes and tanks business primarily through Zhongfu Lianzhong, a subsidiary of China Composites. Zhongfu Lianzhong was converted from an FRP pipes and tanks factory in Lianyungang, established in October 1989, into a limited liability company in October 1997. In 2003, Parent acquired, through China Composites, a 51% equity interest in Zhongfu Lianzhong by injecting cash into its capital in 2003 and increased its equity interest in Zhongfu Lianzhong to 94.5% in 2005.

We operate our glass fiber mats business through Zhongxin Tianma, a sino-foreign equity joint venture established by Tianma Group, Parent and JM International in December 1995. In 2004, Parent transferred its 40% equity interest in Zhongxin Tianma to China Composites by way of allocation at nil consideration.

Zhongfu Liberty was established by China Composites and CNBM Equipment in December 2003. On February 10, 2004, CNBM Equipment and Liberty Group entered into a share transfer agreement for the transfer of CNBM Equipment's 20% equity interest in Zhongfu Liberty to Liberty Group at a consideration of RMB 10 million. It is principally engaged in the production of glass fiber and composites products.

After a series of share allocations in 1999 and 2002, China Composites acquired from China National Building Material Technology and Equipment Company (中國建材技術裝備公司) and Beijing Zhongbei Glass Industrial Company (北京中北玻璃工業公司) a 16.83% equity interest in Yaohua, a major float glass manufacturer in the PRC, whose shares are listed on the Shanghai Stock Exchange.

***Engineering Services***

We carry out engineering services through China Triumph. China New Building Material Property Development Company (中國新型建築材料房地產開發公司), a wholly-owned subsidiary of Parent, was renamed China Triumph International Engineering Consulting Company (中國凱盛國際工程諮詢公司) and changed its scope of business to the provision of engineering design and construction services in July 2000 and further changed its name to China Triumph International Engineering Company (中國凱盛國際工程公司) in March 2002. China Triumph initially provided its services to glass manufacturers and later extended its services to cement manufacturers through Nanjing Triumph.

ALRMH-CNBM00000092

## HISTORY, REORGANIZATION AND GROUP STRUCTURE

Nanjing Triumph was established by China Triumph and Bengbu Design & Research Institute for Glass Industry (蚌埠玻璃工業設計研究院) on December 26, 2001. Shenzhen Triumph was established by China Triumph, Bengbu Huajin Technology Development Company Limited (蚌埠市華金技術開發有限責任公司) and 13 individuals on April 8, 2002. Bengbu Triumph was established by China Triumph, Shenzhen Triumph and Nanjing Triumph in July 2004. It principally supplies equipment for projects undertaken by China Triumph, Nanjing Triumph and Shenzhen Triumph. Immediately before the Reorganization, China Triumph was principally managed by Mr. Peng Shou (彭壽) and Mr. Shi Chunren (施純仁).

**Reorganization**

In anticipation of the Global Offering, we underwent the Reorganization. The objective of the Reorganization was to position the Company, then a wholly-owned subsidiary of Parent, as the holding company of our cement, lightweight building materials, glass fiber and FRP products and engineering services businesses. Our proposal for the Reorganization was approved by SASAC in November 2004.

Prior to the Reorganization, CNBM Equipment was principally engaged in the import and export business. As part of the Reorganization, (i) CNBM Equipment transferred all of its operations, assets and liabilities to CNBM Trading, a subsidiary of Parent, by way of allocation at nil consideration; and (ii) Parent Group injected into CNBM Equipment all of our current operations, assets and liabilities. We underwent a series of asset and shareholding restructuring, which included the following:

*Cement*

The purpose of the Reorganization included the separation of our NSP cement operations from other operations. The asset restructuring of China United involved the following:

- On September 30, 2004, Parent approved (Zhong Jian Cai Ban Fa [2004] No. 441) the restructuring of China United. The restructuring involved the disposal by China United of assets mainly relating to its mining and vertical kiln cement operations and minority interests in certain cement operations and the capitalization of retained earnings of approximately RMB 9.75 million. As a result, China United was held as to 44.79%, 47.42% and 7.79% by Parent, CNBM Equipment and Hefei Institute, respectively.

- On November 2, 2004, Parent approved the adjustment of the shareholding structure of China United (Zhong Jian Cai Ban Fa [2004] No. 442), under which (a) Parent transferred a 9.9% equity interest in China United to BNBMG; (b) CNBM Equipment transferred its entire 47.42% equity interest in China United to CNBM Trading; and (c) Hefei Institute transferred its entire 7.79% equity interest in China United to Parent. As a result, China United was held as to 42.68%, 47.42% and 9.9% by Parent, CNBM Trading and BNBMG, respectively.

- On December 3, 2004, Parent approved (Zhong Jian Cai ban Fa [2004] No. 514) the transfer of a 90.1% equity interest in China United. Pursuant to the approval, Parent and CNBM Trading transferred their respective entire 42.68% and 47.42% equity interest in China United to CNBM Equipment. As a result, China United was held as to 90.1% by CNBM Equipment.

ALRMH-CNBM00000093

## HISTORY, REORGANIZATION AND GROUP STRUCTURE

- China United retained the assets and liabilities relating to NSP cement production that were held by Lunan Cement (through Luhong), Julong Cement (through Huaihai) and Nanyang Hangtian's Zhenping branch factory (through Nanyang), prior to the Reorganization, as they were the core cement operations of Parent. Other assets and liabilities, including cement operations using the vertical kiln technique and the mining rights in respect of certain limestone and clay quarries, were transferred to Parent by way of allocation at nil consideration. Such assets and liabilities were historically associated with the NSP cement production, but do not form part of the core business.

- China United transferred to Parent Group its 98.55% equity interest in Xinlei as well as minority investment holdings in certain cement operations in Guangxi, Hunan, Hubei, Henan, Gansu, Sichuan, Inner Mongolia Autonomous Region and Heilongjiang by way of allocation at nil consideration. Xinlei is currently principally engaged in the production of cement using the vertical kiln technique.

### *Lightweight Building Materials*

- On December 27, 2004, SASAC issued an approval (Guo Zi Chan Quan [2004] No. 1204) approving, amongst other things, the transfer of BNBMG's 60.33% equity interest in BNBM to CNBM Equipment.

- On January 28, 2005, CSRC issued an opinion (Zheng Jian Gong Si Zi [2005] No. 6) relating to, amongst other things, the waiver from the obligation for CNBM Equipment to make a general offer for the A shares in BNBM, which were listed on the Shenzhen Stock Exchange, as a result of the above transfer.

- On March 24, 2005, registration procedures relating to the transfer of BNBMG's 60.33% equity interest in BNBM to CNBM Equipment were completed. As a result, BNBM was held as to 60.33% by CNBM Equipment and 39.67% by the public.

### *Glass Fiber and FRP Products*

#### *China Fiberglass*

- On December 28, 2004, SASAC issued an approval (Guo Zi Chan Quan [2004] No. 1204) approving, amongst other things, the transfer of BNBMG's 37.79% equity interest in China Fiberglass to CNBM Equipment.

- On January 28, 2005, CSRC issued an opinion (Zheng Jian Gong Si Zi [2005] No. 6) relating to, amongst other things, the waiver from the obligation for CNBM Equipment to make a general offer for the A shares in China Fiberglass, which were listed on the Shanghai Stock Exchange, as a result of the above transfer.

- As part of the Reorganization, (i) BNBMG and CNBM Trading respectively transferred to CNBM Equipment 37.79% and 0.31% equity interests in China Fiberglass by way of allocation at nil consideration; and (ii) CNBM Equipment acquired a 2.07% equity interest from China Fiberglass for a total cash consideration of RMB12,890,000. As a result, China Fiberglass was held as to 40.17% by CNBM Equipment.

ALRMH-CNBM00000094

---

## HISTORY, REORGANIZATION AND GROUP STRUCTURE

---

*China Composites*

- On July 14, 2004, Parent approved (Zhong Jian Cai Ban Fa [2004] No. 283) the transfer of China Composites' equity interests in companies which it does not control, have ceased operation or do not produce its core glass fiber mats and FRP products (including certain glass product manufacturers) to Parent Group at nil consideration.

- On September 8, 2004, Parent approved (Zhong Jian Cai Ban Fa [2004] No. 353) the conversion of China Composites into a limited liability company. Upon completion of the conversion, China Composites was held as to 80% and 20% by CNBM Equipment and Parent, respectively.

- On November 2, 2004, Parent approved (Zhong Jian Cai Ban Fa [2004] No. 444) the transfer of CNBM Equipment's 3% equity interest in China Composites to Parent at nil consideration. As a result of such transfer, China Composites was held as to 77% and 23% by CNBM Equipment and Parent, respectively.

- On December 17, 2004, Parent and China Fiberglass entered into a share transfer agreement for the transfer of Parent's 23% equity interest in China Composites to China Fiberglass. As a result, China Composites was held as to 77% and 23% by CNBM Equipment and China Fiberglass, respectively.

- As part of the Reorganization, China Composites retained the assets and liabilities which form part of its core glass fiber mats and FRP products business. China Composites' equity interests in companies which it does not control, have ceased operation or do not produce its core products were transferred to Parent Group by way of allocation at nil consideration.

*Engineering Services*

- On July 30, 2004, Parent approved (Zhong Jian Cai Ban Fa [2004] No. 282) the transfer of cash of RMB 11 million held by Bengbu Design and Research Institute for Glass Industry, a wholly-owned subsidiary of Parent, to China Triumph, to ensure that China Triumph has sufficient funds to meet its working capital requirement. Such funds were mainly used by China Triumph for purchasing supplies for its engineering services business.

- On September 8, 2004, Parent approved (Zhong Jian Cai Ban Fa [2004] No. 352) the conversion of China Triumph into a limited liability company. Upon completion of the conversion, China Triumph was held as to 91% and 9% by Parent and Bengbu Huajin Technology and Development Company Limited (蚌埠市華金技術開發有限責任公司), respectively.

- On November 2, 2004, Parent approved (Zhong Jian Cai Ban Fa [2004] No. 443) the transfer of Parent's 91% equity interest in China Triumph to CNBM Equipment at nil consideration. As a result, China Triumph was held as to 91% and 9% by CNBM Equipment and Bengbu Huajin Technology and Development Company Limited (蚌埠市華金技術開發有限責任公司), respectively.

ALRMH-CNBM00000095

## HISTORY, REORGANIZATION AND GROUP STRUCTURE

*Properties*

- On January 27, 2005, Beijing Haidian State Land Resources and Housing Management Bureau (北京市海澱區國土資源和房屋管理局) approved the allocation of the land use rights in respect of 11 parcels of land having a total area of approximately 383,906.88 sq.m. from BNBMG to CNBM Equipment.

- On April 18, 2005, Beijing Municipal State Land Resources Bureau (北京市國土資源局) approved the change of the registered owner of the land use rights in respect of 11 parcels of land having a total area of approximately 383,906.88 sq.m. from CNBM Equipment to the Company.

As a result, the Company currently holds, directly and indirectly, the following:

- 96.07% equity interest in China United;

- 60.33% equity interest in BNBM;

- 40.17% equity interest in China Fiberglass;

- 86.24% equity interest in China Composites;

- 91.00% equity interest in China Triumph; and

- land use rights in respect of 11 parcels of land having a total area of approximately 383,906.88 square meters, which is occupied by us for production and office purposes.

**Split Share Structure Reform**

The Company currently holds equity interests directly or indirectly in three public companies listed in the PRC, namely, BNBM, China Fiberglass and Yaohua. As with most other public companies listed in the PRC, these companies had a "split share" structure during the Track Record Period, whereby in addition to freely tradable shares denominated in RMB, or "A shares," listed on the PRC stock exchanges, these companies had also issued non-tradable shares. All of the Company's equity interests in BNBM and China Fiberglass are held in the form of non-tradable shares. All of the Company's equity interests in Yaohua were held in the form of non-tradable shares during the Track Record Period.

On September 4, 2005, the CSRC issued "Administrative Measures on the Split Share Structure Reform of Listed Companies," permitting companies listed in the PRC to eliminate the transfer restrictions placed on their non-tradable shares through a consideration arrangement that balances the interests of holders of non-tradable shares and those of holders of A shares (the "Conversion Scheme"). In accordance with such measures, holders of at least two-thirds of a listed company's non-tradable shares shall have the power to propose and then negotiate a Conversion Scheme with holders of A shares. The Conversion Scheme is then subject to the approval of two-thirds majority of the holders of A shares participating in the vote, two-thirds majority of all shareholders participating in the vote and, in the case of BNBM and China Fiberglass, the SASAC.

— 92 —

ALRMH-CNBM00000096

## HISTORY, REORGANIZATION AND GROUP STRUCTURE

The consideration arrangements under the Conversion Schemes proposed or implemented to date have been primarily in the form of share transfers from holders of non-tradable shares to holders of A shares, and in certain cases supplemented or substituted by other considerations, including, without limitation, payments in cash, issuances of warrants, cancellation of outstanding non-tradable shares, promises of asset injections into listed companies by holders of non-tradable shares, or a combination of the above.

The Company currently holds a 60.33% equity interest, while holders of A shares have a 39.67% equity interest, in BNBM. As at September 30, 2005, BNBM had a net asset value of RMB 1,396.3 million, of which the Group's share of interest amounted to RMB 842.4 million. For the nine months ended September 30, 2005, BNBM generated a net profit of RMB 84.0 million, of which RMB 50.7 million was attributable to the Group. The Company currently has no plan to propose a Conversion Scheme with respect to BNBM prior to the Global Offering. If the Company were to propose a Conversion Scheme with respect to BNBM following the Global Offering, the Company's equity interest in BNBM and/or the Company's asset value may be reduced as a result of the consideration arrangement involved in the Conversion Scheme. If the proposed Conversion Scheme involves only the transfer of non-tradable shares from the Company to holders of A shares of BNBM, the Company's equity interest in BNBM will be reduced. As a result, the Company will incur a one-time disposal charge in the net asset value of BNBM and a recurring reduction of BNBM's income attributable to equity holders of the Company, both in proportion to the non-tradable shares transferred from the Company to the holders of A shares of BNBM. If the Conversion Scheme involves only payment of cash by the Company to the holders of A shares of BNBM, the Company's equity interest in BNBM will not be affected, but the net asset value of the Company will be reduced by the amount of cash paid to the holders of A shares of BNBM. If the Conversion Scheme involves both the transfer of non-tradable shares and the payment of cash the Company will be subject to a combined effect discussed above. It is currently the intention of the Company that it will not propose any Conversion Scheme pursuant to which the Company will not be able to maintain its controlling position in BNBM.

The Company currently holds a 40.17% equity interest, while holders of A shares have a 33.33% equity interest and certain other shareholders hold a 26.50% non-tradable equity interest, in China Fiberglass. As at September 30, 2005, China Fiberglass had a net asset value of RMB 691.0 million, of which the Group's share of interest amounted to RMB 277.6 million. For the nine months ended September 30, 2005, China Fiberglass generated a net profit of RMB 89.0 million, of which RMB 35.8 million was attributable to the Group. The Company currently has no plan to propose a Conversion Scheme with respect to China Fiberglass prior to the Global Offering. If the Company were to propose a Conversion Scheme with respect to China Fiberglass following the Global Offering, the Company's equity interest in China Fiberglass and/or the Company's asset value may be reduced as a result of the consideration arrangement involved in the Conversion Scheme. If the proposed Conversion Scheme involves only the transfer of non-tradable shares from holders of non-tradable shares to holders of A shares of China Fiberglass, the Company's equity interest in China Fiberglass will be reduced. As a result, the Company will incur a one-time disposal charge in its share of the net asset value of China Fiberglass and a recurring reduction of its share of profit of associates from China Fiberglass, both in proportion to the non-tradable shares transferred from the Company to the holders of A shares of China Fiberglass. If the Conversion Scheme involves only a payment of cash by the holders of non-tradable shares to the holders of A shares of China Fiberglass, the Company's equity interest in China Fiberglass will not be affected, but the net asset value of the Company will be reduced by the amount of cash paid by the Company to the holders of A shares of China Fiberglass. If the Conversion Scheme involves both the transfer of non-tradable shares and the payment of cash, the Company will be subject to a combined effect discussed above.

ALRMH-CNBM00000097

## HISTORY, REORGANIZATION AND GROUP STRUCTURE

In the event that either BNBM or China Fiberglass implements a Conversion Scheme following the Global Offering that requires holders of non-tradable shares to pay a consideration in excess of two non-tradable shares for every ten A shares, Parent has agreed to be responsible for the excess consideration payable by the Company.

China Composites held a 16.83% equity interest in the form of non-tradable shares in Yaohua, including a 0.13% equity interest held in the form of a special type of publicly purchased non-tradable shares, during the Track Record Period. The shareholders of Yaohua recently approved and Yaohua implemented a Conversion Scheme whereby each holder of A shares in Yaohua was entitled to receive from holders of non-tradable shares (excluding the special type of public purchased non-tradable shares) of Yaohua 3.5 existing non-tradable shares in respect of every ten existing A shares held, and following which all the non-tradable shares were converted to A shares. The implementation of this Conversion Scheme reduced the Company's total equity interests in Yaohua to approximately 16.26%. As at September 30, 2005, Yaohua had a net asset value of RMB 1,868.3 million, of which the Group's share of interest amounted to RMB 242.1 million. For the nine months ended September 30, 2005, Yaohua generated a net profit of RMB 101.4 million, of which RMB 13.1 million was attributable to the Group.

### Segregation of Certain Liabilities

Immediately prior to disposal of all assets and liabilities by CNBM Equipment to CNBM Trading, CNBM Equipment had certain liabilities of (1) approximately RMB 25.9 million plus accrued interest arising from a bank debt incurred by it prior to such disposal, and (2) RMB 28.0 million plus penalty and accrued interest arising from a legal proceeding against CNBM Equipment prior to the disposal. As part of the Reorganization, these liabilities were transferred to CNBM Trading. However, based on the advice of our PRC legal counsel, we may remain liable if CNBM Trading fails to fulfill its obligations in respect of these transferred liabilities (the "Transferred Liabilities").

CNBM Trading has agreed with us to be responsible for the Transferred Liabilities. In addition, pursuant to an indemnification undertaking, Parent has agreed to indemnify and hold us harmless against all damages that may arise from the Transferred Liabilities. This above-mentioned indemnity includes, without limitation, all payments, costs or expenses arising from the resolution of related claims. See "*Risk Factors — Risks Relating to the Group — Failure by Parent Group to fulfill its obligations to us may have a material adverse effect on our business operations, growth prospects and profitability.*"

We may be liable for the Transferred Liabilities only if: (1) CNBM Trading fails to fulfill its obligations in respect of the Transferred Liabilities; and (2) Parent fails to indemnify and hold us harmless against all damages that may arise from the Transferred Liabilities. As at September 30, 2005, the Transferred Liabilities represented approximately 1.66% (excluding the accrued interest in relation to the bank debt and the penalty and interest in relation to the legal proceeding against CNBM Equipment) of the consolidated net assets of the Company.

ALRMH-CNBM00000098

---

## HISTORY, REORGANIZATION AND GROUP STRUCTURE

---

After the Reorganization, we entered into two debt restructuring agreements with Parent Group on May 16, 2005 and May 20, 2005 to settle certain outstanding amounts due from and to Parent Group. After a series of debt restructuring as provided in the above debt restructuring agreements, a total of approximately RMB 57.3 million due from Parent to us was set off against part of the dividend declared by the Company in favour of Parent. See "*Financial Information — Dividends*", "*Appendix I — Accountants' Report — Note 25. Amounts due from and to related parties*" and "*Appendix VIII — Statutory and General Information — Further Information about the Business — Summary of materials contracts*."

### Establishment of the Company

With Parent, BNBMG, CNBM Trading, Cinda and Building Materials Academy as Promoters, the Company was converted into a joint stock limited company on March 28, 2005. The Company allotted and issued a total of 1,387,760,000 Domestic Shares to the Promoters according to their respective contributions. Parent, BNBMG, CNBM Trading, Cinda and Building Materials Academy contributed by way of assets and cash RMB566,579,600, RMB1,261,969,800, RMB193,440,800, RMB112,000,000 and RMB1,000,000 to the capital of the Company, respectively. As a result, the Company was held as to 26.54%, 59.11%, 9.06%, 5.25% and 0.05% by Parent, BNBMG, CNBM Trading, Cinda and Building Materials Academy, respectively.

To effect the Reorganization, the Company and the Promoters entered into the Reorganization Agreement on March 7, 2006, pursuant to which the Promoters have agreed to indemnify the Company against any claims or costs incurred in connection with or arising from the Reorganization. These are more fully described in "*Connected Transactions — Non-Recurrent Connected Transactions — Reorganization Agreement.*"

Parent retained some of its cement operations as well as certain design and research institutes which provide engineering services to cement and glass manufacturers. To deal with competition between the businesses retained by Parent and our businesses, the Company entered into a Non-Competition Agreement with Parent on February 28, 2006, details of which are set out in "*Relationship with Parent — Competition — Non-Competition Agreement*."

Parent retained certain non-core assets which will continue to provide certain production supplies and support services to our core businesses after the Reorganization. Parent also retained its mining operations in respect of certain limestone and clay quarries. The quarries were not transferred to us as part of the Reorganization because the nature of the mining operations is very different from that of our core business, which is mainly the production and sale of building materials. We have entered into a number of agreements with Parent for these transactions, the terms of which are described in more detail below in the section headed "*Connected Transactions*."

Further details of the Reorganization and subsequent shareholding changes are set out in "*Further Information About the Company — 4. Corporate Reorganization and Subsequent Shareholding Changes*" in Appendix VIII to this prospectus.

ALRMH-CNBM00000099

# HISTORY, REORGANIZATION AND GROUP STRUCTURE

**Group Structure**

The following charts set out the simplified corporate structure of the Group immediately before the Global Offering, assuming no changes in shareholding after the Latest Practicable Date (all percentages shown are approximate figures):



\* Sum of these shareholding percentages may differ from total due to rounding.

ALRMH-CNBM00000100

# HISTORY, REORGANIZATION AND GROUP STRUCTURE



The following chart sets out the simplified corporate structure of the Group immediately after the Global Offering, assuming the Over-allotment Option is not exercised:



* Sum of these shareholding percentages may differ from total due to rounding.

ALRMH-CNBM00000101

# BUSINESS

## OVERVIEW

We are a leading PRC building materials company with significant operations in the cement, lightweight building materials, glass fiber and FRP products and engineering services business segments. Our total revenue was RMB 2,898.1 million in 2004 and RMB 3,334.4 million for the nine months ended September 30, 2005, and our profit attributable to equity holders of the Company for the same periods was RMB 193.1 million and RMB 223.9 million, respectively. We focus on creating long-term corporate value by developing, managing, acquiring and, to a lesser degree, investing in businesses in the building materials industry in the PRC. Our vision is to become a world-class building materials producer.

We believe that the business sectors in which we operate have significant growth opportunities and that we are well positioned to benefit from these opportunities given the scale, scope and market positions of our existing operations, our track record and our government and industry relationships.

The table below summarizes our business segments and the major operating entities in each business segment:

| Business segments | Key products and services | Major operating entities[1] | Direct and indirect equity interests attributable to the Company |
|---|---|---|---|
| Cement . . . . . . . . . . . . . . . . . . | Cement | China United | 96.07% |
| Lightweight building materials. . . . . | Dry wall and ceiling systems | BNBM | 60.33% |
| Glass fiber and FRP products . . . . . | Glass fiber | China Fiberglass | 40.17% |
| | Glass fiber mats and FRP pipes and tanks | China Composites | 86.24%[2] |
| Engineering services . . . . . . . . . . | Design and EPC services: float glass production lines and NSP cement production lines | China Triumph | 91.00% |

_Notes:_

(1)   Each is a direct subsidiary of ours, other than China Fiberglass, which is an associate. See "— _Glass Fiber and FRP Products Segment — Glass Fiber._" Unless otherwise indicated, the reference to our operating results in the glass fiber and FRP products segment does not include those of China Fiberglass.

(2)   Includes a 77% equity interest held directly by the Company and a 23% equity interest held by China Fiberglass.

ALRMH-CNBM00000102

# BUSINESS

The following table sets out, for the periods indicated, the amount and percentage of our total revenue of each of our four business segments:

| | For the year ended December 31, | | | | | | For the nine months ended September 30, | | | |
| | 2002 | | 2003 | | 2004 | | 2004 | | 2005 | |
| | Revenue | % of total | Revenue | % of total | Revenue | % of total | Revenue | % of total | Revenue | % of total |
| | | | | | | | (unaudited) | | | |
| | | | | | (RMB in millions, except for percentages) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Cement. . . . . . . . . . | 560.4 | 33.7 | 611.7 | 33.2 | 778.8 | 26.9 | 533.4 | 27.3 | 889.2 | 26.7 |
| Lightweight building materials . . . . . . . | 1,021.2 | 61.5 | 1,027.9 | 55.7 | 1,482.6 | 51.1 | 1,002.1 | 51.2 | 1,676.9 | 50.3 |
| Glass fiber and FRP products. . . . . . . | 0.9 | 0.0 | 75.1 | 4.0 | 261.3 | 9.0 | 201.6 | 10.3 | 223.9 | 6.7 |
| Engineering services. . . | 79.0 | 4.8 | 145.5 | 7.9 | 465.9 | 16.1 | 295.4 | 15.1 | 592.7 | 17.7 |
| Consolidation adjustment and eliminations . . . | 0.0 | 0.0 | (15.0) | (0.8) | (90.5) | (3.1) | (76.4) | (3.9) | (48.3) | (1.4) |
| Total . . . . . . . . . | 1,661.5 | 100.0 | 1,845.2 | 100.0 | 2,898.1 | 100.0 | 1,956.1 | 100.0 | 3,334.4 | 100.0 |

The following table sets out, for the periods indicated, the amount and percentage of our total operating profit of each of our four business segments:

| | For the year ended December 31, | | | | | | For the nine months ended September 30, | | | |
| | 2002 | | 2003 | | 2004 | | 2004 | | 2005 | |
| | Operating profit | % of total | Operating profit | % of total | Operating profit | % of total | Operating profit | % of total | Operating profit | % of total |
| | | | | | | | (unaudited) | | | |
| | | | | | (RMB in millions, except for percentages) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Cement. . . . . . . . . . | 38.5 | 24.1 | 48.5 | 34.6 | 125.9 | 42.5 | 83.5 | 50.8 | 139.0 | 38.6 |
| Lightweight building materials . . . . . . . | 113.4 | 71.0 | 76.1 | 54.2 | 98.2 | 33.1 | 52.5 | 32.0 | 124.0 | 34.4 |
| Glass fiber and FRP products. . . . . . . | (7.1) | (4.5) | 0.7 | 0.5 | 23.8 | 8.0 | 15.0 | 9.2 | 47.5 | 13.2 |
| Engineering services. . . | 15.0 | 9.4 | 14.9 | 10.7 | 57.4 | 19.4 | 19.1 | 11.6 | 58.7 | 16.3 |
| Company[1]. . . . . . . . | — | — | — | — | — | — | — | — | (6.0)[1] | (1.6) |
| Consolidation adjustment and eliminations . . . | 0.0 | 0.0 | 0.1 | 0.0 | (8.8) | (3.0) | (5.9) | (3.6) | (3.1) | (0.9) |
| Total . . . . . . . . . | 159.8 | 100.0 | 140.3 | 100.0 | 296.5 | 100.0 | 164.2 | 100.0 | 360.1 | 100.0 |

_____

*Note:*

(1)   Consists of administrative expenses incurred by the Company following its establishment in March 2005.

— 99 —

ALRMH-CNBM00000103

## BUSINESS

The map below indicates the locations of our primary production plants and the annual capacities (as at September 30, 2005):



| ■ Cement | Annual Capacity |
|---|---|
| Luhong (Shandong) | 3.87 million tonnes |
| Huaihai (Jiangsu) | 3.43 million tonnes |
| Ziyan (Hebei) | 1.41 million tonnes |
| Nanyang (Henan) | 1.21 million tonnes |
| Zaozhuang Luhong (Shandong) | 1.01 million tonnes |

| △ Gypsum Board | Annual Capacity |
|---|---|
| Tai'an (Shandong) | 101 million sq.m. |
| Zhuozhou (Hebei) | 50 million sq.m. |
| Beijing (Beijing) | 45 million sq.m. |
| Jiangyin (Jiangsu) | 30 million sq.m. |
| Weifang (Shandong) | 30 million sq.m. |
| Zaozhuang (Shandong) | 30 million sq.m. |
| Qinhuangdao (Hebei) | 20 million sq.m. |
| Jingmen (Hubei) | 20 million sq.m. |
| Pizhou (Jiangsu) | 19 million sq.m. |
| Lucheng (Shanxi) | 9 million sq.m. |
| Xuzhou (Jiangsu) | 6 million sq.m. |

| ● Glass Fiber | Annual Capacity |
|---|---|
| Tongxiang (Zhejiang) | 131,500 tonnes |
| Jiujiang (Jiangxi) | 44,500 tonnes |
| Chengdu (Sichuan) | 34,000 tonnes |

Immediately after the Global Offering, the Company will be 63.49%-owned (assuming that the Over-allotment Option is not exercised), directly and indirectly, by Parent. Parent is a SASAC-managed company in the PRC, which manages a wide range of operations in the building materials industry, including building materials manufacturing, machinery and equipment fabrication, production line design, engineering, equipment procurement and construction, product research and development, logistics, wholesale and retail distributions and international trading. Parent assumed ownership of and management responsibility for a majority of the state-owned enterprises and research institutes under the management of the former State Administration of Building Materials Industry, the State Council agency then in charge of China's building materials industry. See "*History, Reorganization and Group Structure*."

***Cement.*** We are a major cement producer in the PRC. We operate five clinker and cement plants with nine production lines in Shandong, Jiangsu, Henan and Hebei provinces. We operated three production lines with an aggregate annual capacity of 3.3 million tonnes throughout 2004 and operated a newly constructed production line with an annual capacity of 1.2 million tonnes from October to December 2004, producing approximately 3.7 million tonnes of cement in the aggregate in the same year. We acquired three additional cement production lines in early 2005 with an aggregate annual capacity of 2.4 million tonnes and we commenced production on two other newly constructed production lines in July 2005 with an aggregate annual capacity of 4.0 million tonnes. As a result, our aggregate annual cement production capacity reached nearly 11.0 million tonnes as at September 30, 2005. Assuming our production lines currently under construction will be completed and ready to commence production on schedule, we expect that our aggregate annual cement production capacity will increase to approximately 13.4 million tonnes by the end of 2006 and

ALRMH-CNBM00000104

## BUSINESS

to approximately 15.8 million tonnes in the second quarter of 2007. We had the largest aggregate cement production capacity as at the end of 2004 and the largest cement sales volume for that year in the Huaihai Economic Zone. The Huaihai Economic Zone spans 20 municipalities in four provinces. It housed approximately 9.4% of the nation's population and recorded a GDP growth rate that was significantly higher than the national average in 2004. See "— *Cement Segment — Production — Planned Expansion.*"

*Lightweight building materials.* The Company's direct subsidiary in the lightweight building materials segment, BNBM, constructed its first gypsum board production line in the early 1980s, and has since developed into a leading supplier of integrated dry wall and ceiling systems in the PRC, providing customers with a wide variety of gypsum boards and related products, including acoustical ceiling panels and lightweight metal frames. In 2004, BNBM sold approximately 41.7 million square meters of gypsum boards, 5.2 million square meters of acoustical ceiling panels and 23,561 tonnes of lightweight metal frames. According to the Quantitative Economics and Audit Society of China Building Materials, BNBM had approximately a 12.7% share of the PRC gypsum board market in 2004 in terms of sales volume among the PRC producers with annual gypsum board sales of at least RMB 5 million. BNBM's position in the PRC gypsum board market has been enhanced by its acquisition of a 42% equity interest in Taihe in April 2005. As measured by sales volume in 2004, Taihe had a market share of approximately 37.9% among the PRC producers with annual gypsum board sales of at least RMB 5 million. It also had the largest gypsum board production capacity in the PRC immediately prior to being acquired by us. As BNBM has gained long-term control of Taihe's board of directors in connection with the acquisition, Taihe became a subsidiary consolidated with BNBM. Similarly, BNBM's position in the PRC acoustical ceiling panels market has been enhanced by its acquisition of a 75% equity interest in Tianfeng in March 2005. Tianfeng was a major producer of acoustical ceiling panels in the Yangtze River Delta area.

*Glass fiber and FRP products.* Our business in the glass fiber and FRP products segment is conducted through the Company's associate, China Fiberglass, and the Company's subsidiary, China Composites. The primary business of China Fiberglass is manufacturing glass fiber and the primary business of China Composites is manufacturing glass fiber mats and FRP pipes and tanks. According to the China Fiber Glass Industry Association, China Fiberglass, in which the Company has an equity interest of 40.17%, was Asia's largest manufacturer of glass fiber in terms of production capacity in 2004. Its output in 2004 accounted for approximately 13.5% and 22.8% of the output of glass fiber in Asia and China, respectively. According to the China FRP Industry Association, China Composites was the second largest FRP pipes and tanks manufacturer in the PRC. It accounted for approximately 5.0% of the PRC's total sales volume in FRP pipes and tanks in 2004, compared to approximately 9.0% and 4.5% by China's largest and third largest manufacturers, respectively. According to the China Fiber Glass Industry Association, China Composites was also one of China's largest glass fiber mats manufacturers in terms of production capacity and the largest glass fiber mats exporter in 2004, accounting for approximately 49.8% of the country's total output and approximately 66.5% of the country's total exports in 2004.

*Engineering services.* We are an international engineering design and EPC (engineering, procurement and construction) services provider in domestic and overseas glass and cement industries. We are also the only PRC engineering firm in the building materials industry that has been named one of the top 200 international design firms by *Engineering News-Record*, an American trade magazine in the construction industry, for three consecutive years since 2002. We are licensed by the relevant PRC government authorities to provide engineering services using the China float glass technology. We have been involved in the design and/or construction of approximately 50% of the float glass production lines in the PRC. In overseas glass industries, we are an active EPC services provider to turn-key production line projects.

ALRMH-CNBM00000105

# BUSINESS

## OPERATING PRINCIPLES

Our aspiration is to build a corporate culture focusing on continuous improvement of our long-term enterprise value. We strive to achieve satisfactory returns to our shareholders. In addition, we also aim to align and satisfy the commercial interests of our other key constituents — management, employees and customers — and the interests of the community in social well-being, environmental protection and resource conservation in order to achieve long-term and sustainable growth. To that end, we are governed by the principles described below.

### *We focus on building our core competence as a leading manufacturer of quality building materials, complemented by engineering services capabilities.*

Our core competence is the manufacturing of quality building materials, complemented by our capabilities in engineering services. We aim to build enterprises that are value-centric institutions as opposed to ones that are scale-centric along our four business segments. As a collective of state-owned assets, we believe that there is a potential to increase the efficiency of our operations by focusing our businesses on a few areas which, we believe, present the best growth opportunities. We are in the process of streamlining the products, services and operations of each of our business segments to target a few selected products, customer groups and regional markets, so as to capitalize on our competitive advantages to strengthen our market-leading positions.

### *We manage potential risks in the PRC's volatile market environment by operating in different business segments and serving different customer bases.*

Operating in four different business segments allows us to better cope with the cyclical nature of China's building materials industry. China's building materials industry is affected by a variety of factors, including shift in market supply and demand, fluctuations in infrastructure projects, volatility in real estate market and changes in governmental policies. Further, some of our business segments, such as cement, are in industries that are characterized by sizable capital investments, intense price competition and heavy reliance on domestic market, and, as a result, are particularly vulnerable to downturns in the PRC's infrastructure investments and real estate developments. We believe that the combination of our four different business segments (which produce different products and serve different customers) has enabled us to reduce the disruptive effects of such downturns on our sales and operations. In addition, we also encourage our business segments to expand in selective developing markets and to develop products or services for the export market in order to reduce our dependence on the domestic market.

### *We emphasize management, operational and financial control of our business segments.*

We recognize that our success is dependent on our ability to develop a strong system to oversee the management, operations and financial performance of our different business segments. We are in the process of implementing a set of operating protocols that require strict authorization and transparent decision-making procedures in each business segment, particularly in relation to capital investments. Since our conversion into a joint-stock company, the individual business segments are not permitted to take on any capital project without due authorization from the senior management of the Company, and in certain circumstances, the

ALRMH-CNBM00000106

# BUSINESS

Board needs to review and approve the market analysis and business plan, as well as the budgeting, forecasting and scheduling for each major capital investment project requested. Upon the completion of a project, an internal audit of the final accounts will be conducted, the result of which will be used as a benchmark for the segment's performance evaluation.

We have developed a set of key operating and financial performance indicators, including revenue, gross margin, operating profit, accounts receivable and inventory turnover, for each of our business segments. Internal audits are conducted regularly to determine the progress against these targets and the results are used to develop our business plans, annual budgets and capital allocation strategies. The compensation of senior management in each business segment directly correlates to these performance results.

***We integrate operations across different business segments by cultivating a uniform corporate culture and implementing strict control procedures at each business segment.***

As we continue to expand and grow our business, we need to achieve seamless integration of our newly acquired or internally developed businesses. Throughout our corporate development history, we have been applying our management experience to integrate operations across different segments by fostering a uniform corporate culture. Our goal is to establish and maintain strong controls by strictly enforcing operational procedures in areas of strategic development, project investment, financial management and performance evaluations at each of our business segments.

## CEMENT SEGMENT

We are a major cement producer in China and we are also the largest cement enterprise, in terms of aggregate production capacity and sales volume in 2004, in the Huaihai Economic Zone. We conduct our cement business through China United, in which we have an effective equity interest of 96.07%.

### Competitive Strengths

***We are the market leader in the Huaihai Economic Zone.***

We are the market leader in the Huaihai Economic Zone in the PRC. The population of the Huaihai Economic Zone was approximately 122.1 million as at the end of 2004, representing 9.4% of the nation's total population. According to the National Bureau of Statistics of China, the 20 municipalities in the Huaihai Economic Zone generated an aggregate GDP of approximately RMB 1.0 trillion in 2004. However, the economic development of the Huaihai Economic Zone still lags behind that of the national average. In 2004, the per capita GDP realized in the Huaihai Economic Zone was only 78.6% of that of the national average. On the other hand, the economy of the Huaihai Economic Zone grew at a rate of 15.4% in 2004, as compared to the national average of 10.1%. Investment in urban fixed assets in the Huaihai Economic Zone grew at a rate of 31.0%, as compared to the national average of 27.6% in 2004.

ALRMH-CNBM00000107

## BUSINESS

We believe we have a competitive advantage over competitors in this area because we are able to capitalize on our economy of scale and have a better ability to lower our production costs. Our Luhong, Huaihai and Zaozhuang Luhong plants had, in aggregate, the largest cement production capacity and sales volume in the Huaihai Economic Zone in 2004. These three plants operated six large-scale NSP production lines with an aggregate production capacity of approximately 8.3 million tonnes per year as at September 30, 2005. Three of these six production lines, with a total annual cement capacity of 5.0 million tonnes, were added in 2005, as a result of the construction of two new production lines and the acquisition of Zaozhuang Luhong. The expansion of our production capacity in the Huaihai Economic Zone allows us to increase our production efficiency and lower our unit labor costs, purchase costs and management costs.

The map below sets out the locations of our plants in the Huaihai Economic Zone:



***We have access to rich deposits of high quality limestone.***

Cement production requires large quantities of limestone. Cement plants generally require access to reliable limestone deposits within a short distance. Our Luhong, Huaihai and Zaozhuang Luhong plants are located in southern Shangdong and northern Jiangsu, an area with some of the richest limestone deposits in the PRC. Each of our cement plants is within a distance of no more than seven kilometers to large quantities of limestone deposits. We have entered into supply contracts with respect to these limestone quarries. See *"Connected Transactions — Non-Exempt Continuing Connected Transactions — Transactions with Parent Group — Master Mineral Supply Agreement."*

ALRMH-CNBM00000108

## BUSINESS

Low-alkali limestone yields low-alkali cement, which is more durable than regular cement. The construction of many important infrastructure projects, such as major bridges, dams and airport runways, requires low-alkali cement. Low-alkali limestone deposits are rare in North China. Not only does our Qingzhou plant possess its own excavation right to a nearby low-alkali limestone quarry, but also our contract with Parent provides our Ziyan plant with a supply of low-alkali limestone from a quarry less than seven kilometers away. We believe such access will allow our Qingzhou and Ziyan plants to compete more effectively.

### *We are well positioned to benefit from a consolidating cement industry in the PRC.*

We believe that we are well positioned to benefit from the current consolidation of the cement industry in the PRC given our experience in acquisition and our relationship with Parent. Parent may, from time to time, identify state-owned cement producers as targets for acquisition and seek to, following their acquisitions, improve their asset quality by restructuring their debt, stripping off their under-performing or unwanted assets (for example, vertical kiln production lines), and enhancing their management and operations. If we identify any such restructured cement producers that, in our judgment, have satisfactory sales networks, sufficient limestone resources and established brands in their respective market, we may acquire them from Parent. We believe this strategy will reduce the costs and risks of our future acquisitions.

In addition, we also have extensive acquisition experience in the PRC cement industry. We believe our own capability in revamping, upgrading and integrating acquired companies will facilitate us to expand through direct acquisition. Therefore, if opportunities arise, we may directly acquire other cement producers.

## Corporate Strategy

### *Strengthen our Market-leading Position in the Huaihai Economic Zone through Expansion.*

We intend to strengthen our position as the market leader and expand our influence in the Huaihai Economic Zone through the construction of new production facilities inside the economic zone and in the surrounding areas. In the Huaihai Economic Zone, we are currently constructing four grinding facilities with an aggregate annual capacity of 3.3 million tonnes of cement in Heze, Shandong (山東省荷澤市), Fuyang, Anhui (安徽省阜陽市), Lianyungang, Jiangsu (江蘇省連雲港市) and Suqian, Jiangsu (江蘇省宿遷市). Adjacent to the west end of the Huaihai Economic Zone, we are extending our market reach into Henan through our Nanyang plant. We are preparing for the construction of a 6,000 tonnes per day clinker production line at our Nanyang plant. Adjacent to the east end of the Huaihai Economic Zone, we are extending our reach into eastern Shandong through the construction of a 6,000 tonnes per day clinker production line and a grinding facility with an annual grinding capacity of 1.0 million tonnes of cement in Qingzhou, Shandong (山東省青州市), and another grinding facility with an annual grinding capacity of 1.0 million tonnes of cement in Qingdao, Shandong (山東省青島市). The completion of these production lines and grinding facilities will be conditional on a number of factors, including our ability to obtain the requisite financing. For further details, see "*Risk Factors — Risks Relating to the Group — We may not be able to obtain external financing in time or on terms acceptable to us for our capital expenditures and other corporate needs, which could limit our ability to grow our business*" and "*Risk Factors — Risks Relating to the Group — The construction of our production facilities may not be completed in the time frame or at the cost levels originally anticipated and, as a result, we may not be able to realize our expected production capacity increases or the full economic benefits.*"

ALRMH-CNBM00000109

# BUSINESS

***Realize Cost Savings by Creating Synergies through Further Management Integration and Centralization and Technological Advancement.***

We aim to integrate and centralize the purchasing, sales and marketing, financial control, and control of capital investments and expansion policies of our various plants to reduce costs and improve efficiency. Our integration and centralization efforts include:

- consolidating and creating coordinated sales, marketing and customer service teams across our plants;

- introducing coordinated supply chain management and centralized purchasing management to reduce our purchasing costs and our working capital requirements;

- introducing centralized project planning and management to reduce project risks, improve project efficiency and lower project costs; and

- streamlining our management structure to reduce operating costs by eliminating redundant functions and departments and by controlling our overall workforce level.

All of our existing clinker production lines, as well as our production lines under construction or to be constructed, use or will use the NSP technology. Our Luhong and Huaihai plants have been operating NSP production lines since the 1980s. In addition, these plants have also conducted multiple technical upgrades on their NSP production lines to increase production capacity and operating efficiency. Through our centralized management and cooperation among our various plants, we intend to leverage the extensive experience of our Luhong and Huaihai plants on the NSP technology to upgrade the technical capabilities of our other plants and shorten the start-up time on our newly constructed NSP production lines.

The PRC government has been promoting the use of industrial waste in the production of the building materials industry since 2001. Our Luhong, Huaihai and Nanyang plants use blast furnace slags and other slags in the production of cement and therefore we are enjoying a preferential income tax treatment. We plan to use blast furnace slags and other slags in the production of cement in our Zaozhuang Luhong and Ziyan plants so that we may enjoy preferential income tax treatment in those two plants as well. See "*Financial Information — Management's Discussion and Analysis of Financial Condition and Results of Operations — Factors Affecting Results of Operations — Income Tax Expense*" and "*Financial Information — Management's Discussion and Analysis of Financial Condition and Results of Operations — Description of Selected Income Statement Line Items — Other Income.*"

***Develop Bulk Sales and Enter into Related Product Areas.***

We believe increasing the ratio of bulk sale cement in our product mix will enhance our profit margins by reducing packaging costs. We also believe that entering into commercial concrete mixing will provide us with an opportunity to achieve vertical integration and improve our market positions. All of our cement production lines have pre-installed bulk sale facilities to handle at least 70% of the cement output. For example, our Huaihai plant has increased its percentage of bulk sale cement from approximately 20.4% in 2001 to 56.1% in 2004. We expect our bulk sales will continue to increase in the near future and anticipate that our packaging costs will be further reduced as a result. In addition, we have also embarked on

ALRMH-CNBM00000110

## BUSINESS

commercial concrete-mixing. We have conducted pilot runs at our facilities in Heze, Shandong (山東省菏澤市) and Jining, Shandong (山東省濟寧市), each equipped with a 400,000 cubic meter commercial concrete-mixing station. Based on the results of these pilot runs, we will increase our output in this downstream business of the cement industry.

***Continue to execute our low-cost expansion strategy through acquiring cement assets in the Huaihai Economic Zone and other selected markets.***

We believe acquisition in a consolidating industry represents a faster and more cost-efficient expansion strategy than the construction of new production lines. The current consolidation in the PRC's cement industry presents us with potential acquisition opportunities. We will actively take on acquisition opportunities where appropriate, including in the Huaihai Economic Zone and other areas in which we operate, to strengthen our market-leading position. Furthermore, we believe that several areas in Central China, South China and North China, including provinces such as Hebei, Hunan and Jiangxi, present growth potential for NSP cement producers in the PRC. We intend to expand into these areas when suitable acquisition opportunities arise. We will continue to leverage our consolidation and integration experience, and, when necessary, capitalize on Parent's ability to serve as our acquisition platform to continue our low-cost acquisition strategy. We aim to take a disciplined approach that is consistent with our corporate operating principles to these acquisitions. We intend to acquire only those NSP cement producers with access to adequate limestone deposits and established sales networks in their local markets.

### Products

Our cement is generally graded according to compression resistant strength after setting for 28 days, which may range from 32.5 to 52.5 million Pascal. In addition to cement, we also sell a small amount of clinker. The table below sets out the percentage of revenues of our cement segment arising from sales of clinker and different grades of cement, for the periods indicated:

| | For the year ended December 31, | | | For the nine months ended September 30, |
|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 |
| | (%) | (%) | (%) | (%) |
| Clinker . . . . . . . . . . . . . . . . . . . . . | 10.0 | 10.7 | 6.4 | 21.9 |
| 32.5-grade cement . . . . . . . . . . . . . . | 55.0 | 58.3 | 54.8 | 55.0 |
| 42.5-grade cement . . . . . . . . . . . . . | 33.2 | 27.1 | 33.8 | 20.3 |
| 52.5-grade cement . . . . . . . . . . . . . | 1.8 | 3.9 | 5.0 | 2.8 |

Clinker sales accounted for a higher percentage of our revenue for the nine months ended September 30, 2005, primarily due to our lack of grinding capacity to process the additional amount of clinker produced by our new production lines.

ALRMH-CNBM00000111

## BUSINESS

### Production

We currently operate, through China United, five clinker and cement production plants, namely, the Luhong plant in Tengzhou, Shandong (山東省滕州市), the Huaihai plant in Xuzhou, Jiangsu (江蘇省徐州市), the Nanyang plant in Nanyang, Henan (河南省南陽市), the Zaozhuang Luhong plant in Zaozhuang, Shandong (山東省棗莊市) and the Ziyan plant in Xingtai, Hebei (河北省邢臺市).

Our Luhong, Huaihai and Zaozhuang Luhong plants are all located within the Huaihai Economic Zone, while our Nanyang plant is located in an area adjacent to the west end of the Huaihai Economic Zone.

In 2004, we acquired a piece of land in Qingzhou, Shandong (山東省青州市), which is adjacent to the east end of the Huaihai Economic Zone, on which we are constructing a new cement plant. The plant is scheduled for completion by the end of 2006.

### *Production Volume*

The table below sets out our cement production output for the periods indicated, by location:

| Plant and location | For the year ended December 31, | | | For the nine months ended September 30, |
|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 |
| | (in thousand tonnes) | | | |
| Luhong (Tengzhou, Shandong) . . . . . . . . . . . | 1,311.7 | 1,420.8 | 2,000.0 | 1,534.4 |
| Huaihai (Xuzhou, Jiangsu) . . . . . . . . . . . . . . | 1,466.3 | 1,600.3 | 1,520.0 | 1,142.8 |
| Nanyang (Nanyang, Henan) . . . . . . . . . . . . . . | — | — | 197.2 | 719.2 |
| Zaozhuang Luhong (Zaozhuang, Shandong) . . . . | — | — | — | 259.5 |
| Ziyan (Xingtai, Hebei). . . . . . . . . . . . . . . . . . | — | — | — | 102.2 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,778.0 | 3,021.1 | 3,717.2 | 3,758.1 |

### *Production Capacity*

All of our clinker production lines employ the NSP technology. The table below sets out the production capacities of our existing plants as at September 30, 2005, by location:

| Plant and location | Our equity interest | Number of production lines | Daily clinker capacity | Annual cement capacity |
|---|---|---|---|---|
| | | | (in tonnes) | (in thousand tonnes) |
| Luhong (Tengzhou, Shandong) . . . . . . . . . . . | 77.2% | 3 | 9,600 | 3,869 |
| Huaihai (Xuzhou, Jiangsu) . . . . . . . . . . . . . . | 85.3% | 2 | 8,500 | 3,426 |
| Nanyang (Nanyang, Henan) . . . . . . . . . . . . . . | 96.1% | 1 | 3,000 | 1,209 |
| Zaozhuang Luhong (Zaozhuang, Shandong) . . . . | 88.1% | 1 | 2,500 | 1,008 |
| Ziyan (Xingtai, Hebei). . . . . . . . . . . . . . . . . . | 65.1% | 2 | 3,500 | 1,411 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 9 | 27,100 | 10,923 |

ALRMH-CNBM00000112

## BUSINESS

The majority of our production capacity was recently added. Three production lines in Luhong, Huaihai and Nanyang with an aggregate daily clinker capacity of 13,000 tonnes, representing an aggregate annual cement capacity of approximately 5.2 million tonnes, were completed in 2004 and 2005. Three additional production lines with an aggregate daily clinker capacity of 6,000 tonnes, representing an aggregate annual cement capacity of approximately 2.4 million tonnes, were added when Zaozhuang Luhong and Ziyan were acquired in April 2005. See "— *Overview — Cement.*"

The table below sets out the status and capacities of our grinding stations in production as at September 30, 2005, by location:

| Plant where a grinding station is installed in/adjacent to | Grinding station location | Our equity interest in the grinding station | Number of grinding facilities | Annual grinding capacity |
|---|---|---|---|---|
| | | | | (in thousand tonnes) |
| Luhong . . . . . . . . . . . . . . . . . . | Tengzhou, Shandong | 77.2% | 4 | 2,000 |
| | Heze, Shandong | 72.9% | 1 | 500 |
| Huaihai . . . . . . . . . . . . . . . . . | Xuzhou, Jiangsu | 85.3% | 2 | 1,600 |
| Nanyang. . . . . . . . . . . . . . . . . | Nanyang, Henan | 96.1% | 2 | 1,250 |
| Zaozhuang Luhong . . . . . . . . . . . | Zaozhuang, Shandong | 88.1% | 2 | 1,000 |
| Ziyan . . . . . . . . . . . . . . . . . . | Xingtai, Hebei | 65.1% | 1 | 360 |
| Total . . . . . . . . . . . . . . . . . . | | | 12 | 6,710 |

Our existing clinker capacity exceeds the aggregate capacity of our grinding facilities. We currently sell our excess clinker to other cement producers. We are currently in the process of constructing seven new grinding facilities with an aggregate capacity of approximately 6.1 million tonnes of cement per year. See "— *Planned Expansion*" for a description of our new grinding facilities.

### Planned Expansion

We are constructing or have plans to shortly begin construction of some clinker production lines and grinding facilities at various locations. The construction of each of the following production lines and grinding facilities has received the requisite governmental approvals in the PRC. The construction of these production lines and grinding facilities is nevertheless contingent on our ability to obtain the requisite financing and other factors. For further details, see "*Risk Factors — Risks Relating to the Group — We may not be able to obtain external financing in time or on terms acceptable to us for our capital expenditures and other corporate needs, which could limit our ability to grow our business*" and "*Risk Factors — Risks Relating to the Group — The construction of our production facilities may not be completed in the time frame or at the cost levels originally anticipated and, as a result, we may not be able to realize our expected production capacity increases or the full economic benefits.*"

ALRMH-CNBM00000113

# BUSINESS

The table below sets out the relevant information of our clinker production lines currently under construction or to be constructed, by location:

| Plant and location | Our equity interest | Daily clinker capacity | Annual cement capacity |
|---|---|---|---|
| | | (in tonnes) | (in thousand tonnes) |
| Qingzhou (Qingzhou, Shandong) . . . . . . . . . . . . . . . . . . . . . . . | 92.3% | 6,000 | 2,418 |
| Nanyang (Nanyang, Henan) . . . . . . . . . . . . . . . . . . . . . . . . . | 96.1% | 6,000 | 2,418 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 12,000 | 4,836 |

Upon completion of our Qingzhou production line, which we expect to be by the end of 2006, and of our Nanyang production line, which we expect to be at the second quarter of 2007, our aggregate annual clinker capacity will be able to support the production of approximately 13.4 million and 15.8 million tonnes of cement per year, respectively.

The table below sets out the status and capacities of our grinding stations under construction or to be constructed, by location:

| Plant where a grinding station is installed in/adjacent to | Location | Our equity interest | Number of grinding facilities | Annual grinding capacity |
|---|---|---|---|---|
| | | | | (in thousand tonnes) |
| Huaihai . . . . . . . . . . . . . . . . . . . | Lianyungang, Jiangsu | 86.4% | 1 | 750 |
| | Fuyang, Anhui | 86.4% | 1 | 750 |
| | Suqian, Jiangsu | 86.4% | 1 | 750 |
| Luhong . . . . . . . . . . . . . . . . . . . | Heze, Shandong | 72.9% | 1 | 1,000 |
| | Qingzhou, Shandong | 92.3% | 1 | 1,000 |
| | Qingdao, Shandong | 90.6% | 1 | 1,000 |
| Ziyan . . . . . . . . . . . . . . . . . . . . | Xingtai, Hebei | 65.1% | 1 | 800 |
| Total . . . . . . . . . . . . . . . . . . . . | | | 7 | 6,050 |

We expect to complete five of these grinding stations by the second quarter of 2006, which will increase our aggregate annual cement grinding capacity to 10.8 million tonnes. We expect to complete the remaining grinding stations by the end of 2006, at which time our aggregate annual cement grinding capacity will be increased to approximately 12.8 million tonnes.

## Raw Materials

Limestone is the primary raw material for clinker production. To produce one tonne of clinker, cement producers in China, including us, generally consume on average approximately 1.3 tonnes of limestone. Due to high freight cost of transporting limestone, each of our cement plants is within a distance of seven kilometers from one or more limestone quarries. Furthermore, our Qingzhou and Ziyan plants are each

ALRMH-CNBM00000114

## BUSINESS

located less than seven kilometers away from a low-alkali limestone quarry. The excavation rights to the limestone quarries which supply our cement plants, other than the excavation rights to quarries supplying our Qingzhou plant, are owned by entities in the Parent Group, and exclusive limestone supply agreements have been entered into between us, Parent and the relevant Parent Group entities for the supply of limestone at market price for our existing and future production needs. See "*Connected Transactions.*" Qingzhou possesses its own excavation right to a nearby limestone quarry. In addition to limestone, we also use, on average, approximately 0.15 tonnes of clay and 0.08 tonnes of other additives to produce one tonne of clinker.

In the Track Record Period, we did not experience any difficulty in obtaining a sufficient supply of limestone and other raw materials, such as clay, fly ash, blast furnace slags and gypsum, for our cement productions.

### Suppliers

The largest supplier accounted for approximately 11.9%, 12.7%, 11.2% and 7.6% and the top five suppliers in the aggregate accounted for approximately 32.9%, 34.6%, 41.8% and 28.2% of the consolidated purchases of our cement segment for 2002, 2003, 2004 and the nine months ended September 30, 2005, respectively. The top five suppliers of our cement segment offered us credit terms of 60 days for the nine months ended September 30, 2005.

Parent holds equity interests of 10.6% in Zaozhuang Gaize Plastic Packing Company Limited and 69.5% in Shandong Gaize Industry Co., Ltd. In 2002 and 2003, our purchases from Zaozhuang Gaize Plastic Packing Company Limited, which was one of the top five suppliers of our cement segment in those years, were RMB 15.5 million and RMB 14.9 million, respectively. In 2002, our purchases from Shandong Gaize Industry Co., Ltd, which was one of the top five suppliers of our cement segment in that year, were RMB 10.9 million. All the other top five suppliers of our cement segment during the Track Record Period were Independent Third Parties.

See "*Financial Information — Management's Discussion and Analysis of Financial Condition and Results of Operations — Factors Affecting Results of Operations — Raw Material Prices*" for further information.

### Sales and Marketing

Our customers are mainly operators of commercial concrete mixing stations, developers of construction projects, and construction companies. Our cement is mainly sold or distributed to these customers through direct sales. As at September 30, 2005, we had, in aggregate, 247 sales staff in our cement segment. Our Luhong, Zaozhuang Luhong and Huaihai plants are in the process of establishing a joint distribution system to coordinate sales in the Huaihai Economic Zone. We intend, subject to market conditions, to add our Nanyang and Qingzhou plants to this sales system. Our Ziyan plant has its own sales network and channels in its own markets.

We provide customer service to our cement clients through our customer service departments.

The largest customer accounted for approximately 3.8%, 5.6%, 4.1% and 4.1% and the top five customers in the aggregate accounted for approximately 15.5%, 18.1%, 15.7% and 15.1% of the consolidated revenue of our cement segment for 2002, 2003, 2004 and the nine months ended September 30, 2005,

ALRMH-CNBM00000115

## BUSINESS

respectively. Hengzhijiu Trade, one of the top five customers of our cement segment in 2002, 2003, 2004 and for the nine months ended September 30, 2005, has a 29.0% equity interest in Hengjiu Concrete, a subsidiary of the Company in which Luhong has a 54.3% equity interest. In 2002, 2003, 2004 and for the nine months ended September 30, 2005, the sales revenues of our cement segment attributable to Hengzhijiu Trade were RMB 16.5 million, RMB 30.5 million, RMB 31.7 million and RMB 36.6 million, respectively. All of the other top five customers of our cement segment during the Track Record Period were Independent Third Parties.

We determine the credit terms applicable to a specific customer of our cement segment based on such factors as prior dealings, financial strength and prevailing market condition. It is the credit policy of our cement segment to offer credit terms of 60 days to customers. For customers who have had at least two years of reliable payment history with us, heads of the sales and accounting divisions of the relevant subsidiary within our cement segment may jointly propose to extend the credit terms applicable to such customers to up to 90 days, subject to the approval of the vice president in charge of sales and the president of such subsidiary. As at September 30, 2005, the turnover of trade receivables of our cement segment was 33 days, largely in line with our customer credit policy. However, as at September 30, 2005, our cement segment had approximately RMB 5.4 million of trade receivables that had been aged in excess of one year, accounting for approximately 4.7% of the total amount of trade receivables of our cement segment. In order to continue to strengthen the collection of our trade receivables in our cement segment, we have implemented, in connection with the Reorganization, a set of uniform customer credit approvals and trade receivable protocols and procedures in our cement segment.

At present, our cement is sold to our customers primarily in packed bags. We expect the proportion of our bulk-sale cement, at approximately 40.4% of total sales volume in 2004, to increase significantly in the near future.

We price our cement and clinker according to market conditions. The table below sets out, for the periods indicated, the Average Realized Sales Prices of our clinker and different grades of cement:

|  | For the year ended December 31, | | | For the nine months ended September 30, |
| --- | --- | --- | --- | --- |
|  | 2002 | 2003 | 2004 | 2005 |
|  | (RMB per tonne) | | | |
| Clinker . . . . . . . . . . . . . . . . . . . . | 145.6 | 137.9 | 154.1 | 152.3 |
| 32.5-grade cement . . . . . . . . . . . . . . | 164.7 | 164.0 | 176.9 | 163.5 |
| 42.5-grade cement . . . . . . . . . . . . . . | 211.1 | 209.6 | 225.4 | 212.5 |
| 52.5-grade cement . . . . . . . . . . . . . . | 263.2 | 240.7 | 265.0 | 256.2 |

We sell our cement using four brands, namely, Julong, Luhong, Ziyan and Hangtian, trademarks of which have been registered since 1986, 1990, 1988, and 1997, respectively.

Given the intense competition in the PRC's cement market, we recognize the importance of advertising and have been promoting our products through advertising in industry newspapers and magazines, such as *China Building Materials Daily*, on cement industry web sites and through the use of billboards. Luhong, Huaihai and Nanyang have also participated in various provincial exhibitions and trade fairs.

ALRMH-CNBM00000116

## BUSINESS

**Competition**

The cement industry is generally a regional industry. It is common for a cement production plant's sales market to be concentrated within a 300-kilometer radius of the plant's location, primarily because cement is heavy, bulky, used in large volumes, expensive to transport and has a short shelf life. As a result, the competitive environment at the locations of our cement plants, in addition to the price and quality of our cement products, determines the competitiveness of our cement plants.

The primary source of competition for low-end users that our cement plants face in the Huaihai Economic Zone is vertical kiln producers. In recent years, our increasing economy of scale has reduced our operating costs, while increasing fuel costs have increased the operating costs of the less fuel-efficient vertical kiln producers. As a result, vertical kiln producers no longer have a cost advantage over us. We expect that there will be increasingly fewer vertical kiln producers in the Huaihai Economic Zone due to the current consolidation cycle in the PRC cement industry. Based on the survey of the China Cement Association, besides us, there are 11 NSP cement producers in the Huaihai Economic Zone. However, each of those NSP cement producers has no more than two NSP production lines with a daily clinker capacity ranging from 1,000 to 5,000 tonnes, except for one NSP production line with a daily clinker capacity of 10,000 tonnes in Xuzhou, Jiangsu (江蘇省徐州市). We intend to compete with these cement producers by leveraging our competitive strengths, including our extensive sales network, our economy of scale, our established brands and our customer services.

## LIGHTWEIGHT BUILDING MATERIALS SEGMENT

We are a leading manufacturer of lightweight building materials in the PRC. We conduct our lightweight building materials business through a subsidiary, BNBM, which is listed on the Shenzhen Stock Exchange. We currently hold a 60.33% equity interest in BNBM. Following BNBM's acquisition of Taihe, we have also become the largest producer of gypsum boards in the PRC.

In April 2005, we completed the acquisition of a 42% equity interest in Taihe, which, according to the China Association of Decorative Building Materials, was the largest PRC manufacturer of gypsum boards in terms of production capacity prior to the acquisition. In 2004, Taihe had a market share of approximately 37.9%, as compared to BNBM's market share of approximately 12.7%, in terms of their respective sales volume among PRC producers with annual gypsum board sales of at least RMB 5 million. In addition, pursuant to the Articles of Association of Taihe, we have the right to nominate four of the seven directors of Taihe.

In March 2005, we completed the acquisition of a 75% equity interest in Tianfeng, a producer of acoustical ceiling panels in the Yangtze River Delta area. According to the China Heat & Sound Insulation Materials Association (中國絕熱隔音材料協會). Tianfeng had a market share of approximately 10.0%, as compared to BNBM's market share of approximately 8.6%, in terms of their respective sales volume of acoustical ceiling panels among all PRC producers in 2004.

ALRMH-CNBM00000117

## BUSINESS

### Competitive Strengths

*We control a substantial market share and we have well-recognized brands and product quality in the PRC gypsum board market.*

After the Taihe acquisition, we became the largest gypsum board manufacturer in the country, with a combined market share of approximately 50.6% in terms of sales volume among PRC producers having an annual gypsum board sales of at least RMB 5 million, based on gypsum boards sold by BNBM and Taihe in 2004.

BNBM is a long-standing gypsum board producer in the PRC. BNBM has the ability to produce gypsum boards that satisfy the ASTM standards of the United States and the BS standards of the United Kingdom and are approved by the independent safety testing company, Underwriter Laboratories Inc., to use the UL marks for import to the U.S. market. According to *China Building Materials Daily*, BNBM's "Dragon" brand is widely recognized as a symbol of quality gypsum boards, and we have leveraged the brand quality to sell other related products in our dry wall and ceiling systems.

Taihe's "Tai Shan" brand gypsum board targets a lower tier of the gypsum board market in the PRC as compared to that targeted by BNBM.

*We have a broad product mix in lightweight building materials and an ability to provide integrated dry wall and ceiling systems.*

We have developed a wide range of gypsum boards to satisfy the diverse needs of our customers. BNBM has developed 13 types of gypsum board products in five different categories that can be produced in a wide range of dimensions to serve the varying and specific needs of its customers, including its super-thick 25 millimeter gypsum boards, moisture and mildew resistant gypsum boards and water and fire resistant gypsum boards. The moisture and mildew resistant gypsum boards and water and fire resistant gypsum boards are covered by the patents licensed exclusively to BNBM from BNBMG. In addition, the acquisition of Taihe has also enhanced our ability to serve a broader base of customers than was possible prior to the acquisition.

In addition to gypsum boards, we produce acoustical ceiling panels and lightweight metal frames. Beside selling these products individually, we market our gypsum boards, acoustical ceiling panels and lightweight metal frames as integrated dry wall and ceiling systems. Our ability to supply all the products in the integrated dry wall and ceiling systems offers our customers a one-stop purchasing option which features compatibility, coordinated delivery and consistent quality. Through integrating and marketing our various products as integrated dry wall and ceiling systems, we believe we have also developed the capability to leverage the brand of our gypsum boards to enhance the sales of other products such as acoustical ceiling panels and lightweight metal frames.

ALRMH-CNBM00000118

## BUSINESS

*BNBM has achieved high efficiency and low cost in gypsum board production.*

BNBM pioneered the production and the application of gypsum boards in the PRC. After assimilating foreign technology, advancing domestic adaptations and optimizing process flow for more than 20 years, we believe BNBM has developed a core technical competence in the production of gypsum boards. BNBM's technical expertise has enabled it to operate large-scale gypsum board production lines at high speeds and low scrap rates. Combining its technical expertise and refinement of its product scheduling aimed to reduce stoppage time, BNBM has achieved capacity utilization rates of almost 100% for its production lines in 2004, as measured on the basis of the standard gypsum boards that are 9.5 millimeter thick. As a result, BNBM was able to lower its unit operating expenses, which represented a substantial part of the production cost, by approximately 22.6% from 2003 to 2004.

## Corporate Strategy

*Strengthen our Market Position through our Synergy with Taihe.*

We intend to take the following measures to integrate the operations of BNBM and Taihe to improve our operating efficiency, competitiveness and market position:

- We intend to capitalize on BNBM's brand recognition and apply BNBM's technical expertise to increase Taihe's profit margins and reduce its costs. As Taihe's "Tai Shan" brand gypsum boards are generally regarded as belonging to a lower tier of the market as compared with BNBM's "Dragon" brand products, BNBM intends to leverage its technical expertise to improve Taihe's gypsum boards and then sell them under BNBM's "Dragon" brand for a higher price. This approach would also allow BNBM's "Dragon" brand to take advantage of Taihe's broad market penetration in northern, eastern and central China. Taihe is currently operating 16 production lines in Tai An, Shandong (山東省泰安市), Jingmen, Hubei (湖北省荊門市), Qinhuangdao, Hebei (河北省秦皇島市), Lucheng, Shanxi (山西省潞城市), Pizhou, Jiangsu (江蘇省邳州市), Weifang, Shandong (山東省濰坊市) and Xuzhou, Jiangsu (江蘇省徐州市) and is conducting trial runs of two newly constructed production lines in Weifang, Shandong and Jiangyin, Jiangsu (江蘇省江陰市).

- We intend to make use of our combined market positions to increase our bargaining power with suppliers, primarily suppliers of liner paper, to enhance profitability.

- We also intend to leverage the combined technical, sales and financial strengths of BNBM and Taihe to jointly construct or relocate production lines to strategic locations in the PRC.

*Streamline the Organizational Structure of BNBM.*

The management structure of BNBM has been undergoing transformation from a production-oriented structure to a market-oriented structure. We have established product divisions at BNBM, including a gypsum board division (which is responsible for both gypsum board and lightweight metal frame products), an acoustical ceiling panel and rock wool division, an external wall board division, a heating units division and a window and door division, based on the functions and applications of the different products. Each division manages its own production plants and operates its own technical support department to integrate sales and production of those products with related functions. The purpose of establishing these product divisions is to strengthen the sales of our principal product categories, namely gypsum boards, acoustical ceiling panels

— 115 —

ALRMH-CNBM00000119

## BUSINESS

and lightweight metal frames, which are marketed either as integrated dry wall and ceiling systems or as stand-alone products, and to improve sales of other categories of products, which include our heating products, PVC building materials, and windows and doors. In addition to the product divisions, BNBM has also formed a purchase department to centralize and coordinate the purchasing functions for all product divisions and a commercial department to centralize and coordinate post sales support, transportation, logistics, accounts receivable and bad debt management functions for all product divisions.

### *Expand Customer Base by Developing New Applications for Residential Structures.*

Historically, our lightweight building materials are used in the construction and renovation of large-scale commercial, industrial or municipal building projects. We intend to strengthen our research and development efforts in the application of lightweight building materials in residential structures to expand our customer base.

### Products

### *Dry Wall and Ceiling Systems*

We produce and sell gypsum boards and related products, such as acoustical ceiling panels and lightweight metal frames. We generally market them as integrated dry wall and ceiling systems to our customers, but our customers also have the option to purchase each product on a stand-alone basis. The table below sets out, for the periods indicated, revenues of the principal products composing our dry wall and ceiling systems, by product categories, and their respective contribution to the total revenue of the lightweight building materials segment:

| | | | | | | | For the nine months ended September 30, | |
|---|---|---|---|---|---|---|---|---|
| | For the year ended December 31, | | | | | | | |
| | 2002 | | 2003 | | 2004 | | 2005 | |
| | Revenue | % of total | Revenue | % of total | Revenue | % of total | Revenue | % of total |
| | (RMB in millions except for percentages) | | | | | | | |
| Gypsum boards . . . . . . . . | 218.9 | 21.4 | 232.3 | 22.6 | 255.2 | 17.2 | 457.0[1] | 27.3 |
| Acoustical ceiling panels . . . | 81.0 | 7.9 | 91.8 | 8.9 | 86.2 | 5.8 | 105.3[2] | 6.3 |
| Lightweight metal frames . . | 111.0 | 10.9 | 126.9 | 12.3 | 134.0 | 9.0 | 122.0 | 7.3 |
| Total . . . . . . . . . . . . . | 410.9 | 40.2 | 451.0 | 43.8 | 475.4 | 32.0 | 684.3 | 40.8 |

*Notes:*

(1)     Includes revenue of RMB 250.8 million from Taihe during the period from May 1, 2005 to September 30, 2005

(2)     Includes revenue of RMB 34.8 million from Tianfeng during the period from April 1, 2005 to September 30, 2005.

ALRMH-CNBM00000120

## BUSINESS

The table below sets out, for the periods indicated, sales volume of the principal products composing our dry wall and ceiling systems:

| | For the year ended December 31, | | | For the nine months ended September 30, |
|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** |
| | (in million m² or in thousand tonnes) | | | |
| Gypsum boards . . . . . . . . | 35.3 | 37.7 | 41.7 | 97.3[1] |
| Acoustical ceiling panels . . | 4.8 | 5.4 | 5.2 | 8.3[2] |
| Lightweight metal frames  . | 19.9 | 22.4 | 23.6 | 20.4 |

_____

*Notes:*

(1)    Includes 64.0 million square meters sold by Taihe from May 1, 2005 to September 30, 2005.

(2)    Includes 4.0 million square meters sold by Tianfeng from April 1, 2005 to September 30, 2005.

***Gypsum boards.*** Gypsum board is the largest product category in terms of revenue in our lightweight building materials segment. Gypsum boards are used in the construction of dry walls and ceilings. We produce, sell and market quality gypsum boards under the "Dragon" brand through the gypsum board division of BNBM and under the "Tai Shan" brand through Taihe. Our "Dragon" brand gypsum boards in general have superior durability, dimensional consistency and stability and have a greater variety of special features such as higher resistance to fire and water as compared to the "Tai Shan" brand. They are generally sold to customers for the construction and renovation of offices, hotels, sports facilities and other national key projects. Our "Tai Shan" brand gypsum boards are sold to a broader base of cost-conscious customers.

BNBM pioneered gypsum board production and application in the PRC and introduced the PRC's first modern production line in the early 1980s from the former West Germany. After more than 20 years of operations, BNBM has developed 13 types of gypsum boards in five different categories that can be produced in a wide range of dimensions. Patents relating to these gypsum boards were retained by BNBMG following the Reorganization but BNBM is exclusively licensed to produce all of BNBMG's patented gypsum boards, which include such special features as resistance to moisture, mildew, water and fire. BNBM has the ability to produce gypsum boards that satisfy both the U.S. ASTM standards and the U.K. BS standards and have been certified to use the UL marks for entry into the U.S. market by the independent safety testing company, Underwriter Laboratories Inc.

In 2004, BNBM sold 41.7 million square meters of "Dragon" brand gypsum boards. According to the Quantitative Economics and Audit Society of China Building Materials, in 2004 BNBM had a market share of approximately 12.7% in terms of sales volume among the gypsum board producers with annual sales of at least RMB 5.0 million, and a market share of approximately 36.0% among the gypsum board producers in the PRC in terms of sales volume of the high-end gypsum boards. For a description of the high-end market, see "*Industry Overview — Lightweight Building Materials — Gypsum Boards.*" In 2004, Taihe sold 124.6 million square meters of "Tai Shan" brand gypsum boards and, according to the Quantitative Economics and Audit Society of China Building Materials, had a market share of approximately 37.9% in terms of sales volume among the producers that sold at least RMB 5 million of gypsum boards in China.

— 117 —

ALRMH-CNBM00000121

## BUSINESS

*Acoustical ceiling panels.* Acoustical ceiling panels are made from blast furnace slag and possess better noise absorption characteristics than most other ceiling materials. BNBM produces over 200 types of acoustical ceiling panels. Prior to the acquisition of Tianfeng, our acoustical ceiling panels represented a market share of approximately 8.6% in 2004 in terms of sales volume among all producers in the PRC.

Tianfeng is a major producer of acoustical ceiling panels in the Yangtze River Delta. In 2004, Tianfeng sold approximately 6.1 million square meters of acoustical ceiling panels in the PRC and abroad and had a market share of 10.0% in terms of sales volume of acoustical ceiling panels among all producers in the PRC.

*Lightweight metal frames.* Lightweight metal frames are used to construct the framework that supports gypsum boards and acoustical ceiling panels in dry wall and ceiling structures. We currently produce regular and "T-bar" metal frames, which are sold either as stand-alone products or as an integrated component of our integrated dry wall and ceiling systems.

*Other related products.* We commenced production of rock wool products in the PRC in the late 1970s. Rock wool is made from melted basalt rock and widely used as a heat insulation or sound absorption material in the construction industry. We market "Dragon" brand rock wool either as a stand-alone product or as an integrated component of our integrated dry wall and ceiling systems. Our rock wool production was suspended between July 2003 and April 2004 during the relocation of our rock wool plant from Beijing to Zhangjiakou, Hebei (河北省張家口市). In 2002, 2003, 2004 and for the nine months ended September 30, 2005, our revenue attributable to rock wool products was RMB 11.5 million, RMB 7.5 million, RMB 6.8 million and RMB 12.6 million, respectively.

We also manufacture and sell interior wall paint under the "Dragon" brand. We market paint either as a stand-alone product or as an integrated component of our integrated dry wall and ceiling systems. In 2002, 2003, 2004 and for the nine months ended September 30, 2005, our revenue attributable to interior wall paint was RMB 12.0 million, RMB 9.9 million, RMB 12.3 million and RMB 8.7 million, respectively.

### Other Businesses

*BND.* BND is currently 80% owned by BNBM and 20% owned by China Fiberglass. We operate several lines of business under BND, including merchandise trading, commercial real estate leasing, retail distribution, and contract decoration services.

BND's merchandise trading business is conducted through BND and one of its subsidiaries. Both as a principal and agent, BND's merchandise trading business provides domestic and overseas customers with a variety of products relating to the building materials industry, including traditional building materials, hardware, wood flooring materials, bathroom fixtures, doors and windows, lighting fixtures, electronics, and sourcing of minerals, chemical products and metallurgic products. In 2002, 2003, 2004 and for the nine months ended September 30, 2005, the revenue of BND's merchandise trading business was RMB 220.6 million, RMB 205.3 million, RMB 432.9 million and RMB 360.8 million, respectively.

BND operates retail stores in Papua New Guinea, selling products including hardware and home appliances. In 2002, 2003, 2004 and for the nine months ended September 30, 2005, its retail business in Papua New Guinea generated a revenue of RMB 40.7 million, RMB 56.1 million, RMB 68.8 million and RMB 71.4 million, respectively.

ALRMH-CNBM00000122

## BUSINESS

From November 2003 and July 2005 BND operated a home appliance, personal electronics and home furnishing retail chain, "E-HOME," in the PRC. In August 2005, BND sold the retail chain to a major PRC retail company. See "*Financial Information — Management's Discussion and Analysis of Financial Condition and Results of Operations — Lightweight Building Materials Segment — Sale of E-HOME Stores.*" In 2003, 2004 and for the seven months ended July 31, 2005, our revenue from E-HOME stores was RMB 3.4 million, RMB 58.7 million and RMB 237.6 million, respectively.

BND has developed and is currently leasing retail spaces in a commercial building in the city of Shenzhen to three major retailers. The gross floor area of this commercial building is approximately 61,767.9 square meters. In 2002, 2003, 2004 and for the nine months ended September 30, 2005, the revenue of BND's commercial real estate business was RMB 8.1 million, RMB 10.7 million, RMB 11.0 million and RMB 11.0 million, respectively.

BND's contract decoration services generated a revenue of RMB 16.0 million, RMB 30.2 million, RMB 73.2 million and RMB 46.0 million, respectively, in 2002, 2003, 2004 and for the nine months ended September 30, 2005.

Our business under BND generally has a high level of revenue but a low profit margin, primarily due to the nature of BND's merchandise trading and retail distribution businesses. In 2002, 2003, 2004 and for the nine months ended September 30, 2005, the total revenue of BND was RMB 285.4 million, RMB 305.6 million, RMB 644.6 million and RMB 726.8 million, respectively, which accounted for 27.9%, 29.7%, 43.5% and 43.3% of the total revenue of the lightweight building materials segment, respectively, but the gross margin of BND for the same periods was 16.7%, 19.9%, 12.5% and 11.7%, respectively.

BND holds a 35.0% equity interest in Shenzhen B&Q and a 17% equity interest in Beijing B&Q, each a home improvement retail joint venture established by B&Q (China) B.V. in the PRC. We use equity method and cost method, respectively, to account for the results of operations of Shenzhen B&Q.

***Steel trading.*** We use cold-pressed steel rolls in connection with our production of lightweight metal frames. Since our suppliers offer us volume discounts, we usually purchase more steel rolls than we need for our own manufacturing activities and re-sell the excess to third parties. In 2002, 2003, 2004 and for the nine months ended September 30, 2005, we generated a revenue of RMB 140.9 million, RMB 93.7 million, RMB 104.6 million and RMB 98.7 million, respectively, from such resale.

***Prefabricated homes.*** We entered into a joint venture with Nippon Steel Corporation, Toyota Motor Corporation and Mitsubishi Corporation in 2002 to conduct the business of prefabricated homes. The resulting joint venture company, BNBM Homes, constructed and sold homes that could be assembled quickly using lightweight steel frameworks, wallboards, ceiling panels and external covers. In 2002, 2003, 2004 and for the nine months ended September 30, 2005, the total revenue generated by our business of prefabricated homes was RMB 21.9 million, RMB 15.3 million, RMB 30.8 million and RMB 29.5 million, respectively.

***Other construction products.*** We are also active in the business of manufacturing and selling other products, including primarily PVC building materials and metal heating radiator units. We generated a revenue of RMB 97.8 million, RMB 83.1 million, RMB 102.1 million and RMB 86.3 million, respectively, from the sale of PVC building materials in 2002, 2003, 2004 and for the nine months ended September 30, 2005, and a revenue of RMB 23.0 million and RMB 11.8 million, respectively, from the sale of metal heating radiator units in 2004 and for the nine months ended September 30, 2005.

ALRMH-CNBM00000123

## BUSINESS

*GRC external wall boards.* In 2004, we started to construct a glassfiber reinforced cement (GRC) external wall board production line using Japanese technology and equipment in Suzhou, Jiangsu. The production line has a design capacity of approximately 1.8 million square meters per year. GRC external wall boards provide an alternative external wall covering material to glass, ceramic tiles, paint and other materials. It has the advantage of high strength-to-weight ratio, good heat insulation and easy installation. The production line is currently undergoing pilot runs.

## Production

### *Gypsum Boards*

BNBM currently operates four gypsum board production lines capable of producing approximately 125 million square meters of gypsum boards in the aggregate per year. Two of BNBM's longest running production lines, both of which are located in Beijing, have been in operation since 1983 and 1997, respectively. These two lines have an aggregate annual capacity of 45 million square meters, and were running at near full capacity in 2004. They produced approximately 40.5 million square meters of gypsum boards, which were equivalent to approximately 44.7 million square meters of the standard gypsum boards that are 9.5 millimeter thick. BNBM commenced production on a third gypsum board production line with an annual capacity of 30 million square meters in September, 2005. This production line was placed in Zaozhuang, Shandong to take advantage of its close proximity to gypsum quarries and liner paper mills. In 2004, BNBM also purchased a gypsum board production line with a design capacity of approximately 50 million square meters from an Indonesian seller and finished installing it in September 2005 in a plant in Zhuozhou, Hebei (河北省涿州市), a city which is located less than 100 kilometers from Beijing. This production line is currently undergoing pilot runs.

Taihe currently has nine gypsum board production lines in operation at its headquarter in Tai'an, Shandong (山東省泰安市), with an aggregate annual capacity of 101.0 million square meters. In addition, it also operates seven production facilities in Jingmen, Hubei (湖北省荆門市), Qinhuangdao, Hebei (河北省秦皇島市), Lucheng, Shanxi (山西省潞城市), Weifang, Shandong (山東省濰坊市), Xuzhou, Jiangsu (江蘇省徐州市) and Pizhou, Jiangsu (江蘇省邳州市) with an aggregate capacity of 84.0 million square meters per year. In addition, Taihe has recently completed the construction of and is running pilot productions on two production lines with an aggregate design capacity of 50.0 million square meters per year in Weifang, Shandong (山東省濰坊市) and Jiangyin, Jiangsu (江蘇省江陰市). Altogether, Taihe has a total of 18 production lines, with an aggregate production capacity of approximately 235 million square meters of gypsum boards per year. Six of the 18 production lines are large scale production lines, each with a design capacity of at least 20 million square meters of gypsum boards per year.

### *Acoustical Ceiling Panels*

Acoustical ceiling panels are manufactured by BNBM's Beijing plant, which has a production line with a design capacity of 8.0 million square meters per year, and by Tianfeng's Suzhou plant which has a production line with a design capacity of 8.0 million square meters per year.

ALRMH-CNBM00000124

## BUSINESS

*Lightweight Metal Frames*

We currently produce lightweight metal frames in three different locations to serve three major markets. Our Beijing plant has 20,000 tonnes of annual production capacity for regular metal frames and 5,000 tonnes of production capacity for "T-bar" metal frames. Our Suzhou plant supplies the Yangtze River Delta and our Guangzhou plant supplies the Pearl River Delta. These two plants have an annual production capacity for lightweight metal frames of 20,000 tonnes and 10,000 tonnes per year, respectively.

*Rock Wool*

We manufactured rock wool in a plant located in Beijing prior to July 2003. The plant was upgraded upon its relocation to Zhangjiakou, Hebei in April 2004. The upgraded plant has a production capacity of 30,000 tonnes per year.

*Paint*

We have a production line in Beijing, which has a design capacity of 20,000 tonnes of paint per year.

**Raw Materials**

During the Track Record Period, BNBM did not experience any difficulty in obtaining a sufficient supply of raw materials discussed below. See "— *Energy Supply*" for a discussion of the use and supply of coal and electricity by the lightweight building materials segment.

*Gypsum Boards*

Gypsum rock accounted for 25.0% and 25.6%, respectively of BNBM's gypsum board production costs in 2004 and for the first nine months of 2005. The price of gypsum rock used by BNBM increased by approximately 15.7% during the Track Record Period. In the Track Record Period, gypsum rock used in BNBM's Beijing plant was primarily purchased from quarries located in Hebei and Shandong, including a gypsum rock quarry owned by us. For the nine months ended September 30, 2005, the gypsum rock used in BNBM's Zaozhuang plant was primarily acquired from a nearby gypsum rock quarry. Gypsum rock accounted for 11.8% of Taihe's production costs for the period from May 1, 2005 to September 30, 2005. Production plants at Taihe's headquarters in Taian used gypsum rock purchased from stable sources nearby. Other product lines all used local gypsum rock resources.

Liner paper accounted for 32.8% and 31.4%, respectively, of BNBM's gypsum board production costs in 2004 and for the first nine months of 2005. During the Track Record Period, BNBM purchased liner paper primarily from two paper mills in Shandong, in one of which we have a minority equity interest. The price of liner paper used by BNBM increased by approximately 10.2% during the Track Record Period. Taihe's headquarters in Tai'an coordinated the purchase of liner paper for all of its production lines. Liner paper accounted for 41.5% of Taihe's gypsum board production cost for the period from May 1, 2005 to September 30, 2005. Taihe has constructed a paper mill with a design capacity of 50,000 tonnes of liner paper per year. As at September 30, 2005, this paper mill was in its pilot production. Upon entering into full production, we expect that Taihe's own paper mill will be able to supply the liner paper required for the production of approximately 100 million square meters of our gypsum boards per year. From May 1, 2005 to September 30, 2005, Taihe primarily purchased liner paper from a paper mill in Shandong that also supplied liner paper to BNBM, and supplemented it by liner paper produced from its own paper mill.

ALRMH-CNBM00000125

## BUSINESS

### *Acoustical Ceiling Panels*

We use blast furnace slag to produce acoustical ceiling panels. Throughout the Track Record Period, our acoustical ceiling panel production did not experience any supply shortage of blast furnace slag, which is a high volume by-product from the steel industries. Each of BNBM's Beijing plant and Tianfeng's Suzhou plant, respectively, sourced its blast furnace slag from a single merchant of such commodity, each an Independent Third Party, during the Track Record Period.

### *Lightweight Metal Frames*

BNBM purchases cold-pressed steel rolls at discounted bulk rates from major PRC steel makers primarily for the production of lightweight metal frames. In addition, BNBM sold approximately 64.1%, 47.0%, 44.8% and 41.9% of the cold-pressed steel rolls that it had purchased to third parties in 2002, 2003, 2004 and for the nine months ended September 30, 2005, respectively. The average price of steel purchased by us increased from RMB 3,696.4 per tonne in 2002 to RMB 4,746.8 per tonne in 2004 and RMB 5,045.8 per tonne for the nine months ended September 30, 2005. Steel rolls accounted for 93.1% and 91.9%, respectively, of the production cost of our light weight metal frames in 2004 and for the first nine months of 2005.

### Suppliers

The largest supplier accounted for 5.7%, 5.7%, 5.3% and 7.2% and the top five suppliers in the aggregate accounted for 23.6%, 21.6%, 19.6% and 21.5% of our total purchases in the lightweight building materials segment in 2002, 2003, 2004 and for the nine months ended September 30, 2005, respectively. Beijing Chemical, one of the top five supplies of our lightweight building materials segment in 2002, 2003 and 2004, has a 45% equity interest in BNBM Plastic, a subsidiary of the Company in which BNBM holds a 55% equity interest. In 2002, 2003 and 2004, our purchases from Beijing Chemical were RMB 42.3 million, RMB 43.7 million and RMB 60.2 million, respectively.

BNBM has a 29.2% equity interest in Tan Cheng Xinxing New Decorative Materials Co., Ltd., which was one of the top five suppliers of our lightweight building materials segment in 2002 and 2003. In 2002 and 2003, our purchases from this company were RMB 44.1 million and RMB 35.1 million, respectively. All the other top five suppliers of our lightweight building materials segment during the Track Record Period were Independent Third Parties. Each of the top five suppliers of BNBM offered BNBM a credit term of 60 days for the nine months ended September 30, 2005.

### Sales and Marketing

### *Sales*

BNBM primarily conducts sales of its gypsum board, acoustical ceiling panels and lightweight metal frames to end users through a network of over 200 dealers. Taihe sells its gypsum board through a network of over 300 dealers. A small number of the dealers in the two networks overlap. During the Track Record Period, over 95% of BNBM's gypsum boards and related products and Taihe's gypsum boards were sold through their respective dealers. Neither BNBM nor Taihe maintains a direct sales team. Direct sales are made only upon requests from our customers.

ALRMH-CNBM00000126

# BUSINESS

The largest customer accounted for 5.2%, 2.9%, 5.3% and 2.2% and the top five customers in the aggregate accounted for 12.9%, 11.6%, 14.4 and 8.8% of the consolidated revenue of our lightweight building materials segment in 2002, 2003, 2004 and for the nine months ended September 30, 2005, respectively.

Parent holds (through BNBMG, its wholly-owned subsidiary) equity interests of:

(i)    50% in Tianjin Development District BNBM Company Limited, one of the top five customers of our lightweight building materials segment in 2002 and 2003;

(ii)   100% in Beijing New Building Material (Group) Company Limited Zhengzhou Subsidiary Company, one of the top five customers of our lightweight building materials segment in 2002; and

(iii)  3% in BNBM Southwest Sales Company Ltd., one of the top five customers of our lightweight building materials segment in 2003 and 2004.

Our sales revenues to Tianjing Development District BNBM Company Limited in 2002 and 2003 were RMB 10.9 million and RMB 15.6 million, respectively, and our sales revenue to Beijing New Building Material (Group) Company Limited Zhengzhou Subsidiary Company was RMB 10.0 million in 2002. Our sales revenue to BNBM Southwest Sales Company Ltd. in 2003 and 2004 was RMB24.8 million and RMB28.0 million, respectively. All the other top five customers of BNBM during the Track Record Period were Independent Third Parties.

We determine the credit terms applicable to a specific customer of our lightweight building materials segment based on such factors as prior dealings, financial strength and prevailing market condition. It is the credit policy of our lightweight building materials segment to offer credit terms of 60 days to customers. As at September 30, 2005, the turnover of trade receivables of our lightweight building materials segment was 61 days, largely in line with our customer credit policy. However, as at September 30, 2005, our lightweight building materials segment had approximately RMB 33.0 million of trade receivables that had been aged in excess of one year, accounting for approximately 7.9% of the total amount of trade receivables of our lightweight building materials segment. This is largely a result of delayed payment by our customers in the construction industry, which tend to pay off our trade receivables at a later stage of a construction project or upon its completion. The fact that we had many product divisions that each controlled its own credit policies at BNBM also contributed to inconsistent collection of trade receivables. In addition, the receivable control policies at the recently acquired Taihe also require further improvement.

We have taken steps to strengthen internal control mechanism for collecting trade receivables at our lightweight building materials segment. In connection with the recent streamlining of the organization structure at BNBM, a commercial department has been formed to centralize trade receivable control and bad debt management for all product divisions of BNBM. See "— *Corporate Strategy — Streamline the Organizational Structure of BNBM.*" Furthermore, we have put in relevant protocols to ensure that vigorous approval procedures are followed to grant any credit terms that exceed 60 days. In general, only for customers who have had at least two years of reliable payment history with us or upon special business occasions, and only upon the joint proposal of the head of the relevant product division and head of the

— 123 —

ALRMH-CNBM00000127

## BUSINESS

commercial department of BNBM, and the approval of vice president in charge of sales of BNBM and the president of BNBM, would any applicable credit terms be extended to up to 90 days. We are also in the process to implementing similar protocols and procedures at Taihe as a part of its integration with BNBM.

*Pricing*

BNBM prices "Dragon" products of gypsum boards, acoustical ceiling panels and lightweight metal frames at the high-end of the market. Taihe's "Tai Shan" brand gypsum boards, on the other hand, are usually priced at the lower end of the market. The following table sets out the average prices of some of our key lightweight building materials products, for the period indicated, by principal product categories:

| | For the year ended December 31, | | | For the nine months ended September 30, |
|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 |
| | (RMB)[1] | | | |
| Dragon brand gypsum boards (per m$^2$) . . . . . . . | 6.2 | 6.2 | 6.1 | 6.2 |
| Tai Shan brand gypsum boards (per m$^2$) . . . . . . | 3.9 | 3.8 | 3.9 | 3.9 |
| Acoustical ceiling panels (per m$^2$) . . . . . . . . . . | 16.8 | 17.0 | 16.5 | 16.5 |
| Lightweight metal frames (per tonne) . . . . . . . . | 5,573.0 | 5,668.0 | 5,687.0 | 5,970.5 |

———————

*Note:*

(1)    Prices exclude VAT and freight.

*Marketing*

For sales and marketing purposes, BNBM currently maintains one subsidiary, one branch and two field offices, staffed with a total of around 40 employees, to coordinate the dealers' sales and marketing activities in the regional markets. Taihe currently has around 120 employees coordinating its sales and marketing activities in approximately 50 field offices. We maintain relationships with our customers, architects, developers and construction contractors in the PRC by providing technical support at both the pre-sale stages and the post-sale stages. Such support is generally provided by our dealers, regional sales offices and branch companies.

## Competition

Our primary competitors are foreign-invested gypsum board producers. In 2004, the aggregate market share of gypsum boards sold by these foreign-invested producers was approximately 17.0% of all gypsum boards sold and 64.0% of high-end gypsum boards produced in the PRC. For a description of the high-end market, see "*Industry Overview — Lightweight Building Materials — Gypsum Boards.*"

ALRMH-CNBM00000128

# BUSINESS

## GLASS FIBER AND FRP PRODUCTS SEGMENT

Our glass fiber and FRP products segment conducts its operations through China Fiberglass and China Composites. China Fiberglass, an associate of the Company, primarily manufactures glass fiber. China Composites manufactures glass fiber mats and FRP pipes and tanks.

## Competitive Strengths

### *We have strong market positions in our core products.*

As at the end of 2004, China Fiberglass was the largest glass fiber producer in Asia and the fifth largest glass fiber producer in the world in terms of production capacity, according to the China Fiber Glass Industry Association. As at December 31, 2004, China Fiberglass had an aggregate annual glass fiber production capacity of 210,000 tonnes. In 2004, its production output accounted for approximately 22.8% of China's national glass fiber output and 21.1% of China's glass fiber exports. China Fiberglass's glass fiber is currently being sold to many countries and regions in America, Europe, Asia, Africa and Middle East. It was the fourth largest glass fiber supplier in the U.S. market in 2004.

As at December 31, 2004, Zhongxin Tianma, a subsidiary of China Composites, was one of the largest glass fiber mats manufacturers in the PRC in terms of production capacity, according to the China Fiber Glass Industry Association. In 1990, the plant that is now operated by Zhongxin Tianma constructed China's first glass fiber mat production line. China Composites currently produces over 100 glass fiber mat products in eight categories. In 2004, China Composites was also the largest exporter of glass fiber mats in China.

In 2004, China Composites was the second largest manufacturer of FRP pipes and tanks in the PRC in terms of both production volume and sales volume, according to the China FRP Industry Association. It had an annual production capacity of 30,000 tonnes and accounted for approximately 5.0% of the total sales volume of FRP pipes and tanks in the PRC in 2004, compared to approximately 9.0% and 4.5% by China's largest and third largest manufacturers, respectively.

### *The Company's associate, China Fiberglass, is one of the most experienced glass fiber producers in the PRC.*

China Fiberglass has the longest operating history among the large-scale glass fiber producers in the PRC. It has developed three major technologies in connection with the design and construction of direct-melt furnaces, including direct-melt furnace for alkali-free glass fiber for up to 60,000 tonnes per year, direct-melt furnace for mid-alkali glass fiber for up to 30,000 tonnes per year and direct-melt furnace that uses scrap glass fiber as feed stock for up to 6,000 tonnes per year. China Fiberglass produces over 200 glass fiber products in eight major product categories ranging from the high-end electronic grade products, mid- to high-end alkali-free products, to corrosion resistant mid-alkali products. In 2003, certain of its chopped strand mats were approved by the *Det Norske Veritas* of Norway for use in marine vessels. In the same year, its woven rovings and gun rovings each received a *Certificate of Approval of a Fibre Reinforcement* from the Lloyd's Register of the United Kingdom.

ALRMH-CNBM00000129

## BUSINESS

### Corporate Strategy

*Improve our Product Mix by Increasing Sales of High Value-added Products.*

We will actively develop high value-added products to improve our glass fiber product mix. Capitalizing on our product quality and strong technical support capabilities, China Fiberglass intends to expand its customer base to users of high value-added glass fiber, such as manufacturers of copper clad laminates, yachts, automobiles, bathroom fixtures and transparent wall boards that are used in large sports facilities and hotels.

While reinforcing our position in filament winding FRP pipes and tanks, our FRP products business will also seek to actively develop high value-added products, such as high-end storage tanks, desulphurization equipment, composite respiratory tanks and fan blades for wind mill power generators.

*Enhance our Product Development, Product Quality and Customer Service to Strengthen our Market Position.*

We plan to continue to improve our production technology, research and development, customer service, management and business development in accordance with international standards. We believe that in an established and mature global market for glass fiber, the success of a glass fiber producer depends on the quality of its products and customer services. We strive to provide our domestic and overseas customers with quality products and first-class customer service and technical support.

While glass fiber produced by PRC manufacturers currently has a large share of the domestic market, high-end glass fiber sales in the PRC are dominated by overseas glass fiber producers. We intend to increase our product development in areas of high-end glass fiber to improve our position in the domestic market.

*Expand our Production Capacity and Increase our Domestic Market Share in Glass Fiber Mats.*

Due to the nature of the technology for the production of glass fiber mats, considerable machine downtime is generally required in connection with product changes. We finished construction of the second production line in Changzhou, Jiangsu (江蘇省常州市) at the end of September, 2005, which we believe will provide us with the needed flexibility in our production management, reduce our downtime between product changes and improve our production efficiency.

We intend to give priority to high-margin and high-growth products, such as glass fiber mats used in copper clad laminates, plastic flooring and carpet tiles, and we plan to begin commercial production of these products in the first quarter of 2006. To the extent such higher-margin but lower-volume products cannot fully utilize the increased capacity provided by our second production line, we plan to increase production of lower- margin but higher-volume products, such as water-proof roofing mats. In 2004 we exported approximately 45% of our glass fiber mat output. However, as the domestic market demand for glass fiber mats has been growing, we intend to focus our promotional effort in the domestic market and increase the production of those products that meet growing domestic market demand.

— 126 —

ALRMH-CNBM00000130

## BUSINESS

### Glass Fiber

Our glass fiber operations are conducted through China Fiberglass, in which the Company directly holds a 40.17% equity interest. China Fiberglass is a public company listed on the Shanghai Stock Exchange. We are currently its single largest shareholder. The public currently holds a 33.33% equity interest in China Fiberglass, while two other promoters that jointly established China Fiberglass with the Company hold the remainder. Four of the six non-independent directors on China Fiberglass's nine-member board, including the chairman, were nominated by the Company. However, the operating results of China Fiberglass are not consolidated with those of the Group and we use equity method to account for China Fiberglass. Unless otherwise stated, any references in this prospectus to the results of operations of our glass fiber and FRP products segment do not include the results of operations of China Fiberglass. Share of profit of associates derived from China Fiberglass accounted for approximately 12.4% and 11.4% of our profit for the year/period in 2004 and for the nine months ended September 30, 2005, respectively.

The table below sets out, for the periods indicated, the results of operations of China Fiberglass, which were prepared in accordance with IFRS:

| | For the year ended December 31, | | | For the nine months ended September 30, |
| --- | --- | --- | --- | --- |
| | 2002 | 2003 | 2004 | 2005 |
| | (RMB in millions) | | | |
| Revenue. . . . . . . . . . . . . . . . . . . . . . . . . . . | 649.0 | 851.0 | 1,143.3 | 1,074.7 |
| Gross profit . . . . . . . . . . . . . . . . . . . . . . | 210.0 | 272.1 | 338.8 | 362.0 |
| Profit before tax and minority interest. . . . . . . . | 35.6 | 131.0 | 187.1 | 192.8 |
| Net profit . . . . . . . . . . . . . . . . . . . . . . . . . | 15.6 | 69.2 | 88.4 | 89.0 |

According to China Fiber Glass Industry Association, China Fiberglass is the largest producer of glass fiber in Asia in terms of production capacity. It produced approximately 92,000 tonnes, 121,336 tonnes, 149,000 tonnes and 158,700 tonnes of glass fiber in 2002, 2003, 2004 and for the nine months ended September 30, 2005, respectively. In 2004, China Fiberglass produced approximately 22.8% of China's total glass fiber output, approximately 21.1% of China's glass fiber exports and approximately 5.4% of the world's total glass fiber output.

### *Products*

China Fiberglass manufactures over 200 types of glass fiber products that range from high-end electronic grade products to low-end mid-alkali products. In addition, not only has it successfully implemented the environmentally friendly alkali-free direct-melt furnace production technology, it is also the leading PRC producer of the glass fiber that acts as a reinforcement in recyclable fiberglass reinforced thermoplastics ("FRTP"). These FRTP products are used in the construction and manufacturing of

ALRMH-CNBM00000131

## BUSINESS

automobiles, houseware, sports equipment, entertainment equipment and airplanes. The table below sets out the average historical price range, cost range and sales volume, for the periods indicated, of each grade of glass fiber China Fiberglass produces:

| | | | Sales volume | | | |
|---|---|---|---|---|---|---|
| | | | For the year ended December 31, | | | For the nine months ended September 30, |
| | Historical price range | Historical cost range | 2002 | 2003 | 2004 | 2005 |
| | (RMB/tonne) | | | | (tonnes) | |
| Electronic grade . . . . . | 9,000-12,000 | 7,000-9,000 | 293 | 744 | 1,473 | 706 |
| Alkali-free grade . . . . . | 6,500-9,000 | 4,000-5,000 | 65,455 | 102,735 | 132,563 | 107,805 |
| Mid-alkali grade . . . . . | 4,500-6,000 | 3,000-4,000 | 10,455 | 11,321 | 16,964 | 31,914 |

### Production Lines and Expansion Plans

China Fiberglass' glass fiber production lines are located in Tongxiang, Zhejiang, Jiujiang, Jiangxi and Chengdu, Sichuan. As at December 31, 2004, it had a total glass fiber production capacity of approximately 210,000 tonnes per year, approximately 165,000 tonnes of which were attributable to the seven alkali-free or mid-alkali production lines that employed the direct-melt furnace process, which was suitable for mass production of glass fiber. China Fiberglass completed a production line in Tongxiang with an annual glass fiber production capacity of approximately 60,000 tonnes in 2004 and another production line in Tongxiang with an annual glass fiber production capacity of approximately 80,000 tonnes in February 2006. Based on a study conducted by the China Fiber Glass Industry Association in 2005, the 60,000-tonne production line was the largest direct melt furnace production line in Asia as at the end of 2004, and the 80,000-tonne production line would be one of the largest direct melt furnace production line in the world upon its completion. China Fiberglass is in the process of building three glass fiber production centers in the PRC in Tongxiang, Zhejiang, Jiujiang, Jiangxi and Chengdu, Sichuan.

### Glass Fiber Mats

We manufacture glass fiber mats through a sino-foreign joint venture, Zhongxin Tianma, in which China Composites holds a 40% interest. China Composites is the largest shareholder of this joint venture. The financial results of this joint venture prior to January 1, 2004 were not consolidated with ours. We entered into an agreement in January 2004 with another shareholder of the joint venture, pursuant to which we obtained the voting rights of two other board seats. As a result, commencing January 1, 2004, we began to consolidate the operating results of this joint venture. The joint venture accounted for approximately 3.1% and 1.3% of our profit attributable to equity holders of the Company in 2004 and for the nine months ended

— 128 —

## BUSINESS

September 30, 2005, respectively. The table below sets out, for the periods indicated, the revenue, gross profit, profit before tax and minority interest and net profit of this joint venture, which were prepared in accordance with IFRS:

| | For the year ended December 31, | For the nine months ended September 30, |
|---|---|---|
| | 2004 | 2005 |
| | (RMB in millions) | |
| Revenue. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 56.4 | 44.0 |
| Gross profit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 17.8 | 14.1 |
| Profit before tax and minority interest. . . . . . . . . . . . . . . . . . . . | 6.1 | 2.9 |
| Net profit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6.1 | 2.9 |

In 2004 and for the nine months ended September 30, 2005, we produced approximately 61.9 million square meters and 47.5 million square meters of glass fiber mats, respectively, as converted to the standard roofing mats of 50 grams per square meter. In 2004, we produced approximately 49.8% of China's total output and 66.5% of China's exports. We currently produce and market approximately 100 types of glass fiber mats in eight categories, namely, roofing mats, PVC plastic flooring mats, anti-corrosion pipe wrap mats, copper clad laminate mats, carpet tile mats, wall-covering mats, FRP surfacing mats and lead acid battery separator mats.

We currently operate a 70 million square meter per year production line located in Changzhou, Jiangsu. We finished construction of a new 70 million square meter per year production line in September, 2005. We are currently conducting pilot productions and anticipate that commercial production will commence on this new production line in the first quarter of 2006. This second production line will markedly reduce our downtime between product changes.

**FRP Pipes and Tanks**

We manufacture FRP pipes and tanks in the PRC and conduct our operations through Zhongfu Lianzhong, a 94.5%-owned subsidiary of China Composites. China Composites acquired a 51% equity interest and a further 43.5% in Zhongfu Lianzhong in June 2003 and May 2005, respectively. Our principal products include municipal water and sewage FRP pipes and industrial FRP pipes, FRP tanks and filament winding FRP non-standard equipment. We constructed China's largest vertical filament winding FRP storage tank to date. We sold approximately 9,467 tonnes, 7,765 tonnes, 11,293 tonnes and 10,368 tonnes of FRP pipes and tanks in 2002, 2003, 2004 and for the nine months ended September 30, 2005, respectively. In 2004, we produced approximately 5.7% of China's output of FRP pipes and tanks.

As at the end of 2004, we had an aggregate annual capacity of approximately 30,000 tonnes of FRP pipes and tanks. The majority of our FRP production facilities are located at Lianyungang, Jiangsu (江蘇省連雲港市) with the remaining located in a few other provinces including Guangdong (廣東省) and Xinjiang (新疆維吾爾族自治區).

ALRMH-CNBM00000133

## BUSINESS

In addition to being a supplier of traditional FRP pipes and tanks for large-scale civil and industrial projects, we are also a supplier of FRP pipes and tanks to domestic nuclear power stations, and a major supplier of gas desulphurization equipment to domestic power plants. In addition, we have extended our filament winding technology to produce carbon fiber respiratory tanks with an aluminum alloy inner shell.

Due to intense competition, prices and profit margins for FRP pipes and tanks have been sliding since 2002. As a result, we have shifted our focus to the development of high value added products, such as carbon fiber respiratory tanks, power plant gas desulphurization equipment and fan blades for wind mill power generators. Small-scale sales have commenced with respect to our power station gas desulphurization equipment and carbon fiber respiratory tanks.

### Liberty TOLI

In December 2004, Zhongfu Liberty, a subsidiary of China Composites, acquired an additional 35% equity interest in Liberty TOLI. The acquisition increased Zhongfu Liberty's equity interest in Liberty TOLI to 60%, making Liberty TOLI a consolidated subsidiary of ours. Liberty TOLI's major product is PVC floor tiles. For the nine months ended September 30, 2005, Liberty TOLI produced 1,030 thousand square meters of PVC floor tiles, generating a revenue of RMB 27.4 million.

### Yaohua

Yaohua is a major float glass producer in the PRC. Its shares are listed on the Shanghai Stock Exchange. China Composites directly held a 16.83% equity interest in Yaohua and held two seats on its 12-member board during the Track Record Period. As a result of the recent securities reform in China, the equity interest of China Composites in Yaohua was decreased to 16.26%. See "*Risk Factors — Risks Relating to the Group — The Company's direct or indirect equity interests in its publicly-listed subsidiaries or associates in the PRC are subject to the recent securities reform in the PRC.*"

### Raw Materials

In 2002, 2003, 2004 and for the nine months ended September 30, 2005, we did not experience any difficulty in obtaining a sufficient supply of raw materials for the production of our glass fiber and FRP products segment.

### Glass Fiber

The primary raw material used in the production of alkali-free glass fiber is phrophyllite powder. China Fiberglass consumed 27,178 tonnes, 26,436 tonnes, 38,085 tonnes and 66,700 tonnes of phrophyllite powder in 2002, 2003, 2004 and for the nine months ended September 30, 2005, respectively, primarily at its Tongxiang and Jiujiang plants. It sourced all of the phrophyllite powder required by its Tongxiang plant and Jiujiang plant at a discount to the prevailing market price from an affiliated phrophyllite quarry operated by a shareholder of Jushi Group, the operating subsidiary of China Fiberglass. Mid-alkali glass fiber is manufactured using primarily quartz sand. China Fiberglass's Chengdu plants purchased quartz sand for the production of mid-alkali glass fiber from various local vendors at the prevailing market price. The price for phrophyllite powder and quartz sand paid by China Fiberglass has been relatively stable during the Track Record Period.

— 130 —

ALRMH-CNBM00000134

## BUSINESS

*Glass Fiber Mats*

Glass fiber and binder are used as base materials in glass fiber mats production. We consumed 2,151 tonnes, 2,554 tonnes, 2,237 tonnes and 1,738 tonnes of glass fiber and 1,033 tonnes, 1,202 tonnes, 1,101 tonnes and 865 tonnes of binder in our glass fiber mats production in 2002, 2003, 2004 and for the nine months ended September 30, 2005, respectively. We purchased approximately 56.0%, 45.2%, 60.7% and 32.2% of the glass fiber for our glass fiber mats production, on a volume basis, from a glass fiber company which is also a shareholder of Zhongxin Tianma in 2002, 2003, 2004 and for the nine months ended September 30, 2005, respectively. We purchased the rest of our glass fiber and binder required for our glass fiber mats production from several other suppliers.

The average price of glass fiber purchased by us for the production of glass fiber mats were RMB 6,890, RMB 6,060, RMB 6,227 and RMB 5,908 per tonne and the average price of binder was RMB 10,680, RMB 10,510, RMB 8,395 and RMB 8,477 per tonne in 2002, 2003, 2004 and for the nine months ended September 30, 2005, respectively.

*FRP Pipes and Tanks*

The principal raw materials used in the production of FRP pipes and tanks are glass fiber reinforcement materials and resins. We consumed approximately 3,010 tonnes, 1,804 tonnes, 4,309 tonnes and 3,528 tonnes of glass fiber reinforcement materials and approximately 3,441 tonnes, 2,058 tonnes, 4,500 tonnes and 3,648 tonnes of resins in our FRP pipes and tanks production in 2002, 2003, 2004 and for the nine months ended September 30, 2005, respectively. We purchased the glass fiber and resins required for FRP pipe and tank production from a variety of suppliers.

**Suppliers**

The largest supplier accounted for approximately 30.7%, 15.0% and 13.3% and the top five suppliers in the aggregate accounted for approximately 89.9%, 51.4% and 46.2% of the total purchases in our glass fiber and FRP products segment (excluding China Fiberglass) in 2003, 2004 and for the nine months ended September 30, 2005, respectively. The top five suppliers of China Composites offered us credit terms of 60 days for the nine months ended September 30, 2005.

The largest supplier accounted for approximately 9.5%, 6.9%, 5.1% and 6.1% and the top five suppliers in the aggregate accounted for approximately 26.5%, 23.2%, 20.4% and 23.1% of the total purchases of China Fiberglass in 2002, 2003, 2004 and for the nine months ended September 30, 2005, respectively. For the nine months ended September 30, 2005, the largest and the fifth largest supplier of China Fiberglass offered it a credit term of 90 days, while the remaining of its top five suppliers required payment for delivery.

Jushi Group, the operating subsidiary of China Fiberglass, was the third largest supplier of our glass fiber and FRP products segment and approximately RMB 14.1 million of the segment's total purchases was attributable to it for the same period. Tianma Group, which holds a 35% equity interest in Zhongxin Tianma, was the fourth and fifth largest supplier of our glass fiber and FRP products segment in 2004 and for the nine

ALRMH-CNBM00000135

## BUSINESS

months ended September 30, 2005, respectively, accounting for approximately RMB 14.8 million and RMB 8.7 million of the segment's total purchases, respectively. All of the other top five suppliers of our glass fiber and FRP products segment and China Fiberglass during the Track Record Period were Independent Third Parties.

### Sales and Marketing

#### Sales

China Fiberglass sells its glass fiber in both the domestic and the international markets. It primarily makes direct sales to its domestic customers, while using a combination of direct sales and dealer distributions to export to its international customers. In 2002, 2003, 2004 and for the nine month ended September 30, 2005, exports accounted for approximately 55.9%, 56.8%, 57.2% and 57.7%, respectively, of its total sales of glass fiber.

In 2002, 2003, 2004 and for the nine months ended September 30, 2005, approximately 100%, 99.2%, 86.4% and 98.9%, respectively, of our revenue from FRP pipes and tanks were generated from domestic sales. On the other hand, we exported a significant proportion of the glass fiber mats produced. In 2002, 2003, 2004 and for the nine months ended September 30, 2005, exports accounted for approximately 49.9%, 56.7% 40.6% and 45.9%, respectively, of our total sales of glass fiber mats.

#### Pricing

Pricing for China Fiberglass' glass fiber products is individually negotiated with each customer based on the prevailing market price and each such customer's requirements regarding volume, delivery, shipping, packaging, product characteristics and payment methods. The Average Realized Sales Price of our glass fiber products was RMB 7,795, RMB 7,296, RMB 7,054 and RMB 6,899 per tonne in 2002, 2003, 2004 and for the nine months ended September 30, 2005, respectively.

The Average Realized Sales Price of our glass fiber mats was RMB 1.23, RMB 1.30, RMB 1.41 and RMB 1.23 per square meter in 2002, 2003, 2004 and for the nine months ended September 30, 2005, respectively.

#### Marketing

Other than distribution through our dealers, our glass fiber products are marketed to our customers through an annual trade fair held by us at Tongxiang, Zhejiang Province, a trade fair that has been held each year in the fourth quarter since 1995. Over 600 participants from over 60 countries and regions took part in the trade fair in November 2005. Orders for the coming year are usually placed by our customers based on the discussions at the trade fair. We do not rely on other active marketing or promotional activities.

From 1995 to 2004, we co-organized each of the annual "China International Composites Industrial Technical Expo," at which we marketed our FRP products to the participants. In addition, we also promoted our FRP products through direct communications with potential customers. As at September 30, 2005, our FRP products were sold through six sales offices with a total staff of 32.

ALRMH-CNBM00000136

## BUSINESS

*Customers*

The largest customer accounted for 16.7%, 13.3% and 7.1% and the top five customers in the aggregate accounted for approximately 43.6%, 33.1% and 24.2% of the total revenue of our glass fiber and FRP products segment in 2003, 2004 and for the nine months ended September 30, 2005, respectively. Japan TOLI, the second largest customer of our glass fiber and FRP products segment for the nine months ended September 30, 2005, holds a 30% equity interest in Liberty TOLI, a subsidiary of China Composites. For the same period, approximately RMB 11.5 million of the total revenue of our glass fiber and FRP products segment was attributable to Japan TOLI. All of the other top five customers of our glass fiber and FRP products segment in 2003, 2004 and for the nine months ended September 30, 2005 were Independent Third Parties. The largest customer accounted for approximately 21.5%, 18.8%, 20.0% and 20.1% and the top five customers in the aggregate accounted for approximately 32.1%, 37.8%, 38.3% and 34.8% of the revenue of China Fiberglass in 2002, 2003, 2004 and for the nine months ended September 30, 2005, respectively. The top customer of China Fiberglass throughout the Track Record Period was Gibson Enterprises, Inc., a U.S. company that has the exclusive right to distribute China Fiberglass' glass fiber products in the United States. Such distributor is also under common control with Surest Finance Limited, a British Virgin Islands company that owns a 25.0% equity interest in Jushi Group, the major operating subsidiary of China Fiberglass that manufactures all of its glass fiber products. Gibson Enterprises, Inc. and Surest Finance Limited are otherwise Independent Third Parties. In addition, the fifth largest customer of China Fiberglass for the nine months ended September 30, 2005 was CNBM Trading, a Promoter of the Company and a wholly-owned subsidiary of Parent. CNBM Trading accounted for RMB 29.5 million of the total revenue of China Fiberglass for such period. All of the other top five customers of China Fiberglass during the Track Record Period were Independent Third Parties.

We determine the credit terms applicable to a specific customer of our glass fiber and FRP products segment based on such factors as our prior dealings with that customer, its financial condition and the prevailing market condition. China Fiberglass generally offers credit terms ranging from 15 to 60 days. For customers of China Fiberglass who have had at least two years of reliable payment history with China Fiberglass, heads of the sales and accounting divisions of the Jushi Group may jointly propose to extend the credit terms applicable to such customers to up to 90 days, subject to the approval of the vice president in charge of sales and the president of such company.

It is the credit policy of China Composites to offer credit terms of 60 days to the customers that purchase glass fiber mats from Zhongxin Tianma, PVC floor tiles from Liberty TOLI and FRP pipes and tanks from Zhongfu Lianzhong. Only for customers that have had at least two years of reliable payment history with us, may the heads of the sales and accounting divisions of Zhongxin Tianma, Liberty TOLI or Zhongfu Lianzhong, as applicable, jointly propose to extend the applicable credit terms to up to 90 days, which are further subject to the approval of the vice president in charge of sales and the president of the company. However, the enforcement of such policy has been inconsistent at Zhongfu Lianzhong. Zhongfu Lianzhong supplies FRP pipes and tanks to municipal projects, large scale petrochemical projects and other infrastructure projects and is frequently required to install the FRP pipes and tanks supplied by it. Although the revenues for the FRP pipes and tanks are generally recognized upon completion of their installation, a part of payments are often not made until after the completion of the entire project, upon which time trial runs can be conducted on the FRP pipes and tanks. In line with industry practice, China Composites have also regularly permitted the customers to withhold a percentage of the total contracted amount, usually 10%, for one to two years following the completion of the installation to cover any defects.

ALRMH-CNBM00000137

## BUSINESS

As at September 30, 2005, China Composites had approximately RMB 36.6 million of trade receivables that had been aged in excess of one year, accounting for approximately 29.2% of the total amount of trade receivables of China Composites. The turnover of trade receivables of China Composites was 141 days as at September 30, 2005.

To improve the turnover of trade receivables at China Composites, we have implemented a new protocol requiring that all trade receivables of Zhongfu Lianzhong be directly monitored and supervised by the auditing department of the Company. In addition, we have requested that rather than permitting its customers to delay a part of payments until after the trial runs, Zhongfu Lianzhong explore other approaches to provide quality assurance to its customers.

### Competition

#### *Glass Fiber*

China Fiberglass competes primarily with two large domestic glass fiber manufacturers in the PRC. As at December 31, 2004, China Fiberglass' annual production capacity was significantly greater than that of either of these two competitors. China Fiberglass competes with them on the basis of scale of operations, product quality and product variety, technology, management and costs. Particularly, China Fiberglass seeks to compete by lowering its costs. In the past, China Fiberglass aimed to achieve cost reduction through improving its production efficiencies. In recent years, China Fiberglass has also been seeking other ways to reduce its costs. For example, China Fiberglass established its Jiujiang plant through an acquisition, which was followed by a technical upgrade using its self-developed technology. The upgrade expanded the annual production capacity of the plant's production line from 6,000 tonnes to 25,000 tonnes of glass fiber. During the process, China Fiberglass achieved a unit production capacity investment cost that was substantially lower than that of building a new direct- melt furnace production line of the same scale. As another example, China Fiberglass established a production base in Chengdu to take advantage of an offer by the local government of a natural gas price that was substantially lower than that of its Tongxiang plant.

In the international market, approximately 67.3% of the world's output was produced by four multinational glass fiber manufacturers in 2004. In the past, China Fiberglass relied on its low-cost basis to compete with these multi-national companies. It intends to increase its research and development efforts to upgrade its products, such that it may also increase its competitive capabilities with respect to the high-value added products.

#### *Glass Fiber Mats*

In both domestic and international markets our glass fiber mats primarily compete with the products of certain global manufacturers. In addition, there has been a rapid increase in the aggregate domestic glass fiber mats production capacity due to the construction of new production lines since the fourth quarter of 2004.

#### *FRP Products*

Our FRP pipes and tanks primarily compete with the products of domestic producers in both the domestic and export markets. In addition, our mass-produced FRP pipes have been used by nuclear power stations for the purposes of circulating cooling water, piping fresh water supply, draining precipitations, desalinizing sea water and exhausting gas.

ALRMH-CNBM00000138

# BUSINESS

## ENGINEERING SERVICES SEGMENT

We are a leading provider of engineering design and EPC (engineering, procurement and construction) services in the glass industry in the PRC and also a major provider of such services in the cement industry in the PRC. Our engineering design and EPC services to overseas projects, primarily in the glass industry, generated approximately 22% of the total revenue of our engineering services segment in 2004. We provide glass engineering services through China Triumph, a 91%-owned subsidiary of the Company. We provide cement engineering services through Nanjing Triumph, a 51.15%-owned subsidiary of China Triumph. In 2004, our glass business produced approximately 74% of the revenue and approximately 90% of the operating profit of our engineering services segment.

## Competitive Strengths

### *We have a large pool of engineering talent and have a strong ability to market and commercialize our technical innovations.*

Our business of engineering services to the glass industry was founded on the technical strength and personnel of the Bengbu Design & Research Institute for Glass Industry (蚌埠玻璃工業設計研究院), which we assumed during a national reform of state-run design and research institutes that commenced in 1999. The Bengbu Design & Research Institute for Glass Industry is a state-run design and research institute with over 50 years history in the PRC's glass industry.

China Triumph is the only PRC engineering firm in the building materials industry that has been named as one of the top 200 international design firms for three consecutive years since 2002 by the *Engineering News-Record*. It was ranked 162 in 2004. We possess Grade-A design certificates issued by the PRC Ministry of Construction in areas of building materials, architectural engineering, environmental engineering and EPC services, which are required for providing engineering design and EPC services both in the domestic market and the overseas markets. We have 34 PRC patents and eight PRC patent applications, as well as 16 self-developed technologies in engineering design and EPC services. See "*Appendix VIII — Statutory and General Information — Further Information about the Business — Intellectual property rights.*" We have a full range of design, technology and equipment procurement capabilities for float glass production lines with a capacity of 180 to 1,000 tonnes of glass melt per day. We also operate the following industry-wide associations:

—   the PRC Glass Development Center, which is jointly established by the United Nations Development Program and the PRC government;

—   the Sheet Glass Thermotechnical Testing Center of China Building Materials Industry;

—   the Standard and Norm Station of Glass and Ceramics;

—   the Quality Supervision and Inspection Center of Containers for Sheet Glass; and

—   the Siliceous Raw Materials Professional Committee of China Non-metallic Minerals Industry Association.

— 135 —

ALRMH-CNBM00000139

## BUSINESS

*We are a leading glass engineering services provider to the PRC glass industry.*

According to the China Architectural and Industrial Glass Association, our technical staff has designed and provided engineering services to approximately 50% of the float glass production lines in the PRC. We have also developed EPC capabilities and are currently involved in turn-key projects for the construction of float glass production lines in both the domestic and the overseas markets. As compared with EPC firms that only focus on project management, our EPC services can be carried out more efficiently and are less prone to technical breakdowns because our EPC capabilities are complemented by our design expertise, which may permit better and tighter coordination between the construction and the design functions within a single organization.

*We have a strong presence in overseas float glass engineering markets.*

We are licensed to employ the China float glass technology by the relevant PRC government authorities. The low cost base of engineering services using the China float glass technology gives us a pricing advantage in the bidding process for EPC projects in the international markets. In addition, we have improved our design and EPC capabilities and are capable of constructing turn-key glass production lines that can produce float glass meeting the Japanese product standards using the China float glass technology. Since 2001, we have completed turn-key glass and cement projects in a number of countries in Southeast Asia, the Middle East and South America. In 2004, we entered into an agreement with an Indonesian party to provide EPC services for a float glass production line in Indonesia with daily capacity of 900 tonnes of glass melt. It will be the fifth EPC project that we have conducted using the China float glass technology and the PRC domestically sourced equipment and according to the China Architectural and Industrial Glass Association, it will be one of the largest and most technologically advanced float glass production line ever constructed by a PRC engineering firm in an overseas market.

## Corporate Strategy

*Enhance our Capabilities for Technical Innovations.*

We recognize that the growth of our engineering services business is dependent on the development and enhancement of our capability for technical innovations. We intend to leverage our internal research and development resources to enhance our core competence and to satisfy the needs of our clients. We have established an equipment development center and a new materials center to help focus our research efforts on energy efficient glass production technology and on production technologies for specialty glass.

We intend to further enhance our technical capabilities through partnerships with international engineering firms and equipment suppliers specializing in certain glass production technologies. We recently entered into a joint venture agreement with Bottero S.p.A. of Italy, a manufacturer of cool-end equipment for glass production lines in 2005. We have also entered into an agreement with Teledo Engineering Co., Inc. of the United States, an engineering firm specializing in smelt furnaces for the establishment of a joint venture in the United States in 2005. In addition, we have entered into agreements with two other international suppliers for the supply of certain equipment, machinery and materials, including with Siemens for the supply of automated equipment and technology and with RHI Glas GmbH of Austria for the supply of refractory materials to us.

ALRMH-CNBM00000140

## BUSINESS

*Maintain Leading Position in the Domestic Market and Increase our Share of Overseas Markets.*

We believe the success of our engineering segment is dependent upon our ability to maintain a leading position in the domestic market and our ability to benefit from the current industry-wide technological upgrade in the PRC glass industry. To that end, we intend to explore opportunities in specialty glass sectors, such as automobile glass, high-end construction glass and electronic grade glass.

We expect to continue our expansion in the overseas markets, capitalizing on our established technology know-how, low-cost base and overseas experience in providing EPC services. We plan to consolidate our existing position in Indonesia, Vietnam and Bangladesh, and to extend our business to Eastern Europe by focusing on exploring market opportunities in those regions.

*Enter into Core Equipment Development and Manufacturing.*

Many of our self-developed technologies were embedded in the design and manufacturing of the core equipment to a float glass production line. In the past, third party equipment fabricators were given access to these technologies because we lacked the capability to manufacture the necessary core equipment for our EPC projects. In order to improve the protection of such technologies, enhance our core competitiveness in the engineering services market and expand our revenue base, we have begun to design and manufacture the core equipment ourselves. Such equipment includes the electronic weighing system, core equipment and automatic-control system of the glass melting section, glass tin bath, glass defect-detecting system, equipment and automatic-control system of cold end cutting section, glass stacking equipment and core equipment of the cement production line.

**Engineering Services**

We have designed or engineered approximately 50% of the float glass production lines in the PRC. Prior to 2001, we primarily operated in the domestic market, providing engineering services relating to the design, planning, engineering supervisory and technical support to the construction and operations of float glass production lines and the provision of certain core equipment. Since 2001, we have also developed an EPC services business for the construction of turn-key glass projects in a number of Southeast Asian, Middle East and South American countries. In 2001, we established a subsidiary, Nanjing Triumph, which focuses on providing engineering services with regard to NSP technology in the cement industry.

Our services to the glass industry and cement industry accounted for approximately 73.6% and 26.4%, and 89.5% and 10.5%, respectively, of our total revenue in the engineering services segment in 2004 and for the nine months ended September 30, 2005.

ALRMH-CNBM00000141

# BUSINESS

The table below sets out, for the periods indicated, the newly contracted amount of our engineering services segment by regions and types:

| | For the year ended December 31, | | | For the nine months ended September 30, |
|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 |
| | (RMB in thousands) | | | |
| **Glass** | | | | |
| *Domestic* | | | | |
| Design | 7,500.0 | 54,230.0 | 55,624.6 | 18,580.0 |
| Equipment procurement | 2,674.0 | 31,606.0 | 20,408.2 | 72,087.7 |
| EPC | — | 1,780.0 | 533,420.0 | 402,236.0 |
| *Overseas* | | | | |
| Design | — | — | — | — |
| Equipment procurement | — | — | — | 936.2 |
| EPC | 128,661.6 | 90,440.0 | 289,239.0 | 96,357.1 |
| **Cement** | | | | |
| *Domestic* | | | | |
| Design | 15,680.0 | 29,540.0 | 15,540.0 | 5,680.0 |
| Equipment procurement | 54,965.0 | 91,088.0 | 72,980.0 | — |
| EPC | — | 302,280.0 | — | — |
| *Overseas* | | | | |
| Design | 800.0 | — | — | 4,500.0 |
| Equipment procurement | — | — | — | — |
| EPC | — | — | — | — |

ALRMH-CNBM00000142

**BUSINESS**

The table below sets out, for the periods indicated, the number of new contracts entered into by our engineering services segment by regions and types:

| | For the year ended December 31, | | | For the nine months ended September 30, |
|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 |
| **Glass** | | | | |
| *Domestic* | | | | |
| Design | 10 | 27 | 32 | 18 |
| Equipment procurement | 6 | 17 | 42 | 48 |
| EPC | — | 1 | 8 | 10 |
| *Overseas* | | | | |
| Design | — | — | — | — |
| Equipment procurement | — | — | — | 5 |
| EPC | 4 | 6 | 8 | 1 |
| **Cement** | | | | |
| *Domestic* | | | | |
| Design | 9 | 12 | 6 | 3 |
| Equipment procurement | 8 | 9 | 6 | — |
| EPC | — | 2 | — | — |
| *Overseas* | | | | |
| Design | 1 | — | — | 1 |
| Equipment procurement | — | — | — | — |
| EPC | — | — | — | — |

**Suppliers**

There are four primary suppliers providing our engineering services segment with machinery and equipment, refractory materials and electrical control systems used in our EPC projects. We did not experience any supply shortage throughout the Track Record Period. The largest supplier accounted for approximately 20.1%, 19.6%, 5.9% and 9.5% and the top five suppliers in the aggregate accounted for approximately 40.0%, 53.9%, 22.6% and 31.8% of our total expenses on equipment, machinery and materials in our engineering services segment in 2002, 2003, 2004 and for the nine months ended September 30, 2005, respectively. Each of the top five suppliers of our engineering services segment offered us a credit term of 60 days for the nine months ended September 30, 2005.

Parent holds an equity interest of 97.9% in Bengbu Huayu Electromechanical Device Company, one of the top five suppliers of our engineering services segment in each of 2002, 2003 and 2004. Our purchases from Bengbu Huayu Electromechanical Device Company were RMB 10.4 million, RMB 19.8 million and RMB 21.0 million, respectively, in 2002, 2003 and 2004. All of the other top five suppliers for our engineering services segment during the Track Record Period were Independent Third Parties.

— 139 —

ALRMH-CNBM00000143

# BUSINESS

## Sales and Marketing

### Sales

Our engineering services segment provides design, equipment procurement and EPC services in both the domestic and overseas markets. The table below sets out, for the periods indicated, the sales of our engineering services segment, by regions and types of services provided:

| Region | For the year ended December 31, | | | For the nine months ended September 30, |
|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 |
| | (RMB in thousands) | | | |
| **Glass** | | | | |
| *Domestic* | | | | |
| Design | 4,900.0 | 3,900.0 | 3,100.0 | 633.0 |
| Equipment procurement | 50,700.0 | 3,500.0 | 10,000.0 | 208,083.0 |
| EPC | 10,350.0 | 27,196.0 | 226,976.0 | 22,434.0 |
| *Overseas* | | | | |
| Design | — | — | — | — |
| Equipment procurement | — | — | — | — |
| EPC | — | 45,900.0 | 102,800.0 | 299,090.0 |
| **Cement** | | | | |
| *Domestic* | | | | |
| Design | 13,000.0 | 8,000.0 | 20,000.0 | 13,276.0 |
| Equipment procurement | — | 57,000.0 | 103,000.0 | 49,250.0 |
| EPC | — | — | — | — |
| *Overseas* | | | | |
| Design | — | — | — | — |
| Equipment procurement | — | — | — | — |
| EPC | — | — | — | — |

### Pricing

Pricing for our engineering services projects is generally determined through a bidding process or individually negotiated with the customers, based on our cost and the prevailing market prices for similar projects. We estimate that the cost base of our EPC projects is lower than those projects that use other prevailing float glass technologies in the world because most of the equipment used by the production lines employing the China float glass technology can be sourced at a lower cost in the PRC domestic market. We believe our low-cost equipment, together with other cost savings resulting from our cost control measures, generally permits us to bid for projects at competitive prices while maintaining a reasonable profit margin.

ALRMH-CNBM00000144

## BUSINESS

The design contracts entered into by our engineering services segment generally require the customers to make full payments upon delivery of service. In contrast, our equipment procurement and EPC contracts generally require the customers to make payments along the process of a project, including a prepayment at the inception, a number of customized milestone payments upon completion of certain stages of the project and a final payment typically made a year following the completion of the project. Each of the prepayment, milestone payments and final payment on average contributes to approximately 30%, 60% and 10%, respectively, of the total payment under our typical EPC contracts and approximately 10%, 85% and 5%, respectively, of the total payment under our typical equipment procurement contracts. The duration of our design projects typically ranges from six months to one year. The duration of our EPC projects typically ranges from one year to two years. The duration of our equipment procurement projects typically ranges from several days to six months depending on the types of equipment to be procured.

### *Marketing*

We market our services primarily at domestic and international trade shows and expositions in the glass industry. We established a representative office in Vietnam to provide customer services to our existing clients and to liaise with potential clients and we expect to establish additional offices in important overseas markets in the future. The marketing expenses of our engineering services segment were approximately RMB 5.0 million and RMB 4.2 million in 2004 and for the nine months ended September 30, 2005, respectively.

### *Customers*

The largest customer accounted for approximately 67.3%, 25.1%, 22.0% and 25.4% and the top five customers in the aggregate accounted for approximately 93.5%, 48.1%, 58.3% and 69.6% of the consolidated revenue of our engineering services segment in 2002, 2003, 2004 and for the nine months ended September 30, 2005, respectively. All the top five customers of our engineering services segment during the Track Record Period were Independent Third Parties. Our engineering services segment conducts a small number of projects within a specific time period, and as a result, may have a high concentration of customers in terms of revenue within a specific period of time.

Our engineering segment generally offers its customers credit terms of 60 days. However, we regularly permit our customers to withhold a percentage of the total contracted amount for a period of time, typically one year, following the recognition of the related revenue by us to cover any defects. For a description of the milestone payments, see "— *Pricing*." As at September 30, 2005, the turnover of trade receivables of our engineering services segment was 43 days, largely in line with our customer credit policy. However, as at September 30, 2005, our engineering services segment had approximately RMB 9.8 million of trade receivables that had been aged in excess of one year, accounting for approximately 6.2% of the total amount of trade receivables of our engineering services segment. The credit term offered in connection with each project undertaken by our engineering services segment is subject to the approval of the general manager of China Triumph.

ALRMH-CNBM00000145

# BUSINESS

## Competition

We compete primarily against two large research and design institutes in the domestic glass industry. We believe we have a competitive advantage over these two research and design institutes primarily due to our technical strength, our market share and our experience. In the overseas markets, we primarily compete with a few established international engineering firms in France and the United States. Because our China float glass technology is capable of producing glass products which meet the Japanese Industrial Standard and that we have a low-cost base, we believe that we have a competitive advantage over the international engineering firms in the PRC market and certain Southeast Asian markets such as Vietnam and Indonesia.

In the domestic cement industry, our engineering services business competes against two well-established research and design institutes. Because of its market-oriented organizational structure, Nanjing Triumph, despite a new comer to the industry, was still able to grow its business during the Track Record Period. From its establishment at the end of 2001 to the end of 2004, Nanjing Triumph designed approximately 9.3% of the PRC's large-scale NSP production lines with daily clinker capacity of at least 4,000 tonnes.

## ENERGY SUPPLY

Production of cement and gypsum boards is heavily dependent on the reliable supply of coal and electricity. Interruption in the supply of such energy sources can lead to reduced levels of production and lower production yields. See "*Financial Information — Management's Discussion and Analysis of Financial Condition and Results of Operations — Factors Affecting Results of Operations — Fuel and Power Prices.*" We did not experience any material impact on our production due to interruption of supply of energy sources during the Track Record Period.

## Coal

A coal mine in Shandong was our largest supplier of coal to our cement segment during the Track Record Period. We also purchased coal from a number of other coal mines for our cement segment. BNBM has been sourcing substantially all of its coal from a single coal mine in Baotou, Inner Mongolia, which is located about 700 kilometers from Beijing, under a contract that is renewed annually. Taihe purchased coal from stable sources since its acquisition by us on April 28, 2005. We did not experience any stoppage or reduction in production due to interruption in coal supply during the Track Record Period.

See "*Financial Information — Management's Discussion and Analysis of Financial Condition and Results of Operations — Factors Affecting Results of Operations — Fuel and Power Prices*" for detailed description of our energy cost during the Track Record Period. See "*Risk Factors — Risks Relating to the Building Materials Industry in the PRC — Increases in energy and fuel costs could have a material adverse effect on our business, financial condition and results of operations.*"

## Electricity

Our cement and lightweight building materials business did not experience any stoppage or reduction in production due to interruption in electricity supply during the Track Record Period. Our cement segment mainly purchases electricity from the East China Grid during the Track Record Period. To reduce our reliance on the power grid and to reduce our energy cost, our Huihai plant is planning to construct a power generator

ALRMH-CNBM00000146

## BUSINESS

that utilizes residual heat from our cement production to generate power. This power generator, scheduled to be completed in December 2006, is designed to supply Huaihai with 72.6 million kWh of electricity per year. Our lightweight building materials business purchases the required electricity primarily from the North China Grid during the Track Record Period. Taihe purchases its electricity primarily from the East China and North China Grid. China composites purchases its electricity primarily from the East China Grid.

See "*Financial Information — Management's Discussion and Analysis of Financial Condition and Results of Operations — Factors Affecting Results of Operations — Fuel and Power Prices*" for a description of our energy cost during the Track Record Period. See also "*Risk Factors — Risks Relating to the Building Materials Industry in the PRC — Increases in energy and fuel costs could have a material adverse effect on our business, financial condition and results of operations.*"

### CUSTOMERS AND SUPPLIERS

The largest customer, which was different for each period, accounted for approximately 3.2%, 2.0%, 3.5% and 4.5%, and our top five customers in the aggregate accounted for approximately 11.2%, 8.7%, 11.5% and 12.9% of the Group's consolidated revenue in 2002, 2003, 2004 and for the nine months ended September 30, 2005, respectively.

The largest supplier, which supplied either coal or power, accounted for approximately 3.8%, 3.8%, 2.9% and 3.7% and our top five suppliers in the aggregate accounted for approximately 17.7%, 16.1%, 12.4% and 12.3% of the Group's consolidated purchases in 2002, 2003, 2004 and for the nine months ended September 30, 2005, respectively.

Except for Hengzhijiu Trade in 2003, all of the other top five customers of the Group throughout the Track Record Period were Independent Third Parties.

Except for Beijing Chemical in 2002, 2003 and 2004 and Tan Cheng Xinxing New Decorative Materials Co., Ltd. in 2002, all the other top five suppliers of the Group throughout the Track Record Period were Independent Third Parties.

For a discussion of our purchases or sales revenues attributable to these related suppliers or customers during the Track Record Period, see "*— Cement Segment — Suppliers,*" "*— Cement Segment — Sales and Marketing,*" "*— Lightweight Building Materials Segment — Suppliers*" and "*— Engineering Services Segment — Suppliers.*"

### QUALITY CONTROL

Quality control is an important part of our production process. As at September 30, 2005, the quality control divisions of our cement, lightweight building materials, glass fiber and FRP products and engineering services segments employed 215, 175, 21 and 12 employees, respectively. China Fiberglass employed 64 employees in its quality control division as at September 30, 2005. These employees are responsible for quality inspections throughout the production or engineering processes. All raw materials, semi-finished products and final products are subject to sampling and quality inspection before each stage of processing. Our engineering services segment operates a quality control division that is responsible for monitoring the quality of project management in both the PRC and overseas as well as the quality of the contractors involved in the projects.

ALRMH-CNBM00000147

# BUSINESS

We have also implemented certain quality control standards established by the International Organization for Standardization ("ISO"). We have received various ISO 9000 series accreditations for our quality control systems in the four segments that we have significant operations, namely the cement, lightweight building materials, glass fiber and FRP products, and engineering services segments.

## RESEARCH AND DEVELOPMENT

Our research and development efforts are primarily conducted by the technology departments or the research and development centers at our individual business segments.

Specifically, in the cement segment, research and development is primarily conducted by the technology departments at the individual production plants. Our technology office provides project and technology management support for China United. In the lightweight building materials segment, the technology centers of BNBM and Taihe are responsible for long-term technology development, product upgrades and improvements and the engineers and mechanics in each production plant conduct technology management and improvement, for the routine production and sales process. In the glass fiber and FRP products segment, research and development is conducted by the research and development centers and technology departments affiliated with either China Fiberglass, China Composites or their respective subsidiaries. The research and development center under China Triumph is responsible for substantially all of the research and development activities in the engineering services segment. In addition, we also collaborate with universities to conduct other research and development activities.

In 2002, 2003, 2004 and for the nine months ended September 30, 2005, our research and development expenses were approximately RMB 7.5 million, RMB 10.5 million, RMB 10.2 million and RMB 5.3 million, respectively, and as at September 30, 2005, we had 52, 98, 50 and 54 full-time employees in our cement, lightweight building materials, glass fiber and FRP products (excluding China Fiberglass) and engineering services segments, respectively, dedicated to research and development. China Fiber Glass' research and development expenses were RMB 8.9 million, RMB 13.2 million, RMB 18.9 million and RMB 21.0 million in 2002, 2003, 2004 and for the nine months ended September 30, 2005, respectively, and as at September 30, 2005, it had 16 full-time employees dedicated to research and development.

The Company does not plan to deviate from its practice described above in terms of the amount of resources dedicated to research and development. We have been granted and have filed applications for a number of patents in the PRC. See "*Appendix VIII — Statutory and General Information — Further Information about the Business — Intellectual property rights*."

## ENVIRONMENTAL MATTERS

We are subject to the national environmental laws of the PRC, the regulations of the State Council issued thereunder and the environmental rules promulgated by the local governments in whose jurisdictions our plants are located. These include regulations on air pollution, water pollution, noise emission and solid waste discharge. The State Environmental Protection Administration sets national discharge standards for various pollutants and local environmental protection bureaus may set stricter local standards. Enterprises are required to comply with the stricter of the two applicable standards. The central and local government provide schedules of base-level discharge fees for various polluting substances and if such levels are exceeded, the polluting entity will be required to pay excess discharge fees. Local governments are also authorized to issue orders to stop or reduce discharges in excess of the base levels.

ALRMH-CNBM00000148

# BUSINESS

Each of our production plants, prior to its construction, is required to be evaluated for its environmental impact and when commissioned, is required to be tested and approved by local environmental agencies, and is subject to continuous government monitoring thereafter.

We aim to develop our business without compromising environmental protection. We have obtained governmental certificates regarding our compliance with the environmental laws and regulations for our major production plants. We were not punished or reprimanded for violating environmental laws or regulations during the Track Record Period. Substantially all of our production plants have adopted measures to control different emissions into the atmosphere. Our production plants have in general installed environmental protection facilities and have designated full-time environmental compliance officers responsible for monitoring compliance with relevant national and local environmental rules and regulations, including monitoring the emission level of wastes and pollutants, operating environmental protection facilities, monitoring the government policy changes and liaising with local government agencies. In addition, the Company has dedicated staff at our headquarters responsible for liaising with environmental compliance officers at our production plants and reviewing environmental-related reports.

We believe that we have not committed any material breach of environmental laws or regulations applicable to us. We believe that our environmental protection systems and facilities are adequate to comply with applicable PRC national and local environmental protection regulations. However, the PRC government may impose additional, stricter regulations which would require additional expenditure on compliance with environmental regulations. See "*Risk Factors — Risks Relating to the Building Materials Industry in the PRC — Our business operations may be materially adversely affected by environmental regulations.*"

## EMPLOYEES

As at September 30, 2005, we had 8,793 employees, and China Fiberglass had 3,107 employees.

The table below sets out the number of employees by function in each business as at September 30, 2005:

| | Cement | Lightweight building materials | China Composites | Engineering services | Headquarters | Group total | China Fiberglass |
|---|---|---|---|---|---|---|---|
| Management (including certain quality control personnel) . . . . . . | 366 | 545 | 83 | 60 | 17 | 1,071 | 422 |
| Production (including certain quality control and repair and maintenance personnel) . . . | 2,111 | 2,864 | 539 | 456 | — | 5,970 | 2,491 |
| Sales and marketing . . . . . . . | 247 | 691 | 57 | 52 | — | 1,047 | 57 |
| Research and development . . . | 52 | 98 | 50 | 54 | — | 254 | 16 |
| Finance and accounting . . . . . | 69 | 124 | 26 | 28 | 6 | 253 | 20 |
| General and supporting staff . | 132 | 0 | 58 | 7 | 1 | 198 | 101 |
| Total . . . . . . . . . . . . . . . | 2,977 | 4,322 | 813 | 657 | 24 | 8,793 | 3,107 |

ALRMH-CNBM00000149

# BUSINESS

We have not experienced any strike or other labor dispute which has affected our operations since January 1, 2002.

We operate employee training programs that provide technical and other trainings to employees.

In 2002, 2003, 2004 and for the nine months ended September 30, 2005, our labor costs were approximately RMB 121.1 million, RMB 169.8 million, RMB 208.3 million and RMB 197.3 million, respectively. In the same periods, China Fiberglass's labor costs were approximately RMB 42.0 million, RMB 43.0 million, RMB 54.5 million and RMB 55.9 million, respectively. We pay social welfare expenses covering pension insurance, medical insurance and unemployment insurance for our employees, in accordance with PRC labor regulations. See "*Directors, Supervisors, Senior Management and Employees — Employees.*"

## INTELLECTUAL PROPERTY RIGHTS

We currently own 64 PRC patents and license the right to use 339 PRC patents. These patents are important to our business. In the PRC, a granted patent for an invention is valid for 20 years from the date of application and a patent for a utility model or design is valid for 10 years from the date of application. Details of our patent portfolio are set out in "*Appendix VIII — Statutory and General Information — Further Information about the Business — Intellectual property rights.*"

Of the trademarks that we own or have the right to use, 106 trademarks are currently used by us and are important to our business. We currently own 89 of such trademarks and license the right to use 17 of such trademarks, the majority of which are registered in the PRC. In the PRC, a trademark is valid for 10 years from the date of registration. Details of our important trademark portfolio are set out in "*Appendix VIII — Statutory and General Information — Further Information about the Business — Intellectual property rights.*"

We also have a license to practice the China Float Glass Technology granted by the relevant PRC government authority.

## REPAIR AND MAINTENANCE

We have regular repair and maintenance programs to promote production efficiency and to avoid unexpected stoppages. Production lines are periodically shut down for overhauls and repairs. Overhauls or repairs are conducted as circumstances may require but are generally conducted periodically according to present maintenance schedules, which vary depending on the production lines.

As at September 30, 2005, our cement, lightweight building materials and glass fiber and FRP products (excluding China Fiberglass) segments each had 796, 256 and 33 maintenance staff in total. China Fiberglass employed 267 maintenance staff as at September 30, 2005. We did not experience any major interruption of production caused by equipment defects during the Track Record Period.

ALRMH-CNBM00000150

## BUSINESS

**LEGAL MATTERS**

The Group has obtained all material licenses, permits or certificates necessary to conduct its operations from the relevant government authorities in the PRC. The Directors confirm that there is no violation by the Group of the laws or regulations of the PRC (or any other jurisdictions where the Group has material operations) in any material respect.

As at the Latest Practicable Date, we are not involved in any legal, regulatory or administrative proceedings as a defendant, the outcome of which could have a material adverse effect on our business. Notwithstanding the foregoing:

(1)  the adjudicating PRC court rendered a decision against Zaozhuang Luhong, a subsidiary in our cement segment, in October 2005 in a dispute over a merchandise purchase contract. The judgment was in the amount of RMB 808,920 plus accrued penalties. We are in the process of appealing this judgment.

(2)  a judgment was delivered in September 2005 against Zhongfu Lianzhong, the subsidiary that manufactures FRP pipes and tanks, as the second defendant in a legal proceeding over alleged technology infringement. Zhongfu Lianzhong is held to be jointly and severally liable for damages in the amount of RMB 150,000 with the first defendant.

(3)  China Fiberglass provided a guarantee in respect of a credit line of its subsidiary, Jushi Group, in September 2001. Under applicable PRC laws and regulations, China Fiberglass was required to disclose by way of announcement such guarantee within a prescribed period. China Fiberglass did not publish an announcement. It only disclosed such guarantee in its subsequent periodical reports to the extent that the underlying loan was drawn down and made full disclosure regarding the guarantee in its semi-annual report in 2003. In response to an anonymous complaint, the CSRC conducted an investigation against China Fiberglass in 2002. As a result of such investigation, the CSRC determined in 2003 that the foregoing non-compliance constituted a breach of Article 123 of the PRC Company Law regarding fiduciary duties by the board of directors and management of China Fiberglass then in place. The CSRC further made a non-mandatory suggestion for China Fiberglass to replace its directors, reorganize the board and improve its corporate governance. In fact, a new slate of board of directors led by Mr. Cao Jianglin, who is currently the President of the Company, had already been elected in 2002. To improve corporate governance, this new board included three independent directors comprising a finance expert, an accounting expert and a management expert. The new board appointed a new general manager and a new executive secretary of the board and put in place training programs for its directors and senior management to strengthen its internal disclosure controls. Apart from the recommendations set out above, the CSRC did not make any other recommendation or impose any sanction against China Fiberglass.

ALRMH-CNBM00000151

## BUSINESS

### INSURANCE

We have purchased insurance policies from multiple insurance companies that cover many of our production facilities (including buildings, machinery, equipment and vehicles) adequately, we believe, against losses and damages of these production facilities (excluding business interruption losses) caused by natural perils.

We also purchase pension insurance, unemployment insurance and medical insurance for our employees according to the relevant PRC laws and regulations.

Consistent with what we believe to be customary practice in the PRC, we do not carry any third-party liability insurance to cover claims in respect of personal injury or property or environmental damage arising from accidents on our property or relating to our operations (other than our automobiles), nor do we carry any business interruption insurance or key-man life insurance on our key employees. Such insurances are not mandatory according to the laws and regulations of the PRC, and the insurances are either unavailable in the PRC or would impose a large cost on our operations, which would reduce our competitiveness against our competitors in the PRC. See "*Risk Factors — Risks Relating to the Group — Our insurance coverage may not be sufficient to cover the risks related to our operations and losses*."

### LAND AND BUILDINGS

### Land

We currently own 68 parcels of land, which are located in Beijing, Shandong, Henan, Hebei, Anhui, Guangdong, Hubei, Hainan and Jiangsu in the PRC, with an aggregate area of approximately 5,032,153 square meters. We use these land for the purposes of our operations and businesses. Eleven parcels of the land we own in Beijing were transferred to us by BNBMG pursuant to the Reorganization. These parcels cover an aggregate area of approximately 383,906 square meters.

We also own six parcels of land with a total site area of approximately 12,376 square meters, which are located in Papua New Guinea. We occupy such land for operational and business purposes.

We also lease 21 parcels of land with an aggregate site area of approximately 317,593 square meters in the PRC for the purposes of our operations and businesses, of which two parcels of land with a total site area of approximately 10,216 square meters were leased from BNBMG. BNBMG has obtained land use right certificates to these two parcels of granted land. The two parcels of land leased from BNBMG are leased for two years commencing from September 1, 2005.

See "*Appendix IV — Property Valuation*" for further details regarding the land that we occupy and the terms of the leases.

ALRMH-CNBM00000152

## BUSINESS

### Buildings

Our principal executive office building is located at A-11, Sanlihe Road, Haidian District, Beijing, People's Republic of China, 100037.

We currently own 601 buildings or units, which are located in Beijing, Shandong, Henan, Hebei, Anhui, Guangdong, Hubei, Hainan, Tianjin, Heilongjiang, Liaoning and Jiangsu in the PRC, with an aggregate gross floor space of approximately 862,723 square meters. We use these buildings for the purposes of our operations and businesses.

We currently lease 35 buildings or units in the PRC, with an aggregate gross floor space of approximately 35,213 square meters. Our related parties leased 20 of these buildings, and third parties leased 15 of these buildings to us.

We also own or lease five buildings or units with a total gross floor area of approximately 6,013 square meters, which are located in Papua New Guinea and the U.S., respectively. We occupy these buildings or units as offices and for other business purposes.

In addition, we currently have 128 buildings and structures under construction in the PRC with an aggregate planned gross floor space of approximately 209,976 square meters upon completion.

See "*Appendix IV — Property Valuation*" for further details regarding the buildings or units that we occupy and the terms of the leases.

### Title Certificates

We or the lessors of the properties we lease lack formal title certificates to a small percentage of the land and buildings that we occupy for our business. See "*Risk Factors — Risks Relating to the Group — We have not obtained formal title certificates to some of the properties we occupy*" for a discussion of the risks relating to these title defects.

As disclosed in the valuation report set out in Appendix IV to this prospectus, as at December 31, 2005, we held and occupied 68 parcels of land with an aggregate site area of approximately 5,032,153 square meters, 601 buildings and structures with an aggregate gross floor area of approximately 862,723 square meters, and 128 buildings and structures which are currently under construction with a planned gross floor area of approximately 209,976 square meters in the PRC.

In addition, we also lease 21 parcels of land with an aggregate site area of 317,593 square meters, and 35 buildings and structures with an aggregate gross floor area of approximately 35,213 square meters in the PRC.

The land, buildings and structures referred to above include:

(i)    1% of the total site area of land held and occupied by us is allocated land which cannot be freely transferred, leased, mortgaged or otherwise disposed of by us unless such land is converted into granted state-owned land;

— 149 —

---

**BUSINESS**

---

(ii)   12.26% of the total gross floor area of buildings and structures owned by us have title issues, of which:

- 10.92% of the total gross floor area of buildings and structures owned by us for production purpose are not issued with building ownership certificates;

- 0.64% of the total gross floor area of buildings and structures owned by us for production purposes are issued with a building ownership certificate but such building and structure are situated on land leased from the local land administrative bureau and the transfer, lease, mortgage and disposal of such buildings and structures require the consent of the land bureau;

- 0.59% of the total gross floor area of the buildings and structures owned by us are for non-production purposes and are not issued with building ownership certificates; and

- 0.11% of the total gross floor area of the buildings and structures are issued with building ownership certificates but such buildings and structures are situated on land where land use certificates cannot be provided;

(iii)  81.2% of the total site area of land leased by us (which is approximately 4.82% of the total site area of land used by us) is not issued with granted state-owned land use certificates, of which:

- 12.6% of the total site area of land is allocated land leased by Tianfeng (which is approximately 0.8% of the total site area of land used by us); and

- 68.6% of the total site area of land is collectively owned land leased by Taihe (which is approximately 4.2% of the total site area of land used by us).

(iv)  1.57% of the total gross floor area of buildings and structures is leased by us from a lessor without a building ownership certificate.

We are indemnified by the Parent Group for any losses (including consequential losses) and expenses that we may suffer from these title defects.

**Owned Properties**

In relation to the above owned land, buildings and structures in the PRC, we have not obtained proper legal title certificates (including the building ownership certificate and the relevant land use right certificate) to two parcels of land with an aggregate gross floor area of approximately 50,124 sq.m. and 89 owned buildings or units with a total area of approximately 99,268 sq.m., representing 1% of the total area of land and 11.5% of the total gross floor area of buildings or units that we currently own in the PRC. Sallmanns has attributed no commercial value to such land and buildings.

ALRMH-CNBM00000154

**BUSINESS**

The Directors believe that such owned properties to which no proper legal title has been obtained are not crucial to the Group's operations because:

- Among those 89 buildings or units,

    — There are no title certificates for five buildings or units because they are unused and will be demolished soon.

    — There are no building ownership certificates for 69 buildings or units because they are erected on leased land. According to the PRC legal opinion, building ownership certificates can only be issued to the holder of the land use rights. Nevertheless, the local Building Administrative Bureau has confirmed the Group has legally obtained the building ownership rights to these properties without any title dissensions.

    — For the remaining 15 buildings or units, applications have been made to the appropriate authorities to obtain the relevant title certificates and permits and the PRC legal advisers have advised that there is no material impediment to obtaining such title certificates.

- For the two parcels of land, (1) one is of allocated nature and applications have been made to the appropriate authorities to obtain the relevant title certificate for granted land and our PRC legal advisers have advised that the Group has the right to occupy, use, transfer, lease or mortgage the land upon completing relevant land grant procedures and obtaining relevant title certificate and that there is no material impediment to completing such land grant procedures and obtaining such title certificate; and (2) the other one is currently vacant with no building or structure on it and therefore is not material to the Group's operations and our PRC legal advisers have advised that the Group has the right to transfer, lease or mortgage the land upon completing relevant land grant procedures and obtaining the relevant land use rights certificate.

- In addition, Parent has agreed, pursuant to a written indemnification undertaking, to indemnify the Group against any losses suffered from the absence of title certificates and provide alternate buildings and/or land to the Group to ensure it may carry on its normal operations if the Group is unable to continue to use the relevant buildings and/or land.

**Leased Properties**

In relation to the above leased land, buildings or units in the PRC, the relevant lessors have not been able to produce or provide proper building ownership certificates or land use rights certificates to 16 parcels of leased land with a total site area of 257,937 sq.m. and a unit with a gross floor area of 552 sq.m. Sallmanns has attributed no commercial value to these properties.

ALRMH-CNBM00000155

## BUSINESS

The Directors believe that such leased properties in respect of which the lessors have not been able to produce or provide building ownership certificates or land use rights certificates are not crucial to the Group's operations because:

- Taihe occupied 15 of the 16 parcels of leased land. To further expand its gypsum production business, Taihe has recently passed a board resolution to relocate most of its production lines to Yunnan, Chongqing, Hunan and Hebei. Since the relocation of Taihe's facilities is in the normal course of its operations, the estimated financial impact for the Group is trivial. In addition, (1) according to a confirmation letter, the local government authority has undertaken to Taihe that Taihe can continually use and occupy the 15 parcels of leased land during its term of operation; and (2) according to a further confirmation letter, the State-owned Resource Bureau of Taian City has confirmed the 15 parcels of leased land will not be confiscated during Taihe's term of operation, and if the land use rights of the 15 parcels of land are expropriated by the local authority for public reasons, the Group will be indemnified against any loss or damage.

- For the remaining parcel of leased land, the lessor has undertaken to indemnify the Group against any loss or damage if the Group cannot continue to occupy and use the parcel of land due to the lack of land use rights certificates.

- Since the leased unit is for office use, it may be replaced with comparable alternative buildings without any material adverse effect to the Group's operations.

- In addition, Parent has agreed, pursuant to a written indemnification undertaking, to indemnify the Group against any losses suffered from the absence of title certificates and provide alternative buildings and/or land to the Group to ensure it may carry on its normal operations if the Group is unable to continue to use the relevant buildings and/or land.

**Valuation**

Sallmanns (Far East) Limited, an independent real estate valuation company, valued the capital value of our property interests at approximately RMB 2,881 million and the capital value of property interests attributable to us at approximately RMB 2,022 million as at December 31, 2005. The letter, summary of values and the valuation certificate issued by Sallmanns (Far East) Limited in connection with its valuation are set out in Appendix IV to this prospectus.

ALRMH-CNBM00000156

# RELATIONSHIP WITH PARENT

## INTRODUCTION

The Company was established as a joint stock limited company on March 28, 2005. Parent Group owned approximately 94.75% of the share capital of the Company immediately prior to the Global Offering. Immediately after the completion of the Global Offering, Parent Group will hold in aggregate approximately 63.49% of the Company's share capital (or 60.34% if the Over-allotment Option is exercised in full), and will be our controlling shareholder.

In anticipation of the Global Offering, Parent Group transferred to us substantially all of its building material businesses which have been organized into our cement, lightweight building materials, glass fiber and FRP products and engineering services segments. We also entered into a number of agreements with Parent and other connected persons of the Company. These agreements are described in more detail below in the section headed "*Connected Transactions*".

## COMPETITION

### Retained Businesses

#### *Cement Operations*

After the Reorganization, Parent retained its interests in Nanyang Hangtian and Xinlei. These small-scale cement operations target the lower end of the market and mainly supply cement for the construction of residential buildings in villages, small factories in the same region and mid to small scale construction projects. They were not transferred to us because they produce cement using the vertical kiln technique, which will be gradually replaced by NSP technology. Such replacement is directed by the PRC Government because as compared to NSP technology, the vertical kiln technique is more energy consuming and labour intensive, less environmentally friendly and produces cement of poorer quality. We are of the view that these operations do not constitute material competing businesses, as all of our cement production lines produce cement using NSP technology. Our NSP cement operations target the higher end of the market and mainly supply cement to city commercial concrete-mixing, large scale state and regional construction projects. Due to their larger scale, NSP cement operations normally have long-term arrangements with suppliers to ensure a stable supply of raw materials and lower procurement costs. Parent also retained minority interests in certain cement operations which may compete with our business. These include a 17.26% equity interest in Hubei Baoshi Group Guanghua Cement Company Limited (湖北寶石集團光華水泥有限公司), a 14.46% equity interest in Gansu Qilianshan Building Material Holding Company Limited (甘肅祁連山建材控股有限公司) and a 13.18% equity interest in Guangxi Hongshuihe Cement Company Limited (廣西紅水河水泥股份有限公司). In order to deal with such competition, on February 28, 2006, the Company entered into a Non-Competition Agreement with Parent, details of which are set out in the section headed "*Non-Competition Agreement*." The core management personnel of these cement operations and the Group are independent of each other.

The Company has been granted an option and a pre-emption right, but currently do not have any plan, to acquire these cement operations.

ALRMH-CNBM00000157

# RELATIONSHIP WITH PARENT

### Cement-related Engineering Operations

Parent retained the entire equity interest in Hefei Institute. Hefei Institute was not transferred to us as it is primarily engaged in the research and development of technologies and equipment relating to the production of cement and the manufacture of such equipment. We carry out our cement-related engineering operations through Nanjing Triumph. Although both Hefei Institute and Nanjing Triumph provide engineering services to cement manufacturers, Hefei Institute's target customers are principally those with small scale cement production lines with a daily clinker capacity of no more than 2,500 tonnes. Nanjing Triumph, on the other hand, focuses on the provision of engineering design and EPC services in respect of large scale cement production lines with a daily clinker capacity of about 2,500 to 6,000 tonnes. Given the different customer groups in the industry, the competition between Hefei Institute and Nanjing Triumph, if any, is not material. The core management personnel of Hefei Institute and the Group are independent of each other.

We have been granted an option and a pre-emption right, but currently do not have any plan, to acquire Hefei Institute.

### Glass-related Engineering Operations

Parent also retained its equity interests in Qinhuangdao Institute and Hangzhou Institute. These institutes provide engineering services to glass manufacturers.

Qinhuangdao Institute was not transferred to us as it focuses on conducting research on technologies relating to glass production lines. It also provides engineering design services to glass factories in northern China. Our engineering services segment, on the other hand, focuses on providing engineering design and EPC services primarily to glass factories in southern China. We and Qinhuangdao Institute have established a good reputation and a stable customer base in our respective markets. We believe that our customers are unlikely to procure services from Qinhuangdao Institute, as procuring services from a different geographical area would increase the production costs. Given our different business objectives, different target markets and the continuous nature of our services, we believe that Qinhuangdao Institute does not pose any material competition with our business.

Hangzhou Institute is an institute which conducts research on new building materials in the PRC. Hangzhou Institute was not transferred to us as it focuses on providing engineering design services to new building materials manufacturers; it only provides glass-related engineering design services as a side business. The number of glass-related engineering design projects completed by Hangzhou Institute since 2000 is about one-third of those relating to lightweight building materials. Our engineering services segment mainly provides engineering design and EPC services to glass manufacturers and unlike Hangzhou Institute, is more focused on EPC. Given our different business focus, we believe that there is no material competition between our engineering services business and that of Hangzhou Institute.

The core management personnel of Qinhuangdao Institute and Hangzhou Institute are independent of those of the Group.

We have been granted an option and a pre-emption right to, but currently do not have any plan to acquire Qinhuangdao Institute and Hangzhou Institute.

ALRMH-CNBM00000158

## RELATIONSHIP WITH PARENT

**Directors' Competing Interests**

The Directors have confirmed that they are not interested in any business which competes or is likely to compete, either directly or indirectly, with our business.

**Non-Competition Agreement**

In order to reduce competition between the Group and Parent Group, the Company entered into a Non-Competition Agreement with Parent on February 28, 2006, pursuant to which Parent has agreed not to, and to procure its subsidiaries (excluding the Group) not to compete with us in our core businesses. For the purpose of the Non-Competition Agreement, our core businesses are research and development, production and sale of cement products, lightweight building materials and products, prefabricated houses, glass fiber products, FRP products; logistics and distribution services relating to building materials; research and development, provision of engineering design and EPC services relating to cement and glass production lines; any other building materials business which we may carry out from time to time.

Pursuant to the Non-Competition Agreement, Parent has undertaken the following:

(i) it will not, and will procure its subsidiaries (excluding the Group) not to compete with us, directly or indirectly, whether on its own or jointly with another entity by engaging, participating or investing in, providing any support to or holding any interest in any activity or business which directly or indirectly competes with our core businesses in regions where we operate.

This undertaking does not apply to the following circumstances:

- the holding of equity interests in the Group or businesses retained by Parent as described in the section headed "*Retained Businesses*" above;

- engaging in businesses resulting from the business opportunity which is notified to the Company in accordance with paragraph (ii) and which the Company decides not to take up;

- the holding of securities in a company which is engaged in a competing business and whose securities are listed on the Stock Exchange or any other stock exchange, provided that Parent does not directly or indirectly hold or control the voting rights in respect of 10% or more of the issued share capital of such company or control the board of directors of such company.

(ii) If Parent Group becomes aware of a business opportunity which directly or indirectly competes, or may lead to competition, with our core businesses in regions where we operate, Parent will notify (or procure that its subsidiaries notify) the Company of such business opportunity immediately upon becoming aware of such opportunity. Parent is also obliged to use its best efforts to procure that such opportunity is first offered to the Company on terms and conditions no less favorable than those offered to Parent, its subsidiaries or any other third party. Directors who are independent of Parent Group (including but not limited to the independent non-executive Directors) will consider whether the Company should take up the business opportunity. Within 30

ALRMH-CNBM00000159

## RELATIONSHIP WITH PARENT

days after receiving the notice, the Company will notify Parent in writing as to whether, and the extent to which, the Company will take up the opportunity. Parent or any of its subsidiaries may take up the opportunity or offer it to a third party to the extent that the Company decides not to take up such opportunity.

(iii) Parent has granted to the Company options to acquire the following:

- the businesses retained by Parent as described in the section headed "*Retained Businesses*" above;

- any other business retained by Parent Group as part of the Reorganization; and

- any business of Parent Group resulting from the business opportunity referred to in paragraph (ii) above which has been offered to, but has not been taken up by the Company.

The senior management of the Company will meet with representatives from Parent Group every six months to discuss Parent Group's business plan and review the operational and financial performance of its businesses. They will prepare a report on the result of the discussion for review by the Directors. Directors who are independent of Parent Group (including but not limited to the independent non-executive Directors) will consider whether the Company should or should not exercise its options on a semi-annual basis. Within 30 days of the meeting, we will notify Parent in writing as to whether the Company will exercise any options. The Company will engage an independent valuer to determine the exercise price if it decides to exercise its options.

(iv) Parent has also granted to the Company pre-emption rights to acquire the interests referred to in paragraph (iii) above. Where Parent Group proposes to dispose of such interests, it must first offer such interests to the Company on terms no less favorable than those offered to third parties. The offer must be made in writing, setting out full terms of the proposed disposal and any information which may be required by the Company in order to make a decision as to whether the Company ought to exercise the pre-emption rights. Directors who are independent of Parent Group (including but not limited to the independent non-executive Directors) will review the terms of the offer and consider whether the Company should or should not exercise the pre-emption rights. Within 30 days of receiving the offer, the Company will notify Parent in writing as to whether it will exercise the pre-emption rights to require Parent or any of its relevant subsidiaries (excluding the Group) to sell its interest to the Company. If the Company decides to exercise its pre-emption rights, the Company and Parent will jointly appoint an independent valuer for determining the price within 30 days of the Company's notice to Parent. The Company will notify Parent if it decides not to exercise the pre-emption rights, in which case Parent or any of its relevant subsidiaries (excluding the Group) may dispose of its interest to a third party, provided the terms must not be more favorable than those offered to the Company.

(v) Parent has undertaken to provide to the Company all information relating to the businesses referred to in paragraph (iii) above that the Company may require from time to time.

ALRMH-CNBM00000160

# RELATIONSHIP WITH PARENT

The Company will disclose the decision of the Directors who are independent of Parent Group (including but not limited to the independent non-executive Directors) relating to the exercise of the options and pre-emption rights granted under the Non-Competition Agreement in the annual reports or by way of announcements to the public in addition to complying with the disclosure requirements under the Listing Rules.

In the Company's annual reports, Parent will make an annual declaration that it has complied with its undertakings under the Non-Competition Agreement. The Company will disclose in its annual reports how such undertakings were complied with and enforced in accordance with the principles of making voluntary disclosures in the Corporate Governance Report (as defined in Appendix 23 of the Listing Rules).

The Non-Competition Agreement shall remain effective until (a) Parent ceases to be a controlling shareholder of the Company; or (b) the H Shares are no longer listed on the Stock Exchange.

## INDEPENDENCE FROM PARENT GROUP

We are satisfied that we can carry on our businesses independently of Parent Group after the H Shares are listed on the Stock Exchange, after considering the following factors:

### Independence of our Management and Employees

The Directors, Mr. Song Zhiping and Mr. Cao Jianglin, will continue to be directors of Parent. The directors of Parent are only involved in the high level decision-making of important strategic and policy matters, such as formulation of business plans, investment strategies, changes in business focus, market and customer groups. As confirmed by the Company's PRC legal counsel, Mr. Song and Mr. Cao do not have executive functions and are not responsible for or have any involvement in the day-to-day management of Parent. Mr. Song's and Mr. Cao's involvement in Parent is only attending board meetings of Parent on an annual basis (other than any meetings for considering special corporate actions) for the purpose of reviewing the president's work report on the operations of Parent. Save for the foregoing, Mr. Song and Mr. Cao are involved in the management of the Group on a full time basis. The president and vice presidents of Parent are responsible for the ordinary course operations of Parent.

While two of the executive Directors will continue to be directors of Parent, the remaining executive Director, Mr. Li Yimin, will be independent of Parent Group. Mr. Li will devote his entire time and attention to the affairs of the Group.

Where there is a situation which involves a potential conflict of interest between the Group and Parent Group, such situation will be automatically reported to the Directors who are independent of Parent Group (including but not limited to the independent non-executive Directors) in accordance with our internal control system. They will consider the relevant facts and circumstances concerning the potential conflict of interest. Directors who are not independent of Parent Group will abstain from voting at the relevant board meeting and will not be counted in the quorum for such meeting.

In addition, we have established our own human resources department for managing our employees. We have entered into employment contracts with all of our employees.

— 157 —

ALRMH-CNBM00000161

# RELATIONSHIP WITH PARENT

Save as disclosed above, the Company's senior management will not hold any senior position in Parent after the Global Offering.

## Independence of Business Operations

As part of the Reorganization, Parent Group has transferred to us substantially all of its building materials businesses, including all relevant properties, equipment and employees necessary to carry on such businesses. China United transferred, inter alia, the mining rights in respect of limestone quarries in Qinglongshan (青龍山), Jiaoshan (焦山), Mashan (馬山), Shanwangzhuang (山王莊) and Xishaoming (西邵明) and a clay quarry in Jiushan (九山) to Parent Group by way of allocation at nil consideration and share acquisition. The mining rights were not transferred to us for commercial reasons as (i) in preparation of the Global Offering, we must streamline our cement operations by disposing of assets which do not form part of the core business of our cement segment, which is the production and sale of NSP Cement; (ii) mining is a labor-intensive business and is inconsistent with our operating principles; and (iii) we are able to secure a stable supply of minerals by entering into a Master Mineral Supply Agreement, further details of which are set out in the section headed "*Connected Transactions*". For each of the three years ended December 31, 2004 and the nine months ended September 30, 2005, the amount of minerals we procured from Parent Group was approximately nil, nil, 88% and 72% of our total minerals requirement, respectively. For each of the three years ending December 31, 2007, we expect to procure from Parent Group approximately 78%, 78% and 65% of the minerals required for our cement production, respectively. We procured limestone and clay from quarries operated by Parent Group as they are located in close proximity to our plants. If Parent Group is unable to supply limestone and clay, we can procure them from quarries operated by Independent Third Parties in the same region at market price. Although this would increase production costs, we believe such increase would not have a material impact on our business.

As disclosed in the section headed "*Business*" in this prospectus, Parent has interest in some of the top five suppliers and customers of our business segments during the Track Record Period. The purchases or sales attributable to such suppliers and customers are immaterial to the Group as a whole. Further, we have direct access to our suppliers and customers, and do not rely on Parent's suppliers and customers base.

Apart from the leasing by us to Parent mining equipment which is not material to our core business operations, we do not share any operational facilities with Parent Group.

We have leased from Parent Group a small number of buildings mainly for use as offices. Where necessary, we believe we can lease suitable replacement buildings from third parties in regions where we operate. We have also leased from Parent Group a small amount of equipment which is not crucial to our operations. In addition, the Company has entered into the Non-Competition Agreement with Parent to ensure a clear delineation of our respective businesses going forward. Further details of the Non-Competition Agreement are set out in the section headed "*Non-Competition Agreement*" above.

## Financial Independence

We have settled all amounts due from us to Parent Group and procured the release of all guarantees provided to us by Parent Group prior to the listing of our H Shares on the Stock Exchange.

Based on the above, the Directors believe that the Group operates independently of Parent Group from a financial perspective.

ALRMH-CNBM00000162

# CONNECTED TRANSACTIONS

## CONNECTED TRANSACTIONS

### Summary of Continuing Connected Transactions

Set out below is a summary of the continuing connected transactions that we entered into with the connected persons of the Company:

| | | Type of transaction | Applicable Listing Rule | Waiver sought | Cap (RMB million) | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | Financial year ended/ending December 31, | | |
| | | | | | 2005 | 2006 | 2007 |
| | | **Non-Exempt Continuing Connected Transactions** | | | | | |
| | | *Transactions with Parent Group:* | | | | | |
| 1 | | Supply of minerals by Parent Group to the Group | 14A.35 | Announcement and independent shareholders' approval requirements | 55 | 105 | 110 |
| 2 | (a) | Provision of production supplies and support services by Parent Group to the Group | 14A.35 | Announcement and independent shareholders' approval requirements | 65 | 125 | 140 |
| | (b) | Provision of production supplies and support services by the Group to Parent Group | 14A.35 | Announcement and independent shareholders' approval requirements | 135 | 160 | 235 |
| 3 | | Supply of equipment by Parent Group to the Group | 14A.35 | Announcement and independent shareholders' approval requirements | 35 | 80 | 60 |
| 4 | (a) | Provision of engineering services by Parent Group to the Group | 14A.34 | Announcement requirement | 12 | 15 | 25 |
| | (b) | Provision of engineering services by the Group to Parent Group | 14A.34 | Announcement requirement | 3 | 10 | 10 |
| | | *Transactions with BNBM Homes:* | | | | | |
| 5 | | Provision of production supplies and support services by the Group to BNBM Homes | 14A.34 | Announcement requirement | 6 | 25 | 35 |
| 6 | | Provision of engineering design, construction and supervisory services by Chenlong Decoration to BNBM Homes | 14A.34 | Announcement requirement | 3 | 3 | 5 |
| | | *Transactions with Beijing Chemical:* | | | | | |
| 7 | | Supply of raw materials by Beijing Chemical to BNBM Plastic | 14A.35 | Announcement and independent shareholders' approval requirement | 50 | 70 | 75 |

— 159 —

ALRMH-CNBM00000163

# CONNECTED TRANSACTIONS

| | Type of transaction | Applicable Listing Rule | Waiver sought | Cap (RMB million) | | |
|---|---|---|---|---|---|---|
| | | | | Financial year ended/ending December 31, | | |
| | | | | 2005 | 2006 | 2007 |
| | *Transactions with Liberty Group:* | | | | | |
| 8 | Provision of technical consultation services by the Group to Liberty Group | 14A.34 | Announcement requirement | 6 | 10 | 10 |
| | *Transactions with Tianma Group:* | | | | | |
| 9 | Supply of raw materials by Tianma Group to Zhongxin Tianma | 14A.34 | Announcement requirement | 12 | 20 | 20 |
| 10 | Supply of electricity and water by Tianma Group to Zhongxin Tianma | 14A.34 | Announcement requirement | 3 | 6 | 6 |
| | *Transactions with Jushi Group:* | | | | | |
| 11 | Supply of raw materials by Jushi Group to the Group | 14A.34 | Announcement requirement | 20 | 25 | 30 |
| | *Transactions with Aobao Chemical:* | | | | | |
| 12 | Supply of raw materials by Aobao Chemical to Weifang Aotai | 14A.34 | Announcement requirement | 3 | 10 | 10 |
| | *Transactions with Hengzhijiu Trade:* | | | | | |
| 13 | Supply of coal by Hengzhijiu Trade to Luhong | 14A.34 | Announcement requirement | 45 | 55 | 55 |
| 14 | Supply of cement by Luhong to Hengzhijiu Trade | 14A.34 | Announcement requirement | 45 | 60 | 60 |
| | **Exempt Continuing Connected Transactions** | | | | | |
| | *Transactions with Parent Group:* | | | | | |
| 15 | Licensing of patents by BNBMG to BNBM *(note 1)* | 14A.33(3) | — | n/a | n/a | n/a |
| 16 (a) | Licensing of trademarks by Parent to the Company *(note 1)* | 14A.33(3) | — | n/a | n/a | n/a |
| (b) | Licensing of trademarks by the Group to Parent Group *(note 1)* | 14A.33(3) | — | n/a | n/a | n/a |

ALRMH-CNBM00000164

# CONNECTED TRANSACTIONS

| | Type of transaction | Applicable Listing Rule | Waiver sought | Cap (RMB million) | | |
|---|---|---|---|---|---|---|
| | | | | **Financial year ended/ending December 31,** | | |
| | | | | **2005** | **2006** | **2007** |
| | *Transactions with JM International:* | | | | | |
| 17 | Provision of shareholders' loan by JM International to Zhongxin Tianma *(note 2)* | 14A.65(4) | — | n/a | n/a | n/a |
| | *Transactions with Tianma Group:* | | | | | |
| 18 | Provision of shareholders' loan by Tianma Group to Zhongxin Tianma *(note 2)* | 14A.65(4) | — | n/a | n/a | n/a |

_____

*Notes:*

1.  Each of the percentage ratio (other than the profits ratio) for the three financial years ending December 31, 2007 is less than 0.1%. Therefore, under Listing Rule 14A.33(3), the transaction is exempt from the reporting, announcement and independent shareholders' approval requirements under Chapter 14A of the Listing Rules.

2.  The shareholders' loan is provided by a connected person for our benefit on normal commercial or better terms where no security over our assets is granted in respect of such loan. Therefore, under Listing Rule 14A.65(4), the transaction is exempt from the reporting, announcement and independent shareholders' approval requirements under Chapter 14A of the Listing Rules.

In connection with the Reorganization, we entered into a number of transactions with the following entities which will be regarded as connected persons of the Company under the Listing Rules:

### Promoters

Each of Parent, BNBMG, CNBM Trading, Building Materials Academy and Cinda is a promoter of the Company and therefore constitutes a connected person of the Company under the Listing Rules.

### Parent Group

Parent has a direct equity interest of 26.54% and an indirect equity interest of 68.22% in the Company immediately prior to the Global Offering. It is a controlling shareholder and a promoter of the Company. Each of Parent and its subsidiaries therefore constitutes a connected person of the Company under the Listing Rules.

### BNBM Homes

BNBM Homes is an indirect non-wholly-owned subsidiary of the Company. BNBMG, a controlling shareholder and promoter of the Company, has an 11% equity interest in BNBM Homes. BNBM Homes therefore constitutes a connected person of the Company under the Listing Rules.

ALRMH-CNBM00000165

# CONNECTED TRANSACTIONS

*Beijing Chemical*

Beijing Chemical has a 45% equity interest in BNBM Plastic, an indirect non-wholly-owned subsidiary of the Company. It is a substantial shareholder of a subsidiary of the Company and therefore constitutes a connected person of the Company under the Listing Rules.

*Liberty Group*

Liberty Group has a 20% equity interest in Zhongfu Liberty, an indirect non-wholly-owned subsidiary of the Company. It is a substantial shareholder of a subsidiary of the Company and therefore constitutes a connected person of the Company under the Listing Rules.

*Tianma Group*

Tianma Group has a 35% equity interest in Zhongxin Tianma, an indirect non-wholly-owned subsidiary of the Company. It is a substantial shareholder of a subsidiary of the Company and therefore constitutes a connected person of the Company under the Listing Rules.

*Jushi Group*

Jushi Group is a 59.90% owned subsidiary of China Fiberglass, which has a 20% equity interest in BND, an indirect non-wholly owned subsidiary of the Company. Jushi Group is an associate of a substantial shareholder of a subsidiary of the Company and therefore constitutes a connected person of the Company under the Listing Rules.

*Aobao Chemical*

Aobao Chemical has a 25% equity interest in Weifang Aotai, an indirect non-wholly-owned subsidiary of the Company. It is a substantial shareholder of a subsidiary of the Company and therefore constitutes a connected person of the Company under the Listing Rules.

*Hengzhijiu Trade*

Hengzhijiu Trade has a 29% equity interest in Hengjiu Concrete, an indirect non-wholly-owned subsidiary of the Company. It is a substantial shareholder of a subsidiary of the Company and therefore constitutes a connected person of the Company under the Listing Rules.

*JM International*

JM International has a 25% equity interest in Zhongxin Tianma, an indirect non-wholly-owned subsidiary of the Company. It is a substantial shareholder of a subsidiary of the Company and therefore constitutes a connected person of the Company under the Listing Rules.

ALRMH-CNBM00000166

# CONNECTED TRANSACTIONS

## Non-Recurrent Connected Transactions

### *Reorganization Agreement*

To effect the Reorganization, the Company entered into the Reorganization Agreement with the Promoters on March 7, 2006. Pursuant to the Reorganization Agreement, the Reorganization took effect from March 28, 2005 and each of the Promoters agreed to indemnify the Company against, among other things:

(i)   all claims incurred in connection with or arising from the breach of any provisions of the Reorganization Agreement on the part of the Promoters;

(ii)   all claims incurred in connection with or arising from the assets and liabilities retained by or transferred to the Promoters in accordance with the Reorganization Agreement;

(iii)   all claims incurred in connection with or arising from the assets and liabilities which have been transferred to us pursuant to the Reorganization Agreement arising on or before March 28, 2005, the effective date of the Reorganization; and

(iv)   all taxes payable in respect of the assets which have been transferred to us pursuant to the Reorganization Agreement arising on or before March 28, 2005, the effective date of the Reorganization.

### *Non-competition Agreement*

In connection with the Reorganization, the Company entered into the Non-Competition Agreement with Parent on February 28, 2006. Pursuant to this agreement, Parent has agreed not to, and to procure its subsidiaries not to, compete with us in our core businesses and granted the Company options and pre-emptive rights to acquire certain businesses retained by Parent. Further details of the terms of the Non-Competition Agreement are set out in the section headed "*Relationship with Parent — Competition — Non-Competition Agreement*".

## Non-Exempt Continuing Connected Transactions

### *Transactions with Parent Group*

#### 1.   *Master Mineral Supply Agreement*

As part of the Reorganization, China United retained the assets and liabilities which relate to NSP cement production. Other assets and liabilities, including the mining rights in respect of limestone quarries in Qinglongshan (青龍山), Jiaoshan (焦山), Mashan (馬山), Shanwangzhuang (山王莊), Xishaoming (西邵明) and a clay quarry in Jiushan (九山), were transferred to Parent by way of allocation at nil consideration and share acquisition. The mining rights were not transferred to us for commercial reasons as (i) in preparation of the Global Offering, we must streamline our cement operations by disposing of assets which do not form part of the core business of our cement segment, which is the production and sale of NSP Cement; (ii) mining is a labour intensive business and is inconsistent with our operating principles; and (iii) we are able to secure a stable supply of minerals by entering into a Master Mineral Supply Agreement. Prior to the Reorganization,

— 163 —

# CONNECTED TRANSACTIONS

the mining operations were conducted by Julong Cement, Lunan Cement and Nanyang Hangtian which underwent asset segregation as described in the section headed "History, Reorganization and Group Structure". After the Reorganization, we have procured limestone and clay from these quarries for our clinker production because they are located in proximity to our cement plants.

*Description of Transaction and Principal Terms*

In this connection, the Company entered into a Master Mineral Supply Agreement with Parent on February 28, 2006 whereby Parent agreed to supply, or procure its subsidiaries to supply, to the Company limestone and clay for the production of clinker and other cement products.

Pursuant to the Master Mineral Supply Agreement, the Company will give priority in sourcing limestone and clay from Parent, provided that the terms and conditions offered by Parent are no less favorable than those offered by Independent Third Parties for the same type of limestone and clay. If Parent cannot satisfy the Company's requirements or the terms offered by Independent Third Parties are more favorable, the Company may procure limestone and clay from Independent Third Parties. Before meeting the Company's requirements, Parent may not provide limestone and clay to any Independent Third Party. The Company will provide to Parent on an annual basis an estimate of the limestone and clay that the Company requires in the coming year.

It is envisaged that from time to time and as required, the Company's subsidiaries will enter into individual mineral supply agreements with subsidiaries of Parent. The individual mineral supply agreements are expected to contain provisions which reflect the binding principles, guidelines, terms and conditions in the Master Mineral Supply Agreement. As the individual mineral supply agreements are simply further elaborations on the transactions pursuant to and as contemplated by the Master Mineral Supply Agreement, they do not constitute new categories of connected transactions.

*Price Determination*

Parent shall supply to the Company limestone and clay from its quarries at the market price, namely, the price at which the same type of mineral is provided to Independent Third Parties under normal commercial terms in the ordinary course of business in the same area, in the vicinity or in the PRC.

*Term and Termination*

The Master Mineral Supply Agreement is for a term of three years commencing from January 1, 2005. Upon expiry of the term, the Master Mineral Supply Agreement will, subject to the requirements of the Stock Exchange, be automatically renewed for further periods of three years. The Company may terminate the Master Mineral Supply Agreement or any specific agreement entered into pursuant to the Master Mineral Supply Agreement by three months' prior written notice. Parent may not terminate the Master Mineral Supply Agreement or any specific agreement entered into pursuant to the Master Mineral Supply Agreement unless (i) with the Company's prior written consent; or (ii) Parent is unable to supply limestone and clay due to expiry of the relevant mining license or the mine life of its quarries.

— 164 —

## CONNECTED TRANSACTIONS

*Historical Figures*

There are no historical transaction values available for the supply of limestone and clay for 2002 and 2003 as the mining operations of Parent Group were only segregated from our cement operations in 2004.

For the year ended December 31, 2004 and the nine months ended September 30, 2005, our expenditure for limestone and clay supplied by Parent Group was approximately RMB 8.4 million and RMB 46.0 million, respectively. The significant increase in our expenditure for limestone and clay was due to the separation of mining operations from our cement operations pursuant to the Reorganization.

*Annual Caps*

In 2005, each of Luhong and Huaihai constructed a cement production line with a daily clinker capacity of 5,000 tonnes. These new production lines are expected to improve their production rate in 2006. Qingzhou in 2006 and Nanyang in 2007 will complete a new cement production line, with a combined daily clinker capacity of 12,000 tonnes. Based on our current requirement and the requirement of the new production lines, the annual caps for this transaction for the three years ending December 31, 2007 have been set at RMB 55 million, RMB 105 million and RMB 110 million, respectively.

2.   *Master Mutual Provision of Production Supplies and Support Services Agreement*

As part of the Reorganization, Parent retained certain non-core assets and businesses which will continue to provide certain production supplies and support services to our core businesses. We will also provide certain production supplies and support services to Parent Group to support the businesses retained by Parent Group. The support services provided by us to Parent Group include the leasing of mining equipment. Such equipment relates to the mining operations carried on by Parent Group and was retained by us in order to exert a greater degree of control over Parent Group's mining operations for the purpose of securing a stable supply of minerals for our cement operations. According to the initial restructuring plan, Parent Group's mining operations were to form part of our core businesses. To improve the output of Parent Group's quarries, we purchased additional equipment for use in connection with our mining operations. Upon further consideration, however, we decided to exclude the mining operations from our core businesses for the commercial reasons of streamlining our cement operations, and the fact that mining, being a labour intensive business, is inconsistent with our operating principles. The mining rights and mining personnel were therefore transferred to Parent as a result of the asset segregation undertaken by Julong Cement, Lunan Cement and Nanyang Hangtian, but the mining equipment remained with us for the reasons stated above.

*Description of Transaction and Principal Terms*

In this connection, on February 28, 2006, the Company entered into the Master Mutual Provision of Production Supplies and Support Services Agreement with Parent pursuant to which:

(a)   Parent agreed to provide, or procure its subsidiaries to provide, the following production supplies and support services to the Company:

- *Production supplies:* oriented strand board, cement ancillary grind mill, plastic pipes and other similar raw materials for our production; spare parts and other materials for the projects undertaken by our engineering segment; other similar supplies;

— 165 —

ALRMH-CNBM00000169

## CONNECTED TRANSACTIONS

- *Support services:* transportation and loading services; equipment repair, design and installation services; equipment and vehicles leasing; water, electricity and steam; property management services; other similar services;

(b)   the Company agreed to provide, or procure its subsidiaries to provide the following production supplies and support services to Parent:

- *Production supplies*: clinker, cement, lightweight building materials and other building materials; prefabricated houses; other similar supplies; and

- *Support services*: transportation and loading services; mining equipment leasing; water, electricity and steam; other similar services.

Pursuant to the Master Mutual Provision of Production Supplies and Support Services Agreement, Parent undertook that it will not, and will procure its subsidiaries not to, provide production supplies and support services to the Company on terms which are less favorable than those offered to third parties. Each party is entitled to provide the relevant production supplies and support services to any third party provided that the provision of such production supplies and support services to the other party will not be affected. Each party is entitled to obtain the relevant production supplies and support services from Independent Third Parties if the other party cannot satisfy its requirements for such production supplies and support services or the terms offered by Independent Third Parties are more favorable. Each party will provide to the other on an annual basis an assessment of the production supplies and support services that it requires in the coming year.

It is envisaged that from time to time and as required, the Company's subsidiaries will enter into individual supply or service agreements with subsidiaries of Parent. The individual agreements are expected to contain provisions which reflect the binding principles, guidelines, terms and conditions in the Master Mutual Provision of Production Supplies and Support Services Agreement. As the individual agreements are simply further elaborations on the provision of production supplies and support services pursuant to and as contemplated by the Master Mutual Provision of Production Supplies and Support Services Agreement, they do not constitute new categories of connected transactions.

*Price Determination*

The production supplies and support services pursuant to the Master Mutual Provision of Production Supplies and Support Services Agreement shall be provided at:

(a)   the government-prescribed price;

(b)   if there is no government-prescribed price but there is a government-guided price, the government-guided price applies;

(c)   if there is neither a government-prescribed price nor a government-guided price, then the market price applies. For the purpose of the Master Mutual Provision of Production Supplies and Support Services Agreement, the term "market price" is defined as the price at which the same type of production supplies or support services is provided by Independent Third Parties under normal commercial terms in the ordinary course of business in the same area, in the vicinity or in the PRC; and

ALRMH-CNBM00000170

# CONNECTED TRANSACTIONS

(d)   if none of the above is applicable, the price is to be agreed between the relevant parties for the provision of the relevant production supplies or support services, which shall be the reasonable costs incurred in providing the same plus a profit margin of not more than 5% of such costs. For the purpose of the Master Mutual Provision of Production Supplies and Support Services Agreement, the term "reasonable costs" is defined as the costs confirmed by both parties after arm's length negotiations and permitted by the accounting systems of the PRC.

The prices for electricity, water and steam are currently prescribed by the government.

*Term and Termination*

The Master Mutual Provision of Production Supplies and Support Services Agreement is for a term of three years commencing from January 1, 2005. Upon expiry of the term, the Master Mutual Provision of Production Supplies and Support Services Agreement will, subject to the requirements of the Stock Exchange, be automatically renewed for further periods of three years. Either party may terminate the Master Mutual Provision of Production Supplies and Support Services Agreement or any specific agreements entered into pursuant thereto by giving the other party three months' prior written notice, provided that if the Company cannot conveniently obtain such production supplies and support services from a third party, Parent shall not be permitted to terminate and shall continue to provide such production supplies and support services under any circumstances. However, if Parent cannot obtain such production supplies and support services from a third party, the Company may nevertheless terminate the provision (in whole or in part) of the Master Mutual Provision of Production Supplies and Support Services Agreement or any specific agreements entered into pursuant thereto.

*Historical Figures*

For each of the three years ended December 31, 2004 and the nine months ended September 30, 2005, our expenditure for the production supplies and support services provided by Parent Group was approximately RMB 136.8 million, RMB 121.1 million, RMB 99.1 million and RMB 30.0 million, respectively.

For each of the three years ended December 31, 2004 and the nine months ended September 30, 2005, our revenue from the production supplies and support services provided to Parent Group was approximately RMB 78.3 million, RMB 78.6 million, RMB 61.1 million and RMB 89.6 million, respectively.

*Annual Caps*

The Directors assume that our and Parent Group's businesses will continue to grow and the need for the mutual provision of production supplies and support services will continue to increase. Based on the historical transaction values, the production supplies and support services required by our new production lines and the increase in the production of our cement operations, the annual caps for this transaction for the three years ending December 31, 2007 have been set at RMB 65 million, RMB 125 million and RMB 140 million, respectively.

ALRMH-CNBM00000171

## CONNECTED TRANSACTIONS

The above annual caps are mainly attributable to the following:

- BNBM Homes' expenditure on oriented strand board. It is determined by reference to BNBM Homes' forecasted sales growth, which is expected to be over 30% for 2006 and 2007.

- Luhong's expenditure on cement ancillary grind mill (助磨劑), fly ash (粉煤灰), transportation and loading services, equipment repair, design and installation services, and property management services. In 2004, Luhong had a cement production capacity of 4,600 tonnes per day. In 2005, it completed the construction of a new 5,000 tonnes per day cement production line. As a result, there was a significant increase in Luhong's production capacity and requirements for production supplies and support services in 2005.

- Heze Company's expenditure on transportation and loading services. There will be a significant increase in Heze Company's requirement for transportation and loading services in 2006 because Heze Company intends to increase its production capacity from 500,000 tonnes per annum in 2005 to 1,500,000 tonnes per annum in 2006. which will significantly increase its transportation and loading service requirement.

The annual caps for the production supplies and support services provided to Parent Group for the three years ending December 31, 2007 have been set at RMB 135 million, RMB 160 million and RMB 235 million, respectively.

The above annual caps are attributable to the following:

- Nanyang's revenue from clinker supplied to Nanyang Hangtian. There will be an increase in the volume of clinker supplied by Nanyang to Nanyang Hangtian because (1) Nanyang intends to construct a 6,000 tonnes per day clinker production line which will commence production in 2007 and will increase the volume of clinker available for sale by Nanyang to Nanyang Hangtian; and (2) due to the gradual replacement of the vertical kiln technique with NSP technology, Nanyang Hangtian intends to convert its vertical kiln cement plant into a grinding station, which will increase its clinker requirement.

- Shenzhen Triumph's revenue from raw materials supplied to Bengbu Huayang Technology Company Limited (蚌埠華洋超細粉體新技術有限責任公司). We expect that such revenue will increase in 2006 and 2007 due to the construction of two new production lines by Bengbu Huayang Technology Company Limited (蚌埠華洋超細粉體新技術有限責任公司) during such period.

- Ziyan's revenue from transportation and loading services provided to Xinlei. In 2007, Ziyan will complete the upgrade of a 2,500 tonnes per day clinker production line, which is expected to increase its production capacity. As a result, there will be a significant increase in the volume of clinker supplied by Ziyan to Xinlei.

ALRMH-CNBM00000172

# CONNECTED TRANSACTIONS

3.   *Master Supply of Equipment Agreement*

Following the Reorganization, Parent has agreed to provide, or procure its subsidiaries to provide us with certain equipment that Parent Group manufactures or imports from overseas. We will utilize such equipment (mainly cement containers, steel structural equipment (工程鋼結構設備), conveyor belts, conveyor pumps and other ancillary equipment) mainly for constructing our cement production lines.

*Description of Transaction and Principal Terms*

In this connection, the Company entered into a Master Supply of Equipment Agreement with Parent on February 28, 2006 whereby Parent agreed to supply, or procure its subsidiaries to supply, equipment to the Company for the construction of our production lines.

Pursuant to the Master Supply of Equipment Agreement, Parent will provide equipment to the Company on terms that are no less favorable than those offered by Independent Third Parties for the same type of equipment. Parent may provide equipment to any third party provided that the provision of such equipment to the Company will not be affected. If Parent cannot satisfy the Company's equipment requirement or the terms offered by Independent Third Parties are more favorable, the Company may procure equipment from Independent Third Parties.

It is envisaged that from time to time and as required, the Company's subsidiaries will enter into individual equipment supply agreements with subsidiaries of Parent. The individual equipment supply agreements are expected to contain provisions which reflect the binding principles, guidelines, terms and conditions in the Master Supply of Equipment Agreement. As the individual equipment supply agreements are simply further elaborations on the supply of equipment pursuant to and as contemplated by the Master Supply of Equipment Agreement, they do not constitute new categories of connected transactions.

*Price Determination*

The equipment provided pursuant to the Master Supply of Equipment Agreement shall be at the market price, namely, the price at which the same type of equipment is provided by Independent Third Parties under normal commercial terms in the ordinary course of business in the same area, in the vicinity or in the PRC.

*Term and Termination*

The Master Supply of Equipment Agreement is for a term of three years commencing from January 1, 2005. Upon expiry of the term, the Master Supply of Equipment Agreement will, subject to the requirements of the Stock Exchange, be automatically renewed for further periods of three years. Either party may terminate the Master Supply of Equipment Agreement or any specific agreements entered into pursuant to the Master Supply of Equipment Agreement by giving the other party three months' prior written notice, provided that if the Company cannot conveniently obtain equipment from a third party, Parent shall not be permitted to terminate and shall continue to provide such equipment under any circumstances.

ALRMH-CNBM00000173

## CONNECTED TRANSACTIONS

*Historical Figures*

For each of the three years ended December 31, 2004 and the nine months ended September 30, 2005, our expenditure for equipment supplied by Parent Group was approximately nil, RMB 5.4 million, RMB 76.0 million and RMB 25.7 million, respectively. There was a substantial increase in our expenditure for equipment supplied by Parent Group in 2004 due to the commencement of construction work for Huaihai's and Nanyang's new cement production lines in 2004. Construction of Nanyang's and Huaihai's production lines was completed in 2004 and 2005, respectively, resulting in a decrease in our expenditure for equipment in 2005.

*Annual Caps*

Our equipment requirement will increase in 2006 due to the construction of a new cement production line with a daily clinker capacity of 6,000 tonnes by Nanyang and the construction of grinding stations in Fuyang, Suqian and Lianyungang. Our equipment requirement in 2007 is mainly attributable to the construction of a new production line by Huaihai. Based on our current requirement and requirement for the above construction projects, the annual caps for this transaction for the three years ending December 31, 2007 have been set at RMB 35 million, RMB 80 million and RMB 60 million, respectively.

4.  *Master Mutual Provision of Engineering Services Agreement*

Pursuant to the Reorganization, the assets retained by Parent include Hefei Institute, Qinhuangdao Institute and Hangzhou Institute which primarily provide engineering services in relation to cement, glass and lightweight building materials, respectively.

We will continue to procure from Parent Group engineering services which mainly comprise the following:

- BNBM will procure from Hangzhou Institute engineering design services for its gypsum board production lines. Our engineering segment only provides engineering design services for cement and glass production lines and does not provide the services required by BNBM.

- Luhong and Nanyang will procure from Hefei Institute repair, maintenance and technical support services for their production lines that were designed by Hefei Institute in order to ensure service quality and cost efficiency.

- China Triumph will procure from Parent Group engineering consultation services such as evaluation of investment opportunity, preparing project proposals, conducting feasibility studies and budget planning. Only licensed engineering consultants are permitted to provide such services. As none of the Company's subsidiaries holds such licenses, China Triumph can only procure engineering consultation services from Parent Group.

- China Triumph and Nanjing Triumph will procure from Parent Group certain equipment design services. Although both we and Parent Group provide equipment design services, Parent Group focuses on the design of dedusting filter and ancillary equipment of grinding mills while our focus is on rotary kiln and its ancillary equipment.

The Company's subsidiary, Chenlong Decoration, will also continue to provide BNBMG with engineering services relating to decoration and renovation of premises.

ALRMH-CNBM00000174

# CONNECTED TRANSACTIONS

*Description of Transaction and Principal Terms*

In this connection, the Company entered into a Master Mutual Provision of Engineering Services Agreement with Parent on February 28, 2006 whereby:

(a)   Parent agreed to provide, or procure its subsidiaries to provide, us with engineering design, construction and supervisory services; and

(b)   the Company agreed to provide, or procure its subsidiaries to provide, Parent with engineering services.

Where contracts are to be tendered, the Company will not accord any priority to Parent to provide such services, and the tender may be awarded to one or more Independent Third Parties. However, if the terms of an offer from Parent are no less favorable than those offered by another tenderer, the Company expects to award the tender to Parent. Parent may provide engineering services to any third party, provided that the provision of such services to the Company will not be affected. The Company is entitled to obtain such services from any third party if Parent cannot satisfy its needs.

It is envisaged that from time to time and as required, the Company's subsidiaries will enter into individual engineering services agreements with subsidiaries of Parent. The individual engineering services agreements set out the terms and conditions under which specific engineering services are to be requested from time to time. The individual engineering services agreements are expected to contain provisions which reflect the binding principles, guidelines, terms and conditions in the Master Mutual Provision of Engineering Services Agreement. As the individual engineering services agreements are simply further elaborations on the provision of engineering services pursuant to and as contemplated by the Master Mutual Provision of Engineering Services Agreement, they do not constitute new categories of connected transactions.

*Price Determination*

The prices of all contracts for engineering services to be provided pursuant to the Master Mutual Provision of Engineering Services Agreement shall be in accordance with the state-guided price. If there is no state-guided price, then according to market price. Where contracts are to be tendered, the price for the provision of engineering services shall be set according to the procedures adopted by the tender supervisory and administrative bureau in the locality of the construction project, which should be maintained at a level reasonably close to the lowest market price.

For the purpose of the Master Mutual Provision of Engineering Services Agreement, the term "state-guidance price" shall mean the price which the contracting parties may agree, which is within the price range set in accordance with the applicable laws and regulations of the PRC; and the term "market price" shall mean either the price at which the same type of engineering design, construction and supervisory services are provided by Independent Third Parties in the same area, in the vicinity or in the PRC in the ordinary course of their businesses on normal commercial terms or the price at which the same type of engineering design, construction and supervisory services are provided to Independent Third Parties in the PRC on normal commercial terms.

ALRMH-CNBM00000175

## CONNECTED TRANSACTIONS

*Term and Termination*

The Master Mutual Provision of Engineering Services Agreement is for a term of three years commencing from January 1, 2005. Upon expiry of the term, the Master Mutual Provision of Engineering Services Agreement will, subject to the requirements of the Stock Exchange, be automatically renewed for further periods of three years. Either party may terminate the Master Mutual Provision of Engineering Services Agreement or any specific agreements entered into pursuant to the Master Mutual Provision of Engineering Services Agreement by giving the other party three months' prior written notice, provided that if the Company cannot conveniently obtain engineering services from a third party, Parent shall not be permitted to terminate and shall continue to provide such services under any circumstances.

*Historical Figures*

For each of the three years ended December 31, 2004 and the nine months ended September 30, 2005, our expenditure for engineering services provided by Parent Group was approximately RMB 7.8 million, RMB 13.9 million, RMB 10.8 million and RMB 5.0 million, respectively. Our service requirement in 2003 was attributable to (i) the engineering design services that we procured from Parent Group for our gypsum production lines; and (ii) technology consultation services for certain construction projects of our engineering services segment.

For each of the three years ended December 31, 2004 and the nine months ended September 30, 2005, our revenue from engineering services provided to Parent Group was approximately nil, nil, RMB 4.7 million and RMB 0.6 million, respectively.

*Annual Caps*

We will construct new production lines and our need for engineering services will continue to grow. Based on our current requirement and construction plans, the annual caps for this transaction for the three years ending December 31, 2007 have been set at RMB 12 million, RMB 15 million and RMB 25 million, respectively.

BNBMG will renovate its staff living quarters in 2006 and require engineering services from Chenlong Decoration. Based on historical transaction values and BNBMG's renovation plans, the annual caps for this transaction for the three years ending December 31, 2007 have been set at RMB 3 million, RMB 10 million and RMB10 million, respectively.

ALRMH-CNBM00000176

# CONNECTED TRANSACTIONS

*Transactions with BNBM Homes*

5.   *Master Provision of Production Supplies and Support Services Agreement*

BNBM Homes is engaged in the construction and sale of prefabricated houses. It procures from us its supply of building materials and support services.

*Description of Transaction and Principal Terms*

In this connection, BNBM entered into a Master Provision of Production Supplies and Support Services Agreement with BNBM Homes on February 28, 2006 pursuant to which BNBM agreed to provide to BNBM Homes the following:

- *Production supplies:* gypsum board, rock wool, lightweight metal frame and other raw materials for the construction of prefabricated houses; and

- *Support services:* transportation and loading services, water, electricity and steam.

BNBM Homes will provide BNBM on an annual basis an estimate of the production supplies and support services that it requires in the coming year. It is envisaged that from time to time and as required, BNBM's subsidiaries will enter into individual supply or service agreements with BNBM Homes which set out the terms and conditions for the provision of such production supplies and support services. The individual agreements are expected to contain provisions which reflect the binding principles, guidelines, terms and conditions in the Master Provision of Production Supplies and Support Services Agreement. As the individual agreements are simply further elaborations on the provision of production supplies and support services pursuant to and as contemplated by the Master Provision of Production Supplies and Support Services Agreement, they do not constitute new categories of connected transactions.

*Price Determination*

The production supplies and support services pursuant to the Master Mutual Provision of Production Supplies and Support Services Agreement shall be provided at:

(a)   the government-prescribed price;

(b)   if there is no government-prescribed price but there is a government-guided price, the government-guided price applies;

(c)   if there is neither a government-prescribed price nor a government-guided price, then the market price applies. For the purpose of the Master Provision of Production Supplies and Support Services Agreement, the term "market price" is defined as the price at which the same type of production supplies or support services is provided by Independent Third Parties under normal commercial terms in the ordinary course of business in the same area, in the vicinity or in the PRC; and

ALRMH-CNBM00000177

# CONNECTED TRANSACTIONS

(d)   if none of the above is applicable, the price is to be agreed between the relevant parties for the provision of the relevant production supplies or support services, which shall be the reasonable costs incurred in providing the same plus a profit margin of not more than 5% of such costs. For the purpose of the Master Provision of Production Supplies and Support Services Agreement, the term "reasonable costs" is defined as the costs confirmed by both parties after arm's length negotiations and permitted by the accounting systems of the PRC.

*Term and Termination*

The Master Provision of Production Supplies and Support Services Agreement is for a term of three years commencing from January 1, 2005. Upon expiry of the term, the Master Provision of Production Supplies and Support Services Agreement will, subject to the requirements of the Stock Exchange, be automatically renewed for further periods of three years. Either party may terminate the Master Provision of Production Supplies and Support Services Agreement by giving the other party three months' prior written notice.

*Historical Figures*

According to the management accounts of BNBM Homes for each of the three years ended December 31, 2004 and the nine months ended September 30, 2005, our revenue from the production supplies and support services provided to BNBM Homes was approximately RMB 1.0 million, RMB 2.2 million, RMB 3.8 million and RMB 2.4 million, respectively.

*Annual Caps*

We assume that the business of BNBM Homes will continue to grow and its need for lightweight metal frame and other raw materials for the construction of prefabricated houses will continue to increase. The annual caps for this transaction for the three years ending December 31, 2007 have therefore been set at RMB 6 million, RMB 25 million and RMB 35 million, respectively.

The production supplies and support services procured by BNBM Homes from the Group comprise raw materials (mainly gypsum board, rock wool and lightweight metal frame), transportation and loading services, water, electricity and steam. The annual caps are mainly attributable to its forecasted sales growth, which is expected to be over 30% for 2006 and 2007.

6.   *Master Engineering Services Agreement*

In addition to building materials and support services, BNBM Homes also procures from us engineering services for its construction projects.

*Description of Transaction and Principal Terms*

The Company's subsidiary Chenlong Decoration entered into a Master Engineering Services Agreement with BNBM Homes on February 28, 2006 whereby Chenlong Decoration agreed to provide engineering design, construction and supervisory services to BNBM Homes.

ALRMH-CNBM00000178

# CONNECTED TRANSACTIONS

Where contracts are to be tendered, BNBM Homes does not accord any priority to Chenlong Decoration to provide such services, and the tender may be awarded to one or more Independent Third Parties. However, if the terms of an offer from Chenlong Decoration are no less favorable than those offered by another tenderer, it is expected that BNBM Homes would award the tender to Chenlong Decoration. Chenlong Decoration may provide engineering services to any third party, provided that the provision of such services to BNBM Homes will not be affected. BNBM Homes is entitled to obtain such services from any third parties if Chenlong Decoration cannot satisfy its needs.

It is envisaged that from time to time and as required, Chenlong Decoration will enter into individual engineering services agreements with BNBM Homes. The individual engineering services agreements set out the terms and conditions under which specific engineering services are to be requested by BNBM Homes from time to time. The individual engineering services agreements are expected to contain provisions which reflect the binding principles, guidelines, terms and conditions in the Master Engineering Services Agreement. As the individual engineering services agreements are simply further elaborations on the provision of engineering services pursuant to and as contemplated by the Master Engineering Services Agreement, they do not constitute new categories of connected transactions.

*Price Determination*

The prices of all contracts for engineering design, construction and supervisory services to be provided pursuant to the Master Engineering Services Agreement shall be in accordance with the state-guided price. If there is no state-guided price, then according to market price.

For the purpose of the Master Engineering Services Agreement, the term "state-guided price" shall mean the price which the contracting parties may agree, which is within the price range set in accordance with the applicable laws and regulations of the PRC; and the term "market price" shall mean either the price at which the same type of engineering design, construction and supervisory services are provided by Independent Third Parties in the same area, in the vicinity or in the PRC in the ordinary course of their businesses upon normal commercial terms or the price at which the same type of engineering design, construction and supervisory services are provided to Independent Third Parties in the PRC upon normal commercial terms.

Where contracts are to be tendered, the price for the provision of engineering design, construction and supervisory services shall be set according to the procedures adopted by the tender supervisory and administrative bureau in the locality of the construction project. The tender price should be maintained at a level reasonably close to the lowest market price.

*Term and Termination*

The Master Engineering Services Agreement is for a term of three years commencing from January 1, 2005. Upon expiry of the term, the Master Engineering Services Agreement will, subject to the requirements of the Stock Exchange, be automatically renewed for further periods of three years. Either party may terminate the Master Engineering Services Agreement by giving the other party three months' prior written notice.

ALRMH-CNBM00000179

# CONNECTED TRANSACTIONS

*Historical Figures*

According to the management accounts of Chenlong Decoration for each of the three years ended December 31, 2004 and the nine months ended September 30, 2005, Chenlong Decoration's revenue from the engineering services provided to BNBM Homes was approximately RMB 0.5 million, RMB 2.8 million, RMB 1.5 million and RMB 0.7 million, respectively.

*Annual Caps*

Based on the historical transaction values and assuming normal growth in BNBM Homes' business, the annual caps for this transaction for the three years ending December 31, 2007 have been set at RMB 3 million, RMB 3 million and RMB 5 million, respectively.

***Transactions with Beijing Chemical***

7.    *Supply of Raw Material Agreement*

BNBM Plastic and Beijing Chemical entered into a Supply of Raw Material Agreement on February 28, 2006, pursuant to which Beijing Chemical agreed to provide PVC to BNBM Plastic for the production of plastic products.

*Price Determination*

The raw materials pursuant to the Supply of Raw Material Agreement shall be provided at market price, namely, the price at which the same type of raw material is provided by Independent Third Parties under normal commercial terms in the ordinary course of business in the same area, in the vicinity or in the PRC.

*Term and Termination*

The Supply of Raw Material Agreement is for a term of three years commencing from January 1, 2005. Upon expiry of the term, the Supply of Raw Material Agreement will, subject to the requirements of the Stock Exchange, be automatically renewed for further periods of three years. Either party may terminate the Supply of Raw Material Agreement by giving the other party three months' prior written notice.

*Historical Figures*

For each of the three years ended December 31, 2004 and the nine months ended September 30, 2005, BNBM Plastic's expenditure for the raw materials supplied by Beijing Chemical was approximately RMB 42.3 million, RMB 43.7 million, RMB 60.2 million and RMB 39.4 million, respectively.

*Annual Caps*

Based on the historical transaction values and assuming normal growth in the business of BNBM Plastic, the annual caps for this transaction for the three years ending December 31, 2007 have been set at RMB 50 million, RMB 70 million and RMB 75 million, respectively.

ALRMH-CNBM00000180

# CONNECTED TRANSACTIONS

*Transactions with Liberty Group*

8.    *Supply of Technical Consultation Services Agreements*

Each of China Composites and Zhongfu Liberty entered into a Supply of Technical Consultation Services Agreement on March 2, 2006 for the provision of technical consultation services to Liberty Group.

*Price Determination*

The technical consultation services pursuant to the Supply of Technical Consultation Services Agreements shall be provided at market price, namely, the price at which the same type of service is provided by Independent Third Parties under normal commercial terms in the ordinary course of business in the same area, in the vicinity or in the PRC.

*Term and Termination*

Each of the Supply of Technical Consultation Services Agreements is for a term of three years commencing from January 1, 2005. Upon expiry of the term, the Supply of Technical Consultation Services Agreements will, subject to the requirements of the Stock Exchange, be automatically renewed for further periods of three years. For each of the Supply of Technical Consultation Services Agreements, either party may terminate it by giving the other party three months' prior written notice.

*Historical Figures*

For each of the three years ended December 31, 2004 and the nine months ended September 30, 2005. our revenue from the technical consultation services provided to Liberty Group was approximately nil, nil, RMB 2.5 million and RMB 5.4 million, respectively.

*Annual Caps*

Based on historical transaction values and assuming normal growth in Liberty Group's business, the annual caps for this transaction for the three years ending December 31, 2007 have been set at RMB 6 million, RMB 10 million and RMB 10 million, respectively.

ALRMH-CNBM00000181

# CONNECTED TRANSACTIONS

*Transactions with Tianma Group*

9. *Supply of Raw Material Agreement*

Zhongxin Tianma and Tianma Group entered into a Supply of Raw Material Agreement on March 2, 2006, pursuant to which Tianma Group agreed to provide raw materials to Zhongxin Tianma for the production of glass fiber products.

*Price Determination*

The raw materials pursuant to the Supply of Raw Material Agreement shall be provided at market price, namely, the price at which the same type of raw material is provided by Independent Third Parties under normal commercial terms in the ordinary course of business in the same area, in the vicinity or in the PRC.

*Term and Termination*

The Supply of Raw Material Agreement is for a term of three years commencing from January 1, 2005. Upon expiry of the term, the Supply of Raw Material Agreement will, subject to the requirements of the Stock Exchange, be automatically renewed for further periods of three years. Either party may terminate the Supply of Raw Material Agreement by giving the other party three months' prior written notice.

*Historical Figures*

For each of the three years ended December 31, 2004 and the nine months ended September 30, 2005, Zhongxin Tianma's expenditure for raw materials supplied by Tianma Group was approximately nil, nil, RMB 11.9 million and RMB 6.7 million, respectively.

*Annual Caps*

Zhongxin Tianma's second glass fiber mat production line commenced production in the first quarter of 2006. Its future need for raw materials is expected to increase significantly. Based on the historical transaction values and the requirement of the new production line, the annual caps for this transaction for the three years ending December 31, 2007 have been set at RMB 12 million, RMB 20 million and RMB 20 million, respectively.

ALRMH-CNBM00000182

## CONNECTED TRANSACTIONS

*10.   Service Agreement*

Zhongxin Tianma and Tianma Group entered into a Service Agreement on March 2, 2006 pursuant to which Tianma Group agreed to provide electricity and water to Zhongxin Tianma.

*Price Determination*

The utilities pursuant to the Service Agreement shall be provided at:

(a)   the government-prescribed price;

(b)   if there is no government-prescribed price but there is a government-guided price, the government-guided price applies;

(c)   if there is neither a government-prescribed price nor a government-guided price, then the market price applies. For the purpose of the Service Agreement, the term "market price" is defined as the price at which the same type of utilities is provided by Independent Third Parties under normal commercial terms in the ordinary course of business in the same area, in the vicinity or in the PRC; and

(d)   if none of the above is applicable, the price is to be agreed between the relevant parties for the provision of the relevant utilities, which shall be the reasonable costs incurred in providing the same plus a profit margin of not more than 5% of such costs. For the purpose of the Service Agreement, the term "reasonable costs" is defined as the costs confirmed by both parties after arm's length negotiations and permitted by the accounting systems of the PRC.

The prices for electricity and water are currently prescribed by the government.

*Term and Termination*

The Service Agreement is for a term of three years commencing from January 1, 2005. Upon expiry of the term, the Service Agreement will, subject to the requirements of the Stock Exchange, be automatically renewed for further periods of three years. Either party may terminate the Service Agreement by giving the other party three months' prior written notice.

*Historical Figures*

For each of the three years ended December 31, 2004 and the nine months ended September 30, 2005, Zhongxin Tianma's expenditure for utilities provided by Tianma Group was approximately nil, nil, RMB 2.9 million and RMB 2.0 million, respectively.

ALRMH-CNBM00000183

## CONNECTED TRANSACTIONS

*Annual Caps*

For the reason set out in paragraph 9 above, Zhongxin Tianma's future utilities requirement is expected to increase significantly. The annual caps for this transaction for the three years ending December 31, 2007 have therefore been set at RMB 3 million, RMB 6 million and RMB 6 million, respectively.

**Transactions with Jushi Group**

11.   *Supply of Raw Material Agreement*

The Company entered into a Supply of Raw Material Agreement with Jushi Group on March 2, 2006 pursuant to which Jushi Group agreed to provide the Company with raw materials for the production of glass fiber products.

*Price Determination*

The raw materials pursuant to the Supply of Raw Material Agreement shall be provided at market price, namely, the price at which the same type of raw material is provided by Independent Third Parties under normal commercial terms in the ordinary course of business in the same area, in the vicinity or in the PRC.

*Term and Termination*

The Supply of Raw Material Agreement is for a term of three years commencing from January 1, 2005. Upon expiry of the term, the Supply of Raw Material Agreement will, subject to the requirements of the Stock Exchange, be automatically renewed for further periods of three years. Either party may terminate the Supply of Raw Material Agreement by giving the other party three months' prior written notice.

*Historical Figures*

For each of the three years ended December 31, 2004 and the nine months ended September 30, 2005, our expenditure for the raw materials supplied by Jushi Group was approximately nil, RMB 0.6 million, RMB 8.4 million and RMB 14.1 million, respectively.

*Annual Caps*

Assuming that our business will continue to grow, our requirement for raw materials supplied by Jushi Group will continue to increase. Zhongxin Tianma's second glass fiber mat production line commenced production in the first quarter of 2006 and its requirement for raw materials from Jushi Group will increase. Based on historical transaction values, normal growth in our business and the requirement of Zhongxin Tianma's new production line, the annual caps for this transaction for the three years ending December 31, 2007 have been set at RMB 20 million, RMB 25 million and RMB 30 million, respectively.

**Transactions with Aobao Chemical**

12.   *Supply of Raw Material Agreement*

Weifang Aotai and Aobao Chemical entered into a Supply of Raw Material Agreement on March 2, 2006 pursuant to which Aobai Chemical agreed to supply Weifang Aotai with raw materials for the production of gypsum.

— 180 —

ALRMH-CNBM00000184

## CONNECTED TRANSACTIONS

*Price Determination*

The raw materials pursuant to the Supply of Raw Material Agreement shall be provided at market price, namely, the price at which the same type of raw material is provided by Independent Third Parties under normal commercial terms in the ordinary course of business in the same area, in the vicinity or in the PRC.

*Term and Termination*

The Supply of Raw Material Agreement is for a term of three years commencing from January 1, 2005. Upon expiry of the term, the Supply of Raw Material Agreement will, subject to the requirements of the Stock Exchange, be automatically renewed for further periods of three years. Either party may terminate the Supply of Raw Material Agreement by giving the other party three months' prior written notice.

*Historical Figures*

There are no historical transaction values for the three years ended December 31, 2004 as Weifang Aotai only commenced production in June 2005. For the nine months ended September 30, 2005, Weifang Aotai's expenditure for raw materials supplied by Aobao Chemical was approximately RMB708,000.

*Annual Caps*

Weifang Aotai commenced production in 2005 and its second production line will commence production in 2006. Based on the expected requirement of its production lines, the annual caps for this transaction for the three years ending December 31, 2007 have been set at RMB 3 million, RMB 10 million and RMB 10 million, respectively.

**Transactions with Hengzhijiu Trade**

*13.   Supply of Raw Material Agreement*

Luhong and Hengzhijiu Trade entered into a Supply of Raw Material Agreement on March 2, 2006 pursuant to which Hengzhijiu Trade agreed to provide coal to Luhong for the production of cement.

*Price Determination*

The coal pursuant to the Supply of Raw Material Agreement shall be provided at market price, namely, the price at which the same type of coal is provided by Independent Third Parties under normal commercial terms in the ordinary course of business in the same area, in the vicinity or in the PRC.

*Term and Termination*

The Supply of Raw Material Agreement is for a term of three years commencing from January 1, 2005. Upon expiry of the term, the Supply of Raw Material Agreement will, subject to the requirements of the Stock Exchange, be automatically renewed for further periods of three years. Either party may terminate the Supply of Raw Material Agreement by giving the other party three months' prior written notice.

ALRMH-CNBM00000185

## CONNECTED TRANSACTIONS

*Historical Figures*

There are no historical transaction values for the three years ended December 31, 2004. For the nine months ended September 30, 2005, Luhong's expenditure for coal supplied by Hengzhijiu Trade was approximately RMB 18.2 million.

*Annual Caps*

Luhong established a new clinker production line, increasing its daily clinker capacity from 4,600 tonnes to 9,600 tonnes. The new production line commenced production in 2005. Based on historical transaction values and the increase in Luhong's requirement for coal, the annual caps for this transaction for the three years ending December 31, 2007 have been set at RMB 45 million, RMB 55 million and RMB 55 million, respectively.

*14.   Supply of Product Agreement*

Luhong and Hengzhijiu Trade entered into a Supply of Product Agreement on March 2, 2006, pursuant to which Luhong agreed to provide cement to Hengzhijiu Trade for use in connection with its business.

*Price Determination*

The cement pursuant to the Supply of Product Agreement shall be provided at market price, namely, the price at which the same type of cement is provided by Independent Third Parties under normal commercial terms in the ordinary course of business in the same area, in the vicinity or in the PRC.

*Term and Termination*

The Supply of Product Agreement is for a term of three years commencing from January 1, 2005. Upon expiry of the term, the Supply of Product Agreement will, subject to the requirements of the Stock Exchange, be automatically renewed for further periods of three years. Either party may terminate the Supply of Product Agreement by giving the other party three months' prior written notice.

*Historical Figures*

There are no historical transaction values for each of the three years ended December 31, 2004. For the nine months ended September 30, 2005, Luhong's revenue from cement supplied to Hengzhijiu Trade was approximately RMB 36.6 million.

*Annual Caps*

As mentioned in paragraph 13 above, Luhong's annual production volume will increase as its new cement production line, which has a daily clinker capacity of 5,000 tonnes, commenced production in 2005. Based on historical transaction values and the increase in the volume of cement produced by Luhong, the annual caps for this transaction for the three years ending December 31, 2007 have been set at RMB 45 million, RMB 60 million and RMB 60 million, respectively.

ALRMH-CNBM00000186

# CONNECTED TRANSACTIONS

**Exempt Continuing Connected Transactions**

*Transactions with Parent Group*

15.   *Patent Licensing Agreement*

As one of the first state-owned enterprises with registered patents, BNBMG received from the State Intellectual Properties Bureau (國家知識產權局) monetary and other support for research and development purposes the continuance of which is in our interest. As the Company's controlling shareholder, it is also in BNBMG's interest to support us with any new technology developed. Furthermore, the transfer of such patents is subject to valuation and regulatory approvals which would involve considerable expenses and lengthy and complicated procedures. For these reasons, BNBMG decided not to transfer to us its patents.

To ensure that we have exclusive use of its patents, BNBM entered into a Patent Licensing Agreement with BNBMG on February 28, 2006 pursuant to which BNBMG has licensed to BNBM certain patents and technologies which BNBMG is applying for registration as patents, details of which are set out in Appendix VIII to this prospectus, for use in connection with its business operations. The patents and technologies were licensed to BNBM on an exclusive and royalty-free basis for a term of 10 years commencing from January 1, 2005. Upon expiry of the term, the Patent Licensing Agreement may be renewed for a further period of 10 years upon BNBM's request.

BNBM has undertaken to make timely payment of fees for maintaining effective registration of the licensed patents. BNBMG has undertaken to apply for registration of the patents in designated jurisdictions according to BNBM's reasonable request.

BNBM may sub-license the licensed patents and technologies to its subsidiaries without BNBMG's prior consent. BNBMG is not permitted to use or license to any third party any of the licensed patents and technologies during the term of the Patent Licensing Agreement. BNBM has been granted pre-emption rights to acquire the licensed patents and technologies.

16.   *Trademark Licensing Agreements*

Since Parent registered the "CNBM" trademarks with the objective of projecting a unified image for Parent Group, they have mainly been registered as service marks. Some of them are registered in respect of certain categories of building products for the sole purpose of avoiding the effect on Parent's general image resulting from their registration by external parties. Therefore, since registration, they have always been used by Parent in the promotion of corporate image and have never been used by Parent Group as brand names of any products.

ALRMH-CNBM00000187

## CONNECTED TRANSACTIONS

We are of the view that it would be sufficient for us to obtain a licence to use the "CNBM" trademarks from Parent without acquiring ownership to such trademarks because:

(a)  in the short to medium run, we do not expect our business to be dependent on such trademarks, as they have never been used as brand names of any of our products; and

(b)  in the long run, should the need ever arise for us to obtain ownership to such trademarks, we would enter into discussion with Parent to arrange for the necessary transfer.

The Company entered into a Trademark Licensing Agreement on February 28, 2006 pursuant to which Parent has licensed to the Company the right to use the "CNBM" trademarks on a non-exclusive basis at a consideration of RMB 1.00 per annum and for a term of 10 years commencing from January 1, 2005. Upon expiry of the term, the term may be renewed for a further period of 10 years upon the Company's request. The Company has been granted pre-emption rights to acquire the "CNBM" trademarks from Parent.

Prior to the Reorganization, the "Hangtian" and "Ziyan" trademarks were owned by Nanyang Hangtian and Xinlei (members of the Parent Group carrying on the vertical kiln cement business), respectively. As part of the Reorganization, the "Hangtian" and "Ziyan" trademarks have been transferred to Nanyang and Ziyan (members of the Group carrying on the NSP cement business), respectively.

Despite the transfers, Nanyang Hangtian and Xinlei need to use the trademarks to carry on their vertical kiln cement business. However, they will not be using the trademarks for a long period of time because vertical kiln cement will be gradually replaced by NSP Cement.

Nanyang entered into a Trademark Licensing Agreement on June 10, 2005 for licensing to Nanyang Hangtian the "Hangtian" trademark for a term of three years commencing from June 20, 2005 at nil consideration.

Ziyan entered into a Trademark Licensing Agreement on February 28, 2006 for licensing to Xinlei the "Ziyan" trademark for a term of three years commencing from January 1, 2005 at a consideration of RMB 1.00 per tonne of cement sold by Xinlei. For each of the three years ending December 31, 2007, the fee payable by Xinlei to Ziyan is currently estimated to be approximately RMB 276,000, RMB 400,000 and RMB 600,000, respectively.

### Transactions with Tianma Group

17.  *Shareholders' Loan Agreement*

Zhongxin Tianma is a sino-foreign equity joint venture currently held by China Composites, Tianma Group and JM International as to 40%, 35% and 25%, respectively. A total of approximately RMB 58.9 million is currently due from Zhongxin Tianma to its shareholders, of which approximately RMB 21.0 million, RMB 17.7 million and US$ 2.5 million is due to China Composites, Tianma Group and JM International, respectively, representing approximately 35.6%, 30.1% and 34.3% of the total amount, respectively. China Composites' share of the loan is less than its percentage shareholding interest in Zhongxin Tianma. No financial assistance is provided by us to Tianma Group. The shareholders' loan is interest bearing

— 184 —

## CONNECTED TRANSACTIONS

at the rate of 6.03% per annum (being the prevailing lending rate of People's Bank of China at the time when the loan was provided), unsecured and expired on December 31, 2005. The shareholders' loan provided by Tianma Group to Zhongxin Tianma is on normal commercial or better terms as the shareholders' loan is unsecured, while bank loans must normally be secured with a guarantee. The shareholders' loan therefore falls under Listing Rule 14A.65(4) and will not be subject to any announcement requirement or independent shareholders' approval requirements regarding connected transactions as set out in Chapter 14A of the Listing Rules.

***Transactions with JM International***

18.   *Shareholders' Loan Agreement*

Zhongxin Tianma is a sino-foreign equity joint venture currently held by China Composites, Tianma Group and JM International as to 40%, 35% and 25%, respectively. A total of approximately RMB 58.9 million is currently due from Zhongxin Tianma to its shareholders, of which approximately RMB 21.0 million, RMB 17.7 million and US$ 2.5 million is due to China Composites, Tianma Group and JM International, respectively, representing approximately 35.6%, 30.1% and 34.3% of the total amount, respectively. China Composites' share of the loan is less than its percentage shareholding interest in Zhongxin Tianma. No financial assistance is provided by us to JM International. The shareholders' loan is interest bearing at the rate of 6.03% per annum (being the prevailing lending rate of People's Bank of China at the time when the loan was provided), unsecured and expired on December 31, 2005. The shareholders' loan provided by JM International to Zhongxin Tianma is on normal commercial or better terms as the shareholders' loan is unsecured, while bank loans must normally be secured with a guarantee. The shareholders' loan therefore falls under Listing Rule 14A.65(4) and will not be subject to any announcement or independent shareholders' approval requirements regarding connected transactions as set out in Chapter 14A of the Listing Rules.

**Application for Waivers**

Following the completion of the Global Offering, we will continue to enter into the transactions described in the sections headed "*Non-Exempt Continuing Connected Transactions*" and "*Exempt Continuing Connected Transactions*" above. The Directors (including the independent non-executive Directors) are of the opinion that (i) the transactions have been entered into and will be carried out in our ordinary and usual course of business, on normal commercial terms which are fair and reasonable and in the interests of the Shareholders as a whole; and (ii) the annual caps for such transactions are fair and reasonable.

***No Waiver Applied for Certain Categories of Continuing Connected Transactions***

For the continuing connected transactions set out in paragraphs 15 and 16 above, each of the percentage ratio (other than the profits ratio) calculated by reference to Rule 14A.07 of the Listing Rules, where applicable, is on an annual basis less than 0.1% and accordingly will qualify as continuing connected transactions under Rule 14A.33(3) of the Listing Rules. These transactions are exempt from reporting, announcement and independent shareholders' approval requirements. In the case of the transactions set out in paragraphs 17 and 18, pursuant to Listing Rule 14A.65(4), they are exempt from the reporting, announcement and independent shareholders' approval requirements under Chapter 14A of the Listing Rules.

ALRMH-CNBM00000189

# CONNECTED TRANSACTIONS

*Scope of Waiver*

Under the Listing Rules, the continuing connected transactions under paragraphs 1, 2, 3 and 7 are considered to be non-exempt continuing connected transactions under Rule 14A.35 and would require compliance with the reporting and announcement requirements set out in Rules 14A.45 to 14A.47 of the Listing Rules and the independent shareholders' approval requirements set out in Rule 14A.48 of the Listing Rules.

For the continuing connected transactions under paragraphs 4 to 6, 8 to 14, each of the percentage ratio (other than the profits ratio) calculated by reference to Rule 14A.07 of the Listing Rules, where applicable, is on an annual basis less than 2.5% and are considered to be continuing connected transactions under Rule 14A.34 of the Listing Rules. Such transactions are exempt from the independent shareholders' approval requirements set out in Rule 14A.48 of the Listing Rules but are subject to the reporting and announcement requirements set out in Rules 14A.45 to 14A.47 of the Listing Rules.

The Company has applied to the Stock Exchange for, and was granted, a waiver from strict compliance with the above announcement and independent shareholders' approval requirements under Rule 14A.42(3) of the Listing Rules.

*Confirmation from the Sponsor*

The Sponsor is of the view that (i) the continuing connected transactions described above for which waivers are sought have been entered into in the ordinary and usual course of business of the Company, on normal commercial terms, are fair and reasonable and in the interests of the Shareholders as a whole, and (ii) the annual caps for such transactions are fair and reasonable.

ALRMH-CNBM00000190

## DIRECTORS, SUPERVISORS, SENIOR MANAGEMENT AND EMPLOYEES

**Management**

### Board of Directors

The board of Directors consists of 10 Directors, of whom four are independent non-executive Directors and three are non-executive Directors. The Directors are elected at meetings of the shareholders of the Company for a term not exceeding three years, renewable upon re-election and re-appointment. The functions and duties conferred on the board of Directors include: convening shareholders' meetings and reporting its work to the shareholders' meetings, implementing the resolutions of the shareholders' meetings, determining the Company's business plans and investment plans, formulating the Company's annual budget and final accounts, formulating the Company's proposals for dividend and bonus distributions and for the increase or reduction of registered capital as well as exercising other powers, functions and duties as conferred by the Articles of Association. Service contracts between the Company and its executive Directors, non-executive Directors and independent non-executive Directors were entered into on February 28, 2006 (except for Mr. Lau Ko Yuen, Tom who has entered into a service contract with the Company on March 9, 2006).

### Supervisory Committee

The Company Law requires a joint stock limited company to establish a supervisory committee and this requirement is reflected in the Articles of Association. The supervisory committee is responsible for monitoring the Company's financial matters and overseeing the actions of the board of Directors and the management personnel of the Company. The supervisory committee consists of six Supervisors, of whom three are elected by the shareholders as their representatives, one is elected by the employees of the Company while the other two are independent Supervisors. The term of office of the Supervisors does not exceed three years, and they may be re-elected and re-appointed. An elected Supervisor cannot concurrently hold the position of a Director, manager or financial controller. The functions and powers conferred on the supervisory committee include: attending board meetings, examining the financial affairs, examining balance sheets, profit and loss accounts, business reports, dividend distribution proposals and other financial information proposed at shareholders' general meetings by the Directors from time to time and overseeing the actions of the board of Directors and other senior management personnel of the Company in carrying out their duties. In the case of any conflict of interest between the Company and any of its Directors, the Supervisors shall confer with or initiate legal proceedings against such Directors on behalf of the Company. A resolution proposed at any meeting of the supervisory committee shall be adopted only if it is approved by two-thirds or more of the Supervisors.

ALRMH-CNBM00000191

## DIRECTORS, SUPERVISORS, SENIOR MANAGEMENT AND EMPLOYEES

### Directors

The following table sets out certain information concerning the Directors of the Company. The business address of each of the Directors, Supervisors and senior management is 17th Floor, China National Building Materials Plaza, No. A-11, Sanlihe Road, Haidian District, Beijing, the PRC, 100037. There is no family relationship between any of the Directors, Supervisors or senior management of the Company.

| Name | Age | Senior Position in Company | Senior Position in Parent |
|---|---|---|---|
| Song Zhiping . . . . . . | 49 | Executive Director and Chairman of the Board of Directors | Chairman of the Board of Directors |
| Cao Jianglin . . . . . . . | 39 | Executive Director and President | Director |
| Li Yimin . . . . . . . . . | 52 | Executive Director and Vice President | — |
| Cui Lijun . . . . . . . . . | 45 | Non-Executive Director | — |
| Huang Anzhong . . . . . | 42 | Non-Executive Director | — |
| Zuo Fenggao . . . . . . . | 50 | Non-Executive Director | — |
| Zhang Renwei . . . . . . | 65 | Independent Non-Executive Director | — |
| Zhou Daojiong . . . . . | 72 | Independent Non-Executive Director | — |
| Chi Haibin . . . . . . . . | 74 | Independent Non-Executive Director | — |
| Lau Ko Yuen, Tom . . | 54 | Independent Non-Executive Director | — |

The Directors, Mr. Song Zhiping and Mr. Cao Jianglin, will continue to be directors of Parent. The directors of Parent are only involved in the high level decision making of important strategic and policy matters. As confirmed by the Company's PRC counsel, Mr. Song and Mr. Cao do not have executive functions and are not responsible for nor have any involvement in the day-to-day management of Parent. Mr. Song's and Mr. Cao's involvement in Parent is their being members of the board of directors which only meets on a regular basis for the purpose of reviewing the president's work report on the operations of Parent. The president and vice presidents of Parent are responsible for the ordinary course of operations of Parent.

### *Executive Directors*

Song Zhiping, aged 49, is an executive Director and chairman of the Board. He has been the chairman of Parent since October 2005. Mr. Song joined the Group since May 1997 and has over 25 years of business and management experience in China's building materials industry. He served as the president of Parent from March 2002 to October 2005 and the chairman of China United from March 2003 to April 2005. He also

ALRMH-CNBM00000192

## DIRECTORS, SUPERVISORS, SENIOR MANAGEMENT AND EMPLOYEES

served as the vice president of general affairs and the vice president of Parent from December 1998 to March 2002 and from October 1995 to December 1998, respectively. From May 1997 to May 2002, Mr. Song served as the chairman of BNBM. Apart from serving as the chairman and the secretary of the Party Committee of BNBMG since January 1996 and June 1996, respectively, Mr. Song served several positions in BNBMG (both prior to and after its conversion) from 1987 to 2002, including deputy director and director of the factory, and president. Mr. Song received a master's degree in engineering from Wuhan Industrial University (now Wuhan University of Technology) in July 1995 and a doctor's degree in management from Huazhong University of Science and Technology in June 2002. Mr. Song is qualified as a senior engineer and is currently a member of National MBA Education Supervisory Committee (NMESC) (全國工商管理碩士教育指導委員會). He is also the vice president of China Building Materials Industry Association (中國建材工業協會), the vice president of the Third Session of China Logistics Alliance Network (第三屆中國物流與採購聯合會) and the president of the China Capital Entrepreneurs' Club (首都企業家俱樂部). Mr. Song received a number of awards for his management and entrepreneurial skills from 1993 to 2003, including 500 Chinese Enterprise's Pioneers (中國500名企業創業者), National Outstanding Young Entrepreneur (全國優秀青年企業家), the Eighth Session of National Outstanding Entrepreneur "Golden Globe Awards" (第八屆全國優秀企業家金球獎), Management Elite Award (管理人物精英獎) and Chinese Entrepreneur for the year of 2003 (2003年度中國創業企業家).

Cao Jianglin, aged 39, is an executive Director and president of the Company. Mr. Cao joined the Group since April 1992 and has over 15 years of business and management experience in the building materials industry. Mr. Cao has been the chairman of the board of directors of BND and BNS Company Limited (北新科技發展有限公司) since March 2002, the chairman of China Fiberglass since June 2002, the director of Parent since October 2005 and the chairman of BNBM since October 2004. From April 1998 to October 2005, Mr. Cao served in a number of positions in Parent and the Group, including president of BND from December 2000 to April 2004, general manager of China Fiberglass from June 2002 to March 2005, assistant to the president and vice president of Parent from April 2002 to October 2005, assistant to the president, vice president and president of BNBMG from April 1998 to March 2005, and general manager of China National Building Material & Equipment Import and Export Zhujiang Corporation (中國建築材料及設備進出口珠江公司) from April 1998 to March 2002. Mr. Cao received a bachelor's degree in economics from Shanghai University of Finance and Economics in July 1990 and an MBA degree from Tsinghua University in January 2004. Mr. Cao was elected as a member of the Sixth Session of Committee of Shenzhen Youth Federation (深圳市青年聯合會第六屆委員會), president of Shenzhen Building Material Association (深圳市建材行業協會), vice president of China Logistics Alliance Network (中國物流與採購聯合會) and chairman (理事長) of the Listed Companies Association of Beijing (北京市上市公司協會).

Li Yimin, aged 52, is an executive Director and vice president of the Company. Mr. Li joined the Group since May 1997 and has over 20 years of business and management experience in China's building materials industry. Mr. Li served as the chief engineer of Parent from December 2003 to March 2005, the chairman of BNBM from April 2002 to February 2004, and the general manager of BNBM from May 1997 to April 2002. From January 1996 to December 2003, Mr. Li served successively as the vice president, vice chairman and president of BNBMG. He also served as the deputy head of BNBMG (prior to its conversion from Beijing New Building Materials Factory) from September 1985 to January 1996. Mr. Li graduated from electro-mechanical engineering from Shanghai Tongji University in August 1978 and received a master's degree in engineering from Wuhan Industrial University (now Wuhan University of Technology) in 1995. He is qualified as a senior engineer at professor level and was awarded a special grant of the government approved by the State Council.

— 189 —

ALRMH-CNBM00000193

## DIRECTORS, SUPERVISORS, SENIOR MANAGEMENT AND EMPLOYEES

*Non-Executive Directors*

Cui Lijun, aged 45, is a non-executive Director of the Company. Ms. Cui joined the Group since September 1998 and has over 20 years of business and management experience in China's building materials industry. Ms. Cui has served as a director of BNBM since June 2003. Since August 1997, she has served successively as the financial manager of BNBMG and financial manager of BNBM. She is currently the president and deputy chairwoman of BNBMG. Ms. Cui graduated in the investment management from the Graduate School of Chinese Academy of Social Sciences in November 1998.

Huang Anzhong, aged 42, is a non-executive Director of the Company. Mr. Huang joined the Group since March 2003 and has over 20 years of business and management experience in China's building materials industry. Mr. Huang served as the vice president of CNBM Equipment from April 1996 to November 2000, and the president of CNBM Equipment from November 2000 to February 2005. Mr. Huang graduated with a bachelor's degree in engineering from Nanjing Institute of Chemical Technology in July 1985 and graduated in the business management from the Graduate School of Chinese Academy of Social Sciences in November 1998. He received an EMBA degree from Xiamen University in June 2005. He is currently a senior economist.

Zuo Fenggao, aged 50, is a non-executive Director. Mr. Zuo joined the Group in March 2005 and has over 16 years' experience in business and management. Mr. Zuo has served as the head of Cinda, Beijing representative office since May 2004. Mr. Zuo also served as the deputy head of Cinda, Beijing representative office from September 1999 to May 2004, the head of the Beijing Xisi sub-branch of China Construction Bank from January 1997 to September 1999, the general manager of the mortgage department in China Construction Bank, Beijing branch and the deputy head of the Beijing Qianmen Sub-branch of China Construction Bank from June 1989 to January 1997. Mr. Zuo graduated in monetary and banking from the Faculty of Finance and Economics of the Graduate School of Chinese Academy of Social Sciences in July 1998. He is currently an economist.

*Independent Non-executive Directors*

Zhang Renwei, aged 65, is an independent non-executive Director of the Company. Mr. Zhang joined the Group since March 2005 and has over 40 years of business and management experience in China's building materials industry. Mr. Zhang has served as an independent non-executive director of Yaohua since June 2003, the president of China Building Materials Industry Association since February 2001 and the chairman of China Silicate Academy since January 2000. He also served as the director and secretary-general of State Bureau of Building Materials Industry from January 1994 to February 2001 and the deputy director of the same bureau from July 1985 to January 1994. Mr. Zhang graduated in silicate studies from East China Institute of Chemical Technology) (now known as East China University of Technology) in 1963. He is qualified as a senior engineer at professor level.

ALRMH-CNBM00000194

## DIRECTORS, SUPERVISORS, SENIOR MANAGEMENT AND EMPLOYEES

Zhou Daojiong, aged 72, is an independent non-executive Director of the Company. Mr. Zhou has served as an independent non-executive director of Harbin Power Equipment Company Limited (哈爾濱動力設備股份有限公司), a company listed on the Stock Exchange, since June 2003 and has accumulated experience in the review and establishment of internal controls, risk management measures and corporate governance of publicly listed companies. Mr. Zhou joined the Group since May 2005 and has over 50 years' experience in macro-economic management and finance. From March 1998 to March 2003, Mr. Zhou served as a member of the standing committee and the finance and economic committee of the 9th NPC. He also served as the audit commissioner of the State Council from March 1998 to August 2000. His primary responsibilities in the NPC and the State Council include monitoring corporate accounting and budgets, examining and supervising financial budgets of the PRC, participated in enacting PRC legislation on securities and futures development and supervising the implementation of such legislation. From March 1995 to June 1997, Mr. Zhou served as the chairman of CSRC. His primary responsibilities in CSRC include regulating the securities market of the PRC, participated in drafting securities law, reviewing financial statements of listing applicants and listed companies to ensure compliance with the relevant securities law and corporate governance requirements, and monitoring the trading activities of listed companies. From December 1984 to August 2000, Mr. Zhou served a number of key positions in China Construction Bank, including the secretary-general, the president and the chairman of the supervisory committee of China Construction Bank. He also served as the vice president of National Development Bank and the deputy director of the securities committee of the State Council. Before December 1984, Mr. Zhou served as the department head of the finance department, and the secretary-general of, Anhui provincial government. Mr. Zhou is currently the chairman of Taoxing Zhi Fund of China (中國陶行知基金會會長) and China Investment Development and Promotion Association (中國投資發展促進會會長), the honorary chairman of China Investment Association (中國投資學會名譽會長), and the consultant of the China Capital Entrepreneurs' Club (首都企業家俱樂部). Mr. Zhou is also qualified as a senior economist. Mr. Zhou is experienced in financial management, risk management measures and corporate governance of publicly listed companies. The Board is of the view that Mr. Zhou is suitable for the position of independent non-executive Director, with appropriate professional qualifications or accounting or related financial management expertise, as required under Rule 3.10(2) of the Listing Rules.

Chi Haibin, aged 74, is an independent non-executive Director of the Company. Mr. Chi joined the Group since May 2005 and has an in-depth knowledge of the PRC accounting standards. Mr. Chi has been the chairman of China Accounting Association (中國會計學會會長) since 1996 and served as the vice chairman of the Chinese Institute of Certified Public Accountants (中國註冊會計師協會副會長) from June 1996 to November 2004. The primary responsibilities of Mr. Chi, as the chairman of China Accounting Association and the vice chairman of the Chinese Institute of Certified Public Accountants, include providing proposals to the relevant supervision authorities on the accounting and finance rules and regulations in the PRC, studying and researching on the internal accounting standards, formulating rules and code of practice for PRC certified public accountants, and monitoring the implementation of such rules and code of practice in the PRC. Mr. Chi is qualified as a senior economist and has about 50 years' experience in macro-economic management. Mr. Chi joined the Ministry of Finance in 1954, and served in a number of significant positions therein from December 1954 to April 1993, including the deputy supervisor and deputy director of the economic construction division and the deputy head of the Ministry of Finance. From April 1993 to March 2003, Mr. Chi was also appointed as a member of the Standing Committee and the deputy supervisor of the finance and economic committee of the 8th NPC and a member of the standing committee and the finance and economic committee of the 9th NPC. His primary responsibilities in the Ministry of Finance and the NPC include monitoring corporate accounting and budgets, examining and supervising financial budgets of the

— 191 —

## DIRECTORS, SUPERVISORS, SENIOR MANAGEMENT AND EMPLOYEES

PRC, participated in enacting PRC legislation on economics and supervising the implementation of such legislation. Mr. Chi has served as an independent non-executive director of Fengfan Co., Ltd. (風帆股份有限公司), a company listed on the Shanghai Stock Exchange, since April 2004 and has accumulated experience in the review and establishment of internal controls, risk management measures and corporate governance of publicly listed companies. The Board is of the view that Mr. Chi is suitable for the position of independent non-executive Director, with appropriate professional qualifications or accounting or related financial management expertise, as required under Rule 3.10(2) of the Listing Rules.

Lau Ko Yuen, Tom, aged 54, is an independent non-executive Director of the Company. Mr. Lau joined the Group in January 2006. He is a deputy chairman and managing director of PYI Corporation Limited, and a deputy chairman of Paul Y. Engineering Group Limited. Mr. Lau has over 30 years of international corporate management experience within the construction industry.

### Supervisors

The following table sets out certain information concerning the Supervisors of the Company.

| Name | Age | Senior Position in Company | Senior Position in Parent |
|---|---|---|---|
| Shen Anqin . . . . . . . . | 56 | Supervisor | Vice President and Chief Accountant |
| Zhou Guoping . . . . . . | 46 | Supervisor | — |
| Bao Wenchun . . . . . . | 52 | Supervisor | — |
| Cui Shuhong . . . . . . . | 38 | Supervisor | — |
| Zhang Zhaomin . . . . . | 68 | Independent Supervisor | — |
| Liu Chijin . . . . . . . . | 43 | Independent Supervisor | — |

Shen Anqin, aged 56, is the chairman of the supervisory committee of the Company. Mr. Shen joined the Group since July 1999 and has over 15 years' experience in supervisory roles and management positions. Mr. Shen has been the vice president of Parent since August 1998 and the chief accountant of Parent since September 2003. From September 1990 to August 1998, Mr. Shen served successively as the deputy head of the comprehensive development and economic and finance division, the head of economic and finance division, and the deputy director of finance and state-owned assets supervision division, of the State Bureau of Building Materials Industry. Mr. Shen received a bachelor's degree in engineering from Xi Bei Electric Engineering School (now Xi Dian University) in April 1982. He is qualified as a senior accountant.

Zhou Guoping, aged 46, is a Supervisor of the Company. Ms. Zhou joined the Group since July 1999 and has over 13 years' experience in supervisory roles and management positions. Ms. Zhou has been the assistant to the president of Parent since October 2003 and the financial manager of Parent since April 2002. From March 1992 to April 2002, Ms. Zhou served successively as the deputy head of planning division in integrated planning department, assistant to the manager of integrated planning department, assistant to the

ALRMH-CNBM00000196

## DIRECTORS, SUPERVISORS, SENIOR MANAGEMENT AND EMPLOYEES

manager of planning and finance department, and deputy manager and manager of planning and finance division and deputy manager of financial management division of Parent. Ms. Zhou received a bachelor's degree in engineering from Wuhan Building Materials Technology Institute (now Wuhan University of Technology) in July 1982. She is qualified as a senior engineer.

Bao Wenchun, aged 52, is a Supervisor of the Company. Mr. Bao joined the Group since May 1997 and has over 12 years' experience in supervisory roles and management positions. Mr. Bao has been the executive deputy general manager of BNBMG since September 2004, the director of BNBMG since April 2002 and the secretary-general of BNBMG since August 2004. From May 1997 to September 2004, Mr. Bao served successively as a deputy general manager, general manager and chairman of the board of directors of BNBM. Mr. Bao also served as the manager of finance department of BNBMG from January 1996 to August 1997 and the deputy chief of the finance department of BNBMG (prior to its conversion from Beijing New Building Materials Factory) from February 1993 to January 1996. Mr. Bao graduated from accounting department of Beijing Chemical Engineering Administration Cadre Institute in July 1987. He is qualified as an accountant.

Cui Shuhong, aged 38, is a Supervisor of the Company. Ms. Cui joined the Group since October 2001 and has over 12 years' experience in supervisory roles and management positions. Ms. Cui has been the general manager of the administration and human resources department of the Company since April 2005. She served as the deputy director of the general manager office of Parent from April 2002 to April 2005, and the deputy manager of human resources office and deputy director of general manager office of BNBM from October 2001 to April 2002. She also served as the deputy director of the general manager's office of BNBMG from August 1997 to October 2001. Ms. Cui received a bachelor's degree in economics from Beijing Economics Institute in July 1990. She is qualified as a senior economist.

Zhang Zhaomin, aged 68, is an independent Supervisor of the Company. Mr. Zhang is also an expert advisor of Beijing Dongfang Petrochemical Company Limited (北京市東方石油化工有限公司). He joined the Group since May 2005 and has over 30 years' experience in supervisory roles and management positions. He served successively as a member of the preparation committee for converting the debts of Beijing Beihua Group Company's Ethylene Factory (北京市北化集團公司乙烯系列廠) into equity from 2001 to 2002, deputy chief of integration group of listing working committee of Sinopec (Group) Company (中石化集團公司) from 1999 to 2001 and the secretary of the board of directors of Sinopec Beijing Yanhua Petrochemical Co., Ltd. from 1997 to 2000. Mr. Zhang also served successively as the deputy chief economic and chief of planning division of Beijing Yanshan Petrochemical Company Limited (北京市燕山石油化工有限公司) from 1988 to 1993, its chief economist from 1993 to 1997 and its deputy general manager from July 1997 to December 1999. From 1983 to 1988, Mr. Zhang served as assistant to head of the factory and chief economist of Dongfanghong Oil Refinery of Beijing Yanshan Petrochemical Company (東方紅煉油廠). He is qualified as a senior economist.

Liu Chijin, aged 43, is an independent Supervisor of the Company. Mr. Liu joined the Group since May 2005 and has over 20 years' experience in supervisory roles and management positions. He has been the chairman and the president of Pan-Pacific Management Research Center (泛太平洋管理研究中心) since 2002 and the general manager and chairman of Beijing Pan-Pacific Management Training Company Limited (北京泛太平洋管理培訓有限公司) since 2004. Mr. Liu also served as the vice president of Nokia (China) Investment Company Limited from 1999 to 2001, senior vice president of Ericsson (China) Limited and head of Ericsson China Institute from 1997 to 1999, senior consultant of McKinsey & Company in 1996 and vice

ALRMH-CNBM00000197

## DIRECTORS, SUPERVISORS, SENIOR MANAGEMENT AND EMPLOYEES

president of Dover Corporation in the United States from 1993 to 1995. From 1985 to 1988, Mr. Liu served as an assistant professor of the Shandong Building Material Institute. He is currently the deputy director of the China Capital Entrepreneurs' Club (北京首都企業家俱樂部), the chairman of Beijing Alumni Association of Harvard Business School, joint director of the EMBA project of the Management School of Xiamen University. Mr. Liu received a master's degree in physics from the University of Memphis in 1990, and an MBA degree from Harvard Business School in 1997.

**Senior Management**

The following table sets out certain information concerning the senior management of the Company.

| Name | Age | Senior Position in Company | Senior Position in Parent |
|---|---|---|---|
| Cui Xingtai . . . . . . . . . . . . . . | 44 | Vice President | — |
| Peng Shou . . . . . . . . . . . . . . | 45 | Vice President | — |
| Zhang Dingjin . . . . . . . . . . . . | 48 | Vice President | — |
| Chen Xuean . . . . . . . . . . . . . | 41 | Chief Financial Officer | — |
| Pei Hongyan . . . . . . . . . . . . . | 32 | Qualified Accountant | — |
| Chang Zhangli . . . . . . . . . . . | 35 | Joint Company Secretary | — |

Cui Xingtai, aged 44, is a vice president of the Company. Mr. Cui joined the Group since June 1999 and has over 21 years of business and management experience in China's building materials industry. He has served as the secretary of the Party Committee of China United since August 2004 and the chairman of China United since April 2005. Mr. Cui served as the vice chairman of China United from August 2004 to April 2005, deputy chief engineer of Parent from November 2003 to March 2005, chief engineer of China United from July 1999 to August 2004, and deputy general manager of China United from April 2002 to August 2004. From June 1997 to January 1999, Mr. Cui served as the head of Shandong Lunan Cement Factory. Mr. Cui received a bachelor's degree in engineering from Wuhan Industry University (now Wuhan University of Technology) in July 1984 and graduated in enterprise management from the Graduate School of the Chinese Academy of Social Sciences in July 1998. He is qualified as a senior engineer.

Peng Shou, aged 45, is a vice president of the Company. Mr. Peng joined the Group in June 2001 and has over 20 years of business and management experience in China's building materials industry. He is an expert in inorganic materials research and development, engineering design and consulting. Mr. Peng has served as the chairman of China Triumph since September 2004 and the general manager of China Triumph since May 2002. He also served as the deputy general manager of China Triumph from June 2001 to May 2002. Mr. Peng received a bachelor's degree in engineering from Wuhan Building Material Industrial Institute (now Wuhan University of Technology) in December 1982 and a master's degree in management from Wuhan Industrial University (now Wuhan University of Technology) in January 2002. He is qualified as a senior engineer at professor level and was awarded a special grant of the government approved by the State Council. Since July 2003, Mr. Peng is the deputy chairman of general affairs of the fourth general committee of the China Building and Industrial Glass Committee.

Zhang Dingjin, aged 48, is a vice president of the Company. Mr. Zhang joined the Group since August 1999 and has over 20 years of business and management experience in China's building materials industry. He has served as the chairman of China Composites since September 2004 and the general manager of China Composites since January 2003. He also served as the general manager of China Inorganic Materials Science and Technology Enterprise (Group) Company from March 2002 to January 2003, deputy general manager of

ALRMH-CNBM00000198

# DIRECTORS, SUPERVISORS, SENIOR MANAGEMENT AND EMPLOYEES

China Inorganic Materials Science and Technology Enterprise (Group) Company from January 2001 to March 2002 and the general manager of Beijing Pennvasia Glass Company Limited from August 1999 to September 2001. From February 1997 to August 1999, Mr. Zhang served as the deputy dean of Shangdong Industrial Ceramics Research and Design Institute. Mr. Zhang received a bachelor's degree in engineering from Anshan Institute of Iron and Steel in August 1982 and an EMBA degree from Xiamen University in June 2005. He is qualified as a senior engineer at professor level and was awarded a special grant of the government approved by the State Council.

Chen Xuean, aged 41, is the chief financial officer of the Company. Mr. Chen joined the Group since March 2005 and has over 19 years' experience in finance. Mr. Chen served as the head of the Central Department of Statistics and Evaluation Division of the Ministry of Finance from June 2000 to January 2004. He also served as the head of the Monitoring Department of Statistics and Evaluation Division of the Ministry of Finance, the deputy chief of Assets Inspection and Verification Department of Statistics and Evaluation Division of the Ministry of Finance, and the deputy head of finance department of general office of SASAC from August 1995. Mr. Chen received a master's degree in management from Beijing Institute of Technology in November 1999. He is currently a senior accountant.

Pei Hongyan, aged 32, is the qualified accountant of the Company. She joined the Group in May 2001 and has over six years' experience in accounting. She served as a senior accountant of the finance division of Parent from November 2003 to April 2005 and an assistant to the general manager of the finance division of Parent from November 2002 to April 2005. She also served as a director of Kunming Cement Inc. from March 2002 to December 2004 and the chief financial officer of China Composites from May 2001 to October 2004. Ms. Pei received a master's degree in management from Dongbei University of Finance and Economics in 1999, and is a member of the Association of Chartered Certified Accountants. She is also a non-practising member of the Chinese Institute of Certified Public Accountants. Ms. Pei works on a full time basis for the Company.

## Company Secretary

Chang Zhangli, aged 35, is the joint company secretary of the Company. Mr. Chang joined the Group in August 1997 and has over eight years' experience in handling listing-related matters for the Group. From August 1997 to March 2005, Mr. Chang served in a number of key positions in BNBM, including the deputy manager and manager of the securities division of BNBM, the manager of the management and corporate planning division of BNBM, the secretary to the board of directors and the deputy general manager of BNBM. During this period, in addition to performing his general corporate duties for BNBM, Mr. Chang was responsible for handling all legal matters related to BNBM and was actively involved in the reorganization and acquisitions of BNBM and its various subsidiaries. Mr. Chang graduated with a bachelor's degree in engineering from Wuhan Industrial University (now Wuhan University of Technology) in July 1994, and received an MBA degree from Tsinghua University in June 2005. Currently, Mr. Chang is the general manager of the legal division of the Company and is involved in all legal matters related to the Company's Global Offering and listing of its shares on the Stock Exchange. He is also the deputy secretary of the Listed Companies Association of Beijing (北京市上市公司協會).

ALRMH-CNBM00000199

## DIRECTORS, SUPERVISORS, SENIOR MANAGEMENT AND EMPLOYEES

Lo Yee Har Susan, aged 47, is the joint company secretary of the Company. Ms. Lo is a director of Corporate Services Department of Tricor Services Limited and an associate member of both the Institute of Chartered Secretaries and Administrators and the Hong Kong Institute of Chartered Secretaries. Ms. Lo has over 20 years of experience in the company secretarial area and is currently the company secretary of four Stock Exchange listed companies, namely, Shanghai Forte Land Co., Ltd., Dongfeng Motor Group Company Limited, Chia Hsin Cement Greater China Holding Corporation and K.P.I. Company Limited.

### Audit Committee

The Company has established an audit committee in compliance with Rule 3.21 of the Listing Rules. The primary duties of the audit committee will be to review and supervise the financial reporting process and internal control system of the Group and provide advice and comments to the board of Directors. The audit committee consists of three members, Mr. Chi Haibin (Chairman), Mr. Zhou Daojiong and Ms. Cui Lijun, of whom Mr. Chi Haibin and Mr. Zhou Daojiong are independent non-executive Directors of the Company and have appropriate professional qualifications or accounting or related financial management expertise as required under Rule 3.10.

### Remuneration Committee

The Company has also set up a remuneration committee which consists of two independent non-executive Directors of the Company, Mr. Zhang Renwei (Chairman) and Mr. Zhou Daojiong, and the chairman of the board of Directors, Mr. Song Zhiping. The remuneration committee considers and recommends to the Board or approves (after authorisation by the shareholders' meeting) the remuneration and other benefits paid by the Company to the Directors and senior management. The remuneration of all Directors and senior management is subject to regular monitoring by the remuneration committee to ensure that levels of their remuneration and compensation are appropriate.

### Rule 8.12 and Rule 19A.15 Requirements

According to Rule 8.12 and Rule 19A.15 of the Listing Rules, an issuer must have a sufficient management presence in Hong Kong with at least two of the issuer's executive directors ordinarily residing in Hong Kong. The central management and headquarters of the Company are located in Beijing. All of the existing business of the Company is located in the PRC and all of the Directors are residents of the PRC. Accordingly, the Company does not and, for the foreseeable future, will not have a sufficient management presence in Hong Kong. The Company has certain internal arrangements in place to maintain effective communication between the Company and the Stock Exchange, including appointing Mr. Song Zhiping (the Company's executive director and chairman of the Board) and Mr. Chang Zhangli (one of the joint company secretaries of the Company) as the Company's authorized representatives and to act as the principal channel of communication with the Stock Exchange, appointing Ms. Lo Yee Har Susan (the other joint company secretary of the Company), a Hong Kong resident, as alternate to the authorized representatives to act at all times as a channel of communication with the Stock Exchange and retaining Anglo Chinese Corporate Finance, Limited to act as the Company's compliance adviser and principal channel of communication with the Stock Exchange, in addition to the authorized representatives, for the period commencing on the Listing Date and ending on the date on which the Company complies with Rule 13.46 in respect of its financial results for the first full financial year commencing after the Listing Date pursuant to Rule 3A.19 and Rule 19A.06(4) of the Listing Rules. The authorized representatives, their alternate and the compliance adviser will be fully available to answer queries from the Stock Exchange. Accordingly, the Company has applied to the Stock Exchange for, and the Stock Exchange has granted, a waiver from strict compliance with Rule 8.12 and Rule 19A.15 of the Listing Rules which require the Company to have a sufficient management presence in Hong Kong.

ALRMH-CNBM00000200

# DIRECTORS, SUPERVISORS, SENIOR MANAGEMENT AND EMPLOYEES

## Rule 8.17 and Rule 19A.16 Requirements

Mr. Chang Zhangli, the Company's joint company secretary, does not possess the relevant qualification required under Rule 8.17 of the Listing Rules. The Company has appointed, and will continue to do so for a minimum period of three years after the Listing Date, Ms. Lo Yee Har Susan, who is a Hong Kong resident and an associate member of the Hong Kong Institute of Chartered Secretaries (which is the required qualification stipulated in Rule 8.17(2) of the Listing Rules) to act as joint company secretary in assisting Mr. Chang to acquire the necessary experience for satisfying the requirements of Rule 8.17(3) of the Listing Rules. Moreover, the Company has procedures in place to provide Mr. Chang with appropriate training in order to enable Mr. Chang to acquire such necessary experience. The Company has applied to the Stock Exchange for, and the Stock Exchange has granted, a waiver from strict compliance with the requirements under Rule 8.17 and Rule 19A.16 of the Listing Rules in connection with Mr. Chang's appointment as our joint company secretary for a period of three years from the Listing Date, on the condition that Ms. Lo Yee Har Susan is appointed as a joint company secretary. Upon the expiry of the three-year period, the Company will re-evaluate the qualifications of Mr. Chang to determine whether the requirements of Rule 8.17 can be satisfied.

## Compensation of Directors, Supervisors and Senior Management

All Directors and Supervisors receive reimbursements from the Company for expenses which are necessarily and reasonably incurred for providing services to the Company or executing matters in relation to the operations of the Company. The executive Directors and the Supervisor elected by the employees of the Company, who are also employees of the Company, receive, in their capacity as employees of the Company, compensation in the form of salaries, housing allowances, other allowances and benefits in kind, including the Company's contribution to the pension scheme for its executive Directors and the Supervisor in accordance with the relevant PRC law.

The aggregate amount of salaries, housing allowances, discretionary bonuses, pension scheme contributions, other allowances and benefits in kind paid by the Company to the five highest paid individuals of the Company during the three years ended December 31, 2004 and the nine months ended September 30, 2005 was approximately RMB 1,183,810, RMB 2,162,729, RMB 2,127,976 and RMB 883,447, respectively.

During the three years ended December 31, 2004 and the nine months ended September 30, 2005, the aggregate amount of salaries, housing allowances, discretionary bonuses, pension scheme contributions, other allowances and benefits in kind paid by the Company to its Directors and Supervisors was approximately RMB 688,898, RMB 1,046,027, RMB 656,077 and RMB 209,586, respectively.

Save as disclosed above, no other payments have been paid or are payable, in respect of the three years ended December 31, 2004 and the nine months ended September 30, 2005, by the Company or any of its subsidiaries to the Directors and Supervisors.

Under the arrangements currently in force, the aggregate remuneration of the Directors and Supervisors payable for the year ending December 31, 2006 is estimated to be approximately RMB 3,500,000.

ALRMH-CNBM00000201

## DIRECTORS, SUPERVISORS, SENIOR MANAGEMENT AND EMPLOYEES

**Compliance Adviser**

The Company has appointed Anglo Chinese Corporate Finance, Limited, as its compliance adviser pursuant to Rule 3A.19 of the Listing Rules to provide advisory services to the Company pursuant to the requirements thereunder. Anglo Chinese Corporate Finance, Limited will, *inter alia*, provide advice to the Company with due care and skill on a timely basis when consulted by the Company in the following circumstances:

(i)   before the publication by the Company of any regulatory announcement (whether required by the Listing Rules or requested by the Stock Exchange or otherwise), circular or financial report;

(ii)   where a transaction, which might be a notifiable or connected transaction under Chapters 14 or 14A of the Listing Rules, is contemplated by the Company, including share issues and share repurchases;

(iii)   where the Company proposes to use the proceeds of the Global Offering in a manner different from that detailed in this prospectus or where the business activities, developments or results of the Company deviate from any forecast, estimate, or other information in this prospectus; and

(iv)   where the Stock Exchange makes an inquiry of the Company under Rule 13.10 of the Listing Rules.

The term of the appointment shall commence on the Listing Date and end on the date on which the Company complies with Rule 13.46 of the Listing Rules in respect of its financial results for the first full financial year commencing after the Listing Date.

ALRMH-CNBM00000202

## DIRECTORS, SUPERVISORS, SENIOR MANAGEMENT AND EMPLOYEES

**Employees**

As at September 30, 2005, we had 8,793 employees, and China Fiberglass had 3,107 employees.

The table below sets out the number of employees by function in each business as at September 30, 2005.

| | Cement | Lightweight building materials | Composite products | Engineering services | Headquarter | Company Total | China Fiberglass |
|---|---|---|---|---|---|---|---|
| Management (including certain quality control personnel). . . . . . | 366 | 545 | 83 | 60 | 17 | 1,071 | 422 |
| Production (including certain quality control and repair and maintenance personnel) . . . | 2,111 | 2,864 | 539 | 456 | — | 5,970 | 2,491 |
| Sales and marketing . . . . . . . | 247 | 691 | 57 | 52 | — | 1,047 | 57 |
| Research and development . . . | 52 | 98 | 50 | 54 | — | 254 | 16 |
| Finance and accounting . . . . . | 69 | 124 | 26 | 28 | 6 | 253 | 20 |
| General and supporting staff . | 132 | 0 | 58 | 7 | 1 | 198 | 101 |
| Total . . . . . . . . . . . . . . . | 2,977 | 4,322 | 813 | 657 | 24 | 8,793 | 3,107 |

The remuneration package of the Company's employees includes salary, bonuses and allowances. In accordance with the relevant national and local labor and social welfare laws and regulations, each member of the Company is required to pay in respect of each of its relevant employees a monthly social insurance premium covering pension insurance, medical insurance, unemployment insurance and housing reserve fund. In Beijing, according to the currently applicable local regulations, the percentages of the pension insurance, medical insurance, unemployment insurance, occupational injury insurance and housing reserve fund to be contributed by the relevant members of the Company are 20%, 9%, 1.5%, 3% and 10% of their respective employees' total monthly basic salary, respectively.

The Company endeavors to provide training facilities for the employees. The scope of the induction and on-going training programs includes management skill and technology training, overseas exchange programs and other courses. The Company also encourages the employees to engage in self-learning programs by awarding scholarships.

The Company currently has no share option schemes for either senior management or employees.

ALRMH-CNBM00000203

## DIRECTORS, SUPERVISORS, SENIOR MANAGEMENT AND EMPLOYEES

**Share Appreciation Rights Plan**

In order to provide additional incentives for our senior management and to enhance the alignment between the performance of our senior management and shareholder value, we have adopted a long-term incentive plan (the "Plan") of stock appreciation rights, or SA Rights, for our senior management officers, senior experts and specialists who make important contributions to the Company. The plan is designed to link the financial interests of our senior management with the future results of our operations and the performance of the H Shares.

Under the Plan, a share appreciation right represents the right to receive a cash payment equal to the appreciation, if any, in the fair market value of an H Share from the date of the grant of the right to the date of exercise.

No Shares will be issued under the Plan. Accordingly, the shareholding of the shareholders will not be diluted by any issuance of SA Rights under the Plan. The Plan will be effective for a term of 10 years from the date that the Plan is approved by the shareholders' meeting. All SA Rights will lapse after the 10-year term.

SA Rights will be granted in units with each unit representing one H Share. The total number of SA Rights that have been granted may not exceed 10% of the Company's issued Shares. During any 12-month period, the total number of SA Rights granted to any participant may not exceed 1% of the Company's total issued Shares. SA Rights may be granted once in every two or more full financial years after the Global Offering to participants of the Plan as determined by the Board or the remuneration committee. The Board may determine at any time that no further SA Rights will be issued.

All SA Rights will have an exercise period of six years from the date of grant. An individual may not exercise his or her SA Rights during the first two years after the date of grant. After two, three and four years of the date of grant, the total number of SA Rights exercised by an individual may not in aggregate exceed one-third, two-thirds and 100%, respectively, of the total SA Rights granted to the individual.

ALRMH-CNBM00000204

# SUBSTANTIAL SHAREHOLDERS

So far as the Directors are aware, the following persons (who are not Directors) will, immediately following the completion of the Global Offering and taking no account of any Shares which may be taken up under the Global Offering or which may be allotted and issued pursuant to the exercise of the Over-allotment Option, have interests or short positions in the Shares or underlying Shares which would fall to be disclosed to the Company under the provisions of Divisions 2 and 3 of Part XV of the SFO, or who will be directly and/or indirectly interested in 10% or more of the Company's issued and outstanding share capital then in issue carrying rights to vote in all circumstances at general meetings of the Company:

*Number of shares directly and indirectly held immediately after the Global Offering*

(1)  Assuming Over-allotment Option is not exercised:

| Shareholder | Number of Shares | % of issued share capital | % of domestic share capital |
|---|---|---|---|
| Parent . . . . . . . . . . . . . . . . . | 1,258,602,438 | 63.49% | 94.75% |
| BNBMG . . . . . . . . . . . . . . . | 785,134,919 | 39.60% | 59.11% |

(2)  Assuming Over-allotment Option is exercised in full:

| Shareholder | Number of Shares | % of issued share capital | % of domestic share capital |
|---|---|---|---|
| Parent . . . . . . . . . . . . . . . . . | 1,250,149,846 | 60.34% | 94.75% |
| BNBMG . . . . . . . . . . . . . . . | 779,862,307 | 37.64% | 59.11% |

For details of the Directors' and Supervisors' interests in Shares immediately following the completion of the Global Offering, please refer to the section entitled *"IV. Further Information about the Directors, Supervisors, Staff and Management, and Substantial Shareholders — 2. Disclosure of Directors' and Supervisors' interests in the shares in issue of the Company"* in Appendix VIII to this prospectus.

Save as disclosed herein, the Directors are not aware of any person (who are not Directors) who will, immediately following the completion of the Global Offering, be directly or indirectly interested in 10% or more of the Company's share capital. The Directors are not aware of any arrangement which may at a subsequent date result in a change of control of the Company.

ALRMH-CNBM00000205

## SHARE CAPITAL

The share capital of the Company is currently RMB 1,387,760,000.

The following is a description of the share capital of the Company in issue and to be issued as fully paid or credited as fully paid immediately before and after the completion of the Global Offering:

| Description of Shares | Before Global Offering | | After Global Offering assuming no exercise of the Over-allotment Option | | After Global Offering assuming full exercise of the Over-allotment Option | |
|---|---|---|---|---|---|---|
| Domestic Shares . . . . . . | 1,387,760,000[(1)] | 100.00% | 1,328,286,000 | 67.00% | 1,319,366,000 | 63.69% |
| H Shares . . . . . . . . . . . | 0 | 0% | 654,214,000 | 33.00% | 752,334,000 | 36.31% |
| Total . . . . . . . . . . . . | 1,387,760,000 | 100.00% | 1,982,500,000 | 100.00% | 2,071,700,000 | 100.00% |

*Note:*

(1)   59,474,000 Domestic Shares (assuming no exercise of the Over-allotment Option) or 68,394,000 Domestic Shares (assuming full exercise of the Over-allotment Option) will be converted into H Shares to be offered for sale by the Selling Shareholders. Please refer to the section entitled "*Structure of the Global Offering — The Selling Shareholders.*"

The above table assumes the Global Offering becomes unconditional.

## Ranking

Domestic Shares and H Shares are both ordinary shares in the share capital of the Company. However, H Shares may only be subscribed for by, and traded in Hong Kong dollars between, legal or natural persons of Hong Kong, Macau, Taiwan or any country other than the PRC. Domestic Shares, on the other hand, may only be subscribed for by, and traded between, legal or natural persons of the PRC (other than Hong Kong, Macau and Taiwan) and must be subscribed for and traded in Renminbi. All dividends in respect of H Shares are to be paid by the Company in Hong Kong dollars whereas all dividends in respect of Domestic Shares are to be paid by the Company in Renminbi.

Under the recently amended Company Law, all the existing Domestic Shares may not be sold within a period of one year from the date of the listing of H Shares on the Stock Exchange. Under the Articles of Association, it is provided that upon approval of the State Council or its authorized supervisory departments and subject to the requirements of the Stock Exchange, the Domestic Shares may be converted into H Shares.

Except as described above and in relation to the despatch of notices and financial reports to shareholders, dispute resolution, registration of shares on different parts of the register of shareholders, the method of share transfer and the appointment of dividend receiving agents, which are all provided for in the Articles of Association and summarized in Appendix VI to this prospectus, the Domestic Shares and the H Shares will rank *pari passu* with each other in all respects and, in particular, will rank equally for all dividends or distributions declared, paid or made after the date of this prospectus. However, the transfer of Domestic Shares is subject to such restrictions as PRC law may impose from time to time.

Save for the Global Offering, the Company does not propose to carry out a public or private issue or to place securities simultaneously with the Global Offering or within the next six months. The Company has not approved any share issue plan other than the Global Offering.

The Company has given certain undertakings in respect of the issuance of the H Shares and other securities. Please refer to the section entitled "*Underwriting — Underwriting Arrangements and Expenses — Hong Kong Public Offering — Hong Kong Underwriting Agreement — Undertakings.*"

ALRMH-CNBM00000206

# FINANCIAL INFORMATION

The following discussion should be read in conjunction with our audited consolidated financial statements and historical consolidated financial data, in each case together with the accompanying notes. See "*Appendix I — Accountants' Report.*" The financial statements have been prepared in accordance with IFRS. The following discussion contains certain forward-looking statements that involve risks and uncertainties and, accordingly, you should not place undue reliance on any such statements.

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

### Overview

We are a leading PRC building materials company with significant operations in cement, lightweight building materials, glass fiber and FRP products and engineering services business segments. In terms of market positions, we are:

- the largest cement producer in the Huaihai Economic Zone of the PRC in terms of production capacity and sales volume in 2004;

- the largest gypsum board producer in the PRC, with a combined market share of approximately 50.6% in terms of sales volume among PRC producers having annual gypsum board sales of at least RMB 5 million, based on gypsum boards sold by BNBM and Taihe in 2004;

- the largest glass fiber producer in Asia in terms of production capacity in 2004 through China Fiberglass, an associate of the Company;

- one of the largest glass fiber mats producers in the PRC in terms of production capacity in 2004;

- the second largest FRP pipes and tanks producer in the PRC in terms of production volume and sales volume in 2004; and

- the engineering firm that designed and/or constructed approximately 50% of the float glass production lines in the PRC.

See "*Business*" for further descriptions of our business operations.

We manage our operations and report our financial results according to the following four business segments:

- Cement segment, which produces and sells cement and clinker in the PRC;

- Lightweight building materials segment, which produces and sells gypsum boards and related products in the PRC, such as acoustical ceiling panels and lightweight metal frames;

- Glass fiber and FRP products segment, which produces, sells and exports products including glass fiber, glass fiber mats and FRP pipes and tanks; and

- Engineering services segment, which provides engineering design and EPC services in the domestic and overseas glass and cement industries.

ALRMH-CNBM00000207

# FINANCIAL INFORMATION

The table below summarizes our business segments and the major operating entities in each business segment:

| Business Segment | Major operating entity[1] | Direct and indirect equity interests attributable to the Company |
|---|---|---|
| Cement . . . . . . . . . . . . . . . . . . . . . | China United | 96.07% |
| Lightweight building materials . . . . . . | BNBM | 60.33% |
| Glass fiber and FRP products . . . . . . . | China Fiberglass | 40.17% |
| | China Composites | 86.24%[2] |
| Engineering services . . . . . . . . . . . . . | China Triumph | 91.00% |

———————

*Notes:*

(1)    Each is a direct subsidiary of the Company except for China Fiberglass, which is an associate of the Company.

(2)    Includes a 77% equity interest held directly by the Company and a 23% equity interest held by China Fiberglass.

## Reorganization and Basis of Presentation

The Company was converted into a joint stock limited company from CNBM Equipment, a state-owned enterprise, on March 28, 2005. Prior to the conversion, CNBM Equipment disposed of all of its former operations and the related assets and liabilities to Parent Group at nil consideration and Parent transferred its interests in certain businesses engaging in the production and sales of NSP cement, glass fiber and FRP products and the provision of engineering services as well as its equity interests in BNBM and China Fiberglass (the "Transferred Operations") to the Company, each as a part of the Reorganization. See "*History, Reorganization and Group Structure — Reorganization.*" The Company is regarded as a new holding company in the Reorganization for the purpose of holding its current businesses.

As Parent controlled the Transferred Operations before the Reorganization and continues to control the Transferred Operations after the Reorganization, the Reorganization is considered as a business combination under common control for accounting purposes. Our audited consolidated financial statements for 2002, 2003, 2004 and the nine months ended September 30, 2005, set forth in Appendix I to this prospectus, present our consolidated results of operations, cash flows and financial condition as if the current organizational structure of the Company had been in existence throughout the Track Record Period or since the deemed effective dates for accounting purposes of the establishment or acquisition by Parent or the Company, as the case may be, of the businesses now comprising the Company, whichever is the shorter period, and as if the Company had not owned or controlled any other business. However, the consolidated results of operations, cash flows and financial condition of the Company presented in this prospectus do not purport to be indicative of what the Company's actual consolidated results of operations, cash flows and financial condition would have been had the Company been operating its businesses under its current organizational structure throughout the Track Record Period or since the deemed effective dates for accounting purposes of the establishment or acquisition by Parent or the Company, as the case may be, of the businesses now comprising the Company, whichever is the shorter period. The assets and liabilities previously associated with the Transferred Operations that were retained by Parent have been reflected as a distribution to owner in the consolidated statement of changes in equity.

— 204 —

ALRMH-CNBM00000208

# FINANCIAL INFORMATION

**Critical Accounting Policies**

Preparation of our financial statements requires us to make estimates and judgments in applying our critical accounting policies which have a significant impact on the consolidated results that we report in our consolidated financial statements. We base our estimates on historical experience and other assumptions which we believe to be reasonable under the circumstances. Actual results may differ from these estimates under different assumptions and conditions. The selection of critical accounting policies, the judgments and other uncertainties affecting application of those policies and the sensitivity of reported results to changes in conditions and assumptions are factors to be considered when reviewing our audited combined financial information. Our principal accounting policies are set out in detail in Note 2 of the *Accountants' Report* in Appendix I to this prospectus. We identify below the accounting policies that are most critical to our consolidated financial statements.

The financial information has been prepared in accordance with IFRS and the applicable disclosure requirements of the Listing Rules.

The financial information has been prepared on the historical cost basis, as modified for the revaluation of investments held for trading. The critical accounting policies adopted are set out below.

### *Revenue Recognition*

Revenue is measured at the fair value of the consideration received or receivable and represents amounts receivable for goods and services provided in the normal course of business, net of discounts and sales-related taxes.

Sales of goods are recognized when goods are delivered and title has been passed.

Service income is recognized when services are provided.

Revenue from provision of engineering services is recognized in accordance with our accounting policy on construction contracts. See "— *Construction Contracts*."

Interest income is accrued on a time basis by reference to the principal outstanding and at the effective interest rate applicable, which is the rate that exactly discounts estimated future cash receipts through the expected life of the financial asset to that asset's net carrying amount.

Dividend income from investments is recognized when the Group's rights to receive payment have been established.

Rental income from operating leases is recognized on a straight-line basis over the term of the relevant lease.

VAT refund is recognized as income when the Group's rights to receive the VAT refund have been established.

ALRMH-CNBM00000209

# FINANCIAL INFORMATION

### *Construction Contracts*

Where the outcome of a construction contract can be estimated reliably, revenue and costs are recognized by reference to the stage of completion of the contract activity at the balance sheet date. This is normally measured by the proportion that contract costs incurred for work performed to date bear to the estimated total contract costs, except where this would not be representative of the stage of completion. Variations in contract work, claims and incentive payments are included to the extent that they have been agreed with the customer.

Where the outcome of a construction contract cannot be estimated reliably, contract revenue is recognized to the extent of the contract costs incurred that are probable to be recoverable. Contract costs are recognized as expenses in the period in which they are incurred.

When it is probable that total contract costs will exceed total contract revenue, the expected loss is recognized as an expense immediately.

### *Property, Plant and Equipment*

Property, plant and equipment, other than construction in progress, are stated at cost less depreciation and any accumulated impairment losses.

Construction in progress is stated at cost which includes all construction costs and other direct costs attributable to such projects including borrowing costs capitalised. It is not depreciated until completion of construction. Costs of completed construction works are transferred to the appropriate categories of property, plant and equipment.

Depreciation is provided to write off the cost of property, plant and equipment other than construction in progress over their estimated useful lives and after taking into account their estimated residual value, using the straight line method, as follows:

| | Annual depreciation percentage of original book value |
| --- | --- |
| Land or buildings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2.38% |
| Plant and machinery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5.28 to 9.50% |
| Motor vehicles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9.50% |

The gain or loss arising on the disposal or retirement of an item of property, plant and equipment is determined as the difference between the sales proceeds and the carrying amount of the asset and is recognized in the profit or loss.

### *Impairment of Tangible and Intangible Assets Excluding Goodwill*

At each balance sheet date, we review the carrying amounts of our tangible and intangible assets to determine whether there is any indication that those assets have suffered an impairment loss. If any such indication exists, the recoverable amount of the asset is estimated in order to determine the extent of the

ALRMH-CNBM00000210

## FINANCIAL INFORMATION

impairment loss (if any). Where the asset does not generate cash flows that are independent from other assets, we estimate the recoverable amount of the cash-generating unit to which the asset belongs. An intangible asset with an indefinite useful life is tested for impairment annually and whenever there is an indication that the asset may be impaired.

The recoverable amount is the higher of fair value less costs to sell and value in use. In assessing value in use, the estimated future cash flows are discounted to their present value using a pre-tax discount rate that reflects the current market assessments of the time value of money and the risks specific to the asset for which the estimates of future cash flows have not been adjusted.

If the recoverable amount of an asset (or cash-generating unit) is estimated to be less than its carrying amount, the carrying amount of the asset (cash-generating unit) is reduced to its recoverable amount. An impairment loss is recognized as an expense immediately.

Where an impairment loss subsequently reverses, the carrying amount of the asset (cash-generating unit) is increased to the revised estimate of its recoverable amount, so that the increased carrying amount does not exceed the carrying amount that would have been determined had no impairment loss been recognized for the asset (cash-generating unit) in prior years. A reversal of an impairment loss is recognized as income immediately.

### *Goodwill*

Goodwill arising from the acquisition of a subsidiary represents the excess of the cost of acquisition over our interest in the net fair value of the identifiable assets, liabilities and contingent liabilities of the subsidiary recognized on the date of acquisition. Goodwill is initially recognized as an asset at cost and is subsequently measured at cost less any accumulated impairment losses.

For the purpose of impairment testing, goodwill is allocated to each of the Company's cash-generating units expected to benefit from the synergies of the combination. Cash-generating units to which goodwill has been allocated are tested for impairment annually, or more frequently when there is an indication that the unit may be impaired. If the recoverable amount of the cash-generating unit is less than the carrying amount of the unit, the impairment loss is allocated first to reduce the carrying amount of any goodwill allocated to the unit and then to the other assets of the unit pro rata on the basis of the carrying amount of each asset in the unit. An impairment loss recognized for goodwill is not reversed in a subsequent period.

Determining whether goodwill is impaired requires an estimation of the value in use of the cash-generating units to which goodwill has been allocated. The value in use calculation requires the entity to estimate the future cash flows expected to arise from the cash-generating unit and a suitable discount rate in order to calculate present value.

On disposal of a subsidiary, the attributable amount of goodwill is included in the determination of the profit or loss on disposal.

ALRMH-CNBM00000211

# FINANCIAL INFORMATION

*Inventories*

Inventories are stated at the lower of cost and net realizable value. Cost is calculated using the weighted average method. Net realizable value represents the estimated selling price less all estimated costs of completion and costs to be incurred in marketing, selling and distribution.

## Factors Affecting Results of Operations

Our results of operations and the period-to-period comparability of our financial results are affected by the following factors.

*Economic Growth in the PRC*

A majority of our revenue is derived from sales in the PRC. Economic growth in the PRC, particularly in those areas in which we operate, has a direct impact on virtually all aspects of our operations, including the level of demand for our products and services, the availability and prices of our raw materials, and the level of our other expenses. In particular, demand for our cement and lightweight building materials products depends on the level of activities in the PRC construction market. According to the China Statistical Year Book for 2004 and 2005, in the ten years from 1995 to 2004, the PRC's GDP increased from approximately RMB 6,079.4 billion to approximately RMB 15,987.8 billion, representing a CAGR of approximately 11.3%, making the PRC one of the fastest growing economies in the world. During the period between 2000 and 2004, the growth of China's infrastructure, renovation and real estate development sectors was particularly robust as the year-on-year increase in investment activities in these sectors during that period had exceeded that of the GDP by significant margins. According to the Quantitative Economics and Audit Society of China Building Materials, the year-on-year growth rates of the PRC's sales of building materials reached 25.5% and 31.8% in 2003 and 2004, respectively, which more or less tracked the rapid increase in the infrastructure, renovations and real estate development.

*PRC Government Policies*

Changes in PRC government policies over the industries in which our customers operate have an indirect impact on our cement and lightweight building materials businesses. While the current policies of the PRC government toward the domestic construction industry are generally market-oriented, the PRC government may from time to time issue new industrial policies to adjust the level of investments in infrastructure projects and real estate development using both economic and administrative means.

In addition, changes in PRC government policies may also have a direct impact our business. Recently, the PRC government has been implementing a series of macro-adjustment measures to slow down the exuberant growth of the PRC economy. According to a notice issued by the State Council in April 2004, cement companies investing in new expansionary cement projects must fund at least 35% of the cost of investment from internal resources (instead of the previous 20%). The PRC government has also imposed approval or filing requirements for any project involving significant capital investments. See "*Risk Factors — Risks Relating to the Building Materials Industry in the PRC — Changes in government policies could have an adverse effect on our cement segment.*"

ALRMH-CNBM00000212

## FINANCIAL INFORMATION

*Sales Volume*

Our results of operations are directly affected by our sales volume which in turn is a function of market demand and our production capacity. During the Track Record Period, we have been able to sell substantially all of the cement, gypsum boards and glass fiber mats we produced. However, we have been increasing our production capacities through constructing new production facilities and/or through acquiring enterprises operating in the same industry. See "*Business*" for further information on our production capacity. No assurance can be given that there will be adequate market demand for our recent increases in production capacity.

Our engineering services segment provides design, equipment procurement and EPC services. The sales volume of our engineering segment is a function of the number of new customer contracts we are able to obtain each year and the contracted amount and duration of projects. Projects that require us to provide EPC services generally produce a greater amount of revenue and gross profit per project as compared with our design and equipment procurement projects. We have been increasing our focus on our EPC capability in the last two years.

*Competition and Pricing of Our Products and Services*

Competitive forces and supply and demand in regional, national and international markets affect the pricing of our products and services. The building materials industry in the PRC is highly competitive. Our cement segment competes in a fragmented industry, but our NSP cement generally enjoys a price premium of RMB 10 to RMB 15 per tonne over that of our major vertical kiln competitors. Because cement is costly to transport, competition in the cement segment is local rather than national, and cement prices vary significantly in different regions due to factors such as levels of economic development and construction activities and the demand supply balance in the region. Cement prices in the Huaihai Economic Zone were generally lower and less volatile than those in the more economically developed regions such as the Yangtze River Delta Region during the Track Record Period. See "*Industry Overview — Cement*" for further information. Because we are the market leader in the Huaihai Economic Zone in terms of production capacity and sales volume, the price of our cement was relatively stable during the Track Record Period. In 2002, 2003 and 2004, and for the nine months ended September 30, 2005, the Average Realized Sales Price for our cement was RMB 180.7, RMB 178.2, RMB 195.6 and RMB 176.4 per tonne, respectively.

In the lightweight building materials segment, our primary competitors are foreign-invested gypsum board producers. The price of gypsum board in the domestic market went through a depressed phase in the late 1990s due to price competition from foreign-invested producers. The price of gypsum board has remained relatively stable since the beginning of 2000. The Average Realized Sales Price for each square meter of our "Dragon" brand gypsum board was RMB 6.2, RMB 6.2, RMB 6.1 and RMB 6.2 in 2002, 2003, 2004 and for the nine months ended September 30, 2005, respectively. We believe our acquisition of a 42% interest in Taihe has substantially enhanced our competitiveness in the gypsum board market. Taihe and BNBM had a market share of 37.9% and 12.7%, respectively, as measured by sales volume among the PRC producers with gypsum board sales of at least RMB 5 million in 2004.

ALRMH-CNBM00000213

# FINANCIAL INFORMATION

Pricing of our glass fiber and FRP products segment is primarily affected by the grade of products we produce. High value-added products such as glass fiber mats used to produce copper clad laminates generally command a higher price than other glass fiber mats products we produce.

The contracted amount of the projects engaged by our engineering services segment is generally determined through a bidding process or individually negotiated with the customers. EPC service providers employing the China float glass technology have, in general, a lower cost base than those providers employing other prevailing float glass technologies, due to relatively low price of the equipment manufactured in China. Because of this lower cost base and the cost control measures we have implemented, we have generally been able to bid for international projects at competitive prices while maintaining a reasonable profit margin.

### Fuel and Power Prices

The cost of fuel and power constituted 53.2%, 47.5%, 56.4% and 61.8% of the cost of sales of our cement segment in 2002, 2003, 2004 and for the nine months ended September 30, 2005, respectively. In comparison, cost of fuel and power was less significant to our other business segments as it constituted less than 15.0% of the cost of sales of the manufacturing business in our lightweight building materials segment and less than 4.1% of the cost of sales of our glass fiber and FRP products segment during the Track Record Period. The cost of sales and the operating results of our cement segment are significantly affected by fluctuations in the price of coal. Cost of coal accounted for over 24.0% of the cost of sales of our cement segment in each of 2002, 2003 and 2004. For the nine months ended September 30, 2005, this percentage further increased to 34.5%, as compared to 30.7% for the nine months ended September 30, 2004, primarily due to escalating coal prices. We do not engage in any hedging transactions to protect ourselves against such fluctuations. We try to protect ourselves against this risk by, among other measures, entering into long-term supply contracts. Price of electricity, which was regulated by the PRC government, generally remained stable during the Track Record Period. To reduce our reliance on the power grid and to reduce our energy costs, our Huaihai plant is planning to construct a power generator that utilizes residual heat from our cement production to generate power. The power generator, the construction of which is scheduled for completion in December 2006, is designed to supply us with approximately 72.6 million kWh of electricity per year.

To reduce our cost of fuel and power, we intend to focus on increasing our production efficiency and employing cost control measures such as coordination among our business segments to enable bulk purchasing. We believe such measures are essential to maintain our profitability. See "*Risk Factors — Risks Relating to the Building Materials Industry in the PRC — Increases in energy and fuel costs could have a material adverse effect on our business, financial condition and results of operations.*"

ALRMH-CNBM00000214

## FINANCIAL INFORMATION

The following chart illustrates average coal purchase prices at each of our cement plants for the periods indicated:



### Raw Material Prices

Fluctuations in the prices of raw materials have a direct impact on our results of operations, particularly on those of the lightweight building materials segment. Raw materials, primarily gypsum rock and liner paper, have consistently accounted for over 59.0% of our cost of sales for gypsum board products during the Track Record Period. To reduce our cost of raw materials, we have acquired equity interest in a liner paper manufacturer. In addition, we have constructed a paper mill, which was in its ramp-up period as at September 30, 2005. See "*Business — Lightweight Building Materials Segment — Raw Materials*" for an analysis of the raw material supplies to our lightweight building materials segment.

### Share of Profit of Associates

The results of operations of our associates have a material impact on our combined profit of operations. Share of profit of associates attributable to China Fiberglass accounted for approximately 5.9%, 23.4%, 17.3% and 16.0% of our profit attributable to equity holders of the Company in 2002, 2003, 2004 and for the nine months ended September 30, 2005, respectively. Share of profit of associates attributable to Yaohua, Shenzhen B&Q and other associates of the Company accounted for approximately 23.8%, 30.4%, 23.5% and 11.4% of our profit for the year/period in 2002, 2003, 2004 and for the nine months ended September 30, 2005, respectively. See "*— Description of Selected Income Statement Line Items — Share of Profit of Associates.*"

ALRMH-CNBM00000215

## FINANCIAL INFORMATION

*Income Tax Expense*

The Company and substantially all of our subsidiaries and associates are subject to PRC income tax. The statutory PRC enterprise income tax rate is 33.0% of the assessable profit as determined in accordance with the relevant PRC income tax rules and regulations. PRC state and local tax laws provide for a number of tax incentives to different enterprises. The table below sets out the favorable income tax rate or income tax credits enjoyed by the Company and our major subsidiaries, for the periods indicated:

| Entity | Income tax rate | Commencement date | Expiration date | Renewability |
| --- | --- | --- | --- | --- |
| Company . . . . . . . . . . | 15% | January 1, 2005 | December 31, 2006 | Every two years upon approval |
| Huaihai . . . . . . . . . . . | Tax credit up to approximately RMB 62.0 million[1] | January 1, 2005 | December 31, 2009 | |
| Nanyang. . . . . . . . . . . | Tax credit up to approximately RMB 46.0 million[1] | January 1, 2005 | December 31, 2009 | |
| Luhong . . . . . . . . . . . | Tax credits up to approximately RMB 14.0 million[2] | January 1, 2005 | December 31, 2005 | Annually upon approval |
| BNBM. . . . . . . . . . . . | 0% on rock wool and acoustical ceiling panels | January 1, 1999 | December 31, 2003 | |
| | 0% on gypsum board[3] | August 1, 2000 | July 31, 2005 | |
| | 15% | January 1, 2005 | December 31, 2006 | Every two years upon approval |
| BNBM Homes. . . . . . . | 15% | January 1, 2005 | December 31, 2006 | Every two years upon approval |
| | Exemption from income tax | January 1, 2002 | December 31, 2004 | |

ALRMH-CNBM00000216

# FINANCIAL INFORMATION

| Entity | Income tax rate | Commencement date | Expiration date | Renewability |
|---|---|---|---|---|
| BND . . . . . . . . . . . . . | 15% | Date of establishment | Permanent | Permanent |
| | 0% | The beginning of its first profitable year | The end of its first profitable year | |
| | 7.5% | The beginning of the first year immediately following its first profitable year | The end of the second year immediately following its first profitable year | |
| China Composites  . . . . | 15% | January 1, 2005 | December 31, 2006 | Every two years upon approval |
| Zhongxin Tianma . . . . . | 27% | Date of establishment | Permanent | Permanent |
| Liberty TOLI  . . . . . . . | 27% | Date of establishment | Permanent | Permanent |
| China Triumph  . . . . . . | 15% | January 1, 2005 | December 31, 2006 | Every two years upon approval |

—————

*Notes:*

(1)     Tax credit for installment of domestically-made equipment.

(2)     Tax credit for use of industry waste in cement production.

(3)     Tax exemption not applicable to Taihe.

Any adverse change or revocation of the favorable tax treatment enjoyed by the Company and its subsidiaries and associates would likely have a negative impact on our results of operations and financial condition. See "*Risk Factors — Risks Relating to the Group — Changes in tax incentives or government grants may adversely affect our business and results of operations and/or financial condition.*"

ALRMH-CNBM00000217

## FINANCIAL INFORMATION

Our effective tax rates were approximately 1.5%, 5.9%, 8.5%, 7.5% and 11.2% in 2002, 2003, 2004 and for the nine months ended September 30, 2004 and 2005, respectively. See Note 11 of "*Appendix I — Accountants' Report*" to this prospectus for a reconciliation of the amount of our tax expenses to the amount of statutory tax. The table below sets out, for the period indicated, a reconciliation of our effective tax rate to the statutory tax rate, with each item expressed as a percentage of our profit before tax:

| | For the year ended December 31, | | | For the nine months ended September 30, | |
| --- | --- | --- | --- | --- | --- |
| | 2002 | 2003 | 2004 | 2004 | 2005 |
| | | | | (unaudited) | |
| Profit before tax. . . . . . . . . . . . . . . . | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Tax at domestic income tax rate of 33% . | 33.0 | 33.0 | 33.0 | 33.0 | 33.0 |
| Effect of share of profit of associates[1]. . | (9.1) | (15.1) | (10.8) | (11.4) | (6.7) |
| Tax effect of expenses that are not deductible . . . . . . . . . . . . . . . . . . . . | 0.6 | 1.8 | 3.3 | 7.0 | 1.0 |
| Tax effect of unrealized tax losses . . . . . | 1.4 | 6.2 | 4.5 | 11.8 | 4.6 |
| Tax effect of income tax credits granted to subsidiaries on utilization of certain industrial waste . . . . . . . . . . . . . . . | (11.6) | (11.6) | (9.6) | (14.0) | (3.4) |
| Tax effect of income tax credits granted to subsidiaries on acquisition of certain qualified equipment . . . . . . . . | — | — | — | — | (8.5) |
| Tax effect of tax losses incurred by Lunan Cement and Julong Cement[2]. . | (5.3) | (7.5) | (7.4) | (16.1) | — |
| Effect of differential tax rate on subsidiaries' income . . . . . . . . . . . . | (7.5) | (1.0) | (4.4) | (2.9) | (8.8) |
| | 1.5 | 5.9* | 8.5* | 7.5* | 11.2 |

\*     Sum of numbers in table may differ from total due to rounding

———————

*Notes:*

(1)     Share of profit of associates is accounted for based on the after tax net profit of our associates that will not be taxed as part of the Company's profit before taxes. Therefore its inclusion in the profit before taxes for the calculation of effective tax rate leads to a lower effective tax rate as compared with the statutory tax rate.

(2)     China United disposed of Lunan Cement and Julong Cement, together with the part of their operations not relating to NSP cement production, and transferred them to Parent pursuant to the Reorganization. Luhong and Huaihai were established by China United for the purpose of holding the NSP cement operations of Lunan Cement and Julong Cement, respectively. However, pursuant to the PRC tax rules and regulations, neither NSP cement operations of Lunan Cement and Julong Cement, respectively, was treated as a separate tax paying through September 30, 2004. The income taxes of each of Luhong and Huaihai for such periods were assessed based on the combined profit of Luhong and Lunan Cement and the combined profit of Huaihai and Julong Cement, respectively. Since both Lunan Cement and Julong Cement suffered a loss for the years ended December 31, 2002 and 2003, and the nine months ended September 30, 2004, the Company recognized a tax benefit for the same period.

ALRMH-CNBM00000218

# FINANCIAL INFORMATION

## Description of Selected Income Statement Line Items

### Revenue

Our revenue represents: (i) the net invoiced value of goods sold, after allowances for returns and trade discounts, and (ii) the value of services rendered, both net of sales taxes and surcharges. Historically, over 88.0% of our revenue has been derived from sale of goods, while the rest has been derived from provision of design, equipment procurement and EPC services.

### Cost of Sales

Our cost of sales primarily consists of raw materials, fuel and power costs, staff costs relating to production, utilities charges, depreciation and amortization of fixed assets, and repair and maintenance costs. Raw material costs and fuel and power costs are the largest components of our cost of sales.

The following table sets out, for the periods indicated, our cost of raw materials and fuel and power as a percentage of the total cost of sales of our cement segment, the manufacturing businesses of our lightweight building materials segment and our glass fiber and FRP products segment:

| | For the year ended December 31, | | | | | | For the nine months ended September 30, | |
| | 2002 | | 2003 | | 2004 | | 2005 | |
| | Raw materials | Fuel and power | Raw materials | Fuel and power | Raw materials | Fuel and power | Raw materials | Fuel and power |
|---|---|---|---|---|---|---|---|---|
| | (%) | | | | | | | |
| Cement segment. . . . . . | 25.5 | 53.2 | 27.2 | 47.5 | 30.2 | 56.4 | 27.0 | 61.8 |
| Lightweight building materials segment[1]. . | 63.2 | 9.7 | 64.7 | 9.3 | 72.8 | 10.4 | 79.4 | 15.0 |
| Glass fiber and FRP products segment . . . | — | — | 83.5 | 2.9 | 85.8 | 2.8 | 80.3 | 4.1 |

_____

*Note:*

(1)   Excludes the segment's merchandise trading, steel trading, retail distribution, contract decoration services and commercial real estate leasing businesses.

Raw material costs represented 44.1%, 45.3%, 47.1% and 43.3% of the combined cost of sales of our manufacturing businesses, including those of our cement, lightweight building materials (excluding the segment's merchandise trading, steel trading, retail distribution, contract decoration services and commercial real estate leasing businesses) and glass fiber and FRP products segments in 2002, 2003, 2004 and for the nine months ended September 30, 2005, respectively. Fuel and power costs constituted 53.2%, 47.5%, 56.4% and 61.8% of the combined cost of sales of our cement segment in 2002, 2003, 2004 and for the nine months ended September 30, 2005, respectively. Certain research and development costs that are directly associated with a specific project or product are booked as cost of sales.

ALRMH-CNBM00000219

---

# FINANCIAL INFORMATION

---

*Other Income*

Our other income primarily consists of VAT refund, interest from bank deposits, rental income, government grants and dividend income from available-for-sale investments.

The State Council issued a "Notice Encouraging Comprehensive Utilization of Natural Resources" (the "Notice") in 1996 to encourage and support enterprises, through incentive policies, to comprehensively utilize natural resources. Incentive policies under the Notice include, but are not limited to, tax incentives. The Notice was issued by the State Council to the SETC and other relevant government agencies for implementation. Pursuant to the Notice, the Ministry of Finance and the State Administration of Taxation of the PRC enacted several regulations providing incentives in the form of VAT refund for certain environmentally friendly products, including products that utilize industrial waste as part of their raw materials. Under the Notice and such regulations, companies are entitled to receive immediate or future refund on any paid VAT with respect to any eligible products upon receiving approvals from the relevant government authorities.

The following table summarizes our products that currently enjoy recurring VAT refund:

| Company | Products | Commenced |
|---------|----------|-----------|
| BNBM . . . . . . . . . . . . . . . . . . . | Gypsum boards<br>Acoustical ceiling panels | Prior to the Track Record Period |
| | Rock wool | January 2005 |
| | Granulate wool | January 2003 |
| Taihe . . . . . . . . . . . . . . . . . . . . | Gypsum boards | Prior to the Track Record Period |
| Qinhuangdao Taishan . . . . . . . . . . | Gypsum boards | July 2003 |
| Pizhou Taihe . . . . . . . . . . . . . . . | Gypsum boards | April 2004 |
| Luhong . . . . . . . . . . . . . . . . . . | PC32.5 cement | January 2002 |
| | PO32.5 cement | September 2004 |
| | PO42.5 cement | January 2005 |
| Huaihai . . . . . . . . . . . . . . . . . . | PC32.5 cement | Prior to the Track Record Period |

ALRMH-CNBM00000220

# FINANCIAL INFORMATION

The directors consider that the VAT refunds fall within the ordinary and usual course of business of the Group for the following reasons:

- We receive VAT refunds pursuant to regulations enacted by the Sate Council and other relevant government authorities, which will stay effective until repealed or modified by the relevant government authorities. During the Track Record Period, we continuously received VAT refund on our eligible and we expect to continue to receive such VAT refund in the future. The Directors are not aware of any indication that there would be any change in such regulations.

- Pursuant to the relevant regulations, all enterprises meeting certain criteria, such as utilizing industry waste as part of the raw materials for the production of certain lightweight building materials and cement, are eligible for VAT refund. Accordingly, VAT refund should be regarded as tax incentives and compensation granted to all enterprises carrying out such businesses in the PRC.

- Sales tax is within the ordinary and usual course of business for any enterprise carrying out its business in the PRC. VAT refund is calculated based on output VAT received on sales less corresponding input VAT paid for purchases of raw materials.

Further, as with our other products, revenues attributable to sales of the products enjoying VAT refund are recognized net of statutory VAT without giving effect to the VAT refund. In accordance with IFRS and our accounting policies, we have therefore consistently recognized the amount of VAT refund as other income throughout the Track Record Period, when our rights to receive the same have been established and recognized.

Government grants are awarded to us from time to time by the Ministry of Finance or the local government agencies as incentives in respect of certain environmental matters, primarily to encourage us to locate or relocate some of our operations to outside of Beijing, and as incentives to encourage technological innovations by our subsidiaries. See "*Risk Factors — Risks Relating to the Group — Changes in tax incentives or government grants may adversely affect our business and results of operations and/or financial condition.*"

VAT refund was the largest component of our other income, followed by rental income, during most of the Track Record Period, government grants were the largest component of our other income both for the nine months ended September 30, 2004 and in 2004, and technical and other service income was the second largest component of our other income for the nine months ended September 30, 2005. VAT refunds accounted for approximately 43.1%, 50.4%, 29.3% and 32.0% of our other income in 2002, 2003 and 2004 and for the nine months ended September 30, 2005, respectively, and rental income accounted for approximately 11.7%, 18.0%, 11.0% and 7.2% of our other income in 2002, 2003 and 2004 and for the nine months ended September 30, 2005, respectively.

ALRMH-CNBM00000221

# FINANCIAL INFORMATION

### Selling and Distribution Costs

Our selling and distribution costs primarily consist of transportation costs, commissions and salaries, bonuses and other subsidies for sales staff, packaging expenses, expenses for the sales network, expenses for after-sales services, and marketing expenses.

### Administrative Expenses

Our administrative expenses include general administrative expenses, research and development expenses and provision for bad debt.

General administrative expenses primarily consist of salaries for administrative staff, various employee welfare contributions required by labor regulations, subsidies and insurance for administrative staff, depreciation of office equipment, entertainment expenses, repair and maintenance expenses, miscellaneous real property taxes, and other miscellaneous expenses related to administration.

Research and development expenses not already included in the cost of sales primarily consist of salaries, bonuses and benefits paid to research and development personnel, and cost of materials, depreciation and maintenance on the equipment used in our research and development efforts.

Provision for bad debt consists of provision made for trade receivables and other receivables based on an assessment of the recoverability of such trade and other receivables.

### Other Expenses

Other expenses primarily include provision for investment, impairment of fixed assets and loss on disposal of fixed assets.

### Finance Costs

Finance costs consist of interest payments on bank loans and other loans and discounts to principal amounts of trade bills that are incurred when such trade bills are cashed prior to their specified maturity dates. Finance costs directly attributable to the construction or production of certain assets that take a substantial period of time to prepare for their intended use or sale are capitalized as part of the cost of these assets.

### Share of Profit of Associates

An associate is a company, not being a subsidiary, in which we have a long-term interest of generally not less than 20.0% of the equity voting rights (or less in certain exceptions) and over which we have significant influence. Our share of profit of an associate is the profit attributable to us of such associate pursuant to our equity interest in such associate.

ALRMH-CNBM00000222

## FINANCIAL INFORMATION

We conduct our glass fiber operations through an associate, China Fiberglass, a public listed company in the PRC in which we are currently the largest shareholder with a 40.17% equity interest. The public currently holds a 33.33% equity interest in China Fiberglass. Four of the six non-independent directors on China Fiberglass's nine-member board, including the Chairman, were nominated by the Company. The financial results of China Fiberglass are not consolidated with those of the Group and we account for China Fiberglass using the equity method. The table below sets out, for the periods indicated, the results of operations of China Fiberglass, which were prepared in accordance with IFRS:

| | For the year ended December 31, | | | For the nine months ended September 30, | |
|---|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2004 | 2005 |
| | (RMB in millions) | | | | |
| Revenue . . . . . . . . . . . . . . . . . . . . . . | 649.0 | 851.0 | 1,143.3 | 788.4 | 1,074.7 |
| Gross profit . . . . . . . . . . . . . . . . . . . | 210.0 | 272.1 | 338.8 | 237.3 | 362.0 |
| Profit before tax and minority interest. . . | 35.6 | 131.0 | 187.1 | 118.6 | 192.8 |
| Net profit . . . . . . . . . . . . . . . . . . . . . | 15.6 | 69.2 | 88.4 | 47.9 | 89.0 |

In addition, we hold equity interests through our subsidiaries in a number of other associates, including holding through China Composites, an equity interest in Yaohua, a major float glass manufacturer in the PRC, and holding through BND, an equity interest in Shenzhen B&Q, a retail joint venture set up by B&Q (China) B.V., the major British home improvement retail chain. China Composites has the right to appoint two directors to Yaohua's board and BND has the right to appoint two directors to Shenzhen B&Q's board.

The table below sets out, for the periods indicated, the amount of share of profit of associates from our major associates and their respective contributions to our profit for the year/period:

| | For the year ended December 31, | | | | | | For the nine months ended September 30, | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2002 | | 2003 | | 2004 | | 2004 | | 2005 | |
| | Share of profit | % | Share of profit | % | Share of profit | % | Share of profit | % | Share of profit | % |
| | | | | | | | (unaudited) | | | |
| | (RMB in millions, except for percentages) | | | | | | | | | |
| China Fiberglass . . . | 5.9 | 4.1 | 26.1 | 18.1 | 33.4 | 12.4 | 18.1 | 14.4 | 35.8 | 11.4 |
| Yaohua . . . . . . . . | 18.6 | 12.9 | 22.4 | 15.5 | 37.0 | 13.7 | 24.3 | 19.4 | 17.1 | 5.4 |
| Shenzhen B&Q . . . . | 1.9 | 1.3 | 9.7 | 6.7 | 21.2 | 7.9 | 5.8 | 4.6 | 10.2 | 3.3 |
| Other associates . . . . | 13.9 | 9.6 | 11.8 | 8.2 | 5.1 | 1.9 | (1.5) | (1.2) | 8.4 | 2.7 |
| Total . . . . . . . . | 40.3 | 27.9 | 70.0 | 48.5 | 96.7 | 35.9 | 46.7 | 37.2 | 71.5 | 22.8 |

See "*Risk Factors — Risks relating to the Group — The Company's direct or indirect equity interests in its publicly-listed subsidiaries or associates in the PRC are subject to the recent securities reform in the PRC*" for description of the impact of securities reform on China Fiberglass and Yaohua.

ALRMH-CNBM00000223

# FINANCIAL INFORMATION

### Minority Interests

Minority interests represent the interests of outside shareholders in the results and net assets of our subsidiaries that we do not wholly own. Minority interests are deducted from our profit for the year/period in order to determine our profit attributable to equity holders of the Company when the relevant entity has a profit before minority interests or added to our profit for the year/period in order to determine our profit attributable to equity holders of the Company when the relevant entity has a loss before minority interests. See "*Appendix I — Accountants' Report*" for an analysis of the minority interests in the Company.

### Consolidated Results of Operations

The following discussion is based on our historical results of operations. Such results of operations may not be indicative of our future operating performance. Our consolidated income statements for 2002, 2003 and 2004 and the nine months ended September 30, 2004 and 2005 are summarized below:

| | For the year ended December 31, | | | For the nine months ended September 30, | |
|---|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2004 | 2005 |
| | | | | (unaudited) | |
| | (RMB in millions) | | | | |
| Revenue | 1,661.5 | 1,845.2 | 2,898.1 | 1,956.1 | 3,334.4 |
| Cost of sales | (1,290.3) | (1,426.8) | (2,343.3) | (1,593.9) | (2,733.0) |
| Gross profit | 371.2 | 418.4 | 554.8 | 362.2 | 601.4 |
| Other income | 79.5 | 81.2 | 151.3 | 100.7 | 177.5 |
| Selling and distribution costs | (126.5) | (146.5) | (188.1) | (138.0) | (207.3) |
| Administrative and other expenses | (164.4) | (212.8) | (221.5) | (160.7) | (211.5) |
| Operating profit | 159.8 | 140.3 | 296.5 | 164.2 | 360.1 |
| Share of profit of associates | 40.3 | 70.0 | 96.7 | 46.7 | 71.5 |
| Finance costs | (53.3) | (58.2) | (98.8) | (75.4) | (104.7) |
| Profit on partial disposals | 0 | 1.3 | 0 | 0 | 0 |
| Profit on disposal of a subsidiary | 0 | 0 | 0 | 0 | 27.3 |
| Income tax expense | (2.3) | (9.1) | (25.0) | (10.2) | (39.6) |
| Profit for the year/period | 144.5 | 144.3 | 269.4 | 125.3 | 314.6 |
| Attributable to: | | | | | |
| Equity holders of the Company | 99.2 | 111.7 | 193.1 | 91.4 | 223.9 |
| Minority interests | 45.3 | 32.6 | 76.3 | 33.9 | 90.7 |
| | 144.5 | 144.3 | 269.4 | 125.3 | 314.6 |
| Distributions to equity holders of the Company[1] | 22.8 | 136.4 | 27.8 | 27.8 | 135.6 |
| Earnings per Share — basic (RMB)[2] | 0.07 | 0.08 | 0.14 | 0.07 | 0.16 |

_____

*Notes:*

(1)   Distributions consisted of declared dividends and deemed distributions. For a discussion on declared dividends, see "— *Dividends*." The Company incurred deemed distributions in the amount of RMB 5.5 million, RMB 115.6 million, nil, nil and nil, respectively, for the year ended December 31, 2002, 2003, 2004 and the nine months ended September 30, 2004 and 2005. See Note 12 of "*Appendix I — Accountants' Report*" for details.

(2)   The calculations of basic earnings per Share are based on the profit attributable to equity holders of the Company of each period and on the weighted average number of 1,387,110,000 Shares for each of 2002, 2003, 2004 and the nine months ended September 30, 2004 and 1,387,555,238 Shares for the nine months ended September 30, 2005, as if the Reorganization had been completed on January 1, 2002.

ALRMH-CNBM00000224

# FINANCIAL INFORMATION

The following table sets out the amount and percentage of our consolidated revenue provided by each of our four business segments for the periods indicated:

| | For the year ended December 31, | | | | | | For the nine months ended September 30, | | | |
| | 2002 | | 2003 | | 2004 | | 2004 | | 2005 | |
| | Revenue | % of total | Revenue | % of total | Revenue | % of total | Revenue | % of total | Revenue | % of total |
| | | | | | | | (unaudited) | | | |
| | (RMB in millions, except for percentages) | | | | | | | | | |
| Cement . . . . . . . . . . | 560.4 | 33.7 | 611.7 | 33.2 | 778.8 | 26.9 | 533.4 | 27.3 | 889.2 | 26.7 |
| Lightweight building materials . . . . . . . | 1,021.2 | 61.5 | 1,027.9 | 55.7 | 1,482.6 | 51.1 | 1,002.1 | 51.2 | 1,676.9 | 50.3 |
| Glass fiber and FRP products . . . . . . . . | 0.9 | 0.0 | 75.1 | 4.0 | 261.3 | 9.0 | 201.6 | 10.3 | 223.9 | 6.7 |
| Engineering services . . . | 79.0 | 4.8 | 145.5 | 7.9 | 465.9 | 16.1 | 295.4 | 15.1 | 592.7 | 17.7 |
| Consolidation adjustment and eliminations . . . . | 0.0 | 0.0 | (15.0) | (0.8) | (90.5) | (3.1) | (76.4) | (3.9) | (48.3) | (1.4) |
| Total . . . . . . . . . | 1,661.5 | 100.0 | 1,845.2 | 100.0 | 2,898.1 | 100.0 | 1,956.1 | 100.0 | 3,334.4 | 100.0 |

The following table sets out the amount and percentage of our total operating profits provided by each of our four business segments for the periods indicated:

| | For the year ended December 31, | | | | | | For the nine months ended September 30, | | | |
| | 2002 | | 2003 | | 2004 | | 2004 | | 2005 | |
| | Operating profit | % of total | Operating profit | % of total | Operating profit | % of total | Operating profit | % of total | Operating profit | % of total |
| | | | | | | | (unaudited) | | | |
| | (RMB in millions, except for percentages) | | | | | | | | | |
| Cement . . . . . . . . . . | 38.5 | 24.1 | 48.5 | 34.6 | 125.9 | 42.5 | 83.5 | 50.8 | 139.0 | 38.6 |
| Lightweight building materials . . . . . . . | 113.4 | 71.0 | 76.1 | 54.2 | 98.2 | 33.1 | 52.5 | 32.0 | 124.0 | 34.4 |
| Glass fiber and FRP products . . . . . . . . | (7.1) | (4.5) | 0.7 | 0.5 | 23.8 | 8.0 | 15.0 | 9.2 | 47.5 | 13.2 |
| Engineering services . . . | 15.0 | 9.4 | 14.9 | 10.7 | 57.4 | 19.4 | 19.1 | 11.6 | 58.7 | 16.3 |
| Company[1] . . . . . . . . | — | — | — | — | — | — | — | — | (6.0)[1] | (1.6) |
| Consolidation adjustment and eliminations . . . | 0.0 | 0.0 | 0.1 | 0.0 | (8.8) | (3.0) | (5.9) | (3.6) | (3.1) | (0.9) |
| Total . . . . . . . . . | 159.8 | 100.0 | 140.3 | 100.0 | 296.5 | 100.0 | 164.2 | 100.0 | 360.1 | 100.0 |

_____

Note:

(1)   Consists of administrative expenses incurred by the Company following its establishment in March 2005.

ALRMH-CNBM00000225

## FINANCIAL INFORMATION

The following table sets out our consolidated balance sheet as at December 31, 2002, 2003, 2004 and September 30, 2005:

| | As at December 31, | | | As at September 30, |
|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 |
| | (RMB in millions) | | | |
| Non-current assets . . . . . . . . . . . . . . . . . . . . . . | 2,215.4 | 2,613.1 | 4,438.3 | 6,287.5 |
| Current assets . . . . . . . . . . . . . . . . . . . . . . . . . | 1,716.4 | 2,280.5 | 2,513.2 | 3,372.0 |
| Net current assets (liabilities) . . . . . . . . . . . . . . | 453.8 | 536.7 | (225.0) | (1,858.9) |
| Net assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,557.7 | 2,662.4 | 2,966.0 | 3,250.6 |
| Equity attributable to equity holders of the Company . . . . . . . . . . . . . . . . . . . . . . . . | 1,657.1 | 1,681.1 | 1,888.6 | 1,985.0 |

### The Latest Financial Period Reported on by the Reporting Accountants Required under the Listing Rules and the Companies Ordinance

Rule 4.04(1) of the Listing Rules requires the accountants' report of the Company to include our consolidated results in respect of each of the three financial years immediately preceding the issue of this prospectus.

Under section 342(1)(b) of the Companies Ordinance, the Company is required to, among other things, state in this prospectus the matters specified in Part I of the Third Schedule to the Companies Ordinance and set forth in this prospectus the reports specified in Part II of the Third Schedule to the Companies Ordinance. Paragraph 27 of Part I of the Third Schedule to the Companies Ordinance requires that a statement as to the gross trading income or sales turnover (as may be appropriate) of the Company during each of the three financial years immediately preceding the issue of this prospectus, including an explanation of the method used for the computation of such income or turnover and a reasonable breakdown between the more important trading activities, shall be included in this prospectus. Paragraph 31 of Part II of the Third Schedule to the Companies Ordinance requires this prospectus to include a report by the auditors of the Company with respect to the profits and losses and assets and liabilities in respect of each of the three financial years immediately preceding the issue of this prospectus.

The *Accountants' Report* set out in Appendix I to this prospectus includes the audited financial statements of the Company for the three years ended December 31, 2004 and the nine months ended September 30, 2005 but not the audited financial statements of the Company (including the requisite statements as to its gross trading income or sales turnover) for the full financial year ended December 31, 2005 as required under Rule 4.04 of the Listing Rules and paragraphs 27 of Part I and 31 of Part II of the Third Schedule of the Companies Ordinance. As this prospectus is issued on March 13, 2006, our Directors believe that it will be unduly burdensome to include in it audited financial statements of the Company for the full financial year ended December 31, 2005.

In the circumstances, an application has been made to the SFC for a certificate of exemption from strict compliance with paragraphs 27 and 31 of the Third Schedule to the Companies Ordinance in relation to the inclusion of the accountants' report for the full financial year ended December 31, 2005 in this prospectus on the ground that it would be unduly burdensome for our company to do so, and a certificate of exemption from such strict compliance has been granted by the SFC.

ALRMH-CNBM00000226

## FINANCIAL INFORMATION

An application has also been made to the Stock Exchange for a waiver from strict compliance with Rule 4.04(1) of the Listing Rules in relation to the inclusion of the accountants' report for the full financial year ended December 31, 2005 in this prospectus. The Stock Exchange has granted to us such a waiver on the condition that the Listing Date should be on or before March 31, 2006.

The Directors confirm that they have performed sufficient due diligence on the Group to ensure that, up to the date of this prospectus, there has been no material adverse change in our financial position or prospects since September 30, 2005 and there is no event since September 30, 2005 which would materially affect the information shown in the *Accountants' Report* set out in Appendix I to this prospectus.

### *Nine Months Ended September 30, 2005 Compared with Nine Months Ended September 30, 2004*

#### *Revenue*

Revenue increased by 70.5% to RMB 3,334.4 million for the nine months ended September 30, 2005 from RMB 1,956.1 million for the nine months ended September 30, 2004, primarily due to an increase of RMB 674.8 million in revenue from our lightweight building materials segment, an increase of RMB 355.7 million in revenue from our cement segment, and an increase of RMB 297.3 million in revenue from our engineering services segment.

#### *Cost of sales*

Cost of sales increased by 71.5% to RMB 2,733.0 million for the nine months ended September 30, 2005 from RMB 1,593.9 million for the nine months ended September 30, 2004, primarily due to an increase of RMB 544.0 million in cost of sales from our lightweight building materials segment, an increase of RMB 316.9 million in cost of sales from our cement segment, and an increase of RMB 237.7 million in cost of sales from our engineering services segment.

#### *Gross profit and gross margin*

As a result of the foregoing, the gross profit for the nine months ended September 30, 2005 was RMB 601.4 million, an increase of RMB 239.2 million, or 66.0%, from RMB 362.2 million for the nine months ended September 30, 2004. Gross margin decreased from 18.5% for the nine months ended September 30, 2004 to 18.0% for the nine months ended September 30, 2005, primarily due to a decrease in gross margin from our cement segment.

#### *Other income*

Our other income increased by 76.3% to RMB 177.5 million for the nine months ended September 30, 2005 from RMB 100.7 million for the nine months ended September 30, 2004. Our VAT refund increased by 115.4% to RMB 56.8 million for the nine months ended September 30, 2005 from RMB 26.3 million for the nine months ended September 30, 2004, primarily due to an additional RMB 16.0 million VAT refund arising from Taihe, an increase in the amount of RMB 11.1 million in VAT refund arising from an increase in the sales volume of the cement products qualifying for such refund, and an increase in the amount of RMB 3.3 million in VAT refund arising from an increase in the sales volume of our gypsum boards.

ALRMH-CNBM00000227

---

## FINANCIAL INFORMATION

---

Our technical and other service income was RMB 31.6 million for the nine months ended September 30, 2005, comprising primarily (i) RMB 18.5 million arising from our glass fiber and FRP products segment, attributable primarily to a consulting fee arising from a new consulting contract in the amount of RMB 13.7 million and an installation fee in the amount of RMB 2.7 million, (ii) RMB 7.1 million arising from our cement segment, attributable primarily to a transportation and labor service fee in the amount of RMB 3.1 million and a consulting fee in the amount of RMB 2.5 million, and (iii) RMB 5.9 million arising from our lightweight building materials segment, attributable primarily to an installation fee in the amount of RMB 1.9 million and a consulting fee in the amount of RMB 1.7 million.

In addition, in connection with our acquisition of an additional 43.5% of equity interest in Zhongfu Lianzhong, a subsidiary in our glass fiber and FRP products segment, we recognized a release of discount on acquisition to income in the amount of RMB 10.9 million, which reflected the discount of our acquisition consideration paid to the net asset value of Zhongfu Lianzhong represented by the 43.5% equity interest acquired.

### Selling and distribution costs

Selling and distribution costs increased by 50.2% to RMB 207.3 million for the nine months ended September 30, 2005 from RMB 138.0 million for the nine months ended September 30, 2004, primarily due to an increase of RMB 41.1 million in selling and distribution costs from our lightweight building materials segment and an increase of RMB 14.8 million in selling and distribution costs from our cement segment.

### Administrative and other expenses

Administrative and other expenses increased by 31.6% to RMB 211.5 million for the nine months ended September 30, 2005 from RMB 160.7 million for the nine months ended September 30, 2004, primarily due to an increase of RMB 32.4 million in administrative and other expenses from our lightweight building materials segment and an increase of RMB 14.1 million in administrative and other expenses from our engineering services segment.

### Operating profit

Operating profit increased by 119.4% to RMB 360.1 million for the nine months ended September 30, 2005 from RMB 164.2 million for the nine months ended September 30, 2004, due to an increase of RMB 71.5 million in operating profit from our lightweight building materials segment, an increase of RMB 55.4 million in operating profit from our cement segment, an increase of RMB 39.7 million in operating profit from our engineering services segment, and an increase of RMB 32.4 million in operating profit from our glass fiber and FRP products segment.

### Operating margin

Our operating margin was 10.8% for the nine months ended September 30, 2005 as compared with 8.4% for the nine months ended September 30, 2004, primarily due to an increase in the operating margin of our lightweight building materials business.

ALRMH-CNBM00000228

# FINANCIAL INFORMATION

*Finance costs*

Finance costs increased by 38.8% to RMB 104.7 million for the nine months ended September 30, 2005 from RMB 75.4 million for the nine months ended September 30, 2004, due to our increased short-term borrowings needed to support the increase in the business volume in each of our four business segments. See "— *Liquidity and Capital Resources — Indebtedness — Borrowings*."

*Share of profit of associates*

Our share of profit of associates increased by 53.1% to RMB 71.5 million for the nine months ended September 30, 2005 from RMB 46.7 million for the nine months ended September 30, 2004, primarily due to increases in the profits of our associates China Fiberglass and Shenzhen B&Q, partially offset by a decrease in the profit of our associate Yaohua. Our share of profit of associates from China Fiberglass increased for the nine months ended September 30, 2005 as compared with the same period in 2004, primarily due to increased sales volume as a result of increased production from two newly constructed glass fiber production lines, a 60,000-tonne-per-year line that entered into production in September 2004 and a 30,000-tonne-per-year line that entered into production in August 2004. Our share of profit of associates from Shenzhen B&Q increased over the same period, primarily due to an increase in its revenue from RMB 452.5 million to RMB 567.7 million as a result of increased sales volume arising from the opening of a new store. Our share of profit of associates from Yaohua decreased for the nine months ended September 30, 2005 as compared with the same period in 2004, primarily due to increases in Yaohua's costs of raw materials and fuel.

*Profit on disposal of a subsidiary*

On August 1, 2005, we sold our interests in the E-HOME stores to a major electronics retailer and recognized a gain of RMB 27.3 million. See "— *Lightweight Building Materials Segment — Sale of E-HOME Stores*" for details.

*Income tax expense*

Income tax expense increased by 288.1% to RMB 39.6 million for the nine months ended September 30, 2005 from RMB 10.2 million for the nine months ended September 30, 2004, primarily due to an increase in profit before taxation and an increase in effective tax rate to 11.2% for the nine months ended September 30, 2005 from 7.5% for the nine months ended September 30, 2004. The increase in our effective tax rate for the nine months ended September 30, 2005 was primarily due to the termination of combining Luhong and Lunan Cement for tax purposes as well as the termination of combining Huaihai and Julong Cement for tax purposes as of September 30, 2004. See note (2) under the tax reconciliation table in "— *Factors Affecting Results of Operations — Income Tax Expense.*" It was also due to the expiration of certain tax credits on July 31, 2005 applicable to the gypsum boards produced by BNBM, and a decrease in the contribution of share of profit of associates to our profit for the period, partially offset by a new tax credit applicable to Huaihai for the use of certain equipment recognized by the relevant authority and a reduction in the tax effect of non-deductible expenses. See "— Factors Affecting Results of Operations — Income Tax Expense" for a discussion of our effective tax rates.

— 225 —

ALRMH-CNBM00000229

## FINANCIAL INFORMATION

*Minority interests*

Minority interests increased by 167.9% to RMB 90.7 million for the nine months ended September 30, 2005 from RMB 33.9 million for the nine months ended September 30, 2004, primarily due to the increase in operating profit in each of our business segments.

*Profit attributable to the equity holders of the Company*

As a result of the foregoing factors, profit attributable to the equity holders of the Company increased by 145.0%, or RMB 132.5 million, to RMB 223.9 million for the nine months ended September 30, 2005 from RMB 91.4 million for the nine months ended September 30, 2004. Our net profit margin increased to 6.7% for the nine months ended September 30, 2005 from 4.7% for the nine months ended September 30, 2004.

**Year Ended December 31, 2004 Compared with Year Ended December 31, 2003**

*Revenue*

Revenue increased by 57.1% to RMB 2,898.1 million in 2004 from RMB 1,845.2 million in 2003, primarily due to an increase of RMB 454.6 million in revenue from our lightweight building materials segment, an increase of RMB 320.4 million in revenue from our engineering services segment, an increase in revenue of RMB 186.2 million from our glass fiber and FRP products segment and an increase in revenue of RMB 167.1 million from our cement segment.

*Cost of sales*

Cost of sales increased by 64.2% to RMB 2,343.3 million in 2004 from RMB 1,426.8 million in 2003, primarily due to an increase of RMB 440.3 million in cost of sales from our lightweight building materials segment, an increase of RMB 267.2 million in cost of sales from our engineering services segment, an increase of RMB 138.2 million in cost of sales from our glass fiber and FRP products segment and an increase of RMB 137.3 million in cost of sales from our cement segment.

*Gross profit and gross margin*

As a result of the foregoing, gross profit increased by 32.6% to RMB 554.8 million in 2004 from RMB 418.4 million in 2003. Gross margin decreased to 19.1% in 2004 from 22.7% in 2003, due to a decrease in gross margin in each of our business segments.

*Other income*

Other income increased by 86.1% to RMB 151.3 million in 2004 from RMB 81.2 million in 2003, primarily due to an increase of RMB 38.8 million in other income from our lightweight building materials segment and an increase of RMB 22.6 million in other income from our cement segment.

Our government grants increased by RMB 39.1 million to RMB 39.7 million in 2004 from RMB 0.6 million in 2003. In 2004, BNBM received government grants from the Ministry of Finance in the aggregate amount of RMB 24.8 million arising from the environmental incentives granted to BNBM for locating a third gypsum board production line and relocating its rock wool plant outside of Beijing. In addition, BNBM also received a government grant in the amount of RMB 10.0 million as an incentive for technological innovations in connection with the manufacturing of PVC building materials and metal heating radiator units.

— 226 —

# FINANCIAL INFORMATION

*Selling and distribution costs*

Selling and distribution costs increased by 28.4% to RMB 188.1 million in 2004 from RMB 146.5 million in 2003, primarily due to an increase of RMB 25.3 million in selling and distribution costs from our lightweight building materials segment and an increase of RMB 15.8 million in selling and distribution costs from our glass fiber and FRP products segment.

*Administrative and other expenses*

Administrative and other expenses increased by 4.1% to RMB 221.5 million in 2004 from RMB 212.8 million in 2003, primarily due to an increase of RMB 17.2 million in administrative and other expenses from our glass fiber and FRP products segment.

*Operating profit*

Operating profit increased by 111.3% to RMB 296.5 million in 2004 from RMB 140.3 million in 2003, primarily due to an increase of RMB 77.4 million in operating profit of our cement segment, an increase of RMB 42.5 million in operating profit of our engineering services segment, an increase of RMB 22.2 million in operating profit of our lightweight building materials segment and an increase of RMB 23.1 million in operating profit from our glass fiber and FRP products segment.

*Operating margin*

Our operating margin increased to 10.2% in 2004 from 7.6% in 2003, primarily due to increases in operating margin in our cement segment and glass fiber and FRP products segment.

*Finance costs*

Finance costs increased by 69.7% to RMB 98.8 million in 2004 from RMB 58.2 million in 2003, primarily attributable to increased working capital borrowings in 2004 to support the increased business volume in our cement segment, lightweight building materials segment and glass fiber and FRP products segment.

*Share of profit of associates*

Our share of profit of associates increased by 38.2% to RMB 96.7 million in 2004 from RMB 70.0 million in 2003, primarily due to improved performance of China Fiberglass, Yaohua and Shenzhen B&Q in 2004 as compared with 2003. Revenue of China Fiberglass increased by 34.3% to RMB 1,143.3 million in 2004 from RMB 851.0 million in 2003 as a result of the increased sales volume from a newly constructed 60,000-tonne-per-year glass fiber production line that entered into production in September 2004 and another newly constructed 30,000-tonne-per-year glass fiber production line that entered into production in August 2004. Revenue of Yaohua increased by 40.1% to RMB 1,660.3 million in 2004 from RMB 1,185.1 million in 2003 as a result of the increased sales volume due to production from two newly constructed glass production lines. Revenue of Shenzhen B&Q increased by 62.4% to RMB 697.5 million in 2004 from RMB 429.4 million in 2003 as a result of the increased sales volume arising from the opening of a new store.

ALRMH-CNBM00000231

# FINANCIAL INFORMATION

*Income tax expense*

Income tax expense increased by 175.9% to RMB 25.0 million in 2004 from RMB 9.1 million in 2003 due to an increase in profit before taxation and an increase in our effective tax rate. Our effective tax rate was 5.9% for 2003 and 8.5% for 2004. The increase in our effective tax rate in 2004 was primarily due to the decreased contribution of share of profit of associates to our profit for 2004. Our share of profit of associates decreased from 48.5% of our profit for 2003 to 35.9% of our profit for 2004. See "— *Factors Affecting Results of Operations — Income Tax Expense*" for a discussion of our effective tax rates.

*Minority interests*

Minority interests increased by 133.9% to RMB 76.3 million in 2004 from RMB 32.6 million in 2003 due to increased profits before minority interests in 2004.

*Profit attributable to the equity holders of the Company*

As a result of the foregoing factors, profit attributable to the equity holders of the Company increased by 72.9% to RMB 193.1 million in 2004 from RMB 111.7 million in 2003. Our net profit margin increased to 6.7% in 2004 from 6.1% in 2003.

**Year Ended December 31, 2003 Compared with Year Ended December 31, 2002**

*Revenue*

Revenue increased by 11.1% to RMB 1,845.2 million in 2003 from RMB 1,661.5 million in 2002, primarily due to an increase in revenue of RMB 74.2 million from our glass fiber and FRP products segment, an increase in revenue of RMB 66.5 million from our engineering services segment and an increase in revenue of RMB 51.2 million from our cement segment.

*Cost of sales*

Cost of sales increased by 10.6% to RMB 1,426.8 million in 2003 from RMB 1,290.3 million in 2002, primarily due to an increase in cost of sales of RMB 60.6 million from our engineering services segment, an increase in cost of sales of RMB 46.3 million from our glass fiber and FRP products segment and an increase in cost of sales of RMB 40.7 million from our cement segment.

*Gross profit and gross margin*

As a result of the foregoing, gross profit increased by 12.7% to RMB 418.4 million in 2003 from RMB 371.2 million in 2002. Gross margin increased slightly to 22.7% in 2003 from 22.3% in 2002, primarily due to an increase in revenue carrying a relatively high gross margin in our glass fiber and FRP products segment.

ALRMH-CNBM00000232

## FINANCIAL INFORMATION

*Other income*

Other income increased by 2.3% to RMB 81.2 million in 2003 from RMB 79.5 million in 2002, due to slight increases in other income from our lightweight building materials segment, our cement segment and our engineering services segment, partially offset by a slight decrease in other income from our glass fiber and FRP products segment.

*Selling and distribution costs*

Selling and distribution costs increased by 15.8% to RMB 146.5 million in 2003 from RMB 126.5 million in 2002, primarily due to an increase of RMB 13.5 million in selling and distribution costs from our lightweight building materials segment and an increase of RMB 11.8 million in selling and distribution costs from our glass fiber and FRP products segment.

*Administrative and other expenses*

Administrative and other expenses increased by 29.5% to RMB 212.8 million in 2003 from RMB 164.4 million in 2002, primarily due to an increase of RMB 28.2 million in administrative and other expenses from our lightweight building materials segment.

*Operating profit*

Operating profit decreased by 12.2% to RMB 140.3 million in 2003 from RMB 159.8 million in 2002, primarily due to a decrease in operating profit of RMB 37.3 million, or 32.9%, from our lightweight building materials segment, partially offset by an increase in operating profit of RMB 10.0 million, or 25.9%, from our cement segment.

*Operating margin*

Our operating margin decreased to 7.6% in 2003 from 9.6% in 2002, primarily due to decreases in operating margin in our lightweight building materials segment and engineering services segment.

*Finance costs*

Finance costs increased by 9.4% to RMB 58.2 million in 2003 from RMB 53.3 million in 2002, primarily due to the acquisition of our FRP pipes and tanks business in our glass fiber and FRP products segment and an increase in short-term borrowings by our cement segment to support its increased business volume.

*Share of profit of associates*

Our share of profit of associates increased by 73.7% to RMB 70.0 million in 2003 from RMB 40.3 million in 2002, primarily due to the improved performance of China Fiberglass, Yaohua and Shenzhen B&Q. Revenue of China Fiberglass increased by 31.1% to RMB 851.0 million in 2003 from RMB 649.0 million in 2002, primarily due to increased sales volumes arising from technological innovations on a 10,000-tonne-per-year glass fiber production line that increased its production capacity to 16,000 tonnes per year. Revenue

— 229 —

ALRMH-CNBM00000233

## FINANCIAL INFORMATION

of Yaohua increased by 8.4% to RMB 1,185.1 million in 2003 from RMB 1,083.5 million in 2002 as a result of its increased sales and marketing effort. Revenue of Shenzhen B&Q increased by 96.1% to RMB 429.4 million in 2003 from RMB 218.9 million in 2002 as a result of the increased sales volume arising from the opening of a new store.

*Income tax expense*

Income tax expense increased by 298.3% to RMB 9.1 million in 2003 from RMB 2.3 million in 2002, primarily due to an increase in profit before taxation and an increase in our effective tax rate. Our effective tax rate was 1.5% in 2002 and 5.9% in 2003. The increase in our effective tax rate in 2003 was primarily due to an increase in the tax effect of differential tax rate on our subsidiaries' income and a greater impact of unrealized tax losses, partially offset by an increase in the tax effect of share of profit of associates in 2003. Our share of profit of associates increased from 27.9% of our profit for the year in 2002 to 48.5% of our profit for the year in 2003. See "— *Factors Affecting Results of Operations — Income Tax Expense*" for a discussion of our effective tax rates.

*Minority interests*

Minority interests decreased by 28.0% to RMB 32.6 million in 2003 from RMB 45.3 million in 2002, primarily due to an increase in the losses suffered by the subsidiaries of BNBM.

*Profit attributable to the equity holders of the Company*

As a result of the foregoing factors, profit attributable to the equity holders of the Company increased by 12.5% to RMB 111.7 million in 2003 from RMB 99.2 million in 2002. Our net profit margin increased slightly to 6.1% in 2003 as compared with 6.0% in 2002.

## Cement Segment

The following table sets out the principal income statement information for our cement segment for 2002, 2003, 2004 and the nine months ended September 30, 2004 and 2005:

| | For the year ended December 31, | | | For the nine months ended September 30, | |
| --- | --- | --- | --- | --- | --- |
| | 2002 | 2003 | 2004 | 2004 | 2005 |
| | | | | (unaudited) | |
| | | | (RMB in millions) | | |
| Revenue | 560.4 | 611.7 | 778.8 | 533.4 | 889.2 |
| Cost of sales | (380.3) | (421.1) | (558.3) | (375.1) | (692.1) |
| Gross profit | 180.1 | 190.6 | 220.5 | 158.3 | 197.1 |
| Other income | 19.7 | 20.3 | 42.9 | 24.4 | 58.1 |
| Selling and distribution costs | (76.0) | (71.2) | (69.0) | (51.0) | (65.7) |
| Administrative expenses | (79.2) | (71.2) | (65.8) | (46.7) | (50.0) |
| Other expenses | (6.1) | (20.0) | (2.7) | (1.5) | (0.5) |
| Operating profit | 38.5 | 48.5 | 125.9 | 83.5 | 139.0 |

ALRMH-CNBM00000234

# FINANCIAL INFORMATION

*Nine Months Ended September 30, 2005 Compared with Nine Months Ended September 30, 2004*

*Acquisition and addition of new production lines*

We commenced production at a new cement production line at our Nanyang plant in October 2004 and we acquired Zaozhuang Luhong and Ziyan in April 2005. The operating results from these three plants are included in our financial results for the nine months ended September 30, 2005 but not for the nine months ended September 30, 2004. The following table sets out the revenue, cost of sales, gross profit and operating profit arising from these three plants for the nine months ended September 30, 2005 and their respective contribution to our cement segment:

| | New Nanyang production line | % of segment total | Zaozhuang Luhong | % of segment total | Ziyan | % of segment total |
|---|---|---|---|---|---|---|
| | (RMB in millions, except for percentages) | | | | | |
| Revenue . . . . . . . . | 147.7 | 16.6 | 63.4 | 7.1 | 43.8 | 4.9 |
| Cost of sales . . . . . . | 107.2 | 15.5 | 58.2 | 8.4 | 39.6 | 5.7 |
| Gross profit . . . . . . | 40.5 | 20.5 | 5.2 | 2.6 | 4.2 | 2.1 |
| Operating profit . . . . | 34.8 | 25.1 | 4.2 | 3.0 | 6.8 | 4.9 |

In addition to the reasons stated below, the changes in the operating results of our cement segment for the nine months ended September 30, 2005 as compared with the nine months ended September 30, 2004 also resulted from the inclusion of the results from our three newly added plants described above.

*Revenue*

Revenue for our cement segment increased by 66.7% to RMB 889.2 million (18.9% to RMB 634.3 million excluding the three newly added plants described above) for the nine months ended September 30, 2005 from RMB 533.4 million for the nine months ended September 30, 2004, primarily due to an increase in sales volume resulting from our newly added production lines in Huaihai and Luhong, partially offset by a decrease in the Average Realized Sales Price of our cement products. We added one 5,000 tonne clinker per day production line in each of Huaihai and Luhong in July 2005, which produced approximately 645,000 tonnes of clinker in the aggregate in the nine months ended September 30, 2005. We produced approximately 80,000 tonnes of cement from the additional clinker produced from the two production lines and sold the remaining clinker directly due to our limited grinding capacity. The Average Realized Sales Price of our cement products decreased to RMB 176.4 per tonne for the nine months ended September 30, 2005 from RMB 202.0 per tonne for the nine months ended September 30, 2004, primarily due to a general decline in the market condition.

*Cost of sales*

Cost of sales for our cement segment increased by 84.5% to RMB 692.1 million (29.8% to RMB 487.1 million excluding the three newly added plants described above) for the nine months ended September 30, 2005 from RMB 375.1 million for the nine months ended September 30, 2004, primarily due to an increase in sales resulting from our newly added production lines in Huaihai and Luhong and an increase in the price

ALRMH-CNBM00000235

## FINANCIAL INFORMATION

of coal. The weighted average price of coal that we purchased for the cement segment increased to approximately RMB 443.7 per tonne for the nine months ended September 30, 2005 from approximately RMB 393.3 per tonne for the nine months ended September 30, 2004. See "*Business — Cement Segment — Sales and Marketing*" for a discussion of our cement prices.

*Gross profit and gross margin*

Gross profit for our cement segment increased by 24.5% to RMB 197.1 million for the nine months ended September 30, 2005 from RMB 158.3 million for the nine months ended September 30, 2004. Excluding the three newly added plants described above, gross profit for our cement segment decreased by 7.0% to RMB 147.2 million. Gross margin for our cement segment decreased to 22.2% for the nine months ended September 30, 2005 from 29.7% for the nine months ended September 30, 2004. The decreases in gross profit (excluding the three newly added plants described above) and gross margin for our cement segment were primarily due to the increase in the price of coal and the decrease in the Average Realized Sales Price of our cement products as discussed above. The impact of these changes on the gross profit for our cement segment was offset by an increase in sales resulting from our newly added production lines in Huaihai and Luhong.

*Other income*

Other income for our cement segment was RMB 58.1 million (RMB 42.2 million excluding the three newly added plants described above) for the nine months ended September 30, 2005 as compared with RMB 24.4 million for the nine months ended September 30, 2004, primarily due to an increase in VAT refund in the amount of RMB 11.2 million resulting from an increase in the sales volume of cement products qualifying for VAT refund in the aggregate amount of approximately 1.0 million tonnes and an increase in government grants to several of our cement plants.

*Selling and distribution costs*

Selling and distribution costs for our cement segment increased by 29.0% to RMB 65.7 million (by 6.9% to RMB 54.5 million excluding the three newly added plants described above) for the nine months ended September 30, 2005 from RMB 51.0 million for the nine months ended September 30, 2004, primarily due to additional transportation and packaging costs in connection with the increased sales volume from our additional production capacity.

*Administrative expenses*

Administrative expenses for our cement segment was RMB 50.0 million (RMB 41.4 million excluding the three newly added plants described above) for the nine months ended September 30, 2005, as compared with RMB 46.7 million for the nine months ended September 30, 2004. The increase in administrative expenses from our additions of new production lines and acquisitions (inclusive of the three newly added plants described above) was partially offset by a decrease in provision for bad debt resulting from our enhanced collection effort on our trade receivables.

ALRMH-CNBM00000236

## FINANCIAL INFORMATION

*Other expenses*

Other expenses for our cement segment decreased to RMB 0.5 million (RMB 0.3 million excluding the three newly added plants described above) for the nine months ended September 30, 2005 from RMB 1.5 million for the nine months ended September 30, 2004, primarily due to larger losses on disposal of fixed assets for the nine months ended September 30, 2004.

*Operating profit*

As a result of the foregoing, operating profit for our cement segment increased by 66.4% to RMB 139.0 million (11.5% to RMB 93.1 million excluding the three newly added plants described above) for the nine months ended September 30, 2005 from RMB 83.5 million for the nine months ended September 30, 2004. Operating margin for the segment decreased slightly to 15.6% for the nine months ended September 30, 2005 from 15.7% for the nine months ended September 30, 2004.

**Year Ended December 31, 2004 Compared with Year Ended December 31, 2003**

*Revenue*

Revenue for our cement segment increased by 27.3% to RMB 778.8 million in 2004 from RMB 611.7 million in 2003, primarily due to an increase in revenue of RMB 63.5 million from our Huaihai plant resulting from an increase in the Average Realized Sales Price of Huaihai's cement products to RMB 212.1 per tonne in 2004 from RMB 179.4 per tonne in 2003, and an increase in revenue of RMB 76.8 million due to increased sales volume from Phase 2 of our Heze grinding mill and the new cement production line at our Nanyang plant. Our Heze grinding mill, which commenced production in April 2004, produced approximately 208,000 tonnes of cement from commercial clinker and generated revenue of approximately RMB 39.0 million in 2004, and our new Nanyang production line, which commenced production in October 2004, produced approximately 197.0 thousand tonnes of cement and generated additional revenue of approximately RMB 37.8 million in 2004.

*Cost of sales*

Cost of sales for our cement segment increased by 32.6% to RMB 558.3 million in 2004 from RMB 421.1 million in 2003, primarily due to an increase in the price of coal and the increased production from Phase 2 of our Heze grinding mill and from our new cement production line at our Nanyang plant. The weighted average purchase price of coal for our cement segment increased to approximately RMB 414.2 per tonne in 2004 from RMB 232.0 per tonne in 2003. Cost of sales from our Heze grinding mill was RMB 29.6 million in 2004, and cost of sales from our new Nanyang production line was RMB 29.1 million in 2004.

*Gross profit and gross margin*

Gross profit for our cement segment increased by 15.7% to RMB 220.5 million in 2004 from RMB 190.6 million in 2003, primarily due to an increase in sales volume, partially offset by an increase in the price of coal. Gross margin for our cement segment decreased to 28.3% in 2004 from 31.2% in 2003, primarily due to an increase in production cost resulting from a significant increase in the price of coal and increased production from our Heze grinding mill, which uses commercial clinker purchased from third parties, rather than clinker produced internally, to produce cement.

— 233 —

## FINANCIAL INFORMATION

*Other income*

Other income for our cement segment increased by 111.3% to RMB 42.9 million in 2004 from RMB 20.3 million in 2003, primarily due to an increase of RMB 8.1 million in deferred income recognized, which came from interest subsidies granted by the relevant PRC government authority for the new production line in Nanyang and an increase of RMB 5.5 million in interest from bank deposits.

*Selling and distribution costs*

Selling and distribution costs for our cement segment decreased by 3.4% to RMB 69.0 million in 2004 from RMB 71.2 million in 2003, primarily due to an increase in the percentage of bulk sale cement we sold in 2004, which reduced transportation and shipping and handling expenses. Our bulk sale cement accounted for 40.4% of our cement sold in 2004, as compared to 39.1% in 2003.

*Administrative expenses*

Administrative expenses for our cement segment decreased by 7.6% to RMB 65.8 million in 2004 from RMB 71.2 million in 2003, primarily due to a reduction in provision for bad debt as a result of tighter controls on accounts receivable implemented in 2004.

*Other expenses*

Other expenses for our cement segment decreased by 86.3% to RMB 2.7 million in 2004 from RMB 20.0 million in 2003, primarily due to a loss of RMB 17.3 million relating to a fixed asset disposal by Luhong in 2003.

*Operating profit*

As a result of the foregoing, operating profit for our cement segment increased by 159.9% to RMB 125.9 million in 2004 from RMB 48.5 million in 2003. Operating margin for the segment increased to 16.2% in 2004 from 7.9% in 2003, primarily due to the expansion of our production, the increase in other income and the decrease in our expenses.

**Year Ended December 31, 2003 Compared with Year Ended December 31, 2002**

*Revenue*

Revenue for our cement segment increased by 9.1% to RMB 611.7 million in 2003 from RMB 560.4 million in 2002, primarily due to an increase in sales volume of 10.6%, or 295.4 thousand tonnes, as a result of a technical upgrade at our Huaihai plant and the commencement of production at Phase 1 of our Heze grinding station.

ALRMH-CNBM00000238

# FINANCIAL INFORMATION

*Cost of sales*

Cost of sales for our cement segment increased by 10.7% to RMB 421.1 million in 2003 from RMB 380.3 million in 2002, primarily due to an increase in production.

*Gross profit and gross margin*

Gross profit in our cement segment increased by 5.8% to RMB 190.6 million in 2003 from RMB 180.1 million in 2002, primarily due to the increases in production and sales volume of cement. Gross margin in our cement segment decreased to 31.2% in 2003 from 32.1% in 2002, primarily due to an increase in production costs as Phase 1 of our Heze grinding station used commercial clinker purchased from third parties to produce cement, which was more expensive than clinker produced internally.

*Other income*

Other income for our cement segment was RMB 19.7 million in 2002 and RMB 20.3 million in 2003.

*Selling and distribution costs*

Selling and distribution costs for our cement segment decreased by 6.3% to RMB 71.2 million in 2003 from RMB 76.0 million in 2002, primarily due to an increase in the volume of bulk sale cement that reduced costs associated with packing bags.

*Administrative expenses*

Administrative expenses for our cement segment decreased by 10.1% to RMB 71.2 million in 2003 from RMB 79.2 million in 2002, primarily due to a reduction in provision for bad debt as a result of tighter controls on accounts receivable implemented in 2002.

*Other expenses*

Total other expenses increased by 228.7% to RMB 20.0 million in 2003 from RMB 6.1 million in 2002, primarily due to a loss of RMB 17.3 million relating to an asset disposal by Luhong in 2003.

*Operating profit*

As a result of the foregoing, operating profit for our cement segment increased by 25.9% to RMB 48.5 million in 2003 from RMB 38.5 million in 2002. Operating margin for the segment increased to 7.9% in 2003 from 6.9% in 2002, primarily due to a decrease in administrative expenses and selling and distribution costs.

ALRMH-CNBM00000239

# FINANCIAL INFORMATION

**Lightweight Building Materials Segment**

The following table sets out the principal income statement information for our lightweight building materials segment for 2002, 2003, 2004 and the nine months ended September 30, 2004 and 2005:

| | For the year ended December 31, | | | For the nine months ended September 30, | |
| --- | --- | --- | --- | --- | --- |
| | **2002** | **2003** | **2004** | **2004** | **2005** |
| | | | | (unaudited) | |
| | | | (RMB in millions) | | |
| Revenue . . . . . . . . . . . . . . . . . . . . . . | 1,021.2 | 1,027.9 | 1,482.6 | 1,002.1 | 1,676.9 |
| Cost of sales . . . . . . . . . . . . . . . . . . . | (857.8) | (861.8) | (1,302.1) | (884.6) | (1,428.6) |
| Gross profit . . . . . . . . . . . . . . . . . . . . | 163.4 | 166.1 | 180.5 | 117.5 | 248.3 |
| Other income . . . . . . . . . . . . . . . . . . . | 57.0 | 58.6 | 97.4 | 71.3 | 85.4 |
| Selling and distribution costs . . . . . . . . | (47.3) | (60.7) | (86.1) | (63.6) | (104.6) |
| Administrative expenses . . . . . . . . . . . . | (58.9) | (76.5) | (88.7) | (69.3) | (102.3) |
| Other expenses . . . . . . . . . . . . . . . . . . | (0.8) | (11.4) | (4.9) | (3.4) | (2.8) |
| Operating profit . . . . . . . . . . . . . . . . . | 113.4 | 76.1 | 98.2 | 52.5 | 124.0 |

*Sale of E-HOME Stores*

We entered into an agreement with a major electronics retailer in July 2005 to sell our interest in the E-HOME business. We decided to sell our E-HOME stores because such business was inconsistent with our focus on dry wall and ceiling systems. Transfer of ownership occurred on August 1, 2005. BND received RMB 15.0 million for the transfer of a 75% interest in E-HOME and BND Decoration received RMB 5.0 million for the transfer of a 25% interest in E-HOME to the buyer. In addition, BND and BND Decoration transferred their interests in a loan of RMB 180.0 million owed by E-HOME for a total consideration of RMB 160.0 million. The sale price was calculated based on the fair value of net assets of E-HOME at the reference date of July 31, 2005 and the amount of debt that E-HOME owed to BND. We recognized a profit on disposal of a subsidiary in the amount of RMB 27.3 million from the transaction.

ALRMH-CNBM00000240

# FINANCIAL INFORMATION

E-HOME commenced operations in November 2003 and its operating results were consolidated with ours from then until the sale of E-HOME on August 1, 2005. The following table sets out, for the periods indicated, the revenue, cost of sales and operating profit of E-HOME and their respective contribution to the lightweight building materials segment:

| | For the year ended December 31, | | | | For the nine months ended September 30, | | | |
| | 2003 | | 2004 | | 2004 | | 2005[1] | |
| | E-HOME | % of segment total | E-HOME | % of segment total | E-HOME | % of segment total | E-HOME | % of segment total |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | (unaudited) | | | |
| | | | (RMB in millions, except for percentages) | | | | | |
| Revenue . . . . . . . | 3.4 | 0.3 | 58.7 | 4.0 | 10.1 | 1.0 | 237.6 | 14.2 |
| Cost of sales . . . . | 2.9 | 0.3 | 50.2 | 3.9 | 11.0 | 1.2 | 225.3 | 15.8 |
| Gross profit . . . . . | 0.5 | 0.3 | 8.5 | 5.1 | (0.9) | (1.0) | 12.3 | 5.0 |
| Operating profit . . | (14.3) | (18.0) | (9.7) | (9.9) | (22.7) | (43.2) | (32.8) | (26.4) |

_____

*Note:*

(1)    Includes results from operations for seven months, as we sold the E-HOME stores on August 1, 2005.

### Nine Months Ended September 30, 2005 Compared with Nine Months Ended September 30, 2004

#### Acquisitions

We acquired a 42% equity interest in Taihe in April 2005. According to the Articles of Association of Taihe, we have the right to nominate four of the seven directors of Taihe. As a result, Taihe is accounted for as a subsidiary of BNBM and Taihe's operating results were consolidated with ours from May 2005.

We acquired a 75% equity interest in Tianfeng in March 2005. As a result, Tianfeng's operating results were consolidated with ours from April 2005.

The table below sets out the revenue, cost of sales, gross profit and operating profit of Taihe and Tianfeng and their respective contribution to the lightweight building materials segment for the nine months ended September 30, 2005:

| | For the nine months ended September 30, 2005 | | | |
| | Taihe | % of segment total | Tianfeng | % of segment total |
| --- | --- | --- | --- | --- |
| | (RMB in millions, except for percentages) | | | |
| Revenue. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 252.0 | 15.0 | 34.8 | 2.1 |
| Cost of sales . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 188.3 | 13.2 | 30.9 | 2.2 |
| Gross profit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 63.7 | 25.6 | 3.9 | 1.6 |
| Operating profit. . . . . . . . . . . . . . . . . . . . . . . . . . . | 50.8 | 41.0 | 2.0 | 1.6 |

ALRMH-CNBM00000241

## FINANCIAL INFORMATION

In addition to the reasons stated below, the changes in the operating results of our lightweight building materials segment for the nine months ended September 30, 2005 as compared with the nine months ended September 30, 2004 also resulted from the consolidation of operating results of Taihe and Tianfeng.

*Revenue*

Revenue for our lightweight building materials segment increased by 67.3% to RMB 1,676.9 million (38.7% to RMB 1,390.1 million excluding Taihe and Tianfeng) for the nine months ended September 30, 2005 from RMB 1,002.1 million for the nine months ended September 30, 2004, due to revenue increases from all but one of our major businesses, particularly the sales of our E-HOME stores prior to the sale of such stores in August 2005. Revenue generated from our E-HOME stores increased 22.5-fold to RMB 237.6 million for the nine months ended September 30, 2005 from RMB 10.1 million for the nine months ended September 30, 2004 due to increase of our E-HOME stores business volume.

The table below sets out the revenue generated from the three principal products of our dry wall and ceiling systems for the nine months ended September 30, 2004 and 2005, respectively:

| | For the nine months ended September 30, | | Period on period change |
|---|---|---|---|
| | 2004 | 2005 | |
| | (unaudited) (RMB in millions) | | (%) |
| Gypsum boards | 176.0 | 457.0[1] | 159.7 |
| Acoustical ceiling panels | 57.7 | 105.3[2] | 82.5 |
| Lightweight metal frames | 95.7 | 122.0 | 27.5 |
| Total | 329.4 | 684.3 | 107.8 |

*Notes:*

(1)   Includes revenue from Taihe during the period from May 1, 2005 to September 30, 2005 in the amount of RMB 250.8 million.

(2)   Includes revenue from Tianfeng during the period from April 1, 2005 to September 30, 2005 in the amount of RMB 34.8 million.

ALRMH-CNBM00000242

## FINANCIAL INFORMATION

The table below sets out the revenue generated from the other major products and businesses of our lightweight building materials segment for the nine months ended September 30, 2004 and 2005, respectively:

| | For the nine months ended September 30, | | Period on period change |
|---|---|---|---|
| | 2004 | 2005 | |
| | (unaudited) | | |
| | (RMB in millions) | | (%) |
| Merchandise trading . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 314.7 | 360.8 | 14.6 |
| Retail distribution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 56.6 | 309.0 | 446.1 |
| Commercial real estate leasing . . . . . . . . . . . . . . . . . . . . . . . | 8.2 | 11.0 | 33.6 |
| Contract decoration services . . . . . . . . . . . . . . . . . . . . . . . . . | 49.2 | 46.0 | (6.5) |
| Steel trading . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 80.8 | 98.7 | 22.1 |
| Prefabricated homes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16.1 | 29.5 | 83.7 |
| PVC building materials . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 68.9 | 86.3 | 25.3 |
| Metal heating radiator units . . . . . . . . . . . . . . . . . . . . . . . . . | 8.3 | 11.8 | 40.9 |
| Sub-total. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 602.8 | 953.1 | 58.1 |
| Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 69.9 | 39.5 | (43.5) |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 672.7 | 992.6 | 47.5 |

*Cost of sales*

Cost of sales for our lightweight building materials segment increased by 61.5% to RMB 1,428.6 million (36.7% to RMB 1,209.4 million excluding Taihe and Tianfeng) for the nine months ended September 30, 2005 from RMB 884.6 million for the nine months ended September 30, 2004, due to increases in cost of sales from all but one of our major business categories as a result of their respective increases in sales volume, particularly from an increase in cost of sales in our E-HOME stores. Cost of sales in our E-HOME stores increased by RMB 214.3 million to RMB 225.3 million for the nine months ended September 30, 2005 (prior to the sale of such stores on August 1, 2005) from RMB 11.0 million for the nine months ended September 30, 2004.

ALRMH-CNBM00000243

## FINANCIAL INFORMATION

The table below sets out the cost of sales of the three principal products of our dry wall and ceiling systems for the nine months ended September 30, 2004 and 2005, respectively:

| | For the nine months ended September 30, | | Period on period change |
|---|---|---|---|
| | 2004 | 2005 | |
| | (unaudited) | | |
| | (RMB in millions) | | (%) |
| Gypsum boards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 132.1 | 334.9[1] | 153.5 |
| Acoustical ceiling panels . . . . . . . . . . . . . . . . . . . . . . . . . | 60.2 | 94.9[2] | 57.7 |
| Lightweight metal frames . . . . . . . . . . . . . . . . . . . . . . . . . | 81.7 | 103.4 | 26.7 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 274.0 | 533.2 | 94.7 |

*Notes:*

(1)    Includes cost of sales from Taihe during the period from May 1, 2005 to September 30, 2005 in the amount of RMB 187.0 million.

(2)    Includes cost of sales from Tianfeng during the period from April 1, 2005 to September 30, 2005 in the amount of RMB 30.9 million.

The table below sets out the cost of sales of the other major products and businesses of our lightweight building materials segment for the nine months ended September 30, 2004 and 2005, respectively:

| | For the nine months ended September 30, | | Period on period change |
|---|---|---|---|
| | 2004 | 2005 | |
| | (unaudited) | | |
| | (RMB in millions) | | (%) |
| Merchandise trading . . . . . . . . . . . . . . . . . . . . . . . . . . . | 289.5 | 324.4 | 12.1 |
| Retail distribution . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 48.4 | 284.4 | 487.5 |
| Commercial real estate leasing . . . . . . . . . . . . . . . . . . . . . . | 1.8 | 1.9 | 5.8 |
| Contract decoration services . . . . . . . . . . . . . . . . . . . . . . . | 39.6 | 31.0 | (21.8) |
| Steel trading . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 77.0 | 97.1 | 26.1 |
| Prefabricated homes . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15.0 | 23.1 | 54.7 |
| PVC building materials . . . . . . . . . . . . . . . . . . . . . . . . . . | 71.3 | 83.4 | 16.8 |
| Metal heating radiator units . . . . . . . . . . . . . . . . . . . . . . . | 6.2 | 10.4 | 67.6 |
| Sub-total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 548.8 | 855.7 | 55.9 |
| Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 61.8 | 39.7 | (35.8) |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 610.6 | 895.4 | 46.6 |

*Gross profit and gross margin*

Gross profit for our lightweight building materials segment increased by 111.3% to RMB 248.3 million (53.9% to RMB 180.8 million excluding Taihe and Tianfeng) for the nine months ended September 30, 2005 from RMB 117.5 million for the nine months ended September 30, 2004, primarily due to an increase in gross

ALRMH-CNBM00000244

# FINANCIAL INFORMATION

profit of RMB 28.1 million from increased sales of our gypsum boards, acoustical ceiling panels and lightweight metal frames from BNBM, an increase in gross profit of RMB 16.4 million from our retail distribution business resulting primarily from increased sales at our E-HOME stores, and an increase in gross profit of RMB 11.2 million from our merchandise trading business.

The table below sets out the gross profit generated from the three principal products of our dry wall and ceiling systems for the nine months ended September 30, 2004 and 2005, respectively:

| | For the nine months ended September 30, | | Period on period change |
| --- | --- | --- | --- |
| | 2004 | 2005 | |
| | (unaudited) | | |
| | (RMB in millions) | | (%) |
| Gypsum boards | 43.9 | 122.1[1] | 178.5 |
| Acoustical ceiling panels | (2.5) | 10.4[2] | — |
| Lightweight metal frames | 14.0 | 18.6 | 32.4 |
| Total | 55.4 | 151.1 | 172.6 |

Notes:

(1)    Includes gross profit from Taihe from May 1, 2005 to September 30, 2005 in the amount of RMB 63.7 million.

(2)    Includes gross profit from Tianfeng from April 1, 2005 to September 30, 2005 in the amount of RMB 3.9 million.

The table below sets out the gross profit generated from the other major products and businesses of our lightweight building materials segment for the nine months ended September 30, 2004 and 2005, respectively:

| | For the nine months ended September 30, | | Period on period change |
| --- | --- | --- | --- |
| | 2004 | 2005 | |
| | (unaudited) | | |
| | (RMB in millions) | | (%) |
| Merchandise trading | 25.1 | 36.3 | 44.6 |
| Retail distribution | 8.1 | 24.6 | 200.9 |
| Commercial real estate leasing | 6.5 | 9.1 | 41.3 |
| Contract decoration services | 9.5 | 15.0 | 57.0 |
| Steel trading | 3.8 | 1.6 | (58.2) |
| Prefabricated homes | 1.2 | 6.4 | 453.5 |
| PVC building materials | (2.4) | 3.0 | — |
| Metal heating radiator units | 2.2 | 1.4 | (36.0) |
| Sub-total | 54.0 | 97.4 | 80.5 |
| Miscellaneous | 8.1 | (0.2) | (102.5) |
| Total | 62.1 | 97.2 | 56.6 |

ALRMH-CNBM00000245

# FINANCIAL INFORMATION

Gross margin for our lightweight building materials segment increased to 14.8% for the nine months ended September 30, 2005 from 11.7% for the nine months ended September 30, 2004, primarily due to an increase in the percentage of revenue from our three principal products, which have a higher gross margin than our other products in this segment, and the increased gross margins of those three principal products from the decreased average fixed cost as a result of the increase of production volumes.

*Other income*

Other income for our lightweight building materials segment increased by 19.8% to RMB 85.4 million for the nine months ended September 30, 2005 from RMB 71.3 million for the nine months ended September 30, 2004. Excluding Taihe and Tianfeng, other income decreased by 4.2% to RMB 68.3 million, primarily due to a decrease of RMB 32.5 million in government grants, partially offset by the entrance fee and the shelving fee in a combined total amount of RMB 17.7 million charged to vendors for entrance and placement of their merchandise in two newly opened E-HOME stores, an increase in VAT refund of RMB 3.4 million, an exchange gain of RMB 3.0 million and an increase in rental income of RMB 2.0 million. The aggregated amount of other income arising from the operating results of Taihe and Tianfeng during the nine months ended September 30, 2005 was RMB 17.1 million, which primarily consisted of VAT refund of RMB 16.0 million from Taihe.

*Selling and distribution costs*

Selling and distribution costs for our lightweight building materials segment increased by 64.6% to RMB 104.6 million (35.7% to RMB 86.3 million excluding Taihe and Tianfeng) for the nine months ended September 30, 2005 from RMB 63.6 million for the nine months ended September 30, 2004, primarily due to an increase of RMB 26.0 million in our transportation costs, rental costs, electricity and water costs and labor costs resulting from the increased business volume in many of our businesses, including primarily our retail distribution (mainly E-HOME stores) and merchandise trading businesses.

*Administrative expenses*

Administrative expenses for our lightweight building materials segment increased by 47.5% to RMB 102.3 million (28.8% to RMB 89.3 million excluding Taihe and Tianfeng) for the nine months ended September 30, 2005 from RMB 69.3 million for the nine months ended September 30, 2004, primarily due to an increase of RMB 18.0 million in our depreciation costs, rental costs, certain advertisement costs and labor costs related to the two newly opened E-HOME stores.

*Other expenses*

Other expenses for our lightweight building materials segment decreased by 17.2% to RMB 2.8 million (32.0% to RMB 2.3 million excluding Taihe and Tianfeng) for the nine months ended September 30, 2005 from RMB 3.4 million for the nine months ended September 30, 2004.

*Operating profit*

As a result of the foregoing, operating profit for our lightweight building materials segment increased by 136.2% to RMB 124.0 million (35.2% to RMB 71.0 million excluding Taihe and Tianfeng) for the nine months ended September 30, 2005 from RMB 52.5 million for the nine months ended September 30, 2004. Operating margin in this segment increased to 7.4% for the nine months ended September 30, 2005 from 5.2% for the nine months ended September 30, 2004.

ALRMH-CNBM00000246

# FINANCIAL INFORMATION

*Year Ended December 31, 2004 Compared with Year Ended December 31, 2003*

*Revenue*

Revenue for our lightweight building materials segment increased by 44.2% to RMB 1,482.6 million in 2004 from RMB 1,027.9 million in 2003, primarily due to an increase in revenue of RMB 295.6 million from our merchandise trading and retail distribution businesses due to increased business volume. Sales volume in most of our other operations in this segment also increased in 2004 as compared with 2003.

The table below sets out the revenue generated from the three principal products of our dry wall and ceiling systems in 2003 and 2004, respectively:

| | For the year ended December 31, | | Period on period change |
|---|---|---|---|
| | 2003 | 2004 | |
| | (RMB in millions) | | (%) |
| Gypsum boards | 232.3 | 255.2 | 9.8 |
| Acoustical ceiling panels | 91.8 | 86.2 | (6.1) |
| Lightweight metal frames | 126.9 | 134.0 | 5.6 |
| Total | 451.0 | 475.4 | 5.4 |

The table below sets out the revenue generated from the other major products and businesses included in our lightweight building materials segment in 2003 and 2004, respectively:

| | For the ear ended December 31, | | Period on period change |
|---|---|---|---|
| | 2003 | 2004 | |
| | (RMB in millions) | | (%) |
| Merchandise trading | 205.3 | 432.9 | 110.8 |
| Retail distribution | 59.4 | 127.4 | 114.5 |
| Commercial real estate leasing | 10.7 | 11.0 | 2.9 |
| Contract decoration services | 30.2 | 73.2 | 142.4 |
| Steel trading | 93.7 | 104.6 | 11.6 |
| Prefabricated homes | 15.3 | 30.8 | 101.6 |
| PVC building materials | 83.1 | 102.1 | 22.9 |
| Metal heating radiator units | 0.0 | 23.0 | — |
| Sub-total | 497.7 | 905.0 | 81.8 |
| Miscellaneous | 79.2 | 102.2 | 29.0 |
| Total | 576.9 | 1,007.2 | 74.6 |

ALRMH-CNBM00000247

## FINANCIAL INFORMATION

*Cost of sales*

Cost of sales for our lightweight building materials segment increased by 51.1% to RMB 1,302.1 million in 2004 from RMB 861.8 million in 2003, primarily due to an increase in cost of sales of RMB 280.0 million from our merchandise trading and retail distribution businesses as a result of increased sales volume. Cost of sales from most of our other operations also increased along with the increased business volume in those operations.

The table below sets out the cost of sales of the three principal products of our dry wall and ceiling systems in 2003 and 2004, respectively:

| | For the year ended December 31, | | Period on period change |
|---|---|---|---|
| | 2003 | 2004 | |
| | (RMB in millions) | | (%) |
| Gypsum boards | 167.6 | 197.6 | 17.9 |
| Acoustical ceiling panels | 85.3 | 90.6 | 6.2 |
| Lightweight metal frames | 105.3 | 113.6 | 7.9 |
| Total | 358.2 | 401.8 | 12.2 |

The table below sets out the cost of sales of the other major products and businesses of our lightweight building materials segment in 2003 and 2004, respectively:

| | For the year ended December 31, | | Period on period change |
|---|---|---|---|
| | 2003 | 2004 | |
| | (RMB in millions) | | (%) |
| Merchandise trading | 178.5 | 398.0 | 122.9 |
| Retail distribution | 44.5 | 105.1 | 136.3 |
| Commercial real estate leasing | 1.7 | 1.8 | 10.2 |
| Contract decoration services | 20.3 | 59.1 | 191.5 |
| Steel trading | 88.1 | 98.8 | 12.1 |
| Prefabricated homes | 14.4 | 27.0 | 88.2 |
| PVC building materials | 77.2 | 103.6 | 34.1 |
| Metal heating radiator units | 0.0 | 19.5 | — |
| Sub-total | 424.7 | 812.9 | 91.4 |
| Miscellaneous | 78.9 | 87.4 | 10.7 |
| Total | 503.6 | 900.3 | 78.8 |

ALRMH-CNBM00000248

# FINANCIAL INFORMATION

*Gross profit and gross margin*

Gross profit for our lightweight building materials segment increased by 8.6% to RMB 180.5 million in 2004 from RMB 166.1 million in 2003, primarily due to an increase of RMB 15.7 million in gross profit from the merchandise trading and retail distribution businesses, an increase of RMB 7.4 million in gross profit from the contract decoration business and increases in gross profit from many other businesses, partially offset by a decrease of RMB 19.3 million in gross profit from our three principal products as a result of increases in the costs of raw materials.

The table below sets out the gross profit generated from the three principal products of our dry wall and ceiling systems for 2003 and 2004, respectively:

| | For the year ended December 31, | | Period on period change |
| --- | --- | --- | --- |
| | 2003 | 2004 | |
| | (RMB in millions) | | (%) |
| Gypsum boards | 64.7 | 57.6 | (11.1) |
| Acoustical ceiling panels | 6.5 | (4.4) | — |
| Lightweight metal frames | 21.6 | 20.4 | (5.6) |
| Total | 92.8 | 73.6 | (20.8) |

The table below sets out the gross profit generated from the other major products and businesses of our lightweight building materials segment in 2003 and 2004, respectively:

| | For the year ended December 31, | | Period on period change |
| --- | --- | --- | --- |
| | 2003 | 2004 | |
| | (RMB in millions) | | (%) |
| Merchandise trading | 26.8 | 34.9 | 30.5 |
| Retail distribution | 15.0 | 22.4 | 49.5 |
| Commercial real estate leasing | 9.0 | 9.2 | 1.5 |
| Contract decoration services | 9.9 | 14.1 | 42.0 |
| Steel trading | 5.5 | 5.8 | 4.5 |
| Prefabricated homes | 0.9 | 3.7 | 318.0 |
| PVC building materials | 5.9 | (1.5) | — |
| Metal heating radiator units | 0.0 | 3.5 | — |
| Sub-total | 73.0 | 92.1 | 26.2 |
| Miscellaneous | 0.3 | 14.8 | 4,729.3 |
| Total | 73.3 | 106.9 | 45.9 |

ALRMH-CNBM00000249

## FINANCIAL INFORMATION

Gross margin for our lightweight building materials segment decreased to 12.2% in 2004 from 16.2% in 2003, primarily due to a decrease in gross margin of our merchandise trading and retail distribution businesses to 10.2% in 2004 from 15.8% in 2003, which primarily resulted from overall price reductions on sold products effected to increase sales volume. The increases in price of raw materials used in our three principal products also contributed to the decrease in gross margin.

*Other income*

Other income for our lightweight building materials segment increased by 66.2% to RMB 97.4 million in 2004 from RMB 58.6 million in 2003, primarily due to receipt of government grants of RMB 35.9 million in 2004 for the construction of our third gypsum board production line in Zaozhuang, Shandong and the relocation of our rock wool plant.

*Selling and distribution costs*

Selling and distribution costs for our lightweight building materials segment increased by 41.6% to RMB 86.1 million in 2004 from RMB 60.7 million in 2003, primarily due to an increase of RMB 5.58 million in transportation costs associated with shipping products to our new distribution centers in Shanghai and Shaoxing, Zhejiang for our major products, an increase of RMB 6.7 million in salaries as a result of increase in salary level for our employees and an increase in our rental costs resulting from the opening of new E-HOME stores in 2004.

*Administrative expenses*

Administrative expenses for our lightweight building materials segment increased by 15.9% to RMB 88.7 million in 2004 from RMB 76.5 million in 2003, primarily due to an increase of RMB 6.9 million in salaries as a result of a general increase in salary level for all of our employees in this segment.

*Other expenses*

Other expenses for our lightweight building materials segment decreased by 57.3% to RMB 4.9 million in 2004 from RMB 11.4 million in 2003, primarily due to an RMB 7.7 million one-time expense of certain previously capitalized remodeling expenses incurred in connection with the relocation of certain E-HOME stores in 2003.

*Operating profit*

As a result of the foregoing, operating profit for our lightweight building materials segment increased by 29.2% to RMB 98.2 million in 2004 from RMB 76.1 million in 2003, while the operating margin for the segment decreased to 6.6% in 2004 from 7.4% in 2003.

ALRMH-CNBM00000250

## FINANCIAL INFORMATION

*Year Ended December 31, 2003 Compared with Year Ended December 31, 2002*

*Revenue*

Revenue for our lightweight building materials segment increased by 0.7% to RMB 1,027.9 million in 2003 from RMB 1,021.2 million in 2002. Revenue generated from the three principal products of our dry wall and ceiling systems increased by RMB 40.2 million. This increase was largely offset by a decrease in the total revenue from our other operations.

The table below sets out the revenue generated from the three principal products of our dry wall and ceiling systems in 2002 and 2003, respectively:

| | For the year ended December 31, | | Period on period change |
| --- | --- | --- | --- |
| | 2002 | 2003 | |
| | (RMB in millions) | | (%) |
| Gypsum boards | 218.9 | 232.3 | 6.1 |
| Acoustical ceiling panels | 81.0 | 91.8 | 13.3 |
| Lightweight metal frames | 111.0 | 126.9 | 14.4 |
| Total | 410.9 | 451.0 | 9.8 |

The table below sets out the revenue generated from the other major products and businesses of our lightweight building materials segment in 2002 and 2003, respectively:

| | For the year ended December 31, | | Period on period change |
| --- | --- | --- | --- |
| | 2002 | 2003 | |
| | (RMB in millions) | | (%) |
| Merchandise trading | 220.6 | 205.3 | (6.9) |
| Retail distribution | 40.7 | 59.4 | 46.0 |
| Commercial real estate leasing | 8.1 | 10.7 | 32.0 |
| Contract decoration services | 16.0 | 30.2 | 88.4 |
| Steel trading | 140.9 | 93.7 | (33.5) |
| Prefabricated homes | 21.9 | 15.3 | (30.2) |
| PVC building materials | 97.8 | 83.1 | (15.1) |
| Sub-total | 546.0 | 497.7 | (8.8) |
| Miscellaneous | 64.3 | 79.2 | 23.2 |
| Total | 610.3 | 576.9 | (5.5) |

ALRMH-CNBM00000251

## FINANCIAL INFORMATION

*Cost of sales*

Cost of sales for our lightweight building materials segment increased by 0.5% to RMB 861.8 million in 2003 from RMB 857.8 million in 2002. The cost of sales of our three core products increased by RMB 36.2 million as a result of increased sales volumes of these products. This increase was largely offset by a decrease in cost of sales of our other operations in the segment because of decreased sales volumes in those operations.

The table below sets out the cost of sales of the three principal products of our dry wall and ceiling systems in 2002 and 2003, respectively:

| | For the year ended December 31, | | Period on period change |
|---|---|---|---|
| | 2002 | 2003 | |
| | (RMB in millions) | | (%) |
| Gypsum boards | 167.9 | 167.6 | (0.2) |
| Acoustical ceiling panels | 74.9 | 85.3 | 13.9 |
| Lightweight metal frames | 79.2 | 105.3 | 32.9 |
| Total | 322.0 | 358.2 | 11.2 |

The table below sets out the cost of sales of the other major products and businesses of our lightweight building materials segment in 2002 and 2003, respectively:

| | For the year ended December 31, | | Period on period change |
|---|---|---|---|
| | 2002 | 2003 | |
| | (RMB in millions) | | (%) |
| Merchandise trading | 193.3 | 178.5 | (7.6) |
| Retail distribution | 30.7 | 44.5 | 44.8 |
| Commercial real estate leasing | 0.4 | 1.7 | 299.3 |
| Contract decoration services | 13.2 | 20.3 | 53.2 |
| Steel trading | 132.6 | 88.1 | (33.5) |
| Prefabricated homes | 17.4 | 14.4 | (17.1) |
| PVC building materials | 81.9 | 77.2 | (5.7) |
| Sub-total | 469.5 | 424.7 | (9.5) |
| Miscellaneous | 66.3 | 78.9 | 19.0 |
| Total | 535.8 | 503.6 | (6.0) |

*Gross profit and gross margin*

Gross profit for our lightweight building materials segment increased by 1.7% to RMB 166.1 million in 2003 from RMB 163.4 million in 2002. Gross profit from our three principal products increased by RMB 4.0 million, which was largely offset by a decrease in gross profit from our other operations.

ALRMH-CNBM00000252

---

## FINANCIAL INFORMATION

---

The table below sets out the gross profit generated from the three principal products of our dry wall and ceiling systems for 2002 and 2003, respectively:

| | For the year ended December 31, | | Period on period change |
|---|---|---|---|
| | 2002 | 2003 | |
| | (RMB in millions) | | (%) |
| Gypsum boards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 51.0 | 64.7 | 27.0 |
| Acoustical ceiling panels . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6.1 | 6.5 | 6.2 |
| Lightweight metal frames. . . . . . . . . . . . . . . . . . . . . . . . . . . . | 31.8 | 21.6 | (32.1) |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 88.9 | 92.8 | 4.5 |

The table below sets out the gross profit generated from the other major products and businesses of our lightweight building materials segment in 2002 and 2003, respectively:

| | For the year ended December 31, | | Period on period change |
|---|---|---|---|
| | 2002 | 2003 | |
| | (RMB in millions) | | (%) |
| Merchandise trading . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 27.3 | 26.8 | (1.7) |
| Retail distribution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10.0 | 15.0 | 49.8 |
| Commercial real estate leasing . . . . . . . . . . . . . . . . . . . . . . . . | 7.7 | 9.0 | 17.4 |
| Contract decoration services . . . . . . . . . . . . . . . . . . . . . . . . . . | 2.8 | 9.9 | 255.0 |
| Steel trading . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8.3 | 5.5 | (33.1) |
| Prefabricated homes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4.5 | 0.9 | (80.4) |
| PVC building materials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15.9 | 5.9 | (63.2) |
| Sub-total. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 76.5 | 73.0 | (4.6) |
| Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (2.0) | 0.3 | — |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 74.5 | 73.3 | (1.6) |

Gross margin for our lightweight building materials segment remained relatively stable at 16.2% in 2003 as compared with 16.0% in 2002.

*Other income*

Other income for our lightweight building materials segment has remained relatively stable at RMB 58.6 million in 2003 as compared with RMB 57.0 million in 2002.

*Selling and distribution expenses*

Selling and distribution expenses for our lightweight building materials segment increased by 28.5% to RMB 60.7 million in 2003 from RMB 47.3 million in 2002, primarily due to an increase in salary expenses resulting from our newly established E-HOME subsidiary in 2003 and an increase in advertisement expenses for E-HOME stores.

ALRMH-CNBM00000253

# FINANCIAL INFORMATION

*Administrative expenses*

The administrative expenses for our lightweight building materials segment increased by 29.8% to RMB 76.5 million in 2003 from RMB 58.9 million in 2002, primarily due to the increase in salary expenses from BNBM homes and E-HOME stores and a corresponding increase in payments into pension funds.

*Other expenses*

Total other expenses increased to RMB 11.4 million in 2003 from RMB 0.8 million in 2002, primarily due to a one-time charge of certain previously capitalized expenses in connection with the relocation of certain E-HOME stores.

*Operating profit*

As a result of the foregoing, operating profit for our lightweight building materials segment decreased by 32.9% to RMB 76.1 million in 2003 from RMB 113.4 million in 2002, and the operating margin for the segment decreased to 7.4% in 2003 from 11.1% in 2002.

**Glass Fiber and FRP Products Segment**

As China Fiberglass is our associate but not our subsidiary, operating results of China Fiberglass are not consolidated with ours and are not included in the results of our glass fiber and FRP products segment. Unless otherwise indicated, reference to our operating results in this segment does not include China Fiberglass. See "— *Description of Selected Income Statement Line Items — Share of Profit of Associates*" for financial information regarding China Fiberglass.

The following table sets out the principal income statement information for our glass fiber and FRP products segment for 2002, 2003, 2004 and the nine months ended September 30, 2004 and 2005, respectively:

| | For the year ended December 31, | | | For the nine months ended September 30, | |
|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2004** | **2005** |
| | | | | (unaudited) | |
| | | | (RMB in millions) | | |
| Revenue . . . . . . . . . . . . . . . . . . . . . . | 0.9 | 75.0 | 261.2 | 201.6 | 223.9 |
| Cost of sales . . . . . . . . . . . . . . . . . . | (0.1) | (46.4) | (184.6) | (145.2) | (160.3) |
| Gross profit . . . . . . . . . . . . . . . . . . . | 0.8 | 28.6 | 76.6 | 56.4 | 63.6 |
| Other income . . . . . . . . . . . . . . . . . . | 2.6 | 2.1 | 10.2 | 4.5 | 33.0 |
| Selling and distribution costs . . . . . . . . | — | (11.8) | (27.6) | (20.1) | (27.1) |
| Administrative expenses. . . . . . . . . . . . | (8.7) | (17.7) | (34.0) | (24.5) | (20.5) |
| Other expenses . . . . . . . . . . . . . . . . . | (1.8) | (0.5) | (1.4) | (1.3) | (1.5) |
| Operating (loss) profit . . . . . . . . . . . . . | (7.1) | 0.7 | 23.8 | 15.0 | 47.5 |

ALRMH-CNBM00000254

## FINANCIAL INFORMATION

Revenue in our glass fiber and FRP products segment is primarily generated from our FRP pipes and tanks business and our glass fiber mats business, which accounted for 78.1% and 21.5%, respectively, of our revenue from this segment in 2004. The remaining revenue from this segment, before our acquisitions of Liberty TOLI and Zhongfu Xigang as described below, arose from China Composites' technical services, which are consulting services provided to clients on composites technology. China Composites' consulting services accounted for RMB 1.0 million, or 0.4% of the segment's revenue in 2004.

### *Nine Months Ended September 30, 2005 Compared with Nine Months Ended September 30, 2004*

#### *Acquisitions*

Zhongfu Liberty, a subsidiary of China Composites, acquired an additional 35% interest in Liberty TOLI in January 2005. The acquisition increased Zhongfu Liberty's ownership interest in Liberty TOLI to 60%, making Liberty TOLI a consolidated subsidiary of ours from January 2005.

China Composites also acquired a 51% equity interest in Zhongfu Xigang, a company in the business of manufacturing and selling fishing boats and yachts, in December 2004. As a result, Zhongfu Xigang's operating results were consolidated with ours from January 2005.

The following table sets out the revenue, cost of sales, gross profit and operating profit of Liberty TOLI and Zhongfu Xigang and their respective contribution to our glass fiber and FRP products segment for the nine months ended September 30, 2005:

| | For the nine months ended September 30, 2005 | | | |
| --- | --- | --- | --- | --- |
| | Liberty TOLI | % of segment total | Zhongfu Xigang | % of segment total |
| | (RMB in millions, except for percentages) | | | |
| Revenue | 27.4 | 12.3 | 10.9 | 4.9 |
| Cost of sales | 21.9 | 13.6 | 13.7 | 8.5 |
| Gross profit (loss) | 5.5 | 8.7 | (2.8) | (4.3) |
| Operating profit | 1.0 | 2.1 | (4.4) | (9.2) |

In addition to the reasons stated below, the changes in the operating results of our glass fiber and FRP product segment for the nine months ended September 30, 2005 as compared with the nine months ended September 30, 2004 also resulted from the consolidation of results from Liberty TOLI and Zhongfu Xigang.

#### *Revenue*

Revenue for our glass fiber and FRP products segment increased by 11.0% to RMB 223.9 million for the nine months ended September 30, 2005 from RMB 201.6 million for the nine months ended September 30, 2004. Excluding Liberty TOLI and Zhongfu Xigang, revenue in this segment decreased by 8.0% to RMB 185.5 million, primarily due to a decrease of RMB 20.1 million in revenue from our FRP pipes and tanks business resulting from decreased sales volume in connection with a shift in our product mix to higher margin but lower volume products, partially offset by an increase of RMB 2.3 million in revenue from our technical services business.

ALRMH-CNBM00000255

# FINANCIAL INFORMATION

*Cost of sales*

The cost of sales for our glass fiber and FRP products segment increased by 10.4% to RMB 160.3 million for the nine months ended September 30, 2005 from RMB 145.2 million for the nine months ended September 30, 2004. Excluding Liberty TOLI and Zhongfu Xigang, the cost of sales decreased by 14.1% to RMB 124.7 million, primarily due to a decrease of RMB 21.5 million in cost of sales from our FRP pipes and tanks business as a result of our shifting to higher margin but lower volume products.

*Gross profit and gross margin*

Gross profit for our glass fiber and FRP products segment increased by 12.6% to RMB 63.6 million (7.6% to RMB 60.8 million excluding Liberty TOLI and Zhongfu Xigang) for the nine months ended September 30, 2005 from RMB 56.4 million for the nine months ended September 30, 2004. Gross margin for our glass fiber and FRP products segment increased to 28.4% for the nine months ended September 30, 2005 from 28.0% for the nine months ended September 30, 2004. The increases in gross profit and gross margin were primarily due to increased sales of higher margin products in our FRP pipes and tanks business.

*Other income*

Other income increased by 634.4% to RMB 33.0 million (631.1% to RMB 32.9 million excluding Liberty TOLI and Zhongfu Xigang) for the nine months ended September 30, 2005 from RMB 4.5 million for the nine months ended September 30, 2004, primarily due to negative goodwill released to income of RMB 10.9 million in connection with the acquisition of an additional 43.5% equity interest of our subsidiary, Zhongfu Lianzhong, in May 2005 and the increase in technical and other service income of RMB 18.1 million.

*Selling and distribution costs*

Selling and distribution costs for our glass fiber and FRP products segment increased by 35.3% to RMB 27.1 million (22.8% to RMB 24.6 million excluding Liberty TOLI and Zhongfu Xigang) for the nine months ended September 30, 2005 from RMB 20.1 million for the nine months ended September 30, 2004, primarily due to increases in transportation costs and sales commissions of RMB 3.3 million resulting from the increase in sales of exported glass fiber mats.

*Administrative expenses*

Administrative expenses for our glass fiber and FRP products segment decreased by 16.5% to RMB 20.5 million (32.5% to RMB 16.5 million excluding Liberty TOLI and Zhongfu Xigang) for the nine months ended September 30, 2005 from RMB 24.5 million for the nine months ended September 30, 2004, primarily due to a decrease of RMB 7.5 million in provision for bad debt resulting from our enhanced collection efforts with regard to our trade receivables, partially offset by increased salary expenses resulting from additional employees in connection with our acquisitions of Liberty TOLI and Zhongfu Xigang.

ALRMH-CNBM00000256

## FINANCIAL INFORMATION

*Other expenses*

Other expenses were little changed at RMB 1.5 million (RMB 1.2 million excluding Liberty TOLI and Zhongfu Xigang) for the nine months ended September 30, 2005 as compared with RMB 1.3 million for the nine months ended September 30, 2004.

*Operating profit*

As a result of the foregoing, operating profit for our glass fiber and FRP products segment increased by 215.5% to RMB 47.5 million (238.0% to RMB 50.9 million excluding Liberty TOLI and Zhongfu Xigang) for the nine months ended September 30, 2005 from RMB 15.0 million for the nine months ended September 30, 2004. The operating margin for the segment increased to 21.2% for the nine months ended September 30, 2005 from 7.5% for the nine months ended September 30, 2004, primarily due to the negative goodwill released to income of RMB 10.9 million, excluding which the operating margin would have been 16.4%. The increase in the operating margin was also due to increased sales of higher margin products from our FRP pipes and tanks business in our product mix.

**Year Ended December 31, 2004 Compared with Year Ended December 31, 2003**

*Acquisition and change in consolidation*

We manufacture glass fiber mats through Zhongxin Tianma, a sino-foreign joint venture in which China Composites holds a 40.0% interest. China Composites is the largest shareholder of this joint venture. Two of the directors on the joint venture's five-member board, including its chairman, as well as all of its executive officers, are nominated by us. The financial results of this joint venture were not consolidated with ours prior to January 1, 2004. We entered into an agreement in January 2004 with another shareholder of the joint venture, pursuant to which we had obtained the voting rights of two other board seats. As a result, commencing from January 1, 2004, Zhongxin Tianma became a subsidiary of China Composites, and the operating results of this joint venture have been included in our consolidated results. The table below sets out the operating results of our glass fiber mats business and FRP pipes and tanks business in 2004:

| | For the year ended December 31, 2004 | | | |
| --- | --- | --- | --- | --- |
| | FRP pipes and tanks | Percentage of segment total | Glass fiber mats | Percentage of segment total |
| | (RMB in millions, except for percentages) | | | |
| Revenue . . . . . . . . . . . . . . . . . . . . . . | 204.0 | 78.1 | 56.4 | 21.6 |
| Cost of sales . . . . . . . . . . . . . . . . . . . | 146.0 | 79.1 | 38.6 | 20.9 |
| Gross profit . . . . . . . . . . . . . . . . . . . | 58.0 | 75.5 | 17.8 | 23.2 |
| Operating profit . . . . . . . . . . . . . . . . . | 21.2 | 89.1 | 9.6 | 40.3 |

In addition, Zhongfu Lianzhong, which conducts our FRP pipes and tanks business, was acquired by us in June 2003 and its operating results were therefore included in our consolidated statements in 2003 only from June to December.

ALRMH-CNBM00000257

## FINANCIAL INFORMATION

In addition to reasons stated below, the changes in the operating results of our glass fiber and FRP products segment in 2004 as compared with 2003 also resulted from (i) the consolidation of our glass fiber mats business in 2004 but not in 2003 and (ii) the additional five months of operating results from our FRP pipes and tanks business in 2004 as compared with 2003.

*Revenue*

Revenue for our glass fiber and FRP products segment increased by 248.1% to RMB 261.2 million (by 173.0% to RMB 205.0 million excluding our glass fiber mats business) in 2004 from RMB 75.0 million in 2003, primarily due to an increase in the sales of FRP pipes and tanks by approximately 183.2% to RMB 204.0 million in 2004 from RMB 72.0 million in 2003. The increase in sales from our FRP pipes and tanks business was partially due to two major project contracts for the supply of our higher-priced FRP products. In addition, the Average Realized Sales Price of our FRP products increased to RMB 18,156 per tonne in 2004 from RMB 9,400 per tonne in 2003, primarily due to a higher percentage of higher-priced FRP products in our product mix in 2004.

*Cost of sales*

The cost of sales for our glass fiber and FRP products segment increased by 297.6% to RMB 184.6 million (by 214.6% to RMB 146.1 million excluding our glass fiber mats business) in 2004 from RMB 46.4 million in 2003, primarily due to an increase in the sales volume of our FRP tanks and pipes in 2004. In addition, prices of our primary raw materials, glass fiber and resins, both increased significantly in 2004. The weighted average purchase price for glass fiber increased to RMB 5,810 per tonne in 2004 from RMB 5,459 per tonne in 2003, and the weighted average purchase price for resins increased to RMB 11,631 per tonne in 2004 from RMB 9,351 per tonne in 2003.

*Gross profit and gross margin*

Gross profit for our glass fiber and FRP products segment increased by 167.8% to RMB 76.6 million (by 105.6% to RMB 58.9 million excluding our glass fiber mats business) in 2004 from RMB 28.6 million in 2003, primarily due to an increase in sales of FRP pipes and tanks, partially offset by an increase in the price of raw materials. Gross margin for our glass fiber and FRP products segment decreased to 29.3% in 2004 from 38.1% in 2003, primarily due to a higher percentage of higher-priced but lower margin FRP products in our product mix and the increased prices of raw materials. Gross profit and gross margin for our glass fiber mats business was RMB 17.8 million and 31.6%, respectively, in 2004.

*Other income*

Other income of our glass fiber and FRP products segment increased by 382.6% to RMB 10.2 million in 2004 from RMB 2.1 million in 2003, primarily due to an increase in interest income and the inclusion of gains from technical services.

ALRMH-CNBM00000258

## FINANCIAL INFORMATION

*Selling and distribution costs*

Selling and distribution costs of our glass fiber and FRP products segment increased by 134.1% to RMB 27.6 million (by 113.6% to RMB 25.2 million excluding our glass fiber mats business) in 2004 from RMB 11.8 million in 2003, primarily due to an increased sales volume of our FRP pipes and tanks.

*Administrative expenses*

Administrative expenses for our glass fiber and FRP products segment increased by 92.5% to RMB 34.0 million (by 60.2% to RMB 28.3 million excluding our glass fiber mats business) in 2004 from RMB 17.7 million in 2003, partially due to an increase in provision for bad debt for our FRP pipes and tanks business. The increase in such provision for bad debt was primarily due to the increase in sales and the average age of our accounts receivable.

*Other expenses*

Other expenses for our glass fiber and FRP products segment increased to RMB 1.4 million in 2004 from RMB 0.5 million in 2003, primarily due to a loss of RMB 1.4 million arising from a disposal of fixed assets in 2004.

*Operating profit*

As a result of the foregoing, operating profit for our glass fiber and FRP products segment increased significantly to RMB 23.8 million (to RMB 14.2 million excluding our glass fiber mats business) in 2004 from RMB 0.7 million in 2003. The increase in operating profit in 2004 comprised primarily an RMB 21.2 million operating profit arising from our FRP pipes and tanks business and an operating loss of RMB 7.4 million from the operations of China Composites (excluding the results of operations of its subsidiaries). The operating margin for the segment increased to 9.1% in 2004 from 0.9% in 2003. Operating profit and the operating margin for our glass fiber mats business was RMB 9.6 million and 17.0%, respectively, in 2004.

**Year Ended December 31, 2003 Compared with Year Ended December 31, 2002**

*Acquisition*

China Composites acquired a 51.0% equity interest in Zhongfu Lianzhong, the entity operating our FRP pipes and tanks business, in June 2003, and the operating results of which were consolidated with ours from June 1, 2003. Prior to its acquisition of the FRP pipes and tanks business, China Composites' scope of operations were limited. Except as otherwise stated below, the changes in the results of operations of our glass fiber and FRP products segment in 2003 as compared with 2002 were primarily due to the consolidation of the FRP pipes and tanks business.

*Revenue*

Revenue for our glass fiber and FRP products segment increased to RMB 75.0 million in 2003 from RMB 0.9 million in 2002.

ALRMH-CNBM00000259

# FINANCIAL INFORMATION

*Cost of sales*

The cost of sales for our glass fiber and FRP products segment increased to RMB 46.4 million in 2003 from RMB 0.1 million in 2002.

*Gross profit and gross margin*

Gross profit for our glass fiber and FRP products segment increased to RMB 28.6 million in 2003 from RMB 0.8 million in 2002. Gross margin for our glass fiber and FRP products segment decreased to 38.1% in 2003 from 86.2% in 2002, primarily due to the increase of the lower margin FRP pipes and tanks business in 2003 as compared with the technical services business conducted by China Composites in 2002.

*Other income*

Other income for our glass fiber and FRP products segment decreased by 18.1% to RMB 2.1 million in 2003 from RMB 2.6 million in 2002, primarily due to a loss on disposal of the investment in securities of RMB 2.8 million in 2003, offset by an increase in rental income of RMB 2.8 million from leasing out our extra office space.

*Selling and distribution costs*

Selling and distribution costs for our glass fiber and FRP products segment increased to RMB 11.8 million in 2003 from nil in 2002.

*Administrative expenses*

Administrative expenses for our glass fiber and FRP products segment increased by 104.1% to RMB 17.7 million in 2003 from RMB 8.7 million in 2002.

*Other expenses*

Total other expenses decreased by 67.8% to RMB 0.5 million in 2003 from RMB 1.8 million in 2002, primarily due to a one-time loss arising from disposals of fixed assets in 2002 that did not recur in 2003.

*Operating profit*

As a result of the foregoing, operating profit for our glass fiber and FRP products segment increased to a profit of RMB 0.7 million in 2003 from a loss of RMB 7.1 million in 2002. Operating margin for the segment was 0.9% in 2003.

ALRMH-CNBM00000260

## FINANCIAL INFORMATION

**Engineering Services Segment**

The following table sets out the principal income statement information for the engineering services segment for 2002, 2003, 2004 and the nine months ended September 30, 2004 and 2005, respectively:

| | For the year ended December 31, | | | For the nine months ended September 30, | |
| --- | --- | --- | --- | --- | --- |
| | **2002** | **2003** | **2004** | **2004** | **2005** |
| | | | | (unaudited) | |
| | | | (RMB in millions) | | |
| Revenue | 78.9 | 145.5 | 465.9 | 295.4 | 592.7 |
| Cost of sales | (52.0) | (112.6) | (379.8) | (259.5) | (497.2) |
| Gross profit | 26.9 | 32.9 | 86.1 | 35.9 | 95.5 |
| Other income | 0.1 | 0.2 | 0.8 | 0.4 | 0.9 |
| Selling and distribution costs | (3.1) | (2.7) | (5.6) | (3.4) | (9.7) |
| Administrative expenses | (8.8) | (15.2) | (23.8) | (13.8) | (27.9) |
| Other expenses | (0.1) | (0.3) | (0.1) | — | (0.1) |
| Operating profit | 15.0 | 14.9 | 57.4 | 19.1 | 58.7 |

For detailed information about our contracts during the Track Record Period, see "*Business — Engineering Services Segment — Engineering Services.*"

***Nine Months Ended September 30, 2005 Compared with Nine Months Ended September 30, 2004***

*Revenue*

Revenue for our engineering services segment increased by 100.6% to RMB 592.7 million for the nine months ended September 30, 2005 from RMB 295.4 million for the nine months ended September 30, 2004, primarily due to a greater number of new and ongoing EPC projects for the glass industry in 2005. We performed services under 25 EPC contracts during the nine months ended September 30, 2005 as compared to 21 EPC contracts during the nine months ended September 30, 2004.

*Cost of sales*

The cost of sales for our engineering services segment increased by 91.6% to RMB 497.2 million for the nine months ended September 30, 2005 from RMB 259.5 million for the nine months ended September 30, 2004, primarily due to a greater number of new and ongoing EPC projects for the glass industry.

*Gross profit and gross margin*

Gross profit for our engineering services segment increased by 166.0% to RMB 95.5 million for the nine months ended September 30, 2005 from RMB 35.9 million for the nine months ended September 30, 2004, primarily due to the increase in the number of new and ongoing projects in 2005. Gross margin for our engineering services segment increased to 16.1% for the nine months ended September 30, 2005 from 12.2% for the nine months ended September 30, 2004, primarily due to an increase in gross margin of our EPC projects.

ALRMH-CNBM00000261

## FINANCIAL INFORMATION

*Other income*

Other income for our engineering services segment increased to RMB 0.9 million for the nine months ended September 30, 2005 from RMB 0.4 million for the nine months ended September 30, 2004, primarily due to an increase in interest income from increased bank deposits.

*Selling and distribution costs*

Selling and distribution costs for our engineering services segment increased by 182.9% to RMB 9.7 million for the nine months ended September 30, 2005 from RMB 3.4 million for the nine months ended September 30, 2004, primarily due to an increase in transportation costs of RMB 3.7 million resulting from the increased number of new and ongoing EPC projects.

*Administrative expenses*

Administrative expenses for our engineering services segment increased by 101.8% to RMB 27.9 million for the nine months ended September 30, 2005 from RMB 13.8 million for the nine months ended September 30, 2004, primarily due to an increase in the number of and compensation to project management personnel. In addition, our bad debt provision increased by RMB 2.5 million for the nine months ended September 30, 2005 due to our increased accounts receivable resulting from the increased number of new and ongoing projects.

*Other expenses*

Other expenses increased to RMB 0.1 million for the nine months ended September 30, 2005 from nil for the nine months ended September 30, 2004, primarily due to a one-time charitable donation.

*Operating profit*

As a result of the foregoing, operating profit for our engineering services segment increased by 208.0% to RMB 58.7 million for the nine months ended September 30, 2005 from RMB 19.1 million for the nine months ended September 30, 2004, and operating margin for the segment increased to 9.9% for the nine months ended September 30, 2005 from 6.5% for the nine months ended September 30, 2004, primarily due to the increase in the number of new and ongoing projects.

**Year Ended December 31, 2004 Compared with Year Ended December 31, 2003**

*Revenue*

Revenue for our engineering services segment increased by 220.2% to RMB 465.9 million in 2004 from RMB 145.5 million in 2003, primarily due to a greater number of new and ongoing engineering projects in 2004 as well as an increase in the percentage of EPC projects in our project mix. We performed services under 117 contracts, 24 of which were EPC projects, in 2004, as compared to 69 contracts, 10 of which were EPC projects, in 2003.

— 258 —

ALRMH-CNBM00000262

---

## FINANCIAL INFORMATION

---

*Cost of sales*

Cost of sales for our engineering services segment increased by 237.2% to RMB 379.8 million in 2004 from RMB 112.6 million in 2003, primarily due to the increase in the number of new and ongoing projects as well as the shift in our project mix towards more cost-intensive EPC projects.

*Gross profit and gross margin*

Gross profit for our engineering services segment increased by 161.9% to RMB 86.1 million in 2004 from RMB 32.9 million in 2003, primarily due to the increase of projects we serviced in 2004. Gross margin for our engineering services segment decreased to 18.5% in 2004 from 22.6% in 2003, primarily due to the increased percentage of EPC projects and decreased percentage of engineering design projects in our project mix. EPC projects typically have a higher per project revenue but a lower gross margin than engineering design projects.

*Other income*

Other income for our engineering services segment increased by 205.6% to RMB 0.8 million in 2004 from RMB 0.2 million in 2003, primarily due to an increase in interest income from bank deposits, which was generated from the substantial increase in project revenue.

*Selling and distribution costs*

Selling and distribution costs for our engineering services segment increased by 104.3% to RMB 5.6 million in 2004 from RMB 2.7 million in 2003, primarily due to the increase in the number of projects and an increase in transportation costs arising from overseas EPC projects. We provided services to 14 overseas EPC projects in 2004, as compared to 9 projects in 2003.

*Administrative expenses*

Administrative expenses for our engineering services segment increased by 56.5% to RMB 23.8 million in 2004 from RMB 15.2 million in 2003, primarily due to an increase in the number of and the compensation to project management personnel. Our research and development expenses not already reflected in cost of sales increased by 17.4% to RMB 2.9 million in 2004 from RMB 2.5 million in 2003.

*Other expenses*

Other expenses for our engineering services segment decreased by 73.8% to RMB 0.1 million in 2004 from RMB 0.3 million in 2003, primarily due to a loss of RMB 0.1 million arising from a disposal of fixed assets in 2003 that did not recur in 2004.

*Operating profit*

As a result of the foregoing, operating profit for our engineering services segment increased by 284.3% to RMB 57.4 million in 2004 from RMB 14.9 million in 2003, and operating margin for this segment increased to 12.3% in 2004 from 10.3% in 2003.

ALRMH-CNBM00000263

# FINANCIAL INFORMATION

*Year Ended December 31, 2003 Compared with Year Ended December 31, 2002*

*Revenue*

Revenue for our engineering services segment increased by 84.3% to RMB 145.5 million in 2003 from RMB 78.9 million in 2002, primarily due to a 33.9% increase in the revenue from our equipment procurement business to RMB 91.9 million in 2003 from RMB 68.7 million in 2002. We performed services under 27 equipment procurement contracts in 2003 as compared to 8 in 2002.

*Cost of sales*

The cost of sales for our engineering services segment increased by 116.6% to RMB 112.6 million in 2003 from RMB 52.0 million in 2002, primarily due to an increase in our business volume, particularly in our equipment procurement business.

*Gross profit and gross margin*

Gross profit for our engineering services segment increased by 22.0% to RMB 32.9 million in 2003 from RMB 26.9 million in 2002, primarily due to the increase in business volume. Gross margin for our engineering services segment decreased to 22.6% in 2003 from 34.1% in 2002, primarily due to a decrease in the gross margin from equipment procurement and engineering design projects, which was partially offset by an increase in the gross margin from EPC services.

*Other income*

Other income for our engineering services segment increased to RMB 0.2 million in 2003 from RMB 0.1 million in 2002, primarily due to an increase in interest income from bank deposits, which was generated from the substantial increase in project revenue.

*Selling and distribution expenses*

Selling and distribution expenses for our engineering services segment decreased by 13.5% to RMB 2.7 million in 2003 from RMB 3.1 million in 2002, primarily due to a decrease in cost of samples.

*Administrative expenses*

Administrative expenses for our engineering services segment increased by 73.0% to RMB 15.2 million in 2003 from RMB 8.8 million in 2002, primarily due to an increase in the number of project management personnel hired to manage our increased business volume and the resulting increase in compensation to such personnel.

*Other expenses*

Other expenses for our engineering services segment increased to RMB 0.3 million in 2003 from RMB 0.1 million in 2002, primarily because of a loss of RMB 0.1 million arising from a disposal of fixed assets in 2003.

ALRMH-CNBM00000264

# FINANCIAL INFORMATION

*Operating profit*

As a result of the foregoing, operating profit for our engineering services segment remained at about RMB 15.0 million in both 2002 and 2003 and operating margin for the segment decreased to 10.3% in 2003 from 19.0% in 2002.

## LIQUIDITY AND CAPITAL RESOURCES

To date, the Company has funded its growth principally from internal funds, proceeds from the sale of its products and bank borrowings.

We have historically met our working capital and other capital requirements principally from cash provided by operations, primarily payments for our products from customers. We have met the remainder of our requirements primarily through equity contributions from our shareholders and long-term and short-term borrowings. Following the Global Offering, we expect to fund our foreseeable expenditures and development plans with loan facilities provided by banks and internally generated cash flows as well as net proceeds from the Global Offering. Failure to obtain capital on reasonable commercial terms would increase our financing costs and might cause delay to our expenditure plans.

### Cash Flow Data

We conduct substantially all our operations through our operating subsidiaries or associates, some of which we do not wholly own and/or are joint ventures or public companies. Therefore, we may not be able in all circumstances to allocate our free cash flow as we would like among our subsidiaries. In addition, the cash flows generated by our significant operating subsidiaries on a stand-alone basis may differ significantly from that represented by our combined cash flow data.

The following table presents selected cash flow data from the Company's consolidated cash flow statements for 2002, 2003, 2004 and the nine months ended September 30, 2005, respectively:

| | For the year ended December 31, | | | For the nine months ended September 30, | |
|---|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2004 | 2005 |
| | | | | (unaudited) | |
| | | | (RMB in millions) | | |
| Net cash from operating activities . . . . . | 293.4 | 168.6 | 364.7 | 142.6 | 83.5 |
| Net cash used in investing activities . . . . | (303.3) | (178.8) | (1,625.4) | (1,385.7) | (972.2) |
| Net cash from financing activities . . . . . | 110.6 | 387.0 | 1,170.9 | 940.5 | 963.2 |
| Cash and cash equivalents at end of the period . . . . . . . . . . . . . . . . . . . . | 536.4 | 916.1 | 826.3 | 612.5 | 899.6 |

### *Cash Flow from Operating Activities*

We derive our cash inflow from operations principally from the receipt of payments for the sale of our products and delivery of our services. Our cash outflow from operations is principally for purchases of raw materials, fuel and power, as well as for selling and distribution costs, staff costs and interest payments.

— 261 —

---

## FINANCIAL INFORMATION

---

For the nine months ended September 30, 2005, our net cash inflow generated from operating activities was RMB 83.5 million. Such inflow was primarily a result of an RMB 480.0 million operating cash flow before movements in working capital, an RMB 532.9 million increase in trade payable and other payables, offset primarily by an RMB 609.5 million increase in trade and other receivables, of which RMB 140.9 million was attributable to a one-time increase in other receivables arising from the sale of our E-HOME stores, and an RMB 108.0 million increase in inventories.

In 2004, our net cash inflow generated from operating activities was RMB 364.7 million. Such inflow was primarily a result of an RMB 420.3 million operating cash flow before movements in working capital, an RMB 361.2 million increase in trade payable and other payables, offset primarily by an RMB 220.9 million increase in trade receivable and other receivables and an RMB 149.1 million increase in inventories.

In 2003, our net cash inflow from operating activities was RMB 168.6 million, which was primarily a result of an RMB 298.0 million operating cash flow before movements in working capital and an RMB 92.4 million increase in trade payable and other payables, offset primarily by an RMB 80.4 million increase in trade receivable and other receivables.

In 2002, our net cash inflow from operating activities was RMB 293.4 million, which was primarily a result of an RMB 277.7 million operating cash flow before movements in working capital and an RMB 50.0 million increase in trade and other payables, offset primarily by an RMB 130.2 million increase in amounts due from related parties.

For a discussion of working capital changes, see "— *Working Capital*."

### *Cash Flow from Investing Activities*

Our cash inflow from investing activities primarily consists of interest income and dividends received from our subsidiaries and associates. Our cash outflow from investing activities primarily consists of acquisitions of equity interest in subsidiaries, purchases of fixed assets and intangible assets, and purchases of long-term and short-term investments.

For the nine months ended September 30, 2005, our net cash outflow from investing activities was RMB 972.2 million, which was primarily a result of RMB 931.2 million property, plant and equipment purchases, primarily in the cement and lightweight building materials segments.

In 2004, our net cash outflow from investing activities was RMB 1,625.4 million, which was primarily a result of RMB 1,535.5 million property, plant and equipment purchases, primarily in the cement and lightweight building materials segment.

In 2003, net cash outflow from investing activities was RMB 178.8 million, which was primarily a result of RMB 229.8 million property, plant and equipment purchases, primarily in the cement and lightweight building materials segment.

In 2002, our net cash outflow from investing activities was RMB 303.3 million, which was primarily a result of RMB 222.3 million property, plant and equipment purchases, primarily in the cement and lightweight building materials segments.

ALRMH-CNBM00000266

---

## FINANCIAL INFORMATION

---

*Cash Flow from Financing Activities*

Our cash inflow from financing activities primarily consists of draw downs of bank loans and other loans, as well as increases in paid-up capital. Our cash outflow from financing activities primarily consists of repayments of bank loans, interests paid on our loans, and dividends paid to minority shareholders.

For the nine months ended September 30, 2005, we had a net cash inflow from financing activities in the amount of RMB 963.2 million, primarily as a result of RMB 2,754.5 million in new borrowings raised, offset by RMB 1,803.4 million repayment of borrowings.

In 2004, we had a net cash inflow from financing activities in the amount of RMB 1,170.9 million, primarily due to a total of RMB 2,537.6 million in new borrowings raised, offset by an RMB 1,373.6 million repayment of borrowings.

In 2003, we had a net cash inflow of RMB 387.0 million from financing activities, primarily due to a total of RMB 2,383.7 million in new borrowings raised, offset by an RMB 2,023.2 million repayment of borrowings.

In 2002, we had a net cash inflow of RMB 110.6 million from financing activities, primarily due to RMB 1,264.8 million in new borrowings raised, offset by an RMB 1,159.9 million repayment of borrowings.

**Working Capital**

Taking into account the net proceeds available to us from the Global Offering, short term and long term bank loans and our operating cash flow, we confirm that we have sufficient working capital to meet our requirements for at least the next 12 months from the date of this prospectus.

ALRMH-CNBM00000267

# FINANCIAL INFORMATION

*Net Current Liabilities*

The table below sets out our current assets, current liabilities and net current assets (liabilities) at the balance sheet dates indicated:

| | As at December 31, | | | As at September 30, |
|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** |
| | (RMB in millions) | | | |
| Current assets | | | | |
| Inventories . . . . . . . . . . . . . . . . . . . . . . . . . . | 296.3 | 358.4 | 530.2 | 617.0 |
| Trade and other receivables. . . . . . . . . . . . . . . | 481.2 | 669.8 | 921.6 | 1,601.9 |
| Investments held for trading . . . . . . . . . . . . . . | 183.9 | 112.7 | 11.3 | 13.3 |
| Amount due from related parties . . . . . . . . . . . | 218.6 | 223.5 | 223.7 | 212.2 |
| Pledged bank deposits . . . . . . . . . . . . . . . . . . . | — | — | — | 28.0 |
| Bank balances and cash . . . . . . . . . . . . . . . . . . | 536.4 | 916.1 | 826.3 | 899.6 |
| | 1,716.4 | 2,280.5 | 2,513.2 | 3,372.0 |
| Current liabilities | | | | |
| Trade and other payables . . . . . . . . . . . . . . . . . | 469.9 | 696.3 | 1,109.2 | 1,902.6 |
| Amount due to related parties . . . . . . . . . . . . . | 52.0 | 48.7 | 159.7 | 214.3 |
| Borrowings - due within one year. . . . . . . . . . . | 737.8 | 989.8 | 1,450.4 | 3,011.4 |
| Income tax payable . . . . . . . . . . . . . . . . . . . . . | 2.9 | 9.0 | 18.9 | 33.4 |
| Dividend payable . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | 69.2 |
| | 1,262.6 | 1,743.8 | 2,738.2 | 5,230.9 |
| Net current assets (liabilities) . . . . . . . . . . . . . . | 453.8 | 536.7 | (225.0) | (1,858.9) |

We had net current liabilities of RMB 225.0 million and RMB 1,858.9 million as at December 31, 2004 and September 30, 2005, respectively, as compared to net current assets of RMB 453.8 million and RMB 536.7 million as at December 31, 2002 and 2003, respectively. Our net current liabilities position in recent periods was primarily attributable to our increasing amount of outstanding short-term loans. Our outstanding amount of borrowings due within one year was RMB 737.8 million, RMB 989.8 million, RMB 1,450.4 million and RMB 3,011.4 million as at December 31, 2002, 2003, 2004 and September 30, 2005, respectively. The increase in short-term loans reflected our increasing working capital requirements as a result of the expansion of our scale of operations and the acquisition of a number of operating subsidiaries during the Track Record Period. The increase was also due to our increased use of short-term loans to finance some of our capital expenditures and acquisitions to achieve a lower cost of capital by taking advantage of the lower interest rates applicable to short-term loans compared to long-term loans.

ALRMH-CNBM00000268

## FINANCIAL INFORMATION

According to our management's unaudited accounting records, our net current liabilities increased by approximately 4% between September 30, 2005 and January 31, 2006, mainly attributable to an RMB 180.3 million increase in the amount of long-term debt that became current. Such debt that became current comprises of nine loans from 5 different banks to 5 different entities within the Group, each in the principal amount of between RMB 3.6 million and RMB 44 million. Investors in the H Shares should be aware that the above numbers may be different from equivalent numbers produced on the basis of audited financial statements prepared in accordance with applicable accounting standards.

Our net current liabilities position exposes us to liquidity risk. Our future liquidity and the repayment of our outstanding debt obligations when they become due will primarily depend on our ability to maintain adequate cash inflows from operating activities and our ability to obtain adequate external financing. Historically, we managed a significant portion of our short-term loans by rolling them over on an annual basis. As at March 6, 2006, we had obtained agreements from relevant creditors to renew a number of our outstanding short-term loans, respectively, for a year upon maturity, in an aggregate amount of approximately RMB 2,057.3 million.

For the nine months ended September 30, 2005, we had cash inflows from operating activities in the amount of RMB 83.5 million, which reflected the impact of a one-time increase in our accounts receivable in the amount of RMB 140.9 million due to the sale of our E-HOME stores. We had bank balances and cash of RMB 899.6 million and RMB 957.6 million as at September 30 and December 31, 2005, respectively. We had a number of unused credit facilities in the aggregate amount of approximately RMB 598.0 million as at September 30, 2005 and RMB 778.0 million as at December 31, 2005. We have begun to take measures to further reduce the amount of our net current liabilities including, among others, improving our operating cash flow, strengthening the management of credit policy, tightening the screening of those investment projects that will incur substantial current liabilities, negotiating for additional credit facilities and refinancing current bank loans with mid- to long-term bank loans. See "*Risk Factors — Risks Relating to the Group — We had net current liabilities that could adversely affect our business, results of operations and/or financial condition.*"

The Directors confirm that the Group did not experience any material difficulty in renewing its short-term bank loans at maturity or obtaining new short-term bank loans during the Track Record Period. We have also begun to take measures to improve our cash generating capabilities and to reduce our overall financial leverage, particularly, our reliance on the short-term borrowings. See "*— Indebtedness — Borrowings.*"

ALRMH-CNBM00000269

## FINANCIAL INFORMATION

*Inventory Analysis*

The following table sets out a summary of our inventory balances as at the balance sheet dates indicated, as well as our turnover of average inventory for the periods indicated:

| | As at and for the year ended December 31, | | | As at and for the nine months ended September 30, | |
|---|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2004 | 2005 |
| | | | | (unaudited) | |
| | (RMB in millions) | | | | |
| Raw materials . . . . . . . . . . . . . . . . . . | 126.7 | 123.6 | 176.3 | 192.6 | 254.9 |
| Work-in-progress . . . . . . . . . . . . . . . . | 23.0 | 25.7 | 51.0 | 42.7 | 80.8 |
| Finished goods . . . . . . . . . . . . . . . . . | 139.0 | 202.3 | 290.1 | 247.1 | 267.4 |
| Consumable goods . . . . . . . . . . . . . . | 7.7 | 6.8 | 12.8 | 1.8 | 13.9 |
| Total . . . . . . . . . . . . . . . . . . . . . . | 296.4 | 358.4 | 530.2 | 484.2 | 617.0 |
| Turnover of average inventory (days)[1] . . | 76 | 84 | 69 | 71 | 57 |

---

*Note:*

(1)   Average inventory equals inventory at the beginning of the period plus inventory at the end of the period, divided by two. Turnover of average inventory (in days) equals average inventory divided by cost of sales and then multiplied by 365 for each of the three years ended December 31, 2002, 2003 and 2004 or by 270 for each of the two nine-month periods ended September 30, 2004 and 2005.

Our inventory balances have been increasing over the Track Record Period. This increase was primarily due to our increased production and sales volume. Our inventory turnover period declined in 2004 as compared to 2003 as well as in the nine months ended September 30, 2005 as compared to the same period in 2004. The improvement in our inventory turnover period was mainly due to the increased demand for our products in the PRC.

ALRMH-CNBM00000270

# FINANCIAL INFORMATION

*Accounts Receivable and Accounts Payable*

Our accounts receivable represents receivables from the sale of our products and services. Our accounts payable represent amounts payable in connection with the purchase of steel, coal and other raw materials from various suppliers. The following table sets out turnover days for our average accounts receivable and average accounts payable for the periods indicated:

| | For the year ended December 31, | | | For the nine months ended September 30, | |
|---|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2004 | 2005 |
| | | | | (unaudited) | |
| | | | (days) | | |
| Turnover of average trade receivable[1] . . | 70 | 83 | 60 | 69 | 57 |
| Turnover of average trade payable[2] . . . . | 48 | 65 | 61 | 63 | 65 |

*Notes:*

(1)  Average trade receivable equals trade receivable at the beginning of the period plus trade receivable at the end of the period, divided by two. Turnover of average trade receivable (in days) equals average trade receivable divided by revenue for the relevant period and then multiplied by 365 for each of the three years ended December 31, 2002, 2003 and 2004 or by 270 for each of the two nine-month periods ended September 30, 2004 and 2005.

(2)  Average trade payable equals trade payable at the beginning of the period plus trade payable at the end of the period divided by two. Turnover of average trade payable (in days) equals average trade payable divided by cost of sales and then multiplied by 365 for each of the three years ended December 31, 2002, 2003 and 2004 or by 270 for each of the two nine-month periods ended September 30, 2004 and 2005.

The decrease in turnover of average trade receivable in 2004 and for the nine months ended September 30, 2005 was primarily due to our increased effort in collecting receivables on a timely basis. The increase in turnover of average trade payable in 2003 was primarily due to the acquisition of a subsidiary and opening of E-HOME stores.

The table below sets out an analysis of the age of our trade receivables, net of provision for bad and doubtful debts, based on invoice date as at the balance sheet dates indicated:

| | As at December 31, | | | As at September 30, |
|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 |
| | (RMB in millions) | | | |
| Within two months . . . . . . . . . . . . . . . . . . . . . | 91.3 | 131.0 | 217.4 | 477.2 |
| Between two months and one year . . . . . . . . . . . | 152.5 | 183.0 | 148.0 | 253.3 |
| Between one and two years . . . . . . . . . . . . . . . . | 39.0 | 41.0 | 50.7 | 64.6 |
| Between two and three years. . . . . . . . . . . . . . . | 14.3 | 12.2 | 12.4 | 11.7 |
| Over three years . . . . . . . . . . . . . . . . . . . . . . . | 4.2 | 8.2 | 6.5 | 8.5 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 301.3 | 375.4 | 435.0 | 815.3 |

— 267 —

ALRMH-CNBM00000271

## FINANCIAL INFORMATION

It is our general corporate policy to offer our customer credit terms of up to 60 days. For customers that have had at least two years of reliable payment history with us or upon special occasions, we may extend the applicable credit terms to up to 90 days. As at September 30, 2005, the turnover of trade receivables of the Group was 57 days. However, as at September 30, 2005, approximately 10.4% of the Group's total outstanding trade receivables had been aged in excess of one year, of which approximately 6.4%, 38.9%, 43.1% and 11.5% were attributable to our cement segment, lightweight building materials segment, China Composites under our glass fiber and FRP products segment and our engineering services segment, respectively. Due to diverse market environment and customer bases of each of our business segments, we have implemented customized customer credit policies and internal control mechanisms for collecting trade receivables at each of our business segments. Specific customer credit decisions are made by each segment, while the auditing department at the Company generally monitors the turnover trend of trade receivables of each segment and conduct aging analysis on these trade receivables. For a discussion of the trade receivables and customer credit policies at each of our business segment, see "*Business — Cement Segment — Sales and Marketing*," "*Business — Lightweight Building Materials Segment — Sales and Marketing — Sales*," "*Business — Glass Fiber and FRP Products Segment — Sales and Marketing — Customers*" and "*Business — Engineering Services Segment — Sales and Marketing — Customers*."

As at December 31, 2002, 2003 and 2004 and September 30, 2005, the amount held by customers to cover any defects was approximately nil, RMB 14.6 million, RMB 16.3 million and RMB 22.3 million, respectively, and are included in our trade receivable. In respect of the construction contracts, there was no retention held by the customers as at December 31, 2002, 2003 and 2004 and September 30, 2005. For a discussion of the amount held by our customers to cover any defects, see "*Business — Glass Fiber and FRP Products Segment — Sales and Marketing — Customers*" and "*Business — Engineering Services Segment — Sales and Marketing — Customers*."

The following table sets out an analysis of the age of trade payables based on the invoice date for the purchase of goods as at the balance sheet dates indicated:

| | As at December 31, | | | As at September 30, |
|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 |
| | (RMB in millions) | | | |
| Within two months . . . . . . . . . . . . . . . . . . . . . | 92.3 | 137.9 | 216.6 | 442.1 |
| Between two months and one year . . . . . . . . . . . | 68.3 | 112.1 | 188.7 | 253.7 |
| Between one and two years . . . . . . . . . . . . . . . . | 6.2 | 24.6 | 19.4 | 79.3 |
| Between two and three years. . . . . . . . . . . . . . . . | 2.3 | 4.0 | 7.0 | 7.7 |
| Over three years . . . . . . . . . . . . . . . . . . . . . . . | 2.7 | 5.8 | 7.0 | 5.3 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 171.8 | 284.4 | 438.7 | 788.1 |

ALRMH-CNBM00000272

# FINANCIAL INFORMATION

*Other Receivables and Other Payables*

The following table sets out, by principle category, our other receivables as at the balance sheet dates indicated:

| | As at December 31, | | | As at September 30, |
|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 |
| | (RMB in millions) | | | |
| Prepayments[1] | 89.4 | 152.5 | 218.8 | 319.0 |
| Tax refunds receivables[2] | 34.6 | 50.4 | 32.8 | 37.1 |
| Advances to third parties[3] | — | 5.5 | 39.2 | 84.6 |
| Deposits[4] | 0.7 | 4.7 | 3.0 | 9.5 |
| Disbursements on behalf of the suppliers[5] | 5.0 | 8.0 | 6.1 | 30.7 |
| Advances for staff disbursement[6] | 18.9 | 18.3 | 24.5 | 47.0 |
| Receivables relating to sale of equity interests | — | — | — | 146.0 |
| Expenses relating to the Global Offering | — | — | — | 17.4 |
| Others | 0.1 | 7.4 | 7.6 | 7.6 |
| Total | 148.7 | 246.8 | 332.0 | 698.9 |

*Notes:*

(1)   Consists primarily of prepayments made to our suppliers of raw materials.

(2)   Consists of tax refunds from the PRC government relating to BNBM's export activities.

(3)   Consists primarily of short-term advances extended to our customers.

(4)   Consists of deposits held by third parties relating to the operations of certain of our businesses.

(5)   Consists of advances made to suppliers for certain transportation related costs that should be paid by the suppliers.

(6)   Consists of advances made to our employees for travel and other expenses relating to our business operations.

Our other receivables increased by RMB 366.9 million from December 31, 2004 to September 30, 2005 primarily due to an increase in receivables relating to sale of equity interests of RMB 146.0 million, an increase in prepayments to suppliers of RMB 100.2 million and an increase in advances to third parties of RMB 45.4 million. The increase in receivables relating to sale of equity interests primarily resulted from receivables created in the aggregate amount of RMB 140.9 million in connection with our sale of E-HOME stores in August 2005. See "— *Lightweight Building Materials Segment — Sale of E-HOME Stores.*" The increase in prepayments to suppliers resulted primarily from an increase in our business volume, and the increase in advances to third parties resulted primarily from short-term advances extended to our customers to maintain business relations. Such advances are typically repaid within six months. We had received full payment on these advances as of March 2, 2006.

Our other receivables increased by RMB 85.2 million from December 31, 2003 to December 31, 2004 primarily due to an increase in prepayments to suppliers of RMB 66.3 million and an increase in advances to third parties of RMB 33.7 million, partially offset by a decrease in tax refunds receivables of RMB 17.6 million. The increase in prepayments to suppliers resulted primarily from an increase in our business volume and increases in the prices of raw materials and fuel. The increase in advances to third parties resulted

ALRMH-CNBM00000273

## FINANCIAL INFORMATION

primarily from short-term advances extended to our customers to maintain business relations. We have received full payment on these advances. Tax refunds receivables decreased because the PRC government decided in 2003 to expedite the refund of taxes relating to BNBM's export activities prior to 2003, which resulted in an increase in tax refunds receivables at the end of 2003.

Our other receivables increased by RMB 98.1 million from December 31, 2002 to December 31, 2003 primarily due to an increase of RMB 63.1 million in prepayments to suppliers and an increase of RMB 15.8 million in tax refunds receivables. The increase in prepayments primarily resulted from our increased business volume. The increase in tax refunds receivables resulted primarily from the PRC government's decision in 2003 to expedite the refund of taxes relating to BNBM's export activities prior to 2003.

The following table sets out, by principle category, our other payables as at the balance sheet dates indicated:

| | As at December 31, | | | As at September 30, |
|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 |
| | (RMB in millions) | | | |
| Advances from customers | 102.4 | 155.6 | 242.5 | 361.0 |
| Staff costs accruals | 122.3 | 121.7 | 132.3 | 161.6 |
| Other taxes payable | 29.1 | 34.2 | 36.6 | 36.8 |
| Accrued expenses | 15.4 | 15.7 | 24.4 | 42.1 |
| Payables for construction in progress and acquisition of lands | 6.4 | 15.6 | 93.7 | 105.3 |
| Disbursements paid on behalf of the Company by its suppliers[1] | 5.8 | 10.0 | 11.9 | 18.8 |
| Deposits received[2] | 3.1 | 11.2 | 16.7 | 20.7 |
| Transportation payables | 2.2 | 1.5 | 5.9 | 8.5 |
| Payables in respect of acquisitions of subsidiaries | — | — | — | 14.0 |
| Dividend payable | — | — | — | 13.0 |
| Investments | — | — | — | 4.2 |
| Others | 2.0 | 4.4 | 6.3 | 17.6 |
| Total | 288.7 | 369.9 | 570.3 | 803.6 |

_____

*Notes:*

(1)    Consists primarily of certain transportation costs paid by third parties that should be paid by us.

(2)    Consists primarily of warranty deposits received from our contractors or our customers for construction projects undertaken or constructed by us.

Our other payables increased by RMB 233.3 million from December 31, 2004 to September 30, 2005 primarily due to an increase in advances from customers of RMB 118.5 million and an increase in staff costs accruals of RMB 29.2 million. The significant increase in advances from our customers resulted primarily from an increase in our business volume, especially from a significant increase in contracted amount from our engineering services segment where we generally require a large percentage of prepayment from our customers. Our staff cost accruals increased primarily because of our increased business volume, especially from our acquisitions, that resulted in a larger number of employees on our payroll at September 30, 2005.

ALRMH-CNBM00000274

# FINANCIAL INFORMATION

Our other payables increased by RMB 200.4 million from December 31, 2003 to December 31, 2004, primarily due to an increase in advances from customers of RMB 86.9 million and an increase in payables for construction in progress and acquisition of land of RMB 78.1 million. The increase in advances from our customers resulted primarily from our increased business volume, and the increase in payables for construction in progress and acquisition of land resulted primarily from our acquisitions of land and equipment in connection with our expansion in business capacity.

Our other payables increased by RMB 81.2 million from December 31, 2002 to December 31, 2003, primarily due to an increase in advances from customers of RMB 53.2 million as a result of our increased business volume.

## Indebtedness

### *Borrowings*

The table below sets out our borrowings as at the dates indicated:

|  | As at December 31, | | | As at September 30, | As at December 31, |
|---|---|---|---|---|---|
|  | **2002** | **2003** | **2004** | **2005** | **2005** |
|  |  |  |  |  | **(unaudited)** |
|  |  |  | (RMB in millions) | | |
| Bank loans . . . . . . . . . . . . . . . . | 843.9 | 1,461.4 | 2,660.8 | 4,067.1 | 4,154.5 |
| Unsecured other borrowings from non-financial institutions. . . . . | 5.4 | 5.4 | 31.5 | 118.2 | 82.1 |
|  | 849.3 | 1,466.8 | 2,692.3 | 4,185.3 | 4,236.6 |

The table below sets out our borrowings as at the dates indicated, by maturity date:

|  | As at December 31, | | | As at September 30, | As at December 31, |
|---|---|---|---|---|---|
|  | **2002** | **2003** | **2004** | **2005** | **2005** |
|  |  |  |  |  | **(unaudited)** |
|  |  |  | (RMB in millions) | | |
| Borrowings are repayable as follows: |  |  |  |  |  |
| within one year or on demand . . | 737.8 | 989.8 | 1,450.3 | 3,011.4 | 3,232.0 |
| between one and two years . . . . | — | 50.9 | 318.2 | 215.8 | 49.5 |
| between two and three years . . . | 15.5 | 152.4 | 34.5 | 210.0 | 502.0 |
| between three and five years, inclusive . . . . . . . . . . . . . . . | 96.0 | 263.7 | 889.3 | 748.1 | 453.1 |
| over five years . . . . . . . . . . . . | — | 10.0 | — | — | — |
| Total . . . . . . . . . . . . . . . . | 849.3 | 1,466.8 | 2,692.3 | 4,185.3 | 4,236.6 |

Parent Group provided guarantees to the Group on bank borrowings in the amount of nil, RMB 225.0 million, RMB 465.0 million and RMB 103.5 million, respectively, as at December 31, 2002, 2003 and 2004 and September 30, 2005. All such guarantees were released prior to December 31, 2005.

— 271 —

ALRMH-CNBM00000275

# FINANCIAL INFORMATION

The increase in our borrowings repayable within one year or on demand from September 30, 2005 to December 31, 2005 was primarily due to the increase of RMB 180.3 million (unaudited) in long-term bank loans that became current.

As at December 31, 2005, bank loans in the amount of RMB 264.6 million were secured by our assets. The table below sets out the carrying amount of the pledged assets as at December 31, 2005:

|  | Carrying amount of pledged assets as at December 31, 2005 |
| --- | --- |
|  | (unaudited) (RMB in millions) |
| Property, plant and equipments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 553.7 |
| Land use rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 95.4 |
| Bills receivable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7.1 |
| Trade receivables . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 13.0 |
| Bank deposits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 52.5 |
|  | 721.7 |

Furthermore, bank loans of RMB 314.0 million as at December 31, 2005 were guaranteed by Independent Third Parties. All such guarantees were released prior to March 2, 2006.

As at September 30, 2005 and December 31, 2005, we had aggregate unused banking facilities of approximately RMB 598.0 million and RMB 778.0 million, respectively.

As at December 31, 2002, 2003, 2004, September 30, 2005 and December 31, 2005, we had a debt-to-asset ratio, calculated by dividing our consolidated borrowings by our total consolidated assets, of 21.6%, 30.0%, 38.7% and 43.3% and 43.6%, respectively. The increase in our financial leverage through the Track Record Period was primarily due to our increasing balance of short-term loans to finance our growing working capital needs and the expansion of our business, including both capital investments and acquisitions. As at March 6, 2006, we had obtained agreements from relevant creditors to renew a number of our outstanding short-term loans, respectively for a year upon maturity, in an aggregate amount of approximately RMB 2,057.3 million. In addition, we plan to reduce our indebtedness through the proceeds from the Global Offering. See "*Future Plans and Use of Proceeds — Use of Proceeds*." We have begun to take measures to lower our financial leverage and reduce our level of indebtedness through focusing on the cash-generating capabilities of our operations and through taking a prudent approach with respect to capital investments and implementing centralized controls over capital expenditures. See "*Business — Operating Principles — We emphasize management, operational and financial control of our business segments*."

The Directors confirm that there has been no material change in bank indebtedness since December 31, 2005.

### *Amounts Due to Related Parties with Non-trading Nature and Dividend Payable*

As at December 31, 2005, we had amounts due to related parties with non-trading nature of RMB 59.5 million, except for the amounts due to minority shareholders of a subsidiary of RMB 37.3 million, the balances due to related parties with non-trading nature as at December 31, 2005 were settled prior to March 3, 2006. In addition, as at December 31, 2005, we had dividend payable of approximately RMB 69.2 million, the entire amount of which was paid prior to March 2, 2006.

ALRMH-CNBM00000276

---

# FINANCIAL INFORMATION

---

### *Contingent Liabilities*

We had certain contingent liabilities arising from guarantees given to banks in respect of banking facilities utilized by Independent Third Parties. The table below sets out the undiscounted maximum amount of potential future payments under such guarantees:

| | As at December 31, | | | As at September 30, | As at December 31, |
|---|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 | 2005 |
| | | | | | (unaudited) |
| | | (RMB in millions) | | | |
| Guarantees given to banks in respect of banking facilities utilized by Independent Third Parties . . . . . . . . . . . . . | 85.5 | 87.5 | 55.0 | 144.5 | 144.5 |

All such guarantees were released prior to the Listing Date.

Furthermore, we have certain contingent liabilities arising from the Reorganization, which are under indemnification undertakings by Parent. See "*History, Reorganization and Group Structure — Reorganization.*"

The Directors confirm that there has been no material change in our contingent liabilities since December 31, 2005.

### *Other Liabilities*

Except as disclosed above and other than intra-group liabilities, which have been disregarded for these purposes, the Company did not have any outstanding loan capital, bank overdrafts, liabilities under acceptances or other similar indebtedness, debentures, mortgages, charges or loans or acceptance credits or hire purchase commitments, or guarantees or other material contingent liabilities outstanding as at December 31, 2005.

### Capital Commitments

The following table presents our capital commitments as at the dates indicated:

| | As at December 31, | | | As at September 30, |
|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 |
| | | (RMB in millions) | | |
| Capital expenditure of the company in respect of acquisition of property, plant and equipment contracted for but not provided . . . . . . . . . . . . | 42.9 | 450.7 | 649.2 | 551.7 |

ALRMH-CNBM00000277

# FINANCIAL INFORMATION

The Directors confirm that there has been no material change in our capital commitments since September 30, 2005.

## Capital Expenditures

Our capital expenditures comprise purchases of property, plant and equipment. The following table shows our capital expenditures by segment for the periods indicated:

| | For the year ended December 31, | | | For the nine months ended September, 30 |
|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 |
| | (RMB in millions) | | | |
| Cement | 123.3 | 108.6 | 814.3 | 530.8 |
| Lightweight building materials | 91.3 | 110.4 | 830.3 | 408.4 |
| Glass fiber and FRP products | 18.6 | 9.1 | 34.6 | 36.2 |
| Engineering services | 4.3 | 12.7 | 10.8 | 10.0 |
| Total | 237.5 | 240.8 | 1,690.0 | 985.4 |

The following table sets out our current estimate of capital expenditures in fixed assets investment for the year ended December 31, 2005, by segments:

| | For the year ended December 31, 2005 | |
|---|---|---|
| | (unaudited) | |
| | (RMB in millions) | % of total |
| Cement | 630.0 | 55.1 |
| Lightweight building materials | 455.6 | 39.8 |
| Glass fiber and FRP products | 42.7 | 3.7 |
| Engineering services | 14.2 | 1.2 |
| Others | 1.8 | 0.2 |
| Total | 1,144.3 | 100 |

The actual amounts of expenditures incurred may vary from the estimated amounts of expenditures for a variety of reasons, including changes in market conditions and other factors. Our ability to obtain additional funding required for increased capital expenditure in the future is subject to a variety of uncertainties including the future results of our operations, financial condition and cash flows, and economic and political and other conditions in the PRC and Hong Kong.

ALRMH-CNBM00000278

# FINANCIAL INFORMATION

## MARKET RISKS

We are exposed to various types of market risks in the normal course of our business, including changes in interest rates, foreign exchange risks and inflation.

### Interest Rate

We are exposed to risks resulting from fluctuations in interest rates on our debt. We undertake debt obligations to support general corporate purposes, including capital expenditures and working capital needs. Our loans bear interest at rates that are subject to adjustment by our lenders in accordance with changes in relevant PBOC regulations. If the PBOC increases interest rates, our finance costs will increase. In addition, to the extent that we may need to raise debt financing in the future, upward fluctuations in interest rates will increase the cost of new debt.

### Foreign Exchange

We collect a large majority of our revenue in Renminbi, some of which need to be converted into foreign currencies to purchase imported raw materials and to pay dividends to our shareholders. Therefore we have a certain level of exposure to foreign exchange fluctuations. The exchange rate for Renminbi has been relatively stable during the past few years. Renminbi is not a freely convertible currency. However, the PRC Government may take actions that could cause future exchange rates to vary significantly from current or historical exchange rates. Fluctuations in exchange rates may adversely affect the value, translated or converted into Hong Kong dollars, of our net assets, earnings and any dividends we declare. See "*Risk Factors — Risks Relating to the PRC — Changes in foreign exchange regulations may adversely affect the Group's results of operations.*"

### Inflation

In recent years, the PRC has not experienced significant inflation, and thus inflation has not had a significant effect on our business during the past three years. According to the National Bureau of Statistics of the PRC, the changes in the consumer price index in the PRC were (0.8)%, 1.2% and 3.9% for the years 2002, 2003 and 2004, respectively. We have not been materially and adversely affected by any recent inflationary or deflationary pressures in China.

## RELATED PARTY TRANSACTIONS

Our independent auditors have determined that certain of our related party transactions conducted during the Track Record Period were not conducted in normal commercial terms. See note 40 of "*Appendix I — Accountants' Report.*" Had the related party transactions in question been conducted on normal commercial terms, the net effect would be an increase of the gross profit of the Group by approximately RMB 5 million for each of the two years ended December 31, 2002 and 2003 and a reduction of the gross profit of the Group by not more than RMB 3 million for the year ended December 31, 2004.

## DISCLOSURE REQUIRED UNDER THE LISTING RULES

The Directors have confirmed that there are no circumstances which, had we been required to comply with Rules 13.13 to 13.19 in Chapter 13 of the Listing Rules, would have given rise to a disclosure requirement under Rules 13.13 to 13.19 in Chapter 13 of the Listing Rules.

— 275 —

ALRMH-CNBM00000279

# FINANCIAL INFORMATION

## DIVIDENDS

The Board decides whether to pay any dividend and in what amount based on our results of operations, cash flows, financial condition, capital requirements, future prospects, statutory and regulatory restrictions on the payment of dividends by the Company and other factors that the Board deems relevant. Any dividend for a financial year declared by the Board shall be subject to Shareholders' approval. If the Board decides to pay dividends, holders of H Shares will be entitled to receive dividends in proportion to their shareholdings.

Under the Company Law and our Articles of Association, all of the Shareholders have equal rights to dividends and distribution.

The Company may only distribute dividends after it has made allowance for:

- recovery of accumulated losses, if any;

- appropriations to the statutory surplus reserve equivalent to 10% of our profit attributable to equity holders of the Company available for appropriation, as determined under PRC GAAP; no further appropriations to the statutory surplus reserve are required once this reserve reaches an amount equal to 50% of our registered capital;

- appropriations to the statutory public welfare fund equivalent to between 5% and 10% of our profit attributable to equity holders of the Company available for appropriation, as determined under PRC GAAP; and

- appropriations to a discretionary surplus reserve fund, if any, that are approved by the Shareholders in an annual Shareholders' meeting.

Under PRC law, dividends may be paid only out of distributable profits, which are the Company's retained earnings, as determined in accordance with PRC GAAP or IFRS, whichever is lower, less any accumulated loss and appropriations to the statutory and discretionary reserve funds. Any distributable profits that are not distributed in a given year are retained and available for distribution in subsequent years. However, the Company will not ordinarily pay any dividends in a year in which the Company does not have any distributable earnings in respect of that year.

The Company was converted into a joint stock limited company on March 28, 2005. Prior to such conversion, CNBM Equipment did not declare or pay any dividend for the years ended December 31, 2002, 2003 and 2004. The dividends reflected on our audited consolidated financial statements for the years ended December 31, 2002, 2003 and 2004 in the amount of approximately RMB 17.3 million, RMB 20.8 million and RMB 27.8 million, respectively, represented the amount of dividends declared and paid by BNBM, which became a subsidiary of the Company as a result of the Reorganization. BNBM is a public company listed in the PRC. Neither the Company nor CNBM Equipment received any such dividends, which were declared and paid prior to September 30, 2004. See "*History, Reorganization and Group Structure.*"

— 276 —

ALRMH-CNBM00000280

# FINANCIAL INFORMATION

In accordance with the "Provisional Regulations Relating to Corporate Reorganization of Enterprises and Related Management of State-owned Capital and Financial Treatment" issued by the Ministry of Finance, the Company is required to make a distribution to Parent and BNBMG, its shareholders prior to the conversion of the Company, in an amount equal to the profit attributable to equity holders of the Company generated during the period from October 1, 2004 to March 27, 2005, the date immediately prior to the conversion of the Company to a joint stock limited company, from the business and operations contributed to the Group by Parent and BNBMG, respectively, pursuant to the Reorganization. The Company has declared a dividend in an aggregate amount of RMB 135.6 million to Parent and BNBMG in respect of this period, of which RMB 57.3 million payable to Parent was settled through eliminating the receivable of the same amount from Parent, and the remainder was paid on March 3, 2006.

For the period between March 28, 2005 and December 31, 2005, the Board currently intends to recommend a final dividend of no less than 30% of the distributable profits during the period. However, the final determination to pay such dividends will be made at the discretion of our Board of directors and will be based upon our earnings, cash flow, financial condition, capital requirements, and any other conditions that the Board may deem relevant. The payment of dividends may be limited by legal restrictions and by financing agreements that we may enter into in the future.

## ADJUSTED NET TANGIBLE ASSETS

The following statement of adjusted net tangible assets of the Company is prepared based on the net tangible assets of the Company as set out in "*Appendix I — Accountants' Report*" adjusted as described below.

The unaudited pro forma adjusted net tangible assets has been prepared to show the effect on the audited consolidated net tangible assets attributable to the equity holders of the Company as at September 30, 2005 and the Global Offering had occurred on September 30, 2005.

The following statement of unaudited pro forma net tangible assets of the Group as at September 30, 2005 is based on audited consolidated net tangible assets attributable to the equity holders of the Company as at September 30, 2005, as shown in the *Accountants' Report*, set out in Appendix I to this prospectus and the adjustments described below.

| | Audited consolidated net tangible assets attributable to the equity holders of the Company as at September 30, 2005[1] | Estimated net proceeds from the Global Offering[2] | Unaudited pro forma adjusted net tangible assets | Unaudited pro forma adjusted net tangible assets per Share | |
|---|---|---|---|---|---|
| | (RMB '000) | (RMB '000) | (RMB '000) | (RMB) | (HK$) |
| Based on the Offer Price of HK$2.30 for each Offer Share . . . . | 1,905,461 | 1,303,138 | 3,208,599 | 1.62 | 1.56 |
| Based on the Offer Price of HK$2.75 for each Offer Share . . . . | 1,905,461 | 1,570,674 | 3,476,135 | 1.75 | 1.69 |

— 277 —

ALRMH-CNBM00000281

# FINANCIAL INFORMATION

*Notes:*

(1)   The adjusted consolidated net tangible assets attributable to the equity holders of the Company as at September 30, 2005 have been extracted with adjustments on goodwill and intangible assets of RMB 56,480,000 and RMB 23,050,000 respectively, from the *Accountants' Report* set out in Appendix I to this prospectus.

(2)   The estimated net proceeds form the Global Offering are based on the Offer price of HK$2.30/HK$2.75 per Share, after deduction of the underwriting fees and other related expenses payable by us. No account has been taken of the Shares which may be issued pursuant to any exercise of the Over-allotment Option.

(3)   The Group's property interests were valued by Sallmanns (Far East) Limited ("Sallmanns") and the valuation in respect of which was set out in Appendix IV to this prospectus. Pursuant to the valuation performed by Sallmanns, the Group's property interests as at December 31, 2005 amounted to approximately RMB 2,881,318,000. Comparing the valuation amount as at December 31, 2005 to the unaudited net book value of the Company's property interests as at December 31, 2005 of RMB 2,346,851,000, there was a difference of approximately RMB 534,467,000 which will not be included in the Group's annual report for the year ended December 31, 2005. Had the properties been stated at the valuation amount, additional depreciation of approximately RMB 10,358,000 would have been charged for the year ended December 31, 2005.

(4)   The unaudited pro forma net tangible asset value per Share is arrived at after the adjustments referred to in the preceding paragraphs and on the basis that 1,982,500,000 Shares (being the number of shares expected to be in issue immediately after completion of the Global Offering, without taking into account of any shares which may be issued upon the exercise of the Over-allotment Option) were in issue as at September 30, 2005.

## PROFIT ESTIMATE

We estimate that, based on our audited results for the nine months ended September 30, 2005 and our unaudited management accounts for the three months ended December 31, 2005 and on the bases set out in Appendix III to this prospectus and in the absence of unforeseen circumstances, our estimated consolidated profit attributable to equity holders of the Company for the year ended December 31, 2005 will not be less than RMB 350 million under IFRS.

On a pro forma fully diluted basis and on the assumption that we had been listed since January 1, 2005 and a total of 1,982,500,000 Shares were issued and outstanding during the entire year (taking no account of any Shares which may be issued upon exercise of the Over-allotment Option), the estimated earnings per Share for the year ended December 31, 2005 will not be less than RMB 0.18 (HK$0.17) representing a price/earnings multiple of 13.50 times and 16.14 times if the Offer Price is HK$2.30 per Share and HK$2.75 per Share, respectively.

The texts of letters from the reporting accountants, Deloitte Touche Tohmatsu, and from the Sponsor in respect of the profit estimate are set out in Appendix III to this prospectus.

## PROPERTY

Particulars of the Company's property interests are set out in Appendix IV to this prospectus. Sallmanns (Far East) Limited has valued the property interests of the Company as at December 31, 2005. A summary of values and valuation certificates issued by Sallmanns (Far East) Limited are included in Appendix IV to this prospectus.

ALRMH-CNBM00000282

# FINANCIAL INFORMATION

The table below sets forth (i) the reconciliation of properties interests of the Group from its audited consolidated financial statements as at September 30, 2005 to the unaudited net book value of the Group's property interests as at December 31, 2005; and (ii) the reconciliation of the unaudited net book value of the Group's property interests and the valuation of such property interests as at December 31, 2005:

|  | (RMB in thousands) |
|---|---|
| Net book value of property interests of the Group as at September 30, 2005 | |
| — Land and buildings | 1,212,030 |
| — Construction in progress *(Note)* | 412,174 |
| — Investment properties | 288,822 |
| — Land use rights | 306,541 |
| | 2,219,567 |
| Movements for the three months ended December 31, 2005 | |
| Additions | 149,878 |
| Depreciation | (14,404) |
| Disposals | (8,190) |
| Net book value as at December 31, 2005 | 2,346,851 |
| Valuation surplus as at December 31, 2005 | 534,467 |
| Valuation as at December 31, 2005 per Appendix IV | 2,881,318 |

*Note:*   The net book value of property interests of the Group as at September 30, 2005 has been extracted with adjustment on construction in progress not relating to the Group's property interests of RMB 1,000,448,000.

## DISTRIBUTABLE RESERVES

According to the Company's Articles of Association, the amount of retained profits available for distribution to the Shareholders is the lower of the amount determined in accordance with the PRC accounting rules and regulations and the amount determined in accordance with IFRS. At September 30, 2005, the amount of retained profits available for distribution was approximately RMB 20.0 million, as determined in accordance with IFRS.

## NO MATERIAL ADVERSE CHANGE

The Directors have confirmed that there has been no material adverse change in our financial or trading position since September 30, 2005, being the date of our latest audited combined financial results as set out in "*Appendix I — Accountants' Report*" to this prospectus.

ALRMH-CNBM00000283

## FUTURE PLANS AND USE OF PROCEEDS

**Future Plans**

For descriptions of our corporate strategies, please refer to the sections entitled *"Business — Cement Segment — Corporate Strategy," "Business — Lightweight Building Materials Segment — Corporate Strategy," "Business — Glass Fiber and FRP Products Segment — Corporate Strategy,"* and *"Business — Engineering Services Segment — Corporate Strategy."*

**Use of Proceeds**

The listing expenses in relation to the Global Offering will be borne by the Company and the Selling Shareholders in proportion to the number of Offer Shares to be issued by the Company and the number of Sale H Shares to be sold by the Selling Shareholders. The net proceeds of the Global Offering accruing to the Company (after deduction of underwriting fees and estimated expenses payable by the Company in relation to the Global Offering, assuming the Over-allotment Option is not exercised) are estimated to be approximately HK$1,258 million, assuming an Offer Price of HK$2.30 per H Share, or approximately HK$1,516 million, assuming an Offer Price of HK$2.75 per H Share, (or if the Over-allotment Option is exercised in full, such net proceeds are estimated to be approximately HK$1,456 million, assuming an Offer Price of HK$2.30 per H Share, or approximately HK$1,753 million, assuming an Offer Price of HK$2.75 per H Share). The Company currently intends to use all the net proceeds from the Global Offering for the following purposes:

(i)   up to approximately HK$350 million for a clinker production line (including approximately HK$150 million for equipment and approximately HK$100 million for engineering and construction, with the remaining being used for other costs) for Qingzhou with a daily clinker production capacity of 6,000 tonnes, which is expected to be completed by the end of 2006;

(ii)  up to approximately HK$250 million for a clinker production line (including approximately HK$110 million for equipment and approximately HK$75 million for engineering and construction, with the remaining being used for other costs) for Nanyang with a daily clinker production capacity of 6,000 tonnes, which is expected to be completed in the second quarter of 2007;

(iii) up to approximately HK$140 million for a gypsum board production line with an annual production capacity of 50 million square meters, which is expected to commence operation in the second half of 2006;

(iv)  up to approximately HK$150 million for a glass fiber reinforced cement board production line with an annual production capacity of 1.8 million square meters, which is expected to commence operation in the second half of 2006;

(v)   up to approximately HK$50 million for a glass fiber mat production line with an annual production capacity of 70 million square meters for Zhongxin Tianma, which is expected to commence commercial production in the first quarter of 2006;

(vi)  up to approximately HK$40 million for the phase I of a cement grinding station for Fuyang Julong with an annual production capacity of 750,000 tonnes, which is expected to be completed in the second quarter of 2006;

ALRMH-CNBM00000284

## FUTURE PLANS AND USE OF PROCEEDS

(vii)  up to approximately HK$25 million for the phase I of a cement grinding station for Suqian Julong with an annual production capacity of 750,000 tonnes, which is expected to be completed in the second quarter of 2006;

(viii) repayment of outstanding bank borrowings due in August 2006 totaling approximately RMB 100 million which were utilized by our cement segment to finance working capital and have an interest rate of 5.58% per annum; and

(ix)  the remainder for (1) repayment of a portion of the Company's outstanding short-term working capital loans in the aggregate amount of up to approximately RMB 620 million which carry interest rates ranging from 4.7% to 5.6% per annum, including loans in the aggregate amount up to approximately RMB 320 million for the Company at the corporate level, RMB 80 million for China Composites and RMB 220 million for China United and (2) working capital purposes, but not more than 10% of the total net proceeds accruing to the Company will be used for working capital purposes.

Assuming that the Over-allotment Option is exercised in full, the additional net proceeds of approximately HK$198 million, assuming an Offer Price of HK$2.30 per H Share, or approximately HK$237 million, assuming an Offer Price of HK$2.75 per H Share, will be applied for (1) repayment of a further portion of the Company's outstanding short-term working capital loans which carry interest rates ranging from 4.7% to 5.6% per annum and (2) working capital purposes, but not more than 10% of the total net proceeds accruing to the Company will be used for working capital purposes.

To the extent that the net proceeds from the Global Offering to the Company are not immediately applied for the above purposes, our Directors presently intend that the amount will be placed on short-term deposits with banks or financial institutions.

The net proceeds from the sale of the Sale H Shares by the Selling Shareholders in the Global Offering (after deducting underwriting fees and estimated expenses payable by the Selling Shareholders in connection with the Global Offering and assuming the Over-allotment Option is not exercised) are estimated to be approximately HK$126 million, assuming an Offer Price of HK$2.30 per H Share, or approximately HK$152 million, assuming an Offer Price of HK$2.75 per H Share. If the Over-allotment Option is exercised in full, such net proceeds are estimated to be approximately HK$146 million, assuming an Offer Price of HK$2.30 per H Share, or approximately HK$175 million, assuming an Offer Price of HK$2.75 per H Share. The Company will not receive any of such proceeds. In accordance with relevant PRC laws and regulations, the Selling Shareholders will be required to contribute the net proceeds they receive from the Global Offering to the National Social Security Fund.

In accordance with the PRC accounting rules applicable to joint stock limited companies, the net proceeds from the Global Offering received by the Company in a currency other than Renminbi will be converted and accounted for in the Company's consolidated financial statements at the PBOC Rate in effect at the time when the net proceeds are received.

ALRMH-CNBM00000285

# UNDERWRITING

## HONG KONG UNDERWRITERS

### Lead Manager

Morgan Stanley Dean Witter Asia Limited

### Co-Lead Managers (in alphabetical order)

China International Capital Corporation (Hong Kong) Limited

Daiwa Securities SMBC Hong Kong Limited

### Co-Managers (in alphabetical order)

BCOM Securities Company Limited

China Merchants Securities (HK) Co. Limited

First Shanghai Securities Limited

Guotai Junan Securities (Hong Kong) Limited

Prudential Brokerage Limited

## UNDERWRITING ARRANGEMENTS AND EXPENSES

### Hong Kong Public Offering

#### *Hong Kong Underwriting Agreement*

Pursuant to the Hong Kong Underwriting Agreement, the Company is offering initially 65,422,000 Public Offer Shares for subscription by the public in Hong Kong on and subject to the terms and conditions of this prospectus and the Application Forms. Subject to the Listing Committee of the Stock Exchange granting the listing of, and permission to deal in, the H Shares (including the additional H Shares which may be made available pursuant to the exercise of the Over-allotment Option) mentioned herein and to certain other conditions set out in the Hong Kong Underwriting Agreement, the Hong Kong Underwriters have agreed severally to subscribe or procure subscribers for their respective applicable proportions of the Public Offer Shares now being offered which are not taken up under the Hong Kong Public Offering on the terms and conditions of this prospectus, the Application Forms and the Hong Kong Underwriting Agreement.

The Hong Kong Underwriting Agreement is conditional upon, and subject to the International Underwriting Agreement having been signed and becoming unconditional.

ALRMH-CNBM00000286

# UNDERWRITING

*Grounds for termination*

The obligations of the Hong Kong Underwriters to subscribe or procure subscribers for the Public Offer Shares under the Hong Kong Underwriting Agreement are subject to termination, if, at any time prior to 8:00 a.m. on the day that trading in the Offer Shares commences on the Stock Exchange:

(i)   there shall have developed, occurred, happened or come into effect any event or series of events, matters or circumstances concerning or relating to:

    (a)   any new law or regulation or any change in existing laws or regulations or any change in the interpretation or application thereof by any court or other competent authority in Hong Kong, the U.S., the PRC, the United Kingdom or Japan;

    (b)   any change or development, or any event or series of events likely to result in any change or development, in local, national or international financial, political, legal, military, industrial, economic, fiscal, regulatory, currency or securities or financial market conditions or any monetary or trading settlement system (including but not limited to a change in the system under which the value of the Hong Kong currency is linked to that of the U.S. or a revaluation of the Renminbi against any foreign currencies) in Hong Kong, the U.S., the PRC, the United Kingdom or Japan;

    (c)   any suspension or material limitation in trading of any of the securities of the Company or any member of the Group or China Fiberglass or Yaohua on any exchange or over-the-counter market or any major disruption in commercial banking or securities settlement or clearing services in Hong Kong, the U.S., the PRC, the United Kingdom or Japan;

    (d)   the imposition of any moratorium, suspension or material restriction on trading in securities generally on the Stock Exchange, the Shenzhen Stock Exchange, the Shanghai Stock Exchange or New York Stock Exchange;

    (e)   a change, or a development occurs involving a prospective change, in taxation or exchange control (or the implementation of any exchange control) in Hong Kong, the PRC, the U.S., the United Kingdom or Japan;

    (f)   any adverse change or prospective adverse change in the business or in the financial or trading position or prospects of the Company or any member of the Group or China Fiberglass or Yaohua including any litigation, claim or arbitral proceeding being threatened or instigated against the Company or any member of the Group or China Fiberglass or Yaohua;

    (g)   any act of God, war, riot, public disorder, civil commotion, economic sanctions, fire, flood, explosion, epidemic, outbreak of an infectious disease, terrorism, strike or lock-out and any local, national, regional or international outbreak or escalation of hostilities (whether or not war is or has been declared) or other state of emergency or calamity or crisis (whether or not covered by insurance) affecting Hong Kong, the PRC, the U.S., the United Kingdom or Japan; or

ALRMH-CNBM00000287

## UNDERWRITING

    (h)    any change or prospective change, or a materialisation of, any of the risks set out in the section headed "Risk Factors" in this prospectus,

which in the sole opinion of the Global Coordinator (for itself and on behalf of the Hong Kong Underwriters):

    (i)    is or may be, or is likely to be, materially adverse to the general affairs, management, business, financial, trading or other condition or prospects of the Company or the Group, China Fiberglass and Yaohua taken as a whole or, in the case of sub-paragraph (e) above, to any present or prospective shareholder of the Company in his/its capacity as such;

    (j)    has or may have, or is likely to have, a material adverse effect on the success of the Global Offering or the level of Offer Shares being applied for, accepted, subscribed for or purchased or the distribution of Offer Shares; or

    (k)    makes it inadvisable, impracticable or inexpedient to proceed with the Global Offering or the delivery of the Offer Shares on the terms and in the manner contemplated in this prospectus;

(ii)    there comes to the notice of the Global Coordinator any matter or event showing any of the representations, warranties and undertakings given by the Company or any of the Controlling Shareholders in the Hong Kong Underwriting Agreement to be untrue, incorrect, inaccurate or misleading when given or repeated; or there has been a material breach on the part of the Company and/or any of the Controlling Shareholders of any of the provisions of the Hong Kong Underwriting Agreement;

(iii)    there comes to the notice of the Global Coordinator that any matter has arisen or has been discovered which would, had it arisen immediately before the date of this prospectus, not having been disclosed in this prospectus, constitute a material omission therefrom;

(iv)    there comes to the notice of the Global Coordinator that any statement contained in this prospectus has become or been discovered to be untrue, incorrect or misleading in any material respect;

(v)    there comes to the notice of the Global Coordinator that there shall have occurred any event, act or omission which gives or is likely to give rise to any material liability of the Company or any of the Controlling Shareholders pursuant to the indemnities in the Hong Kong Underwriting Agreement;

(vi)    a valid demand by any creditor for repayment or payment of any indebtedness of the Company, any other member of the Group, China Fiberglass or Yaohua or in respect of which the Company, any other member of the Group, China Fiberglass or Yaohua is liable prior to its stated maturity which demand has or could reasonably be expected to have a material adverse effect on the Company or the Group, China Fiberglass and Yaohua taken as a whole; or

(vii)    a petition is presented for the winding-up or liquidation of the Company, any other member of the Group, China Fiberglass or Yaohua, or the Company, any other member of the Group, China Fiberglass or Yaohua makes any composition or arrangement with its creditors or enters into a

ALRMH-CNBM00000288

## UNDERWRITING

scheme of arrangement or any resolution is passed for the winding-up of the Company, any other member of the Group, China Fiberglass or Yaohua or a provisional liquidator, receiver or manager is appointed over all or part of the assets or undertaking of the Company, any other member of the Group, China Fiberglass or Yaohua or anything analogous thereto occurs in respect of the Company, any other member of the Group, China Fiberglass or Yaohua which in the sole opinion of the Global Coordinator may or is likely to be material in the context of the Global Offering provided that the Global Coordinator shall, to the extent practicable, seek to consult with the Company on the effect of any such development,

then the Global Coordinator (for itself and on behalf of the Hong Kong Underwriters) may, in its sole and absolute discretion, after prior consultation with, and upon giving notice in writing to the Company and the other Hong Kong Underwriters, terminate the Hong Kong Underwriting Agreement with immediate effect.

*Undertakings*

For the purpose of Rule 10.08 of the Listing Rules, the Company has undertaken to the Stock Exchange that no further shares or securities convertible into equity securities of the Company (whether or not a class already listed) may be issued or form the subject of any agreement to such an issue within six months from the date on which the H Shares first commence dealing on the Stock Exchange (whether or not such issue of shares or securities will be completed within six months from the commencement of dealing), except under the circumstances set out in Rule 10.08 of the Listing Rules.

For the purpose of Rule 10.07(1) of the Listing Rules, each Controlling Shareholder has undertaken to the Stock Exchange that, except pursuant to the Global Offering (including the exercise of the Over-allotment Option), it shall not and shall procure that the relevant registered holder shall not:

(a)  in the period commencing on the date by reference to which disclosure of the shareholding of the Controlling Shareholders is made in this prospectus and ending on the date which is six months from the date on which dealings in the H Shares commence on the Stock Exchange, dispose of, nor enter into any agreement to dispose of or otherwise create any options, rights, interests or encumbrances in respect of, any of those shares or securities of the Company in respect of which it is shown by this prospectus to be the beneficial owner; or

(b)  in the period of six months commencing on the date on which the six-month period referred to under (a) above expires, dispose of, nor enter into any agreement to dispose of or otherwise create any options, rights, interests or encumbrances in respect of, any of the shares or securities referred to in (a) above if, immediately following such disposal or upon the exercise or enforcement of such options, it would cease to be a controlling shareholder (as defined in the Listing Rules) of the Company.

Pursuant to Note (3) to Rule 10.07(2) of the Listing Rules, each Controlling Shareholder has undertaken to the Stock Exchange and the Company that, within the period commencing on the date by reference to which disclosure of shareholding the Controlling Shareholders is made in this prospectus and ending on the date which is 12 months from the date on which dealings in the H Shares commence on the Stock Exchange, it will (A) if and when it pledges or charges any securities of the Company beneficially owned by it in favour

ALRMH-CNBM00000289

## UNDERWRITING

of an authorized institution pursuant to Note (2) to Rule 10.07(2), immediately inform the Company of such pledge or charge together with the number of securities so pledged or charged; and (B) if and when it receives indications, either verbal or written, from any pledgee or chargee that any of the pledged or charged securities of the Company will be disposed of, immediately inform the Company of such indications.

The Company undertakes to inform the Stock Exchange as soon as it has been informed of the matters under (A) or (B) above by any Controlling Shareholder and disclose such matters by way of an announcement which is published in the newspapers as soon as possible.

The Company has undertaken to the Global Coordinator and each of the Hong Kong Underwriters pursuant to the Hong Kong Underwriting Agreement and will undertake to the Global Coordinator and each of the International Underwriters pursuant to the International Underwriting Agreement that, except pursuant to the Global Offering (including the exercise of the Over-allotment Option), it will not without the prior written consent of the Global Coordinator (on behalf of the Hong Kong Underwriters) and unless in compliance with the Listing Rules:

(i) during the period commencing on the date of the Hong Kong Underwriting Agreement and the International Underwriting Agreement, respectively, and ending six months after the date on which dealings in the H Shares commence on the Stock Exchange (the "**First Six-Month Period**"):

    (a) offer, accept subscription for, pledge, charge, allot, issue, repurchase, sell, mortgage, assign, contract to allot, issue or sell, sell any option or contract to purchase, purchase any option or contract to sell, grant or agree to grant any option, right or warrant to purchase or subscribe for, lend or otherwise transfer or dispose of, either directly or indirectly, conditionally or unconditionally, any H Share or any other share capital or other securities of the Company or any interest therein (including, but not limited to, any securities convertible into or exercisable or exchangeable for, or that represent the right to receive any such share capital or securities of the Company or any interest therein);

    (b) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any such share capital or securities of the Company or any interest therein; or

    (c) agree or contract to, or publicly announce any intention to enter into, any transaction described in paragraphs (i)(a) or (b) above,

    whether any such transaction described in paragraphs (i)(a) or (b) above is to be settled by delivery of H Shares and/or other shares of the Company or other securities, in cash or otherwise; or

(ii) during the six-month period immediately following the First Six-Month Period (the "**Second Six-Month Period**"), enter into any of the transactions in paragraphs (i)(a) or (b) above or agree or contract to, or publicly announce an intention to enter into any such transaction without taking all reasonable steps to ensure that such act and transaction will not create a disorderly or false market for the H Shares in breach of any relevant laws or regulations, any other shares and/or other securities of the Company.

ALRMH-CNBM00000290

# UNDERWRITING

Each of the Selling Shareholders has undertaken to the Global Coordinator, and each of the Hong Kong Underwriters pursuant to the Hong Kong Underwriting Agreement (and, in the case of Cinda, pursuant to a separate undertaking) and will undertake to the Global Coordinator and each of the International Underwriters pursuant to the International Underwriting Agreement that, except pursuant to the Global Offering (including the exercise of the Over-allotment Option), it will not without the prior written consent of the Global Coordinator (on behalf of the Hong Kong Underwriters) and unless in compliance with the Listing Rules:

(iii)  during the First Six-Month Period:

(a)  offer, pledge, charge, sell, mortgage, assign, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant or agree to grant any option, right or warrant to purchase or subscribe for, lend or otherwise transfer or dispose of, either directly or indirectly, conditionally or unconditionally, any H Share or any other share capital or other securities of the Company or any interest therein (including, but not limited to, any securities convertible into or exercisable or exchangeable for, or that represent the right to receive any such share capital or other securities of the Company or any interest therein);

(b)  enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any share capital or securities of the Company or any interest therein; or

(c)  agree or contract to, or publicly announce any intention to enter into, any transaction described in paragraphs (iii)(a) or (b) above,

whether any such transaction described in paragraphs (iii)(a) or (b) above is to be settled by delivery of H Shares and/or other shares of the Company or other securities, in cash or otherwise; or

(iv)  during the Second Six-Month Period, enter into any of the transactions in paragraphs (iii)(a) or (b) above or agree or contract to, or publicly announce an intention to enter into any such transaction without taking all reasonable steps to ensure that such act and transaction will not create a disorderly or false market for the H Shares in breach of any relevant laws or regulations, any other shares and/or other securities of the Company.

The Company and the Controlling Shareholders have agreed to jointly and severally indemnify the Hong Kong Underwriters for certain losses which they may suffer, including losses incurred arising from their performance of their obligations under the Hong Kong Underwriting Agreement and any breach by the Company and/or the Controlling Shareholders of the Hong Kong Underwriting Agreement.

— 287 —

ALRMH-CNBM00000291

## UNDERWRITING

*Hong Kong Underwriters' Interests in the Company*

Save as disclosed in this prospectus and save for its obligations under the Hong Kong Underwriting Agreement, none of the Hong Kong Underwriters has any shareholding interests in the Company or the right or option (whether legally enforceable or not) to subscribe for or nominate persons to subscribe for securities in the Company or any of its subsidiaries.

The Company has in accordance with Rule 3A.19 of the Listing Rules retained Anglo Chinese Corporate Finance, Limited as its compliance adviser. The term of the appointment shall commence on the Listing Date and end on the date on which the Company complies with Rule 13.46 of the Listing Rules in respect of its financial results for the first full financial year commencing after the Listing Date.

**International Placing**

*International Underwriting Agreement*

In connection with the International Placing, the Company and the Selling Shareholders expect to enter into the International Underwriting Agreement with the International Underwriters. Under the International Underwriting Agreement, the International Underwriters to be named therein would severally agree to purchase the International Placing Shares or procure purchasers for the International Placing Shares offered in the International Placing.

Under the International Underwriting Agreement, the Company and the Selling Shareholders intend to grant to the International Underwriters the Over-allotment Option, exercisable by the Global Coordinator on behalf of the International Underwriters for up to 30 days from the last day for lodging of application under the Hong Kong Public Offering, to require the Company to issue up to 89,200,000 additional Offer Shares, and the Selling Shareholders to sell up to 8,920,000 additional Offer Shares, in aggregate representing approximately 15% of the number of Offer Shares initially available under the Global Offering. These Offer Shares will be issued or sold at the Offer Price and will be solely for the purpose of covering over-allocations in the International Placing, if any.

The Company and the Selling Shareholders will agree to jointly and severally indemnify the International Underwriters against certain liabilities, including liabilities under the U.S. Securities Act.

*Commission and Expenses*

The Hong Kong Underwriters will receive a commission of 3.5% of the aggregate Offer Price of the Public Offer Shares initially offered under the Hong Kong Public Offering, out of which they will pay any sub-underwriting commission. For unsubscribed or unpurchased Public Offer Shares reallocated to the International Placing, the Company will pay an underwriting commission at the rate applicable to the International Placing and such commission will be paid to the International Underwriters and not the Hong Kong Underwriters.

ALRMH-CNBM00000292

# UNDERWRITING

Assuming an Offer Price of HK$2.525 per Offer Share (being the mid-point of the stated offer price range of HK$2.30 to HK$2.75 per Offer Share), the aggregate commissions and fees, together with Stock Exchange listing fees, SFC transaction levy and Stock Exchange trading fee, legal and other professional fees, printing and other expenses relating to the Global Offering, are estimated to amount in aggregate to approximately HK$126 million (assuming the Over-allotment Option is not exercised) in total. Such commissions, fees and expenses are payable by the Company as to HK$115 million and the Selling Shareholders as to HK$11 million, being in proportion to the amount of Offer Shares sold by the Company and the Selling Shareholders in the Global Offering. In addition, the Company may in its sole discretion pay to the Global Coordinator an incentive fee.

ALRMH-CNBM00000293

# STRUCTURE OF THE GLOBAL OFFERING

**The Global Offering**

This prospectus is published in connection with the Hong Kong Public Offering as part of the Global Offering. The Global Offering comprises:

(i) the Hong Kong Public Offering of 65,422,000 H Shares (subject to adjustment as mentioned below) in Hong Kong as described below in the section entitled "*The Hong Kong Public Offering*"; and

(ii) the International Placing of an aggregate of 588,792,000 H Shares (subject to adjustment as mentioned below) outside the United States (including to professional and institutional investors within Hong Kong) in reliance on Regulation S and in the United States to QIBs in reliance on Rule 144A.

Morgan Stanley is the Global Coordinator and the bookrunner of the Global Offering. Morgan Stanley & Co. International Limited is the lead manager of the International Placing. Morgan Stanley is the Sponsor and the lead manager for the Hong Kong Public Offering.

Investors may apply for H Shares under the Hong Kong Public Offering or apply for or indicate an interest for H Shares under the International Placing, but may not do both.

The requisite PRC governmental approvals, including the approval of the CSRC, in respect of the Global Offering have been obtained.

**The Hong Kong Public Offering**

*Number of H Shares initially offered*

The Company is initially offering 65,422,000 H Shares (including Sale H Shares from Selling Shareholders) for subscription by the public in Hong Kong at the Offer Price, representing approximately 10.0% of the total number of H Shares initially available under the Global Offering.

The Hong Kong Public Offering is open to members of the public in Hong Kong as well as to institutional and professional investors. The Offer Shares will represent approximately 33.0% of the Company's registered share capital immediately after completion of the Global Offering, assuming that the Over-allotment Option is not exercised. Professional investors generally include brokers, dealers, companies (including fund managers) whose ordinary business involves dealing in shares and other securities and corporate entities which regularly invest in shares and other securities.

Completion of the Hong Kong Public Offering is subject to the conditions as set out in the section below entitled "*Conditions of the Hong Kong Public Offering.*"

ALRMH-CNBM00000294

# STRUCTURE OF THE GLOBAL OFFERING

*Allocation*

Allocation of H Shares to investors under the Hong Kong Public Offering will be based solely on the level of valid applications received under the Hong Kong Public Offering. The basis of allocation may vary, depending on the number of Public Offer Shares validly applied for by applicants, but, subject to that, will be made strictly on a pro rata basis. Such allocation could, where appropriate, consist of balloting, which would mean that some applicants may receive a higher allocation than others who have applied for the same number of Public Offer Shares, and those applicants who are not successful in the ballot may not receive any Public Offer Shares.

The total number of H Shares available under the Hong Kong Public Offering (after taking account of any reallocation referred to below) is to be divided into two pools for allocation purposes: pool A and pool B. The H Shares in pool A will be allocated on an equitable basis to applicants who have applied for H Shares with an aggregate price of HK$ 5 million (excluding the brokerage, SFC transaction levy and Stock Exchange trading fee payable) or less. The H Shares in pool B will be allocated on an equitable basis to applicants who have applied for H Shares with an aggregate price of more than HK$ 5 million (excluding the brokerage, SFC transaction levy and Stock Exchange trading fee payable). Investors should be aware that applications in pool A and applications in pool B may receive different allocation ratios. If H Shares in one (but not both) of the pools are under subscribed, the surplus H Shares will be transferred to the other pool to satisfy demand in this other pool and be allocated accordingly. For the purpose of this paragraph only, the "price" for H Shares means the price payable on application (without regard to the Offer Price as finally determined). Applicants can only receive an allocation of H Shares from either pool A or pool B but not from both pools. Multiple or suspected multiple applications and any application for more than 32,710,000 H Shares (being the greatest multiple of 2,000 H Shares which does not exceed 50.0% of the 65,422,000 H Shares initially being offered for public subscription under the Hong Kong Public Offering) are liable to be rejected.

*Reallocation*

The allocation of the H Shares between (i) the Hong Kong Public Offering and (ii) the International Placing is subject to adjustment. If the number of H Shares validly applied for under the Hong Kong Public Offering represents (i) 15 times or more but less than 50 times, (ii) 50 times or more but less than 100 times and (iii) 100 times or more of the number of H Shares initially available under the Hong Kong Public Offering, then certain of the H Shares initially being offered for subscription by the Company and placed under the International Placing will be reallocated to the Hong Kong Public Offering. As a result of such reallocation, the total number of H Shares available under the Hong Kong Public Offering will be increased to 196,266,000 H Shares (in the case of (i)), 261,686,000 H Shares (in the case of (ii)) and 327,108,000 H Shares (in the case of (iii)) representing approximately 30.0%, 40.0% and 50.0% of the H Shares initially available under the Global Offering, respectively (before any exercise of the Over-allotment Option). In each case, the additional H Shares reallocated to the Hong Kong Public Offering will be allocated between pool A and pool B and the number of H Shares allocated to the International Placing will be correspondingly reduced in such manner as the Global Coordinator deems appropriate. In addition, the Global Coordinator may allocate H Shares from the International Placing to the Hong Kong Public Offering to satisfy valid applications under the Hong Kong Public Offering.

ALRMH-CNBM00000295

# STRUCTURE OF THE GLOBAL OFFERING

If the Hong Kong Public Offering is not fully subscribed for, the Global Coordinator has the authority to reallocate all or any unsubscribed Public Offer Shares to the International Placing, in such proportions as the Global Coordinator deems appropriate.

### Applications

Each applicant under the Hong Kong Public Offering will also be required to give an undertaking and confirmation in the Application Form submitted by him that he and any person(s) for whose benefit he is making the application have not applied for or taken up, or indicated an interest for, and will not apply for or take up, or indicate an interest for, any H Shares under the International Placing, and such applicant's application is liable to be rejected if the said undertaking and/or confirmation is breached and/or untrue (as the case may be) or it has been or will be placed or allocated H Shares under the International Placing.

The listing of the H Shares on the Stock Exchange is sponsored by the Sponsor. Applicants under the Hong Kong Public Offering are required to pay, on application, the maximum price of HK$2.75 per H Share in addition to any brokerage, SFC transaction levy and Stock Exchange trading fee payable on each H Share. If the Offer Price, as finally determined in the manner described in the section entitled "*Pricing of the Global Offering*" below, is less than the maximum price of HK$2.75 per H Share, appropriate refund payments (including the brokerage, SFC transaction levy and Stock Exchange trading fee attributable to the surplus application monies) will be made to successful applicants, without interest. Further details are set out below in the section entitled "*How to Apply for Public Offer Shares.*"

References in this prospectus to applications, Application Forms, application monies or the procedure for application relate solely to the Hong Kong Public Offering.

## The International Placing

### Number of H Shares offered

Subject to reallocation as described above and the exercise of the Over-allotment Option as described below, the International Placing will consist of an aggregate of 588,792,000 H Shares.

### Allocation

The International Placing will include selective marketing of H Shares to institutional and professional investors and other investors anticipated to have a sizeable demand for such H Shares in Hong Kong and other jurisdictions outside the U.S. in reliance on Regulation S and in the U.S. to QIBs in reliance on Rule 144A. Professional investors generally include brokers, dealers, companies (including fund managers) whose ordinary business involve dealing in shares and other securities and corporate entities which regularly invest in shares and other securities. Allocation of H Shares pursuant to the International Placing will be effected in accordance with the "book-building" process described in the section entitled "*Pricing of the Global Offering*" below and based on a number of factors, including the level and timing of demand, the total size of the relevant investor's invested assets or equity assets in the relevant sector and whether or not it is expected that the relevant investor is likely to buy further H Shares, and/or hold or sell its H Shares, after the listing of the H Shares on the Stock Exchange. Such allocation is intended to result in a distribution of the H Shares on a basis which would lead to the establishment of a solid professional and institutional shareholder base to the benefit of the Company and its shareholders as a whole.

ALRMH-CNBM00000296

# STRUCTURE OF THE GLOBAL OFFERING

The Global Coordinator (on behalf of the Underwriters) may require any investor who has been offered H Shares under the International Placing, and who has made an application under the Hong Kong Public Offering to provide sufficient information to the Global Coordinator so as to allow it to identify the relevant applications under the Hong Kong Public Offering and to ensure that it is excluded from any application of H Shares under the Hong Kong Public Offering.

**Over-allotment Option**

In connection with the Global Offering, the Company and the Selling Shareholders are expected to grant an Over-allotment Option to the International Underwriters exercisable by the Global Coordinator on behalf of the International Underwriters.

Pursuant to the Over-allotment Option, the Global Coordinator has the right, exercisable at any time from the day on which trading of the H Shares commences on the Stock Exchange until 30 days after the last day for lodging applications under the Hong Kong Public Offering, to require the Company to allot and issue up to 89,200,000 additional H Shares, and the Selling Shareholders to sell up to 8,920,000 additional Sale H Shares, in aggregate representing approximately 15% of the initial Offer Shares, at the same price per H Share under the International Placing, solely to cover over-allocations in the International Placing, if any. If the Over-allotment Option is exercised in full, the additional H Shares will represent approximately 4.7% of the Company's enlarged share capital immediately following the completion of the Global Offering and the exercise of the Over-allotment Option. In the event that the Over-allotment Option is exercised, a press announcement will be made.

**Stabilization and Over-allocation**

In connection with the Global Offering, Morgan Stanley, as stabilizing manager, or any person acting for it, on behalf of the Underwriters, may over-allocate or effect transactions with a view to stabilizing or maintaining the market price of the H Shares at a level higher than that which might otherwise prevail for a limited period after the issue date. Please refer to the section entitled "*Information about this Prospectus and the Global Offering — Over-allotment, Stabilization and Over-allocation*" for details regarding stabilization, over-allocation and stock borrowing arrangements in connection with the Global Offering.

**The Selling Shareholders**

The Selling Shareholders are initially offering a total of 59,474,000 Sale H Shares as part of the Global Offering. The Selling Shareholders may sell up to an additional 8,920,000 Sale H Shares if the Over-allotment Option is exercised in full. Pursuant to an approval issued by the SASAC dated May 20, 2005, the Sale H Shares are held by Parent, BNBMG, Cinda, the Building Materials Academy and CNBM Trading as registered holders on behalf of the National Social Security Fund. Accordingly, Parent, BNBMG, Cinda, CNBM Trading and the Building Materials Academy remain the registered holders of the Sale H Shares holding the interest therein for and on behalf of the National Social Security Fund until completion of the Global Offering.

ALRMH-CNBM00000297

# STRUCTURE OF THE GLOBAL OFFERING

The sale of Sale H Shares by the Selling Shareholders in connection with the Global Offering has been approved by a shareholder meeting of the Company and by the SASAC in accordance with the approval from the State Council. In accordance with the relevant PRC regulations, the Selling Shareholders will be required to contribute all the net proceeds from the sale of its Sale H Shares in the Global Offering to the National Social Security Fund.

**Pricing of the Global Offering**

The International Underwriters will be soliciting from prospective investors indications of interest in acquiring H Shares in the International Placing. Prospective professional and institutional investors will be required to specify the number of H Shares under the International Placing they would be prepared to acquire either at different prices or at a particular price. This process, known as "book-building," is expected to continue up to, and to cease on or around, the last day for lodging applications under the Hong Kong Public Offering.

Pricing for the H Shares for the purpose of the various offerings under the Global Offering will be fixed on the Price Determination Date, which is expected to be on or around Thursday, March 16, 2006, and in any event on or before Tuesday, March 21, 2006, by agreement between the Global Coordinator, on behalf of the Underwriters, and the Company, on behalf of itself and the Selling Shareholders, and the number of H Shares to be allocated under various offerings will be determined shortly thereafter.

The Offer Price will not be more than HK$2.75 per H Share and is expected to be not less than HK$2.30 per H Share unless otherwise announced, as further explained below, not later than the morning of the last day for lodging applications under the Hong Kong Public Offering. **Prospective investors should be aware that the Offer Price to be determined on the Price Determination Date may be, but is not expected to be, lower than the indicative offer price range stated in this prospectus.**

The Global Coordinator, on behalf of the Underwriters, may, where considered appropriate, based on the level of interest expressed by prospective professional and institutional investors during the book-building process, and with the consent of the Company, reduce the number of Offer Shares and/or the indicative offer price range below that stated in this prospectus at any time on or prior to the morning of the last day for lodging applications under the Hong Kong Public Offering. In such a case, the Company will, as soon as practicable following the decision to make such reduction, and in any event not later than the morning of the day which is the last day for lodging applications under the Hong Kong Public Offering, cause there to be published in the South China Morning Post and the Hong Kong Economic Times notices of the reduction in the number of Offer Shares and/or the indicative offer price range. Upon issue of such a notice, the revised offer price range will be final and conclusive and the offer price, if agreed upon by the Global Coordinator, on behalf of the Underwriters, and the Company, will be fixed within such revised offer price range. Applicants should have regard to the possibility that any announcement of a reduction in the number of Offer Shares and/or the indicative offer price range may not be made until the day which is the last day for lodging applications under the Hong Kong Public Offering. Such notice will also include confirmation or revision, as appropriate, of the working capital statement and the profit estimate for the year ended December 31, 2005 and the Global Offering statistics as currently set out in this prospectus, and any other financial information which may change as a result of such reduction. **Applicants under the Hong Kong Public Offering should note that in no circumstances can applications be withdrawn once submitted,**

— 294 —

ALRMH-CNBM00000298

# STRUCTURE OF THE GLOBAL OFFERING

**even if the number of Offer Shares and/or the offer price range is so reduced.** In the absence of any such notice so published, the Offer Price, if agreed upon with the Company (on behalf of itself and the Selling Shareholders) and the Global Coordinator (on behalf of the Underwriters), will under no circumstances be set outside the offer price range as stated in this prospectus.

The net proceeds of the Global Offering accruing to the Company (after deduction of underwriting fees and estimated expenses payable by the Company in relation to the Global Offering, assuming the Over-allotment Option is not exercised) are estimated to be approximately HK$1,258 million, assuming an Offer Price per H Share of HK$2.30, or approximately HK$1,516 million, assuming an Offer Price per H Share of HK$2.75 (or if the Over-allotment Option is exercised in full, approximately HK$1,456 million, assuming an Offer Price per H Share of HK$2.30, or approximately HK$1,753 million, assuming an Offer Price per H Share of HK$2.75).

The final Offer Price, the indications of interest in the Global Offering, the results of applications and the basis of allotment of H Shares available under the Hong Kong Public Offering, are expected to be announced on Wednesday, March 22, 2006 in the South China Morning Post and the Hong Kong Economic Times.

## Hong Kong Underwriting Agreement

The Hong Kong Public Offering is fully underwritten by the Hong Kong Underwriters under the terms of the Hong Kong Underwriting Agreement and is subject to the Company and the Global Coordinator, on behalf of the Underwriters, agreeing on the Offer Price.

The Company expects to enter into the International Underwriting Agreement relating to the International Placing on the Price Determination Date.

These underwriting arrangements, and the respective Underwriting Agreements, are summarized in the section entitled "*Underwriting.*"

## Dealing

Assuming that the Hong Kong Public Offering becomes unconditional at or before 8:00 a.m. in Hong Kong on Thursday, March 23, 2006, it is expected that dealings in the H Shares on the Stock Exchange will commence at 9:30 a.m. on Thursday, March 23, 2006.

## Conditions of the Hong Kong Public Offering

Acceptance of all applications for H Shares pursuant to the Hong Kong Public Offering will be conditional on:

(i)   the Listing Committee of the Stock Exchange granting the listing of, and permission to deal in, the H Shares being offered pursuant to the Global Offering (including the additional H Shares which may be made available pursuant to the exercise of the Over-allotment Option) (subject only to allotment and despatch of the share certificates in respect thereof and such other normal conditions acceptable to the Company and the Global Coordinator, on behalf of the Underwriters)

— 295 —

ALRMH-CNBM00000299

## STRUCTURE OF THE GLOBAL OFFERING

not later than Thursday, March 23, 2006 (or such later date as the Company and the Global Coordinator on behalf of the Public Offer Underwriters may agree) and such listing and permission not subsequently having been revoked prior to the commencement of dealings in the H Shares on the Stock Exchange;

(ii)    the Offer Price having been duly determined and the execution and delivery of the International Underwriting Agreement on or around the Price Determination Date; and

(iii)    the obligations of the Underwriters under the respective Underwriting Agreements becoming and remaining unconditional (including, if relevant, as a result of the waiver of any conditions by the Global Coordinator (on behalf of the Underwriters)) and not having been terminated in accordance with the terms of the respective agreements,

in each case on or before the dates and times specified in the respective Underwriting Agreements (unless and to the extent such conditions are validly waived on or before such dates and times) and in any event not later than the date which is 30 days after the date of this prospectus.

The consummation of each of the Hong Kong Public Offering and the International Placing is conditional upon, among other things, the other offering becoming unconditional and not having been terminated in accordance with its terms.

If the above conditions are not fulfilled or waived prior to the times and dates specified, the Global Offering will lapse and the Stock Exchange will be notified immediately. Notice of the lapse of the Hong Kong Public Offering will be published by the Company in the South China Morning Post and the Hong Kong Economic Times on the next day following such lapse. In such eventuality, all application monies will be returned, without interest, on the terms set out in the section entitled *"How to Apply for Public Offer Shares."* In the meantime, all application monies will be held in (a) separate bank account(s) with the receiving banker(s) or other licensed bank(s) in Hong Kong licensed under the Banking Ordinance (Chapter 155 of the Laws of Hong Kong) (as amended).

We expect the H Share certificates to be issued by the Company on Wednesday, March 22, 2006. However, the H Share certificates for the Offer Shares will only become valid certificates of title at 8:00 a.m. on Thursday, March 23, 2006 provided that (i) the Global Offering has become unconditional in all respects and (ii) the right of termination as described in the section entitled *"Underwriting — Underwriting Arrangements and Expenses — Hong Kong Public Offering — Hong Kong Underwriting Agreement — Grounds for termination"* has not been exercised.

ALRMH-CNBM00000300

# HOW TO APPLY FOR PUBLIC OFFER SHARES

## 1.   Methods of Applying for the Public Offer Shares

There are two ways to make an application for the Public Offer Shares. You may apply for the Public Offer Shares by either using a **white** or **yellow** Application Form or giving **electronic application instructions** to HKSCC via CCASS to cause HKSCC Nominees to apply for the Public Offer Shares on your behalf. Except where you are a nominee and provide the required information in your application, you or you and your joint applicant(s) may not make more than one application (whether individually or jointly) by applying on a **white** or **yellow** Application Form or by giving **electronic application instructions** to HKSCC.

## 2.   Applying by Using a White or Yellow Application Form

### Which Application Form to Use

Use a **white** Application Form if you want the H Shares to be issued in your own name.

Use a **yellow** Application Form if you want the H Shares to be issued in the name of HKSCC Nominees and deposited directly into CCASS for credit to your CCASS Investor Participant stock account or your designated CCASS Participant's stock account.

---

*Note:   The H Shares are not available to existing beneficial owners of Shares in the Company, Directors, Supervisors or chief executives of the Company or any of its subsidiaries, or associates of any of them (an "associate" as defined in the Listing Rules) or to legal or natural persons of the PRC (other than Hong Kong, Macau and Taiwan) or persons who do not have a Hong Kong address or natural persons who are under 18 years of age.*

### Where to Collect the Application Forms

You can collect a **white** Application Form and a prospectus during normal business hours from 9:00 a.m. on Monday, March 13, 2006 until 12:00 noon on Thursday, March 16, 2006 from:

Any of the following addresses of the Hong Kong Underwriters:

**Morgan Stanley Dean Witter Asia Limited**
30th Floor
Three Exchange Square
Central, Hong Kong

or

**BCOM Securities Company Limited**
3rd Floor
Far East Consortium Building
121 Des Voeux Road Central
Central, Hong Kong

or

ALRMH-CNBM00000301

## HOW TO APPLY FOR PUBLIC OFFER SHARES

**China International Capital Corporation (Hong Kong) Limited**
Suite 2307, 23rd Floor
One International Finance Centre
1 Harbour View Street
Central, Hong Kong

or

**China Merchants Securities (HK) Co. Limited**
48th Floor
One Exchange Square
Central, Hong Kong

or

**Daiwa Securities SMBC Hong Kong Limited**
Level 26
One Pacific Place
88 Queensway
Hong Kong

or

**First Shanghai Securities Limited**
19/F., Wing On House
71 Des Voeux Road Central
Central, Hong Kong

or

**Guotai Junan Securities (Hong Kong) Limited**
27th Floor, Low Block
Grand Millennium Plaza
181 Queen's Road Central
Central, Hong Kong

or

**Prudential Brokerage Limited**
9/F., World-Wide House
19 Des Voeux Road Central
Central, Hong Kong

or any of the following branches or sub-branches of **Bank of Communications Co., Ltd., Hong Kong Branch**:

| Hong Kong Island | Hong Kong Branch | 20 Pedder Street, Central, Hong Kong |
| | Central District Sub-branch | 125A Des Voeux Road Central, Hong Kong |
| | Taikoo Shing Sub-branch | Shop 38, G/F., City Plaza 2, 18 Taikoo Shing Road, Hong Kong |

ALRMH-CNBM00000302

## HOW TO APPLY FOR PUBLIC OFFER SHARES

| Kowloon | Kowloon Sub-branch | 563 Nathan Road, Kowloon |
|---|---|---|
| | Cheung Sha Wan Plaza Sub-branch | Unit G04, Cheung Sha Wan Plaza, 833 Cheung Sha Wan Road, Kowloon |
| | Hunghom Sub-branch | 1-3A Tak Man Street, Whampoa Estate, Hunghom, Kowloon |
| | Ngau Tau Kok Sub-branch | Shop G1, G/F., Phase I, Amoy Plaza, 77 Ngau Tau Kok Road, Kowloon |
| | Wong Tai Sin Sub-branch | Shops 127-129, 1/F., Lung Cheung Mall, 136 Lung Cheung Road, Wong Tai Sin, Kowloon |
| New Territories | Tseung Kwan O Sub-branch | Shops 253-255, Metro City Shopping Arcade, Phase I, Tseung Kwan O, New Territories |
| | Tsuen Wan Sub-branch | Shop G10-11, Pacific Commercial Plaza, Bo Shek Mansion, 328 Sha Tsui Road, New Territories |
| | Tai Po Sub-branch | Shop 1, Wing Fai Plaza, 29-35 Ting Kok Road, Tai Po, New Territories |
| | Sheung Shui Sub-branch | Shops 1010-1014, G/F., Sheung Shui Centre Shopping Arcade, Sheung Shui, New Territories |

or any of the following branches of **Bank of China (Hong Kong) Limited**:

| Hong Kong Island | Bank of China Tower Branch | 3/F., 1 Garden Road |
|---|---|---|
| | Central District (Wing On House) Branch | 71 Des Voeux Road Central |
| | 409 Hennessy Road Branch | 409-415 Hennessy Road, Wanchai |
| | North Point (Kiu Fai Mansion) Branch | 413-415 King's Road, North Point |
| | Shek Tong Tsui Branch | 534 Queen's Road West, Shek Tong Tsui |
| Kowloon | Kwun Tong Branch | 20-24 Yue Man Square, Kwun Tong |
| | Mong Kok (President Commercial Centre) Branch | 608 Nathan Road, Mong Kok |
| | To Kwa Wan Branch | 80N To Kwa Wan Road, To Kwa Wan |
| | Mei Foo Mount Sterling Mall Branch | Shop N47-49 Mount Sterling Mall, Mei Foo Sun Chuen |
| | Humphrey's Avenue Branch | 4-4A Humphrey's Avenue, Tsim Sha Tsui |
| New Territories | Castle Peak Road (Tsuen Wan) Wealth Management Centre | 167 Castle Peak Road, Tsuen Wan |
| | Lucky Plaza Branch | Lucky Plaza, Wang Pok Street, Shatin |

You can collect a **yellow** Application Form and a prospectus during normal business hours from 9:00 a.m. on Monday, March 13, 2006 until 12:00 noon on Thursday, March 16, 2006 from:

(1) The Depository Counter of HKSCC at 2nd Floor, Vicwood Plaza, 199 Des Voeux Road Central, Hong Kong, or

ALRMH-CNBM00000303

## HOW TO APPLY FOR PUBLIC OFFER SHARES

(2)   The Customer Service Centre of HKSCC at Upper Ground Floor, V-Heun Building, 128-140 Queen's Road Central, Hong Kong; or

(3)   Your stockbroker, who may have such Application Forms and this prospectus available.

***How to complete the Application Form and make payment***

There are detailed instructions in this prospectus and on each Application Form. You should read these instructions carefully. If you do not follow the instructions your application is liable to be rejected and returned by ordinary post together with the accompanying cheque or banker's cashier order to you (or the first-named applicant in the case of joint applicants) at your own risk at the address stated in the Application Form.

Each Application Form must be accompanied by either **one cheque** or **one banker's cashier order**, which must be stapled to the top left-hand corner of the Application Form.

If you pay by cheque, the cheque must:

- be in Hong Kong dollars;

- be drawn on your Hong Kong dollar bank account in Hong Kong;

- show your account name, which must either be pre-printed on the cheque, or be endorsed on the back by a person authorized by the bank. This account name must be the same as the name in the Application Form. If it is a joint application, the account name must be that of the **first-named** applicant;

- be made payable to "Bank of Communications (Nominee) Co Ltd — CNBM Public Offer";

- be crossed "Account Payee Only"; and

- not be post-dated.

Your application may be rejected if your cheque does not meet all these requirements or is dishonored on its first presentation.

If you pay by banker's cashier order, the banker's cashier order must:

- be issued by a licensed bank in Hong Kong and have your name certified on the back by a person authorized by the bank. The name on the back of the banker's cashier order and the name on the Application Form must be the same. If it is a joint application, the name on the back of the banker's cashier order must be the same as the name of the **first-named** joint applicant;

- be in Hong Kong dollars;

- be made payable to "Bank of Communications (Nominee) Co Ltd — CNBM Public Offer";

ALRMH-CNBM00000304

## HOW TO APPLY FOR PUBLIC OFFER SHARES

- be crossed "Account Payee Only"; and

- not be post-dated.

Your application is liable to be rejected if your banker's cashier order does not meet all these requirements.

You should note that by completing and submitting the Application Form, amongst other things, you (and if the application is made by joint applicants, you and your joint applicant(s) jointly and severally):

(i)     agree with the Company and each shareholder of the Company, and the Company agrees with each of its shareholders, to observe and comply with the Company Law, the Special Regulations, and the Articles of Association;

(ii)    agree with the Company, each shareholder, Director, Supervisor, manager and officer of the Company, and the Company acting for itself and for each Director, Supervisor, manager and officer of the Company agrees with each shareholder to refer all differences and claims arising from the Articles of Association or any rights or obligations conferred or imposed by the Company Law or other relevant laws and administrative regulations concerning the affairs of the Company to arbitration in accordance with the Articles of Association, and any reference to arbitration shall be deemed to authorize the arbitration tribunal to conduct hearings in open session and to publish its award, which arbitration shall be final and conclusive;

(iii)   represent and warrant that you understand that the H Shares have not been and will not be registered under the U.S. Securities Act and you are outside the United States (as defined in Regulation S) when completing the Application Form or you are a person described in paragraph (h)(3) of Rule 902 of Regulation S;

(iv)    agree with the Company and each shareholder of the Company that H Shares in the Company are freely transferable by the holders thereof;

(v)     authorize the Company to enter into a contract on your behalf with each of the Directors, Supervisors and officers of the Company whereby each such Director, Supervisor, and officer undertakes to observe and comply with his obligations to shareholders as stipulated in the Articles of Association;

(vi)    confirm that you have received a copy of this prospectus and have only relied on the information and representations in this prospectus in making your application and will not rely on any other information and representations save as set out in any supplement to this prospectus;

(vii)   agree that the Company and the Directors and any person who has authorized this prospectus are liable only for the information and representations contained in this prospectus and any supplement thereto;

(viii)  undertake and confirm that, you (if the application is made for your benefit) or the person(s) for whose benefit you have made the application have not applied for or taken up, or indicated an interest for or received or been placed or allocated (including conditionally and/or provisionally), and will not apply for or take up, or indicate an interest for, any Offer Shares under the International Placing nor otherwise participate in the International Placing; and

ALRMH-CNBM00000305

## HOW TO APPLY FOR PUBLIC OFFER SHARES

(ix)  agree to disclose to the Company, its registrar, receiving bankers, the Global Coordinator, the Underwriters and their respective advisors and agents any personal data and any information which they require about you or the person(s) for whose benefit you have made the application.

In order for the **yellow** Application Forms to be valid:

(i)  **If the application is made through a designated CCASS Participant (other than a CCASS Investor Participant):**

  (a)  the designated CCASS Participant or its authorized signatories must sign in the appropriate box on the Application Form; and

  (b)  the designated CCASS Participant must endorse the form with its company chop (bearing its company name) and insert its CCASS Participant I.D. in the appropriate box on the Application Form.

(ii)  **If the application is made by an individual CCASS Investor Participant:**

  (a)  the Application Form must contain the CCASS Investor Participant's full name and Hong Kong Identity Card Number; and

  (b)  the CCASS Investor Participant must insert its CCASS Participant I.D. and sign in the appropriate box on the Application Form.

(iii)  **If the application is made by a joint individual CCASS Investor Participant:**

  (a)  the Application Form must contain all joint CCASS Investor Participants' names and the Hong Kong Identity Card Numbers of all joint CCASS Investor Participants; and

  (b)  the CCASS Participant I.D. must be inserted and the authorized signatory(ies) of the CCASS Investor Participant's stock account must sign in the appropriate box on the Application Form.

(iv)  **If the application is made by a corporate CCASS Investor Participant:**

  (a)  the Application Form must contain the CCASS Investor Participant's company name and Hong Kong Business Registration number; and

  (b)  the CCASS Participant I.D. and company chop (bearing its company name) endorsed by its authorized signatory(ies) of the CCASS Investor Participant's stock account must be inserted in the appropriate box on the Application Form.

The signature(s), number of signatories and form of chop, where appropriate, should match the records kept by HKSCC. Incorrect or incomplete details of the CCASS Participant or the omission or inadequacy of authorized signatory(ies) (if applicable), CCASS Participant I.D. or other similar matters may render the application invalid.

ALRMH-CNBM00000306

# HOW TO APPLY FOR PUBLIC OFFER SHARES

If your application is made through a duly authorized attorney, the Company and the Global Coordinator (or its agents and nominees) as its agent, may accept it at their discretion, and subject to any conditions they think fit, including evidence of the authority of your attorney. The Company and the Global Coordinator, in the capacity as its agent, will have full discretion to reject or accept any application, in full or in part, without assigning any reason.

*How Many Applications You May Make*

**You may make more than one application for Public Offer Shares if and only if:**

you are a nominee, in which case you may (i) give **electronic application instructions** to HKSCC via CCASS (if you are a CCASS Participant) or (ii) use a **white** or **yellow** Application Form, and lodge more than one Application Form in your own name if each application is made on behalf of different beneficial owners. In the box on the Application Form marked "For nominees" you must include:

- an account number; or

- some other identification code,

for each beneficial owner (or, in the case of joint beneficial owners, for each such beneficial owner). If you do not include this information, the application will be treated as being made for your benefit.

**Otherwise, multiple or suspected multiple applications are liable to be rejected.**

It will be a term and condition of all applications that by completing and delivering an Application Form, you:

- (if the application is made for your own benefit) warrant that the application is the only application which will be made for your benefit on a **white** or **yellow** Application Form or by giving **electronic application instructions** to HKSCC; or

- (if you are an agent for another person) warrant that reasonable enquiries have been made of that other person that the application is the only application which will be made for the benefit of that other person on a **white** or **yellow** Application Form or by giving **electronic application instructions** to HKSCC and that you are duly authorized to sign the Application Form as that other person's agent.

Except where you are a nominee and provide the information required to be provided in your application, all of your applications are liable to be rejected as multiple applications if you, or you and your joint applicant(s) together:

- make more than one application (whether individually or jointly) on a **white** or **yellow** Application Form or by giving **electronic application instructions** to HKSCC;

- both apply (whether individually or jointly) on one **white** Application Form and one **yellow** Application Form or on one **white** or **yellow** Application Form and give **electronic application instructions** to HKSCC;

ALRMH-CNBM00000307

## HOW TO APPLY FOR PUBLIC OFFER SHARES

- apply on one **white** or **yellow** Application Form (whether individually or jointly) or by giving **electronic application instructions** to HKSCC for more than 32,710,000 Public Offer Shares, being the greatest multiple of 2,000 H Shares which does not exceed 50.0% of the 65,422,000 H Shares initially being offered for public subscription under the Hong Kong Public Offering, as more particularly described in the section entitled "*Structure of the Global Offering — The Hong Kong Public Offering*", or

- have applied for or taken up, or indicated an interest for, or have been or will be placed (including conditionally and/or provisionally) Offer Shares under the International Placing.

**All** of your applications will also be rejected as multiple applications if more than one application is made for **your benefit** (including the part of the application made by HKSCC Nominees acting on **electronic application instructions**). If an application is made by an unlisted company and

- the principal business of that company is dealing in securities; and

- you exercise statutory control over that company,

then the application will be treated as being made for your benefit.

**Unlisted company** *means a company with no equity securities listed on the Stock Exchange.*

**Statutory control in relation to a company** *means you:*

- control the composition of the board of directors of the company;

- control more than half of the voting power of the company; or

- hold more than half of the issued share capital of the company (not counting any part of it which carries no right to participate beyond a specified amount in a distribution of either profits or capital).

### Members of the Public — Time for Applying for Public Offer Shares

Completed **white** or **yellow** Application Forms, together with payment attached, must be lodged by 12:00 noon on Thursday, March 16, 2006, or, if the application lists are not open on that day, by the time and date stated in the sub-paragraph headed "*Effect of Bad Weather on the Opening of the Application Lists*" below.

Your completed Application Form, together with payment attached, should be deposited in the special collection boxes provided at any of the branches/sub-branches of Bank of Communications Co., Ltd., Hong Kong Branch or Bank of China (Hong Kong) Limited listed under the section entitled "*Where to Collect the Application Forms*" above at the following times:

**Monday, March 13, 2006 — 9:00 a.m. to 5:00 p.m.**
**Tuesday, March 14, 2006 — 9:00 a.m. to 5:00 p.m.**
**Wednesday, March 15, 2006 — 9:00 a.m. to 5:00 p.m.**
**Thursday, March 16, 2006 — 9:00 a.m. to 12:00 noon**

ALRMH-CNBM00000308

## HOW TO APPLY FOR PUBLIC OFFER SHARES

The application lists will be open **from 11:45 a.m. to 12:00 noon on** Thursday, March 16, 2006, except as provided in the sub-paragraph headed "*Effect of Bad Weather on the Opening of the Application Lists*" below.

No proceedings will be taken on applications for the Public Offer Shares and no allotment of any such Public Offer Shares will be made until after the closing of the application lists. No allotment of any of the Public Offer Shares will be made later than Wednesday, April 12, 2006.

### Effect of Bad Weather on the Opening of the Application Lists

The application lists will not open in relation to the Hong Kong Public Offering if there is:

- a tropical cyclone warning signal number 8 or above; or

- a "black" rainstorm warning,

in force in Hong Kong at any time between 9:00 a.m. and 12:00 noon on Thursday, March 16, 2006. Instead they will open between 11:45 a.m. and 12:00 noon on the next Business Day which does not have either of those warnings in Hong Kong in force at any time between 9:00 a.m. and 12:00 noon.

If the application lists do not open and close on Thursday, March 16, 2006, the dates mentioned in the "*Expected Timetable*" may be affected in which case a press announcement will be made by the Company.

### Publication of Results

The Company expects to announce the basis of allotment, the results of applications and the Hong Kong Identity Card/passport/Hong Kong Business Registration numbers of successful applicants under the Hong Kong Public Offering on Wednesday, March 22, 2006 in the South China Morning Post (in English) and the Hong Kong Economic Times (in Chinese).

### Despatch/Collection of H Share Certificates and Refund Cheque

If an application is rejected, not accepted or accepted in part only, or if the Offer Price as finally determined is less than the offer price of HK$2.75 per H Share (excluding brokerage, SFC transaction levy and Stock Exchange trading fee thereon) initially paid on application, or if the conditions of the Hong Kong Public Offering are not fulfilled in accordance with the section entitled "*Structure of the Global Offering — Conditions of the Hong Kong Public Offering*" or if any application is revoked or any allotment pursuant thereto has become void, the application monies, or the appropriate portion thereof, together with the related brokerage, SFC transaction levy and Stock Exchange trading fee, will be refunded, without interest. It is intended that special efforts will be made to avoid any undue delay in refunding application monies where appropriate.

ALRMH-CNBM00000309

## HOW TO APPLY FOR PUBLIC OFFER SHARES

No temporary documents of title will be issued in respect of the H Shares. No receipt will be issued for sums paid on application but, subject to personal collection as mentioned below, in due course there will be sent to you (or, in the case of joint applicants, to the first-named applicant) by ordinary post, at your own risk, to the address specified on your Application Form:

(a)   for applications on **white** Application Forms: (i) H Share certificate(s) for all the Public Offer Shares applied for, if the application is wholly successful; or (ii) H Share certificate(s) for the number of Public Offer Shares successfully applied for, if the application is partially successful (for wholly successful and partially successful applicants on **yellow** Application Forms: H Share certificates for their H Shares successfully applied for will be deposited into CCASS as described below); and/or

(b)   for applications on **white** or **yellow** Application Forms, refund cheque(s) crossed "Account Payee Only" in favor of the applicant (or, in the case of joint applicants, the first-named applicant) for (i) the surplus application monies for the Public Offer Shares unsuccessfully applied for, if the application is partially unsuccessful; or (ii) all the application monies, if the application is wholly unsuccessful; and/or (iii) the difference between the Offer Price and the maximum offer price per H Share paid on application in the event that the Offer Price is less than the offer price per H Share initially paid on application, in each case including the brokerage of 1.0%, SFC transaction levy of 0.005% and Stock Exchange trading fee of 0.005%, attributable to such refund/surplus monies but without interest.

Subject to personal collection as mentioned below, refund cheques for surplus application monies (if any) in respect of wholly and partially unsuccessful applications and the difference between the Offer Price and the offer price per H Share initially paid on application (if any) under **white** or **yellow** Application Forms without interest; and H Share certificates for wholly and partially successful applicants under **white** Application Forms are expected to be posted on or around Wednesday, March 22, 2006. The right is reserved to retain any H Share certificate(s) and any surplus application monies pending clearance of cheque(s).

H Share certificates will only become valid certificates of title at 8:00 a.m. on Thursday, March 23, 2006 provided that the Hong Kong Public Offering has become unconditional in all respects and the right of termination described in the section entitled "*Underwriting — Underwriting Arrangements and Expenses — Hong Kong Public Offering — Hong Kong Underwriting Agreement — Grounds for termination*" has not been exercised.

**(a)   If you apply using a white Application Form:**

If you apply for 1,000,000 Public Offer Shares or more on a **white** Application Form and have indicated your intention in your Application Form to collect your refund cheque(s) (where applicable) and/or H Share certificate(s) (where applicable) from Tricor Investor Services Limited and have provided all information required by your Application Form, you may collect your refund cheque(s) (where applicable) and H Share certificate(s) (where applicable) from Tricor Investor Services Limited at 26/F, Tesbury Centre, 28 Queen's Road East, Wanchai, Hong Kong from 9:00 a.m. to 1:00 p.m. on Wednesday, March 22, 2006 or such other date as notified by the Company in the newspapers as the date of collection/despatch of refund cheques/H Share certificates. If you are an individual who opts for personal collection, you must not authorize any other person to make collection on your behalf. If you are a corporate applicant which opts for personal collection,

ALRMH-CNBM00000310

## HOW TO APPLY FOR PUBLIC OFFER SHARES

you must attend by your authorized representative bearing a letter of authorization from your corporation stamped with your corporation's chop. Both individuals and authorized representatives (if applicable) must produce, at the time of collection, evidence of identity acceptable to Tricor Investor Services Limited. If you do not collect your refund cheque (where applicable) and/or H Share certificate (where applicable) personally within the time specified for collection, they will be sent to the address as specified in your Application Form promptly thereafter by ordinary post and at your own risk.

If you apply for less than 1,000,000 Public Offer Shares or if you apply for 1,000,000 Public Offer Shares or more but have not indicated on your Application Form that you will collect your refund cheque (where applicable) and/or H Share certificate (where applicable) in person, your refund cheque (where applicable) and/or H Share certificate (where applicable) will be sent to the address on your Application Form on Wednesday, March 22, 2006, by ordinary post and at your own risk.

**(b)   If you apply using a yellow Application Form:**

If you apply for 1,000,000 Public Offer Shares or more and you have elected on your **yellow** Application Form to collect your refund cheque (where applicable) in person, please follow the same instructions as those for **white** Application Form applicants as described above.

If you apply for Public Offer Shares using a **yellow** Application Form and your application is wholly or partially successful, your H Share certificate(s) will be issued in the name of HKSCC Nominees and deposited into CCASS for credit to your CCASS Investor Participant stock account or the stock account of your designated CCASS Participant as instructed by you in your Application Form at the close of business on Wednesday, March 22, 2006, or under contingent situations, on any other date as shall be determined by HKSCC or HKSCC Nominees.

If you are applying through a designated CCASS Participant (other than a CCASS Investor Participant):

- for Public Offer Shares credited to the stock account of your designated CCASS Participant (other than a CCASS Investor Participant), you can check the number of Public Offer Shares allocated to you with that CCASS Participant.

If you are applying as a CCASS Investor Participant:

- the Company expects to publish the results of CCASS Investor Participants' applications together with the results of the Hong Kong Public Offering in the South China Morning Post (in English) and the Hong Kong Economic Times (in Chinese) on Wednesday, March 22, 2006. You should check the announcement published by the Company and report any discrepancies to HKSCC before 5:00 p.m. on Wednesday, March 22, 2006 or such other date as shall be determined by HKSCC or HKSCC Nominees. Immediately after the credit of the Public Offer Shares to your CCASS Investor Participant stock account, you can check your new account balance via the CCASS Phone System and the CCASS Internet System (under the procedures contained in HKSCC's "An Operating Guide for Investor Participants" in effect from time to time). HKSCC will also make available to you an activity statement showing the number of Public Offer Shares credited to your stock account.

ALRMH-CNBM00000311

---

## HOW TO APPLY FOR PUBLIC OFFER SHARES

---

**3.   Applying by Giving Electronic Application Instructions to HKSCC**

*General*

CCASS Participants may give **electronic application instructions** via CCASS to HKSCC to apply for the Public Offer Shares and to arrange payment of the monies due on application and payment of refunds. This will be in accordance with their participant agreements with HKSCC and the General Rules of CCASS and the CCASS Operational Procedures.

If you are a CCASS Investor Participant, you may give **electronic application instructions** through the CCASS Phone System by calling 2979 7888 or through the CCASS Internet System at https://ip.ccass.com (using the procedures contained in HKSCC's "An Operating Guide for Investor Participants" in effect from time to time).

HKSCC can also input **electronic application instructions** for you if you go to:

**Hong Kong Securities Clearing Company Limited**
Customer Service Centre
Upper Ground Floor
V-Heun Building
128-140 Queen's Road Central
Hong Kong

and complete an input request form.

Prospectuses are available for collection from the above address.

If you are not a CCASS Investor Participant, you may instruct your broker or custodian who is a CCASS Broker Participant or a CCASS Custodian Participant to give **electronic application instructions** via CCASS terminals to apply for the Public Offer Shares on your behalf.

You are deemed to have authorized HKSCC and/or HKSCC Nominees to transfer the details of your application, whether submitted by you or through your designated CCASS Broker Participant or CCASS Custodian Participant, to the Company and its registrars.

*Giving Electronic Application Instructions to HKSCC to Apply for Public Offer Shares by HKSCC Nominees on Your Behalf*

Where a **white** Application Form is signed by HKSCC Nominees on behalf of persons who have given **electronic application instructions** to apply for the Public Offer Shares:

(i)    HKSCC Nominees is only acting as a nominee for those persons and shall not be liable for any breach of the terms and conditions of the **white** Application Form or this prospectus; and

(ii)   HKSCC Nominees does the following things on behalf of each such person:

- agrees that the Public Offer Shares to be allotted shall be issued in the name of HKSCC Nominees and deposited directly into CCASS for the credit of the stock account of the CCASS Participant who has inputted **electronic application instructions** on that person's behalf or that person's CCASS Investor Participant stock account;

— 308 —

## HOW TO APPLY FOR PUBLIC OFFER SHARES

- undertakes and agrees to accept the Public Offer Shares in respect of which that person has given **electronic application instructions** or any lesser number;

- undertakes and confirms that that person has not applied for or taken up any H Shares under the International Placing nor otherwise participated in the International Placing;

- (if the **electronic application instructions** are given for that person's own benefit) declares that only one set of **electronic application instructions** has been given for that person's benefit;

- (if that person is an agent for another person) declares that that person has only given one set of **electronic application instructions** for the benefit of that other person and that that person is duly authorized to give those instructions as that other person's agent;

- understands that the above declaration will be relied upon by the Company, the Directors and the Global Coordinator in deciding whether or not to make any allotment of Public Offer Shares in respect of the **electronic application instructions** given by that person and that that person may be prosecuted if he makes a false declaration;

- authorizes the Company to place the name of HKSCC Nominees on the register of members of the Company as the holder of the Public Offer Shares allotted in respect of that person's **electronic application instructions** and to send H Share certificates and/or refund monies in accordance with the arrangements separately agreed between the Company and HKSCC;

- confirms that that person has read the terms and conditions and application procedures set out in this prospectus and agrees to be bound by them;

- confirms that that person has only relied on the information and representations in this prospectus in giving that person's **electronic application instructions** or instructing that person's designated CCASS Broker Participant or CCASS Custodian Participant to give **electronic application instructions** on that person's behalf;

- agrees that the Company, the Directors and any person who has authorized this prospectus are liable only for the information and representations contained in this prospectus;

- agrees to disclose that person's personal data to the Company, the Global Coordinator, the Underwriters, the registrar, receiving bankers, and/or their respective agents and any information which they may require about that person;

- agrees (without prejudice to any other rights which that person may have) that once the application of HKSCC Nominees has been accepted, the application cannot be rescinded for innocent misrepresentation;

- agrees that any application made by HKSCC Nominees on behalf of that person pursuant to **electronic application instructions** given by that person is irrevocable before Wednesday, April 12, 2006, such agreement to take effect as a collateral contract with the

— 309 —

ALRMH-CNBM00000313

## HOW TO APPLY FOR PUBLIC OFFER SHARES

Company and to become binding when that person gives the instructions and such collateral contract to be in consideration of the Company agreeing that it will not offer any Public Offer Shares to any person before Wednesday, April 12, 2006, except by means of one of the procedures referred to in this prospectus. However, HKSCC Nominees may revoke the application before Wednesday, April 12, 2006 if a person responsible for this prospectus under Section 40 of the Companies Ordinance gives a public notice under that section which excludes or limits the responsibility of that person for this prospectus;

- agrees that once the application of HKSCC Nominees is accepted, neither that application nor that person's **electronic application instructions** can be revoked, and that acceptance of that application will be evidenced by the announcement of the results of the Hong Kong Public Offering published by the Company;

- agrees to the arrangements, undertakings and warranties specified in the participant agreement between that person and HKSCC, read with the General Rules of CCASS and the CCASS Operational Procedures, in respect of the giving of **electronic application instructions** relating to Public Offer Shares;

- agrees with the Company, for itself and for the benefit of each of the shareholders of the Company (and so that the Company will be deemed by its acceptance in whole or in part of the application by HKSCC Nominees to have agreed, for itself and on behalf of each of the shareholders of the Company, with each CCASS Participant giving **electronic application instructions**) to observe and comply with the Company Law, the Special Regulations and the Articles of Association;

- agrees with the Company, for itself and for the benefit of each of the shareholders of the Company and each Director, Supervisor, manager and other officer of the Company (and so that the Company will be deemed by its acceptance in whole or in part of this application to have agreed, for itself and on behalf of each shareholder of the Company and each Director, Supervisor, manager and other officer of the Company, with each CCASS Participant giving **electronic application instructions**):

  (a) to refer all differences and claims arising from the Articles of Association or any rights or obligations conferred or imposed by the Company Law or other relevant laws and administrative regulations concerning the affairs of the Company to arbitration in accordance with the Articles of Association; and

  (b) that any reference to arbitration shall be deemed to authorize the arbitration tribunal to conduct hearings in open session and to publish its award, which arbitration shall be final and conclusive;

- agrees with the Company (for the Company itself and for the benefit of each of the shareholders of the Company) that H Shares in the Company are freely transferable by the holders thereof;

ALRMH-CNBM00000314

## HOW TO APPLY FOR PUBLIC OFFER SHARES

- authorizes the Company to enter into a contract on its behalf with each of the Directors, Supervisors and officers of the Company whereby each such Director, Supervisor and officer undertakes to observe and comply with his obligations to shareholders stipulated in the Articles of Association; and

- agrees that that person's application, any acceptance of it and the resulting contract will be governed by and construed in accordance with the Laws of Hong Kong.

### *Effect of Giving Electronic Application Instructions to HKSCC*

By giving **electronic application instructions** to HKSCC or instructing your broker or custodian who is a CCASS Broker Participant or a CCASS Custodian Participant to give such instructions to HKSCC, you (and if you are joint applicants, each of you jointly and severally) are deemed to have done the following things. Neither HKSCC nor HKSCC Nominees shall be liable to the Company or any other person in respect of the things mentioned below:

- instructed and authorized HKSCC to cause HKSCC Nominees (acting as nominee for the relevant CCASS Participants) to apply for the Public Offer Shares on your behalf;

- instructed and authorized HKSCC to arrange payment of the maximum offer price, brokerage, SFC transaction levy and Stock Exchange trading fee by debiting your designated bank account and, in the case of a wholly or partially unsuccessful application and/or the Offer Price is less than the offer price per H Share initially paid on application, refund the unsuccessful portion of the application monies and/or, the surplus application monies, in each case including the related portion of brokerage of 1%, SFC transaction levy of 0.005% and Stock Exchange trading fee of 0.005%, without interest, by crediting your designated bank account;

- instructed and authorized HKSCC to cause HKSCC Nominees to do on your behalf all the things which it is stated to do on your behalf on the **white** Application Form.

### *Multiple Applications*

If you are suspected of having made multiple applications or if more than one application is made for your benefit, the number of Public Offer Shares applied for by HKSCC Nominees will be automatically reduced by the number of Public Offer Shares in respect of which you have given such instructions and/or in respect of which such instructions have been given for your benefit. Any **electronic application instructions** to make an application for the Public Offer Shares given by you or for your benefit to HKSCC shall be deemed to be an actual application for the purposes of considering whether multiple applications have been made. No application for any other number of Public Offer Shares will be considered and any such application is liable to be rejected.

### *Minimum Subscription Amount and Permitted Multiples*

You may give or cause your broker or custodian who is a CCASS Broker Participant or a CCASS Custodian Participant to give **electronic application instructions** in respect of a minimum of 2000 Public Offer Shares. Such instructions in respect of more than 2,000 Public Offer Shares must be in one of the numbers or multiples set out in the table on the Application Forms.

ALRMH-CNBM00000315

## HOW TO APPLY FOR PUBLIC OFFER SHARES

*Time for Inputting Electronic Application Instructions*

CCASS Broker/Custodian Participants can input **electronic application instructions** at the following times on the following dates:

**Monday, March 13, 2006 — 9:00 a.m. to 8:30 p.m.**[1]
**Tuesday, March 14, 2006 — 8:00 a.m. to 8:30 p.m.**[1]
**Wednesday, March 15, 2006 — 8:00 a.m. to 8:30 p.m.**[1]
**Thursday, March 16, 2006 — 8:00 a.m.**[1] **to 12:00 noon**

———————

*Note:*

(1)   The above time is subject to change as HKSCC may determine from time to time with prior notification to CCASS Broker/Custodian Participants.

CCASS Investor Participants can input **electronic application instructions** from 9:00 a.m. on Monday, March 13, 2006 until 12:00 noon on Thursday, March 16, 2006 (24 hours daily, except the last application date).

*Effect of Bad Weather on the Opening of the Application Lists*

The latest time for inputting your **electronic application instructions** will be 12:00 noon on Thursday, March 16, 2006, the last application day. If:

- a tropical cyclone warning signal number 8 or above; or

- a "black" rainstorm warning signal,

is in force in Hong Kong at any time between 9:00 a.m. and 12:00 noon on Thursday, March 16, 2006, the last application day will be postponed to the next Business Day which does not have either of those warning signals in force in Hong Kong at any time between 9:00 a.m. and 12:00 noon on such day.

*Allocation of Public Offer Shares*

For the purpose of allocating Public Offer Shares, HKSCC Nominees will not be treated as an applicant. Instead, each CCASS Participant who gives **electronic application instructions** or each person for whose benefit each such instruction is given will be treated as an applicant.

*Deposit of H Share Certificates into CCASS and Refund of Application Monies*

- No temporary document of title will be issued. No receipt will be issued for application monies received.

- If your application is wholly or partially successful, your H Share certificate(s) will be issued in the name of HKSCC Nominees and deposited into CCASS for the credit of the stock account of the CCASS Participant which you have instructed to give **electronic application instructions** on your behalf or your CCASS Investor Participant stock account at the close of business on Wednesday, March 22, 2006, or, in the event of a contingency, on any other date as shall be determined by HKSCC or HKSCC Nominees.

— 312 —

# HOW TO APPLY FOR PUBLIC OFFER SHARES

- The Company expects to publish the application results of CCASS Participants (and where the CCASS Participant is a broker or custodian, the Company will include information relating to the relevant beneficial owner), your Hong Kong identity card/passport number or other identification code (Hong Kong business registration number for corporations) and the basis of allotment of the Hong Kong Public Offering in the newspapers on Wednesday, March 22, 2006. You should check the announcement published by the Company and report any discrepancies to HKSCC before 5:00 p.m. on Wednesday, March 22, 2006 or such other date as shall be determined by HKSCC or HKSCC Nominees.

- If you have instructed your designated CCASS Broker Participant or CCASS Custodian Participant to give **electronic application instructions** on your behalf, you can also check the number of Public Offer Shares allotted to you and the amount of refund monies (if any) payable to you with that CCASS Broker Participant or CCASS Custodian Participant.

- If you have applied as a CCASS Investor Participant, you can also check the number of Public Offer Shares allotted to you and the amount of refund monies (if any) payable to you via the CCASS Phone System by calling 2979 7888 and the CCASS Internet System at https://ip.ccass.com (under the procedures contained in HKSCC's "An Operating Guide for Investor Participants" in effect from time to time) on Wednesday, March 22, 2006. Immediately after the credit of the Public Offer Shares to your CCASS Investor Participant stock account and the credit of refund monies to your designated bank account, HKSCC will also make available to you an activity statement showing the number of Public Offer Shares credited to your CCASS Investor Participant stock account and the amount of refund monies (if any) credited to your designated bank account.

- Refund of your application monies (if any) in respect of wholly and partially unsuccessful applications and/or difference between the Offer Price and the offer price per H Share initially paid on application, in each case including the unsuccessful portion of brokerage of 1%, SFC transaction levy of 0.005% and Stock Exchange trading fee of 0.005%, will be credited to your designated bank account or the designated bank account of your CCASS Broker Participant or CCASS Custodian Participant on Wednesday, March 22, 2006. No interest will be paid thereon.

### *Section 40 of the Companies Ordinance*

For the avoidance of doubt, the Company and all other parties involved in the preparation of this prospectus acknowledge that each CCASS Participant who gives or causes to give **electronic application instructions** is a person who may be entitled to compensation under Section 40 of the Companies Ordinance.

### *Personal Data*

The section of the Application Form entitled "Personal Data" applies to any personal data held by the Company and the H Share Registrar about you in the same way as it applies to personal data about applicants other than HKSCC Nominees.

ALRMH-CNBM00000317

# HOW TO APPLY FOR PUBLIC OFFER SHARES

*Warning*

The application for the Public Offer Shares by giving **electronic application instructions** to HKSCC is only a facility provided to CCASS Participants. The Company, the Directors, the Sponsor, the Global Coordinator and the Underwriters take no responsibility for the application and provide no assurance that any CCASS Participant will be allotted any Public Offer Shares.

To ensure that CCASS Investor Participants can give their **electronic application instructions** to HKSCC through the CCASS Phone System or the CCASS Internet System, CCASS Investor Participants are advised not to wait until the last minute to input their **electronic application instructions** to the systems. In the event that CCASS Investor Participants have problems connecting to the CCASS Phone System or the CCASS Internet System to submit their **electronic application instructions**, they should either: (i) submit a **white** or **yellow** Application Form (as appropriate); or (ii) go to HKSCC's Customer Service Centre to complete an input request form for **electronic application instructions** before 12:00 noon on Thursday, March 16, 2006 or such later time as described under the paragraph headed "*Effect of Bad Weather on the Opening of the Application Lists*."

**4.   Circumstances in which you will not be Allotted Public Offer Shares**

Full details of the circumstances in which you will not be allotted the Public Offer Shares are set out in the notes attached to the Application Forms (whether you are making your application by an Application Form or electronically instructing HKSCC to cause HKSCC Nominees to apply on your behalf), and you should read them carefully. You should note in particular the following situations in which Public Offer Shares will not be allotted to you:

- **If your application is revoked:**

  By completing and submitting an Application Form or **electronic application instructions** to HKSCC you agree that your application or the application made by HKSCC Nominees on your behalf may not be revoked on or before Wednesday, April 12, 2006. This agreement will take effect as a collateral contract with the Company, and will become binding when you lodge your Application Form or submit your **electronic application instructions** to HKSCC and an application has been made by HKSCC Nominees on your behalf accordingly. This collateral contract will be in consideration of the Company agreeing that it will not offer any Public Offer Shares to any person before Wednesday, April 12, 2006 except by means of one of the procedures referred to in this prospectus.

  Your application or the application made by HKSCC Nominees on your behalf may only be revoked on or before Wednesday, April 12, 2006 if a person responsible for this prospectus under Section 40 of the Companies Ordinance gives a public notice under that section which excludes or limits the responsibility of that person for this prospectus.

  If any supplement to this prospectus is issued, applicant(s) who have already submitted an application may or may not (depending on the information contained in the supplement) be notified that they can withdraw their applications. If applicant(s) have not been so notified, or if

ALRMH-CNBM00000318

## HOW TO APPLY FOR PUBLIC OFFER SHARES

applicant(s) have been notified but have not withdrawn their applications in accordance with the procedure to be notified, all applications that have been submitted remain valid and may be accepted. Subject to the above, an application once made is irrevocable and applicants shall be deemed to have applied on the basis of this prospectus as supplemented.

For the avoidance of doubt, the Company and all other parties involved in the preparation of this prospectus acknowledge that each CCASS Participant who gives, or causes to give, **electronic application instructions** is a person who may be entitled to compensation under Section 40 of the Companies Ordinance.

If your application or the application made by HKSCC Nominees on your behalf has been accepted, it cannot be revoked. For this purpose, acceptance of applications which are not rejected will be constituted by notification in the announcement of the results of allocation, and where such basis of allocation is subject to certain conditions or provides for allocation by ballot, such acceptance will be subject to the satisfaction of such conditions or results of the ballot, respectively.

- **Full discretion of the Company or its agents to reject or accept your application**

  The Company and the Global Coordinator (as agent for the Company), or their respective agents and nominees, have full discretion to reject or accept any application, or to accept only part of any application.

  The Company, the Global Coordinator and the Hong Kong Underwriter(s), in their capacity as the Company's agents, and their agents and nominees do not have to give any reason for any rejection or acceptance.

- **If the allotment of Public Offer Shares is void**

  The allotment of Public Offer Shares to you or to HKSCC Nominees (if you give **electronic application instructions** or apply by a **yellow** Application Form) will be void if the Listing Committee of the Stock Exchange does not grant permission to list the H Shares either:

  - within three weeks from the closing of the application lists; or

  - within a longer period of up to six weeks if the Listing Committee of the Stock Exchange notifies the Company of that longer period within three weeks of the closing date of the application lists.

- **You will not receive any allotment if:**

  - you make multiple applications or suspected multiple applications;

  - you, or the person for whose benefit you apply, have applied for or taken up, or indicated an interest for, or have been or will be placed or allocated (including conditionally and/or provisionally) Public Offer Shares and/or Offer Shares in the International Placing. By

— 315 —

ALRMH-CNBM00000319

## HOW TO APPLY FOR PUBLIC OFFER SHARES

filling in any of the Application Forms or applying by giving **electronic application instructions** to HKSCC, you agree not to apply for Public Offer Shares as well as Offer Shares in the International Placing. Reasonable steps will be taken to identify and reject applications in the Hong Kong Public Offering from investors who have received Offer Shares in the International Placing, and to identify and reject indications of interest in the International Placing from investors who have received Public Offer Shares in the Hong Kong Public Offering;

- your payment is not made correctly or you pay by cheque or banker's cashier order and the cheque or banker's cashier order is dishonored upon its first presentation;

- your Application Form is not completed in accordance with the instructions as stated in the Application Form (if you apply by an Application Form);

- either of the Hong Kong Underwriting Agreement or the International Underwriting Agreement does not become unconditional;

- either of the Hong Kong Underwriting Agreement or the International Underwriting Agreement is terminated in accordance with its terms;

- you apply for more than 50% of the Public Offer Shares initially being offered to the public for subscription; or

- if you are giving **electronic application instructions** to HKSCC to apply for Public Offer Shares on your behalf, you will also not be allocated any Public Offer Shares if HKSCC Nominees' application is not accepted.

You should also note that you may apply for H Shares under the Hong Kong Public Offering or indicate an interest for H Shares under the International Placing, but may not do both.

## 5.    How Much are the Public Offer Shares

The maximum offer price is HK$2.75 per H Share. You must also pay brokerage of 1%, SFC transaction levy of 0.005% and Stock Exchange trading fee of 0.005% in full. This means that for every board lot of 2,000 H Shares you will pay HK$5,555.56. The Application Forms have tables showing the exact amount payable for certain numbers or multiples of H Shares up to 32,710,000 H Shares. Your application must be for a minimum of 2,000 H Shares. Applications must be in one of the numbers set out in the table. No application for any other number of H Shares will be considered and any such application is liable to be rejected.

You must pay the amount payable upon application for the H Shares by one cheque or one banker's cashier order in accordance with the terms set out in the Application Form (if you apply by an Application Form).

If your application is successful, brokerage is paid to participants of the Stock Exchange or the Stock Exchange (as the case may be), the SFC transaction levy and the Stock Exchange trading fee are paid to the Stock Exchange (in the case of the SFC transaction levy collected on behalf of the SFC).

— 316 —

ALRMH-CNBM00000320

# HOW TO APPLY FOR PUBLIC OFFER SHARES

**6.    Refund of Application Monies**

If you do not receive any Public Offer Shares for any reason, the Company will refund your application monies, including brokerage of 1%, SFC transaction levy of 0.005% and Stock Exchange trading fee of 0.005%. No interest will be paid thereon. All interest accrued on such monies prior to the date of despatch of refund cheques will be retained for the benefit of the Company.

If your application is accepted only in part, the Company will refund the appropriate portion of your application monies, including the related brokerage of 1%, SFC transaction levy of 0.005% and Stock Exchange trading fee of 0.005%, without interest.

If the Offer Price as finally determined is less than the offer price per H Share (excluding brokerage, SFC transaction levy and Stock Exchange trading fee thereon) initially paid on application, the Company will refund the surplus application monies, together with the related brokerage of 1%, SFC transaction levy of 0.005% and Stock Exchange trading fee of 0.005%, without interest.

In a contingency situation involving a substantial over-subscription, at the discretion of the Company and the Global Coordinator, cheques for applications for certain small denominations of Public Offer Shares (apart from successful applications) may not be cleared.

Refund of your application monies (if any) will be made on Wednesday, March 22, 2006 in accordance with the various arrangements as described above. All refunds will be made by a cheque crossed "Account Payee Only" made out to you, or, if you are joint applicants, to the first-named applicant. Part of your Hong Kong identity card number/passport number, or, if you are joint applicants, part of the Hong Kong identity card number/passport number of the first-named applicant, provided by you may be printed on your refund cheque, if any. Such data would also be transferred to a third party for refund purposes. Banker(s) may require verification of your Hong Kong identity card number/passport number before encashment of your refund cheque. Inaccurate completion of your Hong Kong identity card number/passport number may lead to delay in encashment of or may invalidate your refund cheque.

**7.    Dealings and Settlement**

***Commencement of Dealings in the H Shares***

Dealings in the H Shares on the Stock Exchange are expected to commence on Thursday, March 23, 2006.

The H Shares will be traded in board lots of 2,000 H Shares each. The stock code of the H Shares is 3323.

ALRMH-CNBM00000321

# HOW TO APPLY FOR PUBLIC OFFER SHARES

*H Shares will be Eligible for Admission into CCASS*

If the Stock Exchange grants the listing of, and permission to deal in, the H Shares and the Company complies with the stock admission requirements of HKSCC, the H Shares will be accepted as eligible securities by HKSCC for deposit, clearance and settlement in CCASS with effect from the date of commencement of dealings in the H Shares on the Stock Exchange or any other date HKSCC chooses. Settlement of transactions between participants of the Stock Exchange is required to take place in CCASS on the second Business Day after any trading day.

All activities under CCASS are subject to the General Rules of CCASS and CCASS Operational Procedures in effect from time to time.

Investors should seek the advice of their stockbroker or other professional advisor for details of the settlement arrangement as such arrangements may affect their rights and interests.

All necessary arrangements have been made enabling the H Shares to be admitted into CCASS.

ALRMH-CNBM00000322

---

## APPENDIX I                                    ACCOUNTANTS' REPORT

---

*The following is the text of a report, prepared for the purpose of incorporation in this prospectus, received from the Company's auditors and independent reporting accountants, Deloitte Touche Tohmatsu, Certified Public Accountants, Hong Kong. As described in the section headed "Documents Delivered to the Registrar of Companies and Available for Inspection" in Appendix IX, a copy of the accountants' report is available for inspection.*

# Deloitte.
# 德勤

德勤·關黃陳方會計師行                    Deloitte Touche Tohmatsu
香港中環干諾道中111號                      26/F Wing On Centre
永安中心26樓                                111 Connaught Road Central
                                          Hong Kong

March 13, 2006

The Directors
China National Building Material Company Limited
Morgan Stanley Dean Witter Asia Limited

Dear Sirs,

We set out below our report on the financial information relating to China National Building Material Company Limited (the "Company") and its subsidiaries (hereinafter collectively referred to as the "Group") for each of the three years ended December 31, 2004 and the nine months ended September 30, 2005 (the "Track Record Period") for inclusion in the prospectus of the Company dated March 13, 2006 (the "Prospectus").

China National Building Material and Equipment Import and Export Company ("CNBM Equipment") was established as a state-owned enterprise in the People's Republic of China (the "PRC") on June 24, 1985 and became a wholly-owned subsidiary of China National Building Material Group Corporation ("Parent"), a state-owned enterprise under the direct supervision of the Stated-owned Assets Supervision and Administration Commission of the State Council, on March 25, 1999. As part of the restructuring (the "Restructuring") of Parent as described more fully in the section headed "Corporation Reorganisation and Subsequent Shareholding Changes" in appendix VIII to the Prospectus, CNBM Equipment transferred all of its assets and liabilities to a wholly-owned subsidiary of Parent effective December 31, 2003 and Parent effected the transfer of the following to the Company effective September 30, 2004 at nil consideration respectively:

(1)    the equity interests in certain subsidiaries of Parent which are principally engaged in the production and sale of cement, glass fiber and fiberglass reinforced thermoplastics or thermosetting ("FRP") products and the provision of engineering services to cement and glass manufacturers, and the equity interests in Beijing New Building Material Company Limited ("BNBM"), a joint stock company listed on the Shenzhen Stock Exchange, and China Fiberglass Company Limited ("China Fiberglass"), a joint stock company listed on the Shanghai Stock Exchange; and

(2)    land use rights in respect of 11 parcels of land, the transfer is accounted for as shareholders' contribution to the Group on September 30, 2004.

I-1

ALRMH-CNBM00000323

---

## APPENDIX I                            ACCOUNTANTS' REPORT

---

On March 28, 2005, CNBM Equipment was converted to a joint stock company with limited liability by capitalising the value of its net assets into 1,387,110,000 shares of RMB1 each and issuing of 650,000 shares of RMB1 each in the Company for a total cash consideration of RMB1,000,000 to a wholly-owned subsidiary of Parent. The Company was renamed as China National Building Material Company Limited on the same date.

As at the date of this report, the particulars of the Company's principal subsidiaries and associates are set out in notes 18 and 19 to the financial information below.

The financial statements of the principal entities now comprising the Group were prepared in accordance with the relevant accounting rules and regulations applicable to these enterprises in the PRC for the three years ended December 31, 2004 and were audited by the following respective certified public accountants registered in the PRC:

| | 2002 | 2003 | 2004 |
|---|---|---|---|
| BNBM | Beijing Xinghua Certified Public Accountants Co., Ltd. | Beijing Xinghua Certified Public Accountants Co., Ltd. | Beijing Xinghua Certified Public Accountants Co., Ltd. |
| China United Cement Company Limited ("China United") | Beijing Xinghua Certified Public Accountants Co., Ltd. | ShineWing Certified Public Accountants | ShineWing Certified Public Accountants |
| China United Luhong Cement Company Limited ("Luhong") | Not applicable (Note i) | Not applicable (Note i) | ShineWing Certified Public Accountants |
| China United Julong Huaihai Cement Company Limited ("Huaihai") | Not applicable (Note i) | Not applicable (Note i) | ShineWing Certified Public Accountants |
| China United Qingzhou Luhong Cement Company Limited | Not applicable (Note ii) | Not applicable (Note ii) | ShineWing Certified Public Accountants |
| China Composites Group Corporation Limited ("China Composites") | Beijing Xinghua Certified Public Accountants Co., Ltd. | ShineWing Certified Public Accountants | ShineWing Certified Public Accountants |
| Lianyungang Zhongfu Lianzhong Composite Material Group Company Limited ("Zhongfu Lianzhong") | Jiangsu Zhong Rui Hua Certified Public Accountants Co., Ltd. | ShineWing Certified Public Accountants | ShineWing Certified Public Accountants |
| Changzhou China Composites Liberty Company Limited ("Zhounfu Liberty") | Not applicable (Note ii) | Not applicable (Note ii) | ShineWing Certified Public Accountants |
| Changzhou China Composites Tianma Fiberglass Products Company Limited ("Zhongxin Tianma") | Jiangsu Gong Zheng Certified Public Accountants Co., Ltd. | Jiangsu Gong Zheng Certified Public Accountants Co., Ltd. | ShineWing Certified Public Accountants |
| China Triumph International Engineering Company Limited ("China Triumph") | Anhui Yonghe Certified Public Accountants Co., Ltd. | Anhui huaan Certified Public Accountants Co., Ltd. | ShineWing Certified Public Accountants |
| CTIEC Shenzhen Scieno-tech Engineering Company Limited | Not applicable (Note iii) | Anhui huaan Certified Public Accountants Co., Ltd. | ShineWing Certified Public Accountants |
| China Triumph Nanjing Cement Technological Engineering Company Limited | Anhui Yongan Certified Public Accountants Co., Ltd. | Anhui huaan Certified Public Accountants Co., Ltd. | ShineWing Certified Public Accountants |

ALRMH-CNBM00000324

*Notes:*

(i)    As part of the Restructuring, Luhong and Huaihai were established for the purpose of taking over the new suspension preheater dry process cement production and operations ("NSP Cement Operations") from Shandong Lunan Cement Company Limited ("Lunan Cement") and Jiangsu Julong Cement Group Company Limited ("Julong Cement") respectively effective December 31, 2003.

(ii)   This entity commenced business in year 2004.

(iii)  This entity commenced business in year 2003.

For the purpose of this report, the directors of the Company have prepared the financial statements of the Group and of the Company for the Track Record Period in accordance with International Financial Reporting Standards ("IFRS") (the "Underlying Financial Statements"). We have audited the financial statements of the Group and of the Company in accordance with the Hong Kong Standards on Auditing issued by the Hong Kong Institute of Certified Public Accountants ("HKICPA").

For the purpose of this report, we have examined the Underlying Financial Statements of the Group and of the Company for the Track Record Period in accordance with the Auditing Guideline "Prospectuses and the Reporting Accountants" as recommended by the HKICPA.

The financial information of the Group for the Track Record Period and of the Company for the year ended December 31, 2004 and the nine months ended September 30, 2005 set out in this report has been prepared from the Underlying Financial Statements, on the basis set out in Note 1 to the financial information. No adjustments are considered necessary to adjust the Underlying Financial Statements for the Track Record Period to conform to the financial information.

The directors of the Company are responsible for preparing the Underlying Financial Statements and also for the contents of the Prospectus in which this report is included. It is our responsibility to compile the financial information set out in this report from the Underlying Financial Statements, to form an opinion on the financial information, and to report our opinion to you.

In our opinion, on the basis of presentation set out in Note 1 to the financial information, the financial information gives, for the purpose of this report, a true and fair view of the state of affairs of the Group as at December 31, 2002, 2003 and 2004 and September 30, 2005 and of the Company as at December 31, 2004 and September 30, 2005 and of the consolidated results and consolidated cash flows of the Group for the Track Record Period.

The comparative consolidated income statement, cash flow statement and statement of changes in equity of the Group for the nine months ended September 30, 2004 together with the notes thereon have been extracted from the Group's consolidated financial information for the same period (the "September 30, 2004 Financial Information") which was prepared by the directors of the Company solely for the purpose of this report. We have reviewed the September 30, 2004 Financial Information in accordance with Statement of Auditing Standards 700 "Engagements to review interim financial reports" issued by the HKICPA. Our review consisted principally of making enquiries of group management and applying analytical procedures to the financial information and based thereon, assessing whether the accounting policies and presentation have been consistently applied unless otherwise disclosed. A review excluded audit procedures such as tests of controls and verification of assets and liabilities and transactions. It is substantially less in scope and therefore provides a lower level of assurance than an audit and, accordingly, we do not express an audit

ALRMH-CNBM00000325

| APPENDIX I | ACCOUNTANTS' REPORT |
|---|---|

opinion on the September 30, 2004 Financial Information. On the basis of our review which does not constitute an audit, we are not aware of any material modifications that should be made to the consolidated results and consolidated cash flows of the Group as set out in the September 30, 2004 Financial Information.

## I.   FINANCIAL INFORMATION

### CONSOLIDATED INCOME STATEMENTS

| | NOTES | Year ended December 31, | | | Nine months ended September 30, | |
|---|---|---|---|---|---|---|
| | | 2002 | 2003 | 2004 | 2004 | 2005 |
| | | RMB'000 | RMB'000 | RMB'000 | RMB'000 (unaudited) | RMB'000 |
| Revenue . . . . . . . . . . . . . . . | 4 | 1,661,505 | 1,845,197 | 2,898,072 | 1,956,111 | 3,334,469 |
| Cost of sales . . . . . . . . . . . . . | | (1,290,296) | (1,426,803) | (2,343,315) | (1,593,867) | (2,733,044) |
| Gross profit . . . . . . . . . . . . . . | | 371,209 | 418,394 | 554,757 | 362,244 | 601,425 |
| Other income . . . . . . . . . . . . . | 6 | 79,455 | 81,283 | 151,297 | 100,673 | 177,541 |
| Selling and distribution costs . . . . | | (126,498) | (146,540) | (188,105) | (138,031) | (207,308) |
| Administrative expenses . . . . . . . | | (155,619) | (180,610) | (212,376) | (154,386) | (206,631) |
| Other expenses . . . . . . . . . . . . | | (8,783) | (32,229) | (9,103) | (6,310) | (4,876) |
| Operating profit . . . . . . . . . . . | 7 | 159,764 | 140,298 | 296,470 | 164,190 | 360,151 |
| Share of profit of associates. . . . . | | 40,280 | 69,954 | 96,708 | 46,699 | 71,490 |
| Finance costs . . . . . . . . . . . . . | 8 | (53,230) | (58,223) | (98,795) | (75,422) | (104,651) |
| Profit on partial disposal . . . . . . . | 10 | — | 1,312 | — | — | 12 |
| Profit on disposal of a subsidiary . | | — | — | — | — | 27,281 |
| Profit before tax . . . . . . . . . . . . | | 146,814 | 153,341 | 294,383 | 135,467 | 354,283 |
| Income tax expense . . . . . . . . . . | 11 | (2,274) | (9,057) | (24,990) | (10,217) | (39,648) |
| Profit for the year/period. . . . . . . | | 144,540 | 144,284 | 269,393 | 125,250 | 314,635 |
| Attributable to: | | | | | | |
| Equity holders of the Company . | | 99,232 | 111,683 | 193,138 | 91,382 | 223,908 |
| Minority interests. . . . . . . . . . | | 45,308 | 32,601 | 76,255 | 33,868 | 90,727 |
| | | 144,540 | 144,284 | 269,393 | 125,250 | 314,635 |
| Distributions to equity holders of the Company . . . . . . . . . . . | 12 | 22,825 | 136,443 | 27,759 | 27,759 | 135,637 |
| Earnings per share - basic (RMB) . | 13 | 0.07 | 0.08 | 0.14 | 0.07 | 0.16 |

I-4

ALRMH-CNBM00000326

**APPENDIX I**                                               **ACCOUNTANTS' REPORT**

## I.   FINANCIAL INFORMATION — continued

### CONSOLIDATED BALANCE SHEETS

| | | As at December 31, | | | As at September 30, |
| --- | --- | --- | --- | --- | --- |
| | NOTES | 2002 | 2003 | 2004 | 2005 |
| | | RMB'000 | RMB'000 | RMB'000 | RMB'000 |
| Non-current assets | | | | | |
| Property, plant and equipment . . . . . . | 14 | 1,357,153 | 1,604,097 | 3,146,157 | 4,710,016 |
| Investment properties . . . . . . . . . . . . | 15 | 94,530 | 112,729 | 113,979 | 288,822 |
| Goodwill . . . . . . . . . . . . . . . . . . . | 16 | 427 | 706 | 1,604 | 56,480 |
| Intangible assets . . . . . . . . . . . . . . . | 17 | 1,350 | 3,316 | 23,670 | 23,050 |
| Interests in associates . . . . . . . . . . . . | 19 | 619,731 | 733,108 | 799,373 | 822,823 |
| Available-for-sale investments . . . . . . | 20 | 33,170 | 36,962 | 41,042 | 51,860 |
| Deposits . . . . . . . . . . . . . . . . . . . . | 21 | — | 9,000 | 66,900 | 29,456 |
| Land use rights . . . . . . . . . . . . . . . . | 22 | 106,801 | 109,175 | 240,218 | 299,584 |
| Deferred tax asset . . . . . . . . . . . . . . | 35 | 2,238 | 3,966 | 5,387 | 5,393 |
| | | 2,215,400 | 2,613,059 | 4,438,330 | 6,287,484 |
| Current assets | | | | | |
| Inventories . . . . . . . . . . . . . . . . . . | 23 | 296,366 | 358,380 | 530,222 | 616,962 |
| Trade and other receivables . . . . . . . . | 24 | 481,185 | 669,774 | 921,623 | 1,601,869 |
| Investments held-for-trading . . . . . . . | 20 | 183,949 | 112,748 | 11,312 | 13,299 |
| Amount due from related parties . . . . | 25 | 218,585 | 223,547 | 223,678 | 212,215 |
| Pledged bank deposits . . . . . . . . . . . | 27 | — | — | — | 27,991 |
| Bank balances and cash . . . . . . . . . . | | 536,358 | 916,075 | 826,332 | 899,619 |
| | | 1,716,443 | 2,280,524 | 2,513,167 | 3,371,955 |
| Current liabilities | | | | | |
| Trade and other payables . . . . . . . . . | 28 | 469,884 | 696,269 | 1,109,160 | 1,902,590 |
| Amount due to related parties . . . . . . | 25 | 52,037 | 48,781 | 159,730 | 214,323 |
| Borrowings - due within one year . . . . | 29 | 737,821 | 989,757 | 1,450,369 | 3,011,417 |
| Income tax payable . . . . . . . . . . . . . | | 2,871 | 9,033 | 18,900 | 33,369 |
| Dividend payable . . . . . . . . . . . . . . | 30 | — | — | — | 69,237 |
| | | 1,262,613 | 1,743,840 | 2,738,159 | 5,230,936 |
| Net current assets (liabilities) . . . . . . . | | 453,830 | 536,684 | (224,992) | (1,858,981) |
| Total assets less current liabilities . . . . . | | 2,669,230 | 3,149,743 | 4,213,338 | 4,428,503 |
| Non-current liabilities | | | | | |
| Borrowings - due after one year . . . . . | 29 | 111,500 | 477,011 | 1,241,963 | 1,173,910 |
| Deferred income . . . . . . . . . . . . . . . | | — | 10,361 | 5,362 | 3,950 |
| | | 111,500 | 487,372 | 1,247,325 | 1,177,860 |
| Net assets . . . . . . . . . . . . . . . . . . . . | | 2,557,730 | 2,662,371 | 2,966,013 | 3,250,643 |
| Capital and reserves | | | | | |
| Share capital . . . . . . . . . . . . . . . . . | 31 | — | — | — | 1,387,760 |
| Reserves/shareholders' equity . . . . . . . | | 1,657,119 | 1,681,121 | 1,888,618 | 597,231 |
| Equity attributable to equity holders of the Company . . . . . . . . . . . . . . . | | 1,657,119 | 1,681,121 | 1,888,618 | 1,984,991 |
| Minority interests . . . . . . . . . . . . . . . | | 900,611 | 981,250 | 1,077,395 | 1,265,652 |
| Total equity . . . . . . . . . . . . . . . . . . . | | 2,557,730 | 2,662,371 | 2,966,013 | 3,250,643 |

I-5

**APPENDIX I**                                      **ACCOUNTANTS' REPORT**

## I    FINANCIAL INFORMATION — continued

### BALANCE SHEETS

| | NOTES | As at December 31, 2004 RMB'000 | As at September 30, 2005 RMB'000 |
|---|---|---|---|
| Non-current assets | | | |
| Property, plant and equipment | 14 | — | 1,667 |
| Investments in subsidiaries | 18 | 1,521,653 | 1,521,653 |
| Interests in associates | 19 | 220,364 | 220,364 |
| Land use rights | 22 | 28,401 | 27,966 |
| | | 1,770,418 | 1,771,650 |
| Current assets | | | |
| Trade and other receivables | | 580 | 21,723 |
| Amounts due from related parties | 25 | — | 223,318 |
| Bank balances and cash | | — | 6,209 |
| | | 580 | 251,250 |
| Current liabilities | | | |
| Trade and other payables | | — | 940 |
| Amount due to a related party | 25 | — | 318 |
| Borrowings - due within one year | 29 | — | 296,000 |
| Dividend payable | 30 | — | 69,237 |
| | | — | 366,495 |
| Net current assets (liabilities) | | 580 | (115,245) |
| Net assets | | 1,770,998 | 1,656,405 |
| Capital and reserves | | | |
| Share capital | 31 | — | 1,387,760 |
| Reserves/shareholders' equity | 32 | 1,770,998 | 268,645 |
| Total equity | | 1,770,998 | 1,656,405 |

ALRMH-CNBM00000328

## APPENDIX I

## ACCOUNTANTS' REPORT

### I.   FINANCIAL INFORMATION — continued

### CONSOLIDATED STATEMENTS OF CHANGES IN EQUITY

| | Share capital | Share premium | Capital reserve | Retained earnings/ shareholders' equity (Note) | Attributable to equity holders of the Company | Minority interests | Total |
|---|---|---|---|---|---|---|---|
| | RMB'000 | RMB'000 | RMB'000 | RMB'000 | RMB'000 | RMB'000 | RMB'000 |
| At January 1, 2002 . . . . . . . . . . . | — | — | — | 1,514,098 | 1,514,098 | 829,607 | 2,343,705 |
| Shareholders' contributions . . . . . . . | — | — | — | 66,368 | 66,368 | 33,443 | 99,811 |
| Exchange differences arising on translation of overseas operations . . | — | — | — | 246 | 246 | — | 246 |
| Contributions from minority shareholders . . . . . . . . . . . . | — | — | — | — | — | 5,750 | 5,750 |
| Profit for the year . . . . . . . . . . . | — | — | — | 99,232 | 99,232 | 45,308 | 144,540 |
| Distributions to equity holders of the Company . . . . . . . . . . . . . . | — | — | — | (22,825) | (22,825) | — | (22,825) |
| Distribution made by subsidiaries to minority shareholders  . . . . . . . . | — | — | — | — | — | (13,497) | (13,497) |
| At December 31, 2002 . . . . . . . . . | — | — | — | 1,657,119 | 1,657,119 | 900,611 | 2,557,730 |
| Shareholders' contributions . . . . . . . | — | — | — | 50,020 | 50,020 | 5,386 | 55,406 |
| Exchange differences arising on translation of overseas operations . . | — | — | — | 2,948 | 2,948 | — | 2,948 |
| Increase in minority interests as a result of acquisition of subsidiaries . | — | — | — | — | — | 37,322 | 37,322 |
| Partial disposal of subsidiaries . . . . . | — | — | — | — | — | 52,936 | 52,936 |
| Contributions from minority shareholders  . . . . . . . . . . . . . | — | — | — | — | — | 15,500 | 15,500 |
| Profit for the year . . . . . . . . . . . | — | — | — | 111,683 | 111,683 | 32,601 | 144,284 |
| Distributions to equity holders of the Company . . . . . . . . . . . . . . | — | — | — | (136,443) | (136,443) | — | (136,443) |
| Distributions made by subsidiaries to minority shareholders . . . . . . . . | — | — | — | — | — | (63,106) | (63,106) |
| Dividend paid by an associate  . . . . . | — | — | — | (4,206) | (4,206) | — | (4,206) |
| At December 31, 2003 . . . . . . . . . | — | — | — | 1,681,121 | 1,681,121 | 981,250 | 2,662,371 |
| Shareholders' contributions . . . . . . . | — | — | — | 48,794 | 48,794 | — | 48,794 |
| Exchange differences arising on translation of overseas operations . . | — | — | — | 53 | 53 | — | 53 |
| Increase in minority interests as a result of acquisition of subsidiaries . | — | — | — | — | — | 37,020 | 37,020 |
| Decrease in minority interests as a result of disposal of subsidiary  . . . | — | — | — | — | — | (986) | (986) |
| Contributions from minority shareholders . . . . . . . . . . . . . | — | — | — | — | — | 6,974 | 6,974 |
| Decrease in minority interests as a result of increase in interests in subsidiaries . . . . . . . . . . . . . . | — | — | — | — | — | (4,865) | (4,865) |
| Profit for the year . . . . . . . . . . . | — | — | — | 193,138 | 193,138 | 76,255 | 269,393 |
| Distribution to equity holders of the Company . . . . . . . . . . . . . . . | — | — | — | (27,759) | (27,759) | — | (27,759) |
| Dividend paid by a subsidiary to minority shareholders . . . . . . . . . | — | — | — | — | — | (18,253) | (18,253) |
| Dividend paid by an associate  . . . . . | — | — | — | (6,729) | (6,729) | — | (6,729) |
| At December 31, 2004 . . . . . . . . . | — | — | — | 1,888,618 | 1,888,618 | 1,077,395 | 2,966,013 |

ALRMH-CNBM00000329

| APPENDIX I | ACCOUNTANTS' REPORT |
|---|---|

## I.   FINANCIAL INFORMATION — continued

### CONSOLIDATED STATEMENTS OF CHANGES IN EQUITY — continued

| | Share capital | Share premium | Capital reserve | Exchange reserve | Retained earnings/ shareholders' equity (Note) | Attributable to equity holders of the parent | Minority interests | Total |
|---|---|---|---|---|---|---|---|---|
| | RMB'000 | RMB'000 | RMB'000 | RMB'000 | RMB'000 | RMB'000 | RMB'000 | RMB'000 |
| Shareholders' equity contributions . . . . . . . . | — | — | — | — | 8,234 | 8,234 | — | 8,234 |
| Conversion as a joint stock company. . . . . . . . . . . | 1,387,110 | — | 387,401 | — | (1,774,511) | — | — | — |
| Issue of shares . . . . . . . . . | 650 | 350 | — | — | — | 1,000 | — | 1,000 |
| Distribution to equity holders of the Company . . . . . . | — | — | — | — | (135,637) | (135,637) | — | (135,637) |
| Dividend paid by a subsidiary . . . . . . . . . | — | — | — | — | — | — | (15,531) | (15,531) |
| Contributions from minority shareholders. . . . . . . . . | — | — | — | — | — | — | 10,974 | 10,974 |
| Increase in minority interests as a result of acquisition of subsidiaries . . . . . . . | — | — | — | — | — | — | 219,565 | 219,565 |
| Decrease in minority interests as a result of disposal of subsidiary . . . . . . . . . | — | — | — | — | — | — | (7,290) | (7,290) |
| Decrease in minority interests as a result of increase in interests in subsidiaries . . | — | — | — | — | — | — | (110,188) | (110,188) |
| Exchange differences arising on translation of overseas operations . . . . . . . . . | — | — | — | (1,132) | — | (1,132) | — | (1,132) |
| Profit for the period . . . . . . | — | — | — | — | 223,908 | 223,908 | 90,727 | 314,635 |
| At September 30, 2005 . . . . | 1,387,760 | 350 | 387,401 | (1,132) | 210,612 | 1,984,991 | 1,265,652 | 3,250,643 |
| At January 1, 2004 . . . . . . | — | — | — | — | 1,681,121 | 1,681,121 | 981,250 | 2,662,371 |
| Shareholders' contributions . . | — | — | — | — | 33,957 | 33,957 | — | 33,957 |
| Exchange differences arising on translation of overseas operations . . . . . . . . . | — | — | — | — | (974) | (974) | — | (974) |
| Increase in minority interests as result of acquisition of subsidiaries . . . . . . . . | — | — | — | — | — | — | 22,595 | 22,595 |
| Contribution from minority shareholders. . . . . . . . . | — | — | — | — | — | — | 1,453 | 1,453 |
| Decrease in minority interests as result of disposal of subsidiary . . . . . . . . . | — | — | — | — | — | — | (986) | (986) |
| Decrease in minority interests as result of increase in interests in subsidiary . . . | — | — | — | — | — | — | (4,865) | (4,865) |
| Profit for the period . . . . . . | — | — | — | — | 91,382 | 91,382 | 33,868 | 125,250 |
| Distribution to equity holders of the Company . . . . . . | — | — | — | — | (27,759) | (27,759) | — | (27,759) |
| Dividend paid by a subsidiary to minority shareholders. . . . . . . . . | — | — | — | — | — | — | (18,253) | (18,253) |
| Dividend paid by an associate . . . . . . . . . . | — | — | — | — | (6,729) | (6,729) | — | (6,729) |
| At September 30, 2004 . . . . | — | — | — | — | 1,770,998 | 1,770,998 | 1,015,062 | 2,786,060 |

Note: The shareholders' equity prior to conversion as a joint stock company mainly represent the then capital of the companies now comprising the Group and the equity contributions from or distributions to Parent.

ALRMH-CNBM00000330

## I.   FINANCIAL INFORMATION — continued

### CONSOLIDATED CASH FLOW STATEMENTS

| | Year ended December 31, | | | Nine months ended September 30, | |
|---|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2004 | 2005 |
| | RMB'000 | RMB'000 | RMB'000 | RMB'000 (unaudited) | RMB'000 |
| **Operating activities** | | | | | |
| Profit for the year/period . . . . . . . . . . | 144,540 | 144,284 | 269,393 | 125,250 | 314,635 |
| Adjustments for: | | | | | |
| Share of profit of associates . . . . . . . | (40,280) | (69,954) | (96,708) | (46,699) | (71,490) |
| Income tax expenses . . . . . . . . . . . | 2,274 | 9,057 | 24,990 | 10,217 | 39,648 |
| Loss (gain) on disposal of property, plant and equipment . . . . . . . . . . . | 850 | 26,694 | 2,566 | 2,073 | (1,821) |
| Depreciation . . . . . . . . . . . . . . . | 120,097 | 130,398 | 127,661 | 99,179 | 139,840 |
| Amortisation of intangible assets . . . . | — | 466 | 1,749 | 499 | 1,551 |
| Profit on partial disposal . . . . . . . . . | — | (1,312) | — | — | (12) |
| Profit on disposal of a subsidiary . . . . | — | — | — | — | (27,281) |
| Net (gain) loss on disposal of investments . . . . . . . . . . . . . . . | (1,315) | (1,621) | 4,540 | 1,526 | — |
| Net unrealised holding loss on investments . . . . . . . . . . . . . . . | — | — | — | — | 1,759 |
| Discount on acquisition released to income . . . . . . . . . . . . . . . . . . | — | — | — | — | (10,850) |
| Land use rights released to income . . . | 1,582 | 2,312 | 4,564 | 1,772 | 4,835 |
| Deferred income released to income . . | — | — | (8,081) | (6,072) | (2,280) |
| Gain on debt restructuring . . . . . . . . | (4,558) | — | (2,472) | (2,472) | (4,029) |
| Interest income . . . . . . . . . . . . . . | (15,726) | (15,912) | (17,653) | (13,890) | (12,200) |
| Finance costs . . . . . . . . . . . . . . . . | 53,230 | 58,223 | 98,795 | 75,422 | 104,651 |
| Allowances for bad and doubtful debts . . . . . . . . . . . . . . . . . . | 11,439 | 13,187 | 7,719 | 5,444 | 767 |
| Write-down of inventories . . . . . . . . | 1,844 | 930 | 3,199 | 357 | 2,237 |
| Impairment of property, plant and equipment . . . . . . . . . . . . . . . . | 3,700 | 1,269 | — | — | — |
| Operating cash flows before movements in working capital . . . . . . . . . . . . . | 277,677 | 298,021 | 420,262 | 252,606 | 479,960 |
| Decrease (increase) in inventories . . . . . | 3,739 | (365) | (149,148) | (103,454) | (108,044) |
| Decrease (increase) in trade and other receivables . . . . . . . . . . . . . . . . | 101,956 | (80,433) | (220,874) | (202,241) | (609,497) |
| Increase in amounts due from related parties . . . . . . . . . . . . . . . . . . | (130,176) | (88,308) | (34,170) | (16,865) | (100,050) |
| Increase in trade and other payables . . . . | 49,954 | 92,380 | 361,226 | 198,473 | 532,912 |
| Increase in deferred income . . . . . . . . | — | — | 3,082 | — | 868 |
| Increase (decrease) in amounts due to related parties . . . . . . . . . . . . . . . | 29,547 | (3,256) | 108,449 | 107,670 | 41,690 |
| Cash from operations . . . . . . . . . . . . | 332,697 | 218,039 | 488,827 | 236,189 | 237,839 |
| Income tax paid . . . . . . . . . . . . . . . | (1,786) | (5,521) | (16,544) | (16,078) | (26,218) |
| Interest received . . . . . . . . . . . . . . . | 15,726 | 15,912 | 17,653 | 13,890 | 12,200 |
| Interest paid . . . . . . . . . . . . . . . . . | (53,230) | (59,855) | (125,273) | (91,407) | (140,370) |
| Net cash from operating activities . . . . . | 293,407 | 168,575 | 364,663 | 142,594 | 83,451 |

ALRMH-CNBM00000331

| APPENDIX I | ACCOUNTANTS' REPORT |
|---|---|

## I.   FINANCIAL INFORMATION — continued

### CONSOLIDATED CASH FLOW STATEMENTS — continued

| | Year ended December 31, | | | Nine months ended September 30, | |
|---|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2004 | 2005 |
| | RMB'000 | RMB'000 | RMB'000 | RMB'000 (unaudited) | RMB'000 |
| **Investing activities** | | | | | |
| Purchases of investments . . . . . . . . . . | (139,593) | (121,217) | (196,120) | (125,414) | (7,551) |
| Net proceeds on disposal of investments . | 81,469 | 182,067 | 292,705 | 106,327 | 6,137 |
| Purchases of intangible assets . . . . . . . . | (1,350) | (2,432) | (19,305) | (12,604) | (931) |
| Purchases of investment properties . . . . . | — | — | (513) | — | (156) |
| Proceeds on disposal of Property, plant and equipment . . . . . . . . . . . . . . . . | 148 | 7,919 | 920 | 920 | 4,862 |
| Purchases of property, plant and equipment . . . . . . . . . . . . . . . . . . . | (222,298) | (229,772) | (1,535,492) | (1,333,510) | (931,152) |
| Payments for land use rights . . . . . . . . . | (13,894) | (6,938) | (108,261) | (29,270) | (17,426) |
| Deposits paid . . . . . . . . . . . . . . . . . . | — | (9,000) | (57,900) | — | (12,556) |
| Dividend paid . . . . . . . . . . . . . . . . . . | (28,758) | (38,715) | (52,741) | (52,741) | (24,594) |
| Acquisition of interests in associates. . . . | — | (66,544) | (4,812) | (4,812) | — |
| Dividend received from associates . . . . . | — | 20,616 | 36,861 | 36,861 | 35,607 |
| Payments for acquisition of additional interests in subsidiaries . . . . . . . . . . | — | — | (2,803) | (2,803) | (27,545) |
| Increase in pledged bank deposits . . . . . | — | — | — | — | (27,991) |
| Acquisition of subsidiaries . . . . . . . . . . | 20,976 | 30,981 | 24,634 | 33,927 | 88,369 |
| Disposal of subsidiaries . . . . . . . . . . . . | — | — | (2,577) | (2,577) | (57,286) |
| Partial disposal of subsidiaries. . . . . . . . | — | 54,248 | — | — | 12 |
| Net cash used in investing activities . . . . | (303,300) | (178,787) | (1,625,404) | (1,385,696) | (972,201) |
| | | | | | |
| **Financing activities** | | | | | |
| Issue of shares . . . . . . . . . . . . . . . . . . | — | — | — | — | 1,000 |
| Shareholder's cash contribution . . . . . . . | — | 11,000 | — | — | — |
| Contributions from minority shareholders. | 5,750 | 15,500 | 6,974 | 1,453 | 10,974 |
| Repayments of borrowings . . . . . . . . . . | (1,159,900) | (2,023,180) | (1,373,627) | (797,068) | (1,803,352) |
| New borrowings raised . . . . . . . . . . . . | 1,264,757 | 2,383,661 | 2,537,598 | 1,736,109 | 2,754,547 |
| Net cash from financing activities . . . . . | 110,607 | 386,981 | 1,170,945 | 940,494 | 963,169 |
| | | | | | |
| Net increase (decrease) in cash and cash equivalents . . . . . . . . . . . . . . . | 100,714 | 376,769 | (89,796) | (302,608) | 74,419 |
| Effect of foreign exchange rate changes. . | 246 | 2,948 | 53 | (974) | (1,132) |
| Cash and cash equivalents, at beginning of year/period . . . . . . . . . . . . . . . . | 435,398 | 536,358 | 916,075 | 916,075 | 826,332 |
| Cash and cash equivalents, at end of the year/period | | | | | |
| Bank balance and cash . . . . . . . . . . . . | 536,358 | 916,075 | 826,332 | 612,493 | 899,619 |

ALRMH-CNBM00000332

---

**APPENDIX I**  **ACCOUNTANTS' REPORT**

---

**NOTES TO THE FINANCIAL INFORMATION**

1. **REORGANISATION AND BASIS OF PRESENTATION OF FINANCIAL INFORMATION**

Pursuant to the Restructuring which was approved by SASAC on November 25, 2004, Parent underwent the Restructuring to rationalise the structure of the Group in preparation for the listing of the Company's shares on the main board of The Stock Exchange of Hong Kong Limited. As part of the Restructuring, CNBM Equipment transferred all of its former operations and the related assets and liabilities to a wholly-owned subsidiary of Parent effective December 31, 2003 at nil consideration. Accordingly, the Company is regarded as a new holding company in the Restructuring for the purpose of holding the companies now comprising the Group.

As part of the Restructuring, Parent effected the transfer of its interests in certain businesses which are engaged in the production and sale of cement, glass fiber and FRP products and provision of engineering services, and its equity interests in BNBM and China Fiberglass (collectively the "Transferred Operations") and certain other relevant assets associated with the Transferred Operations to the Company effective September 30, 2004 at nil consideration.

As Parent controlled the Transferred Operations before the Restructuring and continues to control the Transferred Operations after the effective date of the Restructuring, the Restructuring is considered as a business combination under common control. Accordingly, the financial information presents the results, cash flows and financial position of the Group as if the current group structure had been in existence throughout the Track Record Period, or since their respective dates of establishment and as if the Company had not owned and controlled other business other than the Transferred Operations, including companies historically associated with production and sales of cement prior to the Restructuring but were disposed of by China United to Parent as part of the Restructuring. Certain operating assets and liabilities previously associated with the Transferred Operations that were retained by Parent for the purpose of improving the return on equity have been reflected as a distribution to owner in the consolidated statement of changes in equity.

A summary of the assets and liabilities previously associated with the Transferred Operations that were retained by Parent was as follows:

|  | RMB'000 |
|---|---|
| Property, plant and equipment associated with cement segment |  |
| - Land and buildings | 48,483 |
| - Plant and machinery | 20,061 |
| - Motor vehicles | 1,318 |
|  | 69,862 |
| Amounts due from related parties | 83,346 |
| Other receivables | 3,588 |
| Other payables | (1,890) |
|  | 154,906 |

The financial results generated from the above operating assets and liabilities are included in the consolidated financial information up to the effective date of deemed distribution to owner. The directors are of the view that the property, plant and equipment retained by Parent were not crucial to the Transferred Operations and the results generated from these operating assets did not account for a material portion of the Group's results during the Track Record Period.

ALRMH-CNBM00000333

---

**APPENDIX I**                                     **ACCOUNTANTS' REPORT**

---

2. **SIGNIFICANT ACCOUNTING POLICIES**

The financial information has been prepared in accordance with IFRS and also complies with the applicable disclosure requirements of the Rules Governing the Listing of Securities on The Stock Exchange of Hong Kong Limited. The Group has early adopted all of the new and revised standards and interpretations issued by the International Accounting Standards Board (the "IASB") and the International Financial Reporting Interpretations Committee (the "IFRIC") of the IASB that are relevant to its operations and effective for accounting periods beginning on January 1, 2005.

At the date of this report, the following standards and interpretations were in issue but not yet effective:

| | |
|---|---|
| IAS 1 (Amendment) | Capital Disclosures[1] |
| IAS 19 (Amendment) | Actuarial Gains and Losses, Group Plans and Disclosures[2] |
| IAS 21 (Amendment) | Net Investment in a Foreign Operation[2] |
| IAS 39 (Amendment) | Cash Flow Hedges of Forecast Intragroup Transactions[2] |
| IAS 39 (Amendment) | The Fair Value Option[2] |
| IAS 39 and IFRS 4 (Amendments) | Financial Guarantee Contracts[2] |
| IFRS 6 | Exploration for and Evaluation of Mineral Resources[2] |
| IFRS 7 | Financial Instruments: Disclosures[1] |
| IFRIC 4 | Determining whether an Arrangement contains a Lease[2] |
| IFRIC 5 | Rights to Interests Arising from Decommissioning, Restoration and Environmental Rehabilitation Funds[2] |
| IFRIC 6 | Liabilities arising from Participating in a Specific Market - Waste Electrical and Electronic Equipment[3] |
| IFRIC 7 | Applying the Restatement Approach under IAS 29 Financial Reporting in Hyperinflationary Economies[4] |
| IFRIC 8 | Scope of IFRS 2[5] |

---

[1]     Effective for annual periods beginning on or after January 1, 2007

[2]     Effective for annual periods beginning on or after January 1, 2006

[3]     Effective for annual periods beginning on or after December 1, 2005

[4]     Effective for annual periods beginning on or after March 1, 2006

[5]     Effective for annual periods beginning on or after May 1, 2006

The Group has commenced considering the potential impact of these new IFRS but is not yet in a position to determine whether these IFRS would have a significant impact on how its results of operations and financial position are prepared and presented. These IFRS may result in changes in the future as to how the results and financial position are prepared and presented.

ALRMH-CNBM00000334

2.    **SIGNIFICANT ACCOUNTING POLICIES — continued**

The financial information has been prepared on the historical cost basis as modified for the revaluation of investments held for trading.

The principal accounting policies adopted are set out below.

**Basis of consolidation**

The consolidated financial information incorporates the financial information of the Company and entities controlled by the Company (its subsidiaries). Control is achieved where the Company has the power to govern the financial and operating policies of an entity so as to obtain benefits from its activities.

The results of subsidiaries acquired or disposed of, other than the Restructuring, during the year/period are included in the consolidated income statement from the effective date of acquisition or up to the effective date of disposal, as appropriate.

All intra-group transactions, balances, income and expenses are eliminated on consolidation.

Minority interests in the net assets of consolidated subsidiaries are identified separately from the Group's equity therein. Minority interests consist of the amount of those interests at the date of the original business combination (see below) and the minority's share of changes in equity since the date of the combination. Losses applicable to the minority in excess of the minority's interest in the subsidiary's equity are allocated against the interests of the Group except to the extent that the minority has a binding obligation and is able to make an additional investment to cover the losses.

**Business combinations**

The acquisition of subsidiaries/businesses, other than the Restructuring, is accounted for using the purchase method. The cost of the acquisition is measured at the aggregate of the fair values, at the date of exchange, of assets given, liabilities incurred or assumed, and equity instruments issued by the Group in exchange for control of the acquiree, plus any costs directly attributable to the business combination. The acquiree's identifiable assets, liabilities and contingent liabilities that meet the conditions for recognition under IFRS 3 are recognised at their fair values at the acquisition date.

Goodwill arising on acquisition is recognised as an asset and initially measured at cost, being the excess of the cost of the business combination over the Group's interest in the net fair value of the identifiable assets, liabilities and contingent liabilities recognised. If, after reassessment, the Group's interest in the net fair value of the acquiree's identified assets, liabilities and contingent liabilities exceeds the cost of the business combination, the excess is recognised immediately in profit or loss.

The interest of minority shareholders in the acquiree is initially measured at the minority's proportion of the net fair value of the assets, liabilities and contingent liabilities recognised.

**Investments in associates**

An associate is an entity over which the Group has significant influence and that is not a subsidiary. Significant influence is the power to participate in the financial and operating policy decisions of the investee but is not control over those policies.

ALRMH-CNBM00000335

## 2.   SIGNIFICANT ACCOUNTING POLICIES — continued

### Investments in associates — continued

The results and assets and liabilities of associates are incorporated in this financial information using the equity method of accounting, except when the investment is classified as held for sale, in which case it is accounted for under IFRS 5 "Non-current Assets Held for Sale and Discontinued Operations". Under the equity method, investments in associates are carried in the consolidated balance sheet at cost as adjusted for post-acquisition changes in the Group's share of the net assets of the associates, less any impairment in the value of individual investments. Losses of the associates in excess of the Group's interest in those associates are not recognised.

Any excess of the cost of acquisition over the Group's share of the net fair value of the identifiable net assets of the associates at the date of acquisition is recognised as goodwill. The goodwill is included within the carrying amount of the investment and is assessed for impairment as part of the investment. Any excess of the Group's share of the net fair value of the identifiable assets, liabilities and contingent liabilities over the cost of acquisition, after reassessment, is recognised in profit or loss.

Where a group entity transacts with an associate of the Group, profits and losses are eliminated to the extent of the Group's interest in the relevant associate.

### Joint venture companies

A joint venture company is a company set up by contractual arrangement, whereby the Group and other parties undertake an economic activity. The joint venture company operates as a separate entity in which the Group and the other parties have an interest.

The joint venture agreement between the venturers stipulates the capital contributions of the joint venture parties, the duration of the joint venture and the basis on which the assets are to be realized upon its dissolution. The profits and losses from the joint venture company's operations and any distribution of surplus assets are shared amongst the venturers, either in proportion to their respective capital contributions, or in accordance with the terms of the joint venture agreement.

A joint venture company is treated as:

(a)   a subsidiary, if the Company has unilateral control, directly or indirectly, over the joint venture company; or

(b)   an associate, if the Company does not have unilateral or joint control, but holds, directly or indirectly, generally not less than 20% of the joint venture company's registered capital and is in a position to exercise significant influence over the joint venture company.

### Goodwill

Goodwill arising on the acquisition of a subsidiary represents the excess of the cost of acquisition over the Group's interest in the net fair value of the identifiable assets, liabilities and contingent liabilities of the subsidiary recognised at the date of acquisition. Goodwill is initially recognised as an asset at cost and is subsequently measured at cost less any accumulated impairment losses.

ALRMH-CNBM00000336

**APPENDIX I**                                              **ACCOUNTANTS' REPORT**

## 2.  SIGNIFICANT ACCOUNTING POLICIES — continued

### Goodwill — continued

For the purpose of impairment testing, goodwill is allocated to each of the Group's cash-generating units expected to benefit from the synergies of the combination. Cash-generating units to which goodwill has been allocated are tested for impairment annually, or more frequently when there is an indication that the unit may be impaired. If the recoverable amount of the cash-generating unit is less than the carrying amount of the unit, the impairment loss is allocated first to reduce the carrying amount of any goodwill allocated to the unit and then to the other assets of the unit pro-rata on the basis of the carrying amount of each asset in the unit. An impairment loss recognised for goodwill is not reversed in a subsequent period.

On disposal of a subsidiary, the attributable amount of goodwill is included in the determination of the profit or loss on disposal.

The Group's policy for goodwill arising on the acquisition of an associate is described under "Investments in associates" above.

### Revenue recognition

Sales of goods are recognised when goods are delivered and title has passed.

Service income is recognised when services are provided.

Revenue from provision of engineering services is recognised in accordance with the Group's accounting policy on construction contracts (see below).

Interest income is accrued on a time basis by reference to the principal outstanding and at the effective interest rate applicable, which is the rate that exactly discounts estimated future cash receipts through the expected life of the financial asset to that asset's net carrying amount.

Dividend income from investments is recognised when Group's right to receive payment has been established.

Rental income from operating leases is recognised on a straight-line basis over the term of the relevant lease.

VAT refund is recognised as income when the Group's rights to receive the VAT refund has been established.

### Construction contracts

Where the outcome of a construction contract can be estimated reliably, revenue and costs are recognised by reference to the stage of completion of the contract activity at the balance sheet date. This is normally measured by the proportion that contract costs incurred for work performed to date bear to the estimated total contract costs, except where this would not be representative of the stage of completion. Variations in contract work, claims and incentive payments are included to the extent that they have been agreed with the customer.

ALRMH-CNBM00000337

**2.   SIGNIFICANT ACCOUNTING POLICIES — continued**

**Construction contracts — continued**

Where the outcome of a construction contract cannot be estimated reliably, contract revenue is recognised to the extent of contract costs incurred that it is probable will be recoverable. Contract costs are recognised as expenses in the period in which they are incurred.

When it is probable that total contract costs will exceed total contract revenue, the expected loss is recognised as an expense immediately.

**Leasing**

Leases are classified as finance leases whenever the terms of the leases transfer substantially all the risks and rewards of ownership to the leasee. All other leases are classified as operating leases.

Rentals payable under operating leases are charged to the profit or loss on a straight-line basis over the relevant lease terms.

**Foreign currencies**

In preparing the financial information of the individual entities, transactions in currencies other than the entity's functional currency ("foreign currencies") are recorded at the rates of exchange prevailing on the dates of the transactions. At each balance sheet date, monetary items denominated in foreign currencies are retranslated at the rates prevailing on the balance sheet date. Non-monetary items carried at fair value that are denominated in foreign currencies are retranslated at the rates prevailing on the date when the fair value was determined. Non-monetary items that are measured in terms of historical cost in a foreign currency are not retranslated.

Exchange differences arising on the settlement of monetary items, and on the retranslation of monetary items, are included in profit or loss for the period. Exchange differences arising on the retranslation of non-monetary items carried at fair value are included in profit or loss for the period except for differences arising on the retranslation of non-monetary items in respect of which gains and losses recognised directly in equity. For such non-monetary items, any exchange component of that gain or loss is also recognised directly in equity.

For the purpose of presenting consolidated financial information, the assets and liabilities of the Group's foreign operations are expressed in RMB, which is the Group's functional currency, using exchange rates prevailing on the balance sheet date. Income and expense items are translated at the average exchange rates for the period unless exchange rates fluctuate significantly. Exchange differences arising, if any, are classified as equity and transferred to the Group's exchange reserve. Such translation differences are recognised as profit or loss in the period in which the overseas operation is disposed of.

ALRMH-CNBM00000338

## 2.   SIGNIFICANT ACCOUNTING POLICIES — continued

### Government subsidies

Government subsidies are recognised as income when the conditions for the grants are met and there is a reasonable assurance that the grant will be received. Government subsidy relating to cost are deferred and recognised as income over the period necessary to match the subsidy on a systematic basis to the costs that it is intended to compensate. Where the subsidy relates to an asset, it is credited to a deferred income account and is released to the profit or loss over the expected useful life of the relevant asset by equal annual instalments.

### Borrowing costs

Borrowing costs directly attributable to the acquisition, construction or production of qualifying assets, are capitalised as part of the cost of those assets. Capitalisation of such borrowing costs ceases when the assets are substantially ready for their intended use or sale.

All other borrowing costs are recognised as an expense in the year/period in which they are incurred.

### Retirement benefits costs

Payments to defined contribution retirement benefit schemes are charged as an expense as they fall due. Payments made to state-managed retirement benefit schemes are dealt with as payments to defined contribution schemes where the Group's obligations under the schemes are equivalent to those arising in a defined contribution retirement benefit scheme.

### Taxation

Income tax expense represents the sum of the tax currently payable and deferred tax.

The tax currently payable is based on taxable profit for the year/period. Taxation profit differs from net profit as reported in the income statement because it excludes items of income and expense that are taxable or deductible in other years and it further excludes income statement items that are never taxable. The Group's liability for current tax is calculated using tax rates that have been enacted or substantively enacted by the balance sheet dates.

Deferred tax is recognised on differences between the carrying amounts of assets and liabilities in the financial information and the corresponding tax bases used in the computation of taxable profit, and is accounted for using the balance sheet liability method. Deferred tax liabilities are generally recognised for all taxable temporary differences and deferred tax assets are recognised to the extent that it is probable that taxable profits will be available against which deductible temporary differences can be utilised. Such assets and liabilities are not recognised if the temporary difference arises from goodwill or from the initial recognition (other than in a business combination) of other assets and liabilities in a transaction that affects neither the tax profit nor the accounting profit.

ALRMH-CNBM00000339

---

**APPENDIX I**                                            **ACCOUNTANTS' REPORT**

---

**2.   SIGNIFICANT ACCOUNTING POLICIES — continued**

**Taxation — continued**

Deferred tax liabilities are recognised for taxable temporary differences arising on investments in subsidiaries and associates, except where the Group is able to control the reversal of the temporary difference and it is probable that the temporary difference will not reverse in the foreseeable future.

The carrying amount of deferred tax assets is reviewed at each balance sheet date and reduced to the extent that it is no longer probable that sufficient taxable profits will be available to allow all or part of the asset to be recovered.

Deferred tax is calculated at the tax rates that are expected to apply in the period when the liability is settled or the asset is realised. Deferred tax is charged or credited to the profit or loss, except when it relates to items charged or credited directly to equity, in which case the deferred tax is also dealt with in equity.

**Property, plant and equipment**

Property, plant and equipment, other than construction in progress, are stated at cost less depreciation and any accumulated impairment losses.

Construction in progress is stated at cost which includes all construction costs and other direct costs attributable to such projects including borrowing costs capitalised. It is not depreciated until completion of construction. Costs of completed construction works are transferred to the appropriate categories of property, plant and equipment.

Depreciation is provided to write off the cost of property, plant and equipment other than construction in progress over their estimated useful lives and after taking into account their estimated residual value, using the straight line method, as follows:

Land and buildings ................................................. 2.38%
Plant and machinery ........................................ 5.28% to 9.50%
Motor vehicles .................................................. 9.50%

The gain or loss arising on the disposal or retirement of an item of property, plant and equipment is determined as the difference between the sales proceeds and the carrying amount of the asset and is recognised in the profit or loss.

**Investment properties**

Investment properties, which are properties held to earn rentals and/or for capital appreciation, are stated at cost less depreciation and any accumulated impairment losses.

Depreciation is provided to write off the cost of the investment properties over their estimated useful lives and after taking into account their estimated residual value, using the straight line method, at 2.38%.

ALRMH-CNBM00000340

## 2.   SIGNIFICANT ACCOUNTING POLICIES — continued

### Patents and trademarks

Patents have finite useful lives and are measured initially at purchase cost and are amortised on a straight-line basis over their estimated useful lives.

Trademarks have indefinite useful lives and are carried at cost less any accumulated impairment losses.

### Land use rights

The prepayment made on acquiring land use right represents prepaid lease payments and it is accounted for as an operating lease. The prepaid lease payment is amortised on a straight-line basis over the lease term, or when there is impairment, the impairment is expensed in the income statement.

### Impairment of tangible and intangible assets excluding goodwill

At each balance sheet date, the Group reviews the carrying amounts of its tangible and intangible assets to determine whether there is any indication that those assets have suffered an impairment loss. If any such indication exists, the recoverable amount of the asset is estimated in order to determine the extent of the impairment loss (if any). Where the asset does not generate cash flows that are independent from other assets, the Group estimates the recoverable amount of the cash-generating unit to which the asset belongs. An intangible asset with an indefinite useful life is tested for impairment annually and whenever there is an indication that the asset may be impaired.

Recoverable amount is the higher of fair value less costs to sell and value in use. In assessing value in use, the estimated future cash flows are discounted to their present value using a pre-tax discount rate that reflects current market assessments of the time value of money and the risks specific to the asset for which the estimates of future cash flows have not been adjusted.

If the recoverable amount of an asset (or cash-generating unit) is estimated to be less than its carrying amount, the carrying amount of the asset (cash-generating unit) is reduced to its recoverable amount. An impairment loss is recognised as an expense immediately.

Where an impairment loss subsequently reverses, the carrying amount of the asset (cash-generating unit) is increased to the revised estimate of its recoverable amount, but so that the increased carrying amount does not exceed the carrying amount that would have been determined had no impairment loss been recognised for the asset (cash-generating unit) in prior years. A reversal of an impairment loss is recognised as income immediately.

### Inventories

Inventories are stated at the lower of cost and net realisable value. Cost comprises direct materials and, where applicable, direct labour costs and those overheads that have been incurred in bringing the inventories to their present location and condition. Cost is calculated using the weighted average method. Net realisable value represents the estimated selling price less all estimated costs to completion and costs to be incurred in marketing, selling and distribution.

ALRMH-CNBM00000341

**2.   SIGNIFICANT ACCOUNTING POLICIES — continued**

**Financial Instruments**

Financial assets and financial liabilities are recognised on the Group's balance sheet when the Group becomes a party to the contractual provision of the instrument.

*Trade and other receivables*

Trade and other receivables are measured at initial recognition at fair value, and are subsequently measured at amortised cost using the effective interest rate method. Appropriate allowances for estimated irrecoverable amounts are recognised in profit or loss when there is objective evidence that the asset is impaired. The allowance recognised is measured as the difference between the asset's carrying amount and the present value of estimated future cash flows discounted at the effective interest rate computed at initial recognition.

*Investments*

Investments are recognised on a trade date basis and are initially measured at fair value.

At subsequent reporting dates, debt securities that the Group has the expressed intention and ability to hold to maturity (held-to-maturity debt securities) are measured at amortised cost, using the effective interest rate method less any impairment loss recognised to reflect irrecoverable amounts. The annual amortisation of any discount or premium on the acquisition of a held-to-maturity security is aggregated with other investment income receivable over the term of the instrument so that the revenue recognised in each period represents a constant yield on the investment.

Investments other than held-to-maturity debt securities are classified as either held-for-trading or available-for-sale, and are measured at subsequent reporting dates at fair value except those investments which do not have a quoted market price in an active market and whose fair value cannot be reliably measured. Where investments are held-for-trading purposes, gains and losses arising from changes in fair value are included in net profit or loss for the year/period. For available-for-sale investments, gains and losses arising from changes in fair value are recognised directly in equity, until the investment is disposed of or is determined to be impaired, at which time the cumulative gain or loss previously recognised in equity is included in the profit or loss for the year/period. Investments that do not have a quoted market price in an active market and whose fair value cannot be reliably measured are stated at cost less any accumulated impairment losses.

ALRMH-CNBM00000342

**2.   SIGNIFICANT ACCOUNTING POLICIES — continued**

**Financial Instruments — continued**

*Borrowings*

Interest bearing bank loans and other borrowings are recorded at the proceeds received, net of direct issue costs. Finance charges, including premiums payable on settlement or redemption, are accounted for on an accrual basis to the income statement using effective interest method and are added to the carrying amount of the instrument to the extent that they are not settled in the period in which they arise.

*Trade and other payables*

Trade and other payables are initially measured at fair value, and are subsequently measured at amortised cost, using the effective interest rate method.

**3.   KEY SOURCES OF ESTIMATION UNCERTAINTY**

The Group makes estimates and assumptions concerning the future. The estimates and assumptions that have a significant risk of causing a material adjustment to the carrying amounts of assets are discussed below.

**Depreciation of property, plant and equipment**

Property, plant and equipment are depreciated on a straight-line basis over their estimated useful lives, after taking into account their estimated residual value. The Group assesses annually the residual value and the useful life of the property, plant and equipment and if the expectation differs from the original estimate, such difference will impact the depreciation in the year/period in which such estimate has been changed.

**Impairment of goodwill**

Determining whether goodwill is impaired requires an estimation of the value in use of the cash-generating units to which goodwill has been allocated. The value in use calculation requires the entity to estimate the future cash flows expected to arise from the cash-generating unit and a suitable discount rate in order to calculate present value.

**Impairment of property, plant and equipment**

The Group assesses annually whether property, plant and equipment have any indication of impairment in accordance with the accounting policy. The recoverable amounts of property, plant and equipment have been determined based on value-in-use calculations. These calculations require the use of judgment and estimates.

ALRMH-CNBM00000343

**3.    KEY SOURCES OF ESTIMATION UNCERTAINTY — continued**

**Allowances for bad and doubtful debts**

The Group makes allowances for bad and doubtful debts based on an assessment of the recoverability of trade and other receivables. Allowances are applied to trade and other receivables where events or changes in circumstances indicate that the balances may not be collectible. The identification of bad and doubtful debts requires the use of judgment and estimates. Where the expectation is different from the original estimate, such difference will impact carrying value of trade and other receivables and doubtful debts expenses in the year/period in which such estimate has been changed.

**4.    REVENUE**

|  | Year ended December 31, | | | Nine months ended September 30, | |
|---|---|---|---|---|---|
|  | **2002** | **2003** | **2004** | **2004** | **2005** |
|  | **RMB'000** | **RMB'000** | **RMB'000** | **RMB'000** (unaudited) | **RMB'000** |
| Sales of goods . . . . . . . . . . . . . . . . . . | 1,625,389 | 1,747,656 | 2,526,933 | 1,770,972 | 2,947,664 |
| Provision of engineering services . . . . . . | 1,430 | 35,134 | 208,167 | 83,491 | 276,576 |
| Rendering of services . . . . . . . . . . . . . | 34,686 | 62,407 | 162,972 | 101,648 | 110,229 |
|  | 1,661,505 | 1,845,197 | 2,898,072 | 1,956,111 | 3,334,469 |

**5.    BUSINESS AND GEOGRAPHICAL SEGMENTS**

**Business segments**

For management purpose, the Group is currently organised into four operating divisions - lightweight building materials, cement, engineering services and glass fiber and FRP products. These activities are the basis on which the Group reports its primary segment information.

Principal activities are as follows:

| Lightweight building materials | — | Production and sale of lightweight building materials |
|---|---|---|
| Cement | — | Production and sale of cement |
| Engineering services | — | Provision of engineering services to glass and cement manufacturers and equipment procurement |
| Glass fiber and FRP products | — | Production and sale of glass fiber and FRP products |

ALRMH-CNBM00000344

5.   BUSINESS AND GEOGRAPHICAL SEGMENTS — continued

Segment information about these businesses is presented below.

**Year ended December 31, 2002**

| | Lightweight building materials | Cement | Engineering services | Glass fiber and FRP products | Total |
|---|---|---|---|---|---|
| | RMB'000 | RMB'000 | RMB'000 | RMB'000 | RMB'000 |
| Revenue | | | | | |
| External sales. | 1,021,223 | 560,450 | 78,950 | 882 | 1,661,505 |
| Cost of sales | (857,841) | (380,318) | (52,015) | (122) | (1,290,296) |
| Gross profit | 163,382 | 180,132 | 26,935 | 760 | 371,209 |
| Other income | 57,056 | 19,715 | 103 | 2,581 | 79,455 |
| Selling and distribution costs | (47,317) | (76,032) | (3,149) | — | (126,498) |
| Administrative expenses. | (58,944) | (79,229) | (8,781) | (8,665) | (155,619) |
| Other expenses | (804) | (6,083) | (73) | (1,823) | (8,783) |
| Operating profit | 113,373 | 38,503 | 15,035 | (7,147) | 159,764 |
| Share of profit of associates | 12,198 | — | — | 28,082 | 40,280 |
| Finance costs | | | | | (53,230) |
| Profit before tax. | | | | | 146,814 |
| Income tax expense | | | | | (2,274) |
| Profit for the year | | | | | 144,540 |
| OTHER INFORMATION | | | | | |
| Capital expenditure | 91,329 | 123,342 | 4,326 | 18,545 | 237,542 |
| Depreciation and amortisation | 64,321 | 55,973 | 1,068 | 317 | 121,679 |
| Impairment losses recognised in profit or loss. | — | 3,700 | — | — | 3,700 |
| BALANCE SHEET | | | | | |
| ASSETS | | | | | |
| Segment assets. | 2,076,561 | 1,096,792 | 102,464 | 36,295 | 3,312,112 |
| Interests in associates. | 112,940 | — | — | 506,791 | 619,731 |
| | | | | | 3,931,843 |
| LIABILITIES | | | | | |
| Segment liabilities. | 774,882 | 515,149 | 71,224 | 12,858 | 1,374,113 |

ALRMH-CNBM00000345

APPENDIX I                                                     ACCOUNTANTS' REPORT

**5.    BUSINESS AND GEOGRAPHICAL SEGMENTS — continued**

**Year ended December 31, 2003**

| | Lightweight building materials RMB'000 | Cement RMB'000 | Engineering services RMB'000 | Glass fiber and FRP products RMB'000 | Eliminations RMB'000 | Total RMB'000 |
|---|---|---|---|---|---|---|
| Revenue | | | | | | |
| External sales. . . . . . . | 1,027,958 | 611,675 | 130,496 | 75,068 | — | 1,845,197 |
| Inter-segment sales . . . . | — | — | 15,000 | — | (15,000) | — |
| Cost of sales . . . . . . . . . | (861,825) | (421,057) | (112,640) | (46,432) | 15,151 | (1,426,803) |
| Gross profit . . . . . . . . . | 166,133 | 190,618 | 32,856 | 28,636 | 151 | 418,394 |
| Other income . . . . . . . . | 58,613 | 20,303 | 252 | 2,115 | — | 81,283 |
| Selling and distribution costs . . . . . . . . . . . . | (60,784) | (71,246) | (2,723) | (11,787) | — | (146,540) |
| Administrative expenses. . . | (76,515) | (71,218) | (15,192) | (17,685) | — | (180,610) |
| Other expenses . . . . . . . | (11,396) | (19,994) | (252) | (587) | — | (32,229) |
| Operating profit . . . . . . . | 76,051 | 48,463 | 14,941 | 692 | 151 | 140,298 |
| Share of profit of associates . . . . . . . . . . | 16,392 | — | (27) | 53,589 | — | 69,954 |
| Finance costs . . . . . . . . . | | | | | | (58,223) |
| Profit on partial disposal . . | | | | | | 1,312 |
| Profit before tax. . . . . . . . | | | | | | 153,341 |
| Income tax expense . . . . . | | | | | | (9,057) |
| Profit for the year . . . . . . | | | | | | 144,284 |
| | | | | | | |
| OTHER INFORMATION | | | | | | |
| Capital expenditure . . . . | 110,363 | 108,558 | 12,724 | 9,129 | | 240,774 |
| Depreciation and amortisation . . . . . . . | 66,924 | 62,365 | 1,069 | 2,818 | | 133,176 |
| Impairment losses recognised in profit or loss . . . . . . . . . . . . | — | 1,269 | — | — | | 1,269 |
| | | | | | | |
| BALANCE SHEET | | | | | | |
| | | | | | | |
| ASSETS | | | | | | |
| Segment assets . . . . . . . | 2,239,022 | 1,459,548 | 151,856 | 310,049 | | 4,160,475 |
| Interests in associates. . . | 189,588 | — | 573 | 542,947 | | 733,108 |
| | | | | | | 4,893,583 |
| | | | | | | |
| LIABILITIES | | | | | | |
| Segment liabilities. . . . . | 936,456 | 941,434 | 98,497 | 254,825 | | 2,231,212 |

ALRMH-CNBM00000346

5.   BUSINESS AND GEOGRAPHICAL SEGMENTS — continued

Year ended December 31, 2004

| | Lightweight building materials | Cement | Engineering services | Glass fiber and FRP products | Eliminations | Total |
|---|---|---|---|---|---|---|
| | RMB'000 | RMB'000 | RMB'000 | RMB'000 | RMB'000 | RMB'000 |
| **Revenue** | | | | | | |
| External sales. . . . . . . | 1,482,574 | 778,802 | 375,418 | 261,278 | — | 2,898,072 |
| Inter-segment sales . . . . | — | — | 90,458 | — | (90,458) | — |
| Cost of sales . . . . . . . . . . | (1,302,084) | (558,343) | (379,811) | (184,602) | 81,525 | (2,343,315) |
| Gross profit . . . . . . . . . . | 180,490 | 220,459 | 86,065 | 76,676 | (8,933) | 554,757 |
| Other income . . . . . . . . | 97,410 | 42,910 | 770 | 10,207 | — | 151,297 |
| Selling and distribution costs . . . . . . . . . . . . . | (86,087) | (68,856) | (5,564) | (27,598) | — | (188,105) |
| Administrative expenses. . . | (88,716) | (65,835) | (23,780) | (34,045) | — | (212,376) |
| Other expenses . . . . . . . . | (4,861) | (2,738) | (66) | (1,438) | — | (9,103) |
| Operating profit . . . . . . . | 98,236 | 125,940 | 57,425 | 23,802 | (8,933) | 296,470 |
| Share of profit of associates . . . . . . . . . . | 27,578 | — | (83) | 69,213 | — | 96,708 |
| Finance costs . . . . . . . . . | | | | | | (98,795) |
| Profit before tax. . . . . . . | | | | | | 294,383 |
| Income tax expense . . . . . | | | | | | (24,990) |
| Profit for the year . . . . . . | | | | | | 269,393 |
| | | | | | | |
| **OTHER INFORMATION** | | | | | | |
| Capital expenditure . . . . | 830,343 | 814,299 | 10,810 | 34,597 | | 1,690,049 |
| Depreciation and amortisation . . . . . . . | 84,658 | 34,095 | 474 | 14,747 | | 133,974 |
| **BALANCE SHEET** | | | | | | |
| **ASSETS** | | | | | | |
| Segment assets . . . . . . . | 2,867,382 | 2,413,367 | 307,549 | 563,826 | | 6,152,124 |
| Interests in associates. . . | 211,043 | — | 2,917 | 585,413 | | 799,373 |
| | | | | | | 6,951,497 |
| **LIABILITIES** | | | | | | |
| Segment liabilities. . . . . | 1,559,635 | 1,812,820 | 202,584 | 410,445 | | 3,985,484 |

ALRMH-CNBM00000347

ACCOUNTANTS' REPORT

**5.   BUSINESS AND GEOGRAPHICAL SEGMENTS — continued**

**Nine months ended September 30, 2005**

| | Lightweight building materials RMB'000 | Cement RMB'000 | Engineering services RMB'000 | Glass fiber and FRP products RMB'000 | Eliminations RMB'000 | Total RMB'000 |
|---|---|---|---|---|---|---|
| Revenue | | | | | | |
| External sales. . . . . . . | 1,676,927 | 885,852 | 547,818 | 223,872 | — | 3,334,469 |
| Inter-segment sales . . . . | — | 3,311 | 44,949 | — | (48,260) | — |
| Cost of sales . . . . . . . . . | (1,428,585) | (692,105) | (497,196) | (160,300) | 45,142 | (2,733,044) |
| Gross profit . . . . . . . . . | 248,342 | 197,058 | 95,571 | 63,572 | (3,118) | 601,425 |
| Other income . . . . . . . . | 85,426 | 58,182 | 923 | 33,010 | — | 177,541 |
| Selling and distribution costs . . . . . . . . . . . . . | (104,673) | (65,747) | (9,736) | (27,152) | — | (207,308) |
| Administrative expenses. . . | (102,312) | (50,046) | (27,927) | (20,456) | — | (200,741) |
| Unallocated expenses . . . . | — | — | — | — | — | (5,890) |
| Other expenses . . . . . . . | (2,811) | (478) | (89) | (1,498) | — | (4,876) |
| Operating profit . . . . . . . | 123,972 | 138,969 | 58,742 | 47,476 | (3,118) | 360,151 |
| Share of profit of associates . . . . . . . . . . | 20,906 | | (1,016) | 51,600 | — | 71,490 |
| Finance costs . . . . . . . . . | | | | | | (104,651) |
| Profit on partial disposal . . | | | | | | 12 |
| Profit on disposal of a subsidiary . . . . . . . . . . | | | | | | 27,281 |
| Profit before tax. . . . . . . | | | | | | 354,283 |
| Income tax expense . . . . . | | | | | | (39,648) |
| Profit for the period . . . . . | | | | | | 314,635 |
| | | | | | | |
| OTHER INFORMATION | | | | | | |
| Capital expenditure . . . . | 408,362 | 530,795 | 9,982 | 36,245 | | 985,384 |
| Depreciation and amortisation . . . . . . . | 75,023 | 52,971 | 1,338 | 16,894 | | 146,226 |
| BALANCE SHEET | | | | | | |
| ASSETS | | | | | | |
| Segment assets . . . . . . . | 4,331,724 | 3,108,991 | 514,781 | 851,522 | | 8,807,018 |
| Interests in associates. . . | 228,006 | — | 1,900 | 592,917 | | 822,823 |
| Unallocated assets. . . . . | — | — | — | — | | 29,598 |
| | | | | | | 9,659,439 |
| LIABILITIES | | | | | | |
| Segment liabilities. . . . . | 2,749,032 | 2,466,554 | 360,089 | 466,626 | | 6,042,301 |
| Unallocated liabilities . . . | — | — | — | — | | 366,495 |
| | | | | | | 6,408,796 |

I-26

ALRMH-CNBM00000348

5.    BUSINESS AND GEOGRAPHICAL SEGMENTS — continued

Nine months ended September 30, 2004 (unaudited)

| | Lightweight building materials RMB'000 | Cement RMB'000 | Engineering services RMB'000 | Glass fiber and FRP products RMB'000 | Eliminations RMB'000 | Total RMB'000 |
|---|---|---|---|---|---|---|
| Revenue | | | | | | |
| External sales . . . . . . . | 1,002,122 | 533,447 | 218,908 | 201,634 | — | 1,956,111 |
| Inter-segment sales . . . . | — | — | 76,553 | — | (76,553) | — |
| Cost of sales . . . . . . . . . | (884,586) | (375,197) | (259,527) | (145,179) | 70,622 | (1,593,867) |
| Gross profit . . . . . . . . . | 117,536 | 158,250 | 35,934 | 56,455 | (5,931) | 362,244 |
| Other income . . . . . . . . | 71,251 | 24,476 | 451 | 4,495 | — | 100,673 |
| Selling and distribution costs . . . . . . . . . . . . | (63,563) | (50,965) | (3,441) | (20,062) | — | (138,031) |
| Administrative expenses. . . | (69,362) | (46,685) | (13,839) | (24,500) | — | (154,386) |
| Other expenses . . . . . . . | (3,395) | (1,542) | (33) | (1,340) | — | (6,310) |
| Operating profit . . . . . . . | 52,467 | 83,534 | 19,072 | 15,048 | (5,931) | 164,190 |
| Share of profit of associates . . . . . . . . . . | 5,654 | — | (550) | 41,595 | — | 46,699 |
| Finance costs . . . . . . . . . | | | | | | (75,422) |
| Profit before tax. . . . . . . | | | | | | 135,467 |
| Income tax expense . . . . . | | | | | | (10,217) |
| Profit for the period . . . . . | | | | | | 125,250 |
| | | | | | | |
| OTHER INFORMATION | | | | | | |
| Capital expenditure . . . . | 749,946 | 611,168 | 10,342 | 10,242 | | 1,381,698 |
| Depreciation and amortisation . . . . . . . | 65,599 | 25,279 | 364 | 10,208 | | 101,450 |

Geographical segment

The Group's operations and assets are principally located in the PRC. Accordingly, no geographical segment analysis is presented.

ALRMH-CNBM00000349

**APPENDIX I**                                                    **ACCOUNTANTS' REPORT**

6.   **OTHER INCOME**

|  | Year ended December 31, | | | Nine months ended September 30, | |
|---|---|---|---|---|---|
|  | **2002** | **2003** | **2004** | **2004** | **2005** |
|  | **RMB'000** | **RMB'000** | **RMB'000** | **RMB'000** **(unaudited)** | **RMB'000** |
| Investment income |  |  |  |  |  |
| - Dividend from available-for-sale investments . . . . . . . . . . . . . . . | 2,100 | 1,162 | 1,100 | 200 | 1,051 |
| - Interest on bank deposits . . . . . . . . | 7,726 | 14,252 | 17,653 | 13,890 | 12,200 |
| - Interest on debt securities . . . . . . . . | 8,000 | 1,660 | — | — |  |
| - Net gain on disposal of investments . | 1,315 | 1,621 | — | — | — |
| Government subsidies |  |  |  |  |  |
| - Government grants . . . . . . . . . . . | 6,632 | 612 | 39,746 | 35,909 | 24,742 |
| - VAT refund . . . . . . . . . . . . . . . . . | 34,240 | 40,970 | 44,404 | 26,347 | 56,750 |
| - Interest subsidy . . . . . . . . . . . . . . | — | — | 8,081 | 6,072 | 2,280 |
| Net rental income. . . . . . . . . . . . . . . | 9,265 | 14,616 | 16,585 | 8,972 | 12,750 |
| Discount on acquisition released to income . . . . . . . . . . . . . . . . . . . . . | — | — | — | — | 10,850 |
| Gain on disposal of property, plant and equipment . . . . . . . . . . . . . . . . . . . . | — | — | — | — | 1,821 |
| Gain on debt restructuring . . . . . . . . . | 4,558 | — | 2,472 | 2,472 | 4,029 |
| Promotion fee . . . . . . . . . . . . . . . . . | — | 2,800 | 7,325 | — | 17,724 |
| Technical and other service income . . . . | 5,179 | 2,480 | 11,744 | 6,697 | 31,617 |
| Net foreign exchange gain . . . . . . . . . . | 440 | 1,110 | 2,187 | 114 | 1,727 |
|  | 79,455 | 81,283 | 151,297 | 100,673 | 177,541 |

I-28

### 7. OPERATING PROFIT

Operating profit has been arrived at after charging:

| | Year ended December 31, | | | Nine months ended September 30, | |
|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2004** | **2005** |
| | **RMB'000** | **RMB'000** | **RMB'000** | **RMB'000 (unaudited)** | **RMB'000** |
| Depreciation of property, plant and equipment and investment properties . . | 120,097 | 130,398 | 127,661 | 99,179 | 139,840 |
| Amortisation of intangible assets . . . . . . | — | 466 | 1,749 | 499 | 1,551 |
| Land use rights release to income . . . . . | 1,582 | 2,312 | 4,564 | 1,772 | 4,835 |
| Auditors' remuneration . . . . . . . . . . . . | 570 | 1,139 | 1,046 | 712 | 1,125 |
| Staff costs | | | | | |
|   - Salaries and other allowances . . . . . | 105,930 | 152,355 | 185,628 | 129,059 | 177,270 |
|   - Retirement plan contributions . . . . . | 15,201 | 17,405 | 22,644 | 15,827 | 20,011 |
| Loss on disposal of property, plant and equipment . . . . . . . . . . . . . . . . . . . | 850 | 26,694 | 2,566 | 2,073 | — |
| Net loss on disposal of investments . . . . | — | — | 4,540 | 1,526 | — |
| Net unrealised holding loss on investments . . . . . . . . . . . . . . . . . . | — | — | — | — | 1,759 |
| Allowances for bad and doubtful debts . . | 11,439 | 13,187 | 7,719 | 5,444 | 767 |
| Write-down of inventories . . . . . . . . . . | 1,844 | 930 | 3,199 | 357 | 2,237 |
| Impairment of property, plant and equipment . . . . . . . . . . . . . . . . . . . | 3,700 | 1,269 | — | — | — |
| Operating lease rentals . . . . . . . . . . . . | 2,660 | 3,638 | 4,911 | 3,662 | 9,851 |

### 8. FINANCE COSTS

| | Year ended December 31, | | | Nine months ended September 30, | |
|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2004** | **2005** |
| | **RMB'000** | **RMB'000** | **RMB'000** | **RMB'000 (unaudited)** | **RMB'000** |
| Interest on bank borrowings | | | | | |
|   - wholly repayable within five years . . | 53,230 | 59,279 | 125,273 | 91,407 | 140,370 |
|   - repayable over five years . . . . . . . . | — | 576 | — | — | — |
| Less: interest capitalised to construction in progress . . . . . . . . . . . . . . . . . . | — | (1,632) | (26,478) | (15,985) | (35,719) |
| | 53,230 | 58,223 | 98,795 | 75,422 | 104,651 |

Borrowing costs capitalised for the two years ended December 31, 2004 and the nine months ended September 30, 2005 arose on the general borrowing pool of respective subsidiaries and were calculated by applying a capitalisation rate of 5.6%, 5.5% and 5.3%, respectively, to expenditure on the qualifying assets.

ALRMH-CNBM00000351

**9.    DIRECTORS' AND EMPLOYEES' EMOLUMENTS**

a.    *Directors' and supervisors' emoluments*

The aggregate amounts of emoluments paid and payable to the directors and supervisors of the Company by the Group during the Track Record Period are as follows:

**Year ended December 31, 2002**

| | Fees | Salaries, allowances and benefits in kinds | Discretionary bonuses | Retirement plan contributions | Total |
|---|---|---|---|---|---|
| | RMB'000 | RMB'000 | RMB'000 | RMB'000 | RMB'000 |
| Executive directors | | | | | |
| Mr. Song Zhiping . . . . . . . . . . . | — | 3 | — | — | 3 |
| Mr. Cao Jianglin . . . . . . . . . . . | — | 106 | — | 16 | 122 |
| Mr. Li Yimin . . . . . . . . . . . . . . | — | 178 | 44 | 10 | 232 |
| Non-executive directors | | | | | |
| Ms. Cui Lijun . . . . . . . . . . . . . | — | 14 | — | — | 14 |
| Mr. Huang Anzhong . . . . . . . . . | — | — | — | — | — |
| Mr. Zuo Fenggao . . . . . . . . . . . | — | — | — | — | — |
| Mr. Guo Chaomin . . . . . . . . . . | — | — | — | — | — |
| Independent non-executive directors | | | | | |
| Mr. Zhang Renwei . . . . . . . . . . | — | — | — | — | — |
| Mr. Zhou Daojiong . . . . . . . . . . | — | — | — | — | — |
| Mr. Chi Haibin  . . . . . . . . . . . . | — | — | — | — | — |
| Mr. Lau Ko Yuen, Tom . . . . . . . | — | — | — | — | — |
| Supervisors | | | | | |
| Mr. Shen Anqin . . . . . . . . . . . . | — | — | 90 | — | 90 |
| Ms. Zhou Guoping . . . . . . . . . . | — | — | — | — | — |
| Mr. Bao Wenchun . . . . . . . . . . . | — | 167 | 51 | 10 | 228 |
| Ms. Cui Shuhong . . . . . . . . . . . | — | — | — | — | — |
| Mr. Zhang Zhaomin . . . . . . . . . . | — | — | — | — | — |
| Mr. Liu Chijin . . . . . . . . . . . . . | — | — | — | — | — |
| | — | 468 | 185 | 36 | 689 |

ALRMH-CNBM00000352

9.   DIRECTORS' AND EMPLOYEES' EMOLUMENTS — continued

Year ended December 31, 2003

| | Fees | Salaries, allowances and benefits in kinds | Discretionary bonuses | Retirement plan contributions | Total |
|---|---|---|---|---|---|
| | RMB'000 | RMB'000 | RMB'000 | RMB'000 | RMB'000 |
| Executive directors | | | | | |
| Mr. Song Zhiping . . . . . . . . . . . | — | — | — | — | — |
| Mr. Cao Jianglin . . . . . . . . . . . . | — | 27 | — | — | 27 |
| Mr. Li Yimin . . . . . . . . . . . . . . | — | 225 | 260 | 12 | 497 |
| Non-executive directors | | | | | |
| Ms. Cui Lijun . . . . . . . . . . . . . | — | 27 | — | — | 27 |
| Mr. Huang Anzhong . . . . . . . . . | — | — | — | — | — |
| Mr. Zuo Fenggao . . . . . . . . . . . | — | — | — | — | — |
| Mr. Guo Chaomin . . . . . . . . . . . | — | — | — | — | — |
| Independent non-executive directors | | | | | |
| Mr. Zhang Renwei . . . . . . . . . . | — | — | — | — | — |
| Mr. Zhou Daojiong . . . . . . . . . . | — | — | — | — | — |
| Mr. Chi Haibin . . . . . . . . . . . . . | — | — | — | — | — |
| Mr. Lau Ko Yuen, Tom . . . . . . . | — | — | — | — | — |
| Supervisors | | | | | |
| Mr. Shen Anqin . . . . . . . . . . . . | — | — | — | — | — |
| Ms. Zhou Guoping . . . . . . . . . . | — | — | — | — | — |
| Mr. Bao Wenchun . . . . . . . . . . . | — | 223 | 260 | 12 | 495 |
| Ms. Cui Shuhong . . . . . . . . . . . | — | — | — | — | — |
| Mr. Zhang Zhaomin . . . . . . . . . . | — | — | — | — | — |
| Mr. Liu Chijin . . . . . . . . . . . . . | — | — | — | — | — |
| | — | 502 | 520 | 24 | 1,046 |

ALRMH-CNBM00000353

9.   DIRECTORS' AND EMPLOYEES' EMOLUMENTS — continued

**Year ended December 31, 2004**

| | Fees | Salaries, allowances and benefits in kinds | Discretionary bonuses | Retirement plan contributions | Total |
|---|---|---|---|---|---|
| | RMB'000 | RMB'000 | RMB'000 | RMB'000 | RMB'000 |
| Executive directors | | | | | |
| Mr. Song Zhiping . . . . . . . . . . . | — | — | — | — | — |
| Mr. Cao Jianglin . . . . . . . . . . . . | — | 36 | — | — | 36 |
| Mr. Li Yimin . . . . . . . . . . . . . . | — | — | — | — | — |
| Non-executive directors | | | | | |
| Ms. Cui Lijun . . . . . . . . . . . . . | — | 36 | 50 | — | 86 |
| Mr. Huang Anzhong . . . . . . . . . | — | — | — | — | — |
| Mr. Zuo Fenggao . . . . . . . . . . . | — | — | — | — | — |
| Mr. Guo Chaomin . . . . . . . . . . . | — | — | — | — | — |
| Independent non-executive directors | | | | | |
| Mr. Zhang Renwei . . . . . . . . . . | — | — | — | — | — |
| Mr. Zhou Daojiong . . . . . . . . . . | — | — | — | — | — |
| Mr. Chi Haibin . . . . . . . . . . . . | — | — | — | — | — |
| Mr. Lau Ko Yuen, Tom . . . . . . . | — | — | — | — | — |
| Supervisors | | | | | |
| Mr. Shen Anqin . . . . . . . . . . . . | — | — | — | — | — |
| Ms. Zhou Guoping . . . . . . . . . . | — | — | — | — | — |
| Mr. Bao Wenchun . . . . . . . . . . . | — | 270 | 216 | 14 | 500 |
| Ms. Cui Shuhong . . . . . . . . . . . | — | 4 | 10 | — | 14 |
| Mr. Zhang Zhaomin . . . . . . . . . . | — | — | 20 | — | 20 |
| Mr. Liu Chijin . . . . . . . . . . . . . | — | — | — | — | — |
| | — | 346 | 296 | 14 | 656 |

ALRMH-CNBM00000354

9.    **DIRECTORS' AND EMPLOYEES' EMOLUMENTS — continued**

**Nine months ended September 30, 2005**

| | Fees | Salaries, allowances and benefits in kinds | Discretionary bonuses | Retirement plan contributions | Total |
|---|---|---|---|---|---|
| | RMB'000 | RMB'000 | RMB'000 | RMB'000 | RMB'000 |
| Executive directors | | | | | |
| Mr. Song Zhiping . . . . . . . . . . . | — | — | — | — | — |
| Mr. Cao Jianglin . . . . . . . . . . . | — | 27 | — | — | 27 |
| Mr. Li Yimin . . . . . . . . . . . . . | — | 70 | — | 7 | 77 |
| Non-executive directors | | | | | |
| Ms. Cui Lijun . . . . . . . . . . . . | — | 27 | — | — | 27 |
| Mr. Huang Anzhong . . . . . . . . . | — | — | — | — | — |
| Mr. Zuo Fenggao . . . . . . . . . . . | — | — | — | — | — |
| Mr. Guo Chaomin . . . . . . . . . . . | — | — | — | — | — |
| Independent non-executive directors | | | | | |
| Mr. Zhang Renwei . . . . . . . . . . | — | — | — | — | — |
| Mr. Zhou Daojiong . . . . . . . . . . | — | — | — | — | — |
| Mr. Chi Haibin  . . . . . . . . . . . | — | — | — | — | — |
| Mr. Lau Ko Yuen, Tom  . . . . . . . | — | — | — | — | — |
| Supervisors | | | | | |
| Mr. Shen Anqin . . . . . . . . . . . . | — | — | — | — | — |
| Ms. Zhou Guoping . . . . . . . . . . | — | — | — | — | — |
| Mr. Bao Wenchun . . . . . . . . . . . | — | 27 | — | — | 27 |
| Ms. Cui Shuhong . . . . . . . . . . . | — | 45 | — | 7 | 52 |
| Mr. Zhang Zhaomin . . . . . . . . . . | — | — | — | — | — |
| Mr. Liu Chijin . . . . . . . . . . . . . | — | — | — | — | — |
| | — | 196 | — | 14 | 210 |

ALRMH-CNBM00000355

9.    DIRECTORS' AND EMPLOYEES' EMOLUMENTS — continued

### Nine months ended September 30, 2004 (unaudited)

| | Fees | Salaries, allowances and benefits in kinds | Discretionary bonuses | Retirement plan contributions | Total |
|---|---|---|---|---|---|
| | RMB'000 | RMB'000 | RMB'000 | RMB'000 | RMB'000 |
| **Executive directors** | | | | | |
| Mr. Song Zhiping . . . . . . . . . . . | — | — | — | — | — |
| Mr. Cao Jianglin. . . . . . . . . . . . | — | 27 | — | — | 27 |
| Mr. Li Yimin . . . . . . . . . . . . . . | — | — | — | — | — |
| **Non-executive directors** | | | | | |
| Ms. Cui Lijun . . . . . . . . . . . . . | — | 27 | — | — | 27 |
| Mr. Huang Anzhong . . . . . . . . . | — | — | — | — | — |
| Mr. Zuo Fenggao . . . . . . . . . . . | — | — | — | — | — |
| Mr. Guo Chaomin . . . . . . . . . . . | — | — | — | — | — |
| **Independent non-executive directors** | | | | | |
| Mr. Zhang Renwei . . . . . . . . . . | — | — | — | — | — |
| Mr. Zhou Daojiong . . . . . . . . . . | — | — | — | — | — |
| Mr. Chi Haibin  . . . . . . . . . . . . | — | — | — | — | — |
| Mr. Lau Ko Yuen, Tom . . . . . . . | — | — | — | — | — |
| **Supervisors** | | | | | |
| Mr. Shen Anqin . . . . . . . . . . . . | — | — | — | — | — |
| Ms. Zhou Guoping . . . . . . . . . . | — | — | — | — | — |
| Mr. Bao Wenchun . . . . . . . . . . . | — | 208 | — | 10 | 218 |
| Ms. Cui Shuhong . . . . . . . . . . . | — | — | — | — | — |
| Mr. Zhang Zhaomin. . . . . . . . . . | — | — | — | — | — |
| Mr. Liu Chijin . . . . . . . . . . . . . | — | — | — | — | — |
| | — | 262 | — | 10 | 272 |

For the three years ended December 31, 2004 and the nine months ended September 30, 2005, the Parent and Beijing New Material (Group) Company Limited ("BNBMG"), a shareholder of the Company, bore approximately RMB2,170,000, Nil, RMB920,000 and RMB220,000 as part of the cost of the purchase of apartments by three directors of the Company, Mr. Song Zhiping, Mr. Li Yimin and Mr. Guo Chaomin (resigned on February 20, 2006) respectively. The emoluments were paid by the Parent and BNBMG in respect of their services to the Group and the Parent.

ALRMH-CNBM00000356

**9.   DIRECTORS' AND EMPLOYEES' EMOLUMENTS — continued**

The emoluments paid by the Group to the directors and supervisors are within the following band:

| | Number of directors and supervisors | | | | |
| --- | --- | --- | --- | --- | --- |
| | Year ended December 31, | | | Nine months ended September 30, | |
| | 2002 | 2003 | 2004 | 2004 | 2005 |
| | Number of directors and supervisors | Number of directors and supervisors | Number of directors and supervisors | Number of directors and supervisors | Number of directors and supervisors |
| | | | | (unaudited) | |
| Nil - RMB1,036,000 (equivalent to HK$1,000,000) . . . . . . . . . . . | 17 | 17 | 17 | 17 | 17 |

b.   *Employees' emoluments*

The emoluments of the five highest paid individuals included one director of the Company for the two years ended December 31, 2003 (details of whose emoluments are set out above). The emoluments of the remaining four, four, five, five and five highest paid individuals respectively for the Track Record Period are as follows:

| | Year ended December 31, | | | Nine months ended September 30, | |
| --- | --- | --- | --- | --- | --- |
| | 2002 | 2003 | 2004 | 2004 | 2005 |
| | RMB'000 | RMB'000 | RMB'000 | RMB'000 | RMB'000 |
| | | | | (unaudited) | |
| Salaries, allowances and benefits in kind . . . . . . . . . . | 393 | 446 | 720 | 680 | 642 |
| Discretionary bonuses . . . . . . . . . | 533 | 1,176 | 1,356 | 66 | 187 |
| Retirement plan contributions . . . . | 25 | 43 | 52 | 51 | 54 |
| | 951 | 1,665 | 2,128 | 797 | 883 |

Their emoluments paid by the Group are within the following band:

| | | | | | |
| --- | --- | --- | --- | --- | --- |
| Nil — RMB1,036,000 (equivalent to HK$1,000,000) . . . . . . . . . . | 4 | 4 | 5 | 5 | 5 |

During the Track Record Period, no emoluments were paid by the Group to the directors, supervisors nor the five highest paid individuals as an inducement to join or upon joining the Group or as compensation for loss of office. None of the directors and supervisors has waived any emoluments during the Track Record Period.

ALRMH-CNBM00000357

---

**APPENDIX I**                                                          **ACCOUNTANTS' REPORT**

---

### 10. PROFIT ON PARTIAL DISPOSAL

For the year ended December 31, 2003, the Group disposed of its 25% equity interests in BNBM Homes Company Limited to the independent third parties for a total consideration of RMB49,262,000, resulting in profit on partial disposal of RMB501,000. In addition, the Group also disposed of its 1.45% equity interests in BND Co. Ltd., to China Fiberglass for a total consideration of RMB4,986,000 in the same year, resulting in profit on partial disposal of RMB811,000.

### 11. INCOME TAX EXPENSE

|  | Year ended December 31, | | | Nine months ended September 30, | |
|---|---|---|---|---|---|
|  | 2002 | 2003 | 2004 | 2004 | 2005 |
|  | RMB'000 | RMB'000 | RMB'000 | RMB'000 (unaudited) | RMB'000 |
| Current income tax . . . . . . . . . . . . . . . | 3,452 | 10,785 | 26,411 | 11,245 | 39,654 |
| Deferred income tax (Note 35) . . . . . . . | (1,178) | (1,728) | (1,421) | (1,028) | (6) |
|  | 2,274 | 9,057 | 24,990 | 10,217 | 39,648 |

PRC income tax is calculated at 33% of the estimated assessable profit of the Group as determined in accordance with the relevant income tax rates and regulations in the PRC for the Track Record Period, except for certain subsidiaries of the Company, which are exempted or taxed at preferential rates of 15%.

ALRMH-CNBM00000358

**APPENDIX I**                                                          **ACCOUNTANTS' REPORT**

**11.   INCOME TAX EXPENSE — continued**

The total charge for the year/period can be reconciled to the accounting profit as follows:

|  | Year ended December 31, | | | Nine months ended September 30, | |
|---|---|---|---|---|---|
|  | **2002** | **2003** | **2004** | **2004** | **2005** |
|  | **RMB'000** | **RMB'000** | **RMB'000** | **RMB'000 (unaudited)** | **RMB'000** |
| Profit before tax. . . . . . . . . . . . . . . . | 146,814 | 153,341 | 294,383 | 135,467 | 354,283 |
| Tax at domestic income tax rate of 33% . | 48,449 | 50,603 | 97,146 | 44,704 | 116,913 |
| Effect of share of profit of associates . . . | (13,292) | (23,085) | (31,914) | (15,411) | (23,592) |
| Tax effect of expenses that are not deductible . . . . . . . . . . . . . . . . . . . | 871 | 2,823 | 9,782 | 9,524 | 3,485 |
| Tax effect of unrealised tax losses . . . . . | 1,989 | 9,432 | 13,117 | 16,035 | 16,309 |
| Tax effect of income tax credits granted to subsidiaries on utilisation of industrial waste (Note i) . . . . . . . . . . | (16,958) | (17,721) | (28,372) | (18,950) | (12,101) |
| Tax effect of income tax credits granted to subsidiaries on acquisition of certain qualified equipment (Note ii) . . | — | — | — | — | (30,204) |
| Tax effect of tax losses incurred by Lunan Cement and Julong Cement (Note iii) . . . . . . . . . . . . . . . . . . | (7,827) | (11,431) | (21,772) | (21,772) | — |
| Effect of differential tax rate on subsidiaries' income . . . . . . . . . . . . | (10,958) | (1,564) | (12,997) | (3,913) | (31,162) |
|  | 2,274 | 9,057 | 24,990 | 10,217 | 39,648 |

_____

*Notes:*

(i)    Pursuant to the relevant tax rules and regulations, tax credits were granted to BNBM and certain of its subsidiaries on utilisation of industrial waste as part of the raw materials. The credits are allowed as a deduction of current PRC income tax expenses upon relevant conditions were fulfilled and relevant tax approval was obtained from the relevant tax bureau.

(ii)   Pursuant to the relevant tax rules and regulations, Huaihai and Luhong can claim PRC income tax credits on 40% of the acquisition cost of certain qualified equipment manufactured in the PRC, to the extent to the PRC income tax expense in excess of that in the previous year. Such PRC income tax credits are allowed as a deduction of current income tax expenses upon relevant conditions were fulfilled and relevant tax approval was obtained from the relevant tax bureau.

(iii)  Luhong and Huaihai were established for the purpose of taking over the NSP Cement Operations of Lunan Cement and Julong Cement respectively pursuant to the Restructuring. Accordingly, NSP Cement Operations of Lunan Cement and Julong Cement respectively was not a stand-alone tax paying entity in accordance with the relevant PRC tax rules and regulations and the assessable profit of Luhong and Huaihai as a whole was reduced by the tax losses incurred by the operations other than the NSP Cement Operations of Lunan Cement and Julong Cement respectively prior to the Restructuring. As a result, the PRC income tax payable by Luhong and Huaihai was less than what it would have to pay had the NSP Cement Operations been a stand-alone tax paying entity.

I-37

ALRMH-CNBM00000359

## 12.  DISTRIBUTIONS TO EQUITY HOLDERS OF THE COMPANY

Set out below are the details of distributions to equity holders of the Company made during the Track Record Period:

|  | Year ended December 31, | | | Nine months ended September 30, | |
|---|---|---|---|---|---|
|  | 2002 | 2003 | 2004 | 2004 | 2005 |
|  | RMB'000 | RMB'000 | RMB'000 | RMB'000 (unaudited) | RMB'000 |
| Deemed distribution (Note i) . . . . . . . . | 5,476 | 115,623 | — | — | — |
| Dividend (Note ii) . . . . . . . . . . . . . . . | 17,349 | 20,820 | 27,759 | 27,759 | 135,637 |
|  | 22,825 | 136,443 | 27,759 | 27,759 | 135,637 |

---

*Notes:*

(i)    Details of deemed distribution were as follows:

|  | Year ended December 31, | | | Nine months ended September 30, | |
|---|---|---|---|---|---|
|  | 2002 | 2003 | 2004 | 2004 | 2005 |
|  | RMB'000 | RMB'000 | RMB'000 | RMB'000 (unaudited) | RMB'000 |
| Carve-out of assets pursuant to the Restructuring |  |  |  |  |  |
| - Properties, plant and equipment . . . . . . . . . . . . . | 7,564 | — | — | — | — |
| - Available-for-sale investments . | — | 10,134 | — | — | — |
| Carve-out of operating assets and liabilities (Note 1). . . . . . . . . | — | 154,906 | — | — | — |
|  | 7,564 | 165,040 | — | — | — |

Analysis of the deemed distribution was as follows:

|  | 2002 | 2003 | 2004 | 2004 | 2005 |
|---|---|---|---|---|---|
| Deemed distribution to equity holders of the Company . . . . . . | 5,476 | 115,623 | — | — | — |
| Deemed distribution to minority shareholders of subsidiaries. . . . | 2,088 | 49,417 | — | — | — |
|  | 7,564 | 165,040 | — | — | — |

(ii)    For the three years ended December 31, 2004, the amount represented dividend paid by BNBM, the Company's subsidiary and its shares are listed on the Shenzhen Stock Exchange.

ALRMH-CNBM00000360

**12. DISTRIBUTIONS TO EQUITY HOLDERS OF THE COMPANY — continued**

Pursuant to the "Provisional Regulation relating to Corporate Restructuring of Enterprises and Related Management of State-owned Capital and Financial Treatment" which was issued by the PRC Ministry of Finance and became effective from August 27, 2002, the Company's profit for the period from October 1, 2004 (being the first date after the effective date of Restructuring) to March 27, 2005 (being the date immediately prior to the date of its conversion as a joint stock company) belongs to the then shareholders of the Company. A dividend of RMB135,637,000 was declared to the then shareholders of the Company on March 28, 2005.

The rates of dividend and the number of shares ranking for dividends are not presented for those profit distributions as such information is not considered meaningful.

**13. EARNINGS PER SHARE**

The calculation of basic earnings per share is based on the profit attributable to equity holders of the Company during the Track Record Period and on the weighted average number of 1,387,110,000 and 1,387,555,238 shares for the three years ended December 31, 2004 and the nine months ended September 30, 2005 respectively on the assumption that the Restructuring had been completed on January 1, 2002.

No diluted earnings per share is presented as the Company did not have any potential shares during the Track Record Period or at each of the balance sheet dates.

ALRMH-CNBM00000361

## 14.  PROPERTY, PLANT AND EQUIPMENT

### THE GROUP

| | Construction in progress RMB'000 | Land and buildings RMB'000 | Plant and machinery RMB'000 | Motor vehicles RMB'000 | Total RMB'000 |
|---|---|---|---|---|---|
| **COST** | | | | | |
| At January 1, 2002 . . . . . . . . . . . . . | 86,484 | 590,689 | 1,115,175 | 35,462 | 1,827,810 |
| Additions . . . . . . . . . . . . . . . . . | 118,275 | 36,635 | 52,744 | 14,644 | 222,298 |
| Acquired on acquisition of subsidiaries . | 1,201 | 109,196 | 52,304 | 468 | 163,169 |
| Transfer . . . . . . . . . . . . . . . . . . . | (34,106) | 5,864 | 28,242 | — | — |
| Disposals . . . . . . . . . . . . . . . . . | — | — | (2,017) | (477) | (2,494) |
| Transfer to investment properties . . . . . | (63,551) | (4,486) | — | — | (68,037) |
| At December 31, 2002 . . . . . . . . . . . | 108,303 | 737,898 | 1,246,448 | 50,097 | 2,142,746 |
| | | | | | |
| **DEPRECIATION AND IMPAIRMENT** | | | | | |
| At January 1, 2002 . . . . . . . . . . . . . | — | 173,519 | 478,542 | 13,576 | 665,637 |
| Provided for the year . . . . . . . . . . . . | — | 24,295 | 89,377 | 4,170 | 117,842 |
| Eliminated on disposals . . . . . . . . . . . | — | — | (1,225) | (271) | (1,496) |
| Impairment loss recognised in profit or loss . . . . . . . . . . . . . . . . . . . . . | — | — | 3,620 | 80 | 3,700 |
| Transfer to investment properties . . . . . | — | (90) | — | — | (90) |
| At December 31, 2002 . . . . . . . . . . . | — | 197,724 | 570,314 | 17,555 | 785,593 |
| **NET BOOK VALUE** | | | | | |
| At December 31, 2002 . . . . . . . . . . . | 108,303 | 540,174 | 676,134 | 32,542 | 1,357,153 |
| **COST** | | | | | |
| At January 1, 2003 . . . . . . . . . . . . . | 108,303 | 737,898 | 1,246,448 | 50,097 | 2,142,746 |
| Additions . . . . . . . . . . . . . . . . . . . | 194,962 | 1,316 | 20,250 | 14,876 | 231,404 |
| Acquired on acquisition of subsidiaries . | 214,895 | 23,616 | 27,603 | 3,767 | 269,881 |
| Transfer . . . . . . . . . . . . . . . . . . . | (71,725) | 19,223 | 52,161 | 341 | — |
| Disposals . . . . . . . . . . . . . . . . . . . | — | (14,836) | (51,131) | (5,373) | (71,340) |
| Distributions . . . . . . . . . . . . . . . . . | — | (69,115) | (65,021) | (6,417) | (140,553) |
| Transfer to investment properties . . . . . | (21,468) | — | — | — | (21,468) |
| At December 31, 2003 . . . . . . . . . . . | 424,967 | 698,102 | 1,230,310 | 57,291 | 2,410,670 |
| **DEPRECIATION AND IMPAIRMENT** | | | | | |
| At January 1, 2003 . . . . . . . . . . . . . | — | 197,724 | 570,314 | 17,555 | 785,593 |
| Provided for the year . . . . . . . . . . . . | — | 24,010 | 96,412 | 6,707 | 127,129 |
| Eliminated on disposals . . . . . . . . . . . | — | (2,788) | (31,697) | (2,242) | (36,727) |
| Eliminated on distributions . . . . . . . . | — | (20,632) | (44,960) | (5,099) | (70,691) |
| Impairment loss recognised in profit or loss . . . . . . . . . . . . . . . . . . . . . | — | 96 | 442 | 731 | 1,269 |
| At December 31, 2003 . . . . . . . . . . . | — | 198,410 | 590,511 | 17,652 | 806,573 |
| **NET BOOK VALUE** | | | | | |
| At December 31, 2003 . . . . . . . . . . . | 424,967 | 499,692 | 639,799 | 39,639 | 1,604,097 |

ALRMH-CNBM00000362

14.   PROPERTY, PLANT AND EQUIPMENT — continued

THE GROUP — continued

| | Construction in progress | Land and buildings | Plant and machinery | Motor vehicles | Total |
|---|---|---|---|---|---|
| | RMB'000 | RMB'000 | RMB'000 | RMB'000 | RMB'000 |
| COST | | | | | |
| At January 1, 2004 . . . . . . . . . . . . . | 424,967 | 698,102 | 1,230,310 | 57,291 | 2,410,670 |
| Additions. . . . . . . . . . . . . . . . . . . . | 1,280,882 | 80,848 | 184,307 | 15,933 | 1,561,970 |
| Capital injection . . . . . . . . . . . . . . . | — | — | — | — | — |
| Acquired on acquisition of subsidiaries. | 3,547 | 60,125 | 42,962 | 5,968 | 112,602 |
| Transfer. . . . . . . . . . . . . . . . . . . . . | (452,035) | 127,474 | 322,086 | 2,475 | — |
| Disposals. . . . . . . . . . . . . . . . . . . . | — | — | (6,266) | (3,902) | (10,168) |
| Disposal of a subsidiary . . . . . . . . . . | — | — | (296) | (863) | (1,159) |
| Transfer to investment properties. . . . . | — | (3,026) | — | — | (3,026) |
| At December 31, 2004 . . . . . . . . . . | 1,257,361 | 963,523 | 1,773,103 | 76,902 | 4,070,889 |
| DEPRECIATION AND IMPAIRMENT | | | | | |
| At January 1, 2004 . . . . . . . . . . . . . | — | 198,410 | 590,511 | 17,652 | 806,573 |
| Provided for the year . . . . . . . . . . . . | — | 28,000 | 89,080 | 8,608 | 125,688 |
| Eliminated on disposals. . . . . . . . . . . | — | — | (3,960) | (2,722) | (6,682) |
| Elimination on disposal of a subsidiary. | — | — | (188) | (343) | (531) |
| Transfer to investment properties. . . . . | — | (316) | — | — | (316) |
| At December 31, 2004 . . . . . . . . . . | — | 226,094 | 675,443 | 23,195 | 924,732 |
| NET BOOK VALUE | | | | | |
| At December 31, 2004 . . . . . . . . . . | 1,257,361 | 737,429 | 1,097,660 | 53,707 | 3,146,157 |
| COST | | | | | |
| At January 1, 2005 . . . . . . . . . . . . . | 1,257,361 | 963,523 | 1,773,103 | 76,902 | 4,070,889 |
| Additions. . . . . . . . . . . . . . . . . . . . | 890,644 | 14,872 | 49,618 | 11,737 | 966,871 |
| Acquired on acquisition of subsidiaries. | 279,317 | 267,580 | 429,320 | 13,297 | 989,514 |
| Transfer. . . . . . . . . . . . . . . . . . . . . | (838,556) | 235,976 | 602,257 | 323 | — |
| Transfer to investment properties. . . . . | (171,804) | — | — | — | (171,804) |
| Disposals. . . . . . . . . . . . . . . . . . . . | (260) | (9,654) | (19,875) | (2,463) | (32,252) |
| Disposal of subsidiaries . . . . . . . . . . | (4,080) | (21,070) | (71,360) | (1,629) | (98,139) |
| At September 30, 2005 . . . . . . . . . . | 1,412,622 | 1,451,227 | 2,763,063 | 98,167 | 5,725,079 |
| DEPRECIATION AND IMPAIRMENT | | | | | |
| At January 1, 2005 . . . . . . . . . . . . . | — | 226,094 | 675,443 | 23,195 | 924,732 |
| Provided for the period . . . . . . . . . . . | — | 23,084 | 107,859 | 6,205 | 137,148 |
| Eliminated on disposals. . . . . . . . . . . | — | (8,548) | (19,303) | (1,360) | (29,211) |
| Elimination on disposal of subsidiaries . | — | (1,433) | (15,738) | (435) | (17,606) |
| At September 30, 2005 . . . . . . . . . . | — | 239,197 | 748,261 | 27,605 | 1,015,063 |
| NET BOOK VALUE | | | | | |
| At September 30, 2005 . . . . . . . . . . | 1,412,622 | 1,212,030 | 2,014,802 | 70,562 | 4,710,016 |

ALRMH-CNBM00000363

## 14.   PROPERTY, PLANT AND EQUIPMENT — continued

### THE COMPANY

| | Construction in progress | Land and buildings | Plant and machinery | Motor vehicles | Total |
|---|---|---|---|---|---|
| | RMB'000 | RMB'000 | RMB'000 | RMB'000 | RMB'000 |
| COST | | | | | |
| Additions during the period and balance at September 30, 2005 . . . . | — | 1,421 | 279 | — | 1,700 |
| DEPRECIATION | | | | | |
| Provided for the period and balance at September 30, 2005 . . . . . . . . . . . | — | — | (33) | — | (33) |
| NET BOOK VALUE | | | | | |
| At September 30, 2005 . . . . . . . . . . . | — | 1,421 | 246 | — | 1,667 |

The Group assesses the recoverable amounts of the property, plant and equipment and impairment of RMB3,700,000 and RMB1,269,000 was recognised for the two years ended December 31, 2003.

The carrying amount of the Group's property, plant and equipment pledged to secure the bank loans granted to the Group is analysed as follows:

| | At December 31, | | | At September 30, |
|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 |
| | RMB'000 | RMB'000 | RMB'000 | RMB'000 |
| Land and buildings . . . . . . . . . . . . . . . . . . . . | 34,307 | 53,987 | 189,333 | 127,030 |
| Plant and machinery . . . . . . . . . . . . . . . . . . | 94,340 | 248,354 | 157,612 | 261,554 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 128,647 | 302,341 | 346,945 | 388,584 |

ALRMH-CNBM00000364

**APPENDIX I**                                          **ACCOUNTANTS' REPORT**

15.  **INVESTMENT PROPERTIES**

|  | RMB'000 |
|---|---:|
| COST | |
| At January 1, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 29,494 |
| Transfer from property, plant and equipment . . . . . . . . . . . . . . . . . . . . . . . . . . . | 68,037 |
| At December 31, 2002. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 97,531 |
| DEPRECIATION | |
| At January 1, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 656 |
| Provided for the year. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,255 |
| Transfer from property, plant and equipment . . . . . . . . . . . . . . . . . . . . . . . . . . . | 90 |
| At December 31, 2002. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,001 |
| NET BOOK VALUE | |
| At December 31, 2002. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 94,530 |
| COST | |
| At January 1, 2003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 97,531 |
| Transfer from property, plant and equipment . . . . . . . . . . . . . . . . . . . . . . . . . . . | 21,468 |
| At December 31, 2003. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 118,999 |
| DEPRECIATION | |
| At January 1, 2003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,001 |
| Provided for the year. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,269 |
| At December 31, 2003. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6,270 |
| NET BOOK VALUE | |
| At December 31, 2003. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 112,729 |

ALRMH-CNBM00000365

15.   **INVESTMENT PROPERTIES — continued**

|  | RMB'000 |
|---|---|
| **COST** | |
| At January 1, 2004 | 118,999 |
| Addition | 513 |
| Transfer from property, plant and equipment | 3,026 |
| At December 31, 2004 | 122,538 |
| **DEPRECIATION** | |
| At January 1, 2004 | 6,270 |
| Provided for the year | 1,973 |
| Transfer from property, plant and equipment | 316 |
| At December 31, 2004 | 8,559 |
| **NET BOOK VALUE** | |
| At December 31, 2004 | 113,979 |
| **COST** | |
| At January 1, 2005 | 122,538 |
| Addition | 156 |
| Acquired on acquisition of subsidiaries | 5,575 |
| Transfer from construction in progress | 171,804 |
| At September 30, 2005 | 300,073 |
| **DEPRECIATION** | |
| At January 1, 2005 | 8,559 |
| Provided for the period | 2,692 |
| At September 30, 2005 | 11,251 |
| **NET BOOK VALUE** | |
| At September 30, 2005 | 288,822 |

The fair value of the Group's investment properties as at September 30, 2005 was RMB377,255,000. The fair value has been arrived at on the basis of a valuation carried out by Sallmanns (Far East) Ltd., independent valuers not connected with the Group. The valuation, which conforms to the HKIS Valuation Standards on Properties published by the Hong Kong Institute of Surveyors, was determined by reference to comparable sale transactions as available in the relevant market.

The property rental income earned by the Group from its investment properties, all of which is leased out under operating leases, amounted to RMB12,473,000, RMB20,280,000, RMB22,285,000 and RMB18,736,000 for the Track Record Period. Direct operating expenses arising on the investment properties during the Track Record Period amounted to RMB3,208,000, RMB5,664,000, RMB5,700,000 and RMB5,986,000.

ALRMH-CNBM00000366

**APPENDIX I**                                                    **ACCOUNTANTS' REPORT**

16.  **GOODWILL**

|  | At December 31, | | | At September 30, |
|---|---|---|---|---|
|  | **2002** | **2003** | **2004** | **2005** |
|  | **RMB'000** | **RMB'000** | **RMB'000** | **RMB'000** |
| CARRYING VALUE |  |  |  |  |
| At beginning of the year/period . . . . . . . . . . . . | 427 | 427 | 706 | 1,604 |
| Additions on acquisition of subsidiaries . . . . . . . | — | 279 | 898 | 51,174 |
| Addition on acquisition of additional interest in a subsidiary . . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | 3,702 |
| At end of the year/period . . . . . . . . . . . . . . . . | 427 | 706 | 1,604 | 56,480 |

Goodwill is allocated to the cash generating units ("CGUs") that are expected to benefit from the business combination. The carrying amount of goodwill had been allocated as follows:

|  | At December 31, | | | At September 30, |
|---|---|---|---|---|
|  | **2002** | **2003** | **2004** | **2005** |
|  | **RMB'000** | **RMB'000** | **RMB'000** | **RMB'000** |
| Lightweight building materials . . . . . . . . . . . . | 427 | 706 | 1,542 | 38,149 |
| Cement . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | 18,269 |
| Engineering services . . . . . . . . . . . . . . . . . . . | — | — | 62 | 62 |
|  | 427 | 706 | 1,604 | 56,480 |

The Group tests goodwill annually for impairment, or more frequently if there are indications that goodwill might be impaired.

The recoverable amounts of the CGUs are determined from value in use calculations. Management estimates discount rate using pre-tax rates that reflect current market assessments of the time value of money and the risks specific to the CGUs. Changes in selling prices and direct costs are based on past practices and expectations of future changes in the market.

The Group prepares cash flow forecasts derived from the most recent financial budgets approved by management for the next five years and the rate used to discount the forecast cash flows is 5 %.

ALRMH-CNBM00000367

**APPENDIX I**                                    **ACCOUNTANTS' REPORT**

## 17.   INTANGIBLE ASSETS

|  | Patents and trademarks |
|---|---|
|  | **RMB'000** |
| COST AND NET BOOK VALUE | |
| Additions during the year and balance at December 31, 2002 . . . . . . . . . . . . . . . | 1,350 |
| COST | |
| At January 1, 2003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,350 |
| Additions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,432 |
| At December 31, 2003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,782 |
| AMORTISATION | |
| Charged for the year and balance at December 31, 2003 . . . . . . . . . . . . . . . . . . | 466 |
| NET BOOK VALUE | |
| At December 31, 2003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,316 |
| COST | |
| At January 1, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,782 |
| Additions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 19,305 |
| Acquired on acquisition of subsidiaries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,798 |
| At December 31, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 25,885 |
| AMORTISATION | |
| At January 1, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 466 |
| Charged for the year . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,749 |
| At December 31, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,215 |
| NET BOOK VALUE | |
| At December 31, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23,670 |
| COST | |
| At January 1, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 25,885 |
| Additions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 931 |
| At September 30, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 26,816 |
| AMORTISATION | |
| At January 1, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,215 |
| Charged for the period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,551 |
| At September 30, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,766 |
| NET BOOK VALUE | |
| At September 30, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23,050 |

Trademarks have indefinite useful lives. Patents included above have finite useful lives, over which the assets are amortised. The average amortisation period for the patents is 9 years.

ALRMH-CNBM00000368

| APPENDIX I | ACCOUNTANTS' REPORT |
|---|---|

## 18.   INVESTMENTS IN SUBSIDIARIES

| | THE COMPANY | |
|---|---|---|
| | As at December 31, 2004 | As at September 30, 2005 |
| | RMB'000 | RMB'000 |
| Unlisted investments, at cost. . . . . . . . . . . . . . . . . . . . . . . . . . | 1,521,653 | 1,521,653 |

Details of the Company's principal subsidiaries as at December 31, 2004 and September 30, 2005, which are established in the PRC, are as follows:

| Company | Date of establishment | Nominal value of registered and paid-up capital | Attributable equity interest to the Company | | | | Principal activities |
|---|---|---|---|---|---|---|---|
| | | | December 31, 2004 | | September 30, 2005 | | |
| | | | Direct | Indirect | Direct | Indirect | |
| BNBM (Note i) | May 30, 1997 | RMB575,150,000 | 60.33% | — | 60.33% | — | Production and sale of lightweight building materials |
| China United | September 29, 1992 (Note ii) | RMB415,580,000 | 90.10% | — | 90.10% | 5.97% | Production and sale of cement |
| Luhong (Note iii) | September 28, 2004 | RMB200,000,000 | — | 72.38% | — | 77.18% | Production and sale of cement |
| Huaihai (Note iii) | September 29, 2004 | RMB139,820,000 | — | 66.49% | — | 85.30% (Note iv) | Production and sale of cement |
| China United Qingzhou Luhong Cement Company Limited | February 20, 2004 | RMB100,000,000 | — | 86.56% | — | 92.29% | Production and sale of cement |
| China Composites | June 28, 1988 (Note v) | RMB200,000,000 | 77% | — | 77% | — | Production and sale of FRP products |
| Zhongfu Lianzhong | October 26, 1989 (Note vi) | RMB66,579,600 | — | 39.27% | — | 72.77% | Production and sale of FRP products |
| Zhongfu Liberty | December 18, 2003 | RMB50,000,000 | — | 61.60% | — | 61.60% | Production and sale of PVC tiles |
| Zhongxin Tianma (Note vii) | December 11, 1995 | USD11,885,000 | — | 30.80% | — | 30.80% | Production and sale of glass fiber mats |
| China Triumph | December 28, 1991 (Note viii) | RMB60,000,000 | 91% | — | 91% | — | Provision of engineering services |
| CTIEC Shenzhen Scieno-tech Engineering Company Limited | April 8, 2002 | RMB5,000,000 | — | 50.05% | — | 50.05% | Provision of engineering services |
| China Triumph Nanjing Cement Technological Engineering Company Limited | December 26, 2001 | RMB7,820,000 | — | 46.55% | — | 46.55% | Provision of engineering services |

I-47

ALRMH-CNBM00000369

## 18.   INVESTMENTS IN SUBSIDIARIES — continued

*Notes:*

(i)     BNBM is a joint stock company listed on the Shenzhen Stock Exchange.

(ii)    China United was established as a state-owned enterprise in the PRC on September 29, 1992 and converted to a limited liability company on June 28, 1999.

(iii)   As part of the Restructuring, Luhong and Huaihai were established for the purpose of taking over the Transferred Operations from Lunan Cement and Julong Cement respectively effective December 31, 2003.

(iv)    The registered capital of Huaihai was increased from RMB59,820,000 at December 31, 2004 to RMB139,820,000 on April 27, 2005 and the Group's equity interests in Huaihai were increased from 66.49% in year 2004 to 85.30% in year 2005.

(v)     China Composites was established as a state-owned enterprise in the PRC on June 28, 1988 and converted to a limited liability company on September 28, 2004.

(vi)    Zhongfu Lianzhong was established as a state-owned enterprise in the PRC on October 26, 1989 and converted to a limited liability company on October 8, 1997. China Composites held 51% equity interest in Zhongfu Lianzhong and accordingly, Zhongfu Lianzhong is classified as a subsidiary of the Company as at December 31, 2004. China Composites subscribed for an additional 43.5% equity interests in Zhongfu Lianzhong on April 30, 2005.

(vii)   China Composites is entitled to nominate two directors to the five-member board of directors of Zhongxin Tianma in accordance with the joint venture agreement of Zhongxin Tianma. Pursuant to the agreement dated January 29, 2004 entered into between China Composites and Changzhou Tianma Group Company Limited ("Changzhou Tianma") which holds 35% equity interests in Zhongxin Tianma, Changzhou Tianma assigned Zhongxin Tianma the voting rights of the two directors nominated by Changzhou Tianma. Consequently, Zhongxin Tianma has been controlled by China Composites since year 2004 and is accounted for as a subsidiary since year 2004.

(viii)  China Triumph was established as a state-owned enterprise in the PRC on December 28, 1991 and converted to a limited liability company on September 30, 2004.

## 19.   INTERESTS IN ASSOCIATES

|  | THE GROUP | | | | THE COMPANY | |
|---|---|---|---|---|---|---|
|  | As at December 31, | | | As at September 30, | As at December 31, | As at September 30, |
|  | 2002 | 2003 | 2004 | 2005 | 2004 | 2005 |
|  | RMB'000 | RMB'000 | RMB'000 | RMB'000 | RMB'000 | RMB'000 |
| Cost of investments in associates | 282,074 | 346,540 | 345,340 | 329,638 | 220,364 | 220,364 |
| Share of post-acquisition profit, net of dividend received | 330,933 | 380,124 | 447,589 | 486,741 | — | — |
| Goodwill | 6,724 | 6,444 | 6,444 | 6,444 | — | — |
|  | 619,731 | 733,108 | 799,373 | 822,823 | 220,364 | 220,364 |

ALRMH-CNBM00000370

## 19.   INTERESTS IN ASSOCIATES — continued

As at the balance sheet dates, the Group had interests in the following principal associates:

| Company | Place and date of registration | Issued and fully paid capital | Attributable equity interest to the Group | | | | Principal activities |
|---|---|---|---|---|---|---|---|
| | | | As at December 31, | | | As at September 30, | |
| | | | 2002 | 2003 | 2004 | 2005 | |
| China Fiberglass (Note i) | PRC April 16, 1999 | 427,392,000 | 38.1% | 38.1% | 40.17% | 40.17% | Production of glass fiber |
| Shanghai Yaohua Pilkington Glass Co., Ltd. ("Yaohua") (Note ii) | PRC December 9, 1993 | 731,250,082 | 12.96% | 12.96% | 12.96% | 12.96% | Production of float glass |

———————

*Notes:*

(i)     China Fiberglass is a joint stock company listed on the Shanghai Stock Exchange. Although the Company has four non-independent directors on the China Fiberglass nine-member board, including the chairman, the Company holds less than 50% of the voting power in the shareholding meeting of China Fiberglass. As such, China Fiberglass is accounted for as an associate.

(ii)    Yaohua is a joint stock company listed on the Shanghai Stock Exchange. Although the Group holds less than 20% of the voting power in Yaohua, the Group has exercised significant influence to govern the financial and operating policies by virtue of having two non-independent directors on the eight-member board of Yaohua.

Summarised financial information in respect of the Group's associates is set out below.

| | For the year ended December 31, | | | Nine months ended September 30, | |
|---|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2004 | 2005 |
| | RMB'000 | RMB'000 | RMB'000 | RMB'000 (unaudited) | RMB'000 |
| Revenue. . . . . . . . . . . . . . . . . . . . . . | 2,698,947 | 3,355,498 | 4,493,711 | 3,140,830 | 3,532,043 |
| Profit for the year/period . . . . . . . . . . | 205,855 | 338,677 | 476,064 | 261,155 | 319,704 |
| Group's share of associates' profit for the year/period . . . . . . . . . . . . | 40,280 | 69,954 | 96,708 | 46,699 | 71,490 |

ALRMH-CNBM00000371

## 19.   INTERESTS IN ASSOCIATES — continued

| | As at December 31, | | | As at September 30, |
| --- | --- | --- | --- | --- |
| | **2002** | **2003** | **2004** | **2005** |
| | **RMB'000** | **RMB'000** | **RMB'000** | **RMB'000** |
| Total assets . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4,570,412 | 6,029,708 | 7,893,693 | 9,267,763 |
| Total liabilities . . . . . . . . . . . . . . . . . . . . . . . . . | (1,771,569) | (2,623,280) | (4,018,638) | (5,074,070) |
| Minority interests . . . . . . . . . . . . . . . . . . . . . . . | (125,703) | (279,731) | (544,643) | (831,380) |
| Net assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,673,140 | 3,126,697 | 3,330,412 | 3,362,313 |
| Group's share of associates' net assets . . . . . . . . . | 613,007 | 726,664 | 792,929 | 816,379 |

## 20.   INVESTMENTS

| | As at December 31, | | | As at September 30, |
| --- | --- | --- | --- | --- |
| | **2002** | **2003** | **2004** | **2005** |
| | **RMB'000** | **RMB'000** | **RMB'000** | **RMB'000** |
| **Available-for-sale Investments** | | | | |
| Unlisted equity shares, at cost (Note) . . . . . . . . . . | 33,170 | 36,962 | 41,042 | 51,860 |
| **Investments held-for-trading** | | | | |
| Listed equity securities in the PRC . . . . . . . . . . . . | — | 6,648 | — | — |
| Quoted investment funds . . . . . . . . . . . . . . . . . . . | 40,301 | 2,124 | 10,405 | 12,392 |
| Quoted debt securities . . . . . . . . . . . . . . . . . . . . . | 143,648 | 103,976 | 907 | 907 |
| | 183,949 | 112,748 | 11,312 | 13,299 |
| Investments held-for-trading, at market values . . . . . . | 183,949 | 112,748 | 11,312 | 13,299 |

———————

*Note:*   The available-for-sale investments are accounted for at cost less accumulated impairment losses as such investments do not have a quoted market price in an active market and whose fair value cannot be reliably measured.

## 21.   DEPOSITS

| | As at December 31, | | | As at September 30, |
| --- | --- | --- | --- | --- |
| | **2002** | **2003** | **2004** | **2005** |
| | **RMB'000** | **RMB'000** | **RMB'000** | **RMB'000** |
| Investment deposit . . . . . . . . . . . . . . . . . . . . . . . | — | — | 50,000 | 5,000 |
| Deposits paid to acquire property, plant and equipment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 9,000 | 16,900 | 24,456 |
| | — | 9,000 | 66,900 | 29,456 |

ALRMH-CNBM00000372

---

**APPENDIX I**                                                     **ACCOUNTANTS' REPORT**

---

## 22. LAND USE RIGHTS

| | THE GROUP | | | | THE COMPANY | |
| | As at December 31, | | | As at September 30, | As at December 31, | As at September 30, |
| | 2002 | 2003 | 2004 | 2005 | 2004 | 2005 |
| | RMB'000 | RMB'000 | RMB'000 | RMB'000 | RMB'000 | RMB'000 |
|---|---|---|---|---|---|---|
| CARRYING AMOUNT | | | | | | |
| At beginning of the year/ period . . . . . . . . | 96,801 | 109,113 | 113,739 | 246,417 | — | 28,981 |
| Additions . . . . . . . . . . . . | 13,894 | 6,938 | 108,261 | 17,426 | — | — |
| Shareholder's contribution . | — | — | 28,981 | — | 28,981 | — |
| Acquisition of subsidiaries . | — | — | — | 47,533 | — | — |
| Released to income statement . . . . . . . . . | (1,582) | (2,312) | (4,564) | (4,835) | — | (435) |
| At end of the year/period . . | 109,113 | 113,739 | 246,417 | 306,541 | 28,981 | 28,546 |

Analysis of the carrying amount of land use rights is as follows:

| | THE GROUP | | | | THE COMPANY | |
| | As at December 31, | | | As at September 30, | As at December 31, | As at September 30, |
| | 2002 | 2003 | 2004 | 2005 | 2004 | 2005 |
| | RMB'000 | RMB'000 | RMB'000 | RMB'000 | RMB'000 | RMB'000 |
|---|---|---|---|---|---|---|
| Land use rights . . . . . . . . | 109,113 | 113,739 | 246,417 | 306,541 | 28,981 | 28,546 |
| Less: Portion to be charged to income statement in the coming twelve months included as prepayments under current assets . . . . . . . | (2,312) | (4,564) | (6,199) | (6,957) | (580) | (580) |
| Amount due after one year . | 106,801 | 109,175 | 240,218 | 299,584 | 28,401 | 27,966 |

The amount represents the prepayment of rentals for land use rights situated in the PRC for a period of 38 - 50 years.

As at September 30, 2005, the Group has pledged land use rights having a net book value of approximately RMB89,835,000 to secure bank loans granted to the Group.

ALRMH-CNBM00000373

## 23.  INVENTORIES

| | As at December 31, | | | As at September 30, |
|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** |
| | **RMB'000** | **RMB'000** | **RMB'000** | **RMB'000** |
| Raw materials . . . . . . . . . . . . . . . . . . . . . . . . . | 126,677 | 123,554 | 176,247 | 254,928 |
| Work-in-progress . . . . . . . . . . . . . . . . . . . . . . | 23,019 | 25,704 | 51,023 | 80,751 |
| Finished goods . . . . . . . . . . . . . . . . . . . . . . . | 138,967 | 202,359 | 290,113 | 267,391 |
| Consumables. . . . . . . . . . . . . . . . . . . . . . . . . | 7,703 | 6,763 | 12,839 | 13,892 |
| | 296,366 | 358,380 | 530,222 | 616,962 |

As at December 31, 2002, 2003 and 2004 and September 30, 2005, included above are finished goods of RMB2,964,000, RMB9,445,000, RMB18,170,000 and RMB6,451,000 and raw materials of Nil, Nil, RMB5,537,000 and RMB6,183,000 which are carried at net realisable value.

## 24.  TRADE AND OTHER RECEIVABLES

| | As at December 31, | | | As at September 30, |
|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** |
| | **RMB'000** | **RMB'000** | **RMB'000** | **RMB'000** |
| Trade receivable, net of allowances for bad and doubtful debts . . . . . . . . . . . . . . . . . . . . . . . | 301,259 | 375,384 | 435,000 | 815,312 |
| Bills receivable . . . . . . . . . . . . . . . . . . . . . . . . | 31,199 | 44,288 | 109,845 | 28,227 |
| Amounts due from contract customers. . . . . . . . . . | — | 3,304 | 44,773 | 59,480 |
| Other receivables, deposits and prepayments. . . . . . . | 148,727 | 246,798 | 332,005 | 698,850 |
| | 481,185 | 669,774 | 921,623 | 1,601,869 |

The Group normally allowed an average credit period of 60 to 90 days to its trade customers.

Ageing analysis of trade receivable is as follows:

| | As at December 31, | | | As at September 30, |
|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** |
| | **RMB'000** | **RMB'000** | **RMB'000** | **RMB'000** |
| Within two months . . . . . . . . . . . . . . . . . . . . . . | 91,285 | 130,983 | 217,344 | 477,208 |
| More than two months but within one year . . . . . . . | 152,479 | 182,955 | 148,018 | 253,235 |
| Between one and two years . . . . . . . . . . . . . . . . | 39,033 | 41,062 | 50,714 | 64,626 |
| Between two and three years. . . . . . . . . . . . . . . . | 14,307 | 12,162 | 12,425 | 11,728 |
| Over three years . . . . . . . . . . . . . . . . . . . . . . . | 4,155 | 8,222 | 6,499 | 8,515 |
| | 301,259 | 375,384 | 435,000 | 815,312 |

The directors consider that the carrying amount of trade and other receivables approximates its fair value.

ALRMH-CNBM00000374

**24.  TRADE AND OTHER RECEIVABLES — continued**

**Credit risk**

The Group's principal financial assets are bank balances and cash, trade and other receivables, amounts due from related parties and investments, which represent the Group's maximum exposure to credit risk in relation to the financial assets.

The Group's credit risk is primarily attributable to its trade receivables. The amounts presented in the consolidated balance sheets are net of allowances for doubtful receivables, if any, estimated by the Group's management based on previous experience and their assessment of the current economic environment.

The Group has no significant concentration of credit risk, with exposure spread over a large number of counterparties and customers.

**Liquidity risk**

The Group is exposed to liquidity risk as a significant percentage of the Group's funding requirements is through short term bank borrowings. The directors intend to refinance a significant portion of such short term bank borrowings each year. Up to the date of this report, the Group had obtained agreements from certain banks in which these banks agreed to renew the short term bank loans of approximately RMB2,057,300,000 for one year upon maturity. As at December 31, 2005, the Group had unused banking facilities of approximately RMB778,000,000.

ALRMH-CNBM00000375

## APPENDIX I                                          ACCOUNTANTS' REPORT

### 25.   AMOUNTS DUE FROM AND TO RELATED PARTIES

| | THE GROUP | | | | THE COMPANY | |
| --- | --- | --- | --- | --- | --- | --- |
| | As at December 31, | | | As at September 30, | As at December 31, | As at September 30, |
| | 2002 | 2003 | 2004 | 2005 | 2004 | 2005 |
| | RMB'000 | RMB'000 | RMB'000 | RMB'000 | RMB'000 | RMB'000 |
| Amounts due from related parties | | | | | | |
| Trading in nature: | | | | | | |
| Fellow subsidiaries . . . . | 62,055 | 90,831 | 49,248 | 106,964 | — | 64 |
| Associates . . . . . . . . . | 14,219 | 10,666 | 73 | 31,965 | — | — |
| Immediate holding company . . . . . . . . . | — | — | — | — | — | — |
| Minority shareholders of subsidiaries . . . . . . . | — | 4,746 | 7,244 | 4,659 | — | — |
| | 76,274 | 106,243 | 56,565 | 143,588 | — | 64 |
| Non-trading in nature: | | | | | | |
| Fellow subsidiaries . . . . | 136,761 | 60,472 | 95,839 | 22,751 | — | — |
| Associates . . . . . . . . . | 5,550 | 33,317 | 7,007 | 26,055 | — | — |
| Immediate holding company . . . . . . . . . | — | 19,175 | 36,536 | — | — | — |
| Minority shareholders of subsidiaries . . . . . . . | — | 4,340 | 27,731 | 19,821 | — | — |
| Subsidiaries . . . . . . . . . | — | — | — | — | — | 223,254 |
| | 142,311 | 117,304 | 167,113 | 68,627 | — | 223,254 |
| | 218,585 | 223,547 | 223,678 | 212,215 | — | 223,318 |
| Amounts due to related parties | | | | | | |
| Trading in nature: | | | | | | |
| Fellow subsidiaries . . . . | 22,044 | 26,548 | 22,452 | 49,915 | — | 318 |
| Associates . . . . . . . . . | 5,632 | 836 | — | 14,765 | — | — |
| Immediate holding company . . . . . . . . . | — | — | — | — | — | — |
| Minority shareholders of subsidiaries . . . . . . . | — | — | 12,185 | 5,836 | — | — |
| | 27,676 | 27,384 | 34,637 | 70,516 | — | 318 |
| Non-trading in nature: | | | | | | |
| Fellow subsidiaries . . . . | 23,660 | 11,493 | 72,172 | 84,824 | — | — |
| Associates . . . . . . . . . | 701 | 9,904 | 2 | 7,026 | — | — |
| Immediate holding company . . . . . . . . . | — | — | 228 | 6,000 | — | — |
| Minority shareholders of subsidiaries . . . . . . . | — | — | 52,691 | 45,957 | — | — |
| | 24,361 | 21,397 | 125,093 | 143,807 | — | — |
| | 52,037 | 48,781 | 159,730 | 214,323 | — | 318 |

ALRMH-CNBM00000376

**25. AMOUNTS DUE FROM AND TO RELATED PARTIES — continued**

Amounts are unsecured and repayable on demand.

As at December 31, 2002, 2003 and 2004 and September 30, 2005, amounts due from related parties of RMB2,514,000, RMB49,984,000, RMB38,831,000 and RMB14,964,000 carry interests at rates ranging from 5.31% to 6.03%.

As at September 30, 2005, amounts due to related parties of RMB41,691,000 carry interests at rate of 6.03%.

Save as disclosed above, all other balances with related parties are interest free.

The directors confirm that except for the amounts due to minority shareholders of a subsidiary of RMB37,930,000, the non-trading balances with related parties have been fully settled before listing.

The directors consider the carrying amount of amounts due from and to related parties approximates its fair value.

**26. CONSTRUCTION CONTRACTS**

|  | As at December 31, | | | As at September 30, |
|---|---|---|---|---|
|  | 2002 | 2003 | 2004 | 2005 |
|  | RMB'000 | RMB'000 | RMB'000 | RMB'000 |
| Contracts in progress at balance sheet date: |  |  |  |  |
| Amounts due from contract customers included in trade and other receivables . . . . . . . . . . . . . | — | 3,304 | 44,773 | 59,480 |
| Amounts due to contract customers included in trade and other payables . . . . . . . . . . . . . . | — | — | — | (1,829) |
|  | — | 3,304 | 44,773 | 57,651 |
| Contract costs incurred plus recognised profits less recognised losses to date . . . . . . . . . . . . . . . . . | — | 35,134 | 243,301 | 488,162 |
| Less: progress billings . . . . . . . . . . . . . . . . . . . . . . | — | (31,830) | (198,528) | (430,511) |
|  | — | 3,304 | 44,773 | 57,651 |

As at December 31, 2002, 2003 and 2004 and September 30, 2005, advances received from customers for contract works amounted to RMB38,424,000, RMB52,733,000, RMB85,269,000 and RMB61,517,000 respectively and are included in other payables. There was no retention held by customers for contract works as at the balance sheet dates.

ALRMH-CNBM00000377

## 27. PLEDGED BANK DEPOSITS

Amount represents the Group's bank deposits pledged to banks to secure the bank facilities granted to the Group.

## 28. TRADE AND OTHER PAYABLES

An analysis of trade payable is as follows:

| | As at December 31, | | | As at September 30, |
|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 |
| | RMB'000 | RMB'000 | RMB'000 | RMB'000 |
| Within two months | 92,318 | 137,905 | 216,606 | 442,074 |
| More than two months but within one year | 68,256 | 112,129 | 188,722 | 253,709 |
| Between one and two years | 6,173 | 24,575 | 19,358 | 79,280 |
| Between two and three years | 2,276 | 4,010 | 7,009 | 7,682 |
| Over three years | 2,731 | 5,811 | 7,033 | 5,361 |
| Trade payable | 171,754 | 284,430 | 438,728 | 788,106 |
| Bills payable | 9,451 | 41,894 | 100,112 | 309,083 |
| Amounts due to contract customers | — | — | — | 1,829 |
| Other payables | 288,679 | 369,945 | 570,320 | 803,572 |
| | 469,884 | 696,269 | 1,109,160 | 1,902,590 |

The directors consider that the carrying amount of trade and other payables approximates its fair value.

## 29. BORROWINGS

| | THE GROUP | | | | THE COMPANY | |
|---|---|---|---|---|---|---|
| | As at December 31, | | | As at September 30, | As at December 31, | As at September 30, |
| | 2002 | 2003 | 2004 | 2005 | 2004 | 2005 |
| | RMB'000 | RMB'000 | RMB'000 | RMB'000 | RMB'000 | RMB'000 |
| Bank loans | 843,921 | 1,461,368 | 2,660,832 | 4,067,062 | — | 296,000 |
| Other borrowings from non-financial institutions | 5,400 | 5,400 | 31,500 | 118,265 | — | — |
| | 849,321 | 1,466,768 | 2,692,332 | 4,185,327 | — | 296,000 |

ALRMH-CNBM00000378

**APPENDIX I**          **ACCOUNTANTS' REPORT**

## 29. BORROWINGS — continued

The borrowings are repayable as follows:

| | THE GROUP | | | | THE COMPANY | |
| --- | --- | --- | --- | --- | --- | --- |
| | As at December 31, | | | As at September 30, | As at December 31, | As at September 30, |
| | 2002 | 2003 | 2004 | 2005 | 2004 | 2005 |
| | RMB'000 | RMB'000 | RMB'000 | RMB'000 | RMB'000 | RMB'000 |
| Within one year . . . . . . . . | 737,821 | 989,757 | 1,450,369 | 3,011,417 | — | 296,000 |
| Between one and two years . . . . . . . . . . . . . | — | 50,900 | 318,203 | 215,800 | — | — |
| Between two and three years . . . . . . . . . . . . . | 15,500 | 152,446 | 34,500 | 210,050 | — | — |
| Between three and four years . . . . . . . . . . . . . | 96,000 | 44,500 | 431,200 | 598,060 | — | — |
| Between four and five years . . . . . . . . . . . . . | — | 219,165 | 458,060 | 150,000 | — | — |
| Over five years . . . . . . . . | — | 10,000 | — | — | — | — |
| | 849,321 | 1,466,768 | 2,692,332 | 4,185,327 | — | 296,000 |
| Less: Amount due within one year shown under current liabilities. . . . . . | (737,821) | (989,757) | (1,450,369) | (3,011,417) | — | (296,000) |
| Amount due after one year . | 111,500 | 477,011 | 1,241,963 | 1,173,910 | — | — |

The analysis of the borrowings is as follows:

| | THE GROUP | | | | THE COMPANY | |
| --- | --- | --- | --- | --- | --- | --- |
| | As at December 31, | | | As at September 30, | As at December 31, | As at September 30, |
| | 2002 | 2003 | 2004 | 2005 | 2004 | 2005 |
| | RMB'000 | RMB'000 | RMB'000 | RMB'000 | RMB'000 | RMB'000 |
| Secured . . . . . . . . . . . . | 302,350 | 632,757 | 1,359,353 | 708,208 | — | — |
| Unsecured . . . . . . . . . . | 546,971 | 834,011 | 1,332,979 | 3,477,119 | — | 296,000 |
| | 849,321 | 1,466,768 | 2,692,332 | 4,185,327 | — | 296,000 |

ALRMH-CNBM00000379

**29.  BORROWINGS — continued**

The bank loans at December 31, 2002, 2003 and 2004 and September 30, 2005 carry interests at rates ranging from 5.0% to 6.1%, 4.8% to 6.2%, 4.8% to 8.3% and 4.3% to 8.0% respectively.

Other borrowings are unsecured, non-interest bearing and repayable on demand.

The directors consider the carrying amount of borrowings due within one year approximate its fair value.

As at December 31, 2002, 2003 and 2004 and September 30, 2005, bank loans of RMB127,450,000, RMB44,600,000, RMB84,600,000 and RMB317,629,000 were guaranteed by independent third parties. The directors confirm that such guarantees have been released before listing.

Parent Group provided guarantees to the Group on bank borrowings amounted to RMB225,000,000, RMB465,000,000 and RMB103,500,000, respectively, at December 31, 2003 and 2004 and September 30, 2005. The directors confirm that such guarantees have been fully released before listing.

**30.  DIVIDEND PAYABLE**

The amount represented outstanding dividend payable as at September 30, 2005 to the then shareholders of the Company. The directors confirm that the amount has been fully settled by cash before listing.

**31.  SHARE CAPITAL**

|  | September 30, 2005 |
| --- | --- |
|  | RMB'000 |
| Registered, issued and fully paid: |  |
| 1,387,760,000 shares of RMB1.0 each . . . . . . . . . . . . . . . . . . . . . . | 1,387,760 |

On March 28, 2005, the Company was converted to a joint stock company by capitalising the value of its net assets into 1,387,110,000 shares of RMB1 each and issuing of 650,000 shares of RMB1 each in the Company for a total cash consideration of RMB1,000,000 to a wholly-owned subsidiary of Parent.

Pursuant to the Restructuring, Parent effected the transfer of its interests in the Transferred Operations to the Company effective September 30, 2004. Accordingly, no share capital was presented as at December 31, 2002, 2003 and 2004.

ALRMH-CNBM00000380

**APPENDIX I**                                 **ACCOUNTANTS' REPORT**

32.  **RESERVES**

**THE COMPANY**

| | Share premium RMB'000 | Capital reserve RMB'000 | Other reserve *(Note)* RMB'000 | Retained earnings/ shareholders' equity RMB'000 | Total RMB'000 |
|---|---|---|---|---|---|
| Arising from Restructuring and balance at December 31, 2004 . . . . . . . . . . . | — | — | — | 1,770,998 | 1,770,998 |
| Conversion as a joint stock company . . . | — | 383,888 | — | (1,770,998) | (1,387,110) |
| Issue of shares. . . . . . . . . . . . . . . . . . | 350 | — | — | — | 350 |
| Distributions . . . . . . . . . . . . . . . . . . . | — | — | (135,637) | — | (135,637) |
| Profit for the period . . . . . . . . . . . . . . | — | — | — | 20,044 | 20,044 |
| As at September 30, 2005 . . . . . . . . . . | 350 | 383,888 | (135,637) | 20,044 | 268,645 |

—————

*Note:*

The amount represents the dividend declared to the then shareholders of the Company on March 28, 2005 (being the date of its conversion as a joint stock company).

ALRMH-CNBM00000381

## 33.   ACQUISITION OF SUBSIDIARIES/BUSINESSES

During the Track Record Period, the Group acquired certain subsidiaries/businesses. These transactions have been accounted for by the purchase method of accounting.

Details of the acquired subsidiaries other than the Reorganisation during the Track Record Period are as follows:

| Name of subsidiaries | Date of acquisition | Percentage of interests acquired | Nature of business acquired |
|---|---|---|---|
| Longyao Gypsum Company Limited | January 2003 | 24.12% | Production and sale of lightweight building materials |
| Zhongfu Lianzhong | May 2003 | 51% | Production and sale of FRP products |
| Beijing Dragon Star Building Material Equipment Company Limited | May 2004 | 100% | Production and sale of lightweight building materials |
| Beijing Dragon Technology Company Limited | May 2004 | 100% | Provision of technical service lightweight building materials manufacturers |
| BNBM Delivery Company Limited | May 2004 | 100% | Provision of transportation service |
| Beijing Haidian Chenlong Decoration Company Limited | May 2004 | 100% | Provision of decoration service |
| BNBM Southwest Distribution Company Limited | May 2004 | 70% | Sale of lightweight building materials |
| Weihai China Composites Xigang Boat Company Limited | December 2004 | 39.75% | Production and sale of FRP products |
| Changzhou Liberty TOLI Building Material Company Limited | January 2005 | 35% | Production and sale of lightweight building materials |
| Suzhou Tianfeng New Building Material Company Limited | March 2005 | 75% | Production and sale of lightweight building materials |
| Xingtai China United Ziyan Company Limited | April 2005 | 67.71% | Production and sale of cement |
| Zaozhuang China United Luhong Cement Company Limited | April 2005 | 100% | Production and sale of cement |
| Shandong Luhong Hengjiu Concrete Company Limited | April 2005 | 54.30% | Production and sale of cement |
| Shandong Heze Luhong Concrete Company Limited | April 2005 | 75% | Production and sale of cement |
| Shandong Taihe Dongxin Company Limited | April 2005 | 42% | Production and sale of lightweight building materials |
| Jiangyin Taishan Gypsum Building Material Company Limited | May 2005 | 57.50% | Production and sale of lightweight building materials |

ALRMH-CNBM00000382

**33.   ACQUISITION OF SUBSIDIARIES/BUSINESSES — continued**

The net assets acquired in the transactions, and the goodwill arising, are as follows:

| | Carrying amount before acquisition and fair value | | | |
| --- | --- | --- | --- | --- |
| | Year ended December 31, | | | Nine months ended September 30, |
| | 2002 | 2003 | 2004 | 2005 |
| | RMB'000 | RMB'000 | RMB'000 | RMB'000 |
| Net assets of subsidiaries/businesses acquired: | | | | |
| Property, plant and equipment . . . . . . . . . . . . . . | 163,169 | 269,881 | 112,602 | 989,514 |
| Land use rights. . . . . . . . . . . . . . . . . . . . . . | — | — | — | 47,533 |
| Investment properties. . . . . . . . . . . . . . . . . . . | — | — | — | 5,575 |
| Intangible assets . . . . . . . . . . . . . . . . . . . . . | — | — | 2,798 | — |
| Interests in associates. . . . . . . . . . . . . . . . . . . | — | — | — | 7,862 |
| Available-for-sale investments . . . . . . . . . . . . . . | — | — | — | 4,800 |
| Inventories . . . . . . . . . . . . . . . . . . . . . . . . . | 58,478 | 62,579 | 35,535 | 94,588 |
| Trade and other receivables. . . . . . . . . . . . . . . . | 158,448 | 122,679 | 43,171 | 235,149 |
| Investment held-for-trading . . . . . . . . . . . . . . . | — | 1,954 | 1,324 | 8,601 |
| Bank balances and cash . . . . . . . . . . . . . . . . . . | 20,976 | 62,888 | 35,054 | 257,417 |
| Trade and other payables . . . . . . . . . . . . . . . . . | (143,860) | (135,895) | (56,245) | (604,520) |
| Borrowings . . . . . . . . . . . . . . . . . . . . . . . . . | (157,400) | (256,966) | (63,193) | (577,800) |
| Income tax payable . . . . . . . . . . . . . . . . . . . . | — | (898) | — | (1,033) |
| Deferred income . . . . . . . . . . . . . . . . . . . . . . | — | (10,361) | — | — |
| | 99,811 | 115,861 | 111,046 | 467,686 |
| Minority interests. . . . . . . . . . . . . . . . . . . . . . | (33,443) | (41,718) | (37,020) | (219,565) |
| Interests in associates . . . . . . . . . . . . . . . . . . . | — | (2,505) | (18,207) | (13,031) |
| Goodwill . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 279 | 898 | 51,174 |
| | 66,368 | 71,917 | 56,717 | 286,264 |
| Other assets acquired under asset exchange agreement (Note 40(c)(i)): | | | | |
| Additional equity interest in an existing subsidiary | — | — | 2,062 | — |
| Available-for-sale investments . . . . . . . . . . . . . | — | — | 2,665 | — |
| Amount due from a fellow subsidiary . . . . . . . . . | — | — | 8,281 | — |
| Total consideration . . . . . . . . . . . . . . . . . . . . . | 66,368 | 71,917 | 69,725 | 286,264 |
| Satisfied by: | | | | |
| Cash . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 31,907 | 10,420 | 169,048 |
| Shareholder's contribution. . . . . . . . . . . . . . . . . | 66,368 | 40,010 | — | — |
| Equity interests in a subsidiary/business. . . . . . . . | — | — | 14,485 | — |
| Investment deposit . . . . . . . . . . . . . . . . . . . . . | — | — | — | 50,000 |
| Amounts due from fellow subsidiaries . . . . . . . . . | — | — | 42,320 | 54,176 |
| Amounts due to related parties. . . . . . . . . . . . . . | — | — | 2,500 | 4,667 |
| Trade and other payables . . . . . . . . . . . . . . . . . | — | — | — | 8,373 |
| | 66,368 | 71,917 | 69,725 | 286,264 |
| Net cash inflow arising on acquisition | | | | |
| Cash consideration paid . . . . . . . . . . . . . . . . . . | — | (31,907) | (10,420) | (169,048) |
| Cash and cash equivalents acquired. . . . . . . . . . . | 20,976 | 62,888 | 35,054 | 257,417 |
| | 20,976 | 30,981 | 24,634 | 88,369 |

ALRMH-CNBM00000383

**33.   ACQUISITION OF SUBSIDIARIES/BUSINESSES — continued**

The goodwill arising on the acquisition is attributable to the anticipated profitability of the distribution of the Group's products and the anticipated future operating synergies from the combination.

The acquirees' contributions to the revenue and the Group's profit before tax for the period between the date of acquisition and the balance sheet date are as follows:

|  | Year ended December 31, | | | Nine months ended September 30, |
|---|---|---|---|---|
|  | **2002** | **2003** | **2004** | **2005** |
|  | **RMB'000** | **RMB'000** | **RMB'000** | **RMB'000** |
| Revenue | 273,784 | 80,209 | 179,139 | 431,466 |
| Group's profit before tax | 7,593 | 2,292 | 8,993 | 16,775 |

If the acquisition had been completed at the beginning of that year/period, the acquirees' contributions to the revenue and the Group's profit before tax would have been as follows:

|  | Year ended December 31, | | | Nine months ended September 30, |
|---|---|---|---|---|
|  | **2002** | **2003** | **2004** | **2005** |
|  | **RMB'000** | **RMB'000** | **RMB'000** | **RMB'000** |
| Revenue | 273,784 | 111,338 | 206,932 | 643,879 |
| Group's profit before tax | 7,593 | 2,493 | 9,405 | 10,107 |

The above proforma information is for illustrative purposes only and is not necessarily an indication of revenue and results of operations of the Group that actually would have been achieved had the acquisition been completed at the beginning of the respective year/period, nor is it intended to be a projection of actual results.

ALRMH-CNBM00000384

---

**APPENDIX I**                                     **ACCOUNTANTS' REPORT**

---

## 34. DISPOSAL OF SUBSIDIARIES

The net assets disposed of in the transactions are as follows:

| | 2004 | 2005 |
|---|---|---|
| | RMB'000 | RMB'000 |
| Net assets of subsidiaries disposed of: | | |
| Property, plant and equipment | 628 | 80,533 |
| Inventories | 9,642 | 113,655 |
| Trade and other receivables | 6,112 | 164,391 |
| Investments held-for-trading | 220 | 251 |
| Bank balances and cash | 2,577 | 77,286 |
| Trade and other payables | (2,108) | (356,582) |
| Bank borrowings | (1,600) | (36,000) |
| Minority interests | (986) | (7,290) |
| | 14,485 | 36,244 |
| Profit on disposals of subsidiaries | — | 27,281 |
| | 14,485 | 63,525 |
| Other asset disposed of under asset exchange agreement *(Note 40(c)(i))*: | | |
| Amount due from a fellow subsidiary | 42,320 | — |
| Total consideration | 56,805 | 63,525 |
| | | |
| Satisfied by: | | |
| Cash | — | 20,000 |
| Equity interests in subsidiaries/business | 42,899 | — |
| Additional equity interests in existing subsidiaries | 2,062 | 51,761 |
| Available-for-sale investments | 2,665 | — |
| Amount due from a fellow subsidiary | 8,281 | — |
| Amount due to a fellow subsidiary | — | (8,236) |
| Goodwill on acquisition of subsidiary/business | 898 | — |
| | 56,805 | 63,525 |
| | | |
| Net cash outflow arising on disposal: | | |
| Cash consideration received | — | 20,000 |
| Cash and cash equivalents disposal of | (2,577) | (77,286) |
| | (2,577) | (57,286) |

ALRMH-CNBM00000385

## 35.   DEFERRED TAX ASSET

The following is the major deferred tax asset recognised by the Group, and the movements thereon, during the Track Record Period.

|  | Allowances for inventories and trade and other receivables |
|---|---|
|  | RMB'000 |
| At January 1, 2002 | 1,060 |
| Credit to income for the year | 1,178 |
| At December 31, 2002 | 2,238 |
| Credit to income for the year | 1,728 |
| At December 31, 2003 | 3,966 |
| Credit to income for the year | 1,421 |
| At December 31, 2004 | 5,387 |
| Credit to income for the period | 6 |
| At September 30, 2005 | 5,393 |

## 36.   MAJOR NON-CASH TRANSACTIONS

Other than the Restructuring, the Group entered into significant non-cash transactions during the Track Record Period as follows:

(a)   During the year ended December 31, 2003, certain operating assets and liabilities previously associated with the Transferred Operations that were retained by Parent of RMB165,040,000 was reflected as a distribution to owner.

(b)   During the year ended December 31, 2004, BNBM transferred its entire equity interest in two subsidiaries and amount due from a fellow subsidiary of RMB42,320,000 to BNBMG for a total consideration of RMB56,805,000. The consideration was satisfied by transfer of an available-for-sale investment of RMB2,665,000 and BNBMG's entire equity interests in certain subsidiaries to BNBM and the remaining balance of RMB8,281,000, by increase in amount due from a fellow subsidiary.

(c)   During the nine months ended September 30, 2005, BNBM acquired 9.9% equity interest in China United for a total consideration of RMB51,761,000. The consideration was satisfied by the transfer of its entire 60% equity interest in BNBM Plastic Company Limited, certain assets and the remaining balance of RMB8,236,000, by increase in amount due to a fellow subsidiary.

ALRMH-CNBM00000386

**36. MAJOR NON-CASH TRANSACTIONS — continued**

(d) During the nine months ended September 30, 2005, the Group disposed of its entire interest in a subsidiary and assigned the amount due from the subsidiary of approximately RMB141,000,000 for a total consideration of approximately RMB161,000,000. The consideration was satisfied by increase in other receivable of approximately RMB141,000,000 and the remaining balance of RMB20,000,000 in cash.

(e) During the nine months ended September 30, 2005, dividend payable of RMB57,337,000 was offset against the same amount of amounts due from related parties.

**37. CONTINGENT LIABILITIES**

(a) At the balance sheet dates, the Group had the following undiscounted maximum amount of potential future payments under guarantees:

|  | As at December 31, | | | As at September 30, |
|---|---|---|---|---|
|  | 2002 | 2003 | 2004 | 2005 |
|  | RMB'000 | RMB'000 | RMB'000 | RMB'000 |
| Guarantees given to banks in respect of banking facilities utilised by independent third parties . . . . . . . . . . . . . . . . . . . . . | 85,510 | 87,495 | 55,000 | 144,500 |

The directors confirm that such guarantees will be fully released before listing.

(b) In connection with the Restructuring, CNBM Equipment transferred to China National Building Material Import and Export Company ("CNBM Trading") , a shareholder of the Company, certain liabilities (1) in the amount of approximately RMB25,910,000 plus accrued interest arising from a bank debt incurred by it prior to the Restructuring, and (2) in the amount of RMB28,000,000 plus penalty and accrued interest as a result of a legal proceeding that was decided prior to the Restructuring. Based on the advice of the Company's PRC legal counsel, the Company may remain liable if CNBM Trading fails to fulfill its obligations in respect of these transferred liabilities. Pursuant to an indemnification undertaking, Parent has agreed to indemnify the Company in respect of any loss or damage relating to the transferred liabilities prior to the Restructuring.

ALRMH-CNBM00000387

**APPENDIX I**                                     **ACCOUNTANTS' REPORT**

### 38.  COMMITMENTS

#### THE GROUP

| | As at December 31, | | | As at September 30, |
|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** |
| | **RMB'000** | **RMB'000** | **RMB'000** | **RMB'000** |
| Capital expenditure of the Group in respect of acquisition of property, plant and equipment contracted for but not provided in the financial statements . . . . . . . . . . . . . . . | 42,886 | 450,748 | 649,205 | 551,653 |

The Company has no significant capital commitment at December 31, 2004 and September 30, 2005.

### 39.  OPERATING LEASE COMMITMENTS

#### The Group as lessee

At the balance sheet dates, the Group had outstanding commitments under non-cancelable operating leases, which fall due as follows:

| | As at December 31, | | | As at September 30, |
|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** |
| | **RMB'000** | **RMB'000** | **RMB'000** | **RMB'000** |
| Within one year . . . . . . . . . . . . . . . . . . . . . . . | 2,926 | 7,392 | 14,513 | 8,530 |
| In the second to fifth year inclusive . . . . . . . . . . | 8,256 | 23,840 | 45,328 | 19,658 |
| Over five years . . . . . . . . . . . . . . . . . . . . . . . | 5,890 | 28,915 | 18,887 | 34,017 |
| | 17,072 | 60,147 | 78,728 | 62,205 |

Operating lease payments represent rentals payable by the Group for certain of its business premises. Leases are negotiated for an average term of three years and rentals are fixed for an average of three years.

ALRMH-CNBM00000388

**39.   OPERATING LEASE COMMITMENTS — continued**

**The Group as lessor**

At the balance sheet dates, the Group has contracted with tenants for the following future minimum lease payments:

|  | As at December 31, | | | As at September 30, |
|---|---|---|---|---|
|  | **2002** | **2003** | **2004** | **2005** |
|  | **RMB'000** | **RMB'000** | **RMB'000** | **RMB'000** |
| Within one year . . . . . . . . . . . . . . . . . . . . . . | 11,231 | 14,188 | 12,566 | 33,214 |
| In the second to fifth year inclusive . . . . . . . . . . . | 42,990 | 46,291 | 43,240 | 128,653 |
| Over five years . . . . . . . . . . . . . . . . . . . . . . | 151,221 | 142,176 | 131,446 | 412,574 |
|  | 205,442 | 202,655 | 187,252 | 574,441 |

The Company has no significant operating lease commitments at December 31, 2004 and September 30, 2005.

**40.   RELATED PARTY TRANSACTIONS**

Parties are considered to be related if one party has the ability, directly or indirectly, to control the other party or exercise significant influence over the other party in making financial and operating decisions. Parties are also considered to be related if they are subject to common control.

The Group is controlled by Parent and has significant transactions and relationships with the Parent and its affiliates. Related parties refer to enterprises over which Parent is able to exercise significant influence or control. The Company also has entered into transactions with its associates, over which the Company can exercise significant influence. Because of the above relationships, it is possible that the terms of these transactions are not the same as those that would result from transactions among wholly unrelated parties.

ALRMH-CNBM00000389

## 40.   RELATED PARTY TRANSACTIONS — continued

(a)   Apart from the amounts due from and to related companies as disclosed in Note 25, during the Track Record Period, the Company had the following transactions with Parent and its affiliates ("Parent Group"), the associates of the Group and minority shareholders of the Group's subsidiaries that were carried out in the normal course of business:

| | Year ended December 31, | | | Nine months ended September 30, | |
|---|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2004 | 2005 |
| | RMB'000 | RMB'000 | RMB'000 | RMB'000 | RMB'000 |
| | | | | (unaudited) | |
| **Continuing transactions:** | | | | | |
| Provision of production supplies to | | | | | |
| - Parent Group[*] . . . . . . . . . | 75,895 | 78,642 | 55,424 | 38,675 | 77,962 |
| - Associates . . . . . . . . . . . . . . | 2,495 | 2,268 | 3,926 | 1,265 | 3,839 |
| - Minority shareholders of subsidiaries . . . . . . . . . . . . | — | — | — | — | 36,839 |
| | 78,390 | 80,910 | 59,350 | 39,940 | 118,640 |
| Provision of support services to Parent Group . . . . . . . . . . . . . | — | — | 3,740 | 2,379 | 7,882 |
| Provision of technical consultation services to | | | | | |
| - Parent Group . . . . . . . . . . | 2,442 | — | 1,920 | 1,440 | 1,164 |
| - A minority shareholder of a subsidiary . . . . . . . . . . . | — | — | 2,500 | — | 5,380 |
| | 2,442 | — | 4,420 | 1,440 | 6,544 |
| Rental income in respect of supply of equipment to Parent Group . . | — | — | — | — | 3,106 |
| Rental income received from an associate . . . . . . . . . . . . . | 7,638 | 10,089 | 10,391 | 7,803 | 7,800 |
| Rendering of engineering services to Parent Group . . . . . . . . . . . | — | — | 4,658 | 4,241 | 567 |
| Licensing of trademarks to Parent Group . . . . . . . . . . . . . | — | — | — | — | 160 |
| Supply of raw materials by | | | | | |
| - Parent Group . . . . . . . . . . | — | — | 8,422 | — | 45,979 |
| - Associates[*] . . . . . . . . . . . | — | 571 | 8,448 | 4,767 | 41,997 |
| - Minority shareholders of subsidiaries[*] . . . . . . . . . | 42,261 | 43,662 | 72,093 | 52,233 | 48,415 |
| | 42,261 | 44,233 | 88,963 | 57,000 | 136,391 |

ALRMH-CNBM00000390

## 40.   RELATED PARTY TRANSACTIONS — continued

| | Year ended December 31, | | | Nine months ended September 30, | |
|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2004** | **2005** |
| | **RMB'000** | **RMB'000** | **RMB'000** | **RMB'000** | **RMB'000** |
| | | | | **(unaudited)** | |
| Provision of production supplies by | | | | | |
| - Parent Group[(*)] . . . . . . . . . . | 67,488 | 42,077 | 45,341 | 28,903 | 13,553 |
| - Associates . . . . . . . . . . . . . | 44,110 | 35,085 | 23,635 | 20,870 | 685 |
| - Minority shareholders of subsidiaries . . . . . . . . . . . . | — | — | — | — | 18,175 |
| | 111,598 | 77,162 | 68,976 | 49,773 | 32,413 |
| Provision of support services by | | | | | |
| - Parent Group[(*)] . . . . . . . . . | 69,266 | 78,999 | 54,085 | 30,712 | 16,974 |
| - Minority shareholders of Subsidiaries . . . . . . . . . . . . | — | — | 2,882 | 1,921 | 2,370 |
| | 69,266 | 78,999 | 56,967 | 32,633 | 19,344 |
| Rendering of engineering services by Parent Group . . . . . . . . . . | 7,849 | 13,944 | 10,824 | — | 4,999 |
| Supplying of equipment by Parent Group . . . . . . . . . . . . | — | 5,480 | 76,070 | 53,761 | 25,872 |
| Interest expenses paid to minority shareholders of subsidiaries . . . | — | — | 2,569 | 1,927 | 1,721 |
| **Discontinued transactions:** | | | | | |
| Provision of production supplies to minority shareholders of subsidiaries . . . . . . . . . . . . . . | — | — | 7,584 | 6,581 | 12,176 |
| Provision of services to Parent Group . . . . . . . . . . . . . | 3,360 | 2,837 | 2,462 | 1,570 | 5,809 |
| Provision of consultation services to minority shareholders of subsidiaries . . . . . . . . . . . . . . | — | — | — | — | 13,740 |
| Rental expenses paid to Parent Group . . . . . . . . . . . . . | 1,007 | 1,495 | 1,495 | — | 685 |
| Interest income received from | | | | | |
| - Parent Group . . . . . . . . . . . | 227 | 2,177 | 6,653 | 5,660 | 1,317 |
| - An associate . . . . . . . . . . . . | — | — | 88 | — | 1,535 |
| - Minority shareholders of subsidiaries . . . . . . . . . . . . | — | 347 | — | — | 64 |
| | 227 | 2,524 | 6,741 | 5,660 | 2,916 |
| Licensing of trademarks by Parent Group . . . . . . . . . . . . . | 1,000 | 1,000 | 500 | — | — |

---

*(\*)* Including transactions in which terms are not the same as those that would result from transactions among wholly
        unrelated parties.

ALRMH-CNBM00000391

## 40.   RELATED PARTY TRANSACTIONS — continued

In the opinion of the directors, the above transactions were conducted in the ordinary course of business and the continuing transactions will continue after the listing of the Company's H shares on The Stock Exchange of Hong Kong Limited. Except for transactions marked (*) above, all the above transactions were conducted on normal commercial terms.

(b)   Material transactions and balances with other state-owned enterprises in the PRC

The Group operates in an economic environment currently predominated by enterprises directly or indirectly owned or controlled by the PRC government (these enterprises other than CNBM Group are hereinafter collectively referred to as "State-Owned Enterprises"). During the Track Record Period, the Group had material transactions with some of these State-Owned Enterprises in its ordinary and usual course of business. In establishing its pricing strategies and approval process for its products and services, the Group does not differentiate whether the counter-party is a State-Owned Enterprise or not. In the opinion of the directors, all such transactions were conducted in the ordinary course of business and on normal commercial terms.

While the directors of the Company consider State-Owned Enterprises are independent third parties so far as the Group's business transactions with them are concerned, for the purpose of this report, the Group has identified the nature and quantified the amounts of its material transactions with State-Owned Enterprises during the Track Record Period as follows:

(i)   Material transactions

|  | Year ended December 31, | | | Nine months ended September 30, | |
|---|---|---|---|---|---|
|  | **2002** | **2003** | **2004** | **2004** | **2005** |
|  | **RMB'000** | **RMB'000** | **RMB'000** | **RMB'000** (unaudited) | **RMB'000** |
| Sales . . . . . . . . . . . . . . . | 150,573 | 122,355 | 187,927 | 94,551 | 147,001 |
| Purchases . . . . . . . . . . . . | 257,239 | 311,793 | 449,738 | 292,155 | 552,370 |
| Interest expense . . . . . . . . . | 53,230 | 59,855 | 125,273 | 91,407 | 140,370 |

ALRMH-CNBM00000392

**40.  RELATED PARTY TRANSACTIONS — continued**

(ii)  Material balances

| | THE GROUP | | | | THE COMPANY | |
|---|---|---|---|---|---|---|
| | As at December 31, | | | As at September 30, | As at December 31, | As at September 30, |
| | 2002 | 2003 | 2004 | 2005 | 2004 | 2005 |
| | RMB'000 | RMB'000 | RMB'000 | RMB'000 | RMB'000 | RMB'000 |
| Bank balances and deposits . . . . . | 535,763 | 915,017 | 824,259 | 923,385 | — | 6,209 |
| Trade and other receivables . . . | 38,018 | 24,821 | 28,325 | 18,914 | — | — |
| Trade and other payables . . . . . | 16,180 | 11,927 | 35,065 | 62,720 | — | — |
| Bank borrowings . | 843,921 | 1,461,368 | 2,660,832 | 4,067,062 | — | 296,000 |
| Other borrowings . | 5,400 | 5,400 | 23,400 | 77,000 | — | — |

(c)  Other than the Restructuring, the Group acquired and disposed of subsidiaries/business from/to Parent Group during the Track Record Period. The details were as follows:

(i)  Pursuant to an asset exchange agreement dated April 29, 2004 entered into between BNBM and BNBMG, a shareholder of the Company, BNBM transferred its entire 80% equity interest in BNBM Trading Company Limited and the entire interest in BNBM Beijing Wood Products Branch and amount due from a fellow subsidiary of RMB42,320,000 to BNBMG for a total consideration of RMB56,805,000. The consideration was satisfied by transfer of an available-for-sale investment of RMB2,665,000 and BNBMG's entire equity interests in certain subsidiaries to BNBM and the remaining balance of RMB8,281,000, by increase in amount due from a fellow subsidiary. The consideration was determined by reference to the net assets acquired.

(ii)  Pursuant to an asset exchange agreement dated February 25, 2005 entered into between BNBM and BNBMG, BNBM acquired 9.9% equity interest in China United for a total consideration of RMB51,761,000. The consideration was satisfied by the transfer of its entire 60% equity interest in BNBM Plastic Pipe Company Limited, certain assets and the remaining balance of RMB8,236,000, by increase in amount due to a fellow subsidiary. The consideration was determined by reference to the net assets acquired.

(iii)  Pursuant to debt restructuring agreement dated April 20, 2005 entered into between China United and Xingtai Xinlei Building Material (Group) Co. Ltd. ("Xinlei") a fellow subsidiary of the Company, China United acquired 67.71% equity interest in Xingtai China United Ziyan Company Limited ("Ziyan") for a total consideration of RMB34,176,000 to set off Xinlei's debts to China United. The consideration was determined by reference to the net assets of Ziyan as at April 20, 2005.

ALRMH-CNBM00000393

**40.   RELATED PARTY TRANSACTIONS — continued**

(d)   During the year ended December 31, 2004, the Company acquired an additional 2.07% equity interests in China Fiberglass from China Fiberglass for a total cash consideration of RMB12,890,000.

(e)   Parent Group provided guarantees to the Group on bank borrowings amounted to RMB225,000,000, RMB465,000,000 and RMB103,500,000, respectively, at December 31, 2003 and 2004 and September 30, 2005. The directors confirm that such guarantees have been fully released before listing.

**41.   EMPLOYEE BENEFITS PLAN**

The PRC employees of the Group are members of state-managed retirement benefit scheme operated by the local government. The Group is required to contribute a specified percentage of their payroll costs to the retirement benefit scheme to fund the benefits. The only obligation of the Group with respect to the retirement benefit scheme is to make the specified contributions.

The contributions payable to the scheme by the Group at rate specified in the rules of the scheme included in staff costs are disclosed in Note 7.

On February 28, 2006, the Company's board of directors approved a long-term incentive plan of stock appreciation rights for senior management officers, senior experts and specialists who make important contributions to the Group with a term of ten years. The rights will be granted in units with each unit representing one H Share of the Company and may be granted once in every two or more financial years after its global offering as determined by the directors or the remuneration committee of the Company.

The rights to the units will have an exercise period of six years from the date of grant and can be exercised after the second, third and fourth years of the date of grant and the total number of the rights exercised by an individual may not in aggregate exceed one third, two thirds and 100% respectively.

**II.   DIRECTORS' AND SUPERVISORS' REMUNERATION**

Save as disclosed in this report, no remuneration has been paid or is payable by the Group to the directors and supervisors of the Company in respect of the Track Record Period.

Under the arrangement presently in force, the aggregate amount of the directors' and supervisors' fees and other emoluments for the year ending December 31, 2006, is estimated to be approximately RMB3,500,000.

**III.   DISTRIBUTABLE RESERVE**

According to the Articles of Association of the Company as a joint stock company, distribution of profit by the Company is determined with reference to the profit as reported under PRC accounting rules and standards or IFRS, whichever is less.

As at September 30, 2005, the Company's reserve available for distribution to shareholders is RMB20,044,000.

ALRMH-CNBM00000394

**APPENDIX I**                                      **ACCOUNTANTS' REPORT**

**IV.   ULTIMATE HOLDING COMPANY**

The directors consider Parent as the ultimate holding company of the Company.

**V.   SUBSEQUENT EVENT**

On February 28, 2006, shareholders' resolutions were passed to approve the matters set out in the paragraph headed "Resolutions of the Company's shareholders passed on February 28, 2006" in appendix VIII to the Prospectus.

**VI.   SUBSEQUENT FINANCIAL STATEMENTS**

No audited financial statements of the Group, the Company or any of its subsidiaries have been prepared in respect of any period subsequent to September 30, 2005.

Yours faithfully,
**Deloitte Touche Tohmatsu**
*Certified Public Accountants*
Hong Kong

ALRMH-CNBM00000395

# APPENDIX II                   PRO FORMA FINANCIAL INFORMATION

The information set forth in this appendix does not form part of the accountants' report prepared by Deloitte Touche Tohmatsu, Certified Public Accountants, Hong Kong, the reporting accountants of the Company, as set forth in Appendix I to this prospectus, and is included herein for information only.

The unaudited pro forma financial information should be read in conjunction with the section headed "*Financial Information*" in this prospectus and the "*Accountants' Report*" set forth in Appendix I to this prospectus.

## (A)   UNAUDITED PRO FORMA ADJUSTED NET TANGIBLE ASSETS

The following statement of unaudited pro forma net tangible assets of the Group as at September 30, 2005 is based on audited consolidated net tangible assets of the Group as at September 30, 2005, as shown in the accountants' report, the text of which is set out in Appendix I to this prospectus and the adjustments described below.

|  | Audited consolidated net tangible assets attributable to the equity holders of the Company as at September 30, 2005[1] | Estimated net proceeds from the Global Offering | Unaudited pro forma adjusted net tangible assets | Unaudited pro forma adjusted net tangible assets per Share | |
|---|---|---|---|---|---|
|  | RMB '000 | RMB '000 | RMB '000 | RMB | HK$ |
| Based on the Offer Price of HK$2.30 for each Offer Share . . . . | 1,905,461 | 1,303,138 | 3,208,599 | 1.62 | 1.56 |
| Based on the Offer Price of HK$2.75 for each Offer Share . . . . | 1,905,461 | 1,570,674 | 3,476,135 | 1.75 | 1.69 |

*Notes:*

(1)   The adjusted consolidated net tangible assets attributable to the equity holders of the Company as at September 30, 2005 has been extracted with adjustments on goodwill and intangible assets of RMB56,480,000 and RMB23,050,000 respectively from the accountants' report of the Group as at September 30, 2005, the text of which is set out in Appendix I to the Prospectus.

(2)   The estimated net proceeds form the Global Offering are based on the Offer price of HK$2.30/HK$2.75 per Share, after deduction of the underwriting fees and other related expenses payable by us. No account has been taken of the Shares which may be issued pursuant to any exercise of Over-allotment Option.

(3)   The Group's property interests were valued by Sallmanns (Far East) Limited ("Sallmanns") and the valuation in respect of which was set out in Appendix IV to the Prospectus. Pursuant to the valuation performed by Sallmanns, the Group's property interests as at December 31, 2005 amounted to approximately RMB2,881,318,000. Comparing the valuation amount as at December 31, 2005 to the unaudited net book value of the Group's property interests as at December 31, 2005 of RMB2,346,851,000, there was a difference of approximately RMB534,467,000 which will not be included in the Group's annual report for the year ended December 31, 2005. Had the properties been stated at approximately RMB10,358,000 will be charged for the year ended December 31, 2005.

(4)   The unaudited pro forma net tangible asset value per Share is arrived at after the adjustments referred to in the preceding paragraphs and on the basis that 1,982,500,000 Shares (being the number of shares expected to be in issue immediately after completion of the Global Offering, without taking into account of any shares which may be issued upon the exercise of the Over-allotment Option) were in issue as at September 30, 2005.

ALRMH-CNBM00000396

**APPENDIX II**            **PRO FORMA FINANCIAL INFORMATION**

**(B)   UNAUDITED PRO FORMA FULLY DILUTED ESTIMATED EARNINGS PER SHARE**

Estimated consolidated profit attributable to the equity

  holders of the Company for the year ended

  December 31, 2005 *(Notes 1 and 3)* . . . . . . . . . . . . . . . . . . . . . . . . . . . .not less than RMB350 million

(HK$338 million)

Unaudited pro forma estimated earnings per Share

  — pro forma fully diluted *(Notes 2 and 3)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .RMB0.18

(HK$0.17)

———————

*Notes:*

1.   The estimated consolidated profit attributable to the equity holders of the Company for the year ended December 31, 2005 is extracted from the section headed "*Financial information — Profit estimate*" in the prospectus. The bases of preparation of the above profit estimate for the year ended December 31, 2005 are summarised in Appendix III to the prospectus.

2.   The calculation of the unaudited pro forma estimated earnings per Share on a fully diluted basis is based on the Company's estimated consolidated profit attributable to the equity holders of the Company for the year ended December 31, 2005 and a total of 1,982,500,000 Shares is issued during the entire year. This calculation assumes that the Over-allotment Option will not be exercised and the Shares issued pursuant to the Global Offering were issued on January 1, 2005.

3.   The Company's estimated consolidated profit attributable to the equity holders of the Company and the unaudited pro forma fully diluted estimate earnings per Share are converted into Hong Kong dollars at an exchange rate of RMB1.036 to HK$1.00, the PBOC Rate prevailing on March 2, 2006.

ALRMH-CNBM00000397

## APPENDIX II                                   PRO FORMA FINANCIAL INFORMATION

# Deloitte.
# 德勤

德勤 · 關黃陳方會計師行
香港中環干諾道中111號
永安中心26樓

Deloitte Touche Tohmatsu
26/F Wing On Centre
111 Connaught Road Central
Hong Kong

March 13, 2006

The Directors
China National Building Material Company Limited
Morgan Stanley Dean Witter Asia Limited

Dear Sirs,

We report on the unaudited pro forma financial information of China National Building Material Company Limited (the "Company") and its subsidiaries (hereinafter collectively referred to as the "Group") (the "Unaudited Pro Forma Financial Information") set out in Appendix II to the prospectus dated March 13, 2006 in connection with the global offering of 654,214,000 H Shares of RMB1.00 each in the Company, which has been prepared, for illustrative purposes only, to provide information about how the global offering might have affected the financial information presented.

**Responsibilities**

It is the sole responsibility of the directors of the Company to prepare the Unaudited Pro Forma Financial Information in accordance with paragraph 29 of Chapter 4 of the Rules Governing the Listing of Securities on The Stock Exchange of Hong Kong Limited (the "Listing Rules").

It is our responsibility to form an opinion, as required by paragraph 29(7) of Chapter 4 of the Listing Rules, on the Unaudited Pro forma Financial Information and to report our opinion to you. We do not accept any responsibility for any reports previously given by us on any financial information used in the compilation of the Unaudited Pro Forma Financial Information beyond that owed to those to whom those reports were addressed by us at the dates of their issue.

**Basis of Opinion**

We conducted our work with reference to the Statements of Investment Circular Reporting Standards and Bulletin 1998/8 "Reporting on pro forma financial information pursuant to the listing rules" issued by the Auditing Practices Board in the United Kingdom, where applicable. Our work, which involved no independent examination of any of the underlying financial information, consisted primarily of comparing the unadjusted financial information with the source documents, considering the evidence supporting the adjustments and discussing the Unaudited Pro Forma Financial Information with the directors of the Company.

Our work does not constitute an assurance engagement performed in accordance with Hong Kong Standards on Auditing, Hong Kong Standards on Review Engagement or Hong Kong Standards on Assurance Engagements issued by the Hong Kong Institute of Certified Public Accountants and accordingly, we do not express any such assurance on the Unaudited Pro Forma Financial Information.

ALRMH-CNBM00000398

## APPENDIX II                           PRO FORMA FINANCIAL INFORMATION

The Unaudited Pro Forma Financial Information has been prepared on the basis set out in Appendix II to the prospectus for illustrative purposes only and, because of its nature, it may not give an indicative financial position of the Group as at September 30, 2005 or at any future date nor the earnings per share of the Group for the year ended December 31, 2005 or for any future period.

**Opinion**

In our opinion:

(a)    the Unaudited Pro Forma Financial Information has been properly complied on the basis stated;

(b)    such basis is consistent with the accounting policies of the Group; and

(c)    the adjustments are appropriate for the purposes of the Unaudited Pro Forma Financial Information as disclosed pursuant to paragraph 29(1) of Chapter 4 of the Listing Rules.

Yours faithfully,
**Deloitte Touche Tohmatsu**
*Certified Public Accountants*
Hong Kong

ALRMH-CNBM00000399

**APPENDIX III**                                          **PROFIT ESTIMATE**

*The estimated consolidated profit attributable to equity holders of the Company for the year ended December 31, 2005 is set out in the section headed "Financial Information — Profit Estimate."*

**(A)   Bases**

The Directors have prepared the estimate of the consolidated profit attributable to equity holders of the Company for the year ended December 31, 2005 based on the audited results of the Group for the nine months ended September 30, 2005 and unaudited management accounts of the Group for the remaining three months ended December 31, 2005. The estimate has been presented on the basis of the accounting policies consistent in all material respects with those currently adopted by the Group as summarized in the Accountants' Report, the text of which is set out in Appendix I to this prospectus.

ALRMH-CNBM00000400

**(B) Letters**

*The following is the text of the letters received by the Directors from the Company's auditors and reporting accountants, Deloitte Touche Tohmatsu, Certified Public Accountants, Hong Kong, and from the Company's Sponsor, prepared for the purpose of incorporation in this prospectus in connection with the profit estimate.*

*Letter from the Reporting Accountants*

# Deloitte.
# 德勤

德勤 · 關黃陳方會計師行
香港中環干諾道中111號
永安中心26樓

Deloitte Touche Tohmatsu
26/F Wing On Centre
111 Connaught Road Central
Hong Kong

March 13, 2006

The Directors
China National Building Material Company Limited
Morgan Stanley Dean Witter Asia Limited

Dear Sirs,

We have reviewed the accounting policies adopted and calculations made in arriving at the estimate of the consolidated profit attributable to equity holders of China National Building Material Company Limited (the "Company") for the year ended December 31, 2005 (the "Estimate"), for which the directors of the Company are solely responsible, as set out in the prospectus dated March 13, 2006 (the "Prospectus") issued by the Company. The Estimate is prepared based on the audited results of the Company and its subsidiaries (hereinafter collectively referred to as the "Group") for the nine months ended September 30, 2005 and unaudited management accounts of the Group for the remaining three months ended December 31, 2005.

In our opinion the Estimate, so far as the accounting policies and calculations are concerned, has been properly compiled on the bases made by the directors of the Company as set out in part (A) of appendix III to the Prospectus and is presented on a basis consistent in all material respects with the accounting policies normally adopted by the Group as set out in our accountants' report dated March 13, 2006.

Yours faithfully,
**Deloitte Touche Tohmatsu**
*Certified Public Accountants*
Hong Kong

ALRMH-CNBM00000401

## APPENDIX III                                    PROFIT ESTIMATE

*Letter from the Sponsor*

Morgan Stanley

30th Floor
Three Exchange Square
Central, Hong Kong
香港中環交易廣場
第三座三十樓
tel　電話 (852) 2848 5200
fax　傳真 (852) 2845 1012

March 13, 2006

The Directors

**China National Building Material Company Limited**

Dear Sirs,

We refer to the estimate of the consolidated net profit attributable to equity holders of China National Building Material Company Limited (the "Company") for the year ended December 31, 2005 (the "Profit Estimate") as set out in the prospectus issued by the Company dated March 13, 2006.

We understand that the Profit Estimate has been prepared by the Directors of the Company based on the audited results of the Company and its subsidiaries (hereinafter collectively referred to as the "Group") for the nine months ended September 30, 2005 and the unaudited management accounts of the Group for the 3 months ended December 31, 2005.

We have discussed with you the bases made by the directors of the Company as set out in Appendix III to the Prospectus upon which the Profit Estimate has been made. We have also considered the letter dated March 13, 2006 addressed to yourselves and ourselves from Deloitte Touche Tohmatsu regarding the accounting policies and calculations upon which the Profit Estimate has been made.

On the basis of the information comprising the Profit Estimate and on the basis of the accounting policies and calculations adopted by you and reviewed by Deloitte Touche Tohmatsu, we are of the opinion that the Profit Estimate, for which you as directors of the Company are solely responsible, has been made after due and careful enquiry.

Yours faithfully,
For and on behalf of
**Morgan Stanley Dean Witter Asia Limited**
**Terence Keyes**
*Managing Director*

ALRMH-CNBM00000402

## APPENDIX IV                                           PROPERTY VALUATION

*The following is the text of a letter, summary of values and valuation certificates, prepared for the purpose of incorporation in this prospectus received from Sallmanns (Far East) Limited, an independent valuer, in connection with its valuation as at December 31, 2005 of the property interests of the Group.*





Corporate valuation and consultancy
www.sallmanns.com

22/F Siu On Centre
188 Lockhart Road
Wanchai
Hong Kong
Tel: (852) 2169 6000
Fax: (852) 2528 5079

March 13, 2006

The Board of Directors
China National Building Material Company Limited
No.A-11 Sanlihe Road,
Haidian District,
Beijing,
The People's Republic of China

Dear Sirs,

In accordance with your instructions to value the properties in which China National Building Material Company Limited (the "Company") and its subsidiaries (hereinafter together referred to as the "Group") have interests in the People's Republic of China (the "PRC"), Papua New Guinea (the "PNG") and the United States of America (the "USA"), we confirm that we have carried out inspections, made relevant enquiries and searches and obtained such further information as we consider necessary for the purpose of providing you with our opinion of the capital values of the property interests as at December 31, 2005 (the "date of valuation").

Our valuations of the property interests represent the market value which we would define as intended to mean "the estimated amount for which a property should exchange on the date of valuation between a willing buyer and a willing seller in an arm's-length transaction after proper marketing wherein the parties had each acted knowledgeably, prudently, and without compulsion".

We have valued the property interests in property nos. A1 to A4, A7, A9, A16 to A18, A24, A33, A34, A40, A42 and A43 in Group I, Group III, Group V, Group VI and Group VII by the direct comparison approach assuming sale of the property interests in their existing state with the benefit of immediate vacant possession and by making reference to comparable sale transactions as available in the relevant market.

ALRMH-CNBM00000403

Where, due to the nature of the buildings and structures of the properties in the PRC, there are no market sales comparables readily available, the remaining property interests in Group I and Group IV have been valued on the basis of their depreciated replacement cost.

Depreciated replacement cost is defined as "the current cost of replacement (reproduction) of a property less deductions for physical deterioration and all relevant forms of obsolescence and optimization." It is based on an estimate of the market value for the existing use of the land, plus the current cost of replacement (reproduction) of the improvements, less deductions for physical deterioration and all relevant forms of obsolescence and optimization. The depreciated replacement costs of the property interests are subject to adequate potential profitability of the concerned business.

In valuing the property interests in Group II, which are currently under construction, we have assumed that they will be developed and completed in accordance with the Group's latest development proposal provided to us. In arriving at our opinion of value, we have taken into account the construction costs and professional fees relevant to the stage of construction as at the date of valuation and the remainder of the costs and fees to be expended to complete the developments.

We have attributed no commercial value to the property interests in Group VIII and IX, which are leased by the Group in the PRC, the PNG and the USA, respectively, due either to the short-term nature of the leases or the prohibition against assignment or sub-letting or otherwise due to the lack of substantial profit rents.

In the course of our valuations, the property interests of the Group are categorized into the following groups:

Group I — Property interests held and occupied by the Group in the PRC
Group II — Property interests held under development by the Group in the PRC
Group III — Property interests held for investment by the Group in the PRC
Group IV — Property interests held for development by the Group in the PRC
Group V — Property interest held for sale by the Group in the PRC
Group VI — Property interests held and occupied by the Group in the PNG
Group VII — Property interest held for development by the Group in the PNG
Group VIII — Property interests rented and occupied by the Group in the PRC
Group IX — Property interests rented and occupied by the Group in overseas countries

Our valuations have been made on the assumption that the seller sells the property interests in the market without the benefit of a deferred term contract, leaseback, joint venture, management agreement or any similar arrangement, which could serve to affect the values of the property interests.

ALRMH-CNBM00000404

No allowance has been made in our valuations for any charges, mortgages or amounts owing on the property interests nor any expenses or taxation, which may be incurred in effecting a sale. Unless otherwise stated, it is assumed that the property interests are free from encumbrances, restrictions and outgoings of any onerous nature that could affect their values.

In valuing the property interests, we have complied with all the requirements contained in Chapter 5 and Practice Note 12 to the Rules Governing the Listing of Securities issued by The Stock Exchange of Hong Kong Limited; the RICS Appraisal and Valuation Standards (5th Edition May 2003) published by the Royal Institution of Chartered Surveyors; and the HKIS Valuation Standards on Properties (1st Edition January 2005) published by the Hong Kong Institute of Surveyors.

We have relied to a very considerable extent on the information given by the Group and have accepted advice given to us on such matters as tenure, planning approvals, statutory notices, easements, and particulars of occupancy, lettings, and all other relevant matters.

We have been shown copies of various title documents including State-owned Land Use Rights Certificates, Building Ownership Certificates, Real Estate Title Certificates and other title documents relating to the property interests in the PRC, the PNG and the USA and have made relevant enquiries. Where possible, we have examined the original documents to verify the existing titles to the property interests and any material encumbrances that might be attached to the property interests or any lease amendments. We have relied considerably on the advice given by the Company's PRC legal advisers — Jingtian and Gongcheng Law Offices, concerning the validity of the Group's titles to the property interests in the PRC.

We have not carried out detailed site measurements to verify the correctness of the site areas in respect of the properties but have assumed that the site areas shown on the documents and official site plans handed to us are correct. All documents and contracts have been used as reference only and all dimensions, measurements and areas are approximations. No on-site measurement has been taken.

We have inspected the exterior and, where possible, the interior of the properties. However, no structural survey has been made, but in the course of our inspection, we did not note any serious defects. We are not, however, able to report whether the properties are free of rot, infestation or any other structural defects. No tests were carried out on any of the services.

We have had no reason to doubt the truth and accuracy of the information provided to us by the Group. We have also sought confirmation from the Group that no material factors have been omitted from the information supplied. We consider that we have been provided with sufficient information to reach an informed view, and we have no reason to suspect that any material information has been withheld.

ALRMH-CNBM00000405

## APPENDIX IV                                          PROPERTY VALUATION

Unless otherwise stated, all monetary figures stated in this report are in Renminbi (RMB). Where necessary, the exchange rates adopted in our valuation are approximately KINA 1 = USD 0.311 and USD 1 = RMB 8.093, being the prevailing exchange rates as at the date of valuation.

Our valuations are summarized below and the valuation certificates are attached.

Yours faithfully,
for and on behalf of
**Sallmanns (Far East) Limited**
**Paul L. Brown**
*B.Sc. FRICS FHKIS*
*Director*

---

*Note:* Paul L. Brown is a Chartered Surveyor who has 23 years' experience in the valuation of properties in the PRC and 26 years of property valuation experience in Hong Kong, the United Kingdom and the Asia-Pacific region.

ALRMH-CNBM00000406

| APPENDIX IV | PROPERTY VALUATION |
|---|---|

## SUMMARY OF VALUES

**Group I — Property interests held and occupied by the Group in the PRC**

| No. | Property | Capital value in existing state as at December 31, 2005 *RMB* | Interest attributable to the Group | Capital value attributable to the Group as at December 31, 2005 *RMB* |
|---|---|---|---|---|
| A1. | Levels 27 and 28 Zhongqi Mansion No.2000 Zhongshan Bei Road Putuo District Shanghai The PRC | 23,786,000 | 91% | 21,645,000 |
| A2. | 10 office units Chuangxin Shangwu Mansion No.305 Jiangdong Bei Road Gulou District Nanjing Jiangsu Province The PRC | 14,114,000 | 46.55% | 6,570,000 |
| A3. | Units 601A to 603A Cheng Jian Building Long She Po Haikou Hainan Province The PRC | No commercial value | 86.24% | No commercial value |
| A4. | Unit 708 of Block D Zhongshan Mansion No.18 Yilong Road Haikou Hainan Province The PRC | No commercial value | 86.24% | No commercial value |
| A5. | Land, various buildings and structures No.195 Hailian Dong Road Xinpu District Lianyungang Jiangsu Province The PRC | 32,391,000 | 81.5% | 26,399,000 |

ALRMH-CNBM00000407

**APPENDIX IV**                                         **PROPERTY VALUATION**

| No. | Property | Capital value in existing state as at December 31, 2005 RMB | Interest attributable to the Group | Capital value attributable to the Group as at December 31, 2005 RMB |
|-----|----------|---------:|:---:|---------:|
| A6. | A parcel of land and an industrial building located at Songtiao Industrial Development Zone Lianyungang Jiangsu Province The PRC | 5,598,000 | 60.09% | 3,364,000 |
| A7. | Unit 3-101 of Block 33 Gang Li Garden Residential Area No.43 Hailian Dong Road Lianyungang Jiangsu Province The PRC | 139,000 | 81.5% | 113,000 |
| A8. | Land, various buildings and structures No.1 Changcheng Road Changzhou Jiangsu Province The PRC | 28,929,000 | 34.5% | 9,981,000 |
| A9. | Unit 604 of Block 7 Chengshi Garden Residential Area Changzhou Jiangsu Province The PRC | 646,000 | 34.5% | 223,000 |
| A10. | A parcel of land, various buildings and structures located at Laozhuang Town Zhenping County Nanyang Henan Province The PRC | 118,170,000 | 96.07% | 113,526,000 |

ALRMH-CNBM00000408

APPENDIX IV                                             PROPERTY VALUATION

| No. | Property | Capital value in existing state as at December 31, 2005 *RMB* | Interest attributable to the Group | Capital value attributable to the Group as at December 31, 2005 *RMB* |
|---|---|---|---|---|
| A11. | A parcel of land, various buildings and structures located at Tanshan Village Maocun Town Tongshan County Xuzhou Jiangsu Province The PRC | 311,005,000 | 85.3% | 265,287,000 |
| A12. | Land, various buildings and structures located at Jiehe Town Tengzhou Shandong Province The PRC | 338,176,000 | 77.18% | 261,004,000 |
| A13. | A parcel of land, various buildings and structures located at the southern side of Xinfeng Road Development Zone Heze Shandong Province The PRC | 23,757,000 | 72.91% | 17,321,000 |
| A14. | Land, various buildings and structures located at the western side of Xiazhuo Road Xiahuayuan District Zhangjiakou Hebei Province The PRC | 20,077,000 | 60.33% | 12,112,000 |

ALRMH-CNBM00000409

---

**APPENDIX IV**                                       **PROPERTY VALUATION**

---

| No. | Property | Capital value in existing state as at December 31, 2005 *RMB* | Interest attributable to the Group | Capital value attributable to the Group as at December 31, 2005 *RMB* |
|---|---|---|---|---|
| A15. | A parcel of land and 3 ancillary buildings located at the eastern side of Xiazhuo Road Xiahuayuan District Zhangjiakou Hebei Province The PRC | 391,000 | 60.33% | 236,000 |
| A16. | A residential unit and a commercial unit of apartment house No.70 Xi Wei Di Dao Hexi District Tianjin The PRC | No commercial value | 60.33% | No commercial value |
| A17. | An office unit and a residential unit of apartment house No.19-1 Shayang Road Heping District Shengyang Liaoning Province The PRC | No commercial value | 60.33% | No commercial value |
| A18. | Units 801A to 806A of Block A Yin Dian Yuan Residential Area located at the eastern side of Haidian San Road Haikou Hainan Province The PRC | 1,284,000 | 60.33% | 775,000 |

ALRMH-CNBM00000410

**APPENDIX IV**                                    **PROPERTY VALUATION**

| No. | Property | Capital value in existing state as at December 31, 2005 RMB | Interest attributable to the Group | Capital value attributable to the Group as at December 31, 2005 RMB |
|---|---|---|---|---|
| A19. | Various buildings and structures No.16 Jiancaicheng Xi Road Xisanqi Haidian District Beijing The PRC | 228,086,000 | 60.33% | 137,604,000 |
| A20. | Various buildings No.16 Jiancaicheng Xi Road Xisanqi Haidian District Beijing The PRC | 26,848,000 | 38.61% | 10,366,000 |
| A21. | An industrial building No.16 Jiancaicheng Xi Road Xisanqi Haidian District Beijing The PRC | 33,068,000 | 33.18% | 10,972,000 |
| A22. | A parcel of land and a composite building No.11 Chuangye Road Shangdi Development Zone Haidian District Beijing The PRC | 25,456,000 | 60.33% | 15,358,000 |
| A23. | A parcel of land, various buildings and structures located at Kaisai Dong Road Hi-Tech Development Zone Jining Shandong Province The PRC | 11,159,000 | 41.91% | 4,677,000 |
| A24. | Level 12 of Block B International Trading Center Renmin Nan Road Luohu District Shenzhen Guangdong Province The PRC | 7,104,000 | 56.3% | 4,000,000 |

ALRMH-CNBM00000411

APPENDIX IV                                                    PROPERTY VALUATION

| No. | Property | Capital value in existing state as at December 31, 2005 *RMB* | Interest attributable to the Group | Capital value attributable to the Group as at December 31, 2005 *RMB* |
|---|---|---|---|---|
| A25. | Land, various buildings and structures No.2 Dalian Road Xiaoshi Island Hi-Tech Development Zone Weihai Shandong Province The PRC | 18,799,000 | 43.98% | 8,268,000 |
| A26. | An industrial building No.89 Huaide Nan Road Changzhou Jiangsu Province The PRC | No commercial value | 41.39% | No commercial value |
| A27. | 11 parcels of land No.16 Jiancaicheng Xi Road Xisanqi Haidian District Beijing The PRC | 210,470,000 | 100% | 210,470,000 |
| A28. | 5 buildings and ancillary structures located at Hengjing Village Huguan Town Suzhou Jiangsu Province The PRC | No commercial value | 45.25% | No commercial value |
| A29. | 14 buildings and ancillary structures located at Tong'an Town Suzhou Jiangsu Province The PRC | No commercial value | 45.25% | No commercial value |

ALRMH-CNBM00000412

**APPENDIX IV**                                    **PROPERTY VALUATION**

| No. | Property | Capital value in existing state as at December 31, 2005 *RMB* | Interest attributable to the Group | Capital value attributable to the Group as at December 31, 2005 *RMB* |
|---|---|---|---|---|
| A30. | Land, various buildings and structures No.1 Xinlei Road Neiqiu County Xingtai Hebei Province The PRC | 107,417,000 | 65.05% | 69,875,000 |
| A31. | Land, various buildings and structures located at Hanzhuang Village Qicun Town Shizhong District Zaozhuang Shandong Province The PRC | 85,370,000 | 88.14% | 75,245,000 |
| A32. | Land, various buildings and structures located at Dawenkou Town Daiyue District Tai'an Shandong Province The PRC | 34,402,000 | 25.34% | 8,717,000 |
| A33. | Level 3 of Block 1 Area C located at the western side of Haoli Hill Tai'an Shandong Province The PRC | 5,740,000 | 25.34% | 1,455,000 |
| A34. | An office unit of Block 422 Yichang Xiaoqu Longsha District Qiqihar Heilongjiang Province The PRC | No commercial value | 25.34% | No commercial value |

ALRMH-CNBM00000413

APPENDIX IV                                                    PROPERTY VALUATION

| No. | Property | Capital value in existing state as at December 31, 2005 *RMB* | Interest attributable to the Group | Capital value attributable to the Group as at December 31, 2005 *RMB* |
|-----|----------|-------------------------------------------------------------|-----------------------------------|----------------------------------------------------------------------|
| A35. | 19 buildings and ancillary structures No.69 Gangcheng Avenue Haigang District Qinhuangdao Hebei Province The PRC | No commercial value | 17.74% | No commercial value |
| A36. | Land, various buildings and structures located at Zhaozhuang Village Zizhuang Town Jiawang District Xuzhou Jiangsu Province The PRC | 13,199,000 | 25.69% | 3,391,000 |
| A37. | A parcel of land, various buildings and structures located at the southern side of Xuhai Main Road Pizhou Xuzhou Jiangsu Province The PRC | No commercial value | 27.09% | No commercial value |
| A38. | A parcel of land, various buildings and structures located at Economic Technique Development Zone Anqiu Shandong Province The PRC | 18,849,000 | 19% | 3,581,000 |

IV-12

| APPENDIX IV | | | PROPERTY VALUATION |
|---|---|---|---|

| No. | Property | Capital value in existing state as at December 31, 2005 *RMB* | Interest attributable to the Group | Capital value attributable to the Group as at December 31, 2005 *RMB* |
|---|---|---|---|---|
| A39. | A parcel of land, various buildings and structures located at the junction of Bayi Road and Zhengzhou Road Development Zone Heze Shandong Province The PRC | 4,198,000 | 76.12% | 3,196,000 |
| A40. | Unit 11B on Level 11 of Yue Hua Ge Huali Garden Huali Xi Road Luohu District Shenzhen Guangdong Province The PRC | 460,000 | 56.3% | 259,000 |
| A41. | A parcel of land, various buildings and structures located at the western side of Cement Factory Baitabu Town Donghai County Lianyungang Jiangsu Province The PRC | 53,319,000 | 86.38% | 46,057,000 |
| A42. | Unit 1A4 of Block 2 Saige Keji Industrial Zone Huaqiang Bei Road Futian District Shenzhen Guangdong Province The PRC | 8,063,000 | 56.3% | 4,539,000 |

ALRMH-CNBM00000415

APPENDIX IV                                                    PROPERTY VALUATION

| No. | Property | Capital value in existing state as at December 31, 2005 *RMB* | Interest attributable to the Group | Capital value attributable to the Group as at December 31, 2005 *RMB* |
|---|---|---|---|---|
| A43. | Units A, B, C and D on Level 27 Chuangxin Shangwu Mansion No.305 Jiangdong Bei Road Gulou District Nanjing Jiangsu Province The PRC | 1,466,000 | 23.74% | 348,000 |
| A44. | A parcel of land, various buildings and structures located at Jiaotong Village Duodao District Jingmen Hubei Province The PRC | 49,285,000 | 27.09% | 13,351,000 |
| A45. | A parcel of land, various buildings and structures located at Xincheng Jianshe Xi Road Shanting District Zaozhuang Shandong Province The PRC | 76,976,000 | 60.33% | 46,440,000 |
| A46. | Land and various buildings located at Suzhou Industrial Zone Loufeng Town Suzhou Jiangsu Province The PRC | 147,097,000 | 60.33% | 88,744,000 |
| | **Sub-total:** | 2,085,294,000 | | 1,505,469,000 |

IV-14

ALRMH-CNBM00000416

**Group II — Property interests held under development by the Group in the PRC**

| No. | Property | Capital value in existing state as at December 31, 2005 *RMB* | Interest attributable to the Group | Capital value attributable to the Group as at December 31, 2005 *RMB* |
|---|---|---|---|---|
| B1. | Land, various buildings and structures under construction located at Econ-Tech Development Zone Zhuozhou Hebei Province The PRC | 107,827,000 | 60.33% | 65,052,000 |
| B2. | A parcel of land, various buildings and structures under construction located at Changchun Road Jiaonan Qingdao Shandong Province The PRC | 19,727,000 | 90.63% | 17,879,000 |
| B3. | A parcel of land, various buildings and structures under construction located at Putong Town Qingzhou Shandong Province The PRC | 76,203,000 | 92.3% | 70,335,000 |
| B4. | A parcel of land, various buildings and structures under construction located at Yangxu Village Yangbei Town Suqian Jiangsu Province The PRC | 37,267,000 | 86.38% | 32,191,000 |

ALRMH-CNBM00000417

| No. | Property | Capital value in existing state as at December 31, 2005 RMB | Interest attributable to the Group | Capital value attributable to the Group as at December 31, 2005 RMB |
|---|---|---|---|---|
| B5. | A parcel of land, various buildings and structures under construction located at Zhouda Village and Panzhai Village Yingquan Town Fuyang Anhui Province The PRC | 42,942,000 | 86.38% | 37,093,000 |
| B6. | A parcel of land, various buildings and structures under construction located at Shengang Industrial Park Economic Development Zone Jiangyin Jiangsu Province The PRC | 35,187,000 | 17.1% | 6,017,000 |
| B7. | A parcel of land, various buildings and structures under construction located at the southern side of Xingji Road Bengbu Anhui Province The PRC | 51,876,000 | 78.19% | 40,562,000 |
| | Sub-total: | 371,029,000 | | 269,129,000 |

**Group III — Property interests held for investment by the Group in the PRC**

| No. | Property | Capital value in existing state as at December 31, 2005 RMB | Interest attributable to the Group | Capital value attributable to the Group as at December 31, 2005 RMB |
|---|---|---|---|---|
| C1. | Level 13 Shiji Jinyuan Shangwu Center No.69 Banjing Road Haidian District Beijing The PRC | 11,836,000 | 86.24% | 10,207,000 |

ALRMH-CNBM00000418

APPENDIX IV                                        PROPERTY VALUATION

| No. | Property | Capital value in existing state as at December 31, 2005 RMB | Interest attributable to the Group | Capital value attributable to the Group as at December 31, 2005 RMB |
|---|---|---|---|---|
| C2. | 17 residential units of Blocks A & D Cuizhu composite building No.1189 Cuizhu Road Luohu District Shenzhen Guangdong Province The PRC | 17,217,000 | 56.3% | 9,693,000 |
| C3. | Units 17C, 18C and 19C of Block 5 Hai Hua Ju Shijie Garden Tianhe Road Nanshan District Shenzhen Guangdong Province The PRC | 2,753,000 | 56.3% | 1,550,000 |
| C4. | An office unit on Level 8 Chiwei Mansion No.2093 Shennan Zhong Road Futian District Shenzhen Guangdong Province The PRC | 4,301,000 | 56.3% | 2,421,000 |
| C5. | Units 611 and 3005 of Tong De Ge Tongle Mansion Sungang Road Luohu District Shenzhen Guangdong Province The PRC | 886,000 | 56.3% | 499,000 |

ALRMH-CNBM00000419

## APPENDIX IV                                    PROPERTY VALUATION

| No. | Property | Capital value in existing state as at December 31, 2005 *RMB* | Interest attributable to the Group | Capital value attributable to the Group as at December 31, 2005 *RMB* |
|---|---|---|---|---|
| C6. | Units 1706 and 1707 of Block B Jinfengcheng Mansion Shennan Dong Road Luohu District Shenzhen Guangdong Province The PRC | 918,000 | 56.3% | 517,000 |
| C7. | A parcel of land and a warehouse center No.4008 Bao'an Bei Road Luohu District Shenzhen Guangdong Province The PRC | 272,596,000 | 56.3% | 153,472,000 |
| C8. | Unit 3-14 of Block B International Trading Center Renmin Nan Road Luohu District Shenzhen Guangdong Province The PRC | 515,000 | 56.3% | 290,000 |
| C9. | Rooms 12A, 8G, 12G, 12D and 12H Junjing Haoyuan Xiangmei Road Futian District Shenzhen Guangdong Province The PRC | 3,110,000 | 56.3% | 1,751,000 |
| C10. | A parcel of land and a composite building No.265 Taishan Avenue Tai'an Shandong Province The PRC | 10,413,000 | 25.34% | 2,639,000 |
| | **Sub-total:** | 324,545,000 | | 183,039,000 |

ALRMH-CNBM00000420

**APPENDIX IV**                                                     **PROPERTY VALUATION**

**Group IV — Property interests held for development by the Group in the PRC**

| No. | Property | Capital value in existing state as at December 31, 2005 | Interest attributable to the Group | Capital value attributable to the Group as at December 31, 2005 |
|---|---|---|---|---|
| | | *RMB* | | *RMB* |
| D1. | A parcel of land located at the eastern side of Zhenxing Road and the northern side of Chongqing Road Hi-Tech Development Zone Lianyungang Jiangsu Province The PRC | 28,775,000 | 81.5% | 23,452,000 |
| D2. | A parcel of land located at the eastern side of Rongliao Dong Road Tai'an Shandong Province The PRC | 4,916,000 | 25.34% | 1,246,000 |
| | **Sub-total:** | 33,691,000 | | 24,698,000 |

ALRMH-CNBM00000421

**APPENDIX IV** **PROPERTY VALUATION**

**Group V — Property interest held for sale by the Group in the PRC**

| No. | Property | Capital value in existing state as at December 31, 2005 RMB | Interest attributable to the Group | Capital value attributable to the Group as at December 31, 2005 RMB |
|---|---|---|---|---|
| E1. | A parcel of land and a composite building (known as Zhongxin Building) located at the eastern side of Development Zone Hai Dian Island Haikou Hainan Province The PRC | 52,453,000 | 60.33% | 31,645,000 |
| | **Sub-total:** | 52,453,000 | | 31,645,000 |

**Group VI — Property interests held and occupied by the Group in the PNG**

| No. | Property | Capital value in existing state as at December 31, 2005 RMB | Interest attributable to the Group | Capital value attributable to the Group as at December 31, 2005 RMB |
|---|---|---|---|---|
| F1. | Allotment 66 & 67 Section 52, Hohola Kennedy Road, Gordons, NCD Papua New Guinea | 6,302,000 | 56.3% | 3,548,000 |
| F2. | Allotment 4 & 5 Section 14, Josey Street, LAE Morobe Province, Papua New Guinea | 3,524,000 | 56.3% | 1,984,000 |
| | **Sub-total:** | 9,826,000 | | 5,532,000 |

ALRMH-CNBM00000422

**APPENDIX IV**                                        **PROPERTY VALUATION**

**Group VII — Property interest held for development by the Group in the PNG**

| No. | Property | Capital value in existing state as at December 31, 2005 *RMB* | Interest attributable to the Group | Capital value attributable to the Group as at December 31, 2005 *RMB* |
|-----|----------|---------|---------|---------|
| G1. | Allotment 68, 69 and 70 Section 52, Hohola Kennedy Road, Gordons, NCD Papua New Guinea | 4,480,000 | 56.3% | 2,522,000 |
| | **Sub-total:** | 4,480,000 | | 2,522,000 |

**Group VIII — Property interests rented and occupied by the Group in the PRC**

| No. | Property | Capital value in existing state as at December 31, 2005 *RMB* |
|-----|----------|---------|
| H1. | 35 properties leased by the Group in the PRC | No commercial value |
| | **Sub-total:** | Nil |

**Group IX — Property interests rented and occupied by the Group in overseas countries**

| No. | Property | Capital value in existing state as at December 31, 2005 *RMB* |
|-----|----------|---------|
| I1. | Two properties leased by the Group in Papua New Guinea | No commercial value |
| I2. | An office/warehouse unit 16018 Adelante Street, Unit C, Irwindate, California, USA | No commercial value |
| | **Sub-total:** | Nil |
| | **Grand Total:** | 2,881,318,000 | 2,022,034,000 |

ALRMH-CNBM00000423

**APPENDIX IV**                                                  **PROPERTY VALUATION**

## VALUATION CERTIFICATE

**Group I — Property interests held and occupied by the Group in the PRC**

| No. | Property | Description and tenure | Particulars of occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|-----|----------|----------------------|------------------------|---------------------------------|
| A1. | Levels 27 and 28 Zhongqi Mansion No.2000 Zhongshan Bei Road Putuo District Shanghai The PRC | The property comprises the whole of Levels 27 and 28 of a 28-storey composite building completed in about 1997.<br><br>The property has a total gross floor area of approximately 2,642.90 sq.m. | The property is currently occupied by the Group for office purposes. | 23,786,000<br><br>91% interest attributable to the Group: RMB 21,645,000 |

——————

*Notes:*

1.   Pursuant to 2 Real Estate Title Certificates — Hu Fang Di Pu Zi (2004) Nos.046481 and 046484 (滬房地普字(2004)第046481和046484號 ), the property with a total gross floor area of approximately 2,642.90 sq.m. is owned by China Triumph International Engineering Company Limited ("China Triumph"), a 91% owned subsidiary of the Company.

2.   We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

(i)   Pursuant to a Real Estate Title Certificate — Hu Fang Di Shi Zi (1998) No.100292 (滬房地市字(1998)第100292號 ), the land on which the property is located, has been granted for a term expiring on September 16, 2047 for commercial use;

(ii)   The Group has legally obtained the real estate certificate of the property and has the right to occupy and use the property in accordance with the valid term and usage stipulated by the relevant title certificate;

(iii)   The Group has the right to transfer, lease, mortgage or otherwise dispose of the property; and

(iv)   The property is not subject to mortgage and any other encumbrances.

ALRMH-CNBM00000424

**APPENDIX IV**                                    **PROPERTY VALUATION**

| No. | Property | Description and tenure | Particulars of occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|---|---|---|---|---|
| A2. | 10 office units Chuangxin Shangwu Mansion No.305 Jiangdong Bei Road Gulou District Nanjing Jiangsu Province The PRC | The property comprises 10 office units on Levels 23, 24, 25 and 27 of a 29-storey composite building completed in 2004.<br><br>The property has a total gross floor area of approximately 2,566.33 sq.m.<br><br>The land use rights of the property with a total apportioned land area of approximately 157.10 sq.m. have been granted for a term expiring on November 1, 2051 for non-residential use. | The property is currently occupied by the Group for office purposes. | 14,114,000<br><br>46.55% interest attributable to the Group: RMB 6,570,000 |

_____

*Notes:*

1.   Pursuant to 10 Nanjing City Property Sale and Purchase Contracts, the property was purchased by Nanjing Triumph Cement Engineering Company Limited ("Nanjing Triumph"), a 51.15% owned subsidiary of China Triumph, at a total consideration of RMB 13,043,693. According to the information given, the payment had been fully settled by Nanjing Triumph.

2.   Pursuant to 10 Building Ownership Certificates — Ning Fang Quan Zheng Gu Zhuan Zi Di Nos.274392, 252986 to 252994 (南房權證鼓轉字第 274392號 ,252986至 252994號 ), 10 units with a total gross floor area of approximately 2,566.33 sq.m. are owned by Nanjing Triumph.

3.   Pursuant to 10 State-owned Land Use Rights Certificates — Ning Gu Guo Yong (2004) Di Nos.24012, 24014 to 24021, and Ning Gu Guo Yong (2005) Zi Di No.09297 (南鼓國用(2004)第 24012號 ,第 24014號至第 24021號 ,南鼓國用(2005)第 09297 號 ), the land use rights of the property with a total apportioned land area of approximately 157.10 sq.m. have been granted to Nanjing Triumph for a term expiring on November 1, 2051 for non-residential use.

4.   We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

(i)    The Group has legally obtained both the state-owned land use rights certificate and the building ownership certificate of the property, and has the right to use and occupy the property in accordance with the valid term and usages stipulated by the Land Use Rights Certificate;

(ii)   The Group has the right to transfer, lease, mortgage or otherwise dispose of the property; and

(iii)  The property is not subject to mortgage and any other encumbrances.

ALRMH-CNBM00000425

**APPENDIX IV**                                                                                    **PROPERTY VALUATION**

| No. | Property | Description and tenure | Particulars of occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|---|---|---|---|---|
| A3. | Units 601A to 603A Cheng Jian Building Long She Po Haikou Hainan Province The PRC | The property comprises 3 residential units on Level 6 of a 7-storey residential building completed in 1990.<br><br>The property has a total gross floor area of approximately 250.80 sq.m. | The property is currently occupied by the Group for residential purposes. | No commercial value |

_____

*Notes:*

1.   Pursuant to 3 Building Ownership Certificates — Haikou Shi Fang Quan Zheng Hai Fang Zi Di Nos.HJ001774, HJ001780 and HJ001782 (海口市房權證海房字第 HJ001774, HJ001780 和 HJ001782號 ), 3 units with a total gross floor area of approximately 250.80 sq.m. are owned by China Composites Group Company Limited ("China Composites"), an 86.24% owned subsidiary of the Company.

2.   We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

   (i)    The Group has legally obtained the building ownership certificate of the property and is entitled to use and occupy the property;

   (ii)   As the relevant land titles to the property have not been obtained, the Group cannot transfer, lease or mortgage the property; and

   (iii)  The property is not subject to mortgage and any other encumbrances.

3.   We have relied on the aforesaid legal opinion and attributed no commercial value to the property. However, for reference purposes, we are of the opinion that the capital value of the property as at the date of valuation would be RMB 702,000 assuming the property could be freely transferred.

ALRMH-CNBM00000426

**APPENDIX IV**                                              **PROPERTY VALUATION**

| No. | Property | Description and tenure | Particulars of occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|-----|----------|------------------------|--------------------------|---------------------------------------------------------------|
| A4. | Room 708 of Block D Zhongshan Mansion No.18 Yilong Road Haikou Hainan Province The PRC | The property comprises a residential unit on Level 7 of a 9-storey residential building completed in 1993.<br><br>The property has a gross floor area of approximately 159.29 sq.m. | The property is currently occupied by the Group for residential purposes. | No commercial value |

———————

*Notes:*

1.  Pursuant to a Building Ownership Certificate — Haikou Shi Fang Quan Zheng Hai Fang Zi Di No.22342 (海口市房權證海房字第22342號), the property with a gross floor area of approximately 159.29 sq.m. is owned by China Composites.

2.  We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

   (i)   The Group has legally obtained the building ownership certificate of the property and is entitled to use and occupy the property;

   (ii)  As the relevant land titles to the property have not been obtained, the Group cannot transfer, lease or mortgage the property; and

   (iii) The property is not subject to mortgage and any other encumbrances.

3.  We have relied on the aforesaid legal opinion and attributed no commercial value to the property. However, for reference purposes, we are of the opinion that the capital value of the property as at the date of valuation would be RMB 558,000 assuming the property could be freely transferred.

ALRMH-CNBM00000427

**APPENDIX IV**                                                                          **PROPERTY VALUATION**

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|-----|----------|------------------------|--------------------------|-------------------------------------------------------------|
| A5. | Land, various buildings and structures No.195 Hailian Dong Road Xinpu District Lianyungang Jiangsu Province The PRC | The property comprises 3 parcels of land with a total site area of approximately 94,427.1 sq.m. on which are constructed 15 buildings and ancillary structures completed in various stages between 1989 and 2004.<br><br>The buildings have a total gross floor area of approximately 18,667.21 sq.m.<br><br>The buildings mainly include industrial buildings, offices, warehouses, distribution rooms, a dining hall and a boiler room.<br><br>The major structures include roads, walls, a water tower, bicycle sheds and lawn.<br><br>The land use rights of the property have been granted for various terms with the latest date expiring on May 30, 2037 for industrial use. | The property is currently occupied by the Group for production and office purposes. | 32,391,000<br><br>81.5% interest attributable to the Group: RMB 26,399,000 |

_____

*Notes:*

1. Pursuant to 3 State-owned Land Use Rights Certificates — Lian Guo Yong (2004) Zi Di Nos.D005276, 4D002341 and D003446 (連國用(2004)字第 D005276號 ,4D002341號和第 D003446號 ), the land use rights of 3 parcels of land with a total site area of approximately 94,427.1 sq.m. have been granted to Lianyungang Zhongfu Lianzhong Composites Group Company Limited ("Zhongfu Lianzhong"), a 94.5% owned subsidiary of China Composites, for various terms with latest date expiring on May 30, 2037 for industrial use.

2. Pursuant to 4 Building Ownership Certificates — Lian Fang Quan Zheng Xin Zi Di Nos. X00145647, X00134946, X00134946-1 and X00156182-1 (連房權證新字第 X00145647, X00134946, X00134946-1 和 X00156182-1號 ), 15 buildings of the property with a total gross floor area of approximately 22,585.17 sq.m. are owned by Zhongfu Lianzhong.

   As advised by Zhongfu Lianzhong, 3 buildings with a total gross floor area of approximately 4,967.96 sq.m. are registered repetitively on the above Building Ownership Certificates. Thus, Zhongfu Lianzhong actually holds 12 buildings with Building Ownership Certificate which have a total gross floor area of approximately 17,617.21 sq.m.

3. For the remaining 3 buildings with a total gross floor area of approximately 1,060 sq.m., we have not been provided with any title certificates.

   As advised by the Group, the reason that there is no building ownership certificates for these 3 buildings is that they are unused and will be demolished soon.

ALRMH-CNBM00000428

4.   We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

    (i)   The Group has legally obtained the state-owned land use rights certificates of the 3 parcels of land mentioned in note.1 and the building ownership certificates of 12 buildings mentioned in note.2, and has the right to use, occupy, transfer, lease, mortgage or otherwise dispose of them in accordance with the valid term and usage stipulated by the Land Use Rights Certificate;

    (ii)   For the 3 buildings mentioned in note.3, the Group can legally use, occupy, transfer, lease, mortgage or otherwise dispose of them upon obtaining building ownership certificates; and

    (iii)   The property is not subject to mortgage or any other encumbrances.

5.   In the valuation of this property, we have relied on the aforesaid legal opinion and attributed no commercial value to the 3 buildings stated in note.3. However, for reference purposes, we are of the opinion that the capital value of the 3 buildings (excluding the land) as at the date of valuation would be RMB 602,000 assuming all relevant title documents had been obtained and the buildings could be freely transferred.

6.   According to a written Indemnification Undertaking from China National Building Material Group Corporation ("Parent"), the controlling shareholder of the Company, Parent has agreed to indemnify the Group against any losses suffered from the absence of title certificates and provide alternate buildings and/or land to the Group to ensure its normal operation if the Group is unable to continue to use the relevant buildings and/or land.

ALRMH-CNBM00000429

**APPENDIX IV**                                **PROPERTY VALUATION**

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|---|---|---|---|---|
| A6. | A parcel of land and an industrial building located at Songtiao Industrial Development Zone Lianyungang Jiangsu Province The PRC | The property comprises a parcel of land with a site area of approximately 9,487.90 sq.m. on which are constructed an industrial building completed in 2000.<br><br>The industrial building has a gross floor area of approximately 3,390.33 sq.m.<br><br>The land use rights of the property have been granted for a term expiring on March 22, 2048 for industrial use. | The property is currently occupied by the Group for production purposes. | 5,598,000<br><br>60.09% interest attributable to the Group: RMB 3,364,000 |

———————

*Notes:*

1. Pursuant to a State-owned Land Use Rights Certificate — Lian Guo Yong (2002) Zi Di No.B000057 (連國用(2002)字第 B000057), the land use rights of a parcel of land with a site area of approximately 9,487.90 sq.m. have been granted to Lianyungang Lianzhong Pipeline Company Limited ("Lianzhong Pipeline"), a 73.73% owned subsidiary of Zhongfu Lianzhong, for a term expiring on March 22, 2048 for industrial use.

2. Pursuant to a Building Ownership Certificate — Lian Fang Quan Zheng Xin Zi Di No.X00104955 (連房權證新字第 X00104955號 ), the industrial building with a gross floor area of approximately 3,390.33 sq.m. is owned by Lianzhong Pipeline.

3. We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

   (i) The Group has legally obtained both the state-owned land use rights certificate and the building ownership certificate of the property, and has the right to use and occupy the property in accordance with the valid term and usage stipulated by the Land Use Rights Certificate;

   (ii) The Group has the right to transfer, lease, mortgage or otherwise dispose of the property; and

   (iii) The property is not subject to mortgage or any other encumbrances.

ALRMH-CNBM00000430

**APPENDIX IV**                                                    **PROPERTY VALUATION**

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 RMB |
|---|---|---|---|---|
| A7. | Unit 3-101 of Block 33 Gang Li Garden Residential Area No.43 Hailian Dong Road Lianyungang Jiangsu Province The PRC | The property comprises a residential unit on Level 1 of a 7-storey residential building completed in 1998. The property has a gross floor area of approximately 105.19 sq.m. | The property is currently occupied by the Group for residential purposes. | 139,000 81.5% interest attributable to the Group: RMB 113,000 |

———————

*Note:*

1.  Pursuant to a Building Ownership Certificate — Lian Fang Quan Zheng Xin Zi Di No.X0152549 (連房權證新字第 X0152549號 ), the property with a gross floor area of approximately 105.19 sq.m. is owned by Zhongfu Lianzhong.

2.  We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

    (i)   Pursuant to a State-owned Land Use Rights Certificate — Lian Guo Yong (1999) Zi Di No.D006 (連國用(1999)字第 D006 號 ), the land use rights on which the property is located, are of granted nature;

    (ii)  The Group has legally obtained building ownership certificate of the property and is entitled to transfer, lease, mortgage or otherwise dispose of the property; and

    (iii) The property is not subject to mortgage or any other encumbrances.

ALRMH-CNBM00000431

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|---|---|---|---|---|
| A8. | Land, various buildings and structures No.1 Changcheng Road Changzhou Jiangsu Province The PRC | The property comprises 2 parcels of land with a total site area of approximately 21,400 sq.m. on which are constructed 8 buildings and other structures completed in various stages between 1990 and 1998. The buildings have a total gross floor area of approximately 16,395.45 sq.m. The buildings mainly include industrial buildings, an office building, warehouses and boiler rooms. The major structures include roads, walls, chimneys and sheds. The land use rights of the property have been granted for terms expiring on December 10, 2025 and July 18, 2026 for industrial use. | The property is currently occupied by the Group for production and office purposes. | 28,929,000 34.5% interest attributable to the Group: RMB 9,981,000 |

*Notes:*

1.  Pursuant to 2 State-owned Land Use Rights Certificates — Chang Guo Yong (2003bian) Zi Di No. 06056 and Chang Guo Yong (2002) Zi Di No.110052 (常國用(2003變)字第 06056 號和常國用(2002)字第 110052號 ), the land use rights of 2 parcels of land with a total site area of approximately 21,400 sq.m. have been granted to Changzhou China Composites Tianma Fiberglass Products Company Limited ("Zhongxin Tianma"), a 40% owned subsidiary of China Composites, for terms expiring on December 10, 2025 and July 18, 2026 for industrial use.

2.  Pursuant to 3 Building Ownership Certificates — Chang Fang Quan Zheng Zi Nos.00092893, 00092896 and 00110850 (常房權證字第 00092893號 , 第 00092896號和第 00110850號 ), the 8 buildings with a total gross floor area of approximately 16,395.45 sq.m. are owned by Zhongxin Tianma.

3.  We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

    (i)   The Group has legally obtained both the state-owned land use rights certificate and the building ownership certificate of the property, and has the right to use and occupy the property in accordance with the valid term and usage stipulated by the Land Use Rights Certificates;

    (ii)  The Group has the right to transfer, lease, mortgage or otherwise dispose of the property; and

    (iii) The property is not subject to mortgage or any other encumbrances.

ALRMH-CNBM00000432

## APPENDIX IV                                    PROPERTY VALUATION

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|-----|----------|------------------------|--------------------------|--------------------------------------------------------------|
| A9. | Unit 604 of Block 7 Chengshi Garden Residential Area Changzhou Jiangsu Province The PRC | The property comprises a residential unit on Level 6 of a 7-storey residential building completed in about 1995.<br><br>The property has a gross floor area of approximately 129.17 sq.m.<br><br>The land use rights of the property with an apportioned land area of approximately 28.5 sq.m. have been granted for a term expiring on September 10, 2062 for residential use. | The property is currently occupied by the Group for residential purposes. | 646,000<br><br>34.5% interest attributable to the Group: RMB 223,000 |

——————

*Notes:*

1.  Pursuant to a Building Ownership Certificate — Chang Fang Quan Zheng Zi Di No.00093784 (常房權證字第 00093784 號 ), the property with a gross floor area of approximately 129.17 sq.m. is owned by Zhongxin Tianma.

2.  Pursuant to a State-owned Land Use Rights Certificate — Chang Guo Yong (2004) Di No.01712 (常國用(2004)第 01712), the land use rights of the property with an apportioned land area of approximately 28.5 sq.m. have been granted to Zhongxin Tianma for a term expiring on September 10, 2062 for residential use.

3.  We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

    (i)    The Group has legally obtained both the state-owned land use rights certificate and the building ownership certificate of the property, and has the right to use and occupy the property in accordance with the valid term and usage stipulated by the Land Use Rights Certificate;

    (ii)   The Group has the right to transfer, lease, mortgage or otherwise dispose of the property; and

    (iii)  The property is not subject to mortgage or any other encumbrances.

ALRMH-CNBM00000433

**APPENDIX IV**                                   **PROPERTY VALUATION**

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|---|---|---|---|---|
| A10. | A parcel of land, various buildings and structures located at Laozhuang Town Zhenping County Nanyang Henan Province The PRC | The property comprises a parcel of land with a site area of approximately 271,476.63 sq.m. on which are erected 41 buildings and ancillary structures completed in 2005.<br><br>The buildings have a total gross floor area of approximately 27,916.98 sq.m.<br><br>The buildings mainly include industrial buildings, offices, warehouses, distribution rooms, a dining hall and boiler rooms.<br><br>The major structures include roads, walls, gates, lawn and sheds.<br><br>The land use rights of the property have been granted for a term expiring on March 29, 2053 for industrial use. | The property is currently occupied by the Group for production and office purposes except for a portion of the property which is rented to an independent party. (See note 3) | 118,170,000<br><br>96.07% interest attributable to the Group: RMB 113,526,000 |

Notes:

1. Pursuant to a State-owned Land Use Rights Certificate — Zhen Guo Yong (2004) Di Zi No.04433 (鎮國用(2004)第 04433 號), the land use rights of a parcel of land with a site area of approximately 271,476.63 sq.m. have been granted to China United Cement Company Limited Nanyang Branch ("Nanyang"), a branch of China United Cement Company Limited ("China United"), for a term expiring on March 29, 2053 for industrial use.

2. Pursuant to 40 Building Ownership Certificates — Fang Quan Zheng Zi Di Nos.00006413 to 00006416, 00006418, 00006423, 00006424, 00006430 to 00006433, 00006445, 00006450 to 00006453, 00006809, 0006876, 0006879, 00006881, 00006882, 00006896, 00006901 to 00006908, 00006910 to 00006912, 00006914, 00006915, 00006917, 00006918, 00007052, 00007053 and 00007328, 41 buildings of the property with a total gross floor area of approximately 27,916.98 sq.m. are owned by Nanyang.

3. Pursuant to a Tenancy Agreement entered into between Nanyang and Zhenping Huahang Plastic Company Limited (鎮平華航塑業有限公司), an Independent Third Party, various structures, 5 buildings with a total gross floor area of approximately 3,668.77 sq.m. and a total apportioned land area of approximately 20 mu (13,333.33 sq.m.) of the property are rented to Zhenping Huahang Plastic Company Limited for a term of 6 years commencing from July 1, 2004 and expiring on June 30, 2010 at an annual rental of RMB 180,000 for the first two years for production use, exclusive of water and electricity charges. The rental will be increased by RMB 10,000 every year from the third year.

4. Pursuant to 2 Mortgage Contracts, 2 Loan Contracts and a 債務承接協議書, the property (including the buildings and land only) is subject to a mortgage in favour of Industrial and Commercial Bank of China Neiqiu County Branch as security for borrowing 2 bank loans with maximum amount of RMB 45,060,000 granted to Xingtai Zhonglian Ziyan Cement Company Limited (a 67.71% owned subsidiary of China United) commencing from December 31, 2004 and expiring on November 1, 2006.

ALRMH-CNBM00000434

5.      We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

      (i)      The Group has legally obtained both the state-owned land use rights certificate and the building ownership certificate of the property, and has the right to use and occupy the property in accordance with the valid term and usage stipulated by the Land Use Rights Certificate;

      (ii)      The Group has the right to transfer, lease, mortgage or otherwise dispose of the property;

      (iii)      The Tenancy Agreement is valid, binding and enforceable under the PRC laws; and

      (iv)      During the mortgage term, the Group cannot lease, re-mortgage, transfer, present and otherwise dispose of the property unless obtaining the approval from the mortgagee.

6.      We are of the opinion that the capital value of the property as at the date of valuation would be RMB 118,170,000 assuming the approval from the mortgagee had been obtained and the property can be freely transferred.

ALRMH-CNBM00000435

## APPENDIX IV                                                    PROPERTY VALUATION

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|-----|----------|------------------------|--------------------------|---------------------------------------------------------------|
| A11. | A parcel of land, various buildings and structures located at Tanshan Village Maocun Town Tongshan County Xuzhou Jiangsu Province The PRC | The property comprises a parcel of land with a site area of approximately 820,421.7 sq.m. on which are constructed 71 buildings and ancillary structures completed in various stages between 1981 and 2005.<br><br>The buildings have a total gross floor area of approximately 85,792.93 sq.m.<br><br>The buildings mainly include industrial buildings, offices, warehouses, distribution rooms, a dining hall and boiler rooms.<br><br>The major structures include roads, walls, water towers, pipes, ponds and lawn.<br><br>The land use rights of the property have been granted for a term expiring on December 23, 2054 for industrial use. | The property is currently occupied by the Group for production and office purposes. | 311,005,000<br><br>85.3% interest attributable to the Group: RMB 265,287,000 |

*Notes:*

1.   Pursuant to a State-owned Land Use Rights Certificate — Xu Tu Guo Yong (2004) Di No.52628 (徐土國用(2004)第52628 號 ), the land use rights of a parcel of land with a site area of approximately 820,421.7 sq.m. have been granted to China United Julong Huaihai Cement Company Limited ("Huaihai"), an 88.79% owned subsidiary of China United, for a term expiring on December 23, 2054 for industrial use.

2.   Pursuant to 15 Building Ownership Certificates — Xu Fang Quan Zheng Jiu Li Qu Zi Di Nos.7234 to 7246, 8017 and 8018 (徐房權證九里區字第 7234號至第 7246號 , 8017號和 8018號 ), the 71 buildings of the property with a total gross floor area of approximately 85,792.93 sq.m. are owned by Huaihai.

3.   We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

   (i)    The Group has legally obtained the state-owned land use rights certificate of a land mentioned in note.1 and the building ownership certificate of the property mentioned in note.2, and has the right to use, occupy, transfer, lease, mortgage or otherwise dispose of them in accordance with the valid term and usage stipulated by the Land Use Rights Certificate;

   (ii)   The Group should fully pay the relevant land premium before transferring the property. According to information given by Huaihai, the total land premium is approximately RMB 72,607,300, of which approximately RMB 18,518,200 has been paid up to the date of valuation. Xuzhou City State-owned Resource Bureau has approved Huaihai to pay up the remaining land premium (approximately RMB 54,089,100) after listing within a month; and

   (iii)  The property is not subject to mortgage or any other encumbrances.

4.   In the valuation of this property, the remaining land premium (approximately RMB 54,089,100) is excluded from our valuation of the whole property.

ALRMH-CNBM00000436

## APPENDIX IV                                                    PROPERTY VALUATION

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|---|---|---|---|---|
| A12. | Land, various buildings and structures located at Jiehe Town Tengzhou Shandong Province The PRC | The property comprises 13 parcels of land with a total site area of approximately 498,126.75 sq.m. on which are constructed 90 buildings and ancillary structures completed in various stages between 1985 and 2005.<br><br>The buildings have a total gross floor area of approximately 107,455.87 sq.m.<br><br>The buildings mainly include industrial buildings, offices, warehouse, distribution rooms, a dining hall, boiler rooms and pump rooms.<br><br>The major structures include roads, walls, water towers and bicycle sheds.<br><br>The land use rights of the property have been granted for various terms expiring on March 30, 2049 and June 30, 2044 for industrial use. | The property is currently occupied by the Group for production and office purposes except for a portion of the property which is rented to a connected party (See note.5). | 338,176,000<br><br>77.18% interest attributable to the Group: RMB 261,004,000 |

_____

*Notes:*

1.  Pursuant to 13 State-owned Land Use Rights Certificates — Teng Guo Yong (2004) Di Zuo Jia Nos. 03 to 12, Teng Guo Yong (2004) Di Zhuan Nos. 13 to 15 (滕國用(2004)第作第 03 號至 第作價 12號 , 滕國用(2004)第轉 013 號至第轉 015 號 ), the land use rights of 13 parcels of land with a total site area of approximately 498,126.75 sq.m. have been granted to China United Luhong Cement Company Limited ("Luhong"), an 80.34% owned subsidiary of China United, for various terms expiring on March 30, 2049 and June 30, 2044 for industrial use.

2.  Pursuant to 8 Building Ownership Certificates — Teng Fang Quan Zheng Jie He Zi Di Nos.21701009 to 21701016 (滕房產證界河字第 21701009 號至第 21701016 號 ), various buildings (including 88 buildings of the property) with a total gross floor area of approximately 109,457.27 sq.m. are owned by Luhong. As confirmed by Luhong, the building ownership rights of 5 buildings with a total gross floor area of approximately 2,842.55 sq.m. are not vested in Luhong, hence we excluded them from our valuation.

3.  For the remaining 2 buildings of the property with a total gross floor area of approximately 841.15 sq.m., they are constructed on the land which are not vested in Luhong.

    As advised by the Group, the reason that there is no building ownership certificate for these 2 buildings is that they are unused and will be demolished soon.

    According to a legal opinion given by the Company's PRC legal advisers, the 2 buildings cannot be freely transferred, therefore we have attributed no commercial value to them.

4.  Pursuant to a Maximum Amount Mortgage Contract, a portion of buildings with a gross floor area of approximately 530.1 sq.m. and a portion of land with a site area of approximately 5,557.36 sq.m. of the property are subject to a mortgage in favour of Industrial and Commercial Bank of China Tengzhou Branch as security for borrowing a bank loan with maximum amount of RMB 50,000,000 granted to Luhong commencing from October 8, 2005 and expiring on October 7, 2006.

ALRMH-CNBM00000437

5.   Pursuant to a Building and Land Tenancy Agreement entered into between Luhong and Shandong Lunan Cement Company Limited (山東魯南水泥有限公司), a connected party of the Company, a portion of buildings with a gross floor area of approximately 715.3 sq.m. and a portion of land with a site area of approximately 3,533.63 sq.m. of the property are rented to Shandong Lunan Cement Company Limited for a term of 1 year commencing from January 1, 2006 and expiring on December 31, 2006 at a total annual rental of RMB 43,835.92.

6.   We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

(i)    The Group has obtained the state-owned land use rights certificates of the 13 parcels of land mentioned in note.1 and the building ownership certificates of the property mentioned in note.2, and has the right to use, occupy, transfer, lease, mortgage or otherwise dispose of them in accordance with the valid term and usage stipulated by the Land Use Rights Certificate;

(ii)   The Building and Land Tenancy Agreement is valid, binding and enforceable under the PRC laws; and

(iii)  During the mortgage term, the Group cannot lease, re-mortgage, transfer, present and otherwise dispose of the buildings and land mention in note.5 unless obtaining the approval from the mortgagee.

7.   We are of the opinion that the capital value of the property (excluding the buildings mentioned in note.3) as at the date of valuation would be RMB 338,176,000 assuming the approval from the mortgagee had been obtained and the property can be freely transferred.

8.   According to a written Indemnification Undertaking from China National Building Material Group Corporation ("Parent"), the controlling shareholder of the Company, Parent has agreed to indemnify the Group against any losses suffered from the absence of title certificates and provide alternate buildings and/or land to the Group to ensure its normal operation if the Group is unable to continue to use the relevant buildings and/or land.

ALRMH-CNBM00000438

**APPENDIX IV**                                          **PROPERTY VALUATION**

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|-----|----------|----------------------|------------------------|-----------------------------------------------------------|
| A13. | A parcel of land, various buildings and structures located at the southern side of Xinfeng Road Development Zone Heze Shandong Province The PRC | The property comprises a parcel of land with a site area of approximately 33,513 sq.m. on which are erected 12 buildings and other structures completed in 2003.<br><br>The buildings have a total gross floor area of approximately 4,862.66 sq.m.<br><br>The buildings mainly include industrial buildings, offices, warehouses, distribution rooms, a dining hall and a pump room.<br><br>The major structures include roads, walls, a well and sheds<br><br>The land use rights of the property have been granted for a term expiring on January 9, 2053 for industrial use. | The property is currently occupied by the Group for production and office purposes. | 23,757,000<br><br>72.91% interest attributable to the Group: RMB 17,321,000 |

———————

*Notes:*

1.   Pursuant to a State-owned Land Use Rights Certificate — He Guo Yong (2004) Di No.12788 (菏國用(2004)第 12788 號 ), the land use rights of a parcel of land with a site area of approximately 33,513 sq.m. have been granted to Shandong Heze Luhong Cement Company Limited ("Heze Company"), a 94.46% owned subsidiary of Luhong, for a term expiring on January 9, 2053 for industrial use.

2.   Pursuant to 3 Building Ownership Certificates — He Fang Quan Zheng Shi Zhi Zi Nos. 034350 to 034352 (菏房權證市直字第 034350 號至第 034352 號 ), the 12 buildings with a total gross floor area of approximately 4,862.66 sq.m. are owned by Heze Luhong.

3.   We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

   (i)   The Group has legally obtained both the state-owned land use rights certificate and the building ownership certificate of the property, and has the right to use and occupy the property in accordance with the valid term and usage stipulated by the Land Use Rights Certificate;

   (ii)   The Group has the right to transfer, lease, mortgage or otherwise dispose of the property; and

   (iii)   The property is not subject to mortgage and any other encumbrances.

ALRMH-CNBM00000439

**APPENDIX IV**                                                    **PROPERTY VALUATION**

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|---|---|---|---|---|
| A14. | Land, various buildings and structures located at the western side of Xiazhuo Road Xiahuayuan District Zhangjiakou Hebei Province The PRC | The property comprises 2 parcels of land with a total site area of approximately 49,217.50 sq.m. on which are erected 20 buildings and ancillary structures completed in various stages between 1993 and 2004. The buildings have a total gross floor area of approximately 15,881.26 sq.m. The buildings mainly include industrial buildings, boiler room, dormitories, distribution rooms and warehouses. The major structures include roads, walls, gates, sheds and wells. The land use rights of the property have been granted for terms expiring on July 1, 2052 and August 8, 2052 for industrial use. | The property is currently occupied by the Group for production and office purposes. | 20,077,000 60.33% interest attributable to the Group: RMB 12,112,000 |

———————

*Notes:*

1.  Pursuant to 2 State-owned Land Use Rights Certificates — Zhang Shi Xia Guo Yong (2000) Zi Di No.031 and (2003) Zi Di No.005 (張市下國用(2000)字第 031 號和(2003)字第 005 號 ), the land use rights of 2 parcels of land with a total site area of approximately 49,217.50 sq.m. have been granted to Beijing New Building Material Company Limited ("BNBM"), a 60.33% owned subsidiary of the Company, for terms expiring on July 1, 2052 and August 8, 2052 for industrial use.

2.  Pursuant to 9 Building Ownership Certificates — Zhang Fang Quan Zheng Zi Xia Zi Di No.00000012 to No.00000016, No.00000019, 00000159 to 00000161 (張房權證字下自第 00000012號至 00000016號， 第 00000019號， 00000159 號至 00000161號 ), 25 buildings (including 20 buildings of the property) with a total gross floor area of approximately 16,308.68 sq.m. are owned by BNBM. As advised by BNBM, 5 buildings with a total gross floor area of approximately 427.42 sq.m. have been demolished as at the date of valuation.

3.  We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

    (i)   The Group has legally obtained the state-owned land use rights certificates of the 2 parcels of land mentioned in note.1 and the building ownership certificates of 20 buildings mentioned in note.2, and has the right to use, occupy, transfer, lease, mortgage or otherwise dispose of them in accordance with the valid term and usage stipulated by the Land Use Rights Certificate; and

    (ii)  The property is not subject to mortgage and any other encumbrances.

ALRMH-CNBM00000440

**APPENDIX IV**                                      **PROPERTY VALUATION**

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|---|---|---|---|---|
| A15. | A parcel of land and 3 ancillary buildings located at the eastern side of Xiazhuo Road Xiahuayuan District Zhangjiakou Hebei Province The PRC | The property comprises a parcel of land with a site area of approximately 2,684 sq.m. on which are erected 3 buildings completed in 1991.<br><br>The buildings have a total gross floor area of approximately 174.04 sq.m.<br><br>The buildings include an office, a gas station and a warehouse.<br><br>The land use rights of the property have been granted for a term expiring on August 8, 2052 for gas station use. | The property is currently occupied by the Group for ancillary production purposes. | 391,000<br><br>60.33% interest attributable to the Group: RMB 236,000 |

———————

*Notes:*

1. Pursuant to a State-owned Land Use Rights Certificate — Zhang Shi Xia Guo Yong (2000) Zi Di No.032 (張市下國用(2000)字第 032 號 ), the land use rights of a parcel of land with a site area of approximately 2,684 sq.m. have been granted to BNBM for a term expiring on August 8, 2052 for gas station use.

2. Pursuant to a Building Ownership Certificate — Zhang Fang Quan Zheng Zi Xia Zi Di No.00000017 (張房權證字下自第 00000017 號 ), the 3 buildings with a total gross floor area of approximately 174.04 sq.m. are owned by BNBM.

3. We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

   (i) The Group has legally obtained both the state-owned land use rights certificate and the building ownership certificate of the property, and has the right to use and occupy the property in accordance with the valid term and usage stipulated by the Land Use Rights Certificate;

   (ii) The Group has the right to transfer, lease, mortgage or otherwise dispose of the property; and

   (iii) The property is not subject to mortgage and any other encumbrances.

ALRMH-CNBM00000441

**APPENDIX IV**                                                       **PROPERTY VALUATION**

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|---|---|---|---|---|
| A16. | A residential unit and a commercial unit of apartment house No.70 Xi Wei Di Dao Hexi District Tianjin The PRC | The property comprises a residential unit on Level 2 and a commercial unit on Level 1 of a 6-storey apartment house completed in 1996.<br><br>The units have a total gross floor area of approximately 230.77 sq.m. | The property is currently occupied by the Group for residential and distribution office purposes. | No commercial value |

———————

*Notes:*

1.   Pursuant to 2 Building Ownership Certificates — Fang Quan Zheng Hexi Zi Di Jin Nos. 0099377 and 0099378 (房權證河西字第津 0099377號和 0099378號 ), the 2 units with a total gross floor area of approximately 230.77 sq.m. are owned by BNBM.

2.   We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

   (i)   The Group has legally obtained the building ownership rights of the property and is entitled to use and occupy the property;

   (ii)   As the relevant land titles to the property have not been obtained, the Group cannot transfer, lease for mortgage the property; and

   (iii)   The property is not subject to mortgage or any other encumbrances.

3.   We have relied on the aforesaid legal opinion and attributed no commercial value to the property. However, for reference purposes, we are of the opinion that the capital value of the property as at the date of valuation would be RMB 830,000 assuming the property could be freely transferred.

ALRMH-CNBM00000442

## APPENDIX IV                                              PROPERTY VALUATION

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|---|---|---|---|---|
| A17. | An office unit and a residential unit of apartment house No.19-1 Shayang Road Heping District Shengyang Liaoning Province The PRC | The property comprises an office unit on Level 1 and a residential unit on Level 2 of a 7-storey apartment house completed in 1997.<br><br>The property has a total gross floor area of approximately 202.18 sq.m. | The property is currently occupied by the Group for residential and office purposes. | No commercial value |

——————

*Notes:*

1.  Pursuant to a Building Ownership Certificate — Shen Fang Quan Zheng He Ping Zi Di No.15748 (沈房權證和平字第 15748 號), the property with a total gross floor area of approximately 202.18 sq.m. is owned by BNBM.

2.  We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

    (i)   The Group has legally obtained the building ownership certificate of the property and is entitled to use and occupy the property;

    (ii)  As the relevant land titles to the property have not been obtained, the Group cannot transfer, lease or mortgage the property; and

    (iii) The property is not subject to mortgage or any other encumbrances.

3.  We have relied on the aforesaid legal opinion and attributed no commercial value to the property. However, for reference purposes, we are of the opinion that the capital value of the property as at the date of valuation would be RMB 799,000 assuming the property could be freely transferred.

ALRMH-CNBM00000443

**APPENDIX IV**                                    **PROPERTY VALUATION**

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|-----|----------|------------------------|--------------------------|---------------------------------------------------------------|
| A18. | Units 801A to 806A of Block A Yin Dian Yuan Residential Area located at the eastern side of Haidian San Road Haikou Hainan Province The PRC | The property comprises 6 office units on Level 8 of a 9-storey building completed in 1992.<br><br>The property has a total gross floor area of approximately 583.88 sq.m. | The property is currently occupied by the Group for office purposes. | 1,284,000<br><br>60.33% interest attributable to the Group: RMB775,000 |

———————

*Notes:*

1.  Pursuant to 6 Building Ownership Certificates — Haikou Shi Fang Quan Zheng Hai Fang Zi Di Nos.HK038034 to HK038039 (海口市房權證海房字第 HK038034號至 HK038039號 ), 6 units with a total gross floor area of approximately 583.88 sq.m. are owned by BNBM.

2.  We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

    (i)   Pursuant to a State-owned Land Use Rights Certificate — Hai Kou Shi Guo Yong Ji Zi Di No.2002002834 (海口市國用籍字第 2002002834號 ), the land use rights on which 6 units are located, are of granted nature;

    (ii)  The Group has legally obtained building ownership certificate of the property and is entitled to transfer, lease, mortgage or otherwise dispose of the property; and

    (iii) The property is not subject to mortgage or any other encumbrances.

ALRMH-CNBM00000444

## APPENDIX IV             PROPERTY VALUATION

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|---|---|---|---|---|
| A19. | Various buildings and structures No.16 Jiancaicheng Xi Road Xisanqi Haidian District Beijing The PRC | The property comprises 53 buildings and other ancillary structures completed in various stages between 1981 and 2000.<br><br>The buildings have a total gross floor area of approximately 162,727.65 sq.m.<br><br>The buildings mainly include industrial buildings, offices, warehouses, distribution rooms, a dining hall, boiler rooms and pump rooms.<br><br>The major structures include roads, walls, parterre, sheds and car parking space.<br><br>The property is constructed on 13 parcels of land leased from the Company and a connected party respectively for industrial use. (See notes 3 and 4) | The property is currently occupied by the Group for production and office purposes except for 5 portions of the property which are rented to 4 connected parties and a subsidiary of BNBM. (See note 6) | 228,086,000<br><br>60.33% interest attributable to the Group: 137,604,000 |

---

*Notes:*

1. Pursuant to 9 State-owned Land Use Rights Certificates — Haidian Qu Guo Yong (1997churang) Zi Di No. 0730, Jing Hai Guo Yong (2004chu) Zi Di No.3181, Jing Hai Guo Yong (2005chu) Zi Di Nos.3264 to 3265, Jing Hai Guo Yong (2005chu) Zi Di Nos.3269 to 3271, Jing Hai Guo Yong (2005chu) Zi Di Nos.3273 to 3274 (海淀區國用(1997出讓)字第0730號、 京海國用(2004出)第3181號 、 京海國用(2005出)字第3264號至3265號、 京海國用(2005出)字第 3269號至3271號 、京海國用(2005出)字第 3273號至3274號), the land use rights of 9 parcels of land with a total site area of approximately 338,505.07 sq.m. have been granted to the Company for various terms with the latest date expiring on November 3, 2047 for industrial use. (See Property no. A27)

2. Pursuant to 2 State-owned Land Use Rights Certificates — Jing Hai Guo Yong (2005chu) Zi Di Nos.3268 and 3275 (京海國用(2005出)字第3268號和第3275號), the land use rights of 2 parcels of land with a total site area of approximately 195,193.10 sq.m. have been granted to Beijing New Building Material (Group) Company Limited ("BNBMG"), a shareholder of the Company, for various terms expiring on November 23, 2054 for industrial use.

3. Pursuant to a Land Use Rights Tenancy Agreement entered into between the Company and BNBM dated September 1, 2005, 9 parcels of land stated in note no.1 with a total site area of approximately 338,505.07 sq.m. are rented to BNBM for a term of 3 years commencing from September 1, 2005 and expiring on August 31, 2008. The current annual rent is RMB 2.87 per sq.m.

4. Pursuant to a Land Use Rights Tenancy Agreement entered into between BNBM and BNBMG dated September 1, 2005, portions of 2 parcels of land stated in note no.2 with a total apportioned land area of approximately 10,126 sq.m. are rented to BNBM for a term of 2 years commencing from September 1, 2005 and expiring on August 31, 2007. The current annual rent is RMB 15 per sq.m.

5. Pursuant to 12 Building Ownership Certificates — Jing Fang Quan Zheng Hai Guo Geng Zi Di Nos.02284, 02285, 02288, 02296 and 02297; Jing Fang Quan Zheng Hai Guo Zi Di Nos.02289 to 02290; Jing Fang Quan Zheng Hai Gu Geng Zi Di Nos.0049810, 0049800 to 0049803 (京房權證海國更字第 02284、02285、02288、02296和02297號 ; 京房權證海國字第 02289 號至第 02290號 ; 京房權證海股更字第 0049810, 0049800至 0049803號), the 53 buildings with a total gross floor area of approximately 162,727.65 sq.m. are owned by BNBM.

IV-43

ALRMH-CNBM00000445

---

**APPENDIX IV**                                                                                          **PROPERTY VALUATION**

---

6.  Pursuant to 5 Building Tenancy Agreements, portions of the property with a total gross floor area approximately 4,271.41 sq.m. are rented to 4 connected parties and Beijing Haidian Chenlong Decoration Co., Ltd (a 99% owned subsidiary of BNBM) for office or production uses, exclusive of water and electricity charges. The details are set out as follows:

| No. | Lessee | G.F.A. | Term | | Annual Rental |
| --- | --- | --- | --- | --- | --- |
| | | | From | To | |
| | | (sq.m.) | | | (RMB) |
| 1 | BNBMG | 345.00 | 2005-09-01 | 2007-08-31 | 151,110 |
| 2 | BNBM Suguan Co., Ltd | 3,187.00 | 2005-09-01 | 2007-08-31 | 1,046,930 |
| 3 | Beijing Haidian Chenlong Decoration Co., Ltd | 414.00 | 1999-03-01 | 2007-02-27 | 144,000 |
| 4 | Beijing BNBM Research Institute Co., Ltd | 235.00 | 2005-09-01 | 2007-08-31 | 102,930 |
| 5 | Beijing BNBM Building Material Business and Commercial Co., Ltd | 90.41 | 2005-09-01 | 2007-08-31 | 39,600 |
| | Total: | 4,271.41 | | | 1,484,570 |

7.  We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

    (i)  Regarding the land use rights under the Land Use Rights Tenancy Agreements as mentioned in notes 3 and 4, the followings have been agreed upon between BNBM and the Company, BNBMG, respectively, including but not limited to:

        a.  The Company or BNBMG grants BNBM the priority to renew the relevant land use rights tenancy agreement upon its expiry under the same conditions;

        b.  During the lease term, BNBM has the right to lease/sublet the buildings and structures of the property together with the leased land in full or in part to any other third parties without obtaining the approval from the Company or BNBMG;

        c.  During the lease term, BNBM has the right to transfer the buildings and structures of the property but the Company has the priority to purchase the buildings and structures under the same transaction conditions; in case of giving up the purchase priority, the Company will agree to transfer the relevant leased land to the same third party; and

        d.  During the lease term, the Company or BNBMG will agree to mortgage the relevant land use rights if BNBM mortgages the buildings and structures of property.

    (ii)  The Group has legally obtained the building ownership certificates of the 53 buildings mentioned in note 5 and is entitled to transfer, lease, mortgage or otherwise dispose of the buildings;

    (iii)  The Land Use Rights Tenancy Agreements and Building Tenancy Agreements are valid, binding and enforceable under the PRC laws; and BNBM can legally occupy and use the land use rights of the property; and

    (iv)  The property is not subject to mortgage and any other encumbrances.

ALRMH-CNBM00000446

**APPENDIX IV**                                                  **PROPERTY VALUATION**

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|-----|----------|------------------------|--------------------------|------------------------------------------------------------------|
| A20. | Various buildings No.16 Jiancaicheng Xi Road Xisanqi Haidian District Beijing The PRC | The property comprises 9 buildings completed in various stages between 1984 and 2004.<br><br>The buildings have a total gross floor area of approximately 19,835.14 sq.m.<br><br>The buildings mainly include industrial buildings, offices, warehouses and distribution rooms.<br><br>The property is constructed on a parcel of land leased from the Company for industrial use. (See note 3) | The property is currently occupied by the Group for production and office purposes. | 26,848,000<br><br>38.61% interest attributable to the Group: RMB 10,366,000 |

_____

*Notes:*

1.  Pursuant to a State-owned Land Use Rights Certificate — Jing Hai Guo Yong (2004chu) Zi Di No. 3108 (京海國用(2004出)字第3108號 ), the land use rights of a parcel of land with a site area of approximately 32,490.65 sq.m. have been granted to the Company for a term expiring on March 9, 2053 for industrial use. (See Property no.A27).

2.  Pursuant to 3 Building Ownership Certificates — Jing Fang Quan Zheng Hai She Geng Zi Di No.0049797, No. 0049833 and Jing Fang Quan Zheng Hai Guo Geng Zi Ki No.02295 (京房權證海涉更字第0049797號, 0049833號和 京房權證海國更字第02295號 ), the buildings with a total gross floor area of approximately 19,835.14 sq.m. are owned by BNBM Homes Company Limited ("BNBM Homes"), a 64% owned subsidiary of BNBM.

3.  Pursuant to a Land Use Rights Tenancy Agreement entered into between the Company and BNBM Homes dated September 1, 2005, a parcel of land stated in note no.1 with a site area of approximately 32,490.65 sq.m. are rented to BNBM Homes for a term of 3 years commencing from September 1, 2005 and expiring on August 31, 2008. The current annual rent is RMB 15 per sq.m.

4.  We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

    (i)   Regarding the land use rights under the Land Use Rights Tenancy Agreement as mentioned in note 3, the followings have been agreed upon between BNBM Home and the Company, including but not limited to:

        a.   The Company grants BNBM Homes the priority to renew the relevant land use rights tenancy agreement upon its expiry under the same conditions;

        b.   During the lease term, BNBM Homes has the right to lease/sublet the buildings together with the leased land in full or in part to any other third parties without obtaining the approval from the Company;

        c.   During the lease term, BNBM Homes has the right to transfer the buildings but the Company has the priority to purchase the buildings under the same transaction conditions; In case of giving up the purchase priority, the Company will agree to transfer the relevant leased land to the same third party; and

IV-45

ALRMH-CNBM00000447

    d.    During the lease term, the Company will agree to mortgage the relevant land use rights if BNBM Homes mortgages the buildings.

(ii)    The Group has legally obtained the building ownership certificate of the buildings with a total gross floor area of approximately 19,835.14 sq.m. and is entitled to transfer, lease, mortgage or otherwise dispose of the buildings;

(iii)    The Land Use Rights Tenancy Agreement is valid, binding and enforceable under the PRC laws; and BNBM Homes can legally occupy and use the land use rights of the property; and

(iv)    The property is not subject to mortgage and any other encumbrances.

ALRMH-CNBM00000448

## APPENDIX IV                                      PROPERTY VALUATION

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 RMB |
|---|---|---|---|---|
| A21. | An industrial building No.16 Jiancaicheng Xi Road Xisanqi Haidian District Beijing The PRC | The property comprises an industrial building completed in 1998.<br><br>The industrial building has a total gross floor area of approximately 17,080.37 sq.m.<br><br>The property is constructed on a parcel of land leased from the Company for industrial use. (See note. 3) | The property is currently occupied by the Group for production purposes except for a portion of the property which is rented to a connected party (See note.4). | 33,068,000<br><br>33.18% interest attributable to the Group: RMB 10,972,000 |

_____

*Notes:*

1.    Pursuant to a State-owned Land Use Rights Certificate — Jing Hai Guo Yong (2005chu) Zi Di No. 3272 (京海國用(2005)出字第3272號), the land use rights of a parcel of land with a site area of approximately 12,911.16 sq.m. have been granted to the Company for a term expiring on November 23, 2054 for industrial use. (See Property no. A27)

2.    Pursuant to a Building Ownership Certificate — Jing Fang Quan Zheng Hai Guo Geng Zi Di No.02291 (京房權證海國更字第02291號), the building with a gross floor area of approximately 17,080.37 sq.m. is owned by BNBM Building Plastic Co., Ltd ("BNBM Plastic"), a 55% owned subsidiary of BNBM.

3.    Pursuant to a Land Use Rights Tenancy Agreement entered into between the Company and BNBM Plastic dated September 1, 2005, a parcel of land stated in note no.1 with a site area of approximately 12,911.16 sq.m. are rented to BNBM Plastic for a term of 3 years commencing from September 1, 2005 and expiring on August 31, 2008. The current annual rent is RMB 2.87 per sq.m.

4.    Pursuant to a Tenancy Agreement entered into between BNBM Plastic and Beijing Jieruixin Door & Windows Company Limited (北京捷瑞信門窗有限公司), an associated party of the Company, a portion of the building with a gross floor area of approximately 100 sq.m. is rented to Beijing Jieruixin Door & Windows Company Limited for a term commencing from September 1, 2005 and expiring on August 31, 2007 at an annual rental of RMB 12,000.

5.    We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

(i)    Regarding the land use rights under the Land Use Rights Tenancy Agreement as mentioned in note. 3, the followings have been agreed upon between BNBM Plastic and the Company, including but not limited to:

a.    The Company grants BNBM Plastic the priority to renew the relevant land use rights tenancy agreement upon its expiry under the same conditions;

b.    During the lease term, BNBM Plastic has the right to lease/sublet the buildings together with the leased land in full or in part to any other third parties without obtaining the approval from the Company;

ALRMH-CNBM00000449

      c.     During the lease term, BNBM Plastic has the right to transfer the buildings but the Company has the priority to purchase the buildings under the same transaction conditions; In case of giving up the purchase priority, the Company will agree to transfer the relevant leased land to the same third party; and

      d.     During the lease term, the Company will agree to mortgage the relevant land use rights if BNBM Plastic mortgages the buildings.

(ii)     The Group has legally obtained the building ownership certificate of the building and is entitled to transfer, lease, mortgage or otherwise dispose of the building;

(iii)    The Land Use Rights Tenancy Agreement is valid, binding and enforceable under the PRC laws; and BNBM Plastic can legally occupy and use the land use rights of the property; and

(iv)    The property is not subject to mortgage and any other encumbrances.

ALRMH-CNBM00000450

## APPENDIX IV                                               PROPERTY VALUATION

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 RMB |
|-----|----------|------------------------|--------------------------|---------------|
| A22. | A parcel of land and a composite building No.11 Chuangye Road Shangdi Development Zone Haidian District Beijing The PRC | The property comprises a parcel of land with a site area of approximately 3,315.42 sq.m. on which are constructed a 7-storey composite building completed in about 1998. The building has a gross floor area of approximately 4,892.07 sq.m. The land use rights of the property have been granted for a term expiring on March 22, 2050 for industrial use. | The property is currently occupied by the Group for office purposes. | 25,456,000<br><br>60.33% interest attributable to the Group: RMB 15,358,000 |

------------

*Notes:*

1.  Pursuant to a State-owned Land Use Rights Certificate — Jing Shi Hai Gu Guo Yong (2004chu) Zi Di No. 10039 (京市海股國用(2004出)字第10039號), the land use rights of a parcel of land with a site area of approximately 3,315.42 sq.m. have been granted to BNBM for a term expiring on March 22, 2050 for industrial use.

2.  Pursuant to a Building Ownership Certificate — Jing Fang Quan Zheng Hai Gu Zi Di No.10014 (京房權證海股字第10014號), the building with a gross floor area of approximately 4,892.07 sq.m. is owned by BNBM.

3.  We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

    (i)   The Group has legally obtained both the state-owned land use rights certificate and the building ownership certificate of the property, and has the right to use and occupy the property in accordance with the valid term and usage stipulated by the Land Use Rights Certificate;

    (ii)  The Group has the right to transfer, lease, mortgage or otherwise dispose of the property; and

    (iii) The property is not subject to mortgage and any other encumbrances.

ALRMH-CNBM00000451

**APPENDIX IV**                                                    **PROPERTY VALUATION**

| No. | Property | Description and tenure | Particulars of occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|-----|----------|------------------------|--------------------------|---------------------------------------------------------------|
| A23. | A parcel of land, various buildings and structures located at Kaisai Dong Road Hi-Tech Development Zone Jining Shandong Province The PRC | The property comprises a parcel of land with a site area of approximately 30,383 sq.m. on which on which are erected 3 buildings and various ancillary structures completed in 2005.<br><br>The buildings have a total gross floor area of approximately 1,036.62 sq.m.<br><br>The buildings and structures mainly include a composite building, a reception room, a loadometer room, sheds, gates, walls and reception rooms.<br><br>The land use right of the property have been granted for a term expiring on January 28, 2055 for industrial use. | The property is currently occupied by the Group for production and ancillary office purposes. | 11,159,000<br><br>(41.91% interest attributable to the Group: RMB 4,677,000 |

_____

*Notes:*

1. Pursuant to a State-owned Land Use Rights Certificate — Ji Kai Guo Yong (2005) Zi No.0816050012 (濟開國用(2005)字第 0816050012號 ), the land use rights of a parcels of land with a site area of approximately 30,383 sq.m. have been granted to Shandong Luhong Hengjiu Concrete Engineering Company Limited ("Hengjiu Concrete"), a 54.3% owned subsidiary of the Luhong, for a term expiring on January 28, 2055 for industrial use.

2. Pursuant to 3 Building Ownership Certificates — Ji Ning Fang Quan Zheng Zhong Zi Di Nos. 035015 to 035017 (濟寧市房權証中字第 035015至 035017), the 3 buildings with a total gross floor area of approximately 1,036.62 sq.m. are owned by Hengjiu Concrete.

3. We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

   (i) The Group has legally obtained both the state-owned land use rights certificate and the building ownership certificate of the property, and has the right to use and occupy the property in accordance with the valid term and usage stipulated by the Land Use Rights Certificate;

   (ii) The Group has the right to transfer, lease, mortgage or otherwise dispose of the property; and

   (iii) The property is not subject to mortgage and any other encumbrances.

ALRMH-CNBM00000452

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|---|---|---|---|---|
| A24. | Level 12 of Block B International Trading Center Renmin Nan Road Luohu District Shenzhen Guangdong Province The PRC | The property comprises the whole of Level 12 of a 53-storey composite building completed in about 1986.<br><br>The property has a gross floor area of approximately 1,518 sq.m.<br><br>The land use rights of the property with an apportioned land area of approximately 227.70 sq.m. have been granted for a term of 50 years expiring on June 1, 2031 for commercial and financial uses. | The property is currently occupied by the Group for office purposes. | 7,104,000<br><br>56.3% interest attributable to the Group: RMB 4,000,000 |

*Notes:*

1.    Pursuant to a Real Estate Title Certificate — Shen Fang Di Zi No.2000108107 (深房地字第2000108107號 ), the property with a gross floor area of approximately 1,518 sq.m. is owned by BND Company Limited ("BND"), an 80% owned subsidiary of the BNBM.

      The land use rights of the property with an apportioned land area of approximately 227.7 sq.m. have been granted to BND for a term of 50 years expiring on June 1, 2031 for commercial and financial uses.

2.    We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

      (i)    The Group has legally obtained the building ownership rights and the land use rights of the property and has the right to occupy and use the property in accordance with the valid term and usage stipulated by the Real Estate Title Certificate;

      (ii)   The Group has the right to transfer, lease, mortgage or otherwise dispose of the real estate ownership of the property under the applicable laws; and

      (iii)  The property is not subject to mortgage and any other encumbrances.

ALRMH-CNBM00000453

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|-----|----------|----------------------|--------------------------|------------------------------------------------------------|
| A25. | Land, various buildings and structures No.2 Dalian Road Xiaoshi Island Hi-Tech Development Zone Weihai Shandong Province The PRC | The property comprises 2 parcels of land with a total site area of approximately 30,686.93 sq.m. on which are erected 11 buildings and ancillary structures completed in various stages between 1981 and 2005.<br><br>The buildings have a total gross floor area of approximately 7,146.3 sq.m.<br><br>The buildings mainly include industrial buildings, a dormitory and a distribution room.<br><br>The major structures include roads, walls, gates and dams.<br><br>The land use rights of a parcel of land have been granted for a term expiring on December 27, 2054 for industrial use.<br><br>The remaining parcel of land is of allocated nature. | The property is currently occupied by the Group for production and office purposes. | 18,799,000<br><br>43.98% interest attributable to the Group: RMB 8,268,000 |

—————

*Notes:*

1. Pursuant to a State-owned Land Use Rights Certificate — Wei Gao Guo Yong (2005) Di No.Z-36 (威高國用(2005)第Z-36 號), the land use rights of a parcel of land with a site area of approximately 19,653.60 sq.m. have been granted to Weihai China Composites Xigang Boat Company Limited ("Zhongfu Xigang"), a 51% owned subsidiary of China Composites, for a term expiring on December 27, 2054 for industrial use.

2. Pursuant to 4 Building Ownership Certificates — Wei Fang Quan Zheng Zi Di Nos.2005006965, 2005006966, 2005006972 and 2005006974 (威房權證字第2005006965號, 第2005006966號, 第2005006972號和第2005006974號), the 5 buildings with a total gross floor area of approximately 3,937.05 sq.m. is owned by Zhongfu Xigang.

3. For the remaining 6 buildings with a total gross floor area of approximately 3,209.25 sq.m. and the remaining parcel of land with a site area of approximately 11,033.33 sq.m., we have not been provided with any title documents.

   As confirmed by the Group, the parcel of land without formal title certificate has been injected into Zhongfu Xigang by way of capital injection but the Group has not completed the relevant register conversion; the parcel of land is currently vacant as of the date of valuation.

   As advised by the Group, applications have been made to the appropriate authorities to obtain the relevant title certificates of the remaining 6 buildings and land, the PRC legal advisers have advised that there is no material impediment to obtaining the relevant title certificates for these buildings.

ALRMH-CNBM00000454

**APPENDIX IV**                                                    **PROPERTY VALUATION**

4.    We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

    (i)    The Group has legally obtained the state-owned land use rights certificate of the land mentioned in note.1 and the building ownership certificates of the 5 buildings mentioned in note.2, and has the right to use, occupy, transfer, lease, mortgage or otherwise dispose of them in accordance with the valid term and usage stipulated by the Land Use Rights Certificate;

    (ii)    For the land mentioned in note.3, the Group has the right to transfer, lease or mortgage the land upon completing relevant land grant procedures and obtaining the relevant land use rights certificate; and

    (iii)    The property is not subject to mortgage or any other encumbrances.

5.    In the valuation of this property, we have relied on the aforesaid legal opinion and have attributed no commercial value to the 6 buildings and the land mentioned in note.3. However, for reference purposes, we are of the opinion that the capital value of 6 buildings as at the date of valuation would be RMB 2,757,000 assuming all relevant title documents had been obtained and the buildings could be freely transferred.

6.    According to a written Indemnification Undertaking from China National Building Material Group Corporation ("Parent"), the controlling shareholder of the Company, Parent has agreed to indemnify the Group against any losses suffered from the absence of title certificates and provide alternate buildings and/or land to the Group to ensure its normal operation if the Group is unable to continue to use the relevant buildings and/or land.

ALRMH-CNBM00000455

## APPENDIX IV                                                    PROPERTY VALUATION

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|-----|----------|------------------------|--------------------------|---------------------------------------------------------------|
| A26. | An industrial building No.89 Huaide Nan Road Changzhou Jiangsu Province The PRC | The property comprises a 4-storey industrial building completed in 1994.<br><br>The property has a total gross floor area of approximately 5,545.29 sq.m.<br><br>The land use rights of the property have been rented for a term of 19 years commencing from November 24, 1999 and expiring on November 23, 2018 for industrial use. | The property is currently occupied by the Group for production purposes. | No commercial value |

———————

*Notes:*

1.   Pursuant to a Building Ownership Certificate — Chang Fang Quan Zheng Zi Di No.00026019 (常房權證字第 00026019 號 ), the building with a gross floor area of approximately 5,545.29 sq.m. is owned by Changzhou Liberty TOLI Building Material Co., Ltd ("Liberty TOLI"), a 60% owned subsidiary of Changzhou China Composites Liberty Company Limited ("Zhongfu Liberty"), an 80% owned subsidiary of China Composites.

2.   Pursuant to a State-owned Land Use Rights Certificate — Chang Guo Yong (1999) Zi Di No.000122 (常國用(1999)字第 000122), the land use rights of a parcel of land with a site area of approximately 11,570 sq.m. are rented to Liberty TOLI from Changzhou City Planning & State-owned Land Administration Bureau (常州市規劃國土管理局 ) ("the Lessor") for a term of 19 years commencing from November 24, 1999 and expiring on November 23, 2018 for industrial use.

3.   We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

   (i)   The Group has obtained the building ownership certificate of the property and is entitled to occupy and use the building and the land use rights in accordance with the lease term and usage stipulated by the Land Use Rights Certificate;

   (ii)   The Group can transfer, lease, mortgage or otherwise dispose of the building ownership rights of the property upon obtaining the consent from the Lessor; and

   (iii)   The property is not subject to mortgage and any other encumbrances.

4.   We have relied on the aforesaid legal opinion and attributed no commercial value to the property. However, for reference purposes, we are of the opinion that the capital value of the property (excluding the land) as at the date of valuation would be RMB 7,386,000 assuming the building could be freely transferred.

ALRMH-CNBM00000456

## APPENDIX IV                                          PROPERTY VALUATION

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|-----|----------|------------------------|--------------------------|---------------------------------------------------------------|
| A27. | 11 parcels of land No.16 Jiancaicheng Xi Road Xisanqi Haidian District Beijing The PRC | The property comprises 11 parcels of land with a total site area of approximately 383,906.88 sq.m.<br><br>On the above land, there are erected 71 buildings and structures completed in various stages between 1979 and 2004. The details are set out in Property nos. A19, A20 and A21.<br><br>The land use rights of 11 parcels of land have been granted to the Company for a term of 50 years with the latest date expiring on November 3, 2047 for industrial use. | The property is rented to 3 connected parties. (See notes.2 to 4).<br><br>9 parcels of land of the property with a total site area of approximately 338,505.07 sq.m. are rented to BNBM, a 60.33% owned subsidiary of the Company. (See Property no.A19).<br><br>A parcel of land with a site area of approximately 32,490.65 sq.m. is rented to BNBM Homes, a 64% owned subsidiary of BNBM. (See Property no.A20).<br><br>A parcel of land with a site area of approximately 12,911.16 sq.m. is rented to BNBM Plastic, a 55% owned subsidiary of BNBM. (See Property no.A21). | 210,470,000<br><br>100% interest attributable to the Group: RMB 210,470,000 |

------------

*Notes:*

1.  Pursuant to 11 State-owned Land Use Rights Certificates — Jing Hai Guo Yong (2005chu) Zi Di Nos.3264 to 3265,3269 to 3274 (京海國用(2005出)字第 3264至 3265 號，3269至 3274 號), Hai Dian Qu Guo Yong (1997chu rang) Zi Di No.0730 海淀區國用(1997出讓)字第 0730號), Jing Hai Guo Yong (2004chu) Zi Di No.3181 and No.3108 (京海國用(2004出)第 3181 號和 3108號), the land use rights of 11 parcels of land with a total site area of approximately 383,906.88 sq.m. have been granted to the Company for a term of 50 years with the latest date expiring on November 3, 2047 for industrial use.

2.  Pursuant to 3 Land Use Rights Tenancy Agreements, 9 parcels of land stated in note no.1 with a total site area of approximately 338,505.07 sq.m. are rented to BNBM; a parcel of land stated in note no.1 with a site area of approximately 32,490.65 sq.m. is rented to BNBM Homes; a parcel of land stated in note no.1 with a site area of approximately 12,911.16 sq.m. is rented to BNBM Plastic. The details are set out in Property nos.A19, A20 and A21.

ALRMH-CNBM00000457

3.    We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

(i)    Regarding the land use rights under the Land Use Rights Tenancy Agreements as mentioned in note. 2, the followings have been agreed upon between the Company and BNBM, BNBM Homes, BNBM Plastic, respectively, including but not limited to:

    a.    The Company grants BNBM, BNBM Homes or BNBM Plastic the priority to renew the relevant land use rights tenancy agreements upon their expiry under the same conditions;

    b.    During the lease term, BNBM, BNBM Homes or BNBM Plastic has the right to lease/sublet the buildings and structures together with the relevant leased land in full or in part to any other third parties without obtaining the approval from the Company;

    c.    During the lease term, BNBM, BNBM Homes or BNBM Plastic has the right to transfer the buildings and structures but the Company has the priority to purchase the buildings and structures under the same transaction conditions; In case of giving up the purchase priority, the Company will agree to transfer the relevant leased land to the same third parties; and

    d.    During the lease term, the Company will agree to mortgage the relevant land use rights if BNBM, BNBM Homes or BNBM Plastic mortgages the buildings and structures.

(ii)    The Company has legally obtained the land use rights of the 11 parcels of land and is entitled to transfer, lease, mortgage or otherwise dispose of them; and

(iii)    The property is not subject to mortgage and any other encumbrances.

ALRMH-CNBM00000458

**APPENDIX IV**                                        **PROPERTY VALUATION**

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|-----|----------|------------------------|--------------------------|----------------------------------------------------------------|
| A28. | 5 buildings and ancillary structures located at Hengjing Village Huguan Town Suzhou Jiangsu Province The PRC | The property comprises 5 buildings and ancillary structures completed in 2002.<br><br>The buildings have a total gross floor area of approximately 1,307 sq.m.<br><br>The buildings and structures mainly include a workshop, an office building, bicycle sheds and a distribution room.<br><br>The land use rights of the property have been leased from an Independent Third Party for a term of 5 years commencing from March 14, 2002 for industrial use. | The property is currently occupied by the Group for production and office purposes. | No commercial value |

———————

*Notes:*

1. Pursuant to a Cooperation and Tenancy Agreement entered into between Jiangsu Sugang Group Company Limited (江蘇蘇鋼集團有限公司) and Suzhou Tianfeng New Building Material Company Limited ("Tianfeng"), a 75% owned subsidiary of BNBM, a parcel of vacant ground with a site area of approximately 840 sq.m. and several office units are rented to Tianfeng for a term of 5 years commencing from March 14, 2002 for industrial use. The total annual rental is RMB 50,000 for vacant grounds and RMB 5,000 for per office unit, respectively.

2. Pursuant to a State-owned Land Use Rights Certificate — Su Guo Yong (96) Zi Di No.099 (蘇國用(96)字第 099號 ), the land use rights of a parcel of land with a site area of approximately 69,610 sq.m. have been granted to Jiangsu Sugang Group Company Limited (江蘇蘇鋼集團有限公司) for a term of 50 years expiring on September 25, 2046.

3. As advised by the Company, the property is erected on the land mentioned in note.2.

   In respect of the building ownership rights of the property, we have not been provided with any title certificates. The reason for no building ownership certificate of these buildings is that they are erected on the leased land.

4. We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

   (i)    The Cooperation and Tenancy Agreement is valid, binding and enforceable under the PRC laws and the Group has the right to occupy and use the land use rights stipulated by the Cooperation and Tenancy Agreement;

   (ii)   Pursuant to the relevant regulations of PRC laws, the title registration of building shall comply with the rule that the respective titles of building ownership and land use rights shall be under the same party. Since the land of the property is leased from a party other than Tianfeng, there is certain legal impediment for Tianfeng to obtain building ownership certificates. However, according to a confirmation letter from the State-owned Land & Building Administrative Bureau of Suzhou Hi-Tech Industry Development Zone (蘇州高新技術產業開發區國土房產局), Tianfeng has legally obtained the building ownership rights of the property without any title dissensions;

ALRMH-CNBM00000459

(iii)   Due to lack of title certificates to the property, the Group has the right to occupy and use the property but cannot transfer, lease, mortgage or otherwise dispose of the property; and

(iv)   The property is not subject to mortgage or any other encumbrances.

5.   In the valuation of this property, we have relied on the aforesaid legal opinion and have attributed no commercial value to the property. However, for reference purposes, we are of the opinion that the capital value of the buildings (excluding the land) as at the date of valuation would be RMB 514,000 assuming all relevant title documents had been obtained and the property could be freely transferred.

6.   According to a written Indemnification Undertaking from China National Building Material Group Corporation ("Parent"), the controlling shareholder of the Company, Parent has agreed to indemnify the Group against any losses suffered from the absence of title certificates and provide alternate buildings and/or land to the Group to ensure its normal operation if the Group is unable to continue to use the relevant buildings and/or land.

ALRMH-CNBM00000460

**APPENDIX IV**                                         **PROPERTY VALUATION**

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|---|---|---|---|---|
| A29. | 14 buildings and ancillary structures located at Tong'an Town Suzhou Jiangsu Province The PRC | The property comprises 14 buildings and ancillary structures completed in various stages between 2003 and 2004.<br><br>The buildings have a total gross floor area of approximately 13,153.79 sq.m.<br><br>The buildings mainly include industrial buildings, warehouses, a distribution room and boiler rooms.<br><br>The major structures include roads, walls and sheds.<br><br>The land use rights of the property have been leased from an Independent Third Party for a term of 30 years expiring on September 30, 2032 for industrial use. | The property is currently occupied by the Group for production and office purposes. | No commercial value |

—————

*Notes:*

1.   Pursuant to a State-owned Land Use Rights Certificate — Wuxian Shi Guo Yong (2000) Zi Di No.09037 吳縣市國用(2000)字第 09037 號), the land use rights of a parcel of land with a site area of approximately 110,937.3 sq.m. have been allocated to Jiangsu Sugang Group Company Limited (江蘇蘇鋼集團有限公司).

2.   Pursuant to a Cooperation Agreement of Kuangmian Panels Production Line Area entered into between Jiangsu Sugang Group Company Limited (the "Lessor") and Tianfeng, portion of the land stated in note.1 with a site area of approximately 60 mu (40,000 sq.m.). is rented to Tianfeng for a term of 30 years expiring on October 1, 2032 at an annual rental of RMB 120,000 for industrial use.

3.   As advised by the Company, the property is erected on the land mentioned in note.1

In respect of the building ownership rights of the property, we have not been provided with any title certificates. The reason for no building ownership certificate of these buildings is that they are erected on the leased land.

4.   We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

(i)    Pursuant to the relevant regulations of PRC laws, the title registration of building shall comply with the rule that the respective titles of building ownership and land use rights shall be under the same party. Since the land of the property is leased from a party other than Tianfeng, there is certain legal impediment for Tianfeng to obtain building ownership certificates. However, according to a confirmation letter from the State-owned Land & Building Administrative Bureau of Suzhou Hi-Tech Industry Development Zone (蘇州高新技術產業開發區國土房產局), a granted State-owned Land Use Rights Certificate to the parcel of land mentioned in note.1 is under application; The Cooperation Agreement of Kuangmian Panels Production Line Area will be valid, binding and enforceable after the Lessor obtains a granted State-owned Land Use Rights Certificate.

ALRMH-CNBM00000461

According to a confirmation letter, the Lessor has undertaken to indemnify the Group against any loss or damage if the Group cannot continue to occupy and use the parcel of land due to the title of land use rights.

(ii)     According to a confirmation letter from the State-owned Land & Building Administrative Bureau of Suzhou Hi-Tech Industry Development Zone (蘇州高新技術產業開發區國土房產局), Tianfeng has legally obtained the building ownership rights of the property without any title dissensions;

(iii)    Due to lack of title certificates to the property, the Group has the right to occupy and use the property but cannot transfer, lease, mortgage or otherwise dispose of the property; and

(iv)     The property is not subject to mortgage or any other encumbrances.

5.    In the valuation of this property, we have relied on the aforesaid legal opinion and have attributed no commercial value to the property. However, for reference purposes, we are of the opinion that the capital value of the buildings (excluding the land) as at the date of valuation would be RMB 8,990,000 assuming all relevant title documents had been obtained and the property could be freely transferred.

6.    According to a written Indemnification Undertaking from China National Building Material Group Corporation ("Parent"), the controlling shareholder of the Company, Parent has agreed to indemnify the Group against any losses suffered from the absence of title certificates and provide alternate buildings and/or land to the Group to ensure its normal operation if the Group is unable to continue to use the relevant buildings and/or land.

ALRMH-CNBM00000462

## APPENDIX IV                                                      PROPERTY VALUATION

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|-----|----------|------------------------|--------------------------|--------------------------------------------------------------|
| A30. | Land, various buildings and structures No.1 Xinlei Road Neiqiu County Xingtai Hebei Province The PRC | The property comprises 2 parcels of land with a total site area of approximately 102,900.58 sq.m. on which are erected 29 buildings and ancillary structures (the "Completed Property") completed in 1999.<br><br>The buildings have a total gross floor area of approximately 20,989.81 sq.m.<br><br>The buildings mainly include industrial buildings, warehouses, distribution rooms and pump rooms.<br><br>The major structures include roads, walls, gates and pipes.<br><br>In addition to the Completed Property on the above land, there are various buildings and structures that are still under construction as at the date of valuation (the "CIP Property"). The estimated total construction cost is approximately RMB 16,907,000, of which approximately RMB 15,832,000 has been paid up to the date of valuation .The total gross floor area of the CIP Property will be approximately 1,383 sq.m. upon completion. The CIP Property is scheduled to be completed in March 2006.<br><br>The land use rights of the property have been granted for terms expiring on September 12, 2045 and July 1, 2043 for industrial use. | The property is currently occupied by the Group for production and office purposes. | 107,417,000<br><br>65.05% interest attributable to the Group: RMB 69,875,000 |

---

*Notes:*

1.  Pursuant to 2 State-owned Land Use Rights Certificates — Nei Guo Yong (2005) Di Nos.021 and 022 (內國用(2005)第 021 和 022 號 ), the land use rights of 2 parcels of land with a total site area of approximately 102,900.58 sq.m. have been granted to Xingtai China United Ziyan Company Limited ("Ziyan"), a 67.71% owned subsidiary of China United, for terms expiring on September 12, 2045 and July 1, 2043 for industrial use.

2.  Pursuant to 2 Building Ownership Certificates — Fang Quan Zheng Zi Di Nos.20050411 and 20050410 (房權證字第 20050411 號和第 20050410 號 ), the 29 buildings of the Completed Property with a total gross floor area of approximately 20,989.81 sq.m. are owned by Ziyan.

3.  Pursuant to a Construction Work Planning Permit — Nei Jian Gong Zi No.2004-002 (內建工字 2004-002) and a Construction Commencement Permit — 04-002 issued by the Neiqiu County Construction Bureau, the CIP Property has been approved for construction.

ALRMH-CNBM00000463

## APPENDIX IV                                    PROPERTY VALUATION

4.  Pursuant to a Mortgage Contract, a Loan Contract and a 債務承接協議書 , a portion of buildings with a gross floor area of approximately 11,494.3 sq.m. and a portion of land with a site area of approximately 9,220 sq.m. of the property are subject to a mortgage in favour of Industrial and Commercial Bank of China Neiqiu County Branch as security for borrowing a bank loan with maximum amount of RMB 5,000,000 granted to Ziyan commencing from August 31, 2004 and expiring on August 21, 2005.

5.  We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

   (i)   The Group has legally obtained the state-owned land use rights certificate of a land mentioned in note.1 and the building ownership certificate of the Completed Property mentioned in note.2, and has the right to use, occupy, transfer, lease, mortgage or otherwise dispose of the relevant land use rights and building ownership rights in accordance with the valid term and usage stipulated by the Land Use Rights Certificate;

   (ii)  The construction of the CIP Property complies with all requirements of the relevant PRC laws and regulations. There is no material legal impediment to obtain building ownership certificate after the CIP Property has been completed and passed the acceptance inspection; and

   (iii) The property has been mortgaged in favour of Neiqiu Branch of Industrial and Commercial Bank of China. During the mortgage term, the Group cannot transfer, lease, remortgage or otherwise dispose of the buildings and land mentioned in note. 4 unless obtaining the approval from mortgagee.

6.  We are of the opinion that the capital value of the property as at the date of valuation would be RMB 107,417,000 assuming the approval from mortgagee had been obtained and the property can be freely transferred.

ALRMH-CNBM00000464

**APPENDIX IV**                                                      **PROPERTY VALUATION**

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|-----|----------|----------------------|------------------------|-----------------|
| A31. | Land, various buildings and structures located at Hanzhuang Village Qicun Town Shizhong District Zaozhuang Shandong Province The PRC | The property comprises 2 parcels of land with a total site area of approximately 333,523.6 sq.m. on which are erected 20 buildings and ancillary structures completed in 2004.<br><br>The buildings have a total gross floor area of approximately 11,255.11 sq.m.<br><br>The buildings mainly include industrial buildings, distribution rooms and pump rooms.<br><br>The major structures include roads, walls, sheds, a water tower, stack ground and gates.<br><br>The land use rights of the property have been granted for various terms expiring on April 18, 2034 and July 2024 for industrial use. | The property is currently occupied by the Group for production and office purposes. | 85,370,000<br><br>88.14% interest attributable to the Group: RMB 75,245,000 |

_____

*Notes:*

1.  Pursuant to 2 State-owned Land Use Rights Certificates — Shi Zhong Guo Yong (2005) Di Nos.0141 and 0142 (市中國用(2005)第 0141和 0142 號), the land use rights of 2 parcels of land with a total site area of approximately 333,523.6 sq.m. have been granted to Zaozhuang China United Luhong Cement Company Limited ("Zaozhuang Luhong"), for various terms expiring on April 18, 2034 and July 2024 for industrial use.

2.  Pursuant to 5 Building Ownership Certificates — Zao Fang Quan Zheng Zao Zi Di Nos.194898 to 194902 (棗房權證棗字第 194898 號至 194902 號), the 20 buildings of the property with a total gross floor area of approximately 11,255.11 sq.m. is owned by Zaozhuang Luhong.

3.  As advised by Zaozhuang Luhong, Zaozhuang Luhong is a 42% owned subsidiary of Luhong and the remaining 58% interest is owned by China United.

4.  We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

    (i)  The Group has legally obtained both the state-owned land use rights certificate and the building ownership certificate of the property and has the right to occupy and use the property in accordance with the valid term and usage stipulated by the Land Use Rights Certificate;

    (ii)  The Group has the right to transfer, lease, mortgage or otherwise dispose of the property; and

    (iii)  The property is not subject to mortgage or any other encumbrances.

ALRMH-CNBM00000465

## APPENDIX IV                                                                    PROPERTY VALUATION

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|-----|----------|------------------------|--------------------------|--------------------------------------------------------------|
| A32. | Land, various buildings and structures located at Dawenkou Town Daiyue District Tai'an Shandong Province The PRC | The property comprises 28 parcels of land with a total site area of approximately 292,239.37 sq.m. on which are erected 48 buildings and ancillary structures (the "Completed Property") completed in various stages between 1985 and 2003.<br><br>The Completed Property has a total gross floor area of approximately 85,051.78 sq.m.<br><br>The Completed Property mainly includes industrial buildings, warehouses, office buildings and distribution rooms.<br><br>The major structures include roads, walls, bicycle sheds, gates, chimneys and ponds.<br><br>In addition to the Completed Property on the above land, there are various buildings and structures that are still under construction as at the date of valuation (the "CIP Property"). The estimated total construction cost is approximately RMB 35,399,000, of which approximately RMB 34,391,940 has been paid up to the date of valuation. The total gross floor area of the CIP Property will be approximately 25,478 sq.m. upon completion. The CIP Property is scheduled to be completed in March 2006.<br><br>The land use rights of 2 parcels of land have been granted for terms expiring on November 21, 2053 for industrial use.<br><br>The remaining 26 parcels have been leased from various Independent Third Parties for various terms with the latest date expiring on October 6, 2005. | The property is currently occupied by the Group for production and office purposes. | 34,402,000<br><br>25.34% interest attributable to the Group: RMB 8,717,000 |

---

*Notes:*

1.  Pursuant to 2 State-owned Land Use Rights Certificates — Tai Tu Guo Yong (2004) Di Nos. D-0061 and D-0062 (泰土國用(2004)第 D-0061 和 D-0062 號）, the land use rights of 2 parcels of land with a total site area of approximately 74,302.7 sq.m. have been granted to Shandong Taihe Dongxin Co., Ltd ("Taihe"), a 42% owned subsidiary of BNBM, for terms expiring on November 21, 2053 for industrial use. As confirmed by Taihe, 17 buildings of the Completed Property with a total gross floor area of approximately 34,130.46 sq.m. are erected on the 2 parcels of land.

ALRMH-CNBM00000466

---

## APPENDIX IV                                            PROPERTY VALUATION

2.  Pursuant to 4 Land Tenancy Agreements entered into between Taihe and 4 Independent Third Parties, 15 parcels of land with a total site area of approximately 326.91 mu (217,936.67 sq.m.) is rented to Taihe for a term of 20 years commencing from July 1, 2005 and expiring on June 30, 2025 at a total annual rental of RMB 383,500 for industrial use. As confirmed by Taihe, 31 buildings of the Completed Property with a total gross floor area of approximately 50,770.52 sq.m. are erected on the above 15 parcels of leased land.

3.  Pursuant to 5 Building Ownership Certificates — Tai Fang Quan Zheng Tai Zi Di Nos. 130127, 130128, 130131 to 130133 (泰房權證泰字第 130127, 130128, 130131至 130133 號 ), 17 buildings of the Completed Property with a total gross floor area of approximately 34,130.46 sq.m. are owned by Taihe.

4.  Regarding the remaining 31 buildings of the Completed Property, the CIP Property and the land use rights of 15 parcels land mentioned in note.2, we have not been provided with any title documents.

    The reason for no title certificate or construction permit of these buildings and CIP Property is that they are erected on the leased land.

5.  We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

    (i)    The Group has legally obtained both the state-owned land use rights certificate and the building ownership certificate of the property mentioned in notes.1 and 3, respectively, and has the right to occupy, use, transfer, lease, mortgage or otherwise dispose of them;

    (ii)   Pursuant to the relevant regulations of PRC laws, the title registration of building shall comply with the rule that the respective titles of building ownership and land use rights shall be under the same party. Since the land of the property is leased from a party other than Taihe, there is certain legal impediment for Taihe to obtain building ownership certificates. However, according to a confirmation letter from Tai'an City Building Administrative Bureau (泰安市房產管理局), Taihe has legally obtained the building ownership rights of 31 buildings mentioned in note.2 and has the right to occupy and use the buildings;

    (iii)  Due to lack of title documents to the land use rights of the 15 parcels of land and 31 buildings mentioned in note.2, the Land Tenancy Agreements cannot be protected by the PRC laws and 31 buildings cannot be transferred, leased, mortgaged by the Group;

           According to a confirmation letter, the People's Government of Dawenkou Town of Taian City has undertaken that Taihe can continually use and occupy the 15 parcels of leased land during its operation term; According to a further confirmation letter, the State-owned Land Resource Bureau of Taian City has confirmed: a) the 15 parcels of leased land will not be confiscated during Taihe's term of operation; and b) if the land use rights of the 15 parcels of land are expropriated by the local authority for public reasons, the Group will be indemnified against any loss or damage.

    (iv)   For the CIP Property, the Group can legally construct the CIP Property upon obtaining the relevant permits from local authority; and there is no material legal impediment to obtain the relevant building ownership certificate after the CIP Property has been completed and passed the acceptance inspection; and

    (v)    The property is not subject to mortgage or any other encumbrances.

6.  In the valuation of this property, we have relied on the aforesaid legal opinion and have attributed no commercial value to the 31 buildings mentioned in note.4 and the CIP Property. However, for reference purposes, we are of the opinion that the capital value of them (excluding the land) as at the date of valuation would be RMB 60,362,000 assuming all relevant title documents had been obtained and they could be freely transferred.

7.  According to a written Indemnification Undertaking from China National Building Material Group Corporation ("Parent"), the controlling shareholder of the Company, Parent has agreed to indemnify the Group against any losses suffered from the absence of title certificates and provide alternate buildings and/or land to the Group to ensure its normal operation if the Group is unable to continue to use the relevant buildings and/or land.

ALRMH-CNBM00000467

**APPENDIX IV**                                                        **PROPERTY VALUATION**

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|-----|----------|------------------------|--------------------------|---------------------------------------------------------------|
| A33. | Level 3 of Block 1 Area C located at the western side of Haoli Hill Tai'an Shandong Province The PRC | The property comprises Level 3 of a 5-storey composite building completed in 2005.<br><br>The property has a gross floor area of approximately 2,669.77 sq.m.<br><br>The land use rights of the property with a total apportioned land area of approximately 743 sq.m. have been granted for a term expiring on October 25, 2042 for business and service uses. | The property is currently occupied by the Group for office purposes. | 5,740,000<br><br>25.34% interest attributable to the Group: RMB 1,455,000 |

———————

*Notes:*

1.  Pursuant to a State-owned Land Use Rights Certificate — Tai Tu Guo Yong (2003) Zi Di No. 0045 (泰土國用(2003)字第 0045 號 ), the land use rights of the property with a total apportioned land area of approximately 743 sq.m. have been granted to Shandong Taihe Dongxin Co., Ltd ("Taihe"), a 42% owned subsidiary of BNBM, for a term expiring on October 25, 2042 for business and service use.

2.  Pursuant to a Building Ownership Certificate — Tai Fang Quan Zheng Tai Zi Di No.130792 (泰房權證泰字第 130792 號 ), the property with a gross floor area of approximately 2,669.77 sq.m. is owned by Taihe.

3.  We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

    (i)   The Group has legally obtained both the state-owned land use rights certificate and the building ownership certificate of the property, and has the right to use and occupy the property in accordance with the valid term and usages stipulated by the Land Use Rights Certificate;

    (ii)  The Group has the right to transfer, lease, mortgage or otherwise dispose of the property; and

    (iii) The property is not subject to mortgage or any other encumbrances.

ALRMH-CNBM00000468

**APPENDIX IV**                                                    **PROPERTY VALUATION**

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|-----|----------|------------------------|--------------------------|---------------------------------------------------------------|
| A34. | An office unit of Block 422 Yichang Xiaoqu Longsha District Qiqihar Heilongjiang Province The PRC | The property comprises an office unit on Level 1 of a multi-storey building completed in 2003.<br><br>The property has a gross floor area of approximately 104.97 sq.m. | The property is currently occupied by the Group for office purposes. | No commercial value |

————————

*Notes:*

1.  Pursuant to a Building Ownership Certificate — Fang Quan Zheng Zi Di No.00256072 (房權證字第 00256072 號 ), the unit with a gross floor area of approximately 104.97 sq.m. are owned by Taihe.

2.  We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

    (i)   The Group has legally obtained the building ownership certificate of the property and is entitled to use and occupy the property;

    (ii)  As the relevant land titles to the property have not been obtained, the Group cannot transfer, lease or mortgage the property; and

    (iii) The property is not subject to mortgage or any other encumbrances.

3.  We have relied on the aforesaid legal opinion and attributed no commercial value to the property. However, for reference purposes, we are of the opinion that the capital value of the property as at the date of valuation would be RMB 283,000 assuming the property could be freely transferred.

ALRMH-CNBM00000469

## APPENDIX IV                    PROPERTY VALUATION

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 RMB |
|-----|----------|------------------------|--------------------------|-------------------------------------------------------------|
| A35. | 19 buildings and ancillary structures No.69 Gangcheng Avenue Haigang District Qinhuangdao Hebei Province The PRC | The property comprises 19 buildings and ancillary structures completed in various stages between 2003 and 2004.<br><br>The buildings have a total gross floor area of approximately 18,185.16 sq.m.<br><br>The buildings mainly include industrial buildings, composite buildings and distribution rooms.<br><br>The major structures include roads, walls, gates, sheds and chimneys.<br><br>The land use rights of the property have been leased from an Independent Third Party for a term commencing from August 1, 2003 and expiring on April 18, 2032 for industrial use. | The property is currently occupied by the Group for production and office purposes. | No commercial value |

_Notes:_

1.  Pursuant to a Land Tenancy Agreement entered into between Qinhuangdao Huaying Phosphoric Acid Company Limited (秦皇島華贏磷酸有限公司) and Qinhuangdao Taishan Building Material Company Limited ("Qinhuangdao Taishan"), a 70% owned subsidiary of Taihe, a parcel of land with a site area of approximately 55.681 mu (37,121 sq.m.). is rented to Qinhuangdao Taishan for a term commencing from August 1, 2003 and expiring on April 18, 2032 for industrial use at an annual rental of RMB 9,680 per mu.

2.  Pursuant to a State-owned Land Use Rights Certificate — Qin Ji Guo Yong (1997) Zi Di No.106 (秦籍國用(1997)字第 106 號 ), the land use rights of a parcel of land with a site area of approximately 167,928.30 sq.m. have been granted to Qinhuangdao Huaying Phosphoric Acid Company Limited for a term expiring on November 19, 2027 for industrial use.

3.  In respect of the building ownership rights of the property, we have not been provided with any title documents. The reason for no building ownership certificate of these buildings is that they are erected on the leased land.

4.  We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

    (i)   The Land Tenancy Agreement is valid (excluding the term exceeded 20 years), binding and enforceable under the PRC laws and the Group has the right to occupy and use the land use rights stipulated by the Land Tenancy Agreement;

    (ii)  Pursuant to the relevant regulations of PRC laws, the title registration of building shall comply with the rule that the respective titles of building ownership and land use rights shall be under the same party. Since the land of the property is leased from a party other than Qinhuangdao Taishan, there is certain legal impediment for Qinhuangdao Taishan to obtain building ownership certificates. However, according to a confirmation letter from Qinhuangdao Shi Real Estate Title Administrative Bureau (秦皇島市房地產產權產籍管理處 ), Qinhuangdao Taishan has legally obtained the building ownership rights of the 19 buildings;

ALRMH-CNBM00000470

(iii)   Due to lack of title certificates to the buildings, Qinhuangdao Taishan has the right to occupy and use the buildings but cannot transfer, lease, mortgage or otherwise dispose of them; and

(iv)   The property is not subject to mortgage or any other encumbrances.

5.   In the valuation of this property, we have relied on the aforesaid legal opinion and have attributed no commercial value to the property. However, for reference purposes, we are of the opinion that the capital value of the buildings and structures (excluding the land) as at the date of valuation would be RMB 15,289,000 assuming all relevant title documents had been obtained and the property could be freely transferred.

6.   According to a written Indemnification Undertaking from China National Building Material Group Corporation ("Parent"), the controlling shareholder of the Company, Parent has agreed to indemnify the Group against any losses suffered from the absence of title certificates and provide alternate buildings and/or land to the Group to ensure its normal operation if the Group is unable to continue to use the relevant buildings and/or land.

ALRMH-CNBM00000471

## APPENDIX IV                                    PROPERTY VALUATION

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|-----|----------|------------------------|--------------------------|-----------------------------------------------------------------|
| A36. | Land, various buildings and structures located at Zhaozhuang Village Zizhuang Town Jiawang District Xuzhou Jiangsu Province The PRC | The property comprises a parcel of land with a site area of approximately 37,382.2 sq.m. on which are constructed 12 buildings and ancillary structures (the "Completed Property") completed in various stages between 1998 and 1999.<br><br>The Completed Property has a total gross floor area of approximately 9,257.46 sq.m.<br><br>The Completed Property mainly includes industrial buildings, an office building, warehouses, pump rooms, toilet and a boiler room. The major structures include roads, walls, bicycle sheds and ponds.<br><br>In addition to the Completed Property on the above land, there are various buildings and structures that are still under construction as at the date of valuation (the "CIP Property"). The estimated total construction cost is approximately RMB 2,271,000, of which approximately RMB 2,100,700 has been paid up to the date of valuation. The total gross floor area of the CIP Property will be approximately 1,225 sq.m. upon completion. The CIP Property is scheduled to be completed in May 2006.<br><br>The land use rights of the property have been granted for a term expiring on November 2053 for industrial use. | The property is currently occupied by the Group for production and office purposes. | 13,199,000<br><br>25.69% interest attributable to the Group: RMB 3,391,000 |

---------

*Notes:*

1. Pursuant to a State-owned Land Use Rights Certificate — Jia Guo Tu Zi Guo Yong (2003) Zi Di No.2352 (買國土資國用(2003)字第 2352 號 ), the land use rights of a parcel of land with a site area of approximately 37,382.2 sq.m. have been granted to Xuzhou Fasite Building Material Co., Ltd. ("Xuzhou Fasite"), an 80% directly-owned subsidiary of Taihe, for a term expiring on November 2053 for industrial use.

2. Pursuant to a Building Ownership Certificate — Fang Quan Zheng Zi Di No.006818 (房權證字第 006818號 ), the 12 buildings of the Completed Property on the land stated in note.1 with a total gross floor area of approximately 9,257.46 sq.m. are owned by Xuzhou Fasite.

3. For the CIP Property, we have not been provided with any title certificates. Applications have been made to the appropriate authorities to obtain the relevant permits, the PRC legal advisers have advised that there is no material impediment to obtaining the relevant construction permits for the CIP Property.

ALRMH-CNBM00000472

4.      We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

(i)      The Group has legally obtained the land use rights certificate of the land mentioned note.1 and the building ownership certificate of 12 buildings mentioned in note.2 and has the right to use, occupy, transfer, lease, mortgage or otherwise dispose of them in accordance with the valid term and usage stipulated by the Land Use Rights Certificate;

(ii)      The Group can legally construct the CIP Property upon obtaining the relevant permits from local authority government; and there is no material legal impediment to obtain the relevant building ownership certificate after the CIP Property has been completed and passed the acceptance inspection; and

(iii)      The property is not subject to mortgage or any other encumbrances.

5.      In the valuation of this property, we have relied on the aforesaid legal opinion and have attributed no commercial value to the CIP Property. However, for reference purposes, we are of the opinion that the capital value of them (excluding the land) as at the date of valuation would be RMB 2,117,000 assuming all relevant title documents had been obtained and they could be freely transferred.

6.      According to a written Indemnification Undertaking from China National Building Material Group Corporation ("Parent"), the controlling shareholder of the Company, Parent has agreed to indemnify the Group against any losses suffered from the absence of title certificates and provide alternate buildings and/or land to the Group to ensure its normal operation if the Group is unable to continue to use the relevant buildings and/or land.

ALRMH-CNBM00000473

**APPENDIX IV**                                              **PROPERTY VALUATION**

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|-----|----------|------------------------|--------------------------|--------------------------------------------------------------|
| A37. | A parcel of land, various buildings and structures located at the southern side of Xuhai Main Road Pizhou Xuzhou Jiangsu Province The PRC | The property comprises a parcel of land with a site area of approximately 39,090.8 sq.m. on which are constructed 9 buildings and ancillary structures (the "Completed Property") completed in various stages between 1997 and 2003.<br><br>The buildings have a total gross floor area of approximately 10,590.03 sq.m.<br><br>The buildings mainly include industrial buildings, offices, dormitory and boiler rooms.<br><br>The major structures include roads, walls, water towers and ponds.<br><br>In addition to the Completed Property on the above land, there is a dormitory building that is still under construction as at the date of valuation (the "CIP Property"). The estimated total construction cost is approximately RMB 400,000, of which approximately RMB 247,954 has been paid up to the date of valuation. The total gross floor area of the CIP Property will be approximately 1,140 sq.m. upon completion. The CIP Property is scheduled to be completed in March 2006.<br><br>The land use rights of the property have been allocated for industrial use. | The property is currently occupied by the Group for production and office purposes. | No commercial value |

--------------

*Notes:*

1.  Pursuant to a State-owned Land Use Rights Certificate — Pi Guo Yong (2002) Di No.0739 邳國用(2002)第 0739 號 ), the land use rights of a parcel of land with a site area of approximately 39,090.8 sq.m. have been allocated to Pizhou Taihe Building Material Co., Ltd. a 95% owned subsidiary of Taihe, for industrial use.

2.  We have not been provided with any the relevant title certificates or construction permits to the Completed Property and the CIP Property respectively.

ALRMH-CNBM00000474

3.   We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

(i)   Because the land on which the property is located is a parcel of allocated land, the Group has the right to occupy, use, transfer, lease or mortgage the property upon completing relevant grant procedures and obtaining the relevant title certificates or construction permits. As advised by the Group, applications have been made to the appropriate authorities to complete relevant land grant procedures and to obtain the relevant title certificates or construction permits. The PRC legal advisers have advised that there is no material impediment to completing such land grant procedures and obtaining the relevant title certificates and construction permits for these buildings, land and CIP Property; and

(ii)   The property is not subject to mortgage or any other encumbrances.

4.   We have relied on the aforesaid legal opinion and attributed no commercial value to the property. However, for reference purposes, we are of the opinion that the capital value of the property (excluding the land) as at the date of valuation would be RMB 6,606,000 assuming all relevant title documents had been obtained and the property could be freely transferred without additional payment of any charges.

5.   According to a written Indemnification Undertaking from China National Building Material Group Corporation ("Parent"), the controlling shareholder of the Company, Parent has agreed to indemnify the Group against any losses suffered from the absence of title certificates and provide alternate buildings and/or land to the Group to ensure its normal operation if the Group is unable to continue to use the relevant buildings and/or land.

ALRMH-CNBM00000475

## APPENDIX IV                                                    PROPERTY VALUATION

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 _RMB_ |
|-----|----------|------------------------|--------------------------|---------------------------------------------------------------|
| A38. | A parcel of land, various buildings and structures located at Economic Technique Development Zone Anqiu Shandong Province The PRC | The property comprises a parcel of land with a site area of approximately 45,813 sq.m. on which are erected 12 buildings and ancillary structures completed in 2004.<br><br>The buildings have a total gross floor area of approximately 27,375.85 sq.m.<br><br>The buildings mainly include industrial buildings, offices, storehouse, dormitory and distribution rooms.<br><br>The major structures include roads, walls, sheds, well, and ponds.<br><br>The land use rights of the property have been granted for a term expiring on November 4, 2055 for industrial use. | The property is currently occupied by the Group for production and office purposes. | 18,849,000<br><br>19% interest attributable to the Group: RMB 3,581,000 |

_____

_Notes:_

1.   Pursuant to a State-owned Land Use Rights Certificate — An Guo Yong (2005) Di No. 0319 (安國用(2005)第0319號), the land use rights of a parcel of land with a site area of approximately 45,813 sq.m. have been granted to Weifang Aotai Gypsum Co., Ltd. ("Weifang Aotai"), a 75% owned subsidiary of Taihe, for a term expiring on November 4, 2055.

2.   Pursuant to a Building Ownership Certificate — Wei An Fang Quan Zheng Shi Zhi Zi Guan Zi Di No. 001140 (濰安房權証市直自管字第001140號), the 12 buildings of the property with a total gross floor area of approximately 27,375.85 sq.m. are owned by Weifang Aotai.

3.   We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

(i)    The Group has legally obtained the state-owned land use rights certificate and the building ownership certificate of the property and has the right to use and occupy the property in accordance with the valid term and usage stipulated by the Land Use Rights Certificate;

(ii)   The Group has the right to transfer, lease, mortgage or otherwise dispose of the property; and

(iii)  The property is not subject to mortgage and any other encumbrances.

ALRMH-CNBM00000476

**APPENDIX IV**                                                    **PROPERTY VALUATION**

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|---|---|---|---|---|
| A39. | A parcel of land, various buildings and structures located at the junction of Bayi Road and Zhengzhou Road Development Zone Heze Shandong Province The PRC | The property comprises a parcel of land with a site area of approximately 27,983 sq.m. on which are erected an industrial building and ancillary structures completed in 2004. The industrial building has a gross floor area of approximately 692.24 sq.m. The major structures include roads, walls, lawns, well, and ponds. The land use rights of the property have been granted for a term expiring on June 9, 2053 for industrial use. | The property is currently occupied by the Group for production purposes. | 4,198,000 76.12% interest attributable to the Group: RMB 3,196,000 |

―――――――
*Notes:*

1.   Pursuant to a State-owned Land Use Rights Certificate — He Guo Yong (2005) Zi No.13504 (菏國用(2005)字第 13504 號 ), the land use rights of a parcels of land with a site area of approximately 27,983 sq.m. have been granted to Shandong Heze Luhong Concrete Company Limited ("Heze Concrete"), a 75% directly-owned subsidiary of the Luhong, for a term expiring on June 9, 2053 for industrial use.

2.   Pursuant to a Building Ownership Certificate — He Fang Quan Zheng Shi Zhi Di No.039378 (菏房權證市直字第 039378 號 ), the building with a gross floor area of approximately 692.24 sq.m. is owned by Heze Concrete.

3.   We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

(i)   The Group has legally obtained both the land use rights certificate and building ownership certificate of the property and has the right to use and occupy the property in accordance with the valid term and usage stipulated by the Land Use Rights Certificate;

(ii)   The Group can legally transfer, lease, mortgage or otherwise dispose of the property; and

(iii)   The property is not subject to mortgage and any other encumbrances.

ALRMH-CNBM00000477

**APPENDIX IV**                                   **PROPERTY VALUATION**

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|-----|----------|------------------------|--------------------------|----------------------------------------------------------------|
| A40. | Unit 11B on Level 11 of Yue Hua Ge Huali Garden Huali Xi Road Luohu District Shenzhen Guangdong Province The PRC | The property comprises a residential unit on Level 11 of a 30-storey composite building completed in 1995. <br><br> The property has a gross floor area of approximately 100.45 sq.m. <br><br> The land use rights of the property to an apportioned land area of approximately 14.80 sq.m. have been granted for a term of 70 years expiring on May 27, 2062 for business and residential uses. | The property is currently vacant. | 460,000 <br><br> 56.3% interest attributable to the Group: RMB 259,000 |

---------

*Notes:*

1.   Pursuant to a Real Estate Title Certificate — Shen Fang Di Zi No. 2000064699 (深房地字第 2000064699 號 ), the property with a gross floor area of approximately 100.45 sq.m. is owned by BND, an 80% owned subsidiary of BNBM.

     The land use rights of the property to an apportioned land area of approximately 14.80 sq.m. have been granted for a term of 70 years expiring on May 27, 2062 for business and residential uses.

2.   We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

     (i)    The property is legally owned by the Group and can be freely transferred, leased, mortgaged or handled by the Group in accordance with the valid term and usage stipulated by Real Estate Title Certificate; and

     (ii)   The property is not subject to mortgage and any other encumbrances.

ALRMH-CNBM00000478

**APPENDIX IV**                                                     **PROPERTY VALUATION**

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|---|---|---|---|---|
| A41. | A parcel of land, various buildings and structures located at the western side of Cement Factory Baitabu Town Donghai County Lianyungang Jiangsu Province The PRC | The property comprises a parcel of land with a site area of approximately 113,333.30 sq.m. on which are erected 7 buildings and various ancillary structures completed in 2005.<br><br>The buildings have a total gross floor area of approximately 4,698.5 sq.m.<br><br>The buildings and structures mainly include a dormitory building, an office building, an industrial building, a dinning room, roads, sheds, gates and walls.<br><br>The land use rights of the property have been granted for a term expiring on April 17, 2055 for industrial use. | The property is currently occupied by the Group for production and ancillary office purposes. | 53,319,000<br><br>86.38% interest attributable to the Group: RMB 46,057,000 |

—————

*Notes:*

1.  Pursuant to a State-owned Land Use Rights Certificate — Dong Guo Yong (2005) Di No.0440100 (東國用(2005)第0440100號), the land use rights of a parcel of land with a site area of approximately 113,333.30 sq.m. have been granted to Zhonglian Julong Cement (Lianyungang) Co., Ltd. ("Lianyungang Julong"), a 90% owned subsidiary of Huaihai, for a term expiring on April 17, 2055 for industrial use.

2.  Pursuant to a Building Ownership Certificate — Dong Bai Zi Di No. 08255036 (東白字第08255036號), the 7 buildings with a total gross floor area of approximately 4,698.5 sq.m. are owned by Lianyungang Julong.

3.  We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

    (i)   The Group has legally obtained both the land use rights certificate and building ownership certificate of the property and has the right to use and occupy the property in accordance with the valid term and usage stipulated by the Land Use Rights Certificate;

    (ii)  The Group can legally transfer, lease, mortgage or otherwise dispose of the property; and

    (iii) The property is not subject to mortgage and any other encumbrances.

ALRMH-CNBM00000479

**APPENDIX IV**                                                          **PROPERTY VALUATION**

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|-----|----------|------------------------|--------------------------|--------------------------------------------------------------|
| A42. | Unit 1A4 of Block 2 Saige Keji Industrial Zone Huaqiang Bei Road Futian District Shenzhen Guangdong Province The PRC | The property comprises an office unit on Level 1 of an 8-storey commercial building completed in 1990.<br><br>The property has a gross floor area of approximately 447.95 sq.m.<br><br>The land use rights of the property to an apportioned land area of approximately 84.80 sq.m. have been granted for a term of 50 years expiring on March 20, 2038 for industrial storage use. | The property is currently vacant. | 8,063,000<br><br>56.3% interest attributable to the Group: RMB 4,539,000 |

———————

*Notes:*

1. Pursuant to a Real Estate Title Certificate — Shen Fang Di Zi No. 3000070334 (深房地字第 3000070334號 ), the property with a gross floor area of approximately 447.95 sq.m. are owned by BND, an 80% owned subsidiary of the BNBM.

   The land use rights of the property to an apportioned land area of approximately 84.80 sq.m. have been granted for a term of 50 years expiring on March 20, 2038 for industrial storage use.

2. We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

   (i)   The property is legally owned by the Group and can be freely transferred, leased, mortgaged or handled by the Group in accordance with the valid term and usage stipulated by the Real Estate Title Certificate; and

   (ii)  The property is not subject to mortgage and any other encumbrances.

ALRMH-CNBM00000480

**APPENDIX IV**                                              **PROPERTY VALUATION**

| No. | Property | Description and tenure | Particulars of occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|---|---|---|---|---|
| A43. | Units A, B, C and D on Level 27 Chuangxin Shangwu Mansion No.305 Jiangdong Bei Road Gulou District Nanjing Jiangsu Province The PRC | The property comprises 4 office units on Level 27 of a 29-storey composite building completed in 2004.<br><br>The property has a total gross floor area of approximately 266.48 sq.m.<br><br>The land use rights of the property with a total apportioned land area of approximately 16.3 sq.m. have been granted for a term expiring on November 1, 2051 for non-residential use. | The property is currently occupied by the Group for office purposes. | 1,466,000<br><br>23.74% interest attributable to the Group: RMB 348,000 |

————————

*Notes:*

1. Pursuant to a Nanjing City Property Sale and Purchase Contract, the property was purchased by Nanjing Triumph Machinery and Equipment Installation Company Limited ("NTMEC"), a 51% owned subsidiary of Nanjing Triumph, at a total consideration of RMB 2,130,507. According to the information given, the payment has been fully settled by NTMEC.

2. Pursuant to a Building Ownership Certificate — Ning Fang Quan Zheng Gu Zhuan Zi Di No.274390 (寧房權證鼓轉字第 274390號 ), the property with a total gross floor area of approximately 266.48 sq.m. is owned by NTMEC.

3. Pursuant to a State-owned Land Use Rights Certificate — Ning Gu Guo Yong (2005) Zi Di No.09295 (寧鼓國用(2005)第 09295號 ), the land use rights of the property to a total apportioned land area of approximately 16.3 sq.m. have been granted to NTMEC for a term expiring on November 1, 2051 for non-residential use.

4. We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

    (i) The Group has legally obtained both the state-owned land use rights certificate and the building ownership certificate of the property, and has the right to use and occupy the property in accordance with the valid term and usages stipulated by the Land Use Rights Certificate;

    (ii) The Group has the right to transfer, lease, mortgage or otherwise dispose of the property; and

    (iii) The property is not subject to mortgage and any other encumbrances.

ALRMH-CNBM00000481

## APPENDIX IV                                            PROPERTY VALUATION

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 RMB |
|---|---|---|---|---|
| A44. | A parcel of land, various buildings and structures located at Jiaotong Village Duodao District Jingmen Hubei Province The PRC | The property comprises a parcel of land with a site area of approximately 138,866.49 sq.m. on which are erected 6 buildings and ancillary structures completed in 2005.<br><br>The buildings have a total gross floor area of approximately 25,380.51 sq.m.<br><br>The buildings mainly include industrial buildings, offices and dormitories.<br><br>The major structures include roads, walls, sheds, well and ponds.<br><br>The land use rights of the property have been granted for a term expiring on March 3, 2054 for industrial use. | The property is currently occupied by the Group for production and office purposes. | 49,285,000<br><br>27.09% interest attributable to the Group: RMB 13,351,000 |

_____

*Notes:*

1.   Pursuant to a State-owned Land Use Rights Certificate — Jing Guo Yong (2004) Zi No. 01040500256 (荊國用(2004)第 01040500256號), the land use rights of a parcel of land with a site area of approximately 138,866.49 sq.m. have been granted to Hubei Taishan Building Material Company Limited ("Hubei Taishan"), a 95% owned subsidiary of Taihe, for a term expiring on March 3, 2054 for industrial use.

2.   Pursuant to 2 Building Ownership Certificates — Jingmen Shi Fang Quan Zheng Duodao Qu Zi Di No.10004700 and 10004701 (荊門市房權證掇刀區字第 10004700號 和 10004701號), the 6 buildings with a total gross floor area of approximately 25,380.51 sq.m. are owned by Hubei Taishan.

3.   We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

(i)   The Group has legally obtained both the land use rights certificate and building ownership certificate of the property and has the right to use and occupy the property in accordance with the valid term and usage stipulated by the Land Use Rights Certificate;

(ii)   The Group can legally transfer, lease, mortgage or otherwise dispose of the property; and

(iii)   The property is not subject to mortgage and any other encumbrances.

ALRMH-CNBM00000482

## APPENDIX IV                                    PROPERTY VALUATION

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|-----|----------|------------------------|--------------------------|----------------------------------------------------------------|
| A45. | A parcel of land, various buildings and structures located at Xincheng Jianshe Xi Road Shanting District Zaozhuang Shandong Province The PRC | The property comprises a parcel of land with a site area of approximately 211,070.4 sq.m. on which are erected 10 buildings and various ancillary structures completed in 2005.<br><br>The buildings have a total gross floor area of approximately 43,003.14 sq.m.<br><br>The buildings and structures mainly include office buildings, industrial buildings, reception rooms, cisterns, sheds, gates and walls.<br><br>The land use rights of the property have been granted for a term expiring on September 15, 2053 for industrial use. | The property is currently occupied by the Group for production and ancillary office purposes. | 76,976,000<br><br>60.33% interest attributable to the Group: RMB 46,440,000 |

———————

*Notes:*

1.   Pursuant to a State-owned Land Use Rights Certificate — Shan Guo Yong (2003) Zi No.198 (山國用(2003)字第198號), the land use rights of the property with a site area of approximately 211,070.40 sq.m. have been granted to BNBM, a 60.33% owned subsidiary of the Company, for a term expiring on September 15, 2053, for industrial use.

2.   Pursuant to 3 Building Ownership Certificates — Shan Fang Quan Zheng 03GFZ Zi Di No.170957 to 170958 (山房權證03GFZ字第170957至170959號), the 10 buildings with a total gross floor area of approximately 43,003.14 sq.m. are owned by BNBM.

3.   We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

(i)   The Group has legally obtained both the land use rights certificate and building ownership certificate of the property and has the right to use and occupy the property in accordance with the valid term and usage stipulated by the Land Use Rights Certificate;

(ii)   The Group can legally transfer, lease, mortgage or otherwise dispose of the property; and

(iii)   The property is not subject to mortgage and any other encumbrances.

ALRMH-CNBM00000483

**APPENDIX IV**            **PROPERTY VALUATION**

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|-----|----------|----------------------|-------------------------|----------------------------------------------------------------|
| A46. | Land and various buildings located at Suzhou Industrial Zone Loufeng Town Suzhou Jiangsu Province The PRC | The property comprises a parcel of land with a site area of approximately 386,092.91 sq.m. on which are erected an office building and an industrial building completed in 2005 ("the completed buildings"). The buildings have a total gross floor area of approximately 6,829.75 sq.m. In addition to the completed buildings, the property also includes two buildings that were still under construction as at the date of valuation (the "CIP buildings"). The estimated total construction cost is approximately RMB19,728,000, of which approximately RMB1,775,405 has been paid at the date of valuation. The total gross floor area of the CIP buildings will be approximately 18,697.4 sq.m. upon completion. The CIP buildings are scheduled to be completed in December 2006. The land use right of the property have been granted for terms expiring on September 7, 2053 for industrial use. | The property is currently occupied by the Group for production and ancillary office purposes. | 147,097,000 <br><br> 60.33% interest attributable to the Group: RMB 88,744,000 |

---

*Notes:*

1. Pursuant to 2 State-owned Land Use Rights Certificates — Su Gong Yuan Guo Yong (2004) Zi Nos.0519 and 0520 (蘇工園國用(2004)字第0519號 和 0520號 ), the land use rights of 2 parcels of land with a total site area of approximately 386,092.91 sq.m. have been granted to BNBM, a 60.33% owned subsidiary of the Company, for terms expiring on September 7, 2053 for industrial use.

2. Pursuant to a Building Ownership Certificate — Su Fang Quan Zheng Yuan Qu Zi Di No. 00126262 (蘇房權證園區字第 00126262號 ), the 2 completed buildings with a total gross floor area of approximately 6,829.75 sq.m. are owned by BNBM.

3. For the CIP buildings, pursuant to a Construction Work Planning Permit-0952600 and 2 Construction Commencement Permits — 320501200404130101 and 3205012000411160501 issued by the Suzhou Industrial Zone Planning & Construction Bureau in favour of BNBM, the CIP buildings with a total gross floor area of approximately 17,697 sq.m. have been approved for construction.

ALRMH-CNBM00000484

**APPENDIX IV**  PROPERTY VALUATION

4.   We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

(i)   The Group has legally obtained the state-owned land use rights certificate of a land mentioned in note 1 and the building ownership certificate of the completed buildings mentioned in note 2, and has the right to use, occupy, transfer, lease, mortgage or otherwise dispose of the relevant land use rights and building ownership rights in accordance with the valid term and usage stipulated by the Land Use Rights Certificate;

(ii)   The construction of the CIP buildings complies with all requirements of the relevant PRC laws and regulations. There is no material legal impediment to obtaining building ownership certificate after the CIP buildings have been completed and passed the acceptance inspection; and

(iii)   The property is not subject to mortgage and any other encumbrances.

ALRMH-CNBM00000485

**APPENDIX IV**                                     **PROPERTY VALUATION**

### Group II — Property interests held under development by the Group in the PRC

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|---|---|---|---|---|
| B1. | Land, various buildings and structures under construction located at Econ-Tech Development Zone Zhuozhou Hebei Province The PRC | The property comprises 2 parcels of land with a total site area of approximately 317,571.97 sq.m. on which various industrial buildings and structures are under construction.<br><br>The property is scheduled to be completed in December 2006, and the total investment of the construction cost is estimated to be approximately RMB 53,000,000, of which RMB 43,908,414 has been spent up to the date of valuation. The total gross floor area of the buildings will be approximately 57,000 sq.m. upon completion.<br><br>The land use rights of the property have been granted for a term expiring on April 27, 2051 and September 28, 2054 for industrial use. | The property is currently under construction. | 107,827,000<br><br>60.33% interest attributable to the Group: RMB 65,052,000 |

*Notes:*

1.  Pursuant to 2 State-owned Land Use Rights Certificates — Zhuo Guo Yong (2001) Zi No.06-0013 and (2004) Zi No.06-0077 (涿國用(2001)第 06-0013號和(2004)字第 06-0077號 ), the land use rights of 2 parcels of land with a total site area of approximately 317,571.97 sq.m. have been granted to BNBM, a 60.33% owned subsidiary of the Company, for a term expiring on April 27, 2051 and September 28, 2054 for industrial use.

2.  Pursuant to a Construction Work Planning Permit — ZZ8 and a Construction Commencement Permit — (2004)018 issued by the Hebei Province Development Zone Planning & Construction Bureau in favour of BNBM, the property with a total gross floor area of approximately 57,000 sq.m. has been approved for construction.

3.  We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

    (i)   The Group has legally obtained the state-owned land use rights certificate of the property, and has the right to use, occupy, transfer, lease, mortgage or otherwise dispose of the land in accordance with the valid term and usage stipulated by the Land Use Rights Certificate;

    (ii)  The construction of the property complies with all requirements of the relevant PRC laws and regulations. There is no material legal impediment to obtain building ownership certificate after the property has been completed and passed the acceptance inspection; and

    (iii) The property is not subject to mortgage and any other encumbrances.

ALRMH-CNBM00000486

**APPENDIX IV**                                                              **PROPERTY VALUATION**

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|-----|----------|------------------------|--------------------------|--------------------------------------------------------------|
| B2. | A parcel of land, various buildings and structures under construction located at Changchun Road Jiaonan Qingdao Shandong Province The PRC | The property comprises a parcel of land with a site area of approximately 40,000 sq.m. on which various industrial buildings and structures are under construction.<br><br>The property is scheduled to be completed in December 2006, and the total investment of the construction cost is estimated to be approximately RMB 46,120,000, of which RMB 1,619,000 has been spent up to the date of valuation. The total gross floor area of the buildings will be approximately 10,716 sq.m. upon completion.<br><br>The land use rights of the property have been granted for a term expiring on June 19, 2055 for industrial use | The property is currently under construction. | 19,727,000<br><br>90.63% interest attributable to the Group: RMB 17,879,000 |

———————

*Notes:*

1.  Pursuant to a State-owned Land Use Rights Certificate — Nan Guo Yong (2005) Zi No.6807 (南國用(2005)字第 6807 號 ), the land use rights of a parcel of land with a site area of approximately 40,000 sq.m. have been granted to Qingdao Luhong Cement Company Limited ("Qingdao Company"), an 89% owned subsidiary of China United Qingzhou Luhong Cement Company Limited ("Qingzhou"), for a term expiring on June 19, 2055 for industrial use.

2.  Pursuant to a Construction Work Planning Permit — 2005-088 and a Construction Commencement Permit — 370284200505150511 issued by Jiaonan City Planning Bureau in favour of Qingdao Company, the property with a total gross floor area of approximately 12,000 sq.m. has been approved for construction.

3.  We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

   (i)   The Group has legally obtained the state-owned land use rights certificate of the property, and has the right to use, occupy, transfer, lease, mortgage or otherwise dispose of the land in accordance with the valid term and usage stipulated by the Land Use Rights Certificate;

   (ii)  The construction of the property complies with all requirements of the relevant PRC laws and regulations. There is no material legal impediment to obtain building ownership certificate after the property has been completed and passed the acceptance inspection; and

   (iii) The property is not subject to mortgage and any other encumbrances.

ALRMH-CNBM00000487

**APPENDIX IV**                                                    **PROPERTY VALUATION**

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|---|---|---|---|---|
| B3. | A parcel of land, various buildings and structures under construction located at Putong Town Qingzhou Shandong Province The PRC | The property comprises a parcel of land with a site area of approximately 392,326 sq.m. on which various industrial buildings and structures are under construction.<br><br>The property is scheduled to be completed in December 2006, and the total investment of the construction cost is estimated to be approximately RMB 68,205,000, of which RMB 55,156,899 has been spent up to the date of valuation. The gross floor area of the buildings will be approximately 18,381 sq.m. upon completion.<br><br>The land use rights of the property have been granted for a term expiring on December 26, 2054 for industrial use. | The property is currently under construction. | 76,203,000<br><br>92.3% interest attributable to the Group: RMB 70,335,000 |

———————

*Notes:*

1. Pursuant to a State-owned Land Use Rights Certificate — Qing Guo Yong (2004) Zi No.11004 (青國用(2004)第 11004), the land use rights of a parcel of land with a site area of approximately 392,326 sq.m. have been granted to China United Qingzhou Luhong Cement Company Limited ("Qingzhou"), an 80% owned subsidiary of China United, for a term expiring on December 26, 2054 for industrial use.

2. Pursuant to 2 Construction Work Planning Permits — 2005 Lu 06-2-008 and 2005 Lu 06-2-009, and 2 Construction Commencement Permits — 2004-018 and 2004-019 issued by The Qingzhou City Planning Bureau in favour of Qingzhou, the property with a total gross floor area of approximately 7,259 sq.m. has been approved for construction.

3. We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

    (i)    The Group has legally obtained the state-owned land use rights certificate of the property, and has the right to use, occupy, transfer, lease, mortgage or otherwise dispose of the land in accordance with the valid term and usage stipulated by the Land Use Rights Certificate;

    (ii)    The construction of the property complies with all requirements of the relevant PRC laws and regulations. There is no material legal impediment to obtain building ownership certificate after the property has been completed and passed the acceptance inspection; and

    (iii)    The property is not subject to mortgage and any other encumbrances.

ALRMH-CNBM00000488

**APPENDIX IV**                                                  **PROPERTY VALUATION**

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|-----|----------|------------------------|--------------------------|--------------------------------------------------------------|
| B4. | A parcel of land, various buildings and structures under construction located at Yangxu Village Yangbei Town Suqian Jiangsu Province The PRC | The property comprises a parcel of land with a site area of approximately 79,251 sq.m. on which various industrial buildings and structures are under construction.<br><br>The property is scheduled to be completed in May 2006, and the total investment of the construction cost is estimated to be approximately RMB 32,307,000, of which RMB 1,490,959 has been spent up to the date of valuation. The total gross floor area of the buildings will be approximately 3,766 sq.m. upon completion.<br><br>The land use rights of the property have been granted for a term expiring on November 15, 2055 for industrial use. | The property is currently under construction. | 37,267,000<br><br>86.38% interest attributable to the Group: RMB 32,191,000 |

_____

*Notes:*

1. Pursuant to a State-owned Land Use Rights Certificate — Su Guo Yong (2005) Di No.0553 (宿國用(2005)第 0553號 ), the land use rights of a parcel of land with a site area of approximately 79,251 sq.m. have been granted to Zhonglian Julong Cement (Suqian) Co., Ltd. ("Suqian Julong"), a 90% owned subsidiary of Huaihai, for a term expiring on November 15, 2055 for industrial use.

2. Pursuant to a Construction Work Planning Permit — Su Jian Gui Di No.2005071 (宿建規第2005071號 ) issued by Suqian City Planning Bureau and a Construction Commencement Permit — No. 2005.03 issued by the Suqian City Construction Bureau in favour of Suqian Julong, the property has been approved for construction.

3. We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

   (i) The Group has legally obtained the state-owned land use rights certificate of the property, and has the right to use, occupy, transfer, lease, mortgage or otherwise dispose of the land in accordance with the valid term and usage stipulated by the Land Use Rights Certificate;

   (ii) The construction of the property complies with all requirements of the relevant PRC laws and regulations. There is no material legal impediment to obtain building ownership certificate after the property has been completed and passed the acceptance inspection; and

   (iii) The property is not subject to mortgage and any other encumbrances.

ALRMH-CNBM00000489

## APPENDIX IV                                         PROPERTY VALUATION

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|-----|----------|------------------------|--------------------------|---------------------------------------------------------------|
| B5. | A parcel of land, various buildings and structures under construction located at Zhouda Village and Panzhai Village Yingquan Town Fuyang Anhui Province The PRC | The property comprises a parcel of land with a site area of approximately 106,152 sq.m. on which various industrial buildings and structures are under construction.<br><br>The property is scheduled to be completed in June 2006, and the total investment of the construction cost is estimated to be approximately RMB 33,982,000, of which RMB 21,620,989 has been spent up to the date of valuation. The total gross floor area of the buildings will be approximately 4,328 sq.m. upon completion.<br><br>The land use rights of the property have been granted for a term expiring on December 16, 2055 for industrial use. | The property is currently under construction. | 42,942,000<br><br>86.38% interest attributable to the Group: RMB 37,093,000 |

_____

*Notes:*

1. Pursuant to a State-owned Land Use Rights Certificate — Fu Quan Guo Yong (2005) Di No.A110149 (阜泉國用(2005)第A110149號), the land use rights of a parcel of land with a site area of approximately 106,152 sq.m. have been granted to Zhonglian Julong Cement (Fuyang) Co., Ltd. ("Fuyang Julong"), a 90% owned subsidiary of Huaihai, for a term expiring on December 16, 2055 for industrial use.

2. Pursuant to a Construction Work Planning Permit — (2006) No.052 and a Construction Commencement Permit—120006020009 (Bu) issued by the Fuyang City Planning & Construction Bureau in favour of Fuyang Julong, the property with a total gross floor area of approximately 16,594 sq.m. has been approved for construction.

3. We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

    (i) The Group has legally obtained the state-owned land use rights certificate of the property, and has the right to use, occupy, transfer, lease, mortgage or otherwise dispose of the land in accordance with the valid term and usage stipulated by the Land Use Rights Certificate;

    (ii) The construction of the property complies with all requirements of the relevant PRC laws and regulations. There is no material legal impediment to obtain building ownership certificate after the property has been completed and passed the acceptance inspection; and

    (iii) The property is not subject to mortgage and any other encumbrances.

ALRMH-CNBM00000490

**APPENDIX IV**                                                        **PROPERTY VALUATION**

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 RMB |
|-----|----------|------------------------|--------------------------|------------------------------------------------------------|
| B6. | A parcel of land, various buildings and structures under construction located at Shengang Industrial Park Economic Development Zone Jiangyin Jiangsu Province The PRC | The property comprises a parcel of land with a site area of approximately 63,097.1 sq.m. on which various industrial buildings and structures are under construction.<br><br>The property is scheduled to be completed in June 2006, and the total investment of the construction cost is estimated to be approximately RMB 21,420,000 of which RMB 9,928,676 has been spent up to the date of valuation. The total gross floor area of the buildings will be approximately 33,177.10 sq.m. upon completion.<br><br>The land use rights of the property have been granted for a term expiring on October 19, 2054 for industrial use. | The property is currently under construction. | 35,187,000<br><br>17.1% interest attributable to the Group: RMB 6,017,000 |

--------------

*Note:*

1.  Pursuant to a State-owned Land Use Rights Certificate — Cheng Guo Yong (2004) Di No.012794 (澄國用(2004)第 012794 號), the land use rights of a parcel of land with a site area of approximately 63,097.1 sq.m. have been granted to Jiangyin Taishan Gypsum Building Material Co., Ltd. ("Jiangyin Taishan"), a 67.5% owned subsidiary of Taihe for a term expiring on October 19, 2054 for industrial use.

2.  Pursuant to a Construction Work Planning Permit — (2004) Kai 165 and 2 Construction Commencement Permits — Cheng Jian Shi Xu (2005) Zi Nos.040 and 042 issued by the Jiangyin Shi Construction Bureau in favour of Jiangyin Taishan, the property has been approved for construction.

3.  We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

    (i)   The Group has legally obtained the state-owned land use rights certificate of the property, and has the right to use, occupy, transfer, lease, mortgage or otherwise dispose of the land in accordance with the valid term and usage stipulated by the Land Use Rights Certificate;

    (ii)  The construction of the property complies with all requirements of the relevant PRC laws and regulations. There is no material legal impediment to obtain building ownership certificate after the property has been completed and passed the acceptance inspection; and

    (iii) The property is not subject to mortgage and any other encumbrances.

ALRMH-CNBM00000491

**APPENDIX IV**                                    **PROPERTY VALUATION**

| No. | Property | Description and tenure | Particulars of occupancy | Capital value in existing state as at December 31, 2005 RMB |
|-----|----------|----------------------|------------------------|----------------------------------------------------------|
| B7. | A parcel of land, various buildings and structures under construction located at the southern side of Xingji Road Bengbu Anhui Province The PRC | The property comprises a parcel of land with a site area of approximately 67,642.20 sq.m. on which various industrial buildings and structures are under construction.<br><br>The property is scheduled to be completed in December 2006, and the total investment of the construction cost is estimated to be approximately RMB 44,780,000, of which RMB 598,704 has been spent up to the date of valuation. The total gross floor area of the buildings will be approximately 17,084 sq.m. upon completion.<br><br>The land use rights of the property have been granted for a term expiring on October 13, 2054 for industrial use. | The property is currently under construction. | 51,876,000<br><br>78.19% interest attributable to the Group: RMB 40,562,000 |

_____

*Notes:*

1.  Pursuant to a State-owned Land Use Rights Certificate — Beng Guo Yong (Chu Rang) Di No.04210 蚌國用(出讓)第 04210號 ), the land use rights of a parcel of land with a site area of approximately 67,642.20 sq.m. have been granted to China Triumph Bengbu Engineering and Technology Co., Ltd. ("Bengbu Triumph") for a term expiring on October 13, 2054 for industrial use.

2.  Pursuant to a Construction Work Planning Permit and a Construction Commencement Permit — 34030505062385 issued by the Bengbu City Hi-Tech Industry Development Zone Planning & Administering Bureau in favour of Bengbu Triumph, the property with a total gross floor area of approximately 17,084 sq.m. has been approved for construction.

3.  As confirmed by the Group, Bengbu Triumph is a 70% owned subsidiary of China Triumph, Nanjing Triumph owns the remaining 15% interest, and CTIEC Shenzhen Scieno-tech Engineering Co., Ltd (a 55% owned subsidiary of China Triumph) owns the other 15% interest.

4.  We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

    (i)   The Group has legally obtained the state-owned land use rights certificate of the property, and has the right to use, occupy, transfer, lease, mortgage or otherwise dispose of the land in accordance with the valid term and usage stipulated by the Land Use Rights Certificate;

    (ii)  The construction of the property complies with all requirements of the relevant PRC laws and regulations. There is no material legal impediment to obtain building ownership certificate after the property has been completed and passed the acceptance inspection; and

    (iii) The property is not subject to mortgage and any other encumbrances.

ALRMH-CNBM00000492

**APPENDIX IV**                                                      **PROPERTY VALUATION**

**Group III — Property interests held for investment by the Group in the PRC**

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|---|---|---|---|---|
| C1. | Level 13<br>Shiji Jinyuan<br>Shangwu Center<br>No.69 Banjing Road<br>Haidian District<br>Beijing<br>The PRC | The property comprises the whole of Level 13 of a 16-storey composite building completed in 2002.<br><br>The property has a gross floor area of approximately 1,207.75 sq.m.<br><br>The land use rights of the property have been granted for a term expiring on November 5, 2071. | The property is currently subject to a Tenancy Agreement. (See note.3) | 11,836,000<br><br>86.24% interest attributable to the Group: RMB 10,207,000 |

—————————

*Notes:*

1.    Pursuant to a Sale and Purchase Property Agreement dated May 21, 2002, Levels 12 and 13 of a building have been purchased by 中國無機材料科技實業集團公司 , prior to its conversion into China Composites, an 86.24% owned subsidiary of the Company, at a consideration of RMB 20,531,750. According to the information given, the payment had been fully settled by China Composites.

2.    Pursuant to a Building Ownership Certificate — Jing Fang Quan Zheng Hai Qi Yi Zi Di No.0008532 (京房權證海其移字第 0008532 號 ), Level 13 with a gross floor area of approximately 1,207.75 sq.m. is owned by China Composites and the land use rights of the property have been granted for a term expiring on November 5, 2071.

3.    Pursuant to a Tenancy Agreement entered into between China Composites and Chengdu Suobei Digital Technology Co., Ltd (成都索貝數碼科技有限公司), an Independent Third Party, the property is rented to Chengdu Suobei Digital Technology Co., Ltd for a term of 3 years commencing from January 27, 2003 and expiring on January 23, 2006 at a monthly rental of RMB 132,983, exclusive of water and electricity charges.

4.    We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

(i)     The Group has legally obtained the building ownership certificate of the property and has the right to occupy, use, transfer, lease, mortgage or otherwise dispose of the property;

(ii)    The Tenancy Agreement is valid, binding and enforceable under the PRC laws; and

(iii)   The property is not subject to mortgage and any other encumbrances.

ALRMH-CNBM00000493

## APPENDIX IV                                                    PROPERTY VALUATION

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 RMB |
|-----|----------|------------------------|--------------------------|-----------------------------------------------------------|
| C2. | 17 residential units of Block A &D Cuizhu composite building No.1189 Cuizhu Road Luohu District Shenzhen Guangdong Province The PRC | The property comprises 2 residential units on Level 2 & 3 of a 3-storey composite building and 15 residential units on Levels 1, 2, 3, 6, 7 and 8 of an 8-storey composite building completed in 1993.<br><br>The property has a total gross floor area of approximately 2,602.38 sq.m.<br><br>The land use rights of the property with a total apportioned land area of approximately 1,274.8 sq.m. have been granted for a term of 70 years expiring on December 17, 2061 for residential use. | The property is currently occupied by the Group for staff quarters purposes except for 13 units of the property which are rented to 17 independent parties. (See note 2) | 17,217,000<br><br>56.3% interest attributable to the Group: RMB 9,693,000 |

_Notes:_

1.  Pursuant to 17 Real Estate Title Certificates, 17 units with a total gross floor area of approximately 2,602.38 sq.m. are owned by BND, an 80% owned subsidiary of the BNBM.

    The land use rights of the property with a total apportioned land area of approximately 1,274.8 sq.m. have been granted to BND for a term of 70 years expiring on December 17, 2061 for residential use.

2.  Pursuant to 17 Tenancy Agreements entered into between BND and various Independent Third Parties, portions of the property with a total gross floor area of approximately 2,307.90 sq.m. are rented to 17 Independent Third Parties, respectively. The details are set out as follows:-

| No. | Lessee | G.F.A. (sq.m.) | Term From | To | Annual Rental (RMB) |
|-----|--------|----------------|-----------|-----|---------------------|
| 1 | Hong Shaozan | 76.32 | 2005-06-01 | 2006-05-31 | 21,600 |
| 2 | Li Ping | 76.32 | 2005-09-17 | 2006-09-16 | 18,600 |
| 3 | Rao Jinxiu | 40.35 | 2005-08-01 | 2006-07-31 | 10,800 |
| 4 | Li Yonggang | 46.50 | 2005-06-01 | 2006-05-31 | 12,000 |
| 5 | Li Shengdi | 46.46 | 2005-06-01 | 2006-05-31 | 13,800 |
| 6 | Liu Daqiang | 86.85 | 2006-01-05 | 2007-01-04 | 20,400 |
| 7 | Zhang Yongqun | 80.31 | 2006-01-01 | 2006-12-31 | 18,000 |
| 8 | Qiu Liping | 76.32 | 2007-07-08 | 2006-07-07 | 16,800 |
| 9 | Xu Aiping | 77.05 | 2005-06-20 | 2008-06-19 | 19,200 |
| 10 | Shenjiaxin Co., Ltd | 1,050.93 | 2004-10-25 | 2007-10-24 | 480,000 |
| 11 | Zhang Wenxi | 188.00 | 2003-02-23 | 2006-12-31 | 248,160 |
| 12 | Chen Xiuzu | 51.00 | 2005-01-01 | 2006-12-31 | 75,600 |
| 13 | Li Ping | 65.00 | 2004-12-31 | 2006-12-31 | 109,200 |
| 14 | Yao Xiaoping | 107.00 | 2004-11-01 | 2007-10-31 | 166,920 |
| 15 | Yao Xiaobin | 86.85 | 2005-04-01 | 2007-03-31 | 19,200 |
| 16 | Chen Yiqin | 76.32 | 2005-11-07 | 2006-11-06 | 18,000 |
| 17 | Liu Bangchuang | 76.32 | 2005-05-13 | 2006-05-12 | 16,800 |
| | **Total:** | 2,307.90 | | | 1,285,080 |

ALRMH-CNBM00000494

3.    We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

(i)    The property is legally owned by the Group and can be freely transferred, leased, mortgaged or handled by the Group in accordance with the valid term and usage stipulated by the Real Estate Title Certificate;

(ii)    The Tenancy Agreements are valid, binding and enforceable under the PRC laws; and

(iii)    The property is not subject to mortgage and any other encumbrances.

ALRMH-CNBM00000495

## APPENDIX IV                                                            PROPERTY VALUATION

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|-----|----------|------------------------|--------------------------|------------------------------|
| C3. | Units 17C, 18C and 19C of Block 5 Hai Hua Ju Shijie Garden Tianhe Road Nanshan District Shenzhen Guangdong Province The PRC | The property comprises 3 residential units on Level 17 to 19 of a 22-storey composite building completed in 2002.<br><br>The property has a total gross floor area of approximately 440.49 sq.m.<br><br>The land use rights of the property have been granted for a term of 70 years expiring on April 27, 2063 for residential use. | The property is currently subject to 3 Tenancy Agreements. (See notes.2 to 4). | 2,753,000<br><br>56.3% interest attributable to the Group: RMB 1,550,000 |

*Notes:*

1.  Pursuant to 3 Real Estate Title Certificates — Shen Fang Di Zi Nos. 4000100332 to 4000100334 (深房地字第 4000100332 號至第 4000100334 號), 3 units with a total gross floor area of approximately 440.49 sq.m. are owned by BND.

    The land use rights of the property have been granted for a term of 70 years expiring on April 27, 2063 for residential use.

2.  Pursuant to a Tenancy Agreement entered into between BND and Shenzhen Shi Julan Information Technology Co., Ltd (深圳市巨瀾資訊技術有限公司), an Independent Third Party, Room 17C with a gross floor area of approximately 146.83 sq.m. is rented to Shenzhen Shi Julan Information Technology Co., Ltd for a term of 2 years commencing from October 8, 2004 and expiring on October 7, 2006 at a monthly rental of RMB 3,000, exclusive of water and electricity charges.

3.  Pursuant to a Tenancy Agreement entered into between BND and DE.MELLO.EDVARDO, an Independent Third Party, Room 18C with a gross floor area of approximately 146.83 sq.m. is rented to DE.MELLO.EDVARDO for a term of a year commencing from November 6, 2005 and expiring on November 5, 2006 at a monthly rental of RMB 3,000, exclusive of water and electricity charges.

4.  Pursuant to a Tenancy Agreement entered into between BND and Wang Jinguo (王錦國), an Independent Third Party, Room 19C with a gross floor area of approximately 146.83 sq.m. is rented to Wang Jinguo for a term of a year commencing from July 1, 2005 and expiring on June 30, 2006 at a monthly rental of RMB 3,000, exclusive of water and electricity charges.

5.  We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

    (i)   The property is legally owned by the Group and can be freely transferred, leased, mortgaged or handled by the Group in accordance with the valid term and usage stipulated by the Real Estate Title Certificate;

    (ii)  The Tenancy Agreements are valid, binding and enforceable under the PRC laws; and

    (iii) The property is not subject to mortgage and any other encumbrances.

ALRMH-CNBM00000496

## APPENDIX IV                                          PROPERTY VALUATION

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|-----|----------|------------------------|--------------------------|---------------------------------------------------------------|
| C4. | An office unit on Level 8 Chiwei Mansion No.2093 Shennan Zhong Road Futian District Shenzhen Guangdong Province The PRC | The property comprises an office unit on Level 8 of a 12-storey composite building completed in 2001.<br><br>The property has a gross floor area of approximately 827.05 sq.m.<br><br>The land use rights of the property to an apportioned land area of approximately 144.64 sq.m. have been granted for a term expiring in 2040. | The property is currently subject to a Tenancy Agreement. (See note.2) | 4,301,000<br><br>56.3% interest attributable to the Group: RMB 2,421,000 |

———————

*Notes:*

1.     Pursuant to a Real Estate Title Certificate — Shen Fang Di Zi No.3000083934 (深房地字第 3000083934 號 ), the property with a gross floor area of approximately 827.05 sq.m. is owned by BND.

       The land use rights of the property to an apportioned land area of approximately 144.64 sq.m. have been granted for a term expiring in 2040.

2.     Pursuant to a Tenancy Agreement entered into between BND and Liao Qiong (廖瓊), the property with a gross floor area of approximately 827.05 sq.m. is rented to Liao Qiong for a term of 5 years commencing from May 1, 2005 at an annual rental of RMB 258,040, exclusive of water and electricity charges.

3.     We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

       (i)     The property is legally owned by the Group and can be freely transferred, leased, mortgaged or handled by the Group in accordance with the valid term and usage stipulated by the Real Estate Title Certificate;

       (ii)    The Tenancy Agreement is valid, binding and enforceable under the PRC laws; and

       (iii)   The property is not subject to mortgage and any other encumbrances.

ALRMH-CNBM00000497

**APPENDIX IV**                                                       **PROPERTY VALUATION**

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 RMB |
|---|---|---|---|---|
| C5. | Units 611 and 3005 of Tong De Ge Tongle Mansion Sungang Road Luohu District Shenzhen Guangdong Province The PRC | The property comprises an office unit on Level 6 and an office unit on Level 30 of a 32-storey composite building completed in 1995. <br><br> The property has a total gross floor area of approximately 186.5 sq.m. <br><br> The land use rights of the property with a total apportioned land area of approximately 20.10 sq.m. have been granted for a term of 70 years expiring on April 27, 2062 for business and residential use. | The property is currently subject to 2 Tenancy Agreements. (See notes.2 and 3). | 886,000 <br><br> 56.3% interest attributable to the Group: RMB 499,000 |

_____

*Notes:*

1.  Pursuant to 2 Real Estate Title Certificates — Shen Fang Di Zi No.2000064698 and No.2000073499 (深房地字第 2000064698 號和第 2000073499 號 ), the property with a total gross floor area of approximately 186.50 sq.m. is owned by BND.

    The land use rights of the property with a total apportioned land area of approximately 20.10 sq.m. have been granted to BND for a term of 70 years expiring on April 27, 2062 for business and residential use.

2.  Pursuant to a Tenancy Agreement entered into between BND and Zhu Meng (朱猛 ), an Independent Third Party, Room 611 with a gross floor area approximately 60.55 sq.m. is rented to Zhu Meng for a term of a year commencing from December 5, 2005 and expiring on December 4, 2006 at a monthly rental of RMB 700, exclusive of water and electricity charges.

3.  Pursuant to a Tenancy Agreement entered into between BND and He Sicheng(何思誠 ),an Independent Third Party, Room 3005 with a gross floor area approximately 125.95 sq.m. is rented to He Sicheng for a term of a year commencing from March 1, 2005 and expiring on February 28, 2006 at an annual rental of RMB 20,400, exclusive of water and electricity charges.

4.  We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

    (i)   The property is legally owned by the Group and can be freely transferred, leased, mortgaged or handled by the Group in accordance with the valid term and usage stipulated by the Real Estate Title Certificate;

    (ii)  The Tenancy Agreements are valid, binding and enforceable under the PRC laws; and

    (iii) The property is not subject to mortgage and any other encumbrances.

ALRMH-CNBM00000498

**APPENDIX IV**                                                    **PROPERTY VALUATION**

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|---|---|---|---|---|
| C6. | Units 1706 and 1707 of Block B Jinfengcheng Mansion Shennan Dong Road Luohu District Shenzhen Guangdong Province The PRC | The property comprises 2 office units on Level 17 of a 26-storey composite building completed in about 1995.<br><br>The property has a total gross floor area of approximately 139.54 sq.m.<br><br>The land use rights of the property with a total apportioned land area of approximately 15.20 sq.m. have been granted for a term of 50 years expiring on April 7, 2041 for business and office use. | The property is currently subject to a Tenancy Agreement. | 918,000<br><br>56.3% interest attributable to the Group: RMB 517,000 |

───────────

*Notes:*

1.  Pursuant to 2 Real Estate Title Certificates — Shen Fang Di Zi No. 2000064992 and No. 2000064993 (深房地字第 2000064992 號和第 2000064993 號 ), the property with a total gross floor area of approximately 139.54 sq.m. is owned by BND.

    The land use rights of the property with a total apportioned land area of approximately 15.20 sq.m. have been granted to BND for a term of 50 years expiring on April 7, 2041 for business and office use.

2.  Pursuant to a Tenancy Agreement entered into between BND and Huang Zhiping (黃智平 ), an Independent Third Party, the property with a total gross floor area approximately 139.54 sq.m. is rented to Huang Zhiping for a term of 2 years commencing from March 16, 2005 and expiring on March 15, 2007 at a monthly rental of RMB 4,884, exclusive of water and electricity charges.

3.  We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

    (i)   The property is legally owned by the Group and can be freely transferred, leased, mortgaged or handled by the Group in accordance with the valid term and usage stipulated by the Real Estate Title Certificate;

    (ii)  The Tenancy Agreement is valid, binding and enforceable under the PRC laws; and

    (iii) The property is not subject to mortgage and any other encumbrances.

ALRMH-CNBM00000499

---

**APPENDIX IV**                                          **PROPERTY VALUATION**

---

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|-----|----------|------------------------|--------------------------|-------------------------------------------------------------|
| C7. | A parcel of land and a warehouse center No.4008 Bao'an Bei Road Luohu District Shenzhen Guangdong Province The PRC | The property comprises a parcel of land with a site area of approximately 42,374.5 sq.m. on which are erected a 2-storey building and a 3-storey building completed in about 2001 and 2005 respectively.<br><br>The property has a total gross floor area of of approximately 62,480.03 sq.m.<br><br>The land use rights of the property have been granted for a term expiring on April 5, 2051 for storage use. | Portions of the property is currently subject to 4 Tenancy Agreements. (See notes.3 to 6). The remaining portion is currently vacant. | 272,596,000<br><br>56.3% interest attributable to the Group: RMB 153,472,000 |

---

*Notes:*

1.  Pursuant to a Real Estate Title Certificate — Shen Fang Di Zi No. 2000066400 (深房地字第 2000066400 號 ), the land use rights of a parcel of land with a site area of approximately 42,374.5 sq.m. have been granted to BND for a term expiring on April 5, 2051 for storage use.

2.  Pursuant to 2 Construction Work Planning Permits — Shen Gui Tu Jian Xu Zi No.2001058 and Shen Gui Jian Xu Zi No.2004059 (深規土建許字 2001058號和深規建許字 2004059號 ) and 2 Construction Work Commencement Permits — 44030020010060050201 and 44030020040442001 issued by the Shenzhen City Planning Bureau in favour of BND, the buildings with a total gross floor area of approximately 60,407 sq.m. (including both the Completed Property and the CIP Property) have been approved for construction.

3.  Pursuant to a Tenancy Agreement and a Supplemental Agreement entered into between BND and Shenzhen B&Q Decoration & Building Materials Co., Ltd (深圳百安居裝飾建材有限公司) ("Shenzhen B&Q"), a 35% owned subsidiary of BND, a portion of the property with a gross floor area of approximately 23,799.04 sq.m. is rented to Shenzhen B&Q for a term of 20 years commencing from March 28, 2002 and expiring on March 28, 2022 at an annual rental of RMB 10,761,025 on the first four years, inclusive of management and maintenance fee. The rental will be increased by 5% every two years from the fifth year.

4.  Pursuant to a Tenancy Agreement and a Tenancy Supplement Agreement entered into between BND and Shi Yanhua (石炎華 ), an Independent Third Party, a portion of the property with a gross floor area of approximately 76.5 sq.m. is rented to Shi Yanhua for a term of 3 years commencing from December 1, 2003 and expiring on November 30, 2006 at a monthly rental of RMB 15,182.5, exclusive of water and electricity charges.

5.  Pursuant to a Tenancy Agreement entered into between BND and Shenzhen Yongze Business and Trade Co., Ltd (深圳市永澤商貿有限公司), an Independent Third Party, a portion of the property with a gross floor area of approximately 193.69 sq.m. is rented to Shenzhen Yongze Business and Trade Co., Ltd for a term of 2 years commencing from April 10, 2005 and expiring on April 9, 2007 at a monthly rental of RMB 22,275, exclusive of water and electricity charges.

6.  Pursuant to a Tenancy Agreement entered into between BND and METRO Jinjiang Cash & Carry Co., Ltd (錦江麥德龍現購自運有限公司 ) ("Jinjiang METRO"), an Independent Third Party, a portion of the property with a gross floor area of approximately 11,000 sq.m. is rented to Jinjiang METRO for a term of 20 years commencing from June 18, 2005 and expiring on June 17, 2025 at a monthly rental of RMB 45 per sq.m. on the first four years, inclusive of management and maintenance fee. The rental will be increased by 2% every year from the fifth year.

ALRMH-CNBM00000500

7.    We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

(i)    The land use rights of the property is legally owned by the Group and can be freely transferred, leased, mortgaged or handled by the Group in accordance with the valid term and usage stipulated by the Real Estate Title Certificate;

(ii)    The construction of the buildings complies with all requirements of the relevant PRC laws and regulations. There is no material legal impediment to obtain building ownership certificate after the property has been completed and passed the acceptance inspection;

(iii)    The Tenancy Agreements are valid, binding and enforceable under the PRC laws; and

(iv)    The property is not subject to mortgage or any other encumbrances.

ALRMH-CNBM00000501

**APPENDIX IV**                                                    **PROPERTY VALUATION**

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|-----|----------|----------------------|-------------------------|------------------------------------------------------|
| C8. | Unit 3-14 of Block B International Trading Center Renmin Nan Road Luohu District Shenzhen Guangdong Province The PRC | The property comprises an office unit on Level 3 of a 53-storey composite building completed in about 1986.<br><br>The property has a gross floor area of approximately 115 sq.m.<br><br>The land use rights of the property to an apportioned land area of approximately 31.6 sq.m. have been granted for a term of 50 years expiring on June 1, 2031 for business and finance use. | The property is subject to a Tenancy Agreement. (See note.2). | 515,000<br><br>56.3% interest attributable to the Group: RMB 290,000 |

_____

*Notes:*

1.  Pursuant to a Real Estate Title Certificate — Shen Fang Di Zi No. 2000108108 (深房地字第 2000108108號 ), the property with a gross floor area of approximately 115 sq.m. is owned by BND.

    The land use rights of the property to an apportioned land area of approximately 31.6 sq.m. have been granted to BND for a term of 50 years expiring on June 1, 2031 for business and finance use.

2.  Pursuant to a Tenancy Agreement entered into between BND and Shenzhen Zhongyuan Property Consultant Co., Ltd (深圳中原物業顧問有限公司), an Independent Third Party, the unit with a gross floor area of approximately 115 sq.m. is rented to Shenzhen Zhongyuan Property Consultant Co., Ltd for a term of a year commencing from May 1, 2005 and expiring on April 30, 2006 at a monthly rental of RMB 6,095, exclusive of water and electricity charges.

3.  We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

    (i)   The property is legally owned by the Group and can be freely transferred, leased, mortgaged or handled by the Group in accordance with the valid term and usage stipulated by the Real Estate Title Certificate;

    (ii)  The Tenancy Agreement is valid, binding and enforceable under the PRC laws; and

    (iii) The property is not subject to mortgage and any other encumbrances.

ALRMH-CNBM00000502

**APPENDIX IV**                                                    **PROPERTY VALUATION**

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|-----|----------|----------------------|-------------------------|----------------------------------------------------------------|
| C9. | Rooms 12A, 8G, 12G, 12D and 12H Junjing Haoyuan Xiangmei Road Futian District Shenzhen Guangdong Province The PRC | The property comprises 5 residential units on Level 12 and Level 8 of a 27-storey composite building completed in 2003.<br><br>The property has a total gross floor area of approximately 435.68 sq.m.<br><br>The land use rights of the property have been granted for a term of 70 years expiring on March 31, 2064 for business and residential use. | The property is currently subject to 5 Tenancy Agreements. (See notes.2 to 6). | 3,110,000<br><br>56.3% interest attributable to the Group: RMB 1,751,000 |

*Notes:*

1.  Pursuant to 5 Real Estate Title Certificates — Shen Fang Di Zi Nos. 3000204394 to 3000204398 (深房地字第 3000204394號至第 3000204398號 ), the property with a total gross floor area of approximately 435.68 sq.m. is owned by BND.

    The land use rights of the property have been granted for a term of 70 years expiring on March 31, 2064 for business and residential use.

2.  Pursuant to a Tenancy Agreement entered into between BND and Luo Cheng (羅誠 ), an Independent Third Party, Room 12A with a gross floor area of approximately 48.04 sq.m. is rented to Luo Cheng for a term of 1 year commencing from June 15, 2005 and expiring on June 14, 2006 at a monthly rental of RMB 1,400, exclusive of water and electricity charges.

3.  Pursuant to a Tenancy Agreement entered into between BND and Tang Quan (唐泉 ), an Independent Third Party, Room 8G with a gross floor area of approximately 111.75 sq.m. is rented to Tang Quan for a term of 1 year commencing from June 1, 2005 and expiring on May 31, 2006 at a monthly rental of RMB 2,500, exclusive of water and electricity charges.

4.  Pursuant to a Tenancy Agreement entered into between BND and Lian Hailun (連海倫 ),an Independent Third Party, Room 12G with a gross floor area of approximately 111.75 sq.m. is rented to Lian Hailun for a term of 1 year commencing from July 12, 2005 and expiring on July 11, 2006 at a monthly rental of RMB 3,300, exclusive of water and electricity charges.

5.  Pursuant to a Tenancy Agreement entered into between BND and Li Hanyun (李漢蘊 ), an Independent Third Party, Room 12H with a gross floor area of approximately 82.07 sq.m. is rented to Li Hanyun for a term commencing from December 1, 2005 and expiring on May 31, 2006 at a monthly rental of RMB 2,500, exclusive of water and electricity charges.

6.  Pursuant to a Tenancy Agreement entered into between BND and Liu Sihua (劉思華 ), an Independent Third Party, Room 12D with a gross floor area of approximately 82.07 sq.m. is rented to Liu Sihua for a term commencing from November 15, 2005 and expiring on December 31, 2006 at a monthly rental of RMB 2,000, exclusive of water and electricity charges.

ALRMH-CNBM00000503

**APPENDIX IV**                                    **PROPERTY VALUATION**

7. We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

  (i) The property is legally owned by the Group and can be freely transferred, leased, mortgaged or handled by the Group in accordance with the valid term and usage stipulated by the Real Estate Title Certificate;

  (ii) The Tenancy Agreements are valid, binding and enforceable under the PRC laws; and

  (iii) The property is not subject to mortgage and any other encumbrances.

ALRMH-CNBM00000504

## APPENDIX IV
## PROPERTY VALUATION

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|---|---|---|---|---|
| C10. | A parcel of land and a composite building No.265 Taishan Avenue Tai'an Shandong Province The PRC | The property comprises a parcel of land with a site area of approximately 2,967.31 sq.m. on which is erected a 7-storey composite building completed in 2000.<br><br>The property has a total gross floor area of approximately 5,730.57 sq.m.<br><br>The land use rights of the property have been granted for a term expiring on October 8, 2043 for commercial use. | The property is currently subject to 6 tenancy agreements except for a portion of the property which is occupied by the Group as office. (See notes.3 to 4). | 10,413,000<br><br>25.34% interest attributable to the Group: RMB 2,639,000 |

---

*Notes:*

1. Pursuant to a State-owned Land Use Rights Certificate — Tai Tu Guo Yong (2003) Di No.0341 (泰土國用(2003)第0341號), the land use rights of a parcel of land with a site area of approximately 2,967.31 sq.m. have been granted to Taihe for a term expiring on October 8, 2043 for commercial use.

2. Pursuant to a Building Ownership Certificate — Tai Fang Quan Zheng Tai Zi Di No.112903 (泰房權證泰字第112903號), the composite building with a gross floor area of approximately 5,730.57 sq.m. is owned by Taihe.

3. Pursuant to 5 Tenancy Agreements, portions of the property with a total gross floor area of approximately 3,269.65 sq.m. are rented to 4 Independent Third Parties for office or commercial use, exclusive of water and electricity charges. The details are set out as follows:

| | | | | Term | | Annual |
|---|---|---|---|---|---|---|
| No. | Lessee | Location | G.F.A. | From date | Lease (year) | Rental |
| | | | (sq.m.) | | | (RMB) |
| 1 | The Bank of China Taishan Branch | Level 1 | 174.01 | April 1, 2004 | 3 years | 80,000 |
| 2 | Jinan Shi Tianqiao District Beiyuan Jiujiuhong Sauna | Levels 1 to 6 | 2,555.79 | February 18, 2000 | 10 years | 315,000 |
| 3 | Taishan Shi New Horizon Economic and Trade Co., Ltd. | Level 1 | 108.50 | January 20, 2001 | 10 years | 39,060 |
| 4 | Shandong Mobile Communication Co., Ltd. Tai'an Branch | Levels 1 and 4 | 264.95 | October 15, 2004 | 5 years | 120,000 |
| 5 | Tai'an Stone Material Factory | Level 2 | 166.40 | January 1, 2004 | 3 years | 6,000 |
| | **Total:** | | **3,269.65** | | | **560,060** |

4. Pursuant to a Tenancy Agreement entered into between Taihe and Tai'an Shi Jindun Building Material Co., Ltd. (泰安市金盾建材有限公司), an associated company of Taihe, a portion of levels 1 to 6 with a gross floor area of approximately 2,034.68 sq.m. is rented to Tai'an Shi Jindun Building Material Co., Ltd for a term of 3 years commencing from January 1, 2004 at an annual rental of RMB 80,000 for commercial use, exclusive of water and electricity charges.

ALRMH-CNBM00000505

5.    Pursuant to a Maximum Amount Mortgage Contract and 2 Loan Contracts, the property was subject to a mortgage in favour of Tai'an Branch of China Agriculture Bank as security for borrowing 2 bank loans with maximum amount of RMB 12,500,000 commencing from December 31, 2003 and expiring on December 31, 2005. According to an agreement entered into between Taihe and Tai'an Branch of China Agriculture Bank, Tai'an Branch of China Agriculture Bank agrees that Taihe leases portions of the property to the above Lessees.

6.    We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

(i)    The Group has legally obtained both the state-owned land use rights certificate and the building ownership certificate of the property, and has the right to use and occupy the property in accordance with the valid term and usage stipulated by the Land Use Rights Certificate;

(ii)    The property has been mortgaged in favour of Tai'an Branch of China Agriculture Bank; During the mortgage term, the Group cannot transfer, lease, remortgage or otherwise dispose of the property unless obtaining the approval from mortgagee; and

(iii)    The Tenancy Agreements are valid, binding and enforceable under the PRC laws.

7.    We are of the opinion that the capital value of the property as at the date of valuation would be RMB 10,413,000 assuming the approval from mortgagee had been obtained and the property can be freely transferred.

ALRMH-CNBM00000506

## APPENDIX IV                                    PROPERTY VALUATION

**Group IV — Property interest held for development by the Group in the PRC**

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|-----|----------|----------------------|------------------------|-------|
| D1. | A parcel of land located at the eastern side of Zhenxing Road and the northern side of Chongqing Road Hi-Tech Development Zone Lianyungang Jiangsu Province The PRC | The property comprises a parcel of land with a site area of approximately 151,448.7 sq.m. The land use rights of the property have been granted for a term expiring on December 17, 2054 for industrial use. | The property is currently vacant. | 28,775,000<br><br>81.5% interest attributable to the Group: RMB 23,452,000 |

--------------

*Notes:*

1.   Pursuant to a State-owned Land Use Rights Granted Contract — GF-2000-2601(0004407) entered into between Lianyungang City State-owned Land Resource Bureau (連雲港市國土資源局) and Zhongfu Lianzhong dated December 26, 2004, the land use rights of a parcel of land with a site area of approximately 151,448.7 sq.m. are contracted to be granted to Zhongfu Lianzhong and the total land premium payments is RMB 24,231,792.

2.   Pursuant to a State-owned Land Use Rights Certificate — Lian Guo Yong (2005) Zi Di No.X001717 (連國用(2005)字第X001717號), the land use rights of a parcel of land with a site area of approximately 151,448.7 sq.m. have been granted to Zhongfu Lianzhong for a term expiring on December 17, 2054 for industrial use.

3.   As advised by Zhongfu Lianzhong, the property is planned for future expansion.

4.   We have been provided with a legal opinion regarding the property interest by the Company's PRC legal adviser, which contains, inter alia, the following:

   (i)   The property is legally owned by the Group and can be freely transferred, leased, mortgaged or handled by the Group in accordance with the valid term and usage stipulated by the Land Use Rights Certificate; and

   (ii)   The property is not subject to mortgage and any other encumbrances.

ALRMH-CNBM00000507

**APPENDIX IV**                                                **PROPERTY VALUATION**

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|---|---|---|---|---|
| D2. | A parcel of land located at the eastern side of Rongliao Dong Road Tai'an Shandong Province The PRC | The property comprises a parcel of land with a site area of approximately 6,161 sq.m.<br><br>The land use rights of the property have been granted for a term expiring on October 8, 2073 for residential use. | The property is currently vacant. | 4,916,000<br><br>25.34% interest attributable to the Group: RMB 1,246,000 |

_____

*Notes:*

1.   Pursuant to a State-owned Land Use Rights Certificate — Tai Tu Guo Yong (2003) Di No.0342 (泰土國用(2003)第 0342號 ), the land use rights of a parcel of land with a site area of approximately 6,161 sq.m. have been granted to Shandong Taihe Dongxin Co., Ltd ("Taihe"), a 42% owned subsidiary of BNBM, for a term expiring on October 8, 2073 for residential use.

2.   We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

(i)    The property is legally owned by the Group and can be freely transferred, leased, mortgaged or handled by the Group in accordance with the valid term and usage stipulated by the Land Use Rights Certificate; and

(ii)   The property is not subject to mortgage and any other encumbrances.

ALRMH-CNBM00000508

## APPENDIX IV                                    PROPERTY VALUATION

**Group V — Property interest held for sale by the Group in the PRC**

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|---|---|---|---|---|
| E1. | A parcel of land and a composite building (known as Zhongxin Building) located at the eastern side of Development Zone Hai Dian Island Haikou Hainan Province The PRC | The property comprises a parcel of land with a site area of approximately 3,755.50 sq.m. on which is erected a 20-storey composite building completed in 2005. The building has a gross floor area of approximately 17,600 sq.m. The land use rights of the property have been granted for a term expiring on September 15, 2060 for residential use. | The unsold portion is vacant, whilst the remaining portion of the property that is contracted to be sold has been delivered to the respective purchasers. | 52,453,000 60.33% interest attributable to the Group: RMB 31,645,000 |

---

*Notes:*

1. Pursuant to a State-owned Land Use Rights Certificate — Haikou Shi Guo Yong (Ji) Zi Di No.2002020833 (海口市國用(籍)字第2002020833號 ), the land use rights of a parcel of land with a site area of approximately 3,755.50 sq.m. have been granted to BNBM for a term expiring on September 15, 2060 for residential use.

2. Pursuant to a Construction Commencement Permit — 460100200302280701 issued by the Hainan Province Construction Office in favour of BNBM and a Construction Work Planning Permit issued by the Hainan Province Planning Bureau in favour of BNBM, a building with a gross floor area of approximately 17,964 sq.m. has been approved for construction.

3. Pursuant to a Haikou Shi Real Estate Pre-sale Permit — (2003) Hai Fang Yu Zi No. (462) issued by the Haikou Shi Building Administration Bureau, BNBM has been approved to sell the building with a gross floor area of approximately 17,600 sq.m.

4. Units C & D on Levels 13, unit B on Level 18, the whole of Level 12 and the whole of Level 17 with a total gross floor of approximately 1,961.46 sq.m. of the property are subject to various sale and purchase agreements in a total consideration of RMB 5,547,000. Capital value in respect of this portion of the property is stated at total consideration aforesaid, and is included in our valuation shown above.

5. We have been provided with a legal opinion regarding the property interest by the Company's PRC legal advisers, which contains, inter alia, the following:

   (i) The land use rights are legally owned by the Group and can be freely transferred, leased, mortgaged or handled by the Group in accordance with the valid term and usage stipulated by the Land Use Rights Certificate;

   (ii) The construction of the building complies with all requirements of the relevant PRC laws and regulations; the Group is entitled to construct and sell the property; and

   (iii) The property is not subject to mortgage and any other encumbrances.

IV-107

ALRMH-CNBM00000509

## APPENDIX IV                                                   PROPERTY VALUATION

**Group VI — Property interests held and occupied by the Group in the PNG**

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 RMB |
|---|---|---|---|---|
| F1. | Allotment 66 & 67 Section 52, Hohola Kennedy Road Gordons, NCD Papua New Guinea | The property comprises a single-storey composite building completed in 1997.<br><br>The property has a total gross floor area of approximately 1,000 sq.m.<br><br>In addition to the above completed building, the property also includes a commercial building and ancillary structures that were still under construction as at the date of valuation (the "CIP buildings"). The estimated total construction cost is approximately KINA4,468,000, of which approximately KINA103,206 has been paid at the date of valuation. The total gross floor area of the CIP buildings will be approximately 4,200 sq.m. upon completion. The CIP buildings are scheduled to be completed in August 2006.<br><br>The property occupies a total site area of approximately 3,280 sq.m. with land lease terms of 99 years commencing from May 3, 1992 and May 22, 1992. | The property is occupied by the Group for office, warehouse and residential purposes. | 6,302,000 (equivalent to KINA2,504,000)<br><br>56.3% interest attributable to the Group: RMB 3,548,000 (equivalent to KINA1,410,000) |

_____

*Notes:*

1.   BNBM PNG Limited is the registered proprietor of the property.

2.   Pursuant to a Building Act Permit — No.BB05-040(B), the construction of the CIP building has been approved.

3.   BNBM PNG Limited is a wholly-owned subsidiary of BND.

4.   Our valuation conclusion is reached having regard to the valuation report undertaken by Mr. Leo Digori, a qualified surveyor who has over 16 years' experience in valuation of all classes of real estate in Papua New Guinea and is a member of Papua New Guinea Institute of Valuers and Land Administrators.

5.   The exchange rate adopted in our valuations for the property in Papua New Guinea is KINA1 = RMB 2.517 which was approximately the prevailing exchange rate as at the date of valuation.

ALRMH-CNBM00000510

**APPENDIX IV**                                      **PROPERTY VALUATION**

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|---|---|---|---|---|
| F2. | Allotment 4 & 5 Section 14, Josey Street, LAE Morobe Province Papua New Guinea | The property comprises a single-storey composite building completed in 2000. The property has a total gross floor area of approximately 1,842.5 sq.m. The property occupies a total site area of approximately 3,996.28 sq.m. with a land lease term of 50 years commencing from June 22, 1960. | The property is occupied by the Group for retail, office, warehouse and residential purposes. | 3,524,000 (equivalent to KINA1,400,000) 56.3% interest attributable to the Group: RMB 1,984,000 (equivalent to KINA788,000) |

———————

*Notes:*

1.      BNBMG PNG Limited is the registered proprietor of the property.

2.      BNBMG PNG Limited is a wholly-owned subsidiary of BND.

3.      Our valuation conclusion is reached having regard to the valuation report undertaken by Mr. Chris M. Kabauru, a qualified surveyor who has 20 years' experience in valuation of all classes of real estate in Papua New Guinea and is a member of Papua New Guinea Institute of Valuers and Land Administrators.

4.      The exchange rate adopted in our valuations for the property in Papua New Guinea is KINA1 = RMB 2.517 which was approximately the prevailing exchange rate as at the date of valuation.

ALRMH-CNBM00000511

**APPENDIX IV**                                       **PROPERTY VALUATION**

**Group VII — Property interest held for development by the Group in the PNG**

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|---|---|---|---|---|
| G1. | Allotment 68, 69 and 70 Section 52, Hohola Kennedy Road Gordons, NCD Papua New Guinea | The property comprises 3 parcels of land with a total site area of approximately 5,100 sq.m. | The property is currently vacant. | 4,480,000 (equivalent to KINA1,780,000) 56.3% interest attributable to the Group: RMB 2,522,000 (equivalent to KINA1,002,000) |

———————

*Notes:*

1.  2006 Limited is the registered proprietor of the property.

2.  2006 Limited is a wholly-owned subsidiary of BNBM PNG Limited.

3.  Our valuation conclusion is reached having regard to the valuation report undertaken by Mr. Leo Digori, a qualified surveyor who has over 16 years' experience in valuation of all classes of real estate in Papua New Guinea and is a member of Papua New Guinea Institute of Valuers and Land Administrators.

4.  The exchange rate adopted in our valuations for the property in Papua New Guinea is KINA1 = RMB 2.517 which was approximately the prevailing exchange rate as at the date of valuation.

ALRMH-CNBM00000512

**APPENDIX IV**            **PROPERTY VALUATION**

**Group VIII — Property interests rented and occupied by the Group in the PRC**

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 *RMB* |
|---|---|---|---|---|
| H1. | 35 properties leased by the Group in the PRC | The properties comprise 35 units or buildings completed in various stages between 1984 and 2004. | The properties are occupied by the Group for office and production purposes. | No commercial value |

The properties have a total leased area of approximately 35,213.28 sq.m.

The leased area of the properties in respect of their usage is set out as follows:

| Usage | Leased area (sq.m.) |
|---|---|
| Office | 15,435.28 |
| Production | 19,778.00 |
| **Total** | **35,213.28** |

The properties are leased to the Group for various terms expiring on various dates at a total annual rental of approximately RMB 9,145,964.

———————

*Notes:*

1. Among the above 35 leased properties, 20 properties with a total gross floor area of approximately 17,121.79 sq.m. are leased by the Group from 4 connected parties with a total annual rental of RMB 2,874,106 for various terms with the latest date expiring on April 30, 2006.

2. The remaining 15 properties with a total gross floor area of approximately 18,091.49 sq.m. are leased by the Group from various Independent Third Parties with a total annual rental of RMB 6,262,438 for various terms ranging from 1 year to 20 years with the latest date expiring on June 30, 2006.

3. We have been provided with a legal opinion on the legality of the lease agreements to the properties issued by the Company's PRC legal advisers, which contains, inter alia, the following:

    (i) For the 20 leased properties from various connected parties, the lessors have fully provided to the Group with the relevant Building Ownership Certificates/Real Estate Title Certificates. The Group can legally occupy and use the properties;

    (ii) For the 15 properties leased from various Independent Third Parties, the lessors of 14 properties have fully provided to the Group with the relevant Building Ownership Certificates, Real Estate Title Certificates or confirmation letter that the landlords have the right to sublet the properties. The Group can legally occupy and use the properties;

ALRMH-CNBM00000513

(iii)   For the remaining property that are leased from independent parties, the Group have not been provided with any legal title document to the property. As such, the Group's occupation of the properties could not be protected by the PRC laws; and

(iv)   Among the Tenancy agreements of the 35 leased properties, those Tenancy Agreements relating to 34 properties with valid title documents are valid and enforceable under the PRC laws. For the remaining Tenancy Agreement, due to lack of the relevant title documents, the PRC legal advisers cannot judge the legality of the Tenancy Agreement and whether the Group has the right to occupy and use the property.

4.    According to a written Indemnification Undertaking from China National Building Material Group Corporation ("Parent"), the controlling shareholder of the Company, Parent has agreed to indemnify the Group against any losses suffered from the absence of title certificates and provide alternate buildings and/or land to the Group to ensure its normal operation if the Group is unable to continue to use the relevant buildings and/or land.

ALRMH-CNBM00000514

## APPENDIX IV                                                  PROPERTY VALUATION

**Group IX — Property interests rented and occupied by the Group in overseas countries**

| No. | Property | Description and tenure | Particulars of Occupancy | Capital value in existing state as at December 31, 2005 RMB |
|---|---|---|---|---|
| I1. | Two properties leased by the Group in Papua New Guinea | The properties comprise 2 commercial units of 2 single-storey buildings completed in 1985 and 2001 respectively.<br><br>The properties have a total estimated gross floor area of approximately 2,100 sq.m.<br><br>The properties are leased to the BNBM PNG Limited from an independent party under two tenancy agreements for various terms commencing from 1 December 2002 and 1 April 2001 at a total annual rental of KINA 222,000. | The property is occupied by the Group for distribution office and warehouse purposes. | No commercial value |
| I2. | An office/warehouse unit 16018 Adelante Street, Unit C, Irwindate, California USA | The property comprises an office/warehouse unit on the first floor of a single-storey building completed in 1998.<br><br>The property has a gross floor area of approximately 11,520 sq.ft.<br><br>The property is leased to United Suntech Craft, INC from an independent party for a term of 36 months expiring on July 31, 2008 at a monthly rental of USD 6,681 for the first year. The rental will be changed to USD 6,797 for the 2nd year and USD 6,912 for the 3rd year. | The property is occupied by the Group for office and warehouse purposes. | No commercial value* |

\* Our valuation conclusion is reached having regard to the valuation report undertaken by Steven R. Norris, a qualified real estate professional in Real Estate who has 25 years of valuation experience in respect of the properties in the USA and is a member of the Appraisal Institute and a counselor of Real Estate.

ALRMH-CNBM00000515

**APPENDIX V**                                                                  **TAXATION**

**Taxation of Security Holders**

The following is a summary of certain PRC and Hong Kong tax consequences of the ownership of H Shares by an investor that purchases such H Shares in connection with the Global Offering and holds the H Shares as capital assets. This summary does not purport to address all material tax consequences of the ownership of H Shares, and does not take into account the specific circumstances of any particular investors. This summary is based on the tax laws of the PRC as in effect on the date hereof which are subject to change (or changes in interpretation), possibly with retroactive effect.

The discussion does not address any aspects of Hong Kong or PRC taxation other than income taxation, capital taxation, stamp duty and estate taxation. Prospective investors are urged to consult their tax advisors regarding the PRC, Hong Kong and other tax consequences of owning and disposing of H Shares.

*Taxation of Dividends*

*PRC Taxation*

*Individual Investors.* According to the Individual Income Tax Law of the PRC as amended on October 31, 1993, August 30, 1999 and October 27, 2005, and the Provisional Regulations Concerning Questions of Taxation on Enterprise Experimenting with the Share System which became effective on January 1, 1992, dividends paid by PRC companies are ordinarily subject to a PRC withholding tax levied at a flat rate of 20%. For a foreign individual who is not resident of the PRC, the receipt of dividends from a company in the PRC is normally subject to a withholding tax of 20% unless reduced by an applicable tax treaty or specifically exempted by the tax authority of the State Council. However, the PRC State Administration of Taxation ("SAT") issued, on July 21, 1993, a Notice of the PRC State Administration of Taxation Concerning the Taxation of Gains on Transfer and Dividends from Shares (Equities) Received by Foreign Investment Enterprises, Foreign Enterprises and Foreign Individuals ("Tax Notice") which states that dividends paid by a PRC company to individuals with respect to shares listed on an overseas stock exchange ("Overseas Shares"), such as H Shares, are not subject to PRC withholding tax temporarily. The relevant tax authority has not collected withholding tax on dividend payments on Overseas Shares.

The first Amendments to the Individual Income Tax Law of the PRC (the "Amendments") were promulgated and effective on October 31, 1993. The Amendments state that they shall supersede the provisions of any contradictory prior administrative regulations concerning individual income tax. Pursuant to the requirements of the amended Individual Income Tax Law of the PRC, foreign individuals are subject to withholding tax on dividends paid by a PRC company at a rate of 20% unless specifically exempted by the tax authority of the State Council or reduced by an applicable tax treaty. However, in a letter dated July 26, 1994 to the former State Economic System Restructuring Commission (subsequently renamed as the State Economic Restructuring Office, and is now incorporated under the NDRC), the former Securities Commission (dissolved by the State Council and its functions have been taken up by the CSRC) and CSRC, the SAT reiterated the temporary tax exemption stated in the Tax Notice for dividends received from a PRC

ALRMH-CNBM00000516

---

**APPENDIX V**                                                                          **TAXATION**

---

company listed overseas. In the event that this letter is withdrawn, a 20% tax may be withheld on dividends in accordance with the Provisional Regulations Concerning Questions of Taxation on Enterprise Experimenting with the Share System and the Individual Income Tax Law of the PRC. Such withholding tax may be reduced pursuant to an applicable double taxation treaty.

*Non-individual Investors.* According to the Income Tax Law of the PRC Concerning Foreign Investment Enterprises and Foreign Enterprises, dividends paid by PRC companies to foreign enterprises (including foreign companies and other economic entities) are ordinarily subject to a PRC withholding tax levied at a flat rate of 20%. However, according to the Tax Notice, a foreign enterprise (including foreign companies and other economic entities) receiving dividends paid with respect to a PRC company's Overseas Shares will temporarily not be subject to the 20% withholding tax. If such withholding tax becomes applicable in the future, the rate could be reduced pursuant to an applicable double taxation treaty.

*Tax Treaties.* Investors, who do not reside in the PRC and reside in countries which have entered into double-taxation treaties with the PRC, may be entitled to a reduction of the withholding tax imposed on the payment of dividends to investors of the Company who do not reside in the PRC. The PRC currently has double-taxation treaties with a number of other countries, which include Australia, Canada, France, Germany, Japan, Malaysia, the Netherlands, Singapore, the United Kingdom and the United States. Under each of such double taxation treaties, the rate of withholding tax imposed by PRC's taxation authorities is generally reduced. For example, according to the Agreement between the Government of the PRC and the U.S. for the Avoidance of Double Taxation and the Prevention of Tax Evasion with respect to Taxes on Income (the "PRC-U.S. Treaty"), PRC may tax dividends paid by the Company to a U.S. Beneficial Owner of the Dividends (as defined below) up to a maximum of 10% of the gross amount of such dividends.

A "U.S. Beneficial Owner of the Dividends" is a holder that (i) is a resident of the United States for purposes of the PRC-U.S. Treaty; (ii) does not maintain a permanent establishment (within the meaning of the PRC-U.S. Treaty) in the PRC to which income and gain derived in connection with the H Shares are attributable; and (iii) who is not otherwise ineligible for benefits under the PRC-U.S. Treaty with respect to income and gain derived in connection with the H Shares. There are currently no specific procedures in place for obtaining the treaty rate. Investors should consult their own tax advisors if they need to make a claim under a tax treaty.

*Hong Kong Taxation*

Under the current practice of the Hong Kong Inland Revenue Department, no tax is payable in Hong Kong in respect of dividends paid by the Company.

**Taxation of Capital Gains**

*PRC Taxation*

The Tax Notice provides that gains realized by foreign enterprises, not including their agencies or establishment in the PRC, that are holders of H Shares would, temporarily, not be subject to capital gains taxes. As to individual holders of H Shares, according to the Individual Income Tax Law of the PRC as amended on October 31, 1993, August 30, 1999 and October 27, 2005 and the Provisions for Implementation of Individual Income Tax Law of the PRC issued on January 28, 1994, as amended on December 19, 2005,

ALRMH-CNBM00000517

gains realized on the sale of equity shares would be subject to income tax at a rate of 20% on the gains and the Ministry of Finance is empowered to draft detailed tax rules on the mechanism for collecting such tax. However, no individual income tax on gains realized on sale of equity shares has been collected. Gains on the sale of shares by individuals were temporarily exempted from individual income tax pursuant to Notice On Continuing The Income Tax-Free Policy On The Share Transfer of Individual Holders issued by the Ministry of Finance and SAT dated March 30, 1998. In the event such temporary exemption is withdrawn or ceases to be effective, individual holders of H Shares may be subject to income tax on capital gains at the rate of 20% unless such tax is reduced or eliminated by an applicable double taxation treaty.

On November 18, 2000, the State Council issued a notice entitled State Council Notice on the Income Tax Reduction for Interest and Other Income that Foreign Enterprises Derive in the PRC ("the Tax Reduction Notice"). Under the Tax Reduction Notice, beginning January 1, 2000, enterprise income tax at a reduced 10% rate will apply to interest, rental, license fees and other income obtained in the PRC by foreign enterprises without agencies or establishment in the PRC, or by foreign enterprises without any substantive relationship with their agencies or establishment in the PRC. Therefore, if the exemption as described in the preceding paragraph does not apply or is not renewed, a foreign enterprise shareholder may still be subject to a 10% tax on capital gains under the Tax Reduction Notice, unless reduced by an applicable double taxation treaty.

### *Hong Kong Taxation*

No tax is imposed in Hong Kong in respect of capital gains from the sale of property such as H shares. Trading gains from the sale of property by persons carrying on a trade, profession or business in Hong Kong where such gains are derived from or arise in Hong Kong from such trade, profession or business will be chargeable to Hong Kong profits tax, which is currently imposed at the rate of 17.5% on corporations and at a maximum rate of 15.5% for the year of assessment 2003/04 and 16% for the year of assessment 2004/05 and for each year after that year on individuals. Gains from sales of H shares effected on the Stock Exchange will be considered to be derived from or arise in Hong Kong. Liability for Hong Kong profits tax would thus arise in respect of trading gains from sales of H shares realized by persons carrying on a business of trading or dealing in securities in Hong Kong.

### **Stamp Duty**

### *PRC Stamp Tax*

PRC stamp tax imposed on the transfer of shares of PRC publicly-traded companies should not apply to the acquisition and disposal by non-PRC investors of H Shares outside of the PRC by virtue of the Provisional Regulations of the PRC Concerning Stamp Tax which became effective on October 1, 1988 and which provide that PRC stamp tax is imposed only on documents executed or received within the PRC which are legally binding in the PRC and are protected under PRC law.

ALRMH-CNBM00000518

## APPENDIX V                                              TAXATION

*Hong Kong Stamp Duty*

Hong Kong stamp duty will be payable by the purchaser on every purchase and by the seller on every sale of H shares. The duty is charged at the rate of 0.2% of the consideration or if higher the fair value of the H shares transferred (the buyer and seller each paying half of such stamp duty). In addition, a fixed duty of HK$ 5 is currently payable on any instrument of transfer of shares.

If one of the parties to the sale is a non-resident of Hong Kong and does not pay the required stamp duty, the duty not paid will be assessed on the instrument of transfer (if any), and the transferee will be liable for payment of such duty.

***Estate Duty***

*PRC Estate tax*

No liability for estate tax under PRC law will arise from non-PRC national's holding H Shares.

*Hong Kong Estate Duty*

The Revenue (Abolition of Estate Duty) Ordinance 2005 abolished estate duty in respect of deaths occurring on or after February 11, 2006. The estate duty chargeable in respect of estates of person dying on or after July 15, 2005 and before February 11, 2006 (the transitional period) has been reduced to a nominal duty of HK$100 in respect of estates whose assessed value exceeds HK$7.5 million. No estate duty is payable where the assessed value of the dutiable estate does not exceed HK$7.5 million during this transitional period.

**Taxation of the Company by the PRC**

The Company will not be subject to income tax, capital gain tax, stamp duty and estate tax for the Global Offering in the PRC, and after the Global Offering, its PRC tax treatment will be the same as other PRC enterprises.

**Taxation of the Company by Hong Kong**

The Directors do not consider that any of the Company's income or the income of its subsidiaries is derived from or arises in Hong Kong for the purpose of Hong Kong taxation. The Company will therefore not be subject to Hong Kong taxation.

ALRMH-CNBM00000519

## APPENDIX VI     SUMMARY OF PRINCIPAL PRC LEGAL AND REGULATORY PROVISIONS

*This appendix sets out summaries of certain aspects of PRC law and regulations, which are relevant to Group's operations and business. These include laws relating to the building material industry in the PRC, taxation and foreign exchange control. Laws and regulations relating to taxation in the PRC are discussed separately in Appendix V to this prospectus. This appendix also contains a summary of certain Hong Kong legal and regulatory provisions, including summaries of certain of the material differences between PRC and Hong Kong company law, certain requirements of the Listing Rules and additional provisions required by the Stock Exchange for inclusion in the articles of association of the PRC issuers.*

### 1.    Company Law

On December 29, 1993, the Standing Committee of the Eighth NPC adopted the Company Law, which came into effect on July 1, 1994 and was amended on December 25, 1999 and on August 28, 2004. On October 27, 2005, the Standing Committee of the Tenth NPC reviewed and passed the new amended Company Law, which came into effect from January 1, 2006. Companies established under laws, administrative regulations, local regulations, the Standard Opinion for Limited Liability Companies and the Standard Opinion for Joint Stock Limited Companies formulated by the relevant departments of the State Council before the implementation of the Company Law will not be affected by the Company Law and shall continue to be recognized. Those companies which have not wholly complied with the provisions of the Company Law shall comply with the relevant requirements and apply for registration before December 31, 1996.

Set out below is a summary of the major provisions of the Company Law, the Special Regulations and the Mandatory Provisions. On July 4, 1994, the Special Regulations were passed at the Twenty-Second Standing Committee Meeting of the State Council, and they were promulgated and implemented on August 4, 1994. The Special Regulations are formulated according to the provisions of Sections 85 and 155 of the Company Law prior to the amendments in respect of the overseas share subscription and listing of joint stock limited companies. The Mandatory Provisions were issued jointly by the Securities Commission and the State Economic System Restructuring Commission on August 27, 1994, prescribing provisions which must be incorporated in the articles of association of joint stock limited companies to be listed overseas. Accordingly, the Mandatory Provisions have been incorporated in the Articles of Association. References to a "company" are to a joint stock limited company established under the Company Law with overseas listed foreign invested shares.

### General

A "joint stock limited company" is a corporate legal person incorporated under the Company Law, whose registered capital is divided into shares of equal par value. The liability of its shareholders is limited to the extent of the Shares held by them, and the liability of the company is limited to the full amount of all the assets owned by it.

A State-owned enterprise that is restructured into a company must comply with the conditions and requirements specified by law and administrative regulations, for the modification of its operation mechanisms, the systematic handling and evaluation of the company's assets and liabilities and the establishment of internal management organs.

ALRMH-CNBM00000520

## APPENDIX VI       SUMMARY OF PRINCIPAL PRC LEGAL AND REGULATORY PROVISIONS

A company must conduct its business in accordance with the laws and commercial ethics. A company may invest in other enterprises, but other than as required by the laws, shall not be a contributor that is responsible for the liabilities of the invested enterprises.

### Incorporation

A company may be incorporated by promotion or public subscription.

A company may be incorporated by over two but not exceeding two hundred promoters, but more than half of the promoter must reside within the PRC. According to the Special Regulations, State-owned enterprises or enterprises with the majority of their assets owned by the PRC Government can be restructured in accordance with the relevant regulations to become joint stock limited companies which may issue shares to overseas investors. These companies, if incorporated by public subscription, may have less than five subscribers and can issue new shares once incorporated.

Companies incorporated by promotion are companies the entire registered capital of which is subscribed for by the promoters. Where companies are incorporated by public subscription, not less than 35% of their total shares must be subscribed for by the promoters, or as otherwise required by the laws and administrative regulations.

The registered capitals of companies incorporated by way of promotion shall be the total share capital subscribed by all the promoters registered with the company registration authority. The initial contributions of all the promoters of the company shall not be less than 20% of the registered capital, and the remainder shall be paid by the promoters within two years from the establishment of the company. No share offering shall be made before the capital is being paid up.

The registered capitals of companies incorporated by way of subscription shall be the total share capital actually received and registered with the company registration authority. The minimum registered capital of a joint stock limited company is RMB5 million, or subject to the higher requirements as required by the laws and administrative regulations.

The promoters shall convene an inaugural meeting within 30 days after the issued shares have been fully paid up, and shall give notice to all subscribers or make an announcement of the date of the inaugural meeting 15 days before the meeting. The inaugural meeting may be convened only with the presence of subscribers holding shares representing more than half of the total shares. At the inaugural meeting, matters including the adoption of draft articles of association proposed by the promoter(s) and the election of the board of directors and the supervisory committee of the company will be dealt with. All resolutions of the meeting require the approval of subscribers with more than half of the voting rights present at the meeting.

Within 30 days after the conclusion of the inaugural meeting, the board of directors shall apply to the registration authority for registration of the establishment of the company. Companies established by the public subscription method and public share offering shall file a document that approved by the securities regulatory authorities of the State Council to the registration authority.

ALRMH-CNBM00000521

## APPENDIX VI        SUMMARY OF PRINCIPAL PRC LEGAL AND REGULATORY PROVISIONS

A company's promoter shall individually and collectively be liable for (i) the payment of all expenses and liabilities incurred in the incorporation process if the company cannot be incorporated; (ii) the repayment of subscription moneys to the subscribers together with interest at bank rates for a deposit for the same term if the company cannot be incorporated; and (iii) damages suffered by the company as a result of the default of the promoters in the course of incorporation of the company. According to the Provisional Regulations Concerning the Issue and Trading of Shares promulgated by the State Council on April 22, 1993 (which is only applicable to issue and trading of shares in the PRC and their related activities), if a company is established by means of subscription, the promoters of such company are required to assume joint responsibility for the accuracy of the contents of the prospectus and to ensure that the prospectus does not contain any misleading statement or omit any material information.

### *Share capital*

The promoter may make capital contribution by money, or non-money assets which can be appraised values with money and legally transferred (e.g. objects, intellectual properties and land use rights, etc), other than assets not entitled to be used as capital contributions under the laws and administrative regulations. For non-monetary assets to be used as capital contributions, appraisals and verifications must be carried out, to ensure no over-valuation or under-valuation of the assets, or otherwise as required by the laws and administrative regulations.

The monetary contribution of all the promoters shall not be less than 30% of the registered capital of the company.

A company may issue registered or bearer share certificates. However, shares issued to promoters and legal persons shall be in the form of registered share certificates, and may not be registered under a different name or in the name of an agent.

The Special Regulations and the Mandatory Provisions provide that shares issued to foreign investors and listed overseas be issued in registered form and shall be denominated in Renminbi and subscribed for in foreign currency.

The Special Regulations and the Mandatory Provisions provide that shares issued to foreign investors and investors from the territories of Hong Kong, Macau and Taiwan and listed overseas are known as overseas listed foreign shares, and those shares issued to investors within the PRC other than the territories specified above are known as domestic shares.

Under the Special Regulations, upon approval of the CSRC, a company may agree, in the underwriting agreement in respect of an issue of overseas listed foreign invested shares, to retain not more than 15% of the aggregate number of overseas listed foreign invested shares proposed to be issued after accounting for the number of underwritten shares.

The share offering price may be equal to or greater than the par value, but may not be less than the par value.

ALRMH-CNBM00000522

## APPENDIX VI       SUMMARY OF PRINCIPAL PRC LEGAL AND REGULATORY PROVISIONS

*Increase in capital*

After payment in full for the new shares issued, the company must change its registration with the relevant administration for industry and commerce and issue a public notice accordingly.

*Reduction of share capital*

Subject to the statutory minimum registered capital requirements, a company may reduce its registered capital in accordance with the following procedures prescribed by the Company Law:

(i)     the company shall prepare a balance sheet and a list of its assets;

(ii)    the reduction of registered capital must be approved by shareholders in general meeting;

(iii)   the company shall inform its creditors of the reduction in capital within 10 days and publish an announcement of the reduction in the newspaper at least three times within 30 days after the resolution approving the reduction has been passed;

(iv)    the creditors of the company may within the statutory prescribed time limit require the company to pay its debts or provide guarantees covering the debts; and

(v)     the company must apply to the relevant administration bureau for industry and commence for registration of the reduction in registered capital.

*Repurchase of shares*

A company may not purchase its own shares other than in one of the following circumstances: (i) reducing its registered capital; (ii) merging with another company holding its shares; (iii) offering as awards to its staff; (iv) the shareholders in opposition to the merger and demerger resolution of the general meeting, request the purchase of shares by the company. For purchase of its own shares under reasons in (i) to (iii) above, it shall be subject to approval by resolution in the general meeting. In the situation under (i), the company must cancel the portion of its purchased shares within 10 days following the purchase, and in the situation under (ii) and (iv), the shares must be transferred or cancelled within six months. Purchase of its own shares under (i) and (iii) must not be exceeding 5% of the total shares of the company in issue. The fund to be applied in the purchases shall be made out of the company's profit after tax, and the shares so purchased shall be transferred to the staff within one year.

*Transfer of shares*

Shares may be transferred in accordance with the relevant laws and regulations.

A shareholder may only effect a transfer of its shares on a stock exchange established in accordance with the laws or pursuant to other ways as required by the State Council. Registered shares may be transferred after the shareholders endorse their signatures on the back of the share certificates or in any other manner specified by applicable laws and regulations.

ALRMH-CNBM00000523

---

**APPENDIX VI        SUMMARY OF PRINCIPAL PRC LEGAL AND REGULATORY PROVISIONS**

---

Shares held by promoters may not be transferred within one year after the establishment of the company. Shares of the company in issue prior to the public offering may not be transferred within one year from the listing date of the stock on the stock exchange. Shares transferred by directors, supervisors and senior managers during their term of office shall not exceed 25% of their total shares held in the company, and the shares held may not be transferred within one year from the listing date of the company's shares, and may not be transferred within six months after their resignation from the office. The articles of association of the company may provide other restrictive requirements on the transfer of the company shares by its directors, supervisors and senior managers.

There is no restriction under the Company Law as to the percentage shareholding of a single shareholder of a company. However, according to the Provisional Regulations Concerning the Issue and Trading of Shares, a PRC Individual shareholder cannot own more than 0.5% of the outstanding domestically issued common shares of a listed company.

Transfers of shares may not be entered in the register of shareholders within 20 days before the date of a shareholders' general meeting or within five days before the record date set for the purpose of distribution of dividends.

### *Shareholders*

Shareholders have such rights and obligations as set out in the articles of association of the company. The articles of association of a company are binding on each shareholder.

Under the Company Law and the Mandatory Provisions, the rights of a shareholder include:

(i)   to attend in person or appoint a proxy to attend shareholders' general meetings, and to vote in respect of the number of shares held;

(ii)  to transfer his shares at a legally established stock exchange in accordance with the applicable laws and regulations and the articles of association of the company;

(iii) to inspect the company's articles of association, minutes of shareholders' general meetings and financial and accounting reports and to make proposals or enquiries in respect of the company's operations;

(iv)  if a resolution adopted by a shareholders' general meeting or the board of directors violates any law or administrative regulation or infringes the lawful rights and interests of shareholders, to institute an action in the People's Court demanding that the illegal infringing action be stopped;

(v)   to receive dividends and other forms of benefit in respect of the number of shares held;

(vi)  to receive surplus assets of the company upon its termination in proportion to his shareholding; and

(vii) any other shareholders' rights specified in the company's articles of association.

ALRMH-CNBM00000524

The obligations of a shareholder include the obligation to abide by the company's articles of association, to pay the subscription moneys in respect of the shares subscribed for, to be liable for the company's debts and liabilities to the extent of the amount of subscription moneys agreed to be paid in respect of the shares taken up by him and any other shareholders' obligation specified in the company's articles of association.

*General meetings*

The shareholders' general meeting is the organ of authority of the company, which exercises its powers in accordance with the Company Law.

The shareholders' general meeting exercises the following powers:

(i)    to decide on the company's operational policies and investment plans;

(ii)   to elect or remove the directors and decide on matters relating to the remuneration of directors;

(iii)  to elect or remove the supervisors who are not staff representatives and decide on matters relating to the remuneration of supervisors;

(iv)  to examine and approve reports of the board of directors;

(v)   to examine and approve reports of the supervisory committee;

(vi)  to examine and approve the company's proposed annual financial budget and final accounts;

(vii) to examine and approve the company's proposals for profit distribution plans and recovery of losses;

(viii) to decide on any increase or reduction of the company's registered capital;

(ix)  to decide on the issue of bonds by the company;

(x)   to decide on issues such as merger, division, changes to the company status, dissolution and liquidation of the company and other matters; and

(xi)  to amend the company's articles of association.

Shareholders' general meeting is required to be held once every year. An extraordinary shareholders' general meeting is required to be held within two months after the occurrence of any of the following circumstances:

(i)    the number of directors is less than the number provided for in the Company Law or less than two-thirds of the number specified in the company's articles of association;

ALRMH-CNBM00000525

(ii)    the aggregate losses of the company which are not made up reach one-third of the company's total share capital;

(iii)   whenever so required by shareholders holding 10% or more of the company's issued and outstanding shares carrying voting rights;

(iv)   whenever the board of directors deems necessary;

(v)    the supervisory committee so requests; or

(vi)   other circumstances as required by the articles of association.

Shareholders' general meetings shall be convened by the board of directors, and presided over by the chairman of the board of directors.

Notice of the meeting shall be given to all shareholders 30 days before the meeting under the Company Law and 45 days under the Special Regulations and the Mandatory Provisions, stating the matters to be considered at the meeting. Under the Special Regulations and the Mandatory Provisions, shareholders wishing to attend are required to give to the company written confirmation of their attendance 20 days prior to the meeting. Under the Special Regulations, at an annual general meeting of a company, shareholders holding 5% or more of the voting rights in the company are entitled to propose to the company in writing new resolutions to be considered at that meeting, which if within the powers of a shareholders' general meeting, are required to be added to the agenda of that meeting.

Shareholders present at a shareholders' general meeting have one vote for each share they hold.

Resolutions of the shareholders' general meeting must be adopted by more than half of the voting rights held by shareholders present (including those represented by proxies) at the meeting, with the exception of matters relating to merger, division, addition or reduction of the registered capital, changes to the company status or dissolution of a company or amendments to the articles of association, which must be adopted by more than two-thirds of the voting rights held by shareholders present, including those represented by proxies at the meeting.

According to the Mandatory Provisions, the increase or reduction of share capital, the issue of any class of share certificates, warrants, or other similar securities or bonds or debentures, merger, division, dissolution and liquidation of the company, the amendment to the company's articles of association, and any other matters of material effect on the company in respect of which the shareholders by ordinary resolution so decide, must be approved through special resolutions by more than two-thirds of the voting rights held by shareholders present in general meeting.

Shareholders may appoint representatives to attend shareholders' general meetings by a written appointment document stating the scope of the exercise of the voting rights.

ALRMH-CNBM00000526

---

**APPENDIX VI          SUMMARY OF PRINCIPAL PRC LEGAL AND REGULATORY PROVISIONS**

---

There is no specific provision in the Company Law regarding the number of shareholders constituting a quorum in a shareholders' meeting. However, the Special Regulations and the Mandatory Provisions provide that a company's annual general meeting may be convened when replies to the notice of that meeting from shareholders holding shares representing 50% of the voting rights in the company have been received 20 days before the proposed date, or if that 50% level is not achieved, the company shall within five days of the last day for receipt of the replies notify shareholders by public announcement of the matters to be considered at the meeting and the date and place of the meeting and the annual general meeting may be held thereafter. The Mandatory Provisions require class meetings to be held in the event of a variation or derogation of the class rights of a class. Holders of domestic shares and holders of overseas listed foreign invested shares are deemed to be different classes of shareholders for this purpose.

*Directors*

A company shall have a board of directors, which shall consist of five to nineteen members. Under the Company Law, each term of office of a director shall not exceed three years. A director may serve consecutive terms if re-elected. If new directors have not been elected when the term of the current directors has expired, the directors whose term has just expired shall continue to perform their duties in accordance with the provisions of the laws, regulations and the articles of association until the vacancy has been filled by new directors. If the resignation of any director before the expiry of his or her term of office causes the number of board members to be less than the required quorum, the director who has just resigned shall continue to perform his or her duties in accordance with the provisions of the laws, regulations and the articles of association until the vacancy has been filled by a new director.

Meetings of the board of directors shall be convened at least twice a year. Notice of meeting shall be given to all directors 10 days before the meeting. The board of directors may provide for a different method of giving notice and notice period for convening an extraordinary meeting of the board of directors.

Under the Company Law, the board of directors exercises the following powers:

(i)    to convene the shareholders' general meetings and report on its work to the shareholders' general meetings;

(ii)   to implement the resolutions passed by the shareholders' general meetings;

(iii)  to decide on the company's business plans and investment proposals;

(iv)   to formulate the company's proposed annual financial budget and accounts;

(v)    to formulate the company's proposals for profit distribution and recovery of losses;

(vi)   to formulate proposals for the increase or reduction of the company's registered capital and the issuance of the corporate bonds;

VI-8

ALRMH-CNBM00000527

(vii) to prepare plans for the merger, division, changes to the company status or dissolution of the company;

(viii) to decide on setup of the company's internal management structure;

(ix)  to appoint or dismiss the company's general manager and to decide on their remuneration; based on the general manager's recommendation, to appoint or dismiss the deputy general managers and financial officers of the company and to decide on their remuneration;

(x)   to formulate the company's basic management system; and

(xi)  other duties as required under the articles of association.

In addition, the Mandatory Provisions provide that the board is also responsible for formulating the proposals for amendment to the articles of association of a company.

Meetings of the board of directors shall be held only if more than half of the directors are present. Resolutions of the board of directors require the approval of more than half of all directors.

If a director is unable to attend a board meeting, he may appoint another director by a written power of attorney specifying the scope of the authorization to attend the meeting on his behalf.

If a resolution of the board of directors violates the law, administrative regulations or the company's articles of association as a result of which the company sustains serious losses, the directors participating in the resolution are liable to compensate the company. However, if it can be proven that a director expressly objected to the resolution when the resolution was voted on, and that such objections were recorded in the minutes of the meeting, such director may be relieved from that liability.

The following persons shall not be allowed to hold the posts of directors, supervisors and senior management:

(i)   An individual without the ability of civil acts or the ability of restricting civil acts;

(ii)  An individual convicted of corruption, offering bribes, seizing others' property, embezzlement or disrupting the order of socialist market economy for not more than five years, or an individual deprived of political rights for committing crimes for not more than five years;

(iii) An individual being a director, a factory director or a manager of a company or an enterprise going bankrupt or going into liquidation who is personally liable for the bankruptcy of the company or the enterprise for not more than three years since the completion of the bankruptcy or liquidation of the company or the enterprise;

(iv)  An individual being the legal representative of a company or an enterprise who is personally liable for its operating license cancelled as a result of violating laws and regulations for not more than three years from the date on which the operating license of the company or the enterprise is cancelled ;

ALRMH-CNBM00000528

(v)   An individual failing to settle the debts with a greater amount he/she owes at maturity.

For companies electing, appointing directors, supervisors or engaging senior management without complying with the aforesaid provisions, the election, appointment or engagement shall be void. For directors, supervisors or senior management to whom Item (i) is applicable while they are in office, they shall be removed from their posts.

Other circumstances under which a person is disqualified from acting as a director of a company are set out in the Mandatory Provisions which have been incorporated in the Articles of Association, a summary of which is set out in Appendix VII.

The board of directors shall appoint a chairman, who is elected with approval of more than half of all the directors. The chairman of the board of directors exercises, amongst others, the following powers:

(i)    to preside over shareholders' general meetings and convene and preside over meetings of the board of directors; and

(ii)   to check on the implementation of the resolutions of the board of directors.

The Special Regulations provide that a company's directors, supervisors, managers and other officers bear fiduciary duties and the duty to act diligently. They are required to faithfully perform their duties, protect the interests of the company and not to use their positions for their own benefit. The Mandatory Provisions (which have been incorporated into the Articles of Association, a summary of which is set out in Appendix VII) contain further elaborations of such duties.

*Supervisors*

A joint stock limited company shall have a supervisory committee composed of not less than three members. Each term of office of a supervisor is three years and he or she may serve consecutive terms if re-elected. If new supervisors have not been elected when the term of the current supervisors has expired, the supervisors whose term has just expired shall continue to perform their duties in accordance with the provisions of the laws, regulations and the articles of association until the vacancy has been filled by new supervisors. If the resignation of any supervisor before the expiry of his or her term of office causes the number of the members of the supervisory committee to be less than the required quorum, the supervisor who has just resigned shall continue to perform his or her duties in accordance with the provisions of the laws, regulations and the articles of association until the vacancy has been filled by a new supervisor.

The supervisory committee is made up of representatives of the shareholders and an appropriate proportion of representatives of the company's staff and workers. Directors and senior managers may not act concurrently as supervisors.

The supervisory committee exercises the following powers:

(i)    to inspect the company's financial position;

ALRMH-CNBM00000529

(ii)  to supervise the directors and senior managers in their performance of their duties and to make proposal to remove any director, senior manager who have violated laws, administrative regulations, articles of association or resolutions of general meetings;

(iii)  when the acts of a directors and senior managers are in a harm to the company's interests, to require correction of these acts;

(iv)  to propose the convening of extraordinary shareholders' general meetings, and to convene and hold general meetings in the event the board fails to implement the duties of convening and holding the general meetings;

(v)  to propose resolutions to the general meeting;

(vi)  to file litigation against directors or senior managers pursuant to item 152 of the Company Law;

(vii)  other powers specified in the company's articles of association.

The circumstances under which a person is disqualified from being a director of a company described above apply mutatis mutandis to supervisors of a company.

The Special Regulations provide that a company's directors and supervisors shall have fiduciary duties. They are required to faithfully perform their duties, protect the interests of the company and not to use their positions for their own benefit.

*Managers and senior managers*

A company shall have a manager who shall be appointed or removed by the board of directors. The manager is accountable to the board of directors and may exercise the following powers:

(i)  supervise the administration of production and operation of the company and arrange for the implementation of resolutions of the board of directors;

(ii)  arrange for the implementation of the company's annual business and investment plans;

(iii)  formulate plans for the establishment of the company's internal management structure;

(iv)  formulate the basic administration system of the company;

(v)  formulate the company's internal rules;

(vi)  decide the appointment and dismissal of administration officers other than those required to be appointed or dismissed by the board of directors;

(vii)  attend board meetings; and

(viii) other powers conferred by the board of directors.

ALRMH-CNBM00000530

## APPENDIX VI        SUMMARY OF PRINCIPAL PRC LEGAL AND REGULATORY PROVISIONS

The Special Regulations and Mandatory Provisions provide that the senior management of a company includes the financial controller, secretary of the board of directors and other executives as specified in the articles of association of the company.

The circumstances under which a person is disqualified from being a director of a company described above apply mutatis mutandis to managers and senior managers of the company.

The articles of association of a company shall have binding effect on the shareholders, directors, supervisors, managers and other executives of the company. Such persons shall be entitled to exercise their rights, apply for arbitration and issue legal proceedings according to the articles of association of the company. The provisions of the Mandatory Provisions regarding the senior management of a company have been incorporated in the Articles of Association (a summary of which is set out in Appendix VII).

### *Duties of directors, supervisors, managers and senior managers*

The Special Regulations and the Mandatory Provisions provide that directors, supervisors, managers and officers of a company owe fiduciary duties to the company and are required to perform their duties faithfully and to protect the interests of the Company and not to make use of their positions in the company for their own benefit.

### *Finance and accounting*

A company shall establish its financial and accounting systems according to laws, administrative regulations and the regulations of the responsible financial department of the State Council and at the end of each financial year prepare a financial report which shall be audited by a public accountant as provided by law. The financial accounting report shall be prepared in accordance with the laws, administrative regulations and requirements by the financial department of the State Council.

A company shall deposit its financial statements at the company for the inspection by the shareholders 20 days before the convening of an annual general meeting of shareholders. A company established by the public subscription method must publish its financial statements.

When distributing each year's after-tax profits, the company shall set aside 10% of its after-tax profits for the company's statutory common reserve fund (except where the fund has reached 50% of the company's registered capital).

When the company's statutory common reserve fund is not sufficient to make up for the company's losses of the previous year, current year profits shall be used to make good the losses before allocations are set aside for the statutory common reserve fund.

After the company has made good its losses and made allocations to its statutory common reserve fund, the remaining profits after tax are distributed in proportion to the number of shares held by the shareholders, except for those cannot be distributed in proportion to the shareholding under the articles of association.

ALRMH-CNBM00000531

## APPENDIX VI     SUMMARY OF PRINCIPAL PRC LEGAL AND REGULATORY PROVISIONS

The capital common reserve of a company is made up of the premium over the nominal value of the shares of the company on issue and other amounts required by the relevant governmental authority to be included in the capital common reserve.

The common reserve of a company shall be applied for the following purposes:

(i)     to make up the company's losses;

(ii)    to expand the business operations of the company; and

(iii)   to be capitalised

However, the capital common reserve cannot be used to compensate company's losses. In capitalising the statutory common reserve, the remaining common reserve shall not be less than 25% of the company's registered capital before the capitalisation.

### *Appointment and retirement of auditors*

The Special Regulations require a company to employ an independent PRC qualified firm of accountants to audit the company's annual report and review and check other financial reports.

The auditors are to be appointed for a term commencing from the close of an annual general meeting and ending at the close of the next annual general meeting.

If a company removes or ceases to continue to appoint the auditors, it is required by the Special Regulations to give prior notice to the auditors and the auditors are entitled to make representations before the shareholders in general meeting. The appointment, removal or non re-appointment of auditors shall be decided by the shareholders in general meeting and shall be filed with the CSRC for record.

### *Distribution of profits*

The Special Regulations provide that the dividends and other distributions to be paid to holders of overseas listed foreign invested shares shall be declared and calculated in Renminbi and paid in foreign currency. Under the Mandatory Provisions, the payment of foreign currency to shareholders shall be made through a receiving agent.

### *Amendment of articles of association*

Any amendments to the company's articles of association must be made in accordance with the laws, administrative regulations and procedures set out in the company's articles of association. Any amendment of provisions incorporated in the articles of association in accordance with the Mandatory Provisions will only be effective after approval by the companies approval department authorized by the State Council and the CSRC. In relation to matters involving the company's registration, its registration with the companies registration authority must also be changed.

ALRMH-CNBM00000532

*Termination and liquidation*

A company may apply for the declaration of insolvency by reason of its inability to pay debts as they fall due. After the People's Court has made a declaration of the company's insolvency, the shareholders, the relevant authorities and the relevant professionals shall be arranged by the People's Court to form a liquidation committee to conduct the liquidation of the company.

Under the Company Law, a company shall be dissolved in any of the following events:

(i)     the term of its operations set down in the company's articles of association has expired or events of dissolution specified in the company's articles of association have occurred;

(ii)    the shareholders in general meeting have resolved to dissolve the company;

(iii)   the company is dissolved by reason of its merger or demerger;

(iv)    the business license is being cancelled, ordered to be closed or revoked pursuant to the laws; or

(v)     the company is dissolved by the People's court under item 183 of the Company Law.

Where the company is dissolved in the circumstances described in (i), (ii), (iv) and (v) above, a liquidation committee must be established within 15 days from the date of the dissolution. Members of the liquidation committee shall be consisted of persons appointed by the directors or shareholders in a general meeting.

If a liquidation committee is not established within the stipulated period, the company's creditors can apply to the People's Court to appoint members of the liquidation committee to conduct the liquidation.

The liquidation committee shall notify the company's creditors within 10 days after its establishment, and issue public notices in the newspapers within 60 days. A creditor shall lodge his claim with the liquidation committee within 30 days after receiving notification, or within 45 days of the public notice if he did not receive any notification.

The liquidation committee shall exercise the following powers during the liquidation period:

(i)     to handle the company's assets and to prepare a balance sheet and an inventory of the assets;

(ii)    to notify creditors and issue public notices;

(iii)   to deal with and settle any outstanding businesses of the company;

(iv)    to pay any tax overdue and any tax arisen during the course of the liquidation;

(v)     to settle the company's claims and liabilities;

ALRMH-CNBM00000533

(vi)  to handle the surplus assets of the company after its debts have been paid off; and

(vii)  to represent the company in civil lawsuits.

The company's assets shall be applied towards the payment of the liquidation expenses, wages owed to the employees, social insurance expenses, statutory compensations, tax overdue and debts of the company. Any surplus assets shall be distributed to the shareholders of the company in proportion to the number of shares held by them.

A company shall subsist during the liquidation period, but shall not engage in operation activities not related with the liquidation.

If the liquidation committee becomes aware that the company does not have sufficient assets to meet its liabilities, it must apply to the People's Court for a declaration for bankruptcy. Following such declaration, the liquidation committee shall hand over all affairs of the liquidation to the People's Court.

Upon completion of the liquidation, the liquidation committee shall submit a liquidation report to the shareholders' general meeting or the People's court for verification. Thereafter, the report shall be submitted to the companies registration authority in order to cancel the company's registration, and a public notice of its termination shall be issued.

Members of the liquidation committee are required to discharge their duties honestly and in compliance with the relevant laws. A member of the liquidation committee is liable to indemnify the company and its creditors in respect of any loss arising from his willful or material default.

*Overseas listing*

The shares of a company shall only be listed overseas after obtaining approval from the securities regulatory authority of the State Council and the listing must be arranged in accordance with procedures specified by the State Council.

According to the Special Regulations, a company's plan to issue overseas listed foreign invested shares and domestic shares which has been approved by the CSRC may be implemented by the board of directors of the company by way of separate issues, within 15 months after approval is obtained from the CSRC.

*Loss of share certificates*

A shareholder may apply, in accordance with the relevant provisions set out in the PRC Civil Procedure Law, to a People's Court in the event that share certificates in registered form are either stolen or lost, for a declaration that such certificates will no longer be valid. After such a declaration has been obtained, the shareholder may apply to the company for the issuance of replacement certificates.

The Mandatory Provisions provide for a separate procedure regarding loss of H share certificates (which has been incorporated in the Articles of Association, a summary of which is set out in Appendix VII).

ALRMH-CNBM00000534

## APPENDIX VI        SUMMARY OF PRINCIPAL PRC LEGAL AND REGULATORY PROVISIONS

*Suspension and termination of listing*

The trading of shares of a company on a stock exchange may be suspended if so decided by CSRC under one of the following circumstances:

(i)    the registered capital or shareholding distribution no longer comply with the necessary requirements for a listed company;

(ii)   the company failed to make public its financial position in accordance with the requirements or there is false information in the company's financial report;

(iii)  the company has committed a major breach of the law; or

(iv)   the company has incurred losses for each of the preceding three years.

Under the circumstances referred to in (ii) and (iii) above, where an investigation has revealed that the consequences are serious, or under the circumstances referred to in (i) and (iv) above, where the situation has not been rectified within the time stipulated, CSRC may decide to terminate the listing of a company's shares.

CSRC may also terminate the listing of a company's shares in the event that the company resolves to cease operation or is so instructed by its government supervisory body, or the company is declared bankrupt.

*Merger and demerger*

Companies may merge through merger by absorption or through the establishment of a newly merged entity. In the case of merger by absorption, the company which is absorbed shall be dissolved. In the case of merger by forming a new corporation, both companies will be dissolved.

A merger agreement must be signed in the case of a merging of companies and the relevant companies shall draw up their respective balance sheets and inventory of property. The companies should within 10 days inform their respective creditors and publish a notice in newspapers within 30 days of the resolution to merge. Those creditors who had not received written notice may within 45 days of the published notice, or within 30 days after receiving written notice, request the company to repay any outstanding debts or provide corresponding guarantees. Newly established or reserved entities upon merger shall take-over the debts of the companies involved in the merger.

When a company demerges into two companies, their respective assets must be separated and balance sheets and inventory of property must be drawn up.

The company should notify its creditors within 10 days from the date such resolution being passed and publish a notice advertising the same in newspapers within 30 days.

Changes in registrable particulars of the companies caused by merger or demerger must be registered in accordance with applicable laws.

ALRMH-CNBM00000535

## APPENDIX VI      SUMMARY OF PRINCIPAL PRC LEGAL AND REGULATORY PROVISIONS

### 2.      Securities Law and Supervision

Since 1992, the PRC has promulgated a number of regulations in relation to the issue of and trading in securities and disclosure of information.

In October 1992, the State Council established the Securities Commission and the CSRC. The Securities Commission is responsible for coordinating the drafting of securities regulations, formulating securities-related policies, planning the development of securities markets, directing, coordinating and supervising all securities-related institutions in the PRC and administering the CSRC. The CSRC is the regulatory arm of the Securities Commission and is responsible for the drafting of regulatory provisions governing securities markets, supervising securities companies, regulating public offers of securities by PRC companies in the PRC or overseas, regulating the trading of securities, compiling securities-related statistics and undertaking research and analysis. In early 1998, the State Council dissolved the Securities Commission and the former functions of the Securities Commission were assumed by the CSRC.

On April 22, 1993, the State Council promulgated the Provisional Regulations Concerning the Issue and Trading of Shares. These regulations deal with the application and approval procedures for public offerings of equity securities, trading in equity securities, the acquisition of listed companies, deposit, settlement, and transfer of listed equity securities, the disclosure of information with respect to a listed company, enforcement and penalties and dispute settlement. These regulations specifically provide that separate provisions will be promulgated in relation to the issue of and trading in special Renminbi-denominated shares. However, (i) if a PRC joint stock limited company proposes to issue Renminbi-denominated ordinary shares as well as special Renminbi-denominated shares, it has to comply with these regulations in respect of regulations governing Renminbi-denominated ordinary shares; (ii) if a PRC company proposes to offer shares directly or indirectly outside the PRC, it will require the approval of the Securities Commission; and (iii) provisions of these regulations in relation to acquisitions of listed companies and disclosure of information are expressed to apply to listed companies in general without being confined to listed companies on any particular stock exchange. Hence it is possible that such provisions may be applicable to joint stock limited companies with shares listed on a stock exchange outside the PRC including, for instance, joint stock limited companies with shares listed on the Hong Kong Stock Exchange, such as the Company.

On June 12, 1993, pursuant to the Provisional Regulations Concerning the Issue and Trading of Shares, the CSRC promulgated the Implementation Measures (Provisional) on Disclosure of Corporate Information of Public Issue of Shares. Pursuant to these measures, the CSRC is responsible for supervising the disclosure of information by companies which have offered shares to the public. These measures contain provisions regarding prospectuses and listing reports to be issued in connection with a public offering of shares in the PRC, publication of interim and final reports and announcement of material transactions or matters by companies which have offered shares to the public. Material transactions or matters are those the occurrence of which may have a material effect on the share price of a company. They include changes to a company's articles of association or registered capital, removal of auditors, mortgage or disposal of major operating assets or writing down the value of such assets where the amount being written down exceeds 30% of the total value of such assets, revocation by a court of any resolution passed at the general meetings or at the meetings of the supervisory committee of a company and the merger or demerger of a company. These measures also contain disclosure provisions in relation to acquisition of listed companies which supplement the requirements contained in the Provisional Regulations Concerning the Issue and Trading of Shares.

ALRMH-CNBM00000536

## APPENDIX VI      SUMMARY OF PRINCIPAL PRC LEGAL AND REGULATORY PROVISIONS

On September 2, 1993, the Securities Commission promulgated the Provisional Measures Prohibiting Fraudulent Conduct relating to Securities. The prohibitions imposed by these measures include the use of insider information in connection with the issue of or trading in securities (insider information being defined to include undisclosed material information known to any insider, which may affect the market price of securities); the use of funds or information or the abuse of power in creating a false or disorderly market or influencing the market price of securities or inducing investors to make investment decisions without knowledge of actual circumstances; and the making of any statement in connection with the issue of and trading in securities which is false or materially misleading and in respect of which there is any material omission. Penalties imposed for contravening any of the provisions of the measures include, amongst others: fines, confiscation of profits and suspension of trading. In serious cases, criminal liability may be imposed.

On December 25, 1995, the State Council promulgated the Regulations of the State Council Concerning the Domestic Listed Foreign Shares of Joint Stock Limited Companies. These regulations deal mainly with the issue, subscription and trading of, and declaration of dividends and other distributions or domestic listed foreign shares and disclosure of information of joint stock limited companies having domestic listed foreign shares.

On December 29, 1998, the Securities Law of the PRC was passed by the Standing Committee of the National People's Congress. This is the first national securities law in the PRC and is the fundamental law comprehensively regulating activities such as the issuance and trading of securities in the PRC securities market. The Securities Law became effective on July 1, 1999 and was amended on August 28, 2004. On October 27, 2005, the Standing Committee of the Tenth NPC reviewed and passed the new amended Securities Law which came into effect from January 1, 2006. The Securities Law is applicable to the issuance and trading in the PRC of shares, company bonds and other securities designated by the State Council according to law. Where the Securities Law does not regulate, the Company Law and other applicable laws and administrative regulations regarding securities will apply.

On March 29, 1999, the State Economic and Trade Commission and the CSRC promulgated the Opinion on the Further Promotion of the Regular Operation and In-Depth Reform of Companies Listed Overseas (the "Opinion") which is aimed at regulating the internal operation and management of PRC companies listed overseas. The Company will be subject to the Opinion upon listing of the H Shares on the Stock Exchange. The Opinion regulates, amongst others, the appointments and functions of external directors and independent directors in the board of directors; and the appointment and functions of external supervisors and independent supervisors in the supervisory committee.

On July 14, 1999, the CSRC promulgated the Notice on Issues Regarding Application for Overseas Listing by Enterprises which sets out the requirements to be satisfied by Chinese enterprises seeking overseas main board listing, and matters including the approval procedure and the submission of documents.

### 3.    The Arbitration Law

The Arbitration Law of the PRC (the "Arbitration Law") was promulgated by the Standing Committee of the NPC on August 31, 1994 and came into effect on September 1, 1995. It is applicable to trade disputes involving foreign parties where the parties have entered into a written agreement to refer the matter to arbitration before an arbitration committee constituted in accordance with the Arbitration Law. Under the Arbitration Law, an arbitration committee may, before the promulgation by the PRC Arbitration Association

ALRMH-CNBM00000537

## APPENDIX VI        SUMMARY OF PRINCIPAL PRC LEGAL AND REGULATORY PROVISIONS

of arbitration regulations, formulate interim arbitration rules in accordance with the Arbitration Law and the PRC Civil Procedure Law. Where the parties have by agreement provided arbitration as a method for dispute resolution, the parties are not permitted to institute legal proceedings in a People's Court except when the arbitration agreement is not valid.

The Listing Rules and the Mandatory Provisions require an arbitration clause to be included in the articles of association of a company listed in Hong Kong and in the case of the Listing Rules, also in a contract between the company and each director and supervisor, to the effect that whenever any dispute or claim arises from any rights or obligations provided in the Articles of Association, the Company Law and other relevant laws and administrative regulations concerning the affairs of a company between (i) a holder of overseas listed foreign shares and the company; (ii) a holder of overseas listed foreign shares and a holder of domestic shares; (iii) a holder of overseas listed foreign shares and the directors, supervisors, managers or other senior officers of the company, unless otherwise specified in the Articles of Association, such parties shall submit that dispute or claim to arbitration before either the China International Economic and Trade Arbitration Commission ("CIETAC") or the Hong Kong International Arbitration Centre ("HKIAC") for arbitration. If the party seeking arbitration elects to arbitrate the dispute or claim at the HKIAC, then either party may apply to have such arbitration conducted in Shenzhen according to the securities arbitration rules of the HKIAC. CIETAC is an economic and trade affairs arbitration organ in the PRC. Pursuant to the China International Economic and Trade Arbitration Commission Arbitration Rules, effective on May 1, 2005, CIETAC's jurisdiction covers disputes relating to the Hong Kong Special Administrative Region. CIETAC is located in Beijing with branches in Shenzhen and Shanghai.

Under the Arbitration Law, an arbitral award is final and binding on the parties and if a party fails to comply with an award, the other party to the award may apply to the People's Court for enforcement. A People's Court may refuse to enforce an arbitral award made by an arbitration body if there are certain procedural or membership irregularities or the award exceeds the scope of the arbitration agreement or is outside the jurisdiction of the arbitration commission.

A party seeking to enforce an arbitral award of a foreign affairs arbitration organ of the PRC against a party who or whose property is not within the PRC may apply to a foreign court with jurisdiction over the case for enforcement. Similarly, an arbitral award made by a foreign arbitration body may be recognized and enforced by the PRC courts in accordance with the principles of reciprocity or any international treaty concluded or acceded to by the PRC. The PRC acceded to the New York Convention adopted on June 10, 1958 pursuant to a resolution of the Standing Committee of the NPC passed on December 2, 1986. The New York Convention provides that all arbitral awards made by a state which is a party to the New York Convention shall be recognized and enforced by other parties to the New York Convention subject to their right to refuse enforcement under certain circumstances including where the enforcement of the arbitral award is against the public policy of the state to which the application for enforcement is made. It was declared by the Standing Committee of the NPC simultaneously with the accession of the PRC that (i) the PRC will only recognize and enforce foreign arbitral awards on the principle of reciprocity and (ii) the PRC will apply the New York Convention in dispute considered under PRC laws to be arising from contractual or non-contractual mercantile legal relations. Following the resumption of sovereignty over Hong Kong by the PRC on July 1, 1997, the New York Convention no longer applies to the enforcement of Hong Kong arbitration awards in other parts of the PRC. A Memorandum of Understanding on the Arrangement for

ALRMH-CNBM00000538

Reciprocal Enforcement of Arbitral Awards between Hong Kong and China has been signed on June 21, 1999. The arrangement was made in accordance with the spirit of the New York Convention. To meet present day's needs, it will allow awards made over 100 China arbitral authorities with relevant experience to be enforced in Hong Kong. Under the agreed arrangement, Hong Kong arbitration awards will also be enforceable in the PRC. This new arrangement has been approved by Hong Kong legislative council and the Supreme People's Court of the PRC and became effective on February 1, 2000.

**4.    Foreign Exchange Controls**

The lawful currency of the PRC is the Renminbi, which is subject to foreign exchange controls and is not freely convertible into foreign exchange at this time. The SAFE, under the authority of the PBOC, is empowered with the functions of administering all matters relating to foreign exchange, including the enforcement of foreign exchange control regulations.

On December 28, 1993, the PBOC, under the authority of the State Council, promulgated the Notice of the People's Bank of China Concerning Further Reform of the Foreign Currency Control System (the "Notice"), effective from January 1, 1994. The Notice announces the abolition of the system of foreign exchange quotas, the implementation of conditional convertibility of Renminbi in current account items, the establishment of the system of settlement and payment of foreign exchange by banks, and the unification of the official Renminbi exchange rate and the market rate for Renminbi established at swap centers. On March 26, 1994, the PBOC promulgated the "Provisional Regulations for the Administration of Settlement, Sale and Payment of Foreign Exchange" (the "Provisional Regulations"). The Provisional Regulations set out detailed provisions regulating the sale and purchase of foreign exchange by enterprises, economic organizations and social organizations in the PRC.

On January 29, 1996, the State Council promulgated new Regulations of the People's Republic of China for the Control of Foreign Exchange ("Control of Foreign Exchange Regulations") which became effective from April 1, 1996. The Control of Foreign Exchange Regulations classify all international payments and transfers into current account items and capital account items. Current account items are no longer subject to SAFE approval while capital account items still are. The Control of Foreign Exchange Regulations were subsequently amended on January 14, 1997. This latest amendment affirmatively states that the State shall not restrict international current account payments and transfers.

On June 20, 1996, the PBOC promulgated the "Regulations for Administration of Settlement, Sale and Payment of Foreign Exchange" (the "Settlement Regulations") which became effective on July 1, 1996. The Settlement Regulations supersede the Provisional Regulations and abolish the remaining restrictions on convertibility of foreign exchange in respect of current account items while retaining the existing restrictions on foreign exchange transactions in respect of capital account items. On the basis of the Settlement Regulations, the PBOC also published the Announcement on the Implementation of Foreign Exchange Settlement and Sale at Banks by Foreign-invested Enterprises (the "Announcement"). The Announcement permits foreign-invested enterprises to open, on the basis of their needs, foreign exchange settlement accounts for current account receipts and payments of foreign exchange along with specialized accounts for capital account receipts and payments at designated foreign exchange banks.

ALRMH-CNBM00000539

On October 25, 1998, the PBOC and the SAFE promulgated the Notice Concerning the Discontinuance of Foreign Exchange Swapping Business pursuant to which and with effect from December 1, 1998, all foreign exchange swapping business in the PRC for foreign-invested enterprises shall be discontinued, while the trading of foreign exchange by foreign-invested enterprise shall come under the banking system for the settlement and sale of foreign exchange.

On January 1, 1994, the former dual exchange rate system for Renminbi has been abolished and replaced by a managed unified floating exchange rate system, which is determined by demand and supply. The PBOC sets and publishes daily the Renminbi-U.S. dollar base exchange rate. This exchange rate is determined with reference to the trading price for Renminbi-U.S. dollar in the inter-bank foreign exchange market on the previous day. The PBOC will also, with reference to exchange rates in the international foreign exchange market, announce the exchange rates of Renminbi against other major currencies. In foreign exchange transactions, designated foreign exchange banks may, within a specified range, freely determine the applicable exchange rate in accordance with the exchange rate announced by the PBOC.

Foreign exchange income from loans issued by organizations outside the territory or from the issuance of bonds and shares (for example foreign exchange income received by the Company from the sale of shares overseas) is not required to be sold to designated foreign exchange banks, but may be deposited in foreign exchange accounts at the designated foreign exchange banks.

Chinese enterprises (including foreign-invested enterprises) which require foreign exchange for transactions relating to current account items, may, without the approval of SAFE, effect payment from their foreign exchange account or convert and pay at the designated foreign exchange banks, on the strength of valid receipts and proof. Foreign-invested enterprises which need foreign exchange for the distribution of profits to their shareholders, and other Chinese enterprises which in accordance with regulations are required to pay dividends to shareholders in foreign exchange (like the Company), may on the strength of board resolutions on the distribution of profits and other relevant documents, effect payment from their foreign exchange account or convert and pay at the designated foreign exchange banks.

Convertibility of foreign exchange in respect of capital account items, like direct investment and capital contribution, is still subject to restriction, and prior approval from SAFE and/or its relevant branch must be sought.

Dividends to holders of H Shares are fixed in Renminbi but must be paid in Hong Kong dollars.

**5.      Hong Kong Laws and Regulations**

*(a)    Company Law*

The Hong Kong law applicable to a company having share capital incorporated in Hong Kong is based on the Companies Ordinance and is supplemented by common law. The Company, which is a joint stock limited company established in the PRC seeking a Listing is governed by the PRC Company Law which came into effect on July 1, 1994 and was amended on December 25, 1999, on August 28, 2004 and on October 27, 2005 and all other rules and regulations promulgated pursuant to the PRC Company Law applicable to a joint stock limited company established in the PRC issuing overseas listed foreign shares to be listed on the Stock Exchange.

ALRMH-CNBM00000540

## APPENDIX VI        SUMMARY OF PRINCIPAL PRC LEGAL AND REGULATORY PROVISIONS

Set out below is a summary of the material differences between the Hong Kong company law applicable to a company incorporated in Hong Kong and the PRC Company Law applicable to a joint stock limited company incorporated and existing under the PRC Company Law. This summary is, however, not intended to be an exhaustive comparison:

*(i)    Corporate existence*

Under Hong Kong company law, a company having share capital is incorporated by the Registrar of Companies in Hong Kong issuing a certificate of incorporation and upon its incorporation, a company will acquire an independent corporate existence. A company may be incorporated as a public company or a private company. The articles of association of a private company incorporated in Hong Kong are required by the Companies Ordinance to contain certain pre-emptive provisions. A public company does not contain such pre-emptive provisions in its articles of association.

Under the PRC Company Law, a company may be incorporated by either the promotion method or the public subscription method. A company must have a minimum registered capital of RMB5 million, or higher as may otherwise be required by the laws and regulations. Hong Kong law does not prescribe any minimum capital requirements for a Hong Kong company. Under the PRC Company Law, the monetary contributions by all the shareholders must not be less than 30% of the registered capital. There is no such restriction on a Hong Kong company under Hong Kong law.

*(ii)    Share capital*

Under Hong Kong law, the authorized share capital of a Hong Kong company is the amount of share capital which the company is authorized to issue and a company is not bound to issue the entire amount of its authorized share capital. For a Hong Kong company, the authorized share capital may be larger than the issued share capital. Hence, the directors of a Hong Kong company may, with the prior approval of the shareholders, if required, cause the company to issue new shares. The PRC Company Law does not recognize the concept of authorized share capital. The registered capital of a joint stock limited company is the amount of the issued share capital. Any increase in registered capital must be approved by the shareholders in general meeting and by the relevant PRC governmental and regulatory authorities.

*(iii)    Restrictions on shareholding and transfer of shares*

Under PRC law, the domestic shares ("domestic shares") in the share capital of a joint stock limited company which are denominated and subscribed for in Renminbi may only be subscribed or traded by the State, PRC legal and natural persons. The overseas listed foreign shares ("foreign shares") issued by a joint stock limited company which are denominated in Renminbi and subscribed for in a currency other than Renminbi may only be subscribed and traded by investors from Hong Kong, the Macau Special Administrative Region of the PRC and Taiwan or any country and territory outside the PRC. Under the PRC Company Law, shares in a joint stock limited company held by its promoters cannot be transferred within one year after the date of establishment of the company. Shares in issue prior to the company's public offering cannot be transferred within one year from the listing date of the shares on the Stock Exchange. Shares in a joint stock limited company held by its directors, supervisors and managers and transferred each year during their term of office shall not exceed 25% of the total shares they held in the company, and the shares they held in the company cannot be transferred within one year from the listing date of the shares, and also

ALRMH-CNBM00000541

cannot be transferred within half a year after the said personnel has left office. The articles of association may set other restrictive requirements on the transfer of the company's shares held by its directors, supervisors and officers. There are no such restrictions on shareholdings and transfers of shares under Hong Kong law.

*(iv)   Financial assistance for acquisition of shares*

The PRC Company Law does not contain any provision prohibiting or restricting a joint stock limited company or its subsidiaries from providing financial assistance for the purpose of an acquisition of its own or its holding company's shares. The Mandatory Provisions contain certain restrictions on a company and its subsidiaries providing such financial assistance similar to those under Hong Kong company law.

*(v)   Variation of class rights*

Under Hong Kong company law, if the share capital of a company is divided into different classes of shares, special rights attaching to any class of shares may only be varied if approved by a specified proportion of the holders of the relevant class. The PRC Company Law does not contain any specific provision relating to variation of class rights. The Mandatory Provisions contain detailed provisions relating to circumstances which are deemed to constitute a variation of class rights. Under the Mandatory Provisions, class rights may not be varied or abrogated unless approved by a special resolution of shareholders in general meeting and by two-thirds or more of the votes cast by shareholders of the affected class present in person or by proxy at a separate class meeting. For the purpose of a variation of class rights, domestic shares and foreign shares are treated as separate classes of shares except in the case of (i) an issue of shares by the joint stock limited company in any 12 month period either separately or concurrently following the approval by a special resolution of shareholders in general meeting not exceeding 20% of each of the existing domestic shares and foreign shares existing as at the date of such special resolution; and (ii) an issue of domestic shares and foreign shares in accordance with the plan of the company approved by the securities authority and which are completed within 15 months from the date of such approval. See "Appendix VII — Summary of Articles of Association — Variation of rights of existing Shares or classes of Shares."

*(vi)   Directors*

The PRC Company Law, unlike Hong Kong company law, does not contain any requirements relating to the declaration of interests in material contracts, restrictions on interested directors being counted towards the quorum of and voting at a meeting of the board of directors at which a transaction in which a director is interested is being considered, restrictions on directors' authority in making major dispositions, restrictions on companies providing certain benefits such as loans to directors and guarantees in respect of directors' liability and prohibition against compensation for loss of office without shareholders' approval. The Mandatory Provisions, however, contain requirements and restrictions in relation to the foregoing matters similar to those applicable under Hong Kong law.

*(vii)   Supervisory committee*

Under the PRC Company Law, the board of directors of a joint stock limited company is subject to the supervision and inspection of a supervisory committee but there is no mandatory requirement for the

ALRMH-CNBM00000542

establishment of a supervisory committee for a company incorporated in Hong Kong. The Mandatory Provisions provide that each supervisor owes a duty, in the exercise of his powers, to act in good faith and honestly in what he considers to be in the best interests of the company and to exercise the care, diligence and skill that a reasonably prudent person would exercise under comparable circumstances.

*(viii) Derivative action by minority shareholders*

Hong Kong law permits minority shareholders to start a derivative action on behalf of a company against directors who have been guilty of a breach of their fiduciary duties to the company, if such directors control a majority of votes at a general meeting thereby effectively preventing a company from suing the directors in breach of their duties in its own name. The PRC Company Law gives shareholders of a joint stock limited company the right that in the event that the directors and senior managers violate their fiduciary obligations to a company, shareholders individually or jointly holding over 1% of the shares in the company for more than 180 days consecutively may request in writing the supervisory committee to initiate proceedings in the People's Court. In the event that the supervisory committee violates their fiduciary obligations to a company, the above said shareholders may request in writing the board of directors to initiate proceedings in the People's Court. Upon receipt of such request in writing from the shareholders, if the supervisory committee or the board of directors refuse to initiate such proceedings, or has not initiated proceedings within 30 days upon receipt of the request, or if under urgent situations, failure of initiating immediate proceeding may cause irremediable damages to the company, the above said shareholders shall for the benefit of the company's interests, have the right to initiate proceedings directly to the court in its own name. The Mandatory Provisions further provide remedies to the company against directors, supervisors and officers in breach of their duties to the company. In addition, every director and supervisor of a joint stock limited company applying for a listing of its foreign shares on the Stock Exchange is required to give an undertaking in favor of the company to comply with the company's articles of association. This allows minority shareholders to act against directors and supervisors in default.

*(ix)   Protection of minorities*

Under Hong Kong law, a shareholder who complains that the affairs of a company incorporated in Hong Kong are conducted in a manner unfairly prejudicial to his interests may petition to court to either wind up the company or make an appropriate order regulating the affairs of the company. In addition, on the application of a specified number of members, the Financial Secretary may appoint inspectors who are given extensive statutory powers to investigate the affairs of a company incorporated in Hong Kong. The PRC law does not contain similar safeguards. The Mandatory Provisions, however, contain provisions to the effect that a controlling shareholder may not exercise its voting rights in a manner prejudicial to the interests of the shareholders generally or of some part of the shareholders of a company to relieve a director or supervisor of his duty to act honestly in the best interests of the company or to approve the expropriation by a director or supervisor of the company's assets or the individual rights of other shareholders.

*(x)   Notice of shareholders' meetings*

Under the PRC Company Law, notice of a shareholders' general meeting must be given 20 days before the meeting, while notice of an extraordinary meeting must be given 15 days before the meeting or, in the case of a company having bearer shares, a public announcement of a shareholders' general meeting must be made 30 days prior to it being held. Under the Special Regulations and the Mandatory Provisions, 45 days'

ALRMH-CNBM00000543

written notice must be given to all shareholders and shareholders who wish to attend the meeting must reply in writing 20 days before the date of the meeting. For a company incorporated in Hong Kong, the minimum notice periods of a general meeting convened for passing an ordinary resolution and a special resolution are 14 days and 21 days, respectively; and the notice period for an annual general meeting is 21 days.

*(xi)  Quorum for shareholders' meetings*

Under Hong Kong law, the quorum for a general meeting is two members unless the articles of association of the company otherwise provide. For one member companies, one member will be a quorum. The PRC Company Law does not specify any quorum requirement for shareholders' general meeting but the Special Regulations and the Mandatory Provisions provide that a company's general meeting can be convened when replies to the notice of that meeting have been received from shareholders whose shares represent 50% of the voting rights in the company at least 20 days before the proposed date of the meeting. If that 50% level is not achieved, the company shall within five days notify shareholders by public announcement and the shareholders' general meeting may be held thereafter.

*(xii)  Voting*

Under Hong Kong law, an ordinary resolution is passed by a simple majority of votes cast by members present in person or by proxy at a general meeting and a special resolution is passed by a majority of not less than three-fourths of votes cast by members present in person or by proxy at a general meeting. Under the PRC Company Law, the passing of any resolution requires more than one half of the votes cast by shareholders present in person or by proxy at a shareholders' general meeting except in cases of proposed amendment to the articles of association, increase or reduction of share capital, and merger, demerger or dissolution of a joint stock limited company or changes to the company status, which require two-thirds or more of votes cast by shareholders present at a shareholders' general meeting.

*(xiii)  Financial disclosure*

A joint stock limited company is required under the PRC Company Law to make available at its office for inspection by shareholders its annual balance sheet, profit and loss account, changes in financial position and other relevant annexures 20 days before the annual general meeting of shareholders. In addition, a company established by the public subscription method under the PRC Company Law must publish its financial situation. The annual balance sheet has to be verified by registered accountants. The Companies Ordinance requires a company to send to every shareholder a copy of its balance sheet, auditors' report and directors' report which are to be laid before the company in its annual general meeting not less than 21 days before such meeting.

A joint stock limited company is required under the PRC law to prepare its financial statements in accordance with the PRC accounting standards. The Mandatory Provisions require that the company must, in addition to preparing accounts according to the PRC standards, have its accounts prepared and audited in accordance with International Accounting Standards or Hong Kong accounting standards and its financial statements must also contain a statement of the financial effect of the material differences (if any) from the financial statements prepared in accordance with the PRC accounting standards.

ALRMH-CNBM00000544

## APPENDIX VI          SUMMARY OF PRINCIPAL PRC LEGAL AND REGULATORY PROVISIONS

The Special Regulations require that there should not be any inconsistency between the information disclosed within and outside the PRC and that, to the extent that there are differences in the information disclosed in accordance with the relevant PRC and overseas laws, regulations and requirements of the relevant stock exchanges, such differences should also be disclosed simultaneously.

*(xiv)  Information on directors and shareholders*

Under the PRC Company Law, neither the public nor the shareholders of a joint stock limited company have access to information on its directors and shareholders. Under the Mandatory Provisions, shareholders have the right to inspect and copy (at reasonable charges) certain information about shareholders and directors similar to that available under Hong Kong law to shareholders of a company incorporated in Hong Kong.

*(xv)  Receiving agent*

Under both the PRC and Hong Kong law, dividends once declared become debts payable to shareholders. The limitation period for debt recovery action under Hong Kong law is six years while that under the PRC law is two years. The Mandatory Provisions require the appointment of a trust company registered under the Hong Kong Trustee Ordinance (Chapter 29 of the Laws of Hong Kong) as receiving agent to receive on behalf of holders of foreign shares dividends declared and all other monies owed by a joint stock limited company in respect of such foreign shares.

*(xvi)  Corporate reorganization*

Corporate reorganization involving a company incorporated in Hong Kong may be effected in a number of ways, such as a transfer of the whole or part of the business or property of the company in the course of being wound up voluntarily to another company pursuant to section 237 of the Companies Ordinance or a compromise or arrangement between the company and its creditors or between the company and its members pursuant to section 166 of the Companies Ordinance which requires the sanction of the court. Under PRC law, the merger, demerger, dissolution or change to the status of a joint stock limited company has to be approved by shareholders in general meeting.

*(xvii) Arbitration of disputes*

In Hong Kong, disputes between shareholders and a company incorporated in Hong Kong or its directors may be resolved through the courts. The Mandatory Provisions provide that such disputes should be submitted to arbitration at either the HKIAC or the CIETAC, at the claimant's choice.

*(xviii) Mandatory transfers*

Under the PRC Company Law, a joint stock limited company is required to make transfers equivalent to certain prescribed percentages of its after tax profit to the statutory common reserve fund. There are no such requirements under Hong Kong law.

ALRMH-CNBM00000545

*(b)   Listing Rules*

The Listing Rules provide additional requirements which apply to an issuer which is incorporated in the PRC as a joint stock limited company and seeks a primary listing or whose primary listing is on the Stock Exchange. Set out below is a summary of such principal additional requirements which apply to the Company:

*(i)   Accountants' report*

An accountants' report for a PRC issuer will not normally be regarded as acceptable by the Stock Exchange unless the relevant accounts have been audited to a standard comparable to that required in Hong Kong. Such report will normally be required to conform to either Hong Kong or international accounting standards.

*(ii)   Process agent*

The Company is required to appoint and maintain a person authorized to accept service of process and notices on its behalf in Hong Kong throughout the period during which its securities are listed on the Stock Exchange and must notify the Stock Exchange of his appointment, the termination of his appointment and his contact particulars.

*(iii)   Public shareholdings*

If at any time there are existing issued securities of a PRC issuer other than foreign shares ("H shares") which are listed on the Stock Exchange, the Listing Rules require that the aggregate amount of H shares and other securities held by the public must constitute not less than 25% of the PRC issuer's issued share capital and that the class of securities for which listing is sought must not be less than 15% of the issuer's total issued share capital, having an expected market capitalization at the time of listing of not less than HK$ 50,000,000.

The Stock Exchange may, at its discretion, accept a lower percentage of between 15% and 25% in the case of issuers with an expected market capitalization at the time of listing of over HK$ 10,000,000,000 .

*(iv)   Independent non-executive directors and supervisors*

The independent non-executive directors of a PRC issuer are required to demonstrate an acceptable standard of competence and adequate commercial or professional expertise to ensure that the interests of the general body of shareholders will be adequately represented. The supervisors of a PRC issuer must have the character, expertise and integrity and be able to demonstrate a standard of competence commensurate with their position as supervisors.

*(v)   Restrictions on purchase and subscription of its own securities*

Subject to governmental approvals and the provisions of the Articles of Association, the Company may repurchase its own H shares on the Stock Exchange in accordance with the provisions of the Listing Rules. Approval by way of special resolution of the holders of domestic shares and the holders of H shares at separate class meetings conducted in accordance with the Articles of Association is required for share repurchases. In seeking approvals, the Company is required to provide information on any proposed or actual purchases of all or any of its equity securities, whether or not listed or traded on the Stock Exchange. The

VI-27

Directors must also state the consequences of any purchases which will arise under either or both of the Code on Takeovers and Mergers and any similar PRC law of which the directors are aware, if any. Any general mandate given to the directors to repurchase H shares must not exceed 10% of the total amount of existing issued H shares of the Company.

### (vi)    Mandatory Provisions

With a view to increasing the level of protection afforded to investors, the Stock Exchange requires the incorporation, in the articles of association of a PRC company whose primary listing is on the Stock Exchange, of the Mandatory Provisions and provisions relating to the change, removal and resignation of auditors, class meetings and the conduct of the supervisory committee of the Company. Such provisions have been incorporated into the Articles of Association, a summary of which is set out in Appendix VII to this prospectus.

### (vii)    Redeemable Shares

The Company must not issue any redeemable shares unless the Stock Exchange is satisfied that the relative rights of the holders of the H shares are adequately protected.

### (viii)    Pre-emptive rights

Except in the circumstances mentioned below, the Directors are required to obtain the approval by a special resolution of shareholders in general meeting, and the approvals by special resolutions of the holders of domestic shares and H shares (each being otherwise entitled to vote at general meetings) at separate class meetings conducted in accordance with the Articles of Association, prior to (1) authorizing, allotting, issuing or granting shares or securities convertible into shares, or options, warrants or similar rights to subscribe for any shares or such convertible securities; or (2) any major subsidiary of the Company making any such authorization, allotment, issue or grant so as to materially to dilute the percentage equity interest of the Company and its shareholders in such subsidiary.

No such approval will be required, but only to the extent that, the existing shareholders of the Company have by special resolution in general meeting given a mandate to the Directors, either unconditionally or subject to such terms and conditions as may be specified in the resolution, to authorize, allot or issue, either separately or concurrently once every 12 months, not more than 20% of the existing Domestic Shares and H Shares as at the date of the passing of the relevant special resolution or of such shares that are part of the Company's plan at the time of its establishment to issue Domestic Shares and H Shares and which plan is implemented within 15 months from the date of approval by the CSRC.

### (ix)    Supervisors

The Company is required to adopt rules governing dealings by its Supervisors in securities of the Company in terms no less exacting than those of the model code (set out in Appendix 10 to the Listing Rules) issued by the Stock Exchange.

The Company is required to obtain the approval of its shareholders in a general meeting (at which the relevant Supervisor and his associates shall not vote on the matter) prior to the Company or any of its

ALRMH-CNBM00000547

subsidiaries entering into a service contract of the following nature with a Supervisor or proposed Supervisor of the Company or its subsidiary: (i) the contract is for a duration that may exceed three years; or (ii) the contract expressly requires the Company to give more than one year's notice or to pay compensation or make other payments equivalent to more than one year's emoluments.

The remuneration committee of the Company or an independent board committee must form a view in respect of service contracts that require shareholders' approval and advise shareholders (other than shareholders with a material interest in the service contracts and their associates) as to whether the terms are fair and reasonable, advise whether such contracts are in the interests of the Company and its shareholders as a whole and advise shareholders on how to vote.

*(x)   Amendment to the Articles of Association*

The Company is required not to permit or cause any amendment to be made to its Articles of Association which would cause the same to cease to comply with the mandatory provisions of the Listing Rules relating to such Articles of Association.

*(xi)  Documents for inspection*

The Company is required to make available at a place in Hong Kong for inspection by the public and shareholders free of charge, and for copying by shareholders at reasonable charges the following:

—   a complete duplicate register of shareholders;

—   a report showing the state of the issued share capital of the Company;

—   the Company's latest audited financial statements and the reports of the Directors, auditors and Supervisors (if any) thereon;

—   special resolutions of the Company;

—   reports showing the number and nominal value of securities repurchased by the Company since the end of the last financial year, the aggregate amount paid for such securities and the maximum and minimum prices paid in respect of each class of securities repurchased (with a breakdown between domestic Shares and H Shares);

—   a copy of the latest annual return filed with the State Administration of Industry and Commerce of the PRC; and

—   for shareholders only, copies of minutes of meetings of shareholders.

*(xii) Receiving agents*

The Company is required to appoint one or more receiving agents in Hong Kong and pay to such agent(s) dividends declared and other monies owing in respect of the H Shares to be held, pending payment, in trust for the holders of such H Shares.

ALRMH-CNBM00000548

**APPENDIX VI       SUMMARY OF PRINCIPAL PRC LEGAL AND REGULATORY PROVISIONS**

*(xiii) Statements in share certificates*

The Company is required to ensure that all its listing documents and share certificates include the statements stipulated below and to instruct and cause each of its share registrars not to register the subscription, purchase or transfer of any of its shares in the name of any particular holder unless and until such holder delivers to such share registrar a signed form in respect of such shares bearing statements to the following effect that the acquirer of shares:

— agrees with the Company and each shareholder of the Company, and the Company agrees with each shareholder of the Company, to observe and comply with the PRC Company Law, the Special Regulations, the Articles of Association and other relevant laws and administrative regulations;

— agrees with the Company, each shareholder, Director, Supervisor, manager and officer of the Company, and the Company acting for itself and for each Director, Supervisor, manager and officer of the Company agrees with each shareholder, to refer all differences and claims arising from the Articles of Association or any rights or obligations conferred or imposed by the PRC Company Law or other relevant laws and administrative regulations concerning the affairs of the Company to arbitration in accordance with the Articles of Association, and any reference to arbitration shall be deemed to authorize the arbitration tribunal to conduct hearings in open session and to publish its award. Such arbitration shall be final and conclusive;

— agrees with the Company and each shareholder of the Company that the H Shares are freely transferable by the holder thereof; and

— authorizes the Company to enter into a contract on his behalf with each Director and officer of the Company whereby each such Director and officer undertakes to observe and comply with his obligation to shareholders as stipulated in the Articles of Association.

*(xiv) Compliance with the PRC Company Law, the Special Regulations and the Articles of Association*

The Company is required to observe and comply with the PRC Company Law, the Special Regulations and the Articles of Association.

*(xv) Contract between the Company and its Directors, officers and Supervisors*

The Company is required to enter into a contract in writing with every Director and officer containing at least the following provisions:

— an undertaking by the Director or officer to the Company to observe and comply with the PRC Company law, the Special Regulations, the Articles of Association, the Codes on Takeovers and Mergers and Share Repurchases and an agreement that the Company shall have the remedies provided in the Articles of Association and that neither the contract nor his office is capable of assignment;

ALRMH-CNBM00000549

— an undertaking by the Director or officer to the Company acting as agent for each shareholder to observe and comply with his obligations to shareholders as stipulated in the Articles of Association;

— an arbitration clause which provides that whenever any differences or claims arise from that contract, the Articles of Association or any rights or obligations conferred or imposed by the PRC Company Law or other relevant law and administrative regulations concerning the affairs of the Company between the Company and its Directors or officers and between a holder of H Shares and a Director or officer of the Company, such differences or claims will be referred to arbitration at either the CIETAC in accordance with its rules or the HKIAC in accordance with its Securities Arbitration Rules, at the election of the claimant and that once a claimant refers a dispute or claim to arbitration, the other party must submit to the arbitral body elected by the claimant. Such arbitration will be final and conclusive;

— if the party seeking arbitration elects to arbitrate the dispute or claim at HKIAC, then either party may apply to have such arbitration conducted in Shenzhen according to the Securities Arbitration Rules of HKIAC;

— PRC laws shall govern the arbitration of disputes or claims referred to above, unless otherwise provided by law or administrative regulations;

— the award of the arbitral body is final and shall be binding on the parties thereto;

— the agreement to arbitrate is made by the Director or officer with the Company on its own behalf and on behalf of each shareholder; and

— any reference to arbitration shall be deemed to authorize the arbitral tribunal to conduct hearings in open session and to publish its award.

The Company is also required to enter into a contract in writing with every Supervisor containing statements in substantially the same terms.

### (xvi) Subsequent listing

The Company must not apply for the listing of any of its foreign shares on a PRC stock exchange unless the Stock Exchange is satisfied that the relative rights of the holders of foreign shares are adequately protected.

### (xvii) English translation

All notices or other documents required under the Listing Rules to be sent by the Company to the Stock Exchange or to holders of H Shares are required to be in the English language, or accompanied by a certified English translation.

ALRMH-CNBM00000550

## APPENDIX VI          SUMMARY OF PRINCIPAL PRC LEGAL AND REGULATORY PROVISIONS

*(xviii) General*

If any change in the PRC law or market practices materially alters the validity or accuracy of any of the basis upon which the additional requirements have been prepared, then the Stock Exchange may impose additional requirements or make listing of the equity securities of a PRC issuer, including the Company, subject to special conditions as the Stock Exchange considers appropriate. Whether or not any such changes in the PRC law or market practices occur, the Stock Exchange retains its general power under the Listing Rules to impose additional requirements and make special conditions in respect of the Listing.

### (c)    Other Legal and Regulatory Provisions

Upon Listing, the provisions of the Securities and Futures Ordinance, the Codes on Takeovers and Mergers and Share Repurchases and such other relevant ordinances and regulations as may be applicable to companies listed on the Stock Exchange will apply to the Company.

### (d)    Securities Arbitration Rules

The Articles of Association provide that certain claims arising from the Articles of Association or the PRC Company Law shall be arbitrated at either the CIETAC or the HKIAC in accordance with their respective rules. The Securities Arbitration Rules of the HKIAC contain provisions allowing an arbitral tribunal to conduct a hearing in Shenzhen for cases involving the affairs of companies incorporated in the PRC and listed on the Stock Exchange so that PRC parties and witnesses may attend. Where any party applies for a hearing to take place in Shenzhen, the tribunal shall, where satisfied that such application is based on bona fide grounds, order the hearing to take place in Shenzhen conditional upon all parties including witnesses and the arbitrators being permitted to enter Shenzhen for the purpose of the hearing. Where a party (other than a PRC party) or any of its witnesses or any arbitrator is not permitted to enter Shenzhen, then the tribunal shall order that the hearing be conducted in any practicable manner, including the use of electronic media. For the purpose of the Securities Arbitration Rules, a PRC party means a party domiciled in the PRC other than the territories of Hong Kong, the Macau Special Administrative Region of the PRC and Taiwan.

## PRC LEGAL MATTERS

Jingtian & Gongcheng Law Office, the Company's legal adviser on PRC law, has sent to the Company a letter dated March 13, 2006, confirming that it has reviewed the summaries of PRC company and securities regulations and the summaries of certain material differences between the Hong Kong company law and the PRC company law in so far as they relate to PRC law as contained in this Appendix and that, in its opinion, such summaries are correct summaries of relevant PRC laws and regulations. This letter is available for inspection as referred to in the section of this prospectus headed "Documents Available for Inspection" in Appendix IX.

Any person wishing to have detailed advice on PRC law and the laws of any jurisdiction with which he is more familiar is recommended to seek independent legal advice.

ALRMH-CNBM00000551

## APPENDIX VII                     SUMMARY OF ARTICLES OF ASSOCIATION

*This Appendix contains a summary of the Articles of Association. The principal objective is to provide potential investors with an overview of the Articles of Association. As the information contained below is a summary form, it does not contain all the information that may be important to potential investors. As stated in the paragraph headed "Documents Available for Inspection" in Appendix IX, a copy of the Articles of Association, together with an English translation, is available for inspection.*

**Directors and other officers**

*Power to allot and issue Shares*

There is no provision in the Articles of Association empowering the Directors to allot and issue Shares.

To increase the capital of our Company, the board of Directors (the Board) is responsible for formulating proposals for approval at a shareholders' general meeting by way of special resolution. Any such increase must be conducted in accordance with the procedures stipulated by the relevant laws and administrative regulations.

*Power to dispose of the assets of our Company or any subsidiary*

The Board is accountable to the shareholders' general meeting.

The Board shall not, without the prior approval of shareholders in a general meeting, dispose or agree to dispose of, any fixed assets of our Company where the aggregate of the amount or value of the consideration, for the proposed disposition, and the amount or value of the consideration for any such disposition of any fixed assets of our Company that has been completed in the period of four (4) months immediately preceding the proposed disposition, exceeds 33% of the value of our Company's fixed assets as shown in the last balance sheet placed before the shareholders in general meeting.

The validity of a disposition by our Company shall not be affected by the breach of the above paragraph.

For the purposes of the Articles of Association, a disposition includes an act involving the transfer of an interest in assets but does not include the provision of fixed assets by way of security.

The Board shall carry out its duties in compliance with the laws, regulations, the Articles of Association and resolutions passed by the shareholders in general meetings.

*Loans to Directors, Supervisors and other officers*

Our Company shall not directly or indirectly make a loan to, or provide any guarantee in connection with, the making of a loan to a Director, Supervisor, manager or other senior administrative officer of our Company or of our Company's holding company or any of their respective associates. However, the following transactions are not subject to such prohibition:

(1)   the provision by our Company of a loan or a guarantee of a loan to a company which is a subsidiary of our Company;

ALRMH-CNBM00000552

(2)   the provision by our Company of a loan or a guarantee in connection with the making of a loan or any other funds to any of its Directors, Supervisors, managers and other senior administrative officers to meet expenditure incurred or to be incurred by him for the purposes of our Company or for the purpose of enabling him to perform his duties properly, in accordance with the terms of a service contract approved by the shareholders in general meeting; and

(3)   Our Company may make a loan to or provide a guarantee in connection with the making of a loan to any of the relevant Directors, Supervisors, general manager, deputy general managers and other senior administrative officers or their respective associates in the ordinary course of its business on normal commercial terms, provided that the ordinary course of business of our Company includes the lending of money or the giving of guarantees.

A loan made by our Company in breach of the above provisions shall be forthwith repayable by the recipient of the loan regardless of the terms of the loan.

A guarantee provided by our Company in breach of the above provisions shall be unenforceable against our Company, unless:

(1)   the guarantee was provided in connection with a loan to an associate of any of the Directors, Supervisors, general manager, deputy general managers and other senior administrative officers of our Company or of our Company's holding company and at the time the loan was advanced the lender did not know the relevant circumstances; or

(2)   the collateral provided by our Company has been lawfully disposed of by the lender to a bona fide purchaser.

For these purposes:

(a)   a guarantee includes an undertaking or property provided to secure the performance of obligations by the obligor; and

(b)   a definition of an associate as referred to in the section headed "— *Duties*" below applies, mutatis mutandis, to this provision.

### Financial assistance for the acquisition of Shares in our Company or any subsidiary

Subject to the exceptions in the Articles of Association, our Company and its subsidiaries shall not, by any means at any time, provide any kind of financial assistance (as defined below) to a person who is acquiring or is proposing to acquire Shares. The said acquiror of Shares of our Company includes a person who directly or indirectly incurs any obligations (as defined below) due to the acquisition of Shares. Our Company and its subsidiaries shall not, by any means at any time, provide financial assistance to the said acquiror for the purpose of reducing or discharging the obligations assumed by that person.

ALRMH-CNBM00000553

## APPENDIX VII                    SUMMARY OF ARTICLES OF ASSOCIATION

The following activities shall not be deemed to be prohibited activities:

(1)   the provision of financial assistance by our Company where the financial assistance is given in good faith in the interest of our Company, and the principal purpose in giving the financial assistance is not for the acquisition of Shares, or the giving of the financial assistance is an incidental part of some larger purpose of our Company;

(2)   the lawful distribution of our Company's assets by way of dividend;

(3)   the allotment of bonus Shares as dividends;

(4)   a reduction of registered capital, a repurchase of Shares or a reorganization of the share capital structure of our Company effected in accordance with the Articles of Association;

(5)   the lending of money by our Company within its scope of business and in the ordinary course of its business, where the lending of money is part of the scope of business of our Company (provided that the net assets of our Company are not thereby reduced or that, to the extent that the assets are thereby reduced, the financial assistance is provided out of distributable profits);

(6)   the provision of money by our Company for contributions to staff and workers' share schemes (provided that the net assets of our Company are not thereby reduced or that, to the extent that the assets are thereby reduced, the financial assistance is provided out of distributable profits).

For these purposes:

(a)   "financial assistance" includes, (without limitation), the following meanings:

    (1)   gift;

    (2)   guarantee (including the assumption of liability by the guarantor or the provision of assets by the guarantor to secure the performance of obligations by the obligor), or compensation (other than compensation in respect of our Company's own default) or release or waiver of any rights;

    (3)   provision of loan or any other agreement under which the obligations of our Company are to be fulfilled before the obligations of another party, or a change in the parties to, or the novation of, or the assignment of rights arising under, such loan or agreement; or

    (4)   any other form of financial assistance given by our Company when our Company is insolvent or has no net assets or when its net assets would thereby be reduced to a material extent.

ALRMH-CNBM00000554

(b) "incurring an obligation" includes the incurring of obligations by the changing of the obligor's financial position by way of contract or the making of an arrangement (whether enforceable or not, and whether made on its own account or with any other persons), or by any other means.

*Disclosure of interests in contracts with our Company or any of its subsidiaries*

Where a Director, Supervisor, manager or other senior administrative officer of our Company is in any way, directly or indirectly, materially interested in a contract, transaction or arrangement or proposed contract, transaction or arrangement with our Company, (other than his contract of service with our Company), he shall declare the nature and extent of his interests to the Board at the earliest opportunity, whether or not the contract, transaction or arrangement or proposal therefor is otherwise subject to the approval of the Board.

Unless the interested Director, Supervisor, manager or other senior administrative officer discloses his interests in accordance with the Articles of Association and the contract, transaction or arrangement is approved by the Board at a meeting in which the interested Director, Supervisor, manager or other senior administrative officer is not counted in the quorum and refrains from voting, a contract, transaction or arrangement in which that Director, Supervisor, manager or other senior administrative officer is materially interested is voidable at the instance of our Company except as against a bona fide party thereto acting without notice of the breach of duty by the interested Director, Supervisor, manager or other senior administrative officer.

For these purposes, a Director, Supervisor, manager or other senior administrative officer of our Company is deemed to be interested in a contract, transaction or arrangement in which an associate of him is interested.

Where a Director, Supervisor, manager or other senior administrative officer of our Company gives to the Board a general notice in writing stating that, by reason of the facts specified in the notice, he is interested in contracts, transactions or arrangements of any description which may subsequently be made by our Company, such notice shall be deemed for the purposes of this paragraph to be a sufficient declaration of his interests, so far as the content stated in such notice is concerned, provided that such general notice shall have been given before the date on which the question of entering into the relevant contract, transaction or arrangement is first taken into consideration on behalf of our Company.

**Remuneration**

The remuneration of Directors must be approved by shareholders in general meeting.

**Retirement, appointment and removal**

The term of office of the Chairman and the other Board members shall be three years.

Directors shall be elected and removed by the shareholders in general meeting. A Director is not required to hold Shares of our Company.

ALRMH-CNBM00000555

## APPENDIX VII                    SUMMARY OF ARTICLES OF ASSOCIATION

The Board shall consist of 10 Directors. Our Company shall adopt independent directors system. Independent Directors are those Directors who are independent from the shareholders and do not hold any other position in our Company. The Board shall have one chairman. The chairman shall be elected and removed by more than one half of the Directors.

A person may not serve as a Director, Supervisor, manager and any other senior administrative officer of our Company if any of the following circumstances apply:

(1)   a person without legal or with restricted legal capacity;

(2)   a person who has committed an offence of corruption, bribery, infringement of property, misappropriation of property or sabotaging the social economic order and has been punished because of committing such offence; or who has been deprived of his political rights, in each case where less than five (5) years have elapsed since the date of the completion of implementation of such punishment or deprivation;

(3)   a person who is a former director, factory manager or manager of a company or enterprise which has entered into insolvent liquidation because of mismanagement and he is personally liable for the insolvency of such company or enterprise, where less than three (3) years have elapsed since the date of the completion of the insolvency and liquidation of the company or enterprise;

(4)   a person who is a former legal representative of a company or enterprise which had its business licence revoked due to a violation of the law and who incurred personal liability, where less than three (3) years has elapsed since the date of the revocation of the business license;

(5)   a person who has a relatively large amount of debts due and outstanding;

(6)   a person who is under criminal investigation or prosecution by judicial organization for violation of the criminal law which investigation or prosecution is not yet concluded;

(7)   a person who is not eligible for enterprise leadership according to laws and administrative regulations;

(8)   a non-natural person; or

(9)   a person convicted of the contravention of provisions of relevant securities regulations by a relevant government authority, and such conviction involves a finding that he has acted fraudulently or dishonestly, where less than five (5) years has elapsed since the date of the conviction.

The validity of an act of a Director, Supervisor, manager or other senior administrative officer on behalf of our Company is not, vis-à-vis a bona fide third party, affected by any irregularity in his office, election or any defect in his qualification.

VII-5

ALRMH-CNBM00000556

## APPENDIX VII           SUMMARY OF ARTICLES OF ASSOCIATION

*Borrowing powers*

On condition of compliance with applicable laws and regulations of the PRC, our Company has the power to raise and borrow money, which power includes, without limitation, the issue of debentures, the charging or mortgaging of part or whole of our Company's business or properties and other rights permitted by PRC laws and administrative regulations. The Articles of Association do not contain any specific provision in respect of the manner in which borrowing powers may be exercised by the Directors nor do they contain any specific provision in respect of the manner in which such powers may be varied, other than: (a) provisions which give the Directors the power to formulate proposals for the issuance of debentures by our Company; and (b) provisions which provide that the issuance of debentures must be approved by the shareholders in a general meeting by way of a special resolution.

*Duties*

In addition to obligations imposed by laws, administrative regulations or required by the stock exchanges on which Shares are listed, each of our Company's Directors, Supervisors, manager and other senior administrative officers owes a duty to each shareholder, in the exercise of the functions and powers of our Company entrusted to him:

(1) not to cause our Company to exceed the scope of the business stipulated in its business licence;

(2) to act honestly in the best interest of our Company;

(3) not to expropriate in any guise our Company's property, including (without limitation) usurpation of opportunities advantageous to our Company;

(4) not to expropriate the individual rights of shareholders, including (without limitation) rights to distribution and voting rights, save pursuant to a restructuring of our Company submitted to shareholders for approval in accordance with the Articles of Association.

Each of our Company's Directors, Supervisors, manager and other senior administrative officers owes a duty, in the exercise of his powers and discharge of his duties, to exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances.

Each of our Company's Directors, Supervisors, manager and other senior administrative officers shall exercise his powers or carry on his duties in accordance with the principle of fiduciary and shall not put himself in a position where his duty and his interest may conflict. This principle includes (without limitation) discharging the following obligations:

(1) to act honestly in the best interests of our Company;

(2) to exercise powers within the scope of his powers and not to exceed those powers;

ALRMH-CNBM00000557

(3)   to exercise the discretion vested in him personally and not to allow himself to act under the control of another and, unless and to the extent permitted by laws, administrative regulations or with the informed consent of shareholders given in general meeting, not to delegate the exercise of his discretion;

(4)   to treat shareholders of the same class equally and to treat shareholders of different classes fairly;

(5)   except in accordance with the Articles of Association or with the informed consent of shareholders given in general meeting, not to enter into any contract, transaction or arrangement with our Company;

(6)   without the informed consent of shareholders given in general meeting, not to use our Company's property for his own benefit;

(7)   not to exploit his position to accept bribes or other illegal income or expropriate our Company's property by any means, including (without limitation) opportunities advantageous to our Company;

(8)   without the informed consent of shareholders given in general meeting, not to accept commissions in connection with our Company's transactions;

(9)   to abide by the Articles of Association, faithfully execute his official duties and protect our Company's interests, and not to exploit his position and power in our Company to advance his own private interests;

(10)  not to compete with our Company in any form unless with the informed consent of shareholders given in general meeting;

(11)  not to misappropriate our Company's funds or lend such funds to others, not to open accounts in his own name or other names for the deposit of our Company's assets and not to provide a guarantee for debts of a shareholder of our Company or other individual(s) with our Company's assets; and

(12)  unless otherwise permitted by informed shareholders in general meeting, to keep in confidence information acquired by him in the course of and during his tenure and not to use the information other than in furtherance of the interests of our Company, save that disclosure of such information to the court or other governmental authorities is permitted if:

(i)    disclosure is made under compulsion of law;

(ii)   the interests of the public require disclosure;

(iii)  the interests of the relevant Director, Supervisor, manager or other senior administrative officer require disclosure.

ALRMH-CNBM00000558

## APPENDIX VII                          SUMMARY OF ARTICLES OF ASSOCIATION

Each Director, Supervisor, manager or other senior administrative officer of our Company shall not cause the following persons or institutions ("associates") to do what he is prohibited from doing:

(1)   the spouse or minor child of that Director, Supervisor, manager or other senior administrative officer;

(2)   a person acting in the capacity of trustee of that Director, Supervisor, manager or other senior administrative officer or any person referred to in the preceding paragraph;

(3)   a person acting in the capacity of partner of that Director, Supervisor, manager or other senior administrative officer or any person referred to in paragraphs (1) and (2) above;

(4)   a company in which that Director, Supervisor, manager or other senior administrative officer, alone or jointly with one or more persons referred to in paragraphs (1), (2) and (3) above or other Directors, Supervisors, manager, general manager, deputy general managers and other senior administrative officers have a de facto controlling interest; and

(5)   the Directors, Supervisors, manager and other senior administrative officers of the controlled company referred to in the preceding paragraph.

The fiduciary duties of the Directors, Supervisors, manager and other senior administrative officers of our Company do not necessarily cease with the termination of their tenure. The duty of confidence in relation to trade secrets of our Company survives the termination of their tenure. Other duties may continue for such period as fairness may require depending on the time lapse between the termination and the act concerned and the circumstances under which the relationships between them and our Company are terminated.

In addition to any rights and remedies provided by the laws and administrative regulations, where a Director, Supervisor, manager or other senior administrative officer of our Company is in breach of his duties to our Company, our Company has a right to:

(1)   claim damages from the Director, Supervisor, manager or other senior administrative officer in compensation for losses sustained by our Company as a result of such breach;

(2)   rescind any contract or transaction entered into by our Company with the Director, Supervisor, manager or other senior administrative officer or with a third party (where such third party knows or should know that there is such a breach of duties by such Director, Supervisor, manager or other senior administrative officer);

(3)   demand an account of the profits made by the Director, Supervisor, manager or other senior administrative officer in breach of his duties;

(4)   recover any monies received by the Director, Supervisor, manager or other senior administrative officer to the use of our Company, including (without limitation) commissions; and

VII-8

(5)   demand payment of the interest earned or which may have been earned by the Director, Supervisor, manager or other senior administrative officer on the monies that should have been paid to our Company.

Subject to the Articles of Association, a Director, Supervisor, manager or other senior administrative officer of our Company may be relieved of liability for specific breaches of his duty by the informed consent of shareholders given at a general meeting.

### Alterations to constitutional documents

Our Company may amend its Articles of Association in accordance with the requirements of law, administrative regulation and the Articles of Association.

Amendments to the Articles of Association involving the contents of the Mandatory Provisions shall become effective upon approvals by the companies approving department authorized by and the securities governing authority of the State Council. If there is any change relating to the registered particulars of our Company, application shall be made for registration of the changes in accordance with law.

### Variation of rights of existing Shares or classes of Shares

Holders of Domestic Shares and H Shares are deemed to be Shareholders of different classes.

Rights conferred on any class of shareholders in the capacity of shareholders ("class rights") may not be varied or abrogated unless approved by a special resolution of shareholders in general meeting and by holders of Shares of that class at a separate meeting conducted in accordance with the Articles of Association.

The following circumstances shall be deemed to be variation or abrogation of the class rights of a class:

(1)   to increase or decrease the number of Shares of such class, or increase or decrease the number of Shares of class having voting or equity rights or privileges equal or superior to those of the Shares of such class;

(2)   to effect an exchange of all or part of the Shares of such class into Shares of another class or to effect an exchange or create a right of exchange of all or part of the Shares of another class into the Shares of such class;

(3)   to remove or reduce rights to accrued dividends or rights to cumulative dividends attached to Shares of such class;

(4)   to reduce or remove a dividend preference or a liquidation preference attached to Shares of such class;

(5)   to add, remove or reduce conversion privileges, options, voting rights, transfer or preemptive rights, or rights to acquire securities of our Company attached to Shares of such class;

(6)   to remove or reduce rights to receive payment payable by our Company in particular currencies attached to Shares of such class;

ALRMH-CNBM00000560

(7)   to create a new class of Shares having voting or equity right or privileges equal or superior to those of the Shares of such class;

(8)   to restrict the transfer or ownership of the Shares of such class or add to such restriction;

(9)   to allot and issue rights to subscribe for, or convert into, Shares in our Company of such class or another class;

(10)  to increase the rights or privileges of Shares of another class;

(11)  to restructure our Company where the proposed restructuring will result in different classes of shareholders bearing a disproportionate burden of such proposed restructuring; and

(12)  to vary or abrogate provisions in the Articles of Association.

Shareholders of the affected class, whether or not otherwise having the right to vote at shareholders' general meetings, shall nevertheless have the right to vote at class meetings in respect of matters concerning paragraphs (2) to (8), (11) and (12) above (apart in the circumstances described below), but interested shareholder(s) (as defined below) shall not be entitled to vote at class meetings.

Resolutions of a class of shareholders shall be passed by votes representing more than two-thirds of the voting rights of shareholders of that class represented at the relevant meeting who are entitled to vote at class meetings.

Written notice of a class meeting shall be given forty-five (45) days before the date of the class meeting to notify all of the shareholders in the share register of the class of the matters to be considered, the date and the place of the class meeting. A shareholder who intends to attend the class meeting shall deliver his written reply concerning attendance at the class meeting to our Company twenty (20) days before the date of the class meeting.

If the number of Shares carrying voting rights at the meeting represented by the shareholders who intend to attend the class meeting reaches mores than one half of the voting Shares at the class meeting, our Company may hold the class meeting; if not, our Company shall within five (5) days notify the shareholders of the class again, by public notice, of the matters to be considered, the date and the place for the class meeting. Our Company may then hold the class meeting after such publication of such notice.

Notice of class meetings need only be served on shareholders entitled to vote thereat.

Meetings of any class of shareholders shall be conducted in a manner as similar as possible to that of general meetings of shareholders. The provisions of the Articles of Association relating to the manner of conducting any shareholders' general meeting shall apply to any meeting of a class of shareholders. Holders of Domestic Shares and foreign-invested Shares listed overseas are deemed to be shareholders of different classes.

ALRMH-CNBM00000561

The special procedures for voting at a class of shareholders shall not apply in the following circumstances:

(1)   where our Company issues, upon the approval by a special resolution of its shareholders in general meeting, either separately or concurrently once every twelve months, not more than 20% of each of its existing issued Domestic Shares and overseas-listed foreign-invested Shares; or

(2)   where our Company's plan to issue Domestic Shares and overseas-listed foreign-invested Shares at the time of its establishment is carried out within fifteen (15) months from the date of approval of the securities governing authority of the State Council.

For the purposes of the class rights provisions of the Articles of Association, the meaning of "interested shareholder(s)" is:

(1)   in the case of a repurchase of Shares by offers to all shareholders or public dealing on a stock exchange, a "controlling shareholder" within the meaning of the Articles of Association;

(2)   in the case of a repurchase of Shares by an off-market contract, a holder of the Shares to which the proposed contract relates; and

(3)   in the case of a restructuring of our Company, a shareholder within a class who bears less than a proportionate burden imposed on that class under the proposed restructuring or who has an interest in the proposed restructuring different from the interest of shareholders of that class.

**Resolutions — majority required**

Resolutions of shareholders' general meetings shall be divided into ordinary resolutions and special resolutions.

To adopt an ordinary resolution, votes representing more than one half of the voting rights represented by the shareholders (including proxies) present at the meeting must be exercised in favour of the resolution in order for it to be passed.

To adopt a special resolution, votes representing more than two-thirds of the voting rights represented by the shareholders (including proxies) present at the meeting must be exercised in favour of the resolution in order for it to be passed.

**Voting rights (generally, on a poll and right to demand a poll)**

The ordinary shareholders of our Company have the right to attend or appoint a proxy to attend shareholders' general meetings and to vote thereat. A shareholder (including proxy) when voting at a shareholders' general meeting may exercise voting rights in accordance with the number of Shares carrying the right to vote and each share shall have one vote.

ALRMH-CNBM00000562

At any general meeting of shareholders a resolution shall be decided on a show of hands unless a poll is (before or after any vote by show of hands) demanded:

(1)   by the chairman of the meeting;

(2)   by at least two shareholders entitled to vote present in person or by proxy; or

(3)   by one or more shareholders present in person or by proxy and representing 10% or more of all Shares carrying the right to vote at the meeting.

Unless a poll is so demanded, a declaration by the chairman that a resolution has on a show of hands been carried unanimously, or carried by a particular majority, or lost, and an entry to that effect in the minutes of the meeting shall be conclusive evidence of the fact without proof of the number or proportion of the votes recorded in favour of or against such resolution. The demand for a poll may be withdrawn by the person who makes such demand.

A poll demanded on the election of the chairman of the meeting, or on a question of adjournment of the meeting, shall be taken forthwith. A poll demanded on any other question shall be taken at such time as the chairman of the meeting directs, and any business other than that upon which a poll has been demanded may be proceeded with, pending the taking of the poll. The result of the poll shall be deemed to be a resolution of the meeting at which the poll was demanded. On a poll taken at a meeting, a shareholder (including proxy) entitled to two or more votes need not cast all his votes in the same way.

In the case of an equality of votes, whether on a show of hands or on a poll, the chairman of the meeting at which the show of hands takes place or at which the poll is demanded shall be entitled to one additional vote.

**Requirements for annual general meetings**

The Board shall convene an annual shareholders' meeting once each year and within six (6) months from the close of the preceding financial year.

**Accounts**

Our Company shall establish its financial and accounting system in accordance with the laws, administrative regulations and PRC accounting standards formulated by the finance regulatory department of the State Council.

The Board shall place before the shareholders at every annual general meeting such financial reports as are required by any laws, administrative regulations or directives promulgated by competent regional and central governmental authorities to be prepared by our Company.

Our Company's financial reports shall be made available for shareholders' inspection at our Company twenty (20) days before the date of every shareholders' annual general meeting. Each shareholder shall be entitled to obtain a copy of the financial reports.

ALRMH-CNBM00000563

## APPENDIX VII                    SUMMARY OF ARTICLES OF ASSOCIATION

The financial statements of our Company shall, in addition to being prepared in accordance with PRC accounting standards and regulations, be prepared in accordance with either International Financial Reporting Standards, or that of the overseas place where our Company's Shares are listed. If there is any material difference between the financial statements prepared respectively in accordance with the two accounting standards, such difference shall be stated in an appendix to the financial statements. When our Company is to distribute its after-tax profits, the lower of the after-tax profits as shown in the two financial statements shall be adopted.

Any interim results or financial information published or disclosed by our Company must also be prepared and presented in accordance with PRC accounting standards and regulations, and also in accordance with either International Financial Reporting Standards or that of the overseas place where our Company's Shares are listed.

Our Company shall publish its financial reports twice every fiscal year, that is, the interim financial report shall be published within sixty (60) days after the expiration of the first six (6) months of each fiscal year and the annual financial report shall be published within one hundred and twenty (120) days after the expiration of each fiscal year.

**Notice of meetings and business to be conducted thereat**

The shareholders' general meeting is the organ of authority of our Company and shall exercise its functions and powers in accordance with law.

Our Company shall not, without the prior approval of shareholders in general meeting, enter into any contract with any person other than a Director, Supervisor, general manager, deputy general manager or other senior administrative officer whereby the management and administration of the whole or any substantial part of the business of our Company is to be handed over to such person.

Shareholders' general meetings are divided into annual general meetings and extraordinary general meetings. Shareholders' general meeting shall be convened by the Board.

Under any of the following circumstances, the Board shall convene an extraordinary general meeting within two (2) months:

(1)    when the number of Directors is less than the number of Directors required by the PRC Company Law or two-thirds of the number of Directors specified in the Articles of Association;

(2)    when the unrecovered losses of our Company amount to one third of the total amount of its share capital;

(3)    when shareholder(s) holding 10 per cent or more of our Company's issued and outstanding Shares carrying voting rights request(s) in writing the convening of an extraordinary general meeting;

(4)    when deemed necessary by the Board or as requested by the supervisory committee; or

VII-13

When our Company convenes a shareholders' general meeting, written notice of the meeting shall be given forty-five (45) days before the date of the meeting to notify all of the shareholders in the share register of the matters to be considered and the date and the place of the meeting. A shareholder who intends to attend the meeting shall deliver his written reply concerning the attendance of the meeting to our Company twenty (20) days before the date of the meeting.

When our Company convenes a shareholders' annual general meeting, shareholders holding 5% or more of the total voting Shares of our Company shall have the right to propose new motions in writing, and our Company shall place matters in the proposed motions within the scope of functions and powers of the shareholders' general meeting on the agenda.

A shareholders' extraordinary general meeting shall not decide on those matters not stated in the notice of meeting.

Our Company shall, based on the written replies received twenty (20) days before the date of the shareholders' general meeting from the shareholders, calculate the number of voting Shares represented by shareholders who intend to attend the meeting. If the number of voting Shares represented by the shareholders who intend to attend the meeting reaches one half or more of our Company's total voting Shares, our Company may hold the meeting. If not, then our Company shall within five (5) days notify the shareholders again by public notice of the matters to be considered, the place and the date for the meeting. Our Company then may hold the meeting after such publication of such notice.

A notice of meeting of shareholders shall comply with the following requirements:

(1)   be in writing;

(2)   specify the place, the day and the hour of the meeting;

(3)   state the matters to be discussed at the meeting;

(4)   provide such information and explanation as are necessary for the shareholders to exercise an informed judgment on the proposals before them. Without limiting the generality of the foregoing, where a proposal is made to amalgamate our Company with another, to repurchase Shares, to reorganize the share capital, or to restructure our Company in any other way, the terms of the proposed transaction must be provided in detail together with copies of the proposed agreement, if any, and the cause and effect of such proposal must be properly explained;

(5)   contain a disclosure of the nature and extent, if any, of the material interests of any Director, Supervisor, manager or other senior administrative officer in the transaction proposed and the effect of the proposed transaction on them in their capacity as shareholders in so far as it is different from the effect on the interests of the shareholders of the same class;

(6)   contain the full text of any special resolution proposed to be moved at the meeting;

ALRMH-CNBM00000565

(7)   contain conspicuously a statement that a shareholder entitled to attend and vote is entitled to appoint one or more proxies to attend and vote instead of him and that a proxy need not be a shareholder; and

(8)   specify the time and place for lodging proxy forms for the relevant meeting.

Notice of shareholders' general meeting shall be served on the shareholders (whether or not entitled to vote at the meeting), by delivery or prepaid mail to their addresses as shown in the register of shareholders. For the holders of Domestic Shares, notice of the meetings may be issued by way of public notice.

The public notice shall be published in one or more newspapers designated by the securities governing authority of the State Council within the interval between forty-five (45) days and fifty (50) days before the date of the meeting. After the publication of such notice, the holders of Domestic Shares shall be deemed to have received the notice of the relevant shareholders' general meeting. The accidental omission to give notice of a meeting to, or the non-receipt of notice of a meeting by, any person entitled to receive notice shall not invalidate the proceedings at that meeting.

The following matters shall be resolved by an ordinary resolution at a shareholders' general meeting:

(1)   work reports of the Board and the supervisory committee;

(2)   plans formulated by the Board for the distribution of profits and for making up losses;

(3)   removal of the members of the Board and members of the supervisory committee, their remuneration and method of payment;

(4)   annual preliminary and final budgets, balance sheets and profit and loss accounts and other financial statements of our Company; and

(5)   matters other than those required by the laws and administrative regulations or by the Articles of Association to be adopted by special resolution.

The following matters shall be resolved by a special resolution at a shareholders' general meeting:

(1)   the increase or decrease of share capital and the issue of Shares of any class, warrants and other similar securities;

(2)   the issue of debentures of our Company;

(3)   the division, merger, dissolution and liquidation of our Company;

(4)   amendments to the Articles of Association; and

(5)   any other matters considered by the shareholders' general meeting, by way of an ordinary resolution, to be of a nature which may have a material impact on our Company and should be adopted by a special resolution.

ALRMH-CNBM00000566

## APPENDIX VII                           SUMMARY OF ARTICLES OF ASSOCIATION

**Transfer of Shares**

All the fully paid-up H Shares can be freely transferred in accordance with the Articles of Association. However, the Board may refuse to recognize any instrument of transfer without giving any reason, unless:

(1)   a fee (for each instrument of transfer) of HK$ 2.00 or any higher fee as agreed by the Stock Exchange has been paid to the Company for registration of any transfer or any other documents which is related to or will affect ownership of or change of ownership of the Shares;

(2)   the instrument of transfer only involves H Shares;

(3)   the stamp duty chargeable on the instrument of transfer has been paid;

(4)   the relevant share certificate and, upon the reasonable request of the Board, any evidence in relation to the right of the transferor to transfer the Shares has been submitted;

(5)   if it is intended to transfer the Shares to joint owners, then the maximum number of joint owners shall not exceed four; and

(6)   the Company does not have any lien on the relevant Shares.

The alteration and rectification of each part of the share register shall be carried out in accordance with the laws of the place where the register is maintained.

No changes in the shareholders' register due to the transfer of Shares may be made within thirty (30) days before the date of a shareholders' general meeting or within five (5) days before the record date for our Company's distribution of dividends.

**Power of our Company to purchase its own Shares**

In accordance with the provisions of the Articles of Association, our Company may reduce its registered share capital.

Our Company may, with approval according to the procedures provided in the Articles of Association and subject to the approval of the relevant governing authority of the State, repurchase its issued Shares under the following circumstances:

(1)   cancellation of Shares for the reduction of its capital;

(2)   merging with another company that holds Shares in our Company; and

(3)   other circumstances permitted by laws and administrative regulations.

ALRMH-CNBM00000567

## APPENDIX VII                    SUMMARY OF ARTICLES OF ASSOCIATION

Our Company may, with the approval of the relevant State governing authority for repurchasing its Shares, conduct the repurchase in one of the following ways:

(1)    making a pro rata general offer of repurchase to all of its shareholders;

(2)    repurchase Shares through public dealing on a stock exchange; or

(3)    repurchase by an off-market agreement.

Where our Company repurchases its Shares by an off-market agreement, the prior sanction of shareholders shall be obtained in accordance with the Articles of Association. Our Company may release, vary or waive its rights under a contract so entered into by our Company with the prior approval of shareholders obtained in the same manner.

A contract to repurchase Shares includes (without limitation) an agreement to become obliged to repurchase or an acquisition of the right to repurchase Shares of our Company. Rights of our Company under a contract to repurchase its Shares are not capable of being assigned.

Shares repurchased in accordance with law by our Company shall be cancelled within the period prescribed by laws and administrative regulations, and our Company shall apply to the original companies registration authority for registration of the change of its registered shares capital. The amount of our Company's registered shares capital shall be reduced by the aggregate par value of those cancelled Shares.

Unless our Company is in the course of liquidation, it must comply with the following provisions in relation to repurchase of its issued Shares:

(1)    where our Company repurchases Shares of our Company at par value, payment shall be made out of book surplus distributable profits of our Company or out of proceeds of a fresh issue of Shares made for that purpose;

(2)    where our Company repurchases Shares of our Company at a premium to its par value, payment up to the par value shall be made out of the book surplus distributable profits of our Company or out of the proceeds of a fresh issue of Shares made for that purpose. Payment of the portion in excess of the par value shall be effected as follows:

(i)    if the Shares being repurchased were issued at par value, payment shall be made out of the book surplus distributable profits of our Company; or

(ii)   if the Shares being repurchased were issued at a premium to its par value, payment shall be made out of the book surplus distributable profits of our Company or out of the proceeds of a fresh issue of Shares made for that purpose, provided that the amount paid out of the proceeds of the fresh issue shall not exceed the aggregate of premiums received by our Company on the issue of the Shares repurchased nor the current amount of our Company's share premium account (including the premiums on the fresh issue);

ALRMH-CNBM00000568

## APPENDIX VII                    SUMMARY OF ARTICLES OF ASSOCIATION

(3)    payment by our Company in consideration of the following shall be made out of our Company's distributable profits:

(i)    acquisition of rights to repurchase Shares of our Company;

(ii)    variation of any contract to repurchase Shares of our Company; and

(iii)    release of any of our Company's obligation under any contract to repurchase Shares of our Company; and

(4)    after our Company's registered shares capital has been reduced by the total par value of the cancelled Shares in accordance with the relevant provisions, the amount deducted from the distributable profits of our Company for payment of the par value portion of the Shares repurchased shall be transferred to our Company's share premium account.

**Power for any subsidiary of our Company to own Shares in our Company**

There are no provisions in the Articles of Association preventing ownership of Shares in our Company by a subsidiary.

**Dividends and other method of profit distribution**

Our Company may distribute dividends in the following manner:

(1)    cash; or

(2)    Shares.

Our Company shall appoint receiving agents on behalf of the holders of H Shares to receive on behalf of such shareholders dividends declared and all other monies owing by our Company in respect of their H Shares. The receiving agents appointed on behalf of holders of the H Shares shall be a company registered as a trust company under the Trustee Ordinance of Hong Kong.

In relation to the receipt of dividends by Shareholders, the Company is entitled to forfeit unclaimed dividends, provided that such power shall not be exercised until the expiry of the relevant limitation period.

**Proxies**

Any shareholder entitled to attend and vote at a meeting of our Company shall be entitled to appoint one or more other persons (whether a shareholder or not) as his proxy to attend and vote on his behalf, and a proxy so appointed shall:

(1)    have the same right as the shareholder to speak at the meeting;

(2)    have authority to demand or join in demanding a poll; and

ALRMH-CNBM00000569

(3)    have the right to vote by hand or on a poll, but a proxy of a shareholder who has appointed more than one proxy may only vote on a poll.

The instrument appointing a proxy shall be in writing under the hand of the appointer or his attorney duly authorized in writing, or if the appointer is a legal entity either under seal or under the hand of a director or attorney duly authorized. The instrument appointing a voting proxy and, if such instrument is signed by a person under a power of attorney or other authority on behalf of the appointer, a notarially certified copy of that power of attorney or other authority, shall be deposited at the residence of our Company or at such other place as is specified for that purpose in the notice convening the meeting, not less than twenty-four (24) hours before the time for holding the meeting at which the proxy proposes to vote or the time appointed for the passing of the resolution.

If the appointor is a legal entity, its legal representative or such person as is authorized by resolution of its board of directors or other governing body to act as its representative may attend at any meeting of shareholders of our Company as a representative of the appointer.

Any form issued to a shareholder by the Directors for use by him for appointing a proxy to attend and vote at meeting of our Company shall be such as to enable the shareholder, according to his intention, to instruct the proxy to vote in favour of or against each resolution dealing with business to be transacted at the meeting. Such a form shall contain a statement that in the absence of instructions by the shareholder the proxy may vote as he thinks fit.

A vote given in accordance with the terms of an instrument of proxy shall be valid notwithstanding the previous death or loss of capacity of the appointor or revocation of the proxy or of the authority under which the proxy was executed, or the transfer of the Shares in respect of which the proxy is given, provided that no notice in writing of such death, insanity, revocation or transfer as aforesaid shall have been received by our Company at its residence before the commencement of the meeting at which proxy is used.

**Calls on Shares and forfeiture of Shares**

There are no provisions in the Articles of Association relating to the making of calls on Shares or for the forfeiture of Shares.

**Rights of shareholders (including inspection of register)**

The ordinary shareholders of our Company shall enjoy the following rights:

(1)    the right to dividends and other distributions in proportion to the number of Shares held;

(2)    the right to attend or appoint a proxy to attend shareholders' general meetings and to vote thereat;

(3)    the right of supervisory management over our Company's business operations, and the rights to present proposals or to raise enquires;

(4)    the right to transfer Shares in accordance with laws, administrative regulations and provisions of the Articles of Association;

ALRMH-CNBM00000570

(5) the right to obtain relevant information in accordance with the provisions of the Articles of Association, including:

    (i) the right to obtain a copy of the Articles of Association, subject to payment of the cost of such copy;

    (ii) the right to inspect and copy, subject to payment of a reasonable charge:

        (a) all parts of the register of shareholders;

        (b) personal particulars of each of our Company's Directors, Supervisors, managers and other senior administrative officers as follows:

            (aa) present name and alias and any former name and alias;

            (bb) principal address (residence);

            (cc) nationality;

            (dd) primary and all other part-time occupations; and

            (ee) identification document and its number;

        (c) report on the state of our Company's share capital;

        (d) reports showing the aggregate par value, quantity, maximum and minimum price paid in respect of each class of Shares repurchased by our Company since the end of the last accounting year and the aggregate amount incurred by our Company for this purpose; and

        (e) minutes of shareholders' general meetings;

(6) in the event of the termination or liquidation of our Company, to participate in the distribution of remaining assets of our Company in accordance with the number of Shares held; and

(7) other rights conferred by laws, administrative regulations and the Articles of Association.

**Quorum for meetings and separate class meetings**

Our Company may convene a shareholders' general meeting where the number of voting Shares represented by those shareholders from whom our Company has received, twenty (20) days before the meeting, notices of intention to attend the meeting reaches one half or more of our Company's voting Shares; or, if not, where our Company has five (5) days before the meeting publicly announced the particulars of the meeting.

ALRMH-CNBM00000571

## APPENDIX VII                    SUMMARY OF ARTICLES OF ASSOCIATION

Our Company may convene a class meeting where the number of voting Shares represented by those shareholders from whom our Company has received, twenty (20) days before the meeting, notices of intention to attend the meeting reaches one half or more of the total number of voting Shares of that class; or, if not, where our Company has five (5) days before the meeting publicly announced the particulars of the meeting.

**Rights of the minorities in relation to fraud or oppression**

In addition to obligations imposed by laws, administrative regulations or required by the listing rules of the stock exchange on which Shares of our Company are listed, a controlling shareholder shall not exercise his voting rights in respect of the following matters in a manner prejudicial to the interests of the shareholders generally or of some part of the shareholders of our Company:

(1)    to relieve a Director or Supervisor of his duty to act honestly in the best interests of our Company;

(2)    to approve the expropriation by a Director or Supervisor (for his own benefit or for the benefit of another person), in any guise, of our Company's assets, including (without limitation) opportunities beneficial to our Company; or

(3)    to approve the expropriation by a Director or Supervisor (for his own benefit or for the benefit of another person) of the individual rights of other shareholders, including (without limitation) rights to distributions and voting rights save pursuant to a restructuring submitted to shareholders for approval in accordance with the Articles of Association.

For these purposes, a "controlling shareholder" means a person who satisfies any one of the following conditions:

(1)    he alone, or acting in concert with others, has the power to elect more than half of the Board;

(2)    he alone, or acting in concert with others, has the power to exercise or to control the exercise of 30% or more of the voting rights in our Company;

(3)    he alone, or acting in concert with others, holds 30% or more of the issued and outstanding Shares of our Company; or

(4)    he alone, or acting in concert with others, in any other manner controls our Company in fact.

See "— *Variation of rights of existing Shares or classes of Shares*."

**Procedures on liquidation**

Our Company shall be dissolved and liquidated upon the occurrence of any of the following events:

(a)    a resolution for dissolution is passed by shareholders at a general meeting;

(b)    dissolution is necessary due to a merger or division of our Company;

VII-21

ALRMH-CNBM00000572

(c)   our Company is legally declared bankrupt due to its failure to repay debts due; or

(d)   our Company is ordered to close down because of its violation of laws and administrative regulations.

Where the Board proposes to liquidate our Company due to causes other than where our Company has declared that it is insolvent, the Board shall include a statement in its notice convening a shareholders' general meeting to consider the proposal to the effect that, after making full inquiry into the affairs of our Company, the Board is of the opinion that our Company will be able to pay its debts in full within twelve (12) months from the commencement of the liquidation.

Upon the passing of the resolution by the shareholders in general meeting for the liquidation of our Company, all functions and powers of the Board shall cease.

The liquidation committee shall act in accordance with the instructions of the shareholders' general meeting to make a report at least once every year to the shareholders' general meeting on the committee's receipts and payments, the business of our Company and the progress of the liquidation and to present a final report to the shareholders' general meeting on completion of the liquidation.

**Other provisions material to our Company and our shareholders**

*General provisions*

Our Company is a joint stock limited company in perpetual existence.

From the date of the Articles of Association becoming effective, the Articles of Association constitute a legally binding document regulating our Company's organization and activities, and the rights and obligations between our Company and each shareholder and among the shareholders inter se.

Our Company may invest in other limited liability companies or joint stock limited companies. Our Company's liabilities to an investee company shall be limited to the amount of its capital contribution to such investee company.

Upon approval of the companies approving department authorized by the State Council, our Company may, according to its need of operation and management, operate as a holding company.

Our Company may, based on its requirements for operation and development and in accordance with the relevant provisions of the Articles of Association, approve an increase of capital.

Our Company may increase its capital in the following ways;

(1)   offering new Shares to non-specially-designated investors for subscription;

(2)   placing new Shares to its existing shareholders;

(3)   distributing new Shares to its existing shareholders by way of bonus issues; and

ALRMH-CNBM00000573

(4)   any other way permitted by law and administrative regulations.

Our Company's increase of capital by issuing new Shares shall, after being approved in accordance with the provisions of the Articles of Association, be conducted in accordance with the procedures stipulated by relevant laws and administrative regulations.

Unless otherwise provided by law or administrative regulation, fully-paid-up Shares in our Company are freely transferable and are not subject to any lien. Upon approval of the State Council or its authorized supervisory departments and subject to the requirements of the Stock Exchange, the Domestic Shares may be converted into H Shares.

When our Company reduces its registered share capital, it must draw up a balance sheet and an inventory of assets. Our Company shall notify its creditors within ten (10) days of the date of our Company's resolution for reduction of share capital and shall publish a notice in a newspaper at least three times within thirty (30) days of the date of such resolution. A creditor has the right within thirty (30) days of receiving the notice from our Company or, in the case of a creditor who does not receive the notice, within ninety (90) days of the date of the first public notice, to demand our Company to repay its debts or provide a corresponding guarantee for such debt. Our Company's registered capital after reduction shall not be less than the statutory minimum amount.

The ordinary shareholders of our Company shall assume the following obligations:

(1)   to abide by the Articles of Association;

(2)   to pay subscription monies according to the number of Shares subscribed and the method of subscription; and

(3)   other obligations imposed by laws, administrative regulations and the Articles of Association.

Shareholders are not liable to make any further contribution to the share capital other than as agreed by the subscriber of the relevant Shares on subscription.

### Secretary of the Board

The secretary of the Board shall be a natural person who has the requisite professional knowledge and experience, and shall be appointed by the Board. His primary responsibilities include:

(1)   to ensure our Company has complete organizational documents and records;

(2)   to ensure our Company, in accordance with relevant laws and regulations, prepares and delivers those reports and documents required by competent authorities;

(3)   to ensure that our Company's registers of shareholders are properly maintained, and that persons entitled to our Company's records and documents are furnished with such records and documents without delay.

ALRMH-CNBM00000574

## APPENDIX VII                      SUMMARY OF ARTICLES OF ASSOCIATION

*Supervisory committee*

Our Company shall have a supervisory committee. The Directors, managers and financial controller shall not act concurrently as Supervisors. The supervisory committee shall be composed of 6 Supervisors. One of the members of the supervisory committee shall act as the chairman. The term of office of Supervisors shall be three years, renewable upon reelection and re-appointment. The election or removal of the chairman of the supervisory committee shall be determined by two-thirds or more of the members of the supervisory committee.

The supervisory committee shall comprise 3 representatives of shareholders, 2 independent supervisors and 1 representatives of staff and workers of our Company. The representatives of shareholders and independent supervisors shall be elected and removed by the shareholders in general meeting; the representative of workers and staff of our Company shall be elected and removed by the workers and staff of our Company democratically thereby.

The supervisory committee shall be accountable to the shareholders' general meeting and exercise the following powers in accordance with law:

(1)    to examine our Company's financial situation;

(2)    to examine whether the Directors, managers and other officers act in contradiction with the laws, administrative regulations and the Articles of Association;

(3)    to demand rectification from a Director, the manager or any other officer when the acts of such persons are harmful to our Company's interest;

(4)    to verify the financial information such as the financial report, business report and plans for distribution of profits to be submitted by the Board to the shareholders' general meetings and, should any queries arise, to authorize, in the name of our Company, a re-examination by the certified public accountants and practising auditors of our Company;

(5)    to propose to convene a shareholders' extraordinary general meeting;

(6)    to represent our Company in negotiation with or bringing an action against a Director; and

(7)    to exercise other powers specified in the Articles of Association.

Members of the supervisory committee shall be present at meetings of the Board.

ALRMH-CNBM00000575

## APPENDIX VII                    SUMMARY OF ARTICLES OF ASSOCIATION

*Manager of our Company*

Our Company shall have one manager, who shall be appointed and dismissed by the Board. Our Company shall have a number of deputy managers who shall assist the manager in his work. The deputy managers shall be nominated by the manager, and shall be appointed or dismissed by the Board.

The manager shall be accountable to the Board and exercise the following powers:

(1)    to be in charge of our Company's production, operation and management and to organize the implementation of the resolutions of the Board;

(2)    to organize the implementation of our Company's annual business plan and investment plan;

(3)    to draft plans for the establishment of our Company's internal management structure;

(4)    to draft plans for the establishment of the branches of our Company;

(5)    to draft our Company's basic management system;

(6)    to formulate basic rules and regulations for our Company;

(7)    to propose the appointment or dismissal of our Company's deputy manager(s) and the financial controller;

(8)    to appoint or dismiss management personnel other than those required to be appointed or dismissed by the Board;

(9)    to exercise other powers conferred by the Articles of Association and the Board.

The manager shall be present at meetings of the Board. However, the manager has no voting rights at the meetings unless he is also a Director.

The manager and deputy managers, in performing their functions and powers, shall act honestly and diligently and in accordance with laws, administrative regulations and the Articles of Association.

*Board*

The Board is responsible to the shareholders' general meeting and exercises the following powers:

(1)    to be responsible for convening shareholders' general meetings and to report on its work to the shareholders' general meeting;

(2)    to implement the resolutions of the shareholders' general meetings;

ALRMH-CNBM00000576

(3)    to decide on our Company's business plans and investment plans;

(4)    to formulate our Company's proposed annual preliminary and final financial budget;

(5)    to formulate our Company's profit distribution plan and plan for recovery of losses;

(6)    to formulate the debt and financial policies and proposals for increases or reductions of our Company's registered share capital and the issue of corporate debentures;

(7)    to draw up material acquisition or disposal proposals of our Company and plans for the merger, division or dissolution of our Company;

(8)    to decide on the establishment of our Company's internal management structure;

(9)    to appoint or remove our Company's general manager, and pursuant to the general manager's nominations to appoint or remove the deputy general manager(s) and the financial controller of our Company and decide on their remuneration;

(10)   to formulate our Company's basic management system, including financial and personnel management system;

(11)   to formulate proposals for any amendment to the Articles of Association.

Except the Board's resolutions in respect of the matters specified in the above paragraphs (6), (7) and (11), which shall be passed by two-thirds or more of the Directors, the Board resolutions in respect of all other matters may be passed by more than one half of the Directors.

Meetings of the Board shall be held at least twice every year and convened by the chairman of the Board. Notice of the meeting shall be served on all of the Directors ten (10) days before the date of the meeting. In case of any urgent matters, upon requisition by the general manager or more than one-third (inclusive) of the members of the Board, an extraordinary meeting of the Board may be held.

Meetings of the Board shall be held only if more than half of the Directors are present. Each Director shall have one vote. Where the number of votes cast for and against a resolution are equal, the chairman of the Board shall have a casting vote.

Where a Director or any associate (as defined in the Listing Rules) of such Director is interested in any resolution proposed at a Board meeting, such Director shall not be present and shall not have a right to vote. Such Director shall not be counted in the quorum of the relevant meeting.

ALRMH-CNBM00000577

## APPENDIX VII   SUMMARY OF ARTICLES OF ASSOCIATION

*Accountants and audit*

*Appointment of accountants' firm*

Our Company shall appoint an independent firm of certified public accountants which is qualified under the relevant regulations of the State to audit our Company's annual financial statements and review our Company's other financial reports. The first certified public accountants' firm of our Company may be appointed by the inaugural meeting of our Company before the first annual general meeting and the certified public accountants' firm so appointed shall hold office until the conclusion of the first annual general meeting. If the inaugural meeting fails to exercise its aforesaid powers, those powers shall be exercised by the Board.

The certified public accountants' firm appointed by our Company shall hold office from the conclusion of the annual general meeting of shareholders at which the appointment is made until the conclusion of the next annual meeting of shareholders.

Before the convening of the shareholders' general meeting, the Board may fill any casual vacancy in the office of the certified public accountants' firm, but while any such vacancy continues, the surviving or continuing firm, if any, may act.

The shareholders in general meeting may, by ordinary resolution, remove a certified public accountants' firm before the expiration of its office, notwithstanding the stipulations in the contract between our Company and the firm, but without prejudice to the firm's right to claim, if any, for damages in respect of such removal.

The remuneration of a certified public accountants' firm or the manner in which such firm is to be remunerated shall be determined by the shareholders in general meeting. The remuneration of a certified public accountants' firm appointed by the Board shall be determined by the Board.

*Change and removal of accountants' firm*

Our Company's appointment of, removal of and non-reappointment of a certified public accountants' firm shall be resolved by shareholders in general meeting. The resolution of the shareholders' general meeting shall be filed with the securities governing authority of the State Council.

Where it is proposed that any resolution be passed at a shareholders' general meeting concerning the appointment of a certified public accountants' firm, which is not an incumbent firm, to fill a casual vacancy in the office of the certified public accountants' firm, reappointment of a retiring certified public accountants' firm which was appointed by the Board to fill a casual vacancy, or removal of the certified public accountants' firm before the expiration of its term of office, the following provisions shall apply:

(1)   A copy of the proposal shall be sent to the firm proposed to be appointed or proposing to leave its post or the firm which has left its post (leaving includes leaving by removal, resignation and retirement) before notice of meeting is given to the shareholders.

ALRMH-CNBM00000578

(2)  If the firm leaving its post makes representations in writing and requests our Company to notify such representations to the shareholders, our Company shall (unless the representations are received too late):

(i)  in any notice of the resolution given to shareholders, state the fact of the representations having been made; and

(ii)  attach a copy of the representations to the notice and deliver it to the shareholders in the manner stipulated in the Articles of Association.

(3)  If the firm's representations are not sent in accordance with the preceding paragraph, the relevant firm may require that the representations be read out at the shareholders' general meeting and may lodge further complaints.

(4)  A certified public accountants' firm which is leaving its post shall be entitled to attend:

(i)  the shareholders' general meeting at which its term of office would otherwise have expired;

(ii)  any shareholders' general meeting at which it is proposed to fill the vacancy caused by its removal; and

(iii)  any shareholders' general meeting convened on its resignation;

and to receive all notices of, and other communications relating to, any such meetings, and to speak at any such meeting in relation to matters concerning its role as the former certified public accountants' firm of our Company.

### *Resignation of accountants' firm*

Where the certified public accountants' firm resigns its post, it shall make clear to the shareholders' general meeting whether there has been any impropriety on the part of our Company.

Any certified public accountants' firm may resign its office by depositing at our Company's legal residence a resignation notice which shall become effective on the date of such deposit or on such later date as may be stipulated in such notice. Such notice shall include the following:

(1)  a statement to the effect that there are no circumstances connected with its resignation which it considers should be brought to the notice of the shareholders or creditors of our Company; or

(2)  a statement of any such circumstances.

Where a notice is deposited under the preceding paragraph, our Company shall within fourteen (14) days send a copy of the notice to the relevant governing authority. If the notice contains a statement under subparagraph (2) of the preceding paragraph, a copy of such statement shall be placed at our Company's registered office for shareholders' inspection. Our Company shall also send a copy of such statement by prepaid mail to every holder of overseas listed foreign invested Shares at the address registered in the register of shareholders.

ALRMH-CNBM00000579

## APPENDIX VII                    SUMMARY OF ARTICLES OF ASSOCIATION

Where the certified public accountants' firm's notice of resignation contains a statement of any circumstances which should be brought to the notice of the shareholders or creditors of our Company, the certified public accountants' firm may require the Board to convene a shareholders' extraordinary general meeting for the purpose of giving an explanation of the circumstances connected with its resignation.

### *Dispute resolution*

Whenever any disputes or claims arise between holders of the overseas-listed foreign-invested Shares and our Company, holders of the overseas-listed foreign-invested Shares and our Company's Directors, Supervisors, managers or other senior administrative officers, or holders of the overseas-listed foreign-invested Shares and holders of Domestic Shares, based on the Articles of Association or any rights or obligations conferred or imposed by the PRC Company Law or any other relevant laws and administrative regulations concerning the affairs of our Company, such disputes or claims shall be referred by the relevant parties to arbitration.

A claimant may elect arbitration at either the China International Economic and Trade Arbitration Commission in accordance with its rules or the Hong Kong International Arbitration Centre in accordance with its Securities Arbitration Rules. Once a claimant refers a dispute or claim to arbitration, the other party must submit to the arbitral body elected by the claimant.

If a claimant elects arbitration at Hong Kong International Arbitration Centre, any party to the dispute or claim may apply for a hearing to take place in Shenzhen in accordance with the Securities Arbitration Rules of the Hong Kong International Arbitration Centre.

If any disputes or claims of rights are referred to arbitration, the laws of the People's Republic of China shall apply, save as otherwise provided in laws and administrative regulations.

Disputes in relation to the identification of shareholders and disputes in relation to the share register need not be referred to arbitration.

The award of an arbitration body shall be final and conclusive and binding on all parties.

ALRMH-CNBM00000580

## APPENDIX VIII                    STATUTORY AND GENERAL INFORMATION

### I.    Further Information about the Company

#### 1.    The Company

The Company was established in the PRC as a joint stock limited company on March 28, 2005 by Parent, BNBMG, CNBM Trading, Building Materials Academy and Cinda as the Promoters in accordance with the provisions set out in the Company Law under the name of China National Building Material Company Limited. The Company obtained a Business License (Registration No. 1000001000349) issued by the State Administration for Industry and Commerce (國家工商行政管理總局) on March 28, 2005. The Company has established a place of business in Hong Kong at Level 28, Three Pacific Place, 1 Queen's Road East, Hong Kong and has registered with the Hong Kong Companies Registry as an overseas company in Hong Kong under Part XI of the Companies Ordinance on February 7, 2006. Susan Lo Yee Har and Wendy Kam Mei Ha both have been appointed as the agent of the Company for the acceptance of service of process in Hong Kong.

#### 2.    Changes in the share capital of the Company

(a)    At the time of its establishment as a joint stock limited company, the Company's share capital was RMB 1,387,760,000 divided into 1,387,760,000 domestic shares of nominal value of RMB 1 each, all of which were credited as fully paid up and held as follows:

| Promoters | Number of domestic shares of nominal value of RMB 1 each in the share capital of the Company | Percentage of shareholding |
|---|---|---|
| | | (%) |
| Parent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 368,280,000 | 26.54 |
| BNBMG . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 820,290,000 | 59.11 |
| CNBM Trading . . . . . . . . . . . . . . . . . . . . . . . . . . | 125,740,000 | 9.06 |
| Cinda . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 72,800,000 | 5.25 |
| Building Materials Academy . . . . . . . . . . . . . . . . . | 650,000 | 0.05 |
| | 1,387,760,000 | 100.00* |

*    Sum of numbers in table may differ from total due to rounding

(b)    Upon completion of the Global Offering (assuming the Over-allotment Option is not exercised), the share capital of the Company will be RMB 1,982,500,000 comprising 1,328,286,000 Domestic Shares and 654,214,000 H Shares, representing approximately 67.0% and 33.0% of the share capital of the Company, respectively.

(c)    Save as aforesaid, there has been no alteration in the share capital of the Company since the date of its establishment as a joint stock limited company.

ALRMH-CNBM00000581

3. *Resolutions of the Company's shareholders passed on February 28, 2006 and March 7, 2006*

An extraordinary general meeting of the Company was held on February 28, 2006 at which the following resolutions of the shareholders, among other resolutions, were passed:

(a)    conditional on the Listing Committee of the Stock Exchange granting listing of, and permission to deal in, the H Shares to be issued as mentioned herein and on the obligations of the Underwriters under the Underwriting Agreements becoming unconditional and not being terminated in accordance with their respective terms or otherwise within 30 days from the date of this prospectus, the Global Offering and the Over-allotment Option were approved;

(b)    a mandate was given to the Board to issue Shares within a period commencing on February 28, 2006 and expiring on the date of the next annual general meeting provided that the number of Shares to be issued shall not exceed 20% of the share capital of the Company on the Listing Date; and

(c)    the Directors were authorized to do any act and to sign any agreements, deed or documents as they think necessary for the purpose of the Global Offering.

Resolutions of the Company's shareholders were also passed on March 7, 2006 to:

(a)    approve the aggregate remuneration payable to the Directors and Supervisors for the year ending December 31, 2006 to be approximately RMB 3,500,000; and

(b)    authorize the remuneration committee to determine the remuneration of each individual Director and Supervisor based on the approved aggregate remuneration.

4. *Corporate Reorganization and subsequent shareholding changes*

In anticipation of the Global Offering, we underwent the Reorganization and other subsequent shareholding changes which involved, inter alia, the following:

*Our Company*

•      On May 19, 2004, Parent submitted to SASAC a proposal (Zhong Jian Cai Ban Fa [2004] No. 209) (as supplemented by a report (Zhong Jian Cai Ban Fa [2004] No. 449) dated November 3, 2004) relating to the Reorganization.

•      On June 25, 2004, Parent issued an approval (Zhong Jian Cai Cai Fa [2004] No. 258) approving the transfer of the assets and liabilities of CNBM Equipment to CNBM Trading by way of allocation at nil consideration.

•      On November 25, 2004, SASAC issued an approval (Guo Zi Gai Ge [2004] No. 1047) approving Parent's proposal relating to the Reorganization.

ALRMH-CNBM00000582

APPENDIX VIII                    STATUTORY AND GENERAL INFORMATION

- On December 1, 2004, CNBM Equipment and CNBM Trading entered into an agreement (資產及負債劃轉協議) which governs their rights and obligations relating to the assets and liabilities transferred from CNBM Equipment to CNBM Trading pursuant to the Reorganization.

- On January 27, 2005, Beijing Haidian State Land Resources and Housing Management Bureau (北京市海澱區國土資源和房屋管理局) approved the allocation of the land use rights in respect of 11 parcels of land having a total area of approximately 383,906.88 sq. m. from BNBMG to CNBM Equipment.

- On February 5, 2005, Parent issued a decision on the conversion of CNBM Equipment into a joint stock limited company with Parent, BNBMG, CNBM Trading, Cinda and Building Materials Academy as its promoters.

- On February 6, 2005, the Promoters entered into a promoters' agreement for the establishment of our Company.

- On February 25, 2005, SASAC issued an approval (Guo Zi Chan Quan [2005] No. 206) approving the registered capital of our Company and the Promoters' equity interests therein.

- On March 10, 2005, SASAC issued an approval (Guo Zi Gai Ge [2005] No. 282) approving the establishment of our Company by the Promoters.

- On March 10, 2005, the Promoters convened an inaugural meeting of the Company, at which, among other things, the establishment of the Company as a joint stock limited company was approved.

- On March 28, 2005, a new business license was issued by the State Administration for Industry and Commerce to our Company and our Company was formally reorganized as a joint stock limited company.

- On April 18, 2005, Beijing Municipal State Land Resources Bureau (北京市國土資源局) approved the change of the registered owner of the land use rights in respect of 11 parcels of land having a total area of approximately 383,906.88 sq. m. from CNBM Equipment to our Company.

- On April 29, 2005, SASAC issued an approval (Guo Zi Chan Quan [2005] No. 468) approving our scheme for reduction of our State-owned shares.

- On May 22, 2005, SASAC issued an approval for the conversion of our Company into an "overseas subscription company."

- On August 8, 2005, application was made to CSRC for the issue and listing of the H Shares on the Stock Exchange.

- On February 6, 2006, CSRC issued an approval with regard to the issue of H Shares and the listing of the H Shares on the Stock Exchange.

ALRMH-CNBM00000583

## APPENDIX VIII          STATUTORY AND GENERAL INFORMATION

- The Company and the Promoters entered into the Reorganization Agreement on March 7, 2006, the details of which are set out in "*Connected Transactions — Non-Recurrent Connected Transactions — Reorganization Agreement*" of this prospectus.

*Our Cement Segment*

China United

- On November 2, 2004, Parent approved (Zhong Jian Cai Ban Fa [2004] No. 441) the restructuring of China United. The restructuring involves the disposal by China United mainly of assets relating to its mining and vertical kiln cement operations and minority interests in certain cement operations and the capitalization of profits of approximately RMB 9.75 million. As a result, China United was held as to 44.79%, 47.42% and 7.79% by Parent, CNBM Equipment and Hefei Institute, respectively.

- On November 2, 2004, Parent approved (Zhong Jian Cai Ban Fa [2004] No. 442) the adjustment of the shareholding structure of China United. Pursuant to the decision: (a) Parent transferred a 9.9% equity interest in China United to BNBMG; (b) CNBM Equipment transferred its entire 47.42% equity interest in China United to CNBM Trading; and (c) Hefei Institute transferred its entire 7.79% equity interest in China United to Parent. As a result, China United was held as to 42.68%, 47.42% and 9.9% by Parent, CNBM Trading and BNBMG, respectively.

- On December 3, 2004, Parent approved (Zhong Jian Cai Ban Fa [2004] No. 514) the transfer of a 90.1% equity interest in China United. Pursuant to the approval, CNBM Trading and Parent transferred 47.42% and 42.68% equity interest in China United to CNBM Equipment, respectively. As a result, China United was held as to 90.1% and 9.9% by CNBM Equipment and BNBMG, respectively.

- On February 25, 2005, BNBM and BNBMG entered into an asset exchange agreement (資產置換協議) pursuant to which BNBMG agreed, amongst other things, to transfer its 9.9% equity interest in China United to BNBM for a consideration of approximately RMB 51.8 million. As a result, China United was held as to 90.1% and 9.9% by CNBM Equipment and BNBM, respectively.

Huaihai

- On September 16, 2004, Julong Cement and Huaihai entered into a segregation agreement (分立協議) pursuant to which: (i) assets forming part of our intended cement operation and related liabilities were transferred to Huaihai, a company to be established and held as to 73.8% and 26.2% by China United and Xuzhou State-owned Asset Investment and Management Company Limited (徐州市國有資產投資經營有限公司), respectively; and (ii) other assets were retained by Julong Cement.

ALRMH-CNBM00000584

- On September 29, 2004, a business license was issued by the Administration for Industry and Commerce of Xuzhou, Jiangsu Province, whereupon Huaihai was established as a limited liability company and acquired the status of an enterprise legal person.

- On April 18, 2005, Huaihai and Xuzhou State-owned Asset Investment and Management Company Limited (徐州市國有資產投資經營有限公司) entered into a capital increase agreement for the capitalization of RMB 80 million invested by China United in Huaihai. As a result, the registered capital of Huaihai was increased from RMB 59.82 million to RMB 139.82 million, which was held as to 88.79% and 11.21% by China United and Xuzhou State-owned Asset Investment and Management Company Limited (徐州市國有資產投資經營有限公司), respectively.

Luhong

- On September 16, 2004, Lunan Cement and Luhong entered into a segregation agreement (分立協議) pursuant to which: (i) assets forming part of our intended cement operation and related liabilities were transferred to Luhong, a company to be established and held as to 80.34% and 19.66% by China United and Shandong International Trust Investment Company Limited (山東省國際信托投資有限公司), respectively; and (ii) other assets (including the mining rights in respect of one limestone quarry and one clay quarry) were retained by Lunan Cement.

- On September 28, 2004, a business license was issued by the Administration for Industry and Commerce of Zaozhuang City, whereupon Luhong was established as a limited liability company and acquired the status of an enterprise legal person.

Zaozhuang Luhong

- On April 18, 2005, China United and Luhong entered into a capital increase agreement for the capitalization of RMB 20 million due from Zaozhuang Luhong to China United. As a result, the registered capital of Zaozhuang Luhong was increased from RMB 30 million to RMB 50 million, which was held as to 58% and 42% by China United and Luhong, respectively.

Ziyan

- On April 20, 2005, China United and Xinlei entered into a debt restructuring agreement for the transfer of Xinlei's 67.71% equity interest in Ziyan to China United to set off Xinlei's indebtedness to China United. As a result, Ziyan was held as to 67.71%, 27.29% and 5% by China United, Xinlei and Nanyang Hangtian, respectively.

Nanyang

- On September 2, 2004, Parent approved (Zhong Jian Cai Ban Fa [2004] No. 351) the allocation of Nanyang Hangtian's cement factory in Zhenping (鎮平分廠) to China United.

- On September 23, 2004, a business license was issued by the Administration for Industry and Commerce of Zhenping County, whereupon the above cement factory in Zhenping was established as a branch company of China United, namely, Nanyang.

ALRMH-CNBM00000585

Qingzhou

- In October 2004, Lunan Cement transferred its 20% equity interest in Qingzhou to Luhong as part of the asset segregation referred to in the section headed "Luhong" above. As a result, Qingzhou was held as to 80% and 20% by China United and Luhong, respectively.

*Our Lightweight Building Materials Segment*

BNBM

- On December 27, 2004, SASAC issued an approval (Guo Zi Chan Quan [2004] No. 1204) approving, amongst other things, the transfer of BNBMG's 60.33% equity interest in BNBM to CNBM Equipment.

- On January 28, 2005, CSRC issued an opinion (Zheng Jian Gong Si Zi [2005] No. 6) relating to, amongst other things, the waiver from the obligation for CNBM Equipment to make a general offer for the A shares in BNBM, which were listed on the Shenzhen Stock Exchange, as a result of the above transfer.

- On February 25, 2005, BNBM and BNBMG entered into an asset exchange agreement (資產置換協議) for BNBM's disposal of its 60% equity interest in BNBM Plastic Pipe Company Limited for a consideration of RMB 44,083,200 and its acquisition of a 9.9% equity interest in China United for a consideration of RMB 51,760,700.

- On March 24, 2005, registration procedures relating to the transfer of BNBMG's 60.33% equity interest in BNBM to CNBM Equipment were completed. As a result, BNBM was held as to 60.33% by CNBM Equipment and 39.67% by the public.

Tianfeng

- On February 25, 2005, BNBM, Yan Yu (嚴煜) and Zhang Zhonghua (張忠華) entered into a share transfer agreement for the transfer of Yan Yu's 50% equity interest and Zhang Zhonghua's 25% equity interest in Tianfeng to BNBM for a total of RMB 22 million. As a result, Tianfeng was held as to 75% and 25% by BNBM and Yan Yu, respectively.

Taihe

- On March 19, 2005, BNBM entered into a share subscription agreement for, among other things, the subscription of 65,362,500 shares in Taihe, representing 42% of the registered capital of Taihe upon completion of the share subscription.

*Our Glass Fiber and FRP Products Segment*

China Fiberglass

- On December 28, 2004, SASAC issued an approval (Guo Zi Chan Quan [2004] No. 1204) approving, amongst other things, the transfer of BNBMG's 37.79% equity interest in China Fiberglass to CNBM Equipment.

ALRMH-CNBM00000586

- On January 28, 2005, CSRC issued an opinion (Zheng Jian Gong Si Zi [2005] No. 6) relating to, amongst other things, the waiver from the obligation to make a general offer for the A shares in China Fiberglass, which were listed on the Shanghai Stock Exchange, as a result of the above transfer.

- As part of the Reorganization: (i) BNBMG and CNBM Trading respectively transferred to CNBM Equipment 37.79% and 0.31% equity interests in China Fiberglass by way of allocation at nil consideration; and (ii) CNBM Equipment acquired a 2.07% equity interest from China Fiberglass for a total cash consideration of RMB 12,890,000. As a result, China Fiberglass was held as to 40.17% by CNBM Equipment.

Jushi Group

- On March 3, 2005, China Fiberglass and Surest Finance Limited entered into a share transfer agreement for the transfer of Surest Finance Limited's 3.39% equity interest in Jushi Group to China Fiberglass. As a result, China Fiberglass's interest in Jushi Group was increased from 56.51% to 59.90%.

- On July 22, 2005, the Zhejiang Foreign Cooperative Investment Authority approved (Zhe Wai Jing Mao Zi Han [2005] Nos. 21 and 23) the injection of further capital into the Jushi Group by China Fiberglass, Surest Finance Limited and Zhenshi Group Company Limited (振石集團股份有限公司). As a result, the registered capital of the Jushi Group was increased to US$110,151,600.

China Composites

- On July 14, 2004, Parent approved (Zhong Jian Cai Ban Fa [2004] No. 283) the transfer of China Composites' equity interests in companies which it does not control, have ceased operation or do not produce its core glass fiber mats and FRP products (including certain glass product manufacturers) to Parent Group at nil consideration.

- On September 8, 2004, Parent approved (Zhong Jian Cai Ban Fa [2004] No. 353) the conversion of China Composites into a limited liability company. Upon completion of the conversion, China Composites was held as to 80% and 20% by CNBM Equipment and Parent, respectively.

- On November 2, 2004, Parent approved (Zhong Jian Cai Ban Fa [2004] No. 444) the transfer of CNBM Equipment's 3% equity interest in China Composites to Parent at nil consideration. As a result of such transfer, China Composites was held as to 77% and 23% by CNBM Equipment and Parent, respectively.

- On December 17, 2004, Parent and China Fiberglass entered into a share transfer agreement for the transfer of Parent's 23% equity interest in China Composites to China Fiberglass. As a result, China Composites was held as to 77% and 23% by CNBM Equipment and China Fiberglass, respectively.

ALRMH-CNBM00000587

Liberty TOLI

- On November 22, 2004, Zhongfu Liberty entered into share transfer agreements (as supplemented by an agreement dated November 25, 2004) for acquiring: (a) China Composites' 25% equity interest in Liberty TOLI for a consideration of RMB 10.07 million; and (b) Liberty Group's 15% equity interest in Liberty TOLI for a consideration of RMB 6.04 million. On the same day, Zhongfu Liberty entered into a share transfer agreement for acquiring Japan TOLI's 20% equity interest in Liberty TOLI for a consideration of RMB 5,483,300. As a result, Liberty TOLI was held as to 60% by Zhongfu Liberty.

Zhongfu Lianzhong

- On April 29, 2005, China Composites entered into a share transfer agreement with Zhongfu Lianzhong Staff Union and 14 individual shareholders of Zhongfu Lianzhong, for the transfer of a 41% equity interest in Zhongfu Lianzhong to China Composites at a consideration of approximately RMB 19.1 million. As a result, Zhongfu Lianzhong was held as to 92% by China Composites.

- On April 29, 2005, China Composites and six individual shareholders of Zhongfu Lianzhong entered into a capital increase agreement for the increase of China Composites' contribution to the capital of Zhongfu Lianzhong by RMB 20 million. As a result, the registered capital of Zhongfu Lianzhong was increased from approximately RMB 46.58 million to approximately RMB 66.58 million, which was held as to approximately 94.5% by China Composites.

*Our Engineering Services Segment*

China Triumph

- On July 30, 2004, Parent approved (Zhong Jian Cai Ban Fa [2004] No. 282) the transfer of cash of RMB 11 million held by Bengbu Design and Research Institute for Glass Industry, a wholly-owned subsidiary of Parent, to China Triumph, to ensure that China Triumph has sufficient funds to meet its working capital requirement. Such funds were mainly used by China Triumph for purchasing supplies for its engineering services business.

- On September 8, 2004, Parent approved (Zhong Jian Cai Ban Fa [2004] No. 352) the conversion of China Triumph into a limited liability company. Upon completion of the conversion, China Triumph was held as to 91% and 9% by Parent and Bengbu Huajin Technology and Development Company Limited (蚌埠市華金技術開發有限責任公司), respectively.

- On November 2, 2004, Parent approved (Zhong Jian Cai Ban Fa [2004] No. 443) the transfer of Parent's 91% equity interest in China Triumph to CNBM Equipment at nil consideration. As a result, China Triumph was held as to 91% and 9% by CNBM Equipment and Bengbu Huajin Technology and Development Company Limited (蚌埠市華金技術開發有限責任公司), respectively.

ALRMH-CNBM00000588

## APPENDIX VIII         STATUTORY AND GENERAL INFORMATION

**II.  Subsidiaries**

The Company's principal subsidiaries (for purposes of the Companies Ordinance) as at September 30, 2005 are set out in the Accountants' Report, the text of which is set out in Appendix I to this prospectus.

The following alterations in the share capital of our subsidiaries (as defined under the Companies Ordinance) have taken place within the two years preceding the date of this prospectus:

a)    On September 30, 2004, China United's registered capital was reduced from RMB 1,249,509,300.27 to RMB 415,580,000 pursuant to an approval letter issued by Parent.

b)    On April 28, 2005, Taihe increased its share capital from RMB 83,000,000 to RMB 155,625,000 by issuing 72,625,000 new shares with a par value of RMB 1 per share.

c)    On December 9, 2004, China Fiberglass increased its share capital from RMB 35,616,000 to RMB 427,392,000.

d)    On July 7, 2004, Jushi Group increased its registered capital from US\$ 29,951,600 to US\$ 46,951,600. Its registered capital was subsequently increased to US\$ 110,151,600 on September 15, 2005.

e)    On September 28, 2004, China Composites was converted into a limited liability company and its registered capital was RMB 200,000,000.

f)    On May 24, 2004, Zhongfu Xigang increased its registered capital from RMB 2,160,000 to RMB 32,520,000.

g)    On September 30, 2004, China Triumph was converted into a limited liability company and its registered capital was RMB 60,000,000.

h)    On April 2, 2004, Nanjing Triumph increased its registered capital from RMB 4,000,000 to RMB 7,820,000.

i)    On April 27, 2005, Huaihai increased its registered capital from RMB 59,820,000 to RMB 139,820,000.

j)    On November 4, 2004, Heze Company increased its registered capital from RMB 6,000,000 to RMB 11,000,000.

k)    On April 27, 2005, Heze Company increased its registered capital from RMB 11,000,000 to RMB 42,396,150.

l)    On April 25, 2005, Zaozhuang Luhong increased its registered share capital from RMB 30,000,000 to RMB 50,000,000.

m)    On November 8, 2004, Heze Concrete increased its registered share capital from RMB 10,000,000 to RMB 12,000,000.

ALRMH-CNBM00000589

---

**APPENDIX VIII**  **STATUTORY AND GENERAL INFORMATION**

n)   On June 20, 2005, Fuyang Julong increased its registered share capital from RMB 20,000,000 to RMB 30,000,000.

o)   On June 17, 2005, Suqian Julong increased its registered share capital from RMB 20,000,000 to RMB 30,000,000.

p)   On May 17, 2005, Zhongfu Lianzhong increased its registered share capital from RMB 46,579,600 to RMB 66,579,600.

Save as disclosed in this prospectus, there has been no alteration in the registered share capital of any of our subsidiaries within the two years preceding the date of this prospectus.

### III.  Other Joint Venture Arrangements

In addition to those companies set out in the Accountants' Report, the text of which is set out in Appendix I to this prospectus, and the companies mentioned in paragraph II above, as at the Latest Practicable Date, the Company is also interested in the following joint venture companies:

| Name of Company | Country/Date of Incorporation | Operative Term | Registered Capital | Percentage of Attributable Equity Interest | Principal Business |
|---|---|---|---|---|---|
| BNBM Homes | December 27, 2002 | 25 years | RMB200,000,000 | (1) BNBMG (11%) (2) BNBM (64%) (3) Nippon Steel Corporation (10%) (4) Toyota Motor Corporation (7.5%) (5) Mitsubishi Corporation (7.5%) | Research and development, production of new construction materials (including thin steel framed light-weight high-strength wall materials, parts, buildings, energy saving environment protection steel structure buildings); design, manufacture, processing of high grade environment protection decoration materials and household equipment; provision of technical services for self-produced products; sales of self-produced products |
| Yaohua | November 23, 1993 | Indefinite | RMB731,250,082 | China Composites (16.26%) | Production of transparent float glass, tainted float glass and deep processed product series, sales of self-produced products. (For those involving licenses, operation shall be subject to licenses) |

ALRMH-CNBM00000590

## APPENDIX VIII                         STATUTORY AND GENERAL INFORMATION

| Name of Company | Country/Date of Incorporation | Operative Term | Registered Capital | Percentage of Attributable Equity Interest | Principal Business |
|---|---|---|---|---|---|
| Zhongxin Tianma | December 11, 1995 | 30 years | US$11,885,000 | (1) China Composites (40%) (2) Tianma Group (35%) (3) JM International (25%) | Manufacture of fiber glass thin carpets and its products, sales of self-produced products. (For those involving special requirements, operation shall be subject to special licenses) |
| Liberty TOLI | May 4, 1993 | 25 years | Japanese Yen 940,000,000 | (1) Zhongfu Liberty (60%) (2) Japan TOLI (30%) (3) NN Chemical Corporation (8.11%) (4) Kindai Trading Co., Ltd. (1.89%) | Production of semi-rigid plastic floor tiles and decoration materials, sales of self-produced products. (For those involving special requirements, operation shall be subject to special licenses) |
| Beijing B&Q | October 15, 2003 | 30 years | US$10,000,000 | (1) BND (17%) (2) B&Q (China) BV (65%) (3) China International Book Trading Corporation (18%) | Retail of construction materials, decoration materials, kitchen utensils and bathroom apparatus, paints and coatings, hardware and tools, lamps and electric materials, timber and boards, door and window construction materials, horticulture flowers, furniture, home appliances and household decoration products; organizing exports of domestic products; import and export of self-produced commodities (imports and exports of commodities involving quota license administration shall be subject to the relevant approval procedures of the State); delivery, installation, maintenance and decoration services of products sold by the Company; consultation services on the products sold by the Company |

ALRMH-CNBM00000591

**APPENDIX VIII**                                  **STATUTORY AND GENERAL INFORMATION**

| Name of Company | Country/Date of Incorporation | Operative Term | Registered Capital | Percentage of Attributable Equity Interest | Principal Business |
|---|---|---|---|---|---|
| Shenzhen B&Q | March 8, 2002 | 30 years | US$10,000,000 | (1) BND (35%)<br>(2) B&Q (China) BV (65%) | Retail business of the following commodities (including agency and sale on consignment): floor tile materials, bathroom apparatus and kitchen utensils, paints and coatings, hardware and tools, lamps and electric materials, timber and boards, door and window construction materials, horticulture flowers, home appliances and household decoration products; organizing exports of domestic products; import and export of self-produced commodities (imports and exports of commodities involving quota license administration shall be subject to the relevant approval procedures of the State); delivery and installation, maintenance and decoration services of products sold by the co-operation company; consultation services on the products sold by the co-operation company |
| Generation Doors and Windows Co., Ltd.<br>(北京捷瑞信門窗有限公司) | May 12, 2000 | 20 years | RMB5,000,000 | (1) BNBM Plastic (75%)<br>(2) Zhou Songbo (25%) | Production of doors and window accessories for construction; sales of self-produced products; technical services for self-produced products |
| Jushi Group | June 28, 2001 | 50 years | US$46,951,600 | (1) China Fiberglass (59.9%)<br>(2) Zhenshi Group Company Limited (15.10%)<br>(3) Surest Finance Limited (25%) | Glass fiber, compound materials, engineering plastics and products, chemical materials for glass fiber, manufacture and sales of glass fiber equipment and parts |
| Taili Jewellery | August 24, 1998 | 10 years | RMB600,000 | (1) Taihe (70%)<br>(2) Pan Pacific Jewellery & Handicraft Inc. (30%) | Production of jade carving handicrafts, jade ornaments, granites, marbles, glass steel products; sales of products produced |

ALRMH-CNBM00000592

## APPENDIX VIII                    STATUTORY AND GENERAL INFORMATION

| Name of Company | Country/Date of Incorporation | Operative Term | Registered Capital | Percentage of Attributable Equity Interest | Principal Business |
|---|---|---|---|---|---|
| Tan Cheng Xinxing New Decorative Materials Co., Ltd. (郯城新興新裝飾材料有限公司) | August 5, 1999 | 11 years | RMB108,015,500 | (1) BNBM (29.2%) <br> (2) Tan Cheng County Paper Board Factory (郯城縣紙板廠) (27.96%) <br> (3) Tan Cheng County Feichao Capital Operation Co., Ltd. (郯城縣飛超資本運營有限公司) (17.84%) <br> (4) Rich Sound Asia Limited (3.84%) <br> (5) America Chung Nam Inc. (21.16%) | Production of new construction decoration materials and paper for decoration materials, high grade packaging papers, sales of self-produced products |
| Jiangyin Taishan | April 21, 2004 | 20 years | US$5,800,000 | (1) Taihe (67.5%) <br> (2) Shanghai Hengsheng New Building Material Development Company Limited (2.5%) <br> (3) Harvest Supreme International Ltd. (20%) <br> (4) Rich Well (Far East) Limited (10%) | Production of light-weight high-strength and multi-purpose wall materials (paper surfaced gypsum boards), sales of self-produced products |

## IV. Further Information About the Directors, Supervisors, Staff and Management, and Substantial Shareholders

### 1. Service contracts and remuneration of Directors and Supervisors

#### (a) Particulars of Service Contracts

Each of the Directors has entered into a service contract with the Company on February 28, 2006 (except for Mr. Lau Ko Yuen, Tom who has entered into a service contract on March 9, 2006) for a term commencing on the date on which they are elected and expiring on March 27, 2008 (the "Term"), except where:

(a)  the contract is terminated in accordance with the terms therein prior to March 27, 2008;

(b)  the Director is re-elected by the shareholders or a replacement director is appointed after March 27, 2008 (in which case, the Term will be automatically extended until such re-election or appointment);

(c)  the Director's resignation would result in the number of the Board members falling below the required quorum (in which case and subject to the applicable laws and regulations, the Term will be automatically extended until such time as a replacement director is appointed).

Each of the Directors is entitled to remuneration, the annual amount of which shall be approved by shareholders' meeting or any organization (or person(s)) delegated with such power. In addition, each of the Directors is entitled to reimbursement for all necessary and reasonable expenses properly incurred in the course of employment.

ALRMH-CNBM00000593

*(b)   Remuneration of Directors and Supervisors*

During the three years ended December 31, 2004 and the nine months ended September 30, 2005, the aggregate amount of salaries, housing allowances, discretionary bonuses, pension scheme contributions, other allowances and benefits in kind paid by the Company to its Directors and Supervisors was approximately RMB 688,898, RMB 1,046,027, RMB 656,077 and RMB 209,586, respectively. For further details, please see "*Note 9 of Appendix I — Accountant's Report.*"

Save as disclosed above, no other payments have been paid or are payable, in respect of the three years ended December 31, 2004 and the nine months ended September 30, 2005, by the Company or any of its subsidiaries to the Directors and Supervisors.

Under the arrangements currently in force, the estimated aggregate remuneration payable to the Directors and Supervisors for the year ending December 31, 2006 is approximately RMB 3,500,000.

**2.   *Disclosure of Directors' and Supervisors' interests in the shares in issue of the Company***

Immediately following the completion of the Global Offering, none of our Directors and Supervisors will have any interest or short position in any Shares, underlying shares and debentures of the Company and any of its associated corporations (within the meaning of Part XV of the SFO) which, once the H Shares are listed, (a) will have to be disclosed pursuant to Divisions 7 and 8 of Part XV of the SFO (including interests and short positions which they have taken or deemed to have taken under the SFO), or (b) will be required, pursuant to section 352 of the SFO, to be entered in the register required to be kept therein once the H Shares are listed, or (c) will be required pursuant to the Model Code for Securities Transactions by Directors of Listed Companies in the Listing Rules to be notified to the Company and the Stock Exchange.

**3.   *Substantial shareholders***

Information on the substantial shareholders of the Company is set out in the section entitled "*Substantial Shareholders*" of this prospectus.

**4.   *Connected transactions and related transactions***

Details of the related party transactions are set out in the section entitled "*Connected Transactions*" of this prospectus and in the Accountants' Report, the text of which is set out in Appendix I to this prospectus.

**5.   *Disclaimers***

Save as disclosed in this prospectus:

(a)   as far as the Directors are aware, none of the Directors or chief executive or Supervisors of the Company has any interest or short positions in the Shares, underlying shares or debentures of the Company and any of its associated corporations (within the meaning of Part XV of the SFO) which will have to be disclosed pursuant to Divisions 7 and 8 of Part XV of the SFO (including interests and short positions which they have taken or deemed to have taken under the SFO) once the H Shares are listed, or will be required, pursuant to section 352 of the SFO, to be entered in the register required to be kept therein once the H Shares are listed, or will be required pursuant to the Model Code for Securities Transactions by Directors of Listed Companies in the Listing Rules to be notified to the Company and the Stock Exchange once the H Shares are listed;

ALRMH-CNBM00000594

(b)   none of the Directors or Supervisors or any parties listed in paragraph VI.6 headed "*Qualification of experts*" in this Appendix is interested directly or indirectly in the promotion of the Company or in any assets which have, within the two years immediately preceding the issue of this prospectus, been acquired or disposed of by or leased to the Company or its subsidiaries or are proposed to be acquired or disposed of by or leased to the Company or its subsidiaries;

(c)   none of the Directors or Supervisors or any parties listed in paragraph VI.6 headed "*Qualification of experts*" in this Appendix is materially interested in any contract or arrangement subsisting at the date of this prospectus which is significant in relation to the business of the Company or its subsidiaries;

(d)   save in connection with the Hong Kong Underwriting Agreement and the International Underwriting Agreement, none of the parties listed in paragraph VI.6 headed "*Qualification of experts*" in this Appendix:

   (i)    is interested legally or beneficially in any shares in the Company or its subsidiaries; or

   (ii)   has any right (whether legally enforceable or not) to subscribe for or to nominate persons to subscribe for securities in the Company or its subsidiaries;

(e)   none of the Directors or Supervisors has entered or proposes to enter into a service contract with the Company or its subsidiaries (other than contracts expiring or determinable by the employer within one year without payment of compensation other than statutory compensation);

(f)   no cash, securities or benefit has been paid, allotted or given within the two years preceding the date of this prospectus to the Promoters in connection with the Global Offering nor is any such cash, securities or benefit intended to be paid, allotted or given; and

(g)   none of the Directors or their Associates or any shareholder of the Company which to the knowledge of the Directors owns more than 5% of the Company's Shares in issue has any interest in any of the five largest contractors and five largest customers of the Company or its subsidiaries.

## V.   Further Information about the Business

### *1.   Summary of material contracts*

The following contracts (not being in the ordinary course of business) have been entered into by the Company and its subsidiaries within two years immediately preceding the date of this prospectus and are or may be material:

(a)   a share transfer agreement dated April 29, 2004 and entered into between China United, Lunan Cement, Shizhongqu and Shandong Ansha Cement Group Company Limited (山東安廈水泥集團有限公司) ("Ansha Cement") (as supplemented by an agreement dated April 12, 2005) for the transfer of a 30% equity interest in Zaozhuang Luhong (formerly named 山東安廈水泥集團棗莊鑫廈水泥有限公司) by Shizhongqu to China United for a consideration of RMB 9 million and the transfer of 66.67% and 3.33% equity interests in Zaozhuang Luhong by Ansha Cement and Shighongqu, respectively, to Luhong for a total consideration of RMB 21 million. As a result, Zaozhuang Luhong was held as to 70% and 30% by Luhong and China United, respectively;

ALRMH-CNBM00000595

(b)   a segregation agreement (分立協議) dated September 16, 2004 and entered into between Lunan
      Cement and Luhong for the segregation of assets and liabilities relating to NSP cement production
      from Lunan Cement and transferring them to Luhong;

(c)   a segregation agreement (分立協議) dated September 16, 2004 and entered into between Julong
      Cement and Huaihai (as supplemented by an agreement dated September 16, 2004) for the
      segregation of assets and liabilities relating to NSP cement production from Julong Cement and
      transferring them to Huaihai;

(d)   a share transfer agreement dated November 22, 2004 and entered into between China Composites,
      Liberty Group and Zhongfu Liberty (as supplemented by an agreement dated November 25, 2004)
      for (a) the transfer of China Composites' 25% equity interest in Liberty TOLI to Zhongfu Liberty
      for a consideration of RMB 10.07 million; and (b) the transfer of Liberty Group's 15% equity
      interest in Liberty TOLI to Zhongfu Liberty for a consideration of RMB 6.04 million.

(e)   a share transfer agreement dated November 22, 2004 and entered into between Japan TOLI and
      Zhongfu Liberty for the transfer of Japan TOLI's 20% equity interest in Liberty TOLI to Zhongfu
      Liberty for a consideration of RMB 5,483,300;

(f)   an assets and liabilities allocation agreement (資產及負債劃轉協議) dated December 1, 2004 and
      entered into between CNBM Equipment and CNBM Trading regarding the allocation of assets
      and liabilities from CNBM Equipment to CNBM Trading at nil consideration pursuant to the
      Reorganization;

(g)   a share transfer agreement dated December 17, 2004 and entered into between Parent and China
      Fiberglass (formerly named 中國化學建材股份有限公司) for the transfer of Parent's 23% equity
      interest in China Composites to China Fiberglass for a consideration of approximately RMB 87.1
      million. As a result, China Composites was held as to 77% and 23% by CNBM Equipment and
      China Fiberglass, respectively;

(h)   an asset exchange agreement (資產置換協議) dated February 25, 2005 and entered into between
      BNBM and BNBMG regarding (a) the transfer of BNBM's 60% equity interest in BNBM Plastic
      Pipe Company Limited (北新塑管有限公司) and certain liabilities to BNBMG for a consideration
      of approximately RMB 44.1 million; and (b) the transfer of BNBMG's 9.9% equity interest in
      China United to BNBM for a consideration of approximately RMB 51.8 million;

(i)   a share transfer agreement dated February 25, 2005 and entered into between BNBM, Yan Yu
      (嚴煜) and Zhang Zhonghua (張忠華) for the transfer of Yan Yu's 50% equity interest and Zhang
      Zhonghua's 25% equity interest in Tianfeng to BNBM for a total consideration of RMB 22
      million. As a result, Tianfeng was held as to 75% and 25% by BNBM and Yan Yu, respectively;

(j)   a share subscription agreement dated March 19, 2005 and entered into between BNBM, Taihe,
      Taian State-owned Asset Management Company Limited (泰安市國有資產經營有限公司), Taian
      Anxin Investment Trading Company Limited (泰安市安信投資貿易有限公司), Shandong Taihe

ALRMH-CNBM00000596

Group Staff Shareholder Association (山東泰和集團職工持股者協會) and Jia Tongchun (賈同春) (on behalf of himself and 15 individual shareholders of Taihe) for, among other things, the subscription of 65,362,500 shares in Taihe by BNBM for a consideration of approximately RMB 117.7 million;

(k) a capital increase agreement dated April 18, 2005 and entered into between China United and Xuzhou State-owned Asset Investment and Management Company Limited (徐州市國有資產投資經營有限公司) for the capitalization of RMB 80 million invested in Huaihai by China United. As a result, the registered capital of Huaihai was increased from RMB 59.82 million to RMB 139.82 million, which was held as to 88.79% by China United and 11.21% by Xuzhou State-owned Asset Investment and Management Company Limited (徐州市國有資產投資經營有限公司);

(l) a capital increase agreement dated April 18, 2005 and entered into between China United and Luhong for the capitalization of RMB 20 million invested in Zaozhuang Luhong (formerly named 山東安廈水泥集團棗莊鑫廈水泥有限公司) by China United. As a result, the registered capital of Zaozhuang Luhong was increased from RMB 30 million to RMB 50 million, which was held as to 58% and 42% by China United and Luhong, respectively;

(m) a debt restructuring agreement dated April 20, 2005 and entered into between China United and Xinlei for the transfer of Xinlei's 67.71% equity interest in Ziyan to China United in order to set off approximately RMB 33.0 million of Xinlei's indebtedness to China United. As a result, Ziyan was held as to 67.71%, 27.29% and 5% by China United, Xinlei and Nanyang Hangtian, respectively;

(n) fifteen share transfer agreements dated April 29, 2005 and entered into between China Composites, and each of Zhongfu Lianzhong Staff Union (中複連眾公司職工持股會) and 14 individual shareholders of Zhongfu Lianzhong (Ren Guifang (任桂芳), Wu Xun (吳循), Qiao Guanghui (喬光輝), Dai Yun (戴雲), Yin Jiguo (尹繼國), Nan Yang (南洋), Fu Guangcai (伏廣才), Chen Liyou (陳立友), Luan Liguo (欒立國), Zhang Guojun (張國軍), Huang Hua (黃華), Tian Chaokai (田超凱), Zhang Bin (張斌) and Li Zhongjiang (李忠江)) for the transfer of a total of 41% equity interest in Zhongfu Lianzhong to China Composites for a total consideration of approximately RMB 19.1 million. As a result, Zhongfu Lianzhong was held as to 92% by China Composites;

(o) a capital increase agreement dated April 29, 2005 and entered into between China Composites and six individual shareholders of Zhongfu Lianzhong (Ren Guifang (任桂芳), Qiao Guanghui (喬光輝), Dai Yun (戴雲), Yin Jiguo (尹繼國), Nan Yang (南洋) and Wu Xun (吳循)) for the increase of China Composites' contribution to the capital of Zhongfu Lianzhong by RMB 20 million. As a result, the registered capital of Zhongfu Lianzhong was increased from RMB 46,579,600 to RMB 66,579,600, which was held as to 94.5% by China Composites;

(p) a debt restructuring agreement dated May 16, 2005 and entered into between Parent, the Company, China United, China Composites, China Triumph and Huaihai for, among other things, applying the dividend declared by the Company in favor of Parent to repay RMB 57,338,758.10 of Parent Group's indebtedness to the Group;

ALRMH-CNBM00000597

## APPENDIX VIII            STATUTORY AND GENERAL INFORMATION

(q)  a debt restructuring agreement dated May 20, 2005 and entered into between Luhong, Lunan Cement, Ansha Cement, Zaozhuang Luhong, Heze Concrete and Shandong Gaize Industry Co., Ltd. (山東蓋澤實業有限公司) for reorganizing the debts between the parties;

(r)  the Reorganization Agreement dated March 7, 2006 and entered into between the Company and the Promoters, details of which are set out in the section headed "Connected Transactions";

(s)  the Non-Competition Agreement dated February 28, 2006 and entered into between the Company and Parent, details of which are set out in the section headed "*Relationship with Parent — Competition*";

(t)  the Patent Licensing Agreement dated February 28, 2006 and entered into between BNBM and BNBMG, details of which are set out in the section headed "*Connected Transactions*";

(u)  the Trademark Licensing Agreement dated February 28, 2006 and entered into between the Company and Parent, details of which are set out in the section headed "*Connected Transactions*";

(v)  the Trademark Licensing Agreement dated June 10, 2005 and entered into between Nanyang and Nanyang Hangtian, details of which are set out in the section headed "*Connected Transactions*";

(w)  the Trademark Licensing Agreement dated February 28, 2006 and entered into between Ziyan and Xinlei, details of which are set out in the section headed "*Connected Transactions*"; and

(x)  the Hong Kong Underwriting Agreement, details of which are set out in the section headed "*Underwriting — Underwriting Arrangements and Expenses*."

**2.   Intellectual property rights**

*(a)   Trademarks (and service marks)*

As at the Latest Practicable Date, the Group has registered the following trademarks in the PRC:

| | Mark | Class | Date of Registration | Expiry Date | Registration Number | Services Covered | Registered Owner |
|---|---|---|---|---|---|---|---|
| 1. | 龍牌 + 龍圖形  | 2 | November 30, 1988 | November 29, 2008 | 331328 | Coatings | BNBM |
| 2. | BNBM  | 2 | May 7, 1996 | May 6, 2006 | 836268 | Coatings, paints and accessories (excluding insulating paints), porcelain glaze | BNBM |

VIII-18

ALRMH-CNBM00000598

# APPENDIX VIII                STATUTORY AND GENERAL INFORMATION

| | Mark | Class | Date of Registration | Expiry Date | Registration Number | Services Covered | Registered Owner |
|---|---|---|---|---|---|---|---|
| 3. | BNBM <br> BNBM | 19 | September 21, 1996 | September 20, 2006 | 873200 | Construction materials such as gypsum, sands, stones, grey clay, slags; prefabricated concrete parts, bricks and tiles for construction, non-metallic construction materials, non-metallic construction structures, rock wool materials (for construction), glass and steel doors, windows, gypsum board products | BNBM |
| 4. | BNBM <br> BNBM | 6 | July 7, 1997 | July 6, 2007 | 1049497 | Ordinary metals, ordinary metal plates, ordinary alloys, various profiles of ordinary metals (not including metal materials for welding and railways), metal plates for construction, metal construction materials, metal constructions, metal building structures, metal side plates, metal ceiling materials, metallic chamber for paint spraying | BNBM |
| 5. | 北新 <br> 北新 | 6 | July 14, 1997 | July 13, 2007 | 1055461 | Ordinary metals, ordinary metal plates, ordinary alloys, various profiles of ordinary metals (not including metal materials for welding and railways) | BNBM |
| 6. | 北新 <br> 北新 | 2 | August 7, 1997 | August 6, 2007 | 1068181 | Coatings, paints and accessories (excluding insulating paints), porcelain glaze | BNBM |
| 7. | BNBM <br> BNBM | 2 | August 7, 1997 | August 6, 2007 | 1068182 | Coatings, paints and accessories (excluding insulating paints), porcelain glaze | BNBM |

ALRMH-CNBM00000599

**APPENDIX VIII**                    **STATUTORY AND GENERAL INFORMATION**

| | Mark | Class | Date of Registration | Expiry Date | Registration Number | Services Covered | Registered Owner |
|---|---|---|---|---|---|---|---|
| 8. | 北新  | 19 | August 7, 1997 | August 6, 2007 | 1068280 | Construction materials such as semi-finished panels, sands, stones, gray clay, slags; prefabricated concrete parts, bricks and tiles for construction, non-metallic construction materials, non-metallic construction structures, rock wool materials (for construction), glass and steel doors, windows, stones, concrete or marble artistries | BNBM |
| 9. | BNBM  | 20 | August 7, 1997 | August 6, 2007 | 1068916 | Non-metallic door devices, non-metallic door accessories, non-metallic window accessories | BNBM |
| 10. | 北新  | 27 | August 14, 1997 | August 13, 2007 | 1075178 | Plastic, rubber floor tiles, bricks, hides, non-fabric wall curtain | BNBM |
| 11. | BNBM  | 17 | August 14, 1997 | August 13, 2007 | 1075255 | Temperature preserving materials, heat insulating materials, sound-proof materials | BNBM |
| 12. | 北新  | 17 | August 14, 1997 | August 13, 2007 | 1075267 | Temperature preserving materials, heat insulating materials, sound-proof materials | BNBM |
| 13. | 龍 + 龍圖形  | 17 | August 14, 1997 | August 13, 2007 | 1075268 | Temperature preserving materials, heat insulating materials, sound-proof materials | BNBM |

ALRMH-CNBM00000600

## APPENDIX VIII                    STATUTORY AND GENERAL INFORMATION

| Mark | Class | Date of Registration | Expiry Date | Registration Number | Services Covered | Registered Owner |
|---|---|---|---|---|---|---|
| 14. 北新 北新 | 20 | August 14, 1997 | August 13, 2007 | 1075877 | Non-metallic door devices, non-metallic door accessories, non-metallic window accessories | BNBM |
| 15. 龍 龙 | 20 | August 14, 1997 | August 13, 2007 | 1075917 | Non-metallic door devices, non-metallic door accessories, non-metallic window accessories | BNBM |
| 16. 北新 北新 | 37 | August 14, 1997 | August 13, 2007 | 1079773 | Brick and tile construction, demolishing of constructions, installation of gypsum, internal decorations and repairs, painting and repairs of signboards, installation and repairs of heat supply equipment, cleaning of boiler stains and repairs, automobile maintenance, vehicle servicing station, car washing, maintenance and repair of mechanical cars, vehicle repair | BNBM |
| 17. BNBM BNBM | 37 | August 14, 1997 | August 13, 2007 | 1079774 | Brick and tile construction, demolishing of constructions, installation of gypsum, internal decorations and repairs, painting and repair of signboards, installation and repair of heat supply equipment, cleaning of boiler stains and repairs, automobile maintenance, vehicle servicing station, car washing, maintenance and repair of mechanical cars, vehicle repair | BNBM |
| 18. 龍 + 龍圖形  | 19 | August 28, 1997 | August 27, 2007 | 1086362 | Gypsum board, coating materials for construction | BNBM |

ALRMH-CNBM00000601

**APPENDIX VIII**                    **STATUTORY AND GENERAL INFORMATION**

| Mark | Class | Date of Registration | Expiry Date | Registration Number | Services Covered | Registered Owner |
|------|-------|---------------------|-------------|---------------------|------------------|------------------|
| 19. 龍 +龍圖形  | 19 | September 28, 1997 | September 27, 2007 | 1112155 | Gypsum caulking sealant, bonding gypsum, hydrated gypsum powder | BNBM |
| 20. 龍 +龍圖形  | 2 | March 14, 1998 | March 13, 2008 | 1158475 | Coating materials, paints, oil putty, keratin (putty, grease), paint adhesives, paint diluting agent, curing agent (varnish), wall paper removing agent, paint drying agent, diluting agent | BNBM |
| 21. BNBM  | 17 | March 28, 1999 | March 27, 2009 | 1258101 | Glass fiber grid tape, sound-proof materials, temperature preserving non-heat conducting materials, glass fiber insulation boards and pipes, humidity proof construction materials, insulation materials, fillers, rubber bags for packaging (packs, small bags), textile material soft pipes, rubber bands for sealing | BNBM |
| 22. 北新  | 11 | April 21, 1999 | April 20, 2009 | 1266857 | Gas heater, heater, heater pipes, electric heating device, small heater, gas water heater, air-conditioner, water purifying device, electric water heater, heat radiator | BNBM |
| 23. BNBM  | 11 | April 21, 1999 | April 20, 2009 | 1266858 | Gas heater, heater, heater pipes, electric heating device, small heater, gas water heater, air-conditioner, water purifying device, electric water heater, heat radiator | BNBM |

ALRMH-CNBM00000602

## APPENDIX VIII                    STATUTORY AND GENERAL INFORMATION

| Mark | Class | Date of Registration | Expiry Date | Registration Number | Services Covered | Registered Owner |
|------|-------|----------------------|-------------|---------------------|------------------|------------------|
| 24. 北新  | 17 | August 7, 1999 | August 6, 2009 | 1300030 | Rubber band for sealing, pipe couplings, non-metallic reinforcing material, fiber glass heat preserving board and pipe, humid-proof construction material, insulation material, filler, rubber bags for packaging (packs, small bags), textile material soft pipes, drainage soft pipes (rubber and plastic) | BNBM |
| 25. 北新 + 龍牌圖形  | 11 | November 7, 1999 | November 6, 2009 | 1332023 | Solar energy water heater, gas water heater, heater, heater pipes, pollutant purifying device, electric water heater, heat radiator, water purifying device, sanitary device and equipment, disinfecting device | BNBM |
| 26. 北新 + 龍牌圖形  | 37 | November 7, 1999 | November 6, 2009 | 1332336 | Internal decoration, internal decoration and renovation, painting and repair, cleaning of signboards, installation and repair of heat supply equipment, car maintenance and repair, car servicing station, car washing | BNBM |
| 27. 北新 + 龍牌圖形  | 20 | November 21, 1999 | November 20, 2009 | 1335386 | Non-metallic door device, non-metallic window accessories, non-metallic accessories for furniture, non-metallic parts for furniture | BNBM |

VIII-23

ALRMH-CNBM00000603

## APPENDIX VIII                    STATUTORY AND GENERAL INFORMATION

| Mark | Class | Date of Registration | Expiry Date | Registration Number | Services Covered | Registered Owner |
|------|-------|----------------------|-------------|---------------------|------------------|------------------|
| 28. 北新 + 龍牌圖形  | 17 | November 28, 1999 | November 27, 2009 | 1337527 | Non-heat conducting materials for insulation, heat radiation-proof compound materials, fiber glass heat preserving board and pipes, humid-proof construction materials, plastic pipes, boards, poles, sheets (for non-construction use), fiber glass grid tapes, non-metallic pipe sockets, rock wool sound absorbing boards, non-metallic soft pipes | BNBM |
| 29. 北新 + 龍牌圖形  | 19 | December 14, 1999 | December 13, 2009 | 1342821 | Gypsum board, concrete parts, non-metallic construction materials, non-metallic construction structures, rock wool products (for construction), non-metallic doors, non-metallic windows, non-metallic construction coating materials, cement boards, gypsum, hydrated gypsum, non-metallic side boards | BNBM |
| 30. 北新 + 龍牌圖形  | 2 | December 21, 1999 | December 20, 2009 | 1345501 | Coatings, paints, putty, paint diluting agent, paint thickener, glaze (paint), paint drying agent, curing agent (varnish), paint adhesives | BNBM |
| 31. 北新 + 龍牌圖形  | 6 | March 28, 2000 | March 27, 2010 | 1379206 | Ordinary alloys, metal sheets and metal plates, metallic accessories for windows | BNBM |

ALRMH-CNBM00000604

## APPENDIX VIII                    STATUTORY AND GENERAL INFORMATION

| Mark | Class | Date of Registration | Expiry Date | Registration Number | Services Covered | Registered Owner |
|------|-------|----------------------|-------------|---------------------|------------------|------------------|
| 32. 龍 + 龍圖形  | 11 | April 14, 2000 | April 13, 2010 | 1385584 | Electric heater, gas heater, heat radiator, heater | BNBM |
| 33. 北新 + 龍牌圖形  | 24 | June 21, 2000 | June 20, 2010 | 1411010 | Textile tapestries, fiber glass wall curtains (textile) | BNBM |
| 34. 北新  | 20 | September 14, 2000 | September 13, 2010 | 1443803 | Plastic hooks for cables and pipings, plastic clips for cables and pipings, plastic cards, plastic trough for cables and wires, plastic drainage valves, plastic U-shaped pipes (valves) for sewage | BNBM |
| 35. 龍牌圖形  | 20 | September 21, 2000 | September 20, 2010 | 1446831 | Plastic hooks for cables and pipings, plastic clips for cables and pipings, plastic cards, plastic trough for cables and wires, plastic drainage valves, plastic U-shaped pipes (valves) for sewage | BNBM |
| 36. 北新  | 17 | November 7, 2000 | November 6, 2010 | 1468815 | Soft pipes for watering, soft pipes for drainage, non-metallic soft pipes, piping junctions, sealing rings, pipe coupling junctions, plastic pipes | BNBM |

VIII-25

ALRMH-CNBM00000605

## APPENDIX VIII                    STATUTORY AND GENERAL INFORMATION

| Mark | Class | Date of Registration | Expiry Date | Registration Number | Services Covered | Registered Owner |
|------|-------|----------------------|-------------|---------------------|------------------|-------------------|
| 37. 龍牌圖形  | 17 | November 14, 2000 | November 13, 2010 | 1472837 | Soft pipes for watering, soft pipes for drainage, non-metallic soft pipes, piping junctions, sealing rings, pipe coupling junctions, plastic pipes | BNBM |
| 38. 龍牌圖形  | 19 | November 14, 2000 | November 13, 2010 | 1473627 | Non-metallic pipes, non-metallic water trough pipes, non-metallic water pipes, non-metallic hard pipes (for construction), non-metallic sewage pipes, non-metallic drainage pipes, non-metallic water leading pipes, non-metallic water leading channels, non-metallic pipes for ventilation and air-conditioner, non-metallic roof rain prevention plates | BNBM |
| 39. 北新  | 19 | November 14, 2000 | November 13, 2010 | 1473628 | Non-metallic water pipes, non-metallic hard pipes (for construction), non-metallic sewage pipes, non-metallic drainage pipes, non-metallic water leading pipes, non-metallic water leading channels, non-metallic pipes for ventilation and air-conditioner, non-metallic roof rain prevention plates | BNBM |
| 40. 北新  | 6 | December 7, 2000 | December 6, 2010 | 1486997 | Metal compound couplings for pipes, metal pipe bends, metal pipe couplings, metal pipe accessories, metal pipe reinforcing materials | BNBM |
| 41. 龍牌圖形  | 6 | December 7, 2000 | December 6, 2010 | 1486998 | Metal compound couplings for pipes, metal pipe bends, metal pipe couplings, metal pipe accessories, metal pipe reinforcing materials | BNBM |

ALRMH-CNBM00000606

**APPENDIX VIII**                    **STATUTORY AND GENERAL INFORMATION**

| Mark | Class | Date of Registration | Expiry Date | Registration Number | Services Covered | Registered Owner |
|------|-------|---------------------|-------------|---------------------|------------------|------------------|
| 42. 北新  | 11 | December 7, 2000 | December 6, 2010 | 1487233 | Sanitary equipment pipe accessories, sanitary equipment water pipes, sinks, drainage pipe equipment, pipes and accessories for water heating device (including steam valve, water valve, hose, tee junction, double junction, coupling, pipe hoops, internal and external junctions) | BNBM |
| 43. 龍牌圖形  | 11 | December 7, 2000 | December 6, 2010 | 1487234 | Sanitary equipment pipe accessories, sanitary equipment water pipes, sinks, drainage pipe equipment, pipes and accessories for water heating device (including steam valve, water valve, hose, tee junction, double junction, coupling, pipe hoops, internal and external junctions) | BNBM |
| 44. 柔漫絲  | 27 | January 14, 2001 | January 13, 2011 | 1505000 | Wall papers, non-textile wall hangings, non-textile tapestries, non-textile hangings, carpets, small rugs | BNBM |
| 45. GENERATION 捷瑞信  | 19 | May 28, 2001 | May 27, 2011 | 1576816 | Floor, non-metallic construction materials, non-metallic windows, non-metallic doors, refractory materials, non-metallic bricks for construction, non-metallic constructions, non-metallic construction coating materials, construction glass, concrete construction parts | BNBM |

ALRMH-CNBM00000607

## APPENDIX VIII                    STATUTORY AND GENERAL INFORMATION

| Mark | Class | Date of Registration | Expiry Date | Registration Number | Services Covered | Registered Owner |
|------|-------|----------------------|-------------|---------------------|------------------|------------------|
| 46. 奇亮 SuperBri | 2 | July 21, 2001 | July 20, 2011 | 1604151 | Paints, panel coatings (paints), paint diluting agent, aluminum coatings, silver coatings, coating layer (paints), fire-proof paints, paint adhesives | BNBM |
| 47. 卓彩 Drawch | 2 | July 21, 2001 | July 20, 2011 | 1604152 | Paints, panel coatings (paints), paint diluting agent, aluminum coatings, silver coatings, coating layer (paints), fire-proof paints, paint adhesives | BNBM |
| 48. 沙美 SEEMI | 2 | July 21, 2001 | July 20, 2011 | 1604153 | Paints, panel coatings (paints), paint diluting agent, aluminum coatings, silver coatings, coating layer (paints), fire-proof paints, paint adhesives | BNBM |
| 49. 絲雅 SIYA | 2 | July 21, 2001 | July 20, 2011 | 1604154 | Paints, panel coatings (paints), paint diluting agent, aluminum coatings, silver coatings, coating layer (paints), fire-proof paints, paint adhesives | BNBM |
| 50. GENERATION 捷瑞信 | 6 | July 21, 2001 | July 20, 2011 | 1605522 | Metal construction materials, movable metallic constructions, metal doors, metal windows, metal furniture parts, metallic accessories for construction, metal door devices, metallic accessories for windows, metallic accessories for doors | BNBM |

ALRMH-CNBM00000608

**APPENDIX VIII**                                      **STATUTORY AND GENERAL INFORMATION**

| Mark | Class | Date of Registration | Expiry Date | Registration Number | Services Covered | Registered Owner |
|------|-------|---------------------|-------------|---------------------|------------------|------------------|
| 51. 金邦  | 19 | July 28, 2001 | July 27, 2011 | 1608838 | Non-metallic construction materials, non-metallic windows, non-metallic doors, non-metallic construction structures, gypsum, non-metallic bricks and tiles for construction, refractory materials, non-metallic constructions | BNBM |
| 52. 北新 + 龍牌圖形  | 21 | October 7, 2001 | October 6, 2011 | 1645010 | Daily use glass containers (including cups, plates, pots, jars), daily use pottery (including basins, bowls, plates, pots, dining sets, jars, jugs, cans), daily use pottery (including basins, bowls, plates, jars, jugs, cans, earthen pots, pots and dining sets), porcelain ornaments, non-precious metallic drinking vessels, bathroom utensils, non-precious metallic kitchen utensils, cosmetic sets, cleaning sets (manual) | BNBM |
| 53. 北新 + 龍牌圖形  | 27 | November 28, 2001 | November 27, 2011 | 1673113 | Carpets, cushions, mattresses, plastic and rubber tiles, bricks, hides, wall papers, non-textile wall hangings, non-textile tapestries (wall curtains) | BNBM |
| 54. 龍牌圖形  | 19 | April 7, 2002 | April 6, 2012 | 1740896 | Non-metallic bricks and tiles, floor tiles, panels, plywood, panels, non-metallic partition boards, non-metallic panels, non-metallic doors, non-metallic windows, non-metallic boards for construction | BNBM |
| 55. 柔漫絲  | 2 | April 28, 2002 | April 27 2012 | 1756221 | Coatings, paints, putty, paint diluting agent, paint thickener, glaze (paint), paint drying agent, curing agent (varnish), paint adhesives | BNBM |

VIII-29

ALRMH-CNBM00000609

## APPENDIX VIII                    STATUTORY AND GENERAL INFORMATION

| Mark | Class | Date of Registration | Expiry Date | Registration Number | Services Covered | Registered Owner |
|---|---|---|---|---|---|---|
| 56. 龍牌圖形  | 19 | April 14, 2003 | April 13, 2013 | 3057644 | Non-metallic floor tiles, non-metallic ceilings, non-metallic panels, matched timber floor, non-metallic concrete cover boards, concrete non-metallic mold boards, asphalt, paper boards for construction use (coated with asphalt), asphalt coating for roof tops, cement, felt carpet for construction, road paving materials, construction glass, insulation glass (construction), stone adhesives, stones, concrete or marble statues, non-metallic tablets, non-metallic bricks and tiles for construction, slates, artificial stones | BNBM |
| 57. BNBM  | 19 | April 14, 2003 | April 13, 2013 | 3057645 | Non-metallic floor tiles, non-metallic ceilings, non-metallic panels, matched timber floor, non-metallic concrete cover boards, concrete non-metallic mold boards, asphalt, paper boards for construction use (coated with asphalt), asphalt coating for roof-tops, cement, felt carpet for construction, road paving materials, construction glass, insulation glass (construction), stone adhesives, stones, concrete or marble statues, non-metallic tablets, non-metallic bricks and tiles for construction, slates, artificial stones | BNBM |

ALRMH-CNBM00000610

**APPENDIX VIII**                                    **STATUTORY AND GENERAL INFORMATION**

| Mark | Class | Date of Registration | Expiry Date | Registration Number | Services Covered | Registered Owner |
|------|-------|---------------------|-------------|--------------------|------------------|------------------|
| 58. 北新  | 19 | February 21, 2004 | February 20, 2014 | 3057646 | Non-metallic floor tiles, non-metallic ceilings, non-metallic panels, matched timber floor, non-metallic concrete cover boards, concrete non-metallic mold boards, asphalt, paper boards for construction use (coated with asphalt), asphalt coating for roof-tops, cement, felt carpet for construction, road paving materials, construction glass, insulation glass (construction), stone adhesives, stones, concrete or marble statues, non-metallic tablets, non-metallic bricks and tiles for construction, slates, artificial stones | BNBM |
| 59. 歐松  | 19 | May 14, 2003 | May 13, 2013 | 3105872 | Floor, refractory materials, non-metallic construction, non-metallic floor, non-metallic doors, concrete construction parts, non-metallic bricks and tiles for construction, water proof rolls, stones, concrete or marble artistries, non-metallic construction materials | BNBM |
| 60. 龍牌 + 龍牌圖形  | 19 | May 28, 2003 | May 27, 2013 | 3125653 | Gypsum boards, gypsum, concrete construction parts, concrete slabs, refractory materials, coatings (construction materials), non-metallic construction coating materials, cement pipes, cement pillars, fire-proof cement coating | BNBM |

ALRMH-CNBM00000611

**APPENDIX VIII**   **STATUTORY AND GENERAL INFORMATION**

| Mark | Class | Date of Registration | Expiry Date | Registration Number | Services Covered | Registered Owner |
|---|---|---|---|---|---|---|
| 61. 雨冰花 <br><br> 雨冰花 | 17 | October 7, 2003 | October 6, 2013 | 3210155 | Asbestos boards, asbestos carpets, humid-proof construction materials, sound-proof materials, rock wool (insulator), insulation materials, insulation varnish, slag wool (insulator), insulation coatings, asbestos packaging materials | BNBM |
| 62. 雪絨花 <br><br> 雪绒花 | 17 | October 7, 2003 | October 6, 2013 | 3210156 | Asbestos boards, asbestos carpets, humid-proof construction materials, sound-proof materials, rock wool (insulator), insulation materials, insulation varnish, slag wool (insulator), insulation coatings, asbestos packaging materials | BNBM |
| 63. 水潤 <br><br> 水 润 | 2 | March 21, 2004 | March 20, 2014 | 3210157 | Paints, putty, panel coatings, porcelain coatings, paint diluting agent, coating layer (paints), fire-proof paints, panel coatings, panel preservative, pigment | BNBM |
| 64. 木潤 <br><br> 木 润 | 2 | March 21, 2004 | March 20, 2014 | 3210158 | Paints, putty, panel coatings, porcelain coatings, paint diluting agent, coating layer (paints), fire-proof paints, panel coatings, panel preservative, pigment | BNBM |
| 65. 龍牌圖形 <br><br>  | 6 | December 21, 2003 | December 20, 2013 | 3260390 | Ordinary alloys, steel rods, steel plates, metallic constructions, metallic doors, metallic windows, metal construction parts, steel structure constructions, metal furniture parts, metallic accessories for windows | BNBM |

ALRMH-CNBM00000612

## APPENDIX VIII                                 STATUTORY AND GENERAL INFORMATION

| Mark | Class | Date of Registration | Expiry Date | Registration Number | Services Covered | Registered Owner |
|------|-------|----------------------|-------------|---------------------|------------------|------------------|
| 66. 龍牌 +圖形  | 6 | December 30, 1983 | December 29, 2013 | 202602 | Steel doors and steel windows | BNBM |
| 67.  | 6 | November 21, 2002 | November 20, 2012 | 1909182 | Padlocks, metallic accessories for furniture, metallic slates, metallic construction materials, metal pipes, metal locks (non-electrical), metallic boxes, ordinary metal locks, ordinary metal threads, hardwares | BND |
| 68.  | 8 | September 21, 2004 | September 20, 2014 | 3484536 | Sprayer for pesticides, horticulture tools (manual), shovels (tool), weeders, hoes, sickles (tool), hooks, iron crowbars, forks and picks (tools), harrows (tool) | BND |
| 69.  | 6 | January 14, 2005 | January 13, 2015 | 3594832 | Metallic construction materials, metal frames for construction, metal bars, metallic racks for construction | Taihe |
| 70.  | 19 | September 14, 2004 | September 13, 2014 | 3400510 | Gypsum boards, gypsum, hydrated gypsum | Taihe |
| 71.  | 19 | April 28, 2004 | April 27, 2014 | 3335589 | Gypsum boards, gypsum powder, hydrated gypsum, gypsum | Taihe |
| 72.  | 19 | July 21, 2002 | July 20, 2012 | 1811194 | Gypsum, gypsum boards | Taihe |
| 73.  | 19 | June 14, 2001 | June 13, 2011 | 1584728 | Gypsum boards | Taihe |

ALRMH-CNBM00000613

# APPENDIX VIII                    STATUTORY AND GENERAL INFORMATION

| | Mark | Class | Date of Registration | Expiry Date | Registration Number | Services Covered | Registered Owner |
|---|---|---|---|---|---|---|---|
| 74. |  | 19 | December 21, 1999 | December 20, 2009 | 1345313 | Gypsum boards, gypsum powder | Taihe |
| 75. |  | 19 | July 28, 1997 | July 27, 2007 | 1063238 | Gypsum boards | Taihe |
| 76. |  | 19 | July 14, 1993 | July 13, 2013 | 649888 | Gypsum boards | Taihe |
| 77. | cucc | 19 | March 21, 2004 | March 20, 2014 | 3295060 | Cement, asbestos cement, cement for furnace, cement for blast furnace, magnesium oxide cement, concrete construction parts, cement slates, cement pillars, asbestos cement slates, asbestos cement tiles | China United |
| 78. | 中 联 | 19 | March 14, 2004 | March 13, 2014 | 3254799 | Cements, furnace cement, blast furnace cements, magnesia cements, concrete building elements, floor slabs, cement posts, asbestos cement boards, non-metal concrete screens, asbestos cements | China United |
| 79. |  | 19 | June 30, 1986 | June 29, 2006 | 254014 | Cement | Huaihai |
| 80. |  | 19 | March 30, 1990 | March 29, 2010 | 515813 | Cement | Luhong |
| 81. |  | 22 | October 30, 1988 | October 29, 2008 | 328041 | Cement | Ziyan |

ALRMH-CNBM00000614

APPENDIX VIII                          STATUTORY AND GENERAL INFORMATION

| Mark | Class | Date of Registration | Expiry Date | Registration Number | Services Covered | Registered Owner |
|------|-------|---------------------|-------------|--------------------|-----------------|------------------|
| 82.  | 19 | June 21, 1997 | June 20, 2007 | 1032975 | Cement | Nanyang |
| 83. <br>圖形 | 17 | November 14, 2000 | November 13, 2010 | 1472808 | FRP pipelines | Zhongfu Lianzhong |
| 84.  | 20 | April 14, 2002 | April 13, 2012 | 1746445 | Non-metallic containers | Zhongfu Lianzhong |
| 85.  | 20 | July 14, 2002 | July 13, 2012 | 1806223 | FRP containers | Zhongfu Lianzhong |
| 86. 明麗 | 27 | August 14, 2000 | August 13, 2010 | 1431848 | Floor pads, vehicle carpets, plastic, rubber floor tiles, bricks, hides, polyvinyl floor cover, floor mattresses | Liberty TOLI |
| 87. 科麗 | 27 | August 14, 2000 | August 13, 2010 | 1431849 | Floor pads, vehicle carpets, plastic, rubber floor tiles, bricks, hides, polyvinyl floor cover, floor mattresses | Liberty TOLI |
| 88.  | 17 | July 21, 2004 | July 20, 2014 | 3261214 | Filtering materials (unprocessed bubble-foam or plastic membranes), heat preserving non-heat conductor materials, humid-proof construction materials, asbestos covers, sound-proof materials, fiber glass heat preservation boards and pipes, insulation materials, insulation carpets, insulation fiber glass, insulation fiber glass fabrics | Zhongxin Tianma |

ALRMH-CNBM00000615

**APPENDIX VIII**                         **STATUTORY AND GENERAL INFORMATION**

| | Mark | Class | Date of Registration | Expiry Date | Registration Number | Services Covered | Registered Owner |
|---|---|---|---|---|---|---|---|
| 89. | * | 7 | June 7, 2004 | * | 4105028 | 1. Machinery equipment for construction material industry (including environment protection equipment; | Nanjing Triumph |
| | | | | | | 2. Box style colling machine; | |
| | | | | | | 3. Preheating decomposer; | |
| | | | | | | 4. Burner; | |
| | | | | | | 5. Grinding equipment; | |
| | | | | | | 6. Crusher; | |
| | | | | | | 7. Stacker; | |
| | | | | | | 8. Transmitter; | |
| | | | | | | 9. Dust remover; | |
| | | | | | | 10. Construction material production line (cement, glass, pottery, bricks and tiles). | |

\*    Trademark is in the process of registration.

As at the Latest Practicable Date, the Group has been licensed to use the following trademarks in the PRC:

| | Mark | Class | Date of Registration | Expiry Date | Registration Number | Services Covered | Registered Owner |
|---|---|---|---|---|---|---|---|
| 1. | ○●▮▮▮▮ | 11 | October 14, 2004 | October 13, 2014 | 3902699 | Wall hanging gas stove, hose, water pipes for sanitary equipment, heater pipes, sanitary machinery and equipment, bathroom devices, solar energy collector, heater, lighting equipment and devices, lamps | Parent |
| 2. | ○●▮▮▮▮ | 17 | October 14, 2004 | October 13, 2014 | 3902697 | Non-metallic sockets, plastic pipes, boards, poles, sheets, sound-proof materials, fiber glass heat preserving boards and pipes, humid-proof construction materials, non-heat conducting material for heat preservation, insulating materials, asbestos boards, insulating coatings, water-proof packaging materials | Parent |

ALRMH-CNBM00000616

**APPENDIX VIII**                    **STATUTORY AND GENERAL INFORMATION**

| | Mark | Class | Date of Registration | Expiry Date | Registration Number | Services Covered | Registered Owner |
|---|---|---|---|---|---|---|---|
| 3. | | 42 | October 14, 2004 | October 13, 2014 | 3716169 | Designs of (cement, glass etc.) production lines, engineering, technological research, research on scientific projects, research on technological projects, geological exploration, external designs of industrial products, environment protection consultation, research and development (for others), quality testing | Parent |
| 4. | | 42 | March 21, 2004 | March 20, 2014 | 3202680 | Legal services, construction consultation, drawing of construction plans, design of internal decorations, material testing | Parent |
| 5. | | 19 | September 28, 2003 | September 27, 2013 | 3202665 | Floor tile, gypsum boards, cement, concrete construction parts, non-metallic bricks and tiles, refractory materials, non-metallic construction materials, rock wool products (for construction), non-metallic construction structures, non-metallic constructions, construction glass, coatings (construction materials) | Parent |
| 6. | | 17 | October 7, 2003 | October 6, 2013 | 3202666 | Non-metallic sockets, plastic pipes, boards, poles, sheets, sound proof materials, fiber glass heat preserving boards and pipes, humid-proof construction materials, non-heat conducting material for heat preservation, insulating materials, asbestos boards, insulating coatings, water proof packaging materials | Parent |

ALRMH-CNBM00000617

**APPENDIX VIII**                    **STATUTORY AND GENERAL INFORMATION**

| | Mark | Class | Date of Registration | Expiry Date | Registration Number | Services Covered | Registered Owner |
|---|---|---|---|---|---|---|---|
| 7. |  | 11 | January 21, 2004 | January 20, 2014 | 3202668 | Wall hanging gas stove, hose, water pipes for sanitary equipment, heater pipes, sanitary machinery and equipment, bathroom devices, solar energy collector, heater, lighting equipment and devices, lamps | Parent |
| 8. |  | 6 | January 28, 2004 | January 27, 2014 | 3202669 | Unprocessed or semi-finished ordinary metals, metal pipes, metallic construction materials, metallic constructions, metallic doors, metallic roof-top materials, metallic accessories for windows, metallic furniture parts, hardware, metal locks (non-electrical) | Parent |
| 9. |  | 2 | October 7, 2003 | October 6, 2013 | 3202670 | Coatings (chemical materials), paints, diluting agents, paint adhesives, pigments, pigments for food, printing inks, preservatives, natural resin | Parent |
| 10. |  | 35 | February 21, 2004 | February 20, 2014 | 3202664 | Advertising, advertisement design, commercial information, commercial professional consultation, import and export agency, promotions (for others), programming of computer database information, personnel management consultation, organization of commercial or advertising exhibitions | Parent |
| 11. |  | 37 | April 14, 2004 | April 13, 2014 | 3202682 | Installation, maintenance and repair of machinery, installation and repair of sanitary equipment, installation and repair of bathroom equipment, spraying services | Parent |

ALRMH-CNBM00000618

## APPENDIX VIII                    STATUTORY AND GENERAL INFORMATION

| | Mark | Class | Date of Registration | Expiry Date | Registration Number | Services Covered | Registered Owner |
|---|---|---|---|---|---|---|---|
| 12. |  CNBM | 39 | October 21, 2003 | October 20, 2013 | 3202681 | Tour agents (not including hotel bookings), tour arrangements, transportation, shipment transportation, car transportation, airfreight transportation, car rentals, storage, courier service (letters and commodities), pipe transmission | Parent |
| 13. |  CNBM | 43 | December 14, 2003 | December 13, 2013 | 3202679 | Commodities (hotels, commodities with caterings), restaurants, hotels, hotel bookings, provision of camping facilities, rentals of mobile houses | Parent |
| 14. |  CNBM | 36 | October 14, 2004 | October 13, 2014 | 3716168 | Financial services; financial consultation; insurance; fixed assets agency; fixed assets rental; intermediary of fixed assets; fixed assets management; brokerage; management on trust | Parent |
| 15. |  CNBM | 16 | September 14, 2003 | September 13, 2013 | 3202667 | Periodicals; printing of publications; papers; printed materials; plastic foam packaging materials (for packaging); stationery; drawing instruments; drawing materials; construction models; non-electric credit-card chopping machine | Parent |
| 16. | CENTURY 21 | 36 | February 7, 2005 | February 6, 2015 | 777124 | Fixed asset broking and insurance broking services | Century 21 Real Estate Corporation |
| 17. |  Century 21 | 36 | February 7, 2005 | February 6, 2015 | 777122 | Fixed asset broking and insurance broking services | Century 21 Real Estate Corporation |

ALRMH-CNBM00000619

# APPENDIX VIII                 STATUTORY AND GENERAL INFORMATION

*(b)   Patents\**

As at the Latest Practicable Date, the Group has registered the following patents in the PRC:

|  | Patent | Certificate No. | Effective Date | Application Date | Registered Owner | Type |
|---|---|---|---|---|---|---|
| 1. | a type of W-shaped metal frame for construction-use | 03276803.6 | September 1, 2004 | July 14, 2003 | BNBMG BNBM | utility model |
| 2. | aluminum-plastic composite profile | 03270574.3 | August 25, 2004 | August 18, 2003 | BNBMG BNBM | utility model |
| 3. | aluminum-plastic composite profile (1) | 033576645 | March 17, 2004 | August 20, 2003 | BNBMG BNBM | design |
| 4. | aluminum-plastic composite profile (2) | 03357663.7 | February 11, 2004 | August 20, 2003 | BNBMG BNBM | design |
| 5. | aluminum-plastic composite profile (3) | 033576629 | March 17, 2004 | August 20, 2003 | BNBMG BNBM | design |
| 6. | aluminum-plastic composite profile (4) | 033576610 | March 10, 2004 | August 20, 2003 | BNBMG BNBM | design |
| 7. | aluminum-plastic composite profile (5) | 033576602 | March 10, 2004 | August 20, 2003 | BNBMG BNBM | design |
| 8. | label (15) | 200330100400.2 | May 5, 2004 | October 15, 2003 | BNBMG BNBM | design |
| 9. | label (16) | 200330100399.3 | April 28, 2004 | October 15, 2003 | BNBMG BNBM | design |
| 10. | label (17) | 200330100398.9 | June 16, 2004 | October 15, 2003 | BNBMG BNBM | design |
| 11. | label (18) | 200330100397.4 | April 14, 2004 | October 15, 2003 | BNBMG BNBM | design |
| 12. | label (19) | 200330100396.X | June 2, 2004 | October 15, 2003 | BNBMG BNBM | design |
| 13. | method of producing mineral wool by blast furnace hot smelting | 021381968 | November 18, 2005 | September 2, 2002 | Tianfeng | invention |
| 14. | a type of wired glass severing machine | 03243117.1 | May 5, 2004 | April 4, 2003 | China Triumph | utility model |
| 15. | a type of glass crushing machine | 03244050.2 | April 7, 2004 | April 23, 2003 | China Triumph | utility model |
| 16. | ceramic grinding machine | 03262179.5 | June 23, 2004 | May 12, 2003 | China Triumph | utility model |
| 17. | large-scale skew blanket feeder | 03261243.5 | June 23, 2004 | May 19, 2003 | China Triumph | utility model |
| 18. | a type of solenoid trapping control system for electrostatic precipitator | 03276840.0 | November 17, 2004 | July 15, 2003 | China Triumph | utility model |
| 19. | a type of length measuring transmission device | 03209313.6 | October 27, 2004 | September 5, 2003 | China Triumph | utility model |
| 20. | a type of high-density mineral wool setting furnace | 03276574.6 | September 1, 2004 | August 22, 2003 | China Triumph | utility model |

\*   These are English translations of patents registered in Chinese.

ALRMH-CNBM00000620

**APPENDIX VIII**                    **STATUTORY AND GENERAL INFORMATION**

|  | Patent | Certificate No. | Effective Date | Application Date | Registered Owner | Type |
|---|---|---|---|---|---|---|
| 21 | a type of high oscillating speed compensated swing hammering machine (一種高攪速補償型擺鎚機) | 03279700.1 | September 8, 2004 | September 16, 2003 | China Triumph | utility model |
| 22 | a type of glass smelt furnace gas desulfurization precipitator | 200320102943.2 | November 24, 2004 | November 11, 2003 | China Triumph | utility model |
| 23 | a type of steelwork of the bottom of tin bath | 200320103778.2 | October 27, 2004 | November 6, 2003 | China Triumph | utility model |
| 24. | a type of glass smelt furnace pressure control system | 200320129735.1 | January 5, 2005 | December 22, 2003 | China Triumph | utility model |
| 25. | a type of float glass emergency cross-cutting machine | 200320126471.4 | December 29, 2004 | December 4, 2003 | China Triumph | utility model |
| 26. | sheet glass wheel conveyor | 200420038547.2 | March 30, 2005 | February 14, 2004 | China Triumph | utility model |
| 27. | power supply input device of float glass tin bath | 200420003216.5 | February 16, 2005 | February 12, 2004 | China Triumph | utility model |
| 28. | a type of flat glass tempering furnace actuator | 200420007240.6 | March 23, 2005 | March 18, 2004 | China Triumph | utility model |
| 29. | a type of glass seaming machine | 200420050543.6 | April 20, 2005 | April 30, 2004 | China Triumph | utility model |
| 30. | a type of large glass suction cup device | 200420050648.1 | April 20, 2005 | May 8, 2004 | China Triumph | utility model |
| 31. | a type of glass severing machine | 200420047450.8 | August 17, 2005 | March 29, 2004 | China Triumph | utility model |
| 32. | a type of full-automatic suspension-type float glass edge roller cross beam back swing device | 200420077835.9 | July 13, 2005 | July 15, 2004 | China Triumph | utility model |
| 33. | a type of full-automatic suspension-type float glass edge roller cross beam front rotator | 200420052140.5 | August 17, 2005 | July 7, 2004 | China Triumph | utility model |
| 34. | a type of glass smelt furnace feeder nose sealing device | 200420052728.0 | July 27, 2005 | July 29, 2004 | China Triumph | utility model |
| 35. | a type of L-shaped suspended wall for float glass smelt furnace | 200420052729.5 | July 27, 2005 | July 29, 2004 | China Triumph | utility model |
| 36. | duplex sealing device of glass smelt furnace horizontal stirrer | 200420053340.2 | August 24, 2005 | August 23, 2004 | China Triumph | utility model |
| 37. | a type of tin bath protective gas terminal purifying device | 200420053339.X | August 24, 2005 | August 23, 2004 | China Triumph | utility model |
| 38. | a type of edge roller pole device for full automatic suspension-type float glass edge roller | 200420052139.2 | August 24, 2005 | July 7, 2004 | China Triumph | utility model |

ALRMH-CNBM00000621

## APPENDIX VIII                STATUTORY AND GENERAL INFORMATION

| | Patent | Certificate No. | Effective Date | Application Date | Registered Owner | Type |
|---|---|---|---|---|---|---|
| 39. | four-tank siliceous sand scrubbing machine | 200420096986.9 | October 19, 2005 | September 27, 2004 | China Triumph | utility model |
| 40. | a type of float glass multiple longitudinal distribution system | 200420096736.5 | October 19, 2005 | September 27, 2004 | China Triumph | utility model |
| 41. | exit partition wall device of float glass tin bath | 200420096743.5 | September 28, 2005 | September 28, 2004 | China Triumph | utility model |
| 42. | entrance partition tile of float glass tin bath | 200420096744.X | September 28, 2005 | September 28, 2004 | China Triumph | utility model |
| 43. | rubber nipple for hydroclassification equipment | 2004200527276 | August 12, 2005 | July 29, 2004 | China Triumph | utility model |
| 44. | duplex cyclone multi-channel burner | 200420024933.6 | February 2, 2005 | February 25, 2004 | Nanjing Triumph | utility model |
| 45. | a type of burner for industrial furnace | 200420024934.0 | May 25, 2005 | February 25, 2004 | Nanjing Triumph | utility model |
| 46. | hybrid precipitator | 200420079116.0 | August 24, 2005 | August 31, 2004 | Nanjing Triumph | utility model |
| 47. | a type of high-temperature fixed bed anti-stacking device for industrial furnace cooler | 200420024935.5 | July 6, 2005 | February 25, 2004 | Nanjing Triumph | utility model |
| 48. | multi-purpose heat insulation transportation container | 02293187.2 | February 25, 2004 | December 30, 2002 | Lianyungang Lianzhong FRP Group Co. Ltd. | utility model |
| 49. | heating setting device for pressurized pipe production line | 03206576.0 | July 21, 2004 | July 29, 2003 | Lianyungang Lianzhong FRP Group Co. Ltd. | utility model |
| 50. | high-pressure rated FRP pipe wounding device | 03206575.2 | July 21, 2004 | July 29, 2003 | Lianyungang Lianzhong FRP Group Co. Ltd. | utility model |
| 51. | FRP flange waterline grinding machine | 03221896.6 | June 30, 2004 | May 14, 2003 | Lianyungang Lianzhong FRP Group Co. Ltd. | utility model |
| 52. | FRP storage tank vertical wounding device | 97236507.9 | February 5, 2000 | July 4, 1997 | Lianyungang FRP Factory (連雲港玻纖玻鋼總廠) | utility model |
| 53. | separator | 01245311.0 | June 26, 2002 | August 7, 2001 | Lianyungang Lianzhong FRP Group Co. Ltd., Jianghan Petroleum Prospecting Design Institute | utility model |
| 54. | label (Tai Shan brand gypsum plaster board) | 200330110098.9 | August 4, 2004 | November 12, 2003 | Taihe | design |

ALRMH-CNBM00000622

# APPENDIX VIII                    STATUTORY AND GENERAL INFORMATION

As at the Latest Practicable Date, the Group has been licensed to use the following patents in the PRC:

|     | Patent | Certificate No. | Effective Date | Application Date | Registered Owner | Type |
|-----|--------|-----------------|----------------|------------------|------------------|------|
| 1.  | U-shaped metal frame (1) | 99308753.1 | December 17, 1999 | June 30, 1999 | BNBMG | design |
| 2.  | U-shaped metal frame (2) | 99308752.3 | December 17, 1999 | June 30, 1999 | BNBMG | design |
| 3.  | U-shaped metal frame (3) | 99308751.5 | December 24, 1999 | June 30, 1999 | BNBMG | design |
| 4.  | metal frame (CH) | 99308750.7 | December 24, 1999 | June 30, 1999 | BNBMG | design |
| 5.  | metal frame (92) | 99308749.3 | January 22, 2000 | June 30, 1999 | BNBMG | design |
| 6.  | metal frame (65) | 99308748.5 | December 10, 1999 | June 30, 1999 | BNBMG | design |
| 7.  | metal frame (1) | 99308747.7 | December 17, 1999 | June 30, 1999 | BNBMG | design |
| 8.  | metal frame (2) | 99308754.X | December 24, 1999 | June 30, 1999 | BNBMG | design |
| 9.  | depth round nut wrench | 99308755.8 | December 17, 1999 | June 30, 1999 | BNBMG | design |
| 10. | ceiling metal frame | 99308771.X | December 24, 1999 | June 30, 1999 | BNBMG | design |
| 11. | side hung window frame | 99308770.1 | December 24, 1999 | June 30, 1999 | BNBMG | design |
| 12. | inner parallel frame | 99308769.8 | December 3, 1999 | June 30, 1999 | BNBMG | design |
| 13. | pressing bar profile | 99308768.X | December 10, 1999 | June 30, 1999 | BNBMG | design |
| 14. | frame | 99308767.1 | December 17, 1999 | June 30, 1999 | BNBMG | design |
| 15. | sliding frame | 99308766.3 | December 10, 1999 | June 30, 1999 | BNBMG | design |
| 16. | door and window profile | 99308765.5 | November 27, 1999 | June 30, 1999 | BNBMG | design |
| 17. | profile (1) | 99308764.7 | December 24, 1999 | June 30, 1999 | BNBMG | design |
| 18. | profile (2) | 99308763.9 | December 17, 1999 | June 30, 1999 | BNBMG | design |
| 19. | profile (3) | 99308762.0 | December 3, 1999 | June 30, 1999 | BNBMG | design |
| 20. | profile (4) | 99308761.2 | December 24, 1999 | June 30, 1999 | BNBMG | design |
| 21. | profile (5) | 99308760.4 | December 24, 1999 | June 30, 1999 | BNBMG | design |
| 22. | profile (6) | 99308759.0 | November 27, 1999 | June 30, 1999 | BNBMG | design |
| 23. | profile (7) | 99308758.2 | December 10, 1999 | June 30, 1999 | BNBMG | design |
| 24. | profile (8) | 99308757.4 | December 17, 1999 | June 30, 1999 | BNBMG | design |
| 25. | profile (9) | 99308756.6 | December 10, 1999 | June 30, 1999 | BNBMG | design |
| 26. | Manual hydraulic cutter | 99214981.9 | May 18, 2000 | July 8, 1999 | BNBMG | utility model |
| 27. | metal frame pneumatic servo clipper | 99214980.0 | April 7, 2000 | July 8, 1999 | BNBMG | utility model |
| 28. | automatic metal frame pneumatic unroller | 99214979.7 | May 25, 2000 | July 8, 1999 | BNBMG | utility model |
| 29. | heat shrink furnace for automatic board packing equipment | 99244092.0 | May 18, 2000 | September 6, 1999 | BNBMG | utility model |
| 30. | automatic lightweight board packing equipment | 99244408.x | May 4, 2000 | September 3, 1999 | BNBMG | utility model |
| 31. | holder for board packing equipment | 99244406.3 | May 4, 2000 | September 3, 1999 | BNBMG | utility model |
| 32. | turner for automatic board packing equipment | 99244407.1 | May 4, 2000 | September 3, 1999 | BNBMG | utility model |
| 33. | setting gear for automatic board packing equipment | 99244404.7 | May 4, 2000 | September 3, 1999 | BNBMG | utility model |
| 34. | parabolic stacking machine for automatic board packing equipment | 99244405.5 | May 4, 2000 | September 3, 1999 | BNBMG | utility model |

ALRMH-CNBM00000623

## APPENDIX VIII                    STATUTORY AND GENERAL INFORMATION

| | Patent | Certificate No. | Effective Date | Application Date | Registered Owner | Type |
|---|---|---|---|---|---|---|
| 35. | packing robotic arm for automatic board packing equipment | 99244409.8 | May 4, 2000 | September 3, 1999 | BNBMG | utility model |
| 36. | packing machine for automatic board packing equipment | 99244410.1 | May 4, 2000 | September 3, 1999 | BNBMG | utility model |
| 37. | plastic wrapper for automatic board packing equipment | 99244403.9 | May 4, 2000 | September 3, 1999 | BNBMG | utility model |
| 38. | automatic board packing equipment | 99244307.5 | May 18, 2000 | September 9, 1999 | BNBMG | utility model |
| 39. | decorative panel (1) | 99311200.5 | March 24, 2000 | August 16, 1999 | BNBMG | design |
| 40. | decorative panel (2) | 99311301.X | March 10, 2000 | August 16, 1999 | BNBMG | design |
| 41. | decorative panel (3) | 99311302.8 | April 28, 2000 | August 16, 1999 | BNBMG | design |
| 42. | decorative panel (4) | 99311303.6 | May 18, 2000 | August 16, 1999 | BNBMG | design |
| 43. | profile (10) | 99311304.4 | May 18, 2000 | August 16, 1999 | BNBMG | design |
| 44. | profile (11) | 99311305.2 | March 10, 2000 | August 16, 1999 | BNBMG | design |
| 45. | profile (12) | 99311306.0 | April 14, 2000 | August 16, 1999 | BNBMG | design |
| 46. | profile (13) | 99311307.9 | March 24, 2000 | August 16, 1999 | BNBMG | design |
| 47. | profile (14) | 99311308.7 | March 17, 2000 | August 16, 1999 | BNBMG | design |
| 48. | profile (15) | 99311309.5 | May 18, 2000 | August 16, 1999 | BNBMG | design |
| 49. | profile (16) | 99311310.9 | May 18, 2000 | August 16, 1999 | BNBMG | design |
| 50. | profile (17) | 99311311.7 | March 17, 2000 | August 16, 1999 | BNBMG | design |
| 51. | adjusting pulley for door and window | 99340965.2 | July 7, 2000 | December 21, 1999 | BNBMG | design |
| 52. | window handle | 99340964.4 | July 28, 2000 | December 21, 1999 | BNBMG | design |
| 53. | hidden style tegular panel | 00304316.9 | October 14, 2000 | March 28, 2000 | BNBMG | design |
| 54. | exterior wall decorative panel (1) | 00304171.9 | September 23, 2000 | March 28, 2000 | BNBMG | design |
| 55. | exterior wall decorative panel (3) | 00304170.0 | October 14, 2000 | March 28, 2000 | BNBMG | design |
| 56. | exterior wall decorative panel (4) | 00300422.8 | October 21, 2000 | March 28, 2000 | BNBMG | design |
| 57. | exterior wall decorative panel (5) | 00300423.6 | October 7, 2000 | March 28, 2000 | BNBMG | design |
| 58. | exterior wall decorative panel (6) | 00304169.7 | October 14, 2000 | March 28, 2000 | BNBMG | design |
| 59. | exterior wall decorative panel (7) | 00300424.4 | October 14, 2000 | March 28, 2000 | BNBMG | design |
| 60. | exterior wall decorative panel (9) | 00300425.2 | October 14, 2000 | March 28, 2000 | BNBMG | design |
| 61. | exterior wall decorative panel (10) | 00300426.0 | October 14, 2000 | March 28, 2000 | BNBMG | design |
| 62. | exterior wall decorative panel (11) | 00300427.9 | October 14, 2000 | March 28, 2000 | BNBMG | design |
| 63. | exterior wall decorative panel (12) | 00304301.0 | September 23, 2000 | March 28, 2000 | BNBMG | design |

ALRMH-CNBM00000624

## APPENDIX VIII                    STATUTORY AND GENERAL INFORMATION

| | Patent | Certificate No. | Effective Date | Application Date | Registered Owner | Type |
|---|---|---|---|---|---|---|
| 64. | exterior wall decorative panel (13) | 00304302.9 | January 13, 2001 | March 28, 2000 | BNBMG | design |
| 65. | exterior wall decorative panel (14) | 00304303.7 | October 7, 2000 | March 28, 2000 | BNBMG | design |
| 66. | exterior wall decorative panel (15) | 00300429.5 | October 14, 2000 | March 28, 2000 | BNBMG | design |
| 67. | exterior wall decorative panel (16) | 00304320.7 | October 14, 2000 | March 28, 2000 | BNBMG | design |
| 68. | exterior wall decorative panel (18) | 00304319.3 | October 14, 2000 | March 28, 2000 | BNBMG | design |
| 69. | exterior wall decorative panel (19) | 00304318.5 | December 1, 2000 | March 28, 2000 | BNBMG | design |
| 70. | exterior wall decorative panel (21) | 00304317.7 | October 14, 2000 | March 28, 2000 | BNBMG | design |
| 71. | decorative panel (5) | 00304305.3 | October 7, 2000 | March 28, 2000 | BNBMG | design |
| 72. | decorative panel (6) | 00304306.1 | October 14, 2000 | March 28, 2000 | BNBMG | design |
| 73. | decorative panel (7) | 00304307.X | October 14, 2000 | March 28, 2000 | BNBMG | design |
| 74. | decorative panel (8) | 00304304.5 | October 14, 2000 | March 28, 2000 | BNBMG | design |
| 75. | decorative panel (9) | 00304308.8 | October 21, 2000 | March 28, 2000 | BNBMG | design |
| 76. | decorative panel (10) | 00304309.6 | October 14, 2000 | March 28, 2000 | BNBMG | design |
| 77. | decorative panel (11) | 00304314.2 | October 14, 2000 | March 28, 2000 | BNBMG | design |
| 78. | decorative panel (12) | 00304310.X | October 14, 2000 | March 28, 2000 | BNBMG | design |
| 79. | decorative panel (13) | 00304313.4 | October 7, 2000 | March 28, 2000 | BNBMG | design |
| 80. | decorative panel (14) | 00304321.5 | September 23, 2000 | March 28, 2000 | BNBMG | design |
| 81. | decorative panel (15) | 00304322.3 | October 21, 2000 | March 28, 2000 | BNBMG | design |
| 82. | decorative panel (16) | 00304311.8 | September 23, 2000 | March 28, 2000 | BNBMG | design |
| 83. | decorative panel (17) | 00304312.6 | October 21, 2000 | March 28, 2000 | BNBMG | design |
| 84. | decorative panel (18) | 00304323.1 | October 7, 2000 | March 28, 2000 | BNBMG | design |
| 85. | decorative panel (19) | 00304324.X | October 14, 2000 | March 28, 2000 | BNBMG | design |
| 86. | decorative panel (20) | 00304315.0 | September 30, 2000 | March 28, 2000 | BNBMG | design |
| 87. | profile (1) | 00300417.1 | October 14, 2000 | March 28, 2000 | BNBMG | design |
| 88. | metal composite panel (1) | 00300418.X | October 14, 2000 | March 28, 2000 | BNBMG | design |
| 89. | metal composite panel (2) | 00300416.3 | October 14, 2000 | March 28, 2000 | BNBMG | design |
| 90. | metal frame (3) | 00300415.5 | October 14, 2000 | March 28, 2000 | BNBMG | design |
| 91. | metal frame (4) | 00300419.8 | October 14, 2000 | March 28, 2000 | BNBMG | design |
| 92. | metal frame (5) | 00300420.1 | October 14, 2000 | March 28, 2000 | BNBMG | design |
| 93. | metal frame (6) | 00300421.X | October 7, 2000 | March 28, 2000 | BNBMG | design |
| 94. | glass fiber reinforced lightweight cement board which uses expanded vermiculite as lightweight metal frame material and its process | 96100783.4 | March 3, 2000 | February 8, 1996 | BNBMG | invention |

ALRMH-CNBM00000625

## APPENDIX VIII                    STATUTORY AND GENERAL INFORMATION

| | Patent | Certificate No. | Effective Date | Application Date | Registered Owner | Type |
|---|---|---|---|---|---|---|
| 95. | adjustable lockset for plastic-steel door and window | 00201380.0 | December 5, 2001 | January 27, 2000 | BNBMG | utility model |
| 96. | handle for plastic window | 00306423.9 | October 28, 2000 | April 21, 2000 | BNBMG | design |
| 97. | decorative panel of exterior wall panel (2) | 00306436.0 | October 28, 2000 | April 21, 2000 | BNBMG | design |
| 98. | decorative panel (22) | 00306424.7 | November 4, 2000 | April 21, 2000 | BNBMG | design |
| 99. | left single point handle for plastic window | 00306425.5 | December 15, 2000 | April 21, 2000 | BNBMG | design |
| 100. | turning angle of plastic window 3 | 00306426.3 | October 28, 2000 | April 21, 2000 | BNBMG | design |
| 101. | decorative panel (21) | 00306427.1 | November 4, 2000 | April 21, 2000 | BNBMG | design |
| 102. | turning angle of plastic window 1 | 00306428.X | February 10, 2001 | April 21, 2000 | BNBMG | design |
| 103. | turning angle of plastic window 2 | 00306429.8 | November 4, 2000 | April 21, 2000 | BNBMG | design |
| 104. | exterior wall pendant (5) | 00306430.1 | February 3, 2001 | April 21, 2000 | BNBMG | design |
| 105. | exterior wall pendant (6) | 00306431.X | January 27, 2001 | April 21, 2000 | BNBMG | design |
| 106. | exterior wall pendant (3) | 00306432.8 | November 18, 2000 | April 21, 2000 | BNBMG | design |
| 107. | exterior wall pendant (2) | 00306435.2 | January 20, 2000 | April 21, 2000 | BNBMG | design |
| 108. | exterior wall decorative panel (8) | 00306437.9 | November 4, 2000 | April 21, 2000 | BNBMG | design |
| 109. | left-turning lock base for plastic window | 00306416.6 | October 28, 2000 | April 21, 2000 | BNBMG | design |
| 110. | right tilting and turning lock base for plastic window | 00306415.8 | November 11, 2000 | April 21, 2000 | BNBMG | design |
| 111. | plastic window mal-operation prevention equipment | 00306417.4 | November 4, 2000 | April 21, 2000 | BNBMG | design |
| 112. | safety lock base for plastic window | 00306418.2 | July 6, 2001 | April 21, 2000 | BNBMG | design |
| 113. | left horizontal handle for plastic window | 00306419.0 | November 4, 2000 | April 21, 2000 | BNBMG | design |
| 114. | right horizontal handle for plastic window | 00306420.4 | January 13, 2001 | April 21, 2000 | BNBMG | design |
| 115. | plastic window mal-operation prevention equipment base | 00306421.2 | October 28, 2000 | April 21, 2000 | BNBMG | design |
| 116. | right single point handle for plastic window | 00306422.0 | January 13, 2001 | April 21, 2000 | BNBMG | design |
| 117. | exterior wall panel pendant (4) | 00306433.6 | October 28, 2000 | April 21, 2000 | BNBMG | design |
| 118. | exterior wall panel pendant (1) | 00306434.4 | November 4, 2000 | April 21, 2000 | BNBMG | design |
| 119. | subtle-sprinkling board (2) | 00332280.7 | April 5, 2001 | July 17, 2000 | BNBMG | design |
| 120. | subtle-sprinkling board (1) | 00332279.3 | March 29, 2001 | July 17, 2000 | BNBMG | design |
| 121. | concealed insertion panel (2) | 00332236.X | January 20, 2001 | July 14, 2000 | BNBMG | design |

ALRMH-CNBM00000626

# APPENDIX VIII                STATUTORY AND GENERAL INFORMATION

| Patent | Certificate No. | Effective Date | Application Date | Registered Owner | Type |
|---|---|---|---|---|---|
| 122. concealed insertion panel (1) | 00332235.1 | January 27, 2001 | July 14, 2000 | BNBMG | design |
| 123. hotbed temperature control system of straw board forming machine | 00235991.X | March 29, 2001 | June 13, 2000 | BNBMG | utility model |
| 124. Golden straw board forming machine | 00235990.1 | January 27, 2001 | June 13, 2000 | BNBMG | utility model |
| 125. horizontal viscous liquid stirrer | 00235956.1 | March 15, 2001 | June 13, 2000 | BNBMG | utility model |
| 126. self-adjustable plate conveyor | 00235955.3 | March 8, 2001 | June 13, 2000 | BNBMG | utility model |
| 127. a type of supporting mechanism which is easy to install and uninstall inside a fan | 00235954.5 | March 1, 2001 | June 13, 2000 | BNBMG | utility model |
| 128. single screw extruder which produces fiber cement board by pressurized vacuum extrusion method | 00245749.0 | May 2, 2001 | August 8, 2000 | BNBMG | utility model |
| 129. equipment which produces fiber cement board by vacuum extrusion method | 00245748.2 | October 24, 2001 | August 8, 2000 | BNBMG | utility model |
| 130. a type of stirring kneader | 00245747.4 | May 2, 2001 | August 8, 2000 | BNBMG | utility model |
| 131. exterior wall decorative panel (17) | 01301855.8 | October 17, 2001 | March 15, 2001 | BNBMG | design |
| 132. exterior wall decorative panel (20) | 01301856.6 | October 17, 2001 | March 15, 2001 | BNBMG | design |
| 133. exterior wall decorative panel (22) | 01301857.4 | October 17, 2001 | March 15, 2001 | BNBMG | design |
| 134. exterior wall decorative panel (23) | 01301858.2 | October 17, 2001 | March 15, 2001 | BNBMG | design |
| 135. exterior wall decorative panel (24) | 01301859.0 | October 31, 2001 | March 15, 2001 | BNBMG | design |
| 136. exterior wall decorative panel (25) | 01301860.4 | October 31, 2001 | March 15, 2001 | BNBMG | design |
| 137. exterior wall decorative panel (26) | 01301861.2 | October 31, 2001 | March 15, 2001 | BNBMG | design |
| 138. exterior wall decorative panel (27) | 01301862.0 | November 21, 2001 | March 15, 2001 | BNBMG | design |
| 139. exterior wall decorative panel (28) | 01301863.9 | October 31, 2001 | March 15, 2001 | BNBMG | design |
| 140. exterior wall decorative panel (29) | 01301864.7 | October 31, 2001 | March 15, 2001 | BNBMG | design |
| 141. exterior wall decorative panel (30) | 01301865.5 | October 31, 2001 | March 15, 2001 | BNBMG | design |
| 142. exterior wall decorative panel (31) | 01301866.3 | October 17, 2001 | March 15, 2001 | BNBMG | design |

ALRMH-CNBM00000627

## APPENDIX VIII                    STATUTORY AND GENERAL INFORMATION

| Patent | Certificate No. | Effective Date | Application Date | Registered Owner | Type |
|--------|----------------|----------------|------------------|------------------|------|
| 143. crystalloid-raindrops board | 01306148.8 | October 17, 2001 | March 22, 2001 | BNBMG | design |
| 144. sunflower board | 01306078.3 | October 17, 2001 | March 20, 2001 | BNBMG | design |
| 145. label (1) | 01307864.X | November 28, 2001 | April 27, 2001 | BNBMG | design |
| 146. label (2) | 01307863.1 | November 28, 2001 | April 27, 2001 | BNBMG | design |
| 147. label (3) | 01307862.3 | January 16, 2002 | April 27, 2001 | BNBMG | design |
| 148. label (4) | 01307861.5 | December 5, 2001 | April 27, 2001 | BNBMG | design |
| 149. label (5) | 01307860.7 | December 5, 2001 | April 27, 2001 | BNBMG | design |
| 150. label (6) | 01307859.3 | May 1, 2002 | April 27, 2001 | BNBMG | design |
| 151. label (7) | 01307858.5 | December 19, 2001 | April 27, 2001 | BNBMG | design |
| 152. label (8) | 01307857.7 | December 19, 2001 | April 27, 2001 | BNBMG | design |
| 153. label (9) | 01307856.9 | December 26, 2001 | April 27, 2001 | BNBMG | design |
| 154. label (10) | 01307855.0 | December 19, 2001 | April 27, 2001 | BNBMG | design |
| 155. label (11) | 01307854.2 | January 23, 2002 | April 27, 2001 | BNBMG | design |
| 156. label (12) | 01307853.4 | December 19, 2001 | April 27, 2001 | BNBMG | design |
| 157. label (13) | 01307852.6 | January 16, 2002 | April 27, 2001 | BNBMG | design |
| 158. label (14) | 01307851.8 | December 19, 2001 | April 27, 2001 | BNBMG | design |
| 159. a type of mineral wool acoustical ceiling panel with noise absorption capability and its preparation method | 01120359.5 | November 10, 2004 | August 15, 2001 | BNBMG | invention |
| 160. a type of moisture-resistant and mold-proof gypsum plaster board | 01232108.7 | April 17, 2002 | July 23, 2001 | BNBMG | utility model |
| 161. a type of gypsum plaster board with water-proof and fire-resistant capability | 01232109.5 | May 8, 2002 | July 23, 2001 | BNBMG | utility model |
| 162. openable hidden style ceiling panel | 01259269.2 | September 11, 2002 | September 3, 2001 | BNBMG | utility model |
| 163. tee (1) | 01342436.X | April 3, 2002 | September 4, 2001 | BNBMG | design |
| 164. tee (2) | 01342435.1 | May 1, 2002 | September 4, 2001 | BNBMG | design |
| 165. tee (3) | 01342434.3 | April 3, 2002 | September 4, 2001 | BNBMG | design |
| 166. cross (1) | 01342430.0 | April 3, 2002 | September 4, 2001 | BNBMG | design |
| 167. bend (1) | 01342433.5 | May 1, 2002 | September 4, 2001 | BNBMG | design |
| 168. bend (2) | 01342432.7 | June 12, 2002 | September 4, 2001 | BNBMG | design |
| 169. bend (3) | 01342431.9 | April 3, 2002 | September 4, 2001 | BNBMG | design |
| 170. exterior wall heat insulation layer fastener | 01270130.0 | October 9, 2002 | November 5, 2001 | BNBMG | utility model |
| 171. closed-type two-point press | 01266319.0 | August 21, 2002 | November 2, 2001 | BNBMG | utility model |
| 172. section straightening machine | 01266318.2 | October 9, 2002 | November 2, 2001 | BNBMG | utility model |
| 173. unroller | 01266317.4 | October 9, 2002 | November 2, 2001 | BNBMG | utility model |
| 174. thrower | 01266180.5 | August 21, 2002 | November 12, 2001 | BNBMG | utility model |

ALRMH-CNBM00000628

# APPENDIX VIII                    STATUTORY AND GENERAL INFORMATION

| Patent | Certificate No. | Effective Date | Application Date | Registered Owner | Type |
|---|---|---|---|---|---|
| 175. digital-controlled loader | 01266179.1 | September 11, 2002 | November 12, 2001 | BNBMG | utility model |
| 176. mould guide pin unfixed safety brake-gear | 01266178.3 | July 24, 2002 | November 12, 2001 | BNBMG | utility model |
| 177. metal frame single punch forming machine | 01270701.5 | September 11, 2002 | November 14, 2001 | BNBMG | utility model |
| 178. a type of low-noise level drain pipe | 01144193.3 | November 24, 2002 | December 14, 2001 | BNBMG | invention |
| 179. ejector rod for metallic fittings of side hung and top hung door and window | 02202498.0 | December 18, 2002 | January 30, 2002 | BNBMG | utility model |
| 180. actuator for metallic fittings of side hung and top hung door and window | 02202499.9 | December 4, 2002 | January 30, 2002 | BNBMG | utility model |
| 181. turning angle for metallic fittings of side hung and top hung door and window | 02202500.6 | December 4, 2002 | January 30, 2002 | BNBMG | utility model |
| 182. connecting rod for metallic fittings of side hung and top hung door and window | 02204801.4 | December 18, 2002 | January 30, 2002 | BNBMG | utility model |
| 183. bolster bearing for metallic fittings of side hung and suspended door and window | 02204802.2 | December 4, 2002 | January 30, 2002 | BNBMG | utility model |
| 184. brace for metallic fittings of side hung and top hung door and window | 02204803.0 | December 4, 2002 | January 30, 2002 | BNBMG | utility model |
| 185. lower bearing for metallic fittings of side hung and top hung door and window | 02204804.9 | December 18, 2002 | January 30, 2002 | BNBMG | utility model |
| 186. lower reel for metallic fittings of side hung and top hung door and window | 02204805.7 | January 1, 2003 | January 30, 2002 | BNBMG | utility model |
| 187. a type of automatic welding machine for cross key operating system control | 02205182.1 | March 5, 2003 | February 27, 2002 | BNBMG | utility model |
| 188. connecting architecture of the corner of plastic-steel window | 02205947.4 | December 18, 2002 | March 14, 2002 | BNBMG | utility model |
| 189. connection method of the corner of plastic-steel window | 02104431.7 | January 12, 2005 | March 14, 2002 | BNBMG | invention |

ALRMH-CNBM00000629

## APPENDIX VIII                    STATUTORY AND GENERAL INFORMATION

| Patent | Certificate No. | Effective Date | Application Date | Registered Owner | Type |
|---|---|---|---|---|---|
| 190. connecting architecture of interior suspended ceiling material and the two sides of grid lamp | 02209197.1 | January 1, 2003 | April 3, 2002 | BNBMG | utility model |
| 191. a type of decorative panel with surface coating | 02205645.9 | January 15, 2003 | March 19, 2002 | BNBMG | utility model |
| 192. decorative acoustical panel | 02233453.X | November 12, 2003 | May 9, 2002 | BNBMG | utility model |
| 193. granular material thrower | 02233452.1 | October 29, 2003 | May 9, 2002 | BNBMG | utility model |
| 194. openable concealed decorative panel | 02233451.3 | July 23, 2003 | May 9, 2002 | BNBMG | utility model |
| 195. Tension adjusting device for cold rolled precision ultra-narrow steel belt packing | 02235954.0 | April 9, 2003 | June 5, 2002 | BNBMG | utility model |
| 196. online thickness and length metering device for cold rolled precision ultra-narrow steel belt | 02235955.9 | April 16, 2003 | June 5, 2002 | BNBMG | utility model |
| 197. single wind-up roller for cold rolled precision ultra-narrow steel belt | 02235956.7 | August 25, 2004 | June 5, 2002 | BNBMG | utility model |
| 198. preparation device for cold rolled precision ultra-narrow steel belt | 02235957.5 | June 11, 2003 | June 5, 2002 | BNBMG | utility model |
| 199. surface treatment device for cold rolled precision ultra-narrow steel belt packing | 02235958.3 | December 31, 2003 | June 5, 2002 | BNBMG | utility model |
| 200. wind-up roller for cold rolled precision ultra-narrow steel belt | 02235959.1 | September 22, 2004 | June 5, 2002 | BNBMG | utility model |
| 201. wind-up roller for cold rolled precision ultra-narrow steel belt | 02235960.5 | December 31, 2003 | June 5, 2002 | BNBMG | utility model |
| 202. circular arc tegular panel | 02330613.0 | February 5, 2003 | June 12, 2002 | BNBMG | design |
| 203. multifunctional lightweight composite panel | 95227805.7 | December 20, 1996 | December 11, 1995 | BNBMG | utility model |
| 204. concealed metal frame (H-shaped) | 02333210.7 | February 26, 2003 | August 7, 2002 | BNBMG | design |
| 205. marking equipment of metal frame machine | 02243795.9 | June 11, 2003 | August 7, 2002 | BNBMG | utility model |
| 206. a type of composite gypsum board | 02246425.5 | August 6, 2003 | August 26, 2002 | BNBMG | utility model |
| 207. a type of composite mineral wool type acoustical ceiling panel | 02246424.7 | August 6, 2003 | August 26, 2002 | BNBMG | utility model |

ALRMH-CNBM00000630

# APPENDIX VIII                              STATUTORY AND GENERAL INFORMATION

| | Patent | Certificate No. | Effective Date | Application Date | Registered Owner | Type |
|---|---|---|---|---|---|---|
| 208. | decorative panel (raised streak) | 02370322.9 | September 24, 2003 | November 14, 2002 | BNBMG | design |
| 209. | connector of acoustical panel and metal frame | 02289667.8 | January 7, 2004 | December 2, 2002 | BNBMG | utility model |
| 210. | continuous forming machine for C-shaped fitting of plastic-steel door and window metallic fittings | 02288593.5 | November 12, 2003 | November 29, 2002 | BNBMG | utility model |
| 211. | notching device for manufacturing C-shaped fitting of plastic-steel door and window metallic fittings | 02288592.7 | November 12, 2003 | November 29, 2002 | BNBMG | utility model |
| 212. | creasing device for manufacturing C-shaped fitting of plastic-steel door and window metallic fittings | 02288591.9 | November 12, 2003 | November 29, 2002 | BNBMG | utility model |
| 213. | concealed acoustical panel | 02289666.X | November 5, 2003 | December 2, 2002 | BNBMG | utility model |
| 214. | concealed acoustical panel | 02370582.5 | September 17, 2003 | December 3, 2002 | BNBMG | design |
| 215. | testing machine for side hung and top hung door and window | 02288595.1 | November 5, 2003 | November 29, 2002 | BNBMG | utility model |
| 216. | testing machine for revolving door and window | 02288594.3 | November 5, 2003 | November 29, 2002 | BNBMG | utility model |
| 217. | outer cap of vertical pipe access door (1) | 02375541.5 | June 18, 2003 | December 2, 2002 | BNBMG | design |
| 218. | inner cap of vertical pipe access door (1) | 02370780.1 | August 13, 2003 | November 29, 2002 | BNBMG | design |
| 219. | pipe fitting (1) | 02370779.8 | June 11, 2003 | November 29, 2002 | BNBMG | design |
| 220. | decorative panel (23) | 02370053.X | June 18, 2003 | November 15, 2002 | BNBMG | design |
| 221. | decorative panel (24) | 02370052.1 | June 11, 2003 | November 15, 2002 | BNBMG | design |
| 222. | decorative panel (25) | 02370051.3 | June 18, 2003 | November 15, 2002 | BNBMG | design |
| 223. | decorative panel (26) | 02370050.5 | June 18, 2003 | November 15, 2002 | BNBMG | design |
| 224. | decorative panel (27) | 02370049.1 | June 11, 2003 | November 15, 2002 | BNBMG | design |
| 225. | decorative panel (28) | 02370048.3 | June 18, 2003 | November 15, 2002 | BNBMG | design |
| 226. | decorative panel (29) | 02370047.5 | August 13, 2003 | November 15, 2002 | BNBMG | design |
| 227. | pipe fitting (2) | 02370778.X | June 11, 2003 | November 29, 2002 | BNBMG | design |
| 228. | pipe hoop (1) | 02370777.1 | June 18, 2003 | November 29, 2002 | BNBMG | design |
| 229. | bend (4) | 02370776.3 | June 11, 2003 | November 29, 2002 | BNBMG | design |
| 230. | bend (5) | 02370775.5 | August 13, 2003 | November 29, 2002 | BNBMG | design |
| 231. | vertical pipe (1) | 02370774.7 | August 13, 2003 | November 29, 2002 | BNBMG | design |
| 232. | cross (2) | 02370773.9 | June 11, 2003 | November 29, 2002 | BNBMG | design |
| 233. | pipe fitting (cross) | 02370772.0 | August 27, 2003 | November 29, 2002 | BNBMG | design |
| 234. | tee (4) | 02375542.3 | June 18, 2003 | December 2, 2002 | BNBMG | design |

ALRMH-CNBM00000631

## APPENDIX VIII                    STATUTORY AND GENERAL INFORMATION

| Patent | Certificate No. | Effective Date | Application Date | Registered Owner | Type |
|---|---|---|---|---|---|
| 235. tee (5) | 02375543.1 | June 18, 2003 | December 2, 2002 | BNBMG | design |
| 236. tee (6) | 02375544.X | October 22, 2003 | December 2, 2002 | BNBMG | design |
| 237. tee (7) | 02375545.8 | August 27, 2003 | December 2, 2002 | BNBMG | design |
| 238. tee (8) | 02375546.6 | June 18, 2003 | December 2, 2002 | BNBMG | design |
| 239. window handle (1) | 02383341.6 | August 13, 2003 | December 23, 2002 | BNBMG | design |
| 240. window handle (2) | 02383340.8 | August 20, 2003 | December 23, 2002 | BNBMG | design |
| 241. window handle (3) | 02383339.4 | August 20, 2003 | December 23, 2002 | BNBMG | design |
| 242. window handle (4) | 02383338.6 | August 13, 2003 | December 23, 2002 | BNBMG | design |
| 243. door handle (1) | 02383337.8 | August 13, 2003 | December 23, 2002 | BNBMG | design |
| 244. door handle (2) | 02383336.X | August 13, 2003 | December 23, 2002 | BNBMG | design |
| 245. middle hinge for window | 02383335.1 | August 13, 2003 | December 23, 2002 | BNBMG | design |
| 246. clip installation template | 02383334.3 | August 13, 2003 | December 23, 2002 | BNBMG | design |
| 247. lock installation template | 02383333.5 | June 11, 2003 | December 23, 2002 | BNBMG | design |
| 248. lift sliding block for window | 02383332.7 | August 13, 2003 | December 23, 2002 | BNBMG | design |
| 249. connecting rod for door and window | 02383331.9 | August 13, 2003 | December 23, 2002 | BNBMG | design |
| 250. brace for door and window | 02383330.0 | August 20, 2003 | December 23, 2002 | BNBMG | design |
| 251. window actuator | 02383329.7 | August 20, 2003 | December 23, 2002 | BNBMG | design |
| 252. turning angle for window (1) | 02383328.9 | August 13, 2003 | December 23, 2002 | BNBMG | design |
| 253. turning angle for window (2) | 02383327.0 | August 13, 2003 | December 23, 2002 | BNBMG | design |
| 254. turning angle for window (3) | 02383326.2 | August 13, 2003 | December 23, 2002 | BNBMG | design |
| 255. turning angle for window (4) | 02383325.4 | August 13, 2003 | December 23, 2002 | BNBMG | design |
| 256. caging device for window | 02383324.6 | September 24, 2003 | December 23, 2002 | BNBMG | design |
| 257. turning angle for window (6) | 02383323.8 | June 11, 2003 | December 23, 2002 | BNBMG | design |
| 258. turning angle for window (7) | 02383322.X | August 13, 2003 | December 23, 2002 | BNBMG | design |
| 259. turning angle for window (8) | 02383321.1 | August 13, 2003 | December 23, 2002 | BNBMG | design |
| 260. turning angle for window (9) | 02383320.3 | August 20, 2003 | December 23, 2002 | BNBMG | design |
| 261. ejector rod for window (1) | 02383319.X | August 20, 2003 | December 23, 2002 | BNBMG | design |
| 262. ejector rod for window (2) | 02383318.1 | August 13, 2003 | December 23, 2002 | BNBMG | design |
| 263. ejector rod for window (3) | 02383317.3 | August 13, 2003 | December 23, 2002 | BNBMG | design |
| 264. ejector rod for window (4) | 02383316.5 | August 13, 2003 | December 23, 2002 | BNBMG | design |
| 265. ejector rod for window (5) | 02383315.7 | August 13, 2003 | December 23, 2002 | BNBMG | design |
| 266. lock base installation template (1) | 02383314.9 | August 13, 2003 | December 23, 2002 | BNBMG | design |
| 267. lock base installation template (2) | 02383313.0 | August 13, 2003 | December 23, 2002 | BNBMG | design |
| 268. cutting machine | 02383312.2 | August 13, 2003 | December 23, 2002 | BNBMG | design |

ALRMH-CNBM00000632

## APPENDIX VIII                    STATUTORY AND GENERAL INFORMATION

| Patent | Certificate No. | Effective Date | Application Date | Registered Owner | Type |
|---|---|---|---|---|---|
| 269. bolster bearing for window | 02383311.4 | August 13, 2003 | December 23, 2002 | BNBMG | design |
| 270. lower bearing for window | 02383310.6 | August 20, 2003 | December 23, 2002 | BNBMG | design |
| 271. lower hinge for window | 02383309.2 | August 13, 2003 | December 23, 2002 | BNBMG | design |
| 272. lock base (1) | 02383308.4 | August 13, 2003 | December 23, 2002 | BNBMG | design |
| 273. lock base (2) | 02383307.6 | August 13, 2003 | December 23, 2002 | BNBMG | design |
| 274. plastic pipe fittings with flexible spigot | 02289646.5 | October 15, 2003 | December 2, 2002 | BNBMG | utility model |
| 275. a type of pipe fitting access door and access door cap | 02289837.9 | October 29, 2003 | December 9, 2002 | BNBMG | utility model |
| 276. cartridge (2) | 03300461.7 | September 3, 2003 | January 15, 2003 | BNBMG | design |
| 277. lower hinge for window (2) | 03300358.0 | September 10, 2003 | January 13, 2003 | BNBMG | design |
| 278. upper reel for window | 03300359.9 | August 27, 2003 | January 13, 2003 | BNBMG | design |
| 279. window hinge base | 03300576.1 | August 20, 2003 | January 13, 2003 | BNBMG | design |
| 280. lower bearing for window (2) | 03300577.X | September 3, 2003 | January 13, 2003 | BNBMG | design |
| 281. lower reel for window | 03300578.8 | September 10, 2003 | January 13, 2003 | BNBMG | design |
| 282. middle hinge for window (2) | 03300579.6 | August 27, 2003 | January 13, 2003 | BNBMG | design |
| 283. door hinge template | 03300580.X | August 20, 2003 | January 13, 2003 | BNBMG | design |
| 284. window hinge template (1) | 033005818 | March 10, 2004 | January 13, 2003 | BNBMG | design |
| 285. window hinge template (2) | 03300582.6 | September 24, 2003 | January 13, 2003 | BNBMG | design |
| 286. lock base (3) | 03300583.4 | August 27, 2003 | January 13, 2003 | BNBMG | design |
| 287. false mutin actuator (1) | 03300584.2 | August 27, 2003 | January 13, 2003 | BNBMG | design |
| 288. false mutin actuator (2) | 03300586.9 | September 10, 2003 | January 13, 2003 | BNBMG | design |
| 289. latch (1) | 03300585.0 | September 10, 2003 | January 13, 2003 | BNBMG | design |
| 290. latch (2) | 03300587.7 | August 27, 2003 | January 13, 2003 | BNBMG | design |
| 291. actuator handle | 03300588.5 | September 10, 2003 | January 13, 2003 | BNBMG | design |
| 292. brace for door and window (2) | 03300357.2 | August 27, 2003 | January 13, 2003 | BNBMG | design |
| 293. brace for door and window (3) | 03300356.4 | August 20, 2003 | January 13, 2003 | BNBMG | design |
| 294. door lock | 03300355.6 | August 20, 2003 | January 13, 2003 | BNBMG | design |
| 295. lock base (4) | 03300352.1 | September 24, 2003 | January 13, 2003 | BNBMG | design |
| 296. door hinge | 033003548 | March 17, 2004 | January 13, 2003 | BNBMG | design |
| 297. a type of inflammable gas incinerator | 03201112.1 | June 2, 2004 | January 13, 2003 | BNBMG | utility model |
| 298. decorative acoustical panel (1) | 03303078.2 | October 29, 2003 | March 11, 2003 | BNBMG | design |

VIII-53

ALRMH-CNBM00000633

## APPENDIX VIII                        STATUTORY AND GENERAL INFORMATION

| | Patent | Certificate No. | Effective Date | Application Date | Registered Owner | Type |
|---|---|---|---|---|---|---|
| 299. | decorative acoustical panel (2) | 03303079.0 | September 24, 2003 | March 11, 2003 | BNBMG | design |
| 300. | decorative acoustical panel (5) | 03303082.0 | October 22, 2003 | March 11, 2003 | BNBMG | design |
| 301. | decorative acoustical panel (6) | 03303083.9 | September 24, 2003 | March 11, 2003 | BNBMG | design |
| 302. | decorative acoustical panel (7) | 03303084.7 | October 1,2003 | March 11, 2003 | BNBMG | design |
| 303. | decorative acoustical panel (8) | 03303085.5 | September 24, 2003 | March 11, 2003 | BNBMG | design |
| 304. | temperature control valve | 03305724.9 | October 1, 2003 | March 28, 2003 | BNBMG | design |
| 305. | adjust valve | 03305725.7 | October 1, 2003 | March 28, 2003 | BNBMG | design |
| 306. | backwater angle valve | 03305726.5 | October 1, 2003 | March 28, 2003 | BNBMG | design |
| 307. | valve block of temperature control valve (1) | 03305727.3 | October 1, 2003 | March 28, 2003 | BNBMG | design |
| 308. | valve block of temperature control valve (2) | 03305728.1 | October 22, 2003 | March 28, 2003 | BNBMG | design |
| 309. | under-bed type raft | 03305773.7 | October 1, 2003 | March 31, 2003 | BNBMG | design |
| 310. | a type of raft used as an under-bed for transporting items | 03242775.1 | August 4, 2004 | March 31, 2003 | BNBMG | utility model |
| 311. | metal frame (Z-shaped 1) | 03307417.8 | September 24, 2003 | April 8, 2003 | BNBMG | design |
| 312. | metal frame (Z-shaped 2) | 03307418.6 | October 22, 2003 | April 8, 2003 | BNBMG | design |
| 313. | metal frame (Z-shaped 3) | 03307419.4 | October 1, 2003 | April 8, 2003 | BNBMG | design |
| 314. | metal frame (Z-shaped 4) | 03307420.8 | October 22, 2003 | April 8, 2003 | BNBMG | design |
| 315. | decorative acoustical panel (composite type 1) | 03307260.4 | October 22, 2003 | April 14, 2003 | BNBMG | design |
| 316. | decorative acoustical panel (composite type 2) | 03307261.2 | October 22, 2003 | April 14, 2003 | BNBMG | design |
| 317. | composite acoustical panel | 03244640.3 | June 2, 2004 | April 14, 2003 | BNBMG | utility model |
| 318. | a type of Z-shaped metal frame for construction use | 03206353.9 | November 17, 2004 | July 24, 2003 | BNBMG | utility model |
| 319. | a type of carriage | 200320100031.1 | October 6, 2004 | October 8, 2003 | BNBMG | utility model |
| 320. | decorative acoustical panel (3) | 03303080.4 | September 10, 2003 | March 11, 2003 | BNBMG | design |
| 321. | decorative acoustical panel mould | 03303081.2 | November 26, 2003 | March 11, 2003 | BNBMG | design |
| 322. | a type of reverse twisted wire netting architecture of netting machine | 03261602.3 | September 22, 2004 | May 23, 2003 | BNBMG | utility model |
| 323. | a type of pick-up tool | 03266403.6 | September 22, 2004 | June 30, 2003 | BNBMG | utility model |
| 324. | mineral wool board with capabilities such as anti-bacteria and ultra-violet ray absorption | 01118313.6 | April 20, 2005 | May 22, 2001 | BNBMG | invention |

ALRMH-CNBM00000634

# APPENDIX VIII                     STATUTORY AND GENERAL INFORMATION

| Patent | Certificate No. | Effective Date | Application Date | Registered Owner | Type |
|---|---|---|---|---|---|
| 325. a type of decorative panel with surface coating and its manufacturing method | 02104472.4 | May 18, 2005 | March 19, 2002 | BNBMG | invention |
| 326. a type of positioning method and device for board cutting | 02149174.7 | June 29, 2005 | November 25, 2002 | BNBMG | invention |
| 327. a type of decorative panel and its manufacturing method | 02117767.8 | July 27, 2005 | May 16, 2002 | BNBMG | invention |
| 328. a type of raft used as an under-bed for transporting items | 03256938.6 | July 13, 2005 | May 16, 2003 | BNBMG | utility model |
| 329. preparation method of cold rolled precision ultra-narrow steel belt and its device | 02120917.0 | July 27, 2005 | June 5, 2002 | BNBMG | invention |
| 330. preparation method of cold rolled precision ultra-narrow steel belt | 02120918.9 | July 27, 2005 | June 5, 2002 | BNBMG | invention |
| 331. exterior wall heat insulation layer fastener* | | | | BNBMG | |
| 332. production line for steel belt continuous stamping | 011345527 | December 14 2005 | November 2, 2001 | BNBMG | invention |
| 333. a type of modified wood-plastic composite material and its application and manufacturing method* | | | | BNBMG | |
| 334. manufacturing method for C-shaped fitting of plastic-steel door and window metallic fittings* | | | | BNBMG | |
| 335. forming method and device for C-shaped fitting of plastic-steel door and window metallic fitting* | | | | BNBMG | |
| 336. hidden style acoustical panel* | | | | BNBMG | |
| 337. fiber cement board produced by vacuum extrusion method, its preparation method and equipment* | | | | BNBMG | |
| 338. a type of board finishing process* | | | | BNBMG | |
| 339. production process of a type of granular mineral wool and its air heating system* | | | | BNBMG | |

*   BNBMG has filed applications for the registration of these patents.

ALRMH-CNBM00000635

## APPENDIX VIII                    STATUTORY AND GENERAL INFORMATION

As at the Latest Practicable Date, the Group has filed applications for the registration of the following patents in the PRC:

| | Patent | Application Date | Registered Owner | Type |
|---|---|---|---|---|
| 1. | a type of paint with infrared radiation effect and its preparation method | September 17, 2003 | BNBMG BNBM | invention |
| 2. | a type of paint with infrared radiation effect and its preparation method | September 17, 2003 | BNBMG BNBM | invention |
| 3. | a type of flotation process of quartz tailing and its special flotation collecting agent | September 16, 2004 | China Triumph | invention |
| 4. | lift and leveling device for online coating equipment | September 27, 2004 | China Triumph | utility model |
| 5. | hot interchange method of calendaring process and float production process | September 28, 2004 | China Triumph | invention |
| 6. | a type of glass forming method and its special smelt furnace | April 4, 2005 | China Triumph | invention |
| 7. | a type of glass smelt furnace which allows two types of glass forming processes | April 4, 2004 | China Triumph | utility model |
| 8. | a hanging and floating full-automatic edge roller (edge-handled) elevating steering device | July 14, 2005 | China Triumph | utility model |
| 9. | glass mill | November 1, 2005 | China Triumph | utility model |
| 10. | multi-functional vertically automatic glass-cutting device | November 1, 2005 | China Triumph | utility model |

*Domain Names*

As at the Latest Practicable Date, the Group has registered the following domain names in the PRC:

| | Domain Name | Application Date | Registered Owner |
|---|---|---|---|
| 1. | www.bnbmhomes.com | March 10, 2005 | BNBM Homes |
| 2. | www.bnbmhomes.com.cn | March 10, 2005 | BNBM Homes |
| 3. | szbde.cn | March 30, 2004 | BND Deco Co., Ltd. |
| 4. | www.taihegroup.com | May 26, 1998 | Taihe |
| 5. | www.cucc.cn | June 10, 2005 | China United |
| 6. | zljl.com.cn | January 18, 2005 | Huaihai |
| 7. | Zhonglianjulongshuini.com.cn | January 18, 2005 | Huaihai |
| 8. | www.cugather.com | April 6, 2005 | Luhong |
| 9. | www.Luhong.com.cn | April 6, 2005 | Luhong |
| 10. | www.Luhong.cn | April 6, 2005 | Luhong |
| 11. | ccgc.com.cn | February 13, 2003 | China Composites |
| 12. | Lzfrp.com | August 10, 2000 | Zhongfu Lianzhong |
| 13. | Lzfrp.cn | June 7, 2004 | Zhongfu Lianzhong |
| 14. | czxinma.com | October 13, 2004 | Zhongxin Tianma |
| 15. | Glasscn.com | June 2, 2000 | China Triumph |
| 16. | Ctiec.net | March 3, 2003 | China Triumph |
| 17. | Ctiec.cn | April 14, 2003 | China Triumph |
| 18. | tctec.com.cn | January 25, 2005 | Nanjing Triumph |

As at the Latest Practicable Date, save as disclosed in this prospectus, there are no trademarks, patents or other intellectual property rights which are material to the Company's business.

VIII-56

ALRMH-CNBM00000636

## VI.  Other Information

### 1.  *The Latest Financial Period Reported on by the Reporting Accountants Required under the Listing Rules and the Companies Ordinance*

Rule 4.04(1) of the Listing Rules requires that the accountants' report of the Company include our combined results in respect of each of the three financial years immediately preceding the issue of this prospectus.

Under section 342(1)(b) of the Companies Ordinance, the Company is required to, among other things, state in this prospectus the matters specified in Part I of the Third Schedule to the Companies Ordinance and set forth in this prospectus the reports specified in Part II of the Third Schedule to the Companies Ordinance. Paragraph 27 of Part I of the Third Schedule to the Companies Ordinance requires that a statement as to the gross trading income or sales turnover (as may be appropriate) of the Company, during each of the three financial years immediately preceding the issue of this prospectus, including an explanation of the method used for the computation of such income or turnover and a reasonable breakdown between the more important trading activities, shall be included in this prospectus. Paragraph 31 of Part II of the Third Schedule to the Companies Ordinance requires this prospectus to include a report by the auditors of the Company with respect to the profits and losses and assets and liabilities in respect of each of the three financial years immediately preceding the issue of this prospectus.

The *Accountants' Report* set out in Appendix I to this prospectus includes the audited financial statements of the Company for the three years ended December 31, 2004 and the nine months ended September 30, 2005 but not the audited financial statements of the Company (including the requisite statements as to its gross trading income or sales turnover) for the full financial year ended December 31, 2005 as required under Rule 4.04 of the Listing Rules and paragraphs 27 of Part I and 31 of Part II of the Third Schedule of the Companies Ordinance. As this prospectus is issued on March 13, 2006, our Directors believe that it will be unduly burdensome to include in it audited financial statements of the Company for the full financial year ended December 31, 2005.

In the circumstances, an application has been made to the SFC for a certificate of exemption from strict compliance with paragraphs 27 and 31 of the Third Schedule to the Companies Ordinance in relation to the inclusion of the accountants' report for the full financial year ended 31 December, 2005 in this prospectus on the ground that it would be unduly burdensome for our company to do so, and a certificate of exemption from such strict compliance has been granted by the SFC.

An application has also been made to the Stock Exchange for a waiver from strict compliance with Rule 4.04(1) of the Listing Rules in relation to the inclusion of the accountants' report for the full financial year ended 31 December, 2005 in this prospectus. The Stock Exchange has granted to us such a waiver on the condition that the Listing Date should be on or before March 31, 2006.

Our Directors confirm that they have performed sufficient due diligence on our Company to ensure that, up to the date of this prospectus, there has been no material adverse change in our financial position or prospects since September 30, 2005 and there has been no event since September 30, 2005 which would materially affect the information shown in the Accountants' Report set out in Appendix I.

ALRMH-CNBM00000637

## APPENDIX VIII                    STATUTORY AND GENERAL INFORMATION

### 2.   Estate duty

The Directors have been advised that no material liability for estate duty is likely to fall on the Company or any of its subsidiaries.

### 3.   Litigation

As at the Latest Practicable Date, save as disclosed in the section entitled "*Business — Legal Matters*" of this prospectus which mentioned that the adjudicating PRC court rendered a decision against Zaozhuang Luhong, a subsidiary in our cement segment, in October 2005 in a dispute over a merchandise purchase contract, and a judgment was entered into in September 2005 against Zhongfu Lianzhong, the subsidiary that manufactures FRP pipes and tanks, as the second defendant in a legal proceeding over alleged trade secrets infringement, no member of the Company is engaged in any litigation or arbitration of material importance and no litigation or claims of material importance are known by the Directors to be pending or threatened by or against any member of the Company that would have an effect on the Company's results of operations or financial condition.

### 4.   Sponsor

Morgan Stanley, on behalf of the Company, has made an application to the Listing Committee of the Stock Exchange for the listing of, and permission to deal in, the H Shares to be issued as described in this prospectus. All necessary arrangements have been made enabling the securities to be admitted into CCASS.

### 5.   Preliminary expenses

The estimated preliminary expenses of the Company are approximately RMB 350,000 and are payable by the Company.

### 6.   Qualification of experts

The qualifications of the experts (as defined under the Listing Rules and the Companies Ordinance) who have given opinions in this prospectus are as follows:

| Name | Qualifications |
| --- | --- |
| Morgan Stanley | Licensed to conduct type 1 (dealing in securities), type 4 (advising on securities) and type 6 (advising on corporate finance) as defined under the SFO |
| Deloitte Touche Tohmatsu | Certified Public Accountants |
| Sallmanns | Member of the Hong Kong Institute of Surveyors and the Royal Institution of Chartered Surveyors |
| Jingtian & Gongcheng Law Office | PRC lawyers |

### 7.   Consents of experts

For the purposes of the relevant requirements under the Listing Rules and the Companies Ordinance, Morgan Stanley, Deloitte Touche Tohmatsu, Sallmanns and Jingtian & Gongcheng Law Office have given and have not withdrawn their respective written consents to the issue of this prospectus with the inclusion of their reports, valuation certificate, letters and/or opinions and summaries of opinion (as the case may be) and/or the references to their names included herein in the form and context in which they respectively appear.

ALRMH-CNBM00000638

### 8.   *Financial adviser to the Company*

China Galaxy Securities Company Limited, being the Company's financial adviser in the Company's Reorganization, primarily provides advice and assistance with respect to the Reorganization and the various PRC governmental approvals required in connection with the Reorganization and the Global Offering.

### 9.   *No material adverse change*

The Company confirms that there is no material adverse change in its financial or trading position since September 30, 2005.

### 10.   *Binding effect*

This prospectus shall have the effect, if an application is made in pursuance hereof, of rendering all persons concerned bound by all the provisions (other than the penal provisions) of sections 44A and 44B of the Companies Ordinance so far as applicable.

### 11.   *Miscellaneous*

(a)   Save as disclosed in this prospectus:

    (i)   within the two years immediately preceding the date of this prospectus, the Company and its subsidiaries have not issued or agreed to issue any of their share or loan capital fully or partly paid either for cash or for a consideration other than cash;

    (ii)   no share or loan capital of the Company or any of its subsidiaries is under option or is agreed conditionally or unconditionally to be put under option;

    (iii)   none of our equity or debt securities is listed or dealt with on any other stock exchange or trading system nor is any listing or permission to deal being or proposed to be sought;

    (iv)   the Company has not issued or agreed to issue any founder shares, management shares or deferred shares; and

    (v)   within the two years immediately preceding the date of this prospectus, no commissions, discounts, brokerages or other special terms have been granted in connection with the issue or sale of any Shares of the Company.

(b)   The Company does not intend to apply for the status of a sino-foreign investment joint stock limited company and does not expect to be subject to the Provisional Rules for Several Questions on Establishment of Foreign Invested Joint Stock Company.

(c)   China Galaxy Securities Company Limited is retained by the Company to provide advice and assistance with respect to the structuring of the Reorganization and various PRC governmental approvals required in relation to the Reorganization and the Global Offering.

ALRMH-CNBM00000639

### 12.  Promoters

The Promoters of the Company are Parent, BNBMG, CNBM Trading, Cinda and Building Materials Academy. Save as disclosed in this prospectus, within the two years immediately preceding the date of this prospectus, no cash, securities or benefit has been paid, allotted or given to the Promoters in connection with the Global Offering or the connected transactions described in this prospectus.

### 13.  Particulars of the Selling Shareholders

As the registered holders holding the Sale H Shares on behalf of the National Social Security Fund (located at No. A2, Yue Tan Street, Xicheng District, Beijing, People's Republic of China, an entity set up by the State Council with the principal function of asset management of the social security fund of the PRC):

(i)   Parent, located at No. 2 Zi Zhu Yuan South Road, Haidian District, Beijing, People's Republic of China, is offering 15,784,400 H Shares in the Global Offering (assuming the Over-allotment Option is not exercised). Up to 2,367,368 additional H Shares will be sold by Parent if the Over-allotment Option is exercised.

(ii)  BNBMG, located at No. A-11 Sanlihe Road, Haidian District, Beijing, People's Republic of China, is offering 35,155,081 H Shares in the Global Offering (assuming the Over-allotment Option is not exercised). Up to 5,272,612 additional H Shares will be sold by BNBMG if the Over-allotment Option is exercised.

(iii) CNBM Trading, located at No. 11 Sanlihe Road, Haidian District, Beijing, People's Republic of China, is offering 5,388,344 H Shares in the Global Offering (assuming the Over-allotment Option is not exercised). Up to 808,152 additional H Shares will be sold by CNBM Trading if the Over-allotment Option is exercised.

(iv)  Cinda, located at Donghuan Square, No. 29 Dong Zhong Street, Dong Cheng District, Beijing, People's Republic of China, is offering 3,116,438 H Shares in the Global Offering (assuming the Over-allotment Option is not exercised). Up to 467,408 additional H Shares will be sold by Cinda if the Over-allotment Option is exercised.

(v)   Building Materials Academy, located at No. 1 Guanzhuang Dongli, Chaoyang District, Beijing, People's Republic of China, is offering 29,737 H Shares in the Global Offering (assuming the Over-allotment Option is not exercised). Up to 4,460 additional H Shares will be sold by Building Materials Academy if the Over-allotment Option is exercised.

ALRMH-CNBM00000640

### 14.  Indemnities

The Parent Group has given the following indemnities:

(a)  under the Reorganization Agreement dated March 7, 2006, each of the Promoters has agreed to indemnify the Company against, among other things:

  (i)  all claims incurred in connection with or arising from the breach of any provisions of the Reorganization Agreement on the part of the Promoters;

  (ii)  all claims incurred in connection with or arising from the assets and liabilities retained by or transferred to the Promoters in accordance with the Reorganization Agreement;

  (iii)  all claims incurred in connection with or arising from the assets and liabilities which have been transferred to the Company pursuant to the Reorganization Agreement arising on or before March 28, 2005, the effective date of the Reorganisation; and

  (iv)  all taxes payable in respect of the assets which have been transferred to the Company pursuant to the Reorganization Agreement arising on or before March 28, 2005, the effective date of the Reorganization.

(b)  under an indemnification undertaking dated February 28, 2006, Parent has:

  (i)  undertaken to indemnify the Company in respect of any loss or damage incurred by the Company relating to certain indebtedness, payables and liabilities (including any liabilities arising from litigations brought against CNBM Equipment prior to the Reorganization) which CNBM Equipment has transferred to a subsidiary of Parent, CNBM Trading. Further details of such indemnification undertaking are set out in the sections headed "*History, Reorganization and Group Structure — Reorganization*" and "*History, Reorganization and Group Structure — Segregation of certain liabilities*";

  (ii)  agreed to indemnify the Group against any losses suffered from the absence of certain title certificates. Further details of such indemnities are set out in the section headed "*Risk Factors — We have not obtained formal title certificates to some of the properties we occupy*"; and

  (iii)  agreed to indemnify the Group against any losses suffered from the failure by the Group to complete all the procedures necessary for the commencement of construction in relation to certain existing construction operations of the Group.

### 15.  Separate publication of English and Chinese versions of the prospectus

The English language and Chinese language versions of this prospectus are being published separately, in reliance upon the exemption provided in section 4 of the Companies Ordinance (Exemption of Companies and Prospectuses from Compliance with Provisions) Notice (Chapter 32L of the Laws of Hong Kong).

ALRMH-CNBM00000641

| APPENDIX IX | DOCUMENTS DELIVERED TO THE REGISTRAR OF COMPANIES AND AVAILABLE FOR INSPECTION |
|---|---|

## 1. Documents Delivered to the Registrar of Companies

The documents attached to the copy of this prospectus and delivered to the Registrar of Companies in Hong Kong for registration were copies of the **WHITE** and **YELLOW** application forms, the written consents referred to in the paragraph VI.7 of Appendix VIII, a list of the particulars of the Selling Shareholders and copies of the material contracts referred to in paragraph V.1 of Appendix VIII.

## 2. Documents Available for Inspection

Copies of the following documents will be available for inspection at the offices of Slaughter and May, 47th Floor, Jardine House, One Connaught Place, Central, Hong Kong during normal business hours up to and including 5:30 p.m. on the date which is 14 days from the date of this prospectus:

(a)    the Articles of Association (in Chinese with unofficial English translation);

(b)    the Accountants' Report prepared by Deloitte Touche Tohmatsu, the text of which is set out in Appendix I to this prospectus;

(c)    the audited financial statements, prepared in accordance with the relevant and applicable accounting rules and regulations in the PRC, of the companies comprising the Group for each of the years ended December 31, 2002, 2003 and 2004;

(d)    the letter relating to the unaudited pro forma financial information of the Group, the text of which are set out in Appendix II to this prospectus;

(e)    the letters relating to the profit estimate, the texts of which are set out in Appendix III to this prospectus;

(f)    the letter dated March 13, 2006, summary of values and valuation certificate relating to the property Group's property interests prepared by Sallmanns (Far East) Ltd., the texts of which are set out in Appendix IV to this prospectus, and the full valuation report (in the English language only) of Sallmanns (Far East) Ltd. referred to in Appendix IV to this prospectus;

(g)    the PRC Company Law, the Special Regulations, the Mandatory Provisions together with unofficial English translations thereof;

(h)    the material contracts described in paragraph V.1 of Appendix VIII to this prospectus and the Directors' and Supervisors' service contracts (in Chinese, with a certified English translation) described in paragraph IV.1 of Appendix VIII to this prospectus;

(i)    the written consents referred to in paragraph VI.7 of Appendix VIII to this prospectus;

ALRMH-CNBM00000642

**APPENDIX IX**          **DOCUMENTS DELIVERED TO THE REGISTRAR OF
COMPANIES AND AVAILABLE FOR INSPECTION**

(j)    the PRC legal opinion issued by Jingtian & Gongcheng Law Office, the legal advisors to the
Company on PRC law, dated March 13, 2006, confirming that in their opinion, the summary of
relevant PRC laws and principal regulatory provisions set out in Appendix V and Appendix VI is
a correct summary of the relevant PRC laws and regulatory provisions to this prospectus; and

(k)    a list of the particulars of the Selling Shareholders.

ALRMH-CNBM00000643