```
 1                     UNITED STATES DISTRICT COURT
                       EASTERN DISTRICT OF LOUISIANA
 2       ********************************************************************

 3       IN RE:  CHINESE-MANUFACTURED        Docket No. 09-MD-2047
         DRYWALL PRODUCTS LIABILITY          New Orleans, Louisiana
 4                                           Thursday, September 17, 2015

 5       ********************************************************************

 6

 7                  TRANSCRIPT OF PHONE CONFERENCE PROCEEDINGS
                    HEARD BEFORE THE HONORABLE ELDON E. FALLON
 8                       UNITED STATES DISTRICT JUDGE

 9       APPEARANCES:

10       FOR THE PLAINTIFF:              HERMAN, HERMAN & KATZ
                                         BY:  RUSS M. HERMAN, ESQ.
11                                            LEONARD A. DAVIS, ESQ.
                                         820 O'Keefe Avenue
12                                       New Orleans, LA 70130

13                                       LEVIN, FISHBEIN, SEDRAN & BERMAN
                                         BY:  ARNOLD LEVIN, ESQ.
14                                            FREDERICK S. LONGER, ESQ.
                                         510 Walnut Street, Suite 500
15                                       Philadelphia, PA 19106

16                                       GAINSBURGH, BENJAMIN, DAVID,
                                         MEUNIER & WARSHAUER
17                                       BY:  GERALD E. MEUNIER, ESQ.
                                         2800 Energy Centre
18                                       1100 Poydras Street
                                         New Orleans, LA 70163
19
                                         IRPINO LAW FIRM
20                                       BY:  ANTHONY D. IRPINO, ESQ.
                                         2216 Magazine Street
21                                       New Orleans, LA 70130

22
         FOR TAISHAN:                    ALSTON & BIRD
23                                       BY:  BERNARD TAYLOR, SR., ESQ.
                                         BY:  CHRISTINA H. EIKHOFF, ESQ.
24                                       One Atlantic Center
                                         1201 W. Peachtree St.
25                                       Atlanta, GA 30309-3424
```

FSIA
EXHIBIT
114

```
 1                              ALSTON & BIRD
                                BY:  HELEN SU, ESQ.
 2                              Hanwei Plaza
                                West Wing, Suite 21B2
 3                              Chaoyang District
                                Beijing, China 100004
 4

 5   FOR BNBM GROUP:            DENTONS US, LLP
                                BY:  C. MICHAEL MOORE, ESQ.
 6                              2000 McKinney Ave, Suite 1900
                                Dallas, TX 75201
 7

 8   FOR CNBM GROUP:            ORRICK, HERRINGTON & SUTCLIFFE, LLP
                                BY:  JAMES L. STENGEL, ESQ.
 9                              51 West 52nd Street
                                New York, NY 10019
10
                                GORDON, ARATA, McCOLLAM,
11                              DUPLANTIS & EAGAN
                                BY:  DONNA P. CURRAULT, ESQ.
12                              201 St. Charles Ave, Suite 4000
                                New Orleans, LA 70170-4000
13

14   STATE OF LOUISIANA:        PERKINS COIE
                                BY:  DAVID L. BLACK, ESQ.
15                              1900 Sixteenth Street, Suite 1400
                                Denver, CO 80202-5255
16
                                LOUISIANA DEPARTMENT OF JUSTICE
17                              BY:  L. Christopher Styron, ESQ.
                                Assistant Attorneys General
18                              1885 North Third Street
                                Post Office Box 94005
19                              Baton Rouge, Louisiana 70804-9005

20
     Official Court Reporter:   Karen A. Ibos, CCR, RPR, CRR
21                              500 Poydras Street, Room HB-406
                                New Orleans, Louisiana 70130
22                              (504) 589-7776

23

24      Proceedings recorded by mechanical stenography, transcript
     produced by computer.

25
```

<u>P R O C E E D I N G S</u>

(THURSDAY, SEPTEMBER 17, 2015)

(STATUS CONFERENCE PROCEEDINGS)


(OPEN COURT.)

THE COURT:  Hello.  Good morning, everyone.  This is Judge Fallon.  Who is on the line?

MR. HERMAN:  Russ Herman, Arnold Levin, Anthony Irpino, and folks from our firm's on the line for the Plaintiff Steering Committee, your Honor.

THE COURT:  Okay.

MR. TAYLOR:  On behalf of Taishan, it's Bernard Taylor, Christy Eikhoff, and Helen Su.  Good morning, your Honor.

THE COURT:  Good morning.

MR. MOORE:  Your Honor, for BNBM, Mike Moore.  Good morning.

THE COURT:  Good morning.  Anyone else?

MR. STENGEL:  Your Honor, for CNBM Group & Company, it's Jim Stengel with Orrick Herrington.

