IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| CHINA NATIONAL BUILDING MATERIAL INVESTMENT CO., LTD. (F/K/A BND CO., LTD.) | § § § § | |
| Plaintiff, | § § | Civil Action No. 1:14-cv-00701-SS |
| v. | § § | JURY TRIAL DEMANDED |
| BNK INTERNATIONAL, LLC and JEFFREY J. CHANG | § § § | |
| Defendants. | § | |

**PLAINTIFF'S CERTIFICATE OF INTERESTED PARTIES
AND DISCLOSURE STATEMENT**

COMES NOW, Plaintiff China National Building Material Investment Co., Ltd. (f/k/a

BND Co., Ltd.), by and through its undersigned counsel, pursuant to Federal Rule of Civil

Procedure 7.1, and hereby lists the following persons and/or entities who may have a financial

interest in the outcome of this action:

1.      Counsel for Plaintiff
        R. Edward Perkins
        Sheehy, Ware & Pappas, P.C.
        909 Fannin Street, Suite 2500
        Houston, TX  77010

2.      Plaintiff China National Building Material Investment Co., Ltd. (f/k/a BND Co., Ltd.).

3.      Plaintiff China National Building Material Investment Co., Ltd. (f/k/a BND Co., Ltd.) is a corporation whose shares owned by China National Building Material Company Limited, a company whose shares are publicly traded on the Hong Kong Stock Exchange, stock code 3323, ticker CNBM.

4.      Defendant BNK International, LLC.

5.      Defendant Jeffrey J. Chang.



FSIA
EXHIBIT
132

6.     Counsel for Defendants
       Peter C. Ruggero
       Ruggero Law Firm PC
       1411 West Ave, Ste 200
       Austin, Texas 78701

Respectfully submitted,

/s/ R. Edward Perkins
R. Edward Perkins
State Bar No. 15790410
Sheehy, Ware & Pappas, P.C.
909 Fannin Street
Suite 2500
Houston, Texas 77010
(713) 951-1004
(713) 951-1199 fax
eperkins@sheehyware.com

*Attorneys for Plaintiff China National Building Material Investment Co., Ltd.*

2210813

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| CHINA NATIONAL BUILDING MATERIAL INVESTMENT CO., LTD. (F/K/A BND CO., LTD.) | § § § § | |
| Plaintiff, | § § | Civil Action No. 14-701 |
| v. | § § | JURY TRIAL DEMANDED |
| BNK INTERNATIONAL, LLC and JEFFREY J. CHANG | § § § | |
| Defendants. | § | |

## COMPLAINT

Plaintiff, China National Building Material Investment Co., Ltd. (f/k/a BND Co., Ltd.) ("CNBMI"), files this Original Complaint against Defendants BNK International, LLC ("BNK") and Jeffrey J. Chang ("Chang"), and respectfully shows unto this Court the following:

## JURISDICTION AND VENUE

1.      This Court has original jurisdiction over this action under 28 U.S.C. §1332(a)(2) because CNBMI is a Chinese citizen and Defendants are citizens of Texas and the amount in controversy exceeds $75,000.00, excluding interest and costs.

2.      Venue is proper in this Court under 28 U.S.C. §1391(a) because all Defendants reside in Travis County, Texas in the Western District of Texas, Austin Division.  Venue is also proper because the Western District of Texas is where a substantial part of the events or omissions giving rise to this claim occurred.

## THE PARTIES

3.      CNBMI is a Chinese entity with its principal place of business at 12/F International Trade Center, Shenzhen, 518014, P.R. China.

4.      BNK is a domestic limited liability company.  It may receive service of process by serving its registered agent Jeffrey J. Chang at 9102 Country Canyon Cove, Austin, Texas 78759.

5.      Chang is an individual and a citizen of the State of Texas.  Chang may be served with process at 9102 Country Canyon Cove, Austin, Texas 78759.

## FACTUAL BACKGROUND

**A.      CNBMI's Judgment Against BNK and Proceedings Thereon**

6.      At all relevant times, Chang was and is BNK's sole member, sole director, and president.

7.      On May 8, 2004, CNBMI entered into an Agency Agreement (the "Agreement") with BNK and Chang, whereby BNK and/or Chang were to act as CNBMI's agent, authorized to identify, negotiate, and secure customers in the United States of America to purchase from CNBMI hardwood floor products, in exchange for payment of certain commissions. A copy of the Agency Agreement is attached as Exhibit A.

8.      Pursuant to the Agency Agreement, BNK and/or Chang owed CNBMI fiduciary duties of care and loyalty and were required to report accurate sales to CNBMI and pay CNBMI its specified share of those sales. They also had a fiduciary duty to CNBMI with regard to all funds BNK received and held from third parties in accordance with Agency Agreement.

9.      Pursuant to the Agency Agreement, from 2004 to 2008, BNK and/or Chang procured sales of CNBMI's materials to Lumber Liquidators, Inc. ("Lumber Liquidators"). CNBMI shipped those materials, and Lumber Liquidators received those materials and paid BNK.

