

OFFERING MEMORANDUM           STRICTLY CONFIDENTIAL

## 654,214,000 H Shares



**CNBM**

## China National Building Material Company Limited
## 中國建材股份有限公司

*(a joint stock limited company incorporated in the People's Republic of China with limited liability)*

### H SHARES, NOMINAL VALUE RMB 1.00 EACH

---

*Our H Shares are being offered in this international placing (the "International Placing") by the International Underwriters (as defined in the attached Hong Kong prospectus) to qualified institutional buyers in the United States in reliance on Rule 144A ("Rule 144A") under the Securities Act of 1933, as amended (the "Securities Act"), or outside the United States in reliance on Regulation S ("Regulation S") under the Securities Act. The International Placing is part of a global offering (the "Global Offering") in which we are concurrently offering our H Shares in Hong Kong through an initial public offering (the "Hong Kong Public Offering").*

*Our Global Offering initially consists of 588,792,000 H Shares being offered in the International Placing and 65,422,000 H Shares being offered in the Hong Kong Public Offering. The International Placing includes 529,318,000 H Shares offered by us and 59,474,000 H Shares offered by the Selling Shareholders (as defined in the attached Hong Kong prospectus). Our H Shares being offered in the Global Offering may be reallocated between the International Placing and the Hong Kong Public Offering based on market conditions and relevant regulatory requirements.*

*Prior to the Global Offering, there has been no trading market for our H Shares. Approval in principle has been granted for the listing of, and permission to deal in, our H Shares on the Stock Exchange of Hong Kong Limited (the "Hong Kong Stock Exchange").*

**Investing in our H Shares involves risks. See "Risk Factors" beginning on page W-21 and in the attached Hong Kong prospectus beginning on page 34.**

---

### PRICE HK$2.75 PER H SHARE

---

*The offer price to investors excludes a trading fee imposed by the Hong Kong Stock Exchange, a transaction levy imposed by the Securities and Futures Commission of Hong Kong and a brokerage fee, which together amount to 1.01% of the offer price and shall be payable by investors. The offer prices per H Share in the International Placing and the Hong Kong Public Offering are identical.*

*At any time from the date we sign the International Underwriting Agreement (as defined herein) until 30 days after the last day for the lodging of applications in the Hong Kong Public Offering, Morgan Stanley Dean Witter Asia Limited, on behalf of the International Underwriters, has an option to purchase up to an additional 98,120,000 H Shares from us and the Selling Shareholders, representing 15% of the initial size of the Global Offering, at the offer price, solely to cover over-allotments in the International Placing, if any.*

*Our H Shares have not been and will not be registered under the Securities Act or any state securities laws of the United States. Our H Shares are being offered only (1) to qualified institutional buyers in the United States in reliance on Rule 144A under the Securities Act or (2) outside the United States in reliance on Regulation S under the Securities Act. Our H Shares are not transferable except in accordance with the restrictions described under "Notice to Investors" beginning on page W-46.*

*The International Underwriters expect to deliver our H Shares in book-entry form through the Central Clearing and Settlement System ("CCASS") (or in certificated form, if applicable) in Hong Kong against payment on or about March 23, 2006.*

---

*Sole Global Coordinator, Bookrunner and Lead Manager*

## MORGAN STANLEY

*March 16, 2006*

Confidential



**FSIA EXHIBIT 164**

MS001946

## TABLE OF CONTENTS

### Offering Memorandum

| | Page | | Page |
|---|---|---|---|
| Available Information | W-5 | Description of Shares | W-30 |
| Arbitration of Disputes and Enforceability of Civil Liabilities | W-5 | U.S. Federal Income Tax Considerations | W-35 |
| Forward-Looking Statements | W-7 | Plan of Distribution for the International Placing | W-38 |
| Summary | W-9 | Notice to Investors | W-46 |
| Risk Factors | W-21 | Legal Matters | W-48 |
| Exchange Rate Information | W-24 | Independent Accountants | W-48 |
| Capitalization | W-26 | Independent Professional Valuer | W-48 |
| The Hong Kong Stock Exchange | W-27 | | |

### Hong Kong Prospectus

| | Page | | Page |
|---|---|---|---|
| Expected Timetable | i | Financial Information | 203 |
| Contents | ii | Future Plans and Use of Proceeds | 280 |
| Summary | 1 | Underwriting | 282 |
| Definitions | 17 | Structure of the Global Offering | 290 |
| Risk Factors | 34 | How to Apply for Public Offer Shares | 297 |
| Exemptions from the Companies Ordinance and Waivers from Compliance with the Listing Rules | 55 | Appendix I — Accountants' Report | I-1 |
| Information about this Prospectus and the Global Offering | 57 | Appendix II — Pro Forma Financial Information | II-1 |
| Directors, Supervisors and Parties Involved in the Global Offering | 65 | Appendix III — Profit Estimate | III-1 |
| Corporate Information | 70 | Appendix IV — Property Valuation | IV-1 |
| Industry Overview | 72 | Appendix V — Taxation | V-1 |
| History, Reorganization and Group Structure | 85 | Appendix VI — Summary of Principal PRC Legal and Regulatory Provisions | VI-1 |
| Business | 97 | |  |
| Relationship with Parent | 153 | Appendix VII — Summary of Articles of Association | VII-1 |
| Connected Transactions | 159 | Appendix VIII — Statutory and General Information | VIII-1 |
| Directors, Supervisors, Senior Management and Employees | 187 | |  |
| Substantial Shareholders | 201 | Appendix IX — Document Delivered to the Registrar of Companies and Available for Inspection | IX-1 |
| Share Capital | 202 | |  |

You should rely only on the information contained in this offering memorandum or to which we have referred you. We have not authorized anyone to provide you with information that is different. This offering memorandum may only be used where it is legal to sell these securities. The information in this offering memorandum may only be accurate on the date of this offering memorandum.

Confidential

MS001947

We have not authorized anyone to give any information or to make any information available or to make any representation other than those contained in this offering memorandum, and, if given or made available, you must not rely upon such information or representation as having been authorized. This offering memorandum does not constitute an offer to sell or the solicitation of an offer to buy any securities other than the securities to which it relates or an offer to sell or the solicitation of an offer to buy such securities by any person in any circumstances in which such offer or solicitation is unlawful. In addition, there may be legal restrictions on the distribution of this offering memorandum, the Global Offering and the sale of our H Shares in certain jurisdictions. If you come into possession of this offering memorandum, we and the International Underwriters require that you inform yourself about and observe any such restrictions. For a further description of certain restrictions on the Global Offering, and the offer, sale or resale of our H Shares, see "Plan of Distribution for the International Placing" and "Notice to Investors." Prospective purchasers are hereby notified that sellers of our H Shares may be relying on the exemption from the provisions of Section 5 of the Securities Act provided by Rule 144A under the Securities Act. Neither the delivery of this offering memorandum nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in our affairs since the date hereof or that the information contained herein is correct as of any time subsequent to its date.

Neither the U.S. Securities and Exchange Commission nor any state securities commission in the United States has approved or disapproved of these securities or determined if this offering memorandum is truthful, complete or adequate. Any representation to the contrary is a criminal offense.

This offering memorandum incorporates the prospectus for the Hong Kong Public Offering of our H Shares in Hong Kong (the "Hong Kong prospectus") attached hereto (excluding certain letters regarding unaudited financial information included in Appendix II and a profit estimate included in Appendix III to the Hong Kong prospectus) and certain additional information. This offering memorandum should be read in conjunction with the Hong Kong prospectus and is qualified in its entirety by the more detailed information and financial information contained in the Hong Kong prospectus. Terms used but not defined herein shall have the meanings given to them in the Hong Kong prospectus. The Hong Kong Stock Exchange and the Registrar of Companies in Hong Kong take no responsibility for the contents of this offering memorandum, make no representation as to its accuracy or completeness and expressly disclaim any liability whatsoever for any loss howsoever arising from or in reliance upon the whole or any part of the contents of this offering memorandum.

We, having made all reasonable inquiries, confirm that this offering memorandum and the Hong Kong prospectus contain all information with respect to us, our subsidiaries and associates and our H Shares, which is material in the context of the issue and offering of our H Shares (including all information required by applicable laws of Hong Kong), that the information contained herein is true and accurate in all material respects and is not misleading in any material respect, that the opinions and intentions expressed herein are honestly held and have been reached after considering all relevant circumstances and are based on reasonable assumptions, that there are no other facts, the omission of which would, in the context of the issue and offering of our H Shares, make this offering memorandum as a whole or any of such information or the expression of any such opinions or intentions misleading in any material respect, that all reasonable inquiries have been made by us to verify the accuracy of such information and that this offering memorandum does not contain any untrue statement of a material fact or omit to state a material fact required to be stated herein or necessary in order to make the statements herein, in the light of the circumstances under which they are made, not misleading.

W — 3

MS001948

This offering memorandum is confidential. We are furnishing this offering memorandum solely for the purpose of enabling you to consider the purchase of our H Shares. If you are in any doubt about this offering memorandum, you should consult your stockbroker, bank manager, legal counsel, professional accountant or other professional advisor. We have provided information contained in this offering memorandum and have also relied on other identified sources. The International Underwriters make no representation or warranty, express or implied, as to the accuracy or completeness of such information, and you should not rely on anything contained in this offering memorandum as a promise or representation by the International Underwriters. You should not reproduce or distribute this offering memorandum, in whole or in part, and should not disclose any contents or use any information in this offering memorandum for any purpose other than considering an investment in our H Shares. By accepting delivery of this offering memorandum you agree to these terms.

---

## NOTICE TO NEW HAMPSHIRE RESIDENTS

**NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE REVISED STATUTES WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE OF NEW HAMPSHIRE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATION OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.**

---

In this offering memorandum, all references to "US$" or "U.S. dollars" are to United States dollars; all references to "HK$" or "H.K. dollars" are to Hong Kong dollars; all references to "RMB" or "Renminbi" are to Renminbi, the official currency of the People's Republic of China, or the PRC or China; all references to "euro", "€ " or "EUR" are to the currency of the member states of the European Union, or EU, participating in the EU's Economic and Monetary Union. Solely for your convenience, this offering memorandum contains translations of certain Renminbi amounts into U.S. dollars, of Renminbi amounts into Hong Kong dollars and of Hong Kong dollars into U.S. dollars at specified rates. Unless we indicate otherwise, the translations of Renminbi into U.S. dollars and of Hong Kong dollars into U.S. dollars have been made at the rates of RMB 8.0374 to US$1.00 and HK$7.7583 to US$1.00, the noon buying rates in New York City for cable transfers as certified for customs purposes by the Federal Reserve Bank of New York on March 15, 2006, respectively, and the translation of Renminbi into Hong Kong dollars has been made at the rate of RMB 1.036 to HK$1.00, the exchange rate set by the PBOC for foreign exchange transactions prevailing on March 15, 2006. Further information on exchange rates is set forth in "Exchange Rate Information" in this offering memorandum. You should not construe these translations as representations that the Renminbi amounts could actually be converted into any U.S. dollar or H.K. dollar amounts, as the case may be, or any H.K. dollar amounts could be converted into any U.S. dollar amounts, at the rates indicated or at all.

W — 4

MS001949

Our consolidated financial statements are prepared and presented in accordance with International Financial Reporting Standards, or IFRS, which differ in certain respects from accounting principles generally accepted in certain other countries.

---

In connection with this Global Offering, Morgan Stanley Dean Witter Asia Limited, as stabilizing manager, or any person acting for it, may engage in stabilizing transactions, over-allotment transactions, syndicate covering transactions and penalty bids in compliance with all applicable laws and regulatory requirements. These stabilizing transactions, over-allotment transactions, syndicate covering transactions and penalty bids may have the effect of raising or maintaining the market price of our H Shares or preventing or retarding a decline in the market price of our H Shares. As a result, the price of our H Shares may be higher than the price that might otherwise exist in the open market. If these activities are commenced, they may be discontinued at any time. These transactions may be effected on the Hong Kong Stock Exchange, in an over-the-counter market or otherwise, subject to compliance with applicable legal and regulatory requirements. Morgan Stanley Dean Witter Asia Limited, or any person acting for it, is not required to engage in these activities, and, if it does commence, it may end these activities at any time, but in any event no later than the 30th day after the last day for lodging of applications under the Hong Kong Public Offering. See "Underwriting" in the Hong Kong prospectus.

---

## AVAILABLE INFORMATION

At any time when we are not subject to Sections 13 or 15(d) of the U.S. Securities Exchange Act of 1934, as amended, or the Exchange Act, or exempt from reporting pursuant to Rule 12g3-2(b) under the Exchange Act, we will furnish, upon request, to any owner of our H Shares, or any prospective purchaser designated by any such owner, information satisfying the requirements of Rule 144A(d)(4)(i) under the Securities Act to permit compliance with Rule 144A under the Securities Act in connection with resales of our H Shares for so long as any of our H Shares are "restricted securities" within the meaning of Rule 144(a)(3) under the Securities Act.

---

## ARBITRATION OF DISPUTES AND ENFORCEABILITY OF CIVIL LIABILITIES

*Arbitration of Disputes.* If you have a claim against or dispute with us or a director, supervisor, president or other senior manager of ours or a holder of our domestic shares relating to any rights or obligations conferred or imposed by our Articles of Association, by the PRC Company Law or by any relevant laws or administrative regulations, our Articles of Association require you to submit the dispute or claim to the China International Economic and Trade Arbitration Commission, or CIETAC, or to the Hong Kong International Arbitration Centre for arbitration. Our Articles of Association further provide that the arbitral award will be final and conclusive and binding on all parties. For further information on arbitration, see "Description of Shares — Sources of Shareholders' Rights" in this offering memorandum as well as "Appendix VI — Summary of Principal PRC Legal and Regulatory Provisions" and "Appendix VII — Summary of Articles of Association" in the Hong Kong prospectus.

