# EXHIBIT
# 165

# FILED UNDER SEAL

Confidential - Subject to Further Confidentiality Review

1      IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF LOUISIANA
2                    -  -  -
3    IN RE:                  :  MDL NO. 2047
     CHINESE-MANUFACTURED     :
4    DRYWALL PRODUCTS         : SECTION:  L
     LIABILITY LITIGATION     : JUDGE FALLON
5
     THIS DOCUMENT APPLIES    :
6    TO ALL CASES             :  MAG. JUDGE
                              :  WILKINSON
7                    -  -  -
8            NOVEMBER 13, 2015
         CONFIDENTIAL - SUBJECT TO FURTHER
9            CONFIDENTIALITY REVIEW
                     -  -  -
10
11           Videotaped 30(b)(6)
12   deposition of TERENCE KEYES, taken
13   pursuant to notice, was held at the law
14   offices of Davis Polk & Wardwell, LLP,
15   450 Lexington Avenue, New York, New York
16   10017, commencing at 9:09 a.m., on the
17   above date, before Amanda Dee
18   Maslynsky-Miller, a Certified Realtime
19   Reporter and Notary Public in and for the
20   State of New York.
21

**FSIA EXHIBIT 165**

22                   -  -  -
23        GOLKOW TECHNOLOGIES, INC.
       877.370.3377 ph | 917.591.5672 fax
24           deps@golkow.com

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2
 3    COUNSEL FOR THE PLAINTIFF CLASS:
 4
           STECKLER, LLP
 5         BY:  BRUCE W. STECKLER, ESQUIRE
           12720 Hillcrest Road
 6         Suite 1045
           Dallas, Texas 75230
 7         (972) 387-4040
           Bruce@StecklerLaw.com
 8
 9
10
           LEVIN, FISHBEIN, SEDRAN & BERMAN
11         BY:  FREDERICK S. LONGER, ESQUIRE
           510 Walnut Street
12         Suite 500
           Philadelphia, Pennsylvania 19106
13         (215) 592-1500
           Flonger@lfsblaw.com
14
15
16
    COUNSEL FOR MORGAN STANLEY:
17
           SHER GARNER CAHILL RICHTER KLEIN
18         & HILBERT, LLC
           BY:  JOSHUA S. FORCE, ESQUIRE
19         BY:  ASHLEY GREMILLION COKER, ESQUIRE
           909 Poydras Street
20         Suite 2800
           New Orleans, Louisiana 70112
21         (504) 299-2100
           Jforce@shergarner.com
22         Acoker@shergarner.com
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES CONT.

 2

 3    COUNSEL FOR BNBM DEFENDANTS:

 4         DENTONS US, LLP
           BY:  JUSTIN N. KATTAN, ESQUIRE
 5         1221 Avenue of the Americas
           New York New York 10020
 6         (212) 768-6923
           Justin.kattan@dentons.com

 7

 8

 9

      COUNSEL FOR TAISHAN GYPSUM COMPANY:
10

           ALSTON & BIRD, LLP
11         BY:  STEVEN R. CAMPBELL, ESQUIRE
           90 Park Avenue
12         15th Floor
           New York, New York 10016-1387
13         (212) 210-9400
           Steven.campbell@alston.com

14

15

16

      COUNSEL FOR CNBM DEFENDANTS:
17

           ORRICK, HERRINGTON & SUTCLIFFE, LLP
18         BY:  ERIC A. GRESSLER, ESQUIRE
           777 South Figueroa Street
19         Suite 3200
           Los Angeles, California 90017
20         (213) 612-2208
           Egressler@orrick.com

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES CONT.

 2

 3    COUNSEL FOR THE STATE OF LOUISIANA

 4          PERKINS COIE, LLP
            BY:  CRAIG M. J. ALLELY, ESQUIRE
 5          1900 Sixteenth Street
            Suite 1400
 6          Denver, Colorado 80202
            (303) 291-2304
 7          Callely@perkinscoie.com

 8

 9    ALSO PRESENT:

10    MATTHEW MORNINGSTAR - Morgan Stanley
      THOMAS KEIGHLEY - Videographer

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                    -   -   -
 2                 I N D E X
 3                    -   -   -
 4

    Testimony of:  TERENCE KEYES
 5
 6       By Mr. Steckler              11, 411
         By Mr. Kattan                408
 7
 8                    -   -   -
 9               E X H I B I T S
10                    -   -   -
11

    NO.            DESCRIPTION              PAGE
12
```

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Keyes-1 | Notice of Deposition | 12 |
| Keyes-2 | Hong Kong Stock Exchange Rules, Chapter 1 | 30 |
| Keyes-3 | Chapter A, Equity Securities Issuers Incorporated in the People's Republic of China | 37 |
| Keyes-4 | Hong Kong Stock Exchange Rules, Chapter 2 | 58 |
| Keyes-5 | 4/30/04 Morgan Stanley Memoranda | 81 |
| Keyes-6 | Syndicate of Analyst Presentation | 93 |
| Keyes-7 | Bates MS 5520-246 12/13/05 Letter from Hong Kong Stock Exchange to Morgan Stanley Asia | 103 |

```
13

    Keyes-1        Notice of Deposition         12
13
    Keyes-2        Hong Kong Stock Exchange
14                 Rules, Chapter 1             30
15  Keyes-3        Chapter A, Equity Securities
                   Issuers Incorporated in the
16                 People's Republic of China   37
17  Keyes-4        Hong Kong Stock Exchange
                   Rules, Chapter 2             58
18
    Keyes-5        4/30/04 Morgan Stanley
19                 Memoranda                    81
20  Keyes-6        Syndicate of Analyst
                   Presentation                 93
21
    Keyes-7        Bates MS 5520-246
22                 12/13/05 Letter from Hong
                   Kong Stock Exchange to
23                 Morgan Stanley Asia          103
24
```

Confidential - Subject to Further Confidentiality Review

```
 1                    -   -   -
 2                E X H I B I T S
 3                    -   -   -
 4
     NO.            DESCRIPTION              PAGE
 5
     Keyes-8        Bates MS 005470
 6                  2/20/06 Letter            117
 7   Keyes-9        MS 012858
                    Morgan Stanley Asia Equity
 8                  Committee Memorandum       129
 9   Keyes-10       Bates MS 012063
                    Memorandum on Profit
10                  Estimate                  163
11   Keyes-11       Bates MS 009642
                    3/1/06 CNBM Document       169
12
     Keyes-12       3/2/06 Form C-1           173
13
     Keyes-13       Offering Summary          179
14
     Keyes-14       China National Building
15                  Material Company
                    International Placing
16                  Offering Memorandum        201
17   Keyes-15       Hong Kong Prospectus       203
18   Keyes-16       Bates MS 056022
                    1/4/06 Memorandum          246
19
     Keyes-17       Bates 056130
20                  PowerPoint CNBM Post-Mortem,
                    March 16, 2006             249
21
     Keyes-18       Bates MS 000332-361
22                  Cornerstone Investor
                    Presentation               256
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1                         -   -   -
 2                    E X H I B I T S
 3                         -   -   -
 4
   NO.               DESCRIPTION               PAGE
 5
   Keyes-19          Bates MS 059369-387
 6                   Presentation, CNBM Global
                     IR Road Show Proposal      272
 7
   Keyes-20          MS 054913-941
 8                   March 2006 Slide
                     Presentation               286
 9
   Keyes-21          Bates MS 59475-454
10                   April 2007 China National
                     Building Material Company
11                   Management Road Show
                     Presentation               301
12
   Keyes-22          Bates MS 037379-7546
13                   China National Building
                     Material Company Limited
14                   Annual Report, 2007        309
15 Keyes-23          Bates MS 44561
                     2007 Placing Agreement     321
16
   Keyes-24          Bates MS 044570-578
17                   2009 Placing Agreement     323
18 Keyes-25          China National Building
                     Material Company Annual
19                   Report                     325
20 Keyes-26          Hong Kong Stock Exchange
                     Website Printout           333
21
   Keyes-27          China National Building
22                   Material Company 2014
                     Annual Report              356
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1                     -   -   -

 2               E X H I B I T S

 3                     -   -   -

 4

    NO.            DESCRIPTION              PAGE
 5

 6   Keyes-28      Hong Kong Stock Exchange
                   Website Printout         371
 7

     Keyes-29      Listing of Investors     395
 8

     Keyes-30      Non-Party Morgan Stanley
 9                 Objections to Record
                   Document 18952           413
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                  -   -   -

 2          DEPOSITION SUPPORT INDEX

 3                  -   -   -

 4

 5   Direction to Witness Not to Answer

 6   Page     Line    Page Line      Page Line

 7   406      6

 8   406      14

 9

10   Request for Production of Documents

11   Page     Line    Page Line      Page Line

12   290      10

13

14

15   Stipulations

16   Page     Line    Page Line      Page Line

17   10       1

18

19

20   Question Marked

21   Page Line      Page Line      Page Line

22   None

23

24
```

Confidential - Subject to Further Confidentiality Review

```
1                    -   -   -
2              (It is hereby stipulated and
3         agreed by and among counsel that
4         sealing, filing and certification
5         are waived; and that all
6         objections, except as to the form
7         of the question, will be reserved
8         until the time of trial.)
9                    -   -   -
10             VIDEO TECHNICIAN:  We are
11        now on the record.  My name is
12        Thomas Keighley, I'm a
13        videographer for Golkow
14        Technologies.  Today's date is
15        November 13th, 2015, the time is
16        approximately 9:09 a.m.
17             This video deposition is
18        being held in New York, New York,
19        450 Lexington Avenue, which is the
20        offices of Davis Polk here in the
21        matter of Chinese Drywall
22        Litigation for the United States
23        District Court for the Eastern
24        District of Louisiana.  The
```

1    deponent is Terence Keyes.

2         Counsel, your appearances

3    will be noted on the stenographic

4    record.  The court reporter is

5    Amanda Miller, and if she can

6    swear in the witness, we can

7    proceed.

8              -  -  -

9         TERENCE KEYES, after having

10   been duly sworn, was examined and

11   testified as follows:

12             -  -  -

13             EXAMINATION

14             -  -  -

15   BY MR. STECKLER:

16        Q.   Sir, can you please state

17   your name for the record?

18        A.   My name is Terence Keyes.

19        Q.   Mr. Keyes, have you ever

20   given a deposition before?

21        A.   No.

22        Q.   Do you understand that

23   you're here pursuant to a notice with

24   respect to a lawsuit that's been filed in

Confidential - Subject to Further Confidentiality Review

1    the Eastern District of Louisiana in the

2    United States regarding plaintiffs

3    affected by Chinese drywall and a number

4    of CNBM entities, affiliates and

5    subsidiaries?

6            A.    Yes.

7            Q.    And if you don't understand

8    any of my questions today, will you

9    please let me know?

10           A.    I'll do that.

11           Q.    Otherwise, I'm going to

12   assume that you're understanding the

13   question.

14                 Is that fair?

15   A.    Sure.

16                     -   -   -

17                 (Whereupon, Exhibit Keyes-1,

18           Notice of Deposition, was marked

19           for identification.)

20                     -   -   -

21   BY MR. STECKLER:

22           Q.    Have you seen what I've

23   handed you as Exhibit Number 1 to your

24   deposition, which is a notice for your

Confidential - Subject to Further Confidentiality Review

1    appearance today?

2         A.    Yes.

3         Q.    And have you reviewed this

4    document?

5         A.    Yes, I have.

6         Q.    And I'm going to ask you to

7    turn to -- there's a section at the very

8    end, before Exhibit-1, which involves

9    deposition topics.

10             And have you reviewed this

11   page before?

12        A.    Yes.

13        Q.    And, similarly, have you

14   reviewed the other attachments?

15        A.    I've reviewed Exhibit B.

16        Q.    And are you familiar with

17   the topics that are going to be discussed

18   today in your deposition?

19        A.    Yes.

20        Q.    And what is your

21   understanding of the topics that we're

22   going to be talking about?

23        A.    A number of financing

24   transactions undertaken by CNBM for which

Confidential - Subject to Further Confidentiality Review

1   Morgan Stanley acted as an underwriter;

2   so IPO in 2006, and three follow-on

3   offerings in 2007, 2009 and 2010.

4            Q.    As you sit here today, is it

5   your understanding those are the only

6   transactions that CN -- that Morgan

7   Stanley has been involved in with respect

8   to CNBM?

9            A.    Yes.

10           Q.    And what entity do you work

11  for?

12           A.    I work for Morgan Stanley

13  Asia Limited.

14           Q.    And are they a subsidiary of

15  Morgan Stanley?

16           A.    Yes.

17           Q.    And Morgan Stanley is on the

18  New York Stock Exchange, they're located

19  here in the United States, correct?

20           A.    That's correct.

21           Q.    And how long have you worked

22  for Morgan Stanley Asia?

23           A.    I joined Morgan Stanley Asia

24  in 1997, and I left Morgan Stanley in

Confidential - Subject to Further Confidentiality Review

1    2008.  I worked for another firm for just

2    over a year, and came back to Morgan

3    Stanley in 2009.

4         Q.    And when you returned in

5    2009 from working -- was it with Merrill

6    Lynch?

7         A.    Yes, that's correct.

8         Q.    -- did you do any continuing

9    work on CNBM?

10        A.    I'm sorry, can you --

11        Q.    Did you do any additional

12   work on CNBM after 2009?

13        A.    Yes.

14        Q.    With respect to your work

15   with CNBM, were you the primary person at

16   Morgan Stanley Asia Limited that was

17   handling those transactions?

18             MR. FORCE:  Objection to

19        form.

20             MR. STECKLER:  You can

21        answer.

22             MR. FORCE:  You can answer.

23             THE WITNESS:  Right.

24             Yes, I was the primary

Confidential - Subject to Further Confidentiality Review

1           person working on the IPO, and one

2           of a number of other people

3           working on the other offerings,

4           apart from the one in 2009 which

5           took place when I wasn't at Morgan

6           Stanley.

7    BY MR. STECKLER:

8           Q.    And that's why I ask, is one

9    of those transactions occurred during

10   your hiatus.

11          So I'm wondering, when you

12   came back to work at Morgan Stanley, did

13   you resume your work on CNBM matters?

14          A.    Yes.

15          Q.    And we're going to be using

16   a lot of different names and acronyms

17   today, and I want to make sure that you

18   and I have an understanding.

19          When we talk about CNBM,

20   we're going to be talking about China

21   National Building Materials Company

22   Limited.

23          Do you understand that?

24          A.    Yes.

1      Q.    If we talk about CNBM Group,

2   we're going to be talking about China

3   National Building Materials Group.

4            Do you understand that?

5      A.    Uh-huh.

6      Q.    And explain to me the

7   difference between CNBM Group and CNBM.

8      A.    CNBM is a company whose

9   eight shares are listed on the Hong Kong

10  Stock Exchange since the IPO in 2006.

11  And the Group company is one of the

12  principal shareholders.

13     Q.    And when we talk about BNBM,

14  we're going to be referring to Beijing

15  New Building Materials Public Limited

16  Company.

17           Do you understand that?

18     A.    Yes.

19     Q.    If we talk about BNBM Group,

20  we're going to be talking about Beijing

21  New Building Materials Group.

22           Do you understand that?

23     A.    Yes.

24     Q.    And do you understand the

1    difference between those two entities,

2    BNBM and BNBMG or BNBM Group?

3         A.    BNBM is the company listed

4    on -- I think it's the Shanghai Stock

5    Exchange or Shanghai or Shenzhen Stock

6    Exchange.

7         Q.    And BNBM is a subsidiary of

8    CNBM; is that your understanding?

9         A.    That's right, yes.  Not

10   necessarily the only subsidiary.

11        Q.    But CNBM is the controlling

12   shareholder of BNBM, correct?

13        A.    Correct.

14        Q.    You're familiar with Taishan

15   Gypsum Company?

16        A.    I am.  We used to refer to

17   it as Taihe when we were doing the IPO.

18   I think it may have changed its name.

19        Q.    When we refer to Taishan or

20   TG, we're going to be referring to

21   Taishan Gypsum Company Limited, which was

22   formally known as Shandong Taihe.

23             Do you recall that name?

24        A.    I do recall that name, yes.

Confidential - Subject to Further Confidentiality Review

1    Q.    We say here in the States,

2    just because we're not good at Chinese

3    Taihe, but it's Taihe; is that correct?

4    A.    Taihe, yes.

5    Q.    And Taihe is a subsidiary of

6    BNBM; is that your understanding?

7    A.    Yes, it is.

8    Q.    Similarly, Taishan, which

9    was formerly Taihe, is a subsidiary of

10   BNBM, right?

11   A.    Yes.

12   Q.    And BNBM is a controlling

13   shareholder of Taishan; is that your

14   understanding?

15   A.    That's my understanding.

16   Q.    Now, tell me a little bit

17   about your background.  You're obviously

18   not from the United States.

19        Where did you grow up?

20   A.    I'm a British citizen.  And

21   my working background is that I worked as

22   a childhood accountant in the UK,

23   qualified there, and then worked for S.G.

24   Warburg & Co., Limited, which is a

Confidential - Subject to Further Confidentiality Review

1  British investment bank, now part of the

2  UBS Group from 1986 to 1997.  And I

3  worked with them in London, New York and

4  Hong Kong.

5        I moved to Hong Kong in

6  1994, and I joined Morgan Stanley in

7  Hong Kong in 1997.

8        Q.    And have you been in

9  Hong Kong since 1997?

10        A.    I had one year in Singapore

11  in the middle of that.  Apart from that,

12  yes.

13        Q.    And during the time you've

14  been in Hong Kong, from 1997 to the

15  present, have you been working with the

16  Hong Kong Exchange?

17        A.    Yes.  I initially moved to

18  Hong Kong in 1994, with my previous firm,

19  to work on the Hong Kong IPO.  And I've

20  worked on a number of Hong Kong IPOs

21  since then.

22        Q.    And what is an IPO?

23        A.    It's initial public

24  offering, where a company's shares are

Confidential - Subject to Further Confidentiality Review

1  listed on an exchange for the first time.

2  And usually either new shares are being

3  issued or existing shareholders are

4  selling some of their shares to members

5  of the public and to institutional

6  investors.

7         Q.    And so in your role with

8  Morgan Stanley Asia Limited, you assist

9  companies in initial public offerings for

10 listing on the Hong Kong Exchange; is

11 that right?

12        A.    Yes, that's one of the

13 things I do.

14        Q.    Are you also involved in any

15 sort of investment management?

16        A.    No.

17        Q.    What about asset management?

18        A.    No.

19        Q.    Is your work solely in what

20 we would consider investment banking?

21        A.    Yes, it is.

22        Q.    And what is investment

23 banking?

24        A.    Investment banking is

Confidential - Subject to Further Confidentiality Review

1    providing advice to corporate clients on

2    a variety of transactions they might

3    undertake.

4              So it would include mergers

5    and acquisitions; and raising capital.

6    Capital in the form of equity, new

7    shares; also debt, so bond issues, for

8    example.

9         Q.    And were you engaged by CNBM

10   as an investment banker during the time

11   you were working with Morgan Stanley Asia

12   Limited?

13        A.    Yes.

14        Q.    And when did they retain

15   you?

16        A.    They retained Morgan Stanley

17   in 2004, I believe.

18        Q.    And who retained you?  Was

19   it CNBM or CNBM Group?

20              MR. FORCE:  Before you

21        answer, just to clarify for the

22        record, Mr. Keyes, obviously, is

23        appearing today as a corporate

24        representative of Morgan Stanley.

```
 1            And when you say "you," I just
 2            want to make sure we're clear
 3            whether you're talking about him
 4            individually or whether you're
 5            talking about Morgan Stanley.
 6                    MR. STECKLER:  Fair enough.
 7       BY MR. STECKLER:
 8            Q.    And you were clear to say
 9       Morgan Stanley, which I'm -- while you're
10       a great reputable man, I'm sure the --
11       Morgan Stanley and what it offers is
12       really what they're seeking in investment
13       banking, correct?
14            A.    Indeed.
15            Q.    So did CNBMG or CNBM retain
16       Morgan Stanley as an investment banker in
17       2004?
18                    MR. FORCE:  Object to the
19            form.
20                    THE WITNESS:  I believe it
21            was CNBM.
22       BY MR. STECKLER:
23            Q.    And who at CNBM retained
24       Morgan Stanley, do you know?
```

Confidential - Subject to Further Confidentiality Review

1        A.    I can't put it to a specific

2   name.  I didn't get involved personally

3   in working on the transaction until after

4   Morgan Stanley had already been retained.

5        Q.    Who was the point person

6   that you dealt with at CNBM?

7        A.    I dealt with a number of

8   people.  I dealt with the chairman, Song

9   Zhiping.  I dealt with the CEO, Thomas

10  Cao.  Cao Jianglin.  And Mr. Chang who is

11  the company secretary, primarily.

12       Q.    How do you spell Chang?

13       A.    C-H-A-N-G.

14       Q.    Cao Jianglin?

15       A.    Yes.

16       Q.    So those are the three

17  principal individuals at CNBM that you

18  dealt with?

19       A.    Correct.

20       Q.    Do you know if there were

21  others that dealt with other folks at

22  Morgan Stanley?

23       A.    There were a number of other

24  people from CNBM who were dealing with

Confidential - Subject to Further Confidentiality Review

1    the Morgan Stanley team.

2              Because I don't speak

3    Chinese, my -- I wasn't dealing with the

4    broader group on all the information

5    gathering.  So people who were working on

6    the team were dealing with other people

7    in the CNBM.

8         Q.    And what is your current job

9    title?

10        A.    I'm the head of corporate

11   finance execution for Asia.

12        Q.    And what was your job title

13   in 2004?

14        A.    I was a managing director in

15   the group known as MARD, which is short

16   for mergers, acquisitions and

17   restructuring department.

18        Q.    And at that time, what were

19   your duties and responsibilities in 2004?

20        A.    My duties were to advise

21   companies and to execute the mandates

22   that Morgan Stanley had been retained on.

23   I was working both on M&A deals and

24   capital raising.

1    Q.    During the time you've been

2  at Morgan Stanley, have you ever worked

3  with Song Jingjing?

4    A.    Yes.

5    Q.    In what capacity?

6    A.    She has been involved in

7  pitching for various pieces of business,

8  which I was also involved in as well.

9    Q.    What sort of business?

10   A.    IPOs.

11   Q.    IPOs.

12       Now, you're familiar with

13  the Hong Kong Exchange pretty intimately;

14  is that fair to say?

15   A.    That's fair to say.

16   Q.    In fact, you were on the

17  listing committee; is that right?

18   A.    That's correct.

19   Q.    What does that mean?

20   A.    The listing committee is a

21  body of professionals, not employees of

22  the Exchange, people who are appointed by

23  the Exchange, to supervise the listing

24  process, relying on the work of the

Confidential - Subject to Further Confidentiality Review

1    employees for the Exchange that work in

2    the listing division.

3              And the listing committee

4    consists of some bankers, some lawyers,

5    some accountants, some investors, some

6    corporate governance specialists,

7    primarily.

8         Q.    Do you actually run the

9    Exchange or are you all advisors to the

10   Exchange?

11        A.    Effectively, advisors to the

12   Exchange, with respect to discharging

13   that particular regulatory function.  So

14   the listing committee isn't involved in

15   the commercial operations of the Exchange

16   at all.

17        Q.    I see.  Do you advise on

18   specific transactions?

19        A.    Any company that's being

20   listed in Hong Kong would have to pass a

21   hearing of the listing committee.  And

22   the members of the listing committee

23   would receive a final draft of the

24   prospectus, together with the report

Confidential - Subject to Further Confidentiality Review

1    prepared by the listing division of the

2    Exchange.

3         Q.    And are there rules and

4    regulations that govern the Hong Kong

5    Exchange?

6         A.    Yes, there's a set of

7    Listing Rules.

8         Q.    And companies that want to

9    be listed not only have to get approved

10   by the Hong Kong Exchange listing

11   committee, but then they undergo an

12   initial public offering; is that right?

13        A.    The initial public offering

14   is the actual process of selling the

15   shares and getting listed, yes.

16        Q.    The first step is you have

17   to clear the listing committee?

18        A.    That's right.

19        Q.    They, then, give you the

20   green light, as we say here in the

21   States, so that you can then have an

22   initial public offering, and that would

23   be the selling of your shares?

24        A.    That's right.

Confidential - Subject to Further Confidentiality Review

1  Q.  And the initial public

2  offering, much like the listing, is all

3  governed by rules and regulations

4  promulgated by the Hong Kong Exchange?

5  A.  That's correct.

6  Q.  And then once those shares

7  are listed, they are, then, part of the

8  Hong Kong Exchange board for securities

9  that can be traded; is that right?

10  A.  People would say they are

11  listed on the main board of the Hong Kong

12  Stock Exchange, yes, and people can buy

13  and sell them.

14  Q.  And this is a process that

15  CNBM had engaged Morgan Stanley in, in

16  2004, correct?

17  A.  That's right.

18  Q.  And that meant that CNBM

19  would be governed by the rules and

20  regulations that applied to the Hong Kong

21  Exchange, correct?

22  A.  Yes.

23  Q.  And there are specific

24  definitions that are promulgated by the

1    Hong Kong Exchange; is that your

2    understanding?

3         A.    Yes.

4              MR. STECKLER:  I'm going to

5         go ahead and hand you what we're

6         going to mark as Exhibit Number 2

7         to your deposition.

8                   -  -  -

9              (Whereupon, Exhibit Keyes-2,

10        Hong Kong Stock Exchange Rules,

11        Chapter 1, was marked for

12        identification.)

13                  -  -  -

14   BY MR. STECKLER:

15        Q.    Are you familiar with this

16   Chapter 1 of the Hong Kong Exchange

17   Listing Rules?

18        A.    Yes.

19        Q.    And these are rules that

20   would govern -- and I'm just talking

21   generally, this is just Chapter 1 that

22   I've handed you.

23              But these rules govern

24   companies such as CNBM that are listed on

Confidential - Subject to Further Confidentiality Review

1    the Hong Kong Exchange, correct?

2         A.    That is correct.

3         Q.    What about subsidiaries of

4    listed companies, are they also required

5    to comply with the Hong Kong Exchange

6    Listing Rules?

7         A.    To the extent that

8    Hong Kong's Exchange Listing Rules apply

9    to the group.

10        Q.    To them, okay?

11        A.    Yes.

12        Q.    And, for example, if you

13   filed a consolidated account for a

14   company, like CNBM and BNBM and Taishan

15   do consolidated accounting in their

16   reporting on -- for the Hong Kong

17   Exchange, would they also be required to

18   comply with these rules?

19             MR. FORCE:  Object to the

20        form.

21             THE WITNESS:  So CNBM is the

22        company that's listed on the

23        Hong Kong Stock Exchange, so it's

24        required to produce its financial

1    statements and to publish them

2    through the Hong Kong Stock

3    Exchange website, so the CNBM

4    account.

5  BY MR. STECKLER:

6       Q.    Right.  But CNBM, when they

7  publish them, does a consolidated

8  accounting, correct?

9       A.    That's correct.

10      Q.    And what does that mean?

11      A.    It means -- I think it's the

12  same as any company on the New York Stock

13  Exchange as well.

14            So they would include the

15  financial results and the assets and

16  liabilities of their subsidiaries as well

17  as of the parent company.

18      Q.    And because they're

19  considered a controlling shareholder of

20  that company, is that why they have to

21  file consolidated accounting reports?

22      A.    The Listing Rules require

23  consolidated financial statements.

24      Q.    Is that for any subsidiary?

Confidential - Subject to Further Confidentiality Review

1    A.    Well, consolidated financial

2    statements, by definition, include the

3    results of all the subsidiaries.

4    Q.    Let's look at some of these

5    definitions.

6         If we turn to -- actually,

7    let's look at the very first page, it

8    says, Interpretation, for the avoidance

9    of doubt, the rules governing the listing

10   of securities on the Stock Exchange of

11   Hong Kong Limited apply only to matters

12   related to those securities at issuers

13   with securities listed on the stock

14   market operated by the Exchange other

15   than the Growth Enterprise Market or GEM.

16        Do you see that?

17   A.    Uh-huh.

18   Q.    Does that mean, knowing what

19   you know about CNBM, that the rules

20   governing the listing of securities would

21   apply to CNBM?

22   A.    Yes, it does.

23   Q.    And it says, below that,

24   Throughout these rules, the following

1    terms, except where the context otherwise

2    requires, has the following meanings.

3              Do you see that, under 1.01?

4         A.    Yes.

5         Q.    Now, it talks, on Page 1,

6    Chapter 1.3 about, Close associate.

7              Do you see that?

8         A.    Uh-huh, yes.

9         Q.    And if you go to the next

10   page, because the first page talks about

11   individual, it says, In relation to a

12   company.

13             I'll have you take a look at

14   that and explain what that means to us.

15             MR. FORCE:  You're asking

16        him to explain what Subsection B

17        means?

18             MR. STECKLER:  What a close

19        associate means with respect to a

20        company on the Hong Kong Exchange.

21             MR. FORCE:  Object to the

22        form.

23             THE WITNESS:  It means its

24        subsidiary or holding company or a

Confidential - Subject to Further Confidentiality Review

1     fellow subsidiary of its holding

2     company.

3  BY MR. STECKLER:

4     Q.    And it says that any company

5  in the equity capital of which the

6  company, its subsidiary or holding

7  company, a fellow subsidiary of its

8  holding company, acting in their capacity

9  as trustees.

10     And then it says, Taken

11  together are directly or indirectly

12  interested to exercise or control the

13  exercise of 30 percent or more of the

14  voting power.

15     Can you explain that

16  paragraph, what that means?

17     A.    Well, B.1 is talking about a

18  subsidiary.  B.4 is extending it to

19  include companies where it might not be a

20  subsidiary but where control of at least

21  30 percent is held.

22     Q.    So 30 percent control of

23  voting power, under the Hong Kong

24  Exchange rules, would mean that any

1  company would be considered a,

2  quote/unquote, close associate; is that

3  fair?

4          A.    That's correct.

5          Q.    Now, if we look at Chapter

6  1.5, Controlling shareholder.

7              And it says, under that,

8  that, Any person who are, together,

9  entitled to exercise or control the

10  exercise of 30 percent or more of the

11  voting power at the general meetings of

12  the issuer, or who is or are in a

13  position to control the composition of

14  the majority of the board of directors,

15  or in the case of a PRC issuer, the

16  meaning ascribed to the phrase by Rule

17  19A.14?

18              Do you see that?

19          A.    Yes, I do.

20          Q.    If we want to find out who a

21  controlling shareholder is for CNBM,

22  under this paragraph, we would have to

23  look at 19A; is that right?

24          A.    Yes.

1          Q.     And that's because CNBM is a

2    PRC issuer; is that right?

3          A.     That's correct.

4          Q.     And what is a PRC issuer?

5          A.     It's an issuer that's

6    incorporated in the People's Republic of

7    China.

8          Q.     So CNBM, because its

9    incorporated in the People's Republic of

10   China, its definition of controlling

11   shareholder can be found in Chapter 19A?

12         A.     That's correct.

13         Q.     So if we want to find out

14   that information, we could look here at

15   Exhibit Number 3 to your deposition.

16                     -   -   -

17              (Whereupon, Exhibit Keyes-3,

18         Chapter A, Equity Securities

19         Issuers Incorporated in the

20         People's Republic of China, was

21         marked for identification.)

22                     -   -   -

23   BY MR. STECKLER:

24         Q.     Are you familiar with

Confidential - Subject to Further Confidentiality Review

1  Exhibit Number 3, which is Chapter A,

2  Equity Securities Issuers Incorporated in

3  the People's Republic of China?

4       A.    Yes.

5       Q.    And it, too, has definitions

6  and interpretations, correct?

7       A.    That's correct.

8       Q.    And if we go look at close

9  associate, this would be the definition

10  that would apply to CNBM, correct?

11       A.    Yes, that's correct.

12       Q.    And so if he wanted to find

13  out how we would figure out what a close

14  associate of CNBM is, we could look here

15  to 19A.04, and we would go down here, we

16  could look at B, in relation to a

17  company, and it talks about subsidiaries

18  or holding companies, correct?

19       A.    Correct.

20       Q.    And if we look at Subsection

21  B.4, it would be a -- any other company

22  in which there is an exercise or control

23  of 30 percent or more of the voting power

24  at general meetings?

1          A.     Correct.

2          Q.     So based upon what you know,

3    would you agree that CNBM is a close

4    associate of BNBM --

5              MR. KATTAN:  Objection to

6          form.

7    BY MR. STECKLER:

8          Q.     -- under this definition?

9          A.     Yes.

10          Q.     And would you agree that

11   BNBM is a close associate of Taishan

12   under this definition?

13              MR. KATTAN:  Objection to

14          form.

15              THE WITNESS:  Yes, under

16          this definition, it's an

17          associate.

18   BY MR. STECKLER:

19          Q.     Is CNBMG a close associate

20   of CNBM under this definition?

21          A.     Yes, it is.

22          Q.     Now, this goes on here to

23   Section 5, Any other company with which

24   or any individual with whom the company

Confidential - Subject to Further Confidentiality Review

1    and its subsidiary holding company or

2    fellow subsidiary of its holding

3    company -- again, it says -- have 30

4    percent or more interest in the capital

5    or asset contributions to a joint

6    venture.

7              Do you see that?

8         A.    Yes.

9         Q.    That would be on Page --

10        A.    Yes.  I'm just looking at

11   it.

12        Q.    So even in joint venture

13   situations where there's a 30 percent or

14   more interest in the capital or assets,

15   that entity would be considered a,

16   quote/unquote, close associate under the

17   Hong Kong Exchange rules?

18        A.    That is correct.

19        Q.    And if we go to Page 6 in

20   19A, it talks about H shares.

21        A.    Yes.

22        Q.    And it says, H shares are

23   overseas listed foreign shares which are

24   listed on the Exchange.

Confidential - Subject to Further Confidentiality Review

1       A.    Yes.

2       Q.    Can you explain that to us a

3   little bit more?

4       A.    Yes.  Under Chinese law,

5   there are different categories of share

6   capital.  And for shares in a Chinese

7   company to be listed overseas, they need

8   to be of a particular form.

9             And where they are listed on

10  the Hong Kong Stock Exchange, those

11  shares are referred to as H shares.

12      Q.    So H shares are shares of

13  PRC, which is People's Republic of China,

14  correct?

15      A.    Yes.

16      Q.    So H shares of a PRC company

17  are only available to foreign companies

18  or investors?

19      A.    Yes --

20            MR. FORCE:  Object to the

21        form.

22            THE WITNESS:  -- so the --

23  BY MR. STECKLER:

24      Q.    I'm sorry, did you say yes?

1          A.     Well, the H shares are the

2     shares which are listed on the Hong Kong

3     Stock Exchange.

4               And so people in Hong Kong

5     and other people outside Chinese can

6     invest in those.

7          Q.     And let's look at Page 7 of

8     19A.

9               MR. STECKLER:  Can I ask you

10          the basis of your objection on the

11          form of my prior question?

12               MR. FORCE:  It was

13          incomplete.  I think the witness

14          answered it.  You asked about H

15          shares, but not in the context of

16          the Hong Kong Stock Exchange.

17               MR. STECKLER:  Okay.  So are

18          you okay with my subsequent

19          question, for the record, or

20          should I re-ask it?

21               MR. FORCE:  I'm not sure

22          what your subsequent question was,

23          but I think the witness answered

24          the question in a way that made

1           clear that when he's talking about

2           H shares, those are shares that

3           are listed on the Hong Kong Stock

4           Exchange.

5   BY MR. STECKLER:

6           Q.     Is that correct, sir, H

7   shares are shares that are listed on the

8   Hong Kong Stock Exchange available for

9   purchase for foreigners in Hong Kong and

10  elsewhere throughout the world?

11          A.     Yes.

12          Q.     Thank you.

13                 On Page 19A.7 is a

14  definition of a promoter.

15                 Can you tell us what a

16  promoter is in layman's terms?

17          A.     Promoters are people

18  involved in the foundation of a joint

19  stock company in China.

20          Q.     Would Morgan Stanley be

21  considered the promoter?

22          A.     No.

23          Q.     Who would be the --

24  considered the promoter of CNBM?

Confidential - Subject to Further Confidentiality Review

1      A.    I don't recall.  But I think

2   it would be listed in the prospectus.

3      Q.    And what about a sponsor?

4   What is a sponsor?

5      A.    A sponsor is an entity

6   licensed by the Securities and Futures

7   Commission in Hong Kong to undertake

8   sponsor work in relation to IPOs.  And

9   sponsor work involves preparing a company

10  for the initial public offering,

11  conducting due diligence on the company

12  and communicating with the Stock Exchange

13  about the listing application.

14     Q.    Would Morgan Stanley Asia

15  have been considered the sponsor?

16     A.    Yes.

17     Q.    And that would be the

18  sponsor for CNBM's initial public

19  offering, correct?

20     A.    That is correct, yes.

21     Q.    Now, if we look under

22  Chapter 19A, Page 11, of the Hong Kong

23  Exchange rules, I'd like to look at

24  19A.14.

1       And it says, under Rule

2   8.10, The Exchange requires a new

3   applicant to make disclosure where it has

4   a controlling shareholder or a director

5   with an interest in a business apart from

6   the new applicant's business which

7   competes or is likely to compete either

8   directly or indirectly with the new

9   applicant's business.

10       Do you see that?

11       A.    Yes, I do.

12       Q.    Okay.  Where would this

13   disclosure be located?

14       A.    Usually, in a section that

15   deals with the relationship with the

16   controlling shareholder in the

17   prospectus.

18       Q.    And it then says, In this

19   connection, in the case of a new

20   applicant in which the PRC issuer,

21   quote/unquote, controlling shareholder

22   means -- do you see that?

23       A.    Uh-huh.

24       Q.    -- controlling shareholder

Confidential - Subject to Further Confidentiality Review

1   means -- and, by the way, sir, you're

2   going to have to answer yes or no.

3        A.    I'm sorry.  Yes.

4        Q.    And I apologize, but it's

5   very hard for the court reporter to know

6   whether you're in agreement or not with

7   an uh-huh or uh-uh.

8              So it says here, Controlling

9   shareholder means any shareholder or

10  other person or group of persons together

11  entitled to exercise or control the

12  exercise of 30 percent or such other

13  amount as may, from time to time, be

14  specified in applicable PRC law as being

15  the level for triggering a mandatory

16  general offer or for otherwise

17  establishing legal or management control

18  over a business enterprise or more of the

19  voting power at general meetings of the

20  new applicant or who is in a position to

21  control the composition of a majority of

22  the board of directors of the new

23  applicant.

24              Do you see that?

1    A.    I do.

2    Q.    This definition of

3  controlling shareholder, does this only

4  apply for a new applicant for a new

5  initial public offering or does this

6  definition apply during the course of a

7  PRC issuer's listing on the Hong Kong

8  Exchange?

9    A.    It would continue to apply

10  after the listing.

11    Q.    So a controlling

12  shareholder, in summary, means a

13  shareholder or entity that controls or

14  exercises 30 percent or more of the

15  voting power of another company; is that

16  right?

17    A.    Yes.

18    Q.    Okay.  And so this

19  definition of controlling shareholder for

20  issuers incorporated in the People's

21  Republic of China, would that apply to

22  CNBM?

23    A.    Yes.

24    Q.    And under the definition of

Confidential - Subject to Further Confidentiality Review

1    the Hong Kong Exchange Listing Rules,

2    CNBM is a controlling shareholder of

3    BNBM, correct?

4          A.    The --

5                MR. FORCE:  While he's

6          thinking, I'm just going to object

7          to the form, with respect to at

8          what time you're talking about.

9                THE WITNESS:  The normal

10         usage of controlling shareholder

11         is in relation to the company

12         that's listed on the Hong Kong

13         Stock Exchange, so CNBM and

14         anybody who would be a controlling

15         shareholder of CNBM.

16   BY MR. STECKLER:

17         Q.    Okay.  So is CNBMG a

18   controlling shareholder of CNBM?

19         A.    Yes.

20         Q.    CNBM is listed on the Hong

21   Kong Exchange, correct?

22         A.    That's correct.

23         Q.    And CNBM has BNBM as a

24   subsidiary, correct?

Confidential - Subject to Further Confidentiality Review

1       A.    That's correct.

2       Q.    Is CNBM the controlling

3  shareholder of BNBM?

4            MR. FORCE:  Object to the

5       form.

6            MR. KATTAN:  Object to the

7       form.  Asked and answered.

8            THE WITNESS:  We wouldn't

9       normally talk about a subsidiary

10      of the listed company.  I mean,

11      the phrase "controlling

12      shareholder" as used in the

13      Listing Rules is usually in

14      reference to the company that is

15      listed.

16  BY MR. STECKLER:

17      Q.    Correct.  And BNBM is also

18  listed, correct?

19      A.    But not in Hong Kong.

20      Q.    I understand.  And where is

21  it listed?

22      A.    It's listed in Shanghai or

23  Shenzhen, I forget which; one of the

24  domestic Chinese exchanges.

1    Q.    Are you aware of whether,

2    under the Chinese Domestic Exchange

3    Rules, whether CNBM is considered a

4    controlling shareholder of BNBM?

5    A.    I'm not familiar with the

6    Chinese Domestic Rules.

7    Q.    If we were to look at the

8    definitions on Exhibit-1.

9         MR. FORCE:  Which exhibit?

10        MR. STECKLER:  I'm sorry,

11    it's Exhibit-2.

12 BY MR. STECKLER:

13    Q.    If we look under the

14 definition of controlling shareholder,

15 under Chapter 1, Page 5, it says, Any

16 person who are together entitled to

17 exercise or control the exercise of 30

18 percent or more of the voting power at

19 the general meetings of the issuer.

20    A.    Yes, I see that.

21    Q.    And for that reason, that's

22 why you're saying CNBMG is the

23 controlling shareholder of CNBM, correct?

24    A.    Correct.

1    Q.   All right.  Or who is or are

2    in a position to control the composition

3    of a majority of the board of directors

4    of the issuer or, in the case of the PRC

5    issuer, the meaning ascribed that we

6    talked about earlier, correct?

7    A.   Correct.

8    Q.   Now, in the annual reports,

9    if CNBM is claiming that it is the

10   controlling shareholder of BNBM, how

11   would we look to find out that

12   definition?

13        MR. FORCE:  Object to the

14        form.

15        MR. GRESSLER:  Join.

16        THE WITNESS:  I would expect

17        that you have to look to the

18        Listing Rules in China for BNBM.

19   BY MR. STECKLER:

20        Q.   To see what their definition

21   is?

22        A.   Yes.

23        Q.   But -- so the -- I guess,

24   based upon the definitions and terms that

1    we have with respect to issuers listed on

2    the Exchange, BNBM is considered a close

3    associate of CNBM, correct?

4         A.    Yes.

5         Q.    And Taishan is considered a

6    close associate of BNBM and CNBM,

7    correct?

8         A.    Yes.

9         Q.    And the definition of close

10   associate would be the applicable term to

11   use with respect to BNBM and Taishan and

12   CNBM; is that fair?

13              I'm sorry, let me rephrase

14   the question.

15         A.    Yes, could you?

16         Q.    The proper definition of the

17   relationship between CNBM and BNBM is

18   close associate?

19         A.    That is a phrase that you

20   could use.

21         Q.    And the proper term to use

22   with respect to CNBM and Taishan would be

23   close associate, correct?

24         A.    Yes.

Confidential - Subject to Further Confidentiality Review

1    Q.    And the proper definition to

2  use between BNBM and Taishan would be

3  close associate, correct?

4    A.    Yes.  All of those are --

5  meet that definition under the Hong Kong

6  list of rules, that's right.

7    Q.    And that definition, like

8  controlling shareholder, involves a

9  company that directly or indirectly

10  exercises control of 30 percent or more

11  of the voting power, correct?

12    A.    Correct.

13    Q.    So controlling shareholder

14  and close associate have a very similar

15  meaning under these rules; is that fair?

16          MR. KATTAN:  Objection.

17          MR. FORCE:  Object to the

18      form.

19          MR. CAMPBELL:  Join as well.

20          MR. GRESSLER:  Join.

21          THE WITNESS:  They have some

22      elements in common, yes.

23  BY MR. STECKLER:

24    Q.    And what is different about

1    a close associate and a controlling

2    shareholder, under these rules, when it

3    comes to the exercise of 30 percent or

4    more of the voting power at general

5    meetings?

6             MR. FORCE:  Object to the

7        form.

8             MR. KATTAN:  Object to the

9        form.

10             MR. CAMPBELL:  Join.

11             THE WITNESS:  Well, I think

12        we can look at the definitions on

13        the page and see what the

14        differences are.

15    BY MR. STECKLER:

16        Q.    And with respect to a close

17    associate and controlling shareholder

18    being defined as a company that taken

19    together directly or indirectly has to

20    exercise 30 percent or more of the voting

21    power at general meetings of another

22    company, how are they any different in

23    that regard?

24        A.    Well, close associate is

1    broader than controlling shareholder.

2         Q.    How so?

3         A.    Well, for example, you can

4    be -- two companies that are subsidiaries

5    of the same holding company would be

6    close associates with each other but

7    neither of them -- neither of them would

8    be the controlling shareholder of the

9    other.

10         Q.    I see.  In relation -- so

11   subsidiaries are also considered close

12   associates?

13         A.    Yes.

14         Q.    So you're familiar with

15   CNBM, correct?

16         A.    Yes.

17         Q.    Would China Fiberglass and

18   BNBM be considered close associates?

19         A.    Yes.

20              MR. KATTAN:  Objection to

21         form.

22              MR. GRESSLER:  Join.

23   BY MR. STECKLER:

24         Q.    Would Jushi Group and BNBM

Confidential - Subject to Further Confidentiality Review

1    be considered close associates?

2              MR. KATTAN:  Objection to

3         form.

4              MR. GRESSLER:  Join.

5              THE WITNESS:  Yes, they

6         would be.

7    BY MR. STECKLER:

8         Q.    Would Taishan and Jushi

9    Group be considered close associates?

10             MR. FORCE:  Object to the

11        form.

12             MR. CAMPBELL:  Object to the

13        form.

14             MR. GRESSLER:  Join.

15             THE WITNESS:  Yes, I believe

16        they would.

17   BY MR. STECKLER:

18        Q.    Would CNBMI and BNBM be

19   considered close associates?

20             MR. GRESSLER:  Object to the

21        form.

22             MR. FORCE:  Object to the

23        form.

24             THE WITNESS:  What is CNBMI?

1    BY MR. STECKLER:

2         Q.    Fair enough.  Would China

3    Triumph -- are you familiar with that

4    company?

5         A.    The name rings a bell, but I

6    think it was -- I've heard the name

7    before.

8         Q.    Do you know whether they

9    would be considered a close associate of

10   BNBM?

11        A.    I'd need to refresh my

12   memory as to the group structure to

13   answer that question.

14        Q.    And we'll go over that a

15   little bit.

16             Are you familiar with China

17   Triumph International Engineering

18   Company?

19        A.    I don't recall that.

20             MR. STECKLER:  Let's take a

21        look at what we're going to mark

22        as Exhibit Number 4 to your

23        deposition.

24                  -   -   -

```
 1              (Whereupon, Exhibit Keyes-4,

 2         Hong Kong Stock Exchange Rules,

 3         Chapter 2, was marked for

 4         identification.)

 5                   -  -  -

 6              MR. KATTAN:  Just so we

 7         know, did you guys make enough

 8         copies of any exhibits for all the

 9         parties here?  Because so far, for

10         the ones you've marked, you

11         haven't.

12              MR. STECKLER:  We've made

13         adequate copies.  We weren't

14         anticipating multiple lawyers for

15         the same side.  I think we have

16         enough.  But if you can't, you're

17         welcome to have one of our copies

18         to look at.

19              MR. KATTAN:  Can I?

20              MR. STECKLER:  Or you and

21         your neighbor can share on or

22         maybe the kind gentleman with the

23         state would assist you, too.

24              MR. ALLELY:  I would be
```

Confidential - Subject to Further Confidentiality Review

1          happy to.

2                    MR. STECKLER:  Thank you.

3                    MR. KATTAN:  Thanks.

4                    MR. LONGER:  And maybe over

5          the break we can have photocopies

6          made for you.

7                    MR. KATTAN:  Thanks.

8    BY MR. STECKLER:

9          Q.    Are you familiar with

10   Chapter 2 of the Listing Rules of the

11   Hong Kong Exchange?

12         A.    Yes, I am.

13         Q.    And it says here that the

14   function of the Exchange is to provide a

15   fair, orderly and efficient market for

16   the trading of securities.

17                    Is that your understanding?

18         A.    Yes, it is.

19         Q.    And it indicates here that

20   the Exchange Listing Rules, under Section

21   23 of the Securities and Futures

22   Ordinance prescribe the requirements for

23   the listing of the securities on the

24   Exchange; correct?

1          A.     Yes.

2          Q.     What is that reference?

3          A.     The Securities and Futures

4    Ordinance is part of the body of law of

5    Hong Kong.

6          Q.     And are these definitions

7    part of that?

8                 MR. FORCE:  Object to the

9          form.

10   BY MR. STECKLER:

11         Q.     Or are these simply rules

12   and regulations prescribed pursuant to

13   that law?

14                MR. FORCE:  Same objection.

15   BY MR. STECKLER:

16         Q.     Or do you know?

17                MR. FORCE:  Object to the

18         form.

19                THE WITNESS:  I'm not a

20         lawyer.

21   BY MR. STECKLER:

22         Q.     Okay.  Fair enough.

23                And if you don't know, just

24   let me know or you don't understand my

1    question.

2              Is that fair?

3        A.    Sure.  Of course.

4        Q.    Okay.  If we look under the

5    general principles here, it says that,

6    The Listing Rules reflect currently

7    acceptable standards in the marketplace

8    and are designed to ensure that investors

9    have and can maintain confidence in the

10   market.

11             And as such, under Number 3,

12   it says that investors in the public are

13   kept fully informed by listed issuers.

14             What does that mean, "fully

15   informed"?  How do you do that?

16             MR. FORCE:  Object to the

17        form.

18             MR. STECKLER:  What's your

19        problem with that question,

20        counselor?

21             MR. FORCE:  I think you're

22        asking him to interpret these

23        rules, and I'm objecting to that.

24   BY MR. STECKLER:

1    Q.    Well, sir, you were on the

2    listing committee, right?

3    A.    Yes.

4    Q.    And you're very familiar, I

5    take it, with these rules as both being

6    involved in IPOs and serving on that

7    committee, correct?

8    A.    Yes.

9    Q.    And are you aware of the

10   expectations for issuers as required by

11   these rules?

12   A.    Yes.

13   Q.    And so when it says,

14   Investors in the public are kept fully

15   informed by listed issuers, what is meant

16   by that for a publicly listed company on

17   the Hong Kong Exchange?

18   A.    It means providing

19   sufficient information through public

20   disclosure to investors to enable them to

21   make an informed assessment of the value

22   of the securities.

23            And that would include

24   financial statements, for example, and

1    also announcements of material

2    developments in the business.

3           Q.    Would that also include

4    annual reports?

5           A.    Yes.

6           Q.    Are annual reports required

7    pursuant to the Listing Rules?

8           A.    Yes, they are.

9           Q.    And are they required to

10   have adequate as well as accurate

11   information?

12          A.    I don't recall whether those

13   exact words are used in the Listing

14   Rules, but in practice, yes.

15          Q.    I mean, that is the

16   expectation, is that annual reports be

17   accurate, correct?

18          A.    Yes.

19          Q.    And the idea is that they

20   have to be accurate to fully inform

21   investors in the public who may be

22   investing in these listed companies,

23   right?

24          A.    Correct.

Confidential - Subject to Further Confidentiality Review

1          Q.     If we were to go to Page 13

2    of Chapter 2, it talks about

3    announcements and corporate

4    communications.

5               Do you see that, sir?

6    It's --

7               MR. FORCE:  What rule?

8               MR. STECKLER:  -- 2.13.

9               THE WITNESS:  Yes, I see it.

10   BY MR. STECKLER:

11         Q.     And are you familiar with

12   these general principles?

13         A.     I am, yes.

14         Q.     And would these general

15   principles in 2.13 of the Listing Rules

16   apply to CNBM?

17         A.     Yes, they would.

18         Q.     And they would be required

19   to provide, in annual reports and

20   announcements, information clearly

21   presented in plain language, correct?

22         A.     Correct.

23         Q.     And in their annual reports,

24   the information in the document must be

1    accurate and complete in all material

2    respects, correct?

3          A.    Correct.

4          Q.    And the information

5    contained in CNBM's annual reports must

6    not be misleading or deceptive; is that

7    right?

8          A.    Correct.

9          Q.    And in order to comply with

10   this requirement of being listed on the

11   Hong Kong Exchange, CNBM must not, among

12   other things, Omit material facts of an

13   unfavorable nature or fail to record them

14   with appropriate significance.

15          Do you see that, sir?

16          A.    I do.

17          Q.    And would that apply in

18   their annual reports?

19          A.    It would.

20          Q.    And in addition, they are

21   also required to not omit present risk

22   factors in a misleading way.

23          I think I said that wrong.

24          They are required -- let me

Confidential - Subject to Further Confidentiality Review

1    rephrase the question.  Let me strike

2    that last question.

3              In addition, one of the

4    things that CNBM would be required to do

5    to comply with this, is to present -- to

6    not present risk factors in a misleading

7    way?

8         A.    That is correct.

9         Q.    And would you agree that a

10   judgement against CNBM or one of its

11   close associates be something important

12   that should be disclosed --

13             MR. FORCE:  Object to the

14        form.  I think you're going

15        outside --

16   BY MR. STECKLER:

17        Q.    -- in its annual reports?

18             MR. FORCE:  I think you're

19        going outside of establishing a

20        foundation to ask questions about

21        the transactions that Mr. Keyes is

22        here to speak about, and you're

23        asking about opinions now that go

24        beyond the transactions on which

Confidential - Subject to Further Confidentiality Review

1      he worked.

2              MR. STECKLER:  You may

3          answer, sir.

4              THE WITNESS:  Not all

5          judgements would necessarily be

6          regarded as material.

7   BY MR. STECKLER:

8          Q.   What are the types of

9   judgements that would be material that

10  would be important to be disclosed in an

11  annual report, sir?

12             MR. FORCE:  Object to the

13         form.

14             MR. CAMPBELL:  Join.

15             THE WITNESS:  Ones that

16         involve a material amount of money

17         or material probability of that

18         amount of money ultimately being

19         paid by the company.

20  BY MR. STECKLER:

21         Q.   Would a judgement involving

22  25 percent of an issuer's profits over a

23  nine-month, ten-month period of time be

24  something that should be disclosed?

```
1                    MR. FORCE:  Objection.

2                    MR. CAMPBELL:  Objection to

3          form.

4    BY MR. STECKLER:

5          Q.    In your opinion?

6                    MR. FORCE:  Objection.  The

7          question is outside the scope of

8          the deposition subpoena.

9                    MR. KATTAN:  Objection to

10         form.

11                   MR. GRESSLER:  Join.

12                   THE WITNESS:  If we're

13         talking about 25 percent of the

14         profits in a particular geographic

15         area and the profits in that

16         geographic area are not material,

17         then not necessarily.

18   BY MR. STECKLER:

19         Q.    What if we're talking about

20   25 percent of the profits, without limit

21   to a geographic area?

22         A.    Of the entire group?

23         Q.    Yes, sir.

24                   MR. FORCE:  Object to the
```

Confidential - Subject to Further Confidentiality Review

1         form.  The question is outside the

2         scope of the deposition topics

3         that you marked as Exhibit-1.

4             MR. CAMPBELL:  Join.

5             THE WITNESS:  Potentially

6         material.

7  BY MR. STECKLER:

8       Q.    And, actually, if we look at

9  Chapter 2, Page 7, 2.16, for the purpose

10  of determining whether a shareholder has

11  a material interest, relevant factors

12  include --

13      A.    I'm sorry, could you repeat

14  the page number?

15      Q.    I'm sorry.  It's Page 7 of

16  Chapter 2.  We're looking at 2.16.

17      A.    Page 7.  I don't see 2.16 on

18  Page 7.

19      Q.    I'm sorry.

20             MR. FORCE:  Page 14, I

21         believe.

22             MR. STECKLER:  14.  It's

23         Page 14.

24             THE WITNESS:  Page 14.  I

Confidential - Subject to Further Confidentiality Review

1       thought you said Page 7.

2               MR. STECKLER:  I'm sorry.

3           You know what, it's --

4               THE WITNESS:  That means

5           that this page was renewed July of

6           2014.

7   BY MR. STECKLER:

8           Q.   I apologize.  Yes, that was

9   my fault.  Thank you.

10              Yeah.  It says, on Chapter

11  2.16 -- Chapter 2, Section 2.16, For

12  purposes of determining whether a

13  shareholder has a material interest,

14  relevant factors include whether the

15  shareholder is a party to the transaction

16  or arrangement or a close associate of

17  such a party and whether the transaction

18  or arrangement confers upon the

19  shareholder or his close associate a

20  benefit not available to other

21  shareholders of the issuer.

22              Do you see that?

23          A.   I see that.

24          Q.   Would that be the standard

1    that we would need to look at to

2    determine whether that is something that

3    would be of material interest to

4    disclose --

5                MR. FORCE:  Objection.

6    BY MR. STECKLER:

7        Q.    -- in an annual report or an

8    announcement?

9                MR. FORCE:  Objection.  The

10               question is outside the deposition

11               subpoena.  If you want to ask him

12               in his personal capacity and he

13               can answer it, you're welcome to.

14               THE WITNESS:  I'm just

15               reading the context.

16               This is a section that deals

17               with related party transactions.

18               And so this is talking about

19               whether a particular shareholder

20               of a listed company has a material

21               interest in that related party

22               transaction.

23   BY MR. STECKLER:

24       Q.    Right.  So, for example,

Confidential - Subject to Further Confidentiality Review

1   BNBM and Taishan are close associates of

2   CNBM, correct?

3           A.    Yes.  But -- yes.

4           Q.    Would CNBM have a material

5   interest in the outcome of what occurs in

6   a close associate's - --

7           A.    I think --

8           Q.    -- financials?

9           A.    -- you're using --

10          MR. FORCE:  Before you

11      answer.  Object to the question.

12      You're way outside the scope of

13      the subpoena, and you're asking

14      the witness for opinions on

15      hypotheticals that aren't even

16      complete.

17          MR. CAMPBELL:  Join.

18          MR. GRESSLER:  Join.

19          THE WITNESS:  I think when

20      material interest is used in this

21      way in the Listing Rules, it's not

22      being used in the sort of context

23      that you were just using it there.

24  BY MR. STECKLER:

Confidential - Subject to Further Confidentiality Review

1    Q.    Fair enough.

2          So this would not really

3    apply to the scenario that I was

4    providing to you?

5    A.    Correct.

6    Q.    Okay.

7          MR. STECKLER:  Let's take a

8          quick break, if that's okay.

9          VIDEO TECHNICIAN:  The time

10         is 10:05.  We're off the record.

11               -  -  -

12         (Whereupon, a brief recess

13         was taken.)

14               -  -  -

15         VIDEO TECHNICIAN:  The time

16         is 10:16.  And we are back on the

17         record.

18   BY MR. STECKLER:

19   Q.    Sir, I'd like you to take a

20   look, and I think you have it in front of

21   you, Chapter 1 of the Hong Kong Exchange

22   Listing Rules.

23              There is a definition there

24   of subsidiary.  Is this the definition

Confidential - Subject to Further Confidentiality Review

1    that would apply to CNBM as a company

2    listed on the Hong Kong Exchange?

3        A.    Where are you pointing the

4    definition of subsidiary?

5        Q.    Subsidiary on Page 14.

6        A.    Oh, Page 14, sorry.

7        Q.    I'm sorry, sir.

8        A.    Yes, I see it.

9        Q.    Is this the definition that

10   would apply to CNBM as a company listed

11   on the Hong Kong Exchange?

12       A.    Yes, it would.

13       Q.    And under this definition, A

14   subsidiary includes any entity which is

15   accounted for and consolidated in the

16   audited consolidated accounts of another

17   entity as a subsidiary pursuant to

18   applicable Hong Kong financial reporting

19   standards or international reporting

20   standards and any entity which will, as a

21   result of acquisition of its equity

22   interest by another entity, be accounted

23   for and consolidated in the next audited

24   consolidated accounts for such other

1    entity as a subsidiary, pursuant to the

2    Hong Kong financial reporting standards

3    and international financial reporting

4    standards.

5            Correct?

6        A.    Correct.

7        Q.    Is it your understanding

8    that, utilizing the term "subsidiary,"

9    BNBM is a subsidiary of CNBM?

10       A.    Yes.

11       Q.    And Taishan is a subsidiary

12   of BNBM; is that right?

13       A.    Yes.

14       Q.    Is Taishan also considered a

15   subsidiary of CNBM?

16       A.    Yes, it is.

17       Q.    And if we look at the next

18   definition, substantial shareholder, does

19   the definition of substantial

20   shareholder, on Page 14 of Chapter 1,

21   apply to CNBM as a listed company on the

22   Hong Kong Exchange?

23       A.    Yes, it does.

24       Q.    Okay.  And it says here that

Confidential - Subject to Further Confidentiality Review

1    the definition of substantial shareholder

2    means, In relation to a company -- strike

3    that.

4              Substantial shareholder,

5    under Chapter 1, Page 14 of the Hong Kong

6    Exchange Listing Rules means that, In

7    relation to a company means a person,

8    including a holder of depository

9    receipts, who is entitled to exercise or

10   control the exercise of 10 percent or

11   more of the voting power at any general

12   meeting of the company.

13             Do you see that, sir?

14        A.    I do.

15        Q.    And is it your understanding

16   that CNBM is a substantial shareholder of

17   BNBM?

18        A.    Yes, it is.

19        Q.    And is CNBM a substantial

20   shareholder of Taishan, or do you know?

21        A.    Usually, substantial

22   shareholder refers to one company that

23   directly owns shares in another.  And

24   since Taishan is a subsidiary of BNBM, I

1    don't believe that CNBM is a substantial

2    shareholder.

3         Q.    So CNBM is a substantial

4    shareholder of BNBM.

5              Would BNBM, then, be

6    considered a substantial shareholder of

7    Taishan?

8              MR. KATTAN:  Objection to

9         the form.

10             THE WITNESS:  I believe so,

11        yes.

12             MR. STECKLER:  What's the

13        basis?

14             MR. KATTAN:  You haven't

15        established that this definition

16        applies, necessarily, to BNBM.

17   BY MR. STECKLER:

18        Q.    Do you know whether the

19   definition of substantial shareholder

20   would apply to BNBM, since they are

21   listed in the audited consolidated

22   accounts of CNBM in the annual reports?

23        A.    Well, that's a reference to

24   the definition of subsidiary, isn't it?

1     Q.    Correct.

2     A.    I think.

3     Q.    So my question is, would

4  BNBM be considered a substantial

5  shareholder of Taishan, in light of the

6  fact that they are listed on the

7  consolidated financial reports of CNBM,

8  which is part of the Hong Kong Exchange?

9              MR. KATTAN:  Object to form.

10             THE WITNESS:  I believe so.

11  BY MR. STECKLER:

12     Q.    Okay.  So just to be clear,

13  is it your opinion that the definition of

14  substantial shareholder would apply to

15  BNBM's exercise of control over Taishan?

16             MR. FORCE:  Object to the

17         form.

18             MR. KATTAN:  Object to the

19         form.

20             MR. FORCE:  Outside of the

21         scope of the deposition to ask

22         this witness about opinions

23         regarding these rules and their

24         application to the various

Confidential - Subject to Further Confidentiality Review

1           companies.

2                MR. KATTAN:  I join that

3           objection.  And I add objection to

4           form.

5                MR. FORCE:  If the witness

6           has an answer in his personal

7           capacity, obviously you can ask

8           him about that.

9                THE WITNESS:  Can you repeat

10          the question, please?

11   BY MR. STECKLER:

12          Q.    So just to be clear, is it

13   your opinion that the definition of

14   substantial shareholder would apply to

15   BNBM's exercise of control over Taishan?

16                MR. FORCE:  Same objection.

17                THE WITNESS:  I would agree

18          that BNBM is a substantial

19          shareholder of Taishan.

20   BY MR. STECKLER:

21          Q.    Thank you.

22                When did you personally

23   become involved in the IPO for CNBM?  Was

24   it actually in 2004?

Confidential - Subject to Further Confidentiality Review

1          A.    No, it was in 2005.

2          Q.    Who are the individuals with

3    Morgan Stanley that were dealing with

4    CNBM prior to 2005 when you became

5    involved?

6          A.    Nobody who is still at

7    Morgan Stanley.

8          Q.    They are not now at Invesco,

9    are they?

10         A.    No.

11               The names that come to mind

12   would be Yang Zhizhong.

13               MR. FORCE:  Why don't you --

14         for the record, why don't you

15         spell that name, please?

16               THE WITNESS:  Y-A-N-G.  And

17         then new word, Z-H-I-Z-H-O-N-G.

18         And the other one was Jason Au,

19         spelled A-U.

20   BY MR. STECKLER:

21         Q.    And any others that you can

22   think of?

23         A.    They are the ones that come

24   to mind who were involved at the early

Confidential - Subject to Further Confidentiality Review

1    stage.

2         Q.    And did you do the due

3    diligence in preparation for the IPO for

4    CNBM?

5         A.    Yes.  I was substantially

6    involved in it, from the point where I

7    became involved in the deal.

8         Q.    And at what point in time

9    did you personally become involved?  Do

10   you know specifics?

11        A.    I can't remember the exact

12   date.  But in the second half of 2005, I

13   believe.

14        Q.    Okay.

15             MR. STECKLER:  Fred, can we

16        get MS 005431?  I'll go ahead and

17        mark this as Exhibit Number 5.

18        It's a Morgan Stanley memoranda,

19        dated April 30th, 2004.

20             And to conserve trees, all

21        of my copies are two-sided.

22                  -   -   -

23             (Whereupon, Exhibit Keyes-5,

24        4/30/04 Morgan Stanley Memoranda,

1        was marked for identification.)

2                    -  -  -

3   BY MR. STECKLER:

4        Q.    Are you familiar with this

5   particular memoranda?

6        A.    No.

7        Q.    Okay.  I'd like you to take

8   a look under -- I guess it's 1 on the

9   very first page.

10           And if you go to the third

11  paragraph, it talks about legal concerns.

12           Do you see that, sir?

13       A.    Uh-huh.

14           MR. FORCE:  Make sure you

15       answer yes or no.

16           THE WITNESS:  I'm sorry.

17       Yes.

18  BY MR. STECKLER:

19       Q.    Okay.  Can you read what it

20  says here, where it says, The structure

21  may also lead?  Could you read that for

22  us?

23       A.    The structure may also lead

24  to Listco being regarded, under U.S. law,

1    as a passive foreign investment company

2    and/or an investment company.

3            Q.      Please continue.

4            A.      The former would cause U.S.

5    shareholders to be subject to a higher

6    tax rate for dividends and on sale,

7    making this deal less attractive to U.S.

8    investors, while the latter will severely

9    restrict Listco's ability to issue

10   securities to U.S. investors.

11           Q.      Can you explain that to me,

12   please?

13           A.      I'm not a U.S. lawyer.

14           Q.      I understand.

15           A.      But --

16           Q.      And I'm really asking from

17   the Morgan Stanley corporate rep

18   standpoint and investment banking

19   standpoint in Morgan Stanley's role with

20   respect to CNBM.

21           A.      Yes.  So it would usually be

22   important, in the case of an IPO, to

23   avoid a company being classified as a

24   PFIC, a passive foreign investment

1    company, or an investment company,

2    because of the restrictions that that

3    would place on either shareholders or on

4    the distribution of the shares.

5         Q.    Why would that be an issue

6    that would involve U.S. investors?

7         A.    Because these are U.S. legal

8    definitions.

9         Q.    I see.

10         Why would U.S. legal

11   definitions be important or even

12   applicable to CNBM in their initial

13   public offering?

14         A.    Virtually all larger initial

15   public offerings done on the Hong Kong

16   Stock Exchange would be distributed

17   globally, so all over the world, in

18   Europe and North America as well, and the

19   shares would be sold under Rule 1448 to

20   qualified institutional buyers in the

21   U.S.

22         Q.    So CNBM will be soliciting

23   qualified institutional buyers for its

24   shares?

Confidential - Subject to Further Confidentiality Review

1          A.    At the time of the IPO, yes.

2          Q.    And those -- and the

3    qualified institutional buyers that CNBM

4    will be soliciting will be in the United

5    States; is that right?

6                MR. FORCE:  Object to the

7          form.

8                THE WITNESS:  Yes.

9                So, I mean, just to

10         elaborate on that.  We would be

11         soliciting investors all over the

12         world.  And in the United States,

13         we would be restricted to

14         qualified institutional buyers

15         only.

16   BY MR. STECKLER:

17         Q.    So CNBM will be soliciting

18   only qualified institutional investors in

19   the United States to purchase their

20   shares?

21         A.    Correct.

22                MR. FORCE:  Object to the

23         form.

24                MR. STECKLER:  What's the

Confidential - Subject to Further Confidentiality Review

1              basis for that?

2                   MR. FORCE:  You keep saying,

3              "will be."  And we're talking

4              about what is or didn't happen

5              with respect to an IPO in 2006.

6                   MR. STECKLER:  This is a

7              2004 memorandum.  So this is an

8              opinion being given in 2004 on

9              what they plan to do in 2006.

10     BY MR. STECKLER:

11             Q.    Is that right, sir?

12             A.    Yes.

13             Q.    So my point being is, the

14     intention of CNBM is to solicit its

15     shares in the United States for

16     institutional investors, correct?

17             A.    Yes.

18             Q.    And so CNBM has to be

19     cognizant of U.S. laws if they intend to

20     solicit their shares in the United

21     States; is that right?

22             A.    Yes.

23             Q.    And that's what this memo,

24     in 2004, is saying, is what CNBM needs to

1    do if they intend to solicit their shares

2    in the United States, correct?

3         A.    Yes.  That's why they hired

4    Davis Polk as their U.S. issuers counsel.

5         Q.    And we're right here in the

6    offices of Davis Polk, correct?

7         A.    Yes.

8         Q.    And CNBM hired them as their

9    legal counsel for the IPO transaction,

10   right?

11        A.    As one of their legal

12   counsel, yes.

13        Q.    Right.  In fact, they're

14   listed in the IPO as being involved as

15   the legal counsel, correct?

16        A.    Correct.

17        Q.    Are they involved at all in

18   paying for your counsel in this

19   deposition today?

20            MR. FORCE:  Object to the

21        form.  That's outside the scope of

22        the deposition.  And it's wholly

23        irrelevant.

24            MR. STECKLER:  Well,

Confidential - Subject to Further Confidentiality Review

1        actually, counsel, I'm interested

2        to know if we're taking the

3        deposition in CNBM's legal

4        counsel's office for the IPO of

5        which Morgan Stanley participated,

6        and I'm wondering whether there's

7        a relationship between Morgan

8        Stanley and this law firm.

9            MR. FORCE:  And I'm

10       objecting because I think that's

11       irrelevant.  It's outside the

12       scope, and I don't think this

13       witness needs to get into those

14       issues.

15           MR. STECKLER:  I appreciate

16       your objection.

17   BY MR. STECKLER:

18       Q.    Can you answer that, sir?

19       A.    Could you repeat the

20   question, please?

21       Q.    Is Davis Polk involved in

22   paying for your representation in this

23   deposition today?

24       A.    No.

Confidential - Subject to Further Confidentiality Review

1    Q.    Are they involved in any way

2    with work you're doing for this

3    deposition?

4    A.    No.

5    Q.    If we look on Page 2 of this

6    memorandum, it says, A key objective of

7    the restructuring is to produce a simple

8    and transparent structure for the Listco

9    group.

10        Who is the Listco group?

11    A.    Well, the Listco would be

12    CNBM, and so the Listco group consists of

13    CNBM and its subsidiaries and associates.

14    Q.    And it says here that, Our

15    suggestion are to reduce the number of

16    layers of subsidiaries to eliminate the

17    cross-shareholdings so that all the

18    non-listed direct subsidiaries are 100

19    percent owned by Listco and are 100

20    percent owned by Listco subsidiary and to

21    minimize minority interest.

22        Do you see that?

23    A.    I do.

24    Q.    Now, this was drafted in

Confidential - Subject to Further Confidentiality Review

1    2004.

2            When you did the IPO in

3    2006, did you, in essence, reduce the

4    number of layers of subsidiaries to

5    consolidate control with the Listco

6    group?

7         A.    I'm not familiar.  I don't

8    remember what the prior structure was, so

9    I can't really comment on how it changed.

10        Q.    And if we look on Page 3 at

11   Number 7, it says here, We need to

12   understand better the extent to which

13   Listco, or CNBM, can direct the

14   management and businesses of the various

15   subsidiaries.  Obviously, a holding

16   company which has little say in the

17   affair of subsidiaries will be less

18   attractive to investors.

19            Do you see that?

20        A.    I do.

21        Q.    Do you agree with that

22   statement, sir?

23        A.    Yes.

24        Q.    And was this something that

1  Morgan Stanley worked on with CNBM before

2  the IPO?

3          A.    I don't recall that being

4  something that we spent time on during

5  the period that I was involved.

6          Q.    Was it your understanding

7  that the holding company was to have more

8  say-so in the affairs of the subsidiaries

9  than less say-so --

10              MR. KATTAN:  Objection to

11          form.

12  BY MR. STECKLER:

13          Q.    -- in order to be attractive

14  to investors?

15          A.    I think that they had what I

16  would regard as a normal level of

17  involvement in the business of their

18  subsidiaries.

19          Q.    I appreciate that.

20              But as an investor is

21  concerned, as you know, when they're

22  looking at companies with subsidiaries

23  and they are about to make sufficient

24  financial commitments to those shares,

Confidential - Subject to Further Confidentiality Review

1   you would agree that investors want to

2   see the parent being able to exercise

3   control over the subsidiaries, correct?

4               MR. KATTAN:  Objection to

5          form.

6               THE WITNESS:  I think if

7          investors felt that the parent

8          company wasn't able to exercise

9          appropriate influence at its

10         subsidiaries, that that would be a

11         concern.

12              I don't believe that was

13         ultimately a concern in the case

14         of CNBM.

15  BY MR. STECKLER:

16         Q.   And the reason that wasn't a

17  concern, with respect to CNBM, was

18  because CNBM did have adequate control

19  over its subsidiaries, correct?

20         A.   Yes, I believe so.

21         Q.   Now, what is a syndicate

22  presentation?

23              What is a syndicate

24  presentation or do you know?

1        A.    It would depend on the

2   context.  I'm not sure.

3             MR. STECKLER:  I'm going to

4        go ahead and hand you what we've

5        marked as Exhibit Number 6 to your

6        deposition, which is entitled,

7        Syndicate of Analyst Presentation.

8                  -  -  -

9             (Whereupon, Exhibit Keyes-6,

10       Syndicate of Analyst Presentation,

11       was marked for identification.)

12                 -  -  -

13            MR. STECKLER:  And I want to

14       apologize in advance.  I know the

15       copy is small, it's the way we

16       received this document.

17   BY MR. STECKLER:

18        Q.    Are you familiar with this?

19   Would you like to borrow my readers?

20        A.    No, I'm not familiar with

21   this document.

22        Q.    Okay.  Let me go ahead and

23   ask you to turn to Page 11.  And you'll

24   notice there's a slide that says, Gypsum

1    board production overview.

2              Do you see that, sir?

3         A.    I do.

4         Q.    And it's Slide Number 10,

5    but it's on Page 11 of what was produced

6    to us.

7         A.    Yes.

8         Q.    Is this a Morgan Stanley

9    document?

10        A.    It appears to be.

11        Q.    And do you know whether this

12   was prepared in the ordinary course of

13   business of Morgan Stanley acting as an

14   investment banker in Morgan Stanley Asia

15   Limited?

16        A.    It appears to be, yes.

17        Q.    And would this have been

18   prepared by Morgan Stanley for some

19   presentation?

20        A.    Yes, I think so.

21        Q.    And it indicates, on Page

22   11, Slide 10, with respect to the gypsum

23   board production overview, it says, World

24   class quality satisfy U.S. ASTM and UK

1    B.S. standards.

2         A.    Yes.

3         Q.    Do you know what -- do you

4    know what that means?

5         A.    I don't know what ASTM

6    stands for.  B.S. standards are -- in the

7    UK, are product quality or specification

8    standards.

9         Q.    And why would that be an

10   important qualification for the quality

11   of products that the CNBM gypsum board

12   production would have?

13            MR. FORCE:  Object to the

14        form.

15            THE WITNESS:  Because, I

16        think, most people would regard

17        the standards in developed markets

18        like the U.S. and the UK as being

19        objective and high standards.

20   BY MR. STECKLER:

21        Q.    And in addition, it says,

22   It's the only gypsum board in China that

23   has been certified by the Underwriters

24   Laboratories Inc. for entry into the U.S.

1    market.

2            Do you see that?

3        A.    I do see that.

4        Q.    Was it your understanding

5    that -- or do you know that CNBM was

6    planning on entering the U.S. market for

7    its products?

8            MR. GRESSLER:  Object to

9        form.

10           MR. CAMPBELL:  Object to

11       form.

12           THE WITNESS:  I don't know.

13   BY MR. STECKLER:

14       Q.    You're not aware?

15       A.    I was not aware.

16       Q.    But it does indicate that it

17   has been certified for entry into the

18   U.S. market, correct?

19       A.    I see that, yes.

20       Q.    And because it met those

21   standards, this would be a product that

22   could be sold in the United States if

23   CNBM wanted to; is that your

24   understanding?

1          MR. KATTAN:  Object to form.

2          MR. CAMPBELL:  Object to

3     form.

4          MR. GRESSLER:  Object.

5          MR. FORCE:  Object to form.

6   BY MR. STECKLER:

7     Q.    Well, is -- would that be

8   something important that Morgan Stanley

9   would want to include on a CNBM syndicate

10  of analyst presentation?

11         MR. KATTAN:  Objection to

12    form.

13         MR. FORCE:  Objection to

14    form.

15         MR. GRESSLER:  Join.

16         MR. CAMPBELL:  Join.

17         THE WITNESS:  I think what

18    this goes to is the quality of

19    product, yeah.

20  BY MR. STECKLER:

21    Q.    I appreciate that.  But my

22  point to you is the fact that it was

23  qualified for entry into the U.S.

24  market -- it says that, doesn't it?

Confidential - Subject to Further Confidentiality Review

1        A.    It does say that.

2        Q.    Right.  And you're aware

3    that CNBM products were shipped to the

4    United States, aren't you?

5            MR. GRESSLER:  Objection to

6        form.

7            MR. KATTAN:  Objection to

8        form.

9            THE WITNESS:  At the time of

10        the IPO, I was not aware of gypsum

11        board being sold in the United

12        States.

13    BY MR. STECKLER:

14        Q.    Are you aware of that now?

15        A.    I'm aware of it now, yes.

16        Q.    Right.  And my point to you

17    is, for Morgan Stanley, as an investment

18    banker about to make a presentation -- I

19    assume in conjunction with an IPO,

20    correct?

21        A.    Yes.  I mean, I'll just

22    point out that the date of this

23    presentation is almost two years before

24    the IPO.

1    Q.    I understand that.

2    A.    And I don't recall this

3    point ever being emphasized during the

4    period in which I was involved in the IPO

5    or in the actual IPO marketing.

6    Q.    I understand that.  But

7    you're here on behalf of Morgan Stanley.

8         And the fact that a Chinese

9    company that is interested in an IPO on

10   the Hong Kong Exchange has product that

11   is qualified for entry into the U.S.

12   market, would be an important selling

13   point to investors; is that your

14   understanding?

15        MR. GRESSLER:  Objection to

16        form.

17        MR. KATTAN:  Objection to

18        form.

19        MR. GRESSLER:  Objection.

20        THE WITNESS:  That's my

21        point.  I don't think it was an

22        important selling point to

23        investors.

24   BY MR. STECKLER:

1    Q.    Ultimately, it wasn't.

2    That's not my question, though.

3              On this, it indicates they

4    are advocating that fact, though, aren't

5    they?

6              MR. FORCE:  Object to the

7         form.

8              MR. KATTAN:  Objection to

9         the form.  Asked and answered.

10             MR. GRESSLER:  Join.

11             MR. CAMPBELL:  Join.

12             THE WITNESS:  In this

13        presentation in 2004, yes, it's

14        mentioned.

15   BY MR. STECKLER:

16    Q.    And the ability to be able

17   to enter a product in the U.S. market,

18   would that be of significance to

19   investors, in your opinion, generally

20   speaking?

21             MR. KATTAN:  Objection to

22        form.

23             MR. CAMPBELL:  Join.

24             THE WITNESS:  I think it

Confidential - Subject to Further Confidentiality Review

1           would only be of significance to

2           investors if people believed that

3           there was a plan to generate

4           significant revenues or profits

5           from that in the foreseeable

6           future.

7    BY MR. STECKLER:

8           Q.    So if a company, such as

9    CNBM, could generate significant

10   products -- profits by entering one of

11   its products in the U.S. market, that

12   would be significant to investors; is

13   that your understanding?

14                MR. FORCE:  Object to the

15          form.

16                MR. GRESSLER:  Join.

17                MR. KATTAN:  Join.

18                THE WITNESS:  It could be.

19          But I would say that with regard

20          to CNBM's business, the focus was

21          very much on serving the Chinese

22          domestic market at the time of the

23          IPO.

24                MR. STECKLER:  I'll object

1           as to nonresponsive, after "it

2           could be."

3   BY MR. STECKLER:

4           Q.    If we look on Page 16, it

5   says, Competitors, foreign invested

6   gypsum board producers owned wholly or

7   partially by Lafarge of France, Knauf of

8   Germany and BPB of UK.

9                Do you see that?

10          A.    Yes.

11          Q.    Do you know whether these

12  were competitors for the Chinese market

13  or the world market?

14          A.    For the Chinese market.

15          Q.    And so these are the gypsum

16  board competitors only for the Chinese

17  market?

18          A.    Yes.  And the reference to

19  foreign investor, I think, implies that

20  these are offered in China.

21          Q.    That's all I have with this

22  document.  Thank you, sir.

23               MR. STECKLER:  Let me hand

24          you what we have marked as Exhibit

Confidential - Subject to Further Confidentiality Review

1          Number 7 to your deposition.

2               THE WITNESS:  Thank you.

3                    -  -  -

4               (Whereupon, Exhibit Keyes-7,

5          Bates MS 5520-246, 12/13/05 Letter

6          from Hong Kong Stock Exchange to

7          Morgan Stanley Asia, was marked

8          for identification.)

9                    -  -  -

10   BY MR. STECKLER:

11        Q.    Are you familiar with this

12   document, sir?

13        A.    Yes, I am.

14        Q.    And, in fact, it's even

15   directed to your attention, Mr. Steve Son

16   and Mr. Ernest Ng?

17        A.    Ng, yeah.

18        Q.    One more time.

19        A.    Ng.

20        Q.    Okay.

21        A.    Yes.

22               MR. FORCE:  Please make sure

23          you spell it for the court

24          reporter.

1          THE WITNESS:  N-G.

2          MR. FORCE:  Just like it

3     sounds.

4          And, counsel, for the

5     record, do you want to identify --

6          MR. STECKLER:  I'm about to

7     get there.

8          MR. FORCE:  Thank you.

9  BY MR. STECKLER:

10         Q.    This is a letter from the

11 Stock Exchange of Hong Kong to yourself,

12 Mr. Son and Mr. Ng -- Ng, whatever, I

13 apologize, I'm having trouble with that

14 pronunciation, regarding CNBM's

15 application for listing; is that right?

16         A.    Correct.

17         Q.    And is this a document kept

18 in the ordinary course of business at

19 Morgan Stanley?

20         A.    This is something that, yes,

21 it would be.

22         Q.    And this is part of your

23 business records with respect to the CNBM

24 IPO, correct?

1        A.    Correct.

2        Q.    Okay.  And explain to me

3 these types of letters from the Hong Kong

4 Exchange and the purpose of them.

5        A.    The listing division of the

6 Hong Kong Exchange is responsible for

7 vetting new listing applications and

8 ensuring that the company is suitable for

9 listing and complies with the Listing

10 Rules and that the disclosure is

11 adequate.

12        And they would, always, on

13 any listing application, send usually

14 several rounds of comments and questions

15 to the sponsors for the listing

16 application.

17        Q.    And I take it from these

18 correspondence, they are put out there

19 for CNBM and Morgan Stanley -- and when I

20 say "Morgan Stanley," I understand you're

21 Morgan Stanley Asia Limited.  So when you

22 and I talk, in that regard as an

23 investment banker.

24        This is for you to respond

1    and adjust accordingly; is that right?

2        A.    Yes, that's correct.

3        Q.    And if we can go to Page 11,

4    please.

5            MR. FORCE:  Just for the

6        record, can we just identify, this

7        is dated December 13, 2005, and is

8        Bates numbered MS 5520 to MS 5546?

9            MR. STECKLER:  Okay.

10           MR. FORCE:  This may not be

11       the last one of these letters that

12       you refer to, so I just want to

13       make sure we're clear on which one

14       we're talking about.

15           Thank you.

16   BY MR. STECKLER:

17       Q.    And you'll note, under

18   definitions and glossary, under 12, Plain

19   language, it says, Ensure the same

20   definition has been adopted throughout

21   the prospectus to avoid confusion.

22           And it talks about CNBM

23   Group being defined as CNBM or parent

24   company as with respect to the holding

Confidential - Subject to Further Confidentiality Review

1    company.

2              Correct?

3         A.    Yes.  That appears to be

4    what it says.

5         Q.    Because CNBM Group is -- or

6    CNBMG is the holding company, right?

7         A.    Yes.  I think we ultimately

8    wind up by referring to it as parent

9    throughout the prospectus, eventually.

10        Q.    So CNBM is not parent or is

11   CNBM parent and CNBMG the holding

12   company?

13        A.    I'm sorry.  Could you repeat

14   the question?

15        Q.    I'm trying -- tell me which

16   entity is the holding company and which

17   entity is the parent.

18        A.    CNBM is the listed company

19   and it's the holding company for the

20   group that was listed.  Parent is CNBM

21   Group.

22        Q.    Okay.  And if you look under

23   Number 13A, it says, We note that net

24   proceed from global offering was applied

Confidential - Subject to Further Confidentiality Review

1    for construction of production facilities

2    in cement, lightweight building materials

3    and glass fiber production sectors.

4              Do you see that?

5        A.    I do.

6        Q.    And it says, Disclose

7    further details of the usage of such

8    amount and confirm whether the group

9    intends to acquire land for construction

10   using the net proceeds.

11             Right?

12       A.    I see that, yes.

13       Q.    Now, cement, lightweight

14   building materials and glass, fiber

15   production sectors are -- run through

16   CNBM's subsidiaries; is that right?

17       A.    Yes.

18       Q.    Okay.  So the global

19   offering -- which is intended to bring in

20   more cash for CNBM, correct?

21       A.    Yes.

22       Q.    -- is going to then be

23   utilized by CNBM's subsidiaries for

24   production; is that right?

1    A.    Yes.

2    Q.    Is that then reflected on

3  the consolidated financial reports for

4  CNBM, how the proceeds are allocated for

5  an IPO?

6    A.    If you mean what the actual

7  use of proceeds was as opposed to what

8  was stated to be -- I'm sorry, I'm not

9  sure I understand the question.

10    Q.    What it actually was, yes.

11    A.    It may or may not be in

12  detail.  I'm not familiar with what the

13  subsequent annual report said about that.

14    Q.    But the annual reports do

15  disclose that the proceeds of an IPO are

16  being utilized by subsidiaries for

17  production, correct?

18    A.    That was the use of proceeds

19  as stated in the prospectus, yeah.

20    Q.    Right.  And that also has to

21  be disclosed in annual reports, correct?

22        I don't know about amounts,

23  per se, but the fact that profits are

24  being utilized by specific subsidiaries.

1           MR. FORCE:  Object to the

2     form.

3  BY MR. STECKLER:

4     Q.    Or do you know?  If you

5  don't know, that's fine.

6     A.    I'm not sure I understand

7  exactly, I'm sorry.

8     Q.    Fair enough.  Fair enough.

9           I guess the basic question

10  is, CNBM is utilizing income from its IPO

11  for its subsidiaries?

12     A.    That was the intention, yes.

13     Q.    Okay.  It indicates here on

14  Page 14, Number 16A, that in your

15  prospectus, it was unclear how the five

16  operating subsidiaries were organized

17  into the company or who owned and managed

18  these companies before the

19  reorganization.

20           Do you see that?

21     A.    I do.

22     Q.    Was that amended and made

23  clear?

24     A.    It must have been.

1    Q.    And in order to be listed,

2    does CNBM have to fairly and accurately

3    provide who owns and who manages each one

4    of its subsidiaries as required by the

5    Hong Kong listing group?

6    A.    There would be, in a

7    prospectus, a group structure chart that

8    would show the most important

9    subsidiaries and what the percentage

10   ownerships were, not every single

11   subsidiary in the group.

12   Q.    And that has to be fair and

13   accurate, correct?

14   A.    Yes.

15   Q.    And that's, in fact,

16   required by the Hong Kong Exchange

17   Listing Rules?

18   A.    Yes, a normal disclosure.

19        But I think part of your

20   question was who manages them.  I

21   think -- so the ownership structure would

22   be shown, who the individuals are who are

23   managing the subsidiaries wouldn't

24   necessarily be something that would be

Confidential - Subject to Further Confidentiality Review

1    shown.

2         Q.    So substantial shareholders

3    would need to be disclosed?

4         A.    The substantial shareholders

5    of CNBM, yes, the Listco.  There's a

6    section in the prospectus that deals with

7    that.

8         Q.    And the controlling

9    shareholder of the subsidiaries, as well

10   as close associates, also need to be

11   disclosed in the annual reports?

12        A.    Well, I can't speak to

13   what's in the annual reports.

14        Q.    We'll look at that.  You're

15   talking about the prospectus now.

16        A.    I'm talking about the

17   prospectus, yes.

18        Q.    That has to be disclosed in

19   the prospectus?

20        A.    That would show which the

21   principal subsidiaries were, yes.  But

22   without making reference to, I think you

23   said, close associates.  I don't think

24   that phrase would have been used in

1    describing that.

2              It was simply showing what

3    the subsidiaries are and what percentage

4    ownership is.

5         Q.    Fair enough.

6              Can you explain comment

7    Number C, 16C, Please disclose the

8    following, the percentage of interest in

9    each of Taihe and Tianfeng acquired by

10   BNBM in 2005 and the identity of the

11   parties for whom such interests were

12   acquired and the basis of such

13   consideration.

14             What is the issue there?

15        A.    Without looking at the what

16   previous draft of the prospectus said or

17   didn't say, I can't be certain.

18             But I think what they are

19   asking for is something that we would

20   have included in subsequent drafts in

21   response to this.

22        Q.    And you're aware that BNBM

23   did acquire Taihe and Tianfeng?

24        A.    Yes.

1      Q.     And do you know whether BND

2   merged into BNBM?

3      A.     I don't recall.

4      Q.     This if you turn to Page 16,

5   under Number -- at the very top, there's

6   two little Is.  It says, Please disclose

7   the following in the prospectus where

8   appropriate, whether the controlling

9   shareholder, i.e., Holdings and BNBMG,

10  will indemnify the company for any

11  outlays and losses arising from or as a

12  result of the conversion scheme and the

13  details of the arrangements.

14            Can you explain what that

15  means, what their issue is here?

16     A.     Yes.  At the time that we

17  were doing the offering, there was a plan

18  with respect to domestically listed

19  companies, so companies listed on the

20  domestic exchanges in China, such as

21  China Fiberglass and BNBM, to make the

22  shares held by the controlling

23  shareholders more freely tradeable than

24  they had been previously.

Confidential - Subject to Further Confidentiality Review

1    And because those companies

2    had been listed, in earlier years, under

3    a regime which would have led the public

4    shareholders in those companies to

5    believe that the major state and

6    enterprise controlling shareholders of

7    those companies were unable to sell their

8    shares in the market because they weren't

9    freely tradeable form, the fact that

10    those shares were, then, to become freely

11    tradeable potentially produced an

12    overhang that might depress the prices.

13    And to address that concern,

14    there was a proposal from the Chinese

15    government, at the time, that when those

16    shares were converted into freely

17    tradeable form, that some compensation

18    should be offered to the existing public

19    shareholders of those companies.

20    So that would be a cost to

21    the controlling shareholder, which, in

22    the case of BNBM, would have been CNBM.

23    Q.    So BNBM would be

24    indemnifying CNBM for those costs?

1    A.    No, I think the --

2    Q.    Or reimbursing them?

3    A.    I think the suggestion was

4  that the -- in order to avoid the CNBM --

5  the new shareholders in the CNBM Group

6  incurring an unknown cost, because the

7  basis of which this was going to be done

8  wasn't known at this time, how expensive

9  it was going to be, the concern was that

10  people buying shares in the CNBM IPO

11  would be exposed to some leakage of value

12  because of the minority shareholders in

13  BNBM being compensated by CNBM.

14          And in order to avoid the

15  minority shareholders in CNBM being

16  prejudiced by that, the suggestion was

17  that the parent company above CNBM should

18  indemnify CNBM to make it whole for that

19  cost.

20    Q.    So CNBMG?

21    A.    Yes.

22    Q.    Would indemnify CNBM?

23    A.    I believe so, yes.

24    Q.    Okay.

Confidential - Subject to Further Confidentiality Review

1    A.    At least that was the

2  suggestion being made by the Exchange.

3          As I've said, I don't recall

4  whether that was done in the end or not.

5    Q.    And these were suggestions

6  and issued raised with respect to the

7  proposed IPO at that time that were then

8  addressed and responded to by CNBM and

9  Morgan Stanley?

10   A.    Yes.  I mean, in form, the

11  response would have come in from us.

12  But, obviously, reflecting input from

13  CNBM.

14   Q.    Let's take a look at MS

15  005470, it's a Morgan Stanley

16  correspondence to the listing division,

17  dated February 20th, 2006, which we will

18  call Exhibit-8.

19                -  -  -

20          (Whereupon, Exhibit Keyes-8,

21       Bates MS 005470, 2/20/06 Letter,

22       was marked for identification.)

23                -  -  -

24  BY MR. STECKLER:

Confidential - Subject to Further Confidentiality Review

1        Q.    Is this a business record of

2   Morgan Stanley had -- held in the

3   ordinary course of business by your

4   company?

5        A.    Yes.

6        Q.    And you're not referenced in

7   this particular document, are you?

8        A.    I signed it.

9        Q.    Because you signed it.

10  Right.

11             You're not referenced as an

12  attention there, you actually signed the

13  document as managing director?

14        A.    This one is from us to --

15        Q.    So you're familiar with this

16  document?

17        A.    Yes.

18        Q.    Did you draft and propose

19  it?

20             Excuse me, let me take a

21  second and get a drink here.

22             Did you draft and prepare

23  this correspondence?

24        A.    I was part of the group of

1    people who --

2        Q.    And what is --

3        A.    -- prepared it.

4        Q.    -- this correspondence?

5        A.    Let me refresh my memory by

6    looking at it.

7              This is in relation to a

8    number of -- one of the number of

9    anonymous complaints or letters making

10   allegations against CNBM, some of which

11   were directed to the Exchange, some of

12   which came to us directly.

13             And we were being asked by

14   the Exchange to address the issues raised

15   in those complaints.

16       Q.    So when it became announced

17   that CNBM was going to do an IPO, the

18   listing, the Hong Kong Exchange received

19   a number of complaints --

20       A.    Yes.

21       Q.    -- about CNBM?

22       A.    Yes.

23       Q.    And I take it that's not

24   uncommon?

1        A.     That's not uncommon of IPOs

2    with Chinese companies.  People make

3    allegations and speculate about what

4    their motives are.  But it's not uncommon

5    for us to have to deal with these.

6        Q.     Is that common because it's

7    the People's Republic of China and it's a

8    Communist country that's somewhat closed,

9    or is that just a common occurrence that

10   happens with all companies that want to

11   be listed on the Hong Kong Exchange?

12       A.     I mean, I don't want to

13   speculate the reasons for it.  But it's

14   quite common for companies that are

15   planning to do a listing on the Hong Kong

16   Stock Exchange for there to be

17   allegations made against them.

18       Q.     Is it more common for

19   companies that want to be listed on the

20   Hong Kong Exchange that emanate from the

21   People's Republic of China, in your

22   experience?

23       A.     Yes, I would say so.  The

24   great majority of the companies listed in

Confidential - Subject to Further Confidentiality Review

1    the Hong Kong Stock Exchange are from the

2    People's Republic of China.

3         Q.    But I'm talking about

4    complaints in particular.

5         A.    Yes.

6         Q.    What is a CSRC

7    investigation?

8         A.    That's the China Securities

9    Regulatory Commission.  I suppose you

10   could say it's the Mainland Chinese

11   equivalent of the SEC.

12        Q.    And there was an issue

13   raised with respect to director's

14   compensation.

15            Do you recall that?

16        A.    I do.

17        Q.    And what were the issues

18   with respect to Mr. Cao, Mr. Song, Mr.

19   Li, Mr. Guo and Mr. Ge?

20        A.    To give you a detailed

21   answer, I would probably need to look at

22   the Stock Exchange letter to which this

23   was a reply.

24            But as I recall, it was to

1    do with apartments that were purchased

2    for these individuals.

3         Q.    So Mr. Cao Jianglin received

4    an apartment that was approved by BND, is

5    that right, in 2001?

6         A.    Yes, it appears to be.

7         Q.    And BND, do you know whether

8    it merged into BNBM?

9              MR. FORCE:  Object to the

10        form.

11             THE WITNESS:  I think you

12        asked me that already.

13   BY MR. STECKLER:

14        Q.    Did you know?

15        A.    I said I didn't.

16        Q.    Okay.  Mr. Song received an

17   apartment from BNBMG in 2002?

18        A.    That's what it says.

19        Q.    And was that accounted for?

20             MR. FORCE:  Object to the

21        form.

22             MR. KATTAN:  Join.

23             MR. CAMPBELL:  Join.

24   BY MR. STECKLER:

1    Q.    Based upon this chart?

2    A.    I think what the chart is

3  saying is that the -- part of the cost of

4  the apartment was borne by the parent

5  group.

6    Q.    Who is the parent group with

7  respect to Mr. Song?

8    A.    I think it would be

9  something under CNBM Group, but not --

10  not including the listed company.

11    Q.    I see.  So CNBM Group would

12  have bought an apartment for Mr. Song?

13    A.    Yes, I believe that's what

14  happened.

15    Q.    CNBM Group would have bought

16  an apartment for Mr. Li?

17    A.    Correct.

18    Q.    And CNBM Group would have

19  bought an apartment for Mr. Guo?

20    A.    Sorry, which one.  Mr. --

21    Q.    Guo?

22    A.    Oh, Guo.  Yes, that's right.

23    Q.    How do you say that now?

24  How do you say his name?  I'm sorry.

1       A.    Guo.

2       Q.    And the last name?  First

3  name?  I don't even --

4       A.    Chaomin.

5       Q.    Chaomin.

6       A.    Guo Chaomin.

7       Q.    Guo Chaomin.

8       A.    Yes.

9       Q.    And CNBM Group bought an

10  apartment for Mr. Ge?

11       A.    Yes.

12       Q.    And the holding company,

13  this is CNBM Group, is buying apartments

14  for individuals that hold positions in

15  CNBM, correct, or BNBM?

16            MR. KATTAN:  Object to form.

17            THE WITNESS:  I'm not sure

18       what these individuals'

19       responsibilities or titles were at

20       the time that these apartments

21       were bought.

22  BY MR. STECKLER:

23       Q.    But the holding company,

24  CNBMG, bought an apartment for the

1  chairman, Chairman Song, of CNBM,

2  correct?

3       A.    Chairman Song is also

4  chairman of the holding company as well.

5       Q.    Right.  Does he also hold a

6  position with BNBM?

7            MR. KATTAN:  Object to the

8       form.

9            THE WITNESS:  I don't

10      recall.

11  BY MR. STECKLER:

12      Q.    And Mr. -- I'm going to mess

13  it up -- Cao Jianglin or Cao Jianglin, he

14  also holds a position with CNBMG?

15      A.    Both parent and CNBM, yes.

16      Q.    And CNBM.

17            And what about BNBM?

18            MR. KATTAN:  Objection to

19      form.

20            What time period are you

21      talking about?  Now?  Today?  At

22      the time these apartments were

23      bought?

24            THE WITNESS:  I'm sorry,

Confidential - Subject to Further Confidentiality Review

1        could you repeat the question

2        again?

3                MR. STECKLER:  Can you read

4        it back for him?

5                       -   -   -

6                (Whereupon, the court

7        reporter read the following part

8        of the record:

9                "Question:  And Mr. -- I'm

10       going to mess it up -- Cao

11       Jianglin or Cao Jianglin, he also

12       holds a position with CNBMG?

13               "Answer:  Both parent and

14       CNBM, yes.

15               "Question:  And CNBM.

16               "And what about BNBM?")

17                      -   -   -

18               MR. KATTAN:  Same objection.

19               THE WITNESS:  I don't know

20       what position, if any, he held

21       with BNBM.

22   BY MR. STECKLER:

23       Q.    Were you aware that he had

24   to resign from BNBM, Mr. Cao?

1      A.    No.

2      Q.    So he was with BNBM.

3            MR. FORCE:  Object to the

4      form.

5            MR. GRESSLER:  Join.

6            THE WITNESS:  So you're

7      saying he was with BNBM?

8  BY MR. STECKLER:

9      Q.    I'm asking you.

10     A.    He was with BNBM at some

11  point, yes.

12     Q.    You just don't know whether

13  he's still there or not?

14     A.    Yes.  I mean, I -- I believe

15  that he had transferred from BNBM to CNBM

16  prior to the IPO.

17     Q.    Okay.  And he received an

18  apartment from CNBMG?

19           MR. FORCE:  Object to the

20     form.  Are you saying --

21           THE WITNESS:  According to

22     this table, it says BND.

23  BY MR. STECKLER:

24     Q.    Oh, yes.  BND, which

1    actually, assume with me, became BNBM?

2            MR. FORCE:  Object to the

3        form.

4            THE WITNESS:  I don't know

5        that.

6    BY MR. STECKLER:

7        Q.    All right.  Let's move on.

8    It's getting a little bit -- too many

9    acronyms -- acronyms.  Let's move on.

10                - - -

11            (Whereupon, a discussion off

12        the record occurred.)

13                - - -

14            MR. STECKLER:  Let me go

15        ahead and have you take a look at

16        MS 012858, which is a Morgan

17        Stanley Asia equity committee

18        memorandum from the CNBM team.

19                - - -

20            (Whereupon, Exhibit Keyes-9,

21        MS 012858, Morgan Stanley Asia

22        Equity Committee Memorandum, was

23        marked for identification.)

24                - - -

1           MR. STECKLER:  We're going

2      to go ahead and mark this as

3      Exhibit Number 9 to your

4      deposition.

5           THE WITNESS:  Thank you.

6  BY MR. STECKLER:

7      Q.    Do you recognize this

8  document, sir?

9      A.    I do.

10     Q.    Is this a business record

11 kept in the ordinary course of business

12 in Morgan Stanley investment banking in

13 Asia?

14     A.    Yes, it is.

15     Q.    And it's a memorandum from

16 the CNBM team, dated February 21, 2006,

17 to Asia Equity Commitment Committee?

18     A.    Correct.

19     Q.    And who is the CNBM team?

20     A.    The CNBM team are the people

21 enumerated on the page.

22     Q.    And who is the Asian Equity

23 Commitment Committee?

24     A.    It's an internal committee

Confidential - Subject to Further Confidentiality Review

1    of Morgan Stanley that would be required

2    to provide approval regarding any equity

3    offering that we're undertaking.

4              And in the case of an IPO,

5    the committee would have met at least

6    twice; once before the filing of the

7    initial listing application and then once

8    before, effectively, launching the

9    pre-deal investor education phase of the

10   marketing.

11        Q.    What is MARD?

12        A.    Mergers Acquisitions and

13   Restructuring Department.

14        Q.    GIG?

15        A.    Global Industries Group.

16        Q.    GCM?

17        A.    Global Capital Markets.

18        Q.    And CFD?

19        A.    Corporate Finance

20   Department, I think.

21        Q.    And are these all Morgan

22   Stanley Asia Limited employees?

23        A.    They are all Hong Kong based

24   Morgan Stanley Asia employees, yes.

Confidential - Subject to Further Confidentiality Review

1    Q.    Do some of them work for

2    different Morgan Stanley entities in

3    Asia?

4    A.    No, I think they all would

5    have been employed by Morgan Stanley

6    Asia.

7    Q.    And this is an update on the

8    offering and seeking approval to launch a

9    pre-marketing in February of 2006,

10   correct?

11   A.    Correct.

12   Q.    Okay.  It says that you --

13   that Morgan Stanley -- and when I say

14   "you" we're going to refer to Morgan

15   Stanley, too, that Morgan Stanley has

16   been mandated by CNBM as the sole global

17   coordinator and sole book runner for its

18   proposed IPO on the Stock Exchange of

19   Hong Kong with international placement

20   through 144A in the U.S. and Reg S

21   outside of the U.S.

22          Do you see that?

23   A.    Yes.

24   Q.    What is a slow -- sole

1  global coordinator?

2       A.    It essentially means that

3  we're the only bank with a substantial

4  role in the deal.

5       Q.    And what is a sole book

6  runner?

7       A.    The book runner is the bank

8  which is responsible for taking orders

9  from investors and building a so-called

10  book of demand.

11       Q.    And what does international

12  placement through 144A in the U.S. and

13  Reg S outside of the U.S. mean?

14       A.    The way that most Hong Kong

15  IPOs are structured is that there's a

16  public offering in Hong Kong so retail

17  investors can subscribe there.  And then

18  the sales outside Hong Kong to

19  institutional investors are done through

20  a -- so-called international placement.

21            And, again, I'm not a U.S.

22  securities lawyer, but these are terms

23  from U.S. securities law about the way in

24  which these offerings are distributed so

1    as to avoid any need for a registration

2    with the SEC.

3            Q.    So, again, this is CNBM

4    selling its shares in the United States

5    and this is ensuring compliance with U.S.

6    law in doing so?

7            A.    It's selling everywhere,

8    including the United States, yes.  And

9    ensuring compliance, yes.

10           Q.    It says, The company

11   received approvals from SASAC and CSRC to

12   submit its listing application to the

13   Stock Exchange of Hong Kong in May and

14   July of 2005 respectively.

15                What is the SASAC?

16           A.    I can't remember exactly.

17   It's something like State-Owned Assets

18   Supervision and Administration.  I can't

19   remember what the C stands for.

20           Q.    It's called SASAC?

21           A.    I was -- everybody just

22   refers to it as SASAC.  And it's the body

23   under the state in China that's

24   responsible for administering the state's

1    interest in state-owned enterprises.

2         Q.    So CNBMG was a state-owned

3    enterprise?

4         A.    Yes.

5         Q.    So the Chinese government

6    had to approve this listing application

7    for an IPO?

8         A.    Yes.

9         Q.    And so the state-owned -- so

10   the government of China was approving the

11   listing of CNBM so it could solicit its

12   shares internationally; is that right?

13        A.    Yes.

14        Q.    And then foreign investors

15   can buy shares of a Chinese company and

16   invest in that company?

17        A.    Yes, that's right.  So this

18   is the normal procedure for any foreign

19   offering by a Chinese state-owned

20   enterprise.

21        Q.    And prior to the offering,

22   the Chinese government would provide that

23   money for CNBM to operate; is that right?

24        A.    If the company needed fresh

Confidential - Subject to Further Confidentiality Review

1    capital, yes.  But, I mean, it's a

2    self-sustaining business, for the most

3    part.

4         Q.    So if it's not a

5    self-sustaining business, in lieu of the

6    Chinese government providing money to the

7    company, now foreign investors will be

8    providing money to the company through

9    the Hong Kong Exchange?

10              MR. FORCE:  Object to the

11         form.

12              THE WITNESS:  As one of the

13         sources of capital, yes.

14   BY MR. STECKLER:

15         Q.    And what's the CSRC?

16         A.    That's the China Securities

17   Regulatory Commission.

18         Q.    And what is that?

19         A.    It's -- you could say it's

20   the Chinese equivalent to the SEC.

21         Q.    Still a Chinese governmental

22   agency?

23         A.    Correct.

24         Q.    And it says the -- it says,

Confidential - Subject to Further Confidentiality Review

1    SEHK -- which we know is the Stock

2    Exchange of Hong Kong -- that the listing

3    is going to have a committee hearing on

4    February 23rd, 2006.

5              Do you see that?

6         A.    Yes.

7         Q.    Okay.  And there's a

8    pre-marketing in the week of February

9    27th and a complete offering by mid

10   March.

11             What is a pre-marketing

12   launch?  What do you do?

13        A.    Pre-marketing is the process

14   by which the research analyst for Morgan

15   Stanley, and for any other members of the

16   syndicate, would go out and meet with

17   investors to talk about the company, talk

18   about their views on its investment case

19   and valuation.

20        Q.    I want to make sure I

21   understand this.

22             So you're hired by CNBM for

23   the initial public offering, correct?

24        A.    Yes.

Confidential - Subject to Further Confidentiality Review

1    Q.    And when I say "you" we're

2  talking Morgan Stanley.

3    A.    Yes, I understand.

4    Q.    And CNBM also hires Morgan

5  Stanley to solicit investors on its

6  behalf to purchase shares?

7    A.    Correct.

8    Q.    And CNBM is soliciting

9  shareholders throughout the world to buy

10 its shares in its company, correct?

11   A.    That's correct.

12   Q.    Okay.  And CNBM has hired

13 you to market those shares throughout the

14 world, correct?

15   A.    That's correct.

16   Q.    And that includes the United

17 States, correct?

18   A.    That includes the United

19 States, yes.

20   Q.    And if we look at Page 2 of

21 this memorandum, it talks about the

22 proposed transaction structure and

23 indicative timetable, correct?

24   A.    Yes, it does.

Confidential - Subject to Further Confidentiality Review

1    Q.   Okay.  And, again, the

2    tranche structure indicates an

3    international office -- offer in

4    compliance with U.S. securities laws,

5    correct?

6    A.   Correct.

7    Q.   That allows you to solicit

8    United States institutional investors to

9    buy H shares of CNBM, correct?

10   A.   Correct.

11   Q.   And it also says that the

12   proceeds are going to fund construction

13   of new production capabilities --

14   capacities in cement, lightweight

15   building material and glass fiber,

16   correct?

17   A.   Correct.

18   Q.   So the proceeds from the IPO

19   are going to go to CNBM subsidiaries to

20   invest in their businesses?

21   A.   Yes.

22   Q.   Okay.  And it indicates an

23   indicative timetable at the bottom.  It

24   talks about a pre-marketing from February

1  27th to March 6th.

2         Do you see that?

3     A.    I do.

4     Q.    What does that involve?

5     A.    That's what I just was

6  describing about the research analysts

7  going and meeting investors to talk about

8  their views regarding the company's

9  investment case and valuation.

10    Q.    And where do they go?

11    A.    All around the world.

12    Q.    And on behalf of CNBM,

13 Morgan Stanley analysts go to the United

14 States, correct?

15    A.    Yes, they would have gone.

16    Q.    And it also talks about an

17 investor road show.

18         What is that?

19    A.    So the investor road show,

20 this is -- you have the pre-marketing and

21 this is the actual marketing.  This is

22 where the company's management team would

23 go and visit investors around the world,

24 so starting in Hong Kong and then moving

Confidential - Subject to Further Confidentiality Review

1    on to other countries, doing some group

2    meetings, where they perhaps have a lunch

3    and present to anywhere from a handful to

4    a couple of hundred investors; and then

5    also one-on-one meetings with the larger,

6    more important investors.

7         Q.    And is it your understanding

8    that CNBM chairmen and employees went on

9    an investor road show in the United

10   States for this offering?

11        A.    They did, yes.

12        Q.    And does CNBM do investor

13   road shows annually to market its shares?

14        A.    They do investor relations

15   road shows.  I'm not sure what the

16   frequency is, whether they do it every

17   year or exactly how often.  But they've

18   done it periodically since the IPO.

19             And they would typically do

20   that after making one of their financial

21   results announcements to update investors

22   on how they're performing.

23        Q.    So it's not just an update

24   of where they are, but also to solicit

1    additional investment?

2         A.    No, it's not usually to

3    solicit additional investment.  It's not

4    to solicit -- it's to update investors on

5    what's going on, give them an opportunity

6    to ask questions directly of the

7    management team.

8         Q.    It's like a shareholder

9    meeting?

10        A.    Yes.  It's part of the

11   investor relations efforts.

12        Q.    And I'm using U.S. terms.

13             So is there a term of art

14   used on the Hong Kong Exchange whereby

15   listed companies have annual meetings for

16   shareholders?

17        A.    They have an AGM, an annual

18   general meeting, yes.

19        Q.    Do they have annual general

20   meetings outside of Hong Kong for their

21   investors, especially, let's say, H

22   shares, which are sold worldwide?

23        A.    They would usually do a

24   results briefing at the time that they

Confidential - Subject to Further Confidentiality Review

1    release their annual results and their

2    interim results.  And that would

3    typically involve meeting with the

4    research analysts who are covering the

5    stock and also some of the major

6    shareholders as well.

7           Q.    And would those meetings

8    have occurred in the United States

9    annually?

10          A.    I couldn't tell you where

11   they did all those.

12          Q.    Do you know whether Morgan

13   Stanley analysts annually went to report

14   on the status of CNBM?

15               MR. FORCE:  Object to the

16          form.

17               THE WITNESS:  So we would

18          have been -- part of the job of

19          the Morgan Stanley research

20          analysts is to meet the company on

21          a fairly regular basis and they

22          would typically participate -- if

23          the company is doing a briefing

24          for research analysts generally,

1          they would typically attend those

2          and participate in that.

3    BY MR. STECKLER:

4          Q.    And would that occur in the

5    United States?

6          A.    No.  That would usually

7    occur in Hong Kong.

8          Q.    And would they invite the

9    U.S. H shareholders to come to those

10   meetings?

11         A.    No.  If they were arranging

12   to see investors outside of Hong Kong,

13   that would typically be as part of the

14   investor relations road show that I

15   described.

16             But as I said earlier, I

17   don't know whether they -- which ones

18   they visited the United States on.

19         Q.    And the reason I ask whether

20   they occur annually is there's been

21   deposition testimony thus far that there

22   were annual road shows.

23             If there were annual road

24   shows, would Morgan Stanley individuals

1    be a part of that or not?

2                MR. FORCE:  Object to the

3          form.

4                THE WITNESS:  Sometimes.

5          If -- so when companies do these

6          investor relations road shows,

7          they often ask a bank such as

8          ourselves to help them organize it

9          and to schedule meetings with

10         investors for them because we have

11         the contacts with investors.

12               And we have certainly been

13         involved in organizing a number of

14         the road shows for them.

15   BY MR. STECKLER:

16         Q.   Are you currently the

17   investment banker for CNBM?

18         A.   I'd say that we are probably

19   their closest investment banking

20   relationship.

21         Q.   So --

22         A.   But not exclusive.  I mean,

23   they have other people, too.

24         Q.   I understand.

Confidential - Subject to Further Confidentiality Review

1              But if there were investor

2    road shows, as we've talked about, would

3    Morgan Stanley likely have participated

4    in those road shows?

5              MR. FORCE:  Object to the

6         form.

7              THE WITNESS:  Yes.  Often,

8         somebody from Morgan Stanley would

9         go with the company; not least to

10        help interpret for them.  Yes.

11        Because several of the members of

12        the management team don't speak

13        English, so.

14   BY MR. STECKLER:

15        Q.   On the next page, Page -- I

16   don't think there are page numbers, but

17   on the next page, it talks about company

18   overview.

19              MR. FORCE:  You're on Page

20        MS 12860?

21              MR. STECKLER:  Yes.  My zero

22        is a little cut off, so I kind of

23        hesitated to give a number.

24   BY MR. STECKLER:

1    Q.    It says that CNBM has a

2  nationwide production and distribution

3  network.

4          Is that referring to within

5  China?

6    A.    Yes.

7    Q.    Okay.  And if we go to

8  12861, under Number 2, it says, In any

9  event, the company intends to maintain a

10  majority equity interest in BNBM

11  following any such reform.

12    A.    Where are you exactly?

13    Q.    I'm on Number 2.

14    A.    Yes.  Which bullet?  Oh, I

15  see, the second bullet from the bottom.

16    Q.    Then there's a second

17  bullet, it says, CNBM's management

18  currently has no plan or intention to

19  implement split share structure reform,

20  nor has it been required to devise such a

21  plan in any particular time frame.

22          Do you see that?

23    A.    I do.

24    Q.    It says, In any event, the

Confidential - Subject to Further Confidentiality Review

1    company intends to maintain a majority

2    equity interest in BNBM following any

3    such reform.

4              Correct?

5         A.    Correct.

6         Q.    Okay.  And has the company,

7    CNBM, maintained a majority equity

8    interest in BNBM up until today?

9         A.    I believe so.

10        Q.    Okay.  And it indicates the

11   company held a 60.33 percent equity

12   interest in BNBM and a 40.17 percent

13   equity interest in China Fiberglass.

14              Do you see that?

15        A.    I do.

16        Q.    And are they -- is

17   CNBM still have the largest equity

18   interest in China Fiberglass, which is

19   now China Jushi Group?

20        A.    I believe so.

21        Q.    I'd like you to turn to MS

22   012863.

23              At the very top, it says

24   that, Morgan Stanley conducted a Level 1

1    investigation on each of the directors of

2    the company by Morgan Stanley's security

3    department, though nothing adverse was

4    reported.

5           A.    Which?

6           Q.    The very top of 12863, I

7    believe.

8           A.    Yes, I see it.

9           Q.    What is a Level 1

10   investigation?

11          A.    It is getting a report which

12   would be done by our Corporate Security

13   Department, based on public sources, on

14   individuals or companies.  So it's a

15   background check, essentially.

16          Q.    But you're solely relying on

17   public sources?

18          A.    If it's a Level 1, yes.

19          Q.    Okay.  And so your Level 1

20   investigation of the directors of the

21   company involved simply looking at public

22   sources within the People's Republic of

23   China?

24          A.    Predominantly, yes.

Confidential - Subject to Further Confidentiality Review

1    Q.    And that would be with

2  respect to whether the directors may be

3  influenced by the chairman and the

4  president of the company?

5    A.    I'm sorry, where is that,

6  that you're --

7    Q.    It said, on Number 3, on the

8  prior page, there was a complaint letter

9  about, Imbalanced corporate governance

10  structure under which directors may be

11  influenced by the chairman and the

12  president and, therefore, incapable of

13  performing their fiduciary duties to

14  shareholders independently.

15    Do you see that?

16    A.    I'm looking for it.  Sorry.

17    Q.    I'm sorry.  It's at Number

18  3, there's the first bullet point, and

19  then there's a dash.

20    A.    I see it, yes.

21    Q.    Yes.

22    A.    Thank you.

23    Yeah.  I think we concluded

24  that all that was unfounded.

Confidential - Subject to Further Confidentiality Review

1    Q.    So for Morgan Stanley to

2   satisfy itself that the chairman and the

3   president of CNBM could meet their

4   fiduciary obligations, you all simply

5   looked at public documents that were

6   available?

7              MR. FORCE:  Object to the

8         form.

9              THE WITNESS:  No, that's not

10         accurate.

11   BY MR. STECKLER:

12    Q.    Okay.

13    A.    So a Level 1 investigation

14   is something we would do on any IPO.  And

15   the subjects of the Level 1 searches

16   would be directors, key members of senior

17   management and the companies in the

18   group.  But that's just one small part of

19   the due diligence we're doing.  And it's

20   just the initial stage of that.

21              So in terms of dealing with

22   these complaints, we certainly wouldn't

23   have been relying on the Level 1 report

24   only, which I think is what you were

1    inferring.

2         Q.    So what -- so what more than

3    that did you do to determine whether

4    CNBM's chairman and president could

5    fulfill their fiduciary duties to

6    shareholders?

7         A.    Well, I think on the

8    previous page, under the second bullet

9    point, it enumerates a series of steps

10   that we took.

11        Q.    So you had meetings and

12   calls with the company?

13        A.    Yes.

14        Q.    You had confirmations from

15   the company and advice from advisors such

16   as accountants and lawyers, right?

17        A.    Yes.

18        Q.    You verified information

19   that was provided by the company.  You

20   clarified inconsistencies and questions

21   from above with the company.  You did due

22   diligence on working capital forecasts by

23   the company.  And you verified the

24   maturity of the company's borrowings,

Confidential - Subject to Further Confidentiality Review

1  short-term borrowings.  And you did a

2  Level 1 investigation.

3           MR. FORCE:  Object to the

4      form.

5  BY MR. STECKLER:

6      Q.    Correct?

7           MR. FORCE:  Object to the

8      form.

9           THE WITNESS:  Yes.

10  BY MR. STECKLER:

11      Q.    And so --

12      A.    But the Level 1

13  investigation would have preceded any of

14  this.

15      Q.    So that's what you did to

16  see whether, in fact, the chairman and

17  the president could meet their fiduciary

18  obligations to shareholders; is that

19  right?

20      A.    Well, if you look at that

21  list, it's in relation to the four dash

22  points above.

23      Q.    Correct.

24           So it's not just to see

1    whether they could fulfill their

2    fiduciary obligations, but to look at

3    connected party transactions of the

4    subsidiaries of CNBM to see if they were

5    arm's length, correct?

6        A.    Yes.

7        Q.    And to see whether they

8    intended to inflate profit or direct

9    profit to other entities, correct?

10           And it said here, It was

11   alleged that certain directors of CNBM

12   had used state-owned assets to purchase

13   apartments.

14           You all looked into that,

15   correct?

16       A.    That's right.

17       Q.    It says that, President Cao

18   was alleged to have bribed government

19   officials.

20           You looked into that,

21   correct?

22       A.    Yes.  And as the next point

23   says, the conclusion was that all these

24   allegations were unfounded.

Confidential - Subject to Further Confidentiality Review

1    Q.    Right.  And so my point is,

2  to verify that, you basically consulted

3  with the company and some advisors and

4  did a Level 1 investigation, right?

5            MR. FORCE:  Object to the

6        form.

7            THE WITNESS:  We did all the

8        things that are listed here, yes.

9        And that obviously includes

10       looking at documents and looking

11       at sources of information

12       directly.

13  BY MR. STECKLER:

14    Q.    And that was sufficient for

15  giving you all the green light to proceed

16  with the IPO?

17    A.    It was, yes.

18    Q.    Do you know how much it was

19  alleged that Mr. Cao had bribed the

20  official?

21    A.    I don't recall.

22            MR. KATTAN:  Objection to

23        form.

24            THE WITNESS:  I'm not even

Confidential - Subject to Further Confidentiality Review

1          sure the allegations were specific

2          as to a number.

3     BY MR. STECKLER:

4          Q.    And based upon the Level 1

5     investigation and your consultations with

6     the company and some advisors, you all

7     felt confident that CNBM would be

8     truthful in its annual reports and

9     disclosures --

10              MR. FORCE:  Object to the

11         form.

12    BY MR. STECKLER:

13         Q.    -- correct?

14              MR. FORCE:  Same objection.

15              THE WITNESS:  Well, I think

16         in this exercise we were focusing

17         on them being truthful in the

18         prospectus.  We aren't involved in

19         the production of annual reports

20         for companies that we've listed.

21    BY MR. STECKLER:

22         Q.    You are not?

23         A.    We're not involved in the

24    production of annual reports for

1    companies who we've listed.

2         Q.    All right.  And did you

3    satisfy yourselves that the -- before

4    proceeding with this IPO, that CNBM would

5    adequately apprise its shareholders of

6    any judgements or financial problems that

7    could impair the company?

8         A.    Well, what we did was to

9    ensure that the directors of the company

10   were properly trained in an understanding

11   of the Hong Kong Listing Rules and

12   satisfy ourselves that they were fit and

13   proper people to be directors of a public

14   company.

15        Q.    So you would have advised --

16   Morgan Stanley Asia Limited would have

17   advised Chairman Song and Mr. Cao and

18   Chang Zhangli of their responsibilities

19   with the company with respect to

20   reporting and complying with the laws of

21   the Hong Kong Exchange?

22        A.    They understood the

23   disclosure obligation requirements, yes.

24        Q.    And that was their

1    obligation as fiduciaries and on behalf

2    of CNBM, correct?

3          A.    That's right.

4          Q.    And you all did apprise them

5    of what those obligations were?

6          A.    Yes.

7          Q.    And you would have expected

8    them to meet those obligations as

9    required?

10         A.    Yes.

11         Q.    Okay.

12               MR. STECKLER:  Let's take a

13         quick break, if that's okay.

14               VIDEO TECHNICIAN:  The time

15         is 11:37.  We are off the record.

16                     -  -  -

17               (Whereupon, a brief recess

18         was taken.)

19                     -  -  -

20               VIDEO TECHNICIAN:  It's

21         11:54.  And we are back on the

22         record.

23    BY MR. STECKLER:

24         Q.    Mr. Keyes, when Morgan

Confidential - Subject to Further Confidentiality Review

1    Stanley did its investigation of these

2    complaints and allegations, did it simply

3    accept what the company said as being

4    truthful?

5          A.    No.

6          Q.    You also did your own

7    independent investigation?

8          A.    We would have looked at

9    source documents to verify what we were

10   being told.  We would have spoken with

11   the counsels involved.  We would have

12   spoken with the reporting accountants who

13   would have been auditing the financial

14   statements of the company and would be

15   familiar with the internal controls and

16   processes in the company, and we would

17   have looked at other -- other records.

18         Q.    And when you would have done

19   your interviews with officials with the

20   company, and when we say "company," we're

21   talking CNBM, they weren't under oath or

22   under any sort of subpoena or court order

23   of any form, were they?

24         A.    No.

1          Q.    And for that reason, when

2     you when you inquired and asked them

3     about the allegations, you simply

4     expected them to be truthful; is that

5     fair?

6          A.    We would have expected them

7     to be truthful.  But, also, to the extent

8     that we were making submissions to the

9     Hong Kong Stock Exchange that were based

10    on information that they had given us, we

11    would have gotten -- what we call a

12    back-to-back confirmation form them in

13    writing that the contents were truthful

14    and accurate.

15         Q.    So you would have asked them

16    to sign something saying it was accurate?

17         A.    We would have asked them to

18    sign something confirming that our

19    submissions to the Exchange contained

20    accurate information.

21         Q.    So you would have relied on

22    them in being truthful in signing the

23    documents?

24         A.    As part of doing our work,

1    yes.

2          Q.    And you would have relied on

3    them to be truthful in providing you

4    adequate information to review with

5    respect to their finances, correct?

6          A.    Well, we would have sorted

7    out the information that we felt was

8    necessary by way of supplementary

9    interviews or looking at documents.

10               It's not a case of us only

11   looking at the documents that they choose

12   to provide to us.  We would specifically

13   request things that we felt would meet

14   the threshold in terms of getting

15   comfortable with the issues.

16         Q.    So you would request that

17   information from them?

18         A.    Yes.

19         Q.    And this document we looked

20   at, I believe, you said was a business

21   record of Morgan Stanley, correct?

22         A.    Yes.

23         Q.    And just so we're clear for

24   purposes of the record, when we say this

1   is a "business record" of Morgan Stanley,

2   for our understanding, that's you and I

3   throughout the course of this deposition,

4   we mean that this is a record that's been

5   provided by Morgan Stanley, correct?

6        A.    Yes.

7        Q.    And it's a record -- a

8   Morgan Stanley business record made at or

9   about the time that it's dated, correct?

10       A.    Correct.

11       Q.    And it's a record that's

12   kept in the ordinary course of business

13   at Morgan Stanley?

14       A.    Correct.

15       Q.    And it's a regular part of

16   Morgan Stanley's file with respect to

17   this client, correct?

18       A.    Yes.

19       Q.    So when we talk about

20   business records throughout today, and as

21   we previously talked about, all of those

22   documents have met that requirement to

23   date, correct?

24            MR. FORCE:  Object to the

1          form.

2    BY MR. STECKLER:

3          Q.    That have Morgan Stanley's

4    name on them or Morgan Stanley Bates

5    stamps?

6          A.    No, I think some of the

7    things you showed me, beginning with

8    things like sort of the listing --

9          Q.    No.  I meant the Morgan

10   Stanley documents.  So if they have a

11   Morgan Stanley Bates stamp at the bottom

12   right corner, those would be what we

13   would consider Morgan Stanley business

14   records, correct?

15         A.    Yes, that's right.

16         Q.    So they were kept in the

17   ordinary course of business at Morgan

18   Stanley, made at the time in which they

19   are dated, and they are regularly kept by

20   the company for CNBM and its work?

21         A.    By "the company" meaning by

22   Morgan Stanley.

23         Q.    Yes.

24         A.    Yes.

1  Q. And by "work," its work for

2  CNBM?

3  A. Yes.

4  Q. Okay. All right. Thank

5  you. I just want to make sure that when

6  we say business record we're on the same

7  page.

8  A. Yes.

9  Q. I'd like you to take a look

10 at a memorandum on profit estimate, which

11 is Morgan Stanley 012063.

12 MR. STECKLER: We're going

13 to go ahead and mark this as

14 Exhibit Number 10 to your

15 deposition.

16 - - -

17 (Whereupon, Exhibit

18 Keyes-10, Bates MS 012063,

19 Memorandum on Profit Estimate, was

20 marked for identification.)

21 - - -

22 BY MR. STECKLER:

23 Q. Is this a business record of

24 Morgan Stanley dated February 28, 2006?

1      A.    Yes.

2      Q.    And it's kept in the

3  ordinary business of your company?

4      A.    Yes.

5      Q.    And it is a profit estimate

6  for the year ended December 31, 2005, for

7  CNBM, correct?

8      A.    Correct.

9      Q.    And is this prior to the

10  IPO?

11      A.    Yes.

12      Q.    And if we look at the first

13  page, which is Page 1 to that document,

14  under the third paragraph, it says, The

15  group's profit estimate for the year

16  ended December 31, 2005, has been

17  prepared based on the audited

18  consolidated results of the group for the

19  nine months ended September 30th, 2005.

20          Do you see that?

21      A.    I do.

22      Q.    When it says, Audited

23  consolidated results of the group, what

24  does that mean?

1    A.    If you look in the first

2    paragraph above, it defines the group as

3    being CNBM and its subsidiaries.

4    Q.    So CNBM is reflecting its

5    financials not just by its own financials

6    but also its subsidiaries, correct?

7    A.    Yes.

8    Q.    And if we turn to Page 6,

9    those subsidiaries listed would include

10   BNBM and Taihe?

11   A.    Yes.

12   Q.    Can I say Taihe?  Would that

13   be okay?

14   A.    Please do.

15   Q.    Thank you.

16        And BNBM and Taihe are

17   subsidiaries of CNBM, correct?

18   A.    Yes.

19   Q.    And it indicates, on Page 9

20   to this deposition, or MS 012072, that

21   administrative expenses was increased to

22   RMB 279.1 million primarily due to the

23   acquisition of Taihe, Tianfeng, Ziyan,

24   Zaozhuang Luhong partially offset by the

1    decrease of bad debt expenses.

2            Do you see that?

3        A.    I do.

4        Q.    Are you familiar with these

5    acquisitions?

6        A.    I remember the acquisition

7    of Taihe because we wrote about that in

8    the prospectus.  Also, Tianfeng, I

9    recall, I think that's also in the

10   lightweight building materials area.

11       Q.    Are those drywall

12   manufacturers?

13       A.    I think were Tianfeng was

14   making the --

15       Q.    Ceiling -- acoustical

16   ceiling tiles?

17       A.    Either the acoustical

18   ceiling tiles or the lightweight metal

19   structures that support them, I don't

20   remember which.

21            And the other two, Ziyan and

22   the last one you mentioned, I don't

23   recall.

24       Q.    Do you know what -- so

1    Zaozhuang Luhong, you don't know what

2    that is?

3         A.    Not without refreshing my

4    memory by looking at the prospectus.

5         It should be laid out in the

6    prospectus, though, and the documents

7    have been provided.

8         Q.    And is it your understanding

9    that CNBM -- let's go to Page 5, excuse

10   me.

11        If you go to Page 5,

12   Subsection B, it says, Business segments

13   analysis.  Cement, lightweight building

14   materials, glass fiber and FRP products,

15   engineering services.

16        Do you see that?

17        A.    Yeah, I do.

18        Q.    Are these the businesses of

19   the various subsidiaries within CNBM?

20        A.    Yes.

21        Q.    And is CNBM reflecting its

22   profits through the consolidation of the

23   businesses of its subsidiaries?

24        A.    So CNBM produces

Confidential - Subject to Further Confidentiality Review

1    consolidated financial statements --

2          Q.    Yes.

3          A.    -- that includes the results

4    of its subsidiaries, yes.

5          Q.    And that would include BNBM

6    and Taishan, correct?

7          A.    Correct.

8          Q.    Now, this report was dated

9    February 28th, 2006.

10          Is that required as

11   something that you need to do prior to

12   your listing?

13         A.    Yes.  In -- if a prospectus

14   contains a profit forecast or a profit

15   estimate, which, at the time of this IPO,

16   they almost all did in Hong Kong, then

17   there would be a letter from the

18   reporting accountants and a letter from

19   the sponsor in the prospectus providing a

20   report on the profit estimate or profit

21   forecast.

22          And this memorandum is an

23   important part of the backup for

24   providing that public report.  And it's

1    also a document that is required to be

2    submitted to the Hong Kong Stock

3    Exchange.

4              MR. STECKLER:  And let me

5         hand you what we're going to mark

6         as Exhibit Number 11 to your

7         deposition.  It's MS 009642, which

8         is dated March 1, 2006, which

9         appears to be a CNBM document

10        signed by Executive Director Cao

11        to the Stock Exchange of Hong

12        Kong.

13                   -   -   -

14             (Whereupon, Exhibit

15        Keyes-11, Bates MS 009642, 3/1/06

16        CNBM Document, was marked for

17        identification.)

18                   -   -   -

19   BY MR. STECKLER:

20        Q.    Do you see that?

21        A.    I do.

22        Q.    Is this -- this was produced

23   by Morgan Stanley.

24             Is this a business record of

1    Morgan Stanley's?

2           A.    Yes.

3           Q.    And it's kept in the

4    ordinary course of business of your

5    company?

6           A.    Yes.

7           Q.    In the work that you do with

8    CNBM?

9           A.    Yes.

10          Q.    And it says here that, The

11   company confirms to the Stock Exchange

12   that it is not aware of there being any

13   material adverse change to this company

14   not disclosed in the prospectus that has

15   contributed to the increase in its net

16   current liabilities between September

17   30th, 2005, and January 31, 2006.

18          A.    Yes.

19          Q.    Can you explain the purpose

20   of this document?

21          A.    This is a document that the

22   Exchange would require because of -- as

23   it refers to here, the company having net

24   current liabilities, they always seek

1   some additional documentation from

2   listing applicants where that applies.

3           And in particular here, it

4   would appear that the net current

5   liabilities had increased since the most

6   recent audited financials, which were

7   30th September, 2005.

8       Q.    Why is Executive Director

9   Zuo signing this particular document and

10  not the chairman of CNBM, or do you know?

11      A.    I don't attach any

12  significance to which director signs a

13  document like this.

14      Q.    And do you know what other

15  entities Executive Director Zuo was

16  also -- what other positions he held with

17  other companies?

18      A.    I believe he also held a

19  position at parent.  That's the only one

20  that I know of.

21      Q.    CNBMG?

22      A.    Yes.

23      Q.    Do you know whether he -- at

24  the time he made this representation to

Confidential - Subject to Further Confidentiality Review

1    the Hong Kong Exchange, whether he was

2    also a director or held a position with

3    BNBM?

4           A.    I do not know.

5           Q.    Or BNBMG?

6           A.    I don't know.

7           Q.    After a company prepares all

8    of its paperwork, does it do a -- does it

9    prepare a global offering memorandum or

10   does it have to do an official

11   application first with the listing

12   exchange?

13          A.    So a prospectus is prepared

14   and part of the listing application

15   process involves a submission of the

16   draft prospectus together with a series

17   of other forms and checklists and

18   supporting documents.

19                And then, ultimately, when

20   the Exchange gives the green light for

21   the IPO to go ahead, the prospectus would

22   be finalized and printed and circulated

23   to investors.

24          Q.    And let me hand you what

Confidential - Subject to Further Confidentiality Review

1   we're going to mark as Exhibit Number 12

2   to your deposition, which is the Form

3   C-1.

4                      -   -   -

5              (Whereupon, Exhibit

6         Keyes-12, 3/2/06 Form C-1, was

7         marked for identification.)

8                      -   -   -

9   BY MR. STECKLER:

10        Q.    Do you know what a Form C-1

11  is on the Hong Kong Exchange?

12        A.    I think it's the one to

13  apply for the listing of the shares, if I

14  remember correctly.

15        Q.    This is dated March 2nd,

16  2006.  We're going to mark this

17  Exhibit-12 to your deposition.

18              Is this a Morgan Stanley

19  business record?

20        A.    Yes.

21        Q.    And it's held in the

22  ordinary course of business at Morgan

23  Stanley with respect to your work with

24  CNBM?

1        A.    Yes.

2        Q.    What is the purpose of this

3   document?

4        A.    It's the formal application

5   to the Stock Exchange for the listing of

6   the securities.

7        Q.    And it says, Revised.

8        A.    Yes.

9        Q.    Is this your --

10       A.    So I -- hang on.

11             I think a version of Form

12   C-1 would have been submitted earlier

13   that might have had a smaller -- smaller

14   size offering.  I think the offering size

15   was increased during the course of the

16   planning for the IPO.

17       Q.    Okay.  It indicates on Page

18   2 of this document, 6.1, that at the time

19   of the IPO, the substantial shareholders

20   of CNBM included CNBMG and Beijing New

21   Building Materials Group as well,

22   correct?

23       A.    Yes.

24       Q.    And it also lists below the

Confidential - Subject to Further Confidentiality Review

1    directors of the company as well as their

2    roles, correct?

3           A.    Correct.

4           Q.    In addition, on Page 10, it

5    indicates that, We, China National

6    Building Material Company Limited,

7    undertake to comply with the Listing

8    Rules from time to time so far as

9    applicable to the company.

10                And there's a signature page

11   on Page 11.

12                Do you see that?

13          A.    I do.

14          Q.    Okay.  And it requires

15   Chairman Song to sign it as well as

16   yourself, correct?

17          A.    Correct.

18          Q.    Did Chairman Song sign a

19   revised C-1?

20          A.    He must have done.

21          Q.    And he would have done so on

22   behalf of CNBM, correct?

23          A.    Correct.

24          Q.    And in doing so, that would

Confidential - Subject to Further Confidentiality Review

1  signify that CNBM was going to comply

2  with the Listing Rules of the Hong Kong

3  Exchange during the time it was listed,

4  correct?

5       A.   Correct.

6       Q.   And that's an ongoing

7  obligation, isn't it?

8       A.   Yes.

9       Q.   I'm going to show you two

10 documents.  I'm not going to mark them as

11 exhibits, but I've got some questions.

12 One is MS 000475.  And one is MS 00435.

13           One says revised version,

14 and you'll see all my stickies and tabs

15 on it.  And the other one does not.

16           Is the revised version the

17 most current version or is there a way to

18 know or tell?

19       A.   The difference appears to be

20 this one is drafted, it has some square

21 brackets in it.

22       Q.   Right.

23           MR. FORCE:  When you were

24       saying "this one," which one are

1          you referring to?

2               THE WITNESS:  I'm referring

3          to the one that is not the revised

4          version.

5               MR. FORCE:  What number on

6          the bottom right-hand side of the

7          page?

8               MR. STECKLER:  00435.

9               THE WITNESS:  475 is the

10         unrevised one.

11    BY MR. STECKLER:

12         Q.    Right.  Exactly.  I'm sorry.

13         A.    And that still has some

14    square brackets on it.  So it appears to

15    be a draft.

16         Q.    All right.  Thank you.  Let

17    me take both of those.

18               And what is this document

19    called, by the way?

20         A.    It's the institutional

21    selling memorandum.

22         Q.    What is an institutional

23    selling memorandum?

24         A.    It's a memorandum prepared

1    by the investment banking team who had

2    been the core team that's been working

3    with the company to prepare for a

4    listing, that's prepared for the use of

5    the equity sales force, who are the

6    people who are actually going out and

7    selling the shares to the investors.

8              So it's essentially that

9    briefing pack.

10        Q.    And so this is what the

11   investors use -- the investment analysts

12   use to brief people?

13             MR. FORCE:  Object to form.

14             THE WITNESS:  No.  It's not

15        the investment analysts or the

16        research analysts.  These are the

17        sales force.

18             So equity salesmen.  So the

19        people who are calling up

20        investors and trying to take

21        orders from them for the shares.

22   BY MR. STECKLER:

23        Q.    Okay.

24             MR. STECKLER:  I'm going to

1          go ahead and hand you what I'm

2          going to need to clip and mark as

3          Exhibit Number 13 to your

4          deposition.

5                    -   -   -

6              (Whereupon, Exhibit

7          Keyes-13, Offering Summary, was

8          marked for identification.)

9                    -   -   -

10    BY MR. STECKLER:

11         Q.   And these salesmen, do they

12    work for Morgan Stanley?

13         A.   Yes.

14         Q.   And are they engaged and

15    retained by CNBM?

16         A.   Well, Morgan Stanley is

17    engaged and retained by CNBM, and they

18    are employees of Morgan Stanley who

19    are --

20         Q.   That's my --

21         A.   -- contributing to the

22    effort.

23         Q.   CNBM has hired you and your

24    employees to sell or highlight the

1    investment opportunity of CNBM?

2         A.    Yes.

3         Q.    Okay.  And that's what this

4    institutional selling memorandum is to

5    assist with?

6         A.    That's correct.

7         Q.    And I'm going to give you a

8    copy.

9              MR. STECKLER:  And I'm

10             going to -- I will have Fred try

11             to break down copies for everybody

12             at your convenience.  If there's

13             something you need to see right

14             away, let me know.  And I

15             apologize.

16   BY MR. STECKLER:

17        Q.    And if we look at Page 3 --

18   first of all, this is a business record

19   of Morgan Stanley, correct?

20        A.    Yes.

21        Q.    Kept in the ordinary course

22   of business with respect to the work it's

23   doing for CNBM, correct?

24        A.    Yes.

1        Q.    And I'm not sure if it has

2    an exact date, but I take it it was

3    prepared at or around the time of the

4    initial public offering; is that fair?

5        A.    Yes, that's correct.

6        Q.    And, in fact, your name

7    appears on the very front, correct?

8        A.    That's right.

9        Q.    And if we go to the very

10   first page, it talks about the offering

11   summary, which we've reviewed previously,

12   correct?

13       A.    Page 3?

14       Q.    Page 3.

15       A.    Yes.

16       Q.    And, in fact, once again, we

17   see the reference to the U.S. securities

18   regulations under offering tranches,

19   correct?

20       A.    I'm looking.

21             Yes.

22       Q.    And part of the purpose of

23   that is so that CNBM can solicit its

24   shares to institutional investors in the

1    United States, correct?

2         A.    Correct.

3         Q.    It mentions that Morgan

4    Stanley is the sole global coordinator

5    and book runner for CNBM, correct?

6         A.    That's correct.

7         Q.    It talks about co-lead

8    manager, CICC and Daiwa.

9         A.    Correct.

10        Q.    What is CICC?

11        A.    CICC is a Chinese investment

12   bank, China International Capital

13   Corporation.

14             And Daiwa is a Japanese

15   securities house.

16        Q.    And Morgan Stanley owns

17   interest in CICC, correct?

18        A.    We used to.  We don't

19   anymore.

20        Q.    You did at that time,

21   though?

22        A.    We did at that time.

23        Q.    So Morgan Stanley was the

24   investor banker and they also owned an

1    interest in the Chinese investment

2    banking company that was involved in this

3    transaction as well, correct?

4        A.    Correct.

5        Q.    And, again, it talks about

6    the proceeds are being used to fund some

7    of the businesses of the subsidiaries of

8    CNBM, correct?  Under use of proceeds.

9        A.    Yes, in substance, that's

10    right.

11        Q.    And it also references

12    counsel here, Slaughter and May in Hong

13    Kong.

14            Who are they?

15        A.    Who is Slaughter and May?

16        Q.    Yes, sir.

17        A.    They are one of the leading

18    UK law firms, with a branch in Hong Kong,

19    practicing Hong Kong law.

20        Q.    It also references Davis

21    Polk & Wardwell, U.S.

22            Are they the U.S. counsel

23    that CNBM is using --

24        A.    That's correct.

1    Q.    -- for this transaction?

2          And Jingtian, PRC, are they

3    the --

4    A.    Jingtian was the Chinese

5    counsel, yes.

6    Q.    So for purposes of this

7    transaction, CNBM retained a United

8    Kingdom law firm, a United States law

9    firm, and a People's Republic of China

10   law firm, correct?

11   A.    Yes.

12   Q.    And it says their

13   underwriters are Linklaters in Hong Kong

14   and the United States, correct?

15   A.    Correct.

16   Q.    And so a U.S. company also

17   underwrote part of this --

18   A.    Well, I'm sorry.  Linklaters

19   is underwriter's counsel.

20   Q.    Underwriter's counsel.  I

21   got you.

22   A.    Yes.  A law firm.

23   Q.    Yes, it's a law firm.

24         They are a U.S. law firm

1    that was counsel for the underwriter for

2    this IPO?

3                   MR. FORCE:  Object to the

4          form.

5                   THE WITNESS:  Again, they

6          are a UK firm that happens to

7          practice Hong Kong and U.S. law as

8          well.

9    BY MR. STECKLER:

10         Q.    Oh, they practice U.S. law.

11   I thought they were also in the United

12   States.

13         A.    I think they have an office

14   here, yes.

15         Q.    And I thought they would --

16   I would assume they would be retained to

17   give opinions with respect to U.S. law as

18   part of this transaction as well?

19         A.    Yes.

20         Q.    Okay.  And I see that the

21   auditor is Deloitte & Touche?

22         A.    Correct.

23         Q.    And they are a United States

24   accounting firm?

1        A.    I can't speak to what their

2   legal structure is.  They are a global

3   firm.

4        Q.    Let's go to Page 4 of the

5   memoranda.

6             MR. CAMPBELL:  Can we get a

7        copy of this?

8             MR. STECKLER:  It's 000438.

9   BY MR. STECKLER:

10        Q.    And you'll see it says --

11             MR. FORCE:  Which page?  Can

12        we catch up?

13             MR. STECKLER:  Page 4 or

14        000438.

15             MR. FORCE:  Thank you.

16   BY MR. STECKLER:

17        Q.    It talks about launch of

18   road show.

19             Do you see that?

20        A.    I do.

21        Q.    Okay.  And it indicates,

22   March 13, launch HKPO.

23        A.    Yes.

24        Q.    Hong Kong public offering,

1   correct?

2        A.    Correct.

3        Q.    And it says, New York

4   investor luncheon.

5              Do you see that?

6        A.    I do.

7        Q.    And what is that?

8        A.    The investor luncheon?

9        Q.    Yes, sir.

10       A.    So that would be a meeting

11  for a large group of investors who are

12  interested in the IPO who had been

13  contacted by our sales force and had

14  expressed an interest in investing in the

15  IPO.

16             And they would have been

17  invited to a lunch at which the

18  management team would have given a

19  presentation about the company's

20  business.

21       Q.    And that management team for

22  CNBM, would that include Chairman Song?

23       A.    It would have included

24  Chairman Song and Mr. Cao, yes.

Confidential - Subject to Further Confidentiality Review

1    Q.    Similarly, would they have

2    been involved in the Boston investor

3    luncheon?

4    A.    Yes.

5    Q.    And what about the,

6    quote/unquote, West Coast --

7    A.    They would have been

8    involved in all the investor meetings

9    throughout this.

10   Q.    And this would be after

11   Morgan Stanley, at CNBM's behest, had

12   already attempted to solicit

13   institutional investors in the United

14   States, correct?

15   A.    Yes.  So you can see launch

16   of the road show, we would have opened

17   the books to start taking orders from

18   investors from that date onwards.

19        And so our sales force would

20   have been contacting investors all around

21   the world to build their interest and to

22   take orders from them to buy shares.  So,

23   certainly, before any of these meetings

24   they would have been -- they would have

Confidential - Subject to Further Confidentiality Review

1  had an extensive dialogue with somebody

2  from Morgan Stanley about the

3  opportunity.

4       Q.    And let's take a look at

5  Page 7 of this memoranda.  It talks about

6  corporate structure.

7            Can you explain this

8  corporate structure to us?

9       A.    Yes.  So it -- at the center

10  of the chart, it shows CNBM, which is the

11  company whose shares are being listed.

12  And this shows the -- above CNBM, it

13  shows what the percentage ownership is

14  going to be after the IPO is completed.

15            So public investors would be

16  the people we're selling shares to in the

17  international placement in the Hong Kong

18  public offer.

19            Parent group, I think we

20  know who they are, they would wind up

21  with 63.49 percent of CNBM.

22       Q.    So what would they be

23  called, parent group, CNBMG, what's the

24  term, they're substantial -- they're

1    controlling shareholder?

2        A.    They're controlling

3    shareholder.

4        Q.    So parent group is

5    controlling shareholder, that's CNBMG.

6              And then we have CNBM --

7        A.    Yeah.

8        Q.    -- correct?  And they are

9    the one that's being listed?

10       A.    That's correct.

11             And then underneath it shows

12   the principals, subsidiaries and

13   associated company.

14       Q.    Okay.  And would CNBM be a

15   substantial shareholder of China United?

16       A.    I mean, as that -- as that

17   term sort of applied in normal English

18   usage, yes.  I think we were talking

19   about the definitions earlier.

20       Q.    Right.  And CNBM would be a

21   substantial shareholder of BNBM, correct?

22       A.    Controlling shareholder.

23       Q.    Controlling shareholder?

24       A.    Yes.

1    Q.    CNBM would be the

2  controlling shareholder of China

3  Fiberglass, correct?

4    A.    Of all the companies listed

5  in the bottom row, yes.

6    Q.    So they are the controlling

7  shareholder of all of these companies?

8    A.    Yes.

9    Q.    And each of these companies

10  are close associates of each other, these

11  bottom companies, correct?

12    A.    Yes.  As that's defined in

13  the Hong Kong Listing Rules, that's

14  correct.

15    Q.    And if we look at Page 14,

16  under, Excellent growth potential through

17  organic growth and acquisition.  If we

18  look at the fourth bullet point, it talks

19  about the acquisition of the gypsum board

20  from the Shandong Taihe in April of 2005,

21  correct?

22    A.    Yes.

23    Q.    And that acquisition would

24  have occurred through BNBM; isn't that

1  correct?

2      A.    That did occur through BNBM,

3  yes.

4      Q.    But, nonetheless, CNBM is

5  asserting that they were the company that

6  acquired Shandong Taihe?

7          MR. FORCE:  Object to the

8      form.

9          MR. CAMPBELL:  Join.

10          THE WITNESS:  Well, to

11      start, this is an internal Morgan

12      Stanley rather than a CNBM

13      document.

14  BY MR. STECKLER:

15      Q.    But it's for selling

16  purposes to investors and shareholders,

17  correct?

18      A.    Yes.  It's making the point

19  that the group has acquired these

20  companies.

21      Q.    And so CNBM is the head of

22  the group?

23      A.    Yes.

24      Q.    And CNBM is taking credit

1    here, or is being advocated as taking

2    credit for the acquisition of Shandong

3    Taihe --

4              MR. FORCE:  Object to the

5         form.

6    BY MR. STECKLER:

7         Q.    -- correct?

8              MR. KATTAN:  Join.

9              MR. GRESSLER:  Object to the

10        form.

11             THE WITNESS:  Well, I think

12        this is -- as I said, it's an

13        internal Morgan Stanley document

14        that's prepared to brief the sales

15        force.  And it's making the point

16        that these companies have been

17        acquired by the group.

18             I don't think anybody was

19        trying to sort of make a

20        particular point about which

21        entity in the group acquired

22        anything.

23   BY MR. STECKLER:

24        Q.    I appreciate that.

1          And what I'm -- the point

2    I'm trying to make, and I think we may

3    agree, is CNBM views itself as a group

4    composed of subsidiaries, so that it's

5    showing that it has control over BNBM and

6    Taihe --

7               MR. FORCE:  Object to the

8          form.

9               MR. KATTAN:  Object to the

10         form.

11   BY MR. STECKLER:

12         Q.    -- and that's what's being

13   represented to investors?

14              MR. FORCE:  Object to the

15         form.

16              MR. GRESSLER:  Join.

17              MR. CAMPBELL:  Join.

18              THE WITNESS:  So, I mean,

19         this is talking about the

20         acquisitions being made by the

21         group, yes.

22   BY MR. STECKLER:

23         Q.    And if we looked on Page 15

24   of this memorandum that is being used to

Confidential - Subject to Further Confidentiality Review

1    sell H shares of CNBM, under Number 3, it

2    says, High-end positioning with

3    integrated operations and diverse product

4    range.

5              And it talks about, In

6    gypsum board industry, BNBM's product are

7    targeting at high-end market and has

8    satisfied both U.S. and UK standards.

9              MR. FORCE:  Object to the

10        form.

11   BY MR. STECKLER:

12        Q.    Do you see that?

13        A.    I do see that.

14        Q.    And, again, this goes to the

15   quality of the product, correct?

16        A.    Yes.

17        Q.    Do you know whether, at that

18   time, there was going to be an effort

19   made by BNBM to target the United States

20   market?

21        A.    I -- it's not something I

22   recall.

23        Q.    The fact that BNBM's product

24   had satisfied U.S. and UK standards, was

1    it your understanding that that made it

2    eligible to be sold within the United

3    States?

4            A.    That would appear to be the

5    case.

6            Q.    I would like you to turn to

7    Page 39 of MS 00047 -- I think it's 3.

8                MR. GRESSLER:  I'm sorry,

9            what page?

10               MR. STECKLER:  Page 39 of

11           the actual document, but it's MS

12           000473.

13               MR. GRESSLER:  Thank you.

14               THE WITNESS:  I got it.

15   BY MR. STECKLER:

16           Q.    And this is a list of

17   institutional shareholder analysis,

18   gypsum board and diversified building

19   material sector.

20               Can you explain this to me?

21           A.    Yes.  So this is looking at

22   some of the existing listed companies

23   around the world which are producers of

24   gypsum board or diversified building

1    materials and showing the publicly

2    disclosed major institutional investors

3    in those companies.

4              And the reason why this

5    would be here is that for the

6    salespeople, who might be calling some of

7    these investors, with a view selling them

8    CNBM shares, it could be relevant for

9    them to understand what exposure those

10   investors already have to the sector.

11        Q.    And so -- and then we look

12   at the next page, 40, that talks about

13   the fiberglass sectors.

14              These are -- these are

15   institutional investors in the United

16   States, or elsewhere, that are already

17   invested in that particular business,

18   correct?

19        A.    Yes.

20        Q.    Similarly, if we go to Page

21   38, there are a list of other

22   institutional --

23        A.    In this --

24        Q.    Yes.

Confidential - Subject to Further Confidentiality Review

1          -- investors in cement that

2    have invested in that area, correct?

3          A.    Yes.

4          Q.    And so these are the types

5    of targeted institutional investors that

6    may be interested in CNBM for purposes of

7    selling; is that right?

8          A.    Possibly, yes.

9          Q.    And that's why it's

10   pertinent to this particular document; is

11   that right?

12         A.    Correct.

13         Q.    CNBM, through Morgan

14   Stanley, wanted to target institutional

15   investors like those listed here on Pages

16   38, 39 and 40 of Exhibit Number 13 for

17   sale of its H shares; is that right?

18         A.    Yes.  Just to be clear, it

19   certainly wouldn't be an exhaustive list

20   of the people that we targeted, but these

21   would be included.

22         Q.    Now, when they did these

23   road shows, were there sign-in sheets?

24         A.    Yes.  There would have been

Confidential - Subject to Further Confidentiality Review

1    a record, probably made at the time, just

2    to make sure that people knew who

3    attended the lunches.

4            Q.    Do you know whether Morgan

5    Stanley would have retained those sign-in

6    sheets?

7            A.    I have no idea.

8            Q.    Now, did you participate in

9    the first road show in the United States?

10           A.    I believe I did.

11           Q.    How about subsequent road

12   shows, were you present during subsequent

13   road shows?

14           A.    No, I only joined the IPO

15   road show.

16           Q.    You -- I take it other

17   members of your Morgan Stanley team, or

18   Morgan Stanley, because I know you

19   weren't there the whole time, would have

20   attended those road shows, correct?

21           A.    They -- they may have done,

22   yes.  They wouldn't necessarily always do

23   so.  But, yes, they may have done.

24                 MR. STECKLER:  Counsel, I

1     was looking at my watch.  It's

2     12:35.  We can stop now or we keep

3     going.  I don't --

4          MR. FORCE:  I thought you'd

5     probably finish this document and

6     we could take a break.

7          MR. STECKLER:  I think I'm

8     pretty much done with this

9     particular document at this time.

10    If this is a good stopping point,

11    let's go ahead and take that

12    break.

13         VIDEO TECHNICIAN:  The time

14    is 12:34.  And we are off the

15    record.

16              -  -  -

17         (Whereupon, a luncheon

18    recess was taken.)

19              -  -  -

20         VIDEO TECHNICIAN:  The time

21    is 1:16.  We are back on the

22    record.

23              -  -  -

24         (Whereupon, Exhibit

1              Keyes-14, China National Building

2              Material Company International

3              Placing Offering Memorandum, was

4              marked for identification.)

5                       -  -  -

6    BY MR. STECKLER:

7         Q.    Sir, I've handed you what

8    we've marked as Exhibit Number 14 to your

9    deposition.

10             Can you identify this for

11   us, please?

12        A.    Yes.  This is the

13   international placing offering memorandum

14   for the IPO.

15        Q.    And that would be for the

16   CNBM IPO?

17        A.    Correct.

18        Q.    Is this a business record of

19   Morgan Stanley?

20        A.    Yes.

21        Q.    It's kept in the ordinary

22   course of business by Morgan Stanley for

23   its work with CNBM?

24        A.    Yes.

Confidential - Subject to Further Confidentiality Review

1       Q.    And it was made and created

2   in the time in which it is, I believe,

3   dated at the back somewhere?

4       A.    On the front.

5       Q.    Or on the front?

6       A.    Yes.

7       Q.    There you go.  Yes.

8             What is an offering

9   memoranda?

10      A.    It's a document that is

11  wrapped around the prospectus and

12  delivered to investors.  So what

13  investors would have received would have

14  been a printed document, of which this

15  would have been the front 48 pages, and

16  with the Hong Kong prospectus attached

17  behind it.

18      Q.    Let me hand you what I'm

19  going to mark as Exhibit Number 15.  It's

20  a notebook.

21                  -  -  -

22            (Whereupon, Exhibit

23        Keyes-15, Hong Kong Prospectus,

24        was marked for identification.)

Confidential - Subject to Further Confidentiality Review

1                    -   -   -

2   BY MR. STECKLER:

3        Q.    What is Exhibit Number 15?

4        A.    This is the Hong Kong

5   prospectus.

6        Q.    So that is the offering

7   memorandum plus the prospectus?

8        A.    Yes.

9        Q.    And all of the

10  information --

11       A.    That's right.

12       Q.    -- contained therein?

13       A.    So a prospective investor

14  buying in the Hong Kong public offer

15  would just get this document, the Hong

16  Kong prospectus, but anybody to whom we

17  were selling shares in the international

18  placing, so the institutional investors

19  around the world, would have received a

20  document that had these two bound

21  together.

22       Q.    And is Exhibit Number 15 a

23  business record of Morgan Stanley?

24       A.    Yes, it is.

Confidential - Subject to Further Confidentiality Review

1    Q.    And is it kept and

2  maintained in the ordinary course of

3  business of Morgan Stanley in doing work

4  for CNBM?

5    A.    Yes, it is.

6    Q.    And it was made and created

7  contemporaneously with the date on there?

8    A.    Yes, that's right.

9    Q.    Is it best to utilize the

10  offering memorandum for the highlights of

11  what's in the prospectus or are there

12  additional things in the prospectus that

13  we should look at?

14    A.    Well --

15    Q.    In other words, I

16  understand -- what I'm saying is, the

17  offering memorandum is sort of a summary

18  of the highlights of what's contained in

19  more detail in Exhibit Number 15?

20    A.    I'd say that most of the

21  substance is in Exhibit-15.

22    Q.    Okay.  And what would you

23  say is in Exhibit-14?

24    A.    This is really just

Confidential - Subject to Further Confidentiality Review

1  additional information in relation to the

2  international placing, including some

3  information just presented in a way that

4  international investors are used to

5  seeing it.

6              So, for example, this

7  summary of the offering, it's just a

8  conventional format that people are used

9  to.  But it's merely duplicating selected

10  information from what's in here.

11              MR. FORCE:  And when you say

12          "in here," what document are you

13          referring to?

14              THE WITNESS:  Sorry,

15          Exhibit-15, which is the Hong Kong

16          prospectus.

17  BY MR. STECKLER:

18          Q.    So international investors,

19  that being U.S. investors, for example,

20  would receive the offering memorandum as

21  the cover to the actual prospectus, which

22  is Exhibit-15, correct?

23          A.    Yes.  This is often referred

24  to as the international wrap, because

Confidential - Subject to Further Confidentiality Review

1    it's wrapped around the prospectus.

2         Q.    And like all of us

3    Americans, it provides sort of more of a

4    summary of what's contained in more

5    detail in Exhibit-15; is that fair?

6              MR. FORCE:  Object to the

7         form.

8              THE WITNESS:  No, I

9         wouldn't -- I wouldn't call it a

10        summary.  I'd call it a

11        supplement.

12   BY MR. STECKLER:

13        Q.    A supplement.

14              And why do you say it's a

15   supplement?

16        A.    Because it doesn't summarize

17   everything that's important in here,

18   first of all.

19              And, second, there are some

20   items of information relating to the

21   structure of the international offering

22   that are in addition to what's in the

23   main prospectus.

24              So this is never supposed to

1  be looked at in isolation.  It's taken

2  together.

3          Q.    Fair enough.  Would U.S.

4  investors, though, get the offering

5  memorandum?

6          A.    Yes.

7          Q.    In addition to Exhibit-15,

8  which is the actual prospectus, correct?

9          A.    They would receive a single

10  document which contains both of these

11  components.

12          Q.    Fair enough.

13          A.    Yes.

14          Q.    Let's go ahead and look at

15  Exhibit Number 14.

16              On Page -- I think it's

17  listed W3, at the very bottom, it says,

18  The information contained herein is true

19  and accurate in all material respects and

20  is not misleading in any material respect

21  and that the opinions and intentions

22  expressed herein are honestly held and

23  have been reached after considering all

24  relevant circumstances and are based on

1   reasonable assumptions that there are no

2   other facts, the omissions of which

3   would, in the context of the issue and

4   offering of our H shares, make this

5   offering memorandum, as a whole, or any

6   of such information or the expression of

7   such opinions or intentions, misleading

8   in any material respect.

9            Do you see that?

10       A.    Yes.

11       Q.    Is this supposed to tell

12   investors that these are honest and fair

13   representations, made to the best of the

14   company's ability, about the company and

15   the IPO?

16       A.    Yes.

17       Q.    Okay.  And on Page W4, it

18   says here, Notice to New Hampshire

19   residents.

20            Why is that in there?

21       A.    You have to ask the U.S.

22   Securities.  I have no idea.

23       Q.    Is this the State of New

24   Hampshire in the United States?

Confidential - Subject to Further Confidentiality Review

1      A.    Yes.

2      Q.    Is this a rule that's

3  specific to residents in the State of New

4  Hampshire?

5            MR. FORCE:  Object to the

6       form.

7            THE WITNESS:  As well as I

8       said, I --

9  BY MR. STECKLER:

10     Q.    I'm not asking for a legal

11  opinion.  I'm asking, is that your

12  understanding as a --

13     A.    Something like this appears

14  in every 144A offering memorandum, so I

15  assume there's some requirement that

16  makes it necessary.

17     Q.    And what's your

18  understanding of why it's in here?

19            MR. FORCE:  Object to the

20       form.

21  BY MR. STECKLER:

22     Q.    Let me rephrase it.

23            Is it your understanding

24  that the State of New Hampshire, in the

1    United States, has some special laws that

2    need to be put into this particular

3    offering?

4         A.    That seems reasonable.

5         Q.    Is that your understanding?

6         A.    Yes, it is.

7         Q.    Okay.  And it talks about

8    available information on Page W5.

9              Do you see that?

10        A.    Yes.

11        Q.    Again, it references the

12   U.S. Securities and Exchange Act; is that

13   right?

14        A.    Yes.

15        Q.    And that would be applicable

16   with respect to institutional investors,

17   correct?  Is that your understanding?

18        A.    I'm just reading the

19   paragraph.

20        Q.    Sure.

21        A.    Yes, it's indicating that

22   intention to comply with Rule 144A under

23   the Securities Act, which is -- allows

24   them to sell to qualified institutional

1  buyers without conducting a registered

2  offering.

3       Q.    Within the United States,

4  correct?

5       A.    Correct.

6       Q.    Now, let's go to W6 of

7  Exhibit Number 14.

8            It says here that, We've

9  been advised by our Hong Kong counsel,

10  Slaughter and May, that there is doubt as

11  to the enforceability in Hong Kong in

12  original actions or in actions for

13  enforcement of judgements of United

14  States courts of civil liabilities

15  predicated solely upon the federal

16  securities laws of the United States.

17            Do you see that?

18       A.    I do.

19       Q.    Okay.  And do you have any

20  knowledge of that particular statement or

21  paragraph?

22       A.    I'm familiar with it being

23  in every one of these IPO offering

24  memoranda.

Confidential - Subject to Further Confidentiality Review

1    Q.    Basically, that Hong Kong

2  may not be the place to litigate U.S.

3  security laws or its applicability; is

4  that your understanding?

5    A.    Well, I think that, if you

6  get a judgment in the U.S. court, it may

7  not be enforceable in Hong Kong.  I think

8  that's what it is saying.

9    Q.    It talks about federal

10  securities laws, though, predicated upon

11  federal securities laws.

12          Do you see that?

13    A.    Yes.

14    Q.    And that's what that applies

15  to, right?

16          MR. FORCE:  Object to the

17          form.

18  BY MR. STECKLER:

19    Q.    Is that your understanding?

20    A.    Yes.  My understanding is

21  that what it's saying is that if there's

22  an action that's based purely on federal

23  securities laws of the United States,

24  that that -- a judgment may not be

1    enforceable in Hong Kong.

2         Q.    The next sentence says that,

3    We have been advised by our PRC counsel,

4    Jingtian & Gongcheng Law Office that

5    there is uncertainty as to whether the

6    courts of the PRC would enforce

7    judgements of U.S. courts obtained

8    against us or such persons predicated

9    upon the civil liability provisions of

10   the U.S. federal or state security laws

11   or entertain original actions brought in

12   the PRC against us or such persons

13   predicated upon the U.S. federal or state

14   securities laws.

15        A.    Yes.

16        Q.    Is that in every offering

17   memorandum and prospectus?

18        A.    Something like that would

19   be, yes.

20        Q.    And do you know whether

21   there is still uncertainty as to this

22   issue?

23        A.    I don't think that this has

24   changed, as far as I'm aware.

1    Q.    It will.

2          Let's take a look at W17 of

3    Exhibit-14.

4          This is the actual offering.

5    It talks about international placing.

6    A.    Yes.

7    Q.    This international placing,

8    the H shares are solely international and

9    this is the amount that is being offered;

10   is that fair?

11   A.    Yes.  International, in this

12   context, means excluding Hong Kong.  But,

13   yes.  This is showing the number of H

14   shares that are for sale.  So the global

15   offering, the first paragraph shows the

16   aggregate of the entire offering, which

17   is about 10 percent of the Hong Kong

18   public offering and 90 percent

19   international placing.

20   Q.    And it says, The

21   international placing will be made, one,

22   in the United States to qualified

23   institutional buyers in reliance on Rule

24   144A under the Securities Act and,

1    outside the United States, in reliance on

2    Regulation S under the Securities Act.

3                Correct?

4         A.    Correct.

5         Q.    And we've been through that

6    before.

7                So there's definitely a

8    solicitation in the United States of

9    institutional buyers by CNBM?

10        A.    Yes.

11        Q.    And Morgan Stanley New York

12   would be an institutional investor being

13   solicited for this?

14        A.    No, we wouldn't have been an

15   investor in the IPO.

16        Q.    You can subsequently, as a

17   financial institution, invest in H

18   shares?

19        A.    Yes, we could do.  But --

20        Q.    Right.

21        A.    -- there are rules in Hong

22   Kong which prevent anybody who is

23   connected to a sponsor from investing in

24   the offering.  So we wouldn't be allowed

Confidential - Subject to Further Confidentiality Review

1      to take shares in the placement.

2           Q.    Definitely not in the

3      initial public offering?

4           A.    Correct.

5           Q.    Now, at what point in time

6      could Morgan Stanley, and not Morgan

7      Stanley Asia, but Morgan Stanley the

8      institutional investor in New York, buy H

9      shares?

10          A.    I believe -- I believe

11     there's no restriction once the shares

12     are listed and they're freely tradeable,

13     they can buy and sell.

14          Q.    Let's go to W23 of Exhibit

15     Number 14.

16               Can you read the paragraph

17     in bold?  We cannot guarantee.

18          A.    We cannot guarantee the

19     accuracy of facts and statistics derived

20     from official sources and industry

21     publications with respect to the PRC, the

22     PRC economy and the PRC building

23     materials industry contained in this

24     prospectus, and investors should not

Confidential - Subject to Further Confidentiality Review

1    place undue reliance on them.

2            Q.    Why is that in there?

3            A.    I think it's to put people

4    on notice that although statistics are

5    derived from official sources, it doesn't

6    necessarily mean that they are completely

7    accurate.

8            Q.    And what is the basis for

9    Morgan Stanley including this in the

10   initial public offering memorandum?

11           A.    To put investors on notice

12   that they shouldn't place undue reliance

13   on certain information.

14           Q.    How does Morgan Stanley know

15   that you should not pay undue reliance on

16   official sources and industry

17   publications with respect to the PRC, the

18   PRC economy and PRC building materials

19   industry?

20               MR. FORCE:  Object to the

21       form.

22               THE WITNESS:  I believe that

23       would be due to the experience of

24       our people who study these

1          statistics and compare it with

2          other information.

3               I think it's quite well

4          established, for example, that

5          many economists doubt economic

6          data that comes out of China being

7          accurate, just as an example.

8     BY MR. STECKLER:

9          Q.    Is it fair to say that

10    Morgan Stanley has experienced

11    inaccuracies in official sources,

12    industry publications and documents

13    regarding PRC building materials

14    industry, the PRC economy and their

15    official sources?

16         A.    I can't say the specifics.

17         Q.    I'm not -- I'm speaking

18    generally, obviously.

19              Has that been an experience

20    that Morgan Stanley has had that

21    necessitated this paragraph?

22         A.    I'm not aware of a specific

23    instance that Morgan Stanley has

24    experienced that inaccuracy that's led to

1    this paragraph.

2         Q.    So you're not aware of a

3    specific incident or instance in which

4    Morgan Stanley found PRC documents

5    unreliable or inaccurate, but there have

6    been instances which necessitate putting

7    this caveat in the document?

8         A.    I'm not aware of a specific

9    instance that Morgan Stanley has, that's

10   right.

11        Q.    I understand that.  But

12   there have been instances, and there has

13   been some level of experience, to

14   necessitate putting this in, correct?

15             MR. FORCE:  Object to the

16        form.

17             THE WITNESS:  I believe so.

18   BY MR. STECKLER:

19        Q.    And that's my point.  You

20   don't recall a specific incident but,

21   obviously, there's a basis for this

22   paragraph?

23        A.    Yes.

24        Q.    It's not just thrown in here

Confidential - Subject to Further Confidentiality Review

1   for the hell of it, it's thrown in there

2   based on somebody's experience, at some

3   point in time, dealing with PRC

4   documents, fair?

5        A.    I expect so, yes, that's

6   fair.

7        Q.    I'd like you to take a look

8   at W33.  It talks about restrictions on

9   controlling shareholders.

10           It says, In addition to

11   obligations imposed by law or required by

12   the Hong Kong Stock Exchange, a

13   controlling shareholder --

14        A.    I'm sorry, could we --

15   somebody put the blind down, I'm getting

16   sun in my eye.

17           MR. STECKLER:  Stay tight.

18       I'll do it.

19                 -  -  -

20           (Whereupon, a discussion off

21       the record occurred.)

22                 -  -  -

23   BY MR. STECKLER:

24        Q.    We're on Page W33, the

Confidential - Subject to Further Confidentiality Review

1    offering memorandum, under restrictions

2    on controlling shareholders.

3         A.    Yes.

4         Q.    It says, In addition to

5    obligations imposed by law or required by

6    the Hong Kong Stock Exchange, the

7    controlling shareholder may not exercise

8    his voting rights in a manner prejudicial

9    to the interest of the shareholders

10   generally or of some of the shareholders.

11             Do you see that, sir?

12        A.    Yes.

13        Q.    A controlling shareholder,

14   in this instance, would be CNBMG,

15   correct?

16        A.    Yes.

17        Q.    And it says that they cannot

18   relieve a director or supervisor of his

19   duty to act honestly in the best interest

20   of the company, to approve the

21   expropriation by a director or supervisor

22   in any guise of the assets of the

23   company.

24             And it goes on to say, Or to

1    approve the expropriation by a director

2    or supervisor of the individual rights of

3    shareholders, including, without

4    limitation, the rights to distributions

5    and voting rights.

6                Do you see that?

7        A.    I do.

8        Q.    And then it defines a

9    controlling shareholder underneath that.

10                Controlling shareholder

11   means a person who satisfies one or more

12   of the following conditions.  He acts

13   alone or acting in concert with others

14   and has the power to elect more than half

15   the board of directors.  He alone, or

16   acting in concert with others, has the

17   power to exercise or to control the

18   exercise of 30 percent or more of the

19   voting rights in the company.  He alone,

20   or acting in concert with others, holds

21   30 percent or more of issued and

22   outstanding shares of the company.  Or,

23   he alone, or acting in concert with

24   others, in any other matter controls the

Confidential - Subject to Further Confidentiality Review

1    company in fact.

2         And it says that,

3    Immediately after this global offering,

4    each of parent -- which is BNBMG,

5    Building Materials Academy, and CNBM

6    Trading -- will continue to be a

7    controlling shareholder of the company.

8         Do you see that?

9         A.    I do.

10        Q.    And you're aware that in

11   2014, CNBMG was a controlling

12   shareholder --

13             MR. FORCE:  Object.

14   BY MR. STECKLER:

15        Q.    -- of CNBM?

16             MR. FORCE:  Object.  That

17        question is outside the scope of

18        the deposition subpoena.

19             THE WITNESS:  Should I go

20        ahead and answer?

21   BY MR. STECKLER:

22        Q.    You can answer.

23        A.    Yes.

24        Q.    Okay.  So if we go back to

Confidential - Subject to Further Confidentiality Review

1    Page W33, it says here that, Controlling

2    shareholders should not exercise their

3    right in a manner prejudicial to the

4    interests of shareholders generally.

5            Correct?

6        A.    Yes.

7        Q.    Or of some of the

8    shareholders.

9            You see that, right?

10       A.    I do.

11       Q.    So if a -- if CNBMG is

12   voting to ignore a federal judge's ruling

13   on a case that could open CNBM up to

14   liability, would that be prejudicing the

15   interest of shareholders?

16            MR. GRESSLER:  Object to

17            form.

18            MR. FORCE:  Object to the

19            question as outside the scope of

20            the deposition subpoena.  If you

21            want to ask in his personal

22            capacity, you can ask him that.

23            THE WITNESS:  I'm sorry,

24            could you repeat the question?

1            MR. STECKLER:  Could you

2       read that back, please?

3                 -  -  -

4            (Whereupon, the court

5       reporter read the following part

6       of the record:

7            "Question:  If CNBMG is

8       voting to ignore a federal judge's

9       ruling on a case that could open

10      CNBM up to liability, would that

11      be prejudicing the interest of

12      shareholders?")

13                 -  -  -

14           MR. CAMPBELL:  Objection to

15      form.

16           MR. KATTAN:  Join with it.

17           MR. FORCE:  I'll reassert my

18      objection, just to make sure it's

19      in the record.

20           THE WITNESS:  I think you

21      have the company taking a business

22      decision, whatever it might be.

23  BY MR. STECKLER:

24           Q.    And my question is, if a

1    controlling shareholder is voting to

2    ignore a U.S. federal court ruling that

3    could substantially financially impair

4    CNBM in this case, would that be

5    prejudicing the interests of

6    shareholders?

7            MR. FORCE:  Same objection.

8        And also objection to form.

9            MR. KATTAN:  Objection to

10       form.

11           MR. GRESSLER:  Join.

12           MR. CAMPBELL:  Join.

13   BY MR. STECKLER:

14       Q.    I'm happy to rephrase it.

15           If CNBMG is voting to ignore

16   a United States federal judge's ruling

17   that could significantly financially

18   impair CNBM, are they prejudicing the

19   interests of shareholders of CNBM?

20           MR. FORCE:  Object to the

21       question as being outside the

22       scope of the deposition.  And also

23       objection to form.

24           MR. GRESSLER:  Join the

 1           objection to form.

 2                   MR. GRESSLER:  Join.

 3                   MR. KATTAN:  Join.

 4                   THE WITNESS:  You say voting

 5           in what context?  I'm not quite

 6           sure why they would be voting on

 7           something like that.

 8   BY MR. STECKLER:

 9           Q.    That's a good question.

10           A.    Voting on a shareholder

11   resolution or --

12           Q.    Yes.

13                 If CNBMG --

14           A.    Yeah.

15           Q.    -- as a controlling

16   shareholder of CNBM, is voting its rights

17   and directing CNBM to ignore a United

18   States federal judge's ruling that could

19   significantly financially impair CNBM,

20   are they, as the controlling shareholder,

21   prejudicing the rights of shareholders of

22   CNBM?

23                   MR. FORCE:  Object to form.

24                   MR. KATTAN:  Objection.

1                    MR. CAMPBELL:  Objection.

2                    THE WITNESS:  For them to

3          vote --

4                    MR. FORCE:  Before you

5          answer.

6                    Object to the question as

7          being outside the scope of the

8          deposition.  And I also object to

9          the form of the question.

10                   MR. GRESSLER:  Join.

11                   MR. CAMPBELL:  Join.

12                   THE WITNESS:  For them to

13         vote, there would have to be a

14         shareholder resolution being

15         called at a general meeting.  And

16         I'm not aware of there being any

17         such shareholder resolution.

18  BY MR. STECKLER:

19         Q.   What if at a board of

20  directors meeting, members of CNBMG

21  directed CNBM to ignore United States

22  federal court's ruling that could

23  substantially financially impair CNBM,

24  would that prejudice the rights of

1    shareholders --

2              MR. FORCE:  Object to the

3         question.

4    BY MR. STECKLER:

5         Q.    -- of CNBM?

6              MR. FORCE:  Object to the

7         question as being outside the

8         scope of the deposition.  And I

9         also object to the form of the

10        question.

11             MR. KATTAN:  Object to the

12        form.

13             MR. GRESSLER:  Join.

14             MR. CAMPBELL:  Join.

15             THE WITNESS:  I don't see

16        how that comes under any of the

17        headings that we're talking about

18        here in this paragraph.

19   BY MR. STECKLER:

20        Q.    It says here, Restrictions

21   on controlling shareholders, correct?

22        A.    Yes.

23        Q.    Controlling shareholders

24   cannot exercise a voting right to

Confidential - Subject to Further Confidentiality Review

1    prejudice the interest of shareholders,

2    correct?

3         A.    Yes.

4         Q.    CNBMG is a controlling

5    shareholder of CNBM, correct?

6         A.    But it then goes on to say,

7    to relieve a director of his duty to act

8    honestly or to prove the expropriation,

9    so forth.

10             So it's relating to little

11   1, 2 and 3.

12        Q.    Let's -- let's read the

13   sentence together.  It says here, A

14   controlling shareholder may not exercise

15   his voting rights in a manner prejudicial

16   to the interests of the shareholder's

17   generally -- right -- or some of the

18   shareholders.

19             And then lists three

20   reasons.

21        A.    Yes.

22        Q.    So I'm talking about

23   prejudicing the interest of shareholders

24   generally.

Confidential - Subject to Further Confidentiality Review

1          Do you understand that

2    portion of the sentence?

3          A.    I do.  But then it goes on

4    to say 1, 2 or 3.

5          Q.    Right.  And that has to do

6    with individual shareholders.

7               MR. FORCE:  Object to the

8          form.

9               MR. GRESSLER:  Objection to

10         the form.

11              MR. CAMPBELL:  Join.

12              THE WITNESS:  So I'm trying

13         to understand which of 1, 2 or 3

14         you see this as coming under.

15   BY MR. STECKLER:

16         Q.    I'm asking you about the

17   first sentence, the first phrase before

18   "or."

19              It says here, very simply, A

20   controlling shareholder may not exercise

21   his voting rights in a manner prejudicial

22   to the interests of shareholders

23   generally.

24              Do you agree with that

1   statement?

2            MR. KATTAN:  Objection to

3       form.  Mischaracterizes the

4       document.

5            MR. CAMPBELL:  Objection.

6   BY MR. STECKLER:

7       Q.    Or some of the shareholders.

8            So it's either all or some?

9       A.    Yes.  And that's --

10      Q.    And if you're doing it to

11  all of them, okay, it's not just by these

12  three bases, is it?

13           MR. KATTAN:  Objection to

14      the form.

15           MR. GRESSLER:  Objection to

16      form.

17           MR. CAMPBELL:  Objection.

18           THE WITNESS:  I think that's

19      the way this sentence reads.

20  BY MR. STECKLER:

21      Q.    That's the way you see it?

22      A.    Yes.

23      Q.    So do you -- can you foresee

24  any situation where it would be

Confidential - Subject to Further Confidentiality Review

1  appropriate for a controlling

2  shareholder, at a director's meeting, to

3  vote that CNBM should ignore a U.S.

4  federal court ruling that imposes

5  substantial financial liability on CNBM

6  or one of its subsidiaries?

7       MR. FORCE:  Object to the

8       question as being outside the

9       scope of the deposition subpoena.

10      And I also object to the form.

11      MR. KATTAN:  Objection to

12      form.

13      MR. GRESSLER:  Join.

14      MR. CAMPBELL:  Join.

15      THE WITNESS:  I think the

16      directors have a duty to act

17      honestly in the best interest of

18      the company.  And they reach their

19      view of what -- in good faith,

20      what that duty leads them to do.

21      They may or may not make a

22      something decision.

23  BY MR. STECKLER:

24      Q.   And I'm not asking you --

Confidential - Subject to Further Confidentiality Review

1   they do have a fiduciary duty to

2   shareholders, though, correct?

3       A.    Yes.

4       Q.    And if shareholders' rights

5   are impaired by the actions of the

6   directors, what rights do shareholders

7   have?

8           MR. FORCE:  Object to the

9       again as outside the scope of the

10      deposition.  And also object to

11      form.

12          MR. KATTAN:  Object to form.

13          MR. CAMPBELL:  Join.

14          THE WITNESS:  Well, I mean,

15      as regards the legal rights of the

16      shareholders, I think that's

17      probably a question best addressed

18      to Hong Kong -- Hong Kong lawyers.

19          But the -- as I said, the

20      directors have their fiduciary

21      duty to act in the best interest

22      of the company and they reach

23      their own judgment as to how they

24      should reach decisions.

1          I can't put myself in those

2     shoes of --

3  BY MR. STECKLER:

4          Q.    No, I'm not asking --

5          A.    -- the directors --

6          Q.    -- you to do that at all.

7          A.    -- and know what they took

8  into account in deciding what to do or

9  what not to do.

10         Q.    And is that something that

11 controlling shareholders have a right to

12 do with the -- the controlling

13 shareholders of CNBMG had a right to do

14 with CNBM, based upon the public offering

15 documents?

16              MR. FORCE:  Object to the

17         form.

18              MR. KATTAN:  Objection form.

19              MR. CAMPBELL:  Join.

20              THE WITNESS:  So CNBMG has

21         the ability to control the

22         composition of the board through

23         voting at general meetings when

24         directors are appointed.  And they

Confidential - Subject to Further Confidentiality Review

1          have appointed some directors who

2          represent -- represent their

3          interests.

4               But those directors continue

5          to have a fiduciary duty to the

6          company as a whole, including the

7          minority shareholders.

8     BY MR. STECKLER:

9          Q.   And under the documents that

10    you've put together at Morgan Stanley for

11    this initial public offering, where do

12    you set forth the rights that

13    shareholders have with respect to the

14    fiduciary duties owed to them by the

15    directors?

16               MR. FORCE:  Object to the

17          form.

18               THE WITNESS:  I think that

19          would be -- there would be

20          something in the prospectus.  But

21          I can't, sort of off the top of my

22          head, point you to the right page.

23    BY MR. STECKLER:

24          Q.   We have the prospectus right

Confidential - Subject to Further Confidentiality Review

1    in front of us.  Is there a way to look

2    and we can find that out?

3          A.    Sure.  We can take a little

4    time and take a look.

5                So Appendices 6 and 7 of the

6    prospectus.

7          Q.    What page, sir?

8          A.    Well, starting with little

9    Roman vi.1.  If you're looking at the

10   Bates number, it's MS 002513.  And it

11   sets out PRC legal regulatory provisions.

12               And then the following

13   appendix, Appendix vii --

14         Q.    Hold on.  Let me ask you a

15   question here on, I guess, it's 2513, or

16   Appendix vii.1.

17               This talks about PRC legal

18   and regulatory provisions?

19         A.    Yes.

20         Q.    This is a company listed on

21   the Hong Kong Exchange.

22               Are you telling me that

23   institutional shareholders in the United

24   States that are buying H shares on the

Confidential - Subject to Further Confidentiality Review

1    Hong Kong Exchange should seek their

2    rights under PRC legal and regulatory

3    provisions?

4              MR. FORCE:  Object to the

5         form.

6              THE WITNESS:  I'm not saying

7         anything about how shareholders

8         should seek to enforce their

9         rights.  I'm just saying that this

10        is something that sets out some of

11        the legal background in the

12        prospectus.

13   BY MR. STECKLER:

14        Q.   Okay.  Because if I

15   understood you correctly, the rules of

16   the Hong Kong Exchange would apply with

17   respect to issues having to do with the

18   listing of H shares, not PRC legal and

19   regulatory provisions?

20              MR. KATTAN:  Object to the

21        form.

22              THE WITNESS:  That's right.

23        The Listing Rules govern various

24        things that the company needs to

1          comply with, yes.

2     BY MR. STECKLER:

3          Q.    Right.  So if a

4     shareholder -- if the fiduciary duty by a

5     director of a company is breached, what

6     rights do the shareholders have against

7     the company as set forth in this

8     prospectus?

9               MR. FORCE:  Object to the

10          form.

11               THE WITNESS:  You'd really

12          have to ask a legal counsel to

13          answer that question.

14     BY MR. STECKLER:

15          Q.    I understand.  And I'm

16     wondering whether in your initial public

17     offering documents you set forth,

18     anywhere that you know of or can recall,

19     where shareholders would have a right --

20     or have their rights set forth on what to

21     do if they think their shares are being

22     impaired, either by a controlling

23     shareholder or by the company itself?

24          A.    I don't think anything sets

Confidential - Subject to Further Confidentiality Review

1    out a sort of how-to guide for how to

2    take action against the company.

3         Q.    What do institutional

4    shareholders that hold H shares do if

5    they think there's a breach of fiduciary

6    duty of a company on the Hong Kong

7    Exchange?

8               MR. FORCE:  Object to the

9         form.

10              THE WITNESS:  I'm not aware

11         of institutional shareholders

12         taking legal action in regard to

13         that for H share companies.

14   BY MR. STECKLER:

15        Q.    What about any shareholders?

16              MR. FORCE:  Object to the

17        form.

18              THE WITNESS:  Again, I can't

19        think of it.

20   BY MR. STECKLER:

21        Q.    And what does the Hong Kong

22   Exchange do when it finds out or learns

23   that a listing company has breached its

24   fiduciary duty?

1        A.    They can convene a

2    disciplinary hearing.  But that has

3    fairly limited sanctions that they can

4    bring against the company.

5            The umbrella securities

6    regulation in Hong Kong, the SFC, is the

7    one that has more teeth and can take

8    stronger action against a company.

9        Q.    They are the enforcement

10    agency for the Exchange?

11        A.    Yes, yes.

12        Q.    As the sole global

13    coordinator, book runner, sponsor and

14    lead manager of the IPO for CNBM, are you

15    aware of any action that's been taken

16    against CNBM for its decision to allow a

17    controlling shareholder to dictate to its

18    board of directors to ignore a U.S.

19    federal court ruling that could impair

20    its financial status?

21            MR. FORCE:  Objection.  The

22        question is outside the scope of

23        the deposition subpoena.  Also

24        object to the form of the

1       question.

2               MR. KATTAN:  Objection to

3       form.

4               MR. GRESSLER:  Join.

5               MR. CAMPBELL:  Join.

6               THE WITNESS:  When you say

7       "any action," could you be a bit

8       more specific, please?

9   BY MR. STECKLER:

10          Q.   Yeah.  Whether any

11  enforcement action or complaints have

12  been made to the Hong Kong Exchange about

13  the activities of CNBM and CNBMG for

14  controlling -- for influencing the board

15  of directors?

16              MR. FORCE:  Same objections.

17              THE WITNESS:  I'm not aware

18      of any such action.

19  BY MR. STECKLER:

20          Q.   Okay.  And do you know

21  whether it would be appropriate for a

22  controlling shareholder to inject itself

23  into a board of directors meeting of a

24  subsidiary to tell them how to act

Confidential - Subject to Further Confidentiality Review

1  without a shareholder resolution?

2           MR. FORCE:  Object to the

3       question as outside the scope of

4       the deposition.  And also object

5       to form.

6           MR. KATTAN:  Objection to

7       form.

8           MR. GRESSLER:  Join.

9           MR. CAMPBELL:  Join.

10          THE WITNESS:  I think a

11      controlling share -- shareholder

12      can make its views known to the

13      directors, but the directors

14      ultimately have to take the

15      decision themselves in their own

16      capacities.

17  BY MR. STECKLER:

18      Q.   But they are -- but

19  controlling shareholders, by virtue of

20  the definition, do have control over the

21  company and its directors, correct?

22          MR. KATTAN:  Object to the

23      form.

24          THE WITNESS:  A controlling

1        shareholder is somebody who has a

2        stake that enables them to control

3        the composition of the board of

4        directors.  It doesn't mean that

5        they control every action of the

6        company.

7    BY MR. STECKLER:

8        Q.    They are ultimately

9    responsible, though, for the actions of

10   the board of directors and can remove

11   those board of directors if they don't

12   like them, by virtue of their control,

13   correct?

14       A.    They can remove them.

15       Q.    So they do exercise

16   significant control over the actions of

17   their subsidiary?

18            MR. FORCE:  Object to the

19       form.

20            MR. KATTAN:  Object to the

21       form.

22   BY MR. STECKLER:

23       Q.    Through their -- through

24   their shares, right?

Confidential - Subject to Further Confidentiality Review

1      A.    They can.

2      Q.    Can you go to the last page

3  of the offering memorandum?  Page W48.

4      A.    Yes.

5      Q.    It says, Certain legal

6  matters as to Hong Kong law will be

7  passed on for us by Slaughter and May and

8  to the underwriters by Linklaters, and

9  certain legal matters as to New York and

10  United States federal law will be passed

11  on for us by Davis Polk & Wardwell, and

12  for the underwriters by Linklaters.

13           What does that mean?

14      A.    It means that these law

15  firms are providing legal opinions as to

16  various different matters, some of which

17  are under Hong Kong law, some under U.S.

18  law.

19      Q.    And Davis and Polk and

20  Wardwell, whose offices we are in right

21  now having your deposition taken, was

22  designated and retained as legal counsel

23  by CNBM for purposes of this IPO in 2006,

24  correct?

```
 1              MR. FORCE:  Object to the

 2         form.

 3              THE WITNESS:  Yes, that's

 4         correct.

 5              MR. STECKLER:  Let me hand

 6         you what we'll mark as Exhibit-16,

 7         which is also Morgan Stanley

 8         056022.

 9                   -  -  -

10         (Whereupon, Exhibit

11         Keyes-16, Bates MS 056022, 1/4/06

12         Memorandum, was marked for

13         identification.)

14                   -  -  -

15    BY MR. STECKLER:

16         Q.    Is this a business record of

17    Morgan Stanley?

18         A.    Yes, it is.

19         Q.    Kept in the ordinary course

20    of business with respect to the work that

21    Morgan Stanley did for CNBM?

22         A.    Yes, that's correct.

23         Q.    And it was made at or around

24    January 4th, 2006; is that your
```

Confidential - Subject to Further Confidentiality Review

1    understanding?

2         A.    That's correct.

3         Q.    And this talks about two

4    perspective syndicate members.

5               Who is that referring to?

6         A.    That's referring to the

7    other banks who would have been involved

8    in the offering.

9               So, for example, the co-lead

10   managers and co-managers that we

11   discussed earlier.

12        Q.    And if we turn to Page 2, it

13   says, This memorandum has been prepared

14   taking into account of U.S. and Hong Kong

15   legal considerations.  Legal restrictions

16   applicable to the distribution of

17   research reports and other jurisdictions

18   are not covered by this memoranda.  The

19   U.S. and Hong Kong legal considerations

20   relating to the dissemination of research

21   reports -- and it talks about the

22   consequences that flow from the

23   reports -- have been enumerated by

24   counsel on a number of occasions.  The

1    memorandum is not to reiterate the legal

2    conclusions but to set forth the

3    procedures to be followed by prospective

4    managers.

5              Can you explain why it's

6    important to understand U.S. legal

7    considerations for prospective managers

8    having to do with this offering?

9              MR. FORCE:  Object to the

10        form.

11             THE WITNESS:  The key

12        important point is that these

13        research reports can't be

14        disseminated in the United States.

15   BY MR. STECKLER:

16        Q.    And why is that?

17        A.    I can't recite you what the

18   relevant legal provisions are.  But it's

19   a well-established practice that we

20   always ensure that they don't go into the

21   U.S.

22        Q.    And so they've engaged legal

23   counsel to give them advice to make sure

24   that that isn't done with respect to the

1    initial public offering; is that your

2    understanding?

3         A.    Yes.  I mean, the counsel

4    has been engaged to advise generally on

5    U.S. legal matters, and that's one of the

6    topics that they would have covered.

7              MR. STECKLER:  Let me hand

8         you what we're going to mark as

9         Exhibit Number 17, which is Morgan

10        Stanley MS 056130, which is a

11        PowerPoint that has a Morgan

12        Stanley label on it, entitled,

13        CNBM Post-Mortem, March 16th,

14        2006.

15                   -   -   -

16        (Whereupon, Exhibit

17        Keyes-17, Bates MS 056130,

18        PowerPoint, CNBM Post Mortem,

19        March 16, 2006, was marked for

20        identification.)

21                   -   -   -

22   BY MR. STECKLER:

23        Q.    Is this a business record of

24   Morgan Stanley?

1          A.     Yes, it is.

2          Q.     Kept in the regular and

3    ordinary course of business with respect

4    to the work that Morgan Stanley did for

5    CNBM?

6          A.     That's correct.

7          Q.     And it was made at or around

8    March 16, 2006?

9          A.     Yes, that's correct.

10          Q.     And what is the purpose of a

11   CNBM post-mortem PowerPoint?

12          A.     This was something that we

13   prepared to show to CNBM, to demonstrate

14   that we had done a good job on the IPO

15   and that they should be very happy with

16   us and continue to work with us in the

17   future.

18          Q.     And if we turn to Page 2

19   here, it talks about corporate structure.

20          A.     Yes.

21          Q.     And is this the final

22   corporate structure, at least as of March

23   2006?

24          A.     Yes.

Confidential - Subject to Further Confidentiality Review

1    Q.    And, again, we have CNBMG as

2    the controlling shareholder of CNBM?

3    A.    That's right.

4    Q.    And CNBM is the controlling

5    shareholder of China United, BNBM, China

6    Fiberglass, China Composites and China

7    Triumph, correct?

8    A.    That's right.

9    Q.    And it indicates that Taihe

10   is a subsidiary of BNBM, correct?

11   A.    That's right.

12   Q.    And are all of the entities

13   at the very bottom here of this chart

14   considered close associates as defined by

15   the Hong Kong Listing Rules?

16        MR. FORCE:  Object to the

17        form.

18        MR. KATTAN:  Object to form.

19        THE WITNESS:  Yes.

20        MR. GRESSLER:  Join.

21        MR. STECKLER:  What's the

22        basis, counsel?

23        MR. FORCE:  When you say

24        "all these" on the bottom, I'm not

1        sure what line you're on.

2                MR. STECKLER:  On the --

3        thank you.

4   BY MR. STECKLER:

5        Q.    On the line that goes

6   Luhong, Huahai, Nanyang, Kesou, all the

7   way across, including BNBM Homes, Taihe,

8   Jushi Group, all the way across.

9                Do you see that?

10       A.    I do.

11       Q.    Are all of those entities

12  considered close associates?

13       A.    Yes, they are.

14       Q.    And at the very top left, it

15  says, Morgan Stanley marketed the

16  company's control of each business line

17  and convinced investor not to ask for

18  holding company discount.

19       A.    Yes.

20       Q.    What does that mean?

21       A.    It's making the point that

22  we were able to get a good valuation for

23  the company.

24       Q.    And does it also make the

Confidential - Subject to Further Confidentiality Review

1  point that it wanted -- that Morgan

2  Stanley wanted to show that CNBM was

3  actually controlling its subsidiaries in

4  a consolidated fashion?

5       A.    Yes, I mean, it was making

6  the point that investors should regard

7  this as one -- one group.

8       Q.    Right.  And that was the

9  intent of CNBM and Morgan Stanley in the

10 IPO, correct?

11            MR. FORCE:  Objection as to

12       form.

13            THE WITNESS:  It was our

14       intent to present things in that

15       way, yes.

16 BY MR. STECKLER:

17      Q.    And, in fact, if we go to

18 Page 5, in addressing key investors'

19 concerns, which says, Problems with

20 business integration after recent

21 acquisitions, one of the mitigants is,

22 Management focuses on ensuring strong

23 integration across different business's

24 segments by cultivating a unified

Confidential - Subject to Further Confidentiality Review

1    corporate culture and establishing

2    coordinated purchasing sales, logistics

3    and other operational processes and

4    procedures.

5              Correct?

6         A.   Yes.

7         Q.   And CNBM presented itself as

8    having a management that focuses on

9    strong integration, correct?

10        A.   Yes.

11        Q.   And that's the image that

12   Morgan Stanley encouraged and CNBM

13   presented to its investors, right?

14        A.   Yes.

15        Q.   Was this a document that

16   Morgan Stanley presented solely to CNBM

17   officials?

18        A.   Yes.

19        Q.   Now -- and Exhibit Number --

20   what number is that, sir?

21        A.   This one is 17.

22        Q.   Was that -- I believe we did

23   this.  But is that a business record of

24   Morgan Stanley, sir?

1          A.     I think you asked.  But,

2    yes, it is.

3          Q.     It is, okay.

4          MR. STECKLER:  Can we go off

5    the record?

6          VIDEO TECHNICIAN:  Off

7    record.  2:07.  We're off the

8    record.

9                    -   -   -

10          (Whereupon, a discussion off

11    the record occurred.)

12                    -   -   -

13          VIDEO TECHNICIAN:  The time

14    is still 2:07.  And we're back on

15    the record.

16          MR. STECKLER:  Can we go to

17    MS 000333?

18                    -   -   -

19          (Whereupon, Exhibit

20    Keyes-18, Bates MS 000332-361,

21    Cornerstone Investor Presentation,

22    was marked for identification.)

23                    -   -   -

24    BY MR. STECKLER:

1           Q.    I'll hand you what we're

2     marking as Exhibit Number 18 to your

3     deposition, which is Morgan Stanley

4     000332 to Morgan Stanley 000361.  And

5     it's two-sided again.

6           A.    Thank you.

7           Q.    Is this a business record of

8     Morgan Stanley, sir?

9           A.    Yes, it is.

10          Q.    Was it prepared in the

11    ordinary --

12               MR. FORCE:  Can you wait one

13          second while we get copies of that

14          one?  I'm sorry.  I apologize.

15               MR. STECKLER:  It's right

16          there.

17    BY MR. STECKLER:

18          Q.    Was this prepared in the

19    ordinary course of business of Morgan

20    Stanley in doing its work for CNBM?

21          A.    Yes.

22          Q.    And retained by you all?

23          A.    Yes.

24          Q.    And made contemporaneously

1  at the time it was prepared?

2      A.    Yes.

3      Q.    What is this document?

4      A.    Let me try and work it out.

5            It appears to be a

6  presentation prepared for the purpose of

7  securing a strategic investor, sometimes

8  also known as a cornerstone investor, for

9  the IPO.

10     Q.    And who was this targeted

11  towards in particular?

12     A.    We approached a number of --

13  a number of companies.  From my

14  recollection, it was principally

15  international cement companies that we

16  thought might have an interest in

17  becoming a shareholder in CNBM.

18            And one of the reasons why

19  we would be interested in having

20  something like that as an investor would

21  be to validate, for the purposes of other

22  investors, a major international player

23  in the industry thought highly enough of

24  the company to take a stake in it.

Confidential - Subject to Further Confidentiality Review

1    Q.    Were any U.S. companies

2    solicited, such as Holcim or other cement

3    companies like that?

4    A.    I don't believe so.

5    Q.    And this, on Page 6, talks

6    about sort of the timing of the IPO,

7    correct?

8    A.    Yes.  So it would be after

9    this were that we were looking to get a

10    definitive proposal from any such

11    investor by the middle of January, which

12    would have been a couple of months before

13    we actually launched the IPO.

14              But in the end, we did not

15    find anybody who was willing to pay what

16    we felt was the right price, so this

17    effort was abandoned.

18    Q.    So did you ever present this

19    actual slide show or the whole thing was

20    scrapped at some point?

21    A.    No, I think -- I think we

22    presented it to at least one potential

23    investor.

24              But I have to say, I don't

1  recall precise details.  It was quite a

2  long time ago.

3          Q.    And if you go to Page 10, it

4  sets forth the chronology of events and

5  acquisitions of CNBM entities; is that

6  right?

7                MR. FORCE:  Objection to

8          form.

9                THE WITNESS:  So, I'm sorry,

10         can you repeat your question?

11         What was on Page 10?

12  BY MR. STECKLER:

13         Q.    If we look at Page 10,

14  there's a chronology on there.

15                Do you see that?

16         A.    I do.

17         Q.    What's the purpose of this

18  chronology?

19         A.    Just showing the major

20  corporate milestones in the development

21  of the group.

22         Q.    And the last one is the

23  acquisition of Taihe, correct, among

24  other things?

1          A.     That's right.

2          Q.     Let me ask you, on Page 12,

3    there's a -- that logo, that sort of star

4    logo, is this a logo that's been branded

5    on all -- on CNBM and all of its

6    subsidiaries, just part of showing it as

7    a sort of a group?

8               MR. FORCE:  Object to the

9          form.

10              MR. KATTAN:  Objection to

11         form.

12              MR. CAMPBELL:  Join.

13              MR. GRESSLER:  Join.

14              THE WITNESS:  I don't know.

15   BY MR. STECKLER:

16         Q.     I was wondering if that was

17   something that Morgan Stanley might have

18   been involved in?

19         A.     No.

20         Q.     Did you know that this logo

21   was utilized by not just CNBM but its

22   subsidiaries?

23              MR. FORCE:  Object to form.

24              THE WITNESS:  I didn't know

1          that.

2     BY MR. STECKLER:

3          Q.     Let's take a look at Page

4     14.  If you look at the slide, it talks

5     about quality products with strong brand

6     recognition.

7               What does that mean?

8          A.     That's asserting that the

9     company has high-quality products and

10    that the brands under which they sell

11    them would be widely recognized in China.

12         Q.     And what gypsum board brands

13    are sold by CNBM, based upon this slide?

14              MR. FORCE:  Objection to

15         form.

16              THE WITNESS:  Well, Dragon

17         brand is the -- was the BNBM

18         brand, prior to the acquisition of

19         Taihe.  And it shows Taihe as

20         being the brand, but I'd say I

21         thought Taishan was actually the

22         brand.

23    BY MR. STECKLER:

24         Q.     So some of the well-known

Confidential - Subject to Further Confidentiality Review

1  gypsum board brands of CNBM are Dragon,

2  Taihe and Taishan, as far as you know --

3            MR. KATTAN:  Objection to

4       form.

5  BY MR. STECKLER:

6       Q.    -- or recall?

7       A.    As far as I know it was

8  Dragon and Taishan.  I think Taihe is

9  just the name of the company.  I think

10  this is inaccurate, potentially.  I'm not

11  sure.

12       Q.    And if we look at Page 15,

13  it says, CNBM has strong support to drive

14  industry consolidation.  Particularly

15  significant role in highly fragmented

16  industry such as cement and gypsum board.

17            What is meant by that?

18       A.    Well, particularly with

19  regard to cement, China, it still has,

20  but it had even more at the time,

21  hundreds of cement producers, many of

22  which were conducting environmentally

23  very unfriendly operations, and were,

24  because of their scale, not -- not able

Confidential - Subject to Further Confidentiality Review

1    to produce at a really competitive cost.

2              And part of the state

3    planning in China was to improve the

4    quality of the overall cement industry by

5    consolidating ownership under a number of

6    larger groups, and in the process of

7    doing that, getting them to close down

8    some of the more inefficient or

9    environmentally unfriendly capacity.

10             So in the eyes of the

11   planners in China, the intention was that

12   CNBM would actually acquire other cement

13   players.  And, in fact, they did so over

14   the ensuing years.

15        Q.   And I notice it also says,

16   not just cement, as you pointed out, but

17   particular significant role, not just in

18   highly fragmented industries such as

19   cement, but it also mentions their gypsum

20   board.

21        A.   Yes, I see that.

22        Q.   Do you see that?

23        A.   I'm not aware of them having

24   done much more in the way of acquisitions

Confidential - Subject to Further Confidentiality Review

1    of gypsum board post the IPO.

2           Q.    Other than Taishan?

3           A.    Well, that was before the

4    IPO.

5                 Although they -- I believe

6    they increased their shareholding in

7    Taihe subsequently.

8           Q.    And they put out Taishan

9    board --

10          A.    Yes.

11          Q.    -- is that right?

12                MR. GRESSLER:  Objection to

13          form.  Sorry.

14   BY MR. STECKLER:

15          Q.    And then if we go to Page

16   16, I just want to have an understanding.

17                Executive Directors Song

18   Zhiping, Cao Jianglin and Chang Zhangli

19   are the folks that you dealt with

20   primarily?

21          A.    Primarily, yes.

22          Q.    Did you also deal with these

23   other gentleman, Li Yimin, Peng Shou,

24   Chen -- I give up -- Xuean?

1        A.    I don't recall meeting those

2   individuals.  But I think that other

3   members of the Morgan Stanley team would

4   have met them during the course of the

5   due diligence and other meetings.

6        Q.    And then if we look at Page

7   18, it talks about gypsum board again,

8   with a variety of names such as Tai'an,

9   T-A-I-A-N, Shandong, which is different

10  than Taihe.

11             What is that?  Tai'an?

12  Taihe?

13       A.    Those are all Chinese

14  cities.

15       Q.    And these are cities where

16  they have gypsum board manufacturing

17  plants?

18       A.    Yes, I believe so.  And the

19  word in brackets afterwards is the

20  province.

21       Q.    Do you know where the Luhong

22  mine is?

23       A.    I'm sorry?

24       Q.    Do you know where the Luhong

1    mine is?

2           A.    The Luhong mine?

3                 No.

4           Q.    Do you know the source of

5    the gypsum in Tai'an Shandong?

6           A.    I don't recall.  It may well

7    be specified in the prospectus somewhere.

8           Q.    Where in the prospectus

9    would that be?  Can you look?  That would

10   be great.

11          A.    So Page 121 of Exhibit-15.

12          Q.    What's the number on the

13   bottom, sir?

14          A.    MS 002118.

15          Q.    Terrific.  Thank you.

16                MR. FORCE:  2118?

17                THE WITNESS:  2118.  Or Page

18   121 of the prospectus.

19   BY MR. STECKLER:

20          Q.    Okay.  And show me where

21   you're referencing now to where we can

22   find it?

23          A.    So about halfway down, you

24   see raw materials and there's a

Confidential - Subject to Further Confidentiality Review

1    subheading under that for gypsum boards.

2                    And in the third sentence,

3    In the track record period, gypsum rock

4    used in BNBM Beijing's plant was

5    primarily purchased from quarries located

6    in Hebei and Shandong, including a gypsum

7    rock quarry owned by us.

8           Q.    And that "us" would be CNBM?

9           A.    Yes.  Or the CNBM Group.

10          Q.    And then keep reading.

11          A.    Then it keeps going, For the

12   nine months ended September 30, 2005, the

13   gypsum rock used in BNBM's Zaozhuang

14   plant was primarily acquired from a

15   nearby gypsum rock quarry.  Gypsum rock

16   accounted for 11.8 percent of Taihe's

17   production costs for the period from May

18   1, 2005, to September 30, 2005.  The

19   production plants at Taihe's headquarters

20   at Tai'an used gypsum rock purchased from

21   stable sources nearby.  All product

22   lines -- other product lines all used

23   local gypsum rock resources.

24          Q.    Do you know whether Luhong

Confidential - Subject to Further Confidentiality Review

1    was anywhere near the Tai'an or Taihe

2    headquarters where they might have

3    purchased gypsum?

4          A.    I have no idea.

5          Q.    What does stable sources

6    mean?

7          A.    I would imagine it means

8    suppliers are able to guarantee a

9    steady -- steady supply of the raw

10   material.

11         Q.    In addition, they also make

12   the paper liner for the gypsum, correct?

13              MR. KATTAN:  Objection to

14         form.

15              THE WITNESS:  I'm just

16         reading the paragraph.

17              Yes, it appears.  Yes.  It

18         says, Taihe has constructed a

19         paper mill with a design capacity

20         of 50,000 tons of liner paper per

21         year.

22              And it was in pilot

23         production at the time of the IPO.

24   BY MR. STECKLER:

Confidential - Subject to Further Confidentiality Review

1    Q.    And the goal was to make it

2  multi-integrated, in other words, they

3  made the paper as well as mine the gypsum

4  to create the board, correct?

5             MR. FORCE:  Objection to

6        form.

7             THE WITNESS:  It appears

8        that they are looking to integrate

9        to produce the paper.

10            Apart from the one gypsum

11       rock quarry owned by us that's

12       referred to in the one above, it

13       seems that quite a bit of gypsum

14       rock has been brought in from

15       outside sources.

16  BY MR. STECKLER:

17    Q.    That BNBM would have

18  acquired or Taihe would have acquired,

19  correct?

20            MR. FORCE:  Object to the

21       form.

22            THE WITNESS:  Sorry, what

23       were you referring to?

24  BY MR. STECKLER:

1          Q.    I was following up on your,

2     "other than the rock that they've

3     acquired outside of their own mines."

4               And I was trying to clarify,

5     they would have -- Taihe and BNBM would

6     have been the one purchasing and

7     acquiring the gypsum used in the drywall,

8     correct?

9          A.    Yes.

10         Q.    In addition to also getting

11    it from quarries located close by that

12    they may have control of?

13              MR. KATTAN:  Object to the

14         form.

15              MR. FORCE:  Object to the

16         form.

17              THE WITNESS:  Yes.  I think

18         what it's saying is that in one

19         case, they have their own gypsum

20         rock quarry; but in other cases,

21         they're buying it in from gypsum

22         rock quarries owned by third

23         parties.

24    BY MR. STECKLER:

1       Q.    We're on the same page.

2    Thank you.  I'm not sure why there was a

3    need to object to that.

4               Let's go to Page 20 --

5       A.    Page --

6       Q.    -- of the -- of the

7    presentation.  Actually, let's -- it

8    talks about construction in Shandong of a

9    production line and a meter production

10   line under construction in Hebei.

11      A.    Yes.

12      Q.    And a fourth production line

13   will reinforce our prominent position as

14   the largest gypsum board producer.

15              Do you see all that?

16      A.    I do.

17      Q.    Were these production lines

18   that were being built going to use money

19   that was being raised through the IPO?

20              MR. FORCE:  Object to form.

21   BY MR. STECKLER:

22      Q.    Or do you know?

23      A.    I couldn't tie the use of

24   proceeds to specific production lines.

Confidential - Subject to Further Confidentiality Review

1      Q.    Fair enough.

2            Let me go ahead and hand you

3    what I'm going to mark as Exhibit Number

4    19 to your deposition, entitled CNBM

5    Global IR Road Show Proposal.  Also Bates

6    numbered MS 059369 to 059387.

7                    -  -  -

8            (Whereupon, Exhibit

9        Keyes-19, Bates MS 059369-387,

10       Presentation, CNBM Global IR Road

11       Show Proposal, was marked for

12       identification.)

13                    -  -  -

14           MR. FORCE:  Do you need a

15       break?

16           MR. STECKLER:  Sure.  Yeah,

17       please let me know.  Would you

18       like a break?

19           THE WITNESS:  If I could

20       take a couple minutes to just walk

21       around?

22           VIDEO TECHNICIAN:  The time

23       is 2:26.  And we are off the

24       record.

```
1                    -   -   -

2              (Whereupon, a brief recess

3         was taken.)

4                    -   -   -

5              VIDEO TECHNICIAN:  The time

6         is 2:21.  We are back on the

7         record.

8  BY MR. STECKLER:

9         Q.   Sir, we've handed you --

10             MR. MORNINGSTAR:  I think

11        it's 2:41.

12             VIDEO TECHNICIAN:  2:41.

13        Excuse me.

14             MR. STECKLER:  I got more

15        time.  That's terrific.

16  BY MR. STECKLER:

17        Q.   Sir, we've handed you what

18   we've marked as Exhibit Number 19 to your

19   deposition.

20             Do you recognize this

21   document?

22        A.   I don't remember seeing it

23   before.

24        Q.   Okay.  This is a business
```

1    record, though, of Morgan Stanley --

2           A.    Yes, it is.

3           Q.    -- correct?

4                 And this is the CNBM global

5    IR road show proposal, dated March 27th,

6    2007, correct?

7           A.    It just says March 2007,

8    yes.

9           Q.    And this business record was

10   made at or around the time of March 2007,

11   correct?

12          A.    Yes.

13          Q.    And kept in the ordinary

14   course of business by Morgan Stanley with

15   respect to its work for CNBM, right?

16          A.    Yes.

17          Q.    Now, let's take a look at

18   the executive summary, quickly, which is

19   the first page.

20                And it says that you'll be

21   reaching out and communicating with those

22   investors that matter most that are

23   interested in your stock and have a high

24   propensity to invest.  That's the key

Confidential - Subject to Further Confidentiality Review

1    objective of the road show.

2              Is this presentation for

3    CNBM officials or is it actually the road

4    show presentation itself?  Or is it a

5    proposal to do a road show?

6         A.    It's a proposal to do a road

7    show, to help organize a road show for

8    CNBM.

9         Q.    All right.  And so this is

10   what you would have presented to CNBM?

11        A.    Yes.  This would have been

12   presented by somebody from Morgan Stanley

13   to CNBM, yes.

14        Q.    And it says, on this first

15   page, Global distribution network.  And

16   it says here, CNBM will have full access

17   and penetration to its shareholders and

18   target institutions.

19              Correct?

20        A.    Yes.

21        Q.    And so part of the road show

22   will be to introduce CNBM executives to

23   investors throughout the world?

24        A.    To take them to see them.

Confidential - Subject to Further Confidentiality Review

1    In many cases, they would be investors

2    that they had already met in the course

3    of the IPO road show.

4         Q.    And if we now turn to Page

5    6, it talks about shareholding analysis.

6              Can you -- can you explain

7    this particular chart to us?

8         A.    Yes.  This, and the

9    preceding four pages, are looking at

10   investors grouped by region who would

11   have been possible targets for meetings

12   in the course of the -- in the course of

13   the road show.  And it's setting out,

14   where relevant, how much they have

15   invested in CNBM in stocks in the China

16   construction materials sector generally,

17   and in Chinese stocks generally.

18        Q.    So let's focus on the United

19   States.

20        A.    Sure.

21        Q.    And you understand that's

22   important with respect to this case?

23        A.    I do understand, yes.

24        Q.    All right.  And if we look

1    at Page 6, it indicates that American

2    Century and Clay Finlay both have

3    holdings in CNBM?

4         A.    That's correct.

5         Q.    In addition, it lists a

6    number of other entities here, based in

7    New York, that will be solicited by

8    Morgan Stanley and CNBM in the United

9    States to purchase H shares of the

10   company, right?

11        A.    Well, let me just -- just

12   because the names are on this list

13   doesn't necessarily mean that they would

14   have been -- that a meeting would have

15   taken place with all of these investors

16   during the road show.

17        Q.    And my point is solicited.

18   In other words, Morgan Stanley would

19   have -- strike that.

20             My point is that CNBM and/or

21   Morgan Stanley would have solicited these

22   institutions to purchase H shares?

23        A.    Not necessarily.

24        Q.    Okay.

Confidential - Subject to Further Confidentiality Review

1        A.    What it means is that this

2    is the broader group of investors that

3    were being considered as candidates for

4    that -- for that contact.  And so only in

5    the end a subset would have been

6    contacted.

7        Q.    And just so we're clear,

8    this is a proposal that you made to CNBM?

9        A.    That's right.

10        Q.    They accepted your proposal

11    to make solicitations and to solicit

12    United States institutions as investors

13    in their H shares, correct?

14            MR. FORCE:  Object to the

15        form.

16            THE WITNESS:  Yes.  Just to

17        be clear, so we were making a

18        proposal to organize an IR road

19        show for them, during the course

20        of which they would meet with

21        investors and talk about the

22        company.

23            And in distinction from the

24        IPO road show, where the clear

1          stated purpose of the meeting is

2          to sell shares; in this case, it's

3          really to interest investors in

4          the company.  Because to the

5          extent that they form a favorable

6          impression as a result of the

7          meeting, they would be going out

8          and just buying shares in the

9          market, not buying shares through

10         Morgan Stanley or from the company

11         directly.

12    BY MR. STECKLER:

13         Q.    Right.  But these are

14    touches, as we say in Texas, or

15    opportunities to get in front of these

16    folks to create an interest in the

17    business?

18         A.    Yes.

19         Q.    And so CNBM, Morgan Stanley,

20    was going to reach out to individuals

21    listed on Page 6, 7 and 8, I believe, and

22    try to solicit them to see if they have

23    any interest in purchasing H shares; is

24    that fair?

Confidential - Subject to Further Confidentiality Review

1           MR. FORCE:  Object to the

2       form.

3           THE WITNESS:  To see if they

4       have an interest in meeting with

5       the company.  And the expectation

6       would be that if that meeting goes

7       well, that they might, then, be

8       interested in buying shares in the

9       market.

10  BY MR. STECKLER:

11      Q.    And I understand this is a

12  prospective list of potential people to

13  be solicited; is that fair?

14      A.    Yes, that's right.

15      Q.    How would these companies be

16  solicited, or how would you reach out to

17  them on behalf of CNBM?

18      A.    So the members of the equity

19  sales force would be told that we were

20  planning to organize an IR road show for

21  the company on certain dates, and they

22  would start contacting their best

23  investor clients to see if they're

24  interested in taking a meeting.

1          And the idea is to fill up

2     the schedule for the number of days and

3     the number of meeting slots that the

4     company would have had.  And once the

5     schedule is filled up, then you probably

6     stop contacting other people at that

7     point.

8          Q.    Would there be phone calls

9     and letters and prospectuses sent?  How

10    does that work?

11         A.    No prospectus because

12    there's no offering.

13         Q.    Okay.

14         A.    And I would expect all this

15    probably to have been done over the

16    phone.

17         Q.    And then the meetings would

18    be taking place in the United States?

19         A.    I would expect so, yes.

20         Q.    And you were there for the

21    initial meetings, correct?

22              MR. FORCE:  Object to the

23         form.

24              THE WITNESS:  Just to be

Confidential - Subject to Further Confidentiality Review

1          clear, I was present for the IPO

2          road show.

3     BY MR. STECKLER:

4          Q.    Yes, sir.

5          A.    Back in 2006.

6          Q.    Right.

7          A.    Yes.  I've never been on

8     another road show with CNBM since then.

9          Q.    I understand.  And I don't

10    mean to suggest otherwise.

11             And because this is dated

12    March 2007, I understand why you're

13    trying to clarify that.

14             Yes, you've been on a road

15    show for the initial IPO.  This just

16    happens to be a 2007 proposal for another

17    road show --

18          A.    Yes.

19          Q.    -- correct?

20             These are some of the target

21    companies that were being called that are

22    located in New York who may have an

23    interest and want to meet with the

24    company, fair?

Confidential - Subject to Further Confidentiality Review

1    A.    Some of them would have been

2    called, yes.

3    Q.    And we know it's in 2007,

4    because we know American Century and Clay

5    Finlay have already purchased CNBM

6    shares, correct?

7    A.    So it looks, yes.

8    Q.    And, similarly, Wellington

9    Management Company, Batterymarch

10   Financial Management, Inc., Fidelity

11   Management & Research Company in Boston

12   have -- also have holdings in CNBM,

13   correct?

14   A.    Correct.

15   Q.    In addition, Matthews

16   International Capital Management, LLC and

17   Capital Research in San Francisco also

18   have holdings in CNBM as of 2007,

19   correct?

20   A.    That's correct.

21   Q.    And those companies, do you

22   recall having met with those companies

23   during the initial IPO road show?

24   A.    I don't recall specific

1    names.

2         Q.    Would those have been the

3    types of companies solicited during the

4    course of the IPO road show that you were

5    involved with?

6         A.    I'm sure there would have

7    been a very extensive overlap between the

8    list for the IPO road show and this list.

9         Q.    And then if we look on Page

10   8, it actually gives dates and locations

11   of a proposed IR road show.

12        A.    Yes.

13        Q.    What does "IR" stand for?

14        A.    Investor relations.

15        Q.    And if we look at Page 14,

16   these are some of the investors in the

17   various cities, again, who --

18        A.    I'm sorry.

19        Q.    -- CNBM may be reaching out

20   to, to see if they have any interest --

21        A.    I apologize.  Can you repeat

22   the page number?

23        Q.    Page 14.

24        A.    Thank you.

1    Q.    Would you like me to repeat

2  the question?

3    A.    I'm afraid so, yes.

4    Q.    Are these -- on Page 14, are

5  these some of the investors in the

6  various cities, such as San Francisco,

7  Boston and New York, where CNBM may be

8  reaching out to see if any of these

9  companies have an interest in purchasing

10  their H shares and getting information

11  about their company?

12    A.    Yes.

13    Q.    And during these

14  informational meetings, management of

15  CNBM would be in attendance; is that

16  right?

17    A.    The purpose of the meeting

18  is for the investors to meet CNBM

19  management.

20         MR. STECKLER:  Let me hand

21      you what we're going to mark as

22      Exhibit Number 20 to your

23      deposition, which is Morgan

24      Stanley 054913 to 054941.

1          I'll let you all pass it

2      down.

3                  -  -  -

4          (Whereupon, Exhibit

5      Keyes-20, MS 054913-941, March

6      2006 Slide Presentation, was

7      marked for identification.)

8                  -  -  -

9  BY MR. STECKLER:

10         Q.    Is this a Morgan Stanley

11  business record?

12         A.    Yes, it is.

13         Q.    And is this kept and

14  prepared in the ordinary course of

15  business by Morgan Stanley?

16         A.    Yes.

17         Q.    And was it done so for

18  purposes of its work with CNBM?

19         A.    Yes, it was.

20         Q.    And it was made at or around

21  the time in which it was created?

22         A.    Yes.

23         Q.    Which I'm not sure on this

24  document what that date would be.

1             Do you have any idea?

2        A.    March 2006.

3        Q.    And where do you get that

4   information?

5        A.    If I look at the deal

6   timetable on the slide that's on Page 2,

7   Page MS 054915, it shows dates relating

8   to the IPO.

9        Q.    Right.  But it doesn't show

10  the year, so -- where is the year?

11       A.    Well, I know it's 2006.

12       Q.    Okay.  That's -- thank you.

13            So this was made or created

14  at or around March of 2006?

15       A.    Correct.

16       Q.    Okay.  And what is this

17  document?

18       A.    This is the management road

19  show presentation from the IPO road show.

20  It appears to be a draft rather than the

21  absolute final version.

22       Q.    And is this somewhat similar

23  to what the final version looked like?

24       A.    I think so.

Confidential - Subject to Further Confidentiality Review

1    Q.    And if you look at Page 2,

2  it looks like Morgan Stanley begins the

3  presentation initially on Page 1.

4          Do you see that?

5    A.    I do.

6    Q.    Were you -- were you the

7  individual that began the presentation?

8    A.    I may well have been.

9    Q.    Do you recall or not?

10   A.    Well, this same presentation

11  would have been given in a multiple

12  different cities on different days of the

13  road show.  And I certainly did it in

14  some cities.

15   Q.    You were the master of

16  ceremonies in --

17   A.    Yes, make the introduction,

18  introduce the management team, you run

19  through the terms of -- the key highlight

20  of the offering and then hand it over to

21  the management to talk about the company.

22   Q.    Were these meetings also

23  Boston, New York, San Francisco, as far

24  as you recall?

Confidential - Subject to Further Confidentiality Review

1          A.     Yes.

2          Q.     Where in Boston would you

3   have met?

4          A.     A hotel ballroom or event

5   room.

6          Q.     And what about New York?

7          A.     Similar.

8          Q.     San Francisco?

9          A.     Similar.

10         Q.     And along with you was

11  Chairman Song, Director Cao, and

12  Director -- is it or Secretary?

13         A.     Mr. Chang.

14         Q.     Chang.

15         A.     Yep.

16         Q.     Anyone else that you recall?

17         A.     I don't recall the names.  I

18  do recall there being others traveling

19  with us, though.  It was, not a huge

20  group, but probably -- several other

21  people.

22         Q.     Okay.  It talks about a

23  short video on CNBM.

24         A.     Yes.

1       Q.    Do you see that?

2       A.    I do.

3       Q.    Does Morgan Stanley have

4    that video?

5       A.    I don't know.  I don't think

6    so.  I mean, if we haven't produced it,

7    then I think that would be because we

8    have not got it.

9       Q.    And I appreciate that.

10         MR. STECKLER:  And I'd like

11         to, counsel, make a request that

12         if you do have the video, or

13         you're able to locate that, the

14         plaintiffs' steering committee

15         would be very interested in seeing

16         it, especially since it's related

17         to the road shows with respect to

18         the IPO in 2006.

19            So if you're able to locate

20         that, we would like a copy, if

21         that's okay.

22         MR. FORCE:  Understood.

23         MR. STECKLER:  And, of

24         course, subject to your reviewing

1          it and making sure there's nothing

2          in there that --

3                MR. FORCE:  As you know --

4                MR. STECKLER:  -- would be

5          objectionable.

6                MR. FORCE:  -- we've

7          produced a number of documents to

8          you throughout this discovery

9          process on a rolling basis.  And

10         we advised you, I think, that we

11         may or may not be finished with

12         the production of documents.

13              So to the extent that that

14         is found in the additional

15         documents we reviewed, then --

16              MR. STECKLER:  This is a

17         video, not a document, that's why

18         I asked.  It's kind of unique.

19         That's what I'm seeking.  If you

20         have the video, that would be

21         great.

22   BY MR. STECKLER:

23         Q.    Let's take a look at Page 3

24   real quick.

1          This is basically you're

2    handing over the presentation to Mr.

3    Song, as the presenter, and Mr. Cao,

4    correct?

5          A.    Yes.

6          Q.    And it then has Mr. Song's

7    name.

8          I take it this is his --

9    this is what he's going to say part of

10   the road show?

11         A.    His script, yes.

12         Q.    His script, I guess is the

13   best way to put it.

14         Not to say that it's totally

15   canned, but you guys try to keep a, I

16   take it, consistent message; is that

17   fair?

18         A.    That's right.  And somebody

19   would have been translating this as well.

20   So apart from the first line or two, he

21   would have been speaking in Chinese.

22         Q.    And it indicates, at Page 5,

23   that CNBM is a leading national

24   integrated building materials

1    manufacturer.

2              MR. KATTAN:  What page, did

3        you say?

4              MR. STECKLER:  Page 5.

5              THE WITNESS:  Yes, it does

6        say that.

7    BY MR. STECKLER:

8        Q.    And being integrated as a

9    buildings manufacturer, that includes

10   it's a cement producer, a gypsum board

11   manufacturer, a glass fiber manufacturer,

12   provides engineering services and it's

13   positioned for industry consolidation,

14   correct?

15       A.    That's correct.

16       Q.    And these are many of the

17   issues we talked about earlier, about

18   being a unified group or company,

19   correct?

20             MR. FORCE:  Object to the

21        form.

22             MR. KATTAN:  Join.

23   BY MR. STECKLER:

24       Q.    And the desire to

1   consolidated each industry?

2        A.    Yeah.  I don't think it

3   talks about unified, but it is talking

4   about integrated in the sense of being a

5   company that has a broad range of

6   building materials.

7        Q.    It talks about CNBM being an

8   integrated group of building materials

9   manufacturers; is that fair?

10            MR. FORCE:  Object to the

11        form.

12            MR. KATTAN:  Join.

13            THE WITNESS:  Yes.

14   BY MR. STECKLER:

15        Q.    Thank you.

16            And Mr. Song, on Page 6,

17   talks about how their lightweight

18   building materials business is primarily

19   gypsum boards, which is sold through its

20   subsidiary BNBM, correct?

21        A.    Not just sold through, but

22   their business is conducted through BNBM.

23        Q.    Fair enough.

24            And then it indicates that

1    its glass fiber and fiberglass reinforced

2    plastic is through their associate, I

3    guess a close associate, China

4    Fiberglass, correct?

5        A.    Correct.

6        Q.    China Fiberglass in 2006, as

7    we saw earlier, is a subsidiary of CNBM,

8    correct?

9        A.    I don't believe China

10   Fiberglass was a subsidiary.  I think it

11   was an associate.

12       Q.    Well, it says here -- the

13   reason I say that, is after, it says, We

14   are the largest shareholder with a 40

15   percent equity stake.

16       A.    Yes.  That doesn't make it a

17   subsidiary.

18       Q.    And I'm wondering whether --

19   on that chart we looked at China

20   Fiberglass wasn't listed as a subsidiary

21   at that time?

22       A.    I don't think it said

23   subsidiary.

24       Q.    Would it have been a

1    controlling shareholder of China

2    Fiberglass?

3         A.    Yes.

4         Q.    So CNBM was a controlling

5    shareholder of China Fiberglass in 2006?

6         A.    Correct.

7         Q.    Correct.  Okay.

8               On Page 13, Mr. Cao also

9    makes a presentation; is that right?

10        A.    Yes.  Starting on Page 12,

11   that's right.

12        Q.    And if we look on Page 15,

13   he is not only discussing the gypsum

14   board market, but he's talking about the

15   acquisition of Taihe and BNBM in the

16   gypsum board market, correct?

17        A.    That's correct.

18        Q.    And he indicates that CNBM

19   has it -- well, strike that.

20              He also mentions the Dragon

21   brand as part of his presentation in the

22   United States, correct?

23        A.    Yes.

24        Q.    And he --

Confidential - Subject to Further Confidentiality Review

1    A.    I'm sorry, did you say about

2  United States?

3    Q.    This is a U.S. presentation,

4  isn't it?

5    A.    This is a presentation that

6  would be made to investors everywhere.

7  It's not a specific --

8    Q.    And this would have been

9  made in the United States, correct?

10    A.    It would have been made in

11  the United States.

12    Q.    So in the United States, Mr.

13  Cao is talking about Taihe being acquired

14  by CNBM, correct?

15    A.    Correct.

16    Q.    It's talking about CNBM's

17  subsidiary BNBM, correct?

18    A.    Correct.

19    Q.    And it's talking about

20  BNBM's Dragon brand as well, correct?

21    A.    Correct.

22    Q.    And he's talking about how

23  Taihe's acquisition adds a competitive

24  gypsum board products for mass market,

1  which is being added to BNBM's product

2  portfolio, correct?

3       A.    Correct.

4       Q.    Now, if we look at Page 16,

5  under this Asian glass fiber producer,

6  what is that?  Is that fiberglass as we

7  would call it here in the States or is

8  that something different?

9       A.    Well, fiberglass is often

10  used to describe the material that comes

11  from weaving all of the fiber -- glass

12  fibers together.  So they're talking

13  about glass fiber producing, they're

14  talking about a thing that looks like

15  yarn that would then be further processed

16  into either fiberglass or glass fiber

17  matting.

18       Q.    If we look at this slide, it

19  mentions Jushi and Taishan at the top.

20            Were they part of CNBM at

21  the time?

22            MR. FORCE:  Objection as to

23       form.

24  BY MR. STECKLER:

1    Q.    Or do you know?

2    A.    I -- I don't recall.

3    Q.    And it says that, CNBM is

4    the number one position in glass fiber

5    production in Asia.

6          Correct?

7    A.    Yes.

8    Q.    It also notes, down here,

9    that, We are also the largest exporter,

10   with a 67 percent share in the same

11   period.

12   A.    Yes.

13   Q.    Okay.  Is there a way we can

14   find out where the exports of the

15   fiberglass were going?

16   A.    There's some reference, I

17   think, to export sales in the prospectus.

18   Q.    So we could look --

19   similarly, like we looked for gypsum

20   board, we could look in the prospectus?

21   A.    Yes.

22   Q.    Once you do a prospectus for

23   an initial public offering, does it

24   remain stagnant, or the same, throughout

Confidential - Subject to Further Confidentiality Review

1    the time a company is listed or are

2    prospectuses updated?

3           A.    No, they're not updated.

4    It's a one-off document.

5           Q.    That's what I thought.  So

6    there's just one prospectus; even though

7    the business may have changed

8    significantly through acquisitions and

9    different developments, that's not

10   necessarily revised in a new prospectus?

11          A.    The prospectus is like a

12   snapshot in time when the IPO is done.

13   And then you have subsequent disclosures

14   that would update investors on the

15   current status of the company, like

16   annual reports, for example.

17          Q.    That was my next question.

18                So in lieu of a prospectus

19   after a company is listed on the

20   Exchange, investors would rely on annual

21   reports?

22          A.    Annual reports, interim

23   reports, other company announcements.

24          Q.    Are annual reports governed

1     by the Hong Kong Exchange?

2          A.    So some of the form and

3     content is covered by the Listing Rules.

4     But it's also governed by the

5     requirements of the financial reporting

6     standards in Hong Kong.

7          Q.    So there's a body that

8     governs what's in the --

9          A.    Yes.

10         Q.    Okay.  Do you all prepare

11    annual reports at all?

12         A.    No, we have no involvement.

13         Q.    Let me hand you what we're

14    going to mark as Exhibit Number 21 to

15    your deposition.

16                    -  -  -

17              (Whereupon, Exhibit

18              Keyes-21, Bates MS 59475-454,

19              April 2007 China National Building

20              Material Company Management Road

21              Show Presentation, was marked for

22              identification.)

23                    -  -  -

24              MR. STECKLER:  It's Morgan

1           Stanley 59475 to 59454, and it is

2           two-sided and probably not stapled

3           in the best spot.  So I apologize

4           from the outside.

5     BY MR. STECKLER:

6           Q.    Do you recognize this

7     document?

8           A.    I don't believe I've seen it

9     before.

10          Q.    This was produced to us by

11    Morgan Stanley.

12                Is it a business record of

13    Morgan Stanley?

14          A.    Yes, it is.

15          Q.    Created and prepared in the

16    ordinary course of business by Morgan

17    Stanley or by -- or for CNBM by Morgan

18    Stanley?

19          A.    Yes, I believe it is.

20          Q.    And it appears to have been

21    created at or around 2007; is that right?

22    At least based upon Page --

23          A.    Based upon the cover.

24          Q.    Yeah.  I don't --

1        A.    You've got the back there.

2   This is the front.

3        Q.    This is it.  Okay.  Thank

4   you.

5              April 2007, right?

6        A.    Correct.  So that would be

7   just after they announced the annual

8   results for 2006.

9        Q.    So what is this document?

10       A.    This appears to be the

11  presentation that the management would

12  have used on the IR road show.

13       Q.    So this would have been the

14  actual presentation by CNBM's management?

15       A.    Correct.

16       Q.    And what we just talked

17  about earlier, was that the script for

18  these slides to be used?  Was that your

19  understanding, or how would they relate

20  to the road show presentation?

21       A.    The one we looked at before

22  with the script was the IPO road show

23  presentation from March of 2006.

24              This is just over a year

1    later and investor relations road show,

2    so not in connection with an offering of

3    securities.

4          Q.    I see.  And if we look at

5    Page 13, I believe, under lightweight

6    building materials, here it's referencing

7    the August 2006, that, BNBM, which is a

8    subsidiary of CNBM, acquired a further

9    stake in Taihe and increased its

10   shareholding from 42 percent to 65

11   percent?

12         A.    Yes.

13         Q.    BNBM still remains a

14   controlling shareholder of Taihe,

15   correct?

16         A.    Yes.

17         Q.    And were you aware that CNBM

18   was still a controlling shareholder of

19   BNBM at that time, correct?

20         A.    Yes.

21         Q.    And CNBMG is still a

22   controlling shareholder of CNBM at that

23   time?

24         A.    Yes.

1     Q.    Okay.  And it says here

2  that, BNBM and Taihe have established a

3  country-wide gypsum board production

4  platform and geographic footprint, and we

5  plan to immediately continue expanding

6  capacity.

7           Do you see that?

8     A.    I see that.

9     Q.    And it indicates that, BNBM

10  was awarded the, quote/unquote, most

11  influential enterprise of 2006 with its

12  Dragon and Taihe brands, recognized as,

13  quote, famous brands of China.

14           Do you see that?

15     A.    I do see that.

16     Q.    Was this slide utilized in

17  the United States as part of the road

18  show by the executives of CNBM, as far as

19  you're aware?

20     A.    I believe so.

21     Q.    And if we look on the next

22  page, on Page 14, it indicates that, CNBM

23  further consolidated its position in

24  Jushi Group by acquiring an additional

Confidential - Subject to Further Confidentiality Review

1    11.5 percent stake via a capital increase

2    in equity transfer.

3              Do you see that?

4         A.    I do.

5         Q.    Do you know whether, in

6    2007, CNBM had become a controlling

7    shareholder of Jushi Group?

8         A.    I don't know.

9         Q.    If we wanted to find that

10   out, we could look at the annual reports?

11        A.    You should be able to, yes.

12        Q.    Okay.  If we look on Page

13   17, under key developments, can you read

14   the last one down there?

15        A.    And strengthening management

16   control, simplify corporate shareholding

17   structure, strengthen operational control

18   and reduce risk.

19              And then, Establish

20   consistent internal control systems

21   thereby increasing quality of management.

22        Q.    Was it your understanding

23   that CNBM was trying to strengthen its

24   management control from the top all the

1  way down to its subsidiaries in a unified

2  fashion?

3          MR. GRESSLER:  Objection to

4      form.

5          THE WITNESS:  I don't know.

6  BY MR. STECKLER:

7      Q.    What does this indicate to

8  you?

9          MR. FORCE:  Object to the

10      form.

11          THE WITNESS:  It indicates

12      to me that they're representing

13      that they were improving the

14      management structure of the group.

15  BY MR. STECKLER:

16      Q.    If we look at Page 20, it

17  indicates here, too, that they're going

18  to manage operations through strong

19  corporate culture and systems, correct?

20      A.    It says that, yes.

21      Q.    And that would go to their

22  direction to provide investors with

23  security so that they understood that

24  CNBM had control over BNBM and its

Confidential - Subject to Further Confidentiality Review

1  subsidiaries, correct?

2          MR. FORCE:  Object to the

3      form.

4          MR. CAMPBELL:  Objection to

5      the form.

6          MR. GRESSLER:  Object to

7      form.

8          THE WITNESS:  Sorry, could

9      you repeat the question?

10 BY MR. STECKLER:

11     Q.   Morgan Stanley had

12 recommended that CNBM create a structure

13 and format to show control over its

14 subsidiaries.

15          Do you recall that?

16     A.   I do.

17     Q.   Yeah.  And one of the

18 reasons for that was to ensure investor

19 confidence, correct?

20     A.   Correct.

21     Q.   And my point is, there was a

22 continuing effort to do so, as indicated

23 in their strategy and vision, for

24 managing operations through a strong

1    corporate culture and systems; is that

2    your understanding?

3           A.    Yes.

4           Q.    Okay.

5                 MR. STECKLER:  I'm going to

6           hand you, sir, what we marked as

7           Exhibit Number 22 to your

8           deposition, which is Morgan

9           Stanley 037379 all the way to

10          Morgan Stanley 037546, which is

11          labeled, The China National

12          Building Material Company Limited

13          Annual Report 2007.

14                      -   -   -

15                (Whereupon, Exhibit

16          Keyes-22, Bates MS 037379-7546,

17          China National Building Material

18          Company Limited Annual Report,

19          2007, was marked for

20          identification.)

21                      -   -   -

22    BY MR. STECKLER:

23           Q.    This was produced to us by

24    Morgan Stanley.

Confidential - Subject to Further Confidentiality Review

1          Do you understand that?

2     A.    Yes, I do.

3     Q.    And would this be considered

4  a business record of Morgan Stanley?

5     A.    Yes.

6     Q.    And it was kept and

7  maintained in the ordinary course of

8  business in 2007, up till today, as part

9  of your work with CNBM; is that right?

10     A.    That's right.

11          I would just make a point

12  that it's not a document produced by

13  Morgan Stanley, sorry, in the sense of

14  created.

15     Q.    It's not prepared by Morgan

16  Stanley, but it's kept by Morgan

17  Stanley --

18     A.    That's right.

19     Q.    -- as a business record?

20     A.    Yes.

21     Q.    Yes, I'm aware of that.

22          And I note in the annual

23  reports, you've told us that they have to

24  comply with certain rules and regulations

1    that are established by the Hong Kong

2    Exchange Listing --

3         A.    That's right.

4         Q.    -- correct?

5              And, in fact, if we go to

6    Page 6, there are a number of definitions

7    in the annual report, correct?

8         A.    Yes.

9         Q.    And under controlling

10   shareholder, for example, it says, It has

11   the meaning ascribed thereto under the

12   Listing Rules?

13        A.    That's correct.

14        Q.    And those would be the

15   Listing Rules that we looked at in the

16   exhibits -- I believe they are 2, 3 and 4

17   to your depo today; does that sound

18   right?

19        A.    We looked at them this

20   morning, that's right.

21        Q.    In addition, we talked about

22   several acronyms, and you'll see BNBM

23   listed here, as well as BNBMG and other

24   companies.

Confidential - Subject to Further Confidentiality Review

1          Do you see that?

2     A.    Yes, I see that.

3     Q.    Under Page 7, it says,

4  Group, we and us, and that includes the

5  company, and except where the context

6  otherwise requires, all of its

7  subsidiaries.

8          Do you see that?

9     A.    I do.

10    Q.    So when CNBM, in their

11 annual report, says we, use, or group,

12 they mean CNBM, as well as its

13 subsidiaries, which would include BNBM as

14 well as Taishan and some of the others we

15 talked about, correct?

16    A.    That's correct.

17    Q.    And if we look on Page 9, it

18 talks about Taihe, which also includes

19 Shandong Taihe Dongxin Company Limited

20 and Taishan Gypsum Company Limited.

21         Do you see that?

22    A.    I do.

23    Q.    And if we look under

24 financial highlights on Page 11, it talks

Confidential - Subject to Further Confidentiality Review

1    about, The group's financial results,

2    highlights of the year 2007 and 2006, are

3    as follows.

4              Do you see that, sir?

5         A.    I'm sorry, on Page 11?

6         Q.    At the very, very top, it

7    says, The group's financial results and

8    highlights.

9         A.    Yes, I do.

10        Q.    So when it says the group's

11   financial results and highlights, and it

12   lists their revenue and profits and loss,

13   et cetera, that involves -- under revenue

14   and gross profit, that involves not just

15   CNBM but all of its subsidiaries?

16        A.    That's correct.  It's

17   consolidated numbers.

18        Q.    Right.  And if we look at

19   Page 10, we can get a better

20   understanding of the structure, in 2007,

21   of CNBM; is that right?

22        A.    Yes.

23        Q.    Okay.  Now, these

24   shareholding structures of the group,

Confidential - Subject to Further Confidentiality Review

1   which are listed here on 2010, are

2   provided in all of the annual reports,

3   I'll represent to you, of CNBM.

4           Are they -- have any

5   requirements to be fair and accurate

6   representations under the Listing Rules?

7           MR. FORCE:  Object to the

8       form.

9   BY MR. STECKLER:

10      Q.   Of ownership?

11          MR. GRESSLER:  Join.

12          MR. STECKLER:  What's the

13      basis?  I want to make sure I'm

14      asking --

15          MR. FORCE:  I don't think

16      you established that the Listing

17      Rules applied to this particular

18      information at all.

19          MR. STECKLER:  Well, he

20      actually told us that the Listing

21      Rules apply to certain things that

22      have to be in the annual reports

23      earlier.

24  BY MR. STECKLER:

1      Q.    Do you recall that, sir?

2      A.    Yes, right.

3      Q.    So my question is, to this

4   chart, whether the Listing Rules would

5   require that representations of

6   ownerships and subsidiaries on this chart

7   be fair and accurate?

8           MR. FORCE:  Object to form.

9   BY MR. STECKLER:

10     Q.    In the annual reports?

11     A.    Okay.  So, first of all, I

12  think there's no requirement in the

13  Listing Rules to include a chart like

14  this, it's only done to be helpful to

15  shareholders.

16          But once they include

17  information, there is an obligation to

18  make sure that it's accurate.

19     Q.    And so the ownership

20  interest have to be accurate under the

21  Listing Rules?

22     A.    They should be, yes.

23     Q.    And so in this instance,

24  CNBMG is parent, correct?

Confidential - Subject to Further Confidentiality Review

1       A.    Yes.

2       Q.    And company is CNBM,

3   correct?

4       A.    That's correct.

5       Q.    And CNBM is the controlling

6   shareholder of BNBM, correct?

7       A.    Correct.

8       Q.    It is also the controlling

9   shareholder of China Fiberglass, correct?

10      A.    Yes.

11      Q.    And China Fiberglass is the

12  controlling shareholder of Jushi Group,

13  correct?

14      A.    Correct.

15      Q.    In addition, CNBM owns 11

16  percent of Jushi Group?

17           MR. FORCE:  Object to form.

18  BY MR. STECKLER:

19      Q.    Do you see that?

20      A.    I see that.

21      Q.    11.5 percent?

22           MR. FORCE:  Thank you.

23           MR. STECKLER:  That was

24  really your objection.

Confidential - Subject to Further Confidentiality Review

1           MR. FORCE:  You're reading

2       the document.  Or misreading the

3       document.

4   BY MR. STECKLER:

5       Q.    So does CNBM, are they

6   considered a controlling shareholder of

7   Jushi Group?  How does that work?

8           What would be the proper

9   definition, in this instance?  Or do you

10  know?

11      A.    I'm not sure.

12      Q.    Okay.  And so in this annual

13  report, when we see company or group and

14  we and us listed, that includes all of

15  the companies on this chart below the

16  word "company," all those subsidiaries

17  are reflected when they say group, we and

18  us throughout the annual report; is that

19  fair?

20          MR. KATTAN:  Objection to

21      form.

22          MR. GRESSLER:  Objection to

23      form.

24          MR. STECKLER:  What's the

1     basis?

2          MR. GRESSLER:  Because the

3     definition says "unless

4     otherwise."

5          MR. STECKLER:  So -- that's

6     great.  Thank you for pointing

7     that out.

8  BY MR. STECKLER:

9          Q.   So all of the -- where it

10 says company, all of the entities listed

11 below are included in we, us or group

12 throughout the annual report unless

13 specified otherwise, correct?

14          MR. CAMPBELL:  Objection to

15     form.

16          MR. GRESSLER:  Objection to

17     form.

18          THE WITNESS:  Yes.

19               -  -  -

20          (Whereupon, a discussion off

21     the record occurred.)

22               -  -  -

23  BY MR. STECKLER:

24          Q.   Could you please take a look

1    at Page 58?  It talks about transactions

2    with Jushi Group.

3              It says here, Jushi Group is

4    51 percent owned subsidiary of China

5    Fiberglass, which has a 20 percent equity

6    interest in BND Company Limited, an

7    indirect non-wholly owned subsidiary of

8    the company.

9         A.    Yes.

10        Q.    Jushi Group is an associate

11   of a substantial shareholder of a

12   subsidiary of the company and, therefore,

13   constitutes a connected person of the

14   company under the Listing Rules.

15             Do you see that?

16        A.    I do.

17        Q.    Do you recall what a

18   connected person is under the Listing

19   Rules?

20        A.    I do.  I think it was in the

21   definitions that we looked at earlier.

22        Q.    Can we go and take a look at

23   that real quickly?

24        A.    Yes.  There's a

Confidential - Subject to Further Confidentiality Review

1    cross-reference to Rule 14A, which isn't

2    in the exhibits that you've handed me so

3    far.

4        Q.    So it's not connected person

5    asked to look at Chapter 14A?

6        A.    14A, yes.

7        Q.    Let me ask you a question

8    real quick back on this chart.

9            Is CNBM the controlling

10   shareholders of China United, South

11   Cement, BNBM, China Fiberglass, China

12   Composites, China Triumph and CNBM

13   Investment?

14           MR. FORCE:  Object to the

15       form.

16           THE WITNESS:  Yes, it is.

17   BY MR. STECKLER:

18       Q.    I'm going to go ahead and

19   hand you Morgan Stanley 44561.  We'll

20   mark this as Exhibit Number 23 to your

21   deposition.

22               -  -  -

23           (Whereupon, Exhibit

24       Keyes-23, Bates MS 44561, 2007

1          Placing Agreement, was marked for

2          identification.)

3                    -  -  -

4     BY MR. STECKLER:

5          Q.    Is this a business record of

6     CNBM -- I mean, I'm sorry, strike that.

7     Thank you, counsel.

8               Is this a business record of

9     Morgan Stanley?

10         A.    Yes, it is.

11         Q.    And as we've defined

12    earlier?

13         A.    Yes.

14         Q.    Okay.  What is this

15    document?

16         A.    It's an announcement by CNBM

17    which was published on the Hong Kong

18    Stock Exchange website so that all

19    investors could see it.

20               And it relates to the

21    placing of new shares in the company, I

22    think, actually, new shares and the sale

23    of some existing shares that took place

24    in 2007.

1      Q.    What happened here exactly?

2      A.    What happened is that the

3    company decided to do an additional

4    issuance of shares to raise more capital,

5    and Morgan Stanley acted as the placing

6    agent on that capital raising.

7      Q.    And would there have been a

8    road show that occurred within the United

9    States --

10      A.    No.

11      Q.    -- with the executives for

12    this particular --

13      A.    No.

14      Q.    Okay.

15      A.    These would be done more

16    like an overnight block trade.

17      Q.    I see.

18           Let me hand you another

19    exhibit, which will be Exhibit Number 24.

20                 -  -  -

21           (Whereupon, Exhibit

22           Keyes-24, Bates MS 044570-578,

23           2009 Placing Agreement, was marked

24           for identification.)

1                    -  -  -

2    BY MR. STECKLER:

3         Q.    Is this a business record of

4    Morgan Stanley with respect to the work

5    it's doing for CNBM?

6         A.    Yes.

7         Q.    And it's 044570 to 044578.

8               And this is, I believe, a

9    2009 placing agreement?

10        A.    That's correct.

11        Q.    Similar to the 2007 one we

12   just looked at earlier?

13        A.    Very similar.

14        Q.    Can you explain what this is

15   again?

16        A.    This is, again, the

17   announcement that CNBM would have made to

18   the Hong Kong Stock Exchange to announce

19   the placing of new H shares to raise more

20   capital for the company.

21              And the joint placing agents

22   in this case were Morgan Stanley and

23   CICC.

24        Q.    And do you know whether, at

1    that point in time, in 2009, whether

2    Morgan Stanley, not Morgan Stanley Asia

3    but Morgan Stanley, owned H shares as an

4    institutional investor of CNBM?

5         A.    I don't -- I don't know.

6         Q.    Okay.  Are some of the

7    substantial shareholders of H shares

8    listed in annual reports?

9         A.    Yes.  I mean, there's --

10   yes, if somebody qualifies as a

11   substantial shareholder, it would be.

12              MR. STECKLER:  I'm going to

13         hand you sir, what we marked as

14         Exhibit Number 25 to your

15         deposition.  This is an annual

16         report that is Exhibit-9 to

17         another deposition.  This was not

18         produced to us by Morgan Stanley.

19                   -  -  -

20              (Whereupon, Exhibit

21         Keyes-25, China National Building

22         Material Company Annual Report,

23         was marked for identification.)

24                   -  -  -

Confidential - Subject to Further Confidentiality Review

1    BY MR. STECKLER:

2         Q.    I'd like you to take a look

3    at this and tell me whether this appears

4    to be an annual report that you would

5    expect to see with respect to CNBM --

6         A.    Yes.

7         Q.    -- based upon your

8    experience?

9         A.    It appears to be an annual

10   report of CNBM.

11        Q.    And on Page 13, we see the

12   similar shareholding structure, correct?

13             MR. FORCE:  I just want to

14             object to questions regarding this

15             document as being outside the

16             scope of the deposition notice.

17             But to the extent the

18             witness has his own personal

19             knowledge, you can ask him about

20             it.

21   BY MR. STECKLER:

22        Q.    Well, we know that Morgan

23   Stanley is referenced in the annual

24   report.

1        MR. STECKLER:  And you're

2    aware of that, counsel?

3        MR. FORCE:  It may or may

4    not be.  But it's not a document

5    that Morgan Stanley prepared.

6        MR. STECKLER:  I understand.

7        MR. FORCE:  And it's not a

8    document that is part of any of

9    the four transactions that are

10   part of this deposition.  So it's

11   outside the scope of the

12   deposition.

13       MR. STECKLER:  Well, we

14   have --

15       MR. FORCE:  But if you want

16   to ask --

17       MR. STECKLER:  We haven't

18   even laid the foundation yet.

19       MR. FORCE:  That's fine.

20   I'm not stopping you from asking

21   the question.  I'm just saying

22   that the witness is here as a

23   corporate representative, and I

24   think that questions about this

1        document are outside of the scope

2        of the deposition subpoena.

3            But if you want to ask the

4        witness about it, that's fine.

5            MR. STECKLER:  I understand.

6            MR. FORCE:  You're asking in

7        his personal capacity.

8            MR. STECKLER:  I appreciate

9        that.

10   BY MR. STECKLER:

11        Q.    Again, on Page 13 of the

12   annual report, it indicates the share

13   holding structure of the group, correct?

14        A.    Yes.

15        Q.    And you'll note here that

16   the shareholding structure has changed

17   since the IPO and 2007 report that we

18   looked at, correct?

19            You'll notice, for example,

20   Taishan Gypsum listed under BNBM?

21        A.    Yes.

22        Q.    In addition, you'll notice,

23   at the bottom, there's an CNBM

24   Investment, or what's been referred to as

1   CNBMI in other depositions.

2              Do you see that at the

3   bottom?

4         A.    I see it.

5         Q.    Regardless of this change,

6   we see CNBM at the top under company,

7   correct?

8         A.    Correct.

9         Q.    And these entities below

10  company would be considered subsidiaries;

11  is that right?

12        A.    With the possible exception

13  of China Fiberglass, which I think as I

14  said, is a subsidiary.

15        Q.    And why do you say that?

16        A.    Well, because the

17  shareholding is less than 50 percent.

18        Q.    And is there a definition

19  the subsidiary has to have more than a

20  certain percentage?

21        A.    It's -- I mean, again, I

22  think we can refer back to the definition

23  of subsidiary, if you'd like to.

24        Q.    I was just about to look at

1    this --

2         A.    I mean, the presumption

3    would usually be that if it's above 50,

4    it is a subsidiary.

5         Q.    Because under the definition

6    of subsidiary here, on Page -- I believe

7    it's 14, it would depend on whether they

8    were part of the consolidated accounts?

9         A.    Yeah.

10        Q.    And we can look at that.  So

11   I'll -- I appreciate that qualification.

12             It does appear, though, that

13   CNBM is the controlling shareholder of

14   China United South Cement, North Cement,

15   BNBM, China Composites, China Triumph and

16   CNBM Investment, correct?

17        A.    Yes.

18        Q.    And the term "substantial

19   shareholder," would CNBM be considered a

20   substantial shareholder of these entities

21   because they exercise 10 percent or more

22   of voting power?

23             MR. FORCE:  Object to the

24        form.  Of all the ones on here or

1          the ones you just mentioned?

2              MR. STECKLER:  Of the ones I

3          just mentioned.  I'm sorry.  Thank

4          you, counsel.

5              THE WITNESS:  I mean, if

6          we're using the definition under

7          the Listing Rules, I think the

8          substantial shareholder definition

9          usually applies just to shares in

10          a listed company.

11              MR. STECKLER:  That's right.

12          Thank you.

13    BY MR. STECKLER:

14          Q.    So, really, it's CNBMG who

15    is the substantial shareholder of CNBM --

16          A.    Yes.

17          Q.    -- in this thing -- in this

18    chart.  Thank you.

19              And where could we, find in

20    the annual report, the substantial H

21    shareholders?

22              MR. FORCE:  Object to the

23          form.

24              THE WITNESS:  I'm not really

1          familiar with this annual report,

2          so.

3                Here we go.  Pages 51, 50

4          and 51.

5    BY MR. STECKLER:

6          Q.    And under disclosure of

7    interest, this lists the name of certain

8    substantial shareholders of H shares of

9    CNBM; is that correct?

10         A.    Yes.

11         Q.    And JP Morgan Chase &

12   Company is listed, correct?

13         A.    Yes, it is.

14         Q.    Are they U.S.

15   institutional -- a U.S. financial

16   institution?

17                MR. FORCE:  Object to form.

18                THE WITNESS:  Yes, JP Morgan

19          Chase is a U.S. financial

20          institution.

21   BY MR. STECKLER:

22         Q.    What about T. Rowe Price &

23   Associates?

24         A.    Yes.

1    Q.    What about Warden Alison?

2    A.    No idea.

3    Q.    Okay.  Atlantis Investment

4    Management Limited?

5    A.    No, Atlantis is Chinese

6    money run out of Hong Kong.

7    Q.    What about Value Partners

8    Group Limited?

9    A.    Again, Hong Kong based

10   investment manager.

11   Q.    Which one of these H

12   shareholders have you solicited, or did

13   you solicit, on behalf of CNBM to

14   purchase H shares in the United States,

15   that you recall?

16        MR. FORCE:  I'm sorry, you

17   said in the United States?

18        MR. STECKLER:  Yes.

19        MR. FORCE:  Thank you.

20        THE WITNESS:  I don't

21   recall.

22   BY MR. STECKLER:

23   Q.    Okay.  Fair enough.

24        If I wanted to find out who

1    is a substantial shareholder of a company

2    listed on the Hong Kong Exchange, can I

3    go on their website and find that out?

4          A.    I believe so.  Whether --

5    I'm not sure, exactly, where you go to

6    look for that there.  But my

7    understanding is it is a matter of public

8    record.

9          Q.    Let me hand you what I'm

10   going to mark as Exhibit Number 26 to

11   your deposition.

12                     -   -   -

13          (Whereupon, Exhibit

14          Keyes-26, Hong Kong Stock Exchange

15          Website Printout, was marked for

16          identification.)

17                     -   -   -

18   BY MR. STECKLER:

19          Q.    Are you familiar with the

20   HKE website?

21          A.    Yes.

22          Q.    And under Corporate

23   Substantial Shareholder Notice Form 2, it

24   lists China National Building Materials

Confidential - Subject to Further Confidentiality Review

1    Company Limited H shares.

2              Do you see that?

3         A.    Yes.

4         Q.    And there's a stock code,

5    3323.

6              That is the stock code for

7    CNBM listed on the Hong Kong Stock

8    Exchange, correct?

9         A.    That's correct, yes.

10        Q.    It indicates that Morgan

11   Stanley, whose registered office is in

12   New York, is a substantial shareholder of

13   H shares; is that correct?

14             MR. FORCE:  Objection.

15        Outside the scope of the

16        deposition subpoena.

17             THE WITNESS:  Yes.

18   BY MR. STECKLER:

19        Q.    And do you see the date of

20   relevant event there?

21        A.    Yes.

22        Q.    And it talks about May 13,

23   2013.

24             Do you see that?

1      A.    I do.

2      Q.    And May 14, 2013, correct?

3      A.    Yes.

4      Q.    And what are those events

5   that are being referred to there?

6           MR. FORCE:  Object.  The

7           question is outside the scope of

8           the deposition subpoena.  If the

9           witness can answer, he can answer.

10          THE WITNESS:  I believe that

11          would be the date on which Morgan

12          Stanley acquired an interest that

13          was disclosable under the

14          Securities and Futures Ordinance.

15   BY MR. STECKLER:

16     Q.    And I'll represent to you

17   that this was printed off on Wednesday of

18   this week.

19          Would that -- do you know

20   whether Morgan Stanley still holds H

21   shares, as of today, in CNBM?

22          MR. FORCE:  Same objection.

23          THE WITNESS:  I would -- I

24          have no idea.

Confidential - Subject to Further Confidentiality Review

1    BY MR. STECKLER:

2         Q.    Okay.  Now, you're with --

3    and just to be fair, you're with Morgan

4    Stanley Asia Limited, right?

5         A.    That's right.

6         Q.    This is referring to Morgan

7    Stanley New York, the financial

8    institution, correct?

9         A.    Yes.

10        Q.    And, in fact, it indicates

11   principal place of business in Hong Kong,

12   on the very front page, no place of

13   business in Hong Kong, correct?

14        A.    Yes.

15        Q.    And it it indicates that the

16   Morgan Stanley we're talking about here

17   is the New York Stock Exchange Morgan

18   Stanley, who is headquartered in New

19   York, correct?

20             MR. FORCE:  Object to the

21        form.

22             THE WITNESS:  Yes.

23   BY MR. STECKLER:

24        Q.    And if we look at Number 22

Confidential - Subject to Further Confidentiality Review

1  below, it says, Interests of corporation

2  controlled by substantial shareholder.

3  And it indicates the controlled

4  corporation, the controlling shareholder,

5  the amount of control and the number of

6  shares at the bottom.

7          Do you see that?

8      A.    Yes.

9      Q.    And this is kind of unusual,

10 but I'm trying to understand, since

11 you're the sole book runner and sponsor

12 in the IPO, and you've done these placing

13 agreements, was there a period of time

14 that Morgan Stanley had to wait before

15 they could -- their parent company could

16 purchase H shares?

17          MR. FORCE:  Objection.

18          Outside the scope of the

19          deposition subpoena.

20          THE WITNESS:  Yeah.  The

21          first thing is I'd say is it's

22          not -- I mean, I can't tell from

23          this whether these are Morgan

24          Stanley positions held for Morgan

1          Stanley's own account or whether

2          they involve client transactions.

3          So who the ultimate beneficial

4          owner is of these shares isn't

5          apparent.

6               But to answer the other part

7          of your question, we would be able

8          to trade in the shares of the

9          company, essentially, at any time.

10    BY MR. STECKLER:

11         Q.    So CNBM would have solicited

12    Morgan Stanley, the U.S. entity, as an

13    institutional investor?

14              MR. FORCE:   Object to the

15         form.

16              MR. GRESSLER:   Join.

17    BY MR. STECKLER:

18         Q.    Is that your understanding?

19    Or do you know?

20         A.    That's not my understanding.

21         Q.    Do you know?

22         A.    I'm not aware of them having

23    done so, first of all.

24              And just sort of going to

Confidential - Subject to Further Confidentiality Review

1    the premise of the question, it's not

2    clear to me that Morgan Stanley was ever

3    actually a shareholder, in the sense of

4    holding for its own account, shares in

5    CNBM, just from looking at this.

6         Q.    You don't know?

7         A.    I don't know.

8         Q.    Right.  When it says name of

9    substantial shareholder, it lists Morgan

10   Stanley at the top, correct?

11        A.    Yes.

12        Q.    And then it talks about

13   there being the controlling shareholder

14   of various entities, correct?

15        A.    Yes.

16        Q.    And if we look down on

17   Number 22 at the bottom of Exhibit Number

18   26, it lists various Morgan Stanley

19   entities, some investment holdings

20   companies, some of them -- one says

21   domestic.

22              Do you see that?

23        A.    I do.

24        Q.    You don't know whether this

Confidential - Subject to Further Confidentiality Review

1    is for the benefit of Morgan Stanley or

2    as part of their investment practices for

3    other folks; is that fair?

4            MR. FORCE:  I'm going to let

5        the witness answer.  I just want

6        to object to it being outside the

7        scope of the deposition subpoena.

8        The witness can --

9            MR. STECKLER:  You can have

10        a running objection on that, if

11        you want.  I would agree to

12        disagree, but okay.

13            MR. FORCE:  If we can make

14        that with respect to any questions

15        regarding this document.  Thank

16        you.

17            MR. STECKLER:  Sure.

18            THE WITNESS:  Sorry.  I'm

19        getting tired.  Could you repeat

20        the question again?

21    BY MR. STECKLER:

22        Q.    You don't know whether these

23    U.S. Morgan Stanley entities are

24    investing for Morgan Stanley itself or

Confidential - Subject to Further Confidentiality Review

1  for other folks, correct?

2        A.    That's correct, I do not

3  know.

4        Q.    In addition, you do not know

5  whether the investment managers in the

6  United States that are buying H shares

7  have been solicited by CNBM or not,

8  correct?

9        A.    Correct.

10        Q.    In addition, you're not

11  really sure whether these investments are

12  made on or behalf of U.S. citizens or not

13  by Morgan Stanley, correct?

14        A.    Correct.

15        Q.    And what we do know is that

16  CNBM did come to the United States, based

17  upon what we've learned, annually

18  soliciting institutional investors to buy

19  H shares, correct?

20             Whether Morgan Stanley was a

21  part of that or not, you're not sure?

22             MR. FORCE:  Object to the

23        form.

24             THE WITNESS:  Well, yes,

1        you're right, I'm not sure if

2        Morgan Stanley was a part of that

3        in each case.

4            And I'm also not sure that

5        they actually have made annual

6        visits to the United States.

7   BY MR. STECKLER:

8        Q.    I'm going to represent to

9   you that the testimony, and we can look

10  at it if you'd like, that CNBM executives

11  have stated that they made annual

12  visits --

13       A.    Right.

14       Q.    -- to the United States for

15  what you would call investor relations.

16       A.    Right.

17            MR. KATTAN:  Objection as to

18       form.

19  BY MR. STECKLER:

20       Q.    Does that sound reasonable

21  to you?

22       A.    I have no view on it.  If

23  that's what they represented, that's what

24  they represented.

1      Q.     And you don't know whether

2    Morgan Stanley would have participated or

3    been at an investor relation meeting?

4              MR. FORCE:  Object to the

5         form.

6    BY MR. STECKLER:

7      Q.     Other than -- and when I say

8    "Morgan Stanley," I apologize, I don't

9    mean the Morgan Stanley entity that you

10   work for, I'm talking about the

11   institutions listed here on Exhibit

12   Number 26.

13     A.     I don't know.

14     Q.     Fair enough.

15             MR. STECKLER:  Let's take a

16        quick break.

17             VIDEO TECHNICIAN:  The time

18        is 3:52.  And we are off the

19        record.

20                  -  -  -

21             (Whereupon, a brief recess

22        was taken.)

23                  -  -  -

24             VIDEO TECHNICIAN:  The time

1          is 4:09.  And we are back on the

2          record.

3    BY MR. STECKLER:

4          Q.    Taking a look again at

5    Exhibit Number 26, if you go continue on

6    to the second-to-last page, there are

7    several other U.S. Morgan Stanley

8    entities, such as Morgan Stanley Tower,

9    LLC, Morgan Stanley Commercial Services,

10   MS Beta Holdings, MS Alpha Holdings,

11   Morgan Stanley JV Holdings, Morgan

12   Stanley JV Holdings, LLC, MS Gamma

13   Holdings, Morgan Stanley Smith Barney

14   Holdings.

15          Do you know whether any of

16   those are investor -- investor holdings

17   or whether they are held for the benefit

18   of Morgan Stanley or any other entities?

19         A.    I have no idea.

20         Q.    Okay.  Fair enough.

21          Regardless, the ones that we

22   just talked about, though, on the

23   second-to-last page, are all entities

24   that are -- they're incorporated in the

1  United States, correct?

2          The ones I just mentioned

3  are all incorporated in the United

4  States, those companies?

5          And just for your

6  convenience --

7          A.    Yes.

8          Q.    -- the very first page is

9  where I'm looking at, it says where they

10  are incorporated.

11         A.    Yep.

12         Q.    Fair enough.

13         And I take it these entities

14  that are purchasing H shares of CNBM have

15  to be institutional investors, based upon

16  what we talked about earlier?

17             MR. FORCE:  Object to the

18         form.

19             THE WITNESS:  Well, as I

20         think I said, I'm not sure whether

21         any of these are institution --

22         investors in CNBM.

23  BY MR. STECKLER:

24         Q.    Well, they are entities that

1  hold H shares?

2        A.    Hold as a -- hold as a

3  record.  But, as I said, potentially as

4  part of our client business.

5        Q.    Or not?

6        A.    Or not.  I don't know.

7        Q.    Right.

8        A.    But I think your question

9  presumed that they were investors.

10        Q.    And I don't mean to presume

11  that, and I apologize if I intimated

12  that.

13              No.  I'm saying they do hold

14  H shares, we don't know whether it's for

15  the benefit of the Morgan Stanley entity

16  or for the benefit of others?

17        A.    Correct.

18        Q.    Understood.

19              Regardless, each of those

20  entities is based in the United States?

21        A.    The ones that you mentioned,

22  yes.

23        Q.    Right.  And my understanding

24  is they have to -- to purchase H shares

1  in the States, they have to be

2  institutional financial investors or --

3  financial institution investors; is that

4  right?  Did I say that correctly?

5         A.    For us to sell shares in an

6  offering in the United States, it would

7  have to be the qualified institutional

8  buyers.

9               However, anybody, once the

10  shares have been listed, can go out and

11  buy shares.  So, I mean, tomorrow, you

12  could instruct your broker to buy shares

13  in CNBM.

14        Q.    And so the restriction only

15  applies to the -- for the IPO?

16        A.    For equity offerings.

17        Q.    I see.  And the reason I ask

18  is I thought there might be some tax

19  issues associated with who is -- who may

20  or may not be able to purchase --

21        A.    I'm not aware of any.

22        Q.    -- the securities?

23              I don't know either.

24              I want to go back to the

Confidential - Subject to Further Confidentiality Review

```
1    investor relations road shows.  Who
2    maintains a list of the sign-in sheets?
3              MR. FORCE:  Object to the
4         form.
5              THE WITNESS:  I'm not sure
6         whether those are kept.  I don't
7         know.
8    BY MR. STECKLER:
9         Q.   Who would maintain a record
10   of who attended those investor relation
11   meetings?
12             MR. FORCE:  Object to the
13        form.
14             THE WITNESS:  Again, I'm not
15        sure whether those records are
16        kept for the long-term.
17   BY MR. STECKLER:
18        Q.   And who would keep a record
19   of the U.S. entities that were solicited
20   or invited to attend investor relation
21   road shows?
22             MR. FORCE:  Object to the
23        form.
24             THE WITNESS:  Again, I'm not
```

1    sure if anybody would have

2    maintained that record.

3  BY MR. STECKLER:

4        Q.    Is it your understanding

5  that Morgan Stanley, as the 30(b)(6)

6  corporate rep, would have been in

7  attendance, not you yourself, someone

8  with Morgan Stanley, for the investor

9  road shows?

10        A.    We --

11            MR. FORCE:  Object to the

12        form.

13            THE WITNESS:  Somebody from

14        Morgan Stanley may have been

15        present at meetings; I think, in

16        all likelihood, probably was

17        present at many of them, because

18        the company would have needed

19        somebody to translate for them,

20        and that service is often provided

21        by one of our Chinese bankers.

22  BY MR. STECKLER:

23        Q.    And where could we find a

24  record of the meetings that Morgan

Confidential - Subject to Further Confidentiality Review

1    Stanley was involved in on behalf of CNBM

2    for investors in the United States?

3                   MR. FORCE:  Object to the

4          form.

5                   THE WITNESS:  I'm not sure

6          we could find it.

7    BY MR. STECKLER:

8          Q.   Who would have been the

9    individuals with Morgan Stanley that

10   would have participated in these investor

11   relation road shows or meetings?

12                  MR. FORCE:  Object to the

13         form.

14                  THE WITNESS:  I can't give

15         you names.  I'm not sure who it

16         would have been.

17   BY MR. STECKLER:

18         Q.   Well, you're the director --

19         A.   Yeah.

20         Q.   -- of Morgan Stanley Asia

21   Limited.

22                  Do you not know who would --

23   who would be charged with participating

24   in road -- investor road --

1        A.    I have an idea of which team

2    they would have been drawn from, but not

3    which individuals.

4        Q.    Okay.  What team?

5        A.    It would have been the China

6    corporate finance team.

7        Q.    How many people are in the

8    China corporate finance team?

9        A.    At the time of these road

10    shows, probably, I mean, it would have

11    been in double figures.

12        Q.    How many are part of that

13    team today?

14        A.    Low double figures.

15        Q.    What about in 2014?

16            MR. FORCE:  I'm going to

17        object to that outside of the

18        scope of the deposition notice.

19            THE WITNESS:  I think the

20        answer is the same.

21    BY MR. STECKLER:

22        Q.    I'm sorry?

23        A.    The answer is the same.

24        Q.    And what was that answer,

Confidential - Subject to Further Confidentiality Review

1    sorry?

2           A.    Low double figures, in terms

3    of numbers.

4           Q.    When you say low double

5    figures:  Are you talking 12 to 15?

6           A.    Between 10 to 20.

7           Q.    10 to 20?

8           A.    Yeah.

9           Q.    So -- and of that 10 to 20

10   folks within that team, how many would be

11   qualified to participate in an investor

12   relation road show in 2014 for CNBM?

13                MR. FORCE:  Object to the

14          question as outside the scope of

15          the deposition subpoena.

16                THE WITNESS:  Most of them,

17          I would say.

18   BY MR. STECKLER:

19          Q.    And if I wanted a list of

20   the individuals in 2014, a list of the

21   names of the individuals in 2014 that

22   were part of that particular team, China

23   investment team, where could I find that?

24                A.    Well, I'm sure we could work

Confidential - Subject to Further Confidentiality Review

1   out what the members of the team were.

2   But I don't know off the top of my head.

3        Q.    That's information that

4   Morgan Stanley would have, though,

5   available?

6        A.    Yes.

7        Q.    That would be asking a

8   question.  Okay.

9              Is that a yes?

10       A.    Yes.  I shook my head.

11       Q.    In fact, let me ask you

12  this:  Could you send an e-mail to your

13  China investment team and ask any of them

14  if they attended a 2014 road show in the

15  United States, an investment road show?

16             MR. FORCE:  Object.  The

17             question is outside the scope of

18             the deposition subpoena.

19             THE WITNESS:  Somebody at

20             Morgan Stanley could do that.

21             MR. FORCE:  Sorry.  Also, I

22             object to the form of the

23             question.

24             THE WITNESS:  Somebody at

1          Morgan Stanley could do that, yes.

2     BY MR. STECKLER:

3          Q.    And it would be an e-mail to

4     about 20 to 25 people, correct?

5          A.    I think slightly fewer, but,

6     yes.

7          Q.    Okay.  And the answer would

8     be yes or no, correct?

9          A.    Yes.

10          Q.    Okay.  That wouldn't be

11     unduly burdensome to you, would it?

12               MR. FORCE:  I'm going to

13          object to this whole line of

14          questioning as being outside the

15          scope of the deposition.

16               The witness is here to talk

17          about four transactions.  You did

18          a good job, all day, of sticking

19          to those.  And now you're going

20          outside of it.

21               MR. STECKLER:  Can you

22          answer?

23               THE WITNESS:  Yes.

24     BY MR. STECKLER:

1    Q.    That would be unduly

2  burdensome?

3    A.    I don't think it would be

4  unduly burdensome.

5    Q.    Thank you.

6    A.    I mean, I would just add

7  that I have no idea whether or not we

8  actually did -- were involved --

9    Q.    I understand that.

10   A.    -- in an IR road show in

11  2014.

12   Q.    Like I said, the answer

13  would be yes or no, correct?

14   A.    Yes.

15   Q.    Let's take a look at the

16  2014 CNBM annual report, which we're

17  going to go ahead and mark as Exhibit

18  Number 27.

19             -  -  -

20         (Whereupon, Exhibit

21      Keyes-27, China National Building

22      Material Company 2014 Annual

23      Report, was marked for

24      identification.)

```
 1                        -   -   -

 2              MR. FORCE:  Before you start

 3        asking your questions.  I'll

 4        make --

 5              MR. STECKLER:  Running

 6        objection.

 7              MR. FORCE:  -- the same

 8        objection.  I'll make a continuing

 9        objection, that I'll object to the

10        questions regarding this document

11        as outside the scope of the

12        deposition subpoena.

13              MR. STECKLER:  Fair enough.

14              MR. FORCE:  Thank you.

15   BY MR. STECKLER:

16        Q.    There's a definition section

17   again on Page 7, correct?

18        A.    Yes.

19        Q.    And it says here --

20              MR. GRESSLER:  Can we have a

21        copy?

22              MR. LONGER:  We're just

23        confirming, this is Exhibit-27.

24              MR. STECKLER:  Yes.  Yes.
```

1    BY MR. STECKLER:

2         Q.    There are definitions on

3    Page 7 of the annual report, correct?

4         A.    Yes.

5         Q.    And it indicates that the --

6    In this annual report, unless context

7    otherwise requires, the following terms

8    shall have the meanings set forth below.

9              And they're provided here in

10   the 2014 annual report, correct?

11        A.    Yes.

12        Q.    Again, in this report, group

13   is defined as the company and except

14   where the context otherwise requires, all

15   its subsidiaries?

16        A.    Yes.

17        Q.    Okay.  If you'll note on the

18   definitions, in 2014, do you see where it

19   says, Company law?

20        A.    Yes.

21        Q.    And then I think it's Conch

22   Venture?

23        A.    Yes.

24        Q.    It says, Controlling

1    shareholder, correct?

2           A.    Yes.

3           Q.    And it again ascribes the

4    meaning as provided under the Listing

5    Rules, right?

6           A.    Yes.

7           Q.    And if we look on Page 13,

8    we see a shareholding structure of the

9    group, correct?

10          A.    Yes.

11          Q.    Again, is it your

12   understanding that in annual reports, if

13   they're going to do a chart like this and

14   they're going to reflect percentages,

15   according to the Listing Rules, they're

16   going to have to be accurate?

17          A.    Yes.

18          Q.    And CNBMG is the parent,

19   correct?

20          A.    Yes.

21          Q.    Is CNBM is the company here

22   on Page 13 of Exhibit Number 27, correct?

23          A.    Yes.

24          Q.    And is CNBM the controlling

Confidential - Subject to Further Confidentiality Review

1    shareholder of China United?

2          A.    Yes.

3          Q.    Is CNBM the controlling

4    shareholder of South Cement?

5          A.    Yes.

6          Q.    Is CNBM the controlling

7    shareholder of North Cement?

8          A.    Yes.

9          Q.    Is CNBM the controlling

10   shareholder of Southwest Cement?

11         A.    Yes.

12         Q.    Is CNBM the controlling

13   shareholder of BNBM?

14         A.    Yes.

15         Q.    Is CNBM the controlling

16   shareholder Of China Composites?

17         A.    Yes.

18         Q.    Is CNBM the controlling

19   shareholder of China Jushi?

20         A.    Yes.

21         Q.    And CNBM is the controlling

22   shareholder of China Triumph?

23         A.    Yes.

24         Q.    And is CNBM the controlling

1    shareholder of CNBM Investment?

2          A.    Yes.

3          Q.    And this would have been

4    accurate as of December 31, 2014,

5    correct?

6                MR. FORCE:  Object to the

7          form.

8                THE WITNESS:  Yes.

9    BY MR. STECKLER:

10         Q.    And the companies to the

11   right of the entities I just read out are

12   subsidiaries of those companies; is that

13   right?

14         A.    Most of them.  I can see one

15   that appears not to be.

16         Q.    Which one does not appear to

17   be?

18         A.    Zhongfu Shenying.

19         Q.    Yes. Under China Composites,

20   correct.

21         A.    Correct.

22         Q.    Other than is that, any

23   others?

24         A.    The rest all appear to be

Confidential - Subject to Further Confidentiality Review

1    subsidiaries.

2         Q.    And, for example, BNBM is

3    the controlling shareholder of Taishan

4    Gypsum BNBM, Tai Kang BNBM, Gaoyang BNBM,

5    Hebei BNBM, Green Residence and other

6    companies, correct?

7         A.    Correct.

8         Q.    Similarly, China Jushi is

9    the controlling shareholder of Jushi

10   Group, BNS.  And then it says, Other

11   companies are listed.  I don't know what

12   that means.

13         But China Jushi is the

14   controlling shareholder of Jushi Group

15   and BNS, correct?

16         A.    Correct.

17         Q.    And, similarly, China

18   Triumph is the controlling shareholder of

19   all the entities listed to the right, in

20   which percentages are set forth, correct?

21         A.    Correct.

22         Q.    Now, do you know which one

23   of these entities listed here on Page 13

24   was doing business in the United States?

1              MR. FORCE:  Object to the

2         form.

3              MR. GRESSLER:  Join.

4              THE WITNESS:  No, I don't.

5    BY MR. STECKLER:

6         Q.    Were you aware that Jushi

7    Group had a subsidiary, Jushi USA?

8         A.    No.

9         Q.    Did you know whether any of

10   these entities were doing business in the

11   United States?

12             MR. FORCE:  Object to the

13        form.

14             MR. GRESSLER:  Objection to

15        form.

16             THE WITNESS:  I can't speak

17        to any of the specific entities,

18        no.

19   BY MR. STECKLER:

20        Q.    You were aware that CNBM was

21   shipping drywall to the United States?

22             MR. FORCE:  Object to form.

23             MR. GRESSLER:  Objection to

24        form.

Confidential - Subject to Further Confidentiality Review

1    BY MR. STECKLER:

2        Q.    Weren't you?

3        A.    I mean, I'm aware of it

4    because of the disclosure that was being

5    made about the litigation, so I presumed

6    that must have been the case.

7        Q.    Morgan Stanley, as a

8    shareholder of CNBM, isn't aware of

9    what -- of how much business CNBM is

10   doing in the United States?

11            MR. GRESSLER:  Objection to

12       form.

13            MR. FORCE:  Object to the

14       form.

15            THE WITNESS:  Well, I mean,

16       sort going back to the point, when

17       we were talking about the -- about

18       disclosure.

19            I'm not -- first of all, I'm

20       not aware of whether or not Morgan

21       Stanley is a shareholder for its

22       own account in CNBM.

23            And, second, being a

24       shareholder, even if one has quite

Confidential - Subject to Further Confidentiality Review

1           a large shareholding, didn't

2           confer any particular rights to

3           information that's different from

4           what anybody can see on the public

5           disclosure record.

6       BY MR. STECKLER:

7           Q.    Even if you're a substantial

8       shareholder?

9           A.    Yeah.  Makes no difference.

10          Q.    What if you're controlling

11      shareholder?

12          A.    Not necessarily.  I mean,

13      the presumption of the Listing Rules is

14      if you're a controlling shareholder, you

15      probably would, because you probably

16      would have a board seat.

17              But there's no specific

18      requirement that says that being a

19      controlling shareholder automatically

20      confers board representation.

21          Q.    As the sole book runner,

22      promoter of CNBM, at any time, were you

23      aware that CNBM was doing business in the

24      United States?

1          A.    First of all, we've never

2    been a promoter.

3          Q.    I'm sorry.  I apologize.  I

4    meant to correct myself.

5                As the -- as the book runner

6    and the sole global coordinator of CNBM's

7    IPO, and having been involved in the

8    placing agreements, were you aware that

9    CNBM was doing business in the States?

10         A.    I was --

11               MR. FORCE:  Object to the

12         form.

13               MR. GRESSLER:  Join.

14               THE WITNESS:  I was aware

15         that CNBM was doing business in a

16         number of export markets for its

17         glass fiber business -- I think it

18         was a glass fiber matting

19         business.

20               And I believe that they were

21         exporting to quite a large number

22         of countries.

23    BY MR. STECKLER:

24         Q.    Including the United States?

1    A.    I actually don't remember

2    the list of countries.

3    Q.    You don't have any

4    recollection of whether that would

5    include the United States?

6    A.    Not without looking through

7    the prospectus disclosure to see whether

8    it specifies that.

9    Q.    Okay.  Can we look at the

10   substantial shareholders of CNBM as

11   listed in the annual report?  I believe

12   that's on Page 60 and 61.

13   A.    Yep.

14   Q.    Again, JP Morgan Chase &

15   Company is a substantial shareholder,

16   correct?

17   A.    Yes.

18   Q.    And you're aware that that

19   is a United States corporation, correct?

20   A.    Yes.

21   Q.    And if you look on Page 62,

22   Citigroup, Inc., is also a substantial

23   shareholder, correct?

24   A.    Yes.

1          Q.    And they are also in the

2    United States, correct?

3          A.    Yes.

4          Q.    They're headquartered in the

5    United States, right?

6          A.    Yes.

7                I'd also make the

8    observation that in the same way the for

9    Morgan Stanley, one can't tell whether or

10   not it's for their own account or for the

11   account of a client business, given that

12   these are all -- have investment banking

13   businesses.

14         Q.    And do you recall --

15         A.    So I don't know if is wholly

16   for themselves.

17         Q.    I'm sorry.  I didn't mean to

18   interrupt.

19               Do you recall whether you

20   solicited JP Morgan during the IPO

21   process?

22         A.    I believe that we would have

23   solicited the asset management arm based

24   in Hong Kong, which I think was known as

Confidential - Subject to Further Confidentiality Review

1    Jardine Fleming Asset Management.

2         Q.    And are you aware that JP

3    Morgan, a Delaware corporation, is

4    actually a holder of the H shares?

5              MR. FORCE:  Object to the

6         form.

7              THE WITNESS:  Is a holder of

8         which H shares?

9    BY MR. STECKLER:

10        Q.    The H shares in CNBM.

11        A.    A holder of H shares?

12        Q.    Yes, sir.

13        A.    Yes.

14        Q.    So while you may have

15   solicited someone in Hong Kong, my

16   question to you is whether there was a

17   meeting or investor relations in New York

18   or San Francisco or Boston of JP Morgan

19   or whether they participated in that or

20   not?

21        A.    I wouldn't expect there to

22   be one.  They weren't on that list, in

23   the proposal for the IR road show, and it

24   wouldn't be a normal party for us to be

1    soliciting.

2          Q.    So if we wanted to look at

3    some of the parties that you would have

4    solicited, we could look at that IP road

5    show list; is that fair?

6          A.    That would give an

7    indication of the sort of people we had

8    been going to, yes.

9          Q.    I'm going to hand you a

10   document that I printed off the wonderful

11   Internet on Wednesday.  And I scratched

12   out my notes, because they are going to

13   be misleading.  I'd rather you just look

14   at what I found.

15               This was located on the HK

16   Exchange --

17         A.    Uh-huh.

18         Q.    -- website.

19               You're familiar with that

20   website, correct?

21         A.    Yes.

22         Q.    And you'll notice it lists

23   shareholders in CNBM below and the amount

24   of shares.

1          Do you see that?

2      A.    I do.

3          MR. STECKLER:  I don't have

4      a copy of it, and I have not made

5      it an exhibit yet.  And if we need

6      to take a break and make a copy, I

7      can do so if that would be easier.

8          MR. FORCE:  From our

9      standpoint, that would make it

10     easier.

11         VIDEO TECHNICIAN:  The time

12     is 4:33.  And we are off the

13     record.

14              -  -  -

15         (Whereupon, a brief recess

16     was taken.)

17              -  -  -

18         VIDEO TECHNICIAN:  The time

19     is 4:51.  And we are back on the

20     record.

21 BY MR. STECKLER:

22     Q.    All right.

23         MR. STECKLER:  Now, Josh,

24     what did you do with all those

1        copies?

2             MR. FORCE:  I distributed

3        them across the table.

4             MR. STECKLER:  Can we give

5        one to the witness and call it

6        Exhibit Number 28?

7                  -  -  -

8             (Whereupon, Exhibit

9        Keyes-28, Hong Kong Stock Exchange

10       Website Printout, was marked for

11       identification.)

12                 -  -  -

13            MR. FORCE:  Before you ask

14       questions, I will object to

15       questions regarding this document

16       as being outside the scope of the

17       deposition subpoena.

18            MR. STECKLER:  And you're

19       welcome to have a running

20       objection to anything that ask on

21       this.

22            MR. FORCE:  Thank you.  I

23       will make it running with respect

24       to any questions regarding this

1      document.

2  BY MR. STECKLER:

3      Q.    Mr. Keyes, you're familiar

4  with the Hong Kong Exchange website,

5  correct?

6      A.    Yes.

7      Q.    And you're aware that the

8  Hong Kong Exchange website does list

9  substantial shareholders, as well as the

10  number of shares held in a particular

11  company on the website, correct?

12      A.    Yes.

13      Q.    And Exhibit Number 28, does

14  that appear to be a printout from the

15  Hong Kong Exchange website?

16      A.    It appears to be.

17      Q.    Right.  And if I wanted to

18  find out -- well, first of all, is CNBM,

19  does it also have a stock code of 3323?

20      A.    It does.

21      Q.    And if I wanted to find out

22  the name of the substantial shareholder,

23  the number of shares bought and sold, can

24  I go on that website and find that

1    information out?

2         A.    You can find the disclosures

3    of interests that shareholders have made

4    if they cross the threshold, yes.

5         Q.    If there is a legal reason

6    for disclosure, I take it?

7         A.    Yes, it's under the

8    Securities and Futures Ordinance in Hong

9    Kong.

10        Q.    And, in fact, we look at

11   Exhibit Number 28, and there is -- it

12   says, Reason for disclosure, and it's

13   citing a particular number and a letter.

14             I assume that's the

15   Securities -- what did you call it?  I'm

16   sorry, the Securities and Futures

17   Ordinance Act that's being referenced

18   here?

19        A.    Yes.

20        Q.    And then we'll also be able

21   to look at the dates of the relevant

22   event with respect to the purchase of

23   particular shares; is that right?

24        A.    Yes.

1      Q.    On that website?

2            And so in looking at some of

3    the names of these companies that are

4    provided here, are you familiar with

5    BlackRock, Inc.?

6      A.    Yes.

7      Q.    And what is BlackRock, Inc.?

8      A.    It's an institutional

9    investor in the United States.

10     Q.    And it appears that they

11   held H shares of CNBM?

12     A.    It does.

13     Q.    And, in fact, if we look

14   throughout, it appears that they held

15   them, and I'm just going to look

16   generally, in January of 2015, and as far

17   back as April of 2013 and in March of

18   2014?

19     A.    You're asking me to confirm

20   those dates?

21     Q.    I'm just saying it appears,

22   in looking at that, that I've -- that

23   they've held shares during those periods

24   of time?

Confidential - Subject to Further Confidentiality Review

1    A.    I'll take your word for it.

2    Q.    I appreciate that.

3          Because if we really wanted

4    to look, we could just go through each

5    one, correct?

6    A.    Exactly.

7    Q.    And do you recall whether

8    they would have been a U.S. entity that

9    was solicited by CNBM during a road show

10   in the United States?

11   A.    I do not recall.

12   Q.    You'll see Citigroup, Inc.

13   is also reflected there, which we talked

14   about earlier, correct?

15   A.    Yes.

16   Q.    As well as JP Morgan Chase,

17   correct?

18   A.    Yes.

19   Q.    If we go even further to

20   July of 2014, Morgan Stanley is also

21   listed here as owning H shares, which

22   we've talked about earlier, correct?

23   A.    Yes.  I see May of 2013, but

24   perhaps you find July as well.

Confidential - Subject to Further Confidentiality Review

1          Q.    Yes.   There's several

2     different entries for Morgan Stanley, as

3     well as a number of these other entities

4     that we talked about.

5               Do you know whether CNBM

6     owned shares of Morgan Stanley?

7          A.    I do not know.

8          Q.    Would that have been

9     reflected on a CNBM annual report?

10              MR. FORCE:  Object to the

11         form.

12    BY MR. STECKLER:

13         Q.    Or not?

14         A.    I can't think of any reason

15    why it would be.

16         Q.    Listed companies on the Hong

17    Kong Exchange, such as CNBM, can purchase

18    shares on the New York Stock Exchange,

19    can't they, if they meet certain

20    criteria?

21              MR. FORCE:  Object to the

22         form.

23    BY MR. STECKLER:

24         Q.    Or do you know?

Confidential - Subject to Further Confidentiality Review

1      A.    I think if they can open a

2   brokerage account, then they can buy

3   shares.

4      Q.    And if you wanted to find

5   out whether CNBM was investing in shares

6   of companies in the United States, where

7   would there be a required disclosure of

8   that information?

9           MR. FORCE:  I'm not so sure

10          you're still on the document,

11          Exhibit-28.

12          MR. STECKLER:  Feel free to

13          object.

14          MR. FORCE:  So I'll object

15          to this question as outside the

16          scope of the deposition.  And I'll

17          also object to the form.

18          THE WITNESS:  It wouldn't

19          necessarily give rise to any

20          disclosure.

21   BY MR. STECKLER:

22      Q.    At what point would it give

23   rise to a disclosure?

24          MR. FORCE:  Object to the

```
 1          form.
 2     BY MR. STECKLER:
 3          Q.    Based upon your experience?
 4               MR. FORCE:  Same objection.
 5               THE WITNESS:  Only if it
 6          became such a large stake in the
 7          company in question that they
 8          would have to show it as being a
 9          material investment.
10     BY MR. STECKLER:
11          Q.    I'm just wondering if there
12     were any Listing Rules that would be
13     applicable in which you would -- you
14     could be able -- strike that.
15               I'm wondering whether the
16     Listing Rules provide a certain threshold
17     at which a listing company would have to
18     disclose its holdings in other companies
19     outside the PRC?
20          A.    I'm not aware of any.
21          Q.    And how much did CNBM pay
22     Morgan Stanley for its work in the
23     initial public offering?
24          A.    I don't remember the exact
```

Confidential - Subject to Further Confidentiality Review

1    amount, but the fees on the offering were

2    3.5 percent of the proceeds raised, and

3    Morgan Stanley would have collected the

4    great majority of that.

5         Q.    And do you recall how much

6    of the proceeds were raised?

7         A.    It was -- I believe it was

8    over $200 million U.S. dollars, but I

9    don't recall the exact number.

10        Q.    And was CNBM's engagement

11   with Morgan Stanley, the Morgan Stanley

12   Asia Investment Limited?

13        A.    Yes.

14        Q.    Okay.  And did -- when you

15   went on these investor road shows, did

16   you utilize any of the Morgan Stanley

17   offices or facilities in the United

18   States?

19        A.    Yes, we would have held some

20   meetings in our offices in the United

21   States --

22        Q.    In various --

23        A.    I was going to say, not with

24   investors but meetings between us and the

Confidential - Subject to Further Confidentiality Review

1    company.

2         Q.    And would that have been the

3    case in Boston, New York and San

4    Francisco?

5         A.    We certainly -- I don't know

6    whether we went into the Morgan Stanley

7    office in Boston.  I think we may have

8    gone into the one in San Francisco to do

9    the pricing meeting.

10        Q.    Okay.  And who are all of

11   the individuals that you or Morgan

12   Stanley dealt with, with CNBM?

13             MR. FORCE:  Object to the

14        form.

15             THE WITNESS:  Could you --

16   BY MR. STECKLER:

17        Q.    Could you list for us all of

18   the individuals who Morgan Stanley or you

19   recall having dealt with that was with

20   CNBM?

21             MR. FORCE:  Object to the

22        form.

23             THE WITNESS:  I can't -- I

24        can't give you a complete list.

```
 1    BY MR. STECKLER:

 2         Q.    And we're talking -- I

 3    understand we're talking a long period of

 4    time, from '04 to today, in essence.

 5              But if you can provide a

 6    list.  We've talked about Mr. Cao.

 7         A.    Yes.

 8         Q.    Chairman Song.

 9         A.    Mr. Chang.

10         Q.    Chang.

11         A.    Yes.

12         Q.    Who else do you recall?

13              MR. FORCE:  I'll object to

14         the extent that you're asking for

15         the identification of people with

16         whom Morgan Stanley may have dealt

17         outside of the four transactions

18         that are in the deposition

19         subpoena.

20    BY MR. STECKLER:

21         Q.    And I'm not limiting it to

22    the four transactions.

23         A.    Right.

24         Q.    It's a broad question.  And
```

1    if you can think of names, that would be

2    very helpful.

3          A.    Yeah, I don't think I can

4    think of --

5          Q.    What about Mr. Wang Bing?

6          A.    I don't recall.

7          Q.    Peng Shou?

8          A.    Is that somebody -- if

9    that's one of the people who was on the

10   senior management team mentioned in the

11   prospectus, then we would have dealt --

12   would have met that person.

13         Q.    Are those the people that

14   you recall?  The people that --

15         A.    Anybody who is named in the

16   prospectus, we would have met at some

17   point.

18               There's a section, starting

19   on Page 187 of the prospectus, that is

20   entitled, Directors, managers, senior

21   management employees.

22         Q.    Yes.

23         A.    So we would have been in

24   contact, at one time or another, with all

1    of the people named in there as part of

2    our diligence in the IPO.

3            Q.    So if we look at Page 188 of

4    the prospectus, these are the individuals

5    that you would have met with at some

6    point in time?

7            A.    Somebody from the Morgan

8    Stanley team would have met with.

9            Q.    Can you read those names for

10   us, as best you can, and I'm sorry to do

11   this, but --

12           A.    Song Zhiping.  Cao Jianglin.

13   Li Yimin.  Cui Lijun.  Huang Anzhong.

14   Zuo Fenggao.  Zhang Renusei.  Zhou

15   Daojiong.  Chi Haibin.  Lau Ko Yuen, Tom.

16   That's from the directors.

17              And there's also a list of

18   senior management as well.

19           Q.    I believe it's supervisors

20   on Page 192.  And senior management on

21   194.

22           A.    Yeah. I'm not sure whether

23   we would necessarily have met all the

24   supervisors.  I don't recall.

Confidential - Subject to Further Confidentiality Review

1    Q.    What about the senior

2  management?

3    A.    The senior management,

4  there's Cui Xingtai.  Peng Shou.  Zhang

5  Dingjin.  Chen Xuean.  Pei Hongyan.

6  Chang Zhangli.

7    Q.    And in looking at those,

8  does that refresh your recollection as to

9  who may have participated in the investor

10 road shows, other than Mr. Song and Mr.

11 Cao?

12         MR. FORCE:  Object to the

13         form.

14         THE WITNESS:  I recall Chang

15         Zhangli being along on the IPO

16         road show.  I don't recall which

17         of the others on that list would

18         have come as well.

19 BY MR. STECKLER:

20    Q.    Were you aware of a

21 disclosable transaction in which there

22 was an acquisition of equity interest in

23 Taishan Gypsum through a share issuance

24 of BNBM?

Confidential - Subject to Further Confidentiality Review

1          MR. FORCE:  Object to the

2      form.

3          THE WITNESS:  No.

4  BY MR. STECKLER:

5      Q.    Would you have been involved

6  in the October 2015 BNBM agreement with

7  Taishan Gypsum in which they acquired 35

8  percent interest in the company?

9          MR. FORCE:  Object to the

10      question as being outside the

11      scope of the deposition subpoena.

12      And also object to the form.

13          THE WITNESS:  No.

14  BY MR. STECKLER:

15      Q.    What is a connected

16  transaction acquisition?

17      A.    It would be an acquisition

18  that involves a dealing with a connected

19  party as defined in the Listing Rules.

20      Q.    What is Dong Lien

21  Investment?  Are you familiar with that

22  company?

23      A.    No.

24      Q.    When was the last time you

Confidential - Subject to Further Confidentiality Review

1    met with Mr. Song?

2          A.    I don't -- I don't recall

3    the exact date.  Certainly, I met him in

4    the last -- within the last two years.

5    But I couldn't say when.

6                It was during one of the

7    visits he made to Hong Kong in connection

8    with either a year-end results

9    announcement or an interim results

10   announcement.

11         Q.    Are you still doing business

12   with CNBM?

13               MR. FORCE:  Object to the

14               question as outside --

15   BY MR. STECKLER:

16         Q.    Morgan Stanley?

17               MR. FORCE:  Object to the

18               question as outside the scope of

19               the deposition subpoena.

20               THE WITNESS:  We're still

21               maintaining a relationship with

22               CNBM.  And we would certainly look

23               to try and do business with them.

24               So if they were to do

1          another equity offering, we would

2          seek to be part of that.

3    BY MR. STECKLER:

4          Q.    Such as Sinopharm, for

5    example?

6          A.    Sinopharm is another listed

7    company, different group, but Chairman

8    Song is the chairman of that.

9          Q.    And did you do the initial

10   public offering for Sinopharm?

11              MR. FORCE:  Object to the

12          question as outside the scope of

13          the deposition subpoena.

14              THE WITNESS:  I wasn't

15          involved in it personally.  I

16          don't recall whether or not Morgan

17          Stanley did that one.

18   BY MR. STECKLER:

19         Q.    What do you consider -- how

20   would you describe Morgan Stanley's

21   relationship with CNBM?

22              MR. FORCE:  Object to the

23          form.  Also, object to the

24          question as outside the scope of

1           the deposition subpoena.

2                THE WITNESS:  I'd say we

3           have a good relationship with

4           them.

5    BY MR. STECKLER:

6           Q.    I'm not talking about

7    relationship.  But you were the sole

8    global coordinator and book runner for

9    the IPO.

10                So how do you define your

11   current relationship, from a technical

12   standpoint, with CNBM?

13                MR. FORCE:  Object to the

14           question as outside the scope of

15           the deposition.

16                THE WITNESS:  We have no

17           formal relationship in that sense,

18           because the roles that you

19           described were transactional.  So

20           hired in relation to each

21           transaction.

22                We continue to seek to do

23           business with CNBM on future

24           transactions, whatever they might

1        be.  If they're sufficiently

2        remunerative and the terms are

3        agreeable.

4    BY MR. STECKLER:

5        Q.    Understood.  So you were

6    hired to do the IPO --

7        A.    Yes.

8        Q.    -- by CNBM.

9              You were hired to do the

10   placement of shares that we had talked

11   about in 2007 and 2009, correct?

12       A.    And 2010, yes.

13       Q.    And I was just about to say,

14   and 2010, correct?

15       A.    Yes.

16       Q.    Each of those were separate

17   engagements?

18       A.    Yes.

19       Q.    So is there an ongoing

20   relationship with CNBM now, other than

21   your solicitation of additional work?

22       A.    No.

23       Q.    Okay.  And there may be a

24   relationship with Chairman Song because

Confidential - Subject to Further Confidentiality Review

1    of Morgan Stanley's role with Sinopharm

2    and their initial public offering,

3    correct?

4            MR. FORCE:  Object to the

5        question as outside the scope of

6        the deposition.

7            THE WITNESS:  As I said, I

8        don't remember whether we were --

9        we did that one.  I have a feeling

10       that IPO happened while I was

11       working elsewhere.

12   BY MR. STECKLER:

13       Q.   With Merrill Lynch?

14       A.   Yes, I think so.

15       Q.   But Mr. Song also runs

16   Sinopharm?

17           MR. FORCE:  Object --

18           THE WITNESS:  He --

19   BY MR. STECKLER:

20       Q.   He's the chairman of that

21   company?

22           MR. FORCE:  Object to the

23       question as outside the scope of

24       the deposition.

1          THE WITNESS:  He's the

2     chairman.

3   BY MR. STECKLER:

4          Q.    And so what IPOs have you

5   done with Song Jingjing?

6          MR. FORCE:  Object to the

7     question as outside the scope of

8     the deposition.

9          THE WITNESS:  I haven't

10    worked on any IPOs with Song

11    Jingjing.

12  BY MR. STECKLER:

13         Q.    She solicited business on

14  behalf of Morgan Stanley as part of her

15  work for them?

16         A.    Yes.

17         MR. FORCE:  Object to the

18    question as outside the scope of

19    the deposition.

20  BY MR. STECKLER:

21         Q.    Is she related to Chairman

22  Song?

23         A.    Yes.

24         Q.    How so?

1          A.     She's his daughter.

2          Q.     And the fact that Chairman

3    Song's daughter works for Morgan Stanley,

4    has that influenced your testimony or

5    position in this case?

6          A.     No.

7          MR. FORCE:  Object to the

8          question as outside the scope of

9          the deposition.

10   BY MR. STECKLER:

11         Q.     What did you do in

12   preparation for your deposition today?

13         A.     I looked at some of the

14   documents that we produced.

15         Q.     What documents did you look

16   at, that you recall?

17         A.     The IPO prospectus, some

18   documents in relation to each of the

19   placings.

20         Q.     Anything else?

21         A.     Some of the presentations,

22   like the road show presentation.

23         Q.     There were documents that

24   were produced to us yesterday.

1            Do you know how they --
2     Wednesday.  I apologize, Wednesday.
3            Do you know how they were
4     discovered?
5        A.    I don't know the details,
6     but I know the overall process by which
7     we were looking for documents to respond
8     to the request.
9        Q.    And what was that process?
10       A.    So people from our in-house
11    legal department and from the management
12    of IBD were looking on the shared drives
13    to try to identify folders that contained
14    documents relating to either the IPO or
15    the subsequent placings of shares by
16    CNBM.
17            And I understand that we
18    produced a pretty substantial quantity of
19    documents from those on a running basis
20    over time.
21            And we've recently found
22    some more documents.
23       Q.    Was there a second search
24    done or a different search mechanism or a

Confidential - Subject to Further Confidentiality Review

1    different place you looked?

2         A.    I mean, I think it's

3    important to understand some of these

4    deals happened a long time ago, almost

5    ten years ago, in the case of the IPO.

6    So some of these things have been

7    archived and took a while to identify

8    what they -- you know, what drives had

9    information about these transactions.

10        Q.    Was Morgan Stanley doing

11   work or retained to do any work for CNBM

12   in 2014?

13             MR. FORCE:  Object.  The

14        question is outside the scope.

15        But if he knows, he can answer the

16        question.

17             THE WITNESS:  No, we weren't

18        retained.

19             MR. STECKLER:  I'm going to

20        hand you what we're going to mark

21        as Exhibit Number 29.

22                  -   -   -

23             (Whereupon, Exhibit

24        Keyes-29, Listing of Investors,

1           was marked for identification.)

2                    -   -   -

3   BY MR. STECKLER:

4           Q.    What is this document?

5           A.    I don't know.  It lists a

6   number of investors.

7           Q.    And it talks about investor

8   luncheon, AIG Asset Management, Baring

9   Asset Management, BOCI-Prudential, Chirin

10  Capital.

11               Do you see that at the

12  bottom?

13          A.    Yes.

14          Q.    Citigroup Asset Management,

15  Ludwig Hill Investment, Harry Partners.

16               Do you know anything about

17  any of these entities, whether they were

18  solicited?

19          A.    They are all institutional

20  investors.

21          Q.    Other than that, you don't

22  know whether they were contacted in the

23  United States or in Hong Kong with

24  respect to --

1      A.    This looks like a list of

2  meetings that would have happened in Hong

3  Kong.

4      Q.    And some of these are of

5  U.S. corporations?

6      A.    Yes, but many of the large

7  U.S. fund managers have offices in Hong

8  Kong.

9      Q.    But they're U.S.

10 corporations?

11     A.    Yes.

12     Q.    Okay.  If a listing company

13 is engaging in business abroad, are there

14 any requirements or expectations that

15 they comply with the laws of the country

16 in which they're doing business?

17           MR. FORCE:  Object to the

18      form.

19           MR. GRESSLER:  Join.

20           THE WITNESS:  I don't think

21      there's anything in the Listing

22      Rules that addresses that.

23 BY MR. STECKLER:

24     Q.    What about with respect to

1    disclosures?  At the very beginning of

2    the deposition, we talked about

3    requirements of disclosures not being

4    misleading or having adverse effects on a

5    company.

6              Are those -- are certain

7    disclosures required under the Hong Kong

8    Listing Rules?

9              MR. FORCE:  Object to the

10        form.

11             THE WITNESS:  Yes.  So

12        material developments, periodic

13        financial statements disclosure.

14   BY MR. STECKLER:

15        Q.    In preparing for the

16   deposition, are you aware of any

17   disclosures or information with respect

18   to the drywall shipped to the United

19   States, which off gasses hydrogen sulfide

20   and destroyed thousands of homes in the

21   United States?

22             MR. FORCE:  Object to the

23        question as outside the scope of

24        the deposition.

1        MR. KATTAN:  Objection to

2     form.

3        MR. CAMPBELL:  Join.

4        THE WITNESS:  I'm not aware

5     of the last part of what you just

6     said.

7        I'm aware of the fact that

8     there is litigation in relation to

9     drywall.

10  BY MR. STECKLER:

11     Q.    And my question is, did you

12  see documents, in preparing for your

13  deposition, which indicated that CNBM was

14  involved in exporting drywall that was

15  contaminated and off gassed hydrogen

16  sulfide?

17        MR. FORCE:  To the extent

18     your question goes beyond the

19     scope of the four transactions we

20     listed, I object to it.

21        MR. GRESSLER:  Object to

22     form.

23        THE WITNESS:  I saw some

24     voluntary announcements put out by

1           CNBM in 2014, I think 2015 as

2           well, that made reference to the

3           litigation.

4     BY MR. STECKLER:

5           Q.    Did you see any disclosures

6     by CNBM, or announcements by CNBM, with

7     respect to the judge's ruling in holding

8     Taishan in contempt, which, as you know,

9     is a subsidiary of CNBM?

10          MR. FORCE:  Object to the

11          question as outside the scope of

12          the deposition.  Object to form as

13          well.

14          THE WITNESS:  I'd need to

15          refresh my memory by looking at

16          those announcements to remember

17          whether it reflected contempt.

18    BY MR. STECKLER:

19          Q.    Do you know the impact of a

20    United States federal judge contempt

21    order of 25 percent of the profits of a

22    particular entity and its affiliates?

23          MR. FORCE:  Object to the

24          form of the question.  And also

1          object to the question as outside

2          the scope of the deposition

3          subpoena.

4                  MR. KATTAN:  Object to form.

5                  MR. CAMPBELL:  Join.

6                  MR. GRESSLER:  Join.

7                  THE WITNESS:  No.  I mean,

8          no.

9    BY MR. STECKLER:

10          Q.    Okay.  As a member -- as a

11   former members of the listing committee

12   of the Hong Kong Exchange which lists

13   companies that are incorporated in the

14   People's Republic of China, would you

15   agree that those companies that are doing

16   business abroad and are found liable for

17   putting out products that cause damage or

18   harm people, that when the company fails

19   to take responsibility for its actions,

20   it not only impairs that company's

21   reputation, but the reputation of the

22   Exchange in listing those companies?

23                  MR. FORCE:  Object to the

24          question as outside the scope of

1          the deposition.  And also object

2          to the form, in particular to the

3          extent that it's calling for an

4          opinion from this witness.

5              MR. CAMPBELL:  Join.

6              MR. CAMPBELL:  Join.

7              THE WITNESS:  I'd expect the

8          company to comply with the Listing

9          Rules.  I'd expect them to make

10         appropriate disclosures in

11         relationship to developments in

12         their business.  I would expect

13         them to get appropriate advice, if

14         necessary, to ensure that they

15         comply with the Listing Rules,

16         including advice as to whether or

17         not certain matters might be

18         considered for disclosure or

19         material.

20    BY MR. STECKLER:

21         Q.    And I appreciate that.  But

22    my question really goes to being a

23    listing committee member and the

24    integrity of the Hong Kong Exchange.

1                    I take it you're aware of a

2    lot of news media that, candidly, has

3    been unfavorable to Chinese companies

4    that are exporting products that have,

5    quite frankly, either failed, been

6    defective or found to be dangerous?

7    You're aware of that reputation?

8                    MR. FORCE:  I would object

9            to the question as outside the

10           scope of the deposition.  The

11           witness is not here as a

12           representative of the Hong Kong

13           Stock Exchange or the listing

14           committee.  And I also object to

15           the question as -- to form.

16                    THE WITNESS:  I'm not aware

17           of that being extensive.

18    BY MR. STECKLER:

19           Q.    You're not?

20           A.    No.

21           Q.    So you're not aware of

22    defective products from China or problems

23    that have caused harm in the United

24    States from China?

1      A.    I'm not aware of that being

2    a broad phenomenon as you imply.

3      Q.    Because if it was a broad

4    phenomenon or reputation that Chinese

5    companies had, and they're listed on the

6    Exchange, that would impair their value

7    on your exchange, wouldn't it?

8           MR. FORCE:  I object to the

9           question as outside the scope of

10          the deposition.  And I object to

11          the form as well.

12          THE WITNESS:  I think what

13          would impair the value of the

14          companies on the Exchange would be

15          the investors' views of their

16          future profitability.

17   BY MR. STECKLER:

18     Q.    So an investor like Morgan

19   Stanley, if they became aware that one of

20   the companies that they had invested in

21   had been held in contempt by a United

22   States federal court, and that court was

23   seeking 25 percent of their profits,

24   Morgan Stanley would probably not want to

1    invest in that company?

2            MR. FORCE:  Object to the

3         question as outside the scope of

4         the deposition.  And I also object

5         to the form.

6            Object to the form.

7            MR. CAMPBELL:  Form.

8            MR. GRESSLER:  Object.

9            THE WITNESS:  As we

10        mentioned earlier, I don't -- I'm

11        not aware of whether or not Morgan

12        Stanley actually is an investor or

13        has been on its own account in

14        CNBM.  So maybe that's not the

15        best example.

16            With regard to what you just

17        described as the scenario with the

18        contempt ruling, I think,

19        ultimately, it's going to come

20        down to an assessment whether or

21        not the company will suffer a

22        financial loss as a result of

23        that.

24    BY MR. STECKLER:

1      Q.   I see.  It has nothing to do

2  with whether they're living up or or

3  meeting their expectations in putting out

4  a product, it really has to do with

5  whether their finances are affected; is

6  that right?

7           MR. FORCE:  Object to the

8      question as outside --

9           THE WITNESS:  That's

10      primarily --

11           MR. FORCE:  Let me jump in.

12           Object to the question as

13      outside the scope of the

14      deposition.  And I also object to

15      the form.

16           THE WITNESS:  I think that's

17      primarily what investors will be

18      looking at, is what the financial

19      impact on the company will be.

20  BY MR. STECKLER:

21      Q.   So if we wanted to get

22  CNBM's attention, for example, in this

23  case, it would be important to make sure

24  that they are financially impacted by the

Confidential - Subject to Further Confidentiality Review

1    decisions they make and how they make

2    them?

3                MR. FORCE:  That's outside

4         the scope of the deposition.

5                MR. KATTAN:  Object to form.

6                MR. FORCE:  And I'm going to

7         instruct the witness not to answer

8         that.  We've gone far afield of

9         this deposition.  And you can make

10        these points with other witnesses.

11   BY MR. STECKLER:

12        Q.    Can you answer that

13   question, sir?

14                MR. FORCE:  The witness is

15        not going to answer that question.

16                MR. STECKLER:  Let's take a

17        break.

18                VIDEO TECHNICIAN:  The time

19        is 5:23.  We're off the record.

20                    -  -  -

21                (Whereupon, a brief recess

22        was taken.)

23                    -  -  -

24                VIDEO TECHNICIAN:  The time

```
 1              is 5:28.  We are back on the

 2              record.

 3                    MR. STECKLER:  I don't think

 4              I have any more questions at this

 5              time.  I may have more, but we'll

 6              see.  We'll leave the depo open in

 7              case there's anything else.

 8                    MR. FORCE:  Does anybody

 9              else have any questions?

10                    MR. KATTAN:  I've got a

11              couple of brief ones, yes.

12                         -   -   -

13              (Whereupon, a discussion off

14              the record occurred.)

15                         -   -   -

16                    EXAMINATION

17                         -   -   -

18    BY MR. KATTAN:

19         Q.    Mr. Keyes, thank you for

20    your time and your patience today.  I

21    promise I'll keep it brief.

22              My name is Justin Kattan.

23    I'm from the law firm of Dentons, and

24    we've been represent the entities that
```

1    have been referred to today as BNBM and

2    BNBM Group.

3               If you wouldn't mind just

4    quickly taking out what was marked

5    earlier as Morgan Stanley 17.

6         A.    This is the post-mortem?

7         Q.    It is the CNBM post-mortem,

8    dated March 16th, 2006, starting with

9    Bates number MS 56130.

10              So if you turn to Page 2,

11   earlier, counsel asked you about the

12   bullet point where it states that, Morgan

13   Stanley marketed the company's control of

14   each business line and convinced investor

15   not to ask for a holding company

16   discount.

17              Do you recall that?

18        A.    Yes.

19        Q.    Am I correct that Morgan

20   Stanley did not market to investors that

21   either CNBM, or any of its subsidiaries,

22   ignored corporate formalities?

23              MR. STECKLER:  Objection to

24        form.

1          THE WITNESS:  That is

2     correct.

3  BY MR. KATTAN:

4          Q.    And am I correct that Morgan

5  Stanley did not market to investors that

6  either CNBM, or any of its subsidiaries,

7  ignored corporate legal requirements

8  under Chinese law that applied?

9          A.    That's correct.

10          Q.    And am I correct that Morgan

11  Stanley did not market to investors about

12  either CNBM, or its subsidiary, abused --

13  withdrawn.

14          Am I correct that Morgan

15  Stanley did not market to investors that

16  CNBM did not abuse the corporate form of

17  its subsidiaries?

18          A.    That is correct.

19          MR. FORCE:  I'm going to

20     object to the form.  I think you

21     got a double negative in there.

22          MR. KATTAN:  Did I?  I'll

23     ask it --

24          MR. STECKLER:  I think it's

1      fine.

2              MR. KATTAN:  I'll ask it

3      again.

4   BY MR. KATTAN:

5      Q.    Am I correct that Morgan

6   Stanley did not market to investors that

7   CNBM abused the corporate form of its

8   subsidiaries?

9      A.    That is correct.

10             MR. KATTAN:  Thank you for

11     pointing that out.

12  BY MR. KATTAN:

13     Q.    And, finally, am I correct

14  that Morgan Stanley did not market to

15  investors that CNBM's subsidiaries had

16  nonfunctioning management?

17     A.    That is correct.

18             MR. STECKLER:  Objection.

19     Form.

20             MR. KATTAN:  I have nothing

21     further.

22             MR. GRESSLER:  No questions

23     on behalf of CNBM.

24             MR. CAMPBELL:  No questions

Confidential - Subject to Further Confidentiality Review

1        on behalf of Taishan.

2            MR. FORCE:  Morgan Stanley

3        does not have any questions, but I

4        do want to mark as Exhibit-30 --

5        do you have more questions?

6            MR. STECKLER:  I was going

7        to ask one.

8            MR. FORCE:  Go ahead.

9                    -  -  -

10               EXAMINATION

11                   -  -  -

12   BY MR. STECKLER:

13        Q.    If we wanted to look at how

14   CNBM operated, viewed its subsidiaries

15   and managed its companies, would one of

16   the places we would able to look be the

17   annual reports that were issued by CNBM?

18            MR. FORCE:  Object to the

19        form.  And object to the extent it

20        goes outside the scope of the

21        deposition.

22            THE WITNESS:  It's one place

23        you could look.

24            MR. STECKLER:  That's it.

1      MR. FORCE:  Thank you.

2  Sorry about that.

3      I wanted to mark as 30 the

4  non-party Morgan Stanley's

5  objections to Record Document

6  18952, second amended notice of

7  expedited oral and videotape

8  deposition pursuant to the court's

9  directive during the March 17,

10  2015, special hearing and minute

11  entry and order, Record Document

12  18943.

13            -   -   -

14      (Whereupon, Exhibit

15  Keyes-30, Non-Party Morgan Stanley

16  Objections to Record Document

17  18952, was marked for

18  identification.)

19            -   -   -

20      MR. FORCE:  Also, Morgan

21  Stanley would object to holding

22  this deposition open.  Every

23  counsel has had an opportunity to

24  ask questions, the witness has

Confidential - Subject to Further Confidentiality Review

```
 1           answered those questions.
 2                And to the extent that any
 3           effort is made to keep the
 4           deposition open or to argue it
 5           should be open, Morgan Stanley
 6           objects to that.
 7                        -   -   -
 8                VIDEO TECHNICIAN:  The time
 9           is 5:34.  And we are off the
10           record for November 13th, 2013.
11                        -   -   -
12                (Whereupon, the deposition
13           concluded at 5:34 p.m.)
14                        -   -   -
15
16
17
18
19
20
21
22
23
24
```

Confidential - Subject to Further Confidentiality Review

1                    CERTIFICATE

2

3

4              I HEREBY CERTIFY that the

5     witness was duly sworn by me and that the

6     deposition is a true record of the

7     testimony given by the witness.

8

9

10

         Amanda Maslynsky-Miller

11       Certified Realtime Reporter

         Dated:  November 16, 2015

12

13

14

15

16

17              (The foregoing certification

18    of this transcript does not apply to any

19    reproduction of the same by any means,

20    unless under the direct control and/or

21    supervision of the certifying reporter.)

22

23

24

Confidential - Subject to Further Confidentiality Review

```
1              INSTRUCTIONS TO WITNESS

2

3              Please read your deposition
4    over carefully and make any necessary
5    corrections.  You should state the reason
6    in the appropriate space on the errata
7    sheet for any corrections that are made.
8              After doing so, please sign
9    the errata sheet and date it.
10             You are signing same subject
11   to the changes you have noted on the
12   errata sheet, which will be attached to
13   your deposition.
14             It is imperative that you
15   return the original errata sheet to the
16   deposing attorney within thirty (30) days
17   of receipt of the deposition transcript
18   by you.  If you fail to do so, the
19   deposition transcript may be deemed to be
20   accurate and may be used in court.
21

22

23

24
```

1                    - - - - - -

               E R R A T A

2                    - - - - - -

3   PAGE   LINE   CHANGE/REASON

4   _____  _____  _____

5   _____  _____  _____

6   _____  _____  _____

7   _____  _____  _____

8   _____  _____  _____

9   _____  _____  _____

10  _____  _____  _____

11  _____  _____  _____

12  _____  _____  _____

13  _____  _____  _____

14  _____  _____  _____

15  _____  _____  _____

16  _____  _____  _____

17  _____  _____  _____

18  _____  _____  _____

19  _____  _____  _____

20  _____  _____  _____

21  _____  _____  _____

22  _____  _____  _____

23  _____  _____  _____

24  _____  _____  _____

Confidential - Subject to Further Confidentiality Review

1

ACKNOWLEDGMENT OF DEPONENT

2

3     I,_____, do
hereby certify that I have read the
foregoing pages, 1 - 414, and that the

4     same is a correct transcription of the
answers given by me to the questions

5     therein propounded, except for the
corrections or changes in form or

6     substance, if any, noted in the attached
Errata Sheet.

7

8     _____
TERENCE KEYES                    DATE

9

10

Subscribed and sworn

11    to before me this
_____ day of _____, 20____.

12

My commission expires:_____

13

14    _____
Notary Public

15

16

17

18

19

20

21

22

23

24

Confidential - Subject to Further Confidentiality Review

1                      LAWYER'S NOTES

2      PAGE   LINE

3      _____  _____    _____

4      _____  _____    _____

5      _____  _____    _____

6      _____  _____    _____

7      _____  _____    _____

8      _____  _____    _____

9      _____  _____    _____

10     _____  _____    _____

11     _____  _____    _____

12     _____  _____    _____

13     _____  _____    _____

14     _____  _____    _____

15     _____  _____    _____

16     _____  _____    _____

17     _____  _____    _____

18     _____  _____    _____

19     _____  _____    _____

20     _____  _____    _____

21     _____  _____    _____

22     _____  _____    _____

23     _____  _____    _____

24     _____  _____    _____