# EXHIBIT "2"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION<br><br>**THIS DOCUMENT RELATES TO:**<br>*Amorin, et al. v. Taishan Gypsum Co., Ltd., et al.,*<br>**Case No. 1: 11-22408** | CASE NO. 1: 11-22408<br><br>MIAMI DIVISION<br><br>JUDGE MARCIA G. COOKE |

## DEFENDANTS' TRIAL PLAN PROPOSAL

In the MDL court, this litigation took many unfortunate twists and turns. As it picked up the onerous freight of triplicate complaints, delayed appearances, misguided private criminal contempt proceedings, stalled-out settlement talks, and cumbersome spreadsheets, the MDL train jumped the tracks. The historical causes of that derailment are now not relevant to this Court. Suffice it to say that how the MDL court conducted things was no way to run a railroad. Plaintiffs seek to have this Court pick up where the MDL court left off, extending the compounding errors of all of the years that these cases were in the MDL. They seek to bypass traditional discovery, factfinding and adjudication, and replace them with an unprecedented, unwieldy, and unlawful summary damages calculation procedure of their own invention.

In contrast with Plaintiffs' plan, Defendants Taishan Gypsum Co., Ltd., and Taian Taishan Plasterboard Co., Ltd. (both together "Taishan") as well as Beijing New Building Materials Public Limited Co. (BNBM), submit a plan that is designed to get the train back on

1

track by using traditional mass-tort adjudication mechanisms, adhering to governing law, and enabling efficient resolution of the litigation.

## I. BACKGROUND

In 2009 and 2010, property owners began filing lawsuits across the southeastern United States asserting individual claims of defective Chinese drywall. The allegations targeted several drywall manufacturers, which posed process service challenges, especially in China. Ultimately, only a few were effectively brought into the litigation, mainly Taishan (based in China) and Knauf[1] (based in Germany). BNBM PLC was also named, despite its drywall being alleged to exist in a comparatively small number of Florida properties. The drywall suits prompted the creation of a multidistrict litigation, which the Judicial Panel on Multidistrict Litigation appointed to Judge Eldon Fallon of the Eastern District of Louisiana. Rec. Doc. 1.

### A. The *Amorin* Complaints

A strange feature of this MDL is the plaintiffs' unusual practice of filing identical complaints in multiple jurisdictions. In 2011, attorneys that comprise the Plaintiffs' Steering Committee ("PSC") filed three virtually identical *Amorin* complaints, mounting the same allegations against the same defendants on behalf of the same named plaintiffs in three separate United States District Courts in three states (Florida, Louisiana, and Virginia).[2] *Amorin v. Taishan Gypsum Co., Ltd.,* Case No. 11-cv-01395, Dkt. No. 1 (E.D. La.); *Amorin v. Taishan Gypsum Co. Ltd.*, Case No. 11-cv-0377, Dkt. No. 1 (E.D. Va.); *Amorin v.*

---

[1] The PSC and Knauf resolved all MDL claims via settlement in March 2012, though settlement-related proceedings with Knauf have continued before the MDL Court for the past six years.

[2] For the Court's convenience, Defendants will provide the Court with a courtesy hard copy of all referenced documents.

2

*Taishan Gypsum Co. Ltd.*, Case No. 11-cv-22408, Dkt. No. 1 (S.D. Fla.). In each lawsuit, the PSC filed on behalf of specific property owners and on behalf of all plaintiffs named in prior actions in the MDL. *Id.* Taishan and BNBM PLC had not appeared in the case.

Later in 2012, the PSC filed complaints in intervention in each of the cases, naming numerous new plaintiffs. Rec. Doc. 16225, 16227, 16228.[3] Though the PSC subsequently sought and secured defaults against Taishan in each of the relevant actions, it did *not* seek a default as to BNBM PLC in the Florida *Amorin* action. Rec. Doc. 17089, 17378, 17781. And the MDL court never entered one.

