# Exhibit "6"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| **EDUARDO AND CARMEN AMORIN**, *et al.*, **individually, and on behalf of all others similarly situated,** | |
| **Plaintiffs,** | **Case No. 1:11-CV-22408-MGC** |
| **v.** | |
| **TAISHAN GYPSUM CO., LTD. f/k/a SHANDONG TAIHE DONGXIN CO., LTD.; TAIAN TAISHAN PLASTERBOARD CO., LTD.,** *et al.*, | |
| **Defendants.** | |

### PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO REJECT APPLICATION OF REMEDIATION DAMAGES FORMULA

**I.**     **INTRODUCTION**

Defendants' motion to reject application of the remediation damages formula (ECF No. 61) is another attempt on their part to dismantle everything already established in this decade-old litigation now that the Florida cases have been remanded. Their transparent motive is to delay a final judgment day and break apart the *Amorin* class. It would be unfair to punish the Plaintiffs further for Defendants' misconduct and failed litigation strategy.

**II.**     **HISTORY**

Defendants' *sui generis* motion to reject, which effectively seeks both to avoid the class-wide treatment of certain damages without formally moving to decertify the class under Fed. R. Civ. P. 23 and to vitiate prior rulings of the MDL court without formally proceeding under Fed. R. Civ. P. 59 or 60, is not written on a clean slate. It instead emerges from a procedural, factual, and legal history replete with failed strategies by these same companies to delay accountability for their misconduct and for the profound harm they have visited on thousands of property owners due to the manufacture and sale of defective drywall.

Before the MDL procedures were even established, Defendants were making calculated decisions to avoid paying any Chinese Drywall judgments. The default judgments entered against Defendants in this case, therefore, were not the result of inadvertent failure, but instead were invited by Defendants' deliberate refusal to answer the complaints filed

against them. These Chinese companies, with advice from their American attorneys, made a calculated decision to allow defaults to be entered on the grounds that no treaty exists between the United States and China to support the mutual recognition and enforcement of judgments.[1] *See, e.g., In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2018 WL 279629, at *8-9 (E.D. La. Jan. 2, 2018). The legal proceedings, now nearly a decade old, thus began with a calculation by Defendants that they could, and would, play the "delay game" with impunity.

Prior to the remand of cases now before this Court, the Plaintiffs' Steering Committee rigorously proved that all elements of Fed. R. Civ. P. 23(a)(1)-(4) and 23(b)(3) were met for all owners of properties with remediation damages caused by Taishan's Chinese Drywall. *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 2014 WL 4809520 (E.D. La. Sept. 26, 2014). Defendants were deliberately absent from the litigation when this occurred, despite proper notice and service of complaints against them. In fact, Taishan was in civil and criminal contempt of court at the time.[2]

Ultimately, only after default judgments were entered against them did Defendants appear and participate in the proceedings, although this was done solely to challenge the MDL Court's personal jurisdiction over them as a basis for vacating the defaults. After losing twice before the Fifth Circuit in this effort, Defendants then took the extraordinary step of flouting the MDL Court's order to appear for a judgment debtor examination – firing their counsel and effectively daring the MDL court to do something about it. They ultimately did re-appear and hire new counsel, and faced with a significant sanctions order, entered the MDL. But their delay strategy, even in default, was far from abandoned. On the contrary, these Defendants have continued to do everything possible to delay these proceedings.

---

[1] *See* CNBM Voluntary Announcement on Development of Gypsum Board Litigation in the US dated 7/18/2014 [ECF No. 64-5], at 3 ("<u>according to the US and Chinese lawyers whom BNBM and Taishan Gypsum have respectively consulted</u>, there is no convention or treaty on mutual recognition and enforcement of judgments between China and the US such that <u>the possibility of the US judgments being enforced in China is very low</u>. Therefore, based on information currently available to the Company, <u>the Compay believes that the US courts' judgments will not result in significant economic loss to the Group</u> and will not have material adverse impact on the Group's production and operation.") (emphasis added).

[2] *See* MDL Rec. Doc. 17869 [ECF No. 64-7].

Since reentering the case, these defaulted Defendants have tried to undo every order the MDL Court has entered.  Defendants previously moved to decertify the *Amorin* class.[3] That motion was denied.[4]  Then, Defendants moved to certify the denial of their decertification motion for immediate appeal pursuant to 28 U.S.C.§ 1292(b).[5]  The MDL Court denied that motion, holding that "in light of the complex nature of this case and extensive history of the litigation, a class action is the superior mechanism for resolving these claims."[6]  The MDL judge himself has made a record of Defendants' behavior, stating that Defendants' "delay tactics have permeated every aspect of Defendants' litigation strategy: from their initial failure to appear to their now perpetual motions to re-litigate settled matters." *Chinese Drywall*, 2018 WL 279629, at \*9.

To a large extent, unfortunately, their strategy has been effective. As Defendants have obfuscated and delayed, Plaintiffs have suffered. Many who were current owners when this litigation began have become former owners with the passage of time. They were unable to maintain ownership of contaminated homes over the course of these protracted proceedings. But Plaintiffs should not be penalized for Defendants' misconduct simply because Defendants have repeatedly delayed the consequences of being in deliberate default to a certified class.

Defendants' Motion to Reject ignores the vast procedural history of this case and raises the very issues that the parties have been litigating for over nine years. The remand of cases following lengthy MDL proceedings, in other words, cannot and should not be seized upon by Defendants as a "fresh start." "Although the transferor judge has the power to vacate or modify rulings made by the transferee judge, subject to comity and 'law of the case' considerations, doing so in the absence of a significant change of circumstances would frustrate the purposes of centralized pretrial proceedings." MANUAL COMPLEX LITIGATION

---

[3] *See* CNBM's Motion to Decertify the Class [MDL Rec. Doc. 20627]; BNBM's Joinder in CNMB's Motion to Decertify the Class [MDL Rec. Doc. 20631]; Taishan's Joinder in CNBM's Motion to Decertify the Class [MDL Rec. Doc. 20632] (collectively referred to herein as the "Motion to Decertify").

[4] *See* Order & Reasons re Motion to Decertify [ECF No. 80-1], at 12 ("Decertification Order").

[5] BNBM's and CNBM's Motion to Certify an Immediate Appeal from the Court's Order Denying Their Motions to Decertify the Class [MDL Rec. Doc. 20780].

[6] Order & Reasons re: 1292(b) Motions [MDL Rec. Doc. 20910], at 13, attached hereto as Exhibit "A."

(FOURTH) § 20.133 (2001) (citing Stanley A. Weigel, The Judicial Panel on Multidistrict Litigation, Transferor Courts and Transferee Courts, 78 F.R.D. 575, 577 (1978)). It is within the Transferor Court's sound discretion to apply the law of the case as established by the multidistrict litigation judge. *McKay v. Novartis Pharm. Corp.*, 751 F.3d 694, 704 (5th Cir. 2014). In *McKay*, the Fifth Circuit affirmed the trial court's decision to prohibit a party from re-litigating an issue already decided by the MDL judge with arguments the party could have raised originally. *Id.* at 705. The Fifth Circuit reasoned that "[t]he law of the case doctrine requires attention to the special authority granted to the multidistrict transferee judge and ensures that transferor courts respect the transferee court's decisions." *Id.* (quoting *In re Ford Motor Co.*, 591 F.3d 406, 411 (5th Cir. 2009)) (internal quotations omitted). For these reasons, Defendants' Motion to Reject should be denied.

III.  **ARGUMENT**

    A.  **Due Process Has Been Met in this Case.**

With striking irony, the same Defendants who have trampled on the due process rights of Plaintiff property owners for more than a decade through their egregious delay tactics and strategizing in this litigation, now complain that utilizing a class-wide formula to calculate remediation damages "will trample defendants' due process rights." *See* Defendants' Brief [ECF No. 61-1], at 9. Nonetheless, at the heart of their complaint is nothing more or less than a disguised – and repeat – motion to decertify the class. As noted *supra*, these Defendants previously brought, briefed and argued a motion to decertify in the MDL court, and did not prevail. Yet each decision they now cite in support of their "due process" argument (*Kpadeh*, *Dukes*, and *Cotromano*) addressed the question whether the matter at hand should be certified as a class under Rule 23 (in *Dukes*, the specific question was whether the case should be more properly certified under FRCP 23(b)(3) and not 23(b)(2)).

The question whether to maintain or decertify the Plaintiff class is one that is not before this Court; and neither is this Court called upon to decide whether Plaintiffs' damage claims should be processed on a class-wide basis, notwithstanding Defendants' "due process" objection that the claims are too individualized to be treated as such. Instead, the precise question raised by Defendants' motion is whether, in a case already certified as a class, the Court should avail itself of the efficiencies of class-wide treatment for certain claims, and in particular for claims susceptible to a uniform method of calculating the costs to remediate

defective drywall in a given property. As already discussed, such claims are in no way comparable to those at issue in the *Kpadeh*, *Cotromano* and *Dukes* cases. The claims in those matters were found not suitable for class treatment as a threshold matter, due to their highly-individualized nature and the variable evidence required to support them. The remediation claims in this class action, on the other hand, already have been found suitable for class-wide treatment, pursuant to a formula which has been litigated and deemed reliable in the calculation of restoration costs for all properties requiring the "back-to-studs" remediation of Chinese drywall contamination. *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2017 WL 1421627 (E.D. La. Apr. 21, 2017).

