# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | * * * CIVIL ACTION * * MDL NO. 2047 * * SECTION L (5) |
| THIS DOCUMENT RELATES TO: ALL *AMORIN* CASES | * * * |

## ORDER & REASONS

Before the Court is a Notice of Clarification Regarding the Composition of the *Amorin* Class filed by the Plaintiffs' Steering Committee (the "PSC"). R. Doc. 21741. Defendants have filed a Motion to Reject the PSC's Notice of Clarification, R. Doc. 21763, to which the PSC has responded, R. Doc. 21783.

## I. BACKGROUND

From 2004 through 2006, a housing boom in parts of the United States and rebuilding efforts necessitated by Hurricanes Rita and Katrina in the Gulf South led to a shortage of construction materials, including drywall. As a result, drywall manufactured in China was brought into the United States and used to construct and refurbish homes in coastal areas of the country, notably the Gulf and East Coasts. Sometime after the Chinese drywall was installed, homeowners began to complain of foul-smelling odors, the corrosion and blackening of metal wiring, surfaces, and objects, and the breaking down of appliances and electrical devices in their homes. *See In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 894 F. Supp. 2d 819, 829–30 (E.D. La. 2012), *aff'd*, 742 F.3d 576 (5th Cir. 2014). Many of these homeowners also began to complain of various physical afflictions believed to have been caused by the Chinese drywall.

These homeowners then began to file suit in various state and federal courts against homebuilders, developers, installers, realtors, brokers, suppliers, importers, exporters, distributors, and manufacturers who were involved with the Chinese drywall. Because of the commonality of facts in the various cases, this litigation was designated as a multidistrict litigation. Pursuant to a Transfer Order from the United States Judicial Panel on Multidistrict Litigation on June 15, 2009, all federal cases involving Chinese drywall were consolidated for pretrial proceedings in MDL 09-2047 before this Court.

The Chinese drywall at issue was largely manufactured by two groups of defendants: (1) the Knauf Entities and (2) the Taishan Entities. The litigation has focused on these two entities and their downstream associates and has proceeded on strikingly different tracks for the claims against each group.[1] Relevant to this Order are the Chinese Defendants. These Defendants include the principal Chinese-based Defendant, Taishan, namely, Taishan Gypsum Co. Ltd. ("TG") and its wholly-owned subsidiary, Taian Taishan Plasterboard Co., Ltd. ("TTP") (collectively "Taishan" or "Taishan Entities"). Other Chinese-based Defendants include China New Building Materials Group ("CNBM Group"), China New Building Materials Co. ("CNBM"), CNBMIT Co. Ltd. ("CNBMIT"), CNBM USA Corp. ("CNBM USA"), and United Suntech Craft, Inc. ("United Suntech") (collectively the "CNBM Entities"), as well as the Beijing New Building Materials

---

[1] The Knauf Entities are German-based, international manufacturers of building products, including drywall, whose Chinese subsidiary, Knauf Plasterboard (Tianjin) Co., Ltd. ("KPT"), advertised and sold its Chinese drywall in the United States. On December 20, 2011, the Knauf Entities and the PSC entered into a global, class Settlement Agreement ("Knauf Settlement Agreement"), which was designed to resolve all Knauf-related, Chinese drywall claims. In addition to the Knauf Settlement Agreement and after a jury trial in a bellwether case, numerous defendants in the chain-of-commerce with the Knauf Entities have entered into class settlement agreements, the effect of which settles almost all of the Knauf Entities' chain-of-commerce litigation. The total amount of the Knauf Settlement is approximately $1.1 billion. Although the Court occasionally had to deal with settlement administration and enforcement issues, with the assistance of Special Master Dan Balhoff, the Knauf portion of this litigation is now resolved.

Public Limited Company ("BNBM") and Beijing New Building Material Group ("BNBMG") (collectively the "BNBM Entities").

The Court's initial inquiry regarding Taishan involved four cases in this MDL: (1) *Germano v. Taishan Gypsum Co.* (Case No. 09-6687); (2) *The Mitchell Co. v. Knauf Gips KG* (Case No. 09-4115); (3) *Gross v. Knauf Gips KG* (Case No. 09-6690); and (4) *Wiltz v. Beijing New Building Materials Public Ltd.* (Case No. 10-361).

