UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: CHINESE-MANUFACTURED DRYWALL  \*
PRODUCTS LIABILITY LITIGATION  \*
\*  CIVIL ACTION
\*
\*  MDL NO. 2047
\*
\*  SECTION L (5)
THIS DOCUMENT RELATES TO:  \*
   No. 11-3094  \*
\*

## ORDER & REASONS

Before the Court is a Motion to Strike filed by the Plaintiffs' Steering Committee (the "PSC"). R. Doc. 21820. Defendants filed their opposition on October 16, 2018, R. Doc. 21853, and the PSC filed its reply in support of its motion to strike on October 24, 2018, R. Doc. 21879. Having considered the record, the parties' arguments, and the applicable law, the Court is ready to rule.

### I. BACKGROUND

From 2004 through 2006, a housing boom in parts of the United States and rebuilding efforts necessitated by Hurricanes Rita and Katrina in the Gulf South led to a shortage of construction materials, including drywall. As a result, drywall manufactured in China was brought into the United States and used to construct and refurbish homes in coastal areas of the country, notably the Gulf and East Coasts. Sometime after the Chinese drywall was installed, homeowners began to complain of foul-smelling odors, the corrosion and blackening of metal wiring, surfaces, and objects, and the breaking down of appliances and electrical devices in their homes. *See In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 894 F. Supp. 2d 819, 829–30 (E.D. La. 2012), *aff'd*, 742 F.3d 576 (5th Cir. 2014). Many of these homeowners also began to complain of various physical afflictions believed to have been caused by the Chinese drywall.

These homeowners then began to file suit in various state and federal courts against homebuilders, developers, installers, realtors, brokers, suppliers, importers, exporters, distributors, and manufacturers who were involved with the Chinese drywall. Because of the commonality of facts in the various cases, this litigation was designated as a multidistrict litigation. Pursuant to a Transfer Order from the United States Judicial Panel on Multidistrict Litigation on June 15, 2009, all federal cases involving Chinese drywall were consolidated for pretrial proceedings in MDL 09-2047 before this Court.

The Chinese drywall at issue was largely manufactured by two groups of defendants: (1) the Knauf Entities and (2) the Taishan Entities. The litigation has focused on these two entities and their downstream associates and has proceeded on strikingly different tracks for the claims against each group.[1] Relevant to this Order are the Chinese Defendants. These Defendants include the principal Chinese-based Defendant, Taishan, namely, Taishan Gypsum Co. Ltd. ("TG") and its wholly-owned subsidiary, Taian Taishan Plasterboard Co., Ltd. ("TTP") (collectively "Taishan" or "Taishan Entities"). Other Chinese-based Defendants include China New Building Materials Group ("CNBM Group"), China New Building Materials Co. ("CNBM"), CNBMIT Co. Ltd. ("CNBMIT"), CNBM USA Corp. ("CNBM USA"), and United Suntech Craft, Inc. ("United Suntech") (collectively the "CNBM Entities"), as well as the Beijing New Building Materials

---

[1] The Knauf Entities are German-based, international manufacturers of building products, including drywall, whose Chinese subsidiary, Knauf Plasterboard (Tianjin) Co., Ltd. ("KPT"), advertised and sold its Chinese drywall in the United States. On December 20, 2011, the Knauf Entities and the PSC entered into a global, class Settlement Agreement ("Knauf Settlement Agreement"), which was designed to resolve all Knauf-related, Chinese drywall claims. In addition to the Knauf Settlement Agreement and after a jury trial in a bellwether case, numerous defendants in the chain-of-commerce with the Knauf Entities have entered into class settlement agreements, the effect of which settles almost all the Knauf Entities' chain-of-commerce litigation. The total amount of the Knauf Settlement is approximately $1.1 billion. Although the Court occasionally had to deal with settlement administration and enforcement issues, with the assistance of Special Master Dan Balhoff, the Knauf portion of this litigation is now resolved.

