**STATE OF FLORIDA**          )
                                         )
**COUNTY OF LEE**                 )

## AFFIDAVIT OF ROY MICHAEL FREEMAN

Before me, the undersigned authority in and for said county, in said state, on this day personally appeared Roy Michael Freeman, who, being first duly sworn, deposes and says:

1.     My name is Roy Michael Freeman. I am over the age of nineteen (19) years and have been a resident of Lee County, Florida, for more than five (5) years.  I state that I have personal knowledge of the following facts.

2.     I am currently a shareholder of Asset Portfolio Servicing Company, Inc. ("APSC") and have been so for the period of time relevant to the issues addressed herein.

3.     APSC owns a property with a pending already remediated home claim, located at the following street address: 1305 East 9th Street, Lehigh Acres, FL  33972 ("Affected Property").

4.     APSC purchased Affected Property on June 10, 2011, the date reflected on the Warranty Deed.

5.     The grantor of Affected Property was Jose A. Azcarate and Lori A. Azcarate, husband and wife ("Sellers").

6.     APSC purchased Affected Property for commercial purposes – to either renovate and resell or to renovate and lease the property to tenants.

7.     Affected Property was advertised as a foreclosure to be sold at a county managed real estate auction overseen by the Lee County Sheriff's Department.

8.     Affected Property was advertised indicating that Sellers were offering the property "as-is" with no representations by the seller beyond the basic property information such as date of construction, approximate square footage and number of bedrooms and bathrooms (all of which was publicly available through the Lee County Property Appraiser's website).

9.      To the best of my recollection, Affected Property was offered via auction without reserve to be sold to the highest bidder on the day of the sale, the same as all other properties offered at similar auctions.

10.     No prospective bidders were permitted to enter the Affected Property for a walkthrough or inspection prior to the sale date; consequently, the only inspection permissible was done from the exterior of the home.

11.     As part of my due diligence in evaluating the Affected Property for potential purchase, APSC engaged representatives of Team Realty of Southwest Florida to conduct a home inspection to the extent possible, even if it was only based on observations from the exterior of the home.

12.     Team Realty of Southwest Florida conducted a home inspection of Affected Property and produced a report that APSC utilized for determining its top bid amount at auction.  Team Realty did not find defective Chinese sheetrock through their inspection.

13.     No advertisement for Affected Property disclosed that the property contained defective Chinese sheetrock produced by Knauf Plasterboard Tianjin or any other Chinese manufacturer.

14.     It is worth noting that APSC purchased other homes via county real estate foreclosure auction during this same time period and none were known to contain defective Chinese sheetrock prior to purchase at auction.

15.     It is APSC's position that it defies common sense to purposely purchase homes containing defective Chinese sheetrock that were unremediated due to the added expense that one would expect to incur, in addition to the burden of legal entanglements and delay necessary to secure an uncertain reimbursement for the self-remediation expense.

16.     It was not until APSC took control of the Affected Property that it was learned that the home contained defective Chinese sheetrock.

17.     With respect to Affected Property, APSC engaged TERCO Home Inspections to conduct a post-purchase evaluation to determine whether defective Chinese sheetrock was present and in the case of Affected Property, the result was positive.

18.     After completing the remediation of the Affected Property and learning that the drywall was the subject of litigation, APSC engaged the Doyle Law Firm to pursue a recovery in the defective Chinese-manufacturerd drywall litigation.

19.     Neither the sellers of Affected Property nor the county officials advertising the foreclosure auction disclosed that Affected Property contained defective Chinese sheetrock either prior to or after the the auction.  And, no other person or entity disclosed that Affected Property contained defective Chinese sheetrock prior to or after the auction.

20.     All disclosures made by Lee County were made in writing and available to me prior to the auction date; there was no disclosure to me or any other prospective buyer that Affected Property contained defective Chinese drywall.

21.     It is my opinion that the Affected Property listed for sale "As-Is" should have provided all prospective bidders with a specific disclosure regarding the condition of the structure, if known, including the presence of defective Chinese-manufactured drywall; however, it is my understanding that no state law, federal law, local ordinance, or court order compels a seller to make such disclosures prior to sale.

22.     Due to the nature of the foreclosure auction, it was plainly evident that the previous owners either lost the home due to foreclosure or the bank was offering the auction as a short sale mechanism, although I have no specific personal knowledge about the individual situation that led Sellers into foreclosure or short sale proceedings.

23.     I am a real estate developer and investor in the business of buying and selling property in South Florida and I have owned many other houses that were purchased through auction and otherwise.  I am familiar with the typical defects that might present themselves in the years following construction.  The items I had Team Realty inspect at each Affected Property, to the extent available, were: 1) damaged roof; 2) damaged foundation evidenced by foundational settlement cracks; 3) mold spores if a home has been vacant; 4) electrical issues; 5) plumbing issues; 6) water damage on exterior; 7) water damage on interior; 8) damaged structural components; 8) damaged or incorrectly constructed roof framing; 9) proper insulation in attic area; 10) vandalism or damage to walls by prior owner; 11) condition of cabinets, fixtures and appliances in kitchen; 12) properly functioning heating and cooling system; and, 13) properly functioning water heater.

24.     I personally evaluated the report generated by Team Realty and although Affected Property was vandalized or in disrepair, none of the known issues were viewed by me as significant enough to preclude a bid at auction.

25.     APSC retained Team Realty of Southwest Florida to conduct the inspection of this home and I am not aware of any court order, issued by Judge Fallon or otherwise, requiring a buyer to have a home inspection performed by a particular party or from a list of approved inspectors, with or without certain credentials, prior to purchasing a home.

26.     Likewise, I am not aware of any state or federal statute requiring a buyer to have an inspection performed prior to purchase to evaluate a structure for the presence of Chinese drywall by a particular party or from a list of approved inspectors, with or without certain credentials.

27.     It is my understanding that the Settlement Agreement in my case does not require a plaintiff (i.e., a buyer of a home containing defective Knauf-made drywall) to have either a home inspection or a "Chinese Drywall Inspection" prior to purchase, only that in order to qualify for settlement benefits, a plaintiff cannot purchase with knowledge that a home contains defective Knauf-manufactured Chinese drywall and a "reasonable inquiry" regarding the condition of the property must be made prior to closing the sale.

28.     Without question, APSC meets the requirements of the settlement agreement; APSC did not buy Affected Property with knowledge of defective Chinese-made sheetrock; and, before auction, APSC engaged Team Realty of Southwest Florida to conduct a thorough home inspection that included examining the home, if possible, for the common signs that demonstrated the likelihood that defective Chinese-made sheetrock was present.

29.     It is my understanding that the State of Florida has no state-approved certification for "Chinese Drywall Inspectors" that provides residents with standards to expect regarding the qualifications and credentials of the "Chinese Drywall Inspectors" and/or the objective standard to expect when a "Chinese Drywall Inspection" is conducted.

30.     It is my belief that the evaluation of the condition of the property that Team Realty of Southwest Florida conducted prior to APSC's purchase at auction was indeed a "reasonable inquiry" and I affirm that APSC did not purchase the Affected Property with either actual or constructive notice that it contained defective Knauf-made Chinese drywall.

31.     It is my understanding that banking laws found the U.S. Code, that control the conduct of sellers, including representatives of Lee County who conducted the real estate

foreclosure auction, do not require banking institutions to disclose known defects such as Chinese-manufactured drywall when selling a property containing a damaged structure; thus, the sale of this property "as-is" was immoral and/or unscrupulous if it was a known defect, but it was not a violation of any state or federal law to the best of my knowledge.

32.     I have no recollection of a written disclosure of the defective Chinese drywall in this home by Seller, local city or county agency, State of Florida, federal agency, or by the Knauf Defendants, and after review of my file related to the sale, I have found no written disclosure of any kind related to defective Knauf-manufactured drywall.

33.     It is my understanding that Knauf did not notify the State of Florida or any Lee County governmental agencies about the potential presence of defective drywall it manufactured that was found in the Affected Property.

34.     It is my understanding that the Knauf Defendants did not notify any consumer product safety non-governmental agency about the potential presence of defective drywall it manufactured that was found in the Affected Property.

35.     The Knauf defendants possessed or should have acquired information about the potential locations of structures in the United States that might have used their defective product during construction.

36.     Given the superior knowledge that Knauf possessed about the amount of drywall and timing that it was imported into the United States, the Knauf Defendants knew or should have known about the location of the ports of entry where they imported the defective drywall into the United States, the identity of the distributors that took possession of their defective drywall at the various ports of entry, the identity of the downstream distributors that took possession of their defective drywall, the identity of the contractors and subcontractors that took possession of their defective drywall, and the potential Property that might have received their defective drywall during construction. In addition, the Knauf Defendants should have provided any/all potential buyers, including APSC, with notice about the possible locations of their product, including the Affected Property.

37.     If the Knauf Defendants provided any information to a local, state or federal agency about a possible property that contained defective drywall, APSC would have wanted that notice and APSC would have acted to inspect the Affected Property to the

maximum extent possible for the presence of Chinese drywall before purchase or we would have chosen to make no bid at auction; however, given that no notice was provided to anyone in writing by the Seller, State of Florida, or federal government in any way and no information was available to me that would have provided adequate notice about the potential for the presence of defective Chinese sheetrock in this Affected Property prior to purchase at auction, there was no reason to believe that this home contained this latent defect.

38.     Although APSC engaged Team Realty of Southwest Florida to conduct a thorough property inspection prior to auction, I am not aware of any affirmative duty to pay for either a home inspection or Chinese drywall inspection, prior the purchase of a home, that was imposed by any controlling legal authority.

39.     Given the lack of actual or constructive notice to APSC prior to the auction sales by the Seller, a govermental agency or the defendants, and given the lack of disclosure by the Seller or Knauf Defendants, I firmly believe that APSC made a reasonable inquiry into the condition of the Affected Property prior to purchasing it and full settlement benefits should be paid accordingly.

40.     With regard to each of the Affected Property, APSC employed Superior Contracting to perform repairs, including the remediation of Chinese-made drywall. Superior Contracting completed the work in compliance with the Court's accepted protocol and executed an Owner Disclosure Affidavit that described the remediation of the Affected Property.

41.     Superior Contracting also executed an Environmental Certificate for the Affected Property, confirming that all drywall has been removed, including debris and visible dust, as set forth in the Remediation Protocol, Exhibit F to the Settlement Agreement Regarding Claims Against the Knauf Defendants in MDL No. 2047.  A copy of both the Environmental Certificate and Owner Disclosure Affidavit will be provided to the Court.

42.     Based on the terms of the Settlement Agreement and APSC's full compliance therewith, APSC should be paid $63,896.91 without any further delay.

My signature below affirms my personal knowledge of the circumstances described herein and I hereby represent that this information is true to the best of my knowledge under penalty of perjury.


_____
Affiant
Roy Michael Freeman


SWORN TO AND SUBSCRIBED BEFORE ME on this _19_ day of May, 2018, at _____, Florida.


_____
Notary Public

My Commission Expires: _____

> **ELAINE C LUKES**
> MY COMMISSION # FF227268
> EXPIRES May 05, 2019
> (407) 398-0153   FloridaNotaryService.com

(SEAL)

**STATE OF GEORGIA** )
)
**COUNTY OF GLYNN** )

## <u>AFFIDAVIT OF ERIC K. "RICK" ASCH</u>

Before me, the undersigned authority in and for said county, in said state, on this day personally appeared Eric K. "Rick" Asch, who, being first duly sworn, deposes and says:

1.      My name is Eric K. "Rick" Asch. I am over the age of nineteen (19) years and have been a resident of Glynn County, Georgia, for more than five (5) years.  I state that I have personal knowledge of the following facts.

2.      I own a property located at the following street address: 138 Saint Clair Drive, St. Simons Island, GA 31522 ("Affected Property").

3.      I purchased Affected Property on May 24, 2012, the date reflected on my warranty deed.

4.      On August 31, 2012, roughly three months after closing the sale, the Affected Property was found to contain defective Chinese drywall manufactured by Knauf Plasterboard Tianjin.

5.      I retained Quantum Home Inspections, Inc., located at 105 Southwood Cove, Brunswick, GA 31525, initially to conduct a thorough inspection of the property and generate a report documenting the presence of corrosion and the source of the issue, if possible, for a potential claim with my home owners insurance company.  Quantum Home Inspections ultimately documented both the presence of the defective drywall in the home as well as the effects the gasses emitted by the drywall had on the various wiring, plumbing, fixtures and air conditioner.

6.      In April of 2013, after learning that the defective drywall in the Affected Property was manufactured by Knauf Plasterboard Tianjin, Ltd, and considerably into the remediation of the Affected Property, I engaged the Doyle Law Firm to represent my family in the defective Chinese-manufacturerd drywall litigation.

7.      I was a resident of California prior to purchasing this Affected Property.  My family and I moved to the St. Simons Island area due to a change in my employment.

8.      I do not recall seeing or hearing anything in the news about the effects of Chinese drywall while living in California; thus, I was not on constructive notice about the potential effects of defective Knauf-made Chinese Drywall that was distrubuted and used primarily in the Southeastern United States.

9.      Prior to our purchase of the Affected Property, I traveled to the St. Simons Island area from California on several occasions for limited periods of time (no more than several days on any occasion) specifically to view properties for sale.

10.     I purchased the Affected Property from Deutsche Bank National Trust Company, as Trustee of the IndyMac IMSC Mortgage Loan Trust 2007-F1, under the Pooling and Servicing Agreement dated May 1, 2007.

11.     The Affected Property was listed online by Deutsche Bank National Trust Company to be sold via an online auction "As-Is" with no disclosures regarding the condition of the structure, including the presence of defective Chinese-manufatured drywall.

12.     The sale of the Affected Property was indeed conducted entirely online through an auction service and the entirety of all disclosures made by Deutsche Bank National Trust Company were made in writing and available to me prior to the sale date; there was no disclosure to me or any other prospective buyer that the home contained defective Chinese drywall.

13.     It is my understanding that Deutsche Bank National Trust Company foreclosed on the previous owners of our home, although I have no specific personal knowledge about their foreclosure proceedings that might have taken place prior to my purchase.

14.     After considerable effort, my realtor was able to arrange entry to the interior of the Affected Property on one (1) occasion just prior to the sale date and she and I inspected the Affected Property only on that one occasion.  I cannot recall the exact date of my inspection, but it occurred shortly before the auction, because I only learned of the auction date while in California with approximately two (2) weeks to prepare a purchase offer online.

