## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

IN RE: CHINESE-MANUFACTURED
DRYWALL PRODUCTS LIABILITY          MDL No. 2047
LITIGATION

SECTION: L

THIS DOCUMENT RELATES TO:          JUDGE FALLON
*ALL CASES*                        MAGISTRATE JUDGE WILKINSON
*******************************************************************************

### OBJECTION BY ALLISON GRANT, P.A. TO THE SPECIAL MASTER'S RECOMMENDATIONS CONCERNING THE ALLOCATION OF COMMON BENEFIT FEES AND THE REIMBURSEMENT OF SHARED EXPENSES AND HELD COSTS

Allison Grant, P.A. (hereinafter "GRANT") submits its objection to the Special

Master's Recommendations Concerning the Allocation of Common Benefit Fees dated

December 4, 2018 (Rec. Doc. 21945) as follows:

On June 7, 2016, the Fee Committee filed a Motion to Determine the Allocation of the

Global Fee Award as Between Common Benefit Fees and Individual Counsel's Fees, which

urged the Court to allocate an unprecedented 59.37% (*i.e.,* $119,313,367.08) of the fee fund to

common benefit counsel.  *See* PTO 28, Step Three.  Rec. Doc 20290-4.  GRANT objected to

the disproportionate division of fees in favor of common benefit counsel, particularly in the face

of a severely limited and insufficient fee fund and in light of the unprecedented amount of time

spent by primary counsel in this MDL.[1]  Following objections by twenty-three (23) firms and

proceedings, on January 31, 2018, the Court entered an Order awarding a total common benefit

---

1.  GRANT and her co-counsel, Baron & Budd, represent over 1,000 claimants in this MDL. *See* Primary Counsel's Post-Evidentiary Hearing Brief (filed with  Special Master 7/14/2017); Primary Counsel's Obj. and Resp. to Special Master's  Recommendations Concerning Attorneys' Fees and Expenses (Rec. Doc. 20950) (Rec. Doc.  20993 (motion to file under seal)).

[1]

fee of 52% (*i.e.*, $99,762,099.56) in favor of common benefit attorneys.[2]  Rec. Doc 21168. GRANT reserves the right to object to the final order dividing fees at the appropriate time.

On July 3, 2018, pursuant to Step Six of PTO 28 (Rec. Doc. 17379), the Fee Committee recommended to the Court individual allocations of the total common benefit fee among the counsel who performed common benefit services.   Rec. Doc. 21455.   As to GRANT, the Fee Committee recommended compensation in the amount of $28,000.00 based on 85 hours of credited time.   Rec. Doc. 21455-1.   On June 20, 2018, GRANT filed an Objection to the Fee Committee's Recommendation.   Rec. Doc. 21588; Rec. Doc. 21559 (exhibits filed under seal).

On December 4, 2018, the Special Master issued Recommendations Concerning the Allocation of Common Benefit Fees and the Reimbursement of Shared Expenses and Held Costs (hereinafter "Recommendations"), which recommended compensation for GRANT in the amount of $29,000.00 – an increase of merely $1,000.00.   Rec. Doc. 21945.[3]   GRANT objects to this Recommendation as it severely undervalues GRANT's work.   The Special Master did not adequately consider the full extent of GRANT's work, the number of years that work entailed, and how GRANT's work provided immeasurable value to this litigation as compared to other firms.

As noted by the Special Master in his Recommendations, "not all types of work are

---

2. The proposed allocation to common benefit counsel is actually greater than 52% of the available attorneys' fees because the Voluntary Common Benefit payments (Rec. Doc. 8389) and attorneys' fee and cost payment of $2.4 million in connection with the North River Stipulation were excluded.    It appears that the attorneys' fees in connection with the four Virginia-based Class Action Settlements were also subtracted from the fee fund even though common benefit hours associated with the above matters were not removed.

3. The Special Master also noted that GRANT's hourly rates had not increased from the inception of the litigation through 2013, which is incorrect.   Rec. Doc. 21945 at 24, fn. 114.   GRANT (who has been a practicing attorney in Florida since 1990) was never asked to update its hourly rate.

