# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047 SECTION: L JUDGE FALLON MAG. JUDGE WILKINSON |
| **THIS DOCUMENT RELATES TO:** *Abel, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al.,* **Case No. 11-cv-080 (E.D. La.)** *Almeroth, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al.,* **Case No. 12-cv-498 (E.D. La.)** *Amato, et al. v. Liberty Mutual Insurance Company,* **Case No. 10-cv-932 (E.D. La.)** *Germano, et al. v. Taishan Gypsum Co., Ltd., et al.,* **Case No. 09-cv-6687 (E.D. La.)** *Gross, et al. v. Knauf Gips, KG, et al.,* **Case No. 09-cv-6690 (E.D. La.)** *Haya, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al.,* **Case No. 11-cv-1077 (E.D. La.)** *Wiltz, et al. v. Beijing New Building Materials Public Limited Co., et al.,* **Case No. 10-cv-361 (E.D. La.)** | |

## CLASS COUNSEL'S MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES IN THE SETTLEMENT OF ASSIGNED CLAIMS IN MDL NO. 2047 ON BEHALF OF THE PORTER-BLAINE/VENTURE SUPPLY CLASS REGARDING CLAIMS ASSIGNED TO THE CLASS BY THE PORTER-BLAINE/VENTURE SUPPLY PARTICIPATING DEFENDANTS AND PARTICIPATING INSURERS AGAINST TAISHAN GYPSUM CO., LTD. AND TAIAN <u>TAISHAN PLASTERBOARD CO., LTD.</u>

## TABLE OF CONTENTS

**TABLE OF CONTENTS**..................................................................................................... i

**TABLE OF AUTHORITIES** ........................................................................................... iii

I.       INTRODUCTION.................................................................................................... 2

II.      STATEMENT OF FACTS .................................................................................... 3

    A.   The Chinese Drywall Litigation. ..................................................................... 3

        1.   Background. ............................................................................................ 3

        2.   Litigating the Chinese Drywall Cases Has Been Arduous. ......................... 5

        3.   The Virginia Settlements. ........................................................................ 8

        4.   The Porter-Blaine/Venture Supply Settlement. ......................................... 9

        5.   Litigation and Settlement of the Assigned Claims. .................................. 10

        6.   Preliminary Approval of the Assigned Claims Settlement. ....................... 12

    B.   The Terms of the Assigned Claims Settlement. ............................................... 13

        1.   Settlement Funds. ................................................................................. 13

III.     ARGUMENT ...................................................................................................... 15

    A.   The Principles Governing the Determination of the Amount of a Fee Award Relating to the Assigned Claims Settlement ...................................................... 15

    B.   A Percentage Award of 32% Should be Authorized. ....................................... 16

    C.   The Historic Underpinnings for Awarding Common Benefit Fees Lend Authority to a Global Percentage Fee Award. .................................................................... 17

    D.   Principles Governing Determination of an Appropriate Fee Award under Johnson. ...... 23

        1.   The Time and Labor Required .............................................................. 23

        2.   The Novelty and Difficulty of the Questions Involved ............................ 25

        3.   The Skill Requisite to Perform the Legal Service Properly ...................... 25

        4.   The Preclusion of Other Employment by the Attorney Due to Acceptance of the Case ........................................................................................... 26

        5.   The Customary Fee .............................................................................. 26

        6.   Whether the Fee Is Fixed or Contingent ................................................ 26

        7.   Time Limitations Imposed by the Client or the Circumstances ................ 27

        8.   The Amount Involved and the Results Obtained ..................................... 27

        9.   The Experience, Reputation, and Ability of the Attorneys ....................... 27

        10.   The "Undesirability" of the Case .......................................................... 28

        11.   The Nature and Length of the Professional Relationship with the Client ........ 28

        12.   Awards in Similar Cases ...................................................................... 28

    E.    Common Benefit Counsel Should Be Entitled to Reimbursement of Expenses. ............ 29

IV.    CONCLUSION ............................................................................................................ 30

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*Airline Stewards & Stewardesses Ass'n Local 550 v. Trans World Airlines, Inc.*,
  630 F.2d 1164 (7th Cir. 1980) ................................................................... 17

*Ayers v. Thompson*,
  358 F.3d 356 (5th Cir. 2004) ...................................................................... 24

*Beaulieu v. EQ Indus. Servs., Inc.*,
  2009 WL 2208131 (E.D.N.C. July 22, 2009) ............................................ 23

*Bennett v. Behring*,
  737 F.2d 982 (11th Cir. 1984) ..................................................................... 18

*Braud v. Transport Service Co. of Illinois*,
  2010 WL 3283398 (E.D. La. Aug. 17, 2010) ............................................. 17

*Camp v. The Progressive Group*,
  2004 WL 2149079 (E.D. La. Sept. 23, 2004) ....................................... 19, 21

*City of Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2nd Cir. 1974) ...................................................................... 20

*Cotton v. Hinton*,
  559 F.2d 1326 (5th Cir. 1977) .......................................................... 17, 18, 20

*DeHoyos v. Allstate Corp.*,
  240 F.R.D. 269 (W.D. Tex. 2007) ......................................................... 25, 26

*Eisen v. Carlisle & Jacqueline*,
  417 U.S. 156 (1974) ..................................................................................... 29

*Georgevich v. Strauss*,
  96 F.R.D. 192 (M.D. Pa. 1982) ................................................................... 19

*Grunin v. Int'l House of Pancakes*,
  513 F.2d 114 (8th Cir.) ................................................................................ 20

*In re Chevron U.S.A., Inc.*,
  109 F.3d 1016 (5th Cir. 1997) ....................................................................... 7

*In re Chicken Antitrust Litig. Am. Poultry*,
  669 F.2d 228 (5th Cir. 1982) ....................................................................... 18

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.*,
  626 F. Supp. 2d 1346 (J.P.M.L. 2009) ......................................................... 4

*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*,
706 F. Supp. 2d 655 (E.D. La. 2010) ................................................................. 4

*In re Combustion, Inc.*,
968 F. Supp. 1116 (W.D. La. 1997) ................................................................. 19

*In re Corrugated Container Antitrust Litigation*,
643 F.2d 195 (5th Cir. 1981).................................................................... 18, 21

*In re Educ. Testing Serv. Praxis Principles of Learning and Teaching, Grades 7-12 Litig.*,
447 F. Supp. 2d 612 (E.D. La. 2006) ........................................................ 24, 25

*In re Heartland Payment Systems, Inc. Customer Data Sec. Breach Litigation*,
851 F. Supp. 2d 1040 (S.D. Tex. 2012) ............................................................ 27

*In re Nissan Motor Corp. Antitrust Litig.*,
552 F.2d 1088 (5th Cir. 1977).......................................................................... 29

*In re Oil Spill by Oil Rig Deepwater Horizon*,
295 F.R.D. 112 (E.D. La. 2013) ....................................................... 23, 24, 26

*In re Shell Oil Refinery*,
155 F.R.D. 552 (E.D. La. 1993)................................................................. 23, 28

*In re Wireless Tel. Fed. Cost Recovery Fees Litig.*,
396 F.3d 922 (8th Cir. 2005)........................................................................... 19

*Maher v. Zapata Corp.*,
714 F.2d 436 (5th Cir. 1983)........................................................ 17, 18, 20, 27

*Miller v. Republic Nat'l Life Ins. Co.*,
559 F.2d 426 (5th Cir. 1977)........................................................................... 18

*Newby v. Enron Corp.*,
394 F.3d 296 (5th Cir. 2004)........................................................................... 16

*Oppenlander v. Standard Oil Co.*,
64 F.R.D. 597 (D. Colo. 1974)........................................................................ 29

*Parker v. Anderson*,
667 F.2d 1204 (5th Cir. 1982)..................................................... 16, 18, 21, 25

*Pearson v. Ecological Sci. Corp.*,
559 F.2d 171 (5th Cir. 1975)........................................................................... 18

*Pettway v. American Cast Iron Pipe Co.*,
576 F.2d 1157 (5th Cir. 1978)............................................................. 18, 21, 28

*Phillips Petroleum Co. v. Shutts*,
  472 U.S. 797 (1985) ............................................................................................. 29

*Reed v. General Motors Corp.*,
  703 F.2d 170 (5th Cir. 1983) ................................................................. 18, 21, 26, 28

*Reynolds v. Beneficial Nat'l Bank*,
  288 F.3d 277 (7th Cir. 2002) ............................................................................... 19

*Salinas v. Roadway Express, Inc.*,
  802 F.2d 787 (5th Cir. 1986) ............................................................................... 24

*Slipchenko v. Brunel Energy, Inc.*,
  2015 WL 338358 (S.D. Tex. Jan. 23, 2015) ........................................................ 26

*Turner v. Murphy Oil USA, Inc.*,
  472 F. Supp. 2d 830 (E.D. La. 2007) ............................................................ *passim*

*United States Oil & Gas Litig.*,
  967 F.2d 489 (11th Cir. 1992) ............................................................................. 18

