# Exhibit G

Case 2:09-md-02047-EEF-MBN Document 22080-7 Filed 01/28/19 Page 2 of 9
30(b)(6) Chester Stefan                                November 29, 2018
The Mitchell Company, Inc. Vs. Knauf Gips KG, Et Al.

Page 1

1                UNITED STATES DISTRICT COURT

2                EASTERN DISTRICT OF LOUISIANA

3

4   CASE NO.: 09-CV-4115

5

6   THE MITCHELL COMPANY, INC,

7   INDIVIDUALLY AND ON BEHALF OF

8   OTHERS SIMILARLY SITUATED,

9            Plaintiff,

10               vs.

11  KNAUF GIPS KG, A GERMAN CORPORATION;

12  KNAUF PLASTERBOARD (TIANJIN CO., LTD.,

13  A CHINESE LIMITED LIABILITY CORPORATION;

14  TAISHAN GYPSUM CO., LTD., F/K/A SHANDONG

15  TAIHE DONGXIN CO., LTD., A CHINESE

16  LIMITED LIABILITY CORPORATION); ET AL.,

17           Defendants.

18

19         30(b)(6) VIDEO DEPOSITION OF CHESTER STEFAN

20

21             S T I P U L A T I O N S

22           IT IS STIPULATED AND AGREED by and between the

23  parties, through their respective counsel, that the

24  deposition of CHESTER STEFAN may be taken before Kathleen

25  Cavazos, Commissioner, at the law offices of Cunningham,

Page 46

1  A. No, ma'am.
2  Q. No. So is Rightway Drywall, Inc., still a
3  Defendant in this case along with Taishan?
4  A. Yes, ma'am, to the best of my knowledge.
5  Q. What is the amount of The Mitchell Company's
6  damages that its seeking in this case?
7  A. I believe that we produced the cost run, so that
8  would be the -- whatever the final number is on the cost
9  run that we produced, a listing of all the people that
10 were paid and how much they were paid and then, you know,
11 some amount for all the incidental expenses like, you
12 know, we supplied the homeowner on Brightleaf with a
13 refrigerator, a washer and dryer. She lived in one of
14 our houses for a couple of years. I don't know how many
15 hours of my time and my staff's time. It would be hard
16 to put a number on it, but it's probably in the
17 neighborhood of 250 or 300,000.
18 Q. Total?
19 A. Yes, ma'am.
20 Q. Total damages?
21 A. Yes, ma'am.
22 Q. Around 200 --
23 A. 250 to 300.
24 Q. What documentation do you have to substantiate
25 that figure?

Page 47

1  A. Well, we probably have -- In the case of
2  everything on the cost run, we have an invoice, and a lot
3  of those invoices, specifically the drywall, were
4  actually produced. And then the records of my time and
5  my staff, you know, would be in our payroll records.
6  Q. We'll look at what you've produced and see what
7  we have documentation for. You talked about the cost
8  runs?
9  A. Yes, ma'am.
10 Q. Which you've produced, but now you are also
11 mentioning the value of your time?
12 A. Yes, ma'am.
13 Q. Have you calculated the value of your time and
14 other company members' time?
15 A. No, ma'am.
16 Q. And the 250,000 to 300 estimate that you just
17 gave assumes that there is some time value calculated in
18 there?
19 A. Yes, ma'am.
20 Q. That has not yet --
21 A. That would be the difference from the 100,000
22 that's on the cost run, and the 250 is the time.
23 Q. But you've never calculated that?
24 A. No, ma'am.
25 Q. And we won't see any documents in the document

