# EXHIBIT A

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

••••••••••••••••••••••••••••••••••••••••••••••••••
IN RE:  CHINESE-MANUFACTURED    *   Docket No. 09-MDL-2047
DRYWALL PRODUCTS LIABILITY      *
LITIGATION                      *   March 2, 2017
                                *
Relates to all cases            *   Section "L"
                                *
••••••••••••••••••••••••••••••••••••••••••••••••••

REPORTER'S OFFICIAL TRANSCRIPT OF THE
ORAL MOTIONS HEARING REGARDING

RECORD DOCUMENT 20627, CNBM ENTITIES' MOTION TO DECERTIFY CLASS

AND

RECORD DOCUMENT 18302, MOTION OF PLAINTIFF-INTERVENORS AND
THE PSC FOR AN EXPEDITED HEARING TO ENFORCE THE COURT'S JULY 17,
2014 CONTEMPT ORDER AND INJUNCTION.

BEFORE THE HONORABLE ELDON E. FALLON,
UNITED STATES DISTRICT JUDGE.

REPORTED BY:   Mary Thompson, RMR, FCRR
               500 Poydras Street, Box B275
               New Orleans, Louisiana  70130
               (504)589-7783
               mary_v_thompson@laed.uscourts.gov

**OFFICIAL TRANSCRIPT**

---

2

APPEARANCES:

For the Plaintiffs:        Herman, Herman & Katz
                           BY:  RUSS HERMAN
                             LEONARD DAVIS
                           820 O'Keefe Avenue
                           New Orleans, LA  70113

                           Levin, Fishbein, Sedran & Berman
                           BY:  ARNOLD LEVIN
                             SANDRA L. DUGGAN
                           510 Walnut Street, Ste. 500
                           Philadelphia, PA  19106

For the Defendants:        Baker Donelson Bearman
                           Caldwell & Berkowitz
                           BY:  KERRY J. MILLER
                           201 St. Charles Avenue
                           Ste. 2400
                           New Orleans, LA  70112

                           Orrick, Herrington & Sutcliffe
                           BY:  JAMES L. STENGEL
                           51 West 52nd Street
                           New York, NY 10019

                           Alston & Bird
                           BY: CHRISTY EIKHOFF
                             MICHAEL P. KENNY
                           1201 West Peachtree Street
                           Atlanta, Georgia  29028

                           Dentons US
                           BY: MICHAEL H. BARR
                             RICHARD L. FENTON
                           1221 Avenue of the Americas
                           New York, NY 10020

---

3

1            P R O C E E D I N G S

2            (Call to order of the court.)

3            THE COURT:  Okay.  We have two motions set.  One, the

4    motion to decertify and the other motion involving the penalties.

09:06:50    5            First the motion to decertify.  Each side has

6    30 minutes.

7            Just by way of background, after some six cases were

8    tried, default trials, and the confirmation of default, which

9    took about a week, the Court issued judgments in those six cases.

10   And following that, on July 23rd of 2014, the plaintiffs filed

11   their omnibus motion for class certification pursuant to

12   23(b)(3).

13           Although the question of liability had been established

14   by multiple default judgments, the Court felt and explained that

09:07:46   15   even though -- even when factual allegations are established by

16   default, Rule 23 imposes an independent duty on the Court to

17   determine, by order, that the requirements of Rule 23 would be

18   satisfied regardless of the defendants' admissions.  Thus, the

19   Court performed what we felt was a rigorous analysis to determine

09:08:15   20   whether or not 23 had been satisfied.  After some time, I felt

21   that the plaintiffs established 23 numerosity, commonality,

22   typicality, and adequacy of representation.  The Court determined

23   also that the plaintiffs had met 23(b)(3) requirements of

24   predominance and superiority.  In particular, I felt that the

09:08:45   25   liability and causation had already been determined, but the only

---

4

1    remaining issue was damages.

2            And I felt that some formulaic approach would work in

3    this particular case recognizing that the census of the

4    litigation was -- and I'm not sure why, but the census seemed to

09:09:13    5   be that the type of house was pretty similar, 80, 90 percent of

6    the homes.  Maybe it's because they were the subdivisions that

7    were being built at the time or some remediation after storms,

8    but the houses, with some outliers, seemed to be the same type

9    and construction of house.  And so I looked at the formulaic

09:09:44   10   approach as the best way of handling it other than having 3,000

11   or 4,000 individual trials in the various areas; I felt that

12   certification was proper in this particular matter.

13           CNBM has now filed a motion to decertify the class

14   arguing that predominance is not satisfied in this particular

09:10:16   15   case.  They have favored me with extensive briefing.  I received

16   also responses from the plaintiffs.  We're here today to argue

17   that particular motion.

18           I'll hear from the parties.

19           MR. KENNY:  Michael Kenny on behalf of the Taishan

09:10:35   20   defendants.

21           May it please the Court:

22           Good morning, Your Honor.  I want to pick up -- the

23   point of my remarks this morning will be to focus principally on

24   predominance and superiority.  This morning I want to address the

09:10:50   25   factual and trial plan reasons why the class that you certified

5

1  back in September of 2014 must now be decertified.

2       In the various briefings by the defendants, we have

3  provided Your Honor with an exhaustive list of United States

4  Supreme Court cases and Fifth Circuit cases that are on point and

09:11:12  5  provide Your Honor with all of the legal reasons why the case

6  should be decertified.  But for this morning, I want to focus on

7  the factual reasons and the trial plan reasons that have

8  developed since Your Honor certified the class to demonstrate why

9  the class must now be decertified.

09:11:31  10       Your Honor, the bottom line is pretty simple.  There is

11  no common issue that will predominate over all of the individual

12  issues in this case.  There is no class mechanism that is

13  superior to the agreed-upon need for individualized inquiry for

14  the manifold damages that these plaintiffs are seeking.  Indeed,

09:11:52  15  Your Honor simply needs to read the PSC's trial plans to show

16  that they are blueprints for a series of mini-trials for all of

17  the class plaintiffs over all issues.

18       As Your Honor knows, the defining attribute of a class

19  action is adjudication by representation.  There will be no

09:12:15  20  adjudication by representation over any of the damages in this

21  case.  And that's why, at this stage of the proceedings, it is

22  manifestly clear that there is no substitute for individual

23  trials.

24       THE COURT:  When you say individual trials, we've got

09:12:33  25  about 26 states.  We have about 3,000 or 4,000 claims.  You would

6

1  assume that 4,000 juries would be empaneled to try each of these

2  cases in the same area, same issues?  We're talking about

3  property damage here only.

4       MR. KENNY:  Well, we're not, Your Honor.

09:12:52  5       THE COURT:  Well, the class certification is a --

6       MR. KENNY:  And I will go through, but there are at

7  least ten different types of damages that these plaintiffs are

8  claiming.

9       They're claiming, for example, remediation damages.

09:13:03  10  Well, what do we now know in this case?  We now know that in the

11  class that currently exists, at least a third of them are former

12  owners.  Okay?  There will be no common proof -- no common

13  proof -- for an entire class for all of the damages.  That's

14  game, set, match right there, Your Honor, under *Bell Atlantic* and

09:13:25  15  Fifth Circuit precedent.

16       What else do we know in this case?

17       We know, because the plaintiffs keep telling us, that

18  every single plaintiff in this class is a, quote, named plaintiff

19  and active litigant in the case.  That's exactly what the

09:13:43  20  situation was in the *Robertson v Monsanto* case, a Fifth Circuit

21  case, where the Fifth Circuit said when the plaintiffs are all

22  named and known, and, at least with regard to Taishan, liability

23  has been established, there is no need, as a matter of law, for a

24  class.  That's game, set, match, Your Honor.

09:14:07  25       What do we also know?

7

1       We know that in this case, since the Court certified

2  the class, what did the plaintiffs do?  They immediately filed a

3  motion for class damages, as Your Honor is well aware.  And in

4  that motion they said there are three types of damages that are

09:14:26  5  susceptible to (b)(3) certification:  Remediation, loss of use

6  and enjoyment, and alternative living expenses.

7       Since that motion was filed back in 2014, and up to the

8  point at which the Court had the June 9th hearing, what happened?

9       They drew down alternative living expenses as a class

09:14:51  10  for class damages.  They drew down loss of use and enjoyment as

11  class damages.  They didn't forfeit those damages.  Indeed, as of

12  today, they are making claims for those types of damages.  Their

13  own admission is those types of damages must be individually

14  adjudicated.  There is no common proof for those damages.

09:15:13  15       There's a whole laundry list of other damages that they

16  put back into the case.  Your Honor will recall the September 8,

17  2015, letter that they sent you where they walked back, even from

18  the position they took in the June 9, 2015, hearing, where they

19  said, We want an aggregate sum to be awarded.

09:15:36  20       By September 8th, after they saw what happened with

21  their expert witness, they retreated.  They said, We're not even

22  asking for an aggregate sum.  We have that we have to have

23  individualized inquiry on product ID, ownership, proper square

24  footage.  Those issues -- they are maintaining today that there

09:15:59  25  is a single -- only one -- common issue with regard to damages in

8

1  the case, and that is remediation.

2       But even that requires individualized inquiry.  There

3  is no proof -- the Fifth Circuit in *Bell Atlantic* says game, set

4  match.  If you can't have a common proof that will be

09:16:22  5  applied to all of the absent class members, there is no

6  predominance, there is no superiority.  That's what we have here,

7  Your Honor.

8       THE COURT:  Well, what would you recommend?  Individual

9  trials on 3,000 cases dealing with property damage?  That's your

09:16:39  10  answer?

11       MR. KENNY:  That is our answer at this point because

12  that is the only alternative.

13       THE COURT:  Uh-huh.

14       MR. KENNY:  And it's not my answer, it's not the

09:16:48  15  defendant's answer, it's the plaintiffs' position.  The

16  plaintiffs' are the ones -- they control this case in the sense

17  of the damages that they're asking for.  They're the ones asking

18  for remediation damages, alternative living expenses, loss of use

19  and enjoyment.  They're the ones asking for property -- other

09:17:07  20  kinds of property damages.  Personal property damages; damages

21  associated with short sales, foreclosures, bankruptcies.  They've

22  even suggested that maybe there's some personal injury claims

23  that are in the case.

24       They have a class where a third of which consists of

09:17:22  25  former owners.  They say that they have to be tried

9

1 independently.

2 And Your Honor will recall from *Castano*, the driving

3 force in a class action, as Your Honor knows, is the negative

4 value suit. And here, each one of these -- I don't know how many

09:17:41 5 there are anymore. Let's just say approximately 3,000. Maybe

6 it's 2,000. We think it's under 2,000. But they all -- almost

7 all of them already have lawyers. Almost all of them have

8 claims, to read what they keep submitting to Your Honor, of more

9 than $100,000. Many of them, multiples of $100,000. They have

09:18:07 10 every financial incentive in the world to pursue the case.

11 THE COURT: See, the thing that just -- I can't

12 understand how it's helpful, either to the system or to any of

13 the parties, to have 3,000 juries decide whether or not the

14 Chinese -- how much damages the Chinese company should pay.

09:18:35 15 That's doesn't make sense to me.

16 MR. KENNY: And some of the district courts in the

17 Fifth Circuit, whether the *Corley* case, the *Crutchfield* case, the

18 *Castano* case -- all of the district court judges struggled with

19 that same kind of issue. And there's this felt need to just be

09:18:53 20 expedient. How can we just make this shorter and simpler than it

21 possibly is already? But that's the nature of mass torts.

22 That's the nature of mass torts.

23 THE COURT: But isn't that the movement, though? The

24 movement, even across the country now -- particularly we see with

09:19:10 25 the *Tyson Food* that the Supreme Court is beginning to look at

OFFICIAL TRANSCRIPT

10

1 some method of dealing with this, because the paradigm of

2 litigation in the United States has really changed from the

3 independent, individual trial to multiple trials. We have to

4 come up with some solution to deal with multiple trials where you

09:19:31 5 have thousands of people dealing with really similar issues. If

6 you say they're not the same, similar issues.

7 If you can carve out even the property damage, which is

8 the largest part of this particular case, and come up with some

9 method that's good for everybody, including the system, that

09:19:50 10 seems to me to be a sensible way of dealing with it.

11 MR. KENNY: That possibly is, but that's not the law,

12 Your Honor, and Your Honor knows it. I mean, Your Honor knows

13 what Fifth Circuit law is in mass torts. Your Honor knows

14 *Corley, Crutchfield, Bell Atlantic, Chevron.* I mean, the list --

09:20:07 15 there's a reason why these plaintiffs can't cite a single

16 analogous case, because there are none, and why we can cite 15 to

17 20 U.S. Supreme Court and Fifth Circuit cases in the mass tort

18 context, where you have these individualized nature of damages,

19 where Rule 23 doesn't apply.

09:20:30 20 Thank you.

21 THE COURT: Okay. Thank you so much. I'll hear from

22 the others.

23 MR. LEVINE: I think I've got three against me,

24 Your Honor.

09:20:41 25 THE COURT: Okay.

OFFICIAL TRANSCRIPT

11

1 MR. FENTON: Good morning, Your Honor. Rick Fenton on

2 behalf of BNBM PLC and BNBM Group.

3 Your Honor, I'd sort of like to pick up where Mr. Kenny

4 left off, and I'm going to put aside what I was prepared to say

09:21:04 5 for a moment and just address the issue that Your Honor raised

6 about 3,000 individual trials.

