**EXHIBIT D**

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

IN RE: CHINESE-MANUFACTURED
DRYWALL PRODUCTS LIABILITY    **MDL NO. 2047**
LITIGATION

                              **SECTION: L**

**THIS DOCUMENT RELATES TO:**    **JUDGE FALLON**
***ALL CASES***    **MAG. JUDGE WILKINSON**

*****************************************************************************

### AFFIDAVIT OF ESQUIRE BANK, NATIONAL ASSOCIATION

Eric Bader, the Executive Vice President and Chief Financial Officer of Esquire Bank, National Association ("Esquire Bank"), who being first duly sworn upon oath, states:

1. I make this Affidavit based upon personal knowledge.

2. I am more than Eighteen (18) years of age and of sound mind.

3. I am an authorized agent and representative of Esquire Bank.

4. At the September 17, 2013 status conference, Esquire Bank presented information regarding its QSF Banking program to Judge Fallon. The information included Power Point presentations and exhibits, as well as an exchange of questions and answers with Judge Fallon. In attendance at the status conference were (i) representatives of BrownGreer, (ii) the attorney for Knauf, (iii) the attorney for insurers, (iv) other counsel representing various other parties, (v) Andrew Sagliocca, the President and Chief Executive Officer of Esquire Bank, (vi) Eric Bader, the Executive Vice President and Chief Financial Officer of the Bank, (vii) Lynn Greer who represented BrownGreer, (viii) Robert M. Johnston who appeared as Pro Se Curator, (ix) Arnold Levin who appeared as Lead Counsel for the claimants, and (x) Russ Herman and Lenny Davis who appeared as Liaison Counsel in MDL 2047.

5. Esquire Bank is national banking association, regulated and examined by the Office of the Comptroller of the Currency, a bureau of the U.S. Department of the Treasury ("OCC"). Esquire Bank's deposit accounts are insured by the Federal Deposit Insurance Corporation ("FDIC") up to the applicable limits established by federal law and regulation.

6. Esquire Bank is a highly capitalized FDIC-insured depository institution, with a Common Equity Tier 1 Capital Ratio ("CET1 Ratio") of 17.66% at March 31, 2018. By comparison, at March 31, 2018, the CET1 Ratio of following depository institutions were:



| Name of Depository Institution | CET1 Ratio |
|---|---|
| JP Morgan | 13.59% |
| Regions | 12.92% |
| Iberia | 11.16% |
| Hancock Whitney | 10.63% |
| Home Bank | 12.93% |

CET1 is a measure of bank solvency that gauges a bank's capital strength. In particular, the CET1 ratio measures a bank's capital against its assets. The higher the CET1 ratio, the greater the capital strength of the bank.

7. Esquire Bank is the wholly owned subsidiary of Esquire Financial Holdings, Inc. Esquire Financial Holdings, Inc. is a registered bank holding company with, and is inspected by, the Board of Governors of the Federal Reserve System ("FRB"), and is a public reporting company with the U.S. Securities and Exchange Commission ("SEC"). Esquire Financial Holdings, Inc.'s common stock trades on the NASDAQ under the symbol "ESQ". At June 1, 2018, Esquire Financial Holdings, Inc. had 7,445,723 shares of common stock issued and outstanding. Esquire Financial Holdings, Inc. has never paid a dividend to its stockholders.

8. Russ Herman currently owns approximately 0.8% of the outstanding common stock of Esquire Financial Holdings, Inc. or 62,412 shares, which amount includes 2,500 shares of restricted stock and 14,892 exercisable options to purchase shares of common stock of Esquire Financial Holdings, Inc. Stock options vest over a period of years and are exercised with the personal funds of the grantee. The weighted average price for Mr. Herman to exercise his 14,892 options is $12.50 per share. Accordingly, Mr. Herman would need to pay Esquire Financial Holdings, Inc. approximately $186,150 in order to exercise those options. Mr. Herman also received 2,500 shares of restricted common stock of Esquire Financial Holdings, Inc. in a single grant which vests in equal installments over a three-year period beginning January 23, 2022 and ending January 23, 2024. As the court transcript indicates, Mr. Herman made full disclosure of his relationship with and ownership in Esquire Financial Holdings, Inc. and Esquire Bank. Transcript pages 20-21 indicate full disclosure and responses to all questions. BrownGreer, as Court-appointed Administrator, also made full disclosure of all processes on pages 8-16. The Court directed at that time that the Court-appointed CPA, Phil Garrett be involved in the process. The hearing transcript is attached.

