# EXHIBIT A

Confidential - Subject to Further Confidentiality Review

```
1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF LOUISIANA

3      MDL No. 2047              Section L

       Judge Fallon             Mag. Judge Wilkinson

4

            THIS DOCUMENT RELATES TO ALL CASES

5

        IN RE:  CHINESE-MANUFACTURED DRYWALL

6            PRODUCTS LIABILITY LITIGATION

7

8          CONFIDENTIAL - SUBJECT TO FURTHER

                CONFIDENTIALITY REVIEW

9

10

11

12

13

14      Deposition of MARY VIRGINIA HAINDEL, taken on

15   Tuesday, February 19, 2019, in the office of

16   Barrios, Kingsdorf & Casteix, L.L.P., 701 Poydras

17   Street, Suite 3650, New Orleans, Louisiana 70139,

18   commencing at 9:11 a.m.

19

20

21

22

23

     Reported by:

24   AURORA M. PERRIEN

     CERTIFIED COURT REPORTER

25   REGISTERED PROFESSIONAL REPORTER
```

I N D E X

Page

Caption ......................... 1
Appearances ..................... 5
Agreement of Counsel ............ 7
Reporter's Certificate .......... 166
Witness' Certificate ............ 169


E X A M I N A T I O N

MR. BARRY ....................... 8, 155
MR. CHRISTINA ................... 143
MS. FASSBENDER .................. 163

No. 20  (letter from ReconTrust     133
        Company, N.A. to M. Haindel
        dated 12.22.10)
No. 21  (4.11.07 - 3.23.11          139
        spreadsheet, receipts,
        invoices)

E X H I B I T S
No. 1   U.S. Department of Housing   16
        and Urban Development,
        Settlement Statement
No. 2   Cash Sale, Sale of           27
        Property
No. 3   (Countrywide Home Loans      28
        Monthly Home Loan
        Statements)
No. 4   (copies of checks)           31
No. 5   Chinchuba Creek Gardenhomes  47
        Upgrades
No. 6   (documents relating to       56
        1224 Magnolia Alley)
No. 7   (photographs)                61
No. 8   (Champagne, Inc. quotes,     64
        invoices, receipts)
No. 9   Residential Lease            83
No. 10  Atmosphere Movers, Inc.,     88
        Invoice 2009-434
No. 11  Liberty Self Storage, LLC,   90
        One Month Lease
No. 12  (4.1.07 - 4.2.13             92
        spreadsheet, receipts,
        invoices)
        Taishan_Haindel000001 -
        000172
No. 13  Plaintiff Profile Firm       98
        Haindel000000001 -
        000000029
No. 14  Supplemental Plaintiff       101
        Profile Form
No. 15  2008 Property Tax Parish of  113
        St. Tammany
        2009 Property Tax Parish of
        St. Tammany
No. 16  (letters and attachments     117
        from S. Marx/Chehardy
        Sherman to Bank of America,
        N.A. dated 8.16.10 and
        9.2.10)
No. 17  Affidavit of Short Sale      126
No. 18  (letter from J.              128
        Setair/Latter & Blum dated
        9.9.14)
No. 19  (letter and attachments from 130
        M. Haindel to J. Brasa dated
        10.10.10)

A P P E A R A N C E S
REPRESENTING MARY HAINDEL:
    BARRIOS, KINGSDORF & CASTEIX, L.L.P.
    BY:  EMMA K. SCHWAB, ESQ.
    701 Poydras Street, Suite 3650
    New Orleans, Louisiana 70139
    504.524.3300
    Eschwab@bkc-law.com

    BECNEL LAW FIRM, L.L.C.
    BY:  SALVADORE CHRISTINA, JR., ESQ.
    425 West Airline Highway, Suite B
    LaPlace, Louisiana 70068
    985.536.1186
    Schristina@becnellaw.com
    BECNEL LAW FIRM, L.L.C.
    BY:  TONI S. BECNEL, ESQ.
    425 West Airline Highway, Suite B
    LaPlace, Louisiana 70068
    985.536.1186
    Tbecnel@becnellaw.com

    via telephone
    LEVIN, SEDRAN & BERMAN, L.L.P.
    BY:  KEITH J. VERRIER, ESQ.
    510 Walnut Street, Suite 500
    Philadelphia, Pennsylvania 19106-3697
    215.592.1500
    Kverrier@lfsblaw.com

Page 6

```
1    REPRESENTING TAISHAN GYPSUM CO., LTD.:
2        ALSTON & BIRD, L.L.P.
         BY: MICHAEL J. BARRY, ESQ.
3        1201 West Peachtree Street
         Atlanta, Georgia 30309-3424
4        404.881.7000
         Mike.barry@alston.com
5
         ALSTON & BIRD, L.L.P.
6        BY: MAE MANUPIPATPONG, ESQ.
         1201 West Peachtree Street
7        Atlanta, Georgia 30309-3424
         404.881.7000
8        Mae manupipatpong@alston.com
9
10
     REPRESENTING CNBM COMPANY, BNBM GROUP and
11   BNBM, P.L.C.:
12       ORRICK, HERRINGTON & SUTCLIFFE, L.L.P.
         BY: ARIEL WINAWER, ESQ.
13       405 Howard Street
         San Francisco, California 94105-2669
14       415.773.5472
         Awinawer@orrick.com
15
         ORRICK, HERRINGTON & SUTCLIFFE, L.L.P.
16       BY: DIANA S. FASSBENDER, ESQ.
         1152 15th Street, North West
17       Washington, District of Columbia 20005
         202.339.8533
18       Dszego@orrick.com
19
20
21
22
23
24
25
```

Page 7

```
1         S T I P U L A T I O N
2     It is stipulated by and among Counsel that
3    the deposition of MARY VIRGINIA HAINDEL, is being
4    taken under the Federal Rules of Civil Procedure
5    for all purposes permitted under the law.
6      The formalities of reading and signing are
7    not waived.
8      The formalities of sealing, certification
9    and filing are not hereby waived.  The party
10   responsible for services of the discovery material
11   shall retain the original.
12         *  *  *  *  *
13        Aurora M. Perrien, Certified Court
14   Reporter, Registered Professional Reporter, in and
15   for the State of Louisiana, officiated in
16   administering the oath to the witness.
17
18
19
20
21
22
23
24
25
```

Page 8

```
1         MARY VIRGINIA HAINDEL,
2    after having been first duly sworn, testified on
3    her oath as follows:
4         E X A M I N A T I O N
5    BY MR. BARRY:
6      Q.  Miss Haindel, my name's Mike Barry.
7        Do you mind stating your name for the
8    record.
9      A.  My name's Mary Virginia Haindel.
10     Q.  And -- and Haindel.  So --
11     A.  It's --
12     Q.  I was mispronouncing that.  I apologize.
13     A.  No.  That's okay.
14     Q.  If I do it again, tell me to stop and I'll
15   make sure I get it right.
16        As I said, my name's Mike Barry.  We met a
17   second ago.  With my colleague Mae, we represent
18   Taishan.
19        MR. BARRY:
20          I know there are some unfamiliar faces
21        in the room; so I'm going to ask everyone
22        just to go around and introduce
23        themselves.  And we can start to my left
24        here.
25        MS. WINAWER:
```

Page 9

```
1        Sure.  Ariel Winawer representing
2    BNBM Group, CNBM Company, and BNBM, PLC.
3        MS. FASSBENDER:
4          Diana Fassbender with Orrick on behalf
5        of BNBM.
6        MS. SCHWAB:
7          Emma Schwab on behalf of plaintiffs.
8        MS. BECNEL:
9          Toni Becnel on behalf of the
10       plaintiffs.
11       MR. CHRISTINA:
12         Salvador Christina on behalf of the
13       plaintiffs.
14       MR. BARRY:
15         And -- and Keith Verrier's on the
16       phone.
17   BY MR. BARRY:
18     Q.  Have you -- have you ever sat for a
19   deposition before?
20     A.  No.  This is the first time.
21     Q.  Well, I -- I'm sorry I'm the first time
22   you have to deal with this.  I know sitting around
23   with a bunch of lawyers is probably right on your
24   list next to a root canal.  But I appreciate you
25   being here.  I appreciate your patience, and I
```

Page 10

1 appreciate you talking to us.
2 And, you know, since you've never been
3 through this -- I'm sure your attorneys have
4 talked a little bit about it -- but I'll give some
5 rules of the road, how we work through this
6 deposition, just to make sure that we're using
7 time efficiently but also so that we can get
8 everything on the record so our court reporter
9 here can make sure that everything is written down
10 well and properly.
11 I'm going to ask you questions. You're
12 going to answer them. Sometimes your attorney's
13 going to interject objections. It's very
14 important that we don't talk over each other. If
15 I'm asking a question, if you -- even if you know
16 what you're about to say to my question, you know
17 the answer, just let me finish it so that we can
18 make sure she can get everything down. And I'll
19 do the same for you. I won't speak over you.
20 We'll probably both accidentally speak over each
21 other. So I may be a little nagging and remind you
22 of that. I apologize for that in advance, but
23 it's just important for getting it all down.
24 You know, we -- we don't have a ton of
25 time today, but I want to make sure that if you

Page 11

1 ever need a break, you -- if you're -- you know,
2 need to run to the restroom, if you just want to
3 take a second, don't ever hesitate to ask me to
4 take a break. All I ask is that we finish the
5 questions that are on the table and, if we have a
6 document in front of you, we finish the questions
7 on the document so we don't lose our trains of
8 thought. But, you know, whenever you need a
9 break, don't hesitate to let me know. In that
10 same vein, I'll probably be taking a break about
11 every hour, so just -- if you want to gauge that
12 and know that. I'll probably be doing it anyway
13 before you even ask me.
14 Now, have you -- do you understand that
15 you've been sworn in and must testify as if you're
16 in court and a judge were sitting right here with
17 us?
18 A. Yes.
19 Q. Okay. Are you taking any medications that
20 will impair your ability to give truthful
21 testimony?
22 A. No.
23 Q. Okay. How did you prepare for this
24 deposition?
25 A. Well, I met with my attorney once, and

Page 12

1 that's about it.
2 Q. When did you meet with your attorney?
3 A. Last week.
4 Q. Okay. And I -- and -- and to be clear,
5 I'm not asking for any content --
6 A. No.
7 Q. -- of those conversations.
8 Who was present when you were meeting with
9 your attorney?
10 A. My attorney, Sal; Toni; and Becket Becnel.
11 Q. Okay. Was anyone else present? Did you
12 bring anybody with you?
13 A. Oh, no.
14 Q. Okay. Did you review any documents in
15 advance of this deposition?
16 A. Yes.
17 Q. Okay. Do you remember which documents
18 they are?
19 A. I don't. It just -- actually, it's just
20 my file that --
21 Q. Okay.
22 A. -- I've had for 10 years.
23 Q. Did you review your entire file?
24 A. No.
25 Q. Okay. And if I put a document in front of

Page 13

1 you and you recognized it, you'd know what you
2 reviewed beforehand and what you hadn't?
3 A. Yes.
4 Q. One more thing is, you know, I'm going to
5 ask -- when I ask questions, if there's anything
6 I'm saying that is unclear or you're not sure
7 about, please don't hesitate to ask me to rephrase
8 the question or clarify what I mean. I will ask
9 some bad questions that I didn't mean to be bad,
10 and so, please, you know, make sure that I'm -- I
11 want to make sure that you understand what I'm
12 saying.
13 Another part of this is, I'm losing my
14 voice, and so it's very low right now. And I
15 apologize. So if you can't hear me, I'll try to
16 speak up, but I physically cannot do that
17 particularly well right now because I'm getting
18 over a little bit of a cold.
19 Are you currently employed?
20 A. I'm self-employed.
21 Q. Okay. And what -- what are you doing in
22 your self-employment?
23 A. I do jewelry appraisals. I'm a graduate
24 gemologist.
25 Q. Okay. And do you have any specialty in

Page 14

1 that, or just all across, any kind of gems?
2    A. Pretty much any kind of -- estate
3 antiques, I would tend -- if it's a very old
4 antique or something like that, I'd probably refer
5 it out.
6    Q. And how long have you been self-employed?
7    A. I -- I mean, since I can remember. I
8 mean --
9    Q. Okay. So you've never --
10    A. Well, I've been out of school 30 years.
11    Q. Okay.
12    A. So let's just go with 30 years.
13    Q. So you've never worked for a company --
14    A. Yes, I have. I've worked for
15 Kay Jewelers.
16    Q. Okay. And what -- do you have any
17 employees who work for you?
18    A. No.
19    Q. Okay. And are -- are you married?
20    A. No.
21    Q. Have you ever been married?
22    A. No.
23    Q. And have you ever been involved in a
24 lawsuit other than this one?
25    A. I'm thinking. To my -- I -- off the top

Page 15

1 of my head, no.
2    Q. No.
3     Now, talking a little bit about the
4 subject matter of this lawsuit, what is the
5 address of the property that you allege has been
6 damaged by Chinese drywall?
7    A. 1224 Magnolia Alley --
8    Q. Do --
9    A. -- Mandeville.
10    Q. Do you still live in that property?
11    A. No.
12    Q. And when did you purchase that property?
13    A. I don't remember exactly, but I believe it
14 was June 2008.
15    Q. Okay. And who did you purchase that
16 property from?
17    A. The builder, Lee Laporte.
18    Q. Okay. And was it a new property at that
19 time?
20    A. Yes.
21    Q. And did you -- do you remember how much
22 you paid for that property?
23    A. It was somewhere around $316,000 --
24    Q. Okay.
25    A. -- somewhere around there. Because I --

Page 16

1 my -- okay.
2    MR. BARRY:
3     Do you mind handing me Tab 3.
4    MS. MANUPIPATPONG:
5     Uh-huh.
6 BY MR. BARRY:
7    Q. Did -- when you paid around $316,000 --
8 and I'll -- I'll put some documents in front of
9 you --
10    A. Okay.
11    Q. -- that will help you remember -- was any
12 of that financed?
13    A. Yes.
14    Q. Okay. So I'm going to put some documents
15 in front of you during this deposition. I'm going
16 to hand it first to your counsel just to make sure
17 that --
18    A. Oh.
19    Q. -- there's no issues with it. Once he
20 does that, he's going to hand it to the court
21 reporter, who's going to mark it as an exhibit,
22 and then you'll get a copy of it.
23     So I'm handing what is going to be
24 Exhibit 1, which is the HUD settlement statement.
25     (Exhibit No. 1 was marked for

Page 17

1    identification and attached hereto.)
2    MR. BARRY:
3     Mae, do you mind passing that and
4    distributing it to everybody.
5 BY MR. BARRY:
6    Q. Whenever I put something in front of you,
7 please feel free to take as much time as you want
8 reviewing it. I know some of this is not fresh in
9 your mind, and some of these documents you may not
10 have seen fully. But I -- for most of these, I
11 won't be asking you about the whole thing. I'll
12 just be asking you about certain parts of it.
13    A. Okay.
14    Q. Do you recognize this document?
15    A. Yes.
16    Q. And do you -- do you know what this
17 document is?
18    A. I believe it's a -- is this a HUD
19 statement?
20    Q. And earlier you said that you believe that
21 it was around $316,000 that you paid for the
22 house. Is that amount reflected here?
23    A. Yes.
24    Q. Did you have to pay anything more? Did
25 you have to pay any kind of settlement charge --

Page 18

1 charges?
2    A. I don't -- what do you mean "settlement
3 charges"?
4    Q. Was there any additional amounts that you
5 had to pay for the house, you know, anything that
6 related to the closing of purchasing the home?
7    A. You mean like a deposit? No.
8    Q. No.
9      Well, did you pay any money down for the
10 home?
11    A. Yes.
12    Q. Okay. And how much did you pay down?
13    A. Forty-six -- according to this, 46,000.
14    Q. And was the rest financed?
15    A. Yes.
16    Q. Do you remember who you received -- or who
17 you got the loan from?
18    A. I do not remember.
19    Q. Okay. If you look at Line 103 --
20    A. Yes.
21    Q. -- where it says 11,025.38 --
22    A. Yes.
23    Q. -- was that any -- do -- did you have to
24 pay that amount as part of the settlement charges
25 or did the borrower pay that or --

Page 19

1    A. It says --
2    Q. -- for the --
3    A. -- the borrower.
4    Q. So are you the borrower?
5    A. Yes.
6    Q. Did you have to pay that 11,025 --
7    A. Yes.
8    Q. -- 36 cents -- 38 cents?
9    A. Yes.
10    Q. Do you remember paying that amount?
11    A. No. I mean, no, I don't.
12    Q. You don't. Okay.
13    A. I just -- I mean, this is a long time ago.
14    Q. I totally understand. And hey, you know,
15 if there's stuff that you just don't remember,
16 you're not sure, don't hesitate to tell me that.
17      Now, when you purchased this home, did --
18 do you remember if any amount of the sale price
19 went to satisfy a prior mortgage?
20    A. Oh, no.
21    Q. Okay.
22    A. No.
23    MR. BARRY:
24      Let's see Tab 2.
25      A document here (tenders).

Page 20

1    THE WITNESS:
2      Does it need to go to the court . . .
3    MR. CHRISTINA:
4      Uh-uh.
5    MR. BARRY:
6      She's got it memorized. She doesn't
7    need it.
8 BY MR. BARRY:
9    Q. Do you recognize this document?
10    A. Yes, I do.
11    Q. Do you want to take a chance to take a
12 look at it or . . .
13      Now that you've had a chance to review it,
14 is -- what -- do you -- what is this document?
15    A. It's a cash sale.
16    Q. Okay. And does this include the mortgage
17 that you used to finance the property?
18    A. I do not -- I don't know.
19    Q. If you turn to the third page or the third
20 document here.
21    A. Yes.
22    Q. So is that the mortgage that you used --
23    A. Yes.
24    Q. Okay. And on the fourth page here, under
25 Paragraph E, it says that you were financing

Page 21

1 $284,400.
2      Is -- do you remember -- recall if that
3 was the amount of --
4    A. Yes.
5    Q. -- the mortgage that you took?
6    A. Yes.
7    Q. And in Paragraph D, it says the lender is
8 Quicken Loans.
9      Is that who you recall to be the lender
10 from whom you --
11    A. Yes.
12    Q. -- took the loan?
13    A. Yeah.
14    Q. And it says that the loan ran until
15 July 1st, 2037.
16      Do you remember taking a 30-year loan on
17 this?
18    A. Yes.
19    Q. Okay. Did you take any other mortgages or
20 loans on the property?
21    A. You mean, like, a second --
22    Q. Yes.
23    A. -- a . . . No.
24    Q. Did you take any type of home equity loan
25 or --

Page 22

1    A.  No.
2    Q.  -- anything like that?
3        And -- and I apologize.  That's -- make --
4  let's -- let's make sure I'm finishing the
5  question beforehand.  I know you know exactly what
6  I'm saying.  You're -- you -- my -- my questions
7  aren't subtle.  So don't -- don't -- I -- I know
8  you want to get that answer out, but if you don't
9  mind letting me finish.  It just makes her life a
10  lot easier.
11    A.  I'm sorry.
12    Q.  Now, do you -- when -- did you pay -- I --
13  I know at some point you were -- you sold the
14  home; is that correct?
15    A.  Uh-huh.
16    Q.  Do you remember when you sold the home?
17    A.  December 2010.
18    Q.  Okay.  When you sold the home in
19  December 2010, were you current on the mortgage?
20    A.  No.
21    Q.  When did you stop paying on the mortgage?
22    A.  I don't remember.
23    Q.  Okay.
24    A.  But it's -- it -- I don't remember exact
25  time.

