**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047 |
| | SECTION: L |
| THIS DOCUMENT RELATES TO: *ALL CASES* | JUDGE FALLON MAG. JUDGE WILKINSON |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## YANCE LAW FIRM, LLC'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR AWARD OF ATTORNEY FEES ON INTEREST EARNED

Comes now Yance Law Firm, LLC ("Yance") and submits the following reply memorandum in further support of Yance's Motion for Award of Attorney Fees on Interest Earned [R. Doc. 22108] ("Yance Fee Motion") and in reply to the jointly filed Opposition to Yance Motion for Attorney Fees [R. Doc. 22148] ("Joint Opposition"), filed by Herman, Herman and Katz, LLC ("Herman") and Levin, Sedran, and Berman, LLP ("Levin"), and hereby states the following:

1. Nearly one hundred sixty (160) law firms involved in this litigation benefitted from Yance's work.

2. Only two (2) of the 160 firms oppose Yance's reasonable request for a fee arising therefrom.

3. Ironically, the two (2) firms that oppose the award are far and away the two (2) firms that benefitted the most from Yance's work in terms of interest earned on their money.

4. Also ironically, the two (2) firms that oppose the award are also the only two (2) firms that opposed Yance's efforts to have the Funds moved away from Esquire Bank and into the Court Registry so they could actually earn a reasonable interest rate.

5. Also ironically, the two (2) firms that oppose the award are also the only two (2) firms that, after the Court moved the Funds to the Court Registry following Yance's motion, vehemently argued to this Court that the Funds should be moved back to Esquire Bank despite the dramatically higher interest rate the Funds were earning in the Court Registry compared to the nearly zero interest rate Esquire Bank was paying on the Funds.

6. Consequently, the joint opposition filed by these two (2) firms (Herman and Levin) should be read with great skepticism, and quite frankly the entitlement of these two (2) firms to receive ANY of the interest differential earned on the Funds should be questioned, as they fought emphatically against the very action that created the benefit.

7. As an initial matter Yance must clear up a significant misstatement of fact that should have nothing to do with the issue at hand but was nonetheless emphasized by Herman and Levin. Twice they suggest to the Court in their Joint Opposition that Yance has only recovered approximately $230 thousand for his clients in this litigation and is thus due a total contract fee of only $33 thousand and that this should in some unexplained way affect Yance's present fee request. Not only is the argument baseless, the factual suggestion itself is entirely false, as all of the data held and submitted by Brown Greer for years has clearly shown approximately $2 million recovered by Yance for his clients and thus Yance is now due approximately $300 thousand in contract fees (which of course does not even include any cases in which Yance has a fee interest but is not the attorney of record) [see Exhibit 1- Brown Greer data for Yance Law Firm and Exhibit 2 assimilation by fee committee member of Brown Greer data for all firms]. Not only are Herman and Levin absolutely privy to this data showing the accurate figures, they specifically referenced the data and when comparing Yance's approximate $2 million

recovered for his clients to Herman's $16 million when they filed their response in opposition to the Yance/Esquire Bank Motion 9 months ago [R. Doc. 21429-2 at p. 20 and R. Doc. 21432-3 at p. 17].

8. In any event, because Yance's underlying contract fees are so irrelevant to the present fee request, it is bewildering why Herman and Levin would see fit to make this false assertion about it.  Was it made as part of their consistent effort to paint an inaccurate picture of Yance as a virtual non-participant in this litigation?  Was it made to cause Yance to worry about his underlying contract fee as a penalty for pursuing the interest income issue?  Either way, it is certainly odd that Levin would emphasize any of this data as it applies to Yance, considering Levin's firm doesn't even appear on the data as recovering <u>a single dollar</u> for his firm's individual clients. [see Exhibit 2].  Indeed, this is consistent with Levin's admission that at the time he was appointed <u>Lead Counsel</u> for this litigation he had a total of <u>zero</u> Chinese Drywall cases that his firm was handling in-house and <u>zero</u> Chinese Drywall cases that his firm originated.  Levin has not had any Chinese Drywall victims as clients directly, but "only derivatively" by signing onto or piggy-backing other firms' cases but still not administering those cases at his own firm. Nonetheless, Levin has made and been awarded the largest common benefit attorney fee and expense claim in the entire litigation at over $23 million, yet now uses an erroneous assertion of Yance's lack of individual client recovery as a vague reason to deny Yance a clearly earned $500,000 fee for a significant benefit that he clearly conferred upon all of the involved attorneys- especially him.

