# EXHIBIT B

Confidential - Subject to Further Confidentiality Review

01

                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA


        IN RE:
        CHINESE-MANUFACTURED          MDL NO. 2047
        DRYWALL PRODUCTS LIABILITY
        LITIGATION                    SECTION:  L
                                      JUDGE FALLON
        THIS DOCUMENT APPLIES TO
        ALL CASES                     MAG. JUDGE
                                      WILKINSON
        * * * * * * * * * * * * * * * * * * * * * * * *




                CONFIDENTIAL - SUBJECT TO FURTHER
                      CONFIDENTIALITY REVIEW



                The deposition of NADJA FISHER, taken in
        connection with the captioned cause, pursuant to the
        following stipulations before RITA A. DEROUEN, Certified
        Court Reporter, at Barrios, Kingsdorf & Casteix, LLP,
        701 Poydras Street, Suite 3650, New Orleans, Louisiana,
        on the 13th day of March, 2019, beginning at 10:25 a.m.

```
 1                      NADJA FISHER,
 2    having been first duly sworn, was examined and testified
 3    as follows:
 4                       EXAMINATION
 5    BY MS. HAQUE:
 6         Q.   Could you please state your full name for the
 7    record.
 8         A.   Nadja Teresa Thompson Fisher.
 9         Q.   My name is Aliyya Haque.  I'm one of the
10    attorneys representing Taishan Gypsum, one of the
11    defendants in this lawsuit.  I'm going to be asking you
12    some questions today related to your claims in this
13    lawsuit.
14              Have you ever been deposed before?
15         A.   What does that mean?
16         Q.   Have you ever participated in a similar
17    situation where an attorney is asking you questions and
18    there's a court reporter?
19         A.   A deposition?
20         Q.   Correct.
21         A.   No, ma'am.
22         Q.   Well, I'm going to go ahead and explain some
23    ground rules in order to make the deposition go a little
24    bit more smoothly.
25              As you know, you have just been sworn in by the
```

| | |
|---|---|
| 1 | Q. Did anyone from Habitat for Humanity tell you |
| 2 | these are the things that are being done, pursuant to |
| 3 | the agreement you signed with them? |
| 4 | A. No, no one told me anything. They just gave me |
| 5 | this paper to sign and read. |
| 6 | Q. Removing and replacing defective appliances, to |
| 7 | your knowledge, that was done? |
| 8 | A. Yes. |
| 9 | Q. Finishing and painting all new drywall, you |
| 10 | said that there was not painting. Or did they go ahead |
| 11 | and paint? |
| 12 | A. They painted. What happened was, like I said, |
| 13 | they had to take the Sheetrock that they put up down and |
| 14 | the insulation in, because they didn't put it in. But |
| 15 | they painted. |
| 16 | Q. Okay. Repairing and replacing as necessary all |
| 17 | materials affected by the repair process. So was there |
| 18 | any damage to anything in the home during the |
| 19 | remediation? |
| 20 | A. Yes, there was several -- there was damage to |
| 21 | several things in the home, and they didn't replace |
| 22 | that. |
| 23 | Q. They did not fix it? |
| 24 | A. No. |
| 25 | Q. Okay. Perform an air-out and cleanup following |

Confidential - Subject to Further Confidentiality Review

| | |
|---|---|
| 1 | the removal of drywall, insulation, and ductwork.  I |
| 2 | guess, do you know if that was performed? |
| 3 |     A.   I guess it was.  Basically, they told us to |
| 4 | stay away from there while they were working. |
| 5 |     Q.   And the last thing is restoring the property to |
| 6 | its pre-remediation condition.  Do you feel that was |
| 7 | accomplished by the remediation? |
| 8 |     A.   Yeah. |
| 9 |     Q.   One other thing, I wanted to turn to page 4 of |
| 10 | this document. |
| 11 |     A.   This one here? |
| 12 |     Q.   Yes, correct.  That's Exhibit 7, I believe. |
| 13 | If you look at paragraph 17 -- flip one more |
| 14 | time. |
| 15 |     A.   I thought you said 7.  You said 17? |
| 16 |     Q.   Yes, paragraph number 17. |
| 17 |     A.   Assignment of claims? |
| 18 |     Q.   Yes. |
| 19 | Did you agree to assign your claims regarding |
| 20 | property damage to New Orleans Area Habitat for Humanity |
| 21 | to any expenses related to the remediation? |
| 22 |         MR. VERRIER:  Object to form. |
| 23 |     A.   I don't really understand. |
| 24 | BY MS. HAQUE: |
| 25 |     Q.   So in this paragraph, it says, "NOAHH intends |

```
 1      to seek recovery for the expense arising from the
 2      remediation work from the responsible party or parties.
 3      In order to facilitate such recovery, and in exchange
 4      for NOAHH performing the remediation work and providing
 5      a new warranty for repaired items, homeowner," that's
 6      you, "hereby assigns to NOAHH all of his or her demands,
 7      claims, causes of action, and/or lawsuits against any
 8      individual entity and/or insurer as well as any payments
 9      made by same for any and all direct or indirect, known
10      or unknown, property damage existing or which may later
11      arise in homeowner's favor."
12              And you signed this document, correct?  That's
13      your signature on the next page?
14          A.  Yeah, that's my signature.
15          Q.  Okay.  So from this document, you have assigned
16      to Habitat for Humanity the right to bring claims
17      related to the remediation?
18              MR. VERRIER:  Object to form.
19          A.  I know that they said that they would replace
20      everything that was destroyed.  They didn't do that.
21      They didn't replace anything but the drywall.  I had to
22      pay them to put the tile down on the floor, which was
23      $3,000.  And they didn't put the -- they put it on the
24      floor, but guess what?  They forgot to put the glue
25      down, so...
```

