# EXHIBIT G

Confidential - Subject to Further Confidentiality Review

```
 1                UNITED STATES DISTRICT COURT
 2                EASTERN DISTRICT OF LOUISIANA
 3        MDL No. 2047            Section L
          Judge Fallon            Mag. Judge Wilkinson
 4
             THIS DOCUMENT RELATES TO ALL CASES
 5
             IN RE:   CHINESE-MANUFACTURED DRYWALL
 6                 PRODUCTS LIABILITY LITIGATION
 7
 8           CONFIDENTIAL - SUBJECT TO FURTHER
                    CONFIDENTIALITY REVIEW
 9
10
11
12
13
14     Deposition of JERRY ALLEN PHILLIPS, taken on
15   Wednesday, March 27, 2019, in the office of
16   Barrios, Kingsdorf & Casteix, L.L.P., 701 Poydras
17   Street, Suite 3650, New Orleans, Louisiana 70139,
18   commencing at 9:26 a.m.
19
20
21
22
23
     Reported by:
24   AURORA M. PERRIEN
     CERTIFIED COURT REPORTER
25   REGISTERED PROFESSIONAL REPORTER
```

```
 1                   JERRY ALLEN PHILLIPS,
 2    18423 Hosmer Mill Road, Covington, Louisiana
 3    70435, after having been first duly sworn,
 4    testified on his oath as follows:
 5                   E X A M I N A T I O N
 6    BY MS. MANUPIPATPONG:
 7        Q.  Thank you, Mr. Phillips, and good morning.
 8        A.  Good morning.
 9        Q.  My name is Mae Manupipatpong, and I
10    represent Taishan Gypsum.  Thank you for coming
11    here today to answer some of my questions.
12            Mr. Phillips, do you understand that
13    you've been sworn in and so you have to tell the
14    truth as if testifying in a court?
15        A.  Yes.
16        Q.  And are you taking any medications that
17    will impair your ability to answer my questions
18    fully and accurately today?
19        A.  Well, I'm taking a lot of medications, but
20    I don't know if they -- if any of them will do
21    that.
22        Q.  Okay.  And the court reporter will be
23    transcribing what we'll be saying today; so let's
24    try not to talk over each other.  So I'll let you
25    finish the answers to my questions, and then you
```

```
 1      A.   Three bedrooms.
 2      Q.   How many bathrooms?
 3      A.   Two bathrooms.
 4      Q.   And do you currently own that property?
 5      A.   Yes.
 6      Q.   When was that property bought?
 7      A.   That's a good question.  Two -- 2003, I
 8  think.  I'm -- I'm not -- I'm not quite sure.
 9  2003, 2001.
10      Q.   And from whom did you buy it from?
11      A.   The owners that had it.  I don't -- I
12  don't remember.  That's been so far back.  But, I
13  mean, it's -- y'all obviously have documentation
14  on that.  So . . . We bought it from an --
15  individuals.
16      Q.   And do you remember how much the home
17  cost?
18      A.   Yes.
19      Q.   How much did it cost?
20      A.   107,000.
21      Q.   I'm handing you a document that has been
22  marked as Exhibit 1.
23           (Exhibit No. 1 was marked for
24           identification and attached hereto.)
25  BY MS. MANUPIPATPONG:
```

```
 1        Q.   And I'll give you a second to just look at
 2   it.  It's one of those documents that you
 3   mentioned about the purchase of the property.
 4        A.   All right.  So . . .
 5        Q.   Do you recognize it?
 6        A.   Yeah.  I guess so.  Yeah.
 7        Q.   So it looks like it -- the home was
 8   purchased on February 28th of 2003; is that right?
 9        A.   Yes.
10        Q.   And the purchase price was, if you look to
11   the fourth paragraph, 101,700?
12        A.   That's what I told you.  Yes.
13        Q.   And the home was sold to Judith Beshel;
14   correct?  Is -- is that your wife?
15        A.   Uh-huh.
16        Q.   If you look to the second page there, it
17   looks like -- your wife, Judith Beshel Phillips,
18   that's her signature as the buyer; correct?
19        A.   Yes.
20        Q.   And then that's your signature,
21   Jerry A. Phillips, for -- as an intervenor?
22        A.   Yes.
23        Q.   I've handed you a document that's been
24   marked as Exhibit 2.
25             (Exhibit No. 2 was marked for
```

```
 1              identification and attached hereto.)
 2   BY MS. MANUPIPATPONG:
 3        Q.   This one's a little longer than the first
 4   one; so take your time to look at it.
 5        A.   Excuse me.
 6        Q.   That's okay.  Do you --
 7        A.   Okay.
 8        Q.   Do you recognize this document?
 9        A.   Yes.
10        Q.   What is it?
11        A.   It's just showing the act of dona- -- this
12   is where we put this property in a trust.
13        Q.   And do you know why you decided to put
14   that property into a trust?
15        A.   Yeah.  We put all of our properties in a
16   trust because of passing away.  The kids wouldn't
17   have to go through probate.
18        Q.   For the four kids that you adopted?
19        A.   Yeah.
20        Q.   If you look to the third page there, where
21   it says "Schedule 1" --
22        A.   Yes.
23        Q.   -- is Tract 2 -- the description there, is
24   that of 116 Woodcrest?
25        A.   Yes.
```

