UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | * * * * * * * | CIVIL ACTION<br><br>MDL NO. 2047<br><br>SECTION L (5) |
| THIS DOCUMENT RELATES TO:<br>ALL LOUISIANA *AMORIN* CASES | * * * | |

## ORDER & REASONS

Before the Court is a Motion for an Order Applying the Remediation Damages Formula Adopted by the Findings of Fact & Conclusions of Law Related to the June 9, 2015 Damages Hearing to the Claims of Former Owners of Affected Properties filed by the Plaintiffs' Steering Committee (the "PSC"). R. Doc. 22155. The motion is opposed by Defendants Taishan, R. Doc. 22212, and the CNBM and BNBM Entities, R. Doc. 22216. The PSC has filed a reply. R. Doc. 22225. Having heard oral argument on the motion on April 23, 2019, R. Doc. 22227, the Court rules as follows.

I. BACKGROUND

From 2004 through 2006, a housing boom in parts of the United States and rebuilding efforts necessitated by Hurricanes Rita and Katrina in the Gulf South led to a shortage of construction materials, including drywall. As a result, drywall manufactured in China was brought into the United States and used to construct and refurbish homes in coastal areas of the country, notably the Gulf and East Coasts. Sometime after the Chinese drywall was installed, homeowners began to complain of foul-smelling odors, the corrosion and blackening of metal wiring, surfaces, and objects, and the breaking down of appliances and electrical devices in their

homes. *See In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 894 F. Supp. 2d 819, 829–30 (E.D. La. 2012), *aff'd*, 742 F.3d 576 (5th Cir. 2014). Many of these homeowners also began to complain of various physical afflictions believed to have been caused by the Chinese drywall.

These homeowners then began to file suit in various state and federal courts against homebuilders, developers, installers, realtors, brokers, suppliers, importers, exporters, distributors, and manufacturers who were involved with the Chinese drywall. Because of the commonality of facts in the various cases, this litigation was designated as a multidistrict litigation. Pursuant to a Transfer Order from the United States Judicial Panel on Multidistrict Litigation on June 15, 2009, all federal cases involving Chinese drywall were consolidated for pretrial proceedings in MDL 09-2047 before this Court.

The Chinese drywall at issue was largely manufactured by two groups of defendants: (1) the Knauf Entities and (2) the Taishan Entities. The litigation has focused on these two entities and their downstream associates and has proceeded on strikingly different tracks for the claims against each group.[1] Relevant to this Order are the Chinese Defendants. These Defendants include the principal Chinese-based Defendant, Taishan, namely, Taishan Gypsum Co. Ltd. ("TG") and its wholly-owned subsidiary, Taian Taishan Plasterboard Co., Ltd. ("TTP") (collectively "Taishan" or "Taishan Entities"). Other Chinese-based Defendants include China New Building Materials Group ("CNBM Group"), China New Building Materials Co.

---

[1] The Knauf Entities are German-based, international manufacturers of building products, including drywall, whose Chinese subsidiary, Knauf Plasterboard (Tianjin) Co., Ltd. ("KPT"), advertised and sold its Chinese drywall in the United States. On December 20, 2011, the Knauf Entities and the PSC entered into a global, class Settlement Agreement ("Knauf Settlement Agreement"), which was designed to resolve all Knauf-related, Chinese drywall claims. In addition to the Knauf Settlement Agreement and after a jury trial in a bellwether case, numerous defendants in the chain-of-commerce with the Knauf Entities have entered into class settlement agreements, the effect of which settles almost all the Knauf Entities' chain-of-commerce litigation. The total amount of the Knauf Settlement is approximately $1.1 billion. Although the Court occasionally had to deal with settlement administration and enforcement issues, with the assistance of Special Master Dan Balhoff, the Knauf portion of this litigation is now resolved.

