



EXHIBIT
D-3

**PRIVILEGED AND CONFIDENTIAL SETTLEMENT COMMUNICATIONS **

# TABLE OF CONTENTS
## CLAIMANT' S RESPONSE
## KNAUF'S DEFECTIVE DRYWALLS

### 8757 BAYSTONE COVE
### BOYNTON BEACH, FL 33473

**SUBJECT**                                                                            **PAGES**

1. CLAIMANT RESPONSE ……………………………………………………  9

2. Copy of Executed Purchase Contract: ……………………………..……  4
   EXHIBIT " A "

3. EXECUTED SPECIAL WARRANTY DEED ……………………………………… 2
   EXHIBIT "B"

4. Defendants Knauf EXHIBIT ……………………………………...…..…… 1
   EXHIBIT "C"

5. Copy of Complaint …………………………………………………… 5
   Exhibit "D"

6. Judge Order ………………………………………………..……… 2
   Exhibit "E"

7. Copy of scope agreements with Glhomes ………………..……………….. 5
   Exhibit "F"

8. Pictures of subject property Pre- Demolition ……………………………….. 8
   Exhibit "G"

9. Video of subject property Pre - Demolition ………………..……………… 1
   Exhibit "H"

10. Pictures of some Full KPT's boards installed in the Home ………………….. 15
    Exhibit "I"

11. Copy of PTO 1(B) - Order ………………………………………… 9
    Exhibit "J"

**PRIVILEGED AND CONFIDENTIAL SETTLEMENT COMMUNICATIONS **

12. Email from Glhomes Construction Vice President ……………………………………… 1
    Exhibit "K"

13. Email from Glhomes' counsel (1) ………………………………………………..… 2
    Exhibit "L"

14. Email from Defendants' counsel ………………………………………..……………… 2
    Exhibit "M"

15. Email from Glhomes' counsel (2) ………………………………..……..…… 3
    Exhibit "N"

16. Some Pictures KPT's Drywall samples & related evidences …………………………… 53
    Exhibit "O"

17. Copy of emails correspondence from Glhome's counsel & docs (3) ………..………… 4
    Exhibit "P"

18. Pictures of Present condition of subject property ………………………………………… 3
    Exhibit "Q"

19. Video of Present condition of the subject property ……………………..…………… 1
    (See Attached CD Video)

20. Copy of order from judge Fallon, …………………………………….………… 8
    Exhibit "R"

21. Copy of Business Card - Brad Wall, ………………………………..………..………… 1
    Exhibit "S"

22. Copy of floor Plan/building diagram ………………………….…………..…………… 2
    Exhibit "T

23. Copy of "Air Sample report  Pre Demolition ………………………..…………..… 15
    Exhibit "U"

24. Exhibit Sheets and Cover ……..……………………………………..……………… 21


    TOTAL PAGES …………………………………………..………………… 177

**8757 BAYSTONE COVE**
**BOYNTON BEACH, FL 33473**
**KNAUF'S DEFECTIVE DRYWALLS**

Mediation About Knauf's Drywall: 8757 Baystone Cove Boynton Beach FL 09/2017

**PRIVILEGED AND CONFIDENTIAL SETTLEMENT COMMUNICATIONS **

Today's Date:  09/13/2017

CLAIMANT'S MEDIATION RESPONSE

GUILFORT DIEUVIL, CLAIMANT

SUBJECT PROPERTY:

8757 BAYSTONE COVE

BOYNTON BEACH, FL 33473

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

MEDIATOR:   HONORABLE MR. BALHOFF

MEDIATION

**PRIVILEGED AND CONFIDENTIAL SETTLEMENT COMMUNICATIONS **

# INTRODUCTION

On March 16, 2006, Claimant entered into contract with Glhomes to build a spec home with custom upgrade, and in January 2007 the closing was done with  total purchase price of $ 1,142,015.00. While living in the premises, serious health issues started to take place which pushed my kids and I to seek medical assistance without knowledge that the house contained defective Chinese Drywall. In 2010 the builder (Glhomes) conducted an inspection at the subject property, after inspection Glhomes advised Claimant that the home was built with Chinese Drywall. Upon knowledge of such facts, on April 15, 2010 Claimant rushed to enter into agreement with the builder to remediate the home, in order to bring it into living condition and free from chemical and toxic Chinese Drywalls. The Builder/ Glhomes revealed and noticed during demolition that the subject property was built in facts with KPT Drywall (Knauf's drywalls). During demolition and initial remediation, Glhomes immediately collected multiple samples of the KPT Drywalls and other related components as evidences. Glhomes took and preserved those KPT's samples and evidences in compliance with PTO 1(B). During remediation and renovation process of my property, the builder requested from Mr. Dieuvil/Claimant to contribute substantial large amount of money into remediation of the house, in order to fix the house properly, and to bring the house free from potential chemical and toxic KPT drywall residual.  Such request went into dispute and disagreement which resulted from the Glhomes to stop their initial phase of remediation and renovation; therefore,  the house has remained vacant and incomplete into deplorable conditions since 2010.  Upon knowledge of the class action lawsuit against knauf, and based on Knauf's negligence and its predominant or vicarious liability, Claimant participates in this legal  proceeding against knauf.  Instead Defendants, knauf to come clean and assume its responsibility, without knowledge of all material facts, Defendants knauf has crossed reference and tortuously interfered into other irrelevant matters, and defamation. It is well questionable that Knauf' s conduct may constitute an act of bad faith, in coexistence with failure to present material facts.

---

Exhibit "A" -Executed Purchase Contract: in March 2006 with the builder Glhomes.
Exhibit "B" Executed Special Warranty Deed outlined purchased price of the home $1,142,015.00.

**PRIVILEGED AND CONFIDENTIAL SETTLEMENT COMMUNICATIONS **

PARTIES - PLAINTIFFS/CLAIMANT:

Mr. Guilfort Dieuvil is one of the Plaintiffs in this class action lawsuit against Defendants, Knauf. Claimant, Mr. Dieuvil has been working as a real investor for the past 18 years, with about 14 years experience as a Realtor. Claimant, Mr. Dieuvil used to hold a mortgage lender license in the State of Florida, and several other professional licenses in which Mr. Dieuvil voluntary decided not to renew some of those licenses, and let them expired.

Without knowledge of material facts Defendants, Knauf crossed reference and tortuously interfered into matters that are not relevant into this KPT Drywall's issues, in which Defendants Knauf failed to conduct their due diligence or investigation which would disseminate: at all material times, Claimant and his business's model have been in full compliance with all applicable laws, and acted within their legal rights and boundaries, and all claimant's business transactions were conducted in conformity with all applicable laws, and under explicit supervision and control of legal Counsels including in House Counsel with over 40 years legal experience as former Bar President.

---

**Exhibit "C"** Copy of Knauf Exhibit "G" that was presented by Defendants in their Confidential Position Paper, which is not relevant to this KPT Drywall, but Defendant Knauf has misconstrued the facts with some other frivolous allegations against Claimant that bare no merit whatsoever. "Defendants alleged that Claimant was name as Defendant in 20 civil lawsuits, but Defendants' Exhibit itself conflicted with Defendants's own statements, which only showed that Claimant merely involved into six (6) lawsuits as Defendants.

**Exhibit "D"** - Copy of Complaint - regarding one of the case that Defendants Knauf crossed reference and interfered as their Exhibit "G" Claimant's already filed a complaint against Trustee/Plaintiff for misrepresentations before the court. Trustee failed to conduct her due diligence, and has crossed her duties and obligations by filing an inducement complaint and misrepresentations allegations before the court. Claimant already filed this complaint against Trustee including a judicial notice to outline all facts before the court.

**Exhibit "E"** - Copy of Judge Order - regarding another case that Defendants Knauf crossed reference and interfered as their Exhibit "G" **Even the judge in that case has acknowledged the opposing parties against Claimant/Mr. Dieuvil "was very nasty" "and made completely unfounded, blatantly, false accusations"**

A dirty detective spent about two years to use his influence and connection to conduct a  campaign of defamation against Claimant, Mr. Dieuvil, and piled up some fabricated  and false allegations,  resulting into a malicious prosecution that was enlisted against Mr. Dieuvil in May 2012. The Assistant State Attorney (ASA) that filed charges against Claimant in 2012 was fired several months later for fraud. Upon knowledge of all material facts, State Officials drooped all charges against Mr. Dieuvil.
Defendants Knauf is merely debilitated resources and waste time by paying attention to garbages/false allegations and campaign of defamation against Claimant that are irrelevant. Defendants must stop acting in bad faith, and Knauf shall focus their attention on relevant matters, and come clean to abide under their obligations to remediate Claimant's property.

**PRIVILEGED AND CONFIDENTIAL SETTLEMENT COMMUNICATIONS **

DEFENDANTS:

Defendants, Knauf has directly provided defective construction drywalls that have caused serious health issues and financial damages to Plaintiffs, including Guilfort Dieuvil and his family that were living in the subject property built with KPT Drywalls. Defendants Knauf already admitted that it is engaged in a business causing serious health issues, financial damages and giving rise to great risk of harm that endangered the public, including Claimant Mr. Dieuvil and his family.

FACTS ABOUT THIS CASE:

In January 2007, when Claimant purchased the subject property for $ 1,142,015.00, the visual condition of the home was an excellent conditions, except while living in the home, Claimant and some of his kids encountered health condition problems, in which they went to medical facilities without knowing anything about Drywall issues at that time. Unfortunately later on, Claimant was admitted at the hospital with serious lungs condition problems in which Claimant spent several days at the hospital.

In 2010 the Builder/Glhomes conducted an inspection in the subject property, after inspection Glhomes informed Claimant about existence of Chinese Drywall in the subject property. Shortly thereafter, in order to protect my family and myself, On April 15, 2010 Claimant hurried into scope of work agreement with the Glhomes to remediate the house. Few months later, Glhomes obtained permits and initiated the demolition and remediation of the subject property. During demolition the builder has revealed and noticed those defective drywalls were Knauf's Drywalls (KPT), then immediately Glhomes took multiple physical samples of KPT Drywalls & all others related components as evidences; furthermore, Glhomes instantly labeled and photographed those evidences upon removal.

---

Exhibit "F" Copy of scope agreements with Glhomes,
Exhibit "G" Pictures of the subject property prior of initial demolition,
Exhibit "H" Copy of Video Prior Demolition

**PRIVILEGED AND CONFIDENTIAL SETTLEMENT COMMUNICATIONS **

All physical KPT Drywalls samples, and all others related evidences were explicitly taken, labeled, photographed, videotaped and preserved by Glhomes/builder in full compliance with PTO 1(B) requirements, and Glhomes preserved those evidences in their custody for several years which explicitly outlined the followings:

a)      Labeled each physical sample of the KPT Drywalls, and all other physical related evidences and address the subject property subdivision and its lot number,

b)      Documented specific location every physical sample of the KPT Drywalls, and all other physical related evidences upon removal as outlined in the floor plan/bldg diagram of the home

c)      Upon removal Glhomes divulged the "date" those physical KPT Drywalls samples, and all other physical related evidences were taken.

d)      Glhomes took videotapes & "Photographs of the wall sections so any makings on the backside of the drywall sections are most clearly visible in the photographs" This requirement was done pursuant to PTO 1(B), and such photographs & video have sent to Defendants, Knauf's and remained in Defendants' custody.

e)      All HVAC coil material samples were taken, labeled, photographed, preserved and identified in compliance with PTO 1(B),

f)      All Plumbing component samples were taken, labeled, photographed,  preserved and identified in compliance with PTO 1(B),

g)      All Electrical component samples were taken, labeled, photographed,  preserved and identified in compliance with PTO 1(B).

---

Exhibit "I" Pictures of some full KPT's Drywalls board that were installed in the subject property and related components evidences

**PRIVILEGED AND CONFIDENTIAL SETTLEMENT COMMUNICATIONS **

Upon removal, all physical samples of KPT Drywalls and other related evidences were taken, labeled, photographed, preserved and identified in building diagram/floor plan by Glhomes's employee. At all material times, handwritings on those labels, and handwriting on the floor plan/building diagram were in facts Glhomes's employees.

There is no ambiguity who collected those physical samples of KPT Drywalls and all other related evidences. Glhomes performed the initial demolition of the home, and Glhomes collected/ preserved all evidences in compliance with PTO 1(B) requirements. In 2013 Defendants Knauf was utterly well informed of all facts, and timely received all related evidences, pictures, video and documents of their defective KPT Drywalls that were installed in the subject property. Defendants Knauf failed to concede the facts, due to oversight Knauf is mistakenly acting in bad faith, and alleging that "Claimant submitted photos and samples from an unknown origin"

It is unfortunate that Defendants Knauf failed to attached copy of the PTO 1(B) as an Exhibit in their Confidential Position Paper that Defendant, Knauf falsely alleged that Claimant did not comply with that order. That same PTO 1(B) in page 2 section (A) required; _"The parties shall maintain at least two samples ( of ten inches by ten inches(10" x 10") in size if possible) of every different drywall brand or marking removed from an affected property, including taking samples of unmarked drywall)"._ Glhomes as the demolition company went above requirements by collecting, preserving, photographing tremendous physicals of the KPT drywalls in all sections and portions of the house.

Massive physical KPT Drywalls samples were collected in every section of the subject property which clearly prove themselves that the entire house was contaminated with defective KPT Drywalls, in which those samples and all related evidences have been preserved in compliance with PTO 1(B).

Defendants, Knauf submitted 22 pictures in their exhibit "F" among tremendous pictures evidences of the KPT drywalls that Knauf already has in their possession. 21 out of those 22 pictures already prove the evidence of KPT drywalls located in different sections of the subject property.

