# Exhibit "A"

1

```
 1                IN THE UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
 2                        NORFOLK DIVISION


 3


 4   EDUARDO AND CARMEN AMORIN, et al., )
                                        )
 5             Plaintiffs,              )
                                        )
 6   v.                                 )    Civil Action No.:
                                        )       2:11cv377
 7   TAISHAN GYPSUM CO., LTD, et al.,   )
                                        )
 8             Defendants.              )


 9


10                  TRANSCRIPT OF PROCEEDINGS

11          (Re: Parties' Briefing Plan for Resolution)

12                     Norfolk, Virginia
                       April 30, 2019
13


14


15   BEFORE:       THE HONORABLE MARK S. DAVIS
                   Chief United States District Judge
16                   and
                   THE HONORABLE ROBERT J. KRASK
17                 United States Magistrate Judge

18

19

20

21

22

23

24

25
```

```
 1    Appearances:

 2            LAW OFFICES OF RICHARD J. SERPE, P.C.
                     By: RICHARD JAMES SERPE
 3            -- and --
              BRIET CANTOR GRANA BUCKNER, PLLC
 4                   By: JEFFREY ARNOLD BREIT
              -- and --
 5            LEVIN SEDRAN & BERMAN, LLP
                     By: SANDRA LUCILLE DUGGAN
 6                       Counsel for Plaintiffs

 7            WILLCOX & SAVAGE
                     By: ERIC DAVID COOK
 8            -- and --
              ALSTON & BIRD LLP
 9                   By: BERNARD TAYLOR, SR.
                         CHRISTINA HULL EIKHOFF
10                       DAVID VENDERBUSH
                         HELEN SU
11                       Counsel for Defendants Tiashan Gypsum and
                         Taian Tiashan Plasterboard
12
              KALEO LEGAL
13                   By: WILLIAM RUEGER POYNTER
                         SHEPHERD D. WAINGER
14            -- and --
              ORRICK HERRINGTON & SUTCLIFFE, LLP
15                   By: JAMES LAMONT STENGEL
                         STACY HARRISON
16                       Counsel for Beijing New Building Materials
                         Public Limited Co.

17

18

19

20

21

22

23

24

25
```

3

1            P R O C E E D I N G S

2

3        (Proceedings commenced at 10:05 a.m. as follows:)

4

5        COURTROOM DEPUTY CLERK:  In Case No. 2:11cv377,

6  Eduardo Amorin, et al. v. Taishan Gypsum Co., Limited, et al.

7        Counsel for the plaintiffs, are you ready to proceed?

8        MR. BREIT:  Amorin plaintiffs are ready.

9        CHIEF JUDGE DAVIS:  Good morning, Mr. Breit.

10        MR. BREIT:  Good morning, Judge.

11        COURTROOM DEPUTY CLERK:  Counsel for the defendant,

12  are you ready to proceed?

13        MR. TAYLOR:  Bernard Taylor for Taishan is ready to

14  proceed.  With me is my colleague, David Venderbush and my

15  colleague Eric Cook.  And out in the audience are my colleagues

16  Christina Eikhoff and Helen Su.

17        CHIEF JUDGE DAVIS:  All right.  Good morning to all of

18  you.

19        MR. POYNTER:  Good morning, Your Honor.  Billy Poynter

20  for BNBM, PLC.  With me is James Stengel and Stacy Harrison from

21  the Orrick law firm, and my partner, Shepherd Wainger.

22        CHIEF JUDGE DAVIS:  Good morning to you all.

23        All right, Counsel.  Thank you for your submissions.

24  I think I'd like to hear from defendants first today.  I really

25  want to jump right to the issue of remediation and ask this:  If

1  this Court decides to adopt the formula and findings of Judge

2  Fallon, understanding you disagree with that, but if I decide to

3  do that, do you believe that Judge Fallon's rulings contemplated

4  the Court having some additional hearing regarding ancillary

5  matters such as setoff, on remediation, and any other issues

6  regarding remediation costs, and if so, what?

7         MR. TAYLOR:  If I understand the Court's question is

8  if you agree with Judge Fallon's, with adopting Judge Fallon's

9  formula, you want to know if regarding the decisions regarding

10  remediation damages is there anything else that I believe needs

11  to be heard or that Judge Fallon would believe need to be heard?

12         CHIEF JUDGE DAVIS:  Judge Fallon first, and then you.

13         MR. TAYLOR:  Okay.  Well, Judge Fallon, I'm not

14  certain, but I think he --

15         CHIEF JUDGE DAVIS:  Well, you can infer from what he

16  said and written, so if you see nothing there to suggest any

17  inference, I suppose you move on to what you think.

18         MR. TAYLOR:  Well, but I do think that Judge Fallon

19  has indicated that he would want to hear evidence regarding --

20  or want to consider evidence regarding setoffs, regarding

21  foreclosures, regarding bankruptcies and other issues so that he

22  could understand how that fit into the remediation matrix and

23  context.

24         CHIEF JUDGE DAVIS:  And when you say setoffs, tell me

25  what you think that means.

1          MR. TAYLOR:  If indeed there have been other

2    settlements in the case and the plaintiffs have been partially

3    compensated, then the setoffs would be, from those partial

4    settlements would be allocated to the amount of the remediation

5    damages that they would obtain in this case.

6          CHIEF JUDGE DAVIS:  All right.  Let me ask you

7    something else.  On this issue about whether the Court should

8    adopt the finding of Judge Fallon, if I understand your briefing

9    and your position, it is that constitutional considerations

10   restrict the degree to which this Court can -- notwithstanding

11   Fourth Circuit law on the near-binding effect of such MDL

12   findings --

13          MR. TAYLOR:  Sure.

14          CHIEF JUDGE DAVIS:  -- it's your view that there are

15   Constitutional constraints on that Fourth Circuit precedent.  So

16   my question to you this is:  If in fact I take your view as

17   being accurate, is it a basis for this Court to say,

18   notwithstanding those Constitutional considerations, the unique

19   facts of this case, the unique facts of this case, the way in

20   which the defendants have conducted themselves, makes it so

21   unusual that even if there were Constitutional constraints on

22   the operation of Fourth Circuit precedent on these facts that

23   the Court is within its rights to adopt the findings of Judge

24   Fallon?

25          MR. TAYLOR:  So the Court would be -- and I understand

1    the question, Your Honor.  Again, the Court would be moving away

2    from what we believe is Virginia law that's applicable to this

3    case, and the Court's already acknowledged that --

4            CHIEF JUDGE DAVIS:  Yes, sir.

5            MR. TAYLOR:  -- and focusing more --

6            CHIEF JUDGE DAVIS:  I'm asking you to assume that for

7    the purposes of my question.

8            MR. TAYLOR:  And focusing upon the equities.  And I

9    think, Your Honor, I would have to refer the Court to the case

10   that -- and I was just looking for it in my brief here -- the

11   Kpadeh case, which is an Eleventh Circuit case that deals

12   directly with that issue of -- just a second, Your Honor.

13           As you can imagine, I was prepared to make my argument

14   in a different order.

15           It's on Page 15 and 16 of our brief.  It's an Eleventh

16   Circuit case.  And Your Honor, at some point I would like to

17   have the opportunity to talk about this conduct that has been

18   addressed to the Court that has been attributed to Taishan.

19           But getting right to the Court's question and focusing

20   in on the Court's concern -- and a concern that I understand --

21   regarding the equities that the Court might want to apply in

22   regard to the alleged conduct that counsel has referred to the

23   Court, I think the case of Kpadeh -- it's either --

24           CHIEF JUDGE DAVIS:  I see it.  Page 15.

25           MR. TAYLOR:  I think that case provides -- and I hope

1   that the Court, I could convince the Court to read the entire

2   case -- because I believe that case is an elegant expression of

3   the policies and values relevant to due process that's

4   applicable to all parties, in particular the parties in this

5   case.

6           In that case, Your Honor -- you know, you're talking

7   about the issues that counsel has referred to and attributed to

8   Taishan in this case.  But in that case it involved individuals

9   who were inappropriately incarcerated or involved in being in

10  captivity and brutally tortured by Charles Taylor -- no relation

11  to me, of course, Your Honor -- but in Liberia.  And those folks

12  proposed to use a class mechanism to extrapolate from the named

13  plaintiffs in regards to their confinement and their horrible

14  torture experiences, to develop a formula to assign damages to

15  the larger class, which is very similar to what the Court is

16  trying to do here.  And the Court in that case indicated that

17  they couldn't develop a formula based upon the named plaintiffs'

18  experiences of confinement and torture that is to be applied to

19  the larger class because their experiences varied under that

20  formula.  Some would have received more compensation and some

21  would have received less compensation.  And that's part of the

22  problem here, Your Honor, when you look at the cases that we've

23  cited to, to address this issue in Virginia that you have to

24  have particularity in regards to -- and reasonable certainty, in

25  regards to the damages that you request in this case.  And the

1    reason that I believe that --

2         CHIEF JUDGE DAVIS:  Why isn't there reasonable

3    certainty on the determinations made by the MDL Court?  Why

4    isn't there reasonable certainty?

5         MR. TAYLOR:  Oh, it's not reasonable certainty, Your

6    Honor, for that very reason.  Because in that case -- in this

7    case -- you're talking about our case, right?

8         CHIEF JUDGE DAVIS:  Yes, sir.

9         MR. TAYLOR:  In our case, the MDL judge has focused

10   upon averages, and actually double averages, of the damages to

11   arrive at his formula.  And that's how he arrived at the

12   86-dollar formula.  And his own -- the plaintiff's own expert in

13   that case basically said there were very -- there were real

14   problems with that.  Admitted there were real problems with, in

15   regards to that, relating to the certainty of the reasonable

16   certainty of the damages.

17        CHIEF JUDGE DAVIS:  Can you tell me, when you say

18   double average, tell me how you understand that.

19        MR. TAYLOR:  What happened is there are two local

20   experts that provided estimates of the costs that would be

21   incurred.

22        CHIEF JUDGE DAVIS:  Involving Virginia homes?

23        MR. TAYLOR:  Say it again?

24        CHIEF JUDGE DAVIS:  Involving Virginia?

25        MR. TAYLOR:  I'm sorry?

9

```
 1                CHIEF JUDGE DAVIS:  Involving Virginia?

 2                MR. TAYLOR:  The law in Virginia?

 3                CHIEF JUDGE DAVIS:  Involving Virginia.

 4                MR. TAYLOR:  I'm sorry, Your Honor I misunderstood

 5   what the Court was saying.  Were you asking when I talked about

 6   local experts in the MDL case that helped the Court arrive at

 7   his formula in the MDL case?

 8                CHIEF JUDGE DAVIS:  Yes, sir.

 9                MR. TAYLOR:  That's what I'm referring to.

10                CHIEF JUDGE DAVIS:  Okay.

11                MR. TAYLOR:  He relied upon two local contractors to

12   provide estimates of the various homes involved, and then he

13   averaged those two estimates in order to arrive at his 86-dollar

14   per square foot formula.  And it's important for the Court to

15   understand, though, that the seven Germano intervenors provided

16   specific proof, individualized proof, of the damages that would

17   apply in their cases, and the Court awarded those damages to

18   them based upon that individualized proof.

19                CHIEF JUDGE DAVIS:  So this is the problem I have with

20   your approach.  And you know, in your brief you say that it was

21   problematic that the expert used the 86-dollar figure arrived at

22   from those seven homes as a starting point.

23                MR. TAYLOR:  Yes, sir.

24                CHIEF JUDGE DAVIS:  To me, that's nonsensical.

25   Because you have -- however you chose those seven, it seems to
```

1  me you have a baseline where the Court, the fact-finder had a

2  chance to hear the evidence with respect to seven different

3  properties and to gain an appreciation of the nuances that are

4  involved in making the determinations from not one, not two, but

5  seven different properties.  And it was actually litigated.  And

6  so you have a rational basis, at the very least, some reasonable

7  certainty, it seems to me, as a starting point.  And that's all

8  it was.

9          MR. TAYLOR:  Well, Your Honor -- did I cut you off,

10  Your Honor?

11          CHIEF JUDGE DAVIS:  Go ahead.

12          MR. TAYLOR:  Your Honor, I understand the Court's view

13  of that.  But there's more to it.  First of all, in regards to

14  the original proceeding, which was in February of 2010 when the

15  Court arrived at that 86-dollar per square foot formula, that

16  was a non-adversarial proceedings.  We were not involved.  We

17  were not able to cross-examine the expert.

18          CHIEF JUDGE DAVIS:  Why was that?

19          MR. TAYLOR:  We weren't in the case at that point,

20  Your Honor.

21          CHIEF JUDGE DAVIS:  Bingo.

22          MR. TAYLOR:  That's right.  But let me go further.  In

23  June of 2015 when the expert, when we were able to examine the

24  expert and we were able to show that there was not

25  individualized proof and was not reasonable certainty that

1   arrived when you tried to apply the formula.  And if the Court

2   will bear with me I can explain what happened.  It's Mr. Inglis.

3   And he admits that the method for calculation, calculating the

4   remediation costs and then applying it to 3,000 diverse

5   properties was the first time he had ever done it in his career.

6   He admitted there was no testing of the formula against any

7   actual inspections of any property.  He admits that some people

8   would get more and others would receive less than what they

9   would need for remediation under the formula.  He admits that he

10  was not familiar with the specifics of the individual

11  residences.  He didn't review floorplans of the class

12  properties.  He did not inspect any of the class properties in

13  connection with formulating his class damages estimate.  He did

14  not factor into his calculations whether any class properties

15  had been remediated, because it was only his assignment to

16  calculate the damages to those seven properties.  And he

17  acknowledged variability in remediation costs between the

18  properties, and he acknowledged variability based on the

19  finishes of the interior.  Your Honor, there is still so much

20  still needed to be examined and tested in regards to what he

21  relied upon to get to that formula to show that that -- those

22  particular omissions on his part shows that that formula, under

23  Virginia law, is not an individualized -- it doesn't result in

24  individualized damages, doesn't meet the plaintiff's proof of

25  providing reasonable certainty, and definitely causes a problem

1   in regards to the Virginia law that says that you can't

2   overcompensate someone, you know, in regards to the damages that

3   they would get in a case.  And that's what you would have, Your

4   Honor.

5           And also Your Honor, you've got at least four

6   different categories of individuals who are involved in this

7   particular matter to whom damages would have to be assessed.

8   You've got current owners who have remediated; current owners

9   who have not remediated; former owners who didn't remediate, and

10  then some former owners who may have remediated before they

11  moved.  All of those different categories of individuals, in

12  regards to assessing a remediation formula to those individuals,

13  would require --

14          CHIEF JUDGE DAVIS:  Walk through those again for me.

15  Those that have already remediated?

16          MR. TAYLOR:  I'll give you the full list, Your Honor.

17  Former owners who -- current owners who have remediated; former

18  owners -- current owners who have not remediated; former owners

19  who remediated, and former owners who did not remediate.

20          CHIEF JUDGE DAVIS:  So -- well, I'll let you go on.

21          MR. TAYLOR:  As I indicated, Your Honor, each of those

22  categories have a different injury and a different loss under

23  Virginia law, and therefore you can't use the formula to provide

24  reasonable certainty in regards to those individuals in regards

25  to damages.

1        The Court has read my brief and I'm -- is it all right

2   if I continue, Your Honor?

3        CHIEF JUDGE DAVIS:  Yes, sir.

4        MR. TAYLOR:  And you will see on Pages 28 through 30

5   where we have some charts there, and we try to compare the

6   formula damages claimed to the actual costs of remediation to

7   the total property value to the building value.  And you see in

8   each one of those circumstances you have some real potential

9   that these folks would be overcompensated and would receive --

10  some of these folks would be overcompensated and would receive a

11  windfall in damages.

