IN THE CIRCUIT COURT FOR ESCAMBIA COUNTY

STATE OF FLORIDA

MINDY LISTER and
MARTIN LISTER, individually and as the
next friends of
JONATHAN CAGLE,
NICOLLETTE CAGLE,
GINA CAGLE, and
McKENNA LISTER,

CASE NO.:        2010 CA 1532

        Plaintiffs,

SECTION:        J

        v.

THE MITCHELL COMPANY, INC.,
ABSHIELD L.L.L.P.,
CONSTRUCTION INDUSTRY SOLUTIONS,
INC.,
ROBERT RIFFE,
QUALITY DESIGN & CONSTRUCTION, LLC,
TAISHAN GYPSUM CO., LTD.,
TAI'AN TAISHAN PLASTERBOARD CO., LTD.,
DEVON INTERNATIONAL INDUSTRIES, INC.
f/k/a DEVON INTERNATIONAL TRADING,
INC.,
NORTH PACIFIC GROUP, INC.,
SMOKY MOUNTAIN MATERIALS, INC.
d/b/a EMERALD COAST BUILDING
MATERIALS, and
RIGHTWAY DRYWALL, INC.,

        Defendants.

COPY

CIRCUIT CIVIL DIVISION
FILED & RECORDED

2010 NOV -3 P 4: 31

ERNIE LEE MAGAHA
CLERK OF CIRCUIT COURT
ESCAMBIA COUNTY FL.

AMENDED COMPLAINT

        This is a complaint for damages arising from certain defendants' participation in a supply

chain that caused the plaintiffs' new home to be built using defective Chinese drywall.

1

DEFENDANT'S
EXHIBIT

12

CDW000384

Damages are also claimed as a result of the subsequent application of a fraudulently invented "remediation protocol" to eliminate the effects of the Chinese drywall.

Certain defendants conceded that the plaintiffs' new home had been built with corrosive Chinese drywall that attacked metal objects and the plaintiffs' bodies. Rather than removing the drywall, these defendants made false representations to convince the plaintiffs to permit their home to be used as a test lab to test an unproven, quasi-scientific set of secret chemicals. For eighteen months and counting, the plaintiffs have been needlessly waiting for the remedy they deserve—to get back into their house and on with their lives.

*The Parties, Jurisdiction, and Conditions Precedent to Filing an Action*

1.  The plaintiffs, Mindy Lister, Marty Lister, Jonathan Cagle, Nicollette Cagle, Gina Cagle, and McKenna Lister are citizens of the State of Florida. Mindy and Marty are the parents of Jonathan, Nicollette, Gina, and McKenna, who are minors. All counts are pleaded on behalf of all plaintiffs.

2.  Defendant The Mitchell Company, Inc. ("Mitchell") is an Alabama corporation in the business of building houses. Mitchell sold the Listers their home.

3.  Defendant AbShield, L.L.L.P. ("AbShield") is a Nevada limited liability company with a principal place of business in Florida. AbShield sells the "AbShield" line of chemicals that purportedly solve Chinese drywall problems.

4.  Defendant Construction Industry Solutions, Inc. ("CIS") is a Florida corporation with a principal place of business in Florida. CIS participates in AbShield's enterprise by, at the least, performing testing and installation services and by producing public reports on the effectiveness of the AbShield chemicals.

2

CDW000385

5.   Defendant Robert Riffe ("Riffe") is the owner and principal of AbShield, L.L.L.P. and Construction Industry Solutions, Inc.

6.   AbShield and CIS are each alter egos of Robert Riffe.

7.   "The Riffe Defendants" will be used to describe AbShield, CIS, and Riffe collectively. Where fewer than all three parties is intended to be described, this Amended Complaint gives those parties' shorthand names (as set forth in paragraphs 3–5).

8.   The Riffe Defendants maintain a single collective enterprise whose purpose is to sell AbShield chemicals.

9.   Defendant Quality Design & Construction, LLC ("QDC") is an affiliate of AbShield and CIS and a distributor of AbShield products.  Its state of organization and principal place of business is Louisiana.

10.  The remaining defendants constitute the supply chain—manufacturers, exporters, suppliers, and installer—that brought the defective drywall from China to the Listers' home.

11.  Defendant Taishan Gypsum, Co., Ltd. ("Taishan") is a Chinese company whose address is Dawenkou, Daiyue District, Shandong Province, China.  Taishan made and sold the drywall used to build the Listers' home.

12.  Defendant Tai'an Taishan Plasterboard Co., Ltd. ("Tai'an") is a Chinese company and a subsidiary of Taishan located in Tai'an City, China.  Tai'an made and sold the drywall used to build the Listers' home.

3

CDW000386

13. Shanghai Yu Yuan Import & Export Co., Ltd. purchased the drywall from Taishan and Tai'an and arranged for it to be shipped into the Port of Pensacola aboard the M/V Sanko Rally.

14. The M/V Sanko Rally encountered rough seas in transit and arrived in 2006. It was unloaded at the Port of Pensacola by Pate Stevedore Co., Inc. Unloading took place at least during the period from June 15, 2006 to July 12, 2006 and possibly longer.

15. Defendant Devon International Industries, Inc. f/k/a Devon International Trading, Inc. ("Devon International") is a Pennsylvania corporation with a principal place of business in Pennsylvania. Devon International imported and purchased the drywall from Shanghai Yu Yuan Import & Export Co., Ltd.

16. Defendant North Pacific Group, Inc. ("North Pacific") is an Oregon corporation with a principal place of business in Oregon. North Pacific purchased the drywall from Devon International.

17. Defendant Smoky Mountain Materials, Inc. d/b/a Emerald Coast Building Materials ("Smoky Mountain") is a Tennessee corporation with a principal place of business in Tennessee. As a building materials supplier, Smoky Mountain purchased the drywall from North Pacific and resold it for use by installers.

18. Defendant Rightway Drywall, Inc. ("Rightway Drywall") is a Georgia corporation with a principal place of business in Georgia. Rightway Drywall purchased the drywall from Smoky Mountain.

19. Rightway Drywall contracted with Mitchell to install drywall in the Listers' home.

4

CDW000387

20. According to Mitchell, Rightway Drywall was issued a Mitchell purchase order, dated July 12, 2006, and issued an invoice to Mitchell for the work, dated August 22, 2006.

21. This Court has personal jurisdiction over all out-of-state defendants under multiple sections of Florida's "long arm" statute, Fla. Stat. § 48.193. Jurisdiction lies under § 48.193(1)(b) because the defendants committed a tortious act in the state, under § 48.193(1)(g) because they failed to perform a contract in this state, and under § 48.193(2) because they are "engaged in substantial and not isolated activity within this state." Jurisdiction also lies under § 48.193(1)(f) because they produced a product that caused injury in this state during the normal course of its use. Additional grounds for jurisdiction under § 48.193 also exist.

22. Venue is proper in Escambia County because the home built by Mitchell using certain other defendants' drywall is located here, because the drywall was placed into the stream of commerce with the expectation that it would be delivered here, and because actionable communications made by certain defendants were directed into this county.

23. All conditions precedent to filing an action have been met. In particular, all conditions precedent established by Chapter 558 of the Florida Statutes have been satisfied because: (a) the plaintiffs served a "Chapter 558" letter on Mitchell on January 21, 2010 and the time period for specified in § 558.004(1) has run; (b) under § 558.003, no notice is required for a project that is not complete, and according to the parties themselves, Mitchell and the Riffe Defendants' purported remediation is not complete; (c) regardless of the applicability of Chapter 558, Mitchell and the Riffe Defendants have already conducted numerous inspections of the property, so the purpose behind Chapter 558

5

CDW000388

has already been satisfied; (d) the plaintiffs have already served demands rejected by Mitchell and the Riffe Defendants; and (e) this action contains claims for personal injuries, which § 558.002 specifically excludes from the reach of the statute. Finally, as to the Riffe Defendants, the plaintiffs deny that Chapter 558 provides them with any right to an inspection at all. Nonetheless, notwithstanding that any party's right to a pre-suit inspection has long since expired, the plaintiffs will voluntarily permit these parties to conduct an inspection if they do not seek a stay of this action under Chapter 558.

24. Any conditions precedent to the filing of warranty claims have also been met or waived as to Mitchell. The plaintiffs' January 21, 2010 letter asked Mitchell to forward all applicable warranties and the relevant claims procedures to the plaintiffs. Mitchell failed to do anything in response, so Mitchell has waived the right to demand pre-suit compliance with any procedures.

