IN RE:  CHINESE-MANUFACTURED DRYWALL    *
PRODUCTS LIABILITY LITIGATION    *
   *       **CIVIL ACTION**
   *
   *       **MDL NO. 2047**
   *
   *       **SECTION L (5)**
THIS DOCUMENT RELATES TO:    *
*Mitchell Company Inc v. Knauf Gips KG, et al.*,    *
No. 09-4115    *

## ORDER & REASONS

Before the Court is a motion seeking certification of a builder class filed by named Plaintiff

Mitchell Co. Inc. ("Mitchell"). R. Docs. 20857, 20865. Defendant Taishan opposes the motion. R.

Doc. 22080. Mitchell has filed a reply. R. Doc. 22100. The Court having heard oral argument on

the motion on June 19, 2019, R. Doc. 22274, now rules as follows.

## I.  BACKGROUND

From 2004 through 2006, a housing boom in parts of the United States and rebuilding

efforts necessitated by Hurricanes Rita and Katrina in the Gulf South led to a shortage of

construction materials, including drywall.  As a result, drywall manufactured in China was brought

into the United States and used to construct and refurbish homes in coastal areas of the country,

notably the Gulf and East Coasts.  Sometime after the Chinese drywall was installed, homeowners

began to complain of foul-smelling odors, the corrosion and blackening of metal wiring, surfaces,

and objects, and the breaking down of appliances and electrical devices in their homes.  *See In re*

*Chinese-Manufactured Drywall Prods. Liab. Litig.*, 894 F. Supp. 2d 819, 829–30 (E.D. La. 2012),

*aff'd*, 742 F.3d 576 (5th Cir. 2014). Many of these homeowners also began to complain of various physical afflictions believed to have been caused by the Chinese drywall.

These homeowners then began to file suit in various state and federal courts against homebuilders, developers, installers, realtors, brokers, suppliers, importers, exporters, distributors, and manufacturers who were involved with the Chinese drywall. Because of the commonality of facts in the various cases, this litigation was designated as a multidistrict litigation. Pursuant to a Transfer Order from the United States Judicial Panel on Multidistrict Litigation on June 15, 2009, all federal cases involving Chinese drywall were consolidated for pretrial proceedings in MDL 09-2047 before this Court.

The Chinese drywall at issue was largely manufactured by two groups of defendants: (1) the Knauf Entities and (2) the Taishan Entities. The litigation has focused on these two entities and their downstream associates and has proceeded on strikingly different tracks for the claims against each group.[1] Relevant to this Order are the Chinese Defendants. These Defendants include the principal Chinese-based Defendant, Taishan, namely, Taishan Gypsum Co. Ltd. ("TG") and its wholly-owned subsidiary, Taian Taishan Plasterboard Co., Ltd. ("TTP") (collectively "Taishan" or "Taishan Entities"). Other Chinese-based Defendants include China New Building Materials Group ("CNBM Group"), China New Building Materials Co. ("CNBM"), CNBMIT Co. Ltd. ("CNBMIT"), CNBM USA Corp. ("CNBM USA"), and United Suntech Craft, Inc. ("United

---

[1] The Knauf Entities are German-based, international manufacturers of building products, including drywall, whose Chinese subsidiary, Knauf Plasterboard (Tianjin) Co., Ltd. ("KPT"), advertised and sold its Chinese drywall in the United States. On December 20, 2011, the Knauf Entities and the PSC entered into a global, class Settlement Agreement ("Knauf Settlement Agreement"), which was designed to resolve all Knauf-related, Chinese drywall claims. In addition to the Knauf Settlement Agreement and after a jury trial in a bellwether case, numerous defendants in the chain-of-commerce with the Knauf Entities have entered into class settlement agreements, the effect of which settles almost all the Knauf Entities' chain-of-commerce litigation. The total amount of the Knauf Settlement is approximately $1.1 billion. Although the Court occasionally had to deal with settlement administration and enforcement issues, with the assistance of Special Master Dan Balhoff, the Knauf portion of this litigation is now resolved.

Suntech") (collectively the "CNBM Entities"), as well as the Beijing New Building Materials Public Limited Company ("BNBM") and Beijing New Building Material Group ("BNBMG") (collectively the "BNBM Entities").

