# CHINESE DRYWALL LITIGATION SETTLEMENT: ALLOCATION MODEL AND ALLOCATION NEUTRAL REPORT

J. CAL MAYO, JR.
MAYO MALLETTE PLLC
2094 OLD TAYLOR ROAD
POST OFFICE BOX 1456
OXFORD, MISSISSIPPI 38655
(662) 236-0055



*Background*

This litigation arises from the installation of defective drywall in the construction and renovation of homes in numerous states. The various litigated actions were combined in a multi-district litigation proceeding in the United States District Court for the Eastern District of Louisiana. The matter has a complex procedural history, including a default judgment in favor of one plaintiffs' group.

Subject to court approval, settlement class members ("Class Members"), the Settlement Class Counsel (the "SCC"), and certain defendants have settled numerous claims for a fixed sum, inclusive of attorney fees and costs. These claims are asserted by current or former homeowners for roughly 3600 affected properties ("Unit" or "Units"). The settling defendants include Taishan Gypsum Company, Taian Taishan Plasterboard Co., and Beijing New Building Materials Public Limited Company (the "Defendants") which manufactured drywall delivered to the United States and allegedly installed in the homes once or now owned by the class members. Under the terms of their settlement agreement, the parties have selected me to serve as an Allocation Neutral to design a model for allocating the settlement funds to the Class Members.

As part of this project, I have conferred jointly and separately with the SCC and counsel for the Defendants. I have also reviewed various orders and other papers filed with the courts and received other information provided by counsel. *See* Index (Exhibit "1" to this Report).

In designing a fair, reasonable, and adequate allocation model based on objective data, various considerations have impacted the number and depth of factors included in the final model. On the one hand, each home has a unique value depending on information such as square footage, location, product identification, and prior payments, and the perfect model should recognize and provide for allocation with consideration for these differences. Adding factors makes the model more specific and more accurate. On the other hand, as the model grows in complexity, the allocation process becomes more time consuming and expensive. Time and costs are enemies of the Class Members, as they have waited many years for their payments and bear the cost of allocation through the fixed settlement fund. In the end, the described allocation model strikes a balance between property-specific allocation, on the one hand, and efficient and effective allocation, on the other hand.

Finally, the settlement resolves all claims of any type as between the Class Members and the Defendants. These claims include property damage claims, as well as claims for other types of losses and damages, such as loss of use and enjoyment, personal property damage and repair, bankruptcy, foreclosure, emotional distress, alternatives living expenses, punitive damages, and attorney fees ("Other Losses"). Each Unit will receive a single Unit Allocation, although, as discussed below, some Unit Allocations may be split in certain circumstances.

BrownGreer will serve as the Claims Administrator. I have conferred with Jake Woody of BrownGreer about this allocation model, and he has tested the model using the Master

Spreadsheet. Based on these tests, the Claims Administrator has accepted the model as workable.

The SCC has prepared a Master Spreadsheet containing different types of information about each known plaintiff and property. In the discussion below, I will refer to the letter of the column corresponding to the specific column in the Master Spreadsheet containing the information at issue. BrownGreer will apply the allocation model using the information in the Master Spreadsheet or in the claim forms submitted to the Claims Administrator.

*Factor Analysis and Determination*

**Square Footage (H)**

The Class Members are owners of affected properties or condominium associations ("Unit Owners") impacted by Covered Chinese Drywall. These Unit Owners have provided or will provide satisfactory proof of under-air square footage before application of the allocation model.

**Plaintiff Group (B)**

The Unit Owners fall into three plaintiff groups: *Amorin* (which includes the *Abner* plaintiffs), *Brooke*, and new claims ("New Claims"). As discussed below, the applicable plaintiff group has a major impact on the specific claim value.

For the *Amorin* plaintiffs, the MDL Court has entered a default judgment as to liability and has certified a class, which the courts in Florida and Virginia have acknowledged and adopted. The only step remaining to judicially resolve the *Amorin* claims is a per claim damages determination. In fact, the federal courts in Florida, Virginia, and Louisiana were proceeding with resolution of these claims at the time of settlement. The *Amorin* plaintiffs have the strongest claims. I assign the *Amorin* plaintiffs with a 100% value, for a multiple of 1.

