```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA


****************************************************************

IN RE:  CHINESE-MANUFACTURED      *    Docket No. 09-MDL-2047
DRYWALL PRODUCTS LIABILITY        *
LITIGATION                        *
                                  *    September 20, 2019
                                  *
                                  *
Relates to all cases              *    Section "L"
                                  *
****************************************************************

                 REPORTER'S OFFICIAL TRANSCRIPT OF THE

                      MONTHLY STATUS CONFERENCE

                BEFORE THE HONORABLE ELDON E. FALLON,
                    UNITED STATES DISTRICT JUDGE.
```

**APPEARANCES:**

**For the Plaintiffs:**

    Russ Herman
    Sandra Duggan


**For the Defendants:**

    Harry Rosenberg
    Christy Eikoff




**REPORTED BY:**    Mary Thompson, RMR, FCRR
                     500 Poydras Street, Room B275
                     New Orleans, Louisiana  70130
                     (504)589-7783

OFFICIAL TRANSCRIPT

```
                   P R O C E E D I N G S
                          (Call to order of the court.)
            THE COURT:  Be seated, please.
            Good afternoon, ladies and gentlemen.
            Call the case.
            THE CASE MANAGER:  MDL 2047, In Re: Chinese-
Manufactured Drywall Products Liability Litigation.
            THE COURT:  Counsel, make appearances for the record,
please.
            MR. ROSENBERG:  Good afternoon, Judge Fallon.
Harry Rosenberg as liaison counsel for CNBM, BNBM, and Taishan,
Your Honor.
            THE COURT:  Okay.
            MR. HERMAN:  May it please the Court:
            Good morning, Your Honor -- Judge Fallon.  I'm
Russ Herman for the PSC.  And Sandy Duggan will be the presenter
for the PSC today.
            THE COURT:  Okay.
            We're here for our monthly status conference.  I met a
moment ago with liaison and lead lawyers to just discuss the
proposed agenda.
            We'll take it in the order presented.
            MS. DUGGAN:  Good afternoon, Your Honor.
            Since the Court entered its preliminary approval order
for the Taishan class settlement, we've begun to issue notice to
```

OFFICIAL TRANSCRIPT

 the class members. The agreement has been posted on this court's website. Your Honor has issued letters to every federal district court in the country, and there are a couple of state courts that were sent notice of the settlement and of the stay.

 We were just alerted that in the *Alexander* case in Alabama that, unfortunately, that court did not receive the notice from this court, but we've spoken with the clerk and we're going to reissue that notice.

 THE COURT: Okay. Fine.

 MS. DUGGAN: The class settlement website is up and running, chinesedrywallsettlement.com.

 We have a call center that's also up and running. Class counsel have been responding to inquiries from class members on a daily basis, and we're keeping a log of those calls.

 In addition to that, the long-form notices have been sent out by BrownGreer to every known class member.

 And estimates of the gross recovery for the class members on the master spreadsheet have also been sent out.

 THE COURT: Just by way of background, this case has been before me now for nearly ten years. It has its inception from the drywall following the storms and the building boom in Florida primarily. We in this country ran out of drywall, and, as a result, drywall from other areas -- other countries were sent into the United States. A great number of it was sent in from China, and some of that drywall has been problematic. It

has created some issues with appliances inside of the homes and has required a great deal of effort to remove it.

The Court recognized there are two groups of defendants that produced the drywall. One was Knauf, who had a Chinese subsidiary that manufactured and made a lot of drywall sent into this country; and then there was the Taishan, et al, group that had Chinese drywall also manufactured. The Knauf drywall was the predominate by way of number of houses involved in this particular case.

The cases were from all over the country. They were sent here under MDL legislation. It was declared an MDL and sent to this Court.

After a number of trials, we've been able to focus a bit on a protocol which was required to take the drywall out and restructure the homes.

The Knauf group settled earlier and we have then been proceeding against the Chinese group.

There are issues of jurisdiction, there are issues of service, there are issues of collectability, but the parties have pursued the defendants and we have had a lot of motions. I handled about a thousand motions over the period. We wrote a number of opinions dealing with jurisdiction. The opinions were appealed to the Fifth Circuit.

The long and short of it, after a long period of time, the parties have gotten together and agreed to resolve the case.

