**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| IN RE:  CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047 SECTION: L JUDGE FALLON MAG. JUDGE WILKINSON |
|---|---|
| THIS DOCUMENT RELATES TO: <br><br> ALL ACTIONS (except *The Mitchell Co., Inc. v. Knauf Gips KG, et al.*, Civil Action No. 09-4115 (E.D. La.)) | |

**SETTLEMENT CLASS COUNSEL'S MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION FOR AN AWARD OF ATTORNEYS'**
**FEES AND COST REIMBURSEMENTS FOR COMMON BENEFIT**
<u>**COUNSEL AND INDIVIDUALLY RETAINED ATTORNEYS**</u>

## <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES ................................................................................................. iii

I.      INTRODUCTION ................................................................................................. 1

II.     FACTUAL AND PROCEDURAL BACKGROUND AND OVERVIEW OF
        SETTLEMENT CLASS COUNSELS' COMMON BENEFIT EFFORTS ................. 2

        A.  The Origins of the Litigation ................................................................. 2

        B.  The Omni Complaints. ............................................................................ 3

        C.  Initial Proceedings in the MDL............................................................ 6

        D.  Litigation Against Knauf ...................................................................... 7

        E.  Litigation Against Taishan.................................................................... 8

        F.  Plaintiffs' Counsel Continued to Prosecute Plaintiffs' Claims
            in the Remand Courts.......................................................................... 16

            1.  The Common Benefit Efforts Performed in the Southern
                District of Florida....................................................................... 17

            2.  The Common Benefit Efforts Performed in the Eastern
                District of Virginia..................................................................... 24

        G.  History of the Settlement Negotiations and Mediation........................ 25

III.    ARGUMENT ....................................................................................................... 28

        A.  The Fifth Circuit Has Endorsed a Percentage-of-Fund Method for Awarding
            Common Fund Fees, with an Abbreviated "Lodestar" Crosscheck ...................... 28

        B.  The Requested 30% Fee Falls Well Within the "Benchmark Percentage" ........... 36

        C.  Principles Governing Determination of an Appropriate Fee Award
            under *Johnson* ....................................................................................... 40

            1.  The Time and Labor Required........................................................ 40

            2.  The Novelty and Difficulty of the Questions Involved ................... 41

            3.  The Skill Requisite to Perform the Legal Service Properly............. 41

i

4.  The Preclusion of Other Employment by the Attorney Due to Acceptance of the Case ........................................................................ 42

5.  The Customary Fee .......................................................................... 42

6.  Whether the Fee Is Fixed or Contingent ......................................... 42

7.  Time Limitations Imposed by the Client or the Circumstances ....................... 43

8.  The Amount Involved and the Results Obtained .............................................. 43

9.  The Experience,  Reputation, and Ability of the Attorneys............................. 44

10. The "Undesirability" of the Case ................................................................... 44

11. The Nature and Length of the Professional Relationship with the Client ........ 45

12. Awards in Similar Cases .................................................................................. 45

D.  An Abbreviated Lodestar Cross-Check Easily Confirms the Reasonableness of the Requested POF Award Since it only Accounts for Common Benefit Counsel's Time ....................................................................................... 46

E.  Common Benefit Counsel Should Be Entitled to Reimbursement of Expenses ..... 47

IV.   CONCLUSION.......................................................................................... 48

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*Alyeska Pipeline Serv. Co. v. Wilderness Soc.*,
  421 U.S. 240 (1975) ........................................................................................ 28

*Arenson v. Board of Trade of City of Chicago*,
  372 F. Supp. 1349 (N.D. Ill. 1974) .................................................................. 32

*Blum v. Stenson*,
  465 U.S. 886 (1984) ........................................................................................ 32

*Boeing Co. v. Van Gemert*,
  444 U.S. 472 (1980) ........................................................................................ 28

*Bristol-Myers Squibb v. Superior Court of California*,
  137 S. Ct. 1773 (2017) ...................................................................................... 5

*Brown v. Phillips Petroleum Co.*,
  838 F.2d 451 (10th Cir.) .................................................................................. 35

*Burford v. Cargill, Inc.*,
  No. 05-0283, 2012 WL 5471985 (W.D. La. Nov. 8, 2012) ............................ 34, 35

*Camden I Condominium Ass'n, Inc. v. Dunkle*,
  946 F.2d 768 (11th Cir. 1991) .............................................................. 33, 35, 47

*Central R.R. & Banking Co. v. Pettus*,
  113 U.S. 116 (1885) .................................................................................. 28, 32

*Evans v. TIN, Inc.*,
  No. 11-2067, 2013 WL 4501061 (E.D. La. 2013) ................................ 30, 37, 38

*Fox v. Vice*,
  563 U.S. 826 (2011) ........................................................................................ 35

*Gottlieb v. Barry*,
  43 F.3d 474 (10th Cir. 1994) ........................................................................... 35

*Harman v. Lyphomed, Inc.*,
  945 F.2d 969 (7th Cir. 1991) ........................................................................... 42

*Hensley v. Eckerhart*,
  461 U.S. 424 (1983) .................................................................................. 35, 43

*In re Air Crash Disaster at Florida Everglades*,
  549 F.2d 1006 (5th Cir. 1977) ......................................................................... 29

*In re Bayou Sorrel Class Action*,
  No. 04-1101, 2006 WL 3230771 (W.D. La. Oct. 31, 2006) ............................ 36

*In re Catfish Antitrust Litig.*,
  939 F. Supp. 493 (N.D. Miss. 1996) ................................................................ 34

*In re Cendant PRIDES*,
  243 F.3d 722 (3rd Cir.) .................................................................................... 34

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.*,
  168 F. Supp. 3d 918 (E.D. La. 2016) .............................................................. 6, 9

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.*,
626 F. Supp. 2d 1346 (J.P.M.L. 2009) ................................................................ 3

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.*,
2013 WL 499474 (E.D. La. Feb. 7, 2013) ......................................................... 7, 41

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.*,
2014 WL 4809520 (E.D. La. Sept. 26, 2014) ..................................................... 6, 9

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.*,
2017 WL 1421627 (E.D. La. Apr. 21, 2017) ................................................ 6, 7, 8, 9

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.*,
2017 WL 1476595 (E.D. La. Apr. 21, 2017) ......................................................... 12

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.*,
2018 WL 279629 (E.D. La. Jan. 2, 2018) ......................................................... 13, 14

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.*,
2018 WL 6046189 (E.D. La. Nov. 19, 2018).................................................... 5, 17, 20

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.*,
2019 WL 1057003 (E.D. La. Mar. 6, 2019)......................................................... 16

*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*,
(*Germano*), 706 F. Supp. 2d 655 (E.D. La. 2010) ............................................... 3, 6

*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*,
742 F.3d 576 & 753 F.3d 521 (5th Cir. 2014) ..................................................... 8

*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*,
894 F. Supp. 2d 819 (E.D. La. 2012) ................................................................... 8

*In re Combustion, Inc.*,
968 F. Supp. 1116 (W.D. La. 1997)..................................................................... 36

*In re Continental Illinois Sec. Litig.*,
962 F.2d 566 (7th Cir. 1992)........................................................................ 29, 35

*In re Diet Drugs Prods. Liab. Litig.*,
582 F.3d 524 (3d Cir. 2009)............................................................................... 29

*In re Educational Testing Service Praxis Principles of Learning and Teaching: Grades 7-12
Litig.*,
447 F. Supp. 2d 612 (E.D. La. 2006) .......................................................... passim

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
586 F. Supp. 2d 732 (S.D. Tex. 2008) ........................................................ passim

*In re FEMA Trailer Formaldehyde Prod. Liab. Litig.*,
MDL No. 07-1873, 2013 WL 1867117 (E.D. La. May 2, 2013) ....................... 35, 36

*In re Fender*,
12 F.3d 480 (5th Cir.)......................................................................................... 32

*In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
55 F.3d 768 (3d Cir.).......................................................................................... 29

*In re High Sulfur Content Gasoline Prods. Liab. Litig.*,
517 F.3d 220 (5th Cir. 2008).......................................................................... 29, 30

*In re OCA, Inc. Sec. and Derivative Litig.*,
No. 05-2165, 2009 WL 512081 (E.D. La. Mar. 2, 2009)...................................... 35

*In re Pool Prod. Distribution Market Antitrust Litig.*,
MDL 2328, 2015 WL 4528880 (E.D. La. July 27, 2015)............................. 31, 35, 47

*In re Rite Aid Corp. Sec. Litig.*,
  396 F.3d 294 (3d Cir. 2005) ................................................................. 39
*In re Syngenta AG MIR 162 Corn Litig.*,
  357 F.Supp.3d 1094 (D. Kan. 2018) ................................................. 36, 39
*In re Thirteen Appeals Arising out of San Juan Dupont Plaza Hotel Fire Litig.*,
  56 F.3d 295 (1st Cir. 1995) ................................................................. 34
*In re Unisys Corp. Retiree Medical Benefits ERISA Litig.*,
  886 F. Supp. 445 (E.D. Pa. 1995) ...................................................... 33
*In re Vioxx Prod. Liab. Litig.*,
  MDL No. 1657, 2018 WL 4613941 (E.D. La. Sept. 26, 2018)................. 35, 39
*In re Vioxx Prods. Liab. Litig.*,
  760 F. Supp. 2d 640 (E.D. La. 2010) .......................................... passim
*In re Washington Public Power Supply System Sec. Litig.*,
  ("WPPSS"), 19 F.3d 1291 (9th Cir. 1994) ........................................... 35
*In re: Diet Drugs Prod. Liab. Litig.*,
  553 F. Supp. 2d 442 (E.D.Pa. 2008) .................................................. 37
*In Re: Oil Spill by the Oil Rig "Deepwater Horizon"*,
  MDL 2179, 2016 WL 6215974 (E.D. La. Oct. 25, 2016)................. 35, 44, 46
*Johnson v. Georgia Highway Express, Inc.*,
  488 F.2d 714 (5th Cir. 1974).......................................................... 31, 45
*Johnston v. Comerica Mortg. Corp.*,
  83 F.3d 241 (8th Cir. 1996)................................................................ 35
*Kemp v. Unum Life Ins. Co. of America*,
  No. 14-0944, 2015 WL 8526689 (E.D. La. Dec. 11, 2015)..................... 37
*Klein v. O'Neal, Inc.*,
  705 F. Supp. 2d 632 (N.D. Tex. 2010)............................................... 29
*Lindy Bros. Builders Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp.*,
  487 F.2d 161 (3d Cir. 1973)........................................................... 32, 36
*Migis v. Pearle Vision, Inc.*,
  135 F.3d 1041 (5th Cir. 1998).......................................................... 43
*Mills v. Electric Auto-Lite Co.*,
  396 U.S. 375 (1970) ........................................................................ 28
*Paul, Johnson, Alston & Hunt v. Graulty*,
  886 F.2d 268 (9th Cir. 1989) ........................................................... 35
*Rawlings v. Prudential-Bache Properties, Inc.*,
  9 F.3d 513 (6th Cir. 1993)................................................................. 35
*Six (6) Mexican Workers v. Arizona Citrus Growers*,
  904 F.2d 1301 (9th Cir. 1990)........................................................... 35
*Sprague v. Ticonic Nat'l Bank*,
  307 U.S. 161 (1939) .................................................................... 28, 47
*Strong v. BellSouth Telecommunications, Inc.*,
  137 F.3d 844 (5th Cir. 1998)............................................................. 30
*Swedish Hospital Corp. v. Shalala*,
  1 F.3d 1261 (D.C. Cir. 1993) ........................................................... 35
*Trustees v. Greenough*,
  105 U.S. 527 (1881) ........................................................................ 28

*Turner v. Murphy Oil,*
    472 F. Supp. 2d 830 (E.D. La. 2007) ............................................................................. passim
*Union Asset Management Holding A.G. v. Dell, Inc.,*
    669 F.3d 632 (5th Cir.) ........................................................................................ 31, 32, 34, 36

**Statutes**

28 U.S.C. § 1292(b) ................................................................................................................ 12
28 U.S.C. § 1407 ....................................................................................................................... 3

**Rules**

Rule 23(h) of the Federal Rules of Civil Procedure ................................................................. 30

**Other Authorities**

4 Alba Conte & Herbert B. Newberg, Newberg on Class Actions §13:76 (4th ed. 2002) .......... 29
*Awarding Attorneys' Fees and Managing Fee Litigation* at 63-68 (,
    Fed. Jud. Ctr. 1994 ......................................................................................................... 32
Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and their Fee Awards*, 7 J.
    EMPIRICAL LEGAL STUD. 811 (2010) ............................................................................. 38
Eldon E. Fallon, *Common Benefit Fees in Multi-District Litigation*, 74 La. L. Rev. 371 (2014) 30
Manual for Complex Litigation, Fourth § 14.121 ....................................................................... 38
Manual for Complex Litigation, Fourth § 14.121 (Fed. Jud. Ctr. 2004) ..................................... 38
*Report of the Third Circuit Task Force: Court Awarded Attorney Fees,*
    108 F.R.D. 237 (1985) ............................................................................................. 32, 33, 34
Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action*
    *Settlements: 1993-2008*, 7 J. EMPIRICAL LEGAL STUD. 248 (2010)................................. 38
Theodore Eisenberg, Geoffrey Miller & Roy Germano, *Attorneys' Fees in Class Actions: 2009-*
    *2013*, 92 N.Y.U. L. Rev. 937 (2017) ............................................................................... 38

## I.      **INTRODUCTION**

Settlement Class Counsel[1] submit this Memorandum of Law in support of their Motion on behalf of Common Benefit Counsel and Individually Retained Attorneys for an Award of Attorneys' Fees and Cost Reimbursements from the common fund created by the Class Settlement with Taishan Gypsum Company Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd. and Taian Taishan Plasterboard Co., Ltd. (collectively "Taishan").[2]   Consistent with the Settlement Agreement and the Class Notice program approved by this Court and disseminated to all Class Members,[3] Settlement Class Counsel seek an award of attorneys' fees totaling 30% of the Settlement Fund to compensate Settlement Class Counsel, the Plaintiffs' Steering Committee ("PSC") and other common benefit attorneys working at their direction (collectively, "Common Benefit Counsel") and Individually Retained Attorneys (collectively "Plaintiffs' Counsel") for their efforts in achieving a $248 million cash settlement for the benefit of the Class.[4]   In addition, Settlement Class Counsel seek cost reimbursements totaling in the aggregate 3% of the Settlement Fund to cover $4,608,411.27 in Shared Expenses, $1,166,418.88 in Held Costs, and a $500 stipend (net of previous stipends) to reimburse Individually Retained Attorneys representing Eligible Class

---

[1] Settlement Class Counsel are Arnold Levin, Stephen J. Herman, Richard J. Serpe, Patrick S. Montoya, and Sandra L. Duggan.  *See* Preliminary Approval Order (Rec. Doc. 22314), at ¶ 5.

