# EXHIBIT 18

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

|  |  |
|---|---|
| **EDUARDO AND CARMEN AMORIN**, *et al.*, individually, and on behalf of all others similarly situated,<br><br>        **Plaintiffs,**<br><br>                    **v.**<br><br>**TAISHAN GYPSUM CO., LTD. f/k/a SHANDONG TAIHE DONGXIN CO., LTD.; TAIAN TAISHAN PLASTERBOARD CO., LTD.**, *et al.*,<br><br>        **Defendants.** | **Case No. 1:11-CV-22408-MGC** |

### PLAINTIFFS' RESPONSE BRIEF IN SUPPORT OF THIS COURT GIVING ENTIRELY PRECLUSIVE EFFECT TO JUDGE FALLON'S FINDINGS OF LIABILITY AND APPLICATION OF THE REMEDIATION DAMAGES FORMULA

**I.  INTRODUCTION**

In an effort "to narrow the issues and assist the Court's speedy resolution of this case," the Court has ordered the parties to submit briefs on the question of whether this Court should "give entirely preclusive effect to Judge Fallon's findings of liability and apply the remediation formula he adopted." ECF No. 91. The answer is yes. There is substantial legal authority and compelling reasons to support giving entirely preclusive effect to the MDL Court's orders in this decade-old *Chinese Drywall* litigation with respect to (i) liability of the defaulted Defendants, (ii) certification of the *Amorin* class, and (iii) adoption and application of the remediation damages formula for *Amorin* class members.

The MDL Court carefully and thoroughly considered each of these issues. Beginning in 2009, Defendants were properly notified of the lawsuits and given multiple opportunities to appear and defend the claims against them, but for the most part they declined those opportunities. Defendants willfully sat on the sidelines, refused to answer any *Chinese Drywall* complaints, and allowed default judgments to be entered. In 2014, they failed to object to certification of the *Amorin* class despite their awareness of the proceedings. They did, however, appear in 2015 to participate in the non-jury evidentiary hearing to assess class-wide damages in *Amorin*, and they were given an opportunity to object to the remediation damages

formula proposed by the Plaintiffs. At each step of the litigation Defendants were afforded meaningful due process. Now, *years* after the fact, Defendants urge this Court on remand to revisit these definitive MDL rulings, without *any* showing of a change (much less a significant change) of circumstances or any new legal development that would warrant retracing the steps already undertaken in the MDL. In their Briefs on preclusive effect,[1] Defendants essentially repeat arguments they previously made[2] and effectively move for reconsideration of class certification, the assessment of class-wide damages based on the remediation formula of Plaintiffs' expert, and defaults against BNBM, even though those issues were thoroughly briefed, argued, and carefully considered by the MDL Court.

Defendants' approach is consistent with their long-term strategy to avoid paying any *Chinese Drywall* judgments. For more than nine years Defendants have manipulated our judicial system and engaged in delay tactics that have denied relief to thousands of property owners damaged by defective Chinese Drywall. At this point, Defendants' efforts to further delay the resolution of Plaintiffs' claims should not be countenanced.

## II.  ARGUMENT

### A.  Giving Deference and Preclusive Effect to a Transferee Court's Orders Supports the Core Principles of the MDL Statute.

The "multidistrict litigation statute, 28 U.S.C. § 1407, was enacted as a means of conserving judicial resources in situations where multiple cases involving common questions of fact were filed in different districts." *In re Food Lion, Inc., Fair Labor Standards Act Effective Scheduling Litig.*, 73 F.3d 528, 531-32 (4th Cir. 1996). As such, the MDL process endeavors to avoid duplicative rulings. *See In re Tremont Grp. Holdings, Inc., Sec. Litig.*, 626 F. Supp. 2d 1338, 1340 (J.P.M.L. 2009). Although the Eleventh Circuit has not explicitly ruled on the binding effect of MDL orders on remand, the Fifth Circuit has concluded, after reviewing relevant decisions throughout the country, that the "authorities are unanimous that some deference

---

[1] *See* ECF Nos. 97 & 98.

[2] *See* ECF Nos. 61, 66, 67. Plaintiffs responded to the misleading statements and incorrect arguments in Defendants' Motion to Reject Application of Remediation Damages Formula (*see* ECF No. 84), BNBM's Motion to Enforce Trial Rights (*see* ECF No. 80), and Defendants' Motion to Enforce Discovery Rights (*see* ECF No. 88), and incorporate those responses herein by reference.

must be given to the transferee court's decisions." *In re Ford Motor Co.*, 591 F.3d 406, 410 (5th Cir. 2009), *cert. denied*, 561 U.S. 1006 (2010). This supports the purpose of MDL proceedings.

Courts have differed in their approach to the amount of deference owed. Some courts have taken a bright-line rule against revisiting prior decisions. For example, the Fourth and Seventh Circuits have adopted a categorical rule against review of decisions of the MDL court. Both adhere to the view expressed by a judge who served on the Judicial Panel on Multidistrict Litigation early on:

> [I]t would be improper to permit a transferor judge to overturn orders of a transferee judge even though error in the latter might result in reversal of the final judgment of the transferor court. If transferor judges were permitted to upset rulings of transferee judges, the result would be an undermining of the purpose and usefulness of transfer under [28 U.S.C. §] 1407 for coordinated or consolidated pretrial proceedings because those proceedings would then lack the finality (at the trial court level) requisite to the convenience of witnesses and parties and to efficient conduct of actions.

Stanley A. Weigle, *The Judicial Panel on Multidistrict Litigation, Transferor Courts and Transferee Courts*, 78 F.R.D. 575, 577 (1978); *see In re Food Lion*, 73 F.3d at 531-32 (holding that an MDL court's orders are subject to review only through direct appeal to the MDL's circuit court); *Winkler v. Eli Lilly & Co.*, 101 F.3d 1196, 1202 n.5 (7th Cir. 1996). As *Winkler* explained, "[i]t would vitiate much of the purpose of consolidating litigation if, after remand, parties could simply re-visit the transferee court's pre-trial rulings, and force the common defendant to deal piecemeal with once-collective matters." *Id*. The Seventh Circuit further held that an MDL court retains jurisdiction to "protect the integrity of orders it issued while in charge of the consolidated lawsuits." *Id*. That authority derives from the All Writs Act, 28 U.S.C. § 1651, which authorizes "'such commands ... as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained." *Id*. at 1202 (quoting *United States v. New York Telephone*, 434 U.S. 159, 173 (1977)).

According to the literature, most courts have adopted the "law of the case" doctrine, and the courts adopting that approach "have generally rejected challenges to the MDL court's decision." William B. Rubenstein, 6 NEWBERG ON CLASS ACTIONS, *Preclusive Effect of Orders in Multidistrict Litigations (MDLs)*, § 18:47 (5th ed. Jun. 2018 update). The Fifth Circuit has called this the "better view" and held that "transferor courts should use the law of the case

doctrine to determine whether to revisit a transferee court's decision." *Ford Motor Co.*, 591 F.3d at 411; *see also McKay v. Novartis Pharmaceutical Corp.*, 751 F.3d 694, 703 (5th Cir. 2014).

Under this approach, "transferor courts should rarely reverse, because any widespread overturning of transferee court decisions would frustrate the principle [sic] aims of the MDL process and lessen the system's effectiveness." *Id.* At the same time, the law of the case approach allows the transferor court to consider changes in the law or serious errors. *Id.* Justice Ginsburg, then sitting on the District of Columbia Circuit, also endorsed the law of the case approach. *See In re Korean Air Lines Disaster of Sept. 1, 1983*, 829 F.2d 1171, 1176 (D.C. Cir. 1987) (Ginsburg, J.), *aff'd sub nom. Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122 (1989).

