# EXHIBIT 19

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| **EDUARDO AND CARMEN AMORIN**, *et al.*, individually, and on behalf of all others similarly situated, | |
| **Plaintiffs,** | **Case No. 1:11-CV-22408-MGC** |
| **v.** | |
| **TAISHAN GYPSUM CO., LTD.** f/k/a **SHANDONG TAIHE DONGXIN CO., LTD.; TAIAN TAISHAN PLASTERBOARD CO., LTD.**, *et al.*, | |
| **Defendants.** | |

### PLAINTIFFS' BRIEF IN RESPONSE TO DEFENDANTS' SUPPLEMENTAL BRIEF ADDRESSING LIABILITY AS TO BNBM PLC

I.    **INTRODUCTION**

In response to the Court's order requesting that the parties submit briefs on the question of whether this Court should "give entirely preclusive effect to Judge Fallon's findings of liability and apply the remediation formula he adopted," ECF No. 91, Defendant BNBM PLC ("BNBM") instead denies there is any order in which Judge Fallon has found it liable. BNBM ignores the numerous orders in which the MDL Court found that all Defendants, including BNBM, were defaulted as to each Plaintiff. Most notably, BNBM ignores the MDL Court's Order denying Defendants' Motion to Vacate the Default Judgments and the MDL Court's order denying Defendants' Motion to Decertify the Class where Judge Fallon rejected the very same arguments being made by BNBM here – *i.e.*, there was no default entered against BNBM, Plaintiffs are trying to bootstrap defaults against some Defendants and apply them to others, there is no such thing as a preliminary default judgment, etc.[1] BNBM offers nothing new in its Supplemental Brief on Liability.

---

[1] *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2018 WL 279629, at \*10 (E.D. La. Jan. 2, 2018) (denial of motion to vacate defaults); Order & Reasons re Motion to Decertify dated 4/21/2017 (ECF No. 80-1) ("Decertification Order"), at 10, 12; *see also* Memorandum of Law in Support of Defendants' Motion to Vacate Preliminary Defaults [MDL Rec. Doc. 21050-1] (attached hereto as Exhibit "A") at 1-2, 4-5 (illustrating arguments made by Defendants, including BNBM).

It is no wonder that BNBM used the Court's request for briefing on the question of preclusive effect to refile and reargue its contention that it cannot be held liable under the default judgments that have been entered, because BNBM has done so at every turn including, most recently, in its Motion to Enforce Trial Rights filed in this Court.[2] ECF No. 67 ("BNBM's Trial Rights Motion"). Once again, BNBM seeks to exploit the unorthodox procedural route this litigation has taken without so much as giving a nod to the fact that each and every procedural anomaly that occurred in this case was caused, in some fashion, by its own misconduct.

BNBM is liable in this Florida *Amorin* action in two ways. First, it is liable because the MDL Court found that Taishan was an agent of BNBM under Florida law.[3] The MDL Court's agency finding is on appeal in the Fifth Circuit and is not before this Court at this time.[4] Second, BNBM is liable in this Florida *Amorin* action directly as a result of its sales of defective drywall it manufactured in Florida.[5] Liability on that claim was established by default, and that is the finding that should be given preclusive effect by this Court.[6]

---

[2] BNBM suggests something nefarious on the part of Plaintiffs for referring to the defaults as "default judgments." *See* ECF No. 97 at 7. Then, BNBM acknowledges that Judge Fallon himself referred to them as "preliminary default judgments" but tries to make a guess as to what Judge Fallon was thinking by using that description. *See* BNBM Supp'l Brief at 7 n.4. BNBM made this same argument to Judge Fallon, who found that while not a final judgment because damages were yet to be determined, the defaults were final and preclusive as to liability and causation. *See* Decertification Order [MDL No. 80-1], at 12; *see also* Exhibit "A" hereto (Memorandum of Law in Support of Defendants' Motion to Vacate Preliminary Defaults), at 4-5; *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2018 WL 279629 (not discussing BNBM's "there is no such thing as a 'preliminary default judgment' argument").

[3] *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2017 WL 1476595, at *46 (E.D. La. Apr. 21, 2017) ("Jurisdiction Order"). The parent entity of Taishan Gypsum and BNBM is CNBM. In its Jurisdiction Order, the MDL Court granted CNBM's motion for dismissal from this *Amorin* Florida action on the grounds that CNBM did not have an agency relationship with Taishan. *See id.*

[4] *See In re Chinese Manufactured Drywall Prod. Liab. Litig.*, No. 18-30742 (5th Cir.).

[5] *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2017 WL 1476595, at *42-46.

[6] Further, during this litigation, BNBM purchased 100% of Taishan's shares, which results in BNBM ultimately being liable for any debt Taishan incurs. On October 13, 2015, CNBM publicly announced, through the Hong Kong Stock Exchange, a Framework Agreement between BNBM and Taishan Gypsum's minority shareholders pursuant to which "BNBM will directly and indirectly hold 100% equity interest in Taishan Gypsum." *See* 10/13/15 CNBM Announcement: Acquisition of Equity Interest in Taishan Gypsum Through Share Issuance of BNBM [MDL Rec. Doc. 21641-49] (attached hereto as Exhibit "B"). The machinations involved in BNBM's ultimate acquisition of Taishan in October 2016, which resulted in its complete and total control of the company, are described at length

BNBM deconstructs every decision the MDL Court made hoping that if it hyper-focuses on one piece at a time, it can get the Court to undo not only the initial default decisions but all of the decisions that followed where the MDL Court acknowledged that all of the Defendants, including BNBM, were in default as to all of the Plaintiffs. The MDL Court's treatment of all of the Defendants as defaulted in each case is not haphazard, as BNBM suggests, but was a conscious decision to hold all Defendants who were named in three, identical protective actions filed in three separate jurisdictions and then transferred to the MDL for consolidated proceedings liable for their recalcitrant behavior, failure to appear, active avoidance of the litigation and thwarting of attempts to have their subsidiary, Taishan Gypsum, participate in the case.

BNBM's argument ignores that:

- the *Amorin* complaints are identical, protective actions filed in three different jurisdictions with all of the same parties;

- the *Amorin* class that was certified was a nationwide class that included all Plaintiffs in each jurisdiction;

- defaults have been entered against all Defendants on behalf of all Plaintiffs that are before the Court;[7]

- the defaults were entered by the Transferee Court, which had jurisdiction to enter those defaults at the time they were entered, and those defaults were proper; and

- the MDL Court considered Defendants' argument that liability wasn't established because each Defendant was not defaulted in each case and rejected that argument, noting that what was important was that each Defendant had been defaulted in at least one *Chinese Drywall* Omnibus action in the MDL.[8]

---

in the Plaintiffs' Steering Committee's Supplement to Omnibus Response in Opposition to Defendants' Motion to Dismiss [MDL Rec. Doc. 20585-2].

[7] *Id.*; *see, e.g.*, Amended Order on Third Omnibus Motion for Preliminary Default Judgment (ECF No. 80-2); Amended Order on Fourth Omnibus Motion for Preliminary Default Judgment (ECF No. 80-3); Amended Order on Fifth Omnibus Motion for Preliminary Default Judgment (ECF No. 80-4).

[8] *See* Decertification Order (ECF No. 80-1), at 10, 12.

In addition, BNBM's claim that it did not participate in the litigation prior to its formal entry of appearance ignores the facts of record:

- First, BNBM deliberately refused to accept service of *Chinese Drywall* complaints in these proceedings in accordance with its carefully planned litigation strategy made in consultation with American attorneys to avoid paying for any damages caused by Chinese Drywall;[9]

- On May 28, 2010, BNBM announced to its shareholders that "it had been served with notice of the allegations against the company concerning defects in its Chinese Drywall, but rather than respond to the lawsuits, '[t]he Company and Taishan Gypsum w[ould] continue to keep an eye on the progress of the incident'";[10] and

- BNBM deliberately refused to answer the complaints in this litigation knowing that default judgments would be entered, because "according to the US and Chinese lawyers whom BNBM and Taishan Gypsum have respectively consulted, there is no convention or treaty on mutual recognition and enforcement of judgments between China and the US such that the possibility of the US judgments being enforced in China is very low."[11]

The Court should consider the defaults entered by the Transferee Court to be preclusive for all the reasons set forth in Plaintiffs' Response Brief in Support of This Court Giving Preclusive Effect to Judge Fallon's Findings of Liability and Application of the Remediation Damages Formula ("Plaintiffs' Response Brief on Preclusive Effect") (ECF No. 99), along with the discussion of the defaults themselves contained in Plaintiffs' opposition to

---

[9] *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2018 WL 279629, at *7 (E.D. La. Jan. 2, 2018) ("these entities have refused to accept service at various points in this history of this litigation," but they "received notice of this action and had sufficient time to present their defense—but they did not.").

[10] *Id.*, *citing* BNBM Announcement No. 2010-009 in Relation to Event about Gypsum Board in US dated 5/28/2010 ("So far as is known to the Company, the aggregate number of this kind of complaints [referring to gypsum board of BNBM] is approximately 3,000.").

[11] *See* CNBM Voluntary Announcement on Development of Gypsum Board Litigation in the US dated 7/18/2014 (ECF No. 64-5) at 3 ("based on information currently available to the Company, the Company believes that the US courts' judgments will not result in significant economic loss to the Group and will not have material adverse impact on the Group's production and operation.") (emphasis added).

BNBM's Trial Rights Motion (ECF No. 80). For the sake of brevity, Plaintiffs will not reiterate each and every argument here but instead will focus on a few issues raised by BNBM.

In particular, BNBM mistakenly asserts that Plaintiffs argue that the MDL Court consolidated all three *Amorin* actions into one; mistakenly asserts that Plaintiffs are seeking to transfer (or as they previously called it "bootstrap") defaults from one Defendant to another; and falsely pretends that its conscious choice to avoid the jurisdiction of the United States' courts because it believed a judgment could not be enforced against it in China is irrelevant to the default issue.

## II.  RELEVANT BACKGROUND

BNBM's involvement in this litigation began at the outset. In September, 2009, BNBM and its subsidiary Taishan discussed the *Chinese Drywall* lawsuits with American attorneys, including Orrick.[12] After an initial bellwether trial was held and Taishan was found liable (*In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 706 F. Supp. 2d 655, 712 (E.D. La. 2010)), Taishan's parent companies CNBM and BNBM arranged for Taishan to retain Hogan Lovells and enter its appearance in the MDL solely for the purpose of contesting jurisdiction and opening the default judgments. On September 17, 2010, "BNBM PLC retained Orrick as the legal consultant for the gypsum board litigation in the United States."[13] Following significant jurisdictional discovery and extensive briefing, the district court issued a comprehensive jurisdictional opinion finding jurisdiction to be proper over Taishan under due process and in accordance with Florida, Louisiana, and Virginia law. The MDL Court also refused to vacate the default judgments against Taishan and found that that Taishan and its wholly-owned subsidiary TTP were alter egos.

Faced with having to pay a judgment, the BNBM and CNBM Entities devised a plan for Taishan to fire its counsel of record (Hogan Lovells) and refuse to appear in open court for a judgment debtor examination. The MDL Court entered a civil and criminal contempt order and injunction enjoining Taishan and its affiliates and subsidiaries from conducting any

---

[12] *See* "The Course of Events on Hiring Foreign Law Firms for the Gypsum Board Litigation in the United States" (attached as Exhibit "A" to Plaintiffs' Response Brief on Preclusive Effect, ECF No. 99-1) at 1-3.

[13] *Id.* at 4.

business in the U.S. until or unless Taishan participated in this judicial process.[14]  In violation of the Contempt Order, Taishan's affiliates blatantly continued to do business in the U.S. during the period of time that Taishan was in contempt of court.[15]

Meanwhile, during the time that the jurisdictional briefing occurred in the MDL, from 2010-2012, there existed a colorable question regarding the application of the "stream-of-commerce" and the "stream-of-commerce-plus" jurisdictional tests.  *See Asahi Metal Industry Co., Ltd. v. Superior Court of California*, 480 U.S. 102 (1987) and *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873 (2011).[16]  Accordingly, Plaintiffs filed three identical *Amorin* class action Omnibus complaints in Louisiana,[17] Florida,[18] and Virginia,[19] as protective actions designed to perfect claims against Taishan, as well as its parent entities BNBM and CNBM.  The Florida and Virginia *Amorin* Complaints were transferred by the JPML to the MDL.  The *Amorin* complaints[20] included all Plaintiffs who previously had been named in various Omnibus complaints (along with their complaints in intervention).[21]

---

[14] *See* Contempt Order and Injunction imposing penalties on Taishan and awarding attorneys' fees to Plaintiffs for Defendants' refusal to appear in open court for a judgment debtor examination (ECF No. 64-7).

[15] *See* Transcript of MDL Proceedings dated 3/2/2017 concerning Plaintiffs' Motion to Enforce the Contempt Order and Injunction (ECF No. 64-8) at 33:19-82:13.

[16] Most recently, the differences in the application of these two tests was on display in *Align Corp. Ltd. v. Boustred,* No. 16SC448, 2017 WL 7208133 (Colo. Sup. Ct. Nov. 13, 2017), *cert. denied,* 2018 WL 1142978 (U.S. June 11, 2018), wherein the United States Supreme Court refused to accept the matter for review at the very end of its last term.

[17] *Amorin, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al.,* No. 11-1395 (MDL Omnibus XVI) (Louisiana *Amorin* Complaint).

[18] *Amorin, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, No. 11-1672 (MDL Omnibus XV) (Florida *Amorin* Complaint).

[19] *Amorin, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, No. 11-1673 (MDL Omnibus XVII) (Virginia *Amorin* Complaint).

[20] The Plaintiffs in each *Amorin* complaint are identical, such that the Florida *Amorin* Complaint includes Plaintiffs owning properties in Louisiana and Virginia (and other states), the Louisiana *Amorin* Complaint includes Plaintiffs owning properties in Florida and Virginia (and other states), and the Virginia *Amorin* Complaint includes Plaintiffs owning properties in Florida and Louisiana (and other states).

