# EXHIBIT 23—part 2

*Litigation by Security Holders*

**.08**    A *covered member* may also become involved in litigation (primary litigation) in which the *covered member* and the *attest client* or its management are defendants. For example, one or more stockholders may bring a stockholders' derivative action or class-action lawsuit against the *attest client* or its management, the *attest client's* officers, directors, or underwriters, and *covered members*.

**.09**    Such primary litigation by itself would not *threaten* the *covered member's* compliance with the "Independence Rule" [1.200.001]. However, if other circumstances exist that may create *threats*, the *covered member* should apply the "Conceptual Framework for Independence" interpretation [1.210.010] to evaluate whether the *threats* are at an *acceptable level*. For example, *threats* will exist if cross-claims are filed against the *covered member* alleging that the *covered member* is responsible for any deficiencies in work performed for the *attest client* or if the *covered member*, as a defense, alleges that the *attest client's* management engaged in fraud or deceit.

**.10**    The following are examples of situations in which *threats* to the *covered member's* compliance with the "Independence Rule" [1.200.001] would not be at an *acceptable level* and could not be reduced to an acceptable level by *safeguards*, thereby *impairing independence*:

        *a.* The *attest client* or its management or directors have filed cross-claims to protect a right to legal redress in the event of a future adverse decision in the primary litigation (or, in lieu of cross-claims, agreements to extend the statute of limitations), and there is a significant risk that the cross-claim will result in a settlement or judgment in an amount that is material to the *covered member's firm* or the *attest client*.

        *b.* The *attest client's* underwriter and the *attest client* or its present management assert cross-claims against the *covered member*.

**.11**    If only the underwriter or officers or directors of other *clients* of the *covered member* file cross-claims against the *covered member*, *threats* to the *covered member's* compliance with the "Independence Rule" [1.200.001] would be at an *acceptable level* unless other circumstances create *threats* to compliance with the "Independence Rule."

*Other Third-Party Litigation*

**.12**    A *lending institution* or other creditor, security holder, or insurance company that alleges reliance on the *attest client's financial statements* as a basis for having extended credit or insurance coverage to an *attest client* may commence third-party litigation against the *covered member* to recover their loss. An example is an insurance company commencing litigation either as a result of receiving an assignment of a claim or under subrogation rights against the *covered member* in the *attest client's* name to recover losses that the insurer reimbursed to the *attest client*. If the *attest client* is only the nominal plaintiff, *threats* to the *covered member's* compliance with the "Independence Rule" [1.200.001] would be at an *acceptable level* unless other circumstances exist, such as when the *covered member* alleges, as a defense, that present management engaged in fraud or deceit. The *attest client* is a nominal plaintiff when the insurance company or lender sues in the name of the *attest client* as a result of obtaining subrogation rights or an assignment from the *attest client* and the *attest client* does not have a beneficial interest in the claim.

**.13**    If the real party in interest in the litigation (for example, the insurance company) is also the *covered member's attest client* (the plaintiff client), *threats* to the *covered member's* compliance with the "Independence Rule" [1.200.001] may exist if the litigation carries a significant risk of a settlement or judgment in an amount that would be material to the *covered member's firm* or the plaintiff client.

*Termination of Impairment*

**.14**    *Threats* to the *covered member's* compliance with the "Independence Rule" [1.200.001] would be eliminated or reduced to an *acceptable level* when the parties reach a final resolution of the matter(s) at

issue and the matter(s) no longer affects the relationship between the *covered member* and the *attest client*, as described in paragraph .01 of this interpretation. The *covered member* should determine whether the conditions of such resolution have effectively eliminated such *threats* or reduced them to an *acceptable level*. [Prior reference: paragraph .08 of ET section 101]

### 1.295 Nonattest Services

### 1.295.010 Scope and Applicability of Nonattest Services

**.01** When a *member* performs nonattest services for an *attest client*, self-review, management participation, or advocacy *threats* to the *member's* compliance with the "Independence Rule" [1.200.001] may exist. When significant *independence threats* exist during the *period of the professional engagement* or the period covered by the *financial statements* (except as provided for in paragraph .03), *independence* will be *impaired* unless the *threats* are reduced to an *acceptable level* and any requirements included in the *interpretations* of the "Nonattest Services" subtopic [1.295] under the "Independence Rule" have been met.

**.02** For purposes of the *interpretations* of the "Nonattest Services" subtopic [1.295] under the "Independence Rule" [1.200.001], the term member includes the *member's firm*.

**.03** *Period of engagement*. A member's *independence* would not be *impaired* if the member performed nonattest services that would have otherwise *impaired independence* during the period covered by the *financial statements* if all of the following conditions exist:

    *a.* The nonattest services were provided prior to *period of the professional engagement*.

    *b.* The nonattest services related to periods prior to the period covered by the *financial statements*.

    *c.* The *financial statements* for the period to which the nonattest services relate were audited by another *firm* (or in the case of a review engagement, reviewed or audited by another *firm*).

> Nonauthoritative questions and answers regarding the period of the professional engagement are available at www.aicpa.org/InterestAreas/ProfessionalEthics/Resources/Tools/DownloadableDocuments/NonattestServicesFAQs.pdf.

**.04** *Activities related to attest services*. Performing attest services often involves communications between the member and *client* management regarding

    *a.* the *client's* selection and application of accounting standards or policies and *financial statement* disclosure requirements;

    *b.* the appropriateness of the *client's* methods used in determining accounting and financial reporting;

    *c.* adjusting journal entries that the member has prepared or proposed for *client* management consideration; and

    *d.* the form or content of the *financial statements*.

These communications are considered a normal part of the *attest engagement* and are not considered nonattest services subject to the "General Requirements for Performing Nonattest Services" [1.295.040] and "Documentation Requirements When Providing Nonattest Services" [1.295.050] interpretations.

**.05** However, the member should exercise judgment in determining whether his or her involvement has become so extensive that it would constitute performing a separate service which would be subject to the "General Requirements for Performing Nonattest Services" interpretation [1.295.040].

**.06** For example, activities such as *financial statement* preparation, cash-to-accrual conversions, and reconciliations are considered outside the scope of the *attest engagement* and, therefore, constitute a

nonattest service. Such activities would not *impair independence* if the requirements of the *interpretations* of the "Nonattest Services" subtopic [1.295] are met.

---

Nonauthoritative questions and answers regarding routine activities are available at www.aicpa.org/InterestAreas/ ProfessionalEthics/Resources/Tools/DownloadableDocuments/NonattestServicesFAQs.pdf.

---

**.07** *Engagements subject to independence rules of certain regulatory or standard-setting bodies. Threats* to compliance with the "Independence Rule" [1.200.001] would not be at an *acceptable level* and could not be reduced to an *acceptable level* through the application of *safeguards* if a member is not in compliance with the *independence* regulations of authoritative regulatory bodies that are more restrictive than the *interpretations* of the "Nonattest Services" subtopic [1.295] under the "Independence Rule" (examples of such authoritative bodies are the SEC, the Government Accountability Office [GAO], the Department of Labor [DOL], the Public Company Accounting Oversight Board [PCAOB], and state boards of accountancy) when a member performs nonattest services for an *attest client* and is required to be independent of the *attest client* under the regulations of the applicable regulatory body. Independence would be *impaired* under these circumstances. [Prior reference: paragraph .05 of ET section 101]

### *Effective Date*

**.08** Paragraph .06 of this interpretation is effective for engagements covering periods beginning on or after December 15, 2014.

### 1.295.020 Cumulative Effect on Independence When Providing Multiple Nonattest Services

**.01** The *interpretations* of the "Nonattest Services" subtopic [1.295] under the "Independence Rule" [1.200.001] include various examples of nonattest services that individually would not *impair independence* because the *safeguards* in the "General Requirements for Performing Nonattest Services" interpretation [1.295.040] reduce the self-review and management participation *threats* to an *acceptable level*. However, performing multiple nonattest services can increase the significance of these *threats* as well as other *threats* to *independence*.

**.02** Before agreeing to perform nonattest services, the member should evaluate whether the performance of multiple nonattest services by the *member* or *member's firm* in the aggregate creates a significant *threat* to the member's *independence* that cannot be reduced to an *acceptable level* by the application of the *safeguards* in the "General Requirements for Performing Nonattest Services" interpretation [1.295.040].

**.03** In situations in which a member determines that *threats* are not at an *acceptable level*, *safeguards* in addition to those in the "General Requirements for Performing Nonattest Services" interpretation [1.295.040] should be applied to eliminate the *threats* or reduce them to an *acceptable level*. If no *safeguards* exist that will eliminate or reduce the *threats* to an *acceptable level*, *independence* would be *impaired*.

**.04** For purposes of this interpretation, the member is not required to consider the possible *threats* to *independence* created due to the provision of nonattest services by other *network firms* within the *firm's network*. [Prior reference: paragraph .05 of ET section 101]

### *Effective Date*

**.05** This interpretation is effective for engagements covering periods beginning on or after December 15, 2014.

### 1.295.030 Management Responsibilities

**.01** If a member were to assume a management responsibility for an *attest client*, the management participation *threat* would be so significant that no *safeguards* could reduce the *threat* to an *acceptable level* and *independence* would be *impaired*. It is not possible to specify every activity that is a management

Case 2:09-md-02047-EEF-MBN Document 22363-28 Filed 11/19/19 Page 5 of 104
Case 1:11-cv-22408-MGC Document 271-8 Entered on FLSD Docket 09/13/2019 Page 91 of
190

responsibility. However, management responsibilities involve leading and directing an entity, including making significant decisions regarding the acquisition, deployment, and control of human, financial, physical, and intangible resources.

.02 Whether an activity is a management responsibility depends on the circumstances and requires the exercise of judgment. Examples of activities that would be considered management responsibilities and, as such, *impair independence* if performed for an *attest client*, include

  *a.* setting policy or strategic direction for the *attest client.*

  *b.* directing or accepting responsibility for actions of the *attest client's* employees except to the extent permitted when using internal auditors to provide assistance for services performed under auditing or attestation standards.

  *c.* authorizing, executing, or consummating transactions or otherwise exercising authority on behalf of an *attest client* or having the authority to do so.

  *d.* preparing *source documents*, in electronic or other form, that evidence the occurrence of a transaction.

  *e.* having custody of an *attest client's* assets.

  *f.* deciding which recommendations of the member or other third parties to implement or prioritize.

  *g.* reporting to *those charged with governance* on behalf of management.

  *h.* serving as an *attest client's* stock transfer or escrow agent, registrar, general counsel or equivalent.

  *i.* accepting responsibility for the management of an *attest client's* project.

  *j.* accepting responsibility for the preparation and fair presentation of the *attest client's financial statements* in accordance with the applicable financial reporting framework.

  *k.* accepting responsibility for designing, implementing, or maintaining internal control.

  *l.* performing ongoing evaluations of the *attest client's* internal control as part of its monitoring activities.

[Prior reference: paragraph .05 of ET section 101]

---

Nonauthoritative questions and answers regarding management responsibilities and controllership services are available at www.aicpa.org/InterestAreas/ProfessionalEthics/Resources/Tools/DownloadableDocuments/ NonattestServicesFAQs.pdf.

---

### 1.295.040 General Requirements for Performing Nonattest Services

.01 When a member performs a nonattest service for an *attest client*, *threats* to the member's compliance with the "Independence Rule" [1.200.001] may exist. Unless an *interpretation* of the "Nonattest Services" subtopic [1.295] under the "Independence Rule" states otherwise, *threats* would be at an *acceptable level*, and *independence* would not be *impaired*, when all the following *safeguards* are met:

  *a.* The member determines that the *attest client* and its management agree to

    *i.* assume all management responsibilities as described in the "Management Responsibilities" interpretation [1.295.030].

 i i. oversee the service, by designating an individual, preferably within senior management, who possesses suitable skill, knowledge, and/or experience. The member should assess and be satisfied that such individual understands the services to be performed sufficiently to oversee them. However, the individual is not required to possess the expertise to perform or re-perform the services.

 i ii. evaluate the adequacy and results of the services performed.

 i v. accept responsibility for the results of the services.

 b. The member does not assume management responsibilities (See the "Management Responsibilities" interpretation [1.295.030] of the "Independence Rule") when providing nonattest services and the member is satisfied that the *attest client* and its management will

 i. be able to meet all of the criteria delineated in item *a*;

 i i. make an informed judgment on the results of the member's nonattest services; and

 i ii. accept responsibility for making the significant judgments and decisions that are the proper responsibility of management.

If the *attest client* is unable or unwilling to assume these responsibilities (for example, the *attest client* cannot oversee the nonattest services provided or is unwilling to carry out such responsibilities due to lack of time or desire), the member's performance of nonattest services would *impair independence*.

 c. Before performing nonattest services the member establishes and documents in writing his or her understanding with the *attest client* (board of directors, audit committee, or management, as appropriate in the circumstances) regarding

 i. objectives of the engagement,

 i i. services to be performed,

 i ii. *attest client's* acceptance of its responsibilities,

 iv. member's responsibilities, and

 v. any limitations of the engagement.

**.02**   The *safeguards* in paragraph .01 and the "Documentation Requirements When Providing Nonattest Services" interpretation [1.295.050] of the "Independence Rule" [1.200.001] do not apply to certain routine activities performed by the member, such as providing advice and responding to the *attest client's* questions as part of the *client*-member relationship. However, in providing such services, the member must not assume management responsibilities, as described in the "Management Responsibilities" interpretation [1.295.030] of the "Independence Rule." [Prior reference: paragraph .05 of ET section 101]

Nonauthoritative questions and answers regarding suitable skill, knowledge, and experience are available at www.aicpa.org/InterestAreas/ProfessionalEthics/Resources/Tools/DownloadableDocuments/ NonattestServicesFAQs.pdf.

## 1.295.050 Documentation Requirements When Providing Nonattest Services

**.01**   Before performing nonattest services, the member should document in writing the member's understanding established with the *attest client*, as described in paragraph .01*c* of the "General Requirements for Performing Nonattest Services" interpretation [1.295.040] of the "Independence Rule" [1.200.001].

**.02**    Failure to prepare the required documentation does not *impair independence* provided that the member did establish the understanding with the *attest client*. However, failure to prepare the required documentation would be considered a violation of the "Compliance With Standards Rule" [1.310.001].

**.03**    The documentation requirement does not apply to nonattest services performed prior to the *period of the professional engagement* for an *attest client*. However, for nonattest services provided during the period covered by the *financial statements*, the member should document in writing that the requirements of the "General Requirements for Performing Nonattest Services" interpretation [1.295.040] were met prior to the *period of the professional engagement*, including the requirement to establish an understanding with the *attest client*. [Prior reference: paragraph .05 of ET section 101]

---

Sample language for how to document your understanding with the attest client is available at www.aicpa.org/ InterestAreas/ProfessionalEthics/Resources/Tools/DownloadableDocuments/NonattestServicesFAQs.pdf.

---

### 1.295.105 Advisory Services

**.01**    Self-review or management participation *threats* to compliance with the "Independence Rule" [1.200.001] may exist when a member performs advisory services for an *attest client*.

**.02**    If the member's services are only advisory in nature and the member applies the "General Requirements for Performing Nonattest Services" interpretation [1.295.040] of the "Independence Rule" [1.200.001], *threats* would be at an *acceptable level* and *independence* would not be *impaired*. For example, a member may

> *a.* provide advice, research materials, and recommendations to assist management in performing its functions and making decisions.

> *b.* attend board meetings as a nonvoting advisor.

> *c.* interpret *financial statements*, forecasts, or other analyses.

> *d.* provide management with advice regarding its potential plans, strategies, or relationships.

**.03**    However, *threats* to compliance with the "Independence Rule" [1.200.001] would not be at an *acceptable level* and could not be reduced to an *acceptable level* by the application of *safeguards* if a member assumes any management responsibilities, as described in the "Management Responsibilities" interpretation [1.295.030]. Accordingly, *independence* is *impaired*. [Prior reference: paragraph .05 of ET section 101 and paragraphs .015–.016 of ET section 191]

### 1.295.110 Appraisal, Valuation, and Actuarial Services

**.01**    Self-review or management participation *threats* to compliance with the "Independence Rule" [1.200.001] may exist when a member performs appraisal, valuation, or actuarial service for an *attest client*.

**.02**    *Threats* to compliance with the "Independence Rule" [1.200.001] would not be at an *acceptable level* and could not be reduced to an *acceptable level* by the application of *safeguards* if the member performs an appraisal, a valuation, or an actuarial service for an *attest client* when (*a*) the services involve a significant degree of subjectivity and (*b*) the results of the service, individually or when combined with other valuation, appraisal, or actuarial services, are material to the *attest client's financial statements*. Accordingly, *independence* would be *impaired* under these circumstances..

**.03**    When performing appraisal, valuation, and actuarial services for an *attest client* that are permitted under this interpretation, all requirements of the "General Requirements for Performing Nonattest Services" interpretation [1.295.040] of the "Independence Rule" [1.200.001] should be met, including that all significant assumptions and matters of judgment are determined or approved by the *attest client*, and the

Part 1 — Members in Public Practice

*attest client* is in a position to have an informed judgment on, and accepts responsibility for, the results of the service.

**Valuations Involving a Significant Degree of Subjectivity**

**.04**   Examples of valuations that generally involve a significant degree of subjectivity include, ESOPs, business combinations, or appraisals of assets or liabilities. Accordingly, if these services produce results that are material to the *attest client's financial statements*, *independence* would be *impaired*.

**Actuarial Valuations of Pension or Postemployment Benefit Liabilities**

**.05**   An actuarial valuation of an *attest client's* pension or postemployment benefit liabilities generally does not involve a significant degree of subjectivity because reasonably consistent results are produced when the same assumptions and information are used in performing the valuation. Therefore, *threats* would be at an *acceptable level* and *independence* would not be *impaired*.

**Appraisal, Valuations, and Actuarial Services for Nonfinancial Statement Purposes**

**.06**   *Threats* would be at an *acceptable level* if a member provided appraisal, valuation, or actuarial services solely for nonfinancial statement purposes. Some examples are appraisal, valuation, and actuarial services performed for tax planning or tax compliance, estate and gift taxation, and divorce proceedings. Accordingly, *independence* would not be *impaired*. [Prior reference: paragraph .05 of ET section 101]

Nonauthoritative questions and answers regarding appraisal, valuation, and actuarial services are available at www.aicpa.org/InterestAreas/ProfessionalEthics/Resources/Tools/DownloadableDocuments/NonattestServicesFAQs.pdf.

### 1.295.115 Benefit Plan Administration

**.01**   When a member provides benefit plan administration services to an *attest client*, self-review and management participation *threats* to the member's compliance with the "Independence Rule" [1.200.001] may exist.

**.02**   Notwithstanding the conclusions reached in paragraph .03 of this interpretation, a member should comply with the more restrictive independence provisions of the Employee Retirement Income Security Act (ERISA) of 1974 and DOL regulations when performing audits of employee benefit plans subject to those regulations.

**.03**   If the member applies the "General Requirements for Performing Nonattest Services" interpretation [1.295.040] of the "Independence Rule" [1.200.001], *threats* would be at an *acceptable level* and *independence* would not be *impaired*. For example, the member may

    *a.* communicate summary plan data to a plan trustee.

    *b.* advise management regarding the application and impact of provisions in a plan document.

    *c.* process certain transactions that have been initiated by plan participations or approved by the plan administrators using the member's electronic media, such as an interactive voice response system or Internet connection or other media. Such transactions may include processing investment or benefit elections, changes in contributions to the plan, data entry, participant confirmations, and distributions and *loans*.

    *d.* prepare account valuations for plan participants using data collected through the member's electronic or other media.

    *e.* prepare and transmit participant statements to plan participants based on data collected through the member's electronic or other media.

**.04** However, *threats* to compliance with the "Independence Rule" [1.200.001] would not be at an *acceptable level*, and could not be reduced to an *acceptable level* by the application of *safeguards*, and *independence* would be *impaired* if, for example, a member

   *a.* makes policy decisions on behalf of management.

   *b.* interprets the provisions in a plan document for a plan participant on behalf of management without first obtaining management's concurrence.

   *c.* makes disbursements on behalf of the plan.

   *d.* has custody of the plan's assets.

   *e.* serves in a fiduciary capacity, as defined by ERISA. [Prior reference: paragraph .05 of ET section 101]

### 1.295.120 Bookkeeping, Payroll, and Other Disbursements

**.01** When a member provides bookkeeping, payroll, and other disbursement services to an *attest client*, self-review and management participation *threats* to the *covered member's* compliance with the "Independence Rule" [1.200.001] may exist.

**.02** If the member applies the "General Requirements for Performing Nonattest Services" interpretation [1.295.040] of the "Independence Rule" [1.200.001], *threats* would be at an *acceptable level* and *independence* would not be *impaired*. For example, a member may

   *a.* record transactions to an *attest client's* general ledger when management has determined or approved the account classifications for the transaction.

   *b.* post *client*-coded transactions to an *attest client's* general ledger.

   *c.* prepare *financial statements* based on information in the *attest client's* trial balance.

   *d.* post *client*-approved journal or other entries to an *attest client's* trial balance.

   *e.* propose standard, adjusting, or correcting journal entries or other changes affecting the *financial statements* to the *attest client*. Prior to the member posting these journal entries or changes, the member should be satisfied that management has reviewed the entries and understands the nature of the proposed entries and the effect the entries will have on the *attest client's financial statements*.

   *f.* generate unsigned checks using *source documents* or other records provided and approved by the *attest client*.

   *g.* process an *attest client's* payroll using payroll time records that the *attest client* has provided and approved.

   *h.* transmit *client*-approved payroll or other disbursement information to a bank or similar entity subsequent to the *attest client's* review and authorization for the member to make the transmission. Prior to such transmission, the *attest client* is responsible for making the arrangements with the bank or similar entity to limit the corresponding individual payments regarding the amount and payee. In addition, once transmitted, the *attest client* must authorize the bank or similar entity to process the payroll information.

   *i.* prepare a reconciliation (for example, bank and accounts receivable) that identifies reconciling items for the *client's* evaluation.

Part 1 — Members in Public Practice

**.03**     However, *threats* to compliance with the "Independence Rule" [1.200.001] would not be at an *acceptable level* and could not be reduced to an *acceptable level* by the application of *safeguards*, and *independence* would be *impaired*, if, for example, a member

      *a.* determines or changes journal entries, any account coding or classification of transactions, or any other accounting records without first obtaining the *attest client's* approval.

      *b.* authorizes or approves transactions.

      *c.* prepares *source documents*.

      *d.* makes changes to *source documents* without the *attest client's* approval.

      *e.* accepts responsibility to authorize payment of *attest client* funds, electronically or otherwise, except for electronic payroll tax payments when the member complies with the requirements of the "Tax Services" interpretation [1.295.160] of the "Independence Rule."

      *f.* accepts responsibility to sign or cosign an *attest client's* checks, even if only in emergency situations.

      *g.* maintains an *attest client's* bank account or otherwise has custody of an *attest client's* funds or makes credit or banking decisions for the *attest client*.

      *h.* approves vendor invoices for payment. [Prior reference: paragraph .05 of ET section 101]

> Nonauthoritative questions and answers about bookkeeping services are available at www.aicpa.org/InterestAreas/ ProfessionalEthics/Resources/Tools/DownloadableDocuments/NonattestServicesFAQs.pdf.

## 1.295.125 Business Risk Consulting

**.01**     When a member provides business risk consulting services to an *attest client*, self-review and management participation *threats* to the *covered member's* compliance with the "Independence Rule" [1.200.001] may exist.

**.02**     If the member applies the "General Requirements for Performing Nonattest Services" interpretation [1.295.040] of the "Independence Rule" [1.200.001], *threats* would be at an *acceptable level* and *independence* would not be *impaired*. For example, a member may

      *a.* assist management in its assessment of the *attest client's* business risk control processes.

      *b.* recommend improvements to an *attest client's* business risk control processes and assists in the implementation of these improvements.

**.03**     However, *threats* to compliance with the "Independence Rule" [1.200.001] would not be at an *acceptable level* and could not be reduced to an *acceptable level* by the application of *safeguards*, and *independence* would be *impaired*, if, for example, a member

      *a.* makes or approves business risk decisions.

      *b.* presents business risk considerations to the board or others on behalf of management. [Prior reference: paragraph .05 of ET section 101]

## 1.295.130 Corporate Finance Consulting

**.01**     When a member provides corporate finance consulting services to an *attest client*, self-review, management participation, and advocacy *threats* to the *covered member's* compliance with the "Independence Rule" [1.200.001] may exist.

**.02**     If the member applies the "General Requirements for Performing Nonattest Services" interpretation [1.295.040] of the "Independence Rule" [1.200.001], *threats* would be at an *acceptable level* and *independence* would not be *impaired*. For example, a member may

      *a.* assist management in developing its corporate strategies.

      *b.* assist management in identifying possible sources of capital that meet the *attest client's* specifications or criteria.

      *c.* introduce management to possible sources of capital that meet the *attest client's* specifications or criteria.

      *d.* assist management in analyzing the effects of proposed transactions with potential buyers, sellers, or capital sources.

      *e.* advise an *attest client* during its negotiations with potential buyers, sellers, or capital sources.

      *f.* assist the *attest client* in drafting its offering document or memorandum.

      *g.* participate with management in its transaction negotiations in an advisory capacity.

      *h.* be named as a financial adviser in an *attest client's* private placement memoranda or offering documents.

**.03**     However, *threats* to compliance with the "Independence Rule" [1.200.001] would not be at an *acceptable level* and could not be reduced to an *acceptable level* by the application of *safeguards*, and *independence* would be *impaired*, if, for example, a member

      *a.* commits the *attest client* to the terms of a transaction.

      *b.* consummates a transaction on behalf of the *attest client.*

      *c.* acts as a promoter, an underwriter, a broker-dealer, or a guarantor of an *attest client's* securities or as a distributor of private placement memoranda or offering documents.

      *d.* maintains custody of an *attest client's* securities. [Prior reference: paragraph .05 of ET section 101]

### 1.295.135 Executive or Employee Recruiting

**.01**     When a member provides executive or employee recruiting services to an *attest client*, self-review and management participation *threats* to the *covered member's* compliance with the "Independence Rule" [1.200.001] may exist.

**.02**     If the member applies the "General Requirements for Performing Nonattest Services" interpretation [1.295.040] of the "Independence Rule" [1.200.001], *threats* would be at an *acceptable level* and *independence* would not be *impaired*. For example, a member may

      *a.* recommend a position description or candidate specifications.

      *b.* solicit and screen candidates based on *client*-approved criteria, such as required education, skills, or experience.

      *c.* recommend qualified candidates to the *attest client* for their consideration based on *client*-approved criteria.

      *d.* participate in employee hiring or compensation discussions in an advisory capacity.

**.03**    However, *threats* to compliance with the "Independence Rule" [1.200.001] would not be at an *acceptable level* and could not be reduced to an *acceptable level* by the application of *safeguards*, and *independence* would be *impaired*, if, for example, a member

a. commits the *attest client* to employee compensation or benefit arrangements.

b. hires or terminates the *attest client's* employees. [Prior reference: paragraph .05 of ET section 101]

## 1.295.140 Forensic Accounting

**.01**    *Forensic accounting services.* For purposes of this interpretation, forensic accounting services are nonattest services that involve the application of (*a*) special skills in accounting, auditing, finance, quantitative methods or certain areas of the law, and research and (*b*) investigative skills to collect, analyze, and evaluate evidential matter and to interpret and communicate findings. Forensic accounting services consist of investigative services and litigation services.

**.02**    *Attest client.* For purposes of this interpretation, the term *attest client* refers to an underlying party to the litigation for whom the member is providing services, not the law firm that engages the member on behalf of the law firm's client. If the law firm that engages the member on behalf of the member's *attest client* is also an *attest client* of the member, the member should consider the applicability of the "Cooperative Arrangements With Attest Clients" interpretation [1.265.010] of the "Independence Rule" [1.200.001].

**.03**    *Investigative services.* For purposes of this interpretation, investigative services include all forensic services that do not involve actual or threatened litigation, such as performing analyses or investigations that may require the same skills used in litigation services. When a member provides investigative services to an *attest client*, self-review and management participation *threats* to the *covered member's* compliance with the "Independence Rule" [1.200.001] may exist. However, if the member applies the "General Requirements for Performing Nonattest Services" interpretation [1.295.040] of the "Independence Rule," *threats* will be at an *acceptable level* and *independence* will not be *impaired*.

**.04**    *Litigation services.* For purposes of this interpretation, litigation services recognize the role of the member as an expert or a consultant and consist of providing assistance for actual or potential legal or regulatory proceedings before a trier of fact in connection with the resolution of disputes between parties. Litigation services consist of expert witness services, litigation consulting services, or other litigation services:

a. *Expert witness services.* For purposes of this interpretation, expert witness services are those litigation services in which a member is engaged to render an opinion before a trier of fact about the matter(s) in dispute based on the member's expertise, rather than his or her direct knowledge of the disputed facts or events:

i. Expert witness services create the appearance that a member is advocating or promoting an *attest client's* position. Therefore, the advocacy *threat* would not be at an *acceptable level* and could not be reduced to an *acceptable level* by the application of *safeguards*. Accordingly, if a member is engaged conditionally or unconditionally to provide expert witness services or expert testimony for an *attest client*, *independence* would be *impaired*, except as discussed in the following item ii.

ii. *Threats* to compliance with the "Independence Rule" [1.200.001] would be at an acceptable level, and *independence* would not be *impaired*, if a member provides expert witness services for a large group of plaintiffs or defendants that includes one or more *attest clients* of the *firm*, provided that at the outset of the engagement

1. the member's *attest clients* constitute less than 20 percent of the members of the group, voting interests of the group, and the claim;

2. no *attest client* within the group is designated as the lead plaintiff or defendant of the group; and

Case 1:11-cv-22409-MGC Document 272-8 Entered on FLSD Docket 09/18/2013 Page 99 of
190
Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 13 of 104

3. no *attest client* has the sole decision-making power to select or approve the selection of the expert witness.

   iii. *Fact witness testimony.* Acting as a fact witness (also referred to as a "percipient witness" or "sensory witness") would not be considered a nonattest service. Fact witness testimony is based on the member's direct knowledge of the matters, facts, or events in dispute obtained through the member's performance of prior *professional services* for the *attest client*. As a fact witness, the member's role is to provide factual testimony to the trier of fact. While testifying as a fact witness, the trier of fact or counsel may question a member about the member's opinions pertaining to matters within the member's area of expertise. Answering such questions would not *impair* the member's *independence*.

   iv. In determining whether the member's services are considered expert witness services or fact witness testimony, members should refer to Rules 701–703 of Article VII, "Opinions and Expert Testimony," of the *Federal Rules of Evidence* and also refer to other applicable laws, regulations, and rules.

   v. When providing expert witness services or fact witness testimony, members are required to comply with the "Integrity and Objectivity Rule" [1.100.001].

  *b. Litigation consulting services.* For purposes of this interpretation, litigation consulting services are those litigation services in which a member provides advice about the facts, issues, or strategy pertaining to a matter. The consultant does not testify as an expert witness before a trier of fact:

   i. When a member provides litigation consulting services, advocacy and management participation *threats* to the *covered member's* compliance with the "Independence Rule" may exist. If the member applies the "General Requirements for Performing Nonattest Services" interpretation [1.295.040] of the "Independence Rule," *threats* would be at an *acceptable level* and *independence* would not be *impaired*. For purposes of complying with paragraph *.01b* of the "General Requirements for Performing Nonattest Services" interpretation of the "Independence Rule," the *attest client* may designate its attorney to oversee the litigation consulting services.

   ii. However, if the member providing litigation consulting services subsequently agrees to serve as an expert witness, *threats* to the member's compliance with the "Independence Rule" would not be at an *acceptable level* and could not be reduced to an *acceptable level* by the application of *safeguards*. Accordingly, *independence* would be *impaired*.

