# EXHIBIT 24—part 3

# Prior MLS Listing - Page 1



**Sam Schackow**
Chapman & Associates Inc
samschack@yahoo.com
Ph: (941) 356-2430

## Residential REALTOR Report with Photos



### General Information

| | | | |
|---|---|---|---|
| List Price: | $203,520 | ML# 214063484 | |
| MLS#: | 214063484 | Status: | Expired (02/11/15) |
| Address: | 2510 VAN BUREN | | |
| | CAPE CORAL, FL 33993 | | |
| GEO Area: | CC42 - Cape Coral Unit 50,54,51,52,53,55-57,80,98 | | |
| County: | Lee | Property Class: | Residential |
| Status Type: | Resale Property | Subdivision: | CAPE CORAL |
| List Price/Sqft: | $87.39 | Development: | CAPE CORAL |
| Property ID: | 32-43-23-C2-04106.0700 | DOM: | 43 |
| Furnished: | Unfurnished | CDOM: | 88 |
| Approx. Living Area: | 2329 - Property Appraiser Office | Bedrooms: | 3 Bed |
| Approx.Total Area: | 4104 - Property Appraiser Office | Baths: | 3 (3 0) |
| Building Design: | Single Family | Year Built: | 2006 |
| Virtual Tour URL: | | | |
| Listing Broker: | Carrington Real Estate Service | | |

### Detailed Property Information
ML# 214063484

**Property Information:** Golf Course/Lake View - Single Family Pool Home with southern exposure. Located on the 12th Tee at Coral Oaks Golf Course. Sold AS IS. For Auction information please see confidential remarks. New Auction starting 12/22/2014

| | | | |
|---|---|---|---|
| Ownership: | Single Family | Pets: | No Approval Needed |
| Lot Size: | .24 (acres) / 10,624 (sqft) - Property Appraiser Office | Pets - Max. Weight: | |
| Cable: | Yes | Pets - Max. Number: | |
| | | Pets - Breed Limits: | |
| | | Pets - Other Limits: | |
| Guest House L.A.: | | Approx. Lot Size: | 85x125x85x125 - Property Appraiser Office |
| Guest House Desc: | | Gulf Access Type: | |
| Elementary School: | | Windows: | Single Hung, Sliding |
| Middle School: | | Exterior Finish: | Stucco |
| High School: | | Community Type: | Golf Course |
| Flooring: | Carpet, Tile | Golf Type: | |
| Cooling: | Central Electric | Floor Plan Type: | Split Bedrooms |
| Kitchen: | | Heating: | Central Electric |
| View: | Golf Course, Lake | Gas YN: | |
| Private Pool: | Yes/Below Ground | Gas Description: | |
| Private Spa: | No | | |
| Amenities: | Golf Course | | |
| Bedroom: | Split Bedrooms | | |
| Dining: | Dining - Living | | |
| Equipment: | None | | |
| Exterior Features: | Patio, Sprinkler Auto | | |
| Interior Features: | Walk-In Closet | | |
| Master Bath: | Separate Tub and Shower | | |
| Additional Rooms: | Laundry in Residence, Screened Lanai/Porch | | |
| Parking: | Driveway Paved | | |
| Road: | Public Road | | |
| Restrictions: | See Remarks | | |
| Security: | | | |
| Storm Protection: | Shutters | | |

### Unit/Bldg. Information
ML# 214063484

| | | | | | |
|---|---|---|---|---|---|
| Building #: | | Units in Complex: | 1 | Builder Product: | No |
| Total Floors in Property: | 1 | Building Style: | 1 Story/Ranch | | |
| Total Building Floors: | | Construction: | Concrete Block | | |
| Unit Floor: | 1 | Roof: | Tile | | |
| Units in Building: | 1 | Elevator: | None | | |
| Garage: | Attached | Carport: | | | |
| # Garage Spaces: | 2 | # Carport Spaces: | 0 | | |

### Lot Information
ML# 214063484

| | | | |
|---|---|---|---|
| Waterfront: | No | Waterfront Descrip.: | None |
| Gulf Access: | No | Boat/Dock Info: | None |
| Canal Width: | None | Water: | Well |
| Rear Exposure: | S | Sewer: | Septic |
| Sec/Town/Rng: | 32/43/23 | Irrigation: | Well |
| Legal Unit: | 57 | Lot Description: | Regular |
| Subdivision #: | C2 | Lot: | 70 |
| Zoning: | R1-G | Block/Bldg: | 4106 |
| Legal Desc: | CAPE CORAL UNIT 57 BLK 4106 PB 19 PG 136 LOTS 70 + 71 | | |

### Room Information
ML# 214063484

| Room Type | Room Dimensions | Room Type | Room Dimensions | Room Type | Room Dimensions | Room Type | Room Dimensions |
|---|---|---|---|---|---|---|---|

### Financial/Transaction Information
ML# 214063484

| | | | |
|---|---|---|---|
| Total Tax Bill: | $538 | HOA Description: | |
| Tax Year: | 2013 | Association Mngmt Phone: | |
| Tax Desc: | City And County | Recurring Fees: | |
| Tax District Type: | Not Applicable | HOA Fee: | $0 |
| Terms: | Buyer Finance/Cash | Master HOA Fee: | $0 |
| Possession: | At Closing | Condo Fee: | $0 |
| Approval: | None | Spec Assessment: | $0 |
| Management: | None | Other Fee: | $0 |
| Maintenance: | None | Land Lease: | $0 |
| Special Info: | | Annual Food & Beverage | |
| Num of Leases/Yr: | 0 | Minimum: | |
| Min. Days Of Lease: | 0 | | |

Serial# 91F19BF5
esign.alamode.com/verify

Form SCNLTR - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

## Prior MLS Listing – Page 2

Matrix                                                                    https://matrix.swflamls.com/Matrix/Printing/PrintOptions.aspx?c=AA...

| | | | |
|---|---|---|---|
| Subject to FIRPTA: | No | Mandatory Club Fee: | $0 |
| Subject To Lease YN: | | Rec. Lease Fee: | $0 |
| Lease Description: | | | |
| Lease Expiration Date: | | **Total Annual Recurring Fees:** | $0 |
| | | **One Time Fees** | |
| | | Mandatory Club Fee: | $0 |
| | | Land Lease: | $0 |
| | | Rec. Lease Fee: | $0 |
| | | Other Fee: | $0 |
| | | Spec Assessment: | $0 |
| | | Transfer Fee: | $0 |
| | | Application Fee: | $0 |
| | | **Total One Time Fees:** | $0 |

### Office Information

ML# 214063484

| | | | |
|---|---|---|---|
| Office Code: | CARR3 | Agent ID: | 3175832 |
| Office Name: | Carrington Real Estate Service | Agent Name: | Ilse Veronika Elakman |
| Office Address: | 2124 W. Kennedy Blvd. Ste A | Agent Phone: | (239) 560-4551 |
| | Tampa FL, 33606 | Agent Fax: | |
| Office Ph: | (727) 460-5135 | Agent Email: | veronika.realestate@gmail.com |
| Office Fax: | (727) 499-6879 | | |
| Board: | Florida Gulf Coast | | |

### Settlement Agent Information

| | | |
|---|---|---|
| Name: | | Phone: |
| Address: | | Email: |

### Listing Information

ML# 214063484

| | | | |
|---|---|---|---|
| Owner Name: | American Hm Mtg Asse Trust 2007-1 | | |
| Bonus Amount: | | Appointment Req.: | No |
| Bonus Amount Description: | | Appointment Phone: | |
| Auction: | | | |
| Foreclosed (REO): | Yes | Variable Rate Comm.: | No |
| Potential Short Sale: | No | Target Marketing: | No |
| Short Sale Comp: | | Listing on Internet: | Yes |
| Buyer Agent Comp: | 2.5% | Address on Internet: | Yes |
| Trans Broker Comp: | 2.5% | Blogging: | No |
| Non-Rep Comp: | 0 | AVM: | No |
| Joint Agency: | | | |
| Listing Date: | 11/04/14 | Contract Closing Date | |
| Date Expiration: | 02/11/15 | | |
| Source Of Measurements: | Property Appraiser Office | | |
| Internet Sites: | Broker Reciprocity, NaplesArea.com, Realtor.com | | |
| Showing Inst.: | See Remarks, Vacant | | |
| Listing Type: | Exclusive Right to Sell | | |
| Is there a sign on the property with Seller contact information: | | No | |
| Contact Seller for showing: | | No | |
| Listing Broker available on contract presentation and negotiations: | | No | |
| Listing Broker will perform post contract services: | | Yes | |
| Limited Service Listing: | Yes | | |

### Confidential Information

ML# 214063484

Limited Service Listing. SOLD AS IS. No appointment required for showings, vacant, access code C8165 lock type. Per Seller, all offers must be submitted via Hubzu.com – do not email or fax offers. For assistance call Altisource Customer Care @ 1-855-882-1314 or visit Hubzu.com. This property is being sold via online auction starting on 12/22/2014 at 10:00 pm and ending on 12/29/2014 at 10:00 pm. Buyer to pay $299 Technology Fee and Buyer's Premium to Hubzu.com at closing – see website for auction details. This property may have been built with defective drywall; buyer is advised to perform inspection.

### Driving Directions

ML# 214063484

Burnt Store Rd North, right onto Van Buren Pkwy, property on the right.








Serial# 91F19BF5
esign.alamode.com/verify

Form SCNLTR - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

**Prior MLS Listing – Page 3**

Matrix                                                                    https://matrix.swflamls.com/Matrix/Printing/PrintOptions.aspx?c=AA...







Video and/or audio surveillance with recording capability may be in use on these premises. Conversations should not be considered private.

The source of the foregoing property information is a database compilation of an organization that is a member of the Southwest Florida Multiple Listing Service. Each Southwest Florida Multiple Listing Service member organization owns the copyright rights in its respective proprietary database compilation, and reserves all such rights. Copyright © 2019. The foregoing information including, but not limited to, any information about the size or area of lots, structures, or living space, such as room dimensions, square footage calculations, or acreage is believed to be accurate, but is not warranted or guaranteed. This information should be independently verified before any person enters into a transaction based upon it.

/2019, 2:33 PM

Serial# 91F19BF5
esign.alamode.com/verify

Form SCNLTR - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

**Subject's Cert of Title – Page 1**

INSTR # 2014000222261, Doc Type CT, Pages 2, Recorded 10/29/2014 at 12:45 PM,
Linda Doggett, Lee County Clerk of Circuit Court, Deed Doc. D $784.00 Deputy
Clerk LFAHRNER



$112,000.00
$784.00

IN THE CIRCUIT/COUNTY COURT FOR THE TWENTIETH JUDICIAL CIRCUIT IN AND FOR
LEE COUNTY, FLORIDA                                            CIVIL ACTION

DEUTSCHE BANK NATIONAL TRUST COMPANY, ATF AMERICAN HOME MORTGAGE ASSETS TRUST 2007 1 MORTGAGE
BACKED PASS THROUGH CERTIFIC
    Plaintiff
    vs
WALLS, ROSALEE M, AKA WALLS, ROSALEE ET AL
    Defendant

Case No. **11-CA-050742**

CERTIFICATE OF TITLE

    The undersigned clerk of the court certifies that he or she executed and filed a certificate of sale in this action on October 16, 2014 for the property described herein and that no objections to the sale have been filed within the time allowed for filing objections.

The following real property in Lee County, Florida:

- SEE ATTACHMENT -

Was sold to:    DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE FOR AMERICAN HOME MORTGAGE
ASSET TRUST 2007-1

Whose address is:    1661 Worthington Road STE 100
west palm beach, FL 33409

OCT 2 8 2014

WITNESS my hand and the seal of the court on _____

LINDA DOGGETT, Clerk of Court

Copies furnished to all parties
LINDA DOGGETT, Clerk of Court

By:

Serial# 91F19BF5
esign.alamode.com/verify

2014 OCT 28 AM 10: 01
FILED LEE CO. FLORIDA
CLERK OF COURTS

**Subject's Cert of Title – Page 2**

INSTR # 2014000222261 Page Number: 2 of 2

**LOT 70 AND 71, BLOCK 4106, CAPE CORAL, UNIT 57, AS RECORDED IN PLAT BOOK 19, PAGES 124 TO 137, IN THE PUBLIC RECORDS OF LEE COUNTY, FLORIDA.**

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/19/19 Page 7 of 319
Case 1:11-cv-22408-MGC Document 273-3 Entered on FLSD Docket 05/13/2019 Page 792 of 989
License



RICK SCOTT, GOVERNOR

JONATHAN ZACHEM, SECRETARY



## STATE OF FLORIDA
## DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION

## FLORIDA REAL ESTATE APPRAISAL BD

THE CERTIFIED RESIDENTIAL APPRAISER HEREIN IS CERTIFIED UNDER THE
PROVISIONS OF CHAPTER 475, FLORIDA STATUTES

## WILSON, SARAH DENISE

9409 IVY BROOK RUN 1305
FORT MYERS          FL 33913

**LICENSE NUMBER: RD7689**

**EXPIRATION DATE: NOVEMBER 30, 2020**

Always verify licenses online at MyFloridaLicense.com



Do not alter this document in any form.

This is your license. It is unlawful for anyone other than the licensee to use this document.

Serial# 91F19BF5
esign.alamode.com/verify

**E&O Insurance – Page 1**

## NAVIGATORS INSURANCE COMPANY

### THIS IS A CLAIMS MADE INSURANCE POLICY.

**THIS POLICY APPLIES ONLY TO THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD. ALL CLAIMS MUST BE REPORTED IN WRITING TO THE COMPANY DURING THE POLICY PERIOD OR WITHIN 60 DAYS AFTER THE END OF THE POLICY PERIOD.**

### PLEASE READ THIS POLICY CAREFULLY.

## REAL ESTATE PROFESSIONAL ERRORS AND OMISSIONS INSURANCE POLICY DECLARATIONS

POLICY NUMBER: PH17RELM01679IV    RENEWAL OF: PH16RELM01679IV

1. **NAMED INSURED:**
   Valucentric LLC

2. **ADDRESS:**
   1003 Mt Hermon rd Ste 201
   Salisbury, MD 21804

3. **POLICY PERIOD:  FROM:** 09/19/2017    **TO:** 09/19/2018
   12:01 A.M. Standard Time at the address of the **Named Insured** as stated in Number 2 above.

4. **LIMITS OF LIABILITY:**    $ 1,000,000    **Per Claim**

   $ 2,000,000    **Annual Aggregate**

5. **DEDUCTIBLE:**   $ 10,000

6. **PREMIUM:**  $ 19,304.00
   **TAXES:**   $        $

7. **RETROACTIVE DATE:** 08/14/2014

NAV REL DEC (02 14)        Page 1 of 2

*Navigators*
*Insuring A World In Motion®*

Serial# 91F19BF5
esign.alamode.com/verify

## E&O Insurance – Page 2

**8. FORMS ATTACHED:**

| | |
|---|---|
| NAV REL DEC | Real Estate Professionals Declarations |
| NAV REL NIC PF | Real Estate Professionals Policy |
| NAV REL 025 | Claims Expenses Inside the Limits of Liability |
| NAV REL 027 | Specified Entity Coverage |
| NAV REL 300 MD | Maryland Amendatory |
| MD PREM NOTICE | Notice to Applicants in Maryland Regarding Cancellation and Premium Recalculation |
| NAV-ML-002 | OFAC Endorsement |

**PROGRAM ADMINISTRATOR:**



McGowan Program Administrators
(A Division of McGowan & Company, Inc.)
20595 Lorain Road, Suite 300
Fairview Park, OH 44126
(440) 333-6300

By Acceptance of this policy the Insured agrees that the statements in the Declarations and the Application and any attachments hereto are the Insured's agreements and representations and that this policy embodies all agreements existing between the Insured and the Company or any of its representatives relating to this insurance.

**IN WITNESS WHEREOF, we have caused this policy to be signed by our President and Secretary.**

[Emily Miner]
Secretary

[Stanley A. Galanski]
President

NAV REL DEC (02 14)          Page 2 of 2


Insuring A World In Motion®

Serial# 91F19BF5
esign.alamode.com/verify

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/19/19 Page 10 of 319
Case 4:11-cv-22408-MGC Document 273-3 Entered on FLSD Docket 05/13/2016 Page 795 of
989

File No.    VALU-18-12-1461
File No.    VALU-18-12-1461

## UNIFORM APPRAISAL DATASET (UAD) DEFINITIONS ADDENDUM

(Source: Fannie Mae UAD Appendix D: UAD Field-Specific Standardization Requirements)

Condition Ratings and Definitions

C1

The improvements have been recently constructed and have not been previously occupied. The entire structure and all components are new and the dwelling features no physical depreciation.

Note: Newly constructed improvements that feature recycled or previously used materials and/or components can be considered new dwellings provided that the dwelling is placed on a 100 percent new foundation and the recycled materials and the recycled components have been rehabilitated/remanufactured into like-new condition. Improvements that have not been previously occupied are not considered "new" if they have any significant physical depreciation (that is, newly constructed dwellings that have been vacant for an extended period of time without adequate maintenance or upkeep).

C2

The improvements feature no deferred maintenance, little or no physical depreciation, and require no repairs. Virtually all building components are new or have been recently repaired, refinished, or rehabilitated. All outdated components and finishes have been updated and/or replaced with components that meet current standards. Dwellings in this category are either almost new or have been recently completely renovated and are similar in condition to new construction.

Note: The improvements represent a relatively new property that is well maintained with no deferred maintenance and little or no physical depreciation, or an older property that has been recently completely renovated.

C3

The improvements are well maintained and feature limited physical depreciation due to normal wear and tear. Some components, but not every major building component, may be updated or recently rehabilitated. The structure has been well maintained.

Note: The improvement is in its first-cycle of replacing short-lived building components (appliances, floor coverings, HVAC, etc.) and is being well maintained. Its estimated effective age is less than its actual age. It also may reflect a property in which the majority of short-lived building components have been replaced but not to the level of a complete renovation.

C4

The improvements feature some minor deferred maintenance and physical deterioration due to normal wear and tear. The dwelling has been adequately maintained and requires only minimal repairs to building components/mechanical systems and cosmetic repairs. All major building components have been adequately maintained and are functionally adequate.

Note: The estimated effective age may be close to or equal to its actual age. It reflects a property in which some of the short-lived building components have been replaced, and some short-lived building components are at or near the end of their physical life expectancy; however, they still function adequately. Most minor repairs have been addressed on an ongoing basis resulting in an adequately maintained property.

C5

The improvements feature obvious deferred maintenance and are in need of some significant repairs. Some building components need repairs, rehabilitation, or updating. The functional utility and overall livability is somewhat diminished due to condition, but the dwelling remains useable and functional as a residence.

Note: Some significant repairs are needed to the improvements due to the lack of adequate maintenance. It reflects a property in which many of its short-lived building components are at the end of or have exceeded their physical life expectancy but remain functional.

C6

The improvements have substantial damage or deferred maintenance with deficiencies or defects that are severe enough to affect the safety, soundness, or structural integrity of the improvements. The improvements are in need of substantial repairs and rehabilitation, including many or most major components.

Note: Substantial repairs are needed to the improvements due to the lack of adequate maintenance or property damage. It reflects a property with conditions severe enough to affect the safety, soundness, or structural integrity of the improvements.

Quality Ratings and Definitions

Q1

Dwellings with this quality rating are usually unique structures that are individually designed by an architect for a specified user. Such residences typically are constructed from detailed architectural plans and specifications and feature an exceptionally high level of workmanship and exceptionally high-grade materials throughout the interior and exterior of the structure. The design features exceptionally high-quality exterior refinements and ornamentation, and exceptionally high-quality interior refinements. The workmanship, materials, and finishes throughout the dwelling are of exceptionally high quality.

Q2

Dwellings with this quality rating are often custom designed for construction on an individual property owner's site. However, dwellings in this quality grade are also found in high-quality tract developments featuring residence constructed from individual plans or from highly modified or upgraded plans. The design features detailed, high quality exterior ornamentation, high-quality interior refinements, and detail. The workmanship, materials, and finishes throughout the dwelling are generally of high or very high quality.

Form UADDEFINE1 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

Serial# 91F19BF5
esign.alamode.com/verify

Case 2:09-md-02047-EEF-MBN Document 22362-31 Filed 11/19/19 Page 11 of 319
Case 4:11-cv-22408-MGC-Document 273-4 Entered on FLSD Docket 05/13/2013 Page 796 of
989

## UNIFORM APPRAISAL DATASET (UAD) DEFINITIONS ADDENDUM
(Source: Fannie Mae UAD Appendix D: UAD Field-Specific Standardization Requirements)

Quality Ratings and Definitions (continued)

Q3

Dwellings with this quality rating are residences of higher quality built from individual or readily available designer plans in above-standard residential tract developments or on an individual property owner's site. The design includes significant exterior ornamentation and interiors that are well finished. The workmanship exceeds acceptable standards and many materials and finishes throughout the dwelling have been upgraded from "stock" standards.

Q4

Dwellings with this quality rating meet or exceed the requirements of applicable building codes. Standard or modified standard building plans are utilized and the design includes adequate fenestration and some exterior ornamentation and interior refinements. Materials, workmanship, finish, and equipment are of stock or builder grade and may feature some upgrades.

Q5

Dwellings with this quality rating feature economy of construction and basic functionality as main considerations. Such dwellings feature a plain design using readily available or basic floor plans featuring minimal fenestration and basic finishes with minimal exterior ornamentation and limited interior detail. These dwellings meet minimum building codes and are constructed with inexpensive, stock materials with limited refinements and upgrades.

Q6

Dwellings with this quality rating are of basic quality and lower cost; some may not be suitable for year-round occupancy. Such dwellings are often built with simple plans or without plans, often utilizing the lowest quality building materials. Such dwellings are often built or expanded by persons who are professionally unskilled or possess only minimal construction skills. Electrical, plumbing, and other mechanical systems and equipment may be minimal or non-existent. Older dwellings may feature one or more substandard or non-conforming additions to the original structure

Definitions of Not Updated, Updated, and Remodeled

Not Updated

Little or no updating or modernization. This description includes, but is not limited to, new homes.

Residential properties of fifteen years of age or less often reflect an original condition with no updating, if no major components have been replaced or updated. Those over fifteen years of age are also considered not updated if the appliances, fixtures, and finishes are predominantly dated. An area that is 'Not Updated' may still be well maintained and fully functional, and this rating does not necessarily imply deferred maintenance or physical/functional deterioration.

Updated

The area of the home has been modified to meet current market expectations. These modifications are limited in terms of both scope and cost.

An updated area of the home should have an improved look and feel, or functional utility. Changes that constitute updates include refurbishment and/or replacing components to meet existing market expectations. Updates do not include significant alterations to the existing structure.

Remodeled

Significant finish and/or structural changes have been made that increase utility and appeal through complete replacement and/or expansion.

A remodeled area reflects fundamental changes that include multiple alterations. These alterations may include some or all of the following: replacement of a major component (cabinet(s), bathtub, or bathroom tile), relocation of plumbing/gas fixtures/appliances, significant structural alterations (relocating walls, and/or the addition of) square footage). This would include a complete gutting and rebuild.

Explanation of Bathroom Count

Three-quarter baths are counted as a full bath in all cases.  Quarter baths (baths that feature only a toilet) are not included in the bathroom count.  The number of full and half baths is reported by separating the two values using a period, where the full bath count is represented to the left of the period and the half bath count is represented to the right of the period.

Example:
3.2 indicates three full baths and two half baths.

Form UADDEFINE1 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

Serial# 91F19BF5
esign.alamode.com/verify

## UNIFORM APPRAISAL DATASET (UAD) DEFINITIONS ADDENDUM

(Source: Fannie Mae UAD Appendix D: UAD Field-Specific Standardization Requirements)

Abbreviations Used in Data Standardization Text

| Abbreviation | Full Name | Fields Where This Abbreviation May Appear |
|---|---|---|
| ac | Acres | Area, Site |
| AdjPrk | Adjacent to Park | Location |
| AdjPwr | Adjacent to Power Lines | Location |
| A | Adverse | Location & View |
| ArmLth | Arms Length Sale | Sale or Financing Concessions |
| ba | Bathroom(s) | Basement & Finished Rooms Below Grade |
| br | Bedroom | Basement & Finished Rooms Below Grade |
| B | Beneficial | Location & View |
| Cash | Cash | Sale or Financing Concessions |
| CtySky | City View Skyline View | View |
| CtyStr | City Street View | View |
| Comm | Commercial Influence | Location |
| c | Contracted Date | Date of Sale/Time |
| Conv | Conventional | Sale or Financing Concessions |
| CrtOrd | Court Ordered Sale | Sale or Financing Concessions |
| DOM | Days On Market | Data Sources |
| e | Expiration Date | Date of Sale/Time |
| Estate | Estate Sale | Sale or Financing Concessions |
| FHA | Federal Housing Authority | Sale or Financing Concessions |
| GlfCse | Golf Course | Location |
| Glfvw | Golf Course View | View |
| Ind | Industrial | Location & View |
| in | Interior Only Stairs | Basement & Finished Rooms Below Grade |
| Lndfl | Landfill | Location |
| LtdSght | Limited Sight | View |
| Listing | Listing | Sale or Financing Concessions |
| Mtn | Mountain View | View |
| N | Neutral | Location & View |
| NonArm | Non-Arms Length Sale | Sale or Financing Concessions |
| BsyRd | Busy Road | Location |
| o | Other | Basement & Finished Rooms Below Grade |
| Prk | Park View | View |
| Pstrl | Pastoral View | View |
| PwrLn | Power Lines | View |
| PubTrn | Public Transportation | Location |
| rr | Recreational (Rec) Room | Basement & Finished Rooms Below Grade |
| Relo | Relocation Sale | Sale or Financing Concessions |
| REO | REO Sale | Sale or Financing Concessions |
| Res | Residential | Location & View |
| RH | USDA - Rural Housing | Sale or Financing Concessions |
| s | Settlement Date | Date of Sale/Time |
| Short | Short Sale | Sale or Financing Concessions |
| sf | Square Feet | Area, Site, Basement |
| sqm | Square Meters | Area, Site |
| Unk | Unknown | Date of Sale/Time |
| VA | Veterans Administration | Sale or Financing Concessions |
| w | Withdrawn Date | Date of Sale/Time |
| wo | Walk Out Basement | Basement & Finished Rooms Below Grade |
| wu | Walk Up Basement | Basement & Finished Rooms Below Grade |
| WtrFr | Water Frontage | Location |
| Wtr | Water View | View |
| Woods | Woods View | View |

Other Appraiser-Defined Abbreviations

| Abbreviation | Full Name | Fields Where This Abbreviation May Appear |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

# Anthony M. Graziano, MAI, CRE

**Integra Realty Resources**
Miami/Palm Beach

Dadeland Centre
9155 S. Dadeland Boulevard
Suite 1208
Miami, FL 33156

T 305.670.0001
F 305.670.2276

irr.com

## Experience

Senior Managing Director of Integra Realty Resources – Miami/Palm Beach.

Mr. Graziano has actively counseled and advised clients on the sale, leasing, valuation, management, and development of commercial real estate assets throughout the northeast and southeast U.S. since 1992.

Mr. Graziano's professional perspective is a blend of his experience and educational background which includes formal training in architecture, urban planning, macro and micro economics, real estate finance, institutional asset management, and land development. His market experience in sales, leasing, management, and valuation disciplines combine to bring practical real world answers to complex planning and development projects. He has been actively involved as a consultant and/or member of a consultant team on various major redevelopment and land use projects for public and private clients over the past 25+ years.

Mr. Graziano has specialized in consulting and valuation assignments for corporate and private clients on a wide array of complex issues related to estate and condemnation matters, title defects, environmental contamination/damages, air rights, partial and fractional interests, contract disputes, and mediation/arbitration disputes. Mr. Graziano's experience in these matters provides a comprehensive framework for effective strategic real estate consulting.

## Professional Activities & Affiliations

Advisory Board Member: Urban Land Institute (ULI) South Florida / Caribbean
Advisory Board Member: University of Miami M+RED Program
Member: Economic Roundtable - Miami Beacon Council (2012-present)
Board of Director: Integra Realty Resources, Inc. (2011-2016)
Chairman of the Board:    Integra Realty Resources, Inc. (2016-present)
Director: South Florida Chapter of the Appraisal Institute (2014-2016)
Board Member: Builders Association of South Florida (BASF) (2014-2016)
Subject Matter Expert (SME): Appraisal Practice Board, Appraisal Foundation
Member: Appraisal Institute (MAI) (2008-Present)
Member: Counselors of Real Estate (CRE) (2007-Present)
National Association of Realtors (REALTOR)
Miami Association of REALTORS Industry Analyst of the Year (2016)
Former Fellow: Royal Institute of Chartered Surveyors (FRICS) (2007-2014)
AI Leadership Development Advisory Council, March 1998 - February 2001
Lifetime Member: National Eagle Scout Association (NESA)

## Licenses

Florida, State-Certified General Real Estate Appraiser, RZ3510
New Jersey, State-Certified General Real Estate Appraiser, RG001261

## Education

University of Miami, Coral Gables, Florida 1988-1992
Degree: Bachelor of Science in Land Development and Planning, School of Architecture

New York University Real Estate Institute, New York, New York 1993-1996
Degree: Master of Science in Real Estate Development and Investment



amgraziano@irr.com    -    305.670.0001 x320

# Anthony M. Graziano, MAI, CRE

**Integra Realty Resources**
**Miami/Palm Beach**

The Douglas Centre
2600 Douglas Road, Suite 801
Coral Gables, FL 33134

T 305.670.0001
F 305.670.2276

irr.com

## Qualified Before Courts & Administrative Bodies

Qualified and accepted as an expert before:
US Bankruptcy Court (Newark, Southern District of Texas, Southern District of Florida)
US Federal District Court (Southern District of Florida)
FL Circuit Court (Miami-Dade, Broward, and Monroe Counties)
NJ State Tax Court
NJ Superior Court - Chancery Division
NJ Superior Court - Law Division
Various municipal planning and zoning boards throughout New Jersey and Florida
Various Taxing Authorities and Boards throughout New Jersey and Florida





**Anthony M. Graziano, MAI, CRE, FRICS**
IDENTIFIED EXPERT WITNESS TESTIMONY AT DEPOSITION and/or TRIAL

| RETENTION DATE | ON BEHALF | IRR FILE # | COURT CASE NO. | COURT / VENUE | CASE NAME | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|
| 6/2015 | Plaintiff | 123-2015-0170 | 15-008930-CA-01 | 11th Judicial Circuit Dade County, Florida (Hon. Peter R. Lopez) | Aaron Stauber & Aviva Stauber V. BH 93, LLC | Piedra & Associates, P.A. | Motion to dismiss Lis Pendens in an action to enforce contractual specific performance clause. |
| 1/2015 | Defendant | 123-2015-0037 | 14-CV-22384 UU | Southern District of Florida | Ray Benson & Maria Helena Campos V. QBE Insurance Corporation | John Camps | Retrospective (2004-2006) analysis of market value claims against insurance company related to property damage claims arising from Hurricane Wilma |
| 1/2014 | Plaintiff | 123-2015-0031 | Pending | Miami-Dade County | Igor Ger V. Yacht Club at Portofino Condo Association | Weil Quaranta McGovern, P.A. | Construction defect dispute related to water-intrusion and damage-detrimental conditions analysis of |
| 10/2014 | Plaintiff | 123-2014-0226 | 08-CA-408-P | Monroe County | Ocean Bank V. Lindback, Monroe County | Ocean Bank | Deficiency claim against borrower on real estate collateral in the Florida Keys (development site plus marine related improvements) |
| 10/2014 | Defendant | 123-2014-0215 | 11-24994 CA 06 | 17th Judicial Circuit Dade County, Florida | Palm-Aire Holdings V. JRGS Investments, LLC, Jorge Garcia-Saraff and Course Drive Investments, LLC | Cole, Scott & Kissane, P.A. | Partnership dispute over valuation issues proximal to a fractured condominium project (retrospective values), and operating agreement dispute |
| 7/2014 | Plaintiff | 123-2014-0164 | 13-018022 CACE 02 | 17th Judicial Circuit Broward County, Florida | Amalia I. Irlanda-Rivera V. Rivero Diagnostic Center, Inc., Osnay Rivero & Yudit Rivero | Amalia I. Irlanda-Rivera | Rent default judgement and market rental and damage analysis associated with lease default. |
| 10/2014 | Defendant | 123-2014-0159 | 2014FL534 (Pending) | Palm Beach County | Roehm Title Resources Claim | Title Resources Guaranty Company | Title insurance claim related to before and after damage/value diminution analysis based on defined title defects not identified by Title Insurance Company. |
| 4/2014 | Defendant | 123-2014-0117 | 4:14-CV-01077 | USA District Court for the Eastern District of Missouri Eastern Division | USA V. GSA-VA St. Louis Property, LLC | Bryan Cave LLP | Condemnation of a possessory interest for a term. Retained as consulting/rebuttal expert. |
| 5/2014 | Defendant | 123-2014-0114 | Pending | Miami-Dade County | Euforia Club | Rennert Bogel Mandler & Rodriguez, P.A. | Rent dispute regarding forced relocation of a nightclub, and relevant market rental rate of replacement club space in Miami |
| 4/2014 | Plaintiff | 123-2014-0089 | Pending | Broward County | Pan American Holdings Corp. V. Florida DOT Right of Way (ROW) Acquisition S.R.-7 | Henry Wulf, Esq. | Condemnation for R.O.W. purposes including before and after damage analysis |
| 1/2014 | Debtor | 123-2014-005 | 13-25728-BKC-RAM | US Federal Bankruptcy - Southern District of Florida - Miami Division (Hon. R. Mark) | West Airport Palms Business Park, LLC | Counsel for the Debtor; Michael D. Seese, Esq. | Fairness Opinion and market value opinions in conjunction with Debtor's Plan for Reorganization |
| 8/2013 | Defendant | 123-2009-0016 | 02-23922-CA 09 | 11th Judicial Circuit Dade County, Florida | American Educational Enterprises, LLC v. The Board of Trustees of the Internal Improvement Trust Fund | Richard Alayon, Esq. - Alayon and Associates | Economic Damages case associated with an alleged misrepresentation or omission by seller of real property. |
| 7/2013 | Plaintiff | 123-2013-0126 | CACE 08057624 (14) | 17th Judicial Circuit Broward County, Florida [Hon. Carlos A. Rodriguez] | Bayview Loan Servicing, LLC v. Kayhan Soodjani; Muhammad Mahmoodi; et al | Bayview Servicing; represented by Tabass, Freedman and Soloff; Stacey Soloff, Esq. | Deficiency judgment on multi-family project (Dewey Street Apartments) |
| 3/2013 | Defendant | 123-2013-0105 | 11-23561-CIV - Rosenbaum | US District Court - Southern District of Florida (Hon. Rosenbaum) | United States of America v. G.K.K. etal | Richard Duvall, Holland and Knight and Jeffrey Neiman, Esq. | Condemnation claim on the 137,779 s.f. Miami Federal Bureau of Investigation (F.B.I.) building; condemnation of a possessory interest (leasehold) |
| 02/2013 | Defendant | 123-2013-0670 | 08-05850 CA 04 | 11th Judicial Circuit Dade County, Florida [Hon. Beth Bloom] | Zenaida Gomez v. City of Pinecrest | Cynthia A. Everett, Cynthia A. Everett, P.A. | Economic damage resulting from temporary taking (seizure) of private residence |
| 1/2013 | Defendant | 123-2013-0016 | 12-60950-CIV | US Federal Court - Southern District of Florida | Q Lending, Inc., Equity Financial Group, Inc., and Equity Commercial Group, Inc. v. Travelers Companies, Inc. etal | Heidi Raschke, Butler Pappas etal | Value diminution resulting from alleged mortgage fraud. |
| 11/2012 | Plaintiff | 123-2012-0129 | Pending | Miami-Dade County | 2011 and 2012 Ad Valorem Tax Protest | Ken Wurtenberger, Esq., Kopelowitz Ostrow Ferguson | Tax protest of commercial condominium. |
| 10/19/2012 | Defendant | 123-2011-0111 | 2011-1107 CA - 23 | 11th Judicial Circuit Dade County, Florida [Hon. Stanford Blake] | Renegade at Hialeah Blvd v. Dynatech Engineering | Daniel Levin, Esq., Cole, Scott, Kissane, P.A. | Economic Damages case, diminution in value resulting from ground lease modification. |
| 10/1/2012 | Defendant | 123-2012-0109 | 11-30189 CA21 | 11th Judicial Circuit Dade County, Florida | Yaffa Yakubov vs. Bayview at Fisher Island No.3 | Craig Minko, Esq., Cole Scott Kissane, P.A. | Market Value estimate of Fisher Island Condominium purchased under right of first refusal, economic damages claimed by Plaintiff due to contract dispute arising from association's exercise of right of first refusal. |
| 8/20/2012 | Defendant | 123-2010-0012 | CA-02180 CA-25 | 11th Judicial Circuit Dade County, Florida | 7935 NBV, LLC V. Harbour East Development LTD, Mario Egozi, etal | José Casal, Esq., Holland and Knight | Deficiency judgment on 32-unit fractured condominium, substitute expert following issuance of IRR-Miami reports in 2010 and 2012. |
| 8/15/2012 | Disclosed Dual-Expert | 123-2012-0072 | | Matrimonial Mediation | Vazquez v. Vazquez Matrimonial Matter | Colon and Mendoza and Robert Hertzberg, P.A. | Retained as a court-appointed third party expert to both parties to appraise (2) marital assets composed of office, retail, single and multi-family units in FL, TN, NC, and Bimini, Bahamas |
| 7/2012 | Plaintiff | 109-2011-2014 | Pending; 2003-2014 | Superior Court of New Jersey [Hon. Patrick DeAlmeida] | BASF Inc., successor Ciba Geigy Inc. vs. Township of Toms River | Phil Genuario, Garippa, etal on behalf of BASF | Challenge to multi-year appeal of $80 Million+ land assessment on contaminated superfund site in Central New Jersey |
| 3/2012 | Plaintiff | 109-2010-0199 | ATL-L-4451-08 | Superior Court of New Jersey, Law Division Atlantic County | Scot Netherlands Inc. vs. State of New Jersey Department of Environmental Protection (NJDEP) | Jay Rhatican, Connell Foloey on behalf of Scot Netherlands, Inc. | Challenge to NJDEP permit denial to fill wetlands, deprivation of all reasonable investment backed expectations. |
| 07/2011 | Defendant | 109-2010-0199 | MER-L-3034-08 | Superior Court of New Jersey Mercer County | 480 Mercer Street, LLP and Brookner Southern, LLC vs. Hightstown | Ansell Zaro Grimm & Aaron, P.C. - Hussam Chater | Litigation-Dispute Resolution - Hightstown Zoning Challenge |
| 12/2009 | Plaintiff | 109-2009-0443 | Dept. Justice File 90-11-3-580/1 | Federal District Court of Virginia | United States vs. Atlantic Wood Industries, Inc. | U.S. Department of Justice | Damages/environmental condition dispute between United States Navy and responsible party (Atlantic Wood Industries) |
| 12/2009 | Plaintiff | 109-2009-0377 | | Tax Court of New Jersey | Wextrust/HPC Mortgage Fund v. City of Atlantic City | Cole, Schotz; Meisei, Forman & Leonard, P.A. Carl Rizzo, Esq. | Tax Appeals - To develop an opinion of the market value of the fee simple interest in the property |

M: Quals: Graziano; Trial Lists



**Anthony M. Graziano, MAI, CRE, FRICS**
IDENTIFIED EXPERT WITNESS TESTIMONY AT DEPOSITION and/or TRIAL

| RETENTION DATE | ON BEHALF | IRR FILE # | COURT CASE NO. | COURT / VENUE | CASE NAME | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|
| 11/2009 | Secured Creditor | 109-2009-0439 | | US Bankruptcy Court - Southern District of Texas | Erickson Building | Stuart Glick, Esq., Sills, Cummis & Gross | Market Value for Bankruptcy of 140,000 SF corporate campus in Bethesda, Maryland |
| 09/2009 | Plaintiff | 109-2009-0123 | 3035-001 | Tax Court of New Jersey | Bay Head Yacht Club vs. Ocean County Tax Board | John Doyle, Carluccio, Leone, Dimon, Doyle & Sacks, LLC | Tax Appeal for Bay Head Yacht Club |
| 12/2008 | Plaintiff | 109-2008-XXX | INA (DEPS Pending) | Tax Court of New Jersey | Mirage Atlantic City (MAC) vs. City of Atlantic City | Hank Rovillard, Esq. | Tax Appeal at State Tax Court on 15 acre casino site adjacent to Trump Marina |
| 08/2008 | Defendant | 109-2008-0252 | L-2424-05 | Superior Court of New Jersey Law Division, Middlesex County | The city of South Amboy vs. Lower Main Street Development, LLC & Amboy Aggregates Joint Venture | Bathgate, Wegenar, etal | Verified complaint in condemnation |
| 6/2008 | Defendant | 109-2008-345 | C.A. No. OCNL-3861-06 | Superior Court of New Jersey, Law Division Ocean County | Osbourne Associates, Melbourne Associates VI, LLC, Kingsway Realty Profit Share vs. Citta Enterprises Co, JAC Property Management etal and Eckerd Corporation | Francis X. Manning, Esq, Stradley Ronon Stevens & Young & Michael Gamboli, Esq, Partridge Snow and Hahn, both on behalf of | Dispute re: proper valuation of leasehold and sub-lessee's sandwich leasehold interest on damage claim for breach of agreement claim |
| 1/2008 | Defendant | 109-2008-0125- | N/A | American Arbitration Association [testimony at Arbitration conducted by Hon. Eugene Serpentelli] | Toms River Township vs. Ciba Gelgy Corporation | Mark Troncone, Esq., In-house Counsel to Township of Toms River | Arbitration of environmental damages claim, and counter-claim of appropriateness of zoning on 1,900 acre superfund site. |
| 11/2007 | Defendant | 109-2007-211 | L-003635-06 | Superior Court of New Jersey, Law Division Middlesex County | Kyle Mosteller vs. Gaila Neeman | Frank Caruso, Esq, Hoagland, Longo, Moran and Dunst | Damage claim due to loss of trees and screening between urban properties |
| 6/2007 | Defendant | 109-2007-0134 | 3:07-CV-2322 | Superior Court of New Jersey, Chancery Division Monmouth County | Silver Lakes Inc. vs. Township of Freehold Inc. | Christopher Hanlon, Esq, Hanlon and Nieman | Challenge to validity of Rent Control Ordinance as transfer of property rights from Lessor to Lessee |
| 06/2007 | Plaintiff | 109-2007-0173 | | Federal District Court of Virginia | Laurelwood Homes, LLC vs. United States Department of Navy | William A. Shook Esq. | Leasehold interest in the property, breach of lease claim on behalf of leasehold owner (Laurelwood) claiming breach of lease and damages |
| 12/2006 | Defendant | 109-2006-0192 | CAM - L - 9731-05 | Superior Court of New Jersey, Chancery Division, Camden County | Brandywine Operating Partnership, LP vs. UFCW Local 56 | Brett Last, Esq, O'Brien, Belland and Bushinsky | Estimate the value of damages to landlord on breach of above-market lease |
| 08/2006 | | 109-2006-0257 | | | County Line & Brewers Bridge, Jackson Township | Levin, Shea, Pfeffer, PA Steven Pfeffer | To develop an opinion of the hypothetical market value of the fee simple interest in the property |
| 02/2006 | Defendant | 109-2006-0044 | OCN-L-2482-04 | Ocean Superior Court, Ocean County Courthouse | Carl Brooks vs. K Hovanian | Ronan, Tuzzio & Giannone Linda Olsen | To estimate value diminution in the subject property as a result of various issues asserted by the property owner in conjunction with pending litigation between the property owner, and the subject developer K. Hovnanian @ Sea Oaks |
| 10/2005 | Defendant | 109-2005-0315 | OCN-L-1810-5 | Superior Court of New Jersey, Law Division Ocean County | Atlantic City Electric Company d/b/a Conectiv Power Delivery, a regulated public utility of the state of New Jersey vs. AC I Manahawkin, LLC formly and/or Armstrong | Flaster/Greenberg, PC, David R. Oberlander, Esq. | Compensation for the taking of an easement for construction and maintenance of a 230kv transmission line and towers by Atlantic City Electric |
| 06/2005 | Defendant | 109-2005-0214 | MON-L-2609-05 | Superior Court of New Jersey Law Division: Monmouth County | Township of Howell vs. George Harms Construction Co., Inc. etal | Connell & Foley, LLP Kevin Coakley, Esq. | To develop an opinion of the market value of the fee simple estate of the property |
| 08/2003 | | 109-2003-0282 | | Superior Court of New Jersey Chancery Division, Family Part, Monmouth County | Giuffre vs. Giuffre | Louis & Wolf - Frank A. Louis | To develop an opinion of the market value of the Fee Simple estate of the properties for purposes of equitable distribution of marital assets |
| 07/2003 | Defendant | 109-2003-0203 | OCN-C-78-03 | Superior Court of New Jersey Chancery Division, Ocean County | West, etal vs. Pompanio, etal | Stephen E. Smith, Esq. | To develop an opinion of the diminution in value due to a loss of useable land area |
| 06/2003 | Plaintiff | 109-2003-0161 | OCN-C-316-02 | Superior Court of New Jersey Law Division, Ocean County | Eugene M. Lord vs. Donald W. Rhoads | Lombardi & Lombardi Scott Telson | To develop an opinion of the market value of the fee simple estate of the property |
| 04/2003 | | 109-2003-0128 | FM-15-468-03-C | Superior Court of New Jersey Chancery Division, Family Part Ocean County | Vincent Urbank vs. Lisa Urbank | Marianna Pontoniero, Esq. | Litigation-Matrimonial |
| 02/2002 | Plaintiff | 109-2002-0055 | | | Shenandoah Mobile Home Park | Windels Marx Lane & Mittendorf, LLP - William Cagney | Inverse Condemnation - Rent Control Ordinance |
| 04/2001 | Claimant | 109-2001-0189 | NJ-2624-00 | Superior Court of New Jersey, Chancery Division, Middlesex County | DeForest John Ely and Kimberle A. Ely, h/w | First American Title Insurance Co. Jack Milkis | To derive an opinion of the fair compensation of the fee simple estate, subject to the temporary title encumbrance |
| 03/1999 | Secured Creditors | 109-1999-0062 | | US Bankruptcy Court - District of Newark | Georgetown Apartments | Emmes & Co. Andrew Schwarz | To estimate the market value of the Leased Fee Estate of the property, inclusive of 28 Apartment complexes through NY, NJ, PA, and MD. |
| 12/1997 | Defendant | LKW-257-3186 | FM-15-1465-94 | Superior Court of New Jersey Chancery Division, Family Part, Ocean County | Lisa Franklin, etal vs. Donald Franklin, etal | Greenbaum, Rowe, Smith, Ravin, Davis & Himmel LLP Robert S. Underhill | Estimating the market value of the leased fee interest |
| 8/1994 | Creditor | HUD-XX | | US Bankruptcy Court - District of Newark | Hudson Marina Association vs. Emmes & Co. | | Bankruptcy Reorganization of 200+ slip failed marina/dockominium complex |

M: Quals: Graziano; Trial Lists



**Anthony M. Graziano, MAI, CRE, FRICS**

PREFERRED OR DISCLOSED EXPERT WITNESS REPORTS/SETTLEMENTS

| RETENTION DATE | ON BEHALF | IRR FILE # | COURT CASE NO. | COURT / VENUE | CASE NAME | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|
| 1/2015 | Defendant | 123-2015-0037 | 14-CV-22384 UU | Miami-Dade County, FL | Ray Benson & Maria Helena V. QBE Insurance Corporation | John A. Camp | Retrospective (2004-2006) analysis of market value claims against insurance company related to property |
| 9/2014 | Defendant | 123-2014-0194 | 13-03084CA 10 | 11th Judicial Circuit Miami-Dade, FL | Manuel Soltero V. Adorno & Yoss, LLP | Kaplan Zeena, LLP | Professional Liability suit against law firm and attorneys for malfeasance in litigation matter. |
| 2/2014 | Plaintiff | 123-2014-0030 | Settled | Carribean Islands | Rainmaker Development V. A&F Bahamas, etal | VLASAC & SHMARUK, LLC | Partnership Dispute between Joint Venture in Carribean development project (golf course, villas, and large-scale marina-commercial-retail development) |
| 11/2012 | Defendant | 123-2012-0140 | 42-2012-CA-001065 | Marion County, FL | CSX Transportation, Inc. V. Moshen Sararazi, Fatih Ann Safarazi, Proverbium Hldg, LLC, USA & George Albrigiit | NeJame. La Fay, Jancha, Ahmed, Barker, Joshi & Moreno, P.A. | Condemnation of partial interest with damages |
| 7/2012 | Confidential | 123-2012-0076 | Confidential | Broward County, FL | Ft. Lauderdale-Hollywood Int'l Airport Expansion | White & Case, LLP | Value Diminution Study to assist public agency in good faith negotiations based on airport expansion. |
| 6/2012 | Defendant | 123-2012-0070 | 10-49616-CA-40 | Miami-Dade County, FL | CB Entertainment, LLC V. South Beach Ocean Parcel | Kubicki Draper, P.A. | Construction Damages claim |
| 12/2009 | Plaintiff | 109-2009-0443 | Dept. Justice File 90-11-3-580/1 | Federal District Court of Virginia | United States vs. Atlantic Wood Industries, Inc, | U.S. Department of Justice | Damages/environmental contamination dispute between United States Navy and responsible party (Atlantic Wood Industries) |



**Anthony M. Graziano, MAI, CRE, FRICS**
PROFERRED OR DISCLOSED EXPERT WITNESS REPORTS/SETTLEMENTS

| RETENTION DATE | ON BEHALF | IRR FILE # | COURT CASE NO. | COURT / VENUE | CASE NAME | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|

M: Quals: Graziano: Trial Lists

**Integra Realty Resources**
Miami/Palm Beach

**Appraisal Report & Post-Remediation Damage Related to Chinese Drywall**

**Feldkamp, Andrew & Dawn M.**
Hypothetical Market Value "As If" Remediated
5237 Butte St
Lehigh Acres, Lee County, Florida 33971
Client Reference: 17

**Prepared For:**
Colson Hicks Eidson

**Effective Date of the Appraisal:**
September 24, 2015

**Report Format:**
Appraisal Report

**IRR - Miami/Palm Beach**
File Number: 123-2018-0275





**Feldkamp, Andrew & Dawn M.**
5237 Butte St
Lehigh Acres, Florida



| | | | |
|---|---|---|---|
| **Integra Realty Resources** | In Miami | In Orlando | In Naples/Sarasota |
| Miami | Dadeland Centre | The Magnolia Building | Horseshoe Professional Park |
| Orlando | 9155 South Dadeland Blvd. | 326 N. Magnolia Ave. | 2770 Horseshoe Drive S. |
| Southwest Florida | Suite 1208 | | Suite 3 |
| | Miami, FL 33156 | Orlando, FL 32801 | Naples, FL 34104 |
| www.irr.com | (305) 670-0001 | (407) 843-3377 | (239)-643-6888 |

January 29, 2019

Patrick S. Montoya
Partner
Colson Hicks Eidson
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134

SUBJECT:     Hypothetical Market Value "As If" Remediated
             Case No 11-22408-Civ-COOKE
             United States District Court Southern District of Florida in the matter of
             Eduardo and Carmen Amorin, et al. individually and on behalf of others situated
             similarly v. Taishan Gypsum Co., LTD., f/k/a Shandong Taiche Dongxin Co. Ltd., et al
             Priority Claimant Case at:
             Feldkamp, Andrew & Dawn M.
             5237 Butte St
             Lehigh Acres, Lee County, Florida 33971
             Client Reference: 17
             IRR - Miami/Palm Beach File No. 123-2018-0275

Dear Mr. Montoya:

Integra Realty Resources – Miami/Palm Beach submits the following damage estimate in the
referenced property as of the effective date assuming all remediation was completed by an
appropriate contractor with experience and credentials in remediating defective drywall.

The report is intended to comply the Uniform Standards of Professional Appraisal Practice (USPAP). It
presents summary discussions of the data, reasoning, and analysis that were used in the appraisal
process to develop the opinions. Additional information is contained within our workfile.

The findings will form the basis of expert witness testimony in the above referenced case.

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/19/19 Page 22 of 319
Case 1:11-cv-22408-MGC Document 279-3 Entered on FLSD Docket 05/13/2019 Page 807 of 989

Identification of Subject                                                                     2

## Identification of Subject

The subject of this report is a single-family home configured with 3 bedroom and 2 baths with 1,883 SF under air-conditioning. The subject property was built in 2006 and is located on a 10,000 square foot site.

## Purpose of the Appraisal

The purpose of the appraisal is to develop an opinion of the diminution in value and related damages, collectively "the damages" as of the effective date of the appraisal, September 24, 2015. The damage estimate assumes the defective drywall remediation was completed and does not consider the cost to cure. The date of the report is January 29, 2019. The appraisal is valid only as of the stated effective date or dates.

## Intended Use and User

The intended use of the appraisal is for litigation purposes. The client, Colson Hicks Eidson and related co-counsel, Plaintiff and the Court are the intended users. Integra Realty Resources – Miami/Palm Beach is not responsible for unauthorized use of this report.

## Most Recent Sale History

The most recent closed sale of the subject is summarized as follows:

| Most Recent Subject Sale (Closed) | |
| --- | --- |
| Sale Date (Most Recent) | August 4, 2008 |
| Seller | Soundview Home Loan |
| Buyer | Feldkamp, Andrew & Dawn M. |
| Sale Price | $125,000 |
| Recording Instrument Number | 2008000213954 |
| Disposition Details | Sale of impaired Bank owned property, defect was not known at TOS |

The Property remained impaired as of effective date and was foreclosed on 09/24/2015 by Fifth Third Mortgage Company. Subsequent to the foreclosure the property was sold 04/01/2016 for $ 173,500 We could not identify a listing record for the transaction.

The Property resold in 2018 (01/18/2018) for $222,000. The listing did not disclose the Chinese drywall.

To the best of our knowledge, no other sale or transfer of ownership has taken place within a three-year period prior to the effective appraisal date.

## Pending Transactions

To the best of our knowledge, the property is not subject to an agreement of sale or an option to buy, nor is it listed for sale, as of the effective appraisal date.



Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/19/19 Page 23 of 319
Case 4:11-cv-22408-MGC-EEF-MBN Document 273-5 Entered on FLSD Docket 05/13/2019 Page 808 of 989

Definition of Market Value                                                                                    3

## Definition of Market Value

The following definition of market value is used by agencies that regulate federally insured financial institutions in the United States:

"The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- Buyer and seller are typically motivated;

- Both parties are well informed or well advised, and acting in what they consider their own best interests;

- A reasonable time is allowed for exposure in the open market;

- Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

- The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale."

*(12 C.F.R. Part 34.42(g); 55 Federal Register 54696, August 24, 1990, as amended at 57 Federal Register 12202, April 9, 1992, 59 Federal Register 29499, June 7, 1994)*

## Definition of Retrospective Value Opinion

A value opinion effective as of a specified historical date. The term retrospective does not define a type of value.  Instead, it identifies a value opinion as being effective at some specific prior date. Value as of a historical date is frequently sought in connection with property tax appeals, damage models, lease renegotiation, deficiency judgements, estate tax, and condemnation.  Inclusion of the type of value with this term is appropriate, e.g. "retrospective market value opinion".

*(Source: The Dictionary of Real Estate Appraisal – 6th Edition; Appraisal Institute, 200 W. Madison, Suite 1500, Chicago, IL 60606, www.appraisalinstitute.org)*

## Definition of Hypothetical Condition

1. A condition that is presumed to be true when it is known to be false. (SVP)

2. A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis. Comment: Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of date used in an analysis. (USPAP, 2016-2017 ed.)

*(Source: The Dictionary of Real Estate Appraisal – 6th Edition; Appraisal Institute, 200 W. Madison, Suite 1500, Chicago, IL 60606, www.appraisalinstitute.org)*



Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/19/19 Page 24 of 319
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 05/13/2019 Page 809 of 989

Scope of Work                                                                          4

## Scope of Work

Integra was retained as an expert in the captioned matter of this report to address potential damages related to the subject property, specifically excluding the costs to cure.

Integra was retained to estimate any post remediation damages, and conducted a separate study to determine whether damages persist following defective drywall remediation. The result of that study are outlined within Integra's report entitled "Market Analysis of the Post Remediation Impact of Chinese Drywall on Residential Property Values in Florida." The results of that study are incorporated by reference herein.

In addition, our damage model was requested to include a rental value analysis of the Priority Claimant residence, and a determination of the relevant economic damage associated with having to vacate the home for a period of time (and secure alternate living arrangements) during the remediation. As of the effective date, the claimant would have suffered the damages.

Integra established individual case files on each Priority Claimant residence, and retained professional assistance from qualified residential appraisers in each jurisdiction. Integra managed the process of these retrospective appraisals, interfaced with the residential appraisers, and reviewed the form appraisals completed on each assignment including review of the comparables, adjustments, and form narrative to establish the market value of the residence unimpaired as of the effective date.

Integra professionals reviewed various materials exchanged as part of this case and considered materials that were relevant to the market valuation. These materials were downloaded from the attorney's dropbox and are retained within our workfile.

Integra's participation in and review of the final appraised values results in a conclusion of the market value of the home defined as "Hypothetical Market Value" assuming defective drywall had never been identified within the subject property. This forms the basis of the unimpaired market value as of the effective date.

All properties and comparables were inspected by the local residential appraisers without the benefit of interior inspections. Adjustments for condition and age at the time of sale are based upon photographs contained within the various MLS databases, paired analysis from amongst the comparables, and for the subject, were based on photos, if available. In the event a property had not been remediated as of the effective date, we assume average condition for the property in the market as of the effective date.

The damage analysis expressed within this report follows the peer teachings and market accepted processes for damage analysis. However, the damage analysis only represents a portion of the overall damages because we were specifically requested to exclude the consideration of the costs to cure. This represents a relevant component of damage in this case for property that factually have not been remediated.

Integra's role was strictly to identify post remediation value damage (sometime referred to as a "stigma") and estimate the relevant rental value and moving costs as a proxy for the temporary loss of use during remediation.

Feldkamp, Andrew & Dawn M.



Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/19/19 Page 25 of 319
Case 1:11-cv-22408-MGC Document 273-3 Entered on FLSD Docket 05/13/2019 Page 810 of 989

Highest and Best Use                                                                                  5

## Significant Appraisal Assistance

In addition to Anthony M. Graziano, MAI ,CRE, principal, it is acknowledged that Peter G. Kayworth, Yuliya Georgieva, Joseph Melloni and Paul L. Jones of IRR-Miami/Palm Beach were involved in the assignment consisting of conducting research on the subject and transactions involving comparable properties, performing appraisal analyses and assisting in report writing, under the supervision of the persons signing the report.  The local residential appraisers are also named as providing significant assistance, including exterior inspection of the properties and comparables, application of their local knowledge in adjusting and estimating the unimpaired value, and developing the form report valuations incorporated herein.

## Prior Services

USPAP requires appraisers to disclose to the client any other services they have provided in connection with the subject property in the prior three years, including valuation, consulting, property management, brokerage, or any other services. We have not performed any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

## Valuation Methodology

Appraisers usually consider the use of three approaches to value when developing a market value opinion for real property. These are the cost approach, sales comparison approach, and income capitalization approach.  The valuations consider the only relevant approach for residential valuation, the sales comparison analysis.  The cost and income approach are not considered relevant.

The sales comparison approach is the most applicable valuation method since there is an active market for similar properties, and sufficient sales data is available for analysis.  Additionally, this approach directly considered the prices of alternative properties having similar utility.

### Highest and Best Use

The highest and best use of the subject as if vacant for development of a single-family home which is physically possible, legally permissible as per zoning, financially feasible and maximally productive.

The highest and best use of the subject as improved is for continued use as a single-family home with no other use that could reasonably be expected to provide a higher value to the land as if vacant.  The improvements contribute to the over all value to a greater extent than the land value alone, and therefore, continued use as improved concluded to be maximally productive and the highest and best use of the property.

### Conclusion of Value

The Hypothetical market value appraisal as of the effective date, reflective of a traditional form appraisal, is contained within the Addenda of this report.  This value us hypothetical since it assumes that defective drywall had never been present at the subject property.



Against this value, we then apply the Post Impairment Discount as a percentage of unimpaired value as developed within the Integra report studying this issue. This represents a compensable damage resulting from the prior existence of defective drywall in the home as of the effective date.

In addition, each appraisal (unimpaired) reflects a rental value analysis as of the effective date. This rental value analysis concludes to the equivalent market rent for the home (unimpaired) and reflects a proxy for the probable actual costs the homeowner would experience by having to move-out of the primary residence during remediation.

The homeowner would also have to incur moving /storage costs twice, once before and once after remediation. Professional packing, moving and storage for an average home is estimated at $1,500 per move, or $3,000 in total. This amount is added to the loss of use estimate as an additional damage.

This loss of use calculation does not consider the costs of alternative housing or other tangible costs potentially incurred for damages suffered between the date of discovery and the date of value. These damages, if applicable, are being estimated by a separate expert (Elkins et al). To the extent Elkins posits costs which are duplicative or actual costs that are greater or less, some minor adjustments to Integra's damage model may be required.

The timeframe for remediation (months of actual loss) could vary depending upon the permitting process in the specific community, the availability of labor, and the size of the home. Integra reviewed a number of transactions that were remediated by investors and found the typical timeframe between purchase of an unremediated home and listing[1] of the home post-remediation to be 3-6 months.

Larger more expansive homes would be expected to take longer to remediate since more materials are required, and in higher-priced homes, supplies would typically be custom-ordered. Therefore, we apply the following timeframes based on the subject's size and price range:

< $150,000 Home up to 2,000+/- SF                    4 months

$150,000 - $750,000 home up to 4,000 SF              6 months

$750,000+ home up over 4,000 SF                      9 months

---

[1] The "listing date" is most relevant since a homeowner conducting their own remediation can move back in once the home is ready for sale (ie- coinciding with a final certificate of occupancy).

Feldkamp, Andrew & Dawn M.                                                                      

Conclusion of Value                                                                                          7

The following shows our final estimate of damages as of the effective date, and assuming costs to cure (i.e. – to conduct the remediation) have been expended.

**Conclusions of Damage**

| | | |
|---|---|---|
| Hypothetical Value (Unimpaired - Before) | | $152,000 |
| Market Impairment Discount (As if Remediated) | | 10% |
| Post Impairment Damage ($) | | $15,200 |
| **Hypothetical Value As IF Remediated** | | **$136,800** |
| Post Remediation Damages as of Effective Date | | **$15,200** |
| Loss of Use: | | |
| Rental Rate ($/Month) | **$1,100** | |
| Moving & Storage Costs | | $3,000 |
| Loss of Use Subject (# Months) | 4x | $4,400 |
| Subject Total | | **$7,400** |
| **Post Remediation Damage** | | **$22,600** |

Note: Does not consider "cost to cure". Assumes remediation was completed by qualified contractor who warranties the work.

Feldkamp, Andrew & Dawn M.



Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/19/19 Page 28 of 319
Case 1:11-cv-22408-MGC Document 273-5 Entered on FLSD Docket 05/13/2019 Page 813 of 989

Certification 8

## Certification

We certify that, to the best of our knowledge and belief:

1. The statements of fact contained in this report are true and correct.

2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3. We have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

4. We have not performed any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

5. We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

6. Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

7. Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

8. Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice as well as applicable state appraisal regulations.

9. The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

10. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

11. Anthony M. Graziano, MAI, CRE did not make a personal inspection of the property that is the subject of this report. Sarah Wilson has personally inspected the subject.

12. Significant real property appraisal assistance was provided by Peter G. Kayworth, Yuliya Georgieva, Joseph Melloni and Paul L. Jones. Additionally, real estate assistance was provided by various Valucentric employees and subcontractors, including: John Barcelo, Angela Barcelo, Fred Stites, Carlos Fong, Sarah D. Wilson and Rob Baird.

13. We have experience in appraising properties similar to the subject and are in compliance with the Competency Rule of USPAP.

14. As of the date of this report, Anthony M. Graziano, MAI, CRE, has completed the continuing education program for Designated Members of the Appraisal Institute.

Anthony M. Graziano, MAI, CRE
Senior Managing Director - Miami
State-Certified General RE Appraiser
FL Certificate # RZ#3510

## Assumptions and Limiting Conditions

This appraisal and any other work product related to this engagement are limited by the following standard assumptions, except as otherwise noted in the report:

1. The title is marketable and free and clear of all liens, encumbrances, encroachments, easements and restrictions. The property is under responsible ownership and competent management and is available for its highest and best use.

2. There are no existing judgments or pending or threatened litigation that could affect the value of the property.

3. There are no hidden or undisclosed conditions of the land or of the improvements that would render the property more or less valuable. Furthermore, there is no asbestos in the property.

4. The revenue stamps placed on any deed referenced herein to indicate the sale price are in correct relation to the actual dollar amount of the transaction.

5. The property is in compliance with all applicable building, environmental, zoning, and other federal, state and local laws, regulations and codes.

6. The information furnished by others is believed to be reliable, but no warranty is given for its accuracy.

This appraisal and any other work product related to this engagement are subject to the following limiting conditions, except as otherwise noted in the report:

1. An appraisal is inherently subjective and represents our opinion as to the value of the property appraised.

2. The conclusions stated in our appraisal apply only as of the effective date of the appraisal, and no representation is made as to the effect of subsequent events.

3. No changes in any federal, state or local laws, regulations or codes (including, without limitation, the Internal Revenue Code) are anticipated.

4. No environmental impact studies were either requested or made in conjunction with this appraisal, and we reserve the right to revise or rescind any of the value opinions based upon any subsequent environmental impact studies. If any environmental impact statement is required by law, the appraisal assumes that such statement will be favorable and will be approved by the appropriate regulatory bodies.

5. Unless otherwise agreed to in writing, we are not required to give testimony, respond to any subpoena or attend any court, governmental or other hearing with reference to the property without compensation relative to such additional employment.

6. We have made no survey of the property and assume no responsibility in connection with such matters. Any sketch or survey of the property included in this report is for illustrative purposes only and should not be considered to be scaled accurately for size. The appraisal covers the property as described in this report, and the areas and dimensions set forth are assumed to be correct.



7.   No opinion is expressed as to the value of subsurface oil, gas or mineral rights, if any, and we have assumed that the property is not subject to surface entry for the exploration or removal of such materials, unless otherwise noted in our appraisal.

8.   We accept no responsibility for considerations requiring expertise in other fields. Such considerations include, but are not limited to, legal descriptions and other legal matters such as legal title, geologic considerations such as soils and seismic stability; and civil, mechanical, electrical, structural and other engineering and environmental matters. Such considerations may also include determinations of compliance with zoning and other federal, state, and local laws, regulations and codes.

9.   The distribution of the total valuation in the report between land and improvements applies only under the reported highest and best use of the property. The allocations of value for land and improvements must not be used in conjunction with any other appraisal and are invalid if so used. The appraisal report shall be considered only in its entirety. No part of the appraisal report shall be utilized separately or out of context.

10.  Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraisers, or any reference to the Appraisal Institute) shall be disseminated through advertising media, public relations media, news media or any other means of communication (including without limitation prospectuses, private offering memoranda and other offering material provided to prospective investors) without the prior written consent of the persons signing the report.

11.  Information, estimates and opinions contained in the report and obtained from third-party sources are assumed to be reliable and have not been independently verified.

12.  Any income and expense estimates contained in the appraisal report are used only for the purpose of estimating value and do not constitute predictions of future operating results.

13.  If the property is subject to one or more leases, any estimate of residual value contained in the appraisal may be particularly affected by significant changes in the condition of the economy, of the real estate industry, or of the appraised property at the time these leases expire or otherwise terminate.

14.  Unless otherwise stated in the report, no consideration has been given to personal property located on the premises or to the cost of moving or relocating such personal property; only the real property has been considered.

15.  The current purchasing power of the dollar is the basis for the values stated in the appraisal; we have assumed that no extreme fluctuations in economic cycles will occur.

16.  The values found herein are subject to these and to any other assumptions or conditions set forth in the body of this report but which may have been omitted from this list of Assumptions and Limiting Conditions.

17.  The analyses contained in the report necessarily incorporate numerous estimates and assumptions regarding property performance, general and local business and economic conditions, the absence of material changes in the competitive environment and other matters. Some estimates or assumptions, however, inevitably will not materialize, and unanticipated events and circumstances may occur; therefore, actual results achieved during



Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/19/19 Page 31 of 319
Case 1:11-cv-22408-MGC Document 273-3 Entered on FLSD Docket 05/13/2013 Page 816 of 989

Assumptions and Limiting Conditions                                                                    11

the period covered by our analysis will vary from our estimates, and the variations may be material.

18.  The Americans with Disabilities Act (ADA) became effective January 26, 1992. We have not made a specific survey or analysis of the property to determine whether the physical aspects of the improvements meet the ADA accessibility guidelines. We claim no expertise in ADA issues, and render no opinion regarding compliance of the subject with ADA regulations. Inasmuch as compliance matches each owner's financial ability with the cost to cure the non-conforming physical characteristics of a property, a specific study of both the owner's financial ability and the cost to cure any deficiencies would be needed for the Department of Justice to determine compliance.

19.  The appraisal report is prepared for the exclusive benefit of the Client, its subsidiaries and/or affiliates. It may not be used or relied upon by any other party. All parties who use or rely upon any information in the report without our written consent do so at their own risk.

20.  No studies have been provided to us indicating the presence or absence of hazardous materials on the subject property or in the improvements, and our valuation is predicated upon the assumption that the subject property is free and clear of any environment hazards including, without limitation, hazardous wastes, toxic substances and mold. No representations or warranties are made regarding the environmental condition of the subject property. Integra Realty Resources – Miami/Palm Beach, Integra Realty Resources, Inc., Integra Strategic Ventures, Inc. and/or any of their respective officers, owners, managers, directors, agents, subcontractors or employees (the "Integra Parties"), shall not be responsible for any such environmental conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because we are not experts in the field of environmental conditions, the appraisal report cannot be considered as an environmental assessment of the subject property.

21.  The persons signing the report may have reviewed available flood maps and may have noted in the appraisal report whether the subject property is located in an identified Special Flood Hazard Area. We are not qualified to detect such areas and therefore do not guarantee such determinations. The presence of flood plain areas and/or wetlands may affect the value of the property, and the value conclusion is predicated on the assumption that wetlands are non-existent or minimal.

22.  Integra Realty Resources – Miami/Palm Beach is not a building or environmental inspector. Integra Miami/Palm Beach does not guarantee that the subject property is free of defects or environmental problems. Mold may be present in the subject property and a professional inspection is recommended.

23.  The appraisal report and value conclusions for an appraisal assume the satisfactory completion of construction, repairs or alterations in a workmanlike manner.

24.  It is expressly acknowledged that in any action which may be brought against any of the Integra Parties, arising out of, relating to, or in any way pertaining to this engagement, the appraisal reports, and/or any other related work product, the Integra Parties shall not be responsible or liable for any incidental or consequential damages or losses, unless the appraisal was fraudulent or prepared with intentional misconduct. It is further acknowledged



Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/19/19 Page 32 of 319
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 05/13/2019 Page 817 of 989

Assumptions and Limiting Conditions                                                12

that the collective liability of the Integra Parties in any such action shall not exceed the fees paid for the preparation of the appraisal report unless the appraisal was fraudulent or prepared with intentional misconduct. Finally, it is acknowledged that the fees charged herein are in reliance upon the foregoing limitations of liability.

25. Integra Realty Resources – Miami/Palm Beach, an independently owned and operated company, has prepared the appraisal for the specific intended use stated elsewhere in the report. The use of the appraisal report by anyone other than the Client is prohibited except as otherwise provided. Accordingly, the appraisal report is addressed to and shall be solely for the Client's use and benefit unless we provide our prior written consent. We expressly reserve the unrestricted right to withhold our consent to your disclosure of the appraisal report or any other work product related to the engagement (or any part thereof including, without limitation, conclusions of value and our identity), to any third parties. Stated again for clarification, unless our prior written consent is obtained, no third party may rely on the appraisal report (even if their reliance was foreseeable).

26. The conclusions of this report are estimates based on known current trends and reasonably foreseeable future occurrences. These estimates are based partly on property information, data obtained in public records, interviews, existing trends, buyer-seller decision criteria in the current market, and research conducted by third parties, and such data are not always completely reliable. The Integra Parties are not responsible for these and other future occurrences that could not have reasonably been foreseen on the effective date of this assignment. Furthermore, it is inevitable that some assumptions will not materialize and that unanticipated events may occur that will likely affect actual performance. While we are of the opinion that our findings are reasonable based on current market conditions, we do not represent that these estimates will actually be achieved, as they are subject to considerable risk and uncertainty. Moreover, we assume competent and effective management and marketing for the duration of the projected holding period of this property.

27. All prospective value opinions presented in this report are estimates and forecasts which are prospective in nature and are subject to considerable risk and uncertainty. In addition to the contingencies noted in the preceding paragraph, several events may occur that could substantially alter the outcome of our estimates such as, but not limited to changes in the economy, interest rates, and capitalization rates, behavior of consumers, investors and lenders, fire and other physical destruction, changes in title or conveyances of easements and deed restrictions, etc. It is assumed that conditions reasonably foreseeable at the present time are consistent or similar with the future.

Feldkamp, Andrew & Dawn M.



Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/10/19 Page 33 of 319
Case 1:11-cv-22408-MGC Document 273-3 Entered on FLSD Docket 05/13/2019 Page 818 of 989

Addenda

# Addenda



## USPAP Compliance Addendum

Loan # VALU-18-12-1462
File # VALU-18-12-1462

| Borrower | Feldkamp, Andrew & Dawn | | | | |
|---|---|---|---|---|---|
| Property Address | 5237 Butte St | | | | |
| City | Lehigh Acres | County | Lee | State FL | Zip Code 33971 |
| Lender/Client | Integra Realty Resources (IRR) - Miami | Palm Beach | | | | |

### APPRAISAL AND REPORT IDENTIFICATION

This Appraisal Report is one of the following types:

[X] Appraisal Report — This report was prepared in accordance with the requirements of the Appraisal Report option of USPAP Standards Rule 2-2(a).

[ ] Restricted Appraisal Report — This report was prepared in accordance with the requirements of the Restricted Appraisal Report option of USPAP Standards Rule 2-2(b). The intended user of this report is limited to the identified client. This is a Restricted Appraisal Report and the content may not be understood properly without additional information in the appraiser's workfile.

Appraisal Report; Prepared in Accordance with USPAP Standards Rule 2-2(a). PURPOSE AND INTENDED USE OF THE APPRAISAL
This Appraisal Report is for the sole use of our clients Intended users of this report is to assist the Client with arriving at a conclusion of fair market value for litigation purposes. The intended users of this report is the client listed above, and if other parties choose to rely on the report, the appraiser is not obligated to such parties and does not result in such parties becoming intended users. Finally, I understand that this appraisal may not be a part of a federally related transaction.

### ADDITIONAL CERTIFICATIONS

I certify that, to the best of my knowledge and belief:

- The statements of fact contained in this report are true and correct.

- The report analyses, opinions, and conclusions are limited only by the reported assumptions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

- I have no (or the specified) present or prospective interest in the property that is the subject of this report and no (or specified) personal interest with respect to the parties involved.

- I have no bias with respect to the property that is the subject of this report or the parties involved with this assignment.

- My engagement in this assignment was not contingent upon developing or reporting predetermined results.

- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

- My analyses, opinions, and conclusions were developed and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

- This appraisal report was prepared in accordance with the requirements of Title XI of FIRREA and any implementing regulations.

### PRIOR SERVICES

[X] I have NOT performed services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

[ ] I HAVE performed services, as an appraiser or in another capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment. Those services are described in the comments below.

### PROPERTY INSPECTION

[ ] I have NOT made a personal inspection of the property that is the subject of this report.

[X] I HAVE made a personal inspection of the property that is the subject of this report.

### APPRAISAL ASSISTANCE

Unless otherwise noted, no one provided significant real property appraisal assistance to the person signing this certification. If anyone did provide significant assistance, they are hereby identified along with a summary of the extent of the assistance provided in the report.

APPRAISER INDEPENDENCE REQUIREMENTS:The appraiser has prepared this appraisal in full compliance with applicable Appraiser Independence Requirements and has not performed, participated in, or been associated with any activity in violation of those requirements.All photos in report are appraiser originals taken during the course of this assignment.All of the comparables were "driven by" during the course of this assignment by Appraiser. No one provided significant real property appraisal assistance to the Appraiser Sarah D. Wilson

### ADDITIONAL COMMENTS

Additional USPAP related issues requiring disclosure and/or any state mandated requirements: The analyses, opinions, and conclusions in this appraisal and appraisal report were developed and the report was prepared, to the best of the appraiser(s) ability, in accordance with the standards and reporting requirements of the Appraisal Institute. In addition, this appraisal report conforms to the current Uniform Standards of Professional Appraisal Practice (USPAP), as promulgated by the Appraisal Foundation and FIRREA (Financial Institutions Reform, Recovery and Enforcement Act of 1989) and FDIC minimum requirements. The report conforms to the Federal Reserve Board, Department of the Treasury, Federal Deposit Insurance Corporation, Sate of Florida and the Office of the Comptroller of the Currency, 12CFR, Part 34, Appraisals (Final Rule).
See Addendum

### MARKETING TIME AND EXPOSURE TIME FOR THE SUBJECT PROPERTY

[X] A reasonable marketing time for the subject property is 90-180 day(s) utilizing market conditions pertinent to the appraisal assignment.

[X] A reasonable exposure time for the subject property is 90-180 day(s).

### APPRAISER

| | | SUPERVISORY APPRAISER (ONLY IF REQUIRED) | |
|---|---|---|---|
| Signature | | Signature | |
| Name | Sarah D. Wilson | Name | |
| Date of Signature | 01/29/2019 | Date of Signature | |
| State Certification # | RD7689 | State Certification # | |
| or State License # | | or State License # | |
| State | FL | State | |
| Expiration Date of Certification or License | 11/30/2020 | Expiration Date of Certification or License | |
| | | Supervisory Appraiser Inspection of Subject Property | |
| Effective Date of Appraisal | 09/24/2015 | [ ] Did Not [ ] Exterior-only from Street [ ] Interior and Exterior | |

USPAP Compliance Addendum 2014

Page 1 of 1

Serial# BA996DBF
esign.alamode.com/verify

# Exterior-Only Inspection Residential Appraisal Report

VALU-18-12-1462
File # VALU-18-12-1462

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

**SUBJECT**

| | | |
|---|---|---|
| Property Address | 5237 Butte St | City Lehigh Acres State FL Zip Code 33971 |
| Borrower Feldkamp, Andrew & Dawn | Owner of Public Record Feldkamp, Andrew & Dawn | County Lee |
| Legal Description LEHIGH ACRES UNIT 6 BLK 35 PB 26 PG 33 LOT 23 | | |
| Assessor's Parcel # 20-44-26-06-00035.0230 | Tax Year 2015 | R.E. Taxes $ 2,039 |
| Neighborhood Name Lehigh Acres | Map Reference 15980 | Census Tract 0401.24 |
| Occupant ☒ Owner ☐ Tenant ☐ Vacant | Special Assessments $ 0 | ☐ PUD HOA $ 0 ☐ per year ☐ per month |
| Property Rights Appraised ☒ Fee Simple ☐ Leasehold ☐ Other (describe) | | |
| Assignment Type ☐ Purchase Transaction ☐ Refinance Transaction ☒ Other (describe) Litigation Retrospective DOV 09/24/2015 Client Request | | |
| Lender/Client Integra Realty Resources (IRR) - Miami | | Address 9155 South Dadeland Boulevard, Ste 1208, Miami, FL 33156 | |
| Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? ☐ Yes ☒ No | | |
| Report data source(s), offering price(s), and date(s). MLS | | |

**CONTRACT**

| | |
|---|---|
| I ☐ did ☐ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed. | |
| Contract Price $ Date of Contract Is the property seller the owner of public record? ☐ Yes ☐ No Data Source(s) | |
| Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? ☐ Yes ☐ No | |
| If Yes, report the total dollar amount and describe the items to be paid. | |

**NEIGHBORHOOD**

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | | One-Unit Housing Trends | | | One-Unit Housing | | Present Land Use % | |
|---|---|---|---|---|---|---|---|---|---|
| Location ☐ Urban ☒ Suburban ☐ Rural | | | Property Values ☐ Increasing ☒ Stable ☐ Declining | | | PRICE $ (000) | AGE (yrs) | One-Unit | 50 % |
| Built-Up ☒ Over 75% ☐ 25-75% ☐ Under 25% | | | Demand/Supply ☐ Shortage ☒ In Balance ☐ Over Supply | | | 380 Low 1 | | 2-4 Unit | 6 % |
| Growth ☐ Rapid ☒ Stable ☐ Slow | | | Marketing Time ☐ Under 3 mths ☒ 3-6 mths ☐ Over 6 mths | | | 95 Low 1 | | Multi-Family | 3 % |
| Neighborhood Boundaries The subject is bounded to the north by Alico Rd, to the south by Estero Pkwy, to the east by Interstate 75, and to the west by S Tamiami Trl, Lehigh Acres, FL | | | | | | 380 High 35 | | Commercial | 38 % |
| | | | | | | 155 Pred. 8 | | Other | 3 % |

Neighborhood Description The subject is located in the city of Lehigh Acres, FL which provides the access to major north and south centers of employment. Area schools and recreation parks are in close proximity, supporting services are located on Alico Rd and US 41. The 3% other land use consists of schools, parks and vacant land, and is not considered an adverse external factor.

Market Conditions (including support for the above conclusions) The market is stable and in balance.

**SITE**

| | | | | | |
|---|---|---|---|---|---|
| Dimensions 80 x 125 | Area 10000 sf | Shape Rectangular | View N;Res; | | |
| Specific Zoning Classification RS-1 | Zoning Description Residential Single Family | | | | |
| Zoning Compliance ☒ Legal ☐ Legal Nonconforming (Grandfathered Use) ☐ No Zoning ☐ Illegal (describe) | | | | | |
| Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use? ☒ Yes ☐ No If No, describe | | | | | |

| Utilities | Public | Private | Other (describe) | Public | Private | Off-site Improvements – Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | | Water | ☐ | ☒ Well | Street Asphalt | ☒ | |
| Gas | ☐ | ☐ None | Sanitary Sewer | ☐ | ☒ Septic | Alley None | | |

| | |
|---|---|
| FEMA Special Flood Hazard Area ☐ Yes ☒ No FEMA Flood Zone X FEMA Map # 12071C0313F FEMA Map Date 08/28/2008 | |
| Are the utilities and off-site improvements typical for the market area? ☒ Yes ☐ No If No, describe | |
| Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? ☐ Yes ☒ No If Yes, describe | |
| The subject is not located in a flood zone, not considered adverse to market or appeal. Well and septic are common/typical in the market area and not considered adverse to market or appeal. | |

**IMPROVEMENTS**

| | |
|---|---|
| Source(s) Used for Physical Characteristics of Property ☐ Appraisal Files ☒ MLS ☒ Assessment and Tax Records ☐ Prior Inspection ☐ Property Owner ☐ Other (describe) | Data Source for Gross Living Area Lee County Property Appraiser |

| General Description | | General Description | | Heating/Cooling | | Amenities | | Car Storage | |
|---|---|---|---|---|---|---|---|---|---|
| Units ☒ One ☐ One with Accessory Unit | | ☒ Concrete Slab ☐ Crawl Space | | ☒ FWA ☐ HWBB | | Fireplace(s) # 0 | | ☐ None | |
| # of Stories 1 | | ☐ Full Basement ☐ Finished | | ☐ Radiant | | Woodstove(s) # 0 | | ☒ Driveway # of Cars 2 | |
| Type ☒ Det. ☐ Att. ☐ S-Det./End Unit | | ☐ Partial Basement ☐ Finished | | ☐ Other | | ☐ Patio/Deck None | | Driveway Surface Concrete | |
| ☒ Existing ☐ Proposed ☐ Under Const. | | Exterior Walls CBS | | Fuel Electricity | | ☒ Porch Porches | | ☒ Garage # of Cars 2 | |
| Design (Style) Ranch | | Roof Surface Shingle | | ☒ Central Air Conditioning | | ☐ Pool Pool | | ☐ Carport # of Cars 0 | |
| Year Built 2006 | | Gutters & Downspouts Average | | ☐ Individual | | ☐ Fence None | | ☒ Attached ☐ Detached | |
| Effective Age (Yrs) 5 | | Window Type Unknown | | ☐ Other | | ☒ Other None | | ☐ Built-in | |
| Appliances ☒ Refrigerator ☐ Range/Oven ☐ Dishwasher ☐ Disposal ☐ Microwave ☐ Washer/Dryer ☒ Other (describe) Ext Inspection Only-See addend | | | | | | | | | |
| Finished area above grade contains: 7 Rooms 3 Bedrooms 2.0 Bath(s) 1,883 Square Feet of Gross Living Area Above Grade | | | | | | | | | |

Additional features (special energy efficient items, etc.). See attached addenda. Exterior Inspection Only.

Describe the condition of the property and data source(s) (including apparent needed repairs, deterioration, renovations, remodeling, etc.). C3;For purposes of this report as of effective day, subject property is considered to be an overall C3 condition. Appraiser utilized comparable properties which are considered overall C3 condition similar to the subject property. Appraiser reserves the right to change and or modify should evidence be presented of the true condition of the subject property. Appraiser has utilized the best available comparable sales and comparable listings within the subject's immediate market area, and which represent similar buying alternatives to the subject property. Due to the assignment type, exterior inspection only, the interior condition of the subject property is unknown.

| | |
|---|---|
| Are there any apparent physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? ☐ Yes ☒ No | |
| If Yes, describe. | |
| The appraiser is not a home inspector and this is not intended to be a home inspection. A professional home inspector and structural inspector should be contacted for an inspection if any parties may be concerned. The appraiser makes no warranties. | |

| | |
|---|---|
| Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? ☒ Yes ☐ No If No, describe. | |

| | | | |
|---|---|---|---|
| Freddie Mac Form 2055 March 2005 | Page 1 of 6 | | Fannie Mae Form 2055 March 2005 |

Form 2055UAD - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

Serial# BA996DBF
design.alamode.com/verify

# Exterior–Only Inspection Residential Appraisal Report

VALU-18-12-1462
File # VALU-18-12-1462

| | | | |
|---|---|---|---|
| There are | 14 | comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 150,000 to $ 195,700 . |
| There are | 47 | comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 130,000 to $ 188,500 . |

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | COMPARABLE SALE # 2 | COMPARABLE SALE # 3 |
|---|---|---|---|---|
| Address | 5237 Butte St | 1013 Chapel Ave | 5212 Barth St | 5106 Beauty St |
| | Lehigh Acres, FL 33971 | Lehigh Acres, FL 33971 | Lehigh Acres, FL 33971 | Lehigh Acres, FL 33971 |
| Proximity to Subject | | 0.13 miles NW | 0.41 miles SW | 0.23 miles W |
| Sale Price | $ | $ 144,900 | $ 137,000 | $ 153,000 |
| Sale Price/Gross Liv. Area | $ 125.77 sq.ft. | $ 91.71 sq.ft. | $ 64.08 sq.ft. | $ 84.91 sq.ft. |
| Data Source(s) | | MLS #215010458;DOM 147 | MLS # 214005359;DOM 192 | MLS #215031502;DOM 80 |
| Verification Source(s) | | Pub Records/MLS/Field Inspection | Pub Records/MLS/Field Inspection | Pub Records/MLS/Field Inspection |

| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
|---|---|---|---|---|---|---|---|
| Sales or Financing | | Short | 0 | ArmLth | 0 | ArmLth | 0 |
| Concessions | | Conv;0 | | Conv;0 | | Conv;0 | |
| Date of Sale/Time | | s09/15;c09/15 | 0 | s10/14;c10/14 | +5,000 | s07/15;c07/15 | 0 |
| Location | N;Res; | N;Res; | | N;Res; | | N;Res; | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 10000 sf | 10000 sf | | 10000 sf | | 10000 sf | |
| View | N;Res; | N;Res; | | N;Res; | | N;Res; | |
| Design (Style) | DT1;Ranch | DT1;Ranch | | DT1;Ranch | | DT1;Ranch | |
| Quality of Construction | Q3 | Q3 | | Q3 | | Q3 | |
| Actual Age | 9 | 11 | 0 | 9 | | 9 | |
| Condition | C3 | C3 | | C3 | | C3 | |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | | Total Bdrms. Baths | 0 | Total Bdrms. Baths | |
| Room Count | 7  3  2.0 | 7  3  2.0 | | 7  4  2.0 | | 7  3  2.0 | |
| Gross Living Area | 1,883 sq.ft. | 1,580 sq.ft. | +6,000 | 2,138 sq.ft. | -5,000 | 1,802 sq.ft. | 0 |
| Basement & Finished | 0sf | 0sf | | 0sf | | 0sf | |
| Rooms Below Grade | | | | | | | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | Central | Central | | Central | | Central | |
| Energy Efficient Items | Average | Average | | Average | | Average | |
| Garage/Carport | 2ga2dw | 2ga2dw | | 2ga2dw | | 2ga2dw | |
| Porch/Patio/Deck | Porches | Porches | | Porches | | Porches | |
| Pool Package | Pool Package | Pool Package | | None | +15,000 | Pool Package | |
| Net Adjustment (Total) | | ☒ +  ☐ - | $ 6,000 | ☒ +  ☐ - | $ 15,000 | ☐ +  ☐ - | $ 0 |
| Adjusted Sale Price | | Net Adj. 4.1 % | | Net Adj. 10.9 % | | Net Adj. 0.0 % | |
| of Comparables | | Gross Adj. 4.1 % $ 150,900 | | Gross Adj. 18.2 % $ 152,000 | | Gross Adj. 0.0 % $ 153,000 | |

I ☒ did ☐ did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research ☐ did ☒ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data Source(s)   Public Records
My research ☐ did ☒ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data Source(s)   Public Records
Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | | | | |
| Price of Prior Sale/Transfer | | | | |
| Data Source(s) | Lee County Tax Assessor | Lee County Tax Assessor | Lee County Tax Assessor | Lee County Tax Assessor |
| Effective Date of Data Source(s) | 01/19/2019 | 01/19/2019 | 01/19/2019 | 01/19/2019 |

Analysis of prior sale or transfer history of the subject property and comparable sales   See attached addenda.  All closed comparable sales were verified by at
least 3 supported, reliable resources:
Local MLS, multiple listing service
Lee County Property Appraiser
Realist.com
According to the Lee County Public Records these are the transfers documented within the last thirty six months of the effective appraisal date.
Summary of Sales Comparison Approach   See attached addenda.

Indicated Value by Sales Comparison Approach $   152,000

Indicated Value by: Sales Comparison Approach $   152,000   Cost Approach (if developed) $   Income Approach (if developed) $
Of the three approaches the value conclusion relies on the Sales Comparison approach. Cost approach was not developed due to the
assignment type per client request, as this was an exterior inspection from the street only.  Due to assignment type per client request, the income
approach to value was not developed.
This appraisal is made ☐ "as is", ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been
completed, ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☒ subject to the
following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair:  See attached addenda.  Exterior
Inspection only - Value is based on hypothetical condition the subject interior is in average C3 condition.
Based on a visual inspection of the exterior areas of the subject property from at least the street, defined scope of work, statement of assumptions and limiting
conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report
is $   152,000 , as of   09/24/2015 , which is the date of inspection and the effective date of this appraisal.

Form 2055UAD - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

Serial# BA996DBF
esign.alamode.com/verify

**Exterior–Only Inspection Residential Appraisal Report**

ADDITIONAL COMMENTS

In developing this appraisal an attempt was made to locate properties that are "most like" the subject; in other words, properties that are similar in design, appeal, materials, size and additional amenities and thereby requiring the least amount of adjustments. In the adjustment process it may be necessary to expand guidelines, due to the neighborhood  housing stock, especially where housing design, quality and age vary beyond that which is typical of a homogenous area. I Therefore, find that the extended marketing time, use of comparables from outside the desired radius and/or adjustments exceeding the usual parameters are considered a general economic condition. It is not necessarily adverse and does not weaken the report or the indicated value.Specific information relating to the subject property is obtained from the tax rolls of the county in which the property is located as provided by private data sources. Neighborhood information is obtained from an inspection of the neighborhood as well as sales activity which can be monitored through public and private data sources.

The sales used are obtained from a variety of sources. The primary sources are MLS computer generated sales activity provided by local Board of Realtors, deed transfers as reported by private data sources as well as linkages to the county records.  Whenever possible this information is verified by one of the principals involved in the sale. These sales are supplemented by current listings in the subject's neighborhood. Square footage of living area and other sizes and dimensions of the comparables are obtained through public records. Since the appraiser does not measure the comparables (unless it was a previous subject) these figures cannot be warranted. Since the flood maps published by the National Flood Insurance Program are vague and poorly defined in some areas, the appraiser has used his best judgement as to the subject property by both visual inspection and plotting on the map. In the absence of a survey, the appraiser assumes no responsibility for the flood zone classification.

Adjustments are based on paring of sales, where market data is unavailable or inconclusive a fraction of cost may have been used. The adjustments in the sales comparison approach are rounded to the nearest hundred. Minimal features such as fences, storage areas, sheds, and patios are considered to have no contributory value to the overall opinion of value and are excluded from the sales comparison approach.

**The cost approach was not developed due to assignment type, exterior appraisal only.**

## COST APPROACH TO VALUE (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)     Cost approach not developed.

| ESTIMATED ☐ REPRODUCTION OR ☐ REPLACEMENT COST NEW | OPINION OF SITE VALUE | ............ =$ |
|---|---|---|
| Source of cost data | DWELLING | Sq.Ft. @ $ ............ =$ |
| Quality rating from cost service          Effective date of cost data | | Sq.Ft. @ $ ............ =$ |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | | ............ =$ |
| | Garage/Carport | Sq.Ft. @ $ ............ =$ |
| | Total Estimate of Cost-New | ............ =$ |
| | Less        Physical    Functional    External | |
| | Depreciation | =$(                ) |
| | Depreciated Cost of Improvements | ............ =$ |
| | "As-is" Value of Site Improvements | ............ =$ |
| Estimated Remaining Economic Life (HUD and VA only)                     Years | **INDICATED VALUE BY COST APPROACH** | ............ = $ |

## INCOME APPROACH TO VALUE (not required by Fannie Mae)

| Estimated Monthly Market Rent $ | 1,100 | X Gross Rent Multiplier | = $ | Indicated Value by Income Approach |

Summary of Income Approach (including support for market rent and GRM)     per client request a rent schedule was included, however income approach was not developed.

## PROJECT INFORMATION FOR PUDs (if applicable)

Is the developer/builder in control of the Homeowners' Association (HOA)?  ☐ Yes  ☐ No    Unit type(s)  ☐ Detached  ☐ Attached

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal Name of Project

| Total number of phases | Total number of units | Total number of units sold |
|---|---|---|
| Total number of units rented | Total number of units for sale | Data source(s) |

Was the project created by the conversion of existing building(s) into a PUD?  ☐ Yes  ☐ No  If Yes, date of conversion

Does the project contain any multi-dwelling units?  ☐ Yes  ☐ No  Data Source(s)

Are the units, common elements, and recreation facilities complete?  ☐ Yes  ☐ No  If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association?  ☐ Yes  ☐ No  If Yes, describe the rental terms and options.

Describe common elements and recreational facilities.

**Exterior-Only Inspection Residential Appraisal Report**

VALU-18-12-1462
File # VALU-18-12-1462

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

SCOPE OF WORK: The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a visual inspection of the exterior areas of the subject property from at least the street, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

The appraiser must be able to obtain adequate information about the physical characteristics (including, but not limited to, condition, room count, gross living area, etc.) of the subject property from the exterior-only inspection and reliable public and/or private sources to perform this appraisal. The appraiser should use the same type of data sources that he or she uses for comparable sales such as, but not limited to, multiple listing services, tax and assessment records, prior inspections, appraisal files, information provided by the property owner, etc.

INTENDED USE: The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

INTENDED USER: The intended user of this appraisal report is the lender/client.

DEFINITION OF MARKET VALUE: The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS: The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

3. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

4. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing this appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

5. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

Form 2055UAD - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

Serial# BA996DBF
esign.alamode.com/verify

**Exterior–Only Inspection Residential Appraisal Report**

VALU-18-12-1462
File # VALU-18-12-1462

**APPRAISER'S CERTIFICATION:**   The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a visual inspection of the exterior areas of the subject property from at least the street. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

Form 2055UAD - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

**Serial# BA996DBF**
esign.alamode.com/verify

**Exterior–Only Inspection Residential Appraisal Report**

VALU-18-12-1462
File # VALU-18-12-1462

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

SUPERVISORY APPRAISER'S CERTIFICATION:    The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature | Signature |
| Name  Sarah D. Wilson | Name |
| Company Name  Valucentric; LLC | Company Name |
| Company Address  4590 Ulmerton Road | Company Address |
| Clearwater, FL 33762 | |
| Telephone Number  844-825-8236 | Telephone Number |
| Email Address  info@valucentric.com | Email Address |
| Date of Signature and Report  01/29/2019 | Date of Signature |
| Effective Date of Appraisal  09/24/2015 | State Certification # |
| State Certification #  RD7689 | or State License # |
| or State License # | State |
| or Other (describe)                     State # | Expiration Date of Certification or License |
| State  FL | |
| Expiration Date of Certification or License  11/30/2020 | SUBJECT PROPERTY |
| | ☐ Did not inspect exterior of subject property |
| ADDRESS OF PROPERTY APPRAISED | ☐ Did inspect exterior of subject property from street |
| 5237 Butte St | Date of Inspection |
| Lehigh Acres, FL 33971 | |
| APPRAISED VALUE OF SUBJECT PROPERTY $        152,000 | COMPARABLE SALES |
| LENDER/CLIENT | |
| Name  No AMC | ☐ Did not inspect exterior of comparable sales from street |
| Company Name  Integra Realty Resources (IRR) - Miami | Palm Bea | ☐ Did inspect exterior of comparable sales from street |
| Company Address  9155 South Dadeland Boulevard, Ste 1208, | Date of Inspection |
| Miami, FL 33156 | |
| Email Address | |

Serial# BA996DBF
esign.alamode.com/verify

Form 2055UAD - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/19/19 Page 41 of 319
Case 4:11-cv-22408-KMC DocMulti Doc Ment 22 ... Entered on FLSD Docket 05/13/2019 Page 826 of 989
VALU-18-12-1462

# SINGLE FAMILY COMPARABLE RENT SCHEDULE

File # VALU-18-12-1462

This form is intended to provide the appraiser with a familiar format to estimate the market rent of the subject property. Adjustments should be made only for items of significant difference between the comparables and the subject property.

| ITEM | SUBJECT | COMPARABLE NO. 1 | | COMPARABLE NO. 2 | | COMPARABLE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 5237 Butte St Lehigh Acres, FL 33971 | 4903 Beauty St Lehigh Acres, FL 33971 | | 1005 Alido Ave Lehigh Acres, FL 33971 | | 824 Agnes Ave Lehigh Acres, FL 33971 | |
| Proximity to Subject | | 0.20 miles SE | | 0.32 miles W | | 0.65 miles SW | |
| Date Lease Begins | unknown | 10/04/2014 | | 04/01/2015 | | 12/22/2014 | |
| Date Lease Expires | unknown | 10/04/2015 | | 04/01/2016 | | 12/22/2015 | |
| Monthly Rental | If Currently Rented: $ | $ 1,195 | | $ 1,135 | | $ 1,100 | |
| Less: Utilities | $ 0 | $ 0 | | $ 0 | | $ 0 | |
| Furniture | 0 | 0 | | 0 | | 0 | |
| Adjusted Monthly Rent | $ | $ 1,195 | | $ 1,135 | | $ 1,100 | |
| Data Source | Field Inspection Public Records | MLS 214049643 Public Records | | MLS 215008431 Public Records | | MLS 214059557 Public Records | |
| RENT ADJUSTMENTS | DESCRIPTION | DESCRIPTION | + ( −)$ Adjust. | DESCRIPTION | + ( −)$ Adjust. | DESCRIPTION | + ( −)$ Adjust. |
| Rent Concessions | None None | None None | | None None | | None None | |
| Location/View | N;Res; N;Res; | N;Res; N;Res; | 0 | N;Res; N;Res; | 0 | N;Res; N;Res; | 0 |
| Design and Appeal | DT1;Ranch Ranch | DT1;Ranch Ranch | | DT1;Ranch Ranch | | DT1;Ranch Ranch | |
| Age/Condition | 9 C3 | 12 C3 | | 11 C3 | 0 | 9 C3 | |
| Above Grade | Total : Bdrms : Baths | Total : Bdrms : Baths | | Total : Bdrms : Baths | | Total : Bdrms : Baths | 0 |
| Room Count | 7 : 3 : 2 | 7 : 3 : 2 | | 7 : 3 : 2 | | 7 : 3 : 2.1 | 0 |
| Gross Living Area | 1,883 Sq. Ft. | 1,777 Sq. Ft. | 0 | 1,993 Sq. Ft. | 0 | 1,969 Sq. Ft. | 0 |
| Other (e.g., basement, etc.) | 0sf | 0sf | | 0sf | | 0sf | |
| Other: | None | None | | None | | None | |
| Net Adj. (total) | | ☐ + ☐ − $ | 0 | ☐ + ☐ − $ | 0 | ☐ + ☐ − $ | 0 |
| Indicated Monthly Market Rent | | $ 1,195 | | $ 1,135 | | $ 1,100 | |

Comments on market data, including the range of rents for single family properties, an estimate of vacancy for single family properties, the general trend of rents and vacancy, and support for the above adjustments. (Rent concessions should be adjusted to the market, not to the subject property.)   All rental comps represent similar buying and renting alternatives to the subject property and are all located within the immediate neighborhood and market area.

Rental comps over 1 mile, were necessary to utilize for credible results, and still within the immediate market area.

Final Reconciliation of Market Rent:   All rental comps represent similar buying and renting alternatives to the subject property and are all located within the immediate neighborhood and market area.

All rental comps are rented w̶i̶t̶h̶ ̶.̶.̶.̶ Serial# 9952530BF 100.00 a month.

I (WE) ESTIMATE THE MONTHLY MARKET RENT OF THE SUBJECT AS OF ___09/24/2015___ TO BE $ ___1,100___

Appraiser(S)   SIGNATURE _____   Review Appraiser   SIGNATURE _____
NAME   Sarah D. Wilson   (If applicable)   NAME _____

Date Property Inspected ___09/24/2015___ Report Signed ___01/29/2019___   Date Property Inspected _____ Report Signed _____
License or Certification # ___RD7689___ State ___FL___   License or Certification # _____ State _____
Expiration Date of License or Certification ___11/30/2020___   Expiration Date of License or Certification _____
   Review Appraiser ☐ Did ☐ Did Not   Inspect Subject Property

Freddie Mac Form 1000  (8/88)   Fannie Mae Form 1007  (8/88)

Form 1007 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

Serial# BA996DBF
esign.alamode.com/verify

## Subject Photo Page

| Borrower | Feldkamp, Andrew & Dawn | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 5237 Butte St | | | | | | |
| City | Lehigh Acres | County | Lee | | State | FL | Zip Code 33971 |
| Lender/Client | Integra Realty Resources (IRR) - Miami | Palm Beach | | | | | | |



**Subject Front**

5237 Butte St
Sales Price
Gross Living Area    1,883
Total Rooms    7
Total Bedrooms    3
Total Bathrooms    2
Location    N;Res;
View    N;Res;
Site    10000 sf
Quality    Q3
Age    9

Exterior Inspection
from road only
Per Client Request



**Subject Front**

Exterior Inspection
from road only
Per Client Request



**Subject Street**

Exterior Inspection
from road only
Per Client Request

Serial# BA996DBF
esign.alamode.com/verify

## Comparable Photos 1-3

| | |
|---|---|
| Borrower | Feldkamp, Andrew & Dawn |
| Property Address | 5237 Butte St |
| City | Lehigh Acres | County | Lee | State | FL | Zip Code | 33971 |
| Lender/Client | Integra Realty Resources (IRR) - Miami | Palm Beach |



### Comparable 1

1013 Chapel Ave
Prox. to Subject    0.13 miles NW
Sales Price          144,900
Gross Living Area   1,580
Total Rooms          7
Total Bedrooms       3
Total Bathrooms      2.0
Location             N;Res;
View                 N;Res;
Site                 10000 sf
Quality              Q3
Age                  11

Due To Privacy Rights
Appraiser took best photo.



### 2

5212 Barth St
Prox. to Subject    0.41 miles SW
Sales Price          137,000
Gross Living Area   2,138
Total Rooms          7
Total Bedrooms       4
Total Bathrooms      2.0
Location             N;Res;
View                 N;Res;
Site                 10000 sf
Quality              Q3
Age                  9

Due To Privacy Rights
Appraiser took best photo.



### 3

5106 Beauty St
Prox. to Subject    0.23 miles W
Sales Price          153,000
Gross Living Area   1,802
Total Rooms          7
Total Bedrooms       3
Total Bathrooms      2.0
Location             N;Res;
View                 N;Res;
Site                 10000 sf
Quality              Q3
Age                  9

Due To Privacy Rights
Appraiser took best photo.

Serial# BA996DBF
esign.alamode.com/verify

## Rental Photo Page

| Borrower | Feldkamp, Andrew & Dawn | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 5237 Butte St | | | | | |
| City | Lehigh Acres | County | Lee | State | FL | Zip Code | 33971 |
| Lender/Client | Integra Realty Resources (IRR) - Miami | Palm Beach | | | | | |



### Rental 1

4903 Beauty St

| | |
|---|---|
| Proximity to Subject | 0.20 miles SE |
| Adj. Monthly Rent | 1,195 |
| Gross Living Area | 1,777 |
| Total Rooms | 7 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2 |
| Location | N;Res; |
| View | N;Res; |
| Condition | C3 |
| Age/Year Built | 12 |



### Rental 2

1005 Alido Ave

| | |
|---|---|
| Proximity to Subject | 0.32 miles W |
| Adj. Monthly Rent | 1,135 |
| Gross Living Area | 1,993 |
| Total Rooms | 7 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2 |
| Location | N;Res; |
| View | N;Res; |
| Condition | C3 |
| Age/Year Built | 11 |



### Rental 3

824 Agnes Ave

| | |
|---|---|
| Proximity to Subject | 0.65 miles SW |
| Adj. Monthly Rent | 1,100 |
| Gross Living Area | 1,969 |
| Total Rooms | 7 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.1 |
| Location | N;Res; |
| View | N;Res; |
| Condition | C3 |
| Age/Year Built | 9 |



Serial# BA996DBF
esign.alamode.com/verify

Form DLSTRNT.DS$  LTR - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

# Market Conditions Addendum to the Appraisal Report

File No. VALU-18-12-1462

The purpose of this addendum is to provide the lender/client with a clear and accurate understanding of the market trends and conditions prevalent in the subject neighborhood. This is a required addendum for all appraisal reports with an effective date on or after April 1, 2009.

| Property Address | 5237 Butte St | City Lehigh Acres | State FL | ZIP Code 33971 |
|---|---|---|---|---|
| Borrower | Feldkamp, Andrew & Dawn | | | |

**Instructions:** The appraiser must use the information required on this form as the basis for his/her conclusions, and must provide support for those conclusions, regarding housing trends and overall market conditions as reported in the Neighborhood section of the appraisal report form. The appraiser must fill in all the information to the extent it is available and reliable and must provide analysis as indicated below. If any required data is unavailable or is considered unreliable, the appraiser must provide an explanation. It is recognized that not all data sources will be able to provide data for the shaded areas below; if it is available, however, the appraiser must include the data in the analysis. If data sources provide the required information as an average instead of the median, the appraiser should report the available figure and identify it as an average. Sales and listings must be properties that compete with the subject property, determined by applying the criteria that would be used by a prospective buyer of the subject property. The appraiser must explain any anomalies in the data, such as seasonal markets, new construction, foreclosures, etc.

| Inventory Analysis | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | | Overall Trend | |
|---|---|---|---|---|---|---|
| Total # of Comparable Sales (Settled) | 15 | 15 | 17 | ☐ Increasing | ☒ Stable | ☐ Declining |
| Absorption Rate (Total Sales/Months) | 2.50 | 5.00 | 5.67 | ☐ Increasing | ☒ Stable | ☐ Declining |
| Total # of Comparable Active Listings | 19 | 19 | 19 | ☐ Declining | ☒ Stable | ☐ Increasing |
| Months of Housing Supply (Total Listings/Ab.Rate) | 7.6 | 3.8 | 3.4 | ☐ Declining | ☒ Stable | ☐ Increasing |
| Median Sale & List Price, DOM, Sale/List % | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | | Overall Trend | |
| Median Comparable Sale Price | 155,000 | 155,000 | 155,000 | ☐ Increasing | ☒ Stable | ☐ Declining |
| Median Comparable Sales Days on Market | 150 | 150 | 150 | ☐ Declining | ☒ Stable | ☐ Increasing |
| Median Comparable List Price | 157,700 | 157,700 | 157,700 | ☐ Increasing | ☒ Stable | ☐ Declining |
| Median Comparable Listings Days on Market | 60 | 60 | 60 | ☐ Declining | ☒ Stable | ☐ Increasing |
| Median Sale Price as % of List Price | 94.34 | 94.59 | 94.00 | ☐ Increasing | ☒ Stable | ☐ Declining |
| Seller-(developer, builder, etc.)paid financial assistance prevalent? | | ☐ Yes | ☒ No | ☐ Declining | ☒ Stable | ☐ Increasing |

Explain in detail the seller concessions trends for the past 12 months (e.g., seller contributions increased from 3% to 5%, increasing use of buydowns, closing costs, condo fees, options, etc.).     Seller concessions vary greatly with each individual sale. Where there has been an above normal amount of sellers concessions in the past three years, there has been a decrease lately due to lowered asking prices, with more sales being cash transactions. *The local MLS system stores data in real time, and thus it is impossible to act as if it was, or is, a date in the past. *Current-3 months comparable list price and comparable listing days on market is as of the effective date and may not reflect the prior 3 months accurately. Furthermore, there is no reliable method to track for sale by owner properties.

Are foreclosure sales (REO sales) a factor in the market? ☐ Yes ☒ No   If yes, explain (including the trends in listings and sales of foreclosed properties).
See attached addenda.

Cite data sources for above information.     Local MLS statistics provided the above information.

Summarize the above information as support for your conclusions in the Neighborhood section of the appraisal report form. If you used any additional information, such as an analysis of pending sales and/or expired and withdrawn listings, to formulate your conclusions, provide both an explanation and support for your conclusions.
Appraiser's 'Inventory Analysis', 'Median Sale & List Price, DOM' and other observations in this addendum are based on the data source identified above, which appraiser generally believes to be a reliable source of market data. However, the appraiser cannot verify all of the information in that data source and cannot guarantee the accuracy of such data or conclusions based thereon." Pending sales, expired listings, and withdrawn listings were included in this analysis. The local MLS system stores data in real time, and thus it is impossible to act as if it was, or is, a date in the past. Furthermore, there is no reliable method to track for sale by owner properties. The appraiser cannot guarantee future market conditions affecting the subject property.

| If the subject is a unit in a condominium or cooperative project, complete the following: | | | Project Name: | | | |
|---|---|---|---|---|---|---|
| Subject Project Data | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | | Overall Trend | |
| Total # of Comparable Sales (Settled) | | | | ☐ Increasing | ☐ Stable | ☐ Declining |
| Absorption Rate (Total Sales/Months) | | | | ☐ Increasing | ☐ Stable | ☐ Declining |
| Total # of Active Comparable Listings | | | | ☐ Declining | ☐ Stable | ☐ Increasing |
| Months of Unit Supply (Total Listings/Ab.Rate) | | | | ☐ Declining | ☐ Stable | ☐ Increasing |

Are foreclosure sales (REO sales) a factor in the project? ☐ Yes ☐ No   If yes, indicate the number of REO listings and explain the trends in listings and sales of foreclosed properties.

Summarize the above trends and address the impact on the subject unit and project.

esign.alamode.com/verify     Serial:BA996DBF

| Signature | | Signature | |
|---|---|---|---|
| Appraiser Name Sarah D. Wilson | | Supervisory Appraiser Name | |
| Company Name Valucentric; LLC | | Company Name | |
| Company Address 4590 Ulmerton Road, Clearwater, FL 33762 | | Company Address | |
| State License/Certification # RD7689 | State FL | State License/Certification # | State |
| Email Address info@valucentric.com | | Email Address | |

Serial# BA996DBF
esign.alamode.com/verify

Form 1004MC2 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

## Supplemental Addendum

File No. VALU-18-12-1462

| Borrower | Feldkamp, Andrew & Dawn | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 5237 Butte St | | | | | | |
| City | Lehigh Acres | County | Lee | | State | FL | Zip Code 33971 |
| Lender/Client | Integra Realty Resources (IRR) - Miami | Palm Beach | | | | | |

PURPOSE AND INTENDED USE OF THE APPRAISAL

This Appraisal Report is for the sole use of our client. Intended users of this report is to assist the Client with arriving at a conclusion of fair market value for litigation purposes. The intended users of this report is the client listed above, and if other parties choose to rely on the report, the appraiser is not obligated to such parties and does not result in such parties becoming intended users. Finally, I understand that this appraisal may not be a part of a federally related transaction. Because it may not be part of a federally related transaction, the following does not apply:

The analyses, opinions, and conclusions in this appraisal and appraisal report were developed and the report was prepared, to the best of the appraiser(s) ability, in accordance with the standards and reporting requirements of the Appraisal Institute. In addition, this appraisal report conforms to the current Uniform Standards of Professional Appraisal Practice (USPAP), as promulgated by the Appraisal Foundation and FIRREA (Financial Institutions Reform, Recovery and Enforcement Act of 1989) and FDIC minimum requirements. The report conforms to the Federal Reserve Board, Department of the Treasury, Federal Deposit Insurance Corporation, Sate of Florida and the Office of the Comptroller of the Currency, 12CFR, Part 34, Appraisals (Final Rule).

INTEREST VALUED – FEE SIMPLE ESTATE DEFINITION: "Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat."

_____
The Dictionary of Real Estate Appraisal, Forth Edition, Copyright 2002 by the Appraisal Institute an Illinois Not For Profit Corporation

It is the Appraiser's opinion, for purposes of this appraisal report only, that reasonable "exposure time" for the subject property would be a marketing time of 3-6 months. "Exposure time" as defined by the current, 2018-2019 Uniform Standards of Professional Appraisal Practice (USPAP) is defined as: "Estimated length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal." "Exposure time is a retrospective opinion based on an analysis of past events assuming a competitive and open market." USPAP Standards Rule 1-2(c) requires the appraiser, when developing a real property appraisal, to "identify the type and definition of value…" USPAP further comments, "when reasonable exposure time is a component of the definition for the value opinion being developed, the appraiser must also develop an opinion of reasonable exposure time linked to that value opinion.

Appraiser has had no involvement with the subject property within 3 years of the effective date of this appraisal.

Appraiser, Sarah D. Wilson has performed no services , as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three year period immediately preceding acceptance of this assignment.

SCOPE OF WORK
The scope of this appraisal entails all of the necessary steps required to develop an Appraisal Report. The report is directed toward the specific needs of our client for the intended use stated herein. It includes valuing the subject property using two of the three traditional approaches to value. For this assignment we utilized local market data obtained from the sources mentioned throughout the report. Neighborhood data is based on our inspection and delineation. Site and building (if improved) data was obtained from the sources mentioned throughout the report. The Highest and Best Use analysis considers the intended purpose of this assignment (this appraisal is not a feasibility study). Furthermore, this appraisal is subject to the Assumptions and Limiting Conditions and the Certification contained herein. With respect to this appraisal assignment, the appraiser(s) completed the following;

The reported analyses, opinions, and conclusions were developed, and the report has been prepared, in conformity with the requirements of the code of Professional Ethics & Standards of Professional Appraisal Practice of the Appraisal Institute, which includes the Uniform Standards of Professional Appraisal Practice. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

An Appraisal Report on the subject property has been prepared. The subject property data such as size, location, quality, and zoning are considered. Market data, including comparable improved sales and listings, supply and demand are among the items researched, analyzed, and presented. The data is used to consider the highest and best use of the subject property and to conclude an opinion of the market value.

The appraiser(s) lack the knowledge and experience with respect to the detection and measurement of hazardous substances. Therefore, this assignment does not cover the presence or absence of such substances as discussed in the General Underlying Assumptions section. However, any visual or obviously known hazardous substances affecting the property will be reported and an indication of its impact on value will be discussed.

The documentation necessary to arrive at the value is considered in this appraisal report. A view of the interior and exterior is done to describe the improvements. The market data has been collected, verified, and analyzed. Comparable sales were chosen for their similar highest and best uses as outlined within the report. All sales were analyzed and compared. Due to the current state of residential real estate market the Cost Approach is not given any weight. (The market is currently over supplied). The Income Approach was deemed not applicable for this appraisal since properties of this type are typically owner occupied and are not held for their income producing value. Of the three approaches the value conclusion relies on the Sales Comparisons Approach

This Appraisal Report is a brief recapitulation of the appraiser(s) data, analyses and conclusions. Supporting documentation is retained in our office file.

Serial# BA996DBF
esign.alamode.com/verify

**Supplemental Addendum**

File No. VALU-18-12-1462

| Borrower | Feldkamp, Andrew & Dawn | | | | | |
|----------|-------------------------|--|--|--|--|--|
| Property Address | 5237 Butte St | | | | | |
| City | Lehigh Acres | County | Lee | State | FL | Zip Code 33971 |
| Lender/Client | Integra Realty Resources (IRR) - Miami | Palm Beach | | | | |

No employee, director, officer, or agent of the lender, or any other third party acting as a joint venture partner, independent contractor, appraisal management company, or partner on behalf of the lender has influenced or attempted to influence the development, reporting, result, or review of this assignment through coercion, extortion, collusion, compensation, instruction, inducement, intimidation, bribery or in any other manner. I have not been contacted by anyone other than the intended user (lender/client as identified on the first page of the report), borrower, or designated contact to make an appointment to enter the property. I agree to immediately report any unauthorized contacts either personally by phone or electronic to our client.

PERSONAL PROPERTY, TRADE FIXTURES OR INTANGIBLE ITEMS
This appraisal and its value opinion does not include any personal property (furniture, fixtures & equipment) or other intangible items that are not real property (note: normal real property fixtures are included).

EASEMENTS, RESTRICTIONS, ENCUMBRANCES OR LEASES, ETC.
Unless otherwise referenced herein, there are no known adverse easements, encroachments, restrictions, encumbrances, leases, reservations, covenants, contracts, declarations, special assessments, ordinances or other items of a similar nature.

CONCURRENCY ISSUES, ROAD WIDENING ISSUES & MORATORIUMS
To the best of my knowledge there are no concurrency (level of service) issues, road- widening issues or moratoriums associated with the subject property or access to the subject property.

OIL, GAS, MINERAL DEPOSITS, CROPS, TIMBER, ETC
There were no existing crops found on the property at the time of my inspection and no value has been attributed to timber in this appraisal assignment.  I was not provided with a Title Report for use in this appraisal and the ownership of oil, gas and mineral rights has not been considered in my valuation.  The opinion of value in this report reflects the assumption that all sub-surface rights transfer with surface rights.

HIGHEST & BEST USE
The reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity. The subject is being used at it's highest & best use and is within the neighborhood norm for the assigned zoning class.

Highest and Best Use as if Vacant
Legally Permissible: According to public records, the subject site is currently zoned "RS-1" (Residential Single Family), which is an applicable zoning classification. The code provides for various restrictions such as principal permitted uses, etc.  A change in zoning is not anticipated for the subject property nor is it deemed necessary or appropriate.

Physically Possible: Adequate utilities are available to enable development. Based on the subject's physical characteristics, development of the site is physically possible.

Financially Feasible: In terms of financial feasibility, speculative development would not be warranted at the present time. In addition, the current soft market in addition to an oversupply of property types across will also inhibit build-to-suit or owner/user development. As noted, the market is perceived to be slowing and will likely continue in the near future. Thus, if the site were vacant, a speculative hold would likely be the best investment position until the market reflects a positive move in regards to demand.

Maximally Productive: The financially feasible use that produces the greatest value consistent with investment requirements from the market is the highest and best use. Speculative hold with the ultimate use being residential development in the form of single family residential should be maximally productive.

Conclusion as Vacant: Given the above information, the highest and best use as vacant is a speculative hold with the ultimate use being for residential use.

Highest and Best Use as Improved
Legally Permissible: If the current improvements cannot be legally inhabited, then removal may be required. The current improvements are not in violation of any known legal restrictions.

Physically Possible: The subject is configured as a single family dwelling. The improvements are in average condition and are assumed to be of sound design. As a result, the physical characteristics of the improvements do not appear to hinder marketability. Lastly, the existing building use currently provides an economic contribution to the property as a whole and neither demolition of the improvements nor redevelopment of the site appears warranted.

Financially Feasible: The current improvements must provide a return that exceeds land value. As indicated in the valuation sections, the improvements provide a return to the land and thus, create value.

Maximally Productive: The use that provides the greatest return relative to risk is the highest and best use as improved. Given the cost of demolition and the uncertainty of profitability for a new development, there is not a use that would financially justify the removal or major alteration of the current improvements.

Conclusion as Improved: Given the above information, the subject's current use as a single family dwelling is its highest and best use as improved.

Serial# BA996DBF
esign.alamode.com/verify

**Supplemental Addendum**

File No. VALU-18-12-1462

| Borrower | Feldkamp, Andrew & Dawn | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 5237 Butte St | | | | | | |
| City | Lehigh Acres | County | Lee | | State | FL | Zip Code | 33971 |
| Lender/Client | Integra Realty Resources (IRR) - Miami | Palm Beach | | | | | |

## APPRAISER INDEPENDENCE REQUIREMENTS

The appraiser, Sarah D. Wilson, has prepared this appraisal in full compliance with applicable Appraiser Independence Requirements and has not performed, participated in, or been associated with any activity in violation of those requirements.

All subject photos in report are appraiser originals taken during the course of this assignment. This was an exterior inspection only. Appraiser inspected the subject property from the road only.

All of the comparables were "driven by" during the course of this assignment, unless otherwise noted in the addendum due to reasons beyond the appraiser's control such as, but not limited to: privacy rights, gated communities, etc.

Appraiser has performed competently while completing this assignment.

## ASSIGNMENT RESULTS

**Physical characteristics are not ASSIGNMENT RESULTS. Appraiser has taken reasonable steps to safeguard access to confidential information and assignment results by unauthorized individuals, whether such information or results are in physical or electronic form.**

**Appraiser ensures that employees, co-workers, sub-contractors, or others who may have access to confidential information or assignment results, are aware of the prohibitions on disclosure of such information or results.**

**• Exterior-Only : Sales Comparison Analysis - Summary of Sales Comparison Approach**

Appraiser has utilized the best available comparable sales which occurred within 1-12 months prior to effective date of this appraisal, and within 1-2 miles of the subject property, and which represent the most similar buying alternatives.

Comps over 1 mile were necessary to utilize for credible results. All comps are located in the subject's immediate market area and represent the most similar buying alternatives to the subject property.

Comps over 6 months old were utilized, and necessary for credible results. A time/marketing condition adjustment was warranted. This is not considered distorting, and necessary for credible results.

All comps are located within the subject's immediate market area. Appraiser utilized the best available comps within a 2 mile radius, and which closed within 12 months prior to effective date, and which represent the most similar buying alternatives to the subject property. Requests for additional comps would result in comps over 2 miles, comps with greater adjustments which would exceed lender guidelines and comps which do not represent similar buying alternatives to the subject property.

All adjustments were determined by appraiser's extensive market research and knowledge of the subject's immediate neighborhood as well as market area. Adjustments are determined by the market, and what the market is willing to pay for such features/ similarities/ improvements etc. All adjustments are derived from the market.

All comparables are considered to be overall C3 condition and Q3 quality of construction. For purposes of this report, due to assignment type, exterior only, the subject is assumed to be in average condition and have an overall C3 condition and Q3 quality of construction.

No age adjustments were calculated when there was not a difference of 7 +/- years of the subject's age.

No GLA adjustments were warranted when there was not a difference of 150 +/-SF the subject's GLA. GLA adjustments werecalculated at $20.00 per SF difference of the subject's GLA where there was a difference of 150 +/- SF. This is not considered distorting, and necessary to utilize these comparables for credible results. Appraiser utilized the best available comparables, requests for additional comparables would result in sales outside of the subject's immediate market area, sales over 12 months old, and sales which do not represent similar buying alternatives.

Sales comp 2 exceeded 10% single line adjustment guidelines due to pool amenity. This is not considered distorting and was necessary to utilize this comp for credible results.

Sales comps 1 and 3 were given the most weight as they are most similar match to the subject property in regard to bedroom/den bath count and pool amenity.

Sales comps  2 was given the least amount of weight due to pool amenity and over 6 months old..

All adjustments were desrcibed in the original appraisal, which were based on extensive research by the appraiser of closed sales 1-15 months prior to effective date of this appraisal and what a typical buyer is willing to spend on differences such as location, design/style, gross living area, bed/bath count. age, amenities, view.

No financing concessions were noted for any of the comparable properties utilized.

No adjustments were warranted for minimal features such as furnishings, fireplaces, sheds, exterior storage, porches, patios, decks, fences, etc.

All 3 closed sales are given consideration in the Final Opinion of value. The mean is $151,966 and final opinion of value is $152,000.

Subject is appraising slightly below the predominate neighborhood values of $155,000. However, not considered under built,

Serial# BA996DBF
esign.alamode.com/verify

**Supplemental Addendum**

File No. VALU-18-12-1462

| Borrower | Feldkamp, Andrew & Dawn | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 5237 Butte St | | | | | | |
| City | Lehigh Acres | County | Lee | | State | FL | Zip Code | 33971 |
| Lender/Client | Integra Realty Resources (IRR) - Miami | Palm Beach | | | | | | |

and has no adverse affect on marketability.

Adjustments are based on paring of sales, where market data is unavailable or inconclusive a fraction of cost may have been used. The adjustments in the sales comparison approach are rounded to the nearest hundred. Minimal features such as fences, storage areas, sheds, and patios are considered to have no contributory value to the overall opinion of value and are excluded from the sales comparison approach.

The documentation necessary to arrive at the value is considered in this appraisal report. This was an exterior inspection only, as mentioned throughout report. Comparable sales were chosen for their similar highest and best uses as outlined within the report. All sales were analyzed and compared.

My analysis, opinions, and conclusions were developed, and this report has been prepared, in conformity with USPAP.

Appraiser utilized at least 3 supported, reliable resources:
Local MLS, multiple listing service
Lee County Property Appraiser
Realist.com

Of the three approaches the value conclusion relies on the Sales Comparison approach. Due to the assignment type, exterior inspection only, appraiser did not develop cost approach or income approach.

The documentation necessary to arrive at the value is considered in this appraisal report. Comparable sales were chosen for their similar highest and best uses as outlined within the report. All sales were analyzed and compared.

My analysis, opinions, and conclusions were developed, and this report has been prepared, in conformity with USPAP.

• **Market Conditions Addendum to the Appraisal Report : Foreclosure/REO Sales in the Market**

The market continues to be stabilized, and in balance.

The predominate value is a compilation of closed sales within the last 12 months, and within a 2 mile radius of the subject. Not all comparables are necessarily the same age, same GLA, or overall same condition as the subject.

Appraiser has utilized the best available comparable sales which occurred within 1-12 months prior of effective date of this appraisal, and within 1-2 miles of the subject property, and which represent the most similar buying alternatives.

• **Exterior-Only : Site - Adverse Conditions or External Factors**

The subject property has well water and septic. This is common/ typical in the subject's immediate neighborhood as well as market area and has no adverse affect on market value or marketability.

No apparent adverse easements, encroachments, environmental conditions etc. noted, however the appraiser is not a surveyor.

**APPRAISER IS NOT A HOME INSPECTOR.**

**A HOME INSPECTOR IS RECOMMENDED FOR ANY INTERESTED PARTIES.**

The subject is located in FEMA declared disaster area: As of effective date of this report, appraiser visually saw the subject property slightly from the road. Appraiser can not confirm if the subject had any damage due to being in a fema declared disaster area. However, appraiser did mot visually see any damage from the exterior inspection from the road only.

The subject property is not located in a flood zone however, has no adverse effect on value or marketability. Appraiser utilized comparable properties in the same flood zone as the subject property.

• **Exterior-Only : Improvements - Additional Features**

This was an exterior inspection only, per client request.

According to prior MLS listing, which appraiser has attached as an addendum to this appraisal, as well as property records recorded with Lee County Property Appraiser, the subject is a ranch style home built in 2006 with 3 bedrooms, den, and 2 baths, kitchen, living room, dining area, and 2 car attached garage.

The subject has a below ground pool package with screen enclosure.

According to Lee County Property Appraiser, the subject is overall 1883 sf under air. This was an exterior inspection only. For purposes of this report, Appraiser is basing the subject property's sf at of 1883 sf under air.

Appraiser has attached a copy of the record detail as recorded with Lee County Property Appraiser.

**EXTERIOR IMPROVEMENTS:**

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/19/19 Page 50 of 319
Case 4:11-cv-22408-MGC Document 279-4 Entered on FLSD Docket 05/13/2015 Page 835 of
986

## Supplemental Addendum

File No. VALU-18-12-1462

| Borrower | Feldkamp, Andrew & Dawn | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 5237 Butte St | | | | | | |
| City | Lehigh Acres | County | Lee | | State | FL | Zip Code | 33971 |
| Lender/Client | Integra Realty Resources (IRR) - Miami | Palm Beach | | | | | |

**No contributory value was given for porches, fireplaces,patios, decks, fences, gazebos, ext storage sheds etc.**

**Contributory value was given to the below ground pool package with screen enclosure.**

**Exterior Inspection Only:**

**Per client request, this was an exterior inspection only from the road.  Due to property rights, appraiser viewed the property from the road only.**

**Appraiser relied on mls records, Lee County Property Appraiser records to determine physical characteristics of the subject property.**

**It is assumed for purposes of this report that the subject property is in average condition and is an overall C3 condition.**

**Appraiser has attached a copy of the subject property's record detail as recorded with Lee County Property Appraiser.**

**Extraordinary Assumption**

An extraordinary assumption is defined as: "as assignment-specific assumption as of the effective date regarding uncertain information used in the analysis which, if found to be false, could alter the appraiser's opinions or conclusions".

We have only inspected the subject property from the street and have not performed a thorough interior and exterior inspection. The opinion of value is based on the subject property being in average condition as of the effective date.

**Hypothetical Condition**

A hypothetical condition is defined as: "a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis."

The opinion of value is based on the Hypothetical Condition  the value of the subject property is not affected by any detrimental conditions including Chinese drywall.

Serial# BA996DBF
esign.alamode.com/verify

Case 2:09-md-02047-EEF-MBN Document 22362-31 Filed 11/19/19 Page 51 of 319
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 05/13/2015 Page 836 of
939

**Flood Map**

| Borrower | Feldkamp, Andrew & Dawn | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 5237 Butte St | | | | | | |
| City | Lehigh Acres | County | Lee | State | FL | Zip Code | 33971 |
| Lender/Client | Integra Realty Resources (IRR) - Miami | Palm Beach | | | | | | |



Form MAP.FLOOD - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

Serial# BA996DBF
esign.alamode.com/verify

## Location Map

| Borrower | Feldkamp, Andrew & Dawn | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 5237 Butte St | | | | | | |
| City | Lehigh Acres | County | Lee | | State | FL | Zip Code 33971 |
| Lender/Client | Integra Realty Resources (IRR) - Miami | Palm Beach | | | | | | |



**Plat Map & Aerial View**



Serial# BA996DBF
esign.alamode.com/verify

## Tax Card - Page 1

Lee County Tax Collector - Print Results      https://www.leetc.com/ncp/search_detail.asp





**Real Property Information**

| Account | Tax Year | Status |
|---|---|---|
| 20-44-26-06-00035.0230 | 2015 | PAID |
| **Original Account** | | **Instrument No** |
| 20-44-26-06-00035.0230 | | 2016000074289 |

**Owner**
PARISH RUSDIANA S +
WEIL RICHARD A

| **Physical Address** | **Mailing Address** |
|---|---|
| 5237 BUTTE ST | 5237 BUTTE ST |
| LEHIGH ACRES FL 33971 | LEHIGH ACRES FL 33971 |
| | USA |

**Legal Description**

LEHIGH ACRES UNIT 6 BLK 35 PB 26 PG 33 LOT 23

Outstanding Balance as of 1/29/2019 $0.00

### Values & Exemptions

| District | 048 |
|---|---|
| Market Assessed Value | $110,510 |
| Cap Assessed Value | $107,696 |
| Taxable Value | $107,696 |
| Combined Tax & Assessment Amount | $2,039.41 |

### Ad Valorem Taxes

| Taxing Authority | Mill Rate | Assessed | Exempt | Taxable | Amount |
|---|---|---|---|---|---|
| LEE COUNTY GENERAL REVENUE | 4.1506 | 107,696 | 0 | 107,696 | $447.00 |
| PUBLIC SCHOOL - BY LOCAL BOARD | 2.2480 | 110,510 | 0 | 110,510 | $248.43 |
| PUBLIC SCHOOL - BY STATE LAW | 5.0370 | 110,510 | 0 | 110,510 | $556.64 |
| LEE COUNTY ALL HAZARDS - MSTU | 0.0693 | 107,696 | 0 | 107,696 | $7.46 |
| LEE COUNTY LIBRARY FUND | 0.5956 | 107,696 | 0 | 107,696 | $64.14 |
| LEE COUNTY UNINCORPORATED - MSTU | 0.8398 | 107,696 | 0 | 107,696 | $90.44 |
| LEHIGH ACRES LIGHT - MSTU | 0.3921 | 107,696 | 0 | 107,696 | $42.23 |
| SFL WATER MGMT-DISTRICT LEVY | 0.1459 | 107,696 | 0 | 107,696 | $15.71 |
| SFL WATER MGMT-EVERGLADE CONST | 0.0506 | 107,696 | 0 | 107,696 | $5.45 |
| SFL WATER MGMT-OKEECHOBEE LEVY | 0.1586 | 107,696 | 0 | 107,696 | $17.08 |
| LEE COUNTY HYACINTH CONTROL | 0.0263 | 107,696 | 0 | 107,696 | $2.83 |
| LEE COUNTY MOSQUITO CONTROL | 0.2397 | 107,696 | 0 | 107,696 | $25.81 |
| WEST COAST INLAND NAVIGATION DISTRICT | 0.0394 | 107,696 | 0 | 107,696 | $4.24 |

### Non-Ad Valorem Assessments

| Taxing Authority | Rate | Basis | Amount |
|---|---|---|---|
| LEE COUNTY SOLID WASTE ASSESSMENT | 1.0000 | VARIES | $194.71 |
| LEHIGH ACRES FIRE CONTROL AND RESCUE DISTRICT | 1.0000 | ACTL LEVY | $292.00 |
| EAST COUNTY WATER CONTROL | 105.1500 | PER ACRE | $25.24 |

### Amount Due If Paid In

| Nov 2015 | Dec 2015 | Jan 2016 | Feb 2016 | Mar 2016 |
|---|---|---|---|---|
| $1,957.83 | $1,978.23 | $1,998.62 | $2,019.02 | $2,039.41 |

Additional Options:

- eNotify
- Tax Detail
- Payments Made
- All Unpaid Taxes
- Tax History
- Link to Property Appraiser's Tax Estimator

1 of 2      /2019, 1:10 PM

Serial# BA996DBF
esign.alamode.com/verify

**Tax Card - Page 2**

Lee County Tax Collector - Print Results                    https://www.leetc.com/ncp/search_detail.asp

See also:

Property Appraiser

Clerk of Court

Serial# BA996DBF
esign.alamode.com/verify

Form SCNLTR - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

## Record Detail – Page 1

Lee County Property Appraiser - Online Parcel Inquiry     https://www.leepa.org/Display/DisplayParcel.aspx?FolioID=10315610&...

# Property Data
### STRAP: 20-44-26-06-00035.0230   Folio ID: 10315610



**Owner Of Record - Tenants in Common**

SWARTS ALEXANDER J +
SWARTS MICHAEL J & CINDY L
1120 TURTLE CREEK DR # 620
NAPLES FL 34110

**Site Address**

5237 BUTTE ST
LEHIGH ACRES FL 33971

**Property Description**
Do not use for legal documents!

LEHIGH ACRES UNIT 6 BLK 3S PB 26 PG 33 LOT 23

**Classification / DOR Code**

SINGLE FAMILY RESIDENTIAL / 01

**[ Tax Map Viewer ] [ View Comparables ]**

[ Pictometry Aerial Viewer ]

**Current Working Values**

| | | | |
|---|---|---|---|
| Just | 187,339 | As Of | 07/16/2018 |

**Attributes**

| | |
|---|---|
| Land Units Of Measure | LT |
| Units | 1.00 |
| Total Number of Buildings | 1 |
| Total Bedrooms / Bathrooms | 3 / 2.0 |
| Total Living Area | 1,883 |
| 1st Year Building on Tax Roll | 2006 |
| Historic District | No |

**Image of Structure**

‹ Photo Date February of 2018 › ☐ View other photos

Last Inspection Date: 02/26/2018

## Property Value History

| Tax Year | Just | Market Assessed | Capped Assessed | Taxable |
|---|---|---|---|---|
| 1992 | 1,800 | 1,800 | 1,800 | 1,800 |
| 1993 | 2,200 | 2,200 | 2,200 | 2,200 |
| 1994 | 2,200 | 2,200 | 2,200 | 2,200 |
| 1995 | 2,200 | 2,200 | 2,200 | 2,200 |
| 1996 | 1,800 | 1,800 | 1,800 | 1,800 |
| 1997 | 1,800 | 1,800 | 1,800 | 1,800 |
| 1998 | 2,200 | 2,200 | 2,200 | 2,200 |
| 1999 | 1,800 | 1,800 | 1,800 | 1,800 |
| 2000 | 2,500 | 2,500 | 2,500 | 2,500 |
| 2001 | 2,700 | 2,700 | 2,700 | 2,700 |
| 2002 | 3,200 | 3,200 | 3,200 | 3,200 |
| 2003 | 3,850 | 3,850 | 3,850 | 3,850 |
| 2004 | 7,100 | 7,100 | 7,100 | 7,100 |
| 2005 | 21,000 | 21,000 | 21,000 | 21,000 |
| 2006 | 42,000 | 42,000 | 42,000 | 42,000 |
| 2007 | 234,730 | 234,730 | 234,730 | 234,730 |
| 2008 | 197,170 | 197,170 | 197,170 | 197,170 |
| 2009 | 79,460 | 79,460 | 79,460 | 29,460 |
| 2010 | 58,088 | 58,088 | 58,088 | 25,000 |
| 2011 | 60,801 | 60,801 | 58,959 | 25,000 |
| 2012 | 70,605 | 70,605 | 60,728 | 25,000 |
| 2013 | 81,201 | 81,201 | 61,760 | 25,000 |
| 2014 | 97,905 | 97,905 | 97,905 | 97,905 |
| 2015 | 110,510 | 110,510 | 107,696 | 107,696 |
| 2016 | 128,015 | 128,015 | 128,015 | 128,015 |
| 2017 | 150,208 | 150,208 | 150,208 | 100,208 |
| 2018 | 187,339 | 187,339 | 176,186 | 126,186 |

The **Just** value is the total parcel assessment (less any considerations for the cost of sale). This is the closest value to *Fair Market Value* we produce and is dated as of January 1st of the tax year in question (F.A.C. 12D-1.002).

The **Market Assessed** value is the total parcel assessment (less any considerations for the cost of sale) based upon the assessment standard. Most parcels are assessed based

Form SCNLTR - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

Serial# BA996DBF
esign.alamode.com/verify

# Record Detail – Page 2

Lee County Property Appraiser - Online Parcel Inquiry     https://www.leepa.org/Display/DisplayParcel.aspx?FolioID=10315610&...

## Exemptions

No existing exemptions found for this property.

## 🌐 Values (2018 Tax Roll)

| Property Values | | Attributes | |
|---|---|---|---|
| Just | 187,339 | Land Units Of Measure ⓘ | LT |
| Assessed | 187,339 | Units ⓘ | 1.00 |
| Portability Applied | 0 | Total Number of Buildings | 1 |
| Cap Assessed | 176,186 | Total Bedrooms / Bathrooms | 3 / 2.0 |
| Taxable | 126,186 | Total Living Area ⓘ | 1,883 |
| Cap Difference | 11,153 | 1st Year Building on Tax Roll ⓘ | 2006 |
| | | Historic District | No |

## Taxing Authorities

### LEHIGH ACRES FIRE & LIGHT / 048

| Name / Code | Category | Mailing Address |
|---|---|---|
| LEE CO GENERAL REVENUE / 044 | County | Lee County Office of Management & Budget PO BOX 398 FORT MYERS FL 33902-0398 |
| LEE CO ALL HAZARDS PROTECTION DIST / 101 | Dependent District | Lee County Office of Management & Budget PO BOX 398 FORT MYERS FL 33902-0398 |
| LEE CO LIBRARY DIST / 052 | Dependent District | Lee County Office of Management & Budget PO BOX 398 FORT MYERS FL 33902-0398 |
| LEE CO UNINCORPORATED MSTU / 020 | Dependent District | Lee County Office of Management & Budget PO BOX 398 FORT MYERS FL 33902-0398 |
| LEHIGH ACRES STREET LIGHTING UNIT MSTU / 055 | Dependent District | LEE COUNTY MSTU / MSBU PO BOX 398 FORT MYERS FL 33902-0398 |
| LEE CO HYACINTH CONTROL DIST / 051 | Independent District | RUSSELL BAKER 15191 HOMESTEAD RD LEHIGH ACRES FL 33971 |
| LEE CO MOSQUITO CONTROL DIST / 053 | Independent District | RUSSELL BAKER 15191 HOMESTEAD RD LEHIGH ACRES FL 33971 |
| WEST COAST INLAND NAVIGATION DIST / 098 | Independent District | Justin D. McBride EXECUTIVE DIRECTOR 200 MIAMI AVE E VENICE FL 34285-2408 |
| PUBLIC SCHOOL - BY LOCAL BOARD / 012 | Public Schools | AMI DESAMOURS BUDGET DEPARTMENT 2855 COLONIAL BLVD FORT MYERS FL 33966 |
| PUBLIC SCHOOL - BY STATE LAW / 013 | Public Schools | AMI DESAMOURS BUDGET DEPARTMENT 2855 COLONIAL BLVD FORT MYERS FL 33966 |
| LEHIGH ACRES MUNICIPAL SERVICES IMPROVEMENT DIST / 350 | Special District | 601 EAST COUNTY LN LEHIGH ACRES, FL 33936 |
| SFWMD-DISTRICT-WIDE / 110 | Water District | MICHELLE QUIGLEY 3301 GUN CLUB RD WEST PALM BEACH, FL 33406 |
| SFWMD-EVERGLADES CONSTRUCTION PROJECT / 084 | Water District | MICHELLE QUIGLEY 3301 GUN CLUB RD WEST PALM BEACH, FL 33406 |
| SFWMD-OKEECHOBEE BASIN / 308 | Water District | MICHELLE QUIGLEY 3301 GUN CLUB RD WEST PALM BEACH, FL 33406 |

either upon the *Highest and Best Use* standard or the *Present Use* standard (*F.S. 193.011*) . For *Agriculturally Classified* parcels (or parts thereof), only agricultural uses are considered in the assessment (*F.S. 193.461 (6) (a)*). The difference between the *Highest and Best Use/Present Use* and the *Agricultural Use* is often referred to as the *Agricultural Exemption.*
(i.e. Market Assessed = Just - Agricultural Exemption)

The **Capped Assessed** value is the *Market Assessment* after any *Save Our Homes or 10% Assessment Limitation* cap is applied. This assessment cap is applied to all properties and limits year-to-year assessment increases to either the *Consumer Price Index* or 3%, whichever is lower for Homestead properties OR 10% for non-Homestead properties.

    /2019, 1:07 PM

Form SCNLTR - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

Serial# BA996DBF
esign.alamode.com/verify

# Record Detail – Page 3

Lee County Property Appraiser - Online Parcel Inquiry   https://www.leepa.org/Display/DisplayParcel.aspx?FolioID=10315610&...

The **Taxable** value is the *Capped Assessment* after exemptions (*Homestead, etc.*) are applied to it. This is the value that most taxing authorities use to calculate a parcel's taxes.
(i.e. Taxable = Capped Assessed - Exemptions)

## Sales / Transactions ⓘ

| Sale Price | Date | OR Number | Type | Description | Vacant/Improved |
|---|---|---|---|---|---|
| 222,000.00 | 01/18/2018 | 2018000023311 | 01 | **Sales qualified and included for sales ratio analysis** Transfers qualified as arm's length because of examination of the deed or other instrument transferring ownership of real property | I |
| 173,500.00 | 04/01/2016 | 2016000074289 | 01 | **Sales qualified and included for sales ratio analysis** Transfers qualified as arm's length because of examination of the deed or other instrument transferring ownership of real property | I |
| 102,700.00 | 09/24/2015 | 2015000217753 | 11 | **Sales disqualified as a result of examination of the deed** Corrective Deed, Quit Claim Deed, or Tax Deed; deed bearing Florida Documentary Stamp at the minimum rate prescribed under Chapter 201, F.S.; transfer of ownership in which no documentary stamps were paid | I |
| 125,000.00 | 08/04/2008 | 2008000213954 | 06 | **Sales qualified and included for sales ratio analysis** Qualified (Fair Market Value / Arms Length / One STRAP #) | I |
| 100.00 | 12/18/2007 | 2008000001709 | 03 | **Sales disqualified as a result of examination of the deed** Disqualified (Interest Sales / Court Docs / Government) | I |
| 300,600.00 | 06/07/2006 | 2006000235559 | 06 | **Sales qualified and included for sales ratio analysis** Qualified (Fair Market Value / Arms Length / One STRAP #) | I |
| 37,000.00 | 03/15/2005 | 4626/2742 | 08 | **Sales disqualified as a result of examination of the deed** Disqualified (Doc Stamps Greater than .70/SP Gr. than $100) | V |
| 100.00 | 11/12/2004 | 4646/3034 | 04 | **Sales disqualified as a result of examination of the deed** Disqualified (Multiple STRAP # - 01,03,04,07) | V |
| 100.00 | 10/08/2004 | 4494/2473 | 03 | **Sales disqualified as a result of examination of the deed** Disqualified (Interest Sales / Court Docs / Government) | V |
| 5,500.00 | 10/01/1983 | 1700/1493 | 07 | **Not Classified** No Longer Used (was Disqualified - Mail Order Sales) | V |

## Building/Construction Permit Data

| Permit Number | Permit Type | Date |
|---|---|---|
| RES2017-00973 | Pool & Spa | 03/07/2017 |
| POL2016-00349 | Pool & Spa | 06/08/2016 |
| RES2005-06403 | Building New Construction | 10/21/2005 |

**IMPORTANT INFORMATION: THIS MAY NOT BE A COMPREHENSIVE OR TIMELY LISTING OF PERMITS ISSUED FOR THIS PROPERTY.**

Note: The Lee County Property Appraiser's Office does not issue or maintain any permit information. The Building/Construction permit data displayed here represents only those records this Office may find necessary to conduct Property Appraiser business. Use of this information is with the understanding that in no way is this to be considered a comprehensive listing of permits for this or any other parcel.

The Date field represents the date the property appraiser received information regarding permit activity; it may or not represent the actual date of permit issuance or completion.

Full, accurate, active and valid permit information for parcels can only be obtained from the appropriate permit issuing agency.

## Parcel Numbering History ⓘ

| Prior STRAP | Prior Folio ID | Renumber Reason | Renumber Date |
|---|---|---|---|
| 20-44-26-06-00035.0200 | 10315607 | Split (From another Parcel) | |

## Location Information

| Township | Range | Section | Block | Lot |
|---|---|---|---|---|
| 44 | 26E | 20 | 00035 | 0230 |

| Municipality | Latitude | | Longitude | |
|---|---|---|---|---|
| Lee County Unincorporated - 0 | 26.62841 | | -81.73141 | |

### Links

View Recorded Plat at LeeClerk.org

| View Parcel on Google Maps | Use the above link to do an Official Records search on the Lee County Clerk of Courts website, using 26 and 33 for the book and page numbers. | View Parcel on GeoView |
|---|---|---|

/2019, 1:07 PM

Form SCNLTR - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

Serial# BA996DBF
esign.alamode.com/verify

# Record Detail – Page 4

Lee County Property Appraiser - Online Parcel Inquiry          https://www.leepa.org/Display/DisplayParcel.aspx?FolioID=10315610&...

## Solid Waste (Garbage) Roll Data

| Solid Waste District | Roll Type | Category | Unit / Area | Tax Amount |
|---|---|---|---|---|
| 004 - Service Area 4 | R - Residential Category | | 1 | 226.98 |

### Collection Days

| Garbage | Recycling | Horticulture |
|---|---|---|
| Thursday | Thursday | Thursday |

## Flood and Storm Information

| | Flood Insurance | Find my flood zone | | | | |
|---|---|---|---|---|---|---|
| Community | Panel | Version | Date | Storm Surge Zone | | Evacuation Zone |
| 125124 | 0313 | F | 8/28/2008 | E | | D |

## Appraisal Details (2018 Tax Roll)

### Land

#### Land Tracts

| Use Code | Use Code Description | Number of Units | Unit of Measure |
|---|---|---|---|
| 100 | Single Family Residential | 1.00 | Lot |

#### Land Features

| Description | Year Added | Units |
|---|---|---|
| IRRIGATION SYSTEM LAWN | 2006 | 1 |

### Buildings

#### Building 1 of 1

#### Building Characteristics

| Improvement Type | Model Type | Stories | Living Units |
|---|---|---|---|
| 102 – Ranch | 1 - single family residential | 1.0 | 1 |

| Bedrooms | Bathrooms | Year Built | Effective Year Built |
|---|---|---|---|
| 3 | 2.0 | 2006 | 2008 |

#### Building Subareas

| Description | Heated / Under Air | Area (Sq Ft) |
|---|---|---|
| BAS – BASE | Y | 1,883 |
| FGR – FINISHED GARAGE | N | 413 |
| FOP – FINISHED OPEN PORCH | N | 66 |
| FOP – FINISHED OPEN PORCH | N | 297 |
| FSP – FINISHED SCREEN PORCH | N | 157 |
| PS1 - 1 STORY SCREEN ENCL | N | 623 |

#### Building Features

| Description | Year Added | Units |
|---|---|---|
| POOL - RESIDENTIAL | 2017 | 288 |
| PATIO - CONCRETE | 2017 | 335 |

| Building Front Photo | Building Footprint |
|---|---|

Serial# BA996DBF
esign.alamode.com/verify

Form SCNLTR - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

## Record Detail – Page 5

Lee County Property Appraiser - Online Parcel Inquiry     https://www.leepa.org/Display/DisplayParcel.aspx?FolioID=10315610&...



**Photo Date: February of 2018**

### Appraisal Details (Current Working Values)

#### Land
#### Land Tracts

| Use Code | Use Code Description | Number of Units | Unit of Measure |
|---|---|---|---|
| 100 | Single Family Residential | 1.00 | Lot |

#### Land Features

| Description | Year Added | Units |
|---|---|---|
| IRRIGATION SYSTEM LAWN | 2006 | 1 |

#### Buildings
#### Building 1 of 1
#### Building Characteristics

| Improvement Type | Model Type | Stories | Living Units |
|---|---|---|---|
| 102 - Ranch | 1 - single family residential | 1.0 | 1 |

| Bedrooms | Bathrooms | Year Built | Effective Year Built |
|---|---|---|---|
| 3 | 2.0 | 2006 | 2008 |

#### Building Subareas

| Description | Heated / Under Air | Area (Sq Ft) |
|---|---|---|
| BAS – BASE | Y | 1,883 |
| FGR - FINISHED GARAGE | N | 413 |
| FOP - FINISHED OPEN PORCH | N | 66 |
| FOP - FINISHED OPEN PORCH | N | 297 |
| FSP - FINISHED SCREEN PORCH | N | 157 |
| PS1 - 1 STORY SCREEN ENCL | N | 623 |

#### Building Features

| Description | Year Added | Units |
|---|---|---|
| POOL - RESIDENTIAL | 2017 | 288 |
| PATIO - CONCRETE | 2017 | 335 |

**Building Front Photo**       **Building Footprint**

/2019, 1:07 PM

Serial# BA996DBF
esign.alamode.com/verify

Form SCNLTR - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

## Record Detail – Page 6

Lee County Property Appraiser - Online Parcel Inquiry                    https://www.leepa.org/Display/DisplayParcel.aspx?FolioID=10315610&...



Photo Date: February of 2018

Serial# BA996DBF
esign.alamode.com/verify

/2019, 1:07 PM

Form SCNLTR - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

## 2015 Cert Of Title

INSTR # 2015000217753, Doc Type CT, Pages 1, Recorded 10/07/2015 at 01:14 PM,
Linda Doggett, Lee County Clerk of Circuit Court, Deed Doc. D $718.90 Deputy
Clerk WMILLER



$102,700.00
$718.90

IN THE CIRCUIT/COUNTY COURT FOR THE TWENTIETH JUDICIAL CIRCUIT IN AND FOR
LEE COUNTY, FLORIDA                                      CIVIL ACTION

FIFTH THIRD MORTGAGE COMPANY
    Plaintiff
    vs
FELDKAMP, ANDREW W, AKA FELDKAMP, ANDREW ET AL
    Defendant

Case No. **12-CA-055751**

### CERTIFICATE OF TITLE

The undersigned clerk of the court certifies that he or she executed and filed a certificate of sale in
this action on September 24, 2015 for the property described herein and that no objections to the sale
have been filed within the time allowed for filing objections.

The following real property in Lee County, Florida:

LOT 23, BLOCK 35, UNIT 6, LEHIGH ACRES, SECTION 20, TOWNSHIP
44 SOUTH, RANGE 26 EAST, ACCORDING TO THE MAP OR PLAT
THEREOF AS RECORDED IN PLAT BOOK 26, PAGE 33, OF THE

PUBLIC RECORDS OF LEE COUNTY, FLORIDA

Property address: 5237 BUTTE STREET LEHIGH ACRES, FL 33971.

Was sold to:   BRANDON G GOEKE
Whose address is:  1413 NE 1ST Ave
                   Cape Coral, FL 33909

OCT 0 6 2015

WITNESS my hand and the seal of the court on _____

LINDA DOGGETT, Clerk of Court

Copies furnished to all parties
LINDA DOGGETT, Clerk of Court

By:

Serial# BA996DBF
esign.alamode.com/verify

# Current MLS Listing – Page 1

Matrix     https://matrix.swflamls.com/Matrix/Printing/PrintOptions.aspx?c=AA...



**Sam Schackow**
Chapman & Associates Inc
samsschack@yahoo.com
Ph: (941) 356-2430

## Residential REALTOR Report with Photos



### General Information

| | | | |
|---|---|---|---|
| List Price: | $234,900 | ML# | 217064299 |
| MLS#: | 217064299 | Sold Price: | $222,000 |
| Address: | 5237 BUTTE ST | Status: | Sold (01/19/18) |
| | LEHIGH ACRES, FL 33971 | | |
| GEO Area: | LA05 - West Lehigh Acres | Property Class: | Residential |
| County: | Lee | Subdivision: | NOT APPLICABLE |
| Status Type: | Resale Property | Development: | NOT APPLICABLE |
| Sold Price/Sqft: | $117.90 | DOM: | 16 |
| Property ID: | 20-44-26-06-00035.0230 | CDOM: | 79 |
| Furnished: | Unfurnished | | |
| Approx. Living Area: | 1883 - Property Appraiser Office | Bedrooms: | 3 Bed |
| Approx.Total Area: | 2816 - Property Appraiser Office | Baths: | 2 (2 0) |
| Building Design: | Single Family | Year Built: | 2006 |
| Virtual Tour URL: | http://www.qualityvirtualtours.com/frame/slideshow?key=WXdbNC&autoStart=1&captions=0&navigation=0&playButton=0&randomize=0&speed=3&transition=fade&transitionSpeed=2 | | |
| Listing Broker: | Premiere Plus Realty Co | | |

### Detailed Property Information
ML# 217064299

**Property Information:** SHOWINGS ARE STILL WELCOME- Kick-out clause for financing. Don't miss this beautiful pool home in a quiet neighborhood that is sure to sell fast at this price! Brand new salt water pool and screen lanai was just completed spring of 2017. This spacious home with open floor plan offers granite counter tops with stainless steel appliances in kitchen. Spacious laundry room, lots of windows and two bedrooms have sliding doors to enjoy the lush landscaping and canal views from lanai. New water system, security system and more. Perfect for a year round family or a second home to relax and enjoy beautiful SW Florida. This home was completely renovated in 2015. Built in 2006 but looks new. Centrally located with easy access to I 75, nearby restaurants and shopping.

| | | | |
|---|---|---|---|
| Ownership: | Single Family | Pets: | No Approval Needed |
| Lot Size: | .23 (acres) / 9,980 (sqft) - Property Appraiser Office | Pets - Max. Weight: | |
| Cable: | Yes | Pets - Max. Number: | |
| | | Pets - Breed Limits: | |
| | | Pets - Other Limits: | |
| Guest House L.A.: | | Approx. Lot Size: | 0x0x0x0 - Property Appraiser Office |
| Guest House Desc: | | Gulf Access Type: | |
| Elementary School: | SCHOOL CHOICE | Windows: | Single Hung |
| Middle School: | OPEN ENROLLMENT | Exterior Finish: | Stucco |
| High School: | OPEN ENROLLMENT | Community Type: | No Subdivision |
| Flooring: | Carpet, Tile | Golf Type: | |
| Cooling: | Ceiling Fans, Central Electric | Floor Plan Type: | Split Bedrooms |
| Kitchen: | | Heating: | Central Electric |
| View: | Canal | Gas YN: | |
| Private Pool: | Yes/Below Ground, Salt Water System | Gas Description: | |
| Private Spa: | No | | |
| Amenities: | None | | |
| Bedroom: | Split Bedrooms | | |
| Dining: | Breakfast Bar, Dining - Living | | |
| Equipment: | Auto Garage Door, Cooktop, Dishwasher, Dryer, Microwave, Range, Refrigerator, Smoke Detector, Washer, Water Treatment Owned | | |
| Exterior Features: | Fruit Trees, Patio, Sprinkler Auto | | |
| Interior Features: | Cable Prewire, Smoke Detectors, Walk-In Closet | | |
| Master Bath: | Separate Tub And Shower | | |
| Additional Rooms: | Laundry in Residence, Screened Lanai/Porch | | |
| Parking: | Driveway Paved | | |
| Road: | Paved Road | | |
| Restrictions: | None | | |
| Security: | None | | |
| Storm Protection: | Shutters - Manual | | |

### Unit/Bldg.Information
ML# 217064299

| | | | | | |
|---|---|---|---|---|---|
| Building #: | | Units in Complex: | 0 | Builder Product: | No |
| Total Floors in Property: | 1 | Building Style: | 1 Story/Ranch | | |
| Total Building Floors: | 1 | Construction | Concrete Block | | |
| Unit Floor: | | Roof: | Shingle | | |
| Units in Building: | 1 | Elevator: | None | | |
| Garage: | Attached | Carport: | | | |
| # Garage Spaces: | 2 | # Carport Spaces: | 0 | | |

### Lot Information
ML# 217064299

| | | | |
|---|---|---|---|
| Waterfront: | Yes | Waterfront Descrip.: | Canal |
| Gulf Access: | No | Boat/Dock Info: | None |
| Canal Width: | Canal Width 1-80 | Water: | Well |
| Rear Exposure: | S | Sewer: | Septic |
| Sec/Town/Rng: | 20/44/26 | Irrigation: | Well |
| Legal Unit: | 1 | Lot Description: | See Remarks |
| Subdivision #: | 06 | Lot: | 23 |
| Zoning: | RS-1 | Block/Bldg: | 35 |
| Legal Desc: | LEHIGH ACRES UNIT 6 BLK 35 PB 26 PG 33 LOT 23 | | |

### Room Information
ML# 217064299

| Room Type | Room Dimensions | Room Type | Room Dimensions | Room Type | Room Dimensions | Room Type | Room Dimensions |
|---|---|---|---|---|---|---|---|

### Financial/Transaction Information
ML# 217064299

| | | | |
|---|---|---|---|
| Total Tax Bill: | $2,303 | HOA Description: | |
| Tax Year: | 2016 | Association Mngmt Phone: | |
| Tax Desc: | Homestead | Recurring Fees: | |
| Tax District Type: | Municipal Service Tax Development | HOA Fee: | $0 |
| Terms: | Buyer Finance/Cash, FHA, Seller Pays Title, VA | Master HOA Fee: | $0 |
| Possession: | At Closing | Condo Fee: | $0 |
| Approval: | None | | |

Serial# BA996DBF
esign.alamode.com/verify

Form SCNLTR - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

## Current MLS Listing – Page 2

| | | | |
|---|---|---|---|
| **Management:** | None | **Spec Assessment:** | $0 |
| **Maintenance:** | None | **Other Fee:** | $0 |
| **Special Info:** | Seller Disclosure Available | **Land Lease:** | $0 |
| **Num of Leases/Yr:** | | **Annual Food & Beverage** | |
| **Min. Days Of Lease:** | | **Minimum:** | |
| **Subject to FIRPTA:** | No | **Mandatory Club Fee:** | $0 |
| **Subject To Lease YN:** | | **Rec. Lease Fee:** | $0 |
| **Lease Description:** | | | |
| **Lease Expiration Date:** | | **Total Annual Recurring Fees:** | $0 |

**One Time Fees**
| | |
|---|---|
| **Mandatory Club Fee:** | $0 |
| **Land Lease:** | $0 |
| **Rec. Lease Fee:** | $0 |
| **Other Fee:** | $0 |
| **Spec Assessment:** | $0 |
| **Transfer Fee:** | $0 |
| **Application Fee:** | $0 |
| **Total One Time Fees:** | $0 |

### Office Information
ML# 217064299

| | | | |
|---|---|---|---|
| **Office Code:** | PREP | **Agent ID:** | B3239152 |
| **Office Name:** | Premiere Plus Realty Co | **Agent Name:** | Jennifer Springer Rinden |
| **Office Address:** | 3409 Pelican Landing Parkway | **Agent Phone:** | (920) 540-6822 |
| | Bonita Springs FL, 34134 | **Agent Fax:** | |
| **Office Ph:** | (239) 206-2777 | **Agent Email:** | jennifer@orchidrealtygroup.com |
| **Office Fax:** | (239) 732-8217 | | |
| **Board:** | Bonita Springs | | |

| | | | |
|---|---|---|---|
| **Co-List Office Code:** | FPRP | **Co-List Agent ID:** | 3278551 |
| **Co-List Office Name:** | Premiere Plus Realty Company | **Co-List Agent Name:** | Keri Abed |
| | | **Co-List Agent Phone:** | (612) 385-2725 |
| | | **Co-List Agent Fax:** | |
| | | **Co-List Agent Email:** | keriabed@gmail.com |

### Settlement Agent Information
| | | | |
|---|---|---|---|
| **Name:** | TITLE & ABSTRACT AGENCY OF AMERICA | **Phone:** | 239-275-2144 |
| **Address:** | 5237 SUMMERLIN COMMONS BLVD | **Email:** | |

### Listing Information
ML# 217064299

| | | | |
|---|---|---|---|
| **Owner Name:** | Richard Weil | | |
| **Bonus Amount:** | | **Appointment Req.:** | Yes |
| **Bonus Amount Description:** | | **Appointment Phone:** | 612-385-2725 |
| **Auction:** | No | | |
| **Foreclosed (REO):** | No | **Variable Rate Comm.:** | No |
| **Potential Short Sale:** | No | **Target Marketing:** | No |
| **Short Sale Comp:** | | **Listing on Internet:** | Yes |
| **Buyer Agent Comp:** | 2.5% | **Address on Internet:** | Yes |
| **Trans Broker Comp:** | 2.5% | **Blogging:** | No |
| **Non-Rep Comp:** | 0% | **AVM:** | No |
| **Joint Agency:** | No | | |
| **Listing Date:** | 11/01/17 | **Contract Closing Date** | 01/19/2018 |
| **Date Expiration:** | | | |
| **Source Of Measurements:** | Property Appraiser Office | | |
| **Internet Sites:** | Broker Reciprocity, Homes.com, ListHub, NaplesArea.com, Realtor.com, Zillow Group | | |
| **Showing Inst.:** | Call Listing Agent, No Sign On Property, Owner Occupied, Pet On Premises, Short Notice OK | | |
| **Listing Type:** | Exclusive Right to Sell | | |
| **Is there a sign on the property with Seller contact information:** | | No | |
| **Contact Seller for showing:** | | No | |
| **Listing Broker available on contract presentation and negotiations:** | | Yes | |
| **Listing Broker will perform post contract services:** | | Yes | |
| **Limited Service Listing:** | | No | |

### Confidential Information
ML# 217064299

NOTE- Potted Plants and ground ORCHIDS do not convey- seller taking with. Plenty of plants left! Owner Occupied with small pet. Appreciate 24 hour showing requests but short notice will be considered. Please direct all inquiries to Colisting agent, Keri Abed. 612-385-2725

### Driving Directions
ML# 217064299

From Colonial left on SR 82,right on Buckingham Rd, right onto Carl Ave, right onto Butte Street

### Sold Information
ML# 217064299

| | | | |
|---|---|---|---|
| **Selling Agent:** | Tricia Williams | **Selling Agent Phone:** | 239-738-0581 |
| **Selling Office:** | Homes and Land Brokers Inc | **Selling Office Phone:** | 239-598-9200 |
| **Seller Info On Sign:** | No | **Sell $ Per Sqft:** | $117.90 |
| **Sold Financing Type:** | FHA | **Seller Concession Y:** | No |




Form SCNLTR - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

Serial# BA996DBF
esign.alamode.com/verify

## Current MLS Listing – Page 3



Serial# BA996DBF
esign.alamode.com/verify

## Current MLS Listing – Page 4

 

**Video and/or audio surveillance with recording capability may be in use on these premises. Conversations should not be considered private.**

The source of the foregoing property information is a database compilation of an organization that is a member of the Southwest Florida Multiple Listing Service. Each Southwest Florida Multiple Listing Service member organization owns the copyright rights in its respective proprietary database compilation, and reserves all such rights. Copyright © 2019. The foregoing information including, but not limited to, any information about the size or area of lots, structures, or living space, such as room dimensions, square footage calculations, or acreage is believed to be accurate, but is not warranted or guaranteed. This information should be independently verified before any person enters into a transaction based upon it.

Form SCNLTR - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

Serial# BA996DBF
esign.alamode.com/verify

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/19/19 Page 67 of 319
Case 4:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 05/13/2019 Page 852 of 989

License



RICK SCOTT, GOVERNOR                    JONATHAN ZACHEM, SECRETARY



## STATE OF FLORIDA
## DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION

### FLORIDA REAL ESTATE APPRAISAL BD

THE CERTIFIED RESIDENTIAL APPRAISER HEREIN IS CERTIFIED UNDER THE
PROVISIONS OF CHAPTER 475, FLORIDA STATUTES

## WILSON, SARAH DENISE

9409 IVY BROOK RUN 1305
FORT MYERS              FL 33913

LICENSE NUMBER: RD7689

**EXPIRATION DATE: NOVEMBER 30, 2020**

Always verify licenses online at MyFloridaLicense.com



Do not alter this document in any form.

This is your license. It is unlawful for anyone other than the licensee to use this document.

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/19/19 Page 68 of 318
Case 1:11-cv-22408-MGC Document 279-8 Entered on FLSD Docket 05/13/2019 Page 853 of 989

E&O Insurance – Page 1

## NAVIGATORS INSURANCE COMPANY

### THIS IS A CLAIMS MADE INSURANCE POLICY.

THIS POLICY APPLIES ONLY TO THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD. ALL CLAIMS MUST BE REPORTED IN WRITING TO THE COMPANY DURING THE POLICY PERIOD OR WITHIN 60 DAYS AFTER THE END OF THE POLICY PERIOD.

### PLEASE READ THIS POLICY CAREFULLY.

## REAL ESTATE PROFESSIONAL ERRORS AND OMISSIONS INSURANCE POLICY DECLARATIONS

POLICY NUMBER: PH17RELM01679IV     RENEWAL OF: PH16RELM01679IV

1. **NAMED INSURED:**
   Valucentric LLC

2. **ADDRESS:**
   1003 Mt Hermon rd Ste 201
   Salisbury, MD 21804

3. **POLICY PERIOD:** FROM: 09/19/2017     TO: 09/19/2018
   12:01 A.M. Standard Time at the address of the **Named Insured** as stated in Number 2 above.

4. **LIMITS OF LIABILITY:**      $ 1,000,000          **Per Claim**

                                 $ 2,000,000          **Annual Aggregate**

5. **DEDUCTIBLE:**   $ 10,000

6. **PREMIUM:** $ 19,304.00
   **TAXES:**    $                    $

7. **RETROACTIVE DATE:** 08/14/2014

NAV REL DEC (02 14)              Page 1 of 2

**Navigators**
Insuring A World In Motion®

Serial# BA996DBF
esign.alamode.com/verify

## E&O Insurance – Page 2

**8.** **FORMS ATTACHED:**

| | |
|---|---|
| NAV REL DEC | Real Estate Professionals Declarations |
| NAV REL NIC PF | Real Estate Professionals Policy |
| NAV REL 025 | Claims Expenses Inside the Limits of Liability |
| NAV REL 027 | Specified Entity Coverage |
| NAV REL 300 MD | Maryland Amendatory |
| MD PREM NOTICE | Notice to Applicants in Maryland Regarding Cancellation and Premium Recalculation |
| NAV-ML-002 | OFAC Endorsement |

**PROGRAM ADMINISTRATOR:**



**McGowan Program Administrators**
**(A Division of McGowan & Company, Inc.)**
**20595 Lorain Road, Suite 300**
**Fairview Park, OH 44126**
**(440) 333-6300**

By Acceptance of this policy the Insured agrees that the statements in the Declarations and the Application and any attachments hereto are the Insured's agreements and representations and that this policy embodies all agreements existing between the Insured and the Company or any of its representatives relating to this insurance.

**IN WITNESS WHEREOF, we have caused this policy to be signed by our President and Secretary.**

[Emily Miner]
Secretary

[Stanley A. Galanski]
President

NAV REL DEC (02 14)                    Page 2 of 2



*Insuring A World In Motion®*

Serial# BA996DBF
esign.alamode.com/verify

VALU-18-12-1462
File No. VALU-18-12-1462

## UNIFORM APPRAISAL DATASET (UAD) DEFINITIONS ADDENDUM
### (Source: Fannie Mae UAD Appendix D: UAD Field-Specific Standardization Requirements)

Condition Ratings and Definitions

C1

The improvements have been recently constructed and have not been previously occupied. The entire structure and all components are new and the dwelling features no physical depreciation.

Note: Newly constructed improvements that feature recycled or previously used materials and/or components can be considered new dwellings provided that the dwelling is placed on a 100 percent new foundation and the recycled materials and the recycled components have been rehabilitated/remanufactured into like-new condition. Improvements that have not been previously occupied are not considered "new" if they have any significant physical depreciation (that is, newly constructed dwellings that have been vacant for an extended period of time without adequate maintenance or upkeep).

C2

The improvements feature no deferred maintenance, little or no physical depreciation, and require no repairs. Virtually all building components are new or have been recently repaired, refinished, or rehabilitated. All outdated components and finishes have been updated and/or replaced with components that meet current standards. Dwellings in this category are either almost new or have been recently completely renovated and are similar in condition to new construction.

Note: The improvements represent a relatively new property that is well maintained with no deferred maintenance and little or no physical depreciation, or an older property that has been recently completely renovated.

C3

The improvements are well maintained and feature limited physical depreciation due to normal wear and tear. Some components, but not every major building component, may be updated or recently rehabilitated. The structure has been well maintained.

Note: The improvement is in its first-cycle of replacing short-lived building components (appliances, floor coverings, HVAC, etc.) and is being well maintained. Its estimated effective age is less than its actual age. It also may reflect a property in which the majority of short-lived building components have been replaced but not to the level of a complete renovation.

C4

The improvements feature some minor deferred maintenance and physical deterioration due to normal wear and tear. The dwelling has been adequately maintained and requires only minimal repairs to building components/mechanical systems and cosmetic repairs. All major building components have been adequately maintained and are functionally adequate.

Note: The estimated effective age may be close to or equal to its actual age. It reflects a property in which some of the short-lived building components have been replaced, and some short-lived building components are at or near the end of their physical life expectancy; however, they still function adequately. Most minor repairs have been addressed on an ongoing basis resulting in an adequately maintained property.

C5

The improvements feature obvious deferred maintenance and are in need of some significant repairs. Some building components need repairs, rehabilitation, or updating. The functional utility and overall livability is somewhat diminished due to condition, but the dwelling remains useable and functional as a residence.

Note: Some significant repairs are needed to the improvements due to the lack of adequate maintenance. It reflects a property in which many of its short-lived building components are at the end of or have exceeded their physical life expectancy but remain functional.

C6

The improvements have substantial damage or deferred maintenance with deficiencies or defects that are severe enough to affect the safety, soundness, or structural integrity of the improvements. The improvements are in need of substantial repairs and rehabilitation, including many or most major components.

Note: Substantial repairs are needed to the improvements due to the lack of adequate maintenance or property damage. It reflects a property with conditions severe enough to affect the safety, soundness, or structural integrity of the improvements.

Quality Ratings and Definitions

Q1

Dwellings with this quality rating are usually unique structures that are individually designed by an architect for a specified user. Such residences typically are constructed from detailed architectural plans and specifications and feature an exceptionally high level of workmanship and exceptionally high-grade materials throughout the interior and exterior of the structure. The design features exceptionally high-quality exterior refinements and ornamentation, and exceptionally high-quality interior refinements. The workmanship, materials, and finishes throughout the dwelling are of exceptionally high quality.

Q2

Dwellings with this quality rating are often custom designed for construction on an individual property owner's site. However, dwellings in this quality grade are also found in high-quality tract developments featuring residence constructed from individual plans or from highly modified or upgraded plans. The design features detailed, high quality exterior ornamentation, high-quality interior refinements, and detail. The workmanship, materials, and finishes throughout the dwelling are generally of high or very high quality.

Serial# BA996DBF
esign.alamode.com/verify

## UNIFORM APPRAISAL DATASET (UAD) DEFINITIONS ADDENDUM
(Source: Fannie Mae UAD Appendix D: UAD Field-Specific Standardization Requirements)

Quality Ratings and Definitions (continued)

Q3

Dwellings with this quality rating are residences of higher quality built from individual or readily available designer plans in above-standard residential tract developments or on an individual property owner's site. The design includes significant exterior ornamentation and interiors that are well finished. The workmanship exceeds acceptable standards and many materials and finishes throughout the dwelling have been upgraded from "stock" standards.

Q4

Dwellings with this quality rating meet or exceed the requirements of applicable building codes. Standard or modified standard building plans are utilized and the design includes adequate fenestration and some exterior ornamentation and interior refinements. Materials, workmanship, finish, and equipment are of stock or builder grade and may feature some upgrades.

Q5

Dwellings with this quality rating feature economy of construction and basic functionality as main considerations. Such dwellings feature a plain design using readily available or basic floor plans featuring minimal fenestration and basic finishes with minimal exterior ornamentation and limited interior detail. These dwellings meet minimum building codes and are constructed with inexpensive, stock materials with limited refinements and upgrades.

Q6

Dwellings with this quality rating are of basic quality and lower cost; some may not be suitable for year-round occupancy. Such dwellings are often built with simple plans or without plans, often utilizing the lowest quality building materials. Such dwellings are often built or expanded by persons who are professionally unskilled or possess only minimal construction skills. Electrical, plumbing, and other mechanical systems and equipment may be minimal or non-existent. Older dwellings may feature one or more substandard or non-conforming additions to the original structure

Definitions of Not Updated, Updated, and Remodeled

Not Updated

Little or no updating or modernization. This description includes, but is not limited to, new homes.

Residential properties of fifteen years of age or less often reflect an original condition with no updating, if no major components have been replaced or updated. Those over fifteen years of age are also considered not updated if the appliances, fixtures, and finishes are predominantly dated. An area that is 'Not Updated' may still be well maintained and fully functional, and this rating does not necessarily imply deferred maintenance or physical/functional deterioration.

Updated

The area of the home has been modified to meet current market expectations. These modifications are limited in terms of both scope and cost.

An updated area of the home should have an improved look and feel, or functional utility. Changes that constitute updates include refurbishment and/or replacing components to meet existing market expectations. Updates do not include significant alterations to the existing structure.

Remodeled

Significant finish and/or structural changes have been made that increase utility and appeal through complete replacement and/or expansion.

A remodeled area reflects fundamental changes that include multiple alterations. These alterations may include some or all of the following: replacement of a major component (cabinet(s), bathtub, or bathroom tile), relocation of plumbing/gas fixtures/appliances, significant structural alterations (relocating walls, and/or the addition of) square footage). This would include a complete gutting and rebuild.

Explanation of Bathroom Count

Three-quarter baths are counted as a full bath in all cases.  Quarter baths (baths that feature only a toilet) are not included in the bathroom count.  The number of full and half baths is reported by separating the two values using a period, where the full bath count is represented to the left of the period and the half bath count is represented to the right of the period.

Example:
3.2 indicates three full baths and two half baths.

Serial# BA996DBF
esign.alamode.com/verify

# UNIFORM APPRAISAL DATASET (UAD) DEFINITIONS ADDENDUM
### (Source: Fannie Mae UAD Appendix D: UAD Field-Specific Standardization Requirements)

Abbreviations Used in Data Standardization Text

| Abbreviation | Full Name | Fields Where This Abbreviation May Appear |
|---|---|---|
| ac | Acres | Area, Site |
| AdjPrk | Adjacent to Park | Location |
| AdjPwr | Adjacent to Power Lines | Location |
| A | Adverse | Location & View |
| ArmLth | Arms Length Sale | Sale or Financing Concessions |
| ba | Bathroom(s) | Basement & Finished Rooms Below Grade |
| br | Bedroom | Basement & Finished Rooms Below Grade |
| B | Beneficial | Location & View |
| Cash | Cash | Sale or Financing Concessions |
| CtySky | City View Skyline View | View |
| CtyStr | City Street View | View |
| Comm | Commercial Influence | Location |
| c | Contracted Date | Date of Sale/Time |
| Conv | Conventional | Sale or Financing Concessions |
| CrtOrd | Court Ordered Sale | Sale or Financing Concessions |
| DOM | Days On Market | Data Sources |
| e | Expiration Date | Date of Sale/Time |
| Estate | Estate Sale | Sale or Financing Concessions |
| FHA | Federal Housing Authority | Sale or Financing Concessions |
| GlfCse | Golf Course | Location |
| Glfvw | Golf Course View | View |
| Ind | Industrial | Location & View |
| in | Interior Only Stairs | Basement & Finished Rooms Below Grade |
| Lndfl | Landfill | Location |
| LtdSght | Limited Sight | View |
| Listing | Listing | Sale or Financing Concessions |
| Mtn | Mountain View | View |
| N | Neutral | Location & View |
| NonArm | Non-Arms Length Sale | Sale or Financing Concessions |
| BsyRd | Busy Road | Location |
| o | Other | Basement & Finished Rooms Below Grade |
| Prk | Park View | View |
| Pstrl | Pastoral View | View |
| PwrLn | Power Lines | View |
| PubTrn | Public Transportation | Location |
| rr | Recreational (Rec) Room | Basement & Finished Rooms Below Grade |
| Relo | Relocation Sale | Sale or Financing Concessions |
| REO | REO Sale | Sale or Financing Concessions |
| Res | Residential | Location & View |
| RH | USDA - Rural Housing | Sale or Financing Concessions |
| s | Settlement Date | Date of Sale/Time |
| Short | Short Sale | Sale or Financing Concessions |
| sf | Square Feet | Area, Site, Basement |
| sqm | Square Meters | Area, Site |
| Unk | Unknown | Date of Sale/Time |
| VA | Veterans Administration | Sale or Financing Concessions |
| w | Withdrawn Date | Date of Sale/Time |
| wo | Walk Out Basement | Basement & Finished Rooms Below Grade |
| wu | Walk Up Basement | Basement & Finished Rooms Below Grade |
| WtrFr | Water Frontage | Location |
| Wtr | Water View | View |
| Woods | Woods View | View |

Other Appraiser-Defined Abbreviations

| Abbreviation | Full Name | Fields Where This Abbreviation May Appear |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

# Anthony M. Graziano, MAI, CRE

**Integra Realty Resources**
Miami/Palm Beach

Dadeland Centre
9155 S. Dadeland Boulevard
Suite 1208
Miami, FL 33156

T 305.670.0001
F 305.670.2276

irr.com

## Experience

Senior Managing Director of Integra Realty Resources – Miami/Palm Beach.

Mr. Graziano has actively counseled and advised clients on the sale, leasing, valuation, management, and development of commercial real estate assets throughout the northeast and southeast U.S. since 1992.

Mr. Graziano's professional perspective is a blend of his experience and educational background which includes formal training in architecture, urban planning, macro and micro economics, real estate finance, institutional asset management, and land development. His market experience in sales, leasing, management, and valuation disciplines combine to bring practical real world answers to complex planning and development projects. He has been actively involved as a consultant and/or member of a consultant team on various major redevelopment and land use projects for public and private clients over the past 25+ years.

Mr. Graziano has specialized in consulting and valuation assignments for corporate and private clients on a wide array of complex issues related to estate and condemnation matters, title defects, environmental contamination/damages, air rights, partial and fractional interests, contract disputes, and mediation/arbitration disputes. Mr. Graziano's experience in these matters provides a comprehensive framework for effective strategic real estate consulting.

## Professional Activities & Affiliations

Advisory Board Member: Urban Land Institute (ULI) South Florida / Caribbean
Advisory Board Member: University of Miami M+RED Program
Member: Economic Roundtable - Miami Beacon Council (2012-present)
Board of Director: Integra Realty Resources, Inc. (2011-2016)
Chairman of the Board:    Integra Realty Resources, Inc. (2016-present)
Director: South Florida Chapter of the Appraisal Institute (2014-2016)
Board Member: Builders Association of South Florida (BASF) (2014-2016)
Subject Matter Expert (SME): Appraisal Practice Board, Appraisal Foundation
Member: Appraisal Institute (MAI) (2008-Present)
Member: Counselors of Real Estate (CRE) (2007-Present)
National Association of Realtors (REALTOR)
Miami Association of REALTORS Industry Analyst of the Year (2016)
Former Fellow: Royal Institute of Chartered Surveyors (FRICS) (2007-2014)
AI Leadership Development Advisory Council, March 1998 - February 2001
Lifetime Member: National Eagle Scout Association (NESA)

## Licenses

Florida, State-Certified General Real Estate Appraiser, RZ3510
New Jersey, State-Certified General Real Estate Appraiser, RG001261

## Education

University of Miami, Coral Gables, Florida 1988-1992
Degree: Bachelor of Science in Land Development and Planning, School of Architecture

New York University Real Estate Institute, New York, New York 1993-1996
Degree: Master of Science in Real Estate Development and Investment

amgraziano@irr.com    -    305.670.0001 x320



# Anthony M. Graziano, MAI, CRE

Integra Realty Resources
Miami/Palm Beach

The Douglas Centre
2600 Douglas Road, Suite 801
Coral Gables, FL 33134

T 305.670.0001
F 305.670.2276

irr.com

## Qualified Before Courts & Administrative Bodies

Qualified and accepted as an expert before:
US Bankruptcy Court (Newark, Southern District of Texas, Southern District of Florida)
US Federal District Court (Southern District of Florida)
FL Circuit Court (Miami-Dade, Broward, and Monroe Counties)
NJ State Tax Court
NJ Superior Court - Chancery Division
NJ Superior Court - Law Division
Various municipal planning and zoning boards throughout New Jersey and Florida
Various Taxing Authorities and Boards throughout New Jersey and Florida



amgraziano@irr.com    -    305.670.0001 x320



**Anthony M. Graziano, MAI, CRE, FRICS**
IDENTIFIED EXPERT WITNESS TESTIMONY AT DEPOSITION and/or TRIAL

| RETENTION DATE | ON BEHALF | IRR FILE # | COURT CASE NO. | COURT / VENUE | CASE NAME | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|
| 6/2015 | Plaintiff | 123-2015-0170 | 15-008930-CA-01 | 11th Judicial Circuit Dade County, Florida (Hon. Peter R. Lopez) | Aaron Stauber & Aviva Stauber V. BH 93, LLC | Piedra & Associates, P.A. | Motion to dismiss Lis Pendens in an action to enforce contractual specific perfomance clause. |
| 1/2015 | Defendant | 123-2015-0037 | 14-CV-22384 UU | Southern District of Florida | Ray Benson & Maria Helena Campos V. QBE Insurance Corporation | John Camps | Retrospective (2004-2006) analysis of market value claims against insurance company related to property damage claims arising from Hurricane Willma |
| 1/2014 | Plaintiff | 123-2015-0031 | Pending | Miami-Dade County | Igor Ger V. Yacht Club at Portofino Condo Association | Weil Quaranta McGovern, P.A. | Construction defect dispute related to water-intrusion and damage-detrimental conditions analysis of |
| 10/2014 | Plaintiff | 123-2014-0226 | 08-CA-408-P | Monroe County | Ocean Bank V. Lindback, Monroe County | Ocean Bank | Deficiency claim against borrower on real estate collateral in the Florida Keys (development site plus marine related improvements) |
| 10/2014 | Defendant | 123-2014-0215 | 11-24994 CA 06 | 17th Judicial Circuit Dade County, Florida | Palm-Aire Holdings V. JRGS Investments, LLC, Jorge Garcia-Saraff and Course Drive Investments, LLC | Cole, Scott & Kissane, P.A. | Partnership dispute over valuation issues proximal to a fractured condominium project (retrospective values), and operating agreement dispute |
| 7/2014 | Plaintiff | 123-2014-0164 | 13-018022 CACE 02 | 17th Judicial Circuit Broward County, Florida | Amalia I. Irlanda-Rivera V. Rivero Diagnostic Center, Inc., Osnay Rivero & Yudit Rivero | Amalia I. Irlanda-Rivera | Rent default judgement and market rental and damage analysis associated with lease default. |
| 10/2014 | Defendant | 123-2014-0159 | 2014FL534 (Pending) | Palm Beach County | Roehm Title Resources Claim | Title Resources Guaranty Company | Title insurance claim related to before and after damage/value diminution analysis based on defined title defects not identified by Title Insurance Company. |
| 4/2014 | Defendant | 123-2014-0117 | 4:14-CV-01077 | USA District Court for the Eastern District of Missouri Eastern Division | USA V. GSA-VA St. Louis Property, LLC | Bryan Cave LLP | Condemnation of a possessory interest for a term. Retained as consulting/rebuttal expert. |
| 5/2014 | Defendant | 123-2014-0114 | Pending | Miami-Dade County | Euforia Club | Rennert Bogel Mandler & Rodriguez, P.A. | Rent dispute regarding forced relocation of a nightclub, and relevant market rental rate of replacement club space in Miami |
| 4/2014 | Plaintiff | 123-2014-0089 | Pending | Broward County | Pan American Holdings Corp. V. Florida DOT Right of Way (ROW) Acquisition S.R.-7 | Henry Wulf, Esq. | Condemnation for R.O.W. purposes including before and after damage analysis |
| 1/2014 | Debtor | 123-2014-005 | 13-25728-BKC-RAM | US Federal Bankruptcy - Southern District of Florida - Miami Division (Hon. R. Mark) | West Airport Palms Business Park, LLC | Counsel for the Debtor; Michael D. Seese, Esq. | Fairness Opinion and market value opinions in conjunction with Debtor's Plan for Reorganization |
| 8/2013 | Defendant | 123-2009-0016 | 02-23922-CA 09 | 11th Judicial Circuit Dade County, Florida | American Educational Enterprises, LLC v. The Board of Trustees of the Internal Improvement Trust Fund | Richard Alayon, Esq. - Alayon and Associates | Economic Damages case associated with an alleged misrepresentation or omission by seller of real property |
| 7/2013 | Plaintiff | 123-2013-0126 | CACE 08057624 (14) | 17th Judicial Circuit Broward County, Florida [Hon. Carlos A. Rodriguez] | Bayview Loan Servicing, LLC v. Kayhan Soodjani; Muhammad Mahmoodi; et al | Bayview Servicing; represented by Tabass, Freedman and Soloff; Stacey Soloff, Esq. | Deficiency judgment on multi-family project (Dewey Street Apartments) |
| 3/2013 | Defendant | 123-2013-0105 | 11-23561-CIV - Rosenbaum | US District Court - Southern District of Florida (Hon. Rosenbaum) | United States of America v. G.K.K. etal | Richard Duvall, Holland and Knight and Jeffrey Neiman, Esq. | Condemnation claim on the 137,779 s.f. Miami Federal Bureau of Investigation (F.B.I.) building; condemnation of a possessory interest (leasehold) |
| 02/2013 | Defendant | 123-2011-0670 | 08-05850 CA 04 | 11th Judicial Circuit Dade County, Florida [Hon. Beth Bloom] | Zenaida Gomez v. City of Pinecrest | Cynthia A. Everett, Cynthia A. Everett, P.A. | Economic damage resulting from temporary taking (seizure) of private residence. |
| 1/2013 | Defendant | 123-2011-0016 | 12-60950-CIV | US Federal Court - Southern District of Florida | Q Lending, Inc., Equity Financial Group, Inc., and Equity Commercial Group, Inc. v. Travelers Companies, Inc. etal | Heidi Raschke, Butler Pappas etal | Value diminution resulting from alleged mortgage fraud. |
| 11/2012 | Plaintiff | 123-2012-0129 | Pending | 11th Judicial Circuit Dade County, Florida | 2011 and 2012 Ad Valorem Tax Protest | | Tax protest of commercial condominium. |
| 10/19/2012 | Defendant | 123-2011-0111 | 2011-1107 CA - 30 | 11th Judicial Circuit Dade County, Florida [Hon. Stanford Blake] | Renegade at Hialeah Blvd v. Dynatech Engineering | Daniel Levin, Esq., Cole, Scott, Kissane, P.A. | Economic Damages case, diminution in value resulting from ground lease modification. |
| 10/1/2012 | Defendant | 123-2012-0084 | 11-30189 CA21 | 11th Judicial Circuit Dade County, Florida | Yaffa Yakubov vs. Bayview at Fisher Island No 3 | Craig Minko, Esq., Cole Scott Kissane, P.A. | Market Value estimate of Fisher Island Condominium purchased under right of first refusal, economic damages claimed by Plaintiff due to contract dispute arising from association's exercise of right of first refusal. |
| 8/20/2012 | Plaintiff | 123-2011-0012 | CA-02180 CA-25 | 11th Judicial Circuit Dade County, Florida | 7935 NBV, LLC v. Harbour East Development LTD, Mario Egozi, etal | Jose Casal, Esq., Holland and Knight | Deficiency judgment on 32-unit fractured condominium, substitute expert following issuance of IRR-Miami reports in 2010 and 2012 |
| 8/15/2012 | Disclosed Dual-Expert | 123-2012-0072 | | Matrimonial Mediation | Vazquez v. Vazquez Matrimonial Matter | Colon and Mendoza and Robert Hertzberg, P.A. | Retained as a court-appointed third party expert to both parties to appraise (2) marital assets comprised of office, retail, single and multi-family units in FL, TN, NC, and Bimini, Bahamas |
| 7/2012 | Plaintiff | 109-2011-2014 | Pending; 2003-2014 | Superior Court of New Jersey [Hon. Patrick DeAlemeida] | BASF Inc., successor Ciba Geigy Inc. vs. Township of Toms River | Phil Genuario, Garippa, etal on behalf of BASF | Challenge to multi-year appeal of $80 Million+ land assessment on contaminated superfund site in Central New Jersey |
| 3/2012 | Plaintiff | 109-2010-0172 | ATL-L-4451-08 | Superior Court of New Jersey, Law Division Atlantic County | Scot Netherlands Inc. vs. State of New Jersey Department of Environmental Protection (NJDEP) | Jay Rhatican, Connell Foloey on behalf of Scot Netherlands, Inc. | Challenge to NJDEP permit denial to fill wetlands, deprivation of all reasonable investment backed expectations. |
| 07/2011 | Defendant | 109-2010-0199 | MER-L-3034-08 | Superior Court of New Jersey Mercer County | 480 Mercer Street, LLP and Brookner Southern, LLC vs. Hightstown | Ansell Zaro Grimm & Aaron, P.C. - Hussam Chater | Litigation-Dispute Resolution - Hightstown Zoning Challenge |
| 12/2009 | Plaintiff | 109-2009-0443 | Dept. Justice File 90-11-3-580/1 | Federal District Court of Virginia | United States vs. Atlantic Wood Industries, Inc. | U.S. Department of Justice | Damages/environmental contamination dispute between United States Navy and responsible party (Atlantic Wood Industries) |
| 12/2009 | Plaintiff | 109-2009-0377 | | Tax Court of New Jersey | Wextrust/HPC Mortgage Fund vs. City of Atlantic City | Cole, Schotz; Meisel, Forman & Leonard, P.A. Carl Rizzo, Esq. | Tax Appeals - To develop an opinion of the market value of the fee simple interest in the property |



**Anthony M. Graziano, MAI, CRE, FRICS**
IDENTIFIED EXPERT WITNESS TESTIMONY AT DEPOSITION and/or TRIAL

| RETENTION DATE | ON BEHALF | IRR FILE # | COURT CASE NO. | COURT / VENUE | CASE NAME | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|
| 11/2009 | Secured Creditor | 109-2009-0439 | | US Bankruptcy Court - Southern District of Texas | Erickson Building | Stuart Glick, Esq., Silis, Cummis & Gross | Market Value for Bankruptcy of 140,000 SF corporate campus in Bethesda, Maryland |
| 09/2009 | Plaintiff | 109-2009-0123 | 3035-001 | Tax Court of New Jersey | Bay Head Yacht Club vs. Ocean County Tax Board | John Doyle, Carluccio, Leone, Dimon, Doyle & Sacks, LLC | Tax Appeal for Bay Head Yacht Club |
| 12/2008 | Plaintiff | 109-2008-XXX | INA (DEPS Pending) | Tax Court of New Jersey | Mirage Atlantic City (MAC) vs. City of Atlantic City | Hank Rovillard, Esq. | Tax Appeal at State Tax Court on 15 acre casino site adjacent to Trump Marina |
| 08/2008 | Defendant | 109-2008-0252 | L-2424-05 | Superior Court of New Jersey Law Division, Middlesex County | The city of South Amboy vs. Lower Main Street Development, LLC & Amboy Aggregates Joint Venture | Bathgate, Wegenar, etal | Verified complaint in condemnation |
| 6/2008 | Defendant | 109-2008-345 | C.A. No. OCNL-3861-06 | Superior Court of New Jersey, Law Division Ocean County | Osbourne Associates, Melbourne Associates VI, LLC, Kingsway Realty Profit Share vs. Citta Enterprises Co, JAC Property Management etal and Eckerd Corporation | Francis X. Manning, Esq. Stradley Ronon Stevens & Young & Michael Gamboli, Esq, Partridge Snow and Hahn, both on behalf of | Dispute re: proper valuation of leasehold and sub-lessee's sandwich leasehold interest on damage claim for breach of agreement claim |
| 1/2008 | Defendant | 109-2008-0125- | N/A | American Arbitration Association [testimony at Arbitration conducted by Hon. Eugene Serpentelli] | Toms River Township vs. Ciba Geigy Corporation | Mark Troncone, Esq., In-house Counsel to Township of Toms River | Arbitration of environmental damages claim, and counter-claim of appropriateness of zoning on 1,900 acre superfund site. |
| 11/2007 | Defendant | 109-2007-211 | L-003635-06 | Superior Court of New Jersey, Law Division Middlesex County | Kyle Mosteller vs. Gaila Neeman | Frank Caruso, Esq. Hoagland, Longo, Moran and Dunst | Damage claim due to loss of trees and screening between urban properties |
| 6/2007 | Defendant | 109-2007-0134 | 3:07-CV-2322 | Superior Court of New Jersey, Chancery Division Monmouth County | Silver Lakes Inc. vs. Township of Freehold Inc. | Christopher Hanlon, Esq, Hanlon and Nieman | Challenge to validity of Rent Control Ordinance as transfer of property rights from Lessor to Lessee |
| 06/2007 | Plaintiff | 109-2007-0173 | | Federal District Court of Virginia | Laurelwood Homes, LLC vs. United States Department of Navy | William A. Shook Esq. | Leasehold interest in the property, breach of lease claim on behalf of leasehold owner (Laurelwood) claiming breach of lease and damages |
| 12/2006 | Defendant | 109-2006-0192 | CAM - L - 9731-05 | Superior Court of New Jersey, Chancery Division, Camden County | Brandywine Operating Partnership, LP vs. UFCW Local 56 | Brett Last, Esq, O'Brien, Belland and Bushinsky | Estimate the value of damages to landlord on breach of above-market lease |
| 08/2006 | | 109-2006-0257 | | | County Line & Brewers Bridge, Jackson Township | Levin, Shea, Pfeffer, PA Steven Pfeffer | To develop an opinion of the hypothetical market value of the fee simple interest in the property |
| 02/2006 | Defendant | 109-2006-0044 | OCN-L-2482-04 | Ocean Superior Court, Ocean County Courthouse | Carl Brooks vs. K Hovanian | Ronan, Tuzzio & Glannone Linda Olsen | To estimate value diminution in the subject property as a result of various issues asserted by the property owner in conjunction with pending litigation between the property owner, and the subject developer K. Hovnanian @ Sea Oaks |
| 10/2005 | Defendant | 109-2005-0315 | OCN-L-1810-5 | Superior Court of New Jersey, Law Division Ocean County | Atlantic City Electric Company d/b/a Conectiv Power Delivery, a regulated public utility of the state of New Jersey vs. AC I Manahawkin, LLC formly and/or Armstrong | Flaster/Greenberg, PC, David R. Oberlander, Esq. | Compensation for the taking of an easement for construction and maintenance of a 230kv transmission line and towers by Atlantic City Electric |
| 06/2005 | Defendant | 109-2005-0214 | MON-L-2609-05 | Superior Court of New Jersey Law Division: Monmouth County | Township of Howell vs. George Harms Construction Co., etal | Connell & Foley, LLP Kevin Coakley, Esq. | To develop an opinion of the market value of the fee simple estate of the property |
| 08/2003 | | 109-2003-0282 | | Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County | Giuffre vs. Giuffre | Louis & Wolf - Frank A. Louis | To develop an opinion of the market value of the Fee Simple estate of the properties for purposes of equitable distribution of marital assets |
| 07/2003 | Defendant | 109-2003-0203 | OCN-C-78-03 | Superior Court of New Jersey Chancery Division, Ocean County | West, etal vs. Pompanio, etal | Stephen E. Smith, Esq. | To develop an opinion of the diminution in value due to a loss of useable land area |
| 06/2003 | Plaintiff | 109-2003-0161 | OCN-C-316-02 | Superior Court of New Jersey Law Division, Ocean County | Eugene M. Lord vs. Donald W. Rinaldo | Lombardi & Lombardi Scott Telson | To develop an opinion of the market value of the fee simple estate of the property |
| 04/2003 | | 109-2003-0128 | FM-15-468-03-C | Superior Court of New Jersey Chancery Division, Family Part Ocean County | Vincent Urbank vs. Lisa Urbank | Marianna Pontoriero, Esq. | Litigation-Matrimonial |
| 02/2002 | Plaintiff | 109-2002-0055 | | | Shenandoah Mobile Home Park | Windels Marx Lane & Mittendorf, LLP - William Cagney | Inverse Condemnation - Rent Control Ordinance |
| 04/2001 | Claimant | 109-2001-0189 | NJ-2624-00 | Superior Court of New Jersey, Chancery Division, Middlesex County | DeForest John Ely and Kimberle A. Ely, h/w | First American Title Insurance Co. Jack Milkis | To derive an opinion of the fair compensation of the fee simple estate, subject to the temporary title encumbrance |
| 03/1999 | Secured Creditors | 109-1999-0062 | | US Bankruptcy Court - District of Newark | Georgetown Apartments | Emmes & Co. Andrew Schwarz | To estimate the market value of the Leased Fee Estate of the property, inclusive of 28 Apartment complexes through NY, NJ, PA, and MD. |
| 12/1997 | Defendant | LKW-257-3186 | FM-15-1465-94 | Superior Court of New Jersey, Chancery Division, Family Part, Ocean County | Lisa Franklin, etal vs. Donald Franklin, etal | Greenbaum, Rowe, Smith, Ravin, Davis & Himmel LLP Robert S. Underhill | Estimating the market value of the leased fee interest |
| 8/1994 | Creditor | HUD-XX | | US Bankruptcy Court - District of Newark | Hudson Marina Association vs. Emmes & Co. | | Bankruptcy Reorganization of 200+ slip failed marina/dockominium complex |

M: Quals: Graziano; Trial Lists



**Anthony M. Graziano, MAI, CRE, FRICS**

PROFERRED OR DISCLOSED EXPERT WITNESS REPORTS/SETTLEMENTS

| RETENTION DATE | ON BEHALF | IRR FILE # | COURT CASE NO. | COURT / VENUE | CASE NAME | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|
| 1/2015 | Defendant | 123-2015-0037 | 14-CV-22384 UU | Miami-Dade County, FL | Ray Benson & Maria Helena V. QBE Insurance Corporation | John A. Camp | Retrospective (2004-2006) analysis of market value claims against insurance company related to property |
| 9/2014 | Defendant | 123-2014-0194 | 13-03084CA 10 | 11th Judicial Circuit Miami-Dade, FL | Manuel Soltero V. Adorno & Yoss, LLP | Kaplan Zeena, LLP | Professional Liability suit against law firm and attorneys for malfeasance in litigation matter. |
| 2/2014 | Plaintiff | 123-2014-0030 | Settled | Carribean Islands | Rainmaker Development V. A&F Bahamas, etal | VLASAC & SHMARUK, LLC | Partnership Dispute between Joint Venture in Carribean development project (golf course, villas, and large-scale marina-commercial-retail development) |
| 11/2012 | Defendant | 123-2012-0140 | 42-2012-CA-001065 | Marion County, FL | CSX Transportation, Inc. V. Moshen Sararazi, Fatih Ann Safarazi, Proverbium Hldg, LLC, USA & George Albrigiit | NeJame. La Fay, Jancha, Ahmed, Barker, Joshi & Moreno, P.A. | Condemnation of partial interest with damages |
| 7/2012 | Confidential | 123-2012-0076 | Confidential | Broward County, FL | Ft. Lauderdale-Hollywood Int'l Airport Expansion | White & Case, LLP | Value Diminution Study to assist public agency in good faith negotiations based on airport expansion. |
| 6/2012 | Defendant | 123-2012-0070 | 10-49616-CA-40 | Miami-Dade County, FL | CB Entertainment, LLC V. South Beach Ocean Parcel | Kubicki Draper, P.A. | Construction Damages claim |
| 12/2009 | Plaintiff | 109-2009-0443 | Dept. Justice File 90-11-3-580/1 | Federal District Court of Virginia | United States vs. Atlantic Wood Industries, Inc, | U.S. Department of Justice | Damages/environmental contamination dispute between United States Navy and responsible party (Atlantic Wood Industries) |



**Anthony M. Graziano, MAI, CRE, FRICS**
PROFERRED OR DISCLOSED EXPERT WITNESS REPORTS/SETTLEMENTS

| RETENTION DATE | ON BEHALF | IRR FILE # | COURT CASE NO. | COURT / VENUE | CASE NAME | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|

M: Quals: Graziano: Trial Lists

**Integra Realty Resources**
Miami/Palm Beach

**Appraisal Report & Post-Remediation Damage Related to Chinese Drywall**

**Lalwani, Gul & Deborah**
Hypothetical Market Value "As If" Remediated
4590 Kodiak
Vero Beach, Indian River County, Florida 32967
Client Reference: 18

**Prepared For:**
Colson Hicks Eidson

**Effective Date of the Appraisal:**
March 11, 2011

**Report Format:**
Appraisal Report

**IRR - Miami/Palm Beach**
File Number: 123-2018-0275





**Lalwani, Gul & Deborah**
4590 Kodiak
Vero Beach, Florida



| Integra Realty Resources | In Miami | In Orlando | In Naples/Sarasota |
|---|---|---|---|
| Miami | Dadeland Centre | The Magnolia Building | Horseshoe Professional Park |
| Orlando | 9155 South Dadeland Blvd. | 326 N. Magnolia Ave. | 2770 Horseshoe Drive S. |
| Southwest Florida | Suite 1208 | | Suite 3 |
| | Miami, FL 33156 | Orlando, FL 32801 | Naples, FL 34104 |
| www.irr.com | (305) 670-0001 | (407) 843-3377 | (239)-643-6888 |

January 24, 2019

Patrick S. Montoya
Partner
Colson Hicks Eidson
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134

SUBJECT:     Hypothetical Market Value "As If" Remediated
Case No 11-22408-Civ-COOKE
United States District Court Southern District of Florida in the matter of
Eduardo and Carmen Amorin, et al. individually and on behalf of others situated
similarly v. Taishan Gypsum Co., LTD., f/k/a Shandong Taiche Dongxin Co. Ltd., et al
Priority Claimant Case at:
Lalwani, Gul & Deborah
4590 Kodiak
Vero Beach, Indian River County, Florida 32967
Client Reference: 18
IRR - Miami/Palm Beach File No. 123-2018-0275

Dear Mr. Montoya:

Integra Realty Resources – Miami/Palm Beach submits the following damage estimate in the
referenced property as of the effective date assuming all remediation was completed by an
appropriate contractor with experience and credentials in remediating defective drywall.

The report is intended to comply the Uniform Standards of Professional Appraisal Practice (USPAP). It
presents summary discussions of the data, reasoning, and analysis that were used in the appraisal
process to develop the opinions. Additional information is contained within our workfile.

The findings will form the basis of expert witness testimony in the above referenced case.

Case 1:09-md-02047-EEF-MBN Document 22363-31 Filed 11/10/19 Page 82 of 319
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 05/13/2019 Page 867 of 989

Identification of Subject                                                                    2

## Identification of Subject

The subject of this report is a single-family ranch style home configured with 4 bedroom and 3 baths with 3,552 SF under air-conditioning. The subject property was built in 2006 and is located on a 36,785 SF site.

## Purpose of the Appraisal

The purpose of the appraisal is to develop an opinion of the diminution in value and related damages, collectively "the damages" as of the effective date of the appraisal, March 11, 2011. The damage estimate assumes the defective drywall remediation was completed and does not consider the cost to cure. The date of the report is January 24, 2019. The appraisal is valid only as of the stated effective date or dates.

## Intended Use and User

The intended use of the appraisal is for litigation purposes. The client, Colson Hicks Eidson and related co-counsel, Plaintiff and the Court are the intended users. Integra Realty Resources – Miami/Palm Beach is not responsible for unauthorized use of this report.

## Most Recent Sale History

The most recent closed sale of the subject is summarized as follows:

| Most Recent Subject Sale (Closed) | |
|---|---|
| Sale Date (Most Recent) | December 1, 2004 |
| Seller | Black Bear Development Group |
| Buyer | Lalwani, Gul & Deborah |
| Sale Price | $115,000 |
| Recording Instrument Number | 1816-400 |
| Disposition Details | Sale of vacant land |

To the best of our knowledge, no other sale or transfer of ownership has taken place within a three-year period prior to the effective appraisal date.

The property was listed for sale and sold un-remediated on March 18, 2011 for $174,000.

## Pending Transactions

To the best of our knowledge, the property is not subject to an agreement of sale or an option to buy, nor is it listed for sale, as of the effective appraisal date.

## Definition of Market Value

The following definition of market value is used by agencies that regulate federally insured financial institutions in the United States:

"The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and



Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/19/19 Page 83 of 319
Case 1:11-cv-22408-MGC Document 273-9 Entered on FLSD Docket 05/13/2019 Page 868 of 989

Definition of Retrospective Value Opinion                                                                 3

assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- Buyer and seller are typically motivated;

- Both parties are well informed or well advised, and acting in what they consider their own best interests;

- A reasonable time is allowed for exposure in the open market;

- Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

- The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale."

*(12 C.F.R. Part 34.42(g); 55 Federal Register 54696, August 24, 1990, as amended at 57 Federal Register 12202, April 9, 1992, 59 Federal Register 29499, June 7, 1994)*

## Definition of Retrospective Value Opinion

A value opinion effective as of a specified historical date. The term retrospective does not define a type of value.  Instead, it identifies a value opinion as being effective at some specific prior date. Value as of a historical date is frequently sought in connection with property tax appeals, damage models, lease renegotiation, deficiency judgements, estate tax, and condemnation.  Inclusion of the type of value with this term is appropriate, e.g. "retrospective market value opinion".

*(Source: The Dictionary of Real Estate Appraisal – 6th Edition; Appraisal Institute, 200 W. Madison, Suite 1500, Chicago, IL 60606, www.appraisalinstitute.org)*

## Definition of Hypothetical Condition

1. A condition that is presumed to be true when it is known to be false. (SVP)

2. A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis. Comment: Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of date used in an analysis. (USPAP, 2016-2017 ed.)

*(Source: The Dictionary of Real Estate Appraisal – 6th Edition; Appraisal Institute, 200 W. Madison, Suite 1500, Chicago, IL 60606, www.appraisalinstitute.org)*

## Scope of Work

Integra was retained as an expert in the captioned matter of this report to address potential damages related to the subject property, specifically excluding the costs to cure.

Integra was retained to estimate any post remediation damages, and conducted a separate study to determine whether damages persist following defective drywall remediation.  The result of that study



Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/19/19 Page 84 of 319
Case 4:11-cv-22408-MGC-EEF-MBN Document 273-3 Entered on FLSD Docket 05/13/2019 Page 869 of 989

Scope of Work                                                                                    4

are outlined within Integra's report entitled "Market Analysis of the Post Remediation Impact of Chinese Drywall on Residential Property Values in Florida." The results of that study are incorporated by reference herein.

In addition, our damage model was requested to include a rental value analysis of the Priority Claimant residence, and a determination of the relevant economic damage associated with having to vacate the home for a period of time (and secure alternate living arrangements) during the remediation. As of the effective date, the claimant would have suffered the damages.

Integra established individual case files on each Priority Claimant residence, and retained professional assistance from qualified residential appraisers in each jurisdiction. Integra managed the process of these retrospective appraisals, interfaced with the residential appraisers, and reviewed the form appraisals completed on each assignment including review of the comparables, adjustments, and form narrative to establish the market value of the residence unimpaired as of the effective date.

Integra professionals reviewed various materials exchanged as part of this case and considered materials that were relevant to the market valuation. These materials were downloaded from the attorney's dropbox and are retained within our workfile.

Integra's participation in and review of the final appraised values results in a conclusion of the market value of the home defined as "Hypothetical Market Value" assuming defective drywall had never been identified within the subject property. This forms the basis of the unimpaired market value as of the effective date.

All properties and comparables were inspected by the local residential appraisers without the benefit of interior inspections. Adjustments for condition and age at the time of sale are based upon photographs contained within the various MLS databases, paired analysis from amongst the comparables, and for the subject, were based on photos, if available. In the event a property had not been remediated as of the effective date, we assume average condition for the property in the market as of the effective date.

The damage analysis expressed within this report follows the peer teachings and market accepted processes for damage analysis. However, the damage analysis only represents a <u>portion of the overall damages</u> because we were specifically requested to exclude the consideration of the costs to cure. This represents a relevant component of damage in this case for property that factually have not been remediated.

Integra's role was strictly to identify post remediation value damage (sometime referred to a "stigma") and estimate the relevant rental value and moving costs as a proxy for the temporary loss of use during remediation.

## Significant Appraisal Assistance

In addition to Anthony M. Graziano, MAI ,CRE, principal, it is acknowledged that Peter G. Kayworth, Yuliya Georgieva, Joseph Melloni and Paul L. Jones of IRR-Miami/Palm Beach were involved in the assignment consisting of conducting research on the subject and transactions involving comparable



properties, performing appraisal analyses and assisting in report writing, under the supervision of the persons signing the report.  The local residential appraisers are also named as providing significant assistance, including exterior inspection of the properties and comparables, application of their local knowledge in adjusting and estimating the unimpaired value, and developing the form report valuations incorporated herein.

## Prior Services

USPAP requires appraisers to disclose to the client any other services they have provided in connection with the subject property in the prior three years, including valuation, consulting, property management, brokerage, or any other services. We have not performed any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

## Valuation Methodology

Appraisers usually consider the use of three approaches to value when developing a market value opinion for real property. These are the cost approach, sales comparison approach, and income capitalization approach.  The valuations consider the only relevant approach for residential valuation, the sales comparison analysis.  The cost and income approach are not considered relevant.

The sales comparison approach is the most applicable valuation method since there is an active market for similar properties, and sufficient sales data is available for analysis.  Additionally, this approach directly considered the prices of alternative properties having similar utility.

### Highest and Best Use

The highest and best use of the subject as if vacant for development of a single-family home which is physically possible, legally permissible as per zoning, financially feasible and maximally productive.

The highest and best use of the subject as improved is for continued use as a single-family home with no other use that could reasonably be expected to provide a higher value to the land as if vacant.  The improvements contribute to the over all value to a greater extent than the land value alone, and therefore, continued use as improved concluded to be maximally productive and the highest and best use of the property.

### Conclusion of Value

The Hypothetical market value appraisal as of the effective date, reflective of a traditional form appraisal, is contained within the Addenda of this report.  This value us hypothetical since it assumes that defective drywall had never been present at the subject property.

Against this value, we then apply the Post Impairment Discount as a percentage of unimpaired value as developed within the Integra report studying this issue.  This represents a compensable damage resulting from the prior existence of defective drywall in the home as of the effective date.

In addition, each appraisal (unimpaired) reflects a rental value analysis as of the effective date.  This rental value analysis concludes to the equivalent market rent for the home (unimpaired) and reflects a



proxy for the probable actual costs the homeowner would experience by having to move-out of the primary residence during remediation.

The homeowner would also have to incur moving /storage costs twice, once before and once after remediation.  Professional packing, moving and storage for an average home is estimated at $1,500 per move, or $3,000 in total.  This amount is added to the loss of use estimate as an additional damage.

This loss of use calculation does not consider the costs of alternative housing or other tangible costs potentially incurred for damages suffered between the date of discovery and the date of value.  These damages, if applicable, are being estimated by a separate expert (Elkins et al). To the extent Elkins posits costs which are duplicative or actual costs that are greater or less, some minor adjustments to Integra's damage model may be required.

The timeframe for remediation (months of actual loss) could vary depending upon the permitting process in the specific community, the availability of labor, and the size of the home.  Integra reviewed a number of transactions that were remediated by investors and found the typical timeframe between purchase of an unremediated home and listing[1] of the home post-remediation to be 3-6 months.

Larger more expansive homes would be expected to take longer to remediate since more materials are required, and in higher-priced homes, supplies would typically be custom-ordered.  Therefore, we apply the following timeframes based on the subject's size and price range:

< $150,000 Home up to 2,000+/- SF              4 months

$150,000 - $750,000 home up to 4,000 SF        6 months

$750,000+ home up over 4,000 SF                9 months

---

[1] The "listing date" is most relevant since a homeowner conducting their own remediation can move back in once the home is ready for sale (ie- coinciding with a final certificate of occupancy).

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/19/19 Page 87 of 319
Case 1:11-cv-22408-MGC Document 273-9 Entered on FLSD Docket 05/13/2019 Page 872 of 989

Conclusion of Value                                                                                          7

The following shows our final estimate of damages as of the effective date, and assuming costs to cure (i.e. – to conduct the remediation) have been expended.

**Conclusions of Damage**

| | | | |
|---|---|---|---|
| Hypothetical Value (Unimpaired - Before) | | $300,000 | |
| Market Impairment Discount (As if Remediated) | | 10% | |
| Post Impairment Damage ($) | | $30,000 | |
| **Hypothetical Value As IF Remediated** | | | **$270,000** |
| Post Remediation Damages as of Effective Date | | | **$30,000** |
| Loss of Use: | | | |
| Rental Rate ($/Month) | **$2,600** | | |
| Moving & Storage Costs | | $3,000 | |
| Loss of Use Subject (# Months) | 6x | $15,600 | |
| Subject Total | | | **$18,600** |
| **Post Remediation Damage** | | | **$48,600** |

Note: Does not consider "cost to cure". Assumes remediation was completed by qualified contractor who warranties the work.

The property was listed for sale, and the Claimant sold the property in an un-remediated condition in March 2011 for $174,000 (45%$ discount to Integra's appraised value). Cost to cure damages apply, these costs are prescribed by the Court's special master.

Lalwani, Gul & Deborah



Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/19/19 Page 88 of 319
Case 1:11-cv-22408-MGC Document 273-3 Entered on FLSD Docket 05/13/2019 Page 873 of 989

Certification                                                                                                    8

## Certification

We certify that, to the best of our knowledge and belief:

1. The statements of fact contained in this report are true and correct.

2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3. We have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

4. We have not performed any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

5. We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

6. Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

7. Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

8. Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice as well as applicable state appraisal regulations.

9. The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

10. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

11. Anthony M. Graziano, MAI, CRE did not make a personal inspection of the property that is the subject of this report. Chad F. Stites has personally inspected the subject.

12. Significant real property appraisal assistance was provided by Peter G. Kayworth, Yuliya Georgieva, Joseph Melloni and Paul L. Jones. Additionally, real estate assistance was provided by various Valucentric employees and subcontractors, including: John Barcelo, Angela Barcelo, Fred Stites, Carlos Fong, Sarah D. Wilson and Rob Baird.

13. We have experience in appraising properties similar to the subject and are in compliance with the Competency Rule of USPAP.

14. As of the date of this report, Anthony M. Graziano, MAI, CRE, has completed the continuing education program for Designated Members of the Appraisal Institute.

Anthony M. Graziano, MAI, CRE
Senior Managing Director - Miami
State-Certified General RE Appraiser
FL Certificate # RZ#3510

Lalwani, Gul & Deborah

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/19/19 Page 89 of 319
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 05/13/2019 Page 874 of 989

Assumptions and Limiting Conditions 9

## Assumptions and Limiting Conditions

This appraisal and any other work product related to this engagement are limited by the following standard assumptions, <u>except as otherwise noted in the report</u>:

1. The title is marketable and free and clear of all liens, encumbrances, encroachments, easements and restrictions. The property is under responsible ownership and competent management and is available for its highest and best use.

2. There are no existing judgments or pending or threatened litigation that could affect the value of the property.

3. There are no hidden or undisclosed conditions of the land or of the improvements that would render the property more or less valuable. Furthermore, there is no asbestos in the property.

4. The revenue stamps placed on any deed referenced herein to indicate the sale price are in correct relation to the actual dollar amount of the transaction.

5. The property is in compliance with all applicable building, environmental, zoning, and other federal, state and local laws, regulations and codes.

6. The information furnished by others is believed to be reliable, but no warranty is given for its accuracy.

This appraisal and any other work product related to this engagement are subject to the following limiting conditions, except as otherwise noted in the report:

1. An appraisal is inherently subjective and represents our opinion as to the value of the property appraised.

2. The conclusions stated in our appraisal apply only as of the effective date of the appraisal, and no representation is made as to the effect of subsequent events.

3. No changes in any federal, state or local laws, regulations or codes (including, without limitation, the Internal Revenue Code) are anticipated.

4. No environmental impact studies were either requested or made in conjunction with this appraisal, and we reserve the right to revise or rescind any of the value opinions based upon any subsequent environmental impact studies. If any environmental impact statement is required by law, the appraisal assumes that such statement will be favorable and will be approved by the appropriate regulatory bodies.

5. Unless otherwise agreed to in writing, we are not required to give testimony, respond to any subpoena or attend any court, governmental or other hearing with reference to the property without compensation relative to such additional employment.

6. We have made no survey of the property and assume no responsibility in connection with such matters. Any sketch or survey of the property included in this report is for illustrative purposes only and should not be considered to be scaled accurately for size. The appraisal covers the property as described in this report, and the areas and dimensions set forth are assumed to be correct.

Lalwani, Gul & Deborah



Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/10/19 Page 90 of 319
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 05/13/2019 Page 875 of 989

Assumptions and Limiting Conditions                                          10

7. No opinion is expressed as to the value of subsurface oil, gas or mineral rights, if any, and we have assumed that the property is not subject to surface entry for the exploration or removal of such materials, unless otherwise noted in our appraisal.

8. We accept no responsibility for considerations requiring expertise in other fields. Such considerations include, but are not limited to, legal descriptions and other legal matters such as legal title, geologic considerations such as soils and seismic stability; and civil, mechanical, electrical, structural and other engineering and environmental matters. Such considerations may also include determinations of compliance with zoning and other federal, state, and local laws, regulations and codes.

9. The distribution of the total valuation in the report between land and improvements applies only under the reported highest and best use of the property. The allocations of value for land and improvements must not be used in conjunction with any other appraisal and are invalid if so used. The appraisal report shall be considered only in its entirety. No part of the appraisal report shall be utilized separately or out of context.

10. Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraisers, or any reference to the Appraisal Institute) shall be disseminated through advertising media, public relations media, news media or any other means of communication (including without limitation prospectuses, private offering memoranda and other offering material provided to prospective investors) without the prior written consent of the persons signing the report.

11. Information, estimates and opinions contained in the report and obtained from third-party sources are assumed to be reliable and have not been independently verified.

12. Any income and expense estimates contained in the appraisal report are used only for the purpose of estimating value and do not constitute predictions of future operating results.

13. If the property is subject to one or more leases, any estimate of residual value contained in the appraisal may be particularly affected by significant changes in the condition of the economy, of the real estate industry, or of the appraised property at the time these leases expire or otherwise terminate.

14. Unless otherwise stated in the report, no consideration has been given to personal property located on the premises or to the cost of moving or relocating such personal property; only the real property has been considered.

15. The current purchasing power of the dollar is the basis for the values stated in the appraisal; we have assumed that no extreme fluctuations in economic cycles will occur.

16. The values found herein are subject to these and to any other assumptions or conditions set forth in the body of this report but which may have been omitted from this list of Assumptions and Limiting Conditions.

17. The analyses contained in the report necessarily incorporate numerous estimates and assumptions regarding property performance, general and local business and economic conditions, the absence of material changes in the competitive environment and other matters. Some estimates or assumptions, however, inevitably will not materialize, and unanticipated events and circumstances may occur; therefore, actual results achieved during



Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/19/19 Page 91 of 319
Case 1:11-cv-22408-MGC Document 273-3 Entered on FLSD Docket 05/13/2013 Page 876 of 989

Assumptions and Limiting Conditions                                                                  11

the period covered by our analysis will vary from our estimates, and the variations may be material.

18.    The Americans with Disabilities Act (ADA) became effective January 26, 1992. We have not made a specific survey or analysis of the property to determine whether the physical aspects of the improvements meet the ADA accessibility guidelines. We claim no expertise in ADA issues, and render no opinion regarding compliance of the subject with ADA regulations. Inasmuch as compliance matches each owner's financial ability with the cost to cure the non-conforming physical characteristics of a property, a specific study of both the owner's financial ability and the cost to cure any deficiencies would be needed for the Department of Justice to determine compliance.

19.    The appraisal report is prepared for the exclusive benefit of the Client, its subsidiaries and/or affiliates. It may not be used or relied upon by any other party. All parties who use or rely upon any information in the report without our written consent do so at their own risk.

20.    No studies have been provided to us indicating the presence or absence of hazardous materials on the subject property or in the improvements, and our valuation is predicated upon the assumption that the subject property is free and clear of any environment hazards including, without limitation, hazardous wastes, toxic substances and mold. No representations or warranties are made regarding the environmental condition of the subject property. Integra Realty Resources – Miami/Palm Beach, Integra Realty Resources, Inc., Integra Strategic Ventures, Inc. and/or any of their respective officers, owners, managers, directors, agents, subcontractors or employees (the "Integra Parties"), shall not be responsible for any such environmental conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because we are not experts in the field of environmental conditions, the appraisal report cannot be considered as an environmental assessment of the subject property.

21.    The persons signing the report may have reviewed available flood maps and may have noted in the appraisal report whether the subject property is located in an identified Special Flood Hazard Area. We are not qualified to detect such areas and therefore do not guarantee such determinations. The presence of flood plain areas and/or wetlands may affect the value of the property, and the value conclusion is predicated on the assumption that wetlands are non-existent or minimal.

22.    Integra Realty Resources – Miami/Palm Beach is not a building or environmental inspector. Integra Miami/Palm Beach does not guarantee that the subject property is free of defects or environmental problems. Mold may be present in the subject property and a professional inspection is recommended.

23.    The appraisal report and value conclusions for an appraisal assume the satisfactory completion of construction, repairs or alterations in a workmanlike manner.

24.    It is expressly acknowledged that in any action which may be brought against any of the Integra Parties, arising out of, relating to, or in any way pertaining to this engagement, the appraisal reports, and/or any other related work product, the Integra Parties shall not be responsible or liable for any incidental or consequential damages or losses, unless the appraisal was fraudulent or prepared with intentional misconduct. It is further acknowledged



Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/19/19 Page 92 of 319
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 05/13/2019 Page 8 77 of 989

Assumptions and Limiting Conditions                                                                    12

that the collective liability of the Integra Parties in any such action shall not exceed the fees paid for the preparation of the appraisal report unless the appraisal was fraudulent or prepared with intentional misconduct. Finally, it is acknowledged that the fees charged herein are in reliance upon the foregoing limitations of liability.

25.   Integra Realty Resources – Miami/Palm Beach, an independently owned and operated company, has prepared the appraisal for the specific intended use stated elsewhere in the report. The use of the appraisal report by anyone other than the Client is prohibited except as otherwise provided. Accordingly, the appraisal report is addressed to and shall be solely for the Client's use and benefit unless we provide our prior written consent. We expressly reserve the unrestricted right to withhold our consent to your disclosure of the appraisal report or any other work product related to the engagement (or any part thereof including, without limitation, conclusions of value and our identity), to any third parties. Stated again for clarification, unless our prior written consent is obtained, no third party may rely on the appraisal report (even if their reliance was foreseeable).

26.   The conclusions of this report are estimates based on known current trends and reasonably foreseeable future occurrences. These estimates are based partly on property information, data obtained in public records, interviews, existing trends, buyer-seller decision criteria in the current market, and research conducted by third parties, and such data are not always completely reliable. The Integra Parties are not responsible for these and other future occurrences that could not have reasonably been foreseen on the effective date of this assignment. Furthermore, it is inevitable that some assumptions will not materialize and that unanticipated events may occur that will likely affect actual performance. While we are of the opinion that our findings are reasonable based on current market conditions, we do not represent that these estimates will actually be achieved, as they are subject to considerable risk and uncertainty. Moreover, we assume competent and effective management and marketing for the duration of the projected holding period of this property.

27.   All prospective value opinions presented in this report are estimates and forecasts which are prospective in nature and are subject to considerable risk and uncertainty. In addition to the contingencies noted in the preceding paragraph, several events may occur that could substantially alter the outcome of our estimates such as, but not limited to changes in the economy, interest rates, and capitalization rates, behavior of consumers, investors and lenders, fire and other physical destruction, changes in title or conveyances of easements and deed restrictions, etc. It is assumed that conditions reasonably foreseeable at the present time are consistent or similar with the future.

Lalwani, Gul & Deborah



# Addenda



File No. 4590

## APPRAISAL OF



### LOCATED AT:

4590 Kodiak Drive
Vero Beach, FL 32967

### FOR:

Integra Realty Resources
9155 S. Dadeland Blvd, Ste 1208
Miami, FL 33156

### BORROWER:

Gul Lalwani

### AS OF:

March 11, 2011

### BY:

C. F. Stites, SRA



File No. 4590

Valcentric LLC
Integra Realty Resources
9155 S. Dadeland Blvd, Ste 1208
Miami, FL 33156

File Number: 4590

In accordance with your request, I have appraised the real property at:

4590 Kodiak Drive
Vero Beach, FL 32967

The purpose of this appraisal is to develop an opinion of the market value of the subject property, as improved.
The property rights appraised are the fee simple interest in the site and improvements.

In my opinion, the market value of the property as of   March 11, 2011                                    is:

$300,000
Three Hundred Thousand  Dollars

The attached report contains the description, analysis and supportive data for the conclusions,
final opinion of value, descriptive photographs, limiting conditions and appropriate certifications.

C. F. Stites, SRA

C.F. Shadare A

## Exterior-Only Inspection Residential Appraisal Report

File No. 4590

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

**SUBJECT**

| | |
|---|---|
| Property Address 4590 Kodiak Drive | City Vero Beach State FL Zip Code 32967 |
| Borrower Gul Lalwani | Owner of Public Record N/A | County Indian River |

Legal Description Lot 16, Black Bear Reserve according to the recorded plat thereof (Plat Book 17 Page 86)

| | | |
|---|---|---|
| Assessor's Parcel # 32392000005000000016.0 | Tax Year 2011 | R.E. Taxes $ 1,374 |

Neighborhood Name Black Bear Reserve    Map Reference 20-32-39    Census Tract 0508.04

Occupant [X] Owner [ ] Tenant [ ] Vacant    Special Assessments $ 0    [X] PUD    HOA $ 895    [ ] per year [X] per month

Property Rights Appraised [X] Fee Simple [ ] Leasehold [ ] Other (describe)

Assignment Type [ ] Purchase Transaction [ ] Refinance Transaction [X] Other (describe) VALUATION AS OF RETROSPECTIVE DATE 03/11/2011

Lender/Client Integra Realty Resources    Address 9155 S. Dadeland Blvd, Ste 1208, Miami, FL 33156

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? [X] Yes [ ] No

Report data source(s) used, offering price(s), and date(s). DOM 858;IRCMLS#117881 list date unknown  (pre-dates current MLS system).  House sold 3/18/2011 after 858 DOM.

I [ ] did [ ] did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.

**CONTRACT**

Contract Price $    Date of Contract    Is the property seller the owner of public record? [ ] Yes [ ] No    Data Source(s)

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? [ ] Yes [ ] No
If Yes, report the total dollar amount and describe the items to be paid.

**NEIGHBORHOOD**

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | | One-Unit Housing Trends | | | One-Unit Housing | | Present Land Use % | |
|---|---|---|---|---|---|---|---|---|---|
| Location [ ] Urban [X] Suburban [ ] Rural | | | Property Values [ ] Increasing [X] Stable [ ] Declining | | | PRICE | AGE | One-Unit | 65 % |
| Built-Up [X] Over 75% [ ] 25-75% [ ] Under 25% | | | Demand/Supply [ ] Shortage [X] In Balance [ ] Over Supply | | | $(000) | (yrs) | 2-4 Unit | 1 % |
| Growth [ ] Rapid [X] Stable [ ] Slow | | | Marketing Time [ ] Under 3 mths [X] 3-6 mths [ ] Over 6 mths | | | 170 Low | 1 | Multi-Family | 2 % |
| | | | | | | 799 High | 30 | Commercial | 12 % |
| | | | | | | 400 Pred. | 10 | Other Vac | 20 % |

Neighborhood Boundaries    The subject neighborhood is the area north of 41st St, south of 69th St, between, 66th Ave on the west and US Hwy 1 on the east.

Neighborhood Description    Developing suburban neighborhood near schools, places of worship, and shopping.  Highway access is available within 2 miles.  Close access to a public park.  Work centers are 1-25 miles away.  Mixture of ranch-style houses on small lots with some multi-family including duplex and apt.  Commercial uses are along arterials and highways.  Some new construction was noted.

Market Conditions (including support for the above conclusions)    Developing suburban neighborhood near all vital services.  No adverse conditions were observed.  REO activity was noted in the area during the 2010-2013 time frame.  Agents report average market demand, particularly among investors.  Normal market time for the area is typically 3 - 9 months.

**SITE**

| | | |
|---|---|---|
| Dimensions 150.29 x 237.52 x 161.04 x 235.16 | Area 36785 sf | Shape Nearly Rectangular | View N;Res;Res |

Specific Zoning Classification RS-3    Zoning Description Residential single family

Zoning Compliance [X] Legal [ ] Legal Nonconforming (Grandfathered Use) [ ] No Zoning [ ] Illegal (describe)

Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use? [X] Yes [ ] No  If No, describe.

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements—Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | [X] | | Water | [X] | | Street Asphalt | | [X] |
| Gas | | None | Sanitary Sewer | [X] | | Alley None | | |

FEMA Special Flood Hazard Area [ ] Yes [X] No    FEMA Flood Zone X    FEMA Map # 12061C0237H    FEMA Map Date 12/04/2012

Are the utilities and off-site improvements typical for the market area? [X] Yes [ ] No  If No, describe.

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? [X] Yes [ ] No  If Yes, describe.  Gated development with private streets.  HOA dues cover street maintenance while HOA docs cover roadway use issues.  There are several gated communities in the area with private roads.  No adverse impact on value or marketability results from gated community location or private roadways.

**IMPROVEMENTS**

Source(s) Used for Physical Characteristics of Property [ ] Appraisal Files [ ] MLS [X] Assessment and Tax Records [ ] Prior Inspection [ ] Property Owner
[ ] Other (describe)    Data Source(s) for Gross Living Area County Property Appraiser

| GENERAL DESCRIPTION | GENERAL DESCRIPTION | Heating / Cooling | Amenities | Car Storage |
|---|---|---|---|---|
| Units [X] One [ ] One with Accessory Unit | Concrete Slab [ ] Crawl Space | [X] FWA [ ] HWBB | Fireplace(s) # 0 | [ ] None |
| # of Stories 1.0 | Full Basement [ ] Finished | [ ] Radiant | WoodStove(s) # 0 | [X] Driveway  # of Cars 2 |
| Type [X] Det. [ ] Att. [ ] S-Det./End Unit | Partial Basement [ ] Finished | [ ] Other | [X] Patio/Deck Scrnd | Driveway Surface Concrete |
| [X] Existing [ ] Proposed [ ] Under Const. | Exterior Walls CBS | Fuel Electric | [X] Porch  Front | [X] Garage  # of Cars 2 |
| Design (Style) Ranch | Roof Surface Comp shgl | [X] Central Air Conditioning | [ ] Pool  In-Grnd | [ ] Carport  # of Cars 0 |
| Year Built 2006 | Gutters & Downspouts Barrel tile | [ ] Individual | [ ] Fence  Partial | [X] Attached [ ] Detached |
| Effective Age (Yrs) 4 | Window Type Insul metal | [ ] Other | [X] Other None | [ ] Built-in |

Appliances [X] Refrigerator [X] Range/Oven [X] Dishwasher [ ] Disposal [X] Microwave [ ] Washer/Dryer [ ] Other (describe)

Finished area above grade contains:    8 Rooms    4 Bedrooms    3.0 Bath(s)    3,552 Square Feet of Gross Living Area Above Grade

Additional features (special energy efficient items, etc.)    Physical data per MLS; standard appliance package assumed.

Describe the condition of the property and data source(s) (including apparent needed repairs, deterioration, renovations, remodeling, etc.).    C4;VALUATION AS OF A RETROSPECTIVE DATE (03/11/2011) BASED ON 01/17/2019 ATTEMPTED EXTERIOR FRONTAL DRIVE-BY INSPECTION.  GATED DEVELOPMENT; ACCESS DENIED TO APPRAISER AT ACCESS GATE.  PHOTO CONTAINED HEREIN IS OF THE ACCESS GATE. PHYSICAL DATA  PER COUNTY PROPERTY APPRAISER'S OFFICE.  AVERAGE CONDITION ASSUMED WITH NO SERIOUS ITEMS OF DEFERRED MAINTENANCE.

Are there any apparent physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? [ ] Yes [X] No  If Yes, describe.
SEE COMMENTS ABOVE

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? [X] Yes [ ] No  If No, describe.

## Exterior-Only Inspection Residential Appraisal Report

File No. 4590

| | | | | | |
|---|---|---|---|---|---|
| There are | 3 | comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 405,000 | | to $ 535,000 | . |
| There are | 6 | comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 260,000 | | to $ 465,000 | . |

| FEATURE | SUBJECT | COMPARABLE SALE NO. 1 | | COMPARABLE SALE NO. 2 | | COMPARABLE SALE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 4590 Kodiak Drive<br>Vero Beach, FL 32967 | 5880 Glen Eagle Lane<br>Vero Beach, FL 32967 | | 5881 Bent Pine Drive<br>Vero Beach, FL 32967 | | 5835 Glen Eagle Lane<br>Vero Beach, FL 32967 | |
| Proximity to Subject | | 2.00 miles NE | | 2.33 miles NE | | 1.98 miles NE | |
| Sale Price | $ | | $ 465,000 | | $ 375,000 | | $ 260,000 |
| Sale Price/Gross Liv. Area | $ 0.00 sq. ft. | $ 131.10 sq. ft. | | $ 129.94 sq. ft. | | $ 105.86 sq. ft. | |
| Data Source(s) | | IRCMLS#104665;DOM 261 | | IRCMLS#112446;DOM 39 | | IRCMLS#114055;DOM 33 | |
| Verification Source(s) | | Courthouse Agent | | Courthouse Agent | | Courthouse Agent | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sale or Financing | | ArmLth | | ArmLth | | ArmLth | |
| Concessions | | Cash;0 | | Conv;0 | | Conv;0 | |
| Date of Sale/Time | | s08/10;c07/10 | | s12/10;c11/10 | | s01/11;c12/10 | |
| Location | N;Res;Gated | N;Res;Gated | | N;Res;Gated | | N;Res;Gated | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 36785 sf | 34211 sf | 0 | 1.00 ac | -15,000 | 31845 sf | 0 |
| View | N;Res;Res | B;Glfvw;Pond | -35,000 | B;Glfvw;Res | -20,000 | B;Glfvw;Res | -20,000 |
| Design (Style) | DT1.0;Ranch | DT1.0;Ranch | | DT1.0;Ranch | | DT1.0;Ranch | |
| Quality of Construction | Q4 | Q3 | -25,000 | Q3 | -25,000 | Q4 | |
| Actual Age | 5 | 7 | 0 | 22 | 3,400 | 17 | 2,400 |
| Condition | C4 | C2 | -60,000 | C3 | -30,000 | C4 | |
| Above Grade | Total 8 Bdrms. 4 Baths 3.0 | Total 8 Bdrms. 3 Baths 3.0 | 0 | Total 8 Bdrms. 3 Baths 3.0 | 0 | Total 8 Bdrms. 4 Baths 3.0 | |
| Gross Living Area | 3,552 sq. ft. | 3,547 sq. ft. | 0 | 2,886 sq. ft. | 30,000 | 2,456 sq. ft. | 49,300 |
| Basement & Finished | 0sf | 0sf | | 0sf | | 0sf | |
| Rooms Below Grade | | | | | | | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | Cent/Cent | Cent/Cent | | Cent/Cent | | Cent/Cent | |
| Energy Efficient Items | Insul metal | Insul metal | | Insul metal | | Insul metal | |
| Garage/Carport | 2ga2dw | 2ga2dw | | 2ga2dw | | 2ga2dw | |
| Porch/Patio/Deck | Porch,Scrn Patio | Porch,Scrn Patio | | Porch,Scrn Patio | | Porch,Scrn Patio | |
| Appliances | RO DW Di MW | RO DW Di MW | | RO DW Di MW | | RO DW Di MW | |
| Other | Fence,Pool | Fnc,Pool,Fireplc | -6,000 | Fnc,Pool,SumrK | -5,000 | Fence,Pool | |
| Net Adjustment (Total) | | ☐ + ☒ - | $ 126,000 | ☐ + ☒ - | $ 61,600 | ☒ + ☐ - | $ 31,700 |
| Adjusted Sale Price<br>of Comparables | | Net Adj. -27.1%<br>Gross Adj. 27.1% | $ 339,000 | Net Adj. -16.4%<br>Gross Adj. 34.2% | $ 313,400 | Net Adj. 12.2%<br>Gross Adj. 27.6% | $ 291,700 |

I ☒ did ☐ did not research the sale or transfer history of the subject property and comparable sales. If not, explain **Sales history was researched.**

My research ☐ did ☒ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data source(s) **Courthouse**

My research ☐ did ☒ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data source(s) **Courthouse**

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE NO. 1 | COMPARABLE SALE NO. 2 | COMPARABLE SALE NO. 3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | | | | |
| Price of Prior Sale/Transfer | $0 | $0 | $0 | $0 |
| Data Source(s) | Courthouse | Courthouse | Courthouse | Courthouse |
| Effective Date of Data Source(s) | 01/01/2012 | 01/01/2012 | 01/01/2012 | 01/01/2012 |

Analysis of prior sale or transfer history of the subject property and comparable sales **Courthouse records show no sales or transfers of the subject property in the three years prior to the appraisal assignment effective date. Courthouse records show no sales or transfers of the comparables in the 12 months prior.**

NOTE: No suitable sales were found in the subject development, therefore sales from other nearby areas were used. Driving distance between subject and comparables is typical for this area.

Summary of Sales Comparison Approach. There were no sales in the year prior to the RETROSPECTIVE APPRAISAL DATE in the subject subdivision. Therefore, sales from other gated developments in the northwest portion of Vero Beach were utilized. The comparables above are from the Bent Pine golf development. All have superior golf and/or golf/pond views. Comp #1 and #2 were custom dwellings considered to be superior in terms of construction quality. Comp #1 is most similar in sq ft size. It was superior in condition requiring a large (over 10%) adjustment however. Comp #3 is smaller requiring a large GLA adjustment (over 10%). Those adjustments and others resulted in high net and gross adjustment on Comp #1 and #2 with high gross adjustment on Comp #3. Despite the adjusting needed, the comparables used were the best available. All three sales serve to support the final estimate of market value.

Indicated Value by Sales Comparison Approach $ 300,000

Indicated Value by: Sales Comparison Approach $ 300,000 Cost Approach (if developed) $ 322,900 Income Approach (if developed) $ 312,000

Appraiser relied most heavily on the Sales Comparison Approach since it is the comparison of the subject dwelling to recent sales of similar houses in the area. The Cost Approach serves to support the final estimate of market value.

This appraisal is made ☒ "as is," ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☐ subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair: **VALUATION AS OF RETROSPECTIVE DATE ESTABLISHED BY CLIENT (03/11/2011) BASED ON 1/17/2019 EXTERIOR FRONTAL (GATE) APPRAISER DRIVE-BY INSPECTION.**

Based on a visual inspection of the exterior areas of the subject property from at least the street, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $ **300,000**
as of **03/11/2011** , which is the date of inspection and the effective date of this appraisal.

Freddie Mac Form 2055 March 2005    UAD Version 9/2011    Produced using ACI software, 800.234.8727 www.aciweb.com    Fannie Mae Form 2055 March 2005
Page 2 of 6    2055_05UAD 12182015

STATEWIDE APPRAISAL SERVICE INC.

## Exterior-Only Inspection Residential Appraisal Report

C. F. Stiles, SRA     File No. 4590

**ADDITIONAL COMMENTS**

All three sales serve to support the final estimate of market value.

This appraiser has not conducted an appraisal nor any service on the subject property in the three years prior to the appraisal assignment acceptance date.

As noted, this is a gated development and the appraiser was denied access at the entry gate. Accordingly, the photo of the subject in this appraisal is of the entry gate with MLS photo as well. All comparables are also gated. Appraiser was denied access at the entry gate to Bent Pine. Accordingly, comp photos in this report are of the the entry gate plus MLS photos.

### COST APPROACH TO VALUE (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)    The SITE value is based on 2011 land sales from the Vero Beach area.

| ESTIMATED | [ ] REPRODUCTION OR | [X] REPLACEMENT COST NEW | OPINION OF SITE VALUE ..................................... = $ | 59,500 |
|---|---|---|---|---|
| Source of cost data | Marshall & Swift Co | | Dwelling | 3,552 Sq. Ft. @ $ | 92.00 ........... = $ | 326,784 |
| Quality rating from cost service | Average | Effective date of cost data 12/2011 | | Sq. Ft. @ $ | .............. = $ | |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | | | Appl,Extras,Pool | | 29,220 |
| Physical: Est 4yr effective age in est 50yr economic life, equals | | | Garage/Carport 710 | Sq. Ft. @ $ | 21.00 .......... = $ | 14,910 |
| 8% physical depreciation (Rd) | | | Total Estimate of Cost-New | ............... = $ | 370,914 |
| External: Loss in value due to proliferation of REO and short-sale | | | Less | 50 | Physical | Functional | External | |
| properties. Est as 25% of RCN | | | Depreciation $30,000 | $0 | $92,700 | = $ ( | 122,700) |
| | | | Depreciated Cost of Improvements ................................. = $ | 248,214 |
| | | | "As-is" Value of Site Improvements ................................. = $ | 15,200 |
| Estimated Remaining Economic Life (HUD and VA only) | 46 Years | INDICATED VALUE BY COST APPROACH ........................ = $ | 322,900 |

### INCOME APPROACH TO VALUE (not required by Fannie Mae)

Estimated Monthly Market Rent $   2,600   X Gross Rent Multiplier   120   = $   312,000   Indicated Value by Income Approach

Summary of Income Approach (including support for market rent and GRM)   There was no MLS rental comp data for 2011. Rental comps from 2012 & 2013 show rental rates for executive houses (2100-2700sf) ranging from $0.78 to $0.85/sf/mo; At $0.75/sf subject market rental rate is 2600

### PROJECT INFORMATION FOR PUDs (if applicable)

| | |
|---|---|
| Is the developer/builder in control of the Homeowners' Association (HOA)? [X] Yes [ ] No   Unit type(s) [X] Detached [ ] Attached | |

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal name of project

| Total number of phases | Total number of units | Total number of units sold |
|---|---|---|
| Total number of units rented | Total number of units for sale | Data source(s) |

Was the project created by the conversion of an existing building(s) into a PUD? [ ] Yes [ ] No   If Yes, date of conversion.

Does the project contain any multi-dwelling units? [ ] Yes [ ] No   Data source(s)

Are the units, common elements, and recreation facilities complete? [ ] Yes [ ] No   If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association? [ ] Yes [ ] No   If Yes, describe the rental terms and options.

Describe common elements and recreational facilities.

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/19/19 Page 99 of 319
Case 4:11-cv-22408-MGC   Document 29-3   Entered on FLSD Docket 05/13/2015   Page 884 of 989
C. F. 8889 SRA

## Exterior-Only Inspection Residential Appraisal Report

File No. 4590

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD).  This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications.  Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted.  The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment.  Modifications or deletions to the certifications are also not permitted.  However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

**SCOPE OF WORK:**  The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications.  The appraiser must, at a minimum: (1) perform a visual inspection of the exterior areas of the subject property from at least the street, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

The appraiser must be able to obtain adequate information about the physical characteristics (including, but not limited to, condition, room count, gross living area, etc.) of the subject property from the exterior-only inspection and reliable public and/or private sources to perform this appraisal.  The appraiser should use the same type of data sources that he or she uses for comparable sales such as, but not limited to, multiple listing services, tax and assessment records, prior inspections, appraisal files, information provided by the property owner, etc.

**INTENDED USE:**  The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

**INTENDED USER:**  The intended user of this appraisal report is the lender/client.

**DEFINITION OF MARKET VALUE:**  The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus.  Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions.  No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions.  Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction.  Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

**STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:**  The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1.   The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal.  The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2.   The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area.  Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

3.   The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

4.   The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing this appraisal.  Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied.  The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist.  Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

5.   The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

Freddie Mac Form 2055   March 2005
UAD Version 9/2011
Produced using ACI software, 800.234.8727 www.aciweb.com
Page 4 of 6
Fannie Mae Form 2055 March 2005
2055_05UAD 12182015

C. F. 9889 SRA

## Exterior-Only Inspection Residential Appraisal Report

File No. 4590

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1.   I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2.   I performed a visual inspection of the exterior areas of the subject property from at least the street. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3.   I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4.   I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value.  I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment.  I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5.   I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6.   I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7.   I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8.   I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9.   I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10.  I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11.  I have knowledge and experience in appraising this type of property in this market area.

12.  I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13.  I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14.  I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value.  I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal.  I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15.  I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16.  I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17.  I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction.  I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18.  My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19.  I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report.  If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report.  I certify that any individual so named is qualified to perform the tasks.  I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

20.  I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

21.  The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent.  Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

C. F. Stites SRA

## Exterior-Only Inspection Residential Appraisal Report

File No. 4590

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

**SUPERVISORY APPRAISER'S CERTIFICATION:** The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature | Signature |
| Name C. F. Stites, SRA | Name |
| Company Name C F Stites appraiser | Company Name |
| Company Address P O Box 991 | Company Address |
| Lake Worth, FL 33460 | |
| Telephone Number 561 588-2550 | Telephone Number |
| Email Address realestateappraiserflorida@gmail.com | Email Address |
| Date of Signature and Report 01/24/2019 | Date of Signature |
| Effective Date of Appraisal 03/11/2011 | State Certification # |
| State Certification # RZ2761 | or State License # |
| or State License # | State |
| or Other (describe) _____ State # _____ | Expiration Date of Certification or License |
| State FL | |
| Expiration Date of Certification or License 11/30/2020 | |

ADDRESS OF PROPERTY APPRAISED
4590 Kodiak Drive
Vero Beach, FL 32967

SUBJECT PROPERTY
☐ Did not inspect exterior subject property
☐ Did inspect exterior of subject property from street
  Date of Inspection _____

APPRAISED VALUE OF SUBJECT PROPERTY $ 300,000

LENDER/CLIENT
Name Valcentric LLC
Company Name Integra Realty Resources
Company Address 9155 S. Dadeland Blvd, Ste 1208
Miami, FL 33156
Email Address

COMPARABLE SALES
☐ Did not inspect exterior of comparable sales from street
☐ Did inspect exterior of comparable sales from street
  Date of Inspection _____

Freddie Mac Form 2055 March 2005     UAD Version 9/2011     Produced using ACI software, 800.234.8727 www.aciweb.com     Fannie Mae Form 2055 March 2005
Page 6 of 6     2055_05UAD 12182015

STATEWIDE APPRAISAL SERVICE INC.

C.F. Sidebranch

Uniform Appraisal Dataset Definitions                                    File No. **4590**

---

Condition Ratings and Definitions

C1     The improvements have been very recently constructed and have not previously been occupied. The entire structure and all components are new and the dwelling features no physical depreciation.*

*Note: Newly constructed improvements that feature recycled materials and/or components can be considered new dwellings provided that the dwelling is placed on a 100% new foundation and the recycled materials and the recycled components have been rehabilitated/re-manufactured into like-new condition. Recently constructed improvements that have not been previously occupied are not considered "new" if they have any significant physical depreciation (i.e., newly constructed dwellings that have been vacant for an extended period of time without adequate maintenance or upkeep).*

C2     The improvements have been well maintained and feature limited physical depreciation due to normal wear and tear, little or no physical depreciation, and require no repairs. Virtually all building components are new or have been recently repaired, refinished, or rehabilitated. All outdated components and finishes have been updated and/or replaced with components that meet current standards. Dwellings in this category either are almost new or have been recently completely renovated and are similar in condition to new construction.

*Note: The improvements represent a relatively new property that is well maintained with no deferred maintenance and little or no physical depreciation, or an older property that has been recently completely renovated.*

C3     The improvements are well maintained and feature limited physical depreciation due to normal wear and tear. Some components, but not every major building component, may be updated or recently rehabilitated. The structure has been well maintained.

*Note: The improvement is in its first-cycle of replacing short-lived building components (appliances, floor coverings, HVAC, etc.) and is being well maintained. Its estimated effective age is less than its actual age. It also may reflect a property in which the majority of short-lived building components have been replaced but not to the level of a complete renovation.*

C4     The improvements feature some minor deferred maintenance and physical deterioration due to normal wear and tear. The dwelling has been adequately maintained and requires only minimal repairs to building components/mechanical systems and cosmetic repairs. All major building components have been adequately maintained and are functionally adequate.

*Note: The estimated effective age may be close to or equal to its actual age. It reflects a property in which some of the short-lived building components have been replaced, and some short-lived building components are at or near the end of their physical life expectancy; however, they still function adequately. Most minor repairs have been addressed on an ongoing basis resulting in an adequately maintained property.*

C5     The improvements feature obvious deferred maintenance and are in need of some significant repairs. Some building components need repairs, rehabilitation, or updating. The functional utility and overall livability is somewhat diminished due to condition, but the dwelling remains useable and functional as a residence.

*Note: Some significant repairs are needed to the improvements due to the lack of adequate maintenance. It reflects a property in which many of its short-lived building components are at the end of or have exceeded their physical life expectancy but remain functional.*

C6     The improvements have substantial damage or deferred maintenance with deficiencies or defects that are severe enough to affect the safety, soundness, or structural integrity of the improvements. The improvements are in need of substantial repairs and rehabilitation, including many or most major components.

*Note: Substantial repairs are needed to the improvements due to the lack of adequate maintenance or property damage. It reflects a property with conditions severe enough to affect the safety, soundness, or structural integrity of the improvements.*

---

**Quality Ratings and Definitions**

Q1     Dwellings with this quality rating are usually unique structures that are individually designed by an architect for a specified user. Such residences typically are constructed from detailed architectural plans and specifications and feature an exceptionally high level of workmanship and exceptionally high-grade materials throughout the interior and exterior of the structure. The design features exceptionally high-quality exterior refinements and ornamentation, and exceptionally high-quality interior refinements. The workmanship, materials, and finishes throughout the dwelling are of exceptionally high quality.

Q2     Dwellings with this quality rating are often custom designed for construction on an individual property owner's site. However, dwellings in this quality grade are also found in high-quality tract developments featuring residences constructed from individual plans or from highly modified or upgraded plans. The design features detailed, high-quality exterior ornamentation, high-quality interior refinements, and detail. The workmanship, materials, and finishes throughout the dwelling are generally of high or very high quality.

Q3     Dwellings with this quality rating are residences of higher quality built from individual or readily available designer plans in above-standard residential tract developments or on an individual property owner's site. The design includes significant exterior ornamentation and interiors that are well finished. The workmanship exceeds acceptable standards and many materials and finishes throughout the dwelling have been upgraded from "stock" standards.

Q4     Dwellings with this quality rating meet or exceed the requirements of applicable building codes. Standard or modified standard building plans are utilized and the design includes adequate fenestration and some exterior ornamentation and interior refinements. Materials, workmanship, finish, and equipment are of stock or builder grade and may feature some upgrades.

Q5     Dwellings with this quality rating feature economy of construction and basic functionality as main considerations. Such dwellings feature a plain design using readily available or basic floor plans featuring minimal fenestration and basic finishes with minimal exterior ornamentation and limited interior detail. These dwellings meet minimum building codes and are constructed with inexpensive, stock materials with limited refinements and upgrades.

Q6     Dwellings with this quality rating are of basic quality and lower cost; some may not be suitable for year-round occupancy. Such dwellings are often built with simple plans or without plans, often utilizing the lowest quality building materials. Such dwellings are often built or expanded by persons who are professionally unskilled or possess only minimal construction skills. Electrical, plumbing, and other mechanical systems and equipment may be minimal or non-existent. Older dwellings may feature one or more substandard or non-conforming additions to the original structure.

---

**Definitions of Not Updated, Updated, and Remodeled**

Not Updated
Little or no updating or modernization. This description includes, but is not limited to, new homes.
Residential properties of fifteen years of age or less often reflect an original condition with no updating, if no major components have been replaced or updated. Those over fifteen years of age are also considered not updated if the appliances, fixtures, and finishes are predominantly dated. An area that is 'Not Updated' may still be well maintained and fully functional, and this rating does not necessarily imply deferred maintenance or physical /functional deterioration.

Updated
The area of the home has been modified to meet current market expectations. These modifications are limited in terms of both scope and cost.
An updated area of the home should have an improved look and feel, or functional utility. Changes that constitute updates include refurbishment and/or replacing components to meet existing market expectations. Updates do not include significant alterations to the existing structure.

Remodeled
Significant finish and/or structural changes have been made that increase utility and appeal through complete replacement and/or expansion.
A remodeled area reflects fundamental changes that include multiple alterations. These alterations may include some or all of the following: replacement of a major component (cabinet(s), bathtub, or bathroom tile), relocation of plumbing/gas fixtures/appliances, significant structural alterations (relocating walls, and/or the addition of square footage). This would include a complete gutting and rebuild.

---

**Explanation of Bathroom Count**

The number of full and half baths is reported by separating the two values by a period. The full bath is represented to the left of the period. The half bath count is represented to the right of the period. Three-quarter baths are to be counted as a full bath in all cases. Quarter baths (baths that feature only toilet) are not to be included in the bathroom count.

---

C.F. Signature

Uniform Appraisal Dataset Definitions

File No. 4590

## Abbreviations Used in Data Standardization Text

| Abbrev. | Full Name | Appropriate Fields | Abbrev. | Full Name | Appropriate Fields |
|---------|-----------|--------------------|---------|-----------|--------------------|
| ac | Acres | Area, Site | in | Interior Only Stairs | Basement & Finished Rooms Below Grade |
| AdjPrk | Adjacent to Park | Location | Lndfl | Landfill | Location |
| AdjPwr | Adjacent to Power Lines | Location | LtdSght | Limited Sight | View |
| A | Adverse | Location & View | Listing | Listing | Sale or Financing Concessions |
| ArmLth | Arms Length Sale | Sale or Financing Concessions | MR | Mid-Rise Structure | Design(Style) |
| AT | Attached Structure | Design(Style) | Mtn | Mountain View | View |
| ba | Bathroom(s) | Basement & Finished Rooms Below Grade | N | Neutral | Location & View |
| br | Bedroom | Basement & Finished Rooms Below Grade | NonArm | Non-Arms Length Sale | Sale or Financing Concessions |
| B | Beneficial | Location & View | op | Open | Garage/Carport |
| BsyRd | Busy Road | Location | o | Other | Basement & Finished Rooms Below Grade |
| cp | Carport | Garage/Carport | O | Other | Design(Style) |
| Cash | Cash | Sale or Financing Concessions | Prk | Park View | View |
| CtySky | City View Skyline View | View | Pstrl | Pastoral View | View |
| CtyStr | City Street View | View | PwrLn | Power Lines | View |
| Comm | Commercial Influence | Location | PubTrn | Public Transportation | Location |
| c | Contracted Date | Date of Sale/Time | rr | Recreational (Rec) Room | Basement & Finished Rooms Below Grade |
| Conv | Conventional | Sale or Financing Concessions | Relo | Relocation Sale | Sale or Financing Concessions |
| cv | Covered | Garage/Carport | REO | REO Sale | Sale or Financing Concessions |
| CrtOrd | Court Ordered Sale | Sale or Financing Concessions | Res | Residential | Location & View |
| DOM | Days On Market | Data Sources | RT | Row or Townhouse | Design(Style) |
| DT | Detached Structure | Design(Style) | RH | Rural Housing - USDA | Sale or Financing Concessions |
| dw | Driveway | Garage/Carport | SD | Semi-detached Structure | Design(Style) |
| Estate | Estate Sale | Sale or Financing Concessions | s | Settlement Date | Date of Sale/Time |
| e | Expiration Date | Date of Sale/Time | Short | Short Sale | Sale or Financing Concessions |
| FHA | Federal Housing Authority | Sale or Financing Concessions | sf | Square Feet | Area, Site, Basement |
| g | Garage | Garage/Carport | sqm | Square Meters | Area, Site, Basement |
| ga | Garage - Attached | Garage/Carport | Unk | Unknown | Date of Sale/Time |
| gbi | Garage - Built-in | Garage/Carport | VA | Veterans Administration | Sale or Financing Concessions |
| gd | Garage - Detached | Garage/Carport | wo | Walk Out Basement | Basement & Finished Rooms Below Grade |
| GR | Garden Structure | Design(Style) | wu | Walk Up Basement | Basement & Finished Rooms Below Grade |
| GlfCse | Golf Course | Location | WtrFr | Water Frontage | Location |
| Glfvw | Golf Course View | View | Wtr | Water View | View |
| HR | High Rise Structure | Design(Style) | w | Withdrawn Date | Date of Sale/Time |
| Ind | Industrial | Location & View | Woods | Woods View | View |

## Other Appraiser-Defined Abbreviations

| Abbrev. | Full Name | Appropriate Fields | Abbrev. | Full Name | Appropriate Fields |
|---------|-----------|--------------------|---------|-----------|--------------------|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

SINGLE FAMILY COMPARABLE RENT SCHEDULE

This form is intended to provide the appraiser with a familiar format to estimate the market rent of the subject property.
Adjustments should be made only for items of significant difference between the comparables and the subject property.

C. F. Stites, SRA

File No. 4590

| ITEM | SUBJECT | COMPARABLE NO. 1 | | COMPARABLE NO. 2 | | COMPARABLE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 4590 Kodiak Drive Vero Beach, FL 32967 | 4311 Summer Breeze Terrace Vero Beach, FL 32967 | | 2206 Falls Circle Vero Beach, FL 32967 | | 5421 Barbados Square Vero Beach, FL 32967 | |
| Proximity to Subject | | 3.40 miles SE | | 2.92 miles NE | | 0.97 miles NE | |
| Date Lease Begins | | 12/2012 | | 01/2013 | | 06/2013 | |
| Date Lease Expires | | 11/3013 | | 12/2014 | | 05/2014 | |
| Monthly Rental | If Currently Rented: $ | $                    2,000 | | $                    2,100 | | $                    2,000 | |
| Less: Utilities | | $ | | $ | | $ | |
|       Furniture | | $                        0 | | $                        0 | | $                        0 | |
| Adjusted Monthly Rent | $ | $                    2,000 | | $                    2,100 | | $                    2,000 | |
| Data Source | | MLS#130395 Agent | | MLS#134033 Agent | | MLS#135928 Agent | |
| RENT ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Rent Concessions | | None | | None | | None | |
| Location/View | N;Res;Gated N;Res;Res | N;Res;Res N;Res;Res | 0 | N;Res;Res N;Res;Res | 0 | N;Res;Res N;Res;Res | 0 |
| Design and Appeal | DT1.0;Ranch | DT1.0;Ranch | | DT1.0;Ranch | | DT1.0;Ranch | |
| Age/Condition | 5 C4 | 6 C3 | 0 0 | 5 C3 | 0 0 | 5 C4 | 0 |
| Above Grade | Total 8  Bdrms 4  Baths 3.00 | Total 7  Bdrms 3  Baths 3.00 | | Total 7  Bdrms 3  Baths 3.00 | | Total 8  Bdrms 4  Baths 4.00 | -100 |
| Room Count | | | 0 | | 0 | | |
| Gross Living Area | 3,552 Sq. Ft. | 2,519 Sq. Ft. | 500 | 2,692 Sq. Ft. | 450 | 2,467 Sq. Ft. | 550 |
| Other (e.g., basement, etc.) | 0sf | 0sf | | 0sf | | 0sf | |
| Other: | RO DW Di MW Fence,Pool | RO DW Di MW Spa | 100 | RO DW Di MW None | 150 | RO DW Di MW Fence,Pool | |
| Net Adj. (total) | | [X] + ☐ - $ | 600 | [X] + ☐ - $ | 600 | [X] + ☐ - $ | 450 |
| Indicated Monthly | | 30.0 | | 28.6 | | 32.5 | |
| Market Rent | | 30.0 $ | 2,600 | 28.6 $ | 2,700 | 22.5 $ | 2,450 |

Comments on market data, including the range of rents for single family properties, an estimate of vacancy for single family rental properties, the general trend of rents and vacancy, and support for the above adjustments. (Rent concessions should be adjusted to the market, not to the subject property.)
No rental comparable data for 2010 or 2011 in MLS system; 2012 is the earliest rental data available.  The above rentals are from 2012 and 2013.  All rental comparables are smaller in GLA size - no rentals of similar size were found.  Like the subject, Rental Comparable #3 has a pool.  Rental Comparable #1 has an in-ground spa while Rental Comparable #2 has neither.  Large individual adjustments were needed for differences in GLA size.  Size adjustment is at 50 cents per sq ft.

No suitable rental comparables were found nearby, therefore rentals used were over 1 mile away.

Final Reconciliation of Market Rent:  Comparable rentals used were the best available.  These rentals all occurred AFTER the effective date of this appraisal report.

THIS RENTAL ANALYSIS IS AS OF A RETROSPECTIVE DATE (03/11/2011) BASED ON 01/17/2019 EXTERIOR FRONTAL DRIVE-BY PROPERTY INSPECTION (OF GATE) BY THIS APPRAISER AS NOTED IN THE REPORT WHICH ACCOMPANIES THIS FORM.

I (WE) ESTIMATE THE MONTHLY MARKET RENT OF THE SUBJECT AS OF   03/11/2011                   TO BE $              2,600

APPRAISER:                                                                SUPERVISORY APPRAISER (ONLY IF REQUIRED):

Signature                                                                 Signature
Name   C. F. Stites, SRA                                                  Name
Date Report Signed   01/24/2019                                           Date Report Signed
State Certification #   RZ2761                        State  FL           State Certification #                              State
Or State License #                                   State               Or State License #                                State
Date Property Inspected 03/11/2011                                        Date Property Inspected

☐ Did  ☐ Did Not  Inspect Property

Freddie Mac Form 1000 (8/88)        Produced using ACI software, 800.234.8727 www.aciweb.com        Fannie Mae Form 1007 (8/88)
                                                                                                    1007 08192010

STATEWIDE APPRAISAL SERVICE INC.

Case 1:11-cv-22408-MGC Document 273-5 Entered on FLSD Docket 09/15/2013 Page 890 of 989

SUBJECT PROPERTY PHOTO ADDENDUM

| Borrower: Gail Elkwan | | | |
|---|---|---|---|
| Property Address: 4590 Kodiak Drive | | File No.: 4590 | Case No.: |
| City: Vero Beach | | State: FL | Zip: 32967 |
| Lender: Integra Realty Resources | | | |



**FRONT VIEW OF
SUBJECT PROPERTY**

Appraised Date: March 11, 2011
Appraised Value: $ 300,000



**REAR VIEW OF
SUBJECT PROPERTY**



**STREET SCENE**

COMPARABLE PROPERTY PHOTO ADDENDUM

| | |
|---|---|
| Borrower: Gul Lalwani | |
| Property Address: 4590 Kodiak Drive | File No.: 4580 | Case No.: |
| City: Vero Beach | State: FL | Zip: 32967 |
| Lender: Integra Realty Resources | | |



**COMPARABLE SALE #1**

5880 Glen Eagle Lane
Vero Beach, FL 32967
Sale Date: s08/10;c07/10
Sale Price: $ 465,000



**COMPARABLE SALE #2**

5881 Bent Pine Drive
Vero Beach, FL 32967
Sale Date: s12/10;c11/10
Sale Price: $ 375,000



**COMPARABLE SALE #3**

5835 Glen Eagle Lane
Vero Beach, FL 32967
Sale Date: s01/11;c12/10
Sale Price: $ 260,000

| Borrower: Carl Baldwin | | File No.: 4590 |
| Property Address: 4590 Kodiak Drive | | Case No.: |
| City: Vero Beach | State: FL | Zip: 32967 |
| Lender: Integra Realty Resources | | |



Comp #1 - MLS photo



Comp #2 - MLS photo



Comp #3 - MLS photo

| Borrower: Carl Ellwein | | | |
|---|---|---|---|
| Property Address: 4590 Kodiak Drive | | Case No.: | |
| City: Vero Beach | State: FL | | Zip: 32967 |
| Lender: Integra Realty Resources | | | |



Rental comparable #1
4311 Summer Breeze



Rental comparable #2
2206 Falls Circle



Rental comparable #3
5421 Barbados Sq

| Borrower: Gul Lalwani | | |
|---|---|---|
| Property Address: 4590 Kodiak Drive | | Case No.: |
| City: Vero Beach | State: FL | Zip: 32967 |
| Lender: Integra Realty Resources | | |

File No.: 4590



MLS Photo - subject property



| Borrower: Gul Lalwani | | File No.: 4590 | |
|---|---|---|---|
| Property Address: 4590 Kodiak Drive | | Case No.: | |
| City: Vero Beach | State: FL | | Zip: 32967 |
| Lender: Integra Realty Resources | | | |



Landmark Web Official Records Search

1/24/2019

LOCATION MAP

| | | | |
|---|---|---|---|
| Borrower: Gul Lalwani | | File No.: 4590 | |
| Property Address: 4590 Kodiak Drive | | Case No.: | |
| City: Vero Beach | State: FL | | Zip: 32967 |
| Lender: Integra Realty Resources | | | |



AERIAL MAP

| Borrower: Gul Lalwani | | File No.: 4590 | |
| Property Address: 4590 Kodiak Drive | | Case No.: | |
| City: Vero Beach | State: FL | | Zip: 32967 |
| Lender: Integra Realty Resources | | | |



Subject
4590 Kodiak Drive
Vero Beach, FL 32967

FLOOD MAP



| Borrower: Gul Lalwani | | File No.: 4590 |
| Property Address: 4590 Kodiak Drive | | Case No.: |
| City: Vero Beach | State: FL | Zip: 32967 |
| Lender: Integra Realty Resources | | |

**FLOOD INFORMATION**

**Community:** Indian River County

Property is NOT in a FEMA Special Flood Hazard Area

**Map Number:** 12061C0237H

**Panel:** 0237H

**Zone:** X

**Map Date:** 12-04-2012

**FIPS:** 12061

**Source:** FEMA DFIRM

**LEGEND**

⬛ = FEMA Special Flood Hazard Area – High Risk

🟨 = Moderate and Minimal Risk Areas

**Road View:**

🟩 = Forest  🟦 = Water

**Sky Flood™**

No representations or warranties to any party concerning the content, accuracy or completeness of this flood report, including any warranty of merchantability or fitness for a particular purpose is implied or provided. Visual scaling factors differ between map layers and are separate from flood zone information at marker location. No liability is accepted to any third party for any use or misuse of this flood map or its data.

| Borrower: Gul Lalwani | | | File No.: 4590 |
|---|---|---|---|
| Property Address: 4590 Kodiak Drive | | | Case No.: |
| City: Vero Beach | | State: FL | Zip: 32967 |
| Lender: Integra Realty Resources | | | |

| Borrower: Gul Lalwani | | File No.: 4590 | |
|---|---|---|---|
| Property Address: 4590 Kodiak Drive | | Case No.: | |
| City: Vero Beach | State: FL | Zip: 32967 | |
| Lender: Integra Realty Resources | | | |





# Anthony M. Graziano, MAI, CRE

**Integra Realty Resources**
**Miami/Palm Beach**

Dadeland Centre
9155 S. Dadeland Boulevard
Suite 1208
Miami, FL 33156

T 305.670.0001
F 305.670.2276

irr.com

## Experience

Senior Managing Director of Integra Realty Resources – Miami/Palm Beach.

Mr. Graziano has actively counseled and advised clients on the sale, leasing, valuation, management, and development of commercial real estate assets throughout the northeast and southeast U.S. since 1992.

Mr. Graziano's professional perspective is a blend of his experience and educational background which includes formal training in architecture, urban planning, macro and micro economics, real estate finance, institutional asset management, and land development. His market experience in sales, leasing, management, and valuation disciplines combine to bring practical real world answers to complex planning and development projects. He has been actively involved as a consultant and/or member of a consultant team on various major redevelopment and land use projects for public and private clients over the past 25+ years.

Mr. Graziano has specialized in consulting and valuation assignments for corporate and private clients on a wide array of complex issues related to estate and condemnation matters, title defects, environmental contamination/damages, air rights, partial and fractional interests, contract disputes, and mediation/arbitration disputes. Mr. Graziano's experience in these matters provides a comprehensive framework for effective strategic real estate consulting.

## Professional Activities & Affiliations

Advisory Board Member: Urban Land Institute (ULI) South Florida / Caribbean
Advisory Board Member: University of Miami M+RED Program
Member: Economic Roundtable - Miami Beacon Council (2012-present)
Board of Director: Integra Realty Resources, Inc. (2011-2016)
Chairman of the Board:    Integra Realty Resources, Inc. (2016-present)
Director: South Florida Chapter of the Appraisal Institute (2014-2016)
Board Member: Builders Association of South Florida (BASF) (2014-2016)
Subject Matter Expert (SME): Appraisal Practice Board, Appraisal Foundation
Member: Appraisal Institute (MAI) (2008-Present)
Member: Counselors of Real Estate (CRE) (2007-Present)
National Association of Realtors (REALTOR)
Miami Association of REALTORS Industry Analyst of the Year (2016)
Former Fellow: Royal Institute of Chartered Surveyors (FRICS) (2007-2014)
AI Leadership Development Advisory Council, March 1998 - February 2001
Lifetime Member: National Eagle Scout Association (NESA)

## Licenses

Florida, State-Certified General Real Estate Appraiser, RZ3510
New Jersey, State-Certified General Real Estate Appraiser, RG001261

## Education

University of Miami, Coral Gables, Florida 1988-1992
Degree: Bachelor of Science in Land Development and Planning, School of Architecture

New York University Real Estate Institute, New York, New York 1993-1996
Degree: Master of Science in Real Estate Development and Investment



amgraziano@irr.com    -    305.670.0001 x320

# Anthony M. Graziano, MAI, CRE

**Integra Realty Resources**
**Miami/Palm Beach**

The Douglas Centre
2600 Douglas Road, Suite 801
Coral Gables, FL 33134

T 305.670.0001
F 305.670.2276

irr.com

## Qualified Before Courts & Administrative Bodies

Qualified and accepted as an expert before:
US Bankruptcy Court (Newark, Southern District of Texas, Southern District of Florida)
US Federal District Court (Southern District of Florida)
FL Circuit Court (Miami-Dade, Broward, and Monroe Counties)
NJ State Tax Court
NJ Superior Court - Chancery Division
NJ Superior Court - Law Division
Various municipal planning and zoning boards throughout New Jersey and Florida
Various Taxing Authorities and Boards throughout New Jersey and Florida



amgraziano@irr.com    -    305.670.0001 x320

**Anthony M. Graziano, MAI, CRE, FRICS**
PROFFERED OR DISCLOSED EXPERT WITNESS REPORTS/SETTLEMENTS

| RETENTION DATE | ON BEHALF | IRR FILE # | COURT CASE NO. | COURT / VENUE | CASE NAME | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|
| 1/2015 | Defendant | 123-2015-0037 | 14-CV-22384 UU | Miami-Dade County, FL | Ray Benson & Maria Helena V. QBE Insurance Corporation | John A. Camp | Retrospective (2004-2006) analysis of market value claims against insurance company related to property |
| 9/2014 | Defendant | 123-2014-0194 | 13-030804CA 10 | 11th Judicial Circuit Miami-Dade, FL | Manuel Soltero V. Adorno & Yoss, LLP | Kaplan Zeena, LLP | Professional Liability suit against law firm and attorneys for malfeasance in litigation matter. |
| 2/2014 | Plaintiff | 123-2014-0030 | Settled | Carribean Islands | Rainmaker Development V. A&F Bahamas, etal | VLASAC & SHMARUK, LLC | Partnership Dispute between Joint Venture in Carribean development project (golf course, villas, and large-scale marina-commercial-retail development) |
| 11/2012 | Defendant | 123-2012-0140 | 42-2012-CA-001065 | Marion County, FL | CSX Transportation, Inc. V. Moshen Saranazi, Faith Ann Safarazi, Proverbium Hidg, LLC, USA & Georgi Albright | NeJame, La Fay, Jancha, Ahmed, Barker, Joshi & Moreno, P.A. | Condemnation of partial interest with damages |
| 7/2012 | Confidential | 123-2012-0076 | Confidential | Broward County, FL | Ft. Lauderdale-Hollywood Int'l Airport Expansion | White & Case, LLP | Value Diminution Study to assist public agency in good faith negotiations based on airport expansion. |
| 6/2012 | Defendant | 123-2012-0070 | 10-49616-CA-40 | Miami-Dade County, FL | C8 Entertainment, LLC V. South Beach Ocean Parcel | Kubicki Draper, P.A. | Construction Damages claim |
| 12/2009 | Plaintiff | 109-2009-0443 | Dept. Justice File 90-11-3-5801 | Federal District Court of Virginia | United States vs. Atlantic Wood Industries, Inc. | U.S. Department of Justice | Damages/environmental contamination dispute between United States Navy and responsible party (Atlantic Wood Industries) |

**Anthony M. Graziano, MAI, CRE, FRICS**
IDENTIFIED EXPERT WITNESS TESTIMONY AT DEPOSITION and/or TRIAL

| RETENTION DATE | ON BEHALF | TRI FILE # / COURT/CASE NO. | COURT / VENUE | CASE NAME | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|
| 6/2015 | Plaintiff | 123-2015-0170 / 15-008930-CA-01 | 11th Judicial Circuit Dade County, Florida (Hon. Peter R. Lopez) | Aaron Stauber & Aviva Stauber V. BH 33, LLC | Piedra & Associates, P.A. | Motion to dismiss Lis Pendens in an action to enforce contractual specific performance clause |
| 1/2015 | Defendant | 123-2015-0037 / 14-CV-22384 UU | Southern District of Florida | Ray Benson & Maria Helena Campos V. QBE Insurance Corporation | John Campis | Retrospective (2004-2006) analysis of market value claims against insurance company related to property damage claims arising from Hurricane Wilma |
| 1/2014 | Plaintiff | 123-2015-0031 / Pending | Miami-Dade County | Igor Ceri V. Yacht Club at Portofino Condo Association | Weil Quaranta McGovern, P.A. | Construction defect dispute related to water-intrusion and damage-detrimental conditions analysis of |
| 10/2014 | Plaintiff | 123-2014-0226 / 08-CA-408-P | Monroe County | Ocean Bank V. Lindback, Monroe County | Ocean Bank | Deficiency claim against borrower on real estate collateral in the Florida Keys (development site plus marine related improvements) |
| 10/2014 | Defendant | 123-2014-0215 / 11-24994 CA 06 | 11th Judicial Circuit Dade County, Florida | Palm-Aire Holdings V. JRGS Investments, LLC, Jorge Garcia-Serlff and Course Drive Investments, LLC | Cole, Scott & Kissane, P.A. | Partnership dispute over valuation issues proximal to a fractured condominium project (retrospective values), and operating agreement dispute |
| 7/2014 | Plaintiff | 123-2014-0194 / 13-016922 CACE 02 | 17th Judicial Circuit Broward County, Florida | Amalia I. Inarda-Rivera V. Rivera Diagnostic Center, Inc., Oknay Rivera & Yudit Rivero | Amalia I. Iñarda-Rivera | Rent default judgment and market rental and damage analysis associated with lease default. |
| 10/2014 | Defendant | 123-2014-0159 / 2014FLS34 (Pending) | Palm Beach County | Roehm Title Resources Claim | Title Resources Guaranty Company | Title insurance claim related to before and after damage/value diminution analysis based on defined site defects not identified by Title Insurance Company |
| 4/2014 | Plaintiff | 123-2014-0117 / 4:14-CV-01077 (Pending) | USA District Court for the Eastern District of Missouri Eastern Division | USA V. GSA-VA St. Louis Property, LLC | Bryan Cave LLP | Condemnation of a possessory interest for a term. Retained as consulting/rebuttal expert |
| 5/2014 | Defendant | 123-2014-0114 / Pending | Miami-Dade County | Eufloria Club | Rennert Boggio Marketder & Rodriguez, P.A. | Rent dispute regarding forced relocation of a nightclub, and relevant market rental rate of replacement club space in Miami |
| 4/2014 | Plaintiff | 123-2014-0089 | Broward County | Pan American Holdings Corp. V. Florida DOT Right of Way (ROW) Acquisition S.R. 7 | Henry Wulf, Esq. | Condemnation for R.O.W. purposes including before and after damage analysis |
| 1/2014 | Debtor | 123-2014-005 / 13-25728-BKC-RAM | US Federal Bankruptcy - Southern District of Florida - Miami Division (Hon. R. Mark) | West Airport Plaza Business Park, LLC | Counsel for the Debtor, Michael D. Seese, Esq. | Fairness Opinion and market value opinions in conjunction with Debtor's Plan for Reorganization |
| 8/2013 | Defendant | 123-2009-0016 / 02-23922-CA 09 | 17th Judicial Circuit Broward County, Florida | American Educational Enterprises, LLC v. The Board of Trustees of the Internal Improvement Trust Fund | Richard Alayon, Esq. - Alayon and Associates | Economic Damages case associated with an alleged misrepresentation or omission by seller of real property |
| 7/2013 | Plaintiff | 123-2013-0126 / CACE 0805762-4 (14) | 17th Judicial Circuit Broward County, Florida (Hon. Carlos A. Rodriguez) | Bayview Loan Servicing, LLC v. Kayhan Soodjani, Muhammad Mahmood, et al | Bayview Servicing, represented by Tabsis, Freedman and Soloff; Stacey Soloff, Esq. | Deficiency judgment on multi-family project (Dewey Street Apartments) |
| 3/2013 | Defendant | 123-2013-0105 / 11-23561 CIV - Rosenbaum | US District Court - Southern District of Florida (Hon. Rosenbaum) | United States of America v. G.K.K. etal | Richard Duvall, Holland and Knight and Jeffrey Nieman, Esq. | Condemnation claim on the 137,779 s.f. Miami Federal Bureau of Investigation (F.B.I.) building; condemnation of a possessory interest (leasehold) |
| 2/2013 | Plaintiff | 123-2011-0670 / 09-06850 CA 04 | 11th Judicial Circuit Dade County, Florida (Hon. Beth Bloom) | Zenaida Gomez v. City of Pinecrest | Cynthia A. Everett, Cynthia A. Everett, P.A. | Economic damage resulting from temporary taking (seizure) of private residence |
| 1/2013 | Defendant | 123-2013-0016 / 12-60950-CIV | US Federal Court - Southern District of Florida | G Lending, Inc., Equity Financial Group, Inc., and Equity Commercial Group, Inc. v. Travelers Companies, Inc. etal | Heidi Raschke, Butler Pappas etal | Value diminution resulting from alleged mortgage fraud. |
| 11/2012 | Plaintiff | 123-2013-0003 / Pending | 11th Judicial Circuit Dade County, Florida | Ken Wurtenberger, Esq, Koeboldt Oxbrow Ferguson | Daniel Levin, Esq., Cole, Scott, Kissane, P.A. Tax Protest | Tax protest of commercial condominium. |
| 10/19/2012 | Plaintiff | 123-2012-0111 / 2011-1107 CA-23 | 11th Judicial Circuit Dade County, Florida (Hon. Stanford Blake) | Renegade at Hialeah Blvd v. Dynatech Engineering | Daniel Levin, Esq., Cole, Scott, Kissane, P.A. | Economic Damages case, diminution in value resulting from prepaid lease modification. |
| 10/12/2012 | Plaintiff | 123-2012-0109 / 11-30189 CA21 | 11th Judicial Circuit Dade County, Florida | Yaffa Yakubov vs. Bayview at Fisher Island No 3 | Craig Mirko, Esq., Cole Scott Kissane, P.A. | Market Value estimate of Fisher Island Condominium purchased under right of first refusal; economic damages claimed by Plaintiff due to contract dispute arising from association's exercise of right of first refusal |
| 8/20/2012 | Plaintiff | 123-2010-0012 / CA-(2180) CA-25 | 11th Judicial Circuit Dade County, Florida | 7935 NBV, LLC v. Harbour East Development LTD, Mario Egozi, etal | Jose Casal, Esq., Holland and Knight | Deficiency judgment on 32-unit fractured condominium, substitute expert following issuance of IRR-Miami reports in 2010 and 2012. |
| 8/15/2012 | Disclosed Dual Expert | 123-2012-0072 | Matrimonial Mediation | Vazquez v. Vazquez Matrimonial Matter | Colon and Mendoza and Robert Hertzberg, P.A. | Retained as a court-appointed third party expert to both parties to appraise (2) martial assets comprised of office, retail, single and multi-family units in FL, TN, NC, and Illinois, Bahamas |
| 7/2012 | Plaintiff | 109-2011 / Pending: 2003-2014 | Tax Court of New Jersey (Hon. Patrick DeAlemeida) | BASF Inc., successor Ciba Geigy Inc. vs. Township of Toms River | Phil Genuario, Garippa, etal on behalf of BASF | Challenge to multi-year appeal of $80 Million+ land assessment on contaminated superfund site in Central New Jersey |
| 3/2012 | Plaintiff | 109-2010 / ATL-L-4451-08 | Superior Court of New Jersey, Law Division Atlantic County | Scot Netherlands Inc. vs. State of New Jersey Department of Environmental Protection (NJDEP) | Jay Rhatican, Connell Foley on behalf of Scot Netherlands, Inc. | Challenge to NJDEP permit denial to fill wetlands, deprivation of all reasonable investment backed expectations |
| 07/2011 | Defendant | 109-2010 / MER-L-3034-08 | Superior Court of New Jersey Mercer County | 480 Mercer Street, LLP and Bruckner Southern, LLC vs. Hightstown | Aneil Zaro Grimm & Aaron, P.C. Husam Chater | Litigation-Dispute Resolution - Hightstown Zoning Challenge |
| 12/2009 | Plaintiff | 109-2009-0443 / Dept. Justice File 90-11-3-5801 | Federal District Court of Virginia | United States vs. Atlantic Wood Industries, Inc. | U.S. Department of Justice | Damages/environmental contamination dispute between United States Navy and responsible party (Atlantic Wood Industries) |
| 12/2009 | Plaintiff | 109-2009-0377 | Tax Court of New Jersey | Weixruah/HPC Mortgage Fund vs. City of Atlantic City | Cole, Schotz, Meisel, Forman & Leonard, P.A. Carl Rizzo, Esq. | Tax Appeals - To develop an opinion of the market value of the fee simple interest in the property |

M. Qualis: Graziano; Trial Lists



**Anthony M. Graziano, MAI, CRE, FRICS**
IDENTIFIED EXPERT WITNESS TESTIMONY AT DEPOSITION and/or TRIAL

| RETENTION DATE | ON BEHALF | RR FILE # | COURT CASE NO | CASE NAME | COURT / VENUE | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|
| 1/2009 | Secured Creditor | 109-2009-0438 | 3035-001 | Erickson Building | US Bankruptcy Court - Southern District of Texas | Stuart Glick, Esq., Sills, Cummis & Gross | Market Value for Bankruptcy of 140,000 SF corporate campus in Bethesda, Maryland |
| 09/2009 | Plaintiff | 109-2009-0123 | INA (DEFS Pending) | Bay Head Yacht Club vs. Ocean County Tax Board | Tax Court of New Jersey | John Doyle, Carluccio, Leone, Dimon, Doyle & Sacks, LLC | Tax Appeal for Bay Head Yacht Club |
| 12/2008 | Plaintiff | 109-2008-XXX | INA (DEFS Pending) | Mirage Atlantic City (MAC) vs. City of Atlantic City | Tax Court of New Jersey | Hank Rovitzari, Esq. | Tax Appeal at State Tax Court on 15 acre casino site adjacent to Trump Marina |
| 08/2008 | Defendant | 109-2008-0252 | L-2424-05 | The City of South Amboy vs. Lower Main Street Development, LLC & Amboy Aggregates Joint Venture | Superior Court of New Jersey Law Division, Middlesex County | Bathgate, Wegenar, etal | Verified complaint in condemnation |
| 8/2008 | Defendant | 109-2008-345 | C.A. No. OCNL-3361-05 | Osbourne Associates, Mellbourne Associates VII, LLC Kingsway Realty Profit Share vs. Citta Enterprises Co, JAC Property Management etal and Eckerd Corporation | Superior Court of New Jersey, Law Division Ocean County | Francis X. Manning, Esq, Standley Ronon Stevens & Young & Michael Camboli, Esq, Partridge Snow etc | Dispute re: proper valuation of leasehold and sub-lessee's sandwich leasehold interest on damage claim for breach of agreement claim |
| 1/2008 | Defendant | 109-2008-0125- | N/A | Toms River Township vs. Gas Geigy Corporation | American Arbitration Association [testimony at Arbitration conducted by Hon. Eugene Serpenteli] | Mark Troncone, Esq., In-house Counsel to Township of Toms River | Arbitration of environmental damages claim, and counter-claim of appropriateness of zoning on 1,900 acre superfund site. |
| 11/2007 | Defendant | 109-2007-211 | L-008635-06 | Kyle Mosteller vs. Galla Neeman | Superior Court of New Jersey, Law Division | Frank Canuso, Esq, Hoagland, Longo, Moran and Dunst | Damage claim due to loss of trees and screening between urban properties |
| 6/2007 | Plaintiff | 109-2007-0134 | 3:07-CV-2322 | Silver Lakes Inc. vs. Township of Freehold Inc. | Superior Court of New Jersey, Chancery Division Monmouth County | Christopher Hanlon, Esq, Hanlon and Niemann | Challenge to validity of Rent Control Ordinance as transfer of property rights from Lessor to Lessee. |
| 6/2007 | Plaintiff | 109-2007-0173 | | Laurelwood Homes, LLC vs. United States Department of Navy | Federal District Court of Virginia | William A. Shook Esq. | Leasehold interest in the property, breach of lease claim on behalf of leasehold owner (Laurelwood) claiming breach of lease and damages |
| 12/2006 | Defendant | 109-2006-0192 | CAM - L - 9731-05 | Brandywine Operating Partnership, LP vs. UFCW Local 56 | Superior Court of New Jersey, Law Division, Camden County | Brett Last, Esq, O'Brien, Belland and Bushinsky | Estimate the value of damages to landlord on breach of above-market lease |
| 8/2006 | Defendant | 109-2006-0257 | | County Line & Brewers Bridge, Jackson Township | | Levin, Shea, Pfeffer, PA Steven Pfeffer | To develop an opinion of the hypothetical market value of the fee simple interest in the property |
| 2/2006 | Defendant | 109-2006-0044 | OCN-L-2482-04 | Carl Brooks vs. K. Hovanian | Ocean Superior Court, Ocean County Courthouse | Ronan, Tuzzio & Giannone   Linda Olsen | To estimate value diminution in the subject property as a result of various issues asserted by the property owner in conjunction with pending litigation between the property owner and the subject developer K. Hovnanian @ Sea Oaks |
| 10/2005 | Defendant | 109-2005-0315 | OCN-L-1810-5 | Atlantic City Electric Company d/b/a Conectiv Power Delivery, a regulated public utility in the state of New Jersey vs. AC1 Mahadawalin, LLC family and/or Armstrong | Superior Court of New Jersey, Law Division Ocean County | Flaster/Greenberg, PC, David R. Oberlander, Esq. | Compensation for the taking of an easement for construction and maintenance of a 230kv transmission line and towers by Atlantic City Electric |
| 09/2005 | Defendant | 109-2005-0214 | MON-L-2609-05 | Township of Howell vs. George Harms Construction Co, Inc. etal | Superior Court of New Jersey Law Division, Monmouth County | Connell & Foley, LLP Kevin Coakley, Esq. | To develop an opinion of the market value of the fee simple estate of the property |
| 08/2003 | Defendant | 109-2003-0282 | | Giuffre vs. Giuffre | Superior Court of New Jersey Chancery Division, Family Part, Monmouth County | Louis & Wolf - Frank A. Louis | To develop an opinion of the market value of the Fee Simple estate of the properties for purposes of equitable distribution of marital assets |
| 07/2003 | Defendant | 109-2003-0203 | OCN-C-78-03 | West, etal vs. Pompano, etal | Superior Court of New Jersey Chancery Division, Ocean County | Stephen E. Smith, Esq | To develop an opinion of the diminution in value due to a loss of useable land area |
| 06/2003 | Plaintiff | 109-2003-0128 | OCN-C-316-02 | Eugene M. Lord vs. Donald W. Rinaldo | Superior Court of New Jersey Law Division, Ocean County | Lombardi & Lombardi Scott Telson | To develop an opinion of the market value of the fee simple estate of the property |
| 04/2003 | Plaintiff | 109-2003-0128 | FM-15-468-03-C | Vincent Urbank vs. Lisa Urbank | Superior Court of New Jersey, Chancery Division, Family Part Ocean County | Marianna Pontorero, Esq. | Litigation-Matrimonial |
| 02/2002 | Plaintiff | 109-2002-0055 | | Shenandoah Mobile Home Park | | Winckels Manx Lane & Mittendorf, LLP - William Cagney | Inverse Condemnation - Rent Control Ordinance |
| 04/2001 | Claimant | 109-2001-0169 | NJ-2824-00 | DeForest John Ely and Kimberle A. Ely, h/w | Superior Court of New Jersey, Chancery Division, Middlesex County | First American Title Insurance Co. Jack Mikis | To derive an opinion of the fair compensation of the fee simple estate, subject to the temporary title encumbrance |
| 03/1999 | Plaintiff | 109-1999-0062 | | Georgetown Apartments | US Bankruptcy Court - District of Newark | Emmes & Co, Andrew Schwarz | To estimate the market value of the Leased Fee Estate of the property, inclusive of 28 Apartment complexes through NY, NJ, PA, and MD. |
| 12/1997 | Defendant | LKW-257-3186 | FM-15-1465-94 | Lisa Franklin, etal vs. Donald Franklin, etal | Superior Court of New Jersey, Chancery Division, Family Part, Ocean County | Greenbaum, Rowe, Smith, Ravin, Davis & Himmel LLP Robert S. Underhill | Estimating the market value of the leased fee interest |
| 8/1984 | Creditor | HUD-XX | | Hudson Marina Association vs. Emmes & Co. | US Bankruptcy Court - District of Newark | | Bankruptcy Reorganization of 200+ slip failed marina/dockominium complex |



**Integra Realty Resources**
**Miami/Palm Beach**

**Appraisal Report & Post-Remediation Damage Related to Chinese Drywall**

**Marin, Cassandra**
Hypothetical Market Value "As If" Remediated
3865 SW Wycoff Street
Port St. Lucie, St. Lucie County, Florida 34953
Client Reference: 19

**Prepared For:**
Colson Hicks Eidson

**Effective Date of the Appraisal:**
February 17, 2012

**Report Format:**
Appraisal Report

**IRR - Miami/Palm Beach**
File Number: 123-2018-0275





**Marin, Cassandra**
3865 SW Wycoff Street
Port St. Lucie, Florida



| Integra Realty Resources | In Miami | In Orlando | In Naples/Sarasota |
|---|---|---|---|
| Miami | Dadeland Centre | The Magnolia Building | Horseshoe Professional Park |
| Orlando | 9155 South Dadeland Blvd. | 326 N. Magnolia Ave. | 2770 Horseshoe Drive S. |
| Southwest Florida | Suite 1208 | | Suite 3 |
| | Miami, FL 33156 | Orlando, FL 32801 | Naples, FL 34104 |
| www.irr.com | (305) 670-0001 | (407) 843-3377 | (239)-643-6888 |

January 24, 2019 (Amended February 26, 2019)

Patrick S. Montoya
Partner
Colson Hicks Eidson
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134

SUBJECT:    Hypothetical Market Value "As If" Remediated
                Case No 11-22408-Civ-COOKE
                United States District Court Southern District of Florida in the matter of
                Eduardo and Carmen Amorin, et al. individually and on behalf of others situated
                similarly v. Taishan Gypsum Co., LTD., f/k/a Shandong Taiche Dongxin Co. Ltd., et al
                Priority Claimant Case at:
                Marin, Cassandra
                3865 SW Wycoff Street
                Port St. Lucie, St. Lucie County, Florida 34953
                Client Reference: 19
                IRR - Miami/Palm Beach File No. 123-2018-0275

Dear Mr. Montoya:

Integra Realty Resources – Miami/Palm Beach submits the following damage estimate in the referenced property as of the effective date assuming all remediation was completed by an appropriate contractor with experience and credentials in remediating defective drywall.

The report is intended to comply the Uniform Standards of Professional Appraisal Practice (USPAP). It presents summary discussions of the data, reasoning, and analysis that were used in the appraisal process to develop the opinions. Additional information is contained within our workfile.

The findings will form the basis of expert witness testimony in the above referenced case.

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/19/19 Page 124 of 319
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 08/15/2013 Page 909 of 989

Identification of Subject                                                                          2

## Identification of Subject

The subject of this report is a single-family ranch style home configured with 3 bedroom and 2 baths with 2,082 SF under air-conditioning. The subject property was built in 2007 and is located on a 10,000 SF site.

## Purpose of the Appraisal

The purpose of the appraisal is to develop an opinion of the diminution in value and related damages, collectively "the damages" as of the effective date of the appraisal, February 17, 2012. The damage estimate assumes the defective drywall remediation was completed and does not consider the cost to cure. The date of the report is January 24, 2019. The appraisal is valid only as of the stated effective date or dates.

## Intended Use and User

The intended use of the appraisal is for litigation purposes. The client, Colson Hicks Eidson and related co-counsel, Plaintiff and the Court are the intended users. Integra Realty Resources – Miami/Palm Beach is not responsible for unauthorized use of this report.

## Most Recent Sale History

The most recent closed sale of the subject is summarized as follows:

| Most Recent Subject Sale (Closed) | |
|---|---|
| Sale Date (Most Recent) | November 8, 2006 |
| Seller | Blanchard Jean P |
| Buyer | Marin, Cassandra |
| Sale Price | $270,000 |
| Recording Instrument Number | 3012089 |
| Disposition Details | Property was sold with defective drywall |

At the time of the above transaction the buyer was not aware of the presence of Chinese Drywall in the home.

To the best of our knowledge, no other sale or transfer of ownership has taken place within a three-year period prior to the effective appraisal date. The buyer purchased the home in 2006 without knowledge of Chinese Drywall present on the property.

## Pending Transactions

The home was sold with defective drywall on February 17, 2012 for $81,000

## Definition of Market Value

The following definition of market value is used by agencies that regulate federally insured financial institutions in the United States:

Marin, Cassandra



Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/19/19 Page 125 of 319
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 08/15/2019 Page 910 of 989

Definition of Retrospective Value Opinion                                    3

"The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- Buyer and seller are typically motivated;

- Both parties are well informed or well advised, and acting in what they consider their own best interests;

- A reasonable time is allowed for exposure in the open market;

- Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

- The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale."

*(12 C.F.R. Part 34.42(g); 55 Federal Register 54696, August 24, 1990, as amended at 57 Federal Register 12202, April 9, 1992, 59 Federal Register 29499, June 7, 1994)*

### Definition of Retrospective Value Opinion

A value opinion effective as of a specified historical date. The term retrospective does not define a type of value.  Instead, it identifies a value opinion as being effective at some specific prior date. Value as of a historical date is frequently sought in connection with property tax appeals, damage models, lease renegotiation, deficiency judgements, estate tax, and condemnation.  Inclusion of the type of value with this term is appropriate, e.g. "retrospective market value opinion".

*(Source: The Dictionary of Real Estate Appraisal – 6th Edition; Appraisal Institute, 200 W. Madison, Suite 1500, Chicago, IL 60606, www.appraisalinstitute.org)*

### Definition of Hypothetical Condition

1. A condition that is presumed to be true when it is known to be false. (SVP)

2. A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis. Comment: Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of date used in an analysis. (USPAP, 2016-2017 ed.)

*(Source: The Dictionary of Real Estate Appraisal – 6th Edition; Appraisal Institute, 200 W. Madison, Suite 1500, Chicago, IL 60606, www.appraisalinstitute.org)*

### Scope of Work

Integra was retained as an expert in the captioned matter of this report to address potential damages related to the subject property, specifically excluding the costs to cure.

Marin, Cassandra



Integra was retained to estimate any post remediation damages, and conducted a separate study to determine whether damages persist following defective drywall remediation.  The result of that study are outlined within Integra's report entitled "Market Analysis of the Post Remediation Impact of Chinese Drywall on Residential Property Values in Florida."  The results of that study are incorporated by reference herein.

In addition, our damage model was requested to include a rental value analysis of the Priority Claimant residence, and a determination of the relevant economic damage associated with having to vacate the home for a period of time (and secure alternate living arrangements) during the remediation.  As of the effective date, the claimant would have suffered the damages.

Integra established individual case files on each Priority Claimant residence, and retained professional assistance from qualified residential appraisers in each jurisdiction.  Integra managed the process of these retrospective appraisals, interfaced with the residential appraisers, and reviewed the form appraisals completed on each assignment including review of the comparables, adjustments, and form narrative to establish the market value of the residence unimpaired as of the effective date.

Integra professionals reviewed various materials exchanged as part of this case and considered materials that were relevant to the market valuation.  These materials were downloaded from the attorney's dropbox and are retained within our workfile.

Integra's participation in and review of the final appraised values results in a conclusion of the market value of the home defined as "Hypothetical Market Value" assuming defective drywall had never been identified within the subject property.  This forms the basis of the unimpaired market value as of the effective date.

All properties and comparables were inspected by the local residential appraisers without the benefit of interior inspections.  Adjustments for condition and age at the time of sale are based upon photographs contained within the various MLS databases, paired analysis from amongst the comparables, and for the subject, were based on photos, if available.  In the event a property had not been remediated as of the effective date, we assume average condition for the property in the market as of the effective date.

The damage analysis expressed within this report follows the peer teachings and market accepted processes for damage analysis.  However, the damage analysis only represents a <u>portion of the overall damages</u> because we were specifically requested to exclude the consideration of the costs to cure.  This represents a relevant component of damage in this case for property that factually have not been remediated.

Integra's role was strictly to identify post remediation value damage (sometime referred to as "stigma") and estimate the relevant rental value and moving costs as a proxy for the temporary loss of use during remediation.



Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/19/19 Page 127 of 319
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 08/15/2013 Page 912 of 989

Highest and Best Use                                                                                          5

## Significant Appraisal Assistance

In addition to Anthony M. Graziano, MAI ,CRE, principal, it is acknowledged that Peter G. Kayworth, Yuliya Georgieva, Joseph Melloni and Paul L. Jones of IRR-Miami/Palm Beach were involved in the assignment consisting of conducting research on the subject and transactions involving comparable properties, performing appraisal analyses and assisting in report writing, under the supervision of the persons signing the report.  The local residential appraisers are also named as providing significant assistance, including exterior inspection of the properties and comparables, application of their local knowledge in adjusting and estimating the unimpaired value, and developing the form report valuations incorporated herein.

## Prior Services

USPAP requires appraisers to disclose to the client any other services they have provided in connection with the subject property in the prior three years, including valuation, consulting, property management, brokerage, or any other services. We have not performed any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

## Valuation Methodology

Appraisers usually consider the use of three approaches to value when developing a market value opinion for real property. These are the cost approach, sales comparison approach, and income capitalization approach.  The valuations consider the only relevant approach for residential valuation, the sales comparison analysis.  The cost and income approach are not considered relevant.

The sales comparison approach is the most applicable valuation method since there is an active market for similar properties, and sufficient sales data is available for analysis.  Additionally, this approach directly considered the prices of alternative properties having similar utility.

### Highest and Best Use

The highest and best use of the subject as if vacant for development of a single-family home which is physically possible, legally permissible as per zoning, financially feasible and maximally productive.

The highest and best use of the subject as improved is for continued use as a single-family home with no other use that could reasonably be expected to provide a higher value to the land as if vacant.  The improvements contribute to the over all value to a greater extent than the land value alone, and therefore, continued use as improved concluded to be maximally productive and the highest and best use of the property.

### Conclusion of Value

The Hypothetical market value appraisal as of the effective date, reflective of a traditional form appraisal, is contained within the Addenda of this report.  This value us hypothetical since it assumes that defective drywall had never been present at the subject property.



Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/19/19 Page 128 of 319
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2019 Page 913 of 989

Conclusion of Value                                                                    6

Against this value, we then apply the Post Impairment Discount as a percentage of unimpaired value as developed within the Integra report studying this issue. This represents a compensable damage resulting from the prior existence of defective drywall in the home as of the effective date.

In addition, each appraisal (unimpaired) reflects a rental value analysis as of the effective date. This rental value analysis concludes to the equivalent market rent for the home (unimpaired) and reflects a proxy for the probable actual costs the homeowner would experience by having to move-out of the primary residence during remediation.

The homeowner would also have to incur moving /storage costs twice, once before and once after remediation. Professional packing, moving and storage for an average home is estimated at $1,500 per move, or $3,000 in total. This amount is added to the loss of use estimate as an additional damage.

This loss of use calculation does not consider the costs of alternative housing or other tangible costs potentially incurred for damages suffered between the date of discovery and the date of value. These damages, if applicable, are being estimated by a separate expert (Elkins et al). To the extent Elkins posits costs which are duplicative or actual costs that are greater or less, some minor adjustments to Integra's damage model may be required.

The timeframe for remediation (months of actual loss) could vary depending upon the permitting process in the specific community, the availability of labor, and the size of the home. Integra reviewed a number of transactions that were remediated by investors and found the typical timeframe between purchase of an unremediated home and listing[1] of the home post-remediation to be 3-6 months.

Larger more expansive homes would be expected to take longer to remediate since more materials are required, and in higher-priced homes, supplies would typically be custom-ordered. Therefore, we apply the following timeframes based on the subject's size and price range:

< $150,000 Home up to 2,000+/- SF                    4 months

$150,000 - $750,000 home up to 4,000 SF              6 months

$750,000+ home up over 4,000 SF                      9 months

---

[1] The "listing date" is most relevant since a homeowner conducting their own remediation can move back in once the home is ready for sale (ie- coinciding with a final certificate of occupancy).

Marin, Cassandra



Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/19/19 Page 129 of 319
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2015 Page 914 of 989

Conclusion of Value                                                                                                7

The following shows our final estimate of damages as of the effective date, and assuming costs to cure (i.e. – to conduct the remediation) have been expended.

**Conclusions of Damage**

| | | | |
|---|---|---|---|
| Hypothetical Value (Unimpaired - Before) | | $112,000 | |
| Market Impairment Discount (As if Remediated) | | 10% | |
| Post Impairment Damage ($) | | $11,200 | |
| **Hypothetical Value As IF Remediated** | | | **$100,800** |
| Post Remediation Damages as of Effective Date | | | **$11,200** |
| Loss of Use: | | | |
| Rental Rate ($/Month) | **$1,100** | | |
| Moving & Storage Costs | | $3,000 | |
| Loss of Use Subject (# Months) | 4x | $4,400 | |
| Subject Total | | | **$7,400** |
| **Post Remediation Damage** | | | **$18,600** |

Note: Does not consider "cost to cure". Assumes remediation was completed by qualified contractor who warranties the work.

Marin, Cassandra



Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/19/19 Page 130 of 319
Case 1:11-cv-22408-MGC Document 273-3 Entered on FLSD Docket 09/15/2013 Page 915 of 989

Certification                                                                                          8

## Certification

We certify that, to the best of our knowledge and belief:

1.   The statements of fact contained in this report are true and correct.

2.   The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3.   We have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

4.   We have not performed any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

5.   We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

6.   Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

7.   Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

8.   Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice as well as applicable state appraisal regulations.

9.   The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

10.  The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

11.  Anthony M. Graziano, MAI, CRE did not make a personal inspection of the property that is the subject of this report. Chad F. Stites has personally inspected the subject.

12.  Significant real property appraisal assistance was provided by Peter G. Kayworth, Yuliya Georgieva, Joseph Melloni and Paul L. Jones.  Additionally, real estate assistance was provided by various Valucentric employees and subcontractors, including: John Barcelo, Angela Barcelo, Fred Stites, Carlos Fong, Sarah D. Wilson and Rob Baird.

13.  We have experience in appraising properties similar to the subject and are in compliance with the Competency Rule of USPAP.

14.  As of the date of this report, Anthony M. Graziano, MAI, CRE, has completed the continuing education program for Designated Members of the Appraisal Institute.

Anthony M. Graziano, MAI, CRE
Senior Managing Director - Miami
State-Certified General RE Appraiser
FL Certificate # RZ#3510

Marin, Cassandra

irr

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/19/19 Page 131 of 319
Case 1:11-cv-22408-MGC Document 273-9 Entered on FLSD Docket 09/15/2013 Page 916 of 989

Assumptions and Limiting Conditions 9

## Assumptions and Limiting Conditions

This appraisal and any other work product related to this engagement are limited by the following standard assumptions, <u>except as otherwise noted in the report</u>:

1. The title is marketable and free and clear of all liens, encumbrances, encroachments, easements and restrictions. The property is under responsible ownership and competent management and is available for its highest and best use.

2. There are no existing judgments or pending or threatened litigation that could affect the value of the property.

3. There are no hidden or undisclosed conditions of the land or of the improvements that would render the property more or less valuable. Furthermore, there is no asbestos in the property.

4. The revenue stamps placed on any deed referenced herein to indicate the sale price are in correct relation to the actual dollar amount of the transaction.

5. The property is in compliance with all applicable building, environmental, zoning, and other federal, state and local laws, regulations and codes.

6. The information furnished by others is believed to be reliable, but no warranty is given for its accuracy.

This appraisal and any other work product related to this engagement are subject to the following limiting conditions, except as otherwise noted in the report:

1. An appraisal is inherently subjective and represents our opinion as to the value of the property appraised.

2. The conclusions stated in our appraisal apply only as of the effective date of the appraisal, and no representation is made as to the effect of subsequent events.

3. No changes in any federal, state or local laws, regulations or codes (including, without limitation, the Internal Revenue Code) are anticipated.

4. No environmental impact studies were either requested or made in conjunction with this appraisal, and we reserve the right to revise or rescind any of the value opinions based upon any subsequent environmental impact studies. If any environmental impact statement is required by law, the appraisal assumes that such statement will be favorable and will be approved by the appropriate regulatory bodies.

5. Unless otherwise agreed to in writing, we are not required to give testimony, respond to any subpoena or attend any court, governmental or other hearing with reference to the property without compensation relative to such additional employment.

6. We have made no survey of the property and assume no responsibility in connection with such matters. Any sketch or survey of the property included in this report is for illustrative purposes only and should not be considered to be scaled accurately for size. The appraisal covers the property as described in this report, and the areas and dimensions set forth are assumed to be correct.

Marin, Cassandra



Case 2:09-md-02047-EEF-MBN Document 22365-31 Filed 11/19/19 Page 132 of 319
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 08/15/2013 Page 917 of 989

Assumptions and Limiting Conditions                                                                 10

7.   No opinion is expressed as to the value of subsurface oil, gas or mineral rights, if any, and we have assumed that the property is not subject to surface entry for the exploration or removal of such materials, unless otherwise noted in our appraisal.

8.   We accept no responsibility for considerations requiring expertise in other fields. Such considerations include, but are not limited to, legal descriptions and other legal matters such as legal title, geologic considerations such as soils and seismic stability; and civil, mechanical, electrical, structural and other engineering and environmental matters. Such considerations may also include determinations of compliance with zoning and other federal, state, and local laws, regulations and codes.

9.   The distribution of the total valuation in the report between land and improvements applies only under the reported highest and best use of the property. The allocations of value for land and improvements must not be used in conjunction with any other appraisal and are invalid if so used. The appraisal report shall be considered only in its entirety. No part of the appraisal report shall be utilized separately or out of context.

10.  Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraisers, or any reference to the Appraisal Institute) shall be disseminated through advertising media, public relations media, news media or any other means of communication (including without limitation prospectuses, private offering memoranda and other offering material provided to prospective investors) without the prior written consent of the persons signing the report.

11.  Information, estimates and opinions contained in the report and obtained from third-party sources are assumed to be reliable and have not been independently verified.

12.  Any income and expense estimates contained in the appraisal report are used only for the purpose of estimating value and do not constitute predictions of future operating results.

13.  If the property is subject to one or more leases, any estimate of residual value contained in the appraisal may be particularly affected by significant changes in the condition of the economy, of the real estate industry, or of the appraised property at the time these leases expire or otherwise terminate.

14.  Unless otherwise stated in the report, no consideration has been given to personal property located on the premises or to the cost of moving or relocating such personal property; only the real property has been considered.

15.  The current purchasing power of the dollar is the basis for the values stated in the appraisal; we have assumed that no extreme fluctuations in economic cycles will occur.

16.  The values found herein are subject to these and to any other assumptions or conditions set forth in the body of this report but which may have been omitted from this list of Assumptions and Limiting Conditions.

17.  The analyses contained in the report necessarily incorporate numerous estimates and assumptions regarding property performance, general and local business and economic conditions, the absence of material changes in the competitive environment and other matters. Some estimates or assumptions, however, inevitably will not materialize, and unanticipated events and circumstances may occur; therefore, actual results achieved during

Marin, Cassandra



Case 2:09-md-02047-EEF-MBN  Document 22363-31  Filed 11/19/19  Page 133 of 319
Case 1:11-cv-22408-MGC  Document 273-8  Entered on FLSD Docket 08/15/2013  Page 918 of 989

Assumptions and Limiting Conditions                                                    11

the period covered by our analysis will vary from our estimates, and the variations may be material.

18.     The Americans with Disabilities Act (ADA) became effective January 26, 1992. We have not made a specific survey or analysis of the property to determine whether the physical aspects of the improvements meet the ADA accessibility guidelines. We claim no expertise in ADA issues, and render no opinion regarding compliance of the subject with ADA regulations. Inasmuch as compliance matches each owner's financial ability with the cost to cure the non-conforming physical characteristics of a property, a specific study of both the owner's financial ability and the cost to cure any deficiencies would be needed for the Department of Justice to determine compliance.

19.     The appraisal report is prepared for the exclusive benefit of the Client, its subsidiaries and/or affiliates. It may not be used or relied upon by any other party. All parties who use or rely upon any information in the report without our written consent do so at their own risk.

20.     No studies have been provided to us indicating the presence or absence of hazardous materials on the subject property or in the improvements, and our valuation is predicated upon the assumption that the subject property is free and clear of any environment hazards including, without limitation, hazardous wastes, toxic substances and mold. No representations or warranties are made regarding the environmental condition of the subject property. Integra Realty Resources – Miami/Palm Beach, Integra Realty Resources, Inc., Integra Strategic Ventures, Inc. and/or any of their respective officers, owners, managers, directors, agents, subcontractors or employees (the "Integra Parties"), shall not be responsible for any such environmental conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because we are not experts in the field of environmental conditions, the appraisal report cannot be considered as an environmental assessment of the subject property.

21.     The persons signing the report may have reviewed available flood maps and may have noted in the appraisal report whether the subject property is located in an identified Special Flood Hazard Area. We are not qualified to detect such areas and therefore do not guarantee such determinations. The presence of flood plain areas and/or wetlands may affect the value of the property, and the value conclusion is predicated on the assumption that wetlands are non-existent or minimal.

22.     Integra Realty Resources – Miami/Palm Beach is not a building or environmental inspector. Integra Miami/Palm Beach does not guarantee that the subject property is free of defects or environmental problems. Mold may be present in the subject property and a professional inspection is recommended.

23.     The appraisal report and value conclusions for an appraisal assume the satisfactory completion of construction, repairs or alterations in a workmanlike manner.

24.     It is expressly acknowledged that in any action which may be brought against any of the Integra Parties, arising out of, relating to, or in any way pertaining to this engagement, the appraisal reports, and/or any other related work product, the Integra Parties shall not be responsible or liable for any incidental or consequential damages or losses, unless the appraisal was fraudulent or prepared with intentional misconduct. It is further acknowledged

Marin, Cassandra



Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/19/19 Page 134 of 319
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 08/15/2013 Page 919 of 989

Assumptions and Limiting Conditions                                                              12

that the collective liability of the Integra Parties in any such action shall not exceed the fees paid for the preparation of the appraisal report unless the appraisal was fraudulent or prepared with intentional misconduct. Finally, it is acknowledged that the fees charged herein are in reliance upon the foregoing limitations of liability.

25.   Integra Realty Resources – Miami/Palm Beach, an independently owned and operated company, has prepared the appraisal for the specific intended use stated elsewhere in the report. The use of the appraisal report by anyone other than the Client is prohibited except as otherwise provided. Accordingly, the appraisal report is addressed to and shall be solely for the Client's use and benefit unless we provide our prior written consent. We expressly reserve the unrestricted right to withhold our consent to your disclosure of the appraisal report or any other work product related to the engagement (or any part thereof including, without limitation, conclusions of value and our identity), to any third parties. Stated again for clarification, unless our prior written consent is obtained, no third party may rely on the appraisal report (even if their reliance was foreseeable).

26.   The conclusions of this report are estimates based on known current trends and reasonably foreseeable future occurrences. These estimates are based partly on property information, data obtained in public records, interviews, existing trends, buyer-seller decision criteria in the current market, and research conducted by third parties, and such data are not always completely reliable. The Integra Parties are not responsible for these and other future occurrences that could not have reasonably been foreseen on the effective date of this assignment. Furthermore, it is inevitable that some assumptions will not materialize and that unanticipated events may occur that will likely affect actual performance. While we are of the opinion that our findings are reasonable based on current market conditions, we do not represent that these estimates will actually be achieved, as they are subject to considerable risk and uncertainty. Moreover, we assume competent and effective management and marketing for the duration of the projected holding period of this property.

27.   All prospective value opinions presented in this report are estimates and forecasts which are prospective in nature and are subject to considerable risk and uncertainty. In addition to the contingencies noted in the preceding paragraph, several events may occur that could substantially alter the outcome of our estimates such as, but not limited to changes in the economy, interest rates, and capitalization rates, behavior of consumers, investors and lenders, fire and other physical destruction, changes in title or conveyances of easements and deed restrictions, etc. It is assumed that conditions reasonably foreseeable at the present time are consistent or similar with the future.

Marin, Cassandra



Case 2:09-md-02047-EEF-MBN   Document 22363-31   Filed 11/19/19   Page 135 of 319
Case 1:11-cv-22408-MGC   Document 273-5   Entered on FLSD Docket 09/13/2013   Page 920 of 989

Addenda

# Addenda

Marin, Cassandra



File No. 3865 Wycoff

APPRAISAL OF



LOCATED AT:

3865 SW Wycoff Street
Port St Lucie, FL 34953

FOR:

Integra Realty Resources
9155 S. Dadeland Blvd, Ste 1208
Miami, FL 33156

BORROWER:

Cassandra Yvette Marin

AS OF:

February 17, 2012

BY:

C. F. Stites, SRA

File No. 3865 Wycoff

Valcentric LLC
Integra Realty Resources
9155 S. Dadeland Blvd, Ste 1208
Miami, FL  33156

File Number:   3865 Wycoff

In accordance with your request, I have appraised the real property at:

3865 SW Wycoff Street
Port St Lucie, FL  34953

The purpose of this appraisal is to develop an opinion of the market value of the subject property, as improved.
The property rights appraised are the fee simple interest in the site and improvements.

In my opinion, the market value of the property as of   February 17, 2012                    is:

$112,000
One Hundred Twelve Thousand  Dollars

The attached report contains the description, analysis and supportive data for the conclusions,
final opinion of value, descriptive photographs, limiting conditions and appropriate certifications.



C. F. Stites, SRA

## Exterior-Only Inspection Residential Appraisal Report

File No. 3865 Wycoff

| | |
|---|---|
| The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property. | |

**SUBJECT**

Property Address 3865 SW Wycoff Street    City Port St Lucie    State FL    Zip Code 34953
Borrower Cassandra Yvette Marin    Owner of Public Record N/A    County St Lucie
Legal Description Lot 6, Block 1941, Port St Lucie Section 19, according to the recorded plat thereof
Assessor's Parcel # 3420-590-1483-000-9    Tax Year 2012    R.E. Taxes $ 2,692
Neighborhood Name Port St Lucie    Map Reference 40/30N    Census Tract 3821.06
Occupant [X] Owner [ ] Tenant [ ] Vacant    Special Assessments $ 0    [ ] PUD  HOA $ 0  [ ] per year [ ] per month
Property Rights Appraised [X] Fee Simple [ ] Leasehold [ ] Other (describe)
Assignment Type [ ] Purchase Transaction [ ] Refinance Transaction [X] Other (describe) VALUATION AS OF RETROSPECTIVE DATE 02/17/2012
Lender/Client Integra Realty Resources    Address 9155 S. Dadeland Blvd, Ste 1208, Miami, FL 33156
Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? [X] Yes [ ] No
Report data source(s) used, offering price(s), and date(s). DOM 6;RegMLS#3250704 list date 1/06/2012 at $79,900 with 6 DOM and sold 02/17/2012 at $81,000 on an all cash transaction. No other listings in the previous 12 months.

**CONTRACT**

I [ ] did [ ] did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.

Contract Price $    Date of Contract    Is the property seller the owner of public record? [ ] Yes [ ] No    Data Source(s)
Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? [ ] Yes [ ] No
If Yes, report the total dollar amount and describe the items to be paid.

**NEIGHBORHOOD**

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | | One-Unit Housing Trends | | | One-Unit Housing | | Present Land Use % | |
|---|---|---|---|---|---|---|---|---|---|
| Location [ ] Urban [X] Suburban [ ] Rural | | | Property Values [ ] Increasing [X] Stable [ ] Declining | | | PRICE | AGE | One-Unit | 75 % |
| Built-Up [X] Over 75% [ ] 25-75% [ ] Under 25% | | | Demand/Supply [ ] Shortage [X] In Balance [ ] Over Supply | | | $(000) | (yrs) | 2-4 Unit | 1 % |
| Growth [ ] Rapid [X] Stable [ ] Slow | | | Marketing Time [ ] Under 3 mths [X] 3-6 mths [ ] Over 6 mths | | | 70 Low | 1 | Multi-Family | 2 % |
| Neighborhood Boundaries The subject neighborhood is the area north of Becker Rd, south of Gatlin | | | | | | 190 High | 20 | Commercial | 12 % |
| Blvd, between PSL Blvd on the east and I-95 on the west. | | | | | | 110 Pred. | 10 | Other Vac | 10 % |

Neighborhood Description Established suburban neighborhood near schools, places of worship, and shopping. Highway access is available within 2 miles. Close access to a public park. Work centers are 1-25 miles away. Mixture of ranch-style houses on small lots with some multi-family including duplex and apartment. Commercial uses are along arterials and highways.

Market Conditions (including support for the above conclusions) Stable suburban neighborhod near all vital services. No adverse conditions were observed. Some REO activity was noted in the area. Agents report good market demand, particularly among investors. Normal market time for the area is typically 3 - 6 months.

**SITE**

Dimensions 80 x 125    Area 10000 sf    Shape Rectangular    View N;Res;Res
Specific Zoning Classification RS-2    Zoning Description Residential single family
Zoning Compliance [X] Legal [ ] Legal Nonconforming (Grandfathered Use) [ ] No Zoning [ ] Illegal (describe)
Is the highest and best use of the subject property as improved (or as proposed per plans and specifications) the present use? [X] Yes [ ] No If No, describe.

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements—Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | [X] | | Water | [X] | | Street Asphalt | [X] | |
| Gas | [ ] | None | Sanitary Sewer | [X] | | Alley None | | |

FEMA Special Flood Hazard Area [ ] Yes [X] No    FEMA Flood Zone X    FEMA Map # 12111C0400J    FEMA Map Date 02/16/2012
Are the utilities and off-site improvements typical for the market area? [X] Yes [ ] No If No, describe.
Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? [ ] Yes [X] No If Yes, describe. The subject parcel appears to back to a narrow canal however there is no view benefit.

**IMPROVEMENTS**

Source(s) Used for Physical Characteristics of Property [ ] Appraisal Files [ ] MLS [X] Assessment and Tax Records [ ] Prior Inspection [ ] Property Owner [ ] Other (describe)    Data Source(s) for Gross Living Area County Property Appraiser

| GENERAL DESCRIPTION | | GENERAL DESCRIPTION | | Heating / Cooling | Amenities | | Car Storage | |
|---|---|---|---|---|---|---|---|---|
| Units [X] One [ ] One with Accessory Unit | | [ ] Concrete Slab [ ] Crawl Space | | [ ] FWA [ ] HWBB | Fireplace(s) # 0 | | [ ] None | |
| # of Stories 1.0 | | [ ] Full Basement [ ] Finished | | [ ] Radiant | WoodStove(s) # 0 | | [X] Driveway # of Cars 2 | |
| Type [X] Det. [ ] Att. [ ] S-Det./End Unit | | [ ] Partial Basement [ ] Finished | | [ ] Other | [X] Patio/Deck Cov | | Driveway Surface Concrete | |
| [X] Existing [ ] Proposed [ ] Under Const. | | Exterior Walls CBS | | Fuel Electric | [ ] Porch Front | | [X] Garage # of Cars 2 | |
| Design (Style) Ranch | | Roof Surface Comp shgl | | [X] Central Air Conditioning | Pool None | | [ ] Carport # of Cars 0 | |
| Year Built 2007 | | Gutters & Downspouts Part-mtl | | [ ] Individual | Fence None | | [ ] Att. [ ] Det. | |
| Effective Age (Yrs) 4 | | Window Type Insul metal | | [ ] Other | Other None | | [ ] Built-in | |

Appliances [ ] Refrigerator [X] Range/Oven [X] Dishwasher [ ] Disposal [X] Microwave [ ] Washer/Dryer [ ] Other (describe)
Finished area above grade contains: 7 Rooms    3 Bedrooms    2.0 Bath(s)    2,082 Square Feet of Gross Living Area Above Grade
Additional features (special energy efficient items, etc.) Assumed standard kitchen appliance package. MLS shows 3-bedrooms plus den (no closet).
Describe the condition of the property and data source(s) (including apparent needed repairs, deterioration, renovations, remodeling, etc.) C3;VALUATION AS OF A RETROSPECTIVE DATE (02/17/2012) BASED ON 01/17/2019 EXTERIOR FRONTAL DRIVE-BY INSPECTION. PHYSICAL CONDITION PER COUNTY PROPERTY APPRAISER'S OFFICE. AVERAGE CONDITION ASSUMED WITH NO SERIOUS ITEMS OF DEFERRED MAINTENANCE.

Are there any apparent physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? [ ] Yes [X] No If Yes, describe.
SEE COMMENTS ABOVE

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? [X] Yes [ ] No If No, describe.

C.F. Sandstrom

**Exterior-Only Inspection Residential Appraisal Report**     File No. 3865 Wycoff

| | | | | | |
|---|---|---|---|---|---|
| There are | 4 | comparable properties currently offered for sale in the subject neighborhood ranging in price from $ | 105,000 | to $ | 135,000 . |
| There are | 6 | comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ | 109,000 | to $ | 130,500 . |

| FEATURE | SUBJECT | COMPARABLE SALE NO. 1 | | COMPARABLE SALE NO. 2 | | COMPARABLE SALE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 3865 SW Wycoff Street<br>Port St Lucie, FL 34953 | 1217 SW Santiago Avenue<br>Port St Lucie, FL 34953 | | 3725 Kistler Street<br>Port St Lucie, FL 34953 | | 1261 SW Hunnicut Avenue<br>Port St Lucie, FL 34953 | |
| Proximity to Subject | | 0.84 miles NW | | 0.38 miles NW | | 0.45 miles SW | |
| Sale Price | $ | | $ 110,000 | | $ 113,400 | | $ 109,000 |
| Sale Price/Gross Liv. Area | $ 0.00 sq. ft. | $ 54.46 sq. ft. | | $ 57.07 sq. ft. | | $ 54.50 sq. ft. | |
| Data Source(s) | | RegMLS#3228819;DOM 21 | | RegMLS#3218548;DOM 98 | | RegMLS#3135229;DOM 240 | |
| Verification Source(s) | | Courthouse Agent | | Courthouse Agent | | Courthouse Agent | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sale or Financing | | ArmLth | | ArmLth | | ArmLth | |
| Concessions | | VA;0 | | Conv;0 | | FHA;0 | |
| Date of Sale/Time | | s12/11;c10/11 | | s12/11;c11/11 | | s05/11;c04/11 | |
| Location | N;Res;Res | N;Res;Res | | N;Res;Res | | N;Res;Res | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 10000 sf | 10000 sf | | 10000 sf | | 10000 sf | |
| View | N;Res;Res | N;Res;Res | | N;Res;Res | | N;Res;Res | |
| Design (Style) | DT1.0;Ranch | DT1.0;Ranch | | DT1.0;Ranch | | DT1.0;Ranch | |
| Quality of Construction | Q4 | Q4 | | Q4 | | Q4 | |
| Actual Age | 5 | 7 | 0 | 6 | 0 | 8 | 0 |
| Condition | C3 | C3 | | C3 | | C3 | |
| Above Grade | Total / Bdrms. / Baths | Total / Bdrms. / Baths | | Total / Bdrms. / Baths | | Total / Bdrms. / Baths | |
| Room Count | 7 / 3 / 2.0 | 7 / 3 / 2.0 | | 8 / 4 / 2.0 | 0 | 7 / 3 / 2.0 | |
| Gross Living Area | 2,082 sq. ft. | 2,020 sq. ft. | 2,500 | 1,987 sq. ft. | 3,800 | 2,000 sq. ft. | 3,300 |
| Basement & Finished | 0sf | 0sf | | 0sf | | 0sf | |
| Rooms Below Grade | | | | | | | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | Cent/Cent | Cent/Cent | | Cent/Cent | | Cent/Cent | |
| Energy Efficient Items | Insul metal | Insul metal | | Insul metal | | Insul metal | |
| Garage/Carport | 2ga2dw | 2ga2dw | | 2ga2dw | | 2ga2dw | |
| Porch/Patio/Deck | Porch,Cov Patio | Porch,Scrn Patio | -2,000 | Porch,Cov Patio | | Porch,Cov Patio | |
| Appliances | RO DW Di MW | RO DW Di MW | | RO DW Di MW | | RO DW Di MW | |
| Other | None | None | | Fenced | -4,000 | | |
| Net Adjustment (Total) | | [X] + [ ] - | $ 500 | [ ] + [X] - | $ 200 | [X] + [ ] - | $ 3,300 |
| Adjusted Sale Price | | Net Adj. 0.5% | | Net Adj. -0.2% | | Net Adj. 3.0% | |
| of Comparables | | Gross Adj. 4.1% | $ 110,500 | Gross Adj. 6.9% | $ 113,200 | Gross Adj. 3.0% | $ 112,300 |

I [X] did [ ] did not research the sale or transfer history of the subject property and comparable sales. If not, explain     Sales history was researched.

My research [ ] did [X] did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data source(s) Courthouse

My research [ ] did [X] did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data source(s) Courthouse

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE NO. 1 | COMPARABLE SALE NO. 2 | COMPARABLE SALE NO. 3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | | | | |
| Price of Prior Sale/Transfer | $0 | $0 | $0 | $0 |
| Data Source(s) | Courthouse | Courthouse | Courthouse | Courthouse |
| Effective Date of Data Source(s) | 01/01/2012 | 01/01/2012 | 01/01/2012 | 01/01/2012 |

Analysis of prior sale or transfer history of the subject property and comparable sales     Courthouse records show no sales or transfers of the subject property in the three years prior to the appraisal assignment effective date.  Courthouse records show no sales or transfers of the comparables in the 12 months prior.

Summary of Sales Comparison Approach.   All three of the comparable sales are located in the SW portion of Port St Lucie and are generally similar to the appraised property in terms of age, size, design, and appeal.  Comp #1 and #2 are the most recent.  Comp #3 is somewhat dated (over 6 months) but was one of the best and most recent sales found.  Adjustments were made for differences in GLA size and features.  The adjusted sales produce a reasonably tight range of indicated values.

Indicated Value by Sales Comparison Approach $ 112,000

Indicated Value by: Sales Comparison Approach $ 112,000     Cost Approach (if developed) $ 137,000     Income Approach (if developed) $ 110,000
Appraiser relied most heavily on the Sales Comparison Approach since it is the comparison of the subject dwelling to recent sales of similar houses in the area.  The Cost Approach serves to support the final estimate of market value.

This appraisal is made [X] "as is,"  [ ] subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed,
[ ] subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or  [ ] subject to the following required
inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair:     VALUATION AS OF RETROSPECTIVE DATE
ESTABLISHED BY CLIENT (2/17/2012) BASED ON 1/17/2019 EXTERIOR FRONTAL APPRAISER DRIVE-BY INSPECTION.

Based on a visual inspection of the exterior areas of the subject property from at least the street, defined scope of work, statement of assumptions and limiting
conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $ 112,000
as of 02/17/2012 , which is the date of inspection and the effective date of this appraisal.

STATEWIDE APPRAISAL SERVICE INC.

## Exterior-Only Inspection Residential Appraisal Report   File No. 3865 Wycoff

| ADDITIONAL COMMENTS |
|---|

All three sales serve to support the final estimate of market value.

This appraiser has not conducted an appraisal nor any service on the subject property in the three years prior to the appraisal assignment acceptance date.

### COST APPROACH TO VALUE (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)   The SITE value is based on 2011 land sales from the Port St Lucie area.

| | COST APPROACH | | | | | |
|---|---|---|---|---|---|---|
| ESTIMATED ☐ REPRODUCTION OR ☒ REPLACEMENT COST NEW | OPINION OF SITE VALUE ................................ = $ | | | | | 9,500 |
| Source of cost data Marshall & Swift Co | Dwelling | 2,082 Sq. Ft. @ $ | 82.00 | ............. = $ | | 170,724 |
| Quality rating from cost service Average   Effective date of cost data 12/2011 | | Sq. Ft. @ $ | | ............. = $ | | |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | Appl,Extras | | | | | 4,040 |
| Physical: Est 4yr effective age in est 50yr economic life, equals | Garage/Carport 441 | Sq. Ft. @ $ | 19.00 | ............. = $ | | 8,379 |
| 8% physical depreciation (Rd) | Total Estimate of Cost-New | | | ............. = $ | | 183,143 |
| External: Loss in value due to proliferation of REO and short-sale | Less 50 Physical | Functional | External | | | |
| properties. Est as 25% of RCN | Depreciation $15,000 | $0 | $45,800 | = $ ( | | 60,800) |
| | Depreciated Cost of Improvements ................................ = $ | | | | | 122,343 |
| | "As-is" Value of Site Improvements ................................ = $ | | | | | 5,200 |
| Estimated Remaining Economic Life (HUD and VA only) 46 Years | INDICATED VALUE BY COST APPROACH ................................ = $ | | | | | 137,000 |

### INCOME APPROACH TO VALUE (not required by Fannie Mae)

| | | | |
|---|---|---|---|
| Estimated Monthly Market Rent $ | 1,100 X Gross Rent Multiplier | 100 = $ | 110,000 Indicated Value by Income Approach |

Summary of Income Approach (including support for market rent and GRM)   Rental comparables show a market rental rate of +/- $1100 per month with an applicable GRM of 100

### PROJECT INFORMATION FOR PUDs (if applicable)

Is the developer/builder in control of the Homeowners' Association (HOA)?   ☐ Yes ☐ No   Unit type(s)   ☐ Detached   ☐ Attached

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal name of project

| | | |
|---|---|---|
| Total number of phases | Total number of units | Total number of units sold |
| Total number of units rented | Total number of units for sale | Data source(s) |

Was the project created by the conversion of an existing building(s) into a PUD?   ☐ Yes ☐ No   If Yes, date of conversion.

Does the project contain any multi-dwelling units?   ☐ Yes ☐ No   Data source(s)

Are the units, common elements, and recreation facilities complete?   ☐ Yes ☐ No   If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association?   ☐ Yes ☐ No   If Yes, describe the rental terms and options.

Describe common elements and recreational facilities.

Case 1:09-md-02047-EEF-MBN Document 23362-31 Filed 11/19/18 Page 141 of 319
Case 1:11-cv-22408-MGC Document 27-1 Entered on FLSD Docket 09/15/2011 Page 126 of 989
C. F. 9989 SRA

## Exterior-Only Inspection Residential Appraisal Report

File No. 3865 Wycoff

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD).  This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications.  Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted.  The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment.  Modifications or deletions to the certifications are also not permitted.  However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

**SCOPE OF WORK:**  The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications.  The appraiser must, at a minimum: (1) perform a visual inspection of the exterior areas of the subject property from at least the street, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

The appraiser must be able to obtain adequate information about the physical characteristics (including, but not limited to, condition, room count, gross living area, etc.) of the subject property from the exterior-only inspection and reliable public and/or private sources to perform this appraisal.  The appraiser should use the same type of data sources that he or she uses for comparable sales such as, but not limited to, multiple listing services, tax and assessment records, prior inspections, appraisal files, information provided by the property owner, etc.

**INTENDED USE:**  The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

**INTENDED USER:**  The intended user of this appraisal report is the lender/client.

**DEFINITION OF MARKET VALUE:**  The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus.  Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions.  No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions.  Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction.  Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

**STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:**  The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1.    The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal.  The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2.    The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area.  Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

3.    The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

4.    The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing this appraisal.  Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied.  The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist.  Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

5.    The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

C. F. [illegible] SRA

## Exterior-Only Inspection Residential Appraisal Report

File No. **3865 Wycoff**

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1.  I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2.  I performed a visual inspection of the exterior areas of the subject property from at least the street. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3.  I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4.  I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value.  I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment.  I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5.  I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6.  I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7.  I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8.  I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9.  I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10.  I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11.  I have knowledge and experience in appraising this type of property in this market area.

12.  I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13.  I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14.  I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value.  I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal.  I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15.  I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16.  I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17.  I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction.  I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18.  My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19.  I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report.  If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report.  I certify that any individual so named is qualified to perform the tasks.  I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

20.  I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

21.  The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent.  Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

C. F. Stites SRA

## Exterior-Only Inspection Residential Appraisal Report

File No. 3865 Wycoff

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

**SUPERVISORY APPRAISER'S CERTIFICATION:** The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature | Signature |
| Name C. F. Stites, SRA | Name |
| Company Name C F Stites appraiser | Company Name |
| Company Address P O Box 991 | Company Address |
| Lake Worth, FL 33460 | |
| Telephone Number 561 588-2550 | Telephone Number |
| Email Address realestateappraiserflorida@gmail.com | Email Address |
| Date of Signature and Report 01/24/2019 | Date of Signature |
| Effective Date of Appraisal 02/17/2012 | State Certification # |
| State Certification # RZ2761 | or State License # |
| or State License # | State |
| or Other (describe) _____ State # _____ | Expiration Date of Certification or License |
| State FL | |
| Expiration Date of Certification or License 11/30/2020 | |

| ADDRESS OF PROPERTY APPRAISED | SUBJECT PROPERTY |
|---|---|
| 3865 SW Wycoff Street | ☐ Did not inspect exterior subject property |
| Port St Lucie, FL 34953 | ☒ Did inspect exterior of subject property from street |
| | Date of Inspection |
| APPRAISED VALUE OF SUBJECT PROPERTY $ 112,000 | |

| LENDER/CLIENT | COMPARABLE SALES |
|---|---|
| Name Valcentric LLC | ☐ Did not inspect exterior of comparable sales from street |
| Company Name Integra Realty Resources | ☒ Did inspect exterior of comparable sales from street |
| Company Address 9155 S. Dadeland Blvd, Ste 1208 | Date of Inspection |
| Miami, FL 33156 | |
| Email Address | |

Freddie Mac Form 2055    March 2005          UAD Version 9/2011          Produced using ACI software, 800.234.8727 www.aciweb.com          Fannie Mae Form 2055 March 2005
Page 6 of 6                                                                                                              2055_05UAD 12182015

STATEWIDE APPRAISAL SERVICE INC.

C.F. Shuford, Jr.
**Uniform Appraisal Dataset Definitions**                                    File No.  3865 Wycoff

**Condition Ratings and Definitions**

C1      The improvements have been very recently constructed and have not previously been occupied. The entire structure and all components are new and the dwelling features no physical depreciation.*

*Note: Newly constructed improvements that feature recycled materials and/or components can be considered new dwellings provided that the dwelling is placed on a 100% new foundation and the recycled materials and the recycled components have been rehabilitated/re-manufactured into like-new condition. Recently constructed improvements that have not been previously occupied are not considered "new" if they have any significant physical depreciation (i.e., newly constructed dwellings that have been vacant for an extended period of time without adequate maintenance or upkeep).*

C2      The improvements feature no deferred maintenance, little or no physical depreciation, and require no repairs. Virtually all building components are new or have been recently repaired, refinished, or rehabilitated. All outdated components and finishes have been updated and/or replaced with components that meet current standards. Dwellings in this category either are almost new or have been recently completely renovated and are similar in condition to new construction.

*Note: The improvements represent a relatively new property that is well maintained with no deferred maintenance and little or no physical depreciation, or an older property that has been recently completely renovated.*

C3      The improvements are well maintained and feature limited physical depreciation due to normal wear and tear. Some components, but not every major building component, may be updated or recently rehabilitated. The structure has been well maintained.

*Note: The improvement is in its first-cycle of replacing short-lived building components (appliances, floor coverings, HVAC, etc.) and is being well maintained. Its estimated effective age is less than its actual age. It also may reflect a property in which the majority of short-lived building components have been replaced but not to the level of a complete renovation.*

C4      The improvements feature some minor deferred maintenance and physical deterioration due to normal wear and tear. The dwelling has been adequately maintained and requires only minimal repairs to building components/mechanical systems and cosmetic repairs. All major building components have been adequately maintained and are functionally adequate.

*Note: The estimated effective age may be close to or equal to its actual age. It reflects a property in which some of the short-lived building components have been replaced, and some short-lived building components are at or near the end of their physical life expectancy; however, they still function adequately. Most minor repairs have been addressed on an ongoing basis resulting in an adequately maintained property.*

C5      The improvements feature obvious deferred maintenance and are in need of some significant repairs. Some building components need repairs, rehabilitation, or updating. The functional utility and overall livability is somewhat diminished due to condition, but the dwelling remains useable and functional as a residence.

*Note: Some significant repairs are needed to the improvements due to the lack of adequate maintenance. It reflects a property in which many of its short-lived building components are at the end of or have exceeded their physical life expectancy but remain functional.*

C6      The improvements have substantial damage or deferred maintenance with deficiencies or defects that are severe enough to affect the safety, soundness, or structural integrity of the improvements. The improvements are in need of substantial repairs and rehabilitation, including many or most major components.

*Note: Substantial repairs are needed to the improvements due to the lack of adequate maintenance or property damage. It reflects a property with conditions severe enough to affect the safety, soundness, or structural integrity of the improvements.*

**Quality Ratings and Definitions**

Q1      Dwellings with this quality rating are usually unique structures that are individually designed by an architect for a specified user. Such residences typically are constructed from detailed architectural plans and specifications and feature an exceptionally high level of workmanship and exceptionally high-grade materials throughout the interior and exterior of the structure. The design features exceptionally high-quality exterior refinements and ornamentation, and exceptionally high-quality interior refinements. The workmanship, materials, and finishes throughout the dwelling are of exceptionally high quality.

Q2      Dwellings with this quality rating are often custom designed for construction on an individual property owner's site. However, dwellings in this quality grade are also found in high-quality tract developments featuring residences constructed from individual plans or from highly modified or upgraded plans. The design features detailed, high-quality exterior ornamentation, high-quality interior refinements, and detail. The workmanship, materials, and finishes throughout the dwelling are generally of high or very high quality.

Q3      Dwellings with this quality rating are residences of higher quality built from individual or readily available designer plans in above-standard residential tract developments or on an individual property owner's site. The design includes significant exterior ornamentation and interiors that are well finished. The workmanship exceeds acceptable standards and many materials and finishes throughout the dwelling have been upgraded from "stock" standards.

Q4      Dwellings with this quality rating meet or exceed the requirements of applicable building codes. Standard or modified standard building plans are utilized and the design includes adequate fenestration and some exterior ornamentation and interior refinements. Materials, workmanship, finish, and equipment are of stock or builder grade and may feature some upgrades.

Q5      Dwellings with this quality rating feature economy of construction and basic functionality as main considerations. Such dwellings feature a plain design using readily available or basic floor plans featuring minimal fenestration and basic finishes with minimal exterior ornamentation and limited interior detail. These dwellings meet minimum building codes and are constructed with inexpensive, stock materials with limited refinements and upgrades.

Q6      Dwellings with this quality rating are of basic quality and lower cost; some may not be suitable for year-round occupancy. Such dwellings are often built with simple plans or without plans, often utilizing the lowest quality building materials. Such dwellings are often built or expanded by persons who are professionally unskilled or possess only minimal construction skills. Electrical, plumbing, and other mechanical systems and equipment may be minimal or non-existent. Older dwellings may feature one or more substandard or non-conforming additions to the original structure.

**Definitions of Not Updated, Updated, and Remodeled**

Not Updated
Little or no updating or modernization. This description includes, but is not limited to, new homes.
Residential properties of fifteen years of age or less often reflect an original condition with no updating, if no major components have been replaced or updated. Those over fifteen years of age are also considered not updated if the appliances, fixtures, and finishes are predominantly dated. An area that is 'Not Updated' may still be well maintained and fully functional, and this rating does not necessarily imply deferred maintenance or physical /functional deterioration.

Updated
The area of the home has been modified to meet current market expectations. These modifications are limited in terms of both scope and cost.
An updated area of the home should have an improved look and feel, or functional utility. Changes that constitute updates include refurbishment and/or replacing components to meet existing market expectations. Updates do not include significant alterations to the existing structure.

Remodeled
Significant finish and/or structural changes have been made that increase utility and appeal through complete replacement and/ or expansion.
A remodeled area reflects fundamental changes that include multiple alterations. These alterations may include some or all of the following:  replacement of a major component (cabinet(s), bathtub, or bathroom tile), relocation of plumbing/gas fixtures/appliances, significant structural alterations (relocating walls, and/or the addition of square footage). This would include a complete gutting and rebuild.

**Explanation of Bathroom Count**

The number of full and half baths is reported by separating the two values by a period. The full bath is represented to the left of the period. The half bath count is represented to the right of the period.  Three-quarter baths are to be counted as a full bath in all cases. Quarter baths (baths that feature only toilet) are not to be included in the bathroom count.

C.F. Signature

## Uniform Appraisal Dataset Definitions

File No. **3865 Wycoff**

### Abbreviations Used in Data Standardization Text

| Abbrev. | Full Name | Appropriate Fields | Abbrev. | Full Name | Appropriate Fields |
|---|---|---|---|---|---|
| ac | Acres | Area, Site | in | Interior Only Stairs | Basement & Finished Rooms Below Grade |
| AdjPrk | Adjacent to Park | Location | Lndfl | Landfill | Location |
| AdjPwr | Adjacent to Power Lines | Location | LtdSght | Limited Sight | View |
| A | Adverse | Location & View | Listing | Listing | Sale or Financing Concessions |
| ArmLth | Arms Length Sale | Sale or Financing Concessions | MR | Mid-Rise Structure | Design(Style) |
| AT | Attached Structure | Design(Style) | Mtn | Mountain View | View |
| ba | Bathroom(s) | Basement & Finished Rooms Below Grade | N | Neutral | Location & View |
| br | Bedroom | Basement & Finished Rooms Below Grade | NonArm | Non-Arms Length Sale | Sale or Financing Concessions |
| B | Beneficial | Location & View | op | Open | Garage/Carport |
| BsyRd | Busy Road | Location | o | Other | Basement & Finished Rooms Below Grade |
| cp | Carport | Garage/Carport | O | Other | Design(Style) |
| Cash | Cash | Sale or Financing Concessions | Prk | Park View | View |
| CtySky | City View Skyline View | View | Pstrl | Pastoral View | View |
| CtyStr | City Street View | View | PwrLn | Power Lines | View |
| Comm | Commercial Influence | Location | PubTrn | Public Transportation | Location |
| c | Contracted Date | Date of Sale/Time | rr | Recreational (Rec) Room | Basement & Finished Rooms Below Grade |
| Conv | Conventional | Sale or Financing Concessions | Relo | Relocation Sale | Sale or Financing Concessions |
| cv | Covered | Garage/Carport | REO | REO Sale | Sale or Financing Concessions |
| CrtOrd | Court Ordered Sale | Sale or Financing Concessions | Res | Residential | Location & View |
| DOM | Days On Market | Data Sources | RT | Row or Townhouse | Design(Style) |
| DT | Detached Structure | Design(Style) | RH | Rural Housing - USDA | Sale or Financing Concessions |
| dw | Driveway | Garage/Carport | SD | Semi-detached Structure | Design(Style) |
| Estate | Estate Sale | Sale or Financing Concessions | s | Settlement Date | Date of Sale/Time |
| e | Expiration Date | Date of Sale/Time | Short | Short Sale | Sale or Financing Concessions |
| FHA | Federal Housing Authority | Sale or Financing Concessions | sf | Square Feet | Area, Site, Basement |
| g | Garage | Garage/Carport | sqm | Square Meters | Area, Site, Basement |
| ga | Garage - Attached | Garage/Carport | Unk | Unknown | Date of Sale/Time |
| gbi | Garage - Built-in | Garage/Carport | VA | Veterans Administration | Sale or Financing Concessions |
| gd | Garage - Detached | Garage/Carport | wo | Walk Out Basement | Basement & Finished Rooms Below Grade |
| GR | Garden Structure | Design(Style) | wu | Walk Up Basement | Basement & Finished Rooms Below Grade |
| GlfCse | Golf Course | Location | WtrFr | Water Frontage | Location |
| Glfvw | Golf Course View | View | Wtr | Water View | View |
| HR | High Rise Structure | Design(Style) | w | Withdrawn Date | Date of Sale/Time |
| Ind | Industrial | Location & View | Woods | Woods View | View |

### Other Appraiser-Defined Abbreviations

| Abbrev. | Full Name | Appropriate Fields | Abbrev. | Full Name | Appropriate Fields |
|---|---|---|---|---|---|
| | | | | | |

C. F. Stites, SRA

## Market Conditions Addendum to the Appraisal Report

File No. 3865 Wycoff

The purpose of this addendum is to provide the lender/client with a clear and accurate understanding of the market trends and conditions prevalent in the subject neighborhood. This is a required addendum for all appraisal reports with an effective date on or after April 1, 2009.

Property Address **3865 SW Wycoff Street**　　City **Port St Lucie**　　State **FL**　　Zip Code **34953**

Borrower **Cassandra Yvette Marin**

Instructions: The appraiser must use the information required on this form as the basis for his/her conclusions, and must provide support for those conclusions, regarding housing trends and overall market conditions as reported in the Neighborhood section of the appraisal report form. The appraiser must fill in all the information to the extent it is available and reliable and must provide analysis as indicated below. If any required data is unavailable or is considered unreliable, the appraiser must provide an explanation. It is recognized that not all data sources will be able to provide data for the shaded areas below; if it is available, however, the appraiser must include the data in the analysis. If data sources provide the required information as an average instead of the median, the appraiser should report the available figure and identify it as an average. Sales and listings must be properties that compete with the subject property, determined by applying the criteria that would be used by a prospective buyer of the subject property. The appraiser must explain any anomalies in the data, such as seasonal markets, new construction, foreclosures, etc.

| Inventory Analysis | Prior 7-12 Months | Prior 4-6 Months | Current - 3 Months | Overall Trend | | |
|---|---|---|---|---|---|---|
| Total # of Comparable Sales (Settled) | | | | ☐ Increasing | ☐ Stable | ☐ Declining |
| Absorption Rate (Total Sales/Months) | | | | ☐ Increasing | ☐ Stable | ☐ Declining |
| Total # of Comparable Active Listings | | | | ☐ Declining | ☐ Stable | ☐ Increasing |
| Months of Housing Supply (Total Listings/Ab.Rate) | | | | ☐ Declining | ☐ Stable | ☐ Increasing |
| Median Sale & List Price, DOM, Sale/List % | Prior 7-12 Months | Prior 4-6 Months | Current - 3 Months | Overall Trend | | |
| Median Comparable Sale Price | | | | ☐ Increasing | ☐ Stable | ☐ Declining |
| Median Comparable Sales Days on Market | | | | ☐ Declining | ☐ Stable | ☐ Increasing |
| Median Comparable List Price | | | | ☐ Increasing | ☐ Stable | ☐ Declining |
| Median Comparable Listings Days on Market | | | | ☐ Declining | ☐ Stable | ☐ Increasing |
| Median Sale Price as % of List Price | | | | ☐ Increasing | ☐ Stable | ☐ Declining |
| Seller-(developer, builder, etc.)paid financial assistance prevalent? | ☐ Yes | ☐ No | | ☐ Declining | ☐ Stable | ☐ Increasing |

Explain in detail the seller concessions trends for the past 12 months (e.g., seller contributions increased from 3% to 5%, increasing use of buydowns, closing costs, condo fees, options, etc.).

Are foreclosure sales (REO sales) a factor in the market? ☐ Yes ☐ No If yes, explain (including the trends in listings and sales of foreclosed properties).

Cite data sources for above information.

Summarize the above information as support for your conclusions in the Neighborhood section of the appraisal report form. If you used any additional information, such as an analysis of pending sales and/or expired and withdrawn listings, to formulate your conclusions, provide both an explanation and support for your conclusions.

If the subject is a unit in a condominium or cooperative project , complete the following: Project Name:

| Subject Project Data | Prior 7-12 Months | Prior 4-6 Months | Current - 3 Months | Overall Trend | | |
|---|---|---|---|---|---|---|
| Total # of Comparable Sales (Settled) | | | | ☐ Increasing | ☐ Stable | ☐ Declining |
| Absorption Rate (Total Sales/Months) | | | | ☐ Increasing | ☐ Stable | ☐ Declining |
| Total # of Active Comparable Listings | | | | ☐ Declining | ☐ Stable | ☐ Increasing |
| Months of Unit Supply (Total Listings/Ab. Rate) | | | | ☐ Declining | ☐ Stable | ☐ Increasing |

Are foreclosure sales (REO sales) a factor in the project? ☐ Yes ☐ No If yes, indicate the number of REO listings and explain the trends in listings and sales of foreclosed properties.

Summarize the above trends and address the impact on the subject unit and project.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature | Signature |
| Name C. F. Stites, SRA | Name |
| Company Name C F Stites appraiser | Company Name |
| Company Address P O Box 991 | Company Address |
| Lake Worth, FL 33460 | |
| State License/Certification # RZ2761　　State FL | State License/Certification #　　State |
| Email Address realestateappraiserflorida@gmail.com | Email Address |

# SINGLE FAMILY COMPARABLE RENT SCHEDULE

This form is intended to provide the appraiser with a familiar format to estimate the market rent of the subject property.
Adjustments should be made only for items of significant difference between the comparables and the subject property.

C. F. Stites, SRA    File No. 3865 Wycoff

| ITEM | SUBJECT | COMPARABLE NO. 1 | | COMPARABLE NO. 2 | | COMPARABLE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 3865 SW Wycoff Street Port St Lucie, FL 34953 | 4256 SW Savona Blvd Port St Lucie, FL 34953 | | 3901 SW Savona Blvd Port St Lucie, FL 34953 | | 1031 SW Jerico Avenue Port St Lucie, FL 34953 | |
| Proximity to Subject | | 0.82 miles SW | | 0.31 miles SW | | 0.88 miles SE | |
| Date Lease Begins Date Lease Expires | | 09/01/2011 08/31/2012 | | 06/20/2011 05/31/2012 | | 06/08/2011 05/31/2012 | |
| Monthly Rental | If Currently Rented: $ | $ 1,050 | | $ 1,100 | | $ 1,250 | |
| Less: Utilities Furniture | $ $ | $ $ 0 | | $ $ 0 | | $ $ 0 | |
| Adjusted Monthly Rent | $ | $ 1,050 | | $ 1,100 | | $ 1,250 | |
| Data Source | | MLS#3193979 Agent | | MLS#3200896 Agent | | MLS#3200808 Agent | |
| RENT ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Rent Concessions | | None | | None | | None | |
| Location/View | N;Res;Res N;Res;Res | N;Res;Res N;Res;Res | | N;Res;Res N;Res;Res | | N;Res;Res N;Res;Res | |
| Design and Appeal | DT1.0;Ranch | DT1.0;Ranch | | DT1.0;Ranch | | DT1.0;Ranch | |
| Age/Condition | 5 C3 | 5 C3 | | 8 C3 | | 7 C3 | |
| Above Grade Room Count | Total 7  Bdrms 3  Baths 2.00 | Total 7  Bdrms 3  Baths 2.00 | | Total 7  Bdrms 3  Baths 2.00 | | Total 8  Bdrms 4  Baths 2.00 | -100 |
| Gross Living Area | 2,082 Sq. Ft. | 2,070 Sq. Ft. | 0 | 2,053 Sq. Ft. | 0 | 1,997 Sq. Ft. | 0 |
| Other (e.g., basement, etc.) | 0sf | 0sf | | 0sf | | 0sf | |
| Other: | RO DW Di MW None | RO DW Di MW None | | RO DW Di MW None | | RO DW Di MW None | |
| Net Adj. (total) | | [X] + [ ] - $ | 0 | [X] + [ ] - $ | 0 | [ ] + [X] - $ | 100 |
| Indicated Monthly | | 0.0 | | 0.0 | | 8.0 | |
| Market Rent | | 0.0 $ | 1,050 | 0.0 $ | 1,100 | -8.0 $ | 1,150 |

Comments on market data, including the range of rents for single family properties, an estimate of vacancy for single family rental properties, the general trend of rents and vacancy, and support for the above adjustments. (Rent concessions should be adjusted to the market, not to the subject property.)
Comparable rentals are of similar age and size.  All of the comparable rentals are within a few blocks of the appraised house.

Final Reconciliation of Market Rent:  Comparable rentals are highly similar in size and appeal.  Comparable rental #3 is a 4-bedroom while the subject and other rental comparables are 3-bedroom units.  All comparable rentals are under gross leases with tenant supplied utilities.

THIS RENTAL ANALYSIS IS AS OF A RETROSPECTIVE DATE (02/17/2012) BASED ON 01/17/2019 EXTERIOR FRONTAL DRIVE-BY PROPERTY INSPECTION BY THIS APPRAISER AS NOTED IN THE REPORT WHICH ACCOMPANIES THIS FORM.

I (WE) ESTIMATE THE MONTHLY MARKET RENT OF THE SUBJECT AS OF    02/17/2012    TO BE $    1,100

APPRAISER:    SUPERVISORY APPRAISER (ONLY IF REQUIRED):

| Signature | Signature |
|---|---|
| Name  C. F. Stites, SRA | Name |
| Date Report Signed  01/24/2019 | Date Report Signed |
| State Certification #  RZ2761    State  FL | State Certification #    State |
| Or State License #    State | Or State License #    State |
| Date Property Inspected 01/17/2019 | Date Property Inspected |

[ ]Did [ ]Did Not  Inspect Property

Freddie Mac Form 1000 (8/88)    Produced using ACI software, 800.234.8727 www.aciweb.com    Fannie Mae  Form 1007 (8/88)
1007 08192010

STATEWIDE APPRAISAL SERVICE INC.

SUBJECT PROPERTY PHOTO ADDENDUM

| | | |
|---|---|---|
| Borrower: Cassandra Yvette Marin | | File No.: 3865 Wycoff |
| Property Address: 3865 SW Wycoff Street | | Case No.: |
| City: Port St Lucie | State: FL | Zip: 34953 |
| Lender: Integra Realty Resources | | |



**FRONT VIEW OF
SUBJECT PROPERTY**

Appraised Date: February 17, 2012
Appraised Value: $ 112,000



**REAR VIEW OF
SUBJECT PROPERTY**



**STREET SCENE**

**COMPARABLE PROPERTY PHOTO ADDENDUM**

| | |
|---|---|
| Borrower: Cassandra Yvette Marin | File No.: 3865 Wycoff |
| Property Address: 3865 SW Wycoff Street | Case No.: |
| City: Port St Lucie | State: FL | Zip: 34953 |
| Lender: Integra Realty Resources | |



COMPARABLE SALE #1

1217 SW Santiago Avenue
Port St Lucie, FL 34953
Sale Date: s12/11;c10/11
Sale Price: $ 110,000



COMPARABLE SALE #2

3725 Kistler Street
Port St Lucie, FL 34953
Sale Date: s12/11;c11/11
Sale Price: $ 113,400



COMPARABLE SALE #3

1261 SW Hunnicut Avenue
Port St Lucie, FL 34953
Sale Date: s05/11;c04/11
Sale Price: $ 109,000

| | |
|---|---|
| Borrower: Cassandra Yvette Marin | File No.: 3865 Wycoff |
| Property Address: 3865 SW Wycoff Street | Case No.: |
| City: Port St Lucie | State: FL | Zip: 34953 |
| Lender: Integra Realty Resources | |



Front/Side view



Front/Side view



Address verification

| | | |
|---|---|---|
| Borrower: Cassandra Yvette Marin | | File No.: 3865 Wycoff |
| Property Address: 3865 SW Wycoff Street | | Case No.: |
| City: Port St Lucie | State: FL | Zip: 34953 |
| Lender: Integra Realty Resources | | |



Rental comparable #1
4256 Savona Blvd



Rental comparable #2
3901 Savona Blvd



Rental comparable #3
1031 SW Jericho Avenue

PLAT MAP

| | |
|---|---|
| Borrower: Cassandra Yvette Marin | File No.: 3865 Wycoff |
| Property Address: 3865 SW Wycoff Street | Case No.: |
| City: Port St Lucie | State: FL | Zip: 34953 |
| Lender: Integra Realty Resources | |

LOCATION MAP

| Borrower: Cassandra Yvette Marin | | | File No.: 3865 Wycoff |
| Property Address: 3865 SW Wycoff Street | | Case No.: | |
| City: Port St Lucie | State: FL | | Zip: 34953 |
| Lender: Integra Realty Resources | | | |



AERIAL MAP

| Borrower: Cassandra Yvette Marin | | File No.: 3865 Wycoff | |
| Property Address: 3865 SW Wycoff Street | | Case No.: | |
| City: Port St Lucie | State: FL | | Zip: 34953 |
| Lender: Integra Realty Resources | | | |



FLOOD MAP

| Borrower: Cassandra Yvette Marin | | File No.: 3865 Wycoff |
|---|---|---|
| Property Address: 3865 SW Wycoff Street | | Case No.: |
| City: Port St Lucie | State: FL | Zip: 34953 |
| Lender: Integra Realty Resources | | |



**FLOOD INFORMATION**

Community: CITY OF PORT ST. LUCIE

Property is NOT in a FEMA Special Flood Hazard Area

Map Number: 12111C0400J

Panel: 0400J

Zone: X

Map Date: 02-16-2012

FIPS: 12111

Source: FEMA DFIRM

**LEGEND**

= FEMA Special Flood Hazard Area – High Risk

= Moderate and Minimal Risk Areas

Road View:

= Forest          = Water

Sky Flood™

No representations or warranties to any party concerning the content, accuracy or completeness of this flood report, including any warranty of merchantability or fitness for a particular purpose is implied or provided. Visual scaling factors differ between map layers and are separate from flood zone information at marker location. No liability is accepted to any third party for any use or misuse of this flood map or its data.

| Borrower: Cassandra Yvette Marin | | File No.: 3865 Wycoff | |
|---|---|---|---|
| Property Address: 3865 SW Wycoff Street | | Case No.: | |
| City: Port St Lucie | State: FL | | Zip: 34953 |
| Lender: Integra Realty Resources | | | |

Michelle Franklin, CFA -- Saint Lucie County Property Appraiser -- All rights reserved.

### Property Identification

| | |
|---|---|
| Site Address: | 3865 SW Wycoff ST |
| Parcel ID: | 3420-590-1483-000-9 |
| Account #: | 69819 |
| Map ID: | 44/30N |
| Use Type: | 0100 |
| Zoning: | RS-2 |
| City/County: | Port Saint Lucie |

#### Ownership

Jims Yzacc
1077 Golden Rod Rd
Wellington, FL 33414

#### Legal Description

PORT ST LUCIE-SEC 19- BLK 1941 LOT 6 (MAP 44/30N) (OR 3487-1094)

#### Current Values

| | |
|---|---|
| Just/Market Value: | $212,500 |
| Assessed Value: | $212,500 |
| Exemptions: | $0 |
| Taxable Value: | $212,500 |

Taxes for this parcel: SLC Tax Collector's Office ☑
Download TRIM for this parcel: Download PDF ☑



#### Total Areas

| | |
|---|---|
| Finished/Under Air (SF): | 2,082 |
| Gross Area (SF): | 2,741 |
| Land Size (acres): | 0.23 |
| Land Size (SF): | 10,000 |

### Sale History

| | |
|---|---|
| Date: | Feb 14, 2013 |
| Book/Page: | 3487 / 1094 |
| Sale Code: | 0001 |
| Deed: | WD |
| Grantor: | Pauley Drywall & Construction |
| Price: | $140,000 |

| | |
|---|---|
| Date: | Mar 23, 2012 |
| Book/Page: | 3374 / 0690 |
| Sale Code: | 0111 |
| Deed: | QC |
| Grantor: | Jones John O |
| Price: | $100 |

| | |
|---|---|
| Date: | Feb 15, 2012 |
| Book/Page: | 3365 / 1487 |
| Sale Code: | 0001 |
| Deed: | WD |
| Grantor: | Marin Cassandra |

| Borrower: Cassandra Yvette Marin | | File No.: 3865 Wycoff |
|---|---|---|
| Property Address: 3865 SW Wycoff Street | | Case No.: |
| City: Port St Lucie | State: FL | Zip: 34953 |
| Lender: Integra Realty Resources | | |



# Anthony M. Graziano, MAI, CRE

**Integra Realty Resources**
**Miami/Palm Beach**

Dadeland Centre
9155 S. Dadeland Boulevard
Suite 1208
Miami, FL 33156

T 305.670.0001
F 305.670.2276

irr.com

## Experience

Senior Managing Director of Integra Realty Resources – Miami/Palm Beach.

Mr. Graziano has actively counseled and advised clients on the sale, leasing, valuation, management, and development of commercial real estate assets throughout the northeast and southeast U.S. since 1992.

Mr. Graziano's professional perspective is a blend of his experience and educational background which includes formal training in architecture, urban planning, macro and micro economics, real estate finance, institutional asset management, and land development. His market experience in sales, leasing, management, and valuation disciplines combine to bring practical real world answers to complex planning and development projects. He has been actively involved as a consultant and/or member of a consultant team on various major redevelopment and land use projects for public and private clients over the past 25+ years.

Mr. Graziano has specialized in consulting and valuation assignments for corporate and private clients on a wide array of complex issues related to estate and condemnation matters, title defects, environmental contamination/damages, air rights, partial and fractional interests, contract disputes, and mediation/arbitration disputes. Mr. Graziano's experience in these matters provides a comprehensive framework for effective strategic real estate consulting.

## Professional Activities & Affiliations

Advisory Board Member: Urban Land Institute (ULI) South Florida / Caribbean
Advisory Board Member: University of Miami M+RED Program
Member: Economic Roundtable - Miami Beacon Council (2012-present)
Board of Director: Integra Realty Resources, Inc. (2011-2016)
Chairman of the Board:    Integra Realty Resources, Inc. (2016-present)
Director: South Florida Chapter of the Appraisal Institute (2014-2016)
Board Member: Builders Association of South Florida (BASF) (2014-2016)
Subject Matter Expert (SME): Appraisal Practice Board, Appraisal Foundation
Member: Appraisal Institute (MAI) (2008-Present)
Member: Counselors of Real Estate (CRE) (2007-Present)
National Association of Realtors (REALTOR)
Miami Association of REALTORS Industry Analyst of the Year (2016)
Former Fellow: Royal Institute of Chartered Surveyors (FRICS) (2007-2014)
AI Leadership Development Advisory Council, March 1998 - February 2001
Lifetime Member: National Eagle Scout Association (NESA)

## Licenses

Florida, State-Certified General Real Estate Appraiser, RZ3510
New Jersey, State-Certified General Real Estate Appraiser, RG001261

## Education

University of Miami, Coral Gables, Florida 1988-1992
Degree: Bachelor of Science in Land Development and Planning, School of Architecture

New York University Real Estate Institute, New York, New York 1993-1996
Degree: Master of Science in Real Estate Development and Investment



amgraziano@irr.com    -    305.670.0001 x320

# Anthony M. Graziano, MAI, CRE

## Qualified Before Courts & Administrative Bodies

Qualified and accepted as an expert before:
US Bankruptcy Court (Newark, Southern District of Texas, Southern District of Florida)
US Federal District Court (Southern District of Florida)
FL Circuit Court (Miami-Dade, Broward, and Monroe Counties)
NJ State Tax Court
NJ Superior Court - Chancery Division
NJ Superior Court - Law Division
Various municipal planning and zoning boards throughout New Jersey and Florida
Various Taxing Authorities and Boards throughout New Jersey and Florida

**Integra Realty Resources**
**Miami/Palm Beach**

The Douglas Centre
2600 Douglas Road, Suite 801
Coral Gables, FL 33134

T 305.670.0001
F 305.670.2276

irr.com



amgraziano@irr.com    -    305.670.0001 x320



**Anthony M. Graziano, MAI, CRE, FRICS**
PROFERRED OR DISCLOSED EXPERT WITNESS REPORTS/SETTLEMENTS

| RETENTION DATE | ON BEHALF | IRR FILE # | COURT CASE NO. | COURT / VENUE | CASE NAME | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|
| 1/2015 | Defendant | 123-2015-0037 | 14-CV-22384 U U | Miami-Dade County, FL | Ray Benson & Maria Helena V. QBE Insurance Corporation | John A. Camp | Retrospective (2004-2006) analysis of market value claims against insurance company related to property |
| 9/2014 | Defendant | 123-2014-0194 | 13-03084CA 10 | 11th Judicial Circuit Miami-Dade, FL | Manuel Soltero V. Adorno & Yoss, LLP | Kaplan Zeena, LLP | Professional Liability suit against law firm and attorneys for malfeasance in litigation matter. |
| 2/2014 | Plaintiff | 123-2014-0030 | Settled | Caribbean Islands | Rainmaker Development V. A&F Bahamas, etal | VLASAC & SHMARUK, LLC | Partnership Dispute between Joint Venture in Carribean development project (golf course, villas, and large-scale marina-commercial-retail development) |
| 1/1/2012 | Defendant | 123-2012-0140 | 42-2012-CA-001065 | Marion County, FL | CSX Transportation, Inc. V. Moshen Saranzci, Faith Ann Safaranzi, Provebann Hidg, LLC, USA & George Albright | NeJame, La Fay, Jancha, Ahmed, Barker, Joshi & Moreno, P.A. | Condemnation of partial interest with damages |
| 7/2012 | Confidential | 123-2012-0076 | Confidential | Broward County, FL | Ft. Lauderdale-Hollywood Int'l Airport Expansion | White & Case, LLP | Value Diminution Study to assist public agency in good faith negotiations based on airport expansion. |
| 6/2012 | Defendant | 123-2012-0070 | 10-49616-CA-40 | Miami-Dade County, FL | CB Entertainment, LLC V. South Beach Ocean Parcel | Kubicki Draper, P.A. | Construction Damages claim |
| 12/2009 | Plaintiff | 109-2009-0443 | Dept. Justice File 90-11-3-5801 | Federal District Court of Virginia | United States vs. Atlantic Wood Industries, Inc. | U.S. Department of Justice | Damages/environmental contamination dispute between United States Navy and responsible party (Atlantic Wood Industries) |

**Anthony M. Graziano, MAI, CRE, FRICS**
IDENTIFIED EXPERT WITNESS TESTIMONY AT DEPOSITION and/or TRIAL

M. Qualis: Graziano: Trial Lists



| RETENTION DATE | ON BEHALF | TRI FILE # | COURT/CASE NO. # | CASE NAME | COURT / VENUE | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|
| 6/2015 | Plaintiff | 123-2015-0170 | 15-008930-CA-01 | Aaron Stauber & Aviva Stauber V. BH33, LLC | 11th Judicial Circuit Dade County, Florida (Hon. Peter R. Lopez) | Piedra & Associates, P.A. | Motion to dismiss Lis Pendens in an action to enforce contractual specific performance clause |
| 1/2015 | Defendant | 123-2015-0037 | 14-CV-22384 UU | Ray Benson & Maria Helena Campos V. QBE Insurance Corporation | Southern District of Florida | John Campis | Retrospective (2004-2006) analysis of market value claims against insurance company related to property damage claims arising from Hurricane Wilma |
| 1/2014 | Plaintiff | 123-2015-0031 | Pending | Igor Gel V. Yacht Club at Portofino Condo Association | Miami-Dade County | Weil Quaranta McGovern, P.A. | Construction defect dispute related to water-intrusion and damage-detrimental conditions analysis of |
| 10/2014 | Plaintiff | 123-2014-0226 | 08-CA-408-P | Ocean Bank V. Lindback, Monroe County | Monroe County | Ocean Bank | Deficiency claim against borrower on real estate collateral in the Florida Keys (development site plus marine related improvements) |
| 10/2014 | Defendant | 123-2014-0215 | 11-24994 CA 06 | Palm-Aire Holdings V. JRGS Investments, LLC, Jorge Garcia-Sariff and Course Drive Investments, LLC | 11th Judicial Circuit Dade County, Florida | Cole, Scott & Kissane, P.A. | Partnership dispute over valuation issues proximal to a fractured condominium project (respective values), and operating agreement dispute |
| 7/2014 | Plaintiff | 123-2014-0194 | 13-010822 CACE 02 | Amalia I. Irianda-Rivera V. Rivera Diagnostic Center, Inc., Olexay Rivera & Yudit Rivero | 17th Judicial Circuit Broward County, Florida | Amalia I. Irianda-Rivera | Rent default judgment and market rental and damage analysis associated with lease default. |
| 10/2014 | Defendant | 123-2014-0159 | 2014FLS34 (Pending) | Roehm Title Resources Claim | Palm Beach County | Title Resources Guaranty Company | Title insurance claim related to before and after damage/value diminution analysis based on defined site defects not identified by Title Insurance Company |
| 4/2014 | Defendant | 123-2014-0117 | 4:14-CV-01077 (Pending) | USA V. GSA-VA St. Louis Property, LLC | USA District Court for the Eastern District of Missouri Eastern Division | Bryan Cave LLP | Condemnation of a possessory interest for a term. Retained as consulting/rebuttal expert |
| 5/2014 | Defendant | 123-2014-0114 | Pending | Euforia Club | Miami-Dade County | Rennert Bogel Mandler & Rodriguez, P.A. | Rent dispute regarding forced relocation of a nightclub, and relevant market rental rate of replacement club space in Miami |
| 4/2014 | Plaintiff | 123-2014-0089 | | Pan American Holdings Corp. V. Florida DOT Right of Way (ROW) Acquisition SR-7 | Broward County | Henry Wulf, Esq. | Condemnation for R.O.W. purposes including before and after damage analysis |
| 1/2014 | Debtor | 123-2014-0005 | 13-25728-BKC-RAM | West Airport Plaza Business Park, LLC | US Federal Bankruptcy - Southern District of Florida - Miami Division (Hon. R. Mark) | Counsel for the Debtor, Michael D. Seese, Esq. | Fairness Opinion and market value opinions in conjunction with Debtor's Plan for Reorganization |
| 8/2013 | Defendant | 123-2009-0016 | 02-23922-CA 09 | American Educational Enterprises, LLC v. The Board of Trustees of the Internal Improvement Trust Fund | 11th Judicial Circuit Dade County, Florida | Richard Alayon, Esq. - Alayon and Associates | Economic Damages case associated with an alleged misrepresentation or omission by seller of real property |
| 7/2013 | Plaintiff | 123-2013-0126 | CACE 0865762A (14) | Bayview Loan Servicing, LLC v. Kayhan Soodjani, Muhammad Mahmoodi, et al | 17th Judicial Circuit Broward County, Florida (Hon. Carlos A. Rodriguez) | Bayview Servicing, represented by Tabas, Freedman and Soloff; Stacey Soloff, Esq. | Deficiency judgment on multi-family project (Dewey Street Apartments) |
| 3/2013 | Defendant | 123-2013-0105 | 11-23561-CIV-Rosenbaum | United States of America v. G.K.K. etal | US District Court - Southern District of Florida (Hon. Rosenbaum) | Richard Duvall, Holland and Knight and Jeffrey Neiman, Esq. | Condemnation claim on the 137,779 s.f. Miami Federal Bureau of Investigation (F.B.I.) building; condemnation of a possessory interest (leasehold) |
| 2/2013 | Defendant | 123-2011-0670 | 09-05650 CA 04 | Zenaida Gomez v. City of Pinecrest | 11th Judicial Circuit Dade County, Florida | Cynthia A. Everett, Cynthia A. Everett, P.A. | Economic damage resulting from temporary taking (seizure) of private residence |
| 7/2013 | Defendant | 123-2013-0016 | 12-60950-CIV | US Lending, Inc., Equity Financial Group, Inc., and Equity Commercial Group, Inc. v. Travelers Companies, Inc. etal | US Federal Court - Southern District of Florida | Heidi Raschke, Butler Pappas etal | Value diminution resulting from alleged mortgage fraud. |
| 11/2012 | Plaintiff | 123-2012-0128 | Pending | Renegade at Hialeah Blvd v. Dynatech Engineering | 11th Judicial Circuit Dade County, Florida | Ken Wurtenberger, Esq., Wurtenberger & Ferguson | Tax protest of commercial condominium. |
| 10/19/2012 | Plaintiff | 123-2012-0111 | 2011-1107 CA-23 | BASF Inc., successor Ciba Geigy Inc., vs. Township of Toms River | 11th Judicial Circuit Dade County, Florida (Hon. Stanford Blake) | Daniel Levin, Esq., Cole Scott, Kissane, P.A. | Economic Damages case, diminution in value resulting from prepaid lease modification |
| 10/12/2012 | Defendant | 123-2012-0109 | 11-30188 CA21 | Yaffa Yakubov vs. Bayview at Fisher Island No 3 | 11th Judicial Circuit Dade County, Florida | Craig Mirko, Esq., Cole Scott Kissane, P.A. | Market Value estimate of Fisher Island Condominium purchased under right of first refusal; economic damages claimed by Plaintiff due to contract dispute arising from association's exercise of right of first refusal |
| 8/20/2012 | Plaintiff | 123-2010-0012 | CA-02180 CA-25 | 7935 NBV, LLC v. Harbour East Development LTD, Mario Egozi, etal | 11th Judicial Circuit Dade County, Florida | Jose Casal, Esq., Holland and Knight | Deficiency judgment on 32-unit fractured condominium, substitute expert following issuance of IRR-Miami reports in 2010 and 2012 |
| 8/15/2012 | Disclosed Dual Expert | 123-2012-0072 | | Vazquez v. Vazquez Matrimonial Matter | Matrimonial Mediation | Colon and Mendoza and Robert Hertzberg, P.A. | Retained as a court-appointed third party expert to both parties to appraise (2) marital assets comprised of office, retail, single and multi-family units in FL, TN, NC, and Ill, Bahamas |
| 7/2012 | Plaintiff | 109-2011 | Pending: 2003-2014 | BASF Inc., successor Ciba Geigy Inc, vs. Township of Toms River | Tax Court of New Jersey (Hon. Patrick DeAlemeida) | Phil Genuario, Garippa, etal on behalf of BASF | Challenge to multi-year appeal of $80 Million+ land assessment on contaminated superfund site in Central New Jersey |
| 3/2012 | Defendant | 109-2010-0172 | ATL-L-4451-08 | Scot Netherlands Inc. vs. State of New Jersey Department of Environmental Protection (NJDEP) | Superior Court of New Jersey, Law Division Atlantic County | Jay Rhatican, Connell Foley on behalf of Scot Netherlands, Inc. | Challenge to NJDEP permit denial to fill wetlands, deprivation of all reasonable investment backed expectations |
| 07/2011 | Defendant | 109-2010-0199 | MER-L-3034-08 | 480 Mercer Street, LLP and Bruckener Southern, LLC vs. Hightstown | Superior Court of New Jersey Mercer County | Ansell Zarro Grimm & Aaron, P.C. Husam Chater | Litigation-Dispute Resolution - Hightstown Zoning Challenge |
| 12/2009 | Plaintiff | 109-2009-0443 | Dept. Justice File 90-11-3-5801 | United States vs. Atlantic Wood Industries, Inc. | Federal District Court of Virginia | U.S. Department of Justice | Damages/Environmental contamination dispute between United States Navy and responsible party (Atlantic Wood Industries) |
| 12/2009 | Plaintiff | 109-2009-0377 | | Westrust/HPC Mortgage Fund vs. City of Atlantic City | Tax Court of New Jersey | Cole, Schotz, Meisel, Forman & Leonard, P.A. Carl Rizzo, Esq. | Tax Appeals - To develop an opinion of the market value of the fee simple interest in the property |

**Anthony M. Graziano, MAI, CRE, FRICS**
IDENTIFIED EXPERT WITNESS TESTIMONY AT DEPOSITION and/or TRIAL

| RETENTION DATE | ON BEHALF OF | IRR FILE # | COURT CASE NO | CASE NAME | COURT / VENUE | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|
| 1/2009 | Secured Creditor | 109-2009-0439 | | Erickson Building | US Bankruptcy Court - Southern District of Texas | Stuart Glick, Esq., Sills, Cummis & Gross | Market Value for Bankruptcy of 140,000 SF corporate campus in Bethesda, Maryland |
| 09/2009 | Plaintiff | 3035-601 | | Bay Head Yacht Club vs. Ocean County Tax Board | Tax Court of New Jersey | John Doyle, Carluccio, Leone, Dimon, Doyle & Sacks, LLC | Tax Appeal for Bay Head Yacht Club |
| 12/2008 | Plaintiff | 109-2009-0123 | INA (DEPS Pending) | Mirage Atlantic City (MAC) vs. City of Atlantic City | Tax Court of New Jersey | Hank Rovitrant, Esq. | Tax Appeal at State Tax Court on 15 acre casino site adjacent to Trump Marina |
| 09/2008 | Defendant | 109-2008-0252 | L-2424-05 | The City of South Amboy vs. Lower Main Street Development, LLC & Amboy Aggregates Joint Venture | Superior Court of New Jersey Law Division, Middlesex County | Bathgate, Wegenar, etal | Verified complaint in condemnation |
| 6/2008 | Defendant | 109-2008-345 | C.A. No. OCNL-3361-06 | Osbourne Associates, Melbourne Associates VI, LLC, Kingsway Realty Profit Share vs. Citta Enterprises Co, JAC Property Management etal and Eckert Corporation | Superior Court of New Jersey, Law Division Ocean County | Francis X. Manning, Esq, Stradley Ronon Stevens & Young & Michael Canfoli, Esq. Partridge Snow and Hahn, both on behalf of | Dispute re: proper valuation of leasehold and sublessee's sandwich leasehold interest on damage claim for breach of agreement claim |
| 1/2008 | Defendant | 109-2008-0125- | N/A | Toms River Township vs. Citta Geney Corporation | American Arbitration Association [testimony at Arbitration conducted by Hon. Eugene Serpentelli] | Mark Troncone, Esq., In-house Counsel to Township of Toms River | Arbitration of environmental damages claim, and counter-claim of appropriateness of zoning on 1,900 acre superfund site. |
| 11/2007 | Defendant | 109-2007-211 | L-000835-06 | Kyle Mosteller vs. Galla Neeman | Superior Court of New Jersey, Law Division Middlesex County | Frank Canuso, Esq, Hoagland, Longo, Moran and Dunst | Damage claim due to loss of trees and screening between urban properties |
| 6/2007 | Plaintiff | 109-2007-0134 | 3:07-CV-2322 | Silver Lakes Inc. vs. Township of Freehold Inc. | Superior Court of New Jersey, Chancery Division Monmouth County | Christopher Hanlon, Esq, Hanlon and Niemann | Challenge to validity of Rent Control Ordinance as transfer of property rights from Lessor to Lessee. |
| 6/2007 | Plaintiff | 109-2007-0173 | | Laurelwood Homes, LLC vs. United States Department of Navy | Federal District Court of Virginia | William A. Shook Esq. | Leasehold interest in the property, breach of lease claim on behalf of leasehold owner (Laurelwood) claiming breach of lease and damages |
| 12/2006 | Defendant | 109-2006-0192 | CAM-L-9731-05 | Brandywine Operating Partnership, LP vs. UFCW Local 56 | Superior Court of New Jersey, Law Division, Camden County | Brett Last, Esq, O'Brien, Belland and Bushinsky | Estimate the value of damages to landlord on breach of above-market lease |
| 8/2006 | Defendant | 109-2006-0257 | | County Line & Browers Bridge, Jackson Township | | Levin, Shea, Pfeffer, PA Steven Pfeffer | To develop an opinion of the hypothetical market value of the fee simple interest in the property |
| 02/2006 | Defendant | 109-2006-0044 | OCN-L-2482-04 | Carl Brooks vs. K. Hovanian | Ocean Superior Court, Ocean County Courthouse | Ronan, Tuzzio & Giannone Linda Olsen | To estimate value diminution in the subject property as a result of various issues asserted by the property owner in conjunction with pending litigation between the property owner and the subject developer K. Hovanian @ Sea Oaks |
| 10/2005 | Defendant | 109-2005-0315 | OCN-L-1810-5 | Atlantic City Electric Company d/b/a Conectiv Power Delivery, a regulated public utility of the state of New Jersey vs. AC1 Manahawkin, LLC family and/or Armstrong | Superior Court of New Jersey, Law Division Ocean County | Flaster/Greenberg, PC, David R. Oberlander, Esq. | Compensation for the taking of an easement for construction and maintenance of a 230kv transmission line and towers by Atlantic City Electric |
| 06/2005 | Defendant | 109-2005-0214 | MON-L-2609-05 | Township of Howell vs. George Harms Construction Co., Inc. etal | Superior Court of New Jersey, Law Division Monmouth County | Connell & Foley, LLP Kevin Coakley, Esq. | To develop an opinion of the market value of the fee simple estate of the property |
| 08/2003 | Defendant | 109-2003-0282 | | Giuffre vs. Giuffre | Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County | Louis & Wolf - Frank A. Louis | To develop an opinion of the market value of the Fee Simple estate of the properties for purposes of equitable distribution of marital assets |
| 07/2003 | Plaintiff | 109-2003-0203 | OCN-C-78-03 | West, etal vs. Pompaino, etal | Superior Court of New Jersey, Chancery Division, Ocean County | Stephen E. Smith, Esq | To develop an opinion of the diminution in value due to a loss of useable land area |
| 06/2003 | Plaintiff | 109-2003-0128 | OCN-C-316-02 | Eugene M. Lord vs. Donald W. Rinaldo | Superior Court of New Jersey, Law Division, | Lombardi & Lombardi Scott Telson | To develop an opinion of the market value of the fee simple interest in the property |
| 04/2003 | Plaintiff | 109-2003-0128 | FM-15-468-03-C | Vincent Urbank vs. Lisa Urbank | Superior Court of New Jersey, Chancery Division, Family Part Ocean County | Marianna Pontorero, Esq. | Litigation-Matrimonial |
| 02/2002 | Plaintiff | 109-2002-0055 | | Shenandoah Mobile Home Park | | Windels Marx Lane & Mittendorf, LLP - William Cagney | Inverse Condemnation - Rent Control Ordinance |
| 04/2001 | Claimant | 109-2001-0169 | NJ-2624-00 | DeForest John Ely and Kimberle A. Ely, h/w | Superior Court of New Jersey, Chancery Division Middlesex County | First American Title Insurance Co Jack Mikis | To derive an opinion of the fair compensation of the fee simple estate, subject to the temporary title encumbrance |
| 03/1999 | Defendant | 109-1999-0062 | | Georgetown Apartments | US Bankruptcy Court - District of Newark | Emmes & Co., Andrew Schwarz | To estimate the market value of the Leased Fee Estate of the property, inclusive of 28 Apartment complexes through NY, NJ, PA, and MD. |
| 12/1997 | Defendant | LKW-257-3186 | FM-15-1465-94 | Lisa Franklin, etal vs. Donald Franklin, etal | Superior Court of New Jersey, Chancery Division, Family Part, Ocean County | Greenbaum, Rowe, Smith, Ravin, Davis & Himmel LLP Robert S. Underhill | Estimating the market value of the leased fee interest |
| 8/1984 | Creditor | HUD-XX | | Hudson Marina Association vs. Emmes & Co. | US Bankruptcy Court - District of Newark | | Bankruptcy Reorganization of 200+ slip failed marina/dockominium complex |



**Integra Realty Resources**
Miami/Palm Beach

**Appraisal Report & Post-Remediation Damage Related to Chinese Drywall**

**Deeg, David R. & Hooker, Deborah M.**
Hypothetical Market Value "As If" Remediated
516 SW Akron Avenue
Stuart, Martin County, Florida 34994
Client Reference: 20

**Prepared For:**
Colson Hicks Eidson

**Effective Date of the Appraisal:**
May 2, 2016

**Report Format:**
Appraisal Report

**IRR - Miami/Palm Beach**
File Number: 123-2018-0275

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/19/19 Page 164 of 319
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2013 Page 949 of
989





**Deeg, David R. & Hooker, Deborah M.**
516 SW Akron Avenue
Stuart, Florida

| Integra Realty Resources | In Miami | In Orlando | In Naples/Sarasota |
|---|---|---|---|
| Miami | Dadeland Centre | The Magnolia Building | Horseshoe Professional Park |
| Orlando | 9155 South Dadeland Blvd. | 326 N. Magnolia Ave. | 2770 Horseshoe Drive S. |
| Southwest Florida | Suite 1208 | | Suite 3 |
| | Miami, FL 33156 | Orlando, FL 32801 | Naples, FL 34104 |
| www.irr.com | (305) 670-0001 | (407) 843-3377 | (239)-643-6888 |



January 24, 2019


Patrick S. Montoya
Partner
Colson Hicks Eidson
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134


SUBJECT:    Hypothetical Market Value "As If" Remediated
            Case No 11-22408-Civ-COOKE
            United States District Court Southern District of Florida in the matter of
            Eduardo and Carmen Amorin, et al. individually and on behalf of others situated
            similarly v. Taishan Gypsum Co., LTD., f/k/a Shandong Taiche Dongxin Co. Ltd., et al
            Priority Claimant Case at:
            Deeg, David R. & Hooker, Deborah M.
            516 SW Akron Avenue
            Stuart, Martin County, Florida 34994
            Client Reference: 20
            IRR - Miami/Palm Beach File No. 123-2018-0275


Dear Mr. Montoya:


Integra Realty Resources – Miami/Palm Beach submits the following damage estimate in the
referenced property as of the effective date assuming all remediation was completed by an
appropriate contractor with experience and credentials in remediating defective drywall.

The report is intended to comply the Uniform Standards of Professional Appraisal Practice (USPAP). It
presents summary discussions of the data, reasoning, and analysis that were used in the appraisal
process to develop the opinions. Additional information is contained within our workfile.

The findings will form the basis of expert witness testimony in the above referenced case.

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/19/19 Page 166 of 319
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 08/15/2013 Page 951 of 989

Identification of Subject                                                                    2

## Identification of Subject

The subject of this report is a single-family Key West style home configured with 3 bedroom and 3.5 baths with 2,421 SF under air-conditioning. The subject property was built in 2006 and is located on a 3,223 SF site.

## Purpose of the Appraisal

The purpose of the appraisal is to develop an opinion of the diminution in value and related damages, collectively "the damages" as of the effective date of the appraisal, May 2, 2016. The damage estimate assumes the defective drywall remediation was completed and does not consider the cost to cure. The date of the report is January 24, 2019. The appraisal is valid only as of the stated effective date or dates.

## Intended Use and User

The intended use of the appraisal is for litigation purposes. The client, Colson Hicks Eidson and related co-counsel, Plaintiff and the Court are the intended users. Integra Realty Resources – Miami/Palm Beach is not responsible for unauthorized use of this report.

## Most Recent Sale History

The most recent closed sale of the subject is summarized as follows:

| Most Recent Subject Sale (Closed) | |
| --- | --- |
| Sale Date (Most Recent) | October 10, 2007 |
| Seller | Treasure Coast Communities |
| Buyer | Deeg, David R. & Hooker, Deborah M. |
| Sale Price | $400,500 |
| Recording Instrument Number | 2043812 |
| Disposition Details | Original sale of home from builder |

To the best of our knowledge, no other sale or transfer of ownership has taken place within a three-year period prior to the effective appraisal date.

The property was listed for sale in January 2016 with an asking price of $369,000 with full disclosure of un-remediated Chinese drywall in the listing. The sale closed May 2016 for $330,000 un-remediated.

After remediation, the property was listed for sale in December 2016 for $579,000 and sold January 2017 for $530,000. The remediation was disclosed, and the marketing time was one month.

## Pending Transactions

To the best of our knowledge, the property is not subject to an agreement of sale or an option to buy, nor is it listed for sale, as of the effective appraisal date.

Deeg, David R. & Hooker, Deborah M.



Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/19/19 Page 167 of 319
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2019 Page 952 of 989

Definition of Market Value                                                                                    3

## Definition of Market Value

The following definition of market value is used by agencies that regulate federally insured financial institutions in the United States:

"The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- Buyer and seller are typically motivated;

- Both parties are well informed or well advised, and acting in what they consider their own best interests;

- A reasonable time is allowed for exposure in the open market;

- Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

- The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale."

*(12 C.F.R. Part 34.42(g); 55 Federal Register 54696, August 24, 1990, as amended at 57 Federal Register 12202, April 9, 1992, 59 Federal Register 29499, June 7, 1994)*

## Definition of Retrospective Value Opinion

A value opinion effective as of a specified historical date. The term retrospective does not define a type of value. Instead, it identifies a value opinion as being effective at some specific prior date. Value as of a historical date is frequently sought in connection with property tax appeals, damage models, lease renegotiation, deficiency judgements, estate tax, and condemnation. Inclusion of the type of value with this term is appropriate, e.g. "retrospective market value opinion".

*(Source: The Dictionary of Real Estate Appraisal – 6th Edition; Appraisal Institute, 200 W. Madison, Suite 1500, Chicago, IL 60606, www.appraisalinstitute.org)*

## Definition of Hypothetical Condition

1. A condition that is presumed to be true when it is known to be false. (SVP)

2. A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis. Comment: Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of date used in an analysis. (USPAP, 2016-2017 ed.)

*(Source: The Dictionary of Real Estate Appraisal – 6th Edition; Appraisal Institute, 200 W. Madison, Suite 1500, Chicago, IL 60606, www.appraisalinstitute.org)*



Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/19/19 Page 168 of 319
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 08/15/2013 Page 953 of 989

Scope of Work                                                                                                    4

## Scope of Work

Integra was retained as an expert in the captioned matter of this report to address potential damages related to the subject property, specifically excluding the costs to cure.

Integra was retained to estimate any post remediation damages, and conducted a separate study to determine whether damages persist following defective drywall remediation. The result of that study are outlined within Integra's report entitled "Market Analysis of the Post Remediation Impact of Chinese Drywall on Residential Property Values in Florida." The results of that study are incorporated by reference herein.

In addition, our damage model was requested to include a rental value analysis of the Priority Claimant residence, and a determination of the relevant economic damage associated with having to vacate the home for a period of time (and secure alternate living arrangements) during the remediation. As of the effective date, the claimant would have suffered the damages.

Integra established individual case files on each Priority Claimant residence, and retained professional assistance from qualified residential appraisers in each jurisdiction. Integra managed the process of these retrospective appraisals, interfaced with the residential appraisers, and reviewed the form appraisals completed on each assignment including review of the comparables, adjustments, and form narrative to establish the market value of the residence unimpaired as of the effective date.

Integra professionals reviewed various materials exchanged as part of this case and considered materials that were relevant to the market valuation. These materials were downloaded from the attorney's dropbox and are retained within our workfile.

Integra's participation in and review of the final appraised values results in a conclusion of the market value of the home defined as "Hypothetical Market Value" assuming defective drywall had never been identified within the subject property. This forms the basis of the unimpaired market value as of the effective date.

All properties and comparables were inspected by the local residential appraisers without the benefit of interior inspections. Adjustments for condition and age at the time of sale are based upon photographs contained within the various MLS databases, paired analysis from amongst the comparables, and for the subject, were based on photos, if available. In the event a property had not been remediated as of the effective date, we assume average condition for the property in the market as of the effective date.

The damage analysis expressed within this report follows the peer teachings and market accepted processes for damage analysis. However, the damage analysis only represents a <u>portion of the overall damages</u> because we were specifically requested to exclude the consideration of the costs to cure. This represents a relevant component of damage in this case for property that factually have not been remediated.

Integra's role was strictly to identify post remediation value damage (sometime referred to as "stigma") and estimate the relevant rental value and moving costs as a proxy for the temporary loss of use during remediation.

Deeg, David R. & Hooker, Deborah M.



Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/19/19 Page 169 of 319
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2013 Page 954 of 989

Highest and Best Use                                                                                          5

## Significant Appraisal Assistance

In addition to Anthony M. Graziano, MAI ,CRE, principal, it is acknowledged that Peter G. Kayworth, Yuliya Georgieva, Joseph Melloni and Paul L. Jones of IRR-Miami/Palm Beach were involved in the assignment consisting of conducting research on the subject and transactions involving comparable properties, performing appraisal analyses and assisting in report writing, under the supervision of the persons signing the report.  The local residential appraisers are also named as providing significant assistance, including exterior inspection of the properties and comparables, application of their local knowledge in adjusting and estimating the unimpaired value, and developing the form report valuations incorporated herein.

## Prior Services

USPAP requires appraisers to disclose to the client any other services they have provided in connection with the subject property in the prior three years, including valuation, consulting, property management, brokerage, or any other services. We have not performed any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

## Valuation Methodology

Appraisers usually consider the use of three approaches to value when developing a market value opinion for real property. These are the cost approach, sales comparison approach, and income capitalization approach.  The valuations consider the only relevant approach for residential valuation, the sales comparison analysis.  The cost and income approach are not considered relevant.

The sales comparison approach is the most applicable valuation method since there is an active market for similar properties, and sufficient sales data is available for analysis.  Additionally, this approach directly considered the prices of alternative properties having similar utility.

### Highest and Best Use

The highest and best use of the subject as if vacant for development of a single-family home which is physically possible, legally permissible as per zoning, financially feasible and maximally productive.

The highest and best use of the subject as improved is for continued use as a single-family home with no other use that could reasonably be expected to provide a higher value to the land as if vacant.  The improvements contribute to the over all value to a greater extent than the land value alone, and therefore, continued use as improved concluded to be maximally productive and the highest and best use of the property.

### Conclusion of Value

The Hypothetical market value appraisal as of the effective date, reflective of a traditional form appraisal, is contained within the Addenda of this report.  This value us hypothetical since it assumes that defective drywall had never been present at the subject property.



Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/19/19 Page 170 of 319
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 08/15/2013 Page 955 of 989

Conclusion of Value 6

Against this value, we then apply the Post Impairment Discount as a percentage of unimpaired value as developed within the Integra report studying this issue. This represents a compensable damage resulting from the prior existence of defective drywall in the home as of the effective date.

In addition, each appraisal (unimpaired) reflects a rental value analysis as of the effective date. This rental value analysis concludes to the equivalent market rent for the home (unimpaired) and reflects a proxy for the probable actual costs the homeowner would experience by having to move-out of the primary residence during remediation.

The homeowner would also have to incur moving /storage costs twice, once before and once after remediation. Professional packing, moving and storage for an average home is estimated at $1,500 per move, or $3,000 in total. This amount is added to the loss of use estimate as an additional damage.

This loss of use calculation does not consider the costs of alternative housing or other tangible costs potentially incurred for damages suffered between the date of discovery and the date of value. These damages, if applicable, are being estimated by a separate expert (Elkins et al). To the extent Elkins posits costs which are duplicative or actual costs that are greater or less, some minor adjustments to Integra's damage model may be required.

The timeframe for remediation (months of actual loss) could vary depending upon the permitting process in the specific community, the availability of labor, and the size of the home. Integra reviewed a number of transactions that were remediated by investors and found the typical timeframe between purchase of an unremediated home and listing[1] of the home post-remediation to be 3-6 months.

Larger more expansive homes would be expected to take longer to remediate since more materials are required, and in higher-priced homes, supplies would typically be custom-ordered. Therefore, we apply the following timeframes based on the subject's size and price range:

< $150,000 Home up to 2,000+/- SF          4 months

$150,000 - $750,000 home up to 4,000 SF          6 months

$750,000+ home up over 4,000 SF          9 months

---

[1] The "listing date" is most relevant since a homeowner conducting their own remediation can move back in once the home is ready for sale (ie- coinciding with a final certificate of occupancy).

Deeg, David R. & Hooker, Deborah M.



Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/19/19 Page 171 of 319
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 08/15/2019 Page 956 of 989

Conclusion of Value          7

The following shows our final estimate of damages as of the effective date, and assuming costs to cure (i.e. – to conduct the remediation) have been expended.

**Conclusions of Damage**

| | | |
|---|---|---|
| Hypothetical Value (Unimpaired - Before) | | $450,000 |
| Market Impairment Discount (As if Remediated) | | 10% |
| Post Impairment Damage ($) | | $45,000 |
| **Hypothetical Value As IF Remediated** | | **$405,000** |
| Post Remediation Damages as of Effective Date | | **$45,000** |
| Loss of Use: | | |
|    Rental Rate ($/Month) | $2,400 | |
|    Moving & Storage Costs | | $3,000 |
|    Loss of Use Subject (# Months) | 6x | $14,400 |
|       Subject Total | | **$17,400** |
| **Post Remediation Damage** | | **$62,400** |

Note: Does not consider "cost to cure". Assumes remediation was completed by qualified contractor who warranties the work.

The property was listed for sale in January 2016 with an asking price of $369,000 with full disclosure of un-remediated Chinese drywall in the listing. The sale closed May 2016 for $330,000 un-remediated. After remediation, the property was listed for sale in December 2016 for $579,000 and sold January 2017 for $530,000. The remediation was disclosed, and the marketing time was one month.

Deeg, David R. & Hooker, Deborah M.



Case 2:09-md-02047-EEF-MBN  Document 22363-31  Filed 11/19/19  Page 172 of 319
Case 1:11-cv-22408-MGC  Document 273-8  Entered on FLSD Docket 09/15/2011  Page 957 of 989

Certification                                                                                              8

## Certification

We certify that, to the best of our knowledge and belief:

1.  The statements of fact contained in this report are true and correct.

2.  The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3.  We have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

4.  We have not performed any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

5.  We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

6.  Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

7.  Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

8.  Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice as well as applicable state appraisal regulations.

9.  The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

10. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

11. Anthony M. Graziano, MAI, CRE did not make a personal inspection of the property that is the subject of this report. Chad F. Stites has personally inspected the subject.

12. Significant real property appraisal assistance was provided by Peter G. Kayworth, Yuliya Georgieva, Joseph Melloni and Paul L. Jones.  Additionally, real estate assistance was provided by various Valucentric employees and subcontractors, including: John Barcelo, Angela Barcelo, Fred Stites, Carlos Fong, Sarah D. Wilson and Rob Baird.

13. We have experience in appraising properties similar to the subject and are in compliance with the Competency Rule of USPAP.

14. As of the date of this report, Anthony M. Graziano, MAI, CRE, has completed the continuing education program for Designated Members of the Appraisal Institute.

Anthony M. Graziano, MAI, CRE
Senior Managing Director - Miami
State-Certified General RE Appraiser
FL Certificate # RZ#3510

Deeg, David R. & Hooker, Deborah M.

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/19/19 Page 173 of 319
Case 1:11-cv-22408-MGC Document 273-9 Entered on FLSD Docket 08/15/2013 Page 958 of 989

Assumptions and Limiting Conditions                                                                    9

## Assumptions and Limiting Conditions

This appraisal and any other work product related to this engagement are limited by the following standard assumptions, <u>except as otherwise noted in the report</u>:

1. The title is marketable and free and clear of all liens, encumbrances, encroachments, easements and restrictions. The property is under responsible ownership and competent management and is available for its highest and best use.

2. There are no existing judgments or pending or threatened litigation that could affect the value of the property.

3. There are no hidden or undisclosed conditions of the land or of the improvements that would render the property more or less valuable. Furthermore, there is no asbestos in the property.

4. The revenue stamps placed on any deed referenced herein to indicate the sale price are in correct relation to the actual dollar amount of the transaction.

5. The property is in compliance with all applicable building, environmental, zoning, and other federal, state and local laws, regulations and codes.

6. The information furnished by others is believed to be reliable, but no warranty is given for its accuracy.

This appraisal and any other work product related to this engagement are subject to the following limiting conditions, except as otherwise noted in the report:

1. An appraisal is inherently subjective and represents our opinion as to the value of the property appraised.

2. The conclusions stated in our appraisal apply only as of the effective date of the appraisal, and no representation is made as to the effect of subsequent events.

3. No changes in any federal, state or local laws, regulations or codes (including, without limitation, the Internal Revenue Code) are anticipated.

4. No environmental impact studies were either requested or made in conjunction with this appraisal, and we reserve the right to revise or rescind any of the value opinions based upon any subsequent environmental impact studies. If any environmental impact statement is required by law, the appraisal assumes that such statement will be favorable and will be approved by the appropriate regulatory bodies.

5. Unless otherwise agreed to in writing, we are not required to give testimony, respond to any subpoena or attend any court, governmental or other hearing with reference to the property without compensation relative to such additional employment.

6. We have made no survey of the property and assume no responsibility in connection with such matters. Any sketch or survey of the property included in this report is for illustrative purposes only and should not be considered to be scaled accurately for size. The appraisal covers the property as described in this report, and the areas and dimensions set forth are assumed to be correct.

Deeg, David R. & Hooker, Deborah M.



Case 2:09-md-02047-EEF-MBN Document 22366-31 Filed 11/19/19 Page 174 of 319
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2014 Page 959 of 989

Assumptions and Limiting Conditions                                          10

7.  No opinion is expressed as to the value of subsurface oil, gas or mineral rights, if any, and we have assumed that the property is not subject to surface entry for the exploration or removal of such materials, unless otherwise noted in our appraisal.

8.  We accept no responsibility for considerations requiring expertise in other fields. Such considerations include, but are not limited to, legal descriptions and other legal matters such as legal title, geologic considerations such as soils and seismic stability; and civil, mechanical, electrical, structural and other engineering and environmental matters. Such considerations may also include determinations of compliance with zoning and other federal, state, and local laws, regulations and codes.

9.  The distribution of the total valuation in the report between land and improvements applies only under the reported highest and best use of the property. The allocations of value for land and improvements must not be used in conjunction with any other appraisal and are invalid if so used. The appraisal report shall be considered only in its entirety. No part of the appraisal report shall be utilized separately or out of context.

10. Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraisers, or any reference to the Appraisal Institute) shall be disseminated through advertising media, public relations media, news media or any other means of communication (including without limitation prospectuses, private offering memoranda and other offering material provided to prospective investors) without the prior written consent of the persons signing the report.

11. Information, estimates and opinions contained in the report and obtained from third-party sources are assumed to be reliable and have not been independently verified.

12. Any income and expense estimates contained in the appraisal report are used only for the purpose of estimating value and do not constitute predictions of future operating results.

13. If the property is subject to one or more leases, any estimate of residual value contained in the appraisal may be particularly affected by significant changes in the condition of the economy, of the real estate industry, or of the appraised property at the time these leases expire or otherwise terminate.

14. Unless otherwise stated in the report, no consideration has been given to personal property located on the premises or to the cost of moving or relocating such personal property; only the real property has been considered.

15. The current purchasing power of the dollar is the basis for the values stated in the appraisal; we have assumed that no extreme fluctuations in economic cycles will occur.

16. The values found herein are subject to these and to any other assumptions or conditions set forth in the body of this report but which may have been omitted from this list of Assumptions and Limiting Conditions.

17. The analyses contained in the report necessarily incorporate numerous estimates and assumptions regarding property performance, general and local business and economic conditions, the absence of material changes in the competitive environment and other matters. Some estimates or assumptions, however, inevitably will not materialize, and unanticipated events and circumstances may occur; therefore, actual results achieved during

Deeg, David R. & Hooker, Deborah M.



Case 2:09-md-02047-EEF-MBN   Document 22363-31   Filed 11/19/19   Page 175 of 319
Case 1:11-cv-22408-MGC   Document 273-8   Entered on FLSD Docket 09/15/2011   Page 960 of 989

Assumptions and Limiting Conditions                                                                11

the period covered by our analysis will vary from our estimates, and the variations may be material.

18.  The Americans with Disabilities Act (ADA) became effective January 26, 1992. We have not made a specific survey or analysis of the property to determine whether the physical aspects of the improvements meet the ADA accessibility guidelines. We claim no expertise in ADA issues, and render no opinion regarding compliance of the subject with ADA regulations. Inasmuch as compliance matches each owner's financial ability with the cost to cure the non-conforming physical characteristics of a property, a specific study of both the owner's financial ability and the cost to cure any deficiencies would be needed for the Department of Justice to determine compliance.

19.  The appraisal report is prepared for the exclusive benefit of the Client, its subsidiaries and/or affiliates. It may not be used or relied upon by any other party. All parties who use or rely upon any information in the report without our written consent do so at their own risk.

20.  No studies have been provided to us indicating the presence or absence of hazardous materials on the subject property or in the improvements, and our valuation is predicated upon the assumption that the subject property is free and clear of any environment hazards including, without limitation, hazardous wastes, toxic substances and mold. No representations or warranties are made regarding the environmental condition of the subject property. Integra Realty Resources – Miami/Palm Beach, Integra Realty Resources, Inc., Integra Strategic Ventures, Inc. and/or any of their respective officers, owners, managers, directors, agents, subcontractors or employees (the "Integra Parties"), shall not be responsible for any such environmental conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because we are not experts in the field of environmental conditions, the appraisal report cannot be considered as an environmental assessment of the subject property.

21.  The persons signing the report may have reviewed available flood maps and may have noted in the appraisal report whether the subject property is located in an identified Special Flood Hazard Area. We are not qualified to detect such areas and therefore do not guarantee such determinations. The presence of flood plain areas and/or wetlands may affect the value of the property, and the value conclusion is predicated on the assumption that wetlands are non-existent or minimal.

22.  Integra Realty Resources – Miami/Palm Beach is not a building or environmental inspector. Integra Miami/Palm Beach does not guarantee that the subject property is free of defects or environmental problems. Mold may be present in the subject property and a professional inspection is recommended.

23.  The appraisal report and value conclusions for an appraisal assume the satisfactory completion of construction, repairs or alterations in a workmanlike manner.

24.  It is expressly acknowledged that in any action which may be brought against any of the Integra Parties, arising out of, relating to, or in any way pertaining to this engagement, the appraisal reports, and/or any other related work product, the Integra Parties shall not be responsible or liable for any incidental or consequential damages or losses, unless the appraisal was fraudulent or prepared with intentional misconduct. It is further acknowledged



Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/19/19 Page 176 of 319
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 08/13/2013 Page 961 of 989

Assumptions and Limiting Conditions                                                      12

that the collective liability of the Integra Parties in any such action shall not exceed the fees paid for the preparation of the appraisal report unless the appraisal was fraudulent or prepared with intentional misconduct. Finally, it is acknowledged that the fees charged herein are in reliance upon the foregoing limitations of liability.

25. Integra Realty Resources – Miami/Palm Beach, an independently owned and operated company, has prepared the appraisal for the specific intended use stated elsewhere in the report. The use of the appraisal report by anyone other than the Client is prohibited except as otherwise provided. Accordingly, the appraisal report is addressed to and shall be solely for the Client's use and benefit unless we provide our prior written consent. We expressly reserve the unrestricted right to withhold our consent to your disclosure of the appraisal report or any other work product related to the engagement (or any part thereof including, without limitation, conclusions of value and our identity), to any third parties. Stated again for clarification, unless our prior written consent is obtained, no third party may rely on the appraisal report (even if their reliance was foreseeable).

26. The conclusions of this report are estimates based on known current trends and reasonably foreseeable future occurrences. These estimates are based partly on property information, data obtained in public records, interviews, existing trends, buyer-seller decision criteria in the current market, and research conducted by third parties, and such data are not always completely reliable. The Integra Parties are not responsible for these and other future occurrences that could not have reasonably been foreseen on the effective date of this assignment. Furthermore, it is inevitable that some assumptions will not materialize and that unanticipated events may occur that will likely affect actual performance. While we are of the opinion that our findings are reasonable based on current market conditions, we do not represent that these estimates will actually be achieved, as they are subject to considerable risk and uncertainty. Moreover, we assume competent and effective management and marketing for the duration of the projected holding period of this property.

27. All prospective value opinions presented in this report are estimates and forecasts which are prospective in nature and are subject to considerable risk and uncertainty. In addition to the contingencies noted in the preceding paragraph, several events may occur that could substantially alter the outcome of our estimates such as, but not limited to changes in the economy, interest rates, and capitalization rates, behavior of consumers, investors and lenders, fire and other physical destruction, changes in title or conveyances of easements and deed restrictions, etc. It is assumed that conditions reasonably foreseeable at the present time are consistent or similar with the future.

Deeg, David R. & Hooker, Deborah M.



Case 1:11-cv-22408-MGC Document 273-5 Entered on FLSD Docket 08/15/2019 Page 962 of 989

# Addenda



File No. 516 Akron

APPRAISAL OF



LOCATED AT:

516 SW Akron Avenue
Stuart, FL 34994

FOR:

Integra Realty Resources
9155 S. Dadeland Blvd, Ste 1208
Miami, FL 33156

BORROWER:

David Deeg, Deborah Deeg

AS OF:

May 2, 2016

BY:

C. F. Stites, SRA

File No. 516 Akron



Valcentric LLC
Integra Realty Resources
9155 S. Dadeland Blvd, Ste 1208
Miami, FL  33156

File Number:   516 Akron

In accordance with your request, I have appraised the real property at:

516 SW Akron Avenue
Stuart, FL  34994

The purpose of this appraisal is to develop an opinion of the market value of the subject property, as improved.
The property rights appraised are the fee simple interest in the site and improvements.

In my opinion, the market value of the property as of   May 2, 2016                                      is:

$450,000
Four Hundred Fifty Thousand  Dollars

The attached report contains the description, analysis and supportive data for the conclusions,
final opinion of value, descriptive photographs, limiting conditions and appropriate certifications.

C. F. Stites, SRA

C.F. Shuford

**Exterior-Only Inspection Residential Appraisal Report**     File No. 516 Akron

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

| | | | |
|---|---|---|---|
| Property Address 516 SW Akron Avenue | City Stuart | State FL | Zip Code 34994 |
| Borrower David Deeg, Deborah Deeg | Owner of Public Record N/A | | County Martin |

Legal Description Lot 8, Stuart Cay

Assessor's Parcel # 05-38-41-028-000-00080-0    Tax Year 2016    R.E. Taxes $ 3,764

Neighborhood Name Stuart Cay/Downtown Stuart    Map Reference 05/38/41    Census Tract 0007.00

Occupant [X] Owner [ ] Tenant [ ] Vacant    Special Assessments $ 0    [ ] PUD   HOA $ 148   [ ] per year [X] per month

Property Rights Appraised [X] Fee Simple [ ] Leasehold [ ] Other (describe)

Assignment Type [ ] Purchase Transaction [ ] Refinance Transaction [X] Other (describe) VALUATION AS OF RETROSPECTIVE DATE 05/02/2016

Lender/Client Integra Realty Resources    Address 9155 S. Dadeland Blvd, Ste 1208, Miami, FL 33156

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? [X] Yes [ ] No

Report data source(s) used, offering price(s), and date(s). DOM 87;RegMLS#TX-385902 with list date 1/07/2016 at $369,000 with 87 DOM and sold 5/03/2016 at $330,000 in a conventional loan transaction. No other listings in the previous 12 months.

I [ ] did [ ] did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.

Contract Price $    Date of Contract    Is the property seller the owner of public record? [ ] Yes [ ] No   Data Source(s)

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? [ ] Yes [ ] No

If Yes, report the total dollar amount and describe the items to be paid.

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | One-Unit Housing Trends | One-Unit Housing | | Present Land Use % | |
|---|---|---|---|---|---|
| Location [ ] Urban [X] Suburban [ ] Rural | Property Values [ ] Increasing [X] Stable [ ] Declining | PRICE | AGE | One-Unit | 55 % |
| Built-Up [X] Over 75% [ ] 25-75% [ ] Under 25% | Demand/Supply [ ] Shortage [X] In Balance [ ] Over Supply | $(000) | (yrs) | 2-4 Unit | 1 % |
| Growth [ ] Rapid [X] Stable [ ] Slow | Marketing Time [X] Under 3 mths [ ] 3-6 mths [ ] Over 6 mths | 140 Low | 1 | Multi-Family | 12 % |
| | | 790 High | 99 | Commercial | 22 % |
| | | 330 Pred. | 45 | Other Vac | 10 % |

Neighborhood Boundaries The subject neighborhood is the area north of Federal Hwy, south of the intracoastal waterway, between Federal Hwy on the west and Memorial Park on the east.

Neighborhood Description Older neighborhood near downtown Stuart in close proximity to schools, places of worship, and shopping. Highway access is available within a few blocks. The downtown CBD is within walking distance with other work centers within 10 miles. Mixture of bungalow and ranch-style houses on small lots with multi-family including duplex, apt, condo and townhouse.

Market Conditions (including support for the above conclusions) Stable suburban neighborhood near all vital services. No adverse conditions were observed. Only minimal REO activity was noted in the area. Agents report good market demand for area properties. Readily available mortgage financing primarily conventional and bank transactions.

| | | |
|---|---|---|
| Dimensions 27.34x22.54x82.75x39.51x73.08 | Area 3223 sf | Shape Irregular    View B;Wtr;Twnhouse |

Specific Zoning Classification RS    Zoning Description Residential single family

Zoning Compliance [X] Legal [ ] Legal Nonconforming (Grandfathered Use) [ ] No Zoning [ ] Illegal (describe)

Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use? [X] Yes [ ] No   If No, describe.

| Utilities | Public | Other (describe) | Public | Other (describe) | Off-site Improvements—Type | Public | Private |
|---|---|---|---|---|---|---|---|
| Electricity | [X] | | Water | [X] | Street Pavers | | [X] |
| Gas | [ ] | None | [ ] Yes [X] No   Sanitary Sewer | [X] | Alley None | | |

FEMA Special Flood Hazard Area [ ] Yes [X] No    FEMA Flood Zone X    FEMA Map # 12085C0134G    FEMA Map Date 03/16/2015

Are the utilities and off-site improvements typical for the market area? [X] Yes [ ] No   If No, describe.

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? [ ] Yes [X] No   If Yes, describe. Private street for this development. HOA dues cover street maintenance while HOA docs cover roadway use issues.

Source(s) Used for Physical Characteristics of Property [ ] Appraisal Files [ ] MLS [X] Assessment and Tax Records [ ] Prior Inspection [ ] Property Owner [ ] Other (describe)    Data Source(s) for Gross Living Area County Property Appraiser

| GENERAL DESCRIPTION | GENERAL DESCRIPTION | Heating / Cooling | Amenities | Car Storage |
|---|---|---|---|---|
| Units [X] One [ ] One with Accessory Unit | [X] Concrete Slab [ ] Crawl Space | [ ] FWA [ ] HWBB | Fireplace(s) # 0 | [ ] None |
| # of Stories 3.0 | [ ] Full Basement [ ] Finished | [ ] Radiant | WoodStove(s) # 0 | [X] Driveway   # of Cars 2 |
| Type [X] Det. [ ] Att. [ ] S-Det./End Unit | [ ] Partial Basement [ ] Finished | [ ] Other | [X] Patio/Deck Cov | Driveway Surface Concrete |
| [X] Existing [ ] Proposed [ ] Under Const. | Exterior Walls CBS | Fuel Electric | [X] Porch Front | [X] Garage   # of Cars 2 |
| Design (Style) Key West | Roof Surface Metal | [X] Central Air Conditioning | Pool None | [ ] Carport   # of Cars 0 |
| Year Built 2006 | Gutters & Dwnspts Part-mtl | [ ] Individual | Fence None | [X] Attached [ ] Detached |
| Effective Age (Yrs) 9 | Window Type Impact | [ ] Other | [X] Other Balconys | [ ] Built-in |

Appliances [X] Refrigerator [X] Range/Oven [X] Dishwasher [ ] Disposal [X] Microwave [ ] Washer/Dryer [ ] Other (describe)

Finished area above grade contains: 8 Rooms   3 Bedrooms   3.1 Bath(s)   2,421 Square Feet of Gross Living Area Above Grade

Additional features (special energy efficient items, etc.) Assumed standard kitchen appliance package. MLS shows 3-bedroom,3.1 bathrooms. Elevator, boat dock.

Describe the condition of the property and data source(s) (including apparent needed repairs, deterioration, renovations, remodeling, etc.). C2;VALUATION AS OF A RETROSPECTIVE DATE (05/02/2016) BASED ON 1/17/2019 EXTERIOR FRONTAL DRIVE-BY INSPECTION. PHYSICAL DATA PER COUNTY PROPERTY APPRAISER'S OFFICE. AVERAGE CONDITION ASSUMED WITH NO SERIOUS ITEMS OF DEFERRED MAINTENANCE.

Are there any apparent physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? [ ] Yes [X] No   If Yes, describe. SEE COMMENTS ABOVE

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? [X] Yes [ ] No   If No, describe.

## Exterior-Only Inspection Residential Appraisal Report

File No. 516 Akron

| There are | 2 | comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 395,000 | to $ 445,000 | . |

| There are | 4 | comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 332,500 | to $ 449,900 | . |

| FEATURE | SUBJECT | COMPARABLE SALE NO. 1 | | COMPARABLE SALE NO. 2 | | COMPARABLE SALE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 516 SW Akron Avenue Stuart, FL 34994 | 508 SW California Ave #A Stuart, FL 34994 | | 536 SW Akron Avenue Stuart, FL 34994 | | 524 SW Akron Avenue Stuart, FL 34994 | |
| Proximity to Subject | | 0.06 miles SE | | 0.04 miles SE | | 0.02 miles SE | |
| Sale Price | $ | $ | 420,000 | $ | 510,000 | $ | 449,900 |
| Sale Price/Gross Liv. Area | $ 0.00 sq. ft. | $ 201.92 sq. ft. | | $ 210.66 sq. ft. | | $ 185.83 sq. ft. | |
| Data Source(s) | | RegMLS#381395;DOM 354 | | RegMLS#10214824;DOM 10 | | RegMLS#380145;DOM 42 | |
| Verification Source(s) | | Courthouse Agent | | Courthouse Agent | | Courthouse Agent | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sale or Financing Concessions | | ArmLth Seller;0 | | ArmLth Conv;0 | | ArmLth Conv;0 | |
| Date of Sale/Time | | s04/16;c03/16 | | s05/16;c03/16 | | s04/15;c03/15 | |
| Location | N;Res;Res | N;Res;Res | | N;Res;Res | | N;Res;Res | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 3223 sf | 3123 sf | 0 | 2962 sf | 0 | 2744 sf | 0 |
| View | B;Wtr;Twnhouse | N;Res;Twnhouse | 20,000 | B;Wtr;Twnhouse | | B;Wtr;Twnhouse | |
| Design (Style) | DT3.0;Key West | SD2.0;Key West | 0 | DT3.0;Key West | | DT3.0;Key West | |
| Quality of Construction | Q4 | Q4 | | Q3 | -50,000 | Q4 | |
| Actual Age | 10 | 10 | 0 | 10 | | 10 | |
| Condition | C2 | C2 | | C2 | | C2 | |
| Above Grade | Total 8 Bdrms. 3 Baths 3.1 | Total 7 Bdrms. 3 Baths 2.1 | | Total 8 Bdrms. 3 Baths 3.1 | | Total 8 Bdrms. 3 Baths 3.1 | |
| Room Count | | | 7,000 | | | | |
| Gross Living Area | 2,421 sq. ft. | 2,080 sq. ft. | 15,350 | 2,421 sq. ft. | | 2,421 sq. ft. | |
| Basement & Finished Rooms Below Grade | 0sf | 0sf | | 0sf | | 0sf | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | Cent/Cent | Cent/Cent | | Cent/Cent | | Cent/Cent | |
| Energy Efficient Items | Impact windows | Impact windows | | Impact windows | | Impact windows | |
| Garage/Carport | 2ga2dw | 2ga2dw | 0 | 2ga2dw | | 2ga2dw | |
| Porch/Patio/Deck | Por,CvPat,Balc | Por,CvPat,Balc | | Por,CvPat,Balc | | Por,CvPat,Balc | |
| Appliances | RO DW Di MW | RO DW Di MW | | RO DW Di MW | | RO DW Di MW | |
| Other | Elevator,Dock | Guest apt,Pool | -10,000 | Elevator,Dock | | Elevator,Dock | |
| Net Adjustment (Total) | | [X] + [ ] - $ | 32,350 | [ ] + [X] - $ | 50,000 | [X] + [ ] - $ | 0 |
| Adjusted Sale Price of Comparables | | Net Adj. 7.7% Gross Adj. 12.5% $ | 452,350 | Net Adj. -9.8% Gross Adj. 9.8% $ | 460,000 | Net Adj. 0.0% Gross Adj. 0.0% $ | 449,900 |

I [X] did [ ] did not research the sale or transfer history of the subject property and comparable sales. If not, explain   Sales history was researched.

My research [ ] did [X] did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.

Data source(s)   Courthouse

My research [ ] did [X] did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.

Data source(s)   Courthouse

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE NO. 1 | COMPARABLE SALE NO. 2 | COMPARABLE SALE NO. 3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | | | | |
| Price of Prior Sale/Transfer | $0 | $0 | $0 | $0 |
| Data Source(s) | Courthouse | Courthouse | Courthouse | Courthouse |
| Effective Date of Data Source(s) | 01/01/2016 | 01/01/2016 | 01/01/2016 | 01/01/2016 |

Analysis of prior sale or transfer history of the subject property and comparable sales   Courthouse records show no sales or transfers of the subject property in the three years prior to the appraisal assignment effective date. Courthouse records show no sales or transfers of the comparables in the 12 months prior.

Note: Comp #2 was pending as of the date of value (5/02/2016) and closed on 05/05/2016. It was used in this appraisal at the request of the client.

Summary of Sales Comparison Approach.   All three sales are townhouse units in the immediate area. Comp #2 and #3 are a model-match to the subject property while Comp #1 is a semi-detached dwelling a block to the west. Like the appraised property, Comp #3 have a dock. Comp #1 has a guest apartment and an in-ground pool. Comp #2 has an elevator. MLS indicates Comp #2 has substantial high-end upgrades. Accordingly, a quality adjustment was made to Comp #2. All three sales serve to support the final estimate of market value with weight and emphasis on Comp #1 and #3 since they needed the least adjusting.

Indicated Value by Sales Comparison Approach $ 450,000

Indicated Value by: Sales Comparison Approach $ 450,000   Cost Approach (if developed) $ 462,500   Income Approach (if developed) $ 432,000

Appraiser relied most heavily on the Sales Comparison Approach since it is the comparison of the subject dwelling to recent sales of similar houses in the area. The Cost Approach serves to support the final estimate of market value.

This appraisal is made [X] "as is," [ ] subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, [ ] subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or [ ] subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair:   VALUATION AS OF RETROSPECTIVE DATE ESTABLISHED BY CLIENT (05/02/2016) BASED ON 1/17/2019 EXTERIOR FRONTAL APPRAISER DRIVE-BY INSPECTION.

Based on a visual inspection of the exterior areas of the subject property from at least the street, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $ 450,000
as of   05/02/2016   , which is the date of inspection and the effective date of this appraisal.

Freddie Mac Form 2055   March 2005                    UAD Version 9/2011                    Produced using ACI software, 800.234.8727 www.aciweb.com                    Fannie Mae Form 2055   March 2005
Page 2 of 6                                                                                                                                                         2055_05UAD 12/16/2015

STATEWIDE APPRAISAL SERVICE INC.

Exterior-Only Inspection Residential Appraisal Report    File No. 516 Akron

**ADDITIONAL COMMENTS**

All three sales serve to support the final estimate of market value.

This appraiser has not conducted an appraisal nor any service on the subject property in the three years prior to the appraisal assignment acceptance date.

---

**COST APPROACH TO VALUE** (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)    The SITE value is based on 2015 and 2016 land sales from the downtown Stuart vicinity.

| COST APPROACH | | | | | | |
|---|---|---|---|---|---|---|
| ESTIMATED ☐ REPRODUCTION OR ☒ REPLACEMENT COST NEW | OPINION OF SITE VALUE | | | | = $ | 165,000 |
| Source of cost data Marshall & Swift Co | Dwelling | 2,421 Sq. Ft. @ $ | 122.00 | | = $ | 295,362 |
| Quality rating from cost service Avg/Good  Effective date of cost data 12/2015 | | | Sq. Ft. @ $ | | = $ | |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | Appl,Elev,Dock,etc | | | | | 34,042 |
| Physical: Est 9yr effective age in est 50yr economic life, equals | Garage/Carport 458 | | Sq. Ft. @ $ | 31.00 | = $ | 14,198 |
| 18% physical depreciation (Rd) | Total Estimate of Cost-New | | | | = $ | 343,602 |
| | Less  50  Physical | Functional | External | | | |
| | Depreciation  $61,900 | $0 | $0 | | = $ ( | 61,900) |
| | Depreciated Cost of Improvements | | | | = $ | 281,702 |
| | "As-is" Value of Site Improvements | | | | = $ | 15,800 |
| Estimated Remaining Economic Life (HUD and VA only)  41 Years | INDICATED VALUE BY COST APPROACH | | | | = $ | 462,500 |

**INCOME APPROACH TO VALUE** (not required by Fannie Mae)

| | | | | |
|---|---|---|---|---|
| Estimated Monthly Market Rent $ 2,400 X Gross Rent Multiplier 180 = $ 432,000 | | | Indicated Value by Income Approach | |

Summary of Income Approach (including support for market rent and GRM)  Rental comparables show a market rental rate of +/- $2400 per month with an applicable GRM of 180.

**PROJECT INFORMATION FOR PUDs** (if applicable)

| | | | |
|---|---|---|---|
| Is the developer/builder in control of the Homeowners' Association (HOA)? ☐ Yes ☐ No  Unit type(s) ☐ Detached ☐ Attached | | | |

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal name of project

| | | |
|---|---|---|
| Total number of phases | Total number of units | Total number of units sold |
| Total number of units rented | Total number of units for sale | Data source(s) |

Was the project created by the conversion of an existing building(s) into a PUD? ☐ Yes ☐ No  If Yes, date of conversion.

Does the project contain any multi-dwelling units? ☐ Yes ☐ No  Data source(s)

Are the units, common elements, and recreation facilities complete? ☐ Yes ☐ No  If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association? ☐ Yes ☐ No  If Yes, describe the rental terms and options.

Describe common elements and recreational facilities.

C. F. 989 SRA

## Exterior-Only Inspection Residential Appraisal Report

File No. 516 Akron

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

**SCOPE OF WORK:** The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a visual inspection of the exterior areas of the subject property from at least the street, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

The appraiser must be able to obtain adequate information about the physical characteristics (including, but not limited to, condition, room count, gross living area, etc.) of the subject property from the exterior-only inspection and reliable public and/or private sources to perform this appraisal. The appraiser should use the same type of data sources that he or she uses for comparable sales such as, but not limited to, multiple listing services, tax and assessment records, prior inspections, appraisal files, information provided by the property owner, etc.

**INTENDED USE:** The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

**INTENDED USER:** The intended user of this appraisal report is the lender/client.

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

**STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:** The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

3. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

4. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing this appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

5. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/19/19 Page 184 of 319
Case 1:11-cv-22408-MGC Document 27-3 Entered on FLSD Docket 08/15/2013 Page 169 of 989
C. F. 989 SRA

**Exterior-Only Inspection Residential Appraisal Report**    File No. 516 Akron

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1.  I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2.  I performed a visual inspection of the exterior areas of the subject property from at least the street. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3.  I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4.  I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value.  I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment.  I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5.  I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6.  I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7.  I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8.  I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9.  I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10.  I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11.  I have knowledge and experience in appraising this type of property in this market area.

12.  I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13.  I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14.  I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value.  I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal.  I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15.  I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16.  I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17.  I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction.  I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18.  My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19.  I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report.  If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report.  I certify that any individual so named is qualified to perform the tasks.  I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

20.  I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

21.  The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent.  Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

C. F. Stites SRA

## Exterior-Only Inspection Residential Appraisal Report

File No. 516 Akron

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

**SUPERVISORY APPRAISER'S CERTIFICATION:** The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable State law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature | Signature |
| Name C. F. Stites, SRA | Name |
| Company Name C F Stites appraiser | Company Name |
| Company Address P O Box 991 | Company Address |
| Lake Worth, FL 33460 | |
| Telephone Number 561 588-2550 | Telephone Number |
| Email Address realestateappraiserflorida@gmail.com | Email Address |
| Date of Signature and Report 01/20/2019 | Date of Signature |
| Effective Date of Appraisal 05/02/2016 | State Certification # |
| State Certification # RZ2761 | or State License # |
| or State License # | State |
| or Other (describe) _____ State # _____ | Expiration Date of Certification or License |
| State FL | |
| Expiration Date of Certification or License 11/30/2020 | |

ADDRESS OF PROPERTY APPRAISED
516 SW Akron Avenue
Stuart, FL 34994

SUBJECT PROPERTY
☐ Did not inspect exterior subject property
☐ Did inspect exterior of subject property from street
Date of Inspection _____

APPRAISED VALUE OF SUBJECT PROPERTY $ 450,000

LENDER/CLIENT
Name Valcentric LLC
Company Name Integra Realty Resources
Company Address 9155 S. Dadeland Blvd, Ste 1208
Miami, FL 33156
Email Address

COMPARABLE SALES
☐ Did not inspect exterior of comparable sales from street
☐ Did inspect exterior of comparable sales from street
Date of Inspection _____

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/19/19 Page 186 of 319
Case 1:11-cv-22408-MGC Document 27 Cup-8838-on FLSD Docket 08/15/2013 Page 971 of
989

C.F. Standard Form

**Uniform Appraisal Dataset Definitions**                                                   File No. 516 Akron

---

Condition Ratings and Definitions

C1    The improvements have been very recently constructed and have not previously been occupied. The entire structure and all components are new and the dwelling features no physical depreciation.*

*Note: Newly constructed improvements that feature recycled materials and/or components can be considered new dwellings provided that the dwelling is placed on a 100% new foundation and the recycled materials and the recycled components have been rehabilitated/re-manufactured into like-new condition. Recently constructed improvements that have not been previously occupied are not considered "new" if they have any significant physical depreciation (i.e., newly constructed dwellings that have been vacant for an extended period of time without adequate maintenance or upkeep).*

C2    The improvements feature no deferred maintenance, little or no physical depreciation, and require no repairs. Virtually all building components are new or have been recently repaired, refinished, or rehabilitated. All outdated components and finishes have been updated and/or replaced with components that meet current standards. Dwellings in this category either are almost new or have been recently completely renovated and are similar in condition to new construction.

*Note: The improvements represent a relatively new property that is well maintained with no deferred maintenance and little or no physical depreciation, or an older property that has been recently completely renovated.*

C3    The improvements are well maintained and feature limited physical depreciation due to normal wear and tear. Some components, but not every major building component, may be updated or recently rehabilitated. The structure has been well maintained.

*Note: The improvement is in its first-cycle of replacing short-lived building components (appliances, floor coverings, HVAC, etc.) and is being well maintained. Its estimated effective age is less than its actual age. It also may reflect a property in which the majority of short-lived building components have been replaced but not to the level of a complete renovation.*

C4    The improvements feature some minor deferred maintenance and physical deterioration due to normal wear and tear. The dwelling has been adequately maintained and requires only minimal repairs to building components/mechanical systems and cosmetic repairs. All major building components have been adequately maintained and are functionally adequate.

*Note: The estimated effective age may be close to or equal to its actual age. It reflects a property in which some of the short-lived building components have been replaced, and some short-lived building components are at or near the end of their physical life expectancy; however, they still function adequately. Most minor repairs have been addressed on an ongoing basis resulting in an adequately maintained property.*

C5    The improvements feature obvious deferred maintenance and are in need of some significant repairs. Some building components need repairs, rehabilitation, or updating. The functional utility and overall livability is somewhat diminished due to condition, but the dwelling remains useable and functional as a residence.

*Note: Some significant repairs are needed to the improvements due to the lack of adequate maintenance. It reflects a property in which many of its short-lived building components are at the end of or have exceeded their physical life expectancy but remain functional.*

C6    The improvements have substantial damage or deferred maintenance with deficiencies or defects that are severe enough to affect the safety, soundness, or structural integrity of the improvements. The improvements are in need of substantial repairs and rehabilitation, including many or most major components.

*Note: Substantial repairs are needed to the improvements due to the lack of adequate maintenance or property damage. It reflects a property with conditions severe enough to affect the safety, soundness, or structural integrity of the improvements.*

---

**Quality Ratings and Definitions**

Q1    Dwellings with this quality rating are usually unique structures that are individually designed by an architect for a specified user. Such residences typically are constructed from detailed architectural plans and specifications and feature an exceptionally high level of workmanship and exceptionally high-grade materials throughout the interior and exterior of the structure. The design features exceptionally high-quality exterior refinements and ornamentation, and exceptionally high-quality interior refinements. The workmanship, materials, and finishes throughout the dwelling are of exceptionally high quality.

Q2    Dwellings with this quality rating are often custom designed for construction on an individual property owner's site. However, dwellings in this quality grade are also found in high-quality tract developments featuring residences constructed from individual plans or from highly modified or upgraded plans. The design features detailed, high-quality exterior ornamentation, high-quality interior refinements, and detail. The workmanship, materials, and finishes throughout the dwelling are generally of high or very high quality.

Q3    Dwellings with this quality rating are residences of higher quality built from individual or readily available designer plans in above-standard residential tract developments or on an individual property owner's site. The design includes significant exterior ornamentation and interiors that are well finished. The workmanship exceeds acceptable standards and many materials and finishes throughout the dwelling have been upgraded from "stock" standards.

Q4    Dwellings with this quality rating meet or exceed the requirements of applicable building codes. Standard or modified standard building plans are utilized and the design includes adequate fenestration and some exterior ornamentation and interior refinements. Materials, workmanship, finish, and equipment are of stock or builder grade and may feature some upgrades.

Q5    Dwellings with this quality rating feature economy of construction and basic functionality as main considerations. Such dwellings feature a plain design using readily available or basic floor plans featuring minimal fenestration and basic finishes with minimal exterior ornamentation and limited interior detail. These dwellings meet minimum building codes and are constructed with inexpensive, stock materials with limited refinements and upgrades.

Q6    Dwellings with this quality rating are of basic quality and lower cost; some may not be suitable for year-round occupancy. Such dwellings are often built with simple plans or without plans, often utilizing the lowest quality building materials. Such dwellings are often built or expanded by persons who are professionally unskilled or possess only minimal construction skills. Electrical, plumbing, and other mechanical systems and equipment may be minimal or non-existent. Older dwellings may feature one or more substandard or non-conforming additions to the original structure.

---

**Definitions of Not Updated, Updated, and Remodeled**

Not Updated
Little or no updating or modernization. This description includes, but is not limited to, new homes.
Residential properties of fifteen years of age or less often reflect an original condition with no updating, if no major components have been replaced or updated. Those over fifteen years of age are also considered not updated if the appliances, fixtures, and finishes are predominantly dated. An area that is 'Not Updated' may still be well maintained and fully functional, and this rating does not necessarily imply deferred maintenance or physical /functional deterioration.

Updated
The area of the home has been modified to meet current market expectations. These modifications are limited in terms of both scope and cost.
An updated area of the home should have an improved look and feel, or functional utility. Changes that constitute updates include refurbishment and/or replacing components to meet existing market expectations. Updates do not include significant alterations to the existing structure.

Remodeled
Significant finish and/or structural changes have been made that increase utility and appeal through complete replacement and/ or expansion.
A remodeled area reflects fundamental changes that include multiple alterations. These alterations may include some or all of the following: replacement of a major component (cabinet(s), bathtub, or bathroom tile), relocation of plumbing/gas fixtures/appliances, significant structural alterations (relocating walls, and/or the addition of square footage). This would include a complete gutting and rebuild.

---

**Explanation of Bathroom Count**

The number of full and half baths is reported by separating the two values by a period. The full bath is represented to the left of the period. The half bath count is represented to the right of the period. Three-quarter baths are to be counted as a full bath in all cases. Quarter baths (baths that feature only toilet) are not to be included in the bathroom count.

C.T. Signature SRA

## Uniform Appraisal Dataset Definitions

File No. 516 Akron

### Abbreviations Used in Data Standardization Text

| Abbrev. | Full Name | Appropriate Fields |
|---|---|---|
| ac | Acres | Area, Site |
| AdjPrk | Adjacent to Park | Location |
| AdjPwr | Adjacent to Power Lines | Location |
| A | Adverse | Location & View |
| ArmLth | Arms Length Sale | Sale or Financing Concessions |
| AT | Attached Structure | Design(Style) |
| ba | Bathroom(s) | Basement & Finished Rooms Below Grade |
| br | Bedroom | Basement & Finished Rooms Below Grade |
| B | Beneficial | Location & View |
| BsyRd | Busy Road | Location |
| cp | Carport | Garage/Carport |
| Cash | Cash | Sale or Financing Concessions |
| CtySky | City View Skyline View | View |
| CtyStr | City Street View | View |
| Comm | Commercial Influence | Location |
| c | Contracted Date | Date of Sale/Time |
| Conv | Conventional | Sale or Financing Concessions |
| cv | Covered | Garage/Carport |
| CrtOrd | Court Ordered Sale | Sale or Financing Concessions |
| DOM | Days On Market | Data Sources |
| DT | Detached Structure | Design(Style) |
| dw | Driveway | Garage/Carport |
| Estate | Estate Sale | Sale or Financing Concessions |
| e | Expiration Date | Date of Sale/Time |
| FHA | Federal Housing Authority | Sale or Financing Concessions |
| g | Garage | Garage/Carport |
| ga | Garage - Attached | Garage/Carport |
| gbi | Garage - Built-in | Garage/Carport |
| gd | Garage - Detached | Garage/Carport |
| GR | Garden Structure | Design(Style) |
| GlfCse | Golf Course | Location |
| Glfvw | Golf Course View | View |
| HR | High Rise Structure | Design(Style) |
| Ind | Industrial | Location & View |

| Abbrev. | Full Name | Appropriate Fields |
|---|---|---|
| in | Interior Only Stairs | Basement & Finished Rooms Below Grade |
| Lndfl | Landfill | Location |
| LtdSght | Limited Sight | View |
| Listing | Listing | Sale or Financing Concessions |
| MR | Mid-Rise Structure | Design(Style) |
| Mtn | Mountain View | View |
| N | Neutral | Location & View |
| NonArm | Non-Arms Length Sale | Sale or Financing Concessions |
| op | Open | Garage/Carport |
| o | Other | Basement & Finished Rooms Below Grade |
| O | Other | Design(Style) |
| Prk | Park View | View |
| Pstrl | Pastoral View | View |
| PwrLn | Power Lines | View |
| PubTrn | Public Transportation | Location |
| rr | Recreational (Rec) Room | Basement & Finished Rooms Below Grade |
| Relo | Relocation Sale | Sale or Financing Concessions |
| REO | REO Sale | Sale or Financing Concessions |
| Res | Residential | Location & View |
| RT | Row or Townhouse | Design(Style) |
| RH | Rural Housing - USDA | Sale or Financing Concessions |
| SD | Semi-detached Structure | Design(Style) |
| s | Settlement Date | Date of Sale/Time |
| Short | Short Sale | Sale or Financing Concessions |
| sf | Square Feet | Area, Site, Basement |
| sqm | Square Meters | Area, Site, Basement |
| Unk | Unknown | Date of Sale/Time |
| VA | Veterans Administration | Sale or Financing Concessions |
| wo | Walk Out Basement | Basement & Finished Rooms Below Grade |
| wu | Walk Up Basement | Basement & Finished Rooms Below Grade |
| WtrFr | Water Frontage | Location |
| Wtr | Water View | View |
| w | Withdrawn Date | Date of Sale/Time |
| Woods | Woods View | View |

### Other Appraiser-Defined Abbreviations

| Abbrev. | Full Name | Appropriate Fields | | Abbrev. | Full Name | Appropriate Fields |
|---|---|---|---|---|---|---|
| | | | | | | |

C. F. Stites SRA

## Market Conditions Addendum to the Appraisal Report    File No. 516 Akron

The purpose of this addendum is to provide the lender/client with a clear and accurate understanding of the market trends and conditions prevalent in the subject neighborhood. This is a required addendum for all appraisal reports with an effective date on or after April 1, 2009.

**Property Address** 516 SW Akron Avenue    **City** Stuart    **State** FL    **Zip Code** 34994

**Borrower** David Deeg, Deborah Deeg

**Instructions:** The appraiser must use the information required on this form as the basis for his/her conclusions, and must provide support for those conclusions, regarding housing trends and overall market conditions as reported in the Neighborhood section of the appraisal report form. The appraiser must fill in all the information to the extent it is available and reliable and must provide analysis as indicated below. If any required data is unavailable or is considered unreliable, the appraiser must provide an explanation. It is recognized that not all data sources will be able to provide data for the shaded areas below; if it is available, however, the appraiser must include the data in the analysis. If data sources provide the required information as an average instead of the median, the appraiser should report the available figure and identify it as an average. Sales and listings must be properties that compete with the subject property, determined by applying the criteria that would be used by a prospective buyer of the subject property. The appraiser must explain any anomalies in the data, such as seasonal markets, new construction, foreclosures, etc.

| Inventory Analysis | Prior 7-12 Months | Prior 4-6 Months | Current - 3 Months | Overall Trend | | |
|---|---|---|---|---|---|---|
| Total # of Comparable Sales (Settled) | | | | ☐ Increasing | ☐ Stable | ☐ Declining |
| Absorption Rate (Total Sales/Months) | | | | ☐ Increasing | ☐ Stable | ☐ Declining |
| Total # of Comparable Active Listings | | | | ☐ Declining | ☐ Stable | ☐ Increasing |
| Months of Housing Supply (Total Listings/Ab.Rate) | | | | ☐ Declining | ☐ Stable | ☐ Increasing |
| Median Sale & List Price, DOM, Sale/List % | Prior 7-12 Months | Prior 4-6 Months | Current - 3 Months | Overall Trend | | |
| Median Comparable Sale Price | | | | ☐ Increasing | ☐ Stable | ☐ Declining |
| Median Comparable Sales Days on Market | | | | ☐ Declining | ☐ Stable | ☐ Increasing |
| Median Comparable List Price | | | | ☐ Increasing | ☐ Stable | ☐ Declining |
| Median Comparable Listings Days on Market | | | | ☐ Declining | ☐ Stable | ☐ Increasing |
| Median Sale Price as % of List Price | | | | ☐ Increasing | ☐ Stable | ☐ Declining |
| Seller-(developer, builder, etc.)paid financial assistance prevalent? | ☐ Yes | ☐ No | | ☐ Declining | ☐ Stable | ☐ Increasing |

Explain in detail the seller concessions trends for the past 12 months (e.g., seller contributions increased from 3% to 5%, increasing use of buydowns, closing costs, condo fees, options, etc.).

Are foreclosure sales (REO sales) a factor in the market?    ☐ Yes    ☐ No    If yes, explain (including the trends in listings and sales of foreclosed properties).

Cite data sources for above information.

Summarize the above information as support for your conclusions in the Neighborhood section of the appraisal report form. If you used any additional information, such as an analysis of pending sales and/or expired and withdrawn listings, to formulate your conclusions, provide both an explanation and support for your conclusions.

If the subject is a unit in a condominium or cooperative project , complete the following:    Project Name:

| Subject Project Data | Prior 7-12 Months | Prior 4-6 Months | Current - 3 Months | Overall Trend | | |
|---|---|---|---|---|---|---|
| Total # of Comparable Sales (Settled) | | | | ☐ Increasing | ☐ Stable | ☐ Declining |
| Absorption Rate (Total Sales/Months) | | | | ☐ Increasing | ☐ Stable | ☐ Declining |
| Total # of Active Comparable Listings | | | | ☐ Declining | ☐ Stable | ☐ Increasing |
| Months of Unit Supply (Total Listings/Ab. Rate) | | | | ☐ Declining | ☐ Stable | ☐ Increasing |

Are foreclosure sales (REO sales) a factor in the project?    ☐ Yes    ☐ No    If yes, indicate the number of REO listings and explain the trends in listings and sales of foreclosed properties.

Summarize the above trends and address the impact on the subject unit and project.

**APPRAISER**

Signature

**Name** C. F. Stites, SRA

**Company Name** C F Stites appraiser

**Company Address** P O Box 991

Lake Worth, FL 33460

**State License/Certification #** RZ2761    **State** FL

**Email Address** realestateappraiserflorida@gmail.com

**SUPERVISORY APPRAISER (ONLY IF REQUIRED)**

Signature

Name

Company Name

Company Address

State License/Certification #    State

Email Address

SINGLE FAMILY COMPARABLE RENT SCHEDULE

This form is intended to provide the appraiser with a familiar format to estimate the market rent of the subject property.
Adjustments should be made only for items of significant difference between the comparables and the subject property.

C. F. Stites, SRA

File No. **516 Akron**

| ITEM | SUBJECT | COMPARABLE NO. 1 | | COMPARABLE NO. 2 | | COMPARABLE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 516 SW Akron Avenue Stuart, FL 34994 | 521 SW Akron Avenue Stuart, FL 34994 | | 229 SW Otter Run Stuart, FL 34997 | | 128 SE Crestwood Circle Stuart, FL 34997 | |
| Proximity to Subject | | 0.02 miles NE | | 2.92 miles SE | | 5.42 miles SE | |
| Date Lease Begins Date Lease Expires | | 06/06/2015 to 05/31/2017 | | 04/02/2016 03/31/2017 | | 09/01/2014 Mo to Mo | |
| Monthly Rental | If Currently Rented: $ | $ | 2,500 | $ | 1,800 | $ | 1,600 |
| Less: Utilities | $ | $ | | $ | | $ | |
| Furniture | $ | $ | 0 | $ | 0 | $ | 0 |
| Adjusted Monthly Rent | $ | $ | 2,500 | $ | 1,800 | $ | 1,600 |
| Data Source | | MLS#381973 Agent | | MLS#1375884 Agent | | MLS#10055703 Agent | |
| RENT ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Rent Concessions | | None | | None | | None | |
| Location/View | N;Res;Res B;Wtr;Twnhouse | N;Res;Res N;Res;Twnhouse | 50 | N;Res;Res N;Res;Twnhouse | 50 | N;Res;Res N;Res;Twnhouse | 50 |
| Design and Appeal | DT3.0;Key West | DT2.0;Key West | 0 | SD2.0;Mediterran | 100 | SD2.0;Ranch | 100 |
| Age/Condition | 10 C2 | 10 C2 | | 6 C3 | | 10 C3 | |
| Above Grade Room Count | Total 8 / Bdrms 3 / Baths 3.10 | Total 7 / Bdrms 3 / Baths 2.10 | 100 | Total 7 / Bdrms 3 / Baths 2.10 | 100 | Total 7 / Bdrms 3 / Baths 2.10 | 100 |
| Gross Living Area | 2,421 Sq. Ft. | 2,000 Sq. Ft. | 200 | 2,053 Sq. Ft. | 150 | 2,377 Sq. Ft. | 50 |
| Other (e.g., basement, etc.) | 0sf 2ga | 0sf 2ga | | 0sf 2ga | | 0sf 2ga | |
| Other: | RO DW Di MW Elevator,Dock | RO DW Di MW Efficiency Apt | -400 | RO DW Di MW None | 200 | RO DW Di MW None | 200 |
| Net Adj. (total) | | [ ]+ [X]- $ | 50 | [X]+ [ ]- $ | 600 | [X]+ [ ]- $ | 500 |
| Indicated Monthly Market Rent | | 30.0 -2.0 $ | 2,450 | 33.3 33.3 $ | 2,400 | 31.3 31.3 $ | 2,100 |

Comments on market data, including the range of rents for single family properties, an estimate of vacancy for single family rental properties, the general trend of rents and vacancy, and support for the above adjustments. (Rent concessions should be adjusted to the market, not to the subject property.)
Comparable rental #1 above was the only rental found in the subject development. It is across the street from the subject property and has no water view or dock. Comparable rental #2 and #3 are distant but were the best alternative rental comparables found.
No rental comparables of similar size, bedroom/bath count, and features were found. Accordingly, rental comparables requiring large adjusting were required. Despite the adjusting needed, the rental comparables were considered to be the best and most similar available.

Final Reconciliation of Market Rent: Comparable rentals are reasonably similar in size and appeal. Comparable rental #1 and #2 are the best indicators of value and will receive the most weight. All rentals are under a gross lease with tenant supplied utilities.

THIS RENTAL ANALYSIS IS AS OF A RETROSPECTIVE DATE (05/02/2016) BASED ON 01/17/2019 EXTERIOR FRONTAL DRIVE-BY PROPERTY INSPECTION BY THIS APPRAISER AS NOTED IN THE REPORT WHICH ACCOMPANIES THIS FORM.

I (WE) ESTIMATE THE MONTHLY MARKET RENT OF THE SUBJECT AS OF   05/02/2016   TO BE $   2,400

APPRAISER:                                        SUPERVISORY APPRAISER (ONLY IF REQUIRED):

Signature                                         Signature
Name   C. F. Stites, SRA                          Name
Date Report Signed   01/20/2019                   Date Report Signed
State Certification #   RZ2761          State  FL  State Certification #                      State
Or State License #                     State      Or State License #                         State
Date Property Inspected 01/17/2019                Date Property Inspected
                                                  [ ]Did  [ ]Did Not  Inspect Property

Freddie Mac Form 1000 (8/88)          Produced using ACI software, 800.234.8727 www.aciweb.com          Fannie Mae Form 1007 (8/88)

STATEWIDE APPRAISAL SERVICE INC.

**SUBJECT PROPERTY PHOTO ADDENDUM**

| | | |
|---|---|---|
| Borrower: David Deeg; Deborah Deeg | | File No.: 516 Akron |
| Property Address: 516 SW Akron Avenue | | Case No.: |
| City: Stuart | State: FL | Zip: 34994 |
| Lender: Integra Realty Resources | | |



**FRONT VIEW OF SUBJECT PROPERTY**

Appraised Date: May 2, 2016
Appraised Value: $ 450,000



**REAR VIEW OF SUBJECT PROPERTY**



**STREET SCENE**

COMPARABLE PROPERTY PHOTO ADDENDUM

| | |
|---|---|
| Borrower: David Deeg, Deborah Deeg | |
| Property Address: 516 SW Akron Avenue | File No.: 516 Akron |
| City: Stuart | Case No.: |
| State: FL | Zip: 34994 |
| Lender: Integra Realty Resources | |



COMPARABLE SALE #1

508 SW California Ave #A
Stuart, FL 34994
Sale Date: s04/16;c03/16
Sale Price: $ 420,000



COMPARABLE SALE #2

536 SW Akron Avenue
Stuart, FL 34994
Sale Date: s05/16;c03/16
Sale Price: $ 510,000



COMPARABLE SALE #3

524 SW Akron Avenue
Stuart, FL 34994
Sale Date: s04/15;c03/15
Sale Price: $ 449,900

Borrower: David Deeg; Deborah Deeg
Property Address: 516 SW Akron Avenue
City: Stuart
Lender: Integra Realty Resources

File No.: 516 Akron
Case No.:
State: FL          Zip: 34994



Front/Side view



Front/Side view

Borrower: David Deeg, Deborah Deeg
Property Address: 516 SW Akron Avenue
City: Stuart          State: FL          Zip: 34994
Lender: Integra Realty Resources

File No.: 516 Akron      Case No.:



Rental comparable #1
521 SW Akron - Stuart, FL



Rental comparable #2
229 SW Otter Run - Stuart FL



Rental comparable #3
128 SE Crestwood Circle - Stuart, FL

| Borrower: David Deeg, Deborah Deeg | | File No.: 516 Akron | |
| Property Address: 516 SW Akron Avenue | | Case No.: | |
| City: Stuart | State: FL | Case No.: | Zip: 34994 |
| Lender: Integra Realty Resources | | | |

PLAT MAP



LOCATION MAP

| Borrower: David Deeg, Deborah Deeg | | | File No.: 516 Akron |
| Property Address: 516 SW Akron Avenue | | | Case No.: |
| City: Stuart | State: FL | | Zip: 34994 |
| Lender: Integra Realty Resources | | | |



AERIAL MAP

| Borrower: David Deeg, Deborah Deeg | | File No.: 516 Akron |
|---|---|---|
| Property Address: 516 SW Akron Avenue | | Case No.: |
| City: Stuart | State: FL | Zip: 34994 |
| Lender: Integra Realty Resources | | |



Subject
516 SW Akron Avenue
Stuart, FL 34994

FLOOD MAP

| Borrower: David Deeg, Deborah Deeg | | File No.: 516 Akron |
| Property Address: 516 SW Akron Avenue | | Case No.: |
| City: Stuart | State: FL | Zip: 34994 |
| Lender: Integra Realty Resources | | |



## FLOOD INFORMATION

**Community:** CITY OF STUART
**Property is NOT in a FEMA Special Flood Hazard Area**
**Map Number:** 12085C0134G
**Panel:** 0134G
**Zone:** X
**Map Date:** 03-16-2015
**FIPS:** 12085
**Source:** FEMA DFIRM

## LEGEND

= FEMA Special Flood Hazard Area – High Risk

= Moderate and Minimal Risk Areas

**Road View:**

= Forest    = Water

## Sky Flood™

No representations or warranties to any party concerning the content, accuracy or completeness of this flood report, including any warranty of merchantability or fitness for a particular purpose is implied or provided. Visual scaling factors differ between map layers and are separate from flood zone information at marker location. No liability is accepted to any third party for any use or misuse of this flood map or its data.

| Borrower: David Deeg, Deborah Deeg | | | File No.: 516 Akron |
|---|---|---|---|
| Property Address: 516 SW Akron Avenue | | | Case No.: |
| City: Stuart | | State: FL | Zip: 34994 |
| Lender: Integra Realty Resources | | | |

1/17/2019      Martin County, Florida - Laurel Kelly, C.F.A

## Martin County, Florida - Laurel Kelly, C.F.A

*generated on 1/17/2019 6:41:59 AM*

### Summary

| Parcel ID | Account # | Unit Address | Market Total Value | Website Updated |
|---|---|---|---|---|
| 05-38-41-028-000-00080-0 | 559137 | 516 SW AKRON AVE, STUART | $446,260 | 1/12/2019 |

#### Owner Information

| | |
|---|---|
| Owner(Current) | POMFREY ROBERT POMFREY KELLIE |
| Owner/Mail Address | 516 SW AKRON AVE STUART FL 34994 |
| Sale Date | 1/12/2017 |
| Document Book/Page | 2901 1514 |
| Document No. | 2614548 |
| Sale Price | 530000 |

#### Location/Description

| | | | |
|---|---|---|---|
| Account # | 559137 | Map Page No. | |
| Tax District | 3100 | Legal Description | LOT 8 STUART CAY (PB 16 PG 3) |
| Parcel Address | 516 SW AKRON AVE, STUART | | |
| Acres | .0740 | | |

#### Parcel Type

| | |
|---|---|
| Use Code | 0100 Single Family |
| Neighborhood | 395385 Stuart Cay |

#### Assessment Information

| | |
|---|---|
| Market Land Value | $200,000 |
| Market Improvement Value | $246,260 |
| Market Total Value | $446,260 |

http://fl-martin-appraiser.governmax.com/propertymax/GRM/tab_parcel_v1002_FLMartin.asp?PrintView=True&r_nm=tab%5Freport&t_wc=%7Cparceli

| Borrower: David Deeg, Deborah Deeg | | File No.: 516 Akron | |
| Property Address: 516 SW Akron Avenue | | Case No.: | |
| City: Stuart | State: FL | | Zip: 34994 |
| Lender: Integra Realty Resources | | | |





# Anthony M. Graziano, MAI, CRE

**Integra Realty Resources**
Miami/Palm Beach

Dadeland Centre
9155 S. Dadeland Boulevard
Suite 1208
Miami, FL 33156

T 305.670.0001
F 305.670.2276

irr.com

## Experience

Senior Managing Director of Integra Realty Resources – Miami/Palm Beach.

Mr. Graziano has actively counseled and advised clients on the sale, leasing, valuation, management, and development of commercial real estate assets throughout the northeast and southeast U.S. since 1992.

Mr. Graziano's professional perspective is a blend of his experience and educational background which includes formal training in architecture, urban planning, macro and micro economics, real estate finance, institutional asset management, and land development. His market experience in sales, leasing, management, and valuation disciplines combine to bring practical real world answers to complex planning and development projects. He has been actively involved as a consultant and/or member of a consultant team on various major redevelopment and land use projects for public and private clients over the past 25+ years.

Mr. Graziano has specialized in consulting and valuation assignments for corporate and private clients on a wide array of complex issues related to estate and condemnation matters, title defects, environmental contamination/damages, air rights, partial and fractional interests, contract disputes, and mediation/arbitration disputes. Mr. Graziano's experience in these matters provides a comprehensive framework for effective strategic real estate consulting.

## Professional Activities & Affiliations

Advisory Board Member: Urban Land Institute (ULI) South Florida / Caribbean
Advisory Board Member: University of Miami M+RED Program
Member: Economic Roundtable - Miami Beacon Council (2012-present)
Board of Director: Integra Realty Resources, Inc. (2011-2016)
Chairman of the Board:    Integra Realty Resources, Inc. (2016-present)
Director: South Florida Chapter of the Appraisal Institute (2014-2016)
Board Member: Builders Association of South Florida (BASF) (2014-2016)
Subject Matter Expert (SME): Appraisal Practice Board, Appraisal Foundation
Member: Appraisal Institute (MAI) (2008-Present)
Member: Counselors of Real Estate (CRE) (2007-Present)
National Association of Realtors (REALTOR)
Miami Association of REALTORS Industry Analyst of the Year (2016)
Former Fellow: Royal Institute of Chartered Surveyors (FRICS) (2007-2014)
AI Leadership Development Advisory Council, March 1998 - February 2001
Lifetime Member: National Eagle Scout Association (NESA)

## Licenses

Florida, State-Certified General Real Estate Appraiser, RZ3510
New Jersey, State-Certified General Real Estate Appraiser, RG001261

## Education

University of Miami, Coral Gables, Florida 1988-1992
Degree: Bachelor of Science in Land Development and Planning, School of Architecture

New York University Real Estate Institute, New York, New York 1993-1996
Degree: Master of Science in Real Estate Development and Investment



amgraziano@irr.com    -    305.670.0001 x320

# Anthony M. Graziano, MAI, CRE

**Integra Realty Resources**
**Miami/Palm Beach**

The Douglas Centre
2600 Douglas Road, Suite 801
Coral Gables, FL 33134

T 305.670.0001
F 305.670.2276

irr.com

### Qualified Before Courts & Administrative Bodies

Qualified and accepted as an expert before:
US Bankruptcy Court (Newark, Southern District of Texas, Southern District of Florida)
US Federal District Court (Southern District of Florida)
FL Circuit Court (Miami-Dade, Broward, and Monroe Counties)
NJ State Tax Court
NJ Superior Court - Chancery Division
NJ Superior Court - Law Division
Various municipal planning and zoning boards throughout New Jersey and Florida
Various Taxing Authorities and Boards throughout New Jersey and Florida



**Anthony M. Graziano, MAI, CRE, FRICS**
PROFERRED OR DISCLOSED EXPERT WITNESS REPORTS/SETTLEMENTS

| RETENTION DATE | ON BEHALF | IRR FILE # | COURT CASE NO. | COURT / VENUE | CASE NAME | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|
| 1/2015 | Defendant | 123-2015-0037* | 14-CV-22384 UU | Miami-Dade County, FL | Ray Benson & Maria Helena V. QBE Insurance Corporation | John A. Camp | Retrospective (2004-2006) analysis of market value claims against insurance company related to property |
| 9/2014 | Defendant | 123-2014-0194 | 13-03084CA 10 | 11th Judicial Circuit Miami-Dade, FL | Manuel Soltero V. Adorno & Yoss, LLP | Kaplan Zeena, LLP | Professional Liability suit against law firm and attorneys for malfeasance in litigation matter. |
| 2/2014 | Plaintiff | 123-2014-0030 | Settled | Caribbean Islands | Rainmaker Development V. A&F Bahamas, etal | VLASAC & SHMARUK, LLC | Partnership Dispute between Joint Venture in Caribbean development project (golf course, villas, and large-scale marina-commercial-retail development) |
| 11/2012 | Defendant | 123-2012-0140 | 42-2012-CA-001065 | Marion County, FL | CSX Transportation, Inc. V. Moshen Saranazi, Faith Ann Safarazi, Proverbium Hldg, LLC, USA & George Albright | NeJame, La Fay, Jancha, Ahmed, Barker, Joshi & Moreno, P.A. | Condemnation of partial interest with damages |
| 7/2012 | Confidential | 123-2012-0076 | Confidential | Broward County, FL | Ft. Lauderdale-Hollywood Int'l Airport Expansion | White & Case, LLP | Value Diminution Study to assist public agency in good faith negotiations based on airport expansion. |
| 6/2012 | Defendant | 123-2012-0070 | 10-49616-CA-40 | Miami-Dade County, FL | C8 Entertainment, LLC V. South Beach Ocean Parcel | Kubicki Draper, P.A. | Construction Damages claim |
| 12/2009 | Plaintiff | 109-2009-0443 | Dept. Justice File 90-11-3-5801 | Federal District Court of Virginia | United States vs. Atlantic Wood Industries, Inc. | U.S. Department of Justice | Damages/environmental contamination dispute between United States Navy and responsible party (Atlantic Wood Industries) |

**Anthony M. Graziano, MAI, CRE, FRICS**
IDENTIFIED EXPERT WITNESS TESTIMONY AT DEPOSITION and/or TRIAL

| RETENTION DATE | ON BEHALF OF | TRI FILE # | COURT/CASE NO. # | COURT / VENUE | CASE NAME | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|
| 6/2015 | Plaintiff | 123-2015-0170 | 15-008930-CA-01 | 11th Judicial Circuit Court, Florida (Hon. Peter R. Lopez) | Aaron Stauber & Aviva Stauber V. BH 33, LLC | Piedra & Associates, P.A. | Motion to dismiss Lis Pendens in an action to enforce contractual specific performance clause |
| 1/2015 | Defendant | 123-2015-0037 | 14-CV-22384 UU | Southern District of Florida | Ray Benson & Maria Helena Campos V. QBE Insurance Corporation | John Camps | Retrospective (2004-2006) analysis of market value claims against insurance company related to property damage claims arising from Hurricane Wilma |
| 1/2014 | Plaintiff | 123-2015-0031 | Pending | Miami-Dade County | Igor Gel V. Yacht Club at Portofino Condo Association | Weil Quaranta McGovern, P.A. | Construction defect dispute related to water-intrusion and damage-detrimental conditions analysis of |
| 10/2014 | Plaintiff | 123-2014-0226 | 08-CA-408-P | Monroe County | Ocean Bank V. Lindsack, Monroe County | Ocean Bank | Deficiency claim against borrower on real estate collateral in the Florida Keys (development site plus marine related improvements) |
| 10/2014 | Defendant | 123-2014-0215 | 11-24994 CA 06 | 11th Judicial Circuit Court, Florida | Palm-Aire Holdings V. JRGS Investments, LLC, Jorge Garcia-Sariff and Course Drive Investments, LLC | Cole, Scott & Kissane, P.A. | Partnership dispute over valuation issues proximal to a fractured condominium project (retrospective values), and operating agreement dispute |
| 7/2014 | Plaintiff | 123-2014-0194 | 13-016922 CACE 02 | 13th Judicial Circuit Broward County, Florida | Amalia I. Irlanda-Rivera V. Rivera Diagnostic Center, Inc., Olexay Rivera & Yudit Rivero | Amalia I. Irlanda-Rivera | Rent default judgment and market rental and damage analysis associated with lease default. |
| 10/2014 | Defendant | 123-2014-0159 | 2014FL534 (Pending) | Palm Beach County | Roehm Title Resources Claim | Title Resources Guaranty Company | Title insurance claim related to before and after damage/value diminution analysis based on defined title defects not identified by Title Insurance Company |
| 4/2014 | Plaintiff | 123-2014-0117 | 4:14-CV-01077 (Pending) | USA District Court for the Eastern District of Missouri Eastern Division | USA V. /GSA-VA St. Louis Property, LLC | Bryan Cave LLP | Condemnation of a possessory interest for a term. Retained as consulting/rebuttal expert |
| 5/2014 | Defendant | 123-2014-0114 | Pending | Miami-Dade County | Eufonia Club | Renmert Bogart Mandler & Rodriguez, P.A. | Rent dispute regarding forced relocation of a nightclub, and relevant market rental rate of replacement club space in Miami |
| 4/2014 | Plaintiff | 123-2014-0089 | | Broward County | Pan American Holdings Corp. V. Florida DOT Right of Way (ROW) Acquisition SR-7 | Henry Wulf, Esq. | Condemnation for R.O.W. purposes including before and after damage analysis |
| 1/2014 | Debtor | 123-2014-005 | 13-25728-BKC-RAM | US Federal Bankruptcy - Southern District of Florida - Miami Division (Hon. R. Mark) | West Airport Plaza Business Park, LLC | Counsel for the Debtor, Michael D. Seese, Esq. | Fairness Opinion and market value opinions in conjunction with Debtor's Plan for Reorganization |
| 8/2013 | Defendant | 123-2009-0016 | 02-23922-CA 09 | 11th Judicial Circuit Court, Florida | American Educational Enterprises, LLC v. The Board of Trustees of the Internal Improvement Trust Fund | Richard Alayon, Esq. - Alayon and Associates | Economic Damages case associated with an alleged misrepresentation or omission by seller of real property |
| 7/2013 | Plaintiff | 123-2013-0111 | CACE 08057624 (14) | 17th Judicial Circuit Broward County, Florida (Hon. Carlos A. Rodriguez) | Bayview Loan Servicing, LLC v. Kayhan Soodjani; Muhammad Mahmoodi, et al | Bayview Servicing, represented by Tabais, Freedman and Soloff; Stacey Soloff, Esq. | Deficiency analysis on multi-family project (Dewey Street Apartments) |
| 3/2013 | Defendant | 123-2013-0105 | 11-23561-CIV-Rosenbaum | US District Court - Southern District of Florida (Hon. Rosenbaum) | United States of America v. G.K.K. etal | Richard Duvall, Holland and Knight and Jeffrey Neiman, Esq. | Condemnation claim on the 137,779 s.f. Miami Federal Bureau of Investigation (F.B.I.) building; condemnation of a possessory interest (leasehold) |
| 2/2013 | Plaintiff | 123-2011-0670 | 09-05650 CA 04 | 11th Judicial Circuit Court, Florida | Zenaida Gomez v. City of Pinecrest | Cynthia A. Everett, Cynthia A. Everett, PA | Economic damage resulting from temporary taking (seizure) of private residence |
| 7/2013 | Defendant | 123-2013-0016 | 12-60950-CIV | US Federal Court - Southern District of Florida | G Lending, Inc., Equity Financial Group, Inc.; and Equity Commercial Group, Inc. v. Travelers Companies, Inc. etal | Heidi Raschke, Butler Pappas etal | Value diminution resulting from alleged mortgage fraud. |
| 11/2012 | Plaintiff | 123-2012-0128 | Pending | 11th Judicial Circuit Court, Florida | 2011 and 2012 Ad Valorem Tax Protest | Ken Wurtenberger, Esq., Kopelowitz Ostrow Ferguson | Tax protest of commercial condominium. |
| 10/19/2012 | Plaintiff | 123-2012-0111 | 2011-1107 CA-23 | 11th Judicial Circuit Court, Florida | Renegade at Hialeah Blvd v. Dynatech Engineering | Daniel Levine, Esq., Cole, Scott, Kissane, P.A. | Economic Damages case, diminution in value resulting from unpaid lease modification |
| 10/12/2012 | Plaintiff | 123-2012-0109 | 11-30189 CA21 | 11th Judicial Circuit Court, Florida | Yaffa Yakubov vs. Bayview at Fisher Island No 3 | Craig Minko, Esq., Cole Scott Kissane, P.A. | Market Value estimate of Fisher Island Condominium purchased under right of first refusal; economic damages claimed by Plaintiff due to contract dispute arising from association's exercise of right of first refusal |
| 8/20/2012 | Plaintiff | 123-2010-0012 | CA-25,(16) CA-25 | 11th Judicial Circuit Court, Florida | 7935 NBV, LLC v. Harbour East Development LTD, Mario Egozi, etal | Jose Casal, Esq., Holland and Knight | Deficiency judgment on 32-unit fractured condominium, substitute expert following issuance of IRR-Miami reports in 2010 and 2012. |
| 8/15/2012 | Disclosed Dual Expert | 123-2012-0072 | | Matrimonial Mediation | Vazquez v. Vazquez Matrimonial Matter | Colon and Mendoza and Robert Hertzberg, P.A. | Retained as a court-appointed third party expert to both parties to appraise (2) marital assets comprised of office, retail, single and multi-family units in FL, TN, NC, and Illinois, Bahamas |
| 7/2012 | Plaintiff | 109-2011-0199 | Pending: 2003-2014 | Tax Court of New Jersey (Hon. Patrick DeAlemedia) | BASF Inc., successor Ciba Geigy Inc. vs. Township of Toms River | Phil Gervurtio, Garippa, etal on behalf of BASF | Challenge to multi-year appeal of $80 Million+ land assessment on contaminated superfund site in Central New Jersey |
| 3/2012 | Plaintiff | 109-2010-0172 | ATL-L-4461-08 | Superior Court of New Jersey, Law Division Atlantic County | Scot Netherlands Inc. vs. State of New Jersey Department of Environmental Protection (NJDEP) | Jay Rhatican, Connell Foloey on behalf of Scot Netherlands, Inc. | Challenge to NJDEP permit denial to fill wetlands, deprivation of all reasonable investment backed expectations |
| 7/2011 | Defendant | 109-2010-0199 | MER-L-3034-08 | Superior Court of New Jersey Mercer County | 460 Mercer Street, LLP and Bruckener Southern, LLC vs. Hightstown | Aneel Zarin Grimm & Aaron, P.C. Husam Chater | Litigation-Dispute Resolution - Hightstown Zoning Challenge |
| 12/2009 | Plaintiff | 109-2009-0443 | Dept. Justice File 90-11-3-580/1 | Federal District Court of Virginia | United States vs. Atlantic Wood Industries, Inc. | U.S. Department of Justice | Damage/environmental contamination dispute between United States Navy and responsible party (Atlantic Wood Industries) |
| 12/2009 | Plaintiff | 109-2009-0377 | | Tax Court of New Jersey | Weichurt/HPC Mortgage Fund vs. City of Atlantic City | Cole, Schotz, Meisel, Forman & Leonard, P.A. Carl Rizzo, Esq. | Tax Appeals - To develop an opinion of the market value of the fee simple interest in the property |

**Anthony M. Graziano, MAI, CRE, FRICS**
IDENTIFIED EXPERT WITNESS TESTIMONY AT DEPOSITION and/or TRIAL

| RETENTION DATE | ON BEHALF OF | COURT CASE NO | IRR FILE # | COURT / VENUE | CASE NAME | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|
| 11/2009 | Secured Creditor | | 109-2009-0439 | US Bankruptcy Court - Southern District of Texas | Erickson Building | Stuart Glick, Esq., Sills, Cummis & Gross | Market Value for Bankruptcy of 140,000 SF corporate campus in Bethesda, Maryland |
| 09/2009 | Plaintiff | 3035-001 | 109-2009-0123 | Tax Court of New Jersey | Bay Head Yacht Club vs. Ocean County Tax Board | John Doyle, Carluccio, Leone, Dimon, Doyle & Sacks, LLC | Tax Appeal for Bay Head Yacht Club |
| 12/2008 | Plaintiff | INA (DEPS Pending) | 109-2008-XXX | Tax Court of New Jersey | Mirage Atlantic City (MAC) vs. City of Atlantic City | Hank Rovitani, Esq. | Tax Appeal at State Tax Court on 15 acre casino site adjacent to Trump Marina |
| 09/2008 | Defendant | L-2424-05 | 109-2008-0252 | Superior Court of New Jersey Law Division, Middlesex County | The City of South Amboy vs. Lower Main Street Development, LLC & Amboy Aggregates Joint Venture | Bathgate, Wegenar, etal | Verified complaint in condemnation |
| 6/2008 | Defendant | C.A. No. OCNL-3361-06 | 109-2008-0345 | Superior Court of New Jersey, Law Division, Ocean County | Osbourne Associates, Melbourne Associates VI, LLC, Kingsway Realty Profit Share vs. Citta Enterprises Co, JAC Property Management etal and Eckerd Corporation | Francis X. Manning, Esq., Stradley Ronon Stevens & Young & Michael Camboli, Esq. Partridge Snow and Hahn, both on behalf of | Dispute re: proper valuation of leasehold and sub-lessee's sandwich leasehold interest on damage claim for breach of agreement claim |
| 1/2008 | Defendant | N/A | 109-2008-0125 | American Arbitration Association [testimony at Arbitration conducted by Hon. Eugene Serpenteli] | Toms River Township vs. Gba Geigy Corporation | Mark Troncone, Esq., In-house Counsel to Township of Toms River | Arbitration of environmental damages claim, and counter-claim of appropriateness of zoning on 1,900 acre superfund site. |
| 11/2007 | Defendant | L-000835-06 | 109-2007-0211 | Superior Court of New Jersey, Law Division, Middlesex County | Kyle Mosteller vs. Galla Neeman | Frank Canuso, Esq. Hoagland, Longo, Moran and Dunst | Damage claim due to loss of trees and screening between urban properties |
| 6/2007 | Plaintiff | 3:07-CV-2322 | 109-2007-0134 | Superior Court of New Jersey, Chancery Division Monmouth County | Silver Lakes Inc. vs. Township of Freehold Inc. | Christopher Hanlon, Esq. Hanlon and Niemann | Challenge to validity of Rent Control Ordinance as transfer of property rights from Lessor to Lessee. |
| 6/2007 | Plaintiff | | 109-2007-0173 | Federal District Court of Virginia | Laurelwood Homes, LLC vs. United States Department of Navy | William A. Shook Esq. | Leasehold interest in the property, breach of lease claim on behalf of leasehold owner (Laurelwood) claiming breach of lease and damages |
| 12/2006 | Defendant | CAM-L-9731-05 | 109-2006-0192 | Superior Court of New Jersey, Chancery Division, Camden County | Brandywine Operating Partnership, LP vs. UFCW Local 56 | Brett Last, Esq. O'Brien, Belland and Bushinsky | Estimate the value of damages to landlord on breach of above-market lease |
| 9/2006 | Defendant | | 109-2006-0257 | | County Line & Browers Bridge, Jackson Township | Levin, Shea, Pfeffer, PA Steven Pfeffer | To develop an opinion of the hypothetical market value of the fee simple interest in the property |
| 2/2006 | Defendant | OCN-L-2482-04 | 109-2006-0044 | Ocean Superior Court, Ocean County Courthouse | Carl Brooks vs. K. Hovanian | Ronan, Tuzzio & Giannone, Linda Olsen | To estimate value diminution in the subject property as a result of various issues asserted by the property owner in conjunction with pending litigation between the property owner and the subject developer K. Hovnanian @ Sea Oaks |
| 2/2006 | Defendant | OCN-L-1810-5 | 109-2005-0315 | Superior Court of New Jersey, Chancery Division Ocean County | Atlantic City Electric Company d/b/a Conectiv Power Delivery, a regulated public utility in the state of New Jersey vs. AC1 Manahawkin, LLC family and/or Armstrong | Flaster/Greenberg, PC, David R. Oberlander, Esq. | Compensation for the taking of an easement for construction and maintenance of a 230kw transmission line and towers by Atlantic City Electric |
| 10/2005 | Defendant | MON-L-2609-05 | 109-2005-0214 | Superior Court of New Jersey Law Division, Monmouth County | Township of Howell vs. George Harms Construction Co., Inc. etal | Connell & Foley, LLP Kevin Coakley, Esq. | To develop an opinion of the market value of the fee simple estate of the property |
| 6/2005 | Defendant | | 109-2005-0282 | Superior Court of New Jersey Chancery Division, Family Part, Monmouth County | Giuffre vs. Giuffre | Louis & Wolf - Frank A. Louis | To develop an opinion of the market value of the Fee Simple estate of the properties for purposes of equitable distribution of marital assets |
| 9/2003 | Defendant | OCN-C-78-03 | 109-2003-0203 | Superior Court of New Jersey, Chancery Division, Ocean County | West, etal vs. Pompaino, etal | Stephen E. Smith, Esq. | To develop an opinion of the diminution in value due to a loss of useable land area |
| 6/2003 | Plaintiff | OCN-C-316-02 | 109-2003-0128 | Superior Court of New Jersey Law Division, Ocean County | Eugene M. Lord vs. Donald W. Rinaldo | Lombardi & Lombardi Scott Telson | To develop an opinion of the market value of the fee simple estate of the property |
| 4/2003 | Plaintiff | FM-15-468-03-C | | Superior Court of New Jersey, Chancery Division, Family Part Ocean County | Vincent Urbank vs. Lisa Urbank | Marianna Pontonero, Esq. | Litigation-Matrimonial |
| 2/2002 | Plaintiff | | 109-2002-0055 | Superior Court of New Jersey | Shenandoah Mobile Home Park | Winders Marx Lane & Mittendorf, LLP - William Cagney | Inverse Condemnation - Rent Control Ordinance |
| 4/2001 | Claimant | NJ-2624-00 | 109-2001-0169 | Superior Court of New Jersey, Chancery Division, Middlesex County | DeForest John Ely and Kimberle A. Ely, h/w | First American Title Insurance Co. Jack Mikis | To derive an opinion of the fair compensation of the fee simple estate, subject to the temporary title encumbrance |
| 03/1999 | Secured Creditors | | 109-1999-0062 | US Bankruptcy Court - District of Newark | Georgetown Apartments | Emmes & Co., Andrew Schwarz | To estimate the market value of the Leased Fee Estate of the property, inclusive of 28 Apartment complexes through NY, NJ, PA, and MD. |
| 12/1997 | Defendant | FM-15-1465-94 | LKW-257-3186 | Superior Court of New Jersey, Chancery Division, Family Part, Ocean County | Lisa Franklin, etal vs. Donald Franklin, etal | Greenbaum, Rowe, Smith, Ravin, Davis & Himmel LLP Robert S. Underhill | Estimating the market value of the leased fee interest |
| 8/1984 | Creditor | HUD-XX | | US Bankruptcy Court - District of Newark | Hudson Marina Association vs. Emmes & Co. | | Bankruptcy Reorganization of 200+ slip failed marina/dockominium complex |

M. Qualls: Graziano: Trial Lists



# EXHIBIT F

Case 2:09-md-02047-EEF-MBN Document 22263-31 Filed 11/19/19 Page 206 of 319
Case 1:11-cv-22408-MGC Document 129-4 Entered on FLSD Docket 05/13/2019 Page 2 of 99

Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2
                  Case No. 1:11-CV-22408-MGC
 3
 4     -----------------------------------
       EDUARDO AND CARMEN AMORIN, et al.,
 5     individually, and on behalf of all
       others similarly situated,
 6
           Plaintiffs,
 7
       vs.
 8
       TAISHAN GYPSUM CO., LTD., f/k/a
 9     SHANDONG TAIHE DONGXIN CO., LTD.;
       TAI'AN TAISHAN PLASTERBOARD CO.,
10     LTD., et al.,
11         Defendants.
12     -----------------------------------
13
                            - - -
14
                  Monday, March 18, 2019
15
                            - - -
16
17          CONFIDENTIAL - SUBJECT TO FURTHER
                CONFIDENTIALITY REVIEW
18                          - - -
19         Videotaped deposition of ANTHONY GRAZIANO,
       Volume 1, held at Colson Hicks Eidson, 255
20     Alhambra Circle, Penthouse, Coral Gables,
       Florida, commencing at 10:13 a.m., on the above
21     date, before Susan D. Wasilewski, Registered
       Professional Reporter, Certified Realtime
22     Reporter, Certified Realtime Captioner
23                          - - -
24          GOLKOW LITIGATION SERVICES
          877.370.3377 ph | 917.591.5672 fax
25              deps@golkow.com
```

Case 2:09-md-02047-EEF-MBN Document 22263-31 Filed 11/19/19 Page 207 of 319
Case 2:09-md-02047-EEF-MBN Document 22263-31 Filed 08/13/19 Page 3 of 99
Confidential - Subject to Further Confidentiality Review

## Page 2

1  APPEARANCES:
2  COLSON HICKS EIDSON
   BY: PATRICK S. MONTOYA, ESQUIRE
3    NATALIE M. RICO, ESQUIRE
   255 Alhambra Circle, Penthouse
4  Coral Gables, Florida 33134
   Phone: (305) 476-7400
5  patrick@colson.com
   natalie@colson.com
6  Representing Plaintiffs
7
8  BREIT CANTOR GRANA BUCKNER
   BY: JEFFREY A. BREIT, ESQUIRE
9  600 22nd Street, Suite 402
   Virginia Beach, Virginia 23451
10 Phone: (757) 670-3888
   jeffrey@breitcantor.com
11 Representing Plaintiffs
12
13 ORRICK, HERRINGTON & SUTCLIFFE, LLP
   BY: DIANA SZEGO FASSBENDER, ESQUIRE
14 1152 15th Street, NW
   Washington, D.C. 20005-1706
15 Phone: (202) 339-8533
   dszego@orrick.com
16 Representing Defendant Beijing New Building
   Materials PLC
17
18
   ORRICK, HERRINGTON & SUTCLIFFE, LLP
19 BY: DAN GUERRA, ESQUIRE
   405 Howard Street
20 San Francisco, California 94105-2669
   Phone: (415) 773-5545
21 dguerra@orrick.com
   Representing Defendant Beijing New Building
22 Materials PLC
23
24
25

## Page 3

1  APPEARANCES:
2  ABALLI MILNE KALIL
   BY: JOSHUA D. POYER, ESQUIRE
3    MICHEL AYUB, ESQUIRE
   1 Southeast 3rd Avenue, Suite 2250
4  Miami, Florida 33131
   Phone: (305) 373-6600
5  jpoyer@aballi.com
   mayub@aballi.com
6  Representing Defendants Beijing New Building
   Materials PLC
7
8  ALSTON & BIRD LLP
   BY: STEVEN R. CAMPBELL, ESQUIRE
9  90 Park Avenue, 15th Floor
   New York, New York 10016-1387
10 Phone: (212) 210.9400
   steven.campbell@alston.com
11 Representing Defendant Taishan Gypsum Co., Ltd.
   and Tai'an Taishan Plasterboard Co., Ltd.
12
13 ALSTON & BIRD LLP
   BY: AARON BLOCK, ESQUIRE
14   CAROLINE GIESER, ESQUIRE
   1201 West Peachtree Street
15 Atlanta, Georgia 30309-3424
   Phone: (404) 881-7000
16 aaron.block@alston.com
   caroline.gieser@alston.com
17 Representing Defendant Taishan Gypsum Co., Ltd.
   and Tai'an Taishan Plasterboard Co., Ltd.
18
19 APPEARANCES VIA TELEPHONE:
20 ALSTON & BIRD LLP
   BY: MIN JI KIM, ESQUIRE
21 1201 West Peachtree Street
   Atlanta, Georgia 30309-3424
22 Phone: (404) 881-7000
   mj.kim@alston.com
23 Representing Defendant Taishan Gypsum Co., Ltd.
   and Tai'an Taishan Plasterboard Co., Ltd.
24
25 ALSO PRESENT: JOE MELLONI
   RAUL TORRES, Videographer

## Page 4

1           - - -
          I N D E X
2        Volume 1
3   Monday, March 18, 2019
4          - - -
5  Testimony of: ANTHONY GRAZIANO          Page
6   DIRECT EXAMINATION BY MR. BLOCK............  7
7
           E X H I B I T S
8
      (Attached to transcript)
9
10 ANTHONY GRAZIANO DEPOSITION EXHIBITS        PAGE
11 Exhibit 1  Market Analysis of the      23
              Post-Remediation Impact of Chinese
              Drywall On Residential Property
12            Values in Florida
              February 15, 2019
13
   Exhibit 2  20 Priority Claimant-specific    24
14            Reports
15 Exhibit 3  Priority Clamant List       37
16 Exhibit 4  Post Discovery Submission Binder   50
17 Exhibit 5  Market / Pairing: Broward 10 - Value  90
              Adjustment Conclusions
18
   Exhibit 6  Appraisal Report & Post-Remediation  147
19            Damage Related to Chinese Drywall
              Etter, Steven & Cathy
20
   Exhibit 7  Real Estate Damages - Third Edition  161
21            Author: Randall Bell, PhD, MAI
22 Exhibit 8  Survey Responses          177
23 Exhibit 9  Hillsborough County Property    232
              Appraiser Folio 127850-0100
24            3120 West Wallcraft Avenue
              Tampa, FL
25

## Page 5

1          E X H I B I T S
2      (Attached to transcript)
3  ANTHONY GRAZIANO DEPOSITION EXHIBITS        PAGE
4  Exhibit 10  Martin County Property Appraiser   239
              Document for 516 SW Akron Avenue,
5             Stuart, FL
6  Exhibit 11  E-mail - Subject: Chinese Drywall  252
              From Pete Albanis
7
   Exhibit 12  E-mail - Subject: Comps for Graziano  256
8             From Patrick Montoya
9  Exhibit 13  E-mail - Subject: Order - $105.91  257
              per SF
10

| Page 6 | Page 8 |
|---|---|
| 1       --- | 1   Q.   Okay. Can you explain a little bit about |
| 2      THE VIDEOGRAPHER: We are now on the record. | 2   what Integra Realty Resources, corporate, is in |
| 3   My name is Raul Torres. I am a videographer with | 3   relation to the local offices? |
| 4   Golkow Litigation Services. Today is March 18th. | 4   A.   Sure. In 1999 we formed a -- an LLC, a C |
| 5   The time is 10:13. We're at 255 Alhambra Circle, | 5   corp LLC, which is a franchise corporation. We are |
| 6   Case Number 11-22408-CIV-Cooke for the court | 6   stockholders in that corporation. And I say "we." |
| 7   United States District Court, Southern District | 7   The original founding shareholder of the corporation |
| 8   of Florida, for the deponent Anthony Graziano. | 8   were also the underlying offices that started the |
| 9      Will all counsel please state their | 9   company. |
| 10   appearance for the record. | 10      We created the license and the brand and the |
| 11      MR. MONTOYA: Patrick Montoya, Natalie Rico, | 11   technology, and each of those offices then entered |
| 12   and Jeffery Breit for the Plaintiffs. | 12   into a franchise agreement in their respective |
| 13      MR. BLOCK: Aaron Block from Alston & Bird | 13   states with the corporate parent, Integra Realty |
| 14   for Taishan. | 14   Resources. |
| 15      MR. CAMPBELL: Steven Campbell from Alston & | 15   Q.   And you have -- just so I understand, you |
| 16   Bird, Taishan. | 16   have a role -- a management role at the local level, |
| 17      MS. FASSBENDER: Diana Fassbender, Orrick, | 17   Miami/Palm Beach, and you're the overall chairman of |
| 18   on behalf of Defendant Beijing New Building | 18   Integra? |
| 19   Materials PLC. | 19   A.   That's correct. |
| 20      MR. GUERRA: Dan Guerra, Orrick, also on | 20   Q.   What kinds of things does Integra do? |
| 21   behalf of BNB -- Beijing New Building Materials | 21   A.   Speaking specifically of the franchisor? |
| 22   PLC. | 22   Q.   Sure. Well, actually, let me -- let me ask |
| 23      MR. POYER: Joshua Poyer on behalf of | 23   you a better question. |
| 24   Beijing New Building Materials. | 24      What -- you obviously do some expert witness |
| 25      MR. AYUB: Michel Ayub, Aballi Milne Kalil | 25   work? |

| Page 7 | Page 9 |
|---|---|
| 1   PA, Beijing New Building Materials PLC. | 1   A.   I do. |
| 2      MR. MONTOYA: Is that it? | 2   Q.   And Integra performs that work -- expert |
| 3      THE COURT REPORTER: Would you raise your | 3   witness services. What else does Integra do? I'm |
| 4   right hand? | 4   speaking about the company. What else -- |
| 5      Do you solemnly swear or affirm the | 5   A.   Sure. |
| 6   testimony you're about to give will be the truth, | 6   Q.   -- does the company do? |
| 7   the whole truth, and nothing but the truth? | 7   A.   So many local offices throughout Integra do |
| 8      THE WITNESS: I do. | 8   provide expert witness work. We have a national |
| 9      THE COURT REPORTER: Thank you. | 9   specialty practice. We have a special practice |
| 10      ANTHONY GRAZIANO, called as a witness by | 10   leader that sits in Dallas that oversees that |
| 11   Defendants Taishan Gypsum Co., Ltd. and Tai'an | 11   litigation work. |
| 12   Taishan Plasterboard Co., Ltd., having been duly | 12      But generally, the business -- the license |
| 13   sworn, testified as follows: | 13   business of the firm, Integra Realty Resources, |
| 14       DIRECT EXAMINATION | 14   comprises appraisal, consulting, market studies, and |
| 15   BY MR. BLOCK: | 15   general real estate advisory work. |
| 16   Q.   Mr. Graziano, good morning. Could you | 16   Q.   And so what -- in that nonlitigation work, |
| 17   please state and spell your name for the record? | 17   you-all typically work with developers or large |
| 18   A.   Anthony M. Graziano, G-r-a-z-i-a-n-o. | 18   property owners or what? |
| 19   Q.   And, Mr. Graziano, where are you employed? | 19   A.   Yes and yes. |
| 20   A.   Integra Realty Resources, Miami-Palm Beach. | 20   Q.   Okay. And individuals, as well? |
| 21   Q.   And what's your role at Integra? | 21   A.   Yes. |
| 22   A.   I am the current -- currently the senior | 22   Q.   Okay. And what kind of things do you do for |
| 23   managing director of the Miami office, and I am also | 23   developers and large property owners and |
| 24   the chairman of the board of Integra Realty | 24   individuals? |
| 25   Resources, corporate. | 25   A.   Anything ranging from market studies to real |

Case 2:09-md-02047-EEF-MBN Document 22263-31 Filed 11/19/19 Page 209 of 319
Case 2:09-md-02047-EEF-MBN Document 21641-15 Filed 08/13/18 Page 5 of 99
Confidential - Subject to further confidentiality review

Page 10

1  estate consulting work on the specific deals. Many
2  times we'll be engaged to do valuations particularly
3  for developers if they need internal valuations done
4  for purposes of investor -- either financing and/or
5  reporting.
6      But the -- basically, we provide real estate
7  valuation and consulting expertise whenever it's
8  needed throughout the United States.
9      Q.  And how about you specifically?  Do you get
10  involved in that sort of nonexpert witness work?
11     A.  I do.
12     Q.  Okay.  And what do you do personally?
13     A.  I would say the majority of my engagements
14  surround some type of market study or consultation
15  on either an acquisition, disposition, or evaluation
16  of a real estate for private -- for the private
17  sector.
18     Q.  So --
19     THE COURT REPORTER:  Can we stop for one
20  second, please?
21     (Discussion off the record.)
22  BY MR. BLOCK:
23     Q.  So is it the kind of thing where a developer
24  wants to understand the potential investment that
25  they might make in some real estate and consult with

Page 11

1  them to determine whether it's a good opportunity or
2  not?
3     A.  Yes.
4     Q.  What kind of licenses do you hold?
5     A.  I hold a New Jersey real estate state
6  appraisal license, federal state appraisal license.
7  I hold a Florida real estate state appraisal
8  license.  I'm an MIA designated member of the
9  Appraisal Institute, and I'm a CRE member of the
10  Council of Real Estate.
11     Q.  Are you a licensed realtor?
12     A.  No.  I used to be.  In New Jersey I was a
13  licensed realtor, and I -- when I moved to Florida
14  in 2012, I gave up my realtor's license in New
15  Jersey.
16     Q.  So you've never been a realtor in Florida?
17     A.  No.
18     Q.  Okay.  Have you appraised properties in
19  Florida yourself?
20     A.  Yes, of course.
21     Q.  How often do you do that?
22     A.  My firm conducts -- the local firm here in
23  Miami, we conduct about 200 to 250 assignments a
24  year, not all of which are appraisals, so some
25  fraction of that.

Page 12

1      The firm here in Florida is also comprised
2  of our Orlando and Naples office.  And so combined,
3  I would say we produce somewhere in the order
4  magnitude of 13 to 1500 appraisals or assignments
5  per year, 80 percent of which, plus or minus, would
6  be appraisal work.
7     Q.  Okay.  Of those, how many -- how many
8  appraisals do you, yourself, get involved with a
9  year?
10     A.  When you say "get involved with" --
11     Q.  Let me -- let me ask a better question.
12  That's a good point.
13      So how many appraisals in Florida per year
14  do you perform a substantive role in looking at the
15  property that's the subject of the appraisal and
16  comparing it to the market?
17     A.  I would say probably 100, plus or minus,
18  assignments per year, with a substantive role of --
19  I'm assuming you're defining that to include more
20  than just reviewing an appraisal that another person
21  prepared, right?
22     Q.  Can we define some terms?  Can we agree that
23  by stigma, we're referring to diminution in the
24  value of real estate based on perceptions in the
25  marketplace?  Is that a fair definition of stigma as

Page 13

1  you might use it?
2     A.  If I could ask -- just ask you to restate
3  the question.  I did provide the actual definition
4  within the market analysis here that I did.
5     Q.  Well, give me your definition of stigma.
6     A.  Sure.  This is a definition of market
7  resistance, which reads:  "The risk, if any,
8  associated with the ongoing stage of a detrimental
9  condition's analysis.  Market resistance includes
10  the reluctance on the part of the real estate market
11  to buy a property that has historically been damaged
12  or tainted, sometimes called stigma."
13     Q.  Have you ever conducted an analysis of
14  stigma before?
15     A.  Yes.
16     Q.  What were the circumstances?
17     A.  The -- I'm working on a construction defect
18  case currently on a matter in Miami Beach where
19  there was water intrusion.  And the question there
20  is whether or not that water intrusion, once cured,
21  will continue to present a stigma or pose a stigma
22  problem.
23      I've been engaged on -- in various matters
24  to consult on stigma issues, one of which was a
25  construction defect on two condominiums here in

Case 2:09-md-02047-EEF-MBN Document 22263-31 Filed 11/19/19 Page 210 of 319
Case 1:14-cv-21385-JAL Document 126-1 Entered on FLSD Docket 08/13/2015 Page 6 of 99
Confidential - Subject to Further Confidentiality Review

| Page 14 |
|---|

1 Miami. And then generally, I measure market
2 resistance in most appraisals, right?
3     I mean, every -- every property -- title
4 conditions are a perfect example where there's a
5 detrimental condition that goes for the life of the
6 property. So I would say all of the title cases
7 represent a long-term detrimental condition
8 analysis.
9   Q. Okay. So let's focus on construction -- is
10 that --
11   A. I apologize. I'll turn that off.
12   Q. So how many construction defect type stigma
13 cases or matters have you been involved with?
14   A. I'd have to consult my list, if you don't
15 mind.
16   Q. For the record, are you looking at your
17 testimony list that's appended to the back of your
18 claimant-specific reports?
19   A. I am not. I updated that list in the
20 discovery information I provided last week --
21   Q. Okay.
22   A. -- to update and reflect my most recent
23 cases. The one that's in the report was outdated.
24 I included for it the initial submission, but this
25 was supplemented subsequently.

| Page 15 |
|---|

1   Q. Now what are you looking at, sir?
2   A. This is a continuation of that list. These
3 are the settlement matters.
4   Q. How many are you up to so far on the list of
5 cases that you have --
6   A. Seven.
7   Q. Seven?
8   A. Not including -- excluding this one.
9   Q. Okay. Could you just read the case names,
10 just the first part of that, just so we know what
11 you're talking?
12   A. Sure. St. Regis Homeowners vs. MV
13 Construction was an arbitration hearing. Do you
14 want the case numbers or --
15   Q. No.
16   A. -- you just want the case names?
17   Q. You can just say the first part of the
18 name --
19   A. Okay.
20   Q. -- the first part before the V, and we'll
21 get it from there.
22   A. Renegade at Hialeah Boulevard vs. Dynatech
23 Engineering; BAS -- BASF, Inc., Successor to
24 Ciba-Geigy, Inc., vs. The Township of Toms River;
25 Scott Netherlands, Inc., vs. State of New Jersey

| Page 16 |
|---|

1 Department of Environmental Protection. There was a
2 separate arbitration matter, again, Township -- this
3 was Township of Toms River vs. Ciba-Geigy, where
4 Township of Toms River was the plaintiff in an
5 arbitration, same property in New Jersey but
6 different matter.
7     And then Kyle Mosteller vs. Gayla Nieman.
8   Q. Did any of those cases involve Chinese
9 drywall?
10   A. No, sir.
11   Q. Is this case the first time that you've been
12 involved with Chinese drywall?
13   A. Yes.
14   Q. When were you retained by the plaintiff in
15 these Chinese drywall cases?
16   A. I would have to look back at the signed
17 contract. Roughly late September.
18   Q. And what was your understanding of your role
19 in these cases?
20   A. My role was to prepare an expert report and
21 market analysis to determine whether or not any
22 damage existed -- or whether any residual damage
23 existed, stigma, if you will, post-remediation,
24 after the -- after the property is remediated from
25 drywall, recognizing full disclosure to any

| Page 17 |
|---|

1 subsequent sellers would be a requirement or a
2 condition of that estimate.
3   Q. We'll get to that in a second.
4     You also calculated damages based on time
5 out of the home and moving costs during
6 construction, correct?
7   A. That's correct.
8   Q. We'll get back to that, too.
9     Let's talk a little bit more about your --
10 yeah, about your background. Do you hold yourself
11 out as an expert in statistics?
12   A. No, sir.
13   Q. Do you hold yourself out as an expert in
14 survey design?
15   A. I don't understand the question.
16   Q. Do you hold yourself out in the professional
17 community as someone who is an expert in designing
18 surveys?
19   A. By virtue of my experience and training, I
20 do regularly conduct methodology and surveys as part
21 of my regular practice every day, yes.
22   Q. What kinds of surveys do you conduct as part
23 of your regular practice?
24   A. Ordinarily we conduct surveys on market
25 statistics. We talk to brokers on a regular basis

Case 2:09-md-02047-EEF-MBN Document 22263-31 Filed 11/19/19 Page 211 of 319
Case 1:14-cv-02494-WJM-MEH Document 248-4 Filed 08/15/2015 Page 7 of 99
Confidential - Subject to further confidentiality review

Page 18

1  as to what's happening in th -- in the marketplace.
2      I am the author of the Downtown Development
3  Authority's Miami Residential Real Estate Report.
4  We've been the author of that report for the last
5  four-plus years, where we survey various agents and
6  brokers and people within the marketplace to get an
7  understanding of what's happening in the market.
8      I would say the general practice that we
9  conduct in all the market studies relates to
10  designing and surveying the marketplace and
11  designing market research to demonstrate what's
12  happening the marketplace, in the market.
13     Q.  Do you have any formal training in the
14  design of studies -- excuse me -- surveys?
15     A.  I would say that all of the appraisal
16  training includes formal training on how to conduct
17  market research of the type that I regularly
18  conduct, both in this case and others.
19     Q.  Do you -- backing up to statistics, I
20  noticed that you used the word "correlation" in your
21  report a few times.  Do you mean correlation in a
22  statistical sense?
23     A.  I would have to know what correlation means
24  in a statistical sense.  No.  In my -- in my role, a
25  correlation is an analysis of the data and a final

Page 19

1  determination of what the opinion is going to be.
2  That's a correlation, after consider -- after having
3  considered all the data and the quality of the data
4  and the nature of the data, then to render a result
5  that results in a correlation.
6      Q.  But you're not claiming that your results
7  are statistically significant, and they're
8  correlated in a statistically significant way?
9      A.  I'm not using correlation in that way, no.
10     Q.  And you don't claim to have used formal
11  statistics in any of your work in this case,
12  correct?
13     A.  Not other than, you know, basic statistics,
14  such as mean and median and things of that nature.
15     Q.  Okay.  Have you spoken with any of the other
16  expert witnesses for the plaintiffs in these cases?
17     A.  I would have to know who all of those expert
18  witnesses are.  I don't -- I don't know all the
19  expert witnesses.
20     Q.  Okay.  Who have you -- who outside of
21  Integra and the lawyers in these cases have you
22  spoken with about your work?
23     A.  I only had a brief conversation with Randy
24  Bell.  That was the -- I think that's the only one
25  that I can recall, unless there is somebody else I

Page 20

1  may have spoken to that may be an expert that I
2  don't know about.
3      Q.  How many conversations with Randy Bell have
4  you had about Chinese drywall?
5      A.  I don't know that -- I would say about
6  probably one.
7      Q.  And when was that?
8      A.  I'd have to look back on my notes.  Possibly
9  mid to late January.
10     Q.  What was the purpose of that conversation?
11     A.  Originally, Patrick and I were discussing
12  the methodology and things of that nature, and he
13  was asking me questions about the methodology.  And
14  I said, "Well, you should just go talk to the guy
15  that wrote the book.  He's got the methodology
16  questions, and he can explain it, you know, as best
17  as anyone."
18      And so I connected Patrick with Randy Bell
19  and told him to call him, and we did an initial
20  call, and that was it.
21     Q.  And what was the substance of your
22  discussion with Randy Bell on that call?
23     A.  I don't -- there really wasn't any
24  substance.  Randy was trying to make sure that we
25  weren't asking him within the time frame to review

Page 21

1  my report or in any way to certify to the methods
2  that I used.
3      He asked me some general questions about the
4  nature of my study, but he was very clear that if he
5  was to be retained as an expert on the case, his job
6  would be to just talk about the general theory and
7  to understand what the peer-accepted practices were;
8  that he wasn't going to render or develop any
9  opinions with respect to my report.
10     Q.  Did you tell Dr. Bell what your results
11  were?
12     A.  No.  I don't recall that I had even results
13  at that time.  We had a general discussion about
14  methodology that I was using.  That was it.
15     Q.  Okay.  Is Randy Bell someone that you would
16  defer to on the proper analysis of stigma or market
17  resistance?
18     A.  No, because I've been on the other side to
19  him, so when you say defer to him, not always.
20     Q.  Is -- well, he has a book that you cite in
21  your report, correct?
22     A.  Yes.
23     Q.  And it's Real Estate Damages Third Edition?
24     A.  It is.
25     Q.  And that's something you rely on in your

Page 22

1  report and in your opinions in this case,
2  correct?
3     A.  I certainly use that as a credible source of
4  reliance for methodology, yes.
5     Q.  Is there anything in Real Estate Damages
6  Third by Dr. Randy Bell that you disagree with?
7     A.  It's a 500-page book.  I'm sure there is.  I
8  can't think of anything off the top of my head.
9        I mean, I think the general framework is
10  well-accepted, and we generally tend to follow that
11  framework within our practice.  But I can't say that
12  I agree with every single thing in the book.
13     Q.  Have you read any of Dr. Bell's other work
14  other than his Real Estate Damages Third Edition?
15     A.  I keep up with journal articles and various
16  articles, many of which he's written over the years,
17  yes.
18     Q.  Can you identify any as we sit here?
19     A.  No.
20     Q.  What questions about methodology did you
21  want to discuss with Dr. Randy Bell?
22     A.  I didn't want to discuss any of them.  We
23  just happened to be on the telephone call.  And
24  during that telephone call, he was talking about
25  what his scope was going to be and asked me what
26  methods I used.  I think specifically, he wanted to

Page 23

1  know, you know, how I define my methods, which I
2  laid out for him.
3     Q.  Why don't we turn to your expert reports.
4  Let's -- let's do this.  Let's define them.  And
5  we're going to mark as Exhibit 1 your -- what I
6  think of as your general report entitled Market
7  Analysis of the Post-Remediation Impact of Chinese
8  Drywall On Residential Property in Florida.
9        (Graziano Exhibit 1 was marked for
10  identification.)
11        MR. BLOCK:  You have a copy, I assume,
12  and -- you need it?
13        MR. MONTOYA:  Is that the general?  Yeah.
14  BY MR. BLOCK:
15     Q.  Do you have a copy, Mr. Graziano?
16     A.  I do.
17     Q.  And can we call this your general report for
18  brevity?
19     A.  Sure.
20     Q.  Okay.  And then in addition to the general
21  report, you have 20 claimant-specific reports that
22  relate to the 20 Priority Claimants in these cases;
23  is that true?
24     A.  That's true.
25     Q.  Okay.  And let's collectively mark those as

Page 24

1  Exhibit 2, the 20 Priority Claimant-specific
2  reports.  We're not going to talk about them just
3  yet.
4        (Graziano Exhibit 2 was marked for
5  identification.)
6  BY MR. BLOCK:
7     Q.  And you -- in the last couple of weeks we
8  received from the plaintiffs, I believe, three
9  amended Priority Claimant-specific reports.  Is that
10  your understanding, as well?  There are three
11  amendments?
12     A.  That sounds correct.
13     Q.  Okay.  We'll -- in Exhibit 2, which we'll
14  assemble on a break, we'll use the most updated, the
15  amended version for those three.
16     A.  Just to make sure that I'm working with a
17  correct copy, I would like copies of those.
18     Q.  Yeah, yeah.  We'll deal with that at a break
19  here.
20        So if we're looking at your general report,
21  as I understand things, you have two basic
22  categories of damages opinions, the 10 percent
23  stigma damages factor and then the -- what I think
24  of as alternative living expenses.  Is that your
25  understanding?

Page 25

1     A.  Yes.
2     Q.  Okay.  And you say on Page 4 of your general
3  report that the 10 percent stigma factor is a
4  uniform damages analysis, correct?  Do you see that?
5     A.  I do.  I just don't know if that's what it
6  says.  I'm trying to make sure that it doesn't --
7  what you asked me is -- it says:  "For purposes of
8  developing and applying a uniform damage analysis
9  which is both fair and reasonable, it's my expert
10  opinion."
11        So I determined that a uniform damage
12  analysis was best to withstand minor variations in
13  the market, yes.
14     Q.  So you have a uniform damages analysis of 10
15  percent stigma impact, correct?
16     A.  That's correct.
17     Q.  And you applied the same uniform damage
18  analysis of 10 percent stigma to all of the 20
19  Priority Claimants, correct?
20     A.  That's correct.
21     Q.  Now, did you -- let me ask you a couple of
22  questions here.  The general report has an effective
23  date on the front cover of February 15th, 2019,
24  correct?
25     A.  Yes.

Page 26

1    Q. And that's the date we received it from
2 plaintiffs. Is that the date that you finished your
3 general report?
4    A. Yes.
5    Q. Okay. What is the -- in your appraisal
6 world, what is the meaning of an effective date of a
7 study?
8    A. The effective date of the study is the date
9 that the study was conducted across. So if I
10 issue -- it says: "Effective date of the study:
11 February 15, 2019. Covering the period from 2009 to
12 2018."
13    So effective date is generally the --
14 identified within the report as the date in which
15 the study results are valid.
16    Q. Okay. So if I'm understanding correctly,
17 the -- your results are valid as of the effective
18 date of February 15th, 2019?
19    A. And all of the other -- it says: "Covering
20 the period 2009 to 2018." That's what the cover
21 says or that's what my cover says.
22    Q. So your results are valid, in your view, for
23 2009 to 2019, that 10-year period?
24    A. 2018, correct.
25    Q. Let's -- all right. Let's back up. When

Page 27

1 are your results -- over what period are your
2 results valid?
3    A. Over the period of the study date within the
4 report, so all of the data that's contained within
5 the report sets the framework for the effective
6 date.
7    Q. Okay. But we're here in 2019, and in
8 theory, we're going to trial in July of 2019.
9    A. Yes.
10    Q. Okay. When are your results valid for? Are
11 they valid for trial in July of 2019, or are they
12 valid for July of 2009, or the whole period from
13 2009 to 2019?
14    A. I would say that they're valid for the whole
15 period from 2009 through the last date of data
16 that's contained within here. And I would -- I
17 would suggest that if new data were to come to light
18 in May of 2019, that's not going to be covered in
19 the study, right?
20    I mean, I'm not suggesting that I wouldn't
21 consider that in rendering my opinion, but any --
22 any of the information that's not contained in the
23 study that I don't know about today obviously
24 couldn't have informed my opinion as of February
25 15th of 2019.

Page 28

1    So the reason that we put an effective date
2 is to frame for the reader what our study data
3 contains, and it's relevant as of those dates.
4    Q. And is one of the limitations that the real
5 estate market is dynamic, and so what may be true in
6 the real estate market in 2018 may not be true in
7 2019 or '20 or '21 and so on?
8    A. I think that's characteristic of any market,
9 that everything is always changing, right? So of
10 course.
11    Q. Now, your stigma damages analyses for the 20
12 Priority Claimants, those are predictions of
13 potential future damages, correct?
14    A. Those are predictions of my professional
15 effort as to what they would have suffered as of the
16 date of value within that -- within their respective
17 reports.
18    So it's not a prediction necessarily of the
19 future; it's a prediction of the value diminution as
20 if the property had been remediated as of those
21 effective dates.
22    Q. Is it your opinion that any of the 20
23 Priority Claimants actually experienced stigma
24 damages of 10 percent?
25    A. Some of them experienced damages more. Some

Page 29

1 of them lost their homes in foreclosure. Some of
2 them didn't remediate immediately and suffered other
3 damages that -- and so they had not, at that point,
4 experienced those stigma damages, but they would
5 have, in the cumulative, experienced those stigma
6 damages, yes.
7    Q. So my question was a little different. My
8 question is: Is it your opinion that any of the 20
9 Priority Claimants actually experienced stigma
10 damages of 10 percent?
11    A. Yes.
12    Q. Which of the Priority Claimants experienced
13 stigma damages of 10 percent?
14    A. The people that lost their homes, people
15 that took severe discounts on their homes at sale
16 that were unremediated. Those purchase prices
17 incorporated the buyer's expectation that they
18 would, on resale, suffer damage. So there was
19 stigma embedded in that.
20    And then many of the property owners that
21 have held their homes, it's a current effective
22 date. And my position is if they were to disclose
23 that today and put the property on the market, my
24 prediction is they would experience it. But to your
25 point, they haven't experienced it yet in those

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/18/19 Page 214 of 319
Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/20/19 Page 9 of
99
Confidential - Subject to further confidentiality review

Page 30

1  cases.  The people that held their homes have not
2  experienced it yet.
3      Q.  So let's back out a little bit.  Your theory
4  is that after a home is remediated, it will sell for
5  10 percent less than a similar home that never had
6  Chinese drywall, correct?
7      A.  Yes, yes.  Subject to some other conditions,
8  of course, including the required disclosure of the
9  remediated Chinese drywall, depending on what their
10  Chinese drywall remediation documentation looks
11  like.  All of those things embedded additionally
12  give rise for that discount.
13      Q.  So you're talking about at post-remediation
14  effect?
15      A.  Correct.
16      Q.  Okay.  So if someone sold or lost their home
17  prior to remediation, they could not have suffered
18  the 10 percent stigma -- 10 percent post-remediation
19  stigma impact that you claim?
20      A.  No.  I would suggest that that's cumulative
21  in the other damages that they suffer, because any
22  buyer is expecting that once they remediated,
23  they're going to suffer that 10 percent.  So they're
24  going to incorporate that into their thinking in
25  terms of what to pay for the property.

Page 31

1      Q.  Can you show me where you say that in your
2  report?
3      A.  I just -- I don't know that I do say that in
4  the report.  I think that that's implicit in the
5  concept of damages.  The Bell framework says that
6  the damages are cumulative.
7      If you review the report, on Page 8 I show
8  the detrimental conditions model that Bell puts
9  forth.  At the point at which a detrimental
10  condition occurs, all of the value diminution
11  accrues.  That then comes back at various periods
12  throughout the life.  And the market resistance to
13  get back to full market value unaffected by any
14  market resistance is the last piece.
15      So by its very nature, it's cumulative.  So
16  anybody that suffers all of the value diminution and
17  sells unremediated, inclusive of that, they're
18  suffering that market resistance.
19      Q.  But that's not an opinion that you disclosed
20  in your expert report, is it?
21      A.  I don't know that's true.  I have the
22  methodology in here and --
23      Q.  Do you, anywhere in any Priority Claimant
24  expert report, explain mathematically the damages
25  that someone lost prior to remediation via a stigma

Page 32

1  impact that you've just described?
2      A.  No.
3      Q.  All right.  So I think you're telling me --
4  well, let's -- on one level, you're telling me that
5  stigma damages occur after a home is remediated?
6      A.  That's correct.
7      Q.  And that's really the focus of your
8  analysis, is post-remediation stigma damages,
9  correct?
10      A.  That's correct.
11      Q.  That's the title of your general report, and
12  that's the title of your individual claimant
13  reports, correct?
14      A.  Yes, sir.
15      Q.  Okay.  Let's talk about post-remediation
16  stigma impacts.
17      A.  Okay.
18      Q.  No one can experience post-remediation
19  stigma impacts unless they have actually remediated
20  their home, correct?
21      A.  I just testified to that.  I believe that if
22  you don't sell your home, you're still subject to
23  having suffered those from the -- from the
24  perspective of an equity diminution, right?  You --
25  whether you actually sell your home or not, your

Page 33

1  economics are affected because the value of your
2  home is different.
3      Q.  But the out-of-pocket loss for
4  post-remediation stigma occurs after remediation,
5  correct?
6      A.  You could -- you could look at it that way,
7  sure.
8      Q.  Okay.  And the out-of-pocket loss for
9  post-remediation stigma also requires that you
10  presently own the home, correct, and are selling it?
11      A.  Well, no, no.  As I said, if you lost the
12  home, you suffered -- you suffered that additional
13  damage at the time you sold the home because the
14  buyer of the home has already priced that into
15  their -- what they're willing to pay you for not
16  only what they expect the market resistance to be
17  once they remediate it, plus their cost to cure,
18  plus a profit motivation.
19      Q.  And can we call that pre-remediation stigma,
20  as opposed to post-remediation stigma?
21      A.  Well, you can call it whatever it want --
22  you want.  It's just a different stage in the -- in
23  the detrimental condition framework.  It's -- but
24  they are -- but the stages are cumulative.
25      Q.  But the focus of your report is on post -- I

Page 34

1  want to drill down on what's actually in your
2  report.
3      Okay.  Your report is about post-remediation
4  stigma.  I understand, I think, what you're trying
5  to say about pre-remediation stigma that assumes
6  there will be a future in which there is
7  a remediation and a sale by -- at some point in the
8  future, but I don't want to talk about that.
9    A.  Okay.
10   Q.  I want to talk about what's in your report.
11   A.  Okay.
12   Q.  Okay.  To experience post-remediation stigma
13  effects, you have to remediate the home, correct?
14   A.  What I'd like to say is to observe
15  post-remediation stigma effects, I have to make
16  observations of homes that have been remediated.
17   Q.  I'm -- let me ask a different question.  If
18  someone sold the home or lost the home in 2009,
19  prior to remediation, can they experience an
20  out-of-pocket loss due to post-remediation stigma in
21  2019?
22   A.  No, not in 2019.  They experienced a loss at
23  the time that they lost the home.
24   Q.  And that would not be a post-remediation
25  stigma loss because the home hadn't been remediated,

Page 35

1  in my hypothetical?
2    A.  I understand your hypothetical, but what I'm
3  saying to you is that my analysis of the diminution
4  that results post-remediation, and my quantification
5  of that, is a piece of the total loss.
6      When you -- when a property owner or
7  Priority Claimant may have lost their home, there
8  may have been other damages.  Those are cumulative
9  to the post-remediation damage that's already
10  considered.  It's baked into the overall loss.
11     Their losses would be greater than if they
12  had remediated and then sold post-remediation
13  because they're also suffering all of the other
14  components of loss, the profit that's necessary to
15  motivate someone to undertake the remediation, the
16  risk that's necessary, the costs that's necessary.
17     So that enhances the overall discount, but
18  this quantification of market resistance persists
19  for any subsequent buyer.  So that -- they're going
20  to experience that loss embedded within their
21  overall loss inclusive of other damages.
22   Q.  So the 10 percent stigma effect, that just
23  runs with the home for eternity?
24   A.  The claimant suffers it upon initial loss
25  and then as the property -- then the remediation

Page 36

1  would happen, and that buyer would expect to sell
2  the property for less going forward.  But they've
3  already -- they've already counted for that in their
4  initial purchase price.
5      So although we may -- we may observe that
6  the price may be lower, and we may see that with
7  full disclosure over time, that stigma may continue,
8  the suffering of the damages only happens on the
9  first sale.
10   Q.  And do you know whether this first sale
11  stigma impact pre-remediation that you're talking
12  about -- do you know whether that happens to any of
13  the 20 Priority Claimants?
14   A.  Yes.  I think there were some Priority
15  Claimants that sold their property post-remediation,
16  yes.
17   Q.  So you'd need to look at the reports to
18  answer that question with more specificity?
19   A.  Or my summary.
20     THE WITNESS:  Joe, do you have the summary
21  of the -- do you have my -- the Priority Claimant
22  summary?
23     MR. MELLONI:  Yes.
24   Q.  So while -- I guess Joe is someone who works
25  with you and --

Page 37

1    A.  Yes.
2    Q.  -- is helping you today?
3    A.  Yes.
4      THE WITNESS:  Thank you.
5    Q.  And for the record, what are you looking at,
6  Mr. Graziano?
7    A.  This is entitled a Priority Claimant List.
8  I updated this through yesterday.  As I was
9  reviewing this deposition, I made various notes
10  and transmitted this onto a piece of paper.  This
11  list, I think, exists in the discovery material.  I
12  just included in the list the specific Priority
13  Claimant counties and the testing on each one of
14  these relative to the date of value if there were
15  subsequent sales.
16     So of the 20 Priority Claimants, my
17  information indicates that three of them had been
18  remediated, and four of them were classified as
19  partially remediated.  The balance all sold
20  impaired.
21   Q.  We'll mark that summary you're looking at as
22  Exhibit 3 and make a copy on a break.
23     (Graziano Exhibit 3 was marked for
24  identification.)
25  BY MR. BLOCK:

| Page 38 |
|---|

1  Q.  So let's go back to the theory you have here
2  about pre-remediation stigma.  I think what you're
3  telling me is that that anticipation of
4  post-remediation stigma is priced into the
5  pre-remediation sale price?
6  A.  That's correct.
7  Q.  Okay.  And so the way we would calculate the
8  amount of that pre-remediation anticipatory stigma
9  is to look at the sale price, correct?
10  A.  I'm not sure I understand the question.
11  Q.  Well, how --
12  A.  I mean, the scope of my analysis wasn't to
13  look at the pre-remediation, or I'll call it
14  impaired status.  The scope of my report didn't
15  cover that.  So I would have to give some thought to
16  the design of that.
17  Q.  Okay.  So --
18  A.  I don't know if I can answer that question
19  today as I sit here.
20  Q.  So in your reports, do you claim that there
21  actually is a stigma as to the Priority Claimant
22  homes or just that there will be upon some future
23  sale?
24  A.  I -- my report, I believe, by the
25  preponderance of the data that I analyzed,

| Page 39 |
|---|

1  demonstrate that -- demonstrates that 10 percent
2  stigma is applicable.  We analyzed that across
3  geography, time, and concluded that although there
4  were some ranges in the stigma, the 10 percent was a
5  good, reliable estimate.
6  I then applied that to each of the Priority
7  Claimants' then current value as of the effective
8  dates that the attorneys requested me to calculate
9  those damages.
10  Q.  We'll come back to that.
11  So your alternative living expenses, can you
12  define what you're -- what kind of damages you're
13  trying to recover there?
14  A.  Sure.  As part of our analysis, we had
15  identified a number of sales that were sold
16  impaired, subsequently remediated, and resold.  And
17  so we looked at the marketing times, the time frames
18  it took from the acquisition of an impaired property
19  to then turn around and renovate the property
20  completely and sell it back into the marketplace.
21  That time frame represents the approximate
22  time frame that someone would need to move out of
23  the home, to put it back into a remediated
24  condition, to then sell it remediated.  So that time
25  frame represents a loss of the utilization of the

| Page 40 |
|---|

1  property and an alternative cost for them to be
2  somewhere else.
3  So we estimated that time frame.  And then
4  as part of our appraisals of the unimpaired values
5  in each of the markets, we estimated what the rental
6  rate was for that home to represent a proxy for the
7  economic loss associated with being -- with being
8  out of the home for that amount of time.
9  In addition to that, the claimants that --
10  or the property owners to move out of the home would
11  also have to pack and move twice, once to get out,
12  once to come back in.  And so we estimated that
13  cost, as well and included those two costs as
14  additional damages to reach the point of selling the
15  home as of the effective date and suffering a
16  post -- remediate it and then suffering a
17  post-remediation damage.
18  Q.  All right.  Let's go to -- we will come back
19  to alternative living expenses.
20  Let's -- let's stay with your general
21  report, which is Exhibit 1.  And if you can turn
22  with me to Page 2, I'd like to try and understand a
23  little bit more about your method.  What method do
24  you think you used to calculate this 10 percent
25  stigma factor?

| Page 41 |
|---|

1  A.  We used paired sales analysis on a number of
2  the -- what we call control pairings of properties
3  that had been remediated compared to properties that
4  were not affected by Chinese drywall in the
5  marketplace.
6  We used a survey method to survey properties
7  as -- in conjunction with our confirmations.  We
8  also conducted surveys of the realtors that sold.
9  So we used the paired sales analysis.  We
10  used market interviews and surveys -- paired sales,
11  p-a-i-r-e-d, paired sales analysis.
12  We then looked at the -- at any of the
13  properties that may have sold or resold.  So we did
14  some subsequent testing on that after we prepared
15  the case studies.
16  And so I outline, actually, on Page 10 that
17  we applied various methods, including paired sales
18  analysis, paired sales comparables, market resistant
19  estimates, sale/resale analysis, and what I'll call
20  case study analysis, which incorporates all of
21  those.
22  Q.  When you say that you looked at properties
23  that may have sold or resold, you did some
24  subsequent testing on that after we prepared the
25  case study, what are you referring to there?

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/18/19 Page 217 of 319
Case 2:14-cv-02722-MC Document 224-10 Filed 04/19/16 Page 13 of 99
Confidential - Subject to Further Confidentiality Review

Page 42

1  A.  So as I went into each of the claimant
2  reports, where we identified those properties that
3  sold, we made some additional notes on the -- on
4  the -- you know, the testing of those.
5     And then I also identified additional sales.
6  As we were -- as I was reviewing for deposition, I
7  also reviewed some additional sales that occurred
8  post our date of value, and we tested those with
9  some additional comparables.
10  Q.  So it sounds like you did work on your
11  analysis after the date of your expert report and
12  before today's deposition?
13  A.  Well, I was -- I was preparing for the
14  deposition, and so what I was doing was really
15  looking at the -- at the data on -- from the
16  Priority Claimants' perspective, on subsequent
17  sales.  Now, those subsequent sales occurred after
18  the date of value.  So all I was really doing was
19  testing to see the subsequent dates.
20     But that -- you know, obviously, our damage
21  analysis is as of a retrospective date, and that's
22  really when our opinion stops.  But, of course, I
23  wanted to test to see if any of those subsequent
24  sales continued to demonstrate the damage that I
25  estimated.

Page 43

1  Q.  Okay.  So -- and I'm just asking sort of a
2  factual process question.
3  A.  Sure.
4  Q.  You did some analyses that relate to your
5  report after February 15th, 2019?
6  A.  Sure.
7  Q.  Okay.  And are those written down?
8  A.  Yes.
9  Q.  And do you have copies with you here today?
10  A.  I do.
11  Q.  Could you please give those to us?  We
12  haven't seen them before --
13  A.  Sure.
14  Q.  -- I don't think, unless they were in the
15  production and I missed them.
16  A.  Well, that's the summary copy of the
17  results.
18  Q.  This is Exhibit 3.  Back up.  Actually, what
19  you just handed me was Exhibit 3 that you reviewed
20  before the -- well, let me -- let me just get you --
21  can you explain what we're looking at here that I've
22  marked as Exhibit 3?
23  A.  Sure.  This is entitled Priority Claimant
24  List.  IRR - Miami.  Update: 3/17/2019.  This list
25  should exist in the various discovery materials in

Page 44

1  various versions.
2  Q.  That's the list that Joe handed you 15
3  minutes ago?
4  A.  That's correct.
5  Q.  Okay.  All right.  And so now -- we can take
6  that.
7  A.  Yes.
8  Q.  Now you're looking for something else that
9  reflects work that you did subsequent to the
10  February 15th, 2019 date of your expert reports?
11  A.  Correct.  These are the notes that -- in
12  preparation for my deposition today.  These are the
13  notes and additional backup research related to
14  those notes based on my preparation to arrive today.
15  So I've entitled them and put them in a separate
16  binder called Post-Discovery Submission.
17  Q.  Okay.  And do you have just the one copy
18  here today?
19  A.  I do.
20  Q.  And is this the original, or do you have
21  electronic access?
22  A.  No.  This is the original.
23  Q.  Okay.  We'll make a copy of this, and we're
24  going to mark it as an exhibit --
25  A.  Sure.

Page 45

1  Q.  But we'll make a copy first.
2  A.  Sure.
3     (Discussion off the record.)
4  MR. MONTOYA:  We're going to mark this as 4?
5  MR. BLOCK:  Yeah, that will be 4.
6  THE WITNESS:  Are we at a logical point for
7  me to take a break?
8  MR. BLOCK:  Yeah, we can -- we can take a
9  break.  Yeah.
10  THE WITNESS:  Thank you.  I appreciate it.
11  THE VIDEOGRAPHER:  Off record, 10:58.
12  (Recess from 10:58?a.m. until 11:09?a.m.)
13  THE VIDEOGRAPHER:  On record, 11:09.
14  BY MR. BLOCK:
15  Q.  Mr. Graziano, let's do a little housekeeping
16  before we go back into questions.
17     What all have you brought with you today?
18  We see a large number of binders over there and
19  boxes over here by Joe.  So can you describe what
20  you brought with you today?
21  A.  Sure.  I have a binder for each of the 20
22  Priority Claimants reflective of my individual
23  reports for each of those, damage estimates, and the
24  unimpaired appraisals that are a part of those
25  reports that have been exchanged; all of the work

Page 46

1  file documentation behind those reports that either
2  we've compiled and/or Valucentric compiled as part
3  of their unimpaired evaluations. Those are filed in
4  a separate binder for each of the separate
5  individual Priority Claimants.
6      I also have a copy of the -- what you're
7  referring to as the general report, entitled Market
8  Analysis of Post-Remediation Impact of Chinese
9  Drywall On Residential Property Values in Florida.
10     I also have a binder reflective of the
11  pairings and analyses that went into the compilation
12  of that general report, so all of the backup
13  material, the MLS listings, copies of the interview
14  notes that we had with each of the respective agents
15  regarding those sales and that research.
16     I also have with me a number of the
17  textbooks that govern my education, knowledge, and
18  experience in the matter.
19     THE WITNESS: And, Joe, can you hand me
20  those two binders?
21  A.  I also have a binder entitled Not Used.
22  Q.  Uh-huh.
23  A.  These reflect control pairings that were not
24  included in the report, some of which are referenced
25  as having been excluded.

Page 47

1      And then I have another binder entitled
2  Additional Support, and these are some of the
3  control pairings that were on properties that were
4  sold impaired that were not fully developed. But we
5  identified them as impaired -- impaired through the
6  course of our assignment and then excluded them
7  because they were impaired at the time of sale.
8  They were not post-remediation sales.
9  Q.  So it looks like you might have three other
10  binders in a box that weren't Priority Claimant
11  binders, but I can't see from here.
12  A.  I can't see from here, either.
13     THE WITNESS: Joe.
14     (Discussion off the record.)
15     THE WITNESS: Bring me all the binders that
16  I haven't described so far. Thank you.
17  A.  These three volumes entitled Chinese Drywall
18  Volumes 1 of 3, 2 of 3, and 3 of 3 constitute what
19  I'll call library research that had been compiled
20  over time within my firm, as well as additional
21  research that we supplemented and included in these.
22     This is the background on the Chinese
23  drywall problem, a lot of the different reports and
24  Consumer Product Safety Commission issues, reports,
25  and otherwise that were included as part of my lit

Page 48

1  review and also part of my foundational documents.
2      MR. BLOCK: We won't need to look at those,
3  Joe, if you want to get those in a convenient
4  spot.
5  Q.  And can you just quickly identify for the
6  record the books that you brought with you today
7  that you say you rely on? I can see Dr. Bell Real
8  Estate Damages Third Edition, but what else do you
9  have?
10  A.  Sure. This book is entitled The Appraisal
11  of Real Estate 14th Edition by the Appraisal
12  Institute; The Dictionary of Relevant Estate
13  Appraisal Sixth Edition by the Appraisal Institute;
14  Real Estate Valuation in Litigation, Second Edition,
15  by James Eaton, published by the Appraisal
16  Institute.
17  Q.  And those are all books that you rely on for
18  your opinions in this case?
19  A.  Yes.
20  Q.  We may make some copies of some of that and
21  mark some, but we'll deal with that later.
22      I want to do another housekeeping matter. I
23  want to get on the same page with you about what
24  Priority Claimants still own their homes and which
25  do not. Okay?

Page 49

1  A.  Okay.
2  Q.  Do you have a -- you're -- you pulled out a
3  sheet. Do you think you have a sheet that has this
4  information?
5  A.  I do.
6  Q.  Okay.
7  A.  I think you marked it as Exhibit 3.
8  Q.  3 or 4, which I think is --
9      MR. BLOCK: Do y'all have 3?
10     MS. RICO: They're copying it right now.
11     MR. BLOCK: They're copying it.
12     MS. RICO: Sorry about the --
13     MR. BLOCK: All right.
14     MR. MONTOYA: 3 was pretty short, right?
15     MR. BLOCK: It was just --
16     MS. RICO: It was just one page. I will
17  write and see.
18     MR. MONTOYA: If you want to start on 3, I
19  can run and grab 3 if it keeps you in the flow.
20     MR. BLOCK: Yeah. I mean, let's --
21     MR. BREIT: I'll do it.
22     MR. MONTOYA: Do you know where the room is?
23     MR. BREIT: No, but I'm going to find it.
24  I've been lost before and found.
25     MR. MONTOYA: First door on the right.

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/18/19 Page 219 of 319
Case 2:09-md-02047-MCD Document 22263-31 FRL Docket 11/18/19 Page 15 of 99
Confidential – Subject to further confidentiality Review

1    MR. BREIT:  After I walk in, the far door on
2  the left.
3    MR. BLOCK:  We'll come back to that.
4    MR. MONTOYA:  Second right.
5    (Graziano Exhibit 4 was marked for
6  identification.)
7  BY MR. BLOCK:
8    Q.  Well, and we don't have the work that you --
9  we're copying, I should say, the work that you did
10  subsequent to the date of your report, but can
11  you --
12    A.  Can I interrupt you for one second?
13    THE WITNESS:  Did you tell them not to
14  remove the paper clips?  Did you explain what --
15  okay.
16    A.  Sorry.  There's -- it's organized in a way
17  that was meant to be able so that I could quickly
18  reference it, and if they pull it apart too much, it
19  may be more difficult for me.
20    Q.  I understand.  Can you just give us a high
21  level description of what you did?  We're going to
22  need to look at those documents and ask you about
23  them later, but just generally speaking, what did
24  you do to create that work product after the date of
25  your report?

1    A.  Are you referring to the work product that's
2  being copied currently?
3    Q.  As Exhibit 4, yes.
4    A.  Sure.  So as I reviewed each of the Priority
5  Claimant binders in conjunction with preparation for
6  this deposition, I asked -- I asked my staff to
7  determine whether --
8    MR. BREIT:  How's that?
9    MR. BLOCK:  Good.
10    A.  -- any of those properties sold post the
11  date of value.  That originally wasn't within the
12  original review that we did, but what I was seeking
13  to determine was, were there any sales of those
14  properties after our effective date of value?  If
15  there were, we attempted to identify those sales
16  through MLS records, printed those MLS records,
17  which are included in that binder.
18    We then searched for analogous sales and
19  tried to identify at least one sale in close
20  proximity that would have been representative of a
21  comparable sale, a paired sale that was not
22  impaired, and then tested that against the
23  subsequent sales.
24    Q.  Why did you do that analysis after the
25  February 15th date of your expert report?

1    A.  Because I wanted to be able to address any
2  questions.  Some of -- some of that -- we identified
3  some of those post sales as part of the Priority
4  Claimants analysis within the initial analysis.
5  Some of those are included in the individual
6  claimant reports.
7    But as we discovered that there were
8  additional sales -- and as an example one of the
9  sales closed, you know, February 25th of 2019, after
10  the date that we had delivered the reports.  As I
11  started to identify those, I wanted to have a
12  complete view of when those properties sold to be
13  able to test our estimates.
14    Q.  Is your opinion any different -- is your
15  opinion, sitting here today, any different than it
16  was on February 15th as a result of that subsequent
17  analysis?
18    A.  I would need -- if you don't mind, may I see
19  Exhibit 3?
20    Q.  Yes.
21    A.  I think Exhibit 3 largely reflects similar
22  results as what we found, and so, no, that does not,
23  at this time, change my opinion.
24    Q.  Okay.  And we're -- we're going to have to
25  share Exhibit 3 for a few minutes, but -- so

1  Exhibit 3, is this a summary of the results of your
2  post February 15th, analysis?
3    A.  Really only with respect to the one column
4  entitled Percent Diminution Testing and the date of
5  subsequent sales, which we updated as part of that,
6  yes.
7    MR. BLOCK:  Oh, I see.  Yeah.
8    Q.  My colleague pointed out that the Excel cell
9  is minimized, so that some of the text is not
10  legible.  So if you look at the third one there, it
11  looks like there might be words underneath.  You
12  know, you might have to expand the cell a little
13  bit.
14    A.  Okay.
15    Q.  We can -- we can --
16    A.  On break I can have somebody --
17    Q.  Yeah.
18    A.  -- PDF me -- possibly PDF me a copy
19  expanding that cell on a break.
20    (Discussion off the record.)
21    Q.  Okay.  All right.  Let's -- let's get on the
22  same page about which priority claims still own the
23  property as of today's date.  Okay?
24    A.  Sure.
25    Q.  So if we can just share here, just go down

| | Page 54 |
|---|---|
| 1 | the line. So Miranda -- in your view, Miranda no |
| 2 | longer owns the property as of today's date. Is |
| 3 | that your understanding? |
| 4 | A. Yes. My notes indicate that there was a |
| 5 | foreclosure final judgment, and the house was |
| 6 | vacated on June 8th of 2018. I could check the |
| 7 | individual claimants, but I believe that the home |
| 8 | was foreclosed upon, and therefore, they no |
| 9 | longer -- correct. |
| 10 | Q. And that's consistent with my understanding |
| 11 | from the supplemental plaintiff profile forms, as |
| 12 | well. |
| 13 | A. That's a good start. |
| 14 | Q. Yeah. Yours is -- your sheet is easier to |
| 15 | work with if we agree. |
| 16 | So the Nunez family, they are also former |
| 17 | owners, in your understanding, correct? |
| 18 | A. Correct. |
| 19 | Q. And that's my understanding, too. |
| 20 | Who do you have next as a former owner? |
| 21 | A. Rosen Case 3. There are two Rosens. |
| 22 | Q. Yeah. Is that Kevin Rosen? |
| 23 | A. Kevin and Stacy Rosen, correct. |
| 24 | Q. We agree on that one. |
| 25 | Who is your next one? |

| | Page 55 |
|---|---|
| 1 | A. Marc and Jennifer Wites, Case Number 4. I |
| 2 | believe they're a current owner. |
| 3 | Q. Oh, sorry. Who is your next former owner? |
| 4 | A. Oh, okay. So you want to go through just |
| 5 | the formers? |
| 6 | Q. Just the former. |
| 7 | A. I know that this is an exhibit. Are you |
| 8 | okay if I make a note on -- notes on these? |
| 9 | Q. That will work. We're going to need another |
| 10 | copy anyway. |
| 11 | A. Okay. So Diane and David Griffin was a May |
| 12 | 2010 foreclosure. |
| 13 | Q. Okay. That's my understanding, as well. |
| 14 | A. Michael and Robyn Rosen, August of 2009, I |
| 15 | believe they sold the property. |
| 16 | Q. That's my understanding, as well. |
| 17 | A. Cathy and Steven Etter, September 28th, |
| 18 | 2016, I believe they sold the property. |
| 19 | Q. My understanding, as well. |
| 20 | A. Kelly and Lori O'Brien. |
| 21 | Q. That's my understanding, as well. |
| 22 | A. Janet Avery. |
| 23 | Q. My understanding, as well. |
| 24 | A. Mary and Rosalee Walls. |
| 25 | Q. My understanding on that one, too. |

| | Page 56 |
|---|---|
| 1 | A. Andrew and Dawn Feldkamp. |
| 2 | Q. That's what I have. |
| 3 | A. Gul and Deborah Lalwani. |
| 4 | Q. That's what I have. |
| 5 | A. Cassandra Yvette Marin. |
| 6 | Q. That's what I have. |
| 7 | A. And Deborah and David Deeg. |
| 8 | Q. Okay. That's what I have. And that is 13 |
| 9 | of the 20 Priority Claimants or couples who are no |
| 10 | longer owners of the property? |
| 11 | A. That is correct. |
| 12 | Q. Okay. So do you -- do you have the opinion |
| 13 | that those 13 former owners will experience |
| 14 | post-remediation stigma, as you calculate it in your |
| 15 | expert report? |
| 16 | A. Yes. That embedded within their damage -- |
| 17 | embedded within their damage analysis should be |
| 18 | consideration of any post-remediation stigma. |
| 19 | Q. I understand that's what you're saying, but |
| 20 | I'm asking about your calculations in your expert |
| 21 | reports. Okay. For the 13 former owners -- |
| 22 | A. Yes. |
| 23 | Q. -- people who don't own the property as of |
| 24 | today's date or a month ago, the date of your |
| 25 | report -- |

| | Page 57 |
|---|---|
| 1 | A. Yes. |
| 2 | Q. -- do you calculate post-remediation stigma |
| 3 | damages that those people, those 13 Priority |
| 4 | Claimants or couples, will experience upon the |
| 5 | future sale of their -- of a home they don't own? |
| 6 | A. You're asking me a question in a way that is |
| 7 | mischaracterizing what that damage represented to |
| 8 | them at the time of sale or at the time they lost |
| 9 | the property. |
| 10 | As I stated before, the damage that they |
| 11 | suffered or would have suffered at post-remediation, |
| 12 | had they had financial capacity to remediate or |
| 13 | otherwise, the damage that they would have suffered |
| 14 | is cumulative to the other damages that they |
| 15 | suffered at that -- at that time -- |
| 16 | Q. So -- |
| 17 | A. -- because it's embedded in all of the costs |
| 18 | to cure elements and the expectations that a buyer |
| 19 | would take, and the buyer would have discounted |
| 20 | that, knowing that when the buyer then subsequently |
| 21 | remediates and attempts to make a profit, they may |
| 22 | suffer market resistance on the other side. |
| 23 | Q. Okay. But the post-remediation stigma |
| 24 | damages that you calculate at 10 percent in your |
| 25 | expert reports -- |

Confidential - Subject to Further Confidentiality Review

Page 58

1    A.  Yes.
2    Q.  -- is it your testimony that 13 claimants
3  who do not own the home and, therefore, cannot sell
4  the home in a post-remediated state, with one
5  possible exception, is it your testimony that those
6  people will experience the 10 percent
7  post-remediation stigma impact that you calculate in
8  your expert report?
9    A.  My testimony and my opinion is that the
10  cumulative diminution in value is -- includes the
11  consideration of that post-remediation stigma, yes.
12    Q.  But we -- as we discussed earlier, that's
13  not in your reports.  I wanted to focus on the 10
14  percent stigma impact that you calculated and apply
15  for 20 Priority Claimant homes in your expert
16  reports, not work that you could have done in a
17  different report.  Okay?  We can ask it claimant by
18  claimant.  Okay?
19    A.  Well, if we're going to do that, do you mind
20  if I grab the Priority Claimant -- I mean, if we're
21  going to go claimant by claimant, can we look at
22  the --
23    Q.  We can do that, but I think we can make it
24  easier without getting out 20 binders.  Okay?
25    A.  I just don't know if I can answer that

Page 59

1  without --
2    Q.  Well, okay.
3    A.  -- the material in front of me.
4    Q.  So here's -- here's -- let me ask you this,
5  then.  Just conceptually, if the Mirandas sold their
6  home in -- or lost it to foreclosure in 2017, before
7  it was remediated --
8    A.  Yes.
9    Q.  -- are you testifying that they will sell
10  the home in 2019 as of the effective date of your
11  report and experience 10 percent stigma damages?
12    A.  No, that's not my testimony.
13    Q.  Okay.  And would that be the same answer for
14  anyone -- any Priority Claimant who sold their home
15  prior to remediation and does not own it today?
16    A.  Yes.
17    Q.  Okay.  All right.  I -- thank you.  We
18  can actually just put 3 --
19      MR. BLOCK:  Steven, you can have that.
20    Q.  So I want to focus, for the most part, on
21  the claimants who do own the properties as of today.
22    A.  Okay.
23    Q.  Okay.  Not entirely, but that leaves us --
24  if 13 of the 20 sold their homes, there are seven
25  claimants or couples who still own the home and

Page 60

1  might be in a position to experience
2  post-remediation stigma upon sale of the home,
3  correct?
4    A.  Correct.
5    Q.  Logically, that's just correct?
6    A.  Yes.
7    Q.  Okay.  All right.  And that would be the --
8  you might need that -- Nguyen, Hernandez, Wites --
9  you want to start over?
10    A.  No, that's okay.
11    Q.  Nguyen, Hernandez, Wites, Gody, Foster,
12  Martinez, and Chatmon, those are the current owners,
13  in your understanding?
14    A.  Yes.
15    Q.  Okay.  So if they -- if those seven current
16  owners or couples sell their homes in the future,
17  they might experience, in your opinion, a 10 percent
18  stigma impact upon sale of their home after it's
19  remediated?
20    A.  Yes.  But I've quantified that into an
21  actual dollar damage based on an effective date of
22  value of January 1st of 2019 based on the unimpaired
23  value of their homes as expressed as of that date.
24  So the 10 percent is quantified into a dollar
25  estimate as of a specific date.

Page 61

1    Q.  Okay.  Is that 10 percent estimate and
2  associated dollar value good for every date between
3  now and 2030?
4    A.  It's good as of the effective date because
5  it's a percentage of the unimpaired value.  So the
6  unimpaired value forms the basis of that estimate
7  and when multiplied by 10 percent, that becomes a
8  dollar amount.
9    Q.  So to understand the actual dollar amount of
10  the damages in July of 2019, do we need to update
11  your analysis of the value of the home?
12    A.  I intend to present testimony as the
13  effective dates that we provided the estimates.  So
14  I wasn't intending to provide testimony as of July
15  of 2019.  I would be testifying as to the value
16  damage as of the dates of value that are stated in
17  my report.
18    Q.  Okay.  And the date of -- or, excuse me, the
19  amount of damages could be different depending on
20  the date that -- value that you use?
21    A.  Yes.  As the dates change and as values
22  change, then that would change the estimate of
23  damages as of that new effective date.  That's
24  correct.
25    Q.  Okay.  Let's go back to Exhibit 1, which is

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/10/19 Page 222 of 319
Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/10/19 Page 18 of 99
Confidential - Subject to Further Confidentiality Review

Page 62

1  your general report.  And I'd like to -- do you have
2  that in front of you?
3      A.  I do.
4      Q.  Okay.  And if we can go to Page 3 together,
5  on Page 3 is one place where you summarize the scope
6  of your stigma opinions, correct?
7      A.  Yes.
8      Q.  And the method that you undertook?
9      A.  Yes.
10      Q.  Okay.  And if I understand correctly --
11  well, we need to go back a page.  Actually, let's go
12  back a page to Page 2, as well, and drill down on
13  the effective date.
14      So you write on Page 2:  "The effective date
15  of the study covers the time period December 1, 2009
16  through August 8, 2016 based on the relevant case
17  study evidence developed in this matter."  Correct?
18      A.  Yes.
19      Q.  And what you're saying there is the case
20  study you performed used home values that were dated
21  between December 1 of 2009 and August 8th of 2016,
22  correct?
23      A.  Correct.
24      Q.  And then you used interview methods, your
25  survey, to extend that date through a current

Page 63

1  February 2019 date, correct?
2      A.  Correct.
3      Q.  So if I understand correctly, you used
4  market data and your paired sales analysis for
5  December 1, 2009 through August 8th, 2016, and then
6  you used the survey to bring your results from
7  August 8th of 2016 to -- current through February of
8  2019, correct?
9      A.  I --
10      Q.  2019.
11      A.  I think there's that.  I think also the case
12  study analysis demonstrates that the impacts were
13  relatively consistent over time from 2009 to 2016.
14  So there is no reason for me to believe that between
15  2017 and '18, that those impacts didn't continue to
16  exist.  In other words, there was no systematic
17  declination in the impacts as a result of time or
18  geography.
19      So the -- my opinion is that the case
20  studies are representative of the time period.  I
21  factually describe what that time period is, but,
22  you know, upon reasonable belief and after analysis
23  of these case studies, it would seem to me that this
24  continues to hold true.
25      Q.  Did you -- prior to serving your expert

Page 64

1  report on February 15th, did you analyze market data
2  or perform a case study involving valuation dates
3  from August 9th, 2016 to February 15th, 2019?
4      A.  None of the case studies that we identified
5  that were remediated fell within that time frame.
6      Q.  Why is that?
7      A.  I don't know.  I don't know that we -- as we
8  were identifying the sales, we had -- we were
9  looking for sales all the way as current as
10  possible, and the identification of the control
11  sales just fell within that pattern.  There were --
12  I didn't -- we were not able to identify a
13  remediated control sale within the geographies
14  defined after August 8th of 2016.
15      Q.  You're saying that no homes in Florida that
16  had Chinese drywall and were remediated were sold
17  between August 9th, 2016 and February 15th, 2019?
18      A.  No, that's not what I'm saying.  What I said
19  was, when we -- when we were identifying the control
20  sales, we were not able to identify any that we
21  could see had been disclosed within the MLS listing
22  as having had Chinese drywall that were within those
23  date ranges.
24      We just didn't -- we were not able to
25  identify those sales through the MLS that had

Page 65

1  disclosure during that date.  I'm not saying that
2  none sold.  I presume there may be some, but we
3  didn't -- we weren't able to identify them.
4      Q.  Who looked in the MLS system for homes that
5  had Chinese drywall and were remediated and sold
6  between August 9, 2016 -- excuse me -- August 8th,
7  2016 and February 15th, 2019?
8      A.  That primary research was done by Joe
9  Melloni, who's here today, Yuliya Georgiva, and Juan
10  Gamio in my office.
11      Q.  You, yourself, did not go into the MLS
12  system and look for homes in that time frame?
13      A.  No.  I had them exporting.  These were --
14  these were lists of properties that we were scanning
15  through the comments to identify Chinese drywall.
16  There is no systematic way within the MLS to search
17  for a disclosure form or Chinese drywall.  We had to
18  do it by comment identification.
19      Q.  Well, we'll come back.
20      So if it's your belief that it was not
21  necessary to look for paired sales data between
22  August 9th, 2016 and February 15th, 2019, why did
23  you conduct the survey to examine that time period?
24      A.  I don't know that I testified it was my
25  belief that it wasn't necessary.  What I testified

Case 2:14-cv-02722-MLCF-DEK Document 52-4 Filed 01/17/25 Page 193 of 99

Page 66

1    was that I -- it wasn't possible.  We were not able
2    to identify any sales post August 8th, 2016 within
3    the datasets that we initially compiled.
4         I'm sure with enough time, effort, and pick
5    and shovel we probably could identify those sales.
6    We weren't able to do it within the time frame of
7    our study.
8         Q.  Mr. Graziano, who designed the case study
9    analysis that you did?
10       A.  I did.
11       Q.  Okay.  And who helped you with that?
12       A.  As I said, my staff, Joe Melloni, Yuliya
13   Georgiva, Juan Gamio, Paul Jones, Peter Kayworth,
14   all assisted in market research involved in the data
15   that's included within these case studies.
16       Q.  So when you say you designed the study, can
17   you tell me the specific elements of the study that
18   you, yourself, designed?
19       A.  I designed the entire study in terms of
20   research and methodology, and then I gave
21   instruction to my staff on the data and analysis
22   that we were seeking.  And then I managed that data
23   analysis as it came in, and I analyzed it within the
24   context of these control pairings.
25       The interview sheets that we conducted

Page 67

1    had -- in conjunction with these control pairings
2    were designed by myself, with input from Paul Jones,
3    who did the original draft of that with me.  And
4    then that survey was disseminated, a form of that
5    survey was disseminated to my staff and overseen by
6    me.
7         Q.  Did you have a written protocol for the
8    conduct of the study prior to beginning work on it?
9         A.  No.
10        Q.  Why not?
11        A.  One, time, but also because my staff and I
12   are located in a physical space where we're close,
13   and we were meeting every day on this case.  So
14   there wasn't any reason to write down the protocol.
15        We had a written script for the
16   confirmations.  We had an understanding of what the
17   study design was going to be to identify both
18   impaired and unimpaired control sales, identify
19   which markets those were in, geographically array
20   those, and then to identify unimpaired sales that
21   could be compared to the control sales.
22        Q.  When you began your research, did you assume
23   that you would find a stigma impact on
24   post-remediated homes?
25        A.  No, sir.

Page 68

1         Q.  Did you assume that you would not find an
2    impact?
3         A.  No, sir.
4         Q.  Did plaintiffs' counsel have any input into
5    the design of the study?
6         A.  No, sir.
7         Q.  Did you discuss with plaintiffs' counsel, as
8    you were conducting -- don't tell me what you said,
9    but did you discuss with them a design of your
10   study --
11        A.  No.
12        Q.  -- as it was ongoing?
13        A.  Not that I recall.
14        Q.  If we stay -- if we go back to Page 3, you
15   say in the middle that you found no published
16   appraisal in general real estate literature
17   involving case studies on the post-remediation
18   effect on the value of defective Chinese drywall.
19   Is that right?
20        A.  Yes, with respect to any findings and
21   diminution findings, that's correct.
22        Q.  And there was a lack of published literature
23   on studies of defective drywall pre- or
24   post-remediation?
25        A.  Yes.

Page 69

1         Q.  Okay.  So as far as you know, is yours the
2    first study to demonstrate a post-remediation stigma
3    effect from Chinese drywall?
4         A.  Well, I wouldn't know that because a lot of
5    these studies are conducted in conjunction with
6    litigation and are not readily available to me.
7         Q.  Okay.  Well, in the appraisal literature,
8    you're not aware of a study like yours that purports
9    to find a stigma effect after remediation of Chinese
10   drywall?
11        A.  That's correct.  I've -- I've not been able
12   to locate anything to -- of that nature --
13        Q.  What --
14        A.  -- in the appraisal literature.
15        Q.  What did you do to search the appraisal
16   literature?
17        A.  So we have -- the Louise T. Lum Library is
18   managed by the Appraisal Institute.  It's an online
19   index of all of the materials within the Lum Library
20   -- Library, I believe dating back to the 1980s.
21   That is indexed.
22        So we searched the Lum Library on various
23   keywords, such as defective drywall, Chinese
24   drywall, drywall.  We also searched under value
25   diminution, stigma, and reviewed the literature in

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/10/19 Page 224 of 319

Case 2:09-md-02047-MBN Document 13401-11 Filed 04/19 Page 90 of 99
Confidential - Subject to Further Confidentiality Review

Page 70

```
 1   that regard to see if there was any cross-reference
 2   on that literature within that dataset.
 3           And then we did a typical Google search, and
 4   I don't recall if we did a Westlaw search or not.  I
 5   don't -- I don't think we did Westlaw, a Westlaw
 6   search.
 7       Q.   You say in the next paragraph, beginning
 8   with "Our development," you're -- in that paragraph,
 9   are you describing the market survey that you
10   conducted?
11       A.   Yes.
12       Q.   And you describe that has a contingent
13   valuation method?
14       A.   Yes.
15       Q.   And you interviewed real estate brokers and
16   salespeople?
17       A.   Yes.
18       Q.   Okay.  And you say that the interview
19   process informed your correlation of why the impacts
20   are not uniformly measurable or distributed,
21   correct?
22       A.   Yes.
23       Q.   What do you mean there?
24       A.   So during the process of our interviews with
25   the various market participants as it related to
```

Page 71

```
 1   Chinese drywall, we discovered that some market
 2   participants, particularly real estate agents, were
 3   very adverse to even dealing with a property with
 4   Chinese drywall.  They believed that disclosure was
 5   absolutely mandatory and that there was always going
 6   to be a problem and always going to be a stigma.
 7           There were people on the other side of the
 8   fence that said, you know, as long as you have an
 9   engineer report, it's not a big deal, and, you know,
10   I don't know -- I don't know how much it would have
11   an impact.  Most of the brokers refused -- refused
12   to give us any type of percentage impact.
13           But what I can say is that based on a review
14   of all of the interviews that we conducted, it was
15   clear to me that market participants viewed the
16   problem differently, and as -- particularly as it
17   relates to the brokerage community, probably
18   informed their clients differently as to, you know,
19   measurable risks and value impacts.
20       Q.   So I think what you're telling me is that
21   some realtors or brokers do not think there is a
22   stigma impact after remediation of Chinese drywall,
23   correct?
24       A.   That's my findings, correct.
25       Q.   Okay.  And skipping down a couple lines, you
```

Page 72

```
 1   say -- this is now under your case study, you say
 2   that: "The analysis of the 20 case studies
 3   demonstrates a wide range of value impacts to
 4   properties that have completed effective Chinese
 5   drywall remediation from zero to 30 percent."
 6   Correct?
 7       A.   Yes.
 8       Q.   And is that your -- was that the finding of
 9   your case study, that the value impact ranges from
10   zero to 30 percent?
11       A.   Yes.  If you look at the individual value
12   diminution study by study, what you'll see that the
13   impacts vary, and some of them are zero, and some of
14   them are as high as 30 percent post-remediation.
15       Q.   Is it your testimony under oath that the low
16   side of the impact is zero?
17       A.   Yes.  I don't think -- I guess let me --
18   just so that I understand the question, are you
19   suggesting that people would pay a premium for
20   having had previous defective drywall?  Because that
21   would be the answer that would be nonzero, that
22   somebody would pay a premium.  That would be the
23   opposite of value diminution.  Is that the question
24   you're asking me?
25       Q.   I'm asking about what your results were.  Is
```

Page 73

```
 1   it your testimony that your results range from a
 2   value impact of zero to 30 percent?
 3       A.   Yes.  We did find sales -- we did find, in
 4   our paired sales analysis, that there were instances
 5   where the Chinese drywall did not have an impact.
 6   Yes, that's correct.
 7       Q.   All right.  Now, when you applied -- or you
 8   made damages estimates for the Priority Claimants --
 9   when you made damages estimates for the Priority
10   Claimants, did you account -- let me strike that.
11           You gave every Priority Claimant the same
12   damages estimate impact -- damages impact estimate
13   of 10 percent, correct?
14       A.   I did.
15       Q.   Okay.  Your damages estimates do not vary
16   like your data does, correct?
17       A.   Well, I correlate it to the 10 percent based
18   on the variance in the data.  So the data
19   demonstrated in that some cases, it might be zero.
20   In some cases, it might be 30.  The majority of the
21   data ranged within what I considered to be a tighter
22   range, and I correlated it to a 10 percent damage
23   impact, so --
24       Q.   But --
25       A.   There are things that could affect that,
```

1 right, supply and demand of homes in the market at
2 the time, if there was only one property of that
3 particular type.
4     Our interview of the realtors indicated that
5 in some cases, you know, the quality of the
6 renovations masked the impact. In other words,
7 people were buying a 2006 home in 2016, but the home
8 was completely renovated. So when you're comparing
9 that to similar homes that were built in 2006 that
10 hadn't been renovated, you're -- those impacts are
11 offsetting, right? People would rather say, well,
12 I'll buy a renovated home.
13     And you may just find a magic buyer. I
14 mean, there are instances where you find the one
15 buyer that doesn't have a big problem with it and
16 doesn't necessarily have an impact.
17     But what you're betting on if you don't
18 assess any -- if you don't assess any impact
19 whatsoever, what you're betting on is that all of
20 the Priority Claimants and all of the people within
21 this class of impairment would all find magic
22 buyers. And I find that not to -- not to be
23 credible.
24     So the 10 percent, you know, assumes full
25 disclosure, proper remediation, and represents the

1 general market level impacts that we would expect to
2 see based on the case studies.
3     Q. So the actual impacts, if any, that a seller
4 of a remediated home might experience could be
5 different than 10 percent based on all the variables
6 you just described?
7     A. It could be, but my estimate of damages is
8 also as of a certain date. So if somebody were
9 to -- let's just say, for instance, on a certain
10 date, I say it's a 10 percent impact on a $50,000
11 [sic] home. I'm quantifying that impact at $50,000.
12     Five or eight or nine years from now, they
13 sell the home for $900,000. Maybe it's only an
14 eight percent impact, but it's still the same
15 $48,000. They still suffered that quantified dollar
16 damage.
17     So it's my opinion that the 10 percent
18 reflects a fair statement of what the
19 post-remediation stigma is which, when applied as of
20 the particular value date, it estops the damage as
21 to a dollar amount and probably represents their
22 economic loss that they would suffer even in the
23 future.
24     Q. But in your actual case study, not all of
25 the remediated properties did experience a 10

1 percent reduction in value, correct?
2     A. Correct. And some of them were more, and
3 some of them were less. That's correct.
4     Q. Why did you still assign every single
5 Priority Claimant the same 10 percent value when
6 that's not what your data showed?
7     A. Because my estimate was informed by all the
8 data that -- and reflects what I considered to be,
9 in my professional opinion, the correct assessment
10 of a relevant damage that these property owners are
11 likely to suffer.
12     Q. Can you explain the math behind that,
13 please?
14     A. When you say the math -- I don't understand
15 the question. When you say the math behind -- are
16 you talking about the math behind the likelihood?
17     Q. Your data, as you describe it, shows impacts
18 from zero to 30 percent.
19     A. Correct.
20     Q. And yet you gave -- and that's more or less
21 consistent with what the realtors told you, which is
22 sometimes there's an impact, and sometimes there's
23 not an impact?
24     A. That's correct.
25     Q. But you chose to apply the same 10 percent

1 constant to every single Priority Claimant. So I'm
2 asking you to explain the math that gets you from no
3 impact to 30 percent and giving everyone that's a
4 Priority Claimant 10 percent.
5     A. So I don't know that I would classify it as
6 mathematical. But I think that within the case
7 study analysis, I've arrayed the range of impacts,
8 and I've looked at that across types of impact.
9     So in other words, we arrayed that by
10 geography. We arrayed it by time. We arrayed it by
11 price segmentation to see if there was any
12 systematic difference between -- in other words,
13 were all the homes in the lower end of range more
14 severely impacted than homes in a -- in a higher
15 price segment? Were homes in a particular geography
16 more -- more impacted than those?
17     And for each of those sortings, it didn't
18 appear to me that there was any systematic
19 difference between price segmentation by date or by
20 county, but the answer was clearly not zero. And
21 the variation at the higher end of the range, there
22 were some, maybe 25 or 30 percent that were higher.
23 But in seeking out what I considered to be a fair
24 estimate, I had to give consideration to both and
25 the variations in -- that happen in the normal

Page 78

1  market data.
2      So my estimate at 10 percent is based on my
3  review of these 20 case studies and the order of
4  magnitude of the various impacts and my professional
5  opinion and correlation as to the impacts.
6      Q.  You don't mean statistical correlation?
7      A.  No.  As I testified before, correlation
8  is -- I review the data, and I estimate based on
9  what I consider to be the -- what the data is
10 telling me.
11     Q.  So very briefly, there is no math that gives
12 you from a range of zero to 30 percent to exactly,
13 precisely 10 percent, correct?
14     A.  Well, there is math to do that, and if you
15 were to run the math --
16     Q.  That you did.  There's no math that you did?
17     A.  There's no math that I did to arrive at that
18 10 percent.
19     Q.  Okay.  Now, I think you testified a minute
20 ago that the effect isn't zero percent.  But isn't
21 that what -- if you look at Page 20 of your general
22 report, the low impact for at least four of the case
23 studies is zero percent?
24     A.  I'm sorry.  Could you restate the question?
25     Q.  So if you -- we're both on Page 20 --

Page 79

1      A.  Yes.
2      Q.  -- as it happens.  The low impact for four
3  case studies is zero percent, correct?
4      A.  Yes.  That's reflected there, yes.
5      Q.  And Broward 3 is three percent, which I --
6  you consider anything under five percent to be sort
7  of not a discernable effect, correct?
8      A.  Did I testify to that?
9      Q.  I -- well, I think -- I think you write it
10 in your report, yeah.  If you go to the bottom of
11 Page 21 and into Page 22 you say:  "Price variations
12 of five percent, plus or minus, would be considered
13 within the normal variation in the market with or
14 without detrimental conditions."
15     A.  Sure.
16     Q.  Okay.  So I think what you're saying there
17 is if the putative impact is five percent or less,
18 it's consistent with no impact at all.  That could
19 just be normal variation of the market, not stigma
20 damages.
21     A.  That's how I would view it.
22     Q.  Okay.
23     A.  Correct.
24     Q.  So if we -- if we go back to Page 20, the
25 low and the high impact for three of your case

Page 80

1  studies is basically consistent with no impact from
2  drywall at all, correct?
3      A.  Correct, out of 20.
4      Q.  Right.
5      A.  Three out of 20, right.
6      Q.  Did you assign zero stigma damages to three
7  out of 20 Priority Claimants?
8      A.  No.
9      Q.  Why not?
10     A.  Because the majority of the case studies
11 indicated that there was a damage, some of which
12 were in excess of 20 percent, and I rendered the
13 opinion based on analysis of this case study that if
14 I studied 20 case studies and three of them are
15 zeros and 17 of them were greater than five percent,
16 that, in my estimation, that would indicate that the
17 damage would have to be greater than five percent.
18     I then arrayed those on the high side level
19 the same way that you just did on the low side
20 level, and I said if seven of the 20 case studies
21 were greater than 20 percent, then the likelihood
22 that the damages might be greater than 20 percent is
23 actually more likely, right?  Seven out of 20 versus
24 three out of 20, it's more likely that the damages
25 would be greater than 20 percent.

Page 81

1      I considered this sort of normal variation
2  by other factors that ordinarily happens not only
3  just as a functions of the marketplace, but also a
4  function of the transparency of the data in the
5  marketplace, right?
6      So I have seven out of 20 that are greater
7  than 20 percent.  I have three out of 20 that are
8  less than five percent, n?e zero, and everything
9  else falls in the middle of that.  And so based on
10 that, I correlated to 10 percent.
11     Q.  What is the name of the methodology you used
12 to extrapolate from results that do not show a
13 consistent of 10 percent to giving every single
14 Priority Claimant 10 percent stigma damages?
15     A.  I don't know that there is a name of a
16 methodology that does that.  I regularly, as a part
17 of my practice and experience, assign values, both
18 for adjustment purposes and for analysis purposes,
19 based on looking at an array of data, reaching a
20 conclusion, and applying that conclusion to other
21 factors.  That's a normal part of my practice.
22     Q.  Can -- if we're -- if you stay with me on
23 Page 20, Page 20 is where you summarize the low and
24 high impact of post-remediation stigma damages in
25 your view, correct?

Page 82

1    A. Yes.
2    Q. Okay. And this is sort of the same table
3  that you present on a few other pages, but this is
4  organized a little differently, and a it's little
5  bigger and, therefore, more legible, fair?
6    A. It should be actually the same table, only
7  sorted on different factors.
8    Q. Yeah, yeah. Okay. Well, I like 20 because
9  it's -- the font is bigger, so it's a little easier
10  to read. So can we use that one?
11    A. Sure.
12    Q. Okay. So it looks to me -- and I want to --
13  I want to understand how you get to low and high
14  impact. But it looks to me like the highest and --
15  the highest impact you found was Broward 10,
16  correct, low impact of 48, high impact of 50
17  percent?
18    A. Yes. And I think there's a -- there
19  actually is an error on that particular case study.
20  I want to --
21    Q. Yeah. I wanted to ask you --
22    A. -- be able to modify that, because there's
23  a -- there's the -- in reviewing this, that was
24  actually a home that sold pre-remediation and then
25  post-remediation. And my notes in that case study

Page 83

1  reflect both numbers.
2      But when they prepared the final sheet on
3  the case study, they actually put the
4  pre-remediation discount, instead of the
5  post-remediation discounts. It's shown on my notes
6  in there, but that would need to be edited and
7  rearrayed.
8    Q. Right. And so if you turn with me to the
9  table for Broward 10, which is toward the back of
10  your report --
11    A. Yes.
12    Q. It's not numbered, but -- oh, is it? Do
13  you -- I think in the back of the general report, at
14  least in my copy.
15    A. Right. Probably in the back of the general
16  report, this sheet --
17    Q. I have these in the -- I have --
18    A. And I should, too. I don't know why --
19    Q. Okay.
20    A. -- my staff didn't --
21    Q. All right.
22    A. -- didn't --
23    Q. Well, let's --
24    A. -- give me the complete copy.
25    Q. Hold on. I might -- I might be able to help

Page 84

1  you out here. Yeah. This is clean.
2      So I'm going to give you just a clean copy
3  of your general report, and I'll let you find
4  Broward 10.
5    A. Okay.
6      (Discussion off the record.)
7      MR. BLOCK: That's Exhibit 1. And, Patrick,
8  do you have a copy?
9      MR. MONTOYA: Yeah.
10      MR. BLOCK: The tables at the back. Okay.
11  BY MR. BLOCK:
12    Q. Are you there?
13    A. I am.
14    Q. Okay. And so the mistake in the Broward 10
15  data is that your staff used the pre-remediation
16  value for the control home, correct?
17    A. That's correct.
18    Q. Okay. And that's not a mistake you caught
19  before signing your expert report?
20    A. No, because these case studies were -- these
21  case studies were formatted and published as we were
22  working on them, and I had Broward 10 -- in the
23  exchanged material, you'll see I had both -- I had
24  both indications in my notes here, and it just
25  didn't get translated into this chart. So I did not

Page 85

1  catch the error on that --
2    Q. Okay.
3    A. -- before it got translated into the report.
4    Q. So the pre-remediation sale price that you
5  used in your report and that's reflected on the
6  chart in Page 20 of your general report is $390,000,
7  but the post-remediation sales price is actually
8  755,000, correct?
9    A. That's correct.
10    Q. Okay. Have you done the math using the
11  correct value for the control property of $755,000?
12    A. Yes. I had actually done the math in my
13  work papers. It just didn't get translated into the
14  final number. And the math is 2.6 to 5.6 percent,
15  low to high --
16    Q. Okay. And that's --
17    A. -- based on the correlated value of 775 to
18  800,000.
19    Q. And that's basically no effect, correct?
20    A. I mean, the high is greater than five
21  percent, but essentially, that would -- that would
22  indicate a nominal effect, correct.
23    Q. Okay. So your highest data point is
24  actually either nominal or not meaningful at all,
25  correct, no impact?

Page 86

1    A.   Right.  I would remove this 48 to 50 from
2   this and replace that with 2.6 percent to 5.6
3   percent, at which point we can agree to classify
4   that as being -- one, two, three, four, five --
5   five -- I'm sorry -- one, two, three -- four out of
6   the 20 case studies that would be, you know, less
7   than five percent impact.
8    Q.   Okay.
9    A.   And/or zero.
10    Q.   Thank you.  Is there -- are there any other
11   mistakes that you're aware of on the sheet for
12   Broward 10?
13    A.   Yes.  There was a display entry -- there was
14   a display entry problem, Comp Number -- control
15   subject -- I'm sorry.  The Unimpaired Comparable
16   Number 1 was duplicated twice, and that display
17   error, that Comp 1, was actually in Parkland
18   Estates, 10430 Majestic Court in Parkland.  And so
19   the -- what the -- there was a duplication of
20   Comparable Number 2 into Comparable Number 1.
21    Q.   Let me see if I understand.  What I see in
22   the copy that I have of the table for Broward 10 is
23   that 7003 Lost Garden Terrace in Parkland is listed
24   twice.
25    A.   That's correct.

Page 87

1    Q.   Okay.  And you're telling me that -- and
2   because it's listed twice, 7003 Lost Garden Terrace,
3   it's entered twice into the calculation of the
4   average and the concluded value range, correct?
5    A.   That's correct.
6    Q.   Okay.  So it's double-counted?
7    A.   Well, it's not double-counting.  The low and
8   the high is based on the lowest adjusted sale price
9   and the highest adjusted sale price -- oh, the
10   comparable sale price average may be affected.
11   You're correct.
12    Q.   Okay.  All right.  And so are you telling me
13   that one of those references to 7003 Lost Garden
14   Terrace should refer to a different property?
15    A.   Correct.  If you look at my work papers that
16   were exchanged here, the Unimpaired Comp Number 1
17   and my adjustments to those unimpaired comparables
18   are included in Broward -- in the Broward 10 case
19   study with my hand notes on them.
20       That reflects the development of that sale
21   and the adjustments that I made to that sale against
22   all of -- with all of the other sales.  When that
23   was translated into the display copy, there was a
24   copying error, and it just didn't carry over Comp 1.
25   But in my work papers, I have the relevant dates.

Page 88

1    I also noted that there was some discrepancy
2   in one of the adjustments that I had made for the
3   number of bedrooms.  You'll see a Comp 4 had six
4   bedrooms, and I had made an adjustment in my work
5   papers, and they didn't translate that adjustment
6   into the -- into the grid.
7    Q.   Could you -- could you show me your work
8   paper of Broward 10?
9    A.   Sure.
10    Q.   And is this something that you produced to
11   us?
12    A.   Yes.
13    Q.   Okay.  And can you just turn it so I can --
14    A.   Sure.
15    Q.   -- see it on the screen?
16    A.   No problem.
17    Q.   So one -- so it looks like the second 7003
18   Lost Garden Terrace should refer to 10925 Northwest
19   71st Court in Parkland; is that correct?
20    A.   I'm sorry, I lost you.
21    Q.   Well, so if you look at the copy I have --
22    A.   Yes.
23    Q.   -- of your Broward 10 table --
24    A.   Yes.
25    Q.   -- we have two 7003 Lost Garden Terraces,

Page 89

1   and one of those, are you telling me, should be a
2   different property that's at 10 -- no, it's --
3   10925 is on here.
4    A.   10430 Majestic Court.
5    Q.   10430 Majestic Court.
6    A.   In Parkland --
7    Q.   Okay.
8    A.   -- should have been Comp 1.  And what you'll
9   see is that Comp 2 had been copied twice.
10    Q.   Okay.
11    A.   So this has been supplemented.  I did an
12   errata sheet here.  I did an errata sheet here.  I
13   dated it 3/16 when we discovered the error.
14    Q.   Okay.
15    A.   And I made the relative adjustments, and I
16   calculated the low and high impact.
17    Q.   All right.  I -- and this is in Exhibit 4
18   that we're copying?
19    A.   You have copies of all that.  I would tag --
20   let's tag this.
21    Q.   Yeah, let's tag that.
22    A.   This is an errata sheet that I will provide
23   a copy of to you.
24    Q.   Okay.
25    A.   But you already have the work paper --

Page 90

1    Q.  Yeah.
2    A.  -- copies.
3    Q.  I'm going to -- just for recordkeeping
4    purposes, we're going -- we can make that Exhibit 5.
5    That's the errata sheet --
6    A.  Sure.
7    Q.  -- for Broward 10.
8        (Graziano Exhibit 5 was marked for
9    identification.)
10   BY MR. BLOCK:
11   Q.  Okay.  And so can you walk me through your
12   math here?  Well, in the errata sheet, it looks like
13   you're still using the pre-remediation sale price
14   for the control home, 6935 Long Leaf Drive.
15   A.  No.  We just -- we displayed it.  It's
16   displayed in both, but the calculations and the
17   percentages are against --
18   Q.  Based on the --
19   A.  -- the 775.
20   Q.  Okay.
21   A.  Or, I'm sorry, 755.
22   Q.  755.  Okay.  And so when we have the correct
23   sale price for the remediated home at 8935 Long Leaf
24   Drive and we only have one version of Lost Garden
25   Terrace, 7003, and we have 10430 Majestic Court and

Page 91

1    the other three comps, you get an average of
2    727,800, correct?
3    A.  Correct.
4    Q.  And that is lower than the sale price of the
5    remediated home, correct?
6    A.  Yes.  But that average is -- that average is
7    an average of the overall adjusted, which includes
8    Comp Number 3 that was really given much less weight
9    in the analysis.
10   Q.  We're going to come to that, but just
11   facially, when you corrected the table for Broward
12   10, the remediated property sold for more than
13   average of the comparable properties, correct?
14   A.  Sure.
15   Q.  Okay.  So how do you get from average to the
16   next entry for high and low?
17   A.  Well, the high and the low is just that.
18   It's the maximum adjusted price along the right-hand
19   column where it says "adjusted sale price."
20       So the adjusted sales price considers all
21   the material differences that affect value that
22   we've made adjustments for, number of bedrooms,
23   number of baths, the lot size, the average -- the
24   condition of the home, the age of the home.  All of
25   those result in adjustments that are applied against

Page 92

1    the respective comparable's price.  That adjusted
2    sale price then has a maximum and a minimum.  And so
3    the high is 835, and the low adjusted sales price is
4    805.
5    Q.  Okay.  And so in this case, Broward 10, the
6    remediated home sold for $250,000 than the lowest
7    comparable home that never had drywall, correct?
8    A.  Correct.
9    Q.  How do you get from the average and the high
10   and the low to the concluded value range that has a
11   high and a low?
12   A.  Right.  So we look for those properties that
13   are most comparable, those that tend to have, you
14   know, adjustments that are best supported.  And then
15   also looking at the range in the comparables, I have
16   five adjusted sales prices, 795,000, 804,000,
17   505,000, 835,000, and 700,000.
18       So amongst those comparables, if -- I'm
19   looking for a correlation that -- I'm saying, what
20   should this property have sold for unimpaired?  I'm
21   placing most weight on the comparables that were in
22   the Parkland Golf & Country Club.  That's Comparable
23   Number 2 at 804,000.
24       And I'm also looking at the overall
25   magnitude of the various net adjustments and saying,

Page 93

1    well, you know, we made some adjustments for --
2    large adjustments for location.  What are the other
3    adjustments that reflect a five bedroom,
4    four-and-a-half bath on half-acre to three-quarters
5    of an acre in good condition that were built in
6    2007, and -- you know, recognizing that some of
7    these homes -- the $700,000 correlation was built in
8    2000.  The 505,000 built in 2004.
9        So really, the first two comparables reflect
10   the closest in age to the subject property, and so
11   that ranged from 795 to 804.
12       And then, again, looking at the balance of
13   the three comparables, I've really placed most
14   weight on the first two comparables with support
15   from Comparables Numbers 4 and 5 and placed almost
16   no reliance on Comparable Number 3.  I mean, it's
17   out of range.  There is likely something in that
18   data that we either didn't know about or that
19   couldn't be confirmed.
20   Q.  So the explanation that you just gave for
21   how you arrived at the concluded value range, is
22   that written down anywhere in your expert reports?
23   A.  No.  It's part of the body of knowledge of
24   how, you know, real estate is analyzed.  I mean,
25   that's the way that brokers operate.  It's the way

Case 2:09-md-02047-EEF-MBN Document 23363-31 Filed 11/18/19 Page 230 of 319
Case 2:09-md-02047-EEF-MBN Document 23363-31 Filed 11/18/19 Page 96 of
99
Confidential - Subject to further confidentiality review

Page 94

1  that -- if you went to a real estate broker and
2  said, what do you think the price of my home is, the
3  real estate broker is going to follow similar
4  methodology. They're going to go out. They're
5  going to do a CMA. They're going to show you the
6  last five homes in your neighborhood that sold.
7      They're going to say, you know, your home is
8  a little nicer, it's got one extra bedroom, but your
9  bedrooms are a little small and we're going to do --
10  and so they go through this process of comparing all
11  the features of the home and how the buyers might
12  react and then they render an opinion as to what
13  they think that they could sell your home for. And
14  then you say, well, I want $50,000 more. So they
15  take the listing and they let market set the price
16  of the home.
17      Q.  So the short answer is that that process is
18  not written down anywhere in your expert reports?
19      A.  No. It's part of my body of knowledge.
20      Q.  Did you write that process down for each of
21  the 20 case studies in any of the notes or
22  documentation that you have produced to us or
23  brought with you to the deposition or have at your
24  office?
25      A.  No. It's in the book The Appraisal of Real

Page 95

1  Estate.
2      Q.  But the -- but the math that you did and
3  analysis that -- by which you determined that some
4  comparables are more comparable than others, that's
5  not written down anywhere?
6      MR. MONTOYA: Objection; asked and answered.
7      Go ahead.
8      A.  It's part of my training and experience.
9  That's what I do. That's the -- that's the training
10  and experience that I have that allows me to do what
11  I do. It's what makes me an expert.
12      Q.  What's the difference between what you do
13  and what you did here and what a real estate agent
14  or broker does?
15      A.  Well, a real estate agent or a broker
16  obviously is responsible for assisting in pricing
17  the home, but the process is largely similar. When
18  a real estate broker or sales agent is conducting a
19  comparable market analysis, they're going to look at
20  homes that recently sold in the market and use
21  the -- make adjustments for the various features of
22  the homes to indicate what the likely price -- the
23  selling price of their principal's home would be in
24  the marketplace.
25      Q.  So if we go back really quickly to the

Page 96

1  uncorrected Broward 10, the one that's in your
2  expert report --
3      A.  Okay.
4      Q.  -- and where we do have two versions of 7003
5  Lost Garden Terrace, can you -- can you tell me why
6  you have a $50,000 price adjustment, an upward value
7  adjustment, for the first iteration of 7003 and a
8  $50,000 negative adjustment for the second version
9  of 7003?
10      A.  Yes, because all of the -- as I testified --
11  maybe I wasn't clear. I'll try to be clear again.
12  The comparable information along that row was what
13  was transposed. The actual adjustments, which is in
14  a separate line, were not changed. So if you
15  compare Exhibit 5 to the sheet that's in Exhibit --
16      MR. MONTOYA: 1.
17      A.  -- 1, what you'll see is that the adjustment
18  carried over. It's the labels of that comparable
19  that didn't carry over.
20      Q.  So I'm not sure I'm reading that the same
21  way, because if you go to original Broward 10, the
22  one in your report --
23      A.  Uh-huh.
24      Q.  -- the price -- for both versions of 7003
25  Lost Garden Terrace, the price is the same,

Page 97

1  $849,000. The date of sale is the same, 3/4/2010.
2  The square feet are the same. The bedrooms are the
3  same. The bathrooms are the same. The lot sizes
4  are the same. Everything is the same.
5      A.  Okay.
6      Q.  Right? And that's different than what
7  you're saying the real comp should have been, isn't
8  it?
9      A.  Okay. Let's make sure we're talking about
10  the same thing. There is a row that has the
11  address.
12      Q.  Uh-huh. For 7003?
13      A.  Correct. And we're clear on what rows and
14  columns, right?
15      Q.  Uh-huh.
16      A.  So there is a row that has the address, and
17  when you carry that row all the way across, that row
18  in the display copy of this material was copied
19  incorrectly.
20      The row immediately below it are the
21  adjustments. And those adjustments relate to what's
22  above, but that row was not incorrectly copied. In
23  other words, Exhibit 1 and the errata sheet, those
24  adjustments match exactly. So the row above it,
25  that's wrong, those adjustments don't relate to

Page 98

1   that.
2       Do you understand?
3       Q.  So -- okay.  I think -- I think I
4   understand.
5       A.  It's just a display -- it's just a display
6   error.
7       Q.  Yeah.  Okay.  Okay.  All right.  Who made
8   the decision about how much to adjust each one of
9   the comps for subdivision, date of sale, square
10  foot, bedrooms, so on?
11      A.  I did.
12      Q.  Every single one?
13      A.  Yes.
14      Q.  For all 20 case studies?
15      A.  Yes, sir.
16      Q.  Did you have any help from anyone on your
17  staff?
18      A.  Not other than if I needed support, mapping
19  support.  You know, we looked at various maps, and I
20  had the staff prepare maps to understand the
21  locational adjustments in each of these -- you know,
22  where these sales were relative to one another and
23  relative to the control sale.
24      In some cases, we did some supplemental
25  analysis.  I know in this case, you know, the golf

Page 99

1   course had a large influence on the value.  And so,
2   you know, we did some supplemental research on golf
3   course premiums and which properties were within
4   Parkland Estates Golf & Country Club versus Parkland
5   Isle versus Grand Cypress.
6       Q.  If you go back to the table on Page 20 for a
7   minute.
8       A.  Sure.
9       Q.  The lowest low impact on the table on Page
10  20 is zero percent, correct?
11      A.  The lowest low impact is zero percent.
12      Q.  All right.
13      A.  Yes.
14      Q.  But if you actually look at the underlying
15  tables, you, in some cases, found a negative impact;
16  in other words, a price benefit for the remediated
17  homes compared to comps, correct?
18      A.  I don't know that that's true, but that's
19  probably true.  I did the math.  So if that -- you
20  know, if the home did sell higher than what I
21  considered to be the correlated unimpaired value,
22  then I did that math, and it may have reflected a
23  negative indication.  But I certainly don't believe
24  that anyone was paying a premium as a result of the
25  prior existence of drywall, so I correlated to -- I

Page 100

1   showed that as zero.
2       Q.  We'll come back to that.
3       If you can turn with me to the table for
4   Broward 3 toward the back -- you're going to need
5   the --
6       A.  Oh, thank you.
7       Q.  -- copy there.  And you can keep Table 20 in
8   front of you that I'll be using.  Okay.  So are you
9   at Broward 3?
10      A.  Yes.
11      Q.  The low impact that you found in the
12  underlying data for Broward 34 is negative 1.8
13  percent?
14      A.  Yes.
15      Q.  Okay.  And in principle, that means that the
16  remediated home sold for 1 -- excuse me -- 1.8
17  percent more than the comp hopes that never had
18  drywall, correct?
19      A.  Well, no.  In principle, what it means is
20  that I reflected a concluded value range to the
21  subject.  Based on my concluded value -- my low
22  concluded value range to the subject unimpaired,
23  that means that it sold more than what I would have
24  considered to be the low impact.
25      Q.  But just very simply, when the low impact --

Page 101

1   well, really, when either impact, high or low, is a
2   negative number, that means the remediated home sold
3   for more than the comp's home -- comp homes,
4   correct?
5       A.  More than the indicated range that I -- that
6   it was my opinion would be the subject unimpaired.
7       Q.  Right.  And in plain English, what that
8   means is the remediated home sold for more than the
9   comp homes, correct?  That's what a negative number
10  means?
11      A.  No, because again --
12          MR. MONTOYA:  Objection.
13      A.  -- let's look at Broward, Page 3.  Just to
14  your question, you said:  Does that mean that the
15  remediated home sold for more than the comp homes?
16      Well, no.  The control sale sold for
17  814,000.  Comp 1 on Broward 3 sold for 845.  Comp 2
18  sold for 837.  So in that case, it sold for less --
19      Q.  Right.
20      A.  -- against those adjusted prices.  Comp 3,
21  my adjusted price was 794.  Comp 4, my adjusted
22  price was 720.  So it did sell for more than those
23  two, but I can't make a general statement that the
24  unimpaired some hold -- home sold for more than all
25  of the comparables, because that's not true.

| Page 102 | Page 104 |
|---|---|
| 1  Q.  I think we're talking about different | 1  A.  Correct, but this is a perfect example.  If |
| 2  things. | 2  you look at Tampa 27, I have three comparables, the |
| 3  A.  Okay. | 3  adjusted prices of the comparables are 130, 131,000 |
| 4  Q.  So your concluded value range, the high and | 4  and 92,000.  That 92,000 represents the lower range |
| 5  the low, that is your, sort of, estimate of where | 5  of the three comparables.  So I reflected that.  For |
| 6  the comparable homes that are most like the | 6  credibility and to demonstrate that there is |
| 7  remediated home sold, correct? | 7  variability.  But if you really look at that |
| 8  A.  No.  That is my estimate of what I believe | 8  comparable, it's substantially larger, and I made a |
| 9  the subject property would have sold for unimpaired | 9  size adjustment, and that size adjustment at $38,000 |
| 10  based on a review of the comparable data.  It | 10  represents the bulk of the difference between the |
| 11  doesn't say anything about the value of the | 11  low and the high.  And what that really means is |
| 12  comparable homes.  I'm adjusting all the comparable | 12  that that comparable property didn't get a premium |
| 13  homes to the subject property to make them analogous | 13  for the additional square footage.  In other words, |
| 14  to what the subject property should sell for | 14  that comparable property -- the other properties |
| 15  unremediated. | 15  that were smaller were selling for 120, 121,000, and |
| 16  Q.  So the concluded value range item is | 16  that property got 126,000, so they really only got a |
| 17  actually your estimate of what the remediated home | 17  four or $5,000 premium.  And so in correlating, I |
| 18  should have sold for in a world where it never had | 18  mean, if I were to do a single point appraisal and I |
| 19  drywall in the first place -- Chinese drywall in the | 19  had the three comparables, I would have called the |
| 20  first place? | 20  value 130,000 unimpaired. |
| 21  A.  Perfect.  I wish I had said that five | 21  Q.  So just a factual question. |
| 22  minutes ago. | 22  A.  Sure. |
| 23  Q.  But turning back though to the percent value | 23  Q.  That is low value, that impact of negative |
| 24  diminution, when there is a negative number in high | 24  29 percent -- that's not reflected on the table on |
| 25  or low, that means what? | 25  page 20, is it? |

| Page 103 | Page 105 |
|---|---|
| 1  A.  That means that my low estimate of what I | 1  A.  No, it's not.  I only demonstrate -- I only |
| 2  thought the subject might sell for unimpaired, that | 2  put the percentage impacts at that point on page 20, |
| 3  it sold for more than my low estimate of what I | 3  I believe. |
| 4  thought the subject might sell for unimpaired. | 4  Q.  You put zero percent instead of negative 29 |
| 5  Q.  All right.  So Broward 3 has a negative | 5  percent, correct? |
| 6  number.  It's the low column, it's a negative 1.8 | 6  A.  Correct.  But again, it's not my position |
| 7  percent, correct? | 7  that anything could be negative because that would |
| 8  A.  Correct. | 8  imply that somebody is paying a premium for Chinese |
| 9  Q.  If you look at page 20, do you reflect that | 9  drywall and I don't think that the data demonstrates |
| 10  negative number on the table there? | 10  that. |
| 11  A.  No. | 11  Q.  Okay.  So your math shows negative 27 |
| 12  Q.  Okay.  Turn with me, if you would, please, | 12  percent but you choose to disagree with that because |
| 13  to -- keep going, Tampa 27.  Are you there? | 13  you don't believe that be true? |
| 14  A.  I am. | 14  MR. MONTOYA:  Objection; mischaracterizes |
| 15  Q.  Okay.  And the low impact -- | 15  his testimony.  Go ahead. |
| 16  MR. MONTOYA:  Give me a minute.  I'm sorry. | 16  A.  I'm not suggesting that at all.  My math is |
| 17  Tampa 27? | 17  calculating based on the range.  I intentionally put |
| 18  MR. BLOCK:  Uh-huh. | 18  a range to be able to demonstrate credibility in |
| 19  MR. MONTOYA:  Got it.  Thank you. | 19  understanding that these concluded values are |
| 20  Q.  The low impact is a negative 29 percent, | 20  estimates and those estimates can vary to a certain |
| 21  correct? | 21  extent, and so all of that is -- in this case, I |
| 22  A.  Yes. | 22  don't think a zero is inappropriate.  I think if I |
| 23  Q.  And that low impact of negative 29 percent | 23  look at this conclusion, I would have concluded -- I |
| 24  is also not reflected on Table 20, excuse me, the | 24  would have concluded -- I just as easily could've |
| 25  table on page 20, correct? | 25  concluded, based on the comparable data here, to a |

Page 106

1 single point in value at 130,000.
2 Q. But you actually concluded that the low
3 impact was negative 29 percent and chose to omit
4 that from the table on page 20.
5 A. I didn't intentionally omit that. That is a
6 mischaracterization. I included these charts --
7 Q. It's not on the table in page 20, is it?
8 MR. MONTOYA: Same objection.
9 A. It's not on the table on page 20 because as
10 I've testified where the impacts were negative, I
11 reflected that as zero in the tables within the
12 report, but I did not conceal that in any way. All
13 of these materials were included in the addendum --
14 appendix of this report, all the support material is
15 included. There is no intent to, in any way,
16 manipulate the data or anything else. I don't know
17 if that's what the attempt to characterize what I'm
18 doing but I've testified to you that I don't think
19 Chinese drywall conveys a premium. If it doesn't
20 convey a premium, then if the answer is negative, it
21 has to be zero.
22 Q. So -- but your data for Tampa 27, as you
23 wrote it down and gave it to us under oath, shows a
24 low impact of negative 29 percent, instead of
25 reflecting that in the table on page 20 in the body

Page 107

1 of your report you change negative 29 percent to
2 zero percent because you don't believe in the
3 negative 29 percent, correct?
4 MR. MONTOYA: Asked and answered multiple
5 times. Go ahead.
6 A. Okay.
7 Q. All right. So if you turn with me to Fort
8 Myers 23.
9 MR. MONTOYA: Before or after --
10 Q. Real quick -- it is actually three or four
11 before -- let's stay with Tampa 27 for a second, in
12 the notes it actually says no impact indicated,
13 correct?
14 A. Yes.
15 Q. And that's not reflected in the table on
16 page 20, is it?
17 A. Well, that's reflected -- it is reflected
18 because if you see what I did was I highlighted in
19 gold those that had a -- you know, a nominal impact.
20 You and I previously talked about those with zero
21 impacts, and part of what I was doing was to study
22 how many of those case studies potentially impacted
23 no impact. So by virtue of the fact that all the
24 zeros are colored, obviously with the exception of
25 the errata on Broward 10 that would be 2.6 to 5.6,

Page 108

1 but again, that wasn't zero so I probably wouldn't
2 have colored it, you know, the ones that have five
3 percent plus or minus of an impact to zero or even
4 negative, I colored those. If I had put the
5 negatives there, I would have still colored them. I
6 would have still concluded that those case studies
7 really didn't demonstrate a demonstrable impact on
8 value. That the data demonstrates -- that that
9 particular remediated home was probably not impacted
10 by the existence of -- and disclosure of the Chinese
11 drywall.
12 Q. Okay. So there are four case studies on the
13 table on page 20 that are colored and after you
14 corrected Broward 10, that should be colored as well
15 as basically showing no impact from Chinese drywall,
16 correct?
17 A. Maybe. It's not zero. I mean, I really
18 colored the zeros of where the low impact, you know,
19 where the low impact was zero and the high impact
20 was, you know, greater than five. I could color it,
21 sure.
22 Q. Sure. So that would take us up to five out
23 of the 20 or 25 percent of the time in your case
24 study there was no effect from Chinese drywall after
25 remediation?

Page 109

1 A. Right. 25 percent of this sample, that's
2 correct.
3 Q. Okay. I want to go back to the tables to
4 the end, Fort Myers 23, which is three or four after
5 Tampa 27. Are you there?
6 A. I am.
7 Q. And the high and low impact are both
8 negative numbers, correct?
9 A. Yes.
10 Q. And that is not reflected on Table 20, on
11 Table 20 you listed both of those high and low as
12 zeros instead of negative numbers, correct?
13 A. Correct.
14 Q. I want to drill down a little bit.
15 A. May I get a cup of coffee.
16 MR. BLOCK: Yeah. Let's take a break.
17 THE VIDEOGRAPHER: Off the record, 12:20.
18 (Recess from 12:20?p.m. until 12:38?p.m.)
19 THE VIDEOGRAPHER: On record, 12:38.
20 BY MR. BLOCK:
21 Q. Just a couple more questions about the table
22 on page 20 and then we'll move to a different topic.
23 If we look at just the low impact column,
24 Mr. Graziano, am I right that there are one, two,
25 three, four, five, six -- seven that are explicitly

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/18/19 Page 234 of 319
Case 2:09-md-02047-EEF-MBN Document 23363-31 Filed 11/26/19 Page 30 of 99
Confidential - Subject to Further Confidentiality Review

| Page 110 | Page 112 |
|---|---|

**Page 110**

1 labeled as zero, one that's two percent, one
2 that's three percent, one that is five percent, so
3 that would be 10 that are five percent or less on
4 the low impact side?
5 A. Seven zeros, three that are less than five
6 percent on the low impact, not accounting for
7 Broward 10, which we had -- which by amendment would
8 be a 2.6 therefore less than five, so that would
9 actually be four.
10 Q. So that would take us to 11 -- 11 of the low
11 impact data points on the table on page 20 would be
12 effectively no impact after remediation, correct?
13 A. Correct, based on the correlation of the low
14 end of the value range. The interpretation there
15 would be, you would have to be correlating to the
16 lowest end of the value range in expressing an
17 unimpaired value to the control sale.
18 Q. But what that means in plain English is that
19 on the low impact side in your data, a little more
20 than half the time there is potentially no price
21 difference between a remediated home and a
22 comparable home that never had Chinese drywall,
23 correct?
24 A. If by that the low impact is the -- is --
25 would ultimately be the correlated value of the

**Page 112**

1 Priority Claimants, how did you account for the fact
2 that 11 out of 20 times on the low impact side there
3 is no effect from Chinese drywall post-remediation?
4 A. Well, again, the conclusion in this report
5 was to look at the 11 out of 20 on the low impact.
6 The same analysis could be said on the high impact
7 and I could say that out of the 20, 17 of the 20
8 indicated an impact greater than five percent in the
9 order of magnitudes 12, 13, 15, up to 28 percent.
10 So in looking at that, the way in which I accounted
11 for it is, I arrayed the low impacts, I arrayed the
12 high impacts, I considered the variability in that
13 data and when I correlated the 10 percent that
14 considers the array of data in the low and the array
15 of data in the high.
16 Q. So in reality or in the reality of your
17 data, sometimes the effect is nonexistent from
18 Chinese drywall, correct?
19 A. There are cases, I testified before, that
20 you find a magic buyer and they like the house and
21 they don't discount the home and there are going to
22 be instances like that. But not in the majority of
23 the cases, the fact is that even at the lowest
24 impact level in my analysis -- I'll give you the
25 precise, for the record -- 45 percent of the cases

| Page 111 | Page 113 |
|---|---|

**Page 111**

1 home, that's correct.
2 Q. And it was your decision to use a low impact
3 column and include the low impact in your analysis,
4 correct?
5 A. Yes, sir.
6 Q. And so, if I just look at your low impact
7 data and take that for what it's worth, I would see
8 that 11 out of 20 times there is no effect from
9 Chinese drywall?
10 A. That's what the data indicates, yes.
11 Q. Do you say that anywhere in your expert
12 report?
13 A. I narrate in a number of instances where the
14 impacts were zero, so I don't know if I get to the
15 11 of the 20, but I prepared a number of analyses
16 that demonstrated the number of case studies that
17 suggests high or low impact boundary, but I don't
18 know if I specifically addressed the 11 of the 20,
19 which even in analyzing the data at the time it
20 would have been 10 out of the 20. I don't know that
21 I said --
22 Q. You correctly calculated Broward 10 would be
23 11 out of the 20?
24 A. Correct.
25 Q. When you made damages estimates for the

**Page 113**

1 even in the lowest analysis, 45 percent of the cases
2 demonstrated an impact of five percent or greater.
3 And on the highest, right, because that's the
4 inverse, nine of 11 would be 45 percent. And so if
5 11 out of the 20 demonstrated an impact of five
6 percent or less, then nine out of the 20
7 demonstrated five percent or greater, so in 45
8 percent of the cases, under the most -- the lowest
9 testing possible, 45 percent of those cases
10 demonstrated an impact greater than five percent.
11 And then on the high side impact, 17 out of
12 the 20 or 85 percent of the time on the high impact
13 side, the numbers were greater than five percent,
14 and in most cases there is a percentage there which
15 I could recalculate probably greater than 70 percent
16 of the time the number was greater than 10 percent.
17 If I look at that range of impacts and I correlate
18 to 10 percent, I think that's a reasonable
19 interpretation of the data.
20 Q. So it's important to you that you observed a
21 result in 45 percent of your data on the low impact
22 side?
23 A. It is.
24 Q. Okay. So that -- so when something happens
25 45 percent of the time in your study, that's a

Page 114

1  meaningful result?
2    A.  That's a different question.  You said was
3  it important to me in my analysis that in 45 percent
4  of the time on the low impact I observed impacts.
5  If -- and the answer is yes.  Because if in this
6  analysis all of the -- 75 or 85 or 90 percent of the
7  low impact there was no damage and on the high side
8  75, 80, 90 percent there was a damage, then it would
9  be evenly distributed to say, well, maybe in some --
10  you know, the data would be evenly distributed -- I
11  would have to wonder whether the analysis of the
12  unimpaired values was tight enough, credible enough
13  to make a conclusion.
14    In this case, even under the most adverse
15  interpretation of the data, the low impact still
16  demonstrated five percent or greater impact, 45
17  percent of the time, I think that's relevant.
18    Q.  But when you actually applied your findings
19  to specific cases, why didn't you vary the damages
20  estimates the way your own data varied?
21    MR. MONTOYA:  Object. I'm sorry.  I don't
22  understand the question.  Vague.  Go ahead.
23    A.  Yeah.  I felt like I've answered the
24  question.  Restate the question for me again.
25    Q.  In your own data as you present it, the

Page 115

1  effects range from a negative number or zero percent
2  as you write them on Table 20 to an impact from
3  Chinese drywall.  Okay?  So in your data set,
4  sometimes Chinese drywall remediated homes sell for
5  more than comps and sometimes they sell for less
6  than comps?
7    A.  Correct.
8    Q.  In every single instance when you went to
9  make damages estimates for the plaintiffs, you gave
10  them the exact same estimate of 10 percent?
11    A.  Correct.
12    Q.  Why?  Why did you not in your damages
13  estimates reflect the variability that exists in
14  your data?
15    A.  Because the variability that exists in my
16  data was asymmetrical.  In other words, if I had
17  grouped -- let's just say by location, all of the
18  zeros or negatives, if you want to call them that,
19  and all of the sudden all the properties in a
20  particular location had demonstrated zero impacts
21  then I may have concluded that location was a
22  significant variable and I would have had to study
23  that location.  And if all of that data centered
24  around a particular location like Broward, then I
25  may have concluded that Broward doesn't demonstrate

Page 116

1  an impact.
2    I also did it by price segmentation.  I
3  looked at all of these impacts and if all the zeros
4  had centered around homes in the million-and-a-half
5  dollar plus range, I might have concluded that the
6  impacts decline the higher the price of the home
7  goes or the lower the price home goes, whatever the
8  data demonstrated.
9    But as they have grouped these zeros, there
10  was no systematic appearance of these zeros and/or
11  negative impacts by price, by age of the home, by
12  date of sale or by location.  So there was no
13  variation, there were certain instances where the
14  home was not affected based on my review of the
15  data.  I acknowledge that.  But there were instances
16  where it was significantly higher, more affected to
17  the high side and there certainly were no instances
18  where it was lower than zero.
19    So in the correlation, knowing that there
20  wasn't any systematic difference between price
21  segmentation, geography, date of the sale, et
22  cetera, there was no way for me to conclude to a
23  variability impact.  I had to conclude, based on the
24  data, that there was an impact.  I estimated that
25  impact at 10 percent and I applied that 10 percent

Page 117

1  uniformly to all the Priority Claimants.
2    Q.  So using your method, there was no way for
3  you to approve of -- strike that.
4    I'm just looking at your testimony here.
5  Using your method that you used in your expert
6  report, there was no way to assign variable impacts
7  to the claimant properties?
8    A.  That's correct.  I don't think the data
9  demonstrated that there were variable impacts for
10  the different characteristics, correct.
11    Q.  But there were variable impacts for
12  different properties and different elements of your
13  case study as we've talked about for an hour,
14  correct?
15    A.  Yes.  Specific case studies demonstrated in
16  certain instances that there was no impact.
17    Q.  What I'm asking is, was there a way in your
18  method, that you used to write your expert report,
19  for you to assign variable impacts to claimant
20  properties that -- or not?
21    A.  I don't think the -- I don't think that the
22  data demonstrates that would be required.  I don't
23  think that -- it's not a matter that there wasn't a
24  way in the method.  There was a way in the method,
25  as I testified.  If all of the zeros had been

Confidential - Subject to Further Confidentiality Review

Page 118

1  concentrated by geography or age or date built,
2  et cetera, I would have correlated differently.  The
3  method would have demonstrated those specific
4  differences.  It didn't.  And therefore, there was
5  no reason for me to correlate the different impacts
6  in different geographies or different price
7  segmentations.
8      Q.  Would another way to determine whether the
9  claimant homes experienced a post-remediation stigma
10  impact be to look at whether, after remediation,
11  those claimant homes sell for less than comparable
12  homes?
13     A.  Well, that would be testing whether that
14  estimate holds true in the future.
15     Q.  So that's doable?
16     A.  Sure.  In fact, Exhibit 3 does that.  That's
17  some of the material I prepared in Exhibit 3.
18     Q.  Thank you.
19         MR. BLOCK:  Do you have a copy?
20         MR. MONTOYA:  Yeah.  Thank you.
21     Q.  So I'm going to have to study Exhibit 3 over
22  lunch because we just got it, but can you -- we just
23  got it today.  Can you tell me what you did to
24  generate Exhibit 3?
25     A.  Sure.  Exhibit 4 entitled Post Discovery

Page 119

1  Submission reflects the MLS data that was researched
2  on the sales of the priority claimant homes, and
3  then behind each of those -- and there are
4  separators that demonstrate, you know, which
5  Priority Claimant testing, and then using the same
6  method as the case studies but without the benefit
7  of being able to develop four comparable sales and
8  confirm all those sales and confirm the sale and the
9  disclosure, you know, I looked at the MLS for the
10  Priority Claimant home that sold.  If the MLS
11  indicated that, you know, whether there were remarks
12  or otherwise in that MLS that disclosure was made,
13  or if on page -- most of these occurs on page 2, you
14  will see that there is an area where they can upload
15  the disclosure.  So I'm looking for that disclosure
16  but, you know, we weren't, obviously, able to
17  confirm the disclosures in all cases.
18         And then behind that, in each case study is
19  what I considered to be, sort of, the most analogous
20  sale in that market within the same time frame,
21  bedroom, size, range, et cetera, we took one sale
22  and said -- and said here's a sale compared to the
23  other sale and we calculated the difference.
24     Q.  So you did a version of a paired sales
25  analysis?

Page 120

1      A.  It is a paired sales analysis but it's only
2  with one sale.
3      Q.  Does that limit the reliability of
4  the paired sales analysis to only use one comp?
5      A.  Not necessarily, but it certainly doesn't
6  allow me to develop a high and low range.  It forces
7  me into a single point range.
8      Q.  How do I interpret, I'm looking at
9  Exhibit 3, the second to last column, percent
10  diminution testing, how do I interpret what you're
11  saying there?
12     A.  Within the post discovery submission I have
13  a sale that sold around the same time as the
14  Priority Claimant's sale and I calculated the
15  difference between that test sale and the Priority
16  Claimant's sale to reflect that percentage
17  diminution comparing again on most of the same
18  elements we did in the paired case study size,
19  bedrooms, lot size, et cetera.
20     Q.  Did you use all of the same adjustment
21  elements in Exhibit 3 that you did in your paired
22  sales analysis that's part of your expert report?
23     A.  No, not at this time.
24     Q.  So the negative number, I am looking at the
25  percent diminution testing, why did you use

Page 121

1  different adjustment elements?
2      A.  I don't understand the question.
3      Q.  Well, you just said that you used in
4  Exhibit 3 and I guess 4, compared to your expert
5  report, you did not use the same adjustment
6  elements?
7      A.  No.  I largely did use the same adjustment
8  elements.  These are all in the same location, so
9  the comparable selection brings them all into the
10  same location, preferably the same neighborhood,
11  same relative date of value and then I reviewed each
12  of those for size, bedrooms, baths, lot size,
13  condition and year built.  So yes, I used the same
14  adjustment elements.  I didn't adjust them on a grid
15  the same way as I did with these.
16     Q.  But you did make numerical adjustments the
17  same way you did in your expert report?
18     A.  I did.  And in fact, each of the yellow tabs
19  within this post discovery submission has my
20  handwritten notes on that.
21     Q.  Okay.  So if we go back on Exhibit 3 I just
22  want to understand the way this is presented.  You
23  have a column second to the right -- second from the
24  right, excuse me, percent diminution testing, I'm
25  looking at the Miranda home because it's the first

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/18/19 Page 237 of 319

Page 122

1  row, and you write negative 2.50 percent, what does
2  that mean?
3      A.  That means that the sale of the Miranda
4  residence was 2.5 percent less than the comparable
5  sale or the analog sale that I developed.
6      Q.  And a difference in sales price of 2.5
7  percent is within the range that you consider
8  basically no effect, it's under five percent,
9  correct?
10     A.  Correct.
11     Q.  So did the -- if we were to get out the
12 report that you did for Miranda, the individual
13 claimant report that you had opined that there would
14 be a 10 percent price impact, that was not born out
15 by the post report analysis that you did?
16     A.  Well, it was not born out by the single
17 comparable but in the case of Miranda, you know,
18 Miranda was foreclosed in November of 2017 and a
19 year later it's, you know, it closed and we had an
20 unimpaired value estimate already there.  So I don't
21 know when you say the 10 percent -- oh, you're
22 saying the 10 percent conclusion?
23     Q.  Yes.
24     A.  Yes.  I'm sorry.  Let me -- I'm answering a
25 question you didn't ask.  Please say it again.

Page 123

1      Q.  I'll ask it again.
2      A.  Thank you.
3      Q.  In your claimant report for the Miranda
4  family, you opined that there are -- the property
5  would experience a 10 percent price decrease due to
6  stigma but when you tested the Miranda property
7  against a neighboring property after serving your
8  expert report, you actually found essentially no
9  difference in the price, correct?
10     A.  The subsequent seller of that property that
11 subsequently remediated did not suffer that damage,
12 but Miranda potentially did because they lost it and
13 so that's -- they suffered on the -- on their sale
14 of the property to a speculator.
15     Q.  I'm just asking a math question.
16     A.  Yeah.  The math question is that -- in that
17 particular case, the 10 percent diminution did not
18 apply for the subsequent seller that sold it
19 remediated, that's correct.
20     Q.  Okay.  And if we look at Kevin and Stacy
21 Rosen, row 3, is that a negative seven percent?
22     A.  That's right.  There was a seven percent --
23 I should not have put these in as negatives to be
24 consistent with the prior report, so just for the
25 record, these negatives reflect a diminution in

Page 124

1  value.
2      Q.  Okay.
3      A.  So the 2012 demonstrated a seven percent
4  diminution without making any adjustments for the
5  difference between the date of sale and the impaired
6  value.
7          And then as you say, that area is cut off, I
8  will get you a clean sheet during lunch, but that
9  showed a seven percent impact.
10     Q.  So that again did not -- you didn't hit your
11 10 percent estimate with the Kevin Rosen home?
12     A.  Correct.  Based again on one sale.
13     Q.  Sure.
14     A.  And the estimate of unimpaired value based
15 on one sale, that's correct.
16     Q.  So we go to Michael and Robin Rosen, row 6,
17 you write "inconc," does that stand for
18 inconclusive?
19     A.  Yes, sir.
20     Q.  What do you mean?
21     A.  I could only identify one sale that was,
22 I'll call it, reasonably comparable.  You should see
23 the photographs, I've included the sale in there.
24 The sale traded for about a million nine, and if you
25 look at that analog sale, I'll call it, that million

Page 125

1  nine is based on, you know, the remediated property
2  being a very, very high end property and the
3  unaffected property being a very, very high end
4  property and I didn't think it was appropriate to
5  compare a 1.9 million dollar sale to a 1.3 million
6  dollar remediated property and conclude that that
7  was all a result of Chinese drywall because there
8  were just so many differences in the features of
9  that home that I considered that to be inconclusive.
10 It would have if I applied that million nine against
11 the million five or the million four, it would have
12 demonstrated a very large impact, something in the
13 order of magnitude of 26 percent, but the complexity
14 of that home just didn't, in my view, didn't rise to
15 the level saying that I could assign all of that
16 impact.  Having no way to assign a portion of that
17 impact, I chose to just label it as inconclusive.
18     Q.  So when you studied the Michael and Robin
19 Rosen home after serving your expert report, you did
20 not confirm your report's estimate at a 10
21 percent price impact?
22     A.  I didn't have the -- I don't think the data
23 existed based on what I reviewed to date.  I
24 couldn't find the data to confirm that.  That's
25 correct.

1    Q.   If we go to the next one, it is the Etter
2    family home, you write the zero percent could not
3    confirm disclosure -- and I don't know if there is
4    other text.  But the number is zero percent,
5    correct?
6    A.   Yes.
7    Q.   This is another one where after serving your
8    expert report you studied the claimant property and
9    could not confirm a 10 percent price impact?
10   A.   Right.  We could also not confirm that the
11   property was -- that the disclosure occurred, so,
12   you know, in the view -- in the case where a zero
13   percent occurs and disclosure is not confirmed, I'm
14   not sure that's as relevant.
15   Q.   Okay.  But mathematically, you did not
16   confirm the 10 percent estimate that you had made in
17   your report --
18   A.   Correct.  And in fact, as I may say, as it
19   relates to Catherine and Steven Etter, we -- they
20   sold the property in December 2016, we appraised the
21   property unimpaired as of December 2016 and our
22   unimpaired appraised value came in at a million 58.
23   So we had the comparables, you know, unimpaired
24   comparables, we did a full appraisal analysis and
25   that demonstrated zero percent.

1    Q.   We'll come back to the Etters in a little
2    bit here.
3         So O'Brien, you got a negative 14 and a
4    negative 7.5 percent depending on the sale, right?
5    A.   Correct.  And again, you will see the note,
6    it says subject --
7    Q.   I think we lost somebody on the phone.
8    A.   Oh okay.  It says subject to disclosure
9    confirmation, in other words, the negative
10   seven-and-a-half percent, I think, if we review that
11   data, we will see is that 2017 sale there was
12   nothing in the MLS that indicated that there was
13   disclosure at that time.
14   Q.   You don't have any personal knowledge of
15   whether the seller of that home disclosed the prior
16   existence and remediation of Chinese drywall in the
17   O'Brien home, do you?
18   A.   No, I just know that it's not listed in the
19   MLS.
20   Q.   Just because it's not listed in the MLS,
21   doesn't mean that the seller and the buyer didn't
22   talk about it, right?
23   A.   Correct.
24   Q.   So with that limitation in mind, for the
25   2017 sale, you didn't hit your 10 percent estimate,

1    correct?
2    A.   Correct.
3    Q.   The Avery home, row 11, 8.5 percent, you did
4    not hit your 10 percent estimate there?
5    A.   That's correct.
6    Q.   You write limited data on row 16 for the
7    Walls family?
8    A.   Yes.
9    Q.   What does that mean?
10   A.   We were not able to identify anything that I
11   believed was comparable within the -- within that
12   marketplace.  There was just limited data available
13   from which to pair, so I just tagged it as limited
14   data.  It wasn't that I found data and deemed the
15   data to be inconclusive, we were just unable to find
16   relevant data to pair.
17   Q.   Okay, but the next -- okay.  But in any
18   event you were not able to confirm your 10 percent
19   estimate for the Walls?
20   A.   Correct.
21   Q.   The next row, 17, Feldkamp, you have a
22   range, negative 15 to negative 20.  Is that based on
23   the two sales that are in the next column to the
24   right or do you know what the basis for that is?  Do
25   we need to go to Exhibit 4 and look at that?

1    A.   Yes.
2    Q.   Okay.  So let's do that.
3    A.   That 15 to 20 percent relates to the 2018
4    estimate, based on the data contained herein.
5    Q.   Okay.  Help me out here.  In the value
6    opinion as of date of value column, Exhibit 3, for
7    the Feldkamps you have $152,000?
8    A.   That's correct.
9    Q.   And then for the January 18, 2018 sale for
10   the Feldkamps you have a sale value of $220,000,
11   right?
12   A.   No, I'm sorry, for the January of 2018,
13   222,000.
14   Q.   Yeah.  I got the date wrong.  So how do you
15   then arrive at negative 15 to negative 20 percent?
16   A.   Well, you can't compare our appraisal in
17   2015 to the values in 2018.  So you have to go find
18   a sale in 2018 based on the relative values, in
19   2018, to get to the 15 to 20 percent.
20   Q.   And that would be in Exhibit 4 somewhere?
21   A.   Correct.  So if you look in -- did you find
22   the Feldkamp cover sheet?
23   Q.   Yeah.
24   A.   So the first sheet is the Feldkamp
25   documentation that we had available, and I'll note

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/19/19 Page 239 of 319
Case 2:14-cv-02844-NG-Q Document 214-5 Filed 06/12/19 Page 5 of 99
Confidential - Subject to Further Confidentiality Review

Page 130

1  that -- for the record that there is no listing data
2  here, I believe that this is the property record
3  card, so we should get a copy of the listing data if
4  we have it. I don't know that we could locate it.
5       And then behind that we have a comparable
6  property that sold for $289,000. It was built in
7  2006 -- I'm sorry, the list price was 289.
8       Under contract as of September and the sold
9  price was 289. Okay.
10      So we looked again at the square footage and
11 the number of bedrooms, number of baths, the
12 relative date of value so in the Feldkamp's case,
13 you know, this comparable occurred nine months after
14 the Feldkamp sale in January of 2018. So, you know,
15 adjustment for date of sale, land size, small land
16 size adjustments, indicated that that comparable
17 when paired should put a range of 259 to 279 to the
18 Feldkamps and they closed at 222,000.
19      Q. Who selected the comps that you have
20 included here in Exhibit 4?
21      A. I did.
22      Q. Did you have any help from your staff?
23      A. My staff, you know, brought the relevant
24 data and, you know, identified based on my criteria
25 and then I reviewed that data and incorporated that

Page 131

1  data based on my review of the comparables.
2       Q. So who went on the MLS and searched for
3  comparables?
4       A. I don't know in any particular case, but
5  probably Joe did a lot of the work for me and Yuliya
6  Georgiva and Juan Gamio.
7       Q. Was it -- you, yourself, did not go into the
8  MLS and look for the comparables that you used in
9  Exhibit 4?
10      A. No, sir.
11      Q. And what criteria did you give your staff to
12 search for comparables in the MLS to create
13 Exhibit 4?
14      A. To identify comparables that were within an
15 approximate date range, if available, the date range
16 was selected, needed to be expanded, so be it,
17 geography was important, try to find me comparables
18 that are closest in terms of age, size, bedroom
19 count, bathroom count and that's it. Find
20 properties that the market would deem comparable.
21      Q. Sure. When you were identifying comparable
22 properties in your claimant-specific reports, the
23 ones that you served on February 15, you used local
24 appraisers to identify the comparable properties,
25 correct?

Page 132

1       A. I did.
2       Q. Why didn't you use local appraisals to
3  identify comparable properties for Exhibit 4, your
4  post report analysis?
5       A. Well, I was obviously prepared for the
6  deposition with a time certain and so I didn't -- I
7  wasn't able -- I wasn't able to go back and get
8  those local appraisers to engage in the -- within
9  the time frame I had.
10      Q. Let's just finish with Exhibit -- well, this
11 part of Exhibit 3. So you move to the Lalwani's,
12 you found an impact of negative eight to negative 19
13 percent based on a 2015 sale; is that right?
14      A. Yes.
15      Q. For the Marins, negative 8.5 percent based
16 on a 2013 sale?
17      A. Correct.
18      Q. And a -- for the Deegs, number 20, row 20,
19 negative one percent based on a 2017 sale, right?
20      A. Yes.
21      Q. Okay. So of the -- how many -- let's count
22 how many you tested here. How many of your claim --
23 strike that.
24      I'd like to count how many Priority
25 Claimants you tested, whether your 10 percent

Page 133

1  prediction hit the market for. Okay?
2       A. Okay.
3       Q. So let's count on Exhibit 3 there are one,
4  two, three, four, five, six, seven, eight, nine, 10,
5  11, as I count them, 11 rows where you have some
6  sort of diminution testing information written down;
7  is that right?
8       A. Yes.
9       Q. In how many of those 11 instances did your
10 10 percent estimate hit the mark?
11      A. How do you want to define hitting the mark?
12 Because if it came in at 15 to 20 and I estimated
13 10, that's a 10 percent rate of error. If I
14 estimated 10 and it came in at eight, that's a two
15 percent rate of error, so do you want to give me
16 some type of rate of error to clarify that?
17      Q. Sure. Did you hit -- I will be happy to do
18 that. So when you tested your 10 percent diminution
19 in value estimate for 11 of the Priority Claimant
20 properties, did any of those claimant properties
21 actually experience 10 percent diminution in value
22 in your testing?
23      A. Yes.
24      Q. Which ones?
25      A. Feldkamp, Lalwani within a range of 8 to 19

1  percent, O'Brien during the 2014 sale.
2      Q.  But not during the 2017 sale, correct?
3      A.  Correct, but again, subject to disclosure
4  confirmation and subject to the fact that I only had
5  one sale, so this is a single point estimate.
6      Q.  Okay.  Well, so do you want to count both
7  O'Briens and we'll have our denominator be 12 here?
8  We are going to count both O'Briens sales that you
9  tested.
10     A.  Well, I counted both O'Briens in the 11.
11     Q.  Which one are you not counting?  You have
12  something written -- here's what I was driving at?
13     A.  Okay.
14     Q.  You have some words or numbers written down
15  in 11 rows in the diminution testing column.
16     A.  Yes.
17     Q.  And actually, it looks like there might be a
18  2018 -- something for Kevin Rosen, I can't tell but
19  based on what I can see here you have something
20  written in 11 rows.  So what are you not counting
21  that I am counting?
22     A.  I am not counting the inconclusive Number 6,
23  and I'm not counting the limited data Number 16, and
24  if I have two tests that have a percentage that I
25  can see, and I'll acknowledge that in case Number 3

1  there may be a number there and I can't see it, but
2  all of the percentages that I can see, whether zero
3  or not, I'm counting.  So if I have percentages in
4  there, that's case one, three -- I'm going to give
5  it to you.  So I'm counting one, two, three, four,
6  five, six, seven, eight, nine, 10.  How did I
7  miscount?  I apologize.  I see it's 10.  I thought
8  you had asked me 11 and I confirmed it but it looks
9  like it's 10.
10     Q.  We'll go with 10 the way you're counting it.
11  Let's just go row by row.  Did you confirm your 10
12  percent prediction for the Miranda property?
13     A.  No.
14     Q.  Okay.  So that's one, no confirm.
15         Did you confirm your 10 percent prediction
16  for Kevin Rosen?
17     A.  It was seven.  I think that's within -- so
18  it did not -- it was not 10 percent or greater, so
19  I'll say no.
20     Q.  Did you confirm your 10 percent estimate for
21  the Etter family?
22     A.  No.
23     Q.  Did you confirm your 10 percent estimate for
24  the O'Brien family?
25     A.  Yes in 2014 at 14 percent; and no in 2017 at

1  seven-and-a-half percent.
2      Q.  So we'll put one in both rows.
3      A.  What are you putting --
4      Q.  I'm going to add these up.
5      A.  So it's one no --
6      Q.  It's one no and one yes.
7      A.  Perfect.
8      Q.  Okay.  For the O'Briens.  All right.  So for
9  the Averys -- or Ms. Avery, did you confirm your 10
10  percent estimate?
11     A.  It is not greater than 10 percent.
12     Q.  For the Feldkamps did you confirm your 10
13  percent estimate?
14     A.  Yes.
15     Q.  And you're saying yes because it's higher
16  than 10 percent?
17     A.  Correct.  That's the criteria you were
18  using, right?
19     Q.  I'll spot you that, yes, we're saying the
20  same thing.
21     A.  Yeah.
22     Q.  All right.  So for the Feldkamps did you
23  confirm your 10 percent?
24     A.  Yes.
25     Q.  For the Morins, Ms. Morin, did you confirm

1  your 10 percent?
2      A.  Did we skip Lalwani?
3      Q.  Not intentionally but -- let's go back here.
4  You told me you confirmed your 10 percent one time
5  for the O'Briens?
6      A.  Correct.
7      Q.  And you confirmed your 10 percent for the
8  Feldkamps?
9      A.  Correct.
10     Q.  And then the Lalwanis.  So I have three
11  times that you think you've confirmed?
12     A.  Correct.
13     Q.  So we're on the same page about that.
14     A.  Correct.
15     Q.  Did you confirm your 10 percent estimate for
16  Ms. Morin?
17     A.  The number is less than 10 percent, so under
18  your definition, no.  The characterization that I
19  didn't confirm my 10 percent, if I saw an
20  eight-and-a-half or a seven-and-a-half or a nine
21  percent impact, in my view, that confirms my 10
22  percent, and I think when we talk about the
23  individual Priority Claimants you will see why
24  that's relevant as well.  Because if I apply 10
25  percent to a 2012 or 2013 unimpaired value and I

## Page 138

1  said there is a 40,000 impact and then five years
2  later the property sold and it might only represent
3  a seven percent impact but it's seven percent of a
4  much higher number, it's still 30, 40, $50,000, that
5  damage estimate as a dollar amount holds even though
6  the percentage doesn't necessarily hold.  And as
7  we've discussed, if you are going to exclude
8  everything that has a low boundary of zero or
9  negative up to five percent, based on my testimony
10  that that's difficult to discern in the market,
11  that's fine.  But I think to be fair, that suggests
12  an error rate of plus or minus five percent.  So if
13  I correlated a 10 and the answer is eight, to me
14  that's confirmation that my 10 is reasonable.
15      MR. BREIT:  At the end of that sentence,
16  we'd like to get our iPads back on.  It stopped
17  during that answer.  I hope the court reporter
18  didn't stop but the answers on our machines
19  didn't come through.
20      MR. MONTOYA:  No.
21      MR. BREIT:  Do you see anything on your
22  iPad?
23      MR. BLOCK:  No.
24      MR. BREIT:  Can we take a technological
25  moment because I'd like to be able to see that

## Page 139

1  answer in particular.
2      THE WITNESS:  Me too.
3      THE VIDEOGRAPHER:  Off the record, 1:15.
4      (Recess from 1:15?p.m. until 1:19?p.m.)
5      THE VIDEOGRAPHER:  On record, 1:19.
6  BY MR. BLOCK:
7      Q.  Mr. Graziano, on the break you and your
8  colleague Joe went out in the hall to talk about
9  something.  Were you talking about this case?
10      A.  No, not specifically.  I just explained to
11  him when we were done, the rules of depositions as I
12  generally understand them, is that I don't have any
13  contact with any of the attorneys, that he and I are
14  just going to get up and go to lunch.  We aren't
15  having lunch with the attorneys.  We aren't going to
16  talk to anybody.
17      Q.  That's all -- you didn't discuss the
18  substance of your analysis?
19      A.  No, sir.
20      Q.  So we left off right before the Deeg family
21  and you did not hit your 10 percent damages estimate
22  for the Deeg family, correct?
23      A.  Correct.
24      Q.  So out of the 10, I count that seven out of
25  10 times you did not hit your 10 percent damages

## Page 140

1  estimate, correct?
2      A.  That's your characterization of it, correct.
3      Q.  Why did you conduct the analysis that's
4  reflected in Exhibit 3 and 4 after serving your
5  expert report on February 15th?
6      A.  Because I wanted to be prepared to address
7  the individual claimant issues and I fully expected
8  that we were going to talk about things that
9  happened after the fact, even though I did my
10  appraisal analysis as of a particular effective
11  date.  I expected that some question of some of
12  these sales may occur and I wanted to be prepared.
13      Q.  Most of the sales that you analyzed in
14  Exhibit 3 and 4 predate your February 15th, 2019
15  expert report, correct?
16      A.  Well, they predate my preparation of the
17  report but they don't predate the value dates of
18  reports.
19      Q.  Why are this -- why do the value dates in
20  your Priority Claimant reports vary from, as I
21  understand it, 2009 to 2018 or 2019?
22      A.  I believe -- well, they were directed by the
23  attorneys that gave me those dates that those were
24  the dates and values that they wanted for each of
25  the Priority Claimants and I am going to assume that

## Page 141

1  that's their claim as to their date of loss, so the
2  damage estimate would apply as to that date.
3      Q.  So you used valuation dates for the claimant
4  properties but you do not know the significance of
5  those valuation dates?
6      A.  Well, no.  I mean, when you say I don't know
7  the significance, I didn't develop those dates.
8  That was my testimony.  That's what I was trying to
9  get across.  I was told that those were the dates
10  that the attorneys were alleging damages as of, and
11  of course, you know, if you look at, like, the dates
12  of foreclosure, those correspond to the value dates,
13  so that was the date that the claimant lost the
14  home.  Current owners got a current value date.  If
15  an owner sold the home, then that value date became
16  the relevant date.  So I believe I fully understand
17  why they selected the date.
18      Q.  That was not your choice to use those
19  valuation dates?
20      A.  Correct.  That was my point in the first
21  answer.
22      Q.  Okay.  All right.  So in terms of
23  availability of the market data, it would have been
24  possible for you to conduct analysis, the testing of
25  your predictions that is reflected in Exhibit 3 and

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/18/19 Page 242 of 319
Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/18/19 Page 38 of 99
Confidential - Subject to Further Confidentiality Review

Page 142

1 4 before you served your expert report, correct?
2    A.  Subject to additional time.  I mean I had to
3 10 -- I would have had an additional 10 case studies
4 to develop in addition to the work that we did, so
5 it -- it would have just been a function of time or
6 staffing.
7    Q.  But it would have been possible?
8    A.  Of course.  Anything is possible.
9    Q.  So if instead of doing the case -- well, let
10 me back out a little bit.
11        Your case study that you actually did in
12 your expert report, why did you use the homes that
13 you did instead of looking at the Priority Claimant
14 homes?
15    A.  Well, one reason is in the design of the
16 study I wanted to avoid any claim that there was
17 bias by looking at the Priority Claimant homes.
18 They have their own set of allegations and their own
19 set of damages that result from a number of
20 different reasons, and I didn't want my case studies
21 to be influenced by specific facts and allegations
22 within the claimant homes.  So I intentionally
23 stayed away from the claimant homes and tried to
24 look at properties that were not related to the
25 claimants.  Again, within the case studies, we

Page 143

1 attempted to confirm all of the control sales with
2 the parties to the transaction and I didn't think
3 that considering the litigation that level of
4 confirmation with the primary party to the
5 transaction that happens to be a claimant would have
6 been considered good evidence.
7    Q.  You know that one of your case study homes
8 is a Priority Claimant home, don't you?
9    A.  I was not aware of that.  In fact, we
10 scrubbed the case studies and I eliminated one or
11 two of them as being claimants, so if that's the
12 case, we should look at that case study.
13    Q.  I'm pretty sure that's right but we'll look
14 at it together after lunch.  And you know that in
15 your survey one of the people you interviewed was
16 Ryan Greenblatt, who is an expert for the
17 plaintiffs?
18    A.  Yes, but he told me that he -- he declined
19 to comment on the record.  We did interview him as
20 part of the process because he was one of the
21 listing agents on one of the homes.
22    Q.  Kevin Rosen?
23    A.  Okay, Kevin Rosen.  And he declined to
24 comment on the record on that.
25    Q.  We'll -- all right.  If instead of doing the

Page 144

1 case study you did in your expert report based on 19
2 or 20 nonclaimant homes, you had simply analyzed the
3 Priority Claimant homes, would you have arrived at
4 the same 10 percent stigma damages estimate?
5    A.  Without any of the other case study support,
6 I would have just been working with this sample of
7 10, is that what you're asking me?
8    Q.  Yes.
9    A.  I think again, based on the weighting I
10 would have had fewer homes, I would have had about
11 30 percent of the homes that showed zero -- if I had
12 used the -- again, let me caveat.  There is only one
13 sale tested against all of these tests, so if I had
14 fully developed these, you know, the percentage
15 indications may have changed.  Right?  If I had used
16 three or four comparable sales, if I was able to
17 confirm all the disclosures, the data may have
18 changed.  I have a zero here that we're counting as
19 a zero for purposes of today's discussion but I
20 wasn't able to confirm disclosure.  I had fully
21 developed that case study that may have impacted
22 this.  But based on the data that I have here today,
23 recognizing its limitations, it looks like there
24 were three or four that were zeros or near zeros,
25 minus 2.5, zero, but I could not confirm disclosure,

Page 145

1 minus 1 percent on Deeg, so that was about 30
2 percent of the case studies that demonstrated the
3 zero.  And then I've got one, two, three case
4 studies, about 30 percent of the case studies that
5 demonstrated greater than 14 percent, and then the
6 balance of the case studies are at between zero to
7 nine percent, and so probably based on this data I
8 would have been at around 10 percent.
9    Q.  Or would you have just offered a damaged
10 opinion based on the specific claimant home and the
11 punitive diminution value that that claimant home
12 experienced?
13    A.  Well, again you have to recognize though
14 that if I only had these 10, then from a geographic
15 specificity I would not have been able to array on
16 geography and time and a lot of these impacts are
17 after the date of value.  So -- my date of value, as
18 an example, my date of value on Lalwani was March of
19 2011 but the home didn't sell until 2015, so whether
20 that particular diminution would have been relevant
21 in 2011, I could have only tested if I had enough
22 2011 data, 2013 data, 2015 data to see that there
23 was no pattern that time didn't matter.  So I don't
24 think that the analysis would have been of just
25 these 10 Priority Claimants, I don't think that the

Page 146

1 analysis would have been as comprehensive as the
2 analysis that I did which allowed me to consider
3 time and geography, et cetera, across a wider
4 spectrum of data. I don't think it changes my
5 opinion, and I don't think the data does anything to
6 erode my opinion but I wouldn't have wanted to rely
7 on just the Priority Claimant numbers.
8 Q. You would not want to rely on the Priority
9 Claimant numbers to determine whether the Priority
10 Claimants, themselves, actually experienced
11 diminution in value after remediating their homes?
12 MR. MONTOYA: Objection, mischaracterizes
13 his testimony. You can answer.
14 A. Sure. Again, some of these Priority
15 Claimants are impaired at the time, you know, these
16 are unimpaired estimates. I wouldn't have used the
17 specific percentages from that particular case study
18 on sales that happened two, three, four, five years
19 down the line, correct, that wouldn't be, in my
20 opinion, appropriate methodology.
21 Q. Let's do one more thing and we can take a
22 break for lunch.
23 A. Okay.
24 Q. Let's look at the claimant -- I'm going to
25 look at -- if you can grab the claimant-specific

Page 147

1 report for the Etter family and we'll mark that as 6
2 when we get it.
3 (Graziano Exhibit 6 was marked for
4 identification.)
5 BY MR. BLOCK:
6 Q. Have we got a clean copy to mark? I'm not
7 sure -- we had a clean copy to mark. Yeah. I'll
8 just give this to you, you can look in your binder
9 but Exhibit 6 is going to be the claimant-specific
10 report for the Etter family dated -- well, the
11 effective date is September 28, 2016, but the letter
12 that's page 2 is February 7, 2018, and is this the
13 most up-to-date report for the Etters?
14 A. I believe so.
15 Q. This isn't one you amended?
16 A. I do not believe this is one that I amended.
17 Q. Okay. If you turn with me to page 7 of
18 Exhibit 6, which is your report for the Etters, you
19 found that after the Etters remediated and sold
20 their home, they did not experience any
21 post-remediation stigma discount, correct?
22 A. Based on the unimpaired valuation I
23 completed, it did not appear as if they suffered
24 that post-remediation discount, that's correct.
25 Q. In fact, the Etter home after it was

Page 148

1 remediated, sold for exactly what you appraised it
2 at, $1.58 million, correct?
3 A. Correct.
4 Q. Why do you still opine that the Etters are
5 entitled to $158,000 in post-remediation stigma
6 damages?
7 A. At the time -- at the time I looked at the
8 MLS and I thought that my records reflect that there
9 was -- that they did not disclose the prior drywall
10 remediation. In attempting to reconcile this issue,
11 however, I spoke to the Etters attorney and he
12 provided information that the Etters said they
13 provided it to their listing realtor but I was not
14 able to -- I am still not able to confirm or have
15 not confirmed whether the buyers were aware of that
16 issue.
17 If it is found, however, that they did not
18 disclose -- or that they did disclose the drywall
19 and the buyers knew of the drywall, this is a
20 perfect sample where they hit the lottery. They
21 found a magic buyer that it didn't impact, and I
22 think if you look at the photographs in the Etters'
23 home, this is a very, very nice home on Jupiter
24 Inlet with some very unique features and probably
25 not many perfectly analogous replacement properties,

Page 149

1 so if this happens -- if it happens to be true that
2 the Etters did disclose the drywall and didn't
3 suffer the actual damage, I would agree with you
4 that they should not be compensated for the damage.
5 Q. Are you assuming that the Etters concealed
6 the existence or prior existence of Chinese drywall?
7 A. I was making no such assumption. I am
8 telling you that I was not able to confirm that the
9 buyers were made aware that the representation from
10 the Etters is that they provided the FLABAR
11 disclosure to the realtor.
12 Q. Is it your opinion that disclosure of the
13 prior existence of Chinese drywall is required as a
14 matter of Florida law or real estate practice?
15 MR. MONTOYA: Objection; outside the scope,
16 calls for a legal conclusion, among others, go
17 ahead. You can answer.
18 A. I was going to say that's outside my scope.
19 It is the premise, though, of my damage analysis
20 that the disclosure is required in perpetuity.
21 Q. So it's a premise of your research but it's
22 outside your scope?
23 A. No. It's a -- yes, it's a premise of my
24 research but outside of my scope to opine as to
25 whether or not that is legally accurate.

Page 150

1    Q.  All right.  So assuming that the Etters did
2   disclose the prior existence of Chinese drywall as
3   you assumed they were required to do and as they
4   appeared to have represented they did, they did not
5   experience any post-remediation stigma and are not
6   entitled to $158,000 in post-remediation stigma
7   damages, correct?
8       MR. MONTOYA:  Objection; improper
9   hypothetical.  You can answer.
10   A.  That is correct.  I don't -- if they did not
11  experience that diminution, then, you know, whether
12  that's applicable to their damage or not, it was up
13  to the jury, but I would suggest that if it's zero
14  and they didn't experience it, then they didn't
15  experience the damage, they are not entitled to
16  compensation for it.
17   Q.  So if they did experience the damage, would
18  it have -- I mean, you're basically saying that if
19  they experienced the damage, it's because they
20  concealed the prior existence of Chinese drywall.
21      MR. MONTOYA:  Objection; mischaracterizes
22  testimony.
23   A.  I don't know that I said that or not.  What
24  I'm saying is that if this buyer was not aware, and
25  therefore was not influenced, and did not make a

Page 151

1   conscious decision to accept the Chinese drywall,
2   then the observed price for purposes of measuring
3   the damage is not relevant.
4    Q.  Do you think the Etters are entitled to
5   damages if they concealed the existence of Chinese
6   drywall?
7       MR. MONTOYA:  Objection.  That's a jury
8   question and a legal question.
9       THE COURT REPORTER:  I didn't get the
10  answer.
11   A.  I have no opinion on that.
12   Q.  What have you done to determine whether the
13  Etters disclosed the prior existence of Chinese
14  drywall?
15   A.  I reviewed the MLS listing agreement, I
16  believe, that's in my file, and I contacted the
17  Priority Claimant attorney and asked him to confirm
18  with the Etters whether or not a disclosure was
19  made, and his response was that his clients advised
20  him that they made the disclosure to their selling
21  broker.
22   Q.  When was that that you had those
23  conversations?
24   A.  I have an e-mail within the last two weeks.
25   Q.  Is that one that -- we'll look and see if

Page 152

1   that's one we got.  We got a few e-mails the other
2   day.  I don't know if we got that one or not.
3    A.  And you may not have it because it probably
4   was after the disclosure requirement.
5    Q.  And your information -- the information that
6   you received in that e-mail from the Etters' lawyer
7   was that the Etters disclosed the prior Chinese
8   drywall to their agent, the selling agent?
9    A.  Right.  That they provided the seller's
10  disclosure to the selling agent, that's correct.
11   Q.  And pretty typical that the seller's agent
12  would convey information like that to the buyer and
13  the buyer's agent, correct?
14   A.  I would think so.
15   Q.  Standard practice in real estate?
16   A.  I'm not opining on standard practice in a
17  profession that I don't practice in anymore, but I
18  would say that generally the agents are going to
19  provide any disclosures to buyers, yes.
20   Q.  All right.  I think we're at a good time to
21  take a break so let's go off the record.
22      THE VIDEOGRAPHER:  Off record, 1:34.
23      (Recess from 1:34 p.m. until 2:41 p.m.)
24      THE VIDEOGRAPHER:  On record, 2:41.
25  BY MR. BLOCK:

Page 153

1    Q.  Mr. Graziano, we're back after lunch and you
2   brought with you, what I understand to be, a version
3   of Exhibit 3 that's just with the cells expanded a
4   little bit so they are more legible; is that right?
5    A.  Yes.
6    Q.  Okay.  Is there anything about -- anything
7   else I need to know about Exhibit 3 for the newly
8   expanded version?
9    A.  I don't think.
10   Q.  Okay.  We'll combine that and make -- We'll
11  combine that with the first page of Exhibit 3 so
12  they can just together be Exhibit 3.
13   A.  Okay.
14   Q.  And that will -- I think that will be easier
15  for us down the road.  Let's put those here for
16  safekeeping.
17      THE COURT REPORTER:  Here's Exhibit 3.
18  BY MR. BLOCK:
19   Q.  Mr. Graziano, I'd like to talk with you
20  about the survey that you did.
21   A.  Okay.
22   Q.  Can you put us all on the same page.  What
23  was the purpose of conducting a survey as part of
24  your opinions in this case?
25   A.  There were two principal portions of the

1 survey. One in developing the survey, that was
2 meant to represent an interview or a script during
3 the control pairing, concerning the control pairing
4 verifications. So each of the sales and the control
5 sale were attempted to be verified with respect to,
6 you know, the control sale, the level of disclosure,
7 whether the sale was arm's lengths, et cetera,
8 et cetera, and then the same script was used for
9 verification of the paired sales, the unimpaired
10 properties that sold just to verify that there
11 wasn't any Chinese drywall present or any other
12 situations present that were adverse, potential
13 detrimental conditions that would skew the results.
14        During the course of that survey we also
15 continued to ask questions from those realtors as to
16 what their opinion was with respect to price impacts
17 related to Chinese drywall, post-remediation,
18 pre-remediation, whether they have been involved in
19 those types of transaction and then in listing or
20 marketing other homes in the market whether they
21 noticed the price impact on homes that had Chinese
22 drywall and if so, what percentage impact.
23    Q.  What role does the survey play in your 10
24 percent stigma damages estimates for the Priority
25 Claimants?

1    A.  Within the report we summarized and analyzed
2 the character and nature of those surveys and
3 identified any situations where realtors indicated
4 that it might lead to a damage or that there may be
5 a value diminution associated with Chinese drywall
6 and then we classified all of those comments which
7 we summarized in the report and then when -- in
8 looking at the overall classification of the
9 comments, really tried to understand from all the
10 surveys that we conducted, you know, whether there
11 was a predominance of comments that indicated they
12 were an impact or were not an impact.
13        So the role that it would have played or
14 that it played in my mind is if through these
15 interviews we had all of the realtors that said, oh,
16 no, you know, after remediation it has no impact,
17 you know, I would have had to give that
18 consideration in reconciling to the data.
19    Q.  What about if almost half of the realtors
20 said it had no impact, is that something you give
21 consideration to?
22    A.  Well, the way in which we classified it, and
23 I think we did give consideration to it. I think we
24 weighed that in consideration of the 10 percent
25 impact and we weighed that in consideration of, you

1 know, our overall analysis. So I think we did give
2 consideration to it. We did have a number of
3 realtors that said, you know, if remediated not
4 much, but they didn't indicate, you know, a
5 percentage, and we even classified those as, you
6 know, comments that were -- that demonstrated no
7 impact.
8    Q.  Who designed the survey?
9    A.  I did.
10    Q.  Did you have any help?
11    A.  No.  I worked with Paul Jones to transcribe
12 the initial text and we did some initial testing on
13 the survey with, you know, the first four or five
14 interviews that we did.  I attended those interviews
15 as each of the people in my office were doing those
16 interviews.  You know, I attended some of those
17 interviews to solicit and understand how much time
18 people were spending with them and what types of
19 answers were being gleaned from that information.
20 And just, you know, oversaw but I developed the
21 survey questions themselves.
22    Q.  Have you ever designed a survey for use in
23 litigation before?
24    A.  Yes.
25    Q.  How many times?

1    A.  I would say more than a half a dozen.
2    Q.  Have any of those surveys ever been excluded
3 by a court?
4    A.  Yes.
5    Q.  How many times?
6    A.  Once.
7    Q.  Do you know what the case is?
8    A.  Yes.  It's referenced on my errata sheet on
9 the case history here as Island Estates Homeowners
10 Association vs. Two Island Development Corp, Gary
11 Cohen and NI Holdings.
12    Q.  Do you know who the judge was?
13    A.  I believe it was Judge Thomas.
14    Q.  Is that the only time that your testimony
15 has been excluded by a court?
16    A.  Yes.
17    Q.  What was Judge Thomas's critique?
18    A.  Well, I only had the benefit of the hearing
19 and questions that Judge Thomas asked and I believe
20 the order was written by opposing counsel so he just
21 signed the order, but essentially the critique was,
22 I was retained in a matter where a property
23 developer was subject of a stop work order
24 injunction on an active development plan.  That stop
25 work order was put in place in late 2014 at a time

1  in the condominium market in Miami that was
2  extremely favorable for selling condos and they
3  didn't get the injunction released until the latter
4  part of 2015, so they had a period of about a year
5  where the project was essentially put on hold.
6      I was retained by the attorneys in the
7  matter to estimate what would the absorption -- the
8  number of sales of preconstruction or during
9  construction units, what number of sales should the
10 property have -- should the property have received
11 during that time frame if it hadn't been under the
12 injunction and stop work order.
13     I explained to the client when I took the
14 case that the only way to get that information to be
15 evidentiary would be to actually -- have the actual
16 sales sheets from developers and that was going to
17 be impossible to be able to enter into evidence,
18 that there was no way that, A, I was going to be
19 able to release confidential information where I had
20 information regarding the actual sales history of
21 these projects, and B, there was no way I was going
22 to get my clients, or anybody was going to be able
23 to get their clients, to release confidential
24 information about the number of sales that were
25 happening.  So I said the only way to get the

1  information is to conduct a survey of the
2  development community and brokers and survey how
3  much -- how many sales per month they were doing.
4  But the problem with that from an evidentiary
5  perspective was that that survey method had to stand
6  on its own and there might be a Daubert challenge
7  resulting from the compilation of that material, and
8  in fact, that's exactly what happened.
9      I advised the client when we took on the
10 assignment that it was a risk and they knew about it
11 going in and the method was not flawed but Judge
12 Thomas's position was that I may have accurately
13 been able to -- I may have accurately represented
14 what the sales rate per month was on all of the
15 competitive projects, but I didn't -- I was not able
16 to reconcile how many cancellations of those sales
17 occurred so that it wasn't a fair comparison to the
18 subject, and so the order reads, you know, a bit
19 strong because like I said, opposing counsel
20 prepared the order but essentially, I think, Judge
21 Thomas's position as the gatekeeper was you're not
22 comparing apples and oranges and he excluded my
23 testimony.
24     Q.  Is it your opinion that your sample size in
25 your survey is statistically representative of all

1  realtors in Florida?
2      A.  No.
3      Q.  Is it your opinion that realtors, the
4  opinions of realtors as reflected in your survey,
5  are representative of the opinions and actions of
6  buyers and sellers in the actual marketplace?
7      A.  I do -- I do believe that the realtors
8  opinions about Chinese drywall do affect the actions
9  of the market participants, buyers and sellers in
10 the marketplace, yes.
11     Q.  So my question was a little bit different
12 and maybe it wasn't a good question.
13     Buyers and sellers in the marketplace might
14 act differently than realtors who are offering
15 opinions in the context of a survey, correct?
16     A.  I'm sorry.  Could you ask that question
17 again?
18     Q.  Buyers and sellers in the marketplace might
19 act differently than realtors who are offering
20 opinions in the context of a survey, correct?
21     A.  Sure.
22     Q.  So does your survey actually predict how
23 buyers and sellers in the marketplace will act in
24 reality?
25     A.  No.  My survey reflects the opinions of a

1  components of the market participants and their
2  impressions as to the impact of Chinese drywall.
3  It's an attitude survey, if you will.
4      Q.  You describe your survey on page 3 of your
5  general report as a contingent valuation method.  Is
6  that right?
7      A.  Yes, I believe that's -- that's how Bell
8  defined survey techniques.
9      Q.  So you rely on Dr. Bell for the proper
10 definition of a contingent valuation technique?
11     A.  Yes.
12     Q.  Okay.  Do you have your copy of Dr. Bell's
13 book, Real Estate Damages 3rd?
14     A.  I do.
15     Q.  We'll -- we'll mark Bell's book as Exhibit 7
16 and figure out the copying later.
17     (Graziano Exhibit 7 was marked for
18 identification.)
19 BY MR. BLOCK:
20     Q.  Can you turn with me to page 50 -- let's
21 start on 53 of Dr. Bell's book.  Are you there?
22     A.  Yes, I am.
23     Q.  And at the very bottom of page -- oh, do
24 y'all have a copy?
25     MR. MONTOYA:  Yeah.

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/18/19 Page 247 of 319
Case 2:09-md-02047-EEF-MBN Document 23363-31 Filed 01/13/2019 Page 14 of 99
Confidential — Subject to further confidentiality Review

1    Q.  Page 53 is where Dr. Bell begins his
2  discussion of contingent valuation surveys, correct?
3    A.  Yes.
4    Q.  Let's turn to the next page.  Can you look,
5  the third -- it's really the second full paragraph
6  that reads as follows:  "A concern about contingent
7  valuation surveys in general is the respondent's
8  actual behavior may differ from stated preferences."
9        Do you agree with Dr. Bell?
10    A.  Yes.
11    Q.  All right.  Skip down to the next paragraph:
12  "The use of contingent valuation in measuring the
13  value of private goods, including environmental and
14  other property damages, has nonetheless remained
15  controversial transactional data from the market
16  when available is clearly a preferred alternative."
17        Do you agree with Dr. Bell?
18    A.  I do.
19    Q.  Continuing.  "The appraisal literature
20  indicates the contingent valuation is generally a
21  less reliable and less accurate indicator of value
22  pending analysis of the market data."
23        Do you agree with Dr. Bell?
24    A.  I would add a qualifier there.  When used in
25  isolation or when used by itself, I would agree with

1  that.
2    Q.  So for the period in your study from August
3  2016 to February 15th, 2019, you only -- you do not
4  have market data, correct?
5    A.  I do not have market data for that period,
6  that's correct.
7    Q.  All right.  Dr. Bell continues:
8  "Accordingly, it is appropriate to use contingent
9  valuation in the rare circumstance of market data
10  being unavailable or as a tertiary approach to
11  confirm a market data analysis."
12        Do you agree with Dr. Bell?
13    A.  My apologies.  Can you give me that page
14  number again?  I closed it.
15    Q.  Yeah, it's the same as 54.
16    A.  Thank you.  I am sorry.
17    Q.  "Accordingly, it is appropriate to use
18  contingent valuation in the rare circumstance of
19  market data being unavailable or as a tertiary
20  approach to confirm a market data analysis.
21  Contingent valuation is not generally accepted as
22  primary valuation method when transactional market
23  data is ample and available."
24        Do you agree with Dr. Bell?
25    A.  Actually, that's what I just testified to.

1  When you asked me the question I would say, you
2  know, as a standalone method, it tends to be viewed
3  as less reliable and that's exactly what the next
4  two sentences say.
5    Q.  So you agree with Dr. Bell?
6    A.  I do.
7    Q.  Okay.  Let's turn to the next page, 55, the
8  second paragraph.  Dr. Bell writes:  "A common
9  pitfall with surveys is that without proper
10  discipline, planning and thought they can become
11  little more than casual conversations in which
12  preconceived ideas and notions become superficially
13  validated.  Surveys can, in some instances, provide
14  valuable insight into market behavior although the
15  use of surveys is rarely a substitute for the
16  analysis of actual market data when it is available.
17  It should be noted that formal surveys, particularly
18  such specialized techniques as contingent valuation
19  and conjoint analysis are beyond the expertise of
20  many appraisers and may require the use of
21  specialized experts."
22        Do you agree with Dr. Bell?
23    A.  Yes.
24    Q.  You did not use a specialized expert in
25  designing and conducting your survey, did you?

1    A.  I consider myself to have the specialized
2  expertise.  I have knowledge, training and
3  experience in conducting surveys on a regular basis,
4  and again, you know, I didn't use it as the sole
5  method, it was a tertiary approach.
6    Q.  But it's the only method that you used for
7  the period from August 2016 to February 2019,
8  correct?
9    A.  No.  That's your characterization.  You
10  asked me -- if I had any data after -- after August
11  of 2016 and I answered no.  But you asked me
12  previously in this morning's conversation if I
13  relied only on the survey method for the dates after
14  2016 and I should have -- I did, and I believe,
15  responded no, that my study of the data from the
16  2009 to 2016 time frame indicated that time was not
17  a variable in the estimate, that there was no
18  systematic grouping or declination of the diminution
19  over time, and I applied that in the subsequent
20  period.
21    Q.  Since you didn't have data or didn't examine
22  data from August 2016 to February 2019, you don't
23  know what the impact or the diminution in value or
24  any effect of stigma was during that period, do you?
25    A.  I think that the data that I have in my

Page 166

1  report suggests that there would be. I think that
2  the -- or suggests that the damage persists over a
3  longer time frame from 2009 to 2016 and I'm
4  extending that into the period up through the
5  current date of value and we're talking about a
6  period of a couple of years and I studied a period
7  over seven prior years, so the data suggests that
8  time was not a factor, that that diminution
9  continues to exist.
10  Q.  To go back to my question, you don't know
11  what the data looked like for August 2016 to
12  February 2019 because you didn't study those data?
13  A.  That I will agree with.
14  Q.  On page 11 of your report, your general
15  report, Exhibit 1 -- I'll let you get that -- you
16  said toward the bottom:  As part of the case study
17  and paired sales development, the Integra team
18  conducted and collected dozens of in-person
19  interviews with listing and selling realtors and so
20  on.
21      Did you conduct any of the survey in-person?
22  A.  No.  They were all telephone interviews.
23  Q.  And some were done via text and e-mail,
24  correct?
25  A.  Yes.

Page 167

1  Q.  Okay.  So that's not accurate on page 11
2  when it says that you conducted and collected dozens
3  of in-person interviews?
4  A.  No, we did collect dozens of in-person
5  interviews.  We also had a number of them that
6  weren't in-person -- if e-mail is not considered in
7  person, that's okay.  We conducted and collected
8  dozens.  We also had follow-ups by e-mail.
9  Q.  So are you telling me you interviewed in
10  person, face to face, the realtors that you
11  interviewed in your survey?
12  A.  My apologies.  This term "in person" means
13  person to person, not physically in the same room
14  together.
15  Q.  The survey instrument that you used, the set
16  of questions?
17  A.  Yes.
18  Q.  We'll look at that in a second.
19  A.  Okay.
20  Q.  You wrote those questions?
21  A.  I did.
22  Q.  Okay.  Did you validate the survey
23  instrument?
24  A.  No.
25  Q.  Why not?

Page 168

1  A.  Because I was using it as a secondary or
2  tertiary method, number one and number two the
3  validation would have required a statistical
4  analysis of the survey questions and responses and
5  the data was too asymmetrical for it to be
6  statistically validated.  We were asking open-ended
7  questions about certain things.  It wasn't something
8  that could have been statistically validated, in my
9  opinion.
10  Q.  Do you have enough training and experience
11  in statistics to know whether a survey instrument
12  can be validated statistically or not?
13  A.  No.  As I testified before, I'm not an
14  expert statistician but I do understand the theory
15  of statistics and I understand that the types of
16  questions that we were asking and the design of the
17  survey would not have allowed it to be statistically
18  validated.
19  Q.  But without the expertise and statistics to
20  decide that it couldn't be statistically validated,
21  you just chose not to validate it?
22  A.  Okay.
23  Q.  So let's -- who actually conducted the
24  interviews in your survey?
25  A.  My records reflect that my staff, Paul

Page 169

1  Jones, Juan Gamio, Joe Melloni and Peter Kayworth.
2  Q.  Did you yourself conduct any of the survey
3  interviews?
4  A.  No, I attended a number of the phone
5  interviews, I would say approximately 20 to 25
6  percent, but I didn't do the individual
7  confirmations.
8  Q.  Did you give the staff members who were
9  conducting interviews any written instructions about
10  how to conduct the interviews?
11  A.  No.
12  Q.  Did you give them any formal training about
13  how to conduct the interviews?
14  A.  Well, yes, as I said, I sat through the
15  interviews with them and explained to them that I
16  wanted them to stick directly to the questions.
17  Some people try to lead you off the questions and
18  give you additional information, and I showed them
19  in a couple of instances how to try and drive the
20  follow-up questions that put people back on track.
21  So I would say in about 20 to 25 percent of the
22  cases those were training -- you know, training
23  ground as well.
24  Q.  Did you instruct your interviewers not to
25  ask probing questions?

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/18/19 Page 249 of 319
Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/18/19 Page 85 of 99
Confidential - Subject to Further Confidentiality Review

Page 170

1  A.  No.
2  Q.  The questioners knew that they were working
3  on litigation testimony for the plaintiffs, correct?
4  A.  No.  We did not disclose that.
5  Q.  I'm sorry.  Not to cut you off.  Your staff
6  who asked the questions of the survey respondents,
7  your staff knew what they were working on, correct?
8  A.  Yes.
9  Q.  All right.  So at the time that your staff
10  members conducted interviews, they knew they were
11  working on a litigation report on behalf of the
12  plaintiffs?
13  A.  I don't know what they knew.  I mean, they
14  knew what the assignment was, they knew who our
15  client was but I don't know if they were aware.  I
16  would be speculating on what they knew.
17  Q.  Your staff that helped you write your report
18  didn't know it was on behalf of the plaintiffs?
19  A.  Well, my staff didn't help me write the
20  report.  They collected information at my direction,
21  but my staff is not really looking into plaintiffs
22  versus defendants or anything like that.  They are
23  just following my instructions as to what to do and
24  what to research.
25  Q.  The term you used for your staff's

Page 171

1  assistance, I think, is significant appraisal
2  assistance, right, that's a term of art?
3  A.  Well, it's not a term of art.  It's actually
4  a requirement under the state law that I have to
5  disclose who provided any significant assistance.
6  So it's a regulatory requirement in the state of
7  Florida.
8  Q.  How much time did your staff spend putting
9  -- helping you and giving you significant assistance
10  in your reports in this litigation?
11  A.  I don't know.  I would have to look at my
12  time records but I would say, you know, amongst the
13  four or five staff members that participated
14  internally, better part of 200 hours plus.
15  Q.  And it's your testimony that they, in all
16  that time, never became aware that they were working
17  on a report for the plaintiffs in this litigation?
18  A.  No.  It's my testimony that I don't know
19  what they know.  You asked me whether they knew.  I
20  don't know that answer.
21  Q.  Did you ever discuss with them the fact that
22  you were working on behalf of the plaintiffs in this
23  litigation?
24  A.  Not explicitly.  I mean they knew that we
25  were studying the impacts of drywall remediation,

Page 172

1  post-remediation impacts of Chinese drywall.  That
2  was the scope that they understood.
3  Q.  Did any of them ever ask you which side of
4  the litigation you were on?
5  A.  Not that I can recall.
6  Q.  Was there any quality control process during
7  the survey -- during the running of the survey to
8  ensure that the interviewers were asking the
9  questions appropriately and following the survey
10  instruments?
11  A.  Well, I was reviewing the survey results as
12  they were coming through and, you know, counseling
13  and coaching those that were doing the interviews to
14  be clear on certain things or to make sure that
15  their -- the transcription of the notes were clear,
16  and as I said, you know, I attended probably 20 to
17  25 percent of those interviews so that I was, you
18  know, overseeing that process.  From a quality
19  control perspective, I think that we did a
20  reasonably good job in documenting, you know, the
21  times, the dates, who we spoke to, what the
22  follow-ups were, and, you know, accurately recorded
23  the information that we collected.
24  Q.  So sort of an ad hoc quality control process
25  as you were going?

Page 173

1  A.  I don't know, I mean, I don't know if I
2  would consider it to be ad hoc.  I'll let you make
3  that determination.
4  Q.  Did your quality control process follow a
5  written protocol that you had established in
6  advance?
7  A.  Well, we had a written script and the
8  protocol was to stick to the script.
9  Q.  I'm asking a different question.  Did you
10  have a protocol in advance for how to conduct
11  quality control on the study?  In other words, to
12  make sure that people participating in the study
13  were following your instructions and accurately
14  giving out the -- asking questions on the survey
15  instrument?
16  A.  By observation, yes, I mean, I was
17  overseeing the conduct of those surveys.  There was
18  no written protocol as to -- there was no written
19  protocol, if that's what you were asking.
20  Q.  Do you remember which interviews
21  specifically you attended?
22  A.  I don't.
23  Q.  Did you analyze whether there is nonresponse
24  bias in your survey data?
25  A.  Yes.  I've identified the number of surveys

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/18/19 Page 250 of 319
Case 2:09-md-02047-EEF-MBN Document 21363-31 Filed 01/12/19 Page 46 of 99
Confidential - Subject to Further Confidentiality Review

Page 174

1  we conducted against all the surveys, and then I've
2  also looked at, you know, within the surveys what
3  the interviewee comments demonstrated, whether they
4  were responsive and I classified those.
5     Q.  I'll try and define the term.  I'm referring
6  to whether the people who declined to participate in
7  your survey are different than the people who do
8  participate in your survey.  That's what I mean by
9  nonresponse bias.
10    A.  Well --
11    Q.  Is that a concept you're familiar with?
12    A.  No.  I don't think so.  Not the way in which
13 you're defining it.  I mean, the people that
14 declined to participate couldn't possibly have been
15 the people that participated.  I mean, either you
16 did or you didn't.
17    Q.  Yeah.  Selection bias is another word for
18 it.  The question is whether the people who didn't
19 participate in your survey are different somehow
20 than the people who do say:  Yes, I'll participate
21 in the survey.
22       That's not something you analyzed?
23    A.  No.
24    Q.  Is that something you know how to analyze?
25    A.  No.

Page 175

1     Q.  Did your team use the same questionnaires
2  for all survey respondents?
3     A.  Yes.
4     Q.  Let's -- I'm going to -- we'll look at the
5  survey, the actual responses in a second, but let's
6  look at your summary of the survey results.
7     A.  Okay.
8     Q.  Which I will find a more general report.
9  Okay.  So if you can turn with me to page 23 -- I'm
10 going to look at the written text.
11    A.  Sure.
12    Q.  23 of your general report.  And this is the
13 part of your expert report where you summarize the
14 conduct and results of your contingent valuation
15 survey, correct?
16    A.  Yes.
17    Q.  And you say that among the 45 responses, 13
18 responses were classified as unclear whether the
19 respondent meant pre-remediation or
20 post-remediation; is that right?
21    A.  Yes.
22    Q.  So 13 over 45 is almost a third, right?
23    A.  Yes.
24    Q.  So almost a third of survey respondents
25 didn't know whether you were asking about

Page 176

1  pre-remediation, stigma or post-remediation stigma,
2  correct?
3     A.  I classified them as unclear because the
4  notes that my team transcribed were not clear as to
5  whether they were talking about post or pre.  So I
6  don't want to say that the respondents didn't
7  understand.  It may have also been a transcription
8  error in the notes.
9     Q.  So whether it was the survey respondents or
10 your staff's notes, it is not possible to tell for a
11 third of survey respondents whether they were
12 referring to pre- or post-remediation stigma?
13    A.  Correct.
14    Q.  And the key question -- let me go ahead and
15 hand you, these are the survey responses that you
16 have listed on page 24 of your report.
17       MR. BLOCK:  I've got a copy for you, too,
18    Patrick, just give me a second to get organized.
19       MR. MONTOYA:  Thank you.
20 BY MR. BLOCK:
21    Q.  So these are for you, Mr. Graziano, and
22 then -- actually, this -- no, those are yours, those
23 are yours.  You're good, those are yours.  And these
24 are for you.
25       MR. MONTOYA:  Thank you.

Page 177

1     Q.  And so, Mr. Graziano, what we did was we
2  went through the production of documents that the
3  plaintiffs gave us a little while ago and we pulled
4  out the survey responses for the -- yeah, we're
5  going to mark that as Exhibit -- let's mark all of
6  those as Exhibit 8, if you would, please.  Thank
7  you.
8       (Graziano Exhibit 8 was marked for
9  identification.)
10 BY MR. BLOCK:
11    Q.  So we pulled out the survey responses that
12 you have tabulated on page 24 of your general expert
13 report.  Okay?
14    A.  Yes.
15    Q.  Just getting oriented and it should be 45,
16 45 responses and on your copy, just to keep you
17 organized, I have them tabulated, there is the PR
18 minus minus, PR minus plus and qualified, which
19 corresponds to the way that you categorized them and
20 I think we just didn't get to that, Patrick, on
21 yours but it's minus plus and then qualified.  Okay.
22    A.  Yes.
23    Q.  All right.  So let's look at the first one,
24 for example.  I have the interviewee Bette Abrams,
25 Broward 2 Comp 2.  Okay?

Case 2:09-md-02047-EEF-MBN Document 23363-31 Filed 11/18/19 Page 251 of 319
Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 01/23/19 Page 47 of 99
Confidential - Subject to Further Confidentiality Review

Page 178

1    A. Yes.
2    Q. Which is the question or questions from
3 which you derive your results that you reflect on
4 the table on page 24?
5    A. So Broward 2 Comp 2 will be coded as B2C2.
6 So this would be one, two, three, four, five, six,
7 seven, eight, nine, 10, 11 lines down on the table
8 on page 24.
9    Q. Uh-huh.
10    A. You will see it says Bette Abrams -- I am
11 going to try and correlate -- 10055 Bay Leaf Court,
12 that would have been the property that Bette was
13 either the listing or selling agent on that we were
14 confirming with her, you know, that that property
15 did not have Chinese drywall. I think that was used
16 as a comparable.
17    Q. It may be Bette Abrams. I might have said
18 Allman.
19    A. I am just following your -- it's difficult
20 for me to --
21    Q. Betty A.
22    A. Right, Betty A.
23    Q. Okay. So --
24    A. So that would be B2C2, which is 11 lines
25 down, and then you will see to the right it says

Page 179

1 interviewee comment and then it's a quote from line
2 7.
3    Q. Okay. So line 7 is the -- or question 7 is
4 the question that you used to categorize realtors as
5 to whether they indicate a price impact or not from
6 stigma, price remediation stigma?
7    A. Right. We asked a number of these questions
8 but the question with respect to the sales price
9 being impacted by the prior existence of Chinese
10 drywall even though remediated was a question that
11 would follow if the control sale was what was being
12 interviewed, but Question 7 was the general
13 questions we asked all of the realtors, that's
14 correct.
15    Q. In order to classify a realtor who is
16 responding to the survey as indicating a price
17 impact or no impact or qualified response, are you
18 looking primarily at Question 7?
19    A. It really depends on the control sales.
20 Some people answered the questions in Question 5 and
21 6 and then followed up in Question 7.
22    Q. Okay. All right. So you have to look at
23 the whole sheet to see what their view is on stigma
24 or not?
25    A. Correct.

Page 180

1    Q. Okay. All right. So if you will go with
2 me, keep Betty A and then go with me to your next
3 tab, actually and you will see Natalie Betancur,
4 sale for Comp 4. It looks to me like this survey
5 instrument actually has different question numbering
6 and different questions. And the reason I say that
7 is because on the second one we go from 7 to 8 to 8A
8 and on the first one we only have 8A, there is no 8.
9 Do you see what I'm talking about?
10    A. Yes, and -- well, it's formatted a little
11 different.
12    Q. So do you know why there are at least two
13 different versions of the survey instrument?
14    A. I do not.
15    Q. All right. I want to look at -- right. I
16 think -- oh, I should say one of my colleagues
17 handed me a note. We could not find one of the
18 questionnaire response forms for Ed Poirier, who I
19 think you had classified as a price impact -- yeah,
20 it's the one in Broward, B2C4, we didn't have that
21 in the production. So just telling you that you the
22 stack I gave you is missing one because we were
23 missing one.
24    A. Which one is that?
25    Q. It's Broward B2C4, it's the second from the

Page 181

1 bottom of that first chunk.
2    A. Okay.
3    Q. We couldn't find it. All right. Is it your
4 testimony that in your tabulation on page 24 you
5 included all of the realtors who -- excuse me, who
6 responded that there is no price impact or stigma
7 from Chinese drywall after remediation?
8    A. Yes, if there were comments that said that,
9 we recorded them all, to the best of my knowledge.
10    Q. I'm going to hand you some comments to look
11 at. The first one I want to hand you is for a
12 realtor named Nestor Asencio. Do you see that?
13    A. Yes.
14    Q. Okay. So that is a control pairing
15 verification script that we got via a production
16 from the plaintiffs. Does that look like one of
17 your scripts or your team's scripts?
18    A. Yes.
19    Q. Okay. And if you look at Nestor Asencio's
20 answer to Question 7, he says there is no pricing
21 impact on homes that had Chinese drywall, correct?
22    A. Yes.
23    Q. Can you look on page 24 and see if you see
24 Nestor Asencio listed here?
25    A. I do not.

1    Q.  I'll hand you --
2    A.  Was this -- if I may ask, was this in the
3  case study material of the control sales that we
4  used or was this in the backup material of other
5  material?
6    Q.  I think you -- y'all produced three or four
7  large PDFs of 700 odd pages each and these were in
8  there.  I don't know which specific file.  We could
9  look at that at break.
10    A.  Okay.  Because you asked me the question
11  and, you know, it may be an incomplete answer and I
12  want to be clear.  We have an entire binder as thick
13  as this primary production on -- on properties that
14  sold impaired and we had started down the road of
15  comparing the impaired discounts.  We had been doing
16  research on the impaired discounts so we may have a
17  number of surveys in those packages that were not
18  reflected in the control sales and not reflected in
19  the -- in otherwise that were surveys that were not
20  used.  They were surveys that were representative of
21  our surveys for -- an impaired analysis that we
22  never finally developed.  So there may be additional
23  surveys that are not included but this list
24  comprised all the surveys of people related to the
25  case studies that we have in this report.

1    Q.  Okay.  I'm going to hand you another one of
2  these scripts.  This is Mike Rimkevicius.  I'm going
3  to give you a copy as well.  Here's your copy of
4  Mike Rimkevicius, I'm probably misspelling.
5        This is another one of your control pairing
6  verification scripts T27S.  Do you see if you look
7  at page 24, do you see Mike Rimkevicius' name -- or
8  actually, I didn't even ask you what he says.  I am
9  going to do that.  Mike Rimkevicius' answer to
10  Question 7 says:  No impact.
11        Right?
12    A.  Yes.
13    Q.  Do you see Mike Rimkevicius listed in your
14  table on page 24?
15    A.  No.
16    Q.  Okay.  I'll give you another one.  This is
17  William Figueroa.  There you go.  And if you look at
18  William Figueroa's response to Question 7, when you
19  asked -- or your staff asked:  Have you noticed a
20  pricing impact on the homes that had Chinese
21  drywall?
22        He responded:  Not anymore.
23        Right?
24    A.  Yes.
25    Q.  Do you see William Figueroa listed in your

1  table on page 24?
2    A.  No.
3    Q.  Okay.  All right.  So I'm going to hand you
4  another one.  This is Dennis Boyle, and here is
5  Dennis Boyle for you.  And in response to Question 7
6  Dennis Boyle says:  "The market was impacted by
7  mortgage prices so it's hard to say if there was any
8  Chinese drywall involved."
9        Which I assume means involvement, right?
10    A.  Okay.
11    Q.  So this is another realtor who is telling
12  you that he can't say that there is a stigma impact
13  on post-remediation homes, right?
14    A.  I could -- you could -- I could classify it
15  that way, sure.
16    Q.  Do you see Dennis Boyle listed in your table
17  on page 24?
18    A.  No.
19    Q.  Okay.  Here is another one, Hernando
20  Santacoloma.  Here's your copy.  And if you look at
21  this one, for Hernando Santacoloma, he actually
22  responds in Question 5, when he was asked:  "In your
23  opinion, was the sales price impacted by the prior
24  existence of Chinese drywall even though
25  remediated?"

1        His answer was:  "No, price was the top of
2  the market, appraiser had trouble finding comps to
3  justify price value."
4        Right?
5    A.  Yes.
6    Q.  This is another realtor telling you he
7  wasn't aware of stigma of post-remediated home,
8  correct?
9    A.  No.  What he was saying I think in response
10  to this question, was related to the sale above that
11  was sold to a military family, he was saying that he
12  did not believe this one was but in this case we
13  asked that the -- it says:  "First, the listing
14  information indicates that the property did not
15  mention Chinese drywall and it was remediated, is
16  this correct?"
17        So in this case the realtor is saying yeah,
18  we didn't disclose it, it was remediated by Lennar,
19  we didn't disclose it.
20    Q.  It should have been disclosed elsewhere,
21  just not in the listing.
22    A.  That's what those follow-up questions were
23  about.  We said:  According to the MLS, the property
24  was listed on.
25        If you recall, can you please describe your

Page 186

1 buyer's reaction.
2 Was this timeline impacted by the Chinese
3 drywall?
4 He said no.
5 Can you recall your buyer's reaction?
6 He said they had a certificate and the house
7 sold a year before pre-remediation. So he was
8 saying they had a certificate. And then we asked:
9 Was it impacted by the prior existence?
10 And he said: No, the price was at the top
11 of the market.
12 So he was referring to the actual sale,
13 transfer, you know, that particular sale, not the
14 general market.
15 Q. But in that sale was there a stigma?
16 A. No.
17 Q. Okay. Is Hernando Santacoloma listed in
18 your table on page 24?
19 A. No.
20 Q. Okay. I'll give you another one. This is
21 Paul De La Torres. There you go.
22 If I can get to -- in response to Question
23 7, when he is asked whether there -- In listing and
24 marketing other homes in this market he has noted a
25 pricing impact on the homes that had Chinese

Page 187

1 drywall, he says: "Hard to say."
2 Right?
3 A. Sure.
4 Q. Okay. Is this a realtor who is telling you
5 that there is a stigma impact post-remediation?
6 A. I would call that a qualified comment.
7 Q. You would put him at the bottom of your
8 chart on page --
9 A. Yeah, I don't even think that's indicative
10 of -- I mean "hard to say" doesn't, to me, indicate
11 any way, one way or the other. He says it's hard to
12 say.
13 Q. He doesn't say yes does he?
14 A. He doesn't say yes, he doesn't say no.
15 Q. Is he on your chart on page 24?
16 A. No.
17 Q. I'll hand you one more of these, this is
18 Steve Norrito.
19 In response to Question 7, Steve Norrito
20 says: "If electrical had not remediated, allowed
21 for cost in the sales price, adjusted for any
22 remediation."
23 All right. Is this a realtor who is telling
24 you that there is a stigma impact post-remediation?
25 A. Not necessarily, I mean he's qualifying his

Page 188

1 opinion. He's saying if the electrical was not
2 remediated, you have to allow for the cost in the
3 sale price, which indicates that there would be some
4 stigma if the electrical hadn't been remediated. So
5 I guess the answer is yes.
6 Q. Well. Isn't he saying that if you had
7 remediated, including the electrical, there would
8 not be a pricing impact?
9 A. You could interpret it that way. I wouldn't
10 but you could turn it around and characterize it
11 that way, sure.
12 Q. Do you see Steve Norrito listed in your
13 table on page 24?
14 A. No.
15 Q. All right. So we've looked now at one, two,
16 three, four, five -- well, we've looked at six
17 people who gave survey responses, five of whom did
18 not tell you that there is stigma or said there is
19 no stigma and they are not reflected in your table
20 on page 24, right?
21 A. Correct.
22 Q. Do you know why that is?
23 A. Maybe we just didn't do as -- we may have
24 missed them. I mean, there may be just as many that
25 have negative comments that were not compiled. As I

Page 189

1 said to you before, we conducted a number of surveys
2 and case studies that we put aside and in putting
3 those aside, we may have just, you know, missed
4 compiling those in the survey results.
5 Q. But as we sit here today, you can't testify
6 as to why survey respondents who told you there was
7 no stigma were omitted from the tabulation of your
8 results?
9 A. I think I did testify to that. I would have
10 to cross-reference these against the surveys that we
11 used in the case studies and control sales versus
12 those that we set aside. Part of what I'm
13 testifying to and what I'm telling you is the truth
14 is that, some of these surveys may have been in
15 binders that were in the case studies that we
16 ultimately didn't end up using, and therefore they
17 weren't compiled.
18 Q. You had these survey responses in your
19 files, and they didn't end up in Table 24 where you
20 tabulated the results and I think what you're
21 telling me today is that you don't know why, as we
22 sit here, why these respondents aren't in the table
23 on 24?
24 A. Okay.
25 Q. Do you know which case studies and surveys

Page 190

1 you did set aside and why?
2    A.   Yes.  All of the surveys that were included
3 in the control pairs were all analyzed.  I believe
4 there was only one out of these, so far, that you've
5 shown me that should have gotten transferred to this
6 survey, but again, we were looking through, you
7 know -- I mean there's 40 on this list and there is
8 probably another 30 or 40, close to 100 surveys
9 potentially that we conducted, some of which weren't
10 included in this case study.  They were on
11 properties that were impaired.  So the compilation,
12 we missed a few, and I'm sure we may have missed a
13 few that also had negative comments.  I'll have to
14 go back and look.
15    Q.   If we add to your survey results some of the
16 responses that you omitted, the percentage of
17 realtors who say there is no stigma would increase,
18 wouldn't it?
19    A.   Yes, if there wasn't a corresponding
20 increase in the number of negative comments that we
21 might discover by a similarly scrutinizing look at
22 our survey method.
23    Q.   How did you decide whether to classify a
24 response as qualified or price impact or no impact?
25    A.   Based on what I consider to be the clarity

Page 191

1 of the transcription of the response.  So if it
2 was -- if someone made a response that says there
3 was stigma, deals fell through, people either stayed
4 away or trusted in the repairs, I mean, that to me
5 qualified as a negative response.
6        If somebody said, you know, there is a huge
7 impact and that's all they said, then I made that a
8 qualified statement because it wasn't clear that
9 they were talking about remediated properties, they
10 weren't clear of what their definition of huge was.
11 So I qualified those statements that couldn't be
12 seen as clearly articulating a yes or a no to a
13 negative or positive impact.
14    Q.   Wasn't one of the problems that some people
15 said there was a price impact but they appeared to
16 be referring to homes pre-remediation?
17    A.   There were some situations like that where
18 to me the transcription of the answer or the answer
19 itself was not clear.
20    Q.   All right.  If you go to your table on page
21 24, the third one down says:  Absolutely but don't
22 hear about those since five years ago.
23        How do we know that respondent is talking
24 about stigma on pre-remed -- excuse me, homes
25 post-remediation as opposed to homes that five years

Page 192

1 ago actually had Chinese drywall?
2    A.   I'd have to go look at the specific survey
3 response, if you will give me a second.  PB2C1.
4    Q.   While you're looking for that, does the fact
5 that about a third of survey respondents couldn't
6 give -- only ambiguous answers to Questions 7 and 8
7 suggest that the questions might be vague and hard
8 to answer accurately?
9    A.   I'm sorry.  Could you -- I'm just --
10    Q.   Yeah.  Does the fact that about a third of
11 survey respondents couldn't figure out whether, in
12 Questions 7 and 8, you were referring to pre- or
13 post-remediation homes, doesn't that suggest that
14 the questions are vague and hard to answer
15 accurately?
16    A.   No, because I wasn't directing them to give
17 me a specific answer post- and pre-remediation.  As
18 I testified previously, this initial survey design
19 was based on studying both impacts.
20        My scope to -- to reach just the
21 post-remediation impacts, you know, developed as
22 a -- through -- through the course of the
23 assignment.  So originally we intentionally asked
24 the question this way to elicit responses that would
25 be classified as clear or not clear.

Page 193

1        So I would say that was part -- part of the
2 survey design was to not just ask about
3 post-remediation; we were asking about general
4 impacts of Chinese drywall overall.
5    Q.   Okay.  So just make sure I understand.
6        When you designed the survey, your intent
7 was to ask about pre- and post-remediation stigma,
8 not to isolate post-remediation stigma?
9    A.   Right, except in the case where we asked the
10 specific question, you know, "even though
11 remediated," which would be Question Number 5.
12    Q.   But the intent of the survey was to just ask
13 about stigma generally pre- and post-remediation?
14    A.   Well, the intent of the survey was to elicit
15 responses so the realtors would tell us whether it
16 was or wasn't either post or pre; but the question
17 was structured to elicit a response -- intentionally
18 to have a conversation and elicit a response that
19 would demonstrate both or either.
20        And we asked the question both ways because
21 we said above, you know, were the sales prices
22 impacted by the prior existence of Chinese drywall
23 even though remediated, so we asked that question in
24 the previous question.
25    Q.   Okay.  So I think what you're telling me is

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/18/19 Page 255 of 319
Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/26/19 Page 81 of 99
Confidential - Subject to Further Confidentiality Review

Page 194

1 that the design of your survey meant that
2 respondents might answer Question 7 in reference to
3 pre- or post-remediation impacts from Chinese
4 drywall, right?
5    A.  Yes.
6    Q.  Okay.  You mentioned a minute ago that the
7 scope of your opinion or project changed during the
8 course of your -- preparing your opinion.
9      Did I -- did I understand that correctly?
10    A.  Yes.
11    Q.  What was the initial scope of your work?
12    A.  When we originally started to compile the
13 survey materials and the case studies, we were going
14 to study both the post-remediation impacts and
15 pre-remediation impacts.  Within about a week or two
16 of the engagement, you know, I advised the attorneys
17 that there was going to be insufficient time to do
18 both.  We had developed 30 or 40 potential case
19 studies in both -- both scenarios, and at that time,
20 I think it was early January, Mr. Montoya called me
21 and told me that the exchange date had been moved
22 from, like, March to February, or that the -- that
23 the original date was February 15th.  I don't recall
24 what the specific questioning on date was.
25      I explained there was no way we could be --

Page 195

1 get done both in the six-week time frame.
2    Q.  So you changed the scope of your work based
3 on the litigation schedule?
4    A.  Well, we changed the scope of the work based
5 on what I agreed our scope of work to be with
6 Mr. Montoya.
7    Q.  And that was driven by pressures of the
8 litigation schedule?
9    A.  From my perspective, I -- I told him what I
10 was going to be able to do and I told him that --
11 and I explained -- that's it.  I explained to him
12 what I was going to be able to do within the time
13 frame.  So yes, driven by approximate litigation
14 schedule and my other work assignments.
15    Q.  So if you had more time, you might have
16 designed and conducted your work differently?
17    A.  Look, I think we would have made
18 improvements to -- we could always make improvements
19 to these.  So if I had more time, sure, we would --
20 we would have made improvements in the survey
21 method, sure.
22    Q.  When did you originally design the survey?
23    A.  I would say first two to three weeks in
24 January.
25    Q.  And at -- at some point also in January,

Page 196

1 you -- you discussed with counsel revising the scope
2 of your work; is that right?
3    A.  Yes.
4    Q.  Okay.  Was that discussion with counsel
5 after you designed the survey?
6    A.  Roughly.  I don't know the -- all those two
7 or three weeks blend together.  I couldn't say.
8    Q.  But as we sit here today, your report is
9 based on a scope of work that's different than the
10 one you originally set out to perform?
11    A.  No.  The scope of work that my report covers
12 is the scope of work that we agreed was ultimately
13 going to be my scope of work.  It evolved, though,
14 since -- from -- from -- since the date of the
15 original engagement in late December.
16    Q.  Did you -- I -- I distracted you, but were
17 you able to find the response, Lorma -- Loma Swartz?
18    A.  Yes.
19    Q.  Okay.  So you have that in your binder?
20    A.  I do.
21    Q.  Let's look at her together.
22      MR. BLOCK:  Yeah, it's in what you have,
23 Patrick.
24      MR. MONTOYA:  In Exhibit 8?
25      MR. BLOCK:  Yes.

Page 197

1      MR. MONTOYA:  Which tab?
2      MR. BLOCK:  Yeah.  It's -- it should be the
3 first tab because she's a price impact; and I
4 think those are alphabetical, so she -- she's at
5 the ends, very last one.
6      MR. MONTOYA:  Last tab or first tab?
7      MR. BLOCK:  Sorry.  First tab -- last --
8 last person in the first tab.  There's no page
9 numbers.
10      MR. MONTOYA:  Loma?  Loma what?
11      MR. BLOCK:  Swartz.
12      MR. MONTOYA:  Got it.
13 BY MR. BLOCK:
14    Q.  So you classified Ms. Swartz as a price
15 impact -- a post-remediation price impact person,
16 realtor?
17    A.  I classified her as a post-remediation price
18 impact, yes.
19    Q.  Okay.  How are you sure that she is talking
20 about post-remediation as opposed to
21 pre-remediation?
22    A.  As I sit here today, I can't say that I am.
23 I can see that it wasn't clear that -- it
24 remediate -- her comment on remediation is not clear
25 here.  This would be a qualified impact.

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/18/19 Page 256 of 319
Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/20/19 Page 52 of 99
Confidential - Subject to Further Confidentiality Review

1  Q.  Okay.  So let's move her down to
2  "qualified."
3      And -- and the reason is that the Question 7
4  doesn't make clear whether you are asking about pre-
5  or post-remediation impacts from Chinese drywall,
6  right?
7  A.  Correct.
8  Q.  Okay.  Let's look at another one of these.
9  This is -- gosh, Robert Auerbach; and in your -- in
10  the binder that I -- or the stacks that I gave you
11  two, he would be the second one.  If you want to do
12  it either way.  If you --
13  A.  I'm sorry.  You -- okay.  You gave me --
14  Q.  Yeah.  If you look there, it'll just be the
15  second one.
16  A.  Thank you.  In here?
17  Q.  Yeah.  If you look in there, that's the
18  second one.  Are you there?
19      Robert Auerbach.  It's a little easier to
20  read the address, 6725 Northwest 122nd.
21  A.  My apologies.  Did you say it was the second
22  one?  Because it's not the second one.
23  Q.  It was the first -- sorry, the first tab.
24  A.  First tab?
25  Q.  And then the second -- should be the second

1  response.  Do you not have that?
2  A.  No.  I've got David Grima or "Grima."
3  Q.  Shoot.  I'll give you -- I'll give you my
4  copy.  This is --
5      MR. BLOCK:  Do you have it, Patrick?
6      MR. MONTOYA:  I do.
7      MR. BLOCK:  Okay.  You've got it.  All
8  right.
9  BY MR. BLOCK:
10  Q.  Well, here's -- you can have mine.  It's
11  David Auerbach.  In response to Question 7, he says:
12  "Yes of course."
13  A.  Just for the record --
14  Q.  Yes.
15  A.  Just for the record, so this is Exhibit 8?
16  Q.  Yes.
17  A.  And now you're giving me pieces of your --
18  Q.  Yeah.  It looks like we maybe left a page
19  out of your Exhibit 8.
20      You should have had the piece of paper I
21  just gave you.  Patrick has it.
22  A.  Okay.
23  Q.  I had it.  You didn't have it.
24  A.  Okay.
25  Q.  So we're just giving it to you.

1  A.  All right.  So there is no problem that this
2  is the marked exhibit and there was missing pages?
3  Q.  We'll clean it up.
4      MR. BLOCK:  Let the record reflect that I
5  handed you a piece of paper that should be in
6  your copy of Exhibit 8.
7  A.  Okay.
8  BY MR. BLOCK:
9  Q.  It's a good -- it's a fair question.
10  A.  Yeah.
11  Q.  Lot of paper here.  Okay.
12      Mr. Auerbach, in response to Question 7,
13  said what?
14  A.  He said that he has noted a pricing impact
15  of homes that had Chinese drywall.
16  Q.  Okay.  And that verbal tense is unclear,
17  whether he meant -- whether he meant had Chinese
18  drywall five years ago and still had it at that time
19  or don't have Chinese drywall today but had it five
20  years ago, right?
21  A.  Yep.  I see your point.
22  Q.  Okay.  So that's another one that should be
23  qualified?
24  A.  It could be.  I mean, I -- I certainly
25  qualified this as he said, "Yes, of course," there's

1  an impact.  So I qualified it as negative.  There
2  was no qualifier that said before or after
3  remediation.  He just said, "Yes, if you had Chinese
4  drywall, there is going to be an impact."
5  Q.  Okay.
6  A.  I considered that to be a positive -- or
7  a -- you know, a negative comment -- you know,
8  post-remediation.
9  Q.  But as we sit here today and look at that,
10  it's unclear whether he's referring to pre- or
11  post-remediation, correct?
12  A.  I can see how you'd look at it that way.
13  Q.  All right.  So let's look at Alex Curcio --
14  mangle that.  He should be just another couple
15  people forward, or you can look at him on your table
16  on Page 24.
17      Do you have Alex?
18  A.  No.
19      (Discussion off the record.)
20  BY MR. BLOCK:
21  Q.  We'll -- all right.  Well, let's -- let's
22  look at what you tabulated for Alex in the interim.
23      On Page 24, you wrote "yes."  His answer to
24  Question 7 was "yes."
25  A.  Do you mind if I look at the entire survey?

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/18/19 Page 257 of 319
Case 2:09-md-02047-MDL Documents 21413-1 SEC Locket 01/13/2019 Page 83 of 99
Confidential - Subject to Further Confidentiality Review

| | Page 202 | | Page 204 |
|---|---|---|---|
| 1 | Q. Yeah. Yeah. Okay. I'll hand you my copy | 1 | pause right there. |
| 2 | of Alex Curcio's response. | 2 | So if we -- if we look just at the -- if we |
| 3 | A. Yes. | 3 | just look at the people who gave qualified |
| 4 | Q. Okay. Is that another one that doesn't make | 4 | responses, as you tabulated, you have 32 people who |
| 5 | clear whether he's referring to pre- or | 5 | gave clear responses, "Yes, there is stigma," "No, |
| 6 | post-remediation impacts? | 6 | there is no stigma," right? |
| 7 | A. I don't see him on -- on the first table. | 7 | A. I don't know the count at this point. |
| 8 | Q. He's -- | 8 | Q. Okay. |
| 9 | A. Oh, here he is. | 9 | A. I'm -- I'm confused as to whether you're |
| 10 | Q. -- on -- yeah. | 10 | asking me based on your new tabulation or based on |
| 11 | A. I see. Yes, I got him. Thank you. My | 11 | the -- based on the old tabulation. |
| 12 | apologies. | 12 | Q. Well, I -- I -- the point I'm trying to make |
| 13 | Yes. | 13 | is that it is possible to reclassify some of the |
| 14 | Q. Is it your -- your answer was yes, he might | 14 | survey responses -- respondents when we actually |
| 15 | be a qualified respondent because it's not clear | 15 | look at the forms, and that's going to affect the |
| 16 | whether he's referring to pre- or post-remediation | 16 | bottom line calculations of your survey, right? |
| 17 | stigma? | 17 | A. It will affect the percentages based on the |
| 18 | A. If -- if you believe that the past tense of | 18 | classification, that's correct. |
| 19 | "had Chinese drywall" doesn't refer to remediated, | 19 | Q. Okay. And so if we take the people who said |
| 20 | then yes, I can see how you would qualify that. | 20 | there was a stigma and put them into the qualified |
| 21 | Q. And sitting here today, we really don't know | 21 | category, we're going to be less than half of |
| 22 | how the realtors interpreted that verb, do we? | 22 | realtors who answered the question clearly enough |
| 23 | A. Right. | 23 | for us to know what they were talking about and said |
| 24 | Q. And so -- | 24 | there was a stigma, right? |
| 25 | MR. CAMPBELL: They are all in there. | 25 | A. Sure. |

| | Page 203 | | Page 205 |
|---|---|---|---|
| 1 | You're just going to have to get through it. | 1 | Q. Does that affect your analysis at all? |
| 2 | THE WITNESS: They're not in order. | 2 | A. I would have to go back and retabulate that |
| 3 | MR. BLOCK: Yeah, we'll -- | 3 | to really make that determination. |
| 4 | THE WITNESS: Yeah. | 4 | Q. All right. Now, what if we add the people |
| 5 | MR. BLOCK: I'm not going to -- | 5 | who, for whatever reason, gave an answer that there |
| 6 | BY MR. BLOCK: | 6 | is no stigma and are, for whatever reason, omitted |
| 7 | Q. All right. So just pausing right here for a | 7 | from your table? If we add them into the "no |
| 8 | minute, we've talked about three respondents who you | 8 | stigma" column, that also would mean that more than |
| 9 | qualified as indicating a stigma from | 9 | half of respondents and realtors said there was no |
| 10 | post-remediation that might actually better belong | 10 | stigma, right? |
| 11 | in the third category for qualified respondents | 11 | A. It could. But as I said, I would like to |
| 12 | where it's not clear whether they are talking about | 12 | understand the reasoning why those were excluded; |
| 13 | pre- or post-remediation, right? | 13 | and I'd also like the opportunity to go back and |
| 14 | A. Yes. | 14 | look if any other surveys were excluded because that |
| 15 | Q. Okay. Now, if we -- if we took those three | 15 | could also affect all the percentages. So there may |
| 16 | people -- you can set aside those for a second -- | 16 | be other surveys which, you know, indicate -- add -- |
| 17 | and look back at your report, you initially had 18 | 17 | add some clarity or balance those out. |
| 18 | of the respondents saying that there would be market | 18 | I primarily focused on tabulating the ones |
| 19 | resistance even after remedial actions were | 19 | that were related to those case studies. So, you |
| 20 | completed? It's on Page 23 of your report. | 20 | know, if I did that, all of the percentages would |
| 21 | A. Yes. | 21 | change. |
| 22 | Q. Okay. So that might -- that number might | 22 | Q. All right. So as -- as you sit here today, |
| 23 | actually be 15 of the 45? | 23 | can you stand behind the survey results as you have |
| 24 | A. Yes. | 24 | them tabulated, or do you need to go back and do a |
| 25 | Q. Okay. And we could keep going, but let's | 25 | little more work? |

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/18/19 Page 258 of 319
Case 2:14-cv-24467-NLG Document 249-1 Entered on FLSD Docket 11/20/14 Page 54 of 99
Confidential - Subject to Further Confidentiality Review

Page 206

1    A.  I mean, I'm -- look, I'm prepared to -- to
2  acknowledge that there may be a few that could be
3  classified a different way.  In terms of adding the
4  other ones, I'm not prepared to add the other ones
5  unless I take a comprehensive look and add them all.
6      So if there were some that were missing that
7  you identified in my materials, then I would want
8  the opportunity to go back and identify all the ones
9  that were missing from my materials and retabulate
10  them.
11    Q.  Well, let's look at just the three that we
12  would move from the "yes, there is a stigma" column
13  to the "qualified" column.
14    A.  Okay.
15    Q.  All right.  And let's -- let's just count.
16    A.  And -- excuse me.
17    Q.  So -- yeah.
18    A.  Are you saying then that all the other ones
19  are substantively clear that you agree that they are
20  negative?
21    Q.  I'm -- I'm not agreeing, but let's just take
22  it at face value.
23    A.  Okay.
24    Q.  All right.  So let's -- let's see.
25      If we have your first third on Table 24, you

Page 207

1  started out with -- 1, 2, 3, 4, 5, 6, 7, 8, 9, 10,
2  11, 12, 13, 14, 15, 16, 17 -- 18 people in the "PR
3  minus, minus, yes, there is stigma," right?
4    A.  That was the original, yes.
5    Q.  Yes.  Okay.  All right.
6      And if we move three of those people down to
7  qualified, that leaves us with 15 in the "yes, there
8  is stigma" column, right?
9    A.  Post-remediation stigma, yes.
10    Q.  Uh-huh.
11    A.  Yes.
12    Q.  Okay.  And -- and if we don't do anything to
13  the people who -- the second column that says there
14  is no stigma, that's 14, right?
15    A.  I think it was 13.  Let me -- the qualified?
16    Q.  No, the second column that says --
17    A.  My apologies.
18    Q.  -- there is no stigma?
19    A.  My apologies.
20      That's 14, correct.
21    Q.  And I note also that if you -- if you go
22  back to the upper column, the third one from the
23  gray bar that's Broward B10-C4 -- excuse me, the
24  fourth one, Broward B10-S2, it says:  "Little bit of
25  stigma still - 5 percent."  That's the range that

Page 208

1  you consider more or less nonexistent stigma, right?
2    A.  But she interviewed that there was a --
3  there was stigma.
4    Q.  So you want to keep her in the stigma camp?
5    A.  Well, I would think so, particularly since I
6  had studies that -- some of which demonstrated at
7  two-and-a-half to 7 percent and she's saying 5
8  percent.  I mean, I think that --
9    Q.  Okay.  All right.  Well, just -- if -- if
10  all we do is -- is stick with this adjustment here,
11  we've got 15 for stigma and 14 against stigma, which
12  is very close to fifty-fifty, right?
13    A.  Yes.
14    Q.  Okay.  It's kind of a coin flip whether
15  there is going to be stigma or no stigma if you look
16  at the survey respondents, right?
17    A.  Base -- based on this survey, it's
18  fifty-fifty of realtors that said that clearly
19  remediation, there was or wasn't any impact; and of
20  the ones that said that there was no impact, most of
21  those were qualified by saying, you know, there has
22  to be an inspection report, there has to be -- has
23  to be a clean remediation.  So there -- there was
24  qualified statements; but yes, fifty-fifty.
25    Q.  If your survey results are at more or less

Page 209

1  fifty-fifty whether there is stigma or not and your
2  paired sales analysis data show a number of
3  instances where there is no stigma, can you again
4  explain to me why you think there will be stigma
5  damages in every single one of the Priority
6  Claimants' cases?
7    A.  Yes, because the -- I have 50 percent of the
8  realtor market saying clearly there is
9  post-remediation stigma, some of them quantifying it
10  by percentage; and others -- and other people
11  saying, "No, as long as it's in" -- and then
12  another -- if, you know, approximately -- and if, by
13  the way, it's -- if we're going to use the 29, in
14  fairness to the transcripts --
15    Q.  Yeah.
16    A.  -- it's really 52 percent that said there is
17  a problem, and 49 percent roughly that say that
18  there's -- there is no stigma post-remediation.
19    Q.  And for a survey with only 29 respondents,
20  that's a very small sample, right?
21    A.  It's -- admittedly, we can call it
22  fifty-fifty for discussion purposes.
23    Q.  Okay.  For --
24    A.  But in either case, I have realtors that
25  say, "Absolutely, there is post-remediation."  And

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/18/19 Page 259 of 319
Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/20/19 Page 55 of 99
Confidential - Subject to Further Confidentiality Review

Page 210

1  it's not a few. It's 50 percent of 29 interviews,
2  and it may be more, again, if we go back and review
3  the additional interviews.
4      I do an analysis and I have a paired sale
5  analysis and I have 75 percent of the sample
6  properties demonstrate some level of impact. The
7  other 25 percent were zero to 5 percent, we talked
8  about that earlier today.
9      But 75 percent of the properties showed an
10  impact post-remediation, so I certainly think that
11  that data, combined with the survey data, indicates
12  then there is an impact.
13      Then the question is how much of an impact,
14  and this is where you're saying, "Well, how do you
15  get to the 10 percent," and we talked about all that
16  this morning.
17      Q. Yeah.
18      A. So I don't think that moving a couple people
19  around up here on the survey materially changes the
20  percentages enough for me to say that I would change
21  the 10 percent. But if I have ranges going up to
22  25, 30 percent or even if 15, 20 percent and I
23  correlate to 10 and you tell me it's a fifty-fifty
24  flip, I kind of got the fifty percent of what the
25  max impact would be zero from 20, 10 percent is

Page 211

1  fifty-fifty.
2      Q. All right. The -- the realtors, if you take
3  them at face value, say 50 percent of the time,
4  there is no impact.
5      A. Uh-huh.
6      Q. You don't assign no impact for a single
7  Priority Claimant, do you?
8      A. No.
9      Q. So -- so this is my question. It's not how
10  do you get to 10 percent. It's how do you get to
11  any impact at all when essentially half of your
12  realtors are telling you that there is no impact;
13  and in a significant fraction of your case study
14  analysis, there is no impact? How do you make that
15  data go away so that you can say every single time
16  for the 20 Priority Claimants, there will be an
17  impact?
18      A. I'm not trying to make that data go away.
19  I'm actually disclosing the results of my
20  independent analysis. I've shown you the survey
21  results. I've demonstrated my analysis. I don't
22  want the data to go away.
23      I absolutely recognize that in some cases
24  there may be -- that somebody may get the lucky
25  buyer that doesn't care, or they may look at the

Page 212

1  upgrades that were done to the home and say, "You
2  know what, I will take the shot, I love this home."
3      Q. What percentage of realtors saying there is
4  no stigma in a survey like you did would be required
5  for you to change your opinion that there is always
6  going to be stigma for the Priority Claimants?
7      A. I would say greater than 85 or 90 percent.
8  It would have to -- to me, it would have to be
9  substantial portion of the realtors that say, "This
10  is not a problem."
11      Q. But you don't set the same 85 or 90 percent
12  standard to conclude that there will be a stigma
13  impact, do you?
14      A. No.
15      Q. If the -- if your survey accurately reflects
16  the real estate market, then shouldn't there be no
17  impact about half the time?
18      A. If the survey statistically represents the
19  broader real estate market, that would be an
20  inference you could draw, yes; but I didn't suggest
21  that it does. In fact, I testified that my survey
22  is not statistically validated.
23      And further, you know, these surveys are not
24  segregated by geography or price class or otherwise.
25  These were based on the available realtors that we

Page 213

1  could reach, so in conjunction with the case study
2  sales that we were studying. So there would --
3  there would need to be certainly a much more
4  extensive survey to be able to say that the
5  respondents statistically represent the prevalence
6  of an impact.
7      Q. Okay. Is -- do you know how many homes in
8  Florida formerly had Chinese drywall and have been
9  remediated, ballpark?
10      A. That have been remediated?
11      Q. Uh-huh.
12      A. I -- I don't know that answer off the top of
13  my head. I could -- I could -- I probably have the
14  data in my file.
15      Q. If -- if I told you that data from Knauf --
16  you know who Knauf is?
17      A. I'm sorry?
18      Q. Do you know who Knauf is?
19      A. Yes. K -- K-n-a-u-f-f, yes.
20      Q. If I showed you data from Knauf showing that
21  they had remediated about 2,000 homes in Florida
22  that had their Chinese drywall, would that sound
23  right to you?
24      A. I would have no idea. I would have to look
25  at the overall reports.

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/18/19 Page 260 of 319
Case 2:09-md-02047-EEF-MBN Document 21841-5 Filed 10/09/18 Page 56 of 99
Confidential – Subject to further confidentiality review

Page 214

```
 1   Q.  Okay.  Well, is it plausible to you that
 2   there are at least a few thousand homes in Florida
 3   had Chinese drywall and have been remediated?
 4   A.  It's possible.  Sure.
 5   Q.  Okay.  Well, is it a few hundred?  Are you
 6   comfortable with a few hundred?
 7   A.  I would be comfortable with a few hundred.
 8   Q.  Okay.
 9   A.  Sure.
10   Q.  All right.  Is it your testimony that every
11   single one of those homes that has been remediated
12   will sell for 10 percent less?
13   A.  No.
14   Q.  All right.  Now, do -- are you aware that in
15   addition to the Priority Claimants, there is a
16   broader group of litigants that, I don't know, might
17   number 1,700, maybe more, in Florida that are more
18   or less similarly situated?
19   A.  Yes.
20   Q.  Okay.  Is it your testimony that all of
21   those other claimants will experience a 10 percent
22   stigma effect?
23   A.  No.  It's -- it's my testimony that the
24   correct measure of damages for compensation of those
25   claimants is 10 percent on the basis that some of
```

Page 215

```
 1   them may suffer more and some of them may suffer
 2   less; but the impacts being unknown, the 10 percent
 3   fairly compensates them for damages that they've
 4   either incurred or may incur in the future.
 5   Q.  And you could know what the damages are if,
 6   at the time of sale, you compared the sale price to
 7   comparable ones, right?
 8   A.  Well, that -- again, that would be -- yes,
 9   that would be one way to do it.  But, again, I would
10   say that the fact that somebody may just hit the
11   market right or find the magic buyer and not suffer
12   a damage is just a consequence of good luck.
13       For purposes of ascribing damage, you really
14   should be looking to what the -- what the overall
15   market is doing on the longer term basis.
16   Q.  Do you intend, for your report, to support
17   the theory that all of the other claimants in
18   Florida beyond the Priority Claimants are entitled
19   to 10 percent stigma damages?
20   A.  I don't know that I was aware that my
21   opinion was going to be extrapolated beyond the 20
22   Priority Claimants, no.
23   Q.  Would you need to do more work before you
24   were comfortable with that kind of extrapolation?
25   A.  I would want to know what the geographic
```

Page 216

```
 1   distribution of those were, certainly.
 2   Q.  And --
 3   A.  And the -- and the time, you know, the time
 4   elements.
 5   Q.  And so you would need to do more work before
 6   you could offer that kind of opinion as to the rest
 7   of the claimants in Florida?
 8   A.  Right.  My -- my report was specifically to
 9   address the 20 Priority Claimants before me.
10   Q.  All right.  Is -- are your results and your
11   theory of a 10 percent stigma impact, do they apply
12   outside of Florida?
13   A.  They may.
14   Q.  You don't know, sitting here today, whether
15   they do or not?
16   A.  No, that would not -- that would not
17   constitute my opinion.  I would apply this in
18   Florida.
19   Q.  Okay.
20       MR. BLOCK:  This is probably a good time for
21   a break, just to get paper organized.  Let's go
22   off the record.
23       THE VIDEOGRAPHER:  Off record, 3:55.
24       (Recess from 3:55 p.m. until 4:19 p.m.)
25       THE VIDEOGRAPHER:  On record, 4:19.
```

Page 217

```
 1   BY MR. BLOCK:
 2   Q.  Mr. Graziano, I want to -- I want to go back
 3   to Exhibit 3, but just as a tool, okay, rather than
 4   getting at your claimant-specific reports because
 5   they are large and across the room.
 6       So -- but first I need to understand,
 7   Exhibit 3 tells us whether somebody is a current
 8   owner or not, right?
 9   A.  Yes.
10   Q.  And does Exhibit 3 also have your -- the
11   valuation date for your opinion for those claimants?
12   A.  Yes.
13   Q.  Okay.  So that's basically the information
14   we would get -- the value date is the information we
15   would get if we just grabbed your reports over
16   there?
17   A.  Yes.  And I just reserve the right that if
18   there happen to be -- there happens to be any
19   conflict, obviously I would defer to what's in the
20   binder.
21   Q.  To your report, the binder.  Okay.  All
22   right.
23       Let's look at the first current owner on
24   Exhibit 3 which I think is Marc and Jennifer Wites.
25   Are you with me?
```

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/10/19 Page 261 of 319
Case 2:14-cv-...-MBN Document ... Filed ... Page ... of 99
Confidential - Subject to Further Confidentiality Review

Page 218

```
 1    A.  I am.
 2    Q.  And your valuation date for them, the Wites
 3  family, is January 1st, 2019, right?
 4    A.  Yes.
 5    Q.  Okay.  And so I think what that means in
 6  your method is that you calculate their 10 percent
 7  stigma impairment as of January 1st, 2019, right?
 8    A.  Correct.  Because that's the valuation date
 9  of which I understand will be ascribing damages.
10    Q.  Okay.  And do you also use January 1st, 2019
11  as the appraisal date for the Wites' home?
12    A.  I believe so, yes.
13    Q.  Okay.  If the Wites sold their house on a
14  different date, like January 1st, 2020, a year after
15  your valuation date, would they experience a 10
16  percent stigma impact to the value of their home?
17    A.  They may.
18    Q.  Is it your testimony that they would?
19    A.  No.  It's my testimony that if we ascribe a
20  10 percent damage as of January 1st of 2019, that
21  would represent $150,000 impact against that value.
22  If they sold the home subsequently and the values
23  went up and they had already been compensated for
24  the $150,000, that that could represent some lesser
25  percentage in the future of the actual unimpaired
```

Page 219

```
 1  future value of their home.
 2       So the values are relative to the effective
 3  date.
 4    Q.  So if they sold their home on January 1st,
 5  2020, would they experience a 10 percent stigma
 6  impact to the value of their home?
 7    A.  Most likely.
 8    Q.  Okay.  Are you -- is that something you can
 9  testify to as a certainty?
10    A.  That's something I intend to testify to,
11  that the impact is 10 percent, yes.
12    Q.  Is it going to be 10 percent on January 1st,
13  2020?
14    A.  I don't know.  I don't know what the market
15  conditions are going to be on January 1st, 2020.
16  I'm only evaluating the 10 percent as of the
17  effective date.
18    Q.  And the -- Lillian Chatmon, who is Number 8
19  on your list, current owner, you also value her home
20  as of January 1 -- January 1st, 2019, right?
21    A.  Yes.
22    Q.  Okay.  If she sells her home on January 1st,
23  2021, can you tell me what the stigma impact will
24  be?
25    A.  My estimate would be the 10 percent of her
```

Page 220

```
 1  home today would be $14,500, and that that would
 2  compensate her for any diminution in value.
 3    Q.  Okay.  What if she suffers less diminution
 4  in value in 2021?
 5    A.  That's possible, but it's also possible that
 6  she suffers more.  I mean, that's the difficulty
 7  with a single point estimate.  Some may suffer
 8  slightly more; some may suffer slightly less.
 9    Q.  What about John Hernandez, Number 9, current
10  owner.  If he sells his home on January 1st, 2022,
11  will he experience a 10 percent stigma impact
12  against the value of his home on January 1st, 2022?
13    A.  I don't know.  I don't know what the value
14  of his home is going to be.  The quantification of
15  the percentage was used to apply the unimpaired
16  values to represent a dollar amount.  That dollar
17  amount over time is going to reflect a different
18  percentage in the future depending on what happens
19  to the market conditions of the home.
20    Q.  So in the future, the stigma impact might be
21  different than 10 percent?
22    A.  As a percentage of unimpaired value, which
23  is likely to be different based on the market
24  conditions, yes.
25    Q.  So -- so your 10 percent estimate is good
```

Page 221

```
 1  for January 1st, 2019.  You're not sure whether it's
 2  accurate for subsequent dates, right?
 3    A.  Well, I'm -- I'm not -- I'm not suggesting
 4  that it's not accurate.  I'm saying that the
 5  quantification of the 10 percent against the
 6  unimpaired value will reflect a dollar amount.  That
 7  dollar amount, once -- once fixed, will then
 8  represent some future percentage that will depend on
 9  whatever the -- that relationship is to the future
10  value.
11    Q.  But if we want to know what stigma impact,
12  if any, Mr. Hernandez would suffer if he sold his
13  home January 1st, 2022 instead of January 1st, 2019,
14  when you value his home?
15    A.  Then you'd need to know what his unimpaired
16  value would be in January 1st of 2022; and if you
17  can figure out how to do that, let me know.  We'll
18  make a fortune.
19    Q.  All right.  So William and Vicki Foster,
20  Number 12, they are current owners.  What if they
21  had sold their home in, I don't know, January 1st,
22  2018, about a year ago, what would their stigma
23  damages be as a percentage of the value of their
24  home?
25    A.  Are we speculating here?  As a percentage, I
```

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/10/19 Page 262 of 319
Case 2:14-cv-01392-MLCF Document 14-6 Filed 3/26/15 Page 58 of 99
Confidential - Subject to Further Confidentiality Review

Page 222

1  would say 10 percent. As a dollar amount, I would
2  have to know what the value of their home was during
3  the effective date that you just stated. So I would
4  need to know -- it would be 10 percent of their
5  unimpaired value, so I would need to know what their
6  -- his retrospective unimpaired value is.
7      Q.  Okay. Is it your opinion that 10 percent
8  applies irrespective of time? In other words, it's
9  10 percent every year?
10     A.  In the time frames that I've studied, yes.
11     Q.  Okay. But you only studied through
12 February 15th, 2019 --
13     A.  Right.
14     Q.  -- using your survey?
15     A.  Right. And I think that there -- there is a
16 reasonably close proximity between that date and the
17 current, another year or two goes by; but that study
18 time frame, that held up over time. And based on
19 the correlated numbers, 10 percent, you know, that's
20 over that time frame.
21     I wouldn't want to suggest to you or to the
22 court that that's going to hold up forever and ever
23 and ever; that that, you know, 10 percent over time
24 could be modified in the future depending on
25 continued exposure.

Page 223

1      Q.  Might it also depend on the conditions of
2  the local real estate market at the time of the
3  sale?
4      A.  Sure.
5      Q.  And that's not something you can analyze?
6  The -- the conditions of the local real estate
7  market at the time of sale are not something you can
8  analyze in the future, of course?
9      A.  Correct.
10     Q.  They could be analyzed at the time of sale,
11 though, right?
12     A.  Yes.
13     Q.  All right. The testimony you have given,
14 would it apply to the -- just now, would this apply
15 to the other Priority Claimants who still own their
16 home?
17     A.  Yes.
18     Q.  Do you believe that stigma tends to
19 dissipate over time?
20     A.  It depends.
21     Q.  What does it depend on?
22     A.  A lot of different factors.
23     Q.  Like what?
24     A.  Well, what -- what's giving rise to the
25 stigma, what is the stigma related to, what are the

Page 224

1  conditions which create the stigma. So for
2  instance, in this particular case, the disclosure is
3  one of the things that, you know, certainly causes
4  people to be put on notice. And some people prefer
5  not to buy homes that have -- where they know
6  they're going to have to make a subsequent
7  disclosure.
8      So if the facts were that you would make an
9  initial disclosure and sell the home and then
10 subsequently you didn't have to make any further
11 disclosure about the prior existence of Chinese
12 drywall, then that might be a condition that might
13 cause the diminution to fade.
14     But if, I believe as plaintiffs allege, you
15 would always be required to make the disclosure,
16 then that likely will demonstrate that the stigma
17 conditions will persist.
18     So --
19     Q.  What do you -- what is it that drives stigma
20 in the minds of potential buyers?
21     A.  Generally, risk is the primary driver of
22 stigma.
23     Q.  In the case of Chinese drywall, what is it
24 that drives stigma in the minds of potential buyers?
25     A.  Risk.

Page 225

1      Q.  Risk of what?
2      A.  By forward pricing risk that the disclosure
3  will result in a price that will be less in the
4  future because they have to make a disclosure; risk
5  that they may decide to sell the -- they may decide
6  or need to sell their home at a time in the market
7  where there is more homes in the market and more
8  available properties that are competitive; and at
9  that point, they will be going out with a property
10 that's inferior where disclosure is required, and
11 that they may suffer deeper pricing discounts; risk
12 and recognition that their investment in the home is
13 not going to appreciate so their -- as quickly; and
14 just general -- a general understanding that maybe
15 if this condition comes back, they may have capital
16 costs that they don't -- that are unknown.
17     So the risks of potentially having to
18 further remediate or have something wrong with the
19 home and the risks associated with the future
20 disclosure and its impact on pricing are the two
21 things that are -- that drive the primary resist --
22 market resistance, in my opinion.
23     Q.  Do you think that those factors are likely
24 to dissipate over time as people have more
25 experience living with remediated homes that do not

1 continue to have the problems associated with
2 Chinese drywall, like off-gassing and smells and so
3 on?
4     A.  I'm sorry.  Could you repeat that question?
5         MR. BLOCK:  Could you read it back?
6     (The question was read by the reporter.)
7     A.  I think that the presence or the -- the
8 continued -- I think that if that market continues to
9 demonstrate that the remedial activities don't pose
10 a callback risk, where people have to go back in and
11 spend additional capital, I think that element of
12 risk will help diminish the impact.
13         However, I think the disclosure risk is
14 really the primary concern of the home buyer.  It's
15 that having to constantly make that disclosure.
16 It's like trying to sell a car with a big dent in
17 it.  You just have to -- it's just -- it's a -- it's
18 a sore and there is just some people that weren't
19 going to want to accept that disclosure.
20 BY MR. BLOCK:
21     Q.  And what is the basis for those beliefs of
22 yours?
23     A.  The -- you asked me to quantify what
24 detrimental condition or what stigma, what gives
25 rise to stigma; and I answered risk.  And I think

1 that having conducted the interviews here and having
2 looked at other stigma issues and market resistance
3 before, that's generally what gives rise.  These are
4 my impressions of what creates that pricing gap.
5     Q.  You don't have any data from actual buyers
6 where they say that they're concerned about
7 disclosure risks, do you?
8     A.  From buyers, no.
9         But the realtors, certainly realtors, you
10 know, have indicated that, you know, there are
11 certain buyers that just stay away from these types
12 of things.  They don't want to be involved in
13 anything that has any type of future disclosure
14 requirement.
15     Q.  Are there other conditions that must be
16 disclosed that cause stigma, other conditions other
17 than Chinese drywall?
18     A.  Give me an example.
19     Q.  I'm going to defer to you as the real estate
20 expert.  Are there other conditions, like mold or
21 what have you that --
22     A.  Yeah, sure.
23     Q.  -- that are required to be disclosed in the
24 sale of a home?
25     A.  Sure.  Structural -- structural issues would

1 require disclosure.  If you had, you know, any type
2 of adverse structural condition, you would have to
3 disclose.
4     Q.  Do those kinds of conditions lead to stigma?
5     A.  In my experience?  Yes, but I can't say that
6 I've -- you know, I've studied them in -- on a
7 discrete, particular example before, particularly as
8 it relates to structural issues, you know.
9         But any adverse condition that would alter a
10 buyer's opinion of the property should be disclosed.
11     Q.  Have you ever seen -- outside of Chinese
12 drywall in your experience in this case, have you
13 ever seen a defect or environmental condition or
14 detrimental condition that leads to a uniform stigma
15 impact for all affected properties?
16     A.  I think there are detrimental conditions
17 that generally fall within a range, and so, yes.  I
18 mean --
19     Q.  Do they all hit exactly the same number like
20 you did here?
21     A.  No.
22     Q.  What about things like water intrusion that
23 have been remediated, do those lead to stigma?
24     A.  They can, yes.
25     Q.  And if you want to know if there was a

1 stigma in that case, would you study the individual
2 property to see how it fared to comparable ones in
3 the market?
4     A.  That would be one method, sure.
5     Q.  Is that the main method?
6     A.  No.  Ideally what you would do is study
7 other homes that sold that had the water intrusion
8 in disclosures the same way that I did the subject
9 study.  I mean, you identify a control sale that had
10 water intrusion and I -- and compare it to sales
11 that didn't have the water intrusion problem.
12     Q.  Can you explain why you omitted Lee County
13 from your case study?
14     A.  Yes.  When we looked at the distribution of
15 drywall cases within Lee County and when we looked
16 at the overall presence of the number of cases, we
17 felt that that would be, you know, adverse to -- to
18 the study that county because it was the highest
19 prevalence of Chinese drywall installations.
20         And so we did not -- we intentionally
21 omitted Lee from our study area because we thought
22 that would be adverse to the defendants.  In other
23 words, the amount of -- the amount and public --
24 publication of the Lee County remediation problem
25 was most extensive in Florida.

Page 230

1    Q.  Did you research any properties in Lee
2  County before deciding to exclude Lee County from
3  your study?
4    A.  I think we probably have some Lee County.
5  We probably have some Lee County case studies
6  started.  I think most of them were impaired,
7  though.  I don't recall if -- there were three or
8  four case studies that we omitted because we either
9  couldn't confirm the sale had the control sale
10  properly.  I don't think any of those were in Lee,
11  though.
12    Q.  Why did you omit Collier County from your
13  case study?
14    A.  I don't know that we intentionally omitted
15  Collier County.  I don't know -- I just don't think
16  that we -- I don't know if had the developed -- if
17  we had any developed cases there.
18    Q.  I'm going to ask you about the same question
19  about Indian River, Pinellas, Sarasota, and Pasco
20  County, all of which you did not include in your
21  case study, looking at Page 14 of your report.  Why
22  did you exclude those counties from your case study?
23    A.  We did not intentionally exclude them.  We
24  just didn't identify any control sales to run down
25  in those counties.

Page 231

1    Q.  Do your -- does your damage estimate of 10
2  percent apply to the counties that you excluded from
3  your study -- or strike that.  That wasn't a good
4  question.  I'm anticipating the objection.
5      Does your damage estimate of 10 percent
6  apply for the counties for which you had no cases in
7  your case study?
8    A.  Yes.
9    Q.  So let's look at some estimates that you
10  did.  So I'd like to -- if -- I was going to ask Joe
11  for help getting binders.
12      Can we -- can we grab some binders from your
13  Priority Claimant?
14    A.  Sure.
15    (Discussion off the record.)
16  BY MR. BLOCK:
17    Q.  I just -- I want you to have your --
18    A.  Thank you.
19    THE WITNESS:  So Case 10, Patrick.
20    (Discussion off the record.)
21  BY MR. BLOCK:
22    Q.  Do you have your O'Brien claimant report?
23    A.  I do.
24    Q.  Okay.  All right.
25    MR. BLOCK:  Could you, John, hand --

Page 232

1    (Discussion off the record.)
2  BY MR. BLOCK:
3    Q.  We're handing you, Mr. Graziano, a copy of
4  data from the Hillsborough County Property
5  Appraiser's website for the O'Brien's address of
6  3120 West Wallcraft Avenue in Tampa.
7      Do you see that?
8    A.  I do.
9    Q.  And we will mark that website printout as
10  Exhibit 9.
11    (Graziano Exhibit 9 was marked for
12  identification.)
13    MR. BLOCK:  I'll get better at this next
14  time.
15    (Discussion off the record.)
16  BY MR. BLOCK:
17    Q.  And if you look at your claimant-specific
18  report, or I guess you're looking at Exhibit 3, I'm
19  looking at Page 7 of your claimant-specific report,
20  and I'll let you get there.  Are you there, on
21  Page 7?
22    A.  I am.
23    Q.  Okay.  You have a hypothetical value as if
24  remediated of $508,500, right?
25    A.  With the damage applied, correct.

Page 233

1    Q.  Yes.  Yes.  So basically what that means is
2  you are opining that as of February 17th, 2012,
3  which is the date from the front page of the report,
4  the property that the O'Brien's own would sell,
5  because of stigma, for $508,500, right?
6    A.  Correct.
7    Q.  Okay.  On Exhibit 9 that I've handed you,
8  the Hillsborough County Property Appraiser's
9  website, do you see where the O'Brien house sold in
10  2012 for $542,000?
11    A.  I do.
12    Q.  Okay.  That's more than you estimated the
13  O'Brien house would sell for, correct?
14    A.  That's correct.
15    Q.  Have you -- you've got a calculator there,
16  and I can -- and you can check my math, but I've
17  calculate that the actual sales price as being about
18  $33,500 than your stigmatized prediction, and it's
19  about 6.59 percent higher.  Do you want to check me
20  on that?
21    A.  I could check you on that.  I'm not sure
22  that it -- the record is clear on that.  I think
23  what you're -- are you suggesting that the $542,000
24  that's reflected on the tax record was
25  post-remediation, that was the post-remediation

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/18/19 Page 265 of 319
Case 2:09-md-02047-EEF-MBN Document 23863-31 Filed 11/18/19 Page 81 of 99
Confidential — Subject to further confidentiality review

Page 234

1  sale?
2     Q.  Well, if it's the pre-remediation sale, then
3  your estimate is off by quite a bit?
4     A.  Right.  But that was -- but it's a July -- I
5  mean, we agree it's a July 2012 sale at 542,000.
6     Q.  It's -- it's quite a bit more than the
7  February 2012 sale, so it does seem likely to be the
8  post-remediation sale.  That's -- that's how I would
9  interpret the property records.
10    A.  Okay.
11    Q.  Okay?  And so what I'm asking you is whether
12 the actual sales price for the O'Brien home in July
13 of 2012 is higher than the estimate that you
14 predicted on Page 7 of your report for the O'Briens?
15    A.  It is.
16    Q.  And if you look on Exhibit 9, you will see
17 that the property sold again in June of 2017 for
18 $749,900, right?
19    A.  Yes.
20    Q.  And that is also higher than you predicted
21 the home would sell for several years earlier in
22 2012, right?
23    A.  I mean, five years earlier and in a
24 completely different economic market from 2012 to
25 2017, yes, admitted.

Page 235

1     And let me also make the point that you're
2  comparing the July 2012 value at $542,000 against my
3  February 2012 value of $508, so whatever market
4  conditions time adjustment would be required in
5  there, you would need to make some adjustment for
6  that, too.
7     Q.  So is it your testimony that in the five
8  months between February of 2012 and July of 2012,
9  something about the market changed that explains why
10 your estimate of $508,500 is not matching the actual
11 sales price?
12    A.  Yeah.  I'm suggesting that, yes, property
13 values do change as a result of market conditions
14 and market appreciation.  And during that period,
15 coming out of the Great Recession between 2012 and
16 '13 and '14, property values were changing rather
17 rapidly.  Yes, that is my testimony.
18    Q.  Okay.  But if we look at the actual sales
19 data for this property in July of 2012, is there any
20 indication that it suffered the 10 percent stigma
21 impact leading to a sales price of $508,500 that you
22 offer in your report?
23    A.  There is an indication that it suffered
24 value diminution because by February 2012,
25 unimpaired value was $565,000.  So if I compare the

Page 236

1  565,000 to the 542,000 where it actually sold,
2  that's actually a 4 percent diminution in value; or,
3  said another way, in whole dollars, it represents a
4  $23,000 price impact.  That's number one.
5     Number two, the O'Briens sold the home
6  unimpaired.  So their discount when they sold the
7  home at 342 -- or $340,000, according to the tax
8  record, they already suffered that 10 percent
9  diminution against the impairment.  They took such a
10 deep discount on the sale of the property impaired,
11 that they -- they already suffered that damage.
12    Now, you're -- you are extrapolating that
13 into the future, which is fine, but you have to
14 consistently understand that as the market
15 conditions change, to compare apples to apples, you
16 have to make a market conditions adjustment.
17    So the proper analysis would be do an
18 unimpaired value estimate as of July 2012 and
19 compare that number to $542,000.  That would match
20 my methodology.
21    But what you're doing is you are comparing
22 prices from two different time frames.  Now, I
23 understand they are relatively close, and for
24 purposes of our discussion today, I'm happy to have
25 the discussion.  But it doesn't to me prove that my

Page 237

1  10 percent is wrong just because the answer came out
2  to be 4 percent, but you're using my unimpaired
3  value from six months prior.
4     Q.  Well, let me ask you this:  The actual sales
5  data, does it prove that your 10 percent impairment
6  leading to a value of $508,500 got it right?
7     A.  I'm suggesting that unless you had sales
8  data or a transaction that happened on or, you know,
9  within, you know, a couple of weeks or a month of
10 that -- that date of value that I estimated,
11 comparing the price to my value doesn't -- doesn't
12 make me -- you know, doesn't make me wrong or right.
13 I mean, once -- once you get past that date, you
14 have to make other adjustments.
15    There are ways to do it.  I -- you know, I
16 adjusted for various conditions, differing
17 conditions of properties.  But we're here having the
18 conversation today, and you're say -- you're,
19 think, trying to get me to admit that my estimate
20 wasn't accurate; but you're comparing it to
21 something that's apples and oranges.
22    And I also might add, I don't have the
23 listing data, so I appreciate the Hillsborough
24 County Property Appraiser's website.
25    But the other question that I would have is,

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/19/19 Page 266 of 319
Case 2:14-cv-02722-MBN Document 90-3 Filed 05/13/2019 Page 82 of 99
confidential - Subject to further confidentiality review

1  you know, that 542,000 price, was that on the market
2  for 340 days and all the other properties in the
3  market took 60 or 90 days to sell? Did it
4  experience seven price changes before we reached the
5  point? Was it listed for $529,000 and maybe three
6  buyers came in at the same time and had a bidding
7  war?
8      So I think you need more information than
9  just to look at the property appraiser recorded
10 price and make a direct comparison for me to be able
11 to accurately test that.
12 Q. You could have gone to the Hillsborough
13 County Property Appraiser website and collected the
14 sales data, right?
15 A. Yes.
16 Q. Okay. Did you do that?
17 A. I said in the report, actually, right there
18 at the conclusion that the subject sold in February
19 2012 to an investor who remediated and flipped the
20 property in July of 2012, which offers a reasonable
21 evidence of the loss of use.
22     In other words, the investor bought it in
23 February and flipped it in July. February, March,
24 April, May, June, July -- six months to renovate and
25 resell the home.

1      "The flip to a new buyer post-remediation
2  reflects a 4 percent discount versus the Integra
3  2012 unimpaired estimate assuming no value
4  appreciation between February and July."
5      So I would suggest yes, I did test it.
6  Q. Did you look at -- well, you didn't. I
7  understand.
8      Did you look at the 2017 sale on the
9  Hillsborough County website?
10 A. Not within this report, but it is tested in
11 the -- in the supplemental information that we
12 talked about today, and that indicated about a 7.5
13 percent discount.
14 Q. All right.
15 A. And that was -- incidentally, that was a 7.5
16 percent discount against 749,000, which is
17 $56,000 and -- 56,175, which is almost to the penny
18 what my postimpairment damage is on Page 7.
19 Q. Can we grab the Deeg -- Deeg Hooker report?
20 It's Number 20, I believe.
21     (Graziano Exhibit 10 was marked for
22 identification.)
23     MR. BLOCK: This will be Exhibit 10.
24     MR. MONTOYA: Thank you.
25 A. So we're done with O'Brien for now?

1  BY MR. BLOCK:
2  Q. Yeah, we're done with O'Brien. Yeah.
3  A. Thank you.
4      THE WITNESS: You're actually being useful.
5      MR. MELLONI: Once in a while.
6  BY MR. BLOCK:
7  Q. Do you have the Deeg report?
8  A. I do.
9  Q. Okay. And the effective date of the
10 appraisal for Deeg was May 2nd, 2016?
11 A. Yes.
12 Q. Right?
13     And you estimate a hypothetical value,
14 including stigma impact, of $405,000, right?
15 A. Correct.
16 Q. Okay. And we've handed you as Exhibit 10 a
17 printout from the Martin County Property Appraiser
18 website and that shows a sale in January of 2017, so
19 about eight -- eight months later, roughly speaking,
20 for $533,000 -- excuse me, $530,000.
21     Do you see that?
22 A. I do.
23 Q. Okay. And the difference between your
24 estimate and the actual sales price eight months
25 later was about -- well, it was $125,000, correct?

1  A. Yes. The difference between the sales
2  price and -- sales price in January 2017, the
3  difference between 530,000 and 405,000 is 125,000,
4  correct.
5  Q. It's about a 30.86 percent difference,
6  right, between your prediction and the sale eight
7  months later?
8  A. Yes. But my -- I mean, the difference
9  between my unimpaired value and the actual sales
10 price later was already a 18 percent difference,
11 right? So that would indicate that some market
12 condition, appreciation must have been evident
13 because we did an appraisal as of -- as of the date
14 unimpaired.
15     Forgetting about any discount or how far the
16 discount was, we were -- we start with unimpaired
17 value at 450; and even if you say there was no
18 impact of Chinese drywall, then the 530,000 sale
19 represents an 18 percent appreciation rate just
20 between that time frame.
21     Do you understand?
22 Q. You're telling me that the market was
23 increasing at a pretty good clip during that time
24 period?
25 A. That's what the data suggests, yes.

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/18/19 Page 267 of 319
Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/18/19 Page 63 of 99
Confidential - Subject to Further Confidentiality Review

Page 242

```
 1   Q.  But is there any evidence in this actual
 2  market sale for $530,000 that the Deeg home
 3  experienced a stigma impact of 10 percent?
 4   A.  Not based on the -- not based on a
 5  comparison to the January 2016 data, no.
 6   But, again -- I'll say it again -- the Deegs
 7  actually sold the home in May '16 -- in May of 2016
 8  unremediated at 330,000, so they already
 9  experienced that post -- they already experienced
10  the deep discount which included the buyer's
11  expectation of risk when they go to resell the home.
12   The fact that the subsequent buyer didn't --
13  didn't have that damage, I don't think that your
14  plaintiffs are suggesting that every time a
15  remediated home sells, your client should have to
16  come out-of-pocket 10 percent of the price.  You're
17  paying the 10 percent once based on the claimant's
18  first experience with the home, whether they lost
19  it, whether they had remediated it, whether they
20  sold it remediated.  You're ask -- you're being
21  asked to pay as damages.
22   Once subsequent buyers that don't -- that
23  may or may not experience future damages have
24  already priced that.  They've already gotten the
25  price benefit.  It's the claimants that suffer the
```

Page 243

```
 1  damage.
 2   Q.  Is it -- is it plausible in your mind that
 3  if you have two homes that are roughly comparable,
 4  or even identical, and one of them has been -- had
 5  Chinese drywall but has a brand-new interior because
 6  it's been remediated, that might actually sell at a
 7  premium to the neighboring home that never had
 8  Chinese drywall and has an interior that five or ten
 9  years old?
10   A.  I -- I believe that is absolutely masking
11  part of the -- part of the diminution.  I believe
12  that in this case, the remedial action -- the
13  remedial action is to renovate the home, and many
14  times completely.  So you are getting new, upgraded
15  HVAC.  You're getting new, upgraded wiring --
16   Q.  Appliances --
17   A.  -- all --
18   Q.  Windows, everything?
19   A.  -- a lot because you're ripping out the
20  drywall.  You're doing -- while you're there, you're
21  going to do the kitchen, you're going to do the
22  flooring.
23   And so, again, I think that in this study
24  method, you know, we've assumed reasonably
25  comparable condition with all the comparables, but
```

Page 244

```
 1  we've attempted to pair the comparables with
 2  comparable aged homes, not all of which have been
 3  remediated.
 4   So I agree with you in some cases because
 5  the remediation remedy is to renovate the home, that
 6  actually is probably masking the post-remediation
 7  discount more than it otherwise would because some
 8  people look at it and say, "Well, I'm going to buy a
 9  2006 home and it's got a brand-new interior, a
10  brand-new kitchen, brand-new everything, you know,
11  I'm going to pay more for that than a home that's,
12  you know, ten years old that's never been
13  renovated."
14   That's -- that's part of the -- I think
15  that's part of the bias I think to the benefit of
16  the defendants.
17   Q.  Well, couldn't it just be that people are
18  paying more for homes with brand-new interiors
19  because they like brand-new interiors more than old
20  interiors?
21   A.  Sure.  But the correct reference point would
22  be to compare -- would be to compare homes that
23  are -- have also recently been renovated against
24  your comparables.  So ideally to -- to really
25  measure that post-remediation impact, you -- we
```

Page 245

```
 1  should be having a control sale that has a Chinese
 2  drywall disclosure and is completely remediated and
 3  then having four control sales of the same age that
 4  have been recently renovated.
 5   And if you did that, the impacts could be
 6  higher -- the measurement of the impacts might be
 7  higher than what we've measured because not all of
 8  the homes that we used as comparable homes had been
 9  comparably renovated.
10   So there absolutely is some element of home
11  buyers that say, "You know what?  I'm buying a
12  10-year-old home, but it's brand-new inside and it's
13  beautiful, and I'll deal with the Chinese drywall
14  issue because I'm getting a new renovated home."
15   Q.  So -- so isn't that double-counting to -- to
16  get the remediation cost, to recover the remediation
17  cost, get the brand-new interior, and then say that
18  you should be compared against your neighbors who
19  also have a brand-new interior in your hypothetical?
20   MR. MONTOYA:  Objection as --
21   A.  No, because --
22   MR. MONTOYA:  Objection as to scope, as to
23  his hypothetical, and also as to the rule of law
24  that's been established in the case as to
25  remediation damages.
```

| Page 246 | Page 248 |
|---|---|

**Page 246**

1    You can answer.

2    MR. BLOCK: I don't think any ruling

3  established that you can do it like that. We'll

4  just talk about that later.

5    A. You're asking me as it relates to damage

6  theory, is it double-dipping?

7  BY MR. BLOCK:

8    Q. Yes.

9    A. And the answer is no, because if I didn't

10  have any drywall issues, I own a home, I always have

11  the right to renovate. I have the ability to

12  upgrade the quality of the home to get an enhanced

13  price.

14    When I have Chinese drywall, if I'm

15  compensated to -- to do the remediation and I do the

16  remediation, I still had those rights before. I

17  mean, everybody has the right to renovate their

18  home. So if renovating your home yields you a

19  better price, so be it.

20    I mean, it's not a double dip. You're

21  renovating your home as the remedy. The fact that

22  you're getting some benefit of having a remediated

23  home and it -- and therefore you may not suffer as

24  much post-remediation damage as you otherwise would,

25  in my view, is a benefit to the defendants, not to

**Page 247**

1  the claimants.

2    It's not double-dipping. It's the reverse

3  of double-dipping. Your -- the remediation is

4  masking the depth of the -- of the issue.

5    Q. So if you are entitled to be made whole,

6  shouldn't you be compared to someone who is just

7  like you but for the Chinese drywall; and if you

8  hadn't -- you didn't remediate but for the Chinese

9  drywall, isn't the proper comparison your neighbor

10  who didn't have Chinese drywall and didn't

11  remediate?

12    A. I -- I think that's for somebody else to

13  decide, I think. I don't -- I don't think that the

14  claimants have a choice. They have to remediate.

15  They can't leave the property in an unremediated

16  condition.

17    Q. You have a choice about the comparison that

18  you are doing?

19    A. I agree.

20    Q. Okay. So if you want to compare like with

21  like, for purposes of evaluating damages, the -- the

22  people should be alike but for the Chinese drywall

23  and the remediation, right?

24    A. I -- the only -- the implication of what

25  you're asking me is then what -- you're saying that

**Page 248**

1  I should have done was to estimate the

2  post-remediation impacts as if they hadn't done a

3  full renovation of the home. That's the implication

4  of what you're asking me. Do you understand that?

5    Q. No. I -- I think you're saying that you

6  should -- the proper method is to compare a

7  remediated home that was remediated due to drywall

8  against a comparable home that was remediated just

9  because. Is that what you're saying?

10    A. Well, I don't want to call it "remediated

11  just because." I -- I'm saying you compare it to

12  similar age homes that are in a similar age and

13  condition as your subject.

14    So if I have five 2006 comparables and none

15  of the kitchens have been renovated, those are going

16  to tend to trade at a price lower than the homes

17  where the kitchens have been recently renovated.

18    So if -- and I make the control sale -- if

19  the control sale has drywall remediation disclosure

20  requirement and it has a brand-new, renovated

21  kitchen and I then compare it to five comparables

22  that don't have brand-new, renovated kitchens, don't

23  have brand-new everything inside, the resulting

24  unimpaired indication from those five comparable

25  sales is naturally going to assume that the home is

**Page 249**

1  in that condition.

2    So then when I compare that to the sale

3  price of a brand-new, renovated home, it's going to

4  look at if there is no damages. But that's not true

5  because --

6    Q. Well, there might not be stigma damages,

7  right?

8    A. No. No. But you're -- the definition of

9  what you're trying to quantify has to recognize that

10  they renovated the home. Now they sold it. If it

11  didn't have the drywall problem, what could they

12  have sold it for in that condition on the date?

13    Q. But it would never have -- but we're saying

14  that but for the drywall, it would not have been

15  remediated?

16    A. You're saying that, but I'm saying that --

17    Q. Yes.

18    A. -- at any time, they had the right to put it

19  in that condition.

20    Q. Tell me which of the 20 Priority Claimants

21  you can testify would have remediated their home but

22  for the drywall and the need to remediate their home

23  because of the Chinese drywall?

24    A. I would only know that by talking to the

25  individuals as to whether they intended to renovate.

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/18/19 Page 269 of 319
Case 2:09-md-02047-EEF-MBN Document 21363-31 Filed 05/13/2019 Page 85 of 99
Confidential - Subject to further Confidentiality Review

Page 250

```
 1  I don't know how I could testify to that at this
 2  time.  But everybody renovates their home over the
 3  course of the life of their home, or most people
 4  renovate their home over the course of the life of
 5  their home.
 6     Q.  A full tear-out down to the studs with all
 7  brand-new appliances, most people do that over the
 8  course of owning a home?
 9     A.  I think there's -- there are many, many
10  examples where people buy older homes and renovate
11  it, including gut renovations.  When you rip out
12  your kitchen --
13     Q.  Okay.
14     A.  -- you get all new appliances.
15        MR. BREIT:  Just answer the questions.  Not
16     a time to get into a fight.
17  BY MR. BLOCK:
18     Q.  So you -- actually, you -- you produced in
19  your reliance materials or your production some
20  media and government websites, things from the CPSC,
21  news stories, so on and so forth.
22        Do you remember that?
23     A.  I do.
24     Q.  And a lot of that -- if I understand
25  correctly, a lot of that material was somewhat
```

Page 251

```
 1  dated, you know, to 2009, '10, '11, '12.  I didn't
 2  see a lot that was '17, '18, '19; is that correct?
 3     A.  I think that's accurate.
 4     Q.  Okay.
 5     A.  I'm sorry.  Are we finished with Deeg?
 6     Q.  Yes.
 7        So when you did your search and collected
 8  your reliance materials, is it -- am I wanting to
 9  say that you didn't really find a lot of articles and
10  government websites, news sources, media coverage,
11  and the like about Chinese drywall in the last two
12  or three years?
13     A.  I think that's a fair characterization,
14  sure.
15     Q.  Might that affect the market's perceptions
16  of Chinese drywall, the relative dearth of media
17  coverage?
18     A.  It may.
19     Q.  Is that something you accounted for in your
20  expert report?
21     A.  No.
22     Q.  I'm going to ask you about some -- you can
23  just put that in the stack.
24        I'm going to ask you about some e-mails that
25  we got in the last couple of days.
```

Page 252

```
 1     A.  Okay.
 2     Q.  So this will be 11, Exhibit 11.
 3        (Graziano Exhibit 11 was marked for
 4     identification.)
 5  BY MR. BLOCK:
 6     Q.  This -- sorry.  Thank you.
 7        This is an e-mail exchange that I've handed
 8  you between you and Pete Albanis who is a lawyer at
 9  Morgan -- Morgan & Morgan -- Morgan & Morgan law
10  firm.  Does that -- yeah, forthepeople.com.
11        Does that sound right to you?
12     A.  Yes, sir.
13     Q.  Okay.  And he tells you on February 14th,
14  2019, so that's the day before you served your
15  expert report, right?
16     A.  Yes.
17     Q.  Okay.  And he says he wants to make sure
18  that you have their January 2006 appraisal showing
19  an appraised value of $635,000, right?
20     A.  Yes.
21     Q.  Okay.  Why was he -- why was Mr. Albanis,
22  giving you that appraisal?
23     A.  Well, I think it was in the Dropbox.  I
24  think he was making -- he wanted to make sure that I
25  had looked at it.
```

Page 253

```
 1     Q.  Okay.
 2     A.  And his -- I think -- my conversations with
 3  Mr. Albanis are confidential.
 4     Q.  There's a line.
 5     A.  Where is the line?  Can you draw it for me?
 6     Q.  I can't advise you.
 7        MR. MONTOYA:  What are you asking him?
 8  BY MR. BLOCK:
 9     Q.  I -- well, I'm asking:  This looks like --
10  well, this is an e-mail that you-all gave to us, and
11  it looks like Mr. Albanis was at least pointing you
12  to look at some information to consider for your
13  expert report, and I'm wanting to ask about that.
14     A.  Okay.  And I'll just allow Patrick time to
15  object --
16     Q.  Yeah.
17     A.  -- and tell me whether I need to answer the
18  question.
19     Q.  Okay.  Well, let me ask you this, then:  If
20  you go down in the e-mail, there is an e-mail from
21  Mr. Albanis to you on February 7, 2019, and it says:
22  "240 West End Drive 121 in Punta Gorda is the one
23  that should be removed."
24        What does that refer to?
25        MR. MONTOYA:  If it's -- if he relied upon
```

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/18/19 Page 270 of 319
Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/18/19 Page 86 of 99
Confidential - Subject to Further Confidentiality Review

## Page 254

1  it, I think it's a fair question.  Outside of
2  his --
3      MR. BLOCK:  Yeah.
4      MR. MONTOYA:  -- for his report.  Outside of
5  that, I don't think it is.
6  BY MR. BLOCK:
7      Q.  Yeah.  I'm not asking about strategy; but
8  what is -- it's a piece of property, I'm assuming,
9  based on the description.
10     A.  I had -- and I have to look back at my
11 notes, but I had asked -- I had asked the attorneys
12 to review against the case studies that we did to
13 make sure that there were no claimants included in
14 the case studies, and I believe that that related to
15 an identified potential case study that Mr. Albanis
16 said was a claimant; and what he was telling me was
17 that should be removed from consideration from the
18 case study set.  Otherwise, I was going to be doing
19 a case study on a claimant, which is not desired.
20     Q.  What -- what is the impact of doing a case
21 study on a claimant?
22     A.  Well, again, you know, part of the case
23 study method that we used was to confirm the sales
24 with the parties to the transaction, including the
25 brokers and others.  And so the impact would be

## Page 255

1  that, A, I may not be able to fully develop the case
2  study because I may not get information because
3  people may not want to disclose that information
4  because it's part of their case; and, you know, the
5  brokers and so forth know that the property is
6  subject to a litigation, they are not going to
7  answer questions.
8      Or alternatively, that somebody might claim
9  that that case study was irrelevant because it's a
10 claimant property, and so we were trying to stay --
11 I was trying to stay away intentionally from the
12 claimant properties in developing the case studies
13 so there weren't problems and issues of
14 confidentiality or, you know, answers that we got or
15 claims from the defendant that the answers that we
16 received during the confirmation were biassed
17 because they have a lawsuit going on.
18     It just -- it just created questions in my
19 mind whether the case study would be independent.
20     Q.  Do you know that at least one Priority
21 Claimant home did end up in your case study?
22     A.  You mentioned that.
23     Q.  Yeah.  So if you go -- if you have your
24 report, which is Exhibit 1, your general report,
25 and -- I'll let you get towards the back.  It's

## Page 256

1  going to be Palm Beach-Boca 2.
2      A.  This is Monte Vista Drive?
3      Q.  Yeah.  We think that 17830 Monte Vista Drive
4  in Boca Raton is Kevin and Stacey Rosen.  So if you
5  look at Exhibit 3, your Exhibit 3 that you made --
6  yeah, you've got it.  They are the third one down.
7      A.  Uh-huh.
8      Q.  Okay.  So these issues that you've
9  discussed, the problems with including a claimant
10 home in the case study did, in fact, happen in your
11 case study?
12     A.  Okay.
13     Q.  I wanted to go back to e-mails, although I
14 think this ties to the Rosens as well.  The next one
15 that I'll hand you is going to be 12.  Let me see
16 that.
17     (Graziano Exhibit 12 was marked for
18 identification.)
19     MR. MONTOYA:  Thank you.
20     MR. BLOCK:  This is going to be yours.
21 BY MR. BLOCK:
22     Q.  This is an e-mail -- I'm sorry.  Can you --
23     A.  That's okay.
24     Q.  This is an e-mail actually between
25 Mr. Montoya and you, January 24th, 2019 and it looks

## Page 257

1  like Mr. Montoya sends you a link that says:  "See
2  attached link re comps in the Oaks."
3      Is that right?
4      A.  That's what the e-mail says, yes.
5      Q.  And if you look, there is a file attached
6  and it says MWITES and it has the Bates Number 655
7  to 689, "Letter Regarding Preparation of Taxes Re
8  Chinese Drywall," right?
9      A.  Okay.
10     Q.  Do you -- but do you have a recollection of
11 what that is, that attachment was?
12     A.  No.
13     Q.  Okay.  I'm going to hand you -- I should
14 have handed you as 12, which will be 13 --
15     (Graziano Exhibit 13 was marked for
16 identification.)
17 BY MR. BLOCK:
18     Q.  I'm handing you Exhibit 13.  This is an
19 e-mail exchange between you and Ms. Rico,
20 Mr. Montoya, January 25th, 2019, and it looks like
21 another version of the transmission of this MWITES
22 655 to 689 document, and it's described as "some
23 comparable sales obtained by Priority Claimant Marc
24 Wites."  Reflect -- "it reflects some of the
25 comparable sales in the Oaks community."

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/18/19 Page 271 of 319
Case 2:14-cv-06009-NJB Document 18-3 Filed 12/16/19 Page 67 of 99
Confidential - Subject to Further Confidentiality Review

Page 258

1  Am I reading that correctly?
2  A.  Yes.
3  Q.  And it -- Mr. Wites attached the comparable
4  sales to a letter to his accountant for purposes of
5  the preparation of his taxes, right?
6  A.  Yes.
7  Q.  Okay.  So are you -- were you relying on the
8  plaintiffs to help identify comparable sales for use
9  in preparing your report?
10  A.  No.
11  Q.  Why not?
12  A.  Because that's not how I select comparables.
13  I select comparables based on reviewing the best
14  market information available.
15  Most of these e-mails that came from
16  claimants or their attorneys or otherwise are
17  generated by a request probably from the claimants
18  themselves to say, "Make sure the appraiser has
19  this, and make sure the appraiser has that."
20  And the lawyers are really just responding
21  to that request and saying, "Consider it if you
22  will."
23  But I wouldn't characterize this as -- you
24  know, I didn't rely on the information.  I don't
25  even know -- I could pull the file.  I don't even

Page 259

1  know if I printed the information.
2  Q.  So you think it's important to go and
3  independently find your own comps?
4  A.  I do.
5  Q.  All right.  Can we look at, coming back to
6  your report, general report, Exhibit 1, and that's
7  it for the e-mails.  You can -- how are we on time?
8  A.  Are we at a -- we have plenty of time.
9  Q.  Do you want to take a break?
10  A.  Would you mind?
11  Q.  Yeah, let's go off the record and coordinate
12  your --
13  A.  I thought we were at a logical point, right?
14  MR. BLOCK:  Yeah, yeah.
15  THE WITNESS:  Thank you.
16  THE VIDEOGRAPHER:  Off record, 5:08.
17  (Recess from 5:08?p.m. until 5:23?p.m.)
18  THE VIDEOGRAPHER:  On record, 5:23.
19  BY MR. BLOCK:
20  Q.  Mr. Graziano, could you look at Page 22 of
21  your general report, Exhibit 1.
22  A.  Yes.
23  Q.  Okay.  You write in the second full
24  paragraph:  "I would expect these value diminution
25  impacts to decline over time after numerous resales

Page 260

1  of the same property where no adverse conditions
2  persist."
3  Right?
4  A.  Yes.
5  Q.  Okay.  And what you're saying there is that
6  you would expect the 10 percent value diminution to
7  decline over time after numerous resells, right?
8  A.  Well, as I testified before, the 10 percent
9  is going to decline as a function of a percentage of
10  the sales price because prices are going to go up.
11  So based on the damage impacts that I estimated
12  today, as you move forward in time, the diminution
13  as a percentage is going to go down.
14  Q.  So what's the equation there?  I'm not
15  following.
16  A.  Well, the unimpaired value of a home today
17  is $400,000.  Based on 10 percent, the damage
18  estimate is $40,000.  Five years from now, the
19  property sells for $800,000; but the damage impact
20  was $40,000 as of today, so that represents 5
21  percent of the future sales price.
22  Q.  Now you're -- okay.
23  Are -- you're not saying that the -- I don't
24  know, 10 percent stigma effect might be 9 percent
25  in, you know, five years from now after numerous

Page 261

1  resales, 9 percent of the then-present value of the
2  home?
3  A.  Not if the disclosure continues to be
4  required.
5  Q.  Okay.  So you think -- you think 10 percent
6  will hold constant -- 10 percent of the then-present
7  value of the property or the home will hold constant
8  throughout time as long as disclosure continues to
9  exist?
10  A.  Correct.
11  Q.  Okay.  I -- let's talk about a different
12  topic, which is what you describe as loss of use and
13  I think of that as alternative living expenses, so
14  let's make sure we're on the same page.
15  A.  Sure.
16  Q.  What are you measuring in when you say "loss
17  of use"?
18  A.  Which page are you referring to?
19  Q.  Well, this -- well, if you have a
20  claimant-specific report in front of you, I happen
21  to have Kevin and Stacey Rosen, but I just want to
22  understand the concepts, just if you've got one
23  handy.  That's not -- is that one?
24  A.  Yeah.
25  Q.  Okay.  So how do you define "loss of use" as

Page 262

1  you use it in your claimant-specific reports?
2  A. So "loss of use" relates to you being
3  displaced from the home that you were living in
4  while it's being remediated. Alternate living
5  expenses are the costs that you incur on the other
6  side of the equation where you have to go out and be
7  somewhere else.
8  Q. So those are different things in your mind,
9  "loss of use" and "alternative living expenses"?
10  A. Well, I mean, unless somebody is not going
11  to pay the real estate taxes during the remediation.
12  Q. Okay. Well, let's -- let's go at it this
13  way. You -- the components of your loss of use
14  damages category are the rental rate times the
15  number of months that someone is out of the home
16  during remediation?
17  A. Correct.
18  Q. And then you also added moving and storage
19  cost for your personal effects while you're out of
20  the home during the remediation, correct?
21  A. Correct.
22  Q. Okay. And that strikes me as consistent
23  with the definition of "alternative living expenses"
24  I've seen elsewhere in the litigation, but we'll
25  call it "loss of use" today for you. Okay?

Page 263

1  A. Okay.
2  Q. But conceptually, what "loss of use" means
3  for you is the cost that a claimant will incur while
4  they can't live in their home during the remediation
5  of their home, right?
6  A. Right. It's an economic proxy for what
7  would otherwise be their complete inability to use
8  the home during the time that they're not in it.
9  Q. Okay. Is that a type of damages you have
10  calculated before outside of the Chinese drywall
11  context?
12  A. Yes.
13  Q. In what context have you calculated those
14  kinds of damages?
15  A. In the context of any kind of temporary loss
16  of use. In Florida, it's generally that held the
17  loss of use -- an economic rental rate is the rental
18  rate proxy because it's a gross rent that includes
19  all the carrying costs associated with the home, and
20  it represents the economic quantification of that
21  loss of use for that particular home. So I've done
22  it many times.
23  Q. Okay. And is that something that appraisers
24  typically do?
25  A. Appraisers can do it, sure.

Page 264

1  Q. Is --
2  A. I don't think you need to be an appraiser to
3  estimate it, but I think that appraisers do
4  ordinarily conduct that type of analysis.
5  Q. And outside litigation context, would an
6  appraiser estimate the duration of remediation or
7  construction and the rental rate for alternative
8  housing during remediation or construction?
9  A. It depends.
10  Q. Have you ever done that as an appraiser
11  outside of litigation?
12  A. I have.
13  Q. And --
14  A. Well, outside of litigation, yeah, sure, in
15  title cases which, you know, aren't ordinarily
16  litigation.
17  Q. Well, it's -- okay.
18      In the business world, let's say, do you --
19  have you ever have in the business world, in your
20  work as an appraiser, have you ever estimated the
21  length of a construction project and what it would
22  cost a human being to live somewhere else during the
23  construction project?
24  A. Other than the human being part. I mean, we
25  often have to do a lease-up analysis where we say,

Page 265

1  you know, the property is unstabilized; and 12
2  months from now the future value is going to be X,
3  but I have to deduct all of the occupancy cost
4  expenses and the carrying cost of the property
5  during the lease-up period. So we regularly do that
6  for commercial properties.
7      I'd have to really think on the residential
8  property side, but we often make, you know,
9  absorption time frame estimates, how long it's going
10  to take to either get the property rented up in a
11  residential context for multifamily.
12      So yes, the answer is we regularly estimate
13  those time periods.
14  Q. Do you regularly -- outside of the
15  litigation context, do you regularly estimate the
16  duration of construction projects?
17  A. No. We would ordinarily take the -- you
18  know, there would ordinarily be a construction
19  schedule. Somebody would, you know, come to me and
20  say, "This is going to take six months or 12
21  months."
22      But absent that schedule, I'm perfectly
23  qualified to say what should this class of
24  construction project take.
25  Q. What makes you qualified to estimate the

Page 266

1  duration of a construction project?
2      A.  Based on my observations in the marketplace
3  as to how long things take to complete.
4      Q.  What data did you rely on to estimate how
5  long it would take remediation to occur for the
6  Priority Claimants?
7      A.  I looked at a number of the properties that
8  were purchased impaired and then the subsequent sale
9  date of when the property sold post-remediation, and
10  I quantified the number of months between when the
11  investor purchased the property and when the
12  investor subsequently resold the property.
13      Q.  When the investor purchased the property and
14  sold the property doesn't tell you how long the
15  property was uninhabitable, does it?  I mean, it
16  might set an outer bound but doesn't tell you what
17  the actual duration of the period in which no one
18  could live in the home was, right?
19      A.  There -- there may be some variation in
20  there, but if somebody -- if -- if the investor
21  bought it, remediated it and, you know, sold it or
22  rented it, you know, that occupancy rate is going to
23  be plus or minus his marketing time.
24      I mean, when the property -- when he put it
25  back on the market to sell it, presumably it would

Page 267

1  have been prepared and ready for C of O.  So if we
2  look at the difference between when he bought it and
3  when he listed it, that would represent the
4  construction time frame.  Because presumably the
5  minute the construction was done and the CO was
6  available, he's putting it on the market.
7      In fact, in some cases, he may put it on the
8  market two or three weeks in advance, expecting that
9  everybody is going to come and make him offers.  And
10  by the time he gets a sales contract, he'll have his
11  CO.  So I would say plus or minus 30 days.  That's a
12  good way to do it.  It's a good method.
13      Q.  But 30 days in your method adds thousands of
14  dollars to the estimate of how much it's going to
15  cost to secure alternative housing, right?
16      A.  In most cases.  I mean, I would say most of
17  the -- most of the market rental rates range from 2-
18  to $6,000.  So there could be, you know, a 2- to
19  $6,000 variation based on 30 days.
20      Q.  Okay.  And -- and to be clear, the -- for
21  the -- excuse me.
22      The case study homes that you looked at, you
23  don't know how long the construction actually took
24  in any of those cases, do you?
25      A.  Well, I don't -- I don't know how you're

Page 268

1  defining construction.  I mean, does permitting
2  count as construction?  The actual construction may
3  have taken a certain time frame; but you also have
4  to obtain permits, and you have to wait -- you know,
5  you have to get subs, and you have to order
6  materials.
7      I mean, the actual banging of nails is one
8  thing; but from beginning to end, there is lot more
9  that goes into it than just building.
10      Q.  Well, let me use a different term.  Let me
11  use -- I'm trying to drill down on the period in
12  which someone can't live in the home because it's
13  being remediated and therefore needs to live
14  somewhere else.
15      A.  Okay.
16      Q.  All right.  You don't know how long that
17  period was for any of the case studies, do you?
18      A.  I need you to ask the question again.  You
19  prefaced it and I missed the question.
20      Q.  Sure.  Yeah.  So if we are defining the
21  period as from when the home become uninhabitable
22  because it's being remediated to the period in which
23  it is habitable after remediation, you don't know
24  what that period was for any of the case studies
25  that you rely on, do you?

Page 269

1      A.  I do think that I have some case studies
2  that sold and resold, and I have those time frames,
3  yes.
4      Q.  But we just discussed that sale and resale
5  date may not correspond exactly to the period in
6  which the home is not something you can live in
7  because it's an active construction site, right?
8      A.  Okay.
9      Q.  So you don't know the period in which the
10  home was an active construction site for any of the
11  case study properties, do you?
12      A.  I would suggest to you that the date you
13  move out, it becomes an active construction site.
14  So if the home -- if an investor bought the home,
15  he's not going to sit around for 30 days and not
16  start construction.  He's going to commence
17  immediately.
18      But the investor that buys a home at a
19  foreclosure and with the remediation in process and
20  says it's as-is, he's not going to work around
21  people's furniture.  He's not working around
22  anybody's personal effects.  So there is going to be
23  a time frame that it's going to take you to move
24  out, and you -- you know, I don't think you should
25  have to pay for that.

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/18/19 Page 274 of 319
Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/18/19 Page 274 of 319
Confidential - Subject to Further Confidentiality Review

Page 270

1  So you move out; and then on the date you
2 move out, that's when somebody can start, and I
3 think you're going to time that around the time that
4 you're going to get permits and it becomes
5 uninhabitable.
6  Q. And the investor who buys the home in your
7 example may have to wait some period for
8 construction financing, right?
9  A. Not necessarily. You can do it all cash.
10  Q. But do you know whether that was true or not
11 true for any of the case studies you rely on?
12  A. I don't know what the financing arrangements
13 were. But if he purchased the home, he's not
14 waiting for construction financing at that point.
15 The date that he closed on the home, his
16 construction financing presumably would be in place,
17 as would any follow-on financing to do the
18 remediate -- I mean to do the renovation. He's not
19 going to buy the home and then go get financing to
20 do the construction.
21  Q. You also rely on Zillow for some aspects of
22 your loss of use for alternative living expenses
23 calculation, right?
24  A. I think there may be a Zillow article
25 referencing sort of average moving costs. I think

Page 271

1 related to the moving cost estimate. There was an
2 article or two there.
3  I mean, the moving cost estimate, you know,
4 is based on an average size home. I didn't -- I
5 didn't -- I didn't scale the moving cost estimate
6 really too much. I just said, you know, to move in
7 and move out on average is going to cost you $1500.
8  Q. Okay.
9  A. It could be more; it could be a little less.
10  Q. So how many studies -- when you say you
11 relied on your case studies to -- to estimate the
12 construction duration, how many case studies did you
13 look at?
14  A. I don't know. I would have to go back
15 and -- and look at the specific sales. I would say
16 at least a half a dozen where I had the time frames
17 between remediated and post-remediated sales with
18 listing dates.
19  Q. Okay. You did not look at data for the
20 thousands of Chinese drywall remediation projects
21 that have already been completed?
22  A. No.
23  Q. Did you examine whether any of the -- let me
24 strike that.
25  Before you offered an opinion about the

Page 272

1 costs that the Priority Claimants would incur to
2 live somewhere else during the remediation of their
3 home, did you look at the actual cost that any of
4 those claimants incurred?
5  A. No. That would -- that's the subject I
6 believe of a different expert.
7  Q. Okay. If the actual costs are different
8 than your predictions, which number should the court
9 go with?
10  MR. MONTOYA: I'm going to object to the
11 scope on that. It calls for a legal conclusion.
12 It's also a jury question, and the judge is going
13 to designate that number and has designated that
14 number in the adoption of Judge Fallon's ruling.
15  So I'm going to instruct you not to answer
16 the question.
17 BY MR. BLOCK:
18  Q. All right. Well, if your prediction doesn't
19 match reality, what does that mean for your
20 calculations?
21  MR. MONTOYA: Same objection.
22  THE WITNESS: Same instruction?
23  MR. MONTOYA: Same instruction.
24 BY MR. BLOCK:
25  Q. Well, listen to my question because I'm

Page 273

1 asking -- I'm not asking you what the decision-maker
2 should do with it. I'm asking you: As a -- as an
3 expert, if you've made predictions of loss of use
4 damages that are different than the actual expenses
5 that real people incurred for those items, what does
6 that say about your predictions?
7  MR. MONTOYA: Same objection as to -- same
8 instruction.
9  Q. I think I've cured the problem, if there was
10 one, with that question; but you're not going to
11 answer on the basis of what counsel is saying?
12  A. Well, I mean, he's instructed me not to
13 answer. Of course I'm not going to answer.
14  Q. Okay. Did you ask for any data on or seek
15 to obtain from any source any data on actual costs
16 of alternative housing for construction duration?
17  A. No.
18  Q. Why not?
19  A. Because in reviewing the scope of the
20 assignment, I discussed with Mr. Montoya our
21 approach and that was part of the scope. I said
22 that, you know, rent would be considered the
23 economic loss as a proxy. That's the way Florida
24 law handles it. That's the way I've handled it in
25 the past, and that's the scope of what I was going

Confidential - Subject to Further Confidentiality Review

Page 274

1  to do.
2      So I developed a rental estimate, or I had
3  the local appraisers with local competency develop a
4  rental estimate for each property.
5      And then worked on the duration based on
6  my analysis of the sale/resales of properties that
7  had been individually remediated.
8      Q.  How many real estate markets would you say
9  there are in a state like Florida?
10     A.  For which type of property?
11     Q.  Residential.
12     A.  Yeah.  Probably thousands.
13     Q.  Is it your testimony that a remediated home
14 will experience the exact same stigma amount of
15 damages across all of those thousands of real estate
16 markets in Florida?
17     A.  Yes.  Unless there is data to the contrary,
18 that's my opinion currently.  That's -- that's what
19 my data demonstrates currently.
20     Q.  How many real estate markets did you study
21 in your case study?
22     A.  Some of them were in the same market; so
23 amongst 20 some-odd case studies, I don't -- I never
24 looked to see what the actual dispersion was, but
25 let me review my report.

Page 275

1      So I would suggest that we could start with
2  the counties.  So there is eight distinct counties.
3  We have 21 total case studies and eight distinct
4  counties and then a number of them are in sort of
5  similar markets, so probably a dozen.
6      Q.  So --
7      A.  Because some of them overlap --
8      Q.  Yeah.
9      A.  -- and then some of them are in the same
10 exact market.
11     Q.  Okay.  So you are willing to testify on the
12 basis of a case study involving a dozen markets what
13 the stigma impact will be on the thousands of other
14 residential real estate markets in Florida without
15 examining the facts and circumstances of those other
16 markets?
17     A.  I think I testified earlier today that my --
18 the application of my 10 percent was developed to
19 relate specifically to these 20 Priority Claimants,
20 not to be applied across thousands of properties in
21 different markets.  I think my testimony will
22 reflect that.
23     MR. BLOCK:  This is probably a good place
24 for us to stop for the day.
25     THE WITNESS:  That won't be objectionable to

Page 276

1  me.
2      (Discussion off the record.)
3      THE VIDEOGRAPHER:  Off record, 5:40.
4      (Whereupon, the deposition recessed at
5  5:40 p.m.)

Page 277

1              C E R T I F I C A T E
2      I, SUSAN D. WASILEWSKI, Registered
3  Professional Reporter, Certified Realtime Reporter
4  and Certified Realtime Captioner, do hereby certify
5  that, pursuant to notice, the deposition of ANTHONY
6  GRAZIANO was duly taken on Monday, March 18, 2019,
7  at 10:13 a.m. before me.
8      The said ANTHONY GRAZIANO was duly sworn by
9  me according to law to tell the truth, the whole
10 truth and nothing but the truth and thereupon did
11 testify as set forth in the above transcript of
12 testimony.  The testimony was taken down
13 stenographically by me.  I do further certify that
14 the above deposition is full, complete, and a true
15 record of all the testimony given by the said
16 witness, and that a review of the transcript was
17 requested.
18
19 _____
20 Susan D. Wasilewski, RPR, CRR, CCP
21 (The foregoing certification of this transcript does
22 not apply to any reproduction of the same by any
23 means, unless under the direct control and/or
24 supervision of the certifying reporter.)
25

Confidential - Subject to further Confidentiality Review

## Page 278

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections.  You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.  It will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you.  If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

## Page 280

ACKNOWLEDGMENT OF DEPONENT

I, _____, do hereby acknowledge that I have read the foregoing pages, 1 through 279, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____    _____
ANTHONY GRAZIANO                    DATE

Subscribed and sworn to before me this
_____ day of _____, 20___.
My Commission expires: _____

_____
Notary Public

## Page 279

- - -

E R R A T A

VOLUME 1

PAGE  LINE  CHANGE

____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____

## Page 281

LAWYER'S NOTES

PAGE  LINE

____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____

Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2
                  Case No. 1:11-CV-22408-MGC
 3
 4    -----------------------------------
      EDUARDO AND CARMEN AMORIN, et al.,
 5    individually, and on behalf of all
      others similarly situated,
 6
          Plaintiffs,
 7
      vs.
 8
      TAISHAN GYPSUM CO., LTD., f/k/a
 9    SHANDONG TAIHE DONGXIN CO., LTD.;
      TAI'AN TAISHAN PLASTERBOARD CO.,
10    LTD., et al.,
11        Defendants.
12    -----------------------------------
13
                             - - -
14
                  Tuesday, March 19, 2019
15
                             - - -
16
              CONFIDENTIAL - SUBJECT TO FURTHER
17                 CONFIDENTIALITY REVIEW
18                           - - -
19        Videotaped deposition of ANTHONY GRAZIANO,
      Volume 2, held at Colson Hicks Eidson, 255
20    Alhambra Circle, Penthouse, Coral Gables,
      Florida, commencing at 9:05 a.m., on the above
21    date, before Susan D. Wasilewski, Registered
      Professional Reporter, Certified Realtime
22    Reporter, Certified Realtime Captioner
23                           - - -
24            GOLKOW LITIGATION SERVICES
          877.370.3377 ph | 917.591.5672 fax
25                deps@golkow.com
```

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/18/19 Page 278 of 319
Case 2:14-cv-02722-MBN Document 249-4 entered on FLSD Docket 05/13/2019 Page 54 of 99

Confidential - Subject to Further Confidentiality Review

| Page 283 | Page 285 |
|---|---|

**Page 283**

```
1   APPEARANCES:
2     COLSON HICKS EIDSON
      BY:  PATRICK S. MONTOYA, ESQUIRE
3        NATALIE M. RICO, ESQUIRE
      255 Alhambra Circle, Penthouse
4     Coral Gables, Florida 33134
      Phone:  (305) 476-7400
5     patrick@colson.com
      natalie@colson.com
6     Representing Plaintiffs
7
8     BREIT CANTOR GRANA BUCKNER
      BY:  JEFFREY A. BREIT, ESQUIRE
9     600 22nd Street, Suite 402
      Virginia Beach, Virginia 23451
10    Phone:  (757) 670-3888
      jeffrey@breitcantor.com
11    Representing Plaintiffs
12
13    ORRICK, HERRINGTON & SUTCLIFFE, LLP
      BY:  DIANA SZEGO FASSBENDER, ESQUIRE
14    1152 15th Street, NW
      Washington, D.C. 20005-1706
15    Phone:  (202) 339-8533
      dszego@orrick.com
16    Representing Defendant Beijing New Building
      Materials PLC
17
18
      ORRICK, HERRINGTON & SUTCLIFFE, LLP
19    BY:  DAN GUERRA, ESQUIRE
20    405 Howard Street
      San Francisco, California 94105-2669
21    Phone:  (415) 773-5545
      dguerra@orrick.com
22    Representing Defendant Beijing New Building
      Materials PLC
23
24
25
```

**Page 285**

```
                      - - -
                    I N D E X

                    Volume 2

            Tuesday, March 19, 2019
                     - - -
Testimony of:  ANTHONY GRAZIANO           Page
  DIRECT EXAMINATION BY MR. BLOCK.............. 287
  CROSS-EXAMINATION BY MR. GUERRA.............. 340

            E X H I B I T S
         (Attached to transcript)
ANTHONY GRAZIANO DEPOSITION EXHIBITS          PAGE
Exhibit 14   Article:  The Impact of Detrimental  297
             Conditions on Property Values
             By Arthur Bell, MAI
Exhibit 15   Web Page:  Value Diminution          297
             Services

Exhibit 16   Miami Herald Article:  A good time   301
             to sell in real estate?  What's
             your timing?
             By Anthony M. Graziano
Exhibit 17   Value Diminution Analysis            304
```

**Page 284**

```
1   APPEARANCES:
2     ABALLI MILNE KALIL
      BY:  JOSHUA D. POYER, ESQUIRE
3        MICHEL AYUB, ESQUIRE
      1 Southeast 3rd Avenue, Suite 2250
4     Miami, Florida 33131
      Phone:  (305) 373-6600
5     jpoyer@aballi.com
      mayub@aballi.com
6     Representing Defendant Beijing New Building
      Materials PLC
7
8     ALSTON & BIRD LLP
      BY:  STEVEN R. CAMPBELL, ESQUIRE
9     90 Park Avenue, 15th Floor
      New York, New York 10016-1387
10    Phone:  (212) 210.9400
      steven.campbell@alston.com
11    Representing Defendants Taishan Gypsum Co., Ltd.
      and Tai'an Taishan Plasterboard Co., Ltd.
12
13    ALSTON & BIRD LLP
      BY:  AARON BLOCK, ESQUIRE
14       CAROLINE GIESER, ESQUIRE
      1201 West Peachtree Street
15    Atlanta, Georgia 30309-3424
      Phone:  (404) 881-7000
16    aaron.block@alston.com
      caroline.gieser@alston.com
17    Representing Defendants Taishan Gypsum Co., Ltd.
      and Tai'an Taishan Plasterboard Co., Ltd.
18
19
      ALSO PRESENT:
20
      RAUL TORRES, Videographer
21
22
23
24
25
```

**Page 286**

```
1                        - - -
2         THE VIDEOGRAPHER:  Good morning.  We're now
3    on the record.  This is Day 2 of Anthony
4    Graziano's deposition, Case Number 11-22408-CIV-
5    Cooke.  The time is 9:05.
6         Would all counsel please state their
7    appearance for the record.
8         MR. MONTOYA:  Patrick Montoya and Jeffrey
9    Breit on behalf of the Plaintiffs.
10        MR. BLOCK:  Aaron Block and Caroline Gieser
11   and Steven Campbell from Alston & Bird for
12   Taishan.
13        MR. GUERRA:  Dan Guerra, Orrick Herrington &
14   Sutcliffe, for BNBM PLC.
15        MR. POYER:  Joshua Poyer of Aballi Milne
16   Kalil for BNBM PLC.
17        MS. FASSBENDER:  Diana Fassbender of Orrick
18   for BNBM PLC.
19        MR. BLOCK:  Good morning, Mr. Graziano.
20        THE COURT REPORTER:  Let me remind you you
21   are still under oath.
22        THE WITNESS:  Thank you.
23        ANTHONY GRAZIANO, called as a witness by
24   Defendants Taishan Gypsum Co., Ltd. and Tai'an
25   Taishan Plasterboard Co., Ltd., having been duly
```

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/18/19 Page 279 of 319
Case 2:14-cv-02722-NG Document 240-1 Filed 05/13/19 Page 5 of 99
Confidential - Subject to Further Confidentiality Review

Page 287

1  sworn, testified as follows:
2          DIRECT EXAMINATION
3  BY MR. BLOCK:
4    Q.  Good morning.
5    A.  Good morning.
6    Q.  Did you do any work on your expert opinions
7  after we broke last night and before this morning?
8    A.  No, sir.
9    Q.  Didn't look at your materials, review
10 anything?
11   A.  No.  I left them here in the room.
12   Q.  Okay.  Did you discuss this case with
13 anybody since we broke last night?
14   A.  Not other than with Mr. Breit and Montoya,
15 who wanted to confirm that I was -- my trial
16 availability in July, just talking about the
17 scheduling of the trial and so forth, to make sure I
18 didn't make vacation plans during that time.
19   Q.  Very good.  So it sounds like you are
20 available?
21   A.  Yes.
22       MR. BREIT:  He started off by saying "no."
23   Q.  They turned you around.  All right.
24       Do you plan to -- other than the work that
25 you did after serving your report that was reflected

Page 288

1  in Exhibit 3 and 4 that we discussed yesterday,
2  other than that, do you plan on doing any additional
3  work relating to your opinions before the time of
4  trial in these cases?
5    A.  Well, certainly I'm going to review the file
6  and prepare for the trial, and anything that I find
7  in that time frame, certainly I would want to be
8  able to talk about.
9        And I'd also, you know, after this
10 deposition, like the opportunity to review the
11 deposition.  And based on some of the things that we
12 talked about yesterday, I am going to go back and
13 take a look at the surveys and some of the other
14 issues to understand, you know, what the issues are
15 there.
16   Q.  Okay.  So if I'm understanding you
17 correctly, you intend to review the existing work
18 product in preparation for trial?
19   A.  Yes.
20   Q.  And you intend to review some of the
21 potential mistakes and other issues that we
22 discussed yesterday that may exist in your existing
23 report.  And do you plan to make corrections, if
24 necessary?
25   A.  Yes, I would expect that I would be making

Page 289

1  corrections.
2    Q.  And do you intend to do any additional
3  research or analysis beyond that?  In other words,
4  things like going into the MLS, doing more
5  calculations, looking at -- pulling more comps,
6  whatever it is, do you plan to do anything of that
7  nature?
8    A.  I can't say at this time.  You know,
9  possibly, if that's warranted, if it's -- you know,
10 for me, it's a matter of looking at the information
11 and making sure that I have the best available
12 information at the trial.  So if that's required, I
13 do intend to do that.
14       MR. BLOCK:  Okay.  What I -- what I'd say to
15 you, Patrick, is that we should have a
16 conversation about that.  As we go forward, I do
17 get a little concerned when we have a report
18 that's kind of a moving target, but we can talk
19 about that offline.
20       THE WITNESS:  Okay.
21       MR. BLOCK:  I just wanted to make that
22 known.
23       MR. MONTOYA:  Agreed.
24 BY MR. BLOCK:
25   Q.  All right.  I would like to look with you at

Page 290

1  Dr. Bell's book, Real Estate Damages Third Edition.
2  Do you have a copy?
3    A.  I've got a copy over there.
4        MR. BREIT:  I've got it.  I've got it.
5        THE WITNESS:  Thank you.
6        MR. BLOCK:  All right.
7        MR. MONTOYA:  Give me 30 seconds.  I'm going
8  to grab my copy.
9        MR. BLOCK:  Let's go off the record.
10       THE VIDEOGRAPHER:  Off the record, 9:08.
11       (Recess from 9:08 a.m. until 9:11?a.m.)
12       THE VIDEOGRAPHER:  On record, 9:11.
13 BY MR. BLOCK:
14   Q.  Mr. Graziano, you have in front of you a
15 copy of Exhibit 7, Dr. Bell's book, Real Estate
16 Damages Third Edition, correct?
17   A.  Yes.
18   Q.  Okay.  And this is a book you rely on and
19 cite in your expert report in this case, correct?
20   A.  Yes.
21   Q.  Okay.  Could you turn with me -- well,
22 actually, let me ask you this.  You consider -- in
23 your expert report, Exhibit 1, you consider Chinese
24 drywall to be a Class V building construction
25 condition, right?

1   A.  I thought it was Class VI.
2   Q.  Well, let's look at your report.
3   A.  Okay.
4   Q.  Actually, I'm going to -- you know what?  I
5   did the translation from Roman to Arabic numerals
6   incorrectly.  You're right.  It's a Class VI
7   construction defect.
8   A.  Yes.
9   Q.  All right.  If you will turn with me to Page
10  385 of Dr. Bell's book -- actually, before we go to
11  that, if you could turn with me to Page 175, which
12  is the beginning of Chapter 6.  Chapter 6.  Go back
13  one page.  Sorry, 173.  Sorry.  We're on 173 of
14  Dr. Bell's book.
15  A.  Yes.  And I'll --
16  Q.  Chapter 6.
17  A.  Yes.  And I'll note that particular page is
18  unnumbered, but the next page is 174.
19  Q.  Right.
20  A.  Right.
21  Q.  Right, right, right.  Okay.  Dr. Bell
22  describes Class VI detrimental conditions as those
23  conditions that are associated with the construction
24  of improvements such as construction defects and
25  then some other items, correct?

1   A.  Yes.
2   Q.  Okay.  And in the second paragraph Dr. Bell
3   writes:  "A basic premise of Class VI detrimental
4   conditions is that they are manmade, which generally
5   means that they can be physically repaired."
6   Correct?
7   A.  Yes.
8   Q.  And he goes on to say:  "Often the full
9   value of the property is restored upon the
10  completion of repairs."  Correct?
11  A.  Correct.
12  Q.  Turn with me to Page 6 of Dr. Bell's book,
13  if you would.  Are you there?
14  A.  Yes.
15  Q.  Okay.  This is at the beginning of
16  Dr. Bell's book where he is describing some summary,
17  overview concepts as it relates to appraisal and
18  real estate damages, right?
19  A.  Yes.  The introduction is titled
20  Fundamentals of Property Valuation.
21  Q.  Right.  And on Page 6, the substantive text
22  is a discussion at the top of Dr. Bell's definition
23  of term "value," right, where he begins, "There are
24  various definitions of the term value," and he
25  refers to market value and other concepts, right?

1   A.  Yes.
2   Q.  Okay.  And value is something that you
3   consider in forming your opinions, right?
4   A.  Yes.  The unimpaired value is one of the
5   premises upon which to apply the diminution; that's
6   correct.
7   Q.  In the first paragraph, Dr. Bell writes:
8   "Of course, like any valuation assignment, the date
9   of value is a critical issue in measuring real
10  estate damages as values change over time."
11  Correct?
12  A.  Correct.
13  Q.  Do you have any reason to disagree with
14  Dr. Bell there?
15  A.  No.  In fact, I think my testimony yesterday
16  reflects exactly that.
17  Q.  Turn with me to Page 323 of Dr. Bell's book,
18  if you would.
19  A.  323?
20  Q.  323, yes.  On Page 322, running into 323,
21  Dr. Bell is discussing market data, correct?
22  A.  Yes.
23  Q.  Okay.  And at the end of that discussion on
24  Page 323, I'd like to direct you to the last
25  paragraph.  He says that -- Dr. Bell writes that:

1   "Failing to research and apply relevant market data
2   is the single most common flaw noted in the analysis
3   of detrimental conditions."  Right?
4   A.  That's what it, says.
5   Q.  Okay.  And he concludes that discussion by
6   saying:  "The effect of a detrimental condition
7   cannot be generalized and is unique to a particular
8   market and the facts of a particular property at a
9   specific date of value."  Correct?
10  A.  Yes.
11  Q.  Do you have any reason to disagree with what
12  Dr. Bell writes?
13  A.  No.
14  Q.  You can set that aside for the time being.
15      I'd like to ask you about an article that
16  Dr. Bell wrote called The Impact of Detrimental
17  Conditions on Property Values.
18      MR. MONTOYA:  Thank you.
19  Q.  And this is an article that Dr. Bell wrote
20  and published in the Appraisal Journal in October
21  1998.  Do you see that?  It will show up on the
22  second page -- third page.
23  A.  Yes.
24  Q.  Okay.  Is this an article that you have
25  reviewed before?

Page 295

1    A.  Yes.
2    Q.  Okay.  Is this an article you rely on?
3    A.  The substance of this article has been
4  subsequently incorporated in the book.  Some of the
5  materials may have been incorporated.  I think at
6  this time -- and you can check with Mr. Bell -- the
7  Second Edition of Real Estate Damages had not been
8  issued.  And in 1998, this was probably some of the
9  precursor work that gave rise to his class on
10  detrimental conditions.
11      So you'll see that the classification of the
12  conditions are the same.  The bell chart -- the
13  initial version of the bell chart, or what he calls
14  the detrimental conditions model, is included.  So
15  this is generally the book in its earliest version.
16    Q.  Okay.  On Page 385 of this article, you
17  see where Dr. Bell has a discussion of Class VI
18  building construction condition defects?
19    A.  I do.
20    Q.  Okay.  And we see similar languages in the
21  book, at the beginning of this paragraph, about the
22  basic premise of both Class VI and Class VII DCs is
23  that they are manmade, which means they can often be
24  repaired.  That's consistent, if not largely
25  identical, to text in his book, correct?

Page 296

1    A.  Right.
2    Q.  Okay.  And a couple of sentences later,
3  Dr. Bell writes:  "Class VI DCs" -- detrimental
4  conditions -- "involve construction issues above
5  grade.  As such, they are relatively easy to assess
6  and often result in the restoration of the
7  property's full value upon completion of the
8  repairs."  Right?
9    A.  Yes.
10    Q.  Do you have any reason to disagree with what
11  Dr. Bell writes in this 1998 article?
12    A.  No.  I think he says they often result,
13  which means there are times which they don't, and I
14  don't disagree.
15      I mean, sometimes the construction condition
16  is they didn't install, you know, the flooring
17  correctly, and all you have to do is reinstall the
18  flooring.  Or somebody put the air-conditioning in
19  backwards, and that doesn't necessarily create a
20  long-term detrimental condition.  You reinstall the
21  air-conditioning.
22      So I think he's right.  Often you can cure
23  those things, and there's no associated disclosure
24  required or other requirements, and sometimes --
25  often they do.

Page 297

1    Q.  Thanks.  You can set that aside.
2      THE COURT REPORTER:  Did you want to mark
3  that?
4      MR. BLOCK:  Yeah, let's mark that as 14.
5      (Graziano Exhibit 14 was marked for
6  identification.)
7  BY MR. BLOCK:
8    Q.  Thank you.  You can put that in that pile.
9    A.  Sure thing.
10    Q.  Okay.  I'm going to hand you, Mr. Graziano,
11  what we will mark as Exhibit 15, which is a --
12      (Graziano Exhibit 15 was marked for
13  identification.)
14      MR. BLOCK:  Here you go.
15  BY MR. BLOCK:
16    Q.  -- printout --
17      MR. MONTOYA:  Thank you.
18    Q.  -- from the website for your company,
19  Integra.  Do you recognize this?
20    A.  I do.
21    Q.  Okay.  And this is something we printed out
22  from the value diminution section of the Integra
23  website a few days ago.  Does this accurately
24  reflect what you understand to be on the Integra
25  website?

Page 298

1    A.  I haven't reviewed the website in some time,
2  but it looks reasonably current, yes.
3    Q.  Okay.  If you look at the URL at the bottom,
4  this is the part of the Integra website that
5  discusses litigation support and expert testimony,
6  correct?
7    A.  Yes.
8    Q.  And that's what you're doing here today,
9  right?
10    A.  Correct.
11    Q.  And in these cases, right?
12    A.  Yes.
13    Q.  Okay.  And when you are -- what is the
14  purpose of this part of Integra's website?
15    A.  This is just to explain the different
16  services that we provide and to provide any
17  potential users or existing clients of our services
18  and acknowledgment of, you know, who provides this
19  type of work throughout the company.
20    Q.  Is this material that is used for marketing
21  purposes?
22    A.  Yes.
23    Q.  In other words, when you are telling
24  potential customers how you conduct your work as an
25  expert witness, you -- this is what you're doing

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/18/19 Page 282 of 319
Case 2:14-cv-06228-EEF-JCW Document 52 Filed 06/23/20 Page 8 of 99
Confidential - Subject to Further Confidentiality Review

Page 299

1  with this web page, right?
2  A.  Well, I wouldn't say I'm doing it.  I mean,
3  we have a marketing division that prepares this work
4  product.  I don't have any direct hand in this.
5  Q.  You're the boss of the whole company, right?
6  A.  Well, I'm the chairman of the board, but --
7  and, yes, I guess I am the boss of the whole
8  company, but I'm not involved in the day-to-day
9  marketing components.  I mean, we have a marketing
10  director that oversees a team of people, and they
11  work on this on a regular basis.
12  Q.  In the second sentence, Integra writes on
13  your website: "Diminution in value may arise from a
14  wide variety of causes, including soil substance,
15  viewer access impairment, defective title matters,
16  various types of easements, nearby nuisances, and
17  construct defects to name a few."
18      Is that correct?
19  A.  That's what it says, yes.
20  Q.  Okay.  Integra goes on to say on your
21  website: "As an initial step, we determine whether
22  or not the property's value is truly impaired.  If
23  there is impairment, our next step is to quantify
24  the value diminution with a solid foundation of
25  appropriate market-based evidence."

Page 300

1      Is that what you say on your website?
2  A.  That's what it says.
3  Q.  All right.  So the first step is to
4  determine whether a property's value is truly
5  impaired, and the second step, according to the
6  Integra website, is to quantify the effect or the
7  amount of impairment, right?
8  A.  I wouldn't say that that was my method, but
9  I see that that's what the marketing material says.
10  Q.  Why would you say that's not your method?
11  A.  Because you can't determine whether a
12  property's value is truly impaired until you've
13  conducted the research and quantified the research,
14  so this marketing collateral is inaccurate.
15  Q.  Do you know why that would be?
16  A.  Because some marketing kid wrote it up in
17  New York and published it on the website, and none
18  of our litigation experts have been cross-examined.
19  I guarantee this will be changed by tomorrow.
20  Q.  What do you intend to change it to say?
21  A.  To accurately reflect what -- how the -- how
22  the scope of these assignments normally work.
23  Q.  And what is the scope of how these
24  assignments normally work that you're referring to?
25  A.  Well, I'm not going to, you know, rewrite

Page 301

1  the marketing collateral during our deposition,
2  unless you want me to.  But clearly, it's not
3  accurate to say that you make a determination
4  whether something is impaired and then go do the
5  study.
6      So I think the proper scope here is that we
7  will, you know, scope the assignment with the client
8  and understand the nature of the problem, identify
9  the problem, prepare research and et cetera,
10  et cetera, until we reach an understanding of what
11  the problem is and quantify the problem one way or
12  the other.  That's the correct process.
13  Q.  You can set that aside.
14      (Graziano Exhibit 16 was marked for
15  identification.)
16  BY MR. BLOCK:
17  Q.  I'm going to hand you what I'm marking
18  Exhibit 16, which is a printout from the Miami
19  Herald -- the website for the Miami Herald.  This is
20  an article or a piece that I believe you wrote
21  called: A good time to sell in real estate?  What's
22  your timing?  And it was published in August of
23  2016.
24  A.  Yes.
25  Q.  And updated a little -- a day later in

Page 302

1  August 2016.  And is this an article that you wrote?
2  A.  It is.
3  Q.  Okay.  And you chose to have it published in
4  the Miami Herald?
5  A.  The Miami Herald actually asked me to write
6  for them, which I wrote a number of articles for
7  them in the 2016-2017 time frame for their Business
8  Monday edition.
9  Q.  If you -- if you turn with me -- well, and
10  so this article accurately reflected your views
11  about real estate?
12  A.  Yes.
13  Q.  Okay.  If you turn with me to the third
14  page, which is the end of your article, you -- the
15  third-to-last paragraph that begins:  "It's always a
16  good time to buy, and always a good time to sell, so
17  long as you are never compelled by time or
18  circumstances to do either."
19      Do you see that paragraph?
20  A.  I do.
21  Q.  And you conclude that paragraph by saying:
22  "The only thing that is certain is that real estate
23  will rise and fall with the general economic
24  conditions in which it is situated."  Correct?
25  A.  Yes.

1    Q.   Is that true?
2    A.   Yes.
3    Q.   And you conclude by saying:  "And last,
4  remember my Dad's cardinal rule of real estate
5  investing:  'Timing isn't everything, it's the only
6  thing.'"
7        Is that what you wrote?
8    A.   Yes.
9    Q.   Is that true?
10   A.   That is what my dad said, yes.
11   Q.   Is that an opinion about real estate that
12  you believe in?
13   A.   I think timing is extremely important, and
14  most -- a lot of times the only thing that corrects
15  for your market is your market timing.  There are
16  some things you can't control.
17   Q.   You can set that aside.
18    MR. BLOCK:  Let's go off the record just so
19  we can get some paper organized.
20    THE VIDEOGRAPHER:  Off record, 9:25.
21    (Recess from 9:25?a.m. until 9:35 a.m.)
22    THE VIDEOGRAPHER:  On record, 9:35.
23  BY MR. BLOCK:
24   Q.   In front of you -- well, you have in front
25  of you a binder that you brought with you yesterday,

1  correct?
2    A.   Yes.
3    Q.   And it's called Value Diminution Analysis
4  Chinese Drywall?
5    A.   Yes.
6    Q.   All right.  Let's go ahead and mark that as
7  Exhibit 17.
8        (Graziano Exhibit 17 was marked for
9  identification.)
10  BY MR. BLOCK:
11   Q.   And, Mr. Graziano, is that the -- well, what
12  is that binder of materials?  What does it contain?
13   A.   This constitutes the work file materials for
14  all of the control pairings that are outlined in
15  the -- what you call the general report.
16   Q.   And this is sort of a backup for the work
17  that's reflected in the general report, Exhibit 1?
18   A.   That's correct.
19   Q.   Okay.  And we have a -- we received an
20  electronic copy of this file or this folder called
21  Value Diminution Analysis.pdf.  Does that sound
22  right to you?
23   A.   I don't know what the PDF was called.
24   Q.   Okay.  Well, it's, I guess -- it's a
25  712-page PDF.  Does that -- sounds about right.

1    A.   Looks roughly correct.
2    Q.   Okay.  Well, that's what we're going to be
3  looking at on a computer, and let's hope it matches
4  what you have in front of you, and if not, we'll
5  figure out why.
6        So could you turn with me to the --
7  actually, it would be helpful, too, if you have in
8  front of you a copy of your general report, as well,
9  which is Exhibit 1.
10       And what we're going to be doing is looking
11  at the tables that are at the back of your general
12  report that reflect the conclusions of your case
13  study or your paired sales analysis for various
14  cases and understanding the arithmetic, so we need a
15  copy of your general report that has the tables.  So
16  it's the --
17    MR. MONTOYA:  I think he's got it there.
18    MR. BLOCK:  A copy --
19   A.   This copy doesn't have the tables.
20   Q.   Yeah, I know.
21   A.   And this copy is double-sided.  That's going
22  to be frustrating.
23   Q.   Yeah.
24   A.   Okay.  Thank you.
25   Q.   Yeah.  I think -- so if you could go with me

1  to the table for Tampa 12 at the back of your
2  general report, Exhibit 1.  Are you there?
3    A.   I am.
4    Q.   Okay.  I'd like to --
5    MR. MONTOYA:  You're on the last table?
6  Which one?
7    MR. BLOCK:  Tampa 12, close to the end.
8    Q.   So if you -- so you have Tampa 12 in front
9  of you, the table for Tampa 12, and then can you go
10  to Tampa 12 in your work file in Exhibit 17?
11   A.   Yes.
12   Q.   Okay.  You're there?  So the first page that
13  we have for Tampa 12 in your work file is the -- we
14  actually have a control pairing verification script
15  right after the yellow piece of paper.  Okay?
16   A.   Yes.
17   Q.   And so what's the name on that script, just
18  so we're on the same?  Is it Rich -- Rick something?
19  Yeah.
20   A.   Yes.
21   Q.   Okay.  We're on the same page there.
22   A.   It should have marking up top that says
23  T12S.
24   Q.   Yeah.  Okay.  All right.  So if you can go,
25  then, to the next page, and the next page after that

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/18/19 Page 284 of 319 of
Case 2:14-cv-02722-MLCF-DEK Document 51-14 Filed 05/19/16 Page 8 of
99
Confidential - Subject to Further Confidentiality Review

Page 307

1  actually, this is the MLS printout for 1211 East
2  Giddens Avenue in Tampa.  Is that what you have?
3      A.  Yes.
4      Q.  Okay.  And that's -- is that the MLS
5  printout for the subject home for the Tampa 12
6  analysis?
7      A.  Yes.
8      Q.  Okay.  And -- all right.  So on your -- in
9  Exhibit 1, under the lot size square footage column,
10 you list a lot size square footage of 1,947 square
11 feet, correct?
12     A.  Are you referring to the MLS, or are you
13 referring to my --
14     Q.  Tampa -- in the -- your table for Tampa 12
15 in Exhibit 1.
16     A.  Okay.  Yes, I see it.
17     Q.  Okay.  You see it.
18     A.  It says lot size square footage --
19     Q.  Okay.
20     A.  1,947.
21     Q.  If you go back to the MLS printout that's in
22 Exhibit 17, do you -- and you go under land, site,
23 and tax information -- I'll wait till you're there.
24     A.  Yes.
25     Q.  Do you see where the lot size is actually

Page 308

1  listed at 6,650 square feet?
2      A.  No.  I see in the MLS printout, it's listed
3  up to 10,889.  I don't know if you -- where are you
4  looking at the 6,000?
5      Q.  Under land, site, and tax information, under
6  that heading, if you go to the end of that section,
7  so --
8      A.  Yes, I see it here, 6,650 square feet.
9      Q.  Okay.  Do you know why the MLS lot size
10 square footage is different than the lot size square
11 footage you use in your Tampa 12 table in your
12 general report, Exhibit 1?
13     A.  It looks like somebody took the total area,
14 which would be the garage areas from the
15 residential, and as we transposed that over into the
16 grid, they didn't transpose the lot size over
17 correctly into that grid.  So the lot sizes are
18 reflected inaccurately in my grid from what the MLS
19 statements are.
20     Q.  So that's a mistake in the table for Tampa
21 12 in your general report?
22     A.  That's a transcription error for that -- of
23 the land size, yes.
24     Q.  And we can keep going through these, but if
25 you look through, the lot sizes in the tables that

Page 309

1  you have for the properties tend to be fairly small,
2  on the order of 2,000 square feet or less, pretty
3  consistently.  Is that right?
4      A.  Yes.  I think once this error -- once this
5  error has occurred and they've taken the total area,
6  they consistently created that error.  So if you
7  want to go through each of these lot sizes from the
8  MLS, I think you'll see that they're all about 7 --
9  6,600 and 7,300 square foot lots.
10     Q.  And lot size is a variable that you use to
11 adjust the sale price in your comparison, right?
12     A.  Yes.  If the lot sizes are materially
13 different, that might have -- that might have an
14 impact on value, and we would adjust for it; that's
15 correct.
16     Q.  Okay.  And in order to see the impact of
17 correcting for this error, you would need to do
18 additional work, correct?
19     A.  Well, I mean, I can go through it now.  I
20 mean, all -- I just looked through all the lot
21 sizes, and they're all 6,600 to 7,300 square feet.
22 So there is no material different in the lot size.
23     Q.  Well, you have -- how many -- how many
24 properties are involved in your case study, roughly
25 speaking?

Page 310

1      A.  Four.
2      Q.  Oh, sorry.  Let's -- I mean across your
3  whole 20-case study --
4      A.  I've --
5      Q.  -- we've got almost 100 properties or 70-odd
6  properties?
7      A.  Sure.  I mean, if there is 20 case studies
8  and four comps per, there's at least 80 comparables.
9      Q.  I don't -- I don't want to sit here and
10 readjust all of those on the fly.  But I'm -- what
11 I'm asking you is:  Would you need to go through all
12 of these -- throughout your general report, all of
13 these where the lot size appears to be based on the
14 home and not the actual lot and correct the
15 adjustment?
16     A.  I would certainly -- having identified this
17 error transcription, at least in the Tampa MLS,
18 because the -- I know that in some of the -- many of
19 the case studies, we reflect a quarter acre to half
20 an acre, and that's certainly not referencing a
21 building size.  But, yes, I would go through and
22 check these again to make sure that no additional
23 adjustments were necessary.
24     Q.  Well, if you look at Tampa 25, which is the
25 next page on Exhibit 1, you see those are also lot

1 sizes that are almost all under 2,000 square feet or
2 under 3,000 square feet and also appear to be based
3 on the size of the home and not the lot.
4     A.   Okay.
5     Q.   And in Tampa 26, they're a little over 2,000
6 square feet, but also appear to be the home size and
7 not the lot, right?
8     A.   Yes.  Let me just check.
9     Q.   Uh-huh.
10     A.   I'm out -- I'm out of order here.  We were
11 talking originally about --
12     Q.   We were on Tampa 12.  You can --
13     A.   We were originally on Tampa 12, correct?
14     Q.   Yes.
15     A.   And now you're asking me regarding --
16     Q.   Tampa 25, 26, and 27, and Fort Myers 20 and
17 Fort Myers 21 and Fort Myers 22 and Fort Myers 23.
18 Those all appear to be incorrect lot sizes, correct?
19     A.   Yes.
20     Q.   All right.  Let me ask you a numbering
21 question.  Why do the case study numbers jump from
22 in this -- for example, Tampa 12 to Tampa 25?  Why
23 not Tampa 13, 14, and so on?
24     A.   When we did the original research, we
25 identified all of the potential control sales in the

1 study.  Then we determined that some of them were
2 sold impaired or -- we were looking specifically for
3 the properties that sold remediated.
4         So when we developed the case studies, we
5 numbered all of the control sales initially and then
6 eliminated those if they were determined to be
7 impaired or we couldn't confirm them or whatever
8 the -- whatever the nature of that control sale was.
9         They were initially all numbered for
10 tracking purposes, and we didn't switch
11 properties -- to my knowledge, we didn't switch
12 properties in and out.  I did discover -- there was
13 one case study where the property changed, and I
14 flagged that, but I'd have to go back and look at
15 it.
16         But other than that, the control sales
17 carried those case study numberings, so to the
18 extent that they're skipping, that's because we had
19 identified a control sale and -- you know,
20 identified -- identified the control sale and then
21 maybe didn't use it.
22     Q.   Uh-huh.  So in the case of Tampa, the
23 highest number that we have reflected here is Tampa
24 27, and the only Tampa case studies that are
25 included in your report are Tampa 12, 25, 26, and

1 27.  So we have four out of as many as 27 addresses
2 for Tampa that made it into your report.  Am I
3 understanding that correctly?
4     A.   Could you just ask the question again?
5     Q.   Yeah.
6     A.   I didn't understand it.
7     Q.   Yeah, sure.  So the highest number we have
8 for Tampa -- the highest case study number we have
9 for Tampa is Tampa 27.
10     A.   Okay.
11     Q.   Right.
12     A.   Yes.
13     Q.   In your report, in your general report,
14 Exhibit 1, I see a table for Tampa 12, 25, 26, and
15 27.  So I have four Tampa tables out of a potential
16 of 27, if not more, that you began analysis with?
17     A.   Correct.
18     Q.   Okay.  Do you know specifically why you
19 excluded the 23 or more other addresses in Tampa?
20     A.   I would have to go back and look, but I'm
21 going to suspect that either some were confirmed as
22 either not having drywall.  Some were confirmed as
23 being claimants.  As I mentioned yesterday in my
24 testimony, I sent the original control sale list
25 around and asked if -- asked if any were on the

1 claimant side within the entire suit.  So if these
2 were, we knocked those out.  And then some were
3 confirmed as having sold impaired, so they weren't
4 post-remediation sales.
5     Q.   Do you -- have you produced the addresses
6 for the control sales that you did not use in your
7 study?
8     A.   I believe so.
9     Q.   And do you know where those would be?
10     A.   There are a number of -- sorry.  Was there a
11 question?
12     Q.   Well, is that in the Not Used file?
13     A.   They should be in the Not -- yes, in the Not
14 Used file and the Additional Support file.
15     Q.   We'll take a look at those.
16     A.   Okay.
17     Q.   Would you have -- if they're not in those
18 PDFs, would you have records somewhere at your
19 office indicating which addresses you identified
20 initially, but did not use in your study and why you
21 excluded them from your study?
22     A.   Yes, probably.
23     Q.   I'm going to go back to Tampa 12, the table
24 for Tampa 12 in Exhibit 1, your general report.  Are
25 you there?

Page 315

1    A.  Yes.  Just give me one second.
2    Q.  Okay.
3    A.  I have to get to the binder section.  I'm
4  having a little bit of a space problem over here.
5    Q.  Yeah?
6       THE WITNESS:  Thank you.  You're fine.
7    A.  Okay.
8    Q.  So you've got the table for Tampa 12 in
9  front of you?
10    A.  I do.
11    Q.  Okay.  So the first unimpaired comp is at
12  1413 East Comanche Avenue, right?
13    A.  Yes.
14    Q.  And if you look at the -- if you go toward
15  the right, you have a column for condition.  What is
16  the purpose of having an adjustment for the
17  condition of the property?
18    A.  So various property conditions affect -- you
19  know, the condition of the property can affect the
20  desirability of the -- of the comparable, and we've
21  made adjustments to make the property comparable to
22  the subject property in its condition as of that
23  date.
24    Q.  Are you basically -- making these
25  adjustments, are you trying to adjust for inherent

Page 316

1  differences among the properties so that you're
2  comparing apples to apples?
3    A.  Yes.
4    Q.  So for the first comp, 1413 East Comanche
5  Avenue, you deducted $75,000 from the actual sales
6  price because the condition of that property was
7  new, right?
8    A.  Yes.
9    Q.  Okay.  And the purpose of deducting $75,000
10  was to account for the fact that a new home is
11  likely to be worth more than a good quality home
12  like the remediated control home, right?
13    A.  Broadly, yes.  I mean, there are -- there's
14  obviously issues of incurable -- what we call
15  incurable physical depreciation, right?  So a -- not
16  only does a new home come with new appliances and
17  new features, but it's also functionally new.  So
18  it's upgraded to current -- current building code
19  standards, and you have a new roof.
20       And so the overall -- it's just -- it's not
21  just a condition perception, it's also the market's
22  recognition that there's probably no near term
23  replacement issues that will come up.
24    Q.  So if you look at the second comp,
25  Unimpaired Comp 2, at 931 East McBerry Street, you

Page 317

1  deduct -- well, the condition of that home is good,
2  right?
3    A.  Yes.
4    Q.  And good is not as good as new, right?
5    A.  Correct.
6    Q.  Okay.  You deducted $97,200 from Comp Number
7  2, which is $22,200 more than you deducted for the
8  new home in Unimpaired Comp 1.
9    A.  Yes.
10    Q.  Why?
11    A.  Why is it -- why is it more, or why is it --
12  I don't understand the question, why.
13    Q.  Well, both of those.  But why did you deduct
14  more for the good quality home than for the new
15  quality home?
16    A.  When you look at the sales -- you know, we
17  do -- we entertain or we do a process called
18  pairing.  So we're also looking between the
19  comparables.
20       As you'll note, the second comparable is
21  larger than the first comparable, so, you know, at
22  $50 a square foot for the condition, the adjustment
23  is larger for home -- the second home because it's a
24  larger home.
25       So that just recognizes the condition, and

Page 318

1  my estimate of the condition in that case based on
2  the photographic evidence and otherwise was that
3  that home was -- and based on a pairing of the
4  price, the market demonstrated that that home traded
5  as if it were new.  So there was a premium to that
6  home by pairing that sale with the other sales in
7  the grid.
8    Q.  So you mentioned -- in that answer, you
9  mentioned size, which I understand you actually
10  account for in a different column called size,
11  square -- SF for square footage, right?
12    A.  Correct.
13    Q.  So I want to focus just on the condition of
14  the home which you have a specific column for,
15  labeled condition.  And I'm trying to understand why
16  you deducted more for the good condition home than
17  you did for the new condition home, based solely on
18  the condition, not on other variables that you
19  account for the other places in your analysis.
20    A.  Sure.  And what I'm saying to you in each
21  case, this reflects a $50 per square foot
22  adjustment.  So I didn't deduct more.  It's a -- I
23  actually deducted the same amount for all four of
24  the comparables.  It's a function, if one comparable
25  is bigger than the other, that the gross adjustment

Page 319

1  is bigger.
2  Q.  Did -- so you're telling me you used a 50
3  square foot -- $50 a square foot adjustment factor
4  for condition of the home in Tampa 12?
5  A.  That's correct.
6  Q.  Did you use the same $50 a square foot
7  adjustment factor for condition of home in the other
8  19 cases in your case study?
9  A.  No.  I -- each one of the case -- each one
10  of the case -- I don't know.  I'd have to look, but
11  each one of the case studies are paired against the
12  comparables that are within that case study.  So
13  they're unique to that particular case study.
14  Q.  Why $50 a square foot?
15  A.  When I looked at the -- when I looked at the
16  comparison -- so if you compare Comparable Number
17  1 -- if you pair Comparable Number 1 with Comparable
18  Number 2, the overall difference in that price was
19  about $29,000.
20  And then we look across all of the
21  various -- varying characteristics, and we say, what
22  are the differences between those two comparables?
23  Right?  And that $21,000 is accounted for between
24  1,944 square feet and 1,493 square feet.  That
25  variation is one data point that we look at.

Page 320

1  And obviously if the entire -- and if you
2  take a look at the difference in size between a
3  $38,000 adjustment and 69, remembering those are
4  adjustments to your comparables, really, there is a
5  $21,000 difference between those two sizes, so
6  everything being equal, right, except for the age of
7  the home and the size.
8  We then looked at Comparable Number 1 versus
9  3, and we say, okay, there's a 291,000 price in
10  Comparable Number 1, 268 in Comparable Number 3, so
11  that's a $23,000 difference in price.  How do those
12  prices vary?
13  And so we look at the price variation
14  amongst the comparables to extract what the
15  difference would be, based on those differences, and
16  then apply them to the subject.
17  Q.  Is that arithmetic that you just described
18  written down anywhere in your general report or the
19  backup materials?
20  A.  Well, the actual adjustments are noted in my
21  backup documents.  So you'll see on the next page it
22  says: "All comps and significantly better finishes
23  estimated at $50 per square foot for condition."
24  The base price on the adjustments, we
25  looked -- I did the math on, you know, what these

Page 321

1  homes were selling for against the average square
2  footage, and I applied a 60 percent factor for size.
3  And so I estimated that it was about $100 per square
4  footage for differentials in size.
5  And I noted that this particular case study
6  was heavily dependent upon the gross condition
7  adjustments.
8  Now, I'll say -- you know, I'll note that if
9  the gross conditions adjustments are too heavy, if
10  they're too severe, and we change those gross
11  condition adjustments, that would then raise the
12  adjusted price of the unimpaired comparables, which
13  would then raise the overall diminution discount
14  relative to the impairment analysis.
15  So to whatever extent these condition
16  adjustments are heavy, then, you know, that
17  obviously would make a difference as to the level of
18  impairment.
19  I would also note on my work papers that in
20  these four comparables, I have notes as to the days
21  on market.  So Comparable Number 1 was 59 days on
22  the market.  Comparable Number 2 was seven days on
23  the market.  3 was 92 days on the market.
24  Comparable Number 4 was 42 days on the market.  And
25  the subject property that sold for $179,000, with

Page 322

1  the disclosure, compared to the four comps selected
2  that, albeit in better condition, ranged from
3  $268,000 to $353,000.  Despite the similar size,
4  three-bedroom, two-bath home, it took 11 months to
5  sell that comparable.
6  And when you look at the confirmation notes
7  on that comparable that we conducted with the
8  listing agent, he said that the marketing time was
9  substantially affected by the presence of the
10  Chinese -- of the remediated Chinese drywall.
11  Q.  If the adjustment for the new condition was
12  too low, instead of too heavy, in your terminology,
13  that would bias the comparison against the
14  remediated home and make it look as if the
15  difference between the remediated home and the
16  unimpaired homes was too high, right,
17  mathematically?
18  A.  Mathematically, if you increase the overall
19  condition adjustment by some factor, then that would
20  change the value diminution; that's correct.
21  Q.  If we look -- if we just go back to Tampa 12
22  and look through the condition column, you adjust
23  all of the comparable homes for the condition --
24  whether it's new or good, you adjust them all by 70,
25  80, $90,000, almost $100,000, correct?

Page 323

1  A.  Right.
2  Q.  Okay.  Turn with me to the next page in
3  Exhibit 1, which is the table for Tampa 25.  Are you
4  there?
5  A.  I am.
6  Q.  Okay.  I want to look at that same column
7  for condition.  You didn't make any adjustments in
8  your Tampa 25 analysis for the condition of the
9  homes, right?
10  A.  Correct.
11  Q.  All four of the comparable homes are new,
12  and they were built in 2011, the same year that they
13  were sold, correct?
14  A.  Correct.
15  Q.  The remediated home was built in 2007, and
16  you classified that as only good, correct?
17  A.  Correct.
18  Q.  Why did you not account for the fact that
19  the comparable homes were all brand-new?
20  A.  Well, they were brand-new in 2011 relative
21  to a home that was built in 2007 that had been
22  remediated and renovated.  And when I looked at the
23  renovated conditions -- or the renovated condition
24  of the subject and the photographs relative to the
25  subject and the condition of the -- and the

Page 324

1  photographs of the other homes, the condition
2  appeared to be equal, equivalent.
3  Q.  You're telling me -- let's talk about just
4  the exterior.  You're telling me that the exterior
5  of a home that was built in 2007 is equivalent to
6  the exterior of four homes that had been built a few
7  months prior in 2011?
8  A.  Based on the photographic evidence, I'm
9  telling you that I could not see a discernible
10  difference in the exterior condition.  All of them
11  appeared to be freshly painted, well-manicured.  I
12  mean, other than three years' worth of aging on the
13  roof, all of the interior -- I mean exterior quality
14  condition, landscaping was, you know, similar, in my
15  opinion.
16  Q.  Are you telling me that the interior of the
17  remediated home was just as good as the interior of
18  the brand-new homes built in 2011?
19  A.  Yes.  I'm telling you that the builder's
20  grade finishes that were evident in those four
21  comparables were comparable to the builder's grade
22  finishes in the comparable based on the listing at
23  the time, post-remediation.
24  Q.  So after this drywall home that is the
25  control subject was remediated, it looked just as

Page 325

1  good as the brand-new homes built only a few months
2  before?
3  A.  Yes.  And I think if anybody looks at the
4  pictures, you'll see a lot of the cabinetry is the
5  same.  In addition, I might add, I have a note here
6  in my notes that the control sale remediation was
7  done by KB Homes.  So the builder actually did the
8  remediation.  He was the one -- I say "he."  The
9  company, KB Homes, conducted that remediation.
10  So the fact that those finishes are
11  consistent with the new homes is not -- you know,
12  with builder grade finishes is very consistent with
13  what I would expect if the builder did the
14  renovation.
15  Q.  I think what you're telling me is that a
16  home that's been remediated for a Chinese drywall
17  can look every bit as good as a brand-new home?
18  A.  Yes, or better, depending on how much you
19  spend on the finishes.  I mean, you can -- you can
20  spend a lot of money on finishes to make upgrades to
21  a home that, if done properly with design and
22  otherwise, can absolutely add value by virtue of
23  renovation, certainly.
24  Q.  Why did you not account for the age of the
25  roof in this analysis?

Page 326

1  A.  Because I don't think that the market
2  demonstrates an age discount in -- for a roof that's
3  two or three years older.
4  Q.  In the pictures that you have, can you see
5  what the quality of the roof is, or are your
6  pictures just picking up the edge of the roof from
7  the road?
8  A.  Well, the MLS pictures are what they are.
9  So certainly there -- it's a street-fronting
10  picture.  There are no pictures of the roofs
11  themselves.  But, you know, the home was constructed
12  by a builder, so it would have a 10-year warranty on
13  the roof.  And if I bought a home in 2011 that came
14  with a 10-year warranty and I bought a home in two
15  thousand -- I bought a 2007 home and transferred the
16  warranty, I'd have six years remaining on the home
17  warranty -- I mean, on -- you know, on the roof
18  warranty or the builder's warranty.  So we generally
19  don't see an impact of the -- of that nature unless
20  there is obviously a known problem with the home
21  inspection.
22  Q.  And you didn't have the home inspection for
23  any of these homes, right?
24  A.  Of course not.
25  Q.  And you didn't have pictures of the roof,

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/18/19 Page 289 of 319
Case 2:14-cv-02722-MCR Document 2261-31 Filed 08/13/2019 Page 5 of 99
Confidential - Subject to further confidentiality review

Page 327

1  right?
2      A.  No.
3      Q.  And you don't know if there was a warranty
4  on any of these roofs, right?
5      A.  No, I don't know that.
6      Q.  In terms of the appearance of the homes
7  being equivalent in your mind, is it possible --
8  actually, strike that.  Strike that.
9          All else being equal, would you rather have
10  a ten-year warranty or a six-year warranty on your
11  roof?
12      A.  I'd rather buy a house that I want to buy.
13  I mean, I -- you know, there is other -- I don't
14  think the home warranty or the roof warranty is
15  having a material effect on people's decision to
16  buy.
17      Q.  In your experience, do buyers show a
18  preference for new construction?
19      A.  It depends on the buyer.
20      Q.  It's possible for buyers to have a
21  preference for new construction?
22      A.  It's possible that some buyers have a
23  preference for new construction, sure.
24      Q.  It depends on the specific home, specific
25  time, specific market?

Page 328

1      A.  Well, it depends on the buyer.  I mean, it's
2  a buyer -- it's a buyer preference, right?  I mean,
3  some buyers would like -- you know, like -- would
4  like a new home.  Maybe they've never owned a new
5  home before.
6          Some buyers want the home, and it's seasoned
7  and decorated and painted.  I mean, there's certain
8  benefits for buying a new home.  You know, it's
9  brand-new, and oftentimes it comes with some builder
10  guarantees, but it also comes sometimes with
11  construction defects.
12          So you take on a new home, and you have to
13  paint all the rooms, and you have to do different
14  things and add your touch to it, and that costs you
15  money.  You buy an older home, sometimes you have to
16  replace things.  I mean -- but different buyers want
17  different things.
18      Q.  Does new construction typically receive a
19  premium over sales of older homes?
20      A.  Not always.  It depends on the condition of
21  the older home or the features.
22      Q.  Sometimes an older home can receive a
23  premium over a new home?
24      A.  Let me say it another way.  Sometimes --
25  many times older homes sell for more than comparable

Page 329

1  size newer homes because of the features are
2  embedded, yes.
3      Q.  And it's possible for a drywall remediated
4  home to sell for a premium over a new construction
5  home, right?
6      A.  Well, with the disclosure, if the buyers are
7  okay with the disclosure, it's possible, sure.
8      Q.  So if you can turn with me to the table for
9  Tampa 26, please.  Okay.  Are you there?
10      A.  Yes.
11      Q.  All right.  In the table for Table 26 --
12  excuse me -- Tampa 26, you make adjustments for the
13  date of sale, correct?
14      A.  Yes, correct.
15      Q.  Okay.  And why did you adjust for the date
16  of sale?
17      A.  When you -- when you review the data -- when
18  I reviewed the data and I made the other adjustments
19  that were relevant, the difference in price between
20  the -- the difference in price between Comparables
21  Number 2, 3, and 4 indicated that a time adjustment
22  was required.  The subject control sale sold in
23  February of 2013.
24          If you look at the difference between
25  Comparables Number 3 and 4, making the other

Page 330

1  adjustments as I made them, there was about an 11
2  percent price difference between April and July,
3  with the only difference being the time.
4          And so we made a time -- I made a time
5  adjustment relative from the February to July time
6  frame.  The comparable suggested that time was an
7  element here.
8      Q.  Okay.  If you go back to Tampa 12, for
9  example, you did not adjust based on the date of
10  sale, correct?
11      A.  That is correct.  But I'll note that the
12  first sale actually preceded the control sale by a
13  couple of months, and then the second sale was
14  actually closed within 10 days of the control sale.
15  The third sale closed within 30 days, and the fourth
16  sale closed within about 60 days of the time frame.
17  There wasn't as much of a time variation in the --
18  in Tampa 12 as there was in Tampa 26.
19      Q.  All right.  Go to Fort Myers 20, which is a
20  couple further on in Exhibit 1.  And there, again,
21  you didn't adjust for the date of sale.  And as I
22  understand it, the control home sold in April of
23  2010, and a couple of the comps at the higher end
24  sold four months later in August of 2010.  Is that
25  right?

Confidential - Subject to Further Confidentiality Review

Page 331

```
 1   A.  It is.
 2   Q.  Do you know why you didn't adjust for the
 3  date of sale in that analysis?
 4   A.  The data didn't suggest that an adjustment
 5  was warranted.  If you look at Comparable Number 4,
 6  that transacted in January of 2010, and the adjusted
 7  price there was actually higher than closings that
 8  happened in August of 2010 and even March of 2010.
 9       So the adjustments demonstrate -- and the
10  pairings demonstrate that no time adjustment was
11  required because all of the adjusted comparables
12  fell within a relatively tight range.  And that
13  tight range -- that range, with all the other
14  adjustments having been made to one another, would
15  indicate there was nothing in the data to suggest
16  that a time adjustment was appropriate.
17   Q.  Let's go back to Tampa 26.  Are you there?
18   A.  I am.
19   Q.  Okay.  The Unimpaired Comp 3 is 11120
20  Running Pine Drive, correct?
21   A.  Comparable Number 3 --
22   Q.  Uh-huh.
23   A.  -- is 11120 Running Pine Drive, correct.
24   Q.  Yes.  Okay.  And are you aware that 11120
25  Running Pine Drive has a pool?
```

Page 332

```
 1   A.  Yes.  I have that noted in my -- in my notes
 2  here, yes.
 3   Q.  Okay.
 4   A.  That was --
 5   Q.  You did not make an adjustment for the fact
 6  that 11120 Running Pine Drive, Comp 3, has a pool?
 7   A.  No, that's not true.  Under the condition,
 8  in my hand notes, you'll see the hand notes say,
 9  under condition, very good, pool, 40,000.
10   Q.  So you included the adjustment for the pool
11  in the condition of the home column?
12   A.  Correct.
13   Q.  I thought the condition of the home column
14  had to do with the age and wear level, wear and tear
15  level of the home.
16   A.  That's true, but, I mean, in this case, as I
17  said, you know, it also has to do with the buyer's
18  perception of condition.  And I put the pool
19  adjustment in that column because I didn't have, you
20  know, a separate column for every single feature,
21  you know, for, like, pools.  But obviously
22  there's -- you know, that could have an impact.
23   Q.  So sometimes you adjusted for pools in
24  condition, and sometimes you did not?
25   A.  Correct.
```

Page 333

```
 1   Q.  All right.  So if we stay with Tampa 26,
 2  Unimpaired Comp 1 sold on July 26th of 2013, and
 3  Unimpaired Comp 3 sold for July 30th of 2013, so
 4  four days later, right?
 5   A.  Yes.
 6   Q.  And you adjust -- based on the sales price,
 7  you adjust $3,700 more for the second sale that was
 8  four days later, correct?
 9   A.  Yes.
10   Q.  And that's more than a 50 percent increase
11  in the amount of adjustment from the first sale to
12  the second sale four days later, correct?
13   A.  I don't know.  I would need to calculate
14  that.
15   Q.  Well, 3,700 is more than half of 6,300,
16  right?
17   A.  If that's what you're asking, yes.
18   Q.  Yes.  Okay.  Why did you adjust in such a
19  significant amount based on a sale occurring only
20  four days later?
21   A.  The days on market adjustments here indicate
22  that all three of these comparables sold within 15
23  days on the market.  I'd have to look at the
24  specific confirmation on that sale.
25   Q.  Well, so my question is just the date of
```

Page 334

```
 1  sale column, not time on market.  I understand you
 2  to be saying that the date of -- you adjust for date
 3  of sale because of changes in the overall market
 4  conditions.  And I'm wondering what was so profound
 5  that happened in the broader market in four days in
 6  July of 2013 that changed the adjustment amount?
 7   A.  I think it's probably a percentage
 8  adjustment of the base, but I'm just checking if I
 9  have the -- yeah, it's a 5 percent adjustment to the
10  base price.  I used a 5 percent adjustment based on
11  appreciation factor between the February 2013 sales
12  price and the July 2013 closing, but if you use 5
13  percent of the price as the market adjustment that
14  was occurring and you apply that to the base price
15  of the home, that's where you get the delta in the
16  time adjustments, but again, because we're adjusting
17  the comparable prices to the subject property, that
18  adjustment should reflect the impact of time against
19  the overall price.  So that relationship is
20  important to capture, it's not -- the relationship
21  between $6300 and $10,000, between the two
22  comparables is not what's important.  It's how do
23  you adjust the comparable price to the subject and
24  you need to do that as a percentage adjustment
25  because, obviously, the higher priced homes are
```

Page 335

1 compounding based on market time.
2 Q. The -- in Tampa 26, the subject home, the
3 remediated home had a lake view -- or has a lake
4 view, correct?
5 A. Yes.
6 Q. You say that actually in the notes.
7 A. Yes.
8 Q. And you did not adjust for having a lake
9 view; is that right?
10 A. I did not adjust for that property having a
11 lake view because that property took 60 days on the
12 market and to the extent -- you wouldn't adjust the
13 subject in any case. What I would have done, had I
14 thought the lake view had an impact on the marketing
15 or should have had an impact on the marketing, is I
16 would have adjusted the comparables for their lack
17 of lake view, which then would have drove the
18 comparable prize indications up, which would have
19 drove the diminution estimate up and then you would
20 have asked me what my proofs were for the fact that
21 the comparables didn't have lakes and the control
22 sale did and how do you know that that lake view --
23 So I didn't adjust for the lake view to
24 avoid any discussions about how do I prove the
25 adjustment that I made for the lake view because

Page 336

1 that artificially inflates the diminution estimate.
2 Q. Well, is that right? If the subject home
3 has a lake view and the other homes don't, shouldn't
4 you adjust the comp homes down to reflect the fact
5 that they don't have a lake view?
6 A. No. That would have -- I would pay more for
7 the -- I would -- the -- the comparables in that
8 case would be considered to be inferior. Right? So
9 they get an upward adjustment, because if the
10 comparable sold for $200,000 and it wasn't on the
11 lake, then theoretically if it was on the lake, it
12 would have sold for $210,000. So you would make
13 that adjustment for inferior conditions upward,
14 which would then magnify the diminution estimate
15 which then would have been subject to critique
16 because I didn't have any comparable sales that had
17 lake views by which to extract that adjustment so I
18 would have been making an unsupported adjustment and
19 you guys would have jumped all over me saying,
20 you're making unsupported adjustments to demonstrate
21 your diminution estimate. So I recognize I did have
22 in my notes that the subject had a lake view. I
23 also have in my notes that the subject took 60 days
24 to market and Comp 1 took six and Comp 2 took two
25 days and Comp 3 was 13 days on the market. I also

Page 337

1 didn't make a days on market adjustment. And say
2 the subject's days on market indicate that those
3 prices were actually very favorable.
4 Q. Okay. Let's leave Tampa and go south to
5 Fort Myers 20.
6 A. But I like Tampa. Let's keep talking about
7 Tampa.
8 Q. You had a good answer on Tampa.
9 A. Where are we going?
10 Q. Fort Myers 20.
11 A. Okay. I have to go back to my index.
12 Please give me a moment.
13 Q. Yeah. Are you there?
14 A. Not yet. A lot of paper.
15 Q. Yeah.
16 A. Okay. I'm here.
17 Q. On Fort Myers 20, the table for Fort Myers
18 20 in your general report, I'm going to stay with
19 the condition column. You adjust two of the comp
20 homes downward by $10,000 for being in good
21 condition and do not adjust two of the other comp
22 homes downward at all, even though they are also in
23 good condition. Do you know why you adjusted
24 differently for four homes that are all in good
25 condition?

Page 338

1 A. Yes. Comparables number 1 and 2, if you
2 look at my hand notes, comparables number 1 and 2
3 had a pool and comparables number 3 and 4 did not
4 have a pool. They were all in, what we deemed to
5 be, comparable condition but the pool adjustment is
6 embedded in comparables number 1 and 2.
7 Q. Didn't you adjust a home by $40,000 for
8 having a pool in Tampa 26?
9 A. No. I adjusted it $40,000 and my testimony
10 was that that included the adjustment for the pool
11 but the condition was noted as very good, better
12 than the other comparables, so the cumulative
13 adjustment inclusive of the pool was $40,000, but
14 that also reflected the improved condition of that
15 home.
16 Q. Why adjust by $10,000 for a pool?
17 A. Again, I think if you look at the -- if you
18 pair -- if you pair your analysis, if I had not
19 adjusted -- let's say comparable number 2. Okay?
20 Comparable number 2 was a three bedroom, two bath
21 home 1849 square feet. If I pair that with
22 comparable number 4 and I had not made a $10,000
23 adjustment for the pool, then comparable number 4 --
24 I mean comparable number 2 and 3, you know,
25 together, pretty much represented a very similar

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/18/19 Page 292 of 319
Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/18/19 Page 292 of 319

Confidential - Subject to Further Confidentiality Review

Page 339

1  home. I'm sorry, comparable number 2 and 3
2  represented a pretty similar home in terms of size
3  and overall size, as did 4.
4      There is a delta, though, of about $10,000
5  for the pool. If I put the pool adjustment back in,
6  that that pool -- that would have adjusted to
7  $149,000 and Comp Number 1 would have adjusted to
8  $140,000, so you can extract a $10,000 adjustment
9  for the pool if you look at comparables number 2 and
10  4. In other words, the adjusted price was 1399, but
11  if I put the $10,000 back in that becomes 1499 and
12  the comparable number 4 would have been at 140.
13  Yes? So the delta between those two is the
14  difference and the difference is the pool, so I
15  adjusted the pool downward by $10,000.
16      Q. Do you consistently adjust the comps
17  downward by $10,000 for having a pool?
18      A. In any given data set, once I've made a
19  pairing or created an extraction, then I'm going to
20  apply that consistently, even if that may not make
21  the data fall perfectly in line and may come --
22  there may be slight differences. Once I've created
23  that extraction within a particular case study, then
24  that's the adjustment I'm going to make in that case
25  study, but just like every real estate appraiser

Page 340

1  does, nobody should be making a $10,000 pool
2  adjustment. Right? My pool might be a $25,000 pool
3  adjustment. Your pool in Atlanta, might be $35,000.
4  You may have waterfalls, you may have had the guy
5  from Florida come up --
6      Q. Zero dollars for my pool.
7      A. Zero dollars for your pool. The point is
8  that it obviously relates to the quality of the pool
9  and the size and the size of the home and things
10  like that.
11      MR. BLOCK: All right. Let's go off the
12  record for a minute.
13      THE VIDEOGRAPHER: Off the record, 10:24.
14  (Recess from 10:24?a.m. until 10:52 a.m.)
15      THE VIDEOGRAPHER: On record, 10:52.
16      MR. BLOCK: Mr. Graziano, I think these are
17  all the questions I have for you so thank you for
18  your time and I'm going to turn the questioning
19  over to one of my colleagues from Orrick.
20      THE WITNESS: Thank you.
21           CROSS-EXAMINATION
22  BY MR. GUERRA:
23      Q. Good morning, Mr. Graziano.
24      A. Good morning.
25      Q. We met yesterday. I'm Dan Guerra from

Page 341

1  Orrick Sutcliffe and I've got a few follow-up
2  questions for you.
3      A. Sure.
4      Q. If we could start with Exhibit 1, Broward
5  10.
6      A. Yes.
7      Q. Before we took a break you said that once in
8  a given data set, you apply an adjustment
9  consistently; is that correct?
10      A. Yes.
11      Q. So if you could look at the bathroom's
12  column table for Broward 10?
13      A. Yes.
14      Q. Can you take a look at those adjustments for
15  the comps on bathrooms, please?
16      A. Yes.
17      Q. Now, were those applied consistently?
18      A. No. But we have as Exhibit 5 an entitlement
19  called errata sheet which I had identified this. I
20  think this is an exhibit because I have an exhibit
21  note on here, where there was an error in the
22  adjustment to Comparable Number 3 on the bathroom
23  that was a downward adjustment that should have been
24  an upward adjustment, so that's been corrected in
25  Exhibit 5.

Page 342

1      Q. And is there a reason why Comps 1 and 2 have
2  adjustment of $5,000 for four-and-a-half baths and
3  Comp Number 4 has a $10,000 adjustment for also
4  four-and-a-half baths?
5      A. I'm sorry. Could you ask the question
6  again?
7      (The question was read by the reporter.)
8      A. Again, the errata sheet modifies that
9  adjustment, so what happened was that, as I
10  testified yesterday, this home sold impaired in
11  2010, April, and then sold remediated in September
12  of 2010. When they sold the home remediated, they
13  had added an additional half bathroom on the
14  remediated home as part of the remediation and so in
15  comparing the remediated comparable, comparables 1,
16  2 and 4 have a $5,000 adjustment reflective of them
17  having four-and-a-half baths but not the extra half
18  bath and comparables 3 and 5 in my errata sheet
19  Exhibit 5 have a $10,000 adjustment. Reflective of
20  being short two half baths.
21      Q. And if you could turn to page 22 of
22  Exhibit 1, please.
23      A. Sorry, page 21 you said?
24      Q. 22, please. And while you're doing that,
25  how many errata sheets have you submitted to your

Confidential - Subject to Further Confidentiality Review

Page 343

1  report?
2     A.  I don't know off the top of my head, I'd
3  have to go through each of these.  There were
4  supplemental post-discovery information that I -- was
5  marked as an Exhibit 4, I believe, if I'm reading
6  that correct, yesterday, so there is a number of
7  things in there but I don't know the answer to the
8  number of modifications at this point.
9     Q.  Okay.
10    A.  Do I need this book for the moment?
11    Q.  Exhibit 1.
12    A.  Is this Exhibit 1?
13    Q.  Yes, please.
14       So yesterday, I believe your testimony was
15  that the 10 percent diminution value stigma damage
16  is as of the effective date so if it's $40,000 as of
17  that date it wouldn't necessarily be 10 percent in
18  the future based on market conditions, but it would
19  still be that $40,000.  Is that correct?
20    A.  I would have to review the record.  I mean,
21  you're characterizing my testimony and I'm not sure
22  I can answer that.
23    Q.  Sure.  Why don't you go ahead and explain
24  what you think I'm talking about from yesterday.
25    A.  Okay.  So there were a number of different

Page 344

1  questions relative to this 10 percent.  We applied
2  the 10 percent as of the effective date of value to
3  each of the Priority Claimants.  That 10 percent was
4  then translated into a whole dollar damage.  The
5  line of questioning yesterday regarding, well, what
6  happens in the future?  I believe my testimony
7  reflects that this damage is imposed upon the
8  Priority Claimants as of their effective date of
9  value, that that damage would not continue to occur
10 over time because you will have already paid for it
11 and any future buyers that buy the property will
12 have already received the discount and therefore
13 they wouldn't be subsequently damaged by any
14 post-remediation diminution that they may suffer in
15 the future because their purchase of the property
16 was already at the discount.  That's my line -- that
17 was my discussion.
18       And then someone -- Mr. Block asked me:
19 Well, does that mean that in the future all these
20 properties are going to be forever damaged by 10
21 percent?
22       I said I can't answer that because I would
23 have to be able to study that information into the
24 future and I can't do that.
25    Q.  Okay.  So say a Priority Claimant still has

Page 345

1  their property, has not sold it yet.
2     A.  Correct.
3     Q.  And you determine as of the effective data
4  of whatever it was in the past, say January 1st,
5  2019 for those people --
6     A.  Yes.
7     Q.  -- that they suffered a diminution value of
8  10 percent?
9     A.  They would -- they would suffer -- my
10 opinion is that they would have -- would suffer a
11 diminution value of 10 percent as of that effective
12 date, that's correct.
13    Q.  And that gives you some real damage value of
14 X, say $40,000, for example.
15    A.  Relative to the unimpaired value of their
16 home, correct.
17    Q.  And you're saying that if they sold their
18 house three years from now, that value X, $40,000,
19 would still impact the sale of their home; is that
20 correct?
21    A.  No.  If the damage is compensated for, as of
22 that effective date of value, then they've already
23 received that money so in the future whatever
24 diminution that they may suffer, you've already
25 compensated for it based on the effective date of

Page 346

1  value.  So in the future, if they sold the home and
2  it only reflected an 8 percent or a 7 percent
3  diminution, that may be the case but you will have
4  compensated for them on the effective date of value
5  based on 10.  The actual -- the actuality of what
6  happens in the future they've already been
7  compensated for.
8        And the damage theory says that as of the
9  date, if you've compensated them for it, then they
10 have the money to reinvest and they're not going to
11 get the appreciation on that money.  It's as if they
12 bought the home for 10 percent less, so any
13 diminution that they suffer is already accounted
14 for.  The same way if somebody had purchased their
15 home and got in the discount, they wouldn't be
16 suffering in the future because they've already
17 received the discount.
18    Q.  But the diminution in value doesn't actually
19 occur until the sale happens, correct?
20    A.  No.  The diminution in value is a diminution
21 in value of what they could sell the house for on
22 the effective date so it also affects their current
23 equity status.  Right?  It affects the value of
24 their home as of that date.
25    Q.  But there are no actual damages that accrue

Case 2:09-md-02047-EEF-MBN Document 23363-31 Filed 11/18/21 Page 294 of 319 of
Case 2:14-cv-02722-MSG Document 2310 Filed 9/30/20 Page 90 of
99
Confidential - Subject to further Confidentiality Review

Page 347

1 unless they actually sell and get the full value
2 they would have otherwise received?
3    A.   That's a determination of how you calculate
4 damages.  That's like saying I have $100,000 in the
5 bank, if now I have $90,000 in the bank I'm not
6 affected because I didn't spend the money.  If I
7 have $100,000 in the bank or $90,000 in the bank,
8 there is a difference.  The fact that I didn't need
9 the money or didn't go to spend the money at that
10 particular time doesn't negate the fact that there
11 is $10,000 less in my bank account.  Real estate is
12 an asset, so if the asset value goes down, you've
13 suffered the damage.  The fact that you haven't sold
14 the house to actually realize, it's the difference
15 between realized and unrealized gains.  Right?  So
16 the potential -- if you've suffered that damage,
17 then -- but just because you haven't sold the home,
18 that means you didn't realize the loss at that time,
19 but the loss has occurred.
20    Q.   So it's a difference between realized and
21 unrealized gains or in this case, realized or
22 unrealized damages?
23    A.   I'm saying the damages are real.  They
24 are -- it does affect the value of the home and
25 therefore it is realized.  The fact that they

Page 348

1 haven't sold it or not just means that they haven't,
2 you know, that they haven't actually -- what do I
3 want to say?  They haven't realized it, that's
4 correct.  It's -- the damage that they've suffered
5 is real and I don't want to confuse realize with
6 real.  Their asset value is impaired and therefore
7 they have suffered that damage as of the effective
8 date.
9    Q.   Okay.  If you could turn to page 22, could
10 you read the first full sentence of -- or first
11 sentence of the second full paragraph, please?
12    A.   Where it starts "I would expect."
13    Q.   Uh-huh.
14    A.   "I would expect these value diminution
15 impacts to decline over time after numerous resales
16 of the same property where no adverse conditions
17 persist."
18         Would you like me to continue?
19    Q.   No, that's it.  So over time if there is
20 shown to be no adverse impacts post-remediation, you
21 would expect this diminution in value to decline,
22 correct?
23    A.   That's my prediction, yes.
24    Q.   So if buyers -- or if the homeowners don't
25 sell their home for 10, 20 years, they will

Page 349

1 potentially never have realized any damages related
2 to diminution in value?
3    A.   No.  This doesn't relate to the Priority
4 Claimants, specifically.  This relates to my market
5 analysis and what I'm saying here is that, I would
6 expect that over time as, you know, I just testified
7 yesterday as to what the risk factors were, is that
8 over time that the fact that no additional
9 callbacks, no additional problems may occur, may
10 over time reduce those impacts.  But also because
11 these claimants are getting damages today over time
12 as those things occur, that percentage impact may be
13 different.  That was my testimony yesterday and I
14 stand by it.
15         Because we're quantifying the impact today
16 based on 10 percent, based on the unimpaired values
17 today, as values increase over time as a percentage
18 diminution, those will decline, that percentage will
19 decline.
20    Q.   Does this sentence here say anything about
21 market changes and value changes in the home value?
22    A.   I think that's implicit in the phrase "over
23 time."
24    Q.   All right.  Let's move on to a different
25 topic.  I think you can put that away for now.

Page 350

1         So with respect to the Priority Claimant
2 reports, Exhibit 2, those were the comps in the
3 analysis and the appraisals were all done by third
4 parties, correct?
5    A.   Yes.
6    Q.   And did you give them any instructions?
7    A.   I gave them instructions that I wanted the
8 valuations done on an unimpaired basis.  I did not
9 want them to consider any impact of the remediation
10 and, in all cases, where the properties obviously
11 were in an unremediated condition, that's a
12 hypothetical condition, so I told the appraisers
13 they would be valuing this hypothetically, assuming
14 no impact to the drywall.
15         That has certain implications on their
16 consideration of the sales data, so they were not to
17 include the sale of the subject property as -- they
18 could report it, which is required under our
19 standards, but they weren't to consider that in
20 their final correlation.  I told everybody, you
21 know, we had -- we were bounded by external
22 inspections, but I'd like them to inspect the
23 exterior of the comparables in the subject property
24 and then based on those appraisals when they came
25 back, you know, my staff and I reviewed those

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/18/19 Page 295 of 319
Case 2:09-md-02047-MDL-3 terror Confidential Document 22363-31 Filed 11/18/19 Page 295 of 319
Confidential - Subject to Further Confidentiality Review

| Page 351 |
|---|

1 appraisals and interfaced with the appraisers. If
2 we felt there were any data issues that needed to be
3 resolved or adjustment issues that needed to be
4 resolved, so we participated in that process with
5 the local appraisers that have local competency and
6 that was really the instruction, appraise it
7 unimpaired as the effective date of value.
8 Q. And so did the work you and your staff do,
9 did it serve to provide a quality control on the
10 work of the appraisers at all?
11 A. I think so.
12 Q. And were you, by and large, able to make
13 sure that they were consistent in their applications
14 of adjustments and the selections of comps?
15 A. I think that we wanted to make sure that the
16 selection of comps was relevant for the local market
17 area and we interfaced with the appraisers
18 individually within that selection process, but we
19 really left it up to -- we didn't select the
20 comparables, we asked the local residential
21 appraisers with local competency to select the
22 comparables.
23 Q. Did you have any concerns about some of the
24 homes being in gated communities and the appraisers
25 not having access to them at all?

| Page 352 |
|---|

1 A. We did. I mean, it was a limitation on our
2 ability to inspect some of the homes and one of the
3 homes, I forget which case number it was, I think it
4 was Case Number 4, the Wites, where we asked them
5 for access and they gave us access to go back out
6 and inspect. I think there were three other homes
7 that due to the gate access we were not able to
8 inspect from the exterior.
9 Q. Did you adjust the valuations any way to
10 take into account that or find any way to mitigate
11 any sort of uncertainty that could introduce into
12 the process?
13 A. We did what we would ordinarily do as part
14 of our peer practice, we relied upon public record
15 data, MLS data, photographic evidence, aerials,
16 things of that nature.
17 Q. Okay. And then about your surveys, I
18 believe at one point yesterday you said that a much
19 more comprehensive survey would be necessary for
20 respondents to statistically represent the
21 prevalence of an impact. Does that sound familiar?
22 A. I remember the line of questioning. I don't
23 know if I would characterize it that way, but what's
24 the question?
25 Q. So if a much broader survey would be

| Page 353 |
|---|

1 necessary to represent the prevalence of an impact,
2 what exactly were you using the survey for?
3 A. I was using the survey to gather information
4 as part of the control case studies and I was also
5 using the survey to represent our investigation into
6 the market with respect to brokers and how they
7 handled this type of a problem and whether they felt
8 this was a consistent or persistent problem and then
9 I classified those comments and arrayed those
10 comments to be able to understand based on the
11 surveys that we conducted, the order of magnitude of
12 prevalence or nonprevalence, how brokers were
13 reacting and what their reactions were to the
14 knowledge of the problem.
15 Q. So if a larger survey is necessary to
16 statistically represent the prevalence of impact,
17 then how can you use it for that?
18 A. I don't know that I testified that I was
19 using it for that. I use it to inform my
20 understanding of what the -- how the brokerage
21 community was handling it, whether they felt that
22 there were price impacts, how they believed the
23 market perceived the impacts, and to collect that
24 information to help inform my case studies, but I
25 did not use it as a standalone survey. I think the

| Page 354 |
|---|

1 line of questioning with respect to using surveys
2 yesterday related to a contingent valuation method
3 where there was no market data and, you know, what
4 the process would be in that -- within that type of
5 a survey method. I said in my testimony yesterday
6 that this was not statistically validated.
7 Q. Okay. So but there was no market data for
8 post, I believe, August 2016 through your extension
9 date of February 15 of 2019 that used the surveys
10 for, correct?
11 A. I have no case studies that demonstrate a
12 value or price example of remediated property after
13 August of 2016, that's correct.
14 Q. So the surveys are what you're relying on
15 primarily to extend it to that?
16 A. No. As I testified yesterday, the case
17 study dates range from 2009 to 2016. We arrayed
18 those and looked at the dates and the locations and
19 the segmentation of price and I did not see any
20 discernible difference as it related to date, and so
21 that demonstrated to me that if date is not a factor
22 or an isolating factor to demonstrate that, you
23 know, a grouping of impacts that may be less, the
24 date was not an issue. And so I carried that
25 forward from August of 2016 to January 2019.

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/18/19 Page 296 of 319
Case 2:09-md-02047-EEF-MBN Document 23363-31 Filed 11/18/19 Page 2 of 99
Confidential - Subject to Further Confidentiality Review

Page 355

1  I'm not using the survey to bridge the lack
2  of data, the data was studied over a seven-year time
3  frame and the gap between our effective date,
4  current effective dates of value and August of 2016,
5  is a couple of years.
6  Q. So roughly a third of the period, correct?
7  A. You could classify it that way, sure.
8  Q. So with respect to the survey, why only
9  limit it to your case sample and the comps, the
10 individuals involved with those sales?
11 A. Because those were the people that we were
12 interviewing in conjunction with the case study that
13 we knew would have direct knowledge of potentially
14 remediated issues. They were -- these were brokers
15 that were involved -- either involved in the control
16 sale and/or brokers that were involved in selling
17 properties in markets where the control sale existed
18 and therefore would have presumably had some
19 knowledge or experience with Chinese drywall.
20 Although some indicated that they didn't and we
21 noted that.
22 Q. So I believe yesterday you said you
23 initially did about 100 of those surveys, that's
24 correct, approximately?
25 A. Yes.

Page 356

1  Q. Why exclude those other surveys?
2  A. Not -- I didn't -- I did not exclude them
3  intentionally, as I testified yesterday. We
4  developed a number of case studies -- we were
5  developing a number of case studies on impaired
6  properties and those surveys were ongoing. When we
7  compiled the results of these studies, I believe,
8  these will reflect the case studies that were --
9  these interviews reflect the interviews that were in
10 conjunction with the case studies that we used for
11 the remediated properties, but I do intend to go
12 back and compile all of the surveys and make sure
13 that that's accurately reflected.
14 Q. Okay. So to the extent the surveys had been
15 completed before you changed methodology in -- or
16 scope of your work, would those responses be equally
17 as valid as the ones from -- that you actually
18 included in your final work?
19 A. I don't know. I'd have to review them.
20 Q. Okay. What would make them invalid?
21 A. Well, if there is no comments, if there is
22 no experience by the broker, if the broker indicates
23 no knowledge, you know, I probably would not include
24 those. If the broker indicates very clearly some
25 remediation -- post-remediation impact or very

Page 357

1  clearly that there is no post-remediation impact.
2  Then I would include those.
3  Q. Wouldn't a lack of knowledge of Chinese
4  drywall impact suggest that it's not an issue that
5  is prevalent to the market?
6  A. No. It's just a reflection that that broker
7  may not have handled that problem before or seen
8  that problem in occurrence. It's not that the
9  problem isn't prevalent, it's just that that agent
10 doesn't have any experience. I didn't qualify every
11 one of these surveys by saying how many years of
12 experience do you have in the marketplace. I could
13 be calling agents today and they have a listing and
14 we've called them on the listings and maybe they've
15 only been a practicing agent for three months. You
16 know, I don't know.
17 Q. So would you agree that in limiting the
18 survey responses to only the people involved in your
19 case study and the comparables, that that increases
20 the risk of confirmation bias in the results?
21 A. Equally on both sides, I would agree with
22 that. I think that it would tend to focus the
23 answers on people that either believe there is a
24 post-remediation impact or those that don't. I
25 don't know that that biases the results for the

Page 358

1  purposes of the study because whether there is
2  confirmation bias one way or the other, it's equal
3  on both sides.
4  Q. Well, confirmation bias with respect to what
5  you're looking at, so you're looking at those 20
6  sample cases, correct?
7  A. Yes.
8  Q. And you're talking to people related to
9  those 20 sample cases?
10 A. Or the unimpaired comparables behind them.
11 Q. Correct.
12 A. Yes.
13 Q. So to the extent that those aren't
14 representative of the broader market, you could be
15 creating confirmation bias by only relying on
16 surveys with people associated with those -- with
17 your original analysis?
18 A. I think to the extent there is confirmation
19 bias, it's to the defendant's benefit at least, we
20 surveyed and reviewed and interviewed brokers that
21 had sold four unimpaired comparables and one
22 impaired control sale. So 20 percent of the sample
23 that we would have interviewed had direct experience
24 with a post-remediation drywall problem and the
25 other 70 or 80 percent of those interviewed were

Page 359

1  interviews related to an unimpaired comparable and
2  then we asked them, have you seen this problem, have
3  you experienced this before, do you have any
4  experience with Chinese drywall.  So I mean to the
5  extent that there is confirmation bias, it's 80/20
6  in your favor.
7      Q.  Okay.  But --
8      A.  I would -- excuse me.  Let me just
9  emphasize.  I would understand your point if
10  everybody -- if we interviewed agents that all had a
11  remediated Chinese drywall listing and those were
12  only the people that we interviewed.  Then I would
13  suggest to you that that would present confirmation
14  bias, but the way that we've done it and the way
15  that you're asking the question, I think if there is
16  any confirmation bias it's in your favor, not ours.
17      Q.  Presumably the comps are in the same
18  neighborhoods and the realtors there would have to
19  deal with the same problems, so if there was a
20  drywall in a bunch of homes in those neighborhoods,
21  the realtors would probably be aware of it, correct?
22      A.  Yes.
23      Q.  So that distinction you just made about a
24  realtor related to a -- involved with a remediated
25  home and one that isn't involved with a remediated

Page 360

1  home, doesn't necessarily reflect knowledge of CDW
2  or experience with CDW for those other realtors,
3  correct?
4      A.  I don't agree at all.  In fact, I don't
5  understand what your point is.  If we interviewed
6  realtors that operated in a market where Chinese
7  drywall was present.  That's exactly what we're
8  supposed to be doing.  I mean, if I called a bunch
9  of realtors in Kansas who had never seen a Chinese
10  drywall problem before, then they wouldn't have any
11  knowledge and so those wouldn't be qualified.  We
12  interviewed the realtors that are in a market and
13  they understand this is an issue.  Realtors are
14  trained with continuing education, they are trained
15  on detrimental conditions that have to be disclosed,
16  they are trained on disclosure.  They are constantly
17  updating their knowledge base about things that
18  affect value in the marketplace.  So I don't see how
19  interviewing these people within an area that may
20  have had Chinese drywall prevalence creates
21  confirmation bias.  That's exactly the group of
22  people we want to interview.
23      Q.  I know, but you were suggesting that it
24  would it be a four to one ratio to our benefit but
25  you didn't actually ask these realtors that were

Page 361

1  involved with comp sales whether they had experience
2  with Chinese drywall, in terms of other sales that
3  would influence them, correct?
4      A.  We did.  Question 7 said:  "Finally, in
5  listing and marketing other homes in this market,
6  have you noted a pricing impact on homes that had
7  Chinese drywall?"
8          So yes, we did interview them for their
9  experience outside of the property that we were
10  confirming.
11      Q.  Okay.  So to the -- so do you know how many
12  actually answered that they did have experience with
13  them?
14      A.  Not as I sit here today.  As I said, I would
15  want to go through all of the surveyed responses and
16  compile those again.
17      Q.  Okay.  So the four to one ratio you
18  mentioned earlier is not necessarily correct,
19  though?
20      A.  The four to one ratio I mentioned earlier
21  related to -- you were characterizing these
22  interviews as having confirmation bias on the basis
23  that we were interviewing people that all had a
24  property listed with Chinese drywall and therefore
25  wouldn't they have had the problem and therefore

Page 362

1  felt bias against it.  What I was saying is we
2  interviewed, in each case study, four sales that did
3  not have Chinese drywall, so the confirmation bias
4  was in your favor.  I was only making a point that
5  in every case study, if we did five interviews, one
6  of them was with a Chinese drywall listing agent and
7  four of them were not.  If they had other
8  experience, then I wanted to know what that
9  experience was.  That was part of the survey.
10      Q.  Okay.  Moving on to different topic.  So you
11  said yesterday that originally the scope of your
12  work was going to be analysis of pre-remediation
13  diminution value and post-remediation diminution
14  value, correct?
15      A.  That was my understanding, yes.
16      Q.  Before you changed the scope of your work,
17  did you have preliminary findings for each?
18      A.  I did not.
19      Q.  Okay.  And then you said yesterday because
20  of time you decided to -- you could only do one of
21  the investigations; is that correct, analysis?
22      A.  I did -- I did advise the attorneys that to
23  develop the unremediated damage analysis was going
24  to require, materially, more time and they said, you
25  don't have any more time.

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/18/19 Page 298 of 319
Case 2:09-md-02047-EEF-MBN Document 20404-1 Filed 07/26/16 Page 24 of 99
Confidential - Subject to Further Confidentiality Review

| Page 363 | Page 365 |
|---|---|

**Page 363**

1  Q.  Okay.  So is it -- is my understanding

2  correct that you chose to focus on the

3  post-remediation diminution value analysis because

4  the pre-remediation analysis would take

5  substantially more time?

6  A.  You could say that, yes, or I couldn't do

7  both.

8  Q.  Okay.  To -- so were they going to take

9  about comparable time to one another?

10  A.  It probably would have taken an equal amount

11  of time to what I spent and, obviously, I was

12  concerned and I communicated to the attorneys that

13  it wasn't going to do any good to get half done with

14  both.  So they were going -- we were going to have

15  to, you know, pick one.

16  Q.  So why did you pick the post-remediation

17  analysis instead of the pre-remediation analysis?

18  A.  I didn't.  The attorneys told me what their

19  preference was for me to complete just the

20  post-remediation analysis.

21  Q.  And if you guys initially planned to do

22  both, how can you apply the post-remediation

23  analysis to the pre-remediation analysis that you

24  were previously going to do independently?

25  A.  I don't understand the question.

**Page 364**

1  Q.  So presumably you were doing both separately

2  for a reason as opposed to combining them from the

3  get go.  What was that reason?

4  A.  Well, I don't know that when you say

5  combining them or separately, I mean, it just would

6  have required a completely different data set.

7  Right?  I would have to develop all of the homes

8  that sold pre-remediation and there is some

9  additional complications there because some of the

10  homes that sold pre-remediation were foreclosures,

11  so there is a sale record in the database that

12  reflect as price, but that price is reflective of

13  the bank's outstanding note which includes interest.

14  There is a price that is not -- that price is not as

15  pristine, if you will, as a sale price.  It's not an

16  arm's lengths transaction.

17      There were many sales, as we started to

18  identify those control sales.  There were control

19  sales that were purchased by, I'll call them

20  speculators, builders, flippers, some even drywall

21  companies were buying these sales, you know,

22  pre-remediation at fairly deep discounts.

23      But then the question that we would have had

24  to be able to confirm in the time frame was how much

25  were they planning on spending, how expensive was

**Page 365**

1  the drywall, what did the remediation reports say, I

2  mean there were so many factors that would have

3  needed to be considered to properly isolate that

4  damage, that it just would have required a lot more

5  time and a lot more data confirmation, digging, than

6  eight to 10 weeks of study would permit.

7  Q.  So you chose to just focus on the

8  post-remediation?

9  A.  As I testified, I didn't choose to, the

10  attorneys instructed me to.

11  Q.  Sorry.  There is no change to that.  And

12  given that, in the computations you just mentioned,

13  how are you are you able to extrapolate that 10

14  percent or build it into the pre-remediation damages

15  or -- for the people that have lost or sold their

16  home without remediating?

17  A.  I feel like you've asked me two questions

18  there.  Could I either get it read back or could you

19  ask me the question again?

20  Q.  Let me -- let me try to clean it up.

21      So the scope changed to just

22  post-remediation damages?

23  A.  Yes.

24  Q.  And initially you were just talking about

25  the complications with isolating pricing and

**Page 366**

1  determining the pre-remediation damages, correct?

2  A.  Initially we were doing both.

3  Q.  Yes.

4  A.  Yes.

5  Q.  And yesterday, I believe your testimony was

6  that the 10 percent post-remediation damages is

7  built into the pre-remediation damages?

8  A.  That's right.  At the time that the Priority

9  Claimants sold their home or lose it in foreclosure

10  or otherwise, the discount that they take on that

11  price is cumulative because the buyer that's buying

12  the property intends to buy it unremediated, expend

13  money, cost to cure, direct cost to cure, and have

14  to leave the property vacant during its remediation

15  time, i.e. loss of use, and then they reach a point

16  where they've cured the problem at additional cost,

17  and then they have to sell the property and they

18  know that when they sell the property they are going

19  to suffer some level of -- they are going to have to

20  disclose it and they may suffer some level of

21  post-remediation discount and they have to make a

22  profit, has to be an inventive for them there.  So

23  the combination of all those things, cumulatively,

24  is already included when the Priority Claimant

25  suffers a pre-remediation sale that's all ready

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/18/19 Page 299 of 319
Case 2:14-cv-02722-MLCF-DEK Document 91-5 Filed 05/13/21 Page 85 of 99
Confidential - Subject to further confidentiality Review

Page 367

1  implicit in there.
2  Q.  So if that's true, then why was the original
3  scope of the research to break up the two portions,
4  why calculate them separately?
5  A.  I didn't say I was going to calculate them
6  separately.  I said I was going to quantify them
7  separately but I would have had to acknowledge
8  within the pre-remediation analysis I would have to
9  acknowledge that -- I wouldn't have added the two
10 together.  In other words, I wouldn't have taken the
11 pre-remediated damage and then say oh, you know,
12 let's say I studied it and the overall range was 50
13 percent or 60 percent, right?  I wouldn't say oh
14 it's 60 percent plus 10 percent.  The 60 percent
15 would already include the 10 percent.
16 Q.  So can you apply post-remediation analysis
17 findings to pre-remediation because -- despite the
18 fact that pre-remediation analysis requires a
19 different data set?
20 A.  Yes, because the -- we -- by estimating the
21 value of the unimpaired home and applying that
22 post-remediation discount, what we're doing is
23 quantifying that piece that remains uncured by the
24 cost to cure.  So the cost to cure is one element
25 and that's in a separate track of this case, as I

Page 368

1  understand it.  The damage that you would suffer
2  once cured is the damage and so those two taken
3  together would represent the cumulative damages that
4  the claimants suffered.
5  Q.  Okay.  Can we go back to Exhibit 1, please.
6  A.  Sure.
7  Q.  On page 15 you're talking about price
8  limitation?
9  A.  Yes.
10 Q.  Can you read the paragraph that starts with
11 "notably," on that page?
12 A.  Yes.  "Notably the price segmentation is
13 heavily skewed towards case studies that developed
14 in the $750,000 range.  This overweighting of the
15 greater than 750,000 price segment resulted because
16 five of the seven case studies excluded from final
17 development fell within the other price ranges."
18 Q.  What are the risks of having such a skew?
19 A.  The risks are that of the 20 case studies
20 developed, the heavy percentage the $750,000 may,
21 depending on what the results are for those, may
22 have affected the overall percentages, you know, the
23 lower priced homes or the testing in the 300,000 to
24 750 price range home has less testing data points,
25 fewer testing data points.

Page 369

1  Q.  And so the higher range could have a
2  different impact as opposed to the lower range; is
3  that correct?
4  A.  No.  We didn't see that.  I mean, that's
5  analyzed within the report, but if I had more data
6  within the 300,000 to $750,000 range, then I would
7  have more data to array to determine if price
8  segmentation had as big of an impact.
9  Q.  But if price segmentation was skewed
10 further, it potentially could skew your results?
11 A.  No, I'm not saying that it skews the
12 results.  I used the word skewed to say that the
13 price segmentation is heavily weighted or -- I used
14 the word skewed but I didn't mean it to skew results
15 or to give me bad results.  I used it to mean, to
16 demonstrate that the price segmentation was heavily
17 weighted towards properties in the plus $750,000
18 range.
19     I mean, it's also heavily weighted toward
20 those in the 150 to $300,000 range.  All I'm saying
21 is it's not an evenly distributed sample by price
22 segmentation.
23 Q.  Sure.
24 A.  Probably a better way for me to have said
25 it.

Page 370

1  Q.  Would you turn to page 16?
2  A.  Sure.
3  Q.  Where you say 12 -- 60 percent of the 20
4  case studies fall within the median home price
5  averages.  What do you mean by that?
6  A.  I mean that of the 20 case studies, 12 of
7  those case studies occurred within the median home
8  price average within the respective time frame.
9  Q.  So what is the median home price average, is
10 that the line on the graph above it?
11 A.  It is.
12 Q.  Okay.  Can you just do me a favor and tell
13 me what you think the -- that graph shows for 2010
14 what the price is for a median home price average,
15 just looking at it.  You can eyeball it.
16 A.  I would be forced to eyeball it.  The
17 details on the graph, I mean, if you change this
18 median home price over a shorter time frame, you
19 know, you can obviously see the clear delineations,
20 if you were to draw a line -- you said 2010?
21 Q.  Yes.
22 A.  If you were to draw a line from 2010
23 straight across, that number is something less than
24 $143,000, if I'm eyeballing it, I would say 125 or
25 130,000.

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/10/19 Page 86 of 99

Page 371

1  Q.  And for 2011?
2  A.  Something less than 2010 at the end of 2011,
3  maybe something in the $100,000 price range.
4  Q.  And 2012?  I'm sorry, let me give it back to
5  you, in 2010 you said 125 to 130, 2011, 100K, make
6  it easier for you.
7  A.  Thank you, I appreciate it.  2013 you said?
8  Q.  Sorry, 2012.
9  A.  2012.  I would put back into the 125 to 130
10 category.
11 Q.  Okay.  2013?
12 A.  140.
13 Q.  2014?
14 A.  Again, something between 143 to 189, I'll
15 call it 152.
16 Q.  2015?
17 A.  160.
18 Q.  2016?
19 A.  One -- something less than 189, 180.
20 Q.  2017?
21 A.  200.
22 Q.  Looks to me like it's right on the 189.  Is
23 that --
24 A.  This is 2017?
25 Q.  Yes.

Page 372

1  A.  Okay.  I think -- it's approximation.  Let's
2  say 190.
3  Q.  Okay.  So looking at that, if you can turn
4  to your chart on page 17, the next page.
5  A.  Okay.
6  Q.  So Broward 1, sold for one million, so
7  that's well above the median price for any year.
8  A.  Yeah.
9  Q.  Broward 10 sold for 390 in 2017.  That's
10 also well above, correct?
11 A.  Yes.
12 Q.  Same for Broward 2, which sold for 855, and
13 Broward 3 which sold for 814.
14 A.  Okay.
15 Q.  Broward 5 also sold for 585, which is also
16 above any year.
17 A.  Agreed.  Agreed.
18 Q.  So for -- let's see here.  It is FM20, it
19 sold for 110 in 2010.  So that is below the median,
20 correct?
21 A.  Yes.
22 Q.  And FM21 sold for 115 in 2010, which is also
23 below the median; is that correct?
24 A.  Yes.
25 Q.  FM22 sold for 148 in 2013, which is above

Page 373

1  the median; is that correct?
2  A.  148 is --
3  Q.  You said 140K, so that's $8,000 over?
4  A.  I'm sorry, we're on FM23?
5  Q.  22.
6  A.  22 is 148 and -- in November 2013 and, I
7  think, I said 152 was the median.
8  Q.  You said that for 2014.  For 2013 you said
9  it was 140.
10 A.  No.  I think we said -- I'm sorry.  I
11 apologize.  I'd have to go back and look.  I made my
12 notes here.  I have 2010 at 125 to 130, 2011 at 100,
13 2012 at 140, 2013 at 152.
14 Q.  So you said 2012 was back to 125, 130; 2013,
15 140; 2014, 152; 2015,160; 2016, 180; 2017,190.
16 A.  Okay.  I'd have to go back and look at that.
17 That's -- I agree with you, I may have missed a
18 number here.  Okay.  So let's acknowledge that we'll
19 take that at slightly below the median.
20 Q.  Slightly above, correct?
21 A.  I mean slightly above the median, yes.
22 Q.  Okay.  And then FM23 sold for 159,650 in
23 2014, which is also above the median; is that
24 correct, of 152?
25 A.  I thought that was the one we were talking

Page 374

1  about but okay, yes.
2  Q.  And then so Hialeah -- I probably butchered
3  that name.
4  A.  It's all right.  It's Hialeah, but that's
5  fine.
6  Q.  Sold for 233 in 2017, which is well above
7  the median, because 2017 was 190, so that's 43,000?
8  A.  Yeah.
9  Q.  Likewise, the next one, Miami-Dade 1, sold
10 for 276, which is above any median we had, and
11 Miami-Dade 2 is 210, which is also above any median
12 we had.  Boca 1 was 1.2 million, also above.  Boca 2
13 was 940,000, which is also above.  And PSL Number 6
14 is 228, which is also above any median we had.
15 Stewart 1 is 333,500, which is also above any median
16 we had.  Tampa 12 sold for 179 in 2016.  That is
17 actually, according to what we just agreed on, at
18 the median.
19 A.  Below.
20 Q.  Below?
21 A.  I had it at 180.
22 Q.  So that's okay.  Just note that.  Sorry, one
23 second here.  Change my notes.  Okay on that one.
24    And then so the next two in Tampa 25 and 26
25 are well below the median for both those years.

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/18/19 Page 301 of 319
Case 2:14-cv-02165-NGG Document 24-10 Filed 01/31/18 Page 301 of 319
Confidential - Subject to further Confidentiality Review
99

Page 375

1  Tampa 27 in 2012 is also per the measure below.
2      So if we count those all up, you're at a
3  below median in one, two, three, four, five, six out
4  of the 20 and the rest are above the median, is that
5  correct?
6      A.  For the entire state of Florida, that's
7  correct.
8      Q.  Okay.  But on the previous page you say that
9  12 out of the 20 fall within the median home price
10 averages?
11     A.  Yes.
12     Q.  But we just did the math here and it looks
13 like it's only six, can you explain the difference?
14     A.  Sure.  What I should do, is I should array
15 the median home price averages by county or by a
16 smaller geography, because, obviously, the entire
17 state of Florida median home price averages
18 incorporate a lot of areas that are much more lower
19 value than Miami-Dade or Broward.  So --
20     Q.  Sure.
21     A.  I included this chart and then I said --
22 then I classified this against the median home price
23 averages and I think going back and clarifying which
24 home price average, whether it's throughout the
25 state of Florida, will be important but I

Page 376

1  acknowledge that based on your analysis here, it's
2  six of the 20 if we're talking about the Florida
3  median home price average of $222,000.
4      Q.  That's the chart, the Florida one is what
5  you included in your report so that's presumably
6  what this sentence is referring to; is that correct?
7      A.  I agree that you could read it that way,
8  yes, but I would tend to look at these on a more
9  discrete basis, on a countywide basis, and probably
10 include this chart but include the other charts that
11 relate to the areas, because the most important
12 element, obviously, is whether the prices are
13 typical within the area.
14     Q.  Sure but the report as written does not
15 include those and so any reader would have to assume
16 that you're referring to the chart that you did
17 include in the report?
18     A.  I concede that, yes.
19     Q.  Okay.
20     MR. GUERRA:  I don't have any other
21 questions.
22     MR. POYER:  Before you end your line of
23 questioning, can we go off the record for five
24 minutes?
25     THE VIDEOGRAPHER:  Off record, 11:37.

Page 377

1      (Recess from 11:37?a.m. until 11:43 a.m.)
2      THE VIDEOGRAPHER:  On record, 11:43.
3  BY MR. GUERRA:
4      Q.  Mr. Graziano, I just have one more line of
5  questioning.
6      A.  Okay.
7      Q.  How many hours have you spent so far working
8  on your report?
9      A.  I would have to look at my time records.
10 It's over 100, 130, 140 hours, something in that
11 neighborhood.
12     Q.  And what is your hourly rate?
13     A.  $400 per hour.
14     Q.  And I believe you said yesterday among your
15 associates, that they had spent approximately 200
16 hours working on this report?
17     A.  Sounds about right.
18     Q.  What is their hourly rate?
19     A.  It ranges from, I think, $100 to $350 an
20 hour.  Okay.
21     MR. GUERRA:  No further questions.
22     MR. BLOCK:  Just before we go off, just to
23 reiterate -- we don't need this on the video.
24     THE VIDEOGRAPHER:  Off record, 11:44.
25     THE WITNESS:  Thank you very much.

Page 378

1      (Whereupon, the deposition concluded at
2  11:44 a.m.)

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/18/19 Page 302 of 319
Case 2:09-md-02047-MCB Document 22293 Filed 11/20/19 Page 88 of 99
Confidential - Subject to Further Confidentiality Review

Page 379

```
 1        C E R T I F I C A T E
 2     I, SUSAN D. WASILEWSKI, Registered
 3  Professional Reporter, Certified Realtime Reporter
 4  and Certified Realtime Captioner, do hereby certify
 5  that, pursuant to notice, the deposition of ANTHONY
 6  GRAZIANO was duly taken on Tuesday, March 19, 2019
 7  at 9:05 a.m. before me.
 8         The said ANTHONY GRAZIANO was duly sworn by
 9  me according to law to tell the truth, the whole
10  truth and nothing but the truth and thereupon did
11  testify as set forth in the above transcript of
12  testimony.  The testimony was taken down
13  stenographically by me.  I do further certify that
14  the above deposition is full, complete, and a true
15  record of all the testimony given by the said
16  witness, and that a review of the transcript was
17  requested.
18
19  _____
20  Susan D. Wasilewski, RPR, CRR, CCP
21  (The foregoing certification of this transcript does
22  not apply to any reproduction of the same by any
23  means, unless under the direct control and/or
24  supervision of the certifying reporter.)
25
```

Page 380

### INSTRUCTIONS TO WITNESS

```
 1
 2
 3
 4       Please read your deposition over carefully
 5  and make any necessary corrections.  You should
 6  state the reason in the appropriate space on the
 7  errata sheet for any corrections that are made.
 8
 9       After doing so, please sign the errata sheet
10  and date it.  It will be attached to your
11  deposition.
12
13       It is imperative that you return the
14  original errata sheet to the deposing attorney
15  within thirty (30) days of receipt of the deposition
16  transcript by you.  If you fail to do so, the
17  deposition transcript may be deemed to be accurate
18  and may be used in court.
19
20
21
22
23
24
25
```

Page 381

```
 1        ------
 2        E R R A T A
 3        VOLUME 2
 4  PAGE  LINE  CHANGE
 5  ____  ____  _____
 6    REASON: _____
 7  ____  ____  _____
 8    REASON: _____
 9  ____  ____  _____
10    REASON: _____
11  ____  ____  _____
12    REASON: _____
13  ____  ____  _____
14    REASON: _____
15  ____  ____  _____
16    REASON: _____
17  ____  ____  _____
18    REASON: _____
19  ____  ____  _____
20    REASON: _____
21  ____  ____  _____
22    REASON: _____
23  ____  ____  _____
24    REASON: _____
25
```

Page 382

### ACKNOWLEDGMENT OF DEPONENT

```
 1
 2
 3       I, _____, do hereby
 4  acknowledge that I have read the foregoing pages,
 5  282 through 381, and that the same is a correct
 6  transcription of the answers given by me to the
 7  questions therein propounded, except for the
 8  corrections or changes in form or substance, if any,
 9  noted in the attached Errata Sheet.
10
11
12  _____      _____
13  ANTHONY GRAZIANO                        DATE
14
15
16
17
18  Subscribed and sworn to before me this
19  ____ day of _____, 20___.
20  My Commission expires: _____
21
22  _____
23       Notary Public
24
25
```

Case 2:09-md-02047-EEF-MBN Document 22363-31 Filed 11/18/19 Page 303 of 319
Case 1:16-cv-24682-MGC Document 274-0 Entered on FLSD Docket 11/26/19 Page 99 of 99
Confidential - Subject to further Confidentiality Review

Page 383

```
 1          LAWYER'S NOTES
 2  PAGE  LINE
 3  _____  _____  _____
 4  _____  _____  _____
 5  _____  _____  _____
 6  _____  _____  _____
 7  _____  _____  _____
 8  _____  _____  _____
 9  _____  _____  _____
10  _____  _____  _____
11  _____  _____  _____
12  _____  _____  _____
13  _____  _____  _____
14  _____  _____  _____
15  _____  _____  _____
16  _____  _____  _____
17  _____  _____  _____
18  _____  _____  _____
19  _____  _____  _____
20  _____  _____  _____
21  _____  _____  _____
22  _____  _____  _____
23  _____  _____  _____
24  _____  _____  _____
25
```

# EXHIBIT G

Priority Claimant List

IRR - Miami

Update: 3/17/2019

M:\2018\123-2018-0275 Chinese Drywall 2018_2019\Appraisals\Claimant property status and values

| File # | Claimant Name | Subject Property Address | City | County | Purchase Date | Date of sale/foreclosure/sale in mitigation | Date of Value | Remediation Status on Date of Value | Value Opinion as of Date of Value | Monthly Rent | Site Value Opinion | % Diminution Timing | Date of subsequent sales |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Miranda, Jose and Adela | 8890 SW 229 Street | Miami | Miami-Dade | 1/22/2007 (Had statement) | 11/16/17 (foreclosure final judgment) house vacated 6/8/18 | November 16, 2017 | Impaired | $ 265,000 | $ 1,900 | $ 20,000 | -2.50% | 10/9/2018 - $306,500 |
| 2 | Nunez, Jeremy and Monica | 8049 W. 36th Ave., #4 | Hialeah | Miami-Dade | 1/10/2007 | 9/22/17 (foreclosure) | August 22, 2017 | Impaired | $ 200,000 | $ 1,850 | | | None |
| 3 | Rosen, Kevin and Stacey | 17830 Monte Vista Drive | Boca Raton | Palm Beach | 11/12/04 (pre-construction) | 12/23/2009 | December 23, 2009 | Impaired | $ 1,015,000 | $ 8,500 | $ 150,000 | (2012) -7% w/o time adj (2018) - | 6/29/2012 - $940,000 3/29/2018 - $835,000 |
| 4 | Wien, Marc and Jennifer | 17625 Middlebrooke Way | Boca Raton | Palm Beach | Jun-07 | Current Owner (remediated) | January 1, 2019 | Remediated | $ 1,500,000 | $ 8,250 | $ 150,000 | | None, Current Owner |
| 5 | Griffin, Diane and David | 9801 Cobblestone Lakes Court | Boynton Beach | Palm Beach | 10/5/2006 | May 2010 (foreclosure) | May 1, 2010 | Impaired | $ 350,000 | $ 2,650 | $ 25,000 | | None |
| 6 | Rosen, Michael and Robyn | 17538 Middlebrooke Way | Boca Raton | Palm Beach | 11/6/2006 | Aug-09 | August 1, 2009 | Impaired | $ 1,900,000 | $ 10,000 | $ 150,000 | bonus. | 12/4/2009 - $876,000 8/08/2014 - $1,495,650 02/28/2019 - $1,580,000 |
| 7 | Ifint, Cathy and Steven | 18804 SE Jupiter Inlet Way | Tequesta | Martin | 12/8/2004 | 9/28/2016 | September 28, 2016 | Remediated | $ 1,980,000 | $ 6,200 | $ 300,000 | 0%* Could not conform disclosure | 9/28/2019 - $1,980,000 |
| 8 | Chamoun, Lillian | 4151 Bismarck Palm Drive | Tampa | Hillsborough | 5/30/2007 | Current Owner | January 1, 2019 | Impaired | $ 145,000 | $ 1,250 | | | None, Current Owner |
| 9 | Hernandez, John | 3516 N. Perry Ave. | Tampa | Hillsborough | 10/1/2007 | Current Owner | January 1, 2019 | Remediated | $ 1,065,000 | $ 3,650 | | | None, Current Owner |
| 10 | O'Brien, Kelly and Lori | 3120 W. Wallcraft Avenue | Tampa | Hillsborough | 6/9/2004 (purchase of property) built home 2006 | 2/17/2012 | February 17, 2012 | Impaired | $ 565,000 | $ 3,300 | | (2014) -14%; (027.1) -7.5% w/o to disclosure conf | Sold on 3/1/20/2014 for $542,000; Sold on 06/05/2017 for $749,900 |
| 11 | Avery, Janet | 10571 Camarelle Circle | Ft. Myers | Lee | 11/30/2007 | 7/22/2011 | July 22, 2011 | Impaired | $ 153,000 | $ 1,250 | | -8.50% | 10/11/2012 - $140,000 |
| 12 | Foster, William and Vicki | 10814 Fortina Drive | Ft. Myers | Lee | 3/21/2007 | Current Owner | January 1, 2019 | Partially Remediated | $ 355,000 | $ 2,000 | | | None, Current Owner |
| 13 | Gady, Anthony and Candace | 10842 Tiberio Drive | Ft. Myers | Lee | 4/19/2007 | Current Owner | January 1, 2019 | Partially Remediated | $ 381,000 | $ 2,000 | | | None, Current Owner |
| 14 | Martinez, Dailyn | 1624 NW 37th Avenue | Cape Coral | Lee | 9/10/2008 | Current Owner | January 1, 2019 | Partially Remediated | $ 273,000 | $ 1,625 | | | None, Current Owner |
| 15 | Nguyen, Tracy and Mai, Tuyen | 103 SE 16th Place | Cape Coral | Lee | 4/4/2004 (purchase of property) built home in 2006 | Current Owner | January 1, 2019 | Partially Remediated | $ 208,000 | $ 1,575 | | | None, Current Owner |
| 16 | Walls, Larry and Rosalee | 2510 Van Buren Parkway | Cape Coral | Lee | 3/11/2003 (purchase of property); built home 2006 | 10/16/2014 | October 16, 2014 | Impaired | $ 279,000 | $ 1,550 | | Limited Data | Sold on 02/19/2015 for $171,000; Sold on 09/03/2015 for $305,000 |
| 17 | Feldkamp, Andrew and Dawn | 5237 Butta Street | Lehigh Acres | Lee | 8/4/2008 | 9/24/2015 | September 24, 2015 | Impaired | $ 152,000 | $ 1,100 | | -15% to -20% | 4/1/2016 - $175,500 1/16/2018 - $222,000 |
| 18 | Lalwani, Gul and Deborah | 4550 Kodiak Dr. | Vero Beach | Indian River | 3/30/04 (purchase contract) | 3/11/11 (SRID statement) | March 11, 2011 | Impaired | $ 300,000 | $ 2,600 | $ 59,500 | -8% to -15% | 09/01/2015 - $410,000 |
| 19 | Marin, Cassandra (Yvette) | 2865 SW Wycoff Street | Port St. Lucie | St. Lucie | 2/8/2007 | 2/13/2012 | February 17, 2012 | Impaired | $ 112,000 | $ 1,100 | $ 9,500 | -8.50% | 2/4/2013 - $140,000 |
| 20 | Dong, David and Deborah | 516 SW Akron Ave. | Stuart | Martin | 10/10/2007 | 5/2/2016 | May 2, 2016 | Impaired | $ 450,000 | $ 2,400 | $ 165,000 | -1% | 1/17/2013 - $530,000 |



EXHIBIT SDU
3  3/18/19
GRAZIANO
PENGAD 800-631-6989

Priority Claimant List
IRR - Miami

Update: 3/17/2019

M:\2018\128-2018-0275 Chinese Drywall 2018_2019\Appraisals\Claimant property status and values

| File # | Claimant Name | Affected Property Address | City | County | Purchase Date | Date of sale/foreclosure/date in mitigation | Date of Value | Remediation Status in Date of Value | Value Opinion as of Date of Value | Monthly Rent | Site Value Opinion | % Deviation / Mktng | Dates of subsequent sales |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Miranda, Jose and Adela | 8890 SW 229 Street | Miami | Miami-Dade | 1/22/2007 (filed statement) | 11/16/17 (foreclosure final judgment) home vacated 6/8/18 | November 16, 2017 | Impaired | $ 265,000 | $ 1,900 | $ 20,000 | -2.50% | 10/9/2018 - $506,300 |
| 2 | Nuaez, Jeovany and Monica | 8049 W. 36th Ave., #4 | Hialeah | Miami-Dade | 1/10/2007 | 8/22/17 (foreclosure) | August 22, 2017 | Impaired | $ 200,000 | $ 1,850 | | | None |
| 3 | Rosen, Kevin and Stacey | 17830 Monte Vista Drive | Boca Raton | Palm Beach | 11/12/04 (pre-construction) | 12/23/2009 | December 23, 2009 | Impaired | $ 1,015,000 | $ 8,000 | $ 150,000 | (2012) -7% w/o trim adj (2018) - | 6/29/2012 - $940,000 3/29/2018 - $223,000 |
| 4 | Winn, Marc and Jennifer | 17625 Middlebrooke Way | Boca Raton | Palm Beach | Jan-07 | Current Owner (remediated) | January 1, 2019 | Remediated | $ 1,500,000 | $ 8,230 | $ 150,000 | | None, Current Owner |
| 5 | Griffin, Dane and David | 9801 Cobblestone Lakes Court | Boynton Beach | Palm Beach | 10/5/2006 | May 2010 (foreclosure) | May 3, 2010 | Impaired | $ 350,000 | $ 2,650 | $ 25,000 | | None |
| 6 | Rosen, Michael and Robyn | 17538 Middlebrooke Way | Boca Raton | Palm Beach | 11/6/2006 | Aug-09 | August 1, 2009 | Impaired | $ 1,900,050 | $ 10,000 | $ 150,000 | Income | 12/4/2009 - $876,000 8/09/2010 - $1,499,650 02/28/2019 -$1,380,000 |
| 7 | Elise, Cathy and Steven | 18894 SE Jupiter Inlet Way | Tequesta | Martin | 12/8/2004 | 9/28/2016 | September 28, 2016 | Remediated | $ 1,580,050 | $ 6,200 | $ 300,000 | 0%* Could not confirm disclosure | None |
| 8 | Chatman, Lillian | 4131 Hammock Palm Drive | Tampa | Hillsborough | 5/30/2007 | Current Owner | January 1, 2019 | Impaired | $ 143,000 | $ 1,250 | | | None, Current Owner |
| 9 | Hernandez, John | 3516 N. Perry Ave. | Tampa | Hillsborough | 10/5/2007 | Current Owner | January 1, 2019 | Remediated | $ 1,065,000 | $ 3,600 | | | None, Current Owner |
| 10 | O'Brien, Kelly and Lori | 3120 W. Wallcraft Avenue | Tampa | Hillsborough | 6/9/2004 (purchase of property) built home 2006 | 2/17/2012 | February 17, 2012 | Impaired | $ 365,000 | $ 3,300 | | (2014) -14%; (0217) -7.5% only to disclosure conf | Sold on 07/30/2014 for $342,000; Sold on 06/03/2017 for $349,900 |
| 11 | Avery, Janet | 10671 Castanilla Circle | Ft. Myers | Lee | 11/30/2007 | 7/22/2011 | July 22, 2011 | Impaired | $ 153,000 | $ 1,250 | | -8.50% | 10/11/2012 - $140,000 |
| 12 | Foster, William and Vicki | 10814 Fortina Drive | Ft. Myers | Lee | 3/21/2007 | Current Owner | January 1, 2019 | Partially Remediated | $ 355,000 | $ 2,000 | | | None, Current Owner |
| 13 | Oody, Anthony and Candace | 10842 Tiberio Drive | Ft. Myers | Lee | 4/19/2010 | Current Owner | January 1, 2019 | Impaired | $ 381,000 | $ 2,000 | | | None, Current Owner |
| 14 | Martinez, Gladys | 1624 NW 37th Avenue | Cape Coral | Lee | 9/16/2008 | Current Owner | January 1, 2019 | Partially Remediated | $ 227,000 | $ 1,425 | | | None, Current Owner |
| 15 | Nguyen, Tracy and Mhi, Tuyen | 105 SE 36th Place | Cape Coral | Lee | 6/4/2004 (purchase of property) built home in 2006 | Current Owner | January 1, 2019 | Partially Remediated | $ 308,000 | $ 1,575 | | | None, Current Owner |
| 16 | Walls, Larry and Rosalee | 2510 Van Buren Parkway | Cape Coral | Lee | 3/11/2002 (purchase of property) built home 2006 | 10/16/2014 | October 16, 2014 | Impaired | $ 279,000 | $ 1,550 | | Limited Data | Sold on 02/19/2015 for $171,000; Sold on 09/03/2015 for $305,000 |
| 17 | Feldkamp, Andrew and Dawn | 5237 State Street | Lehigh Acres | Lee | 8/6/2008 | 9/24/2015 | September 24, 2015 | Impaired | $ 152,000 | $ 1,300 | | -15% to -20% | 4/1/2016 - $175,300 3/29/2018 - $223,000 |
| 18 | Lalwani, Gul and Deborah | 4590 Kodiak Dr. | Vero Beach | Indian River | 7/3/2004 (purchase contract) | 3/11/11 (HUD statement) | March 11, 2011 | Impaired | $ 300,000 | $ 2,660 | $ 59,500 | -8% to -15% | 09/01/2015 - $430,000 |
| 19 | Marin, Cassandra (Yvette) | 3865 SW Wycoff Street | Port St. Lucie | St. Lucie | 2/8/2007 | 2/17/2012 | February 17, 2012 | Impaired | $ 112,000 | $ 1,500 | $ 9,500 | -8.50% | 2/14/2013 - $140,000 |
| 20 | Doog, David and Deborah | 316 SW Akron Ave. | Stuart | Martin | 10/10/2007 | 5/2/2016 | May 2, 2016 | Impaired | $ 450,000 | $ 2,800 | $ 165,000 | -1% | 1/12/2017 - $530,000 |

Priority Claimant List
IRR - Miami

Update: 3/17/2019

M:\2018\123-2018-0275 Chinese Drywall 2018_2019\Appraisals\Claimant property status and values

| File # | Claimant Name | Affected Property Address | City | County | Purchase Date | Date of sale/foreclosure/sale in mitigation | Date of Value | Remediation Status on Date of Value | Value Opinion at Date of Value | Monthy Rent | Site Value Opinion | % Diminution Timing | Days of Subsequent Sales |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Miranda, Jose and Adela | 8890 SW 229 Street | Miami | Miami-Dade | 1/22/2007 (Had shortsale) | 11/16/17 (foreclosure final judgment) lease vacated 6/8/18 | November 16, 2017 | Impaired | $ 265,000 | $ 1,900 | $ 20,000 | -2.50% | 10/9/2018 - $306,500 |
| 2 | Nunez, Jazmiry and Monica | 8049 W. 36th Ave., #4 | Hialeah | Miami-Dade | 1/10/2007 | 8/22/17 (foreclosure) | August 22, 2017 | Impaired | $ 200,000 | $ 1,850 | | | None |
| 3 | Rooyo, Kevin and Stacey | 17830 Monte Vista Drive | Boca Raton | Palm Beach | 11/12/04 (pre-construction) | 12/23/2009 | December 23, 2009 | Impaired | $ 1,015,000 | $ 6,000 | $ 150,000 | (2012) -7% w/o lime adj (2018) - | 6/29/2012 - $940,000 3/29/2018 - $835,000 |
| 4 | Wites, Marc and Jennifer | 17025 Middlebrooke Way | Boca Raton | Palm Beach | Jun-07 | Current Owner (remediated) | January 1, 2019 | Remediated | $ 1,500,000 | $ 8,250 | $ 150,000 | | None, Current Owner |
| 5 | Griffin, Diane and David | 9801 Cobblestone Lakes Court | Boynton Beach | Palm Beach | 10/5/2006 | May 2010 (foreclosure) | May 1, 2010 | Impaired | $ 350,000 | $ 2,650 | $ 25,000 | | None |
| 6 | Rosen, Michael and Robyn | 17938 Middlebrooke Way | Boca Raton | Palm Beach | 11/6/2006 | Aug-09 | August 1, 2009 | Impaired | $ 1,900,000 | $ 10,000 | $ 150,000 | Incomp. | 12/4/2009 - $876,000 8/08/2016 - $1,499,636 10/28/2016 - $1,380,000 |
| 7 | Dee, Cathy and Shawn | 18894 SE Jupiter Inlet Way | Tequesta | Martin | 12/8/2004 | 9/28/2016 | September 28, 2016 | Remediated | $ 1,580,000 | $ 6,200 | $ 300,000 | 0%* Could not confirm disclosure | None |
| 8 | Chinnen, Lillian | 4151 Bismarck Palm Drive | Tampa | Hillsborough | 3/30/2007 | Current Owner | January 1, 2019 | Impaired | $ 145,000 | $ 1,250 | | | None, Current Owner |
| 9 | Hernandez, John | 5516 N. Perry Ave. | Tampa | Hillsborough | 10/1/2007 | Current Owner | January 1, 2019 | Impaired | $ 1,065,000 | $ 3,600 | | | None, Current Owner |
| 10 | O'Brien, Kelly and Lori | 3120 W. Walkcraft Avenue | Tampa | Hillsborough | 6/9/2004 (purchase of property) built home 2006 | 2/17/2012 | February 17, 2012 | Impaired | $ 565,000 | $ 3,500 | | (2014) -14% (2017) -7.5% adj to disclosure conf | Sold on 03/30/2014 for $542,000; Sold on 06/05/2017 for $769,900 |
| 11 | Avery, Janet | 10671 Cannanille Circle | Ft. Myers | Lee | 11/30/2007 | 7/23/2011 | July 22, 2011 | Impaired | $ 155,000 | $ 1,250 | | -8.50% | 10/11/2012 - $140,000 |
| 12 | Porter, William and Vicki | 10814 Forbes Drive | Ft. Myers | Lee | 3/21/2007 | Current Owner | January 1, 2019 | Partially Remediated | $ 355,000 | $ 2,000 | | | None, Current Owner |
| 13 | Grady, Anthony and Candace | 10842 Tiburon Drive | Ft. Myers | Lee | 4/19/2007 | Current Owner | January 1, 2019 | Partially Remediated | $ 381,000 | $ 2,000 | | | None, Current Owner |
| 14 | Martinez, Delilyn | 1624 NW 37th Avenue | Cape Coral | Lee | 9/16/2008 | Current Owner | January 1, 2019 | Partially Remediated | $ 227,000 | $ 1,425 | | | None, Current Owner |
| 15 | Nguyen, Tracy and Mai, Tuyet | 703 SE 16th Place | Cape Coral | Lee | 6/4/2004 (purchase of property) built home in 2006 | Current Owner | January 1, 2019 | Partially Remediated | $ 308,000 | $ 1,575 | | | None, Current Owner |
| 16 | Walls, Larry and Rosslee | 2510 Van Buren Parkway | Cape Coral | Lee | 3/11/2002 (purchase of property), built home 2006 | 10/16/2014 | October 16, 2014 | Impaired | $ 279,000 | $ 1,550 | | Limited Data | Sold on 02/19/2015 for $175,000; Sold on 09/03/2015 for $305,000 |
| 17 | Feldkamp, Andrew and Davis | 5257 Butte Street | Lehigh Acres | Lee | 8/6/2008 | 9/24/2015 | September 24, 2015 | Impaired | $ 152,000 | $ 1,100 | | -15% to -20% (2 of 3) | 4/1/2016 - $172,500 1/18/2016 - $222,000 |
| 18 | Lalwani, Gul and Deborah | 4590 Kodiak Dr. | Vero Beach | Indian River | 3/30/04 (purchase contract) | 3/11/11 (HUD statement) | March 11, 2011 | Impaired | $ 500,000 | $ 2,600 | $ 59,500 | 47% to -19% | 09/01/2015 - $410,000 |
| 19 | Marin, Cassandra (Yvette) | 3663 SW Wycoff Street | Port St. Lucie | St. Lucie | 2/8/2007 | 2/17/2012 | February 17, 2012 | Impaired | $ 112,000 | $ 1,100 | $ 9,500 | -8.50% | 2/14/2013 - $145,000 |
| 20 | Doog, David and Deborah | 516 SW Akron Ave. | Stuart | Martin | 10/10/2007 | 5/2/2016 | May 2, 2016 | Impaired | $ 450,000 | $ 2,400 | $ 165,000 | -1% | 1/12/2017 - $530,000 |



EXHIBIT
3
PENGAD 800-631-6989

# EXHIBIT H





# Litigation

## Post Discovery Submission

Colson Hicks Eidson - 123-2018-0275







Matrix v8.3.  © 2019

*Priority Claimant*

*Testing*

MIRANDA Testing

314,000 (comp test)
VI - 306,500

-2.4%/inner 7500 +/-

M.randa

 Listing



**Single Family**
8890 SW 229th St
CUTLER BAY, FL 33190-1959

| | | | |
|---|---|---|---|
| **ML#:** | A10517799 | **List Price:** | $315,000 |
| **Rng Price:** | | **Sold Price:** | $306,500 |
| **LLP:** | | **Status:** | Closed Sale |
| **Short Sale:** | No | **REO:** | No |
| **Listing Brkr:** | LKSR01 /LuckyStart Realty, LLC | | |
| **County:** | Miami-Dade County | | |
| **Area:** | 60 | | **Auction:** No |
| **Geo Area:** | | | |
| **Legal:** | ×TRELLIS AT BAYSHORE PB 164-047 T-22057 LOT 2 BLK 8 LOT SIZE 2337 SQ FT FAU 36 6016 000 0023 COC 25312-0889 01 2007 1 | | |
| **Furnished:** | | | |
| **Bedrooms:** | 3 | **Baths:** | 2/1 |
| **Convert Bed:** | | | |
| **SqFt (Liv):** | ×1,988 | **Tot SqFt:** | ×2,575 |
| **SqFt (Adj):** | ×1,988 | | |
| **Bld Ar/Src:** | | | |
| **Year Built:** | 2006/New Construction | | |
| **Virtual Tour:** | Click Here | | |

---
### Location Information

| | | | | | |
|---|---|---|---|---|---|
| **Folio#:** | ×3660160170390 | **Parcel #:** | 0390 | **Model Name:** | |
| **Municipal Code:** | 36 | **Town/Range:** | 60 | **Section:** | 16 |
| **Subdivision #:** | 17 | **Map Coord:** | | **Zoning:** | ×0100 |
| **Subdivision:** | ×TRELLIS AT BAYSHORE | **Development:** | | | |
| **Elementary:** | | **Middle:** | | | |
| **High:** | | | | | |
| **Neighborhood:** | | | | | |

---
### General Information

| | | | | | |
|---|---|---|---|---|---|
| **Type Property:** | Single | **Front Exposure:** | North East | **HOPA:** | No HOPA |
| **For Lease:** | | **For Lease MLS#:** | | **SS Addend:** | |
| **Unit Services:** | | | | | |
| **Style:** | R30-No Pool/No Water | | | | |
| **Garage:** | 2 | | | **Carport:** | |
| **Lot SF:** | ×2,337 | **Appr Lot Size:** | | | |
| **Parking Desc:** | Covered Parking | | | | |
| **Parking Restr:** | | | | | |
| **Lot Desc:** | Less Than 1/4 Acre Lot | | | | |
| **Waterfront:** | No | | | | |
| **Water Access:** | | | | | |
| **Water Frontage:** | | **View:** | Other View | | |
| **Pool Dim:** | | **Spa:** | | | |
| **Pool:** | No | | | | |
| **Design/Desc:** | Attached/Two Story | | | | |
| **Construction:** | Concrete Block Construction | | | | |
| **Roof Desc:** | Barrel Roof | | | | |
| **Floor:** | Tile Floors, Wood Floors | | | | |

---
### Remarks

**Remarks:** Great Property with Large master bedroom. Huge closet spaces. Nice private backyard for entertaining and your pets. Close to top schools. Short drive to the Marina. Listed as a three bedroom , and one den that can be used as a forth bedroom, two and a half bathrooms, Upgraded kitchen with quartz counter top, all new SS appliances, new washer and dryer, updated vanities , lots of room and light. Do not let this one pass you by.

**Driving Directions:**

**Broker Remarks:** Please submit offer and required docs to BOTH jfernandez@luckystarthomes.com & nl@lyacon.com with DU.

---
### Rooms

| | |
|---|---|
| **Bedroom Desc:** | Master Bedroom Upstairs, Other |
| **Master Bath:** | |
| **Addition Rooms:** | Den/Library/Office |
| **Dining Desc:** | |
| **ADA Compliant:** | |

---
### Additional Information

| | | | |
|---|---|---|---|
| **Pets:** | Yes | **Cable:** | |
| **Pet Rstr:** | Restrictions Or Possible Restrictions | | |
| **Guest House:** | | | |
| **# Ceiling Fans:** | | | |
| **Interior Feat:** | First Floor Entry, Walk-In Closets | | |
| **Equip/Appl:** | Automatic Garage Door Opener, Dishwasher, Dryer, Electric Water Heater, Refrigerator, Washer | | |

| | |
|---|---|
| **Window Treat:** | |
| **Exterior Feat:** | Other |
| **Subd Info:** | Exercise Room, Gate Guarded, Community Pool |
| **Restrictions:** | Assoc Approval Required |
| **Maint Incl:** | |
| **Heating:** | Central Heat |
| **Cooling:** | Central Cooling, Electric Cooling |
| **Sprinkler:** | |
| **Water:** | Municipal Water |
| **Equestrian:** | |
| **Storm Protect:** | |
| **Green Energy:** | |

**Sewer:** Municipal Sewer

---

## Financial Information

| | | | | | |
|---|---|---|---|---|---|
| **Assumable:** | | **$/SOH Value:** | | **Assessed $:** | |
| **Total Mortg:** | | **Terms:** | All Cash, Conventional, FHA | | |
| **Type of Assoc:** | Homeowners | | | **Membership:** | No/$0 |
| **Assoc Fee:** | $74 | **Assoc Fee Pd:** | Monthly | **Flood Zone:** | xAE |
| **Tax Amount:** | $2,482 | **Tax Year:** | 2017 | **Owner Agent:** | No |
| **Tax Info:** | Tax Reflects City & County Tax | | | | |
| **Special Info:** | | | | | |
| **Possession Info:** | Funding | | | | |
| **Bonus:** | | **Spec Assess:** | | **Mult Offers :** | |
| **Hardship Pkg:** | | | | | |

---

## Agent/Office Information

| | | | |
|---|---|---|---|
| **Office:** | LKSR01 /LuckyStart Realty, LLC | **Agent Ph:** | 305-525-3517 |
| **Agent:** | 3398270 /Natan Lustgarten | **Agt Ph 2:** | 786-213-0440 |
| **Ofc Addr:** | 14221 SW 120 ST. | **Office Fax:** | 305-382-6668 |
| | Miami, FL 33186 | | |
| **Agent Email:** | nl@lyacon.com | **Agent License:** | 3398270 |
| **Office Ph:** | 305-382-6688 | | |
| **CoAgt Email:** | | | |
| **Owner Name:** | | **Own Phone:** | |
| **Buy Agt Comp:** | 3% | **Trans Brk Comp:** 3% | **NonRep Cmp:** 3% |
| **VAR Dual Rt:** | No | **AVM:** No | **Blogging:** No |
| **Addrs on Inet:** | Yes | **Contingencies:** No Contingencies | |
| **Photo Instr:** | Realtor to Upload Images 1-35 | **Joint Agcy:** | |
| **List Type:** | Exclusive Right to Sell/Rent | **Occupancy:** Vacant | |
| **Show Instr:** | Showing Assist | | |
| **List Date:** | 08/08/2018 | **Stat Change Dt:** 10/17/2018 | **Prev LP:** |
| **Expire Date:** | 08/08/2019 | | **Orig LP:** $315,000 |
| **Pending Dt:** | 09/04/2018 | **DOM:** 22 | **Internet:** Yes |
| **Closing Dt:** | 10/09/2018 | **Expct Clse Dt:** 10/05/2018 | **Withdrn Dt:** |
| **Intrnt URL:** | | | |
| **Intrnt Rmrks:** | Trellis at Bayshore Association Dues: HOA - $71.13 Monthly , and Master - $100 per annum. | | |
| **Board:** | A-Miami Association of REALTORS | | |

---

## Sold Information

| | | | |
|---|---|---|---|
| **Selling Office:** | APLR01 /A + International Realty Inc | **Selling Office Phone:** | 305-280-2194 |
| **Selling Agent:** | 3198597 /Jose Chapman | **Selling Agent Phone:** | 786-210-1499 |
| **Selling Agt Lic:** | 3198597 | **Sale Price:** | $306,500 |
| **Sell $ Per SqFt:** | $154.18 | **Sell $ Per Acre:** | |
| **Sold Finance:** | Conventional | | |
| **Seller Contrb:** | No | | |

Prepared By: Anthony Graziano

Date Printed: 03/16/2019 08:58 PM

**\* Flood Insurance is Required \***

*Information is Believed To Be Accurate But Not Guaranteed.* Copyright SouthEast Florida MLS. © 2019

3/16/20 Case 1:09-md-02047-EEF-MBN Document 22363-31 Filed 11/18/19 Page 317 of 319
Case 1:17-cv-22400-MGC Document 279-8 Entered on FLSD Docket 05/13/2019 Page 90 of 178

7/17/2018



🏠 **Listing**

**Condo/Co-Op/Villa/Townhouse**
22833 SW 88th Path
CUTLER BAY, FL 33190-1357

| | | | |
|---|---|---|---|
| **ML#:** | A10467835 | **List Price:** | $319,000 |
| **Rng Price:** | | **Sold Price:** | $314,000 |
| **LLP:** | | **Status:** | Closed Sale |
| **Short Sale:** | No | **REO:** | No |
| **Listing Brkr:** | IBIS01 /IBIS Realty Group, Inc. | | |
| **County:** | Miami-Dade County | | |
| **Area:** | 60 | | **Auction:** No |
| **Geo Area:** | | | |
| **Legal:** | ×TRELLIS AT BAYSHORE PB 164-047 T-22057 LOT 6 BLK 28 LOT SIZE 2363 FAU 36 6016 000 0023 | | |
| **Furnished:** | | | |
| **Bedrooms:** | 3 | **Baths:** | 2/1 |
| **Convert Bed:** | | **Efficiency:** | |
| **SqFt (Liv):** | ×1,968 | **Tot SqFt:** | ×2,378 |
| **SqFt (Adj):** | ×1,968 | | |
| **Bld Ar/Src:** | | | |
| **Year Built:** | 2013/New Construction | | |
| **Virtual Tour:** | Click Here | | |

---
**Location Information**

| | | | | | |
|---|---|---|---|---|---|
| **Folio#:** | ×3660160171400 | **Parcel #:** | 1400 | **Model Name:** | |
| **Municipal Code:** | 36 | **Town/Range:** | 60 | **Section:** | 16 |
| **Subdivision #:** | 17 | **Map Coord:** | | | |
| **Complex:** | Isles of Bayshore | | | **Int Levels:** | |
| **Unit Floor Loc:** | 1 | **Tot Flr in Bldg:** | 2 | **Bldg #:** | |
| | | **Development:** | | | |
| **# Bldg Units:** | | **# Cmplx Units:** | | | |
| **Elementary:** | Edward Whigham | **Middle:** | | | |
| **High:** | | | | | |
| **Neighborhood:** | | | | | |

---
**General Information**

| | | | | | |
|---|---|---|---|---|---|
| **Type Property:** | Townhouse | **Front Exposure:** | | **HOPA:** | Unverified |
| **Unit Detached:** | Yes | **Bal/Porch/Pat:** | | **Doc Sp#:** | |
| **Park Sp #:** | | **Min Day Lse:** | 180 | **Lse/Yr:** | 1 |
| **Gov Bodies:** | Homeowner Association | **Main Liv Area:** | | | |
| **For Lease:** | | **For Lease MLS#:** | | **SS Addend:** | |
| **Boat Services:** | | | | | |
| **Style:** | T52-Townhouse Condo | | | | |
| **Garage:** | 1 | | | **Carport:** | |
| **Unit Design:** | None | | | | |
| **Unit View:** | Other View | | | | |
| **Parking Desc:** | Driveway | | | | |
| **Parking Restr:** | | | | | |
| **Waterfront:** | No | | | | |
| **Water Access:** | | | | | |
| **Construction:** | CBS Construction | | | | |
| **Floor:** | Carpeted Floors, Tile Floors | | | | |
| **Security Info:** | Guard At Site, Security Patrol | | | | |

---
**Remarks**

**Remarks:** SPACIOUS AND BRIGHT RECENTLY CONSTRUCTED TOWNHOUSE! REMODELED KITCHEN INCLUDES UPGRADED AND EXTRA CABINETRY, BEAUTIFUL BACKSPLASH, AND PREMIUM GRANITE COUNTERTOP. LARGE LIVING AREA, BEDROOMS AND CLOSETS. HOME FEATURES AN AMPLE SIZED FENCED-IN BACKYARD PERFECT FOR ENTERTAINING AS WELL AS AN EXTENDED PATIO. FINISHED GARAGE INCLUDES SHELVES FOR STORAGE. INTERIOR HAS BEEN COMPLETELY PAINTED FROM ORIGINAL DELIVERY. HOUSE WAS ORIGINALLY SOLD AT A PREMIUM BY DEVELOPER FOR ITS LOT LOCATION AS IT ONLY HAS ONE DIRECT NEIGHBOR. SMART HOME TECHNOLOGY INCLUDES ALARM SYSTEM, REMOTE LOCK/UNLOCK, REMOTE THERMOSTAT, INDOOR CAMERA, AND RING DOORBELL CAMERA. ACCESS TO MAGNIFICENT COMPLEX POOL AND FITNESS FACILITY. CONVENIENTLY LOCATED CLOSE TO TURNPIKE. PRICED TO SELL!

**Driving Directions:**

**Broker Remarks:** 3/2.5. Spacious layout. Call/text listing agent to show. Showings commence with Open House Sunday May 20, 1-3 PM.

---
**Rooms**

| | |
|---|---|
| **Bedroom Desc:** | Master Bedroom Upstairs |
| **Master Bath:** | Dual Sinks |
| **Addition Rooms:** | Utility Room/Laundry |
| **Dining Desc:** | Dining/Living Room |

**ADA Compliant:**

--- **Additional Information** ---

| | | **Cable:** |
|---|---|---|
| **Pets:** | Yes | |
| **Pet Rstr:** | None | |
| **# Ceiling Fans:** | | |
| **Interior Feat:** | First Floor Entry, Pantry, Roman Tub, Volume Ceilings, Walk-In Closets | |
| **Equip/Appl:** | Automatic Garage Door Opener, Dishwasher, Disposal, Dryer, Electric Water Heater, Microwave, Electric Range, Refrigerator, Washer | |
| **Window Treat:** | | |
| **Exterior Feat:** | Awnings, Fence, Patio | |
| **Restrictions:** | Ok To Lease | |
| **Maint Incl:** | Maintenance Incl Security | |
| **Heating:** | Central Heat | |
| **Cooling:** | Ceiling Fans, Central Cooling | |
| **Sprinkler:** | | |
| **Approval Info:** | Association Approval Required | |
| **Amenities:** | Clubhouse-Clubroom, Exercise Room, Fishing Pier, Child Play Area, Pool, Tennis | |
| **Equestrian:** | | |
| **Storm Protect:** | | |
| **Green Energy:** | | |

--- **Financial Information** ---

| | | | | | | |
|---|---|---|---|---|---|---|
| **Assumable:** | | **$/SOH Value:** | | **Assessed $:** | | |
| **Total Mortg:** | | **Terms:** | All Cash, Conventional, FHA, Va | | | |
| **Type of Assoc:** | Homeowners | | | **Membership:** | No | |
| **Application Fee:** | $100 | **Maint Fee:** | $81/Monthly | **Land Lse Fee:** | $ | |
| **Rec Lease/Mo:** | $ | | | | | |
| **Assoc Fee:** | $81 | **Assoc Fee Pd:** | Monthly | **Flood Zone:** | xAE | |
| **Tax Amount:** | $5,122 | **Tax Year:** | 2017 | **Owner Agent:** | No | |
| **Tax Info:** | Tax Reflects Homestead Tax | | | | | |
| **Special Info:** | | | | | | |
| **Possession Info:** | Other | | | | | |
| **Bonus:** | | **Spec Assess:** | | **Mult Offers :** | | |
| **Hardship Pkg:** | | | | | | |

--- **Agent/Office Information** ---

| | | | | | |
|---|---|---|---|---|---|
| **Office:** | IBIS01 /IBIS Realty Group, Inc. | | | **Agent Ph:** | 954-850-3905 |
| **Agent:** | 3290089 /Eric Farmelant | | | **Agt Ph 2:** | 954-850-3905 |
| **Ofc Addr:** | 1521 SW 14 Terrace | | | **Office Fax:** | 954-850-3905 |
| | Miami, FL 33145 | | | | |
| **Agent Email:** | ebfarmelant@gmail.com | | | **Agent License:** | 3290089 |
| **Office Ph:** | 954-850-3905 | | | | |
| **CoAgt Email:** | | | | | |
| **Owner Name:** | | | | **Own Phone:** | |
| **Buy Agt Comp:** | 3.0% | **Trans Brk Comp:** | 3.0% | **NonRep Cmp:** | |
| **VAR Dual Rt:** | No | **AVM:** | Yes | **Blogging:** | Yes |
| **Addrs on Inet:** | Yes | **Contingencies:** | Pending Inspections | | |
| **Photo Instr:** | Realtor to Upload Images 1-35 | | | **Joint Agcy:** | |
| **List Type:** | Exclusive Agency | | | **Occupancy:** | Owner Occupied |
| **Show Instr:** | Appointment Only, See Broker Remarks, Call Listing Agent | | | | |
| **List Date:** | 05/14/2018 | **Stat Change Dt:** | 07/17/2018 | **Prev LP:** | |
| **Expire Date:** | 05/14/2019 | | | **Orig LP:** | $319,000 |
| **Pending Dt:** | 06/05/2018 | **DOM:** | 22 | **Internet:** | Yes |
| **Closing Dt:** | 07/17/2018 | **Expct Clse Dt:** | 07/17/2018 | **Withdrn Dt:** | |
| **Intrnt URL:** | | | | | |
| **Intrnt Rmrks:** | 3/2.5. Spacious layout with remodeled kitchen and extended patio. | | | | |
| **Board:** | A-Miami Association of REALTORS | | | | |

--- **Sold Information** ---

| | | | |
|---|---|---|---|
| **Selling Office:** | KEYE09 /The Keyes Company | **Selling Office Phone:** | 305-595-8166 |
| **Selling Agent:** | 3386928 /Yvonne Fernandez | **Selling Agent Phone:** | 305-710-5811 |
| **Selling Agt Lic:** | 3386928 | **Sale Price:** | $314,000 |
| **Sell $ Per SqFt:** | $159.55 | **Sell $ Per Acre:** | |
| **Sold Finance:** | Fha | | |
| **Seller Contrb:** | No | | |

Prepared By: Anthony Graziano                                          Date Printed: 03/16/2019 08:58 PM

**\* Flood Insurance is Required \***

*Information is Believed To Be Accurate But Not Guaranteed.* Copyright SouthEast Florida MLS. © 2019