# EXHIBIT 25

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| EDUARDO AND CARMEN AMORIN, *et al.*, individually, and on behalf of all others similarly situated,<br><br>　　　Plaintiffs,<br><br>　　　　　v.<br><br>TAISHAN GYPSUM CO., LTD. f/k/a SHANDONG TAIHE DONGXIN CO., LTD.; TAIAN TAISHAN PLASTERBOARD CO., LTD., et al.,<br><br>　　　Defendants. | Case No. 1:11-CV-22408-MGC |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' JOINT MOTION TO EXCLUDE THE OPINION AND PRECLUDE TESTIMONY OF PLAINTIFFS' EXPERT RYAN T. GREENBLATT**

## I.　　INTRODUCTION

　　Plaintiffs, by and through undersigned counsel, hereby file their Response in Opposition to Defendants' Joint Motion to Exclude the Opinion and Preclude Testimony of Plaintiffs' Expert Ryan T. Greenblatt and Incorporated Memorandum of Law. Defendants' Motion is based on the false proposition that a non-scientific expert cannot rely on his experience, wealth of accumulated knowledge, and market observations as an appropriate basis for an expert opinion.  This contention rings particularly false when the standard applicable to  non-scientific experts, such as Mr. Greenblatt, recognize that such an expert may use his experience, training and knowledge of the real estate market, including the  real estate disclosure requirements in the State of Florida applicable to Chinese drywall to opine on the resulting permanent stigma to homes due to the presence (or former presence) of Chinese drywall. The admissibility of the opinions of Mr. Greenblatt is entirely consistent with Florida law. *See infra, Bisque Associates of Fla., Inc. v. Towers of Quayside No. 2 Condominium Assoc., Inc.,* 639 So. 2d 997, 999 (Fla. 3d DCA 1994); *Florida Power & Light Co. v. Jennings* 518 So. 2d 895 (Fla. 1987).

Plaintiffs have been clear throughout this litigation that they intend to seek stigma damages/diminution in value due to the Chinese drywall contamination of their homes whether it be pre or post-remediation. Mr. Greenblatt, a licensed real estate agent has opined within a reasonable degree of probability as a realtor that if Priority Claimants attempt to sell their homes, remediated or unremediated, they will then be required to disclose that the home contained Chinese drywall, and that disclosure will cause permanent stigma/diminution in value.[1] In other words, Mr. Greenblatt is providing causation testimony for Plaintiffs' stigma/diminution in value damages. The need to disclose Chinese drywall in the sale of a residential home is incontrovertible and has gone unchallenged by Defendants.[2] Mr. Greenblatt is not opining as to the precise amount of stigma[3] experienced by the Priority Claimants, merely its existence and that it is permanent due to the need to disclose the Chinese drywall defect when selling the home.[4] To address that metric, Plaintiffs retained an appraisal expert, Mr. Anthony Graziano, to quantify the amount of stigma/diminution in value damages suffered. Mr. Greenblatt's testimony is therefore limited to need to disclose Chinese drywall, remediated or unremediated, in the sale of the Priority Claimants' homes and that as result there will be a permanent stigma.

A brief explanation of Florida law will assist the Court in understanding the significance of Mr. Greenblatt's opinions. Mr. Greenblatt's opinion regarding disclosure is consistent with the Florida Supreme Court's decision in the landmark case of *Johnson v. Davis*, 480 So. 2d 625, 629 (Fla. 1985). *Johnson* holds that a seller of residential property must disclose those facts materially affecting the value of the property which are not readily observable and not known to a buyer. Mr. Greenblatt's opinion is also consistent with the Florida Association of Realtor's ("FAR/BAR")[5] form contracts for disclosures of material defects.[6] The FAR/BAR forms specifically state, "This form has been approved by the Florida Realtors

---

[1] Greenblatt Report at ¶ 33(f), attached hereto as Exhibit "A".

[2] Defendants have challenged Mr. Greenblatt's opinion on the amount of stigma, but Mr. Greenblatt does not opine as to an exact amount of stigma, only that there is a permanent stigma associated with the required disclosure of Chinese drywall.

[3] Mr. Greenblatt's opinion is that the stigma is drastic. Greenblatt Report at ¶ 33(a).

[4] *Id.* at ¶ 34.

[5] The forms are a product of collaboration between the Florida Association of Realtors ("FAR") and the Florida Bar, accordingly, FAR/BAR.

[6] See FAR/BAR forms, attached hereto as composite Exhibit "B".

and the Florida Bar." *Id.* On the FAR/BAR forms, Chinese drywall ("CDW") must be disclosed in a home sale even if repaired or remediated. *See id.* Defendants' rebuttal expert, Mr. Cohen, *agrees* that when a home is sold that has or had CDW, the CDW must be disclosed:

> Q.    And in your practice as a professional broker, would you disclose that a home previously had Chinese drywall and was remediated?
> A.    Yes.
> Q.    And why is that?
> A.    Because it's a requirement on the seller's disclosure.[7]

On the FAR/BAR form, Chinese drywall is included with other hazardous materials such as asbestos, mold, formaldehyde and radon. *Id.*

Plaintiffs' recovery of diminution in value for their home is permitted in Florida when the damages are permanent, due to the disclosure required under *Johnson v. Davis.* *See Bisque Associates of Fla., Inc. v. Towers of Quayside No. 2 Condominium Assoc., Inc.,* 639 So. 2d 997, 999 (Fla. 3d DCA 1994). *Bisque* is on point. In *Bisque,* a unit owner in a condominium sued the condominium association for breach of contract for plumbing problems that caused backups and spillovers. The unit owner sought damages for loss rental income and diminution in value. The unit owner sought damages for diminution in value because of "Bisque's legal obligation to tell potential renters or purchasers about the plumbing problems." *Id.* at 998. The required disclosure made the stigma or diminution in value permanent. The trial court granted a motion in limine to exclude evidence of diminution in value. The appellate court reversed the trial court finding that under *Johnson v. Davis,* the seller has a duty to disclose the defect and that it was error not to allow the unit owner's expert to testify regarding a potential buyer's reluctance to pay full market prices for a unit that had plumbing problems. *Id.* at 999. The appellate court held that in light of the evidence regarding the potentially permanent diminution in value, the trial judge was incorrect to exclude the testimony relating to the permanence of the injury and that a new trial on damages was necessary. *Id.* Here, Plaintiffs find themselves in the same position as the unit owner in *Bisque.* Upon the sale of the CDW

---

[7] Deposition of David J. Cohen, at 49:12-18, attached hereto as Exhibit "C."

home, they are obligated to disclose the presence of or the remediation of the CDW, thus, making it permanent stigma.

*Bisque* is a remarkable case due to its factual similarities to this case and the need to disclose a defect upon sale of the home, even post remediation. *Bisque* is also significant because even though it was a breach of contract claim, diminution in value was found to be an issue for the jury and tort damages were permissible. Importantly, the Third District Court of Appeals found that, "The objective of compensatory damages is to make the injured party whole to the extent that it is possible to measure the injury sustained in terms of money." *Id.* at 999 (citing *Mercury Motors Express, Inc. v. Smith,* 393 So. 2d 545 (Fla. 1981)). Here, Plaintiffs merely seek the consequential damages, inclusive of stigma/diminution in value from the defective CDW in their homes. There can be no dispute under *Johnson v. Davis* that Plaintiffs must disclose that they had defective Chinese drywall in their home. *Bisque* instructs that the issue of how much the diminution in value will be is properly before the jury.

## II.    QUALIFICATIONS OF MR. GREENBLATT

Plaintiffs retained Mr. Ryan T. Greenblatt as a non-scientific expert on Florida real estate. Specifically, Plaintiffs retained Mr. Greenblatt to opine on disclosure requirements for real estate agents in the State of Florida and the resulting stigma to homes caused by the presence (or former presence) of Chinese drywall and its disclosure. Mr. Greenblatt is a licensed real estate agent in Florida with seventeen years' experience in the Florida market.[8] Further, Mr. Greenblatt is also a licensed real estate broker, having obtained his license in 2015.[9]

Contrary to Defendants' assertions, Mr. Greenblatt has sold homes throughout the State of Florida.[10] In fact, Mr. Greenblatt has sold hundreds homes throughout Florida.[11] He is a top producer in sales at Lang Realty, having received the Diamond Award for achieving 25 to 30 Million dollars in sales.[12] The bulk of his work focuses on Broward and Palm Beach Counties – markets that were inundated with Chinese drywall and that contain five of the

---

[8] Ex. A, Greenblatt Report at ¶¶ 2-3.
[9] *Id.* at ¶ 1.
[10] Deposition of Ryan T. Greenblatt (Vol. I) at 106:24-109:4, attached hereto as Exhibit "D".
[11] *Id.*
[12] *Id.* at 146:9-15.

4

Priority Claimants' homes. Defendants allege that Mr. Greenblatt's opinions regarding Chinese drywall pertain solely to the three properties described in his report. However, Defendants' contention grossly misrepresents Mr. Greenblatt's testimony. Mr. Greenblatt testified that he has shown numerous homes with Chinese drywall over the course of his career.[13] He is amply qualified to render his opinion. Indeed, in contrast to Mr. Greenblatt's experience with CDW homes, Defendants' rebuttal expert, Mr. Cohen only has one confirmed sale of a home containing Chinese drywall[14] and Mr. Cohen's principal focus was bank-owned distressed Real Estate Owned ("REO") properties, not general sales of residential homes.[15]

## III.  ARGUMENT

### A. Legal Standard

The admission of expert evidence is governed by Federal Rule of Evidence 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.[16]

District courts play the role of gatekeepers to admit expert testimony testing to ensure that the foundation for the opinions are reliable and relevant. *See Daubert v. Merrell-Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993); *Gomez v. General Nutrition Corp.*, 323 F.Supp.3d 1368,

---

[13]*Id.* at 123:15-124:7.
[14] Ex. C, Cohen Dep. at 59:14-22.
[15] *Id.* at 27:25-28:17.
[16] Fed. R. Evid. 702.

1377 (S.D. Fla. 2018) (Cooke, J.), citing *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291–92 (11th Cir. 2005); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999).

Importantly, the *Daubert* inquiry is inherently a "flexible one" and district courts "have substantial discretion in deciding how to test the expert's reliability. . . ." *United States v. Majors*, 196 F.3d 1206, 1215 (11th Cir. 1999) (citations omitted). Indeed, the Eleventh Circuit recognizes that "Daubert issues are not precisely calibrated and must be applied in case-specific evidentiary circumstances that often defy generalization."[17] But, as *Daubert* explains, the "traditional and appropriate" method of addressing expert opinion is through cross-examination.[18] Therefore, "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence."[19] This is so because the "district court's gatekeeper role under Daubert 'is not intended to supplant the adversary system or the role of the jury.'"[20] Consequently, the *Daubert* analysis focuses on the methodology underlying an expert's opinion, not the expert's conclusions.[21] *Daubert* requires the proponent of the scientific evidence to show that the expert's conclusion has been arrived at "in a scientifically sound and methodologically reliable fashion," not that the expert's opinion or methodology is beyond reproach.[22] Therefore, the focus of admissibility under *Daubert* is the reliability of the experts' methods, not the correctness of their conclusions.[23] The trial court is not "empowered 'to determine which of several competing scientific theories has the best

---

[17] *In re Teltronics, Inc.,* 904 F.3d 1303, 1311 (11th Cir. 2018), quoting *United States v. Brown*, 415 F.3d 1257, 1265-66 (11th Cir. 2005).
[18] *Daubert*, 505 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").
[19] *Quiet Technology DC–8, Inc. v. HurelDubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003). *See also Ortiz v. Home Depot USA, Inc.*, 2013 WL 5774873, at *2 (S.D. Fla. Oct. 25, 2013) (J. Scola) (citation omitted).
[20] *Maiz v. Virani,* 253 F.3d 641, 666 (11th Cir. 2001), quoting *Allison*, 184 F.3d at 1311.
[21] *Daubert,* 505 U.S. at 595.
[22] *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998); *In re TMI Litig.*, 193 F.3d 613, 665 (3d Cir. 1999) (explaining that plaintiffs "do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable" (citation omitted)).
[23] *Daubert*, 509 U.S. at 585. *See also Allison,* 184 F.3d at 1312.

provenance.'"[24] As long as the expert's testimony falls within "the range where experts may reasonably differ," then it is up to the jury to decide among the competing views.[25]

The task of evaluating the admissibility of expert testimony is uniquely entrusted to the district court. *See McCovey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). Accordingly, district courts enjoy "considerable leeway" in the execution of their duty. *Kumho Tire,* 526 U.S. at 152. A district court's decision on the admissibility of expert testimony is reviewed under an abuse of discretion standard. *Id.*; *Rink*, 400 F.3d at 1291. However, the framework for this Court to fulfill its obligations under the *Daubert* standard, requires a three-part determination of whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his opinion is sufficiently reliable; and (3) the testimony is helpful to the trier of fact through the application of scientific, technical, or specialized expertise to understand the evidence. *See City of Tuscaloosa v. Harcros Chems., Inc.,* 158 F.3d 548, 562 (11th Cir.1998) (citing *Daubert,* 509 U.S. at 589). *See also United States v. Frazier,* 387 F.3d 1244, 1260 (11th Cir.2004) (describing the qualifications, reliability and helpfulness analysis).

The qualifications requirement for an expert are not excessively demanding. Courts focus on the expert's background observing their knowledge, skill, experience, training, or education. *Gomez*, 323 F.Supp.3d at 1377. But, as this Court has observed, "an expert is not necessarily unqualified simply because [his] experience does not precisely match the matter at hand. . . . [So long as the expert is minimally qualified, objections to the level of the expert's expertise go to credibility and weight, not admissibility." *Id.* (citations omitted).

As to reliability, expert opinions are evaluated against three factors: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Civ. P. 702 (b-d). *See also Mohamed v. American Motor Company, LLC*, 2017 WL 4310757, *2 (S.D. Fla. Sept. 28, 2017) (Cooke, J.). Courts evaluating complex scientific opinions may examine the following non-exhaustive list of considerations: "1) whether the expert's theory can be and has been tested; 2) whether the theory has been subjected to peer

---

[24] *Milward v. Acuity Specialty Prod. Group, Inc.*, 639 F.3d 11, 15 (1st Cir. 2011) (quoting *Ruiz-Troche,* 161 F.3d at 85).
[25] *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 153 (1999).

review and publication; 3) the known or potential rate of error of the particular scientific technique; and 4) whether the technique is generally accepted in the scientific community." *Frazier*, 387 F.3d at 1261–62. *See also Quiet Tech. DC–8*, 326 F.3d at 1341. Being a non-exhaustive list, courts are not required to apply each factor in every single case. However, "[the same criteria that are used to assess the reliability of a scientific opinion may be used to evaluate the reliability of non-scientific, experience-based testimony." *Frazier*, 387 F.3d at 1262 (citing *Kumho Tire Co*. 526 U.S. at 152). Because the list is non-exhaustive, this Court in the exercise of its discretion may "decide that nonscientific expert testimony is reliable based upon personal knowledge or experience" alone. *Mohamed*, 2017 WL 4310757 at \*2, citing *Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC*, 555 F.3d 1331, 1338 (11th Cir. 2009). "In the context of an expert witness testifying on the basis of specialized experience, a reliable methodology means that the witness must explain how[his] experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts [of the case]." *Id.*

Further, mere disagreement between experts about the reliability of one expert's opinion simply goes to weight, not admissibility. *See Tampa Bay Water v. HDR Engineering, Inc.*, 731 F.3d 1171, 1185 (11th Cir. 2013), *overruled on other grounds by CSX Transp., Inc. v. Gen. Mills, Inc.*, 846 F.3d 1333, 1340 (11th Cir. 2017) (noting preference that any disagreements amongst experts "be aired out in front of the jury and tested by the crucible of cross-examination"). *See also See Rosenfeld v. Oceania Cruises, Inc.,* 654 F.3d 1190, 1193 (11th Cir.2011) ("in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility.") (citations omitted)); *Quiet Technology DC–8,*, 326 F.3d at 1346, quoting *Bazemore v. Friday,* 478 U.S. 385, 400 (1986) (challenges to the inclusiveness of expert's analysis "will affect the analysis' probativeness, not its admissibility'").

Finally, the expert's opinion must be helpful. "This condition goes primarily to relevance." *Daubert,* 509 U.S. at 591. In other words, the opinion must relate to the matters at issue in the case. *See Quiet Technology*, 326 F.3d at 1347. To be helpful, the testimony of the expert must also "fit" the situation. *Id.,* citing *Daubert, 5*09 U.S. at 591. *See also Gomez*, 323 F.Supp.3d at 1378 ("To be appropriate, a "fit" must exist between the offered opinion and the facts of the case.").

8

## B. Mr. Greenblatt's Opinions Are Reliable And Based On A Reliable Methodology for a Non-Scientific Expert Opinion

Defendants argue that Mr. Greenblatt's opinions are not based on a reliable methodology and lack supporting facts. Defendants fail to consider the limited scope of Mr. Greenblatt's opinions as a non-scientific real estate expert. Mr. Greenblatt is not opining as to the exact amount of stigma. Mr. Greenblatt's scope of work was the disclosure requirements for real estate agents in the State of Florida and upon disclosure of CDW if there was a stigma and if it was permanent. To be clear, the exact amount of stigma is the subject of Plaintiffs' certified appraiser Anthony Graziano's testimony, not Mr. Greenblatt. The Court may, in the exercise of its discretion, "decide that nonscientific expert testimony is reliable based upon personal knowledge or experience" alone. *Mohamed*, 2017 WL 4310757 at *2, citing *Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC*, 555 F.3d 1331, 1338 (11th Cir. 2009).

Mr. Greenblatt's testimony regarding a real estate agent's obligation to disclose all facts that materially affect the value of a home is supported by Florida law (*Johnson* and *Bisque*) and requires no precise methodology to determine other than Mr. Greenblatt's many years of experience, knowledge of the real estate market and training as a licensed real estate agent and broker. At a minimum, because the Defendants' do not challenge the disclosure opinion (in fact, their expert confirms this fact), Mr. Greenblatt should be permitted to testify regarding the need to disclose CDW in a home, whether remediated or unremediated.

With regard to stigma/diminution in value, Mr. Greenblatt relies upon his experience as a real estate agent, including sales of multiple CDW homes in Florida, and the Florida real estate market, to testify regarding the resulting stigma/diminution in value he has observed over the years to homes caused by the presence (or former presence) of Chinese drywall and its disclosure. [26] "In the context of an expert witness testifying on the basis of specialized experience, a reliable methodology means that the witness must explain how[his] experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and

---

[26] Ex. D, Greenblatt Dep. (Vol. I) at 106:24-109:4, Ex. E, Greenblatt Dep. (Vol. II) at 332:7-25, 335:4-11; Ex. A, Greenblatt Report.

how that experience is reliably applied to the facts [of the case]."[27]  Mr. Greenblatt's background easily permits him to testify to his experiential knowledge.  This includes his experiences speaking to buyers and other real estate professionals throughout the course of his career and the development of an intimate knowledge of the Florida market.[28]  These experiences and observations qualify Mr. Greenblatt to opine regarding the presence of a stigma as the result of Chinese drywall, as well as to the reaction of buyers in the market.

### C. The Definition of Stigma Is a Legal Determination And Mr. Greenblatt's Description of the Same Does Not Preclude His Testimony

Mr. Greenblatt is not opining as to the precise amount of stigma/diminution value experienced by the Priority Claimants, merely that it exists due to the required disclosure, that it is permanent and that it is drastic.[29]  Defendants argue that Mr. Greenblatt's testimony should be excluded because the notion of stigma/diminution is "purely subjective or speculative." Defendants' argument proves too much. Whether stigma is "subjective" is at least in part based on public fear and that public fear is the proper subject of expert testimony in Florida courts. In *Florida Power & Light Co. v. Jennings*, the Florida Supreme Court recognized that "The public's 'fear' is a factor which may be relevant to the issue of just compensation may be utilized as a basis for an expert's valuation opinion regardless of whether such fear is objectively reasonable." 518 So. 2d 895 (Fla. 1987)(e.s.). In other words, the expert's opinion that there is a public fear is a reflection of the public's fear and the expert's testimony regarding the public's fear, objectively reasonable or not, goes to a jury. Moreover, Mr. Greenblatt's testimony is not "speculative." Rather, it is based on Mr. Greenblatt's significant experience in the real estate market, the sales and listings of CDW homes he participated in, his knowledge of Florida's real estate market and the required disclosure of CDW in Plaintiffs' homes in Florida. Accordingly, Defendants' Joint Motion to Exclude the Opinion and Preclude Testimony of Plaintiffs' Expert Ryan T. Greenblatt must be denied.

---

[27] *Mohamed*, 2017 WL 4310757 at *2, citing *Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC*, 555 F.3d 1331, 1338 (11th Cir. 2009).
[28] *Id.* at 146:9-15.
[29] Ex. A, Greenblatt Report at ¶ 34.

## IV.    CONCLUSION

Defendants do not challenge Mr. Greenblatt's opinion that the Priority Claimants must disclose the presence of CDW in their homes, whether remediated or unremediated. The only issue before the Court as to Mr. Greenblatt is whether as a result of the required disclosure he may testify that permanent stigma/diminution occurs. The *Bisque* opinion informs the Court that disclosure of material defects in a property may lead to permanent stigma/diminution in value that is the proper subject of expert testimony. Mr. Greenblatt is using his vast experience in the Florida real estate market, his actual sales, listing and experience selling Chinese drywall to reach the opinion that such disclosure creates permanent stigma/diminution in value. Further, the Florida Supreme Court has made very clear that stigma/diminution in value may be due to public fear, whether objectively reasonable or not. Thus, it is not speculative for Mr. Greenblatt to opine that stigma/diminution in value will occur at the time of the sale of a Priority Claimants' CDW home upon disclosure of the CDW.  As to the actual amount of stigma/diminution in value, that opinion is for Mr. Graziano, who, as the case law instructs has conducted a rigorous scientific analysis to arrive at his opinions.

For the foregoing reasons, Plaintiffs respectfully request that this Court DENY the Motion to Exclude Opinions of Ryan T. Greenblatt.

Dated: May 13, 2019.

/s/ Patrick S. Montoya, Esq.
Patrick Shanan Montoya
Fla. Bar No. 0524441
Email: Patrick@colson.com
Natalie M. Rico
Fla. Bar No. 0065046
Email: Natalie@colson.com
Colson Hicks Eidson
255 Alhambra Circle, PH
Coral Gables, FL  33134-2351
Telephone:  (305) 476-7400
Facsimile:  (305) 476-7444
*Lead Counsel for Plaintiffs*

<u>**CERTIFICATE OF SERVICE**</u>

     I hereby certify that a true and correct copy of this document was served via CM/ECF on May 13, 2019 on all counsel and/or parties of record.

<u>/s/ Patrick S. Montoya, Esq.</u>
Patrick Shanan Montoya
Fla. Bar No. 0524441
Email: Patrick@colson.com
Colson Hicks Eidson
255 Alhambra Circle, PH
Coral Gables, FL 33134-2351
Telephone: (305) 476-7400
Facsimile: (305) 476-7444
*Interim Lead Counsel for Plaintiffs*

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 11-22408-Civ-COOKE

EDUARDO AND CARMEN AMORIN, *et al.*,
individually and on behalf of others similarly
situated,

      Plaintiffs,

vs.

TAISHAN GYPSUM CO., LTD., f/k/a
SHANDONG TIASHE DONGXIN CO. LTD.,
*et al.*,

      Defendants.

_____

**EXPERT WITNESS REPORT OF:**
**RYAN GREENBLATT, PA**
February 15, 2019

*Eduardo and Carmen Amorin, et al. v. Taishan Gypsum Co. Ltd., et al. – Priority Claimant Trial*
Expert Witness Report of Ryan Greenblatt, February 15, 2019

**TABLE OF CONTENTS:**

I.   BACKGROUND ......................................................................................................... 1

II.  QUALIFICATIONS ................................................................................................... 1

III. SUMMARY OF EXPERT OPINIONS, WORK PERFORMED AND BASES FOR OPINIONS ................ 2

A.   SUMMARY OF CHINESE DRYWALL SALES ................................................................ 3

I.   SALE OF AFFECTED PROPERTY AT 17830 MONTE VISTA DR. ..................................... 3

II.  SALE OF AFFECTED PROPERTY AT 17894 MONTE VISTA DR. ..................................... 4

III. SALE OF AFFECTED PROPERTY AT 9407 BRIDGEBROOK DR. ..................................... 5


IV.  FEES ..................................................................................................................... 6


**ATTACHMENTS:**

Documents and Other Information Considered ......................................................... A

Curriculum Vitae of Ryan Greenblatt ..................................................................... B

Five Year Record of Testimony for Ryan Greenblatt ................................................ C


**EXHIBITS:**

SELLER'S PROPERTY DISCLOSURE – RESIDENTIAL ........................................................ 1

DEFECTIVE DRYWALL COMPREHENSIVE RIDER TO CONTRACT ..................................... 2

DEFECTIVE DRYWALL ADDENDUM TO CONTRACT FOR RESIDENTIAL SALE AND PURCHASE ......... 3

ROSEN HOME COMPOSITE EXHIBIT ............................................................................ 4

GRAJALES HOME COMPOSITE EXHIBIT ...................................................................... 5

NUCOMPASS HOME COMPOSITE EXHIBIT ................................................................... 6

*Eduardo and Carmen Amorin, et al. v. Taishan Gypsum Co. Ltd., et al. – Priority Claimant Trial*
Expert Witness Report of Ryan Greenblatt, February 15, 2019

## I.  BACKGROUND

1.  I, Ryan Greenblatt, was retained by Colson Hicks Eidson on behalf of the Plaintiffs' Steering Committee in MDL 2047 ("Counsel"), in January 2019 to provide expert witness services regarding Priority Claimants' damages in connection with this matter. Specifically, Counsel requested that I testify pertaining to my expertise regarding the South Florida market's response to defective Chinese drywall and the resulting stigma and diminution in value damages.

## II.  QUALIFICATIONS

2.  I am a professional real estate agent in the South Florida region with over seventeen years' experience.

3.  I have been a professional relator since 2001 specializing in Residential Real Estate in both Broward and Palm Beach County. I am also a licensed broker. I have sold hundreds of homes in the South Florida area.

4.  A copy of my curriculum vitae, which further describes my education, professional history, professional affiliations and range of experience, is contained in ATTACHMENT A. Details of the cases in which I have provided expert testimony in the past five years is contained in ATTACHMENT B.

*Eduardo and Carmen Amorin, et al. v. Taishan Gypsum Co. Ltd., et al. – Priority Claimant Trial*
Expert Witness Report of Ryan Greenblatt, February 15, 2019

### III.   SUMMARY OF EXPERT OPINIONS, WORK PERFORMED AND BASES FOR OPINIONS

5.   I have been selling Real Estate in the Boca Raton area for 17+ years. I have been focusing my marketing efforts in the Oaks[1] since 2004. I have sold countless homes in the Oaks, both new and resales, and continue to be a dominating Realtor in the Oaks.

6.   I am generally and specifically aware of factors that affect values of homes in the area, such as location, condition, including size, age, quality of construction, code compliance, updates, appliances, and structural and cosmetic elements of the home.

7.   Homes affected by certain issues can develop a stigma that negatively affect their market value.

8.   Factors that create a stigma that negatively affect the value of home include, but are not limited to: sinkholes, termites, flooding, environmental issues, etc.

9.   My understanding of Florida law is a seller is required to disclosure all material facts that affect the value of a property.

10.   The standard Seller's Property Disclosure – Residential, attached as *EXHIBIT 1*, contains language requiring a seller to identify environmental hazards, including defective drywall. The Seller's Property Disclosure – Residential, further contains language requiring a seller to disclose whether there has been any "damage, clean-up, or repair to the Property due to [defective drywall]."

11.   The FAR and CRSP standard Residential Contracts for Sale and Purchase both contain similar disclosure requirements in the form of a Defective Drywall Comprehensive Rider to

---

[1] Luxury community in Boca Raton containing Chinese drywall where three Priority Claimants' Affected Properties were located.

*Eduardo and Carmen Amorin, et al. v. Taishan Gypsum Co. Ltd., et al. – Priority Claimant Trial*
Expert Witness Report of Ryan Greenblatt, February 15, 2019

Contract and a Defective Drywall Addendum to Contract for Residential Sale and Purchase. *EXHIBITS 2 AND 3*, attached hereto.

12. In the State of Florida, when selling a home that has or had Chinese drywall, remediated or unremediated, disclosure to the buyer is required.

## A. SUMMARY OF CHINESE DRYWALL SALES

13. Through my work, I am familiar with defective Chinese drywall and am aware of its impact of the purchase price of a home. I have also sold several homes that contained Chinese drywall, both remediated and unremediated.

### I. SALE OF AFFECTED PROPERTY AT 17830 MONTE VISTA DR.

14. I sold the home located at 17830 Monte Vista Drive in Boca Raton[2] ("Rosen Home").

15. On September 14th 2009, I listed the Rosen Home for sale in Boca Raton with an asking price of $839,000. After approximately 3 weeks, during which time only 1 person was interested in seeing this home, we lowered the price to $799,000. The market at that time for this home would have been closer to $1,200,000 had it not been built with Chinese Drywall. (See attached CMA). At that time, the average selling price per sq/ft in the Oaks was $251.19. The Rosen home was 4,604 sq/ft which makes the value approximately $1,156,478, had it not had upgrades.. The subject home however was a corner home, it was on a lake and had an impressive cadre of upgrades, including Impact glass throughout the home, marble, wood floors, custom moldings and built ins throughout. Based on this level of finishings, it is my opinion that the value of this home was no less than $1,200,000 in 2009, had it not had Chinese Drywall.

---

[2] Kevin and Stacey Rosen's home.

*Eduardo and Carmen Amorin, et al. v. Taishan Gypsum Co. Ltd., et al. – Priority Claimant Trial*
Expert Witness Report of Ryan Greenblatt, February 15, 2019

16.  Approximately one month later, we lowered the asking price of the home to $599,000. The price change was necessary because knowledgeable purchasers were becoming aware of Chinese Drywall and were expressing concerns regarding unknowns pertaining to the Chinese Drywall and the necessity of remediating affected properties.

17.  In mid-October we received two verbal low ball offers ranging from 300-400k. We countered close to asking price but the buyers never came back.

18.  Finally, after a total of 43 showings, a buyer arrived and the home went under contract the first week of December 2009. The buyer originally offered in the mid 400's but we were able to negotiate to $501,000. The buyer would not pay a penny more and agreed to close before the end of the year.

19.  That buyer remediated the property, spending hundreds of thousands of dollars. The ultimate buyer sold the home in July of 2012 for $940,000.

20.  Based on my professional expertise and my vast experience selling homes in the Oaks community, the home was worth vastly more than the price at the time, but the stigmatism associated with a home that had Chinese drywall continued to affect the home's value.

21.  Attached is the listing report from the MLS of the Rosen's home along with the history of price changes and closing dates. *EXHIBIT 4.*


## II.  SALE OF AFFECTED PROPERTY AT 17894 MONTE VISTA DR.

22.  I sold the home located at 17894 Monte Vista Drive in Boca Raton ("Grajales Home").

23.  The Grajales home was a remediated home that formerly contained Chinese drywall.

24.  On March 27, 2013, I listed the Grajales Home for sale in Boca Raton with an asking price of $1,499,000.00.

*Eduardo and Carmen Amorin, et al. v. Taishan Gypsum Co. Ltd., et al. – Priority Claimant Trial*
Expert Witness Report of Ryan Greenblatt, February 15, 2019

25.   We attempted to sell the Grajales Home for approximately nine months, but were having difficulty finding buyers. Knowledgeable purchasers were becoming aware of Chinese Drywall and in general and buyers were very afraid of this new unknowns and what was required to remediate it. Many people who came in were concerned with whether the remediation had eradicated the problem.

26.   Finally, I sold the Grajales Home on December 19, 2013 for $1,185,000.00, which is substantially less than what a comparable home without Chinese drywall was selling for at the time.

27.   Attached is the listing report from the MLS of the Grajales' home along with the history of price changes and closing dates. *EXHIBIT 5.*

### III.   SALE OF AFFECTED PROPERTY AT 9407 BRIDGEBROOK DR.

28.   I sold the home located at 9407 Bridgebrook Drive in Boca Raton ("NuCompass Home").

29.   The Home was a remediated home that formerly contained Chinese drywall.

30.   On March 11, 2013, I listed the Home for sale in Boca Raton with an asking price of $1,349,000.00.

31.   I sold the NuCompass Home on July 9, 2013 for $1,200,000.00, which is less than what a comparable home without Chinese drywall was selling for at the time.

32.   Attached is the listing report from the MLS of the NuCompass's home along with the history of price changes and closing dates. *EXHIBIT 6.*

### A.   EXPERT OPINIONS

33.   I have reached the following opinions within a reasonable degree of probability as a Florida realtor:

*Eduardo and Carmen Amorin, et al. v. Taishan Gypsum Co. Ltd., et al. – Priority Claimant Trial*
Expert Witness Report of Ryan Greenblatt, February 15, 2019

    a. Chinese drywall has a stigma, whether remediated or unremediated, and drastically lowers the value of a home. *EXHIBITS 4, 5 AND 6.*

    b. The industry standard is that in selling a home that has or had Chinese drywall, remediated or unremediated, disclosure to the buyer is required. *EXHIBITS 1, 2 AND 3.*

    c. The presence of Chinese drywall in a home, damage to the home from Chinese drywall and remediation of Chinese drywall must be disclosed in Florida per Florida Seller's Real Property Disclosure Statement. *EXHIBITS 1.*

    d. The presence of Chinese drywall and the required disclosure by a seller creates a stigma that lowers the value of the home and some buyers will never buy the home, no matter the reduction in price. *EXHIBITS 4, 5 AND 6.*

    e. Because the Priority Claimants will be required in the future to disclose the past presence of Chinese drywall and its remediation, a stigma will attach to their properties that will lower the value of each home.

    f. Because of Florida's disclosure requirement, the stigma created by Chinese drywall is permanent.

34. I am not offering an opinion as to the precise amount of diminution in value for a home impacted by Chinese drywall.

35. In formulating my opinions to date, I have relied on my expertise, documents and other information provided by Counsel and the attached exhibits. A listing of the documents and information I considered is contained in *ATTACHMENT C* to this report.

## IV. FEES

36. My billing for this case was a retainer of $2,500.00 and a $175.00 hourly rate, thereafter.

*Eduardo and Carmen Amorin, et al. v. Taishan Gypsum Co. Ltd., et al.   Priority Claimant Trial*
Expert Witness Report of Ryan Greenblatt, February 15, 2019

Respectfully submitted,

Ryan Greenblatt, PA

February 15, 2019

# EXHIBIT B

# Comprehensive Rider to the
# Residential Contract For Sale And Purchase
THIS FORM HAS BEEN APPROVED BY THE FLORIDA REALTORS AND THE FLORIDA BAR


**LANG**REALTY

**If initialed by all parties**, the clauses below will be incorporated into the Florida Realtors®/Florida Bar Residential Contract
For Sale And Purchase between_____ (SELLER)
and_____ (BUYER)
concerning the Property described as_____

---

**Buyer's Initials**    _____  _____    **Seller's Initials**    _____  _____

---

## M. DEFECTIVE DRYWALL

During the time Florida was experiencing building material shortages, some homes were built or renovated using drywall imported from or manufactured in China or elsewhere which reportedly emit levels of sulfur, methane and/or other volatile organic compounds that cause corrosion of air conditioner and refrigerator coils, copper tubing, electrical wiring, computer wiring and other household items as well as create noxious odors which may also pose health risks ("Defective Drywall").

1. **Seller's Knowledge:** Except as indicated below, Seller has no actual knowledge of the presence of Defective Drywall or the existence of any information, records, reports, or other documents pertaining to Defective Drywall affecting the Property: (describe all known Defective Drywall information and list all available documents pertaining to Defective Drywall and provide documents, if any, to Buyer before accepting Buyer's offer) _____

_____

_____

2. **Defective Drywall Inspection: (Check One):**
   (a) ☐ Buyer waives the opportunity to conduct a risk assessment or inspection for the presence of Defective Drywall and accepts the Drywall in the Property in its existing condition.
   (b) ☐ Buyer, at Buyer's expense, may have a home inspector, licensed contractor or other licensed professional (if required by law) to conduct an inspection or risk assessment of the Property for the presence of Defective Drywall within _____ (if left blank, then 15) days from the Effective Date ("Drywall Inspection Period"). If the drywall inspection or risk assessment reveals the presence of Defective Drywall or reveals damage to the Property resulting from the Defective Drywall and the cost to remove/replace the Defective Drywall or damage resulting from the Defective Drywall exceeds $_____ (if left blank, $500.00), Buyer may cancel this Contract by giving written notice to Seller on or before expiration of the Drywall Inspection Period. If Buyer timely terminates this Contract, the Deposit shall be refunded to Buyer; thereby releasing Buyer and Seller of all further obligations under this Contract, except as provided in Paragraph 3 below. If Buyer fails to timely cancel or fails to conduct the inspections permitted in this Paragraph, Buyer may not terminate this Contract pursuant to this Addendum.
   **IF NEITHER BOX IS CHECKED, THEN OPTION (b) SHALL BE DEEMED SELECTED.**

3. **Repair of Inspection Damages to Property:** Buyer shall be responsible for prompt payment for such inspections and repair all damages to the Property resulting from the inspections.

4. **Professional Advice:** Buyer acknowledges that Broker has not conducted any independent investigations to verify the accuracy or completeness of any representations about Defective Drywall made by Broker or Seller. Buyer agrees to rely solely on Seller, professional inspectors, governmental agencies or any third parties retained by the Buyer regarding any issue related to Defective Drywall.

---

**Page 1 of 1   M. DEFECTIVE DRYWALL**
CR-5 Rev. 9/15 © 2015 Florida Realtors® and The Florida Bar. All rights reserved.

## Seller's Property Disclosure – Residential


**LANG**REALTY

**Notice to Licensee and seller:** Only the **Seller** should fill out this form.

**Notice to Seller:** Florida law[1] requires a **Seller** of a home to disclose to the **Buyer** all known facts that materially affect the value of the property being sold and that are not readily observable or known by the **Buyer**. This disclosure form is designed to help you comply with the law. However, this disclosure form may **not** address every significant issue that is unique to the Property. You should think about what you would want to know if you were buying the Property today; and if you need more space for additional information, comments, or explanations, check the Paragraph 12 checkbox and attach an addendum.

**Notice to Buyer:** The following representations are made by **Seller** and **not** by any real estate licensee. This disclosure is not a guaranty or warranty of any kind. It is not a substitute for any inspections, warranties, or professional advice you may wish to obtain. It is not a substitute for your own personal judgment and common sense. The following information is based only upon **Seller's** actual knowledge of the Property's condition. **Sellers** can disclose only what they actually know. **Seller** may not know about all material or significant items. You should have an independent, professional home inspection to verify the condition of the Property and determine the cost of repairs, if any. This disclosure is not a contract and is not intended to be a part of any contract for sale and purchase.

**Seller** makes the following disclosure regarding the property described as: _____
_____ (the "Property")

The Property is ☐ owner occupied ☐ tenant occupied ☐ unoccupied (If unoccupied, how long has it been since **Seller** occupied the Property? _____

| | Yes | No | Don't Know |
|---|---|---|---|
| **1. Structures; Systems; Appliances** | | | |
| (a) Are the structures including ceilings; walls; doors; windows; foundation; and pool, hot tub, and spa, if any, structurally sound and free of leaks? | ☐ | ☐ | ☐ |
| (b) Is seawall, if any, and dockage, if any, structurally sound? | ☐ | ☐ | ☐ |
| (c) Are existing major appliances and heating, cooling, mechanical, electrical, security, and sprinkler systems, in working condition, i.e., operating in the manner in which the item was designed to operate? | ☐ | ☐ | ☐ |
| (d) Does the Property have aluminum wiring other than the primary service line? | ☐ | ☐ | ☐ |
| (e) Are any of the appliances leased? If yes, which ones: _____ | ☐ | ☐ | ☐ |
| (f) If any answer to questions 1(a) - 1(c) is no, please explain: _____ | | | |

| | Yes | No | Don't Know |
|---|---|---|---|
| **2. Termites; Other Wood-Destroying Organisms; Pests** | | | |
| (a) Are termites; other wood-destroying organisms, including fungi; or pests present on the Property or has the Property had any structural damage by them? | ☐ | ☐ | ☐ |
| (b) Has the Property been treated for termites; other wood-destroying organisms, including fungi; or pests? | ☐ | ☐ | ☐ |
| (c) If any answer to questions 2(a) - 2(b) is yes, please explain: _____ | | | |

| | Yes | No | Don't Know |
|---|---|---|---|
| **3. Water Intrusion; Drainage; Flooding** | | | |
| (a) Has past or present water intrusion affected the Property? | ☐ | ☐ | ☐ |
| (b) Have past or present drainage or flooding problems affected the Property? | ☐ | ☐ | ☐ |
| (c) Is any of the Property located in a special flood hazard area? | ☐ | ☐ | ☐ |
| (d) Is any of the Property located seaward of the coastal construction control line? | ☐ | ☐ | ☐ |
| (e) Does your lender require flood insurance? | ☐ | ☐ | ☐ |
| (f) Do you have an elevation certificate? If yes, please attach a copy. | ☐ | ☐ | ☐ |
| (g) If any answer to questions 3(a) - 3(d) is yes, please explain: _____ | | | |

---

[1] *Johnson v. Davis,* 480 So.2d 625 (Fla. 1985).

**Seller** (_____) (_____) and **Buyer** (_____) (_____) acknowledge receipt of a copy of this page, which is Page 1 of 5.

SPDR-2   Rev 9/16

©2016 Florida Realtors®

|  | **Yes** | **No** | **Don't Know** |
|---|---|---|---|

**4. Plumbing**

(a) What is your drinking water source? ☐ public ☐ private ☐ well ☐ other

(b) Have you ever had a problem with the quality, supply, or flow of potable water?   ☐   ☐   ☐

(c) Do you have a water treatment system?   ☐   ☐   ☐
If yes, is it ☐ owned ☐ leased?

(d) Do you have a   ☐ sewer or   ☐ septic system? If septic system, describe the location of each system: _____

(e) Are any septic tanks, drain fields, or wells that are not currently being used located on the Property?   ☐   ☐   ☐

(f) Have there been any plumbing leaks since you have owned the Property?   ☐   ☐   ☐

(g) Are any polybutylene pipes on the Property?   ☐   ☐   ☐

(h) If any answer to questions 4(b), 4(c), and 4(e) - 4(g) is yes, please explain:

_____

**5. Roof and Roof-Related Items**

(a) To your knowledge, is the roof structurally sound and free of leaks?   ☐   ☐   ☐

(b) The age of the roof is _____ years OR date installed _____

(c) Has the roof ever leaked during your ownership?   ☐   ☐   ☐

(d) To your knowledge, has there been any repair, restoration, replacement (indicate full or partial) or other work undertaken on the roof?   ☐   ☐   ☐
If yes, please explain:_____

(e) Are you aware of any defects to the roof, fascia, soffits, flashings or any other component of the roof system?   ☐   ☐   ☐
If yes, please explain: _____

_____

**6. Pools; Hot Tubs; Spas**

**Note:** Florida law requires swimming pools, hot tubs, and spas that received a certificate of completion on or after October 1, 2000, to have at least one safety feature as specified by Section 515.27, Florida Statutes.

(a) If the Property has a swimming pool, hot tub, or spa that received a certificate of completion on or after October 1, 2000, indicate the existing safety feature(s): ☐ enclosure that meets the pool barrier requirements ☐ approved safety pool cover ☐ required door and window exit alarms ☐ required door locks ☐ none

(b) Has an in-ground pool on the Property been demolished and/or filled?   ☐   ☐   ☐

**7. Sinkholes**

**Note:** When an insurance claim for sinkhole damage has been made by the **Seller** and paid by the insurer, Section 627.7073(2)(c), Florida Statutes, requires the **Seller** to disclose to the **Buyer** that a claim was paid and whether or not the full amount paid was used to repair the sinkhole damage.

(a) Does past or present settling, soil movement, or sinkhole(s) affect the Property or adjacent properties?   ☐   ☐   ☐

(b) Has any insurance claim for sinkhole damage been made?   ☐   ☐   ☐
If yes, was the claim paid? ☐ yes ☐ no If the claim was paid, were all the proceeds used to repair the damage? ☐ yes ☐ no

(c) If any answer to questions 7(a) - 7(b) is yes, please explain:

_____

|  | **Yes** | **No** | **Don't Know** |
|---|---|---|---|

**8. Homeowners' Association Restrictions; Boundaries; Access Roads**
    **(a)** Is membership in a homeowner's association mandatory or do any covenants, conditions or restrictions (CCRs) affect the Property? (CCRs include deed restrictions, restrictive covenants and declaration of covenants.)  ☐  ☐  ☐
    **Notice to Buyer:** If yes, you should read the association's official records and/or the CCRs before making an offer to purchase. These documents contain information on significant matters, such as recurring dues or fees; special assessments; capital contributions, penalties; and architectural, building, landscaping, leasing, parking, pet, resale, vehicle and other types of restrictions.
    **(b)** Are there any proposed changes to any of the restrictions?  ☐  ☐  ☐
    **(c)** Are any driveways, walls, fences, or other features shared with adjoining landowners?  ☐  ☐  ☐
    **(d)** Are there any encroachments on the Property or any encroachments by the Property's improvements on other lands?  ☐  ☐  ☐
    **(e)** Are there boundary line disputes or easements affecting the Property?  ☐  ☐  ☐
    **(f)** Are you aware of any existing, pending or proposed legal or administrative action affecting homeowner's association common areas (such as clubhouse, pools, tennis courts or other areas)?  ☐  ☐  ☐
    **(g)** Have any subsurface rights, as defined by Section 689.29(3)(b), Florida Statutes, been severed from the Property?  ☐  ☐  ☐
    If yes, is there a right of entry? ☐ yes  ☐ no
    **(h)** Are access roads ☐ private ☐ public? If private, describe the terms and conditions of the maintenance agreement: _____

    _____

    **(i)** If any answer to questions 8(a) - 8(g) is yes, please explain: _____

    _____

**9. Environmental**
    **(a)** Was the Property built before 1978?  ☐  ☐  ☐
    If yes, please see Lead-Based Paint Disclosure.
    **(b)** Does anything exist on the Property that may be considered an environmental hazard, including but not limited to, lead-based paint; asbestos; mold; urea formaldehyde; radon gas; methamphetamine contamination; defective drywall; fuel, propane, or chemical storage tanks (active or abandoned); or contaminated soil or water?  ☐  ☐  ☐
    **(c)** Has there been any damage, clean up, or repair to the Property due to any of the substances or materials listed in subsection (b) above?  ☐  ☐  ☐
    **(d)** Are any mangroves, archeological sites, or other environmentally sensitive areas located on the Property?  ☐  ☐  ☐
    **(e)** If any answer to questions 9(b) - 9(d) is yes, please explain: _____

    _____

**10. Governmental, Claims and Litigation**
    **(a)** Are there any existing, pending or proposed legal or administrative claims affecting the Property?  ☐  ☐  ☐
    **(b)** Are you aware of any existing or proposed municipal or county special assessments affecting the Property?  ☐  ☐  ☐
    **(c)** Are you aware of the Property ever having been, or is it currently, subject to litigation or claim, including but not limited to, defective building products, construction defects and/or title problems?  ☐  ☐  ☐
    **(d)** Have you ever had any claims filed against your homeowner's Insurance policy?  ☐  ☐  ☐
    **(e)** Are there any zoning violations or nonconforming uses?  ☐  ☐  ☐

| | | | |
|---|---|---|---|
| (f) Are there any zoning restrictions affecting improvements or replacement of the Property? | ☐ | ☐ | ☐ |
| (g) Do any zoning, land use or administrative regulations conflict with the existing use of the Property? | ☐ | ☐ | ☐ |
| (h) Do any restrictions other than association or flood area requirements, affect improvements or replacement of the Property? | ☐ | ☐ | ☐ |
| (i) Are any improvements, located below the base flood elevation? | ☐ | ☐ | ☐ |
| (j) Have any improvements been constructed in violation of applicable local flood guidelines? | ☐ | ☐ | ☐ |
| (k) Have any improvements to the Property, whether by you or by others, been constructed in violation of building codes or without necessary permits? | ☐ | ☐ | ☐ |
| (l) Are there any active permits on the Property that have not been closed by a final inspection? | ☐ | ☐ | ☐ |
| (m) Is there any violation or non-compliance regarding any unrecorded liens; code enforcement violations; or governmental, building, environmental and safety codes, restrictions or requirements? | ☐ | ☐ | ☐ |

(n) If any answer to questions 10(a) - 10(m) is yes, please explain: _____
_____

**11. Foreign Investment in Real Property Tax Act ("FIRPTA")**

| | | | |
|---|---|---|---|
| (a) Is the **Seller** subject to FIRPTA withholding per Section 1445 of the Internal Revenue Code? | ☐ | ☐ | ☐ |

      **If yes, Buyer and Seller should seek legal and tax advice regarding compliance.**

**12. ☐ (If checked) Other Matters; Additional Comments** The attached addendum contains additional information, explanation, or comments.

**Seller** represents that the information provided on this form and any attachments is accurate and complete to the best of **Seller's** knowledge on the date signed by **Seller**. **Seller** authorizes listing broker to provide this disclosure statement to real estate licensees and prospective **buyers** of the Property. **Seller** understands and agrees that **Seller** will promptly notify **Buyer** in writing if any information set forth in this disclosure statement becomes inaccurate or incorrect.

Seller: _____ / _____ Date: _____
           (signature)                 (print)

Seller: _____ / _____ Date: _____
           (signature)                 (print)

**Buyer** acknowledges that **Buyer** has read, understands, and has received a copy of this disclosure statement.

Buyer: _____ / _____ Date: _____
           (signature)                 (print)

Buyer: _____ / _____ Date: _____
           (signature)                 (print)

**Seller's Update**

**Instructions to Seller:** If the information set forth in this disclosure statement becomes inaccurate or incorrect, you must promptly notify **Buyer**. Please review the questions and your answers. Use the space below to make corrections and provide additional information, if necessary. Then acknowledge that the information is accurate as of date signed below.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**Seller** represents that the information provided on this form and any attachments is accurate and complete to the best of **Seller's** knowledge on the date signed by **Seller**.

**Seller:** _____ / _____      Date: _____
                          (signature)                             (print)

**Seller:** _____ / _____      Date: _____
                          (signature)                             (print)

**Buyer** acknowledges that **Buyer** has read, understands, and has received a copy of this revised disclosure statement.

**Buyer:** _____ / _____      Date: _____
                          (signature)                             (print)

**Buyer:** _____ / _____      Date: _____
                          (signature)                             (print)

Seller (_____) (_____) and **Buyer** (_____) (_____) acknowledge receipt of a copy of this page, which is Page 5 of 5.
SPDR-2  Rev 9/16                                                    ©2016 Florida Realtors®

**Addendum to Contract for Residential Sale and Purchase**



LANGREALTY

1   If initialed by all parties, the terms below will be incorporated into the Contract for Residential Sale and Purchase

2*  between _____ ("Seller")

3*  and _____ ("Buyer")

4*  concerning the Property described as _____

5*  _____

6*  (_____) (_____) - (_____) (_____) **G. Defective Drywall:** During a time when Florida experienced building
7   material shortages, some homes were built or renovated using "Defective Drywall." Defective Drywall emits levels of
8   sulfur, methane, and/or other volatile organic compounds that cause corrosion of air conditioner and refrigerator coils,
9   copper tubing, electrical wiring, computer wiring, and other household items and creates noxious odors that may pose
10  health risks.

11  **1.  Defective Drywall Inspection: Buyer** may, at **Buyer's** expense, have a home inspector, licensed contractor, or
12      other licensed professional (if required by law) conduct an inspection of the Property for the presence of Defective
13*     Drywall within _____ days (10 days if left blank) after Effective Date ("Drywall Inspection Period"). **Buyer** will
14      repair all damage to the Property resulting from the inspection and restore the Property to its pre-inspection
15      condition; this obligation will survive termination of this Contract.

16  **2.  Cancellation:** If the inspection reveals the presence of Defective Drywall or reveals damage to the
17      Property resulting from Defective Drywall and the cost to remove/replace Defective Drywall or damage resulting
18*     from Defective Drywall exceeds $_____ ($500 if left blank), **Buyer** may cancel this Contract by
19      giving written notice to **Seller** within 3 days after expiration of the Drywall Inspection Period; and **Buyer's**
20      deposit(s) will be refunded. If **Buyer** fails to timely conduct the inspection or fails to timely deliver notice of
21      **Buyer's** cancellation, this contingency will be waived; and **Buyer** will continue with this Contract.

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 32 of 580
Case 1:11-cv-22408-MGC Document 260-3 Entered on FLSD Docket 05/13/2019 Page 1 of
121

# EXHIBIT C

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 33 of 580
Case 1:11-cv-22408-MGC Document 291 Entered on FLSD Docket 05/13/2019 Page 2 of 121
Confidential - Subject to Further Confidentiality Review

```
 1                  IN THE UNITED STATES DISTRICT COURT
                  FOR THE SOUTHERN DISTRICT OF FLORIDA
 2
       ----------------------------:
 3     EDUARDO AND CARMEN AMORIN,    :
       et al., individually, and on :
 4     behalf of all others         :
       similarly situated,          :
 5                                   :
            Plaintiffs,             :
 6                                   :
       v.                           : Case No. 1:11-CV-22408-MGC
 7                                   :
       TAISHAN GYPSUM CO., LTD,      :
 8     f/k/a SHANDONG TAIHE DONGXIN :
       CO., LTD.; TAIAN TAISHAN      :
 9     PLASTERBOARD CO., LTD.,       :
       et al.,                      :
10                                   :
            Defendants.            :
11                                   :
       ----------------------------:
12
13                        - - -
14            Wednesday, April 17, 2019
15                        - - -
16
                    ** CONFIDENTIAL **
17
          SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
18
                         - - -
19
            Videotaped deposition of DAVID J. COHEN, held
20      at Boca Raton Conference Center, 301 Northeast 51st
        Street, Suite 1240, Boca Raton, Florida 33431,
21      commencing at 1:10 p.m., on the above date, before
        Joan L. Pitt, Registered Merit Reporter, Certified
22      Realtime Reporter, Florida Professional Reporter
23                        - - -
24            GOLKOW LITIGATION SERVICES
            877.370.3377 ph | 917.591.5672 fax
25                   deps@golkow.com
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 34 of 580
Case 1:11-cv-22408-MGC Document 294 Entered on FLSD Docket 05/13/2019 Page 3 of 121
Confidential — Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2        COLSON HICKS EIDSON
          BY:  PATRICK S. MONTOYA, ESQUIRE
 3             NATALIE M. RICO, ESQUIRE
          255 Alhambra Circle, Penthouse
 4        Coral Gables, Florida 33134
          Phone:  (305) 476-7400
 5        patrick@colson.com
          natalie@colson.com
 6        Representing Plaintiffs
 7
          ABALLI MILNE KALIL
 8        BY:  JOSHUA D. POYER, ESQUIRE
               MICHEL AYUB, ESQUIRE
 9        1 Southeast 3rd Avenue, Suite 2250
          Miami, Florida 33131
10        Phone:  (305) 373-6600
          jpoyer@aballi.com
11        mayub@aballi.com
          Representing Defendant Beijing New Building
12        Materials PLC
13
          ALSTON & BIRD LLP
14        BY:  STEVEN R. CAMPBELL, ESQUIRE
          90 Park Avenue, 15th Floor
15        New York, New York 10016-1387
          Phone:  (212) 210-9400
16        steven.campbell@alston.com
          Representing Defendants Taishan Gypsum Co., Ltd,
17        and Taian Taishan Plasterboard Co., Ltd.
18
          ALSTON & BIRD LLP
19        BY:  SARAH O'DONOHUE, ESQUIRE
          1201 West Peachtree Street
20        Atlanta, Georgia 30309-3424
          Phone:  (404) 881-7000
21        sarah.odonohue@alston.com
          Representing Defendants Taishan Gypsum Co., Ltd,
22        and Taian Taishan Plasterboard Co., Ltd.
23
24    ALSO PRESENT:
25        Danielle DeSantis, Videographer
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 35 of 580
Case 1:01-cv-12257-PBS Document 220 gagest transcript-38 Docket 05/13/2019 Page 4 of
121

```
 1                        - - -

 2                     I N D E X

 3                        - - -

 4

 5  Testimony of:  DAVID J. COHEN                    Page

 6

 7    DIRECT EXAMINATION BY MS. RICO                    6

 8    CROSS-EXAMINATION BY MR. CAMPBELL              112

 9    REDIRECT-EXAMINATION BY MS. RICO              113

10

11                    E X H I B I T S

12               (Attached to transcript)

13  DAVID J. COHEN DEPOSITION EXHIBITS               PAGE

14  Exhibit 1   CV of David J. Cohen                  14

15  Exhibit 2   Report of David J. Cohen dated        20

16              3/21/2019

17  Exhibit 3   REOBroker.com Member Profile          29

18  Exhibit 4   Invoice No. 26506 dated 4/5/2019      42

19  Exhibit 5   Listing of Supplemental Production    64

20  Exhibit 6   Florida Claimants List               83

21  Exhibit 7   MLS Listing - 1690 Renaissance        85

22              Commons Boulevard, Boynton Beach, FL

23  Exhibit 8   MLS Reports and Tax Record - 9447     87

24              Satinleaf Place, Parkland, FL 33076

25
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 36 of 580
Case 1:16-cv-24483-MGC Document 240 Entered on FLSD Docket 03/30/2019 Page 5 of
121

Confidential – Subject to further confidentiality Review

| 1 | Exhibit 9 | MLS Reports - 8232 Emerald Avenue, | 89 |
| 2 | | Parkland, FL 33076 | |
| 3 | Exhibit 10 | Asset Manager Property Inspection | 97 |
| 4 | | Report - 422 Belle Grove Lane, West | |
| 5 | | Palm Beach, FL 33411 | |
| 6 | Exhibit 11 | Photographs - 422 Belle Grove Lane, | 97 |
| 7 | | Royal Palm Beach, FL 33411 | |
| 8 | Exhibit 12 | Settlement Statement - 8232 Emerald | 98 |
| 9 | | Avenue, Parkland, FL 33076 | |
| 10 | Exhibit 13 | Settlement Statement - 422 Belle | 100 |
| 11 | | Grove Lane, Royal Palm Beach, FL | |
| 12 | | 33411 | |
| 13 | Exhibit 14 | HUD-1 Settlement Statement - 9447 | 101 |
| 14 | | Satinleaf Place, Parkland, FL 33076 | |
| 15 | Exhibit 15 | HUD Property Inspection Report - 422 | 102 |
| 16 | | Belle Grove Lane, Royal Palm Beach, | |
| 17 | | FL 33411 | |
| 18 | Exhibit 16 | Property Appraiser Tax Report - 9447 | 103 |
| 19 | | Satinleaf Place, Parkland, FL | |
| 20 | Exhibit 17 | Closing Documents - 9447 Satinleaf | 103 |
| 21 | | Place, Parkland, FL 33076 | |
| 22 | Exhibit 18 | Blog Article entitled What Things | 110 |
| 23 | | Should You Disclose When Selling a | |
| 24 | | Home? | |
| 25 | | | |

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 37 of 580
Case 1:14-cv-24063-MGC Document 240 Entered on FLSD Docket 11/20/19 Page 6 of
121
Confidential — Subject to Further Confidentiality Review

```
 1                     -  -  -

 2          THE VIDEOGRAPHER:  We are now on the record.

 3     My name is Danielle DeSantis.  I'm a videographer

 4     for Golkow Litigation Services.  Today's date is

 5     April 17, 2019, and the time is 1:10 p.m.

 6          This video deposition is being held in Boca

 7     Raton, Florida, in the matter of Eduardo and Carmen

 8     Amorin, et al., vs. Taishan Gypsum Co. Ltd., et al.,

 9     for the United States District Court for the

10     Southern District of Florida.

11          The deponent is David Cohen.

12          Will counsel please identify themselves.

13          MS. RICO:  Natalie Rico and Patrick Montoya on

14     behalf of the plaintiffs.

15          MR. CAMPBELL:  Steven Campbell, from

16     Alston & Bird, on behalf of Defendant Taishan

17     Gypsum.

18          MS. O'DONOHUE:  Sarah O'Donohue, from

19     Alston & Bird, also on behalf of Taishan.

20          MR. POYER:  Joshua Poyer, of Aballi Milne

21     Kalil, on behalf of Beijing New Building Materials.

22          MR. AYUB:  Michel Ayub, of Aballi Milne Kalil,

23     on behalf of Beijing New Building Materials PLC.

24          THE VIDEOGRAPHER:  The court reporter is Joan

25     Pitt and will now swear in the witness.
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 38 of 580
Case 1:11-cv-22408-MGC Document 240 Entered on FLSD Docket 05/13/2019 Page 7 of 121
Confidential - Subject to Further Confidentiality Review

```
1           THE COURT REPORTER:  Raise your right hand,

2      please.  Do you swear or affirm the testimony you

3      give will be the truth, the whole truth, and nothing

4      but the truth?

5           THE WITNESS:  Yes.

6           THE COURT REPORTER:  Thank you.

7           DAVID J. COHEN, called as a witness by the

8   Plaintiffs, having been first duly sworn, testified as

9   follows:

10                    DIRECT EXAMINATION

11  BY MS. RICO:

12      Q.   Good afternoon, Mr. Cohen.

13      A.   Good afternoon.

14      Q.   As I said, I'm Natalie Rico.  We'll be asking

15  you a couple questions today.  We will try to keep it as

16  brief as humanly possible.

17      A.   Thank you.

18      Q.   But I make no promises.

19      A.   No problem.

20      Q.   Could you state your full name for the record,

21  please?

22      A.   David Cohen.

23      Q.   And what is your professional address?

24      A.   240 West Palmetto Park Road, Suite 300, Boca

25  Raton, Florida 33432.
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 39 of 580
Case 1:11-cv-22408-MGC Document 294 Entered on FLSD Docket 05/13/2013 Page 8 of 121
Confidential - Subject to Further Confidentiality Review

```
 1      Q.    And what company is located at that address?

 2      A.    GSIG LLC, and we also have a d/b/a GSIG Select.

 3   GSIG Select.

 4      Q.    Okay.  And so it's the same company, it's

 5   just --

 6      A.    Correct.

 7      Q.    Okay.  Thank you.  I was going to get into that

 8   later.

 9            Could you please walk us real quickly through

10   your educational background?

11      A.    I have an associate's degree in networking

12   technology and I have a real estate license and real

13   estate brokerage license.

14      Q.    And where is your associate's degree from?

15      A.    From Asheville-Buncombe Technical Community

16   College in North Carolina.

17      Q.    And what year did you receive that in?

18      A.    2003.

19      Q.    Okay.  And you mentioned you have your real

20   estate license?

21      A.    Correct.

22      Q.    In what year did you obtain your real estate

23   license?

24      A.    2006, I believe.

25      Q.    And that's in the state of Florida?
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 40 of 580
Case 1:14-cv-06849-WFK Document 280 Attachment F SEC Docket 05/13/2016 Page 9 of 121

Confidential - Subject to further confidentiality Review

```
 1      A.   Correct.

 2      Q.   And you also have your broker's license;

 3   correct?

 4      A.   Yes.

 5      Q.   In what year did you receive your broker's

 6   license?

 7      A.   If I remember correctly, 2007.

 8      Q.   And that's also in the state of Florida?

 9      A.   Correct.

10      Q.   Do you have a license to practice real estate

11   in any other state?

12      A.   No.

13      Q.   And I saw somewhere, please correct me if I'm

14   wrong, that you are a Certified Distressed Property

15   Expert; is that right?

16      A.   Yes.

17      Q.   And where did you obtain that certification?

18      A.   It was a -- at one of the REO conferences that

19   I attended.

20      Q.   What is an REO conference?

21      A.   It's a real estate-owned conference, so it's a

22   conference where real estate professionals who have some

23   interest in bank-owned properties and acquiring those

24   type of clients.

25      Q.   Okay.  And they were offering a Certified
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 41 of 580
Case 1:11-cv-04089-JG Document 293 Entered on FLSD Docket 03/14/2019 Page 9 of 121
Confidential -- Subject to Further Confidentiality Review

 1  Distressed Property Expert certification at one of those

 2  conferences; is that right?

 3      A.   Yeah, there was a lot of different

 4  certifications I attended at different conferences

 5  with -- that one could have been through NRBA [sic],

 6  which is the National Association of Real Estate

 7  Brokers, in Vegas.  It could have been.  I'm not

 8  100 percent sure.

 9      Q.   I believe it was from the Charfen Institute.

10  Does that sound right?

11      A.   Charfen?  Okay.

12      Q.   What is the Charfen Institute?

13      A.   If I remember correctly, it was a company that

14  provided certifications.  At that time I was just

15  getting certifications to deal with the industry as

16  it -- as it was heading to foreclosures.  There was a

17  lot of -- the housing crisis happened in 2007/2008 and

18  there was a lot of foreclosures, so I was just following

19  where the industry was going.  At that time, if you --

20  if you didn't pick up foreclosures, then you weren't

21  getting as much business.

22      Q.   Okay.  And that's the reason that you proceeded

23  with these various certifications?

24      A.   For credibility.

25      Q.   For credibility.  Okay.  What do you mean when

```
 1   you say "credibility"?

 2       A.   Well, when you have a certification, it helps

 3   you with your credibility.

 4       Q.   Okay.  Credibility with respect to work in

 5   that --

 6       A.   Potential clients.

 7       Q.   -- particular market area?

 8       A.   Correct.

 9       Q.   Okay.  And just going back quickly to the

10   Certified Distressed Property Expert, that

11   certification, what is your definition of a distressed

12   property?

13       A.   Just to clarify, it was a very small

14   certification.  It wasn't a big deal.  There was a lot

15   of different certifications that I got similar to those.

16       Q.   Okay.  Thank you for that.

17       A.   Okay.

18       Q.   Just quickly, what is your definition of a

19   distressed property?

20       A.   Distressed property?  It has to do with a

21   seller that needs to sell that -- somebody who's not

22   going to live in a property.  So banks sometimes will

23   sell properties because they need to get them off their

24   books and they're going to continue -- they're going to

25   eventually sell.  It's not like a traditional seller who
```

1    will take the property off the market if they don't get

2    the price they want.  The banks have to sell.

3       Q.   Okay.  So you mentioned that you've obtained a

4    number of other certifications.  What other

5    certifications did you obtain?

6       A.   I don't remember the names at this point.  It

7    was a lot of different companies offering

8    certifications.  Early in my -- my career around when I

9    decided to pursue some of these foreclosures, I just

10   pursued whatever certification I could in order to help

11   give me credibility with -- with the clients.

12      Q.   Okay.  So did you -- for the certification that

13   we were discussing, did you take any classes to obtain

14   that certification, if you remember?

15      A.   I know that I took classes for most of my

16   certifications.

17      Q.   Okay.  How long?

18      A.   Some of them were at the desk on the Internet,

19   and many of them were in class.  So it just -- that one

20   doesn't stand out specifically.  There was numerous

21   certifications I obtained, and not just for the

22   distressed property, but just general real estate

23   through the Realtor Association of Palm Beach County.

24   So I've had various different classes to further my

25   career.

```
 1        Q.   Okay.  How long do the classes typically last?

 2   Are they a day?  Are they a couple months?

 3        A.   It varies.  It varies from just online to

 4   multiday classes.  So I've done three-day classes in

 5   Vegas, I've done different classes in Dallas, classes

 6   here in Palm Beach County.

 7        Q.   Okay.  And do they require an exam at the

 8   termination of the class, or does it vary?

 9        A.   Most of them do have an exam.

10        Q.   Okay.  And the different companies that you

11   mention that offer these classes, are they accredited

12   colleges?

13        A.   It varies.  I don't know that any were

14   accredited colleges, but there are different companies

15   that offer the classes.  Some from the association.

16   Some are private companies.

17        Q.   Okay.  Are these certifications sanctioned by

18   the Florida Association of Realtors?

19             MR. CAMPBELL:  Object to the form.  Answer if

20        you --

21   BY MS. RICO:

22        Q.   To the extent you know, obviously.

23        A.   Some of them.

24        Q.   Okay.  Which ones, if you remember?

25        A.   I don't recall.
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 45 of 580
Case 1:11-cv-22408-MGC Document 203 entered on FLSD Docket 11/14/2019 Page 14 of
121
Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Okay.  Now, aside from your real estate and

 2   broker's licenses and the various certifications we've

 3   alluded to, do you have any other certifications or

 4   licenses?

 5        A.   None that come to mind.

 6        Q.   Okay.  Are you as a real estate agent and a

 7   broker required to take continuing education classes?

 8        A.   Yes.

 9        Q.   Tell me about those requirements.

10        A.   Every two years we're required to take a

11   14-hour continuing education class to maintain our

12   license.

13        Q.   And are you up-to-date with that?

14        A.   Yes.

15        Q.   Have you over the extent of your career ever

16   had a professional complaint filed against you?

17        A.   No.

18        Q.   Now, you mentioned, I believe, the Palm Beach

19   Association of Realtors earlier?

20        A.   Yes.

21        Q.   Is that the association that you are a direct

22   member of or --

23        A.   So I'm a member of the Realtors Association of

24   the Palm Beaches, that's my Realtor membership, and then

25   I have MLS memberships with Greater Fort Lauderdale,
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 46 of 580
Case 1:11-cv-04049-CT Document 203 entered on FLSD Docket 09/13/2019 Page 45 of 121
Confidential — Subject to Further Confidentiality Review

```
 1    South Broward, and Miami for MLS marketing data.

 2        Q.   I'm sorry.  You said Fort Lauderdale, South

 3    Broward, and Miami?

 4        A.   Yeah.  Greater Fort Lauderdale.  Realtor

 5    Association of the Palm Beaches and Greater Fort

 6    Lauderdale merged.

 7        Q.   I'd like to speak quickly about your employment

 8    history, and to ease that I'm going to give you a copy

 9    of your CV that we'll mark as Exhibit 1.

10        A.   Thank you.

11             (Cohen Exhibit No. 1 was marked for

12    identification.)

13    BY MS. RICO:

14        Q.   So you are -- so you are currently employed by

15    GSIG LLC; is that right?

16        A.   Correct.

17        Q.   And what is your position with that

18    organization?

19        A.   The owner.

20        Q.   And you founded -- this is a brokerage firm; is

21    that right?

22        A.   Correct.

23        Q.   And you founded that firm; is that right?

24        A.   Yes.

25        Q.   That was when?  In 2006?
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 47 of 580
Case 1:16-cv-40084-WGY Document 283 entered on FLSD Docket 08/13/2018 Page 6 of
121
Confidential - Subject to Further Confidentiality Review

 1     A.    2006 or maybe late 2005.  Somewhere around

 2  there.

 3     Q.    Okay.  And prior to that, you were at -- how do

 4  you say it?  LTEP?  LTEP?

 5     A.    No, that's just an entity that I own that I had

 6  a few small trial investments in.  There's really

 7  nothing to it.

 8     Q.    And would those be real estate investments?

 9     A.    Just failed investments pretty much, so...

10     Q.    Okay.  Were any of the investments that were

11  kind of under the purview of that company involving

12  Chinese drywall at all?

13     A.    No.

14     Q.    Okay.  And then, so prior to GSIG, you were at

15  RE/MAX; is that right?

16     A.    Correct.

17     Q.    Okay.  And you were a sales associate there for

18  about two years?

19     A.    Yeah, I don't recall when I started in 2006 and

20  when I finished in 2008, but roughly one and a half, two

21  years.

22     Q.    And I'm going to ask you about some other

23  corporations that I do not see on this CV, just for

24  clarity.

25           So you're the founding member of GSIG, and you

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 48 of 580 7 of
121
Confidential - Subject to further Confidentiality Review

1    said that its d/b/a is GSIG Select; is that right?

2        A.    Correct.

3        Q.    Okay.  And you're the CEO of that organization;

4    is that right?

5        A.    GSIG LLC and GSIG Select, correct.

6        Q.    Okay.  What is Foreclosure Rescue LLC?

7        A.    That's a failed entity that we never ended that

8    we had set up, and I think we changed the name to LTEP.

9    So that should be LTEP, if I remember correctly.

10       Q.    So those are the same company, just with a

11   changed name?

12       A.    Yeah.  We -- I had created a lot of entities

13   throughout the years and we had a lot of ideas and

14   spinoff ideas that just never took off.  So I keep

15   paying for the registrations thinking that one day maybe

16   I'll use the entity for something, and I already had a

17   bank account associated with it, and so I pay the fees

18   and it's there, but I don't really do anything with them

19   and...

20       Q.    Okay.  And when you said "we" set up

21   Foreclosure Rescue LLC, who is "we"?

22       A.    My bookkeeper helps me set up the entities.  I

23   mean, I'm not setting up entities now, but I have in the

24   past, and she helped me with it.

25       Q.    And what is her name?

```
1        A.   Sabrina Santucho.  And my brother and I had

2    different ideas for things, but...

3        Q.   What is your brother's name?

4        A.   Jared Cohen.

5        Q.   And what was -- what was the purpose of

6    Foreclosure Rescue LLC?  What was the idea?

7        A.   I think we wanted to start a preservation

8    company to do property preservations, and then as we

9    continued with our real estate business we realized it

10   was a conflict of interest so we didn't pursue that

11   business.

12       Q.   And I am not in your industry, so could you

13   tell me, when you say "property preservation," what does

14   that mean?

15       A.   Preservation is to preserve a property from

16   further deterioration.  So if you have a leaky roof or

17   if you have anything that would -- that left untreated

18   would continue to degradate the property, that needs to

19   be taken care of, and so that's what preservation is.

20            So if there's a hole in the roof and you have

21   water intrusion, that needs to be resolved, versus a

22   renovation, which is fixing something that doesn't --

23   that's not time-sensitive.  So preservation is dealing

24   with time-sensitive issues that need to be repaired.

25       Q.   Okay.  And you mentioned earlier that you
```

```
 1    thought that that concept was a conflict of interest

 2    with what you were doing.  How so?

 3        A.    Because if a client, a bank, asks me to do

 4    preservations on a property, I can't use my own company

 5    to do that, because then there would be -- that would be

 6    a conflict of interest if I were to use my own company.

 7    If I was the custodian of that asset managing that

 8    asset, I need to hire a third party company to do that

 9    work, not my own company.

10        Q.    I see.

11        A.    So we just put all our eggs in the asset

12    management basket.

13        Q.    And what do you mean by "asset management"?

14        A.    Managing the assets and disposing the assets

15    for our clients.  So selling the properties and focusing

16    on that instead of focusing on doing the preservation

17    work.  So we worked with other companies to do the

18    preservation work.

19        Q.    Okay.  And what about a company named -- I'm

20    probably going to butcher this -- Gruchini, Inc.?

21        A.    Oh, Gershuni is just another entity, and

22    basically what that is there for is I have licensed real

23    estate agents who are not members of the Realtor board,

24    and they don't want to pay board dues, so the way to

25    deal with that is we have another entity that does not
```

1    have -- it's not a member of the Realtor board.  And so

2    if we have real estate agents that are licensed agents

3    but not members of the Realtor Association, then they

4    join that company.

5         Because I do have people who have real estate

6    licenses that don't want to pay these dues because it's

7    not a full-time job for them, so they're -- they're

8    just -- they have their real estate license, maybe

9    they're a CPA or they have some other line of work and

10   they want to hang their license somewhere, they'll do it

11   with that entity of mine.

12       Q.   When you say they're not a member of the board,

13   do you mean the Palm Beach Realtors Association you

14   mentioned earlier?

15       A.   Yeah, that would be the primary one for our

16   area, but any -- they're not a member of any real estate

17   board and they don't want to pay the dues associated

18   with that.

19       Q.   And so what, effectively, does this company do

20   for them if they're not paying?

21       A.   It allows them to hold their license and

22   continue to practice real estate, because as a real

23   estate sales associate you have to have your license

24   with a real estate brokerage, and so it gives them a

25   brokerage to hang their license so they can still

Confidential -- Subject to Further Confidentiality Review

 1   practice.

 2           (Cohen Exhibit No. 2 was marked for

 3   identification.)

 4   BY MS. RICO:

 5       Q.   Okay.  I'm going to mark as Exhibit 2 your

 6   expert report in this case.

 7       A.   Thank you.

 8       Q.   You're welcome.  And if you would please turn

 9   to page 1, the first paragraph.

10       A.   Do you want me to read it?

11       Q.   Please.

12       A.   Okay.  "My name is David J. Cohen.  I'm a

13   Florida licensed real estate broker.  I have over a

14   decade of experience in the South Florida real

15   estate -- residential real estate market.  In 2006, I

16   founded GSIG LLC, a real estate brokerage firm based in

17   Boca Raton that focuses on representing buyers and

18   sellers of residential properties located in Palm Beach,

19   Broward, and Miami-Dade counties.  GSIG has sold over

20   4,000 homes in Florida, and I have been the agent of

21   record for over 2,500 sales.  I've represented a wide

22   range of clients - from individuals to corporations and

23   government entities including Fannie Mae, Freddie Mac,

24   Bank of America, Chase Bank, and all three HUD M&M

25   contractors servicing 2A (the southeast region of the

1   United States).  My professional biography is attached

2   as Exhibit 1."

3        Q.   Thank you.  So in that paragraph you mentioned

4   that you've represented a wide range of clients, from

5   individuals to corporations and government entities,

6   including Fannie Mae, Freddie Mac, Bank of America,

7   Chase Bank, and all three HUD M&M contracting

8   services -- servicing 2A, the southeast region of the

9   United States.

10            What kind of work have you done for Fannie Mae?

11       A.   I sold properties for Fannie Mae.  I helped

12  oversee renovations and repairs.  I helped manage

13  vendors.  I helped negotiate offers.  I helped market

14  the properties.  I helped negotiate offers.  I think I

15  mentioned that.  That pretty much sums it up.

16       Q.   And how many sales have you been the agent for

17  for Fannie Mae?  Guesstimate.

18       A.   Probably something in the vicinity of 600

19  homes.

20       Q.   Okay.  And these would -- these would qualify

21  as REO sales; is that right?

22       A.   Real estate-owned properties, correct.

23       Q.   Okay.  And just, I think you explained it

24  before, please explain again what that is.

25       A.   Real estate-owned properties?

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 54 of 580
Case 1:16-cv-06048-AMD Document 261-3 entered on USDocket 08/13/2015 Page 23 of
Confidential - Subject to Further Confidentiality Review
121

```
1        Q.    Yes.

2        A.    They're corporate-owned properties, so the

3   previous occupant is not -- no longer living in the

4   property.  So it's -- it's basically a foreclosure from

5   a mortgage, typically, and now the lender who lent out

6   money to the borrower now has a home that they -- that's

7   not their business and they need to dispose of that home

8   to make good for their investors.  So it's property

9   that's taken back on bad loans.

10       Q.    Okay.  And is this typically done after a

11  failed foreclosure auction?  Or how does --

12       A.    Typically in a foreclosure auction, if the debt

13  is greater than the value of the property, it will not

14  sell at auction, and so then the lender will end up with

15  the property.

16       Q.    Okay.

17       A.    And they're not in the business of holding on

18  to properties, so then one of the dispositions is hiring

19  an agent to dispose of the property or to sell it.

20       Q.    And then you would serve, as you mentioned

21  before, as the custodian of that property; is that

22  right?

23       A.    We were doing traditional real estate

24  activities, but then in addition we were visiting the

25  property, maintaining the property.  We were the eyes
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 55 of 580
Case 1:16-cv-14050-WGY Document 204-3 entered on FLSD Docket 08/13/2019 Page 24 of
121
Confidential - Subject to Further Confidentiality Review

```
 1    and ears for the bank, because they had never lived in

 2    the property, they weren't there.  So we did additional

 3    activities outside of the scope of a traditional real

 4    estate agent.

 5        Q.   And those would include overseeing renovations

 6    and repairs and things of that nature?

 7        A.   Correct.  Overseeing renovations, repairs,

 8    visiting the property on a regular basis.

 9        Q.   Okay.  You also mention in that first paragraph

10    Freddie Mac.  What kind of work have you done for

11    Freddie Mac?  Similar?

12        A.   Pretty much the exact same work.

13        Q.   And what -- how many sales or transactions do

14    you think that you performed for Freddie Mac?

15            MR. CAMPBELL:  Object to the form.  You can

16        answer.

17            THE WITNESS:  It's hard for me to say.  I would

18        have to pull a report, but it's in the three digits,

19        so...

20    BY MS. RICO:

21        Q.   So a guesstimate would be?  I'm not holding you

22    to it.

23        A.   400.  Guesstimate.  It could -- give or take

24    200, I don't know.

25        Q.   And, quickly, what -- what is Fannie Mae?
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 56 of 580
Case 1:16-cv-04048-WFK Document 293-3 entered on FLSD Docket 03/17/2015 Page 25 of
121
Confidential - Subject to Further Confidentiality Review

```
 1       A.    They're the -- it's a company that insures

 2  mortgages, so they buy mortgages on the secondary

 3  market, and it's a government-sponsored entity, so it's

 4  not -- technically, it's a private company, but they

 5  insure mortgages.

 6       Q.    And what about Freddie Mac?

 7       A.    Same thing.

 8       Q.    Now, you also said you served as an agent and

 9  conducted transactions for Bank of America; is that

10  right?

11       A.    Correct, through -- through their various

12  outsourcing companies.

13       Q.    And what --

14       A.    And I believe directly as well, so...

15             They act as a servicer for the original lender.

16  So lenders would be pension funds, and so then they

17  service those pension funds, and part of their servicing

18  agreement they're responsible for disposing or selling

19  REO properties from bad loans.

20       Q.    Okay.

21       A.    And so what they would do, they would hire

22  agents directly or an outsourcing company, who then

23  would hire us.

24       Q.    Okay.  And how many transactions did you work

25  on for Bank of America?
```

```
 1      A.   I don't recall.

 2      Q.   Guesstimate?  Best guess.

 3      A.   It would just be a pure guess.  It was probably

 4  not in the triple digits, but in the double digits.

 5      Q.   Okay.  I'm not going to hold you to it if you

 6  don't remember.

 7      A.   And can I clarify something?

 8      Q.   Yes.

 9      A.   So we've worked with over 130 different

10  outsourcing companies, so there's a lot of ones that are

11  not mentioned on there.  Wilshire Credit Corporation was

12  a big company that we worked for and we sold a lot of

13  properties for, and they were sold out to IBM, who --

14  you know, so there's a lot of companies that we worked

15  for that are not listed on that.

16      Q.   Okay.  What was that last one?  Wilshire?

17      A.   Wilshire Credit Corporation.

18      Q.   And these are also REOs, these sales?

19      A.   They're all similar companies.

20      Q.   Okay.  And continuing down the list, how about

21  Chase Bank?

22      A.   I couldn't tell you the numbers for Chase

23  either.

24      Q.   That's --

25      A.   Because I worked directly with Chase, but then
```

1    they had numerous outsourcing companies, so it's really

2    difficult.  When I work with my client, it's my client

3    and we don't always even know who the underlying

4    servicer is.

5        Q.   Not a problem.  I'm not asking you to guess if

6    you really -- I mean, if you have no memory at all, so

7    don't worry about that.

8            Then later you referred to HUD M&M contractors

9    servicing 2A, which you explain is the southeast region

10   of the United States.  What is HUD M&M contractors?

11   What is that referring to?

12       A.   It's FHA foreclosures.  So they're all the bad

13   loans.  The collateral for the loans that went bad for

14   FHA loans end up with HUD, and then HUD breaks up the

15   country into regions.  It's either four or five regions.

16   And 2A is Florida, Georgia, South Carolina, Louisiana.

17   It's the southeast region of the United States.

18           And they had 12 M&M contractors throughout the

19   country, and three of them handled 2A.  So we were

20   fortunate enough, after making application and with our

21   resume, to be able to work with all three M&M

22   contractors.

23       Q.   And how many transactions, if you remember, did

24   you have with them?

25           MR. CAMPBELL:  Objection to form.

```
1              THE WITNESS:  I don't recall, but it was

2       definitely in the triple digits, so I don't --

3       somewhere around Freddie Mac's volume.  I think

4       Fannie Mae was probably our largest client and then

5       HUD was maybe our second largest client.

6   BY MS. RICO:

7       Q.   Okay.  So of the 2,500 sales you reference in

8   the first paragraph where you've been the agent, roughly

9   how many were REO sales for these types of companies?

10             MR. CAMPBELL:  Objection to form.  Just "over

11      200" -- "2,500" is what it says.  I just want to

12      make sure that we're clear on the number.

13             MS. RICO:  Over 2,500.  Well, actually, no.

14             Yes, you're right.  I'm sorry.

15  BY MS. RICO:

16      Q.   Go ahead.

17      A.   Could you state the question again?

18             MR. CAMPBELL:  Do you know the question?  I'm

19      sorry.  Do you know the question?  You can have her

20      read it back or you can ask it.

21             MS. RICO:  No, that's fine, she can read it

22      back.

23             (The question was read by the reporter.)

24  BY MS. RICO:

25      Q.   And just to clarify, of the over 2,500 sales
```

```
 1   where you've been the agent.

 2      A.   How many were REO?

 3      Q.   How many were REO?

 4      A.   I couldn't attribute a specific number to that.

 5      Q.   But would you say that those types of sales are

 6   your company's specialty?

 7      A.   For a time earlier in the career.  Maybe around

 8   2013, for a time we had, but we had a lot of agents.  I

 9   had 60 agents.  We've had hundreds of agents work for

10   us.  I had a sales manager.  We did trainings.  And our

11   agents worked with buyers and we represented buyers.

12   Traditional real estate.  And we also represented

13   traditional sellers.

14      Q.   But what would be --

15      A.   We did have -- we did have a niche and we were

16   good at REO, but we also did traditional, and it helped

17   us with our traditional.

18      Q.   And how did it help you with your traditional

19   sales?

20      A.   Just being involved in many transactions and

21   seeing all the different things that can go wrong and

22   that can go right and just understanding the real estate

23   process.

24      Q.   And what would you say is your company's mix

25   percentage-wise between this type of work and
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 61 of 580
Case 1:16-cv-04056-WFG Document 245 entered on FLSD Docket 11/14/19 Page 30 of 121
Confidential - Subject to Further Confidentiality Review

```
 1   traditional sales?
 2           MR. CAMPBELL:  Objection.  You're talking about
 3       the during the life of the company or during a
 4       specific time period?
 5   BY MS. RICO:
 6       Q.    The life of the company.
 7       A.    So I would say about 50/50, because we're very
 8   focused on traditional real estate now.  It was just a
 9   sign of the times.  It's not something I wanted to do,
10   but it was where the market was at the time, and the
11   market's not at that point right now.
12       Q.    Okay.  And you were saying that your focus
13   right now is -- is more traditional real estate.  Since
14   when?
15       A.    Since -- I would say it's been since, probably,
16   2014.  It's always been something we've tried to pivot
17   towards, because we always knew that markets are
18   cyclical, they're changing, and so we adjust with the
19   times.  So it's been something that we've -- lead
20   generation, advertising, sales training too.
21           (Cohen Exhibit No. 3 was marked for
22       identification.)
23   BY MS. RICO:
24       Q.    Okay.  I am going to show you what we will mark
25   as Exhibit 3.
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 62 of 580
Case 1:16-cv-14003-WGY Document 203 entered on FLSD Docket 06/13/2019 Page 31 of
121
Confidential -- Subject to Further Confidentiality Review

```
 1               This appears to be, and please correct me if
 2    I'm wrong, a member profile on a website REOBroker.com;
 3    is that right?
 4       A.    That's correct.
 5       Q.    Are you familiar with this website?
 6       A.    I am.
 7       Q.    What is this website?
 8       A.    REOBroker.com is a -- it is a company that is
 9    owned by a Realtor.  I believe, if this is the company
10    that I remember, it's a Realtor in Huntington Beach,
11    California, who does REOs.  And my brother signed us up
12    for this a few years ago just to put our name out there,
13    but, yeah.
14       Q.    And does -- does this website require a
15    membership of any kind?
16       A.    Yes, it does.
17       Q.    And are the members -- do the members control
18    their profiles?
19       A.    The members are supposed to be able to control
20    their profiles.  I wasn't able to control this profile,
21    because my brother's no longer working for my company
22    and he was the one who signed us up.  So I actually did
23    get a call recently from the owner following up with me,
24    and I told him to please cancel, so...
25       Q.    Okay.  Would your brother have checked with you
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 63 of 580
Case 1:14-cv-09148 Document 295-3 entered on FLSD Docket 11/18/2019 Page 32 of
121

Confidential - Subject to Further Confidentiality Review

```
 1   before putting certain information --

 2       A.   Yeah, he checked with me.

 3       Q.   Okay.

 4            MR. CAMPBELL:  Let her finish the question.

 5            THE WITNESS:  Sorry.  I didn't mean to jump.

 6   BY MS. RICO:

 7       Q.   I'm sorry.  Before --

 8       A.   I apologize.

 9       Q.   No, no, that's fine.

10            Before putting certain information on a profile

11   for your company?

12       A.   My guess is he probably copied something, some

13   old sales copy that we had.

14       Q.   Okay.  Let's look at the second page briefly.

15   There's a section here that says "more information."

16            The section states:  "The GSIG team has proven

17   to be a top performer in managing and selling

18   residential REOs in southern Florida.  Our office was

19   opened in 2006 and designed specifically for listing

20   bank and investor-owned homes.  Since that time we have

21   sold over 2,500 properties."

22            Did I read that correctly?

23            MR. CAMPBELL:  Objection to form.

24            MR. POYER:  Object to the form.

25            THE WITNESS:  Yes.
```

```
1    BY MS. RICO:

2         Q.   And is that an accurate statement?

3         A.   Can you repeat the statement specifically?

4         Q.   It says here that GSIG was opened and designed

5    specifically for listing bank and investor-owned sales;

6    is that right?

7         A.   That's what it says on here.

8         Q.   Is that an accurate statement?

9         A.   We -- when we're marketing to corporate

10   clients, that's what we're mentioning, but that's why I

11   created the separate entity called GSIG Select that

12   focuses on individuals.  And we started doing that in

13   2014.  We started to change some of that focus to have a

14   separate entity.

15            So I made my brother the broker of GSIG Select

16   while I stayed the broker of GSIG REO, is what we called

17   it.  And so my sales manager -- and we actually had two

18   signs on our doors, and my sales manager, we were doing

19   CRMs and training and hiring agents and training them

20   how to do lead generation through GSIG Select while GSIG

21   REO stayed an REO company.

22        Q.   Okay.  My -- my understanding from earlier was

23   that the two GSIG companies, one was the d/b/a of

24   another.  Is there a third company?

25        A.   There is -- I created an entity, and then my
```

```
 1   bookkeeper said, you know, it's easier to just keep it
 2   as a d/b/a.  So the entity, I don't know if it still
 3   exists, but we operate GSIG Select as a d/b/a under GSIG
 4   LLC just for accounting purposes.
 5       Q.   Okay.  Thank you for clarifying.
 6            Okay.  The paragraph we were looking at
 7   continues, and it says:  "With our carefully developed
 8   system and the combined years of experience among our
 9   team, we are able to manage and sell your property in
10   any situation while exceeding expectations."
11            Did I read that right?
12       A.   Yes.
13       Q.   What do you mean by "our carefully developed
14   system"?
15       A.   We developed systems to automate processes and
16   just be very efficient in -- in what we did.  So I had
17   developed position agreements.  I had staff that was
18   hired for specific positions that did specific tasks so
19   that we were -- so we ran smooth and we had a good
20   operation, we provided good service.
21       Q.   Then it goes on to say:  "We believe a great
22   deal of our success comes from our sales tactic.  When
23   we prepare and list your asset, we make it a goal that a
24   potential buyer is unable to differentiate our
25   bank-owned listings to a privately owned home."
```

```
 1              Did I read that correctly?

 2      A.   Yes.

 3      Q.   Why is that important?

 4           MR. CAMPBELL:  Objection to form.

 5           MR. POYER:  Join.

 6   BY MS. RICO:

 7      Q.   I'm sorry.  The statement where you say you're

 8   able to -- you make it so "a potential buyer is unable

 9   to differentiate our bank-owned listings to a privately

10   owned home," what is the importance of your being able

11   to do that?

12           MR. CAMPBELL:  Same objection.

13           MR. POYER:  Objection.  Same objection.

14           MS. RICO:  What's the basis for the objection?

15           MR. CAMPBELL:  The assumption, the fact that

16       it's an important distinction.

17   BY MS. RICO:

18      Q.   Is there -- is that distinction important, that

19   you are able to make it so that a potential buyer can't

20   differentiate a bank-owned listing from a privately

21   owned home?

22      A.   For a time in the early REO market a lot of

23   homes were -- bank-owned homes -- were poorly managed,

24   so they would have no electricity on and they were in,

25   typically, generally speaking, in not as good condition
```

1    as a privately owned home, though there are many, many

2    exceptions.  So with the help of our clients, the goal

3    was to make sure that the homes had electricity, running

4    water, were clean.  And over time the industry became

5    better about doing that.

6        Q.   Okay.  I'm going to move on from this document

7    and just ask you quickly, have you ever served as an

8    expert witness before?

9        A.   No, never.

10       Q.   This is your first time?

11       A.   It is my first time.

12       Q.   When were you retained in this case?

13       A.   I believe in February, if I remember correctly,

14   but I'll be honest, I don't recall the exact date.

15   Perhaps March.

16       Q.   Do you have an executed retainer agreement for

17   your work in this case?

18       A.   It's not executed.  My -- from my

19   understanding, there's just some translation issues, but

20   it will -- but I have been paid 60 percent of one of my

21   invoices, so...

22       Q.   And, I'm sorry, what do you mean by

23   "translation issues"?

24       A.   The defendant is a Chinese company, so they

25   have to translate the documents, so...

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 68 of 580
Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 37 of 121
Confidential – Subject to Further Confidentiality Review

1    Q.   Okay.  And so there's not currently an executed

2    agreement; is that right?

3    A.   That's correct, but I have been paid 60 percent

4    of one of my invoices, so...

5    Q.   Okay.

6         MS. RICO:  Whenever the translation issues are

7         sorted, we'd ask -- we haven't seen a retainer

8         agreement, so to the extent that there is one, we'd

9         like a copy.

10   BY MS. RICO:

11   Q.   Do you know if you were retained prior to

12   February 8?  Do you have any recollection?

13   A.   I don't believe that I was.

14   Q.   Okay.  And by whom were you retained?

15   A.   By the defendants.

16   Q.   Is it your understanding that there are

17   multiple defendants in this case?

18   A.   Taishan and BNBM, as far as I understand.

19   Q.   And were you retained by both?

20   A.   Yes.

21   Q.   Who contacted you initially?

22   A.   Sarah contacted me initially.

23   Q.   And do you know, roughly, when this was?

24   A.   If -- if I remember, I think it was Sarah.  It

25   could have been Caroline.  I'm not 100 percent sure, but

```
 1    Alston & Bird.

 2        Q.   Okay.  And was it a phone call?  Was it an

 3    e-mail?

 4        A.   It was a phone call asking me my opinion of

 5    remediated Chinese drywall homes, and I gave my opinion

 6    unknowing anything about the case.

 7        Q.   Okay.  And this was a call that you had with --

 8    you're certain this is a call you had with Alston &

 9    Bird?

10        A.   I'm not 100 percent certain, but I would say 90

11    percent sure.

12        Q.   Do you recall that you received a phone call

13    serving real estate agents regarding Chinese drywall

14    back in February?

15            MR. POYER:  Object to the form.

16            MR. CAMPBELL:  Join.

17            THE WITNESS:  I was contacted by Graziano's

18        office asking me if I had been -- what my opinion

19        was on Chinese drywall homes, remediated Chinese

20        drywall homes.

21    BY MS. RICO:

22        Q.   And to the best of your recollection, was that

23    prior to or after your conversation with Sarah?

24        A.   Prior to.

25        Q.   Prior to.  So at the time you received the call
```

 1    from Graziano's office, you had not been retained in

 2    this case?

 3        A.    Correct.

 4        Q.    Okay.  And can you walk me through what you

 5    remember about your initial conversation with Sarah?

 6        A.    I don't recall the specifics of the

 7    conversation.

 8        Q.    But she did ask you about your opinion

 9    regarding --

10        A.    From what I recall, she asked my opinion, I

11    gave my opinion, and then I was sometime, either on that

12    conversation or a subsequent conversation, made aware of

13    the case and asked to be retained for services, or asked

14    what my -- yeah.

15        Q.    And what did you tell Sarah your opinion was at

16    that time?

17        A.    I told her my opinion was that there is no

18    reduction in value due to remediated Chinese drywall

19    homes.

20        Q.    And it's your opinion that there is never a

21    reduction in value of -- of a remediated Chinese drywall

22    home?

23        A.    I think that it's specific to the buyers and

24    the sellers.  So there are some buyers that would

25    potentially -- there's some buyers that would want to

```
 1    pay less for a Chinese drywall remediated home, but

 2    there's also buyers that would pay more for a remediated

 3    home because it has new interiors versus aged interiors

 4    of other houses in the community.

 5        Q.   So the fact that there is an updated effective

 6    date of the interior of a home may raise the price?

 7        A.   Correct, depending on the buyer.

 8        Q.   And that would also be true of a home that

 9    didn't previously contain Chinese drywall that was

10    renovated; correct?

11        A.   Correct.

12        Q.   Who else did you speak to regarding your

13    initial retention in this case?

14            MR. CAMPBELL:  Object to form.

15            THE WITNESS:  I spoke to Steven and some of the

16        other attorneys in the case.

17    BY MS. RICO:

18        Q.   And what did you speak to them about?

19        A.   I don't recall the specifics of the

20    conversation.

21            MR. CAMPBELL:  Just a reminder, David, that

22        anything that we discussed with you in terms of

23        facts or that you relied on for your report is --

24        you have to talk about that, but anything else about

25        case strategy, to the extent that we did, is
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 72 of 580
Case 1:16-cv-40158-GF Document 24-3 entered on FLSD Docket 03/13/2017 Page 41 of
121

Confidential - Subject to Further Confidentiality Review

```
 1       privileged --

 2            THE WITNESS:  Okay.

 3            MR. CAMPBELL:  -- and would like for you to

 4       keep that privileged.

 5            THE WITNESS:  Yeah, it was just them asking me

 6       my opinion of remediated homes and my experience in

 7       the industry and would I be willing to be deposed

 8       and be an expert witness.

 9  BY MS. RICO:

10       Q.   And you obviously said yes?

11       A.   Yeah, I obviously said yes.

12       Q.   And regarding your billing in this case, you

13  are charging $600 per hour?

14       A.   Correct.

15       Q.   Have you ever charged $600 per hour for work

16  before?

17       A.   I don't charge on an hourly rate.  I work off

18  commission, so...

19       Q.   So you've never previously been paid $600 an

20  hour for any type of work?

21       A.   No, but I -- you know, I sell real estate and I

22  make large commissions on my sales or small commissions

23  and lots of commissions, so...

24       Q.   What's the last job you had where you were paid

25  by the hour?
```

```
1       A.    Probably a skin care company many years ago.

2       Q.    A skin care company?

3       A.    My uncle owns a skin care company.

4       Q.    Okay.  Do you remember what your hourly rate

5   was?

6       A.    Yeah, I do.  It was a lot less than I was

7   making in real estate, that's for sure.

8       Q.    I'm sure.  What was it, if you don't mind my

9   asking?

10      A.    I don't recall exactly, but it was a lot less

11  than I was making in real estate.

12      Q.    A lot less than $600 an hour?

13      A.    Yeah.  The reason why I charged -- I actually

14  asked for more, and it's because this is not the kind of

15  work that I like to do.  I like to work with clients.  I

16  like to work with my buyers and my sellers.  I like to

17  show property.  I just put a $2.5 million property under

18  contract in Boca Bridges.

19            And it's my time.  My name is valuable.  I

20  don't get enough time with my family, and if I'm going

21  to do something I don't like to do, it's not really my

22  line of work, then, you know, that's what I'm going to

23  charge for it.  So, otherwise, I'll just -- and it's

24  also time away from my business.  So my customers, if I

25  work with them, eventually I'll close a property with
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 74 of 580
Case 1:16-cv-04043-LGS-GWG Document 643-5 entered on FLSD Docket 14/19/2019 Page 43 of
Confidential — Subject to Further Confidentiality Review
121

```
 1    them, and when I'm not available it's possible that

 2    they'll go work with another agent because I don't pick

 3    up the phone or I'm not attending to their needs.  And

 4    this has been very time-consuming, so...

 5        Q.   What are we up to?  I'm going to mark -- 4.

 6             (Cohen Exhibit No. 4 was marked for

 7    identification.)

 8    BY MS. RICO:

 9        Q.   Is this your invoice for the work you've done

10    in this case so far?

11        A.   Yes.

12        Q.   Is this your only invoice so far, or are there

13    others?

14        A.   There will be another invoice.  One more

15    invoice.

16        Q.   I would assume that that would include today?

17        A.   Yeah.  Correct.

18        Q.   And so this invoice is dated April 5, 2019; is

19    that right?

20        A.   That's correct.

21        Q.   And it includes -- if we look on the second

22    page, it includes your time from March 12, 2019, through

23    March 21, 2019; is that right?

24        A.   Correct.

25        Q.   Does looking at this invoice refresh your
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 75 of 580
Case 1:16-cv-04008-WFK Document 205 entered on FLSD Docket 08/13/2019 Page 44 of
121
Confidential - Subject to Further Confidentiality Review

 1   memory in terms of when you were retained in this case?

 2        A.   It's possible I was retained in March.  Yeah.

 3   Probably in March.

 4        Q.   Seems likely.

 5        A.   Yeah.

 6        Q.   You started working on the case, or at least

 7   you started billing on the case March 12 --

 8        A.   Yeah.

 9        Q.   -- 2019; right?

10        A.   Yeah, I don't think I billed for our initial

11   conversation, so...

12        Q.   Do you recall if your initial conversation was

13   well before the 12th or right around the 12th?

14        A.   I don't.  I definitely have it somewhere, so...

15        Q.   And so, as we said, this bill is through

16   March 21, 2019.

17             MR. CAMPBELL:  Objection.  Form.

18   BY MS. RICO:

19        Q.   March 21, 2019, is the date of your expert

20   report; is that right?

21        A.   The date -- well, I worked on the report

22   throughout.  I worked on the report on the 19th.

23        Q.   Do we have it handy?

24             MR. CAMPBELL:  Listen to her question.

25             ///

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 76 of 580
Case 1:11-cv-01408-MGC Document 203 entered on FLSD Docket 08/13/2015 Page 45 of
121
Confidential - Subject to Further Confidentiality Review

```
 1    BY MS. RICO:

 2         Q.   I'm sorry.

 3         A.   Sorry.

 4         Q.   It sounded more complicated than I intended it

 5    to.  Your expert report has a date on it.  It is dated

 6    March 21; is that right?

 7         A.   Oh, got it.

 8         Q.   You can look at it, of course.

 9              MR. CAMPBELL:  That's Exhibit 2, David, yeah.

10              THE WITNESS:  Yeah.  Yeah, that's correct.

11    BY MS. RICO:

12         Q.   Okay.  And so this is the work through the date

13    that your report was submitted; correct?

14              MR. CAMPBELL:  Objection.  Form.

15              THE WITNESS:  Correct.

16    BY MS. RICO:

17         Q.   And the invoice reflects a total of 39.87

18    hours; is that right?

19         A.   Yes.

20         Q.   At a rate of $600 per hour; that's right?

21         A.   That's correct.

22         Q.   Totaling $23,922; correct?

23         A.   That's correct.

24         Q.   I just want to walk you through the different

25    tasks that you've identified on this invoice and have
```

1    you explain to me what they are.

2              So we'll start with the first one, 3/12/2019.

3    Could you explain to me what this first task was?

4        A.   It was cross-referencing my homes that -- that

5    I had sold during the time frames that Chinese drywall

6    was an issue with homes of -- in the case.

7        Q.   And when you say "homes in the case," which

8    homes do you mean?

9        A.   I sent them over -- so I sent my homes over to

10   Sarah so that she could cross-reference them to see if

11   there was any homes that I had sold that had been

12   previously remediated.

13       Q.   And were there any?

14       A.   There were some homes that I had that had

15   active Chinese drywall, but none that were remediated.

16       Q.   And just to be clear, you said, "There were

17   some homes that I had that had active Chinese drywall,

18   but none that were remediated."

19              The homes that you had that had active Chinese

20   drywall, is that in reference to homes that you sold?

21       A.   There was a home in Parkland that we had that

22   had Chinese drywall.  We received multiple offers for

23   it.  It went under contract, I believe 70 to 90 days

24   after we put it on the market.  And if I remember

25   correctly, there was some title issues.  It sat off the

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 78 of 580
Case 2:14-cv-04048-EEF-MBN Document 203-1 entered on FLSD Docket 04/13/2015 Page 47 of
121

Confidential - Subject to Further Confidentiality Review

```
 1   market for maybe a year.  It was under contract, and

 2   then the client ended up moving it to another agent, so

 3   we didn't officially sell it.

 4       Q.  And who was the client in that case?

 5       A.  Don't quote me on this, but it was --

 6   potentially -- IAS, potentially.  I can't remember.

 7           MR. CAMPBELL:  You don't have to guess if you

 8       don't know, unless she asks you to.

 9           THE WITNESS:  Okay.  I'm not going to guess.  I

10       don't know.

11   BY MS. RICO:

12       Q.  And was this sale an REO?

13       A.  Yes.

14       Q.  And was the drywall, the presence of Chinese

15   drywall, disclosed as part of the sale?

16       A.  Yes.

17       Q.  I don't believe that you referenced this sale

18   in your report.  Did you?

19       A.  I don't believe that I did, no.  I -- actually,

20   I know I did not reference that sale.

21       Q.  And why is that?

22       A.  It was not remediated.

23       Q.  Was it your decision to omit transactions of

24   nonremediated homes from your report?

25           MR. CAMPBELL:  Objection to form.
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 79 of 580
Case 1:16-cv-05621-LDH-CLP Document 95-3 entered on FLSD Docket 01/13/2019 Page 48 of
121

Confidential -- Subject to Further Confidentiality Review

```
 1              THE WITNESS:  Yes.

 2  BY MS. RICO:

 3      Q.   And why did you make that decision?

 4              MR. CAMPBELL:  Same objection.

 5              THE WITNESS:  I didn't feel it was relevant.

 6  BY MS. RICO:

 7      Q.   Why not?

 8      A.   Because I was asked to give my professional

 9  opinion on Graziano and Greenblatt's reports, and they

10  discussed remediated homes.

11      Q.   Were you given a list of the 20 priority

12  claimants in this case?

13      A.   Yes.

14      Q.   And are you aware that some of those homes are

15  not remediated?

16      A.   Yeah, I suppose -- yeah, I guess some of them I

17  was aware, yeah.

18      Q.   And did counsel tell you about the

19  circumstances of each of the priority claimants?

20      A.   No.

21      Q.   Let's look at the second entry on your invoice.

22  I'll represent that it's the same as the one above.

23  "Research what homes I have sold that had Chinese

24  drywall."

25              Is that task -- was that a continuation of the
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 80 of 580
Case 2:16-cv-04048-EEF-MBN Document 293-3 entered on FLSD Docket 08/13/2019 Page 49 of
121

Confidential — Subject to Further Confidentiality Review

```
 1   same task that's listed above it?

 2       A.   Yes.

 3       Q.   Okay.  How about the third one down?  You said:

 4   "Talked with Caroline, search for selling side

 5   transactions."

 6            What -- what were you doing here?

 7       A.   I was looking to see if there was transactions

 8   I could identify that had remediated homes from the

 9   selling side.  And the selling side in real estate is a

10   little confusing.  It means representing the buyer.

11   It's the listing side represents the seller.  So I was

12   looking for those transactions.

13       Q.   Did you identify any?

14       A.   No, none that were -- that were obvious.

15       Q.   Okay.  And how about the third one down?

16   "Talking with Sarah 1.16 hours."

17            MR. CAMPBELL:  Objection to form.  It's the

18       fourth.

19   BY MS. RICO:

20       Q.   I'm sorry.  The fourth one down.

21       A.   I was speaking to Sarah.

22       Q.   What about, outside of anything privileged?

23       A.   It's -- I can't remember.  I spoke to her many

24   times.

25       Q.   I know the feeling.
```

```
 1              How about -- how about the following one?  "FAR

 2    legal hotline and list of sold properties."

 3         A.   I contacted the Florida Legal Hotline to

 4    inquire if it -- if it was required to disclose that a

 5    home had been remediated with Chinese drywall.

 6         Q.   And what did they tell you?

 7         A.   They actually said that it was not required to

 8    disclose that a home had been remediated with Chinese

 9    drywall, which I realize is a little bit different

10    than -- I asked them about Chinese drywall specifically.

11    I didn't say the word "defective," so maybe that --

12         Q.   And in your practice as a professional broker,

13    would you disclose that a home previously had Chinese

14    drywall and was remediated?

15         A.   Yes.

16         Q.   And why is that?

17         A.   Because it's a requirement on the seller's

18    disclosure.

19         Q.   This next line down, 3/18/2019, "working on

20    report," what were you doing here, to the extent it's

21    not self-explanatory?

22         A.   I believe that the 18th was the date that I

23    began working on my report.

24         Q.   And what work were you doing on your report?

25         A.   Drafting my opinions of Graziano's and
```

1    Greenblatt's report.

2         Q.   Okay.  And let's just keep going down.  Next,

3    "research homes I have sold to Chinese drywall"?

4         A.   Correct.

5         Q.   3/18?  What were you doing there?

6         A.   Just looking into the home that I did have with

7    Chinese drywall.

8         Q.   And which home was that?

9         A.   I can't remember the address, but it was in

10   Parkland.

11        Q.   Is this the same home that you referenced

12   earlier that --

13        A.   Yes.

14        Q.   -- did not sell?

15        A.   Yes, but was under contract within 70 to 90

16   days.

17        Q.   Yes, it was under contract and --

18        A.   There were some title issues.  And it,

19   unfortunately, happens with foreclosures a lot.  So you

20   get a buyer excited, the bank's excited, they go under

21   contract, and then there's a cloud on title, and then

22   it's another year, and typically the buyers will walk at

23   that point.  And then after -- the banks need to

24   reassign the agent after a certain amount of time, so

25   even though it's not our fault, they'll reassign it.

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 83 of 580
Case 1:11-cv-22408-WEG Document 295-3 entered on FLSD Docket 03/13/2013 Page 52 of 121
Confidential - Subject to Further Confidentiality Review

     1        Q.    Yeah.  And that happens with foreclosures

     2    because it's a distressed property; right?

     3        A.    What happens with foreclosures?

     4        Q.    Title issues sometimes happen because it's a

     5    distressed property?

     6        A.    Well, they happen because there's disputes on

     7    the title or that they can't identify the correct

     8    records to find out who correctly owns the property.  So

     9    from -- there's various reasons.  That's not the only

    10    reason.

    11        Q.    What other reasons?

    12        A.    It's -- it's really a title agent thing.  It's

    13    not my expertise, so...

    14        Q.    Okay.  But it is more common with foreclosures?

    15        A.    To have title issues?

    16        Q.    Yes.

    17        A.    I would say, generally speaking, that's --

    18    yeah, that's an accurate statement.

    19        Q.    That would be because they're not arm's length

    20    sales?

    21             MR. CAMPBELL:  Objection to form.  To the

    22        extent you understand the --

    23             MR. POYER:  Join.

    24             THE WITNESS:  They're arm's length

    25        transactions.

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 84 of 580
Case 1:11-cv-22408-MGC Document 243 entered on FLSD Docket 11/04/2013 Page 53 of
121

Confidential – Subject to further Confidentiality Review

```
1    BY MS. RICO:

2        Q.   Okay.  Could we move -- I lost track now.  I

3    think we're at 3/18.  "Review documents and speaking

4    with Sarah."  What work were you doing there?

5        A.   I don't recall.

6        Q.   You don't recall what documents you were

7    reviewing?

8        A.   We reviewed a lot of documents together, so

9    they're just my notes that I took as I started the

10   activity to make sure that I was billing for the time.

11       Q.   Okay.  Did you take notes during any of your

12   conversations with counsel?

13       A.   No.

14       Q.   No?

15       A.   Everything was just what I had on my report.

16       Q.   Okay.  So you never took any notes while you

17   spoke to them?

18       A.   No.

19       Q.   Got a good memory.

20            Next one down.  You've got two entries on 3/19

21   that say "reviewing properties we had with Chinese

22   drywall."  Are those tasks pertaining to that same

23   property we discussed in Parkland or other properties?

24       A.   It could have been also researching other

25   properties, but that could have been that property.  I
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 85 of 580
Case 1:11-cv-01893-MGC Document 2943 Entered on FLSD Docket 11/19/19 Page 84 of 121

Confidential - Subject to Further Confidentiality Review

```
 1    honestly don't recall.  We --

 2          MR. CAMPBELL:  Don't guess if you don't know,

 3       unless she asks you to.

 4          THE WITNESS:  No, I don't recall.

 5    BY MS. RICO:

 6       Q.  I will say, just for the record, I'm never

 7    asking you to guess unless I --

 8       A.  Okay.

 9       Q.  Earlier on I said guesstimate, but I really

10    don't want you to make things up so that your counsel

11    doesn't have to keep saying that.

12       A.  Yeah.

13       Q.  So if you don't know, you can simply say you

14    don't know.

15       A.  Yeah, I mean, I take -- I look at these notes

16    and, you know, at the time that's the first thing, when

17    I started the activity, just to give the task, but what

18    happened is I was working on multiple things at once and

19    I was trying to organize the task for a specific thing,

20    but it's difficult for me to remember the specifics.  So

21    I apologize.

22       Q.  No, that's perfectly all right.  That happens.

23    We're all busy people.

24       A.  And the reason why I --

25          MR. CAMPBELL:  Let her ask the question, David.
```

```
 1              THE WITNESS:  Okay.  Sorry.

 2   BY MS. RICO:

 3       Q.   No, perfectly all right.

 4            The next one down, you say "researching 8232

 5   Emerald Avenue."  Why were you researching this

 6   property, if you remember?

 7       A.   I believe, if I'm not mistaken, it was a

 8   property that was asked -- that I was asked about but

 9   did not have Chinese drywall and I thought maybe did.

10   I -- but I'll be honest.  I don't recall.

11       Q.   Okay.

12       A.   There was a lot of addresses and a lot of

13   different properties that we were looking at.  But that

14   could have been -- that could have been my property with

15   Chinese drywall.  One of the two.

16       Q.   One of the two, you said?

17       A.   One of the two.  It's either the property that

18   I thought had Chinese drywall and I was investigating if

19   it did because it was in Parkland in an -- in an area

20   that had had Chinese drywall, or it was the property

21   that I had with Chinese drywall.  I don't recall the

22   address.

23       Q.   Okay.  And to be clear, there was only one

24   property that you dealt with that had Chinese drywall?

25       A.   My -- dealt with in my career?
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 87 of 580
Case 1:16-cv-04008-WFK Document 2843-3 entered on FLSD Docket 09/13/2019 Page 56 of
121

Confidential – Subject to Further Confidentiality Review

```
1       Q.   Yes, that you've confirmed.

2       A.   I believe there were more, but if -- confirmed,

3   yes.  I'm pretty sure we had more than one property that

4   had Chinese drywall, but that was the one that I was

5   able to confirm.

6       Q.   Okay.  And then the next one down, 3/19, "phone

7   meeting with attorneys," do you recall what this meeting

8   was about?

9       A.   I do not recall the conversation.

10      Q.   Okay.  And then 3/19 you've got two entries

11  following that that say "working on report."  Do you

12  recall specifically what you were working on?

13      A.   This exhibit right here.  This report.

14      Q.   Okay.  And you were drafting that report at the

15  time?

16      A.   Correct.

17      Q.   You've never written a Rule 26 report before;

18  is that right?

19           MR. POYER:  Object to the form.

20           THE WITNESS:  That's correct.

21  BY MS. RICO:

22      Q.   Did you receive guidance on what to include in

23  your report?

24           MR. CAMPBELL:  Object to the form.

25           MR. POYER:  Join.
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 88 of 580
Case 1:16-cv-14804-WGY Document 405 entered on FLSD Docket 11/19/19 Page 57 of
121

Confidential - Subject to Further Confidentiality Review

```
 1        THE WITNESS:  I wrote my report based on my

 2     opinions, so they -- there was -- I had sent it in

 3     and there was some proofreading done to make it --

 4     to clean it up, because I'm not the best writer, but

 5     I was just -- it's all my opinions and just better

 6     worded, more to the point.

 7  BY MS. RICO:

 8     Q.   I was more asking about -- Rule 26 reports have

 9  requirements.  Did you receive guidance regarding those

10  requirements?

11     A.   No, I did not.

12     Q.   Okay.

13     A.   Not that I recall.  Not that I recall.  It's

14  possible.

15     Q.   Now we're looking here at 3/19/2019.  "Reading

16  Greenblatt report."  Is that the first time that you'd

17  seen Mr. Greenblatt's report, on the 19th?

18     A.   No.

19     Q.   No?  When did you first see that report?

20     A.   Sometime around the 18th.  Well, I guess it --

21  it's possible it could have been, but...

22     Q.   Okay.

23     A.   It -- I think I received it and I started

24  reading it maybe around the 18th when I started working

25  on the report.
```

1    Q.   Okay.  I'm going to try to go throughout the

2    rest quickly, because they're very similar.  So "reading

3    Greenblatt deposition," I'll assume that that's what it

4    says it was?

5    A.   Yes.

6    Q.   You were reviewing Mr. Greenblatt's deposition?

7    A.   Yeah.

8    Q.   And is that the first time you'd seen it?

9    A.   No.

10   Q.   Did you make any notes on Mr. Greenblatt's

11   report or deposition as you were reviewing them?

12   A.   You know, I read everything on the computer, so

13   it's a PDF.

14   Q.   Did you make any notes on the PDF?

15   A.   Not that I recall.  I mean, I don't know.

16   Q.   Okay.  To the extent that you did create any

17   working notes on any of these documents, we would ask

18   that they be produced.

19   A.   They've all been provided.

20   Q.   Okay.  They've all been provided to counsel?

21   A.   Correct.

22        MS. RICO:  Do you know if everything's been

23        provided to us?

24        MR. CAMPBELL:  Anything that was responsive

25        that's not work product privilege, yeah.

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 90 of 580
Case 1:16-cv-03461-LTS Document 245 tentative confidential Subject to further Confidentiality Review 121
Confidential -- Subject to further Confidentiality Review

1          MS. RICO:  Well, anything he relied upon

2      wouldn't be privileged, so everything that he relied

3      upon in --

4          MR. CAMPBELL:  Absolutely.

5          MS. RICO:  Okay.

6          MR. CAMPBELL:  And just to -- if this makes it

7      clear, I don't recall ever seeing anything that had

8      notes, whether it be handwritten or on the computer.

9          MS. RICO:  That is helpful.

10         MR. CAMPBELL:  If we did have that, we would

11     have produced it, unless the notes contained work

12     product privilege, but I don't recall seeing

13     anything.

14         MS. RICO:  Okay.

15 BY MS. RICO:

16     Q.   And then let's skip down to 3/21.  "Revised

17 resume."  What were you doing there?

18     A.   Just working on my resume that -- this exhibit

19 right here.

20     Q.   Just making it current, up-to-date?

21     A.   Yeah.  I mean, we had a big marketing packet

22 and most of it didn't pertain to what was required,

23 so...

24     Q.   Okay.  And then let's jump down to the last

25 one.  3/21/2019.  "Reading revised report."  Is that a

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 91 of 580
Case 1:11-cv-22408-MGC Document 293 Entered on FLSD Docket 01/11/2013 Page 60 of
121
Confidential - Subject to Further Confidentiality Review

1    revised report you received from counsel?

2        A.   It's my -- my last revision, and they did make

3    some -- helped me make some edits on it.

4             MS. RICO:  Okay.  I think we can actually take

5        a quick break.

6             MR. CAMPBELL:  Whatever you want.

7             MS. RICO:  Five, 10 minutes.

8             MR. CAMPBELL:  Sure.

9             THE VIDEOGRAPHER:  2:21 p.m.  Off the record.

10            (Recess from 2:21 p.m. until 2:34 p.m.)

11            THE VIDEOGRAPHER:  2:34 p.m.  Back on the

12       record.

13   BY MS. RICO:

14       Q.   Before we took that last break we had discussed

15   properties -- I'm sorry -- sales or transactions that

16   you had confirmed containing Chinese drywall.  Do you

17   remember that?

18       A.   Yes.

19       Q.   And you said that you had confirmed one

20   property that had contained Chinese drywall; is that

21   right?

22       A.   That -- that's what I said, yeah.

23       Q.   Yes.  How did you confirm that that property

24   had Chinese drywall?

25       A.   I pulled my list of properties and I had sorted

1   them by date, and then through the ones that were during

2   that time frame.  I also had to add in dates because

3   some of my date fields weren't filled.  So I had to go

4   and research some of these properties to find out what

5   dates they sold, and then I started looking into

6   properties that I had sold in Parkland around those

7   dates.

8       Q.   And why did you look in Parkland specifically?

9       A.   Because I was aware of homes in Parkland that

10  had Chinese drywall.

11      Q.   And how did you confirm that, once you looked

12  through this list, that this one property had Chinese

13  drywall?

14      A.   We had it on the MLS and then in my notes.

15      Q.   When you say "we had it on the MLS," you mean

16  you identified on the MLS that that property contained

17  Chinese drywall; is that right?

18      A.   My printout -- my printout of the MLS sheet

19  showed that we had mentioned it had Chinese drywall.

20      Q.   And with regard to other transactions that you

21  researched, you did not find any others that contained

22  Chinese drywall?

23      A.   Not out of my -- I think I did find a few, but

24  I can't remember correctly if I didn't list them because

25  they were either a rental or they didn't sell or we had

1    it as an assignment but we never ended up selling it.

2         So when I say "assignment," I mean the bank

3    would give us a property assignment and we do work.  We

4    do work on that property.  Occupancy reports,

5    preservation items, updates, and deal -- we deal with

6    all these issues prior to listing it, and then sometimes

7    we don't end up getting the property for various

8    reasons.  They'll either reassign it or they'll find out

9    that there's an issue with the foreclosure and they'll

10   reassign it.

11        So I was aware of Chinese drywall and I was

12   aware that I had properties there.  This is the only one

13   that I properly identified that we put under contract.

14   Q.   Let's --

15   A.   Do you mind if I add?

16   Q.   I'm sorry.  Did you have something else to add?

17   A.   Yeah, I did.  It's not easy to identify from my

18   system, out of 2,500 properties, properties that had

19   Chinese drywall.  So it's an imperfect search.  It's not

20   like I had a field where I could just pull it up and say

21   "Chinese drywall."  You know, I can search for bedrooms,

22   bathrooms, and whatnot, but there was no easy way to

23   identify, out of 2500 properties, which ones had Chinese

24   drywall.

25   Q.   We were discussing your invoice earlier.  And

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 94 of 580
Case 1:16-cv-04048-WFG Document 293 Filed ... Docket 03/13/2019 Page 63 of
121
Confidential - Subject to further Confidentiality Review

1   the invoice ran through March 21.  Have you done any

2   additional work between March 21 and today?

3          MR. CAMPBELL:  Objection to form just to the

4       extent that the invoice is dated April 5.  The last

5       entry is from March 21.  You can answer the

6       question.

7          THE WITNESS:  Yeah, I did additional work.  I

8       did -- I met with counsel and -- that's the only

9       thing I recall right now.

10  BY MS. RICO:

11      Q.   And how many times did you meet with counsel?

12      A.   At least two times, if I -- two times, if I

13  remember correctly.

14      Q.   Was that in person?

15      A.   Yes.

16      Q.   When was that?

17      A.   One was yesterday, and the other one, sometime

18  after the 21st.

19      Q.   And why was that?

20      A.   In preparation of the deposition.  I've never

21  done this before, so...

22      Q.   It's a little daunting; right?

23      A.   It is.

24      Q.   Approximately how many hours did you meet with

25  counsel?  And let's limit it to the first time.

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 95 of 580
Case 1:16-cv-04048-WGY Document 203 entered on FLSD Docket 08/13/2018 Page 64 of
121
Confidential - Subject to Further Confidentiality Review

```
 1      A.   The first time?  Seven hours.

 2      Q.   And how about the second time?

 3      A.   Four hours.

 4      Q.   And who --

 5      A.   Four and a half.  Sorry.

 6      Q.   Four and a half.  And who did you meet with the

 7  first time?

 8      A.   Sorry.  Three and a half.  Somewhere around

 9  there.

10      Q.   Somewhere between three and --

11      A.   Yeah.  Anyway.

12      Q.   -- four hours?

13      A.   I apologize.

14      Q.   Okay.  And who did you meet with the first

15  time?

16      A.   I met with all of the attorneys that you see

17  here.

18      Q.   And the second time?  Same?

19      A.   Same.

20      Q.   And what did you review, if anything, to

21  prepare for today?

22      A.   I reviewed everything in my invoice.  So I

23  reviewed the Graziano report, the Greenblatt report, and

24  my report.

25      Q.   Did you review anything new at all?
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 96 of 580
Case 1:11-cv-1409-WCG Document 363 entered on FLSD Docket 08/17/2019 Page 65 of
121

Confidential - Subject to Further Confidentiality Review

    1      A.   No.

    2      Q.   Is your expert work in this case complete?

    3      A.   After this deposition, and then if there's a

    4   trial, I'll be present at the trial.

    5      Q.   And are your opinions, as you sit here today,

    6   are they final as contained in your report?

    7      A.   I would say so, yes.

    8      Q.   I'll mark this as Exhibit 5.

    9           (Cohen Exhibit No. 5 was marked for

   10   identification.)

   11   BY MS. RICO:

   12      Q.   We received supplemental production on your

   13   behalf from your counsel on March 15, 2009.  I'm going

   14   to represent to you that this is a printout of the

   15   transfer system that Alston & Bird uses to produce

   16   documents and it lists the titles of the various

   17   documents that -- that were produced.

   18           I'd like to go through them and have you tell

   19   me what they are to the best of your recollection.

   20           MS. RICO:  We also do have the physical

   21       documents if he needs to look at them.

   22   BY MS. RICO:

   23      Q.   So could you just go through, please, and tell

   24   me what you believe each document to be?

   25           MR. CAMPBELL:  Objection just to the extent

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 97 of 580
Case 2:14-cv-04046-CT Document 913 Entered on FLSD Docket 08/15/2019 Page 66 of
121

Confidential – Subject to Further Confidentiality Review

```
 1      that we prepared the --

 2           MS. RICO:  Did you change the titles?

 3           MR. CAMPBELL:  Well -- well, let me just -- I

 4      don't know how this was put together, because I

 5      didn't do it, but I think someone from our office is

 6      the one who put the named -- the folder, if you

 7      will.  I don't know what the system is or how this

 8      is done, but I do not believe that he named the

 9      folders.

10           MS. RICO:  Okay.

11           MR. CAMPBELL:  So to the extent he may not know

12      what a folder is because he was not involved in the

13      folder.

14           MS. RICO:  Right.  I'll represent these are not

15      folders.  They're all individual files.

16           MR. CAMPBELL:  Okay.

17           MS. RICO:  I don't know if he produced them to

18      you that way or if you've altered them, so to the

19      extent that they've been altered by your office and

20      you don't know, that's fine, just let me know that

21      you don't know.

22           MR. CAMPBELL:  Okay, fair enough.

23      BY MS. RICO:

24      Q.   But aside from all of that, just if you could

25      take a look and let me know what these various documents
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 98 of 580
Case 1:16-cv-40498-WGY Document 2643 entered on FLSD Docket 11/14/2019 Page 67 of 121
confidential -- Subject to Further confidentiality Review

1    are.

2        A.   I can't tell you what the documents are without

3    looking at them.

4        Q.   Okay.  I was trying to avoid you having to look

5    at all of them.

6        A.   Yeah.  Sorry.

7        Q.   But looks like we -- we are not going to avoid

8    that, which is fine.

9        A.   I mean, it's --

10       Q.   Do you recognize the titles for any of these

11   documents?

12       A.   Deposition of Ryan Greenblatt, that's .msg, so

13   I'm assuming it's an e-mail.  There's an executed

14   contract.  First sale MLS?

15       Q.   Do you recall what that contract was?  I can

16   show it to you, but --

17       A.   Yeah, I have to look at it.

18       Q.   Okay.  No problem.  If you could just look

19   through the list and to the extent that we can expedite

20   and you can let me know if you know what any of these

21   are.  If not, that's fine.

22       A.   Florida Claimants, I would assume that's a list

23   of the claimants.  Graziano Reports, I assume that's

24   an -- I don't know if that's -- Graziano Reports, if

25   that said PDF, I would assume it's the report, but since

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 99 of 580
Case 1:16-cv-24902-WCT Document 243 Entered on FLSD Docket 11/13/2019 Page 68 of
121
Confidential - Subject to Further Confidentiality Review

1  it's an e-mail, I don't know.  I don't know what's in

2  there.  HUD, I'm assuming it's a settlement statement.

3      And these -- we -- out of our properties, we

4  would have a folder for every single property, and so

5  some of these might have been pulled from one of those

6  folders for one of our properties.

7      HUD is a settlement statement, I assume.  HUD

8  Report could have been a HUD -- a HUD M&M report maybe.

9      MR. CAMPBELL:  Just to the extent there's any

10     confusion, I'm sorry, I don't want to, but I just

11     want to make sure that we're on the same page here.

12     This would include documents that we gave you,

13     not -- these aren't simply just things you gave us.

14     So I don't want you to make a wrong assumption here.

15     THE WITNESS:  Got it.

16     MR. CAMPBELL:  This is everything that's

17     responsive to their document request.

18     THE WITNESS:  Yeah.  Yeah.

19  BY MS. RICO:

20     Q.  I think that it's -- we'll be better served to

21  look at the specific documents.

22     MR. CAMPBELL:  Sure.  It's probably easier.

23  BY MS. RICO:

24     Q.  It was intended to expedite, not confuse,

25  but...

```
 1      A.   Sorry.

 2      Q.   No, that's not on you at all.  So we'll just

 3   put this one aside for now.

 4           Who developed your scope of work in this case?

 5           MR. CAMPBELL:  Objection to form.

 6           MR. POYER:  Same objection.

 7           THE WITNESS:  Scope?

 8   BY MS. RICO:

 9      Q.   What was your scope of work or your assignment

10   in this case?

11      A.   To elaborate on my opinion of remediated homes.

12      Q.   Okay.

13      A.   And how -- and how it affected or did not

14   affect values.

15      Q.   And did anyone give you any input on that

16   scope?

17      A.   The opinions are my own.

18           MR. CAMPBELL:  You can refer to your report if

19       you want to, if that would help you.

20           THE WITNESS:  Yeah.  So I was asked to give my

21       opinion on Mr. Greenblatt's report and

22       Mr. Graziano's report.  Specifically, Mr. Greenblatt

23       was stating that there is a pervasive stigma

24       associated with remediated homes and then

25       Mr. Graziano's report saying that there's -- well, I
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 101 of 580 of
Confidential -- Subject to further Confidentiality Review
121

```
 1          guess Mr. Greenblatt was saying that there's a

 2          pervasive stigma that drastically reduces value.

 3          Mr. Graziano was stating that there should be a

 4          10 percent diminution in value across the board.

 5               And based on my professional experience,

 6          there -- it's -- that's not true for residential

 7          real estate that homes -- either one of those

 8          statements is true, based on my professional

 9          opinion.

10   BY MS. RICO:

11      Q.   What assumptions, if any, did you make in

12   preparing your report?

13      A.   Assumptions.  I made the assumption -- I don't

14   know if I made any assumptions.  I just talked about my

15   experience.  So, in my experience, so on remediated

16   homes, they will often sell for a greater value than an

17   unremediated home that has aged interiors.

18               So, I mean, if I -- if there was some pervasive

19   stigma in the market, I'd be aware of it.  I'm in the

20   real estate market, and we talk, we talk to buyers,

21   sellers, and other agents, so...

22      Q.   When you say --  I'm sorry.

23               MR. CAMPBELL:  You can finish if you have more,

24          but if not, you should answer the next question.

25               THE WITNESS:  Yeah, go ahead.  Go ahead.  I'm
```

```
 1        sorry.

 2   BY MS. RICO:

 3        Q.   When you say, "in your experience selling

 4   remediated homes," what do you mean by that?

 5        A.   So I've overseen numerous renovations and

 6   remediations for mold and for polybutylene pipes.  And

 7   mold has serious health effects.  And I've seen homes

 8   that -- that you had to sign disclosures just to enter

 9   and, once remediated, the remediation companies are

10   wearing suits and masks.  And they'll -- they'll take

11   the drywall off.  They tape off the entryways.  They

12   treat the studs.  They clean the air.  They test the

13   air.  And then they'll continue testing until they have

14   a clear test, and then they'll put back the drywall and

15   the home is -- looks like new.

16        And, in my experience, buyers are concerned

17   with the present condition and not the previous

18   condition.  They care about the home in -- in its

19   existing condition.  So oftentimes -- I mean, it's very

20   rare that I'll see a home not get more than -- a greater

21   price than homes in the community because they have --

22   because it's new, it's renovated.

23        Q.   So your experience that you reference selling

24   remediated homes pertains to homes remediated for other

25   conditions; right?
```

```
 1      A.   For other conditions, correct.

 2      Q.   Not Chinese drywall?

 3      A.   It's very, very similar.  They're taking the --

 4  it's actually -- you know, mold is, I would argue, a far

 5  greater concern than Chinese drywall.  There's health

 6  effects that come with mold.  And I've seen homes in

 7  absolutely deplorable conditions, horrible conditions,

 8  that have been fixed up brand-new and sold for much

 9  higher values than other homes in the community that

10  never had problems.

11      Q.   But you've had more experience remediating

12  homes with mold than Chinese drywall; right?

13      A.   That's correct.

14      Q.   And you only confirmed one Chinese drywall

15  sale; is that right?

16      A.   Correct.

17      Q.   Did you rely on data from any other source when

18  formulating your opinions?

19      A.   My sources.

20      Q.   Which sources were those?

21      A.   My transactions, my customers.  The homes that

22  I've remediated and my own personal experience.  I had

23  polybutylene pipes that burst and we had to take our

24  drywall down to the studs and leave the house when my

25  son was born, and it was a five-month process.  And we
```

1    replumbed the entire house.  We had a lot of mold

2    because of it and we had to put -- take the AC out, take

3    everything out, and then we replaced the entire kitchen.

4    We rebuilt the house and it's -- it's much more

5    beautiful than it was before.  So -- and I have no

6    problem living in it even though I know it previously

7    had mold.  It doesn't presently, so...

8        Q.    And that was in your personal home?

9        A.    In my personal home.

10       Q.    That must have been stressful.

11       A.    Yeah.

12       Q.    Are you aware that the defendants have retained

13   other experts in this case?

14       A.    Yes.

15       Q.    Do you know who they are?

16       A.    No.

17       Q.    Have you spoken with any of them?

18       A.    No.

19       Q.    I'd like to take a moment to discuss the

20   concept of -- we've kind of been on this line -- the

21   concept of environmental risks and their impacts on real

22   estate.

23            Would you agree that environmental risks like

24   radon, asbestos, mold could impact real estate?

25       A.    Yes.

```
1        Q.   There's a number of different impacts that that

2   could include.  Would you agree it includes the ability

3   and opportunity to sell the property?

4             MR. POYER:  Object to the form.

5             MR. CAMPBELL:  Join.

6   BY MS. RICO:

7        Q.   Assuming that a property contained some kind of

8   environmental hazard like the ones I've just mentioned,

9   would that affect the homeowner's ability and

10  opportunity to sell that property?

11       A.   It would -- it depends on the market value.  So

12  it would -- those issues you mentioned, if there was

13  existing mold, could affect the value of the property

14  and require the homeowner to sell at a lower price.

15       Q.   And that would include limiting the number and

16  type of potential buyers; right?

17       A.   I've sold some very ugly homes with all the

18  issues you mentioned and had multiple offers above

19  asking price.  It just depends on the market and the

20  list price.  It depends on a lot of factors.  Just

21  every -- every home is different.  Every buyer is

22  different.  Every seller is different.  So there's

23  really a multitude of factors that goes into a

24  transaction that affects the value.

25       Q.   But it could --
```

```
 1        A.    Correct.

 2        Q.    -- limit the number and type of potential

 3   buyers?

 4        A.    Could?  I mean, it depends on the list price.

 5   It depends on so many different factors.  So I've had

 6   beautiful homes that sat on the market that were perfect

 7   and they just were not a price that the market was happy

 8   with, or they were not in an area that the market was

 9   happy with, or it was a bad timing, you know, it was off

10   season so everyone went back home.

11              So it's a multitude of factors that affect the

12   value, but it's -- mold is not going to help the value

13   of a home.

14        Q.    Could it limit the marketing time?

15        A.    Not if it was priced right.

16        Q.    Meaning?

17        A.    Meaning if I -- if I price a home based on

18   its -- the true value, and if I -- and I do a lot of

19   values, so I've done thousands and thousands of broker

20   price opinions, which are -- they're not appraisals,

21   because I'm not a licensed appraisal -- appraiser, but

22   they're similar.  We have to pull comparables.  We have

23   to make adjustments.  And so I'll pull comparable

24   properties and make adjustments and determine a list

25   price, and if I'm accurate with that list price, the
```

1   house is going to sell.  If I'm off for greater or for

2   less, then -- then it -- it will either sit on the

3   market or I'll have multiple offers.

4       Q.   So you said it wouldn't necessarily limit the

5   marketing time if it was priced right.  Does that mean

6   that the price would be reduced to reflect the condition

7   of the home?

8       A.   If there was mold in a house versus a house

9   that did not have mold, all things being equal, which is

10  impossible, because no two houses are equal, but all

11  things being equal, in a -- in a vacuum, then the house

12  that had mold would be priced -- there would be a lower

13  value for that home than the one that did not have mold.

14      Q.   And could the presence of an environmental risk

15  like mold affect the availability in terms of financing

16  for that home?

17      A.   If there was active mold?  That could affect,

18  yes.

19          MR. CAMPBELL:  Just to be clear, you're asking

20      about houses that actively have mold?

21          MS. RICO:  Yes.

22          MR. CAMPBELL:  Okay.

23          MS. RICO:  At the moment, yes.

24  BY MS. RICO:

25      Q.   Meaning that people might be unable to

Confidential - Subject to Further Confidentiality Review

```
 1    refinance or obtain modifications due to that condition

 2    in the home; is that right?

 3        A.    It's possible during the appraisal, though I

 4    have seen houses that have had financing that had mold

 5    as well.  So it depends on the extent of the mold and it

 6    depends on the lender and their underwriting policies.

 7        Q.    And to be clear, I was not saying that it -- I

 8    was not suggesting that it always does.  I was asking if

 9    it could.

10        A.    It could, yes.

11        Q.    And the presence of a condition like this could

12    also lead to a discounted rate, right, which, I mean,

13    we've already discussed?

14        A.    Discounted rate?  Yeah.

15        Q.    A discounted value to the home.

16        A.    Okay.

17        Q.    Because a buyer might want a discount because

18    of this condition in the home; right?

19        A.    I'm not aware of anyone who wants mold, so...

20        Q.    Touche.

21              Would you please tell me, what -- what is your

22    definition or understanding of stigma?

23        A.    Stigma.  Negativity.

24        Q.    So a negative perception of a property?

25        A.    Well, I don't think of properties when I think
```

1    of stigma.  I just think of -- the word "stigma" is

2    something negative.  I guess attachment, maybe.

3        Q.   Okay.  And would that be a negative -- speaking

4    about property specifically --

5        A.   Okay.

6        Q.   -- how would you qualify stigma?

7        A.   It's not a term that I've used in real estate.

8    It's not a term that I see a lot.  I saw it a lot in

9    this case, but it's not something that I've really seen.

10        Q.   Why do you think that is?

11        MR. CAMPBELL:  Objection.  Form.

12        THE WITNESS:  I think that it's because every

13        homeowner is different and they all have different

14        things that they look for, and a lot of my investors

15        are looking for properties that have problems so

16        that they can renovate them and resell them.  So

17        every property has a price.  It's something that

18        we've always said in our -- in our business.

19    BY MS. RICO:

20        Q.   And when you say a lot of your investors are

21    looking for properties that have problems, who are you

22    referring to?

23        A.   Buyers, investors that I work with, they're

24    looking for properties that they can fix up and resell.

25    So they add their sweat equity and get paid for

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 110 of 580
Confidential - Subject to further confidentiality review
121

1    delivering a fixed-up, renovated, remediated home, and

2    they get paid for their effort, so...

3        Q.    Are you referring to the concept of flipping a

4    property?

5        A.    Yeah, exactly.  Uh-huh.  Yeah.

6        Q.    So are many of your clients investors

7    interested in flipping properties?

8              MR. CAMPBELL:  Objection to form.

9              THE WITNESS:  Yes, some of them are.  I work

10             with a lot of owner occupants.  So primarily owner

11             occupants.  Investors are -- can be a little bit

12             more challenging.

13   BY MS. RICO:

14       Q.    And what -- what percentage of your clients are

15   investors of that kind?

16       A.    It fluctuates throughout the history, but if

17   you were to say now, maybe 35 percent, maybe.  Roughly.

18   Very rough.

19       Q.    And earlier in your career?

20       A.    It depends on the year, so it's harder for me

21   to say, but it was anywhere between 30 and 50 percent or

22   30 and 70 percent in either direction, so...

23       Q.    Okay.  Returning to the concept of stigma,

24   you'd agree with me that there are some people who will

25   never buy a home containing Chinese drywall; right?

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 111 of 580 of
Case 2:09-md-02047-EEF-MBN Document 20913-3 Entered on FLSD Docket 11/26/19 Page 90 of
121
Confidential - Subject to Further Confidentiality Review

1    A.   Yes, but --

2    Q.   And there are some people who would never buy a

3    home that previously contained Chinese drywall; isn't

4    that right?

5    A.   I would say that there are some people that

6    would never buy a home that previously contained Chinese

7    drywall.  I would also say that there's some people who

8    would never buy a home that has a pool or any other

9    factor.  Buyers are very, very specific.  Even husbands

10   and wives can't agree on what they're looking for.  So

11   it's very, very individualistic.

12        And I would also say that there are homeowners

13   that would prefer to buy a remediated home, because then

14   they can say for certainty that there are no -- there is

15   no Chinese drywall in it versus another home built

16   around the same time that they're not sure about.

17   Q.   But back to the original question, some people

18   would never buy a home that previously contained Chinese

19   drywall; right?

20        MR. CAMPBELL:  Objection.  Asked and answered.

21        MR. POYER:  Join.

22   BY MS. RICO:

23   Q.   You can answer.

24   A.   There may be some people that would never -- I

25   would say Greenblatt would probably never buy a home

1    that had been previously remediated.

2        Q.   I would say that you're right.

3             And you don't know how many people feel that

4    way, do you?

5        A.   I have no idea, but it would -- I would

6    assume -- based on my experience, it's probably not a

7    large number, and they would probably defer to their --

8    yeah.  I would say the number is equally as likely that

9    there would be people who would want to buy a Chinese

10   drywall home.  A remediated home.  Not a Chinese drywall

11   home, but a remediated home.

12       Q.   Now, when you say "remediated home," you mean

13   remediated of any condition?

14       A.   Any condition or Chinese drywall.  It's the

15   same.

16       Q.   So, to be clear, remediated of any condition,

17   including Chinese drywall?

18       A.   I mean, let's say specifically for Chinese

19   drywall.  I think that it would be equal that -- equal

20   amount of people that would prefer to buy a house that

21   had been remediated because they can definitively say

22   there is no more Chinese drywall in this home, whereas

23   in the same community you can't definitively say that if

24   there's a house built right next door.  I suppose you

25   could if you had the correct testing, but...

```
1        Q.   So if I'm understanding you clearly, you're

2   saying that people would prefer to buy a home that was

3   remediated, previously had Chinese drywall and

4   remediated, as opposed to a home that currently contains

5   Chinese drywall?

6        MR. CAMPBELL:  Objection.  Form.

7        Mischaracterizes testimony.

8        THE WITNESS:  I'm saying that there are equal

9        amount of people that would not want to buy a

10       remediated Chinese drywall home as there are people

11       who would want to buy it because it was remediated

12       with Chinese drywall, because they can -- there's a

13       couple reasons why a buyer would want to buy a home

14       that had been remediated that previously contained

15       Chinese drywall.

16       Number one is the interiors are going to be

17       renovated and they're going to be newer relative to

18       other homes in that community.  Over -- over time,

19       paint loses its color, scuff marks go on the wall,

20       and things start to look aged even in a short time

21       frame.  So a remediated home is going to have all

22       new drywall and new paint and it's going to look

23       nicer, look newer relative to other aged homes in

24       the community.

25       And the other reason why people would want to
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 114 of 580
Confidential - Subject to further Confidentiality Review
121

```
 1        buy a remediated Chinese drywall home is because
 2        they can definitively say every piece of Chinese
 3        drywall has been replaced, have been torn down to
 4        the studs, and we don't have to worry about there
 5        being one rogue or, you know, a couple rooms that
 6        have rogue Chinese drywall in it that we -- that we
 7        couldn't test for, because it's got to be difficult.
 8        I don't know what goes into it, but I assume it's
 9        very difficult to test for Chinese drywall, I mean,
10        every single drywall in the home to make sure that
11        every single piece of drywall is -- is not correct.
12   BY MS. RICO:
13        Q.   And to be clear, you've never overseen the
14   remediation of a Chinese drywall home, have you?
15        A.   That is correct.
16        Q.   And your experience pertaining to Chinese
17   drywall is in reference to the one Chinese drywall sale
18   that you confirmed; right?
19        A.   I've had experience with Chinese drywall.  That
20   was the one confirmed property that I could identify,
21   but I -- can -- may I add something?
22        Q.   Of course.
23        A.   I don't see any environmental impact as unique.
24   There's asbestos.  There's lead-based paint.  There's
25   mold.  They're all unique when they exist, but once
```

 1    remediated, it's a new home.  That's the way I look at

 2    it, is that the problem has been remediated and

 3    repaired.  So I look -- I look at homes not as a

 4    stagnant thing but a living, breathing, changing thing.

 5         I've had -- I've sold a home that was built by

 6    Addison Mizner and it was burnt and it was very rough

 7    and it -- in Old Floresta, and it had been from 1920s

 8    and it was remediated and renovated to its previous

 9    glory and it's a beautiful home afterwards.

10         So just as you can take an empty piece of land

11    and build a home, you can take an existing home and make

12    changes to it.

13    Q.   The home that you were just referring to, did

14    you oversee the remediation work of that home?

15    A.   No.  I sold it to an investor, who renovated

16    it.

17         MS. RICO:  Could I actually take a five-minute

18         break?  I want to go over the documents you guys

19         produced, but I'd like to just organize them first

20         so that we don't --

21         THE VIDEOGRAPHER:  3:10 p.m.  Going off the

22         record.

23         (Recess from 3:10?p.m. until 3:27 p.m.)

24         THE VIDEOGRAPHER:  3:27 p.m.  Back on record.

25         (Cohen Exhibit No. 6 was marked for

```
 1    identification.)

 2   BY MS. RICO:

 3       Q.   Mr. Cohen, earlier we discussed some

 4   supplemental production that we received from counsel on

 5   March 15.  I'm going to hand you what I've marked as

 6   Exhibit No. 6.

 7           As we received it, this was titled Florida

 8   Claimants List.  What is this document?

 9           MR. CAMPBELL:  Objection to form.

10   BY MS. RICO:

11       Q.   Do you recognize this document?

12       A.   I'm guessing it's either the list of plaintiffs

13   or -- yeah, I'm guessing this is a list of the

14   plaintiffs' homes.

15       Q.   And is that a reference to the list you

16   mentioned earlier that you used to search your

17   transactions?

18       A.   I have my own list of properties, so I just got

19   out my CRM and then I pulled my own report of properties

20   and I sent them to Sarah.  And maybe -- I don't know if

21   at some point she sent these to me or if these were just

22   part of her files.

23       Q.   But you didn't rely on this list in preparing

24   your report?

25       A.   No.
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 117 of 580
Confidential — Subject to further confidentiality review
121

```
 1        Q.   Okay.  So this may be a list that was provided

 2   to you by counsel of Florida claimants?

 3        A.   I know that I sent my list to Sarah and then

 4   she cross-referenced it with this list.  So at some

 5   point she may have sent it back to me, but I -- I don't

 6   know if this -- these documents, if they're in an FTP

 7   server.  I don't recall looking into these.

 8        Q.   Okay.  We also received a series of MLS

 9   listings.  Many of them were different dates but the

10   same property, so I'm going to do this as a composite

11   exhibit per property.  Let me have a second.

12        A.   No problem.  Take your time.

13             MR. CAMPBELL:  7?

14             MS. RICO:  7.

15             (Cohen Exhibit No. 7 was marked for

16   identification.)

17   BY MS. RICO:

18        Q.   Mr. Cohen, could you tell -- could you tell me

19   what these are?

20             MR. CAMPBELL:  Objection to form.

21             THE WITNESS:  This is an MLS listing.  They're

22        MLS listings.

23   BY MS. RICO:

24        Q.   Did you pull this MLS listing in conjunction

25   with your work on this report, or, rather, in this case?
```

```
 1        A.    This is a property rental that I did that I had

 2    cross-referenced with Sarah, and it had -- I believe at

 3    some point it had Chinese drywall, though I don't

 4    believe I was aware of it in two thousand and -- I

 5    listed it in 2007 when I was with RE/MAX.

 6        Q.    And the property is 1690 Renaissance Commons

 7    Boulevard 1418?

 8        A.    Correct.

 9        Q.    In what year did you list this property?

10        A.    2007.

11        Q.    Is that the only time that you listed this

12    property?

13        A.    Yes.

14        Q.    It was a rental property?

15        A.    Yes.

16        Q.    And what about the second page?  Did you -- did

17    you pull the history for this property?  Is that what

18    you did?

19        A.    Yes.

20        Q.    And why did you do that?

21        A.    Because it was a property that I had been

22    involved with at one time.

23        Q.    That you believed had Chinese drywall?

24        A.    Yes.

25        Q.    But you never listed this property for sale?
```

Confidential - Subject to Further Confidentiality Review

```
 1     A.   Correct.

 2     Q.   You never sold this property?

 3     A.   Correct.

 4     Q.   And you were never involved in the remediation

 5  of this property?

 6     A.   Correct.

 7     Q.   Did you rely on the information in these MLS

 8  reports when preparing your report?

 9     A.   No.

10     Q.   Thank you.

11          (Cohen Exhibit No. 8 was marked for

12  identification.)

13  BY MS. RICO:

14     Q.   I'm going to mark the next series of MLS as

15  Composite Exhibit 8.

16          Are these also MLS reports that you pulled in

17  conjunction with your work in this case?

18     A.   The first one is an MLS report, the second one

19  is the tax record from this CRS power tool, and then the

20  next one is an MLS report, and then the next one's an

21  MLS report.

22     Q.   And these are all for the property at 9447 --

23     A.   Satinleaf.

24     Q.   -- Satinleaf Place?

25     A.   Yeah.
```

1    Q.    And why did you pull these MLS reports and the

2    tax records?

3    A.    I don't recall my exact reasoning.  I believe I

4    was asked about this --

5          MR. CAMPBELL:  Don't guess if you don't know.

6          THE WITNESS:  Okay.  I don't recall my exact --

7    exact reasoning.

8    BY MS. RICO:

9    Q.    So is it safe to say you didn't rely on --

10   A.    Correct, I did not.

11   Q.    -- these reports and the tax information in

12   compiling your report?

13   A.    Correct.

14   Q.    Thank you.

15         MR. CAMPBELL:  We were on 8?

16         MS. RICO:  That was 8, yes.

17         THE WITNESS:  Let me put these in order so I

18   can --

19         MR. CAMPBELL:  I can do that for you if you

20   want to cross-reference, if that makes it easier.

21         THE WITNESS:  There's 6 over there.

22         MR. CAMPBELL:  It may be easier to have your

23   report out --

24         THE WITNESS:  Yeah.

25         MR. CAMPBELL:  -- but the others I can get for

1      you.

2              THE WITNESS:  Thank you.

3              (Cohen Exhibit No. 9 was marked for

4      identification.)

5  BY MS. RICO:

6      Q.   And I'm going to show you another set of MLS

7  reports for 8232 Emerald Avenue in Parkland.

8      A.   Thank you.

9      Q.   Are these also MLS reports that you pulled in

10  conjunction with your work in this case?

11     A.   Yes.

12             MR. CAMPBELL:  For the record, you're referring

13         to Exhibit 9?

14             MS. RICO:  Yes.  I'm sorry.  Composite

15         Exhibit 9.

16  BY MS. RICO:

17     Q.   And why did you pull these reports?

18     A.   Because it had Chinese drywall and I had listed

19  it.

20     Q.   How did you identify this property as having

21  Chinese drywall?

22     A.    I first saw it in the notes section of my CRM

23  from my field service vendors, and then I noticed it on

24  the MLS.  Let me see --

25     Q.   Is this --

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 122 of 580
Case 2:14-cv-02722-MBN Document 28-3 Entered on FLSD Docket 11/26/19 Page 91 of
121

Confidential – Subject to further Confidentiality Review

```
 1          MR. CAMPBELL:  Take time to read it if you need

 2      to.

 3          THE WITNESS:  Yeah.  You know what?  I just --

 4      it was in my notes section, and then -- hold on.

 5      Let me look at these.  I could be confusing this

 6      with another property, because when it -- I could be

 7      confusing this with another property.

 8  BY MS. RICO:

 9      Q.   Take your time and look at it.

10      A.   We may have had an addendum that was attached

11  to the MLS, I don't recall, but I -- I guess my memory

12  is not serving me correctly, but I thought that we had

13  mentioned it had Chinese drywall at some point.

14      Q.   If you look at the first page down there where

15  it says "public remarks" --

16      A.   Yes.

17      Q.   -- that may be helpful.  You want to read that

18  to us?

19      A.   This is not my listing, MLS listing, but it

20  says:  "Parkland foreclosure.  Once sold for over 1

21  million.  Needs Chinese drywall remedy.  Has marble

22  floors, huge open kitchen with granite counters and

23  island, tray ceilings, enormous master suite, Roman tub,

24  tile roof, central vacuum, and more upgrades.  Cash

25  only."
```

```
 1        Q.   And so that was in reference to the first page,
 2   which is a listing in 2009; is that right?
 3        A.   Two thousand -- this one was listed in 2010.
 4        Q.   2010.  And your listing was when?
 5        A.   This is -- see this is an incomplete -- this is
 6   a public listing.  It's not the private listing.  So
 7   it's not showing me all the details that I need.
 8        Q.   What is the difference between a public listing
 9   and a private listing?
10        A.   A public listing removes certain information
11   from the public's view.  And I don't see the list date
12   on this public listing here.
13        Q.   What type of information does it remove?
14        A.   It removes the listing agent's information.
15   And then I don't recall all the information that it
16   removes.  But it should have a list date, so that's
17   probably one of the fields that's removed.  It also
18   depends on the MLS that we're using, if we're using
19   Miami or Regional, and this one looks like it's -- R.
20   This is Regional Association of Palm Beaches, so...
21        Q.   But the second page does reflect your listing;
22   correct?
23        A.   Yes, it does.  I'm just trying to find the
24   dates on here.  I don't know if you see any dates that
25   I'm missing.  If I had my CRM in front of me, I could
```

```
 1    tell you the definitive date that we listed it.  I have

 2    a lot of information.

 3         Q.   And could you read for us what it lists under

 4    the public remarks section for your listing?

 5         A.   "5 bedroom 3 bathroom single story in highly

 6    desirable Parkland Golf and Country Club.  Recently

 7    remodeled.  Marble and tile floors only.  Impact windows

 8    and doors.  New dual zone AC with ultraviolet filter

 9    system.  Large backyard."

10         Q.   Do you recall at this time if the listing

11    disclosed the presence of or the previous presence of

12    Chinese drywall?

13         A.   It's not on the MLS, but there -- there are

14    attachments that we include on the MLS.  It could have

15    been on those attachments.  If it was a foreclosure,

16    which this one was, we won't have a seller's disclosure,

17    because they -- the seller doesn't have any information

18    about the home, because the sellers --

19         Q.   Because foreclosures --  I'm sorry, go ahead.

20         A.   With a foreclosure, the sellers never occupy

21    the home, so they don't know anything about the home.

22    I'm their eyes and ears.  And I'm not a professional

23    inspector and I'm -- I'm not able to give my own opinion

24    on what things are going on in the home other than

25    what's in my purview as a real estate agent.
```

1          So if I see an obvious remediation issue, I'll

2     let them know, but if it's not obvious, then there's --

3     I'm not going to -- I'm not asked to pay for inspections

4     to do that.

5          Q.   So with a foreclosure or an REO, the seller

6     indemnifies themselves; right?

7               MR. CAMPBELL:  Objection to form.

8               MR. POYER:  Object to the form.

9               THE WITNESS:  Yeah, I don't know if indemnify

10          is the word.  The seller is reliant on my

11          information.  I'm the -- because they've never

12          visited the property, I'm their eyes and ears, so...

13     BY MS. RICO:

14          Q.   But they sell the property as is?

15          A.   Correct.  And people, when buying an REO,

16     generally will have an expectation of a home that has

17     some potential liabilities associated with it.

18          Q.   And those liabilities are not always disclosed?

19               MR. CAMPBELL:  Objection to form.

20               MR. POYER:  Same.

21               THE WITNESS:  Anything that the seller is aware

22          of or I'm aware of I disclose.

23     BY MS. RICO:

24          Q.   To the extent that you're aware?

25          A.   If I'm not aware of it, I can't disclose it,

1    so...

2        Q.   Did you rely on these MLS reports in creating

3    your report?

4        A.   My report is just based on my professional

5    experience, so I did not rely on this -- these exhibits.

6        Q.   Okay.

7             MS. RICO:  Yeah, I'm sorry for the confusion,

8        but I'm going to add these to the exhibit that you

9        just looked at because it's the same -- it's the

10       same property.

11            MR. CAMPBELL:  And you're handing us, just for

12       the record, a stack of more --

13            MS. RICO:  MLS.

14            MR. CAMPBELL:  -- MLS's?

15            MS. RICO:  Right.

16   BY MS. RICO:

17       Q.   And it was 8232 Emerald Avenue in Parkland,

18   which is the property we were just discussing; is that

19   right?

20       A.   Let me just double-check, but I would assume

21   that's correct.

22            Yes.

23       Q.   Let's stack them all together just for --

24       A.   Oh, okay.

25       Q.   -- when we clip them.

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 127 of 580
Confidential - Subject to further confidentiality review
121

```
 1     A.   Oh, got it.

 2     Q.   Let's clip those all together as the same

 3   exhibit for the court reporter.

 4     A.   Yeah, I can do that.  Okay, so this is

 5   Exhibit 9.  I'll put them together, but if it's all

 6   right with you, I'd like to just review these.

 7     Q.   Yes, please review the new ones I gave you.

 8     A.   Okay.  So put it in the front because it had

 9   the exhibit sticker?

10     Q.   Uh-huh.  That's perfect.

11     A.   All right.

12          MR. CAMPBELL:  David, there's no question

13     pending.  You can obviously review it, but --

14          MS. RICO:  I'm going to have him review it, and

15     I was just going to ask if his statement that he

16     didn't rely on these is still true.

17          THE WITNESS:  Yeah, I would say it's still

18     true.

19   BY MS. RICO:

20     Q.   Okay.  Thank you.

21     A.   So for the record, one of these listings does

22   have Chinese drywall, or we do mention that it does have

23   Chinese drywall.

24     Q.   And which page is that?

25     A.   This -- and this was -- well, these aren't
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 128 of 580
Confidential - Subject to further Confidentiality Review
121

1    page-numbered, so --

2        Q.    I'm sorry.  Which -- which date?

3        A.    It was listed January 6, 2010, and on the

4    listing it says:  "Property has Chinese drywall."  And

5    I -- I don't recall the specifics, so it is possible

6    that my inspector found out that it had Chinese drywall

7    and notified our seller.

8        Q.    Are you referring to the document that has a

9    time stamp on the bottom that says 9:32 a.m.?

10       A.    11:56 a.m.

11       Q.    Okay.  11:56 a.m.  okay.  And it's dated

12   2/11/2010 on the bottom?

13       A.    Correct.

14       Q.    And this was your listing?

15       A.    Correct.  So the original listing did not

16   mention Chinese drywall, and then at some point we

17   updated it.  That's what it appears, based on the

18   timestamps.

19       Q.    Then did you rely on these documents when

20   preparing your report?

21       A.    To the extent that it affected my original

22   opinion, no.

23       Q.    Okay.  Thank you.

24             I'm going to do another composite exhibit,

25   because these are the same property and they appear to

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 129 of 580
Case 9:14-cv-81046-MGC Document 28-31 Entered on FLSD Docket 05/13/2015 Page 98 of
121

Confidential - Subject to Further Confidentiality Review

```
 1    be the same document.  So Composite Exhibit 10.

 2           (Cohen Exhibit No. 10 was marked for

 3    identification.)

 4    BY MS. RICO:

 5       Q.   What -- do you recognize these documents?

 6       A.   It looks like an HUD initial inspection report.

 7       Q.   And did you pull these HUD initial inspection

 8    reports in conjunction with your work in this case?

 9       A.   It -- it was a document that we would have had

10    in our file for this particular property.  And I don't

11    recall why this property was pulled.  I would assume

12    that it had -- I don't -- I don't recall why it was

13    pulled.

14       Q.   Is it safe to say that you didn't rely on these

15    documents when preparing your report in this case?

16       A.   Correct.

17       Q.   Okay.

18           (Cohen Exhibit No. 11 was marked for

19    identification.)

20    BY MS. RICO:

21       Q.   I'm going to show you what we'll mark as

22    Composite Exhibit 11.  If you look at the address, it's

23    422 Belle Grove Lane, Royal Palm Beach, Florida, which

24    is the same address as the HUD initial inspection

25    reports that we were just reviewing.  What are -- do you
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 130 of 580
Case 2:14-cv-02722-NGG-MDG Document 204-3 Filed 08/03/15 Page 130 of 580

Confidential - Subject to further confidentiality Review
121

1    recognize these documents?

2       A.   They're mine.  I recognize they're -- yeah, I

3    recognize them.

4       Q.   And what are they?

5       A.   Reports that HUD required us to send them.

6    Inspection reports, photos.

7       Q.   And why are these reports required?

8       A.   Because we're the eyes and ears for our seller.

9       Q.   So this would have been another REO sale?

10      A.   This was an FHA foreclosure for HUD.

11      Q.   Okay.  And do you know why you pulled these in

12   your work for this case?

13      A.   I don't recall why this property was

14   specifically pulled.

15      Q.   So is it safe to say that you didn't rely on

16   these documents when --

17      A.   Yes.

18      Q.   -- creating your report?  Thank you.

19           MS. RICO:  I'm going to put this just so I

20      don't cover anything.

21           (Cohen Exhibit No. 12 was marked for

22   identification.)

23   BY MS. RICO:

24      Q.   I'm going to show you what we'll mark as

25   Exhibit 12.  Do you recognize this document?

```
1       A.   It's a settlement statement for Emerald Avenue.

2       Q.   And did you pull this document in conjunction

3   with your work in this case?

4       A.   Yes, because this was the property that I had

5   that was under contract for that had Chinese drywall.

6       Q.   So this is the property in Parkland that we

7   discussed earlier --

8       A.   Yes.

9       Q.   -- that there were title issues?  It went to

10  contract, there were title issues?

11      A.   It was a --

12           MR. CAMPBELL:  Let her finish.  Sorry.

13           THE WITNESS:  Sorry.

14           MR. CAMPBELL:  Just for the record.

15  BY MS. RICO:

16      Q.   I lost my train of thought.

17           This is the property we were discussing

18  earlier?

19      A.   Yes.

20      Q.   The one property you confirmed with Chinese

21  drywall?

22      A.   Yes.

23      Q.   Okay.  And did you rely on this document when

24  creating your report?

25      A.   No.  My opinions were regardless of these
```

```
 1    reports.

 2         Q.    Okay.

 3         A.    Documents.

 4         Q.    And this HUD statement would be for -- would

 5    reflect when the sale was under -- when the property was

 6    under contract; is that right?

 7         A.    It was close to closing, and then I suspect

 8    there were title issues is why it didn't close.

 9         Q.    So this HUD statement was prepared for the

10    closing of that property, or in anticipation?

11         A.    Correct.

12         Q.    Okay.  Thank you.

13         A.    It was extensions.

14         Q.    What do you mean, "extensions"?

15         A.    Extensions to the close date.

16         Q.    Okay.

17               (Cohen Exhibit No. 13 was marked for

18    identification.)

19    BY MS. RICO:

20         Q.    Exhibit 13.  Do you recognize this document?

21         A.    This is a settlement statement.

22         Q.    And this is a settlement statement for?

23         A.    Belle Grove.

24         Q.    422 Belle Grove.  And you testified earlier

25    that you couldn't -- you couldn't recall why you had
```

```
 1    pulled this particular property?

 2        A.   Correct.

 3        Q.   So is it safe to assume that you did not rely

 4    on this document in preparation of your report?

 5        A.   Yes.

 6        Q.   Thank you.

 7             (Cohen Exhibit No. 14 was marked for

 8    identification.)

 9    BY MS. RICO:

10        Q.   Exhibit 14.  Same question.  Do you recognize

11    this document?

12        A.   Satinleaf settlement statement.

13        Q.   And did you pull this document in conjunction

14    with your work in this case?

15        A.   Yes.

16        Q.   Do you recall why?

17        A.   I don't recall why I pulled this particular

18    document, no.

19        Q.   Do you know if this property had Chinese

20    drywall?

21        A.   I don't believe that it did.

22        Q.   So is it safe to say you didn't rely on this

23    document --

24        A.   Yes.

25        Q.   -- in preparation of your report?
```

Case 2:09-md-02047-EEF-MBN   Document 22363-34   Filed 11/19/19   Page 134 of 580
Case 1:11-cv-22408-MGC   Document 290-1   Entered on FLSD Docket 08/15/2011   Page 103 of
121
Confidential - Subject to Further Confidentiality Review

 1      A.   Yes.

 2           MR. POYER:  Could we take two minutes, and,

 3      Madam Court Reporter, can you fill out some more

 4      tags for us?  Thank you.

 5           THE VIDEOGRAPHER:  3:55 p.m.  Going off the

 6      record.

 7           (Recess from 3:55?p.m. until 3:59?p.m.)

 8           THE VIDEOGRAPHER:  3:59 p.m.  Back on the

 9      record.

10           (Cohen Exhibit No. 15 was marked for

11      identification.)

12      BY MS. RICO:

13      Q.   Okay.  I'm going to show you what we've marked

14      as Exhibit 15.  Do you recognize this document?

15      A.   It's a HUD Property Inspection Report.

16      Q.   And it is for the property we were discussing

17      earlier, 422 Belle Grove Lane?

18      A.   Yes.

19      Q.   And if I recall, you said earlier that you --

20      you're not sure why you pulled this property in

21      conjunction with your work in this case?

22      A.   That's correct.

23      Q.   So it's safe to say you didn't rely on this

24      document in preparing your report?

25      A.   Yes.

```
1        Q.   Thank you.

2             (Cohen Exhibit No. 16 was marked for

3    identification.)

4    BY MS. RICO:

5        Q.   I'll show you what we've marked as Exhibit 16.

6    Do you recognize this document?

7        A.   This is a tax record report for Satinleaf.

8        Q.   And did you pull this document in conjunction

9    with your work in this case?

10       A.   Yes.

11       Q.   Do you recall why?

12       A.   No.

13       Q.   Is it safe to say you didn't rely on this

14   document in preparing your report?

15       A.   Yes.

16       Q.   Thank you.

17            (Cohen Exhibit No. 17 was marked for

18   identification.)

19   BY MS. RICO:

20       Q.   I'll show you what we've marked as Exhibit 17.

21   Do you recognize this document?

22       A.   It looks like a very large settlement statement

23   and -- give me a minute.

24       Q.   Uh-huh.  Take your time.

25       A.   Okay.  It looks like a, yeah, settlement
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 136 of 580
Case 1:14-cv-22484-MGC Document 290-1 Entered on FLSD Docket 05/15/2015 Page 105 of
121
Confidential – Subject to further confidentiality review

1    statement.  It's just --

2         Q.   If you look at the -- they're not numbered, but

3    if you look at the sixth page in, Settlement Agreement

4    and Release is the title on the page?

5         A.   Yeah.  Yeah.

6         Q.   Are you there?

7         A.   Yeah, I'm looking at it right now.

8         Q.   It looks like this pertains to the property at

9    9447 Satinleaf Place, Parkland; is that right?

10        A.   Yes.  Yes.

11        Q.   Do you know why you pulled this document in

12   conjunction with your work in this case?

13        A.   It was in the file with all the rest of the

14   documents.

15        Q.   But you don't recall why you pulled this

16   particular property?

17        A.   No.  I just threw it in there with the rest of

18   the documents.  I don't know why I pulled this property.

19        Q.   Okay.  Is it safe to say you didn't rely on

20   this document when preparing your report?

21        A.   Yes, that's safe to say.

22        Q.   Okay.  Thanks.

23             Aside from the documents that we were just

24   reviewing, are there any documents that you can recall

25   that you did rely on when preparing your report that we

1    have not discussed today?

2         A.    There's no documents that I used to rely --

3    that I relied on for my report.

4         Q.    Your report is only based on your experience?

5         A.    Correct.

6         Q.    Okay.  Thank you.

7         A.    None that I recall.

8         Q.    You mentioned earlier, you're not a certified

9    appraiser, are you?

10        A.    I'm not a certified appraiser.

11        Q.    And you don't hold yourself out to be an expert

12   in that field, do you?

13        A.    As an appraiser?  No.

14        Q.    And you have no training as an appraiser?

15        A.    My job depended on accuracy of values for list

16   prices and we valued -- we came up with an estimated

17   value, a broker price opinion for every single property

18   we listed, every -- at least for the listing, and then

19   generally every few months, as long as it hadn't sold,

20   and then we would also do broker price opinions,

21   fee-based opinions, for $50.  So we've done multiples of

22   opinions of value past the number of properties we've

23   sold.  So it would be, potentially, 10,000 broker price

24   opinions.  So we -- we are not certified appraisers

25   and -- but I would say I do have experience valuing

1  properties.

2      Q.  But that falls within your experience as a real

3  estate broker; right?

4      A.  Not as a -- I do not have an appraisal license

5  and I'm not governed under the appraisal guidelines.

6      Q.  So you don't follow the Uniform Standards of

7  Professional Appraisal Practice; right?

8      A.  Correct.  Or I don't know if there are some of

9  those that are involved with licensed real estate law,

10  but I'm not a licensed appraiser.

11          May I add something?

12      Q.  Of course.

13      A.  So generally our clients would get an appraisal

14  done on the houses that we sold, so they would compare

15  our value to the appraised value and -- and use that for

16  the list price, for determining their list price, so...

17      Q.  How would they use that?  They would compare

18  the two, is that what you mean?

19      A.  Yeah, and sometimes ours were more accurate

20  than the appraisals.

21      Q.  How so?

22      A.  Because it sold closer to the price that we

23  estimated it.

24      Q.  But you only know that if the property sold?

25  Or when the property sold, rather?

```
 1      A.   Yes.  Or also when it went under contract,

 2   generally speaking, it would sell for the price it went

 3   under contract.

 4           MS. RICO:  I'm almost done.  Could we take a

 5      two-minute break so I can just look through?

 6           THE VIDEOGRAPHER:  4:08 p.m.  Going off the

 7      record.

 8           (Recess from 4:08?p.m. until 4:17 p.m.)

 9           THE VIDEOGRAPHER:  4:17 p.m.  Back on record.

10   BY MS. RICO:

11      Q.   Throughout the day today we've been discussing

12   the one confirmed Chinese drywall transaction that you

13   had.  Do we have your entire file for that property?

14      A.   Yes.

15           MS. RICO:  Counsel, you provided it to us?

16           MR. CAMPBELL:  (Nodding head.)

17           MS. RICO:  Okay.

18   BY MS. RICO:

19      Q.   Additionally, did you go through your e-mails

20   and files and search for anything referencing Chinese

21   drywall?

22      A.   I went through my CRM, which has all my

23   properties in it and all the files associated to those

24   properties.

25      Q.   How about e-mails with investors or former
```

Confidential - Subject to further confidentiality review

```
 1   clients?

 2      A.   E-mails with investors?

 3      Q.   With any of your clients, discussing Chinese

 4   drywall, did you do a search for that?

 5      A.   I don't recall doing a search of my e-mails.  I

 6   have 13 years worth of e-mails and a lot of e-mails, so

 7   it's just --

 8      Q.   Could you please conduct a search like that

 9   and, to the extent that you find anything, produce it

10   through your counsel?

11      A.   I can search my e-mail.

12           MR. CAMPBELL:  Yeah, I mean, if we have an --

13           MS. RICO:  Obviously subject to any review,

14      right.

15           MR. CAMPBELL:  Yeah, objection.

16           MS. RICO:  Subject to your review.

17           MR. CAMPBELL:  Well, and just if it's going to

18      be an undue burden on him, then we may have that

19      objection in addition to any privilege or

20      confidential information.  But we have to talk to

21      him about what it would entail to do that, so just

22      reserving all rights.

23           MS. RICO:  That's -- that's fine, but to the --

24           MR. POYER:  The same.

25           MS. RICO:  That's fine.  No, of course.
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 141 of 580
Confidential - Subject to further Confidentiality Review
121

```
1   BY MS. RICO:

2       Q.   But to the extent that you could, because it

3   does go to your expertise and any work that you've done

4   pertaining to Chinese drywall.

5           MR. CAMPBELL:  And I guess, just for the

6       record, I don't believe you asked -- I don't think

7       that those documents or that search that you've

8       asked for him to do is responsive to any of the

9       document requests that were issued, just for the

10      record.  You may have a disagreement on that,

11      but --

12          MS. RICO:  I would have to look.

13          MR. MONTOYA:  I think we're mirroring what was

14      done with Greenblatt, that's all.  I think y'all

15      asked that at the conclusion of his depo or sometime

16      during it, and we just would ask for the same, and

17      that's what we're saying.  And I understand you've

18      got -- you may have objections to it, but that's

19      what we're requesting.

20          MR. CAMPBELL:  And his may be different

21      requests too.  We used different ones.

22  BY MS. RICO:

23      Q.   We'll -- we'll go through this later, but --

24      A.   Okay, no problem.

25      Q.   -- for your purposes, you can do whatever they
```

```
 1   tell you to do --

 2       A.   Okay.

 3       Q.   -- and we'll hash it out later.

 4            Have you ever read the book Real Estate Damages

 5   by Randall Bell, Dr. Randall Bell?

 6       A.   I have not.

 7       Q.   Have you ever read any -- Hank, I think, is his

 8   first name -- any articles by Mr. Rodaway?

 9            MR. MONTOYA:  Richard, I think.

10       Q.   Richard.

11       A.   I have not.

12            (Cohen Exhibit No. 18 was marked for

13   identification.)

14   BY MS. RICO:

15       Q.   I'm going to show you what we'll -- what I've

16   marked as Exhibit 18.  Do you recognize this document?

17       A.   This looks like it is part of my blog, and my

18   blog is -- it has content on it that's created by a

19   third party for marketing purposes.  The company's name

20   is Ylopo.

21       Q.   What -- could you spell that for us, please?

22       A.   Y-l-o-p-o.  And they provide me -- they do

23   marketing for my company and they do my website and they

24   do content creation.  So they -- they create content in

25   order to help -- it's general content that they use in
```

```
 1    order to help with credibility and lead generation.  And

 2    it's used by a lot of different real estate agents, so

 3    it's not unique copy to me.  It's copy that a lot of

 4    agents are using.  Customers of Ylopo.

 5         Q.   Okay.  And this blog post is titled What Things

 6    Should You Disclose When Selling a Home?; is that right?

 7         A.   That's correct.

 8         Q.   And it appeared on your company's blog on

 9    May 29, 2018; is that right?

10         A.   I -- yeah, I guess so.  Yep, it looks like it.

11         Q.   And I would assume you approve all content

12    before it goes up on your company's website; is that

13    right?

14         A.   There is content on my website that has been

15    used by a lot of other realtors in my -- in the

16    community that uses Ylopo, and so there's a level of

17    trust with the content.  And there's a lot of past

18    content.  So I only joined Ylopo maybe four months ago,

19    so I haven't gone retroactively to read all of the

20    content that they created that spans years.  I have not

21    reviewed all of that content.

22         Q.   But any content on your company's blog is a

23    reflection of your company; right?

24              MR. CAMPBELL:  Objection to form.

25              MR. POYER:  Object to the form.
```

```
 1              THE WITNESS:  So I trust this company, and when
 2       you're a business owner -- in my experience as a
 3       business owner, I -- I can't -- there's certain
 4       things I have to outsource, and I have outsourced
 5       the marketing of my website and certain content to
 6       them.  And I trust the company, they're very
 7       credible, and so I do not review all the content
 8       that they create for the blogs.
 9    BY MS. RICO:
10       Q.   Do you stand behind the content that's on your
11    blog?
12              MR. CAMPBELL:  Objection.  Form.
13              THE WITNESS:  I would say yes, I would stand
14       behind the content.
15              MS. RICO:  That's it.  I have no more
16       questions.  Thank you.
17                        CROSS-EXAMINATION
18    BY MR. CAMPBELL:
19       Q.   I just have one redirect, if that's okay.  Let
20    me see which exhibit it was.
21              MR. CAMPBELL:  Do you recall which one the
22       invoice was?
23              MS. RICO:  I think it was 4.  4 or 5.
24              MR. CAMPBELL:  Okay.
25              ///
```

```
1   BY MR. CAMPBELL:

2       Q.   Yea, here it is.  4.  Can you pull out

3   Exhibit 4, David?

4       A.   Yes.

5       Q.   You discussed this earlier.  I'm going to draw

6   your attention to the entry that says "FAR legal

7   hotline."  Do you see that?

8       A.   Yes.

9       Q.   Okay.  Can you explain the best you can

10  remember exactly what occurred during that telephone

11  call that you discussed earlier?

12      A.   I called to find out if there was a legal

13  requirement to disclose that a home had been remediated

14  that previously had Chinese drywall, and I was told that

15  there's no requirement to disclose, if it was properly

16  remediated, that it had previously had Chinese drywall.

17      Q.   And what is FAR Legal Hotline?

18      A.   It's the Florida Association of Realtors Legal

19  Hotline, and it's available to real estate agents.  And

20  it's paid for out of our board dues.  There are

21  attorneys on there.  I don't know -- yeah, that's it.

22           MR. CAMPBELL:  That's all.

23                    REDIRECT-EXAMINATION

24  BY MS. RICO:

25      Q.   I have one more question.
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 146 of 580
Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 146 of 580

Confidential – Subject to Further Confidentiality Review
121

```
 1              When you called the FAR Legal Hotline, did you

 2    get a reference number for your call?

 3        A.   I did not get a reference number for the call.

 4        Q.   Did you take any notes from your call?

 5        A.   It's possible.  It's possible.  It's possible

 6    that I took notes.  I would have to check.

 7        Q.   Would you please check for us?  And to the

 8    extent that you have them, we'd ask that you produce

 9    them.

10        A.   Yes.

11        Q.   And do you recall who you talked to?

12        A.   I don't recall who I spoke to, but it might be

13    in -- if I took notes -- I know where to check if I took

14    notes, so, yeah.

15        Q.   Okay.  Well, we'd just ask that you check on

16    that.

17              But you did testify earlier that, as a

18    professional, you would disclose that a home was

19    remediated that previously contained Chinese drywall;

20    right?

21        A.   So the seller's disclosure, if required, has to

22    be filled out truthfully, and in the seller's disclosure

23    it does ask if there is drywall that had been previously

24    remediated.  So I would answer that fairly -- well, the

25    truth is my seller -- I will tell my seller to answer
```

```
 1    the seller's disclosure truthfully and fairly.  And it's

 2    their form to fill out, not mine.  I'm not allowed to

 3    fill out that form.

 4           MS. RICO:  Okay.  I have no further questions.

 5        Thank you.

 6           THE VIDEOGRAPHER:  4:27 p.m.  Going off the

 7        record.  This marks the end of the deposition.

 8           (Whereupon, the deposition concluded at

 9    4:27 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                  C E R T I F I C A T E

 2

 3          I, JOAN L. PITT, Registered Merit Reporter,

 4    Certified Realtime Reporter, and Florida Professional

 5    Reporter, do hereby certify that, pursuant to notice,

 6    the deposition of DAVID J. COHEN was duly taken on

 7    April 17, 2019, at 1:10 p.m., before me.

 8          The said DAVID J. COHEN was duly sworn by me

 9    according to law to tell the truth, the whole truth, and

10    nothing but the truth, and thereupon did testify as set

11    forth in the above transcript of testimony.  The

12    testimony was taken down stenographically by me.  I do

13    further certify that the above deposition is full,

14    complete, and a true record of all the testimony given

15    by the said witness.

16

17    _____

18          JOAN L. PITT, RMR, CRR, FPR

19

20          (The foregoing certification of this transcript

21    does not apply to any reproduction of the same by any

22    means, unless under the direct control and/or

23    supervision of the certifying reporter.)

24

25
```

Case 2:09-md-02047-EEF-MBN   Document 22363-34   Filed 11/19/19   Page 149 of 580 8 of
121
Confidential - Subject to further Confidentiality Review

```
 1                  INSTRUCTIONS TO WITNESS

 2

 3

 4          Please read your deposition over carefully and

 5     make any necessary corrections.  You should state the

 6     reason in the appropriate space on the errata sheet for

 7     any corrections that are made.

 8

 9          After doing so, please sign the errata sheet

10     and date it.  It will be attached to your deposition.

11

12          It is imperative that you return the original

13     errata sheet to the deposing attorney within thirty (30)

14     days of receipt of the deposition transcript by you.  If

15     you fail to do so, the deposition transcript may be

16     deemed to be accurate and may be used in court.

17

18

19

20

21

22

23

24

25
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 150 of 580 9 of
121
Confidential - Subject to further confidentiality review

```
 1                      - - - - - -

 2                    E R R A T A

 3                      - - - - - -

 4    PAGE    LINE    CHANGE

 5    _____   _____   _____

 6      REASON: _____

 7    _____   _____   _____

 8      REASON: _____

 9    _____   _____   _____

10      REASON: _____

11    _____   _____   _____

12      REASON: _____

13    _____   _____   _____

14      REASON: _____

15    _____   _____   _____

16      REASON: _____

17    _____   _____   _____

18      REASON: _____

19    _____   _____   _____

20      REASON: _____

21    _____   _____   _____

22      REASON: _____

23    _____   _____   _____

24      REASON: _____

25
```

```
 1                    ACKNOWLEDGMENT OF DEPONENT

 2

 3          I, _____, do hereby

 4     acknowledge that I have read the foregoing pages,

 5     1 - 120, and that the same is a correct transcription of

 6     the answers given by me to the questions therein

 7     propounded, except for the corrections or changes in

 8     form or substance, if any, noted in the attached Errata

 9     Sheet.

10

11

12     _____     _____

13     DAVID J. COHEN                    DATE

14

15

16

17

18     Subscribed and sworn to before me this

19     ____ day of _____, 20___.

20     My Commission expires: _____

21

22     _____

       Notary Public

23

24

25
```

```
  1                        LAWYER'S NOTES

  2    PAGE     LINE

  3    _____   _____   _____

  4    _____   _____   _____

  5    _____   _____   _____

  6    _____   _____   _____

  7    _____   _____   _____

  8    _____   _____   _____

  9    _____   _____   _____

 10    _____   _____   _____

 11    _____   _____   _____

 12    _____   _____   _____

 13    _____   _____   _____

 14    _____   _____   _____

 15    _____   _____   _____

 16    _____   _____   _____

 17    _____   _____   _____

 18    _____   _____   _____

 19    _____   _____   _____

 20    _____   _____   _____

 21    _____   _____   _____

 22    _____   _____   _____

 23    _____   _____   _____

 24    _____   _____   _____

 25
```

# EXHIBIT D

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 01/10/19 Page 154 of 580
Case 1:11-cv-22408-MGC Document 290-1 Entered on FLSD Docket 05/13/2015 Page 2 of 324
Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2

      ------------------------------:
 3   IN RE:  CHINESE-MANUFACTURED  : MDL NO. 2047
     DRYWALL PRODUCTS LIABILITY     :
 4   LITIGATION                     : SECTION:   L
                                    :
 5   THIS DOCUMENT APPLIES TO ALL   : JUDGE FALLON
     CASES                          :
 6                                  : MAG. JUDGE WILKINSON
                                    :
 7   ------------------------------:
 8
                            - - -
 9
                  Monday, March 4, 2019
10
                            - - -
11
12               ** CONFIDENTIAL **
13       SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
14                          - - -
15           Videotaped deposition of RYAN GREENBLATT,
         held at Marshall Grant, PLLC, 197 South Federal
16       Highway, Suite 200, Boca Raton, Florida,
         commencing at 10:23 a.m., on the above date,
17       before Susan D. Wasilewski, Registered
         Professional Reporter, Certified Realtime
18       Reporter, Certified Realtime Captioner
19                          - - -
20             GOLKOW LITIGATION SERVICES
           877.370.3377 ph | 917.591.5672 fax
21                  deps@golkow.com
22
23
24
25
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:

 2       COLSON HICKS EIDSON
         BY:  PATRICK S. MONTOYA, ESQUIRE
 3            NATALIE M. RICO, ESQUIRE
         255 Alhambra Circle, Penthouse
 4       Coral Gables, Florida 33134
         Phone:  (305) 476-7400
 5       patrick@colson.com
         natalie@colson.com
 6       Representing Plaintiffs

 7

 8       ORRICK, HERRINGTON & SUTCLIFFE, LLP
         BY:  DIANA SZEGO FASSBENDER, ESQUIRE
 9       1152 15th Street, NW
         Washington, D.C. 20005-1706
10       Phone:  (202) 339-8533
         dszego@orrick.com
11       Representing Defendant Beijing New Building
         Materials PLC

12

13

         GORDON ARATA MONTGOMERY BARNETT
14       BY:  ALEX B. ROTHENBERG, ESQUIRE
         201 St. Charles  Avenue, 40th Floor
15       New Orleans, Louisiana 70170-4000
         Phone:  (504) 582-1111
16       arothenberg@gamb.law
         Representing Defendant Beijing New Building
17       Materials PLC

18

19       ABALLI MILNE KALIL, P.A.
         BY:  JOSHUA D. POYER, ESQUIRE
20            MICHEL AYUB, ESQUIRE
         1 Southeast 3rd Avenue, Suite 2250
21       Miami, Florida 33131
         Phone:  (305) 373-6600
22       jpoyer@aballi.com
         mayub@aballi.com
23       Representing Defendant Beijing New Building
         Materials PLC

24

25
```

```
 1    APPEARANCES:

 2        ALSTON & BIRD LLP

          BY:  STEVEN R. CAMPBELL, ESQUIRE

 3        90 Park Avenue, 15th Floor

          New York, New York 10016-1387

 4        Phone:  (212) 210.9400

          steven.campbell@alston.com

 5        Representing Defendant Taishan Gypsum Company

 6

 7        ALSTON & BIRD LLP

          BY:  SARAH O'DONOHUE, ESQUIRE

 8        1201 West Peachtree Street

          Atlanta, Georgia 30309-3424

 9        Phone:  (404) 881-7000

          sarah.odonohue@alston.com

10        Representing Defendant Taishan Gypsum Company

11

12    ALSO PRESENT:

13        ANTHONY BARBARO, Videographer

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                         - - -
 2                     I N D E X
 3                         - - -
 4
    Testimony of:  RYAN GREENBLATT                    Page
 5
        DIRECT EXAMINATION BY MS. FASSBENDER..........   7
 6
        CROSS-EXAMINATION BY MR. CAMPBELL.............. 127
 7
 8                     E X H I B I T S
 9                 (Attached to transcript)
10   RYAN GREENBLATT DEPOSITION EXHIBITS              PAGE
11   Exhibit 1    Corrected Notice of Videotaped         8
                  Deposition of Ryan Greenblatt
12
     Exhibit 2    Expert Witness Report of: Ryan         9
13                Greenblatt, PA, February 15, 2019
14   Exhibit 3    Curriculum Vitae                       10
                  Ryan Todd Greenblatt
15
     Exhibit 4    Seller's Property Disclosure -         24
16                Residential
                  Lang Realty
17
     Exhibit 5    Comprehensive Rider to the             28
18                Residential Contract For Sale And
                  Purchase
19                Lang Realty
20   Exhibit 6    Addendum to Contract for Residential   29
                  Sale and Purchase
21                Lang Realty
22   Exhibit 7    Residential Full Report - MLS          41
                  17830 Monte Vista Drive, Boca Raton,
23                FL 33496
24   Exhibit 8    History for MLS # RX-3050040           70
                  17830 Monte Vista Drive, Boca Raton,
25                FL 33496
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 01/10/19 Page 158 of 580
Case 2:11-cv-02404-MCE-CMK Document 280 Entered on FLSD Docket 05/13/2019 Page 5 of 324
Confidential - Subject to further confidentiality Review

```
 1                      E X H I B I T S
 2                 (Attached to transcript)
 3     RYAN GREENBLATT DEPOSITION EXHIBITS              PAGE
 4   Exhibit 9     Residential Full Report - MLS          74
                   17894 Monte Vista Drive, Boca Raton,
 5                 FL 33496
 6   Exhibit 10    Residential Full Report - MLS          89
                   9407 Bridgebrook Drive, Boca Raton,
 7                 FL 33496
 8   Exhibit 11    Ryan Todd Greenblatt Trial Testimony  113
                   List
 9
     Exhibit 12    Composite Reliance Materials           118
10
     Exhibit 13    Seller's Real Property Disclosure      129
11                 Statement
                   9407 Bridgebrook Drive, Boca Raton,
12                 FL 33496
13   Exhibit 14    Seller's Real Property Disclosure      130
                   Statement
14                 17894 Monte Vista Drive, Boca Raton,
                   FL 33496
15
     Exhibit 15    Handwritten Notes                      273
16
     Exhibit 16    E-mail correspondence produced at      287
17                 the deposition
18   Exhibit 17    "AS IS" Residential Contract For       276
                   Sale And Purchase
19
     Exhibit 18    Residential Customer Report (MLS)      306
20                 17800 Key Vista Way, Boca Raton, FL
                   33496
21
     Exhibit 19    Residential Full Report (MLS)          311
22                 9391 Bridgebrook Drive, Boca Raton,
                   FL 33496
23
24
25
```

1                           - - -

2                    THE VIDEOGRAPHER:  We are now on the record.

3          My name is Anthony Barbaro.  I am a videographer

4          for Golkow Litigation Services.  Today's date is

5          March 4th, 2019, and the time is 10:23 a.m.

6                    This video deposition is being held at

7          197 South Federal Highway, Suite 200, Boca Raton,

8          Florida, 33432, in the matter of the Chinese

9          Manufactured Drywall Products Liability

10         Litigation for the United States District Court,

11         Eastern Division of Louisiana.

12                   The deponent is Ryan Greenblatt.

13                   Counsel, would you please identify

14         yourselves for the record.

15                   MR. MONTOYA:  Patrick Montoya and Natalie

16         Rico on behalf of the Plaintiffs.

17                   MS. FASSBENDER:  Diana Fassbender on behalf

18         of Beijing New Building Materials PLC.

19                   MR. CAMPBELL:  Steven Campbell, Alston &

20         Bird, on behalf of Defendant Taishan Gypsum.

21                   MR. ROTHENBERG:  Alex Rothenberg on behalf

22         of BNBM PLC.

23                   MR. POYER:  Joshua Poyer, also on behalf of

24         BNBM PLC, and with me is Michel Ayub, also on

25         behalf of BNBM PLC.

```
 1           THE VIDEOGRAPHER:  The court reporter is

 2      Susan Wasilewski and she will now swear in the

 3      witness.

 4           THE COURT REPORTER:  Would you raise your

 5      right hand?

 6           Do you solemnly swear or affirm the

 7      testimony you're about to give will be the truth,

 8      the whole truth, and nothing but the truth?

 9           THE WITNESS:  Yes.

10           THE COURT REPORTER:  Thank you.

11           RYAN GREENBLATT, called as a witness by BNBM

12      Defendants, having been duly sworn, testified as

13      follows:

14                     DIRECT EXAMINATION

15      BY MS. FASSBENDER:

16      Q.   Good morning.

17      A.   Good morning.

18      Q.   Have you been deposed before?

19      A.   I have not.

20      Q.   Okay.  Well, you understand that you are

21      here testifying under oath today as if we were in

22      court?

23      A.   Um-hmm.

24      Q.   If you want to take a break at any time, let

25      us know.  We're happy to do so, so long as a
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/10/19 Page 161 of 580
Case 1:11-cv-22408-MGC Document 280 Entered on FLSD Docket 05/13/2019 Page 9 of 324
Confidential - Subject to Further Confidentiality Review

```
 1    question is not pending.  And if you need me to

 2    rephrase any questions or if you don't understand

 3    anything I'm asking, please let me know.

 4        A.    Okay.

 5              (Greenblatt Exhibit 1 was marked for

 6    identification.)

 7              MR. MONTOYA:  Thank you.

 8    BY MS. FASSBENDER:

 9        Q.    I'm handing you what's been marked as

10    Exhibit 1, which is the corrected notice of your

11    deposition.  Have you seen this before?

12        A.    No.

13        Q.    Okay.  You're here to testify today as an

14    expert witness on behalf of Plaintiffs, correct?

15        A.    Correct.

16        Q.    When were you engaged for this litigation?

17        A.    It was in December.

18        Q.    Of 2018?

19        A.    Um-hmm.

20        Q.    By whom?

21        A.    Patrick and Natalie and their office.

22        Q.    And for what purpose?

23        A.    To be an expert witness.

24        Q.    About how much time would you estimate you

25    have spent on this case?
```

```
1     A.    It's probably been 10 to 20 hours max.

2     Q.    Okay.  And what is your rate?

3     A.    $175 an hour.

4           (Greenblatt Exhibit 2 was marked for

5     identification.)

6           MR. MONTOYA:  Thank you.

7     BY MS. FASSBENDER:

8     Q.    I've marked -- excuse me.  I've handed you

9     Exhibit 2, which is a copy of your expert report in

10    this matter; is that correct?

11    A.    Yes.

12    Q.    Does your report and the exhibits -- and the

13    exhibits to your report set forth your entire

14    opinion in this case?

15    A.    My entire opinion?

16    Q.    Yes.

17    A.    I don't know about my entire opinion, but my

18    opinion would be the correct answer.

19    Q.    Well, is there anything that you intend to

20    testify about at trial in this case that's not

21    reflected in your report?

22    A.    Not -- I don't think so.

23    Q.    Okay.  Do you currently anticipate a need to

24    supplement your report?

25    A.    No.
```

Confidential - Subject to Further Confidentiality Review

```
1       Q.    Are you aware of any inaccuracies in your

2   report?

3       A.    No.

4       Q.    Since you authored your report, have you

5   reviewed any additional information?

6       A.    Additional information regarding what?

7       Q.    Relating to your opinion in this matter.

8       A.    I've looked at some history of -- like, I

9   went back at the files just to refresh my memory of

10  the transaction times, and that's it.  It's not

11  nothing new.

12      Q.    And when you say "the transaction times," is

13  that -- what transactions are you referring to?

14      A.    I mean the MLS.  I printed out the MLS of

15  one of the sales just to refresh myself, but it's

16  nothing new.

17      Q.    Okay.  Have you reviewed the expert reports

18  of any of the other Plaintiffs' experts in this

19  litigation?

20      A.    Experts' reports?  No.  I -- no.  I reviewed

21  someone else's testimony in another case to just

22  familiarize myself with what would be happening

23  today.

24      Q.    Okay.

25            (Greenblatt Exhibit 3 was marked for
```

Confidential - Subject to Further Confidentiality Review

```
 1    identification.)

 2           MR. MONTOYA:  Thank you.

 3    BY MS. FASSBENDER:

 4       Q.   I'm handing you what -- excuse me, what's

 5    been marked as Exhibit 3, which is a copy of your

 6    CV, and I believe that was Attachment A to your

 7    report.

 8       A.   Um-hmm.

 9       Q.   Where did you go to college?

10       A.   University of Miami.

11       Q.   And what year did you graduate?

12       A.   1998.

13       Q.   And what was your degree?

14       A.   Bachelor of business administration.

15       Q.   While you were in college, did you take any

16    courses in real estate?

17       A.   No.

18       Q.   And where were you employed after college?

19       A.   I worked for an Internet marketing company,

20    and then I got into real estate in 2001.

21       Q.   And when did you obtain your real estate

22    license?

23       A.   2001.

24       Q.   In 2001?

25       A.   Um-hmm.
```

Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Okay.  Can you explain what one's -- what

 2   one needs to do in order to obtain a real estate

 3   license?

 4      A.   You have to pass a State exam.  There is a

 5   course that you have to take, and then you pass a

 6   State exam.

 7      Q.   Is there any requirements in order to sit

 8   for the exam other than the course you mentioned?

 9      A.   I think you have to have a high school

10   diploma.

11      Q.   Okay.  But no college diploma?

12      A.   I don't believe so, but I also have my

13   broker's license.

14      Q.   Okay.  And when did you obtain your broker's

15   license?

16      A.   Probably about four years ago, around there.

17      Q.   So around 2015?

18      A.   Four or five years ago, yeah.

19      Q.   And what -- what do you need to obtain a

20   broker's license?

21      A.   It's more education and another exam.  You

22   have to have at least two years of experience before

23   you can apply.

24      Q.   Two years of experience as a licensed real

25   estate agent?
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 166 of 580
Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 166 of 580
324

Confidential - Subject to further confidentiality review

```
 1      A.    Um-hmm.

 2      Q.    Okay.  Can you explain the difference

 3   between a real estate license and a broker's

 4   license?

 5      A.    A broker can start their own brokerage --

 6      Q.    Okay.

 7      A.    -- if they choose to do so.  I still -- I

 8   haven't changed where I work, but I have the ability

 9   to start my own brokerage if I wanted to with a

10   broker's license.

11      Q.    And how did the -- the courses differ from

12   those with -- for your real estate license?

13      A.    The broker's course was a little more in

14   depth, preparing you to look at closing disclosures,

15   contracts.  It was a little more in depth.

16      Q.    In order to maintain your licenses, are you

17   required to take continuing education classes?

18      A.    Every two years.

19      Q.    For -- separate for real estate --

20      A.    No, once you have your broker's license,

21   it's the same continuing education.

22      Q.    Okay.  And then do you have to renew your

23   license?

24      A.    With the State, um-hmm.

25      Q.    And do you do so every two years?
```

Confidential - Subject to further confidentiality review

```
1     A.   Yes, yes.

2     Q.   Are you a member of any Realtors'

3   associations?

4     A.   I'm a member of the RAPP.

5     Q.   What is that?

6     A.   Realtor Association of Palm Beach.

7     Q.   Do you have an appraisal license?

8     A.   I do not.

9     Q.   Do you have any training in appraisal?

10    A.   I do not.

11    Q.   And you are currently with Lang Realty?

12    A.   I've been with them since I started in real

13  estate.

14    Q.   Okay.  What geographic area do you service?

15    A.   I focus on southern Palm Beach, Boca,

16  Delray, Boynton, but I have done work as far south

17  as Miami Beach.  I have listings currently in

18  Broward.

19    Q.   Has that generally been the scope of the

20  areas since you started?

21    A.   Um-hmm.

22    Q.   Do you focus on one particular area more

23  than others?

24    A.   I am in West Boca/Delray, that's where I do

25  the majority of my business, but I wouldn't --
```

```
1    that's -- that's the main focus, but I -- I think

2    I'm pretty diverse.

3        Q.   Do you market yourself to all geographic --

4    all the geographic areas that you just identified?

5        A.   In Broward and Dade?

6        Q.   Um-hmm.

7        A.   Not in Broward and Dade.

8        Q.   Okay.  Where do you market yourself?

9        A.   Mostly in Boca and Delray, Boynton.

10       Q.   How do you do so?

11       A.   Direct mail, Internet.

12       Q.   Do you have any specialties in terms of --

13   do you focus more on acting as a buying agent,

14   selling agent --

15       A.   No, I do both.  I have -- some years I have

16   more buyers, some years I have more listings.

17       Q.   And what about particular types of homes?

18       A.   I could tell you right now, I have a listing

19   for a rent for $1500 and I have listings well over

20   $1 million.

21       Q.   Okay.  Paragraph 5 of your report states

22   you've been focusing your "marketing efforts in the

23   Oaks since 2004."

24       A.   Um-hmm.

25       Q.   And that you "have sold countless homes in
```

Confidential - Subject to Further Confidentiality Review

 1     the Oaks, both new and resales, and continue to be a

 2     dominating Realtor in the Oaks."

 3         A.   Um-hmm.

 4         Q.   Can you estimate approximately how many

 5     homes in The Oaks you have sold either as a buying

 6     or selling agent?

 7         A.   My guess would be over 20.

 8         Q.   And can you put a -- so approximately how

 9     much of your time do you spend focused on The Oaks?

10         A.   How much of my time?  It varies.  When I

11     have listings in there, I spend more time.  When I

12     have buyers focused on -- every day is different for

13     me.

14         Q.   Okay.  Do you market yourself in The Oaks as

15     well?

16         A.   Um-hmm.

17         Q.   Do you consider yourself to be an expert in

18     that area?

19         A.   Yes.

20         Q.   Can you describe The Oaks?

21         A.   It's a gated neighborhood in West Boca.

22     It's -- it was sort of created to attract buyers out

23     of country clubs.  They have a lot of amenities.  So

24     in the late '90s, early -- around 2000, they

25     created -- at the time it was somewhat new for this

```
 1    part of town to have all these amenities without the

 2    mandatory membership of a country club.  So they

 3    had, you know, things that most single-family

 4    neighborhoods that weren't country clubs didn't

 5    have, and they were trying to pull buyers out of

 6    country clubs into The Oaks.  And it's really -- at

 7    the time, they were really high-end custom -- some

 8    of them were custom homes.

 9        Q.   When were most of the homes built in The

10    Oaks?

11        A.   The first developer started in the late

12    '90s, and then Kenco and Albanese came in early

13    2000s.

14        Q.   And you mentioned amenities.  What sort of

15    amenities are -- do they offer?

16        A.   They have three different types of tennis

17    courts.  They have a very active tennis program with

18    pros.  They have a gym with staff, classes, yoga,

19    Pilates.  There is a restaurant.

20        Q.   And are there sections of The Oaks?

21        A.   Once you're in the gates, you're in the

22    gates.  There are different caliber homes, I guess

23    you could say, within the neighborhood, but once

24    you're in the gates, you're in.

25        Q.   So are certain areas nicer than others?
```

```
 1      A.   Yes, um-hmm.

 2      Q.   And could you -- how does that range?

 3      A.   There is a zero lot section.  Right now,

 4    they are trading probably at the lowest in the

 5    sevens, and there are homes that are over $2

 6    million.

 7      Q.   Do you know when they were -- when the homes

 8    were new, what was the price range then?

 9      A.   It was hard to get under $1 million.

10      Q.   Looking at your report, Paragraph 6 states:

11    "I'm generally and specifically aware of factors

12    that affect values of homes in the area, such as

13    location, condition, including size, age, quality of

14    construction, code compliance, updates, appliances,

15    and structural and cosmetic elements of the home."

16           When you refer to "in the area," what area

17    are you referring to?

18      A.   The area of The Oaks, West Boca, Delray,

19    Boynton.

20      Q.   And are there other factors that come to

21    mind that affect the value of the homes?

22      A.   Beyond what I've stated here?

23      Q.   Yeah.  Correct.

24      A.   No.

25      Q.   Paragraph 7 states that "Homes affected by
```

```
1    certain issues can develop a stigma that negatively

2    affect their market value."

3        A.    Um-hmm.

4        Q.    What do you mean by the term "stigma"?

5        A.    Stigma?  In The Oaks, I've had clients refer

6    to the neighborhood as having a black cloud over the

7    neighborhood, but stigma is a preconceived opinion

8    of a home or a neighborhood.

9        Q.    Based on what?

10            I apologize, go ahead.

11       A.    Based on perception, based on opinions.

12       Q.    In paragraph 8 you identify "Factors that

13   create a stigma that negatively affect the value of

14   homes, including but not limited to sinkholes,

15   termites, flooding, environmental issues, et cetera.

16       A.    Um-hmm.

17       Q.    Are there any other factors in your

18   experience that cause stigma?

19       A.    There could be all kinds of different

20   factors, yeah.

21       Q.    Like, did you have anything else in

22   particular in mind when you were -- used the word

23   et cetera?

24       A.    Nothing in particular, but, I mean, there

25   could be a lot of things that affect a negative --
```

1   you know, create a stigma about a home, but those

2   are some good examples.

3       Q.   Are there any others that you've -- that

4   you've had experience either as a buying or selling

5   agent, other than Chinese drywall?

6       A.   Yeah.  Being close to a road, you know, a

7   busy road, things like that.  I don't know if that's

8   a stigma, though.  That's just a fact.

9       Q.   Any other -- anything else?

10      A.   No, not off the top of my head.

11      Q.   You mentioned earlier that stigma, I think

12  you said, is a preconceived opinion or perception

13  about a home.

14           In your experience, what influences people's

15  perception or opinion about a home?

16      A.   What influences people's perception?  That's

17  a pretty broad question.  I mean, it could be --

18  what -- what's your perception could be different

19  than mine, or your opinion would be different than

20  mine.  It's sort of a broad question.  Everybody has

21  different buttons, every buyer has different

22  buttons.  So I don't think I can answer that

23  question because yours is different than everybody

24  else's at the table.

25      Q.   Did you learn about stigma in obtaining your

1    real estate license, or is this something that you

2    kind of learn on the job?

3        A.   I didn't learn about stigma from real

4    estate.  I knew what the term "stigma" meant before

5    real estate.  I know what "stigma" means.

6             So are you asking about the word "stigma" or

7    stigma --

8        Q.   No, I'm sorry.  About really, I guess, the

9    notion in real estate about --

10       A.   Through experience, I learned about stigma.

11   I learned about clients.  You know, when you show a

12   home, they tell you what they think or when you

13   start to hear consistent opinions about a

14   neighborhood or bad schools or bad construction or

15   whatever it may be.

16       Q.   Earlier you mentioned that there was a

17   "black cloud" over The Oaks.  Can you explain that,

18   what you meant by that?

19       A.   I've had clients that won't look in a

20   neighborhood because they said there is a black

21   cloud over the neighborhood.  That was their term

22   that they used for the neighborhood, meaning just

23   bad -- bad -- just a black cloud, a negative -- a

24   negative perception of the neighborhood.

25       Q.   Have you had clients have that sort of

```
1    perception about neighborhoods other than The Oaks?

2        A.   Sure, here and there, when people don't like

3    a particular neighborhood or location, but The Oaks

4    was a pretty consistent one.

5        Q.   And why is that?

6        A.   The Chinese drywall.

7        Q.   And can you recall specific instances or

8    specific clients?

9        A.   Yeah, absolutely.

10       Q.   And approximately what time frame was that?

11       A.   From the -- probably for almost 10 years

12   today now.  To this day, I have clients that still

13   refer to The Oaks as having a black cloud.

14       Q.   Because of Chinese drywall?

15       A.   Yeah, there is uncertainty.  They've gone

16   through -- because of the -- you know, everything

17   that happened there, they've -- the first developer

18   went under.  Then when Kenco and Albanese came in,

19   they then were done, and another builder came in.

20   It's turned hands many times, so there is, you know,

21   inconsistent now -- somewhat inconsistent

22   construction towards the end, but --

23       Q.   Okay.  If -- turning to, again, your report,

24   Paragraph 9 --

25       A.   Um-hmm.
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 176 of 580
Case 1:07-cv-08065-NGG Document 124-2 Filed 3/30/12 Page 177 of
Confidential -- Subject to Further Confidentiality Review
324

```
1        Q.   -- you state that your understanding of

2   Florida law is a seller is required to disclose

3   your -- "all material facts that affect the value of

4   a property."

5        A.   Um-hmm.

6        Q.   Are you aware of a specific Florida law that

7   requires disclosure of a material fact?

8        A.   You have to disclose all material facts when

9   selling a home.

10       Q.   And are you aware of a specific Florida law

11  that requires that?

12       A.   A specific law?  All I know is when you get

13  your license and when you sell a home, you have to

14  disclose all material facts.

15       Q.   And what's the basis of that understanding?

16       A.   I believe that to be a Florida law.  I don't

17  know what the law is, per se, but I know that every

18  time you sell a home, there is a seller's disclosure

19  and you have to disclose material facts and if you

20  don't, you know, you can be -- I've had clients who

21  didn't disclose, and I've read cases when you're

22  studying for the exams for the renewal that you have

23  to disclose.  It's -- I mean, every two years,

24  you're reminded.

25       Q.   And what do you consider to be a -- a
```

Confidential - Subject to Further Confidentiality Review

```
 1    material fact?

 2       A.   A material fact?  Anything --

 3            MR. MONTOYA:  Object to the extent it calls

 4       for a legal conclusion.

 5            You can answer.

 6       A.   A material fact is anything that's wrong

 7    with the home.  I mean, there's a seller's

 8    disclosure that walks the seller through how to fill

 9    out the form.  So it's not up to me or the seller to

10    make a guess.  There's a form.  I'm not a lawyer, so

11    I hand my clients the form, and they fill it out.

12    And it walks them through what the Bar and the

13    Florida Association of Realtors has deemed necessary

14    for a seller's disclosure.

15            (Greenblatt Exhibit 4 was marked for

16    identification.)

17            MS. FASSBENDER:  Pardon me.

18            MR. MONTOYA:  You wan to mark this one, too?

19            MS. FASSBENDER:  Yes, please.

20            MR. MONTOYA:  Okay.

21            MS. FASSBENDER:  I'm looking for that.

22       Sorry.

23            MR. MONTOYA:  No problem.  I'll keep this

24       one.

25            MS. FASSBENDER:  Yeah, keep that one.
```

Confidential - Subject to Further Confidentiality Review

1    BY MS. FASSBENDER:

2        Q.   I've handed you what's been marked as

3    Exhibit 4, which I believe is Exhibit 1 to your

4    report, the Seller's Property Disclosure --

5    Disclosure - Residential form.

6        A.   Um-hmm.

7        Q.   Is this the form that you were just

8    referencing?

9        A.   That's correct.

10       Q.   And I see that -- well, okay.

11            Can you explain how this document is used,

12   just to be clear?

13       A.   I give this -- this is handed to every

14   seller, and when I represent a buyer, we ask for the

15   seller's agent to produce this.

16       Q.   And the seller for -- I'm sorry.  Excuse me.

17            The seller completes this form when they're

18   interested in putting their house on the market?

19       A.   Correct.

20       Q.   And I see this is on the Lang Realty

21   letterhead.  Is this a standardized form?

22       A.   This is a standard form that Lang just put

23   their logo on.

24       Q.   It is.  And who publishes this form?

25       A.   I believe --

1     Q.   Do you know?

2     A.   My guess is the Association of Realtors.  It

3  looks like it's -- yeah, Florida Realtors, it's

4  right here on the bottom right.

5     Q.   And this is the form that's currently in

6  use?

7     A.   Um-hmm, I believe so.

8     Q.   And turning to -- is it your conclusion that

9  it's Paragraph 9 that requires the disclosure of

10  Chinese drywall?

11     A.   It states "defective drywall," yes.

12     Q.   Do you consider each of these -- each of the

13  conditions or factors listed on this form to be a

14  material fact?

15     A.   If it's in the form, it's a material fact,

16  in my opinion.  I'm not an expert on creating these

17  documents.  I'm not a lawyer.

18     Q.   And in your experience, do you consider that

19  each of these facts can cause stigma on a home?

20     A.   No.  No, I don't think every material fact

21  would create stigma at all.

22     Q.   What sort of facts would or would not create

23  stigma?

24     A.   Something that creates uncertainty would

25  create stigma, something that might be perceived as

1    can't be fixed or fixed to -- I mean, if -- you

2    know, if there's a roof leak, you can fix a roof

3    leak, and buyers can have a documentation that they

4    are comfortable with and they can test it, pour

5    water on it and see that it's not leaking and you

6    usually get a warranty.  And that does not create

7    stigma.

8         It might hurt a transaction during an

9    inspection if there is a roof leak, but there is

10   usually a way that you can remedy it that's somewhat

11   black and white to give peace of mind to continue a

12   transaction.

13   Q.   Whether a particular condition causes

14   stigma, does that depend in part on the particular

15   buyer that's involved in the transaction?

16   A.   Yeah.  Some people are more concerned

17   with -- you know, if we're using Chinese drywall as

18   an example, but I think people who are educated

19   would be -- would consider it a stigma.  There are

20   people that aren't familiar with it, but once they

21   are made aware of it, it would create a stigma.

22   Q.   And do you know -- do you recall when

23   Chinese drywall was added to this form?

24   A.   I don't know.

25   Q.   Is this form amended occasionally, to your

1    knowledge?

2        A.   I believe so.

3        Q.   Have you ever seen things -- factors come

4    off of the form?

5        A.   I don't know.

6             (Greenblatt Exhibit 5 was marked for

7    identification.)

8             MR. MONTOYA:   Thank you.

9    BY MS. FASSBENDER:

10       Q.   I'm handing you what's been marked as

11   Exhibit 5, which is the "Comprehensive Rider to the

12   Residential Contract."

13       A.   Um-hmm.

14       Q.   And I believe that was Exhibit 2 to your

15   report.

16       A.   Um-hmm.

17       Q.   Can you explain this form, please?

18       A.   This is a defective drywall disclosure.

19       Q.   And this is to be entered by the -- the

20   seller and buyer at the time of contract?

21       A.   Correct.  It could also be prepared -- yeah,

22   prepared by a buyer's agent.

23       Q.   And again, is this a standard form?

24       A.   Yes.

25       Q.   Is it your understanding that this form

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 182 of 580 of
Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 182 of 580 of
Confidential - Subject to Further Confidentiality Review
324

1    would require disclosure of Chinese drywall in a

2    property that's been remediated?

3        A.   This form, to my knowledge, is basically

4    giving the buyer an ability to inspect the home for

5    Chinese drywall.

6        Q.   So it -- then, in that case, is it used if

7    there's a question about whether the home does or

8    does not contain Chinese drywall?

9        A.   If there is uncertainty and you are an

10   astute agent, you -- you would prepare this addendum

11   to include in a contract if you have any suspicions

12   of Chinese drywall to protect your client.

13           (Greenblatt Exhibit 6 was marked for

14   identification.)

15           MR. MONTOYA:  Thank you.

16   BY MS. FASSBENDER:

17       Q.   Let me hand you Exhibit 6, which I believe

18   is Exhibit 3 to your report, and this is an Addendum

19   to Contract For Residential Sale and purpose --

20   pur- -- excuse me, Residential Sale and Purchase.

21           Can you explain what this document is?

22       A.   There are two contracts that we use.  There

23   is a CRSP and a FAR/BAR.  One is for one, and one is

24   for the other.

25       Q.   And can you explain what that means?

```
 1              What's a CSRP [sic]?

 2         A.   We -- my office, we use the FAR/BAR, the

 3    FAR/BAR contract.  That's the form that's been

 4    approved by the Florida Association of Realtors and

 5    the Bar.

 6         Q.   Okay.

 7         A.   One of these goes with that, and then the

 8    CRSP is a difference contract.  There are some minor

 9    differences between the two.  One is for one, one is

10    for the other.

11         Q.   So, as an agent, you would use one or the

12    other.  You don't typically use both in a -- in a

13    transaction?

14         A.   No, you use one contract.  I'd say

15    90 percent of transactions that I see are on

16    FAR/BARs.

17         Q.   And do you know what CSRP --

18         A.   I don't -- I don't know what it stands for.

19         Q.   Okay.

20         A.   We don't use it.  We have it in our

21    AppFiles, but we don't -- I don't use it.  We use

22    the FAR/BAR as is contract.

23         Q.   Is there any preference?  I mean, are there

24    any -- between the two?

25         A.   Every lawyer that I've worked with
```

```
1    recommends the FAR/BAR.  Our office recommends it.

2    So we use the FAR/BAR.

3         Q.   Do you know why?

4         A.   It's been approved by the Bar.

5         Q.   And Paragraph 11 of your report states:

6    "The FAR and CRSP standard Residential Contracts for

7    Sale and Purchase both contain similar disclosure

8    requirements in the form of a Defective Drywall

9    Comprehensive Rider to Contract and a Defective

10   Drywall Addendum to Contract for Residential Sale

11   and Purchase."

12             And those are the two documents that we've

13   just gone over, correct?

14        A.   Um-hmm.

15        Q.   Okay.  In Paragraph 12 of your report, you

16   state that "In the state of Florida, when selling a

17   home that has or had Chinese drywall, remediated or

18   unremediated, disclosure to the buyer is required."

19        A.   Um-hmm.

20        Q.   Other than the forms we've just discussed,

21   is there any other basis or -- anything else that

22   forms the basis of your understanding that

23   disclosure is required?

24        A.   Well, I said moments ago that any material

25   fact must be disclosed, so I think it comes right
```

1   back to that again.

2       Q.   Okay.  And there's -- so other than what

3   we've just been talking about, there is nothing else

4   that forms the basis that disclosure is required?

5       A.   You have to disclose any material fact, so

6   that's it.  I think it's -- I feel I'm repeating the

7   same question.

8           THE REPORTER:  I can't hear you.

9           THE WITNESS:  I said I feel like I'm

10      repeating the same question.

11      A.   It's a material fact, so I don't know what

12   else to say.

13          MS. FASSBENDER:  Sorry.  I need to adjust

14      that mic.

15          THE COURT REPORTER:  He'll get you.

16   BY MS. FASSBENDER:

17      Q.   Turning to Paragraph 13 of your report, you

18   state that you're familiar with defective Chinese

19   drywall and are aware of its impact on the purchase

20   price of the home.

21      A.   Um-hmm.

22      Q.   And you also mention that you've "sold

23   several homes that contained Chinese drywall, both

24   remediated and unremediated."

25          Do you -- can you estimate approximately how

```
1    many Chinese drywall homes you've sold?

2       A.   Three that I know of.

3       Q.   And are those the three that are identified

4    in your report?

5       A.   Correct.

6       Q.   So other than those, there is no others that

7    are -- that you have sold, either as the listing

8    agent or the buying agent?

9       A.   Correct.

10      Q.   When did you first learn of Chinese drywall?

11      A.   I don't know.  I can't remember the exact

12   date, but I remember starting to hear a buzz in the

13   office from agents and then I remember seeing

14   something on local news about a woman sleeping in

15   her car in a new construction house because the

16   smells were making her nauseous and it -- it was

17   interesting.  People started talking about it.  And

18   the more you talked about it, you became -- started

19   learning more, educating yourself, and it just

20   started trickling down from --

21      Q.   Do you recall about when that was?

22      A.   I don't remember exactly, so I don't want to

23   say a date because I don't -- I don't know the exact

24   date.

25      Q.   To your knowledge, what -- what problems
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 187 of 580
Confidential - Subject to further Confidentiality Review
324

```
 1    does the presence of Chinese drywall cause?

 2        A.   It corrodes metal, which then corrodes

 3    appliances, air conditioners, gives off a pretty

 4    awful smell.

 5        Q.   And you've been inside a home that has

 6    Chinese drywall, correct?

 7        A.   That is correct.

 8        Q.   Would that be -- what home would that be?

 9        A.   The first one that I was in that I was aware

10    of was the Rosen home.

11        Q.   And have -- have you been inside others?

12        A.   Yes.

13        Q.   Did you do anything at the time to -- when

14    you first started learning about Chinese drywall, to

15    educate yourself about it?

16        A.   No.  There was no -- no.  No.

17        Q.   Do you recall reading any articles or other

18    literature about it?

19        A.   Yeah.  I started reading articles, started

20    talking about it at our office meetings, listening

21    to lawyers speak about it, homeowners.

22        Q.   And are you familiar with the Florida

23    Association of Realtors white paper on Chinese

24    drywall?

25        A.   White paper?  I am not.
```

Confidential - Subject to further confidentiality Review

```
 1        Q.    Are you familiar with the process for

 2   remediating homes with Chinese drywall?

 3        A.    I have a brief understanding that there is a

 4   protocol, but I am not a contractor, so I don't know

 5   what it entails.

 6        Q.    Is it your understanding that once a home is

 7   remediated and the Chinese drywall is removed, are

 8   the -- the problems that it caused, do those cease?

 9        A.    Do the problems cease?

10        Q.    Um-hmm.

11              MR. MONTOYA:  Objection to the extent it's

12        outside the scope of his testimony.

13              You can answer.

14              Of his -- testimony, yeah.

15              MS. FASSBENDER:  I understand.

16              MR. MONTOYA:  Thank you.

17        A.    Do they cease causing damage to appliances?

18        Q.    Correct, or other problems inside the home.

19        A.    I believe, yes, it would -- you would no

20   longer have damage to the copper wiring and to the

21   appliances.

22        Q.    To your knowledge, how many homes in The

23   Oaks contained Chinese drywall?

24        A.    There were a few streets where it was

25   concentrated.  Probably around 25 would be my guess.
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 189 of 580
Case 2:09-md-02047-EEF-MBN Document 20741 Filed 08/30/17 Page 37 of 324
Confidential - Subject to Further Confidentiality Review

```
 1    I never knew the exact number, so I think -- I don't

 2    know.  I don't know the exact number, but that would

 3    be my guess.

 4        Q.   And I apologize if you said this.

 5    Approximately how many homes are in the

 6    neighborhood?

 7        A.   I think it's around 400.

 8        Q.   Do you know how many of the homes that had

 9    Chinese drywall have been remediated?

10        A.   I don't know.

11        Q.   Okay.  Turning to Section A.I. of your

12    report, you discuss the "Sale of Affected Property

13    at 17830 Monte Vista Drive," which is the Rosen

14    home?

15        A.   Um-hmm.

16        Q.   Did you help the Rosens purchase their home

17    on Monte Vista?

18        A.   I did not.

19        Q.   When were you introduced to the Rosens?

20        A.   I helped sell their home in Woodfield

21    Country Club prior to this transaction.

22        Q.   And I'm sorry, where is Woodfield?

23        A.   It's in Boca Raton.

24        Q.   And when did they contact you about selling

25    the -- the property on Monte Vista Drive?
```

```
 1      A.   Well, I remember telling the homeowner that

 2   I thought he had Chinese drywall in his home.  So

 3   not too long before that, we had spoken.  I mean --

 4   so we listed it September 2009, so probably in the

 5   spring would be my guess.  I don't know the exact

 6   time frame of when he discovered it or -- but I

 7   remember as I started learning about it and being in

 8   touch with the Rosens, I was under the belief that

 9   they might have Chinese drywall.  I remember telling

10   them that I think they might have Chinese drywall.

11      Q.   I guess to back up for a minute, do you know

12   when they purchased the home?  Was it when you sold

13   the home in Woodfield or --

14      A.   No.  Soon after, I think, they went under

15   contract to build it.  They built this home with

16   Albanese.

17      Q.   Do you know approximately --

18      A.   I don't know the dates.  I wasn't involved

19   in that transaction.

20      Q.   Do you know the purchase price?

21      A.   I thought it was around 1, 1.12, somewhere

22   around there.

23      Q.   And so had Mr. Rosen reached out to you to

24   discuss selling the property, the Monte Vista

25   property?
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 191 of 580 of
Case 2:09-md-02047-MBN Document 22-4 tendered Filed Docket 11/13/2019 Page 99 of
Confidential - Subject to further confidentiality Review
324

```
 1      A.   The reason that we first spoke, I mean,

 2   was -- I asked him to come into the office to talk

 3   about the house because I thought he had the Chinese

 4   drywall.

 5      Q.   So you contacted him about it; is that

 6   correct?

 7      A.   We've -- I remember my family visited the

 8   home one time to go swimming with the kids, and he

 9   told me that -- I don't remember the exact specifics

10   but something was happening with his appliances, I

11   don't know if it was his AC or his refrigerator, and

12   the wheels started spinning.  And as I learned more

13   and more about it, I put the pieces together that I

14   believed he had Chinese drywall.  So I contacted him

15   and I said I think you have Chinese drywall.

16      Q.   And did he have -- was he aware already that

17   he had Chinese drywall?

18      A.   I don't remember that specifically, but I

19   remember his -- I don't know if it was shock or it

20   was disappointment because I think, as I explained

21   to him, he -- he must have been aware to some

22   degree.

23      Q.   And you listed the home for a price of 839?

24      A.   That's what we listed it at --

25      Q.   Right.
```

Confidential - Subject to Further Confidentiality Review

```
1     A.   -- to start.

2     Q.   And how did you determine that listing

3  price?

4     A.   We knew it was going to be worth less than a

5  regular home that didn't have Chinese drywall, and

6  we wanted to start as high as we possibly could to

7  get them as much money as we could while being

8  realistic.

9     Q.   And so, then, how did -- how did you come up

10  with the number of 839?

11     A.   Kevin and I worked together on it.  We

12  thought the home would have been worth over

13  $1 million, but we were figuring maybe a 20 percent

14  to 30 percent discount.

15     Q.   What was the market -- the housing market

16  like at the time that the Rosens listed their home

17  in 2009?

18     A.   Things were selling in The Oaks.  There was

19  still new construction being built.

20     Q.   Was the -- well, were things in The Oaks

21  selling at the same pace that they had in previous

22  years or had the market slowed down there?

23     A.   It slowed a little bit, but there was still

24  demand.  The Oaks -- The Oaks was a nice

25  neighborhood, it still is a nice neighborhood, but
```

Confidential - Subject to Further Confidentiality Review

```
 1    it slowed down a little bit.

 2        Q.   You stated in Paragraph 15 that during

 3    the -- after approximately three weeks, only one

 4    person was interested in seeing the home.

 5        A.   Um-hmm.

 6        Q.   Did you expect more interest in three weeks?

 7        A.   We thought the price would generate more

 8    interest, yeah.

 9        Q.   And at that time, were there multiple homes

10    in The Oaks with Chinese drywall that were being

11    listed?

12        A.   I don't recall.  I don't know.  I don't

13    remember that.

14        Q.   Do you recall if there were any -- was there

15    a large supply of homes on the market at that time

16    in The Oaks?

17        A.   Not a large supply, no, but we were

18    competing with still the option of new construction.

19        Q.   Paragraph 16 of your report states that you

20    lowered the asking price of the home to 599.

21        A.   Um-hmm.

22        Q.   How did you arrive at that price?

23        A.   I don't remember exactly how we came to the

24    exact number.  It's a long time ago.  I don't

25    remember the exact conversation, but Kevin needed to
```

```
1    get out.  He had already moved his family out of the

2    home and he needed to sell it, and we thought that

3    that was a more aggressive price.

4         We had tried higher, and it wasn't working.

5    We started at 839, then put it to 789, and we

6    weren't getting any bites of any real interest.

7    Q.   And to back up a minute, in Paragraph 15,

8    you state that the market at that time for the Rosen

9    home would have been closer to one -- 1.2 million

10   "had it not been built with Chinese Drywall."

11   A.   Um-hmm.

12   Q.   What is the basis for that conclusion?

13   A.   Other homes that were comparable to theirs.

14   It was a newer home, so we were -- it was a

15   desirable lot, corner lot.  It was a beautiful home.

16   It was built very well with Impact glass.  They put

17   a lot of nice upgrades in it, marble, nice kitchen.

18   Q.   And you said other homes that were

19   comparable.  What homes in particular are you

20   referring to?  Are there any others other --

21   A.   I can't.  I don't have my C- -- CMA from

22   that year, but that was the market at the time.

23        (Greenblatt Exhibit 7 was marked for

24   identification.)

25        MR. MONTOYA:  I've got 7.
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 195 of 580 of
324
Confidential -- Subject to further confidentiality Review

```
 1              MS. FASSBENDER:  7?

 2              MR. MONTOYA:  7, yeah.

 3              MS. FASSBENDER:  Thank you.

 4      BY MS. FASSBENDER:

 5         Q.   I'm handing you Exhibit 7 --

 6         A.   Um-hmm.

 7         Q.   -- which I believe is Exhibit 4 to your

 8      report.

 9         A.   Um-hmm.

10         Q.   Can you explain this -- what these documents

11      include?

12         A.   This is the MLS printout.

13         Q.   For the Rosen home?

14         A.   Correct.  I believe there's other homes that

15      it's comparing it to in terms of square footage,

16      sold price.  And there is a warranty deed and a

17      settlement statement.

18         Q.   Looking first at the listing document --

19         A.   Um-hmm.

20         Q.   -- you stated in the Remarks section that

21      the home was not a short sale.

22         A.   Correct.

23         Q.   Why was that noted?

24         A.   At the time, there were short sales that you

25      never -- you know, if you're a buyer and you
```

1    participated in a short sale, it could take a year,

2    it might not be approved.  So we wanted people to

3    know that you weren't negotiating with a bank here,

4    you could -- if you needed to move into a home in

5    30 days, this -- this was possible.

6        Q.    Were there many short sales on the market at

7    that time?

8        A.    There were some.

9        Q.    And those were undesirable to buyers because

10   of the timing?

11       A.    If -- if you wanted to be in a home quickly,

12   yes, because you weren't necessarily -- you weren't

13   really negotiating with the seller.  It was up to

14   the bank, and they would not respond quickly at all.

15   I had some short sales that took years.

16       Q.    Looking at the -- the CMA report --

17       A.    Yes.

18       Q.    -- these four homes are what you identify as

19   comps to the Rosen home?

20       A.    Um-hmm.

21       Q.    Do you recall when you identified these?

22       A.    I don't.  It looks like -- looks like at the

23   bottom, it says 2013.  I'm not sure.

24       Q.    Can you explain generally the process that a

25   Realtor will use to identify comps?

```
 1        A.    Geographically, you want to be in --

 2   possibly in the same neighborhood, around similar

 3   construction, similar home, similar style.  The

 4   Oaks, at the time was fairly uniform other than the

 5   zero lot homes, which I would not have included.

 6        Q.    Is the way that a Realtor will identify

 7   comps, does that differ than how an appraisal -- an

 8   appraiser will do it?

 9        A.    I don't know how an appraiser chooses.  I

10   know how I choose it.

11        Q.    And why would you consider these four homes

12   to be comps?

13        A.    These four?

14        Q.    I believe there is four, yes.

15        A.    I believe I chose these probably because

16   they're in a similar collection to the Rosens.  Key

17   Vista, Monte Vista, and Bridgebrook were all in the

18   same collection.

19        Q.    I'm sorry.  What do you mean by

20   "collection"?

21        A.    Same caliber of home from the builder.  I

22   guess it was the age of these homes was comparable

23   as well.

24        Q.    Do you know if these were all the same

25   builder?
```

Confidential - Subject to further confidentiality Review

```
 1       A.   I don't.  I don't.  At the time it would

 2    have been either Albanese or Kenco, and the two

 3    were -- they were building before you knew any of

 4    this.  You basically would pick your lot and whoever

 5    owned that lot, that's who you'd choose.

 6       Q.   I see.

 7       A.   Or if you had a specific model, but they --

 8    it was usually equal.

 9       Q.   And these are all in The Oaks, correct?

10       A.   Correct.

11       Q.   And none of these homes had Chinese drywall;

12    is that correct?

13       A.   I don't know.

14       Q.   Did you act as the listing or selling agent

15    for any of these homes?

16       A.   I don't -- no, I did not.

17       Q.   Do -- do you know if anyone from Lang Realty

18    did?

19       A.   I don't know.  I'd have to pull up the MLS.

20       Q.   Do you recall if you've been inside any of

21    these homes?

22       A.   It's possible.  It's very possible.  I don't

23    know the answer.  I'd have to look at the photos

24    and -- I don't know.  I've been in a lot of homes in

25    The Oaks.
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 199 of 580
Case 2:14-cv-02722-NGG Document 20-4 Entered on FLSD Docket 13/29/15 Page 87 of
324

Confidential - Subject to further confidentiality Review

```
  1      Q.   Did you have to make any assumptions about

  2   any of these homes in order to rely on them as

  3   comps?

  4      A.   No, I wouldn't say I made assumptions.  I

  5   looked at the photos, and I know the homes really

  6   well.  So I know -- I know the floor plans, I know

  7   the layouts.  I know them pretty well.

  8      Q.   When you are identifying comps, do you

  9   account for the fact that the comparable home may

 10   have more bedrooms or more square footage?

 11      A.   I try, yes.  I mean, the Rosen's home --

 12   once you get over five bedrooms, I don't think -- it

 13   depends who the buyer is but -- I mean, I know

 14   appraisers can add or subtract values, but to me, as

 15   long as it's sufficient -- you know, if the home had

 16   three bedrooms in The Oaks, that would not be a

 17   sellable home, but once you're over five bedrooms,

 18   five or six is -- it doesn't change the value to

 19   most buyers in that neighborhood.

 20      Q.   Do you know if -- if any of these homes had

 21   the same sort of upgrades that the Rosen home did?

 22      A.   If I recall, yes, they were similar, similar

 23   status, similar styles.

 24      Q.   And what about location?

 25      A.   They were on similar type streets, Key Vista
```

Confidential - Subject to Further Confidentiality Review

```
 1    and Bridgebrook are comparable streets to Monte

 2    Vista.  Grand Estates might be, depending where that

 3    home is, may be slightly nicer but very similar.

 4         Q.   Did you identify any other homes as

 5    potential comps that you --

 6         A.   I don't think so.  It was -- I wouldn't

 7    leave The Oaks if you don't have to.  If there's

 8    enough comps in the neighborhood, an appraiser

 9    wouldn't ever go outside of the neighborhood.

10         Q.   And you don't recall other homes on the

11    market in The Oaks at the time that you did not use?

12         A.   I -- I don't.  I don't know.

13         Q.   Other than the presence of Chinese drywall,

14    what was the condition of the Rosen home at the time

15    you listed it for sale?

16         A.   It smelt awful.  They had already tested the

17    drywall.  After the first time I was in it, I could

18    not go back in the home to show it.  I would unlock

19    the door and stand outside.

20         Q.   Because of the smell?

21         A.   Yes.

22         Q.   Is it -- is it your conclusion that the

23    presence of the Chinese drywall is the sole

24    contributor of the difference in price between the

25    Rosen home and the comps?
```

1    A.   Yes.

2    Q.   And your report states that -- in

3    paragraph -- let's see.  It states in Paragraph 15

4    that at that time, the average selling price per

5    square foot in The Oaks was 251.19.

6    A.   Okay.

7    Q.   Other than the -- did other homes go into

8    calculating the average price per square foot other

9    than these four comps that are --

10   A.   I don't remember.

11   Q.   Do you recall at the time identifying any

12   comparable homes that sold for less than 1.2 million

13   at that time?

14   A.   I don't remember.

15   Q.   Paragraph 16 -- I apologize, I think I

16   already asked you this question.

17        So Paragraph 16 states that you lowered the

18   asking price to 599, and "the price change was

19   necessary because knowledgeable purchasers were

20   becoming aware of Chinese Drywall and were

21   expressing concerns regarding unknowns pertaining to

22   the Chinese Drywall..."

23   A.   Um-hmm.

24   Q.   Did you encounter any potential buyers who

25   were concerned about the Chinese drywall?

Confidential — Subject to further Confidentiality Review

```
 1      A.   I mean, you walked in and the smell burned

 2   your eyes, so everybody was concerned.

 3      Q.   And what was the concern?

 4      A.   What was the concern?  How do you remediate

 5   this?  What is the protocol?  What do you do?  What

 6   is --

 7      Q.   At that time, do you recall if homes had

 8   been remediated yet?

 9      A.   I don't -- I think at that time there was a

10   lot of uncertainty.

11      Q.   And "uncertainty," do you mean -- can you

12   explain what you mean?

13      A.   I don't -- at that time, I wasn't aware of a

14   protocol.  There may have been, but I wasn't aware

15   of one but -- and everybody that came in -- I mean,

16   I wasn't -- I had builders, you know, high --

17   publicly traded companies coming in.  I was getting

18   individuals that either saw opportunity, they

19   thought, and they weren't familiar.  It was still

20   pretty new to most people walking in the door.  And

21   when they walked in and they -- you know, it sort of

22   punches you in the face, and most people weren't --

23   would turn around at the front door.

24           So to get someone to actually walk through

25   the front door and look at the home, you know, you
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 203 of 580
Case 2:09-md-02047-EEF-MBN Document 20441-4 Filed 08/13/2019 Page 51 of 324
Confidential - Subject to Further Confidentiality Review

```
 1   get a real low, low end, little bottom-feeder type

 2   of offer.

 3      Q.   What is that?  What do you mean by that?

 4      A.   Well, I said here in 17 with the verbal

 5   offers were 300 to 400 from -- I don't know -- I

 6   don't recall who the people were, but, you know,

 7   they were just looking to take advantage of -- of

 8   the Rosens.  You know, they smelled opportunity.

 9      Q.   And the home went under contract in December

10   of 2009, correct?

11      A.   I believe so, yes.

12      Q.   And so it was on the market for

13   approximately three months, right?

14      A.   Um-hmm.

15      Q.   Was that a long time to be on the market at

16   that time?

17      A.   At that price, yeah.  I mean, the price

18   appeared to be a giveaway.  Right?  That's why you

19   have so many showings.  People thought, you know,

20   why is this home selling so low?

21           So there was -- you would get people that

22   would call, I want to see it, I want to see it.

23           I'd say, Do you know that the home has

24   Chinese drywall?

25           What's that?
```

```
1              They'd still come, and they'd look and
2    then -- it was not a normal transaction, so I can't
3    compare it to what anything else was doing, but if I
4    had a home in there that didn't have Chinese drywall
5    and it showed nicely, I could have sold it at the
6    right price for the market value.
7              MS. FASSBENDER:  Why don't we take a break
8       for a few minutes?  Okay?
9              THE VIDEOGRAPHER:  Off the record at 11:12.
10         (Recess from 11:12?a.m. until 11:30 a.m.)
11             THE VIDEOGRAPHER:  The time is 11:30.  We're
12         now back on the record.
13   BY MS. FASSBENDER:
14      Q.   Hi.  So turning back to Exhibit 4 of your
15   report, which is the CMA report, it was dated in
16   2013.  Do you recall if you identified these
17   particular homes as comps at the time that you
18   listed the property in 2009?
19      A.   I don't recall.
20      Q.   Do you recall any particular homes that you
21   had relied on as comps in identifying the list price
22   in 2009?
23      A.   I don't recall what I used in 2009 but I --
24   you know, at the time I would have used my
25   expertise.  And I am pretty sure that the timeline
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 205 of 580
Case 2:09-md-02047-EEF-MBN Document 21841-5 Filed 10/13/18 Page 205 of
324
Confidential - Subject to Further Confidentiality Review

 1    of listing the price and showing the history

 2    dictates that we tried to be more aggressive on

 3    price and it didn't work, and we followed the

 4    market's lead.

 5       Q.   And can you explain that?

 6            When you say that you tried to be more

 7    aggressive on the price, you mean with your initial

 8    list price?

 9       A.   Yeah, we priced it.  I mean, it was -- we

10    didn't know what it was going to be worth.

11       Q.   Why is that?

12       A.   Because we didn't know what a home with

13    Chinese drywall was going to be worth at that time.

14    It was somewhat new.  We didn't know how much it was

15    going to depreciate the home, but we tried to get as

16    much as we could for the Rosens.  And when we

17    started at 839 and we weren't getting bites, we knew

18    the market was speaking.

19       Q.   Do you recall if other Chinese drywall homes

20    were on the market at that time in The Oaks?

21       A.   I don't -- I don't recall exactly, but I

22    know around that time there may have been one other.

23    I don't -- I don't recall.

24       Q.   Do you recall the property?

25       A.   No.  No.  That's a long time ago.

Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Looking at the homes in the CMA report --

 2      A.   Um-hmm.

 3      Q.   -- the first one on 17606 Grand Este Way

 4   looks like it was originally listed for $2,985,000

 5   and then sold for 2 million?

 6      A.   Um-hmm.

 7      Q.   Do you have any knowledge of why that list

 8   price or -- I'm sorry, why that sales price was

 9   ultimately much lower than the original list price?

10      A.   Off the cuff, I would say that they were way

11   overpriced to begin with.

12      Q.   All of them or just that one particular

13   home?

14      A.   That one grossly.  The others, you know, not

15   to the same degree, but, you know, it looked to me

16   like everyone was still trying to be quite --

17   starting at 2.2 for Key Vista was a very high price,

18   and starting at 1.8 for Bridgebrook was a high price

19   as well.

20      Q.   And I'm sorry, you said -- you started to

21   say that it looked like everyone was still trying to

22   be quite --

23      A.   These numbers were -- the asking prices were

24   more than the homes were worth.  It's pretty clear

25   from the sale price.
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 207 of 580
Case 1:09-md-02047-MCR Document 2044 entered on FSD Docket 13/2019 Page 95 of
324

Confidential – Subject to further Confidentiality Review

```
1      Q.   Do you know why these were -- the -- why

2   these comparable homes were pulled in 2013?

3      A.   I don't know why they were pulled, but my

4   guess would be that they were -- from my experience,

5   that these were the best comps I could use to be

6   like the Rosens' home minus Chinese drywall.

7   They're comparable homes.  They're the same

8   neighborhood, similar quality.

9      Q.   So did you, yourself, identify these as

10  comparable homes to the Rosens'?

11     A.   I believe so, yeah.

12     Q.   When?

13     A.   I mean, this printout is 2013, so that would

14  be my guess.

15     Q.   But you don't know why you identified those

16  in 2013?

17     A.   I do know why, because they are like homes,

18  they are comps, they are comparable homes to the

19  Rosens' home.

20     Q.   I understand.  And what was the purpose of

21  identifying comps in 2013?

22     A.   I had been asked to prepare a CMA.

23     Q.   By whom?

24     A.   I don't know if it was Kevin.  I don't -- I

25  don't recall.  I think it might have been Kevin.
```

Confidential – Subject to further Confidentiality Review

```
 1        Q.   For what purpose?

 2        A.   To try and figure out -- I don't know.

 3   Actually, I don't know.  I really don't know.  I

 4   know he was going through whatever he was doing on

 5   his end, but I wasn't discussing the particulars as

 6   to what he was trying to accomplish.

 7        Q.   And what did he ask of you at the time?

 8        A.   To do a CMA based on the time frame.

 9        Q.   What time frame?

10        A.   Of when his home sold.

11        Q.   And he did not say why he needed that?

12        A.   I just knew he was involved in some, you

13   know, form of lawsuit with his home with the Chinese

14   drywall.  I didn't know any specifics.

15        Q.   Did you serve as an expert in that

16   litigation?

17        A.   No.

18        Q.   What role did Kevin Rosen play in

19   determining the sales price in 2009?

20        A.   I showed him comps.  I showed him what the

21   home would be worth if it didn't have Chinese

22   drywall.  I don't remember exact specifics of who

23   came up with the number, but I know that every

24   dollar that we could have sold the home for would

25   have gone in his pocket.  He explained to me that he
```

```
 1    used a large amount of money.  It wasn't a huge

 2    mortgage, it wasn't a short sale.  So every dollar

 3    that we got in the sale price was going in his

 4    pocket.  So this wasn't a big fire sale in an

 5    attempt to just dump it.  Every penny that was going

 6    to be sold was something that he would need for his

 7    next home.

 8        Q.   And when you say every dollar was going in

 9    his pocket, is --

10        A.   As opposed to a short sale or a foreclosure.

11    This was his home.  He had paid for the home with

12    his money, and if I got him more money, that would

13    help his family acquire another home.

14        Q.   Do you know if the home had a mortgage on

15    it?

16        A.   I don't know.  I just know that he had

17    mentioned that he was being very fiscally

18    responsible when he bought the home and put down a

19    lot of his own money, and I don't know the

20    specifics.  It wasn't my business.

21        Q.   Were the Rosens trying to sell the property

22    quickly?

23        A.   Quickly?  No.  They wanted to get as much

24    money as they could without dragging it on.

25        Q.   And do you know if they were trying to sell
```

```
1    the property before the end of 2009?

2        A.   No, there was no -- I would have recalled if

3    there was some deadline.  There was no deadline.

4        Q.   And who purchased the Rosen home in December

5    of 2009?

6        A.   The buyers, I believe, were Canadian.

7        Q.   Do you know who they were?

8        A.   I don't remember their names.

9        Q.   Was it a construction company --

10       A.   No.

11       Q.   -- or was it individuals?

12       A.   To my knowledge -- to my knowledge -- I

13   didn't represent the buyer.  To my knowledge,

14   they -- whatever work they did, they lived in the

15   home after, but the home has since sold many times.

16       Q.   And in Paragraph 18 of your report, you say:

17   "The buyer originally offered in the mid 400s but we

18   were able to negotiate $501,000.  The buyer would

19   not pay a penny more and agreed to close before the

20   end of the year."

21            Do you recall having back-and-forth

22   negotiations with the buyer?

23       A.   I know we did have back-and-forths.  I don't

24   know the exact --

25       Q.   What did those involve?
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 211 of 580
Case 2:09-md-02047-MDL Document 2044 terHdShEEF-SD Docket 11/20/19 Page 59 of
324

Confidential - Subject to further confidentiality Review

```
 1        A.   I don't know the specifics.  Trying to get

 2   as much money for my client as I can, like I always

 3   do.

 4             MR. MONTOYA:  Hold on a second.  Y'all are

 5        stepping on each other a little bit.  Let her

 6        finish her question --

 7             MS. FASSBENDER:  Thank you.

 8             MR. MONTOYA:  -- and you answer.

 9             THE WITNESS:  Okay.

10             MR. MONTOYA:  You're doing great.

11   BY MS. FASSBENDER:

12        Q.   Would you have any communications with the

13   buyer?

14        A.   The buyer themselves?  No.  They had a

15   Realtor.

16        Q.   And did you communicate back and forth with

17   the Realtor?

18        A.   Correct.

19        Q.   In writing?

20        A.   No, no.  I'm pretty sure they -- I'm pretty

21   sure in those days they faxed an offer, and then we

22   would discuss it on the phone.

23        Q.   And would you still have any records of

24   that?

25        A.   No.
```

Confidential - Subject to Further Confidentiality Review

```
 1      Q.   How long do you typically hold on to your --

 2      A.   Our --

 3      Q.   -- sales documents?

 4      A.   I'm sorry.

 5           Our office, I don't know how many years ago,

 6      but probably about seven years ago approximately

 7      went on to paperless, but when this was done, we had

 8      paper and I believe our office keeps files for seven

 9      years.  I think that is the State law.  Is it

10      possible it's in a -- the file is somewhere in a

11      warehouse?  I could ask, but I doubt it.  I'm pretty

12      sure after seven years, that's it.

13      Q.   And -- and you said that the purchaser of

14      the Rosen home remediated the property?

15      A.   To my knowledge, yes.

16      Q.   And in Paragraph 19 of your report, you say

17      that the buyer spent hundreds of thousands of

18      dollars to remediate.

19      A.   Um-hmm.

20      Q.   How do you know that?

21      A.   Well, I do a lot of work in The Oaks, so I

22      would be in the neighborhood and I would pop in from

23      time to time and they -- I mean, they ripped out all

24      the drywall, and I know that costs hundreds of

25      thousands of dollars.  Just the scope of work would
```

```
 1    require hundreds of thousands -- I don't know what

 2    the exact number was, but I know what it would

 3    entail financially.

 4        Q.   And to your knowledge or to your

 5    understanding, what does remediation entail?

 6        A.   Removing all of the --

 7             MR. MONTOYA:  Object to the scope.

 8             To the extent that you know, go ahead.

 9        A.   I'm not a GC, but I know you have to rip out

10    the drywall.  I believe you have to rip out all the

11    copper wiring.  I believe you have to rip out all

12    the AC, basically down to the shell, to the

13    concrete.

14        Q.   And do you have any idea or understanding of

15    how much that costs?

16        A.   Rough idea, yeah.  I know what it costs to

17    rebuild.  I know what it costs to build a home, so

18    you're -- other than the concrete structure, you

19    have to put in a lot of new items.  So I know

20    ballpark what things cost.

21        Q.   Have you ever worked with any purchaser on

22    remediation or, I should say, a seller?

23             Have you ever helped any -- a customer or

24    client remediate their property?

25        A.   No.  For Chinese drywall?
```

Confidential - Subject to further Confidentiality Review
324

```
 1       Q.   Yes.

 2       A.   No.

 3       Q.   And you state that the buyer -- the ultimate

 4   buyer of the Rosens' home sold the home in July of

 5   2012 for $940,000?

 6       A.   Um-hmm.

 7       Q.   How do you know that?

 8       A.   From the MLS.

 9       Q.   And were you involved in that transaction?

10       A.   I was not.

11       Q.   Do you know when the -- approximately when

12   that -- that purchaser had remediated the property?

13       A.   Right after they closed would be my guess.

14       Q.   But you don't know?

15       A.   I drove by, and they were doing work on it

16   soon after closing, so --

17       Q.   So soon after the end of 2009?

18       A.   Correct.

19       Q.   Do you know when they completed the

20   remediation?

21       A.   I do not know.

22       Q.   In Paragraph 20 you state that based on your

23   professional expertise and "vast experience selling

24   homes in the Oaks community, the home was worth

25   vastly more than the price at the time."
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/10/19 Page 215 of 580
Confidential - Subject to further confidentiality review
324

```
 1              Do you mean at the time that it resold in

 2    2012 or --

 3       A.   I could probably say forever, but at the

 4    time when I sold it, it certainly affected the value

 5    and it affected the value in 2012 as well and it

 6    would still affect the value.  The home has

 7    traded hands -- I printed out a history of it

 8    somewhere.

 9       Q.   And I'm sorry, what are you looking at?

10       A.   I printed out the history of this last

11    night, how many times it's been listed, but it's

12    turned over a lot, this house:  '09, '12, came on

13    the market in '15, '16, '17, and then it closed

14    again in '18 for 835.

15       Q.   Well, looking back at your report, when you

16    said in Paragraph 20 that "the home was worth vastly

17    more than the price at the time," so are -- are you

18    referring to 2009 or 2012 there?

19       A.   Both.

20       Q.   And what is the basis for that?

21       A.   My expertise, 18 years of selling real

22    estate in The Oaks.

23       Q.   Anything else?

24       A.   No.  And comps.

25       Q.   And do you have comps -- did you -- are you
```

```
 1    aware of comps from 2012 when the property sold

 2    then?

 3         A.   I could pull them but --

 4         Q.   But are you aware now?

 5         A.   I wasn't involved in the transaction, but I

 6    could pull them.

 7         Q.   And you state that "the stigmatism

 8    associated with a home that had Chinese drywall

 9    continued to affect the home's value."

10         A.   Correct, and it -- it still does.  I mean,

11    you could see that the home was on the market --

12    they've been trying to sell that house -- they

13    bought it in 2012.  It came back on the market in

14    2015.  It has stayed on the market until March of

15    2018, and they finally closed it for a lot less than

16    they were trying to sell it for because it didn't

17    appreciate in value.  In fact, it went down in value

18    as the market went up.

19              MS. FASSBENDER:  Could we get a copy of that

20         at a break --

21              MR. MONTOYA:  Sure.

22              MS. FASSBENDER:  -- so that I --

23              MR. MONTOYA:  Absolutely.  Sure.

24    BY MS. FASSBENDER:

25         Q.   What was the market like in July of 2012?
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 217 of 580
Case 2:09-md-02047-EEF-MBN Document 20491-4 Filed 09/09/16 Page 217 of 324
Confidential — Subject to Further Confidentiality Review

```
 1      A.    2012?  2012.  It was -- in The Oaks or in

 2    general?

 3      Q.    Both, but let's take The Oaks first.

 4      A.    2012.  The new builder -- Richmond and

 5    Standard Pacific came in, I think, the following

 6    year.  There were some home -- there were a lot of

 7    lots that Albanese and Kenco had lost or sold were

 8    sitting empty, so you actually couldn't build at

 9    that time, so your only option was a resale.  So

10    while the market in '12 was probably on its

11    beginning of a rebound -- maybe '13 was the

12    beginning rebound.  The Oaks, in general, there

13    wasn't new construction at that time.  So you were

14    limited to resales.

15      Q.    And so how did that affect the market there?

16      A.    It would probably help the resales because

17    you didn't have the option of new.  You weren't

18    competing with new.

19      Q.    And you said that the builders lost the

20    lots.  What do you mean by that?

21      A.    Albanese, who built the Rosens' home, those

22    were the homes that had Chinese drywall.  Kenco did

23    not.  I don't know if it was through foreclosure or

24    what, but their lots were no longer available for

25    sale through Albanese; and Kenco, I think they sold
```

```
 1    their lots to another builder.  They wanted out.

 2    And I don't know -- I'm not exactly sure how

 3    Albanese went out.  I was told they lost them, but I

 4    don't know for sure.

 5        Q.   And what do you mean by "they wanted out"?

 6    Out of the neighborhood?

 7        A.   Kenco wanted out of the neighborhood.  And

 8    Albanese, their name was associated with Chinese

 9    drywall, so they didn't want -- I mean, they were

10    done.  And I think they lost the lots to

11    foreclosure.  That's what I was told.

12        Q.   What is the market like today in The Oaks?

13        A.   I have a closing next week.  It will be, I

14    believe, the last new construction home sale in the

15    neighborhood.  So now it is just resales.

16             But shortly after '12, '13-ish, '14-ish, the

17    builders came in and took over the remaining lots.

18    It was Richmond American Homes, Standard Pacific --

19    or it was actually called CalAtlantic, then Standard

20    Pacific, now Lennar.  They finished out the

21    community.

22             So, you know, when there was new

23    construction -- obviously, when you're competing

24    with new construction, it will suppress resales a

25    little bit, but that's done shortly.
```

```
 1              MR. MONTOYA:  I'm going to hand you what
 2       Ryan was looking at.
 3              MS. FASSBENDER:  Thank you.
 4              THE WITNESS:  That's the MLS history.
 5              MR. MONTOYA:  Right.
 6       BY MS. FASSBENDER:
 7          Q.  And so I'm understanding correctly, what
 8       you're saying is with new construction now complete
 9       in The Oaks, that improves the market for the
10       resales?
11          A.  Um-hmm.  You're not competing with a new
12       option.  I mean, there are other new communities
13       surrounding it, but in The Oaks -- if you want to
14       live in The Oaks now, you can't build, you have to
15       buy someone else's home.
16          Q.  How did The Oaks fare during the market
17       downturn?
18          A.  They were hurt possibly equal or more
19       because of the Chinese drywall compared to a
20       neighborhood that didn't have Chinese drywall.
21          Q.  And what about generally with the -- in the
22       market downturn?
23              Is what you're saying that because of the
24       Chinese drywall, the recession was -- the impact was
25       worse in The Oaks?
```

Confidential - Subject to Further Confidentiality Review

```
 1      A.   Yes.

 2      Q.   How so?

 3      A.   It -- like I said, there was a -- I had

 4   clients that wouldn't look in the neighborhood

 5   because they said it had a black cloud.

 6      Q.   And what do you mean by that?

 7      A.   Chinese drywall.  There was uncertainty.

 8   They just, sort of, thought it was like this

 9   negative perception of the neighborhood.

10      Q.   And when was that?

11      A.   To this day.  I got an offer last week on a

12   home, and the buyer's agent included a Chinese

13   drywall disclosure, that they want to test for

14   Chinese drywall even though the home was built by

15   Kenco.

16      Q.   So you have a -- I'm sorry.

17           Can you explain what -- where is the home

18   that you --

19      A.   In The Oaks.

20      Q.   Okay.

21      A.   I have a listing for sale.

22      Q.   Um-hmm.

23      A.   And we received an offer last week, and the

24   buyer's agent submitted a Chinese drywall disclosure

25   in the contract.
```

Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Is that unusual?

 2      A.   In The Oaks, it's not, but to say that

 3   stigma disappears, clearly it doesn't.  The buyer is

 4   still scared.

 5      Q.   Is it the case that the disclosure forms are

 6   used as a matter of course in every transaction?

 7      A.   No.  No.  I haven't -- other than in The

 8   Oaks, I haven't seen one of those.

 9      Q.   Seen a Chinese --

10      A.   A Chinese drywall disclosure.

11      Q.   Since when?

12      A.   It's been a few years.  I had a client

13   looking in Parkland Golf, maybe one in The Canyons

14   up in Boynton, but it's been a while.

15      Q.   And this is the document that we're talking

16   about earlier that was, I think, Exhibits 2 and 3 to

17   your report?

18      A.   The contract?

19      Q.   No.  I'm sorry, the disclosure form.

20      A.   Yes.  Yes.

21      Q.   The one that's specific to --

22      A.   Chinese drywall.

23      Q.   Okay.

24      A.   To this -- to the FAR/BAR.

25      Q.   And was there a time when that form was
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 222 of 580
Confidential — Subject to further Confidentiality Review
324

1    widely used?

2    A.   If you're in a neighborhood that has Chinese

3    drywall, it's used.

4    Q.   What about elsewhere?

5    A.   The neighborhood I live in, which is not far

6    away from The Oaks -- it's less than a mile away --

7    we were built pre-Chinese drywall.  I have never

8    seen a disclosure used in Saturnia Isles.

9    Q.   What about in later neighborhoods?

10   A.   If it was built after the time when Chinese

11   drywall was around, I won't see it used.

12   Q.   So you typically see it used in

13   neighborhoods that -- where it's known that Chinese

14   drywall was used?

15   A.   Yes, or in the timeline that Chinese drywall

16   was used.  If I'm an astute agent, protecting my

17   client, if I see a home built during that time

18   frame, I would throw it in there.

19   Q.   And -- anywhere, no matter where the home

20   was located?

21   A.   I would, to be safe for my -- to protect my

22   client's best interest, but especially -- I mean,

23   this -- this agent that brought her buyer, I've --

24   you know, she's doing a good job for her client, in

25   my opinion.  We have nothing to hide, that home was

```
1    built by Kenco, but I think she's being a good

2    Realtor representing her client, to protect them.

3        Q.   Other than this particular Realtor, have

4    agents continued to use the Chinese drywall

5    disclosure form in The Oaks?

6        A.   Yes.

7        Q.   Uniformly?

8        A.   I wouldn't say uniformly, but I use it for

9    my clients on any transaction in there on a resale.

10   The new construction, it's not a concern.  If it was

11   built, you know, the newest -- the newest builders,

12   the Richmond and Standard Pacific, CalAtlantic,

13   it's -- it's not an issue.

14       Q.   Is the disclosure form typically used on

15   homes that had been remediated?

16       A.   It's used whether it's been remediated or

17   not.  I mean, you -- if it's suspect, it's used.

18           (Greenblatt Exhibit 8 was marked for

19   identification.)

20   BY MS. FASSBENDER:

21       Q.   I'm going to go ahead and enter this

22   document that we were looking at earlier.

23           MR. MONTOYA:  We're up to 8?

24           MS. FASSBENDER:  Yes.

25   BY MS. FASSBENDER:
```

Confidential - Subject to Further Confidentiality Review

```
1        Q.    This is Exhibit 8.  Can you please explain
2    what this is?
3        A.    This is an MLS history.  So I pulled up the
4    Rosen home.  I wanted to be prepared today.  I
5    hadn't looked at it in a long time, so I pulled up
6    the history of what has happened on the MLS for the
7    Rosen home.  And it starts back when I listed the
8    home September 14th, 2009, and it shows the timeline
9    of everything that's happened on the MLS for that
10   house since.  You can see that it closed November
11   2009; July 5th, 2012; and then again March 29th,
12   2018.
13        I was not involved in any of those
14   transactions other than when it was the Rosens'.
15       Q.    And can you explain, what is the MLS?
16       A.    What is the MLS?
17       Q.    Um-hmm.
18       A.    It's the Multiple Listing Service.
19       Q.    And what is that?
20       A.    That's what Realtors use to list homes, to
21   search MLS, to do our research.  It's how you put a
22   home on the Multiple Listing Service.
23       Q.    And it most recently sold, the -- the Rosen
24   home most recently sold in March 2018, correct?
25       A.    That's what it shows here on the MLS,
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 225 of 580
Confidential - Subject to further confidentiality Review
324

```
 1    correct.

 2       Q.   For 835?

 3       A.   Correct.

 4       Q.   And do you know what a comparable home would

 5    be sold for --

 6       A.   That home should be --

 7       Q.   -- in March of 2018?

 8       A.   Sorry.  I think that home should be over a

 9    million dollars.

10       Q.   And what's the basis for that?

11       A.   Price per square foot, location.

12       Q.   What's the average price per square foot at

13    this time in The Oaks?

14       A.   Depending on the condition, I sold new

15    for -- I mean, they're homes that back up to Lyons.

16    Those are the last homes that are selling now.

17    They're the worst lots, obviously were the last ones

18    to go, but anywhere from the low twos to the mid

19    threes.

20       Q.   200 to 300 per square foot?

21       A.   Low twos would be a bad lot, which this was

22    not, and that's a huge factor in The Oaks.  Backing

23    up to Lyons Road or Clint Moore Road is as bad as it

24    gets in the neighborhood versus being on a corner

25    lot on a nice street.
```

```
1      Q.   I think you may have said that was for the
2    new construction?
3      A.   Or resales on Cadena.  That's where Lyons
4    Road is.
5      Q.   What's Cadena?
6      A.   That's a street where the last few homes
7    that are being sold are on, but there is resales
8    there as well.
9      Q.   What about resales in the area of where the
10   Rosen home was located?
11     A.   I would say mid twos to mid threes,
12   depending on the condition, the location.
13     Q.   Is that lower than the homes have sold for
14   in the past?
15     A.   In the past?
16     Q.   Yes.
17     A.   I don't understand your question.
18     Q.   Is that a lower price per square foot than
19   homes have sold for in the past?
20     A.   Is what a lower price?
21     Q.   200 to 300 a square foot.
22     A.   It depends.  I mean, the market price is
23   constantly changing.  We're talking about today.
24     Q.   Right.  So is that lower than it has been in
25   the past?
```

```
 1      A.   Sure.  The market is constantly changing, so

 2   I'm sure I could show you a time that it changes.

 3           (Greenblatt Exhibit 9 was marked for

 4   identification.)

 5           MS. FASSBENDER:  Oh, I'm sorry.  It's

 6      that --

 7           MR. MONTOYA:  Absolutely.  No problem.

 8   BY MS. FASSBENDER:

 9      Q.   I've handed you Exhibit 9, which is

10   Exhibit 5 to your report.

11      A.   Um-hmm.

12      Q.   This relates to 17894 Monte Vista Drive.

13      A.   Um-hmm.

14      Q.   You sold that home, correct?

15      A.   I was the listing agent.

16      Q.   And that was the Grajales home?

17      A.   Correct.

18      Q.   And that home, at the time you sold it, was

19   remediated, correct?

20      A.   Correct.

21      Q.   And did you help the -- did you help the

22   Grajaleses purchase the home as well?

23      A.   I did not.

24      Q.   When did you meet them?

25      A.   They contacted me.  I market in the
```

1    neighborhood.  They contacted me shortly before we

2    listed the home.  I interviewed, and I got the

3    listing.

4        Q.   Why were they selling at the time?

5        A.   She wanted to sell her home.  I think she

6    didn't need the space anymore.  I think one of her

7    kids had gone off to college, if I recall.

8        Q.   Do you know how much they paid to purchase

9    the house?

10       A.   I don't recall.

11       Q.   Do you know --

12       A.   I could look it up.

13       Q.   -- when they purchased it?

14       A.   I don't know the exact dates.  It says here

15   new -- new 2006, so that would be my guess, that

16   they bought it in 2006.

17       Q.   Do you know that they purchased it new?

18       A.   Yes.

19       Q.   And you -- in Paragraph 24 of your report,

20   you state that you listed the home on March 27,

21   2013, with an asking price of $1,499,000.

22            How did you arrive at that price?

23       A.   It was a long time ago.  I don't remember

24   exactly how I came up with the price, but my

25   assumption would be that I based it on doing what I

```
 1    do, which is looking at comparable homes and pricing

 2    it accordingly based on the market and the condition

 3    of the home.

 4         Q.   Do you always look at comparable homes when

 5    you're arriving at a sales price or listing price?

 6         A.   Yes.

 7         Q.   And typically how many comparable homes do

 8    you like to have for --

 9         A.   At least three.

10         Q.   And do you recall doing that for this home?

11         A.   Absolutely.

12         Q.   Do you recall any of the specific homes that

13    you identified as comps?

14         A.   No.

15         Q.   Do you recall at the time what homes were

16    selling for in The Oaks?

17         A.   I would have to go look up the MLS and do

18    that, but I can tell you I wouldn't do anything

19    different there than I would do today.

20         Q.   And what does that mean?

21              What would you do today?

22         A.   I would look at the comps and sit down with

23    my client and show them the comps and explain to

24    them what I think their home is worth based on the

25    comparables.
```

Confidential - Subject to Further Confidentiality Review

```
 1       Q.   And did they have a -- any kind of

 2  certification that remediation had been completed?

 3       A.   They had a big binder.  I think it was done

 4  by Moss.  So they had paperwork showing the work

 5  being done, all the photographs of the remediation

 6  process and things like that.

 7       Q.   And who is Moss?

 8       A.   I believe they were the general contractors

 9  who did the remediation for them.

10       Q.   Is there a reason you didn't submit any --

11  attach any comps to your -- to your report for this

12  home?

13       A.   I wasn't asked to.

14       Q.   Were you asked to for the Rosen home?

15       A.   At 2013, I must have been.

16       Q.   What about in 2019?

17       A.   I wasn't asked to do that.

18       Q.   Do you know why those comps were attached

19  for the Rosen home?

20       A.   Because I was asked.

21       Q.   For your 2019 report?

22       A.   Because they were produced and they must

23  have been included.

24       Q.   Produced by whom?

25       A.   Produced by me.
```

Confidential - Subject to further confidentiality Review

```
 1      Q.   To whom?

 2      A.   To Kevin Rosen.

 3      Q.   And how were they attached to your 2019

 4   report?

 5      A.   Kevin probably handed it to one of these

 6   two, and they probably included it.

 7      Q.   And you were not asked to look at comps for

 8   the Grajales home in connection with preparing your

 9   report in 2019?

10      A.   Correct.

11      Q.   Did you write your report?

12      A.   Did I write my report?  Yes.  I worked on it

13   with -- with -- I believe I worked on it -- I

14   don't -- I don't remember who I worked on -- but

15   yeah, I wrote this, the majority of it.

16      Q.   Is there sections you did not write?

17      A.   No.  I went over everything with -- I'm

18   pretty sure I went over everything with Natalie and

19   Patrick here.

20      Q.   Did you write it?

21      A.   They helped me write it.

22      Q.   What did -- what did they write?

23      A.   We wrote it together.  I mean, I gave them

24   information and we put it together.

25      Q.   Did you write the first draft?
```

```
 1        A.   I don't recall who wrote a draft, but I gave

 2   them information and we prepared this together and

 3   they asked me to review it and we worked on it

 4   together and that's how we came up with this

 5   document.  It's -- they asked me questions, I gave

 6   them answers, and based on that, we put this

 7   together.

 8        Q.   Did you write any of it?

 9        A.   I didn't type this up, no.

10        Q.   Okay.  In Paragraph 25 of your report you

11   say that you "attempted to sell the Grajales Home

12   for approximately nine months, but were having

13   difficulty finding buyers."

14        A.   Um-hmm.

15        Q.   Why is that?

16        A.   Nobody wanted to buy a home that had Chinese

17   drywall, even though it had been remediated.

18        Q.   How do you know that?

19        A.   Because of the feedback that the buyers gave

20   or their agents would give.

21        Q.   What feedback did you receive?

22        A.   Not interested, they could buy a home that

23   didn't have remediated, didn't have to have a

24   remediation process.  I wouldn't buy it, so I don't

25   blame them.
```

1    Q.    And do you recall any specific buyers?

2    A.    Sure.  I do.

3    Q.    Who?

4    A.    I remember one family looked at it and he's

5    in commercial real estate, and he came to the house

6    and he -- he was looking for a deal, and his wife

7    refused.  She said she didn't care what the price

8    would be, she wouldn't do it.  And he wanted a deal

9    and was trying to convince her it was a deal, and

10   she wouldn't have it.  They ended up building a new

11   construction home a few years later.

12   Q.    And you state that "knowledgeable purchasers

13   were becoming aware of Chinese Drywall and in

14   general and buyers were very afraid of this new

15   unknown and what was required to remediate it"?

16   A.    Um-hmm.

17   Q.    And that was still the case in 2013?

18   A.    Yeah.

19   Q.    And even with a home that had been

20   remediated?

21   A.    Um-hmm.

22   Q.    And what was the concern?

23   A.    You know, people that were aware of Chinese

24   drywall down here were concerned of lasting effects,

25   of lasting effects to the value of the home.  People

1    that did not know what Chinese drywall was, it's

2    almost even worse because as you educate them, it --

3    it becomes scary.

4            And to be honest, you can just go buy a home

5    that didn't have it, so why subject your clients or

6    your family to this when there's other homes?

7        Q.   And when -- have you -- did you educate

8    people about Chinese drywall, potential buyers?

9        A.   If they are not my clients, I don't educate

10   them.  If they're someone else's buyers, all I do is

11   submit documents, the seller's disclosure,

12   prospective -- whatever disclosures I had to

13   disclose.

14       Q.   And -- and when you said you educate them

15   earlier and then it becomes scary, who are you

16   referring to?

17       A.   Well, for example, that family that came in,

18   they called me directly.

19       Q.   Um-hmm.

20       A.   So I have to disclose what I know about the

21   Chinese drywall.  Now, if they would ask more

22   questions, I would give them the information.

23       Q.   And what would you explain?

24       A.   They would ask -- you know, I would show

25   them the binder.  They'd say what has been done?

Confidential - Subject to further confidentiality Review

```
 1    Here you go.

 2         Q.   The binder of remediation that --

 3         A.   That Moss provided to the seller.

 4         Q.   Evidence?

 5         A.   Yeah.  Um-hmm.

 6         Q.   And what else?

 7         A.   That's really it.  I'm not an expert.  I

 8    wasn't a GC, but, you know, I was trying to sell the

 9    home and make a transaction happen.

10         Q.   Do you find that there is still an

11    uncertainty about Chinese drywall?

12         A.   Yes.

13         Q.   What's the -- how so?

14         A.   In The Oaks, I think there is still people

15    that are curious if there are homes that have it.

16    Either the seller doesn't know or doesn't want to

17    know or if the home wasn't remediated properly and

18    are there lasting effects.

19         Q.   Have you encountered that when trying to

20    sell any properties?

21         A.   Yeah.

22         Q.   When?

23         A.   This house that I have on Lake Azure that I

24    have got a contract on, the buyer is still

25    submitting a Chinese drywall disclosure because they
```

Confidential - Subject to further confidentiality review

1    are still scared.

2        Q.   Scared that the house may contain Chinese

3    drywall?

4             Is that a remediated home?

5        A.   No.  It was a Kenco house, but because it's

6    in The Oaks, there is still uncertainty.

7        Q.   And what's "a Kenco house"?  I -- I

8    understand it's -- it's a --

9        A.   That was the other builder that didn't use

10   the Chinese drywall.

11       Q.   I see.

12            Have you ever had a purchaser buy a home

13   that had Chinese drywall?

14       A.   I'm proud to say no.

15       Q.   I'm sorry.  Say that again.

16       A.   No.  No.

17       Q.   What about a remediated home?

18       A.   No.

19       Q.   Have you ever had purchasers look at --

20       A.   Yes.

21       Q.   And in The Oaks?

22       A.   Um-hmm.

23       Q.   And was it your advice to them not to

24   purchase a home that had Chinese drywall?

25       A.   That is correct.

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 237 of 580
Case 2:14-cv-02722-MGC Document 284-4 Entered on FLSD Docket 03/26/2019 Page 85 of
324

Confidential - Subject to further Confidentiality Review

```
 1        Q.   Why is that?

 2        A.   I think it's a bad investment, and I

 3   wouldn't sell them something I wouldn't put my own

 4   family in.

 5        Q.   Why do you think it's a bad investment?

 6        A.   I can prove it by comps that the homes

 7   always have less value, and I wouldn't subject my

 8   family to it.

 9        Q.   Looking at the Grajales home, you said that

10   you sold it on December 19th, 2013, for 1,185,000,

11   which is substantially less than what a comparable

12   home without Chinese drywall was selling for at that

13   time?

14        A.   Um-hmm.

15        Q.   What is the basis for that conclusion?

16        A.   Comps.

17        Q.   What comps?

18        A.   Comps that I would have used at that time.

19        Q.   What comps did you use at that time?

20        A.   I don't know, but like I said, I don't think

21   anything different in 2013, 2009, 2018.

22        Q.   What do you mean by that?

23        A.   I base my values on comparable sales, and I

24   know the neighborhood probably better than anybody

25   else.
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 238 of 580
Case 1:09-md-02047-MCA-Document 244-t-entered on ESD Docket 13/2019 Page 192 of 324
Confidential - Subject to Further Confidentiality Review

```
 1      Q.   But you don't recall what comps you --

 2      A.   I used like homes in the neighborhood.

 3      Q.   Did you use -- did you look at any comps to

 4   come up with this number when you were preparing

 5   your report?

 6      A.   For the sale price?

 7      Q.   For your conclusion that it was

 8   substantially less than what a comparable home

 9   without Chinese drywall was selling for at the time.

10      A.   I did not, but I know for a fact that it was

11   substantially less because when I sold it at that

12   time, I know it was sold for less than what it would

13   have been worth.

14      Q.   How do you know that?

15      A.   Because I sold it and I know what other

16   homes were selling for.

17      Q.   What were other homes selling for?

18      A.   Higher price per square foot.

19      Q.   How high?

20      A.   I don't know the exact number, but I know it

21   was selling for a higher price per square foot and

22   faster.

23      Q.   Can you name a home?

24      A.   I can pull the MLS and give you many homes.

25      Q.   But you've not done that --
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 239 of 580
Confidential - Subject to further confidentiality Review
324

```
 1      A.   No.

 2      Q.   -- in preparing your report?

 3      A.   Not today, but in 2013 when I pulled the

 4   values, I did.

 5      Q.   But you have not done that in connection

 6   with your report, correct?

 7           MR. MONTOYA:  Asked and answered.

 8           You can answer, sir.

 9      A.   No.

10   BY MS. FASSBENDER:

11      Q.   When you've listed homes that either had

12   Chinese drywall or formerly had Chinese drywall,

13   have you shown them to any of your own buyers?

14      A.   People contacted me directly, so that would

15   be considered my own buyer since they weren't

16   represented, but I have never brought someone that

17   was a previous client and tried to sell them a home

18   with Chinese drywall or remediated Chinese drywall.

19      Q.   Looking at Exhibit 9, in addition to the

20   listing, it appears to include the sales contract

21   for the Grajales home.

22      A.   Um-hmm.

23      Q.   And it has the addendum.  Do you recall if

24   there was also the standard form seller's

25   disclosure?
```

 1      A.   I'm sure there was.  I'm sure there was a

 2    seller's disclosure.

 3      Q.   But you do not currently have a copy of that

 4    form?

 5      A.   I could look and see if I have it in an

 6    AppFile, if I have the AppFile.  I could look and

 7    see if I have it, but it -- I mean, it clearly

 8    states here on the addendum that the seller is

 9    disclosing, but I'm sure I have the seller's

10    disclosure.  We always use a seller's disclosure.

11      Q.   Turning to Paragraph 28 of your report, you

12    also sold a home located at 9407 Bridgebrook Drive

13    in Boca Raton?

14      A.   Um-hmm.

15      Q.   Which is the NuCompass home.

16           Who is NuCompass?

17      A.   It was a relo company.  I can't remember the

18    name of the owner.  I would have to pull the

19    AppFile, but it was a relo company that handled

20    the -- the sale for them.

21      Q.   And can you explain what you mean by -- by

22    "a relo company"?

23      A.   I don't remember if it was the husband or

24    the wife.  One of them was being relocated for work

25    and in a relocation, oftentimes the relo company --

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 241 of 580
Confidential - Subject to further Confidentiality Review
324

```
 1    to make the move easier, they become this -- the

 2    client, and they pay their moving fees and -- and I

 3    deal...

 4        Q.   Do you deal directly with the relocation

 5    company or with --

 6        A.   I have to send them documents and forms, but

 7    the negotiation was only with the seller.

 8        Q.   Do you recall who the seller was?

 9        A.   I would have to pull the AppFile.  I don't

10    remember their names.  I remember what they look

11    like, but I can't remember their names.

12        Q.   Did you help them purchase the -- the home

13    on Bridgebrook Drive?

14        A.   I did not.

15        Q.   When did you come in contact with them?

16        A.   They reached out to me, similar to the

17    Grajaleses, through my marketing.

18        Q.   What kind of marketing do you do?

19        A.   Direct mail and Internet.

20        Q.   What sort of Internet marketing?

21        A.   I have websites.  I pay to be on Realtor.com

22    and other websites as well, including my own and

23    Lang's.

24        Q.   What kind of direct mail do you do?

25        A.   Direct mail pieces to them, advertising my
```

```
 1    listings and my activity in the neighborhood.

 2         Q.   Do you focus on certain areas with your

 3    mailings?

 4         A.   If I am sending a mailing into The Oaks, it

 5    will be focused on the Oaks.

 6         Q.   I'm sorry.  Can you explain that?

 7         A.   If I'm accepting a mailer, a direct mail

 8    piece into The Oaks, it will be talking about Oaks

 9    transactions that I've participated in.

10         Q.   Do you market yourself in other

11    neighborhoods?

12         A.   I do.

13         Q.   Where?

14         A.   Saturnia Isles, Saturnia, Boca Isles, Boca

15    Falls, The Shores, Brookfield Country Club, a lot of

16    communities.

17         Q.   And are those -- where are those

18    communities?

19         A.   Nearby.

20         Q.   "Nearby" where?

21         A.   Nearby The Oaks.

22         Q.   So in West Boca?

23         A.   Central and West Boca and Delray, yeah.

24              (Greenblatt Exhibit 10 was marked for

25    identification.)
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 243 of 580
Case 2:09-md-02047-EEF-MBN Document 22364-4 Filed 12/09/19 Page 91 of 324
Confidential — Subject to Further Confidentiality Review

```
1    BY MS. FASSBENDER:

2        Q.   I'm handing you what's been marked as

3    Exhibit 10, which is Exhibit 6 to your report.

4             Can you explain what these documents are?

5        A.   This is the MLS sheet, and this is the

6    contract for the home.

7        Q.   And you listed the home on March 11, 2013,

8    correct?

9        A.   That's what it says, I believe.

10       Q.   And the listing price at that time was

11   $1,349,000?

12       A.   Um-hmm.

13       Q.   How did you arrive at that price?

14       A.   Comps.

15       Q.   Do you recall the specific comps you used?

16       A.   I do not.

17       Q.   Did you look at any comps when you prepared

18   your report in this litigation?

19       A.   No.

20       Q.   In the Remarks section, you stated that "no

21   guess work needed," zero Chinese drywall in this

22   home.

23       A.   Um-hmm.

24       Q.   Can you explain why that was included?

25       A.   It had been remediated with documentation,
```

1    so I had -- just like the Grajales, I had a binder

2    with photos to document that the home had been

3    remediated.

4       Q.   And there was also a certification?

5       A.   Yes.

6       Q.   Did you find that there were any purchasers

7    who preferred having the certification and knowing

8    that there was no Chinese drywall in the home?

9       A.   They would prefer that to a home that had

10   been remediated without a certification, but they

11   would not prefer that to a home that never had

12   Chinese drywall.

13      Q.   What about to a home that did not -- let me

14   start over.

15       Would they have preferred that to a home

16   that it was uncertain whether it contained Chinese

17   drywall or not?

18      A.   If a home was suspect to having Chinese

19   drywall, that would be better, but if a home didn't

20   have Chinese drywall and had no reason to be

21   guessing, that would have much better value than

22   this.

23      Q.   Was there generally a suspicion about all

24   the homes in The Oaks?

25      A.   No.

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 245 of 580
324

```
 1      Q.   What homes did people seem to have concerns

 2   about?

 3      A.   Homes that were built by Albanese during the

 4   time period that Chinese drywall was used.

 5      Q.   And Albanese is one of the construction

 6   companies, correct?

 7      A.   The builders.

 8      Q.   One of the builders?

 9      A.   Um-hmm.

10      Q.   Did -- have you experienced buyers that did

11   not -- that had concern about homes by other

12   builders?

13      A.   I don't understand.

14      Q.   Is the concern only that -- is the concern

15   only about homes by this one particular builder?

16      A.   In The Oaks?

17      Q.   Correct.

18      A.   Yes.  They were the only ones that used

19   Chinese drywall in The Oaks.

20      Q.   Do you know how many homes that particular

21   builder built in The Oaks?

22      A.   I don't know the exact number, but at the

23   time when the market -- when they came in there in

24   the early 2000s, Kenco and them were building homes

25   very quickly.  There was a lot of demand.
```

```
 1       Q.    You eventually sold the NuCompass home on

 2    July 9, 2013, for 1.2 million?

 3       A.    Um-hmm.

 4       Q.    You say that's less than a comparable home

 5    without Chinese drywall was selling for at that

 6    time?

 7       A.    Um-hmm.

 8       Q.    What is the basis for that statement?

 9       A.    Comps.

10       Q.    Have you identified any comps?

11       A.    No, not today.

12       Q.    And you -- you did not identify any in

13    connection with preparing your report, correct?

14       A.    Not for this report, no.

15       Q.    Did you at any other time?

16       A.    When I sold the home.

17       Q.    Do you recall what comps you identified?

18       A.    I do not recall.

19       Q.    Have you ever experienced remediated homes

20    commanding a higher price than a nonremediated home

21    because the inside had been redone?

22       A.    So comparing a remediated home with Chinese

23    drywall to a home that has Chinese drywall that

24    hasn't been remediated?

25       Q.    To a -- to a non-Chinese drywall home.
```

```
 1      A.    So you're asking if a home that has been

 2   remediated with Chinese drywall is worth more than a

 3   home that never had Chinese drywall?

 4      Q.    Correct.

 5      A.    Of course not.

 6      Q.    Why is that?

 7      A.    Because the home that didn't have Chinese

 8   drywall doesn't have Chinese drywall or ever had

 9   Chinese drywall.

10      Q.    And -- and during the remediation process,

11   if floors have been replaced, the kitchen has been

12   redone, and the bathroom has been redone, does that

13   attribute to a higher value than a non-Chinese

14   drywall home?

15      A.    No.

16      Q.    You've not experienced that?

17      A.    No.

18      Q.    Looking at Exhibit 10, it appears to include

19   the sales contract.  Do you recall if a Chinese

20   drywall disclosure form was used with this sale?

21      A.    Yes, I'm sure it was.

22      Q.    Do you have a copy of that?

23      A.    Not here, but I could probably pull it from

24   the AppFile.

25      Q.    Would you still have that?
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 248 of 580
Case 2:09-md-02047-MCD Document 2014 testimony of the docket 11/2014 Page 96 of 324

Confidential - Subject to further confidentiality Review

```
 1      A.    If it's in the AppFile.

 2      Q.    In the what file?

 3      A.    In the AppFile.

 4      Q.    What is that?

 5      A.    It's a program we use.

 6      Q.    And that is what Lang uses for your

 7   electronics records?

 8      A.    Correct.

 9      Q.    What was the market like in The Oaks at the

10   time that the NuCompass home sold in 2013?

11      A.    13 homes were -- the market was improving in

12   West Boca.  The market was starting to improve a

13   little bit, coming out of the -- a bad time, if you

14   will, for real estate in south Florida, but the

15   market was improving in '13.

16      Q.    And how did The Oaks experience the market

17   downturn?

18      A.    Worse because of Chinese drywall.

19      Q.    Worse than other areas because of Chinese

20   drywall?

21      A.    Correct.

22      Q.    Turning to Paragraph 33 of your report, you

23   state that "I have reached the following opinions

24   within a reasonable degree of probability as a

25   Florida Realtor."
```

Confidential - Subject to further Confidentiality Review

```
1    A.   Um-hmm.

2    Q.   Paragraph 33.a. states that "Chinese drywall

3    has a sigma, whether remediated or unremediated, and

4    drastically lowers the value of a home."

5    A.   Um-hmm.

6    Q.   What do you mean by "drastically lowers the

7    value of a home"?

8    A.   I mean that it drastically lowers the value

9    of a home.  What do you want me to explain?

10   Q.   What do you consider to be "drastically"

11   lower, a drastically lower price?

12        MR. MONTOYA:  If you are asking for a

13        number, that's outside the scope of his opinions

14        as contained in the report, but --

15        MR. CAMPBELL:  Sorry.  What was the

16        objection?

17        MR. MONTOYA:  The objection was it's out- --

18        outside the scope of his testimony, what he's

19        been retained for and as far as what's in the

20        report.

21        But you can ask the question.

22   A.   If you lost more than 10 percent,

23   20 percent, 30 percent, I would consider that

24   drastic on a million dollar transaction.

25   BY MS. FASSBENDER:
```

```
 1      Q.   Is that the -- and did you see Chinese
 2   drywall homes selling for 10 percent, 20 percent,
 3   30 percent less than their value?
 4      A.   Yes.
 5      Q.   Other than the three that we've talked about
 6   in your report, are there any specific ones that you
 7   can point to?
 8      A.   I would have to pull up the MLS, but I can
 9   show you.
10      Q.   Do you recall any ones -- any specific
11   homes?
12      A.   Not off the top of my head, but we could sit
13   down and go through comp by comp, sale by sale.
14      Q.   Did you do that in connection with preparing
15   your report?
16      A.   I did not.
17      Q.   Paragraph 33.b. states that "The industry
18   standard is that in selling a home that has or had
19   Chinese drywall, remediated or unremediated,
20   disclosure to the buyer is required."
21      A.   Um-hmm.
22      Q.   And that is still the industry standard; is
23   that your opinion?
24      A.   Yes.
25      Q.   Have you ever seen the standard about
```

```
 1    disclosure change over time?

 2        A.   No.

 3        Q.   What about for factors other than Chinese

 4    drywall?

 5        A.   No.  Material facts must be disclosed.

 6        Q.   Do you still see -- currently, do you see

 7    the same number of homes disclosing Chinese drywall?

 8        A.   The same number?  Well, if they had it, they

 9    still have to disclose it.

10        Q.   And do you commonly see disclosures to this

11    day?

12        A.   Yeah.

13        Q.   Paragraph 33.c. states that -- and I

14    apologize, strike that.

15             Paragraph 33.d. states that "the presence of

16    Chinese drywall and the required disclosure by a

17    seller creates a sigma that lowers the value of the

18    home and some buyers will never buy the home, no

19    matter the reduction in price."

20        A.   Um-hmm.

21        Q.   Is it the case that some buyers will buy a

22    remediated home?

23        A.   Clearly, some buyers will or else they

24    wouldn't be able to sell.

25        Q.   Does it depend on a particular buyer?
```

Confidential - Subject to Further Confidentiality Review

```
 1     A.   Yes.

 2     Q.   Is it the case that some buyers may never

 3   buy a given home regardless of Chinese drywall?

 4     A.   I don't understand.

 5     Q.   In purchasing a home, does it partly come

 6   down to a matter of preference?

 7     A.   Preference?

 8     Q.   Yes.

 9     A.   Yeah, everyone has different buttons, every

10   buyer has different needs and...

11     Q.   And in -- as far as buyers that would never

12   buy the home, can you -- did you deal with any of

13   those buyers directly?

14     A.   Yes.

15     Q.   Who, do you recall?

16     A.   Me and other clients that I've worked with

17   in the past.

18     Q.   What do you mean by be -- by "me"?

19     A.   I would never buy a home that had Chinese

20   drywall.  I wouldn't put my family in it.

21     Q.   And you've had other buyers that have

22   refused to buy a Chinese drywall home?

23     A.   Correct.

24     Q.   In Paragraph 33.e, you state that "because

25   the Priority Claimants will be required in the
```

Confidential - Subject to Further Confidentiality Review

1    future to disclose the past presence of Chinese

2    drywall and its remediation, a stigma will attach to

3    their properties that will lower the value of each

4    home."

5         Is it your opinion that sigma stays constant

6    over time?

7         A.   Constant?  Define "constant."

8         Q.   Doesn't change.

9         MR. MONTOYA:  That's also outside the scope

10   of his testimony.  I mean, the scope of his

11   testimony is laid out in his report, but you can

12   ask him a question.

13        You can answer.

14        A.   Some stigmas, maybe, can change over time.

15   BY MS. FASSBENDER:

16        Q.   Have you seen stigmas change over time?

17        A.   I don't know.  I mean, if you gave me an

18   example, I could give you an answer, but I can't say

19   off the top of my head, guessing what a sigma would

20   change over time on a real estate transaction.

21        Q.   What influences stigma?

22        A.   What influences stigma?

23        Q.   Yes.

24        A.   Perception.

25        Q.   Whose perception?

```
1       A.    The general public.

2       Q.    And what influences the perception of the

3    general public?

4       A.    What influences them?  Information.

5       Q.    So is the more information that's out there,

6    is that a problem or is that -- does that help

7    create stigma or reduce stigma, or both?

8       A.    Information is information.  People can do

9    with it as they please.  The more information you

10   have about Chinese drywall, I mean, I don't think it

11   reduces -- it would never reduce stigma.

12      Q.    Have you seen stigma around Chinese drywall

13   reduce over time?

14      A.    No.

15      Q.    Is the stigma subjective?

16            MR. MONTOYA:  Same objection as to scope.

17            You can answer.

18      A.    I mean, I suppose.  I was able to sell these

19   homes, so obviously someone didn't mind it as much

20   as I might.

21   BY MS. FASSBENDER:

22      Q.    Does it depend on the buyer?

23      A.    Yeah.  Some people, if they get a good

24   enough deal, they are willing to do it.

25      Q.    And in Paragraph -- Paragraph 33.f, you
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 255 of 580
Case 1:14-cv-22848-MGC Document 290-1 Entered on FLSD Docket 09/15/2014 Page 303 of
324
Confidential - Subject to Further Confidentiality Review

```
 1    state that because of Florida's disclosure --

 2    disclosure requirement, the stigma created by

 3    Chinese drywall is permanent.

 4          And "Florida's disclosure requirement," by

 5    that, do you refer to the fact that material facts

 6    must be disclosed?

 7        A.   Um-hmm.

 8        Q.   And the forms that we've discussed earlier?

 9        A.   Um-hmm.

10        Q.   Does stigma depend in part on the market at

11    a given time?

12        A.   I don't think so, because in terms of

13    Chinese drywall -- if that's what we're going to

14    focus on -- when the market was soft, there was a

15    stigma, and the market rebounded, and there was

16    still a stigma, so --

17        Q.   Does --

18        A.   -- as it relates to Chinese drywall, I don't

19    think the market is going to reduce stigma.

20        Q.   What about other -- other things that may

21    cause stigma?  Does it depend on the market?

22        A.   I don't -- I don't know.  You have to be

23    more specific.

24        Q.   Have you found stigma due to Chinese drywall

25    decrease as there is less homes on the market in The
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 256 of 580
Confidential - Subject to further Confidentiality Review
324

1    Oaks?

2        A.   Decrease?  No.  No.

3        Q.   Does stigma -- does the impact of stigma

4    differ depending on the type of home?

5        A.   Are you talking specifically about Chinese

6    drywall?

7        Q.   Yes.

8        A.   No.

9        Q.   What about the type of buyer?  Does stigma

10   from Chinese drywall depend on the type of buyer?

11       A.   No, but I think the more educated you are,

12   the less likely you are to purchase one.

13       Q.   Have you seen that?

14       A.   I can't compare what happens in other

15   neighborhoods, but I can tell that you the majority

16   of buyers in The Oaks are well-educated, fairly

17   affluent, and it's a lot harder to sell in there

18   than perhaps a home that would be in a less affluent

19   area.  I'd be -- I'd be speculating, but that would

20   be a guess.  If you're buying a 200,000-dollar home,

21   your expectations could be different, but in The

22   Oaks, the black cloud is there.

23       Q.   And that's still true to this day?

24       A.   Correct.

25       Q.   Have you seen stigma decrease the further a

```
1    home gets from the time it was remediated?

2        A.    Not for me and my clients, no.

3        Q.    And when was the last time you sold a home

4    that has Chinese drywall?

5        A.    That house on Bridgebrook.

6        Q.    Which was 2013?

7        A.    Um-hmm.  I've shown homes with remediated --

8        Q.    Since 2013?

9        A.    Correct.

10       Q.    To potential purchasers?

11       A.    Correct.  The closing I have next week on

12   new construction, we've been looking for a long time

13   and they considered it back and forth, back and

14   forth.

15       Q.    Was there a particular home that they

16   considered?

17       A.    Several.

18       Q.    In The Oaks?

19       A.    Um-hmm.

20       Q.    Do you recall which ones?

21       A.    I could pull the MLS data for you, but there

22   were a couple of them in The Oaks that they

23   considered and they refused to pull the trigger.

24       Q.    Why is that?

25       A.    Because it had Chinese drywall remediation.
```

```
 1      Q.   And those homes were remediated homes,

 2   correct?

 3      A.   Correct.  He wanted a deal.  That's the only

 4   allure, is the deal.  That's what kept drawing him

 5   in.

 6      Q.   Did you advise them not to purchase?

 7      A.   Yeah.

 8      Q.   Why is that?

 9      A.   Because I think it's a terrible investment.

10      Q.   Is your opinion about stigma limited to The

11   Oaks?

12      A.   No.

13      Q.   So have you considered sales of Chinese

14   drywall homes outside of The Oaks?

15      A.   Um-hmm.

16      Q.   In preparing your report?

17      A.   Not in preparing my report but in my

18   expertise and my experience, I've brought buyers to

19   Parkland Golf.

20      Q.   Where is Parkland Golf?

21      A.   In Parkland, and I've brought buyers to The

22   Canyons in Boynton Beach.

23      Q.   And those are to homes that had Chinese

24   drywall?

25      A.   In those neighborhoods, yes, and I've con --
```

```
 1   consistently -- I'm proud of it, actually --

 2   consistently always advised against it, and I've

 3   never represented a buyer on a home that either had

 4   Chinese drywall or was remediated.

 5       Q.   And what's the basis for your opinion that

 6   homes outside of The Oaks that have Chinese drywall

 7   have a lower value or a stigma, I should say?

 8       A.   What difference does it make if it's

 9   Parkland Golf or The Oaks?  It's the same thing.

10       Q.   Are you -- do you consider yourself to be an

11   expert in Parkland Golf?

12       A.   Absolutely.

13       Q.   Where else do you consider yourself to be an

14   expert?

15       A.   In the areas that I mentioned.

16       Q.   With -- what were those?

17       A.   From South County, Parkland, South County,

18   up to maybe Boynton is where I focus the majority of

19   my time.  Like I said, I've sold places from Miami

20   up to St. Lucie.

21       Q.   Do you consider yourself to be an expert in

22   Miami real estate?

23       A.   No.

24       Q.   Are you offering an opinion today about

25   stigma from Chinese drywall in Miami?
```

```
 1        A.    I'm offering an ex- -- expertise on Chinese

 2    drywall in real estate.  I'm not focusing on Miami.

 3    If you want to The Oaks, we can focus on The Oaks,

 4    but I don't see much of a difference between The

 5    Oaks or Parkland Golf.

 6        Q.    What about other parts of Florida besides

 7    The Oaks or Parkland Golf?

 8        A.    Chinese drywall is Chinese drywall.

 9        Q.    How many homes have you sold in Miami?

10        A.    I don't know.  Not many.

11        Q.    How about Fort Lauderdale?

12        A.    Not many.

13        Q.    What does that mean?

14        A.    A handful.

15        Q.    Less than five?

16        A.    Probably.

17        Q.    When was the last time you sold a home in

18    Fort Lauderdale?

19        A.    I don't know.  I'd have to pull the MLS

20    data.  I could pull it up for you, but I've been

21    doing it 19 years.  So I know I've done it.  I just

22    don't know exactly.

23        Q.    Do you have a recollection?

24        A.    Not off the top of my head.

25        Q.    When was the last time you sold a home in
```

```
 1    Miami?

 2        A.   I don't know.  I sold a condo on South

 3    Beach.  I don't remember what year it was.  It was a

 4    long time ago.

 5        Q.   Was it prior to Chinese drywall?

 6        A.   I don't know.  I'd have to -- I'd have to

 7    look up the file.  I don't know.

 8        Q.   What about Port St. Lucie, when was the last

 9    time you sold a home there?

10        A.   That was a couple years ago.

11        Q.   Did that home have Chinese drywall?

12        A.   No.  It was newer construction.

13        Q.   How many homes have you sold there?

14        A.   That's it.

15        Q.   Have you home -- sold homes elsewhere in

16    Florida?

17        A.   No.

18        Q.   But you can -- you believe you're an expert

19    on stigma outside of the areas in which you've sold?

20        A.   I believe I'm an expert in real estate in

21    South Florida, and I think that there's -- Chinese

22    drywall in Parkland or in Orlando or in -- I

23    would -- if I was representing -- if a friend of

24    mine said to me tomorrow, Can you do me a favor and

25    help me buy a home in Orlando, which I can do since
```

```
 1    I'm licensed in the state of Florida, and I showed

 2    him homes in Orlando, I would still advise him the

 3    same thing I would advise him in The Oaks as I would

 4    advise him in Jacksonville or Orlando or Tampa.

 5         Q.   Have you sold a home in Orlando?

 6         A.   No.

 7         Q.   What about Jacksonville?

 8         A.   No.

 9         Q.   What about Tampa?

10         A.   No.

11         Q.   Would you recommend to a buyer that they

12    work with you in Jacksonville or Tampa or Orlando?

13         A.   Probably not, but I can --

14         Q.   Why?

15         A.   Why?  Because that's not my area -- where I

16    focus.  I could put them in touch with somebody I --

17    I have a referral network, but if they insisted that

18    I work with them or if I was buying something for

19    myself, I could pull the comps.  It's not that hard

20    to do.

21         Q.   Why did you not include any other Chinese

22    drywall homes in your report?

23         A.   I wasn't asked to.

24         Q.   What were you asked to do?

25         A.   What you've got is what I was asked to do.
```

Confidential - Subject to Further Confidentiality Review

```
 1       Q.    Which is look at these three particular

 2   homes in The Oaks?

 3       A.    Those are the ones that I was involved in.

 4       Q.    And you've not been involved in the sale of

 5   Chinese drywall homes elsewhere, correct?

 6       A.    Correct.

 7       Q.    And you are not an expert in Chinese drywall

 8   remediation, correct?

 9       A.    Correct.

10       Q.    And you also are not offering the opinion as

11   to the precise amount of diminution in value for a

12   Chinese drywall home, correct?

13       A.    Correct.

14       Q.    What did you do to prepare for your depo

15   today -- deposition today?

16       A.    I met with Natalie once, and then I met with

17   Patrick and Natalie another time.

18       Q.    When was that?

19       A.    We met last week, the three of us, and the

20   week before I met with Natalie.

21       Q.    For how long?

22       A.    An hour each time, maybe two hours last

23   week, hour and a half, two hours.

24       Q.    Did you review any documents to prepare?

25       A.    They provided me with a binder that had
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 264 of 580
Case 1:11-cv-22408-MGC Document 280-1 Entered on FLSD Docket 08/15/2014 Page 92 of
324

Confidential — Subject to further Confidentiality Review

1    information from a lawsuit where another real estate

2    agent had been deposed in Miami.  And I read that

3    because I've never been involved in a deposition, so

4    I wanted to see what questions were asked.

5        Q.   Did you meet with anyone else to prepare?

6        A.   No, I did not.

7        Q.   Other than the binder of documents, did you

8    review any other documents?

9        A.   No.

10       Q.   And what else was in that binder that you

11   reviewed?

12       A.   That I reviewed?  There was information from

13   an appraiser.  I glanced over it, but what I focused

14   on was the deposition from that agent in Miami.

15       Q.   And why is that?

16       A.   Because that, I thought, would prepare me

17   best for what happens in a deposition.  I've never

18   been in one.

19       Q.   Did you review -- did you review that

20   transcript prior to preparing your report?

21       A.   No.

22       Q.   Have you discussed the deposition with any

23   of the claimants?

24       A.   The claimants?

25            MR. MONTOYA:  You mean this deposition?

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 265 of 580
Case 2:14-cv-02684-CJC Document 290-1 Entered on FLSD Docket 09/15/2014 Page 3 of
324
Confidential – Subject to Further Confidentiality Review

```
 1              MS. FASSBENDER:  Correct.

 2      A.   I don't know if Kevin knows.  I haven't

 3  spoken to him in a while.

 4      Q.   Have you discussed the case with any

 5  claimants?

 6      A.   No.

 7      Q.   Have you discussed your involvement with the

 8  Rosens?

 9      A.   They know that I'm involved.

10      Q.   How so?

11      A.   How so?  Well, I mentioned it to Natalie

12  that, you know, I represented them, and I felt

13  terrible being involved in it.  And I think they

14  recommended me.  That's my guess that's how we were

15  put together.

16      Q.   That the Rosens recommended you?

17      A.   Yes.

18              MS. FASSBENDER:  You know what, why don't we

19      take a break for a minute and I'll --

20              THE VIDEOGRAPHER:  Off the record, 12:33.

21       (Recess from 12:33?p.m. until 12:50?p.m.)

22              THE VIDEOGRAPHER:  We're back on the record

23      at 12:50.

24  BY MS. FASSBENDER:

25      Q.   Can you explain what sort of marketing or
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 266 of 580
Confidential – Subject to further Confidentiality Review
324

1   other efforts you take when you list a home in order

2   to try and sell it?

3       A.   I pay a photographer to do high res photos.

4   We do aerial photos, videos.  Then we go and blast

5   those everywhere on all the different sites I

6   mentioned before.  Call my sphere of realtors,

7   buyers.  And then depending on the neighborhood,

8   usually we'll send a direct mail piece.

9       Q.   And did you take those same efforts for the

10  three homes that we've been talking about in your

11  report?

12      A.   I don't remember.  I don't know.  What I do

13  today is different than what I did then.  The

14  technology is different, too.

15      Q.   How so?

16      A.   Ten years ago I think I had maybe one

17  website.  Today I have several.

18      Q.   And are those websites personal websites for

19  your listings or --

20      A.   I now -- that's something that I've started

21  doing a couple years ago, is each listing has its

22  own website, but back then, that did not happen.

23          (Greenblatt Exhibit 11 was marked for

24  identification.)

25  BY MS. FASSBENDER:

1    Q.   I'm handing you what's been marked as

2    Exhibit 11, which is, I believe, Attachment A to

3    your report, which is the trial testimony list.  And

4    you have not previously testified as an expert in

5    the past four years, correct?

6    A.   Correct.

7    Q.   And have you previously testified as an

8    expert in -- at any time?

9    A.   No.  The only thing I did was that --

10   helping the Rosens prepare in 2013, but that wasn't

11   an -- to my knowledge, be considered an expert

12   witness.

13   Q.   Turning to Exhibit 1, if you still have a

14   copy of that, which is the notice of deposition.

15   A.   Um-hmm.

16   Q.   If you turn to Page 6, it lists nine

17   categories of documents requested.  Have you -- have

18   you previously seen this list?

19   A.   I don't think so.  I don't think so.  I

20   don't --

21   Q.   Have you been asked to look for or collect

22   these documents?

23   A.   To -- for this?

24   Q.   Correct.

25   A.   No.

```
1      Q.   And you brought with you today e-mails?

2      A.   I didn't.

3           MR. MONTOYA:  I did.

4           MS. FASSBENDER:  You brought those?

5           MR. MONTOYA:  Right.

6           MS FASSBENDER:  Okay.  Thank you.

7   BY MS. FASSBENDER:

8      Q.   In looking through this list, do you have --

9   can you say if you have any of these documents in

10  your possession?

11     A.   In my possession?

12     Q.   Not presently, but in your -- in your files

13  at home or elsewhere.

14     A.   Some.  The sales that I have the listings,

15  if the AppFiles -- whatever is in the AppFile I have

16  for the Rosen transaction, I'm -- it's beyond the

17  time frame that my office would have held the files,

18  the paper files.

19     Q.   Okay.  Well, I guess looking at Category

20  Number 1, is it -- do you -- would you have any

21  responsive documents?

22     A.   To the Rosen transaction?

23     Q.   No.  Any transaction.

24     A.   Any transaction involved with Chinese

25  drywall?
```

```
 1     Q.    Correct.  Well, yeah --

 2           MR. MONTOYA:  Yeah, those categories.

 3           MS FASSBENDER:  Yeah.

 4           MR. MONTOYA:  Read through Number 1, and you

 5     can answer the question.

 6     Q.    If you could read Number 1.

 7     A.    You want me to read it?

 8     Q.    Not out loud, but if you'd read it and let

 9  me know if you have any documents responsive to that

10  category.

11     A.    All reports, affidavits, and exhibits you

12  submitted in connection with any matters related --

13  okay.

14           What do you want to know?

15     Q.    Do you have any documents responsive to that

16  request?

17     A.    Additional than to what is here?

18     Q.    Correct.

19     A.    On me personally?

20     Q.    In your files, not --

21     A.    Like I said, I would have to pull up the

22  AppFiles for those two transactions and see what's

23  there.  I could go on a desktop.  For the Rosen

24  file, I don't have the papers for the file.

25           MR. MONTOYA:  I think the short answer to
```

```
1      all this is --
2           MS FASSBENDER:  They're with your counsel
3      perhaps.
4           MR. MONTOYA:  Yeah.  I think the shortest
5      answer to this is:  Anything related to these
6      transactions, he can go back to his file, if he
7      has anything.  We'll produce it if he's got
8      anything --
9           MS FASSBENDER:  Okay.
10          MR. MONTOYA:  -- paper or electronic, no
11     problem.  Number -- he's never been an expert
12     before.
13          MS FASSBENDER:  Right.
14          MR. MONTOYA:  So what you have, you have.
15          Number 2, the e-mails and the billing, we
16     believe, completes the file, in addition to
17     what's already been produced.
18          Number 3, same thing, you've got everything
19     he's reviewed in conjunction with it, except for
20     possibly those files that may or may not -- he
21     may or may not have those, those -- out files,
22     you said, o-u-t?
23          THE WITNESS:  AppFiles.
24          MR. MONTOYA:  App, I'm sorry.  A-p,
25     AppFiles.
```

Confidential - Subject to Further Confidentiality Review

```
 1              4, you'd have to ask him.  I think that may

 2        be a document disposal type issue just with

 3        timing, but I think he's described all the

 4        transactions he's done.

 5              Same thing with 5.

 6              6, you have what he has.

 7              7, I think he has answered that question.

 8              8 is the same thing.

 9              And then 9, I think he's already answered

10        here for you.

11              MS. FASSBENDER:  Okay.  Well, then why don't

12        we -- perhaps we can follow up with you directly

13        after.

14              MR. MONTOYA:  Absolutely.

15              (Greenblatt Exhibit 12 was marked for

16        identification.)

17              MR. MONTOYA:  I'm handing this to you.

18              THE WITNESS:  Really?

19              MR. MONTOYA:  Yeah.

20              THE WITNESS:  This is the binder?

21              MR. MONTOYA:  Yeah.  Thank you.

22        BY MS. FASSBENDER:

23        Q.   I've handed you Exhibit 12, which was

24        Exhibit C to your report.

25        A.   Um-hmm.
```

1    Q.   And that, according to your report, is a

2    listing of the documents and information that you

3    have considered.

4    A.   This is the binder that I was given.

5    Q.   And when did you receive that binder?

6    A.   When I met Natalie two weeks ago-ish.  I can

7    pull out my phone and pull up my calendar and tell

8    you the exact date if you would like that.

9    Q.   Did you consider any of that information

10   prior to executing your report in this case?

11   A.   No.

12   Q.   If you look -- let me look for you.  There's

13   a letter dated Wednesday, July 3, 2013, "To whom it

14   may concern," and it's signed by you.

15   A.   Um-hmm.

16   Q.   Can you explain who this letter was -- or

17   who this letter was to?

18   A.   No.  It was a broad letter that Kevin asked

19   me to produce my opinion of the transaction when we

20   sold his home, what it would have been worth had it

21   not had Chinese drywall.

22   Q.   For what purpose?

23   A.   I think you'd asked me something similar

24   last time.  He was involved in a case, and he'd

25   asked for help, and this was what I was asked to do.

```
 1     Q.    Do you know how this letter was used?

 2     A.    I don't.

 3     Q.    And is it correct that when preparing this

 4  letter, you identified the comps that are attached

 5  to your report?

 6     A.    Yes.

 7     Q.    If you turn a few more pages over, past the

 8  blue sheet, there is a supplemental expert

 9  affidavit?

10     A.    Um-hmm.

11     Q.    Signed by you in December of 2013?

12     A.    Um-hmm.

13     Q.    Was that in connection with the same

14  litigation?

15     A.    I believe so.

16     Q.    And who -- who did you provide this document

17  to?

18     A.    Kevin.

19     Q.    Did you draft it?

20     A.    It was similar to the way this other

21  document was.  We would discuss -- he would ask me

22  questions, and he would base it off of the

23  information I provided to him.  So I didn't type it.

24     Q.    And so you worked directly with Kevin on

25  this, on preparing these two documents?
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 274 of 580
Confidential - Subject to further confidentiality review
324

```
1     A.   I think so, yeah.

2     Q.   Did you work with any -- any attorneys?

3     A.   I don't think so.  I don't recall working

4   with any attorney, no.

5     Q.   Have you reviewed all the materials in

6   this -- in the binder that you were given?

7     A.   All of it?

8     Q.   Correct.

9     A.   No.

10    Q.   Do you know what you did or did not review?

11    A.   I reviewed the deposition.  I think it was

12   Chapter 8 or something.  It had -- mine had --

13    Q.   Tabs?

14    A.   -- tabs, so that's what I focused on.  I

15   glanced over the other stuff.  I glanced over it,

16   but the -- the -- I read this deposition, this part.

17    Q.   For the two other homes in your report,

18   other than the Rosen home, the Grajales and the

19   NuCompass home, did you -- do you recall pulling CMA

20   reports at that time --

21    A.   I --

22    Q.   -- at the time you listed the --

23    A.   Of course.

24    Q.   -- listed the homes?

25    A.   Yeah.  When I go into a listing appointment,
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 275 of 580
Case 1:21-cv-22280-MGC Document 23-1 Entered on FLSD Docket 08/15/2011 Page 923 of 324
Confidential – Subject to further Confidentiality Review

```
1    I come with this -- with listing paperwork, and I

2    always bring comps to show them.  I don't just pull

3    a number out of the air.  I pull the comps.  Then I

4    see the home and condition, and we sit down and

5    discuss.

6        Q.   Do you typically hold onto those or retain

7    them?

8        A.   I leave them with the seller, and then --

9    and today -- sorry, I don't mean to cut you off.

10   But today I would have a program that I use that I

11   would have -- sometime -- I think it keeps them

12   about a year, Toolkit CMA.

13        Back then, the technology wasn't the same.

14   So I would have pulled the specific MLS listings and

15   just sort of said, "Here are the comps."  And today

16   there's more technology where they put together

17   these nice little packets.

18       Q.   And you -- you said you did not run CMA

19   reports on any of the homes in your report at the

20   time you prepared your report?

21       A.   In 2013?

22       Q.   In 2019.

23       A.   When I created a report for what?

24       Q.   This litigation.

25       A.   I didn't create a value or a report or
```

1    anything.  I just submitted the sales documents,

2    like the MLS.  I didn't create -- it happened.  So I

3    didn't create a CMA, a new CMA.  Is that what you're

4    asking?

5          MR. MONTOYA:  You're pointing to Exhibit 2,

6       right, his expert report?

7          MS. FASSBENDER:  Yes.

8          MR. MONTOYA:  Okay.  And I think the

9       question is:  Did you -- did you do -- did you do

10      any CMAs in conjunction with Exhibit 2 --

11         THE WITNESS:  No.

12         MR. MONTOYA:  -- which is your report?

13         THE WITNESS:  No.

14   BY MS. FASSBENDER:

15     Q.   Okay.  And your opinion regarding stigma in

16   Chinese drywall homes, that's based on your

17   experience, correct?

18     A.   Correct.

19     Q.   And your experience is -- selling those

20   homes is in The Oaks; is that correct?

21     A.   That's where I had actual transactions, but

22   I've shown homes in other neighborhoods, like

23   Parkland Golf and in The Canyons.

24     Q.   Do you recall approximately how many?

25     A.   I don't -- I can't tell you the number off

```
1    my head, but I showed a lot in Parkland Golf and a

2    fair amount in The Canyons.

3        Q.   With Chinese drywall?

4        A.   Some of them -- I mean, been doing this 19

5    years, so I ran the course of the process of

6    uncertainty, remediation.  So I've shown homes pre,

7    during, after, so -- yeah.

8        Q.   But you don't remember any specific --

9    specifically how many homes that you've shown or

10   tried to sell with Chinese drywall?

11       A.   I have only tried to sell two homes with

12   Chinese -- three homes with Chinese drywall.

13       Q.   Do you find there is varying levels of

14   information about Chinese drywall among the real

15   estate community?

16       A.   Yeah.  Unfortunately, the barrier to entry

17   is not very high, so, yes.

18       Q.   And how does that affect the ability to sell

19   a home with Chinese drywall?

20       A.   Unfortunately, you could take a course in a

21   week and be licensed, and off you go.  Tomorrow you

22   could go and sell somebody a house.

23       Q.   Do you find misperception among realtors

24   about Chinese drywall?

25       A.   Professionals have the same perception I do,
```

1    but I can't speak to somebody who is not a

2    professional.

3        Q.   What does that mean?

4        A.   Somebody who is new, somebody who doesn't

5    have experience.

6        Q.   And have you encountered real estate agents

7    that are new or inexperienced with respect to

8    Chinese drywall?

9        A.   Sure.

10       Q.   And does -- how does that influence the --

11       A.   I had a client --

12       Q.   -- transaction, if it does?

13       A.   I had -- one of the listings I had, and I

14   remember I pulled out the binder to show -- during

15   the showing -- I think it was the NuCompass home --

16   and I said, "Here, here you go."  They -- I could

17   see they liked the house.  So I handed them the

18   binder.

19           And the agent said to me, "Why would you do

20   that?  You're so stupid.  You just killed the deal."

21           That's my example of an unprofessional

22   agent.

23       Q.   Do -- have you seen agents, in your opinion,

24   that perpetuate the problem of Chinese drywall?

25       A.   I don't think we perpetuate.  I think

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 279 of 580
Confidential — Subject to further confidentiality review
324

```
 1    professional agents would be informative.  I don't

 2    think it's perpetuating.  I look at myself as

 3    providing information, not perpetuating.

 4       Q.   Applying to yourself?

 5       A.   Yeah.

 6       Q.   I was asking about others that you've -- you

 7    know, in dealing in transactions, if you feel that

 8    other real estate agents have made selling Chinese

 9    drywall homes more difficult?

10       A.   No, no.  I don't think an agent can make it

11    more difficult.

12       Q.   And you -- we spoke briefly earlier about

13    remediation.  Do you have an idea of a general cost

14    to remediate a home?

15       A.   I mean, a -- homes of this magnitude, on a

16    square footage basis, I -- like I said, hundreds of

17    thousands.

18       Q.   And did -- have you -- is that based on any

19    experience or just your general knowledge?

20       A.   I remember when the Rosens were going

21    through it.  I think they got some estimates, and I

22    remember Kevin throwing out, you know, ballpark

23    numbers.

24       Q.   Do you remember what those were?

25       A.   Hundreds of thousands of dollars.
```

```
 1      Q.   Do you know the price per square foot?

 2      A.   (Shaking head.)

 3      Q.   Roughly?

 4      A.   (Shaking head.)

 5           MS. FASSBENDER:  I think that's all the

 6      questions I have for right now.

 7           THE WITNESS:  Okay.

 8           MR. CAMPBELL:  Let's go off the record real

 9      quick.

10           THE VIDEOGRAPHER:  Off the record at 1:05.

11        (Recess from 1:05 p.m. until 1:49 p.m.)

12           THE VIDEOGRAPHER:  We're now back on the

13      video record at 1:49.

14                     CROSS-EXAMINATION

15   BY MR. CAMPBELL:

16      Q.   Mr. Greenblatt, my name is Steven Campbell.

17   I'm an attorney at Alston & Bird, and we represent

18   defendant Taishan Gypsum in the case.  I'm going to

19   ask a few more questions.

20           You realize you're still under oath?

21      A.   Yes.

22      Q.   When you came here today, did you bring any

23   documents with you?

24      A.   I brought that history, and I brought a

25   notepad that has a couple of notes.  I didn't know
```

1    what you were going to ask me, so I put down a

2    couple of notes on my production in the last couple

3    of years.  If you were going to question me, I

4    wanted to be prepared.

5        Q.   Can I see the -- your notes?  This is the

6    extent of your notes?

7        A.   That's the extent of my notes.

8            MR. MONTOYA:  I'll be happy to do something

9        after the break.  He went and looked in the

10       AppFile for the sales, the two addendums.

11           MR. CAMPBELL:  Does this pertain to what he

12       brought today with him?

13           MR. MONTOYA:  That's what he has right now,

14       yeah.

15           MR. CAMPBELL:  Okay.

16           MR. MONTOYA:  You had -- you had asked about

17       the other two disclosures and the other two sales

18       that were in his report, if we had the contracts.

19       These are the contracts.  He went back --

20           THE WITNESS:  No.  Those are the seller's

21       disclosures.

22           MR. MONTOYA:  Seller's disclosures.  You can

23       describe what they are, but --

24   BY MR. CAMPBELL:

25       Q.   Why don't you just, you know --

1    A.   Okay.  So you had asked me about the

2    seller's disclosures from the previous two sales of

3    the homes that had been remediated.  I went in the

4    AppFiles, and I found the seller's disclosures.

5    Q.   All right.  So for the record, what are you

6    holding in your right hand?

7    A.   I'm holding a seller's disclosure for the

8    house on Bridgebrook that I sold that had been

9    remediated, and I'm holding the seller's disclosure

10   for the home on -- home on Monte Vista, Beatrice

11   Grajales.

12        You had asked for them.  I found them in the

13   AppFiles.  I still have AppFiles for these two

14   homes.  The Rosens was pre-AppFiles.

15        MR. CAMPBELL:  Let's mark as Exhibit --

16   where are we?

17        THE COURT REPORTER:  13.

18        MR. CAMPBELL:  -- as Exhibit 13.

19        (Greenblatt Exhibit 13 was marked for

20   identification.)

21   BY MR. CAMPBELL:

22   Q.   Please tell me what Exhibit 13 is again.

23   A.   It is a seller's disclosure executed by the

24   seller and the buyer for the Novello, which was

25   NuCompass, but the seller obviously filled it out.

1    Their name was Novello.  Now I have the AppFile.

2    Her name was Novello.  NuCompass was the -- was the

3    relo company that was the seller, but the homeowner

4    was Novello.

5           And the other document --

6           MR. CAMPBELL:  Yeah.  So we'll mark

7       Exhibit 14, this document.

8           (Greenblatt Exhibit 14 was marked for

9    identification.)

10   BY MR. CAMPBELL:

11   Q.   Please describe what Exhibit 14 is.

12   A.   Exhibit 14 is the seller's disclosure for

13   17894 Monte Vista Drive.  The seller was Beatrice

14   Grajales.  And I don't know -- there is something

15   here that was not -- she must have stapled something

16   that was not mine.

17          THE WITNESS:  I think this is yours.

18          MR. MONTOYA:  Yeah.  Those are e-mails we

19       produced already to you guys.  They just got

20       tacked on the back.

21          MR. CAMPBELL:  When you say produced

22       already, that's what you brought with you this

23       morning?

24          MR. MONTOYA:  Correct.  E-mails between

25       counsel and Mr. Greenblatt.

1    BY MR. CAMPBELL:

2        Q.   Just for the record, Exhibit 13 was not

3    brought with you today.  You printed this out during

4    a break?

5        A.   Correct.

6        Q.   Okay.

7        A.   Because you had asked for it, so I thought

8    it would be prudent during my break, while I was in

9    AppFiles working, to find it.

10       Q.   I just wanted to make sure --

11       A.   Correct.  I did not bring it prior to lunch.

12       Q.   Same with Exhibit 14?

13       A.   Correct.

14       Q.   And Exhibit 13 is not attached to your

15   report?

16       A.   Correct.

17       Q.   And Exhibit 14 is not attached to your

18   report, correct?

19       A.   Correct.

20       Q.   Okay.  And did you not consider Exhibit 13

21   or Exhibit 14 in preparing your report; is that

22   correct?

23       A.   No.

24       Q.   Do you recall ever reviewing Exhibit 13

25   prior to just printing it out now?

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 285 of 580
Confidential - Subject to further confidentiality review
324

```
 1     A.   No.

 2     Q.   Okay.  Do you recall ever reviewing

 3   Exhibit 14 prior to printing it out right now?

 4     A.   No.

 5     Q.   Is there a reason why you wouldn't have

 6   reviewed the disclosure of one of the homes that

 7   you've sold?

 8     A.   I wasn't asked to.

 9     Q.   So are you not involved -- as the person who

10   is the listing agent selling the home, are you not

11   involved in the disclosure?

12     A.   Of course I am, in two -- when I sold the

13   home, I was involved in it.

14     Q.   Okay.

15     A.   But you're asking about if I looked at it

16   recently.  Why would I look at it recently?

17     Q.   I didn't ask if it was recently.  I'm just

18   asking if you've ever reviewed it.

19     A.   When I went through it with the seller and

20   we filled that out.

21     Q.   Okay.  And that would have been the only

22   time you reviewed it?

23     A.   Correct.

24     Q.   Same with Exhibit 14?

25     A.   Correct.
```

```
 1      Q.   All right.  To get back to what we were
 2   starting with, you brought a history of MLS, and
 3   that pertains to the Rosen home; is that correct?
 4      A.   Correct.
 5      Q.   And why did you bring that with you?
 6      A.   It was basically a refresher.  Because it's
 7   so long ago, I don't remember the dates of when it
 8   sold or how long it took exactly.  I wanted to
 9   refresh myself.
10      Q.   So you were interested in refreshing
11   yourself on the dates that it sold?
12      A.   (Nodding head.)
13      Q.   Were you interested in refreshing yourself
14   as to any other facts with respect to the Rosen
15   home?
16      A.   No.
17      Q.   Okay.  Is there a reason why you didn't
18   bring with you a printout of the MLS history for the
19   Grajales home?
20      A.   No.
21      Q.   Were you not interested in refreshing
22   yourself on the dates that that home sold?
23      A.   I have an AppFile, so if you ask me for
24   something, I can find it.
25      Q.   I'm just curious as to why you printed one
```

1    and you didn't print the others.

2        A.    I don't have an AppFile for the Grajales.

3        Q.    And the same is true with respect to

4    NuCompass home?

5        A.    No, that's not correct.

6        Q.    Okay.

7        A.    I do have an AppFile for that.

8        Q.    Is there a reason why you didn't print the

9    MLS file?

10       A.    No, because the difference being I sold that

11   home, and it wasn't part of that original document

12   with the deposition, whatever it was called with the

13   Rosens in 2013.  Those homes weren't part of that.

14       Q.    Were there any -- was there anything else

15   that you brought with you today?

16       A.    My keys and my wallet.

17       Q.    I won't ask for that.

18            Are you aware of what your counsel brought

19   in, which has been represented to us to be a number

20   of e-mail correspondence between you and your

21   counsel?

22       A.    I didn't review it, but we've communicated

23   via e-mail.

24       Q.    Did your counsel tell you that he was

25   bringing those?

```
 1    A.   Yes, Um-hmm.

 2    Q.   Were you --

 3         MR. MONTOYA:  To correct that, I'm not his

 4    counsel.

 5    Q.   Did the counsel --

 6         MR. CAMPBELL:  Are you representing this man

 7    in the deposition today?

 8         MR. MONTOYA:  I represent the priority

 9    claimants.

10         MR. CAMPBELL:  Okay.

11         MR. MONTOYA:  He's not my client, though.

12         MR. CAMPBELL:  Okay.

13    BY MR. CAMPBELL:

14    Q.   But you did have a conversation with Patrick

15    before you came in today, and he told you that he

16    was going to be bringing with him some e-mails; is

17    that correct?

18    A.   I believe so, yeah.  Last week we met and he

19    said he might -- he'll probably print out all our

20    communications.

21    Q.   When did you meet with him last week?

22    A.   When?

23    Q.   Yes.

24    A.   You want me to look on my phone?

25    Q.   Please.
```

```
 1      A.   Okay.  We met Wednesday the 27th at my
 2   office at 9:00 a.m.
 3      Q.   Who else was at that meeting?
 4      A.   The three of us, Natalie and Patrick.
 5      Q.   Okay.  How long did the meeting last?
 6      A.   I think it was about an hour and a half to
 7   two hours, because I --
 8      Q.   What did you discuss during the meeting?
 9           MR. MONTOYA:  We did this line of
10      questioning.  Objection to the extent it's been
11      asked and answered.
12           You can answer.
13      A.   We discussed what -- I said, "I've never
14   been in a depo before.  What should I expect?"  And
15   we went through this -- they'd already told me to
16   read that other deposition.
17           I said, "Is there anything I need to know?
18   What do I have to wear?"  I've never been to a
19   deposition.  I had to wear a suit and tie.
20      Q.   Fair enough.  You said that you'd already
21   read the other deposition --
22      A.   Yeah.
23      Q.   -- that's in this binder?
24      A.   Correct.
25      Q.   What deposition had you already reviewed
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 290 of 580
Confidential – Subject to further Confidentiality Review
324

1   before your meeting last Wednesday the 27th?

2       A.   This deposition that was provided to me in

3   this binder.

4       Q.   I'll represent to you that Attachment A to

5   your report has more than one deposition transcript.

6   So I'm curious as to which deposition, of the ones

7   that are in Attachment A, that you are referring to

8   right now that you reviewed before last Wednesday.

9       A.   Page -- it was another realtor's deposition

10  on a case.  I don't know what it was for, but here.

11      Q.   And for the record, I don't think that there

12  is, in your materials, a deposition transcript from

13  a realtor.

14      A.   Yes, there is.

15      Q.   Is there?  Okay.

16      A.   Yeah, there is.  Yeah.

17           MR. MONTOYA:  It's a trial transcript.

18      A.   They go -- her name is -- she was a realtor

19  in Miami.

20      Q.   Okay.  We can get to that, but I just wanted

21  to make sure, when you said earlier that you had

22  reviewed a deposition transcript --

23      A.   Correct.

24      Q.   -- before last Wednesday, it was the trial

25  transcript that's attached to your exhibit -- excuse

```
 1    me -- to your report as Attachment A; is that

 2    correct?

 3        A.    It's not my report.  It was the binder that

 4    they provided to me.  It's in the same binder that

 5    you just pulled out and handed to me in this giant

 6    packet.  It's right here.

 7        Q.    When did you receive the binder from --

 8        A.    The week before, when I met with Natalie.

 9        Q.    Okay.  What -- and what day was that?  Was

10    that on the 27th, or was it before the 27th?

11        A.    It was before the 27th.  I met with Natalie

12    on February the 15th at my office, 10:30.

13        Q.    And how long was that meeting?

14        A.    About an hour and a half.

15        Q.    What did you discuss during that meeting?

16        A.    Same -- basically the same thing, less

17    specific about what would happen in a deposition,

18    more about this binder and what it was and that I

19    should read it.

20        Q.    Why were you told to read --

21        A.    So I could be --

22        Q.    -- the binder?

23        A.    -- prepared for what a deposition would

24    entail.  I also explained to Natalie what my

25    experience was at that time.  I went into more
```

```
 1    detail about my expertise.

 2        Q.   Was February the first -- 15th the first

 3    time you had ever met with Natalie or Patrick?

 4        A.   I didn't meet with Patrick on the 15th.

 5        Q.   Was it the first time that you had ever met

 6    with Natalie?

 7        A.   In person.

 8        Q.   In person.

 9        A.   In person.

10        Q.   Well, was it the first time that you'd ever

11    met with anyone from Patrick's office?

12        A.   In person.

13        Q.   Okay.

14        A.   Correct.

15        Q.   Had you spoken to Patrick or Natalie or

16    someone from Patrick and Natalie's office prior to

17    February 15th?

18        A.   Yes.

19        Q.   When did you speak with someone prior to the

20    15th?

21        A.   In December, that was the first time we ever

22    spoke.

23        Q.   Okay.

24        A.   Sometime in December.

25        Q.   Can you pull it up on your phone and tell us
```

Confidential - Subject to further Confidentiality Review

```
 1    when in December you first --

 2        A.   I don't recall the exact date, but I know we

 3    had a call right around the new year.  I know there

 4    was some day that I had to rush home for a call to

 5    listen.  I don't know if I even have that on my

 6    phone, but it was sometime at the end of December.

 7    It was when we started conversing on the phone.

 8        Q.   When were you first approached by Patrick

 9    and Natalie or someone from their office about

10    serving as an expert witness in this case?

11        A.   You want me to look at my e-mails and --

12        Q.   Please.

13        A.   -- find the first e-mail?

14             Natalie's first e-mail, I believe -- I have

15    an e-mail from Patrick on December 13th.

16        Q.   Was that the first e-mail that you've ever

17    received from Patrick or someone from Patrick's

18    office?

19        A.   December -- December -- it was either the --

20    like, around the 8th or the 9th of December, there

21    were some e-mails starting.  We were trying to set

22    up a conference call.

23        Q.   So back to my original question.  When were

24    you first approached about serving as --

25        A.   Early December.
```

```
 1      Q.   And were you approached initially via

 2    e-mail?

 3      A.   Yes, I believe so.  It might have been a

 4    phone call, but I believe it was an e-mail.

 5      Q.   And who was it that contacted you first?

 6      A.   It was Natalie or Patrick.

 7      Q.   Do you recall what they told you?

 8      A.   That the -- I think Kevin Rosen had

 9    recommended me to be an expert witness for a Chinese

10    drywall case and if we could talk about it.

11      Q.   Were you -- did you discuss anything else

12    during that first conversation?

13      A.   Not much.  I don't remember the exact

14    specifics of that first initial conversation,

15    whether it was phone or e-mail, but it was pretty

16    generic, like, let's set up a time.  And the next

17    few e-mails were trying to figure out a convenient

18    final for the three of us to speak.

19      Q.   Okay.  And as best you can remember, walk me

20    through all the correspondence you had after that

21    initial e-mail.

22      A.   The next correspondence was a phone

23    conversation where they explained that they needed

24    an expert witness.  And I told them a little bit

25    about myself, and they told me a little bit about
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 295 of 580
Case 2:14-cv-02048-MCE Document 290-1 Entered on FLSD Docket 08/15/2014 Page 43 of 324
Confidential – Subject to Further Confidentiality Review

1    the case, and that they would get in touch with me

2    as it got closer.

3         And then towards the end of the month, I

4    came on a conference call, I think, with an

5    appraiser, and I sat in.  It was a call -- I was on

6    mute, but I was listening.  It was -- I don't know

7    how long -- it was a long conversation.  I didn't

8    really -- I don't think I even spoke when the

9    appraiser was on the phone.  I just listened.

10        And then after that, in the new year, we

11   kept trying to set up a date for the deposition, and

12   the dates kept changing.  That was pretty much the

13   bulk of our correspondence, was trying to get a

14   date.

15        And then the next correspondence would have

16   been when Natalie wanted to meet with me in person,

17   and then the following week when we wanted to meet,

18   the three of us.

19        And the following correspondence would be

20   setting this up and the location.

21   Q.   Okay.  So if I followed that, you had two

22   phone calls; is that correct?

23   A.   Two phone calls when?

24   Q.   You had a phone call where -- after you

25   reached out -- after they reached out to new early

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 296 of 580
Case 1:21-cv-22849-MCC Docket 290-1 Entered on FLSD Docket 09/15/2021 Page 414 of 324
Confidential - Subject to Further Confidentiality Review

| 1 | December, you had a phone call to discuss being an |
|---|---|
| 2 | expert witness in this case; is that correct? |
| 3 | A. Sure. Okay. That sounds about correct. |
| 4 | Q. And to the best of your memory, who was on |
| 5 | that phone call? |
| 6 | A. The two of them probably. |
| 7 | Q. And to the best of your memory -- |
| 8 | A. Best of my memory -- |
| 9 | Q. -- what is -- |
| 10 | A. -- they were calls -- |
| 11 | Q. Let me -- sorry. Let me finish my question, |
| 12 | because you may think you know where I'm going, but |
| 13 | I may be going somewhere else. |
| 14 | The best of your memory, what was discussed |
| 15 | during that phone call? |
| 16 | A. Like I said, the first time they spoke to me |
| 17 | was to introduce themselves. I think I answered |
| 18 | this question already, didn't I? |
| 19 | Q. I don't think so. |
| 20 | A. I believe I did. |
| 21 | Q. I appreciate you answering it again. |
| 22 | A. I think I did. I don't know if you want to |
| 23 | check, but I'm pretty sure I answered it. |
| 24 | Q. Answer it again. |
| 25 | A. It was introduction. I -- they introduced |

```
 1    themselves.  I introduced myself.  They explained

 2    what they were trying to do with this case, asked if

 3    I was interested.

 4          And from there, we tried to set up -- I

 5    think it was Natalie the first time, I believe.  I

 6    can't remember exactly who it was.  I think it was

 7    Natalie, and then the next time we were trying to

 8    get Patrick on a call.

 9    Q.   You just said that they explained to you

10    what they were trying to do in this case; is that

11    correct?

12    A.   That there was a case and that they needed

13    an expert witness.

14    Q.   Okay.  What were they trying to do

15    specifically?

16    A.   I don't know what they were trying to do,

17    but they wanted to speak to me regarding being an

18    expert witness.

19    Q.   Okay.  Had you ever served as an expert

20    witness before?

21    A.   No.  As I've stated several times, no.

22    Q.   Okay.  Did you agree during that initial

23    phone call that you would serve as an expert witness

24    in this case?

25    A.   I don't know if I agreed immediately.  I
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 298 of 580
Case 1:11-cv-22408-MGC Document 290-1 Entered on FLSD Docket 09/15/2014 Page 296 of 324
Confidential – Subject to further Confidentiality Review

```
 1    said, "Let's discuss it."  And we discussed a rate

 2    the next conversation, probably.

 3        Q.   Okay.  What -- when did you agree to serve

 4    as an expert witness?

 5        A.   When the three of us were on the phone call.

 6        Q.   That would have been -- when was that phone

 7    call?

 8        A.   The second phone call, my guess, would be

 9    after the December 10th, 12th e-mail-ish time.

10        Q.   Was this the phone call where there was an

11    appraiser on the phone as well?

12        A.   No.

13        Q.   Tell me everything you remember about that

14    second phone call that you had with Patrick and

15    Natalie and yourself on the phone.

16        A.   We discussed a rate.

17        Q.   Okay.

18        A.   I agreed.  We discussed dates for a

19    deposition.  I told them about my travel plans for

20    spring break with my kids.

21        Q.   Did you ask any questions during that first

22    phone call with Patrick and Natalie?

23        A.   Questions about what?

24        Q.   About what it would entail to be an expert

25    in this case or any questions whatsoever.
```

Case 1:11-cv-02048-EEF-MBN Document 22363-34 Filed 11/19/18 Page 299 of 580
Confidential - Subject to further Confidentiality Review
324

```
 1      A.   I don't remember if I had specific

 2   questions.  I told them I had never done it before,

 3   but that I would consider myself an expert in real

 4   estate.

 5      Q.   You told them that you would consider

 6   yourself an expert in real estate generally?

 7      A.   I'm an expert, yes.  I'm a real estate

 8   expert.

 9      Q.   Okay.  And what makes someone a real estate

10   expert?

11      A.   If you look at the notes that I wrote down

12   there, I achieved the Diamond Award from my office.

13   I believe in the last few years, I'm averaging

14   between 25 and 30 million dollars in sales, so I

15   would base my success as one example.

16      Q.   Are you a real estate expert in Tennessee?

17      A.   No.

18      Q.   Okay.  So is there a geographic limitation

19   to your expertise as a real estate expert?

20      A.   Sure.

21      Q.   Where is that?

22      A.   South Florida.

23      Q.   Okay.  So outside of south Florida, you are

24   not an expert in real estate, correct?

25      A.   Well, I think real estate, although it is
```

1   local in nature, there are certain facets that you

2   can be an expert at in general.

3        I mean, there are macro conversations, and

4   there are micro conversations.  So as a macro level,

5   there are some areas that I would consider myself an

6   expert.  But would I know what's happening in the

7   Tennessee market today?  No.  But there are factors

8   of real estate in Tennessee that I can definitely be

9   an expert about to discuss because there are certain

10   parts of real estate that are consistent.

11    Q.   Okay.  Can you explain which of those macro

12   elements of real estate that are consistent that

13   would allow you to be an expert notwithstanding

14   location?

15    A.   Negotiating a deal, pulling comps, being

16   able to facilitate a transaction, keeping both

17   parties on board throughout the transaction.

18    Q.   Is there anything else?

19    A.   Sure.  I think my negotiation skills, my

20   marketing.  I think marketing is pretty -- somewhat

21   consistent.

22    Q.   Anything else?

23    A.   I could go on, but I think that will be

24   enough.

25    Q.   No.  I'd like to know the full extent of

1    what you consider yourself to be an expert in with

2    respect to real estate that has no geographic

3    limitations.

4         A.   I just gave you examples.

5         Q.   I'd like the full list.  If there is more

6    than what you gave me --

7         A.   That's all I can think of right now.

8         Q.   Okay.  And if you were an expert at it, then

9    I assume you'd be able to recall it right now?

10        A.   I just recalled several.

11        Q.   Right.  But if there was one that you didn't

12   recall, you probably wouldn't be an expert in it?

13   Is that fair to say?

14        A.   I disagree.  No.

15        Q.   Okay.

16        A.   That's not fair to say.

17        Q.   Well, how would you go and figure out the

18   full list of --

19        A.   If you gave me time to sit down and sit at a

20   computer and work on it.  I'm sure I could ask you a

21   similar question, and you couldn't knock off every

22   skill set that you have.  You probably couldn't

23   think of all of them.

24        Q.   So you didn't think it was important to

25   review and educate yourself on what you're an expert

1    in when you were coming to sit for a deposition as

2    an expert in a case?

3        A.    Like I said, I'm pretty confident in my

4    ability to call myself an expert, and I think my

5    results speak for themselves.

6        Q.    I'm sure they do.  I'm trying to understand

7    what you're an expert at.

8        A.    Like I said, if I wasn't an expert, I'm

9    pretty confident my sales wouldn't be where they

10   are.

11       Q.    Okay.

12       A.    There are thousands of realtors.

13       Q.    During the phone call -- strike that.

14             The next phone call you had after your phone

15   call with Patrick and Natalie, was that a phone call

16   with an appraisal -- an appraiser?

17       A.    Yeah.  There was a conference call, and

18   there was an appraiser on the phone that they wanted

19   me to be on the call for.

20       Q.    Okay.  In between the call that you had with

21   Natalie and Patrick and then the call with the

22   appraiser, did you do any work?

23       A.    No.  They hadn't asked me to do any work

24   yet.

25       Q.    Okay.  Who was the individual on the phone

```
 1    that was an appraiser?

 2    A.   I don't remember his name.

 3    Q.   Was it a he?

 4    A.   Yes.

 5    Q.   What was discussed during that phone call?

 6    A.   They were talking about valuations of homes,

 7    specifics, specific values.

 8    Q.   Which homes?

 9    A.   I don't remember exactly which homes, but

10    they were talking about how the -- from a number

11    basis, how Chinese drywall affected the value of a

12    home.

13    Q.   And how did it affect the value of a home,

14    according to the appraiser or whoever else --

15    A.   He was trying to figure out a number.  I was

16    listening to the conversation, but it was outside my

17    scope of specific detail.  I'm not an appraiser.  So

18    I listened, but I'm not an appraiser.  So some of

19    the language, things that he was talking about --

20    I'm not an appraiser.  I'm a realtor.

21    Q.   What number was the appraiser trying to come

22    up with during the phone call that you had with the

23    appraiser and Patrick and Natalie?

24    A.   I don't recall a specific number exactly.  I

25    heard different numbers thrown around.
```

```
 1      Q.   What numbers were thrown around?

 2      A.   I think he said around 20 percent, 25

 3  percent, I recall hearing.

 4      Q.   And what were those numbers, 20 percent of

 5  what?

 6      A.   Of what the home would have been worth less

 7  because of the stigma.

 8      Q.   So you were discussing stigma on the phone

 9  call?

10      A.   He didn't say the word "stigma."  That's

11  what I would use as a term.  He had a -- different

12  terms.  He was using -- he was an appraiser.  So he

13  was talking about raw numbers.

14      Q.   And you don't recall this appraiser's name?

15      A.   I don't.

16      Q.   Do you know what the basis was for the

17  numbers that he was coming up with during the call?

18      A.   I'm sure they had an appraisal in hand

19  possibly.  I would assume he had an appraisal in his

20  hand, maybe Patrick.  I don't know.

21      Q.   Prior to that phone call, had you ever tried

22  to quantify the amount of stigma that's associated

23  with a Chinese drywall home?

24      A.   I did not.

25      Q.   Was the 20 percent number that you remember
```

```
1    associated with a home that had been remediated or a

2    home that currently had Chinese drywall in it?

3        A.   That, I don't recall.

4        Q.   What was your impression of the numbers that

5    were being thrown around with respect to Chinese

6    drywall stigma?

7        A.   He had hard numbers.  He wasn't

8    guesstimating.  You know, he had hard numbers.  It

9    was very specific, like, to the penny on his data,

10   which I didn't have.  I didn't have that data in

11   front of me, so I don't know what he was

12   referencing.

13       Q.   And did you rely on that information that

14   you heard during the call to prepare your expert

15   report?

16       A.   No.

17       Q.   Was the gentleman's last name Graziano?

18       A.   I think so.  Sounds familiar.

19       Q.   Tony Graziano or Anthony Graziano?

20       A.   Sounds --

21            THE WITNESS:  I mean, can I ask you?  I

22       don't remember the name.

23            MR. MONTOYA:  I can't testify.

24            THE WITNESS:  Okay.

25       A.   I think so.  I was listening, but it --
```

Confidential - Subject to Further Confidentiality Review

```
 1    there were moments where I was still working, and it

 2    was -- didn't really pertain to me.  So, you know, I

 3    was listening, but I don't remember exact, specific

 4    details of what he said.  But that name sounds

 5    familiar.

 6         Q.   During the call with the appraiser, were you

 7    asked any questions?

 8         A.   Not really, no.

 9         Q.   Well --

10         A.   No.

11         Q.   Okay.  Did you ask any questions?

12         A.   No.

13         Q.   How long was that call?

14         A.   Between one and two hours.

15         Q.   Can you check on your phone?

16         A.   No.  It doesn't go that far back.  Actually,

17    my phone just started buzzing.

18         Q.   Okay.

19         A.   I wanted to see if it was the call I'm

20    waiting for.

21         Q.   Do you understand what it means to be an

22    expert in a federal court case?

23         A.   I do.

24         Q.   What does it mean?

25         A.   To be an expert and to be able to offer
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 307 of 580
Case 1:11-cv-22408-MGC Document 230-1 Entered on FLSD Docket 08/15/2013 Page 155 of
324
Confidential - Subject to Further Confidentiality Review

```
 1    insight to the matter of, in this case, Chinese

 2    drywall, and the effects it has on the home's value.

 3        Q.   And why is -- how did you obtain that

 4    understanding of what it means to be an expert in a

 5    federal court case?

 6        A.   Through conversations, through talking,

 7    looking -- I don't know, just conversations.

 8        Q.   When did you first -- well, strike that.

 9            The first draft of your report, when was

10    that prepared?

11        A.   Which report?

12        Q.   Your expert report.  Do you have more than

13    one?

14        A.   No.  I thought you were talking about the

15    one for the Rosens in '13.

16            MR. MONTOYA:  Talking about Exhibit 2?

17            MR. CAMPBELL:  Yes.

18        A.   We worked on this through phone calls and

19    e-mails from the moment we started conversing in

20    December through February.

21        Q.   As far as a written draft, when was the

22    first time that a written draft was prepared of that

23    report?

24        A.   I don't know the exact date.

25        Q.   Okay.  Do you recall whether you prepared
```

1   that first draft or whether it was prepared by

2   someone else?

3       A.   It was prepared by someone in their office

4   based on the conversations and information I

5   provided.

6       Q.   And did you make any edits or changes to the

7   draft?

8       A.   Um-hmm.  Yes.  I did.

9       Q.   All right.  Walk me through the changes that

10  you made.

11      A.   I think they had some information incorrect

12  about my experience, about how long I'd been

13  working.  I think the years they had incorrect about

14  how long I had been working.  I think at one point

15  they said -- I had mentioned new instead of not just

16  new and resales.

17          The majority of the changes -- the changes

18  that were made were based on my experience, the

19  beginning -- the first -- first few sentences, the

20  qualifications and the background.  It was just

21  specific years that I worked versus what was on the

22  paper.  We just updated them to be correct.

23      Q.   Fair to say that you did not make any edits

24  to Paragraphs 5 through 36 of your expert report

25  that was prepared by Patrick and Natalie?

 1      A.   Yeah.  A lot of this, to be honest, it's

 2   from the 2013 information, so, yes, it was the same.

 3      Q.   What part of your report is from the 2013

 4   information?

 5      A.   When it mentions the Rosen home, Section I.

 6      Q.   Okay.  So fair to say that Paragraphs 14

 7   through 36 --

 8      A.   21.

 9      Q.   Excuse me.

10      A.   21.

11      Q.   Strike that.

12           Fair to say that Paragraphs 22 through 36

13   were new and had not been included in any prior

14   letter or report that you prepared?

15      A.   No.  Paragraph 14 through 21 looks somewhat

16   similar to me to the report in 2013.

17      Q.   And when you're referring to a report,

18   you're talking about a letter that you prepared in

19   2013; is that correct?

20      A.   Correct.

21      Q.   You haven't prepared any other reports or

22   letters with respect to Chinese drywall; is that

23   correct?

24      A.   That is correct.

25      Q.   Okay.  And just so we're clear, the only

```
1    part of your current expert report that is similar
2    to or lifted from your 2013 letter is the part that
3    is Part 1, sales of affected property at 17830 Monte
4    Vista Drive; is that correct?
5         A.   A lot of the information is similar,
6    correct.
7         Q.   So prior to Patrick and Natalie drafting
8    this expert report that you've submitted in this
9    case, you had never given an opinion or had anything
10   in writing that had to do with Paragraphs 22 through
11   36; is that correct?
12        A.   I don't think 22 through 36 were in the
13   affidavit for the Rosens.  Let me see, but I don't
14   think so.  I'd have to look at it, but I don't think
15   so.
16        Q.   And you had never offered an opinion with
17   respect to the Grajales home prior to receiving this
18   draft report from Natalie and Patrick; is that
19   correct?
20        A.   Can you rephrase that?
21        Q.   Sure.  Had you ever offered an opinion as to
22   the Grajales home before receiving a draft report
23   that Natalie and Patrick had prepared for you?
24        A.   I would have definitely discussed the value
25   with the homeowner when we took the listing
```

Confidential – Subject to Further Confidentiality Review

```
 1    agreement.

 2        Q.   Okay.  And do you recall what the value of

 3    that home was when you were discussing it with the

 4    owner, when they were looking at listing it?

 5        A.   I don't have the CMA on me, but that's how I

 6    would have based the value.

 7        Q.   But you never offered an opinion as to

 8    stigma affecting the value of the Grajales home

 9    prior to Natalie and Patrick drafting the first

10    draft of your expert report in this case; is that

11    correct?

12        A.   No, that's not correct.  When I met with

13    Ms. Grajales, I explained to her how the remediation

14    had affected the value of the home.

15        Q.   Okay.  What did you tell Ms. Grajales?

16        A.   I told her, and she was aware of it, that

17    the value of her home would be less, even though it

18    had been remediated, than the home perhaps next door

19    that never had Chinese drywall.

20        Q.   Did you tell her how much less her home

21    would be worth as a result of the Chinese drywall?

22        A.   We had comps.  There were other sales of

23    homes that had Chinese drywall.

24        Q.   Which homes?

25        A.   I don't know the specific homes from 2013 or
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 312 of 580
Case 1:11-cv-22408-MGC Document 290-1 Entered on FLSD Docket 09/15/2011 Page 960 of
324
Confidential - Subject to Further Confidentiality Review

```
 1    '14.

 2         Q.    Did you pull the comps?

 3         A.    At that time, yes.

 4         Q.    But you don't recall any of the comps you

 5    pulled?

 6         A.    Six years later, no.

 7         Q.    Okay.  Is it possible that you didn't pull

 8    any comps?

 9         A.    No, it's not possible.

10         Q.    So when you say "pull comps," I want to make

11    sure I understand what that means.

12         A.    Um-hmm.

13         Q.    What do you mean when you said you pulled

14    comps?

15         A.    I go into the MLS.

16         Q.    Okay.

17         A.    And I search MLS for like homes, and

18    comparables would be homes that had been sold with

19    Chinese drywall compared to homes that didn't have

20    Chinese drywall.

21         Q.    Do you recall whether or not there were any

22    homes that were sold with Chinese drywall in the

23    same subdivision, The Oaks, as Ms. Grajales's home?

24         A.    Absolutely.

25         Q.    Okay.  How many?
```

```
 1      A.   I don't know the exact number.

 2      Q.   Okay.  And you don't know whether or not you

 3   have a copy of the MLS report that you prepared for

 4   Ms. Grajales, correct?

 5      A.   We have an MLS report for the Grajales

 6   listing.

 7      Q.   Well, you don't have the CMA, the comps that

 8   go with it in that --

 9      A.   I don't have the CMA, but I have the MLS

10   sheet.

11      Q.   But does the MLS contain any comps in it?

12      A.   No.

13      Q.   Okay.  Well, I'm asking about comps.

14      A.   You said MLS.

15      Q.   Fair enough.  Is it possible that you did

16   not create a CMA?

17      A.   No.

18      Q.   Why is that not possible?

19      A.   I had an appointment with her.  They were --

20   she was interviewing several realtors.

21      Q.   Okay.

22      A.   And part of the reason I got the listing is

23   when I come, I come prepared, and I was prepared

24   with the CMA for her and showed her what her home

25   was worth.
```

```
 1       Q.   But you don't recall off the top of your

 2   head what the comps' price per square foot were for

 3   the Grajales home; is that correct?

 4       A.   I don't remember six years ago, what the

 5   comps were for her home.

 6       Q.   And you did not attempt to educate yourself

 7   on that prior to submitting your expert report in

 8   this case in which you are opining on the value, the

 9   impact of stigma on the Grajales home; is that

10   correct?

11            MR. MONTOYA:  Objection; mischaracterizes

12       what his expert opinions are in this case.  He's

13       not talking about value.

14   BY MR. CAMPBELL:

15       Q.   Unless he directs you not to answer, which

16   he can't because he's not representing you, you can

17   answer.  He can put his objections on the record.

18            MR. MONTOYA:  You can answer.

19            THE WITNESS:  Okay.

20       A.   When I took the listing, I had done my

21   research, like I always do, and I obtained the

22   listing through being -- competing with other

23   realtors for the listing, expertise helping get the

24   listing.  Pricing the home properly based on comps

25   provided helped me price the home properly and get
```

```
1    it ultimately sold, so --

2        Q.   But you don't know what the value was of the

3    comps compared to Ms. Grajales's home at the time

4    that it sold; is that --

5        A.   At the time, I did.  At the time, I did.

6    Today, I don't have it in front of me.  If you gave

7    me probably 20 minutes, I could pull it for you.

8        Q.   Okay.  So you don't know whether or not her

9    home sold at a 1 or 2 percent different that the --

10   difference than the comps; is that correct?

11       MR. MONTOYA:  Outside the scope of the

12   opinions.

13       You can answer.

14       A.   At this moment, no.  But I'll pull it up in

15   two minutes and show you that my information and

16   opinion is correct.

17       Q.   I would -- during a break I'd like for you

18   to do that.

19       A.   Sure.

20       Q.   So then what was the basis for you saying

21   that the Grajales home sold, quote, substantially

22   less than what a comparable home without Chinese

23   drywall was selling at the time?

24       A.   Comps.

25       Q.   But you can't recall what the value was of
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 316 of 580
Confidential — Subject to further Confidentiality Review
324

1    the comps, correct?

2         MR. MONTOYA:  Asked and answered multiple

3      times.

4      A.   I've answered this question.  In two

5    thousand -- when I took that listing, I pulled

6    comps, based the value on the comps that sold the

7    homes lower than what the comps for nonremediated

8    homes, non-Chinese drywall homes sold for.

9      Q.   But how do you know substantially less if

10   you don't know what the comps were, and you didn't

11   look at them prior to submitting your report?

12     A.   When I did the work, I was in the house,

13   showing the house, in the trench, and I knew exactly

14   what I experienced.  And I know that that home sold

15   for less, and I know what the feedback was, and I

16   know what the showings were like, and I know that we

17   sold the home less because it had been remediated.

18     Q.   Was it less or substantially less?

19     A.   Substantially less.

20     Q.   And what's the difference between less and

21   substantially less to you?

22     A.   I answered that question.  I think that

23   anything, when you start talking over $100,000, is a

24   substantial amount of money to me.

25     Q.   In terms of percentage, do you have an idea

Case 2:09-md-02047-EEF-MBN  Document 22363-34  Filed 11/19/19  Page 317 of 580
Case 1:11-cv-22408-MGC  Document 290-1 Entered on FLSD Docket 08/15/2011  Page 265 of
324
Confidential - Subject to Further Confidentiality Review

```
 1      in your head of what is less or substantially less?

 2            MR. MONTOYA:  Don't answer that question.

 3      It's outside the scope.

 4            MR. CAMPBELL:  You can't -- you can't direct

 5      him not to answer the question.  You're not

 6      representing him.

 7   BY MR. CAMPBELL:

 8      Q.   You can answer the question.

 9            MR. MONTOYA:  Steve, I can make my objection

10      for the record.

11            MR. CAMPBELL:  Yeah, but you can't direct

12      him not to answer the question.

13            MR. MONTOYA:  Are you going to let me make

14      my objection, or you going to talk about it?

15            MR. CAMPBELL:  You can -- you can make your

16      objection if your objection is not to direct him

17      not to answer.  That's a direction not to answer,

18      not an objection.  Feel free to object.

19            MR. MONTOYA:  Are you through?

20            MR. CAMPBELL:  Yeah.

21            MR. MONTOYA:  My objection is it's outside

22      the scope of his testimony.  He's not been

23      retained for that matter.  You're going way

24      outside the scope.  He's not been retained for

25      that matter.  And I'm moving for a protective
```

```
 1       order, and I'm instructing him not to answer the

 2       question.  It's outside the scope.

 3            MR. CAMPBELL:  We'll mark it for a ruling.

 4   BY MR. CAMPBELL:

 5       Q.   I'd like to not have to bring you back, but

 6   if you won't to answer the questions -- and you

 7   don't have to listen to him.  He's not your

 8   attorney.  So if you want to answer the question,

 9   you can answer the question.

10       A.   What is the question?

11       Q.   If you refuse to answer the question, then I

12   may try to bring you back.

13       A.   What is the question?

14       Q.   The question is --

15            MR. CAMPBELL:  Will you read it back?

16            THE COURT REPORTER:  Hopefully.  "In terms

17       of percentage, do you have an idea in your head

18       of what is less or substantially less?

19       A.   In my head, I do not.

20   BY MR. CAMPBELL:

21       Q.   Did you have an opinion of what is less or

22   substantially less in terms of percentage when you

23   signed this expert report and submitted it in this

24   case?

25       A.   I don't have a percentage, no.
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 319 of 580
Confidential – Subject to further Confidentiality Review
324

1    Q.   So you don't really know what substantially

2    less means even though it's in your report.  Is that

3    fair to say?

4         MR. MONTOYA:  Object to form.

5    A.   I told you what I think substantially is.

6    Q.   You think $100,000?

7    A.   When you start talking that type of money, I

8    think it's substantial.  If it was my home, I would

9    consider that a substantial loss.

10   Q.   Okay.  For a $10 million home, would

11   $100,000 be a lot?

12   A.   $100,000 is lot of money.

13   Q.   For a $100 million home, would that be --

14   $100,000 be substantial?

15   A.   I think that's a lot of money.

16   Q.   Okay.  So it doesn't matter the price of the

17   home, as long as it's $100,000, you think that's

18   substantial?

19   A.   You asked me if I think that is -- what is

20   substantial.  In my opinion, $100,000 is a

21   substantial amount of money.

22   Q.   By substantially less with respect to the

23   Grajales home, do you mean $100,000?

24   A.   I don't know the exact number, but it's

25   enough to be substantial.  So I would -- I would be

```
 1    quite confident it was over $100,000.

 2       Q.   Okay.  So you don't know what the number is,

 3    but you're confident that it's substantial?

 4       A.   Yes.

 5       Q.   Explain to me how that can be.

 6       A.   Like I said, anything over 100,000 to me is

 7    a substantial amount of money, and that home sold

 8    for more than that amount -- under that amount.

 9       Q.   All right.

10       A.   So she lost more than $100,000 because of

11    the remediation because of Chinese drywall.

12       Q.   How do you know that it was because of the

13    Chinese drywall having been remediated that her home

14    sold less than $100,000 than it should have sold?

15       A.   Because I showed it countless times to

16    people who would not make offers, to people who

17    won't even come in the house.  I had to market the

18    home aggressively and ultimately ended up selling it

19    for less than what the house down the street without

20    Chinese drywall would have sold for.  And I know,

21    being in the trenches on the Oaks, what it's like on

22    a daily basis during those days and today.

23       Q.   When you say that it sold for less than what

24    a house down the street would have sold for, are you

25    referring to a specific house?
```

Confidential - Subject to Further Confidentiality Review

```
 1      A.   No, any house, any house that did not have

 2   Chinese drywall.

 3      Q.   How many people did you show the Grajales

 4   home to that were potential buyers?

 5      A.   I probably had -- I must have shown that

 6   house over 30 times.

 7      Q.   Is that common in -- when you are

 8   representing a seller of a home, to show a home 30

 9   times?

10      A.   Over 30 times without an offer?  No.

11      Q.   Who did you speak with that were potential

12   buyers that -- well, strike that.

13           Am I correct in understanding that there

14   were potential buyers who looked at the Grajales

15   home, but refused to make an offer because it had

16   been remediated for Chinese drywall; is that

17   correct?

18      A.   That is correct.  In fact, one of them --

19   they weren't my clients at the time, but I knew of

20   them.  And they didn't buy, and they bought another

21   house in a neighborhood nearby.  They stayed

22   completely out of The Oaks.  They went to a

23   neighborhood called The Seven Bridges.

24           I ended up getting their listing, and we

25   spoke to them coming to that house and why they
```

```
 1    never bought that house.  Even though they loved the

 2    layout and they loved the lot, they refused to buy a

 3    home with Chinese drywall.

 4        Q.   What was the name of these potential buyers?

 5        A.   Frisch is their last name.

 6        Q.   How do you spell that?

 7        A.   F-r-i-s-c-h.

 8        Q.   And what were their first names?

 9        A.   Alexis.

10        Q.   Alexis Frisch.  Okay.  What other potential

11    buyers did you speak with that refused to put an

12    offer on the Grajales home because it had been

13    remediated for Chinese drywall?

14        A.   Those were the buyers that I recall.  I

15    don't recall the names of other clients, other

16    realtors' buyers.  Those people, the only reason I

17    know this conversation is because they turned out to

18    become my clients later on.

19        Q.   So you don't know for sure whether there was

20    anyone else who was a potential buyer who decided

21    not to put an offer on the house because it had been

22    remediated for Chinese drywall; is that correct?

23        A.   Feedback from other agents would help me

24    come to that --

25        Q.   What --
```

```
 1      A.   -- conclusion as well.

 2      Q.   Which other agents provided you feedback?

 3      A.   I don't have the specific names at the time

 4   but I can tell you during those showings, you call

 5   for feedback.  You'd ask the agent, "Any feedback so

 6   I can provide my seller feedback?"

 7           They'd say, "The client isn't interested.

 8   They don't want to take on a home that had Chinese

 9   drywall.  They're scared."

10           That's a very common term, scared.

11      Q.   Did you have any notes during this time that

12   you kept --

13      A.   No.

14      Q.   -- contemporaneous notes that would reflect

15   that agents had told you that their clients were not

16   going to put an offer on the home because it had

17   been remediated for Chinese drywall?

18      A.   No.

19      Q.   Okay.  Did you communicate with your

20   client --

21      A.   Yes.

22      Q.   -- and say in e-mail communications that --

23      A.   I don't think I would have e-mailed

24   Ms. Grajales.  We would have had phone

25   conversations.  We like to try to provide feedback
```

Confidential – Subject to further Confidentiality Review

1    as quickly as possible, and it's usually with a

2    phone call.

3        Q.   So there is no written documentation that

4    would substantiate your belief that you spoke to

5    more than one potential buyer who refused to put an

6    offer on the house because it had been remediated

7    for Chinese drywall; is that correct?

8        A.   That is correct.

9        Q.   When you met with Natalie and Patrick on

10   February 15th, what did you discuss during that

11   meeting?

12       A.   I believe the 15th was just Natalie.

13       Q.   Okay.  And that's when she handed you the

14   binder?

15       A.   Correct.

16       Q.   And what did you discuss during that

17   meeting?

18       A.   I told her about some of my experiences with

19   Chinese drywall and everything else that I had

20   mentioned to you the last time I answered this

21   question.

22       Q.   Did she say anything to you other than

23   listening to you tell her about your experience with

24   Chinese drywall?

25       A.   She told me about the case, that it's been

```
 1    ongoing for many years.

 2        Q.   What did she tell you about the binder that

 3    she handed you?

 4        A.   To focus on the deposition from that

 5    realtor.

 6        Q.   Okay.  And you're referring to the trial

 7    transcript?

 8        A.   Yes.

 9        Q.   Okay.

10        A.   I think her last name was Yoder.  Yoder was

11    the --

12        Q.   Did she tell you why you should focus on the

13    trial transcript of the realtor?

14        A.   So I can have an idea of what to expect

15    since I had never been in a deposition before.

16        Q.   Did you discuss any specific questions that

17    you may be asked and how you should answer those

18    questions?

19        A.   They told me that you would try and trip me

20    up and ask repetitive questions over and over again,

21    and they advised me to just tell the truth.

22        Q.   What -- did you discuss any specific

23    questions that you may be asked during the

24    deposition and how you should respond to those

25    specific questions?
```

```
 1      A.   No.

 2      Q.   What about during your meeting on the 27th,

 3   what did you discuss during that meeting?

 4      A.   The meeting with Patrick and Natalie?

 5      Q.   Correct.

 6      A.   Same thing, really.  Same thing.

 7      Q.   Did you discuss any specific questions that

 8   you may be asked and how you should respond to those

 9   specific questions?

10      A.   He was preparing me to -- Patrick told me

11   that, again, from never doing this, that you would

12   continuously ask questions and try and get me to

13   trip up.

14      Q.   But did you discuss any --

15      A.   No.

16      Q.   -- specific questions that --

17      A.   No.

18      Q.   -- may be asked?

19      A.   No.  Exactly what you're doing is what he

20   told me to prepare for, and there were no specific

21   questions.  It was the tactic, as opposed to

22   specifics.

23      Q.   Between the time that you received the

24   binder of information that Natalie provided you on

25   February 15th and the meeting that you had on
```

1    Wednesday the 27th with Patrick and Natalie, did you

2    review the materials in that binder?

3        A.   Yes.  I read the same thing I mentioned to

4    you, Ms. Yoder's deposition -- I don't know if it

5    was a deposition or whatever the trial was that you

6    call it.

7        Q.   Had you reviewed those materials before you

8    signed your expert report that was submitted in this

9    case?

10       A.   No.

11       Q.   I'd like to direct your attention to Page i

12   of your expert report, and your expert report is

13   Exhibit 2, if that's helpful.

14            You see the section with attachments?

15       A.   Um-hmm.

16       Q.   Do you see Attachment A is Documents and

17   Other Information Considered.  Do you see that, Page

18   i under the section Attachments?

19       A.   Yes.

20       Q.   And it says Documents and Other Things --

21   Other Information Considered, doesn't it?

22       A.   Um-hmm.

23       Q.   Fair to say that that's an inaccurate

24   statement?

25       A.   I don't know what your question is.

```
 1      Q.   You didn't review the materials in

 2   Attachment A until after you'd already signed your

 3   expert report; isn't that correct?

 4      A.   About Ms. Yoder's deposition?

 5      Q.   About all the information that's in

 6   Attachment A.

 7      A.   What was provided to me in this binder I had

 8   not reviewed until I met with Natalie.

 9      Q.   Right.

10      A.   So --

11      Q.   Did you review -- and I asked you if you'd

12   reviewed all this information that was in that

13   binder before your meeting on the 27th, and you said

14   that you'd only reviewed --

15      A.   When I met with Natalie --

16      Q.   Let me finish.  Let's make sure we're all on

17   the same page.

18           You received a binder of information from

19   Natalie, correct?

20      A.   Yes.

21      Q.   And that is Exhibit A to your expert report,

22   is it not?

23      A.   Okay.  Yes.

24      Q.   Is that correct?

25      A.   Yeah.
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/18 Page 329 of 580
Case 1:11-cv-22408-MGC Document 290 Entered on FLSD Docket 08/15/2013 Page 7 of 324
Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Okay.  And of the materials that are in
 2   Exhibit A --
 3        A.   Yes.
 4        Q.   -- to your report --
 5        A.   Yes.
 6        Q.   -- the only document that you read --
 7        A.   Yes.
 8        Q.   -- before signing your expert report and
 9   submitting it was the trial transcript of the
10   plaintiff's realtor in the Seifart case?
11        A.   I had --
12        Q.   Is that correct?
13        A.   No, that's not correct.  I glanced through,
14   obviously, the information about me.  I had read
15   through some of the information from the appraiser,
16   and I spent a few hours in bed reading this.  My
17   wife was not happy with me, but I went -- I mean, in
18   depth?  The most in depth was Ms. Yoder, but I did
19   browse through other parts of the document.
20        Q.   When did you finish your browsing through
21   all of the materials that are attached to your
22   expert report as Attachment A?
23        A.   I was even looking at it last night.
24        Q.   Okay.  Well, did you complete your browsing
25   review last night?  Was that the first time you
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 330 of 580
Case 2:14-cv-02684-MCE-DB Document 290-1 Entered on FLSD Docket 08/15/2019 Page 978 of
324
Confidential – Subject to Further Confidentiality Review

```
 1    completed your review of the materials?

 2        A.   I completed what I thought was -- yes.

 3        Q.   And just to clarify, prior to signing this

 4    expert report on February 15th, which of the

 5    materials in Attachment A did you review?

 6        A.   February 15th, I was handed this document,

 7    so I couldn't have reviewed anything prior to

 8    February 15th.

 9        Q.   So you reviewed none of the materials in

10    Attachment A to your expert report before signing

11    and submitting it in this case; is that correct?

12        A.   The binder provided --

13             MR. MONTOYA:  Objection.

14        A.   -- to me February 15th --

15             MR. MONTOYA:  Objection.  I'm sorry.

16    Misconstrues his testimony.

17        A.   February 15th I was handed the binder.

18    That's when I started reading it.

19        Q.   Had you already signed your expert report

20    before you received the binder?

21        A.   I don't believe so.

22        Q.   Do you know what date your expert report is

23    dated?

24        A.   I think the 19th.  February 15th, February

25    15th.
```

```
 1      Q.    Okay.  I'll ask the question again.

 2      A.    Um-hmm.

 3      Q.    Did you sign your expert report before you

 4   received the binder of materials?

 5      A.    I don't -- I don't know.  I don't know the

 6   answer to that.  It says here February 15th.  I

 7   signed it February 15th.

 8      Q.    Have you had a chance to look over your

 9   report since you submitted it?

10      A.    Which report?

11      Q.    Your expert report in this case.

12      A.    Yes.

13      Q.    If I refer to your report --

14      A.    Yes.

15      Q.    -- so we're clear --

16      A.    Yes.

17      Q.    -- I'm referring to your expert report.

18      A.    Yes, I've reviewed it.

19      Q.    When did you review it?

20      A.    When it was handed to me on the 15th.

21      Q.    After submitting it on the 15th, have you

22   reviewed your expert report?

23      A.    Yes.

24      Q.    When did you review it?

25      A.    I don't recall.
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 332 of 580
Case 1:11-cv-22408-MGC Document 290-4 Entered on FLSD Docket 08/15/2019 Page 330 of
324
Confidential - Subject to further confidentiality review

```
 1       Q.   Did you notice any errors or anything that

 2   you -- anything that you'd like to change in your

 3   report?

 4       A.   No.

 5       Q.   Have you met with any witnesses in this case

 6   other than the phone conversation you had with the

 7   appraiser?

 8       A.   No.

 9       Q.   Do you know any of the priority plaintiffs

10   in this case other than Kevin Rosen?

11       A.   No, just the Rosens.

12       Q.   Have you been inside the homes of any of the

13   priority plaintiffs in this case, other than the

14   Rosens' home?

15       A.   It's possible.  If there are any others in

16   The Oaks, it's possible.  I don't have the list.

17       Q.   Do you know who the plaintiffs are in this

18   case?

19       A.   Not all of them.  I don't know who all of

20   them are.

21       Q.   Will you please look at Exhibit 12, Depo

22   Exhibit 12, which is Attachment A to your expert

23   report?

24       A.   Oh, this one?  Yeah.  I --

25       Q.   Well, hold on one second.  I don't have a
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 333 of 580
Case 1:19-cv-22487-MGC Document 290-1 Entered on FLSD Docket 09/15/2019 Page 331 of
324
Confidential - Subject to Further Confidentiality Review

 1    question pending.  I just want you to look at it.

 2         A.   Yeah.

 3         Q.   So for the record, a list of the priority

 4    plaintiffs is listed to your expert report --

 5         A.   Yes.

 6         Q.   -- is that correct?

 7         A.   That is correct.

 8         Q.   And please try to let me finish just so we

 9    can make the record clear.

10         A.   Okay.

11         Q.   It's going to be tough for her.

12              Now, looking at Exhibit A to Attachment A to

13    your expert report, would you agree with me that

14    this is a list of the priority plaintiffs in this

15    case?

16         A.   Yes.

17         Q.   Have you met any of these people other than

18    Kevin Rosen?

19         A.   No.

20         Q.   Have you been inside any of the homes listed

21    here other than Kevin Rosen's home?

22         A.   Yes.

23         Q.   Which ones?

24         A.   I believe I have been in 17538 Middlebrook.

25         Q.   And which number is that in Exhibit A --

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 334 of 580
Case 2:14-cv-02722-EEF-MBN Document 29-1 Entered on FLSD Docket 08/15/2017 Page 82 of 324
Confidential - Subject to further Confidentiality Review

1     A.   15.

2     Q.   -- to Attachment A to your expert report?

3     A.   15.  And the only other property that -- the

4  house on Cobblestone Lakes, Number 13, I did show a

5  lot of homes in Cobblestone, so it is possible I was

6  in that home.  I wouldn't be able to find a

7  guarantee.  Same with Number 8.

8          Any home that was in The Oaks or in

9  Cobblestone, those are areas that I do work in, so

10  is it possible I went in them?  I don't want to say

11  under oath no because I can't guarantee the answer

12  to be 100 percent accurate and I don't want to do

13  that.

14     Q.   Would it be fair to say that the only home

15  listed on Exhibit A to Attachment A to your expert

16  report that you have been inside of, that you know

17  for sure that you've been inside of, is Kevin

18  Rosen's home?

19     A.   For 100 percent certain?

20     Q.   Yeah.

21     A.   Yes.

22     Q.   Is Michael Rosen related to Kevin Rosen?

23     A.   Not to my understanding, no.

24     Q.   Did you prepare Exhibit A?

25     A.   No, I did not.

```
 1      Q.   Do you know what it means -- what the last

 2   column in Exhibit A means that says Category of

 3   Damages?

 4      A.   I do not.

 5      Q.   Did you ask?

 6      A.   No.

 7      Q.   Were you not curious?

 8      A.   No.

 9      Q.   Other than the appraiser that you spoke with

10   and Natalie and Patrick, have you spoken with anyone

11   else about this case?

12      A.   My wife.

13      Q.   Other than your wife?

14      A.   I told two clients today that I was going to

15   be in a deposition, and I couldn't speak to them.

16      Q.   Okay.  Have you spoken to Kevin Rosen about

17   this case?

18      A.   I have not.

19      Q.   Other than what we've discussed so far, have

20   you done anything else to prepare your expert

21   report?

22      A.   No.

23      Q.   Were you ever asked to perform any work on

24   this case that you declined to perform?

25      A.   No.
```

```
 1      Q.   What is diminution in value damages?

 2      A.   What is what?

 3      Q.   Strike that.

 4           What are diminution in value damages?

 5      A.   I don't know.

 6      Q.   Let me direct your attention to Paragraph 1

 7  of your expert report.  The second sentence states:

 8  "Specifically, counsel requested that I testify

 9  pertaining to my expertise regarding south Florida

10  market's response to defective Chinese drywall" --

11           MR. MONTOYA:  Where are you?

12      Q.   -- "and the resulting stigma and diminution

13  in value damages."

14           Do you see that, sir?

15      A.   Can you just tell me what --

16           MR. MONTOYA:  We -- we're not sure where you

17      are.

18           MR. CAMPBELL:  You can read back.

19           MR. MONTOYA:  Just tell us where you are in

20      the --

21           MR. CAMPBELL:  Paragraph 1 --

22           THE WITNESS:  Of Exhibit --

23           MR. CAMPBELL:  -- of the expert report,

24      which is Exhibit 2.

25           MR. MONTOYA:  Gotcha.
```

Case 2:09-md-02047-EEF-MBN Document 22362-34 Filed 11/19/19 Page 337 of 580
Confidential - Subject to further Confidentiality Review
324

```
 1              THE WITNESS:  Okay.

 2              MR. MONTOYA:  Starting "specifically"?

 3       A.   Okay.  Diminution is depreciation or

 4   deduction of value.

 5   BY MR. CAMPBELL:

 6       Q.   You just testified a second ago that you

 7   didn't know what that word --

 8       A.   Okay.  I didn't understand what you said.

 9       Q.   Okay.

10       A.   I still can't pronounce that word properly,

11   and I don't know if you did, either.

12       Q.   How is diminution in value different than

13   stigma?

14       A.   That's a -- that -- diminution to me sounds

15   more like a hard number, as opposed to stigma being

16   a -- an appraiser would not use -- when I say black

17   cloud, I can say black cloud.  I don't think an

18   appraiser can put on an appraisal, black cloud.  He

19   can use these terms as you would a lawyer.  I'm not

20   a lawyer, so I wouldn't use that term.

21       Q.   You wouldn't use the term "diminution in

22   value" because you're not a lawyer?

23       A.   With my clients.

24       Q.   Is that right?

25       A.   With my clients, I wouldn't say diminution.
```

1    I wouldn't say to my buyer, "Let's discuss the

2    diminution of this home."  I'd say, "Let's discuss

3    why this home is worth less because it had Chinese

4    drywall."

5       Q.   Fair to say if you wrote this report, you

6    would not have used "diminution in value"?

7       A.   I know what it means.  I have no doubt what

8    it means, but it's not a word that I use in my

9    common -- my daily use, but I know exactly what it

10   means.

11      Q.   I'm asking a slightly different question.

12           MR. CAMPBELL:  Will you read it back,

13      please?

14           THE COURT REPORTER:  "Fair to say if you

15      wrote this report, you would not have used

16      'diminution in value'"?

17      A.   If I had written the report?

18   BY MR. CAMPBELL:

19      Q.   Correct.

20      A.   I didn't write the report.

21      Q.   Correct.  I'm saying if you had been one who

22   wrote your expert report, you would not have used

23   the term "diminution in value," correct?

24      A.   Maybe.  If I was trying to use legalese,

25   maybe I would, but it's not a word that I would use

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 339 of 580
Case 2:09-md-02047-EEF-MBN Document 23491 Entered on FLSD Docket 05/15/2019 Page 98 of 324
Confidential - Subject to Further Confidentiality Review

```
 1    with my clients, but if I knew I was using it in a

 2    legal document, possibly.

 3        Q.   Staying on paragraph 1, you were asked about

 4    your expertise regarding south Florida market's

 5    response to defective Chinese drywall, correct?

 6        A.   Um-hmm.

 7        Q.   Was that during the first phone conversation

 8    you had with Patrick?

 9        A.   Using the term "south Florida"?  I use that

10    term all the time in my market, so it's very

11    possible.

12        Q.   Did you know what Patrick or Natalie meant

13    when they asked you to opine on your expertise in

14    the south Florida market?

15        A.   Do I know what that meant?

16        Q.   Do you know what they meant when they

17    asked -- let's take a step back.

18        A.   Okay.

19        Q.   Why don't you read aloud the second sentence

20    of Paragraph 1 of your expert report.

21        A.   Specifically, counsel requested that I

22    testify pertaining to my expertise regarding the

23    south Florida market's response to defective Chinese

24    drywall and the resulting stigma and diminution in

25    value damages.
```

```
 1     Q.   Is that an accurate statement?

 2     A.   Yes.

 3     Q.   Okay.  So did Patrick or Natalie mention the

 4   term "south Florida market" when they asked you to

 5   serve as an expert in this case?

 6     A.   Yes.

 7     Q.   Okay.  Did you understand what they meant by

 8   that term, "south Florida market"?

 9     A.   I understand what south Florida means.

10     Q.   Okay.  Did you understand what they meant by

11   it?

12     A.   I think we all understand what south Florida

13   means.

14     Q.   What does it mean?

15     A.   South Florida.

16     Q.   Okay.

17     A.   The southern part of the state.

18     Q.   How many counties --

19     A.   I consider that the Tri-County area.

20     Q.   Well, what is the Tri-County area in --

21     A.   I mean Dade, Broward, and Palm Beach.

22     Q.   Okay.  So they did not ask you to provide an

23   expert opinion in this case outside of the south

24   Florida market?

25     A.   They mentioned that there would be homes
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 341 of 580 of
324
Confidential – Subject to further Confidentiality Review

1    outside of that area.

2        Q.   Right.  But they didn't ask you to give an

3    opinion, an expert opinion, other than with respect

4    to the south Florida market, correct?

5        A.   Okay.

6        Q.   I'm asking you.

7        A.   I don't recall if they ever specified that I

8    won't be focusing on other areas.  We never

9    described whether it was going to be limited to or

10   only south Florida.  I don't recall them ever

11   saying, "Don't -- you're not an expert in other

12   areas."

13       Q.   So the only area that they asked you to

14   provide expert testimony on is the south Florida

15   market; is that correct?

16       A.   Did they ask me to be an expert in the south

17   Florida area?  Yes.

18       Q.   Did they ask you to be an expert outside of

19   south Florida?

20       A.   Did they ask me to be an expert outside of

21   south Florida?  No.  But there were comps on this

22   list, there were homes on this list -- on Exhibit 12

23   of homes that are not in south Florida.  They're on

24   the West Coast.

25       Q.   And by Exhibit 12, are you referring to the

1    attachment -- excuse me, Exhibit A to Attachment A

2    to your expert report?

3        A.   That's what I'm referring to.  There are

4    homes in Cape Coral and Fort Myers.

5        Q.   And you did not review that list prior to

6    signing and submitting your expert report in this

7    case, correct?

8        A.   At February 15th, I had already seen this

9    list.

10       Q.   When did you receive -- when did you see the

11   list on February 15th?

12       A.   February 15th I signed.

13       Q.   Correct.

14       A.   I received this list prior to that.

15       Q.   When?

16       A.   I don't know.  I'd have to search my

17   e-mails.

18       Q.   Well, how do you know that you received it

19   before you signed?

20       A.   Because I had already reviewed this.

21       Q.   Reviewed just Exhibit A to Attachment A or

22   the entire materials?

23       A.   All the -- I don't know which specific

24   materials I had seen or hadn't seen, but I know for

25   a fact I had seen this prior to February 15th.  I

Confidential - Subject to Further Confidentiality Review

```
1     can't go into specific items, but this I saw before

2     February 15th.  There are a lot of papers on my desk

3     right now.

4         Q.   Does Paragraph 1 of your expert report

5     accurately describe the scope of your assignment?

6         A.   Yes.

7         Q.   How many invoices have you submitted for

8     your work on this case?

9         A.   Two.  I gave them a January one, and I just

10    gave them a February one.

11        Q.   Do you have an employment contract with your

12    employer?

13        A.   We have an agreement.

14        Q.   Is it a written agreement?

15        A.   Um-hmm.

16        Q.   Does it contain any clauses that would

17    preclude you from serving as an expert witness in

18    this case?

19        A.   I don't think so.  I haven't reviewed it,

20    but I don't think so.

21        Q.   Have you told your superiors where you work

22    that you're serving as an expert witness in this

23    case?

24        A.   I told -- no, actually, I haven't.

25        Q.   Do you know how Patrick and Natalie came up
```

```
 1    with your name?

 2        A.   I'm guessing from Kevin Rosen.

 3        Q.   Did you speak to Kevin Rosen and he tell you

 4    that he was giving your name to Natalie and Patrick?

 5        A.   A long time ago he asked for my help for the

 6    affidavit.  And so when it came to me -- again, I

 7    don't know if he reached out.  When I -- I knew it

 8    most likely came from Kevin Rosen.

 9        Q.   And by the affidavit, are you referring

10    to --

11        A.   2013.

12        Q.   Is that different than the letter?

13        A.   2013 I provided for Kevin -- you asked me

14    why I came to Patrick and Natalie.  It was through

15    Kevin Rosen, would be my assumption.

16        Q.   Okay.  Let's turn to Paragraph 35 of your

17    report.  Now, based on prior testimony, I understand

18    that you didn't write Paragraph 35; is that correct?

19        A.   That's correct.

20        Q.   Will you please read the second sentence --

21    or, excuse me -- the last sentence of Paragraph 35

22    aloud?

23        A.   "In formulating my opinions to date, I have

24    relied on my expertise, documents, and other

25    information provided by counsel and the attached
```

```
 1    exhibits.  A listing of the documents and

 2    information I considered is contained in Attachment

 3    C to this report.

 4        Q.  Do you know what Attachment C is?

 5        A.  I'm sure I could find it.

 6        Q.  Why don't we look at Page i of your expert

 7    report and see what the description is of Attachment

 8    C.

 9            MR. MONTOYA:  Sorry.  In the report?  He was

10        in the depo notice.  There you go.

11    BY MR. CAMPBELL:

12        Q.  Will you please read aloud what the

13    description of Attachment C is --

14        A.  Five --

15        Q.  -- to your expert report?

16        A.  -- Five-Year Record of Testimony for Ryan

17    Greenblatt.

18        Q.  Let's go back and look at the last sentence

19    of Paragraph 35.  Would you agree that what was

20    meant was Attachment A and not Attachment C?

21        A.  I don't understand.

22        Q.  Okay.

23        A.  I don't understand.

24        Q.  All right.  Let's make this a little easier.

25        A.  Um-hmm.
```

```
 1      Q.    Paragraph 35 says:  "A listing of the

 2   documents and information I considered is contained

 3   in Attachment C to this report."

 4          Do you see that, sir?

 5      A.    Yeah.

 6      Q.    And would you agree with me that Attachment

 7   C to your report, is a five-year record of testimony

 8   for Ryan Greenblatt?

 9      A.    Okay.

10      Q.    Okay.

11      A.    That's what it says.

12      Q.    So is this an accurate statement, that "the

13   listing of documents that I considered is contained

14   in Attachment C to this report"?

15      A.    Five-year record of testimony.  I don't know

16   that I've given testimony for five years, so I don't

17   think that's accurate.

18      Q.    And I understand it may be difficult, since

19   you didn't draft this report, or at least this

20   section of the report, to know what was meant there.

21      A.    Um-hmm.

22      Q.    Well, do you know what documents and

23   information you considered in signing this report?

24      A.    My expertise and the report that I provided

25   for the Rosens and the sales of AI, II and III, and
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 347 of 580
Case 2:14-cv-02484-MCE-DB Document 28-11 Entered on FLSD Docket 08/15/2019 Page 95 of 324
Confidential – Subject to Further Confidentiality Review

```
 1    any other documents that I had submitted to Natalie

 2    and Patrick.

 3        Q.   What do you mean by the sales of I2 and I3?

 4        A.   You asked me what documents.  Those are

 5    documents that are part of my submitted documents.

 6        Q.   Are there any other documents that you

 7    reviewed or relied upon in signing the expert report

 8    that was written for you by Natalie and Patrick?

 9        A.   I mean, this is so obtuse.  Honestly, I

10    don't -- I don't know what you're referring to

11    anymore.

12             MR. CAMPBELL:  Will you read back the

13        question?

14        A.   You've lost me.  Just be honest with you.

15    I'm completely --

16        Q.   Sure.  If you don't understand, I want you

17    to let me know if you don't understand, I will

18    revise or rephrase a question if you don't

19    understand.

20             MR. CAMPBELL:  But will you read it back?

21             THE COURT REPORTER:  "Are there any other

22        documents that you reviewed or relied upon in

23        signing the expert report that was written for

24        you by Natalie and Patrick?"

25             THE WITNESS:  Any other documents --
```

```
 1              MR. CAMPBELL:  Well, you may need to read

 2       back before, because he had testified as to what

 3       documents he relied upon, and I was asking him if

 4       there were any others.

 5              THE WITNESS:  I don't understand.

 6              MR. CAMPBELL:  Will you read back --

 7              THE WITNESS:  I mean, there's --

 8              MR. CAMPBELL:  -- his -- the prior question

 9       prior to answering his answer and my pending

10       question.

11              MR. MONTOYA:  Go ahead.

12       A.   I mean, of course, I -- it's become -- I'm

13    just being honest with you.  I don't --

14       Q.   Well, let's start fresh.

15       A.   Okay.

16       Q.   What documents did you review and rely upon

17    in signing your expert report, which was written by

18    Patrick and Natalie?

19       A.   On the 15th --

20       Q.   Correct.

21       A.   -- what did I rely upon?

22              MR. CAMPBELL:  Will you read back the

23       question?

24              THE COURT REPORTER:  This last one?

25              MR. CAMPBELL:  Yes -- or the actual
```

```
1        question, "let's start fresh."

2            THE COURT REPORTER:  "What documents did you

3        review and rely upon in signing your expert

4        report, which was written by Patrick and

5        Natalie?"

6        A.   I -- honestly, I don't know.  I -- there

7    were -- I don't know.  Anything that I've told you I

8    reviewed, I reviewed.  Any documents that I

9    submitted are here or I've handed them to you.  That

10   would be my answer.

11       Q.   My question is slightly different.

12       A.   Okay.

13       Q.   I'm going to try to make this as easy as

14   possible.

15       A.   Okay.

16       Q.   Prior to signing the expert report --

17       A.   Yes --

18       Q.   -- that Natalie and Patrick wrote --

19       A.   Yes.

20       Q.   -- did you review and rely upon any

21   documents in signing your name to the report?

22       A.   What documents?  Did I review what

23   documents?

24       Q.   I'm asking you.  That's the question.

25       A.   But --
```

```
 1        Q.   Did you review any?

 2        A.   Did I review what document, though?

 3        Q.   Any.

 4        A.   Any?  Yes.  I mean, that's such an obtuse

 5   question.  What document?  CMA?  A sale that I made?

 6   A contract?  I mean, I don't understand where you're

 7   going.  I'm just being honest with you.  I have no

 8   idea what you're talking about, because -- yeah.

 9   The answer is "yes," but I don't know what you're

10   trying to get at here.

11            Did I review a contract?  Did I review my

12   expert witness [sic]?  Did I review -- yes.  Did I

13   review the Rosen -- did I go in the AppFile and look

14   at -- yeah, of course, I looked at things.

15            I don't understand.  And I'm not trying to

16   get frustrated with you, but you keep asking me this

17   question, and I don't -- I don't understand how to

18   answer it.

19        Q.   I'm just trying to understand.  You write on

20   Paragraph 35, or they wrote for you --

21        A.   Yeah.

22        Q.   -- "A listing of the documents and

23   information I considered is contained in Attachment

24   C to this report."

25            You know that?
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 351 of 580
Case 1:91-cv-22484-MGC Document 1 Entered on FLSD Docket 08/15/2015 Page 199 of 324
Confidential - Subject to Further Confidentiality Review

```
1      A.   Okay.

2      Q.   See that?

3      A.   Yes.

4      Q.   Correct?

5      A.   Correct.

6      Q.   And we've already established that

7   Attachment C is a five-year record of your

8   testimony.

9      A.   Okay.

10     Q.   Correct?

11     A.   Correct.

12     Q.   So that would not contain a listing of

13  documents and information that you considered for

14  this report, correct?

15     A.   I'm going to tell you the answer.  I don't

16  know.

17     Q.   Okay.

18     A.   I don't know.

19     Q.   I understand it's frustrating because you

20  didn't write the report.  I get that.

21     A.   No, it's not --

22     Q.   But I just want to make sure --

23     A.   But I reviewed --

24     Q.   -- I understand what you reviewed in signing

25  your name to this report, if anything.
```

```
 1      A.   Of course, I reviewed.  Of course, I

 2   reviewed.  I reviewed -- I mean, the only thing I

 3   hadn't had as of the 15th was this binder.  So on

 4   the 15th is when I received this binder.  Everything

 5   prior to that was what I had reviewed to consider

 6   myself an expert.

 7           Have I reviewed, for the past 19 years,

 8   sales in The Oaks?  Yes.  Have I reviewed being -- I

 9   mean, I do what I do every day, and that's sell real

10   estate in the area.  So have I reviewed a specific

11   document that you're going to ask me?  Ask me a

12   specific document.  Go ahead and ask me that.

13           Did I review this?  I got this on the 15th,

14   so I couldn't review this prior to the 15th.  But

15   every other document -- I don't know what document

16   you're talking about.

17      Q.   And when you say you couldn't have reviewed

18   this, you're referring to Attachment A --

19      A.   The binder.

20      Q.   -- to your expert report?

21      A.   The binder was given to me on the 15th.

22      Q.   Which is Attachment A to your expert report?

23      A.   Okay.

24      Q.   I'm asking you.

25      A.   Okay.
```

```
 1       Q.   Do you know if -- what Attachment A to your
 2    expert report is?
 3       A.   Documents and other information considered.
 4       Q.   Okay.  And which -- what are those documents
 5    and other information that are considered?
 6       A.   Like I just said, what makes me an expert is
 7    all the information that's right here.
 8       Q.   Okay.
 9       A.   Right?  For the 19 years I've been doing
10    this, this is what I've got now, and that's why I'm
11    successful.  Probably why you're successful is from
12    your experience.  My experience is everything I
13    could have reviewed.
14            Can I tell you every single document that I
15    reviewed to get to this point as an expert?  No.
16    Did I have this before the 15th?  No.  I'm not going
17    to -- I mean, I can't list every document that got
18    me to the point to become a witness prior to the
19    February 15th to be knowledgeable about Chinese
20    drywall.
21       Q.   Okay.
22       A.   That's an impossible request.
23       Q.   Fair enough.  So if I understand what you're
24    saying correctly, is that you did not need to review
25    any information --
```

1    A.   No.

2    Q.   -- necessarily to be able to sign this

3    expert report because of your experience and its

4    being in your head; is that correct?

5    A.   It's not being in my head.  I am an expert,

6    and I have a proven track record.  And that's why

7    the Rosens referred me, and when I met with Patrick

8    and Natalie they agreed.  And I don't think -- I

9    understand what you're trying to do, but --

10   Q.   No.  I'm truly trying to understand what it

11   is, if anything, that you reviewed in order to feel

12   comfortable to put your name and sign your name to

13   this expert report --

14   A.   To be an expert --

15   Q.   -- that was written by Natalie.

16   A.   -- in Chinese drywall, my expertise and my

17   experience is what I rely on.

18   Q.   Okay.

19   A.   It's what I rely on.  When I leave this

20   office and go back to work.  I'm not going to tell a

21   client a specific document was how I came up with

22   their value, but my experience and my knowledge and

23   doing this for 19 years is what got me here.

24        Just -- just like your line of questioning,

25   if I asked you what was the specific reason you

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 355 of 580
Confidential - Subject to further Confidentiality Review
324

```
 1    asked me this question, or how did you ever come --

 2    you've probably done it 100 times, and it's your

 3    experience that got you to this point.

 4        Q.   And --

 5        A.   And it's the experience that got me to this

 6    point to be sitting in this chair answering these

 7    questions today.

 8        Q.   And you don't recall needing to look at

 9    anything in particular, a document or -- to get

10    information of any kind before you signed your name

11    to this report --

12        A.   I did.  Of course I looked back at MLS.  I

13    looked at some of my numbers from previous years,

14    yeah.

15        Q.   Okay.  Anything else that you can remember

16    that you looked at before signing your name to this

17    report --

18        A.   I don't --

19        Q.   -- that you relied upon?

20        A.   -- remember specifically what I relied upon.

21    But, again, what I relied upon is this.  That's what

22    I will rely upon for the rest of my career, is my

23    experience and expertise in --

24        Q.   And when you say "this," you're pointing to

25    your --
```

Case 2:09-md-02047-EEF-MBN Document 23263-34 Filed 11/19/18 Page 356 of 580
Case 1:21-cv-22840-FAM Document 236-1 Entered on FLSD Docket 08/15/2013 Page 204 of
324

Confidential - Subject to Further Confidentiality Review

```
 1      A.   It's me.  It's me.  I'm a brand.

 2      Q.   Okay.

 3      A.   I'm my own guy.  And the reason I'm

 4   successful at this is because of me.

 5      Q.   Did you have any training or education with

 6   respect to stigma?

 7      A.   Training for stigma?  No.

 8      Q.   Have you written any articles on stigma?

 9      A.   No.

10      Q.   Have you read any articles on stigma?

11      A.   No.

12      Q.   Have you given any lecture or speeches on

13   stigma?

14      A.   No.

15      Q.   Have you attended any lectures or speeches

16   on stigma?

17      A.   No.

18      Q.   And you've been a real estate agent in

19   Florida for over 17 years?

20      A.   Correct.

21      Q.   During your over 17-year career, what

22   percentage of your work has involved analyzing

23   stigma?

24      A.   I mean, every transaction, there's pros and

25   cons with a house.  I don't know if I would
```

1    necessarily use the term "stigma," but I can't put a

2    specific number of -- it's a skill set, being able

3    to assess value, being able to read buyers, sellers,

4    price homes properly.  It's a skill set.

5        Q.   And your --

6        A.   Understanding the value and -- of a home

7    that had a change in value, understanding feedback

8    from showings and what buyers want.  Working with

9    buyers helps you just as much when you have a

10   listing.  It's understanding what your buyers want,

11   listening to your buyers.

12        So I know working with buyers, what their

13   push-backs, what their feedback, what their buttons

14   are, because when I take the listing, I already know

15   what the next buyer is going to say for the most

16   part.

17       Q.   Fair to say you've never held yourself out

18   to the public as an expert on stigma; is that

19   correct?

20       A.   No.  There's not -- to my knowledge, there's

21   no realtor that would call themselves a stigma

22   expert.

23       Q.   But you specifically, you've never

24   advertised yourself as being an expert on stigma

25   that affects the value of a property; is that

Case 2:09-md-02047-EEF-MBN Document 23263-34 Filed 11/19/18 Page 358 of 580
Case 2:14-cv-02484-EEF-MBN Document 294-1 Entered on FLSD Docket 08/15/2019 Page 206 of
324
Confidential – Subject to further confidentiality review

1   correct?

2       A.   I've never -- well, I think when I've gone

3   into listing appointments, I've said that I have a

4   lot of experience with it.  So I have a lot of

5   experience with Chinese drywall.

6       Q.   But my question is a little bit different.

7   Have you ever held yourself out as being an expert

8   on residential property stigma?

9       A.   No.

10      Q.   Okay.  Are you aware of any

11  industry-recognized methodology for analyzing

12  stigma?

13      A.   Not to my knowledge.  I'm not an appraiser.

14      Q.   Okay.  Well, what's the difference between

15  what you do and what a appraiser does?

16      A.   I am not a licensed appraiser.  I don't use

17  the USPAP or whatever the program is that they --

18  you know, their basis.  We can't produce appraisals.

19  We can only produce CMAs.

20      Q.   If there was an industry-recognized

21  methodology for analyzing stigma in the real estate

22  agent industry, would you know of it?

23      A.   Maybe.

24      Q.   But it's possible that you wouldn't know?

25      A.   There is no stigma -- there is no app for

1    stigma that I'm aware of.

2    Q.   I'm sorry.  What do you mean by "there is no

3    app for stigma"?

4    A.   You're asking me if there was an industry

5    standard.  What would an industry standard for

6    stigma be?  How do you -- how do you place a program

7    for stigma?

8    Q.   Are you aware of any methodology or protocol

9    that realtors use to analyze stigma that affects the

10   value of a property?

11   A.   We can use comps.  That's what we use,

12   comps, comparable sales, like sales.  That's what I

13   use.

14   Q.   And I think you testified earlier that there

15   are a lot of different factors that cause stigma; is

16   that correct?

17   A.   Sure.

18   Q.   And do all of those factors that cause

19   stigma affect the value of a property?

20   A.   Do all factors -- again --

21   Q.   If you don't understand, that's fine.  I can

22   rephrase it.

23   A.   No, it's just too obtuse.

24   Q.   Sure.

25   A.   Your question is -- I mean --

```
 1        Q.    I'll reask it.  Correct me if I'm wrong, but

 2    I believe you testified earlier that there are a lot

 3    of different factors or conditions that a home can

 4    have that will cause stigma.  Is that correct?

 5        A.    Okay.

 6        Q.    I'm -- genuinely, I'm not --

 7        A.    Yeah.  I think there -- I don't know if I --

 8    stigma, I think stigma is a strong word.  It's

 9    saying that a home is backing to a lake is not a

10    stigma.  Stigma is usually a negative term.  So

11    factor, you used the term "factor."  Factor is a

12    much more common-used word.  Stigma is a pretty

13    unique word that I wouldn't use for many homes.

14        Q.    Is Chinese drywall the only condition or

15    factor of a home that you're aware of that causes

16    stigma?

17        A.    No.  But it is a stigma that I think is

18    unique and, you know, creates fear and uncertainty

19    different than others.

20        Q.    What are the other stigmas that you're aware

21    of that affect the value of a property aside from

22    Chinese drywall?

23        A.    Stigma is a strong word, so I don't know if

24    I would use stigma on something like mold or a road,

25    because that's not stigma.  That's just a button.
```

```
 1            If somebody wants a home that backs to

 2    another house, that's their -- that's their choice.

 3    If somebody wants to back to a lake, that's their

 4    choice.  That's not a stigma.

 5            You know, if someone was murdered in a home,

 6    that could be something that's considered a stigma

 7    to some people.  But by law, if I'm not mistaken,

 8    when I took my real estate exam, you do not have to

 9    disclose that.

10       Q.   So if someone is murdered in a home, because

11    you don't have to disclose that, would you consider

12    it not to be a stigma?

13       A.   It would be, but it doesn't stay with the

14    home because you don't have to disclose it.

15       Q.   Can you think of any other condition or

16    factor that causes stigma that affects the value of

17    a home other than Chinese drywall?

18       A.   Yeah.

19       Q.   What?

20       A.   There was an area where they had a cancer

21    cluster.

22       Q.   What's a cancer cluster?

23       A.   There was an area, I think, in -- somewhere

24    in a northern county, or west, out there in

25    Loxahatchee or somewhere, there was -- they thought
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 362 of 580
Case 1:11-cv-22408-MGC Document 290-1 Entered on FLSD Docket 08/15/2013 Page 210 of
324
Confidential - Subject to Further Confidentiality Review

```
 1    there was a cancer cluster, an area of homes where

 2    people were having higher rates of cancer.

 3        Q.   So the stigma was caused by the perception

 4    that something was causing cancer in that area?

 5        A.   Um-hmm.

 6        Q.   Was that stigma attached to any particular

 7    condition that was presumed to be causing cancer in

 8    that area?

 9        A.   I didn't sell any homes out there, but it

10    was just hearing about it through other people.

11    It's not an area that I've ever sold a home.  I've

12    never sold a home in Loxahatchee, but I was told

13    that there was something in the water.

14        Q.   When were you told this?

15        A.   I don't know the exact date.

16        Q.   Yeah.

17        A.   But there was a perception out there that

18    there was something going on.  I've since been told

19    that it's not true.  I don't know.  I don't -- I

20    don't study it because it's not an area that I focus

21    on.

22        Q.   As far as you know, is the stigma of the

23    cancer cluster still present, or has it dissipated

24    since it's now been proven that it's not true?

25        A.   I asked an agent, actually, the other day
```

1    because he was working on a deal there.  And he said

2    it has been, to his knowledge -- again, this is not

3    me -- that he was working with somebody buying a

4    home there.  And he said that it hasn't been proven

5    to be true, to the best of his knowledge.  But,

6    again, I would not want to offer expertise on this

7    area because I don't know it.

8        Q.   Would it be fair to say that if stigma is

9    based on perceptions and opinions, which is what I

10   believe that you -- let me strike that.

11        Stigma is based on perceptions and opinions

12   by the general public; is that a fair statement?

13        A.   And facts.

14        Q.   Is it ever the case that a stigma can be

15   caused by a perception or an opinion that is not

16   based in fact?

17        A.   Could it?  Sure.  But I think lead paint is

18   a stigma that is based on fact as opposed to a

19   cluster that they might -- might be a cause of --

20   this water, whatever they thought it was, might be.

21   Until they had hard facts to prove it, it was

22   perception.  I don't know.

23        Q.   And when a fact or perceived fact is proven

24   untrue, fair to say that the stigma would eventually

25   dissipate with the knowledge of the truth?

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 364 of 580
Case 1:11-cv-22408-MGC Document 290 Entered on FLSD Docket 03/15/2013 Page 2 of 324

Confidential – Subject to Further Confidentiality Review

```
1       A.   According to this agent, he was telling his

2   client -- a professional who I respect, he said that

3   his -- for his -- doing his due diligence and his

4   clients, he was comfortable selling a home in the

5   area.

6       Q.   So you would agree that stigma can be

7   removed if it is proven that the fear is not true

8   and not founded on --

9       A.   Well, I don't know if I would say --

10          MR. MONTOYA:  Outside the scope of his

11      testimony.

12      A.   -- it's removed --

13          MR. MONTOYA:  You can answer.

14      A.   I don't think it's removed.  The fact that I

15  still think about it tells you there is still

16  stigma.  So I'd still be cautious.  So caution

17  creates stigma, right?

18          The fact that I still say, "Oh, can -- I

19  thought there was a cancer cluster," that to me is

20  something that still hasn't gone away.  As far as I

21  knew up until last week, and I still may be giving

22  wrong information, there was a cancer cluster there.

23      Q.   Do you consider yourself an expert on

24  determining the impact of value that stigma has on a

25  property?
```

1    A.   An expert at stigma -- no.  I don't know the

2    exact percentages.  I just go case by case, listing

3    by listing.

4    Q.   And it would be fair to say that your

5    opinions in this case are based solely on your

6    personal experience and not based on any kind of

7    market analysis; is that true?

8    A.   Market analysis in neighborhoods that I work

9    in and other agents that I work with, yeah.

10   Q.   But aside from the three properties that are

11   listed in your expert report, you've not performed

12   any market analysis?

13   A.   Of course I have.  I have in Parkland and in

14   Coral -- Canyon and other neighborhoods.  I've had

15   clients as friends who have bought townhomes in East

16   Boynton that ended up having Chinese drywall in

17   their basement.  So I've done above and beyond these

18   three transactions by a lot.

19   Q.   You're talking about your experience in

20   representing sellers of homes that have Chinese

21   drywall?

22   A.   In working with buyers and sellers, talking

23   with other realtors, builders, and other

24   professionals, I think it goes beyond the scope of

25   three homes.  I think I've proven that.

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 366 of 580
Case 1:11-cv-22408-MGC Document 290-1 Entered on FLSD Docket 08/15/2013 Page 94 of 324

Confidential – Subject to Further Confidentiality Review

```
 1       Q.   But you didn't do any analysis on stigma

 2    outside of what your personal experience was in

 3    preparing --

 4       A.   Correct.

 5       Q.   -- your report in this case, correct?

 6       A.   Correct.

 7       Q.   Okay.  Can you give me the list of homes,

 8    aside from the three that are in your expert report,

 9    that you have dealt with that have some Chinese

10    drywall?

11       A.   That I have dealt with?  Define "dealt

12    with."

13       Q.   Any -- well, strike that.

14            Are the three homes in your expert report

15    the only ones -- strike that.

16            Give me the list of homes that have Chinese

17    drywall or had Chinese drywall that you are familiar

18    with.

19       A.   That I'm familiar with?  Family?  I'm

20    familiar with many homes that have Chinese drywall.

21    I just wasn't involved in the sale of them.

22       Q.   Okay.  Give me the list of homes --

23       A.   I have --

24       Q.   -- that have had Chinese drywall or -- at

25    the time --
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 367 of 580
Case 1:11-cv-22408-MGC Document 290-1 Entered on FLSD Docket 09/15/2015 Page 215 of 324
Confidential – Subject to Further Confidentiality Review

```
 1      A.   I know people who bought --

 2      Q.   Let me finish the question.  I just want to

 3   make sure I get it.

 4           Your testimony in this case is based on your

 5   personal experience, right?

 6      A.   Correct.

 7      Q.   I want to make sure I understand that

 8   personal experience.

 9      A.   Understood.

10      Q.   And what I understand that you're saying is

11   that you have -- beyond the three homes listed in

12   your expert report, you have personal experience

13   with other homes that have or had Chinese drywall.

14      A.   Correct.

15      Q.   Is that correct?

16      A.   Yes.

17      Q.   Please identify those homes.

18      A.   I understand.  Okay.  So I worked with many

19   buyers in Parkland Golf.  I worked with many buyers

20   in The Canyons.  I worked with buyers and renters in

21   Cobblestone, where one of these homes was on the

22   exhibit.

23           I worked and helped friends with properties

24   they bought that they were renting out in East

25   Boynton with Chinese drywall.  I had clients who
```

```
 1    bought homes that were remediated by Toll Brothers

 2    in Parkland Golf.  I showed buyers many homes that

 3    have been remediated in other neighborhoods that I'm

 4    just -- aren't popping off the top of my head that

 5    had Chinese drywall.

 6        Q.   Can you recall the addresses for any of

 7    these homes that you've just testified to?

 8        A.   Not off the top of my head.

 9        Q.   Is there a reason why they weren't included

10    in your expert report?

11        A.   I didn't sell them.  What difference does it

12    make?  Showing a house is showing a house.  I didn't

13    sell it.

14        Q.   Do you know who Lee Waronker is,

15    W-a-r-o-n-k-e-r?

16        A.   That's one of the names on the exhibit,

17    right?  Where is that?  I know that name.  The name

18    sounds familiar.  Is that the appraiser?  Is that

19    the appraiser.  Okay.  That's the appraiser.  I've

20    heard that name before.

21        Q.   Okay.  I'm going to hand you -- this is

22    Exhibit -- excuse me, this is Attachment A to your

23    expert report, which is Depo Exhibit 12.  This will

24    be easier for you because I'm going to ask you some

25    questions --
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 369 of 580
Confidential - Subject to further Confidentiality Review
324

```
 1    A.   Okay.

 2    Q.   -- about some documents in this.  The yellow

 3    tabs indicate a document, the beginning of a

 4    document.

 5    A.   Okay.

 6    Q.   And if you will turn to Page 26 of Lee

 7    Waronker's January 24, 2011 expert report, which is

 8    contained in Exhibit A to your expert report, and

 9    let me know when you get there.  So it would be the

10    fifth yellow tab.

11    A.   Page -- what was it?

12    Q.   Page 26.

13    A.   Okay.

14    Q.   Okay.  Do you know Mr. Waronker?

15    A.   No.

16    Q.   Have you ever spoken to him?

17    A.   I think he was -- is it possible he was the

18    guy on the phone with me?  There was an appraiser on

19    the phone.  It might have been this guy.

20    Q.   It's possible that you spoke with

21    Mr. Waronker on the telephone conversation you

22    had --

23    A.   Conference call.

24    Q.   -- on --

25         MR. MONTOYA:  If I can help, I will tell you
```

Confidential - Subject to Further Confidentiality Review

```
 1        it wasn't.

 2              THE WITNESS:  It wasn't?

 3              MR. MONTOYA:  It wasn't.  Just trying to

 4        move it along for you.

 5        A.   This was in -- this was in -- this was in --

 6        when I was studying at night in my bed, this was the

 7        guy's information that was in the binder.

 8        Q.   Do you recall when you read Mr. Waronker's

 9        expert report?

10        A.   One of the nights in my bed between --

11        Q.   February 15th and today?

12        A.   Yes.

13        Q.   Okay.  So Page 26 are Mr. Waronker's

14        appraisal qualifications.  Do you see that?

15        A.   Um-hmm.

16        Q.   What is the designation "NAI"?

17        A.   I'm sorry?

18        Q.   Do you see at the top it says his name and,

19        comma, NAI?

20        A.   I don't know.

21        Q.   Are you on Page 26?

22        A.   NAI, SRA, I don't know.

23        Q.   Okay.  So you don't know what NAI means?

24        A.   No.

25        Q.   Do you know what SRA means?
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/18 Page 371 of 580 9 of
Case 1:11-cv-22408-MGC Document 88-9 Entered on FLSD Docket 08/15/2019 Page 91 of
324
Confidential - Subject to Further Confidentiality Review

```
 1        A.   I do not.

 2        Q.   If you look at affiliations, do you see it

 3   says, "MAI designation" --

 4        A.   Um-hmm.

 5        Q.   -- "awarded by the Appraisal Institute in

 6   1983"?  Do you see that?

 7        A.   Um-hmm.

 8        Q.   Do you know what the Appraisal Institute is?

 9        A.   Nope.

10        Q.   You see below that, it says, "State

11   Certified General Appraiser, State of Florida

12   License Number RZ162, May 1990"?  Do you see that?

13        A.   I see that.

14        Q.   What does it mean to be a state certified

15   general appraiser in Florida?

16        A.   It means that you're licensed to conduct

17   appraisals.

18        Q.   Is -- do you know what the educational

19   requirements are to become an appraiser?  Do you

20   know what the licensing requirements are to become

21   an appraiser?

22        A.   I do not.

23        Q.   Do you work with appraisers?

24        A.   Do I work with them?  They contact me on

25   almost every transaction whenever there is a finance
```

Confidential - Subject to Further Confidentiality Review

```
 1    involved, yes.

 2         Q.   Okay.  And if an appraiser -- strike that.

 3              What does an appraiser do on all of your

 4    transactions?

 5         A.   Where there's financing involved?

 6              (Mr. Rothenberg exited the room.)

 7    BY MR. CAMPBELL:

 8         Q.   Yes.

 9         A.   They conduct an appraisal.

10         Q.   Which is a value of the house; is that

11    correct?

12         A.   Correct.

13         Q.   And this -- they do that for the bank?

14         A.   Correct.

15         Q.   Okay.  And does the bank accept the

16    appraiser's value?

17         A.   As far as I know, yes.  I mean, they could

18    challenge it, I suppose, but --

19         Q.   Is what the appraiser does in determining

20    value different than what you do in --

21         A.   Yes.

22         Q.   -- in looking at comps?

23         A.   Yeah.

24         Q.   And how is it different?

25         A.   They're much more -- they have a whole
```

```
 1    analytical program.  One of my friends is an

 2    appraiser, and he was explaining it to me.  Things

 3    that I put into -- they're much more raw lists.  I

 4    deal with emotion often, buyers and sellers or

 5    personal things they like or don't like.

 6         They walk into a house and I don't think

 7    they put as much value into things that I know are

 8    going to help or hurt to sell a home.  So they focus

 9    on raw data more so.

10    Q.   And would an appraiser -- certified licensed

11    appraiser in Florida be qualified to have an opinion

12    as to stigma that may affect a home?

13         MR. MONTOYA:  Object to form.  Calls for a

14         legal determination for the court's

15         determination.

16    A.   It's -- yeah, I think so.

17    Q.   Okay.

18    A.   In my opinion, yes.

19    Q.   Would an appraiser be more or less qualified

20    than you at determining --

21    A.   Different.  Different skill set.

22         MR. MONTOYA:  Same objection.

23    Q.   How so?

24         MR. MONTOYA:  Same objection.

25         Go ahead.
```

```
1       A.   You know, it's -- they come in, and it's

2    very easy for them.  It's clean.  They look at their

3    numbers.  They can pull data, blah, blah, blah,

4    blah, blah.  They go back into their little office.

5            I'm there with the buyers.  I'm there with

6    the sellers.  I'm dealing with the emotion.  I know

7    a stain in the roof is going to affect a

8    transaction.  I know the intricacies of getting a

9    deal done, the emotion of keeping deals together.

10   There is so much more that goes into a transaction.

11           The appraisal is clean.  It's clean.  They

12   come in, they do their research, analyze the

13   numbers.  They may not put as much weight into

14   something as I do, but I know that's an emotional --

15   or going to be something that gets a buyer excited

16   that they may or may not put into the appraisal.

17      Q.   An appraiser would be able to determine what

18   the market value is of a particular home; is that

19   correct?

20      A.   Correct.

21      Q.   Okay.  And is that different than the amount

22   that you come up with when you are doing a comp?

23      A.   It could be.  Might be.  I don't know.

24   Depends on what comps they use, depends on what

25   comps I use.
```

```
 1      Q.   When does the appraiser come in in the

 2   process of a home sale?

 3      A.   After you've gotten a contract, during the

 4   finance period the appraiser comes in.

 5      Q.   When you say after you've gotten a contract,

 6   is that after the buyer and seller have agreed to a

 7   term of price?

 8      A.   Correct.

 9      Q.   How often does the appraiser come back and

10   say that the value of the home is identical to what

11   the agreed-to price was between the buyer and the

12   seller?

13      A.   Most of the time, it's at or above.

14      Q.   At or above.  And when it's not the exact

15   same, is it within 5, 10 percent?

16      A.   It's usually very close.  I haven't had one

17   come under in a very long time.  I don't remember

18   the last time, in fact.

19      Q.   But is it -- it's not unusual, I would

20   imagine, that it would be 2 or 3 or 4 percent

21   difference?

22      A.   I don't know the exact number, but the last

23   couple, it's been within -- it's been very close.

24   One -- the last two, I think, were actually at

25   purchase price.  One was maybe 1 percent, if less.
```

```
 1      Q.   Okay.  Have you had any experiences where

 2   the appraisal has come back and been 4 or 5 percent

 3   different than what the agreed-to price was between

 4   the buyer and the seller?

 5      A.   When I sold my own house six years ago, the

 6   appraisal came in ten grand less than the contract

 7   price.

 8      Q.   What was that in percentage of the home

 9   value?

10      A.   Less than two percent.  Actually, two

11   percent, right around two percent.

12      Q.   When you reviewed -- well, strike that.  Did

13   you review Mr. Waronker's expert report that's

14   contained in Attachment A to your expert report?

15      A.   I glanced, glanced.

16      Q.   When you were glancing through it, did you

17   see anything that you disagreed with or that gave

18   you any concerns?

19      A.   No.

20      Q.   Did you also glance through the deposition

21   testimony that Mr. Waronker gave on May 12, 2010 in

22   the Seifart v. Knauf case?

23      A.   That's what was in here?  I don't know what

24   page you are referring to.  Is it the same thing

25   that was given to me in the binder?
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 377 of 580
Case 2:14-cv-02846-EEF-MBN Document 84-1 Entered on FLSD Docket 08/15/2019 Page 25 of
324
Confidential - Subject to Further Confidentiality Review

1    Q.   I will represent to you that it is.

2    A.   Okay, and if that is, then yes, I glanced at

3    it as well.

4    Q.   Do you recall any testimony that

5    Mr. Waronker gave on May 12, 2010, in his deposition

6    in the Seifart v. Knauf case that you disagree with

7    or that you had any concerns about?

8    A.   No.

9    Q.   But you did review his testimony?

10   A.   I glanced over it.

11   Q.   Did you glance at every page or just

12   portions?  Do you recall what you --

13   A.   Portions.  I don't remember exactly what I

14   focused on.  I thought it was interesting to look at

15   some of the trans -- you know, some of the

16   appraisals he's done on homes in the different

17   areas.

18   Q.   Were you curious at all to see if his

19   opinions were the same or different than the ones

20   that were drafted for you by Patrick and Natalie,

21   that you signed and submitted as an expert report in

22   this case?

23   A.   I wasn't looking at hard numbers of his.

24   Q.   Okay.  Will you please turn to page 41 of

25   Mr. Waronker's May 12, 2010 deposition transcript,

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 378 of 580
Case 2:14-cv-02094-MCE Document 290 Entered on FLSD Docket 08/15/2017 Page 326 of
324

```
1    which is attached to your expert report in

2    Attachment A?

3        A.   Um-hmm.

4        Q.   That's -- I put a -- pink.  You're there?

5        A.   Um-hmm.

6        Q.   Okay.  You beat me.

7             Will you please read line -- starting at

8    line 4 on page 41 through page 42, line 13?  You can

9    read it to yourself, just let me know when you are

10   done.

11            The question on 41 starts with:  "What is

12   your understanding of the difference..."

13            Do you see that?  Excuse me.

14       A.   No.

15       Q.   I'm sorry.

16            MR. MONTOYA:  Page 41 line 4, right?

17            MR. CAMPBELL:  Correct.

18            MR. MONTOYA:  Got it.

19            THE WITNESS:  "So your deduction for

20       associated risk."

21   BY MR. CAMPBELL:

22       Q.   Let me strike that.  Yes.  It's the one that

23   starts on:  "So your deduction for associated

24   risk..."

25            Do you see that?  Will you start there, will
```

```
1    you read that through page 42, line 13?  And let me

2    know when you are done.

3        A.   Where did you want me to stop?

4        Q.   On page 42, line 13.

5        A.   Okay.

6        Q.   Do you agree with Mr. Waronker that if

7    remediation is done properly and it's documented,

8    stigma risk associated with Chinese drywall is

9    minimal because you've taken the risk out by doing

10   a proper remediation?

11       MR. MONTOYA:  Objection to the extent it

12       calls for him to comment on another expert's

13       deposition testimony or report.  Go ahead.

14       MR. CAMPBELL:  You can answer.

15   BY MR. CAMPBELL:

16       Q.   Do you want me to read back the question?

17       A.   No, I understand.  I don't know if I would

18   use the term minimal.  I would say it lessens

19   slightly but I wouldn't create it as them being

20   minimal.  From my experience, if it's remediated, I

21   wouldn't say, oh, it's hunky-dory now, like, it's

22   minimal now.  No.  My experience, when someone comes

23   into a house that's remediated, it's still severe.

24       Q.   What is severe?

25       A.   It's going to be very difficult to sell, you
```

Confidential - Subject to Further Confidentiality Review

1    are going to have a hard time selling the house.

2        Q.    I think you testified earlier, but correct

3    me if I'm wrong, that the remediation protocol that

4    you are familiar with, requires you to take the

5    house down to the studs and basically build a new

6    house; is that correct?

7        A.    That's not what I said.  I said -- I was

8    told there is a proper protocol.  I know that the

9    homes, those two homes, had that moss, I think there

10   was some agreement they came to with a distributor

11   and it was done to a specific protocol.  I don't

12   know what the exact protocol is.

13       Q.    If a home was remediated by removing all the

14   drywall and taking out everything that was ever

15   tainted, in any way whatsoever, or compromised by

16   the drywall, and you had a certificate that said the

17   house does not contain drywall and is not affected

18   by Chinese drywall, would that home have less of a

19   stigma than a home that has -- currently has Chinese

20   drywall?

21           MR. MONTOYA:  Objection.  Are you finished?

22           MR. CAMPBELL:  Yeah.

23           MR. MONTOYA:  Objection; improper

24       hypothetical, also outside the scope of his

25       opinion.

```
 1      A.   Less?

 2      Q.   Correct.

 3      A.   Slightly.

 4      Q.   It would only have slightly less stigma than

 5   a home that presently has Chinese drywall?

 6           MR. MONTOYA:  Same objection.

 7      A.   It would have less stigma, less stigma.

 8   Less.

 9      Q.   Significantly less?

10           MR. MONTOYA:  Same objection.

11      A.   I mean, it now doesn't have Chinese drywall,

12   so that's -- I think the stigma that -- the stigma

13   is still there.  Financially, it's different now.

14   Now, if I go and buy that home I don't have to

15   remediate it.  So the stigma doesn't disappear, it's

16   financially I can buy this home and I don't have to

17   remediate it.

18           So if someone is willing to buy a home that

19   has Chinese drywall that's been remediated, they can

20   purchase that house.  If they don't have the

21   finances to do the remediation, it's not apples to

22   apples.

23      Q.   So what is the stigma that's associated with

24   Chinese drywall?

25      A.   What is the stigma?
```

```
 1     Q.    Correct.

 2     A.    It's the uncertainty.  It's the -- who is to

 3     say that the remediation process was done right, who

 4     knows what the long-term effect are on our health,

 5     the corroded metal, what does it do to your lungs.

 6     Q.    Any other uncertainty with respect to

 7     Chinese drywall stigma?

 8     A.    Any other --

 9     Q.    Strike that.  Is there any uncertainty that

10     creates Chinese drywall stigma other than what you

11     just listed?

12     A.    We know that it's toxic, right, so it

13     damages appliances and metals.  So, you know, when

14     you hand that disclosure to somebody and it talks

15     about it, goes into detail on that disclosure, it

16     says -- if we have that disclosure.  Where is that?

17     Q.    Are you talking about a document that's

18     attached to your expert report?

19     A.    Yeah.

20     Q.    Which document are you looking at?

21     A.    I'm trying to find the Chinese drywall --

22     it's not in here.

23           THE WITNESS:  Do you have the sellers

24     disclosure, Chinese drywall disclosure?

25           MR. MONTOYA:  Yeah.
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 383 of 580
Case 1:14-cv-02722-MSK-NYW Document 290-1 Entered on FLSD Docket 09/15/2015 Page 231 of 324
Confidential - Subject to Further Confidentiality Review

```
 1       A.   I'm just going to give you my example as to

 2    why it has the --

 3       Q.   Exhibit 6, see if it's Exhibit 6 to the

 4    deposition.

 5       A.   Okay.  Number 4.  Okay.  So -- 4, 5, 6.

 6    Where is the --

 7            MR. AYUB:  I think 3.

 8       Q.   Or Exhibit 3?

 9       A.   Where is Exhibit 3?  Do you have it?  I

10    don't have 3, I have 2.  Exhibit 3 is my CV.

11       Q.   Exhibit 4?

12            MR. MONTOYA:  There's 4.

13            MR. AYUB:  He's talking about Exhibit 3.

14       A.   It talks about Chinese drywall and it says

15    it's the newest sellers disclosure that talks about

16    Chinese drywall.  I handed it --

17       Q.   Yeah.

18            MR. MONTOYA:  Is it on the Lang Realty?

19       A.   I think so. It is on Lang. I wanted to use

20    it as an example because I just went through it, so

21    I can explain to you why I still think today the

22    home has been remediated.

23       Q.   Well, let's -- we can take a break and we

24    can sort that out.  Let me --  I don't want to waste

25    our time.  You said that the stigma associated with
```

1  Chinese drywall is caused by the uncertainty of what

2  it will do to the home and what it will do to your

3  health; is that correct?

4      A.   And the value.

5      Q.   So if you're disclosing to a potential buyer

6  that the house no longer has Chinese drywall, and if

7  there is a certificate stating that it's clean and

8  everything that has been affected by it has been

9  removed, wouldn't that actually relieve the

10  uncertainty that's in a buyer's mind and actually

11  remove the stigma because they are comfortable that

12  the home no longer has it?

13      A.   To some people.  To me, it wouldn't.  To you

14  it might.  To me it wouldn't.  I learned as much as

15  I think any real estate agent could have in south

16  Florida, and after learning and seeing what I saw, I

17  would not put my family in that home and I'm pretty

18  confident that if I worked with you and educated you

19  on comps and we looked at houses, if there were five

20  and we made the short list of five and one of them

21  had Chinese drywall, we would probably have a short

22  list of four.

23      Q.   Fair to say that some people would buy a

24  remediated home because it removes the stigma, the

25  uncertainty that they have about Chinese drywall

```
 1   because they have a certificate stating --

 2        A.   Some.

 3        Q.   -- there is nothing wrong with the home?

 4        A.   Some, but I think the majority of my

 5   experience, the majority of people who would be

 6   willing to do it, want a deal.

 7        Q.   Okay.

 8        A.   Here it is, I found it here.  It says:

 9   "During the time Florida was experiencing building

10   material shortages, some homes were built or

11   renovated using drywall imported or manufactured in

12   China or elsewhere.  Which reportedly emit levels of

13   sulfur, methane, and or other volatile organic

14   compounds that cause corrosions in air conditioners

15   and refrigerator coils, copper tubing, electrical

16   wiring, computer wiring and other household items,

17   as well as create noxious odors which may also pose

18   health risks."

19             That scares buyers, black and white, and

20   even though I can show them a binder that has

21   pictures of it being removed, that scares people and

22   I can't -- as long as this is involved in a

23   transaction, it scares people and it scares me from

24   not just health, from an investment standpoint too.

25   That's -- I don't think until you get rid of this,
```

1    or any sort of disclosure, it will always be there,

2    and the less educated you are, the more this becomes

3    new -- when I get people from New York or some other

4    part of the country and they never heard of Chinese

5    drywall and you hand them this, it scares the crap

6    out of them.

7        Q.  But fair to say that for some people they

8    are relieved because they know that Chinese drywall

9    now is not an issue because it has been removed and

10    there is a certification and everything has been

11    updated?

12        A.  So if there are two homes built by Albanese

13    next to each other and one hadn't been tested and

14    one had been remediated, if you narrow it down to

15    only two homes, true.  That's like saying, yeah,

16    pick your poison, but yeah, but I don't think it

17    would give me more confidence than a home that never

18    had it.  So if that's the question you are asking,

19    would it give me more confidence buying a home that

20    never had Chinese drywall because it was built by a

21    different builder that never had an issue.  No.  If

22    I am looking at two Albanese homes and one guy stuck

23    his head in the sand and one guy had it remediated.

24    Sure, I'll choose the remediated home.

25        Q.  Right.  Fair to say that people that have

 1    your personal view on this, may just be more

 2    cautious like you, whereas others may not be as

 3    cautious or they -- or more confident in the

 4    certification than you would be, correct, as a

 5    personal choice; is that fair to say?

 6        A.   I look at my client's investments like they

 7    were my own.  I think that's probably why I've

 8    become successful because I believe in the golden

 9    rule and if I wouldn't do it I wouldn't let my

10    clients do it.  So are there people out there?

11    Yeah, I've had agents who knowingly didn't want to

12    disclose to their clients that the home had been

13    remediated.  They thought they could just, sort of,

14    pull a fast one.  So are there people out there?

15    Yeah.  There are people that if they get a good deal

16    they will buy it.  There is all walks of life.

17        Q.   Why is it that you would not buy a home that

18    had been remediated if you knew that every board of

19    Chinese drywall, every board of drywall had been

20    removed, every item that had been compromised in any

21    way had been removed and replaced with nondefective,

22    noncompromised items, and that you've got a

23    certification from an expert saying that the home no

24    longer had any Chinese drywall or any effects of

25    Chinese drywall?

1      A.    Two reasons:  First, you can show me a

2    document that says today there is nothing.  You

3    can't prove to me that tomorrow there is not going

4    to be something.  You can't prove to me that in the

5    concrete something is going to pop up in a few

6    years, we don't know.  This is still somewhat

7    uncertain as to what will happen down the road.  We

8    know that once its remediated you can go test it

9    today and it will be okay, but I can't guarantee,

10    I'm not going to put in writing that tomorrow there

11    won't be something.  So that is A.

12          And B, I know that when I turn around and

13    sell that house, my investment has a black cloud

14    over it.  Strictly from an investment standpoint, I

15    would advise choosing any other option.

16      Q.    If you were aware of homes that had been

17    remediated that had sold for market value or at a

18    premium, would that change your opinion as to the

19    uncertainty with respect to the value of the home?

20      A.    If you could show me consistent data that

21    shows buyers are paying more for remediated Chinese

22    drywall homes to homes that had never had Chinese

23    drywall or had thought to have Chinese drywall,

24    perhaps I would be open to it, sure.

25      Q.    Okay.  And with respect to the fear that

```
 1    there could be something else out there in the walls

 2    and that sort of thing; is that true with radon gas?

 3        A.   We don't have radon in south Florida.  We

 4    don't have basements.

 5        Q.   You don't have disclosures about radon gas?

 6        A.   We do have disclosures but in south Florida

 7    we don't have basements, so when there is no

 8    basements it's not really pertinent to south

 9    Florida.  I know in north Florida it's an issue.

10        Q.   Would the fear not be there in buyers when

11    they read about radon gas?

12        A.   There is fear about radon, sure, there will

13    be fear.

14        Q.   Okay.  So do you think there is stigma

15    associated with radon gas?

16        A.    Yeah.

17        Q.   Okay.  But in every home that's sold in

18    Florida, there is a disclosure about radon gas, is

19    there not?

20        A.    Yes, but I'm not involved in an area of the

21    market where radon gas is prevalent.

22        Q.   But it's disclosed in every single one of

23    those --

24        A.    It is disclosed but not pertinent to our

25    area.
```

1    Q.   Right.  But if someone sees there is radon

2    gas --

3    A.   They can ask.  I will say, here's -- go do

4    your property inspection, speak to your inspector

5    and the inspector will say, we're not going

6    underground, so there is no issue of radon in south

7    Florida.  And he explains the whole story.  I'm not

8    the inspector, I'm not going to talk about it but I

9    say, if you have questions, speak to your inspector.

10   Q.   Why do you not have the same fear of radon

11   gas popping out that do you about Chinese drywall in

12   a remediated home?

13   A.   There has never been a single case of radon

14   in any home I've ever been party to.

15   Q.   Are you aware of any case of a remediated

16   Chinese drywall home, where the home subsequently

17   had sulfur or other issues associated with Chinese

18   drywall occurring after the remediation?

19   A.   There was someone on Monte Vista that

20   claimed they remediated their home by putting a

21   special spray in it.

22   Q.   Well, I'm talking about a proper

23   remediation.  Let me reask the question.

24   A.   Well, that's the problem.  In Cobblestone,

25   for example, a bunch of investors came in.

1    Q.   Right.

2    A.   I remember I had a friend who rented a home

3    there.  And who was the investor?  Joe.  Joe did the

4    remediation.  Don't worry, Joe shakes your hand, he

5    says, "Don't worry.  I did it.  I did it right."

6         I'm an average citizen.  I go into that

7    home.  I don't know.

8    Q.   I'm talking about a home that has been

9    properly remediated and has a certificate from the

10   specialist, from an expert.

11   A.   Okay.

12   Q.   And you're confident that they did properly

13   remediate the home.

14   A.   Okay.  Yeah.

15   Q.   In that situation, why would you have any

16   fear that there would still be Chinese drywall

17   issues coming out of the walls, anymore so than you

18   would be fearful that, maybe, radon comes out

19   of nonbasement areas --

20   A.   Because we haven't had radon and we have had

21   Chinese drywall and I don't know what the future

22   will entail.  I don't and I don't think any of us at

23   this table know for 100 percent certain that there

24   will not be lasting effects, that it didn't affect

25   the soil, that it didn't affect the ground.  I don't

```
 1    know.

 2            I have little kids.  All this was going on

 3    when I had little kids.  I'm not doing it.  I'm not

 4    doing it.  I'm just not taking that risk.  I sleep

 5    at night very well knowing that I bought a home that

 6    I never have to question about Chinese drywall.  I

 7    do the best that I can for my family and to me

 8    that's important.

 9            In terms of a value, I know that when I sell

10    the home with a disclosure, I have to have buyers

11    reading this over and over again, this awful

12    language in here about Chinese drywall and what it

13    does to electrical and copper and all that stuff.

14    And even if I have this document, it's still there.

15    It's still there.  So I -- you know, it can help, it

16    certainly is going to help having that, but it

17    doesn't negate.

18    Q.    Okay.  Can you put a quantification on how

19    it helps?

20    A.    Having that?

21    Q.    Yeah.  A quantification on how having a

22    remediated home -- let's stop for a second.

23    A.    Okay.

24            MR. CAMPBELL:  You need to change the tape?

25            THE VIDEOGRAPHER:  Off the record at 3:35.
```

```
 1              (Recess from 3:35 p.m. until 3:47?p.m.)

 2              THE VIDEOGRAPHER:  We're now back on the

 3         video record at 3:47.

 4    BY MR. CAMPBELL:

 5         Q.   Mr. Greenblatt, when did you first meet

 6    Kevin Rosen?

 7         A.   I sold his house in Woodfield Country Club

 8    before he bought the home in The Oaks.  Maybe,

 9    '04ish, '03 actually.  Let me -- '03, '04, would be

10    my guess.

11         Q.   Were the circumstances that led you to meet

12    Mr. Rosen professional?

13         A.   Yes.

14         Q.   In nature?

15         A.   Yes.

16         Q.   It was when he asked you to sell the home

17    that he owned before the Monte Vista home?

18         A.   Correct.

19         Q.   Between September 2009 and when the house

20    sold on December 2009, did you speak regularly with

21    Mr. Rosen?

22         A.   We spoke between the time it was listed and

23    sold?

24         Q.   Correct.

25         A.   Yes.  Probably daily.
```

Confidential - Subject to Further Confidentiality Review

```
 1      Q.   How would you communicate with Mr. Rosen

 2   during this time?

 3      A.   He would ask what's going on, like many of

 4   my sellers, what's going on, showings, feedback.

 5      Q.   Would he do that over the phone?

 6      A.   Yeah.

 7      Q.   Did you ever text with him?

 8      A.   No, I had a BlackBerry.

 9      Q.   Did you ever e-mail with him?

10      A.   No.

11      Q.   Possible?

12      A.   It was, I would say, 99.9 percent on the

13   phone.

14      Q.   Do you have a work e-mail account?

15      A.   Of course.

16      Q.   And if you wanted to go look at e-mails

17   you've exchanged with Mr. Rosen from your work

18   e-mail account could you pull those?

19      A.   I don't know if I could but I'm sure someone

20   on our server could pull them.

21      Q.   Have you ever e-mailed with Mr. Rosen or his

22   wife on an account other than your work e-mail

23   account?

24      A.   Very possible, yeah.

25      Q.   Okay.  What e-mail accounts do you have?
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 395 of 580
Case 1:11-cv-22408-MGC Document 290-1 Entered on FLSD Docket 08/15/2011 Page 243 of
324
Confidential - Subject to Further Confidentiality Review

```
 1      A.   I'm embarrassed to say but I have an AOL

 2   account.

 3      Q.   Is that the only nonwork account you have?

 4      A.   It's the only nonwork one that I use, yeah.

 5      Q.   Do you have other e-mail accounts?

 6      A.   I think I opened a Hotmail at some point.

 7      Q.   You don't use it?

 8      A.   I don't use it.

 9      Q.   And what is your AOL e-mail account?

10      A.   It's ray1green@aol.

11      Q.   What is your work e-mail contact?

12      A.   R.Greenblatt@Langrealty.com --

13      Q.   And after Mr. Rosen's house, at 17830 Monte

14   Vista, sold in December 2009, did you have any

15   communications with Mr. Rosen?

16      A.   Um-hmm.

17      Q.   How many communications did you have with --

18      A.   I sold him another house.

19      Q.   When did you sell him another house?

20      A.   They moved into a rental for a while.  I

21   would have to pull the MLS to see when it was, but

22   they bought a home in Saturnia for, if I recall,

23   somewhere in the fives.  I'd have to pull the MLS.

24   They have been there since, they are still there.

25      Q.   Have you ever communicated with Mr. and
```

```
 1    Ms. Rosen in a nonprofessional context, in a social

 2    context?

 3        A.    Yes.

 4        Q.    Would you consider the Rosens friends?

 5        A.    Yes.

 6        Q.    I think you mentioned earlier that you

 7    had -- your kids went over to swim?

 8        A.    In The Oaks house.

 9        Q.    In The Oaks house?

10        A.    Yeah.

11        Q.    Are your kids friends?

12        A.    Their kids are older.

13        Q.    Okay.  How often do you socialize with the

14    Rosens?

15        A.    Pretty much nonexistent now, only because --

16    not because we don't care, I really like Kevin and

17    Stacy but their kids are older and life gets busy,

18    his kids' interests and my kids' just don't cross

19    paths, so it takes more effort now than it used to

20    before children.

21        Q.    Do you remember the last time you spoke with

22    Mr. Rosen or Ms. Rosen?

23        A.    I bumped into her at a soccer field last

24    winter.  Kevin called me, I think, towards the end

25    of the year to give me a heads-up that someone might
```

Confidential - Subject to Further Confidentiality Review

```
 1    be calling, and we had a lunch planned at some point

 2    in the fall last year and he had to cancel.  And we

 3    haven't gotten together -- I don't know if I've seen

 4    Kevin.  It's been a long time.  Again, I like Kevin

 5    a lot, he's a great guy, he just works hard, I work

 6    weekends, and the stars don't align to see them.

 7        Q.   I'd like to direct your attention to the

 8    July 2013 letter that you wrote, To Whom it May

 9    Concern, I believe was the title?

10        A.   Yep.

11        Q.   Do you know what I'm talking --

12        A.   Yeah, which one is --

13        Q.   It's in Attachment A, so it would be in

14    the --

15        A.   Do you know what page it is?  Is it after --

16        Q.   The tab, I believe.  Second tab.  Sorry.

17             MR. MONTOYA:  Second yellow tab.

18        Q.   Yeah, second yellow tab.

19             And do you recall -- well, strike that.

20             Did you write this letter?

21        A.   Yes.

22        Q.   And did you write it on the date listed at

23    the top of the letter?

24        A.   Yes.

25        Q.   So you wrote this letter on July 3, 2013?
```

```
1    A.   Yes.

2    Q.   Did you have any assistance in writing this

3    letter?

4    A.   No, Kevin asked me to be factual.  This was

5    a long time ago, I remember him saying, hey, I'm

6    involved in a case if you can help me out, and, you

7    know, go back on the stats and everything.

8    Q.   Did he tell you what he wanted the letter to

9    include?

10   A.   Yeah, he had specific information that he

11   wanted but he didn't tell me to manipulate numbers

12   or anything, he said just tell me facts.

13   Q.   Just so I understand, Kevin Rosen asked you

14   to write this letter and told you what he wanted the

15   subject matter of the --

16   A.   Correct.

17   Q.   Did he review the letter before you

18   submitted it?

19   A.   Yes.

20   Q.   Okay.  To whom did you submit it?

21   A.   I e-mailed it to Kevin.

22   Q.   Do you know if that letter went to anyone

23   else?

24   A.   I have no idea where it went I don't know.

25   Q.   Did he tell you what he was going to do with
```

```
 1    the letter?

 2        A.   He just told me he was involved in a lawsuit

 3    and I wanted to help him.

 4        Q.   How did you send him, Mr. Rosen, your July

 5    3, 2013 letter?

 6        A.   I would guess e-mail.  It's possible I sent

 7    him a hard copy and I signed it.  This is my e-mail

 8    photo and signature, so this is clearly an e-mail,

 9    but it's possible I gave him a hard copy and signed

10    it but this is an e-mail document.

11        Q.   Will you turn to the second page of your

12    July 3, 2013 letter?

13        A.   Um-hmm.

14        Q.   And at the top first paragraph on the second

15    page, will you please read the last sentence?

16        A.   A few years later --

17        Q.   I'm sorry.  It starts with "the home."

18        A.    "The home was worth more but the stigmatism

19    associated with the home that had Chinese drywall

20    continued to affect the home's value."

21        Q.   And do you know, approximately, how much

22    more it was worth?

23        A.   From when they sold it in 20 -- I don't know

24    the exact numbers.  But again, it kept trading under

25    a million dollars.
```

1    Q.   Okay.  And you did not represent the seller

2    of the Rosen home in July of 2012, correct?

3    A.   I was not involved in that transaction.

4    Q.   Okay.  So what would be the basis for you to

5    know that it had sold -- that it was worth more than

6    what it had sold for?

7    A.   I was selling many other homes in The Oaks.

8    Q.   Okay.  Did do you any analysis at that time,

9    in July 2012, to determine that it did -- that the

10    Rosen home did in fact sell for less than it was

11    worth?

12    A.   Yeah, I have a faint recollection of going

13    over some of them with Kevin and saying, like, this

14    was like yours and this.  And sort of discussing it

15    with him.

16    Q.   So you and Kevin got together at some

17    time --

18    A.   I was on the phone and he, you know, he said

19    hey, this and this I think were --

20    Q.   Do you recall about when that phone

21    conversation occurred?

22    A.   No.

23    Q.   Fair to say it wasn't a detailed analysis of

24    comps with respect to the Rosen home in July of 2012

25    that you would have performed?

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 401 of 580
Confidential - Subject to further Confidentiality Review
324

```
1        A.   I wouldn't say it wasn't a formal CMA but it

2     was using the same data I would use to perform a

3     CMA.  So if I wanted to click the button to, you

4     know, spit out the nice, fancy, little report, it's

5     the same data that I would use.  I could pull five

6     comps, right now, and tell you what your home was

7     worth or I could plug into a program and give you a

8     nice folder that looks good on my listing but it's

9     the same details.

10       Q.   Do you know whether Mr. Rosen made any edits

11    to your July 3, 2013 letter?

12       A.   I don't know.  I don't think so.

13       Q.   It's possible that he did?

14       A.   I mean, I don't -- I have no reason to

15    believe he did.

16       Q.   Have you read your July 3, 2013 letter since

17    sending it to Mr. Rosen on or about July 3, 2013?

18       A.   I read it when I was looking through my

19    binder.

20       Q.   Okay.  That was the first time in a long

21    time?

22       A.   Yeah.

23       Q.   That was sometime on or after February 15,

24    2019?

25       A.   Um-hmm.
```

```
 1      Q.   I'd like to direct your attention to

 2   paragraph 20 of the expert report that you signed

 3   and submitted on February 15, 2019.

 4           MR. MONTOYA:  You're at the report, right,

 5      Exhibit 2?

 6           MR. CAMPBELL:  Correct.

 7           MR. MONTOYA:  Let's give him the report.

 8           MR. CAMPBELL:  Sorry.  2.

 9           THE WITNESS:  Yep.

10   BY MR. CAMPBELL:

11      Q.   So are you there?  I'm sorry, paragraph 20.

12      A.   20?

13      Q.   Yes.

14      A.   Okay.

15      Q.   Will you please read paragraph 20?

16      A.   "Based on my professional expertise and my

17   vast experience selling homes in The Oaks community,

18   the home was worth vastly more than the price at the

19   time but the stigmatism associated with a home that

20   had Chinese drywall continued to affect the home's

21   value."

22      Q.   Do you see that compared to July 3, 2013

23   letter, the "vastly" has been added before "more"?

24      A.   Okay.  Yeah, I see it now.

25      Q.   Did you add that or did Patrick or Natalie
```

```
 1    add the word "vastly" before "more" in that

 2    sentence?

 3        A.   I don't know.  I don't think I did.

 4        Q.   Okay.  That's the same sentence, correct,

 5    that's in your July --

 6        A.   It appears to be very similar --

 7        Q.   2013 --

 8        A.   Yeah.  Um-hmm.

 9        Q.   Fair to say that when you wrote your letter

10    in July 3, 2013, that would be a more accurate

11    description of your belief that the home had sold

12    for less than market value than their edited version

13    of your statement several years later?

14        A.   I don't think it's a big difference.  You're

15    adding another word in there.

16        Q.   "Vastly more" is different than "more,"

17    isn't it?

18        A.   It is.

19        Q.   Okay.  So it would be more accurate to say

20    more and not vastly more?

21        A.   I don't know if it's more accurate or not.

22    I would have to dive into the exact -- what's your

23    interpretation of vast?

24        Q.   I'm asking you.  It's your report or your

25    name is on it.
```

```
 1      A.   Right.  It's different.

 2      Q.   Right.

 3      A.   It's a different term.  It's using a new

 4   term that wasn't in the previous, I don't know if it

 5   makes it more accurate or less accurate.  I don't.

 6      Q.   How would you figure that out?

 7      A.   Go back and look at every single comp and

 8   sit down with an appraiser and determine what

 9   equates to vast, and then try and figure out if that

10   number hit.

11      Q.   Let's go back to the 2010 deposition of

12   Mr. Waronker.

13      A.   It's in this one.

14      Q.   It's the sixth yellow tab.

15      A.   Yep.

16      Q.   And on 42, line 10 through 13, will you

17   please read that?

18      A.   I'm sorry.  Which --

19      Q.   Page 42, starting at line 10 and ending at

20   13.

21      A.   Page 42?  Page 42, lines 10?

22      Q.   Correct.

23      A.   You want me to read it privately?

24      Q.   No.  Can you read it out loud?

25      A.   "With that said, I think if you've done all
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 405 of 580
Case 2:14-cv-02684-MSG Document 23-4 Entered on FLSD Docket 03/15/2017 Page 253 of 324
Confidential - Subject to Further Confidentiality Review

 1    the steps properly and it's documented, I think your

 2    stigma risk is minimal because you've taken that

 3    risk out by doing the proper remediation."

 4         Q.   We've already discussed that you don't

 5    necessarily agree with that personally, correct?

 6         A.   Correct.

 7         Q.   But you do think that doing a proper

 8    remediation would lessen the stigma, correct?

 9         A.   It would lessen, yes.

10         Q.   But do you agree that there is going to be

11    some buyers out there and some experts, like

12    Mr. Waronker, who would believe that a proper

13    remediation would remove the stigma entirely,

14    correct?

15         A.   Sure.  It's his opinion here.

16         Q.   You have no reason to disagree with the fact

17    some experts like Mr. Waronker would believe that

18    proper remediation --

19         A.   I can't disagree with him.

20         Q.   -- would remove the stigma, correct?

21         A.   It's his opinion.

22         Q.   Right.  And as long as someone is willing to

23    pay market value for a home, that would be the value

24    of the home, correct?

25         A.   That's what market value is.

Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Right.  So even if there is some people,

 2   like yourself, who would never buy a home that had

 3   been remediated for Chinese drywall, as long as some

 4   people are willing to do so and those people are

 5   willing to pay the market value for the home, then

 6   the home will remain at market value, correct?

 7      A.   If that -- yeah, if the sun doesn't come up

 8   tomorrow, the sun doesn't come up tomorrow.  I've

 9   yet to see that happen but is it possible, sure,

10   it's possible, but you're speculating on something

11   that is it possible the sun doesn't rise tomorrow,

12   yeah, it's possible but is it possible that a home

13   will sell for the same value?  I haven't seen it but

14   is it possible, yes, anything is possible.

15      Q.   Just so you know, I'm not trying to trip you

16   up.  With expert witnesses, hypotheticals are

17   allowed.

18      A.   Okay.  It just seems very hypothetical.

19      Q.   You are making a hypothetical opinion or

20   opinions based on a hypothetical in your report,

21   aren't you?

22      A.   I don't think it's hypothetical.  I'm using

23   comps, I'm using experience, I've had homes listed,

24   I know what happens when people walk in the door, I

25   know what happens when I hand them the disclosures,
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 407 of 580
Case 1:11-cv-22408-MGC Document 250-1 Entered on FLSD Docket 08/15/2011 Page 255 of
324

Confidential - Subject to Further Confidentiality Review

```
 1    and I know what happens on the sales.  I've seen all

 2    the issues that happen from getting from A to B to

 3    sell a home.  So to say that I'm speculating or

 4    guessing, I think I have pretty good credibility in

 5    the trenches.  Who better to speak to than a

 6    soldier.  I don't think I'm speculating.  I wouldn't

 7    use --

 8        Q.   Can you turn to the expert report that you

 9    signed?

10        A.   Sure.  Um-hmm.

11        Q.   On page 6.

12        A.   It's in 4, right?

13             MR. MONTOYA:  2.

14        A.   Okay.  Number 2.  Yeah.

15        Q.   Looking at -- this would be paragraph 33,

16    which starts on page 5.  I want to ask you about --

17        A.   Page 5, got it.

18        Q.   -- what's written --

19        A.   Okay.

20        Q.   And 33, part E.  See that?

21        A.   33, part E?

22        Q.   Right.

23        A.   Yes.

24        Q.   Okay.  Will you read that, please, out loud?

25        A.   "Because the priority claimants will be
```

1    required in the future to disclose the past presence

2    of Chinese drywall and its remediation, a stigma

3    will attach to their properties that will lower the

4    value of each home."

5        Q.   Now, fair to say based on what you just

6    said, that that's not necessarily true?

7            MR. MONTOYA:  Objection.

8        A.   No.

9            MR. MONTOYA:  Mischaracterizes his

10   testimony.

11       A.   No, I do, I do believe that, I do believe

12   that.

13       Q.   Okay.

14       A.   But, you know --

15       Q.   But if some -- if some buyers in the future

16   are willing to pay market value for the home?

17       A.   If --

18       Q.   -- that it would be -- the market value

19   would not be negatively affected by the remediated

20   Chinese drywall, correct?

21       A.   So if you --

22           MR. MONTOYA:  Objection.

23       A.   So if you open the yogurt store across the

24   street and charge $100 for a yogurt, is it possible

25   someone would buy it?  It's possible.  It's very

1    possible someone will buy it.  Is it likely?  No.

2    So I don't understand what you're saying, is it

3    possible?  Anything is possible.  Anything is

4    possible but is it likely, no.

5        Q.   In this case, it's a little more than

6    possible, right --

7        A.   To get --

8        Q.   --  let me explain to you why I think it's a

9    little more impossible.  You have an expert, an

10   appraiser, who has testified under oath and that

11   testimony is attached to your expert report?

12       A.   Hm-hmm.

13       Q.   And that appraiser has said that if the

14   remediation is properly done, then it is possible to

15   remove the stigma that is associated with that

16   property, correct?

17       A.   That's what it says, but I disagree with it

18   but that's fine.

19       Q.   You personally do?

20       A.   Yeah, I do.

21       Q.   So you can't speculate on the future of what

22   a remediated Chinese drywall home will sell for?

23       A.   I can tell you what's happened up until

24   today and what I think will happen -- I can show you

25   factually what has happened till today.  Tomorrow is

1    predicting.  I can pull all kinds of data to predict

2    but can I show you factually in comps why I would

3    disagree with it.  I would be hard pressed to find

4    comps that would prove this, that I've seen, maybe

5    you have them.  I don't.  I'm happy to review them

6    but I don't see them where I work.

7    Q.  So any prediction that you have about the

8    future is based on speculation, fair to say?

9    A.  Base it -- what do you base the future on?

10    Q.  Right.

11    A.  I think we all do.  Right?  I'm not a

12    fortune teller.

13    Q.  Okay.  So then to make that 33E more

14    accurate, would you -- if you had written this,

15    would you change it to say:  Because the priority

16    claimants will be required in the future to disclose

17    the past presence of Chinese drywall remediation, a

18    stigma may attach to their property.

19    Wouldn't that be a more accurate statement?

20    MR. MONTOYA:  Objection; mischaracterizes

21    testimony.  Go ahead.  You can answer.

22    A.  I disagree.  No, I wouldn't change it to

23    that.

24    Q.  But you can't predict the future?

25    A.  But I can tell you what's happening right

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 411 of 580
Case 1:11-cv-22408-MGC Document 290-1 Entered on FLSD Docket 05/13/2014 Page 259 of 324
Confidential - Subject to Further Confidentiality Review

1   now.  Right now it will affect you.  Tomorrow the

2   sun might not come up and none of us are here, so we

3   can put that in there too, and say that tomorrow if

4   the sun doesn't come up, we're all dead.  But I can

5   tell you that today, and most likely tomorrow when I

6   wake up, it won't change.  I can almost guarantee

7   that if I get a call for a listing in The Oaks

8   tomorrow, this is not going to change.

9       Q.   I would like to direct your attention to the

10  first sentence of paragraph 33 of your expert

11  report.  Will you please read that aloud.  You don't

12  have to read anything below it, just the first --

13      A.   Which page again, I'm sorry?

14      Q.   On page 5, 33.

15      A.   Page 5, 33.

16           "I've reached the following opinions within

17  a reasonable degree of probability as a Florida

18  realtor."

19      Q.   What is a reasonable degree of probability?

20           MR. MONTOYA:  Objection; calls for a legal

21      conclusion.

22      Q.   Well, if you didn't write this, then I can't

23  ask you about something you didn't write.  So did

24  you write that sentence there?

25           MR. MONTOYA:  Objection.  Mischaracterizes

1     his testimony.

2     Q.   He can answer the question.

3          MR. MONTOYA:   You can answer.

4     A.   We worked on this together.   Did he use the

5     legal terms that were the same as mine but sounded a

6     lot better?   Yeah, but they are the same words, they

7     are the same definition.   Diminution, or whatever

8     the term you want to use, I might say depreciation

9     or less, doesn't sound as good, but he took my

10    information and put it on a nice document that you

11    guys all agree with is more legal.

12    Q.   You don't know what reasonable degree of

13    probability means?

14    A.   Reasonable, within reason.

15    Q.   What does the term reasonable degree of

16    probability --

17    A.   Within reason.

18         MR. MONTOYA:   Same objection.

19    A.   I mean, that anyone within their right

20    might, any professional, would hold true.   There is

21    a variance, there is going to be a slight variance.

22    I could bring in five appraisers and show you the

23    same home and there is going to be a variance.   So

24    there's a degree, where we might disagree within one

25    to two percent of the value of the home but that's

```
 1    within a reasonable amount of disagreement.  If one

 2    guy came in and he said the home is worth $2 million

 3    and others said a million 50, a million 25, that guy

 4    is not reasonable.

 5        Q.   You're talking about comps; is that correct?

 6        A.   I'm just giving you an example of

 7    reasonable.

 8        Q.   You're talking about numbers.

 9        A.   I'm giving you an example of reasonable,

10    what I think is reasonable within a reasonable

11    variance, if you will.

12        Q.   So if you were giving a value opinion, then

13    you would think that within a risk factor, within

14    plus or minus two percent, would be within a

15    reasonable degree of probability, as you call it?

16        MR. MONTOYA:  Are you asking him a value

17        opinion?  I'm asking you to clarify the question.

18        A.   Yeah.  I don't --

19        MR. MONTOYA:  He's not testifying about

20        value.  That much is clear in his report.

21        Q.   You just mentioned two percent in your

22    answer to my question about reasonable degree of

23    probability.

24        A.   It was giving you an estimate.  I was just

25    giving an example.  I wasn't using a hard term.
```

```
1      Q.   Right.  And I'm asking --

2      A.   If we all sit here and we discuss what color

3   is this wall:  You might say it's like a yellow,

4   off-yellow, beige, we can all, within a variable

5   amount, agree that it's within a certain -- if

6   someone comes in here and says purple, to me that's

7   not reasonable.  So to me, that's the definition if

8   we don't want to use numbers.

9      Q.   Right.  So I'm asking you what would be

10  within the reasonable degree of probability in your

11  field as an expert?

12           MR. MONTOYA:  Same objection.  That calls

13       for a legal conclusion.

14      A.   I don't know what that number is but I would

15  hold -- top, you know, producers that do business

16  and are successful and held in high regard as

17  reasonable people that I would value their opinion.

18      Q.   Will you please turn to Attachment A to the

19  expert report that you signed on February 15th?

20  It's in that binder.  It's Attachment A to the

21  expert report.  It is Exhibit -- Deposition

22  Exhibit 12?

23      A.   So which tab am I going to?

24      Q.   Will you go to the second to last yellow tab

25  and this is, for the record --
```

```
1    A.   The second to last yellow tab?

2    Q.   Correct.  This is the --

3    A.   This is another --

4    Q.   -- transcript of jury trial proceedings,

5    taken on June 11, 2010, in the case of Seifart v.

6    Knauf, do you see that?  And this is -- this

7    transcript is included in Attachment A to the expert

8    report that you signed; is that correct?

9    A.   That's correct.

10   Q.   And this is the document that you said you

11   had reviewed prior to signing your name to the

12   expert report on February 15; is that correct?

13   A.   No.  No.  This was given to me on the 15th.

14   Q.   Okay.  So you had not read it before you --

15   A.   I had not read it --

16   Q.   -- signed the expert report?

17   A.   -- Ms. Yoder's testimony, or whatever the

18   term is for what she said, that was given to me on

19   the 15th.

20   Q.   When did you read her testimony?  Ms.

21   Yoder's testimony?

22   A.   When I got that binder I started reading it

23   probably the next day.

24   Q.   The 16th?

25   A.   Sure.
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 416 of 580
Confidential - Subject to further Confidentiality Review
324

```
 1      Q.    And who is Margaret Yoder?

 2      A.    She's a realtor.

 3      Q.    Do you know her?

 4      A.    No, I do not.

 5      Q.    Had you ever heard of her name before you

 6    read the trial --

 7      A.    No, but it sounds like she's pretty

 8    seasoned.

 9      Q.    Why do you say it sounds like she is pretty

10    seasoned?

11      A.    She said -- from what I read, she said she

12    had been doing it for a long time, 30 or 40 years.

13    Since the early '70s she said she had been a

14    realtor.  That's a long time.

15      Q.    Do you believe that she would be qualified

16    to opine on the stigma associated with Chinese

17    drywall?

18          MR. MONTOYA:  Objection.  Are you asking the

19      witness to comment on another witness's ability

20      to be called an expert?

21          MR. CAMPBELL:  Absolutely.

22          MR. MONTOYA:  You can answer the question.

23      Same objection.

24      A.    I don't know her.  I'd be curious to see if

25    she's active still, in 2010.
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 417 of 580
Confidential – Subject to further confidentiality review
324

```
 1      Q.   At the time, the fact that she had been a

 2   realtor, a licensed realtor in Florida for over 40

 3   years, does that --

 4      A.   I don't know if that necessarily --

 5      Q.   Sorry, let me finish the question.

 6      A.   Go ahead.

 7      Q.   So at the time that Ms. Yoder testified on

 8   July -- excuse me, June 11, 2010, she was a licensed

 9   realtor in the state of Florida; is that correct?

10      A.   Um-hmm.

11      Q.   And she had been a licensed realtor in the

12   state of Florida for over 40 years, correct?

13      A.   Um-hmm.

14      Q.   My question to you is:  Given her 40 years

15   of experience as a licensed realtor in Florida,

16   would you agree that Ms. Yoder was qualified to

17   speak to stigma associated with Chinese drywall?

18           MR. MONTOYA:  Same objection.

19      A.   I honestly don't know.  From what I read,

20   she was -- she had handled one transaction and she

21   knew about that.  Was she sharp and really full-time

22   and really doing this 100 percent with super

23   knowledge?  I don't know.  I've never met her, I've

24   never spoken with her, never worked with her.  I see

25   agents all day.  Some I think are professional and I
```

```
 1    respect them a lot, some are hobbyists.  I don't

 2    know.  Maybe at this point in her career she's

 3    part-time.  I don't know.  I can't answer that.  I

 4    have no idea.

 5         Q.   What do you believe to be the requirements,

 6    for a real estate agent licensed in Florida, to be

 7    qualified to speak to remediation -- excuse me --

 8    strike that.

 9              What are the requirements that a real estate

10    agent licensed in Florida required to have, in your

11    opinion, in order to provide valid and -- let's just

12    strike all that.  Sorry.

13              Why do you believe that you are qualified to

14    speak to the stigma associated with Chinese drywall?

15              MR. MONTOYA:  Asked and answered.

16         Q.   Answer again, please.

17              MR. MONTOYA:  You can answer.

18         A.   Okay.  I think I got into the business at a

19    time where I have seen ups/downs, I've seen

20    pre-Chinese drywall, pre-hurricane, major hurricanes

21    that affect the values here.  And I think I've been

22    through the up and down.  I've sold homes with

23    Chinese drywall in it, I've sold homes that have

24    been remediated.  I've brought buyers to countless

25    homes that have maybe been remediated, not
```

1    remediated.  I do this full-time.  It's how I put

2    food on my family's table.  I'm a top producer.  I'm

3    proud of my accomplishments and I think what

4    separates me from an average is I'm at the top of my

5    game.

6        Q.   Is there anything that you read in the trial

7    testimony, that Ms. Yoder provided, that leads you

8    to believe she did not have the same type of

9    experience as you when she testified in June 2010?

10       A.   She said that she sold hundreds of homes.  I

11   just -- the only thing I would question, you know,

12   if I was doing your job, is what is she doing

13   lately.  Is she full-time?  What are her statistics,

14   is she selling 20 to 30 million dollars in real

15   estate a year, is she grinding.  How many homes has

16   she been involved with Chinese drywall?  I don't

17   know, I know what I've done.

18       Q.   All right.  Please turn to page 1324 from

19   the transcripts of jury trial proceedings until

20   Seifart v. Knauf which are included in Attachment A

21   to the expert report you signed in this case?

22       A.   13 --

23       Q.   24.

24       A.   Okay.

25       Q.   Would you please read starting on line 24 of

```
 1    1324 and read through line 18 of page 1327?

 2         A.   To myself?

 3         Q.   Yes.  Let me know when you finish.

 4         A.   Okay.

 5         Q.   Do you agree with Ms. Yoder that disclosure

 6    of a previous stigma causing condition that has been

 7    fixed does not necessarily mean a decrease in value

 8    of the home?

 9         A.   Do I disagree with her regarding Chinese

10    drywall?

11         Q.   Correct.

12         A.   I disagree with her.

13         Q.   Reasonable to say, though, that some people

14    would agree with Ms. Yoder?

15         A.   Sure.  You can find them.

16         Q.   Right.  Do you think that -- strike that.

17              Why don't you go ahead and read starting on

18    1327:19 and read through 1329:5 and let me know when

19    you are finished?

20         A.   Okay.

21         Q.   Do you agree with Ms. Yoder that in order to

22    understand how to value a home you would rely

23    heavily on an appraiser?

24         A.   I don't need an appraiser to tell me the

25    value of a home.
```

1    Q.   Would you defer to an appraiser's value of a

2    home over your own valuation of a home--

3    A.   I disagree sometimes with appraisers, we've

4    challenged appraisers in the past.

5    Q.   Why would you disagree with an appraiser on

6    how the appraiser valued the home versus how you

7    would value the home?

8    A.   I've had appraisals that come from areas

9    that are green or unfamiliar with the neighborhood

10   and they will use comps from homes that aren't like

11   the subject property.  So you challenge it and you

12   say, well, if there were comps within the

13   neighborhood why would you go there?

14   Q.   Can you give me an example about how that

15   would happen, say, for example, in The Oaks, how

16   could an appraiser mess up in trying to value a home

17   in The Oaks if they use comps from The Oaks?

18   A.   That's just it.  They should use comps from

19   The Oaks.  The only reason it would be an issue is

20   if they didn't pull like homes, or they went

21   outside.  And I have had appraisers -- and I don't

22   know why -- will pull comps when there are -- I have

23   had comp appraisers who go across the street to

24   another neighborhood.  You know, I don't know why.

25   There is no rhyme or reason, you have to challenge

 1    it, it's frustrating but most of the time, lately,

 2    it hasn't been that much of an issue with appraisers

 3    but there are times, there are good ones and bad

 4    ones.

 5        Q.   So even within The Oaks, if an appraiser was

 6    trying to value a home in The Oaks and used homes in

 7    The Oaks to determine that value, there could be a

 8    screw-up because the appraiser is not using the

 9    right homes in The Oaks to determine the value?

10        A.   Yeah.   There are homes that are on zero lots

11    in The Oaks, there are two streets of homes that are

12    zero lots.   Those have different values than the

13    homes in the estate collection.

14        Q.   What are some other differences between the

15    homes in The Oaks that would cause an appraiser to

16    mess up in trying to determine a value of a home in

17    The Oaks?

18        A.   There are some homes that are being

19    constructed now versus ones that were built in 2000,

20    1999, 2000.   The location, putting equal value for a

21    home that's near 441 versus on a lake.

22        Q.   What's 441?

23        A.   It's State Road 7.   It's a busy road.

24        Q.   So the homes that are closer to 441 have

25    lesser value --

```
 1      A.    Of course.

 2      Q.    -- than the homes near the lake?

 3      A.    Of course.

 4      Q.    Okay.  Are there any other differences

 5   within The Oaks that would create a difference in

 6   value among the homes in The Oaks?

 7      A.    Yeah, the different builders over the years

 8   have used somewhat different quality.

 9      Q.    So it depends on who the builder is?

10      A.    Who the builder is, which part of The Oaks

11   you are in, whether it's a zero lot, nonzero lot.

12      Q.    How many different builders built homes in

13   The Oaks?

14      A.    First there -- there has probably been close

15   to nine different builders --

16      Q.    How many homes are built in The Oaks?  I'm

17   sorry.

18      A.    Around 400.

19      Q.    400.

20      A.    But for example, my neighborhood of 400

21   homes are all built by the same builder.  So it is

22   much easier -- it is much more.

23            THE COURT REPORTER:  I can't understand him

24      either.

25      Q.    Do you mind speaking up?
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 424 of 580
Case 1:11-cv-22408-MGC Document 29-4 Entered on FLSD Docket 08/15/2011 Page 272 of 324
Confidential - Subject to Further Confidentiality Review

```
 1      A.   Sure.  Sure.  I'll try.  I'm sorry.

 2      Q.   That's okay.  So would you want, in trying

 3   to determine the comps for a particular home within

 4   The Oaks, would you want to pick homes that are on

 5   the same street?

 6      A.   If you could, sure, that would help.

 7      Q.   And if you didn't pick homes on the same

 8   street, would that necessarily mean that it's not a

 9   good comp?

10      A.   Depends.  I know the streets, I know who

11   built what, I know the neighborhood inside out, so I

12   know that on some streets there is -- for example

13   there is a street now, I'm going to a listing

14   appointment tomorrow, there were three empty lots.

15   Some individual investor bought them and one guy is

16   doing three little homes, no reputation, no nothing,

17   it's pretty random.  Every other builder has been a

18   reputable well-known builder.

19      Q.   Did you say there had been nine builders in

20   --

21      A.   Approximately nine, 10, yeah.

22      Q.   And was there only one that had built homes

23   that had Chinese drywall in them?

24      A.   That I'm aware of, yeah.

25      Q.   And how many homes -- who was --
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 425 of 580
Case 1:11-cv-22408-MGC Document 290-1 Entered on FLSD Docket 08/15/2013 Page 373 of
324
Confidential - Subject to Further Confidentiality Review

```
 1      A.    Albanese.

 2      Q.    How do you spell Albanese?

 3      A.    A-l-b-a-n-e-s-e.

 4      Q.    Okay.  And how many homes did Albanese build

 5   in The Oaks?

 6      A.    I don't know, definitely over 100, I don't

 7   know the exact number but at the time when they were

 8   selling, it was Kenco, Albanese, those were your two

 9   choices for builders and they were considered pretty

10   much at par, and Kenco had no Chinese drywall,

11   Albanese did.

12      Q.    Would you please turn to page 1336 of the

13   deposition -- excuse me, the trial transcript where

14   Ms. Yoder testified as an expert witness for the

15   plaintiffs.  Are you there?

16      A.    Um-hmm.

17      Q.    Okay.  Will you please read line three

18   through 13?

19      A.    Um-hmm.  Done.

20      Q.    All right.  Would you agree with Ms. Yoder

21   that an appraiser determines if there is no change

22   in value to the house because it was remediated to

23   remove Chinese drywall, that a bank would rely on an

24   appraiser's determination?

25      A.    That's what banks rely on, appraisers.
```

```
 1        Q.   Okay.  I'm just going to have probably a few
 2   more questions if you give us a few minutes --
 3        A.   Sure.
 4        Q.   -- to organize, then we'll be more
 5   efficient.  If that's okay to go off the record?
 6        A.   Okay.  Yeah.
 7        Q.   Thanks.
 8             THE VIDEOGRAPHER:  Off the record at 4:23.
 9             (Recess from 4:23?p.m. until 4:37?p.m.)
10             THE VIDEOGRAPHER:  We are back on the record
11   at 4:37.
12             (Greenblatt Exhibit 15 was marked for
13   identification.)
14   BY MR. CAMPBELL:
15        Q.   Mr. Greenblatt, I'm handing you what's been
16   marked as Deposition Exhibit 15.  Take a look at
17   that.  Is that -- are those the notes that you
18   brought with you to this deposition?
19        A.   Um-hmm.
20        Q.   Do you have any other notes?
21        A.   No.
22        Q.   Will you walk me through what's on the
23   notepad that I just handed to you, or the sheet of
24   notepad paper, and what it means, starting with, at
25   the very top, "Tab 7 skim report," what are you
```

1    referring to?

2        A.    That was the instructions that Natalie gave

3    me when she gave me the binder.

4        Q.    Okay.  That was on February 15th?

5        A.    Um-hmm.

6        Q.    Okay.  Below it there is a 10 that's in

7    parenthesis, a comma, and an 11 that's in

8    parenthesis.  Do you see that?

9        A.    Um-hmm.

10       Q.    Are those referring to tabs?

11       A.    Um-hmm.

12       Q.    That Natalie asked you to skim?

13       A.    Correct.

14       Q.    That are in the binder that she gave you on

15   the 15th?

16       A.    Hm-hmm.

17       Q.    And that's Attachment A to the expert report

18   that you signed?

19       A.    Correct.

20       Q.    Okay.  And below that your notes say -- will

21   you read it?  I can't read the handwriting.

22       A.    "10 is depo of other Realtor Yoder."

23       Q.    That's referring to what Tab 10 is in

24   Attachment A to --

25       A.    That we've just been going through.

```
 1        Q.   -- in the expert report that you just

 2   signed?

 3        A.   (Nodding head.)

 4        Q.   And below that will you read what it says?

 5        A.   "635,000."

 6        Q.   Above that?

 7        A.   "E-mail:  Offer on Rosens e-mail to

 8   Natalie."

 9        Q.   What is that referring to?

10        A.   To e-mail her the paperwork for the Rosen

11   file.

12        Q.   Okay.  What specifically were you e-mailing

13   to Natalie about the Rosen file?

14        A.   I don't know, whatever I had, if I had -- I

15   don't -- offer on Rosens' -- oh, this is a different

16   Rosen, actually.  This is -- this is Exhibit -- the

17   newest exhibit of the contract, so I have another

18   client with the last name Rosen in The Oaks and I

19   have an active listing and I gave this to Natalie

20   and I said, this house, when they made an offer,

21   even though it was a Kenco home, they submitted a

22   defective drywall disclosure.

23             The owner's name is Rosen, no relation to

24   Kevin and Stacy.

25        Q.   That has not been marked as an exhibit, so
```

```
 1    let me mark it.  I'm going to mark it as Exhibit --

 2         A.   Is it not marked --

 3              (Discussion off the record.)

 4         A.   Right.  I'm telling you it's redacted.  The

 5    owner's name is Rosen but they are not related.

 6              (Greenblatt Exhibit 17 was marked for

 7    identification.)

 8    BY MR. CAMPBELL:

 9         Q.   I'm handing you what's been marked as

10    Exhibit 17.  Will you take a look at that and tell

11    me if that is what is referred to in Exhibit 15 --

12         A.   Exhibit 15, offer on the Rosens.

13         Q.   -- when it says offer on Rosens --

14         A.   Correct.

15         Q.   Let me finish with the question for the

16    record.

17              So Exhibit 17 is what is referenced in

18    Exhibit 15 as what you were supposed to e-mail to

19    Natalie?

20         A.   That is correct.

21         Q.   That is correct?  Did you e-mail that to

22    Natalie?

23         A.   I did.

24         Q.   When did you e-mail it to Natalie?

25         A.   I'd have to check my e-mail but probably
```

```
 1    close to -- I -- I actually think that this -- I

 2    don't know.  It was either the 15th or the following

 3    meeting but I actually didn't get this offer until

 4    last week so it was probably the meeting afterwards.

 5    This offer came in last week.

 6         Q.   Natalie had asked you to e-mail that or you

 7    were making a note to yourself to e-mail it to

 8    Natalie?

 9         A.   Correct.  I had brought up to her the fact

10    that I had a home listed in The Oaks and I said, by

11    the way, it just came in like the day before maybe,

12    I got an offer on a home in The Oaks and they

13    attached the defective drywall disclosure even

14    though it was a Kenco home.  So I'm just saying,

15    buyers are still scared, they want to do their due

16    diligence and test the home for Chinese drywall.  So

17    I thought that was pertinent and I reminded myself

18    to e-mail her a copy.

19         Q.   So what was the address of this home?

20         A.   I don't want to disclose it.  We're

21    negotiating on a transaction.

22         Q.   Okay.

23         A.   I don't think it really matters.

24         Q.   So this home has not been sold yet?

25         A.   It's under contract but we're going through
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 431 of 580
Case 1:11-cv-22408-MGC Document 391-1 Entered on FLSD Docket 09/15/2011 Page 379 of 324
Confidential – Subject to Further Confidentiality Review

```
 1    the inspection period hopefully this week.

 2         Q.   Now, did this home have Chinese drywall in

 3    it?

 4         A.   It was a Kenco home.

 5         Q.   That means it does not?

 6         A.   Correct.

 7         Q.   Okay.  And you're representing the seller?

 8         A.   Correct.

 9         Q.   Okay.  And so let me make sure I understand,

10    the rider that's at the very end of Exhibit 17, did

11    you include this rider?

12         A.   No, I did not, buyer's agent.

13         Q.   Who included the -- the buyer's agent --

14         A.   Correct.

15         Q.   -- included it?  Okay.  Why did the buyer's

16    agent include this rider?

17         A.   Because this home is in The Oaks and her

18    client had heard -- they were moving down from New

19    York, they had heard that The Oaks had Chinese

20    drywall and they were very scared and they

21    considered buying a home in The Bridges but their --

22    this agent supposedly told them this home was built

23    by Kenco.  I don't know what their conversations

24    were but supposedly she's telling them it never had

25    Chinese drywall, and that gave them confidence but
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/18 Page 432 of 580
Case 2:09-md-02047-EEF-MBN Document 2836-1 Filed 04/15/2013 Page 280 of 324
Confidential - Subject to Further Confidentiality Review

```
 1    they still wanted to do a test for Chinese drywall.

 2       Q.   So the parties agreed to terms in principle;

 3    is that correct?

 4       A.   Um-hmm.

 5       Q.   And is the price term of the agreement

 6    reflective of the market value of this home?

 7       A.   Um-hmm.

 8       Q.   It is?

 9       A.   Um-hmm.

10       Q.   Okay.  So even though the buyer was

11    concerned about Chinese drywall, the buyer still has

12    agreed, in principle, to purchase the home at market

13    value, fair to say?

14       A.   Correct, because they had been -- supposedly

15    they know people on the street, they are coming from

16    New Jersey, they supposedly know other people that

17    have the same house and it's given them confidence

18    that they can proceed but they still want to do an

19    inspection.

20       Q.   Okay.  So the buyer in this case would be --

21    strike that.

22            Is it your understanding that with the

23    inspection, the buyer in this case would feel

24    confident that there are no issues with respect to

25    Chinese drywall?
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.   I would assume so.

 2        Q.   So this rider then at the end of Exhibit 17,

 3   could serve to remove any fears or stigma associated

 4   with the home in The Oaks; is that fair to say?

 5        A.   I don't know -- I guess on this particular

 6   home, it should give them confidence, knowing

 7   that -- I mean I could tell them all day long it's

 8   Kenco, it's Kenco, and Kenco, but they might want to

 9   see it for themselves.  My guess is that's what they

10   want.  They don't want to hear it from their

11   realtor.  They want an inspector to go in and say

12   this home has never had Chinese drywall.

13        Q.   So for this buyer and perhaps other buyers,

14   this rider can end up being something that makes

15   them confident that the home does not have the

16   stigma attached to it with respect to Chinese

17   drywall, correct?

18        A.   If it never had Chinese drywall?  If it

19   never had it, I think it would give confidence

20   beyond knowing, from being in the world of

21   neighborhoods that had it and knowing which homes

22   had it and didn't have it, you don't want to hear it

23   from your realtor, so yeah.  If I tell you, don't

24   worry, this is a Kenco home and you are referred to

25   me by Joe, you want to do your own due diligence, so
```

1    it will give you confidence that home never had

2    Chinese drywall.

3        Q.   Right.  It could also give you confidence

4    that a remediated home has no Chinese drywall issues

5    since it's been remediated, correct?

6        A.   I don't know if it would alleviate all my

7    issues but it would give them confidence if they had

8    documentation like you had mentioned before

9    having -- if that's the buyer who says, I'm okay

10   with it, but I don't think this disclosure is going

11   to help with it.  This particular case, this helps

12   us determine there was never Chinese drywall and

13   that's what this buyer wants.  This buyer would not

14   purchase a home that had been remediated.

15       Q.   Is the rider attached to the -- on the last

16   page of Exhibit 17, is this the same rider that is

17   attached as Exhibit 2 to the expert report that was

18   drafted by Patrick and Natalie, that you signed?

19       A.   I believe it's the same addendum.  I'll

20   review it and be certain.

21       Q.   Just for the record, when you say addendum,

22   are you referring to the comprehensive rider that --

23       A.   Correct.

24       Q.   -- is the last page of Exhibit 17?

25       A.   Correct.

```
 1       Q.   Thank you.

 2       A.   Yeah.  So this one is the CRSP.  Where is

 3    the FAR/BAR one?  Here it is.  Yeah.  This looks --

 4            MR. MONTOYA:  Give him the exhibit number.

 5       A.   Yeah, Exhibit 5.  This is identical.  This

 6    is identical to Exhibit 5.

 7       Q.   Okay.  And Exhibit 5, deposition Exhibit 5

 8    and that is?

 9       A.   The --

10       Q.   Exhibit 2 to the -- to your expert report,

11    correct?

12       A.   It's the FAR/BAR defective drywall addendum.

13       Q.   Okay.  Is the house currently -- well, how

14    would you describe the state this house is in right

15    now?  Is it under contract you said?

16       A.   Correct.

17       Q.   Is this house currently under contract for a

18    price that is at a premium of what its market value

19    is?

20       A.   No.

21       Q.   But it is under contract for a price that is

22    its market value?

23       A.   Correct.

24       Q.   So you would say there is no stigma attached

25    to this house, correct?
```

```
 1      A.   To me, I would say there is no stigma, but I
 2   have had people who say Lake Azure had homes with
 3   Chinese drywall and there are some people that will
 4   not buy on that street.
 5      Q.   That goes back to what we discussed
 6   earlier --
 7      A.   Some buyers -- I can't say --
 8      Q.   -- some people see stigma, other people
 9   don't see stigma, it depends on who the buyer is,
10   correct?
11      A.   Correct, correct.
12      Q.   Okay.  Will you disclose the sales price
13   that is currently been agreed to for the house that
14   is at issue in Exhibit 17?
15      A.   When we close, I will disclose it, if we
16   close.
17      Q.   Would this home be a valid comp for the
18   Rosen home in The Oaks?
19      A.   No.
20      Q.   Why not?
21      A.   It never had Chinese drywall and it's also
22   on Lake Azure which has zero lots, this is the zero
23   lot section.
24      Q.   Any other reasons why it would not be a
25   valid comp for the Rosen home?
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 437 of 580
Case 2:09-cv-02048-EEF-MBN Document 380-1 Entered on FLSD Docket 09/15/2011 Page 285 of
324
Confidential - Subject to Further Confidentiality Review

```
 1      A.    Those are the two reasons.

 2      Q.    Any others than those two?

 3      A.    No.

 4      Q.    Okay.  Is the only way to have an accurate

 5   comp for the Rosen home to have a home that had

 6   Chinese drywall but has now been remediated?

 7      A.    I think so, yeah.  That's apples to apples.

 8      Q.    And would those remediated homes have to be

 9   in The Oaks in order to be a valid comp for the

10   Rosen home?

11      A.    To be as precise as possible, yes.

12      Q.    Would they have to be on a certain street in

13   The Oaks in order to be a valid comparison for the

14   Rosen home?

15      A.    They would have to be the same collection,

16   same caliber of home.  There is basically three

17   different caliber of homes in there:  The zero lot;

18   and the Rosens', we can call it that; and then there

19   is the Grand Estates.  So the majority of the

20   neighborhood is like the Rosens', so it would be

21   doable.

22      Q.    I'm handing you what's -- let's go back to

23   Exhibit 15, which are your notes.

24      A.    Um-hmm.

25            MR. CAMPBELL:  Thank you.
```

```
 1      Q.   The number on the page there, the amounts,
 2   635,000, what is that referring to?
 3      A.   I don't know.
 4      Q.   Did you write that?
 5      A.   I did.
 6      Q.   Okay.
 7      A.   I don't know.  I think -- think during our
 8   meeting I was looking, we took a break and I think
 9   somebody sent me an offer and I was on a phone call
10   with somebody and they presented an offer and I
11   think I was writing it down to remind myself.  I
12   don't think it had anything to do with this.
13      Q.   Were these notes all taken on the same day?
14      A.   The ink was.  The pencil was last night when
15   I was just trying to look at numbers in case you
16   asked me about my numbers.
17      Q.   Well, let's look at the pencil at the
18   bottom.
19      A.   Okay.
20      Q.   What is "48 transactions in 2018" referring
21   to?
22      A.   That's how many transactions I participated
23   in in 2018.
24      Q.   In The Oaks?
25      A.   No.  That was my career in 2018.
```

```
1      Q.   And when you say 48 transactions, are you

2   referring to 48 homes that sold?

3      A.   Bought, sold, maybe a couple of rentals.

4      Q.   Okay.  Closed, as they say in the business?

5      A.   Correct.  Compensated, closed.

6      Q.   Below that you say, "gross commish 775K"

7   what is that referring to?

8      A.   I wasn't expecting to share my personal

9   information with you but that was what my gross

10  commission was last year.

11     Q.   And then below that you say "almost 30 mil?"

12     A.   That's how much --

13     Q.   Total sales?

14     A.   Yeah.

15     Q.   In 25 to 30 mil a year?

16     A.   That's what I'm averaging right now.

17     Q.   For how --

18     A.   A few years.

19     Q.   Few years, last few years?

20     A.   Yeah.  Again, I did not think that my

21  personal notes were -- but I have nothing to hide,

22  I'm not embarrassed of it, it's just personal, but

23  now it's not.

24     Q.   Let's look at --

25          MR. MONTOYA:  Confidentiality in this case,
```

1      so it's not going out.

2      A.   Okay.

3      Q.   I won't share.

4           (Greenblatt Exhibit 16 was marked for

5      identification.)

6      BY MR. CAMPBELL:

7      Q.   I'm handing you what's been marked as

8      Exhibit 16.  These were actually brought to the

9      deposition today --

10     A.   Um-hmm.

11     Q.   -- by Patrick.

12     A.   Um-hmm.

13     Q.   Did you -- do you recognize the --

14     A.   Yeah.

15     Q.   What is -- what are those documents that we

16     have marked as Exhibit 16?

17     A.   This is the e-mail correspondence between

18     myself and Patrick and, I think, Natalie.  There

19     might have been someone else in your office.  Sandra

20     or something.

21     Q.   Do you know if that's all of the e-mail

22     correspondence that you had with Patrick or someone

23     at Patrick's office?

24     A.   Seems pretty accurate.

25          MR. MONTOYA:  Actually, I can tell you and I

```
 1        will tell you, I'd like to do a second comb

 2        through, frankly, because I don't know if that

 3        includes everything that Natalie may have

 4        separate that I don't have on my account, so I am

 5        telling you that now.  I'm happy to supplement it

 6        and we can deal with that down the line.

 7   BY MR. CAMPBELL:

 8        Q.   Did you -- obviously, you e-mailed with

 9   Patrick and people who work at Patrick's office?

10        A.   Um-hmm.  Um-hmm.

11        Q.   Did you always e-mail from the same e-mail

12   account?

13        A.   Correct.

14        Q.   That was from your work account?

15        A.   Only my work account.

16        Q.   You never e-mailed from your AOL account?

17        A.   No.

18        Q.   Did you ever send a text to Patrick or

19   anybody that works at Patrick's office?

20        A.   I don't think so.  I don't think I have

21   their cell phone numbers, no.

22        Q.   Did Patrick ask you to go through your

23   e-mails, your work e-mail account and try to find

24   all the e-mail correspondence you've had with

25   Patrick or someone who worked at Patrick's offices?
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 442 of 580
Case 1:11-cv-22408-MGC Document 290-1 Entered on FLSD Docket 09/15/2017 Page 290 of
324
Confidential - Subject to Further Confidentiality Review

```
 1      A.   He did not.

 2      Q.   You understand that your deposition notice

 3   contained a document request, do you understand

 4   that?

 5      A.   Yes.

 6      Q.   Okay.  And let's get -- this is deposition

 7   Exhibit 1.  Can you pull that up from your stack?

 8           So just for the record, you have not seen

 9   this document request that starts on page 6 of the

10   corrected notice of videotaped deposition of Ryan

11   Greenblatt, which is marked as deposition Exhibit

12   Number 1?

13      A.   I -- it probably was in the folder.  I don't

14   know.  It might have been in the binder, they might

15   have e-mailed it to me.

16      Q.   All right.  Will you please read Document

17   Request Number 1?

18      A.   "All reports, affidavits and exhibits you

19   submitted in connection with any matters related to

20   Chinese or defective drywall, in which you have

21   served as an expert witness."

22      Q.   And is there anything other than the expert

23   report that you signed in this case, and the July

24   2013 letter, which is included in Attachment A to

25   the expert report that you signed in this case, that
```

```
 1   would be responsive to Document Request Number 1

 2   that you can think of?

 3       A.   I thought I did some thing -- I gave Kevin

 4   the letter, what year was that?  I don't know what

 5   year I gave Kevin the letter, I feel like there

 6   was --

 7            MR. MONTOYA:  2013.

 8       A.   2013?  Okay.  That should be it then if

 9   that's --

10       Q.   Will you review your records to make sure

11   that you have produced everything that's responsive

12   to Document Request Number 1 in Exhibit Number 1 of

13   the deposition?

14       A.   Right now?

15       Q.   After the deposition, unless you can do it

16   quickly.

17       A.   No.

18       Q.   Will you read Document Request Number 2?

19       A.   "Your entire file pertaining to the

20   properties of the Florida Amorin plaintiffs."

21       Q.   Are there any documents that would be

22   responsive to this document request that you have

23   not produced or otherwise provided as an attachment

24   to the expert report that you signed in this case?

25       A.   I have not withheld anything.  I have
```

Confidential - Subject to Further Confidentiality Review
324

1    nothing I'm holding.  Best of my knowledge, no.

2        Q.    All right.  What about will you read

3    Document Request Number 3?

4        A.    "All documents you reviewed or considered

5    while serving as an expert witness in any matters

6    relating to Chinese or defective drywall."

7        Q.    Do you have anything responsive to that

8    document request?

9        A.    No.  No.  I've provided everything from

10   those transactions.  I can't provide to you all the

11   homes that I've ever shown.  I've explained to you

12   that I've shown homes but I don't have papers of the

13   listings that I showed 10 years ago or seven years

14   ago, of homes to clients that may or may not have

15   bought homes.

16       Q.    Were there any documents, that are not

17   attached to the expert report that you signed, that

18   you think are material or relevant to the opinions

19   that you've agreed to in this case?

20       A.    When I pulled up the sellers disclosures, I

21   do have the documents from the sellers of the two

22   homes that were -- I have the documents from them,

23   from the remediation and the certifications.  I

24   don't know if that's prudent or not.  That's what I

25   would give the buyers.  That's what the sellers gave

1    to me, so if you would like that, I can supply that.

2       Q.   Yeah, please produce those.  I'd like to see

3    them.

4       A.   Okay.

5       Q.   All right.  Would you read Document Request

6    Number 4?

7       A.   "All written correspondence with any buyer,

8    seller, potential buyer, or potential seller of a

9    property that contains or used to contain Chinese or

10   defective drywall."

11          Man, if I had an e-mail five years ago from

12   a client who wanted to make an offer on a home and I

13   recommended against it, I don't know how I would

14   ever find a specific e-mail.  I would have to do a

15   search with the words Chinese drywall.

16      Q.   Could you do -- I mean, that would probably

17   not take too much time to just run a search across

18   your work e-mail account to see if you have any

19   e-mails that contain the words "Chinese drywall" or

20   "CDW."

21          MR. MONTOYA:  Don't write on that.

22          MR. CAMPBELL:  Okay.  Can I write on my

23      notes again?

24          MR. MONTOYA:  Want to grab a piece of paper?

25          THE WITNESS:  Any e-mails?

```
 1    BY MR. CAMPBELL:

 2        Q.    In your work e-mail account.  This would

 3    include in the inbox or the sent folder, whatever

 4    you have access to.

 5        A.    Clients?

 6        Q.    Or to counsel or --

 7        A.    Counsel, you have every e-mail.  They'll

 8    produce that.

 9        Q.    If it contains the words Chinese or

10    defective drywall or Chinese drywall?

11        A.    Chinese or -- okay.

12        Q.    Will you run that search and whatever

13    responsive documents there are send them to --

14        A.    I'll e-mail that to Natalie --

15        Q.    Patrick.

16        A.    Um-hmm.

17        Q.    All right.  Will you please read number --

18    Document Request Number 5?

19        A.    "All notes related to any conversation you

20    have had with any buyer, seller, potential buyer or

21    potential seller of a property that contains or used

22    to contain Chinese or defective drywall."

23        Q.    Do you have any notes?

24        A.    I don't write any notes.

25        Q.    Number 6, will you please read that?
```

```
 1      A.    "Copies of all studies, surveys or other

 2   analyses that you have performed regarding the value

 3   of properties that contain or used to contain

 4   Chinese drywall."

 5          I don't -- I don't have any of that.  I

 6   haven't made any studies or analyses, other than

 7   what I've supplied to you based on the comps that

 8   were requested for those homes.

 9      Q.    Okay.  Well, I think this would include any

10   comps that you pulled that were not already attached

11   to your expert report, so would there be any of

12   those?

13      A.    You could -- at what point do you want me to

14   stop?  Do you want me to do 100 comps?

15      Q.    At least for the properties -- the three

16   properties --

17      A.    The three properties.  So the two homes that

18   I didn't give you the CMA, do you want those too?

19      Q.    If you had previously pulled them.

20      A.    When I took the listing I did.

21      Q.    Do you know which homes you previously

22   pulled?

23      A.    No.

24      Q.    If you don't know --

25      A.    I don't.
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 448 of 580
Case 1:11-cv-22408-MGC Document 230-1 Entered on FLSD Docket 09/15/2011 Page 296 of
324

Confidential - Subject to further Confidentiality Review

```
 1      Q.   Okay.

 2      A.   So do you want me to create one now or no?

 3      Q.   Not unless you know -- if you don't know

 4   what you pulled before, then it wouldn't --

 5      A.   I used, like, comps in the neighborhood.

 6      Q.   Well, then no.

 7      A.   Okay.

 8      Q.   All right.  Number 7?

 9      A.   "Copies of all listings, disclosures and

10   purchase and sale agreements for all properties that

11   you have sold, that contain or used to contain

12   Chinese or defective drywall."

13           So does that mean you want my listing

14   agreements because that's personal for the clients,

15   isn't it?

16      Q.   There is a confidentiality agreement in its

17   response but I don't think it's privileged.

18      A.   Do you want the listing agreement?  I have

19   it for the two, not for the Rosens, but for the two

20   that I have AppFiles for, I have the listing

21   agreements, all the listing package and I can send

22   you everything from that AppFile.

23      Q.   If you are comfortable with that.

24      A.   I mean, as long as it's confidential, that's

25   okay.
```

1    Q.    And that would be for the homes that you --

2    the three homes that you reference in your -- in the

3    expert report but also any others that had Chinese

4    drywall or had been remediated for Chinese drywall

5    that you're aware of?

6    A.    But I haven't taken listings, any other

7    listings.

8    Q.    For Chinese drywall homes?

9    A.    No.  Those are the only -- the only

10   paperwork that I will have are the two remediated

11   homes.

12   Q.    Okay.

13   A.    I will have listing paperwork.  That's what

14   you want, correct?

15   Q.    Whatever paperwork there is that would be

16   responsive for this request, which would be

17   listings, disclosures, purchases and sale

18   agreements.

19   A.    Or Grajales and what was her name?

20   Q.    NuCompass?

21   A.    NuCompass.

22   Q.    It is listed in the --

23         MR. MONTOYA:  Novello.

24   A.    Novello.  All right.  That's easy.  I can

25   e-mail you everything from those AppFiles.

```
 1      Q.   Will you please read Document Request Number

 2   8?

 3      A.   "All disclosures, listing agreements,

 4   marketing materials, contracts for purchase and

 5   sales, addenda appraisals, inspection reports,

 6   surveys, permit searches and/or broker's opinion of

 7   value for all three properties."

 8      Q.   Is that --

 9      A.   Same thing.

10      Q.   -- the same thing?

11      A.   Yeah.  Whatever was in the AppFile is what I

12   got.

13      Q.   Okay.  And you'll produce --

14      A.   I'll submit every document that's in the

15   AppFile to Patrick.

16      Q.   Number 9?

17      A.   "All documents relating to identification

18   and analysis of comparable homes to the three

19   properties that referenced in your February expert

20   report including any potentially comparable homes

21   that you did not ultimately rely on in your expert

22   report."

23      Q.   You don't know what the comparable homes

24   were for the Grajales home and for the Newcastle

25   home, correct?
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 451 of 580
Case 2:09-md-02047-EEF-MBN Document 20401 Entered on FLSD Docket 09/15/2019 Page 299 of
324
Confidential - Subject to Further Confidentiality Review

```
 1      A.    I don't know what I used.

 2      Q.    Right.

 3      A.    But I know that I would do the same thing,

 4   today, that I would have done then.  Can I guarantee

 5   that I would select the exact same comps, I cannot.

 6      Q.    And you didn't review any comps in -- before

 7   you signed your expert report that was written?

 8      A.    No.  Like I said I trust that I did it right

 9   then, so -- looking at a review and trying to

10   guess --

11      Q.    I don't think you have any responsive

12   documents --

13      A.    No.

14      Q.    Documents request --

15      A.    So based on this document -- based on this,

16   you're asking me for any e-mails to any other

17   clients regarding Chinese drywall, defective

18   drywall, I'll do a search on those terms in my inbox

19   and sent, and then all listed paperwork and

20   addendums, documents, that were part of those two

21   transactions that I have paperwork for.

22      Q.    While we're on the topic, can you please

23   turn to Exhibit 6 of the expert report that you

24   signed, which is Exhibit -- deposition Exhibit 10.

25   Would you look at page 9, please.
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 452 of 580
Case 1:11-cv-22408-MGC Document 290 Entered on FLSD Docket 08/15/2013 Page 300 of 324
Confidential - Subject to Further Confidentiality Review

```
 1              MR. MONTOYA:  Here it is.

 2        Q.   Will you please turn to page 9?

 3        A.   Page 9 of the contract or the ninth page?

 4        Q.   I believe it's the ninth page of the

 5   contract.

 6        A.   Okay.

 7        Q.   Just for the record, this is deposition

 8   Exhibit 10.

 9        A.   Um-hmm.

10        Q.   Which is Exhibit 6 to the expert report that

11   you signed in this case, correct?

12        A.   Um-hmm.

13        Q.   All right.  Will you please look at

14   paragraph 20, Additional Items?

15        A.   Um-hmm.

16        Q.   Well -- strike that.

17              Will you please look at paragraph 19,

18   Addenda?

19        A.   Yeah.

20        Q.   Do you see that at the very end there, there

21   is a box that has been checked?

22        A.   Um-hmm.

23        Q.   It states:  "Other:  Addendum, Chinese

24   Drywall Screening Report, Worldwide ERC Relo Prop,

25   Ass WDO, Radon & Sprinkler Reports."
```

```
 1          Do you see that?

 2      A.   Yeah.

 3      Q.   And please look at paragraph 20, Additional

 4   Items -- Additional Terms.  It states:  "NuCompass

 5   Mobility Services Inc. Addendum to Purchase

 6   Agreement attached and made part hereof."

 7          Do you see that?

 8      A.   Um-hmm.

 9      Q.   Do you have the addendum this is --

10      A.   I believe so.  It should be in the AppFile.

11      Q.   Is there any reason why that wasn't included

12   in Exhibit 6 to the expert report that you signed?

13      A.   No.  I just grabbed a contract and clicked

14   print.

15      Q.   You will produce that?

16      A.   Absolutely.  And again, that's -- the

17   majority of that information is that was a relo, and

18   the relos have specific guidelines as to how they

19   sell the home.  There is all kinds of procedures and

20   documents.  It's quite intrusive.

21      Q.   I'm sorry.  Can you explain to me what the

22   relo is?

23      A.   So NuCompass was a -- there are relo

24   companies, and this seller, my client, was being

25   relo'd out of state and these relo companies take
```

1   some of the burden away from the seller and they --

2   sometimes they cover some of their moving costs, or

3   if they lose money on the homes, they give them some

4   money.  So there is all this extra paperwork, a lot

5   of extra work that needs to be done.

6          So, ultimately, the seller -- the owner is

7   who I dealt with, but I had to kick all these papers

8   to fill out, you know, weekly reports.  There was

9   all kinds of stuff that we had to do with NuCompass.

10  Q.   Do you know what is being referenced in --

11  on Paragraph 19, Addenda, where it says "Chinese

12  drywall screen report"?

13  A.   Yeah, I think I have -- I think they -- I'll

14  look in the AppFile.  Whatever is in the AppFile

15  I'll provide.  Again, these big relo companies they

16  do things nationally.  So whatever they do in Ohio,

17  they are going to do in Florida.  So whatever

18  disclosure they demand, if it's a sprinkler report,

19  I have to have a sprinkler report even though I've

20  never used a sprinkler report, do you follow what

21  I'm saying?

22  Q.   I think so.  So I understand -- I apologize,

23  this is probably a really dumb question -- but are

24  the relos the ones who are buying the home?

25  A.   No.

```
 1      Q.   Who is buying the home?

 2      A.   The buyer of this home was Hongyun Chen and

 3   Kevin Zheyi Sun.  NuCompass was the seller.

 4      Q.   Okay.

 5      A.   Because, again, they do a quitclaim deed to

 6   them.

 7      Q.   Right.

 8      A.   I'll send you the paperwork that I've got.

 9   It's one of the only --

10      Q.   Did you represent the seller in this

11   transaction?

12      A.   Correct.  Correct.

13      Q.   So you represented NuCompass?

14      A.   The Novellos, who then had this relo

15   company, NuCompass.

16      Q.   Okay.  So whose decision was it to accept

17   the sales price?

18      A.   The Novellos.

19      Q.   Even though they are not listed as a party

20   to the transaction?

21      A.   Correct.

22      Q.   Why would they not be listed as a party to

23   the transaction if they are the ones accepting the

24   sales --

25      A.   I'll send you the paperwork.  These
```

1    corporate relos are really a giant headache.

2    Sometimes, I know agencies used to do it and they

3    had to take -- put the power in their own name and

4    the water.  The goal is to make the transition

5    easier for the person that they are moving out of

6    state, so they try to take the burden away from

7    them, but ultimately, in my experience, the seller

8    is still the one determining how this is going to

9    play out, but NuCompass had a procedure to follow

10    and they had to sign the paperwork and blah blah

11    blah.

12        Q.   And these relo situations, does the seller

13    ever get compensated for the difference in what the

14    market value of the house is and what it sold for?

15        A.   I believe there are certain scenarios where

16    if they move, and depends who it is, who the company

17    is, how high up you are.

18        Q.   Right.

19        A.   For them, from what they told me, this was

20    more they were helping them with their moving

21    expenses.

22        Q.   Do you know, one way or the other, whether

23    the Novellos were going to be compensated for the

24    difference in what they sold the house for and what

25    the market value of the house was?

```
 1     A.   I don't believe so.

 2     Q.   But you don't know one way or the other?

 3     A.   I am not 100 percent certain but I do recall

 4   them being disappointed that we couldn't get more

 5   money, because it ultimately was less to them.  So

 6   it wasn't like they were going to be made whole by

 7   NuCompass, plus didn't care what the sale price

 8   would have been, so we held out, we didn't just dump

 9   it.

10     Q.   Do you have any correspondence with the

11   Novellos discussing --

12     A.   I could look in my e-mail.

13     Q.   Would you do that, please, and produce

14   whatever you have?

15     A.   Um-hmm.

16          MR. MONTOYA:  Here you go.

17     Q.   Just so we make sure we get everything

18   together, I'm handing you what has been marked as

19   Exhibit 16, this is e-mail correspondence between

20   you, Patrick and people in Patrick's office that

21   Patrick brought to the deposition today.  I just

22   want you to put that in the stack.

23     A.   Okay.

24     Q.   But also, take a look at the --

25     A.   Is this mine, this black binder now?
```

Confidential – Subject to Further Confidentiality Review

```
 1      Q.   No, I'll take it back.  This is just a tool

 2    to help you go faster.

 3      A.   Okay.

 4      Q.   Will you please take a look at the top

 5    e-mail, which is from Patrick to you copying

 6    Natalie, on February 15th, 2019, at 5:22 p.m.,

 7    Subject:  Chinese Drywall, Attachments:  Ryan

 8    Greenblatt Realtor R. 26 report.

 9      A.   Okay.  Okay.

10      Q.   Is that the first time that you saw the

11    report?

12      A.   Yes.

13      Q.   Okay.

14      A.   I believe so.

15      Q.   When did you -- do you know approximately

16    when after you received it that you signed it?

17      A.   I thought I signed it on the 15th.

18      Q.   Right.  So that was -- that e-mail was at

19    5:18 p.m., correct?

20      A.   5:22.

21      Q.   5:22.  Do you recall, approximately, how

22    long after you received the e-mail that you signed

23    the report?

24      A.   I don't know.

25      Q.   Do you recall how you gave Patrick a signed
```

Case 2:09-md-02047-EEF-MBN   Document 22363-34   Filed 11/19/19   Page 459 of 580
Case 1:14-cv-04884-SCJ   Document 29-1   Entered on FLSD Docket 03/15/2017   Page 307 of 324
Confidential – Subject to Further Confidentiality Review

```
 1    copy of the report?  Would you have e-mailed it to

 2    him?

 3        A.    Maybe if --

 4        Q.    But you will check your records to see?

 5        A.    Yeah.

 6        Q.    Will you also check your e-mail records to

 7    see if you have any e-mails with Kevin Rosen and the

 8    Grajales?

 9        A.    Okay.

10        Q.    And produce whatever you have to Patrick.

11    Obviously, if it's of a personal nature or --

12        A.    Yeah.  The Grajales would not, Kevin could

13    be personal things.

14        Q.    Okay.  So you don't have to produce that.

15    If there is a confidentiality order, if you don't

16    want to go through them, we're not going to expose

17    it to the world but we're not looking for times you

18    guys set up to go swimming or something.

19            (Greenblatt Exhibit 18 was marked for

20    identification.)

21    BY MR. CAMPBELL:

22        Q.    I'm handing you what I'm going to mark as

23    Exhibit 18, I think we're back on track now.

24            MR. MONTOYA:  Thank you.

25        Q.    Would this be an acceptable comp for the
```

1    Rosen home, Kevin Rosen's home, just to be clear?

2       A.   Right.  I mean if it -- did it have Chinese

3    drywall.  I don't see any disclosure here.

4       Q.   Well, setting aside whether or not it had

5    Chinese drywall is there anything else that would --

6       A.   It's the right collection.  It's the right

7    collection of home.  It's a comparable construction,

8    quality, Capri happens to be a Kenco home, so I'm

9    pretty confident this one did not have Chinese

10   drywall.  So I would not -- I wouldn't use it as a

11   comp.

12      Q.   You would not use it as a comp?

13      A.   (Nodding head.)

14      Q.   If it had been remediated for Chinese

15   drywall, would you use it as a comp?

16      A.   Yes.  I'm pretty sure the Capri was a Kenco

17   house, that model.

18      Q.   And just to be clear, the comps that you

19   used and attached to your report with respect to

20   Kevin Rosen's home, there were four comps, correct?

21      A.   Correct.

22      Q.   Did any of those comp homes --

23      A.   No.

24      Q.   -- have Chinese drywall?

25      A.   No.  We were asking -- I was asked to say

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 461 of 580
Case 2:11-cv-22408-MGC Document 290-1 Entered on FLSD Docket 08/15/2014 Page 309 of
324
Confidential — Subject to Further Confidentiality Review

1    what the home would have been worth.  What comps

2    were like for homes that didn't have Chinese drywall

3    or had never been remediated.  That was the purpose

4    of that.

5        Q.   So those would not be -- the four comps that

6    you relied on and that are attached to the expert

7    report that you signed, those would not be valid

8    comps because those homes did not previously contain

9    Chinese drywall; is that correct?

10       A.   If I was trying to find out Kevin's value I

11   couldn't use those because they didn't have Chinese

12   drywall.  If I was trying to figure out what Kevin's

13   home would have been worth had it not been Chinese

14   drywall, which is what my goal was, right, you can

15   do comps for different goals, right, I'm trying to

16   find a home that backs to a road, trying to find a

17   home that's like it, you know.  You can manipulate

18   your data specifically, so that's what I did.

19       Q.   Can you tell me what this home that is

20   Exhibit 18 sold for in 2009?

21       A.   It says here it sold for $1,250,000.

22       Q.   Okay.  What would that be price per square

23   foot?

24       A.   I have to get my calculator.

25            It's 24.86 a foot.

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 462 of 580
Case 1:11-cv-22408-MGC Document 230-1 Entered on FLSD Docket 03/15/2013 Page 310 of
324

Confidential - Subject to Further Confidentiality Review

```
 1      Q.   All right.  If you take a look at the second

 2    page of the exhibit, do you see where it says closed

 3    $1,015,000, date November 2nd, 2009?

 4      A.   Um-hmm.

 5      Q.   Okay.  So is that the -- is that the price

 6    that it sold for?

 7      A.   So the closed price, I gave you the asking

 8    price.  The million divided by -- it closed for

 9    $182.58 a foot.

10      Q.   Do you know why the home sold -- closed at a

11    price that was less than the asking price?

12      A.   I'd have to research it.

13      Q.   What would you do to research that to

14    determine why the home closed for 1,015,000 instead

15    of the asking price of 1.25 million?

16      A.   Could be a lot of things, the location, the

17    condition, who the agents were, be certain it didn't

18    have Chinese drywall.

19      Q.   So there is no way to know, just looking at

20    this document, why the home sold for less than its

21    list price?

22      A.   No.  I'd have to research it.  I don't want

23    to speculate.

24      Q.   Would you look at the disclosure forms for

25    the home?
```

1    A.   If they are there.  If they are on the MLS.

2    Q.   What would the disclosure forms tell you,

3    with respect to why the home sold for less than it

4    was listed?

5    A.   If the disclosure is on the MLS, which most

6    agents back then weren't doing, didn't have the

7    attachments in the MLS, I would look and see what

8    they disclosed about the house.

9    Q.   Would you have to look at a disclosure form

10   to have a reasonably good idea as to why a home sold

11   for the price that it sold?

12   A.   No, I could figure out other things.  I'm

13   sure if I drove around, who knows, maybe the seller

14   was desperate.  I could do some digging around and

15   come up with an answer why I think it sold for what

16   it did.

17   Q.   Do you know what the market was at this

18   time, November -- or the fall of 2009?

19   A.   2009 was --

20   Q.   In The Oaks?

21   A.   2009, it was not great.  Chinese drywall was

22   sort of becoming prevalent and people were becoming

23   aware.  In The Oaks it was there, so I think it hurt

24   everybody even when they didn't have it.

25   Q.   How do you determine what the market

```
 1    conditions are in The Oaks at any given time?

 2        A.    Inventory, average sale prices, time of

 3    market.

 4        Q.    And you know off the top of your head what

 5    the market was, at The Oaks, at any given time going

 6    back to 2009?

 7        A.    I know that when I got in the business in

 8    '01, I know what the market was like overall and I

 9    know that we went in a dip and we came back again

10    and now we're sort of flat right now.  So I'm giving

11    you a generalization, but I know that in The Oaks

12    things were a little worse because of the Chinese

13    drywall.  So every home took a hit, not even ones

14    that never had Chinese drywall.

15            (Greenblatt Exhibit 19 was marked for

16    identification.)

17    BY MR. CAMPBELL:

18        Q.    I'm going to hand you what we're going to

19    mark as Exhibit 19.

20            MR. MONTOYA:  Thank you.

21        Q.    Are you familiar with this home that's in

22    Exhibit 19?

23        A.    Can I pull it up on my phone real quick just

24    to see where it is.

25        Q.    What would you be pulling up on the phone?
```

1    The location?

2        A.    The MLS.  I think I remember this house.  I

3    need you to mount this.

4        Q.    You are pulling up the MLS.  This is a copy

5    of the MLS report, right?

6        A.    Correct.

7        Q.    Why would you -- is there a different MLS?

8        A.    You're missing some information on here.

9        Q.    What are we missing?

10       A.    I just want to see the location, if there is

11   any more detail.

12       Q.    Sure.  Please pull it up.

13       A.    This one was close to Novello's, yeah, this

14   was close to the Novello house.

15       Q.    So would the home that's identified in

16   Exhibit 19 be a proper comp for Kevin Rosen's home?

17       A.    Didn't -- I don't believe this home had

18   Chinese drywall.

19       Q.    Aside from whether or not it had Chinese

20   drywall, would it be a proper comp for Kevin Rosen's

21   home?

22       A.    It's the right street.  It's the right

23   street.

24       Q.    Is there anything else that you would want

25   to look at to determine whether or not it's a proper

```
1    comp for Kevin Rosen's home?

2        A.   It's big.  I know this house.  It's the

3    corner house on -- it's a big home.  This is a big

4    home.  I know this house.

5        Q.   Is it bigger than Kevin Rosen's home?

6        A.   Yeah, it's 6200 feet.

7        Q.   Does that mean it's not a good comp, since

8    it's bigger?  I have no idea, I am just asking.

9        A.   I would use it as a comp.  I've had

10   appraisers say once you get over a 10 percent

11   variance, they won't use it.  At 20 percent -- I

12   mean, Kevin's house is 45, 4600.  This is 6200

13   square feet.

14       Q.   You've had appraisers tell you that if a

15   home is more than 10 percent --

16       A.   I don't know the exact -- I don't know the

17   exact number but some would consider this too big.

18       Q.   Okay.

19       A.   But I would use it because to me it's alike

20   in quality, same collection, right, so I think I

21   could use it.

22       Q.   Would you make any adjustments if you used

23   that home as a comp?

24       A.   I'd have to look at it.  It's a good lot.

25   I'd have to look at the condition inside, the
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 467 of 580
Case 1:11-cv-22408-MGC Document 230-1 Entered on FLSD Docket 05/15/2012 Page 315 of
324
Confidential - Subject to further Confidentiality Review

```
 1    photos.  I haven't seen it in a while, this house.

 2         Q.   Are there any other rules that you're aware

 3    of that appraisers use in picking comps that you

 4    don't use?

 5         A.   I mean, they try and get closer on the

 6    square footage.  I don't know if it's a rule per se

 7    but I've had appraisers tell me they would focus on

 8    homes that are more similar in square footage.

 9         Q.   Are there any opinions that you plan to

10    offer in this case that are not in your report, the

11    expert report that you signed?

12         A.   Any more documents --

13         Q.   Any opinions that you plan to offer in this

14    case as an expert witness that are not stated in the

15    expert report that you signed?

16         A.   No.  I'm pretty firm in my opinion, in my

17    belief.  I continue to work the same way I'll always

18    work, ethically looking out for my client's best

19    interest.  This is my opinion, these are disclosures

20    that I didn't make, sellers disclosure, the Chinese

21    drywall defective addendum, I didn't draw them up,

22    they have to be used, so -- it's fact, you know,

23    then I have to hand this disclosure to my sellers

24    and I demand it when I present an offer with a

25    buyer.
```

1    Q.   I think you may have said earlier, correct

2    me if I'm wrong, but that you don't feel like it's

3    right for you to tell a client that they should buy

4    a home that's been remediated with Chinese drywall;

5    is that correct?

6    A.   I believe that I wouldn't sell my client a

7    house I wouldn't buy.

8    Q.   Right.  But you have represented clients who

9    have Chinese drywall in their home, correct?

10   A.   I've never sold a buyer a home in Chinese

11   drywall.

12   Q.   Never sold a buyer a home with Chinese

13   drywall?

14   A.   Ung-ugh.

15   Q.   Would you do that?

16   A.   I would do my absolute best to not.  I'm

17   pretty sure there is one client, like I mentioned to

18   you, that was closing on a new house.  I was pretty

19   vocal against it.

20   Q.   Do you plan to do any additional work on

21   your opinions in this case?

22   A.   I'm going to provide the information you

23   asked for.  That's going to take some time to, you

24   know, dive in, but I'm going to go back to selling

25   houses when this is over.

```
1        Q.   Well, because we did not have all the

2    documents that we requested and some that are

3    referenced in the report that you submitted, we're

4    going to keep the deposition open.  That being said,

5    we're not going to ask you to come back unless there

6    is something we really need to ask you about.  That

7    concludes my questions in the case, I don't know if

8    you have any questions or whether anyone else does.

9        MS. FASSBENDER:  I have no questions.

10        MR. MONTOYA:  I've got an issue.  He's got a

11    hard stop at 5:30, he's got a closing that he has

12    to do at 6:00.  I have --

13        THE WITNESS:  A listing appointment, not a

14    closing.  It would be better if it's a closing.

15        MR. MONTOYA:  I have more than eight minutes

16    of questions I'd like to go through with him.  I

17    understand you said you were holding it open and

18    I am -- I think to the extent that you have new

19    questions based on the things that will be

20    produced after this deposition, I think that's

21    fair game in my mind, for you all to go over

22    those documents, but I have some things I would

23    like to go back over with him.  I'm not sure

24    quite how to do that or how we do that

25    mechanically, but if we're going to keep it open,
```

```
 1          as you've said, I'm okay with releasing him.
 2               I can't -- I can't force him to stay here
 3          past his 5:30 cutoff.  Can we just agree to keep
 4          it open for now and then we will --  if you need
 5          -- if you think you've got more after you see the
 6          documents, then we'll talk about it.
 7               MR. CAMPBELL:  But if we don't have more,
 8          then -- so we'll just figure it out from there.
 9               MR. MONTOYA:  That's what I think.
10               MR. CAMPBELL:  The problem is if you leave,
11          then you may have to get called back, but if
12          you're okay with that, that's fine.
13               THE WITNESS:  I have to go.
14               MR. CAMPBELL:  We may not be able to do it
15          just depending on schedules and stuff like that,
16          so --
17               MR. MONTOYA:  Yeah.  Yes.
18               MR. CAMPBELL:  Okay.  We can agree to leave
19          it open and --
20               MR. MONTOYA:  I think that's -- and we've
21          got our deadlines and I'm conscious of that, so I
22          may end up doing some things through an affidavit
23          if I have to, depending on the scheduling, but I
24          would, you know, I would like to get back to
25          those questions.
```

Case 2:09-md-02047-EEF-MBN Document 22380-34 Filed 11/19/19 Page 471 of 580
Case 2:14-cv-02094-MCE-DB Document 290-1 Entered on FLSD Docket 08/15/2017 Page 9 of 324
Confidential - Subject to further confidentiality review

```
1              MR. CAMPBELL:  Well, we certainly wouldn't

2       agree to testimony by affidavit, but that's fine,

3       we can deal with that if it comes up.

4              MR. MONTOYA:  Right.

5              MR. CAMPBELL:  I just don't want you to know

6       that I'm agreeing to that.

7              MR. MONTOYA:  I understand.

8              MR. CAMPBELL:  Okay.

9              MR. MONTOYA:  For now the deposition is

10      remaining open, so we've both saved everything

11      that we can for the time being --

12             MR. CAMPBELL:  Fair enough.

13             MR. MONTOYA:  -- and we'll move on from

14      there.

15             MR. CAMPBELL:  That's okay.

16             THE VIDEOGRAPHER:  The time is 5:24 p.m.

17      The deposition has now been adjourned.

18             (Whereupon, the deposition adjourned at

19      5:24 p.m.)

20

21

22

23

24

25
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 472 of 580 of
Confidential - Subject to further Confidentiality Review
324

```
 1                  C E R T I F I C A T E

 2           I, SUSAN D. WASILEWSKI, Registered

 3    Professional Reporter, Certified Realtime Reporter

 4    and Certified Realtime Captioner, do hereby certify

 5    that, pursuant to notice, the deposition of RYAN

 6    GREENBLATT was duly taken on Monday, March 4, 2019,

 7    at 10:23 a.m. before me.

 8           The said RYAN GREENBLATT was duly sworn by

 9    me according to law to tell the truth, the whole

10    truth and nothing but the truth and thereupon did

11    testify as set forth in the above transcript of

12    testimony.  The testimony was taken down

13    stenographically by me.  I do further certify that

14    the above deposition is full, complete, and a true

15    record of all the testimony given by the said

16    witness, and that a review of the transcript was

17    requested.

18

19    _____

20    Susan D. Wasilewski, RPR, CRR, CCP

21    (The foregoing certification of this transcript does

22    not apply to any reproduction of the same by any

23    means, unless under the direct control and/or

24    supervision of the certifying reporter.)

25
```

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4           Please read your deposition over carefully

 5      and make any necessary corrections.  You should

 6      state the reason in the appropriate space on the

 7      errata sheet for any corrections that are made.

 8

 9           After doing so, please sign the errata sheet

10      and date it.  It will be attached to your

11      deposition.

12

13           It is imperative that you return the

14      original errata sheet to the deposing attorney

15      within thirty (30) days of receipt of the deposition

16      transcript by you.  If you fail to do so, the

17      deposition transcript may be deemed to be accurate

18      and may be used in court.

19

20

21

22

23

24

25
```

```
1                    - - - - - -

2                   E R R A T A

3                    - - - - - -

4    PAGE    LINE    CHANGE

5    _____   _____   _____

6       REASON: _____

7    _____   _____   _____

8       REASON: _____

9    _____   _____   _____

10      REASON: _____

11   _____   _____   _____

12      REASON: _____

13   _____   _____   _____

14      REASON: _____

15   _____   _____   _____

16      REASON: _____

17   _____   _____   _____

18      REASON: _____

19   _____   _____   _____

20      REASON: _____

21   _____   _____   _____

22      REASON: _____

23   _____   _____   _____

24      REASON: _____

25
```

```
 1                   ACKNOWLEDGMENT OF DEPONENT

 2

 3           I, _____, do hereby

 4      acknowledge that I have read the foregoing pages, 1

 5      through 322, and that the same is a correct

 6      transcription of the answers given by me to the

 7      questions therein propounded, except for the

 8      corrections or changes in form or substance, if any,

 9      noted in the attached Errata Sheet.

10

11

12      _____       _____

13      RYAN GREENBLATT                              DATE

14

15

16

17

18      Subscribed and sworn to before me this

19      _____ day of _____, 20____.

20      My Commission expires: _____

21

22      _____

        Notary Public

23

24

25
```

```
  1                          LAWYER'S NOTES

  2      PAGE     LINE

  3      _____    _____    _____

  4      _____    _____    _____

  5      _____    _____    _____

  6      _____    _____    _____

  7      _____    _____    _____

  8      _____    _____    _____

  9      _____    _____    _____

 10      _____    _____    _____

 11      _____    _____    _____

 12      _____    _____    _____

 13      _____    _____    _____

 14      _____    _____    _____

 15      _____    _____    _____

 16      _____    _____    _____

 17      _____    _____    _____

 18      _____    _____    _____

 19      _____    _____    _____

 20      _____    _____    _____

 21      _____    _____    _____

 22      _____    _____    _____

 23      _____    _____    _____

 24      _____    _____    _____

 25
```

# EXHIBIT E

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 478 of 580 of
Case 1:11-cv-22408-MGC Document 280 Entered on FLSD Docket 05/30/19 Page 2 of
104
Confidential - Subject to Further Confidentiality Review

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF FLORIDA
 2

    ----------------------------:
 3  EDUARDO AND CARMEN AMORIN,   :
    et al., individually, and on :
 4  behalf of all others         :
    similarly situated,          :
 5                               :
        Plaintiffs,              :
 6                               :
    v.                           : Case No. 1:11-CV-22408-MGC
 7                               :
    TAISHAN GYPSUM CO., LTD,     :
 8  f/k/a SHANDONG TAIHE DONGXIN :
    CO., LTD.; TAIAN TAISHAN     :
 9  PLASTERBOARD CO., LTD.,      :
    et al.,                      :
10                               :
        Defendants.              :
11  ----------------------------:

12                          - - -

13              Wednesday, April 17, 2019

14                          - - -

15
16                  ** CONFIDENTIAL **
17      SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
18                          - - -
19      Volume II of videotaped deposition of
        RYAN GREENBLATT, held at Boca Raton Conference
20  Center, 301 Northeast 51st Street, Suite 1240,
    Boca Raton, Florida 33431, commencing at 10:05 a.m.,
21  on the above date, before Joan L. Pitt, Registered
    Merit Reporter, Certified Realtime Reporter, and
22  Florida Professional Reporter
                            - - -
23
                GOLKOW LITIGATION SERVICES
24      877.370.3377 ph | 917.591.5672 fax
                    deps@golkow.com
25
```

Case 2:09-md-02047-EEF-MBN  Document 22363-34  Filed 11/19/19  Page 479 of 580
Case 1:11-cv-22408-MGC  Document 280  Entered on FLSD Docket 05/13/2019  Page 3 of
104
Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:

 2       COLSON HICKS EIDSON
         BY:  PATRICK S. MONTOYA, ESQUIRE
 3            NATALIE M. RICO, ESQUIRE
         255 Alhambra Circle, Penthouse
 4       Coral Gables, Florida 33134
         Phone:  (305) 476-7400
 5       patrick@colson.com
         natalie@colson.com
 6       Representing Plaintiffs

 7
         ABALLI MILNE KALIL
 8       BY:  JOSHUA D. POYER, ESQUIRE
              MICHEL AYUB, ESQUIRE
 9       1 Southeast 3rd Avenue, Suite 2250
         Miami, Florida 33131
10       Phone:  (305) 373-6600
         jpoyer@aballi.com
11       mayub@aballi.com
         Representing Defendant Beijing New Building
12       Materials PLC

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:

 2         ALSTON & BIRD LLP
           BY:  STEVEN R. CAMPBELL, ESQUIRE
 3         90 Park Avenue, 15th Floor
           New York, New York 10016-1387
 4         Phone:  (212) 210-9400
           steven.campbell@alston.com
 5         Representing Defendants Taishan Gypsum Co., Ltd,
           and Taian Taishan Plasterboard Co., Ltd.
 6
 7         ALSTON & BIRD LLP
           BY:  SARAH O'DONOHUE, ESQUIRE
 8         1201 West Peachtree Street
           Atlanta, Georgia 30309-3424
 9         Phone:  (404) 881-7000
           sarah.odonohue@alston.com
10         Representing Defendants Taishan Gypsum Co., Ltd,
           and Taian Taishan Plasterboard Co., Ltd.
11
12
      ALSO PRESENT:
13
           Danielle DeSantis, Videographer
14
15
16
17
18
19
20
21
22
23
24
25
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 01/10/18 Page 481 of 580
Case 1:11-cv-22408-MGC Document 280 Entered on FLSD Docket 05/30/2013 Page 5 of
104
Confidential - Subject to Further Confidentiality Review

1                           - - -

2                        I N D E X

3                           - - -

4

     Testimony of:  RYAN GREENBLATT                    Page

5

6  RECROSS-EXAMINATION BY MR. CAMPBELL                329

7  CROSS-EXAMINATION BY MS. RICO                      330

8  RECROSS-EXAMINATION BY MR. CAMPBELL                335

9  REDIRECT EXAMINATION BY MR. POYER                  414

10

11                     E X H I B I T S

12                (Attached to transcript)

13 RYAN GREENBLATT DEPOSITION EXHIBITS               PAGE

14 Exhibit 20  E-Mail chain beginning 1/4/2019        340

15 Exhibit 21  Invoices  December 2018/January 2019   351

16 Exhibit 22  E-mail chain beginning 6/19/2015       374

17 Exhibit 23  Environmental Certification of         380

18             Grajales Residence at 17894 Monte

19             Vista Drive, Boca Raton, Florida,

20             dated 7/18/2012

21 Exhibit 24  E-mail chain beginning 12/10/2018      388

22 Exhibit 25  E-mail chain beginning 10/17/2015      397

23 Exhibit 26  E-mail chain beginning 11/21/2017      411

24 Exhibit 27  Supplemental Expert Affidavit of       416

25             Chinese Drywall Economic Damages

```
1                        - - -

2            THE VIDEOGRAPHER:  We are now on the record.

3    My name is Danielle DeSantis.  I'm a videographer

4    for Golkow Litigation Services.  Today's date is

5    April 17, 2019, and the time is 10:05 a.m.

6            This continued video deposition is being held

7    in Boca Raton, Florida, in the matter of Eduardo and

8    Carmen Amorin, et al., vs. Taishan Gypsum Co., Ltd.,

9    et al., for the United States District Court for the

10   Southern District of Florida.

11           The deponent is Ryan Greenblatt.

12           Will counsel please identify themselves.

13           MR. CAMPBELL:  Steven Campbell, Alston & Bird,

14   representing Defendant Taishan Gypsum.

15           MS. O'DONOHUE:  Sarah O'Donohue, from Alston &

16   Bird, representing Defendant Taishan.

17           MR. POYER:  Joshua Poyer, of Aballi Milne

18   Kalil, on behalf of Beijing New Building Materials

19   PLC.

20           MR. AYUB:  Michel Ayub, of Aballi Milne Kalil,

21   representing Beijing New Building Materials PLC.

22           MR. MONTOYA:  Patrick Montoya and Natalie Rico

23   on behalf of the plaintiffs.

24           THE VIDEOGRAPHER:  The court reporter is

25   Joan Pitt and will now swear in the witness.
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 01/10/19 Page 483 of 580
Case 2:14-cv-02404-MCE-DB Document 280-12 Filed 05/13/2019 Page 7 of
104

Confidential - Subject to Further Confidentiality Review

```
 1              THE COURT REPORTER:  Raise your right hand,

 2      please.  Do you swear or affirm the testimony you

 3      give will be the truth, the whole truth, and nothing

 4      but the truth?

 5              THE WITNESS:  I do.

 6              THE COURT REPORTER:  Thank you.

 7              RYAN GREENBLATT, called as a witness by the

 8  BNBM Defendants, having been first duly sworn, testified

 9  as follows:

10                   RECROSS-EXAMINATION

11  BY MR. CAMPBELL:

12      Q.   Morning, Mr. Greenblatt.

13      A.   Good morning.

14      Q.   You understand that this is a continuation of

15  your deposition that was on March 4, 2019?

16      A.   I do.

17      Q.   Okay.  And you understand that you're under

18  oath and subject to civil, possibly criminal penalties,

19  if you do not tell the truth?

20      A.   I do.

21      Q.   Okay.  When we left off, plaintiffs' counsel,

22  Mr. Montoya, had some redirect that he wanted to ask.

23  I'm going to let him do that to start, and then I've got

24  questions about four or five documents that were

25  produced after the deposition on March 4.
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 01/10/18 Page 484 of 580
Case 1:11-cv-22408-MGC Document 290-5 Entered on FLSD Docket 05/13/2014 Page 3 of
104

Confidential - Subject to Further Confidentiality Review

```
1              But before we go, though, I just want to make
2       sure.  Do you have any hard stop?  I don't think it's
3       going to take very long, but I just want to make sure
4       that we're not going to run into a time issue.
5          A.   I should be okay today.
6          Q.   Thank you.
7              MR. MONTOYA:  Do you want to -- do you want to
8       finish your questioning, then I go back?  Because I
9       don't -- I may have to go back on yours.
10             MR. CAMPBELL:  It's different stuff, so why
11      don't we just do -- pick up where we left off.
12             MR. MONTOYA:  Okay.
13             MR. CAMPBELL:  And then -- because I may not
14      even ask him anything more about that --
15             MR. MONTOYA:  Right.
16             MR. CAMPBELL:  -- but I just want to know what
17      it is to -- so I don't have to jump around and do
18      another redirect.
19             MR. MONTOYA:  That's fine.  Do you want to take
20      the mike?  Because I didn't think he was going to
21      ask any questions.
22             MS. RICO:  Sure.
23                        CROSS-EXAMINATION
24      BY MS. RICO:
25         Q.   Hi, Mr. Greenblatt.  How are you?
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 01/10/18 Page 485 of 580
Case 1:11-cv-22408-MGC Document 280 Entered on FLSD Docket 05/13/2013 Page 9 of
104
Confidential – Subject to Further Confidentiality Review

```
 1      A.   Good.  Thanks.

 2      Q.   Just a couple questions for you based on your

 3   testimony from last time.  You're a licensed broker in

 4   the state of Florida?

 5           MR. CAMPBELL:  Objection to form.

 6           THE WITNESS:  Yes.

 7   BY MS. RICO:

 8      Q.   Sorry.  Are you licensed across the state of

 9   Florida?

10      A.   Yes.  It's a state license.

11      Q.   Okay.  And so that license is not limited to

12   any particular region?

13           MR. CAMPBELL:  Objection to form.

14           MR. MONTOYA:  You can answer.

15           THE WITNESS:  It's a state of Florida license.

16      I can practice anywhere in the state.

17           MS. RICO:  Okay.  Do we have his report?

18           MR. MONTOYA:  It's Exhibit 2.

19           MS. RICO:  So we do not have the exhibits that

20      were previously marked, but I'm just going to show

21      him the report.

22           MR. CAMPBELL:  Okay.

23           MS. RICO:  And we'll just state for the record

24      that it was previously marked as Exhibit 2.

25
```

```
1   BY MS. RICO:

2       Q.   Could you turn to pages 5 and 6 of your report?

3            MR. CAMPBELL:  Hold on a second.  Let me grab a

4       copy.  What pages was that?  5 and 6.  Okay, go

5       ahead.

6   BY MS. RICO:

7       Q.   Could you just take a look at your opinions on

8   pages 5 and 6 of the report, please?

9       A.   Uh-huh.

10      Q.   Now, are your opinions -- is your opinion --

11  strike that.

12           Are your opinions on pages 5 to 6 of your

13  report only limited to South Florida?

14      A.   My opinions.  Well, these are just specific

15  homes.  It doesn't really -- you know, my opinion was

16  based on specific homes.  They could be anywhere.  These

17  happen to be in The Oaks, but I --

18      Q.   Okay.  But with regard to your overall opinions

19  as stated in your report about Chinese drywall, are

20  those limited to only South Florida?

21      A.   No.  It could be anywhere in the country,

22  really.  I mean, obviously, I'm not licensed outside of

23  Florida, so I can't offer anything outside of the state

24  of Florida, but, no, it doesn't matter where.

25      Q.   Okay.  And did -- you recall your deposition,
```

```
 1    the first portion of your deposition and the questions

 2    that defense counsel asked you then?

 3         A.   I'll try.

 4         Q.   Do you have a recollection?

 5         A.   Some of it.  It was a long day.

 6         Q.   Okay.  Well, to the best of your knowledge, did

 7    any of the questions asked by defense counsel on that

 8    day change any of your opinions in this case?

 9         A.   No.

10         Q.   Was this case the very first time that you were

11    retained as an expert witness?

12         A.   That is correct.

13         Q.   Okay.  Had you ever written an expert witness

14    report before?

15         A.   I had not.

16         Q.   In preparation of your report in this case, did

17    you ask us to assist you in typing the report?

18         A.   I needed help.  I didn't know the format.  I

19    mean, I don't know how to put one together.  So I

20    provided information and we worked together to make it

21    the official format that we could submit, but it was my

22    information, and I reviewed it and...

23         Q.   Okay.  And did my office prepare that report

24    with the information that you provided us?

25              MR. CAMPBELL:  Objection to form.
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 488 of 580
Case 2:14-cv-02722-MBN Document 205-3 entered on FLSD Docket 11/20/14 Page 92 of
104
Confidential - Subject to Further Confidentiality Review

```
 1              MR. POYER:  Join.

 2              THE WITNESS:  Yes.

 3   BY MS. RICO:

 4       Q.   Okay.  Were you given the opportunity to make

 5   edits --

 6              MR. CAMPBELL:  Objection.

 7       Q.   -- to the report?

 8              MR. CAMPBELL:  Objection to form.

 9              MR. POYER:  Join.

10              THE WITNESS:  Yes, I did make edits.

11   BY MS. RICO:

12       Q.   Did you edit the report?

13              MR. CAMPBELL:  Objection to form.

14              THE WITNESS:  Yes.

15              MR. CAMPBELL:  Just a general objection to all

16         leading questions.

17              MS. RICO:  Yeah.

18              MR. POYER:  Join in that objection.

19   BY MS. RICO:

20       Q.   Did you have full editorial control of your

21   report?

22              MR. CAMPBELL:  Objection to form.

23              THE WITNESS:  Yeah.  I mean, it was my

24         information.  You didn't -- you know, we worked on

25         it together, but there was nothing that was told
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/10/19 Page 489 of 580
Case 1:09-md-02047-MCA Document 285-5 Filed 3-EEF Docket 04-13-2019 Page 93 of
104
Confidential - Subject to Further Confidentiality Review

```
1          this is what's going to be on it or anything like

2          that.  I gave you my information.  Yeah.

3    BY MS. RICO:

4          Q.   And did you reach the opinions in your report

5    within a reasonable degree of probability as a Florida

6    Realtor?

7               MR. CAMPBELL:  Objection to form.

8               THE WITNESS:  Yeah.  This isn't new.  It's been

9          going on for a long time.  I had my opinions formed

10         over many years.  It's not going to change from a

11         deposition or one of these documents.

12              MS. RICO:  No more questions.

13                       RECROSS-EXAMINATION

14   BY MR. CAMPBELL:

15         Q.   You just testified that you gave information to

16   counsel for your report.  What information did you give?

17         A.   The history of the transactions, the -- how --

18   how the transactions played out, getting offers,

19   timelines.

20         Q.   Which -- history of which transactions?

21         A.   It's those two that are on the document.  Monte

22   Vista and the Bridgebrook.

23         Q.   So the two that are on the -- so there's two in

24   Monte Vista, right, and one in Bridgeport?

25         A.   It's Bridgebrook.
```

Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Excuse me.  Bridgebrook.

 2      A.   There's 17830 Monte Vista, 17894 Monte Vista,

 3   and 9407 Bridgebrook.

 4      Q.   So there's three properties; correct?

 5      A.   Correct.

 6      Q.   And what specific information did you give?

 7      A.   I gave them the whole history of the

 8   transaction, from listing, to offers, to -- the whole

 9   timeline.

10      Q.   Did you have any documents?

11      A.   Did I have documents?  Yeah.  I had the MLS

12   info.  I had the contracts.

13      Q.   Okay.  So you gave them MLS info for all three

14   properties?

15      A.   Yes.

16      Q.   Did you provide anything other than MLS info in

17   terms of written information?

18      A.   The contracts.

19      Q.   Okay.  Other than the contracts --

20           (Telephone interruption.)

21           MR. CAMPBELL:  I apologize.  That's my phone.

22   BY MR. CAMPBELL:

23      Q.   Anything other than that?

24      A.   I don't believe so.  I mean, I think after our

25   last deposition you'd asked for correspondence, so I'd
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/10/19 Page 491 of 580
Case 2:09-md-02047-MCD Document 285 termous-1 50 docket 14-2015 Page 95 of
Confidential - Subject to further confidentiality review
104

1   sent them any correspondence that I had.  I searched all

2   my e-mails with the word "Chinese drywall."

3        Q.   Okay.  But that was in response to our document

4   request?

5        A.   Uh-huh.

6        Q.   Okay.  But just I'm trying to understand.  In

7   terms of what information was used to prepare your

8   report, it was just the MLS listings for the three homes

9   that are referenced in your report, as well as the

10  contracts for the three homes that were listed in your

11  report; right?

12       A.   Well, in here it talks about the timeline as

13  well.  I went into a little more detail about -- you

14  know, I provided a CMA --

15       Q.   Okay.

16       A.   -- and I went into specifics about the home,

17  the upgrades.  And I went into the timeline, too, about

18  how we got offers, didn't have offers, how many showings

19  I had.  So I went back and did more than just provide

20  MLS.

21       Q.   Okay.  Yeah, I'm just talking about written

22  materials.

23       A.   Oh.

24       Q.   Just in terms of written materials, you

25  provided MLS for the three properties referenced in your

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 492 of 580
Confidential – Subject to further confidentiality Review
104

```
 1    report, correct, and you provided contracts for the

 2    three homes referenced in your report; correct?

 3         A.   I believe so, yeah.

 4         Q.   And you said a CMA.  Did you also provide a

 5    written CMA?

 6         A.   Well, a CMA is a printout of information.

 7         Q.   Right.  So did you provide that printout to

 8    counsel?

 9         A.   Uh-huh.

10         Q.   Okay.  So those are the only written materials

11    you provided counsel?

12         A.   I believe so.  I mean, I provided other

13    information to them about, like I've said to you, all

14    that information.

15         Q.   I'm still talking about written first.

16         A.   Well, it would have been an e-mail or a

17    conversation.  Yeah.

18         Q.   Okay.  In terms of documents, there are no

19    other documents you provided counsel that was used to

20    prepare your report?

21         A.   I believe -- like I said, it's -- it was a

22    while ago, but I believe, yes, that is correct.

23         Q.   Okay.  And then you discussed, you gave

24    information with respect to the timeline and the

25    history; correct?
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 493 of 580
Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 493 of 580
Confidential - Subject to Further Confidentiality Review
104

 1     A.    Yeah.

 2     Q.    Okay.  You said earlier today that your

 3   opinions on page 5 and 6 were based on the three homes

 4   referenced in your report; is that correct?

 5     A.    Not just those three homes.  It's my experience

 6   selling homes with Chinese drywall, working with buyers

 7   and sellers.  Over my entire career Chinese drywall has

 8   been relevant.

 9     Q.    You've sold two homes that have been remediated

10   for Chinese drywall; correct?

11     A.    Correct, and one that hadn't been remediated.

12     Q.    Right.

13     A.    But I've shown --

14     Q.    Those are the only homes --

15     A.    Those are the closed transactions.  I've shown

16   many, many homes with Chinese drywall, unremediated and

17   remediated, throughout South Florida.

18     Q.    How many?

19     A.    Dozens.

20     Q.    Okay.

21     A.    Dozens.  From Parklands down -- up to Boynton,

22   West Palm.

23     Q.    Is there a reason you didn't reference those in

24   your report?

25     A.    I didn't sell them.

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 494 of 580 of Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 494 of 580 of
Confidential - Subject to further Confidentiality Review
104

```
 1        Q.    Okay.  But you rely on information that you

 2   have about those homes for your report?

 3        A.    My report doesn't talk about anything else.

 4        Q.    So your report only relies on the three homes

 5   that are referenced in your report?

 6        A.    Well, it talks about my expertise.  I mean, I

 7   think I talked specifically about those homes.  I have

 8   to read it all over again, but I talk about -- it says

 9   here that Chinese drywall has a stigma.  It's not just

10   those homes, but in experience in showing homes, not

11   just selling homes, that gives you experience.  It's not

12   just in a transaction.  Working with a buyer who

13   considers making offers on homes with Chinese drywall.

14        Q.    All right.  I'm going to hand you -- I'm going

15   to talk about some documents that you produced since

16   March 4.

17        A.    Uh-huh.

18              (Greenblatt Exhibit No. 20 was marked for

19   identification.)

20   BY MR. CAMPBELL:

21        Q.    I'm handing you what has been marked as

22   Exhibit 20.  Please take a look at that.  I'll give you

23   a chance to briefly review, but my first question is

24   going to be:  Is your e-mail address

25   r.greenblatt@langrealty?
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 495 of 580 of
Confidential – Subject to further Confidentiality Review
104

```
 1      A.   Uh-huh.

 2      Q.   Okay.  Start at the first e-mail in the chain.

 3   It's from Mr. Montoya to you, and the subject is "MLS

 4   Listings."  Do you see that?

 5      A.   On page 2?

 6      Q.   So the way this works is the first e-mail in

 7   the series, in the chain, is on page 6 at the end of the

 8   document.

 9      A.   Okay.

10      Q.   This is a January 4 e-mail from Patrick to you?

11      A.   Uh-huh.

12      Q.   The subject line is "MLS Listings."  Do you see

13   that?

14      A.   Yes.

15      Q.   Okay.  And that is your e-mail address;

16   correct?

17      A.   That is my e-mail.

18      Q.   Do you recall this e-mail?

19      A.   Yeah.

20      Q.   You do?

21      A.   Yeah.

22      Q.   Okay.  There's a reference in the first line,

23   first and second line, to a signed agreement.  Do you

24   see that, sir?

25      A.   Uh-huh.
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 496 of 580 of
Case 2:09-md-02047-MCD Document 2019 testimony of SKD Docket 13/2015 Page 90 of
104

Confidential - Subject to Further Confidentiality Review

```
1     Q.   Do you know what that's referring to?

2     A.   I believe that's for me being retained as an

3  expert witness.

4     Q.   Okay.  That specific agreement, did you have a

5  written retention agreement?

6     A.   At that point?

7     Q.   At any point.

8     A.   Yeah, I believe at some -- at a certain point I

9  signed an agreement with them.

10    Q.   Okay.  I don't think that's been produced to

11 us.  Do you know why that has not?

12         MR. MONTOYA:  If it's not, you should have it.

13         MR. CAMPBELL:  Okay.

14         MR. MONTOYA:  Yeah, absolutely.

15         MR. CAMPBELL:  All right.

16         MS. RICO:  If it's not, it was just an

17     oversight.  We'll check and we'll get it to you.

18         MR. CAMPBELL:  There was a signed agreement and

19     we'll get it?

20         MR. MONTOYA:  Yes.

21         MS. RICO:  It's a one-page.

22         MR. CAMPBELL:  Thank you.

23 BY MR. CAMPBELL:

24    Q.   All right.  And you see in the second sentence

25 of Mr. Montoya's January 4 e-mail to you, he states:
```

Confidential - Subject to Further Confidentiality Review

```
 1    "On the list of priority claimants not in Miami-Dade or

 2    Palm Beach Counties, are you able to pull the historical

 3    MLS listings?"

 4         Do you see that?

 5    A.   I do.

 6    Q.   What was the purpose of pulling MLS listings

 7    for priority claimants not in Miami-Dade or Palm Beach

 8    Counties?

 9    A.   They wanted to get MLS information for their

10    claimants.

11    Q.   Okay.  But that's not for your report?

12    A.   From my report?  This document?

13    Q.   Right.  Your expert report in this case, the

14    MLS material that they were asking you to pull did not

15    pertain to your expert report in this case; correct?

16    A.   No.  My expert witness report was about my

17    experiences and my transactions.

18    Q.   Okay.  Do you know why they were asking you --

19    A.   Because I'm an expert.

20    Q.   -- to pull -- I'm sorry.  Let me finish the

21    question.

22         Do you know why they were asking you to pull

23    MLS information for properties that were not part of

24    your report?

25    A.   They needed an expert to help them pull data on
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 498 of 580
Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 92 of 104
confidential – Subject to further confidentiality review

1    claimants' MLS data.

2         Q.   Okay.  Do you know if it was for another expert

3    in the case?

4         A.   I don't know.

5         Q.   Now let's look at further in the chain.  Let's

6    next look at your response e-mail.  You state on the

7    bottom of page 5, quote:  "I have MLS access to most

8    counties in South Florida.  There could be some areas on

9    the west coast where I could have -- have to call other

10   agents and possibly pay them to help pull history, but

11   I'm confident we can pull all data and history required

12   within the state of Florida."

13        Do you see that?

14        A.   I do.

15        Q.   Okay.  Which counties do you have MLS access

16   to?

17        A.   So MLS is really strange.  There are parts of

18   Palm Beach County where our MLS is different than

19   theirs.  Like, north county has a different MLS system,

20   and ours -- they don't communicate very well.  It's

21   really strange.  I have no idea why.  It's pretty bad

22   that it's structured this way, but it is what it is.

23        We used to have very poor communication with

24   Broward trying to make agreements.  I don't understand

25   the complexity of why we can't just have one state-wide,

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 499 of 580
Confidential - Subject to further Confidentiality Review
104

```
1   but that's just how it is.  So sometimes -- the beauty

2   of my office is we have offices in north county and

3   places elsewhere than just South Palm Beach, so I'm able

4   to log in to other MLS sometimes.

5       Q.   When you say your MLS, what are you referring

6   to specifically?

7       A.   The Realtor association that I'm a member of,

8   we have our own MLS, as does each -- each board has

9   their own MLS, and sometimes they're completely

10  different.

11      Q.   What is a board?

12      A.   A board?

13      Q.   Uh-huh.

14      A.   It's an association of Realtors.  We have one

15  in Palm Beach.

16      Q.   So there could be multiple MLS's for

17  multiple -- or for each county?

18      A.   Yeah.

19      Q.   If there's multiple boards, it could be

20  different MLS's?

21      A.   Yeah.

22      Q.   So you may not have access to certain MLS's?

23      A.   It's not -- you can gain access.  By paying

24  your dues, you can gain access.  It's not simple as just

25  clicking in and logging in to your MLS.  You have to
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 500 of 580
Case 1:09-md-02047-MCR-GRJ Document 2035 transcript text of docket entry 13 Page 1 of
104
Confidential - Subject to Further Confidentiality Review

1   go -- it's complex.  The easiest way is to have

2   relationships.  That was the easiest way for me to

3   access it.  But I believe if I went to my Realtor's

4   office in Palm Beach they have codes for agents to

5   access other MLS data.

6       Q.   What if you tried to get access to an MLS

7   database somewhere where you do not have an office?

8   Would that be possible?

9       A.   I believe if I went -- I'm not 100 percent.  I

10  would have to go to my board and find out.  I believe,

11  if we wanted to, we could go to our Palm -- our office.

12  There's an office on Military in Boca, very close to

13  here.  I believe they have access codes for each MLS.

14      Q.   Is it possible that a particular home could be

15  listed on different MLS's?

16      A.   I -- I see MLS listings in our MLS done by

17  agents who aren't part of our board, and it has -- the

18  first prefix would be an AX as opposed to an RX.  Ours

19  are always RX.  So you'll sometimes see things come with

20  an AX.  That's usually a Miami agent.  FX is a Broward

21  agent.

22          So we can go onto theirs.  I believe it would

23  pull up in their system as well.  But, again, it changes

24  constantly.  It's getting better, but it's still

25  pretty -- pretty historic for 2019.

```
 1      Q.   And there's no MLS database that you can go and

 2   see every MLS that every board has put together; is that

 3   fair?

 4      A.   I've never seen such a thing.

 5      Q.   Okay.

 6      A.   If it exists, I'm not aware of it.

 7      Q.   Let's go to page 4.  I think this is all the

 8   same day, but later in the e-mail chain Patrick tells

 9   you:  "We only need the MLS for non-Miami-Dade and

10   non-Palm Beach County.  Our appraiser can get those."

11      A.   Uh-huh.

12      Q.   Okay.  Does that help refresh your recollection

13   if you were pulling this MLS information to give to the

14   appraiser that's been hired by the plaintiffs in this

15   case?

16      A.   I really honestly do not know who it was for.

17   I was just doing my job.

18      Q.   Right.  And the MLS that you pulled was not

19   attached to your expert report; correct?

20      A.   I don't believe so.

21      Q.   It wasn't referenced anywhere in here?

22      A.   I don't believe so.

23      Q.   If you go to the top of -- let's see.

24           Let's go to the middle, top middle, of page 2.

25   You state that:  "A few were never on the MLS and I am
```

1    still working on partnering with a Tampa agent to be

2    able to access their MLS data"?

3        A.    Uh-huh.

4        Q.    Does that mean that the homes were never on any

5    MLS or just on the MLS that you have access to or --

6        A.    There were some homes that had never been

7    listed.

8        Q.    On any MLS?

9        A.    On any MLS.  There were some.

10       Q.    How would you know that if you don't have

11   access to all the MLS?

12       A.    When I spoke -- the ones that I could access, I

13   could see --

14       Q.    Right.

15       A.    -- and the ones where I had help from other

16   agents, they were able to tell me this home had never

17   been listed.

18       Q.    Is it possible, though, that the agents that

19   you spoke with only had access to one or two MLS's in a

20   county that had more than that?

21       A.    If there's a home that's on the -- listed for

22   sale in Boca, it will be on our -- on our MLS.  Whether

23   that agent's in Broward or Tampa or wherever, it will

24   appear on our feed.  The address will automatically get

25   pulled into our MLS data.

```
 1                So an agent in Tampa, if there's a home in

 2      Tampa, whether I listed it in Boca and it has a Tampa

 3      address, it will be in his MLS.  And the agents that I

 4      work with I'm pretty confident are experts.

 5           Q.   On the top of -- in the first e-mail on page 1,

 6      the top e-mail on page 1, you see at the bottom there

 7      the sentence that starts "keep in mind"?

 8           A.   Uh-huh.

 9           Q.   Is that what you were just explaining?

10           A.   Correct.

11           Q.   Okay.  Do you recall if you were able to pull

12      all 13 MLS's for all 13 priority plaintiff properties

13      that Patrick had asked you to pull?

14           A.   The ones that had been listed, yes.

15           Q.   Okay.  How many had not been listed?

16           A.   I don't remember.  I don't remember.

17           Q.   Okay.  And how many of those 13 properties were

18      not on the database that you or your company has access

19      to?

20           A.   I don't remember.

21           Q.   Okay.

22           A.   I don't remember.  But the ones in north county

23      I was able to access --

24           Q.   Okay.

25           A.   -- North Palm Beach because of our
```

1   relationship.  And our office is in that part of the

2   county, so I was able to log in myself.

3       Q.   Is there a reason why your company -- it's Lang

4   Realty; is that right?

5       A.   Uh-huh.

6       Q.   Is there a reason why Lang Realty doesn't have

7   access to all MLS's available in the state of Florida?

8       A.   Is there a reason?  I don't know.  I don't know

9   the answer to that.

10      Q.   Is it possibly because you don't -- you or Lang

11  Realty does not sell or represent buyers or sellers in

12  certain counties within the state of Florida?

13      A.   I don't believe it exists.

14      Q.   Well, MLS --

15      A.   I don't believe there's an MLS -- even if I

16  worked for Coldwell Banker and I was in the Boca office,

17  I would not have access to Tampa.

18      Q.   But Coldwell Banker would, the company would?

19      A.   But I'm not paying my dues to the Tampa board.

20  Therefore, I don't have access to their MLS.

21      Q.   Even though you work for the company that has

22  access?

23      A.   It doesn't matter.  I pay my dues to the board.

24  Coldwell Banker takes a piece of my commission.  It has

25  nothing to do with my relationship with the board, the

1    MLS.

2        Q.   So there -- are there certain MLS databases

3    that Lang Realty has access to that you don't because

4    you don't pay dues personally?

5        A.   It's not that Lang has it.  It's the

6    individuals that pay their dues.

7        Q.   Okay.

8        A.   It's not Lang.  It's me.

9        Q.   The individuals.

10       A.   Me, yeah.  I pay my board dues.  That gives me

11   MLS data.

12       Q.   Okay.

13       A.   It's not Lang.  Lang doesn't pay for it.  I pay

14   for it.

15       Q.   I'm going to hand -- ask the court reporter to

16   mark this as Exhibit 21.

17           (Greenblatt Exhibit No. 21 was marked for

18   identification.)

19   BY MR. CAMPBELL:

20       Q.   Now, this appears to be invoices for

21   December 2018, January 2019, and February 2019; is -- is

22   that right?

23       A.   The second page is February, uh-huh.

24       Q.   So these are the invoices that you submitted

25   for the time that you worked in December 2018,

Confidential - Subject to Further Confidentiality Review

```
 1   January 2019, and February 2019; is that correct?

 2       A.   That is correct.

 3       Q.   Okay.  So there were two, two separate

 4   invoices?

 5       A.   Uh-huh.  Well, I've -- up to that point,

 6   correct.  Yes.

 7       Q.   Right.  And on the -- the first page of

 8   Exhibit 21, that is your invoice for December and

 9   January?

10       A.   Correct.

11       Q.   Okay.  If you look at the time entry for

12   December 31, 2018 -- do you see that?

13       A.   Yes.

14       Q.   It says:  "Spoke to A. Grant.  Researched MLS-2

15   properties.  4509 Kodiak, 3865 SW Wycoff."

16            Do you see that?

17       A.   Yes, I do.

18       Q.   Who is A. Grant?

19       A.   I think it's someone at your law firm or office

20   or some attorney.

21            MR. MONTOYA:  Yeah -- I'm sorry.  I can tell

22       who it is if it helps.

23            THE WITNESS:  I don't remember.

24   BY MR. CAMPBELL:

25       Q.   You don't remember?
```

1    A.    But I spoke to that person.

2    Q.    Okay.

3    A.    They asked -- it was like a -- it was New

4    Year's Eve.  They asked for some help and I did it.

5    Q.    What was the request?

6    A.    Getting MLS data on specific -- two specific

7    addresses.

8    Q.    You think that's related to the e-mail that was

9    Exhibit 20, the MLS data that Patrick had asked you to

10   pull?

11   A.    I believe it was part of that list.  I believe

12   those two addresses were part of that list, I think.

13   Q.    Okay.  And then on January 1, 2019:

14   "Researched, sent additional history MLS reports per H.

15   Werkema."

16         Do you see that?

17   A.    Uh-huh.

18   Q.    Do you know who H. Werkema is?

19   A.    I see that initial right here.  H. Werkema.  I

20   don't remember.

21   Q.    Okay.  But do you recall whether or not this is

22   the same project that was referenced in Exhibit 20?

23   A.    This is all doing research for the properties

24   that were given to me on the list.

25   Q.    For the MLS research?

```
 1        A.   Yeah.

 2        Q.   Okay.  And the same for all of the time

 3   entries --

 4        A.   Yeah.

 5        Q.   -- on your invoice for December and January?

 6        A.   I believe so.

 7        Q.   Okay.  And that first entry, a 20-minute call

 8   with Natalie and Patrick, that pertained to the MLS

 9   project?

10        A.   I think so.  It was -- you know, I think it was

11   an introduction, speaking and discussing what they

12   wanted.  They were going to send me an e-mail.

13        Q.   Okay.  Let's turn to the second page of

14   Exhibit 21, which is your invoice for February 2019;

15   correct?

16        A.   Uh-huh.

17        Q.   All right.  The first time entry is for

18   February 4, 2019, and the description is:  "Conference

19   calls with attorneys/appraiser."

20             Do you see that?

21        A.   Yes, I do.

22        Q.   If you'll recall, during your deposition on

23   March 4 you said that you had one call that was a very

24   long call in which Patrick and Natalie were on the call,

25   and so was an appraiser, and you think it was Anthony
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/10/19 Page 509 of 580
Case 2:14-cv-02722-MCE-JDP Document 25 Filed 04/15/19 Page 31 of 104
Confidential - Subject to Further Confidentiality Review

1  Graziano.  Do you remember?

2      A.   I remember saying that in a deposition, yeah.

3  This was the call.

4      Q.   Okay.  Was it a three-and-a-half-hour call?

5      A.   It was long, yeah.

6      Q.   Okay.  And so the calls, the "s" at the --

7  after "call," that was just a typo?

8      A.   Yes.

9      Q.   Okay.

10     A.   And I may have, like, disconnected a few times

11 to take my business calls in between.

12     Q.   Oh, okay.

13     A.   So there were multiple call-ins to the

14 conference call.

15     Q.   And if I recall correctly, I think you said

16 that you were kind of half paying attention during

17 the discussion?

18     A.   Well, I was paying attention, but when my phone

19 would ring and I had to take a call, a period of time I

20 would have to take my calls.

21     Q.   Right.  Okay.  I think I asked you if you had

22 asked any questions during this call, and you said no;

23 is that correct?

24     A.   I was on mute.

25     Q.   Okay.  So you didn't ask any questions and you

1    didn't speak during the call?

2        A.   I don't remember if I said -- I don't remember.

3    I don't remember.

4        Q.   Fair to say that this call did not relate to

5    your report in this case, your expert report?

6        A.   I don't remember.  Honestly, I don't remember.

7        Q.   You just don't remember the substance of the

8    call at all?

9        A.   No, I remember the substance of the call, but I

10   don't remember if it pertained to my research.  I don't

11   remember.

12       Q.   Well, what about your expert report?

13       A.   I don't remember.

14       Q.   So you may have discussed the MLS histories

15   that you pulled?

16       A.   I don't think I did.  I don't think I did.

17       Q.   Let's look at the next time entry.

18   February 14.  "Working on schedule for pre and actual

19   deposition."

20            Is that just scheduling?

21       A.   Back and forth.

22       Q.   Yeah.

23       A.   It kept changing constantly.  Yeah.

24       Q.   Let's look at the next entry.  There's two for

25   February 15.  Let's look at the first one.  "Pre

Confidential - Subject to Further Confidentiality Review

```
 1    deposition with Natalie in Boca" --

 2         A.   Uh-huh.

 3         Q.   -- what is that referring to?

 4         A.   Natalie came to Boca, to my office.

 5         Q.   Okay.  And that pre-deposition is just a

 6    meeting?

 7         A.   Yeah.  That's where I got the binder, the giant

 8    binder.

 9         Q.   Okay.  And then the next entry for February 15

10    is "working on CV and expert witness prep documents."

11              Do you see that?

12         A.   Uh-huh.

13         Q.   Okay.  What are the expert witness prep

14    documents?

15         A.   I believe that's the -- I believe that's the

16    binder.  I believe.

17         Q.   Okay.

18         A.   I believe that's what it is.

19         Q.   And did you update your CV on February 15?

20         A.   I don't -- I guess.  If that's what I billed

21    then, yeah.

22         Q.   Okay.  Is there anything else that you recall

23    doing on February 15 that's not reflected in your

24    descriptions in your invoice here in Exhibit 21?

25         A.   I don't recall anything.
```

```
 1      Q.   Okay.  Now, on February 18:  "Review binder

 2   with Natalie:  Review Section 3/4/8."

 3           Is that the same binder?

 4      A.   Correct.

 5      Q.   And that's -- okay.

 6      A.   Uh-huh.

 7      Q.   And then on February 27, "pre deposition with

 8   Patrick and Natalie," that's just prepping for the

 9   deposition; correct?

10      A.   Yeah.  They were kind of telling me how a

11   deposition -- I'd never been deposed, so...

12      Q.   Okay.  I don't see a time entry in here that

13   we've gone through that refers to the information that

14   you provided counsel with respect to your expert report;

15   is that fair to say?

16      A.   To my expert report?  I don't think anywhere in

17   here it specifies it.  I don't see that in here.

18      Q.   So the information that you provided --

19      A.   But I think during the pre-deposition we

20   discussed it.

21      Q.   Okay.  Is that when you think you provided the

22   information?

23      A.   I don't remember the exact specific dates, but

24   it was many phone calls and e-mails to discuss the

25   information.
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 513 of 580
Case 2:09-md-02047-MCD Document 291 Filed 05/13/2019 Page 97 of
104
Confidential — Subject to Further Confidentiality Review

```
 1     Q.   Okay.  Have you submitted an invoice for March?

 2     A.   I just sent it yesterday.

 3     Q.   Do you recall how much that invoice was for?

 4     A.   I think it's -- it was -- the March invoice was

 5   mostly the deposition.

 6     Q.   Okay.

 7     A.   I haven't done anything since then.  Other than

 8   setting this up, I haven't done anything else.

 9     Q.   So we had -- I think we adjourned your

10   deposition on March 4 around, like, the 5:30ish time.

11   Did you do anything after the deposition?

12     A.   I went to work.

13     Q.   Where did you go?

14     A.   I went to my office.

15     Q.   Okay.  And did you meet with counsel?

16     A.   No, I did not.

17     Q.   Okay.  Have you done any work on this case

18   since the end of your deposition on March 4?

19     A.   I don't --

20     Q.   Other than pull -- I mean, I think you pulled

21   some documents.

22     A.   Yeah, that's it.  Yeah, I went back on the

23   e-mails that you had requested in the deposition.

24     Q.   Right.  And have you provided us -- you

25   provided counsel everything that you could find?
```

```
 1        A.    I e-mailed everything I could find with the

 2   words "Chinese drywall."

 3        Q.    I believe that you provided an AppFile for the

 4   Grajales house.

 5        A.    Uh-huh.

 6        Q.    I don't think we got one for the New Compass

 7   home.  Do you recall being able to find an AppFile for

 8   that one?

 9        A.    If -- so we started using AppFiles, I don't

10   remember exactly what year.  If I didn't provide it,

11   it's because we didn't have one, but I -- I would have

12   to see if we have one.  If I didn't provide it, my guess

13   is I don't have one.

14        Q.    And you don't have a recollection right now --

15        A.    I don't.

16        Q.    -- either way?

17        A.    I'd have to look --

18        Q.    Yeah.

19        A.    -- at my phone.  I could look right now and

20   tell you.  I could look in the AppFile program.  If I

21   have it, I have it.

22        Q.    If you would, just take a -- if it would take

23   just a minute, then why don't you do that so we can just

24   confirm one way or the other.  And we may have missed it

25   on our end.  I just want to double-check.
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 515 of 580 of
104
Confidential - Subject to further confidentiality Review

```
 1      A.   The address is the easiest way.

 2           Yeah, I have an AppFile for it.  I could have

 3   sworn I sent you guys everything.

 4      Q.   And they may have provided it to us.  I just

 5   didn't see it.  So we can figure that out.

 6           MS. RICO:  I think we did.  We'll check.

 7           THE WITNESS:  Yeah, there's definitely an

 8      AppFile for it.

 9   BY MR. CAMPBELL:

10      Q.   I just wanted to make sure.

11      A.   Yep.

12      Q.   Thank you.

13           Have you discussed your -- have you discussed

14   your March 4 deposition with anyone?

15      A.   I told my wife.

16      Q.   Other than your wife?

17      A.   No.

18      Q.   Okay.  Have you discussed the case with anyone

19   other than your wife since March 4?

20      A.   No.

21      Q.   Have you spoken to Kevin Rosen since March 4?

22      A.   I have tried.  He referred me a client.

23      Q.   Okay.  So you spoke to him about that and that

24   was it?

25      A.   It was an e-mail.  It wasn't a phone call.
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 516 of 580
Confidential - Subject to further confidentiality review
104

```
1       Q.   It was an e-mail introduction that he's -- he

2   sent the e-mail introducing you to someone that was

3   copied?

4       A.   Yeah.

5       Q.   Okay.  And have you talked to anyone else

6   related to this case in any way?

7       A.   I may have sent Kevin an e-mail.  I just told

8   him that I finished the depo.  Or a text.  I may have

9   said, like, "finished" or something along those lines,

10  and gave, like, a thank you or a thumbs up kind of

11  thing.  I said, "I did it, I've completed a deposition,"

12  something like that.

13      Q.   Okay.  So he was aware that you were --

14      A.   I told him afterward.  I said, "I had a depo.

15  I'm done."

16      Q.   Yeah.

17      A.   I thought I was done, but I'm not.

18      Q.   And we went over this already, or at least I

19  think plaintiffs' counsel went over this with you, but

20  you haven't submitted any corrections, updates, or

21  changes to your expert report; correct?

22      A.   No.

23      Q.   Okay.  And your opinions haven't changed?

24      A.   They have not.

25      Q.   All right.  And you're not planning to offer
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 517 of 580
Case 2:09-md-02047-EEF-JCW Document 20684-5 Filed 03/13/2015 Page 91 of 104
Confidential - Subject to Further Confidentiality Review

```
 1   any new or different opinions?

 2       A.   I'm not what?

 3       Q.   You're not planning to offer any new or

 4   different opinions in this case?

 5       A.   No.  No.  The only thing I could tell you,

 6   though, is I did look at my depo, and I had mentioned

 7   about a file that I was working on.  That deal actually

 8   ended up falling apart.

 9       Q.   I was going to ask you about that.

10       A.   Yeah.

11       Q.   That was the Rosen -- a different Rosen?

12       A.   Different Rosen.

13       Q.   Yeah.

14       A.   It fell apart.  The buyers were moving down

15   from New Jersey --

16       Q.   Yeah.

17       A.   -- and someone told them that there was Chinese

18   drywall in The Oaks --

19       Q.   Yeah.

20       A.   -- and even though this home didn't have

21   Chinese drywall, they got spooked and they asked for

22   documentation that the home didn't have Chinese drywall.

23       Q.   Right.

24       A.   There's no document that says, you know,

25   official no -- you know.
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 518 of 580
Case 2:09-md-02047-MBN Document 2463-4 Filed 05/13/2019 Page 52 of
104

Confidential - Subject to Further Confidentiality Review

```
1      Q.   Right.

2      A.   It was built by Kenco.  Kenco didn't use

3   Chinese drywall.  I know that from being an expert in

4   the community.  I sent them the paperwork showing them

5   that it was a floor plan from Kenco, Kenco never had

6   Chinese drywall.  I showed them the floor plan from

7   Albanese.  I said, "This is the builder that did have

8   it."

9           I sent them as much information as I could to

10  ease their concerns, but they knew that homes on the

11  street did have it and their confidence just dropped and

12  they walked away from the deal.

13     Q.   Okay.

14     A.   Their agent was not an expert and he wasn't

15  able to give them confidence, and hearing it from me,

16  the other side...

17          MR. MONTOYA:  If I can get that thing, I'm

18      going to get it.

19          MR. CAMPBELL:  Yeah, let's get it.  There it

20      is.

21          MR. MONTOYA:  (Indicating.)

22          MR. CAMPBELL:  Nice.

23          MR. MONTOYA:  Bam.

24          MR. CAMPBELL:  That was impressive.

25          THE WITNESS:  So the deal fell apart because of
```

```
 1      stigma.

 2   BY MR. CAMPBELL:

 3      Q.   Yeah, okay.

 4      A.   And it didn't have Chinese drywall.  It never

 5   did.

 6      Q.   Well, let's -- I wanted to ask you about -- I

 7   believe you said, correct me if I'm wrong, but I believe

 8   you said on March 4 that there was a test that the

 9   potential buyer for that home had asked to have a

10   Chinese drywall test to confirm that there wasn't

11   Chinese drywall in the property?

12      A.   They asked their inspector to look for the

13   telltale signs, which is opening plates.  The ACs were

14   original.  The house was built in '05, so, I mean, to

15   me, I know that that would be a telltale sign, and their

16   inspector said, "I see zero signs of it."

17      Q.   The inspector --

18      A.   For the buyer.

19      Q.   Right.  Did they hire someone that was

20   competent or an expert with Chinese drywall?

21      A.   He's done enough inspections over the years.

22   He's been doing it through the Chinese drywall timeline

23   to know what signs to look for.

24      Q.   Was it a different type of inspection than a

25   normal home inspection?
```

```
1        A.   The only thing that I see people do today is --
2    is look for the obvious signs of corroded metal by
3    opening up face plates --
4        Q.   Right.
5        A.   -- checking appliances.  You know, logical
6    timelines, you know --
7        Q.   Right.
8        A.   -- when were the -- when were things replaced.
9    If the home was built in that time frame, there are
10   certain things you can kind of consider, but to really
11   know for sure, obviously, I believe you have to cut --
12   cut some drywall.
13       Q.   Did you see a copy of that -- well, let me take
14   a step back.
15            Was there an inspection report that was issued
16   with respect to that -- that home?
17       A.   Yeah, there was an inspection report, but
18   nowhere on it did it say "clear Chinese drywall,"
19   because the inspector is not going to guarantee anything
20   like that, but he told them verbally, "I see no signs of
21   it."
22       Q.   So this was -- this is Exhibit 17 to your
23   report.
24       A.   Okay.
25       Q.   I'm going to ask-- I only have one copy.
```

```
 1     A.   Okay.

 2     Q.   But this was the --

 3     A.   This was the contract.

 4     Q.   -- the contract; is that right?

 5     A.   Yeah, it was.

 6     Q.   That's the home?

 7     A.   Uh-huh.

 8     Q.   And I flagged --

 9     A.   Yeah.

10     Q.   Can you tell me what that is that I flagged?

11     A.   That's the drywall disclosure.

12     Q.   Right.  And what it says is that they have a

13  right to conduct an inspection for drywall; correct?

14     A.   Correct.

15     Q.   Okay.  And if they find any damage or any

16  drywall issues that cost over $500, then they have a

17  right to back out of the contract?

18     A.   Correct.

19     Q.   Okay.  And they didn't find any drywall --

20     A.   Correct.

21     Q.   -- issues?

22     A.   Correct.

23     Q.   But they still backed out of the contract?

24     A.   It was an as-is contract.  They have a due

25  diligence period of 15 days during the inspection
```

```
 1    period.  That, basically, gives them an out.

 2         Q.    Okay.

 3         A.    And the -- yes, correct, they did not find it.

 4    This home did not have Chinese drywall.

 5         Q.    Right.  So they wouldn't have been able to get

 6    out of this contract --

 7         A.    On the drywall.

 8         Q.    -- on the drywall itself?

 9         A.    No.  But when I say stigma, this is exactly my

10    definition of stigma, is there's this sort of cloud,

11    this uncertainty, this discomfort.

12              These people are moving their young family down

13    from New Jersey, and even though I produced as much

14    documentation as I could that it did not have Chinese

15    drywall, it never had Chinese drywall, they decided not

16    to move into the community.

17         Q.    Do you know if they bought a house?

18         A.    I've heard they're buying new construction.

19    They weren't my clients.

20         Q.    And so I guess new construction would be

21    consistent with they just want to avoid the drywall

22    issue altogether?

23         A.    Yeah.  Correct.

24         Q.    Would you have been comfortable buying this

25    house?
```

```
 1      A.   Me, knowing what I know?

 2      Q.   Personally.

 3      A.   Knowing what I know, I would, because I'm an

 4   expert in this neighborhood and I know that this builder

 5   did not have Chinese drywall, but I understand coming

 6   from out of state and the -- they've never -- most of

 7   those people in New Jersey never heard of Chinese

 8   drywall.

 9      Q.   How do you know for sure that Kenco did not

10   ever use a single piece of defective drywall in their

11   construction?

12      A.   There wasn't a single case.

13      Q.   Just based on the fact there hasn't been

14   reports of it?

15      A.   There hasn't been a single report of it.  I was

16   also told they didn't use the material that had the

17   3/4-inch, whatever that was.  We were told that they

18   used a different thickness that didn't have Chinese

19   drywall, whereas Albanese did.

20      Q.   But you didn't -- you haven't seen the billing

21   or shipping receipts?

22      A.   I haven't seen anything.

23      Q.   You don't know for sure?

24      A.   I don't -- I would not be able to say I'm an

25   expert of construction to know that one -- with
```

```
 1    100 percent guarantee, but I do know I have yet to hear

 2    of a single home in -- of a Kenco home.  And they're

 3    literally next door to each other.  The community was

 4    built, and depending which model you liked, you would

 5    pick your builder.

 6        Q.   Right.

 7        A.   And it was just pure luck.

 8        Q.   Right.

 9        A.   If you said, "I'm taking this lot, this house,"

10    you got it, and if your neighbor built Kenco right next

11    door, they didn't.

12             But if I put you in the room with 10 people who

13    do business in The Oaks, they would tell you the same

14    thing.  There's yet to be a Kenco home with Chinese

15    drywall.

16        Q.   Is it your impression that the buyer who backed

17    out of the Rosen home that's not at issue in this

18    case --

19        A.   Correct.

20        Q.   -- but in The Oaks, would have purchased that

21    home if they could have gotten a guarantee that there

22    was no single piece of defective drywall in the house?

23        A.   I don't know.  I don't -- I think they were

24    just scared.  I think the idea of the neighborhood

25    having it scared them.  So I don't think if I --
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 525 of 580 of
Confidential — Subject to further confidentiality review
104

```
 1        Q.   So they didn't even care about if the home had
 2   it so much as they just didn't want to be near homes
 3   that --
 4        A.   They heard that that street had Chinese
 5   drywall, Lake Azure had Chinese drywall issues, and they
 6   just said, "Why?  Why risk it?"  They had two babies and
 7   they just said, "We're just going to build a new home."
 8        Q.   I'm trying to understand what their concern
 9   was.  Was the concern for the actual house they were
10   buying, that it might have Chinese drywall, or was it
11   the concern that they were going to be on a street with
12   homes that might have Chinese drywall?
13        A.   They were concerned that this home could have
14   had it because it was built in the same time frame and
15   it was built next to other homes, and just because some
16   guy in Florida says, "Oh, this builder didn't have it."
17        Q.   Right.
18        A.   -- - wasn't piece of mind for them.
19        Q.   But if someone had gone in and actually done
20   destructive testing and tested every single piece of
21   drywall in that home, they would have probably --
22        A.   Maybe.
23        Q.   -- been fine?
24        A.   Maybe.  Maybe not.  Because I don't think you
25   can cut a piece of every single drywall in a home and
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 526 of 580
Case 2:09-md-02047-MCD Document 28u-b tendered in SD Docket #1 13-2015 Page 90 of
Confidential - Subject to further Confidentiality Review
104

1    send it to a lab.  Every single piece of drywall and

2    send it to a lab, I don't know.

3        Q.   Let's just say for sake of argument, based on

4    what you understand their concern was, if you could do

5    that, if they had full confidence that there was no --

6        A.   Ever?

7        Q.   Right.

8        A.   If there was never Chinese drywall.

9        Q.   There's nothing in the home that is Chinese

10   drywall.

11       A.   Possible.

12            MR. MONTOYA:  Objection.  Improper

13       hypothetical.  You can answer.

14            THE WITNESS:  Possible, but what they did is

15       what I've always advised my clients to do.  So I

16       can't fault them.  My attitude has always been, why?

17       Why would you take a risk of any sort?  There's no

18       need.  Fortunately, there's inventory elsewhere.

19       You can build a home.  You can buy a home in a

20       neighborhood that never had Chinese drywall.  Why?

21       Why take the risk?

22            So I'm on the listing side.  I'm doing my best

23       to get the deal done.  I know in confidence this

24       home didn't have Chinese drywall, but I get where

25       they're coming from.  I totally understand their

```
 1         concern, and that -- that stigma is on a home that

 2         didn't have Chinese drywall.

 3    BY MR. CAMPBELL:

 4         Q.   Do you know if -- are you still representing

 5    the seller of that home?

 6         A.   Correct.

 7         Q.   Have there been any other offers on that home?

 8         A.   We got another offer.

 9         Q.   Was that offer more or less or the same as the

10    price that the Rosens -- or the buyer had offered that

11    fell through?

12         A.   Less.

13         Q.   Okay.  How much less?

14         A.   I don't know if I can disclose that information

15    until it closes.  We haven't even had our inspection

16    yet.

17         Q.   Have you only had one offer on it since

18    the buyer walked away?

19         A.   Correct.  They're going to do their inspection,

20    and I'm concerned that these people who are moving from

21    Maryland are going to possibly do the same thing.

22         Q.   Have these people from Maryland mentioned

23    anything about Chinese drywall?

24         A.   They have not.  They looked at the house once,

25    signed a contract.  The inspection will be next week.
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 528 of 580
Case 2:14-cv-02722-NGG Document 201-1 Filed 09/13/2015 Page 2 of 104
Confidential - Subject to Further Confidentiality Review

```
 1              MR. CAMPBELL:  Will you please mark this as 22?

 2              (Greenblatt Exhibit No. 22 was marked for

 3      identification.)

 4              MR. MONTOYA:  The other fly is behind you on

 5         the wall.  I'm waiting for it to --

 6              THE WITNESS:  Uh-huh.

 7              MR. MONTOYA:  So if I come at you.

 8   BY MR. CAMPBELL:

 9      Q.   I'm handing you what's been marked as

10   Exhibit 22.  I'll give you a second to look at it.

11              Do you recognize this e-mail?

12      A.   I do, yeah.

13      Q.   Okay.  Who is Melissa Rosen?

14      A.   Melissa Rosen is actually this Rosen.

15      Q.   Okay.  So were you representing -- oh, this

16   is --

17      A.   When they bought this home that we're now

18   selling.  This was in 2015.  That's when they actually

19   bought this home on Lake Azure.  They were looking in

20   The Oaks, which is where they bought.

21      Q.   They bought a home in The Oaks?

22      A.   They bought a home on Lake Azure that was built

23   by Kenco.

24      Q.   Okay.

25      A.   And now we're selling it.
```

```
1       Q.   All right.  Let's -- let's start with your

2  first e-mail.  This is June 19, 2015?

3       A.   Uh-huh.

4       Q.   It starts on page 2.  Do you see that?

5       A.   Uh-huh.

6       Q.   Okay.  Will you please read your e-mail to

7  Ms. Rosen?

8       A.   "Here is the link for inventory in Parkland

9  Golf for resales.  Keep in mind the concern for the

10 homes with Chinese drywall.  Anything built from 04-07

11 could have an issue.  Also some of these homes don't

12 have impact glass etc."

13      Q.   So is it your opinion, or at least then it was

14 your opinion that anything built in 2004 through 2007

15 could have an issue with Chinese drywall?

16      A.   In Parkland Golf.

17      Q.   Why just there?

18      A.   Because they had Chinese drywall in Parkland

19 Golf and that's what we were talking about.  They were

20 considering Parkland Golf.

21      Q.   All right.  Were there -- is there anywhere --

22 let me strike that, take a step back.

23           Is Parkland Golf a community?

24      A.   Yes.

25      Q.   Okay.  Is there any other community that you
```

```
 1   would have a concern about any house that was built from

 2   2004 to 2007 as possibly having Chinese drywall?

 3       A.   Yes.

 4       Q.   Where else?

 5       A.   The Oaks, The Canyons, Renaissance, Boynton.

 6   That would be the ones that jump off of my...

 7       Q.   So any of those communities is your advice

 8   still to potential buyers, if it was built in 2004

 9   through 2007, stay away?

10       A.   Skip it.  Yeah.

11       Q.   Let's turn to your e-mail on June 28 to

12   Ms. Rosen on page 1 of Exhibit 22.  Will you please read

13   your e-mail?  You can start on the second line,

14   sentence, "It is possible."

15       A.   "It is possible the home had Chinese drywall as

16   it was built during that time '05-'06.  I would never

17   buy a home that has been remediated, and to be honest,

18   even if they claim it doesn't have Chinese drywall, the

19   only 100 percent sure proof way to know that it doesn't

20   is to test every single piece of drywall in the home,

21   which is not really possible.  To rip out a piece of

22   every drywall you might as well just re-drywall the home

23   already.  Some people are comfortable buying homes like

24   this, testing a few pieces of drywall.  Personally, I

25   would not be.  With a baby on the way and moving down to
```

1    a new place, it seems like a large risk not really worth

2    taking.  That is my opinion, of course.  Some people

3    would say why not consider buying it and just test the

4    home.  I don't see the value in it.  I do not trust what

5    a Realtor or homeowner says unless they provide

6    documentation from a reputable company that the home was

7    tested."

8        Q.   Now, when you say "documentation from a

9    reputable company that the home was tested," what test

10   are you referring to?

11       A.   A Chinese drywall test.

12       Q.   So what does a Chinese drywall test entail?

13       A.   Testing the Chinese -- testing the drywall.

14   Sending it to a lab.

15       Q.   So it would be different than the inspection

16   that was conducted on the Rosen home that -- where the

17   buyer fell through?

18       A.   I mean, the most thorough way is to send pieces

19   to a lab --

20       Q.   Well --

21       A.   -- to check that off-gas.  They didn't do that.

22   They -- they did the visual test.

23       Q.   Would -- would you consider the

24   documentation -- strike that.

25            When you say "documentation from a reputable

1    company that the home was tested," would you consider

2    the inspection that was performed on the Rosen home to

3    be documentation from a reputable company that the home

4    was tested?

5         A.   It's a reputable inspector.  He did a visual

6    test.  That is usually the first step.  If they see

7    signs of any hints that, hey, this may be an issue,

8    that's usually when they then go to Step 2 to do the

9    drywall testing.  They didn't see that.

10        Q.   So as long as you had an inspection report from

11   a reputable company that did the visual test and didn't

12   show signs of any issues, then you would consider that

13   documentation from a reputable company that the home was

14   tested and did not have drywall, Chinese drywall?

15        A.   I suppose, but I still wouldn't buy it and I

16   wouldn't recommend my clients to buy it.  Some people

17   would.  Obviously transactions happen at discounts, but

18   I wouldn't do it, and like I said to you last time, I'm

19   proud that I have steered all of my clients away from

20   any risk.

21        Q.   So the only 100 percent sure proof way to know

22   that it doesn't is to test every single piece of drywall

23   in the home?

24        A.   Uh-huh.

25        Q.   Okay.  So if a home had been -- if every single

```
1    piece of drywall had been tested in the home and it came

2    back negative, would that be sufficient to alleviate

3    your concerns?

4        A.    I suppose, yeah.  If every single piece of

5    drywall, every single piece, every separated piece were

6    cut and sent to a lab --

7        Q.    Right?

8        A.    -- and the lab said there is zero Chinese

9    drywall, yeah, but I've never heard of such a thing

10   being done.  I don't think it can be done.

11       Q.    Does that apply just to homes that were built

12   in 2004 to 2007?

13       A.    That's when Chinese drywall was in Florida, to

14   my knowledge.

15       Q.    So you wouldn't recommend that test for a home

16   that was built in 2010?

17       A.    No.

18       Q.    2011?

19       A.    No.  From my knowledge, they weren't --

20       Q.    2008?

21       A.    '08 is still on the border.

22       Q.    What year would it stop for you?

23       A.    Probably '10.

24       Q.    Okay.  So anything from '10 on you don't think

25   you would have to have every single piece of drywall in
```

1  the house tested for you to be absolutely certain that

2  it doesn't contain --

3     A.   Well, I can't be absolutely certain of

4  anything.  I'm not an inspector.  I didn't build the

5  home.  But from my experience, I have yet to hear of a

6  single case of a home built after 2010 that had Chinese

7  drywall.  Is it possible something happened?  I'm not

8  aware of it.

9     Q.   Okay.  And you mentioned earlier some people

10  are comfortable buying homes where there's not an

11  inspection that results in the test of every single

12  piece of the drywall; correct?

13     A.   There's people who smoke cigarettes.  Everybody

14  has their own risk tolerance.

15     Q.   I'm handing you what's been marked as -- let me

16  ask the court reporter to mark it -- 23.

17          (Greenblatt Exhibit No. 23 was marked for

18  identification.)

19  BY MR. CAMPBELL:

20     Q.   I'm handing you what's been marked as

21  Exhibit 23.  Do you recognize this document?

22     A.   Uh-huh.  Yes, I do.

23     Q.   And what is it?

24     A.   It's the certification for the Grajales home

25  after the work -- after the remediation had been

```
 1    completed.  This was a certification.

 2         Q.   And who's -- who prepared this certification?

 3         A.   Paul Danforth, Professional Engineer.

 4         Q.   And he's with GFA International; is that

 5    correct?

 6         A.   I had nothing to do with that.  I was handed

 7    these documents from the owner when I took the listing

 8    to provide, when I listed the home, to any prospective

 9    buyer so they would have documentation.

10         Q.   Will you please read the certification?

11         A.   "I certify that I have verified the

12    contractor's certification that all drywall has been

13    removed, including all debris and visible dust, as set

14    forth in the scope of work, Exhibit D to the settlement

15    agreement for the demonstration remediation of homes

16    with KPT Drywall.  This certification is based upon an

17    independent visual inspection of all surfaces in the

18    work area and any adjacent areas (including, but not

19    limited to, floor, walls, ceiling, wall cavities,

20    trusses, joints, studs, pipes, beams, ledges, and

21    framing) that found no dust, debris, or residue.  Also

22    there was no detectible odor of Chinese drywall at the

23    completion of removal and cleaning work and prior to the

24    start of new drywall installation.  In addition, the

25    atmosphere in the house was found to be representative
```

1  of the atmosphere in houses built without 'problem'

2  drywall."

3      Q.   And would this certification alleviate any

4  concerns that you would have about a home having

5  defective drywall inside of it?

6      A.   This would certify that there is no defective

7  drywall in the home.

8      Q.   Right.  So you wouldn't have a problem with a

9  home that had this certification?

10     A.   Would I have a problem selling -- buying it?

11  Is that what you're asking me?

12     Q.   Well, I'm asking about, would you have a

13  concern that the home had defective drywall in it?

14     A.   Well, the documentation would say that it

15  doesn't have Chinese drywall in it anymore, it's been

16  remediated, but I still wouldn't buy it, and I wouldn't

17  recommend my clients to buy it.

18     Q.   Okay.  And why would you not buy or recommend

19  your clients to buy it?

20     A.   Why would I buy it, is my response to that.

21  Why?  Why would you --

22     Q.   Because you like the home?

23     A.   But I can go buy another home that never had

24  Chinese drywall.  If I lived in a neighborhood where I

25  had one choice and had no other option, perhaps I would

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 537 of 580
Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 537 of 580 of
Confidential - Subject to Further Confidentiality Review
104

```
 1   have to consider it, but where -- in South Florida,

 2   there's new construction.  There's ample inventory.

 3   Why?  There's just no reason to risk the financial

 4   implication of it and the potential health.  I have no

 5   idea, I don't think any of us do, what will happen in 20

 6   years.

 7        Q.   So even though a home --

 8        A.   Yeah.

 9        Q.   -- has been certified as not having any --

10        A.   This home still has stigma.  This house is on

11   the market.

12        Q.   Let me finish.  Sorry.

13        A.   Okay.  Uh-huh.

14        Q.   Even though a home has been certified that --

15   by an expert environmental certification stating that

16   every single piece of drywall has been removed, all the

17   dust has been removed, everything has been taken out and

18   that new drywall has been put in, you still have

19   concerns about what specifically?

20        A.   The stigma.  This buyer -- this house on Monte

21   Vista is back on the market now -- he can't sell it.

22        Q.   Is that the only -- is it just the stigma that

23   you wouldn't -- that's the only reason?

24        A.   Stigma, and having young kids, I just wouldn't

25   do it.  I wouldn't take the risk.  There's -- no matter
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 538 of 580
Case 2:09-md-02047-MCD-MBN Document 28863-34 Filed 11/18/19 Docket 13691 Page 52 of
Confidential - Subject to Further Confidentiality Review
104

1    what this document says, no matter what you put on a

2    piece of paper that everything has been taken out, being

3    in a home that had Chinese drywall, I would never, ever

4    want to buy one.

5         Q.   Even if it's been cleaned?

6         A.   Even if it's been cleaned, I would never buy

7    one, and I treat my clients the same way I would treat

8    my family.  I wouldn't want them to take on the unknown

9    of the permanent stigma and the unknown of what, if any,

10   lasting.  I don't know, and I don't think anyone can --

11        Q.   What basis do you have to have concerns about

12   health effects?

13        A.   I have none.  I have no, but -- but I -- if you

14   could send me a document that says there's 100 percent

15   guarantee that there will be no lasting health effects,

16   can you provide that?

17             But I can tell you that there's a guaranteed

18   stigma on the house.  I can tell you they're going to

19   have a hard time selling it and that will stay with the

20   home.  As long as this disclosure is there, that is

21   going to be a stigma with the home.  That stigma is not

22   going away.

23        Q.   You have children, you said?

24        A.   I do.

25        Q.   Did you vaccinate your children?

Confidential - Subject to further confidentiality review

```
 1      A.   I did.

 2      Q.   Why?

 3      A.   Because that is the sane thing to do and that's

 4  protecting my children.

 5      Q.   Yeah.  But there's some people who don't

 6  because they're afraid that it harms their children?

 7      A.   Uh-huh.  Right, just like there's some people

 8  who will buy this home because they don't -- they see

 9  value in getting a discount or they don't think there is

10  a risk.  That's their opinion.  This is my opinion.

11      Q.   But you rely on experts to tell you that --

12      A.   But there is no --

13      Q.   -- the house is clean just like you rely on

14  experts to tell you that the vaccination is healthy for

15  your child; correct?

16      A.   This doesn't say anything about health.  This

17  just says that the house has no Chinese drywall in it

18  now.  It has nothing to do with health.  There's no --

19  I've never seen a document that says anything about

20  health ever.  I've only seen that it says it's been

21  remediated and there's no Chinese drywall.

22      Q.   Did you get 100 percent guarantee from the

23  doctors when your children got vaccinated that the

24  vaccine would not harm them in any way?

25      A.   An analogy of a vaccine to a Chinese drywall is
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 540 of 580
Case 2:14-cv-02722-MCE Document 65-5 Entered on FLSD Docket 12/21/15 Page 94 of
104

Confidential - Subject to Further Confidentiality Review

```
1    somewhat of a stretch, but it's the safest way to

2    prevent having those diseases, but --

3         Q.   If you were going to buy a home in -- if you

4    were going to buy a home that was built in -- between

5    2004 and 2007, or I think you said up to '10 --

6              MR. MONTOYA:  I'm sorry.  I think you cut him

7         off.  Did you finish?

8              THE WITNESS:  It's okay.

9              MR. CAMPBELL:  Oh.  I didn't mean to.

10             MR. MONTOYA:  Sorry.  You can go ahead.

11   BY MR. CAMPBELL:

12        Q.   If you were going to buy a home that was built

13   between 2004 and 2007, you had no other options, you

14   were going to buy a home that was built during that

15   time, would you buy a home that had the environmental

16   certification that is Exhibit No. 23?

17        A.   I'd prefer to buy the Rosens' home that never

18   had Chinese drywall.

19        Q.   How do you know it never had Chinese drywall?

20        A.   Because it's been -- every visual test has been

21   completed, and I would know from speaking to every

22   homeowner that had a Kenco home that it didn't have

23   Chinese drywall, there hasn't been a single case, and

24   they didn't use the 3/4-inch, I would speak to all the

25   experts that I know from the real estate world, from the
```

1    inspection world, to know that this home didn't have

2    Chinese drywall, I would choose that over this.

3        Q.   So you would choose a home that there's not

4    been a test of every single piece, panel of drywall in

5    the home that was built in 2004 to 2007 over a home that

6    has been certified to not have -- every single panel has

7    been tested and certified not to have drywall in it,

8    you'd still take the home where you don't know what

9    every panel is?

10            MS. RICO:  Form.

11            THE WITNESS:  These homes didn't use the type

12        of drywall.  They didn't use that 3/4-inch.

13   BY MR. CAMPBELL:

14       Q.   But you don't know for certain?

15       A.   I have a lot more confidence in that than I do

16   in this.  And if I showed you the comps of Kenco homes

17   to the remediated homes, the comps would agree with me.

18            And I can tell you that this home -- this home

19   on Lake Azure I'd have a much easier time selling than

20   the current owner of this house.  This guy is going to

21   have a lot harder time selling this house than I'm going

22   to have selling Lake Azure.

23       Q.   When you say "this house," you're referring to

24   the Grajales house?

25       A.   Correct, the remediated home.  I have a much,

```
 1    much easier chance.  Much.

 2        Q.   You sold the Grajales home before?

 3        A.   I had the listing, correct.

 4        Q.   Right.  And it sold?

 5        A.   It did sell.

 6             (Greenblatt Exhibit No. 24 was marked for

 7    identification.)

 8    BY MR. CAMPBELL:

 9        Q.   I'm handing you what's been marked as

10    Exhibit 24.  Do you recognize this e-mail chain?

11        A.   I think so.

12        Q.   That's your e-mail address; right?

13        A.   Yes.

14        Q.   Let's start at the back.

15        A.   Okay.

16        Q.   The first e-mail in the chain, this is

17    December 10, 2018, it's from Mr. Montoya.  And he's

18    says:  "Sorry to interrupt your evening.  It's nothing

19    negative.  We'll talk tomorrow."

20             Do you see that?

21        A.   Uh-huh.

22        Q.   Was this the first contact that you had with

23    Mr. Montoya?

24        A.   I don't remember when our first official

25    contact was.
```

Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Turn to page 5.  It's cut off from page 6, but

 2    if you turn to the bottom of page 5, you'll see that the

 3    subject line says "Kevin and Stacey Rosen."

 4             Do you see that?

 5        A.   Uh-huh.

 6        Q.   Does this refresh your recollection that it was

 7    the Rosens, Kevin and Stacey Rosen, who recommended you

 8    to plaintiffs' counsel to serve as an expert in this

 9    case?

10        A.   It sounds about right.

11        Q.   You testified on March 4 that you thought that.

12    I'm just wondering if seeing this refreshes your

13    recollection that it was.

14        A.   It sounds about right.

15        Q.   And did Kevin or Stacey Rosen tell you that

16    they were going to be recommending you before they did?

17        A.   Yes.  Yes, Kevin did, yeah.

18        Q.   And did he tell you what role you would have in

19    the case?

20        A.   He didn't go into specifics.

21        Q.   And do you recall that -- was it a conversation

22    over the phone or in person?

23        A.   I believe it was on the phone.

24        Q.   Okay.  Do you recall the details of that

25    conversation?
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 544 of 580
Case 2:09-md-02047-EEF-MBN Document 22380-15 EF Docket 11/20/15 Page 4 page 8 of 104
Confidential - Subject to Further Confidentiality Review

```
 1      A.   Just that I'd be getting a phone call or an

 2  e-mail from a law firm.

 3      Q.   So he told you that you were going to do this?

 4      A.   He said that he had recommended me.

 5      Q.   Okay.  And did you tell him -- did you say

 6  anything in response to it?

 7      A.   I guess I probably said, "I'll think about it"

 8  or "I'll let you know" or --

 9      Q.   You don't remember the conversation?

10      A.   I don't.  I don't.

11      Q.   Okay.  Let's see.  All right.  December 14.

12  Page 4.  December 14 e-mail from Natalie to you states:

13  "We are looking forward to working with you and will

14  send you information on the properties we discussed."

15           Do you see that?

16      A.   Which page?

17      Q.   On page 4.  The top.  It's an e-mail from

18  Natalie Rico --

19      A.   Yes.

20      Q.   -- December 14?

21      A.   Uh-huh.

22      Q.   She's talking about information to forward you?

23      A.   Uh-huh.  I see that.

24      Q.   What information did they send you about

25  properties?
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 545 of 580 of
Confidential – Subject to further Confidentiality Review
104

```
 1      A.   I don't think they had sent anything at that

 2   point.

 3      Q.   What did -- she's referring -- she says:  "We

 4   will send you information on the properties we

 5   discussed."

 6           Do you see that?

 7      A.   I believe it was going to be a list of

 8   properties that they were going to want me to research.

 9      Q.   The MLS research?

10      A.   Yeah.

11      Q.   Which is different than your expert report?

12      A.   I believe so.

13      Q.   All right.  That's what -- I was curious as to

14   what the information was.  Do you remember what

15   information specifically it was?

16      A.   I don't remember.

17      Q.   Let's go to page 3.  The bottom of the page 3.

18      A.   Uh-huh.

19      Q.   The e-mail from you to Natalie and Patrick

20   December 14 says -- well, why don't you read it?

21      A.   "Thank you, Natalie.  It was a pleasure

22   speaking yesterday.  I look forward to working together

23   to help the Rosens.  Regarding an hourly fee, I feel

24   that $250 an hour is a fair number.  Please let me know

25   if this is agreeable or if you would like to discuss it
```

```
 1    further.  Have a great weekend."

 2        Q.   So you agreed to work on -- as an expert in

 3    this case because you wanted to help the Rosens;

 4    correct?

 5        A.   That's one of the reasons, yeah.

 6        Q.   Main reason?

 7        A.   A fair reason, yeah, uh-huh.

 8        Q.   Probably wouldn't be doing it if you hadn't

 9    been asked by the Rosens to do it?

10        A.   If I got paid enough, I would.

11        Q.   You asked for a fee of 250 an hour and said

12    that was fair.  Do you see that?

13        A.   Yes.

14        Q.   Okay.  Why did you think that was fair?

15        A.   I figure that's a fair number for being an

16    expert witness and what my time is valued at.

17        Q.   Okay.  And why did you pick that number?

18        A.   Tried to figure what I make an hour if I broke

19    down my transactions.

20        Q.   So you had not served as a consultant before?

21        A.   No.

22        Q.   Okay.  What would the price had to have been to

23    do this case if you didn't know the Rosens?

24        A.   It would have to make sense financially for me

25    to take time away from what I do to make a living.  I
```

1    don't know what that number is, but...

2         But my opinions are my opinions, if that's what

3    you're suggesting, that I'm doing this as a strategic or

4    help -- you know, I still feel bad for the Rosens, but I

5    would have probably wanted more money if it was for --

6    uninvolved with them.

7         Q.   If you look at -- Natalie responds to your

8    e-mail and asks if you can perform at a lower rate.

9    Instead of 250, she asked if you can do it for 175.  Do

10   you see that?

11        A.   Yes.

12        Q.   And then you respond.  Why don't you read your

13   response?

14        A.   "That is lower than what I usually charge for

15   consulting, but that will be fine and agreeable.  I

16   truly want to help the Rosens."

17        Q.   All right.  So I think you just told me you'd

18   never done consulting before.

19        A.   That's correct.

20        Q.   So you were not being completely honest when

21   you said you usually charge more than 175?

22        A.   It was a negotiation.  It was a negotiation for

23   an hourly rate.

24        Q.   But you agreed to the lower rate because you

25   truly want to help the Rosens?

```
 1      A.   Yeah.

 2      Q.   Okay.  And then on page 2 -- let's see -- the

 3   middle of the page, you send another e-mail?

 4      A.   Yes.

 5      Q.   Why don't you please read that?

 6      A.   "I'm well aware.  They've been through way too

 7   much.  It's just not fair and I truly hope that I can

 8   help them by being a part of this process."

 9           "Apart" is spelled incorrectly.

10      Q.   What did you mean by "it's just not fair and I

11   truly hope that I can help them by being part of this

12   process"?

13      A.   Kevin and Stacey, when they bought their

14   home -- I wasn't their agent, but when they bought their

15   home I know that they tried to be as financially

16   responsible as they could and put down as much of their

17   own money as they could.  I think they put a good chunk

18   of their life savings into that home.

19           And I remember I was the one who told Kevin

20   that I think he had Chinese drywall from when I started

21   hearing about it and he was telling me what was

22   happening to the house.  And I know it ruined them

23   financially and it set them back many years.

24           And the fact that it's been going on this long

25   and they haven't been compensated, to my knowledge, I
```

```
 1   think it's unfair.

 2        Q.   And you'd like to see them get compensated?

 3        A.   I think all homeowners who had this deserve

 4   compensation.

 5        Q.   And you'd like to do whatever you can to ensure

 6   that result?

 7        A.   I'm not ensuring anything.  I'm just going to

 8   give my expert opinion, and if that helps, great.

 9        Q.   And you truly hope that you can help them by

10   being a part of this process?

11        A.   I hope it helps.  I'm not -- but I'm not -- I'm

12   not providing information that's not my opinion prior to

13   any of this.  This is my expert opinion, and I can prove

14   it from my communications long before I was retained as

15   an expert witness.

16        Q.   Did the experience that the Rosens had impact

17   your opinions about Chinese drywall?

18        A.   It impacted me in the sense that I was able to

19   see what it did to the home.  I was able to smell it.  I

20   was able to see what it did to them financially.  I was

21   able to see what it did to the buyers' opinions of it

22   when it was remediated.

23             It was a very -- it was a good punch in the

24   face introduction to what Chinese drywall does and is

25   and what it can do financially to a homeowner and what
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 550 of 580
Case 2:09-md-02047-EEF-MBN Document 22369-11 Filed 04/13/15 Page 551 of 581

Confidential - Subject to Further Confidentiality Review
104

1    implications it has on the home.  So yes.

2        Q.    Fair to say that if someone had not had a

3    similar experience of a friend being -- going through

4    that similar process they may not have the same feelings

5    that you have?

6        A.    Regardless of being a friend, it was a

7    financial transaction for them.  I had to list their

8    home.  I didn't represent them when they bought it.  So

9    it was a -- it was a business transaction.  That's what

10   got me the experience.  So whether someone took a

11   listing that had Chinese drywall and it was their friend

12   or a stranger, I don't think it really makes a

13   difference.

14       Q.    But even the financial aspect of it, having

15   that happen to someone that you know as a friend of

16   yours impacted your view of Chinese drywall, I would

17   imagine.

18       A.    I think if I was a listing agent and you called

19   me tomorrow, and this is two thousand whatever year this

20   happened, and you called me and I didn't know you and

21   you told me your situation, your story, I think I would

22   have some compassion for you.

23       Q.    Do you regret not being able to get the Rosens

24   more for their home when you were the listing agent?

25       A.    There's no regret.  That's what the market

1    deemed the home was worth.  I did my job.

2        Q.   Well, I mean, if they would have not taken the

3    offer they took, maybe a higher one would have come;

4    right?  That's the way it works?

5        A.   That's what the house was worth then.  It

6    was -- I have no regrets.

7            (Greenblatt Exhibit No. 25 was marked for

8    identification.)

9    BY MR. CAMPBELL:

10       Q.   I'm handing you what's been marked as

11   Exhibit 25.  I'll give you a chance to glance through

12   it.

13       A.   Uh-huh.

14       Q.   Who is Jon Barack?

15       A.   He's a client of mine.

16       Q.   Okay.  Is he a friend of yours?

17       A.   No.

18       Q.   Okay.  When did you first meet him?

19       A.   He was referred to me --

20       Q.   I'm just going to ask you about the Baracks

21   first, and then I'll ask you about the document.

22       A.   Yeah.  Jon and Mara were introduced to me four

23   or five years agoish.

24       Q.   Okay.  And who is Mara?

25       A.   His wife.

```
1    Q.   Okay.  And who introduced you to them?

2    A.   I don't remember.  They were a referral.

3    Q.   So you were introduced to them in a

4    professional capacity?

5    A.   Correct.

6    Q.   Okay.  And do you remember approximately when

7    you were introduced to them?

8    A.   Around four or five years ago.

9    Q.   Okay.

10   A.   They were moving from New York City.

11   Q.   Okay.  Let's look at the very first e-mail in

12   the chain, which is on page 3.

13   A.   Yes.

14   Q.   Does this refresh your recollection --

15   A.   Yes.

16   Q.   -- about the time period when you met them?

17   A.   No.  I had already put them in a rental at that

18   point, I believe.

19   Q.   Okay.

20   A.   I believe.  They rented before they bought.

21   Q.   Do you know approximately how long they rented

22   for?

23   A.   The rental?

24   Q.   Yeah.

25   A.   A year or maybe slightly more.  I'd have to
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 553 of 580
Confidential - Subject to further Confidentiality Review
104

1    look at the AppFile.

2        Q.   And between the time that you interacted with

3    them to put them in the rental and October 2015, did you

4    have any communications with them?

5        A.   Sure.

6        Q.   Okay.  Friendly?  Are you personally friends

7    with them?

8        A.   I mean, a client becomes -- you know, I

9    consider my clients not friends, but I go above and

10   beyond just being their agent.  It's not just a business

11   transaction.  As you can see here, they needed help.

12   When people come from up north, one of the things I take

13   pride in is I can help put them in touch with a baby

14   nurse, the right schools, a doctor.

15       Q.   After you put them in the rental, did you have

16   regular communications with them?

17       A.   For business.

18       Q.   Okay.  Business.  Not personal?

19       A.   No.

20       Q.   Okay.

21       A.   They're nice people.  Lovely.

22       Q.   So you're not friends with them the way you are

23   with, like, Kevin Rosen?

24       A.   I don't see Kevin socially, unfortunately.  I'd

25   like to, but --

Confidential - Subject to Further Confidentiality Review

```
 1        Q.   But your kids used to go to his house and swim

 2   and --

 3        A.   Years ago.

 4        Q.   Right.

 5        A.   Yeah.  Now that they're older -- his kids are

 6   older than mine, so...

 7        Q.   Right.  But I'm saying, you didn't have that

 8   kind of friendship --

 9        A.   No.

10        Q.   -- with the Baracks?

11        A.   No.

12        Q.   I'm just trying to understand the nature of the

13   relationship.

14        A.   Yes.

15        Q.   So why don't we -- so they were asking you

16   about a home, 17979 Lake Azure; is that right?

17        A.   Yeah.

18        Q.   Azure Way?

19        A.   Uh-huh.

20        Q.   Is that how you pronounce it?

21        A.   Lake Azure.

22        Q.   Azure?

23        A.   Uh-huh.

24        Q.   And where is Lake Azure Way?

25        A.   It's the same street that the Rosens' -- not
```

Confidential — Subject to Further Confidentiality Review

1    Kevin -- Rosens' house is on in The Oaks.

2        Q.   Okay.  Melissa Rosen; is that right?

3        A.   Melissa and Richard.

4        Q.   Okay.  So you represented a buyer who bought on

5    Lake Azure Way; is that right?

6        A.   Melissa and Richard's home that we're selling

7    now, they bought it.

8        Q.   Right.  But you represented them in the buying?

9        A.   Correct.

10       Q.   Correct.  Let's look at page 2 in the middle.

11   Your e-mail at 11:37 a.m. on October 17, 2015, will you

12   please read that?

13       A.   "There are two streets that have/had it.  It

14   was one specific builder.  I won't let you go near one

15   of them.  It's not so much of an issue anymore as they

16   have all been remediated.  That being said, I wouldn't

17   buy one, but some people don't mind after they're

18   redone.  I've sold them and both times buyers were from

19   China."

20       Q.   Okay.  Is Melissa Rosen Chinese?

21       A.   No.

22       Q.   Okay.  You say "some people don't mind after

23   they're done"?

24       A.   Uh-huh.

25       Q.   So I think we discussed this before, but some

```
 1    people don't have the same opinion as you when it comes
 2    to a remediated home; correct?
 3        A.    Most people that have -- that I've ever met or
 4    know of that bought them after they were remediated,
 5    they got a discount and they were okay with it.
 6        Q.    How many people have you met that bought a
 7    remediated home?
 8        A.    None of my clients, but people that I know of,
 9    probably -- I know of one.  I could probably think of
10    one more.
11        Q.    Who is the one you can think of?
12        A.    One of my clients' ex-wife.
13        Q.    Okay.
14        A.    She bought --
15        Q.    Who is it?
16        A.    Nicole.  Her name is Hecht.  Her and her new
17    husband bought one.
18        Q.    Do you recall the home that they bought?
19        A.    It was on Lake Azure.  It had been remediated.
20        Q.    Did you represent them?
21        A.    I did not.
22        Q.    Did they buy at a discount?
23        A.    I believe so.  I'd have to look at the MLS, but
24    I'm pretty sure they did.
25        Q.    You don't know for sure?
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 557 of 580
Case 2:09-md-02047-EEF-MBN Document 20553-18 Filed 10/13/16 Page 591 of 104
Confidential - Subject to Further Confidentiality Review

```
 1       A.   I don't know for sure.  I'd have to look at

 2  MLS.

 3       Q.   You don't recall them telling you they bought

 4  at a discount?

 5       A.   No.

 6       Q.   Okay.  And you weren't involved in that

 7  transaction?

 8       A.   Correct.

 9       Q.   Okay.  Have they had any problems with the

10  home?

11       A.   I have no idea.

12       Q.   Are you aware of anyone who has purchased a

13  remediated home that has had any problems with the home?

14       A.   I have no clients that have bought them, so I

15  don't -- I'm not aware.

16       Q.   But just being in the community, being --

17       A.   Like I said --

18       Q.   -- an expert in The Oaks?

19       A.   -- that's one person that I know that bought

20  it, but I don't speak to her.  I speak to her

21  ex-husband.  He was my client.  They were my clients

22  when I sold a home of theirs.  He's still my client.

23  She's not.

24       Q.   Okay.  But you haven't heard they've

25  experienced any problems --
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 558 of 580
Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 558 of 580
Confidential - Subject to further confidentiality Review
104

```
 1      A.   I don't communicate with her.

 2      Q.   -- in a home that was remediated with Chinese

 3  drywall?

 4      A.   I haven't heard anything.  Like I said, I don't

 5  have any clients that bought one.

 6      Q.   Now, you tell Mr. Barack -- or I think both Jon

 7  Barack and Mara Barack are on this e-mail chain.

 8      A.   Uh-huh.

 9      Q.   In addition to telling them that some people

10  don't mind buying remediated homes, you told them that

11  you have sold two remediated homes and both times the

12  buyers were from China.  Do you see that?

13      A.   Uh-huh.

14      Q.   Okay.  Now, the two remediated homes that you

15  sold, those are the two that are in your report;

16  correct?

17      A.   Correct.

18      Q.   Now, you didn't tell them that the homes sold

19  for a discount, did you?

20      A.   No.

21      Q.   Okay.  But you did tell them the nationality of

22  the buyers?

23      A.   Correct.

24      Q.   Why did you think that it was important to tell

25  them the nationality of the buyers?
```

Confidential - Subject to further confidentiality review

```
1       A.   I just thought it was interesting that Chinese

2    drywall-remediated homes, the two transactions that I

3    was involved with both buyers were from Mainland China.

4       Q.   Are there any laws in Florida that prevent you

5    from providing information about the race or nationality

6    of people that live in a residential building or in a

7    neighborhood?

8            MR. MONTOYA:  Object to the form.  You can

9        answer.

10           THE WITNESS:  I believe there are.

11   BY MR. CAMPBELL:

12      Q.   Do you think this runs afoul of that?

13           MR. MONTOYA:  Form.

14           THE WITNESS:  Possibly.

15   BY MR. CAMPBELL:

16      Q.   Would you have mentioned the nationality of the

17   buyers if they had been from Canada?

18      A.   I don't know.  Maybe.  Maybe.  I'm Canadian.

19      Q.   In all honesty?

20      A.   I'm Canadian.  Again, this street -- I don't

21   know.  I don't know the answer to that.

22      Q.   What about if they were from Germany?

23      A.   I don't know.  I don't know.  But it's -- it's

24   a correlation to the drywall being from China and the

25   buyers being from China.  That was the correlation, the
```

Confidential – Subject to Further Confidentiality Review

```
 1    point that I was trying to make.  It wasn't --

 2        Q.   What was the point?

 3        A.   That they were okay with buying the homes.

 4    Maybe -- just the drywall was from China and the buyers

 5    were from China.

 6        Q.   Now, you say the two buyers were from China.

 7    Do you know if they were citizens of the United States?

 8        A.   I don't know.

 9        Q.   Okay.  Do you consider someone that's a citizen

10    of the United States but from a different nationality to

11    be equally a citizen?

12             MR. MONTOYA:  Form.

13             THE WITNESS:  Of course I do.

14    BY MR. CAMPBELL:

15        Q.   Okay.  Do you think that people that are from a

16    different country, or China specifically, that are

17    Americans have different preferences than other

18    Americans when it comes to buying residential homes?

19        A.   I have no idea.

20        Q.   Please let me finish.

21             MR. CAMPBELL:  Can you read back the question?

22             (The question was read by the reporter.)

23             MR. MONTOYA:  Object to the form.  You can

24        answer.

25             THE WITNESS:  I don't believe there's any
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 561 of 580
Confidential - Subject to further Confidentiality Review
104

```
 1        difference in anybody, what nationality.

 2   BY MR. CAMPBELL:

 3        Q.   Okay.  And you've not experienced that in

 4   representing -- I assume you've represented people from

 5   different backgrounds?

 6        A.   That's correct.

 7        Q.   Have you represented anybody that's from China?

 8        A.   Yes.

 9        Q.   Okay.  That were citizens, or just from China?

10        A.   Yes.

11        Q.   Both?

12        A.   I don't know the exact answer.  I don't ask

13   anyone their personal -- but --

14        Q.   Did they have any different -- the people that

15   you've represented that were -- had Chinese

16   background --

17        A.   They were no different than anybody else.

18        Q.   Okay.  Their preferences weren't any different?

19        A.   Correct.

20        Q.   Okay.  So I guess I'm trying to understand then

21   why you added that sentence.

22        A.   I don't know.  It was probably a mistake.

23        Q.   So then there's a little more information at

24   the top.  There's a specific question or discussion

25   about Lake Azure and you state -- why don't you read
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 562 of 580
Case 2:09-md-02047-MCD Document 20135 prepared for SPJ Docket 05/13/2019 Page 896 of
confidential - Subject to further confidentiality review
104

1    what you said?

2        A.   Which?

3        Q.   It starts with "it is" -- or excuse me -- "it

4    was."

5        A.   "It was.  The street is actually the worst.

6    It's Monte Vista I have referred to as Chinatown."

7        Q.   And then Mara Barack, which is Jon's wife,

8    responds, "Hilarious"; right?

9        A.   Uh-huh.

10       Q.   Now, you don't mean to refer to Lake Azure as

11   Chinatown in a complimentary way, do you?

12       A.    It's Monte Vista.  And there were several

13   people on the street that referred to that because it

14   had so much Chinese drywall.  That street had a lot of

15   Chinese drywall.

16       Q.   All right.  Well, you say in your sentence here

17   on October 17, 2015, "I have referred to it as

18   Chinatown."

19       A.   A lot of people do.  A lot of people call it

20   that, because it was sort of like the epicenter of The

21   Oaks.

22       Q.   And that wasn't a compliment to call it

23   Chinatown?

24       A.   No, it was not.  No.

25       Q.   And whether other people did or not, you have

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 563 of 580
Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 563 of 580

Confidential - Subject to Further Confidentiality Review
104

1    referred to it as Chinatown?

2            MR. MONTOYA:  Object to the form.  Asked and

3        answered.

4            THE WITNESS:  I'd been -- I've heard it from

5        several people, so I told them that, yes.

6    BY MR. CAMPBELL:

7        Q.   And you had used that reference to Monte Vista

8    before writing this e-mail?

9        A.   I don't know.

10       Q.   Well, you say, "I have referred to" --

11       A.   I understand.  Yeah, I don't -- I don't recall.

12       Q.   Is there a reason that you used and others have

13   used the term "Chinatown"?  Is that in a derogatory way?

14           MR. MONTOYA:  Asked and answered.

15           THE WITNESS:  It's Chinese drywall.  Chinese

16       drywall.  So on a street with Chinese drywall, they

17       called it Chinatown.

18   BY MR. CAMPBELL:

19       Q.   Would you have sent this e-mail, and

20   specifically the part that says "Monte Vista I have

21   referred to as Chinatown," to a client that is Chinese?

22           MR. MONTOYA:  Form.

23           THE WITNESS:  I don't know.  Maybe.  I don't

24       know.

25           ///

Case 2:09-md-02047-EEF-MBN  Document 22363-34  Filed 11/18/19  Page 564 of 580 of
Confidential – Subject to further confidentiality review
104

```
 1   BY MR. CAMPBELL:

 2        Q.   You really think you would have?

 3        A.   I don't know.  Probably not.

 4             MR. MONTOYA:  Form.

 5             THE WITNESS:  I don't know.  I don't know.  I

 6        honestly don't know the answer to that.  I don't

 7        know.

 8   BY MR. CAMPBELL:

 9        Q.   Well, do you think that someone who's from

10   China would be offended if you said that?

11             MR. MONTOYA:  Form.

12             THE WITNESS:  There's Chinese drywall in the

13        street and people call it Chinatown.  It's a

14        correlation.

15   BY MR. CAMPBELL:

16        Q.   So you don't think there's anything wrong?

17        A.   It could taken --

18             MR. MONTOYA:  Form.

19             THE WITNESS:  It could be construed, yeah.  I

20        understand your point.  I understand.  I understand

21        your point.  Like I said before, previously, it's

22        probably not the best, but...

23   BY MR. CAMPBELL:

24        Q.   You personally don't have a problem with people

25   from China?
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 565 of 580
Case 2:14-cv-02722-MBN Document 204-1 Filed 01/30/18 Docket 13-2915 Page 99 of
104

Confidential - Subject to Further Confidentiality Review

```
 1          MR. MONTOYA:  Form.

 2          THE WITNESS:  I do not.

 3          (Greenblatt Exhibit No. 26 was marked for

 4   identification.)

 5   BY MR. CAMPBELL:

 6      Q.   I'm handing you -- the court reporter is

 7   handing you what's been marked as Exhibit 26.

 8          Now, we'll talk about the document in a second,

 9   but just for some context, I believe that you said on

10   March 4 at your deposition that an example of another

11   type of stigma would be a busy road?

12      A.   Correct.

13      Q.   You still agree with that?

14      A.   I don't think it's a stigma.  I think it's a --

15   I wouldn't used the word "stigma" for a road.  I would

16   use it as a devaluation or a -- I wouldn't use the word

17   "stigma."

18      Q.   But it has the same effect financially?

19      A.   It has a negative effect on the value of a home

20   for its location.  Location is very important in real

21   estate.

22      Q.   Okay.  I just want to ask you about --

23      A.   Sure.

24      Q.   You can look at it to get context.  Well, first

25   of all, sorry, Erica Hecht, is that who you were
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 566 of 580 of
Confidential - Subject to further confidentiality Review
104

```
 1    referring to earlier?

 2        A.   Hecht.

 3        Q.   Hecht.

 4        A.   That's her husband, David Hecht.  His

 5    ex-wife is a client who bought -- Dave Hecht is my

 6    client.

 7        Q.   Yeah.

 8        A.   This is his wife, Erica Hecht.  We just closed

 9    on a new construction home.

10        Q.   Okay.

11        A.   His --

12        Q.   Erica is different than the other Hecht?

13        A.   That's his ex-wife.

14        Q.   His ex-wife.

15        A.   She bought a home on Lake Azure that has been

16    remediated --

17        Q.   Right.

18        A.   -- but I was not privy to that, details or

19    specifics.

20        Q.   Right.

21        A.   I just know it was a remediated home.

22        Q.   You write to Erica Hecht on November 21, 2017:

23    "I have been consistent all along.  No Chinese drywall.

24    No Lyons."

25        A.   Correct.
```

```
1     Q.   What's the reference to "Lyons"?

2     A.   Lyons is a road.

3     Q.   Okay.

4     A.   It's a road at that -- The Oaks.  There's a

5     street where the homes back up to.

6     Q.   So you treat homes that back up to Lyons in the

7     same category as homes that have Chinese drywall in

8     terms of you're not showing your clients those homes or

9     you recommend not to buy those homes?

10    A.   I recommend not buying them, because in The

11    Oaks, the beauty of that neighborhood when this was

12    going on is they had the option to buy other homes that

13    never had Chinese drywall, didn't back up to a road.

14    Q.   Okay.

15    A.   They bought a home that backed up to a road.

16    They didn't listen to me.

17    Q.   Some people would have no problem buying a home

18    that backs up to a road; correct?

19    A.   They bought it.

20    Q.   They bought it.  Okay.  Despite your --

21    A.   It's brand-new.  They wanted a brand-new home.

22    That was the only way they could get a brand-new home

23    when this timing happened.  They waited and the last two

24    lots were -- backed up to Lyons Road.

25    Q.   Did they pay market value for the home?
```

```
 1    A.   Yes.

 2         MR. CAMPBELL:  Let's take a two-minute break

 3    just to make sure we've covered everything, and then

 4    I don't think we have anything else.

 5         THE WITNESS:  Okay.

 6         THE VIDEOGRAPHER:  11:31 a.m.  Going off the

 7    record.

 8         (Recess from 11:31 a.m. until 11:38?a.m.)

 9         THE VIDEOGRAPHER:  11:38 a.m.  Back on record.

10              REDIRECT EXAMINATION

11    BY MR. POYER:

12    Q.   Hi, Mr. Greenblatt.  My name is Joshua Poyer.

13    I represent Beijing New Building Materials.  Diana

14    Fassbender asked you questions last time on behalf of

15    BNBM, but she couldn't be here today, so if it's okay

16    with you, I'd like to just ask you a few follow-up on

17    behalf of BNBM.

18    A.   Okay.

19         MR. MONTOYA:  You're done with your

20    questioning, Steven?

21         MR. CAMPBELL:  Yes.

22         MR. MONTOYA:  Go ahead.

23         THE WITNESS:  Okay.

24    BY MR. POYER:

25    Q.   Could you have a look at Exhibit 21, please?
```

```
 1    A.   Okay.

 2    Q.   So does Exhibit 21, does it represent all of

 3  the time that you spent on this case in January 2019 and

 4  February 2019?

 5    A.   I believe the first page is December/January

 6  and the second page is February.

 7    Q.   You're correct.  It's December 2018,

 8  January 2019, and February 2019; right?

 9    A.   Correct.

10    Q.   Is there anything -- is there any work you did

11  in that time frame that is not represented here?

12    A.   I don't believe so.

13    Q.   Could you look at page 1?

14    A.   Yes.

15    Q.   The entry for December 31, 2018, it says:

16  "Spoke to A. Grant."

17         Do you see that?

18    A.   Yes.

19    Q.   Would that be Allison Grant?  Does that ring a

20  bell?

21    A.   That sounds familiar.  I -- it sounds familiar.

22    Q.   But you don't remember for sure?

23    A.   I don't.

24    Q.   Okay.  Could you look at the next entry on

25  January 2019?
```

Confidential - Subject to Further Confidentiality Review

```
 1      A.   Yes.

 2      Q.   January 2, 2019?

 3      A.   Yes.

 4      Q.   There's a reference to H. Workema.  Do you see

 5   that?

 6      A.   Yes.

 7      Q.   Would that be Holly Workema?

 8      A.   I don't recall exactly, but I believe you had

 9   asked me something about that previously today and I --

10   I don't remember who it is exactly.

11      Q.   Now, Mr. Campbell asked you if you recalled the

12   name, but I don't think that he mentioned her first

13   name.

14      A.   I don't remember.

15      Q.   Okay.  Let me mark this as the next exhibit,

16   whatever that is.  27?

17           (Greenblatt Exhibit No. 27 was marked for

18   identification.)

19           MR. POYER:  I only have -- okay, so, Patrick

20      and Natalie, what that is is that is --

21           MR. MONTOYA:  Supplemental affidavit?

22           MR. POYER:  Yeah.  It's part of Exhibit 12, but

23      I just figured I'll just mark that.

24           MR. MONTOYA:  That's fine.

25           MR. POYER:  It's literally the exact same
```

```
 1        thing, but it just would be easier to -- so we don't

 2        have to -- there's no page numbers on Exhibit 12.

 3             MR. MONTOYA:  That's fine.  Take your time to

 4        review it.

 5             MR. CAMPBELL:  It's part of the exhibit to the

 6        expert report, which is a large binder.

 7             THE WITNESS:  In the big binder, yeah.

 8   BY MR. POYER:

 9        Q.   Are you done reviewing it, Mr. Greenblatt?

10        A.   Yes.

11        Q.   Now, Mr. Greenblatt, what is this document?

12   What is Exhibit 27?

13        A.   I believe when the Rosens were submitting

14   for -- to be claimants, I guess, in a case they needed

15   some -- they needed an affidavit from me.

16        Q.   Do you remember what case that was?

17        A.   I don't.

18        Q.   Who asked you to prepare this document?

19             Well, let me -- let me withdraw that question

20   and ask you a different question.

21             Who prepared this document?

22        A.   I prepared it mostly.  I mean, it was a similar

23   thing.  I worked on it.  I don't remember, it was a

24   while ago, but I knew this was all my information.  I

25   gave them the timeline.  I told them all the information
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/18/19 Page 572 of 580
Case 2:09-md-02047-EEF-MBN Document 22413-5 Filed 12/18/19 Page 96 of 104
Confidential - Subject to further confidentiality Review

```
 1   and the facts.

 2        Q.   When you say "them," who are you referring to?

 3        A.   I don't remember who it was.  I don't know if

 4   it was Kevin or some -- I don't remember.  I honestly

 5   don't.

 6        Q.   Did you work with any attorneys on this?

 7        A.   I don't think so.

 8        Q.   You don't recall working with Mr. Montoya or

 9   Ms. Rico?

10        A.   In 2013?

11        Q.   Yeah.

12        A.   I -- honestly, I don't remember.

13        Q.   Do you remember the law firm named Colson Hicks

14   from that time?

15        A.   I don't remember.

16        Q.   Okay.  Do you recall -- well, going back to the

17   preparation of this document, did you type the document

18   yourself, if you recall?

19        A.   I don't remember.  I honestly don't remember

20   2013.  I don't remember.

21        Q.   Now, I know you said it was prepared for a

22   case.  Do you know if it was actually submitted in a

23   courtroom setting?

24        A.   I have no idea.  I don't know what was done

25   with it.  I don't know.  I see here on line 4 I wrote I
```

1    was hired by Kevin Rosen to assist him, so...

2        Q.    Did you charge any money for the preparation of

3    this document?

4        A.    I did not.

5        Q.    So is it fair to say you did it as a favor to

6    Kevin Rosen?

7            MR. MONTOYA:  Form.  You can answer.

8            THE WITNESS:  Kevin's a client, so take it how

9        you would.  I mean, I do things for my clients.

10   BY MR. POYER:

11       Q.    But how would you take it, Mr. Greenblatt?  Do

12   you take it as you did a favor for Mr. Rosen?

13       A.    I have clients who ask me all the time --

14   they're doing a refi.  "Can you tell me what my home is

15   worth?"  Or I do -- you know, it's just part of my job,

16   doing things like this.  I've had clients who are

17   getting divorced and they need an analysis or they need

18   a CMA or whatever, you know.  Kevin's been a client for

19   many years.  I would try and help him.

20       Q.    So to be clear, you never generated a bill in

21   connection with the preparation of this document and

22   submitted it to anybody?

23       A.    I don't recall doing that.  It's -- I don't

24   remember doing anything like that.

25       Q.    And you don't recall receiving any money for

1    this?

2        A.   I don't think so.

3        Q.   Okay.  So, Mr. Greenblatt, I believe earlier

4    you testified that you have represented clients who

5    are -- who claim China as a national origin?

6        A.   As a national origin?  I don't know what

7    they -- they never said, "I am a national."  I mean,

8    it's not something we discuss.

9        Q.   You represented clients from Mainland China, I

10   think you said?

11       A.   Well, the listing that I had, the Grajales

12   house, the buyer was a student from China and his

13   parents wanted him to go to school in America for the

14   four years of high school.

15       Q.   To your knowledge, have you ever steered any

16   clients that -- from Mainland China away from homes

17   containing Chinese drywall?

18       A.   Absolutely not.  And I didn't represent the

19   buyers on those transactions.  I had the listings.

20       Q.   Were you willing to permit clients from

21   Mainland China to purchase -- purchase homes with

22   Chinese drywall?

23       A.   Anyone can buy those homes.

24       Q.   Have you ever represented any clients from

25   China?

```
1        A.   I don't know.  I'm sure I have.  It's been 18

2    years.  I'm sure I have.  And I don't know where

3    someone's from.  The only reason that specific statement

4    was made was because that student came to Florida just

5    to study for those four years.  It was a stupid comment,

6    but I don't think it has anything to do with my career

7    or my personal opinions.

8        Q.   So just to be clear, to your knowledge, you've

9    never steered any clients from Mainland China away from

10   homes containing Chinese drywall?

11       A.   I wouldn't steer anybody into anything.

12            MR. MONTOYA:  (Indicating.)  Two for two.  I

13       stunned it.

14            MR. POYER:  I think that's all, Patrick,

15       Natalie.  Thank you.  Thank you, Mr. Greenblatt.

16            THE WITNESS:  My pleasure.

17            MR. MONTOYA:  Anything else?  We don't have any

18       further questions.  He'll read.

19            THE VIDEOGRAPHER:  It's 11:47 a.m.  We're going

20       off the record.  This marks the end of the

21       deposition.

22            (Whereupon, the deposition concluded at

23   11:47 a.m.)

24

25
```

```
 1                  C E R T I F I C A T E

 2

 3          I, JOAN L. PITT, Registered Merit Reporter,

 4   Certified Realtime Reporter, and Florida Professional

 5   Reporter, do hereby certify that, pursuant to notice,

 6   Volume II of the deposition of RYAN GREENBLATT was duly

 7   taken on April 17, 2019, at 10:05 a.m. before me.

 8          The said RYAN GREENBLATT was duly sworn by me

 9   according to law to tell the truth, the whole truth, and

10   nothing but the truth, and thereupon did testify as set

11   forth in the above transcript of testimony.  The

12   testimony was taken down stenographically by me.  I do

13   further certify that the above deposition is full,

14   complete, and a true record of all the testimony given

15   by the said witness.

16

17   _____

18        JOAN L. PITT, RMR, CRR, FPR

19

20          (The foregoing certification of this transcript

21   does not apply to any reproduction of the same by any

22   means, unless under the direct control and/or

23   supervision of the certifying reporter.)

24

25
```

```
1                    INSTRUCTIONS TO WITNESS

2

3

4          Please read your deposition over carefully and

5     make any necessary corrections.  You should state the

6     reason in the appropriate space on the errata sheet for

7     any corrections that are made.

8

9          After doing so, please sign the errata sheet

10    and date it.  It will be attached to your deposition.

11

12         It is imperative that you return the original

13    errata sheet to the deposing attorney within thirty (30)

14    days of receipt of the deposition transcript by you.  If

15    you fail to do so, the deposition transcript may be

16    deemed to be accurate and may be used in court.

17

18

19

20

21

22

23

24

25
```

Case 2:09-md-02047-EEF-MBN Document 22363-34 Filed 11/19/19 Page 578 of 580
Case 1:14-cv-22848-MGC Document 290-1 Entered on FLSD Docket 08/15/2017 Page 2 of 104
Confidential - Subject to further confidentiality review

```
 1                    - - - - - -

 2                   E R R A T A

 3                    - - - - - -

 4    PAGE    LINE    CHANGE

 5    _____   _____   _____

 6      REASON: _____

 7    _____   _____   _____

 8      REASON: _____

 9    _____   _____   _____

10      REASON: _____

11    _____   _____   _____

12      REASON: _____

13    _____   _____   _____

14      REASON: _____

15    _____   _____   _____

16      REASON: _____

17    _____   _____   _____

18      REASON: _____

19    _____   _____   _____

20      REASON: _____

21    _____   _____   _____

22      REASON: _____

23    _____   _____   _____

24      REASON: _____

25
```

Confidential - Subject to Further Confidentiality Review

```
 1                  ACKNOWLEDGMENT OF DEPONENT

 2

 3          I, _____, do hereby

 4    acknowledge that I have read the foregoing pages,

 5    324 - 426, and that the same is a correct transcription

 6    of the answers given by me to the questions therein

 7    propounded, except for the corrections or changes in

 8    form or substance, if any, noted in the attached Errata

 9    Sheet.

10

11

12    _____    _____

13    RYAN GREENBLATT                 DATE

14

15

16

17

18    Subscribed and sworn to before me this

19    ____ day of _____, 20___.

20    My Commission expires: _____

21

22    _____

      Notary Public

23

24

25
```

```
 1                         LAWYER'S NOTES

 2     PAGE    LINE

 3     _____   _____   _____

 4     _____   _____   _____

 5     _____   _____   _____

 6     _____   _____   _____

 7     _____   _____   _____

 8     _____   _____   _____

 9     _____   _____   _____

10     _____   _____   _____

11     _____   _____   _____

12     _____   _____   _____

13     _____   _____   _____

14     _____   _____   _____

15     _____   _____   _____

16     _____   _____   _____

17     _____   _____   _____

18     _____   _____   _____

19     _____   _____   _____

20     _____   _____   _____

21     _____   _____   _____

22     _____   _____   _____

23     _____   _____   _____

24     _____   _____   _____

25
```