MS. CURRAULT:  And Donna Currault.

THE COURT:  Anyone else?

MR. BLACK:  And for the State of Louisiana, it's David Black and Chris Styron.

THE COURT:  Anyone else?

Okay.  I have several members of the PSC here in the

08:00:58  1    court.

08:00:58  2           Let me begin by just making some general comments.  This

08:01:02  3    case, as we all know, involves drywall.  The primary issue in the

08:01:09  4    case is the nature and the quality of the drywall and any resulting

08:01:16  5    damages responsibility of the manufacturers of the drywall, as well

08:01:21  6    as the distributors.

08:01:23  7           The drywall in this particular case came from China.  And

08:01:27  8    it was manufactured by two, primarily by two groups:  One group was

08:01:33  9    the Knauf entity, who had a wholly owned subsidiary KPT, a Chinese

08:01:40 10    company that produced and manufactured drywall.  In addition to

08:01:45 11    that, Taishan and its entities or affiliates produced and

08:01:52 12    manufactured drywall.

08:01:54 13           Many suits occurred in the United States and the suits

08:02:01 14    were against Knauf and Taishan.  After a number of trials and prior

08:02:09 15    to that various discovery, Knauf entities resolved their lawsuit,

08:02:16 16    and the focus of the litigation then was directed to Taishan and its

08:02:22 17    affiliates or alter egos.

08:02:25 18           The issues that initially Taishan raised involved

08:02:30 19    jurisdiction, there was some discovery, and then the court had an

08:02:34 20    opportunity to rule on that.  The court's ruling was upheld by the

08:02:40 21    Fifth Circuit.  So the jurisdiction with regard to Taishan is

08:02:44 22    resolved.

08:02:46 23           Now the focus is on the entities, affiliates, alter egos

08:02:53 24    of Taishan.  Those affiliates and alter egos contest their

08:02:57 25    relationship and also urge various jurisdictional issues as well as

08:03:01  1    immunity issues.  This necessitated depositions.

08:03:05  2         The depositions proceeded in the United States for some

08:03:10  3    time and then moved to Hong Kong.  The parties are now in the

08:03:15  4    process of taking depositions in Hong Kong.  The focus of the

08:03:21  5    depositions in Hong Kong are who are the affiliates, what's their

08:03:25  6    relationship, the responsibility, their knowledge, any documents

08:03:29  7    that they had, who produced the documents, and where they are.

08:03:33  8         I received an e-mail a day or two ago from the Plaintiffs

08:03:41  9    Committee who is over there now, and also responses to the e-mail

08:03:47 10    from Taishan and BNBM and CNBM.  They request, in effect, a

08:03:56 11    telephone conference today at 8 A.M. o'clock New Orleans time,

08:04:02 12    9 P.M. o'clock Hong Kong time.

08:04:04 13         The things that were raised in the e-mails and responses

08:04:09 14    to the e-mails is the presence, the whereabouts of Mr. Wenglong Peng

08:04:19 15    and what he had in his possession, what computer he had, what he did

08:04:26 16    with it, where are the documents that he created or had some

08:04:32 17    knowledge of and had some possession of, and, in fact, his

08:04:35 18    whereabouts and the knowledge of the parties about his whereabouts.

08:04:40 19         Other issues that were raised involve spoliation,

08:04:44 20    penalties, and attorney's fees.  So I did feel it was important to

08:04:49 21    meet by way of telephone with the parties, give them an opportunity

08:04:54 22    to express themselves, and then deal with it accordingly.

08:04:57 23         Let me hear from the parties.

08:05:01 24         MR. HERMAN:  Yes, your Honor.  Good morning, it's Russ

08:05:03 25    Herman on behalf of the PSC.

08:05:08 1          While we were here preparing for the deposition in Hong

08:05:12 2     Kong on September 11th, we first received for the first time a

08:05:19 3     November 29, 2010, joint prosecution agreement in which Orrick

08:05:27 4     represented BNBM, the Schonekas firm represented CNBM-G and CNBM,

08:05:33 5     and Hogan Lovells represented Taishan - KPT.

08:05:39 6          According to Che, the 30(b)(6) witness of Taishan,

08:05:49 7     Mr. Peng left employment in March of 2014.  He then acts as a

08:05:58 8     consultant we learned today from Chairman Jia having received while

08:06:06 9     we're here a copy of a consultants agreement, which I'll get to, but

08:06:11 10    we learned that sometime in December 2014, December 2015, Che --

08:06:22 11    excuse me, not Che, Peng has left his position effectively as an

08:06:29 12    unpaid consultant.