10.    BNK and/or Chang reported to CNBMI that the sales of the materials totaled $21,343,145.01, and BNK and/or Chang paid CNBMI the amount of $18,243,072.58 on those sales.

11.    As the Agreement terms provided for a larger portion of the $21,343,145.01 in reported sales to be paid to CNBMI, CNBMI sought legal remedies against BNK and initiated an arbitration proceeding against BNK as provided in the Agency Agreement.

12.    CNBMI won an award of $3,141,835.32.

13.    On June 25, 2009, CNBMI filed an Application and Motion to Confirm a Foreign Arbitration Award ("Motion to Confirm") against BNK, docketed in this Court as Civil Action No. A09CA-488SS.

14.    The Motion to Confirm included as Exhibits BNK's Agency Agreement with CNBMI and the Final Award as Exhibits thereto.

15.    On December 3, 2009, this Court granted CNBMI's Motion to Confirm and rendered a Judgment in favor of CNBMI ("underlying Judgment").   A copy of CNBMI's Judgment is attached as Exhibit B.

16.    On December 31, 2009, BNK filed its Notice of Appeal.

17.    On May 5, 2010, the Fifth Circuit Court of Appeals dismissed BNK's appeal.

**B.    CNBMI's Collection Efforts**

18.    After BNK filed its Notice of Appeal, but before the appeal was dismissed, on April 14, 2010, CNBMI served its Post-Judgment Requests for Production of Documents ("CNBMI's Requests").

19.    CNBMI's Requests sought information for purposes of collecting on the underlying Judgment, including BNK's bank records and statements of financial affairs.

20. On May 17, 2010, BNK served its responses to CNBMI's Requests.

21. The only documents BNK produced in its initial responses to CNBMI's Requests were as follows: (1) a Convertible Promissory Note and Line of Credit from an entity named Crossroads Enterprise, Inc. and (2) a Royalty Agreement. BNK did not produce any of BNK's bank or financial records in its initial responses to CNBMI's Requests.

22. On July 16, 2010, CNBMI filed its Motion to Compel and Motion for Sanctions against BNK requesting that the Court: (1) overrule BNK's objections to CNBMI's Requests and (2) order BNK to produce all responsive documents to CNBMI's Requests.

23. Around the same time, in early July 2010, CNBMI issued a Subpoena to Produce Documents to Lumber Liquidators seeking sales records, invoices, purchase orders, and payment records related to BNK's products purchased by customers from Lumber Liquidators.

24. Sometime after July 30, 2010, Lumber Liquidators produced documents responsive to CNBMI's subpoena, including documents identifying BNK's bank accounts maintained at Bank of America. These records showed that, in fact, the actual amounts paid by Lumber Liquidators to BNK on the sales totaled $29,001,278.71. Lumber Liquidators also provided a declaration of an individual named Franklin Marcus. A copy is attached as Exhibit C.

25. Based on the foregoing, BNK and Chang defrauded CNBMI, breached the fiduciary duties owed to CNBMI, and breached the Agency Agreement by failing to pay CNBMI all of the amounts owed to CNBMI on the Lumber Liquidator sales.

26. CNBMI was not previously aware of this fraud, breach of fiduciary duty, or breach of contract, and because of the unique way in which the relationship between CNBMI and BNK worked, CNBMI could not have known.

27.     On July 30, 2010, BNK paid CNBMI $1,500,000.00 in partial satisfaction of the underlying Judgment; however, the remainder was outstanding.  CNBMI was not aware at the time that the amount paid by Lumber Liquidators in fact exceeded $29 million

28.     As a result of the $1.5 million payment, on August 3, 2010, CNBMI filed its Advisory to the Court stating that it desired to withdraw its Motion to Compel and Motion for Sanctions.  In a further attempt to resolve the underlying dispute and reach a settlement of all potential claims against BNK and Chang, CNBMI and BNK agreed to attend a settlement meeting.

29.     In preparation for the settlement meeting, and based upon the information received from Lumber Liquidators, on August 6, 2010, CNBMI issued a Subpoena to Produce Documents to Bank of America Corporation seeking any and all bank records for BNK's accounts.

30.     Bank of America produced documents responsive to CNBMI's subpoena, including documents identifying BNK's account wire transfers, bank statements, copies of checks drawn on BNK's accounts, and banking resolutions.  The records were surprising to say the least.  They showed a complete pattern of lies, deceit and self-dealing by Chang and his family members, all to the detriment of BNK and CNBMI.

31.     CNBMI and BNK participated in a settlement meeting on October 11, 2010 in Austin, Texas to discuss BNK's under-payment to CNBMI and the underlying Judgment.  However, the parties were unable to resolve the matter.

C.      **BNK's Chapter 11 Filing**

32.     In an effort to stall CNBMI, Chang caused BNK to file a Voluntary Petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the

Western District of Texas, Austin Division, Case No. 10-13034 (CAG) on October 27, 2010. The bankruptcy case was converted to a Chapter 7 on March 31, 2011.