W — 5

Confidential

MS001950

*Enforceability of Civil Liabilities.* We are a joint stock limited company incorporated in the PRC with limited liability and our largest beneficial owner, China National Building Material Group Corporation, is a state-owned enterprise in the PRC. Substantially all of our assets are located in the PRC. In addition, all of our directors and substantially all of our officers are residents of the PRC or Hong Kong, and all or a substantial portion of the assets of such persons are or may be located outside the United States. As a result, it may be difficult for investors to effect service of process upon such persons, or to enforce against them judgments obtained in courts or arbitral tribunals outside the PRC or Hong Kong predicated upon the laws of jurisdictions other than the PRC or Hong Kong, including the civil liability provisions of the U.S. federal or state securities laws. We have been advised by our Hong Kong counsel, Slaughter and May, that there is doubt as to the enforceability in Hong Kong, in original actions or in actions for enforcement of judgments of United States courts, of civil liabilities predicated solely upon the federal securities laws of the United States. We have been advised by our PRC counsel, Jingtian & Gongcheng Law Office, that there is uncertainty as to whether the courts of the PRC would (i) enforce judgments of U.S. courts obtained against us or such persons predicated upon the civil liability provisions of the U.S. federal or state securities laws or (ii) entertain original actions brought in the PRC against us or such persons predicated upon the U.S. federal or state securities laws.

Confidential

MS001951

## FORWARD-LOOKING STATEMENTS

We have included in this offering memorandum and the Hong Kong prospectus forward-looking statements that state our intentions, beliefs, expectations or predictions for the future, including but not limited to those contained under "Summary," "Industry Overview," "Business," "Relationship with Parent," "Connected Transactions," "Financial Information," "Appendix II — Pro Forma Financial Information" and "Appendix III — Profit Estimate" in the Hong Kong prospectus, in particular statements regarding our profit estimate set forth under "Summary," "Financial Information," "Appendix II — Pro Forma Financial Information" and "Appendix III — Profit Estimate."

The forward-looking statements include, without limitation, statements relating to:

- future developments in China in the industrial segments that we operate;

- the general outlook of the industrial segments that we operate;

- our business strategy and plan of operation;

- our operations and business prospects;

- our capital expenditure plans, particularly plans enhancing our production capacity;

- availability of bank loans and other forms of financing;

- our estimated financial information regarding our businesses; and

- our dividend policy.

In some cases, we use words such as "believe," "seek," "intend," "anticipate," "estimate," "project," "forecast," "plan," "potential," "will," "may," "should," "expect" and other similar expressions to identify forward-looking statements. All statements other than statements of historical facts included in this offering memorandum and the Hong Kong prospectus, including statements regarding our future financial position, strategy, projected costs and plans and objectives of management for future operations, are forward-looking statements. Although we believe that the expectations reflected in those forward-looking statements are reasonable, we can give no assurance that those expectations will prove to have been correct, and you are cautioned not to place undue reliance on such statements.

Furthermore, these forward-looking statements merely reflect our current view with respect to future events and are not a guarantee of future performances. Actual results may differ materially from the information contained in the forward-looking statements as a result of a number of factors, including, without limitation, factors disclosed under "Risk Factors" and elsewhere in this offering memorandum and the Hong Kong prospectus and the following:

- the effects of competition on the demand for and the prices of our products;

- the development of new products or technologies affecting our current and future business;

- changes in political, economic, legal and social conditions in the PRC, including the PRC government's specific policies with respect to foreign investment in the building materials industry, economic growth, inflation, foreign exchange and the availability of credit; and

Confidential

MS001952

- changes in population growth and GDP growth and the impact of those changes on the demand for our products.

Subject to the requirements of applicable laws, rules and regulations, we do not have any obligation to update or otherwise revise the forward-looking statements in this offering memorandum and the Hong Kong prospectus, whether as a result of new information, future events or otherwise. Because of these risks, uncertainties or assumptions, the forward-looking events and circumstances discussed in this offering memorandum and the Hong Kong prospectus might not occur in the way we expect, or at all. Accordingly, you should not place undue reliance on any forward-looking statements. All forward-looking statements contained in this offering memorandum and the Hong Kong prospectus are qualified by reference to this cautionary statement.

Confidential

MS001953

# SUMMARY

*You should read the following summary together with the more detailed information regarding our Company, our H Shares being sold in the Global Offering and our historical consolidated financial statements and notes thereto included elsewhere in this offering memorandum and the Hong Kong prospectus. You should read this entire offering memorandum carefully when evaluating an investment in our H Shares. For certain factors you should consider before purchasing our H Shares, see "Risk Factors" beginning on page W-21 and in the Hong Kong prospectus beginning on page 34.*

## Overview

We are a leading PRC building materials company with significant operations in the cement, lightweight building materials, glass fiber and FRP products and engineering services business segments. Our total revenue was RMB 2,898.1 million in 2004 and RMB 3,334.4 million for the nine months ended September 30, 2005, and our profit attributable to equity holders of the Company for the same periods was RMB 193.1 million and RMB 223.9 million, respectively. We focus on creating long-term corporate value by developing, managing, acquiring and, to a lesser degree, investing in businesses in the building materials industry in the PRC. Our vision is to become a world-class building materials producer. In terms of market positions, we are:

- the largest cement producer in the Huaihai Economic Zone of the PRC in terms of production capacity and sales volume in 2004;

- the largest gypsum board producer in the PRC, with a combined market share of approximately 50.6% in terms of sales volume among PRC producers having annual gypsum board sales of at least RMB 5 million, based on gypsum boards sold by BNBM and Taihe in 2004;

- the largest glass fiber producer in Asia in terms of production capacity in 2004 through China Fiberglass, an associate of the Company;

- one of the largest glass fiber mats producers in the PRC in terms of production capacity in 2004;

- the second largest FRP pipes and tanks producer in the PRC in terms of production volume and sales volume in 2004; and

- the engineering firm that designed and/or constructed approximately 50% of the float glass production lines in the PRC.

Confidential

MS001954

The table below summarizes our business segments and the major operating entities in each business segment:

| Business segments | Key products and services | Major operating entities[1] | Direct and indirect equity interests attributable to the Company |
|---|---|---|---|
| Cement . . . . . . . . . . . . . . . . . . . . | Cement | China United | 96.07% |
| Lightweight building materials . . . | Dry wall and ceiling systems | BNBM | 60.33% |
| Glass fiber and FRP products . . . . | Glass fiber | China Fiberglass | 40.17% |
| | Glass fiber mats and FRP pipes and tanks | China Composites | 86.24%[2] |
| Engineering services . . . . . . . . . . | Design and EPC services: float glass production lines and NSP cement production lines | China Triumph | 91.00% |

*Notes:*

(1) Each is a direct subsidiary of ours, except for China Fiberglass, which is an associate. See "Business — Glass Fiber and FRP Products Segment — Glass Fiber" in the Hong Kong prospectus. Unless otherwise indicated, the reference to our operating results in the glass fiber and FRP products segment does not include those of China Fiberglass.

(2) Includes a 77% equity interest held directly by the Company and a 23% equity interest held by China Fiberglass.

## Operating Principles

Our aspiration is to build a corporate culture focusing on continuous improvement of our long-term enterprise value. We strive to achieve satisfactory returns to our shareholders. In addition, we also aim to align and satisfy the commercial interests of our other key constituents — management, employees and customers — and the interests of the community in social well-being, environmental protection and resource conservation in order to achieve long-term and sustainable growth. To that end, we are governed by the following principles:

- We focus on building our core competence as a leading manufacturer of quality building materials, complemented by engineering services capabilities.

- We manage potential risks in the PRC's volatile market environment by operating in different business segments and serving different customer bases.

- We emphasize management, operational and financial control of our business segments.

- We integrate operations across different business segments by cultivating a uniform corporate culture and implement strict control procedures at each business segment.

Confidential

MS001955

**Competitive Strengths**

The following summarizes our competitive strengths in each of our business segments:

*Cement Segment*

- We are the market leader in the Huaihai Economic Zone.

- We have access to rich deposits of high quality limestone.

- We are well positioned to benefit from a consolidating cement industry in the PRC.

Please refer to the section entitled "Business — Cement Segment — Competitive Strengths" in the Hong Kong prospectus for a detailed discussion of these competitive strengths.

*Lightweight Building Materials Segment*

- We control a substantial market share and we have well-recognized brands and product quality in the PRC gypsum board market.

- We have a broad product mix in lightweight building materials and an ability to provide integrated dry wall and ceiling systems.

- BNBM has achieved high efficiency and low cost in gypsum board production.

Please refer to the section entitled "Business — Lightweight Building Materials Segment — Competitive Strengths" in the Hong Kong prospectus for a detailed discussion of these competitive strengths.

*Glass Fiber and FRP Products Segment*

- We have strong market positions in our core products.

- The Company's associate, China Fiberglass, is one of the most experienced glass fiber producers in the PRC.

Please refer to the section entitled "Business — Glass Fiber and FRP Products Segment — Competitive Strengths" in the Hong Kong prospectus for a detailed discussion of these competitive strengths.

*Engineering Services Segment*

- We have a large pool of engineering talent and have a strong ability to market and commercialize our technical innovations.

- We are a leading glass engineering services provider to the PRC glass industry.

- We have a strong presence in overseas float glass engineering markets.

Please refer to the section entitled "Business — Engineering Services Segment — Competitive Strengths" in the Hong Kong prospectus for a detailed discussion of these competitive strengths.

Confidential

MS001956

**Corporate Strategies**

The following summarizes our corporate strategies:

*Cement Segment*

- Strengthen our market-leading position in the Huaihai Economic Zone through expansion.

- Realize cost savings by creating synergies through further management integration and centralization and technological advancement.

- Develop bulk sales and enter into related product areas.

- Continue to execute our low-cost expansion strategy through acquiring cement assets in the Huaihai Economic Zone and other selected markets.

Please refer to the section entitled "Business — Cement Segment — Corporate Strategy" in the Hong Kong prospectus for a detailed discussion of these corporate strategies.

*Lightweight Building Materials Segment*

- Strengthen our market position through our synergy with Taihe.

- Streamline the organizational structure of BNBM.

- Expand our customer base by developing new applications for residential structures.

Please refer to the section entitled "Business — Lightweight Building Materials Segment — Corporate Strategy" in the Hong Kong prospectus for a detailed discussion of these corporate strategies.

*Glass Fiber and FRP Products Segment*

- Improve our product mix by increasing sales of high value-added products.

- Enhance our product development, product quality and customer service to strengthen our market position.

- Expand our production capacity and increase our domestic market share in glass fiber mats.

Please refer to the section entitled "Business — Glass Fiber and FRP Products Segment — Corporate Strategy" in the Hong Kong prospectus for a detailed discussion of these corporate strategies.

Confidential

MS001957

*Engineering Services Segment*

- Enhance our capabilities for technical innovations.

- Maintain leading position in the domestic market and increase our share of overseas markets.

- Enter into core equipment development and manufacturing.

Please refer to the section entitled "Business — Engineering Services Segment — Corporate Strategy" in the Hong Kong prospectus for a detailed discussion of these corporate strategies.

Confidential

MS001958

## SUMMARY FINANCIAL INFORMATION

**Reorganization and Basis of Presentation of Our Financial Information**

The Company was converted into a joint stock limited company from CNBM Equipment, a state-owned enterprise, on March 28, 2005. Prior to the conversion, CNBM Equipment disposed of all of its former operations and the related assets and liabilities to Parent Group at nil consideration and Parent transferred its interests in certain businesses engaging in the production and sales of NSP cement, glass fiber and FRP products and the provision of engineering services as well as its equity interests in BNBM and China Fiberglass (the "Transferred Operations") to the Company, each as a part of the Reorganization. See "History, Reorganization and Group Structure — Reorganization" in the Hong Kong prospectus. The Company is regarded as a new holding company in the Reorganization for the purpose of holding its current businesses.

As Parent controlled the Transferred Operations before the Reorganization and continues to control the Transferred Operations after the Reorganization, the Reorganization is considered as a business combination under common control for accounting purposes. Our audited consolidated financial statements for 2002, 2003 and 2004 and for the nine months ended September 30, 2005, set forth in Appendix I to the Hong Kong prospectus, present our consolidated results of operations, cash flows and financial condition as if the current organizational structure of the Company had been in existence throughout the Track Record Period or since the deemed effective dates for accounting purposes of the establishment or acquisition by Parent or the Company as the case may be, of the businesses now comprising the Company, whichever is the shorter period, and as if the Company had not owned or controlled any other business. However, the consolidated results of operations, cash flows and financial condition of the Company presented in this prospectus do not purport to be indicative of what the Company's actual consolidated results of operations, cash flows and financial condition would have been had the Company been operating its businesses under its current organizational structure throughout the Track Record Period or since the deemed effective dates for accounting purposes of the establishment or acquisition by Parent or the Company, as the case may be, of the businesses now comprising the Company, whichever is the shorter period. The assets and liabilities previously associated with the Transferred Operations that were retained by Parent have been reflected as a distribution to owner in the consolidated statement of changes in equity.