### B. Taishan

Taishan first entered the litigation in June 2010 to challenge jurisdiction on appeal following the MDL court's May 11, 2010, entry of a default judgment in *Germano* (Rec. Docs. 3668 and 3013)—an actual consolidated, non-adversarial damages trial that was held for seven Virginia homes unilaterally chosen by the PSC that named Taishan (but not BNBM) as a defendant. Taishan unsuccessfully appealed the default and jurisdictional issues in *Germano* (and three other cases). Taishan then failed to appear for a judgment debtor examination, on July 17, 2014, effectively withdrawing from the litigation. That day, the MDL court summarily issued a civil and criminal contempt order, fined Taishan $40,000 and ordered an attorneys' fees payment for the missed proceeding. Rec. Doc. 17869. But the contempt order went much further than that, enjoining Taishan and any of its "affiliates or subsidiaries" from doing business in the United States until Taishan re-entered the litigation. *Id.* at 3. In the event the injunction was violated, the order subjected Taishan to a penalty of 25% of its or its affiliates' profits. *Id.*

---

[3] Unless otherwise specified, all subsequent "Rec. Doc." references are to the MDL docket.

3

With Taishan gone, the PSC marched forward with the case. The PSC obtained defaults against Taishan in all of the *Amorin* complaints. Rec. Docs. 17791, 17792, 17793. Then on July 23, 2014, the PSC moved for class certification of all plaintiffs named in each of the three *Amorin* complaints (and several other mass complaints), arguing that liability had been conceded by default, and remediation damages (i.e., the cost of replacing the allegedly defective drywall) could be ascertained on a classwide basis through use of a formula. Rec. Doc. 17883. The PSC submitted a 35-page proposed findings of fact and conclusions of law, which the MDL court adopted virtually verbatim.[4] *Compare* Rec. Doc. 17998 (proposed FOFCOL) *with* Rec. Doc. 18028 (FOFCOL). The court certified an unlawful class defined as "[a]ll owners of real properties in the United States who are named Plaintiffs on the complaints in *Amorin, Germano, Gross,* and/or *Wiltz,* (*i.e.*, not an absent class member) asserting claims for remediated damages" stemming from drywall allegedly produced by the named Defendants.[5] Rec. Doc. 18028 at 34-35. Stated otherwise, it's a "class" with no unnamed class members—essentially, a mass joinder. *See, e.g., Robertson v. Monsanto Co.,* 287 F. App'x 354, 361-62 (5th Cir. 2008) (per curiam) (when "the class . . . is defined to include only individuals . . . who were already named as plaintiffs in the . . . action," there is "simply . . . no gain to be had from using the class action form").

Taishan re-appeared through new counsel in February 2015. Rec. Doc. 18352. Upon its return, Taishan acknowledged the defaults against it and acceded to a process

---

[4] Among the numerous problems with the PSC's proposed FOFCOL was its use of deemed admissions. Specifically, knowing that Taishan was absent from the proceedings, the PSC issued requests for admission from Taishan that touched upon a range of issues, including facts relating to BNBM. Rec. Doc. 18028 at 14 n.5. With no response (by design), the PSC treated their requests as deemed admissions, even as to facts pertaining to companies other than Taishan, and the MDL court adopted those deemed admissions as factual determinations (several pages worth) upon which it based its class certification decision. *Id.* at 14-18.
[5] *Germano* and *Wiltz* are actions filed prior to the *Amorin* complaints. Rec. Doc. 470 (*Germano* complaint); *Wiltz v. BNBM*, Case No. 10-cv-361, Dkt. No. 1 (E.D. La.).

4

focused exclusively on damages. Rec. Doc. 18877 at 1. It paid the $ 2.7 million *Germano* judgment in full, plus interest, as well as the PSC's attorneys' fees and fine imposed by the Court's contempt order. Taishan was then poised to get to the business of fairly and accurately determining the true claimants and true damages related to Taishan's drywall.

However, the litigation became consumed with other issues. Even though Taishan indisputably performed no business in the United States in the interim, the PSC spent the better part of the next few years attempting to determine whether there had been any violations of the contempt order by any "affiliates" of Taishan during the seven-month period of Taishan's absence. Rec. Doc. 18302, 20698, 21679. What's more, despite Defendants' repeated protests that criminal contempt proceedings could only be initiated by a disinterested party (e.g., the government) and that any recovery would inure solely to the public benefit, the MDL court encouraged the PSC to conduct contempt-related discovery, while the PSC insisted that the plaintiffs and their lawyers were entitled to pocket any penalties due. Rec. Doc. 18451, 18872, 19721, 20659. This unconstitutional private prosecution of criminal contempt began immediately upon Taishan's re-entry and continued throughout 2015 and beyond.

### C.     BNBM

In March 2015, BNBM appeared in the litigation for the first time and moved the MDL court to dismiss BNBM from all cases for lack of personal jurisdiction. *See, e.g.*, Rec. Docs. 18774-2, 19646. What followed were a series of rulings that were driven not by legal doctrine but the PSC's claims of delay and pleas for retribution.