Defendants thus should not be heard to conjure their "due process" as some absolute right of defense, by effectively ignoring the legal framework in which Plaintiffs' class claims now proceed. The forfeiture of liability defenses pursuant to the default provisions of Rule 55, as well as the obligation to now defend claims proceeding on a class-wide basis under Rule 23, necessarily modify litigation defenses which otherwise would be available in matters where Rules 55 and 23 have no effect. This is hardly tantamount to a violation of "due process" in the abstract. This is, rather, the outcome of a litigation process in which the provisions of these Rules have been rightly applied, and remain applicable at this time. That Defendants are entitled to a fair opportunity to protect their interests within the contours of a defaulted class action is not in dispute; but they are not entitled, based on the spurious invocation of "due process" rights, to vitiate the effects of Rules 55 and 23. The availment of an evidence-based and fully-litigated formula to initially calculate remediation costs in quantifying a legal debt commonly owed under Rule 55 to the members of a certified class, is not a curtailment of Defendants' due process rights. On the contrary, it is the implementation of a long-overdue process to effectuate important class-wide relief.

**B.** **The Formula Established in the MDL Court for Calculating Remediation Damages is a Proper and Efficient Means to Compensate *Amorin* Class Plaintiffs Harmed by Defendants' Defective Drywall.**

Defendants' Motion seeks to "reject application of the remediation damages formula." ECF No. 61-1. However, these same Defendants have made these same arguments to the MDL Court on five separate occasions in 2015, 2016, and 2017, and each time the MDL court has ruled against them and found the remediation damages formula methodology to be

both reliable and compliant with the requirements of Rule 23. Now in 2018, the facts have not changed, the law has not changed, and none of the MDL Court's rulings on the damages formula have been reversed.

The MDL Court has issued five orders finding Plaintiffs' remediation damages formula to be reliable and compliant with Rule 23 on the following occasions:

1.  <u>June 5, 2015</u> – The MDL Court's *Daubert* Order upheld Plaintiff Expert George Inglis's use of the remediation damages formula ("Mr. Inglis's proposed expert opinion is highly relevant on the issue of class damages… Mr. Inglis is qualified to give an expert opinion within the scope of his experience as a building engineer… Mr. Inglis may testify based on facts or data that are reasonably relied upon by experts in his field…"). *See In re Chinese-Manufactured Drywall Prod. Liab. Litig*., 2015 WL 3603624, at \*3 (E.D. La. June 5, 2015).

2.  <u>August 3, 3015</u> – The MDL Court's Order denied Taishan's Motion to Exclude Plaintiffs' Class Spreadsheet [… which was based on the remediation damages formula and admitted at June 9, 2015 Damages Hearing]. *See* Order & Reasons regarding Taishan's Motion to Exclude Plaintiffs' Class Spreadsheet [MDL Rec. Doc. 19355], attached hereto as Ex. "B."

3.  <u>April 21, 2017</u> – The Court entered Findings of Fact and Conclusions of Law ("FOFCOL") Related to the June 9, 2015 Damages Hearing rejecting every defense argument made in their motion to reject. *Chinese Drywall*, 2017 WL 1421627. Based on a review of all the scientific and economic damages evidence, the MDL Court found the following:

    a.  Chinese Drywall is defective. *See id*. at \*6.

    b.  The remediation protocol is evidence-based and has been confirmed by its application in the actual remediation of several thousand homes. *See id*. at \*6, 11.

    c.  The scope of the remediation protocol is necessary for all Chinese Drywall contaminated homes, and has been used by national builders including Beazer Homes and Lennar Homes, and for 2,200 homes in the Knauf settlement program. *See id*. at \*7-8.

    d.  Mr. Inglis and Mr. Wright (Plaintiff Remediation Damages Experts) have evaluated Chinese Drywall damages in several states to establish the scope and costs of remediation. *See id*. at \*11.

     e.     The scope of remediation work ("strip to the studs") is evidence-based and field tested, and confirmed by scientific investigations, practical construction experience, and building codes. *See id*. at \*11-12.

     f.     The remediation formula utilizes construction bid pricing, RS Means Unit Pricing, Square Footage pricing, and RS Means local building and labor costs adjustment factors – all of which constitute recognized damage evaluation methods in the industry. *See id*.

     g.     The remediation damages model is limited to the interior of homes and does not present the variability of cost factors present in new home construction. *See id.* at \*12-13.

     h.     The relevant case law supports the appropriateness and reliability of the Inglis remediation damages methodology. *See id.* at \*24-25.

    4.    <u>April 21, 2017</u> – The Court denied Defendants' Motion to Decertify the Class, finding that the Plaintiffs properly established a formulaic method to determine class-wide [remediation] property damages, ("The only variation is the extent of damages suffered based on the square footage of the involved property"), and that remediation damages constituted the predominant issue in the case. *See* Decertification Order [ECF No. 80-1], at 7, 14, 20.

    5.    <u>March 12, 2018</u> – The MDL Court's Suggestion of Remand stated that the MDL Court had established and "approved a class-wide evidence – based formula and methodology to calculate property [remediation] damages involving defective drywall," and "strongly encouraged" transferor courts to utilize it "to determine the appropriate award in each individual case." *See* MDL Court's Suggestion of Remand [ECF No. 33], at 10.

    In the face of this robust history of evidentiary support and judicial analysis, Defendants raise isolated and out-of-context arguments that are readily dismissed by a review of the record. For example, Defendants argue that their Certified General Construction expert at the June 9, 2015 hearing (George Pogorolich) testified that the only way to reliably estimate remediation cost is to perform site–specific individual inspection of the property. However, Defendants ignore that the MDL Court specifically considered this testimony and rejected it. First, it found Mr. Pogorolich had "no experience with establishing or implementing the remediation protocol for CDW homes." *See Chinese Drywall*, 2017 WL 1421627, at \*12. Then the Court found that the "strip to studs" protocol does not present the

same variability in costs as new construction but rather is based on the nearly uniform costs of demolition of the drywall and replacement of standard building materials. *See id*. at *13. Most notably, the MDL judge found Plaintiffs' formulaic methodology was confirmed by scientific and practical considerations, analogous to that used by national builders, and based on universally accepted RS Means data. *See id*. at *12. Indeed, the Court noted that each method of estimating damages, including the contractor bid method that defense expert Mr. Pogorolich said was essential, could have up to 30% variance among competitive bids. *See id*. at *14 n.1. In other words, the Court found that individual inspections (as opposed to a well-justified formulaic method to calculate remediation costs) would be "inefficient and unjust." *See id*. at *13, *21.

Defendants further argue that their other expert at the June 9, 2015 hearing, a statistician (Dr. Marais), argued that Plaintiffs could not rely upon an average of seven property owners' damages from the *Germano* trial in 2010 to estimate class-wide damages. The MDL Court also considered and rejected this testimony. The Court found that Dr. Marais was not qualified to address building damage or remediation estimation methodology. *See id*. at *13. The Court further found that Plaintiffs' damages methodology was not merely based on seven Virginia homes in *Germano*, but also based on:

- Application of the remediation protocol to several thousand homes,
- Long term observation sampling and testing of CDW properties,
- Scientific investigation of CDW and the science of corrosion,
- Practical construction experience,
- Electric and building codes,
- The experience of national builders Beazer and Lennar,
- Experts with 40 years of experience in project and construction management,
- Experts utilizing the scope of remediation and cost estimates based on contractor bids and RS Means data in *Germano* as well as investigations in other states from 2010-2015. *See id*. at *6-8, *10-12.

Thus, based on the MDL Court's specific rulings it is clear that remediation damages for each damaged building can be reliably determined utilizing the strongly recommended evidence-based formula. *See* Suggestion of Remand [ECF No. 33], at 10. That formula requires three objective pieces of information for each damaged property: ownership status,

number of square feet, and product identification; and Plaintiffs have proposed a Claims Processing procedure to resolve any disputes regarding this information. ECF No. 52-8 (Ex. 1). As the MDL Court determined, remediation damages are the predominant issue in this case; and thus its resolution is most likely to lead to resolution of the entire litigation.