The first issues involving Taishan arose when Taishan failed to timely answer or otherwise enter an appearance in *Mitchell* and *Germano*, despite the fact that it had been properly served in each case. Thus, after an extended period of time, the Court entered preliminary defaults against Taishan in both cases. Thereafter, the Court moved forward with an evidentiary hearing in furtherance of the preliminary default in *Germano* on Plaintiffs' claimed damages. At the hearing, the PSC presented evidence specific to seven individual properties, which served as bellwether cases. Thereafter, on February 19 and 20, 2010, the Court issued detailed Findings of Fact and Conclusions of Law. On May 11, 2010, the Court issued a Default Judgment against Taishan in *Germano* and in favor of Plaintiffs.

On June 10, 2010, the last day to timely appeal the Default Judgment against them, Taishan filed a Notice of Appeal in *Germano* and entered its appearance in *Germano* and *Mitchell*. After Taishan entered its appearance in the MDL, it quickly sought to have the Default Judgment in *Germano* and the Preliminary Default in *Mitchell* vacated for lack of personal jurisdiction. Because this was the first time Defendants raised jurisdictional issues, the Fifth Circuit remanded the case to this Court to determine whether this Court indeed has jurisdiction over Taishan.

In the fall of 2010, the Court directed the parties to commence the personal jurisdiction discovery necessary to resolve Taishan's motions to vacate. Sometime after the initial discovery,

3

the parties agreed to expand the discovery beyond the *Germano* and *Mitchell* cases to other cases in which Taishan had been served, including *Gross* and *Wiltz*.

Formal personal jurisdiction discovery of Taishan began in October 2010. Discovery included the production of both written and electronic documents as well as depositions of Taishan's corporate representatives, with each type of discovery proceeding in a parallel fashion. This discovery was highly contentious, requiring close supervision by the Court. The Court presided over regularly-scheduled status conferences, conducted hearings, and issued rulings to resolve numerous discovery-related disputes.

In June 2011, the PSC filed identical complaints in Federal district courts in Florida, Virginia, and Louisiana (the "*Amorin* complaints"). The *Amorin* complaints include all Plaintiffs named in the *Wiltz*, *Gross*, *Abel*, and *Haya* actions. The Florida and Virginia actions were transferred by the JPML to the MDL; the PSC filed the Louisiana omnibus complaint directly into the MDL. It is undisputed that the allegations and Plaintiffs named in the *Amoin* complaints are identical. According to the PSC, these identical complaints were filed "out of an abundance of caution," because "there existed a colorable question regarding the application of the jurisdictional tests known as the 'stream-of commerce' test and the 'stream-of-commerce-plus' test reflected in the plurality opinions in *McIntyre* and *Asahi*, as well as Justice Brennan's concurring opinion in *Asahi*."

In April 2012, Taishan filed various motions, including motions to dismiss for lack of personal jurisdiction. On June 29, 2012, over three years since the creation of this MDL and after a year-and-a-half of personal jurisdiction discovery on Taishan, the Court presided over a hearing on Taishan's motions. The Court coordinated its hearing with the Honorable Joseph Farina of the

Florida state court, who had a similar motion involving Taishan's challenge to personal jurisdiction.

On September 4, 2012, this Court issued a 142-page Order regarding Taishan's motions in *Germano*, *Mitchell*, *Gross*, and *Wiltz*, in which the Court denied the motions to dismiss and held that it maintained personal jurisdiction over Taishan. *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 894 F. Supp. 2d 819 (E.D. La. 2012). The Court also ruled that Taishan was operating as the alter ego of TG and TTP. The Court certified an interlocutory appeal, and the Fifth Circuit granted permission to appeal. In January and May of 2014, two different panels of the Fifth Circuit affirmed this Court's ruling and held that this Court maintained personal jurisdiction over Taishan, TG, and TTP. *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 753 F.3d 521 (5th Cir. 2014); *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 742 F.3d 576 (5th Cir. 2014). The time for writ of certiorari passed, and the issue of personal jurisdiction over Taishan became firmly and finally settled. Nevertheless, Taishan refused to voluntarily participate in this suit.