Public Limited Company ("BNBM") and Beijing New Building Material Group ("BNBMG") (collectively the "BNBM Entities").

The Court's initial inquiry regarding Taishan involved four cases in this MDL: (1) *Germano v. Taishan Gypsum Co.* (Case No. 09-6687); (2) *The Mitchell Co. v. Knauf Gips KG* (Case No. 09-4115); (3) *Gross v. Knauf Gips KG* (Case No. 09-6690); and (4) *Wiltz v. Beijing New Building Materials Public Ltd.* (Case No. 10-361).

The first issues involving Taishan arose when Taishan failed to timely answer or otherwise enter an appearance in *Mitchell* and *Germano*, despite the fact that it had been properly served in each case. Thus, after an extended period of time, the Court entered preliminary defaults against Taishan in both cases. Thereafter, the Court moved forward with an evidentiary hearing in furtherance of the preliminary default in *Germano* on Plaintiffs' claimed damages. At the hearing, the PSC presented evidence specific to seven individual properties, which served as bellwether cases. Thereafter, on February 19 and 20, 2010, the Court issued detailed Findings of Fact and Conclusions of Law. On May 11, 2010, the Court issued a Default Judgment against Taishan in *Germano* and in favor of Plaintiffs.

On June 10, 2010, the last day to timely appeal the Default Judgment against them, Taishan filed a Notice of Appeal in *Germano* and entered its appearance in *Germano* and *Mitchell*. After Taishan entered its appearance in the MDL, it quickly sought to have the Default Judgment in *Germano* and the Preliminary Default in *Mitchell* vacated for lack of personal jurisdiction. Because this was the first time Defendants raised jurisdictional issues, the Fifth Circuit remanded the case to this Court to determine whether this Court indeed has jurisdiction over Taishan.

In the fall of 2010, the Court directed the parties to commence the personal jurisdiction discovery necessary to resolve Taishan's motions to vacate. Sometime after the initial discovery,

the parties agreed to expand the discovery beyond the *Germano* and *Mitchell* cases to other cases in which Taishan had been served, including *Gross* and *Wiltz*.

Formal personal jurisdiction discovery of Taishan began in October 2010. Discovery included the production of both written and electronic documents as well as depositions of Taishan's corporate representatives, with each type of discovery proceeding in a parallel fashion. This discovery was highly contentious, requiring close supervision by the Court. The Court presided over regularly-scheduled status conferences, conducted hearings, and issued rulings to resolve numerous discovery-related disputes.

In June 2011, the PSC filed identical complaints in Federal district courts in Florida, Virginia, and Louisiana (the "*Amorin* complaints"). The *Amorin* complaints include all Plaintiffs named in the *Wiltz*, *Gross*, *Abel*, and *Haya* actions. The Florida and Virginia actions were transferred by the JPML to the MDL; the PSC filed the Louisiana omnibus complaint directly into the MDL. It is undisputed that the allegations and Plaintiffs named in the *Amoin* complaints are identical. According to the PSC, these identical complaints were filed "out of an abundance of caution," because "there existed a colorable question regarding the application of the jurisdictional tests known as the 'stream-of commerce' test and the 'stream-of-commerce-plus' test reflected in the plurality opinions in *McIntyre* and *Asahi*, as well as Justice Brennan's concurring opinion in *Asahi*."

In April 2012, Taishan filed various motions, including motions to dismiss for lack of personal jurisdiction. On June 29, 2012, over three years since the creation of this MDL and after a year-and-a-half of personal jurisdiction discovery on Taishan, the Court presided over a hearing on Taishan's motions. The Court coordinated its hearing with the Honorable Joseph Farina of the

Florida state court, who had a similar motion involving Taishan's challenge to personal jurisdiction.