15.     It is my recollection that the Deutsche Bank National Trust Company representative that authorized the viewing of the Affected Property conveyed to my realtor that a walk-through of the structure was allowed, but no destructive testing of any kind was allowed on the one occasion we were permitted entry - only a viewing of the condition of the structure.

16.     I have owned other houses and I am familiar with the typical defects that might present themselves in the years following construction.  The items I inspected in the Affected Property, to the extent available, were: 1) damaged roof; 2) damaged foundation evidenced by foundational settlement cracks; 3) mold spores if a home has been vacant; 4) electrical issues; 5) plumbing issues; 6) water damage on exterior; 7) water damage on interior; 8) damaged structural components; 8) damaged or incorrectly constructed roof framing; 9) proper insulation in attic area; 10) vandalism or damage to walls by prior owner; 11) condition of cabinets, fixtures and appliances in kitchen; 12) properly functioning heating and cooling system; and, 13) properly functioning water heater.

17.     The conclusion I reached after inspecting the Affected Property was that there were no major defects in the home and the likely purchase price via the auction would make it an attractive purchase for my family.

18.     I am not aware of any state or federal statute requiring a buyer to have a home inspection prior to purchasing a home.

19.     I am not aware of any court order requiring a buyer to have a home inspection prior to purchasing a home.

20.     I am not aware of any state or federal statute requiring a buyer to have an inspection performed prior to purchase to evaluate a structure for the presence of Chinese drywall.

21.     I am not aware of any state or federal court order requiring a buyer to have an inspection performed prior to purchase to evaluate a structure for the presence of Chinese drywall.

22.     The realtor that I utilized in the St. Simons Island area to view homes for sale did not indicate either orally or in writing that a home inspection was required by local ordinance, regulation, statute or court order.

23.     The realtor that I utilized in the St. Simons Island area to view homes for sale did not indicate either orally or in writing that a standard home inspection or Chinese drywall inspection was required by any local ordinance, regulation, statute or court order. In fact, to the best of my recollection, we had no conversations about "Chinese drywall" until I contacted her after it was confirmed in the home.

24.     It is my understanding that the Settlement Agreement in my case does not require a plaintiff (i.e., a buyer of a home containing defective Knauf-made drywall) to have either a home inspection or a "Chinese Drywall Inspection" prior to purchase, only that in order to qualify for settlement benefits, a plaintiff cannot purchase with knowledge that a home contains defective Knauf-manufactured Chinese drywall and a "reasonable inquiry" regarding the condition of the property must be made prior to closing the sale.

25.     It is my understanding that the State of Georgia has no state-approved certification for "Chinese Drywall Inspectors" that provides residents with standards to expect regarding the qualifications and credentials of the "Chinese Drywall Inspectors" and/or the objective inspection standard to expect when a "Chinese Drywall Inspection" is conducted.

26.     It is also my understanding that Judge Eldon Fallon, the federal district court judge presiding over the consolidated Chinese drywall litigation, has not issued any order either requiring either a "Chinese Drywall Inspection" or a home inspection.

27.     It is also my understanding that Judge Fallon has not provided any guidance to the litigants regarding the required credentials necessary for a "Chinese Drywall Inspector."

28.     It is also my understanding that Judge Fallon has not provided any guidance to the litigants regarding the proper procedure to be followed or documentation to be provided by a "Chinese Drywall Inspector" that might be used at a buyer's discretion to examine a property for sale.

29.     It is my understanding that banking laws found the U.S. Code, that control the conduct of Deutsche Bank and its affiliates, do not require banking institutions to disclose known defects such as Chinese-manufactured drywall when selling a property containing a damaged structure; thus, Deutsche Bank's sale of this property "as-is" was immoral and/or unscrupulous, but it was not a violation of any state or federal law to the best of my knowledge.

30.     I have no recollection of any written disclosure of the defective Chinese drywall in this home by the seller, local city or county agency, State of Georgia, or federal agency, or by the Knauf Defendants, and after review of my file related to the sale, I have found no written disclosure of any kind related to defective Knauf-manufactured drywall.

31.     It is my understanding that Knauf did not notify the State of Georgia about the potential presence of defective drywall it manufactured that was later found in the Affected Property.

32.     It is my understanding that Knauf did not notify any Glynn County governmental agencies about the potential presence of defective Chinese-manufactured drywall that was found in the Affected Property.

33.     It is my understanding that Knauf did not notify any consumer product safety non-governmental agency about the potential presence of defective drywall it manufactured and sold in the United States that was found in the Affected Property.

34.     The Knauf defendants possessed or should have acquired information about the potential locations of structures in the United States that might have used their defective product during construction.

35.     Given the superior knowledge that Knauf possessed about the amount of drywall and timing it was imported into the United States, Knauf knew or should have known about the location of the ports of entry where they imported the defective drywall into the United States, the identity of the distributors that took possession of their defective drywall at the various ports of entry, the identity of the downstream distributors that took possession of their defective drywall, the identity of the contractors and subcontractors that took possession of their defective drywall, and the potential properties that might have received their defective drywall during construction, Knauf should have provided any/all potential buyers, including me, with notice about the possible locations of their product, including the Affected Property.

36.     Knauf's unclean hands and complete lack of effort to notify local, state, and federal entities of the potential presence of their defective drywall (in homes they could have easily identified) should not be rewarded by this court by imposing an absurd standard requiring home inspections, either "official" or "unofficial," prior to the purchase of a home by a prospective buyer with inferior knowledge about the issue.  The

Court has not imposed such a requirement by pre-trial order and no local, state, or federal ordiance, regulation or law requires it either.  To make either a paid home inspection or paid Chinese drywall inspection a requirement now would impose an unfair requirement on plaintiffs that was never agreed upon and never required by this Court prior to the parties entering this Settlement Agreement.

37.     I am not aware of any affirmative duty to pay for either a home inspection or Chinese drywall inspection, prior the purchase of a home, that was imposed by any controlling authority.

38.     If Knauf provided any information to a local, state or federal agency about possible properties that contained defective drywall, I would have acted to inspect the Affected Property for the presence of Chinese drywall; however, given that no notice was provided to me in writing by the seller, State of Georgia, or federal government in any way, the real estate community in the Glynn County Georgia area was not knowledgable about the affects of defective Chinese sheetrock, and no information was available to me that would have provided adequate notice about the potential for the presence of defective Chinese sheetrock in this Affected Property prior to purchase, there was no reason to believe that the home contained this latent defect.

39.     Neither I nor my realtor are aware of any other claim for defective Chinese sheetrock manufactured by the Knauf or Taishan defendants in the St. Simons Island or Brunswick/Glynn County, Georgia, areas filed either before or after I filed my claim related to the Affected Property.  This appears to be a complete anomaly for the area.

40.     Given the limited time I had to view and consider the purchase of the Affected Property, given the lack of actual or constructive notice to me prior to the sale by the seller, a govermental agency or the defendants, and given the lack of disclosure by the seller or Knauf Defendants, I firmly believe that I made a "reasonable inquiry" into the condition of the Affected Property prior to purchasing it via online auction.

41.     I employed Greg Crosby, a contractor operating as Crosby Services, to perform repairs, including the remediation of Chinese-made drywall.  Mr. Crosby completed the work in compliance with the Court's accepted protocol and executed an Owner Disclosure Affidavit that described the remediation of the Affected Property.

42.     I engaged Quantum Home Inspections, Inc. to perform the post-demolition environmental inspection and they executed an Environmental Certificate for the Affected Property, confirming that all drywall has been removed, including debris and visible dust, as set forth in the Remediation Protocol, Exhibit F to the Settlement Agreement Regarding Claims Against the Knauf Defendants in MDL No. 2047.  A copy of both the Environmental Certificate and Owner Disclosure Affidavit will be provided to the Court.

43.     The final out-of-pocket cost to us related solely to the remediation of the home was $106,700.00.

44.     The Settlement Agreement provides for a lump-sum living expense payment to qualifying plaintiffs who owned residential property, like us.  Because our home was measured to have 3,565 square feet of under air/ air conditioned living space, we are due to receive $35,650.00 in addition to our construction costs.

45.     Based on the terms of the Settlement Agreement, we believe that a disbursement is appropriate for a grand total of $142,350.00.  We request that the court approve this amount and instruct the settlement administrator to issue a check without any further delay.

My signature below affirms my personal knowledge of the circumstances described herein and I hereby represent that this information is true to the best of my knowledge under penalty of perjury.

_____
Affiant
ERic K. "Rick Asch

SWORN TO AND SUBSCRIBED BEFORE ME on this 24th day of May, 2018, at Brunswick , Georgia.

_____
Notary Public

My Commission Expires: 8/11/2020

(SEAL)

**STATE OF NEW YORK** )

)

**COUNTY OF NEW YORK (KINGS BOROUGH)** )

## AFFIDAVIT OF DOODNAUTH BAHADUR

Before me, the undersigned authority in and for said county, in said state, on this day personally appeared Doodnauth Bahadur, who, being first duly sworn, deposes and says:

1.      My name is Doodnauth Bahadur. I am over the age of nineteen (19) years and have been a resident of New York (Kings Borough) County, New York, for more than five (5) years.  I state that I have personal knowledge of the following facts.

2.      I own a property located at the following street address: 1925 SE 22 CT, Miami, FL  33035 ("Affected Property").

3.      I purchased Affected Property on April 7, 2011, the date reflected on my Special Warranty Deed.

4.      I purchased this property from BankUnited, Assignee of the FDIC as Receiver for BankUnited, authorized to do business in the State of Florida ("Sellers").

5.      I purchased the property and intended to use the home during retirement.

6.      The property was advertised as a foreclosure by a bank and my realtor presented the property during one of my visits to South Florida.

7.      To the best of my recollection, the advertisement indicated that the seller was offering the property "as-is" and there were no representations by the seller beyond the basic property information such as date of construction, approximate square footage and number of bedrooms and bathrooms.  There were also pictures of the interior of the property that were included in the advertisement.

8.      The seller did not disclose that the property contained defective Chinese sheetrock produced by Knauf Plasterboard Tianjin or any other Chinese manufacturer.

9.      In April of 2011, the issues related to defective Chinese-manufactured drywall was not widely known in New York or South Florida; moreover, it was certainly not known to me prior to purchase.

10.     Prior to making an offer for purchase in February of 2011, I conducted a walkthrough of the property and conducted an inspection along with my realtor and my contractor who I intended to engage for the purpose of repairing the damage to the property.

11.     At the time of my walkthrough, there were no appliances in the home, fixtures were missing, and there was damage to several walls and floor areas.

12.     I do not recall that the home ever containing a "rotten egg" smell, and even if it did, I would not have associated it with defective drywall from China as this was not even a known possibility to me, my realtor or my contractor.

13.     It was not until my contractor began renovations on the home that I learned that the home had an environmental problem, later identified as Chinese drywall.

14.     On approximately May 21, 2011, my contractor notified me of the corrosion found on the wiring inside one of the walls, as well as the smell emitted from the interior of the wall, so I contacted Pro-Lab to conduct an inspection for a potential claim on my homeowner's insurance policy.

15.     Once my contractor identified the markings on the wall taken down during renovation, I contacted Pro-Lab Environmental Testing of Weston, Florida for an environmental inspection.

16.     Pro-Lab collected samples of materials from areas throughout the Affected Property on May 27, 2011, and issued a report to me on June 10, 2011.  Their report confirmed that the home contained defective Chinese sheetrock in three locations: the master bedroom, kitchen, and garage.

17.     During the walkthrough of the Affected Property prior to purchase and afterwards, we did not notice any particular smell that has come to be associated with defective Chinese drywall, often described as a "rotten egg" or "burnt match."

18.     During the walkthrough of the Affected Property prior to purchase and afterwards, we did not notice any corrosion on fixtures, appliances or any other item. Although the home had been vandalized, the electrical system was in working order, as was the air conditioning system and plumbing system.

confirmed that we indeed had a condominium containing the defective drywall.

19.     After completing the remediation of the Affected Property and learning that the drywall in my Affected Property was the subject of litigation, I engaged the Doyle Law Firm to represent me in the defective Chinese-manufacturerd drywall litigation.

20.     Prior to and after purchasing this property, I resided in New York, New York.  I have no recollection whatsoever of any Chinese drywall issues being reported on the news or notice being provided to me in any way that this might be a problem for homeowners in Miami, Florida.  I was simply unaware of the issue prior to purchasing the Affected Property.

21.     The sellers did not disclose that the structure contained defective Chinese sheetrock prior to or after the the closing.  And, no other person or entity disclosed that the home contained defective Chinese sheetrock prior to or after the closing.

22.     Because I did not see or hearing anything in the news or receive notice from the Knauf Defendants about the effects of Chinese drywall while living in New York in late 2010 or early 2011, I was not on constructive notice about the potential effects of defective Knauf-made Chinese Drywall that was distrubuted and used primarily in the Southeastern United States.

23.     All disclosures made by Sellers were made in writing and available to me prior to the sale date; there was no disclosure to me or any other prospective buyer that the home contained defective Chinese drywall.

24.     It is my opinion that the Affected Property listed online by sellers to be sold "As-Is" should have provided us with a specific disclosure regarding the condition of the structure, including the presence of defective Chinese-manufatured drywall; however, it is my understanding that no state law, federal law, local ordinance, or court order compels a seller to make such disclosures prior to sale.

25.     I came to learn through the closing documents that Sellers foreclosed on the previous owners of my home, although I have no specific personal knowledge about their situation that led to foreclosure proceedings.

26.     I have owned other houses and I am familiar with the typical defects that might present themselves in the years following construction.  The items my contractor and I inspected in the Affected Property, to the extent available, were: 1) damaged roof; 2) damaged foundation evidenced by foundational settlement cracks; 3) mold spores if a

home has been vacant; 4) electrical issues; 5) plumbing issues; 6) water damage on exterior; 7) water damage on interior; 8) damaged structural components; 8) damaged or incorrectly constructed roof framing; 9) proper insulation in attic area; 10) vandalism or damage to walls by prior owner; 11) condition of cabinets, fixtures and appliances in kitchen; 12) properly functioning heating and cooling system; and, 13) properly functioning water heater.  My contractor and I evaluated each of these issues and although the home was vandalized and in disrepair, none of the known issues were major defects in the home.