[2]

created equal." *Citing In re Vioxx Prods. Liab. Litig.*, 802 F.Supp.2d 740, 773 (E.D. La. 2011). This principle is particularly important as to GRANT as the value and import of its contributions to this MDL reveal a much more significant picture than the 85 hours of credited time.   By way of one example, in 2011 and 2012, GRANT worked tirelessly (and frequently onsite) supervising the initial homes being remediated under Pilot Program.   This often included daily communications with Knauf's counsel and the contractors to work through critical problems. The vast majority of this time was not submitted because it was not specifically performed at the PSC's request.   However, GRANT did submit the handful of hours briefing the PSC (in contrast to the underlying work) as this briefing was performed specifically at the PSC's request.[4] GRANT explained at her interview with the Fee Committee on July 9, 2014 and in her objection to the Fee Committee's Recommendation (Rec. Doc. 21588) that while she submitted time communicating and reporting to the PSC, the vast majority of time performing the underlying work (which indisputably benefitted all claimants and was well known by the PSC) was not submitted because GRANT was advised it would be improper to do so since it was not done at the PSC's specific request.   Had GRANT been advised that it could submit the time for the underlying work which benefitted all claimants (as other firms have done and for which compensation has been recommended by the Special Master), it too would have done so.

---

4.   For example, on July 24, 2012, GRANT submitted 1.2 hours for the following: "Telephone conference with Bruce Steckler regarding Pilot Program problems for discussion at upcoming meeting with PSC and Moss; Prepare memo regarding issues with Moss including, returning homes to clients prematurely with excessive punch list items, disagreement over 'substantial completion', delays in resolving punch list items, release of Moss and subcontractors prior to substantial completion, schedule for resolution of punch list items, damage to driveways and lawns.   Address pre-existing conditions and leaks during remediation and owner responsibility.   Also address discovery of building code violations and code required upgrades." This is merely one instance where GRANT submitted time for reporting her work to the PSC, but not for the hundreds of hours of underlying work which enabled GRANT to advise the PSC.

[3]

GRANT recognizes that it is too late to amend its submission of hours.   Notwithstanding, this does not preclude considering GRANT's overall contribution and value to this MDL.   Even looking solely at the description of work performed in connection with the 85 hours submitted, it does not appear that the Special Master qualitatively analyzed GRANT's work or compared it to the work to others.

It is not GRANT's intent to devalue the work performed by any other firm, however, GRANT's recommended allocation of $29,000.00 is inequitable relative to many other Objectors. Some firms made financial contributions at the outset of the litigation and primarily met prospective clients, conducted town hall meetings, and performed initial investigative work prior to the formation of the MDL and/or during the first few months of litigation.   In contrast, GRANT's work began in late 2008 prior to the formation of the MDL[5], it continued throughout the litigation, and continues to this day.   GRANT's work significantly aided and provided immeasurable value to the PSC, other primary attorneys and all claimants in many key aspects of this litigation, yet GRANT's recommended compensation is far less than firms whose involvement was short lived and peripheral.

More specifically, starting in Fall 2008, when the term "Chinese drywall" was unknown to the public, GRANT began contacting and coordinating with local, state and federal governmental entities to investigate the problem.   GRANT also worked with local and national print and broadcast media to inform the public about Chinese drywall.   GRANT interviewed

---

5. In late 2008, GRANT created a website to educate the public regarding Chinese drywall.   GRANT also appeared on television and radio to discuss the effects of Chinese drywall, and served as a lecturer to attorneys, inspectors and realtors to educate them regarding Chinese drywall.   *See* Rec. Doc. 21559-1, Exhibit "A" to Initial Affidavit of Allison Grant, P.A. for Compensation for Common Benefit Time at 1.