*United States v. Allegheny-Ludlum Indus., Inc.*,
  517 F.2d 826 (5th Cir. 1975) ............................................................................... 17

*United States v. Tex. Educ. Agency*,
  679 F.2d 1104 (5th Cir. 1982) ........................................................................ 19, 20

*Van Bronkhorst v. Safeco Corp.*,
  529 F.2d 943 (9th Cir. 1976) ............................................................................... 17

*Young v. Katz*,
  447 F.2d 431 (5th Cir. 1971) ............................................................................... 18

## Statutes

28 U.S.C. § 1407 .......................................................................................................... 4

## Rules

Fed. R. Civ. P. 23 ............................................................................................... 8, 16, 21

Fed R. Civ. P. 16 ....................................................................................................... 18

## Other Authorities

1 Newberg On Class Actions §§ 1:3, 11.47, 11.50 ............................................ 19, 23, 26, 28

Manual For Complex Litigation (Fourth) § 21.61 ............................................. 19

Hon. E. Fallon, J. Grabill, R. Wynne, *Bellwether Trials in Multidistrict Litigation*,
   82 TUL. L. REV. 2323 (2008) ................................................................................. 7

Bruce L. Hay, *The Theory of Fee Regulation in Class Action Settlements*,
   46 AM. U. L. REV. 1429 (1997) ............................................................................... 22

Class Counsel[1] have moved for an Award of Attorneys' Fees and Reimbursement of Expenses in the Settlement of Assigned Claims in MDL No. 2047 on Behalf of the Porter-Blaine/Venture Supply Class Regarding Claims Assigned to the Class by the Porter-Blaine/Venture Supply Participating Defendants and Participating Insurers Against Taishan Gypsum Co., Ltd. and Taian Taishan Plasterboard Co., Ltd. (collectively, "Taishan").

The Court granted the Motion for Final Approval of the Settlement of Assigned Claims in MDL No. 2047 on Behalf of the Porter-Blaine/Venture Supply Class Regarding Claims Assigned to the Class by the Porter-Blaine/Venture Participating Defendants and Participating Insurers Against Taishan Gypsum Co., Ltd. and Taian Taishan Plasterboard Co., Ltd. (the "Assigned Claims Settlement" or the "Assigned Claims Settlement Agreement")[2] on July 18, 2018, from the bench by Minute Entry,[3] following notice to the class, an opportunity to object, and a fairness hearing.  A Final Order and Judgment pursuant to Fed. R. Civ. P. 54(B) was entered on July 19, 2018.[4] Thereafter, Special Master Garretson distributed the Settlement Fund for the Assigned Claims Settlement to Eligible Class Members on a *pro rata* basis in accordance with the settlement payment amounts previously made in the Porter-Blaine/Venture Supply Settlement according to the Revised Proposed Plan of Allocation that was previously approved by the Court [Rec. Doc. 16823-8].[5]

---

[1] The undersigned Plaintiffs' Class Counsel, Russ Herman, Arnold Levin and Richard Serpe, were appointed by the Court to represent the Porter-Blaine/Venture Supply Class [Rec. Doc. 16516].

[2] Capitalized terms used in this Memorandum of Law have the same meaning as the same terms used in the Assigned Claims Settlement Agreement and/or the Porter-Blaine/Venture Supply Settlement Agreement [Rec. Doc. 15969-1].

[3] Minute Entry [Rec. Doc. 21540].

[4] Final Order and Judgment [Rec. Doc. No. 21544].

[5] The Revised Proposed Plan of Allocation [Rec. Doc. 16823-8] was approved by the Court as part of the final approval of the Porter-Blaine/Venture Supply Settlement [Rec. Doc. 16934, at ¶¶ 41-43].  The Assigned Claims Settlement provides that allocation of that Settlement Fund will be in

Now that the claimants have been paid, Class Counsel respectfully believe it is appropriate for the Court to determine this Petition for an award of fees and reimbursement of expenses related to the Assigned Claims Settlement.

## I.   **INTRODUCTION**

The Assigned Claims Settlement is the fulfillment of a component of the Porter-Blaine/Venture Supply Settlement that was finally approved on July 9, 2013. At that time, the Court certified the Porter-Blaine/Venture Supply Class and granted final approval of a settlement that provided $3,000,000 in cash for the benefit of Class Members.[6] In addition to the cash benefit, the defendants provided additional consideration through their assignment to the Class of certain Chinese Drywall indemnification claims they had against Taishan[7] in connection with the Affected Properties.[8]

---

accordance with the allocation undertaken in the Porter-Blaine/Venture Supply Settlement, except that the Intervening Plaintiffs in *Germano, et al. v. Taishan Gypsum Co., Ltd., et al.*, Case No. 09-cv-6687 (E.D. La.) (namely, Deborah and William Morgan; Jerry and Inez Baldwin; Joe and Cathy Leach; Robert and Lisa Orlando; Fred and Vanessa Michaux; Preston and Rachel McKellar; and Steven and Elizabeth Heischober) are Class Members, but they are not eligible for a claim payment from the Assigned Claims Settlement because they already received payments for their claims from Taishan pursuant to the Judgment entered by the Court. *See* Assigned Claims Settlement Agreement, ¶ 13.

[6] *See* Porter-Blaine/Venture Supply Settlement Agreement [Rec. Doc. 15969-6]; Final Approval Order [Rec. Doc. 16934] at 24.

[7] Taishan is defined as: Taishan Gypsum Company Ltd. f/k/a/ Shandong Taihe Dongxin Co., Ltd. and Taishan Gypsum Co., Ltd., and Taian Taishan Plasterboard Co., Ltd., and their respective past, present, and future officers, directors, board members, members, agents, attorneys, consultants, claim administrators, managers, employees, partners, parent corporations, sister corporations, subsidiaries, related entities, divisions, heirs, associates, stockholders, shareholders, retail dealers, distributors, insurers, reinsurers, and all of their predecessors, successors, assigns, legatees, legal representatives, and any other stakeholders of each of the foregoing, including Beijing New Building Materials Public Limited Company ("BNBM PLC"); Beijing New Building Materials (Group) Co., Ltd. ("BNBM Group"); and China National Building Materials Co., Ltd. ("CNBM"); and China National Building Materials Group ("CNBM Group"). Assigned Claims Settlement Agreement, § 1.1.2.

[8] *See* Section 6 of the Porter-Blaine/Venture Supply Settlement [Rec. Doc. 15969-6].

The Court's grant of final approval of the Assigned Claims Settlement that occurred on July 19, 2018 resolves the assigned indemnification claims with Taishan and provides an additional gross cash settlement amount of $1,978,528.40 for the benefit of Eligible Class Members of the previously approved class.  The Court should now consider an award of attorneys' fees and reimbursement of expenses relating to the additional cash benefit of $1,978,528.40 created through the Assigned Claims Settlement, which provides that a petition for an attorneys' fee award of up to 32% can be requested. [9]  As explained below, Class Counsel submit that an award of 32% is appropriate.

## II.    STATEMENT OF FACTS

### A.    The Chinese Drywall Litigation.

A more thorough background of the *Chinese Drywall* Litigation is set forth in the Memorandum of Law in Support of Final Approval of the Porter-Blaine/Venture Supply Settlement.[10]  A succinct summary is included below for the Court's reference.

#### 1.    Background.

This litigation arose out of thousands of individual and class action lawsuits filed in state and federal courts throughout the country on behalf of Plaintiffs seeking compensation for property damage and personal injuries allegedly caused by Chinese Drywall. Chinese Drywall was installed in tens of thousands of homes, commercial buildings and other structures in the United States following the devastation caused by Hurricanes Katrina and Rita at the end of the summer of 2005. In the aftermath of these disasters and in conjunction with a housing boom, there was a critical shortage of drywall in this country, which led to the importation of millions of square feet of

---

[9] Assigned Claims Settlement Agreement, at § 13.6.

[10] *See* Rec. Doc. 16806-1, at 3-10.

Chinese Drywall beginning in the fall of 2005 through 2008.[11]

Having entered the stream of commerce in the United States, Chinese Drywall changed hands from its manufacturers to importers, distributors, suppliers, developers, builders, and/or installers, and was ultimately installed in thousands of properties, primarily in Florida, Louisiana, Virginia, Alabama, Mississippi, Texas, Tennessee, Georgia, North Carolina, Oklahoma, Illinois, and California.  Once installed, residents and owners noticed unpleasant odors and corrosion to anything made of metal.[12]  Plaintiffs filed claims in jurisdictions across the country alleging that Chinese Drywall emits sulfur gases that cause extensive damage to property and, in some cases, physical ailments.[13]

On June 15, 2009, the Judicial Panel for Multidistrict Litigation transferred all federal actions alleging damages from Chinese Drywall to the Eastern District of Louisiana for coordinated discovery and consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407, assigning MDL docket number MDL 2047.  *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 626 F. Supp. 2d 1346 (J.P.M.L. 2009).[14]  More than 1,650 Defendants were brought into the litigation, including the foreign manufacturers of Chinese Drywall, their related entities, homebuilders, developers, installers, retailers, realtors, brokers, suppliers, importers, exporters, and distributors of Chinese Drywall, as well as their insurers and the insurers of homeowners.