Page 48

1  production that calculate that?
2  A. No, ma'am. I think in the production, they talk
3  about some of the ancillary costs. I remember there was
4  an email where we discussed the washer, dryer and
5  refrigerator that were damaged by the sulfur, and so we
6  replaced them for the owner of the Brightleaf property,
7  and I don't believe that's on the cost run.
8  Q. There is no total calculation of your damages in
9  this case?
10 A. No, other than my testimony.
11 Q. What you're testifying today is not all of the
12 damages that Mitchell is seeking are liquidated; is that
13 correct?
14 A. I think they're probably liquidated. They're
15 just not known. I mean, I'm not spending any more time
16 other than sitting here today. So whatever time I spent
17 back then, we just have to go back and make an estimate.
18     MR. NICHOLAS: We're not claiming lost time. I
19 mean, the value of his time, that's not part of the
20 claim.
21 Q. Okay. So do you want to revise your answer of
22 what the -- because I asked --
23     MR. NICHOLAS: You asked him how he was damaged,
24 and they were. I'm just saying we're not claiming that
25 in the litigation.

Page 49

1     MS. EIKHOFF: Okay. And, to be clear, I said
2  what are Mitchell's damages, and I'm asking it in this
3  deposition with him as a 30(b)(6) witness to know what
4  damages Mitchell is claiming in this litigation.
5  Q. What is the amount of damages that Mitchell is
6  claiming in this litigation?
7  A. Well, when we go forward from here, all we are
8  claiming is the damages that are on the cost run that was
9  produced the last date.
10 Q. Okay. Let's look at Exhibit 6, and I'm going to
11 direct your attention to page two, paragraph one, which
12 alleges that Mitchell is bringing this action on behalf
13 of all persons and entities in certain states, and I'm
14 beginning to quote here, "Who used drywall manufactured
15 by Knauf entities or Taishan Gypsum Co., Limited, for the
16 construction, repair or remodeling of any improvement to
17 real property and who have incurred any expenses
18 associated with, one, repair or replacement of all or
19 part of the defective drywall; and/or two, repair or
20 replacement of other property damaged by the defective
21 drywall; and/or, three, other expenses incurred as part
22 of the remediation of the effects of the defective
23 drywall, including without limitation, the cost of
24 investigation and expert analysis of the defect and cost
25 of relocating customers displaced by the presence of

Case 2:09-md-02047-EEF-MBN   Document 22080-7   Filed 01/28/19   Page 4 of 9

30(b)(6) Chester Stefan                                    November 29, 2018
The Mitchell Company, Inc. Vs. Knauf Gips KG, Et Al.

Page 50

1  defective drywall." Did I read that correctly?
2    A. Yes, ma'am.
3    Q. Okay. I want to go through each of those
4  subparts because there's three subparts and ask you
5  questions about them. So the first subpart is expenses
6  associated with repair or replacement of all or part of
7  the defective drywall. Did Mitchell repair or replace
8  all or part of the defective drywall in the subject
9  properties?
10   A. Only one.
11   Q. Which one?
12   A. Partial on Brightleaf, which on your list is
13 number nine.
14   Q. That's owned by Mindy Lister?
15   A. Yes, ma'am.
16   Q. And we'll refer to that as the Lister property.
17   A. Yes, ma'am.
18   Q. There's going to be more questions about the
19 Lister property. So you said only partial on only one of
20 the properties, the Lister property; is that correct?
21   A. Yes, ma'am.
22   Q. Okay. And where are the records of the work
23 that was done to repair or replace the defective
24 drywall -- some of the defective drywall in that
25 property?

Page 51

1    A. The work was actually performed by Mr. C.W.
2  Currie and his crew, and it is -- there will be a check
3  in the cost run -- I think there will be two different
4  checks because he went over there twice -- to C.W.
5  Currie, and those would represent basically patching of
6  drywall that was removed to confirm the manufacturer.
7    Q. I see. So the removal and replacement of
8  drywall in the Lister property was limited to samples
9  that were taken for testing and identification purposes?
10   A. Yes, ma'am. That's correct.
11   Q. Okay. So Mitchell did not actually repair or
12 remove drywall from that property to remediate the
13 property?
14   A. No, ma'am.
15   Q. And you said that Mitchell did not remove or
16 repair any drywall in any of the other subject
17 properties, right?
18   A. There were a couple of patches performed by --
19 under Tom Caldwell's supervision but too minor to
20 mention.
21   Q. Okay. And, again, that would just be for
22 testing or for identification purposes?
23   A. Yes, ma'am. A hole was made to reveal, and
24 then Tom -- I wasn't even involved. Tom said, I've got a
25 guy that will fix that, and we just left the house.