7 I was national counsel for Allstate during

8 Hurricane Katrina. We had, for Allstate, 7500 individual

9 homeowner cases alone, most of which were in this court. There

09:21:28 10 were many other carriers. There were, as Your Honor probably is

11 very familiar with, tens of thousands of individual homeowner

12 claims. And Judge Duval ruled -- and I think his ruling was

13 correct -- in the *In Re: Katrina* cases that none of those were

14 susceptible to class treatment because of the individualized

09:21:49 15 nature of homeowner damages.

16 And the same is really true here. This Court got

17 through it; the cases were tried. Many were settled. But

18 sometimes that's just what you've got to do. And, quite frankly,

19 given the number of cases we were dealing with in that scenario,

09:22:14 20 the notion of 3,000 cases among 29 states I don't find at all a

21 daunting proposition.

22 THE COURT: Yes. But you know how we dealt with those

23 cases. We created a mini-MDL in this particular court and we

24 dealt with them that way. And the cases were bundled, and by and

09:22:34 25 large most of them were resolved in a bundled fashion. We didn't

OFFICIAL TRANSCRIPT

12

1 have to do the individual trials.

2 MR. FENTON: Well, actually, there were a number of

3 individual trials, Your Honor. And at the end of the day, that's

4 what it came down to. Fortunately a lot of those cases were

09:22:50 5 settled, and that may or may not happen here.

6 But the problem we've got, as Mr. Kenny said, is the

7 individual variations here. And the fact is that the formula

8 that was put forward by Mr. Wright and Mr. Inglis just doesn't

9 work. And I know Your Honor would love to have a formula that

09:23:19 10 worked. Quite frankly, it would make life easier for all of us.

11 But the formula that they've put forward, you don't have to be an

12 expert to know that if you have two houses with identical floor

13 space but one has 8-foot ceilings and one has 12-foot ceilings,

14 there's going to be 50 percent more drywall remediation in the

09:23:40 15 house with the 12-foot ceilings.

16 THE COURT: But couldn't you do that administratively?

17 I mean, couldn't you have that examined

18 administratively and simply not necessarily -- just indicate

19 administratively how many square feet you're dealing with in any

09:23:57 20 particular area?

21 MR. FENTON: If that were the only variable,

22 Your Honor, perhaps, but it's not. There's finish. There's

23 internal wall configurations. There's the number of plumbing

24 fixtures. There's location. Quite frankly, the location of a

09:24:11 25 property makes a big difference in terms of accessibility as to

OFFICIAL TRANSCRIPT

13

1 how you're going to remediate.

2 And that's why, when we had the damages hearing back in

3 June of 2015, Mr. Pogorilich indicated, from the construction

4 perspective, why the formula doesn't work because of all these

09:24:31 5 individual variations.  Dr. Marais from the statistical

6 perspective basically said, Look, these numbers are all over the

7 lot.  He compared it to the Knauf settlement.  And in any given

8 case, the numbers were wildly inaccurate, both on the plus side

9 and on the minus side.  And when you looked at it in the

09:24:50 10 aggregate, taking Knauf as a benchmark, it overstated the damages

11 by over 30 percent.

12 So when you look at it on a theoretical basis or on an

13 empirical basis, the formula just doesn't work here.  And I know

14 that, you know, we wish it did, but it doesn't.

09:25:10 15 Your Honor, I do want to cover a couple of points that

16 are specific to the BNBM companies.

17 The first is -- and this has been briefed and argued

18 endlessly and I don't plan to repeat it here, but the first is

19 that there's no jurisdiction over the BNBM companies.  That

09:25:32 20 motion is before Your Honor.

21 But for purposes of the Court's class certification

22 order in 2014, the Court found the jurisdictional hook, and

23 really the class certification hook, through these requests to

24 admit that had been served on Taishan.  And I am going to use

09:25:52 25 Taishan, not in the very broad sense that the PSC uses it, which

14

1 is to rope in all the Chinese defendants, but in the narrow sense

2 of the Taishan company that is a defendant here.

3 And we know from the Fifth Circuit's decision in

4 *Briseno* that it -- the Court was really sort of led into error

09:26:20 5 using the requests to admit to bind the BNBM companies and the

6 CNBM companies.  And as a matter of fact, if you go through the

7 Court's class certification decision, I think it's Paragraphs 30

8 through 47, that's basically a recitation of the request to admit

9 and form the foundation for the class certification decision.

09:26:48 10 And not only were those admissions not binding, Your

11 Honor, but in light of what we've seen in the jurisdictional

12 motions now with respect to the way that these companies operate,

13 their ownership structure, the separate management, the separate

14 facilities, we know that many of those requests to admit, if not

09:27:07 15 all of them, are not accurate.  They do not comport with facts.

16 So I think it has to be reexamined from that

17 perspective as well as the jurisdictional perspective.

18 The other thing I'd like to point out, Your Honor,

19 again specifically as to the BNBM companies, is that the BNBM

09:27:25 20 companies are not foreclosed by any defaults from litigating

21 individual issues of liability or causation.

22 A principal premise of the PSC's theory for class-wide

23 relief is its contention that those issues are foreclosed because

24 of defaults.

09:27:46 25 First of all, defaults have no meaning if there is no

15

1 jurisdiction.  And for this purpose, let me separate my clients

2 for a moment.  There's absolutely no evidence in this record that

3 BNBM Group manufactured or sold drywall to anyone during the

4 relevant period or had any U.S. transactions at all.  There were

09:28:09 5 simply no contacts, let alone minimum contacts, that serve as a

6 basis for personal jurisdiction over BNBM Group.

7 With respect to BNBM PLC, Your Honor -- and, again, as

8 detailed in the jurisdictional motions, there were some sales of

9 drywall that were initiated and completed in China.  Those

09:28:32 10 transactions do not give rise to U.S. contacts because they were

11 centered in China.  But even if one were to assume, contrary to

12 fact, that some of those transactions could give rise to minimum

13 contacts, there's absolutely no evidence that any BNBM Dragon

14 brand drywall ended up in any jurisdiction other than Florida.

09:28:58 15 Therefore, Florida is the only conceivable jurisdiction that even

16 arguably could exercise jurisdiction over BNBM.

17 Now, let's --

18 THE COURT:  But doesn't that give me the jurisdiction,

19 then, as the MDL judge?  I mean, I'm looking at Florida.  I have

09:29:16 20 the Florida cases.  You dealt in Florida.

21 MR. FENTON:  You do, Your Honor.  And I think I'm about

22 to address exactly Your Honor's point.

23 If you look at the cases that were certified for class

24 damages, they did include cases that had been filed in Florida.

09:29:34 25 But if you then eliminate the cases where the BNBM entities are

16

1 not parties, you're left with five cases.  You're left with

2 Gross, which was filed here; Wiltz, which was filed here; and the

3 three Amorin cases, one of which was filed in Florida.

4 The problem is that neither BNBM Group nor BNBM PLC

09:29:59 5 were defaulted in the Florida case.  That's the only case that

6 conceivably could have had jurisdiction over BNBM PLC when it was

7 filed and where it was filed, but there has been no default

8 entered in that case.  So as to the Florida properties where

9 there is some BNBM drywall, there is no default.

09:30:25 10 And issues of causation and liability as to BNBM are

11 alive and well.  In that regard, Your Honor, there is absolutely

12 no class-wide evidence that's been presented that could

13 conceivably prove a product defect as to BNBM drywall.  The only

14 evidence in the record is the report of the Consumer Products

09:30:52 15 Safety Commission that said that Dragon Brand Beijing New

16 Building Materials Company's 2006 drywall had low or no

17 detectable emissions of hydrogen sulfide.  So it is a different

18 product than what is alleged to be dealt with by Taishan.  A

19 defect cannot be proved on a class-wide basis, and it requires an

09:31:19 20 individual determination.

21 The other thing that I think is telling here,

22 Your Honor, is that when we look at those Florida properties,

23 there are less than 70 so there's a real numerosity issue with

24 respect to BNBM that you do not have with respect to Taishan.

09:31:39 25 And that's another reason that I think BNBM stands in a somewhat

17

1    different posture, although I agree with Mr. Kenny as to the
2    impropriety of class proceeding.
3         THE COURT:  But aren't you conflating some of the
4    issues there?  If I have jurisdiction over BNBM because of their
09:32:01  5    sales, it doesn't matter whether it was Dragon or anything else,
6    I have jurisdiction over them for everything.  I mean, it's just
7    not that.  If they do business in the state, it gives me
8    jurisdiction over them.  And if they have some relationship or
9    there's the same commonality of ownership with Taishan, then
09:32:25 10    they -- that may be different.  Isn't it --
11         MR. FENTON:  I don't think so, Your Honor.  And with
12    all due respect, I think you have to keep the cases separate.
13    Just because it's an MDL proceeding doesn't mean that the cases
14    are merged.  They do retain their independent identity.
09:32:41 15         The only class proceeding where there could conceivably
16    be jurisdiction over BNBM PLC is the proceeding that was
17    initiated in Florida, because that's the only one that even
18    arguably -- and we don't think it meets the test there, but
19    that's the one that arguably would have jurisdiction over these
09:33:02 20    Florida properties.  And there's been no default --
21         THE COURT:  And you said that the jurisdiction is
22    restricted to Dragon board?
23         MR. FENTON:  As to BNBM, Your Honor, based on, again,
24    the jurisdictional motions -- and I don't want to go into all of
09:33:19 25    that.  But the only other way that BNBM gets roped into these

19

1    of individual questions on damages.
2         And the other thing I will point out in that regard,
3    Judge -- and then I'll conclude my remarks -- is that in order to
4    even get there, you've got to make shortcuts.
09:35:47  5         What is the shortcut?  The shortcut is the application
6    of the formula that provides estimated damages in place of actual
7    proof of damages.  Most of the properties at this stage of the
8    game have been remediated, some to the full degree, some perhaps
9    partially, but even that raises individual questions.  And I
09:36:13 10    think the law that we've cited in the briefs is very clear that
11    where actual cost data is available, courts may not use estimates
12    to measure damages.  And that is particularly true in a class
13    proceeding, Your Honor, where *Tyson Foods* is also quite clear
14    that you cannot make shortcuts in substantive proof requirements
09:36:42 15    in order to accommodate the class procedure.
16         But that is precisely what is happening here.  If you
17    had an individual damage case and a homeowner was sitting there
18    and they had receipts and Mr. Inglis took the stand to say, I'm
19    going to estimate damages, I think one of the first questions out
09:37:07 20    of Your Honor's mouth would be, Well, why don't we look at the
21    actual receipts and see what the actual cost was?  Why do I need
22    Mr. Inglis to estimate it?
23         Well, it's no different in a class proceeding, but
24    that's exactly the kind of proof shortcut that needs to be
09:37:23 25    utilized if a class proceeding is going to go forward here, all

18

1    proceedings is if the alter-ego theories still have viability,
2    and for all the reasons that we have briefed, it doesn't.
3         Let me just, in concluding, Your Honor, pick up on
4    another point that Mr. Kenny raised, and that has to do with the
09:33:38  5    PSC's trial plan.  And I think this really illustrates the
6    problem that we have here.
7         We took the PSC's trial plan and we tried to map out
8    what this case would look like if that trial plan were followed.
9    The only class or mass part of this -- whatever it is, is
09:34:12 10    highlighted in yellow up at the upper left-hand corner, and that
11    is the application of the remediation formula for current owners
12    on Exhibit 79.  That would not include former owners on
13    Exhibit 79, which I think is roughly a third of the class.  And
14    for both categories, whether it's current owners or former
09:34:36 15    owners, it then devolves into a whole series of individual
16    trials, individual determinations.  They want Bellwether No. 1.
17    They want Bellwether No. 2.  Then there's a whole bunch of
18    non-class proceedings in Florida on the Omni 20 complaint.  It is
19    a mess, Judge.
09:35:02 20         But to say the common issues predominate in the case as
21    a whole, which is the test in the Fifth Circuit, when what we're
22    left with at this stage of the game is a little slice where the
23    remediation formula is being applied, I think cannot reasonably
24    be said, and one really needs to question what the tiny bit of
09:35:30 25    class proceeding here really adds if there's going to be a bunch

20

1    of which ties into Mr. Kenny's point that, for better or worse,
2    Judge, on the facts of this case and on the procedural posture we
3    find ourselves in, we can't just do it.
4         Thank you very much.
09:37:39  5         THE COURT:  Thank you.
6         MR. STENGEL:  Good morning, Your Honor.  Jim Stengel
7    from Orrik Herrington for the CNBM entities.
8         I'd like to try and address, in the first instance,
9    your question about the practical impact of this, because it's a
09:38:12 10    decision the Court will have to make.  I think it's unavoidable
11    given the deficiencies of this class as currently certified, the
12    change in positions made by the PSC, and the fact that I think at
13    the time there was an underappreciation of things that would
14    impact the ability to resolve issues on a class-wide basis like
09:38:30 15    variations in state law which are significant and substantial.
16         But there is a growing body of experience outside the
17    class context.  I am morally certain that Judge Parker was fairly
18    upset when the Fifth Circuit said "no" in *Cimino*.  As you know
19    here, he put together a very complicated statistical methodology
09:38:48 20    to try and estimate the value of asbestos claims, albeit personal
21    injury claims which are a different species generally not viewed
22    as amenable to class treatment.
23         But when you actually do, as I think the briefing
24    illustrates here, look at the variation of these claims, you are
09:39:01 25    going to see that there's so many moving parts with this, there's