9. Since 2007, Russ Herman has been a member of the Board of Directors of Esquire Financial Holdings, Inc. and Esquire Bank, and has attended 93 meetings. Mr. Herman has never been a member of the Loan Committee, Audit Committee, Governance Committee or Strategic Oversight Committee of Esquire Financial Holdings, Inc. or Esquire Bank. As such, he is not privy to any customer information related to loans or deposits.

10. Until 2013, neither Esquire Financial Holdings, Inc. nor Esquire Bank ever paid board fees to members of their Board of Directors. From 2013 to 2018, Mr. Herman has received a total of $27,900 in Director fees, of which Mr. Herman has directly donated $24,540 to

the Jewish Endowment Fund of Louisiana. The net difference between his Board fees and charitable contributions is $3,360. Since 2007, Esquire Financial Holdings, Inc. or Esquire Bank have reimbursed Mr. Herman a total of $112,460.25 in expenses for travel, food, lodging and special events related to his service as a director of Esquire Financial Holdings, Inc. and/or Esquire Bank.

11. Esquire Bank has made a personal loan to Mr. Herman secured by his future receivables and personal guarantee. Because Mr. Herman is a director of Esquire Bank, the loan is subject to the requirements of Regulation O (12 CFR Part 215), a regulation promulgated by the FRB. Regulation O requires that a loan to directors (i) be made on substantially the same terms, including interest rate and collateral, as, and following the credit underwriting procedures that are not less stringent than, those prevailing at the time for comparable transactions with persons that are not subject to Regulation O; and (ii) not involve more than the normal risk of repayment or present other unfavorable terms. Additionally, Regulation O requires that a loan to a director be approved in advance by a majority of the entire board of directors and that the interested director abstain from participating directly or indirectly in the vote. Mr. Herman's loan fully complied with the requirements of Regulation O. The loan was approved in advance by a majority of the directors of Esquire Bank, with Mr. Herman not participating in any discussion or vote on the loan, at market interest rate and without any preferential terms or terms unfavorable to Esquire Bank. The loan is reviewed annually by OCC in connection with its annual examination of Esquire Bank.

12. The QSF funds at issue were administered by Esquire Bank in accordance with Judge Fallon's directive with a focus on safety and soundness, preservation of principal and available liquidity. Esquire Bank has waived all fees related to the QSF other than a $3,100 charge in 2014. See fee schedule in Esquire Presentation to Judge Fallon. Esquire Bank has complied with the directives provided by the Court and will comply with a directive from Judge Fallon should the decision be made to transfer the deposit.

13. Since the approval of Esquire Bank to hold the QSF funds, and in accordance with the Court's directive, account statements have been submitted monthly to BrownGreer and/ or Phil Garrett, CPA. These account statements, representing approximately 1,000 pages, provide detailed information regarding the balances and interest rates earned on the funds. The statements also indicate which products the funds were held in.

14. Esquire Bank provided the following materials concerning interest rates paid on deposits:

    (a) A graph representing the average FDIC insured depository rates for all US Banks and Thrifts for the deposit products listed below over the 5-year period from 2013 to 2018. This graph notes the very low interest rate environment for all average FDIC Insured Depository Rates for all US Banks and Thrifts from 2013 to 2017.

    - ➢ Money Market Rates
    - ➢ NOW Accounts
    - ➢ 3 Month Certificates of Deposit
    - ➢ 3 Month Jumbo Certificates of Deposit (greater than $250,000)

> One Month Treasury Rate – For Comparison)

(b) A graph representing the Federal Funds Target Rate set by the Federal Open Market Committee (FOMC), represented by the Green line. This graph reflects the very low interest rate environment from 2009 to 2016, with rates beginning to increase in 2017.

(c) A graph representing the 3-month and 10-year US Treasury Rates. This graph represents the very low interest rate environment from 2009 to 2016, with Treasury rates beginning to increase in 2017.