Page 23

1    Q.  Do you think you paid for a year?
2    A.  We -- yeah.  I mean, we -- after I moved
3  out?  I'm -- I don't understand the question.
4    Q.  So you -- we -- we've got here -- this
5  says that the mortgage was in 2007; is that
6  correct?
7    A.  Okay.
8    Q.  So I'm -- I'm trying to understand from
9  when you got the mortgage to what point did you
10  stop paying on the mortgage.
11        Do you remember when you stopped paying on
12  the mortgage?
13    A.  Yeah.  No.
14    Q.  When did you move out of the house?  You
15  said that . . .
16    A.  I moved out in April.  I think it was
17  March or April 2009.
18    Q.  Okay.
19    A.  No.  No.  No.  No.  No.  No.  Yeah, I
20  believe it was.  It was early -- it was -- the
21  time runs together; so I -- yeah.  I wasn't in
22  there that long.
23    Q.  Totally understand.
24    A.  So . . .
25    Q.  And during the time you lived in the

Page 24

1  house, were you current on all payments?
2    A.  Yes.
3    Q.  Okay.  So sometime after March 2009 --
4    A.  Yes.
5    Q.  -- that you stopped paying on the house?
6    A.  Yes.
7    Q.  When you moved out of the house, where did
8  you move to?
9    A.  My sister had passed away; so the family
10  had a home a few blocks away, and I went there.
11    Q.  When you moved to that home, were you
12  having to pay rent on that home?
13    A.  Yes.
14    Q.  And so when you started paying rent on
15  that -- the -- the family home, was that when you
16  stopped paying on the mortgage?
17    A.  No.  No.  The rent was an agreement for --
18  with my brothers, because they understood the
19  dynamics.  I had just experienced Katrina.
20    Q.  Right.
21    A.  And they understood financially how -- how
22  this could be very hard.  So they said, Listen --
23  because we didn't expect this to take 10 years.
24  They said, Mary, when you -- when you resolve
25  that, we will do this, But you -- we -- we -- we

Page 25

1  need some kind of document from you stating that
2  you're going to do this, and that's how the lease
3  got written.  Because that's what the -- that's
4  what -- that's what the house would have rented
5  for had I not been living in it.
6    Q.  And so to be clear, you were paying your
7  brother some sort of rent during --
8    A.  No.  I have --
9    Q.  -- that time?
10    A.  -- not.
11    Q.  Okay.  So you were never paying rent on
12  that house?
13    A.  No.  The intent was to pay rent once this
14  resolves.  They didn't expect it to take 10 years.
15  I ended -- I ended up selling the house.
16    Q.  Okay.  And -- and -- and perhaps I'm --
17  I'm just not understanding this.
18        So we have the one house, which is the
19  home that had Chinese drywall in it.
20    A.  That's correct.
21    Q.  And then there is the home that you moved
22  into, which was the family home; correct?
23    A.  That's right.
24    Q.  Which -- which home was the rent -- the
25  rental agreement with your brothers corresponding

Confidential - Subject to Further Confidentiality Review

Page 26

1  to?
2    A. The family home.
3    Q. Family home.
4      So were you paying rent on that family
5  home, or are you owing rent once this resolves?
6    A. Owing rent.
7    Q. Okay. So you've not had to pay any amount
8  on that house so far?
9    A. No.
10   Q. Okay. And are you currently living in
11 that family home?
12   A. No. I had to sell it.
13   Q. Okay. Where -- where are you currently
14 living?
15   A. I'm living Downtown, on Girod and O'Keefe.
16   Q. Okay. And when did you move to that home?
17   A. To Girod and O'Keefe?
18   Q. Uh-huh.
19   A. Two years ago, three years ago.
20   Q. So from 2009 until about two to
21 three years ago, you were living in the family
22 home?
23   A. No.
24   Q. Okay. Where were you living during that
25 time period?

Page 27

1    A. Many places. I lived in Florida for about
2  four years, and then I came back to the city.
3    Q. Okay.
4    A. And I . . .
5    Q. How long did you live in that family home?
6    A. Two years.
7    Q. So you sold it roughly in 2011. Is that
8  about right?
9    A. '11 or '12. I --
10   Q. Okay.
11   A. Somewhere around there.
12   Q. Let's see.
13   COURT REPORTER:
14     Can we go off the record for a second?
15   MR. BARRY:
16     Yeah. Of course.
17   (There is an off-the-record discussion.)
18   MR. BARRY:
19     I just want to make -- clarify for the
20   record that Exhibit 2 is a document
21   entitled "Cash Sale," and that was what we
22   were discussing with the witness a moment
23   ago.
24   (Exhibit No. 2 was marked for
25   identification and attached hereto.)

Page 28

1    MR. BARRY:
2      I'm going to hand to your attorney
3    what will be Exhibit 3.
4    (Exhibit No. 3 was marked for
5    identification and attached hereto.)
6  BY MR. BARRY:
7    Q. The court reporter is labeling as
8  Exhibit 3 a document where the first document is
9  entitled "Countrywide Home Loans," "Monthly Home
10 Loan" Statements.
11     Have you seen this document before?
12   A. Yes.
13   Q. Do you want to take a second to review it
14 or . . . I'll be asking you about it generally,
15 not specifically.
16   A. Okay.
17   Q. Now you've had a chance to review the
18 document.
19     Are -- what is this document?
20   A. It's the amount owed, or you could call
21 them payment coupons for the mortgage.
22   Q. So here, you know, in the first page,
23 we've got a document that says "Statement date,"
24 January 9, 2008. It says it at the top. It's
25 really small type there. And then it shows home

Page 29

1  loan overview. It has $282.909.96 in principal
2  balance and a payment of $2001.04 owed.
3      Did -- do you remember on this loan
4  whether you -- how much you paid down in principal
5  on the loan?
6    A. Well, I guess 316,000 minus 282 would have
7  been the down payment.
8    Q. Well -- so -- I -- and I apologize.
9      To clarify that, over the life of the loan
10 -- I know you said you sold it in roughly 2010; is
11 that correct?
12   A. Uh-huh.
13   Q. Do you remember how much you paid to
14 principal during that time period?
15   A. No.
16   Q. Okay. Did you ever -- I -- I know you
17 made your monthly payments for a period of time.
18     Did you ever make a lump sum payment to
19 pay down principal?
20   A. No.
21   Q. So any payment to principal would have
22 come through your monthly payments; is that
23 correct?
24   A. Yes.
25   Q. Okay. And do you remember the terms of

Page 30

1  your loan, whether you had an interest-only loan
2  or anything, balloon payments or . . .
3     A.  No.  It was a regular 30-year --
4     Q.  Fixed?
5     A.  -- loan.  Yes.  And it's -- PMI, I think,
6  was in there as well.
7        MR. BARRY:
8           Okay.  If you could hand me 16,
9        please.
10 BY MR. BARRY:
11    Q.  On this document, do you know if there
12 were any other monthly statements that may be
13 missing from here?
14    A.  I don't -- I don't understand the
15 question.
16    Q.  These are monthly statements from the home
17 loan that you had the mortgage loan.
18    A.  Uh-huh.
19    Q.  Do you know if there's -- if there are any
20 other monthly statements that we perhaps do not
21 have in our possession?
22    A.  In relation to . . .
23    Q.  To the mortgage loan.
24    A.  No.  Not to my knowledge.
25    Q.  Okay.

Page 31

1     A.  I can't think of any.
2        MR. BARRY:
3           I'm going to hand your counsel a
4        document.  Now I'm marking as Exhibit 4 --
5        and the court reporter wisely told me
6        which one I'm on, because I always forget.
7        (Exhibit No. 4 was marked for
8        identification and attached hereto.)
9  BY MR. BARRY:
10    Q.  And Document 1, Page 1 here has a check in
11 Mary Virginia Haindel, and it's paid to the order
12 of AmTrust.  Miss Haindel, do you mind looking
13 through these checks.  I'm going to ask you what
14 each of these are and what they're payment for.
15       So starting for the first document, there
16 is a check to AmTrust in the amount of -- I think
17 that's 3,288.34.  The 2 is a little bit hurt on
18 the copy; so I think that's correct.
19       Do you know what that was --
20    A.  I don't --
21    Q.  -- for?
22    A.  -- remember that.
23    Q.  Who's AmTrust?
24    A.  That's the thing, I don't know.  I don't
25 remember it.

Page 32

1     Q.  Do you know if this would be related to
2  the home?
3     A.  I doubt it.
4     Q.  Okay.  Is that $3,288.34 damage -- or
5  damages or compensation you're asking from the
6  defendants in this case?
7     A.  I don't know.
8     Q.  You don't know.
9        Turning to the next page, there is a check
10 in the amount of 1,700 and 47 cent -- or $47.14,
11 and it's made to Bank of America, signed by you.
12    A.  Yes.
13    Q.  Do you know what that would be payment
14 for?
15    A.  Yes.
16    Q.  What would that be payment for?
17    A.  I refinanced the house to get a lower
18 interest rate, and that was the bank that had the
19 note at the time of Chinese drywall, right -- it
20 was done right before it was discovered.
21    Q.  So, you know, you -- you took the loan
22 originally with Quicken Loans and then --
23    A.  Which was -- which was Countrywide.
24    Q.  Okay.  And then it was -- was Countrywide
25 either the servicer, or was it the original holder

Page 33

1  of the note?
2     A.  I don't know.
3     Q.  You don't?
4     A.  I don't.
5     Q.  And at some point Bank of America held the
6  note?
7     A.  Yes.
8     Q.  Okay.  So the 1,747.14 was part of a
9  refinance?
10    A.  Yes.  Well, it was the new note for the
11 refinance.
12    Q.  Okay.  Do you remember what the terms of
13 that refinance were?
14    A.  Thirty-year fixed.
15    Q.  Okay.  So you didn't change to, you know,
16 a 10-year adjustable --
17    A.  No.  No.  No.  No.
18    Q.  -- or anything like that?  You still --
19    A.  No.
20    Q.  -- stayed with a fixed?
21    A.  Yes.
22    Q.  Do you remember how much your interest
23 rate decreased to?
24    A.  No.
25    Q.  No?

Confidential - Subject to Further Confidentiality Review

Page 34

1   A. It was less, 1747. So . . .
2   Q. Okay. And this was after you learned of
3 Chinese drywall in --
4   A. No. It --
5   Q. -- your house?
6   A. -- was before.
7   Q. Before. Before. Okay.
8       And what was the reason for why you were
9 refinancing?
10  A. Lower the interest rate.
11  Q. If you turn to the next check here,
12 Page 3, there's a check dated 11/1/09, and it's
13 paid to the order of Joseph Haindel. It's $125.
14  A. Yes.
15  Q. And I mispronounced Haindel. Again, you
16 got to correct me if I'm saying that wrong.
17  A. No. It's all right.
18  Q. For $125. What is this check?
19  A. My brother and I own real estate
20 together --
21  Q. Okay.
22  A. -- and I manage it. And so I owe him his
23 half of the rent.
24  Q. Okay. And where is that real estate?
25  A. The Lakefront airport.

Page 35

1   Q. Is this $125 something you're claiming as
2 damages in this litigation?
3   A. No.
4   Q. Okay. This next document is dated
5 11/1/09. It says, I think, "Sanctuary HOA," but
6 it's not copied well. It says "$45.00."
7       What is that payment?
8   A. I don't know what it's for. It says
9 "Sanctuary under the stars." Sanctuary has
10 HOAs --
11  Q. Okay.
12  A. -- so there's no telling what this was
13 for. I was paying the HOAs.
14  Q. Is Sanctuary the -- HOA the --
15  A. It's the sub of the house that I was
16 living in after Chinese drywall.
17  Q. So after Chinese drywall?
18  A. During.
19  Q. During Chinese drywall?
20  A. Excuse me. During.
21  Q. So the home that is affected by Chinese
22 drywall was part of an HOA; is that correct?
23  A. That's correct.
24  Q. Okay. And as part of an HOA, did you have
25 to pay monthly payments?

Page 36

1   A. Yes.
2   Q. Do you remember how much those monthly
3 payments were?
4   A. No. No idea other -- no.
5   Q. Did -- did you ever have to pay an
6 assessment?
7   A. No.
8   Q. Okay.
9   A. To my -- I don't think so. No.
10  Q. At some point before the sale of the house
11 affected by Chinese drywall, did you stop paying
12 the HOA?
13  A. Where?
14  Q. At the house -- at -- the Sanctuary HOA?
15  A. No. No. Sanctuary, no.
16  Q. So you --
17  A. Neither one -- actually, neither house.
18 They both had HOAs. I did not stop paying on
19 either HOA.
20  Q. Okay.
21      MS. SCHWAB:
22      Can we --
23 BY MR. BARRY:
24  Q. Turning to the --
25      MS. SCHWAB:

Page 37

1       Can we go off the record real quickly?
2       MR. BARRY:
3       Yeah.
4       (There is an off-the-record discussion.)
5 BY MR. BARRY:
6   Q. So Miss Haindel, the Sanctuary HOA
7 corresponded to what house?
8   A. To the family home.
9   Q. Okay. And the -- what was the HOA that
10 corresponded to the home that was affected by
11 Chinese drywall?
12  A. Chinchuba Creek Gardenhomes.
13  Q. Okay. And once you learned of Chinese
14 drywall in the house, did you continue paying on
15 the HOA?
16  A. Yes.
17  Q. And did you continue paying on the HOA for
18 Sanctuary too during that time period?
19  A. Yes.
20  Q. Okay. So the check we just looked at a
21 moment ago was to the Sanctuary HOA, which was the
22 family home; correct?
23  A. Yes.
24  Q. And just for ease of reference, if I'm
25 saying "the property," I'm going to be referring

Page 38

1  to the home that was affected by Chinese drywall.
2  And if I'm saying "the family home," I'll be
3  referring to the family home, because there's a
4  lot of homes here.
5      So now we're on a check that's for Bank of
6  America, $1,747.14. I'm assuming this is another
7  mortgage payment --
8      A. Yes.
9      Q. -- after the refinance?
10     A. Yes.
11     Q. And same thing for the one after that?
12     A. I'm not sure.
13     Q. It says $1,747.14.
14     A. Oh, yeah. That, yes. I'm sorry. Turn
15  the page.
16     Q. This is the check that says 4/11/10.
17     A. Wait. I don't -- I don't know if I have
18  that.
19     Q. So we've got one that's --
20     A. Oh, yes. Yes. That, yes. That is for
21  the mortgage for Chinchuba Creek Gardenhome.
22     Q. And then we've got one that says
23  Delta Title, which is dated 11/12/2010 for
24  $15,000?
25     A. Yes.

Page 39

1      Q. Do you know what that's for?
2      A. Yes.
3      Q. What is that for?
4      A. Wait. You know what? I'm not sure what
5  that's for.
6      Q. Do you know who Delta Title is?
7      A. I do. I believe that was for the closing
8  for -- I think that was for the closing for the --
9  for Chinchuba Creek, when it went to close, I
10  think.
11     Q. Okay.
12     A. I'm not a hundred percent sure, but I
13  think so. Looking at the date -- and look at the
14  amount -- that's my guess, but I'm not sure.
15     Q. And so was November 2010 when you recall
16  selling the home?
17     A. Yeah. Well, it was around that time.
18     Q. Okay.
19     A. Yeah. Around that time. Because it
20  failed. The person trying to buy it, the bank
21  started . . . And then we went back again in
22  December. So . . .
23     Q. It failed, and so are you saying that
24  there was a prior --
25     A. There was a -- there was --

Page 40

1      Q. I'm sorry. Let me finish the question. I
2  apologize. I know it's -- I know you know exactly
3  what I'm going to say.
4      A. Well, I'm --
5      Q. But --
6      A. -- not sure. But, you know . . .
7      Q. No. You've got it right pretty much every
8  time. So . . .
9      So was there a prior contract of sale for
10  the home before you sold it?
11     A. I'm not -- that's not clear.
12     Q. Okay.
13     A. I don't understand --
14     Q. My question's not --
15     A. Yeah.
16     Q. -- clear?
17     A. Yeah.
18     Q. Okay. So you sold the home. And you said
19  that before that there was a sale that fell
20  through.
21     Was that -- that sale that fell through,
22  was there a contract of sale for the home before
23  that fell through?
24     A. I'm still not -- I'm not --
25     Q. So did the prior -- the -- there was a

Page 41

1  buyer who the sale fell through on; is --
2      A. Yes.
3      Q. -- that correct?
4      Did they make an offer on the home?
5      A. Yes.
6      Q. Did they sign a contract to --
7      A. Yes.
8      Q. -- buy the home?
9      A. Yes.
10     Q. When they signed the contract to buy the
11  home, what -- what -- at what point in the sale
12  process did it fall through?
13     A. Quickly, when they realized that it -- I
14  guess the Chinese drywall, and they didn't inspect
15  -- it was just -- they got -- they pulled -- they
16  said no.
17     Q. Had you disclosed that there was Chinese
18  drywall in the --
19     A. Oh, yes.
20     Q. -- house at the time?
21     A. Yeah. Well, the agents did.
22     Q. Now, beyond the mortgage, were there any
23  other loans on the house?
24     A. No.
25     Q. Did you have any liens on the property?