9. **<u>PTO 9 and 28</u>**- Herman and Levin in their Joint Opposition suggest that the Yance fee request should be denied because Yance did not comply with Pre-Trial Order No. 9

(hereinafter "PTO 9") and No. 28 (hereinafter "PTO 28").  However, PTO 9 specifically states: "These Time and Expense Guidelines are intended for all activities performed and expenses incurred by counsel that relate to matters common to all ***claimants*** in MDL 2047." (emphasis added).  Yance has not done work on behalf of any ***claimants*** in many years, as this case has been finished for all of Yance's claimants for a very long time. The work for which Yance now seeks a fee was work that benefitted the attorneys only and has nothing to do with any ***claimants***.  Consequently, PTO 9, by definition, does not apply to Yance's request.  In fact, as set forth in PTO 28, and its numerous amendments and sub-parts, the deadline to submit common benefit time performed on behalf of claimants expired well before Yance ever began working on the interest income issue at hand.  Moreover, PTO 28 explicitly only allowed claims for attorney fees for work performed up through and including December 31, 2013- nearly four years before Yance began working on the interest income issue.  The fruits of Yance's labor (i.e. reasonable interest finally being earned on the Funds) were not even readily quantifiable until after "Step Six" (the FINAL step of PTO 28) had already been completed.

10. The 61 pages comprising PTO 9, 9A, 28, 28A, 28B, 28C, 28D, 28E, 28F and 28G are loaded with provisions that are clearly and expressly intended to apply to the hundreds of attorneys working on behalf of the claimants toward recovery and settlements in the underlying litigation so that the Court could ultimately have a framework to use in dividing the attorney fee among all of them for that work.  The Yance Fee Motion deals with work performed by Yance on an after-the-fact extraordinary circumstance that produced a single, easily quantifiable benefit that is separate from the underlying litigation.  By necessity, neither PTO 9 nor PTO 28 can apply to Yance's fee request

arising out of this extraordinary circumstance. Moreover, contrary to Herman and Levin's unsupported assertions, Yance's motivation for investigating and pursuing the interest income issue was to protect the fees that he and others had already earned and the time value/interest-earning potential thereof, rather than generating a new fee for himself. As the investigation process continued to intensify, Yance began to realize the depth and magnitude of the underlying issues with the Funds. As he continued to uncover more information, his goal was to work as quickly and efficiently as possible so as to seek to protect the Funds and resolve the interest issue rather than disrupt his efficiency attempting to secure his entitlement to some future fee by complying with common benefit fee guidelines that were facially inapplicable to his work and with which he had little to no familiarity. Although it was not at the forefront of Yance's mind to focus on putting himself in a position to later claim a fee for the work he was performing and the significant benefit he would ultimately obtain, this should not and does not detract from the fact that the fee is well-deserved and has absolutely been earned by Yance. This was clearly an extraordinary circumstance and to the extent the Court were to look to PTO 9 or PTO 28 in any way in determining the requested award, Yance respectfully points the Court to the facial inapplicability of the Orders, the impossibility of compliance with many of the provisions, the impracticality of compliance with others, and the many "may" references versus "shall" in those Orders, as it would be totally inequitable to deny Yance the requested fee under the circumstances. The inequity of denying this fee is bolstered by the fact that approximately 160 firms did not object to Yance's fee request and only 2 did. It is further bolstered by the observation that even the 2 firms that did object provided no facts or argument to suggest that Yance's work failed to produce

significant benefit to the attorneys…including Herman and Levin (or especially Herman and Levin).  Yance put forth a very detailed affidavit describing his activities related to his investigation and pursuit of the interest income issue on behalf of all attorneys entitled to a portion of the Funds.  Yance provided a conservative estimate as to the time spent performing those activities, and the benefit already created by those activities is very simple to calculate, which gives the Court sufficient information to recognize that the requested fee is reasonable (or much lower than what could be considered reasonable), and that Yance has clearly earned the requested fee.