Confidential - Subject to Further Confidentiality Review

```
 1     BY MS. HAQUE:
 2         Q.   How much did you pay personally out of pocket
 3     for the remediation?
 4         A.   3,000.
 5         Q.   And the 3,000 was for the tile?
 6         A.   Yes.
 7         Q.   Okay.  Who performed the actual remediation?
 8         A.   I don't know.  Habitat hired everybody.
 9         Q.   If you -- you can put that document aside,
10     Exhibit Number 7.
11              And if you go back to this Exhibit Number 5 --
12     we've added some page numbers for the ease of this
13     deposition.  But if you turn the page -- you'll see
14     there's some page numbers in the corner.
15              If you turn to page 621 -- 622, I'm sorry.
16                  MR. VERRIER:  Did you say 622?
17                  MS. HAQUE:  622, yes.
18     BY MS. HAQUE:
19         Q.   You'll see that it's a document from the
20     Lakewood Corporation.  Have you ever heard of the
21     Lakewood Corporation before?
22         A.   No.
23         Q.   It looks like the Lakewood Corporation were the
24     company that performed the remediation on behalf of
25     Habitat for Humanity.
```

 1      wasn't included in the contract.
 2           Q.   How much did you pay these individuals to help
 3      you move?
 4           A.   Like about 40, $50 each.  My husband, he's --
 5      at that time, he wasn't young.
 6                THE WITNESS:  I'm not calling you old,
 7      honey.
 8           A.   But he's 72 now, so you could just do your
 9      math.  He fell off of the roof at that house when they
10      was working and broke his Achilles heel in three places,
11      so he was out of commission for a long time.
12                And they didn't do anything about that.  They
13      gave me a piece of paper to sign, I don't know what it
14      was.  I was busy crying over him when they gave me the
15      paper.
16      BY MS. HAQUE:
17           Q.   But for the most part, Habitat for Humanity
18      covered your rent, electricity, and the moving costs?
19                MR. VERRIER:  Objection.
20           A.   Yes, and simple water and stuff.
21      BY MS. HAQUE:
22           Q.   How much in water do you recall paying?
23           A.   I don't know, but it's much less now.  I have a
24      problem with my water bill now.
25           Q.   While you were living at the Apple Street

Confidential - Subject to Further Confidentiality Review

```
 1      address?
 2          A.    I had to pay it.
 3          Q.    Do you recall how much total in water you paid?
 4          A.    No, not really, not that far back.
 5          Q.    Just a couple last questions and then I'll go
 6      ahead and pass the witness.
 7                You are also claiming some personal injury
 8      claims in this lawsuit, correct?
 9          A.    Yes.
10          Q.    Are you a smoker?
11          A.    I was.
12          Q.    How long were you a smoker for?
13          A.    About 15 years.
14          Q.    And when did you quit smoking?
15          A.    Approximately six months ago.
16          Q.    And was that on the advice of your physicians?
17          A.    No.  That was me praying and wanting to -- I've
18      been wanting to stop smoking.  And they gave me
19      medicine, they gave me the patches.  And I stopped
20      smoking when I had to have the surgery for two months
21      and started back after the surgery.  I had stopped a few
22      more months and started back.  And I just prayed on it,
23      and the Lord just took me off it.  I didn't use
24      anything, I just stopped.
25          Q.    How many packs a day were you smoking while you
```

Confidential - Subject to Further Confidentiality Review

```
 1      were smoking?
 2          A.    I was a light smoker, you'll see on that paper.
 3      I was -- like maybe a few cigarettes a day, not many.
 4      They have a net 30 packs a year, so that's not that
 5      many.
 6          Q.    When you had your knee replacement, you said
 7      you slipped and fell and hurt your knee?
 8          A.    No.  What happened was I got out of bed one
 9      morning and fell to my knees in the rental property
10      where I was staying at because my doctor told me --
11      advised me to get out of that house as soon as possible.
12              And when I fell, I fell hard on my left side
13      because that's the side that was paralyzed.  I couldn't
14      get up.  But I crushed my knee and my joint, my knee
15      joint.  And after that, they did the surgery.  I have a
16      plate in my neck, a metal plate holding my spine
17      together.  And without this plate, I can't walk.
18              My nervous system they said is messed up.  And
19      they said it could be due to a long-time exposure that I
20      had to the Chinese drywall.
21                  MS. HAQUE:  Mrs. Fisher, those are all the
22      questions I have for you.  I pass the witness to my
23      codefendants.
24                  MR. DAVIDSON:  We have no questions for
25      the witness.  Thank you.
```