 1          A.   I don't know that.
 2          Q.   So we talked a little bit about this, but
 3   when did you first suspect that there was Chinese
 4   drywall in the home?  Do you remember when your
 5   son came to you and told you about this --
 6          A.   Not -- not really.  But I know that he was
 7   very nervous and alarmed about it, saying that --
 8   thinking they were getting sick or something like
 9   that.  I don't know.  But other than that, no.
10          Q.   And was it pretty soon after he told you
11   about the discoloration that you hired
12   Mr. Barclay?  Was it like --
13          A.   Wasn't too much --
14          Q.   -- within that same year?
15          A.   -- longer that I know of, because we
16   figured it was a serious challenge.  We wanted to
17   make sure that we took care of it.
18          Q.   Do you know how many years your son had
19   been living in the home before he started telling
20   you about the drywall symptoms?
21          A.   No.  Not really.  I mean, he was in it
22   after we put it back together for Katrina.  And
23   so . . . And it took a while for Katrina to -- I
24   think it took us a couple years, Katrina, because
25   you couldn't get contractors and all that.  Even

Confidential - Subject to Further Confidentiality Review

```
 1   though we -- my sons were contractors, it was
 2   still very difficult.  So I don't really know.
 3              MS. MANUPIPATPONG:
 4                   I think this is a good time to take a
 5              break if that's --
 6              MR. CHRISTINA:
 7                   Okay.
 8              MS. MANUPIPATPONG:
 9                   -- good with you.
10              THE WITNESS:
11                   Sounds like a winner to me.
12              MS. MANUPIPATPONG:
13                   We can go off the record.
14              (Brief recess was taken.)
15              (Ms. Becnel exits the deposition.)
16   BY MS. MANUPIPATPONG:
17        Q.   Welcome back, Mr. Phillips.
18        A.   Thank you.
19        Q.   Before I go back to the questions about
20   just your son and his experience with Chinese
21   drywall and how he came to suspect that you had
22   Chinese drywall in your home, I just wanted to
23   confirm that -- whether there were any other
24   transfers or written agreements related to
25   ownership of the 116 Woodcrest property besides
```

```
 1    the ones that we went over today?
 2             (Ms. Becnel enters the deposition.)
 3             THE WITNESS:
 4                  No.  No.  Same ownership with just
 5         wife and I.  That's it.
 6    BY MS. MANUPIPATPONG:
 7         Q.  So your wife --
 8         A.  Is that what you -- is that what you're
 9    referring to?
10         Q.  Yes.  Yes.
11             I just wanted to confirm that your wife
12    bought the property in 2003 and then you
13    transferred that property into the trust in 2009;
14    is that correct?
15         A.  I'm not sure of the date, but -- but I --
16    I guess that's true.  We did do -- do the function
17    of what you're talking about.
18         Q.  Okay.  And I know you've never lived in
19    the property.  But I just wanted to know what your
20    son's experience was with the symptoms of Chinese
21    drywall that he thought he experienced in the
22    property.
23             Do you know if he ever had problems with
24    air-conditioning in the home?
25         A.  Due to the Chinese drywall?
```

```
 1        Q.   Uh-huh.
 2        A.   I'm not sure.
 3        Q.   Any appliance problems?
 4        A.   He -- he may have, but I -- I -- I can't
 5   say for sure.
 6        Q.   And did he ever talk about a strange odor
 7   in the home?
 8        A.   Yeah.  He did before.  That's what caused
 9   us to get the inspection done.  And then he
10   started pulling some of the -- the copper wires
11   were screwed up.
12        Q.   He looked behind the sockets to check?
13        A.   Yeah.  I mean . . .
14        Q.   And did he ever say whether the smell was
15   stronger in certain parts of the home than in
16   others?
17        A.   No.  Not -- not to me.  He may have, but I
18   don't remember nothing like that.
19        Q.   When you went to visit him, did you ever
20   notice the smell yourself?
21        A.   I never did go -- I didn't go over there
22   too often.
23        Q.   Okay.  And did he say whether the smell
24   changed over time, whether it was more before and
25   now it's less or it was less and now it's worse?
```