("CNBM"), CNBMIT Co. Ltd. ("CNBMIT"), CNBM USA Corp. ("CNBM USA"), and United Suntech Craft, Inc. ("United Suntech") (collectively the "CNBM Entities"), as well as the Beijing New Building Materials Public Limited Company ("BNBM") and Beijing New Building Material Group ("BNBMG") (collectively the "BNBM Entities").

The Court's initial inquiry regarding Taishan involved four cases in this MDL: (1) *Germano v. Taishan Gypsum Co.* (Case No. 09-6687); (2) *The Mitchell Co. v. Knauf Gips KG* (Case No. 09-4115); (3) *Gross v. Knauf Gips KG* (Case No. 09-6690); and (4) *Wiltz v. Beijing New Building Materials Public Ltd.* (Case No. 10-361).

The first issues involving Taishan arose when Taishan failed to timely answer or otherwise enter an appearance in *Mitchell* and *Germano*, despite the fact that it had been properly served in each case. Thus, after an extended period of time, the Court entered preliminary defaults against Taishan in both cases. Thereafter, the Court moved forward with an evidentiary hearing in furtherance of the preliminary default in *Germano* on Plaintiffs' claimed damages. At the hearing, the PSC presented evidence specific to seven individual properties, which served as bellwether cases. Thereafter, on February 19 and 20, 2010, the Court issued detailed Findings of Fact and Conclusions of Law. On May 11, 2010, the Court issued a Default Judgment against Taishan in *Germano* and in favor of Plaintiffs.

On June 10, 2010, the last day to timely appeal the Default Judgment against them, Taishan filed a Notice of Appeal in *Germano* and entered its appearance in *Germano* and *Mitchell*. After Taishan entered its appearance in the MDL, it quickly sought to have the Default Judgment in *Germano* and the Preliminary Default in *Mitchell* vacated for lack of personal jurisdiction. Because this was the first time Defendants raised jurisdictional issues, the Fifth

3

Circuit remanded the case to this Court to determine whether this Court indeed has jurisdiction over Taishan.

In the fall of 2010, the Court directed the parties to commence the personal jurisdiction discovery necessary to resolve Taishan's motions to vacate. Sometime after the initial discovery, the parties agreed to expand the discovery beyond the *Germano* and *Mitchell* cases to other cases in which Taishan had been served, including *Gross* and *Wiltz*.

Formal personal jurisdiction discovery of Taishan began in October 2010. Discovery included the production of both written and electronic documents as well as depositions of Taishan's corporate representatives, with each type of discovery proceeding in a parallel fashion. This discovery was highly contentious, requiring close supervision by the Court. The Court presided over regularly-scheduled status conferences, conducted hearings, and issued rulings to resolve numerous discovery-related disputes.

In June 2011, the PSC filed identical complaints in Federal district courts in Florida, Virginia, and Louisiana (the "*Amorin* complaints"). The *Amorin* complaints include all Plaintiffs named in the *Wiltz*, *Gross*, *Abel*, and *Haya* actions. The Florida and Virginia actions were transferred by the JPML to the MDL; the PSC filed the Louisiana omnibus complaint directly into the MDL. It is undisputed that the allegations and Plaintiffs named in the *Amoin* complaints are identical. According to the PSC, these identical complaints were filed "out of an abundance of caution," because "there existed a colorable question regarding the application of the jurisdictional tests known as the 'stream-of commerce' test and the 'stream-of-commerce-plus' test reflected in the plurality opinions in *McIntyre* and *Asahi*, as well as Justice Brennan's concurring opinion in *Asahi*."

In April 2012, Taishan filed various motions, including motions to dismiss for lack of personal jurisdiction. On June 29, 2012, over three years since the creation of this MDL and after a year-and-a-half of personal jurisdiction discovery on Taishan, the Court presided over a hearing on Taishan's motions. The Court coordinated its hearing with the Honorable Joseph Farina of the Florida state court, who had a similar motion involving Taishan's challenge to personal jurisdiction.