---

Exhibit "J" copy of PTO 1(B) Upon review that order, it is evidently clear that Claimant and Glhomes have fully complied with that PTO 1(B) -

**PRIVILEGED AND CONFIDENTIAL SETTLEMENT COMMUNICATIONS **

Defendants, Knauf failed to enlarge the backside of those full drywalls sheets to see their markings and brand names in those drywalls.

Also Defendant Knauf was informed that Mr. Dieuvil was willing to travel from Florida to Defendant's counsel office in New Orleans with all physical samples of those KPT Drywalls for physical inspection or legal procedures. Knauf's counsel has declined that request, and waived the opportunity to inspect and catch sight of those physical KPT Drywalls and all other related evidences.

Claimant was under expectations that Glhomes would conduct itself adequately to remediate the home without leaving any potential residual of chemical and toxic Drywalls when Claimant rushed to sign the scope of work agreement with Glhomes in 2010. Some of those metal studs were damaged, blackened, corroded and discolored, equally contained residual of the defective KPT drywalls. Prior of demolition it was agreed that Glhomes would change and remove all damaged, corroded, tainted and contaminated studs, and all related residual of the Defective Drywalls. Knauf's drywalls contain high levels of sulfur, released hydrogen, sulfide gas from bacteria, which damaged, impaired, corroded other components and other metals in the home. During renovation/remediation, Glhomes required Claimant, Guilfort Dieuvil to pay and/or contribute $25,000.00 to ensure the house is free from KPT Drywalls's residual, including changing the studs that were tainted, damaged and corroded by the KPT Drywall.

Dispute and negotiations took place in regards to this payment/contribution which culminated into disagreement resulting of Glhomes's failure to proceed with remediation and repair of the home. Without knowledge of facts Defendants falsely alleged in page 2 of their Position Paper that "without any stated reasons Claimant refused to allow Glhomes to complete the remediation."

---

Exhibit "K" Email from Glhomes Construction Vice President acknowledged that Guilfort Dieuvil has agreed for Glhomes to proceed with renovation and remediation of the home.
Exhibit "L" Glhomes' counsel ordered their personals to stop work at the house, because Claimant intended to hire counsel.
Exhibit "M" Copy of email when Knauf's counsel has denied the request to physically inspect the evidence of their KPT and waive the opportunity to catch sight of their KPT's samples and related evidences that were installed in the home.
Exhibit "N" Glhomes requested from claimant $25,000.00 payments contribution for remediation and renovation of the home.

**PRIVILEGED AND CONFIDENTIAL SETTLEMENT COMMUNICATIONS **

On September 23, 2015 Claimant received an email from his former counsel who informed Claimant, Mr Dieuvil about the fact that Glhomes has petitioned the court to allow destruction of the KPT Drywalls samples. Former Defendant's counsel advised Claimant to pick up those physical samples and evidences of the KPT Drywalls, and all other physical related evidences from Glhomes prior of destruction. Upon knowledge of such facts, Claimant contacted Glhomes and obtained those samples and all related evidences of the KPT Drywalls. On October 27, 2015 around 2:00 PM. Claimant met with Glhomes's assistant counsel, and counsel gave those physical samples of the KPT Drywalls and all related evidences to Claimant, and Claimant is preserving them until today's date.

On December 22, 2016, the Honorabe Judge Fallon has issued an Order to extinguish Knauf Defendants' Settlement Agreement Obligations except the following settlement Claimants:  Claimant Guilfort Dieuvil was name in line 22 as an exception for Knauf not extinguish Settlement Obligations toward this Claimant. Knauf has duties and obligations to abide under court order, but Defendants Knauf's conduct has been in defiance.

## Economic Damages

Claimant, Guilfort Dieuvil has suffered enormous damages as a result of Defendants knauf's negligence and conduct by providing defective drywalls that have caused the following damages to Claimant:

I.   Lost of use - Since September 2010 when Claimant vacated the home until today's date,

II.  Mortgage Payments - Paying for mortgage payments while Claimant can't get the benefit for what he is paying, @ $5,331.00 per month,

III. Relocation expense - Since September 2010 when Claimant vacated the home until today's date, at Glhomes's request shortly prior to demolition, due to knauf's defective drywalls and negligence.

---

Exhibit "O" Pictures of multiples KPT Drywalls and other related evidences.
Exhibit "P" copy of emails correspondence from Glhome's counsel regarding transferring those physical KPT Drywalls and all other physical related evidences to Claimant Mr. Dieuvil On October 27, 2015.
Exhibit "Q" Pictures of Present condition of the house as up today's date
Exhibit "R" copy of order from judge Fallon, for Defendants not to extinguish Claimant from Settlement Obligations.

**PRIVILEGED AND CONFIDENTIAL SETTLEMENT COMMUNICATIONS **

IV.   Remediation and reconstruction cost of the subject property.,

V.   Injuries

VI.   Miscellaneous expenses, furniture storage fees about $50,000.00

Due to Defendants Knauf's negligence, Claimant has suffered substantial losses and damages. Claimant hereby respectfully requests for Defendants Knauf to abide under its obligations to pay for all cost and expenses that will be associated to the home and all damages to Claimant, so the remediation and renovation can be completed by professional in this field of environment. It is proper to recommend Defendants, Knauf to pay for all others cost and expense deemed just and appropriate.

---

Exhibit "S" Copy of Business Card – Brad Wall, Home Warranty Service Manager for Glhomes – Mr. Brad and Jerry Oneil are both Glhomes' employees.

Exhibit "T" Copy of floor Plan/building diagram identified the location of KPT Drywalls in the subject property and all related evidences of KPT.

Exhibit "U" Copy of report of  "Air Sample"  prior to demolition of the home while the home has KPT's drywalls,

Apparently the home was built largely with Knauf's defective drywalls brand in every section/portion of the home, and with some Good American Drywalls brand (National Gypsum/GridmarX). The National Gypsum drywall is a high-quality, safe and environmentally sound product. Every single false allegation has been rebutted by sound science from the nation's leading laboratories and safety experts, including Federal District Court's ruling vindicates this company's products (National Gypsum/GridmarX).

Knauf's toxic and defective drywalls already contaminated, desecrated, tarnished, damaged and impaired the entire house by containing high levels of sulfur, released hydrogen, sulfide gas from bacteria and other toxic chemicals which tarnished, damaged, tainted, and corroded the entire copper, entire plumbings, entire HVAC coil Materials, entire electrical system, damaged, impaired other  good drywalls and other metals inside the home; therefore, Glhomes was required to remove all drywalls and at least maintain two samples of every different drywall brand removed from an affected property; therefore, Knauf is utterly liable for the interior demolition of the home & liable to bring the home into living conditions.

All Physical evidences of KPT drywalls and all related evidences were collected, labeled, photographed, videotaped and preserved in compliance with PTO 1(B) by Glhomes. Brad Wall & Jerry Oneil are both Glhomes's employees that handwrote & Labeled the KPT's evidences, including the information in building diagram/floor plan was signed by Jerry Oneil upon removal.

The initial remediation conducted by Glhomes did not come to completion in which Glhomes demanded claimant to pay $25,000.00 lump sum as contribution for remediation of the home while Claimant did not do anything to create that defective KPT's Drywalls. Dispute and negotiations were emerge over that lump sum, and Glhomes stopped all repairs without any further intent to remediate the home. The premises has never been fully remediated and has not been in living conditions for the past 7 years, while Claimant is paying the mortgage. Reimbursement for repair is not deemed to be appropriate, since the house has never been fully remediated.

Knauf is sitting on the case and acting in bad faith; despite, Defendants Knauf by negligence provided defective KPT drywalls that caused and instigated serious problems and damages to Claimant. Knauf ultimately liable to fix their own problems that Defendants created themselves by negligence; therefore, Knauf is liable to pay for all damages and all cost & expenses to completely remediate the home, and bring the home into living conditions with its previous custom upgrade kitchen, cabinet, bathrooms, granite, stairs, ... which is about $180,000.00 just in upgrade.

Gulfort Dieumé, Claimant
PO BOX 740533
Boynton Beach, Fl 33473

**PRIVILEGED AND CONFIDENTIAL SETTLEMENT COMMUNICATIONS **

# EXHIBIT " A "

### Copy of Executed Purchase Contract:

### March 2006 with the builder Glhomes Claimant Executed Purchase

### Contract for subject property

### 8757 BAYSTONE COVE

### BOYNTON BEACH, FL 33473

### KNAUF'S DEFECTIVE DRYWALLS

## PURCHASE CONTRACT – CANYON ISLES

This Purchase Contract (the "Contract") is made between Seller, whose name is set forth below and whose address is 1401 University Drive, Suite 200, Coral Springs, Florida 33071-6039, and Purchaser, whose name and U S address are set forth below, for the purchase of the Lot as set forth below

**NAME AND ADDRESS OF PURCHASER:**

Purchaser. _Audfort & Magdadene Dieuvil_

Social Security No. _593 95 2039_   Social Security No _____

☐ Permanent Address _1425 NW 192nd Terr._   ☐ Local Address _____
(check address to be used for the mailing of notices)

City: _Miami_   City _____
State: _Florida_  Zip: _33169-3444_   State _____ Zip ___
Telephone (Home) _(305) 654-6099_ (Bus.) ___   Telephone (Home) _(561)732-7686_ (Bus) _786-344 549_
Fax Number _____   Fax Number _____

Purchaser hereby agrees to purchase, and Seller hereby agrees to sell and convey to Purchaser, real property comprising a residential lot and a detached house, as more particularly described below

**LOT.** The real property being purchased is Model _Julian 85_ on Lot _79_ in the community known as Canyon Isles (hereinafter defined as the "Home") in Boynton Beach, Florida

Plat Information (the "Plat")  Name: _Canyon Isles_
Plat Book _TBD_, Page _TBD_, Public Records of Palm Beach County, Florida

**PURCHASE PRICE.** The following items comprise the Purchase Price

| | Price |
|---|---|
| House | $ _928,900_ |
| Lot Premium | $ _95,000_ |
| Option Items  Addendum Numbers: _Crystal 1626_  Total Option Items | $ _-0-_ |
| Other. | $ _-0-_ |
| TOTAL PURCHASE PRICE | $ _1,023,90C_ |

**METHOD OF PAYMENT.** Purchaser agrees to pay the TOTAL PURCHASE PRICE in U S currency to Seller as follows

a) Reservation Deposit (if any) paid prior to the date of execution of this Contract   $ _5,000_

b) Deposit of five percent (5%) of Total Purchase Price, less Reservation Deposit, if any, paid upon execution of this Contract by Purchaser, receipt of which is acknowledged, subject to collection   $ _46,195_

c) Additional deposit of five percent (5%) of Total Purchase Price due thirty (30) days from the date of the execution of this Contract by Purchaser (i e , _4/24_, 200_5_)   $ _51,195_

d) Mortgage Proceeds, subject to the conditions contained in Section A of the Standard Provisions   $ _921,500_

e) Balance of Total Purchase Price due in cash at closing   $ _-10_

TOTAL PURCHASE PRICE .   $ _1,023,90C_

**CLOSING.** The estimated closing date of this transaction is _June / July_, 200_6_ This date is for estimating purposes only  The actual closing date will be determined by (but not limited to) the conditions contained in Paragraphs E 3, E 4 and E 5 of the Standard Provisions

**DEPOSIT FUNDS - NOTICE TO PURCHASER.** THE BUYER OF A ONE-FAMILY OR TWO-FAMILY RESIDENTIAL DWELLING UNIT HAS THE RIGHT TO HAVE ALL DEPOSIT FUNDS (UP TO 10% OF THE PURCHASE PRICE) DEPOSITED IN AN ESCROW ACCOUNT. THIS RIGHT MAY BE WAIVED, IN WRITING, BY THE BUYER  PURCHASER UNDERSTANDS THAT IF THE ABOVE RIGHT IS NOT WAIVED BY PURCHASER, ALL FUNDS (UP TO 10% OF THE PURCHASE PRICE) SHALL BE PLACED IN AN INTEREST BEARING ESCROW ACCOUNT ("ESCROW ACCOUNT") WITH NOVA TITLE COMPANY ("ESCROW AGENT")  In regard, Purchaser hereby agrees as follows

_(Initial One)_  (Check One)

_MD_  _GD_  ☐ A.  Purchaser hereby waives the right to have the deposit funds placed in an interest-bearing escrow account and agrees that all deposits may be used by Seller solely for construction purposes, **OR**

_____  _____  ☐ B.  Purchaser does not waive the right to have all of the deposit funds (up to 10% of the Purchase Price) placed in an interest-bearing escrow account, subject to the terms and conditions imposed by Paragraph G 1 of the Standard Provisions, which include, among others, that Seller can charge Purchaser interest on the money that Seller will have to borrow for construction purposes, or if Seller obtains a master surety bond, that Purchaser shall pay to Seller an amount equal to the premium for the applicable portion of said surety bond securing Purchaser's deposit funds  See Paragraph G 1 of the Standard Provisions.