12       CHIEF JUDGE DAVIS:  Isn't that the very nature,

13  though, of the MDL process?  That is, that there's going to be

14  an economy, an economy of justice as well as an economic economy

15  achieved through the process?  And it has the very strong odor

16  of an effort to relitigate to me.  And that was the feeling I

17  had after reading your remediation argument.

18       MR. TAYLOR:  Your Honor, and again, I can understand

19  the Court's beliefs or feelings about that.  Or inclinations.

20  Maybe I'll say it that way.  I think the facts in this case show

21  that when the MDL arrived at his formula he did not consider

22  Fourth Circuit law that we cited in our brief and the Virginia

23  law that we're citing.

24       CHIEF JUDGE DAVIS:  Well, how could the Fourth Circuit

25  law be any worse for you?  I mean, really, if he had considered

1   it, I don't know, how would it have changed his view?

2          MR. TAYLOR:  Well, I think it would have changed the

3   result from this perspective, Your Honor:  The Fourth Circuit

4   law requires reasonable certainty.  And Younger v. Appalachian

5   Power, which is one of the cases we cite in our brief, at Page 2

6   and I believe Page 20, basically says that rejecting a damages

7   formula not tied to case-specific facts that would

8   overcompensate the injury sustained is in violation of Virginia

9   law.

10          And the Lochaven Company case, also at Page 20, I

11  believe, of our brief -- let me make sure I'm right about that.

12  Page 36 of our brief -- basically says that when you are

13  calculating damages, you can't provide damages to the plaintiffs

14  that would be a windfall.  That's Virginia law as I understand

15  it.  And that's the difference I think that does enure to our

16  benefit to allow us to try to influence this Court not to

17  accept, not to adopt Judge Fallon's -- I'm sorry, the MDL

18  judge's formula.

19          CHIEF JUDGE DAVIS:  All right.  Let me kind of jump

20  around to different things that I'm particularly interested in.

21  I'm sorry to interrupt --

22          MR. TAYLOR:  No, no, that's all right.

23          CHIEF JUDGE DAVIS:  -- the flow of your prepared

24  remarks.

25          But suppose this Court determined that adoption of the

1  MDL remediation formula and calculations was appropriate, and

2  suppose the Court determined that there might be a need for some

3  additional information regarding remediation such as setoff

4  information, for example, and suppose the Court determined that

5  some limited additional development of non-remediation damage

6  information was necessary.  You have suggested that that might

7  be done in a, starting with a, I'll call it a traunch, a group

8  of plaintiffs --

9          MR. TAYLOR:  That's correct, Your Honor.

10         CHIEF JUDGE DAVIS:  -- and that Judge Krask might be

11 able to take on that effort.  Suppose the Court wanted to

12 proceed in that fashion, but recognizing the heavy, heavy load

13 that we each are carrying, wanted to utilize a special master,

14 but wanted to do this very expeditiously.  Can you give me your

15 thoughts on -- understanding it's the hypothetical I've given

16 you, you're kind of stuck with that --

17         MR. TAYLOR:  I am stuck with it, I understand.

18         CHIEF JUDGE DAVIS:  -- as a hypothetical, how would

19 you recommend the Court proceed with finding a special master,

20 providing direction and proceeding?

21         MR. TAYLOR:  Well, the way we've done it in the

22 past -- and the Court knows from our briefing -- that at least

23 in regards to certain categories of damages, the judges in both

24 Florida and Louisiana have allowed some degree of pretrial

25 discovery.  And so I would, we would ask the Court to allow us

1   to pursue some degree of very limited and narrow pretrial

2   discovery.

3         CHIEF JUDGE DAVIS:  That doesn't require depositions,

4   does it?

5         MR. TAYLOR:  It, it, we have --

6         CHIEF JUDGE DAVIS:  It wouldn't require it.  I mean,

7   you could do it without depositions?

8         MR. TAYLOR:  Yeah.  Well, we have found depositions to

9   be helpful, Your Honor, and --

10        CHIEF JUDGE DAVIS:  Sure it is helpful.  But as I

11  said, from the standpoint of the Court's desire to balance due

12  process with the need to expedite a long-delayed matter, if the

13  Court chose not to permit discovery, how would do you that?  I

14  mean excuse me, not to permit depositions, how would you do

15  that?

16        MR. TAYLOR:  Well, the way that we've done it in the

17  past is we have consulted with counsel and we've agreed upon or

18  developed an agreement regarding who a special master would be.

19  We've considered that.  And that's what we did in Florida.  And

20  then we would pursue some limited, straightforward discovery

21  from the standpoint of some interrogatories, possibly, and

22  document requests so that we could gather information that would

23  be helpful in us being able to determine and tease out the real

24  damages that are at issue here.  And then we would file motions,

25  pretrial motions on various issues that may come up during the

```
 1   course of that process, and then we would suggest that we have
 2   some basic evidentiary hearing that would be non-jury, but just
 3   an evidentiary -- because some of the non-remediation damages
 4   even under this construct that the judge is considering, would
 5   likely require some response from us that would need to be
 6   decided by some, either the special master or one of Your
 7   Honors.
 8           CHIEF JUDGE DAVIS:  What do you say to plaintiff's
 9   suggestion that the rules only require a limited number of days'
10   notice prior to a determination being made at a hearing for
11   entry of judgment after default and that you having any
12   discovery is a windfall?  That's sort of the way I interpret
13   what they say.
14           MR. TAYLOR:  I think, having gone through the process
15   that we've gone through in both Florida and Louisiana, we
16   disagree with the plaintiffs's view that we should not have any
17   discovery.  We believe that there are issues that still need to
18   be resolved.  Some of those that the Court has already focused
19   upon.
20           CHIEF JUDGE DAVIS:  But do the Federal Rules of Civil
21   Procedure contemplate such discovery?
22           MR. TAYLOR:  Rule 55(b), Your Honor, provides this
23   Court with a lot of latitude in regards to how you resolve this
24   particular matter.  However, it also, I believe, requires some
25   adherence to Constitutional due process.  And I believe the due
```

18

1    process aspect of that would require the Court to allow us some

2    degree of discovery into the basis for the claims that the

3    plaintiffs will be making in regards to --

4              CHIEF JUDGE DAVIS:  Non-remediation.  For

5    non-remediation?

6              MR. TAYLOR:  Non-remediation.  And I understand that

7    I'm constrained in regards to our arguments regarding

8    remediation, but I would just like to remind the Court that even

9    in regards to remediation, you have the four different

10   categories of individuals who have different injuries and

11   losses, and then you have issues of bankruptcy, you've got

12   issues of foreclosure, and you've got issues of causation

13   regarding whether or not the drywall that was in the home caused

14   that foreclosure or the drywall that was in the home caused that

15   bankruptcy.  We have found in some of the depositions --

16             CHIEF JUDGE DAVIS:  How are you going to get to that?

17             MR. TAYLOR:  Well, we have found some, in of the

18   depositions we've taken Your Honor, that folks have said that

19   foreclosure caused -- that the drywall caused them to foreclose

20   on their property -- and I don't have my notes right here in

21   front of me and I don't want to take the Court's time to run and

22   find them, but -- and then we found out that it was at a

23   different time when the foreclosure occurred and didn't have

24   anything to do with the aspects of the drywall.  And so, I mean,

25   in those kinds of situations, Your Honor, I think we have the

1  right to due process in order to tease out that kind of

2  information.

3          CHIEF JUDGE DAVIS:  I kind of took you in a different

4  direction for a moment, but --

5          MR. TAYLOR:  That's all right.

6          CHIEF JUDGE DAVIS:  -- if I chose to proceed down the

7  special master route, you suggest there would be consultation,

8  agreement on a special master, and then within the parameters

9  the Court set, submission of information to the special master

10 for a determination on non-remediation damages, and if the Court

11 decided to do so, perhaps even with respect to some of these

12 ancillary remediation issues that you've raised like setoffs and

13 bankruptcies?

14         MR. TAYLOR:  That's correct, Your Honor.

15         CHIEF JUDGE DAVIS:  Mr. Taylor, will you give me just

16 a moment?

17         MR. TAYLOR:  Yes.  No problem.

18         CHIEF JUDGE DAVIS:  What is your view of the other

19 types of damages claims that are at issue?

20         MR. TAYLOR:  There are many, Your Honor.  There is

21 loss of enjoyment of the property, alternative living expenses.

22 Could be...

23         Well, the ones I've already raised:  Foreclosure and

24 bankruptcy and setoffs and that kind of thing.

25         (Judge Davis and Judge Krask conferred.)

1      MAGISTRATE JUDGE KRASK:  Mr. Taylor, could you tell me

2  whether the defendants agree that product identity is or is not

3  an issue?

4      MR. TAYLOR:  Your Honor, the current state of the

5  record in this case in Virginia is that product ID is not an

6  issue.

7      MAGISTRATE JUDGE KRASK:  Thank you.  And what is the

8  defendant's position, if you can contrast it, to the plaintiff's

9  position with respect to whether parties who have completely

10 remediated are entitled to pursue recovery under the formula or

11 whether that has to be determined another way?

12     MR. TAYLOR:  Our position is that plaintiffs who have

13 already remediated have the right to get their actual costs of

14 remediation.  To decide otherwise risks the possibility of that

15 grouping of individuals receiving a windfall.  Because the

16 remediation formula may end up being more, much more, than the

17 costs of remediation.  And when you're trying to get

18 individualized damages as is required in Virginia, that our

19 damages that are asserted to a reasonable certainty, the costs

20 of the remediation that they incurred would be their

21 individualized costs that should be provided to them.

22     MAGISTRATE JUDGE KRASK:  And with respect to

23 individuals who have partly remediated, what is your view with

24 respect to the use of the formula as to them?

25     MR. TAYLOR:  Your Honor, you know, you kind of hit

```
1   right into my wheelhouse this time, because in regards to
2   partial remediation, that opens up a wide range of issues that
3   would need to be explored in regards to what was remediated,
4   what was the scope of the remediation, what additional
5   remediation might be needed.  And we would need to be able to
6   have discovery in order to figure that out.
7           But in regards to partial remediation, we would
8   contend that we would need discovery to figure out what those
9   costs are and what additional remediation would be required.
10          MAGISTRATE JUDGE KRASK:  Now, is the logic of Judge
11  Fallon's prior rulings, however, that partial remediation isn't
12  sufficient and basically the plaintiff is going to have to go
13  back to square one and everything's going to have to be torn out
14  in using his formula?
15          MR. TAYLOR:  Well, Your Honor, Judge Fallon has said
16  that, but I think that depends on what's meant by partial
17  remediation.  And that's what I mean by the fact that we would
18  need to explore that.  Because it turns out, just for the
19  Court's edification, and I don't think that we will be, there
20  will be in any disagreement on this -- that at one point many of
21  the individuals who were involved, for example, in the Florida
22  litigation, are involved in the Florida litigation, the
23  claimants, when they provided their profile forms, indicated
24  their homes were completely remediated.  But then the Court
25  issued a ruling that there may be some -- if you've only
```

1  partially remediated, then there may be some damages that need

2  to be, needs to -- if you completely remediated you don't get

3  the formula.  I'm sorry, I said it the wrong way.  And then they

4  changed their answers and said oh, no, we only partially

5  remediated.  Well, I think we have a right to explore that as to

6  why on one hand you would verify that you completely remediated,

7  but when the court says that if you've completely remediated you

8  don't get the formula now you've only partially remediated.  And

9  I don't know how much of that kind of result we would find here

10  in Virginia, but we would want to look at the profile forms,

11  figure that out, and then determine whether or not there's some

12  degree of discovery we need to pursue in order to determine why

13  there is that discrepancy.

14          MAGISTRATE JUDGE KRASK:  Do you have any information

15  as you stand there today as to how the Virginia plaintiffs

16  before this court actually break down in terms of who has

17  remediated, either fully or partly, or who hasn't remediated at

18  all?

19          MR. TAYLOR:  We have what we think is accurate data,

20  Your Honor.

21          MAGISTRATE JUDGE KRASK:  Can you give me some sense of

22  that?

23          MR. TAYLOR:  Yes, sir.  We believe that only 73 out of

24  the 175 Virginia claimants who currently own property that was

25  constructed with Taishan drywall have remediated.  And I'm

1    sorry, let me say it this way:  73 out of 175 Virginia claimants

2    currently own properties that were constructed with Taishan

3    drywall.  So you've got 73.  52 of those have already

4    remediated, although two have said that their remediation

5    projects are complete.  And then of the 102 former owners, the

6    remaining of the 175 is 102, 23 have already remediated.  That

7    is, they have incurred some actual remediation costs.  Those are

8    the best figures we have.

9            MAGISTRATE JUDGE KRASK:  Thank you for those numbers.

10           Those are all the questions I have for you.  Thank

11   you, Mr. Taylor.

12           CHIEF JUDGE DAVIS:  Mr. Taylor, if you've partially

13   remediated, you don't have, you haven't gone through the

14   certification process?

15           MR. TAYLOR:  Wouldn't be a certification process by

16   us, of course --

17           CHIEF JUDGE DAVIS:  No.  No.  I mean --

18           MR. TAYLOR:  -- you mean a certification --

19           CHIEF JUDGE DAVIS:  I should have been clearer.

20           The full remediation.  HEPA filter cleaning --

21           MR. TAYLOR:  Sure.  Understood.

22           CHIEF JUDGE DAVIS:  -- correctly, in quotes, done.  If

23   you haven't done that, what impact does that have on the value

24   of the home and the ability to sell it and your use of the

25   property?

1          MR. TAYLOR:  I think, I think it varies, Your Honor.

2    We don't know how many of the folks who originally told us that

3    they had completely remediated and then said they partially

4    remediated, went through the certification process, we don't

5    know the answer to that at this point.  At least I don't have it

6    in front of me right now.  What the Court is getting to is the

7    issue of stigma in regards to the ability to sell the home.  And

8    we have pursued some expert -- or provided some expert testimony

9    in the case in Florida that indicates that stigma is not

10   something that these plaintiffs have incurred as a result -- I

11   mean as a result of remediation.  And that generally when they

12   have completely remediated, whether they have certification or

13   not, it doesn't appear to have an impact on the value of the

14   home.

15          Now, I know as I stand here that counsel will, can

16   provide other testimony that disagrees with that.  But I'm just

17   responding to the Court's question in regards to our

18   understanding of the impact of that situation on the claimants.

19          CHIEF JUDGE DAVIS:  Getting back to the

20   non-remediation damages --

21          MR. TAYLOR:  Yes.

22          CHIEF JUDGE DAVIS:  -- and plaintiff's assertion that

23   the special master's determinations in the settlement

24   proceedings could have an essentially preclusive effect such

25   that this Court could rely on those special master settlement

1  determinations and not have to go through further hearings, with

2  respect to that view offered by plaintiffs, plaintiffs have

3  suggested that you have the opportunity to participate if you

4  chose in that proceeding; that non- -- in that determination

5  process, I'll call it.  And you say you didn't.

6          MR. TAYLOR:  That's correct, Your Honor.

7          CHIEF JUDGE DAVIS:  So let me ask this:  Prior to that

8  occurring, did defendants know that that process with the

9  special master regarding the settlement figure of apportionment

10  or determination was being made?

11          MR. TAYLOR:  I don't believe we did, Your Honor.  I

12  don't believe Taishan knew.