*Introduction to Chinese Drywall*

25. Drywall imported from Chinese manufacturers and installed in buildings in the United States is contaminated with chemicals that cause corrosive gases to leach out and damage the structure and contents of buildings. These gases are also injurious to human health and irritate the linings of the lungs and other tissues including nasal passages and eyes. The gases give off a distinct noxious odor.

26. The corrosion can destroy electrical, plumbing, HVAC, and life safety systems. In particular, corrosion to wiring reduces its carrying capacity and therefore increases the

6

CDW000389

risk of a dangerous hidden electrical fire starting within the walls.  All of these systems

are at risk of destruction so long as the drywall remains in the home.

27.   The U.S. Consumer Product Safety Commission (CPSC), the U.S. Department of Housing

and Urban Development (HUD), the Florida Department of Health, the U.S.

Environmental Protection Agency, and other government agencies all have active,

ongoing investigations into the problems caused by defective Chinese drywall.

28.   The CPSC and HUD have each determined that to effectively remedy Chinese drywall

problems, all drywall must be removed from the home, as well as the many other

affected components—including wiring, plumbing, appliances, and other fixtures.

29.   In a letter dated April 9, 2009, Mitchell conceded that the Listers' home has Chinese

drywall.

30.   In the same letter, Mitchell conceded liability for all necessary repairs and promised to

do so.

### The Listers Buy Their Home and Begin to Notice Problems

31.   Mitchell constructed the plaintiffs' home located at 1698 Brightleaf Circle, Escambia

County, during 2005–06.

32.   On January 17, 2007, the Listers closed on the house and began moving in.

33.   Months after moving in, the Listers noticed some unusual things about the house.

   a.   There was a heavy smell, like gunpowder or burnt matches.  This smell got into
        everything, especially absorbent items like clothes and furniture.

   b.   They experienced mysterious air conditioner problems and had to have several
        repairs to their system.

   c.   Their computer and their large TV began experiencing intermittent electrical
        problems until each finally failed and had to be replaced.

   d.   They noticed tarnishing on their metal objects, such as picture frames and
        silverware.

7

CDW000390

      e.  And the Lister children were frequently sick with respiratory illnesses and irritation.  Everyone in the home had nosebleeds and headaches.

34.  Mindy Lister grew concerned about the mysterious problems her family was experiencing.  After hearing several media reports about Chinese drywall, Mindy went on the Internet and found stories from other homeowners who were experiencing similar problems.

35.  Mindy learned that Chinese drywall releases sulfur gases that attack copper and silver components in a home, including the wiring and appliances.  She grew concerned that her house would become a fire hazard if the corrosion continued to progress.  She also worried over the health of her family.

36.  On April 9, 2009 (and not yet having received Mitchell's letter dated the same day admitting Chinese drywall was used), Mindy Lister contacted Mitchell to complain of Chinese drywall.  On the telephone, Mitchell denied that it had used Chinese drywall in constructing her house.

37.  The next day, Mindy Lister conducted her own inspection.  She unscrewed switch plate covers and saw black corrosion on copper ground wires.  Inside the AC unit, she found a thick residue of black corrosion.  Inside her refrigerator, she found a thick film of black soot.  She immediately contacted Mitchell with her findings.

38.  On April 11, 2009, Mitchell sent inspectors to her home and they confirmed that there is Chinese drywall in her house.  Mitchell confirmed this with a follow-up letter a week later.

CDW000391

39. On April 17, 2009, Mindy took McKenna to the doctor, where she was diagnosed with croup and bronchitis. At this time, Gina, Nikki, Jon, Marty, and Mindy Lister were also all sick with headaches, coughs, congestion, and runny noses.

*Mitchell Urges The Listers to Move Out and to Install AbShield Products*

40. After continued phone calls and e-mails, Mitchell eventually agreed to come to the Listers' house for a meeting. This meeting was held on May 9, 2009 at the Listers' house, and it was attended by Mindy Lister, Marty Lister, Mitchell representative Steve Schuhmann, and another Mitchell representative.

41. At this meeting, the Listers told Mitchell that they could no longer live at 1698 Brightleaf Circle.

42. The Mitchell representatives agreed that the Chinese drywall in the house was causing corrosion to metal objects in the home.

43. The Mitchell representatives also agreed that the Chinese drywall created an offensive smell and the physical irritation the Listers experienced in the home.

44. Mitchell suggested that they might temporarily let the Lister family live in a vacant house across the street, at 1693 Brightleaf Circle.

45. It was at this May 9, 2009 meeting that Mitchell first introduced to Listers to the AbShield products.

46. Mitchell gave the Listers written information about the AbShield chemicals.

47. Mitchell told the Listers that this was a new solution to Chinese drywall problems that would be cheaper and easier than removing and replacing all of the drywall.

9

CDW000392

48. Mitchell told the Listers that using AbShield would allow them back into their home faster.

49. Mitchell told the Listers that the AbShield system would be safe and effective.

50. Mitchell never told the Listers that leaving the existing sulfur corrosion on all the wiring and plumbing and ductwork in the home could be dangerous.

51. Mitchell told the Listers to allow AbShield into their home and to install their product.

52. Mitchell promised that AbShield's products would work.

53. Steve Schuhmann told the Listers, "Your house will be as good as new, and we will make sure of it."

54. Mindy Lister expressed concern about whether AbShield would really work. She stated, "If this doesn't work, then I want it all ripped out and rebuilt."

55. The Mitchell representatives replied, "We will take care of it."

56. As part of their offer, Mitchell agreed to replace items such as clothing, mattresses, and furniture, all of which had picked up a sulfur odor which could not be eliminated.

57. The Listers agreed to Mitchell's AbShield plan and moved into the temporary house.

58. This house is smaller and lacks many of the upgrades the Listers paid for.

59. Although the Listers continue to pay full mortgage payments on the 1698 Brightleaf Circle house, they have use only of the smaller temporary home.

60. Mitchell paid for some of the moving expenses, but not for the costs of packing their Listers' possessions.

CDW000393

61. The move was completed on May 23, 2009. While working at the old house and thus breathing the drywall fumes deeply, Mindy Lister experienced a bloody nose and a bad headache, and had the same symptoms in the shower that night.

62. Immediately after moving into the new house, the Lister family experienced better health.

63. McKenna began sleeping better during the night and had no chest or nasal congestion.

64. No one had nosebleeds or headaches.

65. On July 17, 2009, the Lister girls went to the pediatrician for a checkup, who noted that their respiratory problems had substantially abated but had not gone. The doctor noted that baby McKenna had gained only 3 pounds since February, but had been expected to gain at least 7 ½ pounds during that period.

*Mitchell and the Riffe Defendants Install AbShield's Products*

66. Mitchell and the Riffe Defendants entered the Lister home together on June 24, 2009 to install the AbShield products. The installation took three days.

67. Employees of Mitchell, AbShield, and CIS, along with Riffe, were responsible for the process, which was overseen by Mitchell in its capacity as builder of the house.

68. As stated below, QDC also claims to have participated in the remediation process.

69. As part of their protocol, the Riffe Defendants drilled a hole at the top of every wall cavity in the entire house and pumped in a black powdery substance.

70. This substance, now known as "AbShield™ SI-201 Activated Organic Powder Blend" but formerly known as AbCoat, is supposed to absorb and neutralize all gaseous sulfur compounds leaching out of the back of the drywall.

11

CDW000394

71. The Riffe Defendants refer to the substance informally as "pixie dust."

72. Pixie dust was delivered to the home in five-gallon buckets.

73. The Riffe Defendants also painted the front of the drywall with a gritty blue powdery paint. They now call this "AbShield™ GS-504 Breathable Barrier Coating."

74. Despite having no knowledge of what is contained inside Chinese drywall or how much of it there is, the Riffe Defendants represented to the Listers that their products, in combination, would absorb more sulfur gases than could ever be emitted from Chinese drywall.

75. To this day, no one knows why Chinese drywall emits sulfur gases.

76. As part of a further "enhancement" measure, the Riffe Defendants installed a "special" air filter in the Listers' HVAC unit to further neutralize any gases that might escape.

77. Unbeknownst to the Listers, the Riffe Defendants intended to use the Lister house for marketing purposes and wanted to document positive results from the installation.

78. Photos of the Lister installation remain on the Internet to this day, including on the "ABSHIELD" YouTube channel, despite the Listers' repeated demands to take them down.