The Court's initial inquiry regarding Taishan involved four cases in this MDL: (1) *Germano v. Taishan Gypsum Co.* (Case No. 09-6687); (2) *The Mitchell Co. v. Knauf Gips KG* (Case No. 09-4115); (3) *Gross v. Knauf Gips KG* (Case No. 09-6690); and (4) *Wiltz v. Beijing New Building Materials Public Ltd.* (Case No. 10-361).

The first issues involving Taishan arose when Taishan failed to timely answer or otherwise enter an appearance in *Mitchell* and *Germano*, despite the fact that it had been properly served in each case. Thus, after an extended period of time, the Court entered preliminary defaults against Taishan in both cases. Thereafter, the Court moved forward with an evidentiary hearing in furtherance of the preliminary default in *Germano* on Plaintiffs' claimed damages. At the hearing, the PSC presented evidence specific to seven individual properties, which served as bellwether cases. Thereafter, on February 19 and 20, 2010, the Court issued detailed Findings of Fact and Conclusions of Law. On May 11, 2010, the Court issued a Default Judgment against Taishan in *Germano* and in favor of Plaintiffs.

On June 10, 2010, the last day to timely appeal the Default Judgment against them, Taishan filed a Notice of Appeal in *Germano* and entered its appearance in *Germano* and *Mitchell*. After Taishan entered its appearance in the MDL, it quickly sought to have the Default Judgment in *Germano* and the Preliminary Default in *Mitchell* vacated for lack of personal jurisdiction. Because this was the first time Defendants raised jurisdictional issues, the Fifth Circuit remanded the case to this Court to determine whether this Court indeed has jurisdiction over Taishan.

In the fall of 2010, the Court directed the parties to commence the personal jurisdiction discovery necessary to resolve Taishan's motions to vacate. Sometime after the initial discovery, the parties agreed to expand the discovery beyond the *Germano* and *Mitchell* cases to other cases in which Taishan had been served, including *Gross* and *Wiltz*.

Formal personal jurisdiction discovery of Taishan began in October 2010. Discovery included the production of both written and electronic documents as well as depositions of Taishan's corporate representatives, with each type of discovery proceeding in a parallel fashion. This discovery was highly contentious, requiring close supervision by the Court. The Court presided over regularly-scheduled status conferences, conducted hearings, and issued rulings to resolve numerous discovery-related disputes.

In June 2011, the PSC filed identical complaints in Federal district courts in Florida, Virginia, and Louisiana (the "*Amorin* complaints"). The *Amorin* complaints include all Plaintiffs named in the *Wiltz*, *Gross*, *Abel*, and *Haya* actions. The Florida and Virginia actions were transferred by the JPML to the MDL; the PSC filed the Louisiana omnibus complaint directly into the MDL. It is undisputed that the allegations and Plaintiffs named in the *Amoin* complaints are identical. According to the PSC, these identical complaints were filed "out of an abundance of caution," because "there existed a colorable question regarding the application of the jurisdictional tests known as the 'stream-of commerce' test and the 'stream-of-commerce-plus' test reflected in the plurality opinions in *McIntyre* and *Asahi*, as well as Justice Brennan's concurring opinion in *Asahi*."

In April 2012, Taishan filed various motions, including motions to dismiss for lack of personal jurisdiction. On June 29, 2012, over three years since the creation of this MDL and after a year-and-a-half of personal jurisdiction discovery on Taishan, the Court presided over a hearing

on Taishan's motions. The Court coordinated its hearing with the Honorable Joseph Farina of the Florida state court, who had a similar motion involving Taishan's challenge to personal jurisdiction.

On September 4, 2012, this Court issued a 142-page Order regarding Taishan's motions in *Germano*, *Mitchell*, *Gross*, and *Wiltz*, in which the Court denied the motions to dismiss and held that it maintained personal jurisdiction over Taishan. *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 894 F. Supp. 2d 819 (E.D. La. 2012). The Court also ruled that Taishan was operating as the alter ego of TG and TTP. The Court certified an interlocutory appeal, and the Fifth Circuit granted permission to appeal. In January and May of 2014, two different panels of the Fifth Circuit affirmed this Court's ruling and held that this Court maintained personal jurisdiction over Taishan, TG, and TTP. *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 753 F.3d 521 (5th Cir. 2014); *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 742 F.3d 576 (5th Cir. 2014). The time for writ of certiorari passed, and the issue of personal jurisdiction over Taishan became firmly and finally settled. Nevertheless, Taishan refused to voluntarily participate in this suit.