The *Brooke* litigation remains in the early stages. The Defendants have not answered, no discovery has occurred, and no court has certified a class. Significant work must occur (taking much time and expense) to resolve these claims, in the face of various defenses, including statutes of limitation defenses. The *Brooke* plaintiffs' claims are worth much less than the *Amorin* plaintiffs' claims. Based on my review of all information, I ascribe a value of 20% to the *Brooke* plaintiffs, for a multiple of .2.

Finally, New Claims will likely pursue recovery following class notification. Assuming New Claims satisfy the proof requirements, the Claims Administrator will apply the allocation model to information on the claim forms. Any New Claims are worth significantly less than the *Amorin* plaintiffs' claims and less than the *Brooke* plaintiffs' claims. Based on my review of all information, I assign a value of 5% to New Claims, for a multiple of .05.

**Product Identification (L)**

The SCC and the Defendants' counsel have agreed to twelve groupings of Covered Chinese Drywall, referred to as buckets ("Buckets") and labeled A to L:

A. BNBM and Dragon Brand;
B. C&K;
C. Chinese Manufacturer #2 (purple stamp);
D. Crescent City Gypsum;
E. DUN;
F. IMT Gypsum;
G. ProWall;
H. TAIAN TAISHAN and Taihe edge tape;
I. MADE IN CHINA MEET[S] OR EXCEED[S];
J. various Drywall dimensions, including, but not limited to, 4feet[x/*]12feet[x/*]1/2inch;
K. Venture Supply; and
L. White Edge Tape, boards with no markings or boards with no markings other than numbers or letters.

Typically, a property's applicable Bucket depends on the presence of particular markings on the drywall. Each Unit Owner has provided or will provide evidence demonstrating the type(s) of drywall used in a specific Unit. For some Buckets, the Defendants do not deny manufacturing all of the drywall with those markings. For other Buckets, the Defendants do not deny manufacturing some of the drywall with those markings. For some Buckets, the SCC and the Defendants disagree as to the Defendants' manufacture of the drywall with those markings. I have considered the parties' positions and make the following determinations for purposes of the allocation model.

For the drywall in Buckets A, E, H, and K, the parties agree the Defendants manufactured the drywall. I assign a value of 100% to these products, with a multiple of 1.

For the drywall in Buckets D, I, and J, the parties agree the Defendants manufactured some of the drywall. I assign a value of 75% to these products, for a multiple of .75.

For the drywall in Buckets B, C, F, G, and L, the parties disagree as to the identity of the product manufacturer. Because the drywall in these Buckets is Covered Chinese Drywall for purposes of the settlement, the Units with these types of drywall are entitled to some compensation. I have assigned a value of 20%, with a multiple of .20.

**Prior Payments (Q)**

As reflected on the Master Spreadsheet, some Unit Owners (roughly 2600) have received prior payments in varying amounts related to their claims, typically from settlements with entities other than the Defendants. To determine an appropriate credit for an earlier payment received, I have assumed the settlement paid for a portion of the remediation, theoretically reducing the square footage for which additional remediation is necessary. To determine the discount, the Claims Administrator will divide the amount of the payment received by the 2019 Remediation Formula Calculation (K) for the specific property. For example, assuming a $20,000 prior payment, a home with 2000 square feet of space, and a $250,000 2019 Remediation Formula Calculation for the Unit, the discount is 20,000/250,000 or 8%. Thus, with a remaining square footage of 92% and a multiple of .92, the Adjusted Square Footage for the Unit, as used in the allocation calculation, is 1840 square feet.

**RS Means Location Factor (J)**

The RS Means Location Factor provides an adjustment to the national average construction cost based on zip code. While the courts have referred to this data in discussing property-specific remediation determinations, use of the factor for this settlement allocation would require a similar, and more granular, application of case-specific laws impacting other factors, such as Other Losses. For efficiency and consistency purposes, I have not used this factor in the model.