OFFICIAL TRANSCRIPT

```
02:06:02     1              A special master was appointed to come up with a
             2   particular plan, and the special master looked at all of the
             3   material involved and devised a particular plan that was tweaked
             4   a little bit by the parties, but agreed to, and that served as a
             5   basis of the settlement.
             6              It's a class action settlement so notice has to go out
             7   notifying everybody of the settlement so that they can see what
             8   amounts they would receive within some reason.  They are
             9   estimates.  And they have an opportunity to look at it; make a
02:06:21    10   decision as to whether to participate.  Or if they don't like it,
            11   don't wish to participate, then they opt-out and go their own way
            12   for it.  But at least there's something for them to look at, and
            13   that's where we are at this stage.
            14              So I preliminarily approved it so that the notice could
02:06:39    15   go out, so that the parties could be notified, and so that the
            16   litigants could look at it, consult their lawyers, make some
            17   decision on it, and then act accordingly.
            18              And that's where we are at this time.
            19              Anything further from the defendants?
02:06:57    20              MR. ROSENBERG:  No, Your Honor.
            21              THE COURT:  Christy, anything?
            22              MS. EIKOFF:  No, Your Honor.
            23              THE COURT:  Is there another item on the agenda, Russ,
            24   that we need to talk about?
02:07:08    25              MR. HERMAN:  No, Your Honor.  I believe there are some
```

folks sitting in the courtroom that --

THE COURT: I know there are. And I have been contacted by them, and they indicated that they wanted to speak, and they certainly are able to. That's why we have this in open court, to give everybody an opportunity to know what's going on and to address the Court, or any of the parties, if you would like to.

Anybody wish to talk to the Court, make any comments?

MS. RAMSAY: (Indicating.)

THE COURT: Sure. Come on up, ma'am.

MS. RAMSAY: I didn't know I was going to go first today.

THE COURT: You can appear at the podium here and say what you need to say. I appreciate you being here first of all.

MS. RAMSAY: Thank you for allowing me to speak.

THE COURT: Certainly.

MS. RAMSAY: My name is Tina Ramsay, and I'm from Alabama.

THE COURT: Yes, ma'am.

MS. RAMSAY: It's a little intimidating up here.

I want to tell you a little bit about when we got started.

THE COURT: Yes, ma'am.

MS. RAMSAY: Me and my husband got married at 18. We bought our property. I was pregnant, and my parents wanted to

give us a place to stay. They gave me a choice between a new mobile home, which was a small two-bedroom, or a used mobile home which was the larger three bedroom. I opted for the small because I only wanted the best for my children -- my daughter.

I did not want her to be able -- to need to worry about what someone could have left behind in the house or was the carpet properly done and she won't get tacks in her feet. I wanted the best for her. We bought the smaller house -- or my parents did for us.

So we stayed in that. And I had two more children, and we were outgrowing the trailer fast so we decided we wanted to start building a house. We started dreaming about it and making our own plans. We went to the department in Mobile where we had to where -- blueprints, and they told my husband, yeah, you can draw your own blueprints if it meets code.

He drew everything. We sat down together and went over room by room by room how big we wanted it. I made it too big, but we kept, you know, working at it.

They allowed him to pull every permit. They came out and inspected every piece of the home. Everything passed. Everything was good.

Well, so, we moved in to it -- I've got a paper I was supposed to read. I'm sorry.

THE COURT: That's okay.

MS. RAMSAY: We moved into the home, and in about six

```
 1  months to a year we started having AC problems, which was no big
 2  deal because it was a new home, new AC, and it was under
 3  warranty.  We called the guy and he came out and fixed it.  Two
 4  or three months later he was coming right back out fixing it.  We
 5  kept having these problems.
 6          The kids kept going through computers and their
 7  chargers and stuff.  We started fussing at them and getting onto
 8  them, saying, Look, we're not going to keep buying things for you
 9  if you don't start taking care of your stuff.
10          So after that, the AC guy come out and was like, Do you
11  know you have Chinese drywall?  I was like, We have heard of it.
12  We had already contacted a lawyer to test our stuff.  Well, we
13  found out -- he said yes.  Then we found out from one of the
14  inspectors that come out and cut the holes in the walls that we
15  do have the Chinese drywall, and there was "Taishan on" the back
16  of every little square he took out.
17          Our home -- well, the kids was so excited because they
18  would have their own bedrooms.  This was our dream home -- all of
19  our dream home.  Our kids got windows -- they were preteens when
20  we moved in to the house, and they got bedroom windows for their
21  birthdays from grandparents because this was our dream, to move
22  in here.  So we got -- you know, we got all of that.  And...
23          THE COURT:  When you found out you had Chinese drywall,
24  did you contact an attorney to be of help to you?
25          MS. RAMSAY:  We did.  We contacted the attorney.
```