[2] The Settlement is of record.  *See* Rec. Doc. 22305; Rec. Doc. 22314.  Capitalized terms used in this Memorandum have the same meaning as those defined in the Class Settlement Agreement (Rec. Doc. 22305-2).

[3] *See* Preliminary Approval Order (Rec. Doc. 22314).

[4] Previously, the Court awarded $633,129.09 in attorneys' fees for Common Benefit Counsel and Individually Retained Attorneys with respect to the Settlement of Assigned Claims in MDL 2047 on Behalf of the Porter-Blaine/Venture Supply Class ("Assigned Claims Settlement") approved on July 19, 2018 (*see* Rec. Doc. 22122). Those funds are being held in the Court's registry until such time as the allocation of the monies among the fee applicant groups can be decided. The Court's award of attorneys' fees from the Assigned Claims Settlement represents 32% of the common fund created. The Court also awarded Class Counsel 2% of the common fund, or $39,570.57, in cost reimbursements.

Members determined by the Claims Administrator to be entitled to an Allocation Amount of more than zero for their individual case costs. The total estimated stipends to be awarded, based on current information, is approximately $1.3 million.  *See* Declaration of Sandra L. Duggan in Support of Settlement Class Counsel's Motion for an Award of Attorneys' Fees and Cost Reimbursements for Common Benefit Counsel and Individually Retained Attorneys, at ¶ 3 (attached hereto as Exhibit "A") [hereafter "Duggan Declaration"].

Through steadfast and substantial efforts on the part of Plaintiffs' Counsel expended over the past decade, an historic, unprecedented, class settlement now awaits approval by this Court. Never before has a Chinese corporation in the People's Republic of China agreed to a multi-million-dollar payment to thousands of American consumers in a product liability settlement.  The requested fee and reimbursement of costs are justified and well-deserved. Although the award of fees requested by this petition will be sequestered in the Court's Registry until an appropriate allocation of the funds between Common Benefit Counsel and Individually Retained Attorneys is decided, the determination of this petition is essential to permit the Claims Administrator to calculate Class Members' Allocation Amounts net of attorneys' fees and costs.

## II.  FACTUAL AND PROCEDURAL BACKGROUND AND OVERVIEW OF SETTLEMENT CLASS  COUNSELS' COMMON BENEFIT EFFORTS[5]

### A.  The Origins of the Litigation.

The *Chinese Drywall* Litigation arose out of thousands of individual and class action lawsuits filed in state and federal courts throughout the country on behalf of Plaintiffs seeking compensation for property damage and personal injuries allegedly caused by defective Chinese Drywall. Chinese Drywall was installed in tens of thousands of homes, commercial buildings and

---

[5] This recitation of the Litigation is fully supported by the Duggan Declaration.

other structures in the United States following the devastation caused by Hurricanes Katrina and Rita at the end of the summer of 2005.  In the aftermath of these disasters and in conjunction with a housing boom, there was a critical shortage of drywall in this country, which led to the importation of millions of square feet of drywall from China beginning in the fall of 2005 through 2008.

Chinese Drywall was installed in thousands of properties, primarily in Florida, Louisiana, and Virginia, and also in Alabama, Mississippi, Texas, Tennessee, Georgia, North Carolina, Illinois, Oklahoma, South Carolina, and California.  Once installed, many residents and owners began to notice unpleasant odors and corrosion to certain items made of metal.[6]  Plaintiffs filed claims for damages in various jurisdictions across the country alleging that Chinese Drywall emits sulfur gases that cause extensive damage to property and also, in some cases, physical ailments.[7] On June 15, 2009, the Judicial Panel for Multidistrict Litigation transferred all federal actions alleging damage from Chinese Drywall to the Eastern District of Louisiana for coordinated discovery and consolidated pretrial proceedings in MDL 2047 pursuant to 28 U.S.C. § 1407.[8]

**B.  The Omni Complaints.**

Since the formation of the MDL, thousands of claimants have been named on one or more of the PSC's Omnibus Class Action Complaints prepared and filed against more than 1,650 different manufacturers, importers, suppliers, distributors, builders, installers, and their insurers involved in the supply chain of Chinese Drywall installed in Plaintiffs' properties. As a result,

---

[6] *See In re Chinese-Manufactured Drywall Prods. Liab. Litig.* (*Germano*), 706 F. Supp. 2d 655, 663 (E.D. La. 2010) (Findings of Fact and Conclusions of Law).

[7] *Id*. at 659, 664-66, 710.

[8] Rec. Doc. 1; *see also In re Chinese-Manufactured Drywall Prod. Liab. Litig*., 626 F. Supp. 2d 1346 (J.P.M.L. 2009).

Individually Retained Attorneys could include their clients as named Plaintiffs on the PSC's Omni

Complaints instead of having to prepare, file, and serve their own pleadings. At considerable effort

and expense in excess of $1.7 million over the span of this Litigation, the PSC prepared, filed and

served pursuant to the Hague Convention or through alternative means 35 Omni Complaints and

a multitude of related complaints in intervention.[9]  In 2010, Taishan filed motions to dismiss for

lack of personal jurisdiction under Louisiana, Florida, and Virginia law.  In order to protect the

---

[9] *See Payton v. Knauf Gips, KG*, No. 09-7628 (E.D. La.) (Omni I, I(A), I(B), I(C)); *Wiltz v. Beijing New Building Materials Public Limited Co.*, No. 10-361 (E.D. La.) (Omni II, II(A), II(B), II(C)); *Gross v. Knauf Gips, KG*, No. 09-6690 (E.D. La.) (original complaint, Omni III, III(A)); *Rogers v. Knauf Gips, KG*, No. 10-362 (E.D. La.) (Omni IV, IV(A), IV(B), IV(C)); *Amato v. Liberty Mutual Ins. Co.*, No. 10-932 (E.D. La.) (Omni V); *Hernandez v. AAA Ins.*, No. 10-3070 (E.D. La.) (Omni VI); *Abel v. Taishan Gypsum Co., Ltd.*, No. 11-080 (E.D. La.) (Omni VII); *Abreu v. Gebrueder Knauf Verwaltungsgesellschaft, KG*, No. 11-252 (E.D. La.) (Omni VIII); *Haya v. Taishan Gypsum Co., Ltd.*, No. 11-1077 (E.D. La.) (Omni IX); *Block v. Gebrueder Knauf Verwaltungsgesellschaft, KG*, No. 11-1363 (E.D. La.) (Omni X); *Benoit v. Lafarge S.A.*, No. 11-1893 (E.D. La.) (Omni XI); *Arndt v. Gebrueder Knauf Verwaltungsgesellschaft, KG*, No. 11-2349 (E.D. La.) (Omni XII); *Almeroth v. Taishan Gypsum Co., Ltd.*, No. 12-0498 (E.D. La.) (Omni XIII); *Cassidy v. Gebrueder Knauf Verwaltungsgesellschaft, KG*, No. 11-3023 (E.D. La.) (Omni XIV); *Amorin v. Taishan Gypsum Co., Ltd.*, No. 11-1672 (E.D. La.) (Omni XV); *Amorin v. Taishan Gypsum Co., Ltd.*, No. 11-1395 (E.D. La.) (Omni XVI); *Amorin v. Taishan Gypsum Co., Ltd.*, No. 11-1673 (E.D. Va.) (Omni XVII); *Beane v. Gebrueder Knauf Verwaltungsgesellschaft, KG*, No. 13-609 (E.D. La.) (Omni XVIII); *Amorin v. State-Owned Assets Supervision and Administration Commission of the State Council*, No. 14-1727 (E.D. La.) (Omni XIX); *Brooke v. State-Owned Assets Supervision and Administration Commission of the State Council*, No. 15-4127 (E.D. La.) (Omni XX); *Macon v. Taishan Gypsum Co., Ltd.*, No. 17-1287 (N.D. Ala.) (Omni XXI); *Peoples v. Taishan Gypsum Co., Ltd.*, No. 17-2890 (N.D. Ga.) (Omni XXII); *Polk v. Taishan Gypsum Co., Ltd.*, No. 17-216H50 (S.D. Miss.) (Omni XXIII); *Bright v. Taishan Gypsum Co., Ltd.*, No. 17-0035 (E.D.N.C.) (Omni XXIV); *DeOliveira v. Taishan Gypsum Co., Ltd.*, No. 17-2019 (D.S.C.) (Omni XXV); *Redden v. Taishan Gypsum Co., Ltd.*, No. 17-1146 (W.D. Tenn.) (Omni XXVI); *Mertlitz v. Taishan Gypsum Co., Ltd.*, No. 17-140 (E.D. Tex.) (Omni XXVII); *Bayne, v. Taishan Gypsum Co., Ltd.*, No. 17-1286 (N.D. Ala.) (Omni XXVIII); *Abner v. Taishan Gypsum Co., Ltd.*, No. 11-3094 (N.D. Calif.) (Omni XXIX); *Bentz v. Taishan Gypsum Co., Ltd.*, No. 17-2892 (N.D. Ga.) (Omni XXX); *Allen v. Taishan Gypsum Co., Ltd.*, No. 17-217LG (S.D. Miss.) (Omni XXXI); *Lochhead v. Taishan Gypsum Co., Ltd.*, No. 17-294 (S.D. Tex.) (Omni XXXII); *Stutzman, et al. v. Taishan Gypsum Co., Ltd., et al.*, No. 17-1209 (S.D. Ill.) (Omni XXXIII); *Allman, et al. v. Taishan Gypsum Co., Ltd., et al.*, No. 17-00051 (E.D.N.C.) (Omni XXXIV); *Cole, et al. v. State-Owned Assets Supervision and Administration Commission of the State Council, et al.*, No. 18-00562 (E.D. La.) (Omni XXXV).

Plaintiffs' claims where jurisdiction over Taishan was in question, the PSC filed identical *Amorin* Class Action Complaints in the MDL, the Southern District of Florida, and the Eastern District of Virginia.  Each of the *Amorin* actions included all Plaintiffs named on any of the Omni actions regardless of where the Plaintiff's property was located.  These identical *Amorin* Complaints were then transferred by the Judicial Panel on Multidistrict Litigation ("JPML") to the MDL Court in Louisiana.[10]

After the *Amorin* Class was certified, the PSC prepared additional complaints with new Plaintiffs, who were not part of the certified *Amorin* Class, asserting similar claims against the Taishan, BNBM and CNBM entities and including, among the Defendants, the State-Owned Assets Supervision and Administration Commission of the State Council ("SASAC").  Much like the protective *Amorin* Complaints, identical *Brooke* Complaints containing all of the same Plaintiffs were filed in Louisiana, Florida, and Virginia, in part, to address the concerns presented by *BMS*.[11]  To further guard the interests of all the Plaintiffs in the MDL by avoiding or minimizing any potential personal jurisdiction defense and as a further service to all Counsel, especially individually retained counsel, the PSC prepared, filed and served at considerable expense protective actions in each jurisdiction in which Plaintiffs resided, *e.g.,* Louisiana, Florida, Virginia, Alabama, Georgia, Mississippi, North Carolina, South Carolina, Oklahoma, Tennessee, Texas, California, and Illinois. These actions were then transferred to the MDL Court in Louisiana. Having the PSC assemble the needed claims information and assume responsibility for the filing and service of these complaints, relieved individually retained counsel of a great burden and the extraordinary cost of service abroad pursuant to the Hague Convention. Taishan, BNBM PLC

---

[10] *See In re Chinese-Manufactured Drywall Prod. Liab. Litig*., 2018 WL 6046189, at *2-3 (E.D. La. Nov. 19, 2018) (discussing background of identical *Amorin* complaints).

[11] *Bristol-Myers Squibb v. Superior Court of California*, 137 S. Ct. 1773 (2017) ("*BMS*").

("BNBM"), BNBM (Group) Co. Ltd. ("BNBM Group"), and CNBM Company ("CNBM")
entered their appearances in *Brooke*. There have been no defaults entered in the *Brooke* cases;
instead Defendants filed motions to dismiss the actions.

Thus, this case presents an extraordinary circumstance, as the preparation, service and
filing of all operative pleadings were effectuated by the PSC and the cost of service for each and
every Omni complaint was advanced by the PSC, not by individually retained counsel.

### C.  Initial Proceedings in the MDL.

Plaintiffs' Counsel in this MDL have pursued primarily two groups of drywall-
manufacturer Defendants: (1) the Knauf entities, and (2) the Taishan entities.[12]  Knauf entered its
appearance early in the Litigation, in July 2009, agreeing to a limited waiver of service in
November 2009.[13]  In contrast, the Taishan entities failed to appear in the Litigation and a default
was entered against Taishan in 2009.[14]  In February 2010, the Court presided over a trial of seven
families' claims in *Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin
Co. Ltd., et al*., Case No. 09-6687 (E.D. La.), after which the Court entered a monetary judgment
in favor of Plaintiffs and against Taishan.[15]  In March 2010, the Court presided over a trial of

---

[12]  *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2017 WL 1421627, *1 (E.D. La.
Apr. 21, 2017).  The Knauf entities ("Knauf") are German-based, international manufacturers of
building products, including drywall, whose Chinese subsidiary, Knauf Plasterboard (Tianjin) Co.,
Ltd., manufactured and sold its Chinese Drywall in the United States.  The Taishan entities are
Chinese companies that include Taishan and its parents BNBM, CNBM, and BNBM Group.  On
March 10, 2016, the Court dismissed CNBM Group based on the Foreign Sovereign Immunity
Act.  *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 168 F. Supp. 3d 918 (E.D. La. 2016).
Taishan, BNBM, BNBM Group, CNBM, and SASAC are referred to herein collectively as
"Defendants."