There are significant reasons to accord near-preclusive effect to determinations in the transferee court. The MANUAL FOR COMPLEX LITIGATION explains that:

> Although the transferor judge has the power to vacate or modify rulings made by the transferee judge, subject to comity and "law of the case" considerations, doing so in the absence of a significant change of circumstances would frustrate the purposes of centralized pretrial proceedings.

*See* MANUAL FOR COMPLEX LITIGATION (FOURTH) § 20.133 (2017); *see also* Edward Sherman, *When Remand is Appropriate in Multidistrict Litigation*, 75 LA. L. REV. 2, 465 (2014) ("If transferor judges were permitted to upset the rulings of transferee judges, the result would be an undermining of the purpose and usefulness of transfer under section 1407 for coordinated or consolidated pretrial proceedings because those proceedings would then lack the finality (at the trial court level) requisite to the convenience of witnesses and parties and to the efficient conduct of actions.").

In other words, as many courts and commentators have determined, the entire purpose of consolidating actions in a transferee court are for the efficient, orderly, and consistent determination of claims with similar factual and evidentiary issues. As the former Chief Counsel for the J.P.M.L. and Executive Editor for the MANUAL FOR COMPLEX LITIGATION Robert Cahn stated:

> The purpose of 28 U.S.C. § 1407 is to streamline the entire pretrial process by eliminating duplication in discovery, reducing litigation costs, and saving time and effort on the part of the parties, the witnesses and the judiciary. *See In re Plumbing Fixture Cases*, 298 F. Supp. 484, 499 (J.P.M.L. 1968). The clear remedial aim of the statute is "to eliminate the potential for conflicting

4

> contemporaneous pretrial rulings by coordinate district and
> appellate courts in multidistrict related civil actions." *Id.* at 491-
> 92.

Robert A. Cahn, *A Look at the Judicial Panel on Multidistrict Litigation*, 72 F.R.D. 211, 213 (1976). The possibility of multiple conflicting rulings of various transferor courts would undermine the entire purpose of the MDL statute.

   For that reason, many courts have held that generally "[o]rders issued by a federal transferee court remain binding if the case is sent back to the transferor court...." *In re Zyprexa Prod. Liab. Litig.*, 467 F. Supp. 2d 256, 273 (E.D.N.Y. 2006); *see also In re EDNY Cathode Ray Tube Antitrust Cases*, 2017 WL 4351503, *1 (E.D.N.Y. Sept. 29, 2017); *Parkinson v. Novartis Pharm. Corp.*, 5 F. Supp. 3d 1265, 1271-72 (D. Ore. 2014); *Rutz v. Novartis Pharm. Corp.*, 2012 WL 12842794, at *5 (S.D. Ill. Dec. 7, 2012) (refusing to revisit *Daubert* rulings that were litigated and decided in the MDL court); *Deutsch v. Novartis Pharm. Corp.*, 768 F. Supp. 2d 420, 428-29 (E.D.N.Y. 2011). "Indeed, exceptions of the law of the case principle should be especially rare in these circumstances, because refusal to follow the previous ruling would result in the sort of piecemeal decision making that MDL centralization is intended to avoid." *Law of the Case Doctrine and the Effect of Transfer and Remand on Choice of Law*, 15 FED. PRAC. & PROC. JURIS. § 3867 (4th ed.).

   It is certainly within this Court's sound discretion to apply the law of the case as established by the MDL judge. *See McKay*, 751 F.3d at 704. In *McKay*, the Fifth Circuit affirmed the trial court's decision to prohibit a party from relitigating an issue already decided by the MDL judge with arguments the party could have raised originally. *Id.* at 705. The Fifth Circuit reasoned that "[t]he law of the case doctrine requires attention to the special authority granted to the multidistrict transferee judge and ensures that transferor courts respect the transferee court's decisions." *Id.* (quoting *Ford Motor Co.*, 591 F.3d at 411) (internal quotations omitted).

   **B.    "Law of the Case" in the Eleventh Circuit.**

   It is likely that the Eleventh Circuit would support using the law of the case framework to grant preclusive effect to Judge Fallon's orders on liability and the use of the remediation formula to award damages to *Amorin* class members in this case. *See, e.g., In re Camp Lejeune N. Carolina Water Contamination Litig.*, 263 F. Supp. 3d 1318, 1328 (N.D. Ga. 2016) (citing

*Venn v. St. Paul Fire & Marine Ins. Co.*, 99 F.3d 1058, 1063 (11th Cir 1996)), *appeal dismissed*, 2018 WL 3238691 (11th Cir. May 10, 2018). Under law of the case doctrine, the court is bound by prior decisions in the case unless: "'(1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to that issue, or (3) the prior decision was clearly erroneous and would work manifest injustice.'" *Venn*, 99 F.3d at 1063 (quoting *Wheeler v. City of Pleasant Grove*, 746 F.2d 1437, 1440 (11th Cir. 1984)) (quoting *United States v. Robinson*, 690 F.2d 869, 872 (11th Cir. 1982)).

In *In re Justice Oaks II, Ltd.*, 898 F.2d 1544, 1549 n.3 (11th Cir.), *cert. denied*, 498 U.S. 959 (1990), the Eleventh Circuit, adopting earlier Fifth Circuit law, noted that:

> [law of the case] is a rule of practice under which a rule of law enunciated by a federal court "not only establishes a precedent for subsequent cases under the doctrine of stare decisis, but [also] establishes the law which other courts owing obedience to it *must*, and which it itself will, normally, apply to the same issues in subsequent proceedings in the same case."

*Id.* (quoting *Morrow v. Dillard*, 580 F.2d 1284, 1289 (5th Cir. 1978)) (quoting James Wm. Moore, 1B Moore's Federal Practice ¶ 0.404[1] (2d ed. 1974) (footnotes omitted)) (emphasis in original). Thus, "[w]hile the law of the case does not bar litigation of issues 'which might have been decided but were not,' *id.* at 1290, it does require a court to follow what has been decided explicitly, as well as by necessary *implication*, in an earlier proceeding, *id.* (emphasis in original).

Some courts have articulated an additional factor to consider in deciding whether to give preclusive effect to a transferee court's decision – *i.e.*, the degree to which a transferor court analyzed a particular legal issue. *See, e.g., In re Bank of America Wage & Hour Emp't Litig.*, 2010 WL 4180530 (D. Kan. Oct. 20, 2010) (declining to consider order of transferor court as "law of the case" where basis of order "unknown"). In this case, the transferor court analyzed each of the specific issues in dispute extensively and adjudicated them upon a full record and with solid legal support.

6

The fact that Defendants disagree with Judge Fallon's rulings is not tantamount to a showing that the rulings are erroneous, let alone clearly erroneous.[3] In the final analysis, Defendants have failed to present any justification for revisiting those issues now, especially in light of their recalcitrant conduct throughout these proceedings. From the outset, Defendants planned to ignore the complaints properly served on them under The Hague Convention, because "responding to the lawsuit[s] would incur a large amount of attorney's fees and traveling fees."[4] There is no question they were aware of the consequences of defaulting. Defendants were monitoring the litigation against them since inception and were represented by American lawyers since the earliest stages of the litigation. In fact, they knew that "Judge Fallon already issued a warning to Taishan Gypsum. If Taishan Gypsum did not respond to the litigation before September 24, 2009, the judge [would] hold a hearing on September 24, 2009, and issue a default judgment against Taishan Gypsum."[5] Despite this warning, Defendants refused to participate in the litigation. Since all of their assets are located in China and "there is no judicial treaty signed between China and the U.S. on mutual recognition and enforcement of court judgements," Defendants were confident that "the possibility of the U.S. judgments being enforced in China is very low."[6]

However, when faced with a $2.6 million default judgment in *Germano*, Defendants modified their litigation strategy. Taishan Gypsum entered the proceedings in 2010 in an attempt to set aside the defaults on the grounds of excusable neglect, claiming falsely that "it did not respond because it not understand the significance of it and it was ignorant of the U.S.