[21] *See, e.g., Kenneth and Barbara Wiltz, et al. v. Beijing New Building Materials Public Limited Co., et al.*, No. 10-361 (E.D. La.) (Omnibus II); *Gross, et al. v. Knauf Gips, KG, et al.*, No. 09-6690 (E.D. La.) (Omnibus III); *Kenneth Abel, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, No. 11-080 (E.D. La.) (Omnibus VII); *Richard and Constance Almeroth, et al.* v. *v. Taishan Gypsum Co., Ltd.,*

Because all of the *Amorin* actions were pending before the Transferee Court, there were no questions with respect to Judge Fallon's authority to issue orders in all three cases. On July 1, 2014, Judge Fallon granted Plaintiffs' Third, Fourth and Fifth Omnibus Motions for Preliminary Default Judgment. *See* Default Order (ECF No. 80-2); Default Order (ECF No. 80-3); Default Order (ECF No. 80-4). In those orders, Judge Fallon sought to align the proper Plaintiffs with the proper Defendants by generally finding that "Plaintiffs [we]re awarded preliminary default judgments against the defendants with whom they are aligned . . . ." In specifically defaulting certain Defendants in one of the three *Amorin* cases (*i.e.*, Louisiana, Florida and Virginia), Judge Fallon issued a default judgment as to BNBM in the *Amorin* action originally filed in the Eastern District of Virginia (*see* ECF No. 80-3, at Ex. C) and as to BNBM of America and BNBM USA in the *Amorin* action originally filed in the Southern District of Florida (*see* ECF No. 80-4, at Ex. B).

Subsequently, on September 26, 2014, the MDL Court certified the *Amorin* class, defining it as: all Plaintiffs named on an Omni complaint as of the date *Amorin* was filed directly into the MDL; and all Plaintiffs named in identical *Amorin* complaints filed in Florida and Virginia federal district courts and transferred to the MDL (collectively, the "*Amorin* class"). *See Chinese Drywall*, 2014 WL 4809520, at *16 (E.D. La. Sept. 26, 2014). Once the *Amorin* class was certified, there was no reason to enter additional defaults since every member of the certified *Amorin* class had a default judgment as to liability with respect to each Defendant. *See id.* at *15, ¶ 71 ("Because the only claims at issue here are against default judgment defendants, and because the Court has already found sufficient facts to establish the causation issue associated with these types of claims, all that is required is an assessment of damages. Liability is conceded by default. Accordingly, the Court will establish class-wide damages pursuant to Rule 55(b)(2)(B).").

After the *Amorin* class was certified, the MDL Court scheduled a non-jury evidentiary hearing to assess class damages. *See Chinese Drywall*, 2014 WL 4809520 (certifying class); *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2017 WL 1421627, at *5 (E.D. La. Apr. 21, 2017) (discussing hearing). On the day of that hearing in February 2015, BNBM entered an

---

*f/k/a Shandong Taihe Dongxin Co., Ltd., et al.,* No. 12-0498 (E.D. La.) (Omnibus XIII); *Laura, Daniel and Irene Haya, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al.,* No. 11-1077 (E.D. La.) (Omnibus IX).

appearance for the first time and requested a continuance of the class damages hearing. Shortly thereafter, Taishan and TTP returned to the litigation and paid the outstanding judgment, plus fines, and BNBM Group and the CNBM entities appeared the litigation for the first time. On June 9, 2015, Taishan, BNBM, and their parent companies participated in the non-jury class damages hearing.

Since that time, the Defendants sought to relitigate seemingly every issue in the case including raising the same issues they raise here with respect to defaults on multiple occasions. In seeking to decertify the class, Defendants argued that "[b]ecause 'at least one defendant has not defaulted in each of the relevant actions,' . . . each non-defaulting Defendant is entitled to address individual questions of liability and causation." Decertification Order (ECF No. 80-1), at 10. In denying the motion to decertify, the MDL Court noted that "each of the defendants have defaulted in at least one action." *Id*. at 12. In addition, in denying Defendants' contentions that the defaults were not "final judgments," the MDL Court noted that it had "already held that Findings of Fact and Conclusions of Law have a preclusive effect in this class proceeding." *Id*.

With respect to the ongoing efforts of CNBM and BNBM to contest jurisdiction over them, the Court entered an Order and Reasons on April 21, 2017, holding that (i) CNBM, BNBM Group, BNBM, and Taishan operate as a single business enterprise under Louisiana law, (ii) Taishan and BNBM are agents under Virginia and Florida law, and (iii) there is jurisdiction over BNBM under Florida law for its manufacture and sales of BNBM Dragon board in Florida. *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2017 WL 1476595, at *46-47 (E.D. La. Apr. 21, 2017). With respect to jurisdiction over BNBM directly, the MDL Court premised that jurisdiction on activity of BNBM of America dating back to 2000 through the period when BNBM of America was winding down and BNBM directly sold its drywall to customers in Florida between 2004-2006. *See id*. at 42

## III. ARGUMENT

### A. The MDL Court Did Not Impermissibly Blend All Three *Amorin* Actions.

Despite Defendants' mischaracterization, Plaintiffs make no claim that Judge Fallon "fused" the three *Amorin* actions together nor do Plaintiffs claim that default as to one entity

8

or in one action should be "transferred" or "bootstrapped" to a different entity in a different action. The MDL Court's default findings simply recognize the realities of the litigation.

The *Amorin* action was initially a putative class action pending in Louisiana on behalf of a nationwide class of homeowners who had defective drywall in their homes. Plaintiffs became concerned about potential jurisdictional issues that could arise so additional *Amorin* complaints were filed in Florida and Virginia to protect Plaintiffs against a potentially adverse jurisdictional ruling. The cases were transferred through the MDL process to Louisiana so that the transferee judge, Judge Fallon, properly presided over all three identical complaints with identical parties and identical claims.

Unlike the cases cited by Defendants for the unremarkable proposition that actions transferred to an MDL retain their individual nature, the three *Amorin* cases were inextricably intertwined from the beginning. In addition, because all three complaints in all three jurisdictions asserted claims on behalf of a nationwide class, there was complete overlap of the classes. Prior to class certification, Plaintiffs obtained defaults as to each Defendant in different jurisdictions (thereby obtaining a default against each Defendant on behalf of each Plaintiff) but not as to each Defendant in all three jurisdictions. There is no argument that Judge Fallon did not have authority as the transferee judge to enter those defaults.

Subsequently, Judge Fallon was faced with Plaintiffs' motion for class certification and determined that, as to liability, it had been established because each Defendant, including BNBM, had been defaulted in at least one action meaning that each Defendant had been defaulted against each class member.[22] At the time of the class certification, even BNBM does not argue that Judge Fallon lacked the authority to enter separate default orders as to each Defendant in each case. However, Judge Fallon clearly decided that it was not necessary to do so because in certifying the nationwide class, there had already been a default against each Defendant on behalf of each Plaintiff. BNBM cannot point to any law that says this prudent decision, within the power of the transferee court, is void.

---

[22] *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2014 WL 4809520, at *10 ("Because of the default judgments, liability is conclusively established, and the Court need only determine whether it is appropriate to certify a class under Rule 23 to determine class-wide damages pursuant to Rule 55(b)(2)(B).").

BNBM acknowledges as much when it says that if Plaintiffs wanted to have all three *Amorin* actions considered one for purposes of default, they could have filed only one complaint instead of three. ECF No. 97, at 6. What BNBM fails to acknowledge is that ***there is one complaint*** filed, except that it was filed three times for the sole purpose of protecting claimants from the potential of an adverse jurisdictional ruling. Considering the nationwide class, BNBM is correct that one complaint in one jurisdiction could have been enough, except that BNBM itself keeps arguing that federal courts lack the power to certify a nationwide class. *See, e.g.*, ECF No. 97, at 6 n.2. Again, with the recurring recalcitrant behavior of all Defendants, including BNBM, Plaintiffs prudently took the more cautious approach to avoid even further complication. To avoid any potential problems associated with the variances in state law, Judge Fallon ultimately treated all three cases as separate for purposes of remand but with each containing the attributes of the certified class.

Recognizing that BNBM was defaulted as to each Plaintiff in a nationwide class is not the same as transferring the default against them from one jurisdiction to another. BNBM continues to push that Plaintiffs are ascribing actions to the MDL Court that, according to BNBM, it did not take. However, BNBM fails to mention that they made these same arguments to the MDL Court, and they were expressly rejected multiple times establishing the validity of Plaintiffs' interpretation of the Court's intent.[23]

### B.   BNBM Actively Participated in the Litigation from the Outset and Sought to Thwart the Administration of Justice.

Defendants surprisingly challenge Plaintiffs' citation to *In re Bush*, 62 F.3d 1319, 1324-25 (11th Cir.1995), and claim that *Bush* deals with "a narrow exception applicable in bankruptcy cases." ECF No. 97, at 8. In *Bush*, the Eleventh Circuit discussed whether a default could satisfy the "actually litigated" prong of the collateral estoppel doctrine and while it did so in the context of a bankruptcy case, there is nothing about the court's opinion that suggests its reasoning was limited to bankruptcy cases. *See Bush*, 62 F.3d at 1325-26. In fact, the opposite is true. In its analysis, the Eleventh Circuit noted with approval the district court's reliance upon a non-bankruptcy case. *See id.* at 1325 (citing *Overseas Motors, Inc. v.*

---

[23] *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2018 WL 279629, at *10; Decertification Order (ECF No. 80-1), at 10, 12; *see also* Exhibit "A" hereto (Memorandum of Law in Support of Defendants' Motion to Vacate Preliminary Defaults), at 1-2, 4-5.

*Import Motors Ltd.*, 375 F. Supp. 499, 516 (E.D. Mich. 1974), *aff'd*, 519 F.2d 119 (6th Cir.), *cert. denied*, 423 U.S. 987 (1975)). The Eleventh Circuit noted that when the Court in *Overseas Motors* gave preclusive effect to a default judgment, it "observ[ed] that 'a party cannot be permitted to avoid the law merely by avoiding the courts.'" *Id.* (citing *Overseas Motors*, 375 F. Supp. at 516 n.49).

The overriding principle in *Bush* was fairness, and the court determined that a party who had defaulted but was aware of the litigation and knew that a default would be entered but chose not to participate to frustrate efforts to bring the case to justice should not be rewarded. *See, e.g., Bush*, 62 F.3d at 1325-26; *Overseas Motors*, 375 F. Supp. at 516 n.49.

It could not be more clear how the principles in *Bush* apply in the instant case. BNBM refused to accept service of *Chinese Drywall* complaints as part of its carefully planned litigation strategy to avoid paying for any damages caused by Chinese Drywall; early in the litigation, BNBM announced to its shareholders that "it had been served with notice of the allegations against the company concerning defects in its Chinese Drywall, but rather than respond to the lawsuits, '[t]he Company and Taishan Gypsum w[ould] continue to keep an eye on the progress of the incident'"; BNBM deliberately refused to answer the complaints knowing that default judgments would be entered because it did not believe the judgments could be enforced in China; and BNBM orchestrated Taishan's avoidance of and then withdrawal from the litigation in part, to avoid paying the judgment that had been entered against Taishan in the *Germano* case.

The Court does not need to consider preclusion doctrines because a default was properly entered against BNBM, but if it chooses to do so, the "actually litigated" prong of the collateral estoppel analysis is satisfied. In addition, as stated previously, the MDL Court found that the findings regarding liability and causation had preclusive effect in this litigation and therefore, were final judgments on those issues for purposes of the collateral estoppel analysis.

## III. <u>CONCLUSION</u>

For the foregoing reasons, the Court should reject BNBM's attack on the MDL Court's finding of default and give entirely preclusive effect to the MDL Court's finding of liability as to BNBM.

Dated: October 26, 2018                          Respectfully Submitted,


                                                 /s/ Patrick S. Montoya, Esq.
                                                 Patrick Shanan Montoya
                                                 Fla. Bar No. 0524441
                                                 Email: Patrick@colson.com
                                                 Colson Hicks Eidson
                                                 255 Alhambra Circle, PH
                                                 Coral Gables, FL  33134-2351
                                                 Telephone:  (305) 476-7400
                                                 Facsimile:  (305) 476-7444
                                                 *Interim Lead Counsel for Plaintiffs*


## **CERTIFICATE OF SERVICE**

I hereby certify that that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Southern District of Florida by using the CM/ECF System, which will send a notice of electronic filing on this 26th day of October, 2018.


                                                 /s/ Patrick S. Montoya, Esq.
                                                 Patrick Shanan Montoya
                                                 Fla. Bar No. 0524441
                                                 Email: Patrick@colson.com
                                                 Colson Hicks Eidson
                                                 255 Alhambra Circle, PH
                                                 Coral Gables, FL  33134-2351
                                                 Telephone:  (305) 476-7400
                                                 Facsimile:  (305) 476-7444

                                                 *Interim Lead Counsel for Plaintiffs*

# EXHIBIT

## "A"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL No. 2:09-md-2047 |
| | SECTION L |
| **THIS DOCUMENT RELATES TO:** | JUDGE ELDON E. FALLON |
| *Gross v. Knauf Gips KG, 2:09-cv-6690* | |
| *Amorin v. Taishan Gypsum, 2:11-cv-1395* | |
| *Amorin v. Taishan Gypsum, 2:11-cv-1673* | MAGISTRATE JUDGE |
| *Wiltz v. Beijing New Building Materials Public Limited Co.,* **10-cv-361** | JOSEPH C. WILKINSON, JR. |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO VACATE PRELIMINARY DEFAULTS**

Defendants China National Building Materials Co., Ltd. ("CNBM Company"), Beijing

New Building Material (Group) Company, Limited ("BNBM Group"), and Beijing New

Building Materials Public Limited Company ("BNBM PLC") (collectively, the "Movants")

respectfully submit this memorandum in support of their motion to vacate the entries of default

against them in the above-captioned proceedings.

I.    <u>INTRODUCTION</u>

Between 2011 and 2014, the PSC haphazardly moved this Court to enter preliminary

defaults against some—but not all—defendants, and in some—but again, not all—cases. This

Court granted the requests as to Movants on the grounds that they had not responded to

Plaintiffs' complaints. Both good cause and recent Supreme Court jurisprudence demand that

the Court set aside the preliminary defaults.

The Court's own orders provide all the good cause necessary to grant this motion. First,

the Court had expressly informed all defendants that no response to any complaint was due until

the PSC both submitted a notice of completion and filed a Master Complaint. Neither of those

events had occurred at the time the Court entered its defaults. Indeed, to this day, the PSC *still*

has not filed a Master Complaint, and it did not submit a notice of completion until several

months ago—and it almost immediately negated even that notice when it filed new, additional

complaints.  Second, setting aside the defaults would not prejudice Plaintiffs because, pursuant to the Court's pre-trial orders, Plaintiffs long have been required to preserve evidence.  This is therefore not a situation in which critical evidentiary concerns would arise if the defaults were set aside.  Third, Movants have meritorious defenses, including those that have resulted in orders by this very Court dismissing several previously defaulted defendants.  In addition to good cause and the Court's own pretrial orders, the recent Supreme Court opinion in *Bristol-Myers Squibb* (*BMS*) requires the preliminary defaults be vacated.