  *c. Other litigation services.* The advocacy *threat* would not be at an *acceptable level* and could not be reduced to an *acceptable level* by the application of *safeguards* if a member serves as a trier of fact, a special master, a court-appointed expert, or an arbitrator (including serving on an arbitration panel) in a matter involving an *attest client*. These services create the appearance that the member is not independent; accordingly, *independence* would be *impaired*.

  *d.* However, if the member applies the "General Requirements for Performing Nonattest Services" interpretation of the "Independence Rule," *threats* would be at an *acceptable level* and *independence* would not be *impaired* when a member serves as a mediator or any similar role in a matter involving an *attest client*, provided that the member is not making any decisions on behalf of the parties but, rather, is acting as a facilitator by assisting the parties in reaching their own agreement. When providing such services, the member should consider the requirements of the "Conflicts of Interest" interpretation [1.110.010] of the "Integrity and Objectivity Rule." [Prior reference: paragraph .05 of ET section 101]

**.05**    See   www.aicpa.org/interestareas/professionalethics/community/downloadabledocuments/transistion %20periods.pdf for information about transition provision for engagements commenced prior to February 28, 2007.

Part 1 — Members in Public Practice

**.06**     When providing any type of forensic accounting service, members are required to comply with the "Integrity and Objectivity Rule" [1.100.001].

### 1.295.145 Information Systems Design, Implementation, or Integration

**.01**     When a member provides information systems design, implementation, or integration services to an *attest client*, self-review and management participation *threats* to the *covered member's* compliance with the "Independence Rule" [1.200.001] may exist.

**.02**     If the member applies the "General Requirements for Performing Nonattest Services" interpretation [1.295.04O] of the "Independence Rule" [1.200.001], *threats* would be at an *acceptable level* and *independence* would not be *impaired*. For example, a member may

> a. install or integrate an *attest client's* financial information system that the member did not design or develop (for example, an off-the-shelf accounting package).
>
> b. assist in setting up the *attest client's* chart of accounts and *financial statement* format with respect to the *attest client's* financial information system.
>
> c. design, develop, install, or integrate an *attest client's* information system that is unrelated to the *attest client's financial statements* or accounting records.
>
> d. provide training and instruction to an *attest client's* employees on an information and control system.
>
> e. perform network maintenance, such as updating virus protection, applying routine updates and patches, or configuring user settings consistent with management's request.

**.03**     However, *threats* to compliance with the "Independence Rule" [1.200.001] would not be at an *acceptable level* and could not be reduced to an *acceptable level* by the application of *safeguards*, and *independence* would be *impaired*, if, for example, a member

> a. designs or develops an *attest client's* financial information system.
>
> b. makes other than insignificant modifications to source code underlying an *attest client's* existing financial information system.
>
> c. supervises *attest client* personnel in the daily operation of an *attest client's* information system.
>
> d. operates an *attest client's* network. [Prior reference: paragraph .05 of ET section 101]

> Nonauthoritative questions and answers regarding information systems design, implementation, and integration services are available at www.aicpa.org/InterestAreas/ProfessionalEthics/Resources/Tools/DownloadableDocuments/NonattestServicesFAQs.pdf.

### 1.295.150 Internal Audit

**.01**     For purposes of this interpretation, internal audit services involve assisting the *attest client* in the performance of its internal audit activities, sometimes referred to as "internal audit outsourcing." When a member provides internal audit services to an *attest client*, self-review and management participation *threats* to the *covered member's* compliance with the "Independence Rule" [1.200.001] may exist.

**.02**     The *attest client's* management is responsible for directing the internal audit function, including the management thereof. Such responsibilities include, but are not limited to, designing, implementing and maintaining internal control. *Threats* to compliance with the "Independence Rule" [1.200.001] would not be at an *acceptable level*, cannot be reduced to an *acceptable level* by the application of *safeguards*, and

*independence* would be *impaired* if the *attest client* outsources the internal audit function to the member, whereby the member, in effect, manages the *attest client's* internal audit activities.

.03    However, except for the outsourcing services discussed in paragraph .02, *threats* to compliance with the "Independence Rule" [1.200.001] would be at an *acceptable level* and *independence* would not be *impaired* if the member assists the *attest client* in performing financial and operational internal audit activities, provided that, in addition to the "General Requirements for Performing Nonattest Services" interpretation [1.295.040] of the "Independence Rule," the member is satisfied that management

    *a.* designates an individual or individuals who possess suitable skill, knowledge, and experience, preferably within senior management, to be responsible for the internal audit function.

    *b.* determines the scope, risk, and frequency of internal audit activities, including those the member will perform in providing the services.

    *c.* evaluates the findings and results arising from the internal audit activities, including those the member will perform in providing the services.

    *d.* evaluates the adequacy of the audit procedures performed and the findings resulting from the performance of those procedures.

.04    For example, if the member applies the *safeguards* in paragraph .03, the member may assess whether performance is in compliance with management's policies and procedures, identify opportunities for improvement, and recommend improvement or further action for management consideration and decision making.

.05    The member may assist the individual responsible for the internal audit function in performing preliminary audit risk assessments, preparing audit plans, and recommending audit priorities. The member should also be satisfied that *those charged with governance* are informed about the member's and management's respective roles and responsibilities in connection with the engagement. Such information should provide *those charged with governance* a basis for developing guidelines for management and the member to follow in carrying out these responsibilities and monitoring how well the respective responsibilities have been met.

.06    *Threats* to compliance with the "Independence Rule" [1.200.001] would not be at an *acceptable level* and could not be reduced to an *acceptable level* by the application of *safeguards*, and *independence* would be *impaired*, if, for example, in addition to those activities listed in the "Management Responsibilities" interpretation [1.295.030] of the "Independence Rule," a member

    *a.* performs ongoing evaluations (see paragraph .10 that follows) or control activities (for example, reviewing *loan* originations as part of the *attest client's* approval process or reviewing customer credit information as part of the customer's sales authorization process) that affect the execution of transactions or ensure that transactions are properly executed or accounted for, or both, and performs routine activities in connection with the *attest client's* operating or production processes that are equivalent to those of an ongoing compliance or quality control function.

    *b.* performs separate evaluations on the effectiveness of a significant control such that the member is, in effect, performing routine operations that are built into the *attest client's* business process.

    *c.* has *attest client* management rely on the member's work as the primary basis for the *attest client's* assertions on the design or operating effectiveness of internal controls.

    *d.* determines which, if any, recommendations for improving the internal control system should be implemented.

    *e.* reports to the board of directors or audit committee on behalf of management or the individual responsible for the internal audit function.

  *f.* approves or is responsible for the overall internal audit work plan, including the determination of the internal audit risk and scope, project priorities, and frequency of performance of audit procedures.

  *g.* is connected with the *attest client* as an employee or in any capacity equivalent to a member of management (for example, being listed as an employee in the *attest client's* directories or other *attest client* publications, permitting himself or herself to be referred to by title or description as supervising or being in charge of the *attest client's* internal audit function, or using the *attest client's* letterhead or internal correspondence forms in communications).

**.07**   *Monitoring activities.* Designing, implementing, or maintaining the *attest client's* monitoring activities are management responsibilities. Accordingly, *independence* would be *impaired* if a member accepts responsibility for performing such activities. Monitoring activities are procedures performed to assess whether components of internal control are present and functioning. Monitoring can be done through ongoing evaluations, separate evaluations, or some combination of the two. Ongoing evaluations are generally defined, routine operations built in to the *attest client's* business processes and performed on a real-time basis. Ongoing evaluations, including managerial activities and everyday supervision of employees, monitor the presence and functioning of the components of internal control in the ordinary course of managing the business. A member who performs such activities for an *attest client* would be considered to be accepting responsibility for maintaining the *attest client's* internal control. Accordingly, the management participation *threat* created by a member performing ongoing evaluations is so significant that no *safeguards* could reduce the *threat* to an *acceptable level*, and thus *independence* would be *impaired*.

**.08**   Separate evaluations are conducted periodically and generally not ingrained within the business but can be useful in taking a fresh look at whether internal controls are present and functioning. Such evaluations include observations, inquiries, reviews, and other examinations, as appropriate, to ascertain whether controls are designed, implemented, and conducted. The scope and frequency of separate evaluations is a matter of judgment and vary depending on assessment of risks, effectiveness of ongoing evaluations, and other considerations. Because separate evaluations are not built into the *attest client's* business process, separate evaluations generally do not create a significant management participation *threat* to *independence*.

**.09**   Members should refer to the Committee of Sponsoring Organizations of the Treadway Commission's (COSO's) *Internal Control—Integrated Framework*, for additional guidance on monitoring activities and distinguishing between ongoing and separate evaluations.

**.10**   Members should use judgment in determining whether otherwise permitted internal audit services performed may result in a significant management participation *threat* to *independence*, considering factors such as the significance of the controls being tested, the scope or extent of the controls being tested in relation to the overall *financial statements* of the *client*, as well as the frequency of the internal audit services. If the *threat* to *independence* is considered significant, the member should apply *safeguards* to eliminate or reduce the *threat* to an *acceptable level*. If no *safeguards* could reduce the *threat* to an *acceptable level*, then *independence* would be *impaired*.

**.11**   *Attest-related services.* Services considered extensions of the member's audit scope applied in the audit of the *attest client's financial statements*, such as confirming accounts receivable and analyzing fluctuations in account balances, are not considered internal audit services and would be subject to this interpretation even if the extent of such testing exceeds that required by generally accepted auditing standards (GAAS). In addition, engagements performed under the attestation standards would not be considered internal audit services and, therefore, would not *impair independence*.

**.12**   When a member performs internal audit services that would not *impair independence* under this interpretation and is subsequently engaged to perform an attestation engagement to report on management's assertion regarding the effectiveness of its internal control, *independence* would not be considered *impaired*, provided the member is satisfied that *attest client* management does not rely on the member's work as the primary basis for its assertion. [Prior reference: paragraph .05 of ET section 101]

**1.295.155 Investment Advisory or Management**

.01 When a member provides investment advisory or management services to an *attest client*, self-review and management participation *threats* to the *covered member's* compliance with the "Independence Rule" [1.200.001] may exist.

.02 If the member applies the "General Requirements for Performing Nonattest Services" interpretation [1.295.040] of the "Independence Rule" [1.200.001], *threats* would be at an *acceptable level* and *independence* would not be *impaired*. For example, a member may

    a. recommend the *attest client's* allocation of funds among various investments or asset classes based upon the *attest client's* desired rate of return, risk tolerance, or other parameters.

    b. perform recordkeeping and reporting of the *attest client's* portfolio balances, including providing the *attest client* with a comparative analysis of the *attest client's* investments to third-party benchmarks.

    c. evaluate the manner in which an *attest client's* portfolio is being managed by investment account managers, including assessing whether the managers are

        i. following the guidelines of the *attest client's* investment policy statement.

        ii. meeting the *attest client's* investment objectives.

        iii. conforming to the *attest client's* stated investment parameters or risk tolerance.

    d. transmit an *attest client's* investment selection, with the *attest client's* consent, to the *attest client's* broker-dealer or equivalent, provided that the *attest client* has authorized the broker-dealer or equivalent to execute the transaction.

.03 However, *threats* to compliance with the "Independence Rule" [1.200.001] would not be at an *acceptable level* and could not be reduced to an *acceptable level* by the application of *safeguards*, and *independence* would be *impaired*, if, for example, a member

    a. makes investment decisions on behalf of management or otherwise has discretionary authority over an *attest client's* investments.

    b. executes a transaction to buy or sell an *attest client's* investments.

    c. has custody of an *attest client's* assets, such as taking temporary possession of securities purchased by an *attest client*. [Prior reference: paragraph .05 of ET section 101]

**1.295.160 Tax Services**

.01 For purposes of this interpretation, tax services include preparation of a tax return, transmittal of a tax return, and transmittal of any related tax payment to the taxing authority, signing and filing a tax return, having a power of attorney limited strictly to tax matters; and authorized representation of *attest clients* in administrative proceedings before a taxing authority.

.02 For purposes of this interpretation, a tax return includes all tax filings, including informational tax forms (such as estimated tax vouchers), extension forms, and Forms 990, 5500, 1099, and W-2, filed with a taxing authority or other regulatory agency.

.03 *Preparation and transmittal.* When a member prepares a tax return and transmits the tax return and related tax payment to a taxing authority in paper or electronic form, self-review and management participation *threats* to the member's compliance with the "Independence Rule" [1.200.001] may exist. If the member applies the "General Requirements for Performing Nonattest Services" interpretation [1.295.040] of the

Case 2:09-md-02047-EEF-MBN Document 22363-28 Filed 11/19/19 Page 18 of 104
Case 4:11-cv-22408-MGC Document 272-8 Entered on FLSD Docket 05/13/2015 Page 4 of
190

"Independence Rule," *threats* would be at an *acceptable level* and *independence* would not be *impaired*, provided that the member does not have custody or control over the *attest client's* funds or assets and the individual designated by the *attest client* to oversee the tax services

    *a.* reviews and approves the tax return and related tax payment.

    *b.* if required for filing, signs the tax return prior to the member transmitting the return to the taxing authority.

The following are not considered having custody or control over an *attest client's* funds: making electronic tax payments authorized by an *attest client* pursuant to a taxing authority's prescribed criteria (as discussed in paragraph .04), affixing the *attest client's* depository account information on a tax return, or remitting an *attest client's* check made payable to the taxing authority.

**.04**      If the member applies the "General Requirements for Performing Nonattest Services" interpretation [1.295.040] of the "Independence Rule" [1.200.001], *threats* would be at an *acceptable level* and *independence* would not be *impaired* when a member signs and files a tax return on behalf of management, provided that the member has the legal authority to do so and

    *a.* the taxing authority has prescribed procedures in place for an *attest client* to permit a member to sign and file a tax return on behalf of the *attest client* (for example, Forms 8879 or 8453), and such procedures meet, at the minimum, standards for electronic return originators and officers outlined in Form 8879, or

    *b.* an individual in management who is authorized to sign and file the *attest client's* tax return provides the member with a signed statement that clearly identifies the return being filed and represents that such individual

        *i.* is authorized to sign and file the tax return.

        *ii.* has reviewed the tax return, including accompanying schedules and statements, and it is true, correct, and complete to the best of the individual's knowledge and belief.

        *iii.* authorizes the *member* or another named individual in the *member's firm* to sign and file the tax return on the *attest client* behalf.

**.05**      *Authorized representation in administrative proceedings.* If the member applies the "General Requirements for Performing Nonattest Services" interpretation [1.295.040] of the "Independence Rule" [1.200.001], *threats* would be at an *acceptable level* and *independence* would not be *impaired* if a member acts as the *attest client's* authorized representative in administrative proceedings before a taxing authority, provided that the member obtains the *attest client's* agreement prior to committing the *attest client* to a specific resolution with the taxing authority. [Prior reference: paragraph .05 of ET section 101]

**.06**      *Power of attorney.* When a member has an *attest client's* power of attorney, the self-review, management participation, and advocacy *threats* to the *covered member's* compliance with the "Independence Rule" [1.200.001] may exist. If the member applies the "General Requirements for Performing Nonattest Services" interpretation [1.295.040] of the "Independence Rule," *threats* would be at an *acceptable level* and *independence* would not be *impaired*, provided that the member's use of the power of attorney is limited strictly to tax matters and the member does not bind the *attest client* to any agreement with a taxing authority or other regulatory agency. [No prior reference: new content]

**.07**      *Representation in court.* Threats to compliance with the "Independence Rule" [1.200.001] would not be at an *acceptable level*, and could not be reduced to an *acceptable level* through the application of *safeguards*, and *independence* would be *impaired* if a member represents an *attest client* in court to resolve a tax dispute. For purposes of this interpretation, court encompasses a tax, district, or federal court of claims and the equivalent state, local, or foreign forums. [Prior reference: paragraph .05 of ET section 101]

**.08**    For information about transition provision for engagements commenced prior to February 28, 2007, see www.aicpa.org/interestareas/professionalethics/community/downloadabledocuments/transition%20periods.pdf.

*Effective Date*

**.09**    Paragraph .06 of this interpretation is effective December 15, 2014.

---

A nonauthoritative basis-for-conclusions document that summarizes considerations that were deemed significant in the development of this interpretation is available at www.aicpa.org/InterestAreas/ProfessionalEthics/Resources/Tools/DownloadableDocuments/BasisforConclusionsNonAttestServices.doc.

In addition, nonauthoritative questions and answers regarding performance tax services are available at www.aicpa.org/InterestAreas/ProfessionalEthics/Resources/Tools/DownloadableDocuments/NonattestServicesFAQs.pdf.

---

**1.297 Independence Standards for Engagements Performed in Accordance With Statements on Standards for Attestation Engagements**

**1.297.010 Application of the Independence Rule to Engagements Performed in Accordance With Statements on Standards for Attestation Engagements**

**.01**    The "<u>Independence Rule</u>" [1.200.001] and its *interpretations* apply to all *attest engagements*. However, when performing engagements to issue reports in accordance with Statements on Standards for Attestation Engagements (SSAEs), when *independence* is required or when the *member's* compilation report does not disclose a lack of *independence*, the *covered member* needs to be independent with respect to the responsible party(ies), as defined in the SSAEs.

**.02**    If the individual or entity that engages the *covered member* is not the responsible party, the *covered member* need not be independent of that individual or entity. However, the *covered member* should consider the "<u>Conflicts of Interest</u>" interpretation [1.110.010] of the "Integrity and Objectivity Rule" [1.100.001], with regard to any relationships that may exist with the individual or entity that engages the *covered member* to perform these services.

**.03**    In addition, application of the "<u>Independence Rule</u>" [1.200.001] is further modified as set forth in the "<u>Agreed-Upon Procedures Engagements in Accordance With SSAEs</u>" interpretation [1.297.020] and the "<u>Engagements, Other Than AUPs, Performed in Accordance With SSAEs</u>" interpretation [1.297.030] of the "Independence Rule." [Prior reference: paragraph .13 of ET section 101]

**1.297.020 Agreed-Upon Procedure Engagements Performed in Accordance With SSAEs**

**.01**    For purposes of this interpretation, subject matter is as defined in the SSAEs.

**.02**    When performing agreed-upon procedures (AUP) engagements in accordance with the SSAEs, the application of the "<u>Independence Rule</u>" [1.200.001] is modified, as described in the "<u>Application of the Independence Rule to Engagements Performed in Accordance With Statements on Standards for Attestation Engagements</u>" interpretation [1.297.010] of the "Independence Rule" and this interpretation.

**.03**    When providing nonattest services that would otherwise *impair independence* under the *interpretations* of the "<u>Nonattest Services</u>" subtopic [1.295] under the "Independence Rule" [1.200.001], *threats* would be at an *acceptable level* and *independence* would not be *impaired*, provided that the nonattest services do not relate to the specific subject matter of the SSAE engagement. *Threats* would be at an *acceptable level* and *independence* would also not be *impaired* if the "<u>General Requirements for Performing Nonattest Services</u>" interpretation [1.295.040] of the "Independence Rule" were not applied when providing the

nonattest services, provided that the nonattest services do not relate to the specific subject matter of the AUP engagement.

**.04**    In addition, when performing an AUP engagement under the SSAEs, *threats* would be at an *acceptable level* and *independence* would not be *impaired*, if the following *covered members* and their *immediate families* are independent of the responsible party(ies):

   *a.* Individuals participating on the AUP engagement team

   *b.* Individuals who directly supervise or manage the AUP engagement *partner* or *partner equivalent*

   *c.* Individuals who consult with the *attest engagement team* regarding technical or industry-related issues specific to the AUP engagement

**.05**    Furthermore, *threats* to compliance with the "Independence Rule" [1.200.001] would not be at an *acceptable level* and could not be reduced to an *acceptable level* by the application of *safeguards*, and *independence* would be *impaired*, if the *firm* had a material financial relationship with the responsible party(ies) that was covered by any of the following interpretations of the "Independence Rule":

   *a.* Paragraph .02 of "Overview of Financial Interests" [1.240.010]

   *b.* "Trustee or Executor" [1.245.010]

   *c.* "Joint Closely Held Investments" [1.265.020]

   *d.* "Loans" [1.260.010] [Prior reference: paragraph .13 of ET section 101]

*Effective Date*

**.06**    The addition of *partner equivalents* to paragraph .04 is effective for engagements covering periods beginning on or after December 15, 2014.

### 1.297.030 Engagements, Other Than AUPs, Performed in Accordance With SSAEs

**.01**    For purposes of this interpretation, subject matter is as defined in the SSAEs.

**.02**    When performing an engagement, other than an AUP, in accordance with the SSAEs, the application of the "Independence Rule" [1.200.001] is modified, as described in the "Application of the Independence Rule to Engagements Performed in Accordance With Statements on Standards for Attestation Engagements" interpretation [1.297.010] of the "Independence Rule" and this interpretation.

**.03**    When providing nonattest services that would otherwise *impair independence* under the *interpretations* of the "Nonattest Services" subtopic [1.295], *threats* would be at an *acceptable level* and *independence* would not be *impaired* if the following safeguards are met:

   *a.* Nonattest services do not relate to the specific subject matter of the SSAE engagement.

   *b.* The "General Requirements for Performing Nonattest Services" interpretation [1.295.040] of the "Independence Rule" [1.200.001] are met when providing the nonattest service. [Prior reference: paragraph .13 of ET section 101]

### 1.298 Breach of an Independence Interpretation

### 1.298.010 Breach of an Independence Interpretation

*Introduction*

**.01**   AICPA bylaws require *members* to comply with the "Independence Rule" [1.200.001]. This interpretation provides guidance to assist *members* in evaluating and addressing the consequences of a breach of an *independence interpretation* and the effect on the *attest engagement team's* integrity, objectivity, and professional skepticism so the *member* or *member's firm* can determine if the consequences of a breach can be satisfactorily addressed. This interpretation also provides specific steps and actions the *member* should take when the *member* becomes aware that a breach of an *independence interpretation* has occurred. However, a *member's* determination that the consequences of a breach of an *independence interpretation* have been satisfactorily addressed will not preclude an investigation or enforcement action. In any case, the *member* should be prepared to justify such determination.

### Required Policies and Procedures Established by the Firm

**.02**   In order for the consequences of an *independence* breach to be addressed by a *member* or the *member's firm* pursuant to the provisions of this interpretation, the *firm* must be compliant with QC section 10, *A Firm's System of Quality Control* (AICPA, *Professional Standards*), which requires the *member's firm* to have established policies and procedures designed to provide it with reasonable assurance that the *firm*, its personnel, and, when applicable, others subject to *independence* requirements, maintain *independence* when required. The policies and procedures should enable the *firm* to communicate its *independence* requirements to its personnel and, when applicable, others subject to them; to identify and evaluate circumstances and relationships that create *threats to independence*; and to take appropriate action to eliminate those *threats* or reduce them to an *acceptable level* by applying *safeguards* or, if effective *safeguards* cannot be applied, withdrawing from the engagement. These policies and procedures should be designed to provide the *firm* with reasonable assurance that it is notified of breaches of *independence* requirements and to enable it to take appropriate actions to resolve such situations.

### Breaches Resulting in Significant Threats

**.03**   In situations in which a *partner* or professional employee of the *firm* breaches an *independence interpretation* and the *threat* to *independence* resulting from the breach is significant such that the *attest engagement team's* integrity, objectivity, and professional skepticism are compromised, the provisions of this interpretation could not address the consequences of the breach as no actions could be taken to satisfactorily address the consequences of the breach.

**.04**   In situations in which the lead *attest engagement* partner or an *individual in a position to influence the attest engagement* either (1) committed the breach or (2) knows of a breach and fails to ensure the breach is promptly communicated to or known by an appropriate individual within the firm as described in this interpretation, there is a rebuttable presumption the provisions of this interpretation would not be able to address the breach as the *threats* to the *attest engagement team's* integrity, objectivity, and professional skepticism and the threats to the appearance of *independence* would be considered so significant that no actions could be taken to satisfactorily address the consequences of the breach.

### Identifying and Communicating a Breach

**.05**   When a breach is identified, the *member* should, in accordance with his or her *firm's* policies and procedures, promptly communicate the breach to an appropriate individual within the *firm*, for example, an individual or individuals with responsibility for the policies and procedures relating to *independence*, or the *attest engagement partner* (the responsible individual).

**.06**   The responsible individual should report the breach to those who need to take appropriate action and, when appropriate, should report the breach to relevant *network firms*. The responsible individual should be satisfied that the interest or relationship that caused the breach has been terminated, suspended, or eliminated and should address the consequences of the breach. A consequence of a breach may be that termination of the *attest engagement* is necessary.

### Evaluating the Significance of a Breach

**.07**   The responsible individual should evaluate the significance of the breach and its effect on the *attest engagement team's* integrity, objectivity, and professional skepticism and the ability to issue an attest report. The significance of the breach will depend on factors such as the following:

   *a.* The nature and duration of the breach

   *b.* The number and nature of any previous breaches with respect to the current *attest engagement*

   *c.* Whether a *member* of the *attest engagement team* had knowledge of the interest or relationship that caused the breach

   *d.* Whether the individual who caused the breach is a *member* of the *attest engagement team* or another individual for whom there are *independence* requirements

   *e.* The role of the individual if the breach relates to a *member* of the *attest engagement team*

   *f.* The effect of the service, if any, on the accounting records or the *attest client's financial statements* if the breach was caused by the provision of a *professional service*

   *g.* Whether a *partner* or *partner equivalent* of the *firm* had knowledge of the breach and failed to ensure that the breach was promptly communicated to an appropriate individual within the *firm*

   *h.* Whether the breach involved solely an *affiliate* of a *financial statement attest client* and if so, the nature of the *affiliate* relationship

   *i.* The extent of the self-interest, advocacy, undue influence, or other *threats* created by the breach

### *Addressing the Consequences of a Breach*

**.08**   Depending upon the significance of the breach, it may be necessary to terminate the *attest engagement* or it may be possible to take action that satisfactorily addresses the consequences of the breach. Certain breaches described in this interpretation cannot be addressed by the provisions of this interpretation. For all other breaches, the responsible individual should determine whether satisfactory action can be taken and is appropriate in the circumstances. In making this determination, the responsible individual should exercise professional judgment and take into account whether a reasonable and informed third party, weighing the significance of the breach, the action to be taken, and all the specific facts and circumstances available to the *member* at that time, would likely conclude that the *attest engagement team's* integrity, objectivity, and professional skepticism would be compromised and therefore whether *independence* is *impaired.*

**.09**   Examples of actions that the responsible individual may consider include the following:

   *a.* Removing the relevant individual from the *attest engagement team*

   *b.* Conducting an additional review of the affected attest work or re-performing that work to the extent necessary; in either case, using different personnel

   *c.* Recommending that the *attest client* engage another *firm* to review or re-perform the affected attest work to the extent necessary

   *d.* Engaging another *firm* to evaluate the results of the nonattest service or having another firm re-perform the nonattest service to the extent necessary to enable it to take responsibility for the service if the breach relates to a nonattest service that affects the accounting records or an amount that is recorded in the *financial statements*

### *Communicating With Those Charged With Governance at the Attest Client*

**.10**   If the responsible individual determines that action cannot be taken to satisfactorily address the consequences of the breach, the responsible individual should inform *those charged with governance* as

Case 4:11-cv-02408-MGC Document 272-8 Entered on FLSD Docket 05/13/2013 Page 409 of
Case 2:09-md-02047-EEF-MBN Document 22363-28 Filed 11/19/19 Page 23 of 104
190

soon as practicable and take the steps necessary to terminate the *attest engagement* in compliance with any applicable legal or regulatory requirements relevant to terminating the *attest engagement*. Where termination is not permitted by law or regulation, the responsible individual should comply with any reporting or disclosure requirements.

.11    If the responsible individual determines that action can be taken to satisfactorily address the consequences of the breach, the responsible individual should discuss the breach and the action taken or proposed to be taken with *those charged with governance* as soon as practicable, unless *those charged with governance* have specified an alternative timing for reporting less significant breaches. The matters to be discussed should include the following:

   *a.* The significance of the breach, including its nature and duration

   *b.* How the breach occurred and how it was identified

   *c.* The action taken or proposed to be taken and the responsible individual's rationale for how the action will satisfactorily address the consequences of the breach and enable the *firm* to issue the attest report

   *d.* The conclusion that, in the responsible individual's professional judgment, the integrity, objectivity, and professional skepticism of the *attest engagement team* has not been compromised and the rationale for that conclusion

   *e.* Any steps that the responsible individual has taken or proposes to take to reduce or avoid the risk of further breaches occurring

.12    The responsible individual should communicate in writing with *those charged with governance* all matters discussed in accordance with the paragraph above and obtain the concurrence of *those charged with governance* that action can be, or has been, taken to satisfactorily address the consequences of the breach. The communication shall include a description of the *firm's* policies and procedures relevant to the breach designed to provide it with reasonable assurance that *independence* is maintained and any steps that the *firm* has taken, or proposes to take, to reduce or avoid the risk of further breaches occurring. If *those charged with governance* do not concur that the action satisfactorily addresses the consequences of the breach, the responsible individual should take the steps necessary to terminate the *attest engagement*, where permitted by law or regulation, in compliance with any applicable legal or regulatory requirements relevant to terminating the *attest engagement*. Where termination is not permitted by law or regulation, the responsible individual should comply with any reporting or disclosure requirements.

### Breaches Relating to Previously Issued Reports

.13    If the breach occurred prior to the issuance of the previous attest report, the responsible individual should comply with this section in evaluating the significance of the breach and its effect on the *attest engagement team's* objectivity, integrity, and professional skepticism and its ability to issue an attest report in the current period. The responsible individual should also consider the effect of the breach, if any, on the *attest engagement team's* integrity, objectivity, and professional skepticism in relation to any previously issued attest reports, and the possibility of withdrawing such attest reports in accordance with professional standards, and discuss the matter with *those charged with governance*.

### Documentation

.14    The responsible individual should document the breach, the action taken, key decisions made and all the matters discussed with *those charged with governance* and any discussions with a professional body, relevant regulator, or oversight authority. When the *firm* continues with the *attest engagement*, the matters to be documented should also include the conclusion that, in the responsible individual's professional judgment, the integrity, objectivity, and professional skepticism of the *attest engagement team* have not been compromised and the rationale for why the action taken satisfactorily addressed the consequences

of the breach such that the *firm* could issue an attest report. Failure to prepare the required documentation does not *impair independence* provided the *member* can demonstrate the *member* satisfactorily addressed the consequences of the breach and discussed the breach, the action taken, and key decisions made with *those charged with governance*, and as applicable, a professional body, relevant regulator, or oversight authority. However, failure to prepare the required documentation would be considered a violation of the "Compliance With Standards Rule" [1.310.001].

**.15**    Refer to the "Unsolicited Financial Interests" interpretation [1.240.020] of the "Independence Rule" [1.200.001] for guidance on unsolicited financial interests.

### Effective Date

**.16**    This interpretation is effective March 31, 2016. Early implementation is allowed.

## 1.300 General Standards

## 1.300.001 General Standards Rule

**.01**    A *member* shall comply with the following standards and with any *interpretations* thereof by bodies designated by *Council*:

      *a.* Professional Competence. Undertake only those *professional services* that the *member* or the *member's firm* can reasonably expect to be completed with professional competence.

      *b.* Due Professional Care. Exercise due professional care in the performance of *professional services*.

      *c.* Planning and Supervision. Adequately plan and supervise the performance of *professional services*.

      *d.* Sufficient Relevant Data. Obtain sufficient relevant data to afford a reasonable basis for conclusions or recommendations in relation to any *professional services* performed.