08:06:30 13         On February 2nd, 2015, Mr. Jia produces last night at

08:06:41 14    Hong Kong time sometime between 11:00 P.M. and 3:00 A.M. a

08:06:46 15    consultant agreement signed in February 2015 in which he is to be

08:06:53 16    paid 50,000 yuan, which according to Jia's deposition today has

08:06:57 17    never been paid because Peng decided that he would not be a

08:07:04 18    consultant anymore.  I just happened --

08:07:08 19         THE OPERATOR:  Excuse me, pardon the interruption.  This

08:07:11 20    is the conference operator, I apologize for interrupting.  Harry

08:07:13 21    Rosenberg has been trying to get on, he has the codes, but for some

08:07:17 22    reason the codes are not being accepted.  May I dial to him and join

08:07:21 23    him on the conference?

08:07:23 24         THE COURT:  As long as you don't mess up anybody else.

08:07:28 25         THE OPERATOR:  I apologize, I am not sure I understand.

08:07:30  1          THE COURT:  Well, I don't want anybody else to get cut

08:07:32  2   off.

08:07:33  3          THE OPERATOR:  I understand that, sir.  I won't be cutting

08:07:36  4   anyone off.  But I'll dial him and I'll join him onto the

08:07:40  5   conference.  Thank you.

08:07:43  6          MR. HERMAN:  Your Honor, perhaps I should wait until Harry

08:07:45  7   gets on to continue.

08:07:46  8          THE COURT:  Okay.

08:07:46  9       (MOMENTARY PAUSE IN THE CONFERENCE.)

08:08:26 10          THE COURT:  Let's go on, Russ, we can't wait all day.

08:08:29 11          MR. HERMAN:  Yes, your Honor.  I am at the point now where

08:08:33 12   about three in the morning Hong Kong time the PSC discovers that it

08:08:43 13   has been sent this February 2015 consultant contract for 50,000

08:08:51 14   yuan, which has never been paid, because Mr. Peng decides within a

08:08:55 15   month that he is not going to be a consultant anymore.  But in the

08:08:59 16   meantime, ten days later, Alston & Bird appears for BNBM, that's on

08:09:06 17   February 12th, Taishan, then Alston Bird appears on February 17th,

08:09:15 18   Dentons then appears for BNBM on March 4th, and Orrick finally in

08:09:22 19   March of 2015 appears for CNBM, CNBM-G.

08:09:32 20          Now, I don't say there's anything wrong with that, the

08:09:36 21   various substitutions of counsel, it just makes it very confusing

08:09:39 22   for plaintiffs in discovery.

08:09:41 23          So where does that leave us?  On June 2nd, 3rd and 4th

08:09:48 24   the Taishan Gypsum TTP 30(b)(6) deposition of Che Gang is taken.

08:09:56 25   There is a 566 page document called transactions that the witness

08:10:03  1    refers counsel to numerous times for answers.  The only problem is

08:10:08  2    it was never produced in English.  And there was no way even to

08:10:13  3    refer the witness at that point.

08:10:17  4         The 30(b)(6) deponent says he doesn't know where Peng

08:10:22  5    resides, he doesn't know where Peng works.  There's no consultant

08:10:28  6    contract mentioned.  Sometime after the deposition there's a meet

08:10:34  7    and confer and we're told that Peng's computer is not searchable,

08:10:40  8    then we're told that it's reconfigured and it's in parts, and we

08:10:51  9    were also told that the 30(b)(6) witness tells us that Peng took his

08:10:56 10    own personnel/personnel file with him.

08:11:02 11         Now, what happened was is while your Honor had under

08:11:08 12    consideration de-privileging the Peng documents, because at that

08:11:12 13    time we didn't have a consultant agreement and didn't know that he

08:11:16 14    was a consultant, we had our investigator try to locate Peng.  And

08:11:24 15    in the meantime, I believe that your Honor had directed at some

08:11:28 16    point the defendants to provide us with Peng's residential address.

08:11:33 17         At any rate, once we find out that Peng's a consultant,

08:11:39 18    we can't contact him and I instruct our investigator don't confirm

08:11:45 19    anything in your report by going to a witness that works for any of

08:11:53 20    the defendants, has worked for the defendants; and whatever you do,

08:11:57 21    don't talk to Peng to confirm anything.  We find out, at least the

08:12:03 22    investigator does, three different employment activities.  We

08:12:08 23    finally get the employment, the current employment, and what do

08:12:15 24    we -- which brings about our difficulties.  The first declaration of

08:12:31 25    Chairman Jia is in August of 2015.  That declaration does not

08:12:39  1   indicate where Peng's residence is, where Peng's work is.  In fact,

08:12:50  2   it avoids the question.

08:12:55  3          The second declaration was filed yesterday on

08:13:00  4   September 16th Hong Kong time.  And the second declaration is really

08:13:10  5   causing the Plaintiff Steering Committee substantial problems,

08:13:17  6   particularly in light of Chairman Jia's testimony of Taishan Gypsum.