33.     On October 18, 2011, CNBMI and the bankruptcy trustee for BNK entered into an Asset Purchase Agreement, a copy of which is attached as Exhibit D.  Through the Asset Purchase Agreement, CNBMI acquired, among other things, any and all claims that BNK might have against Chang, including, without limitation, any claims for breach of fiduciary duty.

34.     The bankruptcy court subsequently issued an order approving the Asset Purchase Agreement.  Thereafter, as part of the bankruptcy process, BNK's assets were liquidated.

**D.     Chang's Misdeeds at BNK**

35.     Chang undercapitalized BNK, comingled assets, mismanaged the company's business dealings and financial transactions, and defrauded business associates, including CNBMI, all to his benefit.

36.     Based on the documents thereafter produced by Lumber Liquidators and Bank of America, CNBMI learned of Chang's improper handling of BNK's finances and his manipulation of information given to and withheld from CNBMI.

37.     Through a series of fraudulent and improper transactions, made while Chang had total control over BNK, he proceeded to denude the company of any assets, avoiding having to pay those sums to CNBMI.  Over the course of several years, Chang systematically transferred over $8 million to family members and dummy companies he controlled.  These persons include Andy Kuan, Cindy Kuan, Linda Chang-Shimaura, Yen Ching, Erica Huang, Crossroads Enterprise, Inc., HK BNG International, CNYES.com, Interpacific Goldenline, Jin-Bao Mountain, Grace Covenant Church, Children's Courtyard, Total Smile Management, A+ Federal Credit Union, and Jose Menchaca,  At the same time, he intentionally withheld information from

CNBMI about these transactions or gave CNBMI false or incomplete information. CNBMI had no way of knowing of these misdeeds by Chang until it obtained the records from Lumber Liquidators and Bank of America. Chang knew that these sums should have been paid by BNK to CNBMI or retained by BNK, and not used for his personal benefit. These transfers served no legitimate business purpose of BNK. BNK received no reasonably equivalent value from the transferees which, in fact, caused BNK to default in its obligations to CNBMI. Chang caused the transfers to be made at a time when the remaining assets of BNK were insufficient to allow it to continue as a viable entity.

**E.  Additional Facts Supporting Liability of BNK and Chang**

**1.  Chang's Improper Wire Transfers from BNK's Account**

38.  Chang, as authorized by BNK, made all wire transfers from BNK's account, as set forth below.

39.  Chang made wire transfers to himself from BNK's accounts for personal use from 2005 until 2008 totaling $88,000.00.

40.  Chang made the wire transfers to himself for personal use through Bank of America's on-line website.

41.  At least one of the wire transfers made to Chang in 2006 for $8,000.00 was made for the purpose of paying Chang's house payment.

42.  BNK from 2005 until 2007 made wire transfers to Chang's family members, Andy and Cindy Kuan, totaling $157,200.55.

43.  One of the wire transfers by BNK to Andy and Cindy Kuan was used to pay for the Kuan's house payment.

44.    BNK from 2005 through 2007 made wire transfers to Chang's sister, Linda Chang-Shimaura, totaling $91,000.

45.    BNK from 2006 through 2007 made wire transfers to family member, Yen Ching, totaling $46,400.

46.    BNK in 2005 made wire transfers to family member, Erica Huang, totaling $25,774.90.

47.    BNK from 2007 through 2010 made wire transfers to Crossroads Enterprise, Inc. totaling $1,926,000.

48.    BNK in 2007 made wire transfers to HK BNG International totaling $4,599,017.22.

49.    BNK from 2004 through 2006 made wire transfers to CNYES.com totaling $415,335.37.

50.    BNK, from 2005 through 2008, made wire transfers to Interpacific Goldenline totaling $161,215.19.

51.    BNK, on October 28, 2004, wired $16,345.51 to Jin-Bao Mountain.

**2.    Chang's Improper Issuance of BNK Checks**

52.    Chang was the authorized signatory on all BNK checks including those issued to Chang and his family members from BNK's account, as set forth below.

53.    BNK issued checks to Chang from 2004 until 2008 totaling $185,999.50.

54.    BNK issued checks to Jennie Chang from 2005 until 2007 totaling $165,182.

55.    BNK issued checks to Grace Covenant Church.

56.    BNK issued tuition checks to an early childhood education school, Children's Courtyard, attended by Chang's children Alison and Valerie.

57.     BNK issued checks to Total Smile Management for dental work performed on Chang's children.

58.     BNK issued checks to Grace Covenant Church for "Jeffrey Chang and Jennie Chang".

59.     BNK issued checks to A$^+$ Federal Credit Union in 2009 and 2010.

60.     BNK issued checks to Jose Menchaca for home remodeling.

61.     BNK to wire additional funds and issued additional checks to others in amounts presently unknown, as shall be further established through continuing investigation and discovery in this matter.