Confidential

MS001959

**Selected Financial Data**

The following tables set forth a summary of our consolidated financial statements for the periods and as of the dates indicated. This summary is derived from, and should be read in conjunction with, our audited consolidated financial statements included in the Accountants' Report in Appendix I to the Hong Kong prospectus.

*Consolidated Income Statement Data*

| | For the year ended December 31, | | | For the nine months ended September 30, | |
|---|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2004 | 2005 |
| | | | | (unaudited) | |
| | (RMB in millions) | | | | |
| Revenue . . . . . . . . . . . . . . . . . . . | 1,661.5 | 1,845.2 | 2,898.1 | 1,956.1 | 3,334.4 |
| Cost of sales . . . . . . . . . . . . . . . . | (1,290.3) | (1,426.8) | (2,343.3) | (1,593.9) | (2,733.0) |
| Gross profit . . . . . . . . . . . . . . . . . | 371.2 | 418.4 | 554.8 | 362.2 | 601.4 |
| Other income . . . . . . . . . . . . . . . . | 79.5 | 81.2 | 151.3 | 100.7 | 177.5 |
| Selling and distribution costs . . . . . . . | (126.5) | (146.5) | (188.1) | (138.0) | (207.3) |
| Administrative and other expenses. . . . | (164.4) | (212.8) | (221.5) | (160.7) | (211.5) |
| Operating profit . . . . . . . . . . . . . . . | 159.8 | 140.3 | 296.5 | 164.2 | 360.1 |
| Share of profit of associates . . . . . . . . | 40.3 | 70.0 | 96.7 | 46.7 | 71.5 |
| Finance costs . . . . . . . . . . . . . . . . . | (53.2) | (58.2) | (98.8) | (75.4) | (104.7) |
| Profit on partial disposals . . . . . . . . . | 0 | 1.3 | 0 | 0 | 0 |
| Profit on disposal of a subsidiary . . . . | 0 | 0 | 0 | 0 | 27.3 |
| Income tax expense. . . . . . . . . . . . . . | (2.3) | (9.1) | (25.0) | (10.2) | (39.6) |
| Profit for the year/period . . . . . . . . . . | 144.5 | 144.3 | 269.4 | 125.3 | 314.6 |
| Attributable to: | | | | | |
| Equity holders of the Company . . . . | 99.2 | 111.7 | 193.1 | 91.4 | 223.9 |
| Minority interests . . . . . . . . . . . . . | 45.3 | 32.6 | 76.3 | 33.9 | 90.7 |
| | 144.5 | 144.3 | 269.4 | 125.3 | 314.6 |
| Distributions to equity holders of the Company[1] . . . . . . . . . . . . . . . . . . | 22.8 | 136.4 | 27.8 | 27.8 | 135.6 |
| Earnings per Share-basic (RMB)[2] . . . | 0.07 | 0.08 | 0.14 | 0.07 | 0.16 |

*Notes:*

(1) Distributions consisted of declared dividends and deemed distributions. For a discussion on declared dividends, see "Financial Information — Dividends" in the Hong Kong prospectus. The Company incurred deemed distributions in the amount of RMB 5.5 million, RMB 115.6 million, nil, nil and nil, respectively, for the year ended December 31, 2002, 2003, 2004 and the nine months ended September 30, 2004 and 2005. See Note 12 of "Appendix I — Accountants' Report" in the Hong Kong prospectus for details.

(2) The calculations of basic earnings per Share are based on the profit attributable to equity holders of the Company of each period and on the weighted average number of 1,387,110,000 Shares for each of 2002, 2003, 2004 and the nine months ended September 30, 2004 and 1,387,555,238 Shares for the nine months ended September 30, 2005, as if the Reorganization had been completed on January 1, 2002.

Confidential

MS001960

*Selected Consolidated Balance Sheet Data*

| | As at December 31, | | | As at September 30, |
|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 |
| | (RMB in millions) | | | |
| Non-current assets .................... | 2,215.4 | 2,613.1 | 4,438.3 | 6,287.5 |
| Current assets ...................... | 1,716.4 | 2,280.5 | 2,513.1 | 3,372.0 |
| Net current assets (liabilities)............. | 453.8 | 536.7 | (225.0) | (1,858.9) |
| Net assets .......................... | 2,557.7 | 2,662.4 | 2,966.0 | 3,250.6 |
| Equity attributable to equity holders of the Company .......................... | 1,657.1 | 1,681.1 | 1,888.6 | 1,985.0 |

Confidential

MS001961

**THE OFFERING**

Global Offering . . . . . . . . . . . . . . .  The International Placing and the Hong Kong Public Offering initially consist of an aggregate of 654,214,000 H Shares. The number of H Shares initially allocated to the International Placing and the Hong Kong Public Offering are subject to reallocation, as described below.

International Placing . . . . . . . . . . .  The International Placing initially consists of 588,792,000 H Shares, of which 529,318,000 H Shares will be offered by us and 59,474,000 H Shares will be offered by the Selling Shareholders, subject to reallocation and the over-allotment option. The International Placing will be made (i) in the United States to qualified institutional buyers in reliance on Rule 144A under the Securities Act and (ii) outside the United States in reliance on Regulation S under the Securities Act.

Hong Kong Public Offering . . . . . .  We will offer initially 65,422,000 H Shares pursuant to an offer for subscription to the public in Hong Kong on, and subject to, the terms and conditions described in the Hong Kong prospectus and the related application forms.

Offer price . . . . . . . . . . . . . . . . . . .  HK$2.75 per H Share, excluding a brokerage fee of 1%, a Hong Kong Stock Exchange trading fee of 0.005% and a Securities and Futures Commission of Hong Kong transaction levy of 0.005%, which together amount to 1.01% of the offer price, and which together shall be payable by the investors.

Total issued and outstanding shares after the Global Offering . . . . . . .  Following the Global Offering, we will have 1,982,500,000 shares issued and outstanding if the over-allotment option is not exercised, or 2,071,700,000 shares if the over-allotment option is exercised in full.

Over-allotment option . . . . . . . . . . .  We and the Selling Shareholders have granted an option to the International Underwriters, exercisable by Morgan Stanley Dean Witter Asia Limited, on behalf of the International Underwriters, for the period beginning on the date we sign the International Underwriting Agreement and ending 30 days from the last day for the lodging of applications in the Hong Kong Public Offering, to purchase up to 89,200,000 additional H Shares from us and up to 8,920,000 additional H Shares from the Selling Shareholders, in aggregate representing 15% of the initial size of the Global Offering, at the offer price, solely to cover over-allotments in the International Placing, if any.

Confidential

MS001962

| Clawback and reallocation . . . . . . . | The allocation of H Shares between the Hong Kong Public Offering and the International Placing is subject to adjustment. We have allocated 65,422,000 H Shares to the Hong Kong Public Offering, representing 10% of our H Shares initially available in the Global Offering. If the number of our H Shares validly applied for in the Hong Kong Public Offering represents (i) 15 times or more but less than 50 times, (ii) 50 times or more but less than 100 times, and (iii) 100 times or more, of the number of our H Shares initially available in the Hong Kong Public Offering, then our H Shares will be reallocated to the Hong Kong Public Offering from the International Placing so that the total number of our H Shares available in the Hong Kong Public Offering will be increased to 196,266,000 H Shares (in the case of (i)), 261,686,000 H Shares (in the case of (ii)), and 327,108,000 H Shares (in the case of (iii)), representing 30%, 40%, and 50%, respectively, of the total number of our H Shares initially available in the Global Offering (before any exercise of the over-allotment option). In each case, the number of H Shares allocated to the International Placing will be correspondingly reduced in such manner as the global coordinator deems appropriate. If the Hong Kong Public Offering is not fully subscribed, the global coordinator may allocate to the International Placing all or any unsubscribed H Shares offered in the Hong Kong Public Offering, in such proportions as it deems appropriate. |
| Use of proceeds . . . . . . . . . . . . . . | We estimate that the net proceeds to us from the Global Offering (after deducting underwriting discounts, commissions and estimated expenses payable by us and assuming no exercise of the over-allotment option) will be approximately HK$1,516.1 million (or HK$1,752.8 million if the over-allotment option is exercised in full). We currently intend to use the net proceeds from the Global Offering for our production facilities, including cement, gypsum board and glass fiber mat production lines, with the balance being used for repayment of outstanding bank borrowings and general corporate purposes. See "Future Plans and Use of Proceeds" in the Hong Kong prospectus. All of the net proceeds from the sale of H Shares in the Global Offering by the Selling Shareholders will be for the accounts of the relevant Selling Shareholders. We will not receive any of the proceeds from the sale of H Shares by the Selling Shareholders in the Global Offering. |

Confidential

MS001963

| Lock-up agreements . . . . . . . . . . . | Pursuant to the International Underwriting Agreement, we and each Selling Shareholder have undertaken to the global coordinator (on behalf of the International Underwriters) that, except pursuant to the Global Offering (including the exercise of the over-allotment option), we and each Selling Shareholder will not without the prior written consent of the global coordinator (i) during the period commencing on the date of the Hong Kong Underwriting Agreement (as defined in the Hong Kong prospectus) and the International Underwriting Agreement, respectively, and ending six months after the date on which dealings in the H Shares commence on the Hong Kong Stock Exchange (the "First Six-Month Period"), (a) offer, pledge, sell, transfer or dispose of, directly or indirectly, any H Share or any other shares of the Company or any securities convertible into or exercisable or exchangeable for any shares of the Company; (b) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any shares of the Company; or (c) agree or contract to, or publicly announce any intention to enter into, any transaction described in paragraphs (a) or (b) above, whether any such transaction described in (a) or (b) above is to be settled by delivery of H Shares and/or other shares of the Company or other securities, in cash or otherwise; or (ii) during the six-month period immediately following the First Six-Month Period (the "Second Six-Month Period"), enter into any of the transactions in paragraphs (i) (a) or (b) above or agree or contract to, or publicly announce an intention to enter into any such transaction without taking all reasonable steps to ensure that such act and transaction will not create a disorderly or false market for the H Shares in breach of any relevant laws or regulations, any other shares and/or other securities of the Company. |
| Dividends . . . . . . . . . . . . . . . . . . . | Our board of directors decides whether to pay any dividend and in what amount based on our results of operations, cash flows, financial condition, capital requirements, future prospects, statutory and regulatory restrictions on the payment of dividends by us and other factors that our board of directors deems relevant. Under the PRC Company Law and our Articles of Association, all of our shareholders have equal rights to dividends and distributions. See "Financial Information — Dividends" in the Hong Kong prospectus. |

Confidential

MS001964

| | |
|---|---|
| Voting rights . . . . . . . . . . . . . . . . . . . | Generally, holders of our H Shares are entitled to one vote per H Share. See "Description of Shares" in this offering memorandum and "Appendix VI — Summary of Principal PRC Legal and Regulatory Provisions" and "Appendix VII — Summary of Articles of Association" in the Hong Kong prospectus. |
| Settlement of H Shares . . . . . . . . . . | Subject to the granting of listing of, and permission to deal in, our H Shares on the Hong Kong Stock Exchange, as well as compliance with the stock admission requirements of Hong Kong Securities Clearing Company Limited, or HKSCC, our H Shares will be accepted as eligible securities by HKSCC for deposit, clearance and settlement in the CCASS in Hong Kong, with effect from the commencement date of dealings in our H Shares or such other date as may be determined by HKSCC. Settlement of transactions between members of the Hong Kong Stock Exchange on any trading day is required to take place in CCASS on the second business day thereafter. A board lot is 2,000 H Shares. The International Underwriters expect to deliver our H Shares in book-entry form through CCASS (or in certificated form, if applicable) in Hong Kong against payment on or about March 23, 2006. |
| Trading markets . . . . . . . . . . . . . . . | Prior to the Global Offering, there has been no trading market for our H Shares. Approval in principle has been granted for the listing of, and permission to deal in, our H Shares on the Hong Kong Stock Exchange. Trading in our H Shares on the Hong Kong Stock Exchange is expected to commence on March 23, 2006. |
| No "when issued" trading . . . . . . . . | Our H Shares offered in the Global Offering will not commence trading on the Hong Kong Stock Exchange until the closing date of the International Placing, which is expected to be four business days after the date of this offering memorandum. Purchasers of our H Shares will not be able to sell or otherwise deal in our H Shares prior to the commencement of trading on the Hong Kong Stock Exchange. |
| Stock code for our H Shares on the Hong Kong Stock Exchange . . . . | 3323 |
| Risk factors . . . . . . . . . . . . . . . . . . | You should read "Risk Factors" beginning on page W-21 of this offering memorandum and page 34 of the Hong Kong prospectus for a discussion of certain factors you should consider in connection with an investment in our H Shares. |

Confidential

MS001965

## RISK FACTORS

*The International Placing involves certain special risks associated with investing in our H Shares. For a discussion of additional matters that should be considered by you before investing in our H Shares, see "Risk Factors" beginning on page 34 of the Hong Kong prospectus.*

**Our profit estimates and pro forma financial information and financial information derived from our unaudited management accounting records are subject to inherent uncertainties and you should not rely on them.**

In accordance with the customary practice for public offerings in Hong Kong, profit estimates and pro forma financial information have been prepared for inclusion in the Hong Kong prospectus. The estimates of our consolidated net profit attributable to shareholders for the year ended December 31, 2005 and pro forma fully diluted estimated earnings per share are set forth under "Summary — Profit Estimate for the Year Ending December 31, 2005," "Financial Information — Profit Estimate" "Appendix II — Pro Forma Financial Information" and "Appendix III — Profit Estimate" in the Hong Kong prospectus. The profit estimates are prepared on the basis of our audited consolidated results for the nine months ended September 30, 2005 and our unaudited management accounting records for the remaining three months to December 31, 2005.