The MDL court ordered BNBM to participate in both contempt and jurisdictional discovery, reserving claimant discovery for a later date. *See, e.g.,* MDL Hearing Tr. at 18:19-

5

20 ("We are only discovering the jurisdiction and the extent of the exceptions, if any . . . .") (July 14, 2015). In the interim, the court held a hearing on damages in which the PSC proposed adoption of a remediation damages formula—predicated upon the average value of the Virginia seven homes in *Germano*—for use across the entire class irrespective of state/locale, type of property (e.g., apartment, commercial, single-family home), or other unique attributes (e.g., custom finishes). *See* MDL Hearing (June 9, 2015).

Without ruling on BNBM's motion to dismiss, the parties and the MDL court stayed the litigation throughout most of 2016 to allow the parties to explore formal settlement talks with the involvement of two Special Masters. Rec. Doc. 20480. After those talks failed, in April 2017, the MDL court denied BNBM's motion to dismiss largely by imputing Taishan's contacts to the company. Rec. Doc. 20739 at 49-79. Despite agreeing that Chinese law governs the imputation inquiry, the MDL court applied state substantive law to conclude that Taishan's contacts in Florida, Louisiana, and Virginia could be attributed to BNBM. *Id.* at 41. With respect to Florida, the court identified two bases for subjecting BNBM to jurisdiction. As to the few dozen properties that allegedly contain BNBM-manufactured drywall, the court found jurisdiction based on BNBM's direct sales. *Id.* at 80-95. With respect to Taishan-manufactured drywall, the court found BNBM subject to jurisdiction because Taishan allegedly acted as BNBM's agent. *Id.* at 54-63. The MDL court drew this conclusion without any claim-specific evidence linking the drywall at issue with BNBM's supposed agency relationship with Taishan. BNBM flagged these errors in its follow-on § 1292(b) request for interlocutory review of the personal jurisdiction order (Rec. Doc. 21095), which the Fifth Circuit subsequently granted. *In re Chinese*

6

*Manufactured Drywall Products Liability Litigation*, Case No. 18-90013, Doc. No. 00514520932 (5th Cir. June 20, 2018). That appeal remains pending.

### D. The MDL Court's Class and Damages-Related Orders

On April 21, 2017, the MDL court issued two additional orders: one denying the Defendants' motions to decertify the class, Rec. Doc. 20740, and another approving the use of the PSC's proposed damages formula, Rec. Doc. 20741. In refusing to decertify the class, the court rejected the Defendants' arguments that (1) a class comprised of only named plaintiffs is, by its nature, not certifiable and (2) the court's predominance determination is improperly predicated upon a flawed formula and undermined by the numerous variations in state law. Rec. Doc. 20740. And, despite expressly acknowledging in its class certification decision that BNBM had not defaulted, the MDL court concluded for the first time (and without identifying any doctrinal basis) that the defaults of other companies could be transferred to BNBM. *Id.* at 12. Based on that transference, the MDL court concluded there are no "open questions of liability and causation." *Id.* However, that conclusion is, at a minimum, at odds with the MDL court's own statements regarding liability in the jurisdictional order, which recognized that it had yet to "address the parties' arguments regarding corporate veil piercing for purposes of liability." Rec. Doc. 20739 at 39-40.

As to damages, the MDL court embraced the PSC's proposed remediation formula. Rec. Doc. 20741. It assumed that irrespective of locale or nature of the property, the remediation scope and costs are one-size-fits-all. Even though the thousands of properties at issue range from tiny apartments to large and small houses to much bigger commercial spaces, the MDL court concluded that the only difference among them was the "under-air

7

square footage of the contaminated property." *Id.* at 39-40. The MDL court accepted the PSC's estimate per square foot based on testimony from the non-adversarial damages trial for the seven Virginia *Germano* homes. *Id.* at 50. Ultimately, it adopted the PSC's inflated $105.90 per square foot figure notwithstanding that actual remediation costs are demonstrably lower—presenting a potential windfall to claimants. *Id.* Likewise, the MDL court ignored settled law capping remediation awards at the value of the home and limiting it to funds actually expended for repairs where remediation has been completed. *See, e.g.*, *Keyes Co. v. Shea*, 372 So. 2d 493, 496 (Fla. App. 4 Dist. 1979) ("measure of damages may be, or should include, the cost of repairs or restoration;" however, "[t]he cost of restoration ... cannot be adopted as the measure of damages where the cost of restoring the property would exceed the value thereof").