Defendants in this case are in default, and, therefore, liability has been established. The Federal Rules of Civil Procedure are "designed for the just, speedy and inexpensive disposition of cases on their merits…." *Sun Bank of Ocala v. Pelican Homestead & Saving Ass'n.*, 874 F.2d 274, 276 (5th Cir. 1989). A defendant that fails to respond to an action effectively derails this process and invites a process of accelerated litigation. A defendant that has been placed in default under Rule 55(a) at the time of a Rule 55(b)(2) damages trial, has confessed liability pursuant to the well-pled allegations of the complaint which that defendant failed to answer. The jurisprudence of the United States Supreme Court, dating from the 19th century, likewise mandates that a defendant which fails to set aside the entry of a default is thereafter barred from contesting any and all facts established by that default. *Ohio Cent. R.R. Co. v. Cent. Trust Co. of New York*, 133 U.S. 83 (1889). As default judgments have been entered against Defendants in this case, all well-pled allegations of Plaintiffs' complaints regarding liability are deemed admitted, leaving only the issue of compensation for Plaintiffs' property damage. In addition, while a plaintiff has the burden to prove damages in a default proceeding, all reasonable inferences from the evidence are drawn in the plaintiff's favor. *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009); *In re Catt*, 368 F.3d 789, 793 (7th Cir. 2004); *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981).

Since the only issue remaining in these remanded default cases is to determine the damages owed to Plaintiffs, the remediation formula is an appropriate method of computing the amount of those restoration costs. Florida law explicitly gives Plaintiffs the right to recover restoration costs. The measure of damages for injury to real property under Florida law is either the diminution in value or the cost of restoration to the condition prior to the injury. *U.S. Steel Corp. v. Benefield*, 352 So. 2d 892, 894 (Fla. Dist. Ct. App. 1977). When the injury is temporary and can be repaired, then the cost of restoration is the preferred measure of damages. *Id.*; *Keyes Co. v. Shea*, 372 So. 2d 493, 496 (Fla. Dist. Ct. App. 1979).

## C.   The Remediation Damages Formula Does Not Provide a "Windfall" for the Plaintiffs.

Left with no legal basis to seek "rejection" of the damages formula, and no reliable expert testimony or data from the record to support its position, Defendants speculate about "windfall recoveries," based on "actual remediation costs," and "reported building value." ECF No. 61-1, at 16.   It is hard to imagine how an injured homeowner recovering the economic cost of repair to a contaminated home – a decade after his/her injury – can be deemed a "windfall" by the Defendants that were found liable and ran away from the court proceeding.   As to repair costs, Florida law recognizes that the central goal of tort damages is to attempt to make the plaintiff whole.   *Phillips v. Ostrer*, 481 So. 2d 1241, 1245 (Fla. Dist. Ct. App. 1985).   Certainly, for an injured homeowner seeking to remediate his/her home for the first time or to supplement an earlier self-funded incomplete or inadequate remediation, the full cost of repair is a recognized measure of damages. *U.S. Steel v. Benefield*, 352 So. 2d at 894-95. The MDL Court has found that each class member is entitled to a sum that would pay for a "proper, full remediation," even if an incomplete remediation had occurred earlier.   *See Chinese Drywall*, 2017 WL 1421627, at *12. A homeowner who did his or her best to mitigate damage by doing an incomplete partial repair should not now be penalized for it and should be allowed to recover for a complete remediation. As to the "reported building values," Plaintiffs recognize that, in Claims Processing, Defendants should have the opportunity to establish set-offs and to use reliable market data and expert opinion (not mere reference to property tax accessor roles) to show that the market value of the property at the time of injury should serve as a cap for this element of damage.   This can be addressed in the set-off stage of Claims Processing.

That set-off procedure does not need to be conducted by the Court.   The Court is expressly authorized to "make referrals" in order to determine the amount of damages. *See* Fed. R. Civ. P. 55(b)(2)(B); *see also Armeni v. Transunion LLC, Inc.*, 2016 WL 7046839, at *3 (W.D. Va. Dec. 2, 2016) ("Rule 55(b)(2) imbues the Court with authority to 'make referrals' to determine the amount of damages") (citing *Consol. Masonry & Fireproofing, Inc. v. Wagman Const. Corp.*, 383 F.2d 249, 252 (4th Cir. 1967) (affirming referral of damages after default to special master)); Fed. R. Civ. P. 53(a)(1)(b)(ii) (special master can be appointed to resolve a difficult computation of damages where issues are to be decided without a jury).

### D.     The Cases Relied Upon by Defendants are Distinguishable.

In their attempt to avoid the consequences of such a remedy on a class-wide basis, Defendants cite jurisprudence clearly distinguishable from the case at bar. In *Kpadeh v. Emmanuel*, 261 F.R.D. 687, 688 (S.D. Fla. 2009), Liberian citizens brought a putative class action against the former leader of the Liberian Anti-Terrorism Unit for various violations of their human rights ranging from arbitrary arrest to prolonged detention and even torture. The court in *Kpadeh* determined that a formulaic approach to the plaintiffs' pain and suffering would result in "callously assigning arbitrary awards based on tables developed through statistical sampling of atrocities (*e.g.*, $X for each instance of rape; $Y for genital mutilation; $Z per month of torture and confinement)." *Id.* at 692. Plaintiffs here, however, have never advocated a formulaic approach to general damages, nor can a person's pain and suffering as a result of torture conceivably be compared to the objective cost of repairing one's home, which only varies based on fixed variables such as square footage.

Similarly, *Cotromano v. United Techs. Corp.*, 2018 WL 2047468 (S.D. Fla. May 2, 2018), is factually distinct from the case before this Court. In *Cotromano*, the plaintiffs brought a putative class action against the owner of an aerospace testing and manufacturing plant for releasing toxic chemicals into the air, water, and soil of the surrounding area. *Id.* at *1. When ruling on class certification, the court noted the difficulty in identifying where exactly the toxic chemicals had migrated and the exposure levels suffered by the plaintiffs on a class-wide basis. *Id.* at *11. The court ultimately declined to certify the class, reasoning in part that the damages associated with the permanent damages to property value associated with the release of toxic chemicals were too amorphous to be measured uniformly across the class: "This case will involve measurements of intangible 'environmental stigma' damage that can vary significantly...depending on the presence of actual or threatened contamination, or proximity to dangerous does of contamination on nearby properties . . . , relevant exposure and dose levels, [and] the type and extent of contamination...." *Id.* at *20. However, unlike the intangible damage to property caused by environmental stigma, the damage of defective drywall can easily be calculated by measuring the cost it would take to remediate the property. Because the properties at issue here can be restored to their original condition before the damage caused by defective drywall, unlike the permanent, stigma damage to the properties

11

in *Cotromano*, repair costs are an appropriate measure of damages, and the remediation formula is an efficient way to determine the amount of damages.

In addition to being factually inapposite, *Kpadeh* and *Cotromano* presented a different procedural posture than the case before this Court. In both cases, the court was asked to certify a class of plaintiffs under Rule 23. *See Kpadeh*, 261 F.R.D. at 689; *Cotromano*, 2018 WL 2047468, at *2. The court in *Cotromano* declined to certify the class because the class definition lacked sufficient specificity to ascertain potential class members under Rule 23(a), *Cotromano*, 2018 WL 2047468, at *12, while the court in *Kpadeh* declined to certify the class because the plaintiffs failed to present a predominant question of law common to the class, *Kpadeh*, 261 F.R.D. at 693. However, Judge Fallon certified the *Amorin* class before this Court back in 2014. Unlike the parties in *Kpadeh* and *Cotromano*, we are past the threshold questions of Rule 23, and this is another attempt on behalf of Defendants to delay proceedings further.

Defendants also cite *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 342 (2011), "one of the most expansive class actions ever" with roughly 1.5 million class members, to support their argument to reject the remediation formula. In *Dukes*, the Supreme Court found the class had been improperly certified, recognizing the individualized, fact-intensive inquiry required to prove a claim for gender discrimination under Title VII. *Id.* at 358-59. The Court further found that the plaintiffs' claims for backpay had been erroneously certified under Rule 23(b)(2) of the Federal Rules of Civil Procedure. *Id.* at 360. The Court based its decision solely on the ground that individual monetary claims cannot be certified under Rule 23(b)(2) when the monetary claims are "not incidental to the injunctive or declaratory relief." *Id.*

*Dukes* is entirely distinguishable from the case before this Court. First, claims for gender discrimination must operate within the complex statutory framework of Title VII, which requires a detailed, factual analysis of each plaintiff's employment circumstances. In contrast, claims for property damage can be reduced to a monetary amount without the same individualized inquiry required of gender discrimination claims. The Court in *Dukes* declined to apply a formulaic approach to backpay claims that were certified under Rule 23(b)(2). *Id.* at 367. Yet, Plaintiffs' claims in the instant case have been certified under Rule 23(b)(3), which allows for individualized monetary claims, as recognized by the Court in *Dukes*. *Id.* at 362-63. Not only did *Dukes* draw a distinction between the two grounds for certification under Rule 23, but also the Court acknowledged that the plaintiffs' individualized claims for backpay

would have been more properly certified under Rule 23(b)(3). *Id.* at 361-62. As *Dukes* analyzed the plaintiffs' claims under the more stringent standards of Rule 23(b)(2), that decision is inapplicable to this case where Plaintiffs' claims have been certified under Rule 23(b)(3).