On June 20, 2014, the Court ordered Taishan to appear in open court on July 17, 2014 to be examined as a judgment debtor. Taishan failed to appear for the July 17, 2014 Judgment Debtor Examination, and the Court held Taishan in contempt, ordering that Taishan pay $15,000.00 in attorneys' fees to Plaintiffs' counsel and $40,000.00 as a penalty for contempt; Taishan and any of its affiliates or subsidiaries be enjoined from conducting any business in the United States until or unless it participates in this judicial process; and if Taishan violates the injunction, it must pay a further penalty of twenty-five percent of the profits earned by the Company or its affiliate who violate the Order for the year of the violation.

On July 23, 2014, the PSC filed their Omnibus Motion for Class Certification pursuant to Rule 23(b)(3). Taishan did not appear and, on September 26, 2014, this Court certified a class of all

5

owners of real properties in the United States, who are named Plaintiffs on the complaints in *Amorin*, *Germano*, *Gross*, and/or *Wiltz* (*i.e.*, not an absent class member), asserting claims for remediated damages arising from, or otherwise related to Chinese Drywall manufactured, sold, distributed, supplied, marketed, inspected, imported or delivered by the Taishan Defendants. R. Doc. 18028.

Taishan finally entered an appearance with the Court in February 2015, and, to satisfy the contempt, Taishan paid both the sum of $15,000.00 in attorneys' fees to Plaintiffs' counsel and the contempt penalty of $40,000.00 in March 2015. On March 17, 2015, the Court ordered Taishan and the BNBM and CNBM Entities to participate in expedited discovery related to "the relationship between Taishan and BNBM/CNBM, including whether affiliate and/or alter ego status exists."

On March 10, 2016, this Court granted CNBM Group's motion to dismiss, finding it was an "agent or instrumentality of a foreign state" within the meaning of the Foreign Sovereign Immunities Act ("FSIA"), and therefore outside the jurisdiction of this Court under 28 U.S.C. § 1603(b). R. Doc. 20150. The Court determined the tortious activity exception did not apply because the alleged tortious conduct did not occur within the United States under 28 U.S.C. § 1605(a)(5). Further, the Court found the commercial activity exception did not apply, as CNBM Group did not directly manufacture, inspect, sell, or market drywall in the United States. Because the PSC failed to present evidence sufficient to overcome the presumption that CNBM Group was entitled to independent status for purposes of the FSIA, the Court granted the motion and dismissed CNBM Group from the present litigation.

After concluding it lacked personal jurisdiction over CNBM Group, on April 21, 2017, the Court issued a 100-page opinion related to jurisdictional challenges being raised with respect to CNBM, BNBM Group, and BNBM. The Court found Taishan was an agent of BNBM under Florida and Virginia law, such that Taishan's contacts in Florida and Virginia are imputed to

BNBM. This Court further found that CNBM, BNBM Group, and BNBM were part of a single business enterprise with Taishan under Louisiana law, such that Taishan's contacts in Louisiana may be imputed to them, and that the Court has jurisdiction over CNBM, BNBM Group, and BNBM in relation to Plaintiffs' claims based on Louisiana law. Also on April 21, 2017, the Court issued its Findings of Fact and Conclusions of Law related to the June 9, 2015 damages hearing and adopted the PSC's damage calculations methodology related to remediation of properties.

On May 22, 2017, Defendants filed a motion pursuant to 28 U.S.C. § 1292(b) to certify an interlocutory appeal from this Court's April 21, 2017 jurisdiction order. Because the Court found the April 21, 2017 Order & Reasons involved a controlling question of law as to which there was substantial ground for difference of opinion, and because the Court further found that an interlocutory appeal might materially advance the ultimate termination of this MDL, on August 4, 2017, the Court certified an interlocutory appeal to the Fifth Circuit pursuant to 28 U.S.C. § 1292(b).

On August 1, 2017, Defendants filed a motion to dismiss for lack of personal jurisdiction following the recent U.S. Supreme Court case of *Bristol-Myers Squibb v. Superior Court of California* ("*Bristol-Myers*"), 137 S. Ct. 1773 (2017). Based on *Bristol-Myers*, Defendants contested this Court's findings of personal jurisdiction, class certification, and agency relationship. On August 14, 2017, Defendants filed a petition for permission to appeal pursuant to 28 U.S.C. § 1292(b) in the Fifth Circuit, in which they argued *Bristol-Myers* impacted questions raised on appeal. On August 24, 2017, this Court vacated its 28 U.S.C. § 1292(b) certification order to avoid piecemeal litigations, noting its duty to address the effect of *Bristol–Myers* on the jurisdictional issue before certifying the matter to the Fifth Circuit. Subsequently, on November 30, 2017, the

Court denied Defendants' motion to dismiss, holding *Bristol-Myers* did not change this Court's jurisdictional findings and class certification.