On September 4, 2012, this Court issued a 142-page Order regarding Taishan's motions in *Germano*, *Mitchell*, *Gross*, and *Wiltz*, in which the Court denied the motions to dismiss and held that it maintained personal jurisdiction over Taishan. *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 894 F. Supp. 2d 819 (E.D. La. 2012). The Court also ruled that Taishan was operating as the alter ego of TG and TTP. The Court certified an interlocutory appeal, and the Fifth Circuit granted permission to appeal. In January and May of 2014, two different panels of the Fifth Circuit affirmed this Court's ruling and held that this Court maintained personal jurisdiction over Taishan, TG, and TTP. *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 753 F.3d 521 (5th Cir. 2014); *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 742 F.3d 576 (5th Cir. 2014). The time for writ of certiorari passed, and the issue of personal jurisdiction over Taishan became firmly and finally settled. Nevertheless, Taishan refused to voluntarily participate in this suit.

On June 20, 2014, the Court ordered Taishan to appear in open court on July 17, 2014 to be examined as a judgment debtor. Taishan failed to appear for the July 17, 2014 Judgment Debtor Examination, and the Court held Taishan in contempt, ordering that Taishan pay $15,000.00 in attorneys' fees to Plaintiffs' counsel and $40,000.00 as a penalty for contempt; Taishan and any of its affiliates or subsidiaries be enjoined from conducting any business in the United States until or unless it participates in this judicial process; and if Taishan violates the injunction, it must pay a further penalty of twenty-five percent of the profits earned by the Company or its affiliate who violate the Order for the year of the violation.

On July 23, 2014, the PSC filed their Omnibus Motion for Class Certification pursuant to Rule 23(b)(3). Taishan did not appear and, on September 26, 2014, this Court certified a class of all

owners of real properties in the United States, who are named Plaintiffs on the complaints in *Amorin*, *Germano*, *Gross*, and/or *Wiltz* (*i.e.*, not an absent class member), asserting claims for remediated damages arising from, or otherwise related to Chinese Drywall manufactured, sold, distributed, supplied, marketed, inspected, imported or delivered by the Taishan Defendants. R. Doc. 18028.

Taishan finally entered an appearance with the Court in February 2015, and, to satisfy the contempt, Taishan paid both the sum of $15,000.00 in attorneys' fees to Plaintiffs' counsel and the contempt penalty of $40,000.00 in March 2015. On March 17, 2015, the Court ordered Taishan and the BNBM and CNBM Entities to participate in expedited discovery related to "the relationship between Taishan and BNBM/CNBM, including whether affiliate and/or alter ego status exists."

On March 10, 2016, this Court granted CNBM Group's motion to dismiss, finding it was an "agent or instrumentality of a foreign state" within the meaning of the Foreign Sovereign Immunities Act ("FSIA"), and therefore outside the jurisdiction of this Court under 28 U.S.C. § 1603(b). R. Doc. 20150. The Court determined the tortious activity exception did not apply because the alleged tortious conduct did not occur within the United States under 28 U.S.C. § 1605(a)(5). Further, the Court found the commercial activity exception did not apply, as CNBM Group did not directly manufacture, inspect, sell, or market drywall in the United States. Because the PSC failed to present evidence sufficient to overcome the presumption that CNBM Group was entitled to independent status for purposes of the FSIA, the Court granted the motion and dismissed CNBM Group from the present litigation.

After concluding it lacked personal jurisdiction over CNBM Group, on April 21, 2017, the Court issued a 100-page opinion related to jurisdictional challenges being raised with respect to CNBM, BNBM Group, and BNBM. The Court found Taishan was an agent of BNBM under Florida and Virginia law, such that Taishan's contacts in Florida and Virginia are imputed to

BNBM. This Court further found that CNBM, BNBM Group, and BNBM were part of a single business enterprise with Taishan under Louisiana law, such that Taishan's contacts in Louisiana may be imputed to them, and that the Court has jurisdiction over CNBM, BNBM Group, and BNBM in relation to Plaintiffs' claims based on Louisiana law. Also on April 21, 2017, the Court issued its Findings of Fact and Conclusions of Law related to the June 9, 2015 damages hearing and adopted the PSC's damage calculations methodology related to remediation of properties.