27.     I am not aware of any state or federal statute requiring a buyer to have a home inspection prior to purchasing a home.

28.     I am not aware of any court order requiring a buyer to have a home inspection prior to purchasing a home.

29.     I am not aware of any state or federal statute requiring a buyer to have an inspection performed prior to purchase to evaluate a structure for the presence of Chinese drywall.

30.     I am not aware of any state or federal court order requiring a buyer to have an inspection performed prior to purchase to evaluate a structure for the presence of Chinese drywall.

31.     The real estate agent that offered the home for sale did not indicate either orally or in writing that a home inspection was required by local ordinance, regulation, statute or court order.

32.     It is my understanding that the Settlement Agreement in my case does not require a plaintiff (i.e., a buyer of a home containing defective Knauf-made drywall) to have either a home inspection or a "Chinese Drywall Inspection" prior to purchase, only that in order to qualify for settlement benefits, a plaintiff cannot purchase with knowledge that a home contains defective Knauf-manufactured Chinese drywall and a "reasonable inquiry" regarding the condition of the property must be made prior to closing the sale.

33.     It is my understanding that the State of Florida has no state-approved certification for "Chinese Drywall Inspectors" that provides residents with standards to expect regarding the qualifications and credentials of the "Chinese Drywall Inspectors" and/or the objective standard to expect when a "Chinese Drywall Inspection" is conducted.

34.     At the time of my purchase, it is my understanding that the litigation was still in its early stages and no standard for remediation had been issued by the Court or anyone else.

35.     It is my understanding that my area of Miami, Florida did not contain many homes that were late found to contain defective Chinese drywall.

36.     It is my understanding that Miami, Florida, had few or no "Chinese Drywall Inspectors" in the area at the time we purchased this property, because the issue was not well known in Miami-Dade County, Florida.

37.     It is my belief that the evaluation of the condition of the property that I conducted prior to purchase was indeed a "reasonable inquiry" and I affirm that I did not purchase the Affected Property with either actual or constructive notice that it contained defective Knauf-made Chinese drywall.

38.     It is my understanding that banking laws found the U.S. Code, that control the conduct of Sellers, do not require banking institutions to disclose known defects such as Chinese-manufactured drywall when selling a property containing a damaged structure; thus, Sellers sale of this property "as-is" was immoral and/or unscrupulous, but it was not a violation of any state or federal law to the best of my knowledge.

39.     I have no recollection of a written disclosure of the defective Chinese drywall in this home by Seller, local city or county agency, State of Florida, or federal agency, or by the Knauf Defendants, and after review of my file related to the sale, I have found no written disclosure of any kind related to defective Knauf-manufactured drywall.

40.     It is my understanding that Knauf did not notify the State of Florida about the potential presence of defective drywall it manufactured that was found in the Affected Property.

41.     It is my understanding that Knauf did not notify any Miami-Dade County governmental agencies about the potential presence of defective drywall it manufactured that was found in the Affected Property.

42.     It is my understanding that the Knauf Defendants did not notify any consumer product safety non-governmental agency about the potential presence of defective drywall it manufactured that was found in the Affected Property.

43.     The Knauf defendants possessed or should have acquired information about the potential locations of structures in the United States that might have used their defective product during construction.

44.     Given the knowledge that Knauf possessed about the amount of drywall and timing that it was imported into the United States, the Knauf Defendants knew or should have known about the location of the ports of entry where they imported the defective drywall into the United States, the identity of the distributors that took possession of their defective drywall at the various ports of entry, the identity of the downstream distributors that took possession of their defective drywall, the identity of the contractors and subcontractors that took possession of their defective drywall, and the potential properties that might have received their defective drywall during construction.  In addition, the Knauf Defendants should have provided any/all potential buyers, including me, with notice about the possible locations of their product, including the Affected Property.

45.     If the Knauf Defendants provided any information to a local, state or federal agency about possible properties that contained defective drywall, I would have wanted that notice and I would have acted to inspect the Affected Property for the presence of Chinese drywall before purchase; however, given that no notice was provided to me in writing by the Seller, State of Florida, or federal government in any way, the real estate community in the Miami-Dade County, Florida area was not knowledgable about the affects of defective Chinese sheetrock, and no information was available to me that would have provided adequate notice about the potential for the presence of defective Chinese sheetrock in this Affected Property prior to purchase, there was no reason to believe that the home contained this latent defect.

46.     I was not aware of any other claim for defective Chinese sheetrock manufactured by the Knauf or Taishan defendants in the Miami-Dade County, Florida, area until a very short time before I filed my claim related to the Affected Property.

47.     I am not aware of any affirmative duty to pay for either a home inspection or Chinese drywall inspection, prior the purchase of a home, that was imposed by any controlling authority.

48.     Given the lack of actual or constructive notice to me prior to the sale by the Seller, a govermental agency or the defendants, and given the lack of disclosure by the

seller or Knauf Defendants, and given the timing of both this purchase and discovery of defective Chinese-made sheetrock in the Affected Property, I firmly believe that I made a "reasonable inquiry" into the condition of the Affected Property prior to purchasing it.

49.     I employed AMBAR Construction, Inc. to perform repairs, including the remediation of Chinese-made drywall.  AMBAR completed much of the work, but a dispute arose during the post-demolition phase that required me to employ multiple subcontractors myself.  I personally oversaw the project to completion.

50.     AMBAR has refused to execute the Owner Disclosure Affidavit, so only the home owner's portion has been completed by me.  Based on my review of the Settlement Agreement, my remediation complied with the Court's accepted protocol and, although AMBAR did not assist in executing either an Owner Disclosure Affidavit, I did so and it will be submitted to the Court.

51.     I engaged Building Envelope Science Institute, Inc. to perform a "Third-Party Remediation Inspection Report," confirming that all drywall has been removed, as set forth in the Remediation Protocol, Exhibit F to the Settlement Agreement Regarding Claims Against the Knauf Defendants in MDL No. 2047.  A copy of both the report issued by Building Envelope Science Institute, Inc. and Owner Disclosure Affidavit will be provided to the Court.

52.     The final out-of-pocket cost to us related solely to the remediation of the home was $160,300.00.

53.     The Settlement Agreement provides for a lump-sum living expense payment to qualifying plaintiffs who owned residential property.  Because my home was measured to have 3,453 square feet of under air/ air conditioned living space, I am due to receive $29,350.50 in addition to my construction costs.

54.     Based on the terms of the Settlement Agreement, I believe that a disbursement is appropriate for a grand total of $189,650.50.  I request that the court approve this amount and instruct the settlement administrator to issue a check without any further delay.

My signature below affirms my personal knowledge of the circumstances described herein and I hereby represent that this information is true to the best of my knowledge under penalty of perjury.

_____
Affiant
Doodnauth Bahadur

SWORN TO AND SUBSCRIBED BEFORE ME on this _23_ day of May, 2018, at _Queens_____, New York (Kings Borough) County, New York.

_____
Notary Public

C. PAUL RAMAUTAR
Notary Public, State of New York
No. 01RA4963161
Qualified in Queens County
Commission Expires March 5, 20__

My Commission Expires:_____

(SEAL)

STATE OF FLORIDA )
)
COUNTY OF LEE )

## AFFIDAVIT OF CHRISTOPHER OWENS

Before me, the undersigned authority in and for said county, in said state, on this day personally appeared Christopher Owens, who, being first duly sworn, deposes and says:

1.      My name is Christopher Owens. I am over the age of nineteen (19) years and have been a resident of Lee County, Florida, for more than five (5) years.  I state that I have personal knowledge of the following facts.

2.      I am currently a member of CDO Investments, LLC ("CDO") and have been so for the period of time relevant to the issues addressed herein.

3.      CDO owns the following three (3) properties, located at the following street addresses: 4698 Globe Terrace, North Port, FL 34286 ("Affected Property 1"); 1374 Cathedall Avenue, North Port, FL 34288 ("Affected Property 2"); 2063 Vancouver Lane, North Port, FL 34286 ("Affected Property 3); (Affected Properties 1-3 collectively referred to as "Affected Properties").

4.      CDO purchased Affected Property 1 on May 15, 2013, the date reflected on the Warranty Deed.

5.      CDO purchased Affected Property 2 on December 21, 2012, the date reflected on the Warranty Deed.

6.      CDO purchased Affected Property 3 on May 27, 2013, the date reflected on the Certificate of Title.

7.      CDO purchased all five Affected Properties for commercial purposes – to either renovate and resell or to renovate and lease the properties to tenants.

8.      All five Affected Properties were advertised as a foreclosures to be sold at a county managed real estate auction overseen by the Charlotte or Sarasota County Sheriff's Department.

9.      All five Affected Properties were advertised indicating that the respective sellers were offering each property "as-is" with no representations by the seller beyond the basic

property information such as date of construction, approximate square footage and number of bedrooms and bathrooms (all of which was publicly available through the Lee County Property Appraiser's website).

10.    To the best of my recollection, all three Affected Properties were offered via auction without reserve to be sold to the highest bidder on the day of the sale.

11.    None of the Affected Properties to be sold at auction provided for prospective bidders to enter the homes for a walkthrough or inspection to be conducted prior to the sale date; consequently, the only inspection permissible was done from the exterior of the homes.

12.    As part of our due diligence in evaluating the five Affected Properties for potential purchase, CDO engaged representatives of Team Realty of Southwest Florida to conduct a home inspection of each property to the extent possible, even if it was only based on observations from the exterior of the homes.

13.    Team Realty of Southwest Florida did in fact conduct a home inspection of each of the three Affected Properties and in each case produced a report that CDO utilized for determining its top bid amount for each property auction.

14.    No advertisement for any of the Affected Properties disclosed that the property contained defective Chinese sheetrock produced by Knauf Plasterboard Tianjin or any other Chinese manufacturer.

15.    It is worth noting that CDO purchased many homes via a county real estate foreclosure auction during this same time period and none were known to contain defective Chinese sheetrock prior to the purchase.

16.    It is CDO's position that it defies common sense to purposely purchase homes containing defective Chinese sheetrock that were unremediated due to the added expense that one would expect to incur, in addition to the burden of uncertain legal entanglements and delay necessary to secure reimbursement for the self-remediation expense.

17.    It was not until CDO took control of the Affected Properties that it was learned that the homes contained defective Chinese sheetrock.

18.    With respect to all three Affected Properties, Ziegler Contracting or Superior Contracting conducted post-purchase evaluations of each home to determine whether

defective Chinese sheetrock was present and in the case of all three Affected Properties, the result was positive.

19.     After completing the remediation of the Affected Properties and learning that the drywall was the subject of litigation, CDO engaged the Doyle Law Firm to represent us in the consolidated defective Chinese-manufacturerd drywall litigation.

20.     Neither the sellers of each affected property nor the county officials advertising the foreclosure auction disclosed that the structures on these Affected Properties contained defective Chinese sheetrock either prior to or after the the auction.  And, no other person or entity disclosed that the homes contained defective Chinese sheetrock prior to or after the auction.

21.     All disclosures made by Charlotte County or Sarasota County were made in writing and available to me prior to the auction date; there was no disclosure to me or any other prospective buyer that any of the homes contained defective Chinese drywall.

22.     It is my opinion that the Affected Properties listed for sale "As-Is" should have provided all prospective bidders with a specific disclosure regarding the condition of the structure, if known, including the presence of defective Chinese-manufatured drywall; however, it is my understanding that no state law, federal law, local ordinance, or court order compels a seller to make such disclosures prior to sale.

23.     Due to the nature of the foreclosure auctions, it was plainly evident that the previous owners lost the homes due to foreclosure or were having their homes sold through a compelled short sale through the auction mechanism, although I have no specific personal knowledge about their individual situations that led to foreclosure or short sale proceedings.

24.     I am a real estate developer, investor, and contractor in the business of buying and selling property in South Florida and I have owned many other houses that were purchased through auction and otherwise.  I retained Team Realty of Southwest Florida to conduct a thorough inspection of each of these three homes and requested a report on each.

25.     I personally evaluated each of these three reports and although the homes were vandalized or in disrepair, none of the known issues were viewed by me as significant enough to preclude a bid at auction.

26.     The conclusion I reached after Team Realty's report for each respective Affected Property was that there were no major defects in the homes and each was suitable for purchase at the anticipated sale price.

27.     CDO retained Team Realty of Southwest Florida to conduct the inspection of these homes and I am not aware of any court order, issued by Judge Fallon or otherwise, requiring a buyer to have a home inspection performed by a particular party or from a list of approved inspectors, with or without certain credentials, prior to purchasing a home.

28.     Likewise, I am not aware of any state or federal statute requiring a buyer to have an inspection performed prior to purchase to evaluate a structure for the presence of Chinese drywall by a particular party or from a list of approved inspectors, with or without certain credentials.

29.     It is my understanding that the Settlement Agreement in my case does not require a plaintiff (i.e., a buyer of a home containing defective Knauf-made drywall) to have either a home inspection or a "Chinese Drywall Inspection" prior to purchase, only that in order to qualify for settlement benefits, a plaintiff cannot purchase with knowledge that a home contains defective Knauf-manufactured Chinese drywall and a "reasonable inquiry" regarding the condition of the property must be made prior to closing the sale.

30.     Without question, CDO meets the requirements of the settlement agreement; CDO did not buy any of these Affected Properties with knowledge of defective Chinese-made sheetrock in the homes; and, before auction, CDO engaged Team Realty of Southwest Florida to conduct a thorough home inspection that included examining the home, if possible, for the common signs that demonstrated the likelihood that defective Chinese-made sheetrock was present.

31.     It is my understanding that the State of Florida has no state-approved certification for "Chinese Drywall Inspectors" that provides residents with standards to expect regarding the qualifications and credentials of the "Chinese Drywall Inspectors" and/or the objective standard to expect when a "Chinese Drywall Inspection" is conducted.

32.     It is my belief that the evaluation of the condition of the property that Team Realty of Southwest Florida conducted prior to CDO's purchase at auction was indeed a "reasonable inquiry" and I affirm that CDO did not purchase the Affected Property with

either actual or constructive notice that it contained defective Knauf-made Chinese drywall.

33.     It is my understanding that banking laws found the U.S. Code, that control the conduct of sellers, including representatives of Charlotte County and Sarasota County who conducted the real estate foreclosure auction, do not require banking institutions to disclose known defects such as Chinese-manufactured drywall when selling a property containing a damaged structure; thus, the sale of this property "as-is" was immoral and/or unscrupulous if it was a known defect, but it was not a violation of any state or federal law to the best of my knowledge.