[4]

witnesses including, but not limited to, longshoremen who unloaded the drywall from ships. GRANT also met with experts, and the Florida Department of Health State Toxicologist to help identify properties for testing and develop investigation criteria.   Rec. Doc. 21559-1, Exhibit "A" to Initial Affidavit of Allison Grant, P.A. for Compensation for Common Benefit Time at 1; Rec. Doc. 21559-2 at 5, 8.   *See also*, Supplemental Affidavit of Allison Grant, Esq. in Support of Opposition to the Motion of the PSC/Fee Committee for Allocation of the Global Fee Award Between Common Benefit Fees and Individual Counsel Fees previously submitted to the Special Master as Primary Counsel Ex. e.1. [6]

Thereafter, GRANT began investigating the identities of builders, installers and suppliers. *Id*. at 2, 8-10.   Both the Fee Committee's Summary and the Special Master's Recommendations failed to mention this work (which was submitted as common benefit) or the fact that GRANT shared this information and pertinent documents with the PSC, and later helped fill in the gaps and enlist additional defendants to participate in the Global and Banner settlements.   *Id*. at 34-36. GRANT also provided the fruits of her extensive research to Brown Greer to help link properties of other counsels' clients to particular defendants.   *Id*. at 34-36.   *See also*, Rec. Doc. Rec. Doc. 21559-2 at 7-8.   GRANT's work increased the number of participating defendants, it pushed many recalcitrant Defendants to ultimately settle, and supplied many other attorneys with evidence to aid in the approval of their GBI claims.

---

6.  On September 21, 2017, the Special Master advised that the entirety of the Special Master record (which includes the Supplemental Affidavit of Allison Grant, Esq. (PC Ex. e.1)) would be made part of the Court's record in this MDL.   It is unclear whether this has been accomplished.   Nevertheless, GRANT refers to and incorporates said Exhibit herein.   "PC Ex." refers to primary counsels' exhibits submitted at the May 31 through June 1, 2017 Evidentiary Hearing.   GRANT does not intend to rehash arguments relating to the division of fees between common benefit counsel and primary counsel, but cites this Supplemental Affidavit as it provides a comprehensive forty-page narrative of GRANT's work.

GRANT was extensively involved in virtually every aspect of the Pilot Program including, but not limited to, attending and monitoring Benchmark's inspections (where GRANT identified properties that were improperly excluded due to marking disputes); attending and monitoring Moss's walk-throughs (which included GRANT's work to correct and revise the Scope of Work to include omitted appliances); observing and monitoring the progress of construction (which initially revealed deviations from the remediation protocol); addressing problems that were discovered during construction (including pre-existing defects such as roof leaks and code violations); workmanship issues/problems; communicating with Moss regarding "substantial completion" (and disagreements concerning same) and with Brown Greer regarding issuance of delay payments; and resolution of punch list items and warranty issues.   PC Ex. e.1 at 12-27.   *See also*, Rec. Doc. 21559-1, Exhibit "A" to Initial Affidavit of Allison Grant, P.A. for Compensation for Common Benefit Time at 1-3; Rec. Doc. 21599-2 at 2.

Contrary to the Special Master's characterization, GRANT did not merely coordinate Benchmark Inspections and Moss Contractors - GRANT was <u>instrumental</u> in ensuring the very success and continued existence of the Pilot Program.   Furthermore, GRANT's work in this regard typically involved daily communications with Knauf's counsel for a myriad of legal issues that required extensive negotiations and drafting documents.   Rec. Doc. 21599-2 at 6-7. GRANT's work was far more extensive than merely "reviewing and proposing changes to various documents."  PC Ex. e.1 at 24.   Some of these issues GRANT tackled had not been previously addressed, such as how to handle pre-existing defects and building code violations which were discovered during remediation under the Pilot Program.     Changes in the applicable building code also necessitated additional work by Moss that was not originally contemplated.     *Id*. at 18.   In some instances, GRANT re-negotiated terms with Knauf's counsel that proved unworkable, such

[6]

as requiring lender approval for mixed properties and requiring performance bonds for Option 2 contractors (which was cost prohibitive and discouraged contractors from accepting jobs).   *Id.* at 23.   *See also*, Rec. Doc. 21599-2 at 6-7.   GRANT worked to find solutions to many different types of problems.   Actively representing approximately 500 clients participating in the Pilot Program put GRANT in a unique position and GRANT used this experience to help all claimants. Exhibit "A" to Initial Affidavit of Allison Grant, P.A. for Compensation for Common Benefit Time at 1-2; Rec. Doc. 21599-2 at 2-3.   GRANT was often the "go-to" person for issues relating to the Pilot Program.   *Id.* at 10.