---

[11]  The Gypsum Association reported that 320 million square feet of Chinese Drywall were imported to the United States between 2005-2007. See Gypsum Association Comments, archived at http://web.archive.org/web/20101216021748/http://gypsum.org/pdf/Gypsum_Association_Comments_on_Chinese_Wallboard_Issue.pdf.

[12]  *See In re Chinese-Manufactured Drywall Prods. Liab. Litig. (German*o), 706 F. Supp. 2d 655, 663 (E.D. La. 2010) (Findings of Fact and Conclusions of Law).

[13]  *Id*. at 659, 664-66, 710.

[14]  Rec. Doc. No. 1.

Discovery has revealed that many of the Affected Properties that are the subject of the litigation contain or contained drywall manufactured by Taishan.

## 2. Litigating the Chinese Drywall Cases Has Been Arduous.

Since the formation of this MDL, thousands of claimants have participated in one or more of the PSC's Omnibus class action complaints.[15]  The Court has held regular monthly status conferences attended by hundreds of attorneys, and it has entered numerous pretrial orders, orders,

---

[15] *See, e.g., Payton v. Knauf Gips, KG*, No. 09-7628 (E.D. La.) (Omni I, I(A), I(B), I(C)); *Wiltz v. Beijing New Building Materials Public Limited Co*., No. 10-361 (E.D. La.) (Omni II, II(A), II(B), II(C)); *Gross v. Knauf Gips, KG*, No. 09-6690 (E.D. La.) (original complaint, Omni III, III(A)); *Rogers v. Knauf Gips, KG*, No. 10-362 (E.D. La.) (Omni IV, IV(A), IV(B), IV(C)); *Amato v. Liberty Mutual Ins. Co*., No. 10-932 (E.D. La.) (Omni V); *Hernandez v. AAA Ins.*, No. 10-3070 (E.D. La.) (Omni VI); *Abel v. Taishan Gypsum Co., Ltd*., No. 11-080 (E.D. La.) (Omni VII); *Abreu v. Gebrueder Knauf Verwaltungsgesellschaft, KG*, No. 11-252 (E.D. La.) (Omni VIII); *Haya v. Taishan Gypsum Co., Ltd*., No. 11-1077 (E.D. La.) (Omni IX); *Block v. Gebrueder Knauf Verwaltungsgesellschaft, KG*, No. 11-1363 (E.D. La.) (Omni X); *Benoit v. Lafarge S.A*., No. 11-1893 (E.D. La.) (Omni XI); *Arndt v. Gebrueder Knauf Verwaltungsgesellschaft, KG*, No. 11-2349 (E.D. La.) (Omni XII); *Almeroth v. Taishan Gypsum Co., Ltd*., No. 12-0498 (E.D. La.) (Omni XIII); *Cassidy v. Gebrueder Knauf Verwaltungsgesellschaft, KG*, No. 11-3023 (E.D. La.) (Omni XIV); *Amorin v. Taishan Gypsum Co., Ltd*., No. 11-1672 (E.D. La.) (Omni XV); *Amorin v. Taishan Gypsum Co., Ltd*., No. 11-1395 (E.D. La.) (Omni XVI); *Amorin v. Taishan Gypsum Co., Ltd*., No. 11-1673 (E.D. La.) (Omni XVII); *Beane v. Gebrueder Knauf Verwaltungsgesellschaft, KG*, No. 13-609 (E.D. La.) (Omni XVIII); *Amorin v. State-Owned Assets Supervision and Administration Commission of the State Council*, No. 14-1727 (E.D. La.) (Omni XIX); *Brooke v. State-Owned Assets Supervision and Administration Commission of the State Council*, No. 15-4127 (E.D. La.) (Omni XX); *Macon v. Taishan Gypsum Co., Ltd*., No. 17-1287 (N.D. Ala.) (Omni XXI); *Peoples v. Taishan Gypsum Co., Ltd.,* No. 17-2890 (N.D. Ga.) (Omni XXII); *Polk v. Taishan Gypsum Co., Ltd*., No. 17-216H50 (S.D. Miss.) (Omni XXIII); *Bright v. Taishan Gypsum Co., Ltd*., No. 17-0035 (E.D.N.C.) (Omni XXIV); *DeOliveira v. Taishan Gypsum Co., Ltd*., No. 17-2019 (D.S.C.) (Omni XXV); *Redden v. Taishan Gypsum Co., Ltd*., No. 17-1146 (W.D. Tenn.) (Omni XXVI); *Mertlitz v. Taishan Gypsum Co., Ltd*., No. 17-140 (E.D. Tex.) (Omni XXVII); *Bayne v. Taishan Gypsum Co., Ltd.*, No. 17-1286 (N.D. Ala.) (Omni XXVIII); *Abner v. Taishan Gypsum Co., Ltd*., No. 11-3094 (N.D. Cal.) (Omni XXIX); *Bentz v. Taishan Gypsum Co., Ltd*., No. 17-2892 (N.D. Ga.) (Omni XXX); *Allen v. Taishan Gypsum Co., Ltd*., No. 17-217LG (S.D. Miss.) (Omni XXXI); *Lochhead v. Taishan Gypsum Co*., No. 17-294 (S.D. Tex.) (Omni XXXII); *Stutzman v. Taishan Gypsum Co., Ltd.*, No. 17-1209 (S.D. Ill.) (Omni XXXIII); *Allman v. Taishan Gypsum Co., Ltd.*, No. 17-051 (E.D.N.C.) (Omni XXXIV); *Cole v. State-Owned Assets Supervision and Administration Commission of the State Council*, No. 18-562 (D. Okla.) (Omni XXXV).

and minute entries.[16]  To date, over 22,000 entries have been recorded on the MDL docket of this case.  In overseeing this MDL, the Court has appointed numerous steering committees and liaison counsel for Plaintiffs, homebuilders, insurers, installers, and manufacturers.[17]  The Court also appointed a curator for *pro se* litigants.[18]  Additionally, the Court has corresponded and coordinated with numerous state and federal court jurists who also preside over related Chinese Drywall cases,[19] including, most recently on remand, Judge Marcia G. Cooke in the Southern District of Florida and Judge Mark S. Davis in the Eastern District of Virginia.

The prosecution and coordination of Chinese Drywall claims on behalf of thousands of Plaintiffs in the MDL has been voluminous, expensive and time-consuming.  These efforts included: (i) translation and service of process of Omnibus Complaints under the Hague Convention on scores of foreign manufacturing Defendants and their related entities; (ii) pretrial discovery of hundreds of entities in the Chinese Drywall supply chain, including depositions in Frankfurt, London, and Hong Kong, as well as in cities throughout the United States, often requiring the use of multiple interpreters; (iii) establishing a document depository that has logged

---

[16] *E.g.*, Minute Entry, Dec. 2, 2010 [Rec. Doc. No. 6525].

[17] *See, e.g.,* Pretrial Order No. 3 (appointing Plaintiffs' Liaison Counsel, Russ Herman) [Rec. Doc. No. 21]; Pretrial Order No. 4 (appointing Defendants' Liaison Counsel) [Rec. Doc. No. 22]; Amended Pretrial Order No. 7 (appointing Defendants' Steering Committee) [Rec. Doc. No. 152]; Pretrial Order No. 8 (creating the PSC and appointing Lead Counsel for Plaintiffs, Arnold Levin) [Rec. Doc. No. 144-2]; Pretrial Order No. 18 (appointing Homebuilders and Installers Liaison Counsel) [Rec. Doc. No. 414]; Pretrial Order No. 19 (appointing a Plaintiffs' State/Federal Coordination Committee and a Defendants' State/Federal Committee) [Rec. Doc. No. 1871]; Pretrial Order No. 20 (appointing Insurer Steering Committee and Co-Lead Counsel for the First-Party Insurer Subcommittee) [Rec. Doc. No. 2369].

[18] Rec. Doc. No. 11327.

[19] *E.g.,* Transcript of Status Conference at 2:17-3:17, Oct. 14, 2010 (comments of J. Fallon praising "the help of state court judges:" "I've counted on their wisdom, on their suggestions in trying to gather all of the cases and move them forward."); Transcript of Status Conference at 7:5-17, Mar. 23, 2011.

in more than a million pages of documents received pursuant to production requests, many of which required translation into English; (iv) testing and preserving the drywall in Plaintiffs' homes; (v) preparing and serving requests upon the government agencies under the Freedom of Information Act; (vi) retaining experts in metallurgy, electrical engineering, and failure analysis; (vii) filing motions for class certification in *Germano*, *Payton* (Knauf), *Payton/Vickers*, and *Amorin*; (viii) filing motions for Florida and Louisiana Homeowners classes for damages and/or declaratory relief;[20] (ix) filing numerous motions to intervene, motions to compel, motions for default judgment, motions for summary judgment, and a motion to establish a Plaintiffs' litigation expense fund; (x) filing and litigating motions for class certification in the *Amorin* cases and defeating subsequent efforts to decertify the class; (xi) responding to motions to dismiss for lack of personal jurisdiction; and (xi) attendance at every MDL 2047 status conference and hearing held before the Court.[21] With the advent of remands, many of these activities continue to occur as the parties prepare for trials in the MDL and the remand courts in Florida and Virginia.