Page 52

1    Q. Right, not work done to remediate the property?
2    A. Correct.
3    Q. So Mitchell is not an example of a home builder
4  that went in and remediated the properties themselves by
5  removing and replacing drywall?
6    A. And we're just speaking now of Taishan?
7    Q. Yes, for Taishan.
8    A. In respect of Taishan, that's correct.
9    Q. Okay. All right. Now let's look at the second
10 subpart of this paragraph, which is expenses associated
11 with repair or replacement of other property damaged by
12 the defective drywall. And I was confusing myself as I
13 was thinking about my questions because we're using the
14 word "property," because there's property and there's
15 property. So when we refer here to other property, what
16 does that refer to in the context of this paragraph?
17   A. Well, the other property in the Pensacola
18 Taishan drywall would be the numerous air handlers that
19 had to be replaced, sometimes the entire air handler,
20 sometimes just the coil, and there were actually coatings
21 placed on the coils, and all of those costs for those
22 type of things. There was the washer, the dryer and the
23 refrigerator that are not on the cost run. That's the
24 only item that I can think of that is not on the cost
25 run. Her's were damaged or claimed to be damaged.

Page 53

1    Q. You said "her's"?
2    A. Mindy Lister's.
3    Q. Okay.
4    A. A washer, dryer and refrigerator were replaced
5  when she moved from her house to the empty house in the
6  Enclave.
7    Q. Okay. So in the context of paragraph one in
8  this subpart two, the references to other property would
9  be things like appliances, refrigerators, washer, dryers,
10 HVAC components; is that correct?
11   A. You used the plural in respect of refrigerators.
12 There was only one, and I think you used the plural in
13 respect of washer and dryers. There was only one. But
14 HVAC units, some houses actually had two, and I think one
15 had three HVAC replacements, and all of those costs of
16 that work are what is in the cost -- what we refer to as
17 the cost run.
18   Q. Okay. So for Mitchell specifically, the other
19 property that was repaired or replaced was, in one
20 instance, a refrigerator, a washer and a dryer?
21   A. Yes, ma'am.
22   Q. And in multiple instances for subject properties
23 were repairs and replacements related to HVAC?
24   A. Yes, ma'am.
25   Q. Is there any other "other property" repairs and

Page 54

1 replacements?
2  A. Personal property.
3  Q. Okay.
4  A. There might have been some jewelry or some small
5 expenditure, but it would be on the cost run because we
6 had two situations, and I can think of, you know, people
7 who had silver or rings and things damaged, and we bought
8 them a new one, but it was de minimus, but if we paid
9 that money, it would get on the cost run.
10  Q. Okay. And so there may have been repair or
11 replacement of personal property in some of the subject
12 properties but not all; is that fair?
13  A. Yes. That's a correct statement.
14  Q. And the only time that you replaced appliances
15 was for the one Mindy Lister property, right?
16  A. If you're talking about a kitchen appliance,
17 that's a correct statement.
18  Q. Okay. So Mitchell is not an example of a home
19 builder that went in and replaced all of the kitchen
20 appliances for all of the homes that had Chinese drywall?
21  A. Not in respect of Taishan drywall.
22  Q. Okay. And there was only one washer dryer?
23  A. Yes, ma'am.
24  Q. And I don't know if you would consider that a
25 kitchen appliance or not, but --