21

1   so little commonality.  There's no basis to proceed on a
2   class-wide basis to resolve this.
3        And there's a general interest in resolving this case,
4   Your Honor.  We've tried for years --
09:39:14  5        THE COURT:  You know, you mention asbestos.  Asbestos
6   now is in the 25th year -- 25 years for asbestos.  The litigants
7   have all gone bankrupt.  The lawyers are the only ones who are
8   making any hay out of the cases now.  Do you want to keep the
9   Chinese companies in for 25 years?  That's a hard row to hoe.
09:39:40  10        MR. STENGEL:  In fairness, asbestos was sold
11  commercially in the United States for over 100 years.  You have
12  literally millions of claimants as opposed to a relatively small
13  group of claimants in this case.  And I'm not unsympathetic to
14  the fact that we have 3,000 people whose claims need to be
09:39:55  15  resolved one way or the other.
16        So I think you're talking about a different model.  To
17  go back to asbestos, if you look at what Judge Robreno did to
18  clean up the MDL mess in asbestos, it's a model that where
19  there's a will, there's a way.  And my bottom line point here,
09:40:07  20  Your Honor, is we, frankly, because of the existence of the
21  certified class, have not joined issue with the PSC, or any other
22  plaintiff lawyers, on how we'd resolve these cases outside of the
23  class context.
24        And I know Your Honor is involved in the Xarelto
09:40:19  25  litigation.  We have a situation where we have putative

22

1   bellwethers Hernandez and Germano.  They don't fit the definition
2   of bellwether that any case in the Fifth Circuit would recognize.
3   They're not statistically valid, they weren't selected properly,
4   et cetera.  But I think it's probably a mistake to assume that
09:40:39  5   they would mechanistically require 3,000 cases to be tried to
6   verdict.  We don't know what we can do because we've never
7   discussed this in an orderly way with the plaintiffs.  We've
8   never had a Rule 16 conference to talk about a non-class
9   approach.
09:40:52  10        I don't know where we'd land.  But I think we, as
11  officers of the court and lawyers with clients, would try and
12  find a happy medium that would honor the due process rights of
13  the defendants, be consistent with the Rules Enabling Act.  All
14  the deficiencies of the class certified right now, which is not
09:41:10  15  legally permissible, I think we could work around, but we simply
16  don't know because we haven't had that opportunity.
17        With that, Your Honor, thank you.
18        THE COURT:  Thank you very much.
19        Let me hear from the plaintiffs.
09:41:38  20        MR. LEVIN:  Mr. Kenny said "game, set, match."  Where I
21  come from, the certification in this case is a slam dunk.  Much
22  of what you heard today dealt with jurisdiction.  Those motions
23  are before you.  We can't overlook that BNBM is here on an
24  alter-ego theory, a single-business enterprise theory, and they
09:42:02  25  have been defaulted in them.

23

1        Last I heard about Castano and the asbestos cases --
2   and it probably wasn't mentioned, but it was Amchem.  This is not
3   Castano.  It's not Amchem.  It's not 25 years of asbestos.  It's
4   not a sprawling class.  There are no futures.  Every class member
09:42:34  5   knows that they're in this litigation, knows why they're in this
6   litigation, and made a decision to be in this litigation.  So you
7   don't have that type of situation.
8        I've also heard about "Allstate knows how to do it."
9   Well, I haven't handled an Allstate case in 40 years, but for the
09:42:56  10  first 15 years of my practice there was Allstate everywhere.  And
11  they said, "You're in good hands with Allstate," and my clients
12  are not in good hands with the theories that are promulgated by
13  the defendants in this litigation.
14        Let's look at this chart.  I just want to cover the
09:43:21  15  three things on top.
16        Current owners, remediation damages.  That's the bulk
17  of the claims in this case.  That's what predominates.  Sure,
18  there are other damages that could be handled as pick-up in our
19  trial plan, but that is the bulk of the damages.
09:43:43  20        Former owners we've removed because there is an issue
21  there, but we believe the former owners are entitled to the same
22  damages as the present owners.  The reason why they're former
23  owners is while Knauf was here with Moss remediating claims, our
24  clients were losing their homes, were in short sales, were in
09:44:12  25  foreclosures, were in bankruptcies, all at the hands of these

24

1   defendants who chose to stay in China; come to the United States
2   and leave the United States with the blessing of CNBM who voted
3   11 to nothing to tell them to leave.  So while they slept in
4   China, we were litigating here.
09:44:37  5        THE COURT:  I'm sure they will hear that in every case
6   they're dealing with, but they say that you don't have any common
7   issues in this particular matter to justify a class action.  They
8   say location, type of construction, and most of the properties
9   have already been remediated; therefore, there's no --
09:45:01  10        MR. LEVIN:  Our expert has gone through an analysis
11  using ZIP Codes to account for locality.  We've used square
12  footage to account for the size of the home.  And we've used
13  RSMeans, which Your Honor approved of in similar litigation, and
14  in CertainTeed in the Eastern District of Pennsylvania
09:45:26  15  Judge O'Neill used.  So we have a formulaic approach to proving
16  damages on remediation.  It's arithmetic.  It is not "e" equals
17  "mc" squared.  And that was used, I believe, by Your Honor in
18  Turner, and in Harrell, in Hernandez.  That's in this
19  jurisdiction.
09:45:50  20        But we've gone even further.  We've used those
21  approaches in Florida in state court with Judge Farina in Siefert
22  and in Harrell, which is a certified class of homeowners.  Judge
23  Hall has used them in Virginia.
24        This case is not on an open slate.  In fact, we had
09:46:11  25  Daubert hearings in Germano.  Your Honor has had three or four

25

1  decisions.  On jurisdiction we've gone to the Fifth Circuit
2  twice.  And I'm not going to deal with the jurisdiction motions,
3  because Your Honor brought it up with alter ego and business
4  enterprise where BNBM says, We only have Dragon board in 65
09:46:34  5  homes.  We have a default judgment against each of the defendants
6  in some jurisdiction.
7        The cases that they cite are anti-trust cases with
8  regression analysis saying you can't prove it in a formulaic
9  method, but we've done it here.  We've done it in *Germano*.  We've
09:46:58  10  done it in *Hernandez*.  We've done it in *Siefert* in Florida.
11  We've done it in *Campbell* here in this courtroom.
12        THE COURT:  Well, how do you anticipate determining the
13  square footage in a particular case?  You know and I know that if
14  a 1400-square-foot or 1500-square-foot house has three rooms as
09:47:27  15  opposed to six rooms, the six-room house, even though it's
16  1500 square feet on a plan, it's going to consume more drywall
17  than the other.  How do you deal with that?
18        MR. LEVIN:  We deal with it because we deal with
19  practicalities.  We go around the perimeter, and you take the
09:47:49  20  walls and you measure the heights of walls and get your square
21  footage.  I mean, every contractor that has to give an estimate
22  for a home takes a look at the home and determines the square
23  footage.  And we have that.  They can come out and examine the
24  home if they want to.
09:48:05  25        But that still doesn't preclude, in the first instance,

OFFICIAL TRANSCRIPT

26

1  current owners on Exhibit 79 getting their damages based on their
2  ZIP Code, their square footage, and the cost-per-square-foot for
3  remediation.
4        If you want to solve problems, you can solve problems.
09:48:27  5  But if you avoid the problems for seven and a half years and then
6  come into court, after the case has been certified, after you
7  chose not to participate in the case, and say, We want to
8  decertify the Class seven and a half years later, Your Honor,
9  there is no -- the brief is replete with it, but there's no issue
09:48:51  10  with any of the provisions of Rule 23 that have changed since
11  your certification order -- not one -- other than some owners
12  have lost their homes because they couldn't afford to be in an
13  apartment and pay the mortgage or buy another home and pay the
14  mortgage.
09:49:11  15        And when we get to former owners, we'll talk about
16  estoppel, too, because it's their conduct that has caused this
17  disaster here.  And it continues to cause a disaster.  It's
18  disruptive.  There are individuals next door to other individuals
19  who had their homes remediated by Knauf but not the Chinese
09:49:32  20  Taishan entities.  They've held back.
21        THE COURT:  How about the argument that most properties
22  have already been remediated?  How do you deal with that?
23        MR. LEVIN:  Well, if they'd been remediated properly,
24  then they are a remediated home, they get their money.  But if
09:49:53  25  they have to go to Handy Andy and get it done for $15,000 as they

OFFICIAL TRANSCRIPT

27

1  would like to do it, no, that's not adequate damages.
2        We've already found what has to be done and what proper
3  remediation is.  It's stripping the homes down to the studs and
4  replacing electrical and air conditioning and everything.
09:50:10  5  They're entitled to those damages.
6        Because they chose not to come into court for seven and
7  a half years should not enure to their benefit.
8        THE COURT:  Let me ask you:  How do you deal with a
9  situation -- let's assume it's already remediated and the person
09:50:26  10  spent $70,000 remediating the home and the formula would bring
11  $60,000.  They've already spent 70- but the formula would bring
12  60-.
13        MR. LEVIN:  The pinball machine tilts, they pay 70,000.
14  They pay the maximum.
09:50:46  15        Your Honor, they talk about multiple state laws.  In
16  90 percent of these classes, the class members are in three
17  states, not 26; Florida, Virginia, and here in Louisiana.  And
18  each of those states recognize the cause of action that we've
19  proceeded on.
09:51:17  20        I think I've taken enough time, Your Honor.  I know I
21  didn't use 30 minutes, but I don't want to give them any of my
22  time.
23        THE COURT:  Okay.
24        (Conferring.)
09:51:28  25        MR. LEVIN:  Well, as Russ -- as Mr. Herman just said,

OFFICIAL TRANSCRIPT

28

1  3,000 homes have not been remediated.
2        THE COURT:  Okay.  All right.
3        MR. KENNY:  Very briefly, Your Honor.  Just look at the
4  trial plan.  Here is *Bell Atlantic* -- I'm going to quote it.
09:51:50  5  339 F3d 302.  This is Fifth Circuit.
6        (As read):  The Fifth Circuit has repeatedly held that
7  where the fact of damages cannot be established for every class
8  member through common proof to the class, then it defeats
9  23(b)(3).
09:52:05  10        All you have to do is look at their own trial plan.
11  They are not even pretending that they can come in with common
12  proof through a class representative and prove all of these
13  damages.  They are not contending that they can have a class
14  representative come in with common proof and prove, for current
09:52:27  15  owners, remediation.
16        Just stay there for a minute, Your Honor.  What do they
17  need to do?  They need to first figure out product ID.  The only
18  way to do that is to go through their list one by one by one.
19  You have to figure out the square footage, as Your Honor has put
09:52:46  20  his finger right on that.  And what was Mr. Levin's response?
21  "Well, then come look at our houses."
22        Well, that's precisely their burden.  And you have to
23  do it house by house by house.  There is no shortcut.  You have
24  to figure out -- they say in their class they have former owners.
09:53:03  25  That's a third of their class.  They're not even pretending to

OFFICIAL TRANSCRIPT

29

```
 1   use the remediation formula to figure out the remediation damages
 2   even for those people.
 3          THE COURT:  Can't you do the square-footage analysis
 4   administratively as opposed to judicially?  I mean, can't you
 5   have a special master just measure the houses and figure it out
 6   that way as opposed to having a trial to determine the square
 7   footage when it's already there?
 8          MR. KENNY:  No, Your Honor, for a couple of reasons.
 9          One, as Mr. Fenton pointed out, and as Your Honor --
10   well, you were at, obviously, the June 9th hearing.  The formula
11   doesn't work.  It starts with faulty data and proceeds to a
12   mechanistic way that ignores all of the variations throughout the
13   various states.
14          But even if you're in the same ZIP Code, House A and
15   House B right next to each other, as Mr. Pogorilich showed
16   Your Honor with his demonstrative, you've got to go in and figure
17   out fit and finish.
18          Mr. Inglis, when he was on the stand, admitted that
19   even with his formula some people get more, some people get less
20   than what they should get.  That's just fundamentally in
21   violation of due process, Your Honor.
22          THE COURT:  All right.  Okay.
23          MR. HERMAN:  Your Honor, may I say something?  It will
24   take two minutes.
25          THE COURT:  Okay.
```

OFFICIAL TRANSCRIPT

30

```
 1          MR. HERMAN:  The old shell game is you move the pea
 2   from shell to shell and you try to guess.  There's no guesswork
 3   here.  There are a thousand Chinese-manufactured drywall homes in
 4   Louisiana that have never been remediated.  RSMeans and ZIP Codes
 5   determine what the value is per square foot.
 6          Those thousand claims -- and I'm just using them as an
 7   example -- have submitted, through required orders of this Court,
 8   their square footage.  They have had inspectors inspect their
 9   properties for ID, and it is merely a mathematical formula.  And
10   if the defendants want to challenge, in a class cert hearing, the
11   methodology as to square footage, well, they'll have to go in and
12   do what we did, hire inspectors, go house by house, measure and
13   measure.  But that does not defeat a formulaic mathematical
14   certification.
15          And I suppose what I object to on behalf of the
16   approximately 3,000 unremediated homes, including those by
17   Habitat for Humanity and Catholic Charities, is we've got
18   defendants that have hidden evidence, that have hidden witnesses,
19   and that have tested every sort of way to delay this case.
20          And I point out, Your Honor, that it was necessary, and
21   I understand it, for the Court to hold a period of time for there
22   to be discussions, and there were discussions in several
23   different states over multiple months that resulted in,
24   unfortunately, no resolutions whatsoever.
25          THE COURT:  Right.
```