15. The QSF earned the following interest income on the Knauf Attorney Fee deposit as interest rates rose:

|          | Avg. Balance | Income  | YOY Change |
|----------|--------------|---------|------------|
| 2014 (a) | 118,824,875  | 8,696   |            |
| 2015     | 139,575,653  | 23,083  | 165%       |
| 2016     | 186,898,965  | 34,038  | 47%        |
| 2017     | 190,375,689  | 169,049 | 397%       |
| 2018 (b) | 189,578,157  | 673,971 | 299%       |

(a) Funds received in March of 2014
(b) Estimated Annualized Income

16. Esquire Bank has unique qualifications to manage QSFs. It has a strong understanding of QSF administration, working with plaintiff counsel, defense counsel, claims administrators, and/or lien resolution firms, as well as the courts. Esquire Bank also has a strong board, investor and customer knowledge base in the legal community, as well as Senior and Executive management team involvement in all discussions and decisions related to QSFs. Esquire Bank has worked with numerous administrators and law offices.

17. Esquire Bank has managed approximately $2,000,000,000 ($2 billion) in QSFs to date. Esquire Bank utilizes "sweep arrangements" for these funds, ensuring the funds are at all times secured by U.S. Treasury notes and/or FDIC-insured deposits, and are readily accessible. With respect to protecting QSF funds, Esquire Bank's goals, in order of priority, are: (1) preservation of principal; (2) daily liquidity to meet client demands on any given day, and (3) returns. The U.S. Treasury (Federated) and FDIC-insured (Promontory) funds that Esquire Bank utilizes for QSF fund management represent funds with total assets under management of approximately $250,000,000,000 billion ($250 billion). It is not Esquire Bank's business model to leverage off-balance sheet QSF funds into on-balance sheet deposit, thereby utilizing these funds to generate and fund asset growth (i.e. Loans and investment securities)

18. The type of funds/products used to manage the QSF deposits is the most important factor in managing QSF funds, not the asset size of the financial institution that manages the QSF. The products that Esquire Bank uses provides the necessary safety and soundness and preservation of principal needed to protect QSF funds. The amount of the deposit is also not relevant to the decision. What is important is Esquire Bank's unique experience

in the legal industry and managing QSFs. For example, The Bank of New York manages $1.9 trillion in assets, (trust department assets) and has total assets (balance sheet) of only $372,000,000,000 ($372 billion).

19. Esquire Bank is a branchless bank model because its attorneys and merchants, Esquire Bank's primary customer sources, do not require brick and mortar bank offices to manage their businesses. Esquire Bank does business nationwide across the United States. It processes in excess of $6,000,000,000 billion ($6 billion) in merchants' payments annually.

20. Esquire Financial Holdings, Inc. and Esquire Bank are both highly regulated entities. Esquire Bank receives annual safety and soundness examinations from the OCC and Esquire Financial Holdings, Inc. is subject to annual inspections by the FRB. These examinations and inspections are presented to the Boards of Directors of Esquire Bank and Esquire Financial Holdings, Inc. The Bank is also examined by the FDIC, which insures its deposits. Since June 2016, Esquire Financial Holdings, Inc. has been a public reporting company to the SEC. Accordingly, both Esquire Financial Holdings, Inc. and Esquire Bank file current, quarterly and annual reports with the SEC, OCC and FDIC, all of which are available in the public domain.

21. Esquire Bank from its inception, adopted a 21st century technological mindset. Today, payment processing is done electronically by most banks. Larger banks are downsizing their branch presence and have either instituted or are presently converting to a technological mindset.

22. The driving force behind Esquire Financial Holdings, Inc.'s Initial Public Offering (IPO) was its unique business model including its core deposits, IOLTA-IOLA accounts, unique assets/loan products, merchant servicing platform, and unique niche as the only bank servicing the legal community with a focus on plaintiff law firms and their clients. Esquire Bank lends to numerous law firms through various unique products, not made available by other banks. Esquire Bank takes the time to understand the unique needs regarding deposits and lending within the plaintiff lawyer community. Documents related to the IPO are available on the SEC website.

Dated this 26th day of June 2018.        ESQUIRE BANK, NATIONAL ASSOCIATION

_____
Eric S. Bader, Affiant

## NOTARY

Subscribed and sworn before me, a Notary Public, this 26th day of June 2018.

Commission Expires: Sept 11th 2018      _____
                                        Notary Public

FEONA KHAN
Notary Public, State of New York
No. 01BA6152435
Qualified in Queens County
Commission Expires Sept 11th 2018