Confidential - Subject to Further Confidentiality Review

Page 42

1    A. No.
2    Q. Did -- do you know -- do you own any -- or
3  do you owe any money on the property today?
4    A. On what property?
5    Q. On -- on the -- sorry. "The property" is
6  the Chinese drywall one. I know --
7    A. No. No. To my knowledge, no.
8    Q. Okay. Do you own any other properties?
9    A. Yes.
10   Q. What properties do you own?
11   A. Commercial.
12   Q. Do you own any other residential
13 properties?
14   A. Yes, but I use it commercially. I rent it
15 out. It's in another state.
16   Q. Okay. What state is it in?
17   A. Florida.
18   Q. Okay. Where in Florida?
19   A. Miramar Beach.
20   Q. From the time that you learned that there
21 was Chinese drywall in the home to the time that
22 you sold the property, did you own any residential
23 -- other residential properties?
24   A. Repeat that question.
25   Q. From the time you learned that there was

Page 43

1  Chinese drywall in the house --
2    A. Yes.
3    Q. -- until the time that you sold the
4  property affected by Chinese drywall --
5    A. Yes.
6    Q. -- did you own any other residential
7  properties?
8    A. Yes.
9    Q. What were those properties?
10   A. The family home --
11   Q. Just the family home?
12   A. -- and property in Florida.
13   Q. Okay. Now, the family home, did you own
14 that house outright, or did you own that jointly
15 with your brothers?
16   A. I owned it jointly with my brothers.
17   Q. Okay. And so when you sold the property,
18 you -- all -- all the siblings have to agree to
19 sell the home?
20   A. Absolutely.
21   Q. Do you remember how much you sold that
22 property for?
23   A. No. I do not remember.
24   Q. From the time that you purchased the home
25 affected by Chinese drywall to the time that you

Page 44

1  -- that you moved out to move into the family
2  home, did you live in the house that whole time?
3    A. Yes.
4    Q. So you -- there was no period where you
5  were living in your Florida house or something
6  like that?
7    A. Oh. No. But I was coming and going a
8  lot --
9    Q. Okay.
10   A. -- you know.
11   Q. What -- did that -- the house that is --
12 was affected by Chinese drywall, did anyone else
13 ever live there with you?
14   A. No. Not live. No.
15   Q. People would stay --
16   A. Yes.
17   Q. -- on the weekends or something?
18   A. Yes.
19   Q. Did you ever rent the home to someone,
20 rent the house that was affected by Chinese
21 drywall to somebody?
22   A. No.
23   Q. Did you ever try to rent the house?
24   A. No.
25   Q. Did you ever make any renovations to the

Page 45

1  house affected by Chinese drywall?
2    A. Yes.
3    Q. What renovations did you make?
4    A. Well, I don't know if this is considered a
5  renovation, but I had to -- I added a HEPA filter
6  to it. And when they went in to do the HEPA
7  filter, they said they -- I needed better
8  ventilation. So I don't know -- I'm -- don't
9  know. I didn't watch them do what they did. But
10 they opened up different parts I guess to let air
11 in and out of the house.
12   Q. Do you --
13   A. I don't know if that's considered
14 renovation.
15   Q. I -- I can -- as -- as a nonbuilder, I can
16 accept that as a renovation. Someone who is --
17 might be more technical than I am could do that
18 otherwise, but I'm not the person to contradict
19 you on that.
20      How much was -- do you remember how much
21 you paid to do the renovations related to the HEPA
22 filter?
23   A. Do I know the exact number? No. But it
24 was anywhere between three to $5,000, if I
25 remember correctly.

Confidential - Subject to Further Confidentiality Review

---

Page 46

1    Q. Are you asking for damages in this case
2 related to the payments you made to do renovations
3 for the HEPA filter?
4    A. Yes.
5    Q. Okay. Do you remember if you've produced
6 receipts for the HEPA filter --
7    A. Yes.
8    Q. -- renovations?
9       Did you ever consider doing any work
10 related to removing Chinese drywall from the
11 house?
12    A. No.
13    Q. Why not?
14    A. At the time, when it was discovered, it
15 was -- we did not know if it was organic or
16 inorganic; so we didn't know if it was going to
17 stay in the house, was it going to have to be torn
18 down. It was too many unknowns. And I had just
19 dealt with Katrina. And I just made the decision
20 to sell and get -- and move out.
21    Q. Did you -- when you purchased the home,
22 did you make any upgrades to the home? I know --
23    A. Yes.
24    Q. -- you said it was a new home.
25       What upgrades did you make?

---

Page 47

1    A. I took some space and made an extra
2 closet, and I added, like, alarm system, a
3 surround sound.
4    Q. Do you remember how much those cost?
5    A. No.
6    Q. Okay. I'm going to hand you a document
7 that will help you remember. The document that is
8 marked Exhibit 5 is a document labeled "Chinchuba
9 Creek Gardenhomes Upgrades."
10       (Exhibit No. 5 was marked for
11       identification and attached hereto.)
12 BY MR. BARRY:
13    Q. Miss Haindel, do you recognize this
14 document?
15    A. Yes.
16    Q. Do you want to take a chance -- or a
17 second to look at it.
18    A. Okay.
19    Q. Now, what is this document?
20    A. Chinchuba Creek Gardenhomes upgrades.
21    Q. So are these invoices from the upgrades
22 you made to the home?
23    A. Yes.
24    Q. I know I ask some dumb questions, but I
25 got to make sure it's clear on the record since

---

Page 48

1 people won't be able to see it.
2       Now -- I won't go line by line here. Do
3 you remember looking at these documents and having
4 it refresh your memory? Do you remember the total
5 amount you paid for upgrades, the amount?
6    MS. BECNEL:
7       Sorry.
8    MR. BARRY:
9       I -- I wouldn't blame you. But . . .
10    MS. BECNEL:
11       No.
12    THE WITNESS:
13       Total, yeah. I mean, I don't -- I see
14 a total here of $3,850.
15 BY MR. BARRY:
16    Q. Sorry. Does it say $3,910?
17    A. Yes, it does. Excuse me. That's the
18 total invoiced amount, was $3,910.
19    Q. Do you remember if there were any other
20 upgrades that wouldn't be reflected here?
21    A. Just the HEPA filter --
22    Q. Okay.
23    A. -- what -- oh.
24    Q. And this is a little confusing here; so
25 I'm not --

---

Page 49

1    A. I don't know if they have the foam
2 insulation on here. Did they? Because I did
3 foaming --
4    MS. BECNEL:
5       I saw it on there. It was --
6    THE WITNESS:
7       Okay.
8    MS. BECNEL:
9       -- 5500, I think.
10    THE WITNESS:
11       Okay.
12    MS. BECNEL:
13       Yeah.
14    THE WITNESS:
15       Then yes.
16    MR. BARRY:
17       5500?
18    MS. BECNEL:
19       It was energy efficient home, spray
20    foam insulation. It's the last draw on
21    the first page.
22    MR. BARRY:
23       I see it there.
24    THE WITNESS:
25       Okay.

---

Page 50

1  BY MR. BARRY:
2      Q.  So beyond the amounts that are listed on
3  these -- so we've got a star here saying family
4  room, $3,591.90 on Page 1; dining room, 1,100 --
5  1,580.44; the Jacuzzi tub, $2500; alarm trim, 425;
6  upgrade mantle faux finish, 750; energy efficient
7  home, $5,512.  And then we've got the upgrade
8  amounts here that look to equal out to 3910.
9      Is that the total amount -- and I'm not
10 going to do the math, because I'll -- I'll add
11 that incorrectly.  Is that the total amount of
12 upgrades, as you recall?  Are those the upgrades?
13     MR. CHRISTINA:
14         I'm going to object.  I think they're
15     two different bills.
16     MR. BARRY:
17         There's two different bills here?
18     THE WITNESS:
19         Yes.
20     MR. BARRY:
21         Right.
22     MR. CHRISTINA:
23         So --
24     MR. BARRY:
25         I understand it's not totally $3,910.

Page 51

1      MR. CHRISTINA:
2          Okay.
3      MR. BARRY:
4          So --
5      MR. CHRISTINA:
6          It was just -- you were asking if the
7      invoice total was 3,910.
8      MR. BARRY:
9          And we've been corrected on that.
10     MR. CHRISTINA:
11         Okay.
12 BY MR. BARRY:
13     Q.  So I'm asking if these are the total
14 amounts you paid for upgrades on this home?
15     A.  Yes.
16     Q.  Okay.  And -- and recognizing that we're
17 not adding all these numbers together, but --
18     A.  Right.
19     Q.  -- those numbers I read off were all
20 individual amounts that you paid for upgrades on
21 this home?
22     A.  Yes.
23     Q.  And other than the HEPA filter, was there
24 anything else that you paid for for upgrades on
25 the home?

Page 52

1      A.  Not that I can remember.
2      Q.  Okay.  How did you pay for the upgrades on
3  the home?
4      A.  Cash.
5      Q.  Okay.  You didn't finance any of that?
6      A.  No.
7          Does wood blinds have anything to do with
8  that, like, window treatments?
9      Q.  How -- are -- are you -- how much did you
10 pay for wood blinds?
11     A.  I don't remember.
12     Q.  Do you have receipts for how much you
13 paid --
14     A.  No.  That's what I'm --
15     Q.  -- for wood blinds?
16     A.  -- saying.  I don't -- I don't remember.
17 I don't know if I'm supposed to say that or not.
18 So anyway . . . No.
19     Q.  Well, you -- you're welcome to say
20 whatever you want to say.  I'm not supposed to
21 tell you whether --
22     A.  No.  No.  No.  I know.  Okay.  Let's
23 just . . .
24     Q.  Are you asking for damages for the
25 payment -- for -- for the amount that you paid

Page 53

1  for --
2      A.  Yes.
3      Q.  -- the wood blinds?
4      A.  Oh, no.  I don't -- I don't think that's
5  included.  I don't remember.
6      Q.  Okay.
7      A.  Okay.
8      Q.  Are -- are you asking for damages for the
9  amount you paid in upgrades?
10     A.  Yes.
11     Q.  Now, this is going to be a very dumb
12 question.
13         Looking through these upgrades, were there
14 any upgrades that you were able to bring with you
15 to your next home?
16     A.  No.
17     Q.  So they all needed to stay at the home?
18     A.  Yes.
19     MR. BARRY:
20         Okay.  If you would hand me Tab 6,
21     please.
22 BY MR. BARRY:
23     Q.  Now, when did you learn that there was
24 Chinese drywall in the home?
25     A.  2009, 2008, whatever that was.  I don't

Page 54

1 remember the exact date. It was Mardi Gras. I
2 know that.
3     MR. BARRY:
4         Let's actually hold that for a little
5     bit.
6     MS. MANUPIPATPONG:
7         Okay.
8 BY MR. BARRY:
9     Q. And how did you learn that Chinese drywall
10 was in the home?
11     A. I was laying in bed sick. Danny Becnel
12 did a special on the news and said, If your house
13 does this, that, or the other thing, talking about
14 the pipes going black and things like this, you
15 have -- you might have it. So I'm laying in bed
16 sick. And I'm fortunate that I have a closet that
17 you walk into, and that is where my hot water is.
18 I walked in, and there they were. All my copper
19 pipes were black. And that's how I discovered it.
20 And shortly thereafter I called Becnel Law Firm.
21     Q. And how -- how soon after did you call
22 that --
23     A. Twenty-four hours. I would have called
24 Becket that day, but it was Mardi -- I think it
25 was like right after Mardi Gras, around that time;

Page 55

1 so it was the next morning.
2     Q. Taking a step back, do you know the square
3 footage of your house?
4     A. It was somewhere between 16 -- 1700 or
5 1800 and 2000. I -- I really don't know the exact
6 number.
7     MR. BARRY:
8         Why don't you hand me Tab 9.
9 BY MR. BARRY:
10     Q. How many bedrooms are in the house?
11     A. Three bedrooms.
12     Q. How many bathrooms?
13     A. Two-and-a-half baths.
14     Q. Did you ever make any kind of expansion on
15 the home, anything that would add to the square
16 footage of the home?
17     A. Yeah. The closet upstairs on the second
18 floor.
19     Q. And what was that that you -- what did you
20 do with the closet upstairs?
21     A. Used it as a closet, stored things.
22     Q. So explain to me what was the change that
23 you made.
24     A. It was just a dead -- it was just an --
25 where the -- similar to the -- where the -- the

Page 56

1 hot water heater was, it was kind of like the same
2 thing. So it was -- there was no Sheetrock on the
3 walls. It was just . . . So they went ahead and
4 they went in and they finished it. They put
5 Sheetrock, hung -- you know, floated, skimmed. It
6 was a room.
7     Q. So it was --
8     A. Carpet.
9     Q. -- an unfinished attic that you turned
10 into some --
11     A. Yes.
12     Q. -- sort of closet? Okay.
13     A. Yes.
14     Q. I'm handing you a document which is
15 Exhibit 6, and it says "Chinchuba Creek
16 Gardenhomes," and it looks like it's listing the
17 different --
18     A. Square footage.
19     Q. -- model plans they have.
20         (Exhibit No. 6 was marked for
21         identification and attached hereto.)
22 BY MR. BARRY:
23     Q. Have you seen this document before?
24     A. Yes.
25     Q. And I'm only going to be asking about

Page 57

1 Page 1 here; so --
2     A. Okay.
3     Q. -- you're welcome to look through it, but
4 I'm not going to be asking you about something
5 after that.
6         Did you -- what -- which of these model
7 plans did you select?
8     A. I believe it's E.
9     Q. And that lists a square footage of 2161,
10 and 1663.
11         1663, although it's not listed here, would
12 be the under-air square footage?
13     A. Uh-huh.
14     Q. Do you recall 1663 being the square
15 footage of your home?
16     A. Uh-huh.
17     Q. Do you have any reason to believe that
18 that number is incorrect?
19     A. When you add the closet --
20     Q. Do you --
21     A. -- it adds square footage.
22     Q. Do you remember how much that added?
23     A. I do not. I do not.
24     Q. Do you know if you've produced any record
25 that shows the amount of the square footage in the

Page 58

1 home --
2    A. I --
3    Q. -- after the addition of the closet?
4    A. I do not remember.
5    Q. Would it -- do you remember -- let's see.
6    A. Here. It's right here.
7    Q. Yeah. I was -- I was going to that.
8       So if we look at the -- the -- the page
9 that says "Driskill Environmental Consultants,
10 LLC," "Confidential Inspection Report" --
11    A. Well, I wasn't -- okay.
12    Q. -- does that -- where it says "Approximate
13 Sq. Ft.," 1700, is that reflecting the addition of
14 the closet?
15    A. I don't know. It should. Yes. It
16 should. But I -- he -- that was an estimate.
17    Q. Okay.
18    A. Because you can see. It's six-by -- I
19 don't know how long it was. Because it's written
20 on the -- on the plans.
21    Q. So does it --
22    A. See? It says "attic."
23    Q. Perhaps my eyes are not reading it.
24       Where -- where do you see where it says --
25    A. Okay. Do you see this right here? And

Page 59

1 then it says, right here, "attic."
2    Q. Uh-huh.
3    A. That's a room.
4    Q. Okay.
5    A. That was enclosed. Across the hall, you
6 see -- is where -- if you walk straight across,
7 where the door opens is where the hot water heater
8 was.
9    Q. And so do you -- do you know how much
10 square footage that added to the home?
11    A. No.
12    Q. Okay. So it's not listed here, where --
13    A. No.
14    Q. -- it says -- okay.
15       So it -- the original purchase of the
16 home, it was 1,663, and then the renovation of the
17 attic added some amount?
18    A. Yes.
19    Q. But we're not sure on that amount right
20 now?
21    A. Yes.
22       MR. BARRY:
23          Okay. Let's take a little bit of a
24          break. I think this is a good breaking
25          point for us.

Page 60

1       THE WITNESS:
2          Okay.
3       (Brief recess was taken.)
4 BY MR. BARRY:
5    Q. Now, you purchased the home -- I'm
6 reminding myself -- you purchased the home, and it
7 was a new construction; that's correct?
8    A. That's correct.
9    Q. So was Chinese drywall installed in the
10 house when you purchased it as a new construction?
11    A. Yes.
12    Q. Okay. Did you have any involvement in
13 selecting the drywall that would --
14    A. No.
15    Q. -- be installed in the house?
16    A. No.
17    Q. When the house was being built, were you
18 aware that they were installing Chinese drywall in
19 the house?
20    A. No.
21    Q. Did you ever see the drywall before it was
22 installed?
23    A. No.
24    Q. How do you know that the drywall in the
25 house is Chinese drywall?

Page 61

1    A. Because it said it.
2    Q. Okay. Did you ever have an inspection --
3    A. Yes.
4    Q. -- done?
5    A. Yes.
6       MR. BARRY:
7          Hand me Tab -- Tab 11.
8          Seven. Thank you.
9       MR. CHRISTINA:
10          Sorry.
11       (Exhibit No. 7 was marked for
12          identification and attached hereto.)
13 BY MR. BARRY:
14    Q. I'm handing you a document which is
15 Exhibit 7, which is an assortment of various
16 pictures. And it's labeled "Mary Haindel
17 1224 Magnolia Alley Mandeville, LA."
18    A. Yes.
19    Q. Do you recognize this document?
20    A. Yes.
21    Q. What is it?
22    A. It's a picture of my closet where the hot
23 water heater is and the HEPA filter. I guess you
24 could call it a utility closet.
25    Q. And -- and where was this closet in the

Page 62

1 house?
2    A. In the house, on the second floor.
3    Q. And looking through all these pictures,
4 are they all from that same closet?
5    A. Yes.
6    Q. Do you know who took these pictures?
7    A. I don't know.
8    Q. What -- did you take these pictures?
9    A. I could have.
10    Q. Okay.
11    A. I took many pictures, but other people
12 could have taken them. I mean -- but yeah.
13    Q. And looking at these pictures, what --
14 what do they show?
15    A. They show the pipes are black.
16    Q. And when you say "black," what do you
17 mean?
18    A. They're copper pipes. So they're copper
19 -- my -- you know, they're brand new copper pipes
20 that are completely black.
21    Q. Okay. And what do you attribute the
22 reasons for why they were black?
23    A. From the gassing from the toxic Chinese
24 drywall.
25    Q. Now, if you turn to the third-to-last page

Page 63

1 here, it's the one with the insulation. This
2 is the --
3    A. Yeah. I'm looking at it.
4    Q. The label says "Made in China. Meets or
5 exceeds."
6    So is that -- is that part of your basis
7 for why there -- you know there's Chinese drywall
8 in the house?
9    A. That's part of my basis. Yes.
10    Q. Do you know if Chinese drywall was
11 installed throughout the home?
12    A. Yes.
13    Q. Do you know if there's any areas of the
14 home that -- that did not have Chinese drywall?
15    A. Not to my knowledge.
16    Q. Do you know who installed the drywall?
17    A. The developer.
18    Q. And who was that developer? Do you
19 remember the name?
20    A. Lee -- Lee Laporte.
21    Q. Okay. Did that developer tell you they
22 were going to install Chinese drywall in the home?
23    A. No.
24    Q. Did they make any guarantees about the
25 products they were using in the home?

Page 64

1    A. No.
2    Q. Did you ever have to repair any devices or
3 -- in -- in the home because of Chinese drywall,
4 appliances? I apologize. Let me rephrase that
5 because that was really poorly asked.
6    Did you ever have to make any repairs to
7 appliances because of Chinese drywall?
8    A. I don't remember.
9    Q. Did you ever have to make any repairs to
10 the HVAC system?
11    A. Yes.
12    MR. BARRY:
13    Do you mind pulling the invoices
14 there. I don't know which tab that is.
15 It's 12?
16    MS. MANUPIPATPONG:
17    Twelve.
18    MR. BARRY:
19    I'll hand your counsel a document.
20 BY MR. BARRY:
21    Q. So this is Exhibit 8, which is a set of
22 invoices from Champagne, Inc., Electric, Heating &
23 Cooling.
24    (Exhibit No. 8 was marked for
25    identification and attached hereto.)