11. **RULE 59(e)-** Herman and Levin next argue Yance did not seek to alter or amend the Court's February 5, 2019 Judgment regarding fees to common benefit counsel within 28 days pursuant to Fed. R. Civ. P. 59(e).  As set forth in the Yance Fee Motion, Yance specifically crafted his motion so that the Court would not have to alter or amend the Judgment and thus the numbers set forth in the Judgment would not have to be adjusted downward for any law firm.  Yance crafted his motion so that the Court could award the fee to Yance to be paid out of the interest that had already accumulated between the effective date of the numbers used in that Judgment (October 31, 2018) and the present. That way Yance could be paid his earned fee and all law firms could be paid the amounts set forth in the Judgment plus all additional interest earned on those amounts, net of Yance's fee.  Doing it this way promotes judicial efficiency, is equitable, practical, fair, and avoids needless delay in a case that is fraught with delay.  There is no need for an altered or amended Judgment to accomplish this objective and thus no additional motion needed by Yance to ask the Court to do so.  Even if Herman and Levin were correct in their assertion that the relief requested by Yance would require an altered or amended

Judgment in order to grant the relief (which they are not), the Yance Fee Motion was filed well before the 28 day deadline set forth in Rule 59(e), as it was filed within 14 days of the Judgment.

12. **Common Benefit Work**- Next, Herman and Levin argue that Yance performed no common benefit work. In making this argument Herman and Levin first emphasize the very provisions Yance emphasizes hereinabove as to why PTO 9 and 28 do not apply- i.e. that Yance's work for which he is claiming a fee was not on matters common to all claimants. However, rather than acknowledging the obvious- that Yance's efforts were intended to and did in fact benefit all interested attorneys, Herman and Levin make the conclusory, unsupported and nonsensical statement that "Yance, in raising the interest issue, was simply attempting to further his own personal interests as an Objector to the allocation of common benefit fees- which funds he did nothing to create." Herman and Levin cannot and do not offer any evidence or argument to rebut or challenge the very clear fact as set forth in the Yance Fee Motion that but for Yance's efforts, the millions of dollars of earned interest on the Funds in the past 9 months would NOT exist.

13. **Order and Approval**- Next, Herman and Levin point out that the Funds were originally placed in Esquire Bank at the Order and approval of the Court. However, Herman and Levin do not articulate how this could possibly affect Yance's entitlement to a fee. These Funds were moved away from Esquire Bank and back into the Court Registry by Order and approval of the Court as a result of Yance's efforts. Again, as a result, in a mere 9 months, the Funds have earned millions more in interest than they would have without Yance's efforts. As clearly set forth in the Yance Fee Motion, this can be demonstrated even giving Esquire Bank the greatest benefit of the doubt by using Esquire Bank's own

2018 "estimates" of what it would pay in interest if it were allowed to keep the Funds following the Yance/Esquire Bank Motion.