1     A.  Am I seeking what now?

2     Q.  Compensation for the damage to --

3     A.  Well --

4     Q.  -- like the wiring or the --

5     A.  Yeah.  Well -- well, the whole --

6     Q.  -- personal property?

7     A.  -- remediation, that's all part of it,
8  isn't it?

9     Q.  So apart from the remediation, there are
10  no specific like personal property that you're
11  seeking --

12    A.  No.  No.

13    Q.  -- compensation for?  I'm sorry.

14    A.  No.

15    Q.  Let's go back to Exhibit 7 for a minute.

16    A.  Okay.

17    Q.  And if you could turn to Page 6.

18    A.  Six?

19    Q.  Six, yes.

20        And specifically where the question
21  states, "If you experienced any loss of use and/or
22  loss of enjoyment of the Property as a result of
23  Chinese Drywall, identify the total amount of such
24  loss."

25    A.  I must not --

```
 1        Q.   Do you see that?
 2        A.   I must not be on the right page.
 3             MR. CHRISTINA:
 4                  (Indicating.)
 5             THE WITNESS:
 6                  Oh.  Up here.
 7   BY MS. MANUPIPATPONG:
 8        Q.   Do you need a minute to read the question?
 9   I can repeat it.  It's:  "If you experienced any
10   loss of use and/or loss of enjoyment of the
11   Property as a result of Chinese Drywall, identify
12   the total amount of such loss."
13             And the amount you noted there is
14   "$50,000"?
15        A.   Yes.
16        Q.   How did you come to that number?
17        A.   That's a good question.  I'm not sure.
18   But I know, you know, the use of it, lack of it,
19   whatever, I think with all the cost of doing
20   remediation and -- and everything, because I took
21   all that out of my pocket.  No insurance or
22   anybody paid for that.  I just -- I had to pay for
23   all that.  So . . .
24        Q.   But you have never lived in the home;
25   correct?
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.   No.
 2        Q.   And if you go to the bottom, in the box,
 3   there's -- you added a note there.  It says, "Lost
 4   rental income of $900 per month for 7 months for a
 5   total of $6,300.00."
 6             Can you explain what the seven months --
 7   is that during the remediation --
 8        A.   Yeah.
 9        Q.   -- that your son couldn't live in the
10   home?
11        A.   No one -- yeah.  Nobody could live in it,
12   because it took seven months to get it all back
13   together.  It probably took longer than that.  It
14   was slow going.
15        Q.   Is this the only time that you were not
16   able to rent out the home to someone because you
17   were remediating the home due Chinese drywall?
18        A.   Well, no.  I couldn't do it right after
19   Katrina.  Katrina got it all screwed up too; so I
20   lost time there.
21        Q.   But then after you renovated the home
22   after Katrina, your son lived there continuously
23   until about two months from today?
24        A.   I don't even think it was that long.
25   But . . .
```

1    Q.  Well, with the exception of the
2    seven months?
3    A.  Yeah.
4    Q.  And are you renting the property out to
5    someone right now?
6    A.  No.
7    Q.  Oh.  You said you're putting it up for
8    sale?
9    A.  Yes.
10   Q.  Do you know how much you're putting it up
11   for sale for?
12   A.  Yes.
13       But, you know, typically we don't tell
14   anybody -- well, I know it's -- it's up for sale
15   for 145,000.  Okay.  But they don't -- we don't --
16   if -- when we get a contract, we don't tell
17   anybody how much it sold for until act -- actual
18   act of sale because we don't want somebody to come
19   say, Well, they took less; so now we'll come back
20   in and offer them that amount of money too.  So
21   it's just one of those things.  I mean, it gets
22   out there.  But typically we don't say that.
23   Q.  And how did you come up with the number,
24   145,000, for the home?
25   A.  We just went through what they call a