On September 4, 2012, this Court issued a 142-page Order regarding Taishan's motions in *Germano*, *Mitchell*, *Gross*, and *Wiltz*, in which the Court denied the motions to dismiss and held that it maintained personal jurisdiction over Taishan. *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 894 F. Supp. 2d 819 (E.D. La. 2012). The Court also ruled that Taishan was operating as the alter ego of TG and TTP. The Court certified an interlocutory appeal, and the Fifth Circuit granted permission to appeal. In January and May of 2014, two different panels of the Fifth Circuit affirmed this Court's ruling and held that this Court maintained personal jurisdiction over Taishan, TG, and TTP. *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 753 F.3d 521 (5th Cir. 2014); *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 742 F.3d 576 (5th Cir. 2014). The time for writ of certiorari passed, and the issue of personal jurisdiction over Taishan became firmly and finally settled. Nevertheless, Taishan refused to voluntarily participate in this suit.

On June 20, 2014, the Court ordered Taishan to appear in open court on July 17, 2014 to be examined as a judgment debtor. Taishan failed to appear for the July 17, 2014 Judgment Debtor Examination, and the Court held Taishan in contempt, ordering that Taishan pay $15,000.00 in attorneys' fees to Plaintiffs' counsel and $40,000.00 as a penalty for contempt; Taishan and any of its affiliates or subsidiaries be enjoined from conducting any business in the

5

United States until or unless it participates in this judicial process; and if Taishan violates the injunction, it must pay a further penalty of twenty-five percent of the profits earned by the Company or its affiliate who violate the Order for the year of the violation.

On July 23, 2014, the PSC filed their Omnibus Motion for Class Certification pursuant to Rule 23(b)(3). Taishan did not appear and, on September 26, 2014, this Court certified a class of all owners of real properties in the United States, who are named Plaintiffs on the complaints in *Amorin*, *Germano*, *Gross*, and/or *Wiltz* (*i.e.*, not an absent class member), asserting claims for remediated damages arising from, or otherwise related to Chinese Drywall manufactured, sold, distributed, supplied, marketed, inspected, imported or delivered by the Taishan Defendants. R. Doc. 18028.

Taishan finally entered an appearance with the Court in February 2015, and, to satisfy the contempt, Taishan paid both the sum of $15,000.00 in attorneys' fees to Plaintiffs' counsel and the contempt penalty of $40,000.00 in March 2015. On March 17, 2015, the Court ordered Taishan and the BNBM and CNBM Entities to participate in expedited discovery related to "the relationship between Taishan and BNBM/CNBM, including whether affiliate and/or alter ego status exists."

On March 10, 2016, this Court granted CNBM Group's motion to dismiss, finding it was an "agent or instrumentality of a foreign state" within the meaning of the Foreign Sovereign Immunities Act ("FSIA"), and therefore outside the jurisdiction of this Court under 28 U.S.C. § 1603(b). R. Doc. 20150. The Court determined the tortious activity exception did not apply because the alleged tortious conduct did not occur within the United States under 28 U.S.C. § 1605(a)(5). Further, the Court found the commercial activity exception did not apply, as CNBM Group did not directly manufacture, inspect, sell, or market drywall in the United States.

Because the PSC failed to present evidence sufficient to overcome the presumption that CNBM Group was entitled to independent status for purposes of the FSIA, the Court granted the motion and dismissed CNBM Group from the present litigation.

After concluding it lacked personal jurisdiction over CNBM Group, on April 21, 2017, the Court issued a 100-page opinion related to jurisdictional challenges being raised with respect to CNBM, BNBM Group, and BNBM. The Court found Taishan was an agent of BNBM under Florida and Virginia law, such that Taishan's contacts in Florida and Virginia are imputed to BNBM. This Court further found that CNBM, BNBM Group, and BNBM were part of a single business enterprise with Taishan under Louisiana law, such that Taishan's contacts in Louisiana may be imputed to them, and that the Court has jurisdiction over CNBM, BNBM Group, and BNBM in relation to Plaintiffs' claims based on Louisiana law. Also on April 21, 2017, the Court issued its Findings of Fact and Conclusions of Law related to the June 9, 2015 damages hearing and adopted the PSC's damage calculations methodology related to remediation of properties.