**STANDARD PROVISIONS.** The Standard Provisions set forth on the following pages are incorporated herein and are an integral part of this Contract  Purchaser acknowledges having read same and agrees thereto

**THIS CONTRACT SHALL NOT BE BINDING ON SELLER UNTIL FULLY EXECUTED BY SELLER.**

PURCHASER (1) _[signature]_   BOYNTON BEACH ASSOCIATES XVI, LLLP, a Florida limited liability limited partnership ("Seller")

PURCHASER (2) _____   By:  Boynton Beach XVI Corporation, a Florida corporation, its general partner

DATE _3/24/05_   By. _[signature]_  Authorized Signatory

DATE _3/28/05_

Last Revision Date 07/10/04

# STANDARD CONSTRUCTION AGREEMENT

**Project: CANYON ISLES**

This Standard Construction Agreement ("Agreement") is made the ____16____ day of ____March____ 20__06__ by and among BOYNTON BEACH ASSOCIATES XVI, LLLP ("Owner"), G.L. Homes Building Corporation ("Construction Manager"), and BETA DRYWALL, LLC ("Subcontractor"). By this Agreement: (a) Owner engages, authorizes, and designates Construction Manager to manage the construction of certain improvements at CANYON ISLES ("Project") and to obtain building permits for such improvements, (b) Construction Manager accepts this duty and responsibility of managing the construction of certain improvements at the Project and of obtaining building permits for such improvements, and (c) Owner, Construction Manager and Subcontractor set forth the terms and conditions pursuant to which Subcontractor is to perform the "Work" (as hereinafter defined) required to be completed under this Agreement.

Witnesseth that Owner, Construction Manager, and Subcontractor (collectively, "Parties") for the consideration named in the "Contract Documents" (as hereinafter defined), and other valuable consideration, agree as follows:

## ARTICLE I. SCOPE OF WORK

Subcontractor will furnish all materials, personnel, supervision, labor, services, plant, facilities, appurtenances, tools, supplies, transportation, equipment (by way of example, but not limitation, cranes, generators, hoists, scaffolds, and pumps), and machinery, as well as, any and all other items necessary to perform and complete all of the work relating to Subcontractor's trade as set forth in Exhibit "A" ("Work"). Subcontractor acknowledges that the "Specifications" (as hereinafter defined) may not set forth certain details and may omit certain items relating to the Work; notwithstanding the omission of such details and items however, if the work in connection with said omitted details and items would normally be considered as part of or within the scope of the Work, then said work shall be deemed to be, and is to be performed and completed by Subcontractor, as part of the Work. It is the intent of the Parties that Subcontractor will fully perform and complete the Work in accordance with the Contract Documents at no additional cost, charge, or expense to Owner in excess of the stated "Contract Sum" and/or the "Option Sum" (as those terms are hereinafter defined) as specified in Article IV below.

The Work will be performed and completed by Subcontractor: (a) in strict accordance with (i) the drawings, plans, and specifications provided by Owner ("Specifications"), (ii) all applicable building and zoning laws, codes, ordinances, rules, and regulations, (iii) the Contract Documents, (iv) the requirements of the Project, and (v) the directions of Owner and Construction Manager; (b) in a first class workmanlike manner free from all defects and deficiencies; and, (c) to the satisfaction of Owner and Construction Manager.

## ARTICLE II. TIME OF COMPLETION

The Work to be performed and completed under this Agreement by Subcontractor shall be performed and completed by Subcontractor according to the production schedule as determined (and as may be amended from time to time) by Owner and/or Construction Manager ("Schedule"). TIME IS OF THE ESSENCE IN THE PERFORMANCE OF THE CONTRACT DOCUMENTS (INCLUDING, BUT NOT LIMITED TO, THIS AGREEMENT) and Subcontractor agrees to perform and complete the Work in strict accordance with the Contract Documents and the Schedule. If in the opinion of Owner or Construction Manager Subcontractor fails to strictly adhere to the Schedule, then Owner and/or Construction Manager shall have the right to (a) hire other persons and/or entities to do any and all work necessary to bring the Work into compliance with the Schedule, and (b) charge Subcontractor (including the deduction of payment from any monies due or that may come due Subcontractor) for all costs and expenses incurred by Owner and/or Construction Manager in connection with bringing the Work into compliance with the Schedule.

The Parties agree that Owner and Construction Manager will each share the exclusive right: (a) to determine the timing, order, and priority of all work to be performed at the Project, including, but not limited to, the Work to be performed and completed by Subcontractor under this Agreement, and (b) to temporarily suspend the performance of any work at the Project, including, but not limited to, the Work to be performed by Subcontractor under this Agreement. In the event of a temporary suspension of the Work, Subcontractor shall have no claim, and Subcontractor hereby waives any and all claims, against Owner or Construction Manager for damages of any kind or nature, whatsoever, in connection with any such temporary suspension.

## ARTICLE III. TERM

This Agreement is for a period of eighteen (18) months commencing on the date on which this Agreement is fully executed by the Parties ("Term"). The Term may be extended only by the written consent of Owner and Construction Manager and only for such period of time as may be determined in writing by Owner and Construction Manager. In the event the Term is extended ("Extended Term"), then all of the terms and conditions of the Contract Documents shall continue to remain in full force and effect during the Extended Term. Entry into any subsequent agreement by Owner, Construction Manager, and Subcontractor (or any combination thereof) covering different lots in the Project, or a different project entirely, will have absolutely no effect on the Term (or Extended Term, if applicable). Notwithstanding anything contained in the Contract Documents to the contrary, Subcontractor acknowledges and agrees that nothing in the Contract Documents constitutes any guaranteed amount of Work (specifically) or work (generally).

## ARTICLE IV. CONTRACT SUM AND OPTION SUM

Subcontractor acknowledges and agrees that Owner, and not Construction Manager, will be solely responsible for any and all payments of Contract Sums and Option Sums due and owing to Subcontractor. Owner will pay Subcontractor (a) the amount as set forth in the Contract Sum Addendum ("Contract Sum") attached hereto as Exhibit "B" for the performance and completion of the Work, and (b) the amounts as set forth in the Option Addendum ("Option Sum") attached hereto as Exhibit "B-1" for the performance and completion of options, if any. The Contract Sum and the Option Sum are both, separately and independently, subject to a ten percent (10%) holdback at the discretion of Owner.

Final payment on all holdbacks will be made by Owner to Subcontractor within ninety (90) days following the completion of the Work by Subcontractor and the proper submission of a Payment Voucher by Subcontractor to Owner as specified in Article V below. Completion of the Work will be verified by Owner and Construction Manager. No Work will be deemed completed until all "Owner Punchlist Items," if any, have also been completed by Subcontractor. The Contract Sum and the Option Sum will remain firm and continue in full force and effect for the Term (and the Extended Term, if applicable), but subject to reduction in amount in accordance with the Contract Documents.

## ARTICLE V. PROGRESS PAYMENTS

Owner will make progress payments at the stages and in the amounts as set forth in the Contract Sum Addendum and in the Option Addendum. Owner will make progress payments on the 1st and 15th of the month provided the following submissions are properly and timely made by Subcontractor and received by Owner: (a) All Payment Vouchers received by Owner at Owner's "Corporate Office" (located at the address set forth below the signature line for Owner) by 5:00 p.m. on the 1st day of a month will be paid on the 1st day of the following month, and (b) Payment Vouchers received by Owner at Owner's Corporate Office by 5:00 p.m. on the 15th day of the month will be paid on the 15th day of the following month. It is the responsibility of Subcontractor to (i) deliver Payment Vouchers to Owner's Corporate Office on a timely basis, (ii) document the date Subcontractor delivered the Payment Voucher to Owner's Corporate Office, and (iii) document the date on which Owner received the Payment Voucher at Owner's Corporate Office.

Subcontractor shall not submit a Payment Voucher for payment on any Work performed unless said Work has been fully completed; it being the intention of the Parties that Subcontractor is not and shall not be entitled to any payment for any partially completed Work except as may otherwise be expressly provided for in the Contract Documents. ANY PAYMENT VOUCHERS SUBMITTED BY SUBCONTRACTOR, WHETHER FOR WORK (INCLUDING ANY WORK PERFORMED BY SUBCONTRACTOR IN CONJUNCTION WITH OR IN ADDITION TO THE SCOPE OF WORK UNDER THIS AGREEMENT) OR FOR OPTIONS, MORE THAN SIXTY (60) DAYS AFTER COMPLETION OF SAID WORK, ADDITIONAL WORK, AND/OR OPTIONS WILL NOT BE PAID BY OWNER. Notwithstanding anything contained in the Contract Documents to the contrary, Owner has the absolute right to withhold any and all payments due Subcontractor when Subcontractor has failed to strictly comply with the terms and conditions of the Contract Documents.

Subcontractor _____

Owner _____

## STANDARD CONSTRUCTION AGREEMENT

Subcontractor will deliver to Owner original and properly executed Affidavits and Releases of Lien on a per lot basis simultaneously with Subcontractor's delivery of Payment Vouchers before Owner has any obligation to make any payment to Subcontractor. The Payment Voucher shall be in the form of Exhibit "C" and the form of Affidavit and Release of Lien shall be in the form of Exhibit "C-1" (as both forms may be modified by Owner or Construction Manager from time to time). The Affidavits and Releases of Lien submitted by Subcontractor will confirm that, among other things, all materials and labor for the Work purchased, performed, and completed have been paid for in full by Subcontractor.

Subcontractor will deliver to Owner original and properly executed Waivers and Releases of Lien from Subcontractor's subcontractors, laborers, and suppliers simultaneously with Subcontractor's delivery of Payment Vouchers before Owner has any obligation to make any payment to Subcontractor. The Waivers and Releases of Lien shall be in the form of Exhibit "C-2" (as the same may be modified by Owner or Construction Manager from time to time). If any "Notices to Owner" (as that term is defined by the Florida Construction Lien Law from time to time) are filed by any subcontractor, laborer, or supplier of Subcontractor against the Project, or any part thereof, Owner shall not be obligated to make any payment to Subcontractor until the original corresponding Waivers and Releases of Lien, properly executed, are provided to Owner.

Owner, in its sole discretion, may issue joint checks to subcontractors and/or materialmen of Subcontractor or single party checks directly to subcontractors or materialmen of Subcontractor. Subcontractor hereby (a) authorizes Owner to (but acknowledges that Owner is under no obligation to) make direct payment to any unpaid lienors listed in any affidavit and release of lien delivered to Owner, and (b) authorizes Owner to deduct such direct payments to unpaid lienors from any unpaid balance due or that may come due to Subcontractor. In the event that the amount of any such payment(s) exceed the unpaid balance due or that may come due to Subcontractor, Subcontractor shall immediately pay the difference to Owner, together with interest thereon at the rate of eighteen (18%) percent per annum from the date such payment(s) are made by Owner through and until the date such difference is paid by Subcontractor to Owner. Owner and/or Construction Manager may, from time to time, require Subcontractor to provide, and Subcontractor hereby agrees to provide, to Owner and/or Construction Manager from time to time, lists of its subcontractors and lists of all suppliers delivering material to the Project and/or proof of payments to such subcontractors and suppliers.

Upon final billing, Subcontractor shall furnish Owner with properly executed Final Payment Waivers and Releases of Lien in the form of Exhibit "C-3" on a per lot basis, for all persons and/or entities (including, without limitation, Subcontractor) that have performed or provided any labor, materials or services in connection with or under this Agreement.

It is imperative that all matters regarding payment for any Work performed be resolved in a timely manner. Accordingly, except as may otherwise be specifically provided to the contrary under the Florida Construction Lien Law, all claims for payment in favor of Subcontractor will expire and become null and void ninety (90) days after completion of the Work giving rise to said claim for payment. Subcontractor's lien rights, if any, for the Work performed shall be on a per lot basis only. In this regard, Subcontractor's lien rights on a particular lot, if any, will solely be in connection with the portion of the Work performed by Subcontractor on that particular lot, and not in connection with the portion of the Work performed by Subcontractor on any other lot, notwithstanding anything contained to the contrary in this Agreement or otherwise.

ARTICLE VI. CONTRACT DOCUMENTS

The term "Contract Documents" shall include, collectively, the Specifications, this Agreement, the General Conditions of the Agreement and Exhibits "A" through and including "E-1" to this Agreement all of which are attached hereto and made a part hereof (Scope of Work is attached hereto and made a part hereof as Exhibit "A"; Contract Sum Addendum is attached hereto and made a part hereof as Exhibit "B"; Option Addendum is attached hereto and made a part hereof as Exhibit "B-1"; Payment Voucher is attached hereto and made a part hereof as Exhibit "C"; Affidavit and Release of Lien is attached hereto and made a part hereof as Exhibit "C-1"; Waiver and Release of Lien is attached hereto and made a part hereof as Exhibit "C-2"; Final Payment Waiver and Release of Lien is attached hereto and made a part hereof as Exhibit "C-3"; Certificate of Insurance Form is attached hereto and made a part hereof as Exhibit "D"; Field Conditions is attached hereto and made a part hereof as Exhibit "E"; and, Customer Service Performance Standards is attached hereto and made a part hereof as Exhibit "E-1"). The Contract Documents constitute the entire agreement between Owner, Construction Manager, and Subcontractor.

ARTICLE VII. CONSTRUCTION MANAGER

Owner engages, authorizes, and designates Construction Manager to manage the construction of certain improvements at the Project, and Construction Manager accepts the duty and responsibility of managing the construction of certain improvements at the Project for and on behalf of Owner.