13          CHIEF JUDGE DAVIS:  Taishan did not know about that?

14          MR. TAYLOR:  That's correct.

15          CHIEF JUDGE DAVIS:  Okay.  Was it on a docket?  A

16  court docket?

17          MR. TAYLOR:  That I don't know if it was on the docket

18  or not.

19          CHIEF JUDGE DAVIS:  But they didn't have direct...

20          MR. TAYLOR:  I don't, I don't -- I don't want to say

21  it wasn't because I don't know.  I just don't believe we knew

22  anything about it.

23          CHIEF JUDGE DAVIS:  But your client's position is they

24  didn't specifically know about it?

25          MR. TAYLOR:  That's correct, Your Honor.

1          CHIEF JUDGE DAVIS:  Well I guess that ends my inquiry,

2   if they had no knowledge of it and you don't know if it's on the

3   docket.

4          MR. TAYLOR:  I believe that's correct, Your Honor.

5   And we will go back and look at the record, but it's my

6   understanding as I stand here in front of the Court that we were

7   not aware that that settlement process was going on, and were

8   not invited to be involved in it.  As a matter of fact, Your

9   Honor, not only were we not a party, but we had no stake in the

10  amount that was being paid in settlements because it was being

11  paid by other individuals, not by us.  And therefore we don't

12  believe it should have any preclusive effect on us.

13          And also, Your Honor, there were documents that were

14  generated during that period of time.  We since have had an

15  opportunity to look at the documents that the claimants

16  submitted in regards to supporting their claims, and it looks

17  like some of the documents are not complete.  They do not

18  provide complete information.  We would want to have an

19  opportunity to look at that.  I mean, the settlement occurred I

20  believe five years ago or so, and so as far as that information

21  goes from five years ago, we can use -- that's a good starting

22  point, but we would want to have some additional information in

23  regards to what's happened since that time that may be relevant

24  to their claims for damages in the case and make sure that any

25  of the documents that were not complete, or when we looked

1  through the file that was provided to us are missing, that we

2  get a chance to get that information so that we can determine

3  what additional questioning we would want to pursue in regards

4  to making sure that we have the most accurate, up-to-date

5  information.

6         CHIEF JUDGE DAVIS:  Well, if that information is out

7  there and is available and if the Court determines that it's

8  going to not adopt the figures arrived at in that special master

9  settlement procedure but is going to allow some, something more,

10  I suppose that something could be as minimal as you have those

11  figures, and you, before a special master, get to ask some

12  questions of that plaintiff with no additional document

13  discovery or deposition discovery.  It could be as minor as

14  that, if the Court took that route, all the way up to paper

15  discovery or electronic discovery and depositions.  That

16  spectrum is available to the Court.  But it could be just as

17  simple as you've got those figures, and you get to have a

18  special master deposition, essentially, a special master

19  hearing, where you get to ask those questions to clarify what

20  may have changed or the accuracy of that determination from the

21  settlement special master.

22         MR. TAYLOR:  Understood, Your Honor.  The only point I

23  would bring to the Court's attention, and I may have said this

24  earlier, but in regards to non-remediation damages in

25  particular, the judges in Florida and in Louisiana have allowed

1  us to pursue some additional actual discovery, actual requests

2  for documents and actual -- some very short depositions.  These

3  depositions --

4          CHIEF JUDGE DAVIS:  I'm sorry, Mr. Taylor.  Now, did

5  they have that special master's preliminary, what you would call

6  a preliminary baseline, maybe?

7          MR. TAYLOR:  No, sir.

8          CHIEF JUDGE DAVIS:  They didn't have that?

9          MR. TAYLOR:  They did not.

10          But what we have found -- and I understand that the

11  Court wants to ensure that we don't stretch this out for any

12  long period of time, and I'm sensitive to that, we're sensitive

13  to that, Your Honor, but the Court should know that, for

14  example, the courts in -- the judge in Florida has allowed us to

15  pursue some additional discovery.  And that's 1,700 cases that

16  are at stake there.  But there are 20 -- more than double of

17  what we're asking the Court to allow us to do here -- only 20

18  priority claimants or 20 priority claimants that we're pursuing

19  that discovery in regards to.  And it was very short.  It

20  occurred in a very short period of time.  The depositions were

21  very brief.  We were able to stay on the court's schedule in

22  that regard.  I mean, we started that process in January of this

23  year, as I recall, and right now we're scheduled for a very

24  short evidentiary trial in July.

25          CHIEF JUDGE DAVIS:  Speaking of Florida, tell me

1  what's going on there that could impact this case.  Is there

2  any -- you know, are you all in any court-sponsored mediation or

3  settlement conference there?  Are you expecting any new

4  determinative rulings that are particularly significant as

5  relevant to our litigation from Judge Cooke, for example?  Those

6  kind of things.

7        MR. TAYLOR:  Your Honor -- and I'm certain that

8  plaintiff's counsel will join me in this:  First, we have had --

9  remember in Florida we have the PID issues, and there was a

10 special master appointed, and the special master has made a

11 report with regards to the categories of drywall that the

12 plaintiffs can pursue in regards to Taishan dealing with setoffs

13 and other issues, the next determination we think is going to

14 come out, the report that we think is going to come out some

15 time in May.

16        But the Court has hit the nail on the head in regards

17 to what we're really trying to do here.  And that is to get

18 these cases resolved.  And in Florida, what's happening is that

19 the Court has determined that we should go through mandatory

20 mediation, and that mandatory mediation is scheduled for

21 May 22nd and 23rd.  And this is the part that I think counsel

22 would agree with me, we are all approaching that mediation in

23 good faith on both sides.

24        CHIEF JUDGE DAVIS:  So you have two tracks going at

25 the same time?  Two tracks; that is, mediation track and

 1  litigation track?

 2          MR. TAYLOR:  That's right.  The mediation is before we

 3  go into the actual evidentiary hearings.  And so it will be

 4  after we've completed all discovery, which we just about have,

 5  and then we will go through mediation.  And as I was saying, I

 6  think we are both looking at that as an opportunity to get these

 7  cases resolved.  And I know that at least Mr. Serpe will be

 8  participating, and I assume that during that participation we'll

 9  be discussing these Virginia cases also.

10          CHIEF JUDGE DAVIS:  Oh, really?

11          MR. TAYLOR:  I assume that.  I believe that's correct.

12          CHIEF JUDGE DAVIS:  You're happy to do it, in other

13  words?

14          MR. TAYLOR:  We're happy to do that.

15          CHIEF JUDGE DAVIS:  I see.

16          Mr. Taylor, thank you very much for answering my

17  questions.

18          MR. TAYLOR:  I appreciate it very much, Your Honor.

19          Your Honor can I, can I -- would you indulge me for

20  just one second?  You started off with this issue of the bad

21  conduct, and I just wanted to tell the Court that Taishan has

22  paid its price for that conduct; that we have suffered the

23  consequences of being in default; that we return to this

24  litigation in an attempt to get this matter resolved.  We have

25  resolved cases in Alabama.  We have resolved cases in Florida.

1  And Your Honor, we have actually resolved cases right here in

2  Virginia.  So what's in the past is in the past.  But we, going

3  forward, have tried to do what we could do to work with the

4  plaintiffs in order to get this matter resolved.  And I just

5  wanted to be sure that the Court understood that before I sat

6  down.

7          CHIEF JUDGE DAVIS:  Well, I understand.  But I must

8  tell you, as I said earlier, those protestations

9  notwithstanding, the odor that is left with the Court out of

10  what I perceive as efforts to re-litigate, re-litigate,

11  re-litigate, doesn't really ring with the sound of, We want to

12  resolve these.

13          MR. TAYLOR:  Understood, Your Honor.

14          CHIEF JUDGE DAVIS:  But I understand.

15          I should say I don't know what's going on behind the

16  scenes, and you know, I probably shouldn't know what's going on

17  with any specificity behind the scenes.  And I'm not prejudging.

18  I walked in here today and I thought I could sit here and just

19  let you start and walk through and hit your high points from

20  your brief, but you know, I've read it, and I thought you

21  deserved to know the things I was particularly interested in,

22  and felt there was no need for you to just rehash what you had

23  already written.

24          MR. TAYLOR:  Yes, Your Honor.

25          CHIEF JUDGE DAVIS:  So I really do appreciate your

1   responses.

2          Ms. Duggan, I think maybe it would be best that we, I

3   think it might be best for everybody if we go ahead and hear

4   from the remaining defense counsel first and then let you

5   respond.

6          MR. TAYLOR:  Your Honor, thank you very much for

7   letting us come and discuss Taishan's position with you.

8          CHIEF JUDGE DAVIS:  Yes, sir.

9          MR. TAYLOR:  Appreciate it.

10         MR. STENGEL:  Good morning, Your Honor.  Jim Stengel

11  from Orrick Harrington for BNBM.

12         CHIEF JUDGE DAVIS:  Good morning.

13         MR. STENGEL:  The first point I want to make is

14  informational.  I don't think this would be controversial.  Your

15  Honor, I think, is aware we challenged on behalf of our clients,

16  both the BNBM and CNBM clients, personal jurisdiction before

17  Judge Fallon.  He denied in part, granted in part those motions,

18  but certified his determination at 1292(b) in part I think

19  because of the complexity of the record.  It took a long time

20  for the record to be transferred to the Fifth Circuit.  That's

21  happened.  We're in the process of briefing.  I suspect there

22  may be adjournments, extensions of time for the parties.  I

23  think we're all relatively comfortable we'll have the briefing

24  completed by August of this year.  Oral argument will follow

25  probably within a two- or three-month cycle.  And when the Fifth

1   Circuit will decide -- it's a fairly complicated case involving

2   cases in multiple jurisdictions -- I wouldn't even hazard a

3   guess.  But the Circuit has been reasonably quick in getting

4   decisions back.  So that's just by way of making sure this

5   Court's aware there is another, an additional parallel path

6   going on with respect to my client here, which is only BNBM

7   Company, which is here exclusively on a derivative basis,

8   because we didn't sell any product in Virginia, we're only here

9   under a purported agency theory with Taishan.

10          I agree with what Mr. Taylor had to say.  I don't want

11  to repeat anything he's said.  But I do think -- and I

12  appreciate your judges' candor in where you came in today

13  thinking about our clients and where this litigation was.  And

14  we're also sensitive, Judge Fallon reminds us repeatedly, that

15  the litigation has gone on for 10 years.  Judge Cooke was

16  somewhat more pointed when we appeared before her the first time

17  in the Southern District of Florida in asking the question of

18  all of us, "Just what have you people been doing?"  And it's not

19  productive, probably, to revisit how the time passed.  But I

20  think it's also useful from the defense perspective necessary

21  for us to say, look, we are trying to find a way out of this

22  that may involve a resolution, it may very well not.  We may

23  have to litigate these cases to conclusion.  And the suggestions

24  we've made in the context of litigating these cases to

25  conclusion we think are expeditious and are designed to get us

1   to a quick resolution.  At the same time, we are unwilling to

2   forego due process rights of our clients.  And again, I don't

3   want to repeat what Mr. Taylor said, he covered most of these

4   issues and I think addressed Your Honor's questions, but taking

5   as an example a point of departure the Germano case, BNBM wasn't

6   a party in Germano.  Not because we chose not to appear.  We

7   weren't named.  So coupling that with Judge Fallon's admonition

8   that the findings in Germano would have no preclusive effect

9   beyond the four corners of the intervenor's case, there's

10  obviously a starting point of a real due process concern.

11        So our view is we need to find a path -- and we think

12  the defendant's proposal of going with true bell-weathers for

13  the first time in this case and on a very expedited schedule

14  allows us to get to closure in a way that is responsible and

15  respectful of due process rights of both sides.

16        Now, I don't think it was an accident that Judge

17  Fallon rendered essentially an advisory opinion in the

18  application of the formula and the remand to the courts.

19  Whether it was an overly cautious application of lexicon,

20  whether I think perhaps also part of it a recognition that a

21  formula in a class setting -- we could talk at length about the

22  unique natures of this class -- is a dangerous proposition.  The

23  Supreme Court's recognized that and, well, that's not so much

24  enticing us, I suspect, but prior cases, the high-water mark of

25  formulaic resolution in class probably happened with Marcos 20

1   years ago and the courts have not gone back there in the

2   circuits like the Fifth.  And cases like Chevron have been very

3   dismissive of even that as a starting point.

4           The problem here is acute because we do have various

5   state legal regimes that determine, in our view, which

6   plaintiffs are entitled to what.  And it's not us saying they're

7   not entitled to compensation.  It's us saying they are entitled

8   to compensation pursuant to the governing state law legal

9   regimes in which their properties exist.  That means it's not

10  just idle speculation to say if you've completely remediated

11  your property and that cost you $50,000, there's something very

12  wrong from the due process perspective in giving you $150,000

13  under a formula.  Which is proof that the formula doesn't work.

14  It's a square peg in a round hole for these purpose.

15          CHIEF JUDGE DAVIS:  Well, let me ask you this:

16  Suppose the Court were to agree with you that Judge Fallon's

17  remand, suggestion of remand rendered an advisory opinion on the

18  formula and figures arrived at and determined that sufficient

19  due process would be afforded by simply -- maybe not simply, but

20  by allowing a limited presentation to a special master with

21  respect to setoffs, foreclosures, bankruptcies and then an

22  ultimate remediation determination, why isn't that, even under

23  your view, sufficient due process?

24          MR. STENGEL:  Well, I think we have to sort of dissect

25  the plaintiff population in the four categories Mr. Taylor

1  talked about, because I think there are different rules that

2  would have to apply to each.

3          As to people who have remediated their properties, if

4  we had an opportunity to -- putting all the evidence of setoffs,

5  bankruptcies, et cetera, and they were put to the proof of what

6  they actually expended to remediate the property, I would

7  probably still have an objection, but at the end of day have to

8  admit we're getting pretty close to the zone of honoring due

9  process by doing that.

10          As we go to people who are former owners -- and I

11  should say just by example, we're still litigating the

12  applicability of former owners before Judge Fallon.  So there's

13  a lot still indeterminate here.

14          But as to former owners who did not remediate, I think

15  under any of the state law legal regimes that are relevant here

16  the issue would be not, You get the formula, which make no sense

17  since you by definition have not remediated and never will, is

18  was there a diminution in market value?  Because some of these

19  people may have sold their properties without the buyer knowing

20  there was any problem with the property, and they're, by

21  definition, uninjured.  And it would be a due process violation

22  again to allow those people to recover the value of the formula

23  for a loss they never suffered.

24          If they are a current owner and haven't remediated, I

25  think there's a threshold issue about, with the passage of time,

1    needing to put on some demonstration of why they need to

2    remediate at this point.  I think an individualized estimate of

3    what's reasonably expected to remediate a property is

4    appropriate as opposed to saying let's take these numbers which

5    have their origin in a handful of claimants which are in no way

6    representative of an overall population in Norfolk, Virginia,

7    which were presented to the other parties as not being

8    preclusive in terms of an event, an average which wasn't even

9    relevant to the individual awards of damages in Germano, and

10   sort of take that step-by-step-by-step and apply it to the

11   property of someone who is going to remediate and has access to

12   someone who can say this is what it's going to cost.

13          CHIEF JUDGE DAVIS:  But aren't you attributing way too

14   much -- in making that statement, aren't you attributing way too

15   much to what happened in the MDL proceeding?  If I understood

16   correctly, all that happened was that experts looked at that

17   base 86-dollar figure as a starting point.  They didn't just say

18   that's it.  I mean, there was further factual and expert

19   development that went into the determination of their figure.