79. The Riffe Defendants' test validation measures were poorly conceived.

80. At the beginning of the process, the Riffe Defendants took air samples from the home using plastic bags.

81. The Riffe Defendants later claimed that the air sample test results were invalidated because the Riffe Defendants collected the samples in the wrong kind of bag.

CDW000395

82. No government agency has found that collection of air samples in a plastic bag is an appropriate method to test for the presence of reactive Chinese drywall.

83. Further, despite the fact that copper was well-known to be corroded by Chinese drywall, the Riffe Defendants never gathered any copper samples at the time they installed their chemicals, so there was no way to compare "before" with "after."

84. At no time did the Riffe Defendants ever send copper samples to a lab for analysis.

85. The Riffe Defendants also sought to use part of the house as a "containment area," or non-treated zone or control zone. The idea was to compare the results of the product installation from the containment area and the treated area of the house.

86. To that end, the master bedroom suite was selected to not receive any treatment. The Riffe Defendants attempted to seal it shut by taping plastic wrap over the door.

87. However, this method of containment makes no sense since the black powder was injected into walls common to the bedroom and other rooms, and thus the powder coated the insides of some of the bedroom walls—not to mention, these walls contained numerous perforations for electrical outlets which would permit air movement, as would the attic.

88. After the installation was complete, Mitchell and the Riffe Defendants set the thermostat so the air conditioner would run continuously.

89. The Riffe Defendants decreed that no one should enter the home until another round of air testing could be conducted.

90. The special HVAC filter promptly clogged up with pixie dust, causing the motor in the HVAC system to burn up and fail.

CDW000396

91. The composition of pixie dust is proprietary.

92. Thus, the Listers have no idea what is coating the back of their walls and whether it is safe to live in the home or breathe the air.

93. A house built with defective Chinese drywall is worth less than a house built with standard, non-defective drywall.

94. No one will buy a house contaminated with the Riffe Defendants' secret chemicals.

95. The air in the Lister house remains laden with a heavy sulfur smell and metal continues to corrode.

96. The AbShield products do not work at all.

### Mitchell and the Riffe Defendants Make Return Trips to the Home

97. On July 9, 2009, Mitchell's vice president Chuck Stefan, Robert Riffe, and Mindy Lister returned to the home. Riffe and Mitchell intended to collect another round of air samples and to install the AbShield chemicals in the containment area.

98. Mindy Lister immediately smelled sulfur when she entered the house.

99. Riffe told her, "This process is not yet completed, but when it's done, you will not smell anything but fresh paint."

100. Riffe also told Mindy Lister that AbShield pixie dust was "completely safe" and could be put into the human mouth without any harm.

101. Riffe declined to taste pixie dust.

102. Lister expressed skepticism about the process since the results were not as advertised.

103. She asked Stefan whether, if the process did not work, Mitchell would gut the home and properly rebuild it.

14

CDW000397

104. Stefan replied, "We'll take care of you.  We assure you—we are here for you and your family.  We are going to take care of you."

105. Stefan also told Lister, "You are doing us a favor, and by helping us, we will help you. Because if this works, this will help our other homes that are affected."

106. Mitchell and AbShield installed more AbShield chemicals in the house.

107. Mitchell left copper samples in the house for later inspection and testing.

108. Mitchell entered the home again in late August or early September.

109. On September 2, 2009, Mitchell's executive Steve Schuhmann promised to conduct the copper testing, writing, "As far as the added copper, that will be done by Mitchell and we will check back over the time frame to see if there is any dusting."

110. "Dusting" is a euphemism for copper corrosion.

111. The next day, Schuhmann wrote Mindy Lister and admitted that on his last visit, he "thought [he] might be able to smell a tinge of sulphurous odor."

112. On September 8, 2009, Schuhmann, Mitchell's vice president Chuck Stefan, AbShield's technician Rick Green, and the Listers' then-representative and now-counsel Bill Cash met at the house again to review progress.

113. The house retained a distinct sulfur odor that all visitors said they detected.

114. Green refused to tell Cash what is in pixie dust.

115. Green stated the house was safe to live in because the third-party lab results stated that certain chemicals in the air were "ND," or not detectable.

116. Green also stated that the house was safe to live in because these chemicals were below OSHA thresholds for workplaces.

CDW000398

117. There is no scientific basis for using workplace standards in a residential setting.

118. Green stated he did not know whether the drywall "had finished off-gassing."

119. Green refused to state whether there was any house in the United States where the AbShield products had successfully remediated the problem.

120. Neither Stefan nor Schuhmann disagreed with any of Green's statements.

121. Mitchell's copper samples from July had already begun to turn black by the time of this September visit.

### Mitchell Concedes the Process Had Failed, But Refuses to Perform

122. Mitchell's Schuhmann and Mindy Lister conducted another tour of the home on October 13, 2009.

123. Schuhmann wrote to other executives at Mitchell, including Chuck Stefan, to describe the visit.

124. Schuhmann wrote: "When we went into the house there was the distinct odor of the drywall present again.  The odor was especially strong in the master bedroom and also the garage area.  Mindy said she was experiencing irritation to her throat."

125. Schuhmann also described that "[m]any of the copper pieces that had been placed in the wall" on a previous visit "had already begun tarnishing," and "[t]here was also tarnish on the copper piping" on door handles.

126. In the e-mail, Schuhmann conveyed that he understood Mindy Lister to have demanded an end to the AbShield process and the complete remediation of the home.  He wrote: "Mindy made it clear that she has no confidence in the Abshield (sic) process and that she wants the sheetrock removed immediately."

16

CDW000399

127. In response, however, Schuhmann's boss Stefan rejected Lister's plea.  On October 26, 2009, he wrote in an e-mail, "we are at an impasse.  I think that we need to allow AbShield back in the house. . . . **Mindy agreed to let them perform their protocol. . . . Our position is that we need to let AbShield back into the house . . . .**" (Emphasis added.) (Ex. A.)

128. On November 4, 2009, Stefan followed up with an e-mail to Lister that read, in its entirety: "**Our position remains unchanged.  We need to allow Abshield (sic) back in the house to complete their work.  c**" (Emphasis added.) (Ex. B.)

129. Mitchell has never budged from this position.

130. The plaintiffs, desperate to get back occupancy of their home and primary asset, eventually capitulated and agreed to allow the Riffe Defendants back into the house, even though Stefan refused to set any date for the end of Mitchell and the Riffe Defendants' "protocol."

131. The Listers made repeated requests for Mitchell and the Riffe Defendants to propose some inspection dates.

132. Upon notification to Mitchell and the Riffe Defendants that the Listers had engaged counsel, these parties withdrew their offer to inspect the house.

*AbShield's False Representations*

133. Despite the admissions made internally by Mitchell, AbShield continued to tell the world that the process in the Lister home on Brightleaf Circle had worked.

134. On October 20, 2009, Robert Riffe, the principal of the AbShield entities, sent an e-mail to say that "[t]he corrosion and odor testing for the Brightleaf home is yeilding (sic)

CDW000400

positive results under extreme accelerated testing.  All indicators are positive, including

up to the last visit 9.08.09 when no dusting of the copper elements reviewed was

documented during the field walk.  **The AbCoat system is performing as designed."**

(Emphasis added.)  (Ex. C.)

135. This statement was false when written and is still false today.

136. AbShield maintains a web site at www.abshield.net.

137. On this web site, the following statement formerly appeared:

"All AbShield™ systems, products, methodology, application techniques, formulations,
and other analytical laboratory calculations, data and associated testing, etc., is (sic)
patent pending, with all related information owned, licensed and copy write (sic) of the
corporate (sic) entity.  AbShield™ are (sic) licensed trademarks of the company, with all
information listed there-under copy writed (sic) and owed (sic) by the corporate (sic)
entity.  Any unauthorized distribution or duplication is strictly prohibited and punishable
by fines and imprisonment."

138. This was the statement on the web site at the time the Riffe Defendants were working

in the Listers' house—namely, the summer of 2009.

139. As of October 2010, the statement was the same, except that it now claimed that "[a]ll

AbShield™ systems, products, methodology, application techniques, formulations, and

other analytical laboratory calculations, data and associated testing, etc." were actually

"protected under patent with the U.S. Patent and Trademark Office."

140. To the extent that it is grammatical, this statement is largely or entirely false.

141. Contrary to AbShield's assertion, at all times during 2009, AbShield™ was not a

trademark registered to anyone.