On June 20, 2014, the Court ordered Taishan to appear in open court on July 17, 2014 to be examined as a judgment debtor. Taishan failed to appear for the July 17, 2014 Judgment Debtor Examination, and the Court held Taishan in contempt, ordering that Taishan pay $15,000.00 in attorneys' fees to Plaintiffs' counsel and $40,000.00 as a penalty for contempt; Taishan and any of its affiliates or subsidiaries be enjoined from conducting any business in the United States until or unless it participates in this judicial process; and if Taishan violates the injunction, it must pay a further penalty of twenty-five percent of the profits earned by the Company or its affiliate who violate the Order for the year of the violation.

On July 23, 2014, the PSC filed their Omnibus Motion for Class Certification pursuant to Rule 23(b)(3). Taishan did not appear and, on September 26, 2014, this Court certified a class of all owners of real properties in the United States, who are named Plaintiffs on the complaints in *Amorin*, *Germano*, *Gross*, and/or *Wiltz* (*i.e.*, not an absent class member), asserting claims for remediated damages arising from, or otherwise related to Chinese Drywall manufactured, sold, distributed, supplied, marketed, inspected, imported or delivered by the Taishan Defendants. R. Doc. 18028.

Taishan finally entered an appearance with the Court in February 2015, and, to satisfy the contempt, Taishan paid both the sum of $15,000.00 in attorneys' fees to Plaintiffs' counsel and the contempt penalty of $40,000.00 in March 2015. On March 17, 2015, the Court ordered Taishan and the BNBM and CNBM Entities to participate in expedited discovery related to "the relationship between Taishan and BNBM/CNBM, including whether affiliate and/or alter ego status exists."

On March 10, 2016, this Court granted CNBM Group's motion to dismiss, finding it was an "agent or instrumentality of a foreign state" within the meaning of the Foreign Sovereign Immunities Act ("FSIA"), and therefore outside the jurisdiction of this Court under 28 U.S.C. § 1603(b). R. Doc. 20150. The Court determined the tortious activity exception did not apply because the alleged tortious conduct did not occur within the United States under 28 U.S.C. § 1605(a)(5). Further, the Court found the commercial activity exception did not apply, as CNBM Group did not directly manufacture, inspect, sell, or market drywall in the United States. Because the PSC failed to present evidence sufficient to overcome the presumption that CNBM Group was entitled to independent status for purposes of the FSIA, the Court granted the motion and dismissed CNBM Group from the present litigation.

After concluding it lacked personal jurisdiction over CNBM Group, on April 21, 2017, the Court issued a 100-page opinion related to jurisdictional challenges being raised with respect to

CNBM, BNBM Group, and BNBM. The Court found Taishan was an agent of BNBM under Florida and Virginia law, such that Taishan's contacts in Florida and Virginia are imputed to BNBM. This Court further found that CNBM, BNBM Group, and BNBM were part of a single business enterprise with Taishan under Louisiana law, such that Taishan's contacts in Louisiana may be imputed to them, and that the Court has jurisdiction over CNBM, BNBM Group, and BNBM in relation to Plaintiffs' claims based on Louisiana law. Also on April 21, 2017, the Court issued its Findings of Fact and Conclusions of Law related to the June 9, 2015 damages hearing and adopted the PSC's damage calculations methodology related to remediation of properties.

On May 22, 2017, Defendants filed a motion pursuant to 28 U.S.C. § 1292(b) to certify an interlocutory appeal from this Court's April 21, 2017 jurisdiction order. Because the Court found the April 21, 2017 Order & Reasons involved a controlling question of law as to which there was substantial ground for difference of opinion, and because the Court further found that an interlocutory appeal might materially advance the ultimate termination of this MDL, on August 4, 2017, the Court certified an interlocutory appeal to the Fifth Circuit pursuant to 28 U.S.C. § 1292(b).

On August 1, 2017, Defendants filed a motion to dismiss for lack of personal jurisdiction following the recent U.S. Supreme Court case of *Bristol-Myers Squibb v. Superior Court of California* ("*Bristol-Myers*"), 137 S. Ct. 1773 (2017). Based on *Bristol-Myers*, Defendants contested this Court's findings of personal jurisdiction, class certification, and agency relationship. On August 14, 2017, Defendants filed a petition for permission to appeal pursuant to 28 U.S.C. § 1292(b) in the Fifth Circuit, in which they argued *Bristol-Myers* impacted questions raised on appeal. On August 24, 2017, this Court vacated its 28 U.S.C. § 1292(b) certification order to avoid piecemeal litigations, noting its duty to address the effect of *Bristol–Myers* on the jurisdictional

issue before certifying the matter to the Fifth Circuit. Subsequently, on November 30, 2017, the Court denied Defendants' motion to dismiss, holding *Bristol-Myers* did not change this Court's jurisdictional findings and class certification.