**Ownership Status (M)**

Because of the protracted length of this litigation, some class members no longer own their homes. Other class members still do. While disputes exist as to the relative claim value for former owners and current owners, I have not discounted the claims of former owners. Instead, guided by the decisions of the courts in Louisiana, Virginia, and Florida, I have generally assumed the remediation cost and the diminution in value equate, such that any former owner received less consideration for the house at the time of ownership separation. Obviously, various factors could distinguish particular circumstances (*i.e.*, an arm's length sale versus a foreclosure with debt forgiveness). However, due to the expense of a claim-by-claim analysis, I treat former owners and current owners the same for purposes of the allocation model. The focus of the model is a Unit Allocation Amount.

**Remediation Status (O)**

Units fall into three categories of remediation status. Some have been fully remediated at a known cost. Other Units have undergone partial remediation to varying degrees. Finally, some properties have not undergone any remediation. After consideration, I have not used remediation status as a factor to vary the allocation model. The need to conduct a claim-by-claim analysis for partial remediations and the resulting time and cost played a major role in my decision.

**Other Losses**

Implicit in the allocation value for each Unit is a sum paid to resolve claims for Other Losses. Determining the particular Other Losses for a Unit and its individual owners would require detailed and cost-prohibitive inquiry and examination. The allocation model is designed for overall fair treatment of the Class Members.

**Miscellaneous Claimants**

There exists 172 Units with varying types of unique claim characteristics. These Units fall into five categories: Condo Owners and Associations (124 in Florida); Non-Profit Remediation (26 in Louisiana); Partially Assigned Claims (8 in Florida); Partially Settled Condo Claims (6 in Florida); and Competing Homeowners (3 in Florida, 3 in Louisiana, 1 in Alabama, and 1 in Mississippi). The claims related to these Units require special handling.

To determine the value of these claims, the model allocates a set portion of the Unit Allocation for the relevant Unit. Based on conversations with the SCC and the Defendants' counsel and a review of amounts claimed for similar type damages, I have allocated 7.5% for Other Losses ("Unit OL Allocation Amount"). In other words, a Unit Owner with only a claim for Other Losses will receive 7.5% of the determined Unit Allocation Amount. For example, assuming a Unit Allocation Amount of $100,000, the Unit Owner with only an Other Losses claim will receive $7,500.

Some Units have more than one owner making a claim. This situation exists for one of three reasons. First, the Unit is a condominium with the specific condo owner making a claim and the condo or homeowner association making a claim. Second, a non-profit third-party (*e.g.*, Habitat for Humanity) remediated the Unit, for which it is seeking recovery, and the Unit Owner is seeking recovery for Other Losses. Finally, a former Unit Owner and a current Unit Owner both seek recovery. Obviously, each Unit will receive only one settlement allocation.

For the condominium owners and associations, respective associations will receive the Remaining Unit Allocation Amount (92.5% (multiple of .925) of the Unit Allocation Amount for each Unit). The individual Unit Owner will receive the Unit OL Allocation Amount. If the association and the Unit Owner belong to different Plaintiff Groups, the Claims Administrator should apply the Plaintiff Group discount as appropriate. If any condominium owner or association submits a written agreement or condominium bylaws or declarations providing for a specific division, the Claims Administrator will divide the Unit Allocation Amount accordingly.

For the Non-Profit Remediation claims, the non-profit organization will receive the Remaining Unit Allocation Amount. The homeowner will receive the Unit OL Allocation Amount. If the non-profit and the Unit Owner belong to different Plaintiff Groups, the Claims Administrator should apply the Plaintiff Group discount as appropriate.

For dueling former and current Unit Owners, the former Unit Owner will receive the entire Unit Allocation Amount absent an assignment or evidence of fraudulent concealment. If an assignment exists, the Claims Administrator will determine if the assignment relates to remediation claims and/or Other Losses. Based on his determination, the Claims Administrator will, if necessary, divide the allocation according to the described methodology. If evidence of fraudulent concealment exists, the Claims Administrator shall inform the Court.

Finally, some Units have separate remediation claims and Other Losses claims. This occurred because (i) the Unit Owner assigned the remediation claim to a commercial builder (which is not eligible to make a claim as part of this settlement) but retained the Other Losses claim (Partially Assigned Claims), or (ii) the Unit Owner's condo association is part of a separate settlement for remediation damages, leaving the Unit Owner as part of this settlement with an Other Losses claim (Partially Settled Condo Claims). For these Units, the Unit Owner is entitled to the Unit OL Allocation Amount.