*OFFICIAL TRANSCRIPT*

1 After the guy was to come out and cut the holes in the
2 wall, he was going to put the holes back the best he could but I
3 told him, Just wait, my husband would do it, because he done the
4 house. Just wait and my husband would do it. And so we did, but
5 then we talked to the attorney and the attorney is like, the
6 house is going to have to be torn down -- not torn down, but all
7 the stuff is going to come out. We said, Okay, it's not going to
8 be that long. We left the holes and they are still there in the
9 house.
10 But when we moved into the house, we only owed $5,000.
11 It took us six years, but we paid for everything. We did not
12 have to finance everything. We were truly blessed.
13 So we got into the house and we were having all these
14 issues. I got to worrying what is Chinese drywall. I was
15 looking it up online. I were fortunate enough to run across a
16 Facebook group that has really been helpful to me over the years,
17 and they gave me a name of a doctor that came here and I guess
18 testified in court way long ago.
19 He was extremely nice. He was an older gentleman. He
20 was in a meeting, and he come out of the meeting to talk to me.
21 And he said the best that he could tell me was to keep my house
22 aired as much as I could, and basically the side effects would be
23 respiratory. I could watch for that, and, you know, go to
24 doctors and let them know.
25 And I did. My son is now 21. He has COPD and severe

OFFICIAL TRANSCRIPT

|   |   |
|---|---|
|  | 1  asthma.  He's been on a breathing machine for all of his life |
|  | 2  almost, but it just intensified when we moved into the home and |
|  | 3  then he developed the COPD. |
|  | 4           The girls, they had to go on breathing machines |
| 02:13:19 | 5  throughout -- you know, after we moved into the home.  They no |
|  | 6  longer live in the home and they are doing great.  They have not |
|  | 7  had to be back on the breathing machine at all.  They are doing |
|  | 8  good. |
|  | 9           THE COURT:  Good. |
| 02:13:32 | 10          MS. RAMSAY:  I do have my grandson -- he will be two in |
|  | 11 December -- that is living with me.  He is already on a |
|  | 12 nebulizer.  He has been on a breathing machine.  I think he |
|  | 13 was -- the doctor put him on it six different times already, and |
|  | 14 he's not two. |
| 02:13:52 | 15          He's also been having bloody noses.  He just went to |
|  | 16 the doctor again yesterday for bloody noses.  And my |
|  | 17 daughter-in-law explained that we was living in the house with |
|  | 18 Chinese drywall, and the doctor was familiar with the Chinese |
|  | 19 drywall.  And she said basically the same thing, watch out for |
| 02:14:12 | 20 respiratory and everything.  But she gave him some allergy |
|  | 21 medicine and thinks he will be okay, but that is a huge worry of |
|  | 22 ours. |
|  | 23          THE COURT:  Are you-all included in the settlement for |
|  | 24 the program? |
| 02:14:23 | 25          MS. RAMSAY:  We are.  We are in the Amorin files. |

**OFFICIAL TRANSCRIPT**

```
            THE COURT:  And you received notice of that and were
you able to determine how much you would receive from that?
            MS. RAMSAY:  Well, as we know, it's an estimate.  It
could go up or down.  I did get the offer -- well, the estimate
that they gave me, and it was unbelievable.  I was just shocked
that they could do that.
            THE COURT:  Less than you had thought?
            MS. RAMSAY:  Yes, sir.
            THE COURT:  Okay.
            MS. RAMSAY:  And I had a friend that has -- I know some
of the attorneys are like, you can't compare the two, but I can.
            My friend has a house in Florida -- I have family and
friends that are in Florida, and we talk constantly.  Well, when
the -- I call it the PW.  When they got their offer, my friend
let me see the contract.  And she was like a thousand more square
foot than me, but at first she was offered $60 a square foot.
Then the MFN came in and they raised it to $87.70 a square foot.
And she got paid a hundred percent of under air.
            She has the same drywall as me.  She bought at the same
place and at the same time as me, and she was able to get that.
They also got 10 percent of their attorneys' fee paid, and we're
not getting any of that.
            THE COURT:  Do you know whether or not that was a Knauf
drywall or the Taishan drywall?
            MS. RAMSAY:  Taishan, same as mine.  Exact same.  Same
```