[13]  *See Chinese Drywall*, 2017 WL 1421627, at *1.

[14]  *See In re Chinese-Manufactured Drywall Prod. Liab. Litig*., 2014 WL 4809520 (E.D. La. Sept.
26, 2014) ("*Class FOFCOL*").

[15]  *See Chinese Drywall*, 706 F. Supp. 2d 655.

homeowners' claims in *Hernandez v. Knauf Gips KG*, Case No. 09-6050 (E.D. La.), after which the Court found in favor of Plaintiffs and against Knauf.[16]

### D.  Litigation Against Knauf.

After initial trials, the Court's findings in *Germano* and *Hernandez* provided a foundation for Knauf and Plaintiffs' Counsel to enter into a comprehensive pilot remediation program for Knauf claimants on October 14, 2010 ("KPT Pilot Program").[17]  The KPT Pilot Program proved to be a catalyst toward a negotiated resolution with Knauf.  As a result, on December 20, 2011, the Knauf entities and Plaintiffs' Counsel entered into a class settlement agreement providing comprehensive remediation and cash benefits to homeowners with Knauf drywall, which the Court certified as a class action and approved on February 7, 2013.[18]  In addition, Plaintiffs' Counsel reached class settlement agreements with hundreds of downstream Defendant homebuilders, suppliers, and installers (and most of their insurers), resulting in the resolution of "almost all of the Knauf Entities' chain-of-commerce litigation."[19]  Relatedly, Plaintiffs' Counsel negotiated, and the Court approved, four additional class settlements with "several downstream entities in the Taishan chain of commerce and their insurers" for the benefit of mostly Virginia claimants.[20]

---

[16] *See Chinese Drywall*, 2017 WL 1421627, at *1.

[17] *See id.* at *2.

[18] *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2013 WL 499474 (E.D. La. Feb. 7, 2013); *see also Chinese Drywall*, 2017 WL 1421627, at *2.

[19] *Chinese Drywall*, 2017 WL 1421627, at *2.

[20] *See* Order and Judgment dated 7/9/2013 (Rec. Doc. 16934), at 6.

**E.  Litigation Against Taishan.**

After entry of the *Germano* judgment, Taishan entered its appearance in the MDL to contest jurisdiction and vacate the default judgments.  In the meantime, defaults were entered against CNBM, BNBM, and BNBM Group.[21]  The initial jurisdiction discovery involving Taishan entailed months of depositions of numerous witnesses located on several continents, as well as numerous motions to compel and for sanctions.  Ultimately, due to conflicts between the parties' interpreters at the foreign depositions, the Court ordered that a second round of depositions of Taishan's witnesses would take place in Hong Kong under the Court's first-hand supervision, using a single court-appointed translator, to oversee the witnesses.  Following extensive briefing, compilation of a monumental record, and an all-day evidentiary hearing in June, 2012, which was coordinated with related State-court proceedings, the Court determined in an epic 142-page opinion that Taishan and TTP were alter-egos subject to the Court's jurisdiction.  *See In re Chinese-Manufactured Drywall Prods. Liab. Litig.,* 894 F. Supp. 2d 819, 834, 865, 892, 903 (E.D. La. 2012).  The Court declined to vacate the default judgments against Taishan and determined that Taishan was subject to the Court's jurisdiction under Louisiana, Florida, and Virginia law.[22]

Taishan filed four separate appeals of the Court's jurisdictional rulings.  The record on appeal in *Germano* alone contained more than 16,000 pages.  Two different appellate panels (six Circuit Court Judges, *i.e.,* Smith, DeMoss, Higginson, Reavley, Elrod, and Haynes) affirmed this Court's jurisdictional analysis and conclusions.  *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 742 F.3d 576 & 753 F.3d 521 (5th Cir. 2014).[23]

---

[21] *See Chinese Drywall*, 2017 WL 1421627, at *8.

[22] *Chinese Drywall*, 894 F. Supp. 2d 819, *aff'd*, 742 F.3d 576 & 753 F.3d 521 (5th Cir. 2014).

[23] Plaintiffs' Counsel recognize that the Court previously considered common benefit time from the inception of MDL 2047 to December 31, 2013, in conducting a lodestar cross-check analysis in connection with the fee petition related to the Knauf settlement.  Accordingly, only submissions

With the issue of jurisdiction resolved, Taishan left the Litigation and did not appear for a judgment debtor examination.[24] The Court entered a civil and criminal contempt order and injunction enjoining Taishan and its affiliates and/or subsidiaries from conducting any business in the United States until or unless Taishan participated in this judicial process.[25] During Taishan's absence from the jurisdiction, Plaintiffs' Counsel filed a Motion for Class Certification pursuant to Rule 23(b)(3).[26] On September 26, 2014, the Court certified the *Amorin* class of homeowners with defective drywall alleged to be manufactured by any of the Taishan entities.[27] The Court scheduled a hearing to determine class damages[28] and extensive efforts were undertaken to prepare for that proceeding.

On the day that hearing was scheduled to occur in February 2015, BNBM entered an appearance and requested a continuance. Shortly thereafter, Taishan returned to the litigation and paid the *Germano* judgment, plus fines, and BNBM Group, CNBM, and additional CNBM entities entered their appearances in the Litigation.

---

for time reported after January 1, 2014 to August 2019, and costs incurred after January 1, 2015 to September 2019, are being presented to this Court for the first time here. But the common benefit efforts of Plaintiffs' Counsel prior to January 2014 specifically contributed to this settlement do remain relevant in the matter *sub judice* and should be given appropriate weight for present purposes. It goes without saying that the work performed since the inception of this litigation remains relevant to this motion since it represents the foundation of the common benefit efforts provided by Plaintiffs' Counsel which directly contributed to the successful resolution of the litigation against Taishan. The joint Declaration of Russ M. Herman and Arnold Levin (Rec. Doc. 17700-2) ably describes this prior work, which is incorporated herein by reference. Excluded from the common benefit time reported to Mr. Garrett is any time associated within the billing category intended to capture work associated with the Fee Committee's efforts intended to collect a fee from the Knauf settlement.

[24] *Chinese Drywall*, 168 F. Supp. 3d at 932.

[25] Contempt Order dated 7/17/2014 (Rec. Doc. 17869).

[26] *Chinese Drywall*, 2017 WL 1421627, at *4.

[27] *Class FOFCOL*, 2014 WL 4809520, at 16.

[28] *Chinese Drywall*, 2017 WL 1421627, at *5.

The return of Taishan and the appearance of the other Defendants in 2015 necessitated a three-track process through which Plaintiffs pursued their claims against these Defendants.[29]  First, the Plaintiffs initiated an extensive discovery program to establish whether Taishan or any of its affiliates were in violation of the Contempt Order.  Second, Plaintiffs proceeded to prosecute the class claims focused on class-wide damages.  Third, Plaintiffs undertook extensive discovery to oppose the jurisdictional motions of BNBM, BNBM Group, and the CNBM entities and also Defendants' motions to decertify the *Amorin* class.[30]

As to the Contempt track, Plaintiffs engaged in expedited discovery, which included depositions and document requests of Defendants and purported Taishan affiliates related to contempt and alter ego issues.  In addition, pursuant to the Court's orders, Plaintiffs commenced discovery of numerous third parties to determine whether any alleged Taishan affiliate violated the Contempt Order.[31]  This discovery led to Plaintiffs' Counsel's motion to enforce contempt (Rec. Doc. 18302) and myriad other related briefings (Rec. Docs. 18367, 18404, 18475, etc.).

---

[29] *See* Minute Entries of April 24, 2015 and April 30, 2015 (Rec. Docs. 18757 & 18844).

[30] *See*, *e.g.*, BNBM and CNBM entities' Motions to Dismiss (Rec. Docs. 19527, 19646, 19663, 19664); CNBM's Motion to Decertify the Class (Rec. Doc. 20627); Taishan's joinder in CNBM's Motion to Decertify the Class (Rec. Doc. 20632); Defendants' Motion to Certify an Immediate Appeal from the Court's Order Denying their Motions to Decertify the Class (§1292(b) Motion #2) (Rec. Doc. 20780); Taishan's Motion to Amend the Order Denying Class Decertification and the Class Damages Order and to Certify for Interlocutory Appeal Under Section 1292(b) (Rec. Doc. 20778).  Separately, Plaintiffs' filed a motion to dismiss Taishan's direct appeal of this Court's Class Damages Order, which the United States Court of Appeals for the Fifth Circuit granted (USCA Case No. 17-30432, Order June 30, 2017).

[31] For example, Plaintiffs served subpoenas and notices of deposition on Plum Creek Timber Co., Inc., New Jersey Institute of Technology, Sunpin Solar Development, LLC, Walmart Stores, Inc., Hampton Affiliates (Trans-Pacific Trading U.S.), Hampton Investment Company, Westerlund Log Handlers, LLC, Murphy Overseas USA Astoria, CTIEC-TECO American Technology, Inc., Hull Forest Products, Inc., WH International, Inc., Steven J. Zika, Western Wood Lumber Co., Baillie Lumber Co., JP Morgan Chase & Co., Morgan Stanley, International Business Machines, Corp., BNK International, Inc., LLC, Jeffrey J. Chang, Great Western Building Materials, Baoan International Investment Co., Ltd., EAC & Son's Corporation, Davis Construction Supply, LLC,

The Class Damages track was prosecuted with alacrity and efficiency by Plaintiffs' Counsel.  Once Taishan returned to defend itself, Plaintiffs were repeatedly challenged in their efforts to prove class damages.  Leading up to the June 9, 2015 class damages hearing, Plaintiffs' Counsel engaged in significant fact discovery and expert discovery.  Extensive pretrial briefing was prepared, which included discovery motions and *Daubert* motions filed against Taishan's experts or responses to the Defendants' motions to exclude Plaintiffs' experts (Rec. Doc. 18908, 19014, 19034, 19062, 19066).  On June 9, 2015, Plaintiffs participated in the class damages hearing.  Plaintiffs prepared witnesses and presented evidence, including the testimony of Jacob Woody of BrownGreer, the Claims Administrator, and George J. Inglis of Berman & Wright, Plaintiffs' expert on remediation damages, at the class damages hearing.  Plaintiffs' Counsel also prepared for and cross-examined the Defendants' expert witnesses, David Pogorolich and Dr. M. Laurentis Marais.  After that hearing, Plaintiffs' Counsel prepared comprehensive findings of fact and conclusions of law, which laid the foundation for the Court's ruling.[32]

Thereafter, Plaintiffs' Lead and Liaison Counsel participated in a lengthy but failed attempt at mediation conducted by Mr. John Perry in 2016.  Cal Mayo was appointed as a Special Master on June 15, 2016 (Rec. Doc. Nos. 20306, 22252) to assist the mediation, and Plaintiffs' Counsel to work with Taishan's counsel to develop a means to evaluate product identification issues for the claimants within the mediation process.  Plaintiffs fully engaged in the effort to analyze and evaluate the various "buckets" or categories of drywall with unique characteristics that were considered within the confines of the mediation.  These efforts laid the groundwork for the spreadsheet on which all Plaintiffs' objective damage measures were quantified.  Indeed, although

---

Triorient Trading, Inc., PABCO Building Products, LLC (d/b/a Pabco Gypsum), and Stepan Company.

[32] Rec. Doc. 19197.

the initial mediation effort failed, Plaintiffs' spreadsheet with Objective Criteria became the cornerstone for subsequent settlement evaluations and ultimately became the Master Spreadsheet for the Settlement (Rec. Doc. 22312-1).

When the parties informed the Court of their impasse on settlement, this Court acted.  On April 21, 2017, the Court issued a trilogy of rulings on motions that had been fully briefed by the PSC but left pending during the settlement discussions:  First, was the "Findings of Fact & Conclusions of Law Related to the June 9, 2015 Damages Hearing" ("Class Damages FOFCOL"). Second, the Court denied Defendants' motion to decertify the *Amorin* class.[33]  Finally, with respect to the ongoing efforts of CNBM and BNBM to contest jurisdiction over them, the Court entered an Order and Reasons holding that for jurisdictional purposes (i) CNBM, BNBM Group, BNBM, and Taishan operate as a single business enterprise under Louisiana law, (ii) Taishan and BNBM are agents under Virginia and Florida law, (iii) there is jurisdiction over BNBM under Florida law for its manufacture and sales of BNBM Dragon board in Florida, and (iv) the Court lacked jurisdiction over BNBM Group and the CNBM entities under Florida law and Virginia law.[34]

Following these rulings, BNBM, BNBM Group, and CNBM filed motions pursuant to 28 U.S.C. § 1292(b), seeking immediate appellate review.[35]  This motion practice was opposed by Plaintiffs' Counsel.  On August 4, 2017, the Court certified its Jurisdiction Order for immediate appeal but, thereafter, Taishan, BNBM and CNBM filed supplemental motions to dismiss based

---

[33] *See* Rec. Doc. 20741.

[34] *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2017 WL 1476595 (E.D. La. Apr. 21, 2017), *mot. to certify appeal granted*, 2018 WL 4863625 (E.D. La. Mar. 06, 2018) ("Jurisdiction Order").

[35] Rec. Doc. 20779; Defendants' Petition for Permission to Appeal Pursuant to 28 U.S.C. § 1292(b), Fifth Circuit Docket 17-90027, filed by CNBM, BNBM Group, and BNBM (Rec. Doc. 20898-2) (permission denied by the Fifth Circuit on September 1, 2017).

on *BMS*.[36]  Extensive briefing occurred on the issue of the Court's jurisdiction over the Defendants and, on November 30, 2017, the Court issued an opinion on personal jurisdiction that rejected the challenges under *BMS*.[37]  The Court also rejected BNBM's and CNBM's efforts to vacate the default judgments that had been entered against them.[38]

Thereafter, the BNBM and CNBM entities revisited their request for interlocutory review,[39] which required Plaintiffs' Counsel to engage again in additional briefing.  Defendants' request was granted in part by the Court, certifying the issues arising from the original Jurisdiction Order but denying certification with respect to issues raised by *BMS*.[40]  BNBM, BNBM Group, and CNBM petitioned the Fifth Circuit for permission to appeal the Jurisdiction Order, which prompted further briefing.[41]  That petition was granted on June 20, 2018, and Plaintiffs' Counsel again participated in another jurisdictional appeal.  CNBM and BNBM were granted leave to file a brief in excess of the standard word count.  Plaintiffs' Counsel were obliged to address these lengthy arguments in their 60 page/12,998 word Brief of Appellees.  The appeal is fully briefed and currently pending.[42]

---

[36] *See* Order and Reasons (8/4/2017) (Rec. Doc. 20890), vacated while *BMS* briefing occurred (Rec. Doc. 20927); *see also* Rec. Doc. 20882.  Defendants' 1292(b) motions on class damages and decertification were denied by Order and Reasons (8/22/2017) (Rec. Doc. 20910).