---

[3] In their Brief to Reject Application of Remediation Damages Formula (ECF No. 98), Defendants go to great lengths to attack the damages formula approved by Judge Fallon, starting with alleged flaws in the *Germano* judgment in 2010, which according to Defendants "grew in several ways," and ultimately conflicted with the opinions of Defendants' damages experts, who the MDL Court found "do not have building damage and cost of repair experience comparable to that of [Plaintiffs' expert] Mr. Inglis." *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2017 WL 1421627, *12 (E.D. La. Apr. 21, 2017). While Defendants dispute the results of the class damages hearing, they have not shown – and cannot show – clear error or manifest injustice.

[4] *See* "Informational Report on the Class Actions Brought by the U.S. Parties Against Taishan Gypsum Company Limited" dated 5/11/2009 (ECF No. 64-3) at 5.

[5] *See* "The Course of Events on Hiring Foreign Law Firms for the Gypsum Board Litigation in the United States" (summarizing information and opinions of various foreign law firms, including the Orrick firm, about the U.S. Chinese Drywall litigation) (attached hereto as Exhibit "A") at 6.

[6] *See* CNBM Voluntary Announcement on Development of Gypsum Board Litigation in the US dated 7/18/2014 (ECF No. 64-5) at 3.

7

legal system."[7] Not only was Taishan aware of this litigation since even before the MDL was formed, but it was "inclined not to respond" and was guided by American counsel from the outset.

After unsuccessfully challenging the defaults entered against Taishan, and after jurisdiction over this Defendant was firmly established through two rulings in the Fifth Circuit,[8] Taishan Gypsum (with support from BNBM) fired its counsel of record (Hogan Lovells) and returned to China in contempt of court. During the period of contempt and Defendants' intentional absence from the proceedings in 2014, the MDL Court certified the *Amorin* class of property owners with claims against Defendants for damages relating to Chinese Drywall. In the class certification order, the MDL Court specifically found that all elements of Rule 23(a) and 23(b)(3) were met.[9]

Thereafter, the MDL Court scheduled a hearing on February 12, 2015, to assess class-wide remediation damages, and it was at this precise point that BNBM appeared for the first time and Taishan returned to the litigation to seek a continuance (which was granted) to prepare for, participate in, and challenge the remediation damages formula proposed by Plaintiffs. In a non-jury evidentiary hearing in the MDL Court on June 9, 2015, Defendants were given meaningful due process and an opportunity to (i) oppose, through *Daubert* motions and cross-examination, Plaintiffs' experts opining on the remediation damages formula, (ii) challenge Plaintiffs' evidence supporting remediation damages, (iii) offer their own experts on damages, and (iv) submit proposed findings of fact and conclusions of law for consideration by the MDL Court.

---

[7] *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 894 F. Supp. 2d 819, 863 (E.D. La. 2012), *aff'd*, 742 F.3d 576 & 753 F.3d 521 (5th Cir. 2014).

[8] *Chinese Drywall*, 742 F.3d 576 & 753 F.3d 521.

[9] *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2014 WL 4809520 (E.D. La. Sept. 26, 2014). As the MDL Court recently held in its denial of Defendants' motion to exclude former owners from the *Amorin* class so as to limit the class to current owners only, "Defendants had the opportunity to participate in sculpting the class definition in 2014," but they "declined" this opportunity. "Moreover, Defendants were put on notice that the definition included both present and former homeowners in 2014 when the Court issued its legal notice and amended legal notice to the class," but "Defendants failed to object." *See* Order and Reasons dated 10/11/2018 [MDL Rec. Doc. 21846] (attached hereto as Exhibit "B") at 11-12.

Despite Defendants' initial decision to stay out of the litigation, despite their refusal to recognize the Court's jurisdiction over them, and despite their subsequent appearance and participation in the class remediation damages hearing in 2015, Defendants repeatedly claim *they* were denied due process in the MDL. "Meanwhile, plaintiffs here—thousands of them— are still without remedy after installing defective Chinese drywalls and suffering from them."[10]

In truth, Defendants' "delay tactics have permeated every aspect of Defendants' litigation strategy: from their initial failure to appear to their now perpetual motions to re-litigate settled matters."[11] Defendants sought on multiple occasions to vacate the defaults against them, they moved to decertify the *Amorin* class, and they requested an immediate appeal of the Class Damages Order as well as the MDL order denying their decertification motion.[12] Most recently, Defendants sought to limit the *Amorin* class to current owners only, taking the unreasonable position that, "if over the course of nine years any of the Plaintiffs named in the *Amorin* complaints no longer own their homes, they should be excluded from the class, notwithstanding the fact that their homes were allegedly damaged by Taishan's Drywall."[13] Indeed, there are many claimants who no longer own their properties, through no fault of their own. Many simply cannot continue living in toxic homes or cannot afford to pay for alternative living expenses. These claimants should not and cannot be penalized as a result of Defendants' efforts to game the system and cause interminable delays.

Thus far, Defendants have been unsuccessful in their efforts "to go back to square one,"[14] however, through their never-ending motion practice Defendants have successfully

---

[10] *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2018 WL 279629, *10 (E.D. La. Jan. 2, 2018).

[11] *Id.* at *9.

[12] *See id.* at *1-2 (describing BNBM's multiple attempts to vacate defaults); *see also* Defendants' Motion to Decertify [MDL Rec. Docs. 20627, 20631, 20632]; MDL Order & Reasons dated 4/21/2017 re Motion to Decertify [ECF No. 80-1] ("Decertification Opinion"); MDL Order & Reasons dated 8/22/2017 [MDL Rec. Doc. 20910] (denying motions to certify Class Damages Order and Decertification Opinion for immediate appeal under Section 1292(b)) ("1292(b) Opinion").

[13] *See* Order and Reasons (Exhibit "B" hereto) at 11. As the MDL Court aptly noted in denying this motion, "[u]nder Defendants' definition, the composition of the class would be ever-changing, and given the glacial speed with which this case has progressed, by the time the case is resolved, there will be very few class members left, if any. Such a construction is untenable and leads to an absurd result." *Id.* at 11-12.

[14] *See Chinese Drywall*, 2018 WL 279629 at *10 (denying motion to vacate defaults); *see also* Decertification Opinion [ECF 80-1]; 1292(b) Opinion [Rec Doc. 20910].

protracted these *Chinese Drywall* proceedings and delayed relief to Plaintiffs in violation of Plaintiffs' due process rights and the paramount mandate of Rule 1 of the Federal Rules of Civil Procedure.[15] Now, Defendants want this Court to revisit and reconsider defaults, class certification, and the remediation damages formula, but there is no justification for said relief. In accordance with the purpose of the MDL statute – to conserve judicial resources – and the well-reasoned decisions that support granting deference to the transferee court's orders, this Court should give entirely preclusive effect to Judge Fallon's rulings on liability and the remediation damages formula applicable to *Amorin* class members. Otherwise, almost ten years of proceedings will have been for naught, and the parties and this Court will likely enter a second decade of litigation.

III.      **CONCLUSION**

The bottom line is that an MDL court, like any federal court, deserves significant deference. Its rulings are subject to review only under the most narrow circumstances. After all, a party to a prior action is generally precluded from relitigating "an issue litigated in a prior proceeding if the issue in the subsequent proceeding is identical to the one involved in the prior action, the issue was actually litigated, and the determination of the issue was necessary in the prior action." *Williams v. Bennett*, 689 F.2d 1370, 1381 (11th Cir. 1982). Given the Defendants' dilatory and obstreperous conduct in this litigation, the substantial due process Defendants have been afforded, the prior adjudication of these issues in the MDL, and the lack of any reason to revisit class certification, Defendants' defaults, or the validity of the remediation damages formula, this Court should grant entirely preclusive effect to the MDL Court's rulings on these issues.