Importantly, no delay will result from granting this motion.  As discussed in greater detail below, preliminary defaults have not been entered in every action, and so even if those defaults had been properly entered—and they were not—proceedings in other cases still would occur.  Further, the PSC itself filed numerous new complaints in recent months.  Those "protective complaints" are operative, the PSC filed them for a reason (presumably to attempt to circumvent the clear effect of the Supreme Court's decision in *BMS*), and those complaints are in their early stages and will proceed from there — with or without this motion.  Accordingly, the Court should vacate the entries of default and follow the federal courts' oft-stated preference to resolve cases on their merits.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  The PSC Did Not Properly Serve Its Complaints, Then Created Further Confusion By Filing More of Them, Which It Also Failed to Serve Properly.

The filing and amendment of the complaints in the four actions in which preliminary defaults have been entered against Movants have involved a bewildering pattern of amendments and inadequate service of process by the PSC.  These complaints, and the complaints-in-intervention that added thousands of claimants thereto, were often unserved, or served on the wrong company, and in several cases even were addressed to non-existent companies.[1]

Further complicating matters, the PSC has repeatedly filed what it refers to as "Omnibus Class Action Complaints" that purport to incorporate the parties and allegations of prior MDL

---

[1] A history of service of process, and the multiple defects therein, is provided in Appendix A.

- 2 -

proceedings. As the PSC described this process as early as 2009, its plan was to "fil[e] several of them on a rolling basis" in which "all of the existing plaintiffs . . . will be suing everybody in the chain of commerce[.]" Rec. Doc. 402, at 20:8-12. The purpose of such complaints was to "only have to spend one amount to get service through the Hague[.]" *Id*. at 21:23-24. The Court endorsed this unorthodox approach despite acknowledging that the "omnibus" complaint is not found in the Federal Rules of Civil Procedure but was instead "invent[ed]" here. Rec. Docs. 612, at 20:23-34, 7203 at 18:2-10. And in permitting the use of pleadings that not even experienced American corporate defendants would understand, the Court never addressed whether a desire to reduce service costs stands constitutes sufficient reason to ignore the clear mandates of a treaty signed by independent nations, and presumably relied upon by those nations' citizens. Nonetheless, perhaps recognizing both the novelty and confusing nature of this strange process, the Court advised the PSC in December 2009 that it "expect[ed] that [a single, Master Complaint] would be forthcoming *as quickly as reasonable*." Rec. Doc. 612, at 20:23-34 (emphasis added).

Nearly eight years later, this still has not happened. Contrary to the Court's stated expectation, the PSC continued *for years* to file more Omnibus complaints. In fact, the PSC repeatedly announced the continuation of this process, representing more than once that it was "still filing omnibus complaints." Rec. Doc. 7203 at 17:24; *see also* Hearing Tr. 2/23/2011 at 18:11-13 (Court: "Anything on the Omnibus class?"; PSC: "They just continue to be filed, Your Honor."). Indeed, the PSC still is ignoring the Court's 2009 admonition. As recently as August 1, 2017, the PSC filed *twelve* new omnibus complaints, consisting of the Omnibus XX(a) complaint in intervention (Rec. Docs. 20811, 20845) and the eleven actions filed as part of the PSC's effort to sidestep the clear mandates of *Bristol-Myers Squibb*. Yet the PSC continues to blame the defendants for both the current procedural quagmire and the delay that inevitably has accompanied its ongoing, decade-long cavalcade of complaints, amendments, interventions, "omnibus" actions, and "protective" actions.

**B.     The Court's Pre-Trial Order 1H Provided a Definitive Statement of the Parties' Deadlines.**

This extraordinary morass—of service of process directed to the wrong entities, identical complaints identifying thousands of new claimants and overlapping defendants, and novel "omnibus" complaints—created obvious and significant uncertainty as to whether any parties were obligated to respond, and if so by what date and to which complaint.  Recognizing this, and in an effort to introduce at least some clarity, the Court entered PTO 1G on May 27, 2010, which **suspended the deadline** for Movants to respond to the iterative complaints until 30 days after Plaintiffs filed a notice expressly informing the Movants that they had completed all amendments to the omnibus complaints.  Rec. Doc. 3348 at 2 ("IT IS FURTHER ORDERED that, once all amendments to the Omnibus complaints are completed, the PSC will file a Notice of Completion . . . .  Thereafter, counsel will be required to file responsive pleadings . . . within thirty (30) days after filing and service of the Notice.").

The Court strove for even greater clarity and precision shortly after issuing PTO 1G, decreeing in PTO 1H that "the [Plaintiffs are] directed to file a Master Complaint *within 60 days* of the filing of the [Plaintiffs'] Notice [of Completion]."  Rec. Doc. 6083 (emphasis added).  Then, "[*o*]*nly after* the Master Complaint is filed will counsel for any defendant identified therein be required to file responsive pleadings within thirty (30) days thereof."  *Id.* at 2 (emphasis added).  The ephemeral nature of the PSC's first notice of completion— issued in April, contradicted in June by a new complaint in intervention, and eviscerated in August by the filing of eleven new actions in federal courts in seven different states—underscored the Court's wisdom in establishing this process.  And of course, to date, the PSC has not filed the Master Complaint that this Court expressly ordered in the plainest of terms.

**C.     Plaintiffs' Motions for "Preliminary Default Judgments" and Movants' Entry into the Litigation.**

Despite having failed to serve Movants properly or adhere to the requirements of PTO 1H, the PSC introduced still more procedural novelty, moving the Court to enter "preliminary default judgments" under Rule 55.  But no such thing exists in the Federal Rules.  Rule 55

- 4 -

contemplates "entry of default" and "default judgments," but nowhere does it mention a "preliminary default judgment."[2]  Because there has been no assessment of damages, the "preliminary default judgments" cannot be default judgments; judgments are final.  So, if they are anything, they are entries of default.  *See, e.g., Duncan v. Tangipahoa Par. Council*, No. 08-cv-3840, 2009 WL 2514150, at *2 (E.D. La. Aug. 12, 2009) ("orders . . . for default judgment are not final" when "there has been no specific assessment of damages.").

Disregarding PTO 1(H), the PSC argued that Movants were in default because they had not "entered an appearance, filed an answer, or otherwise responded to the Complaint."  Rec. Doc. 5621-1.  At the PSC's request, the Court entered preliminary defaults against Movants in the following actions:[3]

| Case and Origin Forum | CNBM Company | BNBM Group | BNBM PLC |
|---|:---:|:---:|:---:|
| *Gross,* 09-6690 (LA) | X | X | X |
| *Wiltz,* 10-00351 (LA) | | | X |
| *Amorin,* 11-1672 (FL) | | | |
| *Amorin,* 11-1395 (LA) | X | | |
| *Amorin,* 11-1673 (VA) | X | | X |

Less than a year after the defaults were entered, Movants entered appearances, served profile forms, proceeded to actively participate in discovery and motion practice, and otherwise defended themselves against the various complaints' allegations.  *E.g.*, Rec. Docs. 18247, 18248, 18444, 18582, 18655, 18675, 18677, 18678, 19115, and 20739.

---

[2] Movants believe that the Court may have intended these "preliminary default judgments" to be the same as the "preliminary default" referenced in Article 1701 of the Louisiana Code of Civil Procedure.  A "preliminary default" most closely resembles the "entry of default" in Rule 55.

[3] To the extent the Court has purported to apply these preliminary defaults more broadly, Movants contend the bootstrapped application of defaults must be vacated once the underlying defaults are vacated.

### D.    Plaintiffs' Newest Round of Complaints.

In the course of discussions with the PSC, Movants reminded the PSC that they had no obligation to respond to any complaints because the PSC still had not filed a notice of completion or a Master Complaint.  In response, the PSC filed a notice of completion on April 16, 2017.  But the PSC quickly put the lie to this notice, filing additional complaints soon after, including an omnibus complaint in intervention in the *Brooke* litigation, and a new round of eleven omnibus complaints on August 1, 2017.

These latter complaints—creatively dubbed "*Amorin* Defaults"— have been filed in Alabama, Georgia, Mississippi, North Carolina, South Carolina, Tennessee, and Texas (the "*BMS* Actions").  While the stated purpose of the *BMS* Actions is to comply with the Supreme Court's recent opinion in *Bristol-Myers Squibb Co. v. Superior Court of California* (Rec. Doc. 20885-1 at 3), the PSC simultaneously has argued that *BMS* has no effect here.  The reality is precisely the opposite—as is shown below.

### III.   GOOD CAUSE EXISTS TO SET ASIDE THE DEFAULTS

Federal Rule of Civil Procedure 55(c) provides that entries of default may be set aside for "good cause."  A defaulted party can meet this standard by demonstrating any of a number of *nonexclusive* factors, including that the default was non-willful, that setting it aside would not prejudice the opposing party, and that a meritorious defense is available.  *Effjohn Int'l Cruise Holdings, Inc. v. A&L Sales, Inc.*, 346 F.3d 552, 563 (5th Cir. 2003).  Courts can also consider other factors, including that the party acted expeditiously to correct the default.  *Id.*  Because "entries of default are serious," "any doubt should . . . be resolved in favor of the movant to the end of securing a trial upon the merits."  *Id.* (quoting *Lacy v. Sitel Corp.*, 227 F.3d 290, 292 (5th Cir. 2000)).

### A.    The Defaults Could Not Be "Willful" Because Movants Were Not Yet Required to Respond.

A defendant "willfully" defaults under Rule 55 when it "intentional[ly] fail[s] to respond to litigation."  *Scott v. Carpanzano*, 556 F. App'x 288, 294 (5th Cir. 2014).  Movants could not

have willfully defaulted because *under the Court's own orders* they were not yet required to respond.

As explained above and in Appendix A, at the time PTO 1G and 1H were issued, Plaintiffs were engaged in a pattern of serving documents on non-existent corporations, failing to serve amended complaints, and failing to complete service under the Hague Convention. While Movants continue to believe they were not properly served, at a minimum, Plaintiffs' chaotic practice certainly creates reasonable doubt on the subject, making any lack of response justifiable and therefore not willful.[4] *See, e.g., Diamond Servs. Corp. v. Oceanografia SA de CV*, No. 10-cv-0177, 2013 WL 312368 (W.D. La. Jan. 24, 2013) (finding that defendant's failure to answer was not willful where plaintiffs failed to effectuate proper service); *Ortega Dominguez v. Pyrgia Shipping Corp.*, No. 98-cv-529, 1998 WL 204798, at *2 (E.D. La. Apr. 24, 1998) (legal ambiguity on proper service supported vacating entry of default).

Moreover, the plain language of PTOs 1G and 1H establishes that Movants cannot have willfully defaulted because responsive pleadings *still* are not yet due. PTO 1G suspends the deadline for Movants to respond to the PSC's Omnibus complaints until 30 days after the PSC files a notice of completion of amendments to the Omnibus complaints. PTO 1H clarifies that after filing the notice, the PSC has 60 days to file a Master Complaint. Rec. Doc. 6083. "Only after the Master Complaint is filed," PTO 1H explicitly states, will "any defendant identified therein be required to file responsive pleadings within thirty (30) days thereof." *Id.* at 2. The PSC filed its notice of completion on April 16, 2017, years after it requested—and this Court entered—the preliminary defaults at issue.[5] And it has yet to file a Master Complaint.

---

[4] As for the PSC's position that the two pretrial orders were entered long ago and should no longer be effective, their existence and authority at the time the defaults were entered cannot be disputed.

[5] Moreover, the PSC's conduct since filing the "notice of completion" shows that the PSC was a long way from having completed its complaint filings at that time. The very purpose of the notice of completion is to put defendants on notice that no further complaints will be filed and

Settled law holds that a party cannot be held in default until it has failed to timely respond to the operative complaint in the litigation. *See, e.g., Henderson v. Compass Groups*, No. 10-cv-447, 2010 WL 3488137, at \*1 (M.D. La. Aug. 30, 2010) (pre-answer default motion is premature); *Mattress Giant Corp. v. Motor Adver. & Design Inc.*, No. CIV A 307-CV-1728-D, 2008 WL 779919, at \*3 (N.D. Tex. Mar. 25, 2008) (where default entered prior to answer deadline, defendant is "entitled to set aside the default entered against him"). Given that no Master Complaint has been filed and there has been no indication that the PSC has finished serving its "omnibus" complaints, the plain language of PTO 1H compels the conclusion that Movants did not fail to timely appear and defend themselves in this litigation, as required to merit an entry of default under Rule 55(a).[6] Requiring the filing of a Master Complaint (and the notice of completion) was no mere technicality. On the contrary, it was, and is, essential because—as courts presiding over large MDLs have recognized—a Master Complaint incorporating all parties and claims into a single document becomes the "operative complaint and supersedes individual complaints." *In re Refrigerant Compressors Antitrust Litig.*, 731 F.3d 586, 590 (6th Cir. 2013); *see also In re Katrina Canal Breaches Litig.*, 309 F. App'x 836, 838 (5th Cir. 2009) ("[T]he Master Complaint, filed pursuant to the district court's Rule 16 pre-trial order, superseded [plaintiff's] individual complaint."). Accordingly, where plaintiffs have been ordered to file a master complaint, that complaint has been "used to calculate deadlines for defendants to file their answers." *In re Refrigerant Compressors Antitrust Litig.*, 731 F.3d at 590. Reliance on the assurance of court orders like PTO 1H that responsive pleadings were not due until after the filing of a Master Complaint, therefore, is entirely reasonable.

---

the litigation may proceed. Since filing its notice of completion, the PSC has filed a dozen new complaints, but no reconstituted notice of completion.

[6] The Court's order that Movants "*appear* or be defaulted" (emphasis added) cannot abrogate the principle, codified in Rule 55(a), that a party is entitled to know the final allegations against it prior to appearing, much less responding.

The record of inadequate service and the express statements in PTOs 1G and 1H make clear that at the time the preliminary defaults were entered Movants were not yet required to respond to this litigation. Any doubt that Movants' failure to appear, serve profile forms, or answer the complaint was not willful "should, as a general proposition, be resolved in favor . . . of securing a trial upon the merits." *Jenkens & Gilchrist v. Groia & Co.*, 542 F.3d 114, 123 (5th Cir. 2008) (evidence must conclusively show that a default is willful). Accordingly, the Court should decline to continue to impose upon Movants the disfavored and draconian measure of defaults.