    (See appendix A, "*Council* Resolution Designating Bodies to Promulgate Technical Standards.") [Prior reference: paragraph .01 of ET section 201]

### Interpretations Under the General Standards Rule

## 1.300.005 Application of the Conceptual Framework for Members in Public Practice and Ethical Conflicts

**.01**    In the absence of an *interpretation* of the "General Standards Rule" [1.300.001] that addresses a particular relationship or circumstance, a *member* should apply the "Conceptual Framework for Members in Public Practice" [1.000.010].

**.02**    A *member* would be considered in violation of the "General Standards Rule" [1.300.001] if the *member* cannot demonstrate that *safeguards* were applied that eliminated or reduced significant *threats* to an *acceptable level*.

**.03**    A *member* should consider the guidance in "Ethical Conflicts" [1.000.020] when addressing ethical conflicts that may arise when the *member* encounters obstacles to following an appropriate course of action. Such obstacles may be due to internal or external pressures or to conflicts in applying relevant professional or legal standards, or both. [No prior reference: new content]

### Effective Date

**.04**    Paragraphs .01 and .02 are effective December 15, 2015, and early implementation is allowed provided the member has implemented the revised code. Paragraph .03 is effective December 15, 2014.

Case 2:09-md-02047-EEF-MBN Document 22363-28 Filed 11/19/19 Page 25 of 104
Case 4:11-cv-22408-MGC-EEF-MBN Document 272-8 Entered on FLSD Docket 05/13/2019 Page 411 of
190

Part 1 — Members in Public Practice

### 1.300.010 Competence

**.01** Competence, in this context, means that the *member* or *member's* staff possess the appropriate technical qualifications to perform *professional services* and that the *member*, as required, supervises and evaluates the quality of work performed. Competence encompasses knowledge of the profession's standards, the techniques and technical subject matter involved, and the ability to exercise sound judgment in applying such knowledge in the performance of *professional services*.

**.02** A *member's* agreement to perform *professional services* implies that the *member* has the necessary competence to complete those services according to professional standards and to apply the *member's* knowledge and skill with reasonable care and diligence. However, the *member* does not assume a responsibility for infallibility of knowledge or judgment.

**.03** The *member* may have the knowledge required to complete the services in accordance with professional standards prior to performance. A normal part of providing *professional services* involves performing additional research or consulting with others to gain sufficient competence.

**.04** If a *member* is unable to gain sufficient competence, the *member* should suggest, in fairness to the *client* and public, the engagement of a competent person to perform the needed *professional service*, either independently or as an associate. [Prior reference: paragraph .02 of ET section 201]

### 1.300.020 Supervision of a Specialist on Consulting Engagements

**.01** A *member* who employs a specialist to perform consulting services for the *member's clients* must be qualified to supervise and evaluate the work of that specialist. Although the *member* is not required to be able to perform each of the specialist's tasks, the *member* should be able to define the tasks and evaluate the end product. [Prior reference: paragraphs .017–.018 of ET section 291]

### 1.300.030 Submission of Financial Statements

**.01** When a *member* prepares or submits *financial statements* as a stockholder, a partner, a director, an officer, or an employee of an entity using the *firm's* letterhead or similar identification, the *member* should comply with the "Compliance With Standards Rule" [1.310.001], including any requirements to disclose a lack of *independence* in the *member's* report.

**.02** Refer to the "Use of a CPA Credential" interpretation [2.400.100] of the "Acts Discreditable Rule" [2.400.001] and the "Submission of Financial Statements" interpretation [2.300.030] of the "General Standards Rule" [2.300.001] for additional guidance. [Prior reference: paragraphs .019–.020 of ET section 291]

### 1.300.040 Use of a Third-Party Service Provider

**.01** A *member* who uses a *third-party service provider* to assist the *member* in providing *professional services* such as bookkeeping, tax preparation, or consulting or attest services, including related clerical or data entry functions, is required to comply with the "General Standards Rule" [1.300.001] and the "Compliance With Standards Rule" [1.310.001]. To accomplish this,

> *a.* before using a *third-party service provider*, the *member* should ensure that the *third-party service provider* has the required professional qualifications, technical skills, and other resources. Factors that can be helpful in evaluating a prospective *third-party service provider* include business, financial, and personal references from banks, other CPAs, and other customers of the *third-party service provider*; the *third-party service provider's* professional reputation and recognition in the community; published materials (articles and books that he or she has authored); and the *member's* personal evaluation of the *third-party service provider*.

> *b.* the *member* must adequately plan and supervise the *third-party service provider's professional services* so that the *member* ensures that the services are performed with competence and due

professional care. The *member* must also obtain sufficient relevant data to support the work product and comply with all technical standards applicable to the *professional services*.

**.02** The *member's* responsibility for planning and supervising the *third-party service provider's* work does not extend beyond the requirements of applicable professional standards, which may vary depending upon the nature of the *member's* engagement.

**.03** Refer to the "Use of a Third-Party Service Provider" interpretation [1.150.040] of the "Integrity and Objectivity Rule" [1.100.001] and the "Disclosing Information to a Third-Party Service Provider" interpretation [1.700.040] of the "Confidential Client Information Rule" [1.700.001] for additional guidance. [Prior references: paragraphs .015–.016 and .023–.024 of ET section 291]

A nonauthoritative basis-for-conclusion document summarizing considerations that were deemed significant in the development of this interpretation is available at www.aicpa.org/InterestAreas/ProfessionalEthics/Resources/Tools/DownloadableDocuments/BasisforConclusionsOutsourcing.pdf.

## 1.310 Compliance With Standards

### 1.310.001 Compliance With Standards Rule

**.01** A *member* who performs auditing, review, compilation, management consulting, tax, or other *professional services* shall comply with standards promulgated by bodies designated by *Council*.

**.02** See Appendix A "*Council* Resolution Designating Bodies to Promulgate Technical Standards." [Prior reference: paragraph .01 of ET section 202]

**Interpretations Under the Compliance with Standards Rule**

### 1.310.005 Application of the Conceptual Framework for Members in Public Practice and Ethical Conflicts

**.01** In the absence of an *interpretation* of the "Compliance With Standards Rule" [1.310.001] that addresses a particular relationship or circumstance, a *member* should apply the "Conceptual Framework for Members in Public Practice" [1.000.010].

**.02** A *member* would be considered in violation of the "Compliance With Standards Rule" [1.310.001] if the *member* cannot demonstrate that *safeguards* were applied that eliminated or reduced significant *threats* to an *acceptable level*.

**.03** A *member* should consider the guidance in "Ethical Conflicts" [1.000.020] when addressing ethical conflicts that may arise when the *member* encounters obstacles to following an appropriate course of action. Such obstacles may be due to internal or external pressures or to conflicts in applying relevant professional or legal standards, or both. [No prior reference: new content]

*Effective Date*

**.04** Paragraphs .01 and .02 are effective December 15, 2015, and early implementation is allowed provided the member has implemented the revised code. Paragraph .03 is effective December 15, 2014.

## 1.320 Accounting Principles

### 1.320.001 Accounting Principles Rule

**.01** A *member* shall not (1) express an opinion or state affirmatively that the *financial statements* or other financial data of any entity are presented in conformity with generally accepted accounting principles or (2) state that he or she is not aware of any material modifications that should be made to such statements or data in order for them to be in conformity with generally accepted accounting principles, if such statements

or data contain any departure from an accounting principle promulgated by bodies designated by *Council* to establish such principles that has a material effect on the statements or data taken as a whole. If, however, the statements or data contain such a departure and the *member* can demonstrate that due to unusual circumstances the *financial statements* or data would otherwise have been misleading, the *member* can comply with the rule by describing the departure, its approximate effects, if practicable, and the reasons why compliance with the principle would result in a misleading statement.

.02      See appendix A "*Council* Resolution Designating Bodies to Promulgate Technical Standards." [Prior reference: paragraph .01 of ET section 203]

### Interpretations Under the Accounting Standards Rule

### 1.320.005 Application of the Conceptual Framework for Members in Public Practice and Ethical Conflicts

.01      In the absence of an *interpretation* of the "Accounting Principles Rule" [1.320.001] that addresses a particular relationship or circumstance, a *member* should apply the "Conceptual Framework for Members in Public Practice" [1.000.010].

.02      A *member* would be considered in violation of the "Accounting Principles Rule" [1.320.001] if the *member* cannot demonstrate that *safeguards* were applied that eliminated or reduced significant *threats* to an *acceptable level*.

.03      A *member* should consider the guidance in "Ethical Conflicts" [1.000.020] when addressing ethical conflicts that may arise when the *member* encounters obstacles to following an appropriate course of action. Such obstacles may be due to internal or external pressures or to conflicts in applying relevant professional or legal standards, or both. [No prior reference: new content]

### *Effective Date*

.04      Paragraphs .01 and .02 are effective December 15, 2015, and early implementation is allowed provided the member has implemented the revised code. Paragraph .03 is effective December 15, 2014.

### 1.320.010 Responsibility for Affirming That Financial Statements Are in Conformity With the Applicable Financial Reporting Framework

.01      A *member* shall not state affirmatively that an entity's *financial statements* or other financial data are presented in conformity with generally accepted accounting principles (GAAP) if such statements or data contain any departure from an accounting principle promulgated by a body designated by *Council* to establish such principles. *Members* who affirm that *financial statements* or other financial data are presented in conformity with GAAP should comply with the "Accounting Principles Rule" [1.320.001]. A *member's* representation in a letter or other communication that an entity's *financial statements* are in conformity with GAAP may be considered an affirmative statement within the meaning of this rule with respect to the *member* who signed the letter or other communication (for example, the *member* signed a report to a regulatory authority). [Prior reference: paragraph .05 of ET section 203]

### 1.320.020 Status of Financial Accounting Standards Board, Governmental Accounting Standards Board, Federal Accounting Standards Advisory Board, and International Accounting Standards Board Interpretations

.01      The "Accounting Principles Rule" [1.320.001] authorizes *Council* to designate bodies to establish accounting principles. *Council* has designated the Financial Accounting Standards Board (FASB) as such a body and has resolved that FASB *Accounting Standards Codification*® (ASC) constitutes accounting principles as contemplated in the rule. *Council* designated the Governmental Accounting Standards Board (GASB), with respect to Statements of Governmental Accounting Standards issued in July 1984 and thereafter, as the body to establish financial accounting principles for state and local governmental entities,

Part 1 — Members in Public Practice

pursuant to the "Accounting Principles Rule." *Council* designated the Federal Accounting Standards Advisory Board (FASAB), with respect to Statements of Federal Accounting Standards adopted and issued in March 1993 and subsequently, as the body to establish accounting principles for federal government entities, pursuant to the "Accounting Principles Rule." *Council* designated the International Accounting Standards Board (IASB) as an accounting body for purposes of establishing international financial accounting and reporting principles.

**.02**    Reference to GAAP in the "Accounting Principles Rule" [1.320.001] means those accounting principles promulgated by bodies designated by *Council*, which are listed in paragraph .01 and in appendix A, "Council Resolution Designating Bodies to Promulgate Technical Standards."

**.03**    The Professional Ethics Division will look to the codification or statements and any *interpretations* thereof issued by FASB, GASB, FASAB, or IASB in determining whether a *member* has departed from an accounting principle established by a designated accounting standard-setter in FASB ASC, a Statement of Governmental Accounting Standards, a Statement of Federal Accounting Standards, or International Financial Reporting Standards (IFRS). [Prior reference: paragraph .03 of ET section 203]

### 1.320.030 Departures From Generally Accepted Accounting Principles

**.01**    It is difficult to anticipate all the circumstances in which accounting principles may be applied. However, there is a strong presumption that adherence to GAAP would, in nearly all instances, result in *financial statements* that are not misleading. The "Accounting Principles Rule" [1.320.001] recognizes that, upon occasion, there may be unusual circumstances when the literal application of GAAP would have the effect of rendering *financial statements* misleading. In such cases, the proper accounting treatment to apply is that which will not render the *financial statements* misleading.

**.02**    The question of what constitutes unusual circumstances, as referred to in the "Accounting Principles Rule" [1.320.001], is a matter of professional judgment involving the ability to support the position that adherence to a promulgated principle within GAAP would be regarded generally by reasonable persons as producing misleading *financial statements*.

**.03**    Examples of circumstances that may justify a departure from GAAP include new legislation or evolution of a new form of business transaction. Examples of circumstances that do not justify departures from GAAP include an unusual degree of materiality or conflicting industry practices. [Prior reference: paragraph .02 of ET section 203]

**.04**    If the statements or data contain such departures, see the "Accounting Principles Rule" [1.320.001] for further guidance.

### 1.320.040 Financial Statements Prepared Pursuant to Financial Reporting Frameworks Other Than GAAP

**.01**    Reference to GAAP in the "Accounting Principles Rule" [1.320.001] means those accounting principles promulgated by bodies designated by *Council*, which are listed in appendix A. The bodies designed by *Council* to promulgate accounting principles are

        *a.* FASAB,

        *b.* FASB,

        *c.* GASB, and

        *d.* IASB.

**.02**    *Financial statements* prepared pursuant to other accounting principles would be considered financial reporting frameworks other than GAAP within the context of the "Accounting Principles Rule" [1.320.001].

Part 1 — Members in Public Practice

**.03**     However,  the "Accounting Principles Rule" [1.320.001] does not preclude a *member* from preparing or reporting on *client financial statements* that have been prepared pursuant to financial reporting frameworks other than  GAAP, such as

   *a.* financial reporting frameworks generally accepted in another country, including jurisdictional variations of IFRS such that the *client's financial statements* do not meet the requirements for full compliance with IFRS, as promulgated by the IASB;

   *b.* financial reporting frameworks prescribed by an agreement or a contract; or

   *c.* other special purpose frameworks, including statutory financial reporting provisions required by law or a  U.S. or foreign governmental regulatory body to whose jurisdiction the entity is subject.

**.04**     In such circumstances, however, the *client's financial statements* and *member's* reports thereon should not purport that the *financial statements* are in accordance with GAAP, and the *financial statements* or reports on those *financial statements*, or both, should clarify the financial reporting framework(s) used. [Prior reference: paragraph .06 of ET section 203]

## 1.400 Acts Discreditable

### 1.400.001 Acts Discreditable Rule

**.01**     A *member* shall not commit an act discreditable to the profession. [Prior reference: paragraph .01 of ET section 501]

### Interpretations Under the Acts Discreditable Rule

### 1.400.005 Application of the Conceptual Framework for Members in Public Practice and Ethical Conflicts

**.01**     In the absence of an *interpretation* of the "Acts Discreditable Rule" [1.400.001] that addresses a particular relationship or circumstance, a *member* should apply the "Conceptual Framework for Members in Public Practice" [1.000.010].

**.02**     A *member* would be considered in violation of the "Acts Discreditable Rule" [1.400.001] if the *member* cannot demonstrate that *safeguards* were applied that eliminated or reduced significant *threats* to an *acceptable level.*

**.03**     A *member* should consider the guidance in "Ethical Conflicts" [1.000.020] when addressing ethical conflicts that may arise when the *member* encounters obstacles to following an appropriate course of action. Such obstacles may be due to internal or external pressures or to conflicts in applying relevant professional and legal standards, or both. [No prior reference: new content]

### *Effective Date*

**.04**     Paragraphs .01 and .02 are effective December 15, 2015, and early implementation is allowed provided the member has implemented the revised code. Paragraph .03 is effective December 15, 2014.

### 1.400.010 Discrimination and Harassment in Employment Practices

**.01**     A *member* would be presumed to have committed an act discreditable to the profession, in violation of the "Acts Discreditable Rule" [1.400.001] if a final determination, no longer subject to appeal, is made by a court or an administrative agency of competent jurisdiction that a *member* has violated any antidiscrimination laws of the United States, a state, or a municipality, including those related to sexual and other forms of harassment. [Prior reference: paragraph .03 of ET section 501]

### 1.400.020 Solicitation or Disclosure of CPA Examination Questions and Answers

**.01**     A *member* who solicits or knowingly discloses the Uniform CPA Examination question(s) or answer(s), or both, without the AICPA's written authorization shall be considered to have committed an act discreditable to the profession, in violation of the "Acts Discreditable Rule" [1.400.001]. [Prior reference: paragraph .07 of ET section 501]

### 1.400.030 Failure to File a Tax Return or Pay a Tax Liability

**.01**     A *member* who fails to comply with applicable federal, state, or local laws or regulations regarding (*a*) the timely filing of the *member's* personal tax returns or tax returns of the *member's firm* that the *member* has the authority to timely file or (*b*) the timely remittance of all payroll and other taxes collected on behalf of others may be considered to have committed an act discreditable to the profession, in violation of the "Acts Discreditable Rule" [1.400.001]. [Prior reference: paragraph .08 of ET section 501]

### 1.400.040 Negligence in the Preparation of Financial Statements or Records

**.01**     A *member* shall be considered in violation of the "Acts Discreditable Rule" [1.400.001] if the *member*, by virtue of his or her negligence, does any of the following:

> *a.* Makes, or permits or directs another to make, materially false and misleading entries in the *financial statements* or records of an entity.

> *b.* Fails to correct an entity's *financial statements* that are materially false and misleading when the *member* has the authority to record an entry.

> *c.* Signs, or permits or directs another to sign, a document containing materially false and misleading information. [Prior reference: paragraph .05 of ET section 501]

### 1.400.050 Governmental Bodies, Commissions, or Other Regulatory Agencies

**.01**     Many governmental bodies, commissions, or other regulatory agencies have established requirements, such as audit standards, guides, rules, and regulations, that *members* are required to follow in the preparation of *financial statements* or related information or in performing attest or similar services for entities subject to their jurisdiction. For example, the SEC; the Federal Communications Commission; state insurance commissions; and other regulatory agencies, such as the PCAOB, have established such requirements.

**.02**     If a *member* prepares *financial statements* or related information for purposes of reporting to such bodies, commissions, or regulatory agencies, the *member* should follow the requirements of such organizations, in addition to the applicable financial reporting framework.

**.03**     If a *member* agrees to perform an attest or a similar service for the purpose of reporting to such bodies, commissions, or regulatory agencies, the *member* should follow such requirements, in addition to the applicable financial reporting framework.

**.04**     A *member's* material departure from such requirements would be considered a violation of the "Acts Discreditable Rule" [1.400.001] unless the *member* discloses in the *financial statements* or his or her report, as applicable, that such requirements were not followed and the applicable reasons. [Prior reference: paragraph .06 of ET section 501]

### 1.400.055 Governmental Audits

**.01**     Engagements for audits of government grants, government units, or other recipients of government monies typically require that such audits be in compliance with government audit standards, guides, procedures, statutes, rules, and regulations, in addition to GAAS.

**.02**     If a *member* accepts such an engagement and undertakes an obligation to follow specified government audit standards, guides, procedures, statutes, rules, and regulations, the *member* is obligated to follow such requirements, in addition to GAAS.

**.03**     Failure to do so is a violation of the "Acts Discreditable Rule" [1.400.001] unless the *member* discloses in his or her report that such requirements were not followed and the applicable reasons for not following the requirements. [Prior reference: paragraph .04 of ET section 501]

### 1.400.060 Indemnification and Limitation of Liability Provisions

**.01**     Certain governmental bodies, commissions, or other regulatory agencies (collectively, regulators) have established requirements through laws, regulations, or published interpretations that

> *a.* prohibit entities subject to their regulation (regulated entity) from including certain types of indemnification and limitation of liability provisions in agreements for the performance of audit or other attest services that are required by such regulators or
>
> *b.* provide that the existence of such provisions disqualifies a *member* from rendering such services to these entities.

For example, federal banking regulators, state insurance commissions, and the SEC have established such requirements.

**.02**     If a *member* enters into or directs or knowingly permits another individual to enter into a contract for the performance of audit or other attest services that are subject to the requirements of these regulators, the *member* should not include or knowingly permit or direct another individual to include an indemnification or limitation of liability provision that would cause the regulated entity or a *member* to be in violation of such requirements or disqualify a *member* from providing such services to the regulated entity. A *member* who enters into or directs or knowingly permits another individual to enter into such an agreement for the performance of audit or other attest services would be considered in violation of the "Acts Discreditable Rule" [1.400.001].

**.03**     Refer to the "Indemnification of a Covered Member" [1.228.010] and "Indemnification of an Attest Client" [1.228.020] interpretations of the "Independence Rule" [1.200.001] for additional guidance. [Prior reference: paragraph .09 of ET section 501]

### 1.400.070 Confidential Information Obtained From Employment or Volunteer Activities

**.01**     A *member* should maintain the confidentiality of his or her employer's or *firm's* (employer) confidential information and should not use or disclose any confidential employer information obtained as a result of an employment relationship, such as discussions with the employer's vendors, customers, or lenders (for example, any confidential information pertaining to a current or previous employer, subsidiary, affiliate, or parent thereof, as well as any entities for which the *member* is working in a volunteer capacity).

**.02**     For purposes of this interpretation, confidential employer information is any proprietary information pertaining to the employer or any organization for whom the *member* may work in a volunteer capacity that is not known to be available to the public and is obtained as a result of such relationships.

**.03**     A *member* should be alert to the possibility of inadvertent disclosure, particularly to a close business associate or *close relative* or *immediate family* member. The *member* should also take reasonable steps to ensure that staff under his or her control or others within the *employing organization* and persons from whom advice and assistance are obtained are aware of the confidential nature of the information.

**.04**     When a *member* changes employment, a *member* should not use confidential employer information acquired as a result of a prior employment relationship to his or her personal advantage or the advantage of a third party, such as a current or prospective employer. The requirement to maintain the confidentiality of an employer's confidential information continues even after the end of the relationship between a *member*

Case 2:09-md-02047-EEF-MBN Document 22363-28 Filed 11/19/19 Page 32 of 104
Case 4:11-cv-22408-MGC-DocuMent 2724 Entered on FLSD Docket 05/13/2019 Page 4 18 of
190

Part 1 — Members in Public Practice

and the employer. However, the *member* is entitled to use experience and expertise gained through prior employment relationships.

**.05** A *member* would be considered in violation of the "Acts Discreditable Rule" [1.400.001] if the *member* discloses or uses any confidential employer information acquired as a result of employment or volunteer relationships without the proper authority or specific consent of the employer or organization for whom the *member* may work in a volunteer capacity, unless there is a legal or professional responsibility to use or disclose such information.

**.06** The following are examples of situations in which *members* are permitted or may be required to disclose confidential employer information or when such disclosure may be appropriate:

*a.* Disclosure is permitted by law and authorized by the employer.

*b.* Disclosure is required by law, for example, to

i. comply with a validly issued and enforceable subpoena or summons or

ii. inform the appropriate public authorities of violations of law that have been discovered.

*c.* There is a professional responsibility or right to disclose information, when not prohibited by law, to

i. initiate a complaint with, or respond to any inquiry made by, the Professional Ethics Division or trial board of the AICPA or a duly constituted investigative or disciplinary body of a state CPA society, board of accountancy, or other regulatory body;

ii. protect the *member's* professional interests in legal proceedings;

iii. comply with professional standards and other ethics requirements; or

iv. report potential concerns regarding questionable accounting, auditing, or other matters to the employer's confidential complaint hotline or *those charged with governance.*

*d.* Disclosure is permitted on behalf of the employer to

i. obtain financing with lenders;

ii. communicate with vendors, *clients*, and customers; or

iii. communicate with the employer's external accountant, attorneys, regulators, and other business professionals.

**.07** In deciding whether to disclose confidential employer information, relevant factors to consider include the following:

*a.* Whether all the relevant information is known and substantiated to the extent that it is practicable. When the situation involves unsubstantiated facts, incomplete information, or unsubstantiated conclusions, the *member* should use professional judgment in determining the type of disclosure to be made, if any.

*b.* Whether the parties to whom the communication may be addressed are appropriate recipients.

**.08** A *member* may wish to consult with his or her legal counsel prior to disclosing, or determining whether to disclose, confidential employer information.

**.09** Refer to the "Subordination of Judgment" interpretation [1.130.020] of the "Integrity and Objectivity Rule" [1.100.001] and the "Confidential Information" topic [1.700] for additional guidance. [Prior reference: paragraph .10 of ET section 501]

### 1.400.090 False, Misleading, or Deceptive Acts in Promoting or Marketing Professional Services

**.01**      A *member* would be in violation of the "Acts Discreditable Rule" [1.400.001] if the *member* promotes or markets the *member's* abilities to provide *professional services* or makes claims about the *member's* experience or qualifications in a manner that is false, misleading, or deceptive.

**.02**      Promotional efforts would be false, misleading, or deceptive if they contain any claim or representation that would likely cause a reasonable person to be misled or deceived. This includes any representation about CPA licensure or any other professional certification or accreditation that is not in compliance with the requirements of the relevant licensing authority or designating body.

**.03**      Refer to the "False, Misleading, or Deceptive Acts in Advertising or Solicitations" interpretation [1.600.010] of the "Advertising and Other Forms of Solicitation Rule" [1.600.001] for additional guidance. [No prior reference: new content]

#### *Effective Date*

**.04**      Effective December 15, 2014.

### 1.400.100 Use of the CPA Credential

**.01**      A *member* should refer to applicable state accountancy laws and board of accountancy rules and regulations for guidance regarding the use of the CPA credential. A *member* who fails to follow the accountancy laws, rules, and regulations on use of the CPA credential in any of the jurisdictions in which the CPA practices would be considered to have used the CPA credential in a manner that is false, misleading, or deceptive and in violation of the "Acts Discreditable Rule" [1.400.001]. [Prior reference .12 section 501]

### 1.400.200 Records Requests

#### *Terminology*

**.01**      The following terms are defined here solely for use with this interpretation:

     *a.* A client includes current and former *clients*.

     *b.* A member means the *member* or the *member's firm*.

     *c.* Client-provided records are accounting or other records, including hardcopy and electronic reproductions of such records, belonging to the client that were provided to the member by, or on behalf of, the client.

     *d.* Member-prepared records are accounting or other records that the member was not specifically engaged to prepare and that are not in the client's books and records or are otherwise not available to the client, thus rendering the client's financial information incomplete. Examples include adjusting, closing, combining, or consolidating journal entries (including computations supporting such entries) and supporting schedules and documents that the member proposed or prepared as part of an engagement (for example, an audit).

     *e.* Member's work products are deliverables set forth in the terms of the engagement, such as tax returns.

     *f.* Working papers are all other items prepared solely for purposes of the engagement and include items prepared by the

         i. member, such as audit programs, analytical review schedules, and statistical sampling results and analyses.

         ii. client at the request of the member and reflecting testing or other work done by the member.

#### *Interpretation*

Part 1 — Members in Public Practice

**.02**     Members must comply with the rules and regulations of authoritative regulatory bodies, such as the member's state board(s) of accountancy, when the member performs services for a client and is subject to the rules and regulations of such regulatory body. For example, a member's state board(s) of accountancy may not permit a member to withhold certain records, even though fees are due to the member for the work performed. Failure to comply with the more restrictive provisions of the applicable regulatory body's rules and regulations concerning the return of certain records would constitute a violation of this interpretation.

**.03**     The member should return client-provided records in the member's custody or control to the client at the client's request.

**.04**     Unless a member and the client have agreed to the contrary, when a client makes a request for member-prepared records or a member's work products that are in the member's custody or control and that have not previously been provided to the client, the member should respond to the client's request as follows:

   *a.* The member should provide member-prepared records relating to a completed and issued work product to the client, except that such records may be withheld if fees are due to the member for that specific work product.

   *b.* Member's work products should be provided to the client, except that such work products may be withheld

       i. if fees are due to the member for the specific work product;

       ii. if the work product is incomplete;

       iii. if for purposes of complying with professional standards (for example, withholding an audit report due to outstanding audit issues); or

       iv. if threatened or outstanding litigation exists concerning the engagement or member's work.

**.05**     Once a member has complied with these requirements, he or she is under no ethical obligation to

   *a.* comply with any subsequent requests to again provide records or copies of records described in paragraphs .03–.04. However, if subsequent to complying with a request, a client experiences a loss of records due to a natural disaster or an act of war, the member should comply with an additional request to provide such records.

   *b.* retain records for periods that exceed applicable professional standards, state and federal statutes and regulations, and contractual agreements relating to the service performed. [Prior reference: paragraph .02 of ET section 501]

**.06**     A member who has provided records to an individual designated or held out as the client's representative, such as the general partner, majority shareholder, or spouse, is not obligated to provide such records to other individuals associated with the client. [Prior reference: paragraphs .377–.378 of ET section 591]

**.07**     Working papers are the member's property, and the member is not required to provide such information to the client. However, state and federal statutes and regulations and contractual agreements may impose additional requirements on the member.

**.08**     In fulfilling a request for client-provided records, member-prepared records, or a member's work products, the member may

   *a.* charge the client a reasonable fee for the time and expense incurred to retrieve and copy such records and require that the client pay the fee before the member provides the records to the client.

   *b.* provide the requested records in any format usable by the client. However, the member is not required to convert records that are not in electronic format to electronic format. If the client requests records

115

in a specific format and the records are available in such format within the member's custody and control, the client's request should be honored. In addition, the member is not required to provide the client with formulas, unless the formulas support the client's underlying accounting or other records or the member was engaged to provide such formulas as part of a completed work product.

    *c.* make and retain copies of any records that the member returned or provided to the client.

**.09**    A member who is required to return or provide records to the client should comply with the client's request as soon as practicable but, absent extenuating circumstances, no later than 45 days after the request is made.

**.10**    The fact that the statutes of the state in which the member practices grant the member a lien on certain records in his or her custody or control does not relieve the member of his or her obligation to comply with this interpretation. [Prior reference: paragraph .02 of ET section 501]

**.11**    A member would be considered in violation of the "Acts Discreditable Rule" [1.400.001] if the member does not comply with the requirements of this interpretation.

### 1.400.210 Removing Client Files or Proprietary Information From a Firm

**.01**    A *member* whose employment relationship is terminated would be considered in violation of the "Acts Discreditable Rule" [1.400.001] if the *member* takes or retains (*a*) originals or copies (in any format) from the *firm's client* files or (*b*) proprietary information without the *firm's* permission, unless the *member* has a contractual arrangement with the *firm* allowing such action. [Prior reference: paragraphs .381–.382 of ET section 591]

**.02**    A *firm's* ownership agreement would govern ownership of *client* files and proprietary information; accordingly, this interpretation would not apply to owners of *firms*. [No prior reference: new content]

*Effective Date*

**.03**    Paragraph .02 of this interpretation is effective December 15, 2014.

### 1.400.240 Use of Confidential Information From Nonclient Sources

**.01**    If a *member* discloses confidential information obtained from a prospective *client* or nonclient without consent, the *member* would be in violation of the "Acts Discreditable Rule" [1.400.001]. [Prior reference: paragraphs .027–.028 of ET section 391 and new content]

*Effective Date*

**.02**    This interpretation is effective December 15, 2014.

## 1.500 Fees and Other Types of Remuneration

### 1.500.008 Unpaid Fees

**.01**    Refer to the "Fees" topic [1.230] of the "Independence Rule" [1.200.001] for guidance. [No prior reference: new content]

*Effective Date*

**.02**    Effective December 15, 2014.

## 1.510 Contingent Fees

### 1.510.001 Contingent Fees Rule

**.01**    A *member* in *public practice* shall not

    *a.* Perform for a contingent fee any *professional services* for, or receive such a fee from a *client* for whom the *member* or the *member's firm* performs,

        i . an audit or review of a *financial statement*; or

        i i. a compilation of a *financial statement* when the *member* expects, or reasonably might expect, that a third party will use the *financial statement* and the *member's* compilation report does not disclose a lack of *independence*; or

        i ii. an examination of prospective financial information; or

    *b.* Prepare an original or amended tax return or claim for a tax refund for a contingent fee for any *client*.