08:13:26  7   Today, he said, No. 1, in no particular order, Peng was the most

08:13:30  8   knowledgeable about any of the information dealing with the

08:13:36  9   litigation.  But Peng told Jia when he left, don't give out where I

08:13:45 10   am working, don't give out where I am living, and don't tell any of

08:13:52 11   the other defendants.  As a matter of fact, Alston & Bird was

08:14:05 12   mislead in what they represented because Jia did not come forth with

08:14:12 13   the information even to their 30(b)(6) representative Che Gang.

08:14:18 14          He said even though he didn't read any of the Gang

08:14:23 15   depositions, the 30(b)(6) depositions of his own company, that he

08:14:29 16   felt Che did a great job.  Jia testifies that he found out for the

08:14:38 17   first time on September 11th, while we're here preparing for these

08:14:43 18   depositions, that Mr. Peng did not take his computer with him, that

08:14:54 19   the computer is somewhere in the company; and Jia's surprised by

08:15:00 20   that, and he tells the 30(b)(6) witness of the company go find the

08:15:05 21   computer, and within a day they find the computer.

08:15:09 22          But he doesn't know who has it right now because it's in

08:15:12 23   the hands of some third party; and he doesn't remember or know who

08:15:16 24   that third party is, but he does know he hasn't turned that computer

08:15:21 25   over to Alston & Bird.  And he does not know how much of that

08:15:27 1   computer has been downloaded, which means that both Taishan's

08:15:35 2   30(b)(6) witness, as well as Jia, we haven't had a fair opportunity

08:15:45 3   to take a deposition, even though tomorrow Arnold Levin will

08:15:51 4   continue with Jia's deposition.

08:16:00 5           Jia at some point this week gets permission from Peng to

08:16:12 6   give Taishan Gypsum's lawyer his residential address, which we still

08:16:21 7   don't have.

08:16:21 8           Jia knows for a year where Peng was working when he left

08:16:26 9   Taishan, he knows that because a cousin told him that at a festival.

08:16:34 10  So for a whole year we haven't had the information of where Peng's

08:16:39 11  working, where he lives.  Jia says, well, you've had his phone

08:16:44 12  number.

08:16:49 13          The other really serious problem here has occurred Monday

08:16:58 14  and Tuesday in the deposition of Chairman Song, who is chairman of

08:17:07 15  the CNBM-G, CNBM and BNBM-G; who we get production of a document,

08:17:20 16  now Exhibit 332, which indicates that there was actually a Board of

08:17:26 17  Directors meeting of CNBM-G in which CNBM-G directors vote 11-0 to

08:17:34 18  support or respect the decision of Taishan not to appear at a

08:17:41 19  Judgment Debtor Rule.  And when you follow who owns what all the way

08:17:50 20  down the line, CNBM-G is listed as a controlling, ultimate

08:17:55 21  controlling shareholder.

08:18:01 22          So all of this occurs after the CNBM-G 30(b)(6) deponent.

08:18:09 23  Why is that important?  Because 98 percent, 392,949 pages of

08:18:19 24  documents by CNBM-G and CNBM are produced after the 30(b)(6)

08:18:27 25  deposition.

08:18:28  1          So we have a situation now where on October 27th, which

08:18:34  2     we agreed to, to brief this question of foreign sovereign immunity

08:18:47  3     of CNBM-G.  And what has happened is, not through any collusion, but

08:18:52  4     through the fact that information was not produced in the ordinary

08:18:55  5     course of serial production timely or fully, a situation in which we

08:19:05  6     have an adverse inference that if Peng were called to testify or

08:19:12  7     could testify or would be produced under HL Document 26, he would

08:19:19  8     have to say that CNBM-G, to his knowledge, is the one that made the

08:19:27  9     ultimate decision on whether Taishan should appear or not and

08:19:34 10     further that Chairman Jia, who Arnold Levin is deposing now, did not

08:19:42 11     have the authority to make the final decisions.

08:19:45 12          And under the circumstances, we are requesting several

08:19:52 13     types of relief:  We're requesting an adverse inference, as I've

08:19:58 14     stated it; monetary sanctions for costs, especially all travel and

08:20:05 15     deposition costs associated with the spoliation finding or

08:20:20 16     sanctions, not limited just to adverse inferences regarding Wenglong

08:20:25 17     Peng's testimony, which is missing, and -- but not limited to CNBM

08:20:34 18     Group controlling the final decision, which we believe would be an

08:20:38 19     exception under the foreign immunity, FSIA, at Foreign Sovereign

08:20:45 20     Immunity Act.  Potentially, your Honor to consider striking the

08:20:53 21     defenses.