## CAUSES OF ACTION

### Count I – Alter Ego/Piercing the BNK Veil

62.     CNBMI reasserts and incorporates all of the foregoing paragraphs by reference as if fully stated herein.

63.     Chang has a financial interest, ownership and/or control of BNK.

64.     There is such a unity between Chang and BNK that the separateness of BNK has ceased.

65.     Chang paid personal debts and obligations with corporate assets.

66.     BNK's assets and profits have been diverted by Chang and his family for their personal use.

67.     BNK was inadequately capitalized. Chang treated it as a mere conduit for his personal use and gain. Chang used the corporation for the purpose of perpetrating and did perpetrate an actual fraud on CNBMI primarily for his direct personal benefit.

68.     Holding only BNK liable on the underlying Judgment and other claims and allowing Chang to escape personal responsibility would result in an injustice, especially since the underlying Judgment against BNK is otherwise uncollectible.

69.     CNBMI requests that BNK's corporate form be disregarded and Judgment be rendered against Chang individually, in addition to BNK, for the remaining amount to be satisfied on the underlying Judgment and other obligations of BNK to CNBMI.

<u>Count II – Sham to Perpetrate a Fraud Requiring Piercing of the BNK Veil</u>

70.     CNBMI reasserts and incorporates all of the foregoing paragraphs by reference as if fully stated herein.

71.     The conduct of Chang described above involves dishonesty of purpose and intent to deceive. Chang treated BNK as a mere conduit for his personal gain. Chang used the corporation for the purpose of perpetrating and did perpetrate an actual fraud on CNBMI primarily for his direct personal benefit.

72.     Chang deceived CNBMI who reasonably relied on BNK to collect receivables, remit them less contractually agreed-upon commissions to CNBMI, and retain funds necessary to meet BNK's business debts, obligations and expenses.

73.     Chang disregarded BNK's form and used its assets and profits for his personal, family expenses and to benefit third parties, rather for BNK's legitimate business debts, obligations and expenses.

74.     CNBMI requests that BNK's corporate form be disregarded and Judgment be rendered against Chang individually, in addition to BNK, for the remaining amount to be satisfied on the underlying Judgment and other obligations of BNK to CNBMI.

<u>Count III – Breach of Contract</u>

75.     CNBMI incorporates all of the foregoing paragraphs by reference as if fully stated herein.

76.     As detailed above, CNBMI and BNK and Chang entered into a valid contractual arrangement, through the Agency Agreement.

77.     CNBMI fully performed its obligations under the Agreement.

78.     BNK and Chang breached the contract by fraudulently understating the amount of sales to Lumber Liquidators and underpaying CNBMI for those sales.

79.     As a result of the breach by BNK and Chang, CNBMI has been damaged in an amount of at least $7,658,133.70.  This amount is in excess of the amounts due under the underlying Judgment for which Chang should be held individually liable, as set forth above.

<u>Count IV – Fraud by BNK and Chang</u>

80.     CNBMI incorporates all of the foregoing paragraphs by reference as if fully stated herein.

81.     By intentionally understating the value of the sales to Lumber Liquidators, BNK and Chang made material misrepresentations to CNBMI.  BNK and Chang also withheld vital information about the sales to Lumber Liquidators that was otherwise not knowable by CNBMI. BNK and Chang knew that CNBMI, located in China, had no other means of knowing the true facts.  They were deliberately silent when, as fiduciaries, they had a duty to speak.  These misrepresentations and omissions prevented CNBMI from otherwise discovering the wrongdoing of BNK and Chang.  BNK had a duty to fully disclose proper information to CNBMI regarding the sales made and intentionally failed to do so.  They did so for the purpose of lining their own pockets at the expense of their principal.

82.     These misrepresentations and omissions were material and were made by BNK and Chang with knowledge of their falsity.

83.     These misrepresentations and omissions were made by BNK and Chang with the intention they should be acted on by CNBMI, or alternatively, were made to induce CNBMI to not act. CNBMI justifiably did rely and was damaged as a result.

84.     BNK and Chang are therefore indebted to CNBMI for that portion of the $7,658,133.7 that is still due pursuant to the Agency Agreement.  This amount is in excess of the amounts due on the underlying Judgment for which Chang should be held individually liable, as set forth above.

<u>Count V – Breach of Fiduciary Duty by BNK and Chang to CNBMI</u>

85.     CNBMI incorporates all of the foregoing paragraphs by reference as if fully stated herein.

86.     Based on the Agency Agreement and the transactions with Lumber Liquidators, BNK and Chang owed fiduciary duties to CNBMI.

87.     By failing to disclose the full $29,001,278.71 in sales and failing to pay CNBMI on the $7,658,133.7 discrepancy, BNK and Chang breached their fiduciary duties to CNBMI.

88.     As a result, CNBMI has been damaged in that it has not received the portion of the $7,658,133.7 that is due pursuant to the Agency Agreement. BNK and Chang are thus indebted to CNBMI for that portion of the $7,658,133.7 that is still due pursuant to the Agency Agreement.  This amount is in excess of the amounts due on the underlying Judgment for which Chang should be held individually liable, as set forth above.