**We did not prepare this information with a view towards compliance with published guidelines of the U.S. Securities and Exchange Commission and the American Institute of Certified Public Accountants, or the AICPA, for the preparation and presentation of projected or forecasted or pro forma financial information. Accordingly, this information does not include disclosure of all information required by the AICPA guidelines on projected or forecasted or pro forma financial information. We prepared this information in accordance with local market practice in Hong Kong. This information necessarily is based upon a number of assumptions and forecasts that, while presented with numerical specificity and considered reasonable by us, are inherently subject to significant business, economic and competitive uncertainties and contingencies, many of which are beyond our control, and upon assumptions with respect to future business decisions which are subject to change. Accordingly, we cannot provide any assurance that these results will be realized. The profit forecasts and pro forma financial information presented in the Hong Kong prospectus may vary materially from actual results. We make no representation that these results will be achieved. You should not place undue reliance on this information.**

The profit estimates and pro forma financial information included in this offering memorandum have been prepared by, and are the responsibility of, our management. Deloitte Touche Tohmatsu has neither examined nor compiled the accompanying estimated financial information under AICPA guidelines regarding forecasts or projections for purposes of its inclusion in an offering document provided to U.S. and international investors, and, accordingly, Deloitte Touche Tohmatsu does not provide any form of assurance with respect thereto. The Accountants' Report included as Appendix I in the Hong Kong prospectus relates to our historical financial information. It does not extend to the prospective financial information and should not be read to do so.

We do not intend to furnish any updated or revised profit estimate or pro forma financial information.

You are cautioned not to place undue reliance on the profit estimates and pro forma financial information. The profit estimates and pro forma financial information should be reviewed in conjunction with the description of the business, the historical financial information and the other information contained in the Hong Kong prospectus, including the information set forth under "Risk Factors" in the Hong Kong prospectus.

Confidential

MS001966

At the instruction of the Hong Kong Stock Exchange, we have also derived financial information relating to the Company's net current liabilities and indebtedness from our unaudited management accounting records for inclusion in the Hong Kong prospectus. The net current liabilities of the Company as at January 31, 2006 and other financial information relating to the Company's indebtedness as at December 31, 2005 were set forth under "Financial Information — Liquidity and Capital Resources — Working Capital — Net Current Liabilities" and "Financial Information — Liquidity and Capital Resources — Indebtedness" in the Hong Kong prospectus.

You are cautioned not to rely on this information, as it was prepared based on the accounting records of our management, which were neither audited nor reviewed by any auditor. We cannot assure you that this information, if audited in accordance with the appropriate accounting standards, would not be materially different. This information should be reviewed in conjunction with the description of the business, the historical financial information and the other information contained in the Hong Kong prospectus, including the information set forth under "Risk Factors" in the Hong Kong prospectus.

**You may not be able to participate in rights offerings or to elect to receive stock dividends and may experience dilution of your holdings.**

We may, from time to time, distribute rights to our shareholders, including rights to acquire securities. We will not distribute rights to holders of our H Shares unless the distribution and sale of rights and the securities to which these rights relate are either exempt from registration under the Securities Act, with respect to all holders of our H Shares, or are registered under the Securities Act. There can be no assurance that we will be able to establish an exemption from registration under the Securities Act, and we are under no obligation to file a registration statement with respect to these rights or underlying securities or to endeavor to have a registration statement declared effective under the Securities Act. Accordingly, holders of our H Shares may be unable to participate in rights offerings and may experience dilution of their holdings as a result. In addition, if we are unable to sell rights that are not exercised or not distributed or if the sale is not lawful or reasonably practicable, we will allow the rights to lapse, in which case holders of our H Shares will receive no value for these rights.

We may offer, from time to time, a stock dividend election to all holders of our H Shares, subject to applicable securities laws, in respect of future dividends. We will, however, not permit holders of our H Shares to exercise such election unless the issuance of our H Shares pursuant to such election is either exempt from registration under the Securities Act or registered under the Securities Act. There can be no assurance that we will be able to establish an exemption from registration under the Securities Act, and we are under no obligation to file a registration statement with respect to H Shares issuable pursuant to these elections or to endeavor to have a registration statement declared effective under the Securities Act. In addition, we may choose not to offer such election to holders of our H Shares, and may instead offer holders of our H Shares dividends in the form of cash only. Accordingly, holders of H Shares may be unable to elect to receive dividends in the form of our H Shares rather than cash and, as a result, may experience dilution of their holdings.

**Our accounting and corporate disclosure standards may differ from those in other jurisdictions.**

We prepare and present our consolidated financial statements in accordance with IFRS, which differ in certain significant respects from those applicable to companies in certain other countries, including the United States.

W − 22

Confidential

MS001967

We have not identified the differences between IFRS and generally accepted accounting principles in other jurisdictions, or quantified the effect of applying generally accepted accounting principles in other jurisdictions would have on our financial information. Investors must make their own judgment in assessing financial information included in our audited consolidated financial statements, and should consult their own professional advisors if necessary to understand the differences between IFRS and generally accepted accounting principles in other jurisdictions, and how those differences would affect our financial information.

Upon the listing of our H Shares on the Hong Kong Stock Exchange, we will become subject to the disclosure requirements under the Hong Kong Listing Rules. These disclosure requirements differ in certain respects from those applicable to companies in certain other countries, including the United States. There may be less publicly available information about companies publicly listed in Hong Kong, such as our company, than is regularly made available by public companies in other countries, including the United States.

**There may not be a liquid market for our H Shares.**

Prior to the Global Offering, there has been no trading market for our H Shares. Application has been made to the Hong Kong Stock Exchange for the listing of, and permission to deal in, our H Shares which are the subject of the Global Offering. There can be no assurance that an active trading market for our H Shares will develop and continue after the Global Offering. Prices for our H Shares will be determined in the marketplace and may be influenced by many factors, including the depth and liquidity of the market for our H Shares, investors' perceptions of us and of Hong Kong and the PRC, general economic and market conditions in Hong Kong and the PRC, conditions in the Chinese building materials industry and other events or factors.

**We cannot guarantee the accuracy of facts and statistics derived from official sources and industry publications with respect to the PRC, the PRC economy and the PRC building materials industry contained in this prospectus, and investors should not place undue reliance on them.**

Certain facts and statistics relating to the PRC, the PRC economy and the PRC building materials industry and building materials technology set forth in the sections headed "Summary," "Industry Overview," "Business" and "Financial Information" in the Hong Kong prospectus are derived from various official PRC sources and industry publications. However, we cannot guarantee the quality or reliability of such source materials. While we have taken reasonable care in the reproduction of the information, they have not been prepared or independently verified by us, the Selling Shareholders, the global coordinator, or the International Underwriters or any of our or their respective affiliates or advisors and, therefore, we make no representation as to the accuracy or completeness of such facts and statistics, which are derived from official PRC sources and industry publications and may not be consistent with other information compiled within or outside the PRC. Due to possibly flawed or ineffective collection methods or discrepancies between published information and market practice and other problems, the statistics herein that are from official PRC sources and industry publications may be inaccurate, incomplete or may not be comparable to statistics produced for other economies and should not be unduly relied upon. Further, there is no assurance that they are stated or compiled on the same basis or with the same degree of accuracy as may be the case elsewhere. In all cases, investors should give consideration as to how much weight or importance they should attach to or place on such facts or statistics.

Confidential

MS001968

## EXCHANGE RATE INFORMATION

### China

The People's Bank of China sets and publishes daily a base exchange rate with reference primarily to the supply and demand of Renminbi against a basket of currencies in the market during the prior day. The People's Bank of China also takes into account other factors such as the general conditions existing in the international foreign exchange markets. Since 1994, the conversion of Renminbi into foreign currencies, including Hong Kong dollars and U.S. dollars, has been based on rates set by the PBOC, which are set daily based on the previous day's interbank foreign exchange market rates and current exchange rates in the world financial markets. From 1994 to July 20, 2005, the official exchange rate for the conversion of Renminbi to U.S. dollars was generally stable. Although Chinese governmental policies were introduced in 1996 to reduce restrictions on the convertibility of Renminbi into foreign currency for current account items, conversion of Renminbi into foreign currency for capital items, such as foreign direct investment, loans or securities, requires the approval of the State Administration for Foreign Exchange and other relevant authorities. On July 21, 2005, the PRC government introduced a managed floating exchange rate system to allow the value of the Renminbi to fluctuate within a regulated band based on market supply and demand and by reference to a basket of currencies. On the same day, the value of the Renminbi appreciated by 2% against the U.S. dollar. The PRC government has since made and in the future may make further adjustment to the exchange rate system. The PBOC announces the closing price of a foreign currency traded against the Renminbi in the interbank foreign exchange market after the closing of the market on each working day, and makes it the central parity for the trading against the Renminbi on the following working day.

The following table sets forth the noon buying rate for U.S. dollars in New York City for cable transfers in Renminbi as certified for customs purposes by the Federal Reserve Bank of New York for the periods indicated:

| Period | Noon buying rate | | | |
| | Period end | Average[1] | High | Low |
| | (RMB per US$1.00) | | | |
|---|---|---|---|---|
| 2000 | 8.2774 | 8.2784 | 8.2799 | 8.2768 |
| 2001 | 8.2766 | 8.2772 | 8.2786 | 8.2676 |
| 2002 | 8.2800 | 8.2772 | 8.2800 | 8.2669 |
| 2003 | 8.2767 | 8.2772 | 8.2800 | 8.2765 |
| 2004 | 8.2765 | 8.2768 | 8.2774 | 8.2764 |
| 2005 | 8.0702 | 8.1826 | 8.2765 | 8.0702 |
| January 2006 | 8.0608 | 8.0654 | 8.0702 | 8.0596 |
| February 2006 | 8.0415 | 8.0512 | 8.0616 | 8.0415 |
| March 2006 (through March 15) | 8.0374 | 8.0434 | 8.0505 | 8.0374 |

Note:

(1)   Determined by averaging the rates on the last business day of each month during the relevant year, except for the average rate of the relevant periods in 2006, which is determined by averaging the daily rates during the respective periods.

On March 15, 2006, the noon buying rate for U.S. dollars in New York City for cable transfers in Renminbi was US$1.00 = RMB 8.0374 as certified for customs purposes by the Federal Reserve Bank of New York.

Confidential

MS001969

**Hong Kong**

Under existing Hong Kong law, (i) there are no foreign exchange controls or other laws, decrees or regulations that affect the remittance of dividend payments to U.S. residents and (ii) there are no limitations on the rights of non-residents or foreign owners to hold our H Shares offered in this Global Offering. The Basic Law of the Hong Kong Special Administrative Region of the People's Republic of China (the "Basic Law"), which came into effect on July 1, 1997, provides that no foreign exchange control policies shall be applied in Hong Kong.

The H.K. dollar is freely convertible into other currencies, including the U.S. dollar. Since 1983, the H.K. dollar has been pegged to the U.S. dollar at the rate of HK$7.80 to US$1.00. The central element in the arrangements which gave effect to the peg is that by agreement between the Hong Kong government and the three Hong Kong banknote issuing banks (i.e., The Hongkong and Shanghai Banking Corporation Limited, Standard Chartered Bank and the Bank of China), issuing banks to be held as cover for their banknote issues, are issued and redeemed only against payment in U.S. dollars, at the fixed exchange rate of HK$7.80 to US$1.00. When the banknotes are withdrawn from circulation, the banknote issuing banks surrender the certificates of indebtedness to the Hong Kong Government Exchange Fund and are paid the equivalent U.S. dollars at the fixed rate.

The market exchange rate of the H.K. dollar against the U.S. dollar continues to be determined by the forces of supply and demand in the foreign exchange market. However, against the background of the fixed rate system which applies to the issuance of Hong Kong currency in the form of banknotes, as described above, the market exchange rate has not deviated materially from the level of HK$7.80 to US$1.00 since the peg was first established. The Hong Kong government has indicated its intention to maintain the link at that rate. Under the Basic Law, the H.K. dollar will continue to circulate and remain freely convertible. The Hong Kong government has also stated that it has no intention of imposing exchange controls in Hong Kong and that the H.K. dollar will remain freely convertible into other currencies, including the U.S. dollar. However, no assurance can be given that the Hong Kong government will maintain the link at HK$7.80 to US$1.00 or at all.

The following table sets forth the noon buying rate for U.S. dollars in New York City for cable transfers in H.K. dollars as certified for customs purposes by the Federal Reserve Bank of New York for the periods indicated:

| Period | Noon buying rate | | | |
| | Period end | Average[1] | High | Low |
| --- | --- | --- | --- | --- |
| | (RMB per US$1.00) | | | |
| 2000 | 7.7999 | 7.7936 | 7.8008 | 7.7765 |
| 2001 | 7.7980 | 7.7996 | 7.8004 | 7.7970 |
| 2002 | 7.7988 | 7.7996 | 7.8095 | 7.7970 |
| 2003 | 7.7640 | 7.7875 | 7.8001 | 7.7085 |
| 2004 | 7.7723 | 7.7891 | 7.8010 | 7.7632 |
| 2005 | 7.7533 | 7.7755 | 7.7999 | 7.7514 |
| January 2006 | 7.7561 | 7.7537 | 7.7571 | 7.7506 |
| February 2006 | 7.7584 | 7.7593 | 7.7618 | 7.7564 |
| March 2006 (through March 15) | 7.7583 | 7.7592 | 7.7620 | 7.7574 |

---

*Note:*

(1)   Determined by averaging the rates on the last business day of each month during the relevant year, except for the average rate of 2006, which is determined by averaging the daily rates during the respective period.