The parties engaged in initial claim discovery in which the MDL court ordered homeowners to submit a form ("Supplemental Plaintiff Profile Form" of "SPPF") that sought certain information regarding product identification, damages claims, and supporting documentation. Rec. Doc. Rec. Doc. 21162. The responses were designed to function as answers to interrogatories and responses to requests for production. *Id.* at 6. Recognizing the value of the SPPFs but also their limited utility, the MDL court expressly reserved the parties' right to additional non-duplicative discovery, and anticipated the need for depositions. *Id.* at 5-6. In the midst of this discovery, the MDL court initiated the remand of the Florida *Amorin* action back to this Court. The MDL court's Conditional Remand Order noted that the proposed formula was advisory only as to the transferor court. Rec. Doc. 21242 at 10.

8

Despite Defendants' appearance in the MDL more than three years ago, claimant-specific discovery began only earlier this year.  And this discovery came not through traditional document requests and depositions, but through the SPPFs which called for a limited amount of information.  More than a thousand claimants missed the initial court-ordered deadline to return verified SPPFs, and were granted extensions (some repeatedly).  To date, approximately seventy (70) Florida *Amorin* claimants still have not complied with the MDL court's order.  And the forms which were submitted were often incomplete, lacking supporting documentation, or otherwise require substantial follow-up discovery.

* * *

In light of this background, Defendants propose the following trial plan which allows for meaningful discovery, proper pre-trial adjudication of salient issues, and efficient resolution of all claims.

## II.  *AMORIN* FLORIDA TRIAL PLAN

Defendants' trial plan tracks those widely utilized by courts adjudicating mass tort claims.  This plan provides for non-bifurcated complete discovery followed by an initial set of trials.  Those trials are designed to foster settlement by enabling the parties to meaningfully gauge the cost of litigation and global claim values.  Defendants' plan also tracks the case management schedule and protocol proposed by the parties and adopted by this Court on August 15, 2018.  By contrast, the PSC's Plan would run roughshod over state law and Defendants' due process rights and deviate from the August 15, 2018 case management schedule by proposing a separate litigation track for adjudication of claims/damages through an unfounded formulaic spreadsheet process.

9

### A. Case-Wide Motions

The irregular procedures employed in the MDL can in large part be cured, and a clean path forward can be fashioned, through case-wide motions. This can be done by dismissing improper and delinquent claimants, excising non-cognizable claims, and ensuring clarity regarding remaining issues for adjudication. The following are among the categories of motions that will be submitted on September 14, 2018:

#### 1. SPPF Non-Compliance Dismissals

Defendants will request that the Court dismiss claims of Florida homeowners who, pursuant to the MDL court's pretrial order, were to submit their SPPF forms by March 2018, but have yet to do so or have submitted incomplete forms. Having had the better part of eight months to comply with the MDL court's discovery order, non-complaint claimants should not be permitted to slow down this litigation. They should be dismissed.[6]

#### 2. Motion to Enforce Discovery and Trial Rights

BNBM anticipates the PSC will seek to preclude BNBM from contesting any issue beyond damages—such as liability, causation, and defect—by claiming BNBM has defaulted. However, no default has ever been entered against BNBM in this case. That's in part because the PSC never asked for one. The MDL court's class certification FOFCOL (flawed as it was) recognized that no default was entered against BNBM in this Florida action. Rec. Doc. 18028 at 6 (charting defaults and excluding BNBM from any default in *Amorin* Florida). Accordingly, BNBM is entitled to contest all issues. And, under *Frow v. De La Vega*, 82 U.S. 552, 554 (1872), the Court should withhold any liability, causation, or

---

[6] Judge Fallon recently dismissed 25 claims in Louisiana *Amorin* for failure to comply with the court's discovery orders, and granted extensions for 21 remaining claims, to be dismissed with prejudice upon failure to cure by the new and final deadline of 30 days from August 14, 2018. Rec. Docs. 21699 and 21700.

10

defect adjudication against Taishan until those issues are resolved as to BNBM. Given the centrality of this issue to both the scope of discovery and nature of any forthcoming trials, this Court may prefer to prioritize this motion and withhold ruling on the scope and procedures attending any forthcoming trials until its resolution.