Furthermore, not a single case cited by Defendants preemptively eliminated the application of a formula to assess objectively-determined damages, such as costs to repair damage to property, on a class-wide basis. Because all of the above cases are distinguishable, the appropriate measure of Plaintiffs' damages under Florida law is cost of repairs. The remediation formula is merely a method of computing those costs for all class members. While Florida law may cap damage to property at the lesser of cost of restoration, value of the property in its original condition, diminution in value, or the damages actually sustained by the plaintiffs, *see Keyes Co.*, 372 So. 2d at 496, such a cap does not render the remediation formula inapplicable. The formula can still be applied to each Plaintiff to calculate an amount for restoration costs to be reduced later so as not to exceed the diminution of value or original value of the property. As previously discussed, Florida law favors cost of restoration as the appropriate measure of damages when the injury to property is temporary and can be repaired, as is the case with defective drywall.

### E. Federal and Florida Law Support the Application of the Damages Formula Approved by the MDL Court.

The application of the damages formula adopted by the MDL Court, using the replacement cost measure, is appropriate in the instant case. Case law has long stated that so long as the methodology is adequate to assess damages, individualized damages inquiries may be appropriate. *See Tyson Foods v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) ("...the action may be proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.") (internal citations omitted); *Klay v. Humana, Inc.*, 382 F.3d 1241, 1259-60 (11th Cir. 2004), *cert. denied*, 543 U.S. 1081 (2005), *abrogated in part on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008); *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013), *cert. denied*, 134 S. Ct. 1277 (2014) (Posner, J.) ("It would drive a stake through the heart of the class action device...that every member of the class have identical damages. If the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined...the fact that damages are not identical across all

class members should not preclude certification."); *Sosa v. Safeway Premium Fin. Co.*, 73 So. 3d 91, 113 (Fla. 2011); *Morgan v. Coats*, 33 So. 3d 59, 65 (Fla. 2d DCA 2010) ("[I]ndividualized damages inquiries do not preclude class certification."); *Ouellette v. Wal–Mart Stores, Inc.*, 888 So. 2d 90, 91 (Fla. 1st DCA 2004) ("[T]he individualized nature of their damages claims should not bar certification of the class."); *see also Broin v. Philip Morris Cos.*, 641 So. 2d 888, 891 (Fla. 3d DCA 1994) ("Entitlement to different amounts of damages is not fatal to a class action.").

Next, despite Defendants' implication that the class damages matter was decided in their absence (*see* Defendants' Brief at 6), the Defendants fully participated in class damages hearing held on June 9, 2015. *See, e.g., Chinese Drywall*, 2017 WL 1421627, at *5, *12-14 (discussing Defendants' participation in the evidentiary hearing). Indeed, both Taishan and BNBM submitted briefing, presented argument, challenged Plaintiffs' experts and put forth their own expert witness in opposition to Plaintiffs' proposed remediation damages formula. At that time, Defendants had the opportunity to introduce and argue that diminution of value was the appropriate damages model for the Florida Plaintiffs. They did not. Now, Defendants seemingly blame the MDL Court and Plaintiffs for their failure to present alternative damages models. This tactic is not only tedious, but tiresome. Defendants should not be afforded the opportunity to relitigate pretrial matters that were already appropriately handled by the MDL Court.

**F. Both Current and Former Owners Are Entitled to Remediation Damages.**

Florida law makes clear that a former owner, absent an assignment to the new owner, retains his/her rights to be compensated for the value of the damage to the property at the time of the injury. *Marianna & B.R. Co. v. Maund*, 56 So. 670, 672 (Fla. 1911); *Dept. Transp. v. Burnette*, 384 So. 2d 916, 920 (Fla. Dist. Ct. App. 1980); *see also Knight v. Empire Land Co.*, 45 So. 1025, 1028 (Fla. 1908). Thus, the cost of repair remains a valid measure of damage for the former owner who did not assign his/her claim to the new owner, subject to the same set-offs and reliable market data and expert opinion establishing the value of the building pre-injury cap noted above.

**G. Defendants' Efforts to Reargue Class Decertification Should Be Refused.**

Defendants contend that the MDL Court's certification of a multi-state property damage class was "clear error." *See* Defendants' Brief at 18 (citing *Hill v. Ford Motor Co.*, 975 F. Supp. 2d 1351, 1358 (N.D. Ga. 2013)). But the MDL Court already addressed and specifically rejected the same arguments that certification was improper that are raised again by the Defendants in this forum,[7] and *Hill* does not support the Defendants' misplaced contention that this Court should decertify the existing class action. To the contrary, *Hill* cautions precisely against the tactics currently being employed by the Defendants, to wit: "when a party challenges an MDL judge's ruling on remand, a transferor court 'should rarely reverse, because any widespread overturning of transferee court decisions would frustrate the principle [sic] aims of the MDL process and lessen the system's effectiveness.'" *Hill*, 975 F. Supp. 2d at 1358 (citing *In re Ford Motor Co.*, 591 F.3d 406, 411 (5th Cir. 2009)). *Hill* promotes deference being afforded to the MDL Court's class determination in part because "the transfer should not be treated as an opportunity to re-litigate all the questions decided by the first judge." *Id.* As explained above it has always been the Taishan Defendants' strategy since the inception of the litigation to delay these proceedings through the late entry of Taishan's parent companies who then improperly seek to relitigate matters long-ago decided under the pretext of Due Process rights. Their arguments should not be tolerated. In any event, they are wrong.

First, Defendants' misinterpretation of *Kpadeh* continues to confound. *Kpadeh* does not prohibit plaintiffs from estimating their remediation damages with the MDL Court's approved formula. Plaintiffs' square foot pricing method was proven through reliable expert testimony at the MDL class damages hearing which the Defendants agreed to, attended and defended against. *See, e.g., Chinese Drywall*, 2017 WL 1421627, at *5, *12-14. Their brazen attempt to relitigate established facts is improper. *See Hill*, *supra*. Other courts recognize that damages estimates based on expertise in building engineering are admissible and reliable. *See, e.g.*, *In re U.S. Foodservice Inc. Pricing Litig.*, 2011 WL 6013551, at *16 (D. Conn. Nov. 29, 2011), *aff'd*, 729 F.3d 108 (2d Cir. 2013), *cert. denied*, 572 U.S. 1087 (2014); *Rai v. Santa Clara Valley Transp. Auth.*, 2015 WL 860761, at *15 (N.D. Cal. Feb. 24, 2015); *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 45 F. Supp. 3d 724, 735-36 (N.D. Ohio 2014) (rejecting defendant's arguments that the methodology of plaintiff's engineering expert was

---

[7] *See* Decertification Order [ECF No. 80-1].

unreliable because it was not representative, particularly where the engineer had "called on his own experience in washer design for Whirlpool to support his conclusion that the design of the Duet machines led to a propensity to develop mold"); *see also Cason-Merenda v. VHS of Mich., Inc.*, 296 F.R.D. 528, 544 (E.D. Mich. 2013) (approving class certification based on damages expert's formula without requiring statistical sampling); *S. States Coop., Inc. v. Melick Aquafeeds, Inc.*, 701 F. Supp. 2d 1348, 1361 (M.D. Ga. 2010), *aff'd sub nom. S. States Co-op., Inc., v. Melick Aquafeeds, Inc.*, 476 Fed. App'x 185 (11th Cir. 2012) (fishery expert can use "simple arithmetic and algebra" to support his opinion); *accord In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. 677, 691-693 (N.D. Ga. 1991) ("The fact that the methodologies contain some form of averaging does not automatically render them methods of fluid recovery. On the contrary, Dr. Beyer's economic analysis evidences common impact and permits, with reasonable certainty, formulaic calculation of damages.").[8]   As the MDL Court's reasoning "toes the line" established by this precedent, Defendants' argument, which mischaracterizes the proposed use of the formula to estimate damages as avoiding individual assessments of damages, is unfounded and without merit.

Second, Defendants' challenge to predominance based on variance in state laws was addressed by the MDL Court and rejected.  The MDL Court held: "The only variation is the *extent* of the damages suffered based on the square footage of the involved property. This variation does not prevent class certification. *See In re Deepwater Horizon*, 739 F.3d 790, 815 (5th Cir.), *cert. denied*, 135 S. Ct. 754 (2014) ("'Even wide disparity among class members as to the amount of damages' does not preclude class certification 'and courts, therefore, have certified classes even in light of the need for individualized calculations of damages.'") (quoting *Bell Atlantic Corp. v. AT&T Corp.*, 339 F.3d 294, 306 (5th Cir. 2003))." *See* Decertification Order [ECF No. 80-1], at 14-15 (emphasis in original).