On January 2, 2018, the Court denied Defendants CNBM, BNBM Group, and BNBM's motion to vacate the default judgments against them. On March 5, 2018, the Court reinstated its order to certifying the interlocutory appeal of its April 21, 2017 order. The Court nevertheless denied Defendants' request to certify the interlocutory appeal of its opinion involving *Bristol–Myers*' impact on the Court's personal jurisdiction analysis, as the Supreme Court's opinion in *Bristol–Myers* does not address class actions and because two separate panels of the Fifth Circuit had already affirmed the Court's original personal jurisdiction analysis with respect to Taishan in 2014. This issue remains with the Fifth Circuit.

On August 28, 2018, the PSC filed a "Notice of Clarification Regarding the Composition of the *Amorin* Class." R. Doc. 21741. On September 6, 2018, the CNBM and BNBM Entities filed a motion to reject the PSC's clarification, arguing that, although the PSC styled its memorandum as a "notice," it was in actuality a proposed modification to the class definition. R. Doc. 21763. The PSC filed its response on September 18, 2018. R. Doc. 21783.

## II. THE PRESENT MOTION

The issue before the Court is whether the *Amoin* Class includes both current and former owners of homes affected by Chinese drywall. Although the Court initially certified the class in 2014, the issue was raised for the first time with the Court during a motion hearing held on August 15, 2018. R. Doc. 21709. During this hearing, at which the Court heard oral argument on the parties' proposed trial plans, counsel for Defendants distinguished between remediation and non-remediation damages, explaining:

> Non-remediation damages covers other categories of damages that could still be considered property damage, but—and are not "personal injury damages." It includes personal injuries, alternative living expenses, loss of use and enjoyment, appliances, foreclosure, bankruptcy, short sale. There's a whole laundry list.
>
> The distinction between remediation and non-remediation is important because this Court certified a class for remediation damages only, and this Court has also identified a formula that can be used for current owners only for remediation damages only. And I will get into why even that isn't quite as simple as it sounds.
>
> But at this point, your Honor, the current owner remediation damages is actually a very small aspect of this case now, because in the original claimants and plaintiffs that came to the court, many have sold the properties so they're former owners now, and many have already remediated their properties and so they're outside of the class. The majority of this case, of the claimants in this case, your Honor, at this point are outside of the class.

*Id.* at 9:8–25. After hearing from Defense counsel, the Court addressed the issue with counsel for Plaintiffs:

> THE COURT: Let me ask you one question. The class they say include—does not include all owners, it just includes the present owners.
> MR. LEVIN: It just included current owners at the time, yes. But you can take your findings and apply them to everybody else.

*Id.* 32:3–8. Following this exchange, the Court did not discuss the issue further at the hearing.

Thereafter, on August 28, 2018, the PSC filed a "Notice of Clarification Regarding the Composition of the *Amorin* Class." R. Doc. 21741. In its notice, the PSC clarifies that the *Amorin* Class includes both present and former homeowners whose homes were adversely affected by Chinese Drywall manufactured, sold, distributed, supplied, marketed, inspected, imported or delivered by the Taishan Defendants. In support of its clarification, the PSC points to the Class Notice and Supplemental Class Notice, which state that the *Amorin* Class "includes *all current and former owners* of properties in the United States containing drywall manufactured by [the Taishan] defendants …." R. Doc. 18028-1 at n.2 (emphasis added); R. Doc. 18086-18 at n.2 (emphasis added).

9

On September 6, 2018, the CNBM and BNBM Entities filed a motion to reject the PSC's clarification. R. Doc. 21763. They argue the phrase "all owners" limits the class definition to only those who currently own their homes. According to Defendants, any person who was a class member but subsequently sold her home or lost the home to foreclosure or bankruptcy is no longer a member of the *Amorin* class. In support for their position, Defendants argue the Court certified the class for present owners only, and only with respect to remediation damages. Thus, according to Defendants, the PSC's notice is an attempt to amend the class definition, which requires the Court to undergo a separate analysis to expand the class definition under Rule 23.