On May 22, 2017, Defendants filed a motion pursuant to 28 U.S.C. § 1292(b) to certify an interlocutory appeal from this Court's April 21, 2017 jurisdiction order. Because the Court found the April 21, 2017 Order & Reasons involved a controlling question of law as to which there was substantial ground for difference of opinion, and because the Court further found that an interlocutory appeal might materially advance the ultimate termination of this MDL, on August 4, 2017, the Court certified an interlocutory appeal to the Fifth Circuit pursuant to 28 U.S.C. § 1292(b).

On August 1, 2017, Defendants filed a motion to dismiss for lack of personal jurisdiction following the recent U.S. Supreme Court case of *Bristol-Myers Squibb v. Superior Court of California* ("*Bristol-Myers*"), 137 S. Ct. 1773 (2017). Based on *Bristol-Myers*, Defendants contested this Court's findings of personal jurisdiction, class certification, and agency relationship. On August 14, 2017, Defendants filed a petition for permission to appeal pursuant to 28 U.S.C. § 1292(b) in the Fifth Circuit, in which they argued *Bristol-Myers* impacted questions raised on appeal. On August 24, 2017, this Court vacated its 28 U.S.C. § 1292(b) certification order to avoid piecemeal litigations, noting its duty to address the effect of *Bristol–Myers* on the jurisdictional issue before certifying the matter to the Fifth Circuit. Subsequently, on November 30, 2017, the

Court denied Defendants' motion to dismiss, holding *Bristol-Myers* did not change this Court's jurisdictional findings and class certification.

On January 2, 2018, the Court denied Defendants CNBM, BNBM Group, and BNBM's motion to vacate the default judgments against them. On March 5, 2018, the Court reinstated its order certifying the interlocutory appeal of its April 21, 2017 order. This issue remains with the Fifth Circuit.

## II. PENDING MOTION

The motion presently before the Court involves the *Abner* omnibus complaint filed in the U.S. District Court for the Central District of California on November 18, 2011. No. 11-3094, R. Doc. 1-1. On January 22, 2016, Defendants moved to dismiss the *Abner* complaint. R. Doc. 19998. The PSC filed its opposition on September 11, 2018. R. Doc. 21775. Defendants filed their reply on October 3, 2018. R. Doc. 21814. In their reply, Defendants included the declaration of Professor Donald Clarke, a purported expert on Chinese law. R. Doc. 21814-1. On October 4, 2018, the PSC moved to strike Professor Clarke's declaration. R. Doc. 21820. Defendants filed their opposition on October 16, 2018, R. Doc. 21853, and the PSC filed its reply in support of its motion to strike on October 24, 2018, R. Doc. 21879.

In their motion to strike Professor Clarke's declaration, the PSC argues the declaration should be stricken for three reasons: (1) it is not proper rebuttal testimony, (2) it is untimely, and (3) Plaintiffs will be prejudiced if the Court admits the declaration. R. Doc. 21820-1 at 2. The PSC submits the declaration should have been included in Defendants' original motion, as it does not respond to any expert opinion offered by the PSC and serves only to challenge findings made by this Court. Additionally, the PSC contends Defendants could have, and should have, amended their motion to dismiss following this Court's jurisdictional order issued on April 21, 2017 to include

Professor Clarke's declaration. *Id.* Finally, the PSC argues Plaintiffs will be prejudiced if the Court considers the declaration, as the PSC has not been given the opportunity to refute it. *Id.* at 3.