34.     I have no recollection of a written disclosure of the defective Chinese drywall in these homes by the sellers, local city or county agency, State of Florida, federal agency, or by the Knauf Defendants, and after review of my file related to the sales, I have found no written disclosure of any kind related to defective Knauf-manufactured drywall.

35.     It is my understanding that Knauf did not notify the State of Florida about the potential presence of defective drywall it manufactured that was found in the Affected Property.

36.     It is my understanding that Knauf did not notify any Lee County governmental agencies about the potential presence of defective drywall it manufactured that was found in the Affected Property.

37.     It is my understanding that the Knauf Defendants did not notify any consumer product safety non-governmental agency about the potential presence of defective drywall it manufactured that was found in the Affected Property.

38.     The Knauf defendants possessed or should have acquired information about the potential locations of structures in the United States that might have used their defective product during construction.

39.     Given the superior knowledge that Knauf possessed about the amount of drywall and timing that it was imported into the United States, the Knauf Defendants knew or should have known about the location of the ports of entry where they imported the defective drywall into the United States, the identity of the distributors that took possession of their defective drywall at the various ports of entry, the identity of the downstream distributors that took possession of their defective drywall, the identity of the

contractors and subcontractors that took possession of their defective drywall, and the potential properties that might have received their defective drywall during construction. In addition, the Knauf Defendants should have provided any/all potential buyers, including CDO, with notice about the possible locations of their product, including the Affected Property.

40.     If the Knauf Defendants provided any information to a local, state or federal agency about possible properties that contained defective drywall, CDO would have wanted that notice and CDO would have acted to inspect the Affected Property to the extent possible for the presence of Chinese drywall before purchase or we would have chosen to make no bid at auction; however, given that no notice was provided to anyone in writing by the Seller, State of Florida, or federal government in any way, the real estate community in the Lee County, Florida area had limited knowledge about the affects of defective Chinese sheetrock, and no information was available to me that would have provided adequate notice about the potential for the presence of defective Chinese sheetrock in these Affected Properties prior to purchase at auction, there was no reason to believe that these homes contained this latent defect.

41.     Although CDO engaged Team Realty of Southwest Florida to conduct a thorough property inspection prior to auction, I am not aware of any affirmative duty to pay for either a home inspection or Chinese drywall inspection, prior the purchase of a home, that was imposed by any controlling legal authority.

42.     Given the lack of actual or constructive notice to CDO prior to the auction sales by the seller, a govermental agency or the defendants, and given the lack of disclosure by the seller or Knauf Defendants, I firmly believe that CDO made a reasonable inquiry into the condition of the Affected Properties prior to purchasing each one of them and full settlement benefits should be paid accordingly.

43.     With regard to the Affected Properties, CDO employed Superior Contracting as the primary contractor to perform repairs, including the remediation of Chinese-made drywall.  Superior Contracting and its stable of subcontractors completed the work in compliance with the Court's accepted protocol and executed an Owner Disclosure Affidavit that described the remediation of each of the Affected Properties.

44.     Superior Contracting also executed an Environmental Certificate for each of the Affected Properties, confirming that all drywall has been removed, including debris and visible dust, as set forth in the Remediation Protocol, Exhibit F to the Settlement Agreement Regarding Claims Against the Knauf Defendants in MDL No. 2047.  A copy of both the Environmental Certificate and Owner Disclosure Affidavit for each property will be provided to the Court.

45.     Based on the terms of the Settlement Agreement and CDO's full compliance therewith, CDO should be paid following monetary amounts without any further delay: 1) $76,612.50 for Affected Property 1;  2) $75,612.50 for Affected Property 2; and,  3) $74,159.31 for Affected Property 3.

My signature below affirms my personal knowledge of the circumstances described herein and I hereby represent that this information is true to the best of my knowledge under penalty of perjury.

_____

Affiant
Chris Owens

SWORN TO AND SUBSCRIBED BEFORE ME on this 19 day of May, 2018, at _____ Lee _____, Florida.

_____

Notary Public

My Commission Expires:

ELAINE C LUKES
MY COMMISSION # FF227268
EXPIRES May 05, 2019
(407) 388-0153      FloridaNotaryService.com

(SEAL)

**STATE OF FLORIDA** )
)
**COUNTY OF LEE** )

### AFFIDAVIT OF ANDREW KUBICK

Before me, the undersigned authority in and for said county, in said state, on this day personally appeared Andrew Kubick, who, being first duly sworn, deposes and says:

1.      My name is Andrew Kubick. I am over the age of nineteen (19) years and have been a resident of Lee County, Florida, for more than five (5) years.  I state that I have personal knowledge of the following facts.

2.      I am the owner of a property with a pending already remediated home claim, located at the following street address: 2802 21st Street West, Lehigh Acres, FL  33971 ("Affected Property").

4.      I purchased Affected Property on February 6, 2012, the date reflected on the Warranty Deed.

5.      Grantor of Affected Property was Jotcar, Inc., a Florida corporation ("Seller").

6.      I purchased Affected Property with the intention to renovate and utilize as a residential property for my family.

7.      Affected Property was advertised as a foreclosure to be sold at a county managed real estate auction overseen by the Lee County Sheriff's Department.

8.      Affected Property was advertised indicating that Seller was offering this property "as-is" with no representations by Seller beyond the basic property information such as date of construction, approximate square footage and number of bedrooms and bathrooms (all of which was publicly available through the Lee County Property Appraiser's website).

9.      To the best of my recollection, Affected Property was offered via auction without reserve to be sold to the highest bidder on the day of the sale, the same as all other properties offered at similar auctions.

10.     No prospective bidders were permitted to enter the Affected Property for a walkthrough or inspection prior to the sale date; consequently, the only inspection permissible was done from the exterior of the home.

11.     As part of my due diligence in evaluating the Affected Property for potential purchase, I engaged Team Realty of Southwest Florida to conduct a home inspection of this property to the extent possible, even if it was only based on observations from the exterior of the home.

12.     Team Realty of Southwest Florida conducted a home inspection of Affected Property and produced a report that I utilized for determining its top bid amount at auction.  Team Realty did not find defective Chinese sheetrock through their inspection.

13.     No advertisement for Affected Property disclosed that the property contained defective Chinese sheetrock produced by Knauf Plasterboard Tianjin or any other Chinese manufacturer.

14.     It is worth noting that I did not purchased any other homes via county real estate foreclosure auction during this same time period.

15.     It is my position that it defies common sense to purposely purchase a home containing defective Chinese sheetrock that was unremediated due to the added expense that one would expect to incur, in addition to the burden of legal entanglements and delay necessary to secure an uncertain reimbursement for the self-remediation expense.

16.     It was not until I took control of the Affected Property that it was learned that the home contained defective Chinese sheetrock.

17.     Superior Contracting was employed to conduct renovations and repairs to Affected Property and on approximately February 12, 2012, shortly after beginning work on the home, they identified the telltale signs that Affected Property contained defective Chinese sheetrock. It was quickly confirmed to be a Knauf-made product.

18.     After completing the remediation of the Affected Property and learning that the drywall was the subject of litigation, I engaged the Doyle Law Firm to pursue a recovery.

19.     Neither the sellers of Affected Property nor the county officials advertising the foreclosure auction disclosed that Affected Property contained defective Chinese sheetrock either prior to or after the the auction.  And, no other person or entity disclosed that Affected Property contained defective Chinese sheetrock prior to or after the auction.

20.     All disclosures made by Lee County were made in writing and available to me prior to the auction date; there was no disclosure to me or any other prospective buyer that Affected Property contained defective Chinese drywall.

21.     It is my opinion that the Affected Property listed for sale "As-Is" should have provided all prospective bidders with a specific disclosure regarding the condition of the structure, if known, including the presence of defective Chinese-manufatured drywall; however, it is my understanding that no state law, federal law, local ordinance, or court order compels a seller to make such disclosures prior to sale.

22.     Due to the nature of the foreclosure auction, it was plainly evident that the previous owners either lost the home due to foreclosure or the bank was offering the auction as a short sale mechanism, although I have no specific personal knowledge about the individual situation that led Sellers into foreclosure or short sale proceedings.

23.     I am not a real estate developer or investor in the business of buying and selling property and I have not owned many other houses that were purchased through auction.  I relied on the inspection report generated by Team Realty and I personally reviewed the report before taking action to bid on Affected Property at the county foreclosure auction.

24.     I retained Team Realty of Southwest Florida to conduct the inspection of this home and I am not aware of any court order, issued by Judge Fallon or otherwise, requiring a buyer to have a home inspection performed by a particular party or from a list of approved inspectors, with or without certain credentials, prior to purchasing a home.

25.     Likewise, I am not aware of any state or federal statute requiring a buyer to have an inspection performed prior to purchase to evaluate a structure for the presence of Chinese drywall by a particular party or from a list of approved inspectors, with or without certain credentials.

26.     It is my understanding that the Settlement Agreement in my case does not require a plaintiff (i.e., a buyer of a home containing defective Knauf-made drywall) to have either a home inspection or a "Chinese Drywall Inspection" prior to purchase, only that in order to qualify for settlement benefits, a plaintiff cannot purchase with knowledge that a home contains defective Knauf-manufactured Chinese drywall and a "reasonable inquiry" regarding the condition of the property must be made prior to closing the sale.

27.     Without question, I meet the requirements of the settlement agreement; I did not buy Affected Property with knowledge of defective Chinese-made sheetrock; and, before auction, I engaged Team Realty of Southwest Florida to conduct a thorough home inspection that included examining the home, if possible, for the common signs that demonstrated the likelihood that defective Chinese-made sheetrock was present.

28.     It is my understanding that the State of Florida has no state-approved certification for "Chinese Drywall Inspectors" that provides residents with standards to expect regarding the qualifications and credentials of the "Chinese Drywall Inspectors" and/or the objective standard to expect when a "Chinese Drywall Inspection" is conducted.

29.     It is my belief that the evaluation of the condition of the property that Team Realty of Southwest Florida conducted prior to my purchase at auction was indeed a "reasonable inquiry" and I affirm that I did not purchase the Affected Property with either actual or constructive notice that it contained defective Knauf-made Chinese drywall.

30.     It is my understanding that banking laws found the U.S. Code, that control the conduct of sellers, including representatives of Lee County, Florida, who conducted the real estate foreclosure auction, do not require banking institutions to disclose known defects such as Chinese-manufactured drywall when selling a property containing a damaged structure; thus, the sale of this property "as-is" was immoral and/or unscrupulous if it was a known defect, but it was not a violation of any state or federal law to the best of my knowledge.

31.     I have no recollection of a written disclosure of the defective Chinese drywall in this home by Seller, local city or county agency, State of Florida, federal agency, or by the Knauf Defendants, and after review of my file related to the sale, I have found no written disclosure of any kind related to defective Knauf-manufactured drywall.

32.     It is my understanding that Knauf did not notify the State of Florida or any Lee County governmental agencies about the potential presence of defective drywall it manufactured that was found in the Affected Property.

33.     It is my understanding that the Knauf Defendants did not notify any consumer product safety non-governmental agency about the potential presence of defective drywall it manufactured that was found in the Affected Property.

34.     The Knauf defendants possessed or should have acquired information about the potential locations of structures in the United States that might have used their defective product during construction.

35.     Given the superior knowledge that Knauf possessed about the amount of drywall and timing that it was imported into the United States, the Knauf Defendants knew or should have known about the location of the ports of entry where they imported the defective drywall into the United States, the identity of the distributors that took possession of their defective drywall at the various ports of entry, the identity of the downstream distributors that took possession of their defective drywall, the identity of the contractors and subcontractors that took possession of their defective drywall, and the potential Property that might have received their defective drywall during construction. In addition, the Knauf Defendants should have provided any/all potential buyers, including myself, with notice about the possible locations of their product, including the Affected Property.

36.     If the Knauf Defendants provided any information to a local, state or federal agency about a possible property that contained defective drywall, I would have wanted that notice and I would have acted to inspect the Affected Property to the maximum extent possible for the presence of Chinese drywall before purchase or we would have chosen to make no bid at auction; however, given that no notice was provided to anyone in writing by the Seller, State of Florida, or federal government in any way and no information was available to me that would have provided adequate notice about the potential for the presence of defective Chinese sheetrock in this Affected Property prior to purchase at auction, there was no reason to believe that this home contained this latent defect.

37.     Although I engaged Team Realty of Southwest Florida to conduct a thorough property inspection prior to auction, I am not aware of any affirmative duty to pay for either a home inspection or Chinese drywall inspection, prior the purchase of a home, that was imposed by any controlling legal authority.

38.     Given the lack of actual or constructive notice to me prior to the auction sale by the Seller, a govermental agency or the defendants, and given the lack of disclosure by the Seller or Knauf Defendants, I firmly believe that I made a reasonable inquiry into the

condition of the Affected Property prior to purchasing it and full settlement benefits should be paid accordingly.

39.     With regard to the Affected Property, I employed Superior Contracting to perform repairs, including the remediation of Chinese-made drywall.  Superior Contracting completed the work in compliance with the Court's accepted protocol and executed an Owner Disclosure Affidavit that described the remediation of the Affected Property.

40.     Superior Contracting also executed an Environmental Certificate for the Affected Property, confirming that all drywall had been removed, including debris and visible dust, as set forth in the Remediation Protocol, Exhibit F to the Settlement Agreement Regarding Claims Against the Knauf Defendants in MDL No. 2047.  A copy of both the Environmental Certificate and Owner Disclosure Affidavit will be provided to the Court.

41.     The final out-of-pocket cost to us related solely to the remediation of the home was $73,365.80.

42.     The Settlement Agreement provides for a lump-sum living expense payment to qualifying plaintiffs who owned residential property.  Because my home was measured to have 1,698 square feet of under air/ air conditioned living space, I am due to receive $14,433.00 in addition to my construction costs.

43.     Based on the terms of the Settlement Agreement, I believe that a disbursement is appropriate for a grand total of $87,798.80.  I request that the court approve this amount and instruct the settlement administrator to issue a check without any further delay.

My signature below affirms my personal knowledge of the circumstances described herein and I hereby represent that this information is true to the best of my knowledge under penalty of perjury.

_____
Affiant
Andrew Kubick

SWORN TO AND SUBSCRIBED BEFORE ME on this 19 day of May, 2018, at _____, Florida.