Notwithstanding, the Fee Committee failed to mention the above work in its Summary other than stating that GRANT worked with members of the PSC and contractors "to implement the Pilot Program and to create efficiencies for participants… [and that she] communicated with Benchmark Inspection and Moss Contractors to provide input in connection with unique Florida condominium law issues and specific homeowner claimant issues."  Rec. Doc. 21455-2 at 42. This severely understates the extent and value of GRANT's work.   And similarly, the Special Master's statement that GRANT served "as co-counsel for Eleanor Aguilar, the first claimant to participate in the Pilot Program" fails to capture the significance of this work.   Rec. Doc. 21559-1, Exhibit "A" to Initial Affidavit of Allison Grant, P.A. for Compensation for Common Benefit Time at 2; Rec. Doc. 21559-2 at 2-3; PC Ex. e.1 at 24.   The hands-on work provided by GRANT in connection with the Aguilar remediation (and the remediations thereafter) enabled her to iron out many complex issues and pave the way for others to receive relief under the Pilot Program.

GRANT also spent countless hours heading off ancillary challenges that endangered the Pilot Program and provided substantial assistance to claimants.   For example, many homeowners were faced with the cancellation of homeowner's insurance due to the presence of Chinese

[7]

drywall.  Without insurance, many lenders utilized forced-placed insurance, which was much more expensive, thereby causing some claimants to default on their mortgage.   Rec. Doc. 21559-1, Exhibit "A" to Initial Affidavit of Allison Grant, P.A. for Compensation for Common Benefit Time at 6; Rec. Doc. 21559-2 at 2-3; PC Ex. e.1 at 22-24.   Additionally, some insurers required homeowners to obtain insurance from  surplus  lines when homes were being remediated under the Pilot Program.  This insurance was difficult to obtain and oftentimes was cost prohibitive. There were also difficulties in obtaining lender  approval (required in some instances) so that affected properties could be remediated.   *Id*. at 22-24.   And most common and potentially threatening to the Pilot Program were the countless homeowners facing foreclosure.   GRANT's work regarding lenders and foreclosures encompassed much more than merely "researching legal issues surrounding . . . foreclosures" as stated by the Special Master.   *Id*. at 24; Rec. Doc. 21559-2 at 3.   Through the years, GRANT had established relationships  with many lenders with whom she had worked to educate about the effects of Chinese drywall.   GRANT often kept lenders apprised of the litigation.   But the key to success was enlisting the cooperation of Moss and Knauf's counsel to speed up the Pilot Program (which was a serious problem) and help prioritize those facing foreclosure.   Additionally, both Moss and Knauf's counsel worked with GRANT to provide lenders with documentation and a remediation schedule so they would feel more comfortable in  providing homeowners with a moratorium on their mortgage during the remediation process.  Rec. Doc. 21559-1, Exhibit "A" to Initial Affidavit of Allison Grant, P.A. for Compensation for Common Benefit Time at 4.   Countless properties were saved and owners (many of whom were not GRANT's clients) were  able to participate in the Pilot Program as a result of GRANT's work.    PC Ex. e.1 at 3, 19, 22-23.