In the spring of 2010, the PSC prepared ten bellwether cases involving Virginia and Louisiana for trial.[22] After considering the testimony of experts in the fields of corrosion, metallurgy, electrical engineering, power electronics, electrical machinery, and failure analysis concerning the effects of having Chinese drywall installed in Plaintiffs' homes, this Court made numerous findings of fact regarding the appropriate scope of remediation. The Court found that

---

[20] Rec. Doc. Nos. 3293 (*Germano*), 5567 (*Silva*), 5611 (*Vickers/Payton*), 5612 (*Payton*), 8125 (*Silva*), 8195 (*Vickers/Payton*), 8197 (*Payton*).

[21] *See* 12/2/2010 Minute Entry at 23-25.

[22] *See Germano, et al. v. Taishan Gypsum Co., Ltd., et al*., Case No. 2:09-cv-06687 (E.D. Va. May 11, 2010) (Rec. Doc. No. 3013) (seven cases); *Hernandez v. Knauf Gips, KG, et al*., Case No. 2:09-cv-06050 (E.D. La. May 11, 2010) (Rec. Doc. No. 3012) (one case). Two additional bellwether cases, *Campbell v. KPT, et al*., Case No. 2:09-cv-7628 (E.D. La.) and *Clement v. KPT, et al*., Case No. 2:09-cv-7628 (E.D. La.), were settled on the eve of trial on June 18, 2010.

Chinese Drywall "has to be remediated."[23]  These bellwether trials served as a useful tool for all litigants involved in the *Chinese Drywall* Litigation, as well as the Court.[24]  The discovery efforts of the PSC, along with the bellwether trials and several mediations facilitated by the Court, have proved fruitful.  The PSC succeeded in reaching nine class settlements with more than 700 Chinese Drywall Defendants.

### 3.    The Virginia Settlements.

Among  the  nine  settlements  were  four  Virginia-based  settlements,[25]  which  provided compensation to persons and entities in the United States, but primarily in Virginia, who were previously  unable  to  recover  against  Defendants  due  to  the  interpretation  of  Total  Pollution Exclusions involving insurance policies under Virginia law.  The Chinese Drywall in those cases was manufactured by Taishan Gypsum Co., Ltd. and distributed by Venture Supply.[26]

All the claims brought against the Defendants in the four Virginia-based Settlements were believed  to  concern  Chinese  Drywall  that  was  within  the  legal  responsibility  of  the  settling Defendants who were in the distribution chain downstream from Taishan (or were an insurer of such an entity).  On July 9, 2013, the Court granted final approval of the four Virginia-based

---

[23] *Germano*, 706 F. Supp. 2d at 671.

[24] *See* Hon. E. Fallon, J. Grabill, R. Wynne, "Bellwether Trials in Multidistrict Litigation," 82 TUL. L. REV. 2323 (June 2008) (concluding that the use of a bellwether trial is "one of the most innovative and useful techniques for the resolution of complex cases"); *see also In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1019 (5th Cir. 1997).

[25] The four Virginia-based settlements were with Defendants: (1) Nationwide-related insurance companies and over thirty entities to whom they issued liability insurance policies, (2) Venture Supply, Porter-Blaine Corporation, and their insurers, the Hanover-related insurance companies (the "Porter-Blaine/Venture Supply Settlement"); (3) Tobin Trading, Inc., Builders Plaster & Drywall, LLC, JMM Drywall Co., LLC, and State Farm related insurance companies; and (4) Builders Mutual Insurance Company and nineteen entities to whom it issued liability insurance policies.  *See* Rec. Doc. 16934.

[26] Findings of Fact & Conclusions of Law, *In Re: Chinese Manufactured Drywall Products Liability Litigation*, at 8, MDL No. 2047 (filed April 8, 2010) [Rec. Doc. 2380].

settlements and, pursuant to Fed. R. Civ. P. 23(a), 23(b)(3) & 23(e), certified the associated classes.[27]

### 4.    The Porter-Blaine/Venture Supply Settlement.

Among the Virginia-based settlements was the Porter-Blaine/Venture Supply Settlement. As part of that settlement, the settling Defendants agreed to pay $3,000,000 in cash for the benefit of the Porter-Blaine/Venture Supply Class (the "Class Members").[28]  The Porter-Blaine/Venture Supply Settlement resolved all Class Members' claims against the settling Defendants in connection with Affected Properties.  In addition, the Porter-Blaine/Venture Supply Settlement expressly reserved Class Members' claims against Non-Participating Defendants and Non-Participating Insurers (including Taishan).[29]

As part of the Porter-Blaine/Venture Supply Settlement, certain settling Defendants assigned indemnification claims they had against Taishan to the Class.  Specifically, the indemnification claims were those that arose from Chinese Drywall at the Affected Properties.[30] These are the "Assigned Claims" and they are separate and apart from the Class Members' own claims against Taishan for remediation and other damages – which are referred to as the "Reserved Claims."[31]

---

[27] *See* Porter-Blaine/Venture Supply Settlement Agreement [Rec. Doc. 15969-6]; Final Approval Order [Rec. Doc. 16934] at 24.  At the same time, the Court also certified the Nationwide Insureds Settlement Class, the Tobin Trading and Installers Settlement Class, and the Builders Mutual Insureds Settlement Class, and approved the corresponding Class Settlements [Rec. Doc. 16934 at 22, 26, 28].

[28] *See* Porter-Blaine/Venture Supply Settlement Agreement [Rec. Doc. 15969-6]; Final Approval Order [Rec. Doc. 16934] at 24.

[29] *See* Porter-Blaine/Venture Supply Settlement [Rec. Doc. 15969-6], § 5.5.

[30] *See id.*, § 6.

[31] *See id.*, §§ 5.5, 6.

The $3,000,000 in settlement funds from the Porter-Blaine/Venture Supply Settlement have been distributed to Class Members who were found to be eligible for a claim payment pursuant to the Revised Proposed Plan of Allocation.[32]   That Revised Proposed Plan of Allocation was approved by the Court as fair and equitable.[33]

### 5.    Litigation and Settlement of the Assigned Claims.

The Assigned Claims were litigated in Virginia state court in *Allen, et al. v. Venture Supply, Inc., et al.*, Case No. 10-6976 (Va. Cir. Ct., Norfolk, Va.) ("*Allen* Consolidation"), pending before the Honorable Mary Jane Hall.  That is where Defendants Porter-Blaine and Venture Supply had brought third-party claims against Taishan.  On December 1, 2011, a default judgment was entered against Taishan with respect to the third-party claims.   Following approval of the Porter-Blaine/Venture Supply Settlement, Class counsel diligently pursued the Assigned Claims against Taishan.  The parties vigorously litigated the default judgment – Taishan pursued multiple motions to dismiss and sought evidence to assist in restricting the size of the award and the parties to whom the award would apply.[34]

Given that the Assigned Claims involve the assignment of a state court, third-party default judgment to a settlement class in federal court from a state that does not authorize state-law class actions, the issue presented significant challenges to the Class.  Taishan argued that there could be no assignment of a Virginia state court judgment to the Class.  In addition, to further compound

---

[32] Rec. Doc. 16823-8.

[33] *See* Final Approval Order [Rec. Doc. 16934], at ¶¶ 41-43.

[34] *See* Declaration of Richard J. Serpe in Support of Class Counsel's Motion for an Order Granting Final Approval of the Settlement of Assigned Claims in MDL No. 2047 on Behalf of the Porter-Blaine/Venture Supply Class Regarding Claims Assigned to the Class by the Porter-Blaine/Venture Supply Participating Defendants and Participating Insurers Against Taishan Gypsum Co., Ltd. and Taian Taishan Plasterboard Co., Ltd. ¶¶2-5 (hereafter "Serpe Declaration") [Rec. Doc. 21485-4] .

these challenges, not all of the Class Members were named Plaintiffs in the *Allen* Consolidation which complicated the determination as to the appropriate size of the default judgment.  Intense motion practice, discovery and expert analysis took place for over a year in Virginia State Court.[35]

Settlement of the Assigned Claims only came after a year of settlement negotiations during which the action was litigated.  Class Counsel made their original demand on Taishan on August 30, 2016 in which they sought $3,000,000 – indemnification of the full amount paid in Porter-Blaine/Venture Supply Agreement.  Over the course of the next twelve months, the parties engaged in numerous conferences and exchanged multiple offers and counter-offers. During that time, as described above, the parties were litigating the matter and significant challenges were posed.[36]  On September 7, 2017, an agreement in principle was reached after vigorous negotiations between Class Counsel and counsel for Taishan.[37]

After reaching the agreement in principle, the parties then negotiated the terms of the written Assigned Claims Settlement Agreement.[38]  Importantly, the Assigned Claims Settlement only applies to the claims pursued by Class Members on behalf of Defendants Porter-Blaine and Venture Supply.  On their own behalf, Class Members continue to pursue claims for remediation damages and other losses against Taishan (*i.e.*, "Reserved Claims") in the MDL and state courts related to the Affected Properties.[39]  Those Reserved Claims are expressly excluded from the Assigned Claims Settlement.[40]

---

[35] *See id.*

[36] *See id.*, ¶ 5.