Page 55

1  A. I was differentiating between an air handler,
2 which is referred to as an appliance in the trade.
3  Q. Understood. Understood. And in my mind, I was
4 thinking of the air handler as being associated with
5 HVAC. Did you repair or replace HVAC on all of the
6 subject properties?
7  A. Yes, ma'am, at least once.
8  Q. Okay. And then the third subpart of paragraph
9 one references other expenses incurred as part of the
10 remediation of the effects of defective drywall
11 including, without limitation, the cost of investigation
12 and expert analysis of the defect and cost of relocating
13 customers displaced by the presence of defective drywall.
14     Why don't I try and break that down a little bit
15 more. Did Mitchell incur cost of investigation and
16 expert analysis of the defect?
17  A. What testing was done, Steve paid for some, and
18 if we paid, it's on the cost run for testing.
19  Q. And when you say Steve paid for some --
20  A. Steve Nicholas, The Mitchell Company's attorney.
21  Q. Okay. And so if that was a cost borne by
22 Mitchell, it would be reflected on the cost run document
23 that you have produced?
24  A. Yes, ma'am.
25  Q. And then costs of relocating customers. How

Page 56

1 many customers were relocated as a result of this?
2  A. Only Mindy Lister.
3  Q. Okay. So the rest of the subject properties,
4 those owners were never relocated, it follows, right?
5  A. They were never relocated by The Mitchell
6 Company.
7  Q. Okay. So The Mitchell Company is not an example
8 of a home builder that paid to relocate all of its
9 homeowners that had Taishan Chinese drywall?
10  A. That's correct.
11  Q. And what were the costs of relocating Mindy
12 Lister?
13  A. Mindy moved herself from the house on Brightleaf
14 to the vacant spec house that Mitchell owned in the
15 Enclave, and our only costs were repairing the property
16 for resale after she moved and the aforesaid three
17 appliances and the cost of the house, the fair rental
18 value of the house, which was $2500 a month.
19  Q. Would you otherwise be renting that property,
20 though?
21  A. No, ma'am, but we couldn't sell it.
22  Q. You couldn't sell it, but it wasn't -- It was a
23 home that would otherwise be for sale?
24  A. Yes, ma'am.
25  Q. But that would not otherwise be rented by

Page 57

1 someone else?
2  A. That's a correct statement.
3  Q. Okay. And have you accounted for the cost of
4 Mindy Lister living there, the cost to Mitchell?
5  A. It would be subsumed into the $2500 a month
6 rent.
7  Q. But there is a $2500 a month line item in the
8 cost run?
9  A. Yes, ma'am, each month.
10  Q. Okay. And that was calculated by what the fair
11 market rental value would be?
12  A. Yes, ma'am.
13  Q. And that was a cost borne by Mitchell?
14  A. Yes, ma'am.
15     MS. EIKHOFF: Let's go off the record for a
16 second.
17     (Whereupon, an off-the-record break was taken,
18 after which the following occurred:)
19     (Whereupon, Defendant's Exhibit 7 was marked for
20 identification and attached hereto.)
21 BY MS. EIKHOFF:
22  Q. Here you go. I'm handing you a document that's
23 been marked as Exhibit 7. I will direct your attention
24 to just the first page of this. So you are free to take
25 as much time as you want to read the whole thing, but I

15 (Pages 54 - 57)

Page 90

1  Q. Okay.
2     (Whereupon, Defendant's Exhibit 14 was marked
3  for identification and attached hereto.)
4  Q. I'm handing you Exhibit 14. That document was
5  produced to us by The Mitchell Company. Is this the
6  document that reflects the settlement of the crossclaims
7  among defendants?
8  A. Yes, ma'am.
9  Q. And I noticed in that document that there's no
10 specified payment amounts.
11 A. Yes, ma'am.
12 Q. Were payments made between and among the parties
13 to settle those claims in exchange for that mutual
14 release?
15 A. We did not make or receive a payment. I don't
16 know about the others.
17 Q. So although the crossclaims among the defendants
18 who were participating in the lawsuit were resolved,
19 payments were not made from any of those entities to
20 another?
21 A. All I can talk about is we did not receive or
22 make one. I don't know the rest.
23 Q. Okay. Fair enough.
24    (Whereupon, Defendant's Exhibit 15 was marked
25 for identification and attached hereto.)