OFFICIAL TRANSCRIPT

31

```
 1          MR. HERMAN:  But at the same time, this matter now is
 2   seven years out.  The folks have done what they're supposed to
 3   do, fill out forms, certify as to what their square footage is --
 4          THE COURT:  Okay.
 5          MR. HERMAN:  -- had inspections.  They're waiting.
 6          Now, we're not talking about remediations here in the
 7   remediation sense, we're talking about monetary value to
 8   remediate.
 9          THE COURT:  All right.  I understand.
10          MR. HERMAN:  I believe that can certainly be done.
11          THE COURT:  I understand.
12          I'll give you time.  Do you want to rebut anything he
13   says, anybody?
14          MR. KENNY:  No, Your Honor.
15          MR. FENTON:  Very briefly, Your Honor.
16          The Germano and the Castano cases, Your Honor, are very
17   clear that you can't just keep carving away pieces of the case to
18   try and narrow it down to a class proceeding.
19          That's exactly what the PSC has done here.  And while
20   they may try to minimize the other components of damages, they
21   aren't so minimal.  There are substantial claims.  And Your Honor
22   entered significant judgments for ALE, for loss of use, for
23   personal property damages.
24          In the Germano case, these are not inconsequential or
25   incidental damages, these are major damage components.  And the
```

OFFICIAL TRANSCRIPT

32

```
 1   PSC itself, in a motion that it filed back in November, asked for
 2   individual trials on both class and non-class claims.  There's
 3   really no way to avoid it.
 4          And when my friend Mr. Levin says to the Court, Well,
 5   you got to inspect each house and, gee, if they overestimate or
 6   underestimate, the defendant should pay the maximum, I don't know
 7   where that rule of law comes from, Judge.  It certainly doesn't
 8   come from Rule 23.  And I think that really exemplifies some of
 9   the problems here.
10          THE COURT:  Okay.  Thank you very much.  I appreciate
11   all the arguments counsel made.
12          Let's go to the next motion, the contempt enforcement.
13          MR. HERMAN:  May we have a five-minute recess?
14          THE COURT:  Sure.  Take a five-minute recess.
15                 (A recess was taken.)
16              AFTER THE RECESS
17                 (Call to order of the court.)
18          THE COURT:  Be seated, please.
19          We're talking about the second motion.  But before the
20   second motion, let me think about the first one, too, with you.
21          It seems to me that this case is in a posture that is
22   different than a lot of other cases.  In a lot of other cases
23   that I've dealt with over the years, there's a period of time
24   where a defendant can be liable.  I mean, there's such a thing
25   called prescription in this country, as everybody knows, or
```

OFFICIAL TRANSCRIPT

33

1  statute of limitations as we sometimes say in Louisiana.

2      This case is different in the sense that you're going

3  to find some people 20 years down the road that get ready to sell

4  their property -- they've never known that Chinese drywall was in

10:06:41  5  it.  They get ready to sell their property and somebody says, I

6  want an inspection.  The inspection turns up Chinese drywall.

7  That's the first indication that they've ever had that there was

8  a problem in the case -- in their property.  So there's a

9  provision in most law -- most state laws, as we all know, with

10:07:02  10  products, particularly where you discover something for the first

11  time.  So here we are 20 years down the road and there are cases

12  that are coming up involving Chinese drywall and the defendants

13  are back in the suit.

14      A mechanism for resolving that problem is a class

10:07:25  15  action where the -- those who are in are in; those who are out

16  are gone.  And that's another vehicle that was, I think, viable.

17  Class certification is helpful to many people in this -- both

18  sides of the "v" as we say.  But it is what it is.

19      Let's go to the second motion.

10:07:50  20      This has to do with contempt.  The cases, as we know,

21  awhile back were tried early on.  But before they were tried,

22  service was made appropriately, at least in some instances, and

23  no answer was filed.  When I got the cases, I tried my best to

24  get the word out to the defendants that it was time to answer.  I

10:08:22  25  gave them a long period of time to answer and then I instructed

34

1  the plaintiffs to take a default because a year or so had gone by

2  without answering.

3      They took a default, and again I put the word out

4  through counsel that something had to be done.  Nothing was done

10:08:47  5  so the plaintiffs filed the necessary motion for a

6  judgment-debtor rule.  That was served and the defendants didn't

7  answer the judgment-debtor rule.

8      I felt I had no alternative but to hold them in

9  contempt of court, something I don't do.  This may be the first

10:09:12  10  time that I've done it over the years, the 20-some-odd years that

11  I've been here.  I take it seriously.  I had no alternative but

12  to hold them in contempt.

13      I provided something like $15,000 in attorneys' fees

14  and $40,000 in penalties, as I recall, but I also said that they

10:09:35  15  would be enjoined from doing business in the United States until

16  they purged themselves of contempt.  And I said they or their

17  associates or other entities attached to them.

18      They eventually came back in and paid the amount, but

19  there was about a six-month period there that it was potential

10:10:08  20  for them to have -- to owe 25 percent of the earnings for that

21  period of time, either they or their other entities, and the

22  plaintiffs conducted some discovery on it.

23      But we're here today to deal with contempt enforcement.

24  I'll hear from the parties.

10:10:31  25      MS. DUGGAN:  Good morning.  Sandra Duggan for the

35

1  plaintiffs.

2      May it please the Court:

3      The Taishan defendants and their parent companies, BNBM

4  and CNBM, have made it clear that they do not subscribe to our

10:10:43  5  system of justice.  When the problems arose concerning the

6  drywall that they manufactured in China and shipped to the

7  United States, when the complaints started coming in, they made a

8  strategic decision simply to ignore the lawsuits.  They decided

9  not to respond to thousands of claims filed against them in this

10:11:02  10  country.

11      Why would they do that?

12      Well, they've told us:  This Court does not have

13  jurisdiction over them.  There is no U.S. treaty with China, a

14  mutual recognition, and enforcement of judgments, and Taishan has

10:11:15  15  no assets here.  Therefore, according to the defendants, the

16  possibility of U.S. judgments being enforced in China is very

17  low.

18      Based on these principles, Taishan, with approval and

19  direction from CNBM, decided early on that it would be far less

10:11:33  20  expensive to avoid the litigation altogether than respond fairly

21  to the claims of thousands of homeowners.

22      That mindset is that our courts cannot tell them what to

23  do, that plaintiffs have no recourse against them because they

24  are Chinese companies with no assets here, that they do not have

10:11:52  25  any obligation at all to respond to our citizens' complaints --

36

1  that mindset is what led us here today.

2      It is not surprising, then, that the CNBM and BNBM

3  entities and Taishan have repeatedly shown disrespect for the

4  Court and for Your Honor's rulings.  They've done everything

10:12:09  5  possible in their ability to avoid having to pay judgments to

6  American citizens, and the plaintiffs have faced innumerable

7  obstacles trying to get these recalcitrant companies to do the

8  right thing.

9      On July 17, 2014, this Court held Taishan in contempt

10:12:27  10  civilly and criminally for its refusal to appear in open court.

11  Taishan did not act alone.  Its parent companies controlled,

12  aided, and abetted Taishan's decision to fire their counsel and

13  withdraw from the case in direct and blatant disobedience of the

14  Court's order.

10:12:46  15      An integral part of the contempt order included an

16  injunction.  Taishan and its affiliates and subsidiaries were

17  prohibited from doing any business in the United States unless or

18  until Taishan participated in these proceedings.  It was

19  necessary, the Court said, to coerce Taishan to return to this

10:13:06  20  Court to pay the valid judgment against it and to answer the

21  claims of thousands of additional victims.

22      The Court held the contempt order alone would not stop

23  Taishan from continuing to disregard the orders of the Court.  We

24  have learned, unfortunately, that even with this injunction,

10:13:24  25  Taishan and its affiliates, including many of the CNBM and BNBM

37

1 entities, disregarded and violated the Court's injunction.

2 We are here today seeking to enforce the penalties

3 imposed for violations of that injunction, and we've been here a

4 very long time. This MDL began on June 15, 2009, and

10:13:45 5 unfortunately, after almost eight years, approximately 3,000

6 plaintiffs with Chinese drywall in their homes are still awaiting

7 redress. It's not for lack of effort on the part of the

8 plaintiff steering committee or this Court. The reason that the

9 plaintiffs have not been compensated is because the manufacturers

10:14:06 10 have refused to pay the damages they caused, and this is in stark

11 contrast to the Knauf manufacturing defendants.

12 Taishan Gypsum and its controlling parents have a long

13 history of disrespecting this Court and our judicial process in

14 this case.

10:14:22 15 First, they refused to participate even though they

16 were served under the Hague Convention.

17 Second, they waited for the *Germano* default judgment to

18 be entered before coming in to challenge jurisdiction.

19 And when they did come in to the litigation, they were

10:14:38 20 not forthright. They claimed falsely that they only made two

21 shipments of drywall to Virginia and two to Louisiana, but they

22 had no idea where that drywall ended up. These defendants knew

23 all along that they purposefully shipped more than 70 million

24 square feet of drywall to customers in the United States.

10:14:55 25 Third, Taishan repeatedly abused the discovery process.

38

1 They exaggerated during depositions, they refused to properly

2 produce documents, and in November of 2011 they threatened to

3 withdraw from the litigation. Their dilatory tactics required

4 the Court to personally travel to Hong Kong for a second round of

10:15:15 5 depositions.

6 Fourth, after two separate panels from the

7 Fifth Circuit upheld Your Honor's ruling that TG and TTP are, in

8 fact, subject to the jurisdiction of this Court, these defendants

9 orchestrated a plan to unilaterally withdraw from the litigation

10:15:32 10 and refused to appear, and this was in direct violation of the

11 Court's order requiring Taishan to appear.

12 Fifth, after the Court held Taishan in contempt and

13 enjoined the companies from doing business in the United States,

14 they repeatedly violated the injunction with no regard for any

10:15:50 15 consequences.

16 And finally, even after they violated the injunction

17 and the Court ordered expedited discovery regarding the

18 violations, Taishan continued to engage in abusive discovery, and

19 that resulted in an additional sanctions order. The enforcement

10:16:10 20 of that order is still pending before the Court and will be heard

21 next month.

22 So in furtherance of their plan to deny relief to the

23 plaintiffs, these defendants have repeatedly demonstrated they

24 have little or no regard for the Court's jurisdiction and the

10:16:22 25 laws of this country. They've shown little or no interest in

39

1 resolving the plaintiffs' claims.

2 Back in 2009 when Taishan abstained from participating,

3 BNBM and CNBM were involved. They monitored the litigation and

4 they controlled the events that transpired.

10:16:41 5 On April 21, 2009, and on May 15, 2009, before the MDL

6 was even formed, Taishan's biggest competitor, Knauf, wrote to

7 the head of CNBM Group about these lawsuits and encouraged CNBM

8 and BNBM to take effective measures to respond to the U.S.

9 consumer lawsuits as soon as possible.

10:17:03 10 And then on May 11, 2009, Taishan Gypsum prepared a

11 report for the leaders of CNBM Group, Chief Song and Chief Sal,

12 so the leaders can understand the facts of the case and give

13 relevant instructions. This report reveals their intent to deny

14 relief to the plaintiffs and ignore and disrespect this Court's

10:17:25 15 jurisdiction.

16 The reported admits large quantities of drywall shipped

17 to the United States from 2005 to 2008, more than 70 million

18 square feet. The report admits that Taishan is subject to

19 complaints from customers, and Taishan tells CNBM Group it is not

10:17:42 20 inclined to respond to the lawsuit because that would incur large

21 amounts of attorneys' fees; and since there's no judicial treaty

22 between China and the U.S., even if the lawsuit is lost, the U.S.

23 court cannot enforce Taishan's assets in China.

24 So instead of responding to those suits, Taishan tells

10:18:01 25 CNBM, When necessary, Taishan will mail evidence that is

40

1 beneficial to Taishan to the U.S. court, and Taishan asked CNBM

2 Group for instructions and approval as to whether such inaction

3 is appropriate.

4 In accordance with this plan, they did allow default

10:18:22 5 judgments to be entered, and a year later, in May of 2010,

6 Your Honor entered the default judgment in *Germano* for

7 $2.7 million.

8 On June 3rd, 2010, a few weeks later, CNBM Group, the

9 entity all the way at the top, had two important telephone

10:18:40 10 conferences with the leaders of BNBM and Taishan about the

11 strategy for responding to gypsum board litigation in the U.S.

12 And the chairman of CNBM Group, of BNBM Group, and of

13 CNBM, Chairman Song, agreed that CNBM Group should organize the

14 response to the litigation. They discussed hiring Hogan Lovells

10:19:02 15 to represent Taishan. And on the last day to appeal the *Germano*

16 judgment, Taishan did come in represented by Hogan Lovells but

17 solely to contest jurisdiction.

18 For the following two years, from 2010 to 2012, CNBM

19 Group continued to control the tortured proceedings that were

10:19:22 20 designed to delay and deny relief to the plaintiffs.

21 There were numerous depositions in the United States.

22 We had to go to Hong Kong twice. There were motions to compel.

23 There were -- Taishan also did not produce a number of the

24 documents that we now have that didn't come to us until 2015.

10:19:44 25 And finally, after two years, there was briefing on four separate

41

1 motions to dismiss for lack of jurisdiction.

2 We were successful on those motions, but rather than

3 pay the judgment, they appealed to the Fifth Circuit. And after

4 four appeals to the Fifth Circuit, finally -- finally -- on

10:20:02 5 January 28, 2014, the Fifth Circuit affirmed jurisdiction over

6 Taishan in the *Germano* case.

7 And from that moment, CNBM and BNBM orchestrated a plan

8 for Taishan to avoid having to pay that judgment. Right away

9 they started strategizing on how to exit the litigation.