Page 65

1 BY MR. BARRY:
2    Q. Do you recognize this document?
3    A. Yes.
4    Q. What is it?
5    A. These are bills I paid or invoices that I
6 paid to --
7    Q. And these are invoices you paid for -- for
8 what?
9    A. For repairs to the house while it had
10 Chinese drywall.
11    Q. And were these repairs related to damage
12 that you believe was caused by Chinese drywall?
13    A. Yes.
14    Q. Do you know if there were any other
15 invoices for air-conditioning repairs?
16    A. I mean, I don't know. I don't remember.
17 But there were two sets of coils that were
18 replaced. But I -- I don't remember. And a
19 recharge at one point.
20    Q. Now, just looking through this -- and
21 maybe I'm misunderstanding -- are some of these
22 invoices duplicated in this set here? Maybe
23 I'm --
24    A. I don't know.
25    Q. See, here, the first one says -- the first

Page 66

1 two pages are dated April 4th, 2008. And there's
2 one for 1,643.25. And then there's one for 3,466.
3     A. No. I think -- they're not double. No.
4 They're not -- I don't -- to my knowledge, I don't
5 think they're --
6     Q. Sorry. Let -- let --
7     A. -- duplicates.
8     Q. Let me finish. I apologize.
9     A. Okay.
10     Q. So that first page we've -- we've said is
11 4408. Now, if we turn to Page 1, 2, 3, 4, 5 --
12 Page 6 and 7 on -- in this right here.
13     A. Yes.
14     Q. Are those the same invoices?
15     A. I don't know if they're the same, but they
16 were put together.
17     Q. Are -- are they the same invoices as the
18 ones that appear on Page 1 and 2?
19     A. Oh. Let me see.
20     Q. So are Pages 6 and 7 identical to
21 Pages 1 and 2?
22     A. Oh. Yes.
23     Q. Okay. So there are -- there are some
24 documents in here that are duplicates; right?
25     A. Yes.

Page 67

1     Q. Okay. Are there any other invoices for
2 air-conditioning repairs that were made?
3     A. I don't remember. I -- I -- I mean, like
4 I said, I know they redid the coils. And I think
5 the developer might have picked it up once. And
6 then I -- I -- I think part of this is a bill for
7 one of them, a recharge, if I remember correctly.
8 It's hard to read.
9     Q. Yes. Of course.
10     A. And -- so . . .
11     Q. Did you personally pay -- other than the
12 one that the developer may have picked up, did you
13 personally pay for all --
14     A. Yes.
15     Q. -- of the other air-conditioning repairs?
16     A. Yes.
17     Q. Are you seeking damages for the amount of
18 air-conditioning repairs that you had to pay
19 related --
20     A. Yes.
21     Q. -- to Chinese drywall?
22     And do you know the total amount that
23 you're asking for related to air-conditioning
24 repairs?
25     A. I don't remember.

Page 68

1     Q. Understand.
2     Did you have to make any other repairs to
3 any other appliances?
4     A. I don't remember.
5     Q. Did you have to make any repairs to a
6 refrigerator?
7     A. I -- I -- I don't remember.
8     Q. All right. Did you have to make any
9 repairs to a television or anything like that?
10     A. I don't remember. I -- I'm sorry to say I
11 don't remember.
12     Q. Do you know if you submitted any --
13     A. I know was I left.
14     Q. I understand. And -- and I -- I -- I
15 appreciate that a lot of this is a long time ago.
16 I'm still going to have to ask the questions, of
17 course.
18     Do you know if you made any -- do you know
19 -- were any appliances in your home that you could
20 have taken with you, such as a TV -- after you
21 left the home, were any of those appliances
22 damaged because of Chinese drywall?
23     A. Yes.
24     Q. Are you seeking compensation for those
25 damaged --

Page 69

1     A. I -- I don't --
2     Q. -- items?
3     A. I don't know. I don't think so.
4     Q. Okay. Did you have homeowners
5 insurance --
6     A. Yes.
7     Q. -- on the house?
8     Who -- who was your home- -- homeowners
9 insurer?
10     A. I don't remember. But if I guessed, it
11 was State Farm.
12     Q. Okay. Did you make any claim to
13 State Farm for damages related to Chinese drywall?
14     A. No.
15     Q. Okay. Why not?
16     A. Because I was aware of a clause in the --
17 the insurance. It says pollution exclusion.
18     Q. And you understood that the pollution
19 exclusion would prevent you from being able to
20 make a successful claim to State Farm?
21     A. Yeah. And then you run the risk if --
22 they might drop me as well. Then I would have no
23 insurance.
24     Q. Did you ever sue the developer for
25 installing Chinese drywall?

Page 70

1    A. No.
2    Q. Why not?
3    A. That's a good question. I don't know.
4    Q. Do you know if any of your neighbors had
5 Chinese drywall installed in their house?
6    A. Yes.
7    Q. How do you know that?
8    A. Because we all talked about it. All the
9 houses had symptoms.
10   Q. Okay. And so -- do you remember roughly
11 how many homes there were in the neighborhood?
12   A. Uh-uh.
13   Q. Was it 10? Was it 15? Was it a hundred?
14   A. No. Maybe 40.
15   Q. Okay.
16   A. Well, I was 45. So at least 45.
17   Q. Okay. And it's the best of your
18 recollection that almost all those homes, if not
19 all of them, had Chinese drywall in them?
20   A. I don't know about all, but most.
21   Q. Do you know if your -- any of your
22 neighbors did any construction to remove the
23 Chinese drywall from their house?
24   A. I don't know.
25   Q. Do you know if any of your neighbors sold

Page 71

1 their homes after learning Chinese drywall was in
2 the house?
3    A. I don't -- I know -- I know some did and
4 some didn't. So . . .
5    Q. Do you recall how much they were selling
6 the homes for?
7    A. When?
8    Q. When they -- once they learned Chinese
9 drywall was in the house, do you recall how much
10 they were selling the homes for?
11   A. Yeah. Anywhere from a hundred to 150,000.
12   Q. Okay. So roughly about what you were --
13   A. Yeah.
14   Q. -- paid for your home?
15      MR. BARRY:
16         Let's see. Let's go to 47.
17 BY MR. BARRY:
18   Q. Now, we've talked a little bit about there
19 being corrosion on the wires.
20      Were there any other symptoms of Chinese
21 drywall within the home? For example, was there
22 an odor in the home?
23   A. Yes.
24   Q. What was that odor?
25   A. Like a rotten egg --

Page 72

1    Q. And --
2    A. -- sulfur.
3    Q. How -- how soon after you purchased the
4 home and moved in did you start noticing that
5 smell?
6    A. I noticed it from the beginning, but we
7 just thought it was possibly new construction,
8 maybe the new carpet. I, not we. I. And I
9 just -- and I -- I was coming and going a lot.
10 So . . .
11   Q. And was -- did it -- did that smell ever
12 subside?
13   A. No.
14   Q. Was there any time period where you could
15 smell it -- it -- it -- it smelled more potent?
16   A. Yes. It started to get more and more
17 pronounced --
18   Q. Okay.
19   A. -- as time went on.
20   Q. And how -- how soon after would that be?
21   A. It was there from day one. So how long?
22 It just constantly increased as I lived in it. I
23 lived in the house.
24   Q. Was it worse during certain times of the
25 day? Like, when -- in the morning --

Page 73

1    A. Well, naturally --
2    Q. -- was it worse?
3    A. -- when it's -- when it's hot, it --
4    Q. Okay.
5    A. -- it would be worse.
6    Q. So would it be worse in the summer versus
7 the winter?
8    A. No. It's bad both because you're putting
9 the heat on. So --
10   Q. Okay.
11   A. -- I usually left my windows cracked.
12   Q. Was there any area of the house where it
13 smelled worse than others?
14   A. The whole house smelled bad except for the
15 attic, where there was no Chinese drywall. I
16 noticed that. We would go up-- I would go
17 upstairs to the attic. I'd say, God, up here
18 smells great. What happens when you go
19 downstairs?
20   Q. So there was no Chinese drywall upstairs
21 in the attic?
22   A. There was no float -- it wasn't floated
23 out. So no, there was no --
24   Q. Because it was unfinished? It was --
25 so --

Page 74

1    A. Yeah. It was unfinished.
2    Q. Okay. And I -- I know you did the
3  renovation where you installed that closet.
4    Was -- that closet, did that also have
5  Chinese --
6    A. Yes.
7    Q. -- drywall in there? Okay.
8    A. Yeah.
9    Q. When you had people over to your house --
10  I know you said you had some people stay there --
11  did they notice the smell?
12    A. Yes.
13    Q. What did they say?
14    A. Something's in -- there's a smell in this
15  house, Mary --
16    Q. Okay.
17    A. -- something's wrong.
18    My eyes would turn red.
19    Q. So you said you learned of Chinese drywall
20  from an interview from the -- with the Becnel Law
21  Firm --
22    A. Uh-huh.
23    Q. -- on TV?
24    A. Uh-huh.
25    Q. Had you heard about Chinese drywall --

Page 75

1    A. No.
2    Q. -- before then?
3    A. No.
4    Q. Had you suspected there was something
5  wrong with your home before you --
6    A. No.
7    Q. So you just -- you --
8    A. Didn't put two and two together. No.
9  I --
10    Q. Okay.
11    A. -- didn't dream. Well, I mean, let me say
12  this: At one point we knew it was something. We
13  just didn't know what. Because that's why I hired
14  -- I can't think of the -- Driskill. That's why I
15  hired him, because we kept saying, something's
16  wrong with the house. But nobody could figure it
17  out. It wasn't formaldehyde. It wasn't mold. I
18  mean, that's what people -- that's what they're
19  looking for at the time.
20    Q. It's like you could read my mind, because
21  that's about what I was going to ask.
22    MR. BARRY:
23    Do you mind handing me Tab 9.
24    MS. MANUPIPATPONG:
25    It's Exhibit 6.

Page 76

1    MR. BARRY:
2    Oh. It's Exhibit 6.
3  BY MR. BARRY:
4    Q. So turning in Exhibit 6 to the document
5  that says "Driskill Environmental Consultants,"
6  and this is dated April 1st, 2008.
7    Why did you hire Driskill Environmental?
8    A. A friend of mine came over. He used to do
9  mold remediation in New Orleans, and -- prior to
10  Katrina and during Katrina a little bit. And he
11  came over. And we were watching television. And
12  he said, Something's wrong here, Mary. He said,
13  You're -- we have blue eyes. And our eyes were
14  both red. The dog was panting. I had the window
15  cracked. He said, Something's just wrong in here,
16  I just don't know what it is. He knew it wasn't
17  mold. He said, Listen, call -- call this guy up,
18  Driskill, whoever he is. And he said, Have him
19  come over and do an inspection on the house,
20  because I -- I don't know what it -- this is. And
21  that's what I did, and that's the date that I did
22  it.
23    Q. And what did Driskill Environmental
24  conclude?
25    A. You know, the usual what they look for,

Page 77

1  which was -- I don't even know, to be honest with
2  you.
3    Q. Is there any more to their report? Is
4  there any more document --
5    A. I don't -- I don't -- not that I can
6  remember.
7    Q. Did you pay Driskill --
8    A. Yes.
9    Q. -- Consultants? Okay.
10    A. Yeah.
11    Q. Do you remember how much you paid them?
12    A. No.
13    Q. The next document here, where it says "The
14  Law Offices of Daniel Becnel," do you -- was that
15  connected to the Driskill Environmental report, or
16  is this a --
17    A. No. They're --
18    Q. -- separate document?
19    A. -- not connected.
20    Q. Okay.
21    A. They -- they're separate.
22    Q. Did Driskill Environmental conclude that
23  you had Chinese drywall in the house?
24    A. No, he didn't.
25    Q. Okay.

Page 78

1    A. No, he didn't.
2    Q. Did they test the drywall? Did they take
3  any samples?
4    A. No.
5    Q. Okay. So this next document that says
6  "The Law" Office "of Daniel Becnel," was this an
7  inspection that -- looking for Chinese drywall?
8    A. No. Well, that was once we knew it was
9  there. And they took a piece of it, and he
10 sampled it and ran tests on it.
11   Q. And who was it that sampled it?
12   A. Mr. Kaltofen.
13   Q. And he's from Boston Chemical Data Corp.?
14   A. (Shrugs.)
15   Q. Did you pay for him to come in and inspect
16 and take a sample?
17   A. No.
18   Q. Do you know who paid for it?
19   A. No.
20   Q. Okay. Did you have any other inspections
21 other than from Boston Chemical Data Corp. and
22 from Driskill Environmental?
23   A. To my knowledge, that's it.
24   Q. Okay. Were you at home when either of
25 these inspections were conducted?

Page 79

1    A. Yes.
2    Q. Now, you said you're self-employed.
3      Do you typically work at home?
4    A. Yes.
5    Q. Do you have clients who come to your house
6  and drop off their --
7    A. No.
8    Q. -- items?
9      So how do you -- when you're making a --
10 when you're assessing a gem, how do you --
11   A. I have a portable lab.
12   Q. Okay.
13   A. So my lab goes with me. I go to their
14 house. Because the reason why I started doing
15 that was -- typically people don't want to leave
16 their jewelry with strangers, not even the stores.
17 And it was just a service that I thought, you
18 know, would be nice.
19   Q. Makes sense.
20   A. So that's what I do.
21   Q. And -- and when you're saying "a portable
22 lab," is it a fan or something like that?
23   A. No. Microscope and gem instruments.
24   Q. Did you ever have any conversations with
25 any of these -- either of these inspections?

Page 80

1    A. Well, yes. With Driskill, I did. I don't
2  remember if I spoke to Kaltofen.
3    Q. Do you know if anyone -- I know Boston
4  Chemical took some samples from your home.
5      Do you know where those samples are?
6    A. No.
7    Q. Did the presence of Chinese drywall in
8  your home limit your usage of the property?
9    A. I couldn't live in it. So yes.
10   Q. Was there -- other than having to move
11 out, was there any other limitations that were
12 created because of Chinese drywall being in the
13 home?
14   A. I was sick.
15   Q. And -- and what were the symptoms of being
16 sick?
17   A. Upper respiratory and a slight rash on my
18 body.
19   Q. Did you go to the doctor for those medical
20 ailments?
21   A. Yeah. The upper respiratory, I did.
22   Q. Did they provide any treatment to you for
23 that?
24   A. There was no fever; so take the flu --
25 like you have the flu.

Page 81

1    Q. Beyond the medical ailments and having to
2  move out of the house, was there any other
3  limitation of your usage of the home? Were you
4  not able to work in the home? Were you not able
5  to --
6    A. It --
7    Q. -- have guests over or anything like that?
8    A. That's prior to -- to diagnosing the
9  house?
10   Q. Uh-huh. Or at any time when you were
11 living in the home.
12   A. What's the question?
13   Q. At any time when you were living in the
14 home, other than what we've talked about, other
15 than having to move out, other than medical
16 ailments that you attribute to Chinese drywall,
17 was there any other limitation on your usage of
18 the home?
19   A. No.
20   Q. No.
21     Are you seeking any monetary payment for
22 any limitations of your usage of the home?
23   A. Yeah. I don't understand the question.
24   Q. We'll -- we'll come back to that in a
25 second.

Confidential - Subject to Further Confidentiality Review

Page 82

1    Did you incur any expenses for the medical
2  -- treating the medical ailments you had --
3    A. No.
4    Q. Are you seeking payment for any of your
5  personal injury or medical conditions in this
6  lawsuit?
7    A. Not to my knowledge.
8    Q. How long did you live in your house after
9  you suspected the house contained Chinese drywall?
10    A. Two weeks.
11    Q. Two weeks.
12    So you moved out --
13    A. Maybe.
14    Q. -- almost immediately afterwards?
15    A. Immediately.
16    My brother said, If the -- if the drywall
17  is eating copper, what's it doing to you and your
18  dogs' lungs? That's how I ended up in the house.
19  It was his suggestion to go. He goes, You cannot
20  live there, You got to go.
21    Q. And you were able to move out in part
22  because you had the family home that you were able
23  to move into?
24    A. Uh-huh.
25    Q. And to clarify, you lived in that home for

Page 83

1  -- and I know we've talked about this -- for about
2  two or three years afterwards -- is that
3  correct -- roughly?
4    A. Two years. Yeah. Yeah. I don't know.
5    Q. And during that time period, you -- you
6  didn't pay rent on that home? You were ultimately
7  owing rent at some point --
8    A. Yes.
9    Q. -- but you were not actively paying rent
10  at --
11    A. No.
12    Q. -- that point?
13    Did -- did you look at any other places to
14  live, or did you just decide you were going to go
15  live in the family home? Did you -- you know,
16  were you looking at other places that you might be
17  able to live? Did you look at other apartments or
18  anything else?
19    A. No.
20    MR. BARRY:
21    Okay. If you can hand me Tab 32.
22    Eight -- nine.
23    THE WITNESS:
24    Nine.
25    (Exhibit No. 9 was marked for

Page 84

1  identification and attached hereto.)
2  BY MR. BARRY:
3    Q. I handed you what is Exhibit 9, which is a
4  residential lease dated April 1, 2009 for a
5  property at 38 Sanctuary Boulevard.
6    Is this the lease for the family home?
7    A. Yes.
8    Q. And in Paragraph 1 it lists the rent
9  payment of $3,000.
10    Was that the rent payment that you
11  promised to pay?
12    A. Yes.
13    Q. Did -- and -- and to this date, you've not
14  made those rent payments to your brothers; is that
15  correct?
16    A. No.
17    Q. When you sold -- I -- I recall you saying
18  that you sold the house roughly in 2012, 2013?
19    A. Yeah.
20    Q. Do you remember how much you sold that
21  house for?
22    A. No. No.
23    Q. Knowing that you don't remember the price
24  that for -- you sold the house for, was -- when
25  you made the sale, was that -- the sale price

Page 85

1  equally distributed between you and your brothers?
2    A. Yes.
3    Q. Did your brothers subtract any unpaid rent
4  payments from --
5    A. No.
6    Q. -- you -- the amount you received?
7    A. No.
8    Q. So you received the full amount that --
9    A. Yes.
10    Q. -- that you were owed? Okay.
11    At some point you stopped paying on the
12  mortgage for the home that was affected by Chinese
13  drywall; is that correct?
14    A. Yes.
15    Q. I know you don't remember the exact date
16  on which you --
17    A. Right.
18    Q. -- stopped making those payments.
19    Do you remember if -- if the time period
20  you stopped making those payments was when you
21  were living in the family home?
22    A. Yes.
23    Q. Why did you stop making payments on the
24  mortgage?
25    A. Because the bank wouldn't talk to me. I

---

Page 86

1  tried -- kept telling -- telling them I -- the --
2  the -- the situation, and the banks just -- no
3  one had ever heard of toxic Chinese drywall. So
4  it was just -- they were just -- they thought I
5  was just trying to run from the mortgage when that
6  wasn't the case.
7     Q. So you couldn't -- so you stopped making
8  payments on the home in part to get the bank's
9  attention? Is that what you're saying?
10    A. That was part of it. Yeah. Plus it's a
11 financial hardship.
12    Q. But at the time you were not actively
13 paying rent for any other alternative living? You
14 were not --
15    A. That's correct.
16    Q. So it wasn't as if you were paying, you
17 know, double the amount to pay for a mortgage and
18 a rental at the same time; is that correct?
19    A. Say that again.
20    Q. So at the time that you were -- you
21 stopped paying on the mortgage, you were not
22 actively paying rent and a mortgage payment at
23 the --
24    A. No.
25    Q. -- same time?