14. In an attempt to further their argument, Herman and Levin make the very interesting statement: "It is counsel's understanding that funds deposited in the Registry of the Court also generated relatively little interest over the relevant time period. And it is only because of a fairly recent change in practice that the Court is now optimizing its holdings over a more diverse portfolio." [see Joint Opposition at FN 18].  The underlying reality behind this statement only serves to solidify the severity of the interest income issue as well as Yance's claim for a fee for rectifying it, as can be demonstrated as follows: It is true that the Court Registry had a rudimentary investment strategy back in March 2014 when the Funds were originally deposited at Esquire Bank.  Despite this unsophisticated strategy, had the Funds remained in the Court Registry, they would have earned more than $130,000 between March and December of 2014[1] versus the mere $8,696 they actually earned at the self-proclaimed expert QSF institution, Esquire Bank.  In 2015 they would have earned between approximately $250,000 and $500,000 in the Court Registry versus the mere $23,083 they actually earned at Esquire Bank. In 2016, they would have earned approximately $500,000 in the Court Registry versus the mere $34,038 they actually earned at Esquire Bank.  In 2017 they would have earned approximately $1,600,000 in the Court Registry versus the mere $169,049 they actually earned at Esquire Bank.  In the first 7 months of 2018 they would have earned approximately $1,750,000 in the Court Registry versus the mere $372,188 they actually earned at Esquire Bank.  Following the Yance/Esquire Bank motion, the Funds are now <u>actually</u>

---

[1] These estimates are based upon the rates given to Yance by the Court's Budget and Financial Administrator.  See two emails attached as Exhibit 3

earning on average $300,000 to $400,000 or more <u>every month</u> in the Court Registry versus the "estimates" of Esquire Bank of $56,164.  Clearly, the more Herman and Levin attempt to water down the benefit created by Yance's efforts, the more obvious the benefit becomes.

15. **<u>Benefit Conferred</u>**- Herman and Levin next make the non-sensical argument that Yance does not deserve a fee because "the Fee Fund- and any interest earned thereon- is the product and culmination of years of collective efforts and investments by numerous common benefit attorneys." [see Joint Opposition at p.6].  If Herman and Levin had added the words "<u>and contract counsel</u>" to the end of this statement, it would be correct as to the <u>principal</u> amount of the Funds and as to the amount of interest that would have been earned if Yance had remained silent and the Funds had remained at Esquire Bank. However, as set forth above and in the Yance Fee Motion, there is clearly and undoubtedly a significant interest differential that would not have been earned absent Yance's efforts.  It is on this interest differential that Yance seeks a percentage fee.  To deny Yance this fee would be utterly inequitable.  Again, Herman and Levin asked the Court to put the Funds back in Esquire Bank even after the Court moved them to the Court Registry following the Yance/Esquire Bank Motion.  Yance emphatically opposed doing that. [see R. Doc. 21338; 21467-1; see also July 12, 2018 hearing transcript] Because the Funds were taken out of Esquire Bank, placed in the Court Registry and never put back in Esquire Bank all as a result of Yance's efforts, Herman and Levin <u>alone</u> have <u>already</u> benefitted around $600,000 as a result of Yance's efforts even though they aggressively opposed those efforts.  Herman and Levin <u>alone</u> will continue to benefit from Yance's work between $60,000 and $100,000 <u>every month</u> that the Funds remain in

9

the Court Registry.  How is it that Yance does not deserve a fee, yet Herman and Levin deserve a windfall of benefit that they specifically opposed getting in the first place?

16.  **Lodestar Cross-Check-** Finally, Herman and Levin attack Yance's fee request because they suggest the "Yance Affidavit is wholly insufficient to conduct a lodestar cross-check for excessiveness" and they cite <u>Turner v. Murphy Oil USA, Inc.</u>, 472 F.Supp.2d 830, 860-861 (E.D. La. 2007) and others in support of their contention.  In this attack, Herman and Levin suggest there is a lack of detailed time records and a lack of information about the firm's hourly rates and thus rendering "any lodestar cross-check impossible to perform."  However, Herman and Levin are incorrect and even a cursory reading of the <u>Murphy Oil USA</u> case upon which they rely precisely reveals that they are incorrect.  In <u>Murphy Oil USA</u>, this Court specifically said:

> Finally, the Court will conduct a rough lodestar analysis to cross-check the reasonableness of the percentage fee award. The lodestar analysis is not undertaken to calculate a specific fee, but only to provide a rough cross check on the reasonableness of the fee arrived at by the percentage method.