On May 22, 2017, Defendants filed a motion pursuant to 28 U.S.C. § 1292(b) to certify an interlocutory appeal from this Court's April 21, 2017 jurisdiction order. Because the Court found the April 21, 2017 Order & Reasons involved a controlling question of law as to which there was substantial ground for difference of opinion, and because the Court further found that an interlocutory appeal might materially advance the ultimate termination of this MDL, on August 4, 2017, the Court certified an interlocutory appeal to the Fifth Circuit pursuant to 28 U.S.C. § 1292(b).

On August 1, 2017, Defendants filed a motion to dismiss for lack of personal jurisdiction following the recent U.S. Supreme Court case of *Bristol-Myers Squibb v. Superior Court of California* ("*Bristol-Myers*"), 137 S. Ct. 1773 (2017). Based on *Bristol-Myers*, Defendants

contested this Court's findings of personal jurisdiction, class certification, and agency relationship. On August 14, 2017, Defendants filed a petition for permission to appeal pursuant to 28 U.S.C. § 1292(b) in the Fifth Circuit, in which they argued *Bristol-Myers* impacted questions raised on appeal. On August 24, 2017, this Court vacated its 28 U.S.C. § 1292(b) certification order to avoid piecemeal litigations, noting its duty to address the effect of *Bristol–Myers* on the jurisdictional issue before certifying the matter to the Fifth Circuit. Subsequently, on November 30, 2017, the Court denied Defendants' motion to dismiss, holding *Bristol-Myers* did not change this Court's jurisdictional findings and class certification.

On January 2, 2018, the Court denied Defendants CNBM, BNBM Group, and BNBM's motion to vacate the default judgments against them. On March 5, 2018, the Court reinstated its order certifying the interlocutory appeal of its April 21, 2017 order. This issue remains with the Fifth Circuit.

## II. PENDING MOTION

On March 15, 2019, the PSC filed a motion seeking an order applying to the claims of former owners the remediation damages formula adopted by the Court in its April 21, 2017 Findings of Fact & Conclusions of Law following the June 9, 2015 damages hearing. R. Doc. 22155. In its April 21, 2017 Order, the Court reaffirmed its finding in the *Germano* litigation that, "remediating a Chinese drywall property requires complete remediation and cleaning." *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, MDL No. 09-2047, 2017 WL 1421627, at *6 (Apr. 21, 2017). The Court ultimately concluded that the total remediation "damages awarded [would] be calculated by multiplying the under air square footage of the affected properties . . . by $105.9110 as adjusted by the RS Means location factor." *Id.* at *24. Notably, the Court's findings at that time related to current property owners.

8

In moving the Court to extend the April 21, 2017 damages finding to former property owners, the PSC points out that these Plaintiffs were current owners when they sustained the damage and when they filed suit in this case. R. Doc. 22155 at 2. Moreover, the PSC contends, many Plaintiffs have since been forced to sell their properties during the decade-long, protracted Chinese Drywall proceedings because of Defendants' dilatory litigation tactics. *Id.* Accordingly, the PSC argues, any Plaintiff who was a current owner when suit was brought and when the first defaults were entered against Taishan in 2009 should be considered a current owner for purposes of calculating damages in these default proceedings. *Id.* at 3.

In support of their position, the PSC points to the Court's Rule 55(b)(2) proceeding in which the Court awarded Plaintiffs Deborah and William Morgan remediation damages, among other damages, despite their having declared bankruptcy. *Id.* at 7. The PSC contends that, their home having been foreclosed on, the Morgans were essentially former owners. *Id.* The PSC further notes that, in *Germano*, this Court entered judgment for both current owners and former owners based on the same formulaic methodology to calculate remediation damages. *See* R. Doc. 18725.