SUBCONTRACTOR: BETA DRYWALL, LLC

By: _____   Title President   Date 3/16/06

6601 LYONS ROAD SUITE I-10
COCONUT CREEK, FLORIDA 33073
954-429-2842

CONSTRUCTION MANAGER: G.L. HOMES BUILDING CORPORATION

By: _____   Title Pres.   Date 3/17/06

1401 UNIVERSITY DRIVE
SUITE 200
CORAL SPRINGS, FL 33071
(954)753-1730

OWNER: BOYNTON BEACH ASSOCIATES XVI, LLLP

By: _____   Title Contracts Manager   Date 3/16/06

1401 UNIVERSITY DRIVE
SUITE 200
CORAL SPRINGS, FL 33071
(954)753-1730

**PRIVILEGED AND CONFIDENTIAL SETTLEMENT COMMUNICATIONS **

# Exhibit "B"

### Executed Special Warranty Deed with custom upgrade

### Total Purchase Price of the subject property

### $1,142,015.00.

### 8757 Baystone cove

### boynton Beach, FL 33473

### KNAUF'S DEFECTIVE DRYWALLS

CFN 20070024961
OR BK 21310 PG 1742
RECORDED 01/17/2007 12:42:37
Palm Beach County, Florida
AMT 1,142,015.00
Doc Stamp 7,994.70
Sharon R. Bock,CLERK & COMPTROLLER
Pgs 1742 - 1743; (2pgs)

RETURN TO:
NOVA TITLE COMPANY
1401 UNIVERSITY    SUITE 402
CORAL SPRING.      33071-8909
        (954) 755-9889

W/C 84

## SPECIAL WARRANTY DEED

THIS INDENTURE is made this ___9___ day of January, 2007, between BOYNTON BEACH ASSOCIATES XVI, LLLP, a Florida limited liability limited partnership ("Seller") whose post office address is 1600 Sawgrass Corporate Parkway, Suite 300, Sunrise, Florida 33323, and Guilfort Dieuvil, a married man ("Buyer"), whose Social Security Numbers are _____ and _____, respectively, and whose post office address is 8757 Baystone Cove, Boynton Beach, Florida 33437.

WITNESSETH, that Seller, for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) and other good and valuable consideration to Seller in hand paid by Buyer, the receipt and sufficiency of which are hereby acknowledged, has granted, bargained and sold, and hereby grants, bargains and sells to Buyer, and Buyer's heirs, successors and assigns forever, the following described land, with a Property Appraiser's Identification Number of 00-42 45 32 03 000 0790.

Lot   79  , CANYON ISLES - PLAT TWO, according to the plat thereof, as recorded in Plat Book  105 at Page 40, of the Public Records of Palm Beach County, Florida.

THIS CONVEYANCE AND TITLE TO SAID PROPERTY is subject to: (a) taxes and assessments for the present year and subsequent years, including, but not limited to, pending and certified county or municipal improvement liens; (b) restrictions, reservations, conditions, limitations, easements and other matters of record or imposed by governmental authorities having jurisdiction or control over the subject property, but this reference shall not operate to reimpose any of same; (c) all laws, ordinances, regulations, restrictions, prohibitions and other requirements imposed by governmental authorities, including, but not limited to, all applicable zoning, building, bulkhead, land use and environmental ordinances, rules and regulations, and rights or interests vested in the United States of America and/or the State of Florida; (d) those certain covenants, restrictions, agreements and lien rights set forth in **Exhibit "A"** attached hereto and by this reference made a part hereof; (e) the Declaration of Covenants, Restrictions and Easements for Canyon Isles, dated January 18, 2006 and recorded January 20, 2006 in Official Records Book 19820, at Page 216 of the Public Records of Palm Beach County, Florida, as amended and/or supplemented from time to time; (f) the plat of Canyon Isles – Plat One, as recorded in Plat Book 105, at Page 1 of the Public Records of Palm Beach County, Florida; (g) the plat of Canyon Isles – Plat Two, as recorded in Plat Book 105, at Page 40 of the Public Records of Palm Beach County, Florida; and (h) the plat of Canyon Isles – Plat Three, as recorded in Plat Book 106, at Page 61 of the Public Records of Palm Beach County, Florida.

SELLER does hereby specially warrant the title to said land, subject to the foregoing matters, and will defend same against the lawful claims of all persons claiming by, through or under Seller and no others.

IN WITNESS WHEREOF, Seller has hereunto set Seller's hand and seal the day and year first above written.

WITNESSES:                                    BOYNTON BEACH ASSOCIATES XVI, LLLP, a
                                              Florida limited liability limited partnership

                                              By:   Boynton Beach XVI Corporation, a Florida
                                                    corporation, its general partner

Print Name of Witness: Jennifer Fowler

                                              By: _____
                                                  N. Maria Menendez, Vice President

Print Name of Witness: Kathleen M. Coffman

STATE OF FLORIDA
COUNTY OF BROWARD

The foregoing instrument was acknowledged before me this ___9___ day of January, 2007, by N. Maria Menendez, as Vice President of Boynton Beach XVI Corporation, a Florida corporation, the general partner of Boynton Beach Associates XVI, LLLP, a Florida limited liability limited partnership, on behalf of said corporation and limited liability limited partnership. She is personally known to me.

_____
Notary Public
My Commission Expires:

This instrument prepared by:
HENRY W. JOHNSON, ESQ.
HUME & JOHNSON, P.A.
1401 University Drive, #301
Coral Springs, Florida 33071
(954) 755-8880

KATHLEEN M. COFFMAN
Notary Public - State of Florida
My Commission Expires Mar 18, 2009
Commission # DD 391078
Bonded By National Notary Assn.

Book21310/Page1742                          Page 1 of 2

**EXHIBIT "A"**
**COVENANTS, RESTRICTIONS, AGREEMENTS AND LIEN RIGHTS**

The title to the property described in the Special Warranty Deed to which this **Exhibit "A"** is attached (the "Deed") shall be subject to and burdened by the covenants, restrictions, agreements and lien rights set forth below.

1.    Capitalized Terms and Definitions.   All initial capitalized terms used in this **Exhibit "A"** but not defined herein shall have the meanings given to such terms as set forth in the Deed.  The following terms as used in this **Exhibit "A"** shall have the meanings given to such terms as set forth below.

"Gain" shall mean and refer to the amount, if any, by which: (i) the gross selling price of the Property (less and except: (y) the actual, documented costs of any physical improvements made by Buyer after the date of the Deed to the exterior of the home on the Property such as pools, patios, screen enclosures and extensions, and (z) the actual documented closing costs required to be paid by Buyer in connection with the sale of the Property such as documentary stamp taxes, recording fees and/or brokerage commissions), exceeds (ii) the "Total Purchase Price" paid to Seller by Buyer pursuant to and as defined in the Purchase Contract executed by Seller and Buyer.

"Hardship Event" shall mean and refer to a sale, transfer, lease or sublet of the Property, as appropriate, following a divorce of the Buyers (if married to each other), death or serious disability of one or more of the Buyers, job transfer of one or more of the Buyers to a location greater than fifty (50) miles from the Property, or other reason acceptable to Seller in Seller's sole and absolute discretion, as evidenced by a written waiver of this provision given by Seller.

"Property" shall mean and refer to the property described in the Deed together with the improvements thereon.

"Transfer Advertisement or Agreement" shall mean and refer to any or all of the following: (i) any listing or advertisement for the sale or lease of the Property or any portion thereof made with a broker, in any multiple listing service, in any classified or other advertisement, or otherwise (including, without limitation, "by owner"), (ii) any agreement (verbal or written) for transfer of title to the Property to any third party, and/or (iii) any agreement (verbal or written) for the leasing and/or subletting of the Property or any portion thereof, notwithstanding anything to the contrary in the Declaration.

2.    Sales/Transfers of the Property.   In the event that Buyer sells or transfers title to the Property (directly or indirectly): (a) at any time within one (1) year following the date of the Deed, and/or (b) at any time thereafter if such sale or transfer results from a Transfer Advertisement or Agreement made or entered into within one (1) year following the date of the Deed, then except only in the event of a Hardship Event released by Seller as provided in Paragraph 4 below, Buyer shall pay to Seller from the proceeds of such sale or transfer, an amount equal to one-hundred percent (100%) of the Gain realized from such sale or transfer.

3.    No Leasing of the Property.   Notwithstanding anything to the contrary in the Declaration, for a period of one (1) year following the date of the Deed, except only in the event of a Hardship Event released by Seller as provided in paragraph 4 below, Buyer shall not lease and/or sublet the Property or any portion thereof.  Any such lease and/or sublet shall be void and unenforceable.  All other leases or sublets, including those resulting from such a Hardship Event, shall be subject to the terms and conditions of the Declaration.

4.    Lien Rights; Releases.   There is and shall be a lien against the Property to secure Buyer's obligations set forth in this **Exhibit "A"**, which lien may be foreclosed on by Seller if Buyer breaches any of its obligations hereunder.  In the event of a proposed sale, transfer, lease or sublet of the Property due to a Hardship Event, Buyer must first provide to Seller evidence of such Hardship Event acceptable to Seller in Seller's sole and absolute discretion, and if acceptable to Seller, Seller shall deliver to Buyer a written acknowledgment of the Hardship Event and waiver of Seller's rights hereunder with respect only to such sale, transfer, lease or sublet.  In addition, upon written request from Buyer to Seller and payment of the Gain due to Seller in connection with any sale or transfer of the Property as provided in this **Exhibit "A"**, then Seller shall provide to Buyer a written acknowledgment of such payment and release of Seller's lien rights with respect only to such sale or transfer provided that Buyer provides Seller with evidence satisfactory to Seller in Seller's sole and absolute discretion of the amount of the Gain due, including, without limitation closing or other settlement statements. Any release provided by Seller shall be specific only to the particular sale, transfer, lease or sublet described in the release and not to any subsequent sale, transfer, lease or sublet which shall remain subject to this **Exhibit "A"**.

5.    Binding and Running with Title to the Property.   The covenants, restrictions, agreements and lien rights set forth in this **Exhibit "A"** shall burden and run with title to the Property.

6.    Remedies.   In addition to its right of foreclosure, Seller shall have all remedies at law and/or in equity for a breach by Buyer under this **Exhibit "A"**.  In the event that Seller prevails in any action (legal or otherwise) to enforce its rights and/or Buyer's obligations, Seller shall be entitled to recover all of its costs incurred including, without limitation, reasonable attorneys' fees, through and including all appellate levels.  By acceptance of the Deed to the Property, Buyer, for itself, and its successors and assigns waives any homestead or other exemption now or hereafter existing or enacted under either Florida or federal law as same may relate to Seller's rights hereunder.

7.    Subordination.   This **Exhibit "A"** shall be subordinate to the right of any holder of an institutional first mortgage on the Property and shall not apply to any sales or leases by an institutional first mortgagee who acquires title to the Property by foreclosure or deed in lieu of foreclosure.

8.    Miscellaneous.   This **Exhibit "A"** shall be construed in accordance with the laws of the State of Florida and shall be binding on Buyer and Buyer's heirs, successors and assigns. In that regard, all references to Buyer in this **Exhibit "A"** shall also mean and refer to each and every of Buyer's heirs, successors and/or assigns. Should any term or provision of this **Exhibit "A"** be ruled to be illegal or otherwise invalid by a court of competent jurisdiction, such term or provision shall be given its nearest legal meaning or be construed as deleted as such court determines, and the same will not invalidate the remaining terms and provisions of this **Exhibit "A"**, which terms, provisions and portions of this Contract will remain in full force and effect. This **Exhibit "A"** may not be amended or modified except by an instrument in writing executed by Seller.

**PRIVILEGED AND CONFIDENTIAL SETTLEMENT COMMUNICATIONS **

# EXHIBIT "C"

Defendants Knauf presented this paper as Exhibit "G" in their Confidential Position Paper, which is definitely irrelevant to this KPT Drywalls' Case. To shine light to this matter, Claimant gave short narrative of facts and hereby submitted the following two exhibits (D & E) which should outline the facts for the record.

## 8757 BAYSTONE COVE

## BOYNTON BEACH, FL 33473

## KNAUF'S DEFECTIVE DRYWALLS

**PRIVILEGED AND CONFIDENTIAL SETTLEMENT COMMUNICATIONS **

# Exhibit "D"-

Copy of Complaint - Defendants Knauf crossed reference and interfered this case in their Exhibit "G" while Defendants, Knauf apparently has a lack of awareness of material facts with respect to this subject matter.  Claimant's already filed a complaint against Trustee  in that case for misrepresentations and inducement before the court. Trustee failed to conduct her due diligence, and has crossed her duties and obligations by filing an inducement complaint and misrepresentations allegations before the court. This complaint against Trustee, and Judicial Notice to outline all facts of the case were already filed.

### 8757 BAYSTONE COVE

### BOYNTON BEACH, FL 33473

### KNAUF'S DEFECTIVE DRYWALLS

services to the Homeowners victims and, instead, unbeknownst to the Homeowners, Defendants act and acting at all material times to defraud the homeowners by taking legal title to their real properties without adequate consideration. The result is and was always the same: The Home-owners still owe their mortgage debts, but no longer own their homes:" In contrary due to Prin-cipal Defendant's intent and hard works, substantial large amount of mortgage debts were satis-fied, millions of dollars mortgage liabilities debts were settled and paid off, and many properties liens were paid off by Principal Defendant. Many homeowners were satisfied and relieved from their mortgage debts, and all remaining mortgage debts were in the right pathway to be settled and satisfied by Principal Defendant prior to the malicious prosecution and defamation campaign against Principal Defendant. In addition to that, Principal Defendant had a PPM which was about to generate close to $50 millions investments prior to defamation campaign. Using those garbage allegations, deliberate lies and deceptive practice to put Principal Defendant down have been merely a disgrace. To maintain the integrity of the court, upon knowledge of al material facts State Attorney office has dropped and dismissed all charges against Principal Defendant.