20   Did I miss something there?

21          MR. STENGEL:  Well, Your Honor, and I don't want to

22   use a rude analogy here, but if you start with a defective

23   presumption to start, there's no way even infinite numbers of

24   iterations of expert application and consideration are going to

25   fix that.  I mean, yes --

1        CHIEF JUDGE DAVIS:  How can it be -- but how can it be

2   said that that is a defective presumption when the fact-finder

3   listened to the presentation of evidence regarding the methods

4   of determining, with respect to seven different properties, what

5   the costs of remediation were with all the various permutations

6   of remediation methods and costs and thereby gained a

7   significant appreciation and understanding for the costs and the

8   methods before listening to additional evidence and reaching a

9   determination?  How can it be said that that's defective?

10  That's what I keep coming back to.  You know, the level of

11  precision that you seem to want belies the realities of the MDL

12  process.  And we keep running up against that.

13        MR. STENGEL:  Well, Your Honor, I don't think it's

14  necessarily excessive precision.  Because let's go back to what

15  happened in Germano.  The eighty-six-dollar figure was not used

16  to assess damage as to any of the intervenors.  It was an

17  after-the-fact observation by Judge Fallon of that's what these

18  properties in Norfolk, Virginia --

19        CHIEF JUDGE DAVIS:  Maybe it was a, "Hey, by the way,

20  this may be a good place to start for reaching some

21  determination.  We've already tried seven cases, I know a lot

22  about this, I've heard a lot of testimony, and that's not a bad

23  place to start"?

24        MR. STENGEL:  Well, Your Honor is in a better position

25  to speculate than I am.  I don't think there's any record that's

1   in fact what happened.  I do think it's important to remember

2   that Germano and -- don't need to get into the fault on this --

3   Germano was not an adversarial proceeding.  Taishan chose not to

4   participate, and what occurred occurred.  But what we're getting

5   into really, Your Honor, is what the MDL process was supposed to

6   produce and again, the basic question of propriety of damages by

7   averages or damages by formula.  We think the Circuit Court

8   record on this, the Supreme Court record on this is quite clear:

9   Courts operate or need to operate with substantial caution if

10  they're going to go down that path.  Here with a record that has

11  twists and turns in terms of how or what preclusive effect is to

12  be given to Germano in the first place, piling on adjustments

13  through means and other mechanisms, doesn't get us to a place

14  where those damages are accurate, and it ignores the fundamental

15  problem of having this four-fold division of the population

16  where substantial numbers of those people, these formulas by

17  definition can't really apply.  And that, I think, is a clear

18  violation to say we're going to essentially make an award based

19  on nothing other than the extension of the formula, which on its

20  terms as a matter of state law does not apply to you.

21          CHIEF JUDGE DAVIS:  Well, you've pointed out the

22  various levels of due process considerations as you drill down

23  into the use of the formula.

24          It's helpful for me to remember that Judge Fallon said

25  in his April 21st, 2017 ruling, No. MDL2047, this:  "In 2010, in

1  the Germano litigation, Verman and Wright established that the

2  cost of remediating the seven Germano homes was $86 per square

3  foot."  And then, "Over the following years of experience with

4  many Chinese drywall properties in several states, plaintiff's

5  expert and his firm, Verman & Wright, have found that $86 per

6  square foot is a reliable measure of the costs on a square foot

7  basis for a full-scope remediation of Chinese drywall properties

8  when adjusted for location and time."  So that's the quote.

9         So when it's suggested to me as I look at the

10  iterations of due process concerns here that Virginia law

11  requires reasonable certainty and that Fourth Circuit law

12  requires the Court to drill down into this determination, I find

13  those arguments really problematic in light of Judge Fallon's

14  determination as just noted and further developed, and in light

15  the Fourth Circuit law directing me not to retry determinations

16  of the MDL Court.  Even if I disagree with them, that's the

17  thing -- I'm not saying I do, that I do disagree with them --

18  but that seems to be the state of the Fourth Circuit's case law.

19         MR. STENGEL:  Well, Your Honor, that would be true I

20  think if Judge Fallon had purported to make this a binding

21  determination on the entire population of MDL cases.  He made

22  the application of the formula as a matter of an advisory

23  opinion.

24         CHIEF JUDGE DAVIS:  Okay.  Let me stop you there.  I'm

25  sorry, but I want to drill down here.

```
 1            If he made a determination in the MDL but then in the
 2   suggestion of remand characterizes it, as you say, advisory,
 3   does that somehow negate what he determined in the MDL
 4   proceeding?  Can he negate it in that fashion just simply on the
 5   suggestion of remand?
 6            MR. STENGEL:  I don't think it negates what he found
 7   in the proceeding in the case before him, but what it does
 8   suggest to the transferor courts is I'm not suggesting that my
 9   determination of the formula should be applied to determine
10   remediation damages necessarily applies.  And again, I don't
11   know -- he doesn't say why he issues that warning or that
12   caution.  Again, it may be a concern about lexicon, I don't
13   know.  I'm speculating.  But it seems to me that -- to unpack
14   this, let's go back.  Your Honor's correct, obviously, on the
15   Fourth Circuit law.  Reasonable certainty.  But our submission
16   would be we know as to three of the four cells of claimants
17   here, you can't argue reasonable certainty for a damage model
18   that simply does not fit as a matter of state law.  So it
19   doesn't matter if we think the average is swell.  If your damage
20   entitlement as a matter of Virginia state law is diminution of
21   value of your property when you sold it because you cannot, you
22   did not remediate, then there's no reasonable certainty as to
23   the value of the formulaic damages calculated by Judge Fallon.
24   So that's our first level objection.  When you look at the
25   population of claimants, you know you've got a group you can't
```

1   even -- worse case from our perspective, Your Honor, is we would

2   not be talking about those people who actually remediated.  And

3   we think as to those, the issue as a matter of state law is also

4   clear.  And I'm leaving aside the complication of the partial

5   remediation for the moment.  But if you have remediated

6   presumably to your satisfaction, if you've disclosed that your

7   property is completely remediated, why is the formula even

8   relevant?  It's not, as a matter of state law.  So reasonable

9   certainty again has no application in that context, because

10  what's at issue is I spent $75,000 to remediate my home.  That's

11  what I'm entitled to recover.  Leaving aside -- and I don't want

12  to leave aside completely the other categories of damages, but I

13  think they have significance in terms of how this Court

14  determines to adjudicate these cases going forward.  The

15  big-ticket items before Judge Fallon were loss of use and

16  enjoyment, alternative living expenses.  He conceded, and I

17  believe the plaintiffs did in that case, is those would be

18  matters of individual adjudication.  Our position is these all

19  relate to property damage relating to allegedly defective

20  Chinese drywall.  So we weren't going to be able to have a

21  judgment for any particular claimant until all these individual

22  adjudications had taken place.  And we're still in the process

23  of arguing what the table is going to be looking like in

24  Louisiana right now, but I think it's fair to say one of the

25  reasons we devolved to bell-weathers, knowing that that causes

1  some pain for the Court because of the passage of time, is that

2  allows us to actually get to judgments on individual cases

3  concerning all the matters, all of the evidence that's relevant,

4  giving us due process rights, making sure the plaintiffs are

5  fully compensated, have a chance to put on their cases.

6  CHIEF JUDGE DAVIS:  Well, if the factual determination

7  is an average arrived at in the seven Germano cases were not a

8  sufficient basis at least as a starting point for determination

9  of an average, then how are bell-weathers going to do it for

10  you?

11  MR. STENGEL:  First of all, let me be clear I'm

12  talking about bell-weathers in the now-conventional sense of

13  non-binding.  We're not advocating we redo a formula.  It's not

14  acceptable from our perspective -- and I don't want to repeat

15  the ground we've both trodden at length here -- but Germano is

16  not a chosen representative group of intervenors.  They

17  intervened.  Small number of cases in one limited geographic

18  location, not purporting to be representative even of Virginia

19  cases.  It was not an adversarial proceeding.  Now, that may

20  have been Taishan's fault, but that's a fact.  Now we're looking

21  at the suggestion that we have bell-weathers where we all get to

22  show up, we put on the appropriate evidence; to the extent there

23  are experts on diminution of value; plaintiffs want to come in

24  and prove up their loss of enjoyment, that's all relevant and

25  necessary to get to full claim value.  If we don't to that, with

1   respect, Your Honor, we're wasting our time.

2          CHIEF JUDGE DAVIS:  Well, it's better me not to

3   respond to that, I think.

4          Well, Mr. Stengel, thank you very much for your

5   answers.

6          MR. STENGEL:  Thank you very much, Your Honor.

7          CHIEF JUDGE DAVIS:  I appreciate it.

8          Anything else from anyone else on the defense side?

9          I think we might benefit from a break.  Let's come

10  back and hear from you, Ms. Duggan.

11         (Recess taken from 11:18 a.m. to 11:41 a.m.)

12         MS. DUGGAN:  Good morning, Judge Davis.  Good morning

13  Judge Krask.  May it please the Court.  Sandra Duggan for the

14  plaintiffs.

15         CHIEF JUDGE DAVIS:  Good morning.

16         MS. DUGGAN:  Your Honor, we've been litigating these

17  claims for 10 years.  Judge Fallon certified the Amorin class of

18  current and former owners of properties with Taishan Chinese

19  drywall September 25th, 2014.  Shortly thereafter, the court

20  scheduled an evidentiary hearing to assess class-wide damages.

21  When BNBM first entered the litigation on February 12, 2015,

22  BNBM asked for an adjournment of that hearing.  Taishan

23  reentered litigation shortly thereafter and they were given an

24  opportunity to conduct discovery, took our experts' deposition,

25  they put up their own experts, they were given the opportunity

1  to present evidence at the hearing that occurred on June 9,

2  2015.  All of these arguments you've heard today were previously

3  made to Judge Fallon.  The defendants' submitted proposed

4  findings of fact, conclusions of law.  They moved to decertify

5  the Amorin class.  That was denied.  They moved to certify

6  1292(b) appeal of that decision.  That was denied.  We are

7  finally here 10 years later before Your Honor to calculate

8  class-wide damages for the Virginia homeowners.  It's a simple

9  calculation.  You need to know what's the square footage of

10  properties, which we already know.  There's been discovery in

11  this case --

12          CHIEF JUDGE DAVIS:  How many properties are there?  Is

13  it 175?

14          MS. DUGGAN:  175.  And in the MDL the defendants

15  agreed to PTO11A which was a supplemental plaintiff profile

16  form.  All of the information was filled out by the plaintiffs,

17  including for the Virginia residents, in the MDL, and their

18  information, their evidence of square footage, their evidence of

19  ownership has been uploaded to the BrownGreer portal to which

20  defendants have access.  The special master in Florida, for

21  example, now has access to that information.  So that discovery

22  has already taken place.

23          CHIEF JUDGE DAVIS:  So if the home has been sold

24  twice, for example, 175 properties and 175 plaintiffs we're

25  dealing with.  So it's not as if a home is sold a couple times

1   you've got multiple plaintiffs or...

2           MS. DUGGAN:  In some instances there may be multiple

3   claimants to one specific property.  But the plaintiffs have

4   never suggested that the defendants would have to -- there would

5   be any kind of double payment on a unit of square footage.  In

6   other words, they would make one payment under the formula.  If

7   there were multiple contestants to that payment that would be

8   something that would have to be worked out.

9           CHIEF JUDGE DAVIS:  Where?  By who?

10          MS. DUGGAN:  Well, by a special master, for example.

11  But that's probably not going to occur, because in many

12  instances there would have been an assignment made, for example,

13  in which case if the assignment was made, then that particular

14  plaintiff would only have other losses, would not have a claim

15  to remediation damages.

16          CHIEF JUDGE DAVIS:  And in that portal that you

17  mentioned, are those kind of facts kept up-to-date?

18          MS. DUGGAN:  They are up to date if the plaintiffs

19  supplement their profile form, which they're required to do.

20  And what I would suggest is if the Court appoints a special

21  master, that we provide -- because these SPPFs were filled out

22  in March of 2018.  I would suggest that -- we did this recently

23  in Florida -- that the plaintiffs provide a spreadsheet with

24  updated square footage information and ownership information.

25  We submitted to the defendants one spreadsheet that had those

1  two questions answered.

2          CHIEF JUDGE DAVIS:  So defendants argue that the Court

3  needs to make additional determinations with respect to things

4  like the setoffs, bankruptcy, et cetera.  What is your view on

5  that?

6          MS. DUGGAN:  If I could address setoffs.  Judge Fallon

7  did contemplate setoffs would be appropriate, and the plaintiffs

8  agree.  If a plaintiff has already received a remediation

9  payment from a prior settlement, that would be a setoff.  And I

10 can tell you that with regard to 1,700 plaintiffs in Florida,

11 the parties were in agreement with virtually all of the numbers.

12 I think there were three that we did not agree on.  But with

13 regard to the rest, the parties were able, with the information

14 that we already have in the BrownGreer portal -- because you

15 have to remember that BrownGreer was the settlement

16 administrator for all the settlements.  All the information is

17 already there.  And we agreed as to the numbers.

18         CHIEF JUDGE DAVIS:  They were the administrator for

19 the Venture Supply --

20         MS. DUGGAN:  Garretson was the administrator for the

21 Venture Supply settlements in Virginia, but all of that data and

22 records and evidence has been transferred over to BrownGreer at

23 this point.  So it's all housed in one place.  And the

24 defendants have access to that.

25         CHIEF JUDGE DAVIS:  All right.  So we were talking

1  about setoff.  Keep going.

2          MS. DUGGAN:  And then with regard to the other losses,

3  that was not part of the class damages hearing and the class was

4  not certified for that purpose.  So we're only talking about

5  class-wide damages for remediation.  If a plaintiff has other

6  losses, those are separate.  And that's always been the case.

7          Now, if a plaintiff's damages are calculated --

8          CHIEF JUDGE DAVIS:  "They're separate" meaning they

9  are not within the scope of this litigation?

10          MS. DUGGAN:  They're in the scope of the litigation,

11  but they were not certified as part of the class.  Those were

12  individual damages that were separate.  The class was certified

13  for remediation damages, not for other losses.

14          CHIEF JUDGE DAVIS:  Okay.

15          MS. DUGGAN:  Because at the time, the defendants were

16  deliberately absent from the jurisdiction and we didn't know

17  they were coming back into the case, and it was easier to

18  certify an objective measure, square footage times the RS means,

19  national unit cost per square foot as a adjusted by the local

20  factor.  It was a means, a reasonable means for assessing

21  remediation damages, whereas the other losses would be more

22  individualized.

23          CHIEF JUDGE DAVIS:  Okay.  So what are the categories

24  of additional determination that the defendants contend the

25  Court should be involved in with respect to remediation other

1  than setoff?

2          MS. DUGGAN:  At this point?

3          CHIEF JUDGE DAVIS:  That the defendants contend.

4          MS. DUGGAN:  Well, at this point it really is a matter

5  of multiplying the RS means number as adjusted by the local

6  factor, by the square footage in the home.  It's an objective

7  measure.  There really is --

8          CHIEF JUDGE DAVIS:  Ms. Duggan, listen to me for a

9  second.  I'm sorry.

10          What is it, other than setoff, that the defendants

11  contend that this Court should engage in determining?  I

12  understand your position.

13          MS. DUGGAN:  I believe they're referring to other

14  losses, Your Honor.  In other words, they would be entitled to

15  discovery on the other losses of the plaintiffs.  They would

16  probably also want to take discovery on square footage and

17  discovery on ownership and a whole lot of of other things.

18          CHIEF JUDGE DAVIS:  They mentioned bankruptcy.

19          MS. DUGGAN:  I would put that as Other Loss.

20          CHIEF JUDGE DAVIS:  You heard those discussions

21  earlier today.