142. The AbShield™ mark was not filed for registration until January 20, 2010.

CDW000401

143. AbShield also previously claimed use of the "AbCoat" trademark and used it in
     connection with the blue paint substance. AbCoat™ is actually registered to the Atrium
     Medical Corporation of New Hampshire. After the plaintiffs' counsel sent a letter to
     Atrium's counsel, AbShield removed this mark from its web site and renamed the
     AbCoat paint to AbShield paint.

144. AbShield does not appear to own any copyrights registered with the Library of Congress.

145. Until at least January 16, 2010, the AbShield web site continued to display photos of the
     plaintiffs' home as its "Northwest Florida" case study.

146. These images can still be retrieved from the AbShield web server today.

147. These photos implied that the process works and that the homeowner is satisfied.

148. The plaintiffs vigorously complained to Mitchell and the Riffe Defendants about the
     photos and Mitchell informed AbShield that they should be taken down.

149. These photos violate the plaintiffs' privacy and are posted without permission.

150. Defendant QDC and the Riffe Defendants also used a web site maintained by QDC to
     make public representations.

151. On January 22, 2010, that web site stated as follows:

     "AbShield™ representatives have engaged in communication with the US Consumer
     Product Safety Commission. We anticipate becoming apart (sic) of a future remediation
     plan."

     (Ex. D.)

152. The CPSC has never recommended the use of any AbShield product.

153. In fact, the CPSC has rejected such "quick fixes" in recommending that all electrical
     wiring be removed and replaced even after the Chinese drywall has been removed.

CDW000402

154. The same web page also stated:

"Warranties will be awarded by AbShield™ and the certified applicators upon verification that the installation meets the AbShield™ technical standards for installation and related protocol. A certification of compliance from a third-party inspection team noting that the product system application was in accordance with the approved product installation protocol may be provided."

(Ex. D.)

155. The same web page also stated:

"AbShield™ AbCoat™ products are environmentally friendly and non-toxic.  MSDS sheets have been completed and available for review.  Green and HomeGuard approvals are forthcoming."

(Ex. D.)

156. The plaintiffs have never been provided with these sheets or given information about

the forthcoming approvals.

157. Albert Miller III is a person who represents himself as a sales manager for AbShield.

158. On November 20, 2009, Miller posted on the Internet that he had lab results that

proved AbShield worked, and that "We have the solution!"

159. On the same date, he also promised that AbShield guarantees its projects with a 15-year

warranty.

160. In an August 21, 2009 e-mail to Mitchell, Robert Riffe of AbShield promised that, "[t]o

make sure . . . that the homeowners['] questions are answered and this project is a

success, we are on board to do what we have to do to cover the bas[e]s."

161. John Rider is a person who claims to work for AbShield.

CDW000403

162. On December 17, 2009, Rider posted the following statement on the Internet: "We get the question about exactly how the product absorbs and neutralizes the gas **and this I cannot answer.**" (Emphasis added.)

163. On December 11, 2009, Rider posted the following statement on the Internet: "We at AbShield face scrutiny and questions everyday (sic) about the product and it's (sic) effectivness (sic).  We have been through some very tough Q&A sessions with very angry home owners, attorneys, contractors," and others.

*Mitchell's False Representations*

164. In addition to the false statements described above, Mitchell has made false statements in public regarding the success of the AbShield process.

165. On August 13, 2009, in response to an article titled "Chinese Drywall Update" on the web site of Builder Magazine, Mitchell's vice president Chuck Stefan posted the following public statement:

"We have successfully remediate (sic) a home in Pensacola, Florida without removing the sheetrock.  We can't get anyone in the media to publish the lab results but they are truly amazing.  The press only wants to print the bad news.  They aren't really interested in the solution.  cstefan"

166. This statement was made five weeks after Stefan's July 9, 2009 visit to the home when he knew that the project was not complete.

167. This statement was made five weeks after Stefan's July 9, 2009 visit to the home when he knew that no final results were available.

168. This statement was made five weeks after Stefan's July 9, 2009 visit to the home when he knew that the home smelled—as it still does today—like noxious sulfur chemicals.

CDW000404

169. On September 2, 2009, Steve Schuhmann of AbShield e-mailed Mindy Lister to say that, although AbShield "'goofed up' on the original testing," AbShield had "an interest in providing accurate information to the builders and individuals they plan on marketing to in the future, as well as the Consumer Product Safety Commission, which they say they have made contact with."

170. On September 3, 2009, Schuhmann wrote Lister to promise that, "We are on the same page as far as being sure that the problem is fixed."

171. Not long after, Schuhmann informed Lister that he was no longer authorized to speak for Mitchell.

*The Riffe Defendants are Jointly Liable For Each Other*

172. The Riffe Defendants—Riffe, AbShield, and CIS—are jointly liable to the plaintiffs because their activities are so intertwined as to be inseparable, and because they have failed to respect the corporate form.

173. These facts support the assertion that the Riffe Defendants' activities are inseparably intertwined:

   a. CIS prepared a 28-page report, dated July 15, 2009, detailing the installation of the AbShield chemicals in the plaintiffs' home. The report bears Robert Riffe's signature and both the "Construction Industry Solutions" and "AbShield™" logos.

   b. Some of the lab results from the third-party air sampling lab were addressed to CIS.

   c. Some of the e-mails sent by Riffe and provided to Mindy Lister by Mitchell were sent using a CIS signature.

   d. Robert Riffe also uses an AbShield mailbox and signature. His October 20, 2009 e-mail that stated "[t]he AbCoat system is performing as designed" is one such e-mail.

   e. At least one AbShield web site purports to be owned by AbShield, L.L.L.P.

   f. CIS, AbShield, and Riffe all share the same residential address in Ocoee, Florida.

22

g.  The Riffe Defendants have confused the public with a multitude of bogus corporate division names, including "Southeast Regional Operations," "Southeast Division," "Technical Division," "AbShield Analytical & Lab Division," "Zone USA—Research and Development," and "AbShield/AbCoat of South East Florida" so as to create the impression that they are a large, complex enterprise. These multiple names make it difficult to determine which entity did what.

h.  Each of these persons shared in the promotion, marketing, and distribution of the AbShield products.

i.  Each of these persons distributed false information about the efficacy of the AbShield products.

j.  Each of these persons has employed common purported trademarks.

k.  Each of these persons is currently litigating this case using identical discovery requests, substantially similar motions practice, and through the same counsel.

174.  Further, AbShield was not formed until June 24, 2009 and was not even registered to do business in Florida until November 23, 2009. All of AbShield's wrongful conduct prior to these dates is chargeable to Riffe and CIS.

175.  Riffe formed AbShield with the express purpose of deceptively selling the AbShield family chemicals.

176.  The AbShield protocol is fraudulent—it does not work—and thus the formation of AbShield was done with an improper purpose. Accordingly, Riffe remains personally liable for AbShield's conduct, and its corporate form may be disregarded.

177.  As the managing member of AbShield L.L.L.P, principal of Construction Industry Solutions, Inc., and owner of both, Robert Riffe derived a personal benefit from their actions.

178.  These entities, registered at and doing business out of Riffe's home, are Riffe's alter egos. Accordingly, Robert Riffe is personally liable for damages arising from their conduct.

23

CDW000406

179. Riffe also bears personal liability for the wrongful statements made through the AbShield and CIS e-mail accounts.

180. At the bottom of each AbShield and CIS e-mail appears a disclaimer like this one:

"Any views expressed in this message are those of the individual sender, except where the sender specifically states them to be the views of the (sic) AbShield." (Ex. C.)

181. Riffe never "specifically state[d]" any of the views expressed in his e-mails to be the views of his corporate entities, so he bears personal liability for all of them.

182. The Riffe Defendants, by entering into a partnership with QDC, are jointly liable with QDC for each others' damages.

### QDC's Role in the AbShield Scheme

183. QDC established and operated a multi-page web site, www.abshieldlouisiana.com, through which QDC and the Riffe Defendants spread false statements to the public.

184. QDC knew that these statements would be directed into the state of Florida.

185. The Chinese drywall problem is centered in Florida. Because of the mid-2000's building boom and the additional demand for drywall after multiple Florida hurricanes, a clear majority of the defective Chinese drywall in the U.S. was imported through Florida ports and sold into the Florida market. The market for Chinese drywall remediation services lies primarily in Florida.

186. QDC knew that Florida homeowners were the primary market. Through its web site offering Chinese drywall remediation services, QDC solicited business primarily in Florida.

24

CDW000407

187. The QDC web site **specifically stated** that "[h]urricanes that made landfall . . . in Florida"
     were a cause for the building materials shortage that led to the importation of Chinese
     drywall.