On January 2, 2018, the Court denied Defendants CNBM, BNBM Group, and BNBM's motion to vacate the default judgments against them. On March 5, 2018, the Court reinstated its order certifying the interlocutory appeal of its April 21, 2017 order. This issue remains with the Fifth Circuit.

## II. PENDING MOTION

In the present motion Mitchell and unnamed Plaintiff Beazer Homes Corporation ("Beazer") seek to certify a homebuilder class against Defendant Taishan defined as:

> All persons and entities in the States of Alabama, Mississippi, Louisiana, Georgia, Texas, and Florida that used drywall manufactured by Taishan Gypsum Co., Ltd., for the construction, repair, or remodeling of any improvement to real property and who incurred any expenses associated with (1) repair or replacement of all or part of the defective drywall, and/or (2) repair or replacement of other property damaged by the defective drywall, and/or (3) attorneys' fees and costs in defense of claims by affected homeowners, and/or (4) other expenses that were or incurred as part of the remediation of the defective drywall, including, without limitation, the cost of investigation and expert analysis of the defect, and cost of relocating customers displaced by the presence of defective drywall.
>
> Excluded from the proposed Class are any owners, landlords, or residents of real properties located in the United States containing defective Chinese drywall manufactured, sold, distributed, supplied, marketed, inspected, imported, or delivered by Taishan Gypsum Co. Ltd.; Defendant Taishan, its legal representatives, officers, directors, assigns, and successors, or any entity in which the Defendant has a controlling interest; the judge to whom this action is assigned and members of the judge's immediate family; claims for personal injury, wrongful death, and/or emotional distress; and all persons or entities who properly execute and timely file a request for exclusion from the class.

R. Doc. 20857-1 at 8–9. They contend their proposed class meets Rule 23's certification requirements. *Id.* at 1. Taishan disagrees. R. Doc. 22080.

As an initial matter, in addition to itself, Mitchell offers unnamed Plaintiff Beazer as a class representative. R. Doc. 20857-1 at 6. Taishan takes issue with Beazer, as it is not a named Plaintiff and, therefore, may not serve as a class representative. R. Doc. 22080 at 12. Because absent class members can represent a class only if they "become [named] plaintiffs by amendment of the Complaint or by intervention," *Johnson v. Am. Credit Co.*, 581 F.2d 526, 533 n.13 (5th Cir. 1978), the Court agrees with Taishan and proceeds in its analysis with Mitchell as the only proposed class representative.

## III.    LAW AND ANALYSIS

Class actions permit representative plaintiffs to litigate their claims on behalf of members of the class not before the court. The purpose of a class action is to avoid multiple actions and to allow claimants who could not otherwise litigate their claims individually to bring them as a class. *See Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 349 (1983). A district court has great discretion in certifying and managing a class action. *See Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999) (citing *Montelongo v. Meese*, 803 F.2d 1341, 1351 (5th Cir. 1986). The party seeking class certification bears the burden of proving all the requirements set out in Rule 23 of the Federal Rules of Civil Procedure. *Berger v. Compaq Comput. Corp.*, 257 F.3d 475, 479 n.4 (5th Cir. 2001).

Class certification is soundly within the district court's discretion, and this decision is essentially a factual inquiry; however, the Court's analysis generally should not reach the merits of the plaintiffs' claims. *Vizena v. Union Pac. R.R. Co.*, 360 F.3d 496, 502-03 (5th Cir. 2004); *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996). The district court must make specific findings regarding how the case satisfies or fails to satisfy the requirements of Rule 23. *Vizena*, 360 F.3d at 503.

Plaintiffs seek certification of their claims as a class action under Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure. R. Doc. 20857-1 at 7, 11. Rule 23 provides in relevant part:

> **(a) Prerequisites to a Class Action.** One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

> **(b) Class Actions Maintainable.** An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition: . . . . (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to these findings include: (A) the interest of the members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Thus, read in combination, Rule 23(a) and 23(b)(3) provide six requirements which must be met for a group of claims to be certified as a class action—numerosity, commonality, typicality, adequacy, predominance, and superiority. The Court will address each requirement in turn.