### *Methodology*

**Step 1:**

For all Units with Prior Payments (Q), perform the following to determine Adjusted Square Footage:

Prior Payment (Q)/2019 Remediation Formula Calculation (K) = Sq. Ft. Discount.
(1 – Sq. Ft. Discount) x Sq. Ft. (H) = Adjusted Square Footage.

**Step 2:**

With the exception of the Partially Assigned Claims (8 in Florida) and the Partially Settled Condo Claims (6 in Florida), perform the following for each Unit (using either Square Footage (H) or Adjusted Square Footage (Step 1), as appropriate) to determine Unit Value:

Sq. Ft. (H) [or Adj. Sq. Ft. (Step 1)] x Pltf Grp (B) Multiple x Product ID (L) Multiple = Unit Value.

**Step 3:**

Only for the Partially Assigned Claims (8 in Florida) and the Partially Settled Condo Claims (6 in Florida), perform the following to determine Unit Other Loss Value:

Sq. Ft. (H) [or Adj. Sq. Ft. (Step 1)] x Pltf Grp (B) Multiple x Product ID (L) Multiple x .075 = Unit OL Value.

**Step 4:**

To determine the total of value for all Units (Aggregate Units Value):

Aggregate Unit Values (Step 2) + Aggregate Unit OL Values (Step 3) = Aggregate Units Value.

**Step 5:**

To determine the specific allocation amount per Unit:

(Unit Value (Step 2)/Aggregate Units Value (Step 4)) x Settlement Fund = Unit Allocation Amount.

(Unit OL Value (Step 3)/Aggregate Units Value (Step 4)) x Settlement Fund = Unit OL Allocation Amount.

**Step 6:**

For the Condo Owners and Associations (124 properties in Florida) and the Non-Profit Remediation Claims (26 properties in Louisiana), perform the following to determine Unit OL Allocation Amount:

Unit Allocation Amount (Step 5) x .075 = Unit OL Allocation Amount.*

Unit Allocation Amount – Unit OL Allocation Amount = Remaining Unit Allocation Amount.

*If a Unit Owner belongs to a different Plaintiff Group than the other claimant as to that Unit, apply the appropriate discount for the Plaintiff Group. For example, in the situation with a particular Louisiana Unit, Habitat for Humanity remediated and made its claim in *Amorin*. The homeowner has a claim for Other Losses in *Brooke*. To determine the appropriate Unit OL Allocation Amount for the homeowner, apply the *Brooke* value (20% or .20) to the initial Unit OL Allocation Amount.

**Step 7:**

For competing Homeowners (3 in Florida, 3 in Louisiana, 1 in Alabama, and 1 in Mississippi):

Absent an assignment or evidence of fraudulent concealment, the former Unit Owner receives the Unit Allocation Amount.

THIS, the 11th day of July, 2019.

                                                              */s/ J. Cal Mayo, Jr.*
                                                              J. Cal Mayo, Jr.
                                                              Allocation Neutral

7

**EXHIBIT 1**

## Index of Documents Provided to Allocation Neutral

**Background Documents**

1. April 8, 2010 *Germano* Findings of Fact and Conclusions of Law, MDL Rec. Doc. 2380 (J. Fallon)

2. September 26, 2014 Class Certification Order, MDL Rec. Doc. 18028 (J. Fallon)

3. Plaintiffs' September 8, 2015 Letter to Judge Fallon re: Status of Damages Claims Against Taishan, Rec. Doc. 19517-1 (FILED UNDER SEAL)

4. April 21, 2017 Class Damages Order, MDL Rec. Doc. 20741 (J. Fallon)

5. Various versions of Plaintiffs' Master Spreadsheet

6. Summary of the Class Settlement and Claims

7. Various drafts of the Settlement Agreement

**Important Court Orders (MDL Court, Florida Court, and Virginia Court)**

1. March 12, 2018 Suggestion of Remand, Opinion and Order Related to Florida *Amorin* Cases, MDL Rec. Doc. 21242 (J. Fallon)