OFFICIAL TRANSCRIPT

```
                1  place.
                2          They did get that.
                3          I've talked to -- I know you've got a copy already
                4  because I'm skipping over a lot, but I talked to my attorney.
02:16:20        5  I've been calling her off and on for the past year and a half.
                6  The original contact person that we talked to retired so I
                7  started talking directly with her.  Every time that I would try
                8  to talk with her, she was like, Tina, you know more than I; I
                9  really don't know.
02:16:40       10          And I talked to her just -- I think it was yesterday
               11  and I told her I was coming here -- no, it was day before
               12  yesterday.  I told her I was coming here, you know, and she's
               13  like, Tina, I just don't know what to tell you; I don't know.  So
               14  she's kind -- you know, she just don't know.
02:16:57       15          And these attorneys here, I mean, it's a blessing that
               16  y'all have stuck with it as long as y'all have.  You have done
               17  amazing to not just say, Oh, I'm getting out of this.  And they
               18  deserve the money.
               19          But our attorneys don't know anything about any of
02:17:11       20  this.  I have informed my attorney on just about everything that
               21  has happened this past year, and then she will have to go back
               22  and double-check, if she did.
               23          THE COURT:  What do you feel the Court should do?
               24          MS. RAMSAY:  As far as that, my husband kind of thinks
02:17:27       25  that she doesn't need that much money because she didn't work for
```

OFFICIAL TRANSCRIPT

```
 1  that.  You know, she did develop the paperwork, don't get me
 2  wrong, and she does deserve some, but it's just such an amount
 3  coming out.
 4          I don't really know.
 5          THE COURT:  Well, yeah.  And there's no amount coming
 6  out at this point.  It's up to -- I'm the one that will set the
 7  amount for the attorneys' fees.
 8          MS. RAMSAY:  Right.  And when I told her that --
 9  because I called her about the settlement.  I didn't get my
10  letter.  I called her.  She didn't know how to get the letter.  I
11  told her how to get the letter.  I said, Call Ashley.  She did.
12  She called Ashley.  She e-mailed me back and told me what it was.
13          At that point I was like, Oh, no, I can't believe this.
14  And I told her that I was going to get around $90,000 or less to
15  fix my home.  And she said surely the attorneys' fees are not
16  coming out of that little bit of money, and I said, Yes, ma'am,
17  they are.  I was at the last conference meeting and they are.
18  And she was like, I don't think so, Tina; let me check into it.
19          So she didn't even -- she didn't know.  She was
20  shocked.  And like I said, she's a wonderful person.  I just --
21  she's just not up to date on this --
22          THE COURT:  Okay.
23          MS. RAMSAY:  -- at all.
24          Also the guy that does the -- I call him the middle
25  man, but he's the Mississippi guy that you hired -- or they hired
```

```
02:19:03

02:19:21

02:19:34

02:19:50

02:20:00
```

1  to pass out the monies.
2          THE COURT:  Yes, ma'am.
3          MS. RAMSAY:  I think -- and I talked to a couple of
4  attorneys before I came in, and I think this guy is clueless on
5  how to fix a home.
6          My house is -- this is not Taishan's fault, I done
7  this, but my house has the spray wall on the inside, but I'm
8  having to remove it because of Taishan.  So the sheetrock has to
9  come out and that spray foam insulation has to come out.  And I
10 don't know if you know that spray foam insulation, but it is like
11 cement so they are going to have to have special tools to get
12 that out.
13         Our power -- our cord barn is behind the --
14         THE COURT:  Right.
15         MS. RAMSAY:  So that has to come out somehow.  And I
16 don't know how that's going to be done, but it has to be.
17         And then we have got to -- they have to have a special
18 landfill to put the drywall in.  You can't just take that
19 drywall -- because they say it's toxic.  You can't just take it
20 to the regular dump.
21         And you also have to have a special person come in and
22 remove it because your normal contractor doesn't want to come in
23 and fool with toxic drywall.
24         All that costs money, and I just don't feel that that
25 middle person knows anything about what it takes to change -- to