[37] Rec. Doc. 20188.

[38] *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2018 WL 279629, at *8 (E.D. La. Jan. 2, 2018).

[39] Rec. Doc. 21095; Rec. Doc. 21096.

[40] Rec. Doc. 21231.

[41] *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, No. 18-90013 (5th Cir.), Doc. No. 00514397054, filed March 15, 2018 (Defendants' Petition); Doc. No. 0051440659, filed March 28, 2018 (Response).

[42] *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, No. 18-30742 (5th Cir.).

In order to conclude this Litigation, the Court requested "End Game" proposals from the parties. Plaintiffs' Counsel drafted and filed the PSC's End Game Proposal (Rec. Doc. 20913), which presented Plaintiffs' template to resolve the Litigation through ongoing pursuit of *Amorin* Class damages coupled with an administrative process for non-remediation damages, and rulings on Product ID, and a determination of Defendants' outstanding motions. This Court's Order and Reasons setting forth its Trial Plan was greatly informed by Plaintiffs' advocacy. *See* Rec. Doc. 21847.

In fulfillment of their ongoing responsibilities to the MDL, members of the PSC have attended each of the regularly scheduled monthly status conferences. Further, these counsel spent months negotiating with the Defendants as to the means by which *Amorin* Class Members would respond to discovery. These negotiations ultimately resulted in the development of the Supplemental Plaintiff Profile Form ("SPPF"), which the Court implemented in PTO 11A. The SPPF provided proofs of Plaintiffs' damages to Defendants through the BrownGreer portal. Obviously, the underlying effort to prepare both the original Plaintiff Profile Form and the SPPF was performed by Individually Retained Counsel, as well as other work not specifically set forth herein. These lawyers consulted with their clients and provided the information necessary for Common Benefit Counsel to present the finished material. Individually Retained Counsel would also provide updated information about their clients to Common Benefit Counsel to advance their clients' interests. Based in part on this newly acquired data, pursuant to the Court's directives, Plaintiffs' Counsel repeatedly updated the Class Plaintiffs' Spreadsheet regarding the Taishan Properties with verified under air living square footage (Rec. Docs. 20824, 20875, 20887).

Anticipating the need to introduce evidence of Taishan's conduct in the Remand Jurisdictions, Plaintiffs' Counsel successfully moved to unseal previously confidential documents. (Rec. Docs. 21280, 21536, 21640).

Plaintiffs' Counsel also protected the rights of former owners by filing a Clarification Regarding the Composition of the *Amorin* Class, which was accepted by the Court (Rec. Docs. 21741, 21846), and successfully opposed Defendants' efforts to dismiss *Amorin* Claims for Plaintiffs whose claims had been the subject of Remand. After briefing and oral argument, the Court instead stayed these claims (Rec. Doc. 21935).

As set forth in more detail below, the Court suggested remand of approximately 1,700 Florida *Amorin* cases (Rec. Docs. 21242, 21252), approximately 850 Florida *Brooke* cases (Rec. Doc. 22138), 175 Virginia *Amorin* cases (Rec. Doc. 21695), and 35 Virginia *Brooke* cases (Rec. Doc. 22139). Prior to these remands, Plaintiffs' Counsel actively assisted the Court by providing spreadsheets identifying those claimants subject to remands, as well as Louisiana Plaintiffs not subject to remand and ready for trial. Given the number of claims at issue, this organizational effort on counsel's part proved essential.

For example, by Order dated August 23, 2018 (Rec. Doc. 21719), the Court scheduled briefing on the BNBM entities' motions to dismiss the *Brooke* and *Abner* Omni Complaints, which had been the subject of a standstill agreement for over 18 months. Plaintiffs responded to the Defendants' efforts to challenge, among other things, the timeliness of these actions (Rec. Docs. 21766, 21767). In addition to individual responses to both motions, Plaintiffs' Counsel complied with this Court's request for supplemental briefing (Rec. Doc. 21963). These efforts were successful, as the Court denied in part Defendants' motions, finding that when Plaintiffs knew of

their claim is a "highly fact based inquiry not appropriate for a motion to dismiss."[43] In preparation

for the contemplated trial phase of the Louisiana Plaintiffs whose claims were pending in the MDL,

Plaintiffs' Counsel met and conferred with Defendants to develop a briefing schedule to afford the

Court an appreciation of each side's positions.[44]  In response to the Defendants' plan for resolution

of the Litigation, Plaintiffs' Counsel prepared their joint response which presented an ambitious

but feasible plan to conclude both *Amorin* and *Brooke* Claims within 12 months.  This precipitated

this Court's trial plan involving the selection of 40 *Amorin* Plaintiffs by the parties to form a

discovery pool.[45]  Upon entry of the Court's trial plan, Plaintiffs' Counsel rapidly set about the

process of assessing their clients and vetting those to be included among the 20 selected by

Plaintiffs' Counsel for the discovery pool.  This same effort was repeated upon receipt of the

Defendants' selection of their 20 Plaintiffs. Thereafter, Plaintiffs' Counsel engaged in the

demanding task of producing relevant documents, identifying fact witnesses and scheduling,

preparing and attending the 55 depositions of the Louisiana Select Plaintiffs and related witnesses.

### F.  Plaintiffs' Counsel Continued to Prosecute Plaintiffs' Claims in the Remand Courts.

Plaintiffs whose claims were remanded to their transferor courts continued to benefit from

the services of an experienced legal team, because Plaintiffs' Counsel's efforts were not limited to

the work performed in the MDL in Louisiana.  In 2018, this Court suggested that the Florida and

Virginia *Amorin* actions be remanded.[46]  On March 11, 2019, the Court suggested that the Florida

---

[43] *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2019 WL 1057003 (E.D. La. Mar. 6, 2019) (Rec. Doc. 22124).

[44] Rec. Doc. 21339.

[45] Rec. Doc. 21847.

[46] *See* Rec. Doc. 21242 (Florida); Rec. Doc. 21695 (Virginia).  The *Amorin* cases were remanded by Order of the JPML to Florida on June 6, 2018, and to Virginia on October 10, 2018.  *See* JPML Rec. Doc. 524 (Florida); JPML Rec. Doc. 547 (Virginia).

and Virginia *Brooke* actions be remanded.[47]  As a result, the Florida *Amorin* action was transferred to Judge Marcia G. Cooke in the Southern District of Florida (Civil Action No. 11-22408), the Virginia *Amorin* action was transferred to Chief Judge Mark S. Davis in the Eastern District of Virginia (Norfolk Civil Action No. 11-00377), the Florida *Brooke* action was transferred to Judge Kathleen M. Williams in the Southern District of Florida (Civil Action No. 15-24348), and the Virginia *Brooke* action was transferred to Judge Rebecca Beach Smith in the Eastern District of Virginia (Norfolk Civil Action No. 15-00506).  Of course, the Louisiana *Amorin* and *Brooke* actions remained pending before the MDL Court.[48]  These remands ratcheted up the burdens and responsibilities of Plaintiffs' Counsel.  Not only were these counsel responsible for overseeing Plaintiffs' efforts in the MDL, but now they were managing matters before four other jurists.

### 1.  The Common Benefit Efforts Performed in the Southern District of Florida

Upon remand of the Florida *Amorin* cases, Plaintiffs' Counsel performed the following tasks on behalf of all Florida litigants:

a.  We negotiated with Defendants a Joint Case Management Plan to resolve the *Amorin* cases (Duggan Declaration, Exhibit "3") (SDFL ECF No. 45).  The Joint Plan included a proposed schedule of pretrial deadlines, mediation, and trial dates. Based on this filing, the Florida Court entered an Order setting trial dates and pretrial deadlines, including for the selection of 20 Priority Plaintiffs (Duggan Declaration, Exhibit "4") (SDFL ECF No. 47).

b.  We prepared and filed a motion to stay the non-Florida claims on the *Amorin*

---

[47] *See* Rec. Doc. 22198; JPML Rec. Doc. 556.

[48] Even though this Court remanded the Florida and Virginia *Amorin* and *Brooke* actions, all of those Plaintiffs' claims also remained in the Louisiana *Amorin* and *Brooke* actions because the Complaints are identical.  *See Chinese Drywall*, 2018 WL 6046189, at *5-6 (staying, instead of dismissing, Florida and Virginia-based claims in the Louisiana *Amorin* Complaint).

17

complaint while we prosecuted those claims in the MDL and other jurisdictions (Duggan Declaration, Exhibits "5" & "6") (SDFL ECF Nos. 49 & 63).

c.  We opposed Defendants' motion to dismiss the non-Florida claims (Duggan Declaration, Exhibit "7") (SDFL ECF No. 57).

d.  On February 13, 2019, Patrick Montoya presented argument in support of our motion to stay and opposed Defendants' motion to dismiss the non-Florida *Amorin* claims.  Ultimately, the Court granted our motion and stayed all non-Florida claims on the *Amorin* complaint (Duggan Declaration, Exhibit "8") (SDFL ECF No. 195).

e.  We prepared a motion to adopt a plan for resolution of the Florida Plaintiffs' claims for remediation and other damages (Duggan Declaration, Exhibits "9" & "10") (SDFL ECF Nos. 52 & 71).  In our papers, we argued that "the judicial labor [was] completed" because liability already had been established in the MDL by the PSC. *See* Plaintiffs' Trial Plan Motion (Duggan Declaration, Exhibit "9") (SDFL ECF No. 52), at 7.  We contended that the only remaining issue to be determined on remand was the amount of damages, and we implored the Court to limit discovery to: 1) verification of under air square footage, 2) proof of Defendants' product in the Affected Properties, and 3) proof of ownership. *Id*. at 5.

f.  We opposed Defendants' trial plan proposal, which essentially sought to relitigate all matters previously decided in the MDL in an effort to undo Plaintiffs' progress and further delay resolution of Plaintiffs' claims (Duggan Declaration, Exhibit "11") (SDFL ECF No. 64).

g.  We opposed BNBM's motion to enforce trial rights, which challenged Judge Fallon's determination that liability has been established as to all Defendants –

including BNBM (SDFL ECF No. 80/ Rec. Doc. 21806-2).

h.   We opposed Taishan's motion to reject application of the MDL Court's remediation damages formula (SDFL ECF No. 84/ Rec. Doc. 21806-4).

i.   We opposed Defendants' motion to enforce discovery rights, which sought to reopen discovery into liability and causation (SDFL ECF No. 88/ Rec. Doc. 22806-4).

j.   We responded to Defendants' motion to dismiss claims for failure to complete a Supplemental Plaintiff Profile Form (Duggan Declaration, Exhibit "12") (SDFL ECF Nos. 82 & 175).

k.   We vetted and selected 20 Priority Plaintiffs for trial (Duggan Declaration, Exhibit "13") (SDFL ECF No. 73) and identified all fact witnesses for these Plaintiffs (Duggan Declaration, Exhibit "14") (SDFL ECF Nos. 86, 130, 131, 132, 133, 134, 135, 136, 137, 138, 139, 140, 141, 142, 143, 144, 145, 146, 147, 148, 149, 150).

l.   We analyzed Defendants' selection of a different set of Priority Plaintiffs (Duggan Declaration, Exhibit "15") (SDFL ECF No. 72) and the list of fact witnesses identified for those Plaintiffs (Duggan Declaration, Exhibit "16") (SDFL ECF No. 153).

m.   We filed a joint motion for a hearing to address the parties' competing trial plans and for a determination on which set of Priority Plaintiffs would be set for trial (Duggan Declaration, Exhibit "17") (SDFL ECF No. 89).

n.   We filed supplemental briefing urging the Court to give entirely preclusive effect to Your Honor's findings of liability and to apply the remediation damages formula to Plaintiffs' claims (Duggan Declaration, Exhibit "18") (SDFL ECF No. 99).

o.  We responded to Defendants' supplemental briefing addressing liability as to BNBM (Duggan Declaration, Exhibit "19") (SDFL ECF No. 100).

p.  On November 7, 2018, We presented oral argument in support of Judge Cooke giving entirely preclusive effect to the MDL Court's rulings prior to remand and in opposition to BNBM's motion seeking to erase Judge Fallon's prior decisions on default. *See* Transcript of Motion Hearing dated 11/7/2019 (Duggan Declaration, Exhibit "20") (SDFL ECF No. 109).

Based on Class Counsel's extensive briefing and argument, on November 16, 2018, Judge Cooke entered an Order "**ADOPT[ING] <u>all</u>** of Judge Fallon's findings of facts and legal conclusions" including the MDL Court's orders (1) certifying the *Amorin* class, (2) holding all of the Defendants in default, (3) establishing liability as to all Defendants, and (4) approving the remediation damages formula as a reasonable and reliable measure of the remediation damages which the Court would apply to determine the appropriate amount of Plaintiffs' property damages (SDFL ECF No. 112 at 2-3/ Rec. Doc. 21933-1).  Further, Judge Cooke adopted a two-track Trial Plan to resolve Plaintiffs' claims on an expedited basis. *Id.* ("Florida Trial Plan Order").

a.  First, the Florida Court appointed Special Master Tiffani Lee (Duggan Declaration, Exhibit "21") (SDFL ECF No. 110) to calculate all Florida *Amorin* Plaintiffs' remediation damages by May 31, 2019, based on this Court's remediation damages formula.  The Court permitted limited discovery on the Chinese Drywall products attributed to Taishan and BNBM, under air square footage of Plaintiffs' properties, and ownership status, and set a schedule for Defendants to assert contests to Plaintiffs' remediation damages. Florida Trial Plan Order (Rec. Doc. 21933-1), at 6-8.

b.  Second, the Florida Court set an aggressive schedule to try within eight months the Claims for Other Losses of 20 Priority Plaintiffs selected by Plaintiffs, including claims for alternate living expenses, loss of use and enjoyment, lost rent, bankruptcy, foreclosure, and short sale. Florida Trial Plan Order (Rec. Doc. 21933-1), at 9-11.