---

[15] *See* Advisory Committee Notes on 2015 Amendments to the Federal Rules of Civil Procedure ("parties share the responsibility to employ the rules [of procedure]" "to secure the just, speedy, and inexpensive determination of every action.").

Dated: October 26, 2018

Respectfully Submitted,

/s/ Patrick S. Montoya, Esq.
Patrick Shanan Montoya
Fla. Bar No. 0524441
Email: Patrick@colson.com
Colson Hicks Eidson
255 Alhambra Circle, PH
Coral Gables, FL 33134-2351
Telephone: (305) 476-7400
Facsimile: (305) 476-7444
*Interim Lead Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Southern District of Florida by using the CM/ECF System, which will send a notice of electronic filing on this 26th day of October, 2018.

/s/ Patrick S. Montoya, Esq.
Patrick Shanan Montoya
Fla. Bar No. 0524441
Email: Patrick@colson.com
Colson Hicks Eidson
255 Alhambra Circle, PH
Coral Gables, FL 33134-2351
Telephone: (305) 476-7400
Facsimile: (305) 476-7444
*Interim Lead Counsel for Plaintiffs*

# EXHIBIT "A"

Case 2:09-md-02047-EEF-JCW Document 21661-13 Filed 06/26/2018 Page 2 of 21

Translation of BNBMPLC-E-0059967-59977

<u>BNBMPLC-E-0059967</u>

## The Course of Events on Hiring Law Firms for the Gypsum Board Litigation in the United States

### I. The Course of Events on Hiring Foreign Law Firms

Background: Since the end of 2008, some homeowners, construction companies, and other companies in the United States have brought lawsuits against multiple Chinese gypsum board manufacturing enterprises in some federal courts and state courts of the United States. Beijing New Building Materials Public Limited Company (abbreviated below as "BNBM PLC") and Taishan Gypsum Company Limited (abbreviated below as "Taishan Gypsum") are listed as defendants in some cases.

### Stage one: Hiring Foreign Law Firms to Issue Legal Opinions

1. After BNBM PLC and Taishan Gypsum were listed as defendants in some of the gypsum board lawsuits in the United States, BNBM PLC responded actively. According to the advice of Chungang Dong, Esq. from Beijing Jingtian & Gongcheng Law Firm (abbreviated below as "Jingtian & Gongcheng"), the Company's legal counsel, he suggested that BNBMPLC should officially appoint a U.S. law firm to provide an official legal opinion to serve as the basis for the official decision. After obtaining information on foreign law firms through various channels, BNBM PLC sent invitation letters to three preliminarily-determined law firms and one U.S. attorney. Among them, three law firms replied.

2. BNBM PLC and its subsidiary Taishan Gypsum discussed the gypsum board lawsuits in the United States, in which BNBM PLC and Taishan Gypsum were involved, with the three candidate law firms on September 10th, 2009 and September 15th, 2009, respectively. The three candidate law firms were Lovells International Law Firm[1] (abbreviated below as "Lovells"), Orrick, Herrington & Sutcliffe LLP (abbreviated below as "Orrick"), and K&L Gates LLP (abbreviated

---

[1] It should be Hogan Lovells. Hogan & Hartson LLP and Lovells merged in May 2010 to become Hogan Lovells. The

MTD Exhibit #186

SONG: Exhibit 331

below as "K&L Gates"). The three candidate law firms each provided the special information they had and their suggestions on the gypsum board litigation in the United States. The minutes of this meeting were provided by Chungang Dong, Esq. at Jingtian & Gongcheng.

**BNBMPLC-E-0059968**

3. On September 22nd, 2009, BNBM PLC and Taishan Gypsum continued the discussion about the candidate law firms for the gypsum board litigation in the United States, and the topic of the discussion was about *Hiring Attorneys for the "Toxic Drywall Event" and Responding to the Default Judgment.* Candidate law firms, Lovells and Orrick, provided the special information each of them had and their suggestions at this meeting.

This meeting solicited the opinions of Tongchun Jia and Gang Zhao at Taishan Gypsum on hiring attorneys. Tongchun Jia's opinions were: 1) according to the instructions of leaders, necessary and limited response to the litigation can be given; 2) at the same time, he thought that Taishan Gypsum was involved in a relatively large number of lawsuits and could not manage the responses to the lawsuits, and that the fees could be very high. He agreed to respond to the hearing on September 24th, and to make further judgments based on the situations after the response; 3) he agreed with the suggestion put forward by Yu Chen at BNBM PLC that the two companies appoint law firms separately and bear the fees on their own.

Gang Zhao's opinion was: for hiring law firms, he suggested to hire one firm, and he was inclined to hire Orrick, because: 1) Orrick paid close attention to the case; 2) there was no problem with their level of professionalism; 3) under the premise that there was no significant difference of the levels of professionalism among the U.S. law firms, Orrick had better attitudes.

4. On October 12th, 2009, the Legal Department of BNBM PLC issued the *Report on Hiring Foreign Lawyers for the Gypsum Board Litigation in the United States*, and reported relevant matters about hiring foreign law firms to provide legal opinions, and etc. This document gives a brief introduction of the three candidate foreign law firms; and, after considering the price offers and comprehensively

analyzing the advantages of the three law firms, BNBM PLC preliminarily decided to have Lovells answer its questions of concern, collect information, provide suggestions and strategies, and issue legal opinions letters.

The price offers of the three law firms are as follows:

K&L Gates: USD 98,500

**BNBMPLC-E-0059969**

Orrick: USD 75,000

Lovells: USD 60,000

**Stage two: Taishan Gypsum retained the law firm**

5. On April 8th, 2010, the time in the United State, Judge Eldon Fallon, a federal district judge in New Orleans, United States, issued an order in the lawsuit of the plaintiffs about the quality issues of the gypsum boards, and ruled that Taishan Gypsum Company Limited (abbreviated as "Taishan Gypsum") pay a sum of USD 2.6 million as the damages to 7 U.S. families. In the teleconference held on April 12th, 2010, BNBM PLC analyzed and discussed with Lovells in depth about the gypsum board litigation in the United States. Daozheng Chen, Esq. from Lovells made a preliminary analysis and judgment on the order.

6. 

7. In the teleconference on June 9th, 2010, CNBM Group, CNBM Co., Ltd., and BNBM PLC discussed the agency agreement; Hogan Lovells briefly introduced its thoughts on the litigation.

8. On June 10th, 2010, according to the results from the discussions on June 3rd and June 9th, Taishan Gypsum and Hogan Lovells signed the agency agreement. It was officially determined that Hogan Lovells would be the law firm to represent Taishan Gypsum in the gypsum board litigation in the United States in which Taishan Gypsum has been involved.

**BNBMPLC-E-0059970**

**Stage three: BNBM PLC retained the law firm**

9. To follow up with the gypsum board litigation in the United States, BNBM PLC considered whether to retain a law firm to provide legal advise. On July 28th, 2010, Attorney Chungang Dong from Jingtian & Gongcheng sent an email on the matter of hiring the law firm by BNBM PLC. In the email, he offered his own suggestions on how to proceed with hiring the law firm while BNBM PLC is following up with the gypsum board litigation in the United States.

According to the suggestions of Attorney Chungang Dong, the Legal Department of BNBM PLC issued the *Second Report on Hiring U.S. Attorneys* on August 12th, 2010, and submitted it together with the *Report on Hiring Foreign Attorneys for the Gypsum Board Litigation in the United States* issued on July 10th, 2010 to the Company's leaders for review. On September 17th, 2010, BNBM PLC signed the confirmation letter for the agency with Orrick, and it was confirmed that BNBM PLC retained Orrick as the legal consultant for the gypsum board litigation in the United States.