### B. Plaintiffs Are Not Prejudiced Merely By Having To Prove Their Case.

No prejudice will result if the defaults are vacated. Doing so only will require Plaintiffs to prove their case. It is axiomatic that "[t]here is no prejudice to the plaintiff where the setting aside of the default has done no harm to plaintiff except to require [it] to prove [its] case." *In re Martinez,* 589 F.3d 772, 778 (5th Cir. 2009) (quoting *Lacy,* 227 F.3d at 293). Merely requiring the plaintiff "to litigate the action is insufficient prejudice" to support an entry of default. *One Parcel*, 763 F.2d at 183 (5th Cir. 1985).

Nor can "delay" be cited as reason not to vacate the defaults. Lifting the preliminary defaults that have been entered in some but not all cases will not cause delay. The numerous "protective complaints" that recently have been filed ensure that that is true (even apart from the significant corrections to the structure of the MDL necessitated by *BMS*). Further, the inconsistent pursuit and entry of defaults means that active cases still will need to be proven in any event. But even if some delay would result, the Fifth Circuit has explained that "the possibility of prejudice from delay is not sufficient in itself to require denial" of relief. *FSLIC v. Kroenke*, 858 F.2d 1067, 1070 (5th Cir. 1988). True prejudice requires proof that the delay underlying the defaults "will result in the loss of evidence, increased difficulties in discovery, or greater opportunities for fraud and collusion." *Lacy*, 227 F.3d at 293; *see also Robinson v. Texas Dep't of Human Servs.*, No. 93-9079, 1995 WL 29203, at *3 (5th Cir. Jan. 10, 1995) (prejudice only where "plaintiff's ability to litigate her claim is now impaired in some material way or if

relevant evidence has become lost or unavailable"). None of those factors apply here. Movants have appeared in the litigation and are fully participating in the discovery process. Indeed, since their appearance in early 2015, the primary reasons the litigation has not advanced beyond its current state are the PSC's own actions—its filing of new complaints and its obsession with contempt discovery chief among them—and the year devoted to Court-ordered mediation. When other defendants have cured their defaults, Plaintiffs have moved to amend the entry of default for those defendants. *See, e.g.*, Plaintiffs' Motion to Amend Order Granting Plaintiffs' Omnibus Motion for Preliminary Default Judgment (Rec. Doc. 15556). The Court should grant Movants the same opportunity.

Moreover, the PSC has taken dozens of depositions and received hundreds of thousands of pages of documents from Movants in response to their voluminous discovery requests. And the Court has entered multiple pretrial orders requiring Plaintiffs to maintain evidence of allegedly defective drywall and appliances, plumbing, or wiring that was allegedly damaged, or else have their claims barred.[7] Thus, Plaintiffs cannot establish any loss of evidence resulting in prejudice as a result of Movants appearing later in this litigation.

### C. Movants Have Meritorious Defenses to Plaintiffs' Claims.

Finally, a court should find good cause to vacate a default when it is clear that a defaulted party has meritorious defenses. *Acree v. Republic of Iraq*, 658 F. Supp. 2d 124, 128-29 (D.D.C. 2009). A defendant need only demonstrate "some possibility that the outcome of the suit after a full trial will be contrary to the result achieved by the default." *In re OCA, Inc.*, 551 F.3d 959, 373 (5th Cir. 2008) (quoting *Jenkens & Gilchrist v. Groia & Co.*, 542 F.3d 114, 122 (5th

---

[7] *See* Pretrial Order 1, ¶14 ("All parties and their counsel are reminded of their duty to preserve evidence that may be relevant to this action."); Pretrial Order 1B ("all persons or entities who have or who intend to pursue a claim relating to allegedly defective Chinese-manufactured drywall . . . shall maintain at least two samples . . . of every different drywall brand or marking removed from an effected property . . . . Evidence or material not preserved in compliance with this Pre-Trial Order may be subject to exclusion for use in either discovery or trial of the matter and further, the party responsible for failing to preserve evidence may be subject to the claim or defense of spoliation."); Pretrial Order 1I (same); Pretrial Order 1J (same).

Cir. 2008)).  Even a *potentially* meritorious defense, made in good faith, constitutes good cause to set aside a default.  *See*, *e.g.*, *Bona Fide Demolition & Recovery, LLC v. Crosby Const. Co. of La., Inc.*, No. 07-cv-3115, 2009 WL 4060192, at *3 (E.D. La. Nov. 20, 2009) ("the defendants dispute both the factual and legal predicates of plaintiffs' claims, and the defendants have asserted a potentially meritorious defenses to those claims—the personal jurisdiction of this Court").

Movants have presented numerous such defenses.  For instance, Plaintiffs have failed to establish the requisite causation between Plaintiffs' injuries and the Movants' conduct because (1) Plaintiffs have not demonstrated that the vast majority of Plaintiffs' homes contained Taishan drywall; (2) most, if not all, of Plaintiffs' properties contained generic drywall that could have been manufactured by any company; (3) any alleged BNBM PLC drywall products were not defective; and (4) Movants have provided evidence that neither CNBM nor BNBM Group ever manufactured drywall for sale into the United States, and they had no role in Taishan's sales of drywall.  Movants have shown that their only direct involvement with drywall sales was with drywall manufactured by BNBM PLC, whose drywall was completely distinct from Taishan's: it was sold under a different brand and produced in different factories in different provinces.  Cai Decl. (Rec. Doc. 18851-4) ¶¶ 7, 10(a)-(f), Chen Decl. (Rec. Doc. 18851-12) ¶¶ 7, 16, 17.  Taishan and BNBM PLC do not "share any plants, factories or production lines."  Jia Tr. 196:10-19 (Apr. 4, 2011).  BNBM PLC's drywall sales were made to only five American companies.  Cai Decl. ¶ 5.  BNBM Group was the export agent for the first few sales to the first three companies.  *Id.* ¶¶ 7, 11(a)-(c).  The PSC has presented no evidence that any of these limited quantities of drywall wound up in the homes of any Plaintiffs outside of a handful of properties in Florida.  Further, testing done on BNBM PLC's drywall shows that it is not defective.[8]  These critical defenses go to the very heart of Plaintiffs' claims and assure that a trial on the merits of

---

[8] Draft Emission Factor Results (µg/m²/h) from Lawrence Berkeley National Laboratories Chamber Testing (May 27, 2010), http://www.cpsc.gov//PageFiles/114656/LBNLsulfur.pdf.

these claims would be vigorously defended towards the goal of finding truth. *See Owens–Illinois, Inc. v. T & N Ltd.,* 191 F.R.D. 522, 526-27 (E.D. Tex. 2000) ("The requirement of a meritorious defense is only intended to ensure that the Court's order vacating the judgment is not an exercise in futility.").

Movants' jurisdictional defenses likewise satisfy the meritorious defense standard. In addition to dismissals already obtained on behalf of CNBM Group, CNBM Company (with the exception of Louisiana claimants), and several other defendants,[9] Movants previously had their jurisdictional arguments certified for interlocutory appeal. Further, a recent federal court decision has found that the Supreme Court's opinion in *Bristol-Myers Squibb v. Superior Court of California* (137 S. Ct. 1773 (2017)) "sheds additional light on the law on personal jurisdiction such that it would be a sufficient basis to allow [the defendant] to move to reconsider" the court's order denying a motion to dismiss. *Artec Group, Inc., v. Klimov, et al.*, Case No. 15-cv-03449-EMC, 2017 WL 4098801, at *3 (N.D. Cal. Sept. 15, 2017). This alone is sufficient to satisfy the meritorious defense standard. *Id.*

## IV.     JURISDICTIONAL DEFECTS REQUIRE SETTING ASIDE THE DEFAULTS

The Supreme Court's recent decision in *Bristol-Myers Squibb v. Superior Court of California*, 137 S. Ct. 1773 (June 2017) ("*BMS*"), also requires the Court to set aside the prior defaults against Movants at least as to all non-resident claimants, if not in their entirety. *BMS*, in conjunction with settled Fifth Circuit precedent, requires that a default entered in a case where jurisdiction is lacking must be vacated as void.

Under *BMS*, in order for a court to exercise jurisdiction over a claim, a plaintiff's claim must arise from the defendant's activity in the forum state. *Id.* Here, Plaintiffs have filed identical complaints in federal court on behalf of the same group of claimants located in over a

---

[9] The Court dismissed CNBM Group for lack of jurisdiction under the Foreign Sovereign Immunities Act (Rec. Doc. 20150), found CNBM Company is not subject to jurisdiction outside of Louisiana and only then under the questionable single business enterprise theory, and dismissed all claims against CNBMIT Co. Ltd., CNBM USA Corp., and United Suntech Craft, Inc., for lack of jurisdiction. (Rec. Doc. 20739).

dozen states, claiming that a single federal district court—this one—would have jurisdiction to resolve all claims. After *BMS*, that clearly is not so. Plaintiffs' claims arise from damage to the properties at issue. This means that, under *BMS*, there can only be jurisdiction in the federal district court in which the properties are located. As the Supreme Court made clear in *BMS*, Plaintiffs who are not residents of a particular district cannot bootstrap on the claims of district residents. Thus, pursuant to this circuit's precedent, the Court lacks jurisdiction over these non-Louisiana property claimants, including the authority to grant defaults in their favor, and the preliminary defaults therefore must be dismissed. *Magness v. Russian Fed'n,* 247 F.3d 609, 619 n.19 (5th Cir. 2001)); *see also Jackson v. Tanfoglio Giuseppe, S.R.L.,* 615 F.3d 579 (5th Cir. 2010); *Fowler Rodriguez Valdes–Fauli, LLP v. Medford,* No. 11-618, 2011 WL 6258493, at *1 (E.D. La. Dec. 15, 2011).

## V.      <u>CONCLUSION</u>

For the reasons set forth herein, the standard for vacating defaults is more than satisfied here. Movants therefore respectfully request that the Court vacate the "preliminary default judgments" against them in *Gross*, *Wiltz*, *Amorin* (Louisiana), and *Amorin* (Virginia), and allow Movants to defend on the merits.


Dated: October 20, 2017

Respectfully submitted,

*/s/ L. Christopher Vejnoska*

L. Christopher Vejnoska (CA Bar No. 96082)
Eric Matthew Hairston (CA Bar No. 229892)
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105
Tel:  415-773-5700
Email: cvejnoska@orrick.com
        ehairston@orrick.com

Eric A. Shumsky (D.C. Bar No. 477926)
ORRICK, HERRINGTON & SUTCLIFFE LLP
Columbia Center
1152 15th Street NW
Washington, D.C. 20005
Tel:  202-339-8400
Email:  eshumsky@orrick.com

James L. Stengel (NY Bar No. 1800556)
Xiang Wang (NY Bar No. 4311114)
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY, 10019
Tel:  212-506-5000
Email: jstengel@orrick.com
        xiangwang@orrick.com

*Counsel for CNBM Co., Ltd., BNBM (Group) Co., Ltd., and BNBM PLC*

Ewell E. Eagan, Jr. (LA Bar No. 5239)
Donna Phillips Currault (LA Bar No. 19533)
GORDON, ARATA, MONTGOMERY,
BARNETT, MCCOLLAM, DUPLANTIS & EAGAN, LLC
201 St. Charles Avenue, 40th Floor
New Orleans, LA 70170-4000
Tel: (504) 582-1111
Email: eeagan@gordonarata.com
        dcurrault@gordonarata.com

*Counsel for CNBM Co., Ltd.*

Harry Rosenberg (LA Bar No. 11465)
Phelps Dunbar LLP
365 Canal St., Suite 2000
New Orleans, LA  70130
Tel:  (504) 566-1311
Email:  Harry.Rosenberg@Phelps.com

*Counsel for BNBM (Group) Co., Ltd., and BNBM PLC*

- 14 -

## Appendix A – Service of Process

*Gross*, **No. 2:09-cv-6690 (E.D. La.).** The *Gross* complaint was filed on October 2, 2009 in the Eastern District of Louisiana, naming CNBM Company, BNBM PLC, and BNBM Group as defendants. An amended complaint was filed soon thereafter naming a number of additional defendants. Rec. Doc. 366. Then, on March 23, 2010, intervening Plaintiffs filed a Substituted and Amended Class Action Complaint in Intervention. Rec. Doc. 2187, at 1.

While the PSC served CNBM Company (Rec. Docs. 3256 and 3257), it offers no proof that service was ever effectuated on BNBM Group or BNBM PLC. Rather, it asserts that service was attempted on BNBM PLC on February 25, 2010 and BNBM Group on August 25, 2010. But the proof of service states the recipient of this attempt was "Beijing New Building Material (Group) Co., Ltd. (CNBM Group)" and "Beijing New Building Material (Group) Co., Ltd (BNBM)." Rec. Doc. 5621-3 at 88-93; Rec. Doc. 7446-6. Having served the wrong companies at the wrong addresses, the PSC's attempt was refused. Movants are aware of no evidence showing that the PSC attempted to serve the "Substituted and Amended Complaint."

*Wiltz*, **No. 10-cv-00361 (E.D. La.).** The *Wiltz* complaint, filed on March 15, 2010, named only one Movant: BNBM PLC. According to the PSC, it attempted to serve BNBM PLC on August 25, 2010 with a summons addressed to "Beijing New Building Material (Group) Co., Ltd. (BNBM)." Having delivered the summons to a completely different and independent company, service was refused.[10]

*Amorin* **Cases, Nos. 11-cv-1395 (E.D. La.) and 11-cv-1673 (originally filed in E.D. Va.).** The first of the *Amorin* complaints was filed in the Eastern District of Louisiana on June 13, 2011, naming, among others, CNBM Company, BNBM Group, and BNBM PLC. *Amorin, et al. v. Taishan Gypsum Co. Ltd., et al.,* Case No. 11-1395 (E.D. La. June 13, 2011). Another

---

[10] Exhibit A to *Wiltz* Plaintiffs' Omnibus Motion for Preliminary Default Judgment, *Wiltz, et al. v. Beijing New Building Materials Public Limited Co., et. al.,* No. 2:10-cv-00361 (E.D. La.) (Rec. Doc. 6974-3); Exhibit A to *Wiltz* Plaintiffs' Supplemental Declaration (Rec. Doc. 7410-3).

*Amorin* complaint was filed in the Eastern District of Virginia on July 5, 2011, also naming Movants.  A Class Action Complaint in Intervention was subsequently filed on November 14, 2012.  Rec. Doc. 16227, at 1.