**.02**    The prohibition in a. above applies during the period in which the *member* or *member's firm* is engaged to perform any of the services listed above and the period covered by any historical *financial statements* involved in any such listed services.

**.03**    Except as stated in the next sentence, a contingent fee is a fee established for the performance of any service pursuant to an arrangement in which no fee will be charged unless a specified finding or result is attained, or in which the amount of the fee is otherwise dependent upon the finding or result of such service. Solely for purposes of this rule, fees are not regarded as being contingent if fixed by courts or other public authorities, or, in tax matters, if determined based on the results of judicial proceedings or the findings of governmental agencies.

**.04**    A *member's* fees may vary depending, for example, on the complexity of services rendered. [Prior reference: paragraph .01 of ET section 302]

**Interpretations Under the Contingent Fees Rule**

**1.510.005 Application of the Conceptual Framework for Members in Public Practice and Ethical Conflicts**

**.01**    In the absence of an *interpretation* of the "Contingent Fees Rule" [1.510.001] that addresses a particular relationship or circumstance, a *member* should apply the "Conceptual Framework for Members in Public Practice" [1.000.010].

**.02**    A *member* would be considered in violation of the "Contingent Fees Rule" [1.510.001] if the *member* cannot demonstrate that *safeguards* were applied that eliminated or reduced significant *threats* to an *acceptable level.*

**.03**    A *member* should consider the guidance in "Ethical Conflicts" [1.000.020] when addressing ethical conflicts that may arise when the *member* encounters obstacles to following an appropriate course of action. Such obstacles may be due to internal or external pressures or to conflicts in applying relevant professional and legal standards, or both. [No prior reference: new content]

*Effective Date*

**.04**    Paragraphs .01 and .02 are effective December 15, 2015, and early implementation is allowed provided the member has implemented the revised code. Paragraph .03 is effective December 15, 2014.

**1.510.010 Tax Matters**

**.01**    This interpretation defines certain terms used in the "Contingent Fees Rule" [1.510.001] and provides examples of the application of the rule in tax matters. When practicing before the IRS or before other taxing authorities, *members* should also comply with other applicable and more restrictive requirements.

*Contingent Fee Language*

**.02**     Preparation of an original or amended tax return or claim for tax refund includes giving advice on events that have occurred at the time that the advice is given if such advice is directly relevant to determining the existence, character, or amount of a schedule, an entry, or another portion of a return or claim for refund

**.03**     A fee is considered determined based on the findings of governmental agencies and, therefore, is not a contingent fee if the *member* can demonstrate a reasonable expectation, at the time of a fee arrangement, that a government agency will provide substantive consideration of the subject matter with respect to the *member's client*. Such an expectation is not reasonable if the *member* prepares a *client's* original tax returns as outlined in paragraph .02 above.

*Examples of When a Contingent Fee Is Permitted*

**.04**     The following are examples of circumstances in which a contingent fee is permitted under the "Contingent Fees Rule" [1.510.001]:

> *a.* Representing a *client* in connection with a revenue agent's examination of the *client's* federal or state income tax return

> *b.* Filing an amended federal or state income tax return claiming a tax refund based on a tax issue that is the subject of a test case involving a different taxpayer or with respect to which the taxing authority is developing a position

> *c.* Filing an amended federal or state income tax return (or refund claim) claiming a tax refund in an amount greater than the threshold for review by the Joint Committee on Taxation or state taxing authority

> *d.* Requesting a refund of either overpayments of interest or penalties charged to a *client's* account or tax deposits that a federal or state taxing authority improperly accounted for in circumstances in which the taxing authority has established procedures for the substantive review of such refund requests

> *e.* Requesting, by means of a protest or similar document, the state or local taxing authority's consideration of a reduction in a property's assessed value under an established taxing authority's review process for hearing all taxpayer arguments relating to assessed value

> *f.* Representing a *client* in connection with obtaining a private letter ruling or influencing the drafting of a regulation or statute

*Example of When a Contingent Fee Is Not Permitted*

**.05**     A contingent fee is not permitted if a *member* prepared a *client's* amended federal or state income tax return claiming a refund of taxes because a valid deduction was inadvertently omitted from the originally filed return. [Prior reference: paragraph .02 of ET section 302]

**1.510.020 Receipt of Contingent Fee**

**.01**     A contingent fee is considered to be received when the *member* has completed the related services and the fee is determined. [Prior reference: paragraphs .033–.034 of ET section 391]

**1.510.030 Services Performed by a Member's Spouse For a Contingent Fee**

**.01**     A *member's* spouse may provide services for a contingent fee to a *client* for whom the *member* performs a service listed in paragraph .01a of the "Contingent Fees Rule" [1.510.001] without causing the *member* to be in violation of the "Contingent Fees Rule" if

> *a.* the activities of the *member's* spouse are separate from the *member's* practice and

> *b.* the *member* is not significantly involved in the spouse's activities.

.02    In all such situations, the *members* should consider the "Conflicts of Interest" interpretation [1.110.010] of the "Integrity and Objectivity Rule" [1.100.001] to determine the appropriate action. [Prior reference: paragraphs .037–.038 of ET section 391]

### 1.510.040 Contingent Fee Arrangements With an Investment Advisory Services Nonattest Client That Is Related to a Client

.01    A *member* or *member's firm* may provide investment advisory services for a contingent fee to

    *a.* owners, officers, or employees of a *client* for whom the *member* performs a service listed in paragraph .01*a* of the "Contingent Fees Rule" [1.510.001].

    *b.* a nonattest *client* employee benefit plan that is sponsored by a *client* for whom the *member* performs a service listed in paragraph .01*a* of the "Contingent Fees Rule."

.02    The *member* should also consider the "Conflicts of Interest" interpretation [1.110.010] and the "Confidential Client Information Rule" [1.700.001] to determine the appropriate action(s). [Prior reference: paragraphs .049–.050 of ET section 391]

### 1.510.050 Investment Advisory Services

.01    A *member* or *member's firm* may provide investment advisory services for a fee based on a percentage of the investment portfolio to a *client* for whom the *member* performs a service listed in paragraph .01*a* of the "Contingent Fees Rule" [1.510.001] without violating that rule if all of the following *safeguards* are met:

    *a.* The fee is determined based on a specified percentage of the *client's* investment portfolio.

    *b.* The dollar amount of the portfolio on which the fee is based is determined at the beginning of each quarter (or longer period of time as may be agreed upon) and is adjusted only for the *client's* additions or withdrawals during the period.

    *c.* The fee arrangement is not renewed with the *client* more frequently than on a quarterly basis. [Prior reference: paragraphs .047–.048 of ET section 391]

.02    When performing such services, the *member* should also consider the "Independence Rule" [1.200.001], especially the *interpretations* of the "Nonattest Services" subtopic [1.295] under the "Independence Rule."

### 1.520 Commissions and Referral Fees

### 1.520.001 Commissions and Referral Fees Rule

.01    *Prohibited commissions.* A *member* in *public practice* shall not for a commission recommend or refer to a *client* any product or service, or for a commission recommend or refer any product or service to be supplied by a *client*, or receive a commission, when the *member* or *member's firm* also performs for that *client*

    *a.* an audit or review of a *financial statement*; or

    *b.* a compilation of a *financial statement* when the *member* expects, or reasonably might expect, that a third party will use the *financial statement* and the *member's* compilation report does not disclose a lack of *independence*; or

    *c.* an examination of prospective financial information.

.02    This prohibition applies during the period in which the *member* is engaged to perform any of the services listed above and the period covered by any historical *financial statements* involved in such listed services.

.03    *Disclosure of permitted commissions.* A *member* in *public practice* who is not prohibited by this rule from performing services for or receiving a commission and who is paid or expects to be paid a commission

Part 1 — Members in Public Practice

shall disclose that fact to any person or entity to whom the *member* recommends or refers a product or service to which the commission relates.

**.04**     *Referral fees.* Any *member* who accepts a referral fee for recommending or referring any service of a CPA to any person or entity or who pays a referral fee to obtain a *client* shall disclose such acceptance or payment to the *client*. [Prior reference: paragraph .01 of ET section 503]

---

A nonauthoritative question and answer regarding disclosure of a commission is available at www.aicpa.org/ InterestAreas/ProfessionalEthics/Resources/Tools/DownloadableDocuments/Ethics-General-FAQs.pdf.

---

**Interpretations Under the Commission and Referral Fees Rule**

**1.520.005 Application of the Conceptual Framework for Members in Public Practice and Ethical Conflicts**

**.01**     In the absence of an *interpretation* of the "Commissions and Referral Fees Rule" [1.520.001] that addresses a particular relationship or circumstance, a *member* should apply the "Conceptual Framework for Members in Public Practice" [1.000.010].

**.02**     A *member* would be considered in violation of the "Commissions and Referral Fees Rule" [1.520.001] if the *member* cannot demonstrate that *safeguards* were applied that eliminated or reduced significant *threats* to an *acceptable level*.

**.03**     A *member* should consider the guidance in "Ethical Conflicts" [1.000.020] when addressing ethical conflicts that may arise when the *member* encounters obstacles to following an appropriate course of action. Such obstacles may be due to internal or external pressures or to conflicts in applying relevant professional and legal standards, or both. [No prior reference: new content]

*Effective Date*

**.04**     Paragraphs .01 and .02 are effective December 15, 2015, and early implementation is allowed provided the member has implemented the revised code. Paragraph .03 is effective December 15, 2014.

**1.520.020 Receipt of Commission**

**.01**     A commission is considered to be received when the performance of the related services is complete and the fee has been determined. For example, if in one year a *member* sells a life insurance policy to a *client*, and the *member's* commission payments are determined to be a fixed percentage of future years' renewal premiums, the commission is deemed to be received in the year that the policy is sold. [Prior reference: paragraphs .367–.368 of ET section 591]

**1.520.030 Services Performed by a Member's Spouse For a Commission**

**.01**     A *member's* spouse may receive a commission for referring products or services to or from a *client* for whom the *member* performs a service listed in paragraph .01 of the "Commissions and Referral Fees Rule" [1.520.001] without causing the *member* to be in violation of the "Commissions and Referral Fees Rule" if both

     *a.* the activities of the *member's* spouse are separate from the *member's* practice and

     *b.* the *member* is not significantly involved in the spouse's activities.

**.02**     In such situations, *members* should consider the "Conflicts of Interest" interpretation [1.110.010] of the "Integrity and Objectivity Rule" [1.100.001] to determine the appropriate action. [Prior reference: paragraphs .373–.374 of ET section 591]

**1.520.040 Referral of Products of Others**

**.01**     Paragraph .04 of the "Application of the AICPA Code" [0.200.020] section of the preface provides that a *member* shall not permit others to perform acts on the *member's* behalf that, if carried out by the *member*, would place the *member* in violation of the rules. Therefore, the *member* would be held responsible for the actions of third parties, such as distributors or agents, that act on the *member's* behalf.

**.02**     For example, if the *member* or *member's firm* performs for a *client* a service listed in paragraph .01 of the "Commissions and Referral Fees Rule" [1.520.001], the *member* may not recommend or refer to that *client* any product or services for a commission that will be paid through a distributor or an agent or receive a commission for the recommendation or referral. This prohibition applies during the period in which the *member* is engaged to perform any of the services listed in paragraph .01 of the rule and during the period covered by any historical *financial statements* in such services.

**.03**     In addition, if a *member* receives a commission for referring a third party's product or service to a *client* for whom the *member* does not perform a service listed in paragraph .01 of the "Commissions and Referral Fees Rule" [1.520.001] through a distributor or an agent and receives a commission from the third party, the *member* should disclose the commission to the *client*, as discussed in paragraph .03 of the "Commissions and Referral Fees Rule." However, any subsequent performance of a service listed in paragraph .01 of that rule during a period in which the commission was received would be considered to violate the rule. [Prior reference: paragraphs .375–.376 of ET section 591]

**1.520.050 Commission Arrangements With an Investment Advisory Services Nonattest Client That Is Related to a Client**

**.01**     A *member* or *member's firm* may receive a commission for referring a nonclient or nonattest *client's* products or services to the following:

   *a.* Owners, officers, or employees of a *client* for whom the *member* performs a service listed in paragraph .01 of the "Commissions and Referral Fees Rule" [1.520.001]

   *b.* A nonattest *client* employee benefit plan that is sponsored by a *client* for whom the *member* performs a service listed in paragraph .01 of the "Commissions and Referral Fees Rule"

**.02**     In such instances, the *member* should disclose the commission arrangement to the *client's* owners, officers, or employees or the employee benefit plan. The *member's* failure to disclose the commission would be in violation of the "Commissions and Referral Fees Rule" [1.520.001].

**.03**     When making the disclosure, *members* should also consider the applicability of the "Conflicts of Interest" interpretation [1.110.010] of the "Integrity and Objectivity Rule" [1.100.001] and the *member's* professional responsibilities under the "Confidential Client Information Rule" [1.700.001] to determine the appropriate action(s). [Prior reference: paragraphs .383–.384 of ET section 591]

**1.520.060 Sale of Products to Clients**

**.01**     If a *member* purchases a product, taking title to the product and assuming all the associated risks of ownership, any profit the *member* receives on reselling it to a *client* would not constitute a commission. [Prior reference: paragraphs .369–.370 of ET section 591]

**1.520.070 Billing for a Subcontractor's Services**

**.01**     If, in providing *professional services* to a *client*, a *member* subcontracts the services of another person or entity, any mark-up of the cost of the subcontracted services would not constitute a commission.

**.02**     Refer to the following for additional guidance:

- "Use of a Third-Party Service Provider" interpretation [1.150.040] of the "Integrity and Objectivity Rule" [1.100.001]

- "Fees" subtopic [1.230] under the "Independence Rule" [1.200.001]

- "Use of a Third-Party Service Provider" interpretation [1.300.040] of the "General Standards Rule" [1.300.001]

- "Disclosing Information to a Third-Party Service Provider" interpretation [1.700.040] of the "Confidential Client Information Rule" [1.700.001] [Prior reference: paragraphs .371–.372 of ET section 591]

### *Effective Date*

**.03**     The revisions to this interpretation are effective December 15, 2014.

### 1.600 Advertising and Other Forms of Solicitation

### 1.600.001 Advertising and Other Forms of Solicitation Rule

**.01**     A *member* in *public practice* shall not seek to obtain *clients* by advertising or other forms of solicitation in a manner that is false, misleading, or deceptive. Solicitation by the use of coercion, over-reaching, or harassing conduct is prohibited. [Prior reference: paragraph .01 of ET section 502]

### Interpretations Under the Advertising and Other Forms of Solicitation Rule

### 1.600.005 Application of the Conceptual Framework for Members in Public Practice and Ethical Conflicts

**.01**     In the absence of an *interpretation* of the "Advertising and Other Forms of Solicitation Rule" [1.600.001] that addresses a particular relationship or circumstance, a *member* should apply the "Conceptual Framework for Members in Public Practice" [1.000.010].

**.02**     A *member* would be considered in violation of the "Advertising and Other Forms of Solicitation Rule" [1.600.001] if the *member* cannot demonstrate that *safeguards* were applied that eliminated or reduced significant *threats* to an *acceptable level*.

**.03**     A *member* should consider the guidance in "Ethical Conflicts" [1.000.020] when addressing ethical conflicts that may arise when the *member* encounters obstacles to following an appropriate course of action. Such obstacles may be due to internal or external pressures or to conflicts in applying relevant professional and legal standards, or both. [No prior reference: new content]

### *Effective Date*

**.04**     Paragraphs .01 and .02 are effective December 15, 2015, and early implementation is allowed provided the member has implemented the revised code. Paragraph .03 is effective December 15, 2014.

### 1.600.010 False, Misleading, or Deceptive Acts in Advertising or Solicitations

**.01**     A *member* would be in violation of the "Advertising and Other Forms of Solicitation Rule" [1.600.001] if the *member's* promotional efforts are false, misleading, or deceptive. If a *member* is asked to perform *professional services* for a *client* or customer of a third party, the *member* should determine that the third party's promotional efforts comply with the "Advertising and Other Forms of Solicitation Rule." Such action is required because the *member* will receive the benefits of such efforts by third parties, and *members* must not do through others what they are prohibited from doing themselves. [Prior reference: paragraph .06 of ET section 502]

**.02** Promotional efforts would be considered false, misleading, or deceptive if they

    *a.* create false or unjustified expectations of favorable results.

    *b.* imply the ability to influence any court, tribunal, regulatory agency, or similar body or official.

    *c.* contain a representation that the *member* will perform specific *professional services* in current or future periods for a stated fee, estimated fee, or fee range when it was likely at the time of the representation that such fees would be substantially increased and the *member* failed to advise the prospective *client* of that likelihood.

    *d.* contain any other representations that would be likely to cause a reasonable person to misunderstand or be deceived. [Prior reference: paragraph .03 of ET section 502]

### 1.600.030 Use of AICPA-Awarded Designation

**.01** A *member* who holds an AICPA-awarded designation, such as the Personal Financial Specialist (PFS) designation, may use the designation after the *member's* name.

**.02** A *member's firm* may use an AICPA-awarded designation, such as the PFS designation, on *firm* letterhead and in marketing materials if all the *firm's* partners hold the AICPA-awarded designation. [Prior reference: paragraphs .365–.366 of ET section 591]

#### *Effective Date*

**.03** The revisions to this interpretation are effective December 15, 2014.

### 1.600.100 Use of the CPA Credential

**.01** A *member* should refer to applicable state accountancy laws and board of accountancy rules and regulations for guidance regarding the use of the CPA credential. A *member* who fails to follow the accountancy laws, rules, and regulations on use of the CPA credential in any of the jurisdictions in which the CPA practices would be considered to have used the CPA credential in a manner that is false, misleading, or deceptive and in violation of the "Advertising and Other Forms of Solicitation Rule" [1.600.001]. [Prior reference .07 section 502.]

## 1.700 Confidential Information

### 1.700.001 Confidential Client Information Rule

**.01** A *member* in *public practice* shall not disclose any *confidential client information* without the specific consent of the *client*.

**.02** This rule shall not be construed (1) to relieve a *member* of his or her professional obligations of the "Compliance With Standards Rule" [1.310.001] or the "Accounting Principles Rule" [1.320.001], (2) to affect in any way the *member's* obligation to comply with a validly issued and enforceable subpoena or summons, or to prohibit a *member's* compliance with applicable laws and government regulations, (3) to prohibit review of a *member's* professional practice under AICPA or state CPA society or Board of Accountancy authorization, or (4) to preclude a *member* from initiating a complaint with, or responding to any inquiry made by, the professional ethics division or trial board of the *Institute* or a duly constituted investigative or disciplinary body of a state CPA society or Board of Accountancy. *Members* of any of the bodies identified in (4) above and *members* involved with professional practice reviews identified in (3) above shall not use to their own advantage or disclose any *member's confidential client information* that comes to their attention in carrying out those activities. This prohibition shall not restrict *members'* exchange of information in connection with the investigative or disciplinary proceedings described in (4) above or the professional practice reviews described in (3) above. [Prior reference: paragraph .01 of ET section 301]

## Interpretations Under the Confidential Client Information Rule

### 1.700.005 Application of the Conceptual Framework for Members in Public Practice and Ethical Conflicts

.01   In the absence of an *interpretation* of the "Confidential Client Information Rule" [1.700.001] that addresses a particular relationship or circumstance, a *member* should apply the "Conceptual Framework for Members in Public Practice" [1.000.010].

.02   A *member* would be considered in violation of the "Confidential Client Information Rule" [1.700.001] if the *member* cannot demonstrate that *safeguards* were applied that eliminated or reduced significant *threats* to an *acceptable level*.

.03   A *member* should consider the guidance in "Ethical Conflicts" [1.000.020] when addressing ethical conflicts that may arise when the *member* encounters obstacles to following an appropriate course of action. Such obstacles may be due to internal or external pressures or to conflicts in applying relevant professional and legal standards, or both. [No prior reference: new content]

### *Effective Date*

.04   Paragraphs .01 and .02 are effective December 15, 2015, and early implementation is allowed provided the member has implemented the revised code. Paragraph .03 is effective December 15, 2014.

### 1.700.010 Client Competitors

.01   When a *member* provides *professional services* to *clients* that are competitors, *threats* to compliance with the "Confidential Client Information Rule" [1.700.001] may exist because the *member* may have access to *confidential client information*, such as sales, purchases, and gross profit percentages of the respective competitors.

.02   To reduce the *threat* of disclosing *confidential client information* to a competitor, the *member* should emphasize to all relevant parties, including employees of the *firm* and affected *clients*, that the "Confidential Client Information Rule" [1.700.001] prohibits *members* from revealing to others any *confidential client information* obtained in their professional capacity. [Prior reference: paragraphs .011–.012 of ET section 391]

### 1.700.020 Disclosing Information From Previous Engagements

.01   When a *member* evaluates whether to accept a new *client* engagement, the *member* should consider whether knowledge and experience that the *member* or *member's firm* will share while providing the *professional services* to the prospective *client* would be *confidential client information*. If such information would be *confidential client information*, and the circumstances are such that the prospective *client* would be able to identify the *client* or *clients* that are the source of the information, the engagement should not be accepted unless the *member* obtains the original *client's* specific consent to disclose the information. [Prior reference: paragraphs .029–.030 of ET section 391]

.02   When a *member* withdraws from an engagement due to, for example, discovery of irregularities in a *client's* tax return, if contacted by the successor, the *member* should suggest that the successor ask the *client* to permit the *member* to discuss all matters freely with the successor. The successor is then on notice of some conflict.

.03   The "Confidential Client Information Rule" [1.700.001] is not intended to help an unscrupulous *client* cover up illegal acts or otherwise hide information by changing CPAs. Due to the possibility of legal implications in such matters, the *member* should seek legal advice on the *member's* status and obligations in the matter. [Prior reference: paragraphs .005–.006 of ET section 391]

### 1.700.030 Disclosing Information to Persons or Entities Associated With Clients

**.01** When a *member* is engaged to prepare a married couple's joint tax return, both spouses are considered to be the *member's client*, even if the *member* was engaged by one spouse and deals exclusively with that spouse.

**.02** Accordingly, if the married couple is undergoing a divorce and one spouse directs the *member* to withhold joint tax information from the other spouse, the *member* may provide the information to both spouses, in compliance with the "Confidential Client Information Rule" [1.700.001], because both are the *member's client*. The *member* should consider reviewing

    *a.* the legal implications of such disclosure with an attorney and

    *b.* responsibilities under any tax performance standards, such as Section 10.29 of IRS Circular 230. [Prior reference: paragraphs .031–.032 of ET section 391]

**.03** If a *member* provides *professional services* to a company's executives at the request of the company, the *member's* disclosure of *confidential client information* to the company without the consent of the applicable executives would be a violation of the "Confidential Client Information Rule" [1.700.001], even if the company is not otherwise a *client*. [Prior reference: paragraphs .041–.042 of ET section 391]

### 1.700.040 Disclosing Information to a Third-Party Service Provider

**.01** When a *member* uses a *third-party service provider* to assist the *member* in providing *professional services*, *threats* to compliance with the "Confidential Client Information Rule" [1.700.001] may exist.

**.02** *Clients* may not expect the *member* to use a *third-party service provider* to assist the *member* in providing the *professional services*. Therefore, before disclosing *confidential client information* to a *third-party service provider*, the *member* should do one of the following:

    *a.* Enter into a contractual agreement with the *third-party service provider* to maintain the confidentiality of the information and provide reasonable assurance that the *third-party service provider* has appropriate procedures in place to prevent the unauthorized release of confidential information to others. The nature and extent of procedures necessary to obtain reasonable assurance depends on the facts and circumstances, including the extent of publicly available information on the *third-party service provider's* controls and procedures to *safeguard confidential client information*.

    *b.* Obtain specific consent from the *client* before disclosing *confidential client information* to the *third-party service provider*.

**.03** Refer to the "Use of a Third-Party Service Provider" interpretation [1.150.040] of the "Integrity and Objectivity Rule" [1.100.001] and the "Use of a Third-Party Service Provider" interpretation [1.300.040] of the "General Standards Rule" [1.300.001] for additional guidance. [Prior reference: paragraphs .001–.002 of ET section 391]

A nonauthoritative basis-for-conclusions document that summarizes considerations that were deemed significant in the development of this interpretation is available at www.aicpa.org/InterestAreas/ProfessionalEthics/Resources/Tools/DownloadableDocuments/BasisforConclusionsOutsourcing.pdf.

In addition, nonauthoritative sample client disclosure language that could be used to fulfill the requirement discussed in this interpretation is also available at www.aicpa.org/InterestAreas/ProfessionalEthics/Resources/Tools/DownloadableDocuments/Sample_Disclosure_Notification.pdf.

### 1.700.050 Disclosing Client Information in Connection With a Review of the Member's Practice

**.01** For purposes of the "Confidential Client Information Rule" [1.700.001], a review of a *member's* professional practice includes a review performed in conjunction with a prospective purchase, sale, or

merger of all or part of a *member's* practice. Such reviews may *threaten* a *member's* compliance with the "Confidential Client Information Rule." To reduce the *threat* to an *acceptable level*, a *member* must take appropriate precautions (for example, through a written confidentiality agreement with the prospective purchaser) to help ensure that the prospective purchaser does not disclose any *confidential client information* obtained in the course of the review.

**.02**  *Members* who perform such reviews shall not use to their advantage or disclose any *confidential client information* that comes to their attention during the review. [Prior reference: paragraph .04 of ET section 301]

### 1.700.060 Disclosure of Client Information to Third Parties

**.01**  When a *member* receives a request from a third party (for example, a trade association, member of academia, or surveying or benchmarking organization) to disclose *client* information or intends to use such information for the *member's* own purposes (for example, publication of benchmarking data or studies) in a manner that may result in the *client's* information being disclosed to others without the *client* being specifically identified, *threats* to compliance with the "Confidential Client Information Rule" [1.700.001] may exist.

**.02**  If the information is considered to be *confidential client information*, the *member* would be in violation of the "Confidential Client Information Rule" [1.700.001] if the *member* discloses or uses the information unless the *member* has the *client's* specific consent, preferably in writing, for the disclosure or use of such information. The consent should specify the nature of the information that may be disclosed, the type of third party to whom it may be disclosed, and its intended use.

**.03**  If the information is not considered to be *confidential client information*, the disclosure or use of the information is not subject to the "Confidential Client Information Rule" [1.700.001]. However, the *member* should be cautious in the disclosure or use of the information so as not to disclose *client* information that may go beyond what is available to the public or that the *client* has agreed may be disclosed.

**.04**  A *member* is not prohibited from marketing his or her services or advising a third party, such as a current or prospective *client*, of information based on his or her expertise or knowledge obtained from prior experiences with *clients* (for example, the nature of services provided to other *clients* or common practices within a *client's* industry). However, if the information may be identifiable to one or more *clients*, specific consent, preferably in writing, is required from such *client(s)*. Prior to disclosing *confidential client information* to a third party, the *member* should consider whether a contractual agreement with the third party to maintain the confidentiality or limit the use of the information is necessary.

**.05**  In addition, the *member* should consider whether federal, state, or local statutes, rules, or regulations concerning the confidentiality of *client* information may be more restrictive than the requirements in this interpretation.

**.06**  Refer to the "Use of a Third-Party Service Provider" interpretation [1.300.040] of the "General Standards Rule" [1.300.001] for additional guidance. [Prior reference: paragraphs .003–.004 of ET section 391]

A nonauthoritative table providing examples of client information that is available to the public, client information not available to the public, and other information in the member's possession is available at www.aicpa.org/InterestAreas/ProfessionalEthics/Resources/Tools/DownloadableDocuments/Categories-of-Information.pdf.

### 1.700.070 Disclosing Client Information During Litigation

**.01**  The "Confidential Client Information Rule" [1.700.001] is not intended to prohibit a *member* from disclosing information necessary to initiate, pursue, or defend the *member* in an actual or a threatened lawsuit or alternative dispute resolution proceeding. Accordingly, releasing *confidential client information* to the *member's* liability insurance carrier solely to assist in the defense against an actual or a potential

Part 1 — Members in Public Practice

claim against the *member* would not violate the "Confidential Client Information Rule." [Prior reference: paragraphs .039–.040 and .045–.046 of ET section 391]

### 1.700.080 Disclosing Client Information in Director Positions

**.01** When a *member* serves as a director of an organization, such as a bank or an insurance company, the *member's* fiduciary responsibilities to the organization may create *threats* to compliance with the "Integrity and Objectivity Rule" [1.100.001] and the "Confidential Client Information Rule" [1.700.001]. For example, the *member's* fiduciary duty to the organization may conflict with the *member's* obligations pursuant to the "Confidential Client Information Rule" (for example, failure to disclose information may constitute a breach of the director's fiduciary responsibilities) when the *member's clients* are customers of the organization.

**.02** A *member's* general knowledge and experience may be very helpful to an organization in formulating a policy and making business decisions. Nevertheless, if the *member's clients* are likely to engage in significant transactions with the organization, it would be more appropriate for the *member* to serve as a consultant to the board. Under such an arrangement, the *member* could limit activities to those that do not *threaten* the *member's* compliance with the "Integrity and Objectivity Rule" [1.100.001] and the "Confidential Client Information Rule" [1.700.001]. If, however, the *member* serves as a board member of the organization, the *member* should evaluate the significance of any *threats* and apply *safeguards*, when necessary, to eliminate or reduce the *threats* to an *acceptable level*.

**.03** See the "Director Positions" interpretation [1.110.020] of the "Integrity and Objectivity Rule" [1.100.001]. [Prior reference: paragraphs .035–.036 of ET section 391]

*Effective Date*

**.04** The revisions to this interpretation are effective December 15, 2014.

### 1.700.090 Disclosing Client Names

**.01** The *member's* disclosure of a *client's* name would not violate the "Confidential Client Information Rule" [1.700.001] if disclosure of the *client's* name does not constitute the release of *confidential client information*. For example, if a *member's* practice is limited to bankruptcy matters, disclosure of the *client's* name could suggest that the *client* may be experiencing financial difficulties, which may be *confidential client information*. [Prior reference: paragraphs .013–.014 of ET section 391]

### 1.700.100 Disclosing Confidential Client Information as a Result of a Subpoena or Summons

**.01** The *member's* disclosure of *confidential client information* in compliance with a validly issued and enforceable subpoena or summons would not violate the "Confidential Client Information Rule" [1.700.001].

**.02** When complying with such subpoena or summons, the *member* is not required to notify the *client* that its records have been subpoenaed or that a summons related to the *client's* records has been issued. The *member* may also wish to consult with legal counsel to determine the validity and enforceability of the subpoena or summons and the specific *client* information required to be provided. The *member* may also wish to consult with his or her state board of accountancy. [No prior reference: New content from informal policy position]

*Effective Date*

**.03** Effective December 15, 2014.

### 1.800 Form of Organization and Name

### 1.800.001 Form of Organization and Name Rule

**.01** A *member* may practice public accounting only in a form of organization permitted by law or regulation whose characteristics conform to resolutions of *Council*.

**.02** A *member* shall not practice public accounting under a *firm* name that is misleading.

**.03** Names of one or more past owners may be included in the *firm* name of a successor organization.

**.04** A *firm* may not designate itself as "*Members* of the American Institute of Certified Public Accountants" unless all its CPA owners are *members* of the AICPA.

**.05** See appendix B, "*Council* Resolution Concerning Form of Organization and Name." [Prior reference: paragraph .01 of ET section 505]

### Interpretations Under the Form of Organization and Name Rule

### 1.800.005 Application of the Conceptual Framework for Members in Public Practice and Ethical Conflicts

**.01** In the absence of an *interpretation* of the "Form of Organization and Name Rule" [1.800.001] that addresses a particular relationship or circumstance, a *member* should apply the "Conceptual Framework for Members in Public Practice" [1.000.010].