08:20:56 22          And at this point we believe that the entire Foreign

08:21:02 23     Sovereign Immunity Act, notwithstanding Mr. Vejnoska's letter to

08:21:05 24     your Honor, should be rescheduled to give us a fair opportunity to

08:21:09 25     complete discovery and for even arguing this.  Wenglong Peng is

08:21:17  1  particularly important and relates to the BNBM and CNBM entities

08:21:23  2  because he is listed in the privilege logs of both BNBM and CNBM and

08:21:33  3  Taishan as a privileged communicator.

08:21:37  4          So with that I am going to turn it over to Arnold and

08:21:40  5  I'll let him finish, your Honor.

08:21:42  6          MR. LEVIN:  Briefly, your Honor.  Here is the situation

08:21:46  7  we're faced with and the record in this case says it.  The

08:21:50  8  defendants have a joint defense agreement from 2010.  Mr. Peng --

08:22:11  9      (WHEREUPON, THE CONNECTION WAS LOST.)

08:22:11  10         THE COURT:  Wait, wait, wait, we missed something, Arnold,

08:22:14  11 we got some static or something on the line.  Go ahead.  Why don't

08:22:21  12 you start over.

08:22:22  13         MR. LEVIN:  We are faced with a very frustrating

08:22:27  14 situation.  Mr. Peng has a lot of information.  He was a consultant

08:22:33  15 to Taishan and BNBM and to CNBM entities by joint defense agreement

08:22:43  16 dating back to 2010, which we just found out about and just were

08:22:49  17 provided with.  Had access to his knowledge.  Everybody on the other

08:22:53  18 side knows what Peng has to say.  Everybody on the other side is

08:22:57  19 privy to what Peng has to say.  The plaintiffs can't find out what

08:23:04  20 Peng has to say.

08:23:05  21         We're in a situation analogous to *Hickman v. Taylor* where

08:23:12  22 the vessel on the Delaware blew up, the defendants had witness

08:23:16  23 statements and they -- and the plaintiffs had no witnesses and the

08:23:20  24 defendants refused to provide the plaintiffs with the witness

08:23:26  25 statements, and that was the genesis of discovery under our Federal

08:23:36  1   Rules of Civil Procedure, plaintiff's attorney received the witness

08:23:38  2   statements so they could prove his case.

08:23:40  3          We have no way of knowing what Peng has to say, other

08:23:45  4   than the fact that he was engaged by Taishan, Taishan withheld

08:23:51  5   information concerning his whereabouts, and in the middle of a

08:23:57  6   deposition today we find out that Chairman Jia knew all along where

08:24:05  7   he lived and where he worked and had refused to tell even his

08:24:11  8   counsel what it was.

08:24:12  9          We're totally frustrated, your Honor, and we need the

08:24:16 10   relief that Russ has indicated we need.

08:24:19 11          THE COURT:  Okay.  Let me hear from the other side.

08:24:22 12   Bernard, do you have any comments?

08:24:25 13          MR. TAYLOR:  Yes, your Honor.  Thank you for this

08:24:28 14   opportunity.

08:24:29 15          I assume that the issue we're dealing with, at least from

08:24:33 16   Taishan's perspective, is Peng now.  And as the court knows, we've

08:24:37 17   been struggling with trying to locate Mr. Peng for a good while.

08:24:43 18   And during the majority of that period of time, we were working with

08:24:47 19   the designated person at Taishan, Mr. Che to try to locate him, and

08:24:55 20   Mr. Che testified during his 30(b)(6) deposition about his efforts

08:24:59 21   to talk to Mr. Peng and Mr. Peng's refusal to continue to cooperate.

08:25:06 22          When the PSC requested or filed the motion to compel the

08:25:13 23   production of the Peng e-mails on the privilege log, we did go to

08:25:19 24   Mr. Che and through Mr. Che, Mr. Che communicated with chairman --

08:25:27 25   prepared the declaration that is at issue here, the original

declaration.

At that time, the declaration was filed I believe on August 31, and at that time we found out about the consulting agreement with Mr. Peng.  We didn't know anything about it until that time.  We didn't hide it.  We actually highlighted it in the declaration.  And then we had the argument before the court on the motion and the court made it very clear that we should double our efforts, make our best effort to try to get Mr. Peng.

We knew we were going to be meeting with Chairman Jia, we figured that for once we would be with the right person, we would be able to maybe help us figure this thing out.  And we met with Chairman Jia last weekend, I think it was like Friday, Saturday -- Friday and Saturday, and we specifically discussed the issue of where Mr. Peng was located and his computer, and Chairman Jia had his people try to figure out his address and he figured it out, and he is going to give that address during the testimony that he is going to be giving, I guess, tomorrow.  And that's his home address.

And then about the computer, he basically told his people they needed to re-double their efforts to try to find the computer.  Now what hasn't been clarified up to now is that the computer that is at issue is a desk top computer, and we never really knew what happened with the computer up to now.  And we were told that several things could have happened to it, that's where the issues about whether it could have been reconfigured or it could have been lost or whatever.