### Count VI – Breach of Fiduciary Duty by Chang to BNK

89.     CNBMI incorporates all of the foregoing paragraphs by reference as if fully stated herein.

90.     As detailed above, CNBMI purchased the rights to BNK's claims against Chang, including that for breach of fiduciary duty.

91.     As an officer and director of BNK, Chang owed BNK fiduciary duties.  He had a duty to avoid self-dealing and personal enrichment and a duties of care and loyalty

92.     Chang breached those fiduciary duties by improperly withdrawing and/or transferring BNK funds for personal, family, and non-business reasons, mismanaging the company's business dealings and financial transactions, and defrauding business contacts, and otherwise poorly performing his functions as an officer and director of BNK.

93.     Due to Chang's breach of fiduciary duty, Chang's siphoning off funds from BNK to himself, his family members, and third parties rather than for BNK's business debts and expenses, BNK was unable to meet its obligations to CNBMI, became unprofitable, and went through the bankruptcy process, ending with no remaining assets or operations.

94.     Based on the foregoing, BNK has been damaged by Chang at least to the extent that it is liable to CNBMI.  Chang is thus indebted to BNK and CNBMI for that portion of the $7,658,133.7 that is still due pursuant to the Agency Agreement.  This amount is in excess of the amounts due on the underlying Judgment for which Chang should be held individually liable, as set forth above.

### Count VII – Exemplary Damages

95.     CNBMI incorporates all of the foregoing paragraphs by reference as if fully stated herein.

96.     The harm caused to CNBMI by BNK and Chang, as set forth above, results from fraud and malicious activity.  CNBMI is entitled to recover exemplary damages from BNK and Chang, jointly and severally, in accordance with Chapter 41 of the Texas Civil Practice and Remedies Code.

Count VIII – Attorneys' Fees

97.     CNBMI incorporates all of the foregoing paragraphs by reference as if fully stated herein.

98.     Because of the BNK's and Chang's actions, CNBMI has been required to retain the services of the undersigned legal counsel to prosecute its interests.  Pursuant to the terms of the Agency Agreement, the Asset Purchase Agreement and Texas Civil Practices and Remedies Code 38.001, CNBMI is entitled to the recovery of its reasonable attorneys' fees from BNK and Chang, jointly and severally.

**JURY DEMAND**

99.     CNBMI requests a trial by jury on all claims and defenses asserted in this matter

**PRAYER FOR RELIEF**

WHEREFORE, China National Building Material Investment Co., Ltd. prays that:

1.      Judgment be rendered in favor of CNBMI and against BNK International, LLC and Jeffrey J. Chang, jointly and severally.

2.      CNBMI be awarded its actual, compensatory, special, incidental, and/or consequential damages;

3.      CNBMI be awarded exemplary damages pursuant to Chapter 41 of the Texas Civil Practice and Remedies Code.

4.      CNBMI be awarded its costs of court, attorneys' fees, prejudgment and post-judgment interest; and

5.      CNBMI be awarded all and other relief to which it may be justly entitled.

Dated: July 30, 2014

Respectfully submitted,

/s/ R. Edward Perkins
R. Edward Perkins
State Bar No. 15790410
Sheehy, Ware & Pappas, P.C.
909 Fannin Street
Suite 2500
Houston, Texas 77010
(713) 951-1004
(713) 951-1199 fax
eperkins@sheehyware.com

*Attorneys for Plaintiff China National Building Material Investment Co., Ltd.*

# AGENCY AGREEMENT

This agreement (the *"Agreement"*) is entered into as of May 8, 2004, between BND CO., LTD, a subsidiary of BNBM GROUP LIMITED, with its principal business located at 12/F International Trade Building, ShenZhen, 518014, China (the *"Company"*) and BNK International LLC (the *"Agent"*), a Texas USA company, located at 9102 Country Canyon Cove, Austin, TX 78759, USA.

## RECITALS

WHEREAS, the Company desires to authorize Agent to identify, negotiate and secure customers in the United States of America to purchase from Company hardwood floor products that are manufactured by Company or by third party manufacturers contracted by Company (*"Product"*).

WHEREAS, Agent intends to identify, negotiate and secure customers in the United States of America to purchase Product from Company through Agent.

WHEREAS, typical profiles of customers for Product in the US market include, but not limited to:

1) Manufacturers in the US that uses Company as its OEM vendor for Product;
2) Distributors or wholesalers in the US that uses Company as its OEM vendor for Product;
3) Distributors or wholesalers in the US that purchase Product from Company;
4) Retailers in the US that use Company as its OEM vendor for Product;
5) Retailers in the US that purchase Product from Company; and
6) Builders in the US that purchase Product from Company.

## 1. Effective Customer.

1) Upon receiving the identity of a potential customer (*"Potential Customer"*) from Agent, Company shall notify Agent if Company has any existing business relationships, including but not limited to Product, with the Potential Customer. The notification shall be delivered to Agent within two (2) business days in verbal and be followed up with delivery of supporting documents to Agent within five (5) business days. Failure by Company to notify Agent within the time periods above in both forms is deemed a recognition by Company that the Potential Customer is an effective customer (*"Effective Customer"*). Any Potential Customer notified by the Agent to the Company which does not have any existing business relationship with the Company is deemed recognition by Company that the Potential Customer is an Effective Customer.