On March 15, 2006, the noon buying rate for U.S. dollars in New York City for cable transfers in Hong Kong dollars was US$1.00 = HK$7.7583 as certified for customs purposes by the Federal Reserve Bank of New York.

Confidential

MS001970

# CAPITALIZATION

The following table sets forth our actual consolidated cash and cash equivalents, debt and capitalization under IFRS as of September 30, 2005, and as adjusted to give effect to the issue of our H Shares in the Global Offering (assuming no exercise of the over-allotment option) and the receipt by us of the estimated net proceeds from the Global Offering, which we currently expect to be approximately HK$1,516.1 million (US$195.4 million).

You should read this table in conjunction with "Financial Information" in the Hong Kong prospectus and our audited consolidated financial statements included in the Accountants' Report set forth in Appendix I to the Hong Kong prospectus.

| | As at September 30, 2005 | | | |
| | Actual | | As adjusted | |
| | RMB | US$[1] | RMB | US$[1] |
| | (in millions) | | | |
| Current debt. | 3,011.4 | 372.1 | 3,011.4 | 372.1 |
| Non-current debt. | 1,173.9 | 145.1 | 1,173.9 | 145.1 |
| Equity | | | | |
| Share capital. | 1,387.8 | 171.5 | 1,982.5 | 245.0 |
| Reserves | 597.2 | 73.8 | 1,573.2 | 194.4 |
| Minority interests | 1,265.6 | 156.4 | 1,265.6 | 156.4 |
| Total equity. | 3,250.7 | 401.7 | 4,821.3 | 595.8 |
| Total capitalization[2]. | 4,424.6 | 546.8 | 5,995.2 | 740.9 |

*Notes:*

(1)  Calculated at the noon buying rate of US$1.00 = RMB 8.0920 as certified for customs purposes by the Federal Reserve Bank of New York for U.S. dollars in New York City for cable transfers in Renminbi on September 30, 2005.

(2)  Total capitalization equals non-current debt plus total equity.

Except as disclosed in this offering memorandum, there have been no material adverse changes in our capitalization since September 30, 2005.

W − 26

MS001971

## THE HONG KONG STOCK EXCHANGE

The Hong Kong Stock Exchange, which commenced trading on April 2, 1986, was formed upon the unification of the four stock exchanges then existing in Hong Kong and, as at December 31, 2005, shares of 934 companies were listed on the main board with a total market capitalization of approximately HK$8,113 billion. During the month ended December 31, 2005, the average trading volume in value for the main board per trading day on the Hong Kong Stock Exchange was approximately HK$24,682 million. On March 3, 1999, the Financial Secretary of Hong Kong announced in his budget speech a comprehensive reform of the securities and futures markets in Hong Kong, which resulted in the merger of the five recognized and approved market operators in Hong Kong, namely the Hong Kong Stock Exchange, Hong Kong Futures Exchange Limited, Hong Kong Securities Clearing Company Limited ("HKSCC"), the SEHK Options Clearing House Limited and HKFE Clearing Corporation Limited under a single holding company (which was subsequently incorporated under the name of Hong Kong Exchanges and Clearing Limited, or HKEx) (the "Merger"). The Merger became effective on March 6, 2000.

As a result of the Merger, the former shareholders of the Hong Kong Stock Exchange and Hong Kong Futures Exchange Limited, which are together referred to as the Exchanges, effectively exchanged their ownership rights in the Exchanges for economic interests in HKEx and the conventional right to receive dividends, while retaining their existing rights to trade on the Exchanges.

Shares in the HKEx were listed on the Hong Kong Stock Exchange on June 27, 2000. As a listed company on its own stock market, HKEx is regulated by the Securities and Future Commission ("SFC") to avoid any conflict of interest and to ensure a level playing field between HKEx and other listed companies that are subject to the Hong Kong Listing Rules. Regulation by the SFC is imposed through two sets of provisions. First, the Hong Kong Listing Rules were amended to incorporate a new chapter (Chapter 38) relating specifically to the listing of HKEx and which sets out the requirements that must be satisfied for the securities of HKEx to be listed on the Hong Kong Stock Exchange. Second, a Memorandum of Understanding, dated June 19, 2000 (which was subsequently replaced and superseded by another Memorandum of Understanding dated August 22, 2001), was entered into among the SFC, HKEx and the Hong Kong Stock Exchange setting forth the way the parties to it will relate to each other in connection with:

- HKEx's and other applicants' and issuers' compliance with the Hong Kong Listing Rules;

- the enforcement by the Hong Kong Stock Exchange of its rules in relation to HKEx's securities and those of other applicants and issuers;

- the SFC's supervision and regulation of HKEx as a listed issuer and, where a conflict of interest arises, other applicants and issuers;

- conflicts of interest that may arise between the interests of HKEx as a listed company and companies of which it is the controller, and the interests of the proper performance of regulatory functions by such companies; and

- market integrity.

Trading on the Hong Kong Stock Exchange takes place on each business day with continuous trading being divided into morning and afternoon session. Trading is order-based using a computer-assisted trading system that conveys bid and ask prices for securities. Trades are then effected on a matched trade basis directly between buyers and sellers. All securities are traded in board lots,

Confidential

MS001972

commonly of 1,000 shares or 2,000 shares; odd lots are traded separately, usually at a small discount to the board lot prices. Settlement of trades on the Hong Kong Stock Exchange is required to take place on the second trading day after the day the trade takes place. All trades on the Hong Kong Stock Exchange are generally required to be settled between broker participants through CCASS, the Central Clearing and Settlement System, operated by HKSCC. CCASS is the central depositary of share certificates and provides a computerized book-entry settlement of share transactions between its participants, which includes all broker participants of the Hong Kong Stock Exchange. Share certificates kept at CCASS are electronically recorded in the stock accounts of its participants. CCASS also facilitates money settlement between participants. It is also possible for settlement to take place outside CCASS (except in relation to trades between broker participants of the Hong Kong Stock Exchange). In such a case, share certificates, together with signed instruments of transfer, must be delivered on the second business day after the day the transaction takes place. Payment is due against delivery. There are no market-makers in the Hong Kong Stock Exchange except in the market for exchange-traded options, but exchange dealers may act as dual capacity broker-dealers. Short selling of securities at or through the Hong Kong Stock Exchange is currently proscribed except in respect of a limited group of securities.

The SFC charges a transaction levy of 0.005% of the consideration of each transaction and the Hong Kong Stock Exchange charges a trading fee of 0.005% of the consideration of each transaction, payable by both seller and buyer. Additional administrative fees are also payable for trades settled through CCASS. Participant brokers are normally required to make a contract note in respect of each transaction in securities. The contract note is required to be stamped with ad valorem stamp duty and to be delivered by the brokers to their clients not later than the end of the second business day following the transaction.

The SFC, an independent, non-governmental statutory body outside the civil service that provides a general regulatory framework of the securities and futures industries, was established by the Hong Kong government in 1989. The SFC administers certain elements of Hong Kong securities law and regulation, including those provisions in the Securities and Futures Ordinance (Chapter 571 of the Laws of Hong Kong) governing activities in the securities market, operations and conduct of intermediaries, investor compensation, market misconduct and disclosure of interests.

The Hong Kong Stock Exchange promulgates its own rules governing share trading and disclosure of information to shareholders and investors. Companies listed on the Hong Kong Stock Exchange are required to comply with the provisions of its listing rules, which provide for, among other things, the issuance of interim and audited annual accounts to shareholders and the making of prompt public disclosure of material transactions and developments. In addition, the Codes on Takeovers and Mergers and Share Repurchase, which have been issued by the SFC but do not have the force of law, provide guidelines for the fair treatment of shareholders and preservation of an impartial trading market in connection with takeovers and mergers of public companies in Hong Kong and guidelines for share repurchases by such companies. Part XV of the Securities and Futures Ordinance also contains provisions which require certain persons holding or being deemed to be holding interests and/or short positions in the shares, underlying shares and debentures in listed companies in Hong Kong to disclose their interests and/or short positions.

Confidential

MS001973

The Hang Seng Index, an index of 33 stocks listed on the Hong Kong Stock Exchange, has experienced significant volatility in recent years. The highest and lowest closing levels of the Hang Seng Index for the five years from 2001 to 2005 were as follows:

| Year | Highest Closing Level | Lowest Closing Level |
|------|----------------------|---------------------|
| 2001 | 16,163.99 | 8,934.20 |
| 2002 | 11,974.61 | 8,858.69 |
| 2003 | 12,594.42 | 8,409.01 |
| 2004 | 14,266.38 | 10,967.65 |
| 2005 | 15,466.06 | 13,355.23 |

The highest and lowest closing levels of the Hang Seng Index for the period from January 1, 2006 to March 15, 2006 were 15,949.89 (on February 27, 2006) and 14,944.77 (on January 3, 2006), respectively.

Confidential

MS001974

## DESCRIPTION OF SHARES

*The discussion below provides information about the share capital of the Company and summaries of related provisions of the Articles of Association, the PRC Company Law and other laws and regulations applicable to the Company. These summaries do not purport to be complete and are qualified in their entirety by reference to the full Articles of Association. See "Appendix VI — Summary of Principal PRC Legal and Regulatory Provisions" and "Appendix VII — Summary of Articles of Association" in the Hong Kong prospectus for a further discussion of these matters.*

Prior to this Global Offering, the registered share capital of the Company was RMB 1,387,760,000, consisting of 1,387,760,000 Domestic Shares, all of which were issued and outstanding and held by our Promoters. Immediately after this Global Offering, without giving effect to the exercise by the International Underwriters of the over-allotment option, the total registered capital of the Company will be RMB 1,982,500,000, consisting of 654,214,000 H Shares and 1,328,286,000 Domestic Shares, or, after giving effect to the exercise by the International Underwriters of their over-allotment option in full, RMB 2,071,700,000, consisting of 752,334,000 H Shares and 1,319,366,000 Domestic Shares.

This Global Offering consists solely of an offering of the H Shares. Thus, the following discussion primarily concerns the H Shares and your rights as holders of the H Shares.

### Sources of Shareholders' Rights

This PRC legal system is based on written statutes, and prior court decisions can only be cited as reference. Since 1979, the PRC government has promulgated laws and regulations in relation to economic matters such as foreign investment, corporate organization and governance, securities, commerce, taxation and trade with a view to developing a comprehensive system of commercial law. However, due to the fact that these laws and regulations have not been fully developed, and because of the limited volume of published cases and their non-binding nature, interpretation of PRC laws and regulations will involve a certain degree of uncertainty.

Currently, the primary sources of shareholder rights are our Articles of Association, the PRC Company Law and, upon listing of the H Shares on the Hong Kong Stock Exchange, Hong Kong Listing Rules, which impose certain standards of conduct, fairness and disclosure on the Company, the Directors and the controlling shareholder of the Company. To facilitate the offer and listing of shares of Chinese companies overseas, and to regulate the behavior of Chinese companies whose shares are listed overseas, the PRC central government issued on August 27, 1994 the Mandatory Provisions for Articles of Association of Companies Listing Overseas (the "PRC Mandatory Provisions"). Once these PRC Mandatory Provisions are incorporated into the articles of association of a Chinese company, they can only be amended with the approval of the relevant PRC central government agencies. The Hong Kong Listing Rules require a number of provisions in addition to the PRC Mandatory Provisions to be included in the articles of association of Chinese companies listing H Shares on the Hong Kong Stock Exchange. The Articles of Association of the Company have incorporated these PRC Mandatory Provisions and the additional provisions required by the Hong Kong Stock Exchange.

The PRC Mandatory Provisions and the additional provisions of the Hong Kong Stock Exchange together reduce many of the differences that exist between the PRC Company Law and Hong Kong company law regarding, among other things, the variation of class rights, shareholders' rights to information, safeguards against the directors' abuse of their powers, the directors' fiduciary duties and duties of the controlling shareholder to other shareholders. Certain differences remain, and you should note that disputes between a holder of the H Shares and the Company, the Directors, supervisors,

Confidential

MS001975

officers of the Company or holders of the Domestic Shares arising out of the Articles of Association or the PRC Company Law concerning the Company's affairs (except in relation to the identity of shareholders or the register of shareholders of the Company) are to be resolved through arbitration by the Hong Kong International Arbitration Centre in Hong Kong or CIETAC, in China, rather than through a court of law, as could be the case under Hong Kong company law.

In addition, upon the listing of and for so long as the H Shares are listed on the Hong Kong Stock Exchange, the Company will be subject to the Hong Kong Listing Rules, the Securities and Futures Ordinance of Hong Kong, and the Hong Kong Codes on Takeovers and Mergers and Share Repurchases.

**Enforceability of Shareholders' Rights**

There has been little public disclosure in relation to the enforcement by holders of Hong Kong listed shares of their rights under constitutive documents of joint stock companies or under the PRC Company Law or in the application or interpretation of the Chinese or Hong Kong regulatory provisions applicable to joint stock companies organized under the laws of the PRC.