### 3. Prohibition Against Use of Remediation Damages Formula

Though Judge Fallon expressly recognized this Court is not bound by his remediation formula, Rec. Doc. 21242 at 10, Defendants anticipate the PSC will ask this Court to apply the inflated formula in a streamlined, spreadsheet-driven track that is inconsistent with the August 14, 2018 case management order. In anticipation of that request, Defendants will move the Court to decline employing the remediation formula because it (1) contravenes settled law by affording binding effect to bellwether trials—i.e., the non-adversarial trials regarding seven Virginia properties from *Germano*, *see Cimino v. Raymark Indus.*, Inc., 151 F.3d 297, 318 (5th Cir. 1998) (in addressing the utility of bellwether trials, precluding any "use of the unitary trial results (whether for general causation or individual causation or otherwise) in cases other than those of the thirty selected plaintiffs"), (2) would contravene Florida law to apply a formula to properties that *have already been remediated* and to provide for damages that exceed the home's value, *see, e.g., Keyes Co.*, 372 So. 2d at 496, and (3) even if the formula were to be applied, it can only be applied to members of the class, which is limited to *current* homeowners, Rec. Doc. 18028 at 34 (class defined as "[a]ll owners").

### B. Selection of Priority Claimants

This Court's case management plan provides for the selection of the first twenty (20) Florida claims to be tried, which are referred as to the "Priority Claimants." The plan

11

does *not* however, provide a methodology for selecting the Priority Claimants. Based on the PSC's proposal in Louisiana, Defendants presume the PSC will ask for unilateral selection of Priority Claimants. Such an approach would however be misguided because one of the primary goals of the case management plan is to enable the parties to draw inferences regarding the claims as a whole (as evidenced by the scheduled mediation following the initial wave of trials (Dkt. No. 47 at 4)). Absent a representative sample, that goal would be undermined, as the parties will inevitably debate proper extrapolation both as to litigation costs and claim value.

To ensure the appropriate level of representativeness, the best way to select the first twenty cases is to pull from each of the drywall product identification (Product ID) categories that have already been established between the parties. The established Product ID categories are designated by letters A through L. Priority claimants shall be selected from each category at random using a computerized random number generator, as follows:

| **Product ID Category** | **Number of Priority Claimants to Pull** |
|---|---|
| A. BNBM/Dragonbrand | 1 |
| B. C&K | 1 |
| C. Purple Stamp | 1 |
| D. Crescent City | 0 (none in Florida) |
| E. DUN | 0 (none in Florida) |
| F. IMT | 1 |
| G. ProWall | 1 |
| H. Taian/Taishan | 2 |
| I. Made in China [Meets or Exceeds] | 4 |
| J. Drywall [with dimensions] | 4 |
| K. Venture Supply | 1 |
| L. Other | 4 |
| **Total:** | **20** |

In addition, Defendants request that the Court approve this approach as soon as possible so that the parties have adequate time to agree to a randomized process for selecting the Priority Claimants (as slated—by the case management schedule—for September 21, 2018, Dkt. No. 47 at 3).

### C. Discovery

As described above, only preliminary discovery has been taken from the Florida *Amorin* claimants. Defendants have yet to engage in depositions and follow-up written discovery. Defendants anticipate the PSC will assert, as they have in Louisiana, that discovery should be limited to a narrow band of formula inputs and seek to impose a "good cause" threshold for depositions. In order to serve the dual due process principles of the plaintiffs' burden of proof and the defendants' rights to defend themselves against the imposition of liability and damages, there is no basis to restrict discovery in this fashion. This is especially true for BNBM, which has no defaults in this action.

To the extent the PSC further proposes—as it also has in Louisiana—to divide discovery topically between remediation and non-remediation damages, that approach should be rejected. It is inefficient, nonsensical, and violative of Defendants' discovery rights. In Louisiana, the PSC proposed a process that acknowledged depositions as to non-remediation damages but precluded them as to remediation damages (subject to an inexplicable showing of good cause). Such dual-track discovery is inefficient given the overlap in evidence to establish remediation and non-remediation damages. Accordingly, Defendants propose that the Court provide for complete discovery subject only to the restriction of non-duplicative requests.

13

Finally, in light of the brief discovery period here and numerous depositions, Defendants request that the Court require all propounded requests for written discovery be complied with within twenty days of issuance. That way, the parties will have all documentary evidence necessary in advance of and for use in the claimant depositions.