---

[8] Even Defendants' authority does not refute this principle.  In *Corley v. Orangefield Indep. Sch. Dist.*, 152 Fed. App'x 350 (5th Cir. 2005), the Court of Appeals recognized long-standing jurisprudence in the Fifth Circuit to the effect that, provided damages are "capable of computation by means of objective standards and not dependent in any significant way on the intangible, subjective differences of each class member's circumstances," *id.* at 354 (quoting *In re Monumental Life Ins. Co.*, 365 F.3d 408, 416 (5th Cir. 2004)), such objective methodologies may be employed to prove class damages.  It was only because the plaintiffs in that case "provide[d] no evidentiary support for [their] claim," that there was no abuse in discretion in the district court's denial of class certification.  *Id.*  This ruling hardly supports the proposition that a property-damage class is improper, as Defendants suggest.

16

Additionally, choice of law issues such as those suggested by the Defendants often devolve into manageability concerns. However, it is well established that manageability alone is not a sufficient ground to deny certification. *Mullins v. Direct Digital*, 795 F.3d 654, 663 (7th Cir. 2015), *cert. denied*, 136 S. Ct. 1161 (2016) (noting "the well-settled presumption that courts should not refuse to certify a class merely on the basis of manageability concerns."); *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1128 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 313 (2017) (same); *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 140 (2d Cir. 2001), *cert. denied*, 536 U.S. 917 (2002) (noting that failure to certify a class action under Rule 23(b)(3) solely on manageability grounds is generally disfavored), *overruled on other grounds by In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006). This reasoning further supports the MDL Court's ruling.

Third, the Defendants challenge the superiority of class certification on the grounds that liability was determined beforehand, and all class members were before the court. This argument should be given no weight as the sole authority for this principle, *Robertson v. Monsanto Co.*, 287 Fed. App'x 354 (5th Cir. 2008), is readily distinguished. In *Robertson*, after obtaining summary judgment on liability for personal injury claims, plaintiffs sought class certification for those persons who were named in the complaints. The *per curiam* panel reversed class certification based on "facts and circumstance unique to this case." *Id*. at 361. It found superiority lacking because liability had already been established in the summary judgment proceeding and "causation and damages are highly individualized." *Id*. These unique facts do not apply here because the sole issue remaining in this case is damages. Unlike the unique circumstances in *Robertson*, causation is not at issue because it too was admitted by the Defendants' default. Where only damages need to be addressed at trial, the superiority of the class device is met. The MDL Court expressly ruled on this point:

> Liability and causation have already been established by default. The Court has already conducted extensive hearings—where Defendants' interests were capably represented—and made detailed findings which apply to all class members. There is only one narrow issue which remains—remediation damages. In light of this history, and the extensive progress that has already been made, a class proceeding is the superior method to adjudicate Plaintiffs' remaining claims.[9]

---

[9] Decertification Order [ECF No. 80-1], at 19.

Finally, Defendants dispute whether Plaintiffs met their burden of proof to establish each of the Rule 23 criteria and also whether the District Court could rigorously analyze the criteria of Rule 23 without expert evidence. Defendants' Brief at 20. For Defendants who deliberately chose to have default judgments entered against them, the argument that Plaintiffs' proofs at class certification were insufficient to permit the district court to rigorously analyze the criteria of Rule 23 rings untrue. *See, e.g., Chinese Drywall*, 2018 WL 279629, at *8-10 (discussing willful nature of defaults). This is so because Defendants ignore hornbook law that the focus of class certification is whether claims are amenable to proof using class-wide evidence, not whether the plaintiffs will win or lose the case on the merits. *See Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013) ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage…[T]he focus of Rule 23(b)(3) is on the predominance of common questions...). Moreover, the MDL Court was aware of its responsibilities and performed the rigorous analysis standard applicable to the class proceedings. *See* Decertification Order [ECF No. 80-1], at 7, where the MDL Court refused to decertify the class in the face of the same argument:

> Thus, the Court performed a rigorous Rule 23 analysis and determined Plaintiffs established Rule 23(a)'s numerosity, commonality, typicality, and adequacy of representation requirements. (R. 18028 at 23-29). Additionally, the Court held that Plaintiffs had met Rule 23(b)(3) requirements for predominance and superiority. (R. 18028 at 30-35). Class certification was particularly appropriate where liability and causation had already been determined. The only remaining issue was the assessment of damages, which could be calculated on an aggregate basis. (R. 18028 at 31-33). Because Plaintiffs could "establish a formulaic method to determine class wide property damages," they met Rule 23(b)(3)'s predominance requirement. (R. 18028 at 33). Finally, the Court determined that class proceedings were a superior method to adjudicate the remaining damage assessments in the case, as any factual determinations that still had to be made were substantially narrower in scope than the factual issues the Court had already resolved in the course of this litigation. (R. 18028 at 34).

Defendants' repetitive arguments have failed before the MDL Court for good reason: they were unsound. This Court should refuse to revisit the MDL Court's determination that

class certification was appropriate to address the needs of class members who are anxiously awaiting their opportunity to prove their damages and conclude this unduly lengthy litigation.

## IV.    **CONCLUSION**

For the foregoing reasons, the Defendants' Motion to Reject Application of Remediation Damages Formula should be denied.

Dated: September 28, 2018                                Respectfully Submitted,


                                                        /s/ Patrick S. Montoya, Esq.
                                                        Patrick Shanan Montoya
                                                        Fla. Bar No. 0524441
                                                        Email: Patrick@colson.com
                                                        Colson Hicks Eidson
                                                        255 Alhambra Circle, PH
                                                        Coral Gables, FL  33134-2351
                                                        Telephone:  (305) 476-7400
                                                        Facsimile:  (305) 476-7444
                                                        *Interim Lead Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Southern District of Florida by using the CM/ECF System, which will send a notice of electronic filing on this 28th day of September, 2018.

                                                        /s/ Patrick S. Montoya, Esq.
                                                        Patrick Shanan Montoya
                                                        Fla. Bar No. 0524441
                                                        Email: Patrick@colson.com
                                                        Colson Hicks Eidson
                                                        255 Alhambra Circle, PH
                                                        Coral Gables, FL  33134-2351
                                                        Telephone:  (305) 476-7400
                                                        Facsimile:  (305) 476-7444
                                                        *Interim Lead Counsel for Plaintiffs*

# EXHIBIT

## "A"

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | CIVIL ACTION |
| | NO. 09-02047 |
| | SECTION "L" (5) |
| THIS DOCUMENT RELATES TO: ALL CASES | |

## ORDER & REASONS

Before the Court are two Motions Pursuant to 28 U.S.C. § 1292(b) to Certify Immediate Appeals from the Court's Order Denying [Defendant's] Motions to Decertify the Class, R. Doc. 20780, and from the Court's Findings of Fact and Conclusions of Law Related to the June 9, 2015 Damages Hearing, R. Doc. 20781. The Court has reviewed the parties' arguments, the relevant evidence, and the applicable law, and it is now ready to rule.

## I.    BACKGROUND

The present MDL litigation arises from alleged property damage and personal injuries sustained as a result of the presence of Chinese-manufactured drywall in homes and other buildings in a number of states. From 2004 through 2006, the housing boom in Florida and rebuilding efforts necessitated by Hurricanes Rita and Katrina led to a shortage of construction materials, including drywall.  As a result, drywall manufactured in China was brought into the United States and used to construct and refurbish homes in coastal areas of the country, notably the Gulf Coast and East Coast.  Sometime after the installation of the Chinese drywall, homeowners began to complain of emissions of smelly gasses, the corrosion and blackening of

metal wiring, surfaces, and objects, and the breaking down of appliances and electrical devices in their homes. *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 894 F. Supp. 2d 819, 829 (E.D. La. 2012), *aff'd*, 742 F. 3d 576 (5th Cir. 2014). Many of these homeowners also began to complain of various physical afflictions believed to be caused by the Chinese drywall. Accordingly, these homeowners began to file suit in various state and federal courts against homebuilders, developers, installers, realtors, brokers, suppliers, importers, exporters, distributors, and manufacturers who were involved with the Chinese drywall. Because of the commonality of facts in the various cases, this litigation was designated as multidistrict litigation. Pursuant to a Transfer Order from the United States Judicial Panel on Multidistrict Litigation on June 15, 2009, all federal cases involving Chinese drywall were consolidated for pretrial proceedings in MDL 2047 in the U.S. District Court, Eastern District of Louisiana.