The PSC filed its response on September 18, 2018. R. Doc. 21783. They argue Defendants' position with respect to who is included in the class definition is inequitable, as it would reward Defendants for their dilatory tactics in this litigation. The PSC further contends that, under Louisiana law, a former owner of real property maintains the right to sue a tortfeasor for damages, even after the owner sells the property in question. R. Doc. 21783 at 2 (citing *Eagle Pipe & Supply, Inc. v. Amerada Hess Corp.*, 79 So. 3d 246, 256 (La. 2011)).

## III. DISCUSSION

The Court must first determine whether the PSC's filing is, in fact, a clarification of the class' definition, or if the Court should construe it as a motion to amend the class definition, as Defendants contend. When called upon to determine the scope of an already certified class, "the district court construes the language of the class definition in much the same way that a court might construe the language of a contract or a statute." *In re Cement and Concrete Antitrust Litig.*, 817 F.2d 1435, 1443 (9th Cir. 1987), *rev'd on other grounds by California v. ARC Am. Corp.*, 490 U.S. 93 (1989).

The language at issue in this case is:

> [A]ll owners of real properties in the United States, who are named Plaintiffs on the complaints in *Amorin*, *Germano*, *Gross*, and/or *Wilz* (*i.e.,* not an absent class member), asserting claims for remediated damages arising from, or otherwise related to Chinese Drywall manufactured, sold, distributed, supplied, marketed, inspected, imported or delivered by the Taishan Defendants.

A plain reading of this language includes any homeowner named in the *Amorin*, *Germano*, *Gross*, and/or *Wilz* complaints whose home was damaged by Chinese Drywall manufactured, sold, distributed, supplied, marketed, inspected, imported or delivered by the Taishan Defendants—having sold or otherwise lost possession of the home does not change the fact that the person's home was damaged by Chinese Drywall.

The Class Notice and Supplemental Class Notice, which state that the *Amorin* Class "includes *all current and former owners*" make this point clear. R. Doc. 18028-1 at n.2 (emphasis added); R. Doc. 18086-18 at n.2 (emphasis added). *See cf. Carlough v. Amchem Prods., Inc.*, 158 F.R.D. 314, 334 (E.D. Pa. 1993) ("The objectors are incorrect in asserting, however, that the additional information included in the notice, identifying specific asbestos-containing products, further describing what constitutes "occupational exposure," and listing relevant occupations, is inconsistent with the definition of the class as preliminarily certified."). Thus, although a district court possesses "broad authority to redefine the class 'as appropriate in response to the progression of the case,'" a modification of the class definition is not necessary in this case. *See, e.g.*, *Montelongo v. Meese*, 803 F.2d 1341, 1352 (5th Cir. 1986) (quoting *Richardson v. Byrd*, 709 F.2d 1016, 1019 (5th Cir. 1983)).

Defendants apparently take the position that, if over the course of nine years any of the Plaintiffs named in the *Amorin* complaints no longer own their homes, they should be excluded from the class, notwithstanding the fact that their homes were allegedly damaged by Taishan's Drywall. Under Defendants' definition, the composition of the class would be ever-changing, and given the

glacial speed with which this case has progressed, by the time the case is resolved, there will be very few class members left, if any. Such a construction is untenable and leads to an absurd result. *See Waggoner v. Gonzales*, 488 F.3d 632, 638 (5th Cir. 2007) ("[T]he common mandate of statutory construction [is] to avoid absurd results.").

With their motion, Defendants effectively seek to significantly narrow the scope of the *Amorin* class. Defendants had the opportunity to participate in sculpting the class definition in 2014, an opportunity they declined. Moreover, Defendants were put on notice that the definition included both present and former homeowners in 2014 when the Court issued its legal notice and amended legal notice to the class, to which Defendants failed to object. R. Doc. 18214. The Court will not amend the class definition to exclude those who have lost their homes at this late date.

## IV. CONCLUSION

For the foregoing reasons, the Court **ACCEPTS** the Plaintiffs' Steering Committee's notice clarifying the composition of the *Amorin* class. R. Doc. 21741. As a result, the CNBM and BNBM entities' motion to reject the Plaintiff's Steering Committee's notice is **DENIED**. R. Doc. 21763.

New Orleans, Louisiana on this 11th day of October, 2018.

Eldon E. Fallon
United States District Judge