In opposition, Defendants first argue Professor Clarke's declaration is an appropriate response to the "the new agency theory advanced by the PSC in its response." R. Doc. 21853 at 2. According to Defendants, in their opening brief, they argued Chinese law should apply to the Court's analysis of whether personal jurisdiction could be imputed on the Chinese entities based on an agency-based imputation theory. *Id.* at 5. Thus, although the PSC did not argue Chinese agency law would allow for imputation in its response in opposition to Defendants' motion to dismiss, Defendants provided Professor Clarke's declaration in their reply "to the extent this Court were inclined to entertain an agency-based imputation theory." *Id.*

Alternatively, Defendants point to Federal Rule of Civil Procedure 44.1, which states in pertinent part that "[i]n determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." *Id.* Defendants submit that because the PSC "rel[ied] solely on California agency law" in its opposition, it has therefore, "forfeited any contention that Chinese agency law would allow for imputation, [but] to the extent the Court were to entertain such an agency-based imputation theory, it is empowered to consider Professor Clarke's declaration under Rule 44.1." *Id.*

In reply, the PSC argues "[t]he suggestion that the Defendants could not have anticipated an agency argument being presented in the Plaintiffs' response to their motion to dismiss, even after this Court had already found such an agency relationship to exist, is simply not credible." R. Doc. 21879 at 2. They contend that, to the extent Defendants argue the Court's jurisdictional order did not address the BNBM Defendants' contacts in California under either Chinese or California

9

law, "[t]his *post hoc* rationalization is hardly [a] sufficient justification for avoiding the timely supplementation of their motion after this Court specifically found Taishan is, in fact, an agent of BNBM." *Id.* Ultimately, the PSC argues that, because it did not present new evidence in its opposition to Defendants' motion to dismiss *Abner*, Defendants' attaching Professor Clarke's declaration to their reply is an improper use of rebuttal evidence. *Id.* at 5.

## III. LAW & ANALYSIS

In their opposition to the PSC's motion to strike Professor Clarke's declaration, Defendants first argue the declaration directly addresses an issue raised for the first time in the PSC's opposition to their motion to dismiss and is therefore admissible. Alternatively, Defendants point to Federal Rule of Civil Procedure 44.1. The Court considers each argument in turn.

### a. Whether Professor Clarke's Declaration Addresses an Issue Raised for the First Time in the PSC's Opposition

It is well established that courts "do not review arguments raised for the first time in a reply brief absent a showing of manifest injustice." *Dean v. Chrysler Corp.*, 38 F.3d 568, at *3 (5th Cir. 1994). "Generally, and for obvious reasons, a reply brief is limited to addressing matters presented by appellant's opening brief and by appellee's response brief, and is not the appropriate vehicle for presenting new arguments or legal theories to the court." *AAR, Inc. v. Nunez*, 408 F. App'x 828, 830 (5th Cir. 2011). For this reason, it is "improper for [a party] to introduce expert evidence [in a reply brief] that could otherwise have been raised in its opening brief." *Karlo v. Pittsburgh Glass Works, LLC*, 880 F. Supp. 2d 629, 641 (W.D. Pa. 2012), *class decertified on other grounds*, No. 10-1283, 2014 WL 1317595 (W.D. Pa. Mar. 31, 2014).

A party may, however, attach declarations to a reply brief to respond to arguments raised for the first time in an opposition brief. *KeyBank Nat'l Ass'n v. Perkins Rowe Assocs., LLC*, No. 09-497,

2010 WL 1945715, at *1–2 (M.D. La. May 12, 2010) (denying a motion to strike "supplemental declarations included in plaintiff's reply brief in support of its motion for summary judgment" because they "respond[ed] directly to [defendant's] attack, raised in its opposition to summary judgment"). "Whether to permit or prohibit the introduction of rebuttal evidence is committed to the sound discretion of the trial court." *Jackson v. City of Pittsburgh*, No. 07–111, 2011 WL 3443951, at *15 (W.D. Pa. Aug. 8, 2011) (citing Fed. R. Evid. 611(a); *Bhaya v. Westinghouse Elec. Corp.*, 922 F.2d 184, 190 (3d Cir. 1990) ("[A] trial judge's decision regarding the scope of rebuttal may not be reversed unless there has been a clear abuse of discretion.")). Thus, because Defendants did not address whether Taishan's conduct could be imputed on the BNBM Entities pursuant to an agency relationship in their opening brief, whether the inclusion of Professor Clarke's declaration is procedurally appropriate turns on whether the declaration directly responds to an issue raised for the first time in the PSC's opposition to Defendants' motion to dismiss.