_____
Notary Public

My Commission Expires: _____

ELAINE C LUKES
MY COMMISSION # FF227268
EXPIRES May 05, 2019
(407) 398-0153    FloridaNotaryService.com

(SEAL)

**STATE OF FLORIDA** )
)
**COUNTY OF MIAMI-DADE** )

### AFFIDAVIT OF MOHAMED LATIFF

Before me, the undersigned authority in and for said county, in said state, on this day personally appeared Mohamed Latiff, who, being first duly sworn, deposes and says:

1. My name is Mohamed Latiff. I am over the age of nineteen (19) years and have been a resident of Miami-Dade County, Florida, for more than five (5) years. I state that I have personal knowledge of the following facts.

2. I own a property located at the following street address: 1898 SE 23 CT, Miami, FL 33035 ("Affected Property").

3. I purchased Affected Property on February 8, 2013, the date reflected on my Warranty Deed.

4. I purchased this property as a short sale from an individual, Frank F. Abad, a single man ("Seller") after approval by his bank.

5. The property was purchased in the name of my business, J.S. Carpentry, Inc. and I intended to renovate the property and use it for my extended family.

6. The Affected Property was nearby my current family home and the property as a great deal, given the location and sale price.

7. To the best of my recollection, the advertisement indicated that the seller's bank was offering the property "as-is" and there were no representations by the Seller or his bank beyond the basic property information such as date of construction, approximate square footage and number of bedrooms and bathrooms.

8. Neither the Seller nor his bank disclosed that the property contained defective Chinese sheetrock produced by Knauf Plasterboard Tianjin or any other Chinese manufacturer.

9. Prior to making an offer for purchase in January of 2013, I conducted a walkthrough and thorough inspection of the Affected Property. The property was in extremely poor condition – it had not been inhabited for over two (2) years. The exterior

was in very poor condition; there were water leaks that caused mold issues inside the home; windows were broken or leaking; the roof was damaged; there was signficant damge to the floors in multiple locations; all appliances were missing; there were no kitchen cabinets; electrical fixtures were damaged or missing; the bathrooms were in disrepair; and, most importantly, the Affected Property was experiencing a significant termite infestation.

10.     The Affected Property was being offered as a short sale for a very attractive price; however, in addition to the purchase price, two (2) years of home owner association fees were in arrears and had to be paid before the HOA lien was satisfied.  I paid two (2) years of HOA fees at closing in addition to the purchase price.

11.     At the time I purchased this Affected Property, I had become familiar with the Chinese drywall issue.  My personal residence contained Knauf-made drywall and had required remediation after purchase.

12.     During my inspection of this Affected Property, I specifically looked for signs of Chinese drywall in addition to the usual home evaluation; however, the bank would not allow any destructive testing to be done, so a full inspection for defective Chinese-made drywall was not possible.  Additionally, because the building code in this area of Florida requires a thicker drywall in the ceiling than the walls, defective sheetrock is usually not found with a visual inspection in an attic.  And, it is very difficult to confirm the presence of defective drywall in the walls if no destructive testing is allowed.

13.     I am a contractor and I have owned other houses.  I am familiar with the typical defects that might present themselves in the years following construction.  The items I inspected in the Affected Property, to the extent available, were: 1) damaged roof; 2) damaged foundation evidenced by foundational settlement cracks; 3) mold spores if a home has been vacant; 4) electrical issues; 5) plumbing issues; 6) water damage on exterior; 7) water damage on interior; 8) damaged structural components; 8) damaged or incorrectly constructed roof framing; 9) proper insulation in attic area; 10) vandalism or damage to walls by prior owner; 11) condition of cabinets, fixtures and appliances in kitchen; 12) properly functioning heating and cooling system; and, 13) properly functioning water heater.  I personally evaluated each of these issues and although the

home was vandalized and in significant disrepair, none of the known issues were viewed by me as significant enough to preclude an offer.

14.     It should be noted that the electricity, water and gas services were not connected at the time prior to purchase, so I was unable to evaluate the integrity of the electrical, plumbing or air conditioning systems.  And, when coupled with the prohibition of destructive testing, I could make no determination about the effects of the mold damage versus any other environmental contaminant such as Chinese drywall.

15.     I can affirm with confidence that during my thorough inspection of the Affected Property, I do not recall that the home containing a "rotten egg" smell and I did not find any markings on exposed drywall in the attic area.  And, based on the exposed copper pipes affected by the water intrusions causing mold and discoloration, I could not rule out the presence of Chinese drywall.  But, by the same token, I could not confirm the presence of Chinese drywall either.

16.     During the walkthrough and inspection of the Affected Property prior to purchase, I did not notice any corrosion on fixtures, appliances or any other item that could not be attributed to the buildup of mold.

17.     It was not until I began renovations on the home (when I opened up one of the walls in the master bedroom) that I learned that the home had Chinese drywall manufactured by Knauf.

18.     Near the end of remediation of the Affected Property, I learned that the drywall in my Affected Property was the subject of litigation, so I engaged the Doyle Law Firm to represent me.

19.     Prior to purchase, no other person or entity disclosed that the Affected Property contained defective Chinese sheetrock. The Seller was offering the property "As-Is."

20.     I did not receive any notice from the Knauf Defendants about the effects of Chinese drywall and, although I was aware of the effects of Chinese drywall on certain components in homes, I was not on actual or constructive notice about the potential presence of Chinese Drywall in this particular Affected Property.

21.     All disclosures made by Seller were made in writing and available to me prior to the sale date; there was no disclosure to me or any other prospective buyer that the home contained defective Chinese drywall.

22.      It is my opinion that the Affected Property listed online by Sellers to be sold "As-Is" should have provided me with a specific disclosure regarding the condition of the structure, including the presence of defective Chinese-manufatured drywall; however, it is my understanding that no state law, federal law, local ordinance, or court order compels a seller to make such disclosures prior to sale.

23.      I came to learn that Seller had this home either foreclosed or were being forced to offer the home as a short sale by their bank.  It was my conclusion that the home was being offered for such a drastically reduced price based on the water damage, mold damage, and termite damage.

24.      A second conclusion I reached after inspecting the Affected Property was that the damage present in the home could be adequately addressed by me and, once completed, would enhance the market value significantly beyond the purchase price plus renovation cost; thus, the purchase made financial sense to me.

25.      I am not aware of any state or federal statute requiring a buyer to have a home inspection by any other person or entity prior to purchasing a home.  Because I am a licensed contractor and capable of building or renovating any dwelling, I saw no need to incur the additional expense.

26.      I conducted the inspection of this home myself and I am not aware of any court order, issued by Judge Fallon or otherwisde, requiring a buyer to have a home inspection performed by another party, with or without certain credentials, prior to purchasing a home.

27.      I am not aware of any controlling legal authority, including state or federal law, ordinance, regulation or court order, requiring a buyer to have an inspection performed prior to purchase to evaluate a structure for the presence of Chinese drywall.

28.      I am also not aware of any controlling legal authority, including state or federal law, ordinance, regulation or court order, requiring a buyer to have an inspection performed prior to purchase to evaluate a structure for the presence of Chinese drywall.

29.      It is my understanding that the Settlement Agreement in my case does not require a plaintiff (i.e., a buyer of a home containing defective Knauf-made drywall) to have either a home inspection or a "Chinese Drywall Inspection" prior to purchase, only that in order to qualify for settlement benefits, a plaintiff cannot purchase with knowledge that a

home contains defective Knauf-manufactured Chinese drywall and a "reasonable inquiry" regarding the condition of the property must be made prior to closing the sale.

30.     I meet the requirements of the settlement agreement; I did not buy this Affected Property with knowledge of defective Chinese-made sheetrock in the home; and, I made a reasonable inquiry regarding the condition of the property prior to closing the sale by performing a comprehensive, thorough home inspection myself as I am fully qualified to inspect a home for common construction defects.

31.     It is my understanding that the State of Florida has no state-approved certification for "Chinese Drywall Inspectors" that provides residents with standards to expect regarding the qualifications and credentials of the "Chinese Drywall Inspectors" and/or the objective inspection standard to expect when a "Chinese Drywall Inspection" is conducted.

32.     It is my understanding that Judge Eldon Fallon, District Court Judge in the United States District Court for the Eastern District of Louisiana, who presides over the consolidated Chinese drywall litigation (MDL No. 2047) has not issued any order declaring necessary credentials or training for an individual or entity to hold themselves out to the public as approved "Chinese Drywall Inspectors."

33.     It is my understanding that banking laws found the U.S. Code, that control the conduct of Sellers, do not require banking institutions to disclose known defects such as Chinese-manufactured drywall when selling a property containing a damaged structure; thus, Sellers sale of this property "as-is" was immoral and/or unscrupulous, but it was not a violation of any state or federal law to the best of my knowledge.

34.     I have no recollection of a written disclosure of the defective Chinese drywall in this home by Seller, local city or county agency, State of Florida, or federal agency, or by the Knauf Defendants, and after review of my file related to the sale, I have found no written disclosure of any kind related to defective Knauf-manufactured drywall.

35.     It is my understanding that Knauf did not notify the State of Florida about the potential presence of defective drywall it manufactured that was found in the Affected Property.

36.     It is my understanding that Knauf did not notify any Miami-Dade County governmental agencies about the potential presence of defective drywall it manufactured that was found in the Affected Property.

37.     It is my understanding that the Knauf Defendants did not notify any consumer product safety non-governmental agency about the potential presence of defective drywall it manufactured that was found in the Affected Property.

38.     The Knauf defendants possessed or should have acquired information about the potential locations of structures in the United States that might have used their defective product during construction.

39.     Given the knowledge that Knauf possessed about the amount of drywall and timing that it was imported into the United States, the Knauf Defendants knew or should have known about the location of the ports of entry where they imported the defective drywall into the United States, the identity of the distributors that took possession of their defective drywall at the various ports of entry, the identity of the downstream distributors that took possession of their defective drywall, the identity of the contractors and subcontractors that took possession of their defective drywall, and the potential properties that might have received their defective drywall during construction.  In addition, the Knauf Defendants should have provided any/all potential buyers, including me, with notice about the possible locations of their product, including the Affected Property.

40.     If the Knauf Defendants provided any information to a local, state or federal agency about possible properties that contained defective drywall, I would have wanted that notice and I would have acted to inspect the Affected Property for the presence of Chinese drywall before purchase; however, given that no notice was provided to me in writing by the Seller, State of Florida, or federal government in any way, and no information was available to me that would have provided adequate notice about the potential for the presence of defective Chinese sheetrock in this Affected Property prior to purchase, there was no reason to believe that the home contained this latent defect.

41.     I was not  aware of any other claim for defective Chinese sheetrock manufactured by the Knauf or Taishan defendants in the Miami-Dade County, Florida, area until a very short time before I filed my claim related to the Affected Property.

42.     I am not aware of any affirmative duty to pay for either a home inspection or Chinese drywall inspection, prior the purchase of a home, that was imposed by any controlling authority.

43.     Given the lack of actual or constructive notice to me prior to the sale by the Seller, a govermental agency or the defendants, and given the lack of disclosure by the Seller and/or Knauf Defendants, I firmly believe that I made a reasonable inquiry into the condition of the Affected Property prior to purchasing it.

44.     JS Carpentry, Inc. performed repairs, including the remediation of Chinese-made drywall in this Affected Property.  The remediation work was completed in compliance with the Court's accepted protocol and executed an Owner Disclosure Affidavit that described the remediation of each of the Affected Properties.

45.     In addition to JS Carpentry, Inc. certifying that the court's approved remediation protocol was followed, including the environmental certificate, Building Envelope Science Institute, Inc. inspected the home after the demolition phase of remediation and executed an Environmental Certificate for the Affected Property, confirming that all drywall has been removed, including debris and visible dust, as set forth in the Remediation Protocol, Exhibit F to the Settlement Agreement Regarding Claims Against the Knauf Defendants in MDL No. 2047.  A copy of both the Environmental Certificate and Owner Disclosure Affidavit will be provided to the Court.

46.     The final remediation-related cost related to the remediation of the Affected Property was $125,000.00.

47.     The Settlement Agreement provides for a lump-sum living expense payment to qualifying plaintiffs who owned residential property, like us.  Because my home was measured to have 3,567 square feet of under air/ air conditioned living space by the Miami-Dade County Property Appraiser, I am due to receive $35,670.00 as a lump sum living expense in addition to my construction costs.

48.     Based on the terms of the Settlement Agreement, I believe that a disbursement is appropriate for a grand total of $160,670.00.  I request that the court approve this amount and instruct the settlement administrator to issue a check without any further delay.

My signature below affirms my personal knowledge of the circumstances described herein and I hereby represent that this information is true to the best of my knowledge under penalty of perjury.

Affiant
Mohamed K. Latiff

SWORN TO AND SUBSCRIBED BEFORE ME on this _24th_ day of May, 2018, at _Homestead_, Miami-Dade County, Florida.

Notary Public

My Commission Expires: _09/26/2020_

(SEAL)



DEBORA K GILBERT-LYTLE
MY COMMISSION # GG033591
EXPIRES September 26, 2020

**STATE OF FLORIDA** )
)
**COUNTY OF MIAMI-DADE** )

## AFFIDAVIT OF MOHAMED LATIFF

Before me, the undersigned authority in and for said county, in said state, on this day personally appeared Mohamed Latiff, who, being first duly sworn, deposes and says:

1.      My name is Mohamed Latiff. I am over the age of nineteen (19) years and have been a resident of Miami-Dade County, Florida, for more than five (5) years.  I state that I have personal knowledge of the following facts.

2.      I own a property located at the following street address: 1943 SE 22 DR, Miami, FL  33035 ("Affected Property").

3.      I purchased Affected Property on August 25, 2011, the date reflected on my Special Warranty Deed.

4.      I purchased this property from U.S. Bank national Association, as Trustee for the Certificateholders Citigroup Mortgage Loan Trust, Inc., Asset-Backed Pass-Through Certificates Series 2007-AMC1, whose mailing address is 12235 SW 192nd Terrace, Miami, FL  33177, authorized to do business in the State of Florida ("Sellers").

5.      I purchased the property in the name of my business, J.S. Carpentry and intended to renovate the property and use the home for my large family.

6.      The property was advertised as a foreclosure by a bank and my realtor presented the property as a great deal, given the location and sale price.