      In his Recommendations, the Special Master noted that GRANT's work included

[8]

researching legal issues surrounding condominium associations.  GRANT's work involving condominium associations was much more extensive than mere legal research.  Rec. Doc. 21559-1, Exhibit "A" to Initial Affidavit of Allison Grant, P.A. for Compensation for Common Benefit Time at 3-4.   For example, in 2010, GRANT and co-counsel filed a class action in state court on behalf of a condominium association, namely, Magdalena Gardens Condominium Association, Inc., which involved approximately 70 affected units.   GRANT performed substantial and important work on this state case (as well as 100 plus other state cases prior to the Court's Order Staying Claims Involving KPT Chinese Drywall (hereinafter the "Stay"). Rec. Doc. 12270.[7]  Rec. Doc. 20993-2 at 10.  This work included attending a mediation in Miami with Knauf and its counsel to discuss Magdalena Gardens as well as several other condominium association claimants represented by GRANT and co-counsel.  This led to months of negotiations and eventual settlements with Knauf with respect to GRANT's condominium association clients, including Lauderdale One, a 109 unit, six story building in Fort Lauderdale and San Lorenzo, a 90 unit, ten story building located in Miami.  PC Ex. e.1 at 27-32. This work substantially benefitted all condominium claimants.

Magdalena Gardens also presented a unique challenge because it contained several mixed properties, an issue never previously addressed in the context of condominiums.  *Id*. 30-31.  And as to another condominium association, GRANT worked with Benchmark and Knauf's counsel to establish a protocol for inspecting condominiums, which was much more complicated and time consuming than single family homes, and particularly where tenants were involved.  Thereafter, GRANT worked with Moss and Knauf's counsel to develop a

---

7.  Other than a few hours, GRANT was advised that she could not submit time for work on state cases.

remediation protocol for a high-rise condominium as the remediation would need to take place in phases. There were numerous meetings with Moss onsite to address the logistics including, but not limited to, rotating occupants, the hiring of a fire marshal, arranging for security and addressing parking issues. There was also a problem with abandoned units, which if left unresolved, would have jeopardized the remediation of the entire building. Once these issues were resolved, GRANT and Knauf's counsel negotiated a specific term sheet and several different releases to address different circumstances. *Id*. None of these issues had been previously addressed and the documents negotiated and draft by GRANT and Knauf's counsel served as a template for other claimants in the MDL. GRANT's work paved the way and set a framework for other attorneys to settle their own condominium claims with Knauf, an important and substantial benefit to this MDL. To state that GRANT merely conducted legal research or that GRANT's work included "reviewing and proposing changes to various documents" understates the substance and importance of GRANT's work to all claimants.

## CONCLUSION

The above recitations are just a few examples demonstrating the extent of GRANT's remarkable efforts and dedication to this litigation over a five-year period of time. Yet GRANT's recommended allocation of $29,000.00 is far less than others who performed limited work. The Special Master undervalued GRANT's work, not only in terms of the comparative value of the 85 hours submitted, but its overall contribution to this litigation. GRANT's work was far more valuable and is worthy of greater compensation. Based on the foregoing, GRANT respectfully requests compensation commensurate with the work performed. An allocation of at least $250,000.00 is reasonable and appropriate under the circumstances.

[10]

Respectfully submitted,

Dated: January 4, 2019                    /s/ Allison Grant
                                          Allison Grant, Esquire (Fla. Bar 858330)
                                          Allison Grant, P.A.
                                          14 S.E. 4th Street
                                          Boca Raton, Florida 33434
                                          Phone: (561) 994-9646
                                          Fax: (561) 431-4627
                                          agrant@allisongrantpa.com

[11]

## **CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on Plaintiffs' Liaison Counsel, Russ Herman, and Defendants' Liaison Counsel, Kerry Miller, by U.S. Mail e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047 on this 3rd day of January, 2019.

Dated: January 3, 2019                              RESPECTFULLY SUBMITTED:


                                          /s/ Allison Grant
                                          Allison Grant, Esquire (Fla. Bar 858330)
                                          Allison Grant, P.A.
                                          14 S.E. 4th Street
                                          Boca Raton, Florida 33434
                                          Phone: (561) 994-9646
                                          Fax: (561) 431-4627
                                          agrant@allisongrantpa.com

[12]