[37] *See id.*, ¶ 6.

[38] *See id.*, ¶ 8.

[39] Assigned Claims Settlement Agreement, §§ 1.2, 5.4.

[40] *Id.*, § 5.4.

Class Counsel, who are vastly experienced in these matters, considered the potential outcomes of the litigation, the strength of the defenses and positions being asserted by Taishan, the risks and uncertainty regarding enforcement of any potential judgment against Taishan, and all of the material factual information when deciding whether to enter into the Assigned Claims Settlement on behalf of the Class.[41]

### 6.   Preliminary and Final Approval of the Assigned Claims Settlement.

On March 13, 2018, Class Counsel filed a motion seeking preliminary approval of the Assigned Claims Settlement along with an order directing the dissemination of class notice and the scheduling of a fairness hearing.[42]  On April 17, 2018, the Court preliminarily approved the Assigned Claims Settlement, the proposed Class Notice, and the protocol for dissemination of Notice to the Class Members.[43]  In addition, the Court required that any objections to the proposed Settlement be postmarked no later than June 27, 2018 (sixty (60) days after the last date to provide Notice to the Class) and that any response to any objections or other papers in support of final approval be filed on or before July 5, 2018.[44]  No objections to any of the provisions of the Settlement, including the 32% fee award, were lodged or filed.

A formal Joint Fairness Hearing before the Court, with the assistance of the Honorable

---

[41] *See* Serpe Decl., ¶ 6.

[42] *See* Class Counsel's Motion for an Order: (1) Preliminarily Approving the Settlement Agreement of Assigned Claims in MDL No. 2047 on Behalf of the Porter-Blaine/Venture Supply Class Regarding Claims Assigned to the Class by the Porter-Blaine/Venture Participating Defendants and Participating Insurers Against Taishan Gypsum Co., Ltd. and Taian Taishan Plasterboard Co., Ltd.; (2) Direction the Dissemination of Class Notice; and (3) Scheduling a Fairness Hearing [Rec. Doc. 21244].

[43] Rec. Doc. 21307 at 2-3.

[44] *Id*. at 3.

Mary Jane Hall of the Norfolk Virginia Circuit Court, was held on July 18, 2018.[45] The Court granted approval of the Assigned Claims Settlement from the bench on July 18, 2018 by a Minute Entry, and then Final approval of the Assigned Claims Settlement occurred on July 19, 2018 by the entry of a Final Order and Judgment pursuant to F. R. C. Pr. 54(B).[46]

**B.      The Terms of the Assigned Claims Settlement.**

**1.      Settlement Funds.**

The approved Assigned Claims Settlement provided that Taishan would pay a gross sum of $1,978,528.40[47] in cash to the Porter-Blaine/Venture Supply Class to resolve all Chinese Drywall claims that Porter-Blaine/Venture Supply had against Taishan.   These claims were previously assigned to the Class by the Porter-Blaine/Venture Participating Defendants and Participating Insurers in connection with the Porter-Blaine/Venture Settlement (*i.e.*, "Assigned Claims").[48]

Section 4.1 of the Assigned Claims Settlement provides that the Settlement Amount shall be deposited into an Escrow Account within sixty (60) days of the Effective Date of the Settlement. To facilitate payment, Plaintiffs' Class Counsel provided Taishan with an invoice for the Settlement Amount, which included wiring instructions, among other things. The Settlement Funds were then to be deposited and held in accordance with specific provisions of the Assigned Claims Settlement.

Section 13.1 of the Assigned Claims Settlement addresses the allocation of the Settlement Funds among Eligible Class Members. Section 13.4 of the Assigned Claims Settlement provides

---

[45] Minute Entry (Rec. Doc. 21540).

[46] Rec. Doc. 21544.

[47] Assigned Claims Settlement Agreement, § 4.1.

[48] *See id.*, § 1.2.

that all costs of administering the allocation of Settlement Amount and the cost of notice to Class Members will be paid out of the Settlement Amount.

Further, Section 13.6 of the Assigned Claims Settlement provides that Class Counsel, common benefit attorneys and privately retained attorneys for all Class Members shall be entitled to petition the Court for attorney's fees totaling in the aggregate up to 32% of the Settlement Funds, and reimbursement of reasonable expenses, excluding the cost of notice.

As for the for reimbursement of reasonable expenses, the Court set the amount at 2% of the Settlement Amount, or $39,570.57, which was withheld from the Settlement Amount so that reimbursement of expenses incurred could be paid.[49] Notice was provided to members of the Class via first class United States Mail and posting on the Court's and other websites. Expenses incurred in connection with the cost of notice included copy cost and expenses reimbursed to Venture Supply attorneys. The costs were identified in the Motion to Establish Settlement Fund (Attorney Fee) and to Appoint Fund Administrator (Assigned Claims Settlement) by Class Counsel, which included back-up supporting documentation of $14,936.58, which was to be reimbursed from the 2% of the Settlement Amount ($39,570.57) that was withheld for reimbursing expenses.[50]

The Court authorized the deposit into the registry of the Court, through the Clerk of Court for the United States District Court, Eastern District of Louisiana, of an amount totaling in the aggregate of 32% of the Settlement Funds or $633,129.09, so that the funds could be held until the Court resolved this Petition and issued an Order awarding attorney's fees. Further, the Court authorized the remaining 68% of the Settlement Funds, after reimbursement of reasonable expenses (*i.e.*, the 2% referenced above that was withheld for reimbursing expenses) to be provided

---

[49] Order, September 18, 2018 [Rec. Doc. No. 21785].

[50] Rec. Doc. No. 21781.

to the Garretson Resolution Group ("GRG") to distribute among eligible Class Members on a prorated basis in accordance with the Settlement payment amounts made in the Porter-Blaine/Venture Supply Settlement pursuant to the court-approved Revised Proposed Plan of Allocation.[51] Special Master Garretson distributed these funds to eligible Class Members on October 30, 2018.

## III.   ARGUMENT

### A.   The Principles Governing the Determination of the Amount of a Fee Award Relating to the Assigned Claims Settlement

This fee petition seeks to confirm that 32% of the Settlement Funds should be made available to compensate all counsel for their efforts creating the common benefit fund at issue. At a later date, the allocation of the attorney fee fund between and amongst common benefit counsel and individually retained counsel will be decided.

This Court has the inherent authority to award attorneys' fees and regulate counsel fees of those attorneys practicing before it, which authority is reinforced by the Assigned Claims Settlement which has already received this Court's imprimatur.

The request for attorneys' fees here is reasonable under the circumstances of this case. *See*, *e.g.*, *In re: Chinese-Manufactured Drywall Products Liability Litigation,* Order and Reasons Setting Common Benefits Fees (E.D. La. Jan. 31, 2018,) (hereafter "Order and Reasons")[52]; *Union Asset Management Holding, A.G. v. Dell, Inc*., 669 F.3d 632 (5th Cir. 2012); *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974); *Evans v. TIN, Inc.*, 2013 WL 4501061 (E.D. La. Aug. 21, 2013) (Africk, J.); *In re Vioxx Prod. Liab. Litig.*, 574 F. Supp. 2d 606 (E.D. La. 2008);

---

[51] Rec. Doc. 16823-8

[52] *See* Rec. Doc No. 21168.

and *Common Benefit Fees*, 74 LA. L.REV. 371 (2014).

**B.     A Percentage Award of 32% Should Be Authorized.**

The PSC accepted the challenge from the inception of this litigation to bring relief to Chinese Drywall victims, many of whom were displaced from their homes and unable to find or sue the manufacturers of these defective products or other responsible parties. Creating the Omnibus Complaints and securing service of those complaints on responsible foreign entities as well as thousands of builders, installers, suppliers and their insurers was critical to secure the Assigned Claims Settlement, providing relief to the Virginia victims of Chinese Drywall.