Page 91

1  Q. I'm handing you Exhibit 15. Take a minute to
2  review it just in general in terms of what it is.
3  A. Yes, ma'am. I'm familiar with this one. I've
4  just reread it very recently.
5  Q. Okay. Is this the settlement document that
6  resolved all of Mindy Lister's claims against the
7  defendants in that lawsuit?
8  A. Just the named -- not against the manufacturer
9  of the drywall but the other parties.
10 Q. Thank you for that correction. Did this
11 settlement lead to the dismissal of the lawsuit against
12 Mitchell?
13 A. Yes, ma'am.
14 Q. And the other participating defendants?
15 A. If "participating" is the people other than the
16 manufacturer, yes.
17 Q. Yes, other than my client, Taishan?
18 A. Yes, ma'am.
19 Q. Okay. And on page 313, using the Bates numbers,
20 there is a total payment identified of $279,000; is that
21 correct? Oh, it's actually in the paragraph that starts,
22 "Now, therefore."
23 A. Yes, 279. That's correct.
24 Q. Okay. And that amount is what all of the
25 plaintiffs would receive as subdivided according to these

Page 92

1  specified paragraphs; is that correct?
2  A. Yes.
3  Q. Okay. Did Mitchell pay $279,000 to settle the
4  Lister claim?
5  A. No, ma'am.
6  Q. How much did Mitchell pay?
7  A. Our share was 57,000.
8  Q. Okay.
9  A. And maybe we didn't produce that. I thought we
10 did. I think it's in there somewhere.
11 Q. What did you think you produced related to the
12 payment of 57,000?
13 A. It was like a summary email, and it said
14 something like this one did this much, and that one did
15 that much, and we did 57. And I think all these people
16 put in some. I know they put in some.
17 Q. Okay. So the only record of your payment of the
18 57,000 is, you believe, an email that reflected how it
19 would break down between the defendants?
20 A. I'm pretty sure there's a more detailed one
21 somewhere, and I probably signed it, but right now, I
22 couldn't tell you.
23 Q. Okay. Is there an accounting entry that shows
24 that that amount was paid?
25 A. You know, that's a special thing. You know what

Page 93

1  I mean? It's not like paying a sub, so, yeah, probably
2  somewhere there would be something like that.
3  Q. Is there a copy of a check?
4  A. I don't know.
5  Q. Okay. If we haven't seen it in the
6  production --
7  A. We were represented in that by a different
8  lawyer. It wasn't Steve. It was Ian Rosenthal at
9  Cabaniss, Johnston, and he would probably have it.
10 Q. Okay. But as we sit here today, you don't have
11 records of that payment?
12 A. The only thing -- When we looked, the only thing
13 we found was that email.
14 Q. Okay. Did insurance cover any of that payment?
15 A. I believe that Scottsdale made that payment and
16 then under the policy sought reimbursement from Mitchell.
17 Q. Okay. So Scottsdale is the name of the insurer?
18 A. Yes, ma'am.
19 Q. And what type of policy was that?
20 A. It's been so long, I don't remember, but Sarah
21 Costello was their agent that we dealt with and respect,
22 and she's in the Arizona office, which I believe to be
23 the home office, and I think you'll see some
24 correspondence. Was there anything in there from her in
25 the production?

Page 94

1  Q. Okay. Well, one of the topics that we wanted to
2  talk about today was insurance coverage. Are you
3  prepared to testify about --
4  A. Yes, ma'am.
5  Q. Okay. So what type of insurance policy was it?
6  A. I don't remember. I guess it was some kind of a
7  liability policy, could have been an officers and
8  directors because they allege fraud and
9  misrepresentation, and only humans can do that.
10  Q. Okay. So the $57,000 in the first instance was
11  paid by Scottsdale Insurance --
12  A. Yes, ma'am.
13  Q. -- as insurer for The Mitchell Company?
14  A. Yes, ma'am.
15  Q. But I believe you testified that you believe
16  that money then was paid back from Mitchell Company to
17  Scottsdale?
18  A. Actually, I don't know if it ever generated into
19  a lawsuit, but there was a -- I believe it did generate
20  into a lawsuit, that we thought we didn't owe it back,
21  and they thought we did, and there was a big fight that
22  ensued over whether or not -- who the economic incidence
23  of that payment fell on.
24  Q. Was that an insurance coverage dispute?
25  A. Yes, ma'am.