10:20:23 10 In February of 2014 we learned that Taishan and its

11 counsel were discussing withdrawal from the litigation and

12 discharging their attorneys.

13 On May 20, 2014, the Fifth Circuit affirmed

14 Your Honor's ruling in *Gross*, *Wiltz*, and *Mitchell*, so the

10:20:39 15 plaintiffs were thinking that finally they could execute on the

16 judgment in *Germano*. That's after five years of litigation.

17 So on June 20, 2014, Your Honor ordered Taishan to

18 appear in this courtroom for a judgment-debtor examination, and

19 there's no question that CNBM and BNBM were involved in and

10:21:00 20 controlled Taishan's refusal to appear for that hearing.

21 Taishan's chairman, Mr. Jia Tongchun, he testified that

22 he was summoned to a CNBM Group meeting, he thinks he was asked

23 to go there by BNBM, to report on the status of the litigation.

24 That was extraordinary. Mr. Jia does not normally attend CNBM

10:21:23 25 Group meetings.

OFFICIAL TRANSCRIPT

42

1 On July 1st, the attorney who represents all of these

2 parties, Mr. Dong Chungang, advised Taishan, CNBM Group, and BNBM

3 about the consequences of failing to appear. He based his advice

4 on the lack of a treaty to enforce U.S. judgments.

10:21:39 5 On July 7, 2014, Mr. Dong told Hogan Lovells, It's not

6 Mr. Jia who can make the decision; this case involves many

7 high-level officers at CNBM Group now.

8 And then on July 11th, six days before the contempt of

9 court, two events occurred. CNBM Group's board of directors

10:22:05 10 unanimously approved the decision for Taishan not to continue to

11 participate in any of the gypsum board litigation brought against

12 Taishan in the U.S. courts. And on that same day, CNBM Group

13 issued orders to its subsidiaries to ensure that their assets and

14 funds would be out of the court's reach. They told their

10:22:24 15 subsidiaries, Don't put your money in New York banks and don't

16 you use company e-mails when doing business overseas; rather, use

17 your personal e-mail accounts.

18 As we all know, on July 17, 2014, Taishan was a

19 no-show, and the Court issued its contempt order. That order was

10:22:43 20 very clear and very precise; it was not vague.

21 Now, the defendants over in China were well-aware of

22 this order, because the very next day, on July 18, 2014, both

23 CNBM and BNBM issued public announcements. They said that TG,

24 after due and careful consideration, decided not to continue to

10:23:06 25 participate. So they admit that they unilaterally decided not to

OFFICIAL TRANSCRIPT

43

1 abide by the Court's order.

2 On August 5, 2014, Taishan's counsel purposefully sent

3 an e-mail to the leadership of CNBM and BNBM, to Chairman Jia and

4 to Peng, and he said, Clearly the U.S. litigation is not simply a

10:23:27 5 matter we can immediately rid ourselves of as we wish; rather,

6 this is a very difficult dilemma.

7 Now, the defendants also contemplated what Your Honor

8 meant by "affiliates."

9 On August 12th, 2014, Taishan's counsel wrote, We

10:23:45 10 communicated with Peng on the affiliates question. Peng said he

11 felt that "affiliates or subsidiaries" in the contempt order

12 might only refer to TG, TTP, BNBM, BNBM Group, CNBM, and CNBM

13 Group.

14 And on August 20, 2014, CNBM and BNBM issued another

10:24:04 15 announcement. They admit and they tell everyone that the U.S.

16 District Court held Taishan in contempt of court ordering it to

17 pay certain amounts of penalty and the plaintiffs' attorneys'

18 fees and enjoining Taishan Gypsum and its affiliates or

19 subsidiaries from conducting any business in the United States.

10:24:24 20 Unfortunately, after Your Honor entered the contempt

21 order, we've learned that despite their awareness and their

22 understanding of the contempt order and injunction, CNBM and BNBM

23 took no steps to comply -- none. Chairman Jia from Taishan did

24 ask an assistant to notify the company subsidiaries about the

10:24:49 25 injunction, but that notification occurred seven months after the

OFFICIAL TRANSCRIPT

44

1 date of the contempt order.

2 At great expense and time, the plaintiffs noticed

3 dozens of third-party depositions here in the United States in an

4 attempt to uncover what the violations were, if any, during the

10:25:11 5 period of contempt. And we have learned, and it's set forth in

6 our brief in great detail, that there were dozens and dozens of

7 the violations of the Court's order.

8 Now, they are set forth with exhibits in the brief. We

9 have invoices, contracts, wire transfers. This is just a summary

10:25:29 10 chart that shows what was going on during the period of contempt

11 from July 17, 2014, until March of 2015.

12 But just a brief summary, Your Honor.

13 These companies were purchasing lumber in the

14 northwest, in Oregon and Washington, to export to China.

10:25:46 15 They were involved in litigation in Oregon. And they

16 settled that litigation, and part of the settlement involved

17 transfers of payments to them.

18 Some of these entities initiated litigation. They used

19 our judicial system as plaintiffs in an attempt to recoup

10:26:03 20 millions of dollars in the state of Texas in federal court for

21 fees from the sale of wood flooring products. When the judge in

22 Texas found out about Your Honor's order, he halted that

23 litigation.

24 BNBM Group acted as a clearing agent for the purchase

10:26:17 25 of lumber to be exported to China.

OFFICIAL TRANSCRIPT

1          They funded United Suntech here in the United States --
2    that's one of the CNBM entities -- and sold goods in the U.S.
3          They operate an e-commerce site that's similar to
4    Alibaba -- it's called okorder.com -- in an attempt to increase
10:26:36 5    their sales.
6          And we know from prior briefing and discovery in the
7    Taishan jurisdictional motions that alibaba.com did find
8    customers to buy their products.  All of these -- many of these
9    affiliates maintained storefronts on alibaba.com during this
10:26:53 10   period.
11         They also did business with a company called Sunpin to
12   manufacture solar panels for Walmart grocery stores.  The
13   contract is for 1100 stores.
14         They have an ongoing relationship with the New Jersey
10:27:08 15   Institute of Technology.  In fact, there's a laboratory at the
16   university and it's called the CNBM Laboratory.  They develop
17   photovoltaic technology there.  They also send their executives
18   for training there.  And this is what led, we believe, to their
19   ability to get these solar panel contracts.
10:27:25 20         And the list goes on and on.  As I said, it's set forth
21   in our brief.  There are numerous individual invoices and
22   receipts.  There's summary charts.  It's all there.
23         Now, why did they violate the order?  Why would they do
24   that?
10:27:40 25         Because, according to them -- and this is a quote from

1    one of their announcements:  The major assets of the companies
2    CNBM, BNBM, and Taishan Gypsum are all located in China.  The
3    possibility of U.S. judgments being enforced in China is very
4    low.
10:27:56 5          So what do we do?  Where do we go from here?
6          There's no doubt that Your Honor had the authority to
7    hold Taishan in contempt of court.  Almost 200 years ago in 1821
8    the Supreme Court in *Anderson v Dunn*, 19 US 204, held:  Courts of
9    justice are universally acknowledged to be vested by their very
10:28:18 10   creation with power to impose silence, respect, and decorum in
11   their presence and submission to their lawful mandates.
12         The Court's orders are not optional.  This is not a
13   so-called court, this is a real court.  Your Honor issues real
14   orders.  And these orders have to be followed or people get hurt.
10:28:40 15   Our system of justice is damaged.  The parties to a litigation
16   cannot simply comply with the orders that they like and ignore
17   the ones they don't like.
18         Look what happened here.  Taishan and TTP, they didn't
19   like the order affirming jurisdiction over them.  But rather than
10:28:54 20   seeking *certiori* from the Supreme Court, they fired their counsel
21   and they unilaterally withdrew from the litigation.  There's no
22   doubt under these circumstances that the Court has broad power to
23   hold them in contempt.
24         The Supreme Court also said -- this is a case from
10:29:12 25   1911, *Gompers v Bucks Stove & Range Co.*:  If a party can make

1    himself a judge of the validity of orders which had been issued,
2    and by his own act of disobedience set them aside, then are the
3    courts impotent, and what the Constitution now fittingly calls
4    the judicial power of the United States would be a mere mockery.
10:29:35 5          Your Honor's injunction has nationwide application.
6    The Fifth Circuit made that clear in *Waffenschmidt v Mackay*.  The
7    Court cannot only bind parties, but non-parties to its orders.
8    Because if a party could violate an injunction by getting a
9    non-party to do the act, then what import would it have?
10:29:57 10         The defendants say:  Well, we don't have enough due
11   process here.  This was a criminal injunction, it wasn't -- a
12   criminal contempt, it wasn't a civil contempt.  And in *Gompers*
13   the Supreme Court said:  Contempts are neither wholly civil nor
14   altogether criminal.  And this Court held Taishan in contempt
10:30:14 15   civilly and criminally.
16         Now, the *Bagwell* case from the Supreme Court in 1994
17   clarified that civil contempt sanctions, or those penalties
18   designed to compel future compliance with a court order, are
19   considered to be coercive and avoidable through obedience.  And
10:30:34 20   that's exactly what happened here.  Your Honor said that you
21   wanted to coerce Taishan to come back to the case and that's why
22   the injunction was put in place.  It's a civil penalty.  And
23   Taishan could and did purge itself of contempt.  That happened.
24   That's why the injunction and the contempt period has an end
10:30:53 25   point.

1          Now, they also say that the order was not clear, they
2    were unsure of it, but that's not a tenable argument.  They did
3    not come to this Court, when the contempt order was entered in
4    July of 2014, and ask for clarification.  They didn't do that.
10:31:11 5    In other cases, that's what occurs.  They didn't do that.  They
6    waited an entire year before they filed that motion.  And that
7    motion has already been denied.  Their appeal from that motion
8    was sent back from the Fifth Circuit.  So it's just not a tenable
9    argument.
10:31:25 10         They say:  What is an affiliate?
11         These are the affiliates that we're talking about
12   (indicating).  These are the ones -- there probably are more, but
13   these are the ones that we've found violations and that's why
14   we're focusing on them.  I can't think of a more apt definition
10:31:41 15   that satisfies the definition of an affiliate.  Black's Law
16   Dictionary says:  It's a corporation that is related to another
17   corporation by shareholdings or other means of control; a
18   subsidiary, a parent, or a sibling corporation.  That's exactly
19   what we have here.
10:31:56 20         And we give numerous examples in our briefs of where
21   they, themselves, use the word "affiliate."  But there's a letter
22   from the Ministry of Foreign Affairs of the PRC that's talking
23   about this case, and the letter says:  Several U.S. plaintiffs
24   instituted a lawsuit in the U.S. against SASAC, CNBM Group, and
10:32:13 25   five of its affiliates.  They know what "affiliates" means,

49

1 there's no doubt.

2 So we submit that no one, no matter their position or

3 title, not even the President of the United States, is above the

4 law. See *United States v Nixon*, 418 US 683.

10:32:31 5 Your Honor's valid contempt order and injunction was

6 not advisory. If there are no consequences to their violations

7 of that injunction, there will be no incentive to follow the

8 Court's orders.

9 We don't know how much the penalty should be,

10:32:44 10 Your Honor. We've asked for the earnings and profits information

11 from these companies multiple times. There's an outstanding

12 motion to compel discovery, and that will be heard next month.

13 So we ask that the Court find that the defendants violated the

14 injunction and set a hearing to determine the amount of the

10:33:02 15 penalty.

16 And to just put some human perspective on this, sadly,

17 by the time that Taishan purged itself of contempt and paid the

18 *Germano* judgment and fines, many of the *Germano* intervenors, the

19 Germano Seven as we refer to them, had lost their homes through

10:33:18 20 foreclosure or bankruptcy. They simply were unable to pay their

21 mortgages and at the same time pay for alternative housing for

22 themselves.

23 And meanwhile Michelle Germano, the named plaintiff,

24 who was not an intervening claimant in the *Germano* bellwether

10:33:38 25 trial, is still waiting for compensation. She recently submitted

50

1 a declaration in this case. She had to move out of her home in

2 2009 because of the Chinese drywall. Her savings were depleted

3 because she had to pay her mortgage. Her homeowners association

4 sued her for back dues that were owing on her toxic home and

5 ultimately she was forced to declare bankruptcy. She's now

10:33:59 6 living in a rented home in Norfolk, Virginia. She's waiting for

7 redress.

8 Will Michelle Germano and the thousands of other

9 homeowners and plaintiffs with claims against Taishan, BNBM, and

10:34:14 10 CNBM receive justice from these proceedings? We submit,

11 Your Honor, that the time is now for you to consider that.

12 Thank you.

13 THE COURT: Thank you.

14 Let me hear from the defendants.

10:34:29 15 MR. STENGEL: Good morning again, Your Honor. Two

16 quick housekeeping matters. The defendants have divided the time

17 so I'll be followed for lawyers Dentons and Alston. I'm taking

18 the lead on opposing the contempt.

19 The other item, we distributed the PowerPoint I intend

10:35:00 20 to use. Obviously I'm reacting to their argument. There are

21 matters in there that I won't use.

22 But something we did do for the convenience of the

23 Court, and probably, more particularly, a new clerk, is we did

24 argue many of these items in August of 2015, and I have included

10:35:12 25 our PowerPoint from that hearing. On the reading of the

51

1 transcript of that proceeding, I realized it was largely

2 meaningless if you didn't have access to the graphics we used.

3 THE COURT: Okay.

4 MR. STENGEL: So with that, Your Honor, what I intend

10:35:23 5 to address are really two or three major points.