---

Page 87

1     At the family home, was anyone else living
2  with you there?
3     A. No.
4        MR. BARRY:
5           Now if you'd turn to Tab 29.
6  BY MR. BARRY:
7     Q. When -- when you sold the home, did you
8  have to pay any fee for terminating the lease or
9  anything like that? No?
10    A. No.
11    Q. Were there any other fees related to the
12 home? Did you have to pay any type of tax
13 assessment or anything like that?
14    A. Say --
15    Q. The -- the family home --
16    A. No.
17    Q. -- did you have to pay towards taxes or
18 anything like that?
19    A. I don't -- I don't rem- -- honestly, I
20 don't remember.
21    Q. Okay.
22    A. I don't remember the closing on it.
23    Q. I'm going to hand you what is Exhibit 10,
24 which is an invoice from Atmosphere Movers, Inc.,
25 which is for the grand total of $350 and lists

---

Page 88

1  your current address as 1224 Magnolia Alley, which
2  is the home affected by Chinese drywall, to
3  Liberty Storage.
4     (Exhibit No. 10 was marked for
5     identification and attached hereto.)
6     THE WITNESS:
7        Yes.
8  BY MR. BARRY:
9     Q. What is this invoice for?
10    A. Moving to a storage unit.
11    Q. And what did you move to a storage unit?
12    A. I don't remember.
13    Q. Was it --
14    A. Because --
15    Q. Sorry. I apologize.
16    A. -- I can't -- I'm -- it had to be a
17 bedroom set, furniture, possibly, in the house.
18    Q. Was it the entire contents of the house,
19 or was it just part of the contents of the house?
20    A. It was probably the entire content- -- my
21 stuff. Yeah. The contents, nothing attached.
22    Q. And was that because the family home was
23 prefurnished?
24    A. No. No. No. No. No. I took -- we
25 split it. Some -- I didn't plan on being in the

---

Page 89

1  house that long; so all I moved was a sofa to the
2  house and a bed.
3     Q. Okay.
4     A. Like, you know . . .
5     Q. Did you eventually move items out of
6  storage and into the family home?
7     A. Probably. I don't remember.
8     Q. So you moved items into storage in part
9  because you expected to move somewhere else pretty
10 soon thereafter and you didn't want to move
11 everything to the family home?
12    A. Right.
13    Q. Could the family home have fit everything
14 that you moved --
15    A. Yes.
16    Q. -- into storage? Okay.
17       Now, are you seeking payment in this
18 lawsuit for the $350 you spent in moving fees?
19    A. Yes.
20       MR. BARRY:
21          Do you mind handing me Exhibit 30,
22       Mae -- or Tab 30.
23 BY MR. BARRY:
24    Q. I'm handing you what is Exhibit 11, which
25 is a set of invoices and a contract from

---

Page 90

1 Liberty Self Storage, and it looks like the
2 contract here is dated 4/28/2009.
3     (Exhibit No. 11 was marked for
4     identification and attached hereto.)
5 BY MR. BARRY:
6     Q. Was -- I -- I assume Liberty Self Storage
7 is where you stored the items from the home that
8 was affected by Chinese drywall?
9     A. Yes.
10     Q. And throughout the entire time that you
11 were living in the family home, did you pay for
12 self-storage at Liberty Self Storage?
13     A. Yes.
14     Q. Do you remember when you terminated your
15 contract with Liberty Self Storage?
16     A. No. I still have it.
17     Q. You still have it.
18     So you're still storing your stuff at
19 Liberty --
20     A. Yes.
21     Q. -- Self Storage?
22     A. Yes.
23     Q. And is it still $150 a month for
24 storing --
25     A. No.

Page 91

1     Q. How much is it now?
2     A. 250, 225, somewhere around there.
3     Q. And how much of -- given that you're still
4 making payments on the self-storage and that
5 started in 2009, how much of that time period, how
6 much of that monthly self-storage fees are you
7 seeking compensation for in this lawsuit?
8     A. I don't know.
9     Q. Are you seeking compensation for every
10 month you've paid, or are you seeking only for the
11 months --
12     A. I think it's only the months that this all
13 took place, the Chinese drywall.
14     Q. So up until the point where you sold --
15     A. Right.
16     Q. -- the home?
17     A. Right.
18     Q. And you sold the home roughly in 2010.
19 So --
20     A. Right.
21     Q. So April 2009 to whatever date you sold
22 the home in 2010?
23     A. Right.
24     Q. I know that's not established here.
25     And fair to say that that's the time

Page 92

1 period by -- for which you're seeking compensation
2 for the storage fees; correct?
3     A. I think so.
4     Q. And do you know during that time period if
5 the storage fees were always $150 a month?
6     A. I believe so. I don't know.
7     Q. Okay. And looking toward the end here --
8 actually, don't even worry about that.
9     MR. BARRY:
10     Do you mind handing me Tab 37.
11 BY MR. BARRY:
12     Q. So I've handed you what is Exhibit 12,
13 which is listed "Register Report - All Dates,"
14 "4/1/2009 through 4/2/2013."
15     (Exhibit No. 12 was marked for
16     identification and attached hereto.)
17 BY MR. BARRY:
18     Q. Do you know what this document is?
19     A. Yes.
20     Q. What is it?
21     A. It's a register report from all the bills
22 I've had during that time, what I paid in and what
23 I was -- everything.
24     Q. And -- and who prepared the register
25 report?

Page 93

1     A. I did.
2     Q. And are these all the bills that are
3 related to the property affected by Chinese
4 drywall, or are all these bills affect -- related
5 to the family home, or are these --
6     A. I think it's --
7     Q. -- just all the bills generally?
8     A. -- all the bills relative to the time
9 period that I had the house. So every -- I think
10 this is all the bills. So I was paying two
11 electricity bills, paying two HOA bills.
12     Q. And so this runs until 4/2/2013; is that
13 correct?
14     A. Yes.
15     Q. So -- and -- and we -- we -- I know I'm
16 sounding like a broken record here, but we spoke
17 about that you sold the home affected by Chinese
18 drywall in 2010?
19     A. Yes.
20     Q. So are you seeking compensation in this
21 lawsuit for any bills after you sold the home in
22 2010?
23     A. You know, it says --
24     Q. It says twenty -- it says 2013 here.
25 Just --

Page 94

1    A. It does. But the date only goes --
2    Q. But it ends 11/15 --
3    A. Yes.
4    Q. -- 2010? So --
5    A. That's correct.
6    Q. -- the cutoff at which you're --
7    A. Yes.
8    Q. So even though it's listing 2013, you're
9    really just seeking from --
10   A. Exactly.
11   Q. -- until 11/15/2010?
12   A. Yeah.
13   Q. Now, this is going to be both painful but
14   also not painful. I don't want to have to go
15   through all these receipts with you.
16       Do you mind just looking through here and
17   letting me know if you know if there's any
18   receipts here that are missing or if there's any
19   receipts here that you are -- as in "missing," you
20   are also seeking compensation for something that
21   is not included in this packet, or alternatively,
22   if there's anything in here that is here by error
23   and you're not seeking compensation for. And take
24   as much time looking through it as possible. And
25   I know that's painful, but it's easier than going

Page 95

1    through it one by one.
2    A. No. No.
3       MR. BARRY:
4       I apologize. I'm going to have to
5       take a quick break off the record after
6       you answer this.
7    BY MR. BARRY:
8    Q. So you don't see anything missing in this,
9    nothing that shouldn't be in there --
10   A. To my knowledge, I don't.
11   Q. Okay. And you've taken some time to look
12   through it, of course?
13   A. Uh-huh.
14   Q. Yes? Have you --
15   A. Yes.
16      MR. BARRY:
17      Okay. I'm going to take a quick break
18      just to grab a tissue, because I'm
19      struggling here with my cold.
20      (Brief recess was taken.)
21   BY MR. BARRY:
22   Q. So you moved out two weeks after you
23   learned there was Chinese drywall in the house.
24      How soon after there -- that did you try
25   to sell the home?

Page 96

1    A. I waited. I waited, but I don't remember
2    how long I waited. It was too many unknowns; so I
3    waited. But I don't know -- I guess maybe
4    eight months, six, seven months.
5    Q. Did you work with a real estate agent
6    to --
7    A. Yes.
8    Q. -- try to sell the home?
9       Did you list the home?
10   A. Yes.
11   Q. And do you remember how much you listed
12   the home for originally?
13   A. No.
14   Q. Did the real estate agent tell you
15   anything about your prospects of being able to
16   sell the home because Chinese drywall was in the
17   house?
18   A. Say it again.
19   Q. Did your real estate agent tell you
20   anything about the likelihood that you'd be able
21   to sell the house given that there was Chinese
22   drywall in the house?
23   A. No. We -- no.
24   Q. Now, how long do you remember -- how long
25   did you have to list the home before it was sold?

Page 97

1    A. I don't remember, but it -- it -- I -- I
2    remember thinking it was -- it was -- the whole
3    process took almost a year.
4    Q. Okay. And -- so do you recall
5    approximately when you originally put up the
6    listing of the house?
7    A. I want to -- I don't know why September
8    sounds familiar.
9    Q. Of 2009?
10   A. Yeah. That -- that sounds familiar.
11   Q. I know you said you had one sale fall
12   through.
13      Did you have any prior offers other than
14   the -- the offer that fell through?
15   A. I don't remember.
16   Q. And earlier you said you weren't aware of
17   anywhere other -- the price of other property
18   sales in your neighborhood or anything like that?
19   A. What do you mean?
20   Q. You weren't aware of how much -- or --
21   sorry. I -- you actually didn't. Never mind.
22   Scratch that question.
23      MR. BARRY:
24      Let's take 25. Twenty-five.
25      MS. MANUPIPATPONG:

Page 98

1    Oh.
2  BY MR. BARRY:
3    Q.  I put in front of you Exhibit 13, which is
4  the profile form that you prepared -- or the
5  plaintiff profile form that was prepared in --
6  related to this litigation produced to us.
7        (Exhibit No. 13 was marked for
8        identification and attached hereto.)
9      MR. BARRY:
10       I'm also representing for the record
11       that attached to this profile form was
12       your homeowners insurance policy, which I
13       think you said earlier was in the -- with
14       State Farm; the purchase agreement for the
15       property, and an addendum to the purchase
16       agreement, which includes any type of
17       upgrades.  We're not really going to talk
18       too much about that, but I just want to
19       make sure it's on the record.
20  BY MR. BARRY:
21    Q.  Do you recognize this document?
22    A.  It looks familiar.  But yes.  Yeah.
23    Q.  You don't?
24    A.  Yes.  I do.
25    Q.  Oh.  You do.  Okay.

Page 99

1    And if we look at Page 3 here, is that
2  your signature?
3    A.  Yes.
4    Q.  And were you the person who prepared this
5  document?
6    A.  Yes.
7    Q.  Now, looking through this, do you see
8  anything here that you believe to be inaccurate?
9  And I'll -- and really, just -- we're looking
10  through the first two --
11    A.  Well, it --
12    Q.  -- two pages here.
13    A.  Oh.  Just the first two pages?
14    Q.  Yeah.  We're not --
15    A.  Okay.
16    Q.  -- going to -- I have nothing for those
17  items.
18    A.  Okay.  And what was your question?
19    Q.  Do you see anything here that's inaccurate
20  or that --
21    A.  No.
22    Q.  And I apologize.  Perhaps I'm not able to
23  read this.
24    What does it say the approximate square
25  foot of the house is here, if you look at

Page 100

1  Section VI?  It's a little difficult --
2    A.  It's on the --
3    Q.  -- to read.
4    A.  -- back -- it's on the --
5    Q.  Yeah.  On --
6    A.  -- back page?
7    Q.  -- the second page.
8    A.  I don't even see the question.
9      THE WITNESS:
10       You see Section VI?
11      MR. CHRISTINA:
12       (Indicating.)
13      THE WITNESS:
14       Oh, okay.  Oh, I don't know.  It's all
15       -- I can't read that.
16  BY MR. BARRY:
17    Q.  And if we look at Section -- so here, you
18  can't read what it says, the approximate square
19  foot of the house; right?
20    A.  Right.
21    Q.  Now, if you look at Section VIII --
22  earlier we talked about -- that Leroy Laporte was
23  the person who installed Chinese drywall; is that
24  correct?
25    A.  Yes.  Yes.

Page 101

1    Q.  And -- and his company is Southern Star
2  Construction; is that correct?
3    A.  Yes.
4    Q.  When you completed this form, it was
5  March 24th, 2009?  It's at least the date of your
6  signature?
7    A.  Yes.
8    Q.  Was that before or after you moved out of
9  the home?
10    A.  I think that's after I moved out.  I'm not
11  a hundred percent sure.  Because when I moved out,
12  I just took a bed and left.  So . . . A blow-up
13  bed literally.  I mean, a little blow-up bed and a
14  lamp.  So I -- you know, my guess is -- is
15  probably after.
16      MR. BARRY:
17       If you can hand me 28, Mae.
18       I'm going to hand you a document.
19       I'll hand it to your counsel first here.
20  BY MR. BARRY:
21    Q.  I'll represent this is Exhibit 14, which
22  is Supplemental Plaintiff Profile Form, and is
23  signed and dated on February 11th, 2018.
24        (Exhibit No. 14 was marked for
25        identification and attached hereto.)

Page 102

BY MR. BARRY:

Q. Have you seen this document before, Miss Haindel?

A. It's -- it's my signature, but -- I guess so. I guess I've seen it.

Q. So --

A. I don't remember it.

Q. On the last page, is this -- that is your signature there?

A. Yes.

Q. I know I get to ask these fun questions, but --

A. But I -- I don't remember the document.

Q. No. Totally --

A. That --

Q. -- understand.

A. That's -- that's why I'm saying. I looked at the back. I said, Well, that's my signature. But I don't remember this.

Q. I feel like half the things I sign is like that.

Did you review this in preparation for your deposition?

A. No.

Q. Okay. So if you don't mind, just take a

Page 103

second looking through this, and just let me know if there's anything you see here that you believe is inaccurate or incomplete or where you would like to say anything has changed. So if you don't mind just starting from the front, reading through, and seeing if there's any answers that might be different than what's reflected here. And please take as much time as you need.

A. It says, "Have you preserved at least one sample of" the "type of drywall," the "endtape . . ." I do have that.

Q. Okay. You do?

A. Yes.

Q. And -- and what section are you pointing to?

A. I don't know. Page 5.

Q. Page 5.

And it's not -- and -- and to be clear here, where it says, "Have you preserved" any samples, it's not checked one way or the other right now?

A. That's correct.

Q. And so you're representing for the record that you have preserved . . .

A. A piece.

Page 104

Q. And -- and where is that preserved?

A. I don't know. At home, in a box with -- with a Zip-- what do you call it? I can't think right now. It's in a Ziploc.

Q. Okay. In looking through the rest of this document, is there -- and -- and so at -- at your home; is that correct?

A. Well, it's -- yes.

Q. Okay. Now, looking through the rest of this document, is there anything else you see that is incorrect or incomplete?

A. No.

Q. No.

Let me see. So if you look on Page 3, just above Section III.

A. Page 3, above Section III?

Q. Yeah.

A. Okay.

Q. Where it says you sold or transferred the property on 12/6/2010, is that when you --

A. Yes.

Q. -- remember selling the property?

A. Yes.

Q. And we talked earlier that you learned of Chinese drywall roughly in March 2009; is that

Page 105

correct?

A. Yes.

Q. So about a year and nine -- nine months is -- later you sold the home?

A. Yeah.

Q. Now, let's look in Section IV. We're going to look at Page 4.

A. Okay.

Q. Here, it says the property was subject to a short sale with the lender, Bank of America. It says the short sale price was $110,000.

Is that what you recall being the short sale price?

A. Yes.

Q. And where it says the amount owed on a loan/mortgage is $118,150, is that in addition to the amount of the short sale price?

A. I don't know.

Q. When you sold the home at the -- at -- for short sale, do you remember how much principal you owed on the -- owe -- owed on the home?

A. See, I don't.

And I also went to the sale with money.

Q. With money.

How much money did you go to the sale

Page 106

1  with?
2      A.  I don't -- I don't -- I'd have to look it
3  up.  I don't remember.
4      Q.  We can -- we'll -- we'll introduce more
5  documents on that.
6      A.  Okay.
7      Q.  So just -- if you don't remember, please
8  just tell me that.  That's fine.  We can come to
9  it later.
10          When you conducted the short sale in
11  December 2010, do you remember if there was less
12  than $200,000 owed on the mortgage?
13      A.  I -- I don't remember.  I -- yeah.  I
14  would say yes --
15      Q.  Okay.
16      A.  -- but I don't remember.
17      Q.  Do you remember if you ultimately had to
18  pay $118,150 to Bank of America after the short
19  sale?
20      A.  I don't remember.
21      Q.  Okay.  Did they ever collect any
22  additional amount on the mortgage after the short
23  sale?
24      A.  Yes.
25      Q.  How much?  Do you remember?