<u>Turner v. Murphy Oil USA, Inc.</u>, 472 F.Supp.2d at 861.  This Court went on to say:

> In recognition of the noted disadvantages of the lodestar method as the principle means for determining attorneys' fees, such as the taxing of judicial resources by examining every time entry and billing rate for each attorney, a lodestar analysis which is rough and more abbreviated is appropriate for a cross check: 'The lodestar cross-check calculation need entail neither mathematical precision nor bean counting. For example, a court performing a lodestar cross-check need not scrutinize each time entry; reliance on representations by class counsel as to total hours may be sufficient…Furthermore, the lodestar cross-check can be simplified by use of a blended hourly rate…'

*Id*. at 867 (quoting Walker & Horwich, *supra*, at 1463-64 (citing In re Rite Aid Corp. Sec.

Litig., 396 F.3d 294, 306 (3d Cir.2005)).  Specifically as to hourly rates in <u>Murphy Oil</u>

<u>USA</u>, this Court went on to say:

> The PSC has not provided any information regarding hourly rates.
> Though many courts conduct surveys to determine a specific
> amount that represents the jurisdiction's prevailing hourly rate, the
> Court chooses to establish a range of reasonable rates rather than
> attempt to pinpoint the prevailing rate.  The range of reasonable
> rates takes into account the varying degrees of skill and experience
> of PSC members and associates, the different services performed
> throughout the conduct of this litigation, and the fact that an hourly
> rate is fictional in this case since it is not used in contingent fee
> litigation. Moreover, this method is consistent with the idea of the
> lodestar cross-check as a simplified or abbreviated version of the
> traditional method.

*Id*. at 868.  This Court then went on to use a lodestar baseline range of $300 to $400 per

hour for principal attorneys ($50 to $80 for paralegals) in conducting the lodestar cross-

check analysis.  *Id*. at 869.  Before conducting the cross-check in <u>Murphy Oil USA </u>, this

Court had already arrived at a percentage award of 17% of the $195 million benefit

produced by the attorneys' efforts.  *Id*. at 867.  Then, in conducting the rough, lodestar

cross-check, this Court analyzed the above hourly rate ranges and applied a 2.5 to 3.5

multiplier thereto.  *Id*. at 869.  This Court then stated:

> Although the fee calculated pursuant to the blended percentage
> method is at the very top of the lodestar range using the highest
> multiplier and the highest billing rate ($33,746,241.88 under the
> blended percentage method vs. $33,767,020 under the rough
> lodestar method), the Court finds an award in this amount
> appropriate.

*Id.*  It is also worth pointing out that in <u>Murphy Oil USA</u>, this Court reiterated:

> While the Manual for Complex Litigation states that a fee of 25%
> of a common fund "represents a typical benchmark," Eisenberg
> and Miller report that "a scaling effect exists, with fees constituting
> a lower percent of the client's recovery as the client's recovery

increases." In other words, the higher the recovery, the lower the
percentage. Thus, after considering fee awards in similar cases, the
Court will use an initial benchmark of 15% in this case, which is
"roughly the average of the mean fee percentages of the two
[Eisenberg and Miller] data sets for settlements of this size."

*Id.* at 864. Along these same lines, this Court has recognized that, when the benefit

conferred amount has been as low as between $1 million and $2 million, fees between

32% and 37% have been awarded. *See* R. Doc. 21168 at 20; *See also* Eldon E. Fallon,

*Common Benefit Fees in Multi-district Litigation*, 74 La. L. Rev. 371, 385 (2014).

17. As to the present fee award, Yance has made the analysis super-easy as Yance is certainly

significantly under-reaching, not over-reaching by asking for an award of $500,000.

According to recent Court Registry records it appears that the interest earned since the

Funds were moved to the Court Registry 9 months ago up through this month is already

around $3 million, versus around $500,000 if they were to have remained at Esquire

Bank (using Esquire's own interest "estimates"). [see Exhibit 4- Court Registry Records]

Thus the conferred benefit is already around $2.5 million. This amount is increasing by

around $10,000 every day or around $300,000 or more every month. Yance's requested

fee is only about 20% of the present benefit conferred and by the end of May only about

15%, and by the end of June only about 13.8%, and by the end of July only about 12.8%.