In opposition, Defendants argue the make-whole analysis for current owners, who can use the estimated repair costs to restore their properties, is much different than the analysis needed for former owners, who no longer have property to repair. R. Doc. 22212 at 1. Defendants aver the June 9, 2015 damages hearing was properly limited to current owners only, because the type of damages suffered differ as to prior owners. *Id.* at 2. Defendants submit, "Were the measure of damages the same for current and former owners, there would have been no reason to segregate and delay the damages calculation for the second group." *Id.* Because former owners

can no longer repair the property, Defendants argue the formula for damages designed to estimate repair costs cannot be applied equally as to them.

## III. ANALYSIS

As an initial matter, the Court begins its analysis by noting the differences in the group of Plaintiffs this order relates to. First, the Court finds no difficulty in extending the remediation damages calculation to the subgroup of former owners who remediated their properties prior to relinquishing ownership of their homes. These Plaintiffs unquestionably are entitled to recoup remediation damages. *See Md. Cas. Co. v. Rittiner*, 133 So. 2d 172, 175 (La. 4 Cir. 1961) ("Had Plaintiff's insured elected to repair the structure, there could be no question of Defendants' obligation to pay for the reasonable cost of repairs."). Thus, the issue before the Court is whether to extend the remediation damages calculation to prior owners who were owners at the time the damage was sustained and at the time suit was filed, but who did not remediate their properties prior to losing possession thereof.

In *Eagle Pipe*, the Louisiana Supreme Court held that a subsequent owner of real property has no right to sue a tortfeasor for damage previously inflicted absent an assignment or subrogation of the prior owner's personal right to sue for that damage. 2010-2267 (La. 10/25/11), 79 So. 3d 246, 275. Thus, a former owner maintains the right to sue the tortfeasor, even after she or he no longer owns the property in question. *Id.*; *see also See Catahoula Lake Invests., LLC v. Hunt Oil Co.*, 2017-649 (La. App. 3 Cir. 1/10/18), 237 So. 3d 585, 587.

When a former owner sues a tortfeasor for damages, Louisiana law allows the former owner to recover from the tortfeasor damages resulting from diminution in value of their home. *Md. Cas. Co.*, 133 So. 2d at 175 ("[S]ince the insured sold the damaged structure, he could not expect to recover from Defendants any more than the difference between the value before the

10

fire and the amount received for it in its damaged condition."); *see also Church of Archdiocese of New Orleans v. La. Gas Serv. Co.*, 618 So. 2d 874, 879 (La. 1993) ("In assessing damage to property, generally, courts have considered the cost of restoration as the proper measure of damage where the thing damaged can be adequately repaired." (quoting *Coleman v. Victor*, 326 So. 2d 344, 346–47 (La. 1976)). "If the damaged property cannot be adequately repaired," such as in the case of a prior owner, "the judicial objective of restoring the claimant to his position immediately prior to damage may be achieved by awarding him the difference in the value of the property before the damage occurred and just afterwards." *Coon v. Placid Oil Co.*, 493 So. 2d 1236, 1240 (La. Ct. App. 1986).

In this case, pursuant to the subsequent purchaser rule, absent evidence that the former owners assigned their personal right to sue Defendants for the damages sustained to their home, these former owners maintain the same right to sue Defendants for damages as the current owners. Because the Court's damage calculation is based on the cost of remediation, however, and former owners cannot remediate their homes, former and current owners do not stand in the same position with respect to proving the actual damages they incurred.

Although these former owners are not in a position to remediate their homes, that does not end the Court's analysis as to the utility of the remediation damage formula. Rather, the Court must consider how to properly calculate diminution in value of the properties in question. Had Defendants not chosen a course of "delay, delay, delay," which in many cases caused the property owners to lose their property and become former owners, the process of ascertaining the fair market value of a house before the defected drywall was installed and its value thereafter might not have been a difficult one. But the reality is that these injuries were sustained more than ten years ago to homes sold or foreclosed upon many years ago. Calculating the diminution