Plaintiff Mediphour also falsely alleged in her complaint that 'Defendants have engaged in reticulated scheme to defraud financially vulnerable South Florida Homeowners at the apex of the region's housing crisis." In contrary Plaintiff knew Defendants including Debtor have never dealt or purchased any property from homeowners except NIF. Nevertheless Plaintiff has en-gaged herself into scheme to defraud Defendants with intend to mislead and deceive the court, and to use our court system as a bridge to promote a sleazy and shameful conduct by planning to consolidate and deprive other people from their assets and homestead properties in which Debtor has no interest in those assets as outlined below:

a) Plaintiff Mediphour wants to consolidate properties that were purchased from builder and Ac-credited Financial Institutions several years prior Debtor was founded, and properties that have nothing to do with homeowners or region's housing crisis,

b) Plaintiff Mediphour wants to consolidate properties that were purchased several years prior to the real-estate market crisis, and several years prior Debtor was founded or in business,

c) Plaintiff Mediphour wants to consolidate properties that are purchased by other entities and/or individual, several years prior Debtor was founded or in business.

Plaintiff Mediphour also falsely alleged " Rather than receiving the help they sought from the Defendants, the vulnerable homeowners unwittingly signed over the deeds to their homes to the Defendants without adequate consideration" In contrary all homeowners/clients have hand-written their own acknowledgement of the sale of their properties subject to the mortgage and liens encumbering the premises in their own native language upon execution of contractual agreements, and every client/homeowner has 7 days to cancel or rescind the entire contractual agreement from execution's date, but Plaintiff deceptively wants to deceive the court and falsely claim otherwise.

Some facts were presented before Plaintiff Mediphour thru motions filed in January 2017 that there is no proof of claim filed by any unsecured creditor which would also make consolida-tion of assets requested by Trustee to manage assets emerged to be unfeasible, including her sleazy unjust enrichment. Despite all deadline to file proof of claim was expired 2.1/2 years ago, Trustee, Mediphour conspired with a fraudulent unsecured creditor to file a fraudulent proof of claim as deemed to be timely filed against Debtor. Such unsecured creditors have nothing to do with Debtor. Debtor was founded in January 2014, and that so called unsecured creditor obtained a fraudulent judgment under perjuries allegations and fraud upon the court against a different corporation in May 2012 in absence of the other parties, and Debtor did not even exist or incor-porated at that time, but US Trustee Mediphour conspired with that fraudulent creditor to deceive and defraud the court.

At all material times, Trustee Mediphour knew that every alleged individual Defendant has made his/her own independent business and financial decisions, and every alleged corporate Defendant or corporation has been independently operated and has different corporate officers, separate bank account, and independently made its own business's decision and has different shareholder. Debtor and Defendants have never conducted business transaction with homeown-ers except NIF. Since Debtor's assets have been extinguished thru foreclosure sale, and Debtor is not solvent while there is no Debtor's asset left; unfortunately, Plaintiff filed a frivolous claim,

in order to defraud Defendants of their assets or to force Defendants into an unjust settlement amount, so Plaintiff can unjustly enrich herself and cause harm and damages to Defendants.

At all material times, Plaintiff Mediphour knew and/or should have known as a member of the judicial system that Principal Defendant purchased properties subject to the mortgages under full disclosures. As a matter of laws, such transactions and conduct have been legally in full compliance with State and Federal Laws, and all business transactions of Principal Defendant (NIF) were performed under supervision of legal counsels with over 60 years combined legal experience including in house counsel.

At all material times, Plaintiff Mediphour knew as a member of the judicial system that State of Florida is a Lien Theory State, and homeowners have the right of disposition of their properties, and Principal Defendant / buyer reserved the right to purchase properties subject to the mortgage, and such transactions are legally enforceable pursuant to State and Federal Laws. Apparently, State and Federal Laws have not been changed; however, Plaintiff merely implied that the ethnicity of Defendants have deprived Defendants' right to purchase properties subject to the mortgage under full disclosures.

US Trustee Mediphour has been called under her duties and obligations as a member of the judicial system, and US Trustee to protect, maintain the integrity and moral standard of our court system; inopportunely, Trustee Mediphour is currently standing to create an impairment to the integrity and moral standard of our court system, and using our court system as a toy of manipulation to commit fraud, deceptive practice and unjust enrichment. Your attention to this matter is extremely vital with expectation to amicably resolve this deceptive practice that does not serve the interest of justice.

Thank you in advance for your corporation and promptly addressing this matter to uphold the interest of justice.

Respectfully yours

Guilfort Dieuvil

**PRIVILEGED AND CONFIDENTIAL SETTLEMENT COMMUNICATIONS **

# Exhibit "E"

Copy of Judge Order - regarding another case that Defendants, Knauf crossed

reference and interfered in their Exhibit "G"

**Even the judge in that case acknowledged the opposing parties against**

**Claimant/Mr. Dieuvil "was very nasty" "and made completely unfounded,**

**blatantly, false accusations"**

**8757 BAYSTONE COVE**

**BOYNTON BEACH, FL 33473**

**KNAUF'S DEFECTIVE DRYWALLS**

**IN THE COUNTY COURT IN AND FOR MIAMI DADE COUNTY, FLORIDA**
**CIVIL DIVISION**
**CASE NO: 2017-11498-SP-23 (2)**

**PAULLETTE HIGGINS**

      **Plaintiff(s)**

**vs.**

**GUILFORT DIEUVIL**

      **Defendant(s)**

_____/

## <u>ORDER OF RECUSAL</u>

    **THIS CAUSE** came before the Court on August 16th, 2017 for Pre-Trial Conference. The Plaintiff appeared at the Pre-Trial Conference, however, the Defendant did not appear because Plaintiff did NOT effectuate service on Defendant in the manner required under Florida law. The Court determined that a recusal in this matter is necessary, after reviewing Plaintiff's handwritten "Motion to 'Resuce' Bias 'Prejuice' Judge" filed with the Clerk and provided to this Judge on August 16, 2017 ("Plaintiff's Motion to Recuse") for the following reasons:

    After I explained to Plaintiff, in a professional and courteous manner, that she did not effectuate service in the manner required under Florida law:

    Plaintiff accused this Judge of not wanting to hear her case;

    Plaintiff accused my Deputy Clerk and the Clerk's office of not filing a return of service, when there was no return of service or returned summons - Plaintiff insisted that the hand written "Return of Service" filed with the Clerk and shown to me by Plaintiff with an accident report attached, was a proper return of service (filed August 16, 2017);

    Plaintiff accused this Judge of not allowing Plaintiff to exercise her constitutional rights based upon the fact that Defendant was present in another case before Judge Stein on some other date and apparently the Plaintiff in that case obtained service on the Defendant;

Plaintiff was incredibly disrespectful and nasty to this Judge and the Judge's staff, and made completely unfounded blatantly false accusations, including:

Accusing my bailiff of torturing her, a disabled person in a wheelchair, while she was in the courtroom, by not letting her speak to me, after I was finished addressing Plaintiff's case;

In Plaintiff's Motion to Recuse, Plaintiff stated, "On August 16 2017 in Room I was abuse by Judge Schwartz and 'toutrue' by 'he' JA and 'blaif' because of my Disability and been wheelchair bound  Judge refuse to hear my case and accept service from local law and enforcement of return of service  I am and fear of this Judge".

This Court cannot preside over a case in which Plaintiff makes such horribly false accusations about my staff and me that defame our high integrity and high level of professionalism. As a note, Plaintiff's reference to my "JA" was incorrect. That was my Deputy Clerk, who was trying hard to explain again what I had explained to Plaintiff about how service is properly effectuated under Florida law.

**Therefore, it is ORDERED AND ADJUDGED** that the undersigned County Court Judge hereby recuses herself in this cause, and that this matter shall be reassigned by the Clerk of this Court by blind filing.

**DONE AND ORDERED** at Dade County, Florida, on this __ day of August, 2017.

SIGNED AND DATED

AUG 2 2 2017

JUDGE CARYN CANNER SCHWARTZ
COUNTY COURT JUDGE

**CARYN CANNER SCHWARTZ**
**COUNTY COURT JUDGE**

Copies furnished to:

**PAULLETTE HIGGINS**
**PO BOX #10616**
**MIAMI, FL 33101**

**GUILFORT DIEUVIL**
**8757 BAYSTONE COVE**
**BOYNTON BEACH, FL 33473**

**PRIVILEGED AND CONFIDENTIAL SETTLEMENT COMMUNICATIONS **

# Exhibit "F"

Copy of scope agreements with Glhomes

executed on April 15, 2010

### 8757 BAYSTONE COVE

### BOYNTON BEACH, FL 33473

### KNAUF'S DEFECTIVE DRYWALLS

From: 5612000431        Page: 1/6        Date: 4/19/2010 4:41:28 PM



April 15, 2010

Mr. Guilfort Dieuvil
8757 Baystone Cove
Boynton Beach, FL 33473-4890

Re:     *Scope of Work Agreement for Repairs to Lot 79 Canyon Isles ("Subject Property" or "Home")*
        *Seller of Home – Boynton Beach Associates XVI, LLLP (herein "GL Homes")*
        *Owner(s) of Home – Guilfort Dieuvil (herein, "Owner")*

Dear Mr. Dieuvil:

   As you know, we have been investigating concerns in the Canyon Isles community regarding the use of defective Chinese drywall. Based on our ongoing investigation, we believe that certain independent subcontractors purchased and installed defective Chinese drywall in a limited number of our homes and we believe that your Home may contain such drywall. We also understand that certain conditions have been reported within the Subject Property which indicates there may be impacts to copper and some types of electrical wiring and/or other property.

   At this time, we believe that the most appropriate repair program involves, among other things, removing and replacing the drywall, as well as repairing or replacing other affected building materials in your Home. It is important to recognize that this is a significant construction project. As such, there is the potential for unforeseen variables that may require alterations to be made throughout the construction process. As you know, we have been working to commence the repair work in your home and this letter will confirm our process for this matter:

1.      GL Homes agrees to repair the Subject Property and return it to its original condition as it existed at the time of the initial closing and as evidenced by the videotape(s) of the Subject Property taken by Visual Evidence, Inc. This work includes, but is not limited to; reinstalling all finishes that were added by GL Homes and/or by the Owner prior to the repair work. This repair work will be done at no cost to the Owner. Please understand that the reconstruction work will not include the reconstruction of any alterations or additions that were made after the original closing if they were done without appropriate permits or are in violation of any applicable code requirements.

   Specifics to the repair process are listed as follows:

   a)    Remove and replace all drywall (walls and ceiling) in the Subject Property. In some very limited circumstances, domestic drywall may be left intact, only if it is located in an isolated area behind stair-railing and/or bathroom tile baseboard, or along tile edge-line. Dura-rock and/or Hardi-board materials will not be removed or replaced unless damaged during the repair process.

   b)    Finish and paint new drywall with same color and quality paint, and replace all wall coverings with same unless otherwise unavailable. If unavailable, alternate selections of like kind and quality will be coordinated with the Owner;

1600 Sawgrass Corporate Parkway, Suite 400
Sunrise, FL 33323

From: 5612000431      Page: 2/6      Date: 4/19/2010 4:41:29 PM

Scope of Work Agreement
Lot 79, Canyon Isles
April 15, 2010
Page 2 of 6

c)   Remove and replace all baseboards, crown moldings and custom moldings with like style and quality. Finish and paint new baseboards, crown moldings and custom moldings with same color and quality paint unless otherwise unavailable. If unavailable, alternate selections of like kind and quality will be coordinated with the Owner;

d)   Remove and replace all wall and ceiling insulation;

e)   Protect tile and hardwood floors during the work and repair any flooring damaged during the repair process. Remove and replace all wall-to-wall carpeting and padding with like style, color and brand unless otherwise unavailable. If unavailable, alternate selections of like kind and quality will be coordinated with the Owner;

f)   Remove, store and re-install all cabinets, countertops, sinks, mirrors and lavatories and the like and repair or replace if damaged during the work;

g)   Bathroom walls with tile shall not be replaced unless the brass fittings or copper piping behind said areas are corroded. If GL Homes is unable to access the brass fittings, copper piping or other plumbing structures to confirm the copper, brass and other metals are unaffected, then GL Homes shall remove and replace the building materials in order to assess the materials and repair or replace any affected materials;

h)   Remove and replace all low-voltage wiring, drywall mounted electrical items that was included in the original Home construction (including outlets, receptacles and switches) and other low voltage equipment (including intercoms, door bells, security alarm and smoke detectors, if applicable);

i)   Inspect all other electrical wiring, drywall mounted electrical items, breakers, main feeder and other electrical wiring that was included in the original Home construction. All of the aforementioned electrical wiring which is discolored black or corroded shall be repaired or removed and replaced. If it is possible to do so without leaving any portion of such items which are discolored black or corroded, a licensed electrician may clip any affected copper, and strip back the insulation so that the exposed wire is the proper length for reinstallation. If the wires are too short, a licensed electrician shall relocate electrical components and/or rewire.

j)   All copper piping will be inspected and any corroded materials will be replaced. There may be original segments of copper throughout the Home that may be left in place in order to allow for reconnection of the new copper piping; however, any areas of copper which are left in place will be cleaned to remove all visible corrosion. Alternatively, GL Homes may elect to remove all visible copper water pipe, abandon any copper below slab and install all new copper water pipe within the walls of the Home;

k)   Remove and replace all other metals which are corroded or discolored black from exposure to defective Chinese drywall including, but not limited to, fixtures, faucets, handles, fasteners, and door hardware;

l)   Remove and replace the A/C air-handler(s) and A/C duct-work;

m)   Unless otherwise damaged, remove and reinstall all wood trim, interior doors, and interior door accessories;

n)   Remove and reinstall all shelving and closet systems;