22          MS. DUGGAN:  Right.  But those are in the Other Loss

23  category.  So bankruptcies, foreclosures, move-in/move-out

24  costs, personal property loss, those are all in the Other Loss

25  category.

1        CHIEF JUDGE DAVIS:  And your position on that again is

2  what?

3        MS. DUGGAN:  Well, my position is that Virginia's

4  unique.  Unlike in Florida and Louisiana where there has been

5  discovery as to those other losses, in Virginia there was

6  already a process for vetting those damages, which the

7  defendants said they were not aware of.  I mean, it was a public

8  hearing, but they said they were not aware of that.

9        CHIEF JUDGE DAVIS:  Well, let's talk about that.  So

10  that proceeding was an effort by the special master on the

11  settlement was with respect to whom and what was done and why do

12  you contend that they had the opportunity and notice to

13  participate?

14        MS. DUGGAN:  There were four different Virginia

15  settlements that were certified by Judge Fallon in the MDL.  And

16  notice was sent to the class, it was a public notice, it was put

17  on the docket, and claimants were entitled to prove up their

18  other losses by filling out a claim form.  And then there was an

19  opportunity after the special master assessed the awards for

20  objections to occur, and that was again posted on the docket.

21        CHIEF JUDGE DAVIS:  Why would defendants, completely

22  different defendants than those that were settling participate

23  in such a proceeding?

24        MS. DUGGAN:  I understand their argument that they

25  didn't have an interest at the time in participating.  They were

1   in the litigation --

2          CHIEF JUDGE DAVIS:  No, that's my question.

3          MS. DUGGAN:  But I understand their argument.

4          CHIEF JUDGE DAVIS:  I'm asking you that question.

5          MS. DUGGAN:  I do understand that argument, Your

6   Honor.  And if Your Honor, if the Court disagrees that they did

7   not have sufficient interest to participating in that, then

8   there should be an opportunity for them to conduct limited

9   discovery with regard to -- or to challenge those Other Loss

10  figures.

11         CHIEF JUDGE DAVIS:  Do you wish to make any further

12  argument to me about why I should not agree with their position

13  on that?

14         MS. DUGGAN:  I think it's a judgment call within your

15  discretion, to be honest with you.  I do understand both sides.

16  These plaintiffs have been waiting a long time.  They have

17  already put forth all of their evidence it's part of a record.

18  There is a record.  It's all in the portal at this point.

19  Defendants have had access to it.  I certainly don't think

20  depositions are necessary.  And I would suggest to Your Honor

21  that once the remediation damages are calculated, which could be

22  done in short order, that each plaintiff should be given an

23  opportunity at that point to decide whether or not to pursue the

24  other losses.  Because again, while you would have setoffs with

25  regard to remediation damages, there would also be setoffs for

1   prior payments made to the plaintiffs for non-remediation

2   damages.

3          CHIEF JUDGE DAVIS:  So you're suggesting that there

4   shouldn't be two tracks going forward at the same time,

5   remediation or non-remediation, you're suggesting make the

6   remediation determination first?  That seems to counter your

7   desire to get things resolved as expeditiously as possible for

8   your clients.

9          MS. DUGGAN:  What I'm thinking when I say that it

10  could be done very shortly, within 30 to 60 days, those

11  calculations can be made because it's a mathematical calculation

12  at this point.  And the track could also proceed simultaneously

13  with regard to Other Losses, but the individual plaintiffs may

14  opt to forego those other losses and just accept the remediation

15  judgment.  The damages judgment.

16         CHIEF JUDGE DAVIS:   Okay.  So can you walk me through

17  an example of what it is -- so as I said to defense counsel,

18  assume that I agree that Judge Fallon made findings and that

19  they are a finding that this Court should adopt regarding

20  remediation formula and determinations, and yet there may be

21  some need for additional determinations by this Court in limited

22  categories affecting remediation that we've just discussed.

23  Walk me through, from your standpoint -- I know there's Appendix

24  A to your brief, but that's kind of, you know, we're down the

25  road -- walk me through what you think it would look like.

1   Should look like.

2           MS. DUGGAN:  With regard to the calculation?

3           CHIEF JUDGE DAVIS:  With regard to a plaintiff.

4           MS. DUGGAN:  With regard to the calculation of

5   remediation damages I would suggest to Your Honor that it

6   applies to current and former owners, and that if a plaintiff

7   completely remediated the property -- and it's my understanding

8   there are two out of 175 plaintiffs that completely remediated

9   their property -- they would be entitled to reimbursement of the

10  actual costs spent on that remediation.

11          And with regard to everyone else --

12          CHIEF JUDGE DAVIS:  When you say that they have

13  already remediated, you mean to the point that they have a

14  certificate?

15          MS. DUGGAN:  Yes.  To clarify, what we consider to be

16  complete remediation is, according to the protocol for the scope

17  of remediation that was already determined by Judge Fallon in

18  Germano, and that was on May 11, 2008, it's about 10 different

19  items that are required.  All of the drywall, not just the

20  Chinese drywall, but all of drywall has to be removed from the

21  home; all of the wiring, the HVAC system, the plumbing and

22  anything that has a button; the carpeting, the flooring, any

23  tile that was broken.  And in addition to all of that -- and the

24  insulation -- there has to be a certification, a clean-up that

25  occurs with a HEPA vacuum and a wet wipe-down of the house to

54

```
1  remove all the particulates, and a certification that it's

2  inhabitable -- it's habitable, excuse me.

3         CHIEF JUDGE DAVIS:  So we start with those two

4  completely remediated, and so your position is.

5         MS. DUGGAN:  They would be entitled to the actual

6  costs that they spent on the remediation and not the formula

7  damages.

8         CHIEF JUDGE DAVIS:  And why?

9         MS. DUGGAN:  Because under the law that's what they

10 would be entitled to.  That's what they're entitled to in

11 Florida.

12        CHIEF JUDGE DAVIS:  Under Judge --

13        MS. DUGGAN:  Cook's order, she says at Page 6 --

14        CHIEF JUDGE DAVIS:  What about Judge Fallon?  Has he

15 made that determination as part of the MDL?

16        MS. DUGGAN:  I don't know that he's been that

17 specific, to be honest with you.  Because we unfortunately

18 haven't gotten that far in the process right now of deciding the

19 competing trial plans that were argued to him.  But in Florida

20 we're a little further along on the calculation of remediation

21 damages.  And the order's at ECF 112, and on Page 6 Footnote 1

22 Judge Cooke says that the plaintiffs who completely remediated

23 their properties are entitled to actual costs; conversely, those

24 who did not completely remediate are entitled to formula

25 damages.  And we contend that those who did not completely
```

1  remediate include those two:  Never remediated, as well as those

2  who started a remediation but did not complete it.  Because what

3  happens is if they replaced the drywall but they didn't replace

4  the wires, they've got to start over again.

5          CHIEF JUDGE DAVIS:  And defendants say that could

6  result in an inequity.  Would you like to address that?

7          MS. DUGGAN:  Yes.  Defendants argue that what people

8  who partially remediated their properties are entitled to is the

9  amount they have spent plus a reasonable estimate as to what

10  remains.  And there's two problems with that argument.  One is

11  that you have to really start over.  To do a proper remediation,

12  even if you replace -- some of the people did just replace their

13  air conditioning over and over again.  But that's not a

14  remediation.  They have to start over, and all of that money

15  they spent was for naught because they didn't fix the problem.

16          CHIEF JUDGE DAVIS:  The noxious fumes are still there?

17          MS. DUGGAN:  Excuse me?

18          CHIEF JUDGE DAVIS:  The noxious fumes are still there

19  and redamage?

20          MS. DUGGAN:  Exactly.  The other problem is we have a

21  certified class, and these are class-wide damages.  If you start

22  to take every single case and assess, you know, whether or not

23  they just removed the air conditioning or whether they removed

24  the wires, you're talking about individualized issues for 175

25  cases, which is not where we are at this point.  The motion to

1  decertify the class was denied.  This is a certified class and

2  we're trying to assess damage class-wide for remediation.

3         CHIEF JUDGE DAVIS:  And stepping back and trying to

4  redetermine individualized nuances to how a formula is applied

5  is essentially a back door to decertify the class, is your

6  position?

7         MS. DUGGAN:  That's exactly correct.

8         CHIEF JUDGE DAVIS:  All right.  So that's two.  173

9  left.

10         MS. DUGGAN:  Well, like I said, I think the formula

11  would apply to current and former owners, is our argument.  And

12  there's only two that have completely remediated.  So unless

13  there was an assignment made by a plaintiff to someone else,

14  they would be entitled to the formula damages.

15         CHIEF JUDGE DAVIS:  So take me back to the question of

16  former owners and why you think you don't have to specially

17  account for their individual situations?

18         MS. DUGGAN:  Our position is that it's an equitable

19  argument at this point.  When these suits were filed back in

20  2009, each of these plaintiffs had a right to bring their suit

21  for damages, and they owned the property.  And through no fault

22  of their own and through the passage of many years, many of them

23  unfortunately have lost their homes.  They were not able to hold

24  on.  They could not move out and pay for rent elsewhere while

25  also paying their mortgages.  And the default against the

1    defendants occurred, Taishan's default was in September of 2009.

2    Right at the very beginning of the litigation.  I think the

3    default in -- that was in Mitchell.  The default in Germano was

4    in November of 2009.  So the debt from Taishan attached at that

5    point, is our argument.  And so the plaintiff should not be

6    penalized, because it was not their fault that these suits have

7    dragged on for so long.  I mean, Your Honor it's well familiar

8    with the facts that are documented in this case.  Taishan was

9    held to criminal civil contempt at one point.  It's true they

10   came back, they satisfied the seven Germano plaintiff's

11   judgment, but that leaves a lot of plaintiffs still waiting to

12   be paid.

13          CHIEF JUDGE DAVIS:  So if we had been here within two

14   years you would have a different position than 10 years?

15          MS. DUGGAN:  There's no question that with the passage

16   of time I think the figures that Mr. Taylor provided were

17   accurate except for the fact that now there's four additional

18   former owners that have occurred just recently.  And Judge

19   Fallon has said, you know, people are dying, people have to move

20   on with their lives, people lose their homes, they just can't

21   hold on.  So it really is a matter of equities.

22          CHIEF JUDGE DAVIS:  So you think that what this Court

23   should do with respect to remediation damages in addition to

24   what Judge Fallon has already done is what with respect to these

25   173 plaintiffs?

```
 1              MS. DUGGAN:  We support the appointment of a special
 2    master to calculate those remediation damages based on the
 3    square footage of the property at issue times the current RS
 4    means national unit cost, which is $117.94.  When Judge Fallon
 5    assessed damages he used the 2015 national unit price which was
 6    $105.91, but if you look at Footnote 10 of the class damages
 7    order he references then-current.  So our argument would be that
 8    since damages are being awarded in 2019, the plaintiffs would be
 9    entitled to the current number.  And we have to remember that
10    that's the national price.  It's as adjusted by a local factor.
11    So every zip code in the United States has an adjustment factor,
12    and that's how you take into consideration the varying costs
13    across the country.
14              CHIEF JUDGE DAVIS:  117.94?
15              MS. DUGGAN:  $117.94 is the 2019 RS means national
16    number.  But then you would adjust it by the local factor, the
17    zip code for each plaintiff.  So in Virginia it happens to be
18    higher than in many other parts of the country.  It might be
19    .94, for example, in a particular zip code.
20              CHIEF JUDGE DAVIS:  Do you know what the defendant's
21    position is on that?
22              MS. DUGGAN:  I don't think the defendants dispute the
23    local factor.  They have argued in Florida that the number that
24    should be used is the $105.91 because that number is in Judge
25    Fallon's class damages order.  The order came out on April 21,
```

1   2017 and it was based on the hearing that occurred on June 9,

2   2015.  So the $105 figure was the 2015 figure, and it just -- no

3   reason not to bring it current to 2019.  And if you look at

4   Footnote 10 of his order he indicates the then-current number he

5   refers to.

6           CHIEF JUDGE DAVIS:  Has Judge Cooke ruled on that?

7           MS. DUGGAN:  We just made these arguments to the

8   special master, I want to say two weeks ago on April 11, 2019

9   and we have submitted updated charts to the special master with

10  the current figure, but there has been no ruling by the judge.

11          CHIEF JUDGE DAVIS:  Or the special master?

12          MS. DUGGAN:  Or the special master.  The special

13  master is scheduled to issue a report and recommendation on the

14  contest that defendants asserted May 3rd, and by May 31 under

15  the Court's trial plan order all remediation damages are to be

16  calculated.

17          CHIEF JUDGE DAVIS:  All right.

18          MS. DUGGAN:  It was a two-step process in Florida

19  because there were product ID issues, whereas here in Virginia

20  that's not an issue.

21          CHIEF JUDGE DAVIS:  Okay.  So I interrupted.  You

22  appoint the damages special master, you're asking the Court to

23  do that for the calculation of these remediation damages for

24  square footage that we already know, and use of this RS factor

25  as adjusted?

```
 1              MS. DUGGAN:  Yes.  I would just like to add with

 2    regard to square footage, recently, last year, in the MDL, there

 3    was approval of a class settlement based on the Allen plaintiffs

 4    here in Virginia.  The Venture Supply class was assigned rights

 5    Venture Supply had against Taishan, we reached a settlement, and

 6    the distribution of that payment was made based on the prior

 7    square footage determinations in this case.  And that was not

 8    objected to by defendants.  They agreed to it.  They agreed to

 9    the allocation which was based on square footage.  That's

10    already been set.

11              CHIEF JUDGE DAVIS:  All right.  So please continue on

12    regarding what you think we should do, what you're asking us to

13    do.

14              MS. DUGGAN:  Well, what I'm asking is that if you take

15    care of the remediation damages, which I think is a very

16    simplified process, that that leaves the other losses.

17              CHIEF JUDGE DAVIS:  Oh, but we didn't finish on that

18    remediation piece.  Did we finish on the remediation piece?

19    With respect to any additional determinations that need to be

20    made?

21              MS. DUGGAN:  Your Honor appropriately mentions

22    setoffs.  I don't think that's going to be a problem.  I think

23    those setoffs are well-documented, and I would be surprised if

24    the parties had a disagreement on the amount of setoff for each

25    plaintiff.
```

1          CHIEF JUDGE DAVIS:  Let's assume they did.  How do we

2     get through that?  Tell me that.

3          MS. DUGGAN:  The payments are already documented, as I

4     said, in the BrownGreer portal, and the plaintiffs had to

5     provide prior payment information on their SPPF.

6          CHIEF JUDGE DAVIS:  Through March of last year?

7          MS. DUGGAN:  Through March of last year.  Plus it

8     should have been updated -- in other jurisdictions the

9     plaintiffs update them.  When they get additional payments they

10    submit that additional information.

11         CHIEF JUDGE DAVIS:  And so what does that look like in

12    front of the special master?  You're going to give them this

13    portal information and what?

14         MS. DUGGAN:  We would actually provide a chart, a

15    proposed chart that gives the name of every plaintiff, the

16    address, we would provide the square footage that we already

17    have that's been provided by the plaintiffs, we would calculate

18    the remediation damages according to these numbers, because we

19    have all the local factors, those are already set, then we would

20    provide the setoff information.  That's what we've done in

21    formula.  With the exception of three plaintiffs there was no

22    disagreement among the parties as to the amount of the setoff.

23    It's a very small thing we've agreed to, but we generally tend

24    to agree to that.

25         CHIEF JUDGE DAVIS:  And your specific argument as to

1  why we don't need to get involved in bankruptcies and

2  foreclosures, those kind of questions?