188. Nowhere on its web site did QDC exclude Florida homeowners from its target audience.

189. Through a contact form, QDC's web site also collected personal information from
     visitors and sought to establish two-way communication with them.

190. Thus, QDC is liable in Florida for damages flowing from its false statements.

191. On September 8, 2009, QDC posted the following comment on a news story that
     appeared on www.fox8live.com, the web site of a Fox television affiliate:

     "Hi, my name is jim davidson with quality design and construction. we have been
     working with a company called abshield in which we will will be partners.we have
     developed a system to neutralize the toxic off load of gas from the chinese drywall. very
     simple proceedure call me 504-616-5468. we are working with gov't for approval. have
     done one house in fla. all tests were good. would love to get word out and start helping.
     just a brief insight. we leave drywall in place and use high pressure to inject powder into
     walls. this turns to gas and neutralizes gas. we then seal holes and repaint two coats of
     sealer and prime walls. this leaves house ready to re paint and move
     in.jd1arh@aol.com"

     (Ex. E.)

192. QDC knew that this statement would be directed into the state of Florida.

193. By its own admission, QDC claimed:

     a.  To play a role in the "develop[ment]" of the AbShield chemicals.

     b.  To intend to be "partners" in the AbShield enterprise.

     c.  To work with the government to gain approval of the AbShield system.

     d.  That it came to Florida to remediate one house.

     e.  That the results of the remediation were successful.

194. And through this posting, QDC continued to actively advertise for the sale and
     installation of the AbShield chemicals until at least September 2009.

CDW000408

195. The house referred to in this posting was the Lister house.

196. QDC is liable for the remediation at the Listers' home.

197. Further, by being a "partner" in the AbShield enterprise, QDC shares joint liability with each of the Riffe Defendants.

*The Riffe Defendants and Mitchell are Vicariously Liable For Each Other's Conduct*

198. The Riffe Defendants and Mitchell are each liable for the actions of each other.

199. Mitchell introduced the plaintiffs to the Riffe Defendants and stood behind their protocol.

200. Mitchell and the Riffe Defendants entered into a contractual relationship with each other as part of the Lister project as well as in other Mitchell developments.

201. Mitchell continues to demand that the Riffe Defendants be included as a part of the remediation process for the plaintiffs' home.

202. Mitchell selected and relied on the Riffe Defendants to help Mitchell remediate the plaintiffs' home, and is accordingly liable for its wrongful selection.

203. Where Mitchell sought to act, or refrained from acting, Mitchell did so in concert with direction from the Riffe Defendants.

204. Mitchell and the Riffe Defendants derived a benefit from each others' conduct: Mitchell used the Riffe Defendants and their AbShield protocol to forestall making costly, proper repairs, and the Riffe Defendants used Mitchell to get access to a real-life test lab for their unproven chemicals so they could build the AbShield market.

26

CDW000409

205. The Riffe Defendants and Mitchell planned together to remediate another set of units at the Prichard Housing Authority's Chinese drywall-contaminated project in Prichard, Alabama.

206. The Riffe Defendants and Mitchell were joint venturers in the application and testing of the AbShield family of chemicals.

## COUNT I:
### FRAUD AND FRAUDULENT INDUCEMENT
#### (Against Mitchell, AbShield, CIS, Riffe, and QDC)

207. Paragraphs 1–206 are incorporated by reference as if written here.

208. Each of the defendants made certain statements to the plaintiffs with the intent of inducing the plaintiffs to allow their home to serve as a test bed for the AbShield chemicals.

209. Each of the defendants had an interest in obtaining successful test results. The Riffe Defendants and QDC hoped to validate their product and expand the market for it. Mitchell sought a quick fix to its significant remediation burden in all its other houses.

210. These statements were also made with the intent of forestalling and dissuading legal action brought by the plaintiffs.

211. These statements were also made with the intent of avoiding payment of the full damages owed to the plaintiffs.

212. The specific statements alleged to have been made with knowing falsity are:

    a. The written materials produced by the Riffe Defendants and given to the plaintiffs by Mitchell at the May 9, 2009 meeting, which stated that the AbShield system was safe, effective, and a reasonable solution for Chinese drywall problems.

    b. Mitchell's statements to the plaintiffs at the May 9, 2009 meeting that the AbShield system would be faster than a proper remediation. In fact, Mitchell

27

CDW000410

knew that this testing would take longer than a straightforward "rip and replace" of the drywall.

c. Mitchell's statements to the plaintiffs at the May 9, 2009 meeting that the AbShield system would be safe and effective. In fact, Mitchell knew that corrosion to wiring would increase the fire risk.

d. The Riffe Defendants' entire pattern of deception regarding the safety and effectiveness of their products. These parties knew that AbShield does not work and that they have no valid proof of its safety or effectiveness.

e. The Riffe Defendants' statement, through Robert Riffe, to the plaintiffs on June 24, 2009 that the AbShield/AbCoat products would absorb more gases than could ever be emitted by drywall.

f. The Riffe Defendants' statement, through Robert Riffe, to the plaintiffs on July 9, 2009 that when the process was complete, the plaintiffs would smell nothing but fresh paint. These parties knew their product would not work and that Chinese drywall sulfur compounds would continue to be smelled.

g. Mitchell's statement, through Chuck Stefan, on August 13, 2009, that the remediation was "truly amazing." In fact, Stefan had visited five weeks earlier and knew the home smelled of sulfur and that there were no test results.

h. Mitchell's statement, through Steve Schuhmann, on September 3, 2009, that Mitchell and the Riffe Defendants intended to "be[] sure that the problem is fixed."

i. QDC's statement, through Jim Davidson, posted on the Internet on September 8, 2009, and including the statement that after QDC participated in the Lister remediation, "all tests were good." QDC knew that there continued to be complaints about the Lister house and that there were no "good" tests.

j. The Riffe Defendants' entire e-mail, through Robert Riffe, to the plaintiffs on October 20, 2009, including the statement that testing yielded "positive results under extreme accelerated testing." In fact, these parties knew that testing had yielded no such results because the testing was entirely invalidated.

k. The twin web sites maintained by Riffe Defendants alone (www.abshield.net) and by QDC and the Riffe Defendants in concert (www.abshieldlouisiana.com), as viewed and accessed throughout this case, and particularly the statements that:

  i. the AbShield products were patent pending or actually patented;

  ii. the AbShield and AbCoat names were properly trademarked and copyrighted;

  iii. there would be "No more rotten eggs," referring to the drywall smell;

  iv. the products were about to receive government approval or had actually received government approval;

28

CDW000411

    v.   third-party warranties would be extended to homeowners;

    vi.   Green and HomeGuard approvals were forthcoming;

    vii.   there was a "patented delivery process involv[ing] Electro-static Impulse Air Infusion";

    viii.   the product line was "A proven time saving measure and noteworthy value to the individual consumer"; and

    ix.   the entire premise of the product line that the system was safe, effective, and an appropriate remediation for homes.

213. Each defendant made these statements knowing they would induce the plaintiffs to rely

on them in conducting their affairs.

214. The plaintiffs did rely on these statements in choosing to permit the defendants to have

access to their home for several months, in permitting the chemicals to be placed into

their walls, and in delaying and averting legal action.

215. The plaintiffs trusted the defendants' statements that their process was going to lead to

an appropriate resolution and that they would stand behind the results.

216. The plaintiffs were damaged by their reliance on the defendants' statements.

217. Accordingly, the defendants are liable for fraud and for fraudulent inducement.

218. Further, these statements constituted wanton, willful, and intentional misconduct.

**COUNT II:**
**BREACH OF EXPRESS WARRANTY—DRYWALL PRODUCTS**
**(Against Mitchell, Taishan, Tai'an, Devon International,**
**North Pacific, Smoky Mountain, and Rightway)**

219. Paragraphs 1–206 are incorporated by reference as if written here.

220. The drywall was marked with writing that stated the drywall met or exceeded ASTM C

1396.

221. This constituted an express warranty that each of the defendants affirmed by selling the

drywall.

CDW000412

222. The plaintiffs relied on the express warranty extended to them.

223. The drywall failed to meet ASTM C 1396 for the reasons stated in Count X, building code violations. See ¶¶ 312–316. Consequently, the express warranty was breached and all defendants are liable for the breach.