### 1. Numerosity – Rule 23(a)(1)

To demonstrate numerosity, Mitchell must establish that joinder is impracticable through "some evidence or reasonable estimate of the number of purported class members." *Pederson v. La. State Univ.*, 213 F.3d 858, 868 (5th Cir. 2000). While the number of members in a proposed class is not determinative of this inquiry, the Fifth Circuit has cited with approval Professor Newberg's treatise, which "suggest[s] that any class consisting of more than forty members 'should raise a presumption that joinder is impracticable.'" *Mullen v. Treasure Chest Casino LLC*, 186 F.3d 620, 624 (5th Cir. 1999).

In this case, Mitchell contends the proposed class "likely consists of over one hundred homebuilders." R. Doc. 20857-1 at 13. Mitchell asks the Court to infer that the number of builders in the proposed class meets the numerosity requirement, as "Taishan exported more than 87 million square feet of drywall to the United States, including more than 200,000 sheets to Florida alone." R. Doc. 22100 at 7. Mitchell also points to other cases in this MDL, specifically: (1) "the Omnibus Complaint filed December 9, 2009, by [the] homeowner plaintiffs . . . against . . . Knauf," which "named 388 builders and 93 contractors and installers as defendants"; and (2) "the Banner Supply settlement and/or the Global Distributor settlement" in which "[a]t least 34 builders participated" with "[a]t least 4 more builders [that] incurred remediation costs [but were] not listed on the referenced settlement list." *Id.* at 3.

Mitchell's submission asks the Court to speculate as to the size of the proposed builder class. However, "While courts do not require evidence of exact size or identity of class members to satisfy the numerosity requirement, a finding of numerosity may not be based on speculation." *Byes v. Accelerated Cash Flow*, No. 95-200, 1997 WL 285004, at *1 (E.D. La. May 27, 1997). Accordingly, the Court limits its evaluation of numerosity to non-speculative evidence presented at the June 17, 2019 evidentiary hearing and in the parties' briefing.

Attached to Mitchell's reply brief is the declaration of Dr. Robert DeMott. R. Doc. 22100-1. Dr. DeMott states his company was retained by "a number of builders to investigate the impact of certain gypsum wallboard manufactured in China." *Id.* at ¶ 3. He testified that his company was specifically retained by 14 builders. *Id.* at ¶ 7. During the evidentiary hearing, Taishan attacked Dr. DeMott's testimony on numerosity, contending he lacks the foundation to make any assertions as to the number of potential class members in this case. Taishan pointed out that one of the

builders Dr. DeMott stated was a potential class member, the Lennar Corporation, has already settled its claims with Taishan. R. Doc. 22278 at 23:12–14.

Defendant also presented its own evidence attacking Plaintiff's claim of numerosity, pointing to deposition testimony from Mitchell's corporate representative, Mr. Chester Stefan. R. Doc. 22277-1 at 2. In his deposition, Mr. Stefan testified as follows:

> **Q**. Do you know of other home builders that have incurred the same types of damages that Mitchell did?
> **A**. Yes, ma'am.
> **Q**. Can you name them?
> **A**. I think we produced a list of all the builders who were on a conference call that we had on a regular basis, and there were probably 15 or 20, and on those calls, we would discuss our mutual problems.
> **Q**. Can you name any of them?
> **A**. Beazer, Lenar, Horton. . . .
> **Q**. Okay. Can you think of any other home builders?
> **A**. WCI.
> **Q**. Okay. Any others?
> **A**. No names are popping up, but there were about 20 names on the list.

*Id.* at 103:19–105:16.

Even crediting Dr. DeMott's testimony as valid, which Taishan contests, Dr. DeMott points to only fourteen homebuilders, R. Doc. 22100-1 at ¶ 5; Taishan having settled claims with the Lennar Corporation leaves Dr. DeMott's estimate at thirteen potential class members. Looking to Mr. Stefan's testimony, that Mitchell compiled a list of approximately twenty homebuilders, which also included Lennar, places the total number of potential class members, at best, at nineteen. As a result, the Court finds Mitchell has failed to present "some evidence" suggesting that the purported class satisfies Rule 23's numerosity requirement. *Pederson*, 213 F.3d at 868.