2. March 20, 2018 Supplemental Order re: Suggestion of Remand, Opinion and Order Related to Florida *Amorin* Cases, MDL Rec. Doc. 21252 (J. Fallon)

3. August 20, 2018 Suggestion of Remand, Opinion and Order Related to Virginia *Amorin* Cases, MDL Rec. Doc. 21695 (J. Fallon)

4. November 16, 2018 Florida *Amorin* Trial Plan, ECF No. 112 (J. Cooke)

5. March 6, 2019 Order and Reasons re: *Brooke* Statute of Limitations MDL Rec. Doc. 22124 (J. Fallon)

6. May 3, 2019 Ruling on Application of Remediation Formula to Former Owners Rec. Doc. 22237 (J. Fallon)

7. May 20, 2019 Louisiana *Amorin* Trial Plan, MDL Rec. Doc. 22251 (J. Fallon)

8. May 20, 2019 Virginia *Amorin* Trial Plan, ECF No. 87 (J. Davis)

**Product ID Documents**

1. Defendants' Product ID Position Chart, MDL Rec. Doc. 22152-3 (All Jurisdictions)

2. Che Gang January 22-23, 2019 Deposition Transcript and Exhibits (All Jurisdictions)

3. Plaintiffs' Brief as to Product ID Categories Attributable to Taishan and Exhibits Submitted to Special Master (Fla.)

4. Taishan's Product ID Brief and Exhibits Submitted to Special Master (Fla.)

5. Plaintiffs' Brief as to Product ID Categories Attributable to BNBM and Exhibits Submitted to Special Master (Fla.)

6. BNBM's Product ID Brief and Exhibits Submitted to Special Master (Fla.)
7. Plaintiffs' Product ID Hearing Presentations to the Special Master (Fla.)
8. Taishan's Product ID Hearing Presentations to the Special Master (Fla.)
9. March 11, 2019 Product ID Hearing Transcript before Special Master (Fla.)
10. Special Master's Product ID Report and Recommendation, ECF No. 233 (Fla.)
11. Plaintiffs' Objections to Special Master's Product ID Report and Recommendation and Exhibits, ECF No. 253 (Fla.)
12. Defendants' Response to Plaintiffs' Objections to Special Master's Product ID Report and Recommendation and Exhibits, ECF No. 277 (Fla.)
13. Plaintiffs' Reply in Support of Objections to Special Master's Product ID Report and Recommendation, ECF No. 297 (Fla.)
14. Excerpt from 2010 Taishan Plasterboard Profile Form
15. 2006 Email re: Crescent City Gypsum

**Contest Briefing**

1. Taishan's Preliminary Contests and Setoffs and Objection Key Submitted to Special Master (Fla.)
2. BNBM's Preliminary Contests and Setoffs Brief and (Fla.)
3. Plaintiffs' Response to Defendants' Preliminary Contests and Setoffs Brief and Exhibits Submitted to Special Master (Fla.)
4. Taishan's Final Contests and Setoffs Brief and Exhibits Submitted to Special Master (Fla.)
5. Taishan's Final Contests and Setoffs Spreadsheet (Fla.)
6. BNBM's Final Contests and Setoffs Brief and Exhibits Submitted to Special Master (Fla.)
7. BNBM's Final Contests and Setoffs Spreadsheet (Fla.)
8. Plaintiffs' Response to Defendants' Final Contests and Setoffs Brief and Exhibits Submitted to Special Master (Fla.)
9. Taishan's Contests and Setoffs Hearing Presentation to the Special Master (Fla.)
10. BNBM's Contests and Setoffs Hearing Presentation to the Special Master (Fla.)
11. Plaintiffs' Contests and Setoffs Hearing Presentation to the Special Master (Fla.)
12. April 10, 2019 Contests and Setoffs Hearing Transcript before Special Master (Fla.)
13. April 11, 2019 Contests and Setoffs Hearing Transcript before Special Master (Fla.)
14. Special Master's Report and Recommendation on Contests and Setoffs, ECF No. 266 (Fla.)
15. Special Master's Supplemental Report and Recommendations on Contests and Setoffs, ECF No. 268 (Fla.)