**OFFICIAL TRANSCRIPT**

1 redo a house.
2    And I mentioned that to the attorneys, and they were
3 like, Well, he really wasn't looking at what it costs to redo a
4 house, because that's not really what you are getting, you know,
5 is to redo a house.
6    And I -- like I said, I've been so upset after getting
7 the offer, I went to the doctor. I was diagnosed with PSTD --
8 PTSD and anxiety, and they put me on all these medicines
9 (indicating), because how am I going to fix this house for my
10 two-year-old grandson that lives with us daily?
11    My husband also worked construction for 22 years, I
12 think, and we made really good money. He traveled. We done
13 good. That's how come we was able to build the house, you know.
14    And now he had -- a couple years back he had a light
15 heat stroke, so he can't be in the direct sunlight so he can't do
16 what he used to do. We own our own business now. We build patio
17 furniture and we've been doing really well for us, and we can't
18 afford to move in and out. That has to come out of our
19 settlement.
20    THE COURT: Let me mention this, ma'am. You really
21 need to talk to an attorney. You know, as a Judge, I'm not going
22 to be able to represent you as an attorney. You need to talk to
23 an attorney and make a decision as to whether you want to take
24 the settlement or whether you want to pursue them outside of the
25 settlement. It's up to you to do that, to take all of that into

OFFICIAL TRANSCRIPT

```
02:21:40






02:22:07



02:22:32





02:23:00




02:23:21
```

 1  consideration.
 2          I certainly will file this into the record to have this
 3  as part of the record.
 4          MS. RAMSAY:  Thank you.
 5          THE COURT:  The question of attorneys' fees, that is,
 6  to some extent, up in the air.  The amounts are up to various
 7  things, but I will be deciding the amounts.  I asked the
 8  attorneys to give you the very maximum that was possible for the
 9  attorneys' fees.  It may or may not be that amount, but I will
10  hear from them and make some decision on it.
11          It's hard sometimes to compare your house with somebody
12  else's house, because the square footage is different, the
13  location is different, and the design of the program was put into
14  place by a person who took a lot of this into consideration.
15          But I hear you and I understand, from what you are
16  telling me, that you feel like you had -- that the amount
17  given -- or at least designated for your house is not -- it's
18  lower than you had hoped, and that you feel that it should be
19  more than it is, and that the attorneys' fee ought not to be the
20  amount that they are asking for.
21          MS. RAMSAY:  Well, let me say this also, since you're
22  going to take it into consideration.  My -- what I was offered
23  was $148,000.  And what -- to replace the stuff in my home, like
24  the appliances, the sheetrock, to do everything -- and I'm not
25  asking for the handmade crown molding and all that, that we done.

That's fine, I don't need it -- but it's only like $180,000 to do everything. So even at $148,000, that is still a huge help, you know. We're only $40,000 off.

Like I said, I'm not -- I'm not worried about everything going back in. But when you take away the attorneys' fees, it's going to bring us down to around 90-something or less.

THE COURT: What is the amount that they are -- that is offered now?

MS. RAMSAY: 148. That's what I'm saying. It's just the attorneys' fees. Even if that was not in there, that would be a huge help being that we're only, you know, 40-something-thousand dollars off from having the house completely back to normal.

THE COURT: Yes, ma'am. Okay. All right. Thank you for coming.

MS. RAMSAY: Thank you.

THE COURT: And thank you for your comments on it. It was very helpful to me, and I appreciate you being here.

MS. RAMSAY: Thank you.

THE COURT: You bet.

Anything else from anyone?

MR. HERMAN: No, Your Honor.

MR. ROSENBERG: Judge, just before you leave the bench, the next status conference.

THE COURT: Yeah, I'm sorry. Thank you, Harry.

OFFICIAL TRANSCRIPT

```
02:24:47
```

 1    The next status conference is October 23rd.
 2    And the following one is November 22nd.
 3    Both at 9:00.
 4    I would like to see liaison and lead counsel at 8:30
 5 that day.
 6    Thank you very much.  Court will stand in recess.
 7                    (Proceedings adjourned.)
 8
 9                        * * * *
10                       **CERTIFICATE**
11
12     **I hereby certify this 23rd day of September, 2019, that**
13 **the foregoing is, to the best of my ability and understanding, a**
14 **true and correct transcript of the proceedings in the**
15 **above-entitled matter.**
16
17                         */s/ Mary V. Thompson*
18                       _____
                           **Official Court Reporter**
19
20
21
22
23
24
25

**OFFICIAL TRANSCRIPT**