Immediately, upon entry of Judge Cooke's Order, Plaintiffs' Counsel constituted several trial teams to meet the tight deadlines and requirements set by the Court, all with an eye towards maximizing the resolution of these cases as expeditiously as possible.  Often, multiple, overlapping events were scheduled in different locations across the state of Florida and in many cities in the U.S., including Atlanta, Chicago, Irvine, San Francisco, New Orleans, and Norfolk, requiring an incredible amount of detailed organization and coordination among multiple teams to ensure consistency of position and to maximize the recovery for all Chinese Drywall litigants.  Because of the 8-month deadline before trial was to begin in Florida, a flurry of activity ensued:

- Plaintiffs' Counsel negotiated a joint stipulation regarding authentication and hearsay regarding certain categories of documents for the Priority Plaintiffs (Duggan Declaration, Exhibit "22") (SDFL ECF No. 156).

- Plaintiffs' Counsel engaged experts around the country in support of Plaintiffs' other losses and the current measure of Plaintiffs' remediation damages.  In particular, Class Counsel retained Bradley Krantz and Lori Streit Ph.D., experts in the fields of corrosion, metallurgy, electrical engineering, power electronics, electrical machinery, and failure analysis to demonstrate the devastating effects of having Chinese Drywall installed in Plaintiffs' homes.  We also engaged Randall Bell, Ph.D., MBA, MAI; Michael P. Elkin, CPA/CFF/ABV, CFE; Ryan D.

Greenblatt; and Anthony M. Graziano, MAI, CRE, real estate and accounting experts to calculate the losses sustained by the Plaintiffs and the economic impact of Chinese Drywall on real estate in support of Plaintiffs' damages.

- Plaintiffs' Counsel defended Plaintiffs' expert depositions and took discovery of Defendants' rebuttal experts. Class counsel deposed Defendants' Experts David J. Cohen; Marcie D. Bour, CPA/ABV, CVA, CFE, MAFF, ABAR, CDBV; Henry H. Fishkind, Ph.D.; Brian D. Flinn, Ph.D., PE; Richard J. Roddewig, MAI, CRE, FRICS.

- Plaintiffs' Counsel opposed Defendants' *Daubert* motions seeking to strike our experts (Duggan Declaration, Exhibits "23," "24," & "25") (SDFL ECF Nos. 272, 273, 280) and Class Counsel filed a motion to strike Defendants' proposed expert on proper remediation protocols (Duggan Declaration, Exhibit "26") (*see* SDFL ECF No. 244).

- Plaintiffs' Counsel propounded written discovery on Defendants and scheduled 30(b)(6) depositions of Taishan (Duggan Declaration, Exhibit "27") (SDFL ECF No. 160) and BNBM (Duggan Declaration, Exhibit "28") (SDFL ECF No. 167) regarding Product ID.

- Plaintiffs' Counsel prepared briefing and presented argument to the Special Master at a hearing to determine whether the various categories of Chinese Drywall present in Plaintiffs' properties should be attributed to Defendants despite their denials. *See* (Duggan Declaration, Exhibit "29") (SDFL ECF No. 253), at Exhibits A and E thereto.

- Plaintiffs' Counsel filed objections to and an appeal from the Special Master's

Report and Recommendation regarding Product ID categories attributable to Taishan (Duggan Declaration, Exhibit "29") (SDFL ECF No. 253).

- Plaintiffs' Counsel coordinated and assisted in the defense of dozens of Priority Plaintiff and other fact witness depositions.

- Plaintiffs' Counsel analyzed and approved the protocol to be used to inspect Plaintiffs' homes and Plaintiffs' Counsel coordinated and monitored the inspections.

- Plaintiffs' Counsel responded to remediation damages discovery directed to more than 1,700 Florida Plaintiffs (Duggan Declaration, Exhibit "42").

- Plaintiffs' Counsel prepared voluminous briefing and 103 exhibits in response to 17 categories of individualized preliminary and final contests lodged against 1,700 Plaintiffs' claims for remediation damages following months of detailed and time-consuming analysis and negotiations with Defendants (*see* Duggan Declaration, Exhibits "43" - "46" (exhibits omitted)).

- Plaintiffs' Counsel updated the calculation of remediation damages for all Florida *Amorin* Plaintiffs in conformity with 2019 national R.S. Means data (Duggan Declaration, Exhibit "47").

- Plaintiffs' Counsel presented oral argument to the Special Master in opposition to Defendants' contests to remediation damages (Duggan Declaration, Exhibit "48").

- Plaintiffs' Counsel prepared detailed spreadsheets setting forth the support for each Plaintiff's claim for remediation damages.

- Plaintiffs' Counsel filed a comprehensive opposition to Defendants' motion for summary judgment directed to all of the Priority Plaintiffs (Duggan Declaration,

Exhibits "30" – "39") (SDFL ECF Nos. 269, 270, 276, 278, 279, 281, 282, 283, 284, 288).

- Plaintiffs' Counsel were in the process of preparing limited objections to the Special Master's Reports and Recommendations regarding Defendants' contests and set-offs (Duggan Declaration, Exhibits "40" & "41") (SDFL ECF Nos. 266 & 268), motions *in limine*, a joint pretrial statement, summaries of the claims and defenses regarding each of the Priority Plaintiffs, and a response to Defendants' expedited motion to establish a bench trial (SDFL ECF No. 299), when the global Class Settlement was reached.

On May 9, 2019, Plaintiffs' Counsel appeared before Judge Williams on behalf of the approximately 850 Florida *Brooke* Plaintiffs. Plaintiffs sought to implement the SPPF process for these Plaintiffs and provided Judge Williams with access to BrownGreer's Chinese Drywall Portal and sample profile forms, including the SPPFs prepared by Plaintiffs pursuant to PTO 11A.

## 2. The Common Benefit Efforts Performed in the Eastern District of Virginia

Plaintiffs' Counsel successfully obtained a similar trial plan in the Virginia *Amorin* litigation. Plaintiffs' Counsel attended the initial status conference before Judge Davis on December 18, 2018. Thereafter, Plaintiffs' Counsel submitted detailed briefing setting forth the most efficient plan for resolving the Virginia litigation, including giving this Court's orders preclusive effect (Duggan Declaration, Exhibits "49," "50," & "51") (EDVA ECF Nos. 69, 71, & 76), and thereafter successfully presented argument at the April 30, 2019 Hearing on the plan for resolution (Rec. Doc. 22245-1). Following the argument, Plaintiffs' Counsel submitted their Updated Remediation Damages Spreadsheet to obtain remediation damages based on current-day building materials and labor, as adjusted for local factors, for the court to calculate formulaic

damage (EDVA ECF No. 85/ Rec. Doc. 21807-1).  On May 20, 2019, the Virginia Court issued an order largely adhering to the Plaintiffs' requests. (EDVA ECF No. 87/ Rec. Doc. 22253-1). Shortly after issuing this ruling, the parties jointly sought a stay of the proceedings as a result of the successful mediation that took place on May 22-23, 2019.

### G.  History of the Settlement Negotiations and Mediation.

In addition to Plaintiffs' Counsel coordinating and overseeing the prosecution of Plaintiffs' efforts to execute the Trial Plans in this Court and the remand Courts, they were instrumental in resolving the Litigation.  This Court's implementation of the MDL "nuclear option" of remanding cases back to their original transferor courts had its intended effect of burdening the parties. Recognizing this burden as opportunity, Plaintiffs' Counsel seized on the moment when Judge Cooke's Trial Plan called for a mediation.  While Plaintiffs' Counsel were actively preparing for the scheduled July 22, 2019 trial on damages for "Other Losses" for 20 Priority Plaintiffs (Florida Trial Plan Order (Rec. Doc. 21933-1), at 11), including preparation of motions *in limine*, they were at the same time preparing for the court-mandated mediation scheduled with Mr. John Sigmund Freud.[49]  The mediation took place over two days between May 22-23, 2019.  With the assistance of the mediator, Plaintiffs' Counsel made a global demand of Taishan, and the Parties exchanged detailed damages calculations, counter-offers and responses.  Following intense, hard-fought in-person negotiations, where each side acquiesced to compromises, the mediation successfully resolved, with the parties achieving a Settlement Term Sheet that set forth (i) the class definition, (ii) the cash payment amount, (iii) the terms of funding, (iv) the Parties' agreement to jointly recommend to the Court that an Allocation Neutral be appointed to determine, subject to Court approval, fair and reasonable allocation criteria for equitably dividing the Settlement Funds among

---

[49] *See* C.V. of Mr. Freud (Rec. Doc. 22305-8).

eligible Class Members based on objective factors including, but not limited to: Product ID; square footage; ownership status; remediation status; and whether the claimant is an *Amorin* Class Member or a *Brooke* Plaintiff, and (v) the non-cash settlement terms.

Because of careful planning and diligent preparation, Plaintiffs' Counsel were able to negotiate the overarching terms of the $248 million Global Settlement that resolved the claims of all *Amorin* Plaintiffs, all *Brooke* Plaintiffs, and absent Class Members. Excluded from the Class are the 498 Florida Plaintiffs listed on Exhibit 1 to the Settlement Agreement. These Plaintiffs, who were offered separate individual settlements by Taishan,[50] not only benefited from the prior ten years of common benefit work product that laid the groundwork for their settlement, but due to a "Most Favored Nations" clause in their settlement, they received enhanced compensation because of the terms of the Settlement negotiated by Plaintiffs' Counsel. The impact of the Class Settlement on the operation of the MFN enabled the 498 FIS claimants to improve their settlement values 46%, from approximately $27.7 million to $40.7 million (Rec. Doc. 22341).

---

[50] The common benefit efforts of Plaintiffs' Counsel in the MDL and the remand courts benefitted all the Plaintiffs in the Litigation. While Plaintiffs' Counsel were diligently litigating the Florida *Amorin* claims before Judge Cooke, certain counsel, spearheaded by Jimmy Faircloth, separately negotiated an agreement to resolve the claims of the Florida *Amorin* clients of Parker Waichman and others, the so-called "Florida Individual Settlement" or FIS. These counsel recognized that Plaintiffs' Counsel were still pursuing claims on behalf of all Class Members, including their clients, and that those efforts might surpass the terms of their FIS. Thus, they negotiated a "Most Favored Nations" clause, which provided their Florida clients parity with whatever terms were later obtained by Settlement Class Counsel with Taishan. As a result of the Class Settlement in the MDL, the 498 FIS claimants improved their recoveries in excess of $12 million through the Most Favored Nations clause. Having bestowed upon the 498 FIS claimants the benefit of representing them throughout the Litigation *and* tremendously improving their individual settlements, Plaintiffs' Counsel petitioned to be separately compensated for their common benefit efforts in connection with the FIS proceeds before Judge Cooke. *See* Rec. Doc. Nos. 22303 & 22341. Plaintiffs' Counsel have requested that Judge Cooke in her discretion refrain from ruling on the fee petition pending before her, until this Court has had an opportunity to determine the instant motion.

Thereafter, the Parties jointly moved this Court and the remand courts to stay the proceedings while the parties negotiated the Settlement Agreement itself.  The Parties then participated in several in-person meetings, as well as numerous meetings over the phone, to negotiate the terms of the final Agreement that was preliminarily approved by the Court on August 29, 2019 (Rec. Doc. 22314) and is now before the Court for final approval.  At all times, the Parties proceeded at arm's length, and did not enter into any side agreements.

Plaintiffs' Counsel then prepared the Motion for Preliminary Approval of the Settlement. Since the announcement of the Settlement and, to a greater extent after formal Notice issued to the Class, Settlement Class Counsel have fielded hundreds of inquiries of Class Members and their counsel regarding the terms of the Settlement Agreement.  Beyond the notice approved by the Court, Plaintiffs' Counsel also established a Settlement website -- https://www.chinesedrywallsettlement.com/ -- to provide important information to all Class Members, including filed papers.  Already the website has received over 99,000 visits.[51]  As a further service, Plaintiffs' Counsel also provided a call center with a toll-free number and had attorneys respond to hundreds of phone call inquiries made about the Settlement.[52]

*  *  *

This common benefit work reflects the dedication and devotion of Plaintiffs' Counsel, which successfully culminated in this unprecedented settlement.

In addition to the request for attorneys' fees, Plaintiffs' Counsel disclosed in the motion for Preliminary Approval of the Settlement with Taishan that they would seek reimbursements of Shared Expenses and Held Costs, and a $500 stipend (net of previous stipends) for individual case

---

[51] *See* Duggan Declaration, Exhibit "52" (Rec. Doc. 22352), at 9.

[52] *Id.*

costs,[53] totaling, in the aggregate, 3% of the Settlement Fund (Rec. Doc. 22305-1, at 25-26).  Based on the records maintained by the court-appointed accountant, Philip Garrett, Plaintiffs' Counsel have incurred $4,608,411.27 in Shared Expenses and $1,166,418.88 in Held Costs, for which they request reimbursement.[54]

The above recitation of the detailed services of Plaintiffs' Counsel obviously will be relevant in the Court's later consideration of a common benefit fee allocation award in connection with this Class Settlement.  But it also serves as an important consideration in assessing the overall fee which would be reasonable to compensate all Plaintiffs' Counsel. The members of this Class have been well and consistently served in the collaborative effort of Common Benefit Counsel and Individually Retained Counsel.

## III.   ARGUMENT

### A.   The Fifth Circuit Has Endorsed a Percentage-of-Fund Method for Awarding Common Fund Fees, with an Abbreviated "Lodestar" Crosscheck.

For well over a century, the Supreme Court has "recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).[55]  Under this "common fund doctrine … a private plaintiff, or plaintiff's

---

[53] Under PTO 30 (Rec. Doc. 19787), stipends were awarded from prior settlements to compensate attorneys for individual case costs incurred related to claims of properties with Knauf and non-Knauf drywall (either $1,000 or $150 depending on the case). The total value of the stipends requested per Affected Property in this Settlement will be $500, net of any prior stipends awarded for each property.