**BNBMPLC-E-0059971**

II.    Related Meetings and Contents of Discussions

| **Time of meeting: September 10, 2009 / September 15, 2009** |
| --- |

Case 2:09-md-02047-EEF-MBN Document 21681-23 Filed 06/26/19 Page 20 of 21

| Topic of meeting: U.S. Litigation Involving BNBM Group and Taishan Gypsum |
|---|
| **Attendees:** BNBM PLC: Yu Chen, Zheng Tao, Ziqiang Bian; Taishan Gypsum: Gang Zhao; Shandong Taishan Lantian Law Firm: Guangbin Liang, Esq. ; Jing Tian & Gong Cheng: Chungang Dong, Esq. |

**The following matters mainly involve facts, and the information and opinions provided by various foreign firms are either identical or similar;**

I.   The existing lawsuits on the quality issues of gypsum boards are being heard in the U.S. federal courts and state courts respectively, totaling to more than 1000 cases, of which, the 127 cases accepted by federal courts are being handled as the multidistrict litigation ("MDL") by the federal court in the state of Louisiana. The judge hearing the case is Eldon E. Fallon.

II.   There are additionally hundreds of cases (the specific number is increasing with time) filed in the courts of 26 states, the majority of which are in the state of Florida and the state of Louisiana. There is the possibility that the cases within each state could be heard in consolidation. Therefore, even if all cases were heard in consolidation, there are at least 27 consolidated cases.

III.



IV.   Among all the Chinese enterprises listed as defendants, only the Chinese subsidiaries of KNAUF hired attorneys to participate in the litigation procedure. They have already filed the motion to dismiss, and raised the objection to jurisdiction.

V.



VI.   Judge Fallon already issued a warning to Taishan Gypsum. If Taishan Gypsum did not respond to the litigation before September 24, 2009, the judge will hold a hearing on September 24, 2009, and issue a default judgment against Taishan Gypsum.



BNBMPLC-E-0059972

| **Special Information and Suggestions Provided at the Meeting by the Law Firms and the Opinions of the Company's Legal Consultant** | |
|---|---|
| Lovells: Daozheng Chen, Gaston Fermandez, Ye Yuan | |



Orrick: Xiang Wang, Raymond G. Mullady, Fang Fu

| | |
|---|---|
| | |
| K&L Gates  Yujing Shu, Xianjin Tian, Miao Li, David Klaber, Eric Stone | I. Except for the juridical process, the CSPA and the EPA in the United States also conducted investigations on this case, but there has not been any conclusion as of now. The above agencies have also conducted cooperation with the relevant departments of the Chinese government, and will appoint a delegation group to China in October to conduct joint investigation with the AQSIQ[2] in China. |
| | II. The CSPA in the U.S. demanded that the construction companies shall take mitigation measures such as to fix, replace, or issue refunds to the homeowners' houses involved. Therefore, these construction companies are simultaneously facing pressures from three parties: the homeowners, the court, and the government. For the losses resulted from the above mitigations measures, the construction companies |

**BNBMPLC-E-0059973**

| | |
|---|---|
| | will also ask for indemnities from the manufacturers. |
| | |

_____

[2] General Administration of Quality Supervision, Inspection and Quarantine of the People's Republic of China

| | |
|---|---|
| | ███████████████████████ |
| Jingtian & Gongcheng: Chungang Dong | I. Lovells quoted USD 50,000 for issuing legal opinions about, but not limited to, the five questions consulted. Orrick quoted USD 75,000 (no additional charge for giving legal advice if the firm is retained to handle a case). K&L Gates quoted USD 98,500.<br><br>II. **The main advantage** of Lovells lies in the direct and rich experience possessed by the attorneys at its Chinese offices with regard to U.S. litigations, which allows it to complete the main work in their Chinese office. In addition, Lovells is the highest ranked and most renowned foreign law firm internationally out of the three.<br><br>III. **The main advantage of Orrick** lies in its striking passion and focus on this case. Also, its attorneys stationed in the U.S. also have good channels of communication with the plaintiffs' attorneys.<br><br>IV. **The main advantage of K&L Gates** lies in the fact that this firm has many offices located at the southern states of the U.S. where the lawsuits are congregated. This provides a convenient geographical condition for investigating the situation and communicating with the courts in the United States. Additionally, two of their foreign attorneys have abundant experience in product liability. |

| |
|---|
| **Time of the Meeting: September 22, 2009 (Live meeting + telephone conference)** |
| **Topic of the Meeting: Hiring Attorneys for the "Toxic Drywall Event" and the Response to the Default Judgement** |
| Attendees: BNBM PLC: Yu Chen, Zheng Tao; Taishan Gypsum: Tongchun Jia, Gang Zhao |
| **Main Contents of the Meeting:** |

I. The information acquired from the law firms includes, but is not limited to, 1) the current situation of the case, 2) suggestions from the attorneys, 3) whether response to the hearing proceeding means the acceptance of jurisdiction of the U.S. courts, whether it entails mandatory participation in the subsequent litigation?

II. Solicited opinions from Tongchun Jia and Gang Zhao of Taishan Gypsum about matters on hiring the law firm and responding to the hearing on September 24th.

**Special Information and Suggestions Provided by the Law Firms During the Meeting**

| | |
|---|---|
| Lovells: Daozheng Chen | |
| Orrick: Xiang Wang | |



| | |
|---|---|
| | |
| K&L Gates: Xianjin Tian | None |
| Notes of this Stage | On October 12, 2009, the Legal Department of BNBM PLC issued the *Report on Hiring Foreign Lawyers for the Gypsum Board Litigation in the United States,* |

BNBMPLC-E-0059974

| | |
|---|---|
| | and it was preliminarily decided to have Lovells answer those questions of concern from BNBM PLC, collect information, provide suggestions and strategies, and issue legal opinion letters. |

**Time of the Meeting:** April 12, 2010 (Telephone Conference)

**Main Contents of the Meeting: Preliminary Introduction and Judgement on the Gypsum Board Litigation in the United States**

**Attendees:** BNBM: Yu Chen, Zhucai Chen; Jingtian & Gongcheng: Chungang Dong; Hogan Lovells: Daozheng Chen

**Main Contents of the Meeting:** On April 8, 2010, U.S. time, Eldon Fallon, a federal district court judge in New Orleans, U.S.A., issued an order in the lawsuit of the plaintiffs about the quality issues of gypsum boards. Taishan Gypsum Limited Company (abbreviated as "Taishan Gypsum") was ordered to pay a sum of USD 2,600,000 to 7 families in the United States in compensatory damages. Based on the progress of the case, (the meeting) made preliminary analysis and judgement on the case.

**Judgements and Suggestions Provided by Lovells and the Company's Legal Counsel**

| | |
|---|---|
| Lovells:<br><br>Daozheng | |

| Chen |  |
|---|---|
| Jingtian & Gongcheng: | |

| Chungang Dong |  |
| --- | --- |

**BNBMPLC-E-0059975**



| **Time of the meeting**: June 3rd, 2010 (teleconference) |
| --- |
| **Topic of the Meeting: the Strategy for Responding to the Gypsum Board Litigation in the United States** |

**Attendees**: CNBM Group: Jian Zhang; BNBM PLC: Bing Wang; Taishan Gypsum: Tongchun Jia; Jingtian & Gongcheng: Chungang Dong; and Lovells: Daozheng Chen

**Summary of the meeting:**

I. Mr. Knauf visited Zhiping Song, chairman of the board of directors, and hoped that CNBM Group could offer a helping hand to them in responding to the United States drywall event. The situations that Knauf reported were that the Knauf Company had done some work and that, for the construction companies, for the moment it did not explore the truth of the matter, nor did it divide up liabilities. They cooperated to fix the issue of home renovation, but the small homeowners who did their own decorations were waiting for the result of the litigation. Knauf was worried that their assets would be enforced in the United States. Knauf has 3 factories in the United States, and the main market is in the heat insulating materials. The plaintiffs have formed an attorney team of more than 100 people. Among them, a leadership body of 5 people has been established to negotiate with the defendants about the compensation. The goal of the team of plaintiffs' attorneys is to work hard to have the court make a judgment on 1-2 cases first and set a precedent for the ruling and settlement negotiations of other recent cases. For the judgment made against Knauf, the Knauf Company has appealed, hoping to delay the time and to reduce the amount of compensation.