       The PSC claims to have attempted service of the initial complaints on CNBM Company (in both *Amorin* actions) and BNBM PLC (in the Virginia action), but states that both companies refused service. Rec. Docs. 17267, 17268, 17916, 17917, 17923.  Movants find no evidence that the PSC attempted to serve BNBM Group.  Rec. Doc. 17378-4.  Likewise, Movants are aware of no evidence showing that the Intervention Complaint was served.

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing **Memorandum in Support of Motion to Vacate Preliminary Defaults** has been served on Plaintiffs' Liaison Counsel, Russ Herman, and Defendants' Liaison Counsel, Kerry Miller, by U.S. mail and e-mail and upon all parties by electronically uploading the same to File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047 on this 20th day of October 2017.

/s/ L. Christopher Vejnoska
L. Christopher Vejnoska (CA Bar No. 96082)
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105
Tel: 415-773-5700
Fax: 415-773-5759
Email: cvejnoska@orrick.com

*Counsel for CNBM Co., Ltd., BNBM (Group) Co., Ltd., and BNBM PLC*

- 17 -

# EXHIBIT

## "B"

*Hong Kong Exchanges and Clearing Limited and The Stock Exchange of Hong Kong Limited take no responsibility for the contents of this announcement, make no representation as to its accuracy or completeness and expressly disclaim any liability whatsoever for any loss howsoever arising from or in reliance upon the whole or any part of the contents of this announcement.*



# CNBM

# China National Building Material Company Limited[*]

# 中 國 建 材 股 份 有 限 公 司

*(a joint stock limited company incorporated in the People's Republic of China with limited liability)*

(Stock Code: 3323)

# DISCLOSEABLE TRANSACTION
# CONNECTED TRANSACTION
# ACQUISITION OF EQUITY INTEREST IN TAISHAN GYPSUM
# THROUGH SHARE ISSUANCE OF BNBM

The Company is pleased to announce that, on 13 October 2015, BNBM (an approximately 45.20%-owned subsidiary of the Company) entered into the Framework Agreement with Taishan Gypsum (a 65%-owned, directly and indirectly, subsidiary of BNBM) Minority Shareholders in relation to the acquisition of the 35% Equity Interest in Taishan Gypsum held by Taishan Gypsum Minority Shareholders collectively through a private issuance of BNBM shares to Taishan Gypsum Minority Shareholders. Pursuant to the Framework Agreement, upon completion of the transaction, BNBM will directly and indirectly hold 100% equity interest in Taishan Gypsum. Taishan Gypsum Minority Shareholders will become shareholders of BNBM, and the equity interest held by the Company in BNBM will reduce from approximately 45.20% to approximately 35.84%. Both BNBM and Taishan Gypsum will remain as subsidiaries of the Company.

**LISTING RULES IMPLICATIONS**

As one of the applicable percentage ratios defined under Chapter 14 of the Listing Rules in respect of the Acquisition exceeds 5% but all such applicable percentage ratios are less than 25%, the Acquisition constitutes a discloseable transaction of the Company under Chapter 14 of the Listing Rules and is subject to the reporting and announcement requirements.

MTD Exhibit #48

Pursuant to the Framework Agreement, upon completion of the transaction, the equity interest held by the Company in BNBM will reduce from approximately 45.20% to approximately 35.84%. Therefore, the transaction contemplated under the Framework Agreement constitutes a Deemed Disposal of BNBM shares by the Company with respect to Rule 14.29 of the Listing Rules. As one of the applicable percentage ratios defined under Chapter 14 of the Listing Rules in respect of the Deemed Disposal exceeds 5% but all such applicable percentage ratios are less than 25%, the Deemed Disposal constitutes a discloseable transaction of the Company under Chapter 14 of the Listing Rules, and is subject to the reporting and announcement requirements.

As Guotai Min'an Investment, one of the Taishan Gypsum Minority Shareholders, is a substantial shareholder of Taishan Gypsum holding 16% equity interest in Taishan Gypsum and Jia Tongchun, one of the Taishan Gypsum Minority Shareholders, is a substantial shareholder of Taishan Gypsum holding 11.36% equity interest in Taishan Gypsum and chairman of the board and general manager of Taishan Gypsum, Guotai Min'an Investment and Jia Tongchun are connected persons of the Company at the subsidiary level under the Listing Rules. The transaction in relation to the acquisition of the 35% Equity Interest in Taishan Gypsum through private issuance of shares of BNBM constitutes a connected transaction of the Company involving connected persons of the Company at the subsidiary level.

One of the applicable percentage ratios under Chapter 14A of the Listing Rules in respect of the Acquisition and the Deemed Disposal exceeds 5%. Since (1) Guotai Min'an Investment and Jia Tongchun are connected persons of the Company at the subsidiary level; (2) the Directors (including the independent non-executive Directors) have approved the transactions contemplated under the Framework Agreement; (3) the independent non-executive Directors have confirmed that the terms of the transactions are fair and reasonable, the transactions are on normal commercial terms and in the interests of the Company and its shareholders as a whole, pursuant to rule 14A.101 of the Listing Rules, the Acquisition and the Deemed Disposal are only subject to the reporting and announcement requirements, but exempt from the circular, independent financial advice and shareholders' approval requirements.

## INTRODUCTION

The Company is pleased to announce that, on 13 October 2015, BNBM (an approximately 45.20%-owned subsidiary of the Company) entered into the Framework Agreement with Taishan Gypsum (a 65%-owned, directly and indirectly, subsidiary of BNBM) Minority Shareholders in relation to the acquisition of the 35% Equity Interest in Taishan Gypsum held by Taishan Gypsum Minority Shareholders collectively through a private issuance of 368,997.4 thousand BNBM shares to Taishan Gypsum Minority Shareholders.

Pursuant to the Framework Agreement, upon completion of the transaction, BNBM will directly and indirectly hold 100% equity interest in Taishan Gypsum. Taishan Gypsum Minority Shareholders will become shareholders of BNBM, and the equity interest held by the Company in BNBM will reduce from approximately 45.20% to approximately 35.84%. Both BNBM and Taishan Gypsum will remain as subsidiaries of the Company. The Group does not expect to record any profit or loss in relation to the Deemed Disposal.

## PRINCIPAL TERMS OF THE FRAMEWORK AGREEMENT

### Date

13 October 2015

### Parties

(1)  BNBM; and

(2)  Taishan Gypsum Minority Shareholders;

### Acquisition of Equity Interest in Taishan Gypsum

BNBM shall acquire the 35% Equity Interest in Taishan Gypsum collectively held by the Taishan Gypsum Minority Shareholders.

Shareholding structure of Taishan Gypsum before the equity transfer:

| Name of shareholder | Number of shares (thousand shares) | Percentage of shareholding (%) |
|---|---|---|
| BNBM | 65,362.5 | 42% |
| Donglian Investment | 35,793.8 | 23% |
| Taishan Gypsum Minority Shareholders | 54,468.7 | 35% |
| **Total** | **155,625.0** | **100%** |

Donglian Investment is a wholly-owned subsidiary of BNBM, and BNBM holds 65% equity interest in Taishan Gypsum on its own and through Donglian Investment.

– 3 –

Shareholding structure of Taishan Gypsum after the equity transfer:

| Name of shareholder | Number of shares *(thousand shares)* | Percentage of shareholding *(%)* |
|---|---|---|
| BNBM | 119,831.2 | 77% |
| Donglian Investment | 35,793.8 | 23% |
| **Total** | **155,625.0** | **100%** |

BNBM will hold 100% equity interest in Taishan Gypsum on its own and through Donglian Investment.

**Share Issuance of BNBM**

As the consideration for the acquisition of the 35% Equity Interest in Taishan Gypsum, BNBM shall issue a total of 368,997.4 thousand A Shares through a private issuance to Taishan Gypsum Minority Shareholders, representing approximately 26.10% of the issued share capital of BNBM as of the date of this announcement or approximately 20.70% of the enlarged issued share capital of BNBM after the private issuance.

Shareholding structure of BNBM before the share issuance:

| Name of shareholder | Number of shares *(thousand shares)* | Percentage of shareholding *(%)* |
|---|---|---|
| CNBM | 639,065.9 | 45.20% |
| Public investors | 774,915.7 | 54.80% |
| **Total** | **1,413,981.6** | **100.00%** |

Shareholding structure of BNBM after the share issuance:

| Name of shareholder | Number of shares (thousand shares) | Percentage of shareholding (%) |
|---|---|---|
| CNBM | 639,065.9 | 35.84% |
| Taishan Gypsum Minority Shareholders | 368,997.4 | 20.70% |
| Public investors | 774,915.7 | 43.46% |
| **Total** | **1,782,979.0** | **100%** |

**Consideration and payment terms**

BNBM shall satisfy the total consideration of approximately RMB4,195,500.0 thousand payable to Taishan Gypsum Minority Shareholders for the 35% Equity Interest in Taishan Gypsum by way of issuing an aggregate of 368,997.4 thousand A Shares at an issue price of RMB11.37 per share.

**Basis of consideration**

For the purposes of the proposed transaction, ZhongHe Appraisal Co., Ltd has issued the Assets Appraisal Report ("Assets Appraisal Report") dated 25 September 2015 which adopted the income-based approach with 30 April 2015 as the Reference Date. All parties to the Framework Agreement are satisfied with the appraisal conclusion of the Assets Appraisal Report. The unaudited book value of net assets attributable to parent company corresponding to the 35% Equity Interest in Taishan Gypsum as at 30 April 2015 is approximately RMB1,133,681.7 thousand. According to the Assets Appraisal Report, the appraised value of the 35% Equity Interest in Taishan Gypsum as at 30 April 2015 is approximately RMB4,195,500.0 thousand. As agreed among the parties through negotiations, the consideration for the proposed acquisition of the 35% Equity Interest in Taishan Gypsum shall be approximately RMB4,195,500.0 thousand.

BNBM will issue shares at the price of RMB11.37 per share, which is determined with reference to 90% of the average trading price of BNBM shares for the 120 trading days prior to the Price Determination Date, as adjusted by the profit distribution of BNBM for 2014.

During the period from the Price Determination Date of this issuance of shares to the date of issuance, if any ex-right or ex-dividend event occurs, such as distribution of dividends, bonus issue, and capitalisation of capital reserve by BNBM, the issue price shall be adjusted accordingly in the light of relevant provisions by CSRC and Shenzhen Stock Exchange while the number of shares to be issued shall also be adjusted according to the issue price. The specific adjustment shall be subject to the resolution made by shareholders' meeting of BNBM.

Based on the appraisal value of the 35% Equity Interest in Taishan Gypsum and the aforesaid issue price of the BNBM shares, BNBM shall issue an aggregate of 368,997.4 thousand shares to Taishan Gypsum Minority Shareholders. The appraisal of such assets shall be approved by or filed with the competent authority, and subject to the appraisal conclusion as approved or filed. The number of shares to be issued by BNBM to Taishan Gypsum Minority Shareholders, as adjusted by the board of directors of BNBM as authorised at its shareholders' meeting with reference to the appraisal conclusion as approved by or filed with the competent authority, shall be finalised subject to the number of shares to be issued as approved by CSRC.

**Lock-up period of the shares to be issued**

Taishan Gypsum Minority Shareholders have undertaken that none of the shares of BNBM acquired through this transaction shall be transferred within 36 months after completion of the issuance. Such lock-up requirement shall also apply to any additional shares of BNBM that are acquired by Taishan Gypsum Minority Shareholders as a result of bonus issue or capitalisation of capital reserve of BNBM during such lock-up period.

**Completion of the transaction**

Completion of the transfer of the 35% Equity Interest in Taishan Gypsum shall take place within one month from the effective date of this transaction. Upon completion, all the rights and obligations in respect of such equity interest shall pass to BNBM.

**Arrangement for profit or loss**

The accumulated retained profit of BNBM before completion of this transaction shall be shared on a pro rata basis among its existing and new shareholders following completion of this transaction.

The profits incurred by Taishan Gypsum during the period from the Reference Date to the date of completion are attributable to BNBM whereas the losses are to be borne by Taishan Gypsum Minority Shareholders on a pro rata basis with reference to their shareholdings in Taishan Gypsum.

After the completion of the acquisition of the 35% Equity Interest in Taishan Gypsum, the auditor responsible for preparing the annual report of BNBM will conduct a special audit on Taishan Gypsum to determine the profit or loss attributable to the 35% Equity Interest in Taishan Gypsum from the Reference Date to the date of completion. If the date of completion falls before the 15th day (inclusive) of a month, the Reference Date for audit of profit or loss for such period shall be the end of the preceding month; if the date of completion falls after the 15th day of a month, the Reference Date for audit of profit or loss for the period shall be the end of that month. In case of loss, Taishan Gypsum Minority Shareholders shall pay the respective portions of such loss to be borne by them to BNBM in cash within 5 working days from the day on which the aforesaid special audit report is issued.

**Conditions for the Framework Agreement to take effect**

The Framework Agreement shall be formed upon signing and the affixing of the seal by authorised representatives of each party, and shall become effective upon the fulfilment of all the following conditions and on the date of the following conditions shall have been fulfilled, whichever is the latest:

1.   the approval by the shareholders' meeting of Taishan Gypsum;

2.   the approvals by the board of directors and shareholders' meeting of BNBM, respectively;

3.   an approval by the competent authority; and

4.   a written approval from CSRC.

## INFORMATION ON THE SUBJECT COMPANIES

Taishan Gypsum is mainly engaged in the production and sale of paper surfaced gypsum boards, gypsum products, lightweight steel frames and relevant products. According to Taishan Gypsum's audited accounts prepared under the PRC generally accepted accounting principles, the audited net profits (before tax) of Taishan Gypsum for the years 2014 and 2013 were approximately RMB1,184,353.5 thousand and RMB1,140,810.1 thousand respectively; and the audited net profits (after tax) of Taishan Gypsum for the years 2014 and 2013 were approximately RMB1,047,053.4 thousand and RMB1,004,381.3 thousand respectively. The audited net assets of Taishan Gypsum as at 31 December 2014 and 31 December 2013 were RMB3,739,706.2 thousand and RMB3,202,766.5 thousand respectively.

BNBM is mainly engaged in the operation of lightweight building materials business. According to BNBM's audited accounts prepared under the PRC generally accepted accounting principles, the audited net profits (before tax) of BNBM for the years 2014 and 2013 were approximately RMB1,662,667.2 thousand and RMB1,439,849.3 thousand respectively; and the audited net profits (after tax) of BNBM for the years 2014 and 2013 were approximately RMB1,469,126.6 thousand and RMB1,258,063.6 thousand respectively. The audited net assets of BNBM as at 31 December 2014 and 31 December 2013 were RMB8,525,151.4 thousand and RMB5,431,721.8 thousand respectively.