**.02** A *member* would be considered in violation of the "Form of Organization and Name Rule" [1.800.001] if the *member* cannot demonstrate the application of *safeguards* that eliminated or reduced significant *threats* to an *acceptable level*.

**.03** A *member* should consider the guidance in "Ethical Conflicts" [1.000.020] when addressing ethical conflicts that may arise when the *member* encounters obstacles to following an appropriate course of action. Such obstacles may be due to internal or external pressures or to conflicts in applying relevant professional and legal standards, or both. [No prior reference: new content]

### *Effective Date*

**.04** Paragraphs .01 and .02 are effective December 15, 2015 and early implementation is allowed provided the member has implemented the revised code. Paragraph .03 is effective December 15, 2014.

### 1.810 Form of Organization and Related Practice Issues

### 1.810.010 Ownership of a Separate Business

**.01** A *member* may own an interest in a separate business that performs for *clients* accounting, tax, personal financial planning, or litigation support services or other services for which standards are promulgated by bodies designated by *Council*.

**.02** If the *member*, either individually or collectively with the *member's firm* or others in the *firm*, *controls* the separate business, then the separate business, its owners (including the *member*), and its professional employees must comply with the code. For example, if one or more *members* individually or collectively *control* the separate business, the *member(s)* and others associated with the separate business are subject to the "Commissions and Referral Fees Rule" [1.520.001] and its *interpretations*. With respect to an *attest client*, the "Independence Rule" [1.200.001] and its *interpretations* would apply to the activities of the separate business, its owners, and its professional employees.

**.03** When the *member*, individually or collectively with the *member's firm* or others in the *firm*, does not *control* the separate business, the provisions of the code would apply to the *member's* actions but not

Case 2:09-md-02047-EEF-MBN Document 22363-28 Filed 11/19/19 Page 48 of 104
Case 4:11-cv-22408-MGC-EGT Document 272-8 Entered on FLSD Docket 05/13/2019 Page 134 of
190

Part 1 — Members in Public Practice

to the separate business, its other (nonmember) owners, and its professional employees. For example, the separate business could enter into a contingent fee arrangement with the *member's attest client* or accept commissions for the referral of products or services to the *member's attest client*. [Prior reference: paragraph .03 of ET section 505]

**.04** When the owners of the separate business are non-CPAs, to prevent any misunderstanding or misrepresentation, the CPA *member* should advise *clients* and other interested parties that the CPA *member* is an owner in two separate businesses: one made up of non-CPAs (except for the CPA *member*) and another that is a CPA *firm*. [Prior reference: paragraphs .275–.276 of ET section 591]

**.05** See the "Network and Network Firms" interpretation [1.220.010] of the "Independence Rule" [1.200.001] and the definitions of *networks* and *network firms* for guidance applicable to these entities.

**1.810.020 Partner Designation**

**.01** Only *members* of a *firm* who are legally *partners* should use the designation *partner*. *Members* who are not parties to the *firm's* partnership agreement should not hold themselves out in any manner that might lead *clients* or the public to believe that they are *partners*. For example, using the designation "nonproprietary partner" to describe a high-ranking professional employee would be misleading and in violation of the "Form of Organization and Name Rule" [1.800.001] even if the professional employee was a *partner* in one of the predecessor *firms* that merged into the *firm*. [Prior reference: paragraphs .273–.274 of ET section 591]

**1.810.030 A Member's Responsibility for Nonmember Practitioners**

**.01** A *member* who becomes an employee of a *firm* made up of one or more nonmember practitioners must still comply with the code. If the *member* becomes an owner in the *firm*, the *member* will be responsible for *firm's* professional employees, including the nonmember practitioners.

**.02** Similarly, if a *member* forms a partnership with a nonmember, the *member* is ethically responsible for all the activities of the partnership. If the nonmember *partner* violates the code, the *member* would be held accountable for that *partner's* actions.

**.03** See paragraph .04 of the "Application of the AICPA Code" [0.200.020] section of the preface and appendix B. [Prior reference: paragraphs .005–.006 and .281–.282 of ET section 591]

**1.810.040 Attest Engagement Performed With a Former Partner**

**.01** Unless there are laws, rules or regulations that are applicable to the *member* that conclude otherwise, two former *partners* may continue to jointly perform an *attest engagement* even if one of them is not a CPA. However, to be clear that a partnership no longer exists and to assure the *attest client* and others that both individuals performed the *attest engagement*, they should present their report on plain paper (that is, paper with no letterhead) that is signed in the following manner:

John Doe, Certified Public Accountant
Richard Roe, Accountant

[Prior reference: paragraphs .271–.272 of ET section 591]

*Effective Date*

**.02** The revisions to this interpretation are effective December 15, 2014.

**1.810.050 Alternative Practice Structures**

**.01** The "Form of Organization and Name Rule" [1.800.001] states, "A *member* may practice public accounting only in a form of organization permitted by law or regulation whose characteristics conform

to resolutions of *Council*." The *Council* resolution (appendix B) requires, among other things, that CPAs own a majority of the *financial interests* in a *firm* engaged to provide attest services (as defined therein) to the public. This interpretation explains the application of this rule to an alternative practice structure (APS) in which (*a*) the majority of the *financial interests* in the attest *firm* is owned by CPAs and (*b*) all or substantially all of the revenues are paid to another entity in return for services and the lease of employees, equipment, and *office* space.

.02      To protect the public interest, the overriding focus of the resolution is that CPAs remain responsible, financially and otherwise, for a *firm's* attest work. In addition to the provisions of the resolution, other requirements of the code and bylaws ensure responsibility for

         *a.* compliance with all aspects of applicable law or regulation,

         *b.* enrollment in an AICPA-approved practice monitoring program,

         *c.* compliance with the "Independence Rule" [1.200.001], and

         *d.* compliance with applicable standards promulgated by *Council*-designated bodies ("Compliance With Standards Rule" [1.310.001]) and all other provisions of the code, including "Structure and Application of the AICPA Code" [0.200].

.03      Given all the previously mentioned *safeguards* that protect the public interest, if the CPAs who own the attest *firm* remain financially responsible, under applicable law or regulation, for the *firm's* attest work, the *member* is considered to be in compliance with the financial interests provision of the resolution. [Prior reference: paragraph .04 of ET section 505]

### 1.820 Firm Name

### 1.820.010 Use of a Retired Partner's Name

.01      The "Form of Organization and Name Rule" [1.800.001] permits the use of the name(s) of former *partner(s)* in a *firm's* name. For example, if two *firms* merge, the newly formed *firm* may use in its *firm* name the name of retired or other *partners* in either or both of the merged *firms* without violating the "Form of Organization and Name Rule." [Prior reference: paragraphs .289–.290 of ET section 591]

### 1.820.020 A Practice With Non-CPA Partners

.01      Unless there are laws, rules, or regulations that are applicable to the *member* that conclude otherwise, a CPA *member* who is in a partnership with non-CPAs may sign reports in the *firm's* name and also affix the designation, "Certified Public Accountant," to the *member's* signature if it is clear that the partnership itself is not being held out as entirely comprising CPAs. [Prior reference: paragraphs .379–.380 of ET section 591]

### 1.820.030 Misleading Firm Names

.01      The "Form of Organization and Name Rule" [1.800.001] prohibits a *member* from practicing public accounting under a *firm* name that is misleading. If the *firm* name contains any representation that would be likely to cause a reasonable person to misunderstand, or be confused about, what the legal form of the *firm* is or who the owners or members of the *firm* are, the *firm* name would be misleading and the *member* would be in violation of the "Form of Organization and Name Rule." For example, the *member* should not refer to a type of organization or an abbreviation thereof that does not accurately reflect the form under which the *firm* is organized.

.02      In addition, the *member* should consider the rules and regulations of his or her state board(s) of accountancy concerning misleading *firm* names that may be more restrictive than the requirements in this interpretation. [Prior reference: paragraph .05 of ET section 505]

Case 2:09-md-02047-EEF-MBN Document 22363-28 Filed 11/19/19 Page 50 of 104
Case 1:11-cv-22408-MGC Document 272-8 Entered on FLSD Docket 05/13/2013 Page 436 of
190

Part 1 — Members in Public Practice

**1.820.040 Use of a Common Brand Name in Firm Name**

.01     *Firms* within a *network* sometimes share the use of a common brand or share common initials as part of the *firm* name. The sharing of a common brand name or common initials of a *network* as part of the *member's firm* name would not be considered misleading, provided the *firm* is a *network firm.*

.02     The sharing of a common brand name or common initials of a *network* as the entire name of the *member's firm* would not be considered misleading, if the *firm* is a *network firm* and shares one or more of the following characteristics with other *firms* in the *network*:

     *a.* Common *control* among the firms through ownership, management, or other means

     *b.* Profits or costs, excluding costs of operating the *network*; costs of developing audit methodologies, manuals, and training courses; and other costs that are immaterial to the *firm*

     *c.* Common business strategy that involves ongoing collaboration amongst the *firms* whereby the *firms* are responsible for implementing the *network's* strategy and are held accountable for performance pursuant to that strategy

     *d.* Significant part of professional resources

     *e.* Common quality control policies and procedures that *firms* are required to implement and that are monitored by the *network*

.03     Refer to the "Network and Network Firms" interpretation [1.220.010] of the "Independence Rule" [1.200.001] for additional guidance. [Prior reference: paragraph .06 of ET section 505]

# Part 2

## Members in Business

### 2.000 Introduction

**.01** Part 2 of the Code of Professional Conduct (the code) applies to *members in business*. Accordingly, when the term *member* is used in part 2 of the code, the requirements apply only to *members in business*. When a *member in business* is also a *member* in *public practice* (for example, a *member* has a part-time tax practice), the *member* should also consult part 1 of the code, which applies to *members* in *public practice*. [No prior reference: new content]

*Effective Date*

**.02** Effective December 15, 2014.

### 2.000.010 Conceptual Framework for Members in Business

*Introduction*

**.01** *Members* may encounter various relationships or circumstances that create *threats* to the *member's* compliance with the rules. The rules and *interpretations* seek to address many situations; however, they cannot address all relationships or circumstances that may arise. Thus, in the absence of an *interpretation* that addresses a particular relationship or circumstance, a *member* should evaluate whether that relationship or circumstance would lead a reasonable and informed third party who is aware of the relevant information to conclude that there is a *threat* to the *member's* compliance with the rules that is not at an *acceptable level*. When making that evaluation, the *member* should apply the conceptual framework approach as outlined in this interpretation.

**.02** The code specifies that in some circumstances, no *safeguards* can reduce a *threat* to an *acceptable level*. For example, the code specifies that a *member* may not subordinate the *member's* professional judgment to others without violating the "Integrity and Objectivity Rule" [2.100.001]. A *member* may not use the conceptual framework to overcome this or any other prohibition or requirement in the code.

*Definitions Used in Applying the Conceptual Framework*

**.03** **Acceptable level.** A level at which a reasonable and informed third party who is aware of the relevant information would be expected to conclude that a *member's* compliance with the rules is not compromised.

**.04** **Safeguards.** Actions or other measures that may eliminate a *threat* or reduce a threat to an *acceptable level*.

**.05** **Threat(s)**. Relationships or circumstances that could compromise a *member's* compliance with the rules.

*Conceptual Framework Approach*

**.06** Under the conceptual framework approach, *members* should identify *threats* to compliance with the rules and evaluate the significance of those *threats*. *Members* should evaluate identified *threats* both individually and in the aggregate because *threats* can have a cumulative effect on a *member's* compliance with the rules. *Members* should perform three main steps in applying the conceptual framework approach:

> *a. Identify threats.* The relationships or circumstances that a *member* encounters in various engagements and work assignments or positions will often create different *threats* to complying with the rules. When a *member* encounters a relationship or circumstance that is not specifically addressed by a rule or an *interpretation*, under this approach, the *member* should determine whether the relationship or circumstance creates one or more *threats*, such as those identified in

paragraphs .09–.14 that follow. The existence of a *threat* does not mean that the *member* is in violation of the rules; however, the *member* should evaluate the significance of the *threat*.

b. *Evaluate the significance of a threat.* In evaluating the significance of an identified *threat*, the *member* should determine whether a *threat* is at an *acceptable level*. A *threat* is at an *acceptable level* when a reasonable and informed third party who is aware of the relevant information would be expected to conclude that the *threat* would not compromise the *member's* compliance with the rules. *Members* should consider both qualitative and quantitative factors when evaluating the significance of a *threat*, including the extent to which existing *safeguards* already reduce the *threat* to an *acceptable level*. If the *member* evaluates the *threat* and concludes that a reasonable and informed third party who is aware of the relevant information would be expected to conclude that the *threat* does not compromise a *member's* compliance with the rules, the *threat* is at an *acceptable level* and the *member* is not required to evaluate the *threat* any further under this conceptual framework approach.

c. *Identify and apply safeguards.* If, in evaluating the significance of an identified *threat*, the *member* concludes that the *threat* is not at an *acceptable level*, the *member* should apply *safeguards* to eliminate the *threat* or reduce it to an *acceptable level*. The *member* should apply judgment in determining the nature of the *safeguards* to be applied because the effectiveness of *safeguards* will vary depending on the circumstances. When identifying appropriate *safeguards* to apply, one *safeguard* may eliminate or reduce multiple *threats*. In some cases, the *member* should apply multiple *safeguards* to eliminate or reduce one *threat* to an *acceptable level*. In other cases, an identified *threat* may be so significant that no *safeguards* will eliminate the *threat* or reduce it to an *acceptable level*, or the *member* will be unable to implement effective *safeguards*. Under such circumstances, providing the specific *professional services* would compromise the *member's* compliance with the rules, and the *member* should determine whether to decline or discontinue the *professional services* or resign from the *employing organization*.

### Threats

**.07** Many *threats* fall into one or more of the following six broad categories: adverse interest, advocacy, familiarity, self-interest, self-review, and undue influence.

**.08** Examples of *threats* associated with a specific relationship or circumstance are identified in the *interpretations* of the code. Paragraphs .09–.14 of this section define and provide examples, which are not all inclusive, of each of these *threat* categories.

**.09** *Adverse interest threat.* The *threat* that a *member* will not act with objectivity because the *member's* interests are opposed to the interests of the *employing organization*. Examples of adverse interest *threats* include the following:

a. A *member* has charged, or expressed an intention to charge, the *employing organization* with violations of law.

b. A *member* or the *member's immediate family* or *close relative* has a financial or another relationship with a vendor, customer, competitor, or potential acquisition of the *employing organization*.

c. A *member* has sued or expressed an intention to sue the *employing organization* or its officers, directors, or employees.

**.10** *Advocacy threat.* The *threat* that a *member* will promote an *employing organization's* interests or position to the point that his or her objectivity is compromised. Examples of advocacy *threats* include the following:

a. Obtaining favorable financing or additional capital is dependent upon the information that the *member* includes in, or excludes from, a prospectus, an offering, a business plan, a financing application, or a regulatory filing.

  *b.* The *member* gives or fails to give information that the *member* knows will unduly influence the conclusions reached by an external service provider or other third party.

**.11**   *Familiarity threat.* The *threat* that, due to a long or close relationship with a person or an *employing organization*, a *member* will become too sympathetic to their interests or too accepting of the person's work or *employing organization's* product or service. Examples of familiarity *threats* include the following:

  *a.* A *member* uses an *immediate family's* or a *close relative's* company as a supplier to the *employing organization*.

  *b.* A *member* may accept an individual's work product with little or no review because the individual has been producing an acceptable work product for an extended period of time.

  *c.* A *member's immediate family* or *close relative* is employed as a *member's* subordinate.

  *d.* A *member* regularly accepts gifts or entertainment from a vendor or customer of the *employing organization*.

**.12**   *Self-interest threat.* The *threat* that a *member* could benefit, financially or otherwise, from an interest in, or relationship with, the *employing organization* or persons associated with the *employing organization*. Examples of self-interest *threats* include the following:

  *a.* A *member's immediate family* or *close relative* has a *financial interest* in the *employing organization*.

  *b.* A *member* holds a *financial interest* (for example, shares or share options) in the *employing organization*, and the value of that *financial interest* is directly affected by the *member's* decisions.

  *c.* A *member* is eligible for a profit or other performance-related bonus, and the value of that bonus is directly affected by the *member's* decisions.

**.13**   *Self-review threat.* The *threat* that a *member* will not appropriately evaluate the results of a previous judgment made or service performed or supervised by the *member*, or an individual in the *employing organization* and that the *member* will rely on that service in forming a judgment as part of another service. Examples of self-review *threats* include the following:

  *a.* When performing an internal audit procedure, an internal auditor accepts work that he or she previously performed in a different position.

  *b.* The *member* accepts the work previously performed by the *member*, alone or with others, that will be the basis for providing another *professional service*.

**.14**   *Undue influence threat.* The *threat* that a *member* will subordinate his or her judgment to that of an individual associated with the *employing organization* or any relevant third party due to that individual's position, reputation or expertise, aggressive or dominant personality, or attempts to coerce or exercise excessive influence over the *member*. Examples of undue influence *threats* include the following:

  *a.* A *member* is pressured to become associated with misleading information.

  *b.* A *member* is pressured to deviate from a company policy.

  *c.* A *member* is pressured to change a conclusion regarding an accounting or a tax position.

  *d.* A *member* is pressured to hire an unqualified individual.

### Safeguards

**.15**   *Safeguards* may partially or completely eliminate a *threat* or diminish the potential influence of a *threat*. The nature and extent of the *safeguards* applied will depend on many factors. To be effective, *safeguards* should eliminate the *threat* or reduce it to an *acceptable level*.

Case 2:09-md-02047-EEF-MBN Document 22363-28 Filed 11/19/19 Page 54 of 104
Case 1:11-cv-22408-MGC-Document 272-8 Entered on FLSD Docket 05/13/2013 Page 440 of
190

Part 2 — Members in Business

**.16**    *Safeguards* that may eliminate a *threat* or reduce it to an *acceptable level* fall into two broad categories:

    *a. Safeguards* created by the profession, legislation, or regulation

    *b. Safeguards* implemented by the *employing organization*

**.17**    The effectiveness of a *safeguard* depends on many factors, including those listed here:

    *a.* The facts and circumstances specific to a particular situation

    *b.* The proper identification of *threats*

    *c.* Whether the *safeguard* is suitably designed to meet its objectives

    *d.* The party(ies) who will be subject to the *safeguard*

    *e.* How the *safeguard* is applied

    *f.* The consistency with which the *safeguard* is applied

    *g.* Who applies the *safeguard*

    *h.* How the *safeguard* interacts with a *safeguard* from another category

    *i.* Whether the *employing organization* is a *public interest entity*

**.18**    Examples of *safeguards* within each category are presented in the following paragraphs. Because these are only examples and are not intended to be all inclusive, it is possible that *threats* may be sufficiently mitigated through the application of other *safeguards* not specifically identified herein.

**.19**    The following are examples of *safeguards* created by the profession, legislation, or regulation:

    *a.* Education and training requirements on ethics and professional responsibilities

    *b.* Continuing education requirements on ethics

    *c.* Professional standards and the threat of discipline

    *d.* Legislation establishing prohibitions and requirements for entities and employees

    *e.* Competency and experience requirements for professional licensure

    *f.* Professional resources, such as hotlines, for consultation on ethical issues

**.20**    Examples of *safeguards* implemented by the *employing organization* are as follows:

    *a.* A tone at the top emphasizing a commitment to fair financial reporting and compliance with applicable laws, rules, regulations, and corporate governance policies

    *b.* Policies and procedures addressing ethical conduct and compliance with laws, rules, and regulations

    *c.* Audit committee charter, including independent audit committee members

    *d.* Internal policies and procedures requiring disclosure of identified interests or relationships among the *employing organization*, its directors or officers, and vendors, suppliers, or customers

    *e.* Internal policies and procedures related to purchasing controls

    *f.* Internal policies and procedures related to customer acceptance or credit limits

*g.* Dissemination of corporate ethical compliance policies and procedures, including whistle-blower hotlines, the reporting structure, dispute resolution, or other similar policies, to promote compliance with laws, rules, regulations, and other professional requirements

*h.* Human resource policies and procedures *safeguarding* against discrimination or harassment, such as those concerning a worker's religion, sexual orientation, gender, or disability

*i.* Human resource policies and procedures stressing the hiring and retention of technically competent employees

*j.* Policies and procedures for implementing and monitoring ethical policies

*k.* Assigning sufficient staff with the necessary competencies to projects and other tasks

*l.* Policies segregating personal assets from company assets

*m.* Staff training on applicable laws, rules, and regulations

*n.* Regular monitoring of internal policies and procedures

*o.* A reporting structure whereby the internal auditor does not report to the financial reporting group

*p.* Policies and procedures that do not allow an internal auditor to monitor areas where the internal auditor has operational or functional responsibilities

*q.* Policies for promotion, rewards, and enforcement of a culture of high ethics and integrity

*r.* Use of third-party resources for consultation as needed on significant matters of professional judgment [No prior reference: new content]

### *Effective Date*

**.21** Effective December 15, 2015. Early implementation is allowed provided the member has implemented the revised code.

### 2.000.020 Ethical Conflicts

**.01** An ethical conflict arises when a *member* encounters one or both of the following:

*a.* Obstacles to following an appropriate course of action due to internal or external pressures

*b.* Conflicts in applying relevant professional and legal standards.

For example, a *member* suspects a fraud may have occurred, but reporting the suspected fraud would violate the *member's* responsibility to maintain the confidentiality of his or her employer's confidential information.

**.02** Once an ethical conflict is encountered, a *member* may be required to take steps to best achieve compliance with the rules and law. In weighing alternative courses of action, the *member* should consider factors such as the following:

*a.* Relevant facts and circumstances, including applicable rules, laws, or regulations

*b.* Ethical issues involved

*c.* Established internal procedures

**.03** The *member* should also be prepared to justify any departures that the *member* believes were appropriate in applying the relevant rules and law. If the *member* was unable to resolve the conflict in a way that

permitted compliance with the applicable rules and law, the *member* may have to address the consequences of any violations.

**.04** Before pursuing a course of action, the *member* should consider consulting with appropriate persons within the organization that employs the *member*.

**.05** If a *member* decides not to consult with appropriate persons within the organization that employs the *member*, and the conflict remains unresolved after pursuing the selected course of action, the *member* should consider either consulting with other individuals for help in reaching a resolution or obtaining advice from an appropriate professional body or legal counsel. The *member* also should consider documenting the substance of the issue, the parties with whom the issue was discussed, details of any discussions held, and any decisions made concerning the issue.

**.06** If the ethical conflict remains unresolved, the *member* will in all likelihood be in violation of one or more rules if he or she remains associated with the matter creating the conflict. Accordingly, the *member* should consider his or her continuing relationship with the specific assignment or employer. [No prior reference: new content]

### *Effective Date*

**.07** Effective December 15, 2014.

### 2.100 Integrity and Objectivity

### 2.100.001 Integrity and Objectivity Rule

**.01** In the performance of any *professional service*, a *member* shall maintain objectivity and integrity, shall be free of conflicts of interest, and shall not knowingly misrepresent facts or subordinate his or her judgment to others. [Prior reference: paragraph .01 of ET section 102]

### Interpretations Under the Integrity and Objectivity Rule

### 2.100.005 Application of the Conceptual Framework for Members in Business and Ethical Conflicts

**.01** In the absence of an *interpretation* of the "Integrity and Objectivity Rule" [2.100.001] that addresses a particular relationship or circumstance, a *member* should apply the "Conceptual Framework for Members in Business" [2.000.010].

**.02** A *member* would be considered in violation of the "Integrity and Objectivity Rule" [2.100.001] if the *member* cannot demonstrate that *safeguards* were applied that eliminated or reduced significant *threats* to an *acceptable level*.

**.03** A *member* should consider the guidance in "Ethical Conflicts" [2.000.020] when addressing ethical conflicts that may arise when the *member* encounters obstacles to following an appropriate course of action. Such obstacles may be due to internal or external pressures or to conflicts in applying relevant professional and legal standards, or both. [No prior reference: new content]

### *Effective Date*

**.04** Paragraphs .01 and .02 are effective December 15, 2015, and early implementation is allowed provided the member has implemented the revised code. Paragraph .03 is effective December 15, 2014.

### 2.110 Conflicts of Interest

### 2.110.010 Conflicts of Interest for Members in Business

**.01** A *member* may be faced with a conflict of interest when undertaking a *professional service*. In determining whether a *professional service*, relationship, or matter would result in a conflict of interest, a *member*

should use professional judgment, taking into account whether a reasonable and informed third party who is aware of the relevant information would conclude that a conflict of interest exists.

**.02**     A conflict of interest creates adverse interest and self-interest *threats* to the *member's* compliance with the "Integrity and Objectivity Rule" [2.100.001]. For example, *threats* may be created when

    *a.* a *member* undertakes a *professional service* related to a particular matter involving two or more parties whose interests with respect to that matter are in conflict, or

    *b.* the interests of a *member* with respect to a particular matter and the interests of a party for whom the *member* undertakes a *professional service* related to that matter are in conflict.

**.03**     A party may include an *employing organization*, a vendor, a customer, a lender, a shareholder, or other party.

**.04**     The following are examples of situations in which conflicts of interest may arise:

    *a.* Serving in a management or governance position for two *employing organizations* and acquiring confidential information from one *employing organization* that could be used by the *member* to the advantage or disadvantage of the other *employing organization*

    *b.* Undertaking a *professional service* for each of two parties in a partnership employing the *member* to assist in dissolving their partnership

    *c.* Preparing financial information for certain *members* of management of the *employing organization* who are seeking to undertake a management buy-out

    *d.* Being responsible for selecting a vendor for the *member's employing organization* when the *member* or his or her *immediate family* member could benefit financially from the transaction

    *e.* Serving in a governance capacity or influencing an *employing organization* that is approving certain investments for the company in which one of those specific investments will increase the value of the personal investment portfolio of the *member* or his or her *immediate family* member

### Identification of a Conflict of Interest

**.05**     In identifying whether a conflict of interest exists or may be created, a *member* should take reasonable steps to determine

    *a.* the nature of the relevant interests and relationships between the parties involved and

    *b.* the nature of the services and its implication for relevant parties.

**.06**     The nature of the relevant interests and relationships and the services may change over time. The *member* should remain alert to such changes for the purposes of identifying circumstances that might create a conflict of interest.

### Evaluation of a Conflict of Interest

**.07**     When an actual conflict of interest has been identified, the *member* should evaluate the significance of the *threat* created by the conflict of interest to determine if the *threat* is at an *acceptable level*. Members should consider both qualitative and quantitative factors when evaluating the significance of the *threat*, including the extent to which existing *safeguards* already reduce the *threat* to an *acceptable level*.

**.08**     In evaluating the significance of an identified *threat*, *members* should consider the following:

    *a.* The significance of relevant interests or relationships.

    *b.* The significance of the *threats* created by undertaking the *professional service* or services. In general, the more direct the connection between the *member* and the matter on which the parties' interests are in conflict, the more significant the *threat* to compliance with the rule will be.

**.09** If the *member* concludes that the *threat* is not at an *acceptable level*, the *member* should apply *safeguards* to eliminate the *threat* or reduce it to an *acceptable level*. Examples of *safeguards* include the following:

    *a.* Restructuring or segregating certain responsibilities and duties

    *b.* Obtaining appropriate oversight

    *c.* Withdrawing from the decision making process related to the matter giving rise to the conflict of interest

    *d.* Consulting with third parties, such as a professional body, legal counsel, or another professional accountant

**.10** In cases where an identified *threat* may be so significant that no *safeguards* will eliminate the *threat* or reduce it to an *acceptable level*, or the *member* is unable to implement effective *safeguards*, the *member* should (*a*) decline to perform or discontinue the *professional services* that would result in the conflict of interest ; or (*b*) terminate the relevant relationships or dispose of the relevant interests to eliminate the *threat* or reduce it to an *acceptable level*.

### *Disclosure of a Conflict of Interest and Consent*

**.11** When a conflict of interest exists, the *member* should disclose the nature of the conflict to the relevant parties, including to the appropriate levels within the *employing organization* and obtain their consent to undertake the *professional service*. The *member* should disclose the conflict of interest and obtain consent even if the *member* concludes that *threats* are at an *acceptable level*.

**.12** The *member* is encouraged to document the nature of the circumstances giving rise to the conflict of interest, the *safeguards* applied to eliminate or reduce the *threats* to an *acceptable level*, and the consent obtained.

**.13** When addressing a conflict of interest, a *member* is encouraged to seek guidance from within the *employing organization* or from others, such as a professional body, legal counsel, or another professional accountant. When making disclosures and seeking guidance of third parties, the *member* should remain alert to the requirements of the "Confidential Information Obtained From Employment or Volunteer Activities" interpretation [2.400.070] of the "Acts Discreditable Rule" [2.400.001]. In addition, federal, state, or local statutes, or regulations concerning confidentiality of employer information may be more restrictive than the requirements contained in the Code of Professional Conduct.

**.14** A *member* may encounter other *threats* to compliance with the "Integrity and Objectivity Rule" [2.100.001]. This may occur, for example, when preparing or reporting financial information as a result of undue pressure from others within the *employing organization* or financial, business or personal relationships that *close relatives* or *immediate family* members of the *member* have with the *employing organization*. Guidance on managing such *threats* is covered by the "Knowing Misrepresentations in the Preparation of Financial Statements or Records" interpretation [2.130.010] and the "Subordination of Judgment" interpretation [2.130.020] under the "Integrity and Objectivity Rule."

[See Revision History Table.]

### 2.120 Gifts and Entertainment

### 2.120.010 Offering or Accepting Gifts or Entertainment

**.01** For purposes of this interpretation, a customer or vendor of the *member's* employer includes a representative of the customer or vendor.

**.02**    When a *member* offers to, or accepts gifts or entertainment from, a customer or vendor of the *member's* employer, self-interest, familiarity, or undue influence *threats* to the *member's* compliance with the "Integrity and Objectivity Rule" [2.100.001] may exist.

**.03**    *Threats* to compliance with the "Integrity and Objectivity Rule" [2.100.001] would not be at an *acceptable level* and could not be reduced to an *acceptable level* by the application of *safeguards*, and the *member* would be presumed to lack integrity in violation of the "Integrity and Objectivity Rule" in the following circumstances:

   *a.* The *member* offers to, or accepts gifts or entertainment from, a customer or vendor of the *member's* employer that violate applicable laws, rules, or regulations or the policies of the member's employer or the customer or vendor.

   *b.* The member knows of the violation or demonstrates recklessness in not knowing.

**.04**    A *member* should evaluate the significance of any *threats* to determine if they are at an *acceptable level*. *Threats* are at an *acceptable level* when gifts or entertainment are reasonable in the circumstances. The *member* should exercise judgment in determining whether gifts or entertainment would be considered reasonable in the circumstances. The following are examples of relevant facts and circumstances:

   *a.* The nature of the gift or entertainment

   *b.* The occasion giving rise to the gift or entertainment

   *c.* The cost or value of the gift or entertainment

   *d.* The nature, frequency, and value of other gifts and entertainment offered or accepted

   *e.* Whether the entertainment was associated with the active conduct of business directly before, during, or after the entertainment

   *f.* Whether other customers or vendors also participated in the entertainment

   *g.* The individuals from the customer or vendor and a *member's* employer who participated in the entertainment

**.05**    *Threats* to compliance with the "Integrity and Objectivity Rule" [2.100.001] would not be at an *acceptable level* and could not be reduced to an *acceptable level* through the application of *safeguards* if a *member* offers to, or accepts gifts or entertainment from, a customer or vendor of the *member's* employer that is not reasonable in the circumstances. The *member* would be considered to lack objectivity in violation of the "Integrity and Objectivity Rule," under these circumstances. [Prior reference: paragraphs .226–.227 of ET section 191]

A nonauthoritative basis-for-conclusions document summarizing considerations that were deemed significant in the development of this interpretation is available at www.aicpa.org/InterestAreas/ProfessionalEthics/Resources/Tools/ DownloadableDocuments/ Gifts_Basis_Document.pdf.