08:27:26  1          Well, it was found and what we intended to do, remember

08:27:31  2    this happened over the weekend and then we had to fly from Beijing

08:27:35  3    to Hong Kong, and what we intended to do was to apprise the PSC that

08:27:41  4    we had found the computer and that we had his home address.  And

08:27:46  5    before we could do that, we get the submission that they filed.

08:27:52  6          We have already had a third party administrator go to the

08:28:02  7    computer, access that computer, image the hard drive, and take down

08:28:10  8    the documents that are on the hard drive.  And we're going through

08:28:14  9    the same process we went through before regarding doing the search

08:28:21 10    and determining what documents are on there.  And then once we

08:28:25 11    determine the responsive document and then having the state secret

08:28:30 12    search done.  As soon as we can figure out how long that will take,

08:28:34 13    we will let the PSC know and we will produce those documents to the

08:28:39 14    PSC.

08:28:41 15          Now, when we received the submission from the PSC that

08:28:47 16    the court received, quite frankly, we think it was inappropriate for

08:28:52 17    it to be sent to the court in the way that it was sent.  But that is

08:28:55 18    what it is.

08:28:58 19          But we looked at the information on it and became

08:29:05 20    concerned because it looked like there was information about where

08:29:08 21    he works, and we had not been able to get that information up to

08:29:12 22    that time.  So we spoke with our client, and as Mr. Herman basically

08:29:18 23    indicated, as a result of that discussion with our client, we

08:29:25 24    prepared the clarification and supplementation where our client's in

08:29:34 25    the clarifying declaration indicated that he knew where Mr. Peng

08:29:38  1    worked and he indicated that in the clarification.

08:29:44  2          We understand that it's our obligation, you know, based

08:29:49  3    upon the professional rules of conduct to make sure that

08:29:53  4    clarification happened.  And we understand that there are other

08:29:56  5    consequences that will likely occur as a result of that, but we had

08:29:59  6    to make sure that we got that done, and that's why we got it done as

08:30:03  7    quickly as we could.

08:30:04  8          We also over that weekend were able to get a hold of the

08:30:10  9    consulting agreement and a couple of other documents.  We got

08:30:15 10    them -- well, we actually had that document when we filed the

08:30:20 11    declaration in August, but we got it translated into English and we

08:30:28 12    produced it to the PSC as quickly as possible.

08:30:35 13          Now, during our discussions with Chairman Jia over the

08:30:41 14    weekend and after this report came out, we told Chairman Jia that

08:30:49 15    since we now know that we prepared the clarification, that we needed

08:30:57 16    to determine whether or not Mr. Peng would now be willing to testify

08:31:03 17    and we needed to re-double those efforts.  And we have re-doubled

08:31:08 18    those efforts and we are, through Chairman Jia, in discussions with

08:31:13 19    Mr. Peng, and Mr. Peng has at least indicated a willingness to have

08:31:23 20    a positive discussion and a willingness potentially to actually

08:31:27 21    testify.

08:31:30 22          So we've made progress on that front, and we would ask

08:31:33 23    the court to let us complete that process, get back whatever

08:31:39 24    documents we're going to get from him and whatever additional

08:31:42 25    documents we will be able to obtain as a result of our discussions

08:31:45  1   with him.  See if he will be willing to testify; and if he is, get

08:31:52  2   that deposition done.  And then see what shakes out in regards to

08:31:59  3   the impact all of this has had on the litigation.

08:32:02  4          Now, in regards to one other aspect, your Honor.  The

08:32:07  5   discovery, the investigator's report that was submitted, we believe

08:32:14  6   that the way it was, as I indicated earlier, submitted to the court,

08:32:18  7   was not done in an appropriate fashion.  But as I said earlier, that

08:32:23  8   is what it is.  But we believe we have a right now to pursue

08:32:27  9   discovery in regards to that report and to determine various factors

08:32:33 10   in regards to how it was prepared, where it was prepared, what was

08:32:38 11   done, who did it, and determine how those issues, what consequences

08:32:44 12   come from those issues that we would bring to the court.

08:32:50 13          On the Peng issue, I think that's all I had to report,

08:32:53 14   your Honor.

08:32:54 15          THE COURT:  How about CNBM or BNBM, anything from them on

08:32:57 16   this issue?

08:33:00 17

08:33:01 18          MR. STENGEL:  Well, your Honor, I think I need to divide

08:33:02 19   this into two parts because I thought this morning's call was going

08:33:07 20   to be primarily directed at Mr. Peng and the discovery issues.

08:33:09 21          In fairness, e-mail or letter to your Honor did included a

08:33:15 22   reference to scheduling for the sovereign immunity briefing.