2) An Effective Customer is subject to this Agreement.

3) Effective Customer will lose its status as an Effective Customer if its first Purchase Order, Sales Contract or any other business arrangements used to effect a purchase

(collectively "*PO*") does not occur within the first six (6) months immediately after recognition by the Company as an Effective Customer.

4) Company shall provide Agent with an official recognition letter of the Effective Customer within 30 days from the date Company was first notified of the identity of the Effective Customer.

## 2. Compensations.

1) Agent is compensated by receiving a profit mark-up ("*Profit Markup*"), determined by the sole discretion of Agent, added on top of the Product price quotations ("*Company's Quotations*") and packaging fees quotations provided by Company and have the final Agent's price quotations ("*Agent's Quotations*") accepted by the Effective Customer. Agent may, but is not obligated to, disclose his mark-up information to Company.

2) Company need not pay Agent with other compensations unless explicitly noted in this Agreement or with separate written agreements.

3) Company agrees that Agent shall continue to be compensated as long as its Effective Customer(s) purchase Product from Company regardless if PO's are placed with Agent or Company; regardless if payments made by Effective Customer are sent to Agent or Company; and regardless if there has been an interruption of PO placement, provided the continuous interruption of PO placement from the Effective Customer is less than twelve (12) months.

## 3. Disclosure of Profit Markup. In the event that Agent elects to disclose its Profit Markup information to Company for a certain product of the Product, the following terms become effective.

1) Agent is entitled to keep a profit margin ("*Margin*") up to 20%.

2) In the event Margin is greater than 20%, Agent will continue to receive one-half (1/2) of each percent point that is over 20% and Company is entitled to receive one-half (1/2) of each percent point that is over 20%.

3) In the event that Margin is less than 12%, Company shall pay to Agent an amount equal to one-half (1/2) of each percent point that is less than 12%.

4) Agent must first obtain approval from Company before presenting to Effective Customer with Agent's Quotations that has a profit margin less than 12%.

5) The base ("*Margin Base*") for calculating Margin is the sum of Company's Quotations and any packaging fees quoted and provided by the Company to Agent.

6) Margin is calculated by dividing the Profit Markup by Margin Base.

7) Company shall disclose in reciprocal to Agent with its cost and profit structures in connection with Product.

8) When changing Company's Quotations, Company must provide proofs of changes in its cost or profit structures as the basis for changes. Any upward revision of Company's Quotations cannot be more than the changes provided in the proofs. Agent shall have the right, at is own expense, with a five business day prior notice, to inspect Company's relevant accounting records during regular business hours to verify the change in the Company's cost or profit structure.

4. **Communications with Customers.** Company agrees that all communications with Potential Customer (other than those that have existing business relationships with Company) or Effective Customer (collectively "Customers") shall go through Agent without exceptions unless it is explicitly authorized by Agent in writing on a case-by-case basis.

5. **Negotiations with Customers.** Company agrees that all negotiations with Customers must be conducted by Agent without exceptions unless it is explicitly authorized by Agent in writing. In the event that Company negotiates Product prices and terms with Customers directly without a prior written consent from Agent or which exceeds the scope authorized by Agent, Agent is entitled to Fifteen Percents (15%) of the prices agreed upon between Company and Customers or Fifteen Percent (15%) of total sales amount Company receive from the Customers (either through a purchase order, sales contract, or any other business arrangements), whichever is higher, as the compensation.

6. **Communications of Purchase Orders.**

1) Agent shall disclose Effective Customer's PO information to Company to obtain Company's commitment in its ability in meeting the requirements. Agent shall disclose the following terms, but not limited to, in the PO to Company:

   1. Quality Requirements
   2. Quantity Requirements
   3. Delivery Requirements
   4. Delivery Dates, and
   5. Penalty Clauses

2) Any failure by Company to notify the rejection or modification of the PO within three (3) business days of receiving the PO shall be deemed as acceptance of the PO in its full terms, provided Agent communicates the PO to Company in both verbal and written forms.

3) Company shall not accept any PO for Product from Effective Customer directly or through any third party other than Agent.

**7. Payments.**

1) If payments made by Effective Customer are sent to Company directly, Company agrees to deliver Agent's Profit Markup portion no later than 3 business days after receipt of payments from Effective Customer. A 2% weekly charge will apply if the payment is not received by Agent within the said period.

2) If payments made by Effective Customer are sent to Agent directly, Agent agrees to deliver Company's portion no later than 3 business days after receipt of payments from Effective Customer. 2% weekly interest charge will apply if the payment is not received by Company within the said period.

3) Agent may elect the payment from Company be made in US dollars or RMB. If paid in RMB, the prevailing exchange rates will apply.

4) This clause is subject to relevant Chinese governing laws in foreign currencies regulations.