The Articles of Association are a legally binding document regulating the Company's organization and activities, as well as the rights and obligations between the Company and its shareholders and among its shareholders. The Articles of Association provide that all differences or claims (i) between a holder of the H Shares and the Company, (ii) between a holder of the H Shares and the Directors, Supervisors, managers or other senior administrative officers of the Company and (iii) between a holder of the H Shares and a holder of the Domestic Shares, arising from any provision of the Articles of Association or any right or obligation conferred or imposed by the PRC Company Law or other relevant laws or regulations and concerning the Company's affairs must, with certain exceptions, be referred to arbitration at either CIETAC in the PRC or the Hong Kong International Arbitration Centre. The Articles of Association provide that such arbitration will be final and conclusive and binding on all parties. On June 21, 1999, an arrangement was made between Hong Kong and China for the reciprocal enforcement of arbitral awards. This arrangement was approved by the Supreme People's Court of the PRC and the Hong Kong Legislative Council, and became effective on February 1, 2000. The arrangement was made in accordance with the spirit of the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards 1958. Under the arrangement, awards made by Chinese arbitral authorities recognized under the Arbitration Ordinance of Hong Kong can be enforced in Hong Kong, while awards made by Hong Kong arbitral authorities are also enforceable in China. China's Arbitration Law was promulgated on August 31, 1994 and became effective from September 1, 1995. However, so far as we are aware, no action has been brought in China by an H shareholder to enforce an arbitral award made by Chinese arbitral authorities or Hong Kong arbitral authorities, and we are uncertain as to the outcome of any action brought in China to enforce an arbitral award made in favor of a shareholder.

W – 31

Confidential

MS001976

We have been advised by our PRC legal counsel, Jingtian & Gongcheng Law Office that it is unclear whether the mandatory arbitration provision described in the preceding paragraph would extend to cover any claim raised under the securities laws of any jurisdiction other than Hong Kong or China.

The holders of the H Shares will not be able to bring actions on the basis of violations of the Hong Kong Listing Rules and must rely on the Hong Kong Stock Exchange to enforce its rules. Part XV of the Securities and Futures Ordinance establishes certain obligations in relation to disclosure of shareholder interests in Hong Kong listed companies, the violation of which is the subject of prosecution by the SFC in Hong Kong. The Hong Kong Codes on Takeovers and Share Repurchases do not have the force of law and are only standards of commercial conduct considered acceptable for takeover and merger transactions and share repurchases in Hong Kong as established by the SFC and the securities and futures industry in Hong Kong.

We have been advised by our PRC legal counsel, Jingtian & Gongcheng Law Office, that there is uncertainty as to whether the courts of the PRC would (i) enforce judgments of U.S. courts obtained against us or such persons predicated upon the civil liability provisions of the U.S. federal or state securities laws or (ii) entertain original actions brought in the PRC against us or such persons predicated upon the U.S. federal or state securities laws.

### Differences Between the H Shares and the Domestic Shares

Both the H Shares and the Domestic Shares are ordinary shares in the capital of the Company and entitle the holders thereof to the same economic and voting rights. However, subject to the exception described below, the H Shares may be owned and traded only by and among foreign investors, including legal and natural persons of Taiwan, Hong Kong, Macau or any country other than China. Prior to November 5, 2002, domestic shares of H Share companies may be owned and traded only by and among PRC domestic investors, but not investors from Taiwan, Hong Kong or Macau or foreign investors. Effective November 5, 2002, a qualified foreign institutional investor ("QFII") which has obtained approval from the China Securities Regulatory Commission and the PRC State Administration of Foreign Exchange is allowed to invest in PRC domestic securities markets. A QFII may own and trade domestic shares including those of the Company. Beginning in May 2003, QFII status has been granted to qualified institutions. Also, while the Domestic Shares of the Company are denominated and subscribed for in Renminbi and dividends in respect of the Domestic Shares are declared in Renminbi and paid in Renminbi, the H Shares are denominated in Renminbi and subscribed for in Hong Kong dollars and dividends in respect of the H Shares are declared in Renminbi and paid in Hong Kong dollars. Holders of the H Shares and holders of the Domestic Shares are treated as different groups and are entitled to vote as a group in certain situations in which the rights of holders of one group may be affected in a manner different from the other group of holders.

### Restrictions on Transferability and the Share Register

The H Shares may be traded only among foreign investors and may not be sold to Chinese investors. Chinese investors are not entitled to be registered as holders of the H Shares. The consequences under Chinese law of a purported transfer of the H Shares to Chinese investors are unclear.

Confidential

MS001977

Pursuant to the Articles of Association, the Company may refuse to register a transfer of its H Shares unless (i) the relevant transfer fee is paid, (ii) the instrument of transfer only involves the H Shares, (iii) the stamp duty chargeable on the transfer document has been fully paid, (iv) the relevant share certificate and other evidence that the Board of Directors of the Company may reasonably require to prove that the transferor has the right to transfer the shares has been submitted, (v) if it is intended to transfer the shares to joint shareholders, then the number of joint shareholders shall not exceed four, and (vi) there is no lien on the relevant shares.

Under the recently amended PRC Company Law, all the existing Domestic Shares may not be sold within a period of one year from the date of the listing of H Shares on the Hong Kong Stock Exchange. Under our Articles of Association, it is provided that upon approval of the State Council or its authorized supervisory departments and subject to the requirements of the Hong Kong Stock Exchange, the Domestic Shares may be converted into H Shares.

In general, under the PRC Company Law, the Domestic Shares held by the promoters of the Company during the one-year period following the establishment of the Company may not be transferred. A special waiver, however, was granted by the State Council to exempt from this share transferal restriction the sale of the H Shares by the promoters of the Company in connection with the Global Offering. In addition, Shares held by the directors, supervisors and managers of the Company during their respective terms of office may not be transferred.

The Company is required to keep a register of its shareholders which shall comprise various parts. One part is to be maintained in Hong Kong in relation to the H Shares listed on the Hong Kong Stock Exchange. The shareholders have the right to inspect and, for a charge, to copy the share register. Under Hong Kong Listing Rules, unless shareholders otherwise permit, all issues of H Shares, securities convertible into the H Shares, options, warrants or similar rights to subscribe for H Shares or such convertible securities must be offered to the existing equity shareholders in proportion to their existing shareholdings. This restriction does not apply in any case where the shareholders in a general meeting have approved the issue of new H Shares or given a general mandate to the Directors, either unconditionally or subject to terms and conditions, to issue and dispose of the new H Shares not exceeding 20% of the existing issued H Share capital.

The Company has appointed Tricor Investor Services Limited to act as the transfer agent and registrar of the H Shares in Hong Kong. The Hong Kong transfer agent and registrar maintains the register of the H Shares at its offices in Level 28, Three Pacific Place, 1 Queen's Road East, Hong Kong, and enters transfers of the H Shares in such register, and issues certificates evidencing such H Shares to and in the name of the transferee, upon the presentation of the instruments of transfer described above and any payment of any relevant tax or governmental charge that may be imposed in relation to such transfer.

**Restrictions on Controlling Shareholders**

In addition to obligations imposed by law or required by the Hong Kong Stock Exchange, a controlling shareholder may not exercise his voting rights in a manner prejudicial to the interests of the shareholders generally or of some of the shareholders: (i) to relieve a director or supervisor of his duty to act honestly in the best interests of the Company; (ii) to approve the expropriation, by a director or supervisor (for his own benefit or for the benefit of another person), in any guise, of the assets of the Company, including, without limitation, opportunities beneficial to the Company; or (iii)

W — 33

Confidential

MS001978

to approve the expropriation by a director or supervisor (for his own benefit or for the benefit of another person) of the individual rights of other shareholders, including, without limitation, rights to distributions and voting rights, save and except where it was done pursuant to a restructuring submitted to and approved by the shareholders in accordance with the Articles of Association.

For these purposes, a "controlling shareholder" means a person who satisfies one or more of the following conditions: (i) he alone or acting in concert with others has the power to elect more than half of the Board of Directors; (ii) he alone or acting in concert with others has the power to exercise or to control the exercise of 30% or more of the voting rights in the Company; (iii) he alone or acting in concert with others holds 30% or more of the issued and outstanding shares of the Company; or (iv) he alone or acting in concert with others in any other manner controls the Company in fact. Immediately after this Global Offering, each of Parent, BNBMG, Building Materials Academy and CNBM Trading will continue to be a controlling shareholder of the Company.

## Financial and Accounting Systems

The Company will establish its financial and accounting system in accordance with applicable laws, administrative regulations and PRC accounting standards formulated by the PRC government.

The board of directors will place before the shareholders at every annual general meeting such financial statements as are required by relevant laws and regulations in China. The financial reports will be made available at the corporate headquarters for inspection by the shareholders at least 20 days prior to the date of the annual general meeting and each shareholder shall be entitled to obtain a copy.

The Company must prepare is financial statements in accordance with PRC accounting standards and regulations as well as IFRSs. If there are material differences in the financial statements prepared in accordance with these two sets of accounting standards, the Company will state such differences in the financial statements. The Company will also prepare its interim results or financial information in accordance with PRC accounting standards and regulations as well as IFRSs. The Company must publish two financial reports every fiscal year in newspapers in accordance with the Articles of Association. The interim report will be published within 60 days of the end of the first six months of the fiscal year and the annual report will be published within 120 days of the end of the fiscal year.

## Disclosure

The Hong Kong Stock Exchange imposes a requirement on the Company to keep the Hong Kong Stock Exchange, the shareholders and other holders of the listed securities informed as soon as reasonably practicable of any information relating to the Company, including information on any major new developments which are not public knowledge, which (i) is necessary to enable them and the public to appraise the Company's position, or (ii) is necessary to avoid the establishment of a false market in the Company's securities, or (iii) might be reasonably expected materially to affect market activity in and the price of the Company's securities.

There are also requirements under the Hong Kong Listing Rules for the Company to obtain prior shareholders' approval and/or to disclose to shareholders details of certain acquisitions or disposals of assets and connected transactions.

Confidential

MS001979

## U.S. FEDERAL INCOME TAX CONSIDERATIONS

*This disclosure is limited to the U.S. federal tax issues addressed herein. Additional issues may exist that are not addressed in this disclosure and that could affect the U.S. federal tax treatment of our H shares. This tax disclosure was written in connection with the promotion or marketing of our H shares by us, and it cannot be used by any holder for the purpose of avoiding penalties that may be asserted under the Internal Revenue Code. Holders should seek their own advice based on their particular circumstances from an independent tax advisor.*

The following is a discussion of certain U.S. federal income tax consequences of purchasing, owning and disposing of our H Shares to U.S. Holders (as defined below), but it does not purport to be a comprehensive description of all the tax considerations that may be relevant to a particular person's decision to acquire such securities. This discussion does not address U.S. state, local and non-U.S. tax consequences. For a discussion of certain PRC and Hong Kong taxes applicable to holders of H Shares, please see the section entitled "Taxation" in Appendix V of the Hong Kong prospectus. The discussion applies only to U.S. Holders who hold H Shares as capital assets for U.S. federal income tax purposes and it does not address special classes of holders, such as:

- certain financial institutions;

- insurance companies;

- dealers and certain traders in securities or foreign currencies;

- persons holding H Shares as part of a hedge, straddle, conversion or other integrated transaction;

- persons whose functional currency for U.S. federal income tax purposes is not the U.S. dollar;

- partnerships or other entities classified as partnerships for U.S. federal income tax purposes;

- persons liable for the alternative minimum tax;

- tax-exempt organizations; or

- persons that own or are deemed to own 10% or more of our voting stock.

This discussion is based on the Internal Revenue Code of 1986, as amended, administrative pronouncements, judicial decisions and final, temporary and proposed Treasury regulations, as well as the income tax treaty between the United States and the PRC (the "Treaty"), all as of the date hereof. These laws are subject to change, possibly on a retroactive basis. Prospective investors should consult their own tax advisors concerning the U.S. federal, state, local and non-U.S. tax consequences of purchasing, owning and disposing of H Shares in their particular circumstances.

As used herein, a "U.S. Holder" is a beneficial owner of an H Share that is, for U.S. federal income tax purposes: (i) a citizen or resident of the United States; (ii) a corporation, or other entity taxable as a corporation, created or organized in or under the laws of the United States or any political subdivision thereof; or (iii) an estate or trust the income of which is subject to U.S. federal income taxation regardless of its source.

Confidential

MS001980

This discussion assumes that we are not, and will not become, a passive foreign investment company, as described below.

*Taxation of Distributions*

Distributions received by a U.S. Holder on H Shares, other than certain pro rata distributions of common stock to all shareholders, will constitute foreign-source dividend income to the extent paid out of our current or accumulated earnings and profits (as determined for U.S. federal income tax purposes). Corporate U.S. Holders will not be entitled to claim the dividends-received deduction with respect to dividends paid by us on H shares. Subject to applicable limitations, dividends received by certain non-corporate U.S. Holders in taxable years beginning before January 1, 2009 will be taxable at a maximum rate of 15%. Non-corporate U.S. Holders should consult their own tax advisors to determine whether they are subject to any special rules that limit their ability to be taxed at these favorable rates.

The amount of the dividend a U.S. Holder will be required to include in income will equal the U.S. dollar value of the Hong Kong dollars, calculated by reference to the exchange rate in effect on the date the payment is received by the holder, regardless of whether the payment is converted into U.S. dollars on the date of receipt. If a U.S. Holder does not convert the Hong Kong dollars into U.S. dollars on the date of receipt, the holder may realize foreign currency gain or loss on a subsequent sale or other disposition of Hong Kong dollars, which will be U.S.-source ordinary income or loss.