### D.     Claimant-Specific and Pre-Trial Motions

Defendants will bring claimant-specific, pre-trial motions, including summary judgment motions, addressing plaintiffs' particular claims as well as key issues, including, but not limited to, ownership, product identification, causation and defect, remediation status, home value, alternative living expenses, loss of use and enjoyment, set-off amounts and other potential damages, including those associated with short sales/forecloses, personal property, taxes, insurance, utilities/property maintenance, and loss rent/business.

### E.     Special Master Participation

Even with a set of Priority Claimants, Defendants recognize that resolution of pre-trial issues will be onerous. Accordingly, Defendants are generally agreeable to the appointment of a Special Master, subject to the requirements of Federal Rule of Civil Procedure 53. The lone exception being adjudication of any class-wide, non-plaintiff specific and other pretrial motions submitted on September 14, 2018. Given the centrality of those issues to the litigation plan, Defendants believe it would be prudent and most efficient for the Court to resolve those issues on its own.

### F.     Trials/Hearings

At trial, Plaintiffs will be required to show that their properties had Defendants' drywall and the Plaintiffs, in fact, were injured by it. They will also bear the burden of

14

showing the extent and amount of any damages—remediation and non-remediation. Defendants will be entitled to rebut such evidence by demonstrating that the drywall was not manufactured by them, did not result in damages, and/or the extent of the damages is less than each Plaintiff contends.

Trials should be conducted as individual adjudications subject to the Federal Rules of Evidence and Due Process Clause of the Constitution.

### G.     Mediation

Following resolution of all claims of the Priority Claimants, the parties will participate in mediation to resolve the remaining cases. Equipped with the initial set of adjudications, both sides will have a deeper appreciation of the remaining claims at issue in Florida *Amorin* and will be capable of more meaningfully engaging in settlement discussions to resolve the remaining claims.

Dated:  August 31, 2018

Respectfully submitted,

**AKERMAN LLP**
Las Olas Centre II - Suite 1600
350 E. Las Olas Boulevard
Ft. Lauderdale, Florida 33301
Tel:  (954) 463-2700
Fax:  (954) 463-2224

By: */s/ Enjoliqué D. Aytch*
    Enjoliqué D. Aytch, Esq.
    enjolique.aytch@akerman.com
    Florida Bar No.:  0104881

**ALSTON & BIRD LLP**
1201 West Peachtree Street
Atlanta, Georgia  30309
Phone: (404) 881-7000
Fax: (404) 881-7777

15

Bernard Taylor, Esq.
Georgia Bar No. 669625
Michael P. Kenny, Esq.
Georgia Bar No. 415064
Christina Hull Eikhoff, Esq.
Georgia Bar No. 242539
David Venderbush, Esq.
New York Bar No. 2920817
bernard.taylor@alston.com
mike.kenny@alston.com
christy.eikhoff@alston.com
david.venderbush@alston.com

*Counsel for Defendants Taishan Gypsum Co., Ltd., and Tai'an Taishan Plasterboard Co., Ltd.*


Craig P Kalil
**Aballi Milne Kalil P.A.**
SunTrust International Center
1 SE 3rd Avenue
Suite 2250
Miami, FL 33131
305-373-6600
Fax: 305-373-7929
Email: ckalil@aballi.com
L. Christopher Vejnoska
Eric Matthew Hairston
Andrew K. Davidson
**Orrick, Herrington & Sutcliffe LLP**
The Orrick Building
405 Howard Street
San Francisco, CA 94105
415-773-5700
Email: cvejnoska@orrick.com

James L. Stengel
**Orrick, Herrington & Sutcliffe LLP**
51 West 52nd Street
New York, NY 10019
212-506-5000
Email: jstengel@orrick.com

*Counsel for Defendant BNBM PLC*

16

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing DEFENDANTS' TRIAL PLAN PROPOSAL has been electronically filed with the Clerk of Court of the United States District Court for the Southern District of Florida by using the CM/ECF System, which will send a notice of electronic filing.

        By: */s/ Enjoliqué D. Aytch*
           Enjoliqué D. Aytch, Esq.
           enjolique.aytch@akerman.com
           Florida Bar No.: 0104881

**AKERMAN LLP**
Las Olas Centre II - Suite 1600
350 E. Las Olas Boulevard
Ft. Lauderdale, Florida 33301
Tel: (954) 463-2700
Fax: (954) 463-2224