The Chinese drywall at issue was largely manufactured by two groups of defendants: (1) the Knauf Entities, and (2) the Taishan Entities. The litigation has focused upon these two entities and their downstream associates, and has proceeded on strikingly different tracks for the claims against each group as described below:

The Knauf Entities are German-based, international manufacturers of building products, including drywall, whose Chinese subsidiary, Knauf Plasterboard (Tianjin) Co., Ltd. ("KPT"), advertised and sold its Chinese drywall in the United States. The Knauf Entities are named defendants in numerous cases consolidated with the MDL litigation and litigation in state courts. The Knauf Entities first entered their appearance in the MDL litigation on July 2, 2009. *See* R. Doc. 18. Thereafter, the Court presided over a bellwether trial in *Hernandez v. Knauf Gips KG*, Case No. 09-6050, involving a homeowner's claims against KPT for defective drywall. *See* R. Doc. 2713. The Court found in favor of the plaintiff family in *Hernandez*, issued a detailed

Findings of Fact and Conclusions of Law and entered a Judgment in the amount of $164,049.64, including remediation damages in the amount of $136,940.46, which represented a cost of $81.13 per square foot based on the footprint square footage of the house. *See* R. Doc. 3012.

Subsequently, the Knauf Entities entered into a pilot remediation program with the Plaintiffs' Steering Committee ("PSC") in the MDL. This program was largely based upon the remediation protocol formulated by the Court from the evidence in *Hernandez*. The Knauf pilot remediation program is ongoing and has, at present, remediated more than 2,200 homes containing KPT Chinese drywall using the same general protocol. At the Court's urging, the parties began working together to monetize this program and make it available to a broader class of plaintiffs.

On December 20, 2011, the Knauf Entities and the PSC entered into a global, class Settlement Agreement ("Knauf Settlement Agreement"), which is designed to resolve all Knauf-related, Chinese drywall claims. *See* R. Doc. 12061-5. In addition to the Knauf Settlement Agreement, numerous defendants in the chain-of-commerce with the Knauf Entities have entered into class settlement agreements, the effect of which settles almost all of the Knauf Entities' chain-of-commerce litigation. Although the Court occasionally must deal with settlement administration and enforcement issues, the Knauf portion of this litigation is largely resolved.

The litigation against the Chinese entities has taken a different course. The Chinese Defendants in the litigation include the principal Chinese-based Defendant Taishan, namely, Taishan Gypsum Co. Ltd. ("TG") and its wholly-owned subsidiary, Taian Taishan Plasterboard Co., Ltd. ("TTP") (collectively "Taishan" or "Taishan Entities"). Other Chinese-based Defendants include the CNBM and BNBM Entities.

The Court's initial inquiry regarding Taishan involved four cases in this MDL: (1) *Germano v. Taishan Gypsum Co., Ltd.*, Case No. 09-6687; (2) *The Mitchell Co., Inc. v. Knauf Gips KG*, Case No. 09-4115; (3) *Gross v. Knauf Gips KG*, Case No. 09-6690; and (4) *Wiltz v. Beijing New Building Materials Public Ltd., Co.*, Case No. 10-361. The first issues involving Taishan arose when Taishan failed to timely answer or otherwise enter an appearance in *Mitchell* and *Germano*, despite the fact that it had been properly served in each case. *See* R. Doc. 52; R. Doc. 1-7 (Case No. 09-6687). Thus, after an extended period of time, the Court entered preliminary defaults against Taishan in both of these cases. *See* R. Docs. 277, 487.

Thereafter, the Court moved forward with an evidentiary hearing in furtherance of the Preliminary Default in *Germano* on the Plaintiffs' claimed damages. *See* R. Doc. 502, 1223, 1258, 2380. At this hearing, the Plaintiffs presented evidence specific to seven individual properties, which served as bellwether cases. Following this hearing, which occurred on February 19 and 20, 2010, the Court issued detailed Findings of Fact & Conclusions of Law. *See* (R. Doc. 2380). On May 11, 2010, the Court issued a Default Judgment against Taishan in *Germano*, in favor of the Plaintiffs. R. Doc. 3031. On the last day to timely do so, June 10, 2010, Taishan filed a Notice of Appeal of the Default Judgment in *Germano* and entered its appearance in *Germano* and *Mitchell*. R. Docs. 3668, 3670.

After TG entered its appearance in the MDL, it quickly sought to have the Final Default Judgment in *Germano* and the Preliminary Default in *Mitchell* vacated for lack of personal jurisdiction, as well as on procedural grounds. *See* R. Docs. 5436, 5583. However, because of the pending appeal, this Court was without jurisdiction to address any motions filed by TG. *See* R. Doc. 5504. Accordingly, TG sought and was granted by the Fifth Circuit, a stay of its appeal to allow this Court to provide an indicative ruling on TG's motions to vacate the preliminary

default and default judgments. *See* R. Doc. 5649. In response, this Court issued an order

pursuant to Federal Rule of Civil Procedure 62.1 to allow it to consider TG's motions. *See* R.

Doc. 6101. In the fall of 2010, the Court directed the parties to commence the personal

jurisdiction discovery necessary to resolve TG's motions to vacate. Sometime after the initial

discovery, the parties agreed to expand the discovery beyond the *Germano* and *Mitchell* cases to

other cases in which Taishan been served, including *Gross* and *Wiltz*.

     Formal personal jurisdiction discovery of the Chinese Defendants began in October 2010.

*See, e.g.*, R. Docs. 5839, 5840. Discovery has included the production of both written and

electronic documents, as well as depositions of Taishan, BNBM, and CNBM corporate

representatives, with each type of discovery proceeding in a parallel fashion. This discovery has

often been contentious, requiring close supervision by the Court. The Court has presided over

regularly-scheduled status conferences to keep the parties on track, and conducted hearings and

issued rulings to resolve numerous discovery-related disputes. *See, e.g.*, R. Docs. 7136, 7511.

     The first depositions of the Chinese defendants were held in Hong Kong on April 4-8,

2011. *See* R. Docs. 8296, 8297. Thirteen attorneys traveled to Hong Kong and deposed the

following three Taishan witnesses: (1) Jia Tongchun, General Manager, Director of Board of

Directors, and five-percent owner of TG; (2) Peng Wenglong (a.k.a. Frank Clem), Manager of

Foreign Trade Department of TG in 2005, salesperson at TTP from 2006-07, and current

Manager of Foreign Trade Department at TG; and (3) Zhang Jianchun, Secretary of TG and

TTP. *See id.*

     Upon return to the United States, several motions were filed seeking to schedule a second

round of depositions as a result of problems during the depositions and seeking discovery

sanctions against Taishan. *See* R. Docs. 8685, 8695, 8755, 8758, 8768, 8792, 8805. Taishan

opposed these motions. *See* R. Docs. 8841, 8842. The Court, after reviewing the transcripts

from the depositions, concluded that the "depositions were ineffective because of disagreement

between interpreters, counsel, and witnesses, translation difficulties, speaking objections,

colloquy among counsel and interpreters, and in general ensuing chaos." *See* R. Doc. 9107.

Accordingly, the Court ordered the parties to move forward with further written discovery and to

schedule a second-round of Taishan depositions, but this time with knowledgeable and prepared

witnesses, a single translator, and Court supervision. *See id.* The parties complied with the

Court's orders and met regularly with the Court to resolve their further discovery disputes. *See*

R. Docs. 9524, 10092, 9649, 9944, 10007, 10216, 10269, 10799, 11175, 10804, 11138, 11192,

11326.

　　　　The Court scheduled the second round of corporate depositions for the week of January

9, 2012, in Hong Kong. *See* R. Docs. 10804, 11138, 11192. The Court appointed a Federal Rule

of Evidence 706 expert to operate as the sole interpreter at the depositions. *See* R. Doc. 11553.

Counsel for the interested parties and Judge Fallon traveled to Hong Kong for these depositions.

The following witnesses were deposed or re-deposed: (1) Peng Wenglong (a.k.a. Frank Clem);

(2) Jia Tongchun; (3) Che Gang (a.k.a. Bill Cher), Manager of International Trading for Taishan,

salesperson at TG from 2001-06 and 2009-12, and salesperson at TTP from 2006-07; (4) Peng

Shiliang, General Manager and Chairman of Board of Directors of TTP from 2006-09, employee

of TTP, and Plant Manager of TG from 2009-12; and (5) Fu Tinghuan, Supervisor at TG, Deputy

General Manager at TG, and Director of TTP. Because the Court was present at the depositions,

objections were ruled upon immediately and the majority of problems which plagued the first

round of depositions were absent. Also, the Court was able to observe the comments, intonation,

and body language of the deponents. Upon return from Hong Kong, the parties informed the

Court that minimal further discovery was necessary before briefing could be submitted on Taishan's personal jurisdiction challenges.

In April 2012, Taishan filed various motions, including its motions to dismiss for lack of personal jurisdiction. On June 29, 2012, over three years since the creation of this MDL, and after a year-and-a-half of personal jurisdiction discovery on Taishan, the Court presided over a hearing on Taishan's motions. The Court coordinated its hearing with Judge Joseph Farina of the 11th Judicial Circuit Court of Florida, who had a similar motion involving Taishan's challenge to personal jurisdiction.