In their motion to dismiss, Defendants argue, "Any veil piercing or alter-ego analysis must be conducted pursuant to Chinese law, which does not permit piercing the veil here." R. Doc. 19998-1 at 24–25 (citing R. Doc. 19631-3 at 51–60 (BNBM Defendants' motion to dismiss *Germano*, *Wiltz*, and *Amorin*)). Defendants also contend "The result is the same under California law, which recognizes the possibility of imputing contacts of a subsidiary to a parent for purposes of personal jurisdiction only when the subsidiary is an alter ago of the parent." *Id.* at 25. Defendants go on to argue that Taishan's purported contacts cannot be imputed to BNBM PLC or BNBM Group, because: (1) Plaintiffs do not adequately plead alter ego and (2) the evidence demonstrates BNBM PLC and BNBM Group are not alter egos of Taishan or of one another. *Id.* at 25–29. Notably, Defendants did not address in their motion whether Taishan's conduct could be imputed on the BNBM Entities pursuant to an agency relationship under either Chinese or California law.

11

After Defendants filed their motion to dismiss the *Abner* complaint, but before the PSC filed its opposition, the Court ruled on Defendants' motion to dismiss other actions pending in this MDL. R. Doc. 20739. In that order, the Court considered whether federal courts in Louisiana, Virginia, and Florida could assert personal jurisdiction over the BNBM Entities. The Court determined Taishan's contacts could not be imputed to the BNBM Entities on an alter ego theory under Florida and Virginia law, *id.* at 54, 64, but that Taishan's contacts could be imputed (1) to both BNBM Entities under Louisiana's "single business enterprise" test and to BNBM PLC under Louisiana alter ego law, and (2) to BNBM PLC on an agency theory under Florida and Virginia law, *id.* at 98.

Considering the Court's findings in the order addressing Defendants' motion to dismiss the *Germano*, *Wiltz*, and *Amorin* complaints, the PSC filed its opposition to Defendants' motion to dismiss the *Abner* complaint, stating it "[did] not . . . intend to misuse the Court's resources regarding why personal jurisdiction over BNBM Group should be asserted when this Court has found otherwise, except under Louisiana's single business enterprise doctrine." R. Doc. 21766-2 at 8. Instead, in its opposition, the PSC argues Taishan's conduct "should be imputed to its parent, BNBM PLC, as BNBM PLC and Taishan share an agency relation." *Id.* at 14. In support of this position, the PSC puts forth two arguments: (1) that Taishan's conduct can be imputed on BNBM PLC under an alter ego theory under California law and (2) that Taishan's conduct can be imputed on BNBM PLC under an agency theory of liability under California law. Notably, the PSC did not argue whether an agency relationship existed between BNBM PLC and Taishan under Chinese law.

In reply to the PSC's arguments, Defendants argue Chinese law, not California law, applies to the Court's evaluation of Taishan's relationship with the BNBM Entities and that, under Chinese

12

law, Taishan could not be considered an agent of BNBM for the purposes of establishing jurisdiction over the BNBM Entities. In support of this argument, Defendants offer Professor Clarke's declaration, which states "there is no basis in Chinese law for finding Taishan to be an agent of BNBM for the purpose of imposing liability on or establishing jurisdiction over BNBM." R. Doc. 21814-1 at ¶ 14. Defendants now argue that including Professor Clarke's declaration was appropriate, as "[o]nce the PSC sought to meet their burden under a new theory based on agency law, citing California agency law, the BNBM Entities necessarily responded with an argument that such a theory fails as a matter of law because Chinese law applies and does not permit agency-based imputation." R. Doc. 21853 at 7.