7.      To the best of my recollection, the advertisement indicated that the seller was offering the property "as-is" and there were no representations by the seller beyond the basic property information such as date of construction, approximate square footage and number of bedrooms and bathrooms (all of which were available at the time through the Miami-Dade County Property Appraiser's website).  I do not recall whether there were pictures of the interior of the property included with the advertisement.

8.      The Sellers did not disclose that the property contained defective Chinese sheetrock produced by Knauf Plasterboard Tianjin or any other Chinese manufacturer.

9.      In early 2011, the issues related to defective Chinese-manufactured drywall were not widely known in South Florida; moreover, the issues were certainly not known to me prior to purchase.

10.     Prior to making an offer for purchase in June of 2011, I conducted a walkthrough of the Affected Property and conducted a thorough inspection.

11.     The Affected Property was a foreclosure and the structure had encountered vandalism damage during the time it was vacant, so I conducted a walkthrough and inspection to assess the extent of the damage to the property.

12.     At the time of my walkthrough and inspection, there were no appliances in the home, most fixtures were missing, and there was obvious damage to several floor areas.

13.     I do not recall that the home ever containing a "rotten egg" smell, and even if it did, I would not have associated it with defective drywall from China as this was not even a known possibility to me at the time.

14.     It was not until I began renovations on the home that I learned that the home had an environmental problem, later identified as Chinese drywall.

15.     On approximately September 10, 2011, one of my subcontractors notified me of the corrosion found on the wiring inside one of the walls, as well as the smell emitted from the interior of the wall, I conducted an inspection and identified the markings on the backside of the drywall indicating that it was produced by a Knauf company.

16.     After conducting research following the discovery of Chinese-made drywall markings, I learned of the ongoing litigation in MDL No. 2047.

17.     During the walkthrough of the Affected Property prior to purchase and afterwards, I did not notice any corrosion on fixtures, appliances or any other item. Although the home had been vandalized, the electrical system was intact, as was the air conditioning system and plumbing system.

18.     After completing the remediation of the Affected Property and learning that the drywall in my Affected Property would be suitable to file a claim in the Chinese drywall litigation, I engaged the Doyle Law Firm.

19.     Prior to and after purchasing this property, I resided in Miami, Miami-Dade County, Florida.  I have no recollection whatsoever of any Chinese drywall issues being reported on the news or notice being provided to me prior to purchase that in any way

might be a problem for homeowners in Miami, Florida.  I was simply unaware of the issue prior to purchasing this Affected Property.

20.     The sellers did not disclose that the structure contained defective Chinese sheetrock prior to or after the the closing.  And, no other person or entity disclosed that the home contained defective Chinese sheetrock prior to or after the closing.

21.     Because I did not see or hear anything in the news or receive notice from the Knauf Defendants about the effects of Chinese drywall in late 2010 or early 2011, I was not on actual or constructive notice about the potential effects of defective Knauf-made Chinese Drywall that was distrubuted and used primarily in the Southeastern United States.

22.     All disclosures made by Sellers were made in writing and available to me prior to the sale date; there was no disclosure to me or any other prospective buyer that the home contained defective Chinese drywall.

23.     It is my opinion that the Affected Property listed online by sellers to be sold "As-Is" should have provided us with a specific disclosure regarding the condition of the structure, including the presence of defective Chinese-manufatured drywall; however, it is my understanding that no state law, federal law, local ordinance, or court order compels a seller to make such disclosures prior to sale.

24.     I came to learn through the property advertisement, later confirmed in the closing documents, that Sellers foreclosed on the previous owners of my home; however, I have no specific personal knowledge about the situation that led to foreclosure proceedings.

25.     I am a contractor and I have owned other houses.  I am familiar with the typical defects that might present themselves in the years following construction.  The items I inspected in the Affected Property, to the extent available, were: 1) damaged roof; 2) damaged foundation evidenced by foundational settlement cracks; 3) mold spores if a home has been vacant; 4) electrical issues; 5) plumbing issues; 6) water damage on exterior; 7) water damage on interior; 8) damaged structural components; 8) damaged or incorrectly constructed roof framing; 9) proper insulation in attic area; 10) vandalism or damage to walls by prior owner; 11) condition of cabinets, fixtures and appliances in kitchen; 12) properly functioning heating and cooling system; and, 13) properly functioning water heater.  I personally evaluated each of these issues and although the

home was vandalized and in disrepair, none of the damages to the home were viewed by me as significant enough to preclude an offer of purchase to the Seller.

26.    The conclusion I reached after inspecting the Affected Property was that there were no major defects in the home.

27.    I am not aware of any state or federal statute requiring a buyer to have a home inspection prior to purchasing a home.  I believed that I could repair the property and renovate it to the extent necessary for an amount, when coupled with the purchase price, would be less than the expected market value; therefore, buying this property for the price offered made financial sense.

28.    I conducted the inspection of this home myself and I am not aware of any court order, issued by Judge Fallon or otherwisde, requiring a buyer to have a home inspection performed by another party, with or without certain credentials, prior to purchasing a home.

29.    I am not aware of any state or federal statute requiring a buyer to have an inspection performed prior to purchase to evaluate a structure for the presence of Chinese drywall.

30.    I am not aware of any state or federal court order requiring a buyer to have an inspection performed prior to purchase to evaluate a structure for the presence of Chinese drywall.

31.    The real estate agent that offered the home for sale did not indicate either orally or in writing that a home inspection was required by local ordinance, regulation, statute or court order.

32.    It is my understanding that the Settlement Agreement in my case does not require a plaintiff (i.e., a buyer of a home containing defective Knauf-made drywall) to have either a home inspection or a "Chinese Drywall Inspection" prior to purchase, only that in order to qualify for settlement benefits, a plaintiff cannot purchase with knowledge that a home contains defective Knauf-manufactured Chinese drywall and a "reasonable inquiry" regarding the condition of the property must be made prior to closing the sale.

33.    I meet the requirements of the settlement agreement; I did not buy this Affected Property with knowledge of defective Chinese-made sheetrock in the home; and, I made a reasonable inquiry regarding the condition of the property prior to closing the sale by

performing a comprehensive home inspection myself as I am fully qualified to inspect a home for common problems.

34.     It is my understanding that the State of Florida has no state-approved certification for "Chinese Drywall Inspectors" that provides residents with standards to expect regarding the qualifications and credentials of the "Chinese Drywall Inspectors" and/or the objective inspection standard to expect when a "Chinese Drywall Inspection" is performed.

35.     At the time of my purchase, it is my understanding that the Chinese drywall litigation was still in its early stages and no standard for remediation had been issued by the Court or anyone else.

36.     It is my understanding that my area of Miami, Florida, did not contain many homes that were found to contain defective Chinese drywall at the time of my purchase.

37.     It is my understanding that Miami, Florida, had few or no "Chinese Drywall Inspectors" in the area at the time we purchased this property, because the issue was not well known at the time in Miami-Dade County, Florida.

37.     It is my belief that the evaluation of the condition of the property that I conducted prior to purchase was indeed a "reasonable inquiry" and I affirm that I did not purchase the Affected Property with either actual or constructive notice that it contained defective Knauf-made Chinese drywall.

38.     It is my understanding that banking laws found the U.S. Code, that control the conduct of Sellers, do not require banking institutions to disclose known defects such as Chinese-manufactured drywall when selling a property containing a damaged structure; thus, Sellers sale of this property "as-is" was immoral and/or unscrupulous, but it was not a violation of any state or federal law to the best of my knowledge.

39.     I have no recollection of a written disclosure of the defective Chinese drywall in this home by Seller, local city or county agency, State of Florida, or federal agency, or by the Knauf Defendants, and after review of my file related to the sale, I have found no written disclosure of any kind related to defective Knauf-manufactured drywall.

40.     It is my understanding that Knauf did not notify any Miami-Dade County  or State of Florida governmental agencies about the potential presence of defective drywall it manufactured that was found in the Affected Property.

41.     It is my understanding that the Knauf Defendants did not notify any consumer product safety non-governmental agency about the potential presence of defective drywall it manufactured that was found in the Affected Property.

42.     The Knauf defendants possessed or should have acquired information about the potential locations of structures in the United States that might have used their defective product during construction.

43.     Given the knowledge that Knauf possessed about the amount of drywall and timing that it was imported into the United States, the Knauf Defendants knew or should have known about the location of the ports of entry where they imported the defective drywall into the United States, the identity of the distributors that took possession of their defective drywall at the various ports of entry, the identity of the downstream distributors that took possession of their defective drywall, the identity of the contractors and subcontractors that took possession of their defective drywall, and the potential properties that might have received their defective drywall during construction.  In addition, the Knauf Defendants should have provided any/all potential buyers, including me, with notice about the possible locations of their product, including the Affected Property.

44.     If the Knauf Defendants provided any information to a local, state or federal agency about possible properties that contained defective drywall, I would have wanted that notice and I would have acted to inspect the Affected Property for the presence of Chinese drywall before purchase; however, given that no notice was provided to me in writing by the Seller, State of Florida, or federal government in any way, the real estate community in the Miami-Dade County, Florida area was not knowledgable about the affects of defective Chinese sheetrock, and no information was available to me that would have provided adequate notice about the potential for the presence of defective Chinese sheetrock in this Affected Property prior to purchase, there was no reason to believe that the home contained this latent defect.

45.     I was not  aware of any other claim for defective Chinese sheetrock manufactured by the Knauf or Taishan defendants in the Miami-Dade County, Florida, area until a very short time before I filed my claim related to the Affected Property.

46.     I am not aware of any affirmative duty to pay some other entity for either a home inspection or Chinese drywall inspection, prior the purchase of a home, that was imposed

by any controlling authority; thus, my personal, official, thorough inspection of the home was entirely proper.

47.     Given the lack of actual or constructive notice to me prior to the sale by the Seller, any govermental agency or the defendants, and given the posture of the Chinese drywall litigation in MDL No. 2047, I firmly believe that I made a "reasonable inquiry" into the condition of the Affected Property prior to purchasing and full settlement benefits should be paid accordingly.

48.     JS Carpentry, Inc. performed repairs, including the remediation of Chinese-made drywall in this Affected Property.  The remediation work was completed in compliance with the Court's accepted protocol and executed an Owner Disclosure Affidavit that described the remediation of each of the Affected Properties.

49.     In addition to JS Carpentry, Inc. certifying that the court's later-approved remediation protocol was followed, including the environmental certificate, Building Envelope Science Institute, Inc. inspected the home after the demolition phase of remediation and executed an Environmental Certificate for the Affected Property, confirming that all drywall has been removed, including debris and visible dust, as set forth in the Remediation Protocol, Exhibit F to the Settlement Agreement Regarding Claims Against the Knauf Defendants in MDL No. 2047.  A copy of both the Environmental Certificate and Owner Disclosure Affidavit will be provided to the Court.

50.     The final remediation-related cost related to the remediation of the Affected Property was $125,000.00.

51.     The Settlement Agreement provides for a lump-sum living expense payment to qualifying plaintiffs who owned residential property, like us.  Because my home was measured to have 3,567 square feet of under air/ air conditioned living space by the Miami-Dade County Property Appraiser, I am due to receive $35,670.00 as a lump sum living expense in addition to my construction costs.

52.     Based on the terms of the Settlement Agreement, I believe that a disbursement is appropriate for a grand total of $160,670.00.  I request that the court approve this amount and instruct the settlement administrator to issue a check without any further delay.

My signature below affirms my personal knowledge of the circumstances described herein and I hereby represent that this information is true to the best of my knowledge under penalty of perjury.


Affiant
Mohamed K. Latiff


SWORN TO AND SUBSCRIBED BEFORE ME on this 24 day of May, 2018, at Homestead , Miami-Dade County, Florida.


Notary Public

My Commission Expires: 09/26/2020


(SEAL)



DEBORA K GILBERT-LYTLE
MY COMMISSION # GG033591
EXPIRES September 26, 2020

**STATE OF FLORIDA**         )
                                        )
**COUNTY OF LEE**             )

<u>**AFFIDAVIT OF ROY MICHAEL FREEMAN**</u>

        Before me, the undersigned authority in and for said county, in said state, on this day personally appeared Roy Michael Freeman, who, being first duly sworn, deposes and says:

1.        My name is Roy Michael Freeman. I am over the age of nineteen (19) years and have been a resident of Lee County, Florida, for more than five (5) years.  I state that I have personal knowledge of the following facts.

2.        I am currently a shareholder of MCF Enterprises, Inc. ("MCF") and have been so for the period of time relevant to the issues addressed herein.

3.        MCF owns the following five (5) properties, located at the following street addresses: 1933 Wanda Avenue North, Lehigh Acres, FL 33971 ("Affected Property 1"); 2511 17th Street SW, Lehigh Acres, FL 33976 ("Affected Property 2"); 343 Ranchito Avenue, Lehigh Acres, FL  33974 ("Affected Property 3"); 3505 9th Street West, Lehigh Acres, FL 33971 ("Affected Property 4"); 900 Tena Avenue North, Lehigh Acres, FL 33971 ("Affected Property 5) (Affected Properties 1-5 collectively referred to as "Affected Properties").

4.        MCF purchased Affected Property 1 on January 26, 2012, the date reflected on the Special Warranty Deed.

5.        MCF purchased Affected Property 2 on October 18, 2012, the date reflected on the Warranty Deed.

6.        MCF purchased Affected Property 3 on April 10, 2013, the date reflected on the Certificate of Title.

7.        MCF purchased Affected Property 4 on February 28, 2013, the date reflected on the Special Warranty Deed.

8.        MCF purchased Affected Property 5 on February 25, 2013, the date reflected on the Special Warranty Deed.

9.      The grantor of Affected Property 1 was Deutsche Bank Trust Company Americas As Trustee for RALI2006QA11, authorized to do business in the State of Florida ("Seller 1").

10.     The grantor of Affected Property 2 was Raymond Failer ("Seller 2").

11.     The grantor of Affected Property 3 was Wachovia Mortgage FSB, authorized to do business in the State of Florida ("Seller 3").

12.     The grantor of Affected Property 4 was MB REO-FL Residential, LLC, authorized to do business in the State of Florida ("Seller 4").

13.     The grantor of Affected Property 5 was MB REO-FL Residential, LLC, authorized to do business in the State of Florida ("Seller 5").

14.     MCF purchased all five Affected Properties for commercial purposes – to either renovate and resell or to renovate and lease the properties to tenants.