 Now, it is incumbent upon this Court to exercise its authority to set a common benefit fee under both Fed. R. Civ. P. 23(h) and traditional MDL litigation principles, *citing, In re air Crash Disaster at Fla. Everglades on Dec. 29, 1972,* 549 F. 2d 1006,1008 (5th Cir. 1977); *In re Diet Drugs Prods. Liab. Litig.,* 582. F. 3d 524,546-47 (3d Cir. 2009) and Eldon E. Fallon, *Common Benefit Fees in Multidistrict Litigation,* 74 LA. L. Rev. 371, 374 (2014).[53]

Pursuant to governing law, this Court determines the reasonableness of a common benefit fee by analyzing the issue pursuant to the lodestar method, the percentage method or a blended method.[54]   Regarding the percentage method, the Court has noted that in cases involving a settlement between $1 million and $2 million, which is relevant here, a common benefit fee between 32-percent and 37-percent has been awarded.[55]

When it evaluated the earlier common fund fee petition from a fund valued at

---

[53] *See* Order and Reasons [Rec. Doc. No. 21168 at 7-8].

[54] *See id.*

[55] *Id.* at 20, *citing,* Eisenberg & Miller, *Attorneys' Fees and Expenses in Class Action Settlements 1993-2008,* 7 J. Empirical Legal Studies 248 (2010).

approximately $1.120 Billion, this Court awarded about 17.5% of the settlement. This percentage is consistent with governing law where the value of the settlement in in the so-called mega-fund amount, *i.e.*, $190 million to $900 million.[56]   When the scale of the settlement is smaller the percentage recoverable slides upwards, *e.g.* in prior Virginia settlements this Court allowed 30% awards.

As the instant Assigned Claim Settlement involves a settlement of less than $2 million, the typical percentage fee award is in the 32-percent to 37-percent range. The request here for an award of 32-percent falls at the lower end of this standard, lending substantial support for the requested percentage award.[57]

As this Court recognized in its Order and Reasons, percentage awards of overall fees from similar common fund cases may range from 32% up to 40%. Based on this authority, the fees sought here for both common benefit counsel and individually retained attorneys, which in the case of the Assigned Claims Settlement represent 32% of the gross value of the settlement, is more than reasonable and substantially justified.

**C.    The Historic Underpinnings for Awarding Common Benefit Fees Lend Authority to a Global Percentage Fee Award.**

Since the common benefit aspect of this award is an integral component of the analysis for evaluating the total fee award that will then be allocated between the common benefit and individual contract attorneys, a brief review of the jurisprudence of common benefit fees is appropriate.

---

[57]   This reasoning will also become pertinent at the time this Court will need to make the division between common benefit counsel and individually retained counsel. *See* Step Five of Pretrial Order 28, ¶ 10.

Over one century ago, in *Trustees v. Greenough*, 105 U.S. 527 (1881), the United States Supreme Court made it clear that the federal trial courts possess equity power to reach beyond the confines of formal joinder, case captions and attorney fee contracts, to ensure that all who are the beneficiaries of litigation efforts undertaken for the common good would contribute proportionately to those services. This doctrine was further articulated and applied in a series of landmark Supreme Court decisions, including *Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116 (1885); *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161 (1939); *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970); *Boeing v.Van Gemert*, 444 U.S. 472 (1980); and *Blum v. Stenson*, 465 U.S. 886 (1984).

In essence, the common benefit doctrine acknowledges "the original authority" of the courts "to do equity in a particular situation" to prevent unjust enrichment. *Sprague v. Ticonic,* 307 U.S. at 166. As the Supreme Court has observed, "[t]o allow the others to obtain full benefit from the plaintiffs' efforts without contributing equally to the litigation expenses would be to enrich the others unjustly at the plaintiffs' expense." *Mills v. Electric Auto-Lite*, 396 U.S. at 392.

While the common benefit doctrine is routinely invoked as the basis for the award of attorneys' fees from common funds or benefits generated in class actions, it is clear that its application is not limited to the class context. The Supreme Court's opinion in *Sprague* illuminates this point. *Sprague* involved a trust fund that was jeopardized when a bank went into receivership. After the plaintiff successfully sued for a lien establishing her right to recover from the trust, she sought reimbursement of attorneys' fees from the trust. Although the suit was not a class action, had only indirectly established the rights of others, and had not created a fund, the Court held that the plaintiff was entitled to compensation from those benefitted by her efforts:

> That the party in a situation like the present neither purported to sue
> for a class nor formally established by litigation a fund available to

18

the class, does not seem to be a differentiating factor so far as it affects the source of the recognized power of equity to grant reimbursements of the kind for which the petitioner in this case appealed to the chancellor's discretion. Plainly the foundation for the historic practice of granting reimbursement for the costs of litigation other than the conventional taxable costs is part of the original authority of the chancellor to do equity in a particular situation.

Whether one sues representatively or formally makes a fund available for others may, of course, be relevant circumstances in making the fund liable for his costs in producing it. But when such a fund is for all practical purposes created for the benefit of others, the formalities of the litigation - the absence of an avowed class suit or the creation of a fund, as it were, through stare decisis rather than through a decree - hardly touch the power of equity in doing justice as between a party and the beneficiaries of his litigation.

*Sprague*, 307 U.S. at 166. *See also Guidant Corp. Implantable Defibulators Prod. Liab. Litig.*, 2008 WL 682174, \*5 (D. Minn. Mar. 7, 2008), *citing*, *Awarding Attorneys' Fees and Managing Fee Litigation* at p. 51 (Fed. Jud. Ctr. 1994) ("[a]lthough many common fund cases are class actions, . . . the doctrine is not limited to class actions"); MANUAL FOR COMPLEX LITIGATION, FOURTH, § 14.121 at 186 (Fed. Jud. Ctr. 2004) ("The common-fund exception to the American Rule is grounded in the equitable powers of the courts under the doctrines of *quantum meruit* and unjust enrichment."); *Common Benefit Fees*, 74 LA. L.REV. at 375 ("But this doctrine is not limited solely to class actions: it has been used in complex litigation to compensate attorneys whose work benefits others similarly situated.").

The majority of courts accept the percentage-of-recovery methodology to determine the amount of the common benefit fee in a mass tort setting where a common fund is created. Since the issuance of the *Report of the Third Circuit Task Force, Court Awarded Attorney's Fees*, 108 F.R.D. 237 (1985) in 1985, virtually every circuit court, including the Fifth Circuit, has joined the United States Supreme Court in approving use of the percentage-of-the-fund method in common

fund cases. *See*, *e.g.*, *In re Thirteen Appeals Arising out of the San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 308 (1st Cir. 1995) ("the court below did not err in proposing to allocate fees based on the POF method, emphasizing the attorneys' 'relative contribution' to the creation of the Fund"); *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) ("The trend in this Circuit is toward the percentage method"); *GMC Pick-Up*, 55 F.3d at 821 (Third Circuit recognizes application of the "percentage-of-recovery method" in mass tort cases "which do not actually generate a common fund"); *Rawlings v. Prudential-Bache Props.*, 9 F.3d 513, 515-17 (6th Cir. 1993); *Florin v. Nationsbank, N.A.*, 34 F.3d 560, 564-65 (7th Cir. 1994); *Johnston*, 83 F.3d at 246 (8th Cir. 1996); *Vincent v. Hughes Air West, Inc.*, 557 F.2d 759, 774-75 (9th Cir. 1977); *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1296 (9th Cir. 1994); *Gottlieb v. Barry*, 43 F.3d 474, 487 (10th Cir. 1994) (authorizing percentage approach and holding that use of lodestar/multiplier method was abuse of discretion); *Camden I Condo. Ass'n v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991) ("After reviewing *Blum*, the [Third Circuit] Task Force Report, and . . . cases from other circuits, we believe that the percentage of the fund approach is the better reasoned in a common fund case."); *Swedish Hosp. Corp. v. Shalala*,1 F.3d 1261, 1271 (D.C. Cir. 1993) (percentage of the fund recovered is the *only* permissible measure of awarding fees in common fund cases).

The Fifth Circuit accepted the principle in 2012.  *See Union Asset Management Holding, A.G. v. Dell, Inc.*, 669 F.3d 632, 644 (5th Cir. 2012).  In *Dell*, the Fifth Circuit permitted district courts discretion to choose between a percentage award or a lodestar analysis in awarding a common fund fee provided that whatever method is employed it is informed by the traditional standards of *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir. 1974):

> We join the majority of circuits in allowing our district courts the
> flexibility to choose between the percentage and lodestar methods
> in common fund cases, with their analyses under either approach
> informed by the *Johnson* considerations.

*Dell,* 669, F.3d at 644.[58] Some commentators, Your Honor, in particular, consider the *Dell* opinion

to have advanced a hybrid approach to percentage fee awards referred to as a "blended approach."

*See Common Benefit Fees*, 74 LA.L.REV. at 385-86 & n.62. Under this blended approach to

common fund fee awards, an initial benchmark percentage is selected, followed by adjustments

from a lodestar cross-check based upon the *Johnson* factors.[59]   *Id.* at 385 n.61, *citing Vioxx*, 760

---

[58] Judge Vance of the Fifth Circuit, in his separate opinion in *Foster v. Boise-Cascade, Inc.*, 577
F.2d 335, 337 n.1 (5th Cir. 1978), anticipated the Fifth Circuit's trend away from the lodestar
method:

> [I]f mechanically applied, the hourly rate approach almost
> inevitably leads to an unsatisfactory result in this type of litigation.
> This method of compensation–which equates professional services
> to those of laborers and mechanics–frequently has little or no
> relationship to the value of the services performed in anything but
> the most routine work.  A flash of brilliance by a trial lawyer may
> be worth far more to his clients than hours or days of plodding
> effort. Few among us would contend that an operation by a gifted
> surgeon who removes an appendix in fifteen minutes is worth only
> one-sixth that performed by his marginal colleague who requires
> an hour and a half for the same operation.