Page 95

1  Q. Okay. And where was that lawsuit filed?
2  A. I don't remember --
3  Q. Okay.
4  A. -- that far back.
5  Q. And as we sit here today, do you know if
6  Mitchell ever paid any part of the 57,000?
7  A. When we researched that, we could not find a
8  payment.
9  Q. So it could be that Mitchell never paid 57,000
10  itself --
11  A. That's correct.
12  Q. -- ever?
13  A. But we don't have a release from the insurance
14  company either.
15  Q. Right. You received demands from homeowners
16  besides Mindy Lister, right?
17  A. Yes, ma'am.
18  Q. Although we've already said none of them filed
19  individual lawsuits against Mitchell Company, right?
20  A. That's correct.
21  Q. But their lawyers sent letters to Mitchell
22  Company alleging wrongdoing by Mitchell Company for
23  providing this Chinese drywall in the homes, right?
24  A. That's correct.
25  Q. Okay. And you've produced all of that

Page 96

1  correspondence to us?
2  A. Yes, ma'am.
3  Q. How did those other homeowner demands get
4  resolved by Mitchell?
5  A. They were never resolved, to the best of my
6  knowledge.
7  Q. Did you make payments to any other homeowners?
8  A. No, ma'am.
9      MR. NICHOLAS: I don't want the record to be
10  screwed up. I'm also not trying to step on your
11  deposition, but when you say "you," do you mean to intend
12  his insurers, because --
13      MS. EIKHOFF: Okay. All right. That's a good
14  point of clarification.
15  Q. Did Mitchell or any of its insurers make
16  payments to any homeowners for Taishan Chinese drywall
17  other than Mindy Lister?
18  A. Mitchell did not make a payment, but the
19  insurance companies as a group made payments.
20  Q. Okay. Payments for the benefit of other
21  homeowners besides Mindy Lister?
22  A. Payment of the other 11 homeowners.
23  Q. Okay. And what amounts were paid on Mitchell's
24  behalf for those other 11?
25  A. I don't know.

Page 97

1  Q. You don't know?
2  A. Those proceedings were conducted totally outside
3  of our knowledge and participation.
4  Q. And is that MDL proceedings that you're
5  referring to?
6  A. Yes, ma'am.
7      MR. NICHOLAS: And, Christy, I've tried mightily
8  to get you that number, and I hope to have it, but I
9  wasn't involved in that either, and so far, I haven't
10  been able to get it, but I will.
11      MS. EIKHOFF: Well, I mean, we're kind of out of
12  time.
13      MR. NICHOLAS: I understand.
14  Q. So why don't we mark the MDL. This is a big
15  document, and I certainly do not expect you to read the
16  whole thing. We'd be here until tomorrow. That's a
17  document only a plaintiff's lawyer would love.
18      (Whereupon, Defendant's Exhibit 16 was marked
19  for identification and attached hereto.)
20  Q. I should say only a class action plaintiff's
21  lawyer would love.
22      Have you ever seen that document before?
23  A. Yes, ma'am.
24  Q. Okay. And this says that it's a settlement
25  agreement, MDL number 2047 regarding claims involving

25 (Pages 94 - 97)

Page 98

1 builders, installers, suppliers and participating
2 insurers. And although this is an unsigned -- this copy
3 is not signed by everyone, was The Mitchell Company one
4 of the builders that was a party to this settlement?
5    A.  I think we're listed in here as The Mitchell
6 Company, so if you go alphabetical, you'll miss it, but
7 if you go down to "The," I believe -- I'll check it, but
8 I believe that's how we're listed.
9        MR. NICHOLAS:  This may not have the chart.
10 Look on page 87.
11    Q.  Okay.  So do you see The Mitchell Company is a
12 party to this settlement agreement?
13    A.  Yes, ma'am.
14    Q.  But, as I understand your testimony, The
15 Mitchell Company did not, itself, make a contribution to
16 this settlement; rather, its insurers made a contribution
17 on The Mitchell Company's behalf?
18    A.  That's correct.
19    Q.  And The Mitchell Company has never been required
20 to pay back that amount to the insurers?
21    A.  Other than the Scottsdale, but I don't think
22 that was part of this.  At least, I didn't see their name
23 in there.
24    Q.  Okay.  And as we can all see just from looking
25 through this, many, many pages of this document are just