6 The first is this issue of civil versus criminal, which

7 we discussed almost two years ago. It is very important in terms

8 of how the Court assesses the priority of the process given the

9 defendants.

10:35:39 10 The second issue really goes to -- and the PSC has

11 cited both Rule 65 and Rule 37 as a rule basis for the exercise

12 of jurisdiction by the Court over the alleged contemnors, and I

13 want to look at those rules in greater detail.

14 I also want to revisit the issue that Ms. Duggan

10:35:57 15 raised, which is the notion of ambiguity and the terms of the

16 order. And while we think there are a variety of places which

17 are open for debate, our primary lines of attack relate to the

18 meaning of "affiliate" in the application of this case and this

19 context and what "doing business" means similarly in this

10:36:16 20 context.

21 Finally, I offered, when we were here in August of

22 2015, a solution to the problem that has been created by the

23 legal deficiencies of the contempt order and the efforts by the

24 PSC to enforce that order in the way that they've done it.

10:36:31 25 I think the presentation you heard gives very stark

52

1 demonstration of the need to put the whole contempt exercise

2 behind us. I understand, although I was not here, the irritation

3 and the anger that was suffered by the Court and the PSC in that

4 time period when Taishan chose not to appear, but we are years

10:36:52 5 past that. The defendants have been here; we've litigated, I

6 think, in good faith. We've attempted to help the Court resolve

7 this matter. And what has now happened is we've had a

8 continuation of a contempt process which should have ended, and

9 in our position did end, with the return of Taishan to the

10:37:07 10 litigation. It purged itself of contempt.

11 But to get to that end point, you have to read the

12 order in a particular way, which again we suggested in August of

13 '15. By leaving that I think you see the problem of that,

14 of an unbounded effort by the PSC to pursue business that had

10:37:26 15 nothing to do with what I was suspect was the Court's ultimate

16 intention with the contempt order itself.

17 But let me turn to the first issue of civil versus

18 criminal contempt.

19 I'll say at the outset much of what Ms. Duggan said I

10:37:41 20 think proved our point. Typically when a court acts to protect

21 its prerogatives, controlling the behavior of people in front of

22 it on a punitive basis, that typically falls into the criminal

23 contempt category. This Court is aware of that. Plaintiffs

24 cited the *Bagwell* case as the controlling Supreme Court authority

10:38:08 25 on this civil versus criminal contempt issue. We think the way

53

1    particularly the PSC has interpreted this order, we are

2    squarely -- as it relates to the 25 percent of profits penalty,

3    squarely in the area and the law of criminal contempt, which has

4    a number of implications for how this litigation goes forward.

10:38:30   5    In brief, we're entitled to a full range of due process

6    rights that are appropriate for criminal prosecution; the PSC,

7    because of its interest in the outcome of the litigation, is

8    disabled -- disqualified from proceeding as a prosecuting counsel

9    here; and the class doesn't receive penalties, those are paid to

10:38:50  10   the Court.

11         Next slide, please.

12         Now, I'm not going to reargue jurisdiction.  Those

13   matters are pending before Your Honor.  You've heard us fully on

14   that.

10:39:00  15         For purposes of whether we violated the order -- "we"

16   meaning for this purpose the CNBM entities -- we have focused

17   primarily on the contempt order entered by this Court in July of

18   2014.  What happened before then may have been an irritant, it

19   may have angered the Court and the parties, but it's not an

10:39:20  20   injunction that had binding effect on the CNBM entities.  So

21   we're going to focus on the court's order, not what happened

22   before it.

23         And with respect to the PSC, as Your Honor knows from

24   prior discussions of this matter, we think they do a fair amount

10:39:34  25   of violence to the decision-making process by Taishan not to

OFFICIAL TRANSCRIPT

55

1    situation, you default to treatment as a criminal contempt.

2         Next slide, please.

3         Now, these are definitions.  *Lamar Finance* is the

4    source of the authority for the fact that when you've got a mixed

10:41:13   5    question of civil and criminal law, you default to the procedural

6    protections that are appropriate for a criminal proceeding.

7         And the backward-looking and unconditional is one of

8    the sort of functional definitions of how you get to is it

9    coercive civil or is it criminal.  And that's a point of some

10:41:30  10   confusion here which I think we can allay.  And I think the PSC

11   has already helped with this.

12         Next slide.

13         Now, this is the Court's order, the document that we

14   think we are here for.  And I think there's some interesting

10:41:42  15   parallels here.

16         The PSC has acknowledged that the $40,000 payment was a

17   penalty.  That was criminal in nature.  It was a fixed amount.

18   Interestingly, the 25-percent-of-profit charge is also

19   deemed a penalty in the four corners of the injunction, which

10:42:00  20   gives further credence to the fact that it was, and was intended

21   to be, criminal in the future.

22         Next slide, please.

23         Now, why this is important.  Ms. Duggan had a slide

24   purporting to show all the activity in the United States by

10:42:16  25   various -- and I'm going to say "related parties," not to fall

OFFICIAL TRANSCRIPT

54

1    appear, and the decision of CNBM Group to respect that decision

2    is a long way from the allegations -- the bald assertions of

3    control.

4         And we'll get to this in greater detail when we look at

10:39:53   5    the order itself.  There is a zone -- and the *Waffenschmidt* case

6    probably outlines this -- where courts have some flexibility to

7    bring in non-parties.  We are well beyond any acceptable scope of

8    the law right now.

9         Next slide, please.

10:40:04  10   Now, I'm not going to belabor the fact that the Court

11   has called this criminal contempt.  That was clear.  That was the

12   intention of the Court at the time.  We think it is clear today.

13         Next slide, please.

14         I would also note that the Court cited Criminal Rule of

10:40:22  15   Procedure 42.  There's no real debate that at the outset there

16   was a criminal element to this order.

17         Now, ironically -- and I'm not sure I fully understand

18   what Footnote 7 in the PSC opposition to class decertification

19   was intended to say, but they are still taking on the mantle of

10:40:40  20   their rights to make sure that the defendants comply with

21   criminal law.  That, I think with the comments from Ms. Duggan

22   here, suggest that the PSC is still, at best, undecided as to

23   whether this is criminal versus civil, and probably would

24   acknowledge that it's largely criminal.  And probably also

10:40:57  25   acknowledge that when you have a mixed civil versus criminal

OFFICIAL TRANSCRIPT

56

1    into the "affiliated" trap.  But Your Honor will notice that some

2    of that conduct started as soon as 2001.  And if you go to the

3    brief that the PSC filed to revivify their contempt efforts --

4    and these numbers will not be precise because under each category

10:42:37   5    there are numerous entities and numerous transactions captured,

6    but of the 21 categories of activity, 14 of those relate to

7    preexisting business activity.

8         And why is that significant?

9         It's highly significant here because of the way that

10:42:53  10   the injunction is formulated.

11         Can we go back to the injunction.

12         There's no warning track with this injunction.  The

13   minute it was entered, this was affective as against the Taishan

14   defendants.  And the way this operates, and it's indeed a large

10:43:16  15   part of the claim being made by the PSC, is that it wasn't only a

16   perspective decision to engage in business that was covered by

17   this injunction, but you can tell by the numerous situations

18   where they're claiming that the injunction applies and should

19   give rise to a penalty, it applied to all the existing activity

10:43:37  20   of their broad definition of affiliates.

21         So this was instantaneous.  The moment this injunction

22   was entered, in the PSC's construction of the order all of this

23   activity would give rise -- would trigger the

24   25-percent-of-profits penalty.

10:43:54  25         That means that there was no ability to purge.  And

OFFICIAL TRANSCRIPT

57

1  remember the amount of damage claimed, the penalty claimed, is
2  25 percent of the profits of each of those entities alleged to
3  have been engaged in contumacious behavior in the United States.
4  That penalty couldn't be purged.  In their own terms, it was
5  fixed.
6       So that takes you squarely into the teachings of
7  *Bagwell* where the Court reacted to a perspective list of fines to
8  be imposed on a union and said:  Well, yes, in some cases
9  perspective fines would be coercive civil penalties.
10      But in this context, given that there was no way for
11  the alleged contemnor to -- and this is to misapply the
12  imprisonment analogy to damages.  The contemnors didn't have the
13  keys to their cells.  They couldn't purge.  According to the
14  PSC's own position, these penalties were fixed and in place.
15      Go forward now.
16      So where are we in terms of how the order as written
17  and read by the PSC applies?
18      We're in a situation where we don't believe these are
19  properly affiliates.  We don't believe they are properly doing
20  business under the terms of the order.  But to the extent there's
21  ambiguity about those terms, they make the order defective under
22  Rule 65.
23      Next slide, please.
24      This puts us in a place where we are entitled and have
25  been entitled throughout this process to the full range of due

OFFICIAL TRANSCRIPT

58

1  process rights that would be available to criminal defendants.
2       Functionally the most important aspect of this, and
3  maybe the most troubling, is the PSC is disqualified from
4  operation.  They shouldn't have been involved in this.
5       Next one.
6       We are also entitled -- and this gets to -- and we will
7  discuss it when we get to Rule 65 in a little greater detail.
8  We're still in a world of relying on findings of fact and
9  conclusions of law this Court entered long ago in terms of the
10 control.
11      We're still in a world -- and I'm not going to repeat
12 all the jurisdiction arguments.  There are multi-layers of
13 subsidiaries here.  There are shareholdings that go up and down.
14 You're going up the line through a sovereign entity and back
15 down.
16      But as we'll talk about, when we're talking about
17 aiding and abetting, the limited window that the Fifth Circuit
18 has recognized where a non-party can be subject to contempt
19 remedies, they require specificity.
20      And here you've got a convergence of an evidentiary
21 burden.  A presumption of innocence, which would operate, as
22 Your Honor recognized, as the Bancec presumption in the foreign
23 sovereign immunities context, coupled with evidence beyond a
24 reasonable doubt.  And as to most of the control issues that are
25 relevant for this issue, particularly as it relates to the CNBM

OFFICIAL TRANSCRIPT

59

1  entities, there aren't even allegations sufficient to make the
2  case, let alone proof at this level.  And then a right to a jury
3  trial.
4       So this Court, in our view, having determined that this
5  is a criminal contempt, is not in a position to decide by summary
6  adjudication what the plaintiffs have asked for in this motion.
7       Next slide.
8       THE COURT:  Do you think I should have a jury trial
9  involving CNBM or BNBM to determine whether or not you're in
10 contempt?
11      MR. STENGEL:  First of all, you can't do it with these
12 lawyers, Your Honor.  You'd have to have new counsel.  And I
13 think --
14      THE COURT:  Is that what you want?  You want a jury
15 trial?
16      MR. STENGEL:  No, Your Honor.
17      We have two grounds to object.  We think this is fatal
18 to the current process.  But as I'll deal with in the remainder
19 of this argument, we think to start over with independent counsel
20 or the U.S. Attorney would be an act of futility.  We strongly
21 suspect that a disinterested prosecuting counsel would look at
22 this record and say it doesn't fall within what the Court was
23 intending to reach -- although the fact that we're all arguing
24 about what the Court was intending to reach for the injunction is
25 a problem in and of itself and probably a fatal legal defect.

OFFICIAL TRANSCRIPT

60

1       But let's cover the other problems.
2       THE COURT:  I'm just trying to figure out.  You want me
3  to appointment an independent counsel to proceed against you?
4       MR. STENGEL:  No, Your Honor.  What we want you to do
5  is to say -- and maybe I'll just get to the end point here and
6  try and be helpful to the Court.
7       You know, the order -- and I say this trying very hard
8  not to offend the Court.  I think the order was -- reads like it
9  was written with some degree of anger.  This Court had been
10 disrespected, and there was a long history of irritations before
11 then.  So it may not have been drawn with the precision that it
12 required.
13      THE COURT:  Well, that's -- you know, I understand your
14 feeling and I don't take offense when you say that.  You're a
15 good lawyer and I appreciate your views.
16      I just felt that I told them to appear; they didn't
17 appear.  After a lot of cajoling and trying to get them to come,
18 they didn't appear, and so I held them in contempt.  And I did
19 the $15,000 and $40,000.  And then I said, Don't do business in
20 the United States.
21      And then I said, Well, what happens if they do do
22 business in the United States?  And that's when I put on there,
23 If you do business in the United States, you or your affiliates,
24 you're going to have to then put up 25 percent.
25      I was hoping they wouldn't do business in the

OFFICIAL TRANSCRIPT

61

1 United States. And I was hoping that they would say, Okay, we're

2 in now. But, you know -- and notwithstanding that, it didn't

3 work.

10:49:46 4      MR. STENGEL: Well, Your Honor, to engage in further

5 speculation of what might have happened -- and I think what

6 you're seeing is ambiguities in the injunction provided a window

7 through which the PSC could charge and make this something very

8 different than I think it was intended.

9      If you read "affiliates" in a conventional way, that

10:50:01 10 might have gotten you one level of relationship. It would have

11 been subsidiaries, obviously. It might have been one level up.

12      But you hadn't intended, I don't believe -- and if you

13 did, I think it's a clear deficiency of the order -- for there to

14 be this endless daisy chain of interest. And it can't have been

10:50:16 15 the Court's -- I mean, let's put it in the context of the

16 *Waffenschmidt* case.

17      There there was a bank and some individuals who helped

18 an individual who was under a TRO to retain funds because of a

19 fraudulent securities transaction. The bank, interestingly, was

10:50:31 20 absolved because it was merely negligent and hadn't intended to

21 violate the order. Two Mississippi residents -- I may be getting

22 the states wrong, but it involved Texas and Mississippi -- were

23 clearly employed by the debtor contemnor to try and get assets

24 out of the control of the court.