Page 107

1      A.  Whenever I came -- I went -- like I said,
2  I brought money to the closing, and I had a -- and
3  I don't know where that -- those funds were.  I
4  had a promissory note for $45,000.  So I don't
5  know who that was to or for --
6      Q.  Understood.
7      A.  -- at the time.
8      Q.  Now, looking at Section VI, which is Prior
9  Payments -- it's on Page 5.
10      A.  Okay.
11      Q.  It lists -- the question asks, "Have you
12  received any payments, including but not limited
13  to settlement payments, payments from
14  homebuilders, and insurance payments, related to
15  damages you claim to have suffered caused by
16  defective Chinese drywall in the Property or
17  related to any other harm caused by defective
18  Chinese drywall?"  "If Yes, identify the" source
19  "and state the amount of" payment "you received."
20          Here, you've listed, "Source:  CDW
21  Settlement Program," and you've received the
22  amount of $32,373.92.
23          Did you receive that amount of money?
24      A.  Yes.
25      Q.  And what does that relate to?  Why did you

Page 108

1  receive that amount of money?
2      A.  Honestly, I don't really remember exactly
3  that went -- came from or went to.  It's 10 years.
4      Q.  Totally understand.
5      A.  In -- in multiple small payments too; so
6  I -- I don't remember.
7      Q.  Have you received any other payments in
8  relation to Chinese drywall?
9      A.  No.  Just whatever's here.
10      Q.  Okay.  Now, looking at Section VII, which
11  is on Page -- starts on Page 5.  Section VII is
12  listed "Other Damages."  The first line here says,
13  "If you incurred alternative living expenses as a
14  result of Chinese Drywall, identify the total
15  moving cost and/or alternative living expense you
16  incurred."
17          And that's $65,854.63?
18      A.  Yes.
19      Q.  Do you know how you came to that number,
20  $65,854.63?
21      A.  I guess Exhibit 12.
22      Q.  And that's the register report?
23      A.  Yes.
24      Q.  Now, looking at the register report, that
25  includes rent payments of $3,000 on 4/1/2009,

Page 109

1  5/2/2009, 6/1/2009, 7/1/2009, so on and so on?
2      A.  Yes.
3      Q.  And as we've discussed earlier, you -- you
4  didn't actually make those payments; right?
5      A.  Right.
6      Q.  So you -- are you seeking compensation for
7  rent payments you have not made?
8      A.  Yes.
9      Q.  Okay.  And that is reflected in the
10  65,854.63 that is in Section VII of Exhibit 14, if
11  you look at Exhibit 14?
12      A.  I am.  Okay.
13      Q.  It's on Page 5 --
14      A.  Okay.
15      Q.  -- at the bottom there.
16      A.  Yes.
17      Q.  And so those rent payments you have not
18  made are reflected in that amount of money?
19      A.  Yes.
20      Q.  If you look at Page -- and -- and I
21  apologize.  Just to reiterate one more time here,
22  we -- when we're talking about the 65,854.63, all
23  of that value, all of those receipts are reflected
24  in Exhibit 12?  There's no other receipts
25  outstanding, no -- nothing else --

Page 110

1    A. Not to my knowledge.
2    Q. If it's not in the register report, it's
3 not included in the damages --
4    A. I don't think so.
5    Q. -- you are seeking?
6    A. Yeah. I don't know.
7    Q. A line down here, it says, "If you
8 experienced any loss of use and/or loss of
9 enjoyment of the Property as a result of Chinese
10 Drywall, identify the total amount of such loss."
11 And so you've listed $50,000.
12       How did you come to $50,000?
13    A. That's just a rough estimate.
14    Q. And -- and what did you include in -- what
15 did you include as your criteria in coming to that
16 rough estimate?
17    A. Well, enjoyment of living, isn't that what
18 it . . . Enjoyment of living. I mean, I haven't
19 been able to buy a house. I haven't been able to
20 do anything. It totally froze my life.
21    Q. Okay.
22    A. I mean $50,000 is just a rough estimate.
23 It's -- it's probably a higher number than that.
24    Q. Okay. And you're saying probably a higher
25 number than that.

Page 111

1       Are -- are you seeking a higher number
2 than that, or are you seeking $50,000?
3    A. I don't know. I don't know.
4    Q. Is there another value that is not listed
5 here that you're seeking here related to the loss
6 of use and enjoyment?
7    A. No.
8    Q. Down two lines here, it says, "If you
9 claim a diminution in value of the Property as a
10 result of Chinese Drywall, identify the total
11 amount of such diminution of value being claimed."
12 And there's no value listed.
13       Are you seeking damages for diminution in
14 value of the property related to Chinese --
15    A. Clarify "diminution of value."
16    Q. The reduction in the value of the home
17 because of Chinese drywall.
18    A. So ask the question again.
19    Q. "If you claim a diminution in value of the
20 Property as a result of Chinese Drywall, identify
21 the total amount of such diminution of value being
22 claimed." And there's nothing listed here.
23       Are you claiming that -- damages for the
24 diminution in value of the home because of Chinese
25 drywall?

Page 112

1    A. I would say yes.
2    Q. What -- what amount are you seeking?
3    A. I guess whatever the price of the house
4 was, less -- less what was paid.
5    Q. So the purchase price less the sale price
6 that you . . .
7    A. I think that would be a rough estimate.
8    Q. Okay. And even though that's not listed
9 here, you are seeking those damages in this
10 litigation?
11    A. I think so.
12    Q. Okay. Are you the sole owner of the claim
13 for all the damages that you seek in this lawsuit?
14 Is there anyone else who can make claim for the
15 damages that were caused to the property because
16 of Chinese drywall?
17    A. Oh, no.
18    Q. Okay. So you had no co-owner who might
19 also have a --
20    A. No.
21       And the person who bought it, he signed
22 his -- he waived his rights.
23    Q. Okay. And you specifically waived --
24 asked for that waiver of rights when you --
25    A. Yes.

Page 113

1    Q. -- made the short sale?
2       MR. BARRY:
3          Let's take a quick break. And then I
4       don't have too many more questions. We'll
5       talk for just a little bit more. But it's
6       a good time for a break --
7       THE WITNESS:
8          Okay.
9       MR. BARRY:
10          -- because the next section's a little
11       long.
12    (Brief recess was taken.)
13       MR. BARRY:
14          I'm going to hand you -- or hand your
15       counsel a document.
16 BY MR. BARRY:
17    Q. This is a document that is Exhibit 15,
18 which is 2008 Property Tax Parish of St. Tammany.
19       (Exhibit No. 15 was marked for
20       identification and attached hereto.)
21 BY MR. BARRY:
22    Q. I've -- if I've mispronounced that too,
23 let me know.
24    A. No.
25    Q. And what we're looking at here is Page 2.

Page 114

1 This is a letter dated September 25th, 2009. And
2 in it, it says that "After a careful review of the
3 above referenced assessment, I have reduced the
4 assessed value to 7,614, a market of" 76140 "for
5 the 2009 tax year, due to Chinese drywall."
6 Did you receive a tax -- a reduction in
7 your tax assessment because of Chinese drywall?
8 A. Yes.
9 Q. Did you request that?
10 A. Yes.
11 Q. And do you remember what the amount --
12 market value was prior to that?
13 A. Prior to what?
14 Q. Prior to the reduction to 76,000.
15 A. You mean how much were the taxes?
16 Q. The tax assessment, do you remember how
17 much --
18 A. Yeah. I don't remember.
19 Q. You don't remember?
20 A. I do not.
21 Q. Do you remember --
22 A. Well, I guess this would be it, $2,632 --
23 Q. So 2008 --
24 A. -- on Page 1.
25 Q. Uh-huh. So in 2008, you paid $2,632.14 in

Page 115

1 taxes on the property?
2 A. Yes.
3 Q. And now -- and that -- that's reflected on
4 Page 1; is that correct?
5 A. Yes.
6 Q. So if we're looking at Page 3 now, it says
7 that you paid $138.14 in taxes in 2009; is that
8 correct?
9 A. That's correct.
10 Q. So there was approximately a 2500-dollar
11 reduction in the amount of taxes you had to pay --
12 A. Yes.
13 Q. -- from 2008 to 2009?
14 And, according to this letter, that was
15 because of Chinese drywall?
16 A. Yes.
17 Q. So -- we talked a little bit, that you did
18 a short sale in 2010, and that was after having
19 listed the property for approximately a year, you
20 said? A little less than a year?
21 A. September to December.
22 Q. Okay. September 2009 to December of 2010?
23 A. Uh-huh.
24 Q. And when you were working with the real
25 estate agent to sell the property, were you also

Page 116

1 trying to negotiate anything with your lender at
2 the time?
3 A. Yeah. I tried to call the lender. The
4 lender wouldn't talk to me.
5 Q. Did you ever receive a response from the
6 lender?
7 A. Well, I think you need to clarify.
8 Because there's a short sale, which has to be
9 approved by the lender --
10 Q. Right. Of course.
11 A. -- so I did get that.
12 Q. So at the time you were listing the
13 property, was there any communication with the
14 lender?
15 A. Yeah. I -- I tried. That was part of the
16 whole not paying the mortgage --
17 Q. So did the --
18 A. -- for those few months.
19 Q. So you tried. Were -- was this a one-side
20 communication? Was the lender responding to you
21 at all?
22 A. Right. And that -- no. Not -- not until
23 the short sale started --
24 Q. Okay.
25 A. -- to take place.

Page 117

1 Q. That's helpful clarification. Thank you.
2 MR. BARRY:
3 Do you mind handing me 19.
4 BY MR. BARRY:
5 Q. I'm going to hand you which is --
6 Exhibit 16.
7 (Exhibit No. 16 was marked for
8 identification and attached hereto.)
9 BY MR. BARRY:
10 Q. This is Exhibit 16, which is a document
11 from Chehardy & Sherman. And it is dated
12 August 16th, 2010, and it is to Bank of America.
13 Have you seen this document before?
14 A. Yes.
15 Q. And looking through these set of
16 documents, what -- what are the documents that are
17 in this -- this Exhibit 16?
18 A. They're letters from the attorney, I
19 believe, to the bank, trying to get communication,
20 explaining the situation, I believe, isn't it?
21 Yes.
22 Q. And in this letter, if you look at
23 Paragraph 3, it says, Miss "Haindel had no choice
24 but to move out of the house last year, and" it's
25 "been vacant ever since then. This property will

Page 118

1 have to be completely gutted before it" could "be
2 occupied again. Although" Miss -- "although" Miss
3 "Haindel tried to keep her Bank of America loan
4 current, she simply could not afford to service
5 both that loan and pay living expenses at her
6 current residence. As a result, she stopped
7 paying the Bank of America loan some months ago."
8      Were -- what -- what were the living
9 expenses that you were having to pay at the
10 current residence that prevented you from paying
11 on the mortgage?
12      A. What -- what do you -- what's the
13 question?
14      Q. Here, it says she -- you "could not afford
15 to service both that loan and pay living expenses
16 at her current residence."
17      A. I was maintaining a whole 'nother house.
18      Q. And -- and --
19      A. And I was paying still two HOA fees, two
20 electric, two everything.
21      Q. So was -- the living expenses, not the --
22 the rent payments or anything like that --
23      A. Right.
24      Q. -- during the . . . Okay.
25      Here, it lists that there -- if you turn

Page 119

1 the page, this is Page 2 on the document. It says
2 you received an offer to purchase the condominium
3 for a hundred thousand dollars in Paragraph 2
4 here.
5      A. Yes.
6      Q. Was that the sale that fell through?
7      A. No. Oh, I don't know.
8      Q. You don't remember one way or the other
9 whether that was the sale that fell through?
10      A. No.
11      Q. Okay.
12      A. I don't remember.
13      Q. Do you know if Bank of America responded
14 to this letter?
15      A. To my knowledge, I don't -- I don't
16 remember. Let me say no, because I didn't -- they
17 didn't give me any reprieves.
18      Q. Okay. So looking at the next letter,
19 which is dated September 22nd, 2010 -- and that's
20 in the same Exhibit 16 -- this shows that you
21 received an offer for $105,000 in September of
22 2010.
23      Is that the offer that --
24      A. That --
25      Q. -- fell through?

Page 120

1      A. -- could have been the offer that fell
2 through.
3      Q. And at that time Bank of America was
4 agreeing to accept $110,000?
5      A. Yes, I guess.
6      Q. Okay. For the short sale?
7      A. Uh-huh.
8      Q. So that would imply that Bank of America
9 made some sort of response during this time period
10 or was at least in communication with you or your
11 counsel?
12      A. Yes. September -- right. So the first
13 letter was August 16th. The second letter was
14 September.
15      Q. Okay. Let's turn to Page 3 or -- sorry.
16 Page 4, 5. Now, this is a short sale amendment to
17 approval letter from Bank of America Home Loans.
18 And it's dated November 22nd, 2010. And it lists
19 the buyer as Lord -- Lloyd Tournet for the sales
20 price of $110,000.
21      A. Yes.
22      Q. Is that who ultimately purchased your
23 home?
24      A. Yes.
25      Q. And at the bottom here are some

Page 121

1 calculations from Bank of America. It says
2 "Proceeds from sale," "$103,150.00." And then it
3 says "Cash Contribution" of "$15,000.00."
4      Earlier we talked about -- you brought
5 some cash to the sale. Was that $15,000?
6      A. Yes.
7      Q. And then there would be a promissory note
8 of $45,000.
9      Did you ultimately sign a promissory note
10 with Bank of America for $45,000?
11      A. Yes, I did.
12      Q. Do you remember if you've paid on that
13 promissory note?
14      A. Did I pay on it? Yes. I paid it.
15      Q. Is it paid off in full now?
16      A. It is.
17      Q. Okay. And beyond that, if there was any
18 remaining principal on the -- on the loan, do you
19 remember if Bank of America forgave the rest of
20 that principal?
21      A. I think so. I'm not --
22      Q. Okay.
23      A. -- sure.
24      Q. So anything above and beyond this $163,150
25 was forgiven by Bank of America?

Page 122

1   A. I don't know.
2   Q. Did the bank ever -- when -- when you
3 stopped making payments on the house, did the bank
4 ever threaten to foreclose on the house?
5   A. That's a good point. I don't think.
6   Q. Did they ever send you a default notice?
7 Do you remember?
8   A. I don't -- this is interesting. I don't
9 remember. Because that would be logical, but I
10 don't remember that.
11   Q. Did you ever request a forbearance?
12   A. Define "forbearance."
13   Q. That's a term in the mortgage world for
14 we'll stop collecting payments for a little bit
15 and allow you --
16   A. Right. No.
17   Q. -- not to pay.
18   A. No. That's what I was looking for. No.
19 No.
20   Q. You ultimately owe that amount, but --
21   A. Yeah.
22   Q. -- we'll -- we won't --
23   A. Right.
24   Q. -- collect it for six months or so.
25   A. Yeah. No. That -- none of that occurred.

Page 123

1   Q. Okay. Do you remember if there's any
2 other correspondence with Bank of America?
3   A. Well, I mean, I -- I --
4   Q. At least prior to this November, or
5 September 2010 --
6   A. I don't remember.
7   Q. Were there any other factors that
8 prevented you from being able to pay on the home
9 loan other than having to maintain two properties?
10   A. I -- I don't -- to -- I don't know.
11   Q. Were there any changes to your job during
12 that time period?
13   A. Well, yeah. I wasn't working because I
14 couldn't -- my -- I couldn't do anything. I was
15 frozen. I mean, my life was total chaos.
16   Q. And so you couldn't work because of --
17 explain --
18   A. You're re-establishing yourself.
19   Q. And -- and --
20   A. I just moved to Mandeville. The timing on
21 this, Katrina -- I'm just getting over there.
22 You -- you have to re-establish yourself.
23 New Orleans wasn't back yet.
24   Q. So because of Katrina, because of new --
25   A. Of the dynamics.

Page 124

1   Q. So -- I apologize.
2   A. I know.
3   Q. That's one where I have to --
4   A. I know. Okay.
5   Q. -- be able to ask the full question and
6 answer. I know you know what I'm asking.
7     So in part, your business was suffering
8 because of the reinvigoration of New Orleans
9 post-Katrina, where people were still moving back
10 into town; so you were not making the same income
11 you were prior to Katrina?
12   A. No.
13   Q. So is it fair to say that
14 Hurricane Katrina affected your income?
15   A. Oh, that's very fair to say.
16   Q. Do you know how much it would have
17 affected your income?
18   A. I have -- I don't know.
19   Q. Okay. But because of that net change in
20 income, that affected your ability to pay for the
21 house?
22   A. Yes.
23   Q. Did you have any -- other than the ones
24 that we've talked about related to Chinese
25 drywall, did you have any medical conditions

Page 125

1 during that time period?
2   A. No.
3   Q. Did any members of your family have any
4 medical conditions or unforeseen expenses that you
5 ended up having to pay for?
6   A. No. I don't think -- I don't remember.
7 But no.
8   Q. Had you been sued, or any -- was there a
9 judgment against you during that time period?
10   A. No. No.
11   Q. I know. I have to ask the question.
12   A. No. I know. I -- and I'm trying to
13 think. I'm trying to put myself back in the time.
14   Q. I totally understand. This is a while
15 ago.
16     Was there any time period where you
17 stopped working not because, you know, the -- what
18 we talked about with post-Katrina and business
19 development, because, you know, you had the
20 inability to work because of health conditions or
21 anything like that?
22   A. I don't know. I don't even -- I don't
23 know.
24   Q. Did you have any -- excluding costs
25 related to Chinese drywall, did you have any

| Page 126 | Page 128 |
|---|---|

**Page 126**

1 unforeseen expenses, such as, you know, needing to
2 replace a car or something of that sort, like some
3 big expense that you were not expecting during
4 this time period?
5    A. During the Chinese drywall period?
6    Q. Uh-huh.
7    A. I -- I don't think so. I don't remember,
8 but I don't . . .
9    Q. Did you have any other major debts besides
10 you're mortgage?
11    A. To my knowledge, I don't remember, but I
12 don't think so.
13    Q. So ultimately Bank of America did approve
14 your short sale; is that correct?
15    A. Yes. That, I remember.
16      MR. BARRY:
17       Now if you'll give me Tab 40.
18      Actually, skip that. Skip that. Let's go
19      to 41.
20      Seventeen.
21    (Exhibit No. 17 was marked for
22    identification and attached hereto.)
23 BY MR. BARRY:
24    Q. I've handed you what is Exhibit 17, which
25 is the affidavit of short sale.