In essence, Yance is requesting a fee that is around half of the "typical benchmark" fee

percentage this Court has recognized for much larger recoveries, and only about a third of

the fee percentage this Court has recognized for recoveries around the size of this one.

Yance is very hopeful the Court will grant the numerous recent pending motions for

immediate disbursement of all the attorney fees, and that all of the attorney fees will be

disbursed quickly. Even if the Court does grant these motions and order disbursements,

the fees will certainly not be disbursed today, but instead it will take at least a matter of weeks at a minimum, and likely a matter of months.  If the Court refuses to disburse any fees until the conclusion of all appeals, then there is no telling how long the Funds will continue to sit in the Court Registry (a year??? more???).  If that happens (and I sure hope it doesn't), the interest differential between what the Funds would have earned if they had stayed in Esquire Bank, versus what they will actually earn as a result of Yance's efforts will be many more millions, and Yance's requested fee will be a miniscule percentage of the conferred benefit.

18. Because Yance's requested fee percentage is so far below any reasonable benchmark given the size of the benefit conferred, and because that fee percentage is getting lower and lower every single day, there is no way for the "*Johnson* factors" to cause the benchmark to even reach the requested percentage.  For instance, even if every single one of the 12 *Johnson* factors justified a downward adjustment from the benchmark of a full percentage point (which of course would be totally outrageous and unprecedented) it would barely, if at all touch the percentage requested by Yance.  A more realistic *Johnson* factor analysis would likely result in a final fee percentage that far exceeds the amount Yance is requesting.  Moreover, even if the Court performed a "lodestar cross-check" methodology precisely in line with the one in Murphy Oil USA as specifically referenced by Herman and Levin, and even using the hourly rates this Court used in Murphy Oil USA more than 12 years ago, Yance's requested fee is less than the $546,000 lodestar cross-check amount that methodology would generate.  Moreover, it certainly would have been reasonable and equitable for Yance to have asked for his fee to increase as the conferred benefit continues to increase but he is not even asking for that.

19. All of this leads Yance to question why he is asking for such a small fee percentage, and to also ponder for what amount Herman and Levin would be asking the Court if they were in Yance's shoes.

20. In any event, Yance's requested fee is far below amounts that could be considered reasonable under the circumstances.  The fee is absolutely warranted and supported, and it would be totally inequitable for Yance to be denied this fee while Herman and Levin reap the benefits of the very efforts by Yance that they so strongly opposed in the first place.

21. For the reasons set forth herein and in the Yance Fee Motion the undersigned counsel moves the Court for an Order granting the Yance Fee Motion and thus awarding Yance attorney fees in the amount of Five Hundred Thousand Dollars ($500,000.00).

Respectfully submitted,

/s/ R. Tucker Yance
R. TUCKER YANCE
Ala. State Bar #- ASB-9775-H71Y
YANCE LAW FIRM, LLC
169 Dauphin Street Suite 318
Mobile, AL  36602
(251) 432-8003
(251) 432-8009 FAX
rty@yancelaw.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that the above and foregoing motion has been served upon Plaintiffs'

Liaison Counsel Russ M. Herman and Defendants' Liaison Counsel Kerry Miller, by e-mail and

upon all parties by electronically uploading the same to File & ServeXpress in accordance with

Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of the Court

of the United States District Court for the Eastern District of Louisiana by using the CM/ECF

System, which will send a notice of electronic filing in accordance with the procedures

established in MDL 2047 on this 21st day of March, 2019.

/s/ R. Tucker Yance
R. TUCKER YANCE
Ala. State Bar #- ASB-9775-H71Y
YANCE LAW FIRM, LLC
169 Dauphin Street Suite 318
Mobile, AL  36602
(251) 432-8003
(251) 432-8009 FAX
rty@yancelaw.com