fire and the amount received for it in its damaged condition."); *see also Church of Archdiocese of New Orleans v. La. Gas Serv. Co.*, 618 So. 2d 874, 879 (La. 1993) ("In assessing damage to property, generally, courts have considered the cost of restoration as the proper measure of damage where the thing damaged can be adequately repaired." (quoting *Coleman v. Victor*, 326 So. 2d 344, 346–47 (La. 1976)). "If the damaged property cannot be adequately repaired," such as in the case of a prior owner, "the judicial objective of restoring the claimant to his position immediately prior to damage may be achieved by awarding him the difference in the value of the property before the damage occurred and just afterwards." *Coon v. Placid Oil Co.*, 493 So. 2d 1236, 1240 (La. Ct. App. 1986).

In this case, pursuant to the subsequent purchaser rule, absent evidence that the former owners assigned their personal right to sue Defendants for the damages sustained to their home, these former owners maintain the same right to sue Defendants for damages as the current owners. Because the Court's damage calculation is based on the cost of remediation, however, and former owners cannot remediate their homes, former and current owners do not stand in the same position with respect to proving the actual damages they incurred.

Although these former owners are not in a position to remediate their homes, that does not end the Court's analysis as to the utility of the remediation damage formula. Rather, the Court must consider how to properly calculate diminution in value of the properties in question. Had Defendants not chosen a course of "delay, delay, delay," which in many cases caused the property owners to lose their property and become former owners, the process of ascertaining the fair market value of a house before the defected drywall was installed and its value thereafter might not have been a difficult one. But the reality is that these injuries were sustained more than ten years ago to homes sold or foreclosed upon many years ago. Calculating the diminution

in value of the homes at issue many years after the fact presents a Herculean task made so as a consequence of Defendants' actions.

In the face of such a difficult task, district courts are encouraged to "devise imaginative solutions to problems created by the presence in a class action of individual damages issues." *Pella Corp. v. Saltzman*, 606 F.3d 391, 391 (7th Cir. 2014). During oral argument on the instant motion, all parties agreed the remediation damages calculation is relevant to the issue of the former owners' diminution damages. This is with good reason. In this case, the remediation damages calculation is based on the Court's finding that the effected properties must be totally remediated, meaning the structure must be gutted and all wiring must be removed and replaced. Effectively, the homes in question must be rebuilt from the studs up. As the Court noted in *Germano*, "If the [remediation] repairs are made properly there may be no diminution in value or at least it may be minimal." *In re Chinese Manufactured Drywall Prods.*, 706 F. Supp. 2d at 689.

Because remediating the home prior to sale or foreclosure likely would have restored the home's value, the cost of remediating that property informs the Court's analysis of its diminution damages. Thus, with respect to homes that were sold without first being remediated, the Court concludes the remediation damages calculation shall serve as a rebuttable presumption of a prior owner's diminution damages. *See cf. Eagle Pipe* at 285 ("The jurisprudence recognizes that the purchaser, who receives the benefit of the diminution in value, suffers no loss and, therefore, no damage."); Restatement (Second) of Torts § 929 (1979) (providing that damages for injury to real property include compensation for loss of use of the property and other consequential injuries in addition to any permanent property damage, whether measured by restoration or market value).

## IV. CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that the Plaintiffs' Steering Committee's Motion for an Order Applying the Remediation Damages Formula Adopted by the Findings of Fact & Conclusions of Law Related to the June 9, 2015 Damages Hearing to the Claims of Former Owners of Affected Properties, R. Doc. 22155, be **GRANTED** in part and **DENIED** in part. To the extent the PSC moves to extend the remediation damages calculation to former owners who remediated their homes prior to relinquishing ownership of the property, the motion is **GRANTED**. For the former owners who did not remediate their homes prior to relinquishing ownership of the property, the motion is **DENIED** in part and **GRANTED** in part, in that the Court concludes the remediation damage formula for these owners, when introduced into evidence, creates a rebuttable presumption of their diminution damage calculation.

New Orleans, Louisiana on this 3rd day of May, 2019.

_____
Eldon E. Fallon
U.S. District Court Judge