Scope of Work Agreement
Lot 79, Canyon Isles
April 15, 2010
Page 3 of 6

o)  Inspect garage door opener system and tracks and repair or replace if visual evidence of abnormal black discoloration or corrosion is present;

p)  Remove and replace refrigerator and microwave originally provided with the Home at closing. Remove, store and reinstall all other appliances. Other appliances that were provided with the Home at closing will be replaced before re-installation only if there are documented electrical problems, otherwise they will be stored and reinstalled.

q)  All mirrors that came with the Home at closing will be inspected and replaced if visual evidence is present of corrosion or deterioration of the silvering;

r)  After drywall is removed, inspect framing for abnormal discoloration, and abnormal corrosion caused by Chinese drywall or sulfur exposure. To the extent that any metal framing, joints or fasteners are abnormally discolored due to Chinese drywall and/or structurally impacted, GL Homes shall contact the Owner to discuss same before any further reconstruction work is undertaken;

s)  After the drywall demolition process is complete and before insulation or drywall reconstruction begins, the interior of the Home will be swept clean and drywall residue will be reasonably removed. HEPA-VAC, fans and/or air scrubbers, or other similar processes will be used as necessary to reasonably remove small debris and construction dust before reinstallation of the new insulation and drywall;

t)  GL Homes will retain an environmental consultant to conduct air testing of the indoor and outdoor environment before the repair work commences and also upon completion of the re-construction work. Provided the parties are not in litigation at the time the reconstruction of the Home is completed, GL Homes will provide copies of the air testing results to Owner;

u)  GL Homes will obtain all permits required by the applicable City or County. Subject to paragraph 9 below, GL Homes will use reasonable efforts to complete repair work and reconstruction in 12 – 16 weeks;

v)  GL Homes will retain a reputable insured moving company to pack and move the Owner's personal property to a secured air-conditioned storage facility. GL Homes will cover the storage costs during the repair and reconstruction through the end of that month if the storage company will not prorate charges. GL Homes will not cover any additional storage costs incurred after reconstruction is completed and GL Homes' Environmental Consultant and the Building Department have signed off on the work; Owner will be allowed reasonable access to the storage unit to their belongings provide that Owner shall be responsible to pay whatever fees are associated to provide such access; and

w)  Clean and restore your Home to a similar condition it was in on the date of closing.

2.     Owner and their experts shall have the right to inspect and conduct testing in the Subject Property, at Owner's own cost, at anytime during the repair process, provided the testing is non-destructive to any new construction and provided it does not interfere or unreasonably delay the ongoing repair process. Specifically, GL Homes will advise the Owner and provide Owner with an opportunity to inspect the Subject Property at the following times: (i) when demolition is complete which includes the removal of all drywall, and the removal or repair of all electrical wiring and affected copper piping. This first opportunity to inspect will be given before re-installation of any new building materials; (ii) a pre-drywall orientation will be offered before any new drywall is installed but after new electrical wiring, plumbing, and a/c duct



From: 5612000431          Page: 4/6          Date: 4/19/2010 4:41:29 PM

Scope of Work Agreement
Lot 79, Canyon Isles
April 15, 2010
Page 4 of 6

work are installed; and (iii) at the time air testing is being conducted after re-construction. There may be other times the Owner is requested to conduct inspections in order to facilitate the ongoing construction progress and Owner agrees to reasonably cooperate and will diligently work to avoid any delays in the construction process. Additionally, at the conclusion of the repair process, GL Homes will also conduct a walk-through inspection of the Subject Property to prepare a punch list of any items which Owner identifies regarding workmanship deficiencies or inaccuracies in the final work, and the parties agree to reasonably work together to rectify any punch list items within a reasonable amount of time.

3.    Upon Owner's request, GL Homes will provide Owner with copies of the photographs and videotape taken of the Home and its contents by Visual Evidence, Inc.

4.    GL Homes will repair all materials affected or damaged during the repair process in your Home and also repair any damages incurred outside the Home but on the Subject Property provided, however, that the damage occurred as a result of and during repair and reconstruction work. Such items that could be damaged outside the Home include pavers, exterior doors, windows, and stucco walls. Please note that we will not repair, replace or pay for any exterior landscaping or pool related issues that are damaged as a result of failed maintenance by the Owners. Owners are solely responsible for all exterior maintenance issues for the Home throughout the repair and reconstruction work.

5.    Please understand that it is Owners' responsibility to be prepared for and to take the necessary precautions for your Home in the event of a hurricane or other storm event. GL Homes will not install or assist in the installation of your hurricane shutters. Therefore, we suggest you take the opportunity before an impending storm to confirm the location and access of your hurricane shutters and hurricane shutter installation items including, but not limited to, shutter installation diagram, brackets, bolts, clips, fully-charged screw guns, and a ladder. We also recommended you do a dry-run installation to ensure that you have all the shutter panels and hardware needed <u>before</u> you vacate your Home for the Chinese drywall repairs. Please make sure you have all the hurricane related materials available to you <u>before</u> you move out and keep any needed items separate from anything being sent to storage. It is also your responsibility to remove the shutters once the storm passes so we can promptly proceed with the repair process as needed.

6.    All work will be performed by or overseen by licensed contractors and free from defects in material and workmanship. Upon sign off from the Building Department for completion of the work, GL Homes will provide a one year warranty against defects in materials and workmanship for all of the foregoing repair work and any appliances or A/C equipment replaced during the work. Other applicable third-party manufacturer's warranties will also be available to the Owner. GL Homes shall also provide an additional one year warranty for other appliances which were not replaced, but which fail within one year of completion of the repairs and remediation due to exposure to Chinese drywall. Additionally, nothing in this agreement shall void, interfere with or extend the existing 10 year structural warranty on the Subject Property which was provided at the time of closing, which shall continue in full force and effect, pursuant to its terms, without interruption or extension.

7.    Once reconstruction is completed, GL Homes will retain a reputable insured moving company to retrieve and move the Owner's personal property from the storage facility back to the Subject Property. To the extent there are any disputes regarding the condition of Owner's personal property as a result of exposure to Chinese drywall, the Owner agrees there is no advance agreement or obligations established at this time as to the personal property. If the Owner does not want the personal property



From: 5612000431          Page: 5/6      Date: 4/19/2010 4:41:30 PM

Scope of Work Agreement
Lot 79, Canyon Isles
April 15, 2010
Page 5 of 6

moved back into the Subject Property, then the Owner will be responsible for disposing of any such personal property or for any ongoing storage costs incurred after the Building Department signs off on the completion of the reconstruction.

8.      GL Homes will pay for temporary housing on a "monthly" basis and the payment for the temporary housing will commence as of the date set by GL Homes for the Owner's move-out. If Owner elects to relocate prior to the GL Homes' established move-out date, the costs associated for Owner's temporary housing during that time will be at Owner's expense. The specific terms of the temporary living expenses agreed to by GL Homes will be confirmed in a separate letter. GL Homes will not cover any other living expenses incurred during the repair work beyond the monthly rental cost agreed to in advance for the temporary housing. Owner is responsible for maintaining electrical and water service to the Home during the repair process.

9.      Before GL Homes can start any of the above work, it will be necessary for Owner to sign a notice of commencement, permit applications, and other documents that may be required from governmental agencies in order for GL Homes to commence the repair process. It is imperative that Owner provide GL Homes and its subcontractors full and unrestricted access to the Subject Property at all times during the entire repair and reconstruction process. With the Owner's full cooperation, GL Homes will work to complete the foregoing repairs as expeditiously as possible. Please understand however, if Owner interferes or obstructs our progress in completing the work, GL Homes will be forced to re-evaluate our position and may no longer be in a position to cooperate with Owner to complete the repairs or pay temporary housing or storage costs. Therefore, if Owner impedes or obstructs the ongoing construction process, we stop paying for any ongoing expenses associated with temporary housing or storage costs. In that event, Owner will be responsible for covering all further housing costs and complete any remaining repairs to the Home.

In our continued efforts to provide you with superior customer service, we are committed to performing all of the foregoing work at our expense. Unfortunately, none of the manufacturers, suppliers, or subcontractors have, thus far, agreed to accept responsibility for their actions. As this process continues, we will be attempting to collect at least some of the costs we incur to perform the work and any other damages from the responsible parties and/or from any governmental funds that may someday be available for builders who have elected to stand behind their products and undertake these repairs for their customers. We appreciate your ongoing cooperation in our efforts to recover our costs and damages as this process unfolds. You recognize that in connection with our efforts in this matter, we will be working with various other third parties to conduct inspections and possibly testing in the home during the demolition stages and prior to the reconstruction. It is necessary for us to work with other third parties involved so they can conduct their own evaluations of the implications of any defective Chinese drywall that may be contained in the Home.

We understand this repair process is an inconvenience to you and your family but we hope you can recognize that we are diligently working to address the multitude of issues involved in this situation in a reasonable manner. In the meantime, if you have any questions or concerns, please do not hesitate to contact us.

Kindly, counter-sign this letter as indicated below and we will proceed to schedule your move-out date upon our receipt of this executed letter with your original signatures and the fully executed permits necessary to start the work. Once your move-out date is established, we anticipate the repair process will



Scope of Work Agreement
Lot 79, Canyon Isles
April 15, 2010
Page 6 of 6

occur in a reasonable time thereafter.  Should you have any questions please contact us at 866-979-2424.

Sincerely,

BOYNTON BEACH ASSOCIATES XVI, LLLP

Jamie Knott
Vice President of Customer Service

Counter-signed by Homeowner(s):

Print Name: _____

_____

Print Name: _____

**PRIVILEGED AND CONFIDENTIAL SETTLEMENT COMMUNICATIONS **

# Exhibit "G"

Pictures of the subject property prior

of interior demolition

### 8757 BAYSTONE COVE

### BOYNTON BEACH, FL 33473

### KNAUF'S DEFECTIVE DRYWALLS













**PRIVILEGED AND CONFIDENTIAL SETTLEMENT COMMUNICATIONS **

# Exhibit "H"

Video of the subject property prior of interior demolition

(See attached CD)

### 8757 BAYSTONE COVE

### BOYNTON BEACH, FL 33473

### KNAUF'S DEFECTIVE DRYWALLS

**PRIVILEGED AND CONFIDENTIAL SETTLEMENT COMMUNICATIONS **

# Exhibit "I"

Pictures of some full KPT's Drywalls board that were installed in the subject

property which also outlined the endtapes of those

Knauf's Drywalls with color blue and yellow

### 8757 Baystone Cove

### Boynton Beach, FL 33473

### KNAUF'S DEFECTIVE DRYWALLS













| Docket No. | Case Style | Court | Case Type | Date Filed |
|---|---|---|---|---|
| 2017-011498-SP-23 | Paullette Higgins Vs. Guilfort Dieuvil | Fla. Cir. Ct. - Miami Dade | Small Claims (Up to $5000) | Jun. 28, 2017 |
| 2017-002455-CA-01 | Ely Charles Et Al Vs. Nationwide Investment Firm, Corp | Fla. Cir. Ct. - Miami Dade | Civil Complaint (Recovery of Property) | Jan. 31, 2017 |
| CACE-16014883 | Prosper F. V. Dieuvil | Fla. Cir. Ct. - Broward | Fraud | Aug. 11, 2016 |
| 2016-AP-01212 | Mehdipour V. Dieuvil | Bankr. S.D. Fla. | Declaratory Judgment - Recovery of Money/Property | May. 05, 2016 |
| 2015-bk-26560 | Debtor:  Guilfort Dieuvil | Bankr. S.D. Fla. | Chapter 11 - Voluntary | Sept. 16, 2015 |
| CACE15016422 | Fatal, Samuel Vs. Petion, Marie | Fla. Cir. Ct.- Broward | Fraud | Sept. 15, 2015 |
| 2015CA006885 | Raoul Charles V. Nationwide Investments | Fla. Cir. Ct. | | Jun. 19, 2015 |
| 2015CA004426 | Woodstock Property V. Nationwide Investment | Fla. Cir. Ct. | Assn Lien Foreclosure =< $50K | Apr. 17, 2015 |
| 14-bk-12478 | Debtor - Magdadene Dieuvil (Pro Se) | Bankr. M.D. Fla. | Chapter 11 - Voluntary | Nov. 10, 2014 |
| 14-bk-23775 | Guilfort Dieuvil | Bankr. S.D. Fla. | Chapter 11 - Voluntary | Jun. 16, 2014 |
| 14-bk-20651 | Debtor: Guilfort Dieuvil | Bankr. S.D. Fla. | Chaper 11 - Voluntary | May. 08, 2014 |
| COWE13010704 | Dieuvil, Guilfort & Nationwide Investment Firm Corp v Marc Edward and Deoda Jacques | Fla. County Ct.- Broward | Removal of Tenant | Oct. 18, 2013 |
| 13-bk-32948 | Debtor:  Guilfort Dieuvil | Bankr. S.D. Fla. | Chapter 7 Voluntary Petition | Sep. 26, 2013 |
| CACE13019421 | Lezin, Nonlac Vs Lezin, Marie | Fla. Cir. Ct. | Real Prop Other - >$50K - <$250,000 | Aug. 21, 2013 |
| COWE13002554 | Dieuvil, Guilfort Vs Vazquez, Michelle | Fla. County Ct. | Removal of Tenant | Mar. 06, 2013 |
| 2011-037678-CA-01 | Pierre, Maryse A Vs. Dieuvil, Guilfort | Fla. Cir. Ct | Injuctive Relief (Greater than $15,000) | Nov. 14, 2011 |
| COSO10000109 | Dieuvil, Guilfort Vs Mccullum, Debra Denise, | Fla. County Ct. - Broward | Removal of Tenant | Jan. 07, 2010 |
| CACE08032397 | Bank Of America Na Vs. Dieuvil Guilfort | Fla. Cir. Ct. | Mortgage Foreclosure | Jul. 17, 2008 |
| 2008CA000336 | Countrywide Home Loans Inc Vs. Guerrier, Dieufaite | Fla. Cir. Ct. | Mortgage Foreclosure / Mech Lien | Jan. 11, 2008 |
| 2007CA002451 | Bank Of New York Vs. Cuerrier, Dieufaite, | Fla. Cir. Ct. | Mortgage Foreclosure / Mech Lien | Jul. 09, 2007 |
| 1998-019060-SP-23 | Francois, Nadine Vs. Dieuvil, Guilfort | Fla. Cir. Ct. | Summary Procedure - Contract & Indebtedness | Dec. 01, 1998 |