3          MS. DUGGAN:  Those would be Other Losses.  For

4  example, a particular plaintiff might say my credit was ruined

5  because of this situation.  So that would be an Other Loss.

6  That's an individualized loss of that particular plaintiff, but

7  that doesn't really impact the remediation damages.  That might

8  be an additional loss that somebody would claim.

9          CHIEF JUDGE DAVIS:  So you don't see that as being

10 included along with setoff, in the same category as a setoff for

11 purposes of any remediation determination?

12         MS. DUGGAN:  I do not.

13         CHIEF JUDGE DAVIS:  And has anyone made that

14 differentiation?  Any judge made a similar finding with respect

15 to that differentiation of Judge Cooke?

16         MS. DUGGAN:  In Judge Cooke's order she defines

17 non-remediation damage as including alternative living expenses,

18 bodily injury, if anybody's claiming that, personal property

19 loss, bankruptcy, short sale, foreclosure.  And that's

20 consistent with Judge Fallon's statements on those types of

21 damages as well.

22         CHIEF JUDGE DAVIS:  And she's treated remediation as

23 part of -- I mean, the setoff as part of remediation?

24         MS. DUGGAN:  Yes.  Correct.

25         CHIEF JUDGE DAVIS:  So keep walking me through the

1   special master idea that you posited.  There's a special master

2   you've used in Florida, you all have used in Florida, right?

3           MS. DUGGAN:  Yes.  And just a slight correction of

4   something that Mr. Taylor had said.  The parties didn't actually

5   choose the special master, Judge Cooke appointed her.

6           CHIEF JUDGE DAVIS:  Okay.  And is she out of Atlanta?

7           MS. DUGGAN:  Her offices are in Miami.  Tiffany Lee.

8   She's with Holland & Knight.

9           CHIEF JUDGE DAVIS:  So what is your vision of who the

10  special master would be and how the special master would be

11  determined, I should say?

12          MS. DUGGAN:  It could go one of two ways.  The Court

13  could appoint the special master or the parties would attempt to

14  jointly agree on a special master here in Virginia.

15          CHIEF JUDGE DAVIS:  Well, I've made it abundantly

16  clear today that, within the bounds of reason and within the

17  bounds of due process and Constitutional protections, I am

18  concerned about expediting the appropriate process.  And so if

19  I'm an attorney and I'm over there at a law firm in downtown

20  Norfolk and a judge calls and says I need you to be a special

21  master and I've got to sit down and read all of these -- I may

22  be asked to do a very limited function, but I'm going to want to

23  be familiar with everything.  So it's going to be a lot and it's

24  going to take a lot of time.  Particularly if you're a litigator

25  or not, you've got a trial schedule, you've got other things

```
 1   going on.  You know, I'm trying to think practically through the
 2   permutations and combinations that have been presented to me and
 3   I need you all to help me envision this.  That's what I pushed
 4   Mr. Taylor a little bit on too.
 5           MS. DUGGAN:  I'm looking at Mr. Breit.  I'm going to
 6   defer to my co-counsel.
 7           MR. BREIT:  If I could just add something, Your Honor?
 8           We have a very specific number of square footage.  We
 9   already know that.  I imagine a -- let's start with picking a
10   special master.  I think all the counsel here can try over the
11   next two weeks to pick someone, whether it's a retired judge or
12   a mediator.  If we don't, aren't successful in picking that
13   person, we would submit to you two names a side, let you pick
14   one who is willing to do it.  We think the mathematical
15   calculation is simple because we know the exact number of square
16   feet.
17           CHIEF JUDGE DAVIS:  Let me stop you there.  In
18   Florida, how did you --
19           MR. BREIT:  She picked a former clerk.
20           CHIEF JUDGE DAVIS:  But did you go through this
21   process and couldn't agree on somebody?
22           MR. BREIT:  No, she just picked a clerk who had
23   formerly worked for her.
24           CHIEF JUDGE DAVIS:  Who was a lawyer at Holland
25   & Knight?
```

1            MR. BREIT:  So former clerk five years out, I think,

2   and just said I'm sending you to my former clerk.  So we know

3   there's 418,000 square feet.  We know that.  We know that --

4   what I think, and I apologize, Sandra, if I'm stepping on your

5   toes, we believe that if the Court started with the remediation

6   damages by the calculation, we would then within a six-week

7   period, Richard and I could contact and speak to every one of

8   our clients and determine whether or not they're happy with the

9   calculation on remediation and advising them of the length of

10  time and delay that would be required to address the other

11  damage issue in light of fact that they have already got some

12  money from that.  We believe -- and Richard has already had 17

13  of those phone calls.  All of those people that he has spoken

14  with have already said if I can just get my remediation number,

15  I don't care to go through the process if I can get finality

16  now.  It's 10 years tomorrow.

17            So we believe in a six-week period we can report back

18  to the Court, out of the 175, a very small number of people who

19  elect to pursue the other damages.  Truly, a very small number.

20  Right now we're 17 out of 17 who have said we got a remediation,

21  we're done, thank you very much.

22            So we believe it will be a very small subset where the

23  defendants might want to inquire.  We believe that the

24  interrogatory will do it for those small sets, and then we would

25  appear before a special master on that issue of those few people

1  who have other damages.  The special master will have our gross

2  number using the 117 number, reduced by all of the other setoffs

3  that we have.

4         CHIEF JUDGE DAVIS:  From the BrownGreer portal?

5         MR. BREIT:  And I seriously doubt, as Sandra said,

6  there will be any questions about that.

7         CHIEF JUDGE DAVIS:  But if there are?

8         MR. BREIT:  What's that?

9         If there are, the special master would say why do you

10  think the setoff number is wrong.  These are just actual monies

11  received by way of the settlement from New Orleans.  So it's a

12  number, it's there, there isn't another number.

13         CHIEF JUDGE DAVIS:  And if they say we want discovery

14  on that?

15         MR. BREIT:  Well, I think the special master could

16  then say what is the issue and tell me what you need, and I

17  think quite frankly the interrogatory should be able to resolve

18  all of those.  There may be someone who said I've got another

19  damage and the Court would say -- or the special master can say,

20  well, I'm going to allow a three-hour deposition for that one

21  person on that issue, then I'm going to make a report to the

22  federal judge after I've heard all this evidence as a special

23  master's report.  That's it.  Then we have a number and it's

24  over with.

25         There is the class -- I mean, I think it can be done

1   that simply.  And I think quite frankly with Richard and me

2   talking to the 175, there will be less than a handful, less than

3   a handful of others left over.  We're not waiving it at this

4   point in time, but quite frankly our conversations to date, 17

5   out of 17 have said, look, if I can get my final number in

6   remediation based on what Judge Fallon has done and I can get a

7   judgment of that amount, I'm out of here, because I don't want

8   to wait three months, six months, nine months or a year to

9   determine whether the other damages is a real issue for me.

10          And I think however we do it, we've got local counsel

11   here, we've got out-of-town counsel, we'll agree, I think, to

12   probably a retired judge.  Maybe someone who will do it.

13          CHIEF JUDGE DAVIS:  And they understand the case is

14   going to keep going?  It's not like -- I mean, they understand

15   that if they elect not to go forward on the other damages and

16   take remediation, that doesn't mean they get a check the next

17   week.

18          MR. BREIT:  We've been explaining to them where we are

19   in the whole world, but the judgment based on the fact this is a

20   Rule 55 hearing and that there has been substantial rulings and

21   evidence taken by Judge Fallon, we can calculate an actual

22   number if they waive their Other and they have a calculated

23   damage amount minus their setoff, they have a final judgment for

24   that number, then we worry about what to do with that judgment.

25   It's not over.

1          CHIEF JUDGE DAVIS:  It at least expedites the appeal

2 process?

3          MR. BREIT:  They get an idea of what they may get in

4 the event that we're able to succeed on appeal and collect this

5 judgment.  Otherwise we're talking about another year or so,

6 based on the defendant's plan, to find out what that number may

7 be.

8          Richard and I started this process with the idea,

9 look, if the judge applies the brightline rule, which we start

10 off our questions that way, there's a calculated damage.  Do you

11 wish to spend another three, six nine months to a year trying to

12 figure out if you have another Other, and we've calculated what

13 that is based on what was provided in Venture Supply.  It's not

14 a big number relative to the remediation.  17 out of 17 said no,

15 you give me a final judgment number, let's go from there.

16 That's why I think it can be done expeditiously and I think we

17 can agree --

18          CHIEF JUDGE DAVIS:  And you said on the other figure,

19 the other damages figure, that you all calculated, you agree

20 with the defendants that the figure arrived at by the special

21 master in that settlement, the separate, earlier settlement

22 procedure didn't break down remediation from other damages?

23          MR. BREIT:  It did.  It broke it down to roughly

24 three million dollars worth of other damages in the other

25 settlement that was done by the special master.  If I'm correct,

1  I believe they have received about a million of the

2  three million in other damages based on the setoffs from other

3  settlements.

4          CHIEF JUDGE DAVIS:  Broken down by plaintiff?

5          MR. BREIT:  By plaintiff.

6          CHIEF JUDGE DAVIS:  So that is --

7          MR. BREIT:  Yeah, that's done.  We're talking about a

8  two million-dollar Other damages among a group of 175.  17 out

9  of 17 before we could get to this hearing today said if I can

10 get my final judgment number based on what we've got, I don't

11 care about that little slice of my Other damage.

12         CHIEF JUDGE DAVIS:  Okay.  So let's stop for a second.

13         MR. BREIT:  I apologize.  Do you want me to sit or do

14 you want me to...

15         CHIEF JUDGE DAVIS:  No, you can stand there, but I

16 want to make sure I understand this.

17         The prior determinations made by the special master in

18 that settlement proceeding did, in fact, then break down

19 remediation costs versus other damages?

20         MR. BREIT:  Five plaintiffs.

21         CHIEF JUDGE DAVIS:  That's in a finding or a document

22 that defendants have access, defendants here have access to?

23         MR. BREIT:  Absolutely.  That was part of the portal

24 information.

25         CHIEF JUDGE DAVIS:  Ms. Duggan?

1          MR. BREIT:  -- and what they got for the regular

2    remediation and what percentage of it was for other damages.

3          MS. DUGGAN:  I just want to put a slight clarification

4    on this.  That was a settlement context, so the plaintiffs were

5    putting in claims for a portion of the settlement which was

6    based on their square footage, but it was not an assessment of

7    their remediation damages.  What it was was a vetting of their

8    other losses and whether or not they were entitled to them,

9    whether they had documented proof of them.  And with regard

10   remediation damages, it was documentation that they owned the

11   property and that they had a certain amount of square feet.  And

12   then they allocated the settlements based on those figures.

13         CHIEF JUDGE DAVIS:  And it's in a document that is

14   uploaded to that portal?

15         MR. BREIT:  Yes, sir.

16         CHIEF JUDGE DAVIS:  Or the findings are reflected in

17   the portal?

18         MS. DUGGAN:  Exactly.  And the payments for each

19   plaintiff are definitely documented.

20         MR. BREIT:  For each category.

21         CHIEF JUDGE DAVIS:  How is the accuracy of what's

22   placed in that portal done?  In other words, is there a document

23   from which those figures are pulled that is available to

24   defendants?

25         MS. DUGGAN:  Judge Fallon had to approve all the claim

1  payments that were calculated by BrownGreer and/or Garretson

2  depending on which settlement it was.  And with regard to these

3  setoffs, we obtained the information from BrownGreer for our

4  spreadsheets.  In other words, this is based on -- all of the

5  checks to each plaintiff are in the portal if you wanted to look

6  up how they were documented, but the actual number came to us

7  from BrownGreer.

8          MR. BREIT:  And all that documentation from BrownGreer

9  went down to Judge Fallon before he would approve the four

10 settlements in the class settlement.

11         CHIEF JUDGE DAVIS:  All right.

12         MR. BREIT:  If you want an extra clarification,

13 Richard said that there are two other steps also, and I think it

14 would help give the Court comfort.

15         CHIEF JUDGE DAVIS:  All right.  Mr. Serpe?

16         MR SERPE:  So Your Honor, there was claim submission

17 process for what we're calling Other Losses.  Every member of

18 the class, which included all 175 of these Amorin plaintiffs,

19 submitted documentary proof to the special master.

20         CHIEF JUDGE DAVIS:  Submitted what?

21         MR SERPE:  Documentary proof in claim forms to

22 demonstrate each of their categories of other losses.  Those

23 were submitted to the special master.  Special master went

24 through all of that documentation and forms, accepted some,

25 rejected others, and sent individualized determinations to each

1  of the members of the class.  They had a due process opportunity

2  to come back and say I'm not getting enough, Other Losses or --

3          CHIEF JUDGE DAVIS:  Was that a public document?

4          MR SERPE:  Judge Fallon set an appeal deadline, and

5  each of the appeals filed were a matter of public record, there

6  was a hearing on the objections for the Other Losses, and that

7  was fully developed in open court on the papers where those

8  disputes were handled.

9          CHIEF JUDGE DAVIS:  Before Judge Fallon?

10         MR SERPE:  Before Judge Fallon.

11         So the special master made a recommendation with the

12  spreadsheet of other losses to Judge Fallon.  Judge Fallon

13  allowed for an objection time period, due process hearing was

14  had, Judge Fallon resolve the objections.

15         CHIEF JUDGE DAVIS:  But within the settlement

16  construct?

17         MR SERPE:  Within the settlement construct, yes.  Then

18  he approved the special master's determination, but then he

19  added two more layers of due process. after he made that

20  determination he required that a motion be made for a

21  distribution according to the special master's recommendations

22  that he had adopted, and he required class counsel to go through

23  and audit everything that had been done and represent to the

24  Court that everything had been accounted for, that due process

25  was done, that each of those steps had been afforded in the

1  context of the settlement.  And he also required the special --

2          CHIEF JUDGE DAVIS:  Class counsel for the people

3  interested in that particular settlement?

4          MR SERPE:  Which included everyone that's here.

5          CHIEF JUDGE DAVIS:  But it wasn't a settlement as to

6  them?

7          MR SERPE:  Every one of 175 Virginia Amorin

8  plaintiffs.

9          CHIEF JUDGE DAVIS:  I'm pointing at defendants.

10          MR SERPE:  But not the defendants.  You're quite

11  right.

12          Special master came in, the Court's hired CPA came in

13  to audit all the numbers to make sure that was there, so he had

14  all of those lawyers of due process available before he allowed

15  the other losses to be distributed from the funds that had been

16  paid in in the class settlement.  So really quite an elaborate

17  process.

18          CHIEF JUDGE DAVIS:  That's why defendants, although

19  they say they shouldn't be bound by those figures, they still

20  say it provides a starting point for them if the Court were to

21  have a special master engage in or oversee a process of some

22  kind of additional discovery?

23          MR SERPE:  With respect to the other losses.

24          CHIEF JUDGE DAVIS:  Hmm-hmm.  Right.

25          MR SERPE:  So I think the point that Mr. Breit said in

1  my words comes down to this:  We're talking about a little tiny

2  tail trying to wag an enormous dog; that to the extent you want

3  to talk about, there were a total of three million dollars in

4  Other Losses, and a million has already been paid.  The amount

5  of damages we're talking about on Other Losses is a tiny thing,

6  but because it is somewhat more individualized, it gives a hook

7  to Taishan today to say we're going to hang on to this hook and

8  say we need depositions, we need to look at what did you do in

9  this house in terms of your remediation, or we want to know what

10 happened on your foreclosure, did you really do it for other

11 reasons?  We want to look into your financial history

12 case-by-case.