224. Mitchell also extended multiple express warranties to the plaintiffs at the time they purchased their home. Mitchell's warranties were stated in its purchase contract, the Limited Warranty extended at the time of sale, and its affirmative representations that the house it was building would be safe and fit for residential use.

225. By delivering a home that was unlivable and unusable, Mitchell breached its warranties.

226. Mitchell also extended express warranties for repair in its April 9, 2009 letter conceding liability for the Chinese drywall and promising to fix it, as well as making written promises to "work with" the plaintiffs.

227. Mitchell failed to make good on these promises.

228. Accordingly, Mitchell is further liable for breach of its particular warranties.

**COUNT III:**
**BREACH OF EXPRESS WARRANTY—ABSHIELD PRODUCTS**
**(Against Mitchell, AbShield, CIS, Riffe, and QDC)**

229. Paragraphs 1–206 are incorporated by reference as if written here.

230. Each of the defendants extended an express warranty to the plaintiffs.

231. Mitchell extended express warranties to the Listers by repeatedly making written promises to "work with" the Listers through the entire AbShield process.

232. The Riffe Defendants jointly extended express warranties to the Listers by also promising to get "on board to do what we have to do to cover the bas[e]s."

30

CDW000413

233. QDC and the Riffe Defendants extended an express warranty on their web sites.

234. The Riffe Defendants, through Albert Miller III, extended a 15-year express warranty for AbShield products.

235. All defendants extended other express warranties through their oral and written statements to the Listers and their representatives.

236. The plaintiffs relied on these warranties in permitting the AbShield products to be installed.

237. The plaintiffs have demanded that all defendants perform on their warranties.

238. None of these defendants has agreed to fulfill these warranties.

239. Accordingly, the defendants are liable for breach of express warranty.

**COUNT IV:**
**BREACH OF IMPLIED WARRANTY—DRYWALL PRODUCTS**
**(Against Mitchell, Taishan, Tai'an, Devon International,**
**North Pacific, Smoky Mountain, and Rightway)**

240. Paragraphs 1–206 are incorporated by reference as if written here.

241. Through their conduct and otherwise, each of the defendants extended an implied warranty to the plaintiffs, that the drywall was safe, effective, and appropriate for its foreseeable intended use as a building material in a dwelling.

242. By passing the drywall through the supply chain, each defendant warranted that the drywall was in merchantable condition and was fit for its intended purpose.

243. The drywall, by virtue of its defective properties, fails to be in merchantable condition or be fit for its intended use.

244. Accordingly, the defendants are liable for breach of implied warranty.

31

CDW000414

## COUNT V:
## BREACH OF IMPLIED WARRANTY—ABSHIELD PRODUCTS
### (Against Mitchell, AbShield, CIS, Riffe, and QDC)

245. Each of the defendants extended an implied warranty to the plaintiffs.

246. The defendants assumed responsibility for all damages stemming from the breach of such warranties.

247. As to Mitchell, a warranty was implied through its conduct, including:

   a. Informing the plaintiffs that they had Chinese drywall;

   b. Promising to do whatever was necessary to remediate the home;

   c. Inspecting and monitoring the home;

   d. Locating AbShield and bringing AbShield into the home to conduct remediation;

   e. Making representations that the government was expected to endorse the AbShield process;

   f. Agreeing to test the copper samples in the home;

   g. Making repairs to the damaged A/C unit;

   h. Making repeated statements and representations that all problems would eventually be fixed;

   i. Assuming public responsibility for the outcome of the process; and

   j. A general course of conduct that entailed repeated trips to the home to install the products and to monitor their prognosis.

248. As to AbShield, L.L.L.P., Construction Industry Solutions, Inc., Riffe, and Quality Design & Construction, LLC, these warranties were implied through their conduct, including:

   a. Promising to do what was necessary to remediate the home;

   b. Inspecting and monitoring the home;

   c. Designing a multi-stage plan for the remediation of the home;

   d. Making representations that the government was expected to endorse the AbShield process;

   e. Agreeing to test the air in the home;

   f. Agreeing to test the copper samples in the home;

   g. Making repairs to the damaged A/C unit;

32

CDW000415

h.  Making repeated statements and representations that all problems would eventually be fixed;

i.  Assuming public responsibility for the outcome of the process; and

j.  A general course of conduct that entailed repeated trips to the home to install the products and to monitor their prognosis.

249. All defendants also made implied warranties that their products would be fit for their intended use and that their products would be merchantable.

250. The plaintiffs relied on these warranties in the conduct of their affairs.

251. None of these defendants has agreed to fulfill these warranties.

252. Accordingly, the defendants are liable for breach of implied warranty.

**COUNT VI:**
**PRODUCTS LIABILITY—DRYWALL PRODUCTS**
**(Against Mitchell, Taishan, Tai'an, Devon International,**
**North Pacific, Smoky Mountain, and Rightway Drywall)**

253. Paragraphs 1–206 are incorporated by reference as if written here.

254. The defective Chinese drywall was a product for purposes of products liability law.  The entire house purchased by the Listers was also a product for these purposes.

255. Defendants are all manufacturers, importers, distributors, wholesalers, suppliers, installers, sellers, and/or retailers of drywall, and each defendant's specific role in the supply chain is outlined above.  In particular, and without exclusion to the prior allegations, Mitchell was a manufacturer, supplier, seller, and retailer of the Lister house, and Rightway Drywall was a supplier, seller, and installer of the drywall in the house.

256. The plaintiffs are the reasonably foreseeable consumers of those products.

257. The plaintiffs have used all products for the purpose which they were intended to be used.

33

CDW000416

258. These products are in the same condition they were when they left the hands of each
defendant.

259. The defendants are all strictly liable in tort for defective product on account of
manufacturing defect, in that the products provided were defectively made, in that they
did not comply with manufacturing specifications and did not work for their intended
purpose.

260. The defendants are all strictly liable in tort for defective product on account of design
defect, in that (a) the risk of using the products outweighs the benefit gained from such
use (risk/utility balancing test) and (b) a reasonable consumer's expectations would be
frustrated by the use of the products (consumer expectations test).

261. The defendants are all strictly liable in tort for defective product on account of failure to
warn of a latent, material defect which could not be reasonably discovered by the
plaintiffs upon purchase.

262. The nature of these defects is such that the plaintiffs have suffered damages to other
physical property and personal injuries, as well as certain economic damages.

263. Accordingly, the defendants are strictly liable in tort for defective product.

### COUNT VII:
### PRODUCTS LIABILITY—ABSHIELD PRODUCTS
### (Against Mitchell, AbShield, CIS, Riffe, and QDC)

264. Paragraphs 1–206 are incorporated by reference as if written here.

265. Defendants are the manufacturers, wholesalers, suppliers, marketers, installers, and/or
retailers of the AbShield family of chemicals. Each defendant's specific role in the
supply chain is outlined above.

CDW000417

266. The plaintiffs are the reasonably foreseeable consumers of the chemicals.

267. The plaintiffs have used the chemicals for the purpose which they were intended to be used and according to the defendants' directions.

268. The chemicals are in the same condition they were when they left the hands of each defendant.

269. The defendants are all strictly liable in tort for defective product on account of manufacturing defect, in that the chemicals do not function according to their intended specifications and do not work for their intended purpose.

270. The defendants are all strictly liable in tort for defective product on account of design defect, in that (a) the risk of using the products outweighs the benefit gained from such use (risk/utility balancing test) and (b) a reasonable consumer's expectations would be frustrated by the use of the products (consumer expectations test).

271. The defendants are all strictly liable in tort for defective product on account of failure to warn of a latent, material defect which could not be reasonably discovered by the plaintiffs upon purchase.

272. The nature of these defects is such that the plaintiffs have suffered damages to other physical property and consequential damages in now needing to remediate both the unknown AbShield chemicals and the Chinese drywall.

273. Accordingly, the defendants are strictly liable in tort for defective product.

274. Further, the defendants' actions, inaction, and misrepresentations constituted wanton, willful, and intentional misconduct.

CDW000418

<u>COUNT VIII:</u>
<u>NEGLIGENCE—DRYWALL PRODUCTS</u>
<u>(Against Mitchell, Taishan, Tai'an, Devon International,</u>
<u>North Pacific, Smoky Mountain, and Rightway Drywall)</u>

275. Paragraphs 1–206 are incorporated by reference as if written here.

276. Each of the defendants owed a duty of care to the plaintiffs.

277. Each defendant owed the plaintiffs a duty of reasonable care in manufacturing, processing, distributing, delivering, supplying, inspecting, marketing, selling, and/or installing what it placed into the stream of commerce, including a duty to assure that their products would perform as intended and would not cause damage to persons or property.