If numerosity were the only impediment to finding class certification was warranted in this case, the Court would consider allowing an amendment and supplemental evidence to be submitted; however, as discussed below, the other requirements for class certification present

hurdles even more challenging than establishing numerosity, and there has been little or no evidence submitted by Plaintiff to support its burden of satisfying Rule 23's requirements.

### 2. Commonality – Rule 23(a)(2)

Rule 23(a)(2) requires that there be issues of law or fact common to the class. The commonality requirement is satisfied if at least one issue's resolution will affect all or a significant number of class members. *James v. City of Dall.*, 254 F.3d 551, 570 (5th Cir. 2001); *Mullen*, 186 F.3d at 625. Commonality, unlike predominance, is a very low threshold. *James*, 254 F.3d at 570.

Mitchell contends that, although Defendants have already defaulted on the issue of liability against it, what effect that default might have on the unnamed class members is an open question. Moreover, Mitchell argues, the extent and type of damages to which the builder class is entitled must also be decided. Accordingly, Mitchell submits these questions are common to all class members. Mitchell admits, however, that "[m]embers of the proposed builder Class will . . . need to produce evidence . . . of their individual damages." R. Doc. 20857-1 at 18.

At the surface, the issues of whether and the type of damages to which each proposed class member is entitled is common to all proposed class members. Upon closer observation, however, commonality proves fleeting. For example, Mitchell contends some of the builders remediated homes by replacing the defective drywall, much akin to the damages to which the Court found the homeowners were entitled, but that others also paid to replace kitchen appliances and HVAC systems. Mitchell offers no evidence as to the portion of the potential class that falls in this category. Moreover, Mitchell represents that some homebuilders settled with homeowners directly, providing the homeowners with the funds necessary to remediate the property; however, Mitchell has not provided the Court with any evidence suggesting this situation applies to all or even a significant number of potential class members. Finally, Mitchell alleges some homebuilders

"incurred time and expense investigating the source of the problem and in testing to determine the cause and extent of the problem," and that some proposed class members are entitled to damages for the cost incurred in relocating homeowners while their homes were being remediated, but Mitchell makes no effort to indicate how many class members sustained these costs. In sum. although it is unclear whether the class would be entitled to recoup these types of damages, Mitchell has not presented any evidence indicating that the resolution of at least one of these issues would affect all or a significant number of class members.

Moreover, when the Court considers how these issues might be resolved, any argument in favor of finding commonality further deteriorates. For example, Mitchell seeks to certify a class consisting of homebuilders in Alabama, Mississippi, Louisiana, Georgia, Texas, and Florida—six states with distinct laws. Thus, whether and what type of damages each proposed class member might be entitled to is state specific. As the movant, Mitchell bears the burden of demonstrating that variations among these state laws do not "pose 'insuperable obstacles' to certification." *Spence v. Glock*, 227 F.3d 308, 313 (5th Cir. 2000) (quoting *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1017 (D.C. Cir. 1986)). It its briefing, Mitchell has not undergone any analysis with respect to the variations in the applicable states' laws. The Court finds these "[v]ariations in state law may swamp any common issues," *Castano*, 84 F.3d at 741 (citations omitted), and therefore concludes these questions are not common to the class.

Finally, with respect to Mitchell's argument that an issue common to all class members is the need for a determination of what preclusive effect the default Mitchell obtained against Taishan has with respect to the remaining class members, that issue has clearly been resolved with respect to Mitchell, the only proposed class representative. Although the Court has yet to determine whether the default applies to the unnamed homebuilders, technically rendering the issue

14

"common to a significant portion of the class," Mitchell's having already obtained a favorable judgment against Taishan with respect to liability fatally impacts the Court's typicality and adequacy analyses, when determining whether Mitchell's claims are representative of the putative class. Thus, even accepting that this issue is common to most class members, Mitchell cannot sustain its burden of demonstrating all of Rule 23's remaining requirements are met in this case.

### 3. Typicality – Rule 23(a)(3)

Rule 23(a)(3) requires that the claims of the class representatives be typical of the class's claims or defenses. Like commonality, the threshold for typicality is low: a class representative must show similarity between its legal and remedial theories and the theories of the rest of the class. *Mullen*, 186 F.3d at 625. Typicality does not require that the claims of the class be identical, but rather that they share the same essential characteristics—a similar course of conduct, or the same legal theory. *James*, 254 F.3d at 571 (quoting 5 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 23.24[4] (3d ed. 2000)).