[54] *See* Affidavit of Philip A. Garrett, C.P.A. ¶¶ 17-19 (Duggan Declaration, Exhibit "1").

[55] This principle, expressed in the High Court's *Boeing* decision, was derived from the following line of Supreme Court authority: *Alyeska Pipeline Serv. Co. v. Wilderness Soc.*, 421 U.S. 240, 257 (1975); *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 393 (1970); *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 164-66 (1939); *Central R.R. & Banking Co. v. Pettus,* 113 U.S. 116, 123-27 (1885); *Trustees v. Greenough,* 105 U.S. 527, 532-37 (1881).

attorney, whose efforts create, discover, increase, or preserve a fund to which others also have a claim, is entitled to recover from the fund the costs of his litigation, including attorneys' fees." *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220, 227 n.10 (5th Cir. 2008) (quoting *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 820 n.39 (3d Cir.), *cert. denied*, 516 U.S. 824 (1995)).

Accordingly, where a class action results in a recovery by way of a common fund providing monetary value for all class members, the attorneys whose efforts contributed to that recovery are entitled to payment of a reasonable fee from the recovery proceeds.[56] *See, e.g., In re Continental Illinois Sec. Litig.*, 962 F.2d 566, 568 (7th Cir. 1992) ("Having employed their professional skills to create a cornucopia for the class, the lawyers for the class were entitled under the principles of restitution to suitable compensation for their efforts"); *Klein v. O'Neal, Inc.,* 705 F. Supp. 2d 632, 673 (N.D. Tex. 2010) ("The use of a common fund to pay attorney's fees in class action settlements is well established"); *In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 647 (E.D. La. 2010) (the "equitable common fund doctrine was originally, and perhaps still is, most commonly applied to awards of attorneys' fees in class actions"); *Turner v. Murphy Oil,* 472 F. Supp. 2d 830, 856-57 (E.D. La. 2007) (quoting 4 Alba Conte & Herbert B. Newberg, Newberg on Class Actions §13:76

---

[56] The common fund principle also supports the assessment of recoveries by individual plaintiffs in multidistrict litigation and the award of attorneys' fees from the fund created by such assessments to compensate the attorneys appointed by the transferee court to assist in management of the litigation for the benefit of the plaintiffs subject to such MDL proceedings. *See, e.g., In re Diet Drugs Prods. Liab. Litig.*, 582 F.3d 524, 546-547 (3d Cir. 2009); *In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 647-649 (E.D. La. 2010). A district court's power to assess recoveries of MDL plaintiffs and to make an award of attorneys' fees from the pool of such assessments is also a necessary incident of its inherent management authority – a court's power to manage consolidated litigation implies a corollary authority to appoint lead, liaison and other common benefit attorneys and to compensate them for their services. *See, e.g., In re Air Crash Disaster at Florida Everglades*, 549 F.2d 1006, 1012-20 (5th Cir. 1977); *see also, e.g., Diet Drugs*, 582 F.3d at 546-47.

(4th ed. 2002)) ("When a plaintiff in an individual or representative capacity creates, increases, or preserves a fund by settlement or judgment, which benefits an ascertainable class, the court in exercising its equity jurisdiction, may grant class counsel fees by directing payment from the fund"); Eldon E. Fallon, *Common Benefit Fees in Multi-District Litigation*, 74 LA. L. REV. 371 (2014). Rule 23(h) of the Federal Rules of Civil Procedure specifically recognizes these principles, providing that, where a case is certified as a class action, "the court may award reasonable attorneys' fees and nontaxable costs authorized by law or by agreement of the parties." Fed. R. Civ. P. 23(h).

While the Settlement Agreement with Taishan[57] – alone or in combination with the Common Fund Doctrine – supports an award of common benefit fees to the petitioners and establishes the upper limit of any such award, the District Court is required to independently analyze the reasonableness of the requested attorneys' fees. *See, e.g., High Sulfur,* 517 F.3d at 227-28; *Strong v. BellSouth Telecommunications, Inc.,* 137 F.3d 844, 849-50 (5th Cir. 1998); *Evans v. TIN, Inc.,* No. 11-2067, 2013 WL 4501061 at *5 (E.D. La. 2013). As the Fifth Circuit Court of Appeals has explained:

> The district court's close scrutiny of fee awards serves to "protect the nonparty members of the class from unjust or unfair settlements affecting their rights as well as to minimize conflicts that may arise between the attorney and the class, between the named plaintiffs and the absentees, and between various subclasses."

*High Sulfur*, 517 F.3d at 228 (citations omitted).

---

[57] The Agreement provides that Petitioning Attorneys shall be entitled to petition the MDL Court for attorneys' fees totaling in the aggregate up to 32% of the Settlement Funds, and reimbursement of reasonable expenses, excluding the cost of notice. *See* Rec. Doc. 22305-2, at ¶ 16.1. Settlement Class Counsel have agreed to limit the *combined* fee and expense request to 33% of the Settlement Fund, comprised of 30% in fees and the remaining 3% toward expenses, as set forth above.

For the district courts within the jurisdiction of the Fifth Circuit, the reasonableness of any fee award is adjudicated by reference to the twelve factors first identified in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974); *see also Union Asset Management Holding A.G. v. Dell, Inc.,* 669 F.3d 632, 642 (5th Cir.), *cert. denied*, 133 S. Ct. 317 (2012) ("Fifth Circuit law requires that when reviewing an attorneys' fee award for abuse of discretion, this Court must determine whether 'the record clearly indicated that the district court has utilized the *Johnson* framework as the basis of its analysis'"); *In re Pool Prod. Distribution Market Antitrust Litig*., MDL 2328, 2015 WL 4528880, *19 (E.D. La. July 27, 2015) ("The Court assesses the fees requested by Class Counsel according to the percentage method, cross-checked with the *Johnson* factors.").

While the *Johnson* factors represent the considerations that necessarily inform the fee adjudication process, they do not, in and of themselves, furnish a methodology by which those considerations can actually be used to compute a fee award, especially in this uncommon situation where the fund is intended to compensate both common benefit and individually retained counsel. The Courts have articulated two distinctly different computational approaches to the award of reasonable counsel fees – the Percentage of Fund ("POF") method and the "lodestar" method. *See, e.g., Dell*, 669 F.3d at 642-43. Under the POF method, "the court awards fees as a reasonable percentage of the common fund." *Dell,* 669 F.3d at 643. *Accord, e.g., Vioxx*, 760 F. Supp. 2d at 650 (using the percentage method "the Court compensates attorneys who recovered some identifiable sum by awarding them a fraction of that sum…"). Under the "lodestar" method, the court multiplies the reasonable number of hours by a reasonable hourly rate, and then adjusts upward or downward by a numeric "multiplier" to account for the court's evaluation of the

*Johnson* factors. *See, e.g., Dell*, 669 F.3d at 642-43; *In re Fender,* 12 F.3d 480, 487 (5th Cir.), *cert. denied*, 511 U.S. 1143 (1994).

From the time the Supreme Court announced its decision in 1885 in *Central R.R. & Banking Co. v. Pettus,* courts typically based fee awards in common benefit cases on a "reasonable percentage of the fund." *See Pettus,* 113 U.S. at 127; *Report of the Third Circuit Task Force: Court Awarded Attorney Fees,* 108 F.R.D. 237, 242 (1985) ("Task Force Report"); Herbert B. Newberg, ATTORNEY FEE AWARDS, §2.02 at 31 (1986); *Arenson v. Board of Trade of City of Chicago*, 372 F. Supp. 1349, 1357 n.14 (N.D. Ill. 1974). Use of the POF method to award attorneys' fees lost favor in 1973 with the Third Circuit's decision in *Lindy*,[58] in which the court required the use of the lodestar method in both common fund and statutory fee-shifting cases. *Task Force Report*, 108 F.R.D. at 242. The "lodestar" approach to fee awards from a common fund was rapidly adopted by several of the Circuits.

The courts, however, recognized that pursing this path had been a mistake. Less than a dozen years after *Lindy*, the lodestar methodology lost substantially all of its vitality as a rule of decision for awarding fees in common fund cases, and the POF method regained its ascendancy as the prevailing template for attorneys' fee awards. *Awarding Attorneys' Fees and Managing Fee Litigation* at 63-68 (Fed. Jud. Ctr. 1994). Two reasons explain this impressive judicial turnabout.

First, the Supreme Court's decision in *Blum v. Stenson*, 465 U.S. 886 (1984), led the courts to question the legal underpinnings for the use of the lodestar rule in common fund cases. In *Blum*'s often-quoted footnote 16, the Court stated that, "under the common fund doctrine...a reasonable fee is based on a percentage of the fund bestowed on the class...." *Blum*, 465 U.S. at 900 n.16. *See*

---

[58] *Lindy Bros. Builders Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp*., 487 F.2d 161, 168 (3d Cir. 1973).

*also Task Force Report*, 108 F.R.D. at 250-51 (discussing *Blum* footnote 16); *Camden I Condominium Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 771 (11th Cir. 1991) (same); *In re Unisys Corp. Retiree Medical Benefits ERISA Litig.*, 886 F. Supp. 445, 458 (E.D. Pa. 1995) ("The 1980s witnessed another major change in the determination of attorneys' fees in common fund cases. This change was sparked by ... the Supreme Court in *Blum v. Stenson*....").

Second, a decade of experience led the courts to conclude that the legal "cure" prescribed by *Lindy* actually did more harm than good. Ironically, this view was first crystallized by the Third Circuit itself in a 1985 report issued by a Task Force appointed by the Court to "develop[] … recommendations to provide fair and reasonable compensation for attorneys in those matters in which fee awards are provided by federal statute or by the fund-in-court doctrine..." *Task Force Report*, 108 F.R.D. at 238. The Third Circuit Task Force, together with the courts and academics, noted a wide range of inequities that attended the use of the lodestar approach in common fund matters, which would be ameliorated by a return to the percentage methodology:

> Recommending the use of the percentage method when a common settlement fund is created, the influential Third Circuit Task Force's Report determined that a lodestar approach (1) "increases the workload of an already overtaxed judicial system"; (2) is "insufficiently objective and produce[s] results that are far from homogenous"; (3) "creates a sense of mathematical precision that is unwarranted in terms of the realities of the practice of law"; (4) "is subject to manipulation by judges who prefer to calibrate fees in terms of percentages of the settlement fund or the amounts recovered by the plaintiffs or of an overall dollar amount"; (5) "encourages lawyers to expend excessive hours, ... engage in duplicative and unjustified work, inflate their 'normal' billing rate, and include fictitious hours or hours already billed on other matters, perhaps in the hope of offsetting any hours the court may not allow"; (6) "creates a disincentive for early settlement of cases"; (7) "does not provide the district court with enough flexibility to reward or deter lawyers to that desirable objectives, such as early settlement will be fostered"; and (8) "works to the particular disadvantage of the public interest bar" by undermining the efficacy of many of the

> fee statutes that Congress has enacted because the lodestars in the
> "money" cases, such as securities, "are set higher than in cases under
> statutes promoting nonmonetary social objectives such as the Civil
> Rights Attorneys Fees Awards Act of 1976."

*In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 746-747 (S.D. Tex. 2008)

(citing and quoting *Task Force Report*, 108 F.R.D. at 247-49) (footnotes and emphasis omitted).[59]

For these reasons and others, the vast majority of Courts of Appeals, including the U.S.

Fifth Circuit, have approved of (or, in some cases, mandated) the use of the POF method to award

attorneys' fees in common fund cases. *Dell*, 669 F.3d at 644 ("the Fifth Circuit has never reversed

a district court judge's decision to use the percentage method, and none of our cases preclude its

use.… To be clear, we endorse the district courts' continued use of the percentage method cross-

checked with the *Johnson* factors").[60]  The POF approach is consistent with the notion that perfect

---

[59] *See also Dell*, 669 F.3d at 643 ("The percentage method brings certain advantages. The district court in this case selected it over the lodestar method in part because it allows for easy computation [and] it aligns the interests of class counsel with those of the class members.…"); *Burford v. Cargill, Inc.,* No. 05-0283, 2012 WL 5471985 at *1 (W.D. La. Nov. 8, 2012) ("the percentage method [is] the most sensible approach in this matter because it is predictable, encourages settlement, and reduces incentives for protracted litigation"); *Vioxx,* 760 F. Supp. 2d at 650-51 ("courts find that the percentage method provides more predictability to attorneys and class members or plaintiffs, encourages settlement, and avoids protracted litigation for the sake of racking up hours, thereby reducing the time consumed by the court and the attorneys"); *In re Educational Testing Service Praxis Principles of Learning and Teaching: Grades 7-12 Litig.*, 447 F. Supp. 2d 612, 628-629 (E.D. La. 2006) (citations omitted) ("The lodestar method has been under increasing criticism because of the practical difficulties in applying it. The method has been called difficult to apply, time consuming to administer, inconsistent in result, and capable of manipulation. Furthermore, the lodestar method creates inherent incentive to prolong the litigation until sufficient hours have been expended") (internal quotations and citations omitted); *In re Catfish Antitrust Litig.*, 939 F. Supp. 493, 500-01 (N.D. Miss. 1996) ("'The lodestar method makes considerable demands upon judicial resources since it can be exceptionally difficult for a court to review attorney billing information over the life of a complex litigation and make a determination about whether the time devoted to the litigation was necessary or reasonable. … Resolution of other cases on this court's already crowded docket would be severely delayed if the court had to attack such an administrative behemoth'") (citations omitted).

[60] *See, e.g., In re Thirteen Appeals Arising out of San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 307 (1st Cir. 1995); *In re Cendant PRIDES,* 243 F.3d 722, 732 (3rd Cir.), *cert. denied*, 534 U.S. 889 (2001) ("The percentage-of-recovery method is generally favored in cases involving a

is the enemy of good while still complying with the "rough justice" standard that should be applied to this case. *See Fox v. Vice,* 563 U.S. 826, 838 (2011). In *Fox,* the Supreme Court noted when evaluating the reasonableness of attorney fees, "'[T]rial courts need not, and indeed should not, become green-eyeshade accountants. The essential goal . . . is to do rough justice, not to achieve auditing perfection.'" *Id.* (quoting *Hensley v. Eckerhart,* 461 U.S. 424, 437 (1983)).