Chairman Song agreed that CNBM Group should organize the response to the litigation, but the purposes of the response are: 1. for the images of Chinese products and Chinese enterprises; 2. for the friendship with Mr. Knauf of more than 30 years. Reluctant to see the Knauf Company fighting alone; 3. insisting on the position that our products do not have any problems. We should consider the situations as we deal with the litigation. The Company may ask the Knauf Company to help recommend attorneys for us and delay the effectiveness of the judgment.

II.

III.

[3] Fourth? typo

BNBMPLC-E-0059976

**Time of the meeting**: June 3rd, 2010 (teleconference)

**Topic of the meeting: the strategy for responding to the United States gypsum board litigation**

**Attendees**: CNBM Group: Chief (Jianglin) Cao and Jian Zhang; CNBM Co., Ltd.: Zhangli Chang; BNBM PLC: Yu Chen; Taishan Gypsum: Tongchun Jia; and Jingtian & Gongcheng: Chungang Dong

**Summary of the meeting:**

Abstract I: Introduction of the Lovells firm and its strengths after the merger, including Attorney Daozheng Chen, Attorney Weining Yang, the advantages are large scale and strong strengths, the attorneys in Shanghai and Beijing representative offices have strong capabilities, and are convenient in communications and exchanges.

Abstract II: The statistics from the Supreme Court showed that there are a total of 81 subpoenas that were served, involving 48 enterprises.

Abstract III:







**Translation of BNBMPLC-E-0059977**





# EXHIBIT "B"

62552530
Oct 11 2018
06:05PM

File & ServeXpress

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE:  CHINESE-MANUFACTURED DRYWALL          *
PRODUCTS LIABILITY LITIGATION                          *
                                                                              *          **CIVIL ACTION**
                                                                              *
                                                                              *          **MDL NO. 2047**
                                                                              *
                                                                              *          **SECTION L (5)**
THIS DOCUMENT RELATES TO:                              *
ALL *AMORIN* CASES                                            *
                                                                              *

**ORDER & REASONS**

Before the Court is a Notice of Clarification Regarding the Composition of the *Amorin*

Class filed by the Plaintiffs' Steering Committee (the "PSC"). R. Doc. 21741. Defendants have

filed a Motion to Reject the PSC's Notice of Clarification, R. Doc. 21763, to which the PSC has

responded, R. Doc. 21783.

## I.     BACKGROUND

From 2004 through 2006, a housing boom in parts of the United States and rebuilding

efforts necessitated by Hurricanes Rita and Katrina in the Gulf South led to a shortage of

construction materials, including drywall.  As a result, drywall manufactured in China was brought

into the United States and used to construct and refurbish homes in coastal areas of the country,

notably the Gulf and East Coasts.  Sometime after the Chinese drywall was installed, homeowners

began to complain of foul-smelling odors, the corrosion and blackening of metal wiring, surfaces,

and objects, and the breaking down of appliances and electrical devices in their homes.  *See In re*

*Chinese-Manufactured Drywall Prods. Liab. Litig.*, 894 F. Supp. 2d 819, 829–30 (E.D. La. 2012),

*aff'd*, 742 F.3d 576 (5th Cir. 2014).  Many of these homeowners also began to complain of various

physical afflictions believed to have been caused by the Chinese drywall.

These homeowners then began to file suit in various state and federal courts against homebuilders, developers, installers, realtors, brokers, suppliers, importers, exporters, distributors, and manufacturers who were involved with the Chinese drywall. Because of the commonality of facts in the various cases, this litigation was designated as a multidistrict litigation. Pursuant to a Transfer Order from the United States Judicial Panel on Multidistrict Litigation on June 15, 2009, all federal cases involving Chinese drywall were consolidated for pretrial proceedings in MDL 09-2047 before this Court.

The Chinese drywall at issue was largely manufactured by two groups of defendants: (1) the Knauf Entities and (2) the Taishan Entities. The litigation has focused on these two entities and their downstream associates and has proceeded on strikingly different tracks for the claims against each group.[1] Relevant to this Order are the Chinese Defendants. These Defendants include the principal Chinese-based Defendant, Taishan, namely, Taishan Gypsum Co. Ltd. ("TG") and its wholly-owned subsidiary, Taian Taishan Plasterboard Co., Ltd. ("TTP") (collectively "Taishan" or "Taishan Entities"). Other Chinese-based Defendants include China New Building Materials Group ("CNBM Group"), China New Building Materials Co. ("CNBM"), CNBMIT Co. Ltd. ("CNBMIT"), CNBM USA Corp. ("CNBM USA"), and United Suntech Craft, Inc. ("United Suntech") (collectively the "CNBM Entities"), as well as the Beijing New Building Materials

---

[1] The Knauf Entities are German-based, international manufacturers of building products, including drywall, whose Chinese subsidiary, Knauf Plasterboard (Tianjin) Co., Ltd. ("KPT"), advertised and sold its Chinese drywall in the United States. On December 20, 2011, the Knauf Entities and the PSC entered into a global, class Settlement Agreement ("Knauf Settlement Agreement"), which was designed to resolve all Knauf-related, Chinese drywall claims. In addition to the Knauf Settlement Agreement and after a jury trial in a bellwether case, numerous defendants in the chain-of-commerce with the Knauf Entities have entered into class settlement agreements, the effect of which settles almost all of the Knauf Entities' chain-of-commerce litigation. The total amount of the Knauf Settlement is approximately $1.1 billion. Although the Court occasionally had to deal with settlement administration and enforcement issues, with the assistance of Special Master Dan Balhoff, the Knauf portion of this litigation is now resolved.

Public Limited Company ("BNBM") and Beijing New Building Material Group ("BNBMG") (collectively the "BNBM Entities").

The Court's initial inquiry regarding Taishan involved four cases in this MDL: (1) *Germano v. Taishan Gypsum Co.* (Case No. 09-6687); (2) *The Mitchell Co. v. Knauf Gips KG* (Case No. 09-4115); (3) *Gross v. Knauf Gips KG* (Case No. 09-6690); and (4) *Wiltz v. Beijing New Building Materials Public Ltd.* (Case No. 10-361).

The first issues involving Taishan arose when Taishan failed to timely answer or otherwise enter an appearance in *Mitchell* and *Germano*, despite the fact that it had been properly served in each case. Thus, after an extended period of time, the Court entered preliminary defaults against Taishan in both cases. Thereafter, the Court moved forward with an evidentiary hearing in furtherance of the preliminary default in *Germano* on Plaintiffs' claimed damages. At the hearing, the PSC presented evidence specific to seven individual properties, which served as bellwether cases. Thereafter, on February 19 and 20, 2010, the Court issued detailed Findings of Fact and Conclusions of Law. On May 11, 2010, the Court issued a Default Judgment against Taishan in *Germano* and in favor of Plaintiffs.

On June 10, 2010, the last day to timely appeal the Default Judgment against them, Taishan filed a Notice of Appeal in *Germano* and entered its appearance in *Germano* and *Mitchell*. After Taishan entered its appearance in the MDL, it quickly sought to have the Default Judgment in *Germano* and the Preliminary Default in *Mitchell* vacated for lack of personal jurisdiction. Because this was the first time Defendants raised jurisdictional issues, the Fifth Circuit remanded the case to this Court to determine whether this Court indeed has jurisdiction over Taishan.

In the fall of 2010, the Court directed the parties to commence the personal jurisdiction discovery necessary to resolve Taishan's motions to vacate. Sometime after the initial discovery,

3

the parties agreed to expand the discovery beyond the *Germano* and *Mitchell* cases to other cases in which Taishan had been served, including *Gross* and *Wiltz*.