## REASONS FOR AND BENEFITS OF THE TRANSACTION

Upon completion of this transaction, Taishan Gypsum will be 100% owned by BNBM, enabling the Group to further integrate its internal resources, allowing BNBM to improve its operating results and further consolidate the Group's market position.

The Directors (including the independent non-executive Directors) believe that the acquisition of 35% Equity Interest in Taishan Gypsum through private issuance of shares of BNBM to Taishan Gypsum Minority Shareholders pursuant to the Framework Agreement is conducted by the Group and relevant parties (including the Company's connected persons) on normal commercial terms negotiated on an arm's length basis in the ordinary course of business of the Group, which are fair and reasonable and in the interest of the Company and the shareholders as a whole.

## LISTING RULES IMPLICATIONS

As one of the applicable percentage ratios defined under Chapter 14 of the Listing Rules in respect of the Acquisition exceeds 5% but all such applicable percentage ratios are less than 25%, the Acquisition constitutes a discloseable transaction of the Company under Chapter 14 of the Listing Rules and is subject to the reporting and announcement requirements.

Pursuant to the Framework Agreement, upon completion of the transaction, the equity interest held by the Company in BNBM will reduce from approximately 45.20% to approximately 35.84%. Therefore, the transaction contemplated under the Framework Agreement constitutes a Deemed Disposal of BNBM shares by the Company with respect to Rule 14.29 of the Listing Rules. As one of the applicable percentage ratios defined under Chapter 14 of the Listing Rules in respect of the Deemed Disposal exceeds 5% but all such applicable percentage ratios are less than 25%, the Deemed Disposal constitutes a discloseable transaction of the Company under Chapter 14 of the Listing Rules, and is subject to the reporting and announcement requirements.

As Guotai Min'an Investment, one of the Taishan Gypsum Minority Shareholders, is a substantial shareholder of Taishan Gypsum holding 16% equity interest in Taishan Gypsum and Jia Tongchun, one of the Taishan Gypsum Minority Shareholders, is a substantial shareholder of Taishan Gypsum holding 11.36% equity interest in Taishan Gypsum and chairman of the board and general manager of Taishan Gypsum, Guotai Min'an Investment and Jia Tongchun are connected persons of the Company at the subsidiary level under the Listing Rules. The transaction in relation to the acquisition of the 35% Equity Interest in Taishan Gypsum through private issuance of shares of BNBM constitutes a connected transaction of the Company involving connected persons of the Company at the subsidiary level.

One of the applicable percentage ratios under Chapter 14A of the Listing Rules in respect of the Acquisition and the Deemed Disposal exceeds 5%. Since (1) Guotai Min'an Investment and Jia Tongchun are connected persons of the Company at the subsidiary level; (2) the Directors (including the independent non-executive Directors) have approved the transactions contemplated under the Framework Agreement; (3) the independent non-executive Directors have confirmed that the terms of the transactions are fair and reasonable, the transactions are on normal commercial terms and in the interests of the Company and its shareholders as a whole, pursuant to rule 14A.101 of the Listing Rules, the Acquisition and the Deemed Disposal are only subject to the reporting and announcement requirements, but exempt from the circular, independent financial advice and shareholders' approval requirements.

## PROFIT FORECAST IN COMPLIANCE WITH LISTING RULES

Since the income-based approach is adopted for carrying out the asset appraisal regarding Taishan Gypsum in the Asset Appraisal Report (《資產評估報告》), such asset appraisal constitutes a profit forecast under Rule 14.61 of the Listing Rules.

Pursuant to Article 14.62(1) of the Listing Rules, the details of the principal assumptions (including commercial assumptions) upon which the Asset Appraisal Report is based are as follows:

1.　　**General Assumptions**

　　①　There will be no material change to the national and regional laws, regulations, systems, social, political and economic policies that are currently in force and are required to be observed by Taishan Gypsum during its operation;

② Taishan Gypsum is to continue as a going concern and its current operating mode will be consistently adopted;

③ The State's existing tax base and tax rate, tax preferential policy, interest rate of bank facility and other charges due to policy will not undergo material changes;

④ There will be no material adverse change caused by force majeure or unforeseeable factors.

**2.    Specific Assumptions**

① The technical team and the senior management of Taishan Gypsum will remain relatively stable over the years and there will be no issue of substantial loss of core professionals;

② In respect of the main operating entities of Taishan Gypsum, the existing and future operators are and will be responsible and diligent. Moreover, the Company's management can steadily promote the Company's development and maintain a good momentum of operation;

③ The future operators of Taishan Gypsum will comply with the relevant national laws and regulations and there will be no material violation affecting the Company's development or income realization;

④ The accounting policy adopted in the historical financial information provided by Taishan Gypsum and the accounting and audit method used in carrying out the profit forecast are fundamentally consistent in all material respects;

⑤ The parent company of Taishan Gypsum and Taishan Gypsum (Hubei) Co., Ltd. (泰山石膏（湖北）有限公司), which are companies within the appraisal scope, are high and new tech enterprises as of the Reference Date. For the purposes of this appraisal, it is assumed that the aforementioned companies will be able to obtain the authentication of the high and new tech enterprises and will be entitled to enjoy relevant preferential policy;

⑥ The operating mode of the appraised entities will remain unchanged; Enterprises operating by leasing will continue to operate by leasing.

⑦ Trademark being used by the appraised entities will be renewed upon expiry; such trademark can be used continually. Proprietary technology within the appraisal scope will be timely maintained during the term of statutory protection; the related annual fee will be paid in accordance with the requirements.

In the event that future circumstances differ from the foregoing appraisal assumptions, the appraisal conclusion will be affected. Users of the Report shall take into account the impact on the appraisal results of the appraisal assumptions when using the Report.

Baker Tilly Hong Kong Limited, acting as the reporting accountant of the Company, has reviewed the method of calculation of the discounted future cash flow for the Valuation.

The Directors confirm that the Valuation, which constitutes a profit forecast under the Listing Rules, has been made after due and careful enquiry.

A letter from the Board and a letter from Baker Tilly Hong Kong Limited are included in the appendices to this announcement for the purpose of Rule 14.60A and 14A.68(7) of the Listing Rules.

As at the date of this announcement, Baker Tilly Hong Kong Limited does not have any shareholding, directly or indirectly, in any member of the Group or any right (whether legally enforceable or not) to subscribe for or to nominate person to subscribe for securities in any member of the Group.

To the best of the Directors' knowledge, information and belief, Baker Tilly Hong Kong Limited is a third party independent of and not connected with the Group.

Baker Tilly Hong Kong Limited has given and has not withdrawn its consent to the publication of this announcement with inclusion of its report and all references to its name in the form and context in which it is included.

## INFORMATION OF THE PARTIES

The Company is a leading building materials company in China with significant operations in the cement, lightweight building materials, glass fibre and composite material and engineering services businesses.

Guotai Min'an Investment is a limited liability company, the business scope of which is the operation of state-owned capital within the authorised scope (except matters requiring pre-approval under national laws and regulations) (matters which require approvals under the law shall be subject to approval from relevant departments before the commencement of business). In 2002, Guotai Min'an Investment acquired 16% equity interest in Taishan Gypsum at a consideration of RMB23,904 thousand.

Jia Tongchun is the chairman of the board and general manager of Taishan Gypsum. Jia Tongchun acquired 11.36% of equity interest in Taishan Gypsum in 2015 at a consideration of RMB367,999 thousand.

Taishan Gypsum Minority Shareholders include ten limited partnership enterprises such as Tai'an Heda Investment Centre (LP), which are principally engaged in proprietary investment, business consulting, enterprise management consulting, etc..

To the best of the Directors' knowledge, information and belief and having made all reasonable enquiries, save that certain Taishan Gypsum Minority Shareholders are current or former employees of Taishan Gypsum or its subsidiaries, Taishan Gypsum Minority Shareholders (other than Guotai Min'an Investment and Jia Tongchun) and their ultimate beneficial owners are independent third parties who are independent of the Company and its connected persons (as defined under the Listing Rules). As Guotai Min'an Investment is a substantial shareholder of Taishan Gypsum holding 16% equity interest in Taishan Gypsum and Jia Tongchun is a substantial shareholder of Taishan Gypsum holding 11.36% equity interest in Taishan Gypsum and chairman of the board and general manager of Taishan Gypsum, Guotai Min'an Investment and Jia Tongchun are connected persons of the Company at the subsidiary level under the Listing Rules.

None of the Directors has any material interest in the connected transaction.

## DEFINITIONS

| | |
|---|---|
| "A Shares" | domestic listed shares with a nominal value of RMB1.00 per share in the share capital of BNBM, which are listed on the Shenzhen Stock Exchange and traded in Renminbi |
| "Acquisition" | the proposed acquisition of the 35% Equity Interest in Taishan Gypsum from Taishan Gypsum Minority Shareholders by BNBM pursuant to the Framework Agreement |
| "BNBM" | 北新集團建材股份有限公司(Beijing New Building Material Public Limited Company*), a joint stock limited company incorporated under the laws of the PRC, the A shares of which are listed on Shenzhen Stock Exchange |
| "Board" | the board of directors of the Company |
| "Company" | 中國建材股份有限公司(China National Building Material Company Limited*), a joint stock limited company incorporated under the laws of the PRC, the H shares of which are listed on the Stock Exchange |
| "CSRC" | China Securities Regulatory Commission |

| | |
|---|---|
| "Deemed Disposal" | the equity interest in BNBM held by the Company will reduce from approximately 45.20% to approximately 35.84% upon completion of the Acquisition, which is therefore deemed as a disposal of approximately 9.36% equity interest in BNBM by the Company to Taishan Gypsum Minority Shareholders |
| "Director(s)" | the director(s) of the Company |
| "Donglian Investment" | 北京東聯投資有限公司(Beijing Donglian Investment Co., Ltd.*), a limited liability company incorporated under the laws of the PRC |
| "Framework Agreement" | the Framework Agreement in relation to the Acquisition of Assets through Share Issue by Beijing New Building Material Public Limited Company* dated 13 October 2015 entered into between BNBM and Taishan Gypsum Minority Shareholders |
| "Group" | the Company and its subsidiaries |
| "Guotai Min'an Investment" | 泰安市國泰民安投資集團有限公司(Tai'an Guotai Min'an Investment Group Co., Ltd.*), a limited liability company incorporated under the laws of the PRC |
| "Listing Rules" | the Rules Governing the Listing of Securities on The Stock Exchange of Hong Kong Limited |
| "Price Determination Date" | The date on which the resolution passed at the 11th extraordinary meeting of the 5th session of the board of directors of BNBM was announced |
| "Reference Date" | 30 April 2015, the reference date for valuation for the purpose of valuation of Taishan Gypsum of the transaction |
| "RMB" or "Renminbi" | Renminbi, the lawful currency of the People's Republic of China |
| "Stock Exchange" | The Stock Exchange of Hong Kong Limited |

| "Taishan Gypsum" | 泰山石膏股份有限公司(Taishan Gypsum Company Limited*), a joint stock limited company incorporated under the laws of the PRC |
| --- | --- |
| "Taishan Gypsum Minority Shareholders" | minority shareholders holding an aggregate of 35% Equity Interest of Taishan Gypsum, including Guotai Min'an Investment (holding 16% equity interest of Taishan Gypsum) and ten limited partnership enterprises such as Tai'an Heda Investment Centre (LP)* (泰安市和達投資中心(有限合夥)) and 35 natural persons such as Jia Tongchun (賈同春) (together holding an aggregate of 19% equity interest of Taishan Gypsum) |
| "35% Equity Interest in Taishan Gypsum" | the 35% Equity Interest in Taishan Gypsum held by Taishan Gypsum Minority Shareholders which is to be acquired by BNBM under the Framework Agreement |

By order of the Board
**China National Building Material Company Limited***
**Chang Zhangli**
*Secretary of the Board*

Beijing, the PRC,
13 October 2015

*As at the date of this announcement, the board of directors of the Company comprises Mr. Song Zhiping, Mr. Cao Jianglin, Mr. Peng Shou, Mr. Cui Xingtai and Mr. Chang Zhangli as executive directors, Mr. Guo Chaomin, Mr. Huang Anzhong and Mr. Tao Zheng as non-executive directors, and Mr. Shin Fang, Mr. Tang Yunwei, Mr. Zhao Lihua, Mr. Wu Liansheng and Mr. Sun Yanjun as independent non-executive directors.*

\* *For identification only*

– 14 –

In compliance with Rule 14.60A and 14A.68(7) of the Listing Rules, the letter from Baker Tilly Hong Kong Limited to the Directors confirming it has reviewed the calculations of the discounted future cash flow and the letter from the Board confirming the Valuation has been made after due and careful enquiry by the Directors both dated 13 October, 2015, for the purpose of, among other things, inclusion in this announcement are reproduced below:

## APPENDIX I – LETTER FROM THE BOARD

Listing Division
The Stock Exchange of Hong Kong Limited
11/F, One International Finance Centre,
1 Harbour View Street, Central
Hong Kong

13 October, 2015

Dear Sirs,

Re: Discloseable Transaction/Connected Transaction – Acquisition of 35% Equity Interest In Taishan Gypsum Through Shares Issuance of BNBM

We refer to the valuation report dated 25 September 2015 (the "Assets Appraisal Report") prepared by ZhongHe Appraisal Co., Ltd (the "Valuer") in relation to the valuation of Taishan Gypsum Company Limited (the "Taishan Gypsum"), which constitutes a profit forecast under Rule 14.61 of the Rules Governing the Listing of Securities on The Stock Exchange of Hong Kong Limited.

We have discussed with the Valuer about the valuation of Taishan Gypsum, including the bases and assumptions upon which such valuation has been prepared, and reviewed the valuation for which the Valuer is responsible. We have also considered the letter from Baker Tilly Hong Kong Limited dated 13 October, 2015 regarding whether the discounted future cash flow of Taishan Gypsum, so far as the arithmetical calculations are concerned, have been properly compiled in all material respects in accordance with the bases and assumptions set out in the Appraisal Report. We note that the calculations of the discounted future cash flow do not involve the adoption of any accounting policies.

On the basis of the foregoing, we confirm that the above valuation has been made after our due and careful enquiry.

Yours faithfully,
For and on behalf of
**China National Building Material Company Limited**
**Chang Zhangli**
*Executive Director*

– 15 –

## APPENDIX II – LETTER FROM BAKER TILLY HONG KONG LIMITED

The following is the text of a letter from the Company's auditor Baker Tilly Hong Kong Limited for inclusion in this announcement.