## 2.130 Preparing and Reporting Information

## 2.130.010 Knowing Misrepresentations in the Preparation of Financial Statements or Records

**.01**    *Threats* to compliance with the "Integrity and Objectivity Rule" [2.100.001] would not be at an *acceptable level* and could not be reduced to an *acceptable level* by the application of *safeguards*, and the *member* would be considered to have knowingly misrepresented facts in violation of the "Integrity and Objectivity Rule," if the *member*

> *a.* makes, or permits or directs another to make, materially false and misleading entries in an entity's *financial statements* or records;
>
> *b.* fails to correct an entity's *financial statements* or records that are materially false and misleading when the *member* has the authority to record the entries; or
>
> *c.* signs, or permits or directs another to sign, a document containing materially false and misleading information. [Prior reference: paragraph .02 of ET section 102]

## 2.130.020 Subordination of Judgment

**.01** The "Integrity and Objectivity Rule" [2.100.001] prohibits a *member* from knowingly misrepresenting facts or subordinating his or her judgment when performing *professional services* for an employer or on a volunteer basis. This interpretation addresses differences of opinion between a member and his or her supervisor or any other person within the *member's* organization.

**.02** Self-interest, familiarity, and undue influence *threats* to the *member's* compliance with the "Integrity and Objectivity Rule" [2.100.001] may exist when a *member* and his or her supervisor or any other person within the *member's* organization have a difference of opinion relating to the application of accounting principles; auditing standards; or other relevant professional standards, including standards applicable to tax and consulting services or applicable laws or regulations.

**.03** A *member* should evaluate the significance of any *threats* to determine if they are at an *acceptable level*. *Threats* are at an *acceptable level* if the *member* concludes that the position taken does not result in a material misrepresentation of fact or a violation of applicable laws or regulations. If *threats* are not at an *acceptable level*, the *member* should apply the *safeguards* in paragraphs .06–.08 to eliminate or reduce the threat(s) to an *acceptable level* so that the *member* does not subordinate his or her judgment.

**.04** In evaluating the significance of any identified *threats*, the *member* should determine, after appropriate research or consultation, whether the result of the position taken by the supervisor or other person

> *a.* fails to comply with professional standards, when applicable;
>
> *b.* creates a material misrepresentation of fact; or
>
> *c.* may violate applicable laws or regulations.

**.05** If the *member* concludes that *threats* are at an *acceptable level*, the *member* should discuss his or her conclusions with the person taking the position. No further action would be needed under this interpretation.

**.06** If the *member* concludes that the position results in a material misrepresentation of fact or a violation of applicable laws or regulations, then *threats* would not be at an *acceptable level*. In such circumstances, the *member* should discuss his or her concerns with the supervisor.

**.07** If the difference of opinion is not resolved after discussing the concerns with the supervisor, the *member* should discuss his or her concerns with the appropriate higher level(s) of management within the *member's* organization (for example, the supervisor's immediate superior, senior management, and *those charged with governance*).

**.08** If after discussing the concerns with the supervisor and appropriate higher level(s) of management within the *member's* organization, the *member* concludes that appropriate action was not taken, then the *member* should consider, in no specific order, the following *safeguards* to ensure that *threats* to the *member's* compliance with the "Integrity and Objectivity Rule" [2.100.001] are eliminated or reduced to an *acceptable level*:

*a.* Determine whether the organization's internal policies and procedures have any additional requirements for reporting differences of opinion.

*b.* Determine whether he or she is responsible for communicating to third parties, such as regulatory authorities or the organization's (former organization's) external accountant. In considering such communications, the *member* should be cognizant of his or her obligations under the "Confidential Information Obtained From Employment or Volunteer Activities" interpretation [2.400.070] of the "Acts Discreditable Rule" [2.400.001] and the "Obligation of a Member to His or Her Employer's External Accountant" interpretation [2.130.030] of the "Integrity and Objectivity Rule" [2.100.001].

*c.* Consult with his or her legal counsel regarding his or her responsibilities.

*d.* Document his or her understanding of the facts, the accounting principles, auditing standards, or other relevant professional standards involved or applicable laws or regulations and the conversations and parties with whom these matters were discussed.

**.09**   If the *member* concludes that no *safeguards* can eliminate or reduce the *threats* to an *acceptable level* or if the *member* concludes that appropriate action was not taken, then he or she should consider the continuing relationship with the *member's* organization and take appropriate steps to eliminate his or her exposure to subordination of judgment.

**.10**   Nothing in this interpretation precludes a *member* from resigning from the organization at any time. However, resignation may not relieve the *member* of responsibilities in the situation, including any responsibility to disclose concerns to third parties, such as regulatory authorities or the employer's (former employer's) external accountant.

**.11**   A *member* should use professional judgment and apply similar *safeguards*, as appropriate, to other situations involving a difference of opinion as described in this interpretation so that the *member* does not subordinate his or her judgment. [Prior reference: paragraph .05 of ET section 102]

## 2.130.030 Obligation of a Member to His or Her Employer's External Accountant

**.01**   The "Integrity and Objectivity Rule" [2.100.001] requires a *member* to maintain objectivity and integrity in the performance of a *professional service*. When dealing with an employer's external accountant, a *member* must be candid and not knowingly misrepresent facts or knowingly fail to disclose material facts. This would include, for example, responding to specific inquiries for which the employer's external accountant requests written representation. [Prior reference: paragraph .04 of ET section 102]

## 2.160 Educational Services

## 2.160.010 Educational Services

**.01**   *Members* who perform educational services, such as teaching full or part time at a university, teaching a continuing professional education course, or engaging in research and scholarship, are performing *professional services* and, therefore, are subject to the "Integrity and Objectivity Rule" [2.100.001]. [Prior reference: paragraph .06 of ET section 102]

## 2.300 General Standards

## 2.300.001 General Standards Rule

**.01**   A *member* shall comply with the following standards and with any *interpretations* thereof by bodies designated by *Council*.

*a. Professional Competence.* Undertake only those *professional services* that the *member* or the *member's firm* can reasonably expect to be completed with professional competence.

  *b. Due Professional Care.* Exercise due professional care in the performance of *professional services.*

  *c. Planning and Supervision.* Adequately plan and supervise the performance of *professional services.*

  *d. Sufficient Relevant Data.* Obtain sufficient relevant data to afford a reasonable basis for conclusions or recommendations in relation to any *professional services* performed.

**.02**   See appendix A, "*Council* Resolution Designating Bodies to Promulgate Technical Standards." [Prior reference: paragraph .01 of ET section 201]

### Interpretations Under the General Standards Rule

### 2.300.005 Application of the Conceptual Framework for Members in Business and Ethical Conflicts

**.01**   In the absence of an *interpretation* of the "General Standards Rule" [2.300.001] that addresses a particular relationship or circumstance, a *member* should apply the "Conceptual Framework for Members in Business" [2.000.010].

**.02**   A *member* would be considered in violation of the "General Standards Rule" [2.300.001] if the *member* cannot demonstrate that *safeguards* were applied that eliminated or reduced significant *threats* to an *acceptable level.*

**.03**   A *member* should consider the guidance in "Ethical Conflicts" [2.000.020] when addressing ethical conflicts that may arise when the *member* encounters obstacles to following an appropriate course of action. Such obstacles may be due to internal or external pressures or to conflicts in applying relevant professional and legal standards, or both. [No prior reference: new content]

#### *Effective Date*

**.04**   Paragraphs .01 and .02 are effective December 15, 2015, and early implementation is allowed provided the member has implemented the revised code. Paragraph .03 is effective December 15, 2014.

### 2.300.010 Competence

**.01**   Competence, in this context, means that the *member* or *member's* staff possesses the appropriate technical qualifications to perform *professional services* and, as required, supervises and evaluates the quality of work performed. Competence encompasses knowledge of the profession's standards, the techniques and technical subject matter involved, and the ability to exercise sound judgment in applying such knowledge in the performance of *professional services.*

**.02**   A *member's* agreement to perform *professional services* implies that the *member* has the necessary competence to complete those services according to professional standards and to apply the *member's* knowledge and skill with reasonable care and diligence. However, the *member* does not assume a responsibility for infallibility of knowledge or judgment.

**.03**   The *member* may have the knowledge required to complete the services in accordance with professional standards prior to performance. A normal part of providing professional services involves performing additional research or consulting with others to gain sufficient competence.

**.04**   If a *member* is unable to gain sufficient competence, the *member* should suggest the involvement of a competent person to perform the needed *professional service*, either independently or as an associate. [Prior reference: paragraph .02 of ET section 201]

### 2.300.030 Submission of Financial Statements

**.01**   When a *member* is a stockholder, a *partner*, a director, an officer, or an employee of an entity and, in this capacity, prepares or submits the entity's *financial statements* to third parties, the *member* should clearly

Part 2 — Members in Business

communicate, preferably in writing, the *member's* relationship to the entity and should not imply that the *member* is independent of the entity. In addition, if the communication states affirmatively that the *financial statements* are presented in conformity with the applicable financial reporting framework, the *member* should comply with the "Accounting Principles Rule" [2.320.001].

**.02** Refer to the "Use of CPA Credential" interpretation [2.400.100] of the "Acts Discreditable Rule" [2.400.001] for additional guidance. [Prior reference: paragraphs .019–.020 of ET section 291]

## 2.310 Compliance With Standards

### 2.310.001 Compliance With Standards Rule

**.01** A *member* who performs auditing, review, compilation, management consulting, tax, or other *professional services* shall comply with standards promulgated by bodies designated by *Council*.

**.02** See appendix A," *Council* Resolution Designating Bodies to Promulgate Technical Standards." [Prior reference: paragraph .01 of ET section 202]

### Interpretations Under the Compliance with Standards Rule

### 2.310.005 Application of the Conceptual Framework for Members in Business and Ethical Conflicts

**.01** In the absence of an *interpretation* of the "Compliance With Standards Rule" [2.310.001] that addresses a particular relationship or circumstance, a *member* should apply the "Conceptual Framework for Members in Business" [2.000.010]

**.02** A *member* would be considered in violation of the "Compliance With Standards Rule" [2.310.001] if the *member* cannot demonstrate that *safeguards* were applied that eliminated or reduced significant *threats* to an *acceptable level*.

**.03** A *member* should consider the guidance in "Ethical Conflicts" [2.000.020] when addressing ethical conflicts that may arise when the *member* encounters obstacles to following an appropriate course of action. Such obstacles may be due to internal or external pressures or to conflicts in applying relevant professional or legal standards, or both. [No prior reference: new content]

### *Effective Date*

**.04** Paragraphs .01 and .02 are effective December 15, 2015, and early implementation is allowed provided the member has implemented the revised code. Paragraph .03 is effective December 15, 2014.

## 2.320 Accounting Principles

### 2.320.001 Accounting Principles Rule

**.01** A *member* shall not (1) express an opinion or state affirmatively that the *financial statements* or other financial data of any entity are presented in conformity with generally accepted accounting principles or (2) state that he or she is not aware of any material modifications that should be made to such statements or data in order for them to be in conformity with generally accepted accounting principles, if such statements or data contain any departure from an accounting principle promulgated by bodies designated by *Council* to establish such principles that has a material effect on the statements or data taken as a whole. If, however, the statements or data contain such a departure and the *member* can demonstrate that due to unusual circumstances the *financial statements* or data would otherwise have been misleading, the *member* can comply with the rule by describing the departure, its approximate effects, if practicable, and the reasons why compliance with the principle would result in a misleading statement.

**.02** See appendix A, "*Council* Resolution Designating Bodies to Promulgate Technical Standards." [Prior reference: paragraph .01 of ET section 203]

**Interpretations Under the Accounting Principles Rule**

**2.320.005 Application of the Conceptual Framework for Members in Business and Ethical Conflicts**

.01      In the absence of an *interpretation* of the "Accounting Principles Rule" [2.320.001] that addresses a particular relationship or circumstance, a *member* should apply the "Conceptual Framework for Members in Business" [2.000.010].

.02      A *member* would be considered in violation of the "Accounting Principles Rule" [2.320.001] if the *member* cannot demonstrate that *safeguards* were applied that eliminated or reduced significant *threats* to an *acceptable level.*

.03      A *member* should consider the guidance in "Ethical Conflicts" [2.000.020] when addressing ethical conflicts that may arise when the *member* encounters obstacles to following an appropriate course of action. Such obstacles may be due to internal or external pressures or to conflicts in applying relevant professional or legal standards, or both. [No prior reference: new content]

*Effective Date*

.04      Paragraphs .01 and .02 are effective December 15, 2015 and early implementation is allowed provided the member has implemented the revised code. Paragraph .03 is effective December 15, 2014.

**2.320.010 Responsibility for Affirming That Financial Statements Are in Conformity With the Applicable Financial Reporting Framework**

.01      A *member* shall not state affirmatively that an entity's *financial statements* or other financial data are presented in conformity with generally accepted accounting principles (GAAP) if such statements or data contain any departure from an accounting principle promulgated by a body designated by *Council* to establish such principles. *Members* who affirm that *financial statements* or other financial data are presented in conformity with GAAP should comply with the "Accounting Principles Rule" [2.320.001]. A *member 's* representation in a letter or other communication that an entity's *financial statements* are in conformity with GAAP may be considered an affirmative statement within the meaning of this rule with respect to the *member* who signed the letter or other communication (for example, the *member* signed a report to a regulatory authority, a creditor, or an auditor). [Prior reference: paragraph .05 ET section 203]

**2.320.020 Status of Financial Accounting Standards Board, Governmental Accounting Standards Board, Federal Accounting Standards Advisory Board, and International Accounting Standards Board Interpretations**

.01      The "Accounting Principles Rule" [2.320.001] authorizes *Council* to designate bodies to establish accounting principles. *Council* has designated the Financial Accounting Standards Board (FASB) as such a body and has resolved that FASB *Accounting Standards Codification®* (ASC) constitutes accounting principles as contemplated in the rule. *Council* designated the Governmental Accounting Standards Board (GASB), with respect to Statements of Governmental Accounting Standards issued in July 1984 and thereafter, as the body to establish financial accounting principles for state and local governmental entities, pursuant to the "Accounting Principles Rule." *Council* designated the Federal Accounting Standards Advisory Board (FASAB), with respect to Statements of Federal Accounting Standards adopted and issued in March 1993 and subsequently, as the body to establish accounting principles for federal government entities, pursuant to the "Accounting Principles Rule." *Council* designated the International Accounting Standards Board (IASB) as an accounting body for purposes of establishing international financial accounting and reporting principles.

.02      Reference to GAAP in the "Accounting Principles Rule" [2.320.001] means those accounting principles promulgated by bodies designated by *Council*, which are listed in paragraph .01 and in appendix A, "Council Resolution Designating Bodies to Promulgate Technical Standards."

**.03** The Professional Ethics Division will look to the codification or statements and any interpretations thereof issued by FASB, GASB, FASAB, or IASB in determining whether a *member* has departed from an accounting principle established by a designated accounting standard-setter in FASB ASC, a Statement of Governmental Accounting Standards, a Statement of Federal Accounting Standards, or International Financial Reporting Standards (IFRS). [Prior reference: paragraph .03 of ET section 203]

## 2.320.030 Departures From Generally Accepted Accounting Principles

**.01** It is difficult to anticipate all the circumstances in which accounting principles may be applied. However, there is a strong presumption that adherence to GAAP would, in nearly all instances, result in *financial statements* that are not misleading. The "Accounting Principles Rule" [2.320.001] recognizes that, upon occasion, there may be unusual circumstances when the literal application of GAAP would have the effect of rendering *financial statements* misleading. In such cases, the proper accounting treatment to apply is that which will not render the *financial statements* misleading.

**.02** The question of what constitutes unusual circumstances, as referred to in the "Accounting Principles Rule" [2.320.001], is a matter of professional judgment involving the ability to support the position that adherence to a promulgated principle within GAAP would be regarded generally by reasonable persons as producing misleading *financial statements*.

**.03** Examples of circumstances that may justify a departure from GAAP include new legislation or evolution of a new form of business transaction. Examples of circumstances that would not justify departures from GAAP include an unusual degree of materiality or conflicting industry practices. [Prior reference: paragraph .02 of ET section 203]

**.04** If the statements or data contain such departures, see the "Accounting Principles Rule" [2.320.001] for further guidance.

## 2.320.040 Financial Statements Prepared Pursuant to Financial Reporting Frameworks Other Than GAAP

**.01** Reference to GAAP in the "Accounting Principles Rule" [2.320.001] means those accounting principles promulgated by bodies designated by *Council*, which are listed in appendix A. The bodies designed by *Council* to promulgate accounting principles are

    *a.* FASAB,

    *b.* FASB,

    *c.* GASB, and

    *d.* IASB.

**.02** *Financial statements* prepared pursuant to other accounting principles would be considered financial reporting frameworks other than GAAP within the context of the "Accounting Principles Rule" [2.320.001].

**.03** However, the "Accounting Principles Rule" [2.320.001] does not preclude a *member* from preparing or reporting on *financial statements* that have been prepared pursuant to financial reporting frameworks other than GAAP, such as

    *a.* financial reporting frameworks generally accepted in another country, including jurisdictional variations of IFRS such that the entity's *financial statements* do not meet the requirements for full compliance with IFRS, as promulgated by the IASB;

    *b.* financial reporting frameworks prescribed by an agreement or a contract; or

*c.* other special purpose frameworks, including statutory financial reporting provisions required by law or a U.S. or foreign governmental regulatory body to whose jurisdiction the entity is subject.

**.04**    In such circumstances, however, the *financial statements* or *member's* reports thereon should not purport that the *financial statements* are in accordance with GAAP and the *financial statements* or reports on those *financial statements*, or both, should clarify the financial reporting framework(s) used. [Prior reference: paragraph .06 of ET section 203]

## 2.400 Acts Discreditable

### 2.400.001 Acts Discreditable Rule

**.01**    A *member* shall not commit an act discreditable to the profession. [Prior reference: paragraph .01 of ET section 501]

### Interpretations Under the Acts Discreditable Rule

### 2.400.005 Application of the Conceptual Framework for Members in Business and Ethical Conflicts

**.01**    In the absence of an *interpretation* of the "Acts Discreditable Rule" [2.400.001] that addresses a particular relationship or circumstance, a *member* should apply the "Conceptual Framework for Members in Business" [2.000.010].

**.02**    A *member* would be considered in violation of the "Acts Discreditable Rule" [2.400.001] if the *member* cannot demonstrate that *safeguards* were applied that eliminated or reduced significant *threats* to an *acceptable level.*

**.03**    A *member* should consider the guidance in "Ethical Conflicts" [2.000.020] when addressing ethical conflicts that may arise when the *member* encounters obstacles to follow an appropriate course of action. Such obstacles may be due to internal or external pressures or to conflicts in applying relevant professional standards or legal standards, or both. [No prior reference: new content]

#### *Effective Date*

**.04**    Paragraphs .01 and .02 are effective December 15, 2015 and early implementation is allowed. Paragraph .03 is effective December 15, 2014.

### 2.400.010 Discrimination and Harassment in Employment Practices

**.01**    A *member* would be presumed to have committed an act discreditable to the profession, in violation of the "Acts Discreditable Rule" [2.400.001] if a final determination, no longer subject to appeal, is made by a court or an administrative agency of competent jurisdiction that a *member* has violated any antidiscrimination laws of the United States, state, or municipality, including those related to sexual and other forms of harassment. [Prior reference: paragraph .03 of ET section 501]

### 2.400.020 Solicitation or Disclosure of CPA Examination Questions and Answers

**.01**    A *member* who solicits or knowingly discloses the Uniform CPA Examination question(s) or answer(s), or both, without the AICPA's written authorization shall be considered to have committed an act discreditable to the profession, in violation of the "Acts Discreditable Rule" [2.400.001]. [Prior reference: paragraph .07 of ET section 501]

### 2.400.030 Failure to File a Tax Return or Pay a Tax Liability

**.01**    A *member* who fails to comply with applicable federal, state, or local laws or regulations regarding (*a*) the timely filing of the *member's* personal tax returns or tax returns for the *member's* employer that the

*member* has the authority to timely file or (*b*) the timely remittance of all payroll and other taxes collected on behalf of others may be considered to have committed an act discreditable to the profession, in violation of the "Acts Discreditable Rule" [2.400.001]. [Prior reference: paragraph .08 of ET section 501]

### 2.400.040 Negligence in the Preparation of Financial Statements or Records

.01      A *member* shall be considered in violation of the "Acts Discreditable Rule" [2.400.001] if the *member*, by virtue of his or her negligence, does any of the following:

> *a.* Makes, or permits or directs another to make, materially false and misleading entries in the *financial statements* or records of an entity.

> *b.* Fails to correct an entity's *financial statements* that are materially false and misleading when the *member* has the authority to record an entry.

> *c.* Signs, or permits or directs another to sign, a document containing materially false and misleading information. [Prior reference: paragraph .05 of ET section 501]

### 2.400.050 Governmental Bodies, Commissions, or Other Regulatory Agencies

.01      Many governmental bodies, commissions, or other regulatory agencies have established requirements, such as standards, guides, rules, and regulations, that *members* are required to follow in the preparation of *financial statements* or related information. For example, the SEC, the Federal Communications Commission, state insurance commissions, and other regulatory agencies have established such requirements.

.02      If a *member* prepares *financial statements* or related information (for example, management's discussion and analysis) for purposes of reporting to such bodies, commissions, or regulatory agencies, the *member* should follow the requirements of such organizations in addition to the applicable financial reporting framework.

.03      A *member's* material departure from such requirements would be considered a violation of the "Acts Discreditable Rule" [2.400.001] unless the *member* discloses in the *financial statements* or related information that such requirements were not followed and the applicable reasons. [Prior reference: paragraph .06 of ET section 501]

### 2.400.060 Indemnification and Limitation of Liability Provisions

.01      Certain governmental bodies, commissions, or other regulatory agencies (collectively, regulators) have established requirements through laws, regulations, or published interpretations that

> *a.* prohibit entities subject to their regulation (regulated entity) from including certain types of indemnification and limitation of liability provisions in agreements for the performance of audit or other attest services that are required by such regulators; or

> *b.* provide that the existence of such provisions disqualifies a *member* from rendering such services to these entities.

For example, federal banking regulators, state insurance commissions, and the SEC have established such requirements.

.02      If a *member* enters into, or directs or knowingly permits another individual to enter into, a contract for the performance of audit or other attest services that are subject to the requirements of these regulators, the *member* should not include, or knowingly permit or direct another individual to include, an indemnification or limitation of liability provision that would cause the regulated entity or a *member* to be in violation of such requirements or disqualify a *member* from providing such services to the regulated entity. A *member*

who enters into, or directs or knowingly permits another individual to enter into, such an agreement for the performance of audit or other attest services would be considered in violation of the "Acts Discreditable Rule" [2.400.001]. [Prior reference: paragraph .09 of ET section 501]

## 2.400.070 Confidential Information Obtained From Employment or Volunteer Activities

.01     A *member* should maintain the confidentiality of his or her employer's confidential information and should not use or disclose any confidential employer information obtained as a result of an employment relationship, such as discussions with the employer's vendors, customers, or lenders (for example, any confidential information pertaining to a current or previous employer, subsidiary, affiliate, or parent thereof, as well as any entities for which the *member* is working in a volunteer capacity).

.02     For purposes of this interpretation, confidential employer information is any proprietary information pertaining to the employer or any organization for whom the *member* may work in a volunteer capacity that is not known to be available to the public and is obtained as a result of such relationships.

.03     A *member* should be alert to the possibility of inadvertent disclosure, particularly to a close business associate or *close relative* or *immediate family* member. The *member* should also take reasonable steps to ensure that staff under his or her control or others within the *employing organization* and persons from whom advice and assistance are obtained are aware of the confidential nature of the information.

.04     When a *member* changes employment, a *member* should not use confidential employer information acquired as a result of a prior employment relationship to his or her personal advantage or the advantage of a third party, such as a current or prospective employer. The requirement to maintain the confidentiality of an employer's confidential information continues even after the end of the relationship between a *member* and the employer. However, the *member* is entitled to use experience and expertise gained through prior employment relationships.

.05     A *member* would be considered in violation of the "Acts Discreditable Rule" [2.400.001] if the *member* discloses or uses any confidential employer information acquired as a result of employment or volunteer relationships without the proper authority or specific consent of the employer or organization for whom the *member* may work in a volunteer capacity, unless there is a legal or professional responsibility to use or disclose such information.

.06     The following are examples of situations in which *members* are permitted or may be required to disclose confidential employer information or when such disclosure may be appropriate:

     *a.* Disclosure is permitted by law and authorized by the employer.

     *b.* Disclosure is required by law, for example, to

         i. comply with a validly issued and enforceable subpoena or summons or

         ii. inform the appropriate public authorities of violations of law that have been discovered.

     *c.* There is a professional responsibility or right to disclose information, when not prohibited by law, to

         i. initiate a complaint with, or respond to any inquiry made by, the Professional Ethics Division or trial board of the AICPA or a duly constituted investigative or disciplinary body of a state CPA society, board of accountancy, or other regulatory body;

         ii. protect the *member's* professional interests in legal proceedings;

         iii. comply with professional standards and other ethics requirements; or

         iv. report potential concerns regarding questionable accounting, auditing, or other matters to the employer's confidential complaint hotline or *those charged with governance*.

Case 2:09-md-02047-EEF-MBN Document 22363-28 Filed 11/19/19 Page 69 of 104
Case 4:11-cv-22408-MGC-Document 272-8 Entered on FLSD Docket 05/13/2019 Page 155 of
190

Part 2 — Members in Business

      *d.* Disclosure is permitted on behalf of the employer to

         i. obtain financing with lenders;

         ii. communicate with vendors, *clients*, and customers; or

         iii. communicate with the employer's external accountant, attorneys, regulators, and other business professionals.

**.07** In deciding whether to disclose confidential employer information, relevant factors to consider include the following:

      *a.* Whether all the relevant information is known and substantiated to the extent that it is practicable. When the situation involves unsubstantiated facts, incomplete information, or unsubstantiated conclusions, the member should use professional judgment in determining the type of disclosure to be made, if any.

      *b.* Whether the parties to whom the communication may be addressed are appropriate recipients.

**.08** A *member* may wish to consult with his or her legal counsel prior to disclosing, or determining whether to disclose, confidential employer information.

**.09** Refer to the "Subordination of Judgment" interpretation [2.130.020] of the "Integrity and Objectivity Rule" [2.100.001] for additional guidance. [Prior reference: paragraph .10 of ET section 501]

**2.400.090 False, Misleading, or Deceptive Acts in Promoting or Marketing Professional Services**

**.01** A *member* would be in violation of the "Acts Discreditable Rule" [2.400.001] if the *member* promotes or markets the *member's* abilities to provide *professional services* or makes claims about the *member's* experience or qualifications in a manner that is false, misleading, or deceptive.

**.02** Promotional efforts would be false, misleading, or deceptive if they contain any claim or representation that would likely cause a reasonable person to be misled or deceived. This includes any representation about CPA licensure or any other professional certification or accreditation that is not in compliance with the requirements of the relevant licensing authority or designating body. [Prior reference: paragraph .11 of ET section 501]

**2.400.100 Use of the CPA Credential**

**.01** A *member* should refer to applicable state accountancy laws and board of accountancy rules and regulations for guidance regarding the use of the CPA credential. A *member* who fails to follow the accountancy laws, rules, and regulations on use of the CPA credential in any of the jurisdictions in which the CPA practices would be considered to have used the CPA credential in a manner that is false, misleading, or deceptive and in violation of the "Acts Discreditable Rule" [2.400.001]. [Prior reference: paragraph .12 of ET section 501].

# Part 3

## *Other Members*

### 3.000 Introduction

**.01**    Part 3 of the Code of Professional Conduct (the code) applies to *members* who are not in *public practice* and are not *members in business*. Accordingly, when the term *member* is used in part 3 of the code, the requirements apply only to such *members*. [No prior reference: new content]

*Effective Date*

**.02**    Effective December 15, 2014.

### 3.000.030 Applicability

**.01**    Part 3 of the code applies to *members* who are neither *members* in *public practice* nor *members in business*, for example *members* who are retired or not currently employed. These *members* are subject to the "Acts Discreditable Rule" [3.400.001]. [No prior reference: new content]

*Effective Date*

**.02**    Effective December 15, 2014.

### 3.400 Acts Discreditable

### 3.400.001 Acts Discreditable Rule

**.01**    A *member* shall not commit an act discreditable to the profession. [Prior reference: paragraph .01 of ET section 501]

### Interpretations Under the Acts Discreditable Rule

### 3.400.010 Discrimination and Harassment in Employment Practices

**.01**    A *member* would be presumed to have committed an act discreditable to the profession, in violation of the "Acts Discreditable Rule" [3.400.001] if a final determination, no longer subject to appeal, is made by a court or an administrative agency of competent jurisdiction that a *member* has violated any antidiscrimination laws of the United States, state, or municipality, including those related to sexual and other forms of harassment. [Prior reference: paragraph .03 of ET section 501]

### 3.400.020 Solicitation or Disclosure of CPA Examination Questions and Answers

**.01**    A *member* who solicits or knowingly discloses the Uniform CPA Examination question(s) or answer(s), or both, without the AICPA's written authorization shall be considered to have committed an act discreditable to the profession, in violation of the "Acts Discreditable Rule" [3.400.001]. [Prior reference: paragraph .07 of ET section 501]

### 3.400.030 Failure to File a Tax Return or Pay a Tax Liability

**.01**    A *member* who fails to comply with applicable federal, state, or local laws or regulations regarding (*a*) the timely filing of the *member's* personal tax returns or (*b*) the timely remittance of all payroll and other taxes collected on behalf of others may be considered to have committed an act discreditable to the profession, in violation of the "Acts Discreditable Rule" [3.400.001]. [Prior reference: paragraph .08 of ET section 501]

### 3.400.070 Confidential Information Obtained From Former Employment or Previous Volunteer Activities

**.01** A *member* should maintain the confidentiality of his or her former employer's confidential information and should not use or disclose any confidential employer information obtained as a result of an employment relationship, such as discussions with the employer's vendors, customers, or lenders (for example, any confidential information pertaining to a previous employer, subsidiary, affiliate, or parent thereof, as well as any entities for which the *member* worked in a volunteer capacity).

**.02** For purposes of this interpretation, confidential employer information is any proprietary information pertaining to the former employer or any organization for whom the *member* may have worked in a volunteer capacity that is not known to be available to the public and is obtained as a result of such relationships.

**.03** A *member* should be alert to the possibility of inadvertent disclosure, particularly to a close business associate or *close relative* or *immediate family* member.

**.04** A *member* should not use confidential employer information acquired as a result of a prior employment relationship to his or her personal advantage or the advantage of a third party, such as a current or prospective employer. The requirement to maintain the confidentiality of an employer's confidential information continues even after the end of the relationship between a *member* and the employer. However, the *member* is entitled to use experience and expertise gained through prior employment relationships.

**.05** A *member* would be considered in violation of the "Acts Discreditable Rule" [3.400.001] if the *member* discloses or uses any confidential employer information acquired as a result of former employment or volunteer relationships without the proper authority or specific consent of the former employer or organization for whom the *member* may work in a volunteer capacity, unless there is a legal or professional responsibility to use or disclose such information.

**.06** The following are examples of situations in which *members* are permitted or may be required to disclose confidential employer information or when such disclosure may be appropriate:

*a.* Disclosure is permitted by law and authorized by the former employer.