08:33:19 23   Frankly, this doesn't have anything to do with the sovereign

08:33:21 24   immunity briefing and some of what's been said by the PSC here, I

08:33:24 25   have to take fairly strong issue with.

08:33:27 1          The joint defense agreement in this case, the 2010
08:33:28 2  agreement is a very vanilla JDA, it doesn't pool the interest of the
08:33:32 3  parties, it doesn't give us access to all information, it merely
08:33:36 4  does what normal JDAs do, which is to underscore the privileged
08:33:40 5  nature of the collective communications.
08:33:42 6          So we don't have a control over Peng, we didn't have
08:33:45 7  access to all of his information.
08:33:48 8          At the end of the day, that really doesn't matter for
08:33:50 9  these purposes.  Mr. Russ said, look, I needed this because I have a
08:33:57 10 board resolution that talked about the approval of the withdrawal
08:34:00 11 from litigation.  What he didn't say was all of the CNBM witnesses
08:34:08 12 that testified concluded consistently from Gang, the 30(b)(6) to
08:34:11 13 President Cao to Mr. Song this week, Chairman Song, they all said
08:34:15 14 the decision to withdraw was made by Taishan, it was its decision,
08:34:19 15 and that the process of consultation said that they would respect
08:34:24 16 the decision.  And to throw in Chinese cooperate law concepts about
08:34:30 17 ultimate control, and controlling shareholders, which are really not
08:34:33 18 even relevant to this.
08:34:35 19         But the fundamental point from the CNBM perspective:
08:34:37 20 First, Peng is not our witness, that's a Taishan issue, Taishan can
08:34:42 21 and will address.  But there is no reason to delay scheduling and
08:34:47 22 argument of the sovereign immunity motion.  We argued this, your
08:34:53 23 Honor, your Honor will recall that.  I will acknowledge that I was
08:34:56 24 apparently unsuccessful in persuading your Honor that sovereign
08:34:59 25 immunity was immunity not only from ultimate enforcement of the

08:35:02 1   judgment, but from the burdens of litigation of the United States.

08:35:05 2   That remains our position, we have cooperated in the discovery

08:35:08 3   process, but there is no reason to defer or delay a hearing on that

08:35:13 4   issue.

08:35:15 5         Group deserves to have that issue considered.  Nothing

08:35:19 6   that's being discussed today has any real relevance to that issue.

08:35:22 7   From our perspective, the December setting was very late, really too

08:35:26 8   late under the controlling law, but we've cooperated, we're

08:35:29 9   proceeding on that basis.  But there is absolutely no reason for

08:35:32 10  this court to delay that further, particularly not when we are

08:35:38 11  reaching these decisions based on telephonic communications with

08:35:38 12  very little development of a record representation about what

08:35:47 13  witnesses have or have not said.

08:35:48 14        I think if the PSC wants further delay of the sovereign

08:35:53 15  immunity motion, they owe it to the court and the record to submit

08:35:56 16  something in detail supported by facts, and we'll take it from

08:36:00 17  there.  But we strenuously object to any efforts to further delay

08:36:03 18  argument of the sovereign immunity.

08:36:05 19        THE COURT:  Okay.  Anyone else from the defendant?

08:36:12 20        MR. MOORE:  Your Honor, Mike Moore for the BNBM companies.

08:36:12 21  I have very little to add here, other than simply to say that there

08:36:15 22  was a statement in the submission, the e-mail to the court about the

08:36:19 23  need to redo or reopen 30(b)(6) depositions of the BNBM entities,

08:36:28 24  and I've been here this entire week, there's been absolutely no

08:36:33 25  basis in the facts for that.  And I just felt the need to just

08:36:36  1     address that part of it with respect to my clients.  But other than

08:36:41  2     that, that's all I have to say.

08:36:43  3             THE COURT:  Okay.  Anything from anybody else, any other

08:36:46  4     defendants?

08:36:48  5             Okay.  I think I understand the issues folks.  It's

08:36:53  6     disappointing to me that these matters come up while everybody is in

08:36:58  7     Hong Kong rather than before they get to Hong Kong.  But it seems to

08:37:01  8     me that, I remind you all that when I first got this case sometime

08:37:08  9     in 2011 before I had an opportunity to provide an order, a

08:37:18 10     preservation order, I put in my first order instructing all parties,

08:37:22 11     all parties and their counsel are reminded of their duty to preserve

08:37:27 12     evidence that may be relevant to this action.  The duty extends to

08:37:31 13     documents, data, tangible things in possession, custody and control

08:37:36 14     of the parties, to this action and any employees, agents,

08:37:40 15     contractors, carriers, bailees, or other non-parties who possess

08:37:47 16     material reasonably anticipated to be a subject of discovery in this

08:37:52 17     action.