8. **Product Quality Assurance.** Company agrees to provide Product quality assurance report, such as Taber test report, to Agent on a monthly basis or upon request to ensure the Product quality is consistent and met with Effective Customer's requirements. Agent will try to obtain quantified quality requirements from Effective Customer for Company.

9. **Third Party Manufacturers.** Company must obtain Agent's approval and provide Agent with an assessment report of the third party manufacturer's qualifications, quality control process and production capacity prior to using or changing any third party manufacturers for the Products.

10. **Export Agency.** Company shall notify Agent when there is a change of Company's export agency or export company.

11. **OEM Authorization.** When an Effective Customer places OEM PO with Agent, Agent must obtain the following from the Effective Customer for the Company:

    1) Proof of ownership or registration of the OEM brand by the Effective Customer; and

    2) Authorization documents issued by Effective Customer to authorize Agent or Company to manufacture the OEM product.

12. **First Right of Refusal on Agency Rights with other products.** Agent shall have First Right of Refusal when Effective Customer intends to purchase products other than Product ("*Other Products*") from Company. Agent shall be entitled to the same rights and terms outlined in this Agreement with regard to those Other Products (the "Other Products shall become the "Product") once the first right of refusal is exercised by Agent. The first right of refusal is deemed exercised when Agent has successfully secured a PO of Other Products from Effective Customer

and has the PO accepted by the Company.

13. **Undertaking by Agent.** Agent undertakes to cause its major shareholder (Jeffrey J. Chang) to grant Company the first right of refusal on any of his future transfer of the shares in Agent.

14. **Joint Venture with Customers.** If Company is to enter into a joint venture or any other similar business arrangements (collectively "Joint Venture") with any of the Customers related to Product, Agent shall have the right to participate in the Joint Venture with at least 15% of total equity. Further, payment by Agent in the Joint Venture may be made in installments and up to 24 months after the establishment of the Joint Venture.

15. **Terms, Termination and Renewal of Agreement.**

1) The effective period for the Agreement is three (3) years from the date Agreement is executed. The Agreement is renewable with mutual consent at the end of the terms; or is automatically renewed at the end of the terms if the following Performance Requirement is met by Agent:

**Performance Requirement:** Under the condition that Company can fulfill all PO's produced by Agent, the sales volume must reach USD$3,000,000, based on Company actual transacted amount, in the last 12-month period of the three (3) 12-month periods of the Agreement.

2) All Effective Customer recognized during the effective period of Agreement shall continue to be subject to the terms and conditions of Agreement even after termination of Agreement.

3) Should Agreement terminate after a customer is recognized as an Effective Customer but before the first PO is placed by the Effective Customer, the customer is subject to Agreement should he successfully place its first PO with Agent or Company within the six (6) month following the termination of the Agreement.

4) Company shall have the rights to modify or terminate this Agreement should Jeffrey J. Chang fail to maintain as the largest shareholder in Agent. This clause does not apply should the Company or its parent company or its sister companies or its subsidiaries or its affiliated companies become shareholders of BNK International LLC.

16. **Incentive Rebate.**

1) In each of the three (3) 12-month periods of Agreement, a 0.25% rebate will be provided by Company to Agent if the sales amount for the period is greater than or equal to USD$5,000,000 but less than USD$7,500,000. The sales amount is based on Company recorded transactions for the period.

2) In each of the three (3) 12-month periods of Agreement, a 0.5% rebate will be provided by Company to Agent if the sales amount for the period is

greater than or equal to USD\$7,500,000. The sales amount is based on Company recorded transactions for the period.

3) The rebates are payable five (5) business days after the end of each of the three (3) 12-month period of Agreement.

**17. Binding Entities.** This Agreement is binding to Company and all Company's subsidiaries. When the Company's sister companies or affiliated companies also approach Effective Customer, the Company will actively involve protecting Agent's stated interests and rights in this Agreement. The Company undertakes to immediately inform Agent when any of its subsidiaries or affiliated companies start to engage in a business of selling competing products and shall cause these companies agree to be bound by this Agreement.

**18. Reimbursement of Fees.** Company shall reimburse Agent any fees or expenses that are spent by Agent on behalf of Company immediately upon submission of receipts of invoices, provided the fees or expenses have prior approval from Company.

**19. Trademarks and Trade names.** During the term of this Agreement, Agent shall have the right to indicate to the public that it is an authorized agent of the Company's Products and to advertise such Products under the trademarks, marks and trade names that Company may adopt from time to time. Nothing herein shall grant Agent any other right, title or interest in Company's trademarks.

**20. Indemnification by Company.** Company shall indemnify and hold Agent free and harmless from any and all claims, damages or lawsuits (including attorneys' fees) arising out of defects in the Products caused by Company, failure of Company to provide Product to any Effective Customer that has been properly ordered through Agent, or failure of Company to provide Product that meets the product requirements specified by the Effective Customer.

**21. Assignment.** The rights, duties or obligation under this Agreement may not be assigned by either party except with the other party's prior written consent. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the successors and assigns of the parties.