If PRC taxes are withheld from dividends paid on H Shares, then such taxes at a rate not exceeding the rate provided in the Treaty would be creditable against a U.S. Holder's U.S. federal income tax liability, subject to applicable restrictions and limitations that may vary depending upon the holder's circumstances. Instead of claiming a credit, a U.S. Holder could elect to deduct such PRC taxes in computing its taxable income, subject to generally applicable limitations. The limitation of foreign taxes eligible for credit is calculated separately with respect to specific classes of income. The rules governing foreign tax credits are complex. Therefore, U.S. Holders should consult their own tax advisors regarding the availability of foreign tax credits in their particular circumstances should PRC taxes be withheld.

*Sale and Other Disposition of H Shares*

A U.S. Holder will generally recognize capital gain or loss on the sale or other disposition of H Shares, which will be long-term capital gain or loss if the holder has held such H Shares for more than one year. The amount of the U.S. Holder's gain or loss will be equal to the difference between the amount realized on the sale or other disposition and such holder's adjusted tax basis in the H Shares, as determined in U.S. dollars. Any gain or loss will generally be U.S.-source gain or loss for foreign tax credit purposes. U.S. Holders should consult their own tax advisors regarding the creditability of taxes paid in the event the PRC imposes a tax on capital gains.

*Passive Foreign Investment Company Considerations*

We believe that we were not a "passive foreign investment company" ("PFIC") for U.S. federal income tax purposes for our most recent taxable year and we do not expect to be considered a PFIC in the foreseeable future. However, because PFIC status depends upon the composition of a company's income and assets and the market value of its assets from time to time, there can be no assurance that we will not be considered a PFIC for any taxable year. If we were treated as a PFIC for any taxable year during which a U.S. Holder held H Shares, certain adverse U.S. federal income tax consequences could apply to such holder.

W – 36

*Information Reporting and Backup Withholding*

Payments of dividends and sales proceeds that are made within the United States or through certain U.S.-related financial intermediaries may be subject to information reporting and to backup withholding unless the U.S. Holder is a corporation or other exempt recipient or, in the case of backup withholding, the holder provides a correct taxpayer identification number and certifies that no loss of exemption from backup withholding has occurred. The amount of any backup withholding from a payment to a U.S. Holder will be allowed as a credit against the holder's U.S. federal income tax liability and may entitle the holder to a refund, provided that the required information is furnished to the Internal Revenue Service.

W — 37

Confidential

MS001982

## PLAN OF DISTRIBUTION FOR THE INTERNATIONAL PLACING

Under the terms and subject to the conditions contained in an international underwriting agreement dated March 16, 2006 among us, the Selling Shareholders, the global coordinator named below and the International Underwriters named below, for whom Morgan Stanley & Co. International Limited is acting as representative (the "International Underwriting Agreement"), we and the Selling Shareholders have agreed to sell to the International Underwriters, and each of the International Underwriters, severally and not jointly, has agreed to purchase or procure purchasers to purchase from us and the Selling Shareholders, the number of our H Shares listed opposite its name in the table below at the price set forth on the cover page. The table does not reflect the exercise by the International Underwriters of their over-allotment option.

| International Underwriters | Number of H Shares |
|---|---|
| Morgan Stanley & Co. International Limited | 494,594,000 |
| China International Capital Corporation (Hong Kong) Limited | 29,438,000 |
| Daiwa Securities SMBC Hong Kong Limited | 29,438,000 |
| China Merchants Securities (HK) Co. Limited. | 11,774,000 |
| Guotai Junan Securities (Hong Kong) Limited | 11,774,000 |
| Kingsway Financial Services Group Limited | 11,774,000 |
| Total | 588,792,000 |

The International Placing will initially consist of 588,792,000 H Shares, of which 529,318,000 H Shares are being offered by us and 59,474,000 H Shares are being offered for sale by the Selling Shareholders.

Morgan Stanley Dean Witter Asia Limited is the global coordinator and the bookrunner of the Global Offering. Morgan Stanley & Co. International Limited is the lead manager of the International Placing. Morgan Stanley Dean Witter Asia Limited is the sponsor and the lead manager of the Hong Kong Public Offering.

The International Underwriting Agreement provides that the obligations of the International Underwriters to pay for and accept delivery of our H Shares are subject to certain conditions contained in the International Underwriting Agreement, such as the listing of our H Shares and the permission to deal in our H Shares on the Hong Kong Stock Exchange. The International Underwriting Agreement provides that the International Underwriters are obligated to procure purchasers for or purchase all of our H Shares being offered in the International Placing if any are purchased, other than those covered by the over-allotment option described below. The International Underwriters reserve the right to withdraw, cancel or modify offers to investors and reject orders in whole or in part. See "Underwriting" in the Hong Kong prospectus for additional conditions to the Global Offering.

Subject to the granting of listing of, and permission to deal in, our H Shares on the Hong Kong Stock Exchange, as well as compliance with the stock admission requirements of HKSCC, our H Shares will be accepted as eligible securities by HKSCC for deposit, clearance and settlement in CCASS in Hong Kong, with effect from the commencement date of dealings in our H Shares or such other date as may be determined by HKSCC. Settlement of transactions between members of the Hong Kong Stock Exchange on any trading day is required to take place in CCASS on the second business day thereafter. A board lot is 2,000 H Shares. The International Underwriters expect to deliver our H Shares in book-entry form through CCASS (or in certificated form, if applicable) in Hong Kong against payment on or about March 23, 2006.

W — 38

MS001983

**Termination and Default**

The International Underwriters are entitled to be released and discharged from their obligations under, and the global coordinator is entitled to terminate, the International Underwriting Agreement under certain circumstances prior to payment to us and the Selling Shareholders. If an International Underwriter defaults, the International Underwriting Agreement provides that (i) if the number of our H Shares to which the default relates is not more than one-tenth of the aggregate number of our H Shares being offered in the International Placing, the non-defaulting International Underwriters will be obligated to purchase these H Shares in proportion to the respective numbers of our H Shares listed opposite their names in the above table, or (ii) if the number of our H Shares to which the default relates is more than one-tenth of the aggregate number of our H Shares being offered in the International Placing, the purchase commitments of the non-defaulting International Underwriters may be increased or the International Underwriting Agreement may be terminated.

**Hong Kong Underwriting Agreement**

We have also entered into an underwriting agreement dated March 10, 2006 with the Hong Kong Underwriters for the concurrent offering and sale by us of 65,422,000 H Shares in the Hong Kong Public Offering. The offer price per H Share in the International Placing and the Hong Kong Public Offering are identical. The closing of the International Placing is conditioned on the closing of the Hong Kong Public Offering and vice versa.

**Over-allotment Option**

We and the Selling Shareholders have granted an option to the International Underwriters for the period beginning on the date we sign the International Underwriting Agreement and ending 30 days from the last day for the lodging of applications under the Hong Kong Public Offering to purchase up to 89,200,000 additional H Shares from us and up to 8,920,000 additional H Shares from the Selling Shareholders, in aggregate representing 15% of the initial size of the Global Offering, at the offer price, solely to cover over-allotments in the International Placing, if any. Following the Global Offering, we will have 1,982,500,000 shares issued and outstanding represented by 654,214,000 H Shares and 1,328,286,000 Domestic Shares if the over-allotment option is not exercised, or 2,071,700,000 shares represented by 752,334,000 H Shares and 1,319,366,000 Domestic Shares if the over-allotment option is exercised in full.

**Underwriting Commission and Expenses**

In connection with the International Placing, the International Underwriters will receive a gross underwriting and selling commission of 3.5% of the offer price set forth on the cover page of this offering memorandum in respect of our H Shares sold in the International Placing. The International Underwriters will also receive the 1.0% brokerage paid by investors in respect of our H Shares sold in the International Placing. In addition, the Company and/or the Selling Shareholders may, in their sole discretion, pay to the global coordinator an incentive fee. We and the Selling Shareholders will also pay certain expenses in connection with the International Placing of our H Shares.

**No Existing Public Market**

Prior to the Global Offering, there has been no trading market for our shares. The offer price has been fixed by agreement among Morgan Stanley Dean Witter Asia Limited (on behalf of the Hong Kong Underwriters and the International Underwriters), us and the Selling Shareholders. Among the factors considered in determining the offering price of our H Shares were prevailing market

W – 39

Confidential

MS001984

conditions, current market valuations of publicly traded companies that we and the Underwriters believe to be reasonably comparable to us, an assessment of our recent historical performance, estimates of our business potential and earnings prospects, the current state of our development and the current state of our industry and economy as a whole.

### No Public Offering outside Hong Kong

We have applied, through our sponsor, for the listing of, and permission to deal in, our H Shares on the Hong Kong Stock Exchange. There can be no assurance that an active trading market for our H Shares will develop, or that our H Shares will trade in the public market subsequent to the Global Offering at or above the offer price.

Other than in connection with the Hong Kong Public Offering, no action has been or will be taken in any jurisdiction that would permit a public offering of our H Shares, or the possession, circulation or distribution of this offering memorandum or any other material relating to us or our H Shares in any jurisdiction where action for that purpose is required. Accordingly, our H Shares may not be offered or sold, directly or indirectly, and neither this offering memorandum nor any other offering material or advertisements in connection with our H Shares may be distributed or published, in or from any country or jurisdiction except in compliance with any applicable laws and regulations of any such country or jurisdiction.

### Lock-up Agreements

Pursuant to the International Underwriting Agreement, we and each Selling Shareholder have undertaken to the global coordinator (on behalf of the International Underwriters) that, except pursuant to the Global Offering (including the exercise of the over-allotment option), we and each Selling Shareholder will not without the prior written consent of the global coordinator (i) during the period commencing on the date of the Hong Kong Underwriting Agreement (as defined in the Hong Kong prospectus) and the International Underwriting Agreement, respectively, and ending six months after the date on which dealings in the H Shares commence on the Hong Kong Stock Exchange (the "First Six-Month Period"), (a) offer, pledge, sell, transfer or dispose of, directly or indirectly, any H Share or any other shares of the Company or any securities convertible into or exercisable or exchangeable for any shares of the Company; (b) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any shares of the Company; or (c) agree or contract to, or publicly announce any intention to enter into, any transaction described in paragraphs (a) or (b) above, whether any such transaction described in (a) or (b) above is to be settled by delivery of H Shares and/or other shares of the Company or other securities, in cash or otherwise; or (ii) during the six-month period immediately following the First Six-Month Period (the "Second Six-Month Period"), enter into any of the transactions in paragraphs (i) (a) or (b) above or agree or contract to, or publicly announce an intention to enter into any such transaction without taking all reasonable steps to ensure that such act and transaction will not create a disorderly or false market for the H Shares in breach of any relevant laws or regulations, any other shares and/or other securities of the Company.

Pursuant to the Hong Kong Underwriting Agreement, we and each Selling Shareholder have agreed to similar lock-up undertakings as described in "Underwriting" in the Hong Kong prospectus.

Confidential

MS001985

**Indemnification**

We and the Selling Shareholders have agreed to indemnify the International Underwriters against certain liabilities, or to contribute to payments which they may be required to make in that respect, including liabilities under the Securities Act.

**Clawback and Reallocation**

The allocation of H Shares between the Hong Kong Public Offering and the International Placing is subject to adjustment. We have allocated 65,422,000 H Shares to the Hong Kong Public Offering representing 10% of our H Shares initially available in the Global Offering. If the number of our H Shares validly applied for in the Hong Kong Public Offering represents (i) 15 times or more but less than 50 times, (ii) 50 times or more but less than 100 times, and (iii) 100 times or more, of the number of our H Shares initially available in the Hong Kong Public Offering, then our H Shares will be reallocated to the Hong Kong Public Offering from the International Placing so that the total number of our H Shares available in the Hong Kong Public Offering will be increased to 196,266,000 H Shares (in the case of (i)), 261,686,000 H Shares (in the case of (ii)), and 327,108,000 H Shares (in the case of (iii)), representing 30%, 40%, and 50%, respectively, of the total number of our H Shares initially available in the Global Offering (before any exercise of the over-allotment option). In each case, the number of H Shares allocated to the International Placing will be correspondingly reduced in such manner as Morgan Stanley Dean Witter Asia Limited deems appropriate. If the Hong Kong Public Offering is not fully subscribed, the global coordinator may allocate to the International Placing all or any unsubscribed H Shares offered in the Hong Kong Public Offering, in such proportions as it deems appropriate.

**Stabilization and Short Positions**

In connection with this Global Offering, Morgan Stanley Dean Witter Asia Limited, as stabilizing manager, or any person acting for it, may engage in stabilizing transactions, over-allotment transactions, syndicate covering transactions and penalty bids in compliance with all applicable laws and regulatory requirements. These stabilizing transactions, over-allotment transactions, syndicate covering transactions and penalty bids may have the effect of raising or maintaining the market price of our H Shares or preventing or retarding a decline in the market price of our H Shares. As a result, the price of our H Shares may be higher than the price that might otherwise exist in the open market. If these activities are commenced, they may be discontinued at any time. These transactions may be effected on the Hong Kong Stock Exchange, in an over-the-counter market or otherwise, subject to compliance with applicable legal and regulatory requirements. Morgan Stanley Dean Witter Asia Limited, or any person acting for it, is not required to engage in these activities, and, if it does commence, it may end these activities at any time, but in any event no later than the 30th day after the last day for lodging of applications under the Hong Kong Public Offering. See "Underwriting" in the Hong Kong prospectus.

Confidential

MS001986

**Selling Restrictions**

*United States*

Our H Shares have not been and will not be registered under the Securities Act, and may not be offered or sold within the United States except in certain transactions exempt from the registration requirements of the Securities Act.

Our H Shares are being offered and sold outside the United States in reliance on Regulation S and within the United States to qualified institutional buyers in reliance on Rule 144A.