On September 4, 2012, this Court issued a 142-page Order regarding Taishan's motions in *Germano*, *Mitchell*, *Gross*, and *Wiltz*, in which the Court denied the motions to dismiss, and held that it maintained personal jurisdiction over Taishan. *In re: Chinese-Manufactured Drywall Products Liability Litigation,* 894 F. Supp. 2d 819 (E.D. La. 2012). The Court also ruled that Taishan was operating as the alter ego of TG. The Court certified an interlocutory appeal and the Fifth Circuit granted permission to appeal. In January and May of 2014, two different panels of the Fifth Circuit affirmed this Court's ruling and held that this Court maintained personal jurisdiction over Taishan and TTP. *In re: Chinese-Manufactured Drywall Products Liability Litigation,* 753 F.3d 521 (5th Cir. 2014); *In re: Chinese-Manufactured Drywall Products Liability Litigation,* 742 F.3d 576 (5th Cir. 2014). The time for writs of certiorari passed and the issue of personal jurisdiction over Taishan became firmly settled.

On June 20, 2014, the Court ordered Taishan to appear in open court on July 17, 2014 to be examined as a judgment debtor. R. Doc. 17774. Taishan failed to appear for the July 17, 2014 Judgment Debtor Examination and the Court held Taishan in contempt and ordered that Taishan pay $15,000.00 in attorney's fees to Plaintiffs' counsel; that Taishan pay $40,000.00 as a penalty

for contempt; that Taishan, and any of its affiliates or subsidiaries be enjoined from conducting any business in the United States until or unless it participates in this judicial process, and if Taishan violates the injunction, it must pay a further penalty of 25% of the profits earned by the Company or its affiliate who violate the Order for the year of the violation. R. Doc. 17869.

On July 23, 2014, Plaintiffs filed their Omnibus Motion for Class Certification pursuant to Rule 23(b)(3). R. Doc. 17883. Taishan did not appear and, on September 26, 2014, after a detailed inquiry this Court certified a class of "[a]ll owners of real properties in the United States, who are named Plaintiffs [in the various MDL complaints] asserting claims for remediated damages arising from, or otherwise related to, Taishan drywall." *See* R. Doc. 18028 at 34-35.

In analyzing whether certification was appropriate, the Court noted that even though the factual allegations and liability had been established by multiple default judgments, "Rule 23(c) imposes an independent duty on the district court to determine by order that the requirements of Rule 23(a) are met regardless of the defendant's admissions." R. 18028 at 22 (quoting *Davis v. Hutchins*, 321 F.3d 641, 648-49 (7th Cir. 2003)). Thus, the Court performed a rigorous Rule 23 analysis and determined Plaintiffs established Rule 23(a)'s numerosity, commonality, typicality, and adequacy of representation requirements. R. 18028 at 23-29. Additionally, the Court held that Plaintiffs had met Rule 23(b)(3) requirements for predominance and superiority. R. 18028 at 30-35. Class certification was particularly appropriate where liability and causation had already been determined. The only remaining issue was the assessment of damages, which could be calculated on an aggregate basis. R. 18028 at 31-33. Because Plaintiffs could "establish a formulaic method to determine class wide property damages," they met Rule 23(b)(3)'s predominance requirement. R. 18028 at 33. Finally, the Court determined that class proceedings

were a superior method to adjudicate the remaining damage assessments in the case, as any factual determinations that still had to be made were substantially narrower in scope than the factual issues the Court had already resolved in the course of this litigation. R. 18028 at 34.

Taishan entered an appearance with the Court in February 2015 and, to satisfy the contempt, Taishan paid both the sum of $15,000 in attorney's fees to Plaintiffs' counsel and the contempt penalty of $40,000 in March 2015.  R. Doc. 18764.  On March 17, 2015, the Court ordered Taishan and the BNBM and CNBM Entities to participate in expedited discovery related to "the relationship between Taishan and BNBM/CNBM, including whether affiliate and/or alter ego status exists."  R. Doc. 17869.  The instant motions are directly concerned with this relationship.

On June 9, 2015, the Court held a class damages hearing, in which Taishan, BNBM, and CNBM all participated. As a result of these hearings and the remediation program, the Court determined that the scope of the necessary remediation is consistent across the effected properties—buildings with the defective drywall require complete remediation and cleaning. The scope of remediation work is the same regardless of the type of building or the location of the property. The only difference is the square footage of the contaminated area of the building. Thus, the Court issued its Findings of Fact and Conclusions of Law and ordered the parties to submit updated information regarding the square footage of each of the affected properties. R. Doc. 20741. Plaintiffs have since timely provided this information to the Court.

In September and October 2016, the remaining CNBM and BNBM entities filed the following motions: (1) Motion to Dismiss by China New Building Materials Group ("CNBM Group"), China New Building Materials Co. ("CNBM"), CNBMIT Co. Ltd. ("CNBMIT"), CNBM USA Corp. ("CNBM USA"), and United Suntech Craft, Inc. ("United Suntech")

(collectively, the "CNBM Entities") (R. Doc. 19527); (2) Motion to Dismiss by Beijing New Building Materials Public Limited Company ("BNBM") (R. Doc. 19646); (3) Motion to Dismiss by Beijing New Building Material Group ("BNBMG") (R. Doc. 19664); and (4) Motion to Dismiss the State of Louisiana's Second Amended and Restated Petition by BNBM and BNBM Group (collectively, the "BNBM Entities") (R. Doc. 19663). The parties submitted substantial briefing and evidence related to the jurisdiction issue. On February 25, 2016, over six years since the creation of MDL 2047, and years of personal jurisdiction discovery on Taishan and its parent entities, the Court presided over a hearing on these motions. On April 21, 2017, the Court issued its Order and Reasons holding that Taishan is an agent of BNBM, such that Taishan's jurisdictional contacts can be imputed to BNBM under Louisiana, Virginia, and Florida law. Further, the Court determined that under Louisiana law, Taishan, BNBM, BNBM Group, and CNBM formed a single business enterprise, such that Taishan's jurisdictional contacts can be imputed to those other entities. R. Doc. 20739.

Additionally, in January 2017, the CNBM Entities filed a Motion to Decertify the Class Pursuant to Rule 23(c)(1)(C). R. Doc. 20627. BNBM, BNBM Group, and Taishan joined the Motion. R. Docs. 20631, 20632. After ruling on the jurisdictional issues, the Court denied the decertification motions on April 21, 2017. The instant motions followed on May 22, 2017.

## II.    PRESENT MOTIONS AND SUMMARY OF THE PARTIES' POSITIONS

CNBM Co., BNBM Group, and BNBM PLC ("CNBM and BNBM Entities" ) have filed three motions seeking orders from this Court certifying appeals pursuant to 28 U.S.C. §1292(b). First, the CNBM and BNBM Entities argue the Court should certify an appeal from its April 21, 2017 Order and Reasons regarding personal jurisdiction in this case. The Court previously granted this motion.

Second, Defendants seek appeal the Court's Order denying the Motion to Decertify. In their motion the CNBM and BNBM Entities argue that class certification is a controlling question of law pursuant to 28 U.S.C. § 1292(b). Defendants further argue that a substantial ground for difference of opinion exists as to whether class certification is warranted in this case, and that an interlocutory appeal would materially advance the MDL by ensuring that judicial and party resources are not wasted on a meaningless trial.

Plaintiffs oppose the motion, and argue that Defendants are yet again seeking to delay the proceedings. Further, Plaintiffs urge that Defendants are attempting to circumvent the deadline for filing an appeal of this Court's original class certification decision, which has long since expired. Plaintiffs argue that the extraordinary remedy of a § 1292(b) is limited to purely legal questions, and the Court's decision to deny the Defendant's motion involves questions of both law and fact. Thus, Plaintiffs contend the Defendant's request for appeal should be denied.

Finally, the CNBM and BNBM Entities seek an order certifying a §1292(b) appeal of this Court's Findings of Fact and Conclusions of Law as to the June 9, 2015 damages hearing. They contend that this appeal presents a controlling question of law, and an immediate appeal would materially advance the litigation. Defendants also argue that the Court's decision regarding damage calculations, namely, to use a formula to calculate the damages to individual properties, presents a legal question which is subject to substantial dispute.

In opposition, Plaintiffs argue that the Court's conclusions were correct and that no substantial ground for difference of opinion exists on the question of the standard of law in the Fifth Circuit. Thus, they contend the Defendants' motion should be denied.

## III.     LAW AND ANALYSIS

### A.     Standard of Review

This Court has the discretion to certify its decisions for interlocutory appeal under 28 U.S.C. § 1292(b). *See Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 47 (1995) ("Congress thus chose to confer on district courts first line discretion to allow interlocutory appeals."). Pursuant to Section 1292(b), this Court may certify an order for appeal where: (1) the order involves a controlling question of law; (2) a substantial ground for difference of opinion concerning the ruling exists; and (3) an immediate appeal would materially advance the litigation. 28 U.S.C. § 1292(b).