Professor Clarke's declaration does not directly address a new argument raised by the PSC in its opposition. Although the PSC points to a theory of personal jurisdiction Defendants did not address in their motion to dismiss, the PSC made this argument based on California law. Thus, the Court finds Professor Clarke's declaration, which addresses *Chinese* law, does not serve to rebut the PSC's argument. Moreover, Defendants could have, but did not, include the declaration in their initial motion, especially given that Professor Clarke's declaration directly supports the legal arguments Defendants make in their original motion to dismiss, namely that Chinese law does not allow a court to impose liability on or establish jurisdiction over BNBM. R. Doc. 21814-1 at ¶ 14. As a result, the Court concludes its inclusion in Defendants' reply cannot be justified by the PSC's opposition.

### b. Whether Defendants Have Waived Their Right to Include Professor Clarke's Declaration

Although Professor Clarke's declaration is not directly responsive to an issue raised for the first time in the PSC's opposition, the Court now addresses whether Federal Rule of Civil Procedure 44.1 nevertheless permits the Court to consider the filing.

Rule 44.1 allows a court to consider any information submitted by the parties that aids the court's interpretation of foreign law. The rule enables litigants to present "any other information concerning foreign law that is believed to further his or her cause," thereby empowering district courts to consider these sources "in determining the content of the applicable foreign law." 9A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 2444 (3d ed. 2018 update). "The trial judge is free to accept these materials and to give them whatever probative value he or she thinks they deserve." *Id.*

Although courts are not encumbered by the Federal Rules of Evidence in considering sources of foreign law under Rule 44.1, when a party's submission concerning foreign law is untimely, a district court may exercise its discretion to exclude it. *See Frietsch v. Refco, Inc.*, 56 F.3d 825, 828 (7th Cir. 1995); *Thyssen Steel Co. v. M/V Kavo Yerakas*, 911 F. Supp. 263, 267 (S.D. Tex. 1996). In *Frietsch v. Refco, Inc.*, for example, the U.S. Court of Appeals for the Seventh Circuit held that the plaintiffs waived their right to rely on foreign law because the issue was raised for the first time in the plaintiffs' motion for reconsideration. *Id.* As the Seventh Circuit explained, "It is not the purpose of allowing motions for reconsideration to enable a party to complete presenting his case after the court has ruled against him. Were such a procedure to be countenanced, some lawsuits really might never end, rather than just seeming endless." *Id.* Similarly, in *Thyssen Steel Co. v. M/V Kavo Yerakas*, the U.S. District Court for the Southern

District of Texas refused to consider a belated submission on Belgian law filed "on the eve of trial," since the submission could have been offered earlier in the litigation before the court ruled on the defendants' motion for summary judgment. 911 F. Supp. at 267. In both cases, the court found the submissions untimely because they essentially asked the court to reconsider its prior orders.

Although the issue of what law applies to this MDL has been raised in this litigation since its inception, and thus notice is not an issue, Defendants have nevertheless waived their right to provide the Court with Professor Clarke's declaration in a reply brief. The issues presented in Defendants' motion to dismiss the *Abner* complaint do not exist in a vacuum, but in the context of the MDL as a whole. This Court has twice ruled on whether Chinese law allows the contacts of one Chinese entity to be imputed on another for purposes of personal jurisdiction. The contents of Professor Clarke's declaration directly contradict these prior jurisdictional orders.

The Fifth Circuit affirmed this Court's first opinion concerning Chinese agency law, explaining:

> TG faults the district court for applying the forum state's law (Florida law) instead of Chinese law to the question of whether to impute TTP's Florida contacts to TG. TG concedes, however, that "Chinese law is not materially different on this issue from Florida law, and the outcome should be the same under either law." Accordingly, we need not choose because "if the laws of both states relevant to the set of facts are the same, or would produce the same decision in the lawsuit, there is no real conflict between them." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 839 n.20 (1985). Therefore, we apply Florida law.

*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 735 F.3d 521, 529 (5th Cir. 2014). Thereafter, the Court held Taishan's contacts can be imputed to BNBM PLC on an agency theory under Florida, Louisiana, and Virginia law, stating, "whether the Court applies Chinese or forum-state law, *there is no meaningful difference in outcome.*" R. Doc. 20739 at 48, 98 (emphasis added).