15.     All five Affected Properties were advertised as a foreclosures to be sold at a county managed real estate auction overseen by the Lee County Sheriff's Department.

16.     All five Affected Properties were advertised indicating that the respective sellers were offering each property "as-is" with no representations by the seller beyond the basic property information such as date of construction, approximate square footage and number of bedrooms and bathrooms (all of which was publicly available through the Lee County Property Appraiser's website).

17.     To the best of my recollection, all five Affected Properties were offered via auction without reserve to be sold to the highest bidder on the day of the sale.

18.     None of the Affected Properties to be sold at auction provided for prospective bidders to enter the homes for a walkthrough or inspection to be conducted prior to the sale date; consequently, the only inspection permissible was done from the exterior of the homes.

19.     As part of our due diligence in evaluating the five Affected Properties for potential purchase, MCF engaged representatives of Team Realty of Southwest Florida to conduct a home inspection of each property to the extent possible, even if it was only based on observations from the exterior of the homes.

20.     Team Realty of Southwest Florida did in fact conduct a home inspection of each of the five Affected Properties and in each case produced a report that MCF utilized for determining its top bid amount for each property auction.

21.     No advertisement for any of the Affected Properties disclosed that the property contained defective Chinese sheetrock produced by Knauf Plasterboard Tianjin or any other Chinese manufacturer.

22.     It is worth noting that MCF purchased well over 100 homes via county real estate foreclosure auction during this same time period that did not contain defective Chinese sheetrock.

23.     It was MCF's position that it defies common sense to purposely purchase homes containing defective Chinese sheetrock that were unremediated due to the added expense that one would expect to incur, in addition to the burden of legal entanglements and delay necessary to secure reimbursement for the self-remediation expense.

24.     It was not until MCF took control of the Affected Properties that it was learned that the homes contained defective Chinese sheetrock.

25.     With respect to all five Affected Properties, MCF engaged TERCO Home Inspections to conduct a post-purchase evaluation of each home to determine whether defective Chinese sheetrock was present and in the case of all five Affected Properties, the result was positive.

26.     After completing the remediation of the Affected Properties and learning that the drywall was the subject of litigation, MCF engaged the Doyle Law Firm to represent us in the defective Chinese-manufacturerd drywall litigation.

27.     Neither the sellers of each affected property nor the county officials advertising the foreclosure auction disclosed that the structures on these Affected Properties contained defective Chinese sheetrock either prior to or after the the auction.  And, no other person or entity disclosed that the homes contained defective Chinese sheetrock prior to or after the auction.

28.     All disclosures made by Lee County were made in writing and available to me prior to the auction date; there was no disclosure to me or any other prospective buyer that any of the homes contained defective Chinese drywall.

29.     It is my opinion that the Affected Properties listed for sale "As-Is" should have provided all prospective bidders with a specific disclosure regarding the condition of the structure, if known, including the presence of defective Chinese-manufatured drywall; however, it is my understanding that no state law, federal law, local ordinance, or court order compels a seller to make such disclosures prior to sale.

30.     Due to the nature of the foreclosure auction, it was plainly evident that the previous owners lost the homes due to foreclosure, although I have no specific personal knowledge about their individual situations that led to foreclosure proceedings.

31.     I am a real estate developer and investor in the business of buying and selling property in South Florida and I have owned many other houses that were purchased through auction and otherwise.  I am familiar with the typical defects that might present themselves in the years following construction.  The items I had Team Realty inspect at each Affected Property, to the extent available, were: 1) damaged roof; 2) damaged foundation evidenced by foundational settlement cracks; 3) mold spores if a home has been vacant; 4) electrical issues; 5) plumbing issues; 6) water damage on exterior; 7) water damage on interior; 8) damaged structural components; 8) damaged or incorrectly constructed roof framing; 9) proper insulation in attic area; 10) vandalism or damage to walls by prior owner; 11) condition of cabinets, fixtures and appliances in kitchen; 12) properly functioning heating and cooling system; and, 13) properly functioning water heater.  I personally evaluated each of these reports and although many of the homes were vandalized or in disrepair, none of the known issues were viewed by me as significant enough to preclude a bid at auction.

32.     The conclusion I reached after Team Realty's report for each respective Affected Property was that there were no major defects in the homes and each was suitable for purchase at the anticipated sale price.

33.     MCF retained Team Realty of Southwest Florida to conduct the inspection of these homes and I am not aware of any court order, issued by Judge Fallon or otherwise, requiring a buyer to have a home inspection performed by a particular party or from a list of approved inspectors, with or without certain credentials, prior to purchasing a home.

34.     Likewise, I am not aware of any state or federal statute requiring a buyer to have an inspection performed prior to purchase to evaluate a structure for the presence of

Chinese drywall by a particular party or from a list of approved inspectors, with or without certain credentials.

35.     It is my understanding that the Settlement Agreement in my case does not require a plaintiff (i.e., a buyer of a home containing defective Knauf-made drywall) to have either a home inspection or a "Chinese Drywall Inspection" prior to purchase, only that in order to qualify for settlement benefits, a plaintiff cannot purchase with knowledge that a home contains defective Knauf-manufactured Chinese drywall and a "reasonable inquiry" regarding the condition of the property must be made prior to closing the sale.

36.     Without question, MCF meets the requirements of the settlement agreement; MCF did not buy any of these Affected Properties with knowledge of defective Chinese-made sheetrock in the homes; and, before auction, MCF engaged Team Realty of Southwest Florida to conduct a thorough home inspection that included examining the home, if possible, for the common signs that demonstrated the likelihood that defective Chinese-made sheetrock was present.

37.     It is my understanding that the State of Florida has no state-approved certification for "Chinese Drywall Inspectors" that provides residents with standards to expect regarding the qualifications and credentials of the "Chinese Drywall Inspectors" and/or the objective standard to expect when a "Chinese Drywall Inspection" is conducted.

38.     It is my belief that the evaluation of the condition of the property that Team Realty of Southwest Florida conducted prior to MCF's purchase at auction was indeed a "reasonable inquiry" and I affirm that MCF did not purchase the Affected Property with either actual or constructive notice that it contained defective Knauf-made Chinese drywall.

39.     It is my understanding that banking laws found the U.S. Code, that control the conduct of sellers, including representatives of Lee County who conducted the real estate foreclosure auction, do not require banking institutions to disclose known defects such as Chinese-manufactured drywall when selling a property containing a damaged structure; thus, the sale of this property "as-is" was immoral and/or unscrupulous if it was a known defect, but it was not a violation of any state or federal law to the best of my knowledge.

40.     I have no recollection of a written disclosure of the defective Chinese drywall in this home by Seller, local city or county agency, State of Florida, federal agency, or by

the Knauf Defendants, and after review of my file related to the sale, I have found no written disclosure of any kind related to defective Knauf-manufactured drywall.

41.     It is my understanding that Knauf did not notify the State of Florida about the potential presence of defective drywall it manufactured that was found in the Affected Property.

42.     It is my understanding that Knauf did not notify any Lee County governmental agencies about the potential presence of defective drywall it manufactured that was found in the Affected Property.

43.     It is my understanding that the Knauf Defendants did not notify any consumer product safety non-governmental agency about the potential presence of defective drywall it manufactured that was found in the Affected Property.

44.     The Knauf defendants possessed or should have acquired information about the potential locations of structures in the United States that might have used their defective product during construction.

45.     Given the knowledge that Knauf possessed about the amount of drywall and timing that it was imported into the United States, the Knauf Defendants knew or should have known about the location of the ports of entry where they imported the defective drywall into the United States, the identity of the distributors that took possession of their defective drywall at the various ports of entry, the identity of the downstream distributors that took possession of their defective drywall, the identity of the contractors and subcontractors that took possession of their defective drywall, and the potential properties that might have received their defective drywall during construction.  In addition, the Knauf Defendants should have provided any/all potential buyers, including MCF, with notice about the possible locations of their product, including the Affected Property.

46.     If the Knauf Defendants provided any information to a local, state or federal agency about possible properties that contained defective drywall, MCF would have wanted that notice and MCF would have acted to inspect the Affected Property to the extent possible for the presence of Chinese drywall before purchase or we would have chosen to make no bid at auction; however, given that no notice was provided to anyone in writing by the Seller, State of Florida, or federal government in any way, the real estate community in the Lee County, Florida area had limited knowledge about the affects of

defective Chinese sheetrock, and no information was available to me that would have provided adequate notice about the potential for the presence of defective Chinese sheetrock in these Affected Properties prior to purchase at auction, there was no reason to believe that these homes contained this latent defect.

47.     Although MCF engaged Team Realty of Southwest Florida to conduct a thorough property inspection prior to auction, I am not aware of any affirmative duty to pay for either a home inspection or Chinese drywall inspection, prior the purchase of a home, that was imposed by any controlling legal authority.

48.     Given the lack of actual or constructive notice to MCF prior to the auction sales by the seller, a govermental agency or the defendants, and given the lack of disclosure by the seller or Knauf Defendants, I firmly believe that MCF made a reasonable inquiry into the condition of the Affected Properties prior to purchasing each one of them and full settlement benefits should be paid accordingly.

49.     With regard to each of the Affected Properties, MCF employed Superior Contracting to perform repairs, including the remediation of Chinese-made drywall. Superior Contracting completed the work in compliance with the Court's accepted protocol and executed an Owner Disclosure Affidavit that described the remediation of each of the Affected Properties.

50.     Superior Contracting also executed an Environmental Certificate for each of the Affected Properties, confirming that all drywall has been removed, including debris and visible dust, as set forth in the Remediation Protocol, Exhibit F to the Settlement Agreement Regarding Claims Against the Knauf Defendants in MDL No. 2047.  A copy of both the Environmental Certificate and Owner Disclosure Affidavit will be provided to the Court.

51.     Based on the terms of the Settlement Agreement and MCF's full compliance therewith, MCF should be paid following monetary amounts without any further delay: 1) $98,382.99 for Affected Property 1;  2) $73,365.80 for Affected Property 2;  3) $78,114.92 for Affected Property 3;  4) $73,332.27 for Affected Property 4; and, 5) $73,332.27 for Affected Property 5.

My signature below affirms my personal knowledge of the circumstances described herein and I hereby represent that this information is true to the best of my knowledge under penalty of perjury.


_____
Affiant
Roy Michael Freeman


SWORN TO AND SUBSCRIBED BEFORE ME on this 19 day of May, 2018, at _____Lee_____, Florida.


_____
Notary Public

My Commission Expires:

ELAINE C LUKES
MY COMMISSION # FF227268
EXPIRES May 05, 2019
(407) 398-0153   FloridaNotaryService.com

(SEAL)

STATE OF FLORIDA          )
                                         )

COUNTY OF ESCAMBIA      )

## <u>AFFIDAVIT OF REBECCA MCINTYRE</u>

Before me, the undersigned authority in and for said county, in said state, on this day personally appeared Rebecca McIntyre, who, being first duly sworn, deposes and says:

1. My name is Rebecca McIntyre. I am over the age of nineteen (19) years and have been a resident of Escambia County, Florida, for approximately two (2) years. Prior to residing in Florida, I was a resident of Hinds County, Mississippi for more than five (5) years. I state that I have personal knowledge of the following facts.

2. I own a property located at the following street address: 15922 Innerarity Point Road, Pensacola, Florida 32507 ("Affected Property").

3. I purchased Affected Property on March 22, 2013, the date reflected on my warranty deed.

4. My late husband, Paul McIntyre, and I purchased this property from SE Property Holdings Ohio, LLC an Ohio Limited Liability Company authorized to do business in the State of Florida – formerly known as SE Property Holdings, LLC, an Ohio Limited Liability Company Successor by merger with Vision Bank ("Sellers").

5. We found the advertisement for the property sale online while we were living in Jackson, Mississippi.

6. The property was advertised as a foreclosure by a bank and the sale was to be conducted via online auction approximately one week later.

7. To the best of my recollection, the advertisement indicated that the seller was offering the property "as-is" and there were no representations by the seller beyond the basic property information such as date of construction, approximate square footage and number of bedrooms and bathrooms. There were also pictures of the interior of the property that were included in the advertisement.

8.     The seller did not disclose that the property contained defective Chinese sheetrock produced by Knauf Plasterboard Tianjin or any other Chinese manufacturer.

9.     Prior to the conclusion of the online auction, we were not permitted by the seller to enter the property to conduct an inspection.  And, the terms of the sale by the seller and/or auction company did not provide for any contingencies to negate the sale based on a subsequent property inspection or otherwise.

10.     The terms of the sale dictated by the auction company and/or seller required payment by the successful buyer.  My recollection is that we were required to present payment at a closing approximately one week after the auction.

11.     After we were the high bidder in the auction we did arrange for one walkthrough of the property prior to closing and it appeared to be in the same condition as reflected in the pictures that accompanied the auction sale advertisement.

12.     During the walkthrough, we did not notice any particular smell that has come to be associated with defective Chinese drywall, often described as a "rotten egg" or "burnt match."

13.     During the walkthrough, we did not notice any corrosion on fixtures, appliances or any other item.  The electrical system was in working order, as was the air conditioning system and plumbing system.

13.     As the terms of the sale dictated, we conducted a closing approximately one week after the online auction and we paid for the property with cash, not via a loan from any bank or lending company.

14.     We took possession of the Affected Property after closing and began preparation for cleaning and painting the property to occur in the months to follow.

15.     It was during this process in the two months following closing that we encountered other property owners, some of whom purchased in the same manner as us in the previous months, who confirmed that their properties contained Chinese drywall. That was the first indication to us that the complex of condimiums had a Chinese drywall issue.

16.     Based on our neighbors' advice, we examined our property more closely and confirmed that we indeed had a condominium containing the defective drywall.

17.     After learning that the defective drywall in the Affected Property was manufactured by Knauf Plasterboard Tianjin, Ltd, I engaged the Doyle Law Firm to represent my family in the defective Chinese-manufacturerd drywall litigation.

18.     Prior to purchasing this property, I resided in Jackson, Mississippi. I have no recollection whatsoever of any Chinese drywall issues being reported on the news or notice being provided to us in any way that this might be a problem for homeowners. I was simply unaware of the issue prior to purchasing the Affected Property.

19.     The sellers did not disclose that the unit contained defective Chinese sheetrock prior to the online auction or the closing.