In fact, many district courts in the Fifth Circuit employed the percentage award method well before
*Dell*'s endorsement of same. *See In re Prudential-Bache Energy Income Partnership Securities
Litigation*, 1994 WL 150742, *4 (E.D. La. Apr. 13, 1994); *Batchelder v. Kerr-McGee Corp.*, 246
F. Supp. 2d 525, 531 (N.D. Miss. 2003) ("A percentage fee approach, as opposed to a lodestar
computation, is the preferred method for determining awards of attorneys' fees in common fund,
or class action, cases."); *Shaw v. Toshiba Am. Info. Sys., Inc*., 91 F. Supp. 2d 942, 967 n.15 (E.D.
Tex. 2000) ("the Fifth Circuit has *never* . . . reversed a district court judge's decision to award a
fee as a percentage"); *Vioxx*, 760 F. Supp. 2d at 650-51 (employing a blended percentage award).

[59] The twelve *Johnson* factors are well known to courts in this circuit:  (1) the time and labor
required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal
service properly; (4) the preclusion of other employment by the attorney due to acceptance of the
case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed
by the client or the circumstances; (8) the amount involved and the results obtained; (9) the
experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the
nature and length of the professional relationship with the client; and (12) awards in similar cases.

F. Supp. 2d 640; *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830 (E.D. La. 2007); and other cases.  Only recently, this Court employed this exact same methodology to award a common benefit fee to class counsel for the consumer class in the *Vioxx* litigation.  *See In re Vioxx Prod. Liab. Litig.*, MDL 1657, Order and Reasons (E.D. La. Sept. 26, 2018) (ECF No. 65586) (awarding 18.5% of $23 million fund) [hereafter "*Vioxx* Order and Reasons"].

The prior global fee petition in this case presented this Court with a hybrid situation involving multiple different settlements, and a request for an award of attorney's fees to both common benefit and individual contract attorneys. As such, a singular percentage award did not easily lend itself to reaching the proper award. To find the right fit, the global petition noted that the percentage award, by necessity, needed to reflect a range of percentage awards (*e.g.*, 32% for the InEx, Banner, Global, and Virginia Settlements, and 14.5% for the Knauf Settlement) that may subsequently be expressed as a blended percentage.

Nevertheless, what is most salient here is that the Assigned Claims Settlement represents a non-mega fund settlement, where the Settlement Agreement provides for a 32% fee award, which percentage was disclosed to the Class in the Notice and approved without a single objection, and is akin to the fee percentage that the Court considered as a component part to the overall blended global fee award portions of which were  derived from the Virginia Settlements. In other words, in previously determining the overall blended percentage, the Court utilized different percentages from the different settlements that contributed to the award of fees.  The overall blended percentage was about 17.5% because the majority of the fees awarded derived from the Knauf Settlement that was contributing fees at a lower percentage than the Virginia Settlements.  In this instance, the

*Johnson*, 488 F.2d at 717-19.

only Settlement Agreement before the Court permits a 32% fee award and that is an appropriate benchmark from which to award fees for a settlement of the size now before the Court.

    **D.**    **Principles Governing Determination of an Appropriate Fee Award under _Johnson_.**

The *Johnson* factor analysis provides an invaluable framework through which the efforts of counsel can be measured to insure the validity of any percentage award.  *Vioxx* Order and Reasons at 22; Order and Reasons at 8.

Accordingly, the following detailed summary of the PSC's common benefit efforts in this litigation fully justify each of the *Johnson* factors and the 32% fee award.

The instant Assigned Claims Settlement is part and parcel of the common benefit effort. We cannot isolate specific time and labor associated with obtaining that Assigned Claims Settlement, yet the amount of time and labor committed overall to the litigation more than supports the fee amount requested here were the *Johnson* analysis to govern. Thus, the below discussion of the *Johnson* factors involves the global common benefit work that was performed.  The global common benefit work facilitated an ability to accomplish the Assigned Claims Settlement. In context, the amount of fee requested here from the amount of the Assigned Claims Settlement, an award of fees of approximately $633,000, pales in comparison to the amount of time and labor in the overall case.

           **1.**    **The Time and Labor Required**

Assembling, administrating and successfully resolving an MDL of the magnitude of this case is a very tall order. During this litigation, approximately 10,000 Plaintiffs were on file in the MDL and thousands of Defendants and their insurers were in litigation.

Consequently, countless tasks existed that were necessary to marshal such a large, disparate group. Indeed, given the adversary nature of this litigation, much attention had to be expended to

manage the docket and develop the caseload for matters both expected and unexpected. Given so many moving parts, to direct the assemblage efficiently and effectively, the PSC was obliged to negotiate case management orders, engage in extensive discovery involving thousands of documents from the Taishan Defendants and expend tens of thousands of hours on discovery, pleadings and complex motions practice, which resulted in appeals to the Fifth Circuit and related litigation in the Virginia Circuit Court before Judge Mary Jane Hall.

Following extensive discovery and motions practice before this Court and substantial briefing before two separate panels of the Fifth Circuit Court of Appeals, this Court's personal jurisdiction Order of September 4, 2012 was affirmed.[60] Thereafter, Taishan, at the direction of CNBM and the BNBM entities deliberately and intentionally failed to appear at the duly-noticed Judgment Debtor Examination hearing scheduled for July 17, 2014, which resulted in a finding of contempt.[61]  Following the Contempt Order, the PSC engaged in further discovery against Taishan, its parent companies, and its affiliates to attempt to enforce this Court's Contempt Order. In the meantime, the Assigned Claims were being litigated in the Virginia State Court. Extensive motions practice in that jurisdiction led to intensive settlement discussions, which ultimately resulted in the Assigned Claims Settlement Agreement which was presented to this Court in March 2018.

Overall, the PSC, common benefit counsel, and others reported thousands of hours of attorney and para-professional time expended to resolve the Assigned Claims.  This post-2014 time was reported pursuant to Pretrial Order No. 9 or 9A and verified by Mr. Garrett as of

---

[60] *In re Chinese Manufactured Drywall Prod. Liab. Litig.,* 892 F.Supp.2d 819 (E.D.La. 2012), *aff'd*, 742 F.3d 576 (5th Cir. 2014) and 753 F.2d 521 (5th Cir. 2014).

[61] *See* Rec.Doc. 17869.

September 2018 to be 96,355.52 hours with a lodestar of $68,686,405.00.[62]  By any estimation, even a small portion of these reported hours and lodestar amply justify the fee award requested.

## 2.      The Novelty and Difficulty of the Questions Involved

As described above, pursuing the Assigned Claims against Taishan was extremely complex and prolix.  The parties vigorously litigated the default judgment – Taishan pursued multiple motions to dismiss and sought evidence to assist in restricting the size of the award and the parties to whom the award would apply.[63]  Novel questions involving the assignment of a state court, third-party default judgment to a settlement class in federal court from a state that does not authorize state-law class actions, presented significant challenges to the Class. Additional complications involving the status of certain class members not named in the Allen Consolidation also presented new and complicated questions of law and fact.

## 3.      The Skill Requisite to Perform the Legal Service Properly

The skill necessary to bring about the result achieved here was not ordinary. Counsel's success in confronting the difficult and complex issues presented by this litigation and in ultimately obtaining so much relief for so many individuals should be rewarded. This litigation required considerable skill and experience to bring it to such a successful conclusion. The ability of Plaintiffs' counsel to obtain the innovative settlement in the face of formidable legal opposition confirms the superior quality of our representation.

---

[62] *See* Lodestar value sortable Report (by Firm) from January 2014 to September 2018 (Attached hereto as Exhibit "A").

[63] *See* Declaration of Richard J. Serpe in Support of Class Counsel's Motion for an Order Granting Final Approval of the Settlement of Assigned Claims in MDL No. 2047 on Behalf of the Porter-Blaine/Venture Supply Class Regarding Claims Assigned to the Class by the Porter-Blaine/Venture Supply Participating Defendants and Participating Insurers Against Taishan Gypsum Co., Ltd. and Taian Taishan Plasterboard Co., Ltd. ¶¶2-5 (hereafter "Serpe Declaration") [Rec. Doc. 21485-4] .

4.      **The Preclusion of Other Employment by the Attorney Due to Acceptance of the Case**

This factor is not pertinent to the fee award requested at this time as the Assigned Claims Settlement was part and parcel of a much larger endeavor. But, this factor will become relevant when the matter of the common benefit award is determined as some counsel devoted their entire practice to this litigation for sustained periods of time.