Page 99

1 lists of other builders, installers and suppliers,
2 correct?
3    A.  That's correct.
4    Q.  And I'll represent to you because I don't
5 think -- I mean, you can see it, but it says that the
6 total amount is 80 million dollars.
7    A.  That's correct.
8    Q.  And as we sit here today, you have no idea what
9 portion of that 80 million dollars was allocated to The
10 Mitchell Company?
11    A.  I was actually told the amount at one point.  I
12 didn't have a piece of paper, but someone told me, and my
13 reaction at the time was it's totally insufficient.
14    Q.  What was the amount that someone told you?
15    A.  I think it was 10 or $15,000 a house, which
16 wouldn't begin to fix the problem.
17    Q.  Okay.  But you don't know who told you that?
18    A.  It was one of the insurance companies, but I
19 couldn't tell you which one, someone who was day-to-day
20 involved in putting this document together.
21    Q.  And do you believe that was 10 to $15,000 a
22 house for just The Mitchell Company houses?
23    A.  I think everyone got the same amount, but again,
24 I don't know.  Everything I'm talking would be hearsay
25 because I didn't look at a document.  I asked a question,

Page 100

1 and that was the answer I got, and my best memory is I
2 said, It's totally insufficient.
3    Q.  Okay.  But this settlement doesn't -- isn't a
4 settlement of just the claims of the 12 or 11 Mitchell
5 Company homeowners.
6    A.  Correct.
7    Q.  You understand that, right?
8    A.  Yes, ma'am.
9    Q.  So this is a class settlement on behalf of --
10    A.  The signatories.
11    Q.  -- hundreds of thousands of homeowners that had
12 Chinese drywall from other manufacturers and provided by
13 other builders, other suppliers, right?
14    A.  That's correct.
15    Q.  Okay.  And it's your recollection that the
16 contribution that was made on behalf of The Mitchell
17 Company equated to 10 or $15,000 a house times 11 or 12?
18    A.  Yes.  That's correct.
19    Q.  So Mitchell Company is not an example of a home
20 builder that resolved its Chinese drywall claims with its
21 homeowners by writing checks to each of the homeowners?
22    A.  That's correct, in respect to Taishan.
23    Q.  Okay.  And besides the Mindy Lister settlement
24 agreement and this MDL class settlement agreement, did
25 The Mitchell Company enter into any other settlement

Page 101

1 agreements with any other homeowners of Taishan drywall?
2    A.  No, ma'am.
3    Q.  Let me ask you about a document I saw in the
4 production that I just wanted an explanation of.
5        (Whereupon, Defendant's Exhibit 17 was marked
6 for identification and attached hereto.)
7    Q.  I just handed you a document marked as Exhibit
8 17.  Do you recognize that document?
9    A.  I don't have a specific -- Obviously, I read it
10 back then whenever I put it into my files, but I couldn't
11 say, Well, I got this from somebody and, you know, this
12 was the person who gave this to me.
13    Q.  My question for this is, the document is
14 entitled "Repair Protocol for Addressing Damages from
15 Defective Gypsum Drywall in Single-Family Detached
16 Homes."  This is not a protocol that Mitchell Homes
17 actually employed, correct?
18        MR. NICHOLAS:  For your --
19    Q.  For Taishan.
20    A.  This looks like the Knauf protocol.
21    Q.  Okay.
22    A.  Because some of the things we did on the Knauf
23 houses.
24    Q.  Got it, but you didn't do any of these things
25 for the Taishan properties?