10:50:46 25      THE COURT: Sure.

62

1      MR. STENGEL: And there the Court did say: The

2 language is there; we could apply contempt to non-parties over

3 whom we don't have jurisdiction. But the Court then went on to

4 say: I have two bases to assert jurisdiction over them. One is

10:51:00 5 respect for the court itself. The other is to apply conventional

6 *International Shoe* evaluation standards.

7      So in that case -- but that gets to my point about what

8 could have been done with a more carefully crafted -- I mean, let

9 me put it in a very concrete way. If after you entered the

10:51:16 10 injunctions, if Taishan had said: Boy, we've got six shiploads

11 of bad drywall we'd really like to get to the United States, but

12 we have an injunction, we can't do it. Well, let me call my

13 friends at BNBM and say, Hey guys, can you do this under your

14 name and ship it to the United States? And they said, Fine.

10:51:33 15 That would be exactly the kind of aiding and abetting of contempt

16 and evasion of your order that I think the law allows.

17      What the law doesn't allow, though -- and when I got to

18 the point about assertions here, I think you'll hear from

19 Taishan -- and I have to be mindful of time because I know there

10:51:52 20 are people anxious to talk behind me. But I don't think there's

21 any assertion that Taishan did any business. There is no

22 assertion that any of the other entities did anything to aid and

23 abet a Taishan violation of the injunction.

24      So we don't have a *Waffenschmidt* situation here. We

10:52:12 25 don't have a clear situation where there's an injunction and a

63

1 third party helps the object of an injunction violate it.

2      Nor are there any indications that Taishan had anything

3 to do with any of that long list of activities, many of which

4 were preexisting. And that's where they get to the point of the

10:52:32 5 dual ambiguities here.

6      And we've briefed this so I'm going to try and be brief

7 because I feel the pressure behind me. Other counsel want to

8 speak.

9      You know, the "affiliates" issue is very difficult in

10:52:42 10 this context, because the PSC -- and we have a slide that I know

11 you're familiar with -- has come up with wildly different numbers

12 of affiliates. They have gone up and down. They've defined them

13 differently. They are now including SASAC. And, you know,

14 there's no logical stopping point. I mean, if you're allowed to

10:53:00 15 chain ownership or control or influence, you should have the

16 Peoples Republic of China here. You should go to the other

17 state-owned enterprises. There's no limiting device in this

18 other than to say we give you one level of ownership and we give

19 you a tangible and substantial relationship with a violation of

10:53:20 20 the injunction.

21      We don't have that here, and that's why "affiliates" as

22 applied in this order is ambiguous.

23      Similarly, "doing business," think of what the PSC

24 definition entails. How was a CNBM-related entity supposed to

10:53:36 25 know that it had to stop a cooperative investment relationship

64

1 with New Jersey Technical Institute having to do with solar

2 power? It had nothing to do with drywall. It had nothing to do

3 with Taishan. It had nothing to do with the litigation in this

4 court. It was a longstanding business relationship with a public

10:53:52 5 interest involved. What reasonable person would have read the

6 order -- and here we had the PSC citing a Chinese non-lawyer

7 asking what he thought "affiliates" meant.

8      So we have an order, just to conclude, that has

9 procedural deficiencies because the wrong lawyers have been

10:54:12 10 persuing remedies which are unavailable to them. I think that's

11 given a lot of the impetus for this process. We spent a

12 tremendous amount -- literally millions of dollars responding to

13 discovery solely on the contempt issue. And we've had this

14 dogged pursuit of contempt remedies, and it's, frankly, been a

10:54:29 15 frolic and detour and not in the interest -- particularly from

16 our perspective, whatever is at issue here, we don't think there

17 will be profits between the businesses properly measured. But

18 even if they were, they would go to the court and not to the

19 class.

10:54:43 20      So you have the waste of time there. You have the

21 ambiguities inherent in the injunction. And what we need to do,

22 Your Honor -- and I'll repeat the suggestion I made in August of

23 2015. The order has a disjunctive. It's "until or unless

24 Taishan returns to this litigation." You can read the order

10:55:03 25 literally as suggesting that Taishan could, in fact, purge --

65

1 different from my interpretation and the PSC's interpretation,
2 that Taishan could actually purge this fixed and attached damage
3 amount by returning to litigation, which they did.
4 And I think the Court will appreciate that while there
10:55:22 5 have been bumps in the road, counsel for the defendants have
6 worked very hard to make sure we're always viewed as acting in
7 good faith. We've tried to make this litigation work for the
8 Court and the PSC. I think we've done a reasonably good job.
9 But that reading ends the default -- excuse me, the
10:55:40 10 contempt process. We're finished. There are no trials. There's
11 no need to reach out further to counsel. It's over. The Court
12 got what it wanted. It penalized Taishan, presumably the $40,000
13 in fees. It made it come back here.
14 The alternative path is knowing there's a tract.
10:55:57 15 Because, as Your Honor knows, once we get into the thicket of
16 criminal versus civil, and whether we've gotten appropriate due
17 process rights, we have all sorts of issues which would be
18 fascinating to the people across the walkway. We have procedures
19 that would have to be followed to get to a point where we could
10:56:12 20 even have a decision on what damage amount is appropriate. Those
21 take time from the Court, which I don't think the Court has
22 available. It would be a diversion for counsel on both sides.
23 It would be a substantial additional expense. And to what end?
24 Nothing good will come of that path. We're at a point
10:56:29 25 in time for this Court to say contempt has served its appropriate

OFFICIAL TRANSCRIPT

66

1 purpose. The order as reasonably interpreted is over, and we
2 shouldn't be engaged in this process.
3 Thank you, Your Honor.
4 THE COURT: Thank you.
10:56:49 5 MR. BARR: I want to thank the Court for its courtesy
6 to let me address the Court in this chariot here rather than
7 standing up at the podium.
8 By the way, I would never put any pressure on
9 Mr. Stengel to finish because we are fully supportive of all the
10:57:02 10 positions that he expressed.
11 Indeed, what I would like to focus on, Your Honor, is
12 whether this particular contempt order can be enforced against my
13 clients, BNBM PLC and BNBM Group. And I think I would like to
14 basically draw down from the positions that Mr. Stengel
10:57:24 15 explicated here to talk about the particular facts that I think
16 are very relevant.
17 First of all, Your Honor, there is no question here
18 that this contempt order related to the *Germano* case and *Germano*
19 case alone. The order itself says, "This document relates to
10:57:43 20 *Germano v Taishan Gypsum.*"
21 With respect to the *Germano* case, what's critical here
22 is that neither BNBM PLC nor BNBM Group were named as defendants
23 in that case. They were never served with any form of process in
24 that case. There are no judgments, defaults or otherwise,
10:58:04 25 entered against either BNBM PLC or BNBM Group in that case.

OFFICIAL TRANSCRIPT

67

1 Your Honor, even if they had been named in that case,
2 this Court would have lacked jurisdiction over them.
3 First of all, *Germano* was a Virginia case at its
4 inception, and this Court -- excuse me, neither BNBM PLC nor
10:58:28 5 Group had the minimum contacts with the state of Virginia to
6 establish long-arm jurisdiction and nor could any of Taishan's
7 contacts be imputed to BNBM under an alter-ego theory,
8 particularly because no such theory was pled in *Germano*. So
9 we're talking about a particular case in a particular
10:58:46 10 jurisdiction, and it's highly relevant what entities were parties
11 to that case.
12 Go to next one.
13 Your Honor --
14 Nope, next one please.
10:58:56 15 Next couple.
16 Your Honor, when we talk about there being no minimum
17 contacts with the BNBM entities with the state of Virginia, this
18 is a slide -- or a portion of a slide that we had presented to
19 the Court during the jurisdictional argument. There were
10:59:12 20 literally 30,000 profile forms, give or take a few, that were
21 examined. There is not a single profile form that identifies any
22 claims that there were any defects in BNBM drywall in any home
23 from any Virginia resident. So under those circumstances, it
24 would be impossible to find long-arm jurisdiction.
10:59:33 25 And of course Your Honor has fully seen everything that

OFFICIAL TRANSCRIPT

68

1 we've presented on the jurisdiction motion itself with respect to
2 the alter-ego issues.
3 So let's focus particularly on what occurred in *Germano*
4 with respect to the order that the Court ultimately entered.
10:59:50 5 *The Germano* plaintiffs filed the judgment-debtor
6 examination, a motion to examine. What did the motion seek? It
7 sought an order compelling the in-court examination of Taishan
8 and Taishan's books and records. There is no reference and no
9 attempt to seek an appearance from either of the BNBM entities.
11:00:07 10 The motion that was made does not mention any
11 affiliates of Taishan. The motion did not seek relief from any
12 entity other than Taishan. And certainly the motion did not seek
13 contempt sanctions against any entity other than Taishan.
14 The order itself was addressed to Taishan alone. The
11:00:25 15 order that Your Honor issued for the appearance at the judgment-
16 debtor examination imposed no requirements on any other entity,
17 neither the BNBM entities nor any of the CNBM entities.
18 And the order did not give anyone notice that they
19 could be held in contempt if Taishan failed to appear.
11:00:44 20 Your Honor, Mr. Stengel addressed at great length the
21 legalities and the unconstitutionality of the application of a
22 criminal sanction order against these parties. I, again wanting
23 to stay strictly focused on the facts as they pertain to the BNBM
24 entities, want to talk about whether or not the BNBM entities
11:01:06 25 received due process -- the appropriate due process protection.

OFFICIAL TRANSCRIPT

69

1         They were not given notice of the contempt hearing.

2         They were not given notice that they could be punished

3 for Taishan's non-appearance at the examination.

4         They had no opportunities to present witnesses at that

5 time.

6         The presumption of innocence that Mr. Stengel

7 addressed.

8         The requirement to prove beyond a reasonable doubt the

9 non-interested prosecutor.

10         The jury trial.

11         What's relevant, Your Honor, is not what happened, as

12 Ms. Duggan recited, all the history prior to the entry of that

13 order, or what has happened in discovery subsequent to the order.

14 What's important is what was before the Court at the time the

15 Court entered that order in that particular case.

16         And, respectfully, at that point in time -- because

17 it's only that point in time that's relevant -- BNBM PLC and

18 BNBM Group received none of the due process protections that are

19 retired with respect to any criminal sanctions.

20         THE COURT:  If they knew of it, though -- do they need

21 a notice if they know it and are kept advised of it?

22         MR. BARR:  No, Your Honor.  They would not be subject

23 to an order unless they were told by this Court, before the Court

24 entered the order, what penalties that they could be subject to.

25         They do not cite a single case in that kind of

OFFICIAL TRANSCRIPT

70

1 circumstance where all of those due process protections were not

2 afforded before the order was entered.

3         Your Honor, respectfully, the Court's first findings

4 with respect to the identity of affiliates came in the Court's

5 class certification order which post-dates that contempt.  So,

6 then, if you don't have, at the time the order was entered, the

7 necessary due process protections afforded, respectfully it

8 cannot be enforced against the other parties.

9         And what may occur subsequent to this litigation, as

10 the Court learned more and proceeded with the case, is not

11 sufficient to effectively retroactively make an order clear that

12 was not clear at the time.

13         THE COURT:  I understand that argument.  But there

14 seems to me that there's two provisions of the contempt order.

15 One is the $15,000 and the $40,000 and pay the judgment of

16 $2 million.  The order doesn't direct CNBM to do that, it directs

17 Taishan to do that.

18         But in the future -- it says don't do business in the

19 future.  And if you do business in the future, you have to come

20 up with 25 percent of it.

21 If BNBM or CNBM, whatever it is, knew about that.

22         I'm not talking about the $40,000 and $15,000 and

23 $2 million.  That was something they didn't know about perhaps.

24         MR. BARR:  Your Honor, they did not --

25         THE COURT:  I'm not saying that.

OFFICIAL TRANSCRIPT

71

1         MR. BARR:  I'm sorry, Your Honor.

2         THE COURT:  But the plaintiffs are focused on the

3 25 percent in the future, and they say that BNBM knew that.

4         MR. BARR:  Your Honor, the question is what procedural

5 protections were afforded to the BNBM entities and the CNBM

6 entities before Your Honor entered that order.  That's the

7 critical thing here in terms of the ability of the Court to

8 enforce the order against my clients and against Mr. Stengel's

9 clients.

10         THE COURT:  Okay.

11         MR. BARR:  The fact that you may learn about an

12 order -- the fact that you may see something and yet have not had

13 an opportunity before its entry to challenge it and to see

14 whether it's appropriate to do the things that they have

15 attempted to do subsequently, that's the critical issue here.

16         Your Honor, I'd like to turn very briefly -- because I

17 know Ms. Eikhoff is now pushing behind me for me to get off the

18 stage here.  I want to speak specifically about the issue of

19 whether BNBM PLC or BNBM Group in any respect, even on its face,

20 arguably violated the order.  And the answer is a very simple

21 they did not.

22         There is not a single fact, a single document, a single

23 argument that they have made with respect to BNBM PLC that

24 BNBM PLC did any business in the United States during the period

25 of the contempt order.  There's absolutely zero facts in the

OFFICIAL TRANSCRIPT

72

1 record to that effect.

2         And after all, when we were talking, as Mr. Stengel

3 talked, about the issue about far-flung related entities, yes,

4 BNBM PLC was a partial owner, a roughly two-thirds owner, of

5 Taishan at that point in time.  It was its direct parent at that

6 point in time.  But they did absolutely no business in the

7 United States during the contempt period; a critical factor here

8 as Your Honor decides how to approach this overall situation.