**Page 127**

1      Do you recognize this document?
2    A. Again, it's my handwriting. But yeah, I
3 have -- I don't remember it.
4    Q. And reading through the document, is this
5 just a document that reflects the amount that --
6 or that there was a short sale, the amount that
7 was paid on the short sale, and then what you
8 purchased the price -- purchased it for?
9    A. Yes.
10    Q. Did you prepare this document? Do you
11 remember?
12    A. Yes.
13    Q. And that is your signature at the bottom?
14    A. Yes.
15    Q. Okay. And does this -- in here, this --
16 does this reflect the amount of loan forgiven by
17 Bank of America or the cash that you brought to
18 the sale?
19    A. No.
20    Q. Okay. So the -- it doesn't show the --
21 the amount of cash you brought to the sale or
22 the --
23    A. No.
24    Q. -- amount secured, the -- the loan, the
25 promissory note that you made, or -- or the -- or

**Page 128**

1 the amount that Bank of America forgave on the
2 loan; correct?
3    A. No.
4      MR. BARRY:
5       If you can hand me 42.
6 BY MR. BARRY:
7    Q. This is Exhibit 18, which is a letter from
8 Latter & Blum, Inc., Realtors, dated
9 September 9th, 2014, signed by John Schaff, an
10 associate broker.
11    (Exhibit No. 18 was marked for
12    identification and attached hereto.)
13 BY MR. BARRY:
14    Q. Who is Latter & Blum?
15    A. Latter & Blum is the listing agent -- the
16 listing company on my house.
17    Q. And was John Schaff --
18    A. He was one --
19    Q. -- your broker?
20    A. -- of the agents.
21    Q. And this letter reads, "I'm writing to
22 confirm that I was the listing agent for Mary
23 Haindel's property at 1224 Magnolia Alley in
24 Mandeville, LA. The property was affected by
25 Chinese drywall and because of that we were unable

**Page 129**

1 to sell it for market value. This not only forced
2 her to take a substantial reduction in price, but
3 also caused her to have to request a short sale."
4      Is this a document you requested your
5 realtor to prepare for you?
6    A. Oh, I -- I don't know why this was
7 written, but it was written. I don't know.
8    Q. Was there any other factors that caused
9 the reduction in value of price other than Chinese
10 drywall?
11    A. No.
12    Q. Was there anything, such as the economic
13 downturn, that affected the price of the home?
14    A. No.
15      Again, you had a city that wasn't back
16 yet; so they were all going across the lake.
17    Q. So other factors that would be included in
18 here was -- in part, there was a -- property value
19 dropped in Louisiana generally speaking? Is that
20 what you're --
21    A. No.
22    Q. -- saying?
23    A. No. What I'm saying is -- what was your
24 question?
25    Q. My question was: Was there other factors

Page 130

1 that affected the price of your home other than
2 Chinese drywall?  So you purchased --
3     A.  I said no.
4     Q.  And so when you're saying the city getting
5 back on its feet, that was not something that you
6 believe affected the price of --
7     A.  No.
8     Q.  Before you sold the house, did you have
9 any appraisal done on the value of the home?
10     A.  No.
11     Q.  Did you ever have any other appraisal
12 done?  Other than when you were purchasing the
13 home, was there any --
14     A.  No.
15     Q.  -- appraisal . . .
16     MR. BARRY:
17         Let's do 43.
18 BY MR. BARRY:
19     Q.  Do you -- this is Exhibit 19, which starts
20 with a document on your letterhead dated
21 October 10th, 2010, and it is sent to Joyce Brasa
22 of Bank of America short sale department.
23     (Exhibit No. 19 was marked for
24         identification and attached hereto.)
25 BY MR. BARRY:

Page 131

1     Q.  And this is -- what is this letter?
2     A.  This letter appears to explain the
3 dynamics of my situation.
4     Q.  And the situation being that you were
5 requesting --
6     A.  The house was --
7     Q.  -- a short sale because of Chinese drywall
8 and your inability to pay on the home?
9     A.  Uh-huh.
10     Q.  And if you turn to here what is Page 1, 2,
11 3, 4 -- the fifth page here.  And this is the HUD
12 settlement statement.
13         Is this the HUD settlement statement from
14 the short sale that you made in December of 2010?
15     A.  Yes.
16     Q.  And -- so it says contract sale price of
17 $110,000; is that correct?
18     A.  Yes.
19     Q.  And we talked earlier that in addition to
20 that $110,000, you also brought $15,000 cash to
21 the table, and then you paid a -- you signed a
22 promissory note with Bank of America for $45,000;
23 is that correct?
24     A.  Yes.
25     Q.  Now, if we turn to this letter that's

Page 132

1 dated February 16th, 2011, which is the third page
2 from the end.
3     A.  Okay.
4     Q.  And this is a letter to you from Bank of
5 America home loans, Mary Haindel.  It says, "In
6 2010, you completed a short sale of your home with
7 BAC Home Loans Servicing, LP.  By this letter, we
8 wish to inform you that the remaining balance on
9 the above-referenced loan will not be pursued."
10         So earlier we talked a little bit about
11 whether they forgave the rest of the loan.
12         Does this refresh your memory that they --
13     A.  Yes.
14     Q.  Did they keep their word on this?  Did
15 they ever try to collect anything more?
16     A.  Actually, they -- they -- I got -- I
17 received one phone call and I told them -- you
18 know, about the letter, and I didn't hear from him
19 again.
20     MR. BARRY:
21         Let's find 18.
22     MS. MANUPIPATPONG:
23         Eighteen?
24     MR. BARRY:
25         Yeah.

Page 133

1 BY MR. BARRY:
2     Q.  But beyond this, there was no other
3 payments you have to make on the loans other than,
4 of course, the promissory one?
5     A.  To my knowledge.
6     MR. BARRY:
7         And I'm going to hand you this.
8     THE WITNESS:
9         Sal.
10 BY MR. BARRY:
11     Q.  So this is Exhibit 19, which is a document
12 from ReconTrust Company --
13     MR. CHRISTINA:
14         Exhibit 20.
15     MR. BARRY:
16         Twenty.  Exhibit 20.
17     (Exhibit No. 20 was marked for
18         identification and attached hereto.)
19 BY MR. BARRY:
20     Q.  Exhibit 20 from ReconTrust Company, NA.
21 It's dated September 22nd, 2010.  And this shows
22 -- here it says, "Recently the above referenced
23 loan was paid-in-full.  We have sent an original
24 Release of Mortgage and a recording fee check to
25 the County Recorder's Office."

Page 134

1    Is this document canceling the mortgage?
2    A. I believe so.
3    Q. And so you owe nothing more on the
4 mortgage as far as --
5    A. Right.
6    Q. -- you're aware of?
7    Now looking back to Exhibit 19, the last
8 two pages here is an invoice from Chehardy,
9 Sherman, Ellis, Murray, Recile, Griffith,
10 Stakelum & Hayes. That's a long name.
11    And the invoice total, based on the second
12 page -- I assume that's a law firm; is that
13 correct?
14    A. It is.
15    Q. And the invoice total is $687.50?
16    A. Yes.
17    Q. Are -- was this the law firm that
18 represented you in relation to the short sale
19 and --
20    A. Yes.
21    Q. -- the close of the property?
22    And did you have to pay $687 --
23    A. Yes.
24    Q. -- 50 cents?
25    And it says "payment applied to bill,"

Page 135

1 minus a hundred dollars. So did you -- sorry.
2 That was done inaccurately. Did I -- did you have
3 to pay $743 --
4    A. Yes.
5    Q. -- and 75 cents?
6    And are you asking for damages related to
7 the amounts you paid to that law firm in this
8 lawsuit?
9    A. Yes.
10    Q. Do you know the total amount of damages
11 you're asking in relation -- in relation to the --
12    A. I don't.
13    Q. -- short sale?
14    A. I -- I don't.
15    Q. You don't know that.
16    Have you tried to calculate that number?
17    A. Probably 10 years ago I did them and not
18 -- you know, I don't remember.
19    Q. Okay. Outside of the -- the law firm
20 prices, the -- you talked about the loss of use
21 and enjoyment. We've talked about the alternative
22 living expenses. And you said there's some number
23 of diminution in value.
24    Are there any other damages you're seeking
25 in this lawsuit?

Page 136

1    A. I don't know. I don't think. I don't
2 know.
3    Q. You don't know just right now?
4    A. Right. I mean, I -- it -- I'm -- I'm --
5 you got to remember, this was 10 years ago. My
6 whole life stopped 10 years ago. And I mean, over
7 -- everything that's happened to me -- so to ask
8 me questions about numbers, I have no earthly
9 idea.
10    Q. I understand. And I --
11    A. This was a horrible time in my life. So
12 look, I -- I -- I'm just -- what can I say, you
13 know? I don't know.
14    Q. I -- I understand. I know this -- these
15 are -- these are questions that are difficult to
16 talk --
17    A. And, I mean, it's easy to ask the
18 questions too. And it doesn't -- it doesn't --
19 you're answering questions that -- that -- that
20 are so small in comparison to the bigger picture.
21    Q. I -- I understand, ma'am. I --
22    A. No. I know. I know.
23    Q. And I -- I'm -- all I'm trying to do is
24 understand what you're asking for here. And it's
25 to be able to -- and if you don't know, that --

Page 137

1 that's --
2    A. Yeah. I don't know.
3    Q. -- that's acceptably fine. But I just --
4 I just need to know that you do not know or . . .
5    A. I don't know.
6    MR. BARRY:
7       Okay. Let us take a quick break --
8    THE WITNESS:
9       Okay.
10    MR. BARRY:
11       -- and talk. And I don't think I have
12    any more questions for you. But they may
13    figure something out that I missed, and
14    they may have a question or two.
15    (Brief recess was taken.)
16 BY MR. BARRY:
17    Q. Going back on the record, I just have a
18 few more questions for you. I promise, just a
19 few. If you can look back at Exhibit 12, which is
20 this one.
21    A. Okay. Okay.
22    THE WITNESS:
23       Thank you.
24 BY MR. BARRY:
25    Q. Now, looking down here on the memo side

Page 138

1 and just looking at the -- the fourth line down
2 here, it says, 26.60 [sic] "total bill. split
3 Utilities w/Lori."
4      Who is Lori?
5    A. Lori was a neighbor who -- in
6 Chinchuba Creek who also had Chinese drywall. And
7 my brother suggested that she -- if she needed a
8 place to stay, that she could stay in the family
9 home. Because it was big enough that she could
10 stay upstairs if she wanted to. So Lori, on
11 occasions, depending on her job, she would stay in
12 the home. And then she would come and go. So she
13 -- you know, we -- she -- we felt that it was
14 fair, that if she wanted to split the utilities,
15 that -- I said, Go ahead and split them if you'd
16 like, to be fair. I mean, these -- this was,
17 again, a very expensive time. I mean, this really
18 cost us a lot of money.
19    Q. Totally understand.
20      Did -- in addition to splitting the
21 utilities when she was there, did Lori ever pay
22 rent --
23    A. No.
24    Q. -- on the house? No?
25    A. No.

Page 139

1    Q. Did you ever ask her to pay rent?
2    A. No.
3    Q. Did she ever provide any other monetary
4 payment related other than paying -- splitting
5 the --
6    A. I don't remember.
7    Q. -- utilities?
8    A. I don't remember. Again, it was 10 years
9 ago. In -- in her job, she traveled a lot. So I
10 don't -- I -- you know . . .
11    Q. You don't remember?
12    A. Uh-uh.
13      MR. BARRY:
14        Do you mind handing me that one more
15      document.
16        And keep Exhibit 12 in front of you
17      just for a second. I'll hand you this.
18      THE WITNESS:
19        Oh. That's for me? Oh.
20      MR. CHRISTINA:
21        Yeah.
22 BY MR. BARRY:
23    Q. And this is Exhibit 21, which is a
24 register report dated 4/11/2007 through 3/23/2011.
25      (Exhibit No. 21 was marked for

Page 140

1      identification and attached hereto.)
2 BY MR. BARRY:
3    Q. And I'm not going to ask you too many
4 questions on this.
5      Just comparing this document to
6 Exhibit 12, what is -- what -- what is the
7 difference between these two documents?
8    A. Well, I think this is more -- I think the
9 4/11 is -- is really concentrating, I guess, on
10 the Chinese drywall.
11    Q. The house with Chinese drywall? Is --
12    A. Yeah. I --
13    Q. -- that what you're saying?
14    A. -- think so.
15    Q. And -- so would it be fair to say that
16 Exhibit 12 relates to the payments that you made
17 on the family home, including utilities and rent,
18 whereas --
19    A. Right.
20    Q. -- Exhibit 21 is related to payments you
21 made on the house that is affected by Chinese
22 drywall?
23    A. Exactly.
24    Q. And now, if you recall, when we were
25 talking about Exhibit 12, I asked you to look

Page 141

1 through everything here and let me know if you see
2 anything that is missing or incorrect.
3      Do you mind looking through this document
4 and -- and --
5    A. Twelve --
6    Q. -- and doing the same thing?
7    A. Exhibit 12 or 21?
8    Q. Let's do the same thing for Exhibit 12 --
9 21. Go through Exhibit 21 --
10    A. Twenty-one.
11    Q. -- if you can look through and see if
12 there's any cost or expenses that are missing here
13 or if there's anything that you think is
14 incorrect. And take as much time as you need.
15    A. No. I -- I think everything is here.
16    Q. And you prepared this; correct?
17    A. Yes.
18    Q. And would this be the best reflection of
19 the expenses that directly relate to the house
20 where -- rephrase the question.
21      Regarding the house that had Chinese
22 drywall, would this be the best reflection of the
23 expenses directly related to the home?
24    A. When you say "directly" . . .
25    Q. So not including, you know, the payments

Page 142

1 you made related to the family home, this reflects
2 the payments that are directly tied to this
3 home --
4    A.  Well, they're --
5    Q.  -- the Chinese drywall?
6    A.  It's all -- it's all relative.  So I
7 don't . . .
8    Q.  This would reflect the utilities, the HOA
9 fees?
10    A.  Right.
11    Q.  This --
12    A.  It does.
13    Q.  Okay.  Would there be any other place
14 where I'd be able to find those expenses or
15 anything else that's directly related to payments
16 or monies received related to the 1224 Magnolia
17 Alley?
18    A.  Ask the question again.
19    Q.  Is there any other place other than this
20 document that I could find any money that you
21 received or amounts you paid related to --
22    A.  Oh.
23    Q.  -- 1224 Magnolia Alley?
24    A.  I guess no.  I -- I have -- no.  I don't
25 know, but I don't think so.

Page 143

1       MR. BARRY:
2         I have no further questions.
3       MS. WINAWER:
4         Nothing further.  No questions.
5       MS. FASSBENDER:
6         No questions.  Thank you.
7       MR. CHRISTINA:
8         I just have a couple of questions to
9 follow-up with you, Miss Haindel.
10 BY MR. CHRISTINA:
11    Q.  I'm going to ask you to look at Exhibit 2.
12       THE WITNESS:
13         Okay.  Thank you.
14 BY MR. CHRISTINA:
15    Q.  And at the bottom of the paragraph that
16 starts off Chinuba [sic] Creek Gardenhomes, LLC,
17 do you see that on the first page?
18    A.  Yes.
19    Q.  Okay.  There's a date at the bottom of --
20 toward the bottom of that paragraph.
21       Can you read that date for me.
22    A.  June 22nd, 2007.
23    Q.  And would that be the date in which you
24 believe you purchased the home?
25    A.  Yes.

Page 144

1    Q.  All right.  And earlier you testified that
2 you were a jewelry appraiser?
3    A.  Yes.
4    Q.  Did you have any other jobs since the time
5 you bought the house in Chinuba Creek?
6    A.  What do you mean by "jobs"?
7    Q.  Did you have any other professions that --
8    A.  I'm a realtor.
9    Q.  Okay.  And did you work for a company, or
10 did you --
11    A.  I work for myself.
12    Q.  Okay.  And it is correct that you still
13 owe rent to your family members for living in the
14 house in the Sanctuary?
15    A.  Yes.
16    Q.  When you left the Sanctuary, where did you
17 move to?
18    A.  I moved to Florida.
19    Q.  Where at in Florida?
20    A.  I have a -- Miramar Beach, Florida, I have
21 a condo that I used to rent out.  And since I had
22 nowhere to go in Louisiana, I moved to Florida.
23    Q.  Okay.  And so you moved into the condo
24 that you used to rent out?
25    A.  That's right.

Page 145

1    Q.  Do you recall how much rental income at
2 that time you were making from that unit?
3    A.  Fifty to 60,000.
4    Q.  And I'm assuming while you were living
5 there you did not rent out the --
6    A.  No.
7    Q.  -- unit?
8       How long did you stay at the condo in
9 Florida?
10    A.  Three years.
11    Q.  Okay.  And are you claiming that lost rent
12 as an item of your damages in this litigation?
13    A.  I hadn't, but I guess yes.
14    Q.  Okay.  If you'll look at Exhibit 8 for me.
15    A.  Exhibit 8.
16    Q.  The -- can you identify what Exhibit 8 is?
17    A.  It's the bills from Champagne --
18    Q.  Okay.
19    A.  -- Electric & Heating.
20    Q.  And the first page, can you read what it
21 is they did for you that day?
22    A.  They installed a Lennox air purifier.
23    Q.  And is that the HEPA filter that you
24 previously testified that you had added to the
25 house?

Confidential - Subject to Further Confidentiality Review

Page 146

1 A. Yes.
2 Q. And how much was -- was the cost of having
3 that added?
4 A. 3,466; is that right?
5 Q. No. It's on that --
6 A. Oh, okay.
7 Q. -- page.
8 A. $1,643.
9 Q. Okay. Can you read the full amount into
10 the record, please.
11 A. Yeah. $1,643.25.
12 Q. Thank you.
13 I'm going to ask you to look at Exhibit 6
14 for me real quick.
15 A. Exhibit 6?
16 Q. Yes, ma'am.
17 A. Okay. They're out of order. Seven, 1, 8,
18 2, 3, 4 . . . 6.
19 Q. It's the one that looks like --
20 A. Yeah. I have it.
21 Q. -- this. Okay.
22 A. Okay.
23 Q. Okay. And if you would turn, it's Page --
24 one, two, three, four -- Page 6.
25 When you met with the representative from

Page 147

1 Driskill Environmental Consultants, LLC, you gave
2 an interview with them?
3 A. Yes.
4 Q. And can you tell me what was said during
5 that interview as to why you were calling Driskill
6 out to the house?
7 A. Because I was having allergic reactions to
8 the house. I had a stuffy nose, watery eyes. For
9 me, I was -- upper respiratory, you know, a
10 scratchy throat --
11 Q. Okay. And --
12 A. -- burning eyes.
13 Q. And so earlier you were asked as to how
14 the -- your loss of enjoyment or your loss of use
15 of the house, how -- how it affected you having a
16 home with Chinese drywall.
17 Was this one of the effects of --
18 A. Yes.
19 Q. -- living in a house with Chinese drywall?
20 A. Yes.
21 Q. Other than having allergic reactions and
22 stuffy nose and watery eyes, what other effects
23 did living in a home with Chinese drywall have on
24 your life?
25 A. Well, first, the house was -- I mean, it

Page 148

1 was -- it was inhabitable, meaning you couldn't
2 have people over. You couldn't live in the house.
3 You couldn't -- it -- it was very difficult -- my
4 whole lifestyle changed again. It was -- you
5 can't have people over. You can't -- you can't do
6 anything.
7 I spent 50 percent or 75 percent outside
8 the house. We couldn't figure out the odor. I --
9 I realized, why are you always outside? Because I
10 didn't like the odor inside the house. It made me
11 sick. I didn't feel well.
12 So, I mean, it just turns your life upside
13 down when you lose a house. Banks won't talk to
14 you. Credit won't talk to you. Nobody's talking
15 to you now. So you -- your whole life's on hold.
16 Q. Okay. And then in your industry as a
17 jewelry appraiser, did you see any effect in that
18 industry due to the Chinese drywall?
19 A. Yes.
20 I'm going to -- since I'm a jewelry
21 appraiser -- I was sitting in Brighton, and I saw
22 someone bring in a chain, a sterling silver chain.
23 And I realized then -- when I saw the chain --
24 they were accusing the product was bad. And I
25 said, The product's not bad. I can't get involved