**PRIVILEGED AND CONFIDENTIAL SETTLEMENT COMMUNICATIONS **

# Exhibit "J"

Copy of PTO 1(B) - Order - Upon review that Order, it is evidently clear that

Claimant and Glhomes have fully complied with that PTO 1(B)

### 8757 Baystone cove

### boynton Beach, FL 33473

### KNAUF'S DEFECTIVE DRYWALLS

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: CHINESE-MANUFACTURED DRYWALL | ) | MDL No. 2047 |
| PRODUCTS LIABILITY LITIGATION | ) | |
| | ) | SECTION: L |
| | ) | |
| | ) | JUDGE FALLON |
| | ) | MAG. JUDGE WILKINSON |
| | ) | |

**THIS DOCUMENT RELATES TO ALL CASES**

## PRE-TRIAL ORDER NO. 1(B)
### (Preservation of Physical Evidence)

Pursuant to the Court's duty to supervise pretrial proceedings in this case, including

discovery, and pursuant to the Court's inherent power, the Court hereby modifies Paragraph 14 of

Pretrial Order No. 1 to address the Court's expectations, from this date forward, with respect to the

preservation of physical evidence from properties that may be repaired by the parties during the

course of this litigation. Those persons or entities who do not undertake to repair their properties

are, by definition, preserving the physical evidence, so long as the drywall and any building

components and contents that are believed to be affected by the allegedly defective drywall remain

intact. This Order addresses preservation requirements for those persons or entities who (1) were

transferred to this Court by the Judicial Panel on Multidistrict Litigation, pursuant to its Order of

June 15, 2009; (2) any tag-along actions subsequently transferred to this Court by the Judicial Panel

on Multidistrict Litigation pursuant to Rule 7.4 of the Rules of Procedure of that Panel; (3) all

related cases originally filed in this Court or transferred or removed to this Court; (4) those persons

or entities who intend to or may seek recovery relating to Chinese-manufactured drywall, including

putative members of any class actions; and (5) any subsidiaries and affiliates of all defendants in any

such actions.

In summary, from this date forward, all persons or entities who have or who intend to pursue a claim relating to allegedly defective Chinese-manufactured drywall and their agents, subsidiaries and affiliates shall preserve the following physical evidence at their own expense, subject to further order by the Court. Notwithstanding the foregoing, the Court reiterates that Paragraph 14 of Pre-Trial Order No. 1 remained in full force and effect up until this modification.

A.      Preservation of Physical Evidence:

1.      ***Drywall*** -- The Parties shall maintain at least two samples (of ten inches by ten inches (10" x 10") in size if possible) of every different drywall brand or marking removed from an affected property, including taking samples of unmarked drywall. If there are any markings on the sample, the samples should include as much of the identifiable marking as possible. In addition, the parties also shall preserve at least one sample of each type of drywall endtape, if any, that is found during inspection, repair or removal of drywall in or from a property. These drywall and endtape samples shall be labeled with the date of collection, the room location and the specific wall that the sample was taken from. These drywall and endtape samples shall be stored separately in double-bagged polyethylene zip-lock bags or equivalents, and not grouped together. Any drywall or endtape sample to be preserved under this paragraph shall be stored in reasonable climate controlled conditions and free of water or moisture. All samples should be clearly labeled on the outside of the plastic bag or equivalent, and then placed inside a second plastic bag or equivalent. The label shall include the name and address of the property from which the sample was taken, the date sampled, a sampler identification which identifies the type of item (e.g. drywall, copper wire, etc.), and where the item was taken from in the property.

In addition to taking these samples, the Parties shall photograph the backside of each Chinese drywall board immediately after it is removed on-site, and, document on a floor plan, building diagram, or other similar form of documentation, the location of each full or partial Chinese drywall board removed from the property and its photograph.  Photographs of the wall sections should be taken so that any markings on the backside of the drywall sections are most clearly visible in the photographs.

2.      ***HVAC coil material samples*** --  Before removing any HVAC coils or attachments, the Parties shall identify the location of each HVAC system on a floor plan, building diagram, or other similar form of documentation, and photograph the HVAC coil and all affected attachments while the HVAC coil and other attachments remain intact. For each HVAC coil removed from the property, the Parties shall either: (a) preserve the entire removed HVAC coil,  or (b) select and label: (i) at least eight representative copper U-bends (four from each side); and (ii) at least eight sections (at least six to ten inches long) of refrigerant line or other straight copper tubing associated with the coil or thermostatic expansion valve (TXV) for each HVAC system that is removed from the property.  In the event that there are HVAC systems that are not removed or repaired,  they should be also identified on the floor plan, building diagram, or other similar form of documentation.  An appropriately trained HVAC technician should then cut off the labeled segments with a pipe cutter or saw.  The serial number, make, and model of each affected HVAC coil shall be recorded and photographed.

All samples of copper U-bends, refrigerant line, and tubing (but not the HVAC coil with refrigerant line attached, if preserved) shall be placed separately in double-bagged zip-lock bags, and not grouped together.  These samples must be allowed to dry, whether wet

from condensation or refrigerant, before the zip-lock bag is sealed and stored. Any HVAC coil or sample to be preserved under this paragraph shall be stored in reasonable climate controlled conditions. All such samples should be clearly labeled on the outside of the plastic bag or equivalent, and then placed inside a second plastic bag or equivalent. The label shall include the name and address of the property from which the sample was taken, the date sampled, a sampler identification which identifies the type of item (drywall, copper wire, etc.), and where the item was taken from in the property.

3.    ***Plumbing component samples*** – The parties shall photograph all of the allegedly affected plumbing fixtures removed from the property, while they are still in place before removal and identify their location on a floor plan, building diagram, or other similar form of documentation. If multiple allegedly affected bathroom or kitchen plumbing fixtures are removed from the property, the Parties shall preserve one complete allegedly affected fixture.In addition, if allegedly affected copper connecting segments to fixtures ("stubouts") are removed, the Parties shall preserve at least one segment (at least four (4) inches long) of such copper stubouts. To the extent that such items are removed, the Parties shall also preserve at least one allegedly affected brass shower valve and a section of any allegedly affected copper riser pipe (at least eight (8) inches long) from between the shower valves and shower head in a bathroom. The Parties shall photograph each sample before cutting or removing the sample from the corresponding location or fixture. An appropriately trained person should cut off, where necessary, each sample with a pipe cutter or saw, and protect all sharp edges with tape or by other appropriate means. These samples should be stored separately in double-bagged polyethylene zip-lock bags or equivalents (if possible due to the size of the sample taken), and not grouped together. These samples must be allowed to dry

before the zip-lock bag, if any, is sealed and stored.  Any fixture or sample to be preserved under this paragraph shall be stored in reasonable climate controlled conditions.  All samples should be clearly labeled on the outside of the plastic bag or equivalent and then placed inside a second plastic bag or equivalent.  The label shall include the name and address of the property from which the sample was taken, the date sampled, a sampler identification which identifies the type of item (drywall, copper wire, etc.), and where the item was taken from in the property.

4.      ***Electrical component samples*** -- The Parties shall preserve at least three affected electrical receptacles and three affected switches, if available, from a wall or walls with allegedly defective Chinese-manufactured drywall.  The samples do not need to be taken from a single wall.  Similarly, the Parties shall preserve at least three affected receptacles and three affected switches, if available, from a wall or walls with non-Chinese manufactured drywall.  These samples likewise do not need to be taken from a single wall but should be representative of the types of receptacles and switches found in the property.

Additionally, if smoke detectors, carbon monoxide detectors, intruder alarm devices or any similar life safety devices are present, the Parties shall collect at least two of each type of device from each floor, if available.  The Parties shall photograph these selected samples prior to their removal and identify the location of all samples and photographs on a floor plan, building diagram, or other similar form of documentation.  An appropriately trained person should cut the electrical wires connecting the receptacles, switches and other electrical fixtures, so that at least two (2) inches of each wire remain connected to the device.  For smoke detectors and similar devices, the electrician should cut the wires above any plug or similar connector.  If other less common devices with copper wire connections are found,

the Parties should preserve representative samples as described in this subparagraph 4.

These samples should be stored in zip-lock bags. Samples shall not be stored in wet conditions. If wet from condensation, the sample must be allowed to dry before the zip-lock bag is sealed and stored. Any sample devices and wiring to be preserved under this paragraph shall be stored in reasonable climate controlled conditions. All samples should be clearly labeled on the outside of the plastic bag or equivalent and then placed inside a second plastic bag or equivalent. The label shall include the name and address of the property from which the sample was taken, the date sampled, a sampler identification which identifies the type of item (drywall, copper wire, etc.), and where the item was taken from in the property.

5.      ***Photograph or video affected items:***  To the extent that a party intends to seek a recovery for building components or contents not described herein allegedly affected by defective Chinese manufactured drywall, such claimed other building components shall be documented by photograph or video and reasonable sampling consistent with this Order. Unless otherwise agreed by all parties in advance of the repair or removal, to the extent that a Party is contending that an appliance has been damaged or affected by defective Chinese drywall and seeks to recover damages for same, then that party shall preserve representative samples of that portion of the appliance exhibiting those effects (e.g., blackened coils in a refrigerator). This paragraph is not related to incidental damages, such as damage to cabinetry, countertops, wood trim, or other materials that must be replaced in order to access or remove the allegedly defective Chinese-manufactured drywall or are necessarily damaged through the repairs to the property. All samples should be clearly labeled on the outside of the plastic bag or equivalent and then placed inside a second plastic bag or equivalent. The

label shall include the name and address of the property from which the sample was taken, the date sampled, a sampler identification which identifies the type of item (drywall, copper wire, etc.), and where the item was taken from in the property.

B.      Property owners and renters shall preserve, at their own expense, any and all personal property items that they claim to be affected by the allegedly defective Chinese-manufactured drywall for which they intend to pursue recovery.

C.      This duty to preserve only applies to those persons or entities that intend to seek recovery for damages in connection with repairs to properties that contain allegedly defective Chinese-manufactured drywall, or recovery for damages to personal property contained in such a property, or personal injury from allegedly defective Chinese-manufactured drywall.

D.      This Order pertains only to preservation of physical evidence in properties being repaired, and it replaces the provisions of Paragraph 14 of Pretrial Order #1 that pertain to physical evidence other than documents.  The Court may enter a separate order that pertains to documents, which may similarly replace the provisions of Paragraph 14 of Pretrial Order #1 that pertain to documents.

E.      Nothing in this Order shall be construed to affect the discoverability or admissibility of evidence.  All objections to discoverability, admissibility or sufficiency of evidence are maintained and may be asserted at any time.

F.      Evidence or material not preserved in compliance with this Pre-Trial Order may be subject to exclusion for use in either discovery or trial of the matter and further, the party responsible for failing to preserve evidence may be subject to the claim or defense of spoliation.

G.      This Order may be subject to future modification when and if a remediation protocol is developed in this litigation.

New Orleans, Louisiana, this 9th day of October, 2009.

ELDON E. FALLON
UNITED STATES DISTRICT JUDGE

**PRIVILEGED AND CONFIDENTIAL SETTLEMENT COMMUNICATIONS **

# Exhibit "K"

Email from Glhomes Construction Vice President acknowledged that

Guilfort Dieuvil has agreed for Glhomes to proceed with

renovation and remediation of the home.  Despite all,

Glhomes was unwilling to finish the renovation

## 8757 BAYSTONE COVE

## BOYNTON BEACH, FL 33473

## KNAUF'S DEFECTIVE DRYWALLS

**CONFIDENTIALITY NOTICE**: This e-mail communication and any documents, previous email messages or other attachments transmitted with it contain confidential information that may be legally privileged and is for the sole use of the intended recipient(s). If this email is received by any unintended recipient, please notify the sender by return email or by telephone and immediately discard this e-mail and all of its content. Unauthorized disclosure or distribution of the contents of this e-mail is **PROHIBITED**. Likewise, review of this e-mail by an unintended recipient shall not constitute a waiver of the attorney-client privilege.

**From:** Mike Toll
**Sent:** Saturday, December 11, 2010 6:54 AM
**To:** Heather Keith
**Cc:** Jamie Knott
**Subject:** CI79, Dieuvil; Metal Studs

Heather,  Please see Dieuvil's email.  He had previously indicated to me that he was okay with us proceeding.