13        CHIEF JUDGE DAVIS:  And you said -- I'm sorry, but I

14 just want to understand.  Three million, determined it was about

15 three million --

16        MR SERPE:  Other Losses.

17        CHIEF JUDGE DAVIS:   -- one million of other losses was

18 already paid?

19        MR SERPE:  Let me be clear.  They approved three

20 million, but there weren't enough dollars available from the

21 prior settlements to pay off all the other losses that had been

22 incurred.  So because there were scarce dollars, it was

23 distributed *pro rata* among those victims, and it was only about

24 a million to go among the three million dollars in other losses.

25 So everyone received partial compensation, and they have another

1  or incremental claim of about two-thirds of those losses left.

2         CHIEF JUDGE DAVIS:  Okay.

3         MR SERPE:  So before agreeing to walk down the road of

4  depositions and, you know, a year of discovery for their

5  proposal of a handful of cases for then a mediation to figure

6  out where are we going to go next year to see if we can figure

7  these things out and if we can't we'll start litigating in 2020,

8  when we explained to these families what the defendants' plan is

9  for resolution, wide-open discovery, a handful of trials at the

10  end of the year and then we maybe to you the next year.  We say

11  to them, look, there's an option.  You if you waive your Other

12  Loss claim for which you've already received about a third of

13  the money and all that's left if your remediation damage, we

14  believe that we have a good chance to ask this Court to enter a

15  final Rule 55 judgment for those homeowners who, as part of

16  their motion papers for final judgment, are stipulating that if

17  the judgment is granted they will not seek their Other Losses,

18  and then there's no discovery left unless the defendants want to

19  make a credible argument that they want to go in and vet square

20  footage.  We know the house is really 2,150 square feet, not

21  2,175 square feet.

22         CHIEF JUDGE DAVIS:  We're beyond that.

23         MR SERPE:  We're beyond that.  We're beyond that.

24         CHIEF JUDGE DAVIS:  The determination has been made

25  already.

```
1              MR SERPE:  It has.
2              CHIEF JUDGE DAVIS:  Defendants are shaking their heads
3  Why are they shaking their heads?  They say there's no
4  determination of square footage that's been made.
5              MR SERPE:  Well, you know, maybe they will point to a
6  plaintiff somewhere that said, gee, you know, I've got 4,000
7  square feet and when they went into the house it was really
8  2,000 square foot, so there was some, you know,
9  mischaracterization of square footage on a one-off plaintiff.
10             CHIEF JUDGE DAVIS:  They don't characterize what
11 happened before Judge Fallon as a determination.
12             MR SERPE:  Pardon me?
13             CHIEF JUDGE DAVIS:  They don't characterize what
14 happened before Judge Fallon was a determination.
15             MR SERPE:  As a determination.  They think that was a
16 mere exercise in math that was done for the purposes of dividing
17 settlement up that we weren't concerned in, so therefore let's
18 start over again.  And Your Honor used the interesting word
19 "odor" in your comments today.  Every single analysis of any
20 issue here for us comes down to start over again, we need
21 full-on discovery, litigation and the trial determination before
22 we can get anything done here.  And we're trying to find a way
23 where we can streamline this case so quickly that the vast
24 majority -- I think Mr. Breit is right -- ninety percent of
25 these cases can be resolved on motions in 45 days.
```

1          CHIEF JUDGE DAVIS:  All right.  Where have plaintiffs

2     presented their contentions previously as to the amount of

3     square footage -- what do you call it, under-air square footage

4     that is at issue for each one of the 175?

5          MR SERPE:  In two places.  One place is in the

6     Supplemental Plaintiff Profile Form that Ms. Duggan referred to.

7     There is a specific entry point on that document for what is the

8     square footage of your home.

9          The second, Your Honor, was that there were claim

10    forms filled out for every one of these people who submitted

11    claims for the four prior class action settlements that Judge

12    Fallon administered, and square footage of the home was a

13    specific item that had to be documented with respect to each of

14    the individual homes, and some evidence of the square footage

15    had to be presented as well.  So those are two robust areas

16    where data had been submitted.

17         CHIEF JUDGE DAVIS:  All right.

18         MR SERPE:  And Sandy just reminded me I missed one.

19         MS. DUGGAN:  What I wanted to say, Your Honor, is in

20    the beginning of litigation each plaintiff filled out a

21    Plaintiff Profile Form and had to put down the square footage.

22    The supplemental Plaintiff Profile asked if the data had

23    changed.  When Judge Fallon issued his damages order in 2017 he

24    instructed the plaintiffs to provide updated spreadsheets to the

25    court which we filed in June of 2017 giving updated square

1  footage information.  And then as I said, most recently with the
2  Allen settlement with regard to the Virginia plaintiffs, the
3  money was divided based on the square footage that had already
4  been determined.
5          CHIEF JUDGE DAVIS:  So in the first form that was
6  filed, what opportunity if any did the defendants have to vet
7  that?
8          MS. DUGGAN:  Well, they certainly had an opportunity.
9  They were served under The Hague, but they chose not to present
10  themselves in the litigation.  They took a strategy in this case
11  to be defaulted.
12          CHIEF JUDGE DAVIS:  But you're saying that was part of
13  the complaint?
14          MS. DUGGAN:  The Plaintiff Profile Forms were filled
15  out under order of Judge Fallon early in the litigation.
16          CHIEF JUDGE DAVIS:  After the complaint was filed?
17          MS. DUGGAN:  Yes.  The Supplemental Plaintiff Profile
18  Form was a negotiated document among the parties.  We agreed to
19  it.  And every Amorin plaintiff was required to fill that out
20  and to upload their information to the BrownGreer portal.
21          CHIEF JUDGE DAVIS:  So is it your position that the
22  default sort of carried along with it the square footage so that
23  it doesn't get revisited, and that's not an element of damages?
24          MS. DUGGAN:  No, it has been -- it is an element.
25  They still have to prove their damages.  The defendants are

1  entitled, as they did, they participated in the class damages

2  hearing, they're entitled to contest those damages, which they

3  did.  And the plaintiffs were required under the court's class

4  damages order to provide updated square footage information.

5        CHIEF JUDGE DAVIS:  And you're saying that these

6  defendants contested the square footage as part of the damages?

7        MS. DUGGAN:  What happened was the plaintiffs were

8  ordered to update their information, which we did.  Then the

9  parties engaged in settlement efforts that didn't go anywhere,

10  unfortunately, and the cases were remanded.  So now those

11  contests to the square footage, for example, recently occurred

12  in Florida.  The defendants contested, actually as to almost

13  every case, the square footage of each of the properties.  And I

14  would submit to Your Honor that there's no need for that to

15  occur here in this litigation because the square footage for the

16  Virginia plaintiffs has already been documented and developed

17  under previous settlements, and even other settlements where

18  Taishan paid money for the settlement claims.

19        CHIEF JUDGE DAVIS:  It's obviously in your interest to

20  make sure that whatever judgment you may eventually get is not

21  Constitutionally infirm, and you therefore, it sounds like, have

22  made a determination that you think that this Court's adoption

23  of a remediation formula, adoption without question of the

24  square footage listed in the portal, a resulting RS number

25  adjusted by zip code being applied and determination of a figure

1   only with setoff outstanding for determination by a special

2   master qualifies for due process from a due process standpoint?

3   That's what I hear you saying.

4           MS. DUGGAN:  I believe it does.  And I would just add

5   one small detail that I had suggested early in the argument, and

6   that's that the plaintiffs provide current, updated square

7   footage and ownership information to the defendants and to the

8   Court, because these profile forms were filled out in March of

9   last year.

10          CHIEF JUDGE DAVIS:  So the thing that I am struggling

11  with right now is, on the square footage issue, your contention

12  is whatever the updated square footage figure is as provided by

13  plaintiff, defendants should have no opportunity to contest that

14  in any way.  Is that your contention?

15          MS. DUGGAN:  I think if they --

16          MR SERPE:  So --

17          CHIEF JUDGE DAVIS:  You understand that --

18          MS. DUGGAN:  I, I --

19          CHIEF JUDGE DAVIS:  Go ahead.

20          MS. DUGGAN:  Sorry.  Judge Fallon and Judge Cooke

21  entitled the defendants to challenge product ID, ownership

22  status and square footage.  So they have been given an

23  opportunity in those jurisdictions to challenge that.  And based

24  on today's date.

25          CHIEF JUDGE DAVIS:  But you believe it's not

1  necessary?

2      MR SERPE:  Well, we believe that Virginia once again

3  is different because we're the only jurisdiction where there's

4  already been a judicial determination by Judge Fallon with

5  respect to square footage in the homes that was necessary for

6  him to have reached his decision.  Your Honor, but let's say

7  that we took as a given that something else had to be done

8  beyond what Judge Fallon had ruled for --

9      CHIEF JUDGE DAVIS:  In addition to the setoff that you

10 agreed to?

11     MR SERPE:  The setoff which we agreed to.  And that

12 square footage was the penultimate issue before you could do the

13 math.  We need to give the defendants an opportunity.  More than

14 half of these homes are no longer owned by these plaintiffs.  So

15 right off the bat we have a question, well, we're not going to

16 get into the homes with, you know, either court appointed

17 neutral federal or two sets of experts that are going to measure

18 and prepare affidavits and we're going to go through *ad seriatim*

19 each home and add up and come up with *di minimus* differences and

20 which one should it be.  So we can't even get in the home.  Are

21 there secondary proofs that are available there?  Well, yeah.

22 Maybe at the time you bought the house there was a drawing of

23 the house with rooms and they had measurements and somebody

24 could do the math and we come up and update.  And so I suppose,

25 Your Honor, if we don't take it as a given, that we could go

82

1    through 175 sets of evidence, some of which could be informed by

2    getting into the actual house now, most of which couldn't, and

3    get into a battle for determination of a few square feet one way

4    or the other.  And I think the question that presents itself to

5    the Court is is that an appropriate use of judicial resources in

6    a certified class that's under a default judgment, or is the

7    amount of information that's been presented on square footage

8    already, a reasonable basis -- reasonable -- with which to

9    provide a final judgment.  If the Court steps off that slope

10   onto, well, what is it plus that we're going to look at, we

11   believe we're going to be handling, you know, very detailed

12   evidentiary arguments on 175 houses with respect to what's the

13   true square footage to arrive at a *di minimus* difference.

14            CHIEF JUDGE DAVIS:  At the time that that original

15   plaintiff's form was filed back in Louisiana with square footage

16   and then there was an additional one filed thereafter, at the

17   time that that was done, was there any incentive or mechanism

18   for defendants to challenge square footage back then?

19            MS. DUGGAN:  When the original form was submitted --

20   and it wasn't -- I don't believe they were actually filed, they

21   weren't in the litigation.  With regard to the supplemental

22   profile forms they have had access to this information since at

23   least March of last year.

24            CHIEF JUDGE DAVIS:  But no mechanism to challenge?

25            MS. DUGGAN:  Unfortunately it hasn't come up because

1  we've been in the process of having been remanded.  So they have

2  challenged it in Florida, for example, through this process.

3          CHIEF JUDGE DAVIS:  So you all want the Court to

4  appoint a special master; for the special master to begin to

5  collect the information and make the determination with respect,

6  on remediation, with respect to 175, and just move forward.

7          Let me ask you this:  And of course defendants are

8  suggesting a very different way of proceeding.  But amongst

9  their ways of proceeding is a bell-weather group at the very

10  least with respect to other damages.  Should there be a

11  particular group that you all agree upon that should go first in

12  the special master remediation determination phase?  Because I

13  have defendants telling me that the reason they want to have

14  these bell-weather groups proceed is so that it gives them

15  something on which to decide whether they want to settle.

16          MS. DUGGAN:  Your Honor, Judge Fallon notes in his

17  Germano findings of fact and conclusions of law that the seven

18  Germano plaintiffs did represent a cross-section of the

19  contaminated homes.  There were townhomes, there were

20  single-family homes, there were duplexes.  I believe that's at

21  Page 689 of his order.  And we are well beyond bell-weathers at

22  this point.  These cases have a wealth of information in each

23  and every file that is available to the defendants.

24          CHIEF JUDGE DAVIS:  No, no, no.  I guess --

25          So we have these two categories:  Remediation and

84

```
 1   Other Damages.  Defendants have suggested that a way of
 2   proceeding here is to select a group that would have
 3   determinations made about it, whether that be other damage
 4   determinations or other damage plus setoff plus square footage,
 5   whatever it is, but at least other damages.  And if I understand
 6   them correctly, they're saying, Judge, we think you ought to do
 7   that, 10, 20, whatever it is, because once you do that, that's
 8   going to give us a basis on which to try to settle the case.
 9   That's what they say.  And so what I guess I'm asking is if I
10   proceed in the fashion you are suggesting, Ms. Duggan, and let
11   the special master move forward on a remediation, final
12   remediation determination for all 175, should we start with a
13   so-called representative sample so that we can test defendant's
14   assertion that they want this done so that they can try to enter
15   into meaningful settlement discussions?  That's all I'm asking.
16           MR SERPE:  Your Honor, to the extent that the
17   selection of cases would be done to inform other damages --
18   because we don't believe it's got anything to do with
19   remediation damages -- we don't need to figure out square
20   footage and do the math.  You don't need discovery or
21   bell-weathers.  But to the extent we're talking about doing that
22   on the Other Loss side, we believe the most efficient way to
23   proceed in terms of selecting those cases is for us to go
24   through and find out does anybody even want to make that claim
25   if they're going to end up having to spend a year of litigation
```

1  where every single element is going to be subjected to the

2  Taishan microscope.

3          CHIEF JUDGE DAVIS:  Okay.

4          MR SERPE:  And if we're down to 17 or 20 families that

5  still want to go forward with other losses, there's your group.

6  There's your group.  Let's do those.  If everyone else is out,

7  then we don't have to figure out who is representative or what

8  an appropriate group would be.

9          CHIEF JUDGE DAVIS:  Ms. Duggan, I've interrupted you a

10  few times.  Did you have something else you wanted to tell me?

11          MS. DUGGAN:  I think we've covered all the ground I

12  wanted to cover, Your Honor.

13          CHIEF JUDGE DAVIS:  All right.

14          MAGISTRATE JUDGE KRASK:  I'm a little confused, I

15  confess.  I'm looking at Judge Fallon's order on the class

16  damages following the hearing, and he says on June 9th, 2015,

17  the Court considered only remediation damages for current

18  owners.  And what you all are suggesting is that that formula

19  applies to former owners.  We're talking about 102 of them.

20  Defendants are saying no, they don't.  I'm trying to understand,

21  has Judge Fallon applied the formula to former owners?  Is he

22  considering that now?  And I'll just -- has the issue, has this

23  issue -- I understand it's still being addressed in front of the

24  special master, but if someone sold their house, let's say that

25  they bought the house -- and I'm asking a lot of questions here,

1   I'll just put them all out there at once -- but they bought it

2   improvidently prior to the crash, prior to them selling it, or

3   it being foreclosed on, this drywall was in the house and they

4   couldn't make the payments regardless of the drywall, you're

5   still saying the formula applies.  I don't understand what,

6   other than your equitable argument, is that this formula applies

7   to former owners.

8          MS. DUGGAN:  The issue was not decided by Judge

9   Fallon.  What he decided was that the class includes current and

10  former owners.  And just last week in New Orleans the parties

11  argued that very issue to Judge Fallon.  So that is under

12  consideration.  The issue has arisen in Florida before the

13  special master, but has not been presented to Judge Cooke.  But

14  regardless of how that is resolved, that issue will be presented

15  to the Court, I'm certain of that.