278. Each defendant's conduct in passing the drywall into the supply chain constituted negligence because each defendant knew or should have known that its products were defective and that further distributing the products would cause harm to the plaintiffs, foreseeable users of the products, as well as create a high risk of unreasonably dangerous side effects.

279. Each defendant owed the plaintiffs a duty to disclose the dangerous properties of the products.

280. Each defendant owed the plaintiffs a duty not to conceal information concerning the products and to truthfully represent their true properties.

281. Mitchell further owed the plaintiffs a duty to promptly use an appropriate remediation protocol to repair their house, which it failed to do.

36

CDW000419

282. Mitchell's selection of the Riffe Defendants and their fraudulent protocol, without an adequate investigation, which would have turned up the fraudulent nature of the AbShield system, constituted negligence.

283. Each of the defendants breached their duties.

284. The negligence of each defendant was the proximate cause of plaintiffs' damages, injuries, harm, and economic loss which they suffered and will continue to suffer.

285. The defendants' actions and inactions, by virtue of violating statutes, ordinances, and regulations, also constituted negligence per se.

286. Accordingly, the defendants are liable for negligence.

## COUNT IX:
### NEGLIGENCE—ABSHIELD PRODUCTS
#### (Against Mitchell, AbShield, CIS, Riffe, and QDC)

287. Paragraphs 1–206 are incorporated by reference as if written here.

288. Each of the defendants owed a duty of care to the plaintiffs.

289. Each defendant owed the plaintiffs a duty of reasonable care in manufacturing, processing, distributing, delivering, supplying, inspecting, marketing and/or selling what it placed into the stream of commerce, including a duty to assure that its products would perform as intended and would not cause damage to persons or property.

290. Each defendants breached its duty by failing to exercise ordinary care in the manufacturing, processing, distributing, delivering, supplying, inspecting, marketing and/or selling what they placed into the stream of commerce, in that it knew or should have known that its products were defective, did not function as intended and/or created a high risk of unreasonable, dangerous side effects.

37

CDW000420

291. Each defendant's negligence included, but was not limited to:

    a.  Designing a chemical remediation protocol that does not work;

    b.  Marketing a chemical remediation protocol that does not work;

    c.  Producing a chemical product that was not approved by or registered with any government agency;

    d.  Failing to disclose the contents of the chemicals;

    e.  Failing to advertise that, even if AbShield worked perfectly as promised, harmfully corroded wiring would remain in a home and continue to pose an unacceptable life safety risk;

    f.  Leading the plaintiffs to believe that various approvals, such as the CPSC's and "Green" approvals, were forthcoming;

    g.  Failing to design adequate tests to detect AbShield's failure early on.

292. The negligence of each defendant was the proximate cause of plaintiffs' damages, injuries, harm, and economic loss which they suffered and will continue to suffer.

293. The defendants' actions and inactions, by virtue of violating statutes, ordinances, and regulations, also constituted negligence per se.

294. Accordingly, the defendants are liable for negligence.

## COUNT X:
## VIOLATION OF BUILDING CODES
### (Against Mitchell, Rightway Drywall, AbShield, CIS, Riffe, and QDC)

295. Paragraphs 1–206 are incorporated by reference as if written here.

296. Fla. Stat. § 553.84 provides a cause of action by any person damaged as a result of a violation of the Florida Building Code.  This cause of action lies "[n]otwithstanding any other remedies available."

297. Mitchell, Rightway Drywall, AbShield, CIS, Riffe, and QDC were subject to state and local building codes.

CDW000421

298. The building codes applicable to the construction of the Lister house were the generally applicable Florida Building Code of 2004 and the Florida Building Code, Residential of 2004. The 2007 versions of these codes came into effect March 1, 2009, and as such the 2007 versions governed the remediation of the home. The relevant portions of these codes are identical.

299. The Florida Building Code, § 101.3, declares that the intent of the Code is "to establish the minimum requirements to safeguard the public health, safety and general welfare" by providing "safety to life and property from fire and other hazards attributed to the built environment[,] and to provide safety to fire fighters and emergency responders during emergency operations."

300. The use of defective drywall to construct a home violates the intent of the Code because, as stated in government reports, by corroding wiring and gas lines, defective drywall directly increases fire risk.

301. By design, the AbShield system also violates the intent of the Code because it does nothing to remove the deleterious drywall from the home.

302. The Florida Building Code, § 104.11, permits the use of "alternative" building materials, designs, or construction methods, but only if approved by the building official. Approval requires the applicant to demonstrate that the proposed material, design, or construction method: (a) "is satisfactory"; (b) "complies with the intent of the provisions of this code"; and (c) is "at least the equivalent of that prescribed in this code in quality, strength, effectiveness, fire resistance, durability and safety."

CDW000422

303. Further, § 104.11.1 requires that "[s]upporting data" in the form of "valid research reports from approved sources" be used to secure approval.

304. The use of defective drywall in the Lister home violates §§ 104.11 and 104.11.1 of the Code. Defective Chinese drywall, being of a different composition than standard U.S. drywall and having different chemical and physical properties (namely, the emission of sulfur gases and being excessively brittle), is an "alternative" building material. None of the defendants sought approval from the building official to use defective Chinese drywall in the Lister home. Moreover, the defective Chinese drywall is certainly not the equivalent of U.S. drywall in quality, strength, effectiveness, fire resistance, durability, or safety.

305. Had the defendants alerted the building official to their request to use Chinese drywall, the building official would have required proof of code compliance and an evaluation report showing that the Chinese drywall could meet U.S. standards. Such report would have been provided by an approved third-party testing lab.

306. The predominate organization that does third-party evaluations, and whose evaluations set the standard in the building industry, is the International Code Council (ICC).

307. To approve Chinese drywall, the ICC would have required proof of ASTM compliance and would have required certain information to be stamped on the drywall, including the name of the manufacturer, the brand name of the drywall, a statement of compliance with ASTM requirements, and certain dimension information.

308. The drywall failed to meet all of the standards that the ICC would have required had it approved the drywall.

CDW000423

309. No defendant alerted the building official of the request to use Chinese drywall, and this was a violation of the code.

310. No defendant secured a report from a third-party lab showing compliance with the code or equivalence to approved U.S. building materials, and this was a violation of the code.

311. The Florida Building Code, Residential § R702.3.1, governs the use of gypsum board, a/k/a drywall, and requires compliance with certain ASTM standards.

312. The ASTM standard applicable to drywall is ASTM C 1396.  (Ex. F.)

313. The drywall in the Listers' home reads, on the back: "MADE IN CHINA MEET OR EXCEEDS ASTM C1396 04 STANDARD."  (Ex. G.)

314. Although the drywall claims to meet this standard, it in fact fails to meet the standard.

315. The drywall fails to meet the standard because it is not made of "a noncombustible core, essentially gypsum, surfaced with paper bonded to the core," ASTM C 1396 ¶ 4.1. In fact, the defective drywall is *not* "essentially gypsum," but rather is a mixture of gypsum and sulfur compound-emitting materials.  Further, the drywall is not of noncombustible character given that its continued use can directly contribute to house fires.

316. The drywall also fails to meet the standard because evidence shows the drywall is more brittle than standard U.S. drywall.  ASTM C 1396 specifies minimum requirements for flexural strength and nail-pull resistance.  ASTM C 1396 ¶¶ 5.1.1, 5.1.3.

317. In addition to the drywall itself, the AbShield system is also an alternative design or construction method that required approval under the Building Code.

CDW000424

318. None of the defendants sought approval from the building official to use the AbShield system as a means to remediate the Lister house, and this was a code violation.

319. Like the drywall itself, the AbShield system fails to meet any standards for quality, effectiveness, fire resistance, and safety.

320. The defendants also violated applicable building codes by failing to secure an inspection or approval by the building official or any government agency.

321. The defendants' violation of these codes was the proximate cause of the plaintiffs' damages.

322. Accordingly, the plaintiffs have a cause of action under Fla. Stat. § 558.84 against the defendants for violating these codes.

323. The defendants are also liable to the plaintiffs in negligence on account of these same code violations.

## COUNT XI:
### NEGLIGENT MISREPRESENTATION
#### (Against Mitchell, AbShield, CIS, Riffe, and QDC)

324. Paragraphs 1–206 are incorporated by reference as if written here.

325. All defendants made representations to the plaintiffs, who were reasonably foreseeable targets of those representations.