Mitchell seeks damages for remediating homes it built using defective drywall manufactured by Taishan. Taishan takes issue with the fact that Mitchell, unlike many members of the proposed class, does not seek damages for directly remediating homes built with defective Chinese drywall. Rather, Mitchell seeks damages for a settlement reached with one of its client. Taishan points to the following exchange with Mitchell's corporate representative:

> **Q**. So Mitchell is not an example of a home builder that went in and remediated the properties themselves by removing and replacing drywall? .
> . . .
>
> **A**. In respect of Taishan, that's correct. . . . .
>
> **Q**. Okay. So Mitchell is not an example of a home builder that went in and replaced all of the kitchen appliances for all of the homes that had Chinese drywall?

**A**. Not in respect of Taishan drywall. . . .

**Q**. Okay. So The Mitchell Company is not an example of a home builder that paid to relocate all of its homeowners that had Taishan drywall?

**A**. That's correct. . . .

**Q**. So Mitchell Company is not an example of a home builder that resolved its Chinese drywall claims with its homeowners by writing checks to each of the homeowners?

**A**. That's correct, in respect to Taishan.

R. Doc. 22080-7 at 52:3–8; 54:18–21; 56:7–10; 100:19–22.

Taishan's point, that Mitchell, by its own admission, is not representative of the class as a whole, is well taken. *See* R. Doc. 22080 at 23–24. Accordingly, the Court concludes Mitchell has failed to show its claims are typical of the class.

### 4. Adequacy – Rule 23(a)(4)

Rule 23(a)(4) demands that the named class representative fairly and adequately represents the claims of the other class members. There can be differences between the position of class representatives and other class members so long as these differences do not "create conflicts between the named plaintiffs' interests and the class members' interests." *Mullen*, 186 F.3d at 626. A district court should evaluate whether the class representative has a sufficient stake in the outcome of the litigation, and whether the class representative has interests antagonistic to the unnamed class members. *Id.* (citing *Jenkins v. Raymark Indus.*, 782 F.2d 468, 472 (5th Cir. 1972)). In addition, the district court should inquire into the zeal and competence of the class representatives' counsel and into the class representatives' willingness to take an active role in the litigation and to protect the interests of absentees. *Berger v. Compaq Comp. Corp.*, 257 F.3d 475, 479 (5th Cir. 2001).

Although the proposed class representative in this case, Mitchell, has actively pursued the case as a class action since its inception, foreseeable conflicts might arise between Mitchell and the proposed class members. Specifically, the determination of whether Taishan is precluded from disputing liability with respect to the unnamed class members poses a potential conflict between Mitchell's interests and those of the proposed members of the class. Mitchell, having already obtained a default against Taishan, might plausibly be less aggressive in pursuing a finding of liability in favor of the remaining class members. This issue is compounded by the possibility that this Court or the transferor court might determine Mitchell's default against Taishan *does not* preclude Taishan from denying liability with respect to the remaining class members. Finally, several differences exist regarding the specifics of each Plaintiff's claim that might cause Mitchell to vigorously represent some, but not all, of the proposed class. Thus, the Court finds Mitchell cannot fairly and adequately represent the proposed class of plaintiffs in this matter under Rule 23(a)(4).[2]

### 5. Predominance – Rule 23(b)(3)

Rule 23(b)(3) requires that the class share common issues of law or fact that predominate over the questions affecting individual class members. Predominance is established where common answers to common questions are likely to "drive the resolution of the [instant] litigation." *See Walmart-Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ("[W]hat matters to class certification is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceedings to generate common answers apt to drive the resolution of the litigation." (citing Richard A. Nagareda, *The Preexistence Principle and the Structure of the Class Action*, 103 COLUM. L. REV. 149, 132 (2003))). In *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, the

---

[2] The Court notes, however, that it is undisputed that proposed class counsel, Ms. Elizabeth Cabraser and Mr. Steven Nicholas, are qualified to represent the class.

Supreme Court explained, "Rule 23(b)(3) . . . does not require a plaintiff seeking class certification to prove that each 'elemen[t] of [her] claim [is] susceptible to classwide proof.'" 568 U.S. 455, 469 (2013). Rather the rule requires common questions "predominate over any questions affecting only individual [class] members." *Id* at 468 (quoting Fed. R. Civ. P. 23(b)(3)).