Indeed, virtually all of the recent common fund fee awards made by the district courts within the Fifth Circuit have utilized the POF method to award fees in common fund cases. *See, e.g., In re Vioxx Prod. Liab. Litig.,* MDL No. 1657, 2018 WL 4613941 (E.D. La. Sept. 26, 2018) (18.5% POF awarded) [hereafter "Vioxx II"]; *In Re: Oil Spill by the Oil Rig "Deepwater Horizon",* MDL 2179, 2016 WL 6215974, *16 (E.D. La. Oct. 25, 2016) (4.3% requested POF in Super-Mega-Fund awarded); *Pool Prod.,* 2015 WL 4528880 at *19 (30% POF awarded); *In re FEMA Trailer Formaldehyde Prod. Liab. Litig.,* MDL No. 07-1873, 2013 WL 1867117, *3 (E.D. La. May 2, 2013) (28% POF awarded); *Burford, supra,* 2012 WL 5471985 at *1 (33.3% POF awarded); *In re OCA, Inc. Sec. and Derivative Litig.,* No. 05-2165, 2009 WL 512081 at *19 (E.D. La. Mar. 2, 2009) (28.5% POF awarded); *Enron,* 586 F. Supp. 2d at 766, 778; *Murphy Oil,* 472 F.

common fund...."); *Rawlings v. Prudential-Bache Properties, Inc.,* 9 F.3d 513, 515-16 (6th Cir. 1993) (noting "the recent trend towards adoption of a percentage-of-the-fund method," and permitting use of this method in common fund cases); *Continental Illinois,* 962 F.2d at 572 (fee award should not be based on "individual hours," but rather on the percentage that counsel "would have received had they handled a similar suit on a contingent fee basis, with a similar outcome, for a paying client"); *Johnston v. Comerica Mortg. Corp.,* 83 F.3d 241, 246 (8th Cir. 1996*); In re Washington Public Power Supply System Sec. Litig. ("WPPSS"),* 19 F.3d 1291, 1296 (9th Cir. 1994); *Six (6) Mexican Workers v. Arizona Citrus Growers,* 904 F.2d 1301, 1311 (9th Cir. 1990) ("a reasonable fee under the common fund doctrine is calculated as a percentage of the recovery"); *Paul, Johnson, Alston & Hunt v. Graulty,* 886 F.2d 268, 272 (9th Cir. 1989) (endorsing use of percentage approach); *Gottlieb v. Barry,* 43 F.3d 474, 483 (10th Cir. 1994); *Brown v. Phillips Petroleum Co.,* 838 F.2d 451, 454 (10th Cir.), *cert. denied,* 488 U.S. 822 (1988) ("a fee award based on a percentage of a common fund" is appropriate); *Camden I Condominium Ass'n, Inc. v. Dunkle,* 946 F.2d 768, 774 (11th Cir. 1991); *Swedish Hospital Corp. v. Shalala,* 1 F.3d 1261, 1271 (D.C. Cir. 1993) (requiring application of the POF method in common fund cases).

Supp. 2d at 859-61 (17% POF awarded); *In re Bayou Sorrel Class Action*, No. 04-1101, 2006 WL 3230771 at *3 (W.D. La. Oct. 31, 2006) (36% POF awarded); *Educational Testing*, 447 F. Supp. 2d at 628-29 (29% POF awarded); *In re Combustion, Inc.,* 968 F. Supp. 1116, 1135-36 (W.D. La. 1997) (36% POF awarded).  *See also In re Syngenta AG MIR 162 Corn Litig.*, 357 F.Supp.3d 1094, 1112-1115 (D. Kan. 2018)(awarding one-third POF fee in super-mega-fund case).

Accordingly, the POF method should be employed to determine this petition for an award of fees.

**B.  The Requested 30% Fee Falls Well Within the "Benchmark Percentage"**

The POF method requires that the court select a reasonable percentage to be applied to the value of the monetary value of the settlement or the fund itself to produce an appropriate fee award. Settlement Class Counsel respectfully proposes that 30% of the Class Settlement Fund would result in a total fee for all Plaintiffs' Counsel that is appropriately fair and reasonable in this case.

"[T]he percentage should not be completely arbitrary, devoid of reality, or inconsistent with the usual fees for the type of case involved. In short, there is no one percentage that should apply to all cases. Each case should be analyzed on its own basis." *Murphy Oil,* 472 F. Supp. 2d at 862 (quotation omitted).  Generally speaking, the amount of this percentage is determined by reference to the twelve *Johnson* factors. *See, generally, Dell*, 669 F.3d at 644 (requiring that percentage award be "informed by the *Johnson* considerations"); *FEMA Trailer*, 2013 WL 1867117 at *3 (the percentage-of-benefit approach "entails the use of a percentage, the reasonableness of which is analyzed in light of the *Johnson* factors"). However, as noted by one court in commenting on the use of a list of factors to make a percentage award, "[t]he mere listing of … factors for consideration by the court makes meaningful review difficult and gives little guidance to attorneys and claimants." *Lindy I,* 487 F.2d at 166-67.

To make the process more concrete, virtually all district courts within the Fifth Circuit employ a two-step consideration of those factors to select an appropriate fee award percentage. In the first of these two steps the courts consider *Johnson*'s fifth factor, "the customary fee," and the twelfth *Johnson* factor, "awards in similar cases," to select a "benchmark percentage." *Vioxx,* 760 F. Supp. 2d at 652; *Murphy Oil,* 472 F. Supp. 2d at 862-64; *Educational Testing*, 447 F. Supp. 2d at 629-30; *Enron,* 586 F. Supp. 2d at 745 n.12 ("some courts applying the percentage method have tried to establish a specific 'benchmark' percentage, either a particular number or a range, … depending on the particular facts of the case"); *In re: Diet Drugs Prod. Liab. Litig.,* 553 F. Supp. 2d 442, 479-80 (E.D.Pa. 2008) ("Although the other [fee award] factors can be quite abstract, th[e awards in similar cases] factor affords the court the opportunity to use as a guide the decisions of our fellow federal judges across the country"); *Kemp v. Unum Life Ins. Co. of America,* No. 14-0944, 2015 WL 8526689, *8 (E.D. La. Dec. 11, 2015) ("The Court notes that attorney fees awarded as percentages of a common fund usually range between 20 and 30%, with 50% as an upper limit. In the Fifth Circuit, the average percent awarded as attorneys' fees is 29.5%.  Furthermore, 'it is not unusual for district courts in the Fifth Circuit to award percentages of approximately one third.'").

For purposes of evaluating customary awards in comparable cases, courts frequently (although not always) do so with reference to the size of the recovery. *Vioxx,* 760 F. Supp. 2d at 652-64;[61] *Murphy Oil*, 472 F. Supp. 2d at 862-65; *Diet Drugs*, 553 F. Supp. 2d at 479-80. Class

---

[61] Both Individually Retained Attorneys and Common Benefit Counsel will share from the common fund being requested. Therefore, the opinion of this Court in *Vioxx, supra* and Judge Africk's opinion in *Evans v. TIN, Inc.,* No. 11- 2067, 2013 WL 4501061 at *2-*3 (E.D. La. Aug. 21, 2013) are relevant.  In *Vioxx,* the Court recognized that given the risks inherent in the litigation, a reasonable contingent fee could range between 33% to 40%, but because individual counsel "benefitted from a uniform and highly efficient resolution procedure; the claimants should similarly benefit from fees reduced to reflect that uniformity and efficiency." *Vioxx,* 760 F. Supp.

recoveries of $100 million or less are common in the federal judicial system, and the case law readily establishes a customary or benchmark percentage-of-benefit award of twenty-five percent of such recoveries. *Murphy Oil,* 472 F. Supp. 2d at 863-64; *Educational Testing*, 447 F. Supp. 2d at 630 (25% is "the 'typical benchmark'"); *Enron,* 586 F. Supp. 2d at 745 n.12 ("A typical benchmark in a common fund case is 25%"); Manual for Complex Litigation, Fourth § 14.121 (Fed. Jud. Ctr. 2004) (Recognizing 25% of a common fund "represents a typical benchmark"). However, as the size of a class recovery reaches the mega-fund, there are relatively fewer percentage awards to serve as a benchmark. *See, e.g., Murphy Oil*, 472 F. Supp. 2d at 864.[62] *See, generally*, Theodore Eisenberg, Geoffrey Miller & Roy Germano, *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. L. REV. 937 (2017) (Noting paucity of mega fund cases in this

---

2d at 617.  To ensure that reasonable attorneys' fees were charged to claimants, the Court imposed a cap of 32% plus reasonable costs on all individual contingent fee arrangements. *Id.*  Significant to this Court's determination that a global fee limitation of 32% was reasonable was "the fact that any award for common benefit work will later be deducted from this sum." *Id*. at 618.  Similarly, in *Evans,* where funds were awarded to compensate both individually retained counsel and common benefit counsel, the court found justified and reasonable a global percentage fee award of 39.22% from all settlement awards. *Evans,* 2013 WL 4501061 at *15 & n.11. Hewing closely to the reasoning of this Court in *Vioxx,* Judge Africk concluded that a 20% cap on individually retained counsel's fees was appropriate. The court recognized that a cap on individually retained counsel was necessary to render fees reasonable and found a 20% contingency fee as reasonable "when compared to the nature and value" of the work performed by common benefit counsel.  The upshot from both opinions is that percentage awards of overall fees from cases that have taken into consideration both individually retained attorneys and common benefit counsel may range from 32% up to 40% is more than reasonable and substantially justified, but restrictions may have to be imposed on contingency contracts to avoid excessive fee recovery.

[62] *See also* Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. EMPIRICAL LEGAL STUD. 248 (2010) (based upon reported settlements between 1993 and 2008); Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and their Fee Awards*, 7 J. EMPIRICAL LEGAL STUD. 811 (2010); Manual for Complex Litigation, Fourth § 14.121, *supra.*

most recent study, while finding "that mean and median fee percentages varied from a low of 16.6% in 2009 to a high of 25.5% in 2011," for settlements in excess of $100 million).

Nonetheless, the courts have been careful to avoid embracing a hard and fast arithmetic rule that specifies that the percentage award should decline in proportion to increases in the size of the recovery and have focused instead on the individual facts and circumstances of each case in crafting percentage awards from mega-fund or super-mega-fund recoveries. *Vioxx*, 760 F. Supp. 2d at 655 ("a reasonable benchmark percentage is a flexible concept"); *Enron*, 586 F. Supp. 2d at 754 ("'[T]here is no rule that a district court must apply a declining percentage reduction in every settlement involving a sizable fund. Put simply, the declining percentage concept does not trump the fact-intensive … analysis'") (quoting *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 302 (3d Cir. 2005)); *Vioxx II,* 2018 WL 4613941 at *10 (awarding an 18.5% POF for a consumer class that had low participation rate and smaller recovery than the *Vioxx* personal injury claimants, while recognizing that the smaller recovery "necessitates a higher percentage to ensure a reasonable fee.").

The earlier *Allen* settlement with Taishan resulted in this Court granting a 32% POF award. Rec. Doc. 22122. Previously, with respect to the Banner, InEx and Global Insurance Settlements, this Court similarly granted 32% POF awards. *Compare* Rec. Doc. 17687-3 at 108 *with* Rec. Doc. 20257. But the combined effort by Plaintiffs' Counsel, both Common Benefit Counsel and Individually Retained Counsel, to achieve this Settlement with Taishan, truly dwarfs the effort to achieve the Knauf/GBI settlements in terms of risk, scope and intensity. The 30% POF requested here is fair and reasonable compensation in relation to the remarkable, historic outcome now at issue. *Compare, Syngenta, supra.*

Moreover, the requested 30% POF fee award is consistent with the Fifth Circuit precedent when the *Johnson* factors are applied, especially when these are considered in the light of the detailed summary of Plaintiffs' common benefit efforts alone in this litigation.  *See*, *generally*, Duggan Declaration.

### C. Principles Governing Determination of an Appropriate Fee Award under *Johnson*.

#### 1.  The Time and Labor Required

Assembling, administrating and successfully resolving an MDL of the magnitude of this case is a very tall order. During the course of this Litigation, approximately 10,000 Plaintiffs brought Chinese Drywall claims against thousands of Defendants, including the Taishan Defendants.  Consequently, the completion of countless tasks was necessary to marshal such a large, disparate group. Indeed, given the adversary nature of this Litigation, much attention had to be expended to manage the docket and develop the caseload for matters both expected and unexpected. Given so many moving parts, to direct the assemblage efficiently and effectively, the PSC was obliged to negotiate Trial Plans and other schedules, engage in extensive discovery involving hundreds of thousands of documents from the Taishan Defendants and third parties, develop Supplemental Plaintiff Profile Forms, and expend tens of thousands of hours on pleadings and complex motions practice.

Since the inception of this Litigation Plaintiffs have worked tirelessly preparing Omni Complaints, which required sweeping efforts to investigate the parties responsible for Chinese Drywall and its importation and delivery to the United States for installation in Plaintiffs' homes, compile the material allegations against Defendants based on diverse governing state laws, and engage in the prolix, time-consuming and expensive efforts to perfect service of process on the foreign Defendants through the Hague Convention, and then by seeking and obtaining permission

to employ alternative service upon counsel. Extensive motions practice, including motions to dismiss based personal jurisdiction, statutes of limitations, motions to decertify the class, damage theories available to former owners, product identification, and myriad other issues were briefed and argued. Assembling lay and expert witnesses, exhibits, depositions, video testimony and other trial materials for these efforts as well as in contemplation of damages trials engaged Settlement Class Counsel who were constantly and consistently occupied in ensuring that the task of proving the Plaintiffs' claims was accomplished.

Tremendous efforts were also made to globally resolve the Litigation. Only after the Court initiated remands, were the Taishan Defendants serious about resolving the litigation. The leadership of the MDL devoted themselves to negotiating the terms of the Class Settlement to expeditiously and efficiently obtain compensation for all of the clients, except those 498 Plaintiffs who were excluded from the Class Definition, because their attorneys had separately negotiated individual settlements with Taishan.