Formal personal jurisdiction discovery of Taishan began in October 2010. Discovery included the production of both written and electronic documents as well as depositions of Taishan's corporate representatives, with each type of discovery proceeding in a parallel fashion. This discovery was highly contentious, requiring close supervision by the Court. The Court presided over regularly-scheduled status conferences, conducted hearings, and issued rulings to resolve numerous discovery-related disputes.

In June 2011, the PSC filed identical complaints in Federal district courts in Florida, Virginia, and Louisiana (the "*Amorin* complaints"). The *Amorin* complaints include all Plaintiffs named in the *Wiltz*, *Gross*, *Abel*, and *Haya* actions. The Florida and Virginia actions were transferred by the JPML to the MDL; the PSC filed the Louisiana omnibus complaint directly into the MDL. It is undisputed that the allegations and Plaintiffs named in the *Amoin* complaints are identical. According to the PSC, these identical complaints were filed "out of an abundance of caution," because "there existed a colorable question regarding the application of the jurisdictional tests known as the 'stream-of commerce' test and the 'stream-of-commerce-plus' test reflected in the plurality opinions in *McIntyre* and *Asahi*, as well as Justice Brennan's concurring opinion in *Asahi*."

In April 2012, Taishan filed various motions, including motions to dismiss for lack of personal jurisdiction. On June 29, 2012, over three years since the creation of this MDL and after a year-and-a-half of personal jurisdiction discovery on Taishan, the Court presided over a hearing on Taishan's motions. The Court coordinated its hearing with the Honorable Joseph Farina of the

Florida state court, who had a similar motion involving Taishan's challenge to personal jurisdiction.

On September 4, 2012, this Court issued a 142-page Order regarding Taishan's motions in *Germano*, *Mitchell*, *Gross*, and *Wiltz*, in which the Court denied the motions to dismiss and held that it maintained personal jurisdiction over Taishan. *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 894 F. Supp. 2d 819 (E.D. La. 2012). The Court also ruled that Taishan was operating as the alter ego of TG and TTP. The Court certified an interlocutory appeal, and the Fifth Circuit granted permission to appeal. In January and May of 2014, two different panels of the Fifth Circuit affirmed this Court's ruling and held that this Court maintained personal jurisdiction over Taishan, TG, and TTP. *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 753 F.3d 521 (5th Cir. 2014); *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 742 F.3d 576 (5th Cir. 2014). The time for writ of certiorari passed, and the issue of personal jurisdiction over Taishan became firmly and finally settled. Nevertheless, Taishan refused to voluntarily participate in this suit.

On June 20, 2014, the Court ordered Taishan to appear in open court on July 17, 2014 to be examined as a judgment debtor. Taishan failed to appear for the July 17, 2014 Judgment Debtor Examination, and the Court held Taishan in contempt, ordering that Taishan pay $15,000.00 in attorneys' fees to Plaintiffs' counsel and $40,000.00 as a penalty for contempt; Taishan and any of its affiliates or subsidiaries be enjoined from conducting any business in the United States until or unless it participates in this judicial process; and if Taishan violates the injunction, it must pay a further penalty of twenty-five percent of the profits earned by the Company or its affiliate who violate the Order for the year of the violation.

On July 23, 2014, the PSC filed their Omnibus Motion for Class Certification pursuant to Rule 23(b)(3). Taishan did not appear and, on September 26, 2014, this Court certified a class of all

owners of real properties in the United States, who are named Plaintiffs on the complaints in *Amorin*, *Germano*, *Gross*, and/or *Wiltz* (*i.e.*, not an absent class member), asserting claims for remediated damages arising from, or otherwise related to Chinese Drywall manufactured, sold, distributed, supplied, marketed, inspected, imported or delivered by the Taishan Defendants. R. Doc. 18028.

Taishan finally entered an appearance with the Court in February 2015, and, to satisfy the contempt, Taishan paid both the sum of $15,000.00 in attorneys' fees to Plaintiffs' counsel and the contempt penalty of $40,000.00 in March 2015. On March 17, 2015, the Court ordered Taishan and the BNBM and CNBM Entities to participate in expedited discovery related to "the relationship between Taishan and BNBM/CNBM, including whether affiliate and/or alter ego status exists."

On March 10, 2016, this Court granted CNBM Group's motion to dismiss, finding it was an "agent or instrumentality of a foreign state" within the meaning of the Foreign Sovereign Immunities Act ("FSIA"), and therefore outside the jurisdiction of this Court under 28 U.S.C. § 1603(b). R. Doc. 20150. The Court determined the tortious activity exception did not apply because the alleged tortious conduct did not occur within the United States under 28 U.S.C. § 1605(a)(5). Further, the Court found the commercial activity exception did not apply, as CNBM Group did not directly manufacture, inspect, sell, or market drywall in the United States. Because the PSC failed to present evidence sufficient to overcome the presumption that CNBM Group was entitled to independent status for purposes of the FSIA, the Court granted the motion and dismissed CNBM Group from the present litigation.

After concluding it lacked personal jurisdiction over CNBM Group, on April 21, 2017, the Court issued a 100-page opinion related to jurisdictional challenges being raised with respect to CNBM, BNBM Group, and BNBM. The Court found Taishan was an agent of BNBM under Florida and Virginia law, such that Taishan's contacts in Florida and Virginia are imputed to

6

BNBM. This Court further found that CNBM, BNBM Group, and BNBM were part of a single business enterprise with Taishan under Louisiana law, such that Taishan's contacts in Louisiana may be imputed to them, and that the Court has jurisdiction over CNBM, BNBM Group, and BNBM in relation to Plaintiffs' claims based on Louisiana law. Also on April 21, 2017, the Court issued its Findings of Fact and Conclusions of Law related to the June 9, 2015 damages hearing and adopted the PSC's damage calculations methodology related to remediation of properties.

On May 22, 2017, Defendants filed a motion pursuant to 28 U.S.C. § 1292(b) to certify an interlocutory appeal from this Court's April 21, 2017 jurisdiction order. Because the Court found the April 21, 2017 Order & Reasons involved a controlling question of law as to which there was substantial ground for difference of opinion, and because the Court further found that an interlocutory appeal might materially advance the ultimate termination of this MDL, on August 4, 2017, the Court certified an interlocutory appeal to the Fifth Circuit pursuant to 28 U.S.C. § 1292(b).

On August 1, 2017, Defendants filed a motion to dismiss for lack of personal jurisdiction following the recent U.S. Supreme Court case of *Bristol-Myers Squibb v. Superior Court of California* ("*Bristol-Myers*"), 137 S. Ct. 1773 (2017). Based on *Bristol-Myers*, Defendants contested this Court's findings of personal jurisdiction, class certification, and agency relationship. On August 14, 2017, Defendants filed a petition for permission to appeal pursuant to 28 U.S.C. § 1292(b) in the Fifth Circuit, in which they argued *Bristol-Myers* impacted questions raised on appeal. On August 24, 2017, this Court vacated its 28 U.S.C. § 1292(b) certification order to avoid piecemeal litigations, noting its duty to address the effect of *Bristol–Myers* on the jurisdictional issue before certifying the matter to the Fifth Circuit. Subsequently, on November 30, 2017, the

Court denied Defendants' motion to dismiss, holding *Bristol-Myers* did not change this Court's jurisdictional findings and class certification.

On January 2, 2018, the Court denied Defendants CNBM, BNBM Group, and BNBM's motion to vacate the default judgments against them. On March 5, 2018, the Court reinstated its order to certifying the interlocutory appeal of its April 21, 2017 order. The Court nevertheless denied Defendants' request to certify the interlocutory appeal of its opinion involving *Bristol–Myers*' impact on the Court's personal jurisdiction analysis, as the Supreme Court's opinion in *Bristol–Myers* does not address class actions and because two separate panels of the Fifth Circuit had already affirmed the Court's original personal jurisdiction analysis with respect to Taishan in 2014. This issue remains with the Fifth Circuit.