13 October, 2015

21st Floor
Tower 2, Guohai Plaza
No. 17 Fuxing Road
Haidian District, Beijing
The PRC

**Report on the discounted future cash flows in connection with the assets valuation of Taishan Gypsum Company Limited**

**To The Board of Directors of China National Building Material Company Limited (the "Company")**

We have been engaged to report on the calculations of the discounted future cash flows on which the assets valuation (the "Valuation") date 25 September 2015 prepared by ZhongHe Appraisal Co., Ltd. (中和資產評估有限公司) in respect of the appraisal of the fair value of Taishan Gypsum Company Limited ("Taishan Gypsum") as at 30 April 2015 is based. The Valuation which is prepared based on the discounted future cash flows is regarded as a profit forecast under Rule 14.61 of the Rules Governing the Listing of Securities on The Stock Exchange of Hong Kong Limited (the "Listing Rules").

**Directors' Responsibility for the Discounted Future Estimated Cash Flows**

The directors of the Company (the "Directors") are responsible for the preparation of the discounted future cash flows in accordance with the bases and assumptions determined by the directors and as set out in the Valuation (the "Bases and Assumptions"). This responsibility includes carrying out appropriate procedures relevant to the preparation of the discounted future cash flows for the Valuation and applying an appropriate basis of preparation; and making estimates that are reasonable in the circumstances.

**Auditor's Responsibility**

It is our responsibility to report, as required by Rule 14.62(2) of the Listing Rules, on the calculations of the discounted future cash flows used in the Valuation. We are not reporting on the appropriateness and validity of the Bases and Assumptions on which the discounted future cash flows are based and our work does not constitute any valuation of Taishan Gypsum.

We conducted our work in accordance with the Hong Kong Standard on Assurance Engagements 3000 "Assurance Engagements Other Than Audits or Reviews of Historical Financial Information" issued by the Hong Kong Institute of Certified Public Accountants ("HKICPA"). This standard requires that we plan and perform our work to obtain reasonable assurance as to whether, so far as the calculations are concerned, the Directors have properly compiled the discounted future cash flows in accordance with the Bases and Assumptions as set out in the Valuation. We performed procedures on the arithmetical calculations and the compilations of the discounted future cash flows in accordance with the Bases and Assumptions. Our work is substantially less in scope than an audit conducted in accordance with Hong Kong Standards on Auditing issued by the HKICPA. Accordingly, we do not express an audit opinion.

The discounted future cash flows do not involve the adoption of accounting policies. The discounted future cash flows depend on future events and on a number of assumptions which cannot be confirmed and verified in the same way as past results and not all of which may remain valid throughout the period. Our work has been undertaken for the purpose of reporting solely to you under paragraph 14.62(2) of the Listing Rules and for no other purpose. We accept no responsibility to any other person in respect of our work, or arising out of or in connection with our work.

**Opinion**

Based on the foregoing, in our opinion, the discounted future estimated cash flows, so far as the arithmetical calculations are concerned, have been properly compiled in all material respects in accordance with the Bases and Assumptions.

Yours sincerely,

**Baker Tilly Hong Kong Limited**
Certified Public Accountants
Hong Kong,
Andrew David Ross
Practising Certificate Number P01183

香港交易及結算所有限公司及香港聯合交易所有限公司對本公告的內容概不負責,對其準確性或完整性亦不發表任何聲明,並明確表示,概不對因本公告全部或任何部分內容而產生或因倚賴該等內容而引致的任何損失承擔任何責任。



**China National Building Material Company Limited**\*

**中 國 建 材 股 份 有 限 公 司**

*(在中華人民共和國註冊成立的股份有限公司)*

(股份代碼:3323)

# 須 予 披 露 交 易
# 關 連 交 易
# 北 新 建 材 發 股 購 買 泰 山 石 膏 股 份

本公司欣然公佈,於二零一五年十月十三日,北新建材(本公司持有約45.20%股份的附屬公司)與泰山石膏(北新建材直接及間接持有65%股份的附屬公司)少數股東簽署框架協議,旨在北新建材通過向泰山石膏少數股東非公開發行股份的形式購買其合共持有的泰山石膏35%股份。根據框架協議,交易完成後北新建材將直接及間接持有泰山石膏100%股份,泰山石膏少數股東將成為北新建材股東,本公司持有北新建材股份由約45.20%降至約35.84%,北新建材及泰山石膏仍為本公司附屬公司。

**上 市 規 則 涵 義**

由於按照上市規則第14章項下就收購事項的適用百分比有某項超逾5%但所有適用百分比均低於25%,根據上市規則第14章,收購事項構成本公司的一項須予披露交易,須遵守申報及公告規定。

– 1 –

根據框架協議，交易完成後本公司持有北新建材股份由約45.20%降至約35.84%，因此，根據上市規則第14.29條，框架協議項下擬進行之交易構成本公司對北新建材股份之視作出售事項。由於按照上市規則第14章項下有關視作出售事項之適用百分比有某項超逾5%但所有適用百分比均低於25%，根據上市規則第14章，視作出售事項構成本公司的一項須予披露交易，須遵守申報及公告規定。

由於泰山石膏少數股東之國泰民安投資持有泰山石膏16%股份，買同春持有泰山石膏11.36%股份，均為泰山石膏的主要股東，且買同春為泰山石膏董事長及總經理，根據上市規則，國泰民安投資及買同春是本公司附屬公司層面的關連人士，故北新建材非公開發行股份以購買泰山石膏35%股份之交易構成涉及本公司附屬公司層面的關連人士的關連交易。

按照上市規則第14A章項下就收購事項及視作出售事項的適用百分比有某項超逾5%。由於(1)國泰民安投資及買同春為本公司附屬公司層面之關連人士；(2)董事(包括獨立非執行董事)已批准框架協議項下擬進行之交易；(3)獨立非執行董事已確認有關交易之條款誠屬公平合理，有關交易乃按一般商業條款訂立，符合本公司及其股東之整體利益，因此，根據上市規則第14A.101條，收購事項及視作出售事項只須遵守申報及公告規定，但獲豁免刊發通函、獨立財務意見及股東批准規定。

## 緒言

本公司欣然公佈，於二零一五年十月十三日，北新建材(本公司持有約45.20%股份的附屬公司)與泰山石膏(北新建材直接及間接持有65%股份的附屬公司)少數股東簽署框架協議，旨在北新建材通過向泰山石膏少數股東非公開發行36,899.74萬股股份的形式購買其合共持有的泰山石膏35%股份。

根據框架協議，交易完成後北新建材將直接及間接持有泰山石膏100%股份，泰山石膏少數股東將成為北新建材股東，本公司持有北新建材股份由約45.20%降為約35.84%，北新建材及泰山石膏仍為本公司附屬公司。本集團不預期就視作出售事項錄得任何盈虧。

## 框架協議的主要條款

### 日期

二零一五年十月十三日

### 訂約方

(1) 北新建材；及

(2) 泰山石膏少數股東；

### 購買泰山石膏股份

北新建材向泰山石膏少數股東購買其合計持有泰山石膏35%股份。

股份轉讓前泰山石膏的股本結構：

| 股東名稱 | 股份數量<br>(萬股) | 佔股本比例<br>(%) |
|---|---|---|
| 北新建材 | 6,536.25 | 42% |
| 東聯投資 | 3,579.38 | 23% |
| 泰山石膏少數股東 | 5,446.87 | 35% |
| **合計** | **15,562.50** | **100%** |

東聯投資為北新建材持股100%的全資子公司，北新建材自身及通過東聯投資持有泰山石膏65%股份。

– 3 –

股份轉讓後泰山石膏的股本結構：

| 股東名稱 | 股份數量 | 佔股本比例 |
|---|---|---|
| | *(萬股)* | *(%)* |
| 北新建材 | 11,983.12 | 77% |
| 東聯投資 | 3,579.38 | 23% |
| **合計** | **15,562.50** | **100%** |

北新建材自身及通過東聯投資持有泰山石膏100%股份。

## 北新建材股份發行

作為獲得泰山石膏35%股份之對價，北新建材向泰山石膏少數股東非公開發行共36,899.74萬股A股股份，相當於北新建材截至發出本公告日的現有已發行股本約26.10%，及北新建材經非公開發行股份後擴大的已發行股本約20.70%。

股份發行前北新建材的股本結構：

| 股東名稱 | 股份數量 | 佔股本比例 |
|---|---|---|
| | *(萬股)* | *(%)* |
| 中國建材 | 63,906.59 | 45.20% |
| 公眾投資者 | 77,491.57 | 54.80% |
| **合計** | **141,398.16** | **100.00%** |

股份發行後北新建材的股本結構：

| 股東名稱 | 股份數量 (萬股) | 佔股本比例 (%) |
|---|---|---|
| 中國建材 | 63,906.59 | 35.84% |
| 泰山石膏少數股東 | 36,899.74 | 20.70% |
| 公眾投資者 | 77,491.57 | 43.46% |
| 合計 | 178,297.90 | 100% |

## 代價及支付條款

北新建材以發行共36,899.74萬股每股發行價人民幣11.37元的A股股份方式向泰山石膏少數股東支付購買泰山石膏35%股份價款合計人民幣約419,550.00萬元。

## 代價基準

為本次交易之目的，中和資產評估有限公司出具了以二零一五年四月三十日為基準日的按收益法釐定的日期為二零一五年九月二十五日的《資產評估報告書》（「《資產評估報告》」），框架協議各方對《資產評估報告》及評估結果均予以認可。二零一五年四月三十日泰山石膏35%股份對應未經審計歸母淨資產賬面值約為人民幣113,368.17萬元。根據《資產評估報告》，二零一五年四月三十日泰山石膏35%股份評估值約為人民幣419,550.00萬元。經各方協商一致同意，本次收購泰山石膏35%股份的代價約為人民幣419,550.00萬元。

本次北新建材發行股份的價格為其定價基準日前120個交易日股票交易均價的90%，並經北新建材2014年度利潤分配實施後相應調整，本次北新建材發行股份的價格調整為人民幣11.37元／股。

在本次發行的定價基準日至發行日期間，北新建材如有派息、送股、資本公積金轉增股本等除權、除息事項，則對本次發行價格根據中國證監會及深圳證券交易所的相關規定相應除權除息處理，本次發行數量也將根據發行價格的情況進行相應調整，具體調整方式以北新建材股東大會決議內容為準。

按照泰山石膏35%股份的評估值及北新建材股份發行價格計算，北新建材須向泰山石膏少數股東發行的股份數量共為36,899.74萬股。該等資產評估項目尚須經有權單位核准／備案，並以核准／備案的評估結果為準。北新建材最終向泰山石膏少數股東發行的股份數量，由北新建材董事會提請股東大會授權其董事會根據有權單位核准／備案的評估結果相應調整，以經中國證監會核准的發行數量為準。

### 發行股份的限售期

泰山石膏少數股東承諾其因本次交易所獲得的北新建材股份自發行完成之日起36個月內不得轉讓。本限售期內，泰山石膏少數股東如因北新建材實施送紅股、資本公積金轉增股本事項而增持的北新建材股份，亦應遵守上述限售期限的約定。

### 交割

泰山石膏35%股份應在本次交易生效之日起1個月內完成交割。自交割日起，其一切權利義務均由北新建材享有和承擔。

## 損益安排

本次交易完成前的北新建材滾存未分配利潤由本次交易完成後北新建材的新老股東按照其持有的股份比例共享。

泰山石膏自基準日至交割之日期間所產生的盈利由北新建材享有,所產生的虧損由泰山石膏少數股東按照其在泰山石膏持股比例承擔。

泰山石膏35%股份交割後,由北新建材年報審計機構對泰山石膏進行專項審計,確定基準日至交割日期間泰山石膏35%股份產生的損益。若交割日為當月15日(含15日)之前,則期間損益審計基準日為上月月末;若交割日為當月15日之後,則期間損益審計基準日為當月月末。如存在虧損,則泰山石膏少數股東應當於前述專項審計報告出具之日起五個工作日內將其應當承擔的虧損金額部分以現金方式支付給北新建材。

## 框架協議的生效

框架協議自各方有權代表簽字並加蓋公章之日起成立,自以下條件全部成就且其中最晚成就之日起生效:

1. 泰山石膏股東大會批准本次交易;

2. 北新建材董事會、股東大會分別批准本次交易;

3. 本次交易獲有權單位批准;及

4. 本次交易獲中國證監會具文核准。

## 有關標的公司資料

泰山石膏主要經營紙面石膏板、石膏製品及輕鋼龍骨等相關產品的生產和銷售。根據泰山石膏按照中國公認會計準則編製的中國經審計賬目，2014年及2013年泰山石膏經審計淨利潤(扣除稅項前)分別約為人民幣118,435.35萬元及人民幣114,081.01萬元，2014年及2013年泰山石膏經審計淨利潤(扣除稅項後)分別約為人民幣104,705.34萬元及人民幣100,438.13萬元。泰山石膏截至2014年12月31日止及2013年12月31日止經審計淨資產分別為人民幣373,970.62萬元及人民幣320,276.65萬元。

北新建材主要經營輕質建材業務。根據北新建材按照中國公認會計準則編製的中國經審計賬目，2014年及2013年北新建材經審計淨利潤(扣除稅項前)分別約為人民幣166,266.72萬元及人民幣143,984.93萬元，2014年及2013年北新建材經審計淨利潤(扣除稅項後)分別約為人民幣146,912.66萬元及人民幣125,806.36萬元。北新建材截至2014年12月31日止及2013年12月31日止經審計淨資產分別為人民幣852,515.14萬元及人民幣543,172.18萬元。

## 進行交易之理由及裨益

本次交易完成後，北新建材對泰山石膏將實現100%控股，有利於本集團進一步整合內部資源，提升北新建材經營業績，進一步鞏固本集團的市場地位。

董事會(包括獨立非執行董事)認為，框架協議項下北新建材通過向泰山石膏少數股東非公開發行股份以收購泰山石膏35%股份乃本集團及有關方(包括本公司之關連人士)在本集團日常業務中經公平磋商後按一般商業條款進行，條款屬公平合理且符合本公司及其股東的整體利益。

## 上市規則涵義

由於按照上市規則第14章項下就收購事項的適用百分比有某項超逾5%但所有適用百分比均低於25%，根據上市規則第14章，收購事項構成本公司的一項須予披露交易，須遵守申報及公告規定。