*b.* Disclosure is required by law, for example, to

i. comply with a validly issued and enforceable subpoena or summons or

ii. inform the appropriate public authorities of violations of law that have been discovered.

*c.* There is a professional responsibility or right to disclose information, when not prohibited by law, to

i. initiate a complaint with, or respond to any inquiry made by, the Professional Ethics Division or trial board of the AICPA or a duly constituted investigative or disciplinary body of a state CPA society, board of accountancy, or other regulatory body;

ii. protect the *member's* professional interests in legal proceedings;

iii. comply with professional standards and other ethics requirements; or

iv. report potential concerns regarding questionable accounting, auditing, or other matters to the former employer's confidential complaint hotline or *those charged with governance*.

*d.* Disclosure is permitted on behalf of the former employer to

i. obtain financing with lenders;

        i ii. communicate with vendors, *clients*, and customers; or

        i iii. communicate with the former employer's external accountant, attorneys, regulators, and other business professionals.

**.07**      In deciding whether to disclose confidential employer information, relevant factors to consider include the following:

      *a.* Whether all the relevant information is known and substantiated to the extent that it is practicable. When the situation involves unsubstantiated facts, incomplete information, or unsubstantiated conclusions, the member should use professional judgment in determining the type of disclosure to be made, if any.

      *b.* Whether the parties to whom the communication may be addressed are appropriate recipients.

**.08**      A *member* may wish to consult with his or her legal counsel prior to disclosing, or determining whether to disclose, confidential employer information. [Prior reference: paragraph .10 of ET section 501]

### 3.400.090 False, Misleading, or Deceptive Acts in Promoting or Marketing Services

**.01**      A *member* would be in violation of the "<ins>Acts Discreditable Rule</ins>" [3.400.001] if the *member* promotes or markets the *member's* abilities to provide services or makes claims about the *member's* experience or qualifications in a manner that is false, misleading, or deceptive.

**.02**      Promotional efforts would be false, misleading, or deceptive if they contain any claim or representation that would likely cause a reasonable person to be misled or deceived. This includes any representation about CPA licensure or any other professional certification or accreditation that is not in compliance with the requirements of the relevant licensing authority or designating body. [No prior reference: new content]

### *Effective Date*

**.03**      Effective December 15, 2014.

### 3.400.100 Use of the CPA Credential

**.01**      A *member* should refer to applicable state accountancy laws and board of accountancy rules and regulations for guidance regarding the use of the CPA credential. A *member* who fails to follow the accountancy laws, rules, and regulations on use of the CPA credential in any of the jurisdictions in which the CPA practices would be considered to have used the CPA credential in a manner that is false, misleading, or deceptive and in violation of the "<ins>Acts Discreditable Rule</ins>" [3.400.001]. [Prior reference: paragraph .12 of ET section 501]

# Appendix A

## *Council Resolution Designating Bodies to Promulgate Technical Standards*

[As amended January 12, 1988; Revised April 1992, October 1999, May 2004, October 2007, May 2008, October 2012 and May 2013.]

Federal Accounting Standards Advisory Board

RESOLVED: That the Federal Accounting Standards Advisory Board, with respect to its statements of federal accounting standards and concepts adopted and issued in March of 1993 and subsequently, in accordance with its rules of procedure, the memorandum of understanding, and public notice designating FASAB's standards and concepts as having substantial authoritative support, be, and hereby is, designated by the Council of the American Institute of Certified Public Accountants as the body to establish financial accounting principles for federal governmental entities pursuant to the "Accounting Principles Rule" (AICPA, *Professional Standards*, ET sec. 1.320.001 and 2.320.001) of the Code.[1]

[Added by *Council* October 1999.]

Financial Accounting Standards Board

WHEREAS: In 1959 the *Council* designated the Accounting Principles Board to establish accounting principles, and

WHEREAS: The *Council* is advised that the Financial Accounting Standards Board (FASB) has become operational, it is

RESOLVED: That as of the date hereof the FASB, in respect of statements of financial accounting standards finally adopted by such board in accordance with its rules of procedure and the bylaws of the Financial Accounting Foundation, be, and hereby is, designated by this *Council* as the body to establish accounting principles pursuant to the "Accounting Principles Rule," (AICPA, *Professional Standards*, ET sec. 1.320.001 and 2.320.001) and standards on disclosure of financial information for such entities outside *financial statements* in published financial reports containing *financial statements* under the "Compliance With Standards Rule" (AICPA, *Professional Standards*, ET sec. 1.310.001 and 2.310.001) of the Code of Professional Conduct of the American Institute of Certified Public Accountants provided, however, any accounting research bulletins, or opinions of the accounting principles board issued or approved for exposure by the accounting principles board prior to April 1, 1973, and finally adopted by such board on or before June 30, 1973, shall constitute statements of accounting principles promulgated by a body designated by *Council* as contemplated in the "Accounting Principles Rule" (AICPA, *Professional Standards*, ET sec. 1.320.001 and 2.320.001) of the Code unless and until such time as they are expressly superseded by action of the FASB.[1]

Governmental Accounting Standards Board

WHEREAS: The Governmental Accounting Standards Board (GASB) has been established by the board of trustees of the Financial Accounting Foundation (FAF) to issue standards of financial accounting and reporting with respect to activities and transactions of state and local governmental entities, and

WHEREAS: The American Institute of Certified Public Accountants is a signatory to the agreement creating the GASB as an arm of the FAF and has supported the GASB professionally and financially, it is

RESOLVED: That as of the date hereof, the GASB, with respect to statements of governmental accounting standards adopted and issued in July 1984 and subsequently, in accordance with its rules of procedure and the bylaws of the

---

[1] The changes to this appendix as of December 15, 2014 are administrative changes that were made to conform to the reformatted Code of Professional Conduct.

Appendix A — Council Resolution Designating
Bodies to Promulgate Technical Standards

FAF, be, and hereby is, designated by the Council of the American Institute of Certified Public Accountants as the body to establish financial accounting principles for state and local governmental entities, pursuant to the "Accounting Principles Rule" (AICPA, *Professional Standards*, ET sec. 1.320.001 and 2.320.001) of the Code of Professional Conduct, and standards on disclosure of financial information for such entities outside *financial statements* in published financial reports containing *financial statements* under the "Compliance With Standards Rule" (AICPA, *Professional Standards*, ET sec. 1.310.001 and 2.310.001) of the Code of Professional Conduct.[1]

Public Company Accounting Oversight Board

WHEREAS: The Public Company Accounting Oversight Board (PCAOB) has been established pursuant to the Sarbanes-Oxley Act of 2002 (the Act), and

WHEREAS: The PCAOB has authority under the Act to establish or adopt, or both, by PCAOB rule, auditing and related attestation standards, quality control, ethics, *independence* and other standards relating to the preparation and issuance of audit reports for issuers as defined in the Act.

RESOLVED: That the PCAOB be, and hereby is, designated by the Council of the American Institute of Certified Public Accountants as the body to establish standards relating to the preparation and issuance of audit reports for entities within its jurisdiction as defined by the Act pursuant to the "General Standards Rule" (AICPA, *Professional Standards*, ET sec. 1.300.001) and the "Compliance With Standards Rule" (AICPA, *Professional Standards*, ET sec. 1.310.001) of the Code of Professional Conduct.[1]

[Added by *Council* May 2004.]

International Accounting Standards Board

RESOLVED: That the International Accounting Standards Board (IASB) is hereby designated as the body to establish professional standards with respect to international financial accounting and reporting principles pursuant to the "Compliance With Standards Rule" (AICPA, *Professional Standards*, ET sec. 1.310.001 and 2.310.001) and the "Accounting Principles Rule" (AICPA, *Professional Standards*, ET sec. 1.320.001 and 2.320.001) of the Code of Professional Conduct; and

BE IT FURTHER RESOLVED: That the *Council* shall reassess, no sooner than three years but no later than five years after the effective date of this resolution, whether continued recognition of the IASB as the body designated to establish professional standards with respect to international financial accounting and reporting principles under the "Compliance With Standards Rule" (AICPA, *Professional Standards*, ET sec. 1.310.001 and 2.310.001) and the "Accounting Principles Rule" (AICPA, *Professional Standards*, ET sec. 1.320.001 and 2.320.001) of the Code of Professional Conduct is appropriate.[1]

[Added by *Council* May 18, 2008; readopted by Council, May 19, 2013.]

AICPA COMMITTEES AND BOARDS

WHEREAS: The membership of the *Institute* has adopted the "General Standards Rule" (AICPA, *Professional Standards*, ET sec. 1.300.001 and 2.300.001) of the Code of Professional Conduct, which authorizes the Council to designate bodies to promulgate technical standards with which members must comply, and therefore it is[1]

Accounting and Review Services Committee

RESOLVED: That the AICPA accounting and review services committee is hereby designated to promulgate standards under the "General Standards Rule" (AICPA, *Professional Standards*, ET sec. 1.300.001) and the "Compliance With Standards Rule" (AICPA, *Professional Standards*, ET sec. 1.310.001) of the Code of Professional Conduct with respect to unaudited *financial statements* or other unaudited financial information of an entity that is not required to file *financial statements* with a regulatory agency in connection with the sale or trading of its securities in a public market.[1]

Auditing Standards Board

RESOLVED: That, with respect to standards relating to the preparation and issuance of audit reports not included within the resolution on the Public Company Accounting Oversight Board, the AICPA auditing standards board is hereby designated as the body authorized under the "General Standards Rule" (AICPA, *Professional Standards*, ET sec. 1.300.001) and the "Compliance With Standards Rule" (AICPA, *Professional Standards*, ET sec. 1.310.001) of the Code of Professional Conduct to promulgate auditing, attestation, and quality control standards and procedures.

RESOLVED: That the auditing standards board shall establish under statements on auditing standards, the responsibilities of *members* with respect to standards for disclosure of financial information outside of the *financial statements* in published financial reports containing *financial statements*.[1]

[Revised May 2004.]

Management Consulting Services Executive Committee

RESOLVED: That the AICPA management consulting services executive committee is hereby designated to promulgate standards under the "General Standards Rule" (AICPA, *Professional Standards*, ET sec. 1.300.001 and 2.300.001) and the "Compliance With Standards Rule" (AICPA, *Professional Standards*, ET sec. 1.310.001 and 2.310.001) of the Code of Professional Conduct with respect to the offering of management consulting services, provided, however, that such standards do not deal with the broad question of what, if any, services should be proscribed.

AND FURTHER RESOLVED: That any *Institute* committee or board now or in the future authorized by the *Council* to issue enforceable standards under the "General Standards Rule" (AICPA, *Professional Standards*, ET sec. 1.300.001 and 2.300.001) and the "Compliance With Standards Rule" (AICPA, *Professional Standards*, ET sec. 1.310.001 and 2.310.001) of the Code of Professional Conduct must observe an exposure process seeking comment from other affected committees and boards, as well as the general membership.[1]

[Revised April 1992.]

Attestation Standards

RESOLVED: That the AICPA accounting and review services committee, auditing standards board, and management consulting services executive committee are hereby designated as bodies authorized under the "General Standards Rule" (AICPA, *Professional Standards*, ET sec. 1.300.001) and the "Compliance With Standards Rule" (AICPA, *Professional Standards*, ET sec. 1.310.001) of the Code of Professional Conduct to promulgate attestation standards in their respective areas of responsibility.[1]

[Added by *Council*, May 1988; revised April 1992.]

Tax Executive Committee

RESOLVED: That the Tax Executive Committee is hereby designated as the body authorized under the "General Standards Rule" (AICPA, *Professional Standards*, ET sec. 1.300.001 and 2.300.001) and the "Compliance With Standards Rule" (AICPA, *Professional Standards*, ET sec. 1.310.001 and 2.310.001) of the Code of Professional Conduct to promulgate professional practice standards with respect to tax services.[1]

[Added by *Council*, October 1999.]

Forensic and Valuation Services Executive Committee

RESOLVED: That the Forensic and Valuation Services Executive Committee is hereby designated as the body to promulgate professional standards with respect to forensic and valuation services under the "General Standards Rule" (AICPA, *Professional Standards,* ET sec. 1.300.001 and 2.300.001) and the "Compliance With Standards Rule" (AICPA, *Professional Standards*, ET sec. 1.310.001 and 2.310.001) of the Code of Professional Conduct.[1]

Appendix A — Council Resolution Designating
Bodies to Promulgate Technical Standards

[Added by *Council*, October 2007.]

Personal Financial Planning Executive Committee

RESOLVED: That the Personal Financial Planning Executive Committee is hereby designated as the body to promulgate professional standards with respect to personal financial planning services under the "General Standards Rule" (AICPA, *Professional Standards*, ET sec. 1.300.001 and 2.310.001) and the "Compliance With Standards Rule" (AICPA, *Professional Standards*, ET sec. 1.310.001 and 2.310.001) of the Code of Professional Conduct.[1]

[Added by *Council*, October 2012.]

Case 2:09-md-02047-EEF-MBN Document 22363-28 Filed 11/19/19 Page 77 of 104
Case 2:14-cv-02722-EEF-MBN Document 22363-28 Filed 11/19/19 Page 163 of
190

# Appendix B

## *Council Resolution Concerning the Form of Organization and Name Rule*

[As adopted May 23, 1994; revised May 7, 1997, May 15, 2000, May 22, 2006 August 2011, and October 19, 2014.]

A. RESOLVED: That with respect to a *member* engaged in *public practice* in a *firm* or organization which performs (1) any audit or other engagement performed in accordance with the Statements on Auditing Standards, (2) any review of a *financial statement* performed in accordance with the Statements on Standards for Accounting and Review Services, (3) any examination of prospective financial information performed in accordance with the Statements on Standards for Attestation Engagements, (4) any engagement to be performed in accordance with the standards of the Public Company Accounting Oversight Board (PCAOB), or (5) any examination, review, or agreed upon procedures engagement to be performed in accordance with the SSAE, other than an examination described in subsection (A) (3), or which holds itself out as a *firm* of certified public accountants or uses the term "certified public accountant(s)" or the designation "CPA" in connection with its name, the characteristics of such a *firm* or organization under the "Form of Organization and Name Rule" (AICPA, *Professional Standards*, ET sec. 1.800.001) of the Code of Professional Conduct are as set forth below:

1. A majority of the ownership of the *member's firm* in terms of financial interests and voting rights must belong to CPAs. Any non-CPA owner would have to be actively engaged as a member of the *firm* or its affiliates. Ownership by investors or commercial enterprises not actively engaged as members of the *firm* or its affiliates is against the public interest and continues to be prohibited.

2. There must be a CPA who has ultimate responsibility for all the services described in A above, compilation services and other engagements governed by Statements on Auditing Standards or Statements on Standards for Accounting and Review Services, and non-CPA owners could not assume ultimate responsibility for any such services or engagements.

3. Non-CPA owners would be permitted to use the title "principal," "owner," "officer," "member" or "shareholder" or any other title permitted by state law, but not hold themselves out to be CPAs.

4. A *member* shall not knowingly permit a person, whom the *member* has the authority or capacity to control, to carry out on his or her behalf, either with or without compensation, acts which, if carried out by the *member*, would place the *member* in violation of the rules. Further, a *member* may be held responsible for the acts of all persons associated with him or her in the *public practice* whom the *member* has the authority or capacity to control.

5. Owners shall at all times own their equity in their own right and shall be the beneficial owners of the equity capital ascribed to them. Provision would have to be made for the ownership to be transferred, within a reasonable period of time, to the *firm* or to other qualified owners if the owner ceases to be actively engaged in the *firm* or its affiliates.

6. Non-CPA owners would not be eligible for regular membership in the AICPA, unless they meet the requirements in BL section 2.2.1.

B. RESOLVED: The characteristics of all other *firms* or organizations are deemed to be whatever is legally permissible under applicable law or regulation, except as otherwise provided in paragraph C below.

C. RESOLVED: That with respect to a *member* engaged in *public practice* in a *firm* or organization which is not within the description of a *firm* or organization set forth in paragraph A above, but who performs compilations of *financial statements* performed in accordance with the Statements on Standards for Accounting and Review Services, the characteristics of such a *firm* or organization under the "Form of Organization and Name Rule" of the Code are as set forth below.

1. There must be a CPA who has ultimate responsibility for any *financial statement* compilation services provided by the *firm* and by each business unit performing such compilation services and non-CPA owners could not assume ultimate responsibility for any such services.

Appendix B — Council Resolution Concerning
the Form of Organization and Name Rule

2. Any compilation report must be signed individually by a CPA, and may not be signed in the name of the *firm* or organization.

# Appendix C

## *Revision History Table*

Revisions made to the Code of Professional Conduct subsequent to June 1, 2014, appear below in the Revision History Table. In addition to identifying the numeric citation for the change, the effective date is identified and a link to the marked version of the content is provided when available. If the revision changes guidance that is already authoritative, the action taken (see "Action" column) will be identified as "revised." If the revision is new guidance, the action taken will be identified as "added."

The "New and Revised Interpretations and Other Guidance" [0.600.010] section and the "Pending Interpretations and Other Guidance" [0.600.020] section provide a listing of current activity.

| Appendix C Revision History | | | |
|---|---|---|---|
| **Citation** | **Action** | **Effective Date** | **Official Release** |
| 1.275.025 paragraphs .01–.06 | Revised April 2015 | April 30, 2015 | www.aicpa.org/InterestAreas/ ProfessionalEthics/Community/ ExposureDrafts/Downloadable Documents/2015/2015April OfficialReleases.pdf |
| 1.224.010 paragraphs .05–.09 | Revised April 2015 | April 30, 2015 | www.aicpa.org/InterestAreas/ ProfessionalEthics/Community/ ExposureDrafts/Downloadable Documents/2015/2015April OfficialReleases.pdf |
| 0.400.03 | Revised April 2015 | April 30, 2015 | www.aicpa.org/InterestAreas/ ProfessionalEthics/Community/ ExposureDrafts/Downloadable Documents/2015/2015April OfficialReleases.pdf |
| 1.298.010 | Added January 2015 | March 31, 2016, early implementation allowed | www.aicpa.org/InterestAreas/ ProfessionalEthics/Community/ ExposureDrafts/Downloadable Documents/2015/2015March OfficialReleases.pdf |
| 1.298 | Added January 2015 | March 31, 2016, early implementation allowed | www.aicpa.org/InterestAreas/ ProfessionalEthics/Community/ ExposureDrafts/Downloadable Documents/2015/2015March OfficialReleases.pdf |
| 0.200.020.06–.07 | Revised January 2015 | March 31, 2016, early implementation allowed | www.aicpa.org/InterestAreas/ ProfessionalEthics/Community/ ExposureDrafts/Downloadable Documents/2015/2015March OfficialReleases.pdf |
| Appendix B | Revised October 2014 | October 19, 2014 | http://aicpa.org/InterestAreas/ ProfessionalEthics/Community/ ExposureDrafts/Downloadable Documents/2014/2014October 19OfficialRelease.pdf |
| 2.110.010 | Revised June 2014 | September 30, 2014 | http://aicpa.org/InterestAreas/ ProfessionalEthics/Community/ ExposureDrafts/Downloadable Documents/2014/2014August OfficialReleases.pdf |
| 1.110.010 | Revised June 2014 | September 30, 2014 | http://aicpa.org/InterestAreas/ ProfessionalEthics/Community/ ExposureDrafts/Downloadable Documents/2014/2014August OfficialReleases.pdf |

Appendix C — Revision History Table

| Appendix C Revision History | | | |
|---|---|---|---|
| 0.200.020 | Revised June 2014 | September 30, 2014 | http://aicpa.org/InterestAreas/ ProfessionalEthics/Community/ ExposureDrafts/Downloadable Documents/2014/2014August OfficialReleases.pdf |

# Appendix D

## *Mapping Document*

[As of December 31, 2013]

On June 1, 2014, the AICPA issued a codification of the code's principles, rules, *interpretations* and rulings (revised code). To assist users in understanding where the content from the prior code appears in the revised code, this mapping document was created. The first two columns identify the citation and title where the content resided in the prior code and the second two columns identify the citation and title where the content now resides *in the revised code*. The "Prior Code Citations" box *has been left* blank *where* the content did not exist in the prior code and is new to the revised code. "New Titles" that appear in regular roman text are effective December 15, 2014, in bold italic December 15, 2015, and in italic have components that are effective both December 15, 2014, and December 15, 2015.

| Prior Code Citations | Title in Prior Code | New Citation | New Title |
|---|---|---|---|
| | | 0.100 | Overview of the Code of Professional Conduct |
| Introduction | Composition, Applicability, and Compliance | 0.100.010 | Principles and Rules of Conduct |
| Introduction | Other Guidance | 0.100.020 | Interpretations and Other Guidance |
| | | 0.200.010 | Structure of the AICPA Code |
| | | 0.200.020.01 | Application of the AICPA Code |
| ET section 91 | Applicability | 0.200.020.02–.05 | Application of the AICPA Code |
| | | 0.200.030 | Citations |
| | | 0.200.040 | Transition Provisions |
| | | 0.200.050 | Drafting Conventions |
| ET section 51 | Preamble | 0.300.010 | Preamble |
| ET section 52 | Article I — Responsibilities | 0.300.020 | Responsibilities |
| ET section 53 | Article II — The Public Interest | 0.300.030 | The Public Interest |
| ET section 54 | Article III — Integrity | 0.300.040 | Integrity |
| ET section 55 | Article IV — Objectivity and Independence | 0.300.050 | Objectivity and Independence |
| ET section 56 | Article V — Due Care | 0.300.060 | Due Care |
| ET section 57 | Article VI — Scope and Nature of Services | 0.300.070 | Scope and Nature of Services |
| ET section 92 | Definitions | 0.400 | Definitions |
| ET section 100-1 | Conceptual Framework for AICPA Independence Standards — Introduction | 0.400.01 | Acceptable level |

Appendix D — Mapping Document

| Prior Code Citations | Title in Prior Code | New Citation | New Title |
|---|---|---|---|
| | | 0.400.01 | Acceptable level |
| ET section 101.20 | Application of the Independence Rules to Affiliates — Definitions | 0.400.02 | Affiliate |
| | | 0.400.03 | Attest Client |
| ET section 92.01 | Attest engagement | 0.400.04 | Attest Engagement |
| ET section 92.02 | Attest engagement team | 0.400.05 | Attest Engagement Team |
| ET section 101.17 | Financial Relationships — Definitions | 0.400.06 | Beneficially Owned |
| ET section 92.03 | Client | 0.400.07 | Client |
| ET section 92.04 | Close relative | 0.400.08 | Close Relative |
| ET section 92.05 | Confidential Client Information | 0.400.09 | Confidential Client Information |
| Various locations | | 0.400.10 | Control (s) (led) |
| ET section 92.06 | Council | 0.400.11 | Council |
| ET section 92.07 | Covered Member | 0.400.12 | Covered Member |
| ET section 101.17 | Financial Relationships — Definitions | 0.400.13 | Direct financial interest |
| | | 0.400.14 | Employing organization |
| ET section 101.17 | Financial Relationships — Definitions | 0.400.15 | Financial interest |
| ET section 101.20 | Application of the Independence Rules to Affiliates — Definitions | 0.400.16 | Financial statement attest client |
| ET section 92.10 | Financial statements | 0.400.17 | Financial statements |
| ET section 92.11 | Firm | 0.400.18 | Firm |
| ET section 92.13 | Immediate family | 0.400.19 | Immediate family |

Appendix D — Mapping Document

| Prior Code Citations | Title in Prior Code | New Citation | New Title |
|---|---|---|---|
| ET section 100-1 paragraph .09 | Conceptual Framework for AICPA Independence Standards — Definitions | 0.400.20 | Impair(ed)(ing) |
| ET section 100-1 paragraphs .06–.08 | Conceptual Framework for AICPA Independence Standards — Definitions | 0.400.21 | Independence |
| ET section 101.17 | Financial Relationships — Definitions | 0.400.22 | Indirect financial interest |
| ET section 92.14 | Individual in a position to influence the attest engagement | 0.400.23 | Individual in a position to influence the attest engagement |
| ET section 92.15 | Institute | 0.400.24 | Institute |
| ET section 92.16 | Interpretation of a rules of conduct | 0.400.25 | Interpretation |
| ET section 92.17 | Joint closely held investment | 0.400.26 | Joint Closely-Held Investments |
| ET section 92.18 | Key position | 0.400.27 | Key position |
| ET section 92.09 | Financial institution | 0.400.28 | Lending institution |
| ET section 92.19 | Loan | 0.400.29 | Loan |
| ET section 92.20 | Manager | 0.400.30 | Manager |
| ET section 92.21 | Member | 0.400.31 | Member |
| ET section 92.22 | Member in business | 0.400.32 | Member in business |
| ET section 92.23 | Network | 0.400.33 | Network |
| ET section 92.24 | Network Firm | 0.400.34 | Network Firm |
| ET section 92.25 | Normal Lending Procedures, Terms, and Requirements | 0.400.35 | Normal lending procedures, terms, and requirements |
| ET section 92.26 | Office | 0.400.36 | Office |
| ET section 92.27 | Partner | 0.400.37 | Partner |
| ET section 92.28 | Partner Equivalents | 0.400.38 | Partner Equivalents |

Appendix D — Mapping Document

| Prior Code Citations | Title in Prior Code | New Citation | New Title |
|---|---|---|---|
| ET section 92.29 | Period of the professional engagement | 0.400.39 | Period of the professional engagement |
| ET section 92.31 | Professional services | 0.400.40 | Professional Services |
| ET section 100-1 paragraph .20 | Conceptual Framework for AICPA Independence Standards — Definitions | 0.400.41 | Public interest entities |
| ET section 92.30 | Practice of public accounting | 0.400.42 | Public Practice (also referred to as the practice of public accounting) |
| ET section 100-1 paragraph .20 | Conceptual Framework for AICPA Independence Standards — Definitions | 0.400.43 | Safeguards |
| ET section 101.02 | Interpretation of Rule 101 —Application of the Independence Rules to Covered Members Formerly Employed by a Client or Otherwise Associated with a Client | 0.400.44 | Share-based compensation arrangements |
| ET section 92.32 | Significant influence | 0.400.45 | Significant influence |
| ET section 101.05 | Performance of nonattest services — Management Responsibilities | 0.400.46 | Source Documents |
| ET section 191.224-.225 | Use of a Third-Party Service Provider to Assist a Member in Providing Professional Services | 0.400.47 | Third-party service provider |
| ET section 291.023-.024 | Applicability of General and Technical Standards When Using a Third-Party Service Provider | 0.400.47 | Third-party service provider |
| ET section 391.001-.002 | Use of a Third-Party Service Provider to Provide Professional Services to Clients or Administrative Support Services to the Member | 0.400.47 | Third-party service provider |
| ET section 92.33 | Those Charged with Governance | 0.400.48 | Those Charged With Governance |
| | | 0.400.49 | Threats |
| | | 0.500 | Nonauthoritative Guidance |
| | | 0.600.010 | New and Revised Interpretations and Other Guidance |
| | | 0.600.020 | Pending Interpretations and Other Guidance |
| | | 0.700 | Deleted Interpretations and Other Guidance |

166

Appendix D — Mapping Document

| Prior Code Citations | Title in Prior Code | New Citation | New Title |
|---|---|---|---|
| | | 1.000 | Members in Public Practice — Introduction |
| | | 1.000.010 | **Conceptual Framework for Members in Public Practice** |
| | | 1.000.020 | Members in Public Practice— Ethical Conflicts |
| ET section 102.01 | Integrity and Objectivity | 1.100.001 | Integrity and Objectivity Rule |
| | | 1.100.005 | *Integrity and Objectivity Rule — Application of the Conceptual Framework for Members in Public Practice and the Ethical Conflicts* |
| ET section 102.03 | Conflicts of Interest | 1.110.010 | Conflicts of Interest |
| ET section 191.186–.187 | Service on Board of Directors of Federated Fund-Raising Organization | 1.110.010.01j | Conflicts of Interest |
| ET section 191.198–.199 | Member Providing Services for Company Executives | 1.110.010.01k | Conflicts of Interest |
| ET section 191.220–.221 | Member is Connected With an Entity That has a Loan to or From a Client | 1.110.010.011 | Conflicts of Interest |
| ET section 191.170–.171 | Bank Director | 1.110.020 | Director Positions |
| ET section 191.226–.227 | Acceptance or Offering of Gifts or Entertainment | 1.120.010 | Offering or Accepting Gifts or Entertainment |
| ET section 102.02 | Knowing misrepresentations in the preparation of financial statements or records | 1.130.010 | Knowing Misrepresentations in the Preparation of Financial Statements or Records |
| ET section 102.05 | Subordination of judgment by a member | 1.130.020 | Subordination of Judgment |
| ET section 102.07 | Professional Services involving client advocacy | 1.140.010 | Client Advocacy |
| ET section 191.224–.225 | Use of a Third-Party Service Provider to Assist a Member in Providing Professional Services | 1.150.040 | Use of a Third-Party Service Provider |
| ET section 101.01 | Rule 101 — Independence | 1.200.001 | Independence Rule |

Appendix D — Mapping Document

| Prior Code Citations | Title in Prior Code | New Citation | New Title |
|---|---|---|---|
| ET section 101.02 | Interpretation of Rule 101 — Other Considerations | 1.200.005.01–.02 | Application of the Conceptual Framework for Independence and Ethical Conflicts Interpretation |
| | | 1.200.005.03 | Application of the Conceptual Framework for Independence and Ethical Conflicts Interpretation |
| ET section 101.02 | Interpretation of Rule 101 — Other Considerations | 1.210.010.01 | Conceptual Framework for Independence |
| ET section 100-1 | Conceptual Framework for AICPA Independence Standards — Introduction | 1.210.010.02–.08 | Conceptual Framework for Independence |
| ET section 101.02 | Interpretation of Rule 101 — Other Considerations | 1.210.010.09 | Conceptual Framework for Independence |
| ET section 100-1 | Conceptual Framework for AICPA Independence Standards — Introduction | 1.210.010.10–.21 | Conceptual Framework for Independence |
| ET section 101.19 | Network and network firms | 1.220.010.01–.05 | Network and Network Firms |
| ET section 101.19 | Network and network firms — Characteristics of a Network | 1.220.010.06–.19 | Characteristics of a Network |
| ET section 101.16 | The effect of alternative practice structures on the applicability of independence rules | 1.220.020 | Alternative Practice Structures |
| ET section 191.142–.143 | Use of Nonindependent CPA Firm on an Engagement | 1.220.030 | Use of a Nonindependent CPA Firm on an Engagement |
| ET section 101.20 | Application of the Independence Rules to Affiliates | 1.224.010 | Client Affiliates |
| ET section 101.12 | The effect of independence of relationships with entities included in the governmental financial statements | 1.224.020 | Entities Included in State and Local Government Financial Statements |
| ET section 191.200–.201 | Actions Permitted When Independence is Impaired | 1.226.010 | Consenting to the Use of a Previously Issued Report |