08:37:52 18             Then I go on to say:  "Documents, data, and tangible

08:37:57 19     things to be interpreted broadly, to include writings, records,

08:38:00 20     files, correspondence, reports, memoranda, calendars, diaries,

08:38:04 21     minute entries, electronic messages, voicemail, e-mail, telephonic

08:38:09 22     messages, computers, network activity logs, hard drives, back-up

08:38:15 23     data," and all of these informations, I expect the parties to the

08:38:20 24     litigation to retain that.  And I expect the lawyers for the parties

08:38:23 25     to instruct them to do that.

08:38:25  1          Now I am not talking about Alston & Bird.  Seems to me

08:38:30  2     that they have represented their clients effectively and have shown

08:38:34  3     nothing but professionalism to this court.  But their parties, their

08:38:39  4     clients put them in a bad situation.  I've had difficulty with

08:38:45  5     Taishan and its affiliates from the very beginning.  They want to

08:38:49  6     come in to the litigation, they want to participate; then when I

08:38:52  7     rule, they then decide not to participate.  Whether or not it's

08:38:55  8     their decision or somebody up the road becomes significant at this

08:39:00  9     time.

08:39:01  10          I've been handling this case since 2005.  2015 in

08:39:07  11    September, I learned for the first time that there is a computer,

08:39:12  12    that the party was a consultant or is a consultant.

08:39:15  13          It's just disappointing.  I am not saying about the

08:39:18  14    lawyers, the lawyers have done their very best to represent their

08:39:22  15    clients; but their clients have a responsibility to communicate

08:39:26  16    properly and effectively with the lawyers.

08:39:28  17          Issues have been raised on spoliation, issues have been

08:39:32  18    raised on contempt, issues have been raised on penalties.  Very

08:39:37  19    serious issues that I have to hear from all sides.

08:39:40  20          I think the best way of handling this is to hold an

08:39:45  21    evidentiary hearing on the issue of spoliation, contempt.  I'll give

08:39:49  22    each party an opportunity to present evidence.  Evidence is not

08:39:53  23    going to be affidavits.  Evidence is going to be things that and

08:39:58  24    witnesses that are admissible into evidence, whether it's

08:40:04  25    depositions or live testimony, that's going to be significant.

08:40:07  1          Documents are documents that are introducible in

08:40:11  2    evidence, not documents that are made up.  Documents that are

08:40:15  3    introducible in evidence.

08:40:17  4          It seems to me that I need an evidentiary hearing for

08:40:26  5    this matter, and I am going to set it for November the 10th of 2015.

08:40:31  6          It may relate to sovereign immunity, I am not saying it

08:40:35  7    isn't.  How does it relate to sovereign immunity?  It may be an

08:40:39  8    exception to sovereign immunity.  I don't know what part BNBM or

08:40:43  9    CNBM participated in this.  They say that they had nothing to do

08:40:47 10    with it.  They don't even know Mr. Peng or had no relationship with

08:40:50 11    Mr. Peng.  On the other hand there's other people that say that

08:40:54 12    there's been a board meeting, they knew everything about it, and

08:40:58 13    instructed Taishan not to participate since they held the strings,

08:41:03 14    they pulled the strings, that's what the plaintiffs say.  I don't

08:41:06 15    know whether it's accurate or not.

08:41:08 16          But it seems to me that the parties ought to have an

08:41:11 17    opportunity to present evidence in this matter, so that if I do

08:41:15 18    rule, the parties will have an opportunity to take it up with the

08:41:20 19    Fifth Circuit.

08:41:20 20          Thank you very much and I ask that you continue to do

08:41:25 21    your job in Hong Kong.  Thank you very much.

08:41:36 22       (WHEREUPON, THE PHONE CALL WAS DISCONNECTED.)

08:41:36 23          MR. DAVIS:  Your Honor, I had a comment, I know we're

08:41:39 24    after the fact, but my comment would be, which my colleague next to

08:41:43 25    me suggested, which that a court appointed custodian take possession

08:41:48  1    of the computer so it's not altered in the interim.  I know we're

08:41:55  2    after the fact.

08:41:56  3               THE COURT:  That's all right.  Okay.  We'll see where it

08:41:59  4    is.  Okay, folks, thank you very much.

5               (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

6

7                              *  *  *  *  *  *

8

9

10

11                         REPORTER'S CERTIFICATE

12

13               I, Karen A. Ibos, CCR, Official Court Reporter, United

14    States District Court, Eastern District of Louisiana, do hereby

15    certify that the foregoing is a true and correct transcript, to the

16    best of my ability and understanding, from the record of the

17    proceedings in the above-entitled and numbered matter.

18

19

20                    /s/ Karen A. Ibos
                      _____

21                    Karen A. Ibos, CCR, RPR, CRR, RMR

22                    Official Court Reporter

23

24

25