**22. Notice.** Any notice, request, demand, or other communication required or permitted hereunder shall be deemed to be properly given by dispatching certified or registered mail addressed:

(a) in the case of Company to: [Address]
Attention: [Person]

(b) in the case of Agent, to: 9102 Country Canyon Cove, Austin, TX 78759,
USA
Attention: Jeffrey J. Chang

or to such other person or address that the receiving party from time to time duly furnished to the other parties.

Page 6 of 8

04/21/2005   9:11   1517958519   STPV   PAGE   07

23. **Amendment.** The parties hereto agree that this Agreement may be modified only by a written agreement duly executed by persons authorized to execute agreements on behalf of the parties.

24. **Completeness.** This Agreement supercedes all previous agreements or understandings between the parties with respect to the subject matter.

25. **Severability.** If any provision of this Agreement is prohibited by the laws of any jurisdiction in which this Agreement may be used or to which it may be applicable, said provision shall be, as to said jurisdiction, ineffective to the extent of such prohibition, without invalidating thereby any of the remaining provisions of this Agreement.

26. **No Implied Waiver.** The failure of any party at any time to require performance by the other party of any provision hereof shall not affect in any way the full right to require such performance at any time thereafter. Nor shall the waiver by either party of a breach of any provision hereof be taken or held to be a waiver of the provision itself.

27. **Chinese Version.** A Chinese version of this Agreement will be prepared and signed within 30 days of the date hereof. The Chinese version of the Agreement shall follow the terms in this Agreement precisely. Once signed by both parties, the Chinese version of this Agreement shall supersede this Agreement. If no Chinese version of this Agreement is prepared and signed within 30 days of the date hereof, then this Agreement shall become final agreement between the parties

28. **Governing Law.** This Agreement shall be governed and construed in accordance with the laws of the People's Republic of China. Any controversy or claim between the parties arising out of or relating to the Agreement or the breach thereof shall be submitted to arbitration held in Hong Kong. Any judgment rendered in such arbitration proceeding shall be final and binding on each of the parties, and may be entered thereon in any court of competent jurisdiction. Nothing herein shall limit the right of the Agent to seek an injunction against the Company's property inside and outside the People's Republic of China prior to the final arbitration judgment is reached.

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first above written.

BND CO., LTD.

BY: _____

NAME: MR. BAI, IAN

TITLE: EXECUTIVE VICE PRESIDENT

DATE: _____

BNK INTERNATIONAL LLC

BY: _____

NAME: JEFFREY J. CHANG

TITLE: PRESIDENT

DATE: May 6, 2004

## ADDENDUM TO THE AGENCY AGREEMENT

This Addendum is made on April ___, 2005, by and between BND Co., Ltd. (the "Company") and BNK International LLC (the "Agent").

Whereas, the Company and the Agent entered into an agency agreement dated May 8, 2004 (the "Agency Agreement") where the Agent is authorized to act as the Company's agent for selling the Company's hardwood floor products in the U.S.

Now it is hereby agreed by both parties that the following terms are added to the Agency Agreement:

1. The "Product" as described under the Recital section of the Agency Agreement shall be expanded to include "all building materials" manufactured by the Company or by third party manufacturers contracted by the Company.

2. The following clause shall be added to the Agency Agreement:

**29. Entire Contract.** This Agreement contains the entire agreement of the parties regarding the subject matter of this Agreement, and there are no other promises or conditions in any other agreement whether oral or written.

3. The following clause shall be added to the Agency Agreement:

**30. Authorization.** Each party warrants that their signature to this Agreement or their signature on subsequently executed PO is in fact authorized and they are of a capacity within their organizations to enter into such transactions and each party may rely on their representation and signature when entering into contracts.

4. The following clause shall be added to the Agency Agreement:

**31. Confidentiality.** Both parties acknowledge that during the course of this Agreement, each may obtain confidential information regarding the other party's business. Both parties agree to treat all such information and the terms of this Agreement as confidential and to take all reasonable precautions against disclosure of such information to unauthorized third parties during and after the term of this Agreement. Upon request by an owner, all documents relating to the confidential information will be returned to such owner.

1

IN WITNESS WHEREOF, the parties have duly executed this Addendum to the
Agency Agreement as of the date first above written.

BND Co., Ltd.                                    BNK International LLC

Name: Ian Bai                                    Name: Jeffrey J. Chang
Title: Executive Vice President                  Title: President

2

BNK INTERNATIONAL LLC
9102 Country Canyon Cove
Austin, TX 78759
4/29/2005

Executive Vice President
Mr. Ian Bai
BND CO. LTD.
12/F International Trade Building
ShenZhen, China

RE: BNK Agency Agreement Addendum

Dear Mr. Bai,

Enclosed please find two signed copies of BNK Agency Agreement Addendum that we
have verbally agreed to in priori.

Please sign both copies at the designated location along with company stamp and have
one copy sent back to me at your earliest convenience.

We look forward to furthering our relationships into a even more mutually beneficial
future.

Sincerely Yours,

4/29/05

Jeffrey J. Chang
President
BNK International LLC