In addition, until 40 days after the later of the commencement of the Global Offering and the closing date, an offer or sale of our H Shares within the United States by a dealer (whether or not participating in the Global Offering) may violate the registration requirements of the Securities Act if such offer or sale is made otherwise than in accordance with Rule 144A under the Securities Act or pursuant to another exemption from registration under the Securities Act.

*Canada*

The distribution of our H Shares in Canada is being made only on a private placement basis exempt from the requirement that we and the Selling Shareholder prepare and file a prospectus with the securities regulatory authorities in each province where trades of our H Shares are made. Any resale of our H Shares in Canada must be made under applicable securities laws which will vary depending on the relevant jurisdiction, and which may require resales to be made under available statutory registration and prospectus exemptions or under a discretionary exemption granted by the applicable Canadian securities regulatory authority. Purchasers are advised to seek legal advice prior to any resale of our H Shares.

*European Economic Area*

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (each, a "Relevant Member State"), each International Underwriter has represented and agreed that, with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the "Relevant Implementation Date") it has not made and will not make an offer of our H Shares to the public in that Relevant Member State prior to the publication of a prospectus in relation to our H Shares which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive, except that it may, with effect from and including the Relevant Implementation Date, make an offer of our H Shares to the public in that Relevant Member State at any time:

(a)  to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities;

(b)  to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than €43,000,000 and (3) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts; or

(c)  in any other circumstances which do not require the publication by us of a prospectus pursuant to Article 3 of the Prospectus Directive.

Confidential

MS001987

For the purposes of this provision, the expression an "offer of shares to the public" in relation to any of our H Shares in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer of our H Shares to be offered so as to enable an investor to decide to purchase or subscribe for our H Shares, as the same may be varied in that Member State, by any measure implementing the Prospectus Directive in that Member State, and the expression Prospectus Directive means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

### United Kingdom

Each International Underwriter offering our H Shares in the International Placing has represented and agreed that (a) it has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of Section 21 of the Financial Services and Markets Act 2000 ("FSMA")) received by it in connection with the issue or sale of any of our H Shares in circumstances in which section 21(1) of the FSMA does not apply to us and (b) it has complied and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to our H Shares in, from or otherwise involving the United Kingdom.

### Japan

Our H Shares offered hereby have not been and will not be registered under the Securities and Exchange Law of Japan (the "Securities and Exchange Law"). Accordingly, each International Underwriter has represented, warranted and agreed that, in connection with the offering made hereby, it will not, directly or indirectly, offer or sell any H Shares in Japan or to, or for the benefit of, any resident of Japan (which term as used herein means any person resident in Japan, including any corporation or other entity organised under the laws of Japan) or to others for re-offering or re-sale, directly or indirectly, in Japan or to, or for the benefit of, any resident of Japan, except pursuant to an exemption from the registration requirements of, and otherwise in compliance with, the Securities Exchange Law and other relevant laws and regulations of Japan.

### Hong Kong

Each International Underwriter has represented and agreed that:

(a)   it has not offered or sold and will not offer or sell in Hong Kong, by means of any document, any of our H Shares other than (a) to "professional investors" as defined in the Securities and Futures Ordnance (Cap. 571) of Hong Kong and any rules made under the Ordinance, or (b) in other circumstances which do not result in the document being a "prospectus" as defined in the Companies Ordinance (Cap. 32) of Hong Kong or which do not constitute an offer to the public within the meaning of that Ordinance; and

(b)   it has not issued or does not have in its possession for the purposes of issue, and will not issue or have in its possession for the purposes of issue, whether in Hong Kong or elsewhere, any advertisement, invitation or document relating to our H Shares, which is directed at or the contents of which are likely to be accessed or read by, the public of Hong Kong (except if permitted to do so under the securities laws of Hong Kong) other than with respect of our H Shares which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" as defined in the Securities and Futures Ordinance (Cap. 571) of Hong Kong and any rules made under the Ordinance.

Confidential

MS001988

*Singapore*

This offering memorandum has not been registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this offering memorandum and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of our H Shares may not be circulated or distributed, nor may our H Shares be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Singapore other than (i) to an institutional investor under Section 274 of the Securities and Futures Act, Chapter 289 of Singapore (the "SFA"), (ii) to a relevant person pursuant to Section 275(1) of the SFA, or any person pursuant to Section 275(1A) of the SFA, and in accordance with the conditions, specified in Section 275 of the SFA, or (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

Where our H Shares are subscribed or purchased under Section 275 of the SFA by a relevant person which is:

(a)  a corporation (which is not an accredited investor) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or

(b)  a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary is an accredited investor,

shares, debentures and units of shares and debentures of that corporation or the beneficiaries' rights and interest in that trust shall not be transferable for six months after that corporation or that trust has acquired our H Shares under Section 275 of the SFA except:

(i)  to an institutional investor (for corporations, under Section 274 of the SFA) or to a relevant person defined in Section 275(2) of the SFA, or to any person pursuant to an offer that is made on terms that such shares, debentures and units of shares and debentures of that corporation or such rights and interest in that trust are acquired at a consideration of not less than $200,000 (or its equivalent in a foreign currency) for each transaction, whether such amount is to be paid for in cash or by exchange of securities or other assets, and further for corporations, in accordance with the conditions, specified in Section 275 of the SFA;

(ii)  where no consideration is given for the transfer; or

(iii)  where the transfer is by operation of law.

*PRC*

Each International Underwriter offering our H Shares in the International Placing has represented and agreed that it has not offered or sold, and will not offer or sell, directly or indirectly, any of our H Shares in the PRC (excluding Hong Kong for the purposes of this paragraph).

*Netherlands*

Our H Shares may not be offered in the Netherlands other than (i) to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities, (ii) to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year, (2) a total balance sheet of more

Confidential

MS001989

than €43,000,000 and (3) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts, (iii) to any legal entity which and any natural person who has asked to be considered as a professional market party and is registered pursuant to the Dutch Exemption Regulation (Vrijstellingregeling Wte 1995), and (iv) in any other circumstances which do not require the publication of a prospectus pursuant to the Dutch Exemption Regulation.

*France*

No offer or sale of our H Shares is being made, directly or indirectly, to the public in France and only qualified investors (Investisseurs Qualifiés) as defined in and in accordance with Article L.411-2 of the French Code Monetairé et Financier, as amended, and Decree no. 98-880 dated 1 October 1998, as amended, acting for their own account, are eligible to accept the offering relating to our H Shares. This offering memorandum or any other offering material relating to the Global Offering has not been and shall not be distributed to the public in France. This offering memorandum has not been submitted to the clearance of the Autorité des marchés financiers.

*Italy*

The offering of the H Shares has not been registered with the Commissione Nazionale per le Societa e la Borsa ("CONSOB"), in accordance with Italian securities legislation. Accordingly, each International Underwriter has represented and agreed that (i) sales of the H Shares in the Republic of Italy shall be effected in accordance with all Italian securities, tax and other applicable laws and regulations; and (ii) it has not offered, sold or delivered, and will not offer, sell or deliver, any H Shares or distribute copies of this offering memorandum or any other document relating to the H Shares in the Republic of Italy unless such offer, sale or delivery of H Shares or distribution of copies of this offering memorandum or other documents relating to the H Shares in the Republic of Italy is:

- made by investment firms (as defined by Legislative Decree No. 58 of February24, 1998) ("Legislative Decree No. 58"), banks and financial companies enrolled in the special register provided for by article 107 of Legislative Decree no. 385 of September 1, 1993, to the extent duly authorized to engage in the placement and/or underwriting of financial instruments in Italy in accordance with the relevant provisions of Legislative Decree No. 58;

- made only to professional investors pursuant to article 30, paragraph 2 and article 100 of Legislative Decree No. 58 and as defined in articles 25 and 31 (2) of CONSOB Regulation no. 11522 of July 1, 1998, as amended; and

- in compliance with any other applicable requirement or limitation which may be imposed by CONSOB or the Bank of Italy or any other Italian regulatory authority.

**Stamp Duty**

If you buy our H Shares from any of the International Underwriters, you may be required to pay stamp duty and other charges in accordance with the laws and practice of the country of purchase in addition to the offer price on the cover page of this offering memorandum.

Confidential

MS001990

## NOTICE TO INVESTORS

*Because of the following restrictions, you are advised to consult legal counsel prior to making any offer, resale, pledge or other transfer of our H Shares. Terms used herein that are defined in Rule 144A or Regulation S under the Securities Act are used herein as defined therein:*

**Notice to Rule 144A Investors**

If you purchase our H Shares offered in reliance on Rule 144A hereby, by accepting delivery of this document, you will be deemed to have represented and agreed as follows:

(1)  you are not an affiliate of ours or otherwise acting on our behalf and (A) are a qualified institutional buyer, (B) are aware that the sale to you is being made in reliance on Rule 144A and (C) are acquiring shares for your own account or for the account of a qualified institutional buyer;

(2)  you understand that our H Shares are being offered in a transaction not involving any public offering in the United States within the meaning of the Securities Act, that our H Shares have not been and will not be registered under the Securities Act or any securities laws of the states or other jurisdictions of the United States and that if in the future you decide to offer, resell, pledge or otherwise transfer any of our H Shares, such H Shares may be offered, resold, pledged or otherwise transferred only (A)(i) in the United States to a person whom you reasonably believe is a qualified institutional buyer in a transaction meeting the requirements of Rule 144A, (ii) in an offshore transaction in accordance with Regulation S under the Securities Act, (iii) pursuant to an exemption from registration under the Securities Act provided by Rule 144 thereunder (if available), (iv) pursuant to another available exemption from the registration requirements of the Securities Act or (v) pursuant to an effective registration statement under the Securities Act, and (B) in each case in accordance with any applicable securities laws of any state or territory of the United States. You acknowledge that our H Shares (whether in physical, certificated form or uncertificated form) offered and sold in accordance with Rule 144A are "restricted securities" within the meaning of Rule 144(a)(3) under the Securities Act and that no representation is made as to the availability of the exemption provided by Rule 144 for resales of H Shares;

(3)  any offer, sale, pledge or other transfer made other than in compliance with the above-stated restrictions shall not be recognized by us in respect of our H Shares; and

(4)  you agree to notify and will be deemed to have notified, and each subsequent holder is required to notify and will be deemed to have notified, any purchaser of our H Shares from you or such subsequent holder of the resale restrictions referred to in clause (2) above, if then applicable.

W − 46

Confidential

MS001991

**Notice to Regulation S Investors**

If you purchase our H Shares offered in reliance on Regulation S hereby, you, by accepting delivery of this offering memorandum, will be deemed to have represented and agreed as follows:

(1) you are, or at the time the H Shares are purchased pursuant to Regulation S will be, the beneficial owner of such H Shares and (A) you are acquiring our H Shares in an offshore transaction in reliance on Regulation S and (B) you are not an affiliate of us or a person acting on behalf of us or such an affiliate;

(2) you understand that our H Shares have not been and will not be registered under the Securities Act and you will not offer, sell, pledge or otherwise transfer such H Shares except in accordance with any applicable laws of any state of the United States and any foreign jurisdiction; and

(3) any offer, sale, pledge or other transfer made other than in compliance with the above-stated restrictions shall not be recognized by us in respect of our H Shares.

**Notice to Both Rule 144A and Regulation S Investors**

Whether you are purchasing our H Shares pursuant to Rule 144A or Regulation S, you will, in addition, be deemed to have represented and agreed that (A) we, the Selling Shareholders, the International Underwriters and others will rely upon the truth and accuracy of your acknowledgements, representations, warranties and agreements set forth above, (B) if any of the representations or warranties of the purchaser deemed to have been made by virtue of purchase of our H Shares by you are no longer accurate, you should promptly notify us, (C) if you are acquiring any of our H Shares as a fiduciary or agent for one or more accounts, you have sole investment discretion with respect to each such account and have full power to make the foregoing acknowledgements, representations, warranties and agreements on behalf of each such account, and (D) you are not an "associate" (as such term is defined in the Hong Kong Listing Rules) of any of our directors or existing shareholders or a nominee of any of the foregoing.

Confidential

MS001992

## LEGAL MATTERS

Certain legal matters as to Hong Kong law will be passed on for us by Slaughter and May and for the Underwriters by Linklaters. Certain legal matters as to New York and United States federal law will be passed on for us by Davis Polk & Wardwell and for the Underwriters by Linklaters. Certain legal matters as to PRC law will be passed on for us by Jingtian & Gongcheng Law Office and for the Underwriters by Haiwen & Partners.

## INDEPENDENT ACCOUNTANTS

Our audited consolidated financial statements for each of the years ended December 31, 2002, 2003 and 2004 and the nine months ended September 30, 2005 included in "Appendix I — Accountants' Report" in the Hong Kong prospectus has been prepared by Deloitte Touche Tohmatsu, our independent auditors and reporting accountants, in accordance with the Auditing Guideline "Prospectuses and the Reporting Accountant" issued by the Hong Kong Institute of Certified Public Accountants. Deloitte Touche Tohmatsu has given and has not withdrawn its written consent to the issue of this offering memorandum with the inclusion of its Accountants' Report included in Appendix I to the Hong Kong prospectus and references to its name included herein in the form and context in which they are respectively included.

## INDEPENDENT PROFESSIONAL VALUER

The property valuation report included in Appendix IV to the Hong Kong prospectus has been prepared by Sallmanns (Far East) Limited, an independent property valuer. Sallmanns (Far East) Limited has given and not withdrawn its written consent to the issue of this offering memorandum with the inclusion of their report in the form and context in which it is included.

Confidential

MS001993