### i.     Motion to Decertify

Interlocutory appeals under 1292(b) are appropriate only in "exceptional cases," *Garner,* 749 F.2d at 286; *accord Clark–Dietz & Assocs.-Eng'rs., Inc. v. Basic Constr. Co.,* 702 F.2d 67, 69 (5th Cir.1983), and "permission to appeal [under § 1292(b) ] is granted sparingly, not automatically," *Ala. Labor Council v. Alabama,* 453 F.2d 922, 924 (5th Cir.1972). The decision regarding whether to certify an order for interlocutory appeal under Section 1292(b) rests within the discretion of the district court. *Swint v. Chambers County Comm'n,* 514 U.S. 35, 47 (1995) ("Congress . . . chose to confer on district courts first line discretion to allow interlocutory appeals."); 16 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3929 (2d ed. 1987) ("The initial determination that appeal is desirable is confided to the discretion of the district judge").

The Court finds that Defendants have not demonstrated that the Court's ruling on class certification raises a question for which there is a substantial grounds for a difference of opinion, such that the extraordinary relief of an appeal under 1292 is justified. The mere fact that "settled

law might be applied differently" is insufficient to show that there is a substantial ground for difference of opinion. *Couch*, 611 F.3d at 633. In this case, the Court is confident in its careful and detailed consideration of the predominance and superiority elements of this particular class. As it indicated in its original order, the class claimants seek to recover for property damages caused by Chinese Drywall. "This is a matter of weighing, not counting, issues." *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico*, on Apr. 20, 2010, 910 F. Supp. 2d 891, 912 (E.D. La. 2012), *aff'd sub nom. In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014).

Further, in light of the complex nature of this case and extensive history of the litigation, a class action is the superior mechanism for resolving these claims. An appeal would not materially advance the ultimate termination of the litigation. Thus, the Court denies Defendants' request to appeal pursuant to 28 U.S.C. §1292(b).

## ii. Findings of Fact and Conclusions of Law

Likewise, the Court finds that Defendants have failed to demonstrate they are entitled to an interlocutory appeal of the Court's Findings of Fact and Conclusions of Law as to the June 9, 2015 damages hearing. While Defendants argue there is a substantial ground for a difference of opinion on a controlling question of law, the Court disagrees. "The threshold for establishing the 'substantial ground for difference of opinion' with respect to a 'controlling question of law' required for certification pursuant to § 1292(b) is a high one." *Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Group,* 233 F.Supp.2d 16, 19 (D.D.C.2002). "An interlocutory appeal assuredly does not lie simply to determine the correctness of a judgment." *Clark–Dietz,* 702 F.2d at 68. Thus, the mere fact that a party disagrees with the district court's ruling is insufficient to establish that there is a substantial ground for a difference of opinion. *E.g., United States ex rel. Branch Consultants, LLC v. Allstate Ins. Co.,* 668 F.Supp.2d 780, 813–14 (E.D.La.2009); *Bush*

*v. Adams,* 629 F.Supp.2d 468, 475 (E.D. Pa. 2009); *First Am. Corp. v. Al–Nahyan,* 948 F.Supp. 1107, 1116 (D.D.C. 1996).

Instead, a substantial ground for difference of opinion exists if there is a "genuine doubt as to the correct legal standard" to be applied. *Kapossy v. McGraw–Hill, Inc.,* 942 F.Supp. 996, 1001 (D.N.J.1996); *accord Sims v. Sunnyside Land, LLC,* 425 B.R. 284, 295 (W.D.La.2010); *Consub Del. LLc v. Schahin Engenharai Limitada,* 476 F.Supp.2d 305, 309 (S.D.N.Y.2007). Such a circumstance can arise if "the circuits are in dispute on the question and the Court of Appeals of the circuit [encompassing the district court] has not spoken on the point ... or if novel and difficult questions of first impression are presented." *Ryan v. Flowserve* Corp., 444 F.Supp.2d 718, 723–24 (N.D. Tex. 2006). In Tyson Foods, the United States Supreme Court held that statistical evidence may be used to make class-wide determinations depending on the purpose for which the evidence is being introduced and on the elements of the underlying cause of action. *Tyson Foods, Inc. v. Bouaphekeo*, 136 S. Ct. 1036, 1046 (2016) (*citing Erica P. John Fund, Inc. v. Haliburton Co.*, 563 U.S. 804, 809 (2011). Thus, not only does Tyson Foods prove the correct legal standard for determining class damages in this case, it also provides a far superior method for resolving these claims than individual adjudications. As such, the Court finds that Defendants have not demonstrated this issue meets the requirements for an appeal under §1292(b).

## IV.    CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that the following motions are **DENIED**: (1) Motion Pursuant to 28 U.S.C. § 1292(b) to Certify Immediate Appeals from the Court's Order Denying [Defendant's] Motions to Decertify the Class, R. Doc. 20780 and (2) Motion Pursuant to 28 U.S.C. § 1292(b)

14

Case 2:09-md-02047-EEF-MBN Document 20951 Filed 08/22/17 Page 15 of 16

to Certify Interlocutory Appeal from the Court's Findings of Fact and Conclusions of Law Related to the June 9, 2015 Damages Hearing, R. Doc. 20781.

New Orleans, Louisiana, this 18th day of August, 2017.

**ELDON E. FALLON**
United States District Judge

# EXHIBIT

# "B"

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE: CHINESE-MANUFACTURED DRYWALL          CIVIL ACTION
PRODUCTS LIABILITY LITIGATION

NO. 09-02047

SECTION "L" (5)

**ORDER & REASONS**

Before this Court is Taishan Gypsum Co., Ltd. and Tai'an Taishan Plasterboard Co.,

Ltd.'s ("Taishan") Motion to Exclude the Plaintiffs' Class Spreadsheet (the "Spreadsheet") (Rec.

Doc. 19191).[1]  Having read the parties' briefs and reviewed the applicable law, the Court now

issues this Order & Reasons.

Plaintiffs' Class Spreadsheet is a spreadsheet that was introduced and admitted into

evidence as Exhibit 79 at the June 9, 2015 Hearing on Class Damages.  *See* Class Damages Hr'g

Tr. 86:16-87:5, June 9, 2015.  The spreadsheet, which was prepared by Brown Greer, shows the

individual remediation damages estimate for 2,686 properties.

Taishan argues that the Spreadsheet should be excluded because it contains errors

regarding ownership status, product identification, prior remediation status, and duplicate entries.

Taishan contends that, given these errors, the Spreadsheet should not form the basis for any

damages calculations.  Plaintiffs argue that the Court, as fact-finder, may properly consider

Exhibit 79 and determine the weight it should be given.  Plaintiffs argue further that each of the

alleged issues raised by the Defendants are administrative in nature and can be resolved through

routine claims processing. (Rec. Doc. 19254).  Notably, Counsel for the Defendants objected on

---

[1] Defendants BNBM PLC and BNBM Group joined in this Motion (Rec. Doc. 19193).

the record to the introduction of the Spreadsheet as proof of Taishan drywall. June 9 Hearing Tr. 87:1-4. Court overruled Defendants' objection as it went to the "validity of the accuracy" of the list and not its admissibility. *See id.* at 87:5-7.

"Evaluating the admissibility of evidence is a matter within the sound discretion of the district court." *United States v. Dixon*, 132 F.3d 192, 196-97 (5th Cir. 1997) (quoting *United States v. Sparks,* 2 F.3d 574, 582 (5th Cir.1993). Assuming *arguendo* that there are "serious errors and deficiencies" in the Spreadsheet, it is nonetheless admissible into evidence. The Plaintiffs correctly assert that Defendants' arguments relate to the weight of the Spreadsheet as evidence and not its admissibility. Challenges to the factual bases or underpinnings of an expert opinion go to the weight and credibility of evidence, not its admissibility. *In re Katrina Canal Breaches Consol. Litig.*, No. CA 10-866, 2012 WL 4328354, at *1 (E.D. La. Sept. 20, 2012) (citing *Moss v. Ole South Real Estate, Inc.,* 993 F.2d 1300, 1307 (5th Cri.1991); *Matador Drilling Co. v. Post,* 662 F.2d 1190, 1199 (5th Cir.1981)); *see also Viterbo v. Dow Chem. Co.,* 826 F.2d 420, 422 (5th Cir.1987) ("[Q]uestions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the [trier of fact's consideration.").

Moreover, the Court will not be misled by any inaccuracies in the Spreadsheet when it issues its upcoming Finding of Facts and Conclusions of Law regarding the Damages Hearing. *See Whitehouse Hotel Ltd. P'ship v. C.I.R.,* 615 F.3d 321, 330 (5th Cir.2010) ("[T]he importance of the trial court's gatekeeper role is significantly diminished in bench trials ... because, there being no jury, there is no risk of tainting the trial by exposing a jury to unreliable evidence.").

Accordingly, **IT IS ORDERED** that the Motion to Exclude Plaintiffs' Class Spreadsheet is **DENIED**.

New Orleans, Louisiana this 3rd  day of August 2015.

UNITED STATES DISTRICT JUDGE