Professor Clarke's declaration, which states "there is no basis in Chinese law for finding Taishan to be an agent of BNBM for the purpose of imposing liability on or establishing jurisdiction over BNBM," R. Doc. 21814-1 at ¶ 14, squarely controverts this holding.

Moreover, in the Court's April 21, 2017 Order, the Court explained its reasoning for applying the law of the forum states instead of Chinese law:

> [C]onsidering the foregoing in conjunction with (1) *the lack of authoritative interpretation of the applicable Chinese law*, (2) the influence of Chinese culture and politics on the applicable Chinese law, and (3) Defendants' acknowledgement that no real conflict exists, this Court is inclined to apply the laws of the forum states which govern the claims at issue.

*Id.* at 49 (emphasis added). Thus, although the Court noted neither party provided the Court with any authority on Chinese law in April 2017, Defendants did not provide the Court with Professor Clarke's declaration until over one year and five months later, on October 3, 2018. Like the litigants' submissions in *Frietsch* and *Thyssen Steel Co.*, this evidence comes too late and essentially asks the Court to reconsider its prior jurisdictional order finding Taishan's contacts could be imputed to BNBM PLC under an agency theory of liability.

To relitigate the Court's prior orders on overlapping issues presented in the several cases before it in this MDL defeats the purpose of considering these cases collectively. *See McKay v. Novartis Pharm. Corp.*, 751 F.3d 694, 705 (5th Cir. 2014) ("'The law of the case doctrine requires attention to the special authority granted to the multidistrict transferee judge and ensures that transferor courts respect the transferee court's decisions.' Allowing the [plaintiffs] to relitigate in the remand court issues decided by the MDL court with arguments that could have been raised but were not would 'frustrate the purposes of centralized pretrial proceedings.'" (quoting *In re Ford Motor Co.*, 591 F.3d 406, 411 (5th Cir. 2009) & Manual for Complex Litigation § 20.133)).

Defendants have had ample opportunity to provide the Court with evidence of Chinese law. Defendants now provide the Court with Professor Clarke's declaration in a manner that is both procedurally improper and several months too late. To consider this submission, especially without providing the PSC the opportunity to refute it, would not only prejudice the PSC, but would also disturb the law of the case in the context of this MDL.[2] As a result, the Court will grant the PSC's motion to strike.

## IV. CONCLUSION

Professor Clarke's declaration should have been provided in Defendants' opening brief and was not filed in response to an argument raised for the first time in the PSC's opposition. Although Federal Rule of Civil Procedure 44.1 allows the Court to consider the filing regardless of whether it is admissible under the Federal Rules of Evidence, Professor Clarke's declaration was filed several months after the Court's April 21, 2017 jurisdictional ruling and directly contradicts the Court's prior findings regarding Chinese agency law. Accordingly,

**IT IS ORDERED** that the Plaintiffs' Steering Committee's Motion to Strike, R. Doc. 21820, be and hereby is **GRANTED**.

New Orleans, Louisiana on this 5th day of December, 2018.

                                                  Eldon E. Fallon
                                                  U.S. District Court Judge

---

[2] It is important to note that Professor Clarke's declaration addresses Chinese agency law only. It does not discuss the similarities between Chinese and California law. Thus, although the Court's prior rulings on Chinese agency law were made in the context of Virginia, Louisiana, and Florida's choice of law rules, Professor Clarkes' assertion that there exists no agency relationship between BNBM and Taishan under Chinese law directly contradicts the Court's finding that such a relationship does exist, notwithstanding the differences in California, Louisiana, Virginia, and Florida law. Moreover, even if the Court were to consider the declaration, the Court would be "free to . . . give [it] whatever probative value [the Court] thinks [it] deserve[s]." 9A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 2444 (3d ed. 2018 update). Given the established law of this MDL, the Court would be inclined to assign Professor Clarke's declaration little value.