20.     No other person or entity disclosed that the unit contained defective Chinese sheetrock prior to the online auction or the closing.

21.     Because I did not see or hearing anything in the news or receive notice from the Knauf Defendants about the effects of Chinese drywall while living in Mississippi, I was not on constructive notice about the potential effects of defective Knauf-made Chinese Drywall that was distrubuted and used primarily in the Southeastern United States.

22.     The sale of the Affected Property was indeed conducted entirely online through an auction service and the entirety of all disclosures made by Sellers were made in writing and available to me prior to the sale date; there was no disclosure to me or any other prospective buyer that the home contained defective Chinese drywall.

23.     It is my opinion that the Affected Property listed online by sellers to be sold via an online auction "As-Is" should have provided us with a specific disclosure regarding the condition of the structure, including the presence of defective Chinese-manufatured drywall; however, it is my understanding that no state law, federal law, local ordinance, or court order compels a seller to make such disclosures prior to sale.

24.     I came to learn through the closing documents, seen for the first time at closing, that Sellers foreclosed on the previous owners of our home, although I have no specific personal knowledge about their foreclosure proceedings that might have taken place prior to my purchase. In addition, my son, Jason McIntyre, has considerable experience with the construction industry overseeing home construction and renovations. He was present when we conducted the walkthrough and he inspected the property with us.

25.    I have owned other houses and I am familiar with the typical defects that might present themselves in the years following construction. The items I inspected in the Affected Property with my husband and son, to the extent available, were: 1) damaged roof; 2) damaged foundation evidenced by foundational settlement cracks; 3) mold spores if a home has been vacant; 4) electrical issues; 5) plumbing issues; 6) water damage on exterior; 7) water damage on interior; 8) damaged structural components; 8) damaged or incorrectly constructed roof framing; 9) proper insulation in attic area; 10) vandalism or damage to walls by prior owner; 11) condition of cabinets, fixtures and appliances in kitchen; 12) properly functioning heating and cooling system; and, 13) properly functioning water heater.

26.    The conclusion I reached after inspecting the Affected Property was that there were no major defects in the home.

27.    I am not aware of any state or federal statute requiring a buyer to have a home inspection prior to purchasing a home.

28.    I am not aware of any court order requiring a buyer to have a home inspection prior to purchasing a home.

29.    I am not aware of any state or federal statute requiring a buyer to have an inspection performed prior to purchase to evaluate a structure for the presence of Chinese drywall.

30.    I am not aware of any state or federal court order requiring a buyer to have an inspection performed prior to purchase to evaluate a structure for the presence of Chinese drywall.

31.    The online auction site that offered the home for sale did not indicate either orally or in writing that a home inspection was required by local ordinance, regulation, statute or court order. And, no opportunity was provided to view or inspect the property prior to the auction date.

32.    The online auction site that offered the home for sale did not indicate either orally or in writing that a Chinese drywall inspection was required by local ordinance, regulation, statute or court order. And, no opportunity was provided to view or inspect the property prior to the auction date.

33.    It is my understanding that the Settlement Agreement in my case does not require a plaintiff (i.e., a buyer of a home containing defective Knauf-made drywall) to have either a home inspection or a "Chinese Drywall Inspection" prior to purchase, only that in order to qualify for settlement benefits, a plaintiff cannot purchase with knowledge that a home contains defective Knauf-manufactured Chinese drywall and a "reasonable inquiry" regarding the condition of the property must be made prior to closing the sale.

34.    It is my understanding that the State of Florida has no state-approved certification for "Chinese Drywall Inspectors" that provides residents with standards to expect regarding the qualifications and credentials of the "Chinese Drywall Inspectors" and/or the objective standard to expect when a "Chinese Drywall Inspection" is conducted.

35.    It is my understanding that Pensacola, Florida is not an area containing many homes with Chinese drywall.

36.    It is my understanding that Pensacola, Florida, had no "Chinese Drywall Inspectors" in the area at the time we purchased this property, because the issue was almost non-existent in Escambia County, Florida, and the surrounding areas.

37.    It is my belief that the evaluation of the condition of the property that I conducted prior to purchase was indeed a "reasonable inquiry" and I affirm that I did not purchase the Affected Property with either actual or constructive notice that it contained defective Knauf-made Chinese drywall.

38.    It is my understanding that banking laws found the U.S. Code, that control the conduct of Sellers, do not require banking institutions to disclose known defects such as Chinese-manufactured drywall when selling a property containing a damaged structure; thus, Sellers sale of this property "as-is" was immoral and/or unscrupulous, but it was not a violation of any state or federal law to the best of my knowledge.

39.    I have no recollection of a written disclosure of the defective Chinese drywall in this home by Seller, local city or county agency, State of Florida, or federal agency, or by the Knauf Defendants, and after review of my file related to the sale, I have found no written disclosure of any kind related to defective Knauf-manufactured drywall.

40.     It is my understanding that Knauf did not notify the State of Florida about the potential presence of defective drywall it manufactured that was found in the Affected Property.

41.     It is my understanding that Knauf did not notify any Escambia County governmental agencies about the potential presence of defective drywall it manufactured that was found in the Affected Property.

42.     It is my understanding that Knauf did not notify any consumer product safety non-governmental agency about the potential presence of defective drywall it manufactured that was found in the Affected Property.

43.     The Knauf defendants possessed or should have acquired information about the potential locations of structures in the United States that might have used their defective product during construction.

44.     Given the knowledge that Knauf possessed about the amount of drywall and timing that it was imported into the United States, Knauf knew or should have known about the location of the ports of entry where they imported the defective drywall into the United States, the identity of the distributors that took possession of their defective drywall at the various ports of entry, the identity of the downstream distributors that took possession of their defective drywall, the identity of the contractors and subcontractors that took possession of their defective drywall, and the potential properties that might have received their defective drywall during construction, Knauf should have provided any/all potential buyers, including me, with notice about the possible locations of their product, including the Affected Property.

45.     If Knauf provided any information to a local, state or federal agency about possible properties that contained defective drywall, I would have been on notice and acted to inspect the Affected Property for the presence of Chinese drywall; however, given that no notice was provided to me in writing by the seller, State of Florida, or federal government in any way, the real estate community in the Escambia County, Florida area was not knowledgable about the affects of defective Chinese sheetrock, and no information was available to me that would have provided adequate notice about the potential for the presence of defective Chinese sheetrock in this Affected Property prior to purchase, there was no reason to believe that the home contained this latent defect.

46.     Neither I nor my husband were/are aware of any other claim for defective Chinese sheetrock manufactured by the Knauf or Taishan defendants in the Pensacola or Escambia County, Florida, areas filed either before or after I filed my claim related to the Affected Property other than those claims filed by our neighbors in this same lawsuit.

47.     I am not aware of any affirmative duty to pay for either a home inspection or Chinese drywall inspection, prior the purchase of a home, that was imposed by any controlling authority.

48.     Given the limited time I had to view the Affected Property after the online auction, given the lack of actual or constructive notice to me prior to the sale by the seller, a governmental agency or the defendants, and given the lack of disclosure by the seller or Knauf Defendants, I firmly believe that I made a reasonable inquiry into the condition of the Affected Property prior to purchasing it online.

49.     It is also my understanding that we purchased this property in the exact same manner as other home owners (i.e., Plaintiffs Darrel Steward, Lowell Butts, Jinxi Zhu, Xiao-Ching Chen, Derrick Racine, and others not represented by Doyle Law Firm, PC) of condominiums in this complex who had their claims approved and had their properties remediated through this very same settlement. To treat our claim differently would be completely unjust.

My signature below affirms my personal knowledge of the circumstances described herein and I hereby represent that this information is true to the best of my knowledge under penalty of perjury.

Affiant
Rebecca McIntyre

SWORN TO AND SUBSCRIBED BEFORE ME on this 29th day of May, 2018, at PENSACOLA , Escambia County, Florida.

Notary Public

My Commission Expires: 9/2/2019



BROOKE PITTENGER
MY COMMISSION # FF915371
EXPIRES September 02, 2019 (SEAL)
(407) 398-0153   FloridaNotaryService.com

STATE OF LOUISIANA            )
                             )
PARISH OF ST. TAMMANY        )

<u>AFFIDAVIT OF THOMAS WILLIAMS</u>

Before me, the undersigned authority in and for said parish, in said state, on this day personally appeared Thomas Williams, who, being first duly sworn, deposes and says:

1.      My name is Thomas Williams. I am over the age of nineteen (19) years and have been a resident of St. Tammany Parish, Louisiana, for more than five (5) years.  I state that I have personal knowledge of the following facts.

2.      I and my wife, Martha Williams, own a property located at the following street address: 301 Intrepid Drive, Slidell, LA 70458 ("Affected Property").

3.      We purchased Affected Property on August 30, 1989 and we have maintained ownership of the Affected Property since that time.

4.      The Affected Property was damaged during Hurricane Katrina and the damage to the home was repaired by Chris Whitty Construction, LLC ("Contractor").

5.      It is my understanding that the Contractor used Interior Exterior Building Supply in New Orleans, Louisiana, to provide the drywall used to repair my home.

6.      Interior Exterior Building Supply provided Contractor with defective, Chinese-manufactured drywall that was made by the Knauf Defendants.

7.       I did not learn that Contractor used defective Knauf-made drywall until April of 2009.

8.      After reading and viewing news articles about the effects of Chinese drywall, I became concerned that I had it in my home, so I conducted a search of my attic for markings on the drywall.

9.      Once I located a set of markings that I believed might indicate that defective Chinese drywall had been used in my home by Contractor, I contacted Contractor to inquire whether they had used the defective product in other home repairs that were done at approximately that same time period.

10.     Mr. Chris Whitty personally returned to our home and conducted an inspection of his own on April 20, 2009.

11.     Mr. Whitty confirmed that defective Knauf-made drywall was indeed used in our home.

12.     Shortly after the defective drywall was confirmed, we began making arrangements for our home to be remediated.

13.     Contractor offered and we agreed to have Contractor perform the remediation of our home.

14.     From May 15, 2009, to August 1, 2009, the full remediation of our home was performed.

15.     From shortly before the start date until shorly after the completion date, we moved away from Affected Property and placed our belongings in storage.

16.     We paid the alternative living expenses during the time that we lived away from Affected Property while remediation was taking place.

17.     Contractor paid the cost of remediation, totaling $40,067.00, according to the Owner Disclosure Affidavit that we executed with Mr. Chris Whitty on behalf of Contrator.

18.     An invoice produced by Contractor summarizes the remediation cost incurred, confirming the amount provided in the Owner Disclosure Affidavit.

18.     We struck an agreement with Contractor to pursue a recovery for the full cost of remediation incurred and we agreed to indemnify Contractor up to the full cost of remediation from any funds that were recovered from the Knauf Defendants related to remediation.

19.     It is my understanding that the remediation performed by Contractor was done prior to the establishment of a remediation protocol by any U.S. Court or agency of the federal government, namely the Consumer Product Safety Commission.

20.     The Owner Disclosure Affidavit that Contractor and I executed was intended to demonstrate to the Court the extent that remediation was performed in compliance with the later-adopted protocol in MDL-2047.

21.     It is also noteworthy that our remediation occurred before the first preservation of evidence order was issued by Judge Fallon.  Pre-Trial Order 1(B), titled, "Preservation of

Physical Evidence" was entered by the court on October 9, 2009, roughly a month after Contractor completed their work.

22.    The Owner Disclosure Affidavit executed by Mr. Chris Whitty and I was a declaration made under penalty of perjury and we both declared that the information we provided was true and correct to the best of our knowledge, information and belief.

23.    One omission from the Owner Disclosure Affidavit I executed was the cost of our appliances that we paid to replace due to the corrosion caused by the Knauf-made drywall.  The replacement cost our refrigerator, stove, hood, microwave, washer and dryer was a total of approximately $3,200.00.

24.    Mr. Whitty and I affirmed that Knauf drywall was found in the home and the home was remediation to the best of Contractor's ability, given that there was no guidance available by the court or otherwise at the time.

25.    As there was no preservation of evidence order at the time of remediation and the litigation against the manufacturers was at its infancy and recovery speculative at the time, Contractor did not retain samples of the defective drywall.

26.    It is my understanding that most pictures of the drywall that were taken during remediation by Contractor were misplaced or inadvertently destroyed; however, one picture of the defective drywall's markings taken in our attic was preserved and produced to defendants and the court.  In addition, one picture of my wife, Martha Williams, holding a drywall board with Knauf's markings was taken at our home and is evidence of defective drywall found in our home.

27.    The markings on the two pictures we've produced are consistent with the Knauf markings confirmed as defective drywall in Exhibit C-1 to the 2011 KPT Settlement Agreement (R. Doc. 12061-10).

28.    Defendants and the court are now in possession of all necessary information to make a determination regarding the total reimburseable costs related to our already remediated.  Because we have produced all the requisite proof regarding our claim, our the full amount of settlement benefits should be made available to us, including the full cost of remediation and alternative living expenses.

29.    I employed Chris Whitty Construction, LLC to perform repairs, including the remediation of Chinese-made drywall.  Mr. Chris Whitty completed the work in

compliance with the Court's later-accepted protocol and executed a later-adopted Owner Disclosure Affidavit that described the remediation of the Affected Property.

30.      The final remediation-related cost to us (and by agreement Chris Whitty Construction, LLC) related to the remediation of the home and appliance replacement was $43,267.00.

31.      The Settlement Agreement provides for a lump-sum living expense payment to qualifying plaintiffs who owned residential property, like us.  Because my home was measured to have 2,075 square feet of under air/ air conditioned living space by the St. Tammany Parish Tax Assessor, I am due to receive $17,637.50 in addition to my construction costs.

32.      Based on the terms of the Settlement Agreement, I believe that a disbursement is appropriate for a grand total of $60,904.50.  I request that the court approve this amount and instruct the settlement administrator to issue a check without any further delay.

My signature below affirms my personal knowledge of the circumstances described herein and I hereby represent that this information is true to the best of my knowledge under penalty of perjury.

_Thomas William_
Affiant
Thomas Williams

SWORN TO AND SUBSCRIBED BEFORE ME on this 25th day of May, 2018, at _Slidell_, St. Tammany Parish, Louisiana.

Notary Public

My Commission Expires: _for Life_

STEVEN E. TEAL - ID NO. 56903
NOTARY PUBLIC
ST. TAMMANY PARISH, LA (SEAL)