5.      **The Customary Fee**

As this Court previously noted, citing Professors Eisenberg and Miller, a 32% fee award is reasonable for a class settlement of this size.[64] Indeed, this percentage was disclosed to the Class in the Notice and there were no objections.

6.      **Whether the Fee Is Fixed or Contingent**

All Plaintiffs' counsel undertook this litigation on a contingent fee basis, assuming a substantial risk that the litigation would yield no recovery and leave them uncompensated. Courts have consistently recognized that the risk of receiving little or no recovery is a major factor in considering an award of attorneys' fees. *See*, *e.g.*, *In re Enron Corporation Securities, Derivative & "ERISA" Litig.*, 586 F. Supp. 2d 732, 791 (S.D. Tex. 2008).

The time in which to evaluate the risk is *ex ante*, *i.e*., as of the time suit was initiated, not with the benefit of hindsight. *See Harman v. Lyphomed, Inc.*, 945 F.2d 969, 974 (7th Cir. 1991). Where counsel face such substantial risks and recover significant compensation for their clients, courts find this factor to favor the fee applicant. *See Enron*, 586 F. Supp. 2d at 796.

---

[64] *See* Order and Reasons at 20.

### 7. Time Limitations Imposed by the Client or the Circumstances

This Court has frequently noted the potential for MDL litigation to become so bogged down as to warrant the appellation of a "black hole." Mindful of this potential morass, the Court has used every device available to it to avoid such a consequence. The Court has regularly held monthly status conferences and employed "hands-on" management to see that discovery was being conducted promptly and that the litigation was progressing at an appropriate rate. Nevertheless, the intransigence of the Taishan Defendants has acted as an anchor weighing down the forward progress of the Plaintiffs' efforts. Despite these impediments, Plaintiffs were still able to achieve this impressive settlement.

### 8. The Amount Involved and the Results Obtained

The eighth *Johnson* factor – the amount involved, and the results achieved – is entitled to significant weight when, as in this case, the efforts of counsel were instrumental in realizing a high recovery on behalf of the plaintiffs. As the Supreme Court has observed, "'the most critical factor' in determining the reasonableness of a fee award is the degree of success obtained." *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983). *See also Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1047 (5th Cir. 1998) (". . . Where recovery of private damages is the purpose, . . .consideration to the amount of damages awarded as to the amount sought represents the primary means to evaluate that concern.").

This Assigned Claims Settlement represents the continuation of the outstanding work performed by Plaintiffs' counsel throughout this litigation. Given such an outstanding result, this, the most important factor, amply supports the requested fee award.

### 9. The Experience, Reputation, and Ability of the Attorneys

When this MDL litigation began, the Court underwent an arduous vetting and selection

process to obtain experienced, reputable and able counsel to participate on the PSC. *See* Pretrial

Order No. 8. Since then, the Court has reappointed PSC Members for one-year terms. *See* Pretrial

Order Nos. 8A, 8B, 8C, and 8D.  This factor supports the requested percentage here.

### 10.    The "Undesirability" of the Case

The risks presented by taking on such a massive case were daunting at the inception of this

litigation. The fact that the manufacturers of Chinese Drywall were foreign entities located

halfway around the world posed a high degree of risk and caution because of the anticipated

service problems, travel expenses, and the potential collectability problems of a judgment against

foreign defendants. Nevertheless, the case was not undesirable as the client-base was comprised

of innocent victims of a patently defective product.

### 11.    The Nature and Length of the Professional Relationship with the Client

This *Johnson* factor was designed to consider those instances when, "a lawyer in private

practice may vary his fee for similar work in the light of the professional relationship of the client

with his office." *Johnson,* 488 F.2d at 719. This factor is therefore neutral as it relates to the

requested fee award since there are few, if any, longstanding client relations with the CDW

claimants. As this Court pointed out in *Murphy Oil*, "'the relationship did not antedate the

litigation, nor will it likely continue beyond the closure of this case,' other than as it relates to this

litigation." *Murphy Oil*, 472 F. Supp. 2d at 866-67, *quoting*, *In re ETS*, 447 F. Supp. 2d 612, 632

(E.D. La. 2006).  Accordingly, little weight is to be afforded this factor.

### 12.    Awards in Similar Cases

All but two of the *Johnson* fee adjudication factors are abstract in that they do not purport

to have any mathematical correlation to the computation of an appropriate percentage award.  The

final *Johnson* factor provides guidance as to how to concretize abstract consideration of the other

factors into a definitive percentage fee award. That factor prescribes consideration of "awards in similar cases." *Johnson*, 448 F.2d at 719. Such consideration is a dominant feature of contemporary percentage-of-the-fund fee adjudication. *See*, *e.g.*, *Dell*, *supra*.

As demonstrated above, the requested 32 percent award is well within the range of percentages that have been awarded by courts for settlements of this size. *See* discussion, *supra* at Section III.B. Accordingly, the "awards in similar cases" factor powerfully argues in support of the reasonableness of the fee requested.

*   *   *

There is no doubt that the fee requested is well within the range of awards established by other courts employing the same rigorous analysis. As the other *Johnson* factors fully endorse the requested fee, the fee requested should be awarded. Once awarded, the allocation between common benefit counsel and individually retained counsel can then be considered. Until that time and an Order from the Court issues, the funds will remain in place.

### E.     Common Benefit Counsel Should Be Entitled to Reimbursement of Expenses.

The relevant fee jurisprudence authorizes reimbursement of the reasonable amounts paid out-of-pocket to achieve a common benefit recovery or to advance the common goals of plaintiffs' in MDL litigation. *See Sprague v. Ticonic*, 307 U.S. at 166-67 (recognizing a federal court's equity power to award costs from a common fund); *Camden I Condominium Ass'n*, 946 F.2d at 771 ("In accordance with the well-established common fund exception to the American Rule, . . . class counsel . . . are entitled to an award of their . . . expenses out of the fund that has been created for the class by their efforts"); *In re Quintus Sec. Litig*., 148 F. Supp. 2d 967, 973 (N.D. Cal. 2001); *In re Orthopedic Bone Screw Prod. Liab. Litig.*, 2001 WL 1622741, *9-*10 (E.D. Pa. 2001) (awarding 5% of the gross recovery for reimbursement of litigation expenses). Accordingly,

reimbursement of costs should be separately recognized and provided for in any fee award by the Court.

As for the for reimbursement of reasonable expenses, the Court set the amount at 2% of the Settlement Amount, or $39,570.57, which was withheld from the Settlement Amount so that reimbursement of expenses incurred could be paid.[65] Notice was provided to members of the Class via first class United States Mail and posting on websites, and class members voiced no objection to these expenses. Expenses incurred in connection with cost of notice included copy cost and expenses reimbursed to Venture Supply attorneys. The costs were identified in the Motion to Establish Settlement Fund (Attorney Fee) and to Appoint Fund Administrator (Assigned Claims Settlement) by Class Counsel, which included back-up supporting documentation of $14,936.58, which was to be reimbursed from the 2% of the Settlement Amount ($39,570.57) that was withheld for reimbursing expenses.[66]  These expenses were reasonably incurred and should be reimbursed.

## IV.   <u>CONCLUSION</u>

. For the reasons set forth above, the instant Petition should be granted.

Respectfully submitted,

Dated: January 4, 2019

/s/ Russ M. Herman
Russ M. Herman, Esq. (Bar No. 6819)
Leonard A. Davis, Esq. (Bar No. 14190)
Stephen J. Herman, Esq. (Bar No. 23129)
HERMAN, HERMAN &KATZ, LLC
820  O'Keefe  Avenue
New Orleans, LA 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
rherman@hhklawfirm.com
*Plaintiffs' Liaison Counsel in MDL 2047 and Class Counsel*

---

[65] Order, September 18, 2018 [Rec. Doc. No. 21785].

[66] Rec. Doc. No. 21781.

Arnold Levin (on the Brief)
Fred S. Longer (on the Brief)
Sandra L. Duggan (on the Brief)
LEVIN SEDRAN & BERMAN LLP
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Phone: (215) 592-1500
Fax: (215) 592-4663
Alevin@lfsblaw.com
*Plaintiffs' Lead Counsel in MDL 2047 and
Class Counsel*

Richard Serpe (on the Brief)
Law Offices of Richard J. Serpe
Crown Center, Suite 310
580 East Main Street
Norfolk, VA 23510-2322
Phone: (757) 233-0009
Fax: (757) 233-0455
rserpe@serpefirm.com
*Class Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing has been served on Defendants' Liaison Counsel, Kerry Miller, by U.S. Mail and e-mail <u>or</u> by hand delivery and e-mail <u>and</u> upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, which will serve a notice of the uploading in accordance with the procedures established in MDL 2047, on this 4th day of January, 2019.

<u>/s/ Leonard A. Davis</u>
Leonard A. Davis
HERMAN, HERMAN & KATZ, LLC
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Ldavis@hhklawfirm.com
Plaintiffs' Liaison Counsel
MDL 2047

*Co-Counsel for Plaintiffs*