26 (Pages 98 - 101)

Page 102

1  A. Well, obviously, there's some things in here we
2  did, like inspect and make pictures and check the back of
3  the board and on and on. So, yeah, there's 25 percent
4  before you get to actually fixing it we did in the
5  identification portion.
6  Q. Okay. So can you show me what parts you think
7  would have applied to the Taishan properties?
8  A. Well, it would all apply to Taishan if you were
9  actually going to do the work.
10 Q. I guess my question is not hypothetical but
11 actual. Is there anything in here that was actually done
12 for the Taishan properties?
13 A. Well, on paragraph one, documentation, we took
14 pictures, and we probably didn't concentrate on stuff
15 like trim, flooring. We did do light fixtures. Counters
16 and cabinets, we didn't take pictures.
17 Q. When you say you did light fixtures, you're
18 saying you took pictures of them?
19 A. Took pictures. I actually remember taking the
20 ceiling fixture down and not untwisting the wire nuts,
21 but -- Well, I guess you had to do at least one, and you
22 could see whether or not they were blackened.
23 Q. Why don't you look at the first -- the very
24 front page of this document because it sounds like what
25 you're describing is what was done to confirm affected

Page 103

1  homes.
2  A. Yes.
3  Q. And so what you're just describing, sounds like
4  it's what's being addressed on the first page, the very
5  first page of the document, page 1346.
6  A. Yes. I would say that we probably did half or
7  most of 1347, and we did paragraph two.
8  Q. Well, this is subsequent to resident move-out,
9  which --
10 A. But you could do that while they're in there.
11 They don't have to move out to do paragraph two.
12 Q. Okay.
13 A. The first section of paragraph two, not the
14 second section.
15 Q. Got it.
16 A. Then after that, we didn't do that. So it would
17 be confined just to pages one, two and a little bit of
18 three.
19 Q. Do you know of other home builders that have
20 incurred the same types of damages that Mitchell did?
21 A. Yes, ma'am.
22 Q. Can you name them?
23 A. I think we produced a list of all the builders
24 who were on a conference call that we had on a regular
25 basis, and there were probably 15 or 20, and on those

Page 104

1  calls, we would discuss our mutual problems.
2  Q. Can you name any of them?
3  A. Beazer, Lenar, Horton. You could basically take
4  a list of the top 50 builders in the country, and they
5  were on the call.
6  Q. Okay. And are you aware that Lenar filed a
7  separate lawsuit against Taishan?
8  A. Yes, ma'am.
9  Q. Okay. Are you aware that that lawsuit was
10 settled?
11 A. No, ma'am.
12 Q. Okay. And Beazer has been proposed in this
13 action as an additional class representative. Are you
14 aware of that?
15 A. Yes, ma'am.
16 Q. And the other one you mentioned is Horton.
17 A. Horton.
18 Q. Okay. Do you know if they've ever sued Taishan?
19 A. I don't know.
20 Q. And do you know how they responded to the
21 Chinese drywall problem?
22 A. Which one?
23 Q. Horton.
24 A. No, I have no idea.
25 Q. Okay.

Page 105

1  A. At that time, they weren't active in Mobile.
2  Q. Okay. Can you think of any other home builders?
3  A. WCI.
4  Q. Okay. Do you know if they ever sued Taishan
5  individually?
6  A. I don't think they did.
7  Q. Okay. And do you know how they responded to
8  Chinese drywall vis-a-vis their homeowners?
9  A. I think that they bought some back.
10 Q. What do you mean bought some back?
11 A. Rather than try and fix the -- These were more
12 resort properties that WCI had, and they just bought them
13 back and ripped it out and then resold them.
14 Q. Okay. Any others?
15 A. No names are popping up, but there were about 20
16 names on the list.
17 Q. Do you believe you produced the list to us?
18 A. If we didn't, I have it.
19 Q. Okay. I'd like for you to identify it to us, if
20 you can.
21    Do you know if you have any common interest
22 agreements with other home builders for purposes of legal
23 issues relating to Chinese drywall?
24 A. We do not.
25 Q. Okay. Why don't we take a break. I'll see if I