9         Furthermore, there is no evidence in the record that

10 BNBM Group did business in the United States during the contempt

11 period.

12         And, again, the plaintiffs put up a chart showing all

13 the various different corporations.  You'll notice that

14 BNBM Group was way up in kind of the upper left-hand corner on

15 that chart describing the various corporate relationships.

16         Critically, BNBM Group does not own, did not own, has

17 never owned a single share -- or at least during the period of

18 this case, a single piece of Taishan.  They had absolutely zero

19 ownership in that entity.

20         Furthermore, BNBM Group's only involvement in the U.S.

21 during that period of time, and all the documents that they have

22 tried to present in that regard with respect to certain lumber

23 transactions, was that they acted as an import agent in China for

24 some timber transactions.  Their role was to, in China, issue

25 letters of credit.  They were not a purchaser of timber.  They

OFFICIAL TRANSCRIPT

73

1  were not a transacting party with respect to that. Their role
2  was to issue letters of credit in China from Chinese banks for
3  Chinese customers who imported timber to China.
4        BNBM Group, during the contempt period, did not sell
5  any products into the United States; did not export any lumber
6  out of the U.S. for its own use; did not solicit business in the
7  United States; did not negotiate or communicate at all with the
8  timber companies; did not receive any compensation from the
9  timber companies; nor was it able to control, once those letters
10  of credit were issued, the drawdowns on those letters of credit.
11  And the facts, as we've presented in our brief, is that with
12  respect to virtually all of those takedowns of the letters of
13  credit, the letters of credit were issued long before the
14  contempt order.
15        Your Honor, there is significant authority from the
16  Supreme Court on down indicating that playing that kind of role,
17  with respect to the export of goods from the United States, does
18  not constitute doing business in the United States. We've
19  presented those cases in our brief. I won't reiterate them here.
20  But it's pretty clear -- when you have Justice Brandeis stating
21  that purchases and related trips, standing alone, are not a
22  sufficient basis for a state's assertion of jurisdiction, the law
23  is really pretty clear in that regard.
24        Finally, Your Honor, I'd like to just address just very
25  briefly -- and I can go through each of these, but you have these

OFFICIAL TRANSCRIPT

74

1  in the PowerPoint that you can take a look at.
2        The plaintiffs took the depositions of each and every
3  one of the timber companies that were part of these transactions.
4  And I think if we just look at Baillie Lumber as being one
5  representative example of those, it's hard to be more clear than
6  to say, "I would say we didn't have any dealings with BNBM," and
7  "...I would not have recognized them as a customer or somebody
8  that we actually do business with."
9        Your Honor, those kinds of statements are replete
10  throughout the depositions that were taken of those witnesses.
11  They did not view themselves as transacting business with BNBM
12  because BNBM had the very limited role that I described before.
13        Unless Your Honor has any further questions, I pass the
14  baton here to Ms. Eikhoff.
15        THE COURT: Okay.
16        MS. EIKHOFF: Your Honor, I realize that collectively
17  we have gone a bit over the allotted time.
18        THE COURT: That's all right.
19        MS. EIKHOFF: May I have five minutes, Your Honor?
20        THE COURT: Sure.
21        MR. BARR: That was Mr. Stengel's fault, not mine.
22        THE COURT: That's fine. Go ahead.
23        MS. EIKHOFF: Your Honor, Christy Eikhoff on behalf of
24  Taishan.
25        Taishan is in a slightly different boat than the other

OFFICIAL TRANSCRIPT

75

1  parties that have addressed the Court this morning because
2  Taishan is named in the contempt order, and, in fact, is squarely
3  at the center of the contempt order at issue. But even so, the
4  profits penalty of the contempt order cannot be enforced against
5  Taishan and the PSC's motion to enforce the contempt order must
6  be denied.
7        And, Your Honor, there are three reasons and I will get
8  to them quite briefly.
9        One moment, please.
10        (A pause in the proceedings.)
11        MS. EIKHOFF: The first reason is that the
12  private-party prosecution by an interested party in the case has
13  been unlawful under a long and unbroken line of Supreme Court and
14  Fifth Circuit cases.
15        And, Your Honor, Ms. Duggan, in her remarks, directed
16  the Court to the *Bagwell* case and also to the *Gompers* case, and
17  if there were two decisions from the Supreme Court that we would
18  love the Court to review, those would be the two cases.
19        *Bagwell* controls. It is legally directly on point on
20  this question of when a fine for violation of an injunction
21  over many months civil, when it is criminal. The Court looked at
22  the objective criteria and said that this backward-looking
23  investigation of fines that incurred for behavior out of court
24  over several months that an injunction was in place was criminal;
25  and as such, the prosecution by the interested party has been

OFFICIAL TRANSCRIPT

76

1  unlawful.
2        And the cases cited here are from the Fifth Circuit and
3  from the U.S. Supreme Court. There's no question that the
4  conflict of interest precludes the investigation and prosecution
5  that is taking place.
6        Your Honor, just as an illustration, my esteemed sister
7  of the bar, Ms. Duggan, started her remarks emphasizing the
8  disrespect for the Court, disrespect for Your Honor's rulings,
9  disrespect for our judicial process. That's how she started.
10  But she ended her presentation with -- by relaying a story about
11  one of the clients that they represent and how her interests have
12  been allegedly harmed. That is a perfect illustration of the
13  conflict that you have when an interested party prosecutes a
14  criminal contempt matter, and that is why it is not allowed. It
15  is disqualifying and any contempt judgments by precedent must
16  be -- will be reversed and cannot stand.
17        THE COURT: So you're suggesting that I should appoint
18  private counsel, too?
19        MS. EIKHOFF: I am not suggesting that, Your Honor,
20  because I share in Mr. Stengel's response to that question, which
21  was that the purposes of the contempt order, to coerce Taishan
22  back into this litigation, were accomplished. We've been back in
23  this litigation for over two years now, and, in fact, the
24  investigation and prosecution of this criminal contempt has
25  lasted almost four times as long as the contempt period itself.

OFFICIAL TRANSCRIPT

77

1    It should have ended when we came back.

2         The first three papers that we filed with this Court in

3    February of 2015 suggested that.  We moved to lift the contempt

4    order, we responded to their motion to enforce the contempt

5    order, and we responded to their motion to preclude our

6    participation in the contempt order, and in each of those we

7    said, It's finished; we're back.  And so that is the right result

8    here.

9         And the Court -- the same power that the Court has --

10   the same inherent contempt power that it has to initiate

11   contempt, it has to exercise a termination of contempt

12   proceedings, and that's what we think should happen.

13        THE COURT:  Okay.

14        MS. EIKHOFF:  But not only is Taishan not liable for

15   any contempt because the prosecution has violated Taishan's due

16   process, but also Taishan did not violate the injunction.

17        Your Honor said earlier from the bench that you hoped

18   that Taishan wouldn't violate it.  Well, those hopes have come to

19   fruition because Taishan didn't.  The PSC has not made any

20   serious allegation that Taishan did.

21        THE COURT:  No, I don't think that that's an issue,

22   frankly.  Taishan eventually came back in.  They paid the money.

23   They paid the judgment.  They paid the attorneys' fees.  They

24   paid the $40,000.  And they tell me that they haven't done

25   business.  I assume that that's right.  Nobody says that they

78

1    have.

2         The issue really is whether or not they did it through

3    another means.  That's the issue.

4         But you don't have any problem with it.  I mean,

5    Taishan did what they had to do.

6         MS. EIKHOFF:  The only thing that the PSC has pointed

7    to for Taishan is that Taishan had postings on a website that is

8    available throughout the entire world via the Worldwide Web.

9    That is not doing business as a matter of law.

10        But you're right, they have not alleged any

11   transactions because no transactions occurred.

12        And, to follow up on what Mr. Stengel said earlier, any

13   of the transactions that they are alleging have nothing to do

14   with drywall.

15        Taishan is a manufacturer of drywall in the Shandong

16   Province of China, and they are talking about solar panels and,

17   you know, cooperatives with the New Jersey Institute of

18   Technology.  These are things that Taishan had nothing to do

19   with.  And the PSC has not alleged that they had anything to do

20   with it, that they benefited from it in any way or influenced it

21   in any way.

22        THE COURT:  Okay.

23        MS. EIKHOFF:  The third point, and my final point that

24   I wanted to make, Your Honor, is that the PSC's motion asked for

25   attorneys' fees.  This is their phrase and not ours.  They want

79

1    their attorneys' fees for the efforts they've made in pursuit of

2    enforcement of the contempt order and injunction.

3         That is a prosecutor's statement and it's not allowed.

4    It's not allowed.  It has been an unconstitutional process, and

5    certainly the subject of an unconstitutional process should not

6    have to pay for that process, particularly when it didn't --

7    there were no violations found.

8         Setting aside the constitutional issues, which are not

9    easily moved, but even if you do, just as a pure legal basis,

10   there's no legal basis for fee-shifting here.  This is a

11   nationwide injunction.  Under the American rule, the parties bear

12   their own costs.  There's no statutory provision for fee-

13   shifting.  There's no contractual basis for fee-shifting here.

14   So there's simply no mechanism to say that this comes somehow

15   back to Taishan to pay for a process that they objected to from

16   the get-go and that others objected to over the course of many

17   months.

18        The last point on the slide, Your Honor, is that this

19   is not a Rule 37 discovery sanction.  We saw that in the reply

20   brief.  Obviously when Taishan came back in February of 2015, hat

21   in hand, we paid the fines.  We paid the $40,000 fine.  We paid

22   attorneys' fees to the PSC for the failure to appear for the

23   judgment-debtor examination.  And then we went one step further

24   and paid the entire *Germano* judgment in full with interest.  And

25   when that was paid, that ended post-judgment discovery in

80

1    *Germano*.

2         So the discovery period is closed and over, and that is

3    when the PSC's investigation of criminal contempt began.  So

4    there's no overlap between the two to say that this is a Rule 37

5    sanction, because it's not.

6         Unless the Court has any questions --

7         THE COURT:  No, I understand.

8         MS. EIKHOFF:  Thank you.

9         THE COURT:  Okay.  Anything in response?

10        MS. DUGGAN:  Yes, Your Honor.

11        Now that these defendants are facing penalties for

12   violating the Court's injunction, they're pleading with the Court

13   and saying that we should not engage in that exercise; it would

14   be a waste of time and a waste of judicial resources.  The PSC

15   was not on a frolic of its own.  The Court ordered us and ordered

16   the defendants to engage in this discovery, and we did exactly

17   what the Court ordered.

18        The Fifth Circuit in the *Waffenschmidt* case made it

19   clear that a Court may assert jurisdiction over persons who, with

20   knowledge of the Court's orders, actively aid and abet an

21   enjoined party.  They don't have to be parties to the case.

22        So there was nothing preventing this Court from seeking

23   future action on the part of Taishan.  CNBM says, Well, that was

24   Taishan that could purge, we couldn't purge for Taishan, but CNBM

25   was controlling Taishan all along.

1  They talked about a daisy wheel.  These companies are

2  all related.  They're all affiliates.

3  And the due process that they're talking about is

4  what's occurring here.  They are getting their due process.  This

11:19:42  5  is a civil contempt hearing.  They can respond as they've done.

6  They can file briefs which they've done.  This is not a criminal

7  contempt against them.  That is not what this is about.

8  And in the *Bagwell* case, the distinguishing fact from

9  this case is that the penalty there was fixed.  The Court noted

11:20:04  10  the difference between fixing a penalty versus a dollar amount

11  per day of violation.  Well, here the passage of time and doing

12  business in the United States is what will determine what the

13  penalty is.  It was not fixed amount, and that's the difference.

14  And there was nothing inappropriate or illegal or

11:20:21  15  against the law for the Court to issue this injunction and to

16  assign penalties for those violations, and we leave it to the

17  Court's sound discretion as to what happens to that money.

18  THE COURT:  Okay.  Thank you very much, both of you

19  all -- both sides.  I've learned a lot from your briefs.

11:20:41  20  Let me say, we've been here now for a long time and I

21  think it's fair to say that it's not the fault of any of the

22  attorneys in the court.

23  This case had two aspects to it.  One aspect was the

24  Knauf drywall and the other aspect was the Taishan drywall, and a

11:21:03  25  lot of effort was placed on the Knauf drywall.  And the Taishan

OFFICIAL TRANSCRIPT

82

1  drywall hit some road bumps on jurisdiction and other things, and

2  the lawyers of both sides have been diligently preparing that

3  sort of thing.

4  With some of the penalties or some of the other things

11:21:20  5  that we've talked about, I have not ruled because the parties

6  have asked me to hold up until this period of time, they wanted

7  to at least explore some other avenues; but it's clear that those

8  avenues haven't borne fruit so I'll be issuing my orders very

9  shortly and you can take them from there.  I suspect either the

11:21:45  10  Fifth Circuit or the Supreme Court might be involved in this

11  particular matter, but that's for another day.

12  Okay.  Thank you very much.  The Court will stand in

13  recess.

14  (Proceedings adjourned.)

15

16  * * * *

17  CERTIFICATE

18

19  I hereby certify this 6th day of March, 2017, that the

20  foregoing is, to the best of my ability and understanding, a true

21  and correct transcript of the proceedings in the above-entitled

22  matter.

23

24  /s/ Mary V. Thompson

25  _____
Official Court Reporter

**OFFICIAL TRANSCRIPT**