Page 149

1 in this at the time. But I realized the product's
2 not bad. It's where they live is bad. It's --
3 because what it would do is -- it would pit your
4 jewelry. It would pit silver. And it would
5 tarnish gold. You -- it took a buffer to get it
6 off because it would pit it.
7 And I ended up writing an article for the
8 National Association of Jewelry Appraisers,
9 explaining to everybody: If you see this, this is
10 what's causing it, it's not a defect in the
11 silver, it's not a defect in -- in the gold or
12 a -- or a alloy, it's because of the environment
13 that they're in.
14 Q. Okay. And did Chinese drywall affect any
15 of the jewelry you had in your house?
16 A. I had one ring -- I had a couple of rings.
17 And my jeweler, when he went to -- he asked me
18 where had I been with my jewelry. Where have you
19 been? I said, I haven't been anywhere. He said,
20 I can't even get this off, Mary, I'm buffing it
21 out on the wheel. And when he buffed it out -- it
22 was a sterling silver or David Yurman ring I had.
23 When he buffed it out, it was all pitted.
24 Q. Were you able to ever get the -- the
25 pitting out --

Page 150

1    A. No.
2    Q. -- or the --
3    A. You can't get the pitting out, no,
4  especially on a designer piece. You have to send
5  it back to David Yurman. You would have to redo a
6  piece. He's not going to do that under these
7  circumstances. A designer piece is a designer
8  piece. You -- nobody else can touch it but the
9  designer. It'll alter -- if I touch it, it'll
10  alter the piece and it won't be a David Yurman
11  piece anymore. That's all designers.
12    Q. And I -- I wanted to bring you back real
13  quick to Exhibit 8. On the second page, this is a
14  bill for replacing existing 12-inch return air
15  duct with a new 18-inch return air duct, replacing
16  duct work in the master bedroom with two new
17  individual 6-inch ducts, installing new 90-degree
18  collars on existing supply box where accessible,
19  and adding a new 7-inch duct in the kitchen,
20  including the supply box and grille.
21        Did that go hand in hand with having the
22  HEPA filter installed in the home?
23    A. There were a couple of issues with the
24  home. But yes, this was all about installing the
25  HEPA filter to make it fit and to make sure that

Page 151

1  the air getting in and out of the house -- that
2  was one of the things they said: Maybe it's
3  something in the house. Because there's no --
4  every house breathes -- okay -- one way or
5  another. And my house wasn't breathing. Between
6  the foam insulation and everything else, it can't
7  breathe. So they -- and they were supposed to
8  have some filt- -- but anyway . . .
9        So, yes. What they did was they came --
10  went in and revamped it. They thought maybe if
11  they opened up the air, I guess whatever this is,
12  and give it more space or whatever, that this
13  would have worked. This is, again, prior to
14  Chinese drywall. We were just figuring out what's
15  wrong with the house.
16    Q. And then -- so the -- the total for all
17  the work done for your air ducts, could you read
18  that amount in for me?
19    A. Three -- $3,466.
20    Q. And while you were living in the
21  Sanctuary, you kept paying the bills at the house
22  in Chinuba Creek; correct?
23    A. That's correct.
24    Q. And what bills would this include?
25    A. I paid the note up until a certain time

Page 152

1  while I was living in the house. So I was paying
2  the note, the HOA fees, electricity, alarm,
3  whatever bills were -- were there with the house.
4    Q. Your homeowners insurance?
5    A. Homeowners insurance, flood insurance,
6  every -- any and all insurances.
7    Q. Okay. The last exhibit that you were
8  asked to look at, Exhibit 21, one, two, three,
9  four . . . if you would turn to Page 5.
10    A. I got to find it first.
11    Q. Okay.
12    A. Twenty-one?
13    Q. Yes.
14    A. Okay. Turn to page what?
15    Q. Page 5.
16    A. Okay. I think this is it.
17    Q. And there's an entry on March 1st, 2010.
18  There's a payment being made to Bank of America in
19  the amount of $1,747.14.
20    A. Yes.
21    Q. Would that refresh your memory as to when
22  the last time you made a mortgage payment was?
23    A. Yes.
24    Q. And so this -- and this time frame would
25  have been after you had moved out of the house;

Page 153

1  correct?
2    A. Yes.
3    Q. Okay. And if you could turn to
4  Exhibit 14, please. If you'd turn to the --
5  Page 6. If you recall, earlier you were asked
6  questions related to Section VII about other
7  damages you had had in the home, and they had gone
8  through your loss of enjoyment and the alternative
9  living expenses you incurred. At the bottom of
10  Page 6, there's a section for comments. And can
11  you read to me what's in that comment section?
12    A. "Had to pay for multiple AC repairs prior
13  to the short sale. SPent" $7,000 and 35 -- wait.
14  "$7,035.15 on AC repairs since buying the home."
15    Q. And that would be in addition to the
16  monies you had listed for alternative living
17  expenses --
18    A. Yes.
19    Q. -- and loss of use; correct?
20    A. Yes.
21    Q. And then to your knowledge, homes on the
22  Northshore, where you lived after Katrina, did
23  they tend to increase in value or decrease in
24  value?
25    A. They increased in value. We were a unique

Page 154

1 time because while the rest of the world was
2 having trouble, New Orleans was growing and
3 Mandeville was growing; so the price of housing
4 was going up in value.
5    Q. So at -- at the time of your short sale,
6 but -- is it your belief that but for Chinese
7 drywall, you would have been able to get a price
8 for your home higher than what you originally paid
9 for it?
10    A. Yes.
11    Q. And then as a result of the short sale,
12 did you have any other difficulties due to having
13 a short sale on your record?
14    A. Yeah. A bank won't talk to you. You
15 can't refinance. I can't buy a house. I haven't
16 bought a house since. I mean, that's just part of
17 it. Credit -- my credit's gone. I mean, there's
18 not a bank that's going to talk to me.
19    Q. Did Bank of America --
20    A. Bank of -- go on. I'm sorry.
21    Q. Did Bank of America cancel any of your
22 credit with them other than dealing with that
23 loan?
24    A. Yep.
25       I had a Bank of America card -- credit

Page 155

1 card which had a very high limit on it. And I
2 worked hard to get that, because I was living in
3 California at the time, going to GIA. And they
4 saw that I was a good -- a good -- you know, I did
5 everything right or whatever. And I had a very
6 high limit on it. The very day that this stopped
7 was the very day that they canceled that credit
8 card. Because nobody would talk to me, not -- not
9 a bank, nobody, nothing. I can't -- I can't -- I
10 still to this day am having difficulty. It's
11 still on my -- all -- still on my record.
12    Q. Are you seeking damages for the impact the
13 short sale had on your credit?
14    A. Yeah, I am.
15    Q. And are you seeking damages for all the
16 appliances and items that you had to abandon in
17 the home when you moved out?
18    A. Yes. Everything inclusive of the house.
19       MR. CHRISTINA:
20          That's all the questions I had.
21       MR. BARRY:
22          I have a few follow-up questions.
23 BY MR. BARRY:
24    Q. We talked a little bit about how you moved
25 to the house in Florida; is that correct?

Page 156

1    A. Yes.
2    Q. And when you moved to that house in
3 Florida -- and you said you were paying 50 to --
4 or what you would have received in rental income
5 if not for you living there would have been
6 between 50 to 60K?
7    A. Yep.
8    Q. That would be per year?
9    A. Yep.
10    Q. Okay. Now, you moved -- when did you move
11 to the house in Florida?
12    A. After I sold Chinchuba and after I sold
13 the family home.
14    Q. So you moved to the house in -- in Florida
15 after you had sold the house affected by Chinese
16 drywall; is that correct?
17    A. Yes.
18       Again, a bank wouldn't talk to me. I
19 can't buy a house. Where am I going to go?
20    Q. We -- you -- you said when your counsel
21 was asking you questions that you believe that
22 homes in the area you lived increased in value if
23 not for Chinese drywall --
24    A. Right.
25    Q. -- is that correct?

Page 157

1    A. That's correct.
2    Q. What is the basis for that belief?
3    A. Sales.
4    Q. What -- and what sales data did you look
5 at?
6    A. Everything that was going on around me.
7 Look -- look -- I -- I sold the house shortly
8 thereafter, my -- the family home. I -- the price
9 of housing -- it was a very unique time because of
10 Katrina. So housing outside of New Orleans
11 started increasing twofold. I mean, it was -- and
12 it kept on because you couldn't even come back
13 into New Orleans until 2006 and 2007; so people
14 who were trying to get back were buying on the
15 Northshore.
16    Q. Did you obtain any assessment that would
17 say that if not for Chinese drywall this house
18 would sell for X, Y, Z amount --
19    A. No.
20    Q. -- of dollars?
21    A. No.
22    Q. You talked a little bit about the effect
23 of the short sale on your credit and your ability
24 to get credit cards since --
25       Have you applied for credit cards since --

Page 158

1    A. Yeah.
2    Q. -- the short sale?
3    A. Thousand dollars is what they'll give me.
4    Q. Okay. Have you applied for a home loan
5 since then?
6    A. Yes. Declined. I tried to refinance
7 Florida. They said no.
8    Q. Have -- have there been any -- other than
9 trying to refinance in Florida, has there been any
10 other effect to obtain a home loan?
11    A. Well, after a while you stop.
12    Q. Okay. So there was one rejection of a
13 home loan. There wasn't any more than that?
14    A. No, there were two. I had tried to buy a
15 condo on St. Charles Avenue. And, again, the
16 banks just were like, nah. They -- they --
17 they're very fuzzy about that.
18    Q. And when were you trying to buy that home
19 on St. Charles Avenue?
20    A. Two years ago.
21    Q. And how much of that home were you trying
22 to finance?
23    A. It was only 280 -- 260,000.
24    Q. And were you trying to finance the entire
25 260,000 or --

Page 159

1    A. No. I would --
2    Q. -- some portion of it?
3    A. -- give a deposit. Yeah.
4    Q. And how much were you trying to refinance
5 on the home in Florida?
6    A. The condo was worth 700,000. There was a
7 200,000-dollar mortgage on it. And I was looking
8 to try and get 300,000. So there was more than
9 enough equity in the house to do it.
10    Q. And when was that one -- was that one
11 rejected?
12    A. 2012, 2011.
13    Q. Besides home loans, were there any other
14 loans that you have been rejected for since the
15 short sale? Have you tried to get a, you know,
16 business credit line, or have you tried to get
17 a --
18    A. No. I mean, you know, you can only take
19 it so much. You start -- it's just stupid to have
20 all this negative. You keep going, and they're
21 saying no. You're going to be very careful when
22 you do it.
23    Q. You just a moment ago said that you had to
24 abandon appliances at the house when you sold it.
25      What -- what appliances did you have to

Page 160

1 abandon?
2    A. The washer and dryer, the -- I mean, the
3 refrigerator, the microwave, anything that was in
4 the house that you might have been -- a
5 refrigerator, you would take with you now.
6    Q. You would normally, when you sell a home,
7 take your --
8    A. You take your --
9    Q. -- refrigerator and your --
10    A. -- refrigerator and take your washer,
11 dryer.
12    Q. When -- when you sold your family home,
13 did you take your refrigerator and washer and
14 dryer with you?
15    A. No, because I was going to a furnished
16 condo.
17    Q. But they stayed with the house --
18    A. Yeah.
19    Q. -- otherwise?
20    A. Not -- yeah.
21    Q. They -- you didn't give them to your
22 brothers or anything like that?
23    A. That's a good point. No, I didn't.
24    Q. Okay.
25    A. I don't think I did. I don't remember

Page 161

1 doing that.
2    Q. All right.
3    A. But no, I don't -- I've got one that would
4 reach their hand out. I don't think I did.
5    Q. Okay. When you moved into the home -- the
6 home affected by Chinese drywall in -- I can't
7 remember. Was that 2007, 2008?
8    A. Whatever. You know, I don't . . .
9    Q. Was there any fixtures or appliances that
10 came with the home? Was there a refrigerator in
11 the home? Was there a microwave in the home? Was
12 there a --
13    A. There was a --
14    Q. -- washer and dryer?
15    A. -- microwave in the home. There was no
16 refrigerator. There was no washer and dryer.
17    Q. So did you --
18    A. There was an --
19    Q. -- purchase --
20    A. -- oven and stove.
21    Q. Did you purchase those items that were not
22 in the home? Did you purchase the refrigerator?
23 Did you --
24    A. Yes.
25    Q. And you purchased the washer and dryer?

Page 162

1   A. Yes.
2   Q. Do you have receipts for those purchases?
3   A. You know, I -- I just started thinking
4 about it. No. I don't know if I do or I don't
5 now.
6   Q. Okay.
7   A. I'd have to go back and look and see.
8   Q. Do you believe those have been produced to
9 us in this litigation? Do you have any
10 recollection or knowledge? Have you provided
11 those to your counsel?
12   A. What?
13   Q. The receipts for the refrigerator, the
14 receipts for the --
15   A. I don't -- I --
16   Q. -- washer and dryer.
17   A. -- don't remember. I don't know if I did
18 or I didn't. I don't think so.
19   MR. BARRY:
20     I have no further questions on my end.
21 I don't . . .
22   MS. WINAWER:
23     No further questions.
24   MS. FASSBENDER:
25     I have -- I have a few questions.

Page 163

1 BY MS. FASSBENDER:
2   Q. You mentioned that you are also a realtor?
3   A. Yes.
4   Q. Do you -- when did you obtain your
5 license?
6   A. 1986. And then I became a broker in 2012
7 or '14, '13, somewhere around there.
8   Q. And -- so are -- are you actively --
9 actively --
10   A. I'm a realtor.
11   Q. You're an active realtor?
12   A. Yes.
13   Q. Okay. And did you try -- attempt to sell
14 your home yourself?
15   A. I cannot.
16   Q. Oh.
17   A. It's an arm's length transaction
18 because --
19   Q. Okay.
20   A. -- it's a short sale.
21   Q. Okay. Have you ever sold a property with
22 Chinese drywall in it?
23   A. No. My house. That --
24   Q. I meant other --
25   A. I mean --

Page 164

1   Q. I mean -- I'm sorry. I wasn't --
2   A. Have I ever --
3   Q. -- clear. Acting --
4   A. -- represented anybody?
5   Q. Yes.
6   A. No.
7   Q. Acting as a realtor?
8   A. No.
9   Q. Okay.
10   A. No.
11   Q. And so you still today are -- are able --
12 an active realtor --
13   A. Yes.
14   Q. -- broker?
15   A. Yes.
16   Q. Okay.
17   A. I'm a member of MLS and NOMAR --
18   Q. Okay.
19   A. -- New Orleans Metropolitan Realtors
20 Association.
21   MS. FASSBENDER:
22     I have no other questions.
23     I did want to note my appearance.
24   Earlier, I'm not sure I stated it
25   correctly. I'm also here on BNBM --

Page 165

1 behalf of BNBM Group, BNBM, PLC, and CNBM
2 Company.
3   MR. CHRISTINA:
4     No questions.
5   MR. BARRY:
6     Do you have any?
7   MR. CHRISTINA:
8     No questions.
9   MR. BARRY:
10     And -- and we'll just put for the
11 record that we'll reserve if any other
12 documents are produced or other -- or
13 items are amended. But I appreciate you
14 being here. Thank you for being patient
15 with me and --
16   THE WITNESS:
17     That's all right.
18   MR. BARRY:
19     -- sitting here and listening and
20 talking. And I -- I -- I hope that you --
21 you get -- you're free from this and do
22 not have to chat again. So thank you so
23 much.
24   (The proceedings concluded at 12:46 p.m.)
25

Confidential - Subject to Further Confidentiality Review

Page 166

C E R T I F I C A T E

1
2    This certification is valid only for
3   a transcript accompanied by my original signature
4   and original seal on this page.
5    I, AURORA M. PERRIEN, Registered Professional
6   Reporter, Certified Court Reporter, in and for the
7   State of Louisiana, as the officer before whom
8   this testimony was taken, do hereby certify that
9   MARY VIRGINIA HAINDEL, after having been duly
10  sworn by me upon the authority of R.S. 37:2554,
11  did testify as hereinbefore set forth in the
12  foregoing 165 pages; that this testimony was
13  reported in me in the stenotype reporting method,
14  was prepared and transcribed by me or under my
15  personal direction and supervision, and is a true
16  and correct transcript to the best of my ability
17  and understanding; that the transcript has been
18  prepared in compliance with transcript format
19  guidelines required by statute or by rules of the
20  board; and that I am informed about the complete
21  arrangement, financial or otherwise, with the
22  person or entity making arrangements for
23  deposition services; that I have acted in
24  compliance with the prohibition on contractual
25  relationships, as defined by Louisiana Code of

Page 167

1   Civil Procedure Article 1434 and in rules and
2   advisory opinions of the board; that I have no
3   actual knowledge of any prohibited employment or
4   contractual relationship, direct or indirect,
5   between a court reporting firm and any party
6   litigant in this matter nor is there any such
7   relationship between myself and a party litigant
8   in this matter.  I am not related to counsel or to
9   the parties herein, nor am I otherwise interested
10  in the outcome of this matter.
11
12
13
14
15         AURORA M. PERRIEN, RPR, CCR
16
17
18
19
20
21
22
23
24
25

Page 168

1               ERRATA SHEET
2   WITNESS:     MARY VIRGINIA HAINDEL
3   DATE TAKEN:   Tuesday, February 19, 2019
4
5   Page#___ Line#___ Reason:_____
6   Now Reads:_____
7   Change To:_____
8   Page#___ Line#___ Reason:_____
9   Now Reads:_____
10  Change To:_____
11  Page#___ Line#___ Reason:_____
12  Now Reads:_____
13  Change To:_____
14  Page#___ Line#___ Reason:_____
15  Now Reads:_____
16  Change To:_____
17  Page#___ Line#___ Reason:_____
18  Now Reads:_____
19  Change To:_____
20  Page#___ Line#___ Reason:_____
21  Now Reads:_____
22  Change To:_____
23  Page#___ Line#___ Reason:_____
24  Now Reads:_____
25  Change To:_____

Page 169

1            WITNESS' CERTIFICATE
2
3    I, MARY VIRGINIA HAINDEL, deponent in the
4   foregoing deposition, do hereby certify that the
5   same was submitted to me for examination; that I
6   have read the deposition and find it to be a true
7   and correct transcription of the testimony as
8   given by me before Aurora M. Perrien, RPR, CCR,
9   with the exception of any corrections noted on the
10  attached Errata Sheet(s).
11
12
13         [ ] Without Corrections
14         [ ] With Corrections, as reflected
              on the Errata Sheet(s)
15            prepared by me and attached
              hereto, consisting of
16            ___ pages
17
18
19
20
   _____  _____
21     Date         Deponent's Signature
22
23
24
25