Mike Toll
Director of Construction

---

**From:** guilf dieuvil [mailto:guilf5@hotmail.com]
**Sent:** Friday, December 10, 2010 7:04 PM
**To:** Mike Toll; Diane Cadorette; Jamie Knott; Elsa Nunes
**Subject:** RE: CI79, Change Order 7

Dear Mike

I think that it would be best to replace all of the metal frame because of health issue that it could create. Even now I am still having health issue because of the Chinese Drywall which I have no choice to schedule apt. to see Doctor again. I believe that it would be better to get the property free from all chinese Drywall issue and contamination. Since those metal frame changed color because of the chinese drywall, replacing them would be the right approach to take. I spoke to several people and company they are telling me the same thing in addition to the resale value that will be affected as well. Also I do not know if Jamie already sent the check to the storage company for payment. if he did not sent it yet please do not mail it to the address in the lease that you have because I did not move to that property I have been living into a different one. Please let me know what happen regarding the storage. So I can know what to do with the storage for the vehicle.
Best regards
Guilfort Dieuvil

From: guilf5@hotmail.com
To: mike.toll@glhomes.com
Subject: RE: CI79, Change Order 7
Date: Wed, 8 Dec 2010 20:25:49 -0500

Hello Mike
I would like you to install the security lights as stated in the change order that you send to me in this attachment, and I will make the check $425,00 payable to Glhomes in our next meeting.
Guilfort Dieuvil

Subject: RE: CI79, Change Order 7
Date: Tue, 7 Dec 2010 11:22:21 -0500
From: mike.toll@glhomes.com
To: guilf5@hotmail.com; jamie.knott@glhomes.com

Mr. Dieuvil,
I have attached the Change Order for the security lights that we had discussed.  Please sign it and send it back to me as

**PRIVILEGED AND CONFIDENTIAL SETTLEMENT COMMUNICATIONS **

# Exhibit "L"

Glhomes' counsel ordered their personals to stop all renovation and

remediation at the subject property, since

Claimant intended to hire counsel.

### 8757 BAYSTONE COVE

### BOYNTON BEACH, FL 33473

### KNAUF'S DEFECTIVE DRYWALLS

# RE: CDW - CIS Lot 79 Dieuvil - Suspend CDW Repairs @ H/O's Request

## Heather Keith <Heather.Keith@glhomes.com>

Fri 12/24/2010 12:24 AM

To: guilf dieuvil <guilf5@hotmail.com>;

Cc: Elsa Nunes <Elsa.Nunes@glhomes.com>; Mike Toll <mike.toll@glhomes.com>; Diane Cadorette <Diane.Cadorette@glhomes.com>; Jamie Knott <jamie.knott@glhomes.com>; Becky Medley <Becky.Medley@glhomes.com>;

Mr. Dieuvil - At your request and direction, we will get in touch with Ervin and proceed from there. All of our staff is hereby instructed to suspend any further work for you at this time and to withhold any further payments to you. We will gladly proceed with our cdw repair program if you change your mind but in the meantime, we will suspend the cdw repair process for your home until we get further direction from you or Ervin.

**From:** guilf dieuvil [mailto:guilf5@hotmail.com]
**Sent:** Friday, December 24, 2010 12:00 AM
**To:** Heather Keith; Elsa Nunes; Mike Toll; Diane Cadorette; Jamie Knott; Becky
**Subject:** RE: CDW - CIS Lot 79 Dieuvil - Metal Studs

Hello Heather
It is unfortunate that I end up to hire an attorney to address this matter that already causes a lot of pains and sufferance to my family and myself. Due to your manipulation, damages and your careless action to create more harm to myself and my family; unfortunately, I left with no more choice. While GLhomes was fully aware about the defective chinese drywall that you installed in my home, and you did not even care to let me know about it when I purchased the property, and you took almost $ 1.2 Million from me to make me live in a chemical environment with five kids that are facing now several health issues as well. It comes to the point that I have no choice than to hire a lawyer that can handle this matter. Based on your statement you have made to me that Glhomes would rather let me stay in the house until the bank repo the property from me from foreclosure because it will cost Glhomes less money since you will not have to horry about moving expense, storage and some other expenses from that point it will be cheaper for GLhomes as you stated previously. Since you are a lawyer please talk to my attorney with respect to this matter. His name is Ervin Gonzalez

Best regards
Guilfort Dieuvil

Subject: CDW - CIS Lot 79 Dieuvil - Metal Studs
Date: Thu, 23 Dec 2010 20:28:35 -0500
From: Heather.Keith@glhomes.com
To: guilf5@hotmail.com
CC: mike.toll@glhomes.com; jamie.knott@glhomes.com

Mr. Dieuvil,

**PRIVILEGED AND CONFIDENTIAL SETTLEMENT COMMUNICATIONS **

# Exhibit "M"

Copy of email that Knauf's counsel denied the request to physically inspect the evidence of KPT Drywalls and waived any opportunity to look at tangible samples of their Knauf's Drywalls and related evidences that were installed in the home.

### 8757 Baystone cove

### boynton Beach, FL 33473

### KNAUF'S DEFECTIVE DRYWALLS

Mediation About Knauf's Drywall: 8757 Baystone Cove Boynton Beach FL 09/2017

# Re: 8757 Baystone Cove Boynton Beach FL 33473

## Dysart, Danny <ddysart@bakerdonelson.com>

Thu 4/20/2017 3:15 PM

To: guilf dieuvil <guilf5@hotmail.com>;

An inspection is not necessary if you can submit pictures of all samples in your possession with readable markings on the drywall.

The ones below are readable. Could you please do the same for all samples.

Thank you.

> On Apr 20, 2017, at 2:00 PM, guilf dieuvil <guilf5@hotmail.com> wrote:
>
> This is the largest that I can make that pictures. Please let me know if this picture is satisfactory to your expectations. If you want to send your agent to the subject property, so he could actually see the sample of the knauf drywall, or if you want I can arrange my schedule next week to come to your office to bring you multiple samples of the knauf Chinese drywall that were taken from the home. Whatever way that you want to resolve this matter will be fine with me. I will pay for my own expense to bring you sample of those drywall, if this approach will resolve all pending issues. Please let me know.
> Thanks in advance for your corporation.
>
> Best regards
> Guilfort Dieuvil
> 786-344-5497
>
>
>
> <IMG_4669.PNG>
>
>
>
> <IMG_4668.PNG>
>
>
>
> Sent from my iPhone

_____

Under requirements imposed by the IRS, we inform you that, if any advice concerning one or more U.S. federal tax issues is contained in this communication (including in any attachments and, if this communication is by email, then in any part of the same series of emails), such advice was not intended or written by the sender or by Baker, Donelson, Bearman, Caldwell & Berkowitz, PC to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or tax-related matter addressed herein.

This electronic mail transmission may constitute an attorney-client communication that is privileged at law. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this electronic mail transmission in error, please delete it from your system without copying it, and notify the sender by reply e-mail, so that our address record can be corrected.

**PRIVILEGED AND CONFIDENTIAL SETTLEMENT COMMUNICATIONS **

# Exhibit "N"

Email from Glhomes requested from claimant to pay $25,000.00 payments / contribution

for remediation and renovation of the home to ensure removal of all residual of KPT

Drywalls. Such request was denied by Claimant, and Glhomes abandoned

and relinquished the subject property without any intent or agreement

to come back and fix the subject property

### 8757 Baystone Cove

### boynton Beach, FL 33473

### KNAUF'S DEFECTIVE DRYWALLS

## Re: CDW - CIS Lot 79 Dieuvil - Suspend CDW Repairs @ H/O's Request

**From:** Heather Keith <Heather.Keith@glhomes.com>
**Sent:** Friday, December 24, 2010 12:24 AM
**To:** guilf dieuvil
**Cc:** Elsa Nunes; Mike Toll; Diane Cadorette; Jamie Knott; Becky Medley
**Subject:** RE: CDW - CIS Lot 79 Dieuvil - Suspend CDW Repairs @ H/O's Request

Mr. Dieuvil - At your request and direction, we will get in touch with Ervin and proceed from there. All of our staff is hereby instructed to suspend any further work for you at this time and to withhold any further payments to you. We will gladly proceed with our cdw repair program if you change your mind but in the meantime, we will suspend the cdw repair process for your home until we get further direction from you or Ervin.

---

**Subject:** CDW - CIS Lot 79 Dieuvil - Metal Studs
**Date:** Thu, 23 Dec 2010 20:28:35 -0500
**From:** Heather.Keith@glhomes.com
**To:** guilf5@hotmail.com
**CC:** mike.toll@glhomes.com; jamie.knott@glhomes.com

Mr. Dieuvil,

However, as a courtesy to you and in an effort to accommodate your request, we will agree to remove and replace the metal framing provided you pay in advance for all work necessary to complete this task. Based on the timing of when you brought this issue to our attention, we already had re-installed the electric wiring and copper plumbing as well as the insulation. To remove the metal framing at this stage, will require all of that work to be removed again and then reinstalled again. Our cost estimate to replace the metal framing together with this other necessary work is $25,000. Accordingly, this $25,000 must be paid by you ASAP if you want the metal framing removed. In order to accommodate your request, we must receive payment in the amount of **$25,000 by Monday January 3, 2011**. Please understand that the cdw repairs in your Home have been on hold for over 2 weeks based on your request which is outside our scope of work protocol. We are agreeing to delay the cdw repairs another week to provide you some additionally time to decide how you wish to proceed. However, we will not

Re: CDW - CIS Lot 79 Dieuvil - Suspend CDW Repairs @ H/O's Request

hold-off endlessly and unreasonably delay the cdw repairs.  Our scope of work clearly explains that we can not be unduly delayed and this issue will result in a delay of over 3 weeks.

Accordingly, please get in touch with Mike Toll to resolve this issue one way or the other by Monday January 3rd.  If you elect to pay the $25,000 by January 3rd, we will absorb the delay costs and conduct this additional work at that time.  If you do not want to cover the $25,000 for the metal framing work, then we will proceed with the repairs in compliance with our scope of work on January 4th.  Finally, if you do not want to pay for the $25,000 and you refuse to allow us to proceed with the work, then we will have no choice but to suspend further repairs, suspend any further payments for temporary housing, terminate our construction permit and turn possession of the Home back over to you for you to complete any further cdw repairs at your cost and at your direction.

Sincerely,
Heather C. Keith
Assistant General Counsel
Boynton Beach Associates XVI, LLLP
1600 Sawgrass Corporate Parkway, Suite 400
Sunrise, FL 33323
(954) 753-1730 ext. 2383
(954) 603-0383 - direct dial
(954) 575-5383 - direct fax
email - heather.keith@glhomes.com
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

CONFIDENTIALITY NOTICE: This e-mail communication and any documents, previous email messages or other attachments transmitted with it contain confidential information that may be legally privileged and is for the sole use of the intended recipient(s). If this email is received by any unintended recipient, please notify the sender by return email or by telephone and immediately discard this e-mail and all of its content. Unauthorized disclosure or distribution of the contents of this e-mail is PROHIBITED. Likewise, review of this e-mail by an unintended recipient shall not constitute a waiver

_____

**From:** Mike Toll
**Sent:** Saturday, December 11, 2010 6:54 AM
**To:** Heather Keith
**Cc:** Jamie Knott
**Subject:** CI79, Dieuvil; Metal Studs

Heather,  Please see Dieuvil's email. He had previously indicated to me that he was okay with us proceeding.

**Mike Toll**
**Director of Construction**

**PRIVILEGED AND CONFIDENTIAL SETTLEMENT COMMUNICATIONS **

# Exhibit "O"

"Pictures of multiples KPT's Drywall samples and other related evidences."

Upon removal of KPT drywall samples and all others related evidences, Glhomes

Immediately collected, labeled, photographed, videotaped and preserved those

evidences and samples as the construction company that initiated the demolition.

Brad Wall & Jerry Oneil are both Glhomes's employees, and they have their own

handwriting on all labels, also filled out and signed the building diagram/floor

in compliance with PTO 1(B)

## 8757 BAYSTONE COVE

## BOYNTON BEACH, FL 33473

## KNAUF'S DEFECTIVE DRYWALLS



















Canyon Isles Lot 79
Cabana Bath/Living Rm
Jerry ONeil 9/29/10

Conyor Isles Lot 79

Family Room
Jenn Aii 9/29/11



Canyon Isles Lot 75

Kitchen/Dining Rm
Jerry Guidi 9/29/10

01/35/6 | 9/35/10
Lt 75 ISI mahon
Terry Guci l
Canyon ISI

Canyon Isles Lot 79
Dining Room/Laundry RM
Jerry Oneil   9/29/10

CIS 079 #5

09-23-10

Living Roon

NE Colunb

Brad Wall



Ziploc BRAND BAGS / SACS de MARQUE

Cayman Isles Lot 79
Jerry oneil 9/29/10

SC Johnson
A FAMILY COMPANY
UNE ENTREPRISE FAMILIALE



CIS 079 # 60
09-23-10
Dining Room
West Wall
Brad Wall



CIS 079 #2

09-23-10

Family Room

East Wall

Brad Wall



Canyon Bleu Lot 79
Bed #2 ceiling
J Perry Drive / 9/29/10



**PRIVILEGED AND CONFIDENTIAL SETTLEMENT COMMUNICATIONS **

"Pursuant to PTO 1(B) which required to maintain of at least 2 samples of any drywall brand removed from an affected property."

Sample of American Drywalls brand (National/GridmarX) that were also installed at the house. The National Gypsum drywall is a high-quality, safe and environmentally sound product. Every single false allegation against Gypsum has been  rebutted by sound science from the nation's leading laboratories and safety experts, including Federal District Court's ruling vindicates this company's products (National Gypsum/GridmarX).