16          With regard to the entitlement, as I've said, we've

17  argued that the debt attached at the time of default judgment.

18  These plaintiffs brought suit, they were current owners.  And

19  his class damages order only addressed current, that's correct,

20  and he says that the other issues with regard to other damages

21  and with regard to former owners would be addressed separately,

22  and it just has not up until this point.

23          MAGISTRATE JUDGE KRASK:  And so let's assume you're

24  wrong on that just for the sake of argument.  How do you

25  envision, what is your response then to how that process should

1  be decided, whether it's decide by the Court or by a special

2  master in the context of remediation damages?  Let's just say

3  the house was diminished in value by $50,000, but the

4  remediation formula is 100,000.  How do you suggest that that be

5  sorted out in that process?

6           MS. DUGGAN:  If we're wrong about that, a

7  determination would have to be made as to what damages a former

8  owner is entitled to.  And if I understand the defendant's

9  argument correctly, if a former owner remediated prior to

10 becoming a former owner, they would still be entitled to

11 damages.  The defendants would argue they're entitled probably

12 to what they spent.  We would argue if it was a complete

13 remediation they would be entitled to what they spent no

14 differently than a current owner.  But if it was anything less

15 than a complete remediation, we would argue that they would be

16 entitled -- and an argument could be made that the diminution

17 value of what would be the estimated amount to repair the home

18 would still be the same as what you're entitled to under the

19 formula.  That could be a measure for those cases.  Otherwise --

20          MAGISTRATE JUDGE KRASK:  And with respect to the --

21 I'm sorry, I cut you off.  Go ahead and finish.

22          MS. DUGGAN:  No, I was just going to say that would

23 have to be made on an individualized basis.

24          MAGISTRATE JUDGE KRASK:  Have any of these former

25 owners conducted, based on your analysis of the case, fire sales

1  because they just wanted to be out from underneath this problem,

2  and do you have sufficient data that that could be provided to a

3  special master or the Court in the context of deciding these

4  remediation damages piece of this relatively easily?

5           MR SERPE:  Absolutely.  There were so-called short

6  sales where people gave the house up for a fraction of what they

7  paid for in order to get out from underneath it.  But I think

8  what it comes down to here is this issue of former owners and

9  how they treat them is extraordinarily important.  And Judge

10 Fallon heard argument on it last week.  And I believe that with

11 respect to your specific question, if a house was diminished in

12 value by $50,000, and I think if you look at the transcript from

13 the hearing -- and we're anticipating a ruling from Judge

14 Fallon -- he says no diminution in value, why wouldn't the

15 question of how much was it diminished in value be, the question

16 of how much it would cost to repair it to bring it back up to

17 where it was before you damaged it.  He says why isn't the

18 formula relevant to what the diminution is.  So that's --

19 regardless of how you look at this, we come back to being able

20 to use the formula to make the determination even with respect

21 to the former owners.

22           And it comes down to this:  In the class setting, can

23 we find a mechanism by which we can apply a formulaic basis,

24 reasonably, to assess damages, or are we going to step out of

25 the formulaic basis into individualized determination.  How much

1    did you sell your house for?  Was there a short sale?  What was

2    it really worth?  What had happened to the market?  What about

3    the mortgage?  Was the mortgage forgiven, it wasn't forgiven, I

4    had to go through a bankruptcy, and we're going through all of

5    those calculations with lots of experts, and the special

6    master's bogging down on a case-by-case-by-case basis, we're

7    going to be here 10 more years.

8            We're imploring the Court -- as we believe Judge

9    Fallon's questions at the hearing last week were very pointed --

10   we're imploring the Court to find in the context of the default

11   class mechanism by which damages can be calculated based upon

12   formulas which don't require years of additional litigation.

13           MAGISTRATE JUDGE KRASK:  Thank you.

14           CHIEF JUDGE DAVIS:  Thank you.

15           (Judge Davis and Judge Krask conferred.)

16           CHIEF JUDGE DAVIS:  So I do want to hear maybe final

17   comments from defense counsel.  You don't have to.  But if you

18   wish to.  But I do want to note, I think I said this at the last

19   hearing, but I'm certainly very grateful -- I asked Judge Krask

20   to join us.  He's co-assigned with me to this case.  And no

21   matter how we proceed, you know, typically here our magistrate

22   judges in our civil cases handle all discovery disputes, and we

23   also refer other matters to them frequently, including summary

24   judgment and things of this nature.  And in the context of this

25   litigation there have been suggestions even in the briefs that

1    Judge Krask might be able to engage in some of these evidentiary

2    hearings versus a special master.  Those are things we have to

3    determine.  But I do just think it important for the record to

4    be clear that the decision on these issues that are before the

5    Court now are for me to make, and I will make them, and nothing

6    about Judge Krask's presence and him asking some questions here

7    should be interpreted in any other way.  But I'm very, very

8    grateful for his presence and participation.

9            So Mr. Taylor, do you have any additional thoughts you

10   want to share with me?

11           MR. TAYLOR:  Your Honor, I think only one main

12   thought, and I think the Court gets it, in regards to former

13   owners.  And thank you for this opportunity.  That in regards to

14   Judge Fallon's orders, he has not indicated that the former

15   owners would get the formula under any of his rulings.  He

16   hasn't ruled at all on that issue.  And I want to be sure the

17   Court's clear on that.

18           CHIEF JUDGE DAVIS:  Did he give you all any indication

19   when you might hear from him?

20           MR. TAYLOR:  I was not directly in court, but I

21   listened to the argument that was made last week and I couldn't

22   get any indication of which way he was going.  He asked all the

23   appropriate questions just like Your Honors have done, but I

24   didn't get the impression that he had arrived at a decision.

25           CHIEF JUDGE DAVIS:  Well, what I was asking about is

1   when he might.

2           MR. TAYLOR:  Oh, when?

3           CHIEF JUDGE DAVIS:  Yes, sir.

4           MR. TAYLOR:  He said he would do it as quickly as

5   possible.

6           MR SERPE:  He said "a little more study," was his

7   comment.

8           CHIEF JUDGE DAVIS:  Okay.

9           MR. TAYLOR:  So that's on former owners.

10          The only other point is, then I'll sit down, is the

11  square footage issue.  When we did get the opportunity in

12  Florida to go through this analysis of square footage we found

13  through public records and other documents that there was

14  discrepancies.  And some of those discrepancies amounted to 100

15  or more feet of square feet of footage.  As a result of that, we

16  would ask the Court to consider whether or not there is some way

17  we can get to that quickly -- we're not talking about a year or

18  more -- in a matter of a few months, to try to figure out that

19  process so that we can make sure that our due process rights are

20  protected on this issue.

21          CHIEF JUDGE DAVIS:  Tell me, if you would, how you

22  would propose, if the Court goes that route, it would allow your

23  due process rights to be protected?

24          MR. TAYLOR:  Well, you know --

25          CHIEF JUDGE DAVIS:  On square footage.

1        MR. TAYLOR:  On the square footage, Your Honor, we

2   would propose -- I mean, we've done this once -- that we get an

3   opportunity receive all of the documents, even the current

4   documents on square footage, compare those documents to the

5   public records that we would have, and then present our analysis

6   to either a special master or to, if you appoint Judge Krask,

7   Judge Krask in regards to where the discrepancies are.

8        CHIEF JUDGE DAVIS:  Okay.  So for example if -- and

9   you all have access to the BrownGreer portal?

10        MR. TAYLOR:  That's correct, Your Honor.

11        CHIEF JUDGE DAVIS:  So you've had the opportunity to

12   look at what's there.  But let's say you get updated forms just

13   to see if that's changed, and you get that form and you look at

14   it for Plaintiff No. 1, and you then do some publicly available

15   document search and you see that it's different by 100 feet or

16   500 feet.  Let's do better.  500 feet example.

17        MR. TAYLOR:  Square foot, yes, sir.

18        CHIEF JUDGE DAVIS:  Yes.  What then do you envision

19   doing?

20        MR. TAYLOR:  What we've done already is presented that

21   evidence to the fact-finder.  And what we've done in one case in

22   Florida is to deal with that with the special master.  And we

23   can do it through this court also.

24        CHIEF JUDGE DAVIS:  You just give your publicly

25   available document and say, look, it's different, and then ask

1  the special master to -- what did you do ask him to do, did you

2  ask him to decide to give you additional discovery?

3        MR. TAYLOR:  In some circumstances we might need

4  additional discovery to clear up why there is this difference

5  between what the plaintiff is saying and what the public records

6  indicate in that situation.

7        CHIEF JUDGE DAVIS:  Is that what you've done in

8  Florida?

9        MR. TAYLOR:  Not with all of them, because there were

10  1,700 claimants, but with some of the -- I guess it would be the

11  39 depositions we took we were able to examine some of the

12  claimants to determine why there were discrepancies in square

13  footage that they were finding.

14        Your Honor, there was some contention this would take

15  a long period of time.  It really wouldn't.  I think that once

16  we have done our, performed our analysis of the public records

17  and documents that the plaintiffs provide, determine whether or

18  not those are accurate and complete, then we could discuss this

19  issue with the special master and the special master may want us

20  to come in and conduct some limited evaluation of the claimant

21  on why that discrepancy exists.

22        CHIEF JUDGE DAVIS:  Let me give you the opportunity to

23  speak with your colleagues on that question we just reviewed

24  just in case there's any difference.

25        MR. TAYLOR:  Any difference of opinion?

1        CHIEF JUDGE DAVIS:  Well, anything in addition that

2   you may want to tell me.

3        MR. VENDERBUSH:  Do you want to me to stand up and

4   say --

5        CHIEF JUDGE DAVIS:  Up to you all.  Come on up.  Happy

6   to hear from you.

7        MR. VENDERBUSH:  David Venderbush from Alston & Bird.

8        In the Florida process this hasn't been that hard.

9   We've gone through the BrownGreer documents and compared them to

10  the square footages that they have claimed when they updated it

11  and we found these -- and not in every case, for sure.  In

12  1,700, we've agreed in most of them.  And we've done some

13  dickering and gotten to the right place for many of them.  But

14  we wanted to have the chance to say you've claimed this and

15  we've found this.  And in every instance, regardless of what the

16  kind of proof was, whether it was a floor plan or whether it was

17  a county appraiser, in every one, you just happened to choose

18  the highest number.  We found that pattern troubling.  And we

19  brought that to the special master and said you should take

20  these people off of the formula track that Judge Cooke had

21  ordered because there is a legitimate discrepancy, and there is

22  a burden of proof in every one of those cases that the formula

23  allies, we think.  So for these in which there's an equal chance

24  that it could be this number or could be this number, that's

25  50/50.  So you haven't met your burden of proof of what your

1  square footage is.  And so at the very least that should be

2  taken off the formula track and put into the Other Damages track

3  for a specific proof of fact finding.  Since they are going to

4  be proving these other damages anyway.  At least that's what we

5  thought until today we heard that everyone's going to waive all

6  those damages.  But this is the plan in Florida, and we've asked

7  the special master to say in the few, I think it's about 50 and

8  we gave the special master a sheet of the differences that were

9  meaningful, and we said take these off track and have them come

10 to some evidence, short evidentiary hearing where they're

11 proving other damages anyway, or doing a evidentiary process,

12 and just have them prove why it's this number and not this

13 number that seem absolutely co-equal.  And if they don't have a

14 basis for this number, then you need to pick the lower number.

15 Because Taishan agrees that it's at least this much and they

16 haven't met their burden of proof at 51 percent to show it's

17 this number.  And if you just take the spreadsheet they're going

18 to update, then none of that has happened.  It's just a

19 self-reporting *ipse dixit* of the number that they want, and we

20 don't know where that came from.

21       So that's what's happened in Florida on square

22 footage.

23       CHIEF JUDGE DAVIS:  All right.  Thank you, sir.

24       Mr. Stengel, did you have anything else?

25       MR. STENGEL:  Very briefly, Your Honor.  And I know

1   you hate it when lawyers say that because it's never true.

2          But I think on the former owners issue, I think Mr.

3   Serpe gave a very nice precis of the proof you'd need to present

4   to make it a determination of what their damages were.  And

5   there really isn't -- although Judge Fallon from the bench mused

6   about the relationship between formula values and diminution of

7   value -- I don't think that's respectable linkage.  I don't

8   think it works to say that's how you get to that number.  In

9   part because -- and this is an unfortunate aspect of this case

10  from the plaintiff's perspective -- all this did occur in the

11  largest real estate recession we've had in 50 years.  So there's

12  going to be a substantial amount of market movement around these

13  properties.  So getting to the diminution of value and loss

14  causation is going to be an interesting issue.  Not one that's

15  insurmountable.

16          There's a reference again to those other settlements

17  that were reached with Virginia Amorin class members.  Those are

18  a matter of contract with other defendants and not the

19  defendants before you this morning.

20          Interesting but largely irrelevant is the matter of

21  proof.  We had no interest or opportunity to get in, nor should

22  we have, tried to challenge someone else's settlement in terms

23  of how they chose to allocate the funds that were available to

24  these plaintiffs.  So there's no real binding effect there.

25          My final comment, Your Honor, would be -- and this is

1  to reiterate what I've said earlier -- you've heard the former

2  owner treatment being justified as a matter of a reference to

3  equity.  And we understand, given the delay in this case, equity

4  is an important consideration.  But equity can't trump due

5  process rights held by our clients.  And this is not a situation

6  where we're saying we want to pay these people nothing, we want

7  to go away.  We understand there will come an adjudication and

8  payments will have to be made.  We think it's appropriate and

9  fair for those adjudications to conform to legal standards and

10  due process, and we're doing everything we can to suggest a path

11  that we think will work to get to a quick resolution, but is i

12  full accommodation or honoring of our due process rights.  To

13  take the other path to go down mere expedience, frankly, with

14  all respect, Your Honor, invites a do-over.  And that's in no

15  one's interest.  It's not in our interest, not in the Court's

16  interest, certainly not in the plaintiff's interest.  We should

17  do this once and do it right, and we think to do it once

18  requires compliance with due process.

19          CHIEF JUDGE DAVIS:  Thank you, Mr. Stengel.

20          Ms. Duggan, anything else?

21          MS. DUGGAN:  Nothing further, Your Honor.

22          CHIEF JUDGE DAVIS:  Anyone have anything else they

23  want to say?

24          MR. TAYLOR:  Nothing further, Your Honor.  Thank you.

25          MR. STENGEL:  Thank you, Your Honor.

98

```
 1              (Judge Davis and Judge Krask conferred.)

 2              CHIEF JUDGE DAVIS:  So I will try to be back to you

 3   all expeditiously.  We've used that phrase quite a bit today.

 4   And I would ask you if you receive, if there are any rulings

 5   made by Judge Fallon or Judge Cooke that you think would be

 6   helpful to the Court after today, if you would pass those on

 7   expeditiously, I would appreciate it.

 8              And so that's all I can tell you at this point.  I

 9   very much appreciate your arguments.  Thank you, Counsel.

10              (Whereupon, proceedings concluded at 1:00 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

99

*CERTIFICATION*

1

2

3        *I certify that the foregoing is a true, complete and*

4    *correct transcript of the proceedings held in the above-entitled*

5    *matter.*

6        Paul L. McManus, OCR

Digitally signed by Paul L. McManus, OCR
DN: cn=Paul L. McManus, OCR, c=US,
email=pmcmanusocer@verizon.net
Date: 2019.05.01 15:04:57 -04'00'

7    _____

8            Paul L. McManus, RMR, FCRR

9            _____

10                   Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Paul L. McManus, RMR, FCRR Official Court Reporter