326. All defendants owed the plaintiffs a duty of care and a duty to make truthful statements, and all defendants knew the plaintiffs were likely to rely on these statements.

42

CDW000425

327. The defendants (a) made representations without regard for their truth or falsity;

(b) failed to investigate whether their representations were true or false; and (c) knew

or should have known that their representations were likely to be false.

328. The defendants' misrepresentations were further made with reckless disregard for the

truth.

329. As to Mitchell, the misrepresentations negligently made include:

    a.  Each of the representations made by Mitchell and alleged to be fraudulent in Count I above.

    b.  Each statement made by the Riffe Defendants that Mitchell was aware of and failed to dispute regarding the effectiveness of the AbShield system.

    c.  That the AbShield system would work and would be a fast way to get back into house.

    d.  That the AbShield system would be safe and leave the house in safe condition.

    e.  Steve Schuhmann's May 9, 2009 statement that "We will take care of it," meaning that Mitchell would work with the plaintiffs until their Chinese drywall problem was completely fixed.

    f.  Chuck Stefan's July 9, 2009 statement that "we are here for you and your family. We are going to take care of you."

    g.  That the Riffe Defendants were professionals.

330. As to the Riffe Defendants and QDC, the misrepresentations negligently made include:

    a.  Each of the representations made by these defendants and alleged to be fraudulent in Count I above.

    b.  All statements on the AbShield web sites that the products were safe and effective.

    c.  All statements, including those on the web sites and John Rider's December 17, 2009 Internet posting, that the product's exact mechanism of action is either proprietary or impossible to explain.

    d.  The statement that because OSHA standards were not violated, Chinese drywall houses would be safe to live in.

    e.  Robert Riffe's August 21, 2009 statement that "we are on board to do what we have to do" to finish the remediation.

43

CDW000426

331. The plaintiffs relied on every representation made by every defendant in ordering their affairs, including in permitting the application of the AbShield system and in not bringing legal action sooner.

332. The plaintiffs' reliance on all these statements was the proximate cause of their damages.

333. Accordingly, the defendants are liable to the plaintiffs for negligent misrepresentation.

### COUNT XII:
### VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
### (Against All Defendants)

334. Paragraphs 1–206 are incorporated by reference as if written here.

335. Each of the defendants committed acts and omissions which violated the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201, *et. seq.*, which was enacted to protect the consuming public from unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.

336. Plaintiffs are "consumers" and the subject transactions are "trade or commerce" as defined by Fla. Stat. § 501.203.

337. Riffe, individually, was a direct participant in the improper dealings that are the subject of this count because he is the principal behind the AbShield enterprise, usually attended the meetings at the Lister house, and was the main correspondent at the AbShield enterprise that made the representations that are the subject of this count.

338. Moreover, the subject transactions included Riffe personally.

339. The specific acts that are the subject of this count are:

    a. Each of the defendants misrepresented the truth and omitted material information about the safety and content of their products;

44

CDW000427

b. Each of the defendants misrepresented the truth and omitted material information about the safety of homes that have Chinese drywall or AbShield products;

c. Mitchell, AbShield, CIS, Riffe, and QDC urged the plaintiffs to undergo the application of the AbShield protocol even though they knew or should have known it would not work and had not been tested anywhere;

d. Mitchell, AbShield, CIS, Riffe, and QDC made numerous false statements in person, in e-mails, in reports, and/or on web sites, including that the AbShield products were about to become government-approved, were covered by trademarks and copyrights, had been third-party lab tested, and were working in the plaintiffs' home;

e. Mitchell, AbShield, CIS, Riffe, and QDC made statements in broadcast news stories that their product was an effective solution for Chinese drywall, when it is not.

340. The defendants' actions constitute unconscionable commercial practices, deception, fraud, false pretenses, misrepresentation, and the knowing concealment of material facts, in violation of FDUTPA.

341. The plaintiffs relied on the defendants' statements and concealments to their detriment.

342. In the First District of Florida, reliance is not an element of a claim under FDUTPA. *Davis v. Powertel, Inc.*, 776 So.2d 971 (Fla. 1st DCA 2000).

343. As a direct and proximate result of the defendants' violations of FDUTPA, plaintiffs have suffered damages.  The plaintiffs are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs and attorney's fees.

344. Accordingly, the defendants are liable to the plaintiffs for violation of FDUTPA.

## COUNT XIII:
## UNJUST ENRICHMENT
## (Against AbShield, CIS, Riffe, and QDC)

345. Paragraphs 1–206 are incorporated by reference as if written here.

45

CDW000428

346. The plaintiffs and the defendants entered into a contract for the remediation of their home through the AbShield system.

347. The defendants failed to perform an adequate remediation, in that it failed.

348. The defendants unjustly derived a benefit from using the plaintiffs' home as a test lab for their unproven chemicals.

349. The defendants have advertised, and **continue** to advertise, their product on the Internet by using photos taken at the plaintiffs' home.

350. The defendants have made public statements regarding the success of the AbShield products based on the purported success at the plaintiffs' home.

351. According to news reports, it costs $45,000 per house to apply AbShield chemicals.

352. This is a fair measure of the minimum unjust enrichment received by the defendants.

353. It would be inequitable under the circumstances to permit these parties to retain the benefit given that the plaintiffs themselves have received no benefit—nothing but detriment.

354. Accordingly, the defendants are liable to the plaintiffs for unjust enrichment.

## PRAYER FOR RELIEF

This is a complex case with multiple claims. The plaintiffs did not choose to be in this position and would much rather have simply had their house constructed with standard, non-defective drywall. Barring that, the plaintiffs would have preferred an honest remediation. The plaintiffs got neither. Instead, the defendants continually led the plaintiffs to trust them and to continue participating in their science experiment without end. Even today, Mitchell and the Riffe Defendants maintain that they should be allowed to finish the job because AbShield

46

CDW000429

works. The plaintiffs, meanwhile, remain in a temporary house from which they have an

excellent view of the home they paid for, but never got.

WHEREFORE, plaintiffs demand judgment against the defendants, jointly and severally,

as follows:

    a.  Compensatory damages as follows:

        i.  the complete repair of the plaintiffs' home using reputable building products under a protocol acceptable to the plaintiffs;

        ii.  loss of use suffered during the displacement of the plaintiffs;

        iii.  stigma damages to the value of the property;

        iv.  damages to the plaintiffs' financial reputation;

        v.  replacement of all personal property and furnishings damaged by the drywall;

        vi.  medical expenses, insurance co-payments, and other economic damages;

        vii.  pain, suffering, emotional injury, and other non-economic damages for personal injuries;

        viii.  and other damages, all in an amount to be determined at trial;

    b.  Pre-judgment and post-judgment interest at the maximum rate allowable at law;

    c.  Treble, exemplary, and punitive damages in an amount to be determined at trial;

    d.  The costs and disbursements incurred by the plaintiffs in connection with this action, including reasonable attorneys' fees;

    e.  All statutory damages;

    f.  Any other relief allowable under state and federal law, and any other relief the Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues.

Dated: November 3, 2010.

CDW000430

Respectfully submitted,

William F. Cash III (Fla. Bar No. 68443)
Benjamin W. Gordon, Jr. (Fla. Bar No. 882836)
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
RAFFERTY, AND PROCTOR, P.A.
316 South Baylen Street Suite 600
Pensacola, Florida 32502-5996
Phone: 850-435-7059
Fax: 850-435-7020
E-mail: bcash@levinlaw.com
*Attorneys for the Plaintiffs*

48

CDW000431

### CERTIFICATE OF SERVICE

I certify that *Plaintiffs' Amended Complaint*, including attached exhibits, was served on

the following counsel for Defendants via e-mail and U.S. Mail November 3, 2010.  Service upon

the new defendants will be made promptly via other means.

_____

William F. Cash III

Mitchell Adler
Greenspoon Marder, P.A.
Trade Centre South, Suite 700
100 West Cypress Creek Road
Ft. Lauderdale, FL 33309
*Attorney for AbShield L.L.L.P., Construction
   Industry Solutions, Inc. and Robert Riffe*

Ian Rosenthal
Cabaniss, Johnston, Gardner, Dumas & O'Neal
PO Box 2906
Mobile, AL 36652
*Attorney for The Mitchell Company, Inc.*

W. David Jester
Galloway, Johnson, Tompkins, Burr & Smith
118 E. Garden Street
Pensacola, FL 32502
*Attorney for Quality Design & Construction, LLC*

CDW000432