In its predominance analysis, a district court should consider how the cases would proceed to trial, that is, whether any cases would require individual trials on particular issues. *See Castano*, 84 F.3d at 744–45 (finding certification was inappropriate where individual trials would be necessary to determine an element of the plaintiffs' fraud claims). To satisfy Rule 23(b)(3)'s requirement that common questions of law and fact predominate, "the predominance test asks whether a class suit for the unitary adjudication of common issues is economical and efficient in the context of all the issues in the suit." 2 NEWBERG ON CLASS ACTIONS § 4:25 (4th ed. 2010); *see also Amchem*, 521 U.S. at 623 ("The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." (citing 7A Wright, Miller, & Kane 518–19)).

In this case, Mitchell brings claims based on: negligence/gross negligence, No. 09-4115, R. Doc. 1-1 at ¶ 34–41; strict products liability, *id.* at ¶ 42–56; unjust enrichment, *id.* at ¶ 57–61; indemnity, *id.* at ¶ 62–70; implied warranty of merchantability, *id.* at ¶ 71–78; and express warranty, *id.* at ¶ 79–84. Mitchell also alleges breaches of implied and express warranties arising under the laws of Alabama, Mississippi, Louisiana, Georgia, and Texas. *Id.* at ¶ 73, 80. Although Plaintiffs seek to certify a class of persons and entities based in Alabama, Mississippi, Louisiana, Georgia, Texas, and Florida, R. Doc. 20857-1 at 8–9, and despite Defendants having been found liable for these damages with respect to Mitchell, whether the proposed class members, and Mitchell itself, are entitled to certain types of remediation damages remains to be determined. As

stated previously, however, given the state-specific and Plaintiff-specific nature of these claims, beyond a superficial level, this issue is not common to all class members. Plainly, if a plaintiff fails to show commonality, it cannot sustain its burden of demonstrating that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P 23(b)(3). Thus, the Court concludes Mitchell has failed to bear its burden of demonstrating predominance.

### 6.   Superiority – Rule 23(b)(3)

Under Rule 23(b)(3), a district court must evaluate four factors to determine whether the class action format is superior to other methods of adjudication: (1) the class members' interest in individually controlling their separate actions, (2) the extent and nature of existing litigation by class members concerning the same claims, (3) the desirability of concentrating the litigation in the particular forum, and (4) the likely difficulties in class management.[3] The Fifth Circuit has noted that there is an important relationship between the superiority analysis and the predominance analysis. *Exxon*, 461 F.3d at 604. Where common issues do not predominate, any effort to conduct a class action "would denigrate in practice into multiple lawsuits separately tried." *Id.* (quoting Fed. R. Civ. P. 23(b)(3) advisory committee's notes).

In this case, Mitchell argues class action litigation is a superior format of adjudication because it will minimize the risk of non-uniformity of results and maximize judicial efficiency. However, like the predominance inquiry, "the superiority analysis is fact-specific and will vary

---

[3]    The Fifth Circuit in *Castano* advised that a district court's superiority analysis should include consideration of the negative impact upon a defendant of certification of a mass tort. 84 F.3d at 746. The court noted that class certification magnifies unmeritorious claims, increases plaintiffs' damage awards, and creates "insurmountable pressure" upon defendants to settle, all of which could be tantamount to "judicial blackmail." *Id.* In this case, Defendant might benefit from class certification, as it offers finality to its liability—because this proposed class action has been pending since 2009, potential class members' claims have been tolled for purposes of the statute of limitations since that date until the issuance of this Order & Reasons

depending on the circumstances of any given case." *Robertson v. Monsanto Co.*, 287 F. App'x 354, 361 (5th Cir. 2008) (citing 7AA Wright, Miller, & Kane, Federal Practice & Procedure § 1783, at 322 (3d ed. 2005)). Here, because "the predominance of the individual issues . . . detract from the superiority of the class action device," *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, No. MDL 071873, 2008 WL 5423488, at *15 (E.D. La. 2008), "whatever advantages might follow from class treatment . . . would surely be overwhelmed by the confusion, time and expense resulting from the countless minitrials on breach, causation and damages," *Bevrotte v. Caesars Entm't Corp.*, No. 11-543, 2011 WL 4634174, at *5 (E.D. La. Oct. 4, 2011). Accordingly, the Court finds a Class action is not the superior method of adjudication of this matter.

## IV. CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that Mitchell Company's motion for class certification, R. Docs. 20857, 20865, be and hereby are **DENIED**.

New Orleans, Louisiana, this 8th day of July, 2019.

UNITED STATES DISTRICT JUDGE