### 2.   The Novelty and Difficulty of the Questions Involved

Throughout this decade-long litigation, the Court has repeatedly been reminded of the complex nature of this prolix multidistrict, multi-party litigation. Indeed, in rendering final approval of the Knauf settlements, the Court noted: "the litigation is complex, expensive, uncertain, and has the potential for lengthy duration." *Chinese Drywall*, 2013 WL 499474 at *10. The far lengthier litigation against Taishan only served to expose the Court to even more complex legal and factual issues. This factor favors a substantial fee award in this case.

### 3.   The Skill Requisite to Perform the Legal Service Properly

The skill necessary to bring about the result achieved here was not ordinary. Counsel's success in confronting the difficult and complex issues presented by this Litigation and in ultimately obtaining so much relief for so many individuals should be rewarded. This Litigation

required considerable skill and experience to bring it to such a successful conclusion. The ability of Plaintiffs' Counsel to obtain the Class Settlement with Taishan in the face of formidable legal opposition confirms the superior quality of our representation.  This factor favors a substantial fee award in this case.

### 4.   The Preclusion of Other Employment by the Attorneys Due to Acceptance of the Case

This factor is not pertinent to the overall fee award requested at this time, but will become relevant when the matter of the common benefit award is determined, as some counsel devoted their entire practice to this litigation for sustained periods of time.

### 5.   The Customary Fee

As discussed above in connection with the benchmark award, this Court has routinely granted 32% POF awards in MDL 2047 settlements.  Given this precedent and the jurisprudence in this Circuit, which finds awards of one-third typical, the lesser amount requested here, 30%, is eminently reasonable.

### 6.   Whether the Fee Is Fixed or Contingent

All Plaintiffs' Counsel undertook this Litigation on a contingent fee basis, assuming a substantial risk that the litigation would yield no recovery and leave them uncompensated. Courts have consistently recognized that the risk of receiving little or no recovery is a major factor in considering an award of attorneys' fees. *See, e.g., In re Enron Corporation Securities, Derivative & "ERISA" Litig.*, 586 F. Supp. 2d 732, 791 (S.D. Tex. 2008). The time in which to evaluate the risk is *ex ante, i.e.,* as of the time suit was initiated, not with the benefit of hindsight. *See Harman v. Lyphomed, Inc.,* 945 F.2d 969, 974 (7th Cir. 1991). Where counsel face such substantial risks and recover significant compensation for their clients, courts find this factor to favor the fee applicant. *See Enron,* 586 F. Supp. 2d at 796.

42

### 7.   Time Limitations Imposed by the Client or the Circumstances

This Court has frequently noted the potential for MDL litigation to become so bogged down as to warrant the appellation of a "black hole." Mindful of this potential morass, the Court has used every device available to it to avoid such a consequence. The Court has regularly held monthly status conferences and employed "hands-on" management to see that discovery was being conducted promptly and that the Litigation was progressing at an appropriate rate.   Always, counsel worked extremely hard to meet the Court's deadlines. Counsel were keenly aware of this Court's fierce determination to force them to mature the Litigation, and get to the point where compromise could be accomplished. This strategy proved itself to be successful and petitioners submit that the requested global award is justified.

### 8.   The Amount Involved and the Results Obtained

The eighth *Johnson* factor – the amount involved and the results achieved – is entitled to significant weight when, as in this case, the efforts of counsel were instrumental in realizing a high recovery on behalf of the Plaintiffs. As the Supreme Court has observed, "'the most critical factor' in determining the reasonableness of a fee award is the degree of success obtained." *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983). *See also Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1047 (5th Cir. 1998) (". . . Where recovery of private damages is the purpose, . . .  consideration to the amount of damages awarded as to the amount sought represents the primary means to evaluate that concern."). A $248 million settlement for a consumer product liability class action, which is being funded by a Chinese corporation in the People's Republic of China is unprecedented in the annals of legal history.  If outcome weighs as "the most critical" consideration, then surely the requested fee award should be deemed fair and appropriate.

In *Deepwater Horizon*, Judge Barbier noted that "[s]uccess is determined not only by the gross amount of the recovery but also by the number of individuals who benefit from the class

settlement, the degree to which it provides them with full compensation for their injuries, and the extent to which the settlement benefits the public at large." *Deepwater Horizon,* 2016 WL 6215974 at *18. Here, Settlement Class Counsel's efforts not only benefited the 3,653 claimants identified on the Master Spreadsheet (Rec. Doc. 22312-1) and absent Class Members, but also the 498 FIS claimants whose settlement would not have been possible but for the common benefit work performed during the preceding ten years of litigation, in addition to the approximately $12 million additional dollars obtained through their settlement's Most Favored Nations clause.

By any measure, the settlement is an outstanding result. Given such an outstanding result, this, the most important factor, amply supports the requested fee award.

### 9.   The Experience, Reputation, and Ability of the Attorneys

When this MDL litigation began, the Court underwent an arduous vetting and selection process to obtain experienced, reputable and able counsel to participate on the PSC. *See* Pretrial Order No. 8. Since then, the Court has reappointed PSC Members, with few exceptions related to death, illness or unwillingness to continue. *See* Pretrial Order Nos. 8A, 8B, 8C, and 8D. This factor supports the requested percentage here.

### 10. The "Undesirability" of the Case

The risks presented by taking on such a massive case were daunting at the inception of this Litigation. The fact that the manufacturers of Chinese Drywall were foreign entities located halfway around the world posed a high degree of risk and caution because of the anticipated service problems, travel expenses, and the potential collectability problems of a judgment against foreign defendants. Nevertheless, the case was not undesirable as the client-base was comprised of innocent victims of a patently defective product.

**11. The Nature and Length of the Professional Relationship with the Client**

This *Johnson f*actor was designed to consider those instances when "a lawyer in private practice may vary his fee for similar work in the light of the professional relationship of the client with his office." *Johnson,* 488 F.2d at 719. This factor is therefore neutral as it relates to the requested fee award since there are few, if any, longstanding client relations with the Chinese Drywall claimants. As this Court pointed out in *Murphy Oil*, "'the relationship did not antedate the litigation, nor will it likely continue beyond the closure of this case,' other than as it relates to this litigation." *Murphy Oil,* 472 F. Supp. 2d at 866-67, quoting, *In re ETS*, 447 F. Supp. 2d 612, 632 (E.D. La. 2006). Accordingly, little weight is to be afforded this factor.

**12. Awards in Similar Cases**

All but two of the *Johnson* fee adjudication factors are abstract in that they do not purport to have any mathematical correlation to the computation of an appropriate percentage award. The final *Johnson* factor provides guidance as to how to concretize abstract consideration of the other factors into a definitive percentage fee award. That factor prescribes consideration of "awards in similar cases." *Johnson*, 488 F.2d at 719.   Such consideration is a dominant feature of contemporary POF fee adjudication. *See, e.g., Dell, supra.*

As demonstrated above, the requested percentages are well within the range of percentages that have been awarded by courts in this Circuit, including this Court in this case. *See discussion, supra.* Accordingly, the "awards in similar cases" factor powerfully argues in support of the reasonableness of the 30% fee requested. As the other *Johnson* factors fully endorse the requested fee, the global fee requested should be awarded.

**D.  An Abbreviated Lodestar Cross-Check Easily Confirms the Reasonableness of the Requested POF Award Since it only Accounts for Common Benefit Counsel's Time**

"[T]he loadstar cross-check is a streamlined process, avoiding the detailed analysis that goes into a traditional lodestar examination." *Deepwater Horizon*, 2016 WL 6215974 at *19 (citing *Vioxx,* 760 F. Supp. 2d at 659).  Here, both Common Benefit Counsel and Individually Retained Attorneys will share in the percentage of fund fee awarded by the Court.  However, only the common benefit time recorded pursuant to PTO 9 and 9A is available for a lodestar cross-check.  The work performed by individual counsel, which has not been memorialized, provided even more value to their clients but does not assist the Court in performing a cross-check. Therefore, the absence of this time should in no way diminish its importance to this Court's consideration of whether the benchmark percentage, if 30%, should be maintained, or enhanced, if a lesser percentage is selected.  To the contrary, this unreported work-product lends even further support to the requested percentage (30%) fee, since whatever percentage is awarded by the Court must support a fee for the labor of both Common Benefit Counsel and Individually Retained Attorneys who have toiled for the past decade to achieve their compensation.

Plaintiffs' Counsel reported 109,236.22 hours of attorney and para-professional time expended on common benefit Chinese Drywall Litigation as of August 31, 2019.  *See* Garrett Affidavit, at ¶ 14. The actual hourly rate reported by each professional submitting time to Mr. Garrett at the inception of the litigation multiplied by the number of hours reported results in a total of $75,314,627.75.  *Id.,* at ¶ 16.  This lodestar readily compares to 30% of the common fund, *i.e.*, $74,400,000, which does not include any of the unreported time of Individually Retained Attorneys, and therefore supports the fee requested.

### E.  Common Benefit Counsel Should Be Entitled to Reimbursement of Expenses.

The relevant fee jurisprudence authorizes reimbursement of the reasonable amounts paid out-of-pocket to achieve a common benefit recovery or to advance the common goals of plaintiffs in MDL litigation. *See Sprague v. Ticonic*, 307 U.S. at 166-67 (recognizing a federal court's equity power to award costs from a common fund); *Camden I Condominium Ass'n*, 946 F.2d at 771 ("In accordance with the well-established common fund exception to the American Rule, . . . class counsel . . . are entitled to an award of their . . . expenses out of the fund that has been created for the class by their efforts"); *Pool Products*, 2015 WL 4528880 at *23 ("Class action counsel who create a common fund for the benefit of the class, are entitled to reimbursement of reasonable litigation expenses from that fund.").

Accordingly, a 3% award from the fund for reimbursement of Shared Expenses, Held Costs, and a Stipend for individual case costs should be separately recognized and provided for in any award by the Court.

Based upon the records maintained by Mr. Garrett, the law firms submitting expenses to the court-appointed CPA pursuant to Pretrial Order No. 9 or 9A, which includes Settlement Class Counsel, the PSC and common benefit counsel, have incurred $1,166,418.88 in Held Costs, and $4,608,411.27 in Shared Expenses.[63]   Class Counsel's cost reimbursement request of $5,774,830.15 should be found reasonable, and reimbursement of these costs should be awarded. Finally, a stipend of up to $500 (less any prior stipend payments) for each Affected Property, which is a reasonable approximation of the individual case costs associated with the prosecution of each

---

[63] Garrett Affidavit ¶¶17-19.  In connection with the Knauf Settlement, by Order dated May 17, 2016, this Court previously authorized payment of held and shared costs incurred from inception until December 2014 (Rec. Doc. 20257).  *See also* Rec. Doc. Nos. 21168 & 22089. These previously reimbursed expenses are not the subject of this petition.  Garrett Affidavit, at ¶17 (only considering costs expended after January 1, 2015).

Eligible Class Member's claim, is estimated to be $1.3 million in the aggregate[64] and should be awarded.  Collectively, these expenses of approximately $7,074,830.15, which are less than 3% of the fund described in the Notice of the Class Settlement, should be awarded.

## IV.    <u>CONCLUSION</u>

The successful resolution of this Litigation against Taishan and the Additional Released Parties achieved by Plaintiffs' Counsel, who have been tirelessly litigating their Chinese Drywall clients' claims for an entire decade, is unprecedented.  There is scant history of any United States judgment ever being enforced against a Chinese corporation in China.  Faced with the possibility of never collecting against these Defendants, Plaintiffs' Counsel persevered against this history and daunting adversaries to achieve the virtually impossible Settlement now before the Court.

Such devotion to a cause, coupled with the strategy, intensity and focus demanded by this Litigation is deserving of acclaim.  Just as our clients have had to endure the hardship of delayed justice, Plaintiffs' Counsel similarly suffered.   After ten years of contingent litigation, over 109,000 hours expended on the matter (since January 1, 2014 alone) with millions of dollars expended on financing the case, the equities support Counsel being amply rewarded for the significant result they have attained for their clients.

For the reasons set forth above, Plaintiffs' Counsel respectfully request that their motion be granted.

---

[64] Duggan Declaration, at ¶ 3.

Respectfully submitted,


Dated:  November 19, 2019          By: */s/ Stephen J. Herman*
                    Russ M. Herman (Bar No. 6819)
                    Leonard A. Davis (Bar No. 14190)
                    Stephen J. Herman (Bar No. 23129)
                    Charles King (Bar No.34621)
                    Herman, Herman & Katz, LLC
                    820 O'Keefe Avenue
                    New Orleans, LA 70113
                    Phone: (504) 581-4892
                    Fax: (504) 561-6024
                    SHerman@hhklawfim.com
                    *Plaintiffs' Liaison Counsel MDL 2047 and*
                    *Settlement Class Counsel*

                    Arnold Levin
                    Fred S. Longer
                    Sandra L. Duggan
                    Keith Verrier
                    Levin Sedran & Berman LLP
                    510 Walnut Street, Suite 500
                    Philadelphia, PA 19106
                    Phone: (215) 592-1500
                    Fax: (215) 592-4663
                    alevin@lfsblaw.com
                    *Plaintiffs' Lead Counsel MDL 2047 and Settlement*
                    *Class Counsel*

                    Patrick Shanan Montoya
                    Fla. Bar No. 0524441
                    Patrick@colson.com
                    Colson Hicks Eidson
                    255 Alhambra Circle, PH
                    Coral Gables, FL  33134-2351
                    Telephone:  (305) 476-7400
                    Facsimile:  (305) 476-7444
                    *Plaintiffs' Steering Committee MDL 2047 and*
                    *Settlement Class Counsel*

Richard J. Serpe, Esq.
LAW OFFICES OF RICHARD J. SERPE, PC
580 E. Main Street, Suite 310
Norfolk, Virginia 23510
757-233-0009
Rserpe@serpefirm.com
*Plaintiffs' Steering Committee MDL 2047 and*
*Settlement Class Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing has been served on Defendants' Liaison Counsel, Kerry Miller, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, which will serve a notice of the uploading in accordance with the procedures established in MDL 2047, on this 19th day of November, 2019.

*/s/ Stephen J. Herman*
Stephen J. Herman
Herman, Herman & Katz, LLC
820 O'Keefe Avenue
New Orleans, LA 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
SHerman@hhklawfim.com
*Plaintiffs' Liaison Counsel MDL 2047 and*
*Settlement Class Counsel*