On August 28, 2018, the PSC filed a "Notice of Clarification Regarding the Composition of the *Amorin* Class." R. Doc. 21741. On September 6, 2018, the CNBM and BNBM Entities filed a motion to reject the PSC's clarification, arguing that, although the PSC styled its memorandum as a "notice," it was in actuality a proposed modification to the class definition. R. Doc. 21763. The PSC filed its response on September 18, 2018. R. Doc. 21783.

## II. THE PRESENT MOTION

The issue before the Court is whether the *Amoin* Class includes both current and former owners of homes affected by Chinese drywall. Although the Court initially certified the class in 2014, the issue was raised for the first time with the Court during a motion hearing held on August 15, 2018. R. Doc. 21709. During this hearing, at which the Court heard oral argument on the parties' proposed trial plans, counsel for Defendants distinguished between remediation and non-remediation damages, explaining:

8

Non-remediation damages covers other categories of damages that could still be considered property damage, but—and are not "personal injury damages." It includes personal injuries, alternative living expenses, loss of use and enjoyment, appliances, foreclosure, bankruptcy, short sale. There's a whole laundry list.

The distinction between remediation and non-remediation is important because this Court certified a class for remediation damages only, and this Court has also identified a formula that can be used for current owners only for remediation damages only. And I will get into why even that isn't quite as simple as it sounds.

But at this point, your Honor, the current owner remediation damages is actually a very small aspect of this case now, because in the original claimants and plaintiffs that came to the court, many have sold the properties so they're former owners now, and many have already remediated their properties and so they're outside of the class. The majority of this case, of the claimants in this case, your Honor, at this point are outside of the class.

*Id.* at 9:8–25. After hearing from Defense counsel, the Court addressed the issue with counsel for

Plaintiffs:

THE COURT: Let me ask you one question. The class they say include—does not include all owners, it just includes the present owners.
MR. LEVIN: It just included current owners at the time, yes. But you can take your findings and apply them to everybody else.

*Id.* 32:3–8. Following this exchange, the Court did not discuss the issue further at the hearing.

Thereafter, on August 28, 2018, the PSC filed a "Notice of Clarification Regarding the Composition of the *Amorin* Class." R. Doc. 21741. In its notice, the PSC clarifies that the *Amorin* Class includes both present and former homeowners whose homes were adversely affected by Chinese Drywall manufactured, sold, distributed, supplied, marketed, inspected, imported or delivered by the Taishan Defendants. In support of its clarification, the PSC points to the Class Notice and Supplemental Class Notice, which state that the *Amorin* Class "includes *all current and former owners* of properties in the United States containing drywall manufactured by [the Taishan] defendants …." R. Doc. 18028-1 at n.2 (emphasis added); R. Doc. 18086-18 at n.2 (emphasis added).

9

On September 6, 2018, the CNBM and BNBM Entities filed a motion to reject the PSC's clarification. R. Doc. 21763. They argue the phrase "all owners" limits the class definition to only those who currently own their homes. According to Defendants, any person who was a class member but subsequently sold her home or lost the home to foreclosure or bankruptcy is no longer a member of the *Amorin* class. In support for their position, Defendants argue the Court certified the class for present owners only, and only with respect to remediation damages. Thus, according to Defendants, the PSC's notice is an attempt to amend the class definition, which requires the Court to undergo a separate analysis to expand the class definition under Rule 23.

The PSC filed its response on September 18, 2018. R. Doc. 21783. They argue Defendants' position with respect to who is included in the class definition is inequitable, as it would reward Defendants for their dilatory tactics in this litigation. The PSC further contends that, under Louisiana law, a former owner of real property maintains the right to sue a tortfeasor for damages, even after the owner sells the property in question. R. Doc. 21783 at 2 (citing *Eagle Pipe & Supply, Inc. v. Amerada Hess Corp.*, 79 So. 3d 246, 256 (La. 2011)).

## III.    DISCUSSION

The Court must first determine whether the PSC's filing is, in fact, a clarification of the class' definition, or if the Court should construe it as a motion to amend the class definition, as Defendants contend. When called upon to determine the scope of an already certified class, "the district court construes the language of the class definition in much the same way that a court might construe the language of a contract or a statute." *In re Cement and Concrete Antitrust Litig.*, 817 F.2d 1435, 1443 (9th Cir. 1987), *rev'd on other grounds by California v. ARC Am. Corp.*, 490 U.S. 93 (1989).

The language at issue in this case is:

10

> [A]ll owners of real properties in the United States, who are named Plaintiffs on
> the complaints in *Amorin*, *Germano*, *Gross*, and/or *Wilz* (*i.e.,* not an absent class
> member), asserting claims for remediated damages arising from, or otherwise
> related to Chinese Drywall manufactured, sold, distributed, supplied, marketed,
> inspected, imported or delivered by the Taishan Defendants.

A plain reading of this language includes any homeowner named in the *Amorin*, *Germano*, *Gross*,
and/or *Wilz* complaints whose home was damaged by Chinese Drywall manufactured, sold,
distributed, supplied, marketed, inspected, imported or delivered by the Taishan Defendants—
having sold or otherwise lost possession of the home does not change the fact that the person's
home was damaged by Chinese Drywall.

The Class Notice and Supplemental Class Notice, which state that the *Amorin* Class
"includes *all current and former owners*" make this point clear. R. Doc. 18028-1 at n.2 (emphasis
added); R. Doc. 18086-18 at n.2 (emphasis added). *See cf. Carlough v. Amchem Prods., Inc.*, 158
F.R.D. 314, 334 (E.D. Pa. 1993) ("The objectors are incorrect in asserting, however, that the
additional information included in the notice, identifying specific asbestos-containing products,
further describing what constitutes "occupational exposure," and listing relevant occupations, is
inconsistent with the definition of the class as preliminarily certified."). Thus, although a district
court possesses "broad authority to redefine the class 'as appropriate in response to the progression
of the case,'" a modification of the class definition is not necessary in this case. *See, e.g.*,
*Montelongo v. Meese*, 803 F.2d 1341, 1352 (5th Cir. 1986) (quoting *Richardson v. Byrd*, 709 F.2d
1016, 1019 (5th Cir. 1983)).

Defendants apparently take the position that, if over the course of nine years any of the
Plaintiffs named in the *Amorin* complaints no longer own their homes, they should be excluded from
the class, notwithstanding the fact that their homes were allegedly damaged by Taishan's Drywall.
Under Defendants' definition, the composition of the class would be ever-changing, and given the

11

glacial speed with which this case has progressed, by the time the case is resolved, there will be very few class members left, if any. Such a construction is untenable and leads to an absurd result. *See Waggoner v. Gonzales*, 488 F.3d 632, 638 (5th Cir. 2007) ("[T]he common mandate of statutory construction [is] to avoid absurd results.").

With their motion, Defendants effectively seek to significantly narrow the scope of the *Amorin* class. Defendants had the opportunity to participate in sculpting the class definition in 2014, an opportunity they declined. Moreover, Defendants were put on notice that the definition included both present and former homeowners in 2014 when the Court issued its legal notice and amended legal notice to the class, to which Defendants failed to object. R. Doc. 18214. The Court will not amend the class definition to exclude those who have lost their homes at this late date.

## IV.    CONCLUSION

For the foregoing reasons, the Court **ACCEPTS** the Plaintiffs' Steering Committee's notice clarifying the composition of the *Amorin* class. R. Doc. 21741. As a result, the CNBM and BNBM entities' motion to reject the Plaintiff's Steering Committee's notice is **DENIED**. R. Doc. 21763.

New Orleans, Louisiana on this 11th day of October, 2018.

_____
Eldon E. Fallon
United States District Judge