根據框架協議，交易完成後本公司持有北新建材股份由約45.20%降至約35.84%，因此，根據上市規則第14.29條，框架協議項下擬進行之交易構成本公司對北新建材股份之視作出售事項。由於按照上市規則第14章項下有關視作出售事項之適用百分比有某項超逾5%但所有適用百分比均低於25%，根據上市規則第14章，視作出售事項構成本公司的一項須予披露交易，須遵守申報及公告規定。

由於泰山石膏少數股東之國泰民安投資持有泰山石膏16%股份，買同春持有泰山石膏11.36%股份，均為泰山石膏的主要股東，且買同春為泰山石膏董事長及總經理，根據上市規則，國泰民安投資及買同春是本公司附屬公司層面的關連人士，故北新建材非公開發行股份以購買泰山石膏35%股份之交易構成涉及本公司附屬公司層面的關連人士的關連交易。

按照上市規則第14A章項下就收購事項及視作出售事項的適用百分比有某項超逾5%。由於(1)國泰民安投資及買同春為本公司附屬公司層面之關連人士；(2)董事(包括獨立非執行董事)已批准框架協議項下擬進行之交易；(3)獨立非執行董事已確認有關交易之條款誠屬公平合理，有關交易乃按一般商業條款訂立，符合本公司及其股東之整體利益，因此，根據上市規則第14A.101條，收購事項及視作出售事項只須遵守申報及公告規定，但獲豁免刊發通函、獨立財務意見及股東批准規定。

## 溢利預測上市規則合規

鑒於《資產評估報告》採用收益法對泰山石膏進行估值，根據上市規則第14.61條，估值構成溢利預測。

根據上市規則第14.62(1)條，作出《資產評估報告》的主要假設(包括商業假設)的詳情載列如下：

1.　一般性假設

　　①　泰山石膏在經營中所需遵循的國家和地方的現行法律、法規、制度及社會政治和經濟政策與現時無重大變化；

② 泰山石膏將保持持續經營，並在經營方式上與現時保持一致；

③ 國家現行的稅賦基準及稅率，稅收優惠政策、銀行信貸利率以及其他政策性收費等不發生重大變化；

④ 無其他人力不可抗拒及不可預見因素造成的重大不利影響。

**2. 針對性假設**

① 泰山石膏各年間的技術隊伍及其高級管理人員保持相對穩定，不會發生重大的核心專業人員流失問題；

② 泰山石膏各經營主體現有和未來經營者是負責盡職的，且公司管理層能穩步推進公司的發展計劃，保持良好的經營態勢；

③ 泰山石膏未來經營者遵守國家相關法律和法規，不會出現影響公司發展和收益實現的重大違規事項；

④ 泰山石膏提供的歷史財務資料所採用的會計政策和進行收益預測時所採用的會計政策與會計核算方法在重要方面基本一致；

⑤ 評估範圍內的泰山石膏母公司及泰山石膏(湖北)有限公司評估基準日屬高新技術企業，本次評估假定上述兩家企業到期能夠獲得高新技術企業認證並享受有關優惠政策；

⑥ 假定被評估單位經營方式保持不變，以租賃方式經營企業仍採用租賃方式經營。

⑦ 假定被評估單位使用的商標到期能夠續展，能夠永續使用；假定評估範圍內的專利技術在法定保護期內企業能夠及時維護，按要求交納年費。

若 將 來 實 際 情 況 與 上 述 評 估 假 設 產 生 差 異 時 ，將 對 評 估 結 論 產 生 影 響 ，報 告 使 用 者 應 在 使 用 本 報 告 時 充 分 考 慮 評 估 假 設 對 本 評 估 結 論 的 影 響 。

天 職 香 港 會 計 師 事 務 所 有 限 公 司 作 為 本 公 司 的 申 報 會 計 師 ，已 審 閱 估 值 的 未 來 現 金 流 量 折 現 的 計 算 方 法 。

董 事 確 認 ，估 值 構 成 上 市 規 則 項 下 溢 利 預 測 ，乃 經 慎 重 查 詢 後 作 出 。

董 事 會 函 件 及 天 職 香 港 會 計 師 事 務 所 有 限 公 司 函 件 已 載 列 於 本 公 告 的 附 件 內 ，以 遵 守 上 市 規 則 第 14.60A 條 及 14A.68(7) 條 。

於 本 公 告 日 期 ，天 職 香 港 會 計 師 事 務 所 有 限 公 司 概 無 直 接 或 間 接 持 有 本 集 團 任 何 成 員 公 司 的 任 何 股 權 或 有 任 何 權 利 (不 論 在 法 律 上 可 強 制 執 行 與 否 )，可 認 購 或 提 名 他 人 認 購 本 集 團 任 何 成 員 公 司 持 有 證 券 。

就 董 事 所 深 知 、全 悉 及 確 信 ，天 職 香 港 會 計 師 事 務 所 有 限 公 司 為 一 獨 立 第 三 方 及 與 本 集 團 概 無 關 連 。

天 職 香 港 會 計 師 事 務 所 有 限 公 司 已 發 出 ，且 未 撤 回 以 現 時 的 形 式 及 涵 義 於 本 公 告 中 刊 載 其 函 件 和 所 有 意 見 的 同 意 書 。

## 訂 約 方 相 關 資 料

本 公 司 乃 中 國 建 築 材 料 行 業 之 領 軍 企 業 ，主 營 水 泥 、輕 質 建 材 、玻 璃 纖 維 及 複 合 材 料 以 及 工 程 服 務 業 務 。

國 泰 民 安 投 資 是 一 間 有 限 責 任 公 司 ，經 營 範 圍 為 授 權 範 圍 內 的 國 有 資 本 運 營 (國 家 法 律 法 規 規 定 需 前 置 審 批 項 目 除 外 )(依 法 須 經 批 准 的 項 目 ，經 相 關 部 門 批 准 後 方 可 開 展 經 營 活 動 )。於 2002 年 ，國 泰 民 安 投 資 取 得 泰 山 石 膏 16% 的 股 份 ，該 等 股 份 價 款 為 人 民 幣 2,390.4 萬 元 。

賈 同 春 為 泰 山 石 膏 董 事 長 及 總 經 理 。賈 同 春 於 2015 年 以 人 民 幣 36,799.9 萬 元 的 代 價 取 得 泰 山 石 膏 11.36% 的 股 權 。

泰 山 石 膏 少 數 股 東 當 中 包 括 泰 安 市 和 達 投 資 中 心 (有 限 合 夥 )在 內 等 10 個 有 限 合 夥 企 業 ，主 營 以 自 有 資 金 投 資 、商 務 諮 詢 、企 業 管 理 諮 詢 等 業 務 。

– 11 –

經作出一切合理查詢後，據董事所深知、所悉及所信，除部分泰山石膏少數股東是泰山石膏或其附屬公司的當前或之前的員工，各泰山石膏少數股東(國泰民安投資及買同春除外)及其最終實益擁有人為獨立第三方，獨立於本公司及其關連人士(定義見上市規則)。由於國泰民安投資持有泰山石膏16%股份，買同春持有泰山石膏11.36%股份，為泰山石膏的主要股東，且買同春為泰山石膏董事長及總經理，根據上市規則，國泰民安投資及買同春是本公司附屬公司層面的關連人士。

本公司董事會無任何董事於關連交易中佔有重大利益。

## 釋義

| 「A股」 | 指 | 北新建材股本中每股面值人民幣1.00元的境內上市股票，於深圳證券交易所上市並以人民幣買賣 |
|---|---|---|
| 「收購事項」 | 指 | 北新建材根據框架協議向泰山石膏少數股東建議購買泰山石膏35%股份 |
| 「北新建材」 | 指 | 北新集團建材股份有限公司，一家根據中國法律註冊成立的股份有限公司，其A股於深圳證券交易所上市 |
| 「董事會」 | 指 | 本公司董事會 |
| 「本公司」 | 指 | 中國建材股份有限公司，一家根據中國法律註冊成立的股份有限公司，其H股於聯交所上市 |
| 「中國證監會」 | 指 | 中國證券監督管理委員會 |

| 「視作出售事項」 | 指 | 由於收購事項完成後本公司持有北新建材股份將由約45.20%降至約35.84%，因此而視作出售北新建材之約9.36%股份予泰山石膏少數股東 |
| --- | --- | --- |
| 「董事」 | 指 | 本公司董事 |
| 「東聯投資」 | 指 | 北京東聯投資有限公司，一家根據中國法律註冊成立的有限責任公司 |
| 「框架協議」 | 指 | 北新建材與泰山石膏少數股東訂立的日期為二零一五年十月十三日的《北新集團建材股份有限公司關於發行股份購買資產的框架協議》 |
| 「本集團」 | 指 | 本公司及其附屬公司 |
| 「國泰民安投資」 | 指 | 泰安市國泰民安投資集團有限公司，一家根據中國法律註冊成立的有限責任公司 |
| 「上市規則」 | 指 | 香港聯合交易所有限公司證券上市規則 |
| 「定價基準日」 | 指 | 北新建材第五屆董事會第十一次臨時會議決議公告日 |
| 「基準日」 | 指 | 為本次交易之目的，對泰山石膏進行評估的評估基準日，具體為二零一五年四月三十日 |
| 「人民幣」 | 指 | 人民幣，中華人民共和國法定貨幣 |
| 「聯交所」 | 指 | 香港聯合交易所有限公司 |

| 「泰山石膏」 | 指 | 泰山石膏股份有限公司，一家根據中國法律註冊成立的股份有限公司 |
|---|---|---|
| 「泰山石膏少數股東」 | 指 | 合共持有泰山石膏35%股份的少數股東，包括持有泰山石膏16%股份的國泰民安投資，合計持有泰山石膏19%股份的泰安市和達投資中心(有限合夥)等10個有限合夥企業及賈同春等35名自然人 |
| 「泰山石膏35%股份」 | 指 | 框架協議項下北新建材擬收購的由泰山石膏少數股東持有的泰山石膏35%股份 |

承董事會命

**中國建材股份有限公司**

**常張利**

*董事會秘書*

中國•北京

二零一五年十月十三日

*於本公告日期，本公司之董事會成員包括執行董事宋志平先生、曹江林先生、彭壽先生、崔星太先生及常張利先生，非執行董事郭朝民先生、黃安中先生及陶錚先生，及獨立非執行董事方勳先生、湯雲為先生、趙立華先生、吳聯生先生及孫燕軍先生。*

\*   僅供識別

– 14 –

遵照上市規則第14.60A及第14A.68(7)條，天職香港會計師事務所有限公司向董事發出的函件已確認其已審閱該估值的未來現金流量折現的計算方法，而董事會函件已確認該估值乃經董事審慎周詳查詢後作出。旨在(其中包括)載入本公告之日期為二零一五年十月十三日的函件的全文現轉載如下：

## 附錄一－董事會函件

敬啟者：

有關：須予披露交易／關連交易－北新建材發股購買泰山石膏35%股份

吾等謹此提述，中和資產評估有限公司(「估值師」)就泰山石膏股份有限公司(「泰山石膏」)的估值，編製日期為二零一五年九月二十五日的《資產評估報告書》(「《資產評估報告》」)，該估值構成香港聯合交易所有限公司證券上市規則第14.61條項下的溢利預測。

吾等已與估值師討論有關泰山石膏的估值，包括編製該等估值的基準及假設，並已審閱估值師負責出具的估值。吾等亦已考慮天職香港會計師事務所有限公司日期為二零一五年十月十三日的函件，內容有關泰山石膏的未來現金流量折現，就算術計算方法而言，是否已根據《評估報告》所載的基準及假設的各重大方面而妥為編製。吾等知悉該未來現金流量折現計算不涉及任何會計政策之採用。

根據上述基準，吾等確認上述估值乃經吾等審慎周詳查詢後作出。

此致

香港
中環
港景街1號
國際金融中心一期11樓
香港聯合交易所有限公司
上市科 台照

謹代表

**中國建材股份有限公司**

*執行董事*

**常張利**

謹啟

二零一五年十月十三日

– 15 –

附錄二－天職香港會計師事務所有限公司函件

下文為本公司核數師天職香港會計師事務所有限公司發出之函件全文，
以供載入本公告。



二零一五年十月十三日

中國
北京市海澱區復興路17號
國海廣場2號樓21層

**有關泰山石膏股份有限公司資產估值之未來現金流量折現報告**

**致中國建材股份有限公司(「貴公司」)董事會**

吾等已獲委聘基於中和資產評估有限公司於二零一五年九月二十五日
編製有關泰山石膏股份有限公司(「泰山石膏」)於二零一五年四月三十日
的公平值估值的資產評估(「評估」)之未來現金流量折現之計算方式作出
報告。此項評估乃基於未來估計現金流量折現所編製，故根據香港聯合
交易所有限公司證券上市規則(「上市規則」)第14.61條，屬溢利預測。

**董事就未來估計現金流量折現承擔的責任**

貴公司董事(「董事」)須負責按照董事釐定並載於評估的基準及假設(「基
準及假設」)編製未來估計現金流量折現。此項責任包括開展與就評估而
編製未來現金流量折現有關的程序及應用適當編製基礎，並按情況作出
合理估計。

## 核 數 師 的 責 任

吾等的責任是根據上市規則第14.62(2)條就評估所使用的未來現金流量折現計算作出報告。吾等並非對未來現金流量折現所依據之基準及假設之合理性與有效性作出報告,且吾等的工作並不構成泰山石膏之任何估值。

吾等已遵守香港會計師公會(「香港會計師公會」)頒佈之香港鑒證業務準則第3000號 –「歷史財務信息審核或審閱以外的鑒證業務」執行委聘工作。該準則要求吾等應計劃和執行工作,以使吾等合理確定(就計算而言)董事是否根據評估所載基礎及假設妥善編製未來現金流量折現。吾等已根據上述基礎及假設對未來現金流量折現之算術計算及編製執行鑒證程序。吾等之工作範圍明顯少於按香港會計師公會頒佈之香港審計準則進行的審計。因此,吾等不發表任何審計意見。

該未來現金流量折現並無涉及應用會計政策。未來現金流量折現取決於未來事件及多項無法按過往業績予以釐定及核證的假設,且並非全部假設於整個期間內一直有效。吾等的工作旨在根據上市規則第14.62(2)條僅向閣下作出報告,而不作其他用途。吾等不會向任何其他人士承擔委聘工作所涉及、產生或相關之任何責任。

## 意 見

基於前述事項,吾等認為就算術計算而言,未來現金流量折現在各重大方面均已按照上述基準及假設妥為編製。

此致

**天 職 香 港 會 計 師 事 務 所 有 限 公 司**

執 業 會 計 師

香 港

Andrew David Ross

執 業 證 書 編 號P01183

謹 啟

– 17 –