Appendix D — Mapping Document

| Prior Code Citations | Title in Prior Code | New Citation | New Title |
|---|---|---|---|
| ET section 191.188–.189 | Indemnification Clause in Engagement Letters | 1.228.010 | Indemnification of a Covered Member |
| ET section 191.204–.205 | Indemnification of a Client | 1.228.020 | Indemnification of an Attest Client |
| ET section 191.190–.191 | Agreement with Attest Client to Use ADR Techniques | 1.228.030.01–.02 | Alternative Dispute Resolution |
| ET section 191.192–.193 | Commencement of ADR Proceeding | 1.228.030.03 | Alternative Dispute Resolution |
| New | | 1.230.010.01 | Unpaid Fees |
| ET section 191.103–.104 | Unpaid Fees | 1.230.010.02–.03 | Unpaid Fees |
| New | | 1.230.020 | Fees and Other Types of Remuneration |
| ET section 101.02(A)(1) | Interpretation of Rule 101-A1 | 1.240.010.01–.02 | Overview of Financial Interests |
| ET section 101.17 | Financial Relationships — Financial Interests | 1.240.010.01–.02 | Overview of Financial Interests |
| ET section 101.02(B) | Interpretation of Rule 101-B | 1.240.010.03 | Overview of Financial Interests |
| ET section 101.17 | Financial Relationships — Unsolicited Financial Interest | 1.240.020 | Unsolicited Financial Interests |
| ET section 101.17 | Financial Relationships — Mutual Funds | 1.240.030 | Mutual Funds |
| ET section 101.17 | Financial Relationships — Retirement, Savings, Compensation, or Similar Plans | 1.240.040 | Retirement, Savings, Compensation, or Similar Plans |
| ET section 101.17 | Financial Relationships — Partnerships | 1.240.050 | Partnerships |
| ET section 101.17 | Financial Relationships — Limited Liability Companies | 1.240.060 | Limited Liability Companies |
| ET section 101.17 | Financial Relationships — Section 529 Plans | 1.240.070 | Section 529 Plans |
| ET section 191.021–.022 | Member Designated to Serve as Executor or Trustee | 1.245.010.01 | Trustee or Executor |
| ET section 101.02(A)(2) | Interpretation of Rule 101-A2 | 1.245.010.02 | Trustee or Executor |

Appendix D — Mapping Document

| Prior Code Citations | Title in Prior Code | New Citation | New Title |
|---|---|---|---|
| ET section 101.17 | Financial Relationships — Trust Investments | 1.245.020 | Trust Investments |
| ET section 191.214–.215 | Participation in Employee Benefit Plan Sponsored by Client | 1.250.010.01 | Plan is an Attest Client or is Sponsored by an Attest Client |
| ET section 101.17 | Financial Relationships — Retirement, Savings, Compensation, or Similar Plans | 1.250.010.02 | Plan is an Attest Client or is Sponsored by an Attest Client |
| ET section 101.04 | Employment or Association with Attest Clients | 1.250.020 | Former Partners and Professional Employees Participation in a Firm-Sponsored Plan |
| ET section 191.140–.141 | Member's Depository Relationship With Client Financial Institution | 1.255.010 | Depository Accounts |
| ET section 191.081–.082 | Financial Services Company Client Has Custody of a Member's Assets | 1.255.020 | Brokerage and Other Accounts |
| ET section 101.17 | Financial Relationships — Insurance Products | 1.257.010 | Insurance Policies with No Investment Option |
| ET section 101.17 | Financial Relationships — Insurance Products | 1.257.020 | Insurance Policies with Investment Options |
| ET section 101.17 | Financial Relationships — Insurance Products | 1.257.030 | Insurer Undergoes Demutualization |
| ET section 101.02(A)(4) | Interpretation of Rule 101-A4 | 1.260.010 | Loans |
| ET section 101.07 | Loans from financial institution clients and related terminology | 1.260.020 | Loans and Leases with Lending Institutions |
| ET section 191.150–.151 | Membership in Client Credit Union | 1.260.020 | Loans and Leases with Lending Institutions |
| ET section 191.134–.135 | Servicing of Loan | 1.260.030 | Servicing of a Loan |
| ET section 191.182–.183 | Member Leasing Property to or From Client | 1.260.040 | Leases |

Appendix D — Mapping Document

| Prior Code Citations | Title in Prior Code | New Citation | New Title |
|---|---|---|---|
| ET section 191.220–.221 | Member is Connected With an Entity That has a Loan to or From a Client | 1.260.050 | Association with an Entity that has a Loan To or From an Attest Client |
| ET section 101.14 | Independence and cooperative arrangements with clients | 1.265.010 | Cooperative Arrangements with Attest Clients |
| ET section 101.02(A)(3) | Interpretation of Rule 101-A3 | 1.265.020.01 | Joint Closely-Held Investments |
| ET section 191.184–.185 | Joint Interest in Vacation Home | 1.265.020.02 | Joint Closely-Held Investments |
| ET section 101.02 | Interpretation of Rule 101 — Application of the Independence Rules to a Covered Member's Immediate Family | 1.270.010 | Immediate Family Members |
| ET section 101.02 | Interpretation of Rule 101 — Application of the Independence Rules to a Covered Member's Immediate Family — Permitted Employment | 1.270.020.01–.03 | Immediate Family Member is Employed by the Attest Client |
| ET section 101.02 | Interpretation of Rule 101 — Grandfathered Employment Relationships | 1.270.020.04 | Immediate Family Member is Employed by the Attest Client |
| ET section 101.02 | Interpretation of Rule 101 — Application of the Independence Rules to a Covered Member's Immediate Family — Employee Benefits Plans Other Than Certain Share-Based Arrangements or Nonqualified Deferred Compensation Plans | 1.270.030 | Immediate Family Member Participation in an Employee Benefit Plan That Is an Attest Client or Is Sponsored by an Attest Client (Other than Certain Share-Based Arrangements or Nonqualified Deferred Compensation Plans) |

Appendix D — Mapping Document

| Prior Code Citations | Title in Prior Code | New Citation | New Title |
|---|---|---|---|
| ET section 101.02 | Interpretation of Rule 101 — Application of the Independence Rules to a Covered Member's Immediate Family — Employee Benefits Plans Other Than Certain Share-Based Arrangements or Nonqualified Deferred Compensation Plans | 1.270.040 | Immediate Family Member Participation in an Employee Benefit Plan With Financial Interests in an Attest Client |
| ET section 101.02 | Interpretation of Rule 101 — Application of the Independence Rules to a Covered Member's Immediate Family — Share-Based Compensation Arrangements Resulting in Beneficial Financial Interests in Attest Clients | 1.270.050 | Immediate Family Member Participation in Share-Based Compensation Arrangements Resulting in Beneficially Owned Financial Interests in Attest Clients |
| ET section 101.02 | Interpretation of Rule 101 — Application of the Independence Rules to a Covered Member's Immediate Family — Share-Based Compensation Arrangements Resulting in Rights to Acquire Shares in an Attest Client | 1.270.060 | Immediate Family Member Participation in Share-Based Compensation Arrangements Resulting in Rights to Acquire Shares in an Attest Client |
| ET section 101.02 | Interpretation of Rule 101 — Application of the Independence Rules to a Covered Member's Immediate Family — Share-Based Compensation Arrangements Based Upon Stock Appreciation | 1.270.070 | Immediate Family Member Participation in Share-Based Compensation Arrangements Based Upon Stock Appreciation |
| ET section 101.02 | Interpretation of Rule 101 — Application of the Independence Rules to a Covered Member's Immediate Family — Nonqualified Deferred Compensation Plans | 1.270.080 | Immediate Family Member Participation in a Nonqualified Deferred Compensation Plan |
| ET section 101.02 | Interpretation of Rule 101 — Application of the Independence Rules to a Close Relatives | 1.270.100.01–.03 | Close Relatives |

Appendix D — Mapping Document

| Prior Code Citations | Title in Prior Code | New Citation | New Title |
|---|---|---|---|
| ET section 101.02 | Interpretation of Rule 101 — Grandfathered Employment Relationships | 1.270.100.04 | Close Relatives |
| ET section 101.02(C) | Interpretation of Rule 101-C | 1.275.005.01–.02 | Simultaneous Employment or Association with an Attest Client |
| ET section 101.21 | Permitted Employment With Client Educational Institution | 1.275.005.03 | Simultaneous Employment or Association with an Attest Client |
| ET section 101.06 | Honorary directorships and trusteeships of not-for-profit organization | 1.275.010 | Honorary Director or Trustee of a Not-for-Profit Organization |
| ET section 191.144–.145 | Member on Advisory Board of Client | 1.275.015 | Member of Advisory Board |
| ET section 191.039–.040 | Member Serving on Governmental Advisory Unit | 1.275.020 | Member of Governmental Advisory Committee |
| ET section 191.164–.165 | Campaign Treasurer | 1.275.025 | Campaign Treasurer |
| ET section 191.027–.028 | Member on Board of Federated Fund-Raising Organization | 1.275.030 | Member of Federated Fund-Raising Organization |
| ET section 191.128–.129 | Member Serves on Board of Organization for Which Client Raises Funds | 1.275.035 | Member of Organization that Receives Funds From Fund-Raising Organization |
| ET section 101.02 | Interpretation of Rule 101 — Application of the Independence Rules to Covered Members Formerly Employed by a Client or Otherwise Associated with a Client | 1.277.010 | Former Employment or Association with an Attest Client |
| ET section 101.04 | Employment or Association with Attest Clients — Considering Employment or Association with the Client | 1.279.010 | Considering Employment or Association with an Attest Client |
| ET section 101.04 | Employment or Association with Attest Clients | 1.279.020 | Subsequent Employment or Association with an Attest Client |

Appendix D — Mapping Document

| Prior Code Citations | Title in Prior Code | New Citation | New Title |
|---|---|---|---|
| ET section 191.033–.034 | Member of Social Club | 1.280.010 | Member of a Social Club |
| ET section 191.003–.004 | Association Membership | 1.280.020 | Member of a Trade Association |
| ET section 191.061–.062 | Performance of Services for CIRAs, Including Cooperatives, Condominium Associations, Planned Unit Developments, Homeowners Associations, and Timeshare Developments | 1.280.030 | Member of a Common Interest Realty Association |
| ET section 191.150–.151 | Membership in Client Credit Union | 1.280.040 | Member of a Credit Union |
| ET section 191.228–.229 | Acceptance or Offering of Gifts and Entertainment to or From an Attest Client | 1.285.010 | Offering or Accepting Gifts or Entertainment |
| ET section 101.08 | The effect of actual or threatened litigation on independence | 1.290.010 | Actual or Threatened Litigation |
| ET section 101.05 | Performance of nonattest services — Introduction and Engagements Subject to Independence Rules of Certain Regulatory Bodies | 1.295.010 | Scope and Applicability of Nonattest Services |
| ET section 101.05 | Cumulative Effect Providing Multiple Nonattest Services | 1.295.020 | Cumulative Effect on Independence When Providing Multiple Nonattest Services |
| ET section 101.05 | Performance of nonattest services — Management Responsibilities | 1.295.030 | Management Responsibilities |
| ET section 101.05 | Performance of nonattest services — General Requirements | 1.295.040 | General Requirements for Performing Nonattest Services |
| ET section 101.05 | Performance of nonattest services — General Requirements | 1.295.050 | Documentation Requirements When Providing Nonattest Services |
| ET section 101.05 | Performance of nonattest services — Management Responsibilities | 1.295.105 | Advisory Services |
| ET section 191.015–.016 | Member Providing Advisory Services | 1.295.105 | Advisory Services |

Appendix D — Mapping Document

| Prior Code Citations | Title in Prior Code | New Citation | New Title |
|---|---|---|---|
| ET section 101.05 | Performance of nonattest services — Appraisal, Valuation and Actuarial Services | 1.295.110 | Appraisal, Valuation, and Actuarial Services |
| ET section 101.05 | Performance of nonattest services — Benefit Plan Administration | 1.295.115 | Benefit Plan Administration |
| ET section 101.05 | Performance of nonattest services — Bookkeeping | 1.295.120 | Bookkeeping, Payroll, and Other Disbursements |
| ET section 101.05 | Performance of nonattest services — Nontax Disbursements | 1.295.120 | Bookkeeping, Payroll, and Other Disbursements |
| ET section 101.05 | Performance of nonattest services — Business Risk Consulting | 1.295.125 | Business Risk Consulting |
| ET section 101.05 | Performance of nonattest services — Corporate Finance — Consulting or Advisory | 1.295.130 | Corporate Finance Consulting |
| ET section 101.05 | Performance of nonattest services — Executive or employee search | 1.295.135 | Executive or Employee Recruiting |
| ET section 101.05 | Performance of nonattest services — Forensic Accounting Services | 1.295.140 | Forensic Accounting |
| ET section 101.05 | Performance of nonattest services — Information Systems — Design, Installation or integration | 1.295.145 | Information Systems Design, Implementation, or Integration |
| ET section 101.05 | Performance of nonattest services — Internal Audit Assistance Services | 1.295.150 | Internal Audit |
| ET section 101.05 | Performance of nonattest services — Investment — Advisory or Management | 1.295.155 | Investment Advisory or Management |
| ET section 101.05 | Performance of nonattest services — Tax Compliance Services | 1.295.160.01–.05, .07 | Tax Services |
| | | 1.295.160.06 | Tax Services — Power of Attorney |

175

Appendix D — Mapping Document

| Prior Code Citations | Title in Prior Code | New Citation | New Title |
|---|---|---|---|
| ET section 101.13 | Modified Application of Rule 101 for Engagements Performed in Accordance with Statements on Standards for Attestations Engagements | 1.297.010 | Application of the Independence Rule to Engagements Performed in Accordance with Statements on Standards for Attestation Engagements |
| ET section 101.13 | Modified Application of Rule 101 for Engagements Performed in Accordance with Statements on Standards for Attestations Engagements — AUP Engagements | 1.297.020 | Agreed-Upon Procedure Engagements Performed in Accordance with SSAEs |
| ET section 101.13 | Modified Application of Rule 101 for Engagements Performed in Accordance with Statements on Standards for Attestations Engagements | 1.297.030 | Engagements, Other Than AUPs, Performed in Accordance with SSAEs |
| ET section 201.01 | General Standards | 1.300.001 | General Standards Rule |
| New | | 1.300.005 | *General Standards Rule — Application of the Conceptual Framework for Members in Public Practice and Ethical Conflicts* |
| ET section 201.02 | Competence | 1.300.010 | Competence |
| ET section 291.017–.018 | Supervision of Technical Specialist on Management Consulting Services Engagements | 1.300.020 | Supervision of a Specialist on Consulting Engagements |
| ET section 291.019–.020 | Submission of Financial Statements by a Member in Public Practice | 1.300.030 | Submission of Financial Statements |
| ET section 291.015–.016 | Subcontractor Selection for Management Consulting Service Engagements | 1.300.040 | Use of a Third-Party Service Provider |
| ET section 291.023–.024 | Applicability of General and Technical Standards When Using a Third-Party Service Provider | 1.300.040 | Use of a Third-Party Service Provider |
| ET section 202.01 | Compliance with Standards | 1.310.001 | Compliance with Standards Rule |

Case 2:09-md-02047-EEF-MBN Document 22363-28 Filed 11/19/19 Page 96 of 104
Case 2:09-md-02047-EEF-MBN Document 22363-28 Filed 11/19/19 Page 96 of 104
190

Appendix D — Mapping Document

| Prior Code Citations | Title in Prior Code | New Citation | New Title |
|---|---|---|---|
| | | 1.310.005 | *Compliance with Standards Rule — Application of the Conceptual Framework for Members in Public Practice and Ethical Conflicts* |
| ET section 203.01 | Accounting Principles | 1.320.001 | Accounting Principles Rule |
| | | 1.320.005 | *Accounting Principles Rule — Application of the Conceptual Framework for Members in Public Practice and Ethical Conflicts* |
| ET section 203.05 | Responsibility of employees for the preparation of financial statements in conformity with GAAP | 1.320.010 | Responsibility for Affirming that Financial Statements Are in Conformity With the Applicable Financial Reporting Framework |
| ET section 203.03 | Status of FASB, GASB and FASAB interpretations | 1.320.020 | Status of Financial Accounting Standards Board, Governmental Accounting Standards Board, Federal Accounting Standards Advisory Board, and International Accounting Standards Board Interpretations |
| ET section 203.02 | Departures from Generally Accepted Accounting Principles | 1.320.030 | Departures From Generally Accepted Accounting Principles |
| ET section 203.06 | Financial Statements Prepared Pursuant to Financial Reporting Frameworks Other than GAAP | 1.320.040 | Financial Statements Prepared Pursuant to Financial Reporting Frameworks Other than GAAP |
| ET section 501.01 | Acts Discreditable | 1.400.001 | Acts Discreditable Rule |
| | | 1.400.005 | *Acts Discreditable Rule — Application of the Conceptual Framework for Members in Public Practice and Ethical Conflicts* |
| ET section 501.03 | Discrimination and Harassment in Employment Practices | 1.400.010 | Discrimination and Harassment in Employment Practices |
| ET section 501.07 | Solicitation or disclosure of CPA examination questions and answers | 1.400.020 | Solicitation or Disclosure of CPA Examination Questions and Answers |

Appendix D — Mapping Document

| Prior Code Citations | Title in Prior Code | New Citation | New Title |
|---|---|---|---|
| ET section 501.08 | Failure to file tax returns or pay tax liability | 1.400.030 | Failure to File a Tax Return or Pay a Tax Liability |
| ET section 501.05 | Negligence in the preparation of financial statements or records | 1.400.040 | Negligence in the Preparation of Financial Statements or Records |
| ET section 501.06 | Failure to follow requirements of governmental bodies, commissions, or other regulatory agencies | 1.400.050 | Governmental Bodies, Commissions, or Other Regulatory Agencies |
| ET section 501.04 | Failure to follow standards and/or procedures or other requirements in governmental audits | 1.400.055 | Governmental Audits |
| ET section 501.09 | Failure to follow requirements of governmental bodies, commissions, or other regulatory agencies on indemnification and limitation of liability provisions in connection with audit and other attest services | 1.400.060 | Indemnification and Limitation of Liability Provisions |
| ET section 501.10 | Confidential Information Obtained From Employment or Volunteer Activities | 1.400.070 | Confidential Information Obtained from Employment or Volunteer Activities |
| | | 1.400.090 | False, Misleading, or Deceptive Acts in Promoting or Marketing Professional Services |
| ET section 501.12 | Use of CPA Credential | 1.400.100 | Use of the CPA Credential |
| ET section 501.02 | Response to Requests by Clients and Former Clients for Records — Terminology | 1.400.200.01–.05, .07–.10 | Records Request |
| ET section 591.377–.378 | Requests for Records Pursuant to Interpretation 501-1 | 1.400.200.06 | Records Request |
| | | 1.400.200.11 | Records Request |
| ET section 591.381–.382 | Member Removing Client Files From an Accounting Firm | 1.400.210.01 | Removing Client Files or Proprietary Information From a Firm |
| | | 1.400.210.02 | Removing Client Files or Proprietary Information From a Firm |

Appendix D — Mapping Document

| Prior Code Citations | Title in Prior Code | New Citation | New Title |
|---|---|---|---|
| ET section 391.027–.028 | Use of Confidential Information on Management Consulting Service Engagements | 1.400.240 | Use of Confidential Information From Nonclient Sources |
| | | 1.400.240 | Use of Confidential Information From Nonclient Sources |
| | | 1.500.008 | Unpaid Fees |
| ET section 302.01 | Contingent Fees | 1.510.001 | Contingent Fee Rule |
| | | 1.510.005 | *Contingent Fee Rule — Application of the Conceptual Framework for Members in Public Practice and Ethical Conflicts* |
| ET section 302.02 | Contingent Fees in tax matters | 1.510.010 | Tax Matters |
| ET section 391.033–.034 | Definition of the Receipt of a Contingent Fee or a Commission | 1.510.020 | Receipt of Contingent Fee |
| ET section 391.037–.038 | Receipt of Contingent Fees or Commissions by Member's Spouse | 1.510.030 | Services Performed by a Member's Spouse for a Contingent Fee |
| ET section 391.049–.050 | Commission and Contingent Fee Arrangements with Nonattest Client | 1.510.040 | Contingent Fee Arrangements with an Investment Advisory Services Nonattest Client that is Related to a Client |
| ET section 391.047–.048 | Investment Advisory Services | 1.510.050 | Investment Advisory Services |
| ET section 503.01 | Commissions and Referral Fees | 1.520.001 | Commissions and Referral Fee Rule |
| | | 1.520.005 | *Commissions and Referral Fee Rule — Application of the Conceptual Framework for Members in Public Practice and Ethical Conflicts* |
| ET section 591.367–.368 | Definition of the Receipt of a Contingent Fee or a Commission | 1.520.020 | Receipt of Commission |
| ET section 591.373–.374 | Receipt of Contingent Fees or Commissions by Member's Spouse | 1.520.030 | Services Performed by a Member's Spouse for a Commission |
| ET section 591.375–.376 | Referral of Products of Others | 1.520.040 | Referral of Products of Others |

Appendix D — Mapping Document

| Prior Code Citations | Title in Prior Code | New Citation | New Title |
|---|---|---|---|
| ET section 591.383–.384 | Commission and Contingent Fee Arrangements with Nonattest Client | 1.520.050 | Commission Arrangements with an Investment Advisory Services Nonattest Client that is Related to a Client |
| ET section 591.369–.370 | Sale of Products to Clients | 1.520.060 | Sale of Products to Clients |
| ET section 591.371–.372 | Billing for Subcontractor's Services | 1.520.070 | Billing for a Subcontractor's Services |
| ET section 502.01 | Advertising and other forms of solicitation | 1.600.001 | Advertising and Other Forms of Solicitation Rule |
| | | 1.600.005 | *Advertising and Other Forms of Solicitation Rule — Application of the Conceptual Framework for Members in Public Practice and Ethical Conflicts* |
| ET section 502.06 | Engagements obtained through efforts of third parties | 1.600.010.01 | False, Misleading, or Deceptive Acts in Advertising or Solicitations |
| ET section 502.03 | False, Misleading, or Deceptive Acts in Advertising or Solicitation | 1.600.010.02 | False, Misleading, or Deceptive Acts in Advertising or Solicitations |
| ET section 591.365–.366 | Use of the AICPA Personal Financial Specialist Designation | 1.600.030 | Use of AICPA-Awarded Designation |
| ET section 502.07 | Use of CPA Credential | 1.600.100 | Use of the CPA Credential |
| ET section 301.01 | Confidential Client Information | 1.700.001 | Confidential Client Information Rule |
| | | 1.700.005 | *Confidential Client Information Rule — Application of the Conceptual Framework for Members in Public Practice and Ethical Conflicts* |
| ET section 391.011–.012 | Revealing Client Information to Competitors | 1.700.010 | Client Competitors |
| ET section 391.029–.030 | Earlier Similar Management Consulting Service Study with Negative Outcome | 1.700.020.01 | Disclosing Information From Previous Engagements |

Appendix D — Mapping Document

| Prior Code Citations | Title in Prior Code | New Citation | New Title |
|---|---|---|---|
| ET section 391.005–.006 | Information to Successor Accountant About Tax Return Irregularities | 1.700.020.02–.03 | Disclosing Information From Previous Engagements |
| ET section 391.031–.032 | Disclosure of Confidential Client Information | 1.700.030.01–.02 | Disclosing Information to Persons or Entities Associated with Clients |
| ET section 391.041–.042 | Member Providing Services for Company Executives | 1.700.030.03 | Disclosing Information to Persons or Entities Associated with Clients |
| ET section 391.001–.002 | Use of a Third-Party Service Provider to Provide Professional Services to Clients or Administrative Support Services to the Member | 1.700.040 | Disclosing Information to a Third-Party Service Provider |
| ET section 301.04 | Confidential information and the purchase, sale, or merger of a practice | 1.700.050 | Disclosing Client Information in Connection with a Review of the Member's Practice |
| ET section 391.003–.004 | Disclosure of Client Information to Trade Associations | 1.700.060 | Disclosure of Client Information to Third Parties |
| ET section 391.039–.040 | Disclosure of Confidential Client Information to Professional Liability Insurance Carrier | 1.700.070 | Disclosing Client Information During Litigation |
| ET section 391.045–.046 | Disclosure of Confidential Client Information in Legal or Alternative Dispute Resolution Proceedings | 1.700.070 | Disclosing Client Information During Litigation |
| ET section 391.035–.036 | Bank Director | 1.700.080 | Disclosing Client Information in Director Positions |
| ET section 391.013–.014 | Revealing Names of Clients | 1.700.090 | Disclosing Client Names |
| | | 1.700.100 | Disclosing Confidential Client Information as a Result of a Subpoena or Summons |
| ET section 505.01 | Form of Organization and Name | 1.800.001 | Form of Organization and Name Rule |

Appendix D — Mapping Document

| Prior Code Citations | Title in Prior Code | New Citation | New Title |
|---|---|---|---|
| | | 1.800.005 | *Form of Organization and Name Rule — Application of Conceptual Framework for Members in Public Practice and Ethical Conflicts* |
| ET section 505.03 | Application of rules of conduct to members who own a separate business | 1.810.010.01–.03 | Ownership of a Separate Business |
| ET section 591.275–.276 | Partner Having Separate Proprietorship | 1.810.010.04 | Ownership of a Separate Business |
| ET section 591.273–.274 | Nonproprietary Partners | 1.810.020 | Partner Designation |
| ET section 591.005–.006 | Employment by Non-CPA Firm | 1.810.030 | A Member's Responsibility for Nonmember Practitioners |
| ET section 591.281–.282 | Responsibility for Non-CPA Partner | 1.810.030 | A Member's Responsibility for Nonmember Practitioners |
| ET section 591.271–.272 | Audit with Former Partner | 1.810.040 | Attest Engagement Performed with a Former Partner |
| ET section 505.04 | Application of rule 505 to alternative practice structures | 1.810.050 | Alternative Practice Structures |
| ET section 591.289–.290 | Firm Name of Merged Partnerships | 1.820.010 | Use of a Retired Partner's Name |
| ET section 591.379–.380 | Non-CPA Partner | 1.820.020 | A Practice with Non-CPA Partners |
| ET section 505.05 | Misleading Firm Names | 1.820.030 | Misleading Firm Names |
| ET section 505.06 | Common Network Brand in Firm Name | 1.820.040 | Use of a Common Brand Name in Firm Name |
| | | 2.000 | Members in Business — Introduction |
| | | 2.000.010 | **Conceptual Framework for Members in Business** |
| | | 2.000.020 | Members in Business— Ethical Conflicts |
| ET section 102.01 | Integrity and Objectivity | 2.100.001 | Integrity and Objectivity Rule |
| | | 2.100.005 | *Integrity and Objectivity Rule — Application of the Conceptual Framework for Members in Business and Ethical Conflicts* |
| ET section 102.03 | Conflicts of Interest | 2.110.010 | Conflicts of Interest |

Case 2:09-md-02047-EEF-MBN Document 22363-28 Filed 11/19/19 Page 102 of 104
Case 2:11-cv-22408-MCE Document 272 Entered on FLSD Docket 08/15/2013 Page 188 of
190

Appendix D — Mapping Document

| Prior Code Citations | Title in Prior Code | New Citation | New Title |
|---|---|---|---|
| ET section 191.226–.227 | Acceptance or Offering of Gifts or Entertainment | 2.120.010 | Offering or Accepting Gifts or Entertainment |
| ET section 102.02 | Knowing misrepresentations in the preparation of financial statements or records | 2.130.010 | Knowing Misrepresentations in the Preparation of Financial Statements or Records |
| ET section 102.05 | Subordination of judgment by a member | 2.130.020 | Subordination of Judgment |
| ET section 102.04 | Obligations of a member to his or her employer's external accountant | 2.130.030 | Obligation of a Member to His or Her Employer's External Accountant |
| ET section 102.06 | Applicability of rule 102 to members performing educational services | 2.160.010 | Educational Services |
| ET section 201.01 | General Standards | 2.300.001 | General Standards Rule |
|  |  | 2.300.005 | *General Standards Rule — Application of the Conceptual Framework for Members in Business and Ethical Conflicts* |
| ET section 201.02 | Competence | 2.300.010 | Competence |
| ET section 291.019–.020 | Submission of Financial Statements by a Member in Public Practice | 2.300.030 | Submission of Financial Statements |
| ET section 202.01 | Compliance with Standards | 2.310.001 | Compliance with Standards Rule |
|  |  | 2.310.005 | *Compliance with Standards Rule — Application of the Conceptual Framework for Members in Business and Ethical Conflicts* |
| ET section 203.01 | Accounting Principles | 2.320.001 | Accounting Principles Rule |
|  |  | 2.320.005 | *Accounting Principles Rule — Application of the Conceptual Framework for Members in Business and Ethical Conflicts* |
| ET section 203.05 | Responsibility of employees for the preparation of financial statements in conformity with GAAP | 2.320.010 | Responsibility for Affirming that Financial Statements Are in Conformity With the Applicable Financial Reporting Framework |

Appendix D — Mapping Document

| Prior Code Citations | Title in Prior Code | New Citation | New Title |
|---|---|---|---|
| ET section 203.03 | Status of FASB, GASB and FASAB interpretations | 2.320.020 | Status of Financial Accounting Standards Board, Governmental Accounting Standards Board, Federal Accounting Standards Advisory Board, and International Accounting Standards Board Interpretations |
| ET section 203.02 | Departures from Generally Accepted Accounting Principles | 2.320.030 | Departures From Generally Accepted Accounting Principles |
| ET section 203.06 | Financial Statements Prepared Pursuant to Financial Reporting Frameworks Other than GAAP | 2.320.040 | Financial Statements Prepared Pursuant to Financial Reporting Frameworks Other than GAAP |
| ET section 501.01 | Acts Discreditable | 2.400.001 | Acts Discreditable Rule |
| New | | 2.400.005 | *Acts Discreditable Rule — Application of the Conceptual Framework for Members in Business and Ethical Conflicts* |
| ET section 501.03 | Discrimination and Harassment in Employment Practices | 2.400.010 | Discrimination and Harassment in Employment Practices |
| ET section 501.07 | Solicitation or disclosure of CPA examination questions and answers | 2.400.020 | Solicitation or Disclosure of CPA Examination Questions and Answers |
| ET section 501.08 | Failure to file tax returns or pay tax liability | 2.400.030 | Failure to File a Tax Return or Pay a Tax Liability |
| ET section 501.05 | Negligence in the preparation of financial statements or records | 2.400.040 | Negligence in the Preparation of Financial Statements or Records |
| ET section 501.06 | Failure to follow requirements of governmental bodies, commissions, or other regulatory agencies | 2.400.050 | Governmental Bodies, Commissions, or Other Regulatory Agencies |

Appendix D — Mapping Document

| Prior Code Citations | Title in Prior Code | New Citation | New Title |
|---|---|---|---|
| ET section 501.09 | Failure to follow requirements of governmental bodies, commissions, or other regulatory agencies on indemnification and limitation of liability provisions in connection with audit and other attest services | 2.400.060 | Indemnification and Limitation of Liability Provisions |
| ET section 501.10 | Confidential Information Obtained From Employment or Volunteer Activities | 2.400.070 | Confidential Information Obtained from Employment or Volunteer Activities |
| ET section 501.11 | False, Misleading, or Deceptive Acts in Promoting or Marketing Professional Services | 2.400.090 | False, Misleading, or Deceptive Acts in Promoting or Marketing Professional Services |
| ET section 501.12 | Use of CPA Credential | 2.400.100 | Use of the CPA Designation |
|  |  | 3.000 | Other Members — Introduction |
|  |  | 3.000.030 | Applicability |
| ET section 501.01 | Acts Discreditable | 3.400.001 | Acts Discreditable Rule |
| ET section 501.03 | Discrimination and Harassment in Employment Practices | 3.400.010 | Discrimination and Harassment in Employment Practices |
| ET section 501.07 | Solicitation or disclosure of CPA examination questions and answers | 3.400.020 | Solicitation or Disclosure of CPA Examination Questions and Answers |
| ET section 501.08 | Failure to file tax returns or pay tax liability | 3.400.030 | Failure to File a Tax Return or Pay a Tax Liability |
| ET section 501.10 | Confidential Information Obtained From Employment or Volunteer Activities | 3.400.070 | Confidential Information Obtained from Former Employment or Previous Volunteer Activities |
|  |  | 3.400.090 | False, Misleading, or Deceptive Acts in Promoting or Marketing Services |
| ET section 501.12 | Use of CPA Credential | 3.400.100 | Use of the CPA Credential |