# EXHIBIT 30

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

**EDUARDO AND CARMEN AMORIN,** *et al.*, **individually, and on behalf of all others similarly situated,**

       **Plaintiffs,**

       **v.**

**TAISHAN GYPSUM CO., LTD. f/k/a SHANDONG TAIHE DONGXIN CO., LTD.; TAIAN TAISHAN PLASTERBOARD CO., LTD., et al.,**

       **Plaintiffs.**

**Case No. 1:11-CV-22408-MGC**

---

### PRIORITY CLAIMANTS' NOTICE OF FILING DEPOSITION TRANSCRIPTS[1] IN RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS NOT IN DISPUTE, AND COUNTERSTATEMENT OF FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON NON-FORMULA DAMAGES

Priority Claimants, by and through undersigned counsel, hereby file the following depositions transcripts in support of their Response to Defendants' Motion and Memorandum for Summary Judgment (Dkt. No. 245) and Defendants' Statement of Material Facts Not In Dispute (Dkt. No. 250). The exhibits below will be cited in Priority Claimants' Reponses to docket numbers 245 and 250.

| Exhibit | Deposition Transcript |
|---------|----------------------|
| A1 | Janet Avery |
| A2 | Lillian Chatmon |
| A3 | David Deeg |
| A4 | Deborah Hooker |
| A5 | Catherin Etter |
| A6 | Steven Etter |
| A7 | Andrew Feldkamp |
| A8 | Dawn Feldkamp |
| A9 | William Foster |
| A10 | Vicki Foster |

---

[1] Including erratas where applicable.

| A11 | Candace Gody |
| A12 | David Griffin |
| A13 | Diane Griffin |
| A14 | Betty Hernandez |
| A15 | John Hernandez |
| A16 | Deborah Lalwani |
| A17 | Gul Lalwani |
| A18 | Cassandra Marin |
| A19 | Yvette Marin |
| A20 | Dailyn Martinez |
| A21 | Adela Miranda |
| A22 | Jose Miranda |
| A23 | Mai Tuyen |
| A24 | Tracy Nguyen |
| A25 | Jeovany Nunez |
| A26 | Monica Alba-Nunez |
| A27 | Kelley O'Brien |
| A28 | Lori O'Brien |
| A29 | Kevin Rosen |
| A30 | Stacy Rosen |
| A31 | Michael Rosen |
| A32 | Robyn Rosen |
| A33 | Larry Walls |
| A34 | Rosalee Walls |
| A35 | Jennifer Wites |
| A36 | Marc Wites |

Dated: May 13, 2019.

/s/ Patrick S. Montoya, Esq.
Patrick Shanan Montoya
Fla. Bar No. 0524441
Email: Patrick@colson.com
Colson Hicks Eidson
255 Alhambra Circle, PH
Coral Gables, FL 33134-2351
Telephone: (305) 476-7400
Facsimile: (305) 476-7444
*Interim Lead Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing motion was served by via CM/ECF on all parties authorized to receive service via CM/ECF, this 13th day of May 2019.

/s/ Patrick S. Montoya, Esq.
Patrick Shanan Montoya
Fla. Bar No. 0524441
Email: Patrick@colson.com
Colson Hicks Eidson
255 Alhambra Circle, PH
Coral Gables, FL  33134-2351
Telephone:  (305) 476-7400
Facsimile:  (305) 476-7444
*Interim Lead Counsel for Plaintiffs*

EXHIBIT A1

Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2              Case No. 1:11-CV-22408-MGC

 3    -------------------------------§
      EDUARDO AND CARMEN AMORIN et      §
 4    al., individually, and on behalf §
      of all others similarly          §
 5    situated,                        §
                                       §
 6       Plaintiffs,                   §
                                       §
 7    vs.                              §
                                       §
 8    TAISHAN GYPSUM CO., LTD. F/K/A    §
      SHANDONG THAIHE DONGXIN CO.,      §
 9    LTD.; TAIAN TAISHAN PLASTERBOARD §
      CO., LTD., et al,                 §
10                                     §
         Defendants.                   §
11    ------------------------------- §
         - - -
12                      - - -
13              FRIDAY, DECEMBER 7, 2018
14                      - - -
15         Confidential  - Subject to Further
                   Confidentiality Review
16
                        - - -
17
18         Deposition of JANET AVERY, held at
           Morgan & Morgan, 12800 University Drive,
19         Suite 600, Fort Myers, Florida, commencing at
           1:08 p.m., on the above date, before
20         Kelly J. Lawton, Registered Professional
           Reporter, Licensed Court Reporter, and Certified
21         Court Reporter.
22                      - - -
23              GOLKOW LITIGATION SERVICES
             877.370.3377 ph | 917.591.5672 fax
24                  deps@golkow.com
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 7 of 3246
Case 1:11-cv-22408-MGC Document 209 Entered on FLSD Docket 05/13/2019 Page 3 of 111
Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:

 2    MORGAN & MORGAN
      BY:  PANAGIOTIS "PETE" V. ALBANIS, ESQUIRE
 3    12800 University Drive, Suite 600
      Fort Myers, Florida 33907
 4    (239) 433-6880
      palbanis@forthepeople.com
 5    Representing Plaintiff

 6

      LEVIN, SEDRAN & BERMAN, LLP
 7    BY:  KEITH J. VERRIER, ESQUIRE
      510 Walnut Street, Suite 500
 8    Philadelphia, Pennsylvania 19106
      (215) 592-1500
 9    kverrier@lfsblaw.com
      Representing Plaintiff

10

11    ALSTON & BIRD, LLP
      BY:  ALIYYA Z. HAQUE, ESQUIRE
12    BY:  PATRICK H. HILL, ESQUIRE
      BY:  BOYKIN LUCAS, ESQUIRE
13    One Atlantic Center
      1201 West Peachtree Street
14    Atlanta, Georgia 30309
      (404) 881-7000
15    aliyya.haque@alston.com
      patrick.hill@alston.com
16    boykin.lucas@alston.com
      Representing Taishan Gypsum Co., Ltd. and Tai'an
17    Taishan Plasterboard, Co., Ltd.

18

      ORRICK, HERRINGTON & SUTCLIFFE, LLP
19    BY:  MARC R. SHAPIRO, ESQUIRE
      51 West 52nd Street
20    New York, New York 10019
      (212) 506-3546
21    mrshapiro@orrick.com
      Representing BNBM PLC

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:

 2        ORRICK, HERRINGTON & SUTCLIFFE, LLP

          BY:  DAN GUERRA, ESQUIRE

 3        The Orrick Building

          405 Howard Street

 4        San Francisco, California 94105

          (415) 773-5545

 5        dguerra@orrick.com

          Representing BNBM PLC

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 9 of 3246
Case 1:11-cv-22408-MGC Document 269 Entered on FLSD Docket 05/13/2013 Page 9 of 111
Confidential - Subject to Further Confidentiality Review

```
 1                         - - -

                         I N D E X

 2                         - - -

 3   Testimony of:  JANET AVERY
```

```
 4        DIRECT EXAMINATION BY MS. HAQUE...............  6

 5        CROSS-EXAMINATION BY MR. SHAPIRO..............  83

 6        CROSS-EXAMINATION BY MR. ALBANIS..............  86

 7        REDIRECT EXAMINATION BY MS. HAQUE.............  92

 8        RECROSS EXAMINATION BY MR. ALBANIS............ 103

 9        FURTHER REDIRECT EXAMINATION BY MS. HAQUE...... 104
```

```
10

11

12                  E X H I B I T S

13             (Attached to Transcript)

14   DEFENDANTS'                                      PAGE
```

```
15   Exhibit 1     Lee County Property Appraiser -    11
                   Online Parcel Inquiry - Property
16                 Data

17   Exhibit 2     Priority Claimant Janet Avery's    12
                   Answers to Defendants' Second Set
18                 of Interrogatories

19   Exhibit 3     Priority Claimant Janet Avery's    16
                   Answers to Interrogatories
20

     Exhibit 4     Floor Plan                         21
21

     Exhibit 5     Drywall Inspection Report - Kross  30
22                 Inspectors

23   Exhibit 6     Ericksons's Drying Systems -       33
                   Chinese Drywall Inspection
```

```
24
```

Case 2:09-md-02047-EEF-MBN  Document 22363-39  Filed 11/19/19  Page 10 of 3246

Case 1:07-cv-22404-MGC  Document 284  Entered on FLSD Docket 05/13/2011  Page 6 of
Confidential - Subject to Further Confidentiality Review
111

```
1                        E X H I B I T S

2    DEFENDANTS'                                      PAGE

3    Exhibit 7      Mortgage                            50

4    Exhibit 8      ACE - Fifth Third Bank              50

5    Exhibit 9      Claim of Lien                       56

6    Exhibit 10     Notice of Lis Pendens               58

7    Exhibit 11     U.S. Department of Housing and      64

                    Urban Development Settlement

8                   Statement

9    Exhibit 12     Release of Mortgage                 65

10   Exhibit 13     Second Amended Supplemental         72

                    Plaintiff Profile Form

11

     Exhibit 14     Chinese Drywall Settlement Program  73

12                  - Copies of Checks

13   Exhibit 15     Note - 10671 Camarelle Circle        74

14   Exhibit 16     Affidavit of Madeline Davis          80

15

16

17

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 11 of 3246
Case 1:11-cv-22408-MGC Document 204 Entered on FLSD Docket 05/13/2011 Page 11 of
111

Confidential - Subject to Further Confidentiality Review

```
 1                        - - -

 2               THE COURT REPORTER:  Ma'am, would you please

 3          raise your right hand.

 4               Do you swear or affirm that the testimony

 5          you're about to give will be the truth, the whole

 6          truth, and nothing but the truth?

 7               THE WITNESS:  I do.

 8               JANET AVERY, called as a witness by the

 9     Defendants, having been first duly sworn, testified

10     as follows:

11                    DIRECT EXAMINATION

12     BY MS. HAQUE:

13          Q.   Ma'am, do you mind please stating your name

14     for the record.

15          A.   Janet Avery.

16          Q.   My name is Aliyya Haque, and I represent

17     Taishan Gypsum, one of the defendants in the lawsuit

18     which you have filed.  I will be asking you some

19     questions related to your claims in this lawsuit.

20               Have you ever been deposed before?

21          A.   No.

22          Q.   I'm going to go ahead and explain some ground

23     rules of the deposition to help make this go

24     smoothly.
```

```
1              As you know, you have been sworn under oath.
2      Do you understand that you must tell the truth as if
3      there was a judge sitting here today?
4         A.   Yes, I do.
5         Q.   You'll see that there is a court reporter who
6      is taking down what you are saying today.  If you
7      could please speak slowly so that the court reporter
8      could take down your full response, that would be
9      helpful.
10             Please also make sure that you respond with a
11     verbal response instead of a head nod or a head shake
12     because the court reporter needs to take down --
13        A.   Okay.  I'm sorry.  It's a bad habit I have.
14        Q.   No problem.  I do it as well.
15             I may prompt you, so please don't hold it
16     against me.  But if I prompt you, it's just for the
17     sake of the court reporter.
18        A.   I have to hold my head still.
19        Q.   Also, if you do not understand one of my
20     questions, please let me know.  Otherwise, if you do
21     respond, I will assume that you understand my
22     questions.
23             We will try and take a break every hour or
24     so.  If you at any point during this afternoon you
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 13 of 3246 of
Case 1:11-cv-03094-MGC Document 289 Entered on FLSD Docket 05/13/2019 Page 8 of
111

Confidential - Subject to Further Confidentiality Review

```
 1    need to take a break, please let me know.  I will

 2    only ask that if I have a question pending that you

 3    please respond to the question before taking a break.

 4          Are you taking any medications that would

 5    impair your ability to understand my questions or

 6    respond truthfully?

 7    A.   No.

 8    Q.   Did you meet with your attorneys to prepare

 9    for this deposition?

10    A.   Yes.

11    Q.   How many times did you meet?

12    A.   Three, I would say right now.

13    Q.   Do you recall the dates of when you met with

14    your attorneys?

15    A.   No.

16    Q.   Do you recall for how long you met with your

17    attorneys during these three occasions?

18    A.   An hour.

19    Q.   Who was present at the meetings with your

20    attorneys?

21    A.   No one.

22    Q.   So it was just you and your attorneys?

23    A.   Correct.

24    Q.   Did you speak with anyone other than your
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 14 of 3246
Case 2:09-md-02047-EEF-MBN Document 20648 Enter on FLSD Docket 12/03/19 Page 50 of
111

```
1    attorneys to prepare for this deposition?

2        A.   No.

3        Q.   Did you review any documents to prepare for

4    this deposition?

5        A.   Yes.

6        Q.   Which documents did you review?

7        A.   My attorney has all the documents on record.

8        Q.   Did you bring any documents with you to this

9    deposition?

10       A.   No.

11       Q.   Did you do anything else to prepare for this

12   deposition?

13       A.   No.

14       Q.   Mrs. Avery, are you currently employed?

15       A.   No.

16       Q.   Were you ever previously employed?

17       A.   Yes.

18       Q.   Where were you employed?

19       A.   In the medical profession mostly, as

20   secretarial.

21       Q.   Do you recall the dates of your employment?

22       A.   Well, that's kind of hard.  I retired in 1995

23   from my last.  I worked there for 15 years.

24            But it was always medical.
```

Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Is it safe to say you did not work at any

 2   point after 1995?

 3        A.    Correct.  Yes.

 4        Q.    Mrs. Avery, are you married?

 5        A.    Widowed.

 6        Q.    How long were you married?

 7        A.    Fifty years.

 8        Q.    Do you have any children?

 9        A.    Two.

10        Q.    Could you please state their names and ages

11   for the record.

12        A.    My daughter is Cheryl Nagy, N-a-g-y.  And

13   she's in Newtown, Connecticut.  My son is probably --

14   Mark is staying with me at this point, formerly from

15   Connecticut.  He came up to help me out.

16        Q.    And approximately what are the ages of your

17   two children?

18        A.    My son is 57, and my daughter is 60 -- no,

19   wait; that's wrong -- no, 60.

20        Q.    Do you have anyone else living with you at

21   the moment other than your son?

22        A.    No.

23        Q.    Mrs. Avery, have you ever been involved in a

24   lawsuit before?
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.    No.

 2        Q.    Mrs. Avery, I'm going to go and ask you now

 3   some questions related to the property at issue in

 4   this lawsuit.

 5              What is the address of the property that you

 6   allege has been damaged by Chinese drywall?

 7        A.    Camarelle Lane in Fort Myers.

 8        Q.    When did you buy that property?

 9        A.    In 2007.  November 30th, 2007.

10        Q.    From whom did you buy that property?

11        A.    From WCI, who was the . . .

12        Q.    Were there any other owners of that property?

13        A.    No.

14        Q.    Do you currently own that property?

15        A.    No.

16        Q.    Do you know who currently owns that property?

17        A.    No.

18        Q.    Mrs. Avery, I'm going to be showing you some

19   documents throughout this deposition.  We're going to

20   start with what I've premarked as Exhibit 1.

21              (Defendants' Exhibit 1 was marked for

22   identification.)

23   BY MS. HAQUE:

24        Q.    Please take your time and review all of the
```

```
 1    documents that I have put before you to get oriented

 2    with the document, and please let me know when you're

 3    ready.

 4           Mrs. Avery, if I could direct your attention

 5    to what is the back of the third page of this packet.

 6           Mrs. Avery, do you recognize this document?

 7      A.   I don't remember.

 8      Q.   Does your name appear on this document?  Do

 9    you see?

10      A.   Yes.

11      Q.   This looks to be the deed of the home that

12    you purchased.  Does that sound accurate?

13      A.   Yes.

14      Q.   Do you recall how much you paid for this home

15    on November 30th, 2007?

16      A.   $195,000.

17      Q.   And did you make a down payment on the home?

18      A.   Yes.

19      Q.   And how much was the down payment for?

20      A.   $100,000.

21      Q.   Was -- Mrs. Avery, I'd like to show you now

22    what is premarked as Exhibit 2.

23           (Defendants' Exhibit 2 was marked for

24    identification.)
```

Confidential - Subject to further Confidentiality Review

```
 1    BY MS. HAQUE:

 2        Q.    Have you -- does this -- do you recognize

 3    this document?

 4        A.    Yes.

 5        Q.    What is this document?

 6        A.    The answer to the defendants' second set of

 7    interrogatories.

 8        Q.    And this is pertaining to your lawsuit in the

 9    case, right?

10        A.    Yes.

11        Q.    Can I direct your attention to Question

12    Number 4, which is on Page 2.  I just wanted to

13    clarify some numbers for the record.

14              Can you take a moment to read your response

15    to Question Number 4.

16              THE WITNESS:  Does she want me to answer?

17    BY MS. HAQUE:

18        Q.    No.  I just want you to just --

19        A.    Read.

20        Q.    -- take a moment to read it for yourself.

21        A.    Thank you.

22              Okay.

23        Q.    To clarify, you purchased your home for

24    $195,000?
```

Confidential - Subject to Further Confidentiality Review

```
1        A.    Yes.

2        Q.    And you put down a down payment of $105,000;

3   is that accurate?

4        A.    Yes.

5        Q.    Was this property purchased -- financed

6   through a bank or other lender?

7        A.    Bank.

8        Q.    Do you recall the name of the bank?

9        A.    Fifth Third.

10       Q.    Was there a mortgage on the property?

11       A.    No.

12       Q.    Did you not take out a mortgage?

13       A.    Yes.

14       Q.    And how much was -- did you take out multiple

15   mortgages for this property?

16       A.    Yes.

17       Q.    Do you recall how much the first mortgage was

18   for?

19       A.    $90,000.

20       Q.    And the second mortgage?

21       A.    $25,000.

22       Q.    To your recollection, were these the only two

23   mortgages that you took out on this property?

24       A.    Yes.
```

Confidential - Subject to Further Confidentiality Review

```
 1         Q.    If you need to take a break or drink some

 2     water, feel free.

 3         A.    No, I'm just reminding myself to speak a

 4     little louder for the secretary.

 5              MR. ALBANIS:  Court reporter.

 6              THE WITNESS:  Court reporter.  Sorry.  I

 7         apologize.

 8     BY MS. HAQUE:

 9         Q.    Does anyone have a lien on the property?

10         A.    No.

11         Q.    Were any liens on the property currently

12     released as far as you know?

13              MR. ALBANIS:  Object to the form.

14              But you can answer.

15              THE WITNESS:  Yes, we were released.

16     BY MS. HAQUE:

17         Q.    Do you own any other properties or homes?

18         A.    No.

19         Q.    Mrs. Avery, when did you vacate the property?

20         A.    I can't remember.

21         Q.    Please answer.

22         A.    October 2011.

23         Q.    I have what has been premarked as Exhibit

24     Number 3.
```

Confidential - Subject to Further Confidentiality Review

```
 1              (Defendants' Exhibit 3 was marked for

 2      identification.)

 3      BY MS. HAQUE:

 4          Q.   Do you recognize this document?

 5          A.   Yes.

 6          Q.   Could you please tell me what this document

 7      is for the record?

 8          A.   It's regarding the Chinese drywall, whether I

 9      had any physical problems, the effect it had on me

10      medically.  I did not pursue with physicians, but I

11      also was not aware that I had the problem with

12      Chinese drywall.

13          Q.   And these are -- these responses are in a

14      document entitled "Answers to Interrogatories"; is

15      that right?

16          A.   Yes.

17          Q.   Could I direct your attention to Page 2 and

18      your response to Question Number 2.

19              And please take a moment to review that

20      response.

21          A.   No.

22          Q.   So did you vacate the property prior to

23      March -- and this is the property at -- and let me

24      make sure I get the address correct --
```

Confidential - Subject to Further Confidentiality Review

```
 1    10671 Camarelle --

 2        A.    Yes.

 3        Q.    -- Circle?

 4              Did you vacate the property prior to

 5    March 2010?

 6        A.    Yes.

 7        Q.    Do you know who currently owns the property

 8    at 10671 Camarelle Circle?

 9        A.    No.

10        Q.    While you lived at the property on Camarelle

11    Circle, how many other people resided in the house

12    with you?

13        A.    None.

14        Q.    Have you ever charged anyone for rent to live

15    in the property at Camarelle Circle?

16        A.    No.

17        Q.    Did you ever renovate or make improvements to

18    the home at Camarelle Circle while you lived there?

19        A.    Improvements.

20        Q.    What was done?

21        A.    My intention was to provide furnishings and

22    to include things -- upgrading it is what I want to

23    say so that the sale -- when I decided to put it on

24    sale, that it would be worth more money, I'd get a
```

1    good return on it.

2        Q.   Do you recall what specific improvements were

3    made on the house at Camarelle Circle?

4        A.   Well, I had the laundry room:  new cabinetry

5    put in there.  I had the kitchen area:  lights over

6    and underneath the cabinets.  I bought all new

7    furnishings that would be left there for whoever

8    wanted to buy the property.  And pretty much did what

9    I think somebody else would like in dressing up the

10   unit up.

11       Q.   Were these upgrades paid for by your second

12   mortgage of $25,000?

13       A.   Yes.

14       Q.   Do you recall approximately when the upgrades

15   or improvements were done?

16       A.   Well, it started after I moved in -- well,

17   prior to my moving in, and it took awhile.  It was --

18   it could have taken two to three months for me.

19       Q.   Do you recall whether any of the improvements

20   included removing Chinese drywall?

21       A.   Can you clarify that for me?

22       Q.   Do you recall whether any of the improvements

23   that you made with the $25,000 mortgage involved

24   removing Chinese drywall?

```
 1        A.    Yes.

 2        Q.    Did they?

 3        A.    Well --

 4        Q.    Let me clarify.

 5              Did they remove Chinese drywall as part of

 6    the improvements?

 7        A.    Oh, no.  No.

 8        Q.    What was the approximate cost in total of the

 9    improvements?

10        A.    I would say in the $25,000 area that I had

11    the loan on.

12        Q.    You mentioned previously that you had bought

13    furnishings.  Can you provide us some examples of

14    what you meant by furnishings?

15        A.    Living room, bedroom -- two bedrooms, open

16    concept in the living room.  Anything that was bought

17    was completely prepared for anybody that was

18    interested in the property.

19        Q.    Were the -- I'm sorry.  Strike that.

20              Were the furnishings furniture or items like

21    window treatments or carpets?

22        A.    That as well.  All window treatments were

23    included, as well as the furniture.

24        Q.    What about carpet or flooring?
```

```
 1        A.   The bedrooms had carpeting.  The flooring in

 2   the rest of the area was tile.  I had purchased

 3   carpets as part of the living room area.  So it was

 4   all there for whoever wanted to buy it.

 5        Q.   So the upgrades included new carpeting in --

 6   in --

 7        A.   In the living room area.

 8        Q.   In the living room area.

 9             Did the upgrades include new tile or hardwood

10   floors?

11        A.   No, no.

12        Q.   Do you recall, Mrs. Avery, the square footage

13   of your home?

14        A.   1429 under air.

15        Q.   If you could turn back to Exhibit Number 1.

16             If you look at the first page, in the middle

17   of the page under "Current Working Values," it says

18   "total living area, and it lists the total living

19   area as 1227 square feet.

20        A.   The 1429 included an oversized garage plus

21   the inner part under air.  I'm sorry about that.

22        Q.   No problem.

23             And I want to show you what has been

24   premarked as Exhibit Number 4.
```

```
 1              (Defendants' Exhibit 4 was marked for

 2      identification.)

 3      BY MS. HAQUE:

 4          Q.   Do you recognize this document?

 5          A.   Yes, I do.

 6          Q.   What is this document?

 7          A.   It's the villa that I -- one of the villas I

 8      bought on the left-hand side.

 9          Q.   Do you see a square footage that's associated

10      with it?

11          A.   11,887.

12          Q.   And is that consistent with your --

13          A.   I have to go by what this says.

14          Q.   When you purchased this property, did you

15      purchase it with the intention of flipping it or

16      reselling it?

17          A.   Yes.

18          Q.   Mrs. Avery, are you claiming any alternative

19      living expenses damages?

20          A.   I'm not quite sure.  Rephrase.

21          Q.   Sure.

22              Are you claiming any damages in this case

23      related to alternative living expenses?

24          A.   No.
```

Confidential - Subject to further confidentiality Review

1    Q.    I'm sorry, did you say yes or no?

2    A.    No.

3          MS. HAQUE:  Can we go off the record for one

4    moment, please.

5          (Discussion off the record.)

6    BY MS. HAQUE:

7    Q.    Mrs. Avery, are you claiming any remediation

8    damages as part of this lawsuit?

9    A.    No.

10   Q.    Mrs. Avery, I want to now ask you questions

11   related to your discovery of Chinese drywall.

12         When do you believe that Chinese drywall was

13   installed in the home?

14   A.    About 2006.

15   Q.    How do you believe the drywall was installed?

16   Was it part of the original construction or an

17   improvement later on?

18   A.    Original.

19   Q.    Do you recall who was in charge of building

20   the home?

21   A.    No.

22   Q.    So you -- would you know who purchased the

23   Chinese drywall to -- or any drywall to build the

24   home?

```
 1        A.   No.

 2        Q.   Did you ever see any of the drywall before it

 3   was installed in the home?

 4        A.   No.

 5        Q.   Did you ever personally see any markings on

 6   any of the drywall in the home?

 7        A.   No.

 8        Q.   Do you know where the drywall in the home was

 9   manufactured?

10        A.   Yes.

11        Q.   Where do you believe it was manufactured?

12        A.   I'm trying to remember the name of it.  I

13   want to say Titum, but I don't think that's the right

14   name.

15        Q.   Let me ask it this way.

16             Do you know from which country the drywall in

17   your home came from?

18        A.   China.

19        Q.   Do you recall the name of the manufacturer?

20        A.   No.

21        Q.   How did you know -- or how do you know that

22   the drywall came from China?

23        A.   Through investigation.

24        Q.   Who performed the investigation?
```

Confidential – Subject to Further Confidentiality Review

```
 1        A.    I don't remember who did it.

 2        Q.    Do you know if there was any U.S. or

 3   domestic-made drywall in your home?

 4        A.    No.

 5        Q.    Is it your belief that the entire home was

 6   made with Chinese drywall?

 7        A.    Yes.

 8        Q.    Do you know who installed the drywall?

 9        A.    No.

10        Q.    When you bought the home from WCI, did they

11   tell you about where the drywall in the home came

12   from?

13        A.    No.

14        Q.    Did WCI make any guarantees to you about the

15   products they used in your home?

16        A.    No.

17        Q.    Do you recall where you believe the Chinese

18   drywall was installed in your home, what rooms?

19        A.    It started in the garage and worked its way

20   into the kitchen at that point.

21        Q.    Did you recall drywall being in -- Chinese

22   drywall being in any other rooms in your house other

23   than the garage or kitchen?

24        A.    Not at that point.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 30 of 3246 of
Confidential - Subject to further confidentiality Review
111

1    Q.    At what point are you describing?

2    A.    It's relative to when I inquired about

3    Chinese drywall and knew that I had it.  It was 2009.

4    Q.    What caused you to -- why don't you walk us

5    through that process.

6          What caused you to suspect that there was

7    Chinese drywall in your home?

8    A.    Because I had been away visiting my daughter,

9    and when I got back, the air-conditioning was not

10   functioning.  I had called an outside agency, and

11   when they came in -- well, two of them, but the

12   second one gave me the answer -- identified that he

13   could smell -- being parked across from my garage, he

14   could smell immediately the odor of sulfur or eggs.

15   Q.    And this was back in 2009?

16   A.    Uh-huh.

17   Q.    Summer of 2009?

18   A.    Uh-huh.

19   Q.    Was this the first time you had experienced

20   problems with the air-conditioning unit since you

21   moved in?

22   A.    Yes.

23   Q.    Did you notice an odor prior to the A/C

24   repairman informing you he smelled an odor?

Confidential - Subject to Further Confidentiality Review

```
 1        A.    Not in that unit.

 2        Q.    Did you experience an odor similar to the

 3   rotten eggs or sulfur in any other part of the house

 4   prior to the A/C repairman coming?

 5        A.    No.

 6        Q.    Did you notice any blackened electrical

 7   wiring in the home?

 8        A.    Depends on the longevity.

 9        Q.    Did you --

10        A.    That's when I found out that I had it.  The

11   A/C unit was totally black, and it had worked its way

12   into the refrigeration in the kitchen.

13        Q.    At that time the A/C repairman showed you the

14   air-conditioning unit --

15        A.    Yes.

16        Q.    -- did you also notice the blackening of the

17   refrigerator at the same time?

18        A.    He told me about it, that he had checked it.

19        Q.    Did you notice any blackening of any

20   electrical wiring prior to the A/C repairman coming?

21        A.    No.

22        Q.    Do you know through your documents with WCI

23   if the drywall was installed at the same time as any

24   other electrical system or appliance?
```

Confidential - Subject to Further Confidentiality Review

```
 1         A.    It wasn't released.

 2         Q.    And do you know the total cost of the drywall

 3    installation?

 4         A.    No.

 5         Q.    Other than the A/C unit, did you experience

 6    any problems with any other appliance?

 7               MR. ALBANIS:  Object to the form.

 8               But you can answer.

 9               THE WITNESS:  No.  It was just the

10         refrigeration at that point.

11    BY MS. HAQUE:

12         Q.    What were the problems that you experienced

13    with the refrigerator?

14         A.    That it hit the wiring coming through the

15    back -- the back part of the garage had gotten into

16    the refrigeration.

17         Q.    Was the refrigerator able to cool or -- cool

18    food and stay cool?

19         A.    At that point, yes.

20         Q.    At any point later did the refrigerator stop

21    working altogether?

22         A.    I wasn't there.

23         Q.    When you mentioned "unit" just now, that you

24    observed the wiring in the unit, are you referring to
```

```
 1    the A/C unit or another --

 2       A.    A/C unit.

 3       Q.    I just want to clarify something with you.

 4             Was it the A/C repairman or the inspector who

 5    came in who noticed the odor?

 6       A.    The A/C gentleman noticed it.  I hadn't

 7    gotten the inspector at that point.

 8       Q.    Now, after the A/C repairman told you about

 9    the odor, did you yourself smell the odor?

10       A.    No.

11       Q.    So you did not smell any other odor anywhere

12    else in the home?

13       A.    No.

14       Q.    When was the first time you heard of problems

15    associated with Chinese drywall?

16       A.    It was back when my A/C gentleman was there

17    informing me that I had it, and then after that, I

18    contacted a board member inquiring about what was

19    going on.  She reported -- referred me to someone

20    else that was on one of the boards and was very

21    familiar with the Chinese drywall, and at that point

22    she said I was Number 49.

23       Q.    By "Number 49," do you know what she meant?

24       A.    49 units were -- had Chinese drywall.
```

```
 1        Q.   And this was a board member of your

 2   homeowner's association?

 3        A.   Yes.

 4        Q.   And what did she tell you to do, if anything?

 5        A.   Move out.

 6        Q.   And --

 7        A.   Don't take furniture.

 8        Q.   I'm sorry?

 9        A.   Move out and don't take furniture.

10        Q.   And did you take her advice?

11        A.   Yes, I did.

12        Q.   Did you ever see anything on the news or TV

13   with problems related to Chinese drywall?

14        A.   Not before I got involved in it in my home.

15        Q.   Just to clarify for the record, are you

16   claiming any damages related to health problems --

17        A.   No.

18        Q.   -- connected to Chinese drywall?

19             Mrs. Avery, when did you first speak to an

20   attorney about problems in your property associated

21   with Chinese drywall?

22        A.   It was 2010.

23        Q.   Do you recall how long it was between when

24   you first spoke to an attorney and when a lawsuit was
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 35 of 3246
Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 35 of 3246

Confidential - Subject to Further Confidentiality Review
111

 1    first filed?

 2        A.   I can't remember.

 3        Q.   Do you need to take a break?  Are you okay to

 4    continue?

 5        A.   I'll be ready in a few minutes.  Finish your

 6    page.

 7        Q.   Sure.

 8             Have you ever had your home inspected for

 9    Chinese drywall?

10        A.   Yes.

11        Q.   When was -- how many times have you had your

12    house inspected?  Do you recall?

13        A.   Just one.

14        Q.   Do you recall the name of the company that

15    inspected your home?

16        A.   I don't remember.

17        Q.   I'm going to show you what has been premarked

18    as Exhibit Number 5.

19             (Defendants' Exhibit 5 was marked for

20    identification.)

21             THE WITNESS:  My attorney has all this

22        information.

23             My attorney has all this information.

24    ///

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 36 of 3246
Case 2:09-md-02047-EEF-MBN Document 20691 Entered on FLSD Docket 11/26/19 Page 92 of
111
Confidential - Subject to Further Confidentiality Review

```
 1    BY MS. HAQUE:

 2        Q.   Do you recall ever looking at this report

 3    yourself or seeing this report before today?

 4        A.   Seen it.

 5        Q.   This report says that Gary DiMarzio of Kross

 6    Inspectors performed an inspection on your home.

 7             Does that sound familiar to you?

 8        A.   Well, I know that Kross was very

 9    accommodating to people that had the problem and

10    managed to provide redoing the properties in question

11    that had Kross.  They had no problem.

12        Q.   Were you at home when this inspection was

13    performed?

14        A.   Yes.

15        Q.   Did you have the opportunity to talk to the

16    inspector at any point during the process?

17        A.   I did.

18        Q.   Do you recall what you all talked about?

19        A.   Where was the Chinese drywall -- the

20    drywall -- who -- who put the chemicals together, in

21    other words.  And I was told Chinese.

22        Q.   Did the inspector tell you approximately what

23    percent of the home --

24        A.   No.
```

Confidential - Subject to Further Confidentiality Review

```
 1        Q.    -- was made with drywall?

 2        A.    No.

 3        Q.    Do you know if anyone has determined what

 4   percentage of the home was constructed with Chinese

 5   drywall?

 6        A.    No.

 7        Q.    Who paid for the inspection with Kross?

 8        A.    I did.

 9        Q.    Do you recall approximately how much?

10        A.    No, I take that back on Kross.  I'm mixing

11   up.  No, I never had an inspection by Kross.

12        Q.    This document shows that it was completed by

13   Kross.

14        A.    I don't remember . . .

15              MR. ALBANIS:  Flip through the pages.

16              THE WITNESS:  Oh, okay.

17              Can I have that question again, please?

18              MS. HAQUE:  I'm sorry?

19              THE WITNESS:  The question again?

20              MS. HAQUE:  Sure.

21   BY MS. HAQUE:

22        Q.    Who paid for the inspection?

23        A.    Well, according to this, Kross.

24        Q.    Do you recall if you paid for this Kross
```

Confidential - Subject to Further Confidentiality Review

```
1     inspection out of pocket?

2         A.   I don't recall it.  I don't remember.

3         Q.   Okay.  Mrs. Avery, I'm going to show you what

4     has been premarked Exhibit Number 6.

5              (Defendants' Exhibit 6 was marked for

6     identification.)

7     BY MS. HAQUE:

8         Q.   Can you please take a moment to familiarize

9     yourself with this document.

10        A.   I know I had somebody come out, so I'm going

11    to say yes on that.

12        Q.   So -- so this appears to be a second

13    inspection that was done.  Do you recall a second

14    home inspection?

15        A.   I don't remember.  I know my name is on it.

16    I don't remember this.

17        Q.   Okay.  Did you ever speak with any of the

18    inspectors about the types of drywall that they found

19    in your home?

20        A.   Yes.  We had a conversation.

21        Q.   And what did they tell you?

22        A.   At that point when -- it was difficult for

23    them to tell because they would have to pull a

24    humongous piece off the wall.
```

Confidential - Subject to further confidentiality Review

```
 1          Q.    Did they find examples of both U.S. and

 2    Chinese drywall in the home?

 3          A.    Yeah, I -- yeah.

 4          Q.    Did they -- do you recall the names of any

 5    manufacturers?

 6          A.    No, I don't.

 7          Q.    Oh, go ahead.

 8          A.    No, I'm talking to myself.

 9          Q.    Has anyone taken any samples of drywall from

10    your home?

11          MR. ALBANIS:  Object to the form.

12          You can answer.

13          THE WITNESS:  Yes, I would say.

14    BY MS. HAQUE:

15          Q.    And was that drywall given to your attorneys,

16    do you recall?

17          A.    No, I don't.

18          Q.    You don't -- just for the record, you don't

19    recall?

20          A.    I don't recall at this point.

21          Wait a minute, wait a minute.  Yes.  They

22    have it on record.

23          Q.    Do you recall -- other than the samples that

24    you gave to your attorney, was any other -- were any
```

```
1    other samples taken of the drywall?

2         A.   I don't remember.

3         Q.   Do you know if anyone collected any samples

4    of end tape?

5         A.   Of what?

6         Q.   End tape, e-n-d t-a-p-e.

7         A.   No.

8         Q.   Do you know if anyone labeled the samples of

9    drywall with their location or took any -- with their

10   location?

11        A.   That's already shown here.  I forget -- but

12   no to the answer because I didn't know about it.

13        Q.   Okay.  Did you take any photos --

14        A.   No.

15        Q.   -- during any of the inspections?

16        A.   No.

17        Q.   Do you know if someone took photos of the

18   drywall samples and the markings on them?

19        A.   No.

20        Q.   Do you know if someone drafted a floor plan

21   that showed where the drywall boards were removed

22   from the house?

23        A.   No.

24        Q.   I have finished my page.  So do you want to
```

Confidential - Subject to Further Confidentiality Review

```
 1    go ahead and take a five- to ten-minute break?

 2        A.    I would love it.

 3        Q.    Please.

 4              MS. HAQUE:  We can go off the record.

 5              (Recess from 1:57 until 2:13 p.m.)

 6    BY MS. HAQUE:

 7        Q.    Mrs. Avery, I just want to ask some questions

 8    to clarify some of your testimony from earlier.

 9        A.    Okay.

10        Q.    Other than the unit at Camarelle Circle, did

11    you purchase any other units?

12        A.    No.

13        Q.    And I think we went back to look at the

14    record on the square footage, and --

15        A.    Yes.

16        Q.    -- we just want to have you confirm one more

17    time.

18              Would you look at Exhibit Number 4 again.

19        A.    And you want me to tell you the square

20    footage?

21        Q.    Yes.

22        A.    1,889.

23        Q.    1,889.

24        Q.    And is -- does that number pertain to the
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 42 of 3246
Case 2:09-md-02047-MCD Chan 2091 terms of 9 clocket 13-2019 Page 98 of
111

Confidential - Subject to Further Confidentiality Review

 1    under air living area?

 2        A.    I believe it only -- it included the garage.

 3        Q.    Okay.  And not including the garage, is the

 4    under air square footage 1,229 square feet?

 5        A.    Yes.

 6        Q.    Okay.  I also wanted to ask you, yes, a few

 7    questions related to the reports you have in your

 8    hand.

 9            If you could turn to Exhibit Number 5,

10    please.

11        A.    Okay.

12        Q.    In this report, if you turn to the second

13    page, if you look at the titled box, "Manufacturer

14    Identified," it says:  In garage, markings were found

15    that are consistent with defective drywall.

16            In the attic access --

17        A.    I'm story, say that again.

18        Q.    In attic access --

19        A.    Okay.

20        Q.    -- in the master bedroom closet, national

21    gypsum from Charlotte, North Carolina was identified.

22            Did I read that correctly?

23        A.    I was not aware.

24        Q.    This report states that defective drywall was

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 43 of 3246 of
Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 99 of
111

Confidential - Subject to Further Confidentiality Review

```
 1    only found in the garage.

 2        A.   But I was not told that.

 3        Q.   Do you recall what you were told?

 4        A.   Just the fact that I had Chinese drywall.

 5        Q.   So just to confirm for the record, no one

 6    told you exactly where in the house the Chinese

 7    drywall was located?

 8             MR. VERRIER:  I'm sorry, where are you

 9        reading from?  "Manufacturer Identified"?  Is

10        that the column you're reading?

11             MS. HAQUE:  Correct.  Yes.

12    BY MS. HAQUE:

13        Q.   Do you want me to repeat the question?

14        A.   No.  But thank you.

15             No, I was not aware.

16        Q.   If you look further down on the same page --

17        A.   Yeah.

18        Q.   -- there's a question that says "odor

19    observed" --

20        A.   Where?  Oh, okay.

21        Q.   Do you see that?

22        A.   Yes.

23        Q.   It says:  Sulfur odor observed in garage --

24        A.   Right.
```

Confidential - Subject to Further Confidentiality Review

```
 1       Q.    -- but weaker to no odor observed throughout

 2    the house.

 3       A.    I know what I want to say, but I don't know

 4    if I should say it.

 5       Q.    Is that consistent with what you recall?

 6       A.    I don't consider it consistent.

 7       Q.    What do you remember?

 8       A.    I know it caused me medical problems.

 9       Q.    What types of problems did the odor cause?

10       A.    Dizziness, headaches, tired, a few of the

11    things.

12             But I could not smell it because I lived

13    there.

14       Q.    In this --

15       A.    And not sleeping well.  All of these things I

16    had issues with medically.

17       Q.    And in this report as well on the same

18    page --

19       A.    That's right.  Thank you.

20       Q.    -- it states:  Results positive -- and this

21    is the first part, all in capital letters:  --

22    results positive, defective drywall not identified;

23    however, symptoms found.

24             And if you go on to the next paragraph, it
```

```
 1    says:  Upon entry to the subject property, the

 2    inspector toured the home to observe typical sulfur

 3    odor emitted by defective drywall.  Faint to no odor

 4    was observed throughout house.  Stronger odor was

 5    observed in garage.

 6              Did I read that correctly?

 7        A.   Yes, you did.  But all that air was coming

 8    from the handler in the garage which was coming into

 9    my unit, and that's where I didn't know I had a

10    problem.

11        Q.   And then the second to last paragraph in the

12    same report --

13        A.   Okay.

14        Q.   -- it says:  All copper wiring observed to be

15    darkened in garage.  All copper wiring inside house

16    observed to have a normal appearance.

17              Is that consistent with what you saw?

18        A.   Except for the -- the refrigerator.

19    Everything else was consisten -- was not consistent.

20        Q.   Okay.  You can go ahead and set that down.

21              And then if I can have you take a look at --

22    this is Exhibit Number 6.  If you look at the first

23    page under "Client Name."

24        A.   I'm sorry?
```

Confidential - Subject to Further Confidentiality Review

```
1       Q.   If you look at the first page under "Client

2  Name."

3       A.   Okay.

4       Q.   What does it say under "Client Name"?

5       A.   Janet Avery.

6       Q.   Under "Client Name" right at the top?

7       A.   Oh, Morgan.  Morgan & Morgan.

8       Q.   Are those your attorneys?

9       A.   Yes.

10      Q.   And is this your address -- or your former

11  address?

12      A.   Yes.

13      Q.   If you look at the second -- in the middle,

14  there's some boxes with some comments from the

15  inspector.

16           If you go to the second box under

17  "Electrical," it states:  Copper ground wires on

18  sockets are discolored.  Picture attached.

19           Did the inspector tell you where the copper

20  ground wires were discolored -- where in the home?

21      A.   I don't remember.

22      Q.   If you go further down on the first page,

23  there's a box that says "Odor."  Sulfur odor was

24  present.
```

Confidential - Subject to Further Confidentiality Review

```
 1              Did the inspector tell you where in the home

 2    the sulfur odor was present when he inspected your

 3    house?

 4        A.   Well, that was basically in the garage,

 5    because that's where it started.

 6        Q.   And did the inspector tell you that?

 7        A.   I'm sure he did.  Having had an A/C gentleman

 8    come out and check my garage, I'm sure he made the

 9    comment about the -- the sulfur.

10        Q.   Okay.  You can go ahead and set that down.

11              Mrs. Avery, are you claiming any damages

12    related to your personal property?

13        A.   Yes.

14        Q.   What damages are you claiming with respect to

15    the personal property?

16        A.   Right now, I can't remember.

17        Q.   Do you recall any personal property being

18    damaged by effects of Chinese drywall?

19        A.   Could you clarify that a little bit more?

20        Q.   Do you have any items of your personal

21    property that you claim was damaged due to Chinese

22    drywall?

23        A.   No.

24        Q.   Mrs. Avery, are you claiming any damages
```

Confidential - Subject to Further Confidentiality Review

```
1    related to the loss of use and enjoyment of your

2    home?

3        A.    Repeat it one more time.

4        Q.    Sure.

5              Mrs. Avery, are you claiming any damages

6    related to the loss of use and enjoyment of your

7    home?

8        A.    Yes.

9        Q.    Approximately how much in damages are you

10   claiming?

11       A.    $200,000.

12       Q.    How have you come to that number?  What is

13   the basis for that number?

14       A.    The basis is my attorney has all the

15   documentation that I -- that feels that should be

16   part of the -- you will have to excuse me.  I'm going

17   dead.

18             MS. HAQUE:  Do you want to take another

19       break?

20             THE WITNESS:  Say it again one more time.  I

21       know what you are asking for, but I just don't

22       have the words to come out.

23             MS. HAQUE:  Sure.  Take your time.

24   ///
```

```
 1    BY MS. HAQUE:

 2        Q.   What is the basis for the $200,000 you are

 3    claiming for the loss of use and enjoyment of your

 4    property?

 5        A.   That's the base, yes.  That's the base.

 6        Q.   Are there -- are there documents that you're

 7    basing that claim upon?

 8        A.   My attorney has those.

 9        Q.   Do you recall what types of documents those

10    relate to?

11             MR. ALBANIS:  Object to the form.

12             But you can answer if you know.

13             THE WITNESS:  Pardon?

14             MR. ALBANIS:  I objected to form, but you can

15        answer Ms. Haque's question if you know.

16             THE WITNESS:  One more time, repeat.

17             MS. HAQUE:  Sure.

18    BY MS. HAGUE:

19        Q.   What types of documents are you using for the

20    basis of the $200,000 in loss of use and enjoyment

21    damages?

22        A.   I'm sorry.

23             I have drawn a blank.  I can't answer that

24    question.  I can't remember right now.
```

Confidential - Subject to Further Confidentiality Review
111

```
1        Q.    Okay.  Has the presence of Chinese drywall

2   limited your use of the property?

3        A.    Yes.

4        Q.    How?

5        A.    Well, it wasn't movable.  It wasn't something

6   I should live in, according to the people on the

7   boards and -- that I should get out.  It was

8   dangerous for my health.

9        Q.    What were some of the things you used to do

10  in the home that you could no longer do because of

11  Chinese drywall?

12       A.    It was getting out of there and not smelling.

13  Removing.

14       Q.    Were there activities that you did in the

15  home that you could no longer do due to the Chinese

16  drywall?

17       A.    Uh-huh.  There were.

18       Q.    What were some of those activities?

19       A.    Well, having my friends over, having a meal,

20  having an evening out at my home, enjoying each

21  other's company.

22       Q.    When you moved into a different location,

23  were you able to do those activities?

24       A.    I'm sorry.  I didn't hear what you said, the
```

Confidential - Subject to further Confidentiality Review

```
1    last part.

2         Q.   Strike that question.

3              And you're claiming $200,000 total with

4    respect to the loss of use and enjoyment, just to

5    confirm?

6         A.   Yes.

7         Q.   But just as we sit here today, you didn't

8    recall any documents on which you're basing that

9    number?

10             MR. ALBANIS:  Objection.  That

11        mischaracterizes her previous testimony.

12   BY MS. HAQUE:

13        Q.   If you can -- you can respond -- let me

14   re-ask the question.

15        A.   I'm just --

16        Q.   Take your time.

17             MR. ALBANIS:  I think you should probably

18        re-state the question or ask it again just to

19        move it along.

20             MS. HAQUE:  Sure.

21   BY MS. HAQUE:

22        Q.   As you sit here today, can you recall any

23   specific documents on which you are basing the

24   $200,000 in damages?
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.    I'm having a problem with this one.  I don't

 2   know why.  I had it all in my head earlier.

 3              I can't remember.

 4        Q.    After you moved out to -- after you moved out

 5   of the home, were you able to have people over at

 6   your new residence?

 7        A.    Not immediately.

 8        Q.    Why not?

 9        A.    Because I had other things going on in my

10   life, to get this taken care of with attorneys,

11   et cetera, and it was stressful.

12        Q.    By "other things" happening in your life, do

13   you mean speaking -- can you --

14        A.    I could talk to my friends, but we didn't --

15   we didn't go out to the dinners like I used to.  I

16   would say, well, I'm tired.

17        Q.    When were you able to start doing that again?

18        A.    When I finally got this part, my attorney,

19   and got the information that was required at that

20   point and why I was here to have an attorney for

21   myself, and it was a matter of, you know, getting all

22   of this documentation.

23              I managed to do it because I remembered

24   things, and my memory is not too great these days.
```

```
 1        Q.   Do you recall approximately when you were
 2   able to start having friends over and living your
 3   life?
 4        A.   I don't think there was any time frame for
 5   that.  They could have been, you know, inviting me.
 6   I don't know.  I don't --
 7        Q.   So it didn't really stop during this time
 8   period?
 9        A.   Not really.
10        Q.   I'm going to switch topics now.
11             Are you okay?  Do you need to take another
12   break?
13        A.   I will, yeah.
14        Q.   Okay.
15        A.   If you don't mind.
16             MS. HAQUE:  We'll go off the record.
17             (Recess from 2:31 until 2:53 p.m.)
18   BY MS. HAQUE:
19        Q.   Mrs. Avery, just some clean-up questions.
20             Do you recall whether your air-conditioning
21   unit was located inside the garage?
22        A.   Yes.
23        Q.   Okay.  All right.  Now I'm going to switch
24   topics on you.
```

```
 1              Mrs. Avery, are you claiming any damages in

 2     lost equity?

 3         A.   No.

 4         Q.   Mrs. Avery, we said -- we asked you some

 5     questions earlier today related to your mortgages.

 6              Do you remember that?

 7         A.   Uh-huh.

 8         Q.   Do you recall what the term of your first

 9     mortgage was?

10         A.   Could you clarify "term"?

11         Q.   Yes.

12              Was it a 30-year mortgage?  Was it a 15-year

13     mortgage?

14         A.   It was a 30-year mortgage.

15         Q.   Do you recall what the monthly mortgage

16     payment was?

17         A.   Five -- it was about 561 and change.

18         Q.   When did you stop making mortgage payments?

19         A.   Let me see what I can find in here.  If I

20     can . . .

21              Say that again to me.

22         Q.   Sure.

23              When did you stop making mortgage payments?

24         A.   In 2011.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 55 of 3246 1 of
Case 1:07-cv-21446-MGC Document 261 Entered on FLSD Docket 12/26/13 Page 91 of
111

Confidential - Subject to Further Confidentiality Review

```
 1         Q.   Mrs. Avery, let me put what has been

 2    premarked as Exhibit 7 in front of you.

 3              (Defendants' Exhibit 7 was marked for

 4    identification.)

 5    BY MS. HAQUE:

 6         Q.   Can you take a moment to familiarize yourself

 7    with this document.

 8         A.   Okay.  Okay.

 9         Q.   Do you recognize that document?

10         A.   Yes, I do.

11         Q.   Does your signature appear on that document?

12         A.   My initials and my signature.

13         Q.   Can you please tell me what that document is?

14         A.   It's when I was purchasing.

15         Q.   Is that your first mortgage?

16         A.   Yes.

17         Q.   And the amount of the mortgage was $90,000,

18    correct?

19         A.   Yes.

20         Q.   I am showing you next what has been premarked

21    Exhibit 8.

22              (Defendants' Exhibit 8 was marked for

23    identification.)

24    ///
```

Confidential - Subject to Further Confidentiality Review

```
 1    BY MS. HAGUE:

 2        Q.   Can you take a moment to familiarize yourself

 3    with that document.

 4             What is -- do you recognize this document?

 5        A.   Uh-huh.  Yes.

 6        Q.   Does your name appear on this document?

 7        A.   Yes.

 8        Q.   And is that the address for the property at

 9    issue in this litigation?

10        A.   Yes.

11        Q.   What is this document?

12        A.   It's a disclosure for short sale.

13        Q.   This document shows your mortgage payments,

14    correct?

15        A.   Right.

16        Q.   And you testified earlier that your mortgage

17    payment was approximately $561.48?

18        A.   Uh-huh.

19        Q.   Did you stop paying your mortgage on or about

20    May 2010?

21        A.   May -- yes.

22        Q.   And if you open that document in front of

23    you, Exhibit 8, to the second page, is that

24    reflected -- I'm sorry, the third page.
```

```
 1              Is that last payment reflected -- of your

 2       mortgage reflected in the right-hand column?

 3       A.    On this page?

 4       Q.    Correct.

 5              Let me --

 6       A.    Could you rephrase that?

 7       Q.    Sure.

 8              Do you recall when the last time you paid

 9       your mortgage was?

10       A.    No, not unless I look at this.

11              I can't remember even though I'm looking at

12       it.

13       Q.    Mrs. Avery, it appears as if the last

14       mortgage payment, according to this document, was

15       made in about April or May 2010.

16              Does that sound about right?

17       A.    Yes, it does.

18       Q.    And this document shows some credits that you

19       received.

20              Do you recall credits?

21       A.    No.

22       Q.    And when did you move out of your home that

23       was at 10671 Camarelle Circle?

24       A.    Because I was informed to do so because of
```

```
 1    issues with previous -- not only myself but with

 2    previous owners on the property.

 3        Q.   I'm sorry.  I meant to ask:  When did you

 4    move out?

 5        A.   Two -- wait a minute -- 2010.

 6        Q.   It was approximately March 2010?

 7        A.   Approximately.  I'm not . . .

 8        Q.   Okay.  Mrs. Avery, I'm going to ask you some

 9    questions now related to the short sale of your

10    property.

11             You say that you sold the home in a short

12    sale, correct?

13        A.   Yes.

14        Q.   And that was approximately in July of 2011?

15        A.   Yes.

16        Q.   Can I have you look again at Exhibit

17    Number 1, which we looked at previously today.

18             Can you flip to the last couple pages of this

19    document.

20        A.   The last couple?

21        Q.   Yes, please.

22             This document shows the sale -- oh, please

23    take a moment to review if you need to.

24        A.   Thank you.
```

```
 1        Q.   Does this document show the sale of the

 2   property for approximately $70,000 --

 3        A.   Yes.

 4        Q.   -- in July of 2011?

 5        A.   Yes.

 6        Q.   Okay.  You can go ahead and set that document

 7   down.

 8             Mrs. Avery, from when you first started

 9   paying your mortgage, which was after November 30th,

10   2007, until you stopped paying the mortgage, until

11   about April 2010, did you pay your mortgage every

12   month, on time?

13             MR. ALBANIS:  Object to the form.

14   BY MS. HAQUE:

15        Q.   Did you understand the question?  Do you want

16   me to rephrase?

17             From approximately November 2007 to

18   April 2010, did you pay your mortgage every month, on

19   time?

20             MR. ALBANIS:  Same objection.  And I think it

21        also mischaracterizes the witness's testimony

22        because I think she testified that she paid

23        through May of 2010.

24             But you can answer Ms. Haque's question if
```

confidential - Subject to further confidentiality Review

```
 1       you can.

 2              THE WITNESS:  Yes.

 3    BY MS. HAQUE:

 4       Q.    Did you ever miss any mortgage payments --

 5       A.    No.

 6       Q.    -- between November 2007 and May 2010?

 7       A.    No.

 8       Q.    What led to you not paying your mortgage back

 9    in May of 2010?

10       A.    Repeat.

11       Q.    What led you to not pay your mortgage back in

12    May of 2010?

13       A.    Due to the fact that I had to relieve myself

14    of the property that I purchased and rent.

15       Q.    Did you also stop paying your HOA community

16    associate fees?

17       A.    Uh-huh.

18       Q.    Did you stop paying those in March of 2010?

19       A.    I don't remember.

20              MR. ALBANIS:  What number are we on?

21              MS. HAQUE:  We might not use this.  One

22       second.

23              MR. ALBANIS:  Oh, okay.

24              MS. HAQUE:  But it would be Exhibit 9.  But
```

Confidential - Subject to Further Confidentiality Review

1        one second.

2            MR. ALBANIS:  Okay.

3    BY MS. HAQUE:

4        Q.   Mrs. Avery, I'm going to show you what's been

5    premarked Exhibit 9.

6            (Defendants' Exhibit 9 was marked for

7    identification.)

8    BY MS. HAQUE:

9        Q.   Please take a moment to refresh your memory

10   regarding this document.

11       A.   I don't remember this.

12       Q.   Okay.  Did you -- did you ever receive any

13   documents related to liens on your property?

14       A.   No.

15       Q.   Okay.  If you look at the first page of this

16   document, is Lot 35, Block B your property, do you

17   recall, of the Villa Preserve at Track T?

18           MR. ALBANIS:  I'm going to object to the

19       extent that this witness would really only know

20       about this had she seen this before -- or would

21       know about the lot had she seen this before.

22           And I think you have initiated your comments

23       regarding Exhibit 9 with asking her to refresh

24       her recollection, which of course implies that

Confidential - Subject to Further Confidentiality Review

```
 1        she has seen this before.

 2    BY MS. HAQUE:

 3        Q.   Let me ask it this way:  Do you recall

 4    stopping payment on the HOA and community associate

 5    fees starting on or about March of 2010?

 6        A.   Well, I never received anything.

 7        Q.   I'm sorry?

 8        A.   I never received anything.

 9        Q.   Let me ask you this question:  Did you stop

10    paying your HOA and --

11        A.   I believe I answered that already.

12        Q.   And just to clarify for the record, did you

13    stop paying your HOA and community associate fees

14    starting in about March of 2010?

15        A.   I did mention that I stopped.

16        Q.   Did the bank ever threaten to foreclose on

17    your property?

18        A.   No.

19        Q.   What led you to decide to short sale your

20    house?

21        A.   Because I thought it was the easiest way to

22    go.  I had a realtor who handled it for me very well.

23    The banks agreed.  And what I owed was foreclosed.  I

24    owed them nothing.  They accepted that.
```

```
 1        Q.    How did Chinese drywall factor into your

 2   decision, if at all?

 3        A.    It all factored into my decision, and the

 4   bank took it into consideration.

 5        Q.    And how did it factor into your decision?

 6        A.    It was a big relief.

 7        Q.    You testified earlier that the bank did not

 8   send you a foreclosure notice.

 9        A.    I did not say that.  It's on -- in the file

10   with my attorney.

11        Q.    So just to clarify for the record, the bank

12   did threaten to foreclose on your property?

13        A.    No threaten.  Did.

14        Q.    Let me show you what has been premarked as

15   Exhibit Number 10.

16             (Defendants' Exhibit 10 was marked for

17   identification.)

18   BY MS. HAQUE:

19        Q.    Please take a moment to review this document.

20             Do you recognize this document?

21        A.    No.

22        Q.    Did you ever see a foreclosure notice from

23   your bank?

24        A.    No.
```

```
 1        Q.    How did you know that the bank was

 2   foreclosing on your house?

 3        A.    It's when I put in for the short sale.

 4        Q.    Did --

 5        A.    And I had a realtor handling the sale and

 6   working with the bank to accept this so they can get

 7   some monies returned to them.  They were agreeable to

 8   that.  I got a release of the foreclosure.  So that's

 9   passe.

10        Q.    So just to clarify, you did not know that the

11   bank had foreclosed on your property prior to you

12   engaging in the short sale?

13        A.    Right.  Yes.

14        Q.    Let's talk about some of the other factors

15   that may have impacted your financial situation.

16              At the time of the short sale, you were

17   retired, correct?

18        A.    Uh-huh.

19        Q.    Did you have any accidents or medical

20   conditions that led to medical bills for either you

21   or your family?

22        A.    No.

23        Q.    Did your house payments or interest rate

24   change for any reason?
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.    Clarify for me, please.

 2        Q.    Before you engaged -- before you decided to

 3    engage in the short sale, did your mortgage payment

 4    or interest rate change at all?

 5        A.    Not to my knowledge.

 6        Q.    I believe you testified earlier that you've

 7    never been involved --

 8        A.    Excuse me.

 9            MR. ALBANIS:  Do you need some more water?

10            THE WITNESS:  Yeah.

11            MR. VERRIER:  I'll get it.

12            THE WITNESS:  Thank you.

13            I have to wait for him to come back.

14            MS. HAQUE:  We can go off the record for a

15        moment.

16            (Recess from 3:17 until 3:18 p.m.)

17    BY MS. HAQUE:

18        Q.    I believe you testified earlier, Mrs. Avery,

19    that you've never been involved in a lawsuit before?

20        A.    Right.  Positively.  This is quite an

21    experience.

22        Q.    Prior to you deciding to engage in the short

23    sale, did you or anyone in your family file for

24    disability?
```

Confidential - Subject to further Confidentiality Review

```
 1        A.   No.

 2        Q.   Did anyone in your family take time off for

 3   work for any reason?

 4        A.   No.

 5        Q.   Did you have any new financial

 6   responsibilities prior to deciding to engage in the

 7   short sale?

 8        A.   Can you clarify that a little bit?

 9        Q.   Did you have any financial obligations that

10   you had to take care of that were new that led you to

11   decide to do the short sale?

12        A.   No.

13        Q.   Did you buy any new property such as a car

14   prior to engaging in the short sale?

15        A.   No.

16        Q.   Did you buy any other properties before

17   engaging in the short sale?

18        A.   No.

19        Q.   Did you make any investments prior to

20   engaging in the short sale?

21        A.   No.

22        Q.   What other debts did you have besides your

23   mortgage?

24        A.   At the time?  I didn't have any other debts.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 67 of 3246 of
Case 1:09-md-02047-MBN Document 22363-39 Filed SD Docket 11/18/19 Page 63 of
111

Confidential - Subject to Further Confidentiality Review

```
1    I was living from month to month.

2       Q.   Do you recall when the bank approved the

3    short sale?

4       A.   November 30th, 2011.

5       Q.   2011?

6       A.   Yeah.

7       Q.   At that time do you recall how much you still

8    owed on your mortgage?

9       A.   No.

10      Q.   Mrs. Avery, if you could turn to -- back to

11   Exhibit Number 8.

12      A.   Okay.

13      Q.   And turn to the second and third pages.

14      A.   Which one?

15      Q.   The second and third pages.

16      A.   Okay.

17      Q.   It looks like you owed $87,394.

18      A.   Uh-huh.

19      Q.   Is that about right?

20      A.   I would say yes.

21      Q.   Okay.  Do you recall how much you sold your

22   property for?

23      A.   The $70,000 that they accepted.

24      Q.   How short was the sale?  Do you recall?
```

```
 1        A.    When you say "how short" --

 2        Q.    From when you --

 3        A.    -- define.

 4        Q.    From when you decided to list the property

 5   and when you sold it.

 6        A.    Actually, it didn't take much time at all.  I

 7   don't remember the dates, but I think it was very

 8   quickly on it.

 9        Q.    Do you recall the difference in price between

10   what you owed and what you sold it for?  Was it about

11   27,000 -- I'm sorry.  Strike that.

12              Do you recall the difference between what you

13   owed to the bank and what you sold your property for?

14              MR. ALBANIS:  Object to the form.

15              THE WITNESS:  Yes.

16   BY MS. HAQUE:

17        Q.    Approximately how much was it?

18        A.    Well, based upon -- wait a minute.  Wait a

19   minute.

20              I rescind that and say no, if that's

21   possible.

22        Q.    Was it about approximately $17,000?  Does

23   that sound about right to you?

24        A.    It doesn't -- I don't remember.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 69 of 3246
Case 2:09-md-02047-EEF-MBN Document 20431-1 Filed 06/19/16 Page 65 of 111
Confidential - Subject to Further Confidentiality Review

```
 1       Q.    Was the debt that you owed to the bank

 2   forgiven by the bank as part of the short sale

 3   transaction?

 4       A.    Yes.   Foreclosure.   Documented.

 5       Q.    Mrs. Avery, I'm going to show you what we've

 6   premarked as Exhibit Number 11.

 7             (Defendants' Exhibit 11 was marked for

 8   identification.)

 9   BY MS. HAQUE:

10       Q.    Please take a moment to familiarize yourself

11   with that document.

12             THE WITNESS:   Am I supposed to know this?

13             MR. ALBANIS:   I can't answer your question.

14       I'm sorry.   But Ms. Haque has asked you to review

15       the document so . . .

16   BY MS. HAQUE:

17       Q.    Mrs. Avery, I just have a question on -- on

18   just the first page of the document.

19       A.    Okay.

20       Q.    We can shortcut this if your attorney agrees.

21             MR. ALBANIS:   Thank you.

22             THE WITNESS:   Thank you.

23   BY MS. HAQUE:

24       Q.    Mrs. Avery, do you recognize this page?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 70 of 3246
Case 2:09-md-02047-EEF-MBN Document 20741 Filed 30 Docket 11/18/19 Page 66 of
111
Confidential - Subject to Further Confidentiality Review

```
 1        A.   Yes.  Partially.

 2        Q.   What is this document to you?

 3        A.   It's a settlement for the purchase under

 4   short sale.

 5        Q.   Can you look with me to Item No. 101.

 6        A.   Okay.

 7        Q.   Is this the amount for which you sold the

 8   property?

 9        A.   Yes.

10        Q.   And that was for $70,000?

11        A.   Yes.

12        Q.   Let's go down to Item No. 504.  It's in the

13   right-hand column, same page.

14        A.   Okay.

15        Q.   And this says:  Payoff of the first mortgage

16   loan.

17             And then lower down, Item No. 506, it says:

18   The release of the second lien.

19        A.   Okay.

20        Q.   Do you recall that these were all paid off?

21        A.   Yes.

22        Q.   Okay.  And let me shortcut this and show you

23   what's been marked Exhibit Number 12, just two pages.

24             (Defendants' Exhibit 12 was marked for
```

Confidential - Subject to Further Confidentiality Review

```
1      identification.)

2    BY MS. HAQUE:

3      Q.    Do you recognize this -- these two documents?

4      A.    I recognize this.  Let's see.

5      Q.    Mrs. Avery, do you recognize that -- that

6    document?

7      A.    Yes.

8      Q.    What is it?

9      A.    It's a notice of the mortgage . . .

10     Q.    Do those documents represent a release for

11   your mortgages?

12     A.    Yes.

13     Q.    And can you flip the document over.

14           Is that the release of your second mortgage?

15     A.    Either I'm blind or I'm not seeing it.

16     Q.    If you look at the title of the document,

17   "Release of Mortgage."

18     A.    Oh, okay.

19           Yes.  Thank you.

20     Q.    Sure.

21           So it's safe to say -- or it's fair to say

22   that the bank has released you from your obligations

23   related to these two mortgages?

24     A.    Uh-huh.  Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 72 of 3246
Case 1:16-cv-02147-MGC Document 26-1 Entered on FLSD Docket 11/30/19 Page 68 of
111

Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Do you know if the bank has any other liens

 2   against you in any amount?

 3        A.   No.

 4        Q.   Do you mean the bank does not have any, or

 5   you don't know?

 6        A.   I don't know.

 7        Q.   If you can go back to this big, thick

 8   document, which is Exhibit Number 11, and flip all

 9   the way to the back.

10        A.   All the way to the back?

11        Q.   And it is this page on the other side.

12             MR. ALBANIS:  Which exhibit is this, Aliyya?

13             MS. HAQUE:  This is Exhibit 11.

14             MR. ALBANIS:  Thank you.

15             Last page, you said?

16             MS. HAQUE:  Third to last page.  The one that

17        starts -- it's dated June 28th, 2011.

18             MR. ALBANIS:  Thank you.

19   BY MS. HAQUE:

20        Q.   Mrs. Avery, do you recall receiving this

21   letter?

22        A.   I'm sorry?

23        Q.   Do you recall receiving this letter?

24        A.   No, I don't.  It doesn't make -- not familiar
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 73 of 3246
Case 2:09-md-02047-EEF-MBN Document 20688-12 Filed 02/13/2019 Page 69 of
111
Confidential – Subject to Further Confidentiality Review

1      to me.

2          Q.    This letter -- let me ask it this way:  Has

3      Fifth Third Bank, since 2011, initiated any action

4      against you to collect any debt?

5          A.    Not to my knowledge.

6          Q.    So you've never received any notice from the

7      bank coming after you for any amount?

8          A.    Uh-huh.

9          Q.    And that's from 2011 all the way until the

10     present day?

11         A.    Yes.

12         Q.    Is that accurate?

13         A.    Yes.

14         Q.    Can you tell me, Mrs. Avery, what dollar

15     figure you are claiming, if any, as damages from the

16     short sale?

17             MR. ALBANIS:  Object to the form.

18             But you can answer it.

19             THE WITNESS:  From the short sale?  I'm not

20         claiming any.  None.

21     BY MS. HAQUE:

22         Q.    Do you recall how much money was owed on your

23     second mortgage for $25,000 at the time of the short

24     sale?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 74 of 3246
Case 1:09-cv-02047-EEF-MBN Document 201-1 Entered on FLSD Docket 11/19/19 Page 90 of
111

Confidential - Subject to Further Confidentiality Review

```
 1        A.   I don't -- I don't know.

 2        Q.   Are you okay?  Do you need to take a break or

 3   can we continue?

 4        A.   No, keep going.  Hopefully I'll get done

 5   today.

 6        Q.   And just to clarify, let's go back to

 7   Exhibit 12, which is that page right here.

 8        A.   Okay.

 9        Q.   The second mortgage was completely discharged

10   in 2017.

11        A.   Okay.

12        Q.   Is that correct to your recollection?

13        A.   As far as I know.  I haven't received

14   anything from them, so I'm basing it on not having

15   received.  I don't recall seeing the letter.

16             MR. ALBANIS:  Where do you see 2017?

17             MR. GUERRA:  Very top.

18             MS. HAQUE:  On the other page.

19             MR. ALBANIS:  Oh, I'm sorry.  Thank you.

20   BY MS. HAQUE:

21        Q.   Mrs. Avery, if you could flip the page over,

22   at the very top of the page.

23             MR. ALBANIS:  Thank you.

24             THE WITNESS:  I don't recall that.  Never got
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 75 of 3246
Case 2:09-md-02047-EEF-MBN Document 20611 Filed 03/15/17 Page 91 of 111
Confidential - Subject to Further Confidentiality Review

```
 1        this.

 2   BY MS. HAQUE:

 3        Q.   Did you receive any communications from the

 4   bank between 2011 to present related to those

 5   mortgages?

 6        A.   No.

 7        Q.   Do you know if any communications went to

 8   your realtor or anyone else?

 9        A.   I'm not aware of it with the move changes I

10   had.

11        Q.   Did you designate anyone to act in an

12   official capacity on your behalf with the bank?

13        A.   No.  My personal business was of no business

14   to anybody else.

15        Q.   Mrs. Avery, are you the sole owner of the

16   claim for all the damages that you seek in this

17   lawsuit?

18             MR. ALBANIS:  Object to the form.

19             THE WITNESS:  Yes.

20   BY MS. HAQUE:

21        Q.   Did you assign any of your rights to anyone

22   else or any entity?

23        A.   My attorney.

24        Q.   Other than your attorney, did you assign --
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.   No.

 2        Q.   Let me just ask the -- finish the question

 3    for the record.

 4        A.   Okay.

 5        Q.   But I understand your response.

 6             You did not assign any rights related to this

 7    lawsuit to any individual or entity?

 8        A.   No.

 9        Q.   Correct?

10             MR. ALBANIS:  You might want to clean up that

11        last bit.  If you look at the realtime:  You did

12        not assign any rights related to any individual

13        or entity?  She answered no.  You said correct.

14    BY MS. HAQUE:

15        Q.   Let me just ask that whole sequence one more

16    time, okay?

17        A.   Okay.

18        Q.   Did you assign any rights related to this

19    lawsuit to any entity or to any individual?

20        A.   No.

21             MR. ALBANIS:  Thanks.

22    BY MS. HAQUE:

23        Q.   Mrs. Avery, did you ever have an appraisal

24    done at 10671 Camarelle Circle?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 77 of 3246
Case 2:09-md-02047-EEF-MBN Document 20891-8 Filed 05/13/19 Page 73 of 111
Confidential - Subject to Further Confidentiality Review

 1    A.   I missed something.  Could you repeat that?

 2    Q.   Sure.

 3         Did you ever have an appraisal done at 10671

 4    Camarelle Circle?

 5    A.   No.

 6    Q.   Did you ever assert a tax appeal for the

 7    property at 10671 Camarelle Circle?

 8    A.   No.

 9    Q.   Mrs. Avery, do you recall providing

10    information on what is called a profile form in this

11    litigation?

12    A.   I'm not quite sure what that means.

13    Q.   Let me show you what has been premarked

14    Exhibit 13.

15         (Defendants' Exhibit 13 was marked for

16    identification.)

17         THE WITNESS:  Yes, I do.

18    BY MS. HAQUE:

19    Q.   If you could turn with me very quickly to

20    Page 5.

21    A.   Yes.

22    Q.   If you look at Section 6, "Prior Payments."

23    A.   That's 7.  Six -- I'm sorry.  I forgot my --

24    go ahead.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 78 of 3246
Case 2:09-md-02047-EEF-MBN Document 20691-3 Filed 09/09/19 Page 79 of 111
Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Have you received any payments from anyone in

 2    relation to your Chinese drywall claims?

 3        A.    It told me I did.  I did get checks from my

 4    attorney's office to the tune of 14,000-plus, but WCI

 5    does not ring a bell to me, that I received any money

 6    from them, the settlement.

 7        Q.    Mrs. Avery, let's go ahead and show you these

 8    checks that's been premarked as Exhibit 14.

 9            (Defendants' Exhibit 14 was marked for

10    identification.)

11    BY MS. HAQUE:

12        Q.    Can you take a moment to familiarize yourself

13    with this document.

14        A.    Yes, I did receive this.

15        Q.    Are these -- do you recognize these

16    documents?

17        A.    Yes.

18        Q.    Were these documents made out to you?

19        A.    Yes.

20        Q.    And these were settlement checks you received

21    in connection with your lawsuit?

22        A.    Yes.

23        Q.    Do you recall what you did with these

24    settlement checks?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 79 of 3246
Case 2:09-md-02047-MCD Document 26911-99 Filed 06/13/2019 Page 95 of 111
Confidential - Subject to Further Confidentiality Review

```
 1        A.   I paid my bills.

 2        Q.   Mrs. Avery, when you vacated your property at

 3    10671 Camarelle Circle, you said you left everything

 4    behind in the home?

 5        A.   Uh-huh.

 6        Q.   Are you also claiming moving expenses?

 7        A.   No.

 8             MS. HAQUE:  Can we take a five-minute break

 9        just to see if there's any more questioning on

10        these topics, and then we can go ahead and wrap

11        up.

12             THE WITNESS:  That sounds good to me.

13             MS. HAQUE:  We can go off the record.

14             (Recess from 3:43 until 3:53 p.m.)

15    BY MS. HAQUE:

16        Q.   Mrs. Avery, I want to show you a document

17    that we have premarked as Exhibit 15.

18             (Defendants' Exhibit 15 was marked for

19    identification.)

20             THE WITNESS:  Okay.

21    BY MS. HAQUE:

22        Q.   And I will point you directly where I want

23    you to look, if you're okay with that.

24        A.   Fifteen?
```

Confidential - Subject to Further Confidentiality Review

 1     Q.   Fifteen.

 2          If you go all the way to the back.

 3     A.   All the way to the back.  You know what I had

 4   a vision of?  Suffocating with paper.

 5     Q.   I hope not.

 6          All right.  The second -- flip one more page.

 7     A.   Over here?

 8     Q.   Yep.  One more flip.

 9     A.   Flip it?

10     Q.   Flip it, please.

11          There you go.

12          And I want you to look at this page.

13     A.   Which one is that?

14     Q.   And it's entitled "Assets and Liabilities."

15     A.   Okay.

16     Q.   Do you recognize this document as being your

17   assets and liabilities?

18     A.   Tell me again.

19     Q.   Do you recognize this document to be a

20   description of your assets and liabilities as of

21   October 13th, 2007?

22     A.   I'm not familiar with it.

23     Q.   Are these your initials at the bottom of the

24   page?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 81 of 3246
Case 2:09-md-02047-MCL-JCW Document 20911-11 Filed 07/22/15 Page 11 of 11
Confidential - Subject to Further Confidentiality Review

```
 1        A.   They are my initials.  I just don't remember

 2   it.

 3        Q.   Understood.

 4             If you want to turn to the back of this page.

 5        A.   Which one?

 6        Q.   The back of this page that you have.

 7             Right there, yes?

 8             Is that your signature?

 9        A.   Yes, it is.

10        Q.   And you signed this document on

11   November 30th, 2007?

12        A.   Okay.

13             MR. ALBANIS:  Object to the form.

14             THE WITNESS:  That time of day, sorry.

15   BY MS. HAQUE:

16        Q.   Did you sign this document --

17        A.   Yes.

18        Q.   -- on November 30th, 2007?

19        A.   Yes, I did.

20        Q.   Can you flip back to the page we were looking

21   at that says "Assets And Liabilities."

22             If you go to the middle of the page, there's

23   a column that says "Total Assets."  Can you read out

24   to me what it says in the "Total Assets" column?
```

Confidential - Subject to further confidentiality Review

```
 1        A.    The dollar amount?

 2        Q.    Correct.

 3        A.    $233,838.37.

 4        Q.    Can you move one box over to where it says

 5    "Net Worth."  Can you read for me the dollar amount?

 6        A.    $210,150.37.

 7        Q.    And if you look at the bottom center of the

 8    page, there is a date.  Can you read the date for me?

 9        A.    October 13th, 2007.

10        Q.    Was your net worth as of October 13th, 2007,

11    $210,150.37?

12        A.    I don't remember.

13        Q.    Okay.  Mrs. Avery, if you could just flip the

14    Document over.  So you are looking at this next page,

15    it looks like it says Page 2 of 5.

16        A.    I'm sorry?

17        Q.    It looks like it says Page 2 of 5?

18        A.    Yeah.

19        Q.    If you can look with me at the middle of the

20    page, Section 5 says:  Monthly income and combined

21    housing expense information.

22              Right in the middle of the page?

23        A.    Oh, up above.  Gotcha.

24        Q.    And if you follow the column all the way
```

Confidential - Subject to Further Confidentiality Review

```
 1    down, can you read that number that is in the "Total"

 2    for the monthly income?

 3         A.    $2,505.02.

 4         Q.    Is that the total amount that you receive in

 5    income each month?

 6         A.    Yes.

 7         Q.    And if you look with me, the next set of

 8    columns, the first mortgage --

 9         A.    Oh, $561.48?

10         Q.    Correct.

11               And there are other items listed:  hazard

12    insurance, real estate taxes, and homeowner

13    association dues.  So you were paying approximately

14    $1,200 in various payments?

15         A.    Uh-huh.

16         Q.    And your monthly income was $2,505?

17         A.    Uh-huh.

18         Q.    Do you still receive a monthly income of

19    $2,505?

20         A.    Clear.

21         Q.    Do you still today receive a monthly income

22    of --

23         A.    No.

24         Q.    -- $2,505?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 84 of 3246
Case 2:09-md-02047-EEF-MBN Document 20691 Entered on FLSD Docket 13/1/2019 Page 90 of 111
Confidential - Subject to Further Confidentiality Review

1     A.    No.

2     Q.    What is your monthly income approximately?

3     A.    $1,756.

4     Q.    When did your monthly income change?

5     A.    It changes every year if they give me an

6     increase.

7     Q.    Do you recall when your monthly income

8     changed from the $2,505 to the $1,700 --

9     A.    Wait a minute, wait a minute.  I'm not giving

10    you the correct information with the total monthly,

11    because I have a -- a retirement that I add to that,

12    which was the 2,000-something.  And then of course

13    you get increases every now and then with your Social

14    Security, plus the demise of my husband, I got an

15    increase.  So all of these were charactered in.

16         Out of that, you pay insurances for Medicare,

17    which is minimal, actually.

18         So presently, my retirement is still $541.89,

19    and my income from Social is $1,756.  So combine the

20    two, of which I am -- no money.

21    Q.    Is it safe to say -- is it fair to say

22    between October 13th, 2007, until present you

23    approximately had between $2,000 and $2,500 in

24    monthly income?

Confidential - Subject to Further Confidentiality Review

```
 1        A.    Uh-huh.

 2        Q.    We can put this big document away.

 3              Last document of the day.  It's a small one.

 4        A.    Okay.

 5        Q.    I am showing you what has been premarked

 6   Exhibit 16.

 7              (Defendants' Exhibit 16 was marked for

 8   identification.)

 9   BY MS. HAQUE:

10        Q.    Have you seen this document before?

11        A.    Not this particular one, no.

12        Q.    Do you know who Madeline Davis is?

13        A.    She was the realtor who handled the short

14   sale for me.

15        Q.    Do you see on this document Number 4?

16        A.    Yeah.

17        Q.    That's been crossed out?

18        A.    Yeah.

19        Q.    Do you know why that's been crossed out?

20        A.    I haven't got a clue.  What was the date on

21   this again?

22              I don't know.  I have never seen this.

23        Q.    Okay.

24        A.    I know it's my name, but I don't recall it.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/10/19 Page 86 of 3246
Case 2:09-md-02047-MCD Document 20911 entered on FSD Docket 13/20/19 Page 92 of
111
Confidential - Subject to Further Confidentiality Review

1    And that's not the way I print, either.

2        Q.   Mrs. Avery, do you know why this document was

3    put together?

4        A.   No.

5        Q.   Was it for the short sale?

6        A.   It could have been.

7        Q.   But you've never seen this document before?

8        A.   No.

9        Q.   Okay.  You can go ahead and put that down.

10            No more documents for the day from us.

11            One last question, Mrs. Avery.

12       A.   Yeah.

13       Q.   As you are aware, during the late 2000s, the

14   Florida housing market was hit by recession.

15            When did you start seeing a downturn in

16   housing prices?

17            MR. ALBANIS:  I'm going to object to that.

18   BY MS. HAQUE:

19       Q.   When did you start seeing a downturn in

20   housing prices?

21            MR. ALBANIS:  Objection again.

22            THE WITNESS:  When we had more social -- more

23       snowbirds coming in buying property, buying

24       property, buying property.  Brought the economy

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 87 of 3246 of
Case 2:09-md-02047-EEF-MBN Document 20141-10 Filed 03/06/19 Page 53 of
111
Confidential - Subject to Further Confidentiality Review

```
 1        up for them, but it made it miserable for us that

 2        were renting because they were all expensive

 3        rentals.  And you have it or you don't have it.

 4   BY MS. HAQUE:

 5        Q.   Do you have a year when you started seeing

 6   this?

 7        A.   Well, that happened --

 8             MR. ALBANIS:  Objection.

 9        A.   -- well, not after -- let's see.

10             It was after, I believe, when I -- Terrel

11   Woods -- and I forget what the year was on that --

12   where I rented for a month with an option to buy,

13   which I changed by mind because they didn't make any

14   repairs for me because they still were owner of the

15   property.

16             And then I started moving into different

17   places, and then I began to notice after that

18   property values -- I mean property rentals were going

19   up.

20        Q.   Was that before or after your short sale?

21        A.   After.

22        Q.   And --

23             MR. SHAPIRO:  Can I just follow up with just

24        a couple questions?
```

```
 1                          CROSS-EXAMINATION

 2   BY MR. SHAPIRO:

 3        Q.   You mentioned that you saw property values

 4   start going up?

 5        A.   Up.

 6        Q.   Was there ever a time you began to see

 7   property values going down?

 8        A.   Oh, that was when my husband passed away.

 9   Everything started going down.

10        Q.   And when was that?

11        A.   That was in 2005.  March of 2005.

12        Q.   Okay.

13        A.   We had a home, and he passed away.  And the

14   property plummeted, and when he passed on just around

15   that period everything started to fall down again.

16        Q.   And do you remember about when property

17   values started to go back up again?

18        A.   It was a long time.  Let's see.  It was

19   2005 -- I would say probably between 2005 and 2007.

20        Q.   That's when they started to go back?

21        A.   Or '05/'06 and 2007 -- not '05/'06.  2006.

22   2006 and up to 2007, and it started to climb again.

23        Q.   And did it ever go back down again?

24        A.   Not that I can recall because, you know,
```

Confidential - Subject to Further Confidentiality Review

1    snowbirds were really buying and buying and buying

2    and buying which caused us to not to be able to rent,

3    not be affordable homes, any of that.

4            It really -- it really helped the people that

5    lived here.  If they wanted to buy something, it was

6    very difficult because they didn't have the money.  I

7    chose not to.  I figured it was somebody else's

8    headache.  If something goes wrong, they have to pay

9    for it, not me.

10       Q.   Are you aware of what is referred to as the

11   great recession?

12       A.   The what?

13       Q.   The great recession.

14       A.   To a point.  Minimal.

15       Q.   What does that term mean to you?

16       A.   That the cost of living was going down.  It

17   wasn't -- grocery stores were going up.  Everything

18   was higher priced, and we didn't have the funds.

19   Let's face it.  We have a lot of seniors down here.

20       Q.   And do you understand that term to be

21   associated with home values?

22       A.   I -- I would.  I would.

23       Q.   In what way?

24       A.   Well, number one, if they paid a lot of money

```
 1    for a piece of property and wanted to -- for resale,

 2    they wouldn't get what they put into it.

 3         Q.   Okay.  And is that something that you saw

 4    friends experience?

 5         A.   Say that again.

 6         Q.   Is that something that you saw friends of

 7    yours experience?

 8         A.   Not so much friends.  It was just in general,

 9    you know, different things that were coming out on

10    the news and people talking to other people or

11    talking to friends or in a gathering, we're having

12    this conversation.  That type of thing.

13         Q.   So you were aware that people were struggling

14    to meet --

15         A.   Oh, yeah.

16         Q.   -- payments --

17         A.   Oh, yeah.

18         Q.   -- for their homes?

19              MS. HAQUE:  I have no further questions.  So

20         I'll pass the witness to my colleagues,

21         co-defendants, if they have any questions.

22              MR. SHAPIRO:  No questions.

23              MR. ALBANIS:  Mrs. Avery, I have some

24         follow-up questions.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 91 of 3246
Case 2:09-md-02047-MCL-JDC Document 4201-18 Filed 05/13/2014 Page 87 of 111
Confidential - Subject to Further Confidentiality Review

```
 1                    CROSS-EXAMINATION

 2   BY MR. ALBANIS:

 3       Q.   I would like you to pull out Exhibit

 4   Number 3.

 5            MR. ALBANIS:  What exhibit number was the

 6       second amended supplemental profile form?

 7            MS. HAQUE:  Thirteen.

 8            MR. ALBANIS:  Thank you.

 9   BY MR. ALBANIS:

10       Q.   Exhibit Number 13.

11       A.   Oh, 13.

12       Q.   Exhibit Number 13.

13       A.   Wait a minute, wait a minute.  Too much paper

14   here.

15            I got Number 13.

16       Q.   Okay.  And Exhibit Number 3.

17       A.   And Exhibit Number 3.

18       Q.   Okay.  I just want to clean up some things,

19   most of which I spoke to opposing counsel during a

20   recent break about, okay?

21            Earlier when Ms. Haque was asking you

22   questions, she asked you whether you were pursuing

23   any remediation damages in this case, and you

24   answered no to remediation damages.
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.   Right.

 2        Q.   Do you remember that?

 3        A.   Yes, I do.

 4        Q.   Were you confused when you made that answer?

 5        A.   Yes, I was.

 6        Q.   Are you pursuing remediation damages in this

 7   case?

 8        A.   Yes, I am.

 9        Q.   By the same token, earlier Ms. Haque asked

10   you whether you were pursuing any damages for

11   alternative living expenses.  And you answered no.

12             Do you remember that line of questioning and

13   your answer?

14        A.   Yes, I do.

15        Q.   Did you answer no at the time?

16        A.   Yes, I did.

17        Q.   Were you confused when you answered no?

18        A.   Yes, I was.

19        Q.   Are you pursuing alternative living expenses

20   in this case?

21        A.   Yes, I am.

22        Q.   Earlier she also asked whether you were

23   pursuing any damages related to lost equity and any

24   damages related to the short sale of the home, and
```

Confidential - Subject to further Confidentiality Review

```
 1    you answered no during different times of the

 2    deposition.

 3              Do you recall answering no?

 4        A.   Yes, I do.

 5        Q.   Were you confused at the time when you

 6    answered no?

 7        A.   Yes, I was.

 8        Q.   Are you pursuing damages for lost equity and

 9    damages related to the short sale in this case?

10        A.   Yes.

11        Q.   Thank you.

12              Now, if you could look at Exhibit Number 3,

13    please.

14              It's right here.

15        A.   Oh, okay.

16        Q.   Do you recall working with me on the answers

17    to this document?

18        A.   Yes.

19        Q.   Would you please read Interrogatory Number 1,

20    which is on Page 1 of Exhibit Number 3?

21        A.   For the answer or the entire thing?

22        Q.   Just read the interrogatory first, which is

23    next to --

24        A.   Okay.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 94 of 3246
Case 2:09-md-02047-EEF-MBN Document 20671-15 Filed 12/11/16 Page 90 of 111

Confidential - Subject to Further Confidentiality Review

```
 1              Identify all types of damages used -- excuse
 2    me -- that you seek in this lawsuit, e.g.,
 3    alternative living expenses --
 4        Q.   Diminution.
 5        A.   -- in value, loss of use/enjoyment,
 6    et cetera, a special amounts sought for each
 7    category.
 8        Q.   Okay.  Thank you.
 9              And just below that is the answer.
10              Do you see that?
11        A.   Yes.
12        Q.   Would you please read that entire answer to
13    Interrogatory Number 1.
14        A.   We seek alternative living expenses from
15    March 2010 through July 2012 of at least $11,322.48;
16    lost equity of at least $115,000; --
17        Q.   Diminution.
18        A.   Thank you.
19              -- in value, loss -- loss of the use of --
20    the use and enjoyment, punitive damages, prejudgment
21    interest.  In addition, I seek remediation damages as
22    determined by the Court.  The total amount of -- that
23    wonderful word --
24        Q.   Diminution.
```

```
 1      A.   Yes.

 2           -- in value, loss of use and enjoyment, and

 3      punitive damages will be determined by the jury at

 4      prejudgment, interest by the Court at post-judgment,

 5      ministerial matter?

 6      Q.   Ministerial.

 7      A.   Ministerial.

 8      Q.   Thank you.

 9           Do you still stand by the answer to

10      Interrogatory Number 1 on Exhibit Number 3?

11      A.   Yes.

12      Q.   Do you still -- are you still pursuing the

13      different categories of damages identified in the

14      answer to Interrogatory Number 1?

15      A.   Yes.

16           I've got a headache.

17      Q.   Please look at Exhibit Number 13 now.

18      A.   Which one?

19      Q.   Number 13.

20      A.   Okay.

21      Q.   Turn to Page 5.

22      A.   Okay.

23      Q.   Section 7, "Other Damages," down at the

24      bottom.
```

```
 1              Do you see that?

 2      A.   Yeah.

 3      Q.   This is the second amended supplemental

 4  plaintiff profile form, Exhibit Number 13 is.  Do you

 5  recall working with me on the answers to this

 6  document?

 7      A.   Yes.

 8      Q.   Do you recall providing all of the

 9  information that's in this document?

10      A.   Yes.

11      Q.   Would you please read your response to what

12  types of damages you are seeking in the "Other

13  Damages" section.

14              It's the last line on Page 5.

15      A.   Have you incurred alternative living expenses

16  as a result of Chinese drywall?  Identify the total

17  moving cost and/or alternative living expenses that

18  you incurred.

19              Listed $14,822.48 including $3,500 in moving

20  expenses.  No -- no receipts for moving expenses, in

21  parentheses.

22      Q.   Thank you.

23              Do you still stand by that answer,

24  Mrs. Avery?
```

```
 1      A.   No.

 2      Q.   You don't stand by that answer?

 3      A.   There I go again.

 4           Yes.

 5      Q.   Do you still stand by that answer,

 6  Mrs. Avery?

 7      A.   Yes, I do.

 8      Q.   So a moment ago when you answered no, you

 9  meant to answer yes?

10      A.   Yes.

11      Q.   Thank you.

12           THE WITNESS:  Time for me to go home.

13           MR. ALBANIS:  That's it.

14           MS. HAQUE:  Not quite yet.

15           THE WITNESS:  You're such a bad girl.

16                    REDIRECT EXAMINATION

17  BY MS. HAQUE:

18      Q.   Based on the questions that were asked by

19  your attorney, I have to follow up.

20      A.   Okay.

21      Q.   Let's go back to Section 7 of the document

22  you just looked at in front of you, Exhibit

23  Number 13.

24           That's this first document right on top.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 98 of 3246
Case 2:09-md-02047-MCD-MBN Document 2637 Entered on FLSD Docket 01/13/2010 Page 94 of
Confidential - Subject to further confidentiality Review
111

```
1        A.   Oh, I thought you said 7, not 13.

2        Q.   Let's go to Page 5, Section 7.

3        A.   Okay.  Yes.

4        Q.   You're claiming in this document at the

5    bottom of the page here, $14,822.48, including $3,500

6    in moving expenses.

7             Was it your testimony earlier that you left

8    everything inside the home at 10761 Camarelle Circle?

9        A.   Camarelle Circle, yes.

10            MR. ALBANIS:  Objection.

11   BY MS. HAQUE:

12       Q.   So what did the $3,500 in moving expenses --

13       A.   It was -- wait a minute.  Now I can't

14   remember.  I really can't remember.  Nothing is

15   coming to my brain.

16       Q.   But you -- but is your testimony that you

17   left everything of your possessions --

18       A.   Right.

19       Q.   -- behind in the home in 10671 Camarelle

20   Circle?

21            MR. ALBANIS:  I think that mischaracterizes

22       her previous testimony.  I don't think she said

23       "all" of her possessions.  It's just the

24       possessions that was in the home.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 99 of 3246
Case 2:09-md-02047-EEF-MBN Document 20491-3 Entered on FLSD Docket 13/18/19 Page 95 of 111
Confidential - Subject to Further Confidentiality Review

1    BY MS. HAQUE:

2        Q.   Mrs. Avery, do you recall what you left

3    behind in the home as you vacated it?

4        A.   Everything I had in the house.  All my

5    furniture, everything that was there, pots, pans,

6    dishes, you name it.  It was there.  The only thing I

7    took out was my clothes.  Actually, I took some

8    dishes out, too, because they were washable.

9        Q.   Mrs. Avery, are you contending that the cost

10   to move your clothes was $3,500?

11       A.   It could have been.

12       Q.   And do you have any receipts --

13       A.   No.

14       Q.   -- showing this?

15       A.   No.  Never kept.  Receipts were always --

16   never carried them because I really didn't think I

17   had a problem, you know, I'd have to go through all

18   this when I purchased the property.

19       Q.   Subtracting the $3,500 from this amount, you

20   have $11,522.48.  What did that correspond to?

21       A.   What did the cost what?

22       Q.   What did the amount that you are seeking

23   correspond to?

24       A.   Yeah.  No, I got that.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 100 of 3246
Case 1:11-cv-22408-MGC Document 64-1 Entered on FLSD Docket 11/21/19 Page 96 of
111

Confidential - Subject to Further Confidentiality Review

```
 1              Correspond to?  It was probably finding

 2    furniture and things of that nature for the new

 3    setting, a rental, because I had to buy furniture,

 4    wherever I went to the next spot.

 5       Q.   Mrs. Avery, in May 2010, did you stop paying

 6    your mortgage?

 7       A.   We have been through that before.  And I

 8    said -- what did I say?

 9              Yes, I think.

10       Q.   And I want to clarify for the record because

11    I misspoke earlier.

12              If you subtract the moving expenses, the

13    amount -- the amount left over is $11,322.48.

14              So your claim is that even though you stopped

15    paying your mortgage, you're still entitled to

16    $11,322.48 in alternative living expenses damages?

17              MR. ALBANIS:  Objection.

18              THE WITNESS:  I believe that was -- the

19         information was in the hands of my attorney.

20    BY MS. HAQUE:

21       Q.   And we looked at this document earlier, but

22    just to ask you again.

23              And at this time you were receiving

24    approximately between $2,000 and $2,500 in monthly
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 101 of 3246
Case 1:11-cv-22408-MGC Document 234-1 Entered on FLSD Docket 11/06/19 Page 97 of
111

Confidential - Subject to Further Confidentiality Review

```
 1    income?

 2         A.    Uh-huh.

 3         Q.    Do you have any documents to show what the

 4    $11,322.48 is based on?

 5         A.    No.

 6         Q.    Let's turn to what is, I believe, Exhibit 3.

 7               And if you can look on the first page, and

 8    your answer to the first question, you've written

 9    that you seek lost equity of at least $115,000.

10               Why did you select that number?

11         A.    At the advice of my attorney.

12         Q.    What is that number based upon?

13         A.    The equity lost.

14         Q.    Do you have any documents to corroborate or

15    show the lost equity of at least $115,000?

16               MR. ALBANIS:  Object to form.

17               You can answer if you . . .

18               THE WITNESS:  Oh.  I didn't know you were

19         talking to me.

20               Let me have the question again.

21    BY MS. HAQUE:

22         Q.    Do you have any documents or evidence to

23    corroborate the -- your -- the amount of $115,000 of

24    which you are seeking damages for lost equity?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 102 of 3246
Case 1:11-cv-22408-MGC Document 204-1 Entered on FLSD Docket 11/29/19 Page 98 of
111
Confidential - Subject to Further Confidentiality Review

```
 1        A.    I think -- I believe it was a relationship to

 2    the down payment that I had made.  I'm sorry, I'm

 3    brain dead right now.  I can't give you an answer.

 4        Q.    So just for the record, as you sit here

 5    today, you don't know of any document that you can

 6    point to --

 7            MR. ALBANIS:  I'm going to object to that.  I

 8        think that mischaracterizes what Mrs. Avery just

 9        said.  And further, all documents that she has

10        given to me, I have produced to the defendants

11        through the report.

12    BY MS. HAQUE:

13        Q.    Which document can you point to regarding the

14    lost equity of at least $115,000?

15        A.    Everything on this was -- because of Chinese

16    drywall.  Had nothing to do with anything else.  And

17    I did lose that money.  I invested, had a problem,

18    had to get out.  And basically I lost about that much

19    money.

20        Q.    What document can you point to --

21        A.    All this is on record.

22        Q.    Let me go ahead and finish the question.

23            What document can you point to that show the

24    lost equity of at least $115,000?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 103 of 3246
Case 2:11-cv-01459-MGC Document 1 Entered on FLSD Docket 11/18/19 Page 99 of
111
Confidential - Subject to Further Confidentiality Review

```
 1        A.   The only thing I have is what the bank gave

 2   me.  The purchase, the -- the short sale, those are

 3   the only documents I have for you.  And the release

 4   of -- on foreclosure of the -- of my sale --

 5        Q.   Did the bank --

 6        A.   -- my mortgage.

 7        Q.   Did the bank forgive your debt for the unpaid

 8   mortgages that you owed them?

 9        A.   By foreclosure.  Through foreclosure.

10        Q.   So you did not have to pay the remainder of

11   the mortgage for either of the two mortgages that you

12   had with the Fifth Third Bank?

13        A.   But I'm still out of money, not only based on

14   that I didn't continue paying the mortgage, but

15   because I had deposited towards the purchase of

16   that -- that home $1,000 [sic] to bring my mortgage

17   down to $90,000.

18             So, in essence, I not only lost money putting

19   it in there to bring the mortgage down, I also for

20   the short sale -- I'm going to assume that this is

21   all part of the two -- to dispose of that mortgage.

22        Q.   What damages are you claiming with respect to

23   the short sale?

24        A.   I'm not claiming anything.  I'm very happy
```

Confidential - Subject to Further Confidentiality Review

```
 1    with the $100,000, but this is -- you know, we

 2    discussed, he and -- the both of us have talked about

 3    these things.  I have given him the documentation.

 4              MR. ALBANIS:  Whoa, whoa, whoa.  Don't get

 5         into our privileged discussions, please.

 6              THE WITNESS:  Okay.

 7              MR. ALBANIS:  Thank you.

 8    BY MS. HAQUE:

 9         Q.   You also state that you're claiming damages

10    with respect to the remediation?

11         A.   Yes.  Of which I made a mistake of saying no,

12    and it's been corrected.  I --

13              MR. ALBANIS:  Let me insert the rolling

14         objections to questions about the remediation.

15              MS. HAQUE:  Okay.  Noted.  And we'll say that

16         these questions are related to the overall issue

17         of damages.

18    BY MS. HAQUE:

19         Q.   What specifically are you claiming as damages

20    for remediation?

21         A.   Well, it states on the -- the exhibits.

22         Q.   Where does it state the damages that you're

23    claiming for remediation?

24         A.   At least $115,000.
```

```
 1          MR. ALBANIS:  No, no.

 2          THE WITNESS:  No?  I don't know.  I'm brain

 3      dead right now.  I can't even think right now.

 4  BY MS. HAQUE:

 5      Q.   Did you remediate your property?

 6      A.   I don't understand what you are saying about

 7  that.

 8      Q.   By remediate, we're saying that where you

 9  removed the defective -- that you removed and

10  replaced the drywall that was in your property.

11          Did you do that?

12      A.   No, I never said that.  I didn't remove it.

13          MR. SHAPIRO:  Why don't we take a two-minute

14      break.

15          MS. HAQUE:  Do you want to take --

16          MR. SHAPIRO:  It's only going to be five more

17      minutes.

18          MR. GUERRA:  Can we go off the record,

19      please.

20          (Recess from 4:27 until 4:32 p.m.)

21  BY MS. HAQUE:

22      Q.   Are you feeling okay, Mrs. Avery, to

23  continue?

24      A.   I'm sorry.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 106 of 3246 of
Case 1:11-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 102 of
111

Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Are you feeling okay, Mrs. Avery, to

 2   continue?

 3        A.   Not yet.  I'm trying to get my bearing here,

 4   and my attorney is trying to be very helpful.

 5             MR. ALBANIS:  But you can continue with the

 6        deposition, correct?

 7             THE WITNESS:  Yeah.

 8             MR. ALBANIS:  Okay.  Good.  That's what

 9        Aliyya was asking.  You can continue with the

10        deposition, right?

11             THE WITNESS:  Yeah.

12   BY MS. HAQUE:

13        Q.   And just a few more questions.

14             So just to go back to the topic that we were

15   discussing earlier, did you remediate your property?

16        A.   Let me come closer because I -- I'm bouncing

17   around here.

18             Go ahead.

19        Q.   Did you remediate your property?

20        A.   I hate that word, remediate.  Clarity.

21        Q.   Unfortunately it's -- well, strike that.

22             Did you remove any drywall from your

23   property?

24        A.   No.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 107 of 3246 of
Case 2:14-cv-02722-EEF-MBN Document 28-1 Filed 08/13/2015 Page 493 of
111
Confidential - Subject to further Confidentiality Review

```
1       Q.    Did you ever plan to remediate your property?

2       A.    No.

3       Q.    Then what are your remediation damages based

4    on?

5       A.    The loss of the property and the money I put

6    in to deposit that purchase.

7       Q.    You're claiming remediation damages related

8    to lost property and the deposit, or are those --

9       A.    No, lost property.

10             Am I getting confusing or what?

11             MR. ALBANIS:  I think so.

12             MS. HAQUE:  I'll move on.

13             THE WITNESS:  Okay.

14    BY MS. HAQUE:

15       Q.    What equity -- going back to your claim for

16    lost equity, what equity are you saying was lost due

17    to Chinese drywall specifically?

18             I can rephrase it if you would like.

19       A.    The equity that I feel I was lost was the

20    $115,000.

21       Q.    And what portion of that do you believe was

22    due to Chinese drywall?

23       A.    Based on the fact that I did not have the

24    money to do any renovation to it, and that's why I
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 108 of 3246
Case 1:11-cv-22408-MGC Document 26-1 Entered on FLSD Docket 08/13/2011 Page 104 of 111

Confidential - Subject to Further Confidentiality Review

```
 1    went to the sale of the property, short sale.  And I

 2    should be receiving some of that equity.

 3         Q.   Do you -- what portion of the $115,000 do you

 4    attribute to the -- to defective drywall?

 5         A.   All of it.

 6         Q.   Last question.

 7              Were you ever paying your mortgage and rent

 8    at another property at the same time?

 9         A.   Not exactly at the same time, but when I

10    moved into a place, yes, I was paying my payments --

11    my rental payments.  But not my mortgage.

12         Q.   So you never paid your mortgage and rental

13    payments at the same time?

14         A.   No.  I didn't have it.

15              MS. HAQUE:  Okay.  Those are all the

16         questions I have for you.

17              THE WITNESS:  Thank you.

18                        RECROSS EXAMINATION

19    BY MR. ALBANIS:

20         Q.   Mrs. Avery, one question.

21         A.   Okay.

22         Q.   Look at Exhibit Number 3, please.

23         A.   Yeah.

24         Q.   The answer to Interrogatory Number 1.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/10/19 Page 109 of 3246
Case 1:14-cv-06066-ILG-SMG Document 26-1 Entered on FLSD Docket 08/13/2015 Page 105 of
111
Confidential - Subject to Further Confidentiality Review

1    A.   Yeah.  I'm reading.

2    Q.   Would you please read the second sentence of

3  the answer out loud, the one that begins "In

4  addition."

5    A.   You're talking here?

6    Q.   "In addition."

7    A.   Oh, I'm sorry.

8         In addition, I seek remediation damages as

9  determined by the Court.  The total amount -- my

10  favorite word --

11    Q.   You can just stop there.  That's fine.

12    A.   Huh?  Stop?

13    Q.   I just asked for that sentence.

14    A.   So this was decided by the Court, not --

15    Q.   Do you still stand by that sentence in your

16  answer to interrogatory --

17    A.   Uh-huh.

18    Q.   Yes?

19    A.   Yes.

20    Q.   Thank you.

21         MR. ALBANIS:  That's all I have.

22              FURTHER REDIRECT EXAMINATION

23  BY MS. HAQUE:

24    Q.   Last question, based off of the question that

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/10/19 Page 110 of 3246
Case 1:11-cv-22408-MGC Document 26-1 Entered on FLSD Docket 08/13/2011 Page 496 of
111
Confidential - Subject to Further Confidentiality Review

1    your attorney just asked you.

2             Do you believe the Court should give you

3    damages even though -- for remediation even though

4    you did not remediate your property?

5             MR. ALBANIS:  Object to the form.

6             THE WITNESS:  Clarity to me again.

7    BY MS. HAGUE:

8        Q.   Do you believe you are entitled to

9    remediation damages by the Court even though you did

10   not remediate your property?

11       A.   Yes, I do.

12            MS. HAQUE:  And we're done.  We can go off

13       the record.

14            (Whereupon, the deposition concluded at

15   4:37 p.m.)

16

17

18

19

20

21

22

23

24

```
 1                    C E R T I F I C A T E

 2

 3          I, KELLY J. LAWTON, Registered Professional

 4     Reporter, Licensed Court Reporter, and Certified

 5     Court Reporter, do hereby certify that, pursuant to

 6     notice, the deposition of JANET AVERY was duly taken

 7     on December 7, 2018, at 1:08 p.m. before me.

 8          The said JANET AVERY was duly sworn by me

 9     according to law to tell the truth, the whole truth

10     and nothing but the truth and thereupon did testify

11     as set forth in the above transcript of testimony.

12     The testimony was taken down stenographically by me.

13     I do further certify that the above deposition is

14     full, complete, and a true record of all the

15     testimony given by the said witness.

16

17     _____

18          KELLY J. LAWTON, RPR, LCR, CCR

19

20          (The foregoing certification of this

21     transcript does not apply to any reproduction of the

22     same by any means, unless under the direct control

23     and/or supervision of the certifying reporter.)

24
```

```
  1                    INSTRUCTIONS TO WITNESS

  2

  3

  4           Please read your deposition over carefully

  5    and make any necessary corrections.  You should state

  6    the reason in the appropriate space on the errata

  7    sheet for any corrections that are made.

  8

  9           After doing so, please sign the errata sheet

 10    and date it.  It will be attached to your deposition.

 11

 12           It is imperative that you return the original

 13    errata sheet to the deposing attorney within thirty

 14    (30) days of receipt of the deposition transcript by

 15    you.  If you fail to do so, the deposition transcript

 16    may be deemed to be accurate and may be used in

 17    court.

 18

 19

 20

 21

 22

 23

 24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 113 of 3246
Case 1:09-cv-01347-EEF-MBN Document 254 Entered on FLSD Docket 08/13/2019 Page 4 of
111

Confidential - Subject to Further Confidentiality Review

```
 1                        - - - - - -

 2                     E R R A T A

 3                        - - - - - -

 4    PAGE    LINE    CHANGE

 5    _____   _____   _____

 6       REASON: _____

 7    _____   _____   _____

 8       REASON: _____

 9    _____   _____   _____

10       REASON: _____

11    _____   _____   _____

12       REASON: _____

13    _____   _____   _____

14       REASON: _____

15    _____   _____   _____

16       REASON: _____

17    _____   _____   _____

18       REASON: _____

19    _____   _____   _____

20       REASON: _____

21    _____   _____   _____

22       REASON: _____

23    _____   _____   _____

24       REASON: _____
```

Confidential - Subject to Further Confidentiality Review

```
 1                    ACKNOWLEDGMENT OF DEPONENT

 2

 3           I, JANET AVERY, do hereby acknowledge that I

 4     have read the foregoing pages, 1 to 110, and that the

 5     same is a correct transcription of the answers given

 6     by me to the questions therein propounded, except for

 7     the corrections or changes in form or substance, if

 8     any, noted in the attached Errata Sheet.

 9

10

11     _____        _____

12     JANET AVERY                                         DATE

13

14

15

16

17     Subscribed and sworn to before me this

18     _____ day of _____, 20___.

19     My Commission expires: _____

20

21     _____

       Notary Public

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                        LAWYER'S NOTES

 2      PAGE     LINE

 3      _____    _____    _____

 4      _____    _____    _____

 5      _____    _____    _____

 6      _____    _____    _____

 7      _____    _____    _____

 8      _____    _____    _____

 9      _____    _____    _____

10      _____    _____    _____

11      _____    _____    _____

12      _____    _____    _____

13      _____    _____    _____

14      _____    _____    _____

15      _____    _____    _____

16      _____    _____    _____

17      _____    _____    _____

18      _____    _____    _____

19      _____    _____    _____

20      _____    _____    _____

21      _____    _____    _____

22      _____    _____    _____

23      _____    _____    _____

24      _____    _____    _____
```

# EXHIBIT A2

Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT

                SOUTHERN DISTRICT OF FLORIDA

 2

     EDUARDO AND CARMEN AMORIN,

 3   et al., individually, and

     on behalf of all others

 4   similarly situated,        Case No. 1:11-CV-22408-MGC

 5       Plaintiffs,

 6   vs.

 7   TAISHAN GYPSUM CO., LTD.,

     F/K/A SHANDONG TAIHE

 8   DONGXIN CO., LTD.; TAIAN

     TAISHAN PLASTERBOARD CO.,

 9   LTD, et al.,

10       Defendants.

11     Confidential - Subject to Further Confidentiality Review

12                  JANUARY 14, 2019

13                    - - -

14        Deposition of LILLIAN CHATMON, held at

         Morgan & Morgan, PA, One Tampa City Center,

15       201 North Franklin Street, 6th Floor, Tampa, Florida

         33602, commencing at 8:07 a.m., on the above date,

16       before Joan L. Pitt, Registered Merit Reporter,

         Certified Realtime Reporter, and Florida

17       Professional Reporter.

18                    - - -

19            GOLKOW LITIGATION SERVICES

            877.370.3377 ph | 917.591.5672 fax

20                 deps@golkow.com

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 118 of 3246
Case 1:14-cv-24049-MGC Document 1-5 Entered on FLSD Docket 05/30/2015 Page 3 of
117
Confidential - Subject to Further Confidentiality Review

```
  1                     APPEARANCES

  2

  3   Counsel for Plaintiffs:

  4        PETE V. ALBANIS, ESQUIRE
           Morgan & Morgan
  5        12800 University Drive, Suite 600
           Fort Myers, Florida 33907
  6        239.433.6880
           palbanis@forthepeople.com

  7
           KEITH J. VERRIER, ESQUIRE
  8        Levin, Sedran & Berman LLP
           510 Walnut Street, Suite 500
  9        Philadelphia, Pennsylvania 19106
           215.592.1500
 10        kverrier@lfsblaw.com

 11

 12   Counsel for Defendants Taishan Gypsum Co., Ltd., and
      Taian Taishan Plasterboard Co., Ltd.:

 13
           ALIYYA Z. HAQUE, ESQUIRE
 14        PATRICK H. HILL, ESQUIRE
           BOYKIN LUCAS, ESQUIRE
 15        Alston & Bird LLP
           One Atlantic Center
 16        1201 West Peachtree Street
           Atlanta, Georgia 30309-3424
 17        404.881.700
           aliyya.haque@alston.com
 18        patrick.hill@alston.com
           boykin.lucas@alston.com

 19

 20

 21

 22

 23

 24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 119 of 3246
Case 1:14-cv-24049-MGC Document 20 Entered on FLSD Docket 05/13/2015 Page 49 of 117
Confidential - Subject to Further Confidentiality Review

```
 1                    APPEARANCES CONTINUED

 2

 3    Counsel for Beijing New Building Materials PLC:

 4         MARC ROBERT SHAPIRO, ESQUIRE
           Orrick, Herrington & Sutcliffe LLP
 5         51 West 52nd Street
           New York, New York 10019-6142
 6         212.506.3546
           mrshapiroo@orrick.com

 7
           HARRY J. MOREN, ESQUIRE
 8         Orrick, Herrington & Sutcliffe LLP
           The Orrick Building
 9         405 Howard Street
           San Francisco, California 94105-2669
10         415.773.5545
           hmoren@orrick.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
  1                    - - -
  2                I N D E X
  3                    - - -
  4   Testimony of:  LILLIAN CHATMON
  5     DIRECT EXAMINATION BY MS. HAQUE          6
  6     CROSS-EXAMINATION BY MR. ALBANIS         106
  7
  8
  9            E X H I B I T   I N D E X
 10   CHATMON          DESCRIPTION            PAGE
 11   No. 1     Corporate Warranty Deed         12
                Chatmon_000051
 12
        No. 2     US Bank Home Mortgage Account    15
 13               Statement
                  Chatmon_000092 through 000093
 14
        No. 3     US Bank Mortgage Statements      19
 15               Chatmon_000058 through 000091
 16   No. 4     Hillsborough County Property      25
                Appraiser Public Records
 17             Chatmon_000052 through 000054
 18   No. 5     Koss Inspectors Inspection Report  41
                Dated 1/27/2010
 19             Chatmon_000094 through 000102
 20   No. 6     Plaintiff Profile Form - Residential  45
                Properties
 21             Chatmon_000037 through 000050
 22   No. 7     Builder Defendant Profile Form    48
                Chatmon_000171 through 000223
 23
 24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 121 of 3246
Case 1:14-cv-02401-WCG Document 28-2 Filed 01/04/19 Page 121 of 48
Confidential - Subject to Further Confidentiality Review
117

```
  1   No. 8     JJ Staten Homes, LLC, Corrosive        58
                Drywall Remediation Contract dated
  2             10/2/2018
                Chatmon_000161 through 000170
  3
      No. 9     Alternative Living Expenses            74
  4             Documentation
                Chatmon_000120 through 000160
  5
      No. 10    Chinese Drywall Settlement Program     77
  6             MDL 2047 Other Loss Eligibility
                Notice dated 1/19/2015
  7
      No. 11    Chinese Drywall Settlement Program     78
  8             Check Copies
                Chatmon_000224 through 000229
  9
      No. 12    Priority Claimant Lillian Chatmon's    81
 10             Answers to Interrogatories
                Chatmon_000027 through 000031
 11
      No. 13    Loss of Use/Loss of Enjoyment          84
 12             Chatmon_000103 through 000111
 13   No. 14    Second Amended Plaintiff Profile Form  87
                Chatmon_000016 through 000022
 14
      No. 15    Sabal Pointe Townhomes POA             95
 15             Transaction History
                Chatmon_000115 through 000119
 16
      No. 16    Florida Building Engineering &         102
 17             Inspections Chinese Drywall
                Inspection Report dated 12/2/2009
 18
 19
 20
 21
 22
 23
 24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 122 of 3246
Case 1:14-cv-24061-MGC Document 32363-39 entered on FLSD Docket 05/30/2014 Page 4 of
117

Confidential - Subject to Further Confidentiality Review

```
1                              - - -

2               THE COURT REPORTER:  Raise your right hand,

3          please.  Do you swear or affirm the testimony you

4          give will be the truth, the whole truth, and nothing

5          but the truth?

6               THE WITNESS:  Yes.

7               THE COURT REPORTER:  Thank you.

8               LILLIAN CHATMON, called as a witness by the

9     Defendant Taishan Gypsum Co., Ltd., having been first

10    duly sworn, testified as follows:

11                         DIRECT EXAMINATION

12    BY MS. HAQUE:

13        Q.   Could you please state your name for the

14    record?

15        A.   My name is Lillian E. Chatmon, C-h-a-t-m-o-n.

16        Q.   Ms. Chatmon, my name is Aliyya Haque.  We met

17    about a month or so ago during the inspection of your

18    home, and then we met again this morning.

19               I'm going to be asking you, primarily, many of

20    the questions today on behalf of my client, Taishan

21    Gypsum, one of the co-defendants in this lawsuit, and

22    we're here to talk about your claims in this Chinese

23    drywall lawsuit.

24               Have you ever been deposed before?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 123 of 3246
Case 1:14-cv-02404-WCG Document 230-1 Filed 10/14/2015 Page 9 of
Confidential - Subject to Further Confidentiality Review
117

```
 1      A.   No.

 2      Q.   So I'm going to go ahead and explain some

 3   ground rules just so that this deposition can go

 4   smoothly.

 5           As you know, you've been sworn under oath.  Do

 6   you understand that you must tell the truth as if a

 7   judge were sitting here or you were in a courtroom?

 8      A.   Yes.

 9      Q.   You've been doing a great job so far, but

10   please make sure you respond with verbal responses.

11   Given that we have a court reporter, she needs to take

12   down all of your responses, so any head shakes or nods

13   she won't be able to take down.  So you'll just have to

14   respond with either a yes or no or your response.  Thank

15   you.

16           If you don't understand my questions, please

17   let me know.  Otherwise, I'll presume, if you start

18   answering, that you understand my questions.

19           We'll try and take a break every hour or so,

20   but if you need to take a break at any time, please let

21   me know so we can go ahead and take the break.  I only

22   ask that if I have a question pending that you go ahead

23   and answer the question before taking the break.

24           Are you taking any medications today that may
```

```
 1    impair your ability to understand my questions or

 2    respond?

 3        A.    No.

 4        Q.    Did you meet with your lawyer in preparation

 5    for this deposition?

 6        A.    Yes.

 7        Q.    Do you remember approximately how many times

 8    you met with your lawyer to prepare today?

 9        A.    Once.

10        Q.    And when was this meeting?

11        A.    Last Friday.

12        Q.    And do you remember how long you met with your

13    attorney during this meeting last Friday?

14        A.    About an hour.

15        Q.    And who was present at the meeting?

16        A.    The lawyer and myself.

17        Q.    Did you speak with anyone other than your

18    lawyer?  And by "lawyer," do you mean Mr. Albanis?

19        A.    Yes.

20        Q.    Did you speak with anyone other than

21    Mr. Albanis to prepare for this deposition?

22        A.    No.

23        Q.    Did you review any documents to prepare for

24    this deposition?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 125 of 3246
Case 1:11-cv-21408-MGC Document 309-1 Entered on FLSD Docket 11/30/13 Page 40 of
117

```
 1      A.   Yes.

 2      Q.   What documents did you review?

 3      A.   Documents pertaining to litigations that had --

 4  that were done by Judge Fallon and some documentation

 5  that I had filled out and given to them pertaining to my

 6  situation there about the drywall and how it commenced

 7  and everything.  Those kinds of things.

 8      Q.   To your knowledge, have all of the documents

 9  that you've reviewed or you've given to your attorney --

10  or let me -- let me strike that.  Let me rephrase that

11  question.

12           To your knowledge, have all the documents that

13  you reviewed been produced to the other side for this

14  litigation?

15      A.   Yes.

16      Q.   Did you bring any additional documents with you

17  today?

18      A.   No.

19      Q.   Did you do anything else to prepare for this

20  deposition?

21      A.   I read over....

22      Q.   What did you read over?

23      A.   I read over materials that -- to try to prepare

24  me for it.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 126 of 3246
Case 1:11-cv-22408-MGC Document 204-1 Entered on FLSD Docket 11/29/13 Page 41 of
117

Confidential - Subject to Further Confidentiality Review

1      Q.    And are these materials what you just told us

2   today?

3      A.    Yes.

4      Q.    Very good.  Ms. Chatmon, what is your

5   educational background?

6      A.    I have a Specialist in Supervision and

7   Administration.  That's about the highest.

8      Q.    And, Ms. Chatmon, are you currently employed?

9      A.    No.  Retired.

10      Q.    And prior to your retirement, where were you

11   employed?

12      A.    Dougherty County School System.

13      Q.    How long were you employed by Dougherty County?

14      A.    1972 to nineteen -- I would say 20 -- I was

15   with more than one county --

16      Q.    Sure.

17      A.    -- but when I retired, I was with Dougherty

18   County.

19      Q.    Very good.  And what year did you retire?

20      A.    I retired in 2002.

21      Q.    Okay.  And with Dougherty County, would you say

22   you were with them for maybe 20 years?  30 years?

23      A.    Yes, I would say 20, yes.

24      Q.    20 years.  And what was your main role with

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 127 of 3246
Case 1:11-cv-22408-MGC Document 204-1 Entered on FLSD Docket 11/4/2013 Page 42 of
117

Confidential - Subject to Further Confidentiality Review

```
 1   Dougherty County?

 2        A.   I was a classroom teacher for a while, and then

 3   I moved up into administration for the remainder of my

 4   time.

 5        Q.   Very good.  Ms. Chatmon, are you married?

 6        A.   No.

 7        Q.   Were you ever married?

 8        A.   Yes.

 9        Q.   And when was that, if you remember?

10        A.   Twice.  In '61, and I married again in '79.

11        Q.   Ms. Chatmon, do you have any children?

12        A.   Yes.

13        Q.   How many children do you have?

14        A.   Two.

15        Q.   And can you state their names and ages and

16   where they live for the record?

17        A.   Sophia Cherry, Ward Cherry.  She lives at 1530

18   Creekbend Drive, Tampa.  Brandon, rather.  Brandon,

19   Florida.  And Kimberly Chatmon Cain, she lives at 1949

20   Grand Isle Drive, Building 18, in Brandon.

21        Q.   Thank you.  Ms. Chatmon, have you ever been

22   involved in a lawsuit before?

23        A.   No.

24        Q.   This is your first one?
```

```
 1      A.   Yes.

 2      Q.   Very good.  I want to switch gears and now ask

 3   you specifically about your claims in this lawsuit.

 4   Okay?

 5           What is the address of the property that you

 6   allege has been damaged by Chinese drywall?

 7      A.   4151 Bismarck Palm Drive, Tampa 33610.

 8      Q.   For the purposes of this deposition, I'm going

 9   to go ahead and call it "the Bismarck Palm home" instead

10   of saying the full address every time.  Is that okay

11   with you?

12      A.   That's fine.

13      Q.   Perfect.  Mrs. Chatmon, do you currently own

14   the Bismarck Palm home?

15      A.   Yes.

16      Q.   When did you first buy that property?

17      A.   March 30, 2007.

18      Q.   And, Mrs. Chatmon, did you build the home

19   yourself, or did you buy a preexisting home?

20      A.   Bought a preexisting home.

21      Q.   Ms. Chatmon, I'm going to show you some

22   documents throughout this deposition and we're going to

23   mark them as different exhibits.

24           (Chatmon Exhibit No. 1 was marked for
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 129 of 3246
Case 1:11-cv-22408-MGC Document 202-1 Entered on FLSD Docket 11/8/2013 Page 41 of
117

Confidential - Subject to Further Confidentiality Review

```
 1   identification.)

 2   BY MS. HAQUE:

 3       Q.   So I'm going to show you what has been

 4   premarked as Exhibit No. 1.

 5            When I show you these documents, you can take

 6   all the time you need to review them before I start

 7   asking you questions.

 8            Mrs. Chatmon, do you recognize this document?

 9       A.   Yes.

10       Q.   And can you tell us, for the record, what this

11   document is?

12       A.   It's the corporate warranty deed for the

13   property.

14       Q.   And that's your name under maybe the fourth

15   line down, Lillian E. Chatmon?

16       A.   Yes.

17       Q.   And it says in the first line the address [sic]

18   March 30, 2007?

19       A.   Yes.

20       Q.   Okay.  And was your previous address 10124

21   Douglas Oaks Circle, Apartment 101, Tampa, Florida

22   33610?

23       A.   Yes.

24       Q.   Very good.  You can go ahead and set that down.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 130 of 3246
Case 1:11-cv-02497-MGC Document 29-17 Entered on FLSD Docket 11/08/19 Page 15 of
117
Confidential — Subject to Further Confidentiality Review

```
 1                Oh, actually, let me ask you one question.

 2     This warranty deed denotes, when it identifies the

 3     parcel, Lot 3, Block 26 of Townhomes at Sabal Pointe,

 4     and that refers to the Bismarck Palm Drive home;

 5     correct?

 6         A.   Yes.

 7         Q.   Thank you very much.  You can go ahead and set

 8     that document down.

 9                Mrs. Chatmon, from whom did you purchase the

10     Bismarck Palm home?

11         A.   The builder was Rottlund Homes.

12         Q.   Were you involved at all in the building

13     process with Rottlund Homes?

14         A.   No.

15         Q.   Do you recall how much you paid for the home at

16     Bismarck Palm Drive?

17         A.   Yes.

18         Q.   How much did you pay?

19         A.   $169,900.

20         Q.   Thank you.  Was that purchase financed through

21     a bank or home lender?

22         A.   Yes.

23         Q.   And do you recall who you financed the property

24     from?
```

```
 1      A.    US Bank.

 2      Q.    And did you take out a mortgage on the property

 3   at Bismarck Palm?

 4      A.    Yes.

 5      Q.    Do you recall how much you -- the total of your

 6   mortgage from US Bank?

 7      A.    $169,900.

 8      Q.    Mrs. Chatmon, how many mortgages did you have

 9   on the Bismarck Palm home?

10      A.    Just one.

11      Q.    Just one.  Okay.  We're going to show you

12   another document.

13            (Chatmon Exhibit No. 2 was marked for

14   identification.)

15      A.    Let me ask you a question, please.

16      Q.    Sure.

17      A.    You said how many mortgages --

18      Q.    Yes.

19      A.    -- did I have on that home?

20      Q.    Correct.

21      A.    Oh.  Well, it was -- let me refrain from that.

22      Q.    Take your time.  Take your time.

23      A.    I had a first and a second mortgage on that

24   same home.
```

Confidential - Subject to Further Confidentiality Review
117

```
 1       Q.   Yes, okay.

 2       A.   Okay.

 3       Q.   Do you recall the details of each of these

 4   mortgages?

 5       A.   One was to -- the first one was to be 15, I

 6   think, the main mortgage, 15-year one.  The other one

 7   went longer than that.

 8       Q.   Okay.

 9       A.   I believe the second one was one that the

10   interest rates were higher.

11       Q.   Okay.  Did you end up refinancing any of these

12   mortgages at any time?

13       A.   Yes.

14       Q.   And do you recall when you refinanced and what

15   those new terms were?

16       A.   US Bank -- I'm thinking.

17       Q.   Sure.  No, take your time.  Take your time.

18       A.   Three, four years ago I refinanced the first

19   mortgage.  I could not refinance the second one.

20       Q.   So the terms of the second mortgage remained in

21   place?

22       A.   Yes.

23       Q.   Understood.  Mrs. Chatmon, have you always paid

24   your mortgage payments on time?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 133 of 3246
Case 1:11-cv-04401-MGC Document 69 Entered on FLSD Docket 11/08/13 Page 48 of
117
Confidential - Subject to Further Confidentiality Review

```
 1      A.    Yes.

 2      Q.    Have you ever had to miss a mortgage payment?

 3      A.    No.

 4      Q.    Do you know if anyone else has a lien or

 5   another loan on the property?

 6      A.    No.

 7      Q.    Do you know how much you still owe in mortgage

 8   payments on the property today?

 9      A.    Are you asking for both together combined?

10      Q.    Correct.

11      A.    Okay.  94.  Over 94.  I think it's a little

12   over 94,000 for the first one, and the second one is

13   around 36,000.

14            (Chatmon Exhibit No. 2 was marked for

15   identification.)

16   BY MS. HAQUE:

17      Q.    Mrs. Chatmon, let me go ahead and show you

18   what's been premarked as Exhibit No. 2.

19            Mrs. Chatmon, what is this document?

20      A.    It looks like it's a statement from the home

21   mortgage, US Bank.

22      Q.    Very good.  And on the first page, it looks

23   like there's a principal of $161,425.96 [sic].  And I'm

24   looking -- there's like a box that says "loan
```

Confidential – Subject to Further Confidentiality Review

```
1    information" towards the top of the page on the

2    right-hand side.

3         A.   I'm looking.

4         Q.   Sure.  Can I point to it, maybe?

5              MR. ALBANIS:  Just hand the document back to

6         Aliyya and she'll show it to you.

7    BY MS. HAQUE:

8         Q.   I'll show it to you.  If you follow my finger,

9    right here.

10        A.   Oh, that's -- you said how much?

11        Q.   I just wanted to point your attention to that.

12   Is that your primary mortgage?  Is that what the amount

13   was?

14        A.   $121,425?

15        Q.   Correct.  Does that sound about right?

16        A.   That is not what I have on the documents that I

17   get now, no.

18        Q.   Okay.  Was this the mortgage amount?

19        A.   It may have been.

20        Q.   Very good.  Okay.  And can you flip it over on

21   the back?  If you look in the same area for me, you'll

22   see there's a principal amount of $40,947.03 at an

23   8 percent interest rate.  Was that your second mortgage?

24        A.   Was it, or is it?
```

```
 1      Q.   Do you recall if that was the original amount

 2   of the second mortgage?

 3      A.   It probably was.

 4      Q.   Okay.  Very good.  You can go ahead and set

 5   that document down.

 6           (Chatmon Exhibit No. 3 was marked for

 7   identification.)

 8   BY MS. HAQUE:

 9      Q.   And then I'm going to show you what has been

10   premarked as Exhibit No. 3.

11      A.   I'm looking at it one more time.

12      Q.   Take your time.  Sure.

13      A.   You were saying, with this -- this was the

14   first document.  Okay.  I'm figuring them out.

15      Q.   Take your time.  Take your time.

16      A.   I better go along with this, yes.

17      Q.   Let me ask it:  To the best of your

18   recollection, does this sound about right?

19      A.   Yes, back then.

20      Q.   Back then.

21      A.   Yes.

22      Q.   Very good.  Well, let me show you now what has

23   been premarked as Exhibit No. 3.

24           Ms. Chatmon, do you recognize this set of
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 136 of 3246
Case 1:11-cv-22408-MGC Document 60-1 Entered on FLSD Docket 11/30/2015 Page 91 of
117
Confidential -- Subject to Further Confidentiality Review

 1   documents?

 2       A.   Yes.  This came from mortgage statements that I

 3   submitted.

 4       Q.   Sure.

 5       A.   Yes.

 6       Q.   And does this first page -- if you look all the

 7   way towards the bottom, there's a number right there on

 8   the left-hand side.  It has about $95,000.  Do you see

 9   that?

10       A.   Yes.

11       Q.   Is that approximately -- now, I know this

12   document was dated back in October 2018, but does that

13   reflect about how much you had left in mortgage payments

14   as of October of 2018?

15       A.   Well, as of October, I would say yes.

16       Q.   And do you recall as of today how much you have

17   remaining of the mortgage payments?  Let me ask it this

18   way --

19       A.   Ninety -- I looked at that statement just

20   recently.

21       Q.   Very good.

22       A.   95 -- 90 -- 95,000, I believe.

23       Q.   Sure.  Absolutely.  And do you recall, in

24   monthly payments, is this accurate as to how much you

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 137 of 3246
Case 1:11-cv-01498-MGC Document 402 Entered on FLSD Docket 11/10/15 Page 92 of 117
Confidential – Subject to Further Confidentiality Review

1   pay each month, the $922, approximately?

2       A.   Yes.

3       Q.   Very good.  Mrs. Chatmon, you can go ahead and

4   set that document aside.

5            Have you always paid the $922?  You said you

6   refinanced, correct, at some point a few years ago?

7       A.   Yes.

8       Q.   Can you flip with me to page -- if you see in

9   the bottom corner, right-hand --

10           MS. HAQUE:  And, Pete, for the record, we went

11       ahead and added page numbers to all these documents

12       for the ease of the deposition.

13  BY MS. HAQUE:

14      Q.   If you turn with me to page, I think 77 --

15  yeah, sorry, it's front and back as well -- under

16  "account information," you'll see that there is -- I

17  think that's the terms of the old mortgage and maybe a

18  payment of about $753.33.  Do you see that?

19      A.   I'm looking.

20      Q.   Sure.  It's right here.

21      A.   Yes.

22      Q.   And those --

23      A.   I see it.

24      Q.   Those were the terms of your original mortgage

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 138 of 3246
Case 1:11-cv-01408-MGC Document 2 Entered on FLSD Docket 11/4/2019 Page 93 of 117
Confidential - Subject to Further Confidentiality Review

```
 1   payment, and then you refinanced it?

 2       A.   Yes.  Now, this $753 talks about -- it mentions

 3   escrow.  Yeah.

 4       Q.   And the 6.5 percent, those were the terms of

 5   the first mortgage; correct?

 6       A.   Yes.

 7       Q.   Okay.  Very good.  You can go ahead and set

 8   that document aside.

 9            Ms. Chatmon, do you own any other properties or

10   homes?

11       A.   Yes.

12       Q.   What properties or homes do you own besides the

13   Bismarck Palm Drive?

14       A.   I own a house in Georgia.

15       Q.   Okay.  What's the address of that home?

16       A.   2305 Alameda Lane, Albany, Georgia.

17       Q.   When did you first purchase that home?

18       A.   19 -- 19 --

19       Q.   Give or take a couple years.

20       A.   Yes, thank you.  1979/80.

21       Q.   Do you recall how much you purchased the home

22   for back in 1979 or '80?

23       A.   51,000.

24       Q.   And is that home fully paid off, or is there a
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 189 of 3246 of
Case 1:11-md-02409-MGC Document 2047 Confidential 118 Document 11-K 19-9 Page 91 of
Confidential - Subject to Further Confidentiality Review
117

1   mortgage on that home as well?

2       A.   It's paid.

3       Q.   And you still own that home today; correct?

4       A.   Yes.

5       Q.   Who lives in that home currently?

6       A.   Family, when they visit, and I from time to

7   time when I'm there.

8       Q.   Is it -- do you consider it a vacation home?

9       A.   Well, it's my primary residence, really.

10      Q.   Understood.  Have you always lived at that --

11  at the property at Bismarck Palm Drive since you bought

12  it in 2007?

13      A.   No, because I had my -- it was uninhabitable.

14      Q.   And we're going to talk about that.  Who lives

15  at the property at Bismarck Palm Drive today?

16      A.   No one.

17      Q.   Has anybody else besides yourself ever resided

18  in the Bismarck Palm Drive home?

19      A.   No.

20      Q.   What are the dates that you officially occupied

21  and lived in the Bismarck Palm Drive, to your

22  recollection?

23      A.   I moved in in April of 2007.  I moved out in

24  April of 2010.

Confidential - Subject to Further Confidentiality Review

```
 1      Q.    Prior to you moving out, Mrs. Chatmon, in April

 2   of 2010, have you ever renovated or made any

 3   improvements to the property at Bismarck Palm Drive?

 4      A.    No.

 5      Q.    Have you ever charged rent for anyone to stay

 6   at the property at Bismarck Palm Drive?

 7      A.    No.

 8      Q.    Mrs. Chatmon, do you know the square footage of

 9   the home at Bismarck Palm Drive?

10      A.    Living space?

11      Q.    Yes.

12      A.    Okay.  Under air?

13      Q.    Correct.

14      A.    Okay.  Under air is 1240 --

15      Q.    I'm going to show you --

16      A.    -- square feet.

17      Q.    Please continue.

18            And how do you know that?

19      A.    Well, it was on the documentations that I

20   received from the builder.

21      Q.    Okay.  Have you ever measured it yourself?  The

22   square footage, I mean.

23      A.    No.

24      Q.    Have you ever had someone come to the house to
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 141 of 3246
Case 1:11-cv-22408-MGC Document 607-1 Entered on FLSD Docket 11/21/11 Page 25 of 117
Confidential - Subject to Further Confidentiality Review

1    assess the square footage after you moved in?

2        A.   Not to my knowledge.

3            (Chatmon Exhibit No. 4 was marked for

4    identification.)

5    BY MS. HAQUE:

6        Q.   Okay.  We're going to show you what has been

7    premarked as Exhibit 4.

8        A.   Let me ask you a question.

9        Q.   Yes, please.

10       A.   As far as square footage is concerned, you're

11   not including the garage, are you?

12       Q.   Let me -- well, let me show you a document

13   first, and then let me clarify that question for you.

14       A.   Okay.

15       Q.   There you go.  Mrs. Chatmon, have you seen this

16   document before?

17       A.   Yes.

18       Q.   And this is the Hillsborough County Property

19   Appraiser for your Bismarck Palm Drive home; correct?

20       A.   Yes.

21       Q.   Okay.  If you flip -- you're already there.  On

22   the second page, the back of the first page, it shows

23   the home price in the middle of the page as $169,900?

24       A.   Yes.  Now, that I remember.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 142 of 3246
Case 1:11-cv-01486-MGC Document 202-1 Entered on FLSD Docket 11/29/19 Page 97 of 117
Confidential – Subject to Further Confidentiality Review

```
 1      Q.    Correct, yes, you said it exactly right earlier

 2   today.  Now, if you look at the very last page, sort of

 3   in the middle of the page you'll see a little set of

 4   columns that say "building sub areas."

 5           Are you with me?  It's right below that.

 6      A.    (Indicating.)

 7      Q.    Yes, correct.

 8      A.    I see.

 9      Q.    Very good.  Under heated area, it says

10   1,240 square feet.  Is that in line with what you

11   remember to be the square footage of your home, the

12   heated area?

13      A.    Yes.

14      Q.    Okay.  And does the heated area include the

15   garage?

16      A.    No.

17      Q.    Okay.  And do you recall what the square

18   footage of the house is with the garage?

19      A.    I don't know that one.

20      Q.    That's okay.  You can go ahead and set that

21   document aside.

22           Mrs. Chatmon, how many bedrooms are in your

23   Bismarck Palm Drive home?

24      A.    Two bedrooms.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 143 of 3246
Case 1:11-cv-21409-MGC Document Entered on FLSD Docket 11/18/13 Page 98 of 117
Confidential - Subject to Further Confidentiality Review

```
 1      Q.    And how many bathrooms are in the home?

 2      A.    Two and a half baths.

 3      Q.    And you said that the house was built in 2007;

 4  is that right?

 5      A.    2006.

 6      Q.    Do you recall when the house was officially

 7  completed?

 8      A.    I don't.  I can't answer that.

 9      Q.    That's fine.  Have there been any changes to

10  the square foot since the house was built?

11      A.    No.

12      Q.    And so the under air heated square footage of

13  the home is 1,240?

14      A.    Square feet.

15      Q.    Square feet.

16      A.    Yes.

17      Q.    Very good.  Ms. Chatmon, I'm going to switch

18  gears and now talk to you about Chinese drywall

19  specifically.  Okay?

20            When do you believe that Chinese drywall was

21  installed in your home?

22      A.    I believe it was installed when the house was

23  built back in 2006.

24      Q.    Okay.  And who was in charge of the building
```

1    project?

2        A.    Rottlund Homes, the developer.

3        Q.    Okay.  Do you know who was paying them -- let

4    me back up.  Let me strike that.

5            Do you know how the drywall was installed in

6    the home?

7        A.    No.

8        Q.    Did you pay them for the complete building of

9    the home?  By "them" I mean Rottlund homes.

10            MR. ALBANIS:  I believe it's Rottlund.

11            MS. HAQUE:  Rottlund.  I'm sorry.  Rottlund.

12            MR. ALBANIS:  Rottlund, R-o-t-t-l-u-n-d.

13    Correct?

14            THE WITNESS:  Yes.

15    BY MS. HAQUE:

16        Q.    Rottlund Homes.  Sorry about that.

17        A.    Did I pay them for the building of the home?

18        Q.    Correct.

19        A.    Yes, when I purchased it.

20        Q.    Do you know who purchased the Chinese drywall

21    to put in the home?

22        A.    The builder, I'm assuming.

23        Q.    Did you ever see or witness yourself any part

24    of the building process?

```
 1      A.    No.

 2      Q.    Like, did you tour it?

 3      A.    No.

 4      Q.    Did you ever see any of the drywall before it

 5  was installed in the home?

 6      A.    No.

 7      Q.    Did Rottlund Homes ever make you any guarantees

 8  as to where they sourced their materials for your home?

 9      A.    No.

10      Q.    Did Rottlund Homes ever inform you that they

11  were installing drywall made in China in your home prior

12  to it being installed?

13      A.    No.

14      Q.    Do you know who installed the drywall

15  specifically?

16      A.    A company, Boardwalk, I believe.

17      Q.    Okay.  Ms. Chatmon, how do you know the drywall

18  in your home was made in China?

19      A.    It had a certain smell to it.  I had it checked

20  out.  I had to call the services of the air conditioning

21  to come and check it out, and they found the coils were

22  eaten through, turned black.

23            And I later ended up -- I got information off

24  of the news too, and I ended up getting with Morgan &
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 146 of 3246
Case 11-cv-1249-MGC Document 600-2 Entered on FLSD Docket 11/18/2015 Page 91 of
117
Confidential - Subject to Further Confidentiality Review

1    Morgan, and they confirmed it.

2        Q.   Let me walk you through that a little bit more

3    slowly.  Approximately in what year and month, if you

4    remember, did you start experiencing problems with the

5    air conditioning?

6        A.   2008 was when I had the system, the air

7    conditioning system, redone.  They had to put in new

8    coils.

9        Q.   Okay.  And at that time, what did the AC

10   repairman say to you about what the problem was?

11       A.   Well, at that time he just replaced the coils

12   and all, but I had to end up calling him a second time

13   for the same problems.

14       Q.   And when was that?

15       A.   This was in August or September of '09, I

16   believe it was, if I have my dates right.

17       Q.   Sure.  And at that time, what did the AC

18   repairman tell you?

19       A.   Well, he believed that it might have had some

20   other problems, because he checked the coils, and the

21   coils were darkened.

22       Q.   Okay.  And what did you do then?

23       A.   I saw that myself too.

24       Q.   Okay.  And what did you do next?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 147 of 3246
Case 1:11-cv-22408-MGC Document 92 Entered on FLSD Docket 11/10/11 Page 92 of
117
Confidential - Subject to Further Confidentiality Review

 1    A.   Well, I went online and I listened to find out

 2   more information about it before I called up, and I

 3   called Morgan & Morgan to get it inspected.

 4    Q.   Can you talk us through that process?  How long

 5   was it from when you -- from when the AC repairman told

 6   you in 2009 there were some more issues to when you

 7   started to do the research yourself?  Do you recall that

 8   time frame?

 9    A.   It may have been a short period of time,

10   because I experienced some other things too.

11    Q.   And can you tell us what those were?

12    A.   Yeah.  The unit was in over the upstairs, and

13   it had a pipe that led out to the garage, to the

14   outside, and in the kitchen I have recessed lightings,

15   and I used to have a drip during this time, a drip that

16   came from the lighting onto my kitchen floor.  And that

17   was sort of surprising, a drip of water.

18        And I also had during this time moisture or

19   water from a pipe that led into the garage, and it was

20   wet also.

21        And I did during this time call Rottlund to ask

22   them about it, and I don't know what kind of story they

23   gave me, but, anyway, they painted over it, and that was

24   it.  So I had these things happen in between the time I

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 148 of 3246
Case 2:11-cv-01408-MCE-SCR Document 691-1 Filed 05/18/2018 Page 43 of
117

Confidential - Subject to Further Confidentiality Review

1    was trying to find out more.

2         Q.   Okay.  Do you recall --

3         A.   And one other thing too.

4         Q.   Sure.

5         A.   I looked behind the -- someone mentioned to me

6    about looking behind the refrigerator and just check on

7    the coils.  The coils were black.

8         Q.   Let me break that down a little bit more.  Do

9    you recall when you first started experiencing the drip

10   into the kitchen where there was water leaking,

11   approximately?

12        A.   I would say 2008.

13        Q.   Okay.

14        A.   Yes.

15        Q.   2008.

16        A.   Yes.

17        Q.   And at that time, did you call Rottlund back in

18   2008 to paint over it or fix it?

19        A.   I did.

20        Q.   And do you recall when they came out to do that

21   fix?

22        A.   No, I don't recall the time exactly.

23        Q.   Did it solve the problem when they painted over

24   it?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 149 of 3246
Case 2:11-cv-01404-MGC Document 291 Entered on FLSD Docket 11/30/19 Page 54 of
117
Confidential - Subject to Further Confidentiality Review

```
1       A.    No.

2       Q.    It still continued to drip?

3       A.    It still continued to drip.

4       Q.    And did you call them a second time?  And by

5   "them," I mean Rottlund Homes.

6       A.    No, I didn't call them a second time.

7       Q.    How about the drip in the garage?  When did

8   that first start, approximately?

9       A.    That started from the water running from the

10  recessed lighting, because I think everything was

11  connected.  It went from that air unit upstairs, and the

12  pipe went out.  The pipes, apparently, were corroded.

13      Q.    And do you recall the month and year that you

14  first started noticing those problems?

15      A.    I can't give you an exact year.

16      Q.    Was it around the same time as the drip in the

17  kitchen?

18      A.    Yes, or it may have been a little bit after

19  that, because we were looking at it from 7 -- from

20  July 2008 to 2009.  Okay?  Between that time, I called

21  the systems out to check it.  They came out three times.

22  One time they came in and put freon back in the unit.

23  It had no freon.  So I made three calls to them for them

24  to check it out for me.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 150 of 3246
Case 1:11-cv-01146-MGC Document 69 Entered on FLSD Docket 11/18/2015 Page 95 of
117
Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  Did Rottlund also fix the leak in the

2  garage?  Did they come to repair that at all?

3    A.    No.  They painted over it.

4    Q.    Did that solve the problem?

5    A.    No.

6    Q.    It continued to leak?

7    A.    Yes.

8    Q.    And then you also described looking behind the

9  refrigerator?

10   A.    Yes.

11   Q.    When did you first do that and notice the

12  blackening of the coils, do you recall?

13   A.    It was during the time when the air

14  conditioning system was being checked out, and that's

15  when one of the servicemen pulled it out.  I asked him

16  to pull it out and let me check it since I had also

17  heard this online.

18   Q.    Would this have been back in August of 2009,

19  approximately, when the second repairman came out, when

20  you had the next big problem with the air conditioning?

21   A.    Yes, it was the second time.

22   Q.    And who told you or how did you find out to

23  check behind the refrigerator?

24   A.    Well, listening to the news, cases that had

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 151 of 3246
Case 1:14-cv-04469-GLR Document 109 Entered on FLSD Docket 11/2015 Page 96 of 117
Confidential - Subject to Further Confidentiality Review

1    been coming up that Rottlund was in charge of, houses

2    that they had built, and just general information that

3    was out there about it, that those were symptoms.

4    Q.  When did you first recall hearing on the news

5    or in media about problems with Chinese drywall?

6    A.  It had to have been after I purchased the

7    house.

8    Q.  So do you think --

9    A.  It was 2007.  2007/early 2008.

10    Q.  Okay.  And when did you decide to go to

11    Morgan & Morgan?  Do you recall the month and year,

12    approximately?

13    A.  After all those things, it was October of 2009.

14    Q.  Okay.  Mrs. Chatmon, do you know what the total

15    cost of the drywall installation was in your home?

16    A.  The total cost of the drywall installation?

17    Q.  Specifically, yes.

18    A.  No.

19    Q.  And do you know if any other work was

20    installed -- being installed at the same time the

21    drywall was installed, for example, the HVAC or any

22    other appliances?

23    A.  No.

24    Q.  Mrs. Chatmon, where exactly in your home do you

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 152 of 3246
Case 1:11-cv-22408-MGC Document 201-1 entered on FLSD Docket 11/30/15 Page 97 of 117

Confidential - Subject to Further Confidentiality Review

1    believe Chinese drywall was installed?

2           MR. ALBANIS:  Object to the form, but you may

3       answer if you know, Ms. Chatmon.

4           THE WITNESS:  Pardon me?

5           MR. ALBANIS:  I said:  Object to the form, but

6       you may answer the question if you know.

7           THE WITNESS:  I object.

8           MR. ALBANIS:  You should --

9           THE WITNESS:  I don't know.

10   BY MS. HAQUE:

11       Q.   That's okay.

12       A.   That's it.

13       Q.   That's fine.

14       A.   I'm sorry.

15       Q.   That's fine.  That's fine.

16           Mrs. Chatmon, do you know if there was any

17   drywall installed in your home that came from US or

18   domestically made sources?

19       A.   No.

20       Q.   Do you -- have you ever seen any markings on

21   any pieces of drywall in your home?

22       A.   No.

23       Q.   Okay.  Mrs. Chatmon, did you ever smell an odor

24   at any point from when you first moved into the home

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 153 of 3246
Case 1:11-cv-02349-MGC Document 2021 Entered on FLSD Docket 11/26/15 Page 48 of
117
Confidential - Subject to Further Confidentiality Review

1    until -- at any point from, I guess, March 30, 2007,

2    until present?

3        A.   Yes.

4        Q.   When did you first start smelling an odor?

5        A.   It was within weeks of moving into the home in

6    2007.

7        Q.   What did you smell?  What did it smell like?

8        A.   Sulfur.

9        Q.   And where in the house specifically did you

10   smell the odor?

11       A.   By the time you open the door, really.

12       Q.   So in the kitchen and living area?

13       A.   It was there and upstairs and all, yes.  The

14   entire house.

15       Q.   Was the odor worse in certain areas of the home

16   than others?  For example, was the odor worse in the

17   kitchen compared to the upstairs bedroom, something like

18   that?

19       A.   It appeared to be worse downstairs.

20       Q.   Okay.  Was it -- was the odor stronger at

21   certain times of the day, for example, the morning

22   versus nighttime?

23       A.   I can't say about that, except that during the

24   summertime it was worse.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 154 of 3246
Case 1:11-cv-01408-MGC Document 202-1 Entered on FLSD Docket 11/09/2015 Page 99 of
117
Confidential - Subject to further Confidentiality Review

```
 1       Q.   The summertime it was worse?

 2       A.   Yes.

 3       Q.   And did the odor change over time?  Was it

 4   worse when you first moved in, and did it get better, or

 5   anything like that?

 6       A.   It didn't get better.

 7       Q.   Okay.  Other than the air conditioning unit,

 8   did you have any other issues with appliances in the

 9   home?

10       A.   Appliances not working, yes.

11       Q.   Can you tell us about that?

12       A.   The upstairs washer and dryer, the dryer would

13   work sometimes, and sometimes it wouldn't.

14       Q.   Did you ever get that repaired?

15       A.   No.

16       Q.   Okay.  Any other issues with appliances?

17       A.   Downstairs, yeah.  The dishwasher didn't work.

18   The disposal didn't work.

19       Q.   And do you know what the problems were with

20   them?  Did you get them repaired at any time?

21       A.   No.

22       Q.   Do you know if any of the problems that either

23   the washer/dryer, dishwasher, or disposal have were

24   related to Chinese drywall?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 155 of 3246
Case 1:11-cv-22408-MGC Document 301-1 Entered on FLSD Docket 11/18/15 Page 40 of
117

```
 1      A.    No.

 2      Q.    Okay.  Now, Mrs. Chatmon, you said that once

 3   the air conditioning repairman came around August of

 4   2009 or so you started to do your own research; right?

 5   Is that about right?

 6      A.    Yes.

 7      Q.    And you said that you went online and you also

 8   heard about it on TV that there may be issues with

 9   Chinese drywall in the area?

10      A.    Yes.

11      Q.    Did you ever talk to any of your neighbors or

12   anyone in the townhome subdivision about whether they

13   had any problems with Chinese drywall?

14      A.    Yes, there were other homes too.

15      Q.    And can you tell us about that and what you

16   learned?

17      A.    I don't know exactly what their situations are,

18   but homes were renovated.

19      Q.    When did you first hear about homes in your

20   subdivision being renovated?

21      A.    2009/2010, and some later.

22      Q.    And how did you hear about them?

23      A.    Well, at the time I had not moved out of the

24   area and I could see what was going on.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 156 of 3246
Case 1:14-cv-14049-MGM Document 202-1 Filed 07/13 Document 1-2015 Page 41 of
117

Confidential - Subject to Further Confidentiality Review

1    Q.   Did you talk to your neighbors about what was

2    going on?

3    A.   There was one neighbor that was -- that lived

4    in the building next to me.  I could see, not

5    necessarily talk about it, but his house was gutted.

6    Q.   And how did you know it was due to Chinese

7    drywall?  Or how did you learn that it was due to

8    Chinese drywall as opposed to, I guess, just other type

9    of renovations?

10   A.   The process they did in clearing it out.  They

11   used a big Dumpster and pulled it out and aired it out

12   and took -- gutted everything, I mean, so it was --

13   Q.   Did you end up talking to -- sorry.

14   A.   I didn't talk to the neighbors.

15   Q.   What about the workers that were doing the

16   gutting?  Did you sort of talk to them about what they

17   were doing?

18   A.   No.

19   Q.   Okay.  So let me take you back then to 2009

20   when you started doing the research.  At what point did

21   you contact Morgan & Morgan?  Can you tell us what you

22   recall?

23   A.   It was the ninth or the tenth month.

24   Q.   Okay.  And you said that they arranged for an

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 157 of 3246
Case 1:11-cv-21409-MGC Document 91 Entered on FLSD Docket 11/18/2015 Page 42 of
117
Confidential - Subject to Further Confidentiality Review

```
1    inspection to occur of your property; is that right?

2         A.   Yes.

3         Q.   And do you recall when that happened?

4         A.   In October.  October of 2010.

5              (Chatmon Exhibit No. 5 was marked for

6    identification.)

7    BY MS. HAQUE:

8         Q.   Okay.  We're going to show you what has been

9    premarked as Exhibit No. 5.

10        A.   It wasn't 2010.  It was 2009.

11        Q.   Ms. Chatmon, have you seen this document

12   before?

13        A.   I believe I have.

14        Q.   And what is this document?

15        A.   It's an inspection report from Morgan & Morgan.

16        Q.   And it was conducted by Kross Inspectors; is

17   that correct?

18        A.   I believe so.

19        Q.   And it says the inspection date was Wednesday,

20   January 27, 2010.  Do you remember that happening?

21        A.   I remember the inspection, but the dates may

22   be -- my date may be off a little.

23        Q.   Sure.  That's okay.  Were you present in the

24   home during this inspection?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 158 of 3246
Case 1:11-cv-22408-MGC Document 204-2 Entered on FLSD Docket 11/30/15 Page 43 of
117

Confidential - Subject to Further Confidentiality Review

1    A.    Yes, I was in the area.

2    Q.    Okay.  Did you ever speak with the inspector at

3  any point during the inspection?

4    A.    I can't recall that.

5    Q.    Did the inspector ever talk to you about

6  finding defective drywall in your home?

7    A.    I can't recall that.

8    Q.    Okay.

9    A.    All I know is they took things, checked it, and

10  took it with them.

11    Q.    So did the inspector actually remove pieces of

12  drywall from the home at that time, to your knowledge?

13    A.    To my knowledge, yes.

14    Q.    Okay.  Do you know who paid for the inspection,

15  Mrs. Chatmon?

16    A.    Morgan & Morgan, I believe.

17    Q.    Okay.  Have you had any other inspections since

18  this Kross inspector, inspection, back in January of

19  2010?

20    A.    The City of Tampa, for tax purposes, in order

21  to give me reduced rates for taxes, sent someone out to

22  check for it, and he does this on a yearly basis, comes

23  so that he can assess the taxes for that year.

24    Q.    And do you recall when that was done?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 159 of 3246
Case 11-cv-1489-MGC Document 604-1 entered on FLSD Docket 11/3/2015 Page 464 of
117

Confidential - Subject to Further Confidentiality Review

```
 1       A.    Well, it happens on a yearly basis, basically.

 2       Q.    Okay.  So it would have probably been sometime

 3   in 2009 then?

 4       A.    Not at that time.

 5       Q.    So 2010?

 6       A.    It was later, because I was paying full taxes

 7   during that time.

 8       Q.    Understood.  Okay.  And do you recall what the

 9   tax inspector found after he did the inspection?

10       A.    Well, there was pieces of drywall that he saw

11   underneath my -- one of the doors in the living area

12   there.

13       Q.    And what did he tell you, sort of, about his

14   findings?

15       A.    Well, it showed up in a report.  I did not have

16   to pay the full amount for the taxes for the county.

17       Q.    Did you ever receive a copy of that report?

18       A.    From the City?

19       Q.    Yes.

20       A.    I don't recall.

21       Q.    Mrs. Chatmon, in the inspection report --

22       A.    Let me say something about this too.

23       Q.    Okay.

24       A.    Since you have down here January 27, 2010, when
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 160 of 3246
Case 1:11-cv-01449-MGC Document 264-12 Entered on FLSD Docket 11/28/19 Page 45 of
117

Confidential - Subject to Further Confidentiality Review

1    this report came out, apparently it was done in 2009, in

2    October of 2009.  October or November 2009.

3         Q.   So there was another inspection that happened?

4         A.   No, I mean with Morgan & Morgan, because I

5    moved out of the house in 2010.

6         Q.   Okay.  We'll ask you about that in one second.

7         A.   Okay.

8         Q.   In terms of the Kross inspection report, you

9    said you didn't talk to anyone or any of the inspectors

10   about their findings here.  Do you know what percentage

11   of the home may have had Chinese drywall based on the

12   inspections that were performed?

13        A.   I don't recall.

14        Q.   In terms of the inspections, did they find any

15   markings to show a specific company that they think that

16   the Chinese drywall came from?

17        A.   I don't have that.  I didn't get that

18   information, if they did.

19        Q.   Do you know to your knowledge any company that

20   you think that the Chinese drywall was manufactured

21   from?  The name of a company, I mean.

22        A.   I would say maybe Taishan.

23        Q.   And how do you know that?

24        A.   Because, as I said, I don't -- I didn't see the

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 161 of 3246
Case 2:11-cv-1408-MGC Document 20-1 Entered on FLSD Docket 11/18/19 Page 46 of
117

Confidential - Subject to Further Confidentiality Review

```
1    drywall itself, so --

2        Q.   So you just --

3        A.   -- I'm just basing it on what I get from the

4    reports, that's all.

5        Q.   This report doesn't look like it mentions

6    Taishan, so did you get another report or have you seen

7    another report of your home where it lists Taishan?

8        A.   I don't recall that either.

9        Q.   Okay.  That's okay.  You can go ahead and set

10   that document aside.

11           (Chatmon Exhibit No. 6 was marked for

12   identification.)

13   BY MS. HAQUE:

14       Q.   We're going to now show you what has been

15   premarked as Exhibit 6.  Here you go.

16           Ms. Chatmon, have you seen this -- you're still

17   looking?

18       A.   I'm still looking so I can place it.

19           Okay.

20       Q.   Mrs. Chatmon, have you seen this document

21   before?

22       A.   Yes.

23       Q.   This is a Plaintiff Profile Form that was filed

24   by your attorneys.  Did you provide information to your
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 162 of 3246
Case 1:11-cv-22408-MGC Document 102-2 Entered on FLSD Docket 11/23/11 Page 47 of
117
Confidential - Subject to Further Confidentiality Review

 1    attorneys for them to fill out this document?

 2        A.   Yes.

 3        Q.   And on page -- it's sort of a little bit hard

 4    to make out, but it's page 41, if you look at the page

 5    numbers in the corner.

 6        A.   This one?

 7        Q.   Correct.  Is that your signature?

 8        A.   Yes.

 9        Q.   And it looks like this was dated January 15,

10    2010; correct?

11        A.   Yes.

12        Q.   Now, can I have you just turn over the document

13    to look at the back side?

14        A.   (Indicating.)

15        Q.   Yes.  You'll see it says Section IV, Inspection

16    Information - continued, and it lists two listings.  One

17    is Florida Building Engineering & Inspections dated

18    December 2, 2009, and then Jackie Dwayne Bronson dated

19    December 2, 2009.  Were these prior inspections of your

20    home?

21        A.   I don't know who Morgan & Morgan got to inspect

22    them.  I don't know the companies.

23        Q.   But when you mentioned some inspections taking

24    place in 2009, do you think these were the inspections

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 163 of 3246
Case 1:11-cv-01146-MGC Document 21 Entered on FLSD Docket 11/22/19 Page 48 of 117
Confidential - Subject to Further Confidentiality Review

1    that you were referring to?

2        A.   It could have been.

3        Q.   Okay.  Did you ever receive a report from these

4    two inspections?

5        A.   It probably went to Morgan & Morgan.  It

6    probably ended up in my information.

7        Q.   And we'll just make a request to your attorneys

8    to the extent that these reports exist, if we can get a

9    copy of these two inspection reports.

10            Mrs. Chatmon, you can go ahead and set that

11   document aside.  Ms. Chatmon, has anyone taken samples

12   of drywall from your home?

13       A.   Yes.

14       Q.   Do you recall who did that?

15       A.   Through an inspection process, I imagine.

16       Q.   Do you recall whether the 2009 inspections took

17   drywall samples from your home?

18       A.   Yes.

19       Q.   What about the Kross inspection in 2010,

20   January 2010, did they also remove samples of drywall

21   from your home?

22       A.   Yes.

23       Q.   And then when -- the inspection that I came to

24   your house for, they also removed samples of drywall;

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 164 of 3246
Case 1:11-cv-22408-MGC Document 60-1 Entered on FLSD Docket 11/28/19 Page 49 of
117

Confidential - Subject to Further Confidentiality Review

```
 1   correct?

 2        A.   Yes.

 3        Q.   Okay.  Do you know where these samples are

 4   right now?

 5        A.   No.

 6        Q.   Do you know how many total Chinese drywall

 7   boards were in your home?

 8        A.   No.

 9        Q.   And no one has ever determined the percentage

10   of your home that was constructed with Chinese drywall;

11   correct?

12        A.   I can't say for that.

13             MS. HAQUE:  Okay.  Why don't we go ahead and

14        take our morning break, about 10 minutes.  Is that

15        okay with you guys?

16             MR. ALBANIS:  Sure.

17             MS. HAQUE:  Let's go off the record.

18             (Recess from 9:11 a.m. until 9:28 a.m.)

19             MS. HAQUE:  We can go back on the record.

20             (Chatmon Exhibit No. 7 was marked for

21        identification.)

22   BY MS. HAQUE:

23        Q.   Ms. Chatmon, I'm going to go ahead and show you

24   another document that has been premarked as Exhibit
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 165 of 3246 of
Case 1:11-cv-22408-MGC Document 401-1 entered on FLSD Docket 11/30/15 Page 50 of
117

Confidential - Subject to Further Confidentiality Review

```
1    No. 7.  And it's a long one, so I specifically want to

2    direct your attention to pages 172 and 173, but I'll ask

3    you:  Have you ever seen this document before, a Builder

4    Defendant Profile Form?

5        A.    The names don't even sound familiar.  It's

6    strange.  I'm not certain whether -- I can't recall

7    because of the names on here.

8        Q.    This document was submitted on your behalf by

9    your attorney, and it looks like it's information

10   related to your builder, Rottlund Homes.

11           Do you see on the first page, middle of the

12   page, where it says:  "A.  Builder name.  Rottlund Homes

13   of Florida"?

14       A.    Yes.

15       Q.    And that was your builder; correct?

16       A.    Correct, yes.

17       Q.    So it looks like this may be information

18   related to your builder.

19           Now, can I take your attention to page 172?

20   It's the back of the first page.  And I want to direct

21   your attention about two-thirds of the way down.

22           And the question is:  "Were you able to

23   determine any of the following information for the

24   subject property."
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 166 of 3246
Case 1:11-cv-01408-MGC Document 69-1 Entered on FLSD Docket 11/18/2019 Page 41 of
117

1          And under A, it says "manufacturer(s) of the

2     Chinese drywall."  And what is written there?

3          A.    "No."

4          Q.    And then if you turn to the next page, you'll

5     see all the way at the bottom, there's Section V,

6     Chinese Drywall Product Identification and -- oh, it's

7     right there, all the way at the bottom.

8          A.    Okay.

9          Q.    Roman numeral V, Chinese Drywall Product

10    Information and Chain of Distribution.

11          And the question is:  "With respect to any

12    Chinese drywall within the defined property, identify

13    the following, if known.

14          "A.   Name of Chinese drywall manufacturer."

15          What does it have written there?

16          A.    It says "unknown."

17          Q.    And that's consistent with your knowledge;

18    correct?

19          A.    Yes.

20          Q.    You don't know the name of any Chinese drywall

21    manufacturer specifically?

22          A.    No, not really.

23          Q.    Very good.  You can go ahead and set the

24    document aside.

1          Mrs. Chatmon, I wanted to just ask you really

2     quickly by about your second mortgage.

3          A.   May I ask another question about this one?

4     This was sent to whom?

5          Q.   Your attorney uploaded this as part of your

6     documents, so -- and so it was one of the documents that

7     we received.

8          MR. ALBANIS:  For the record, we uploaded this

9          in 2013 in reference to Ms. Chatmon's participation

10         in any number of the settlements in the Chinese

11         drywall litigation as proof that Rottlund Homes was

12         the builder of her property.  However, this document

13         was not prepared by my firm; it was prepared by, it

14         appears, counsel for Rottlund Homes.

15    BY MS. HAQUE:

16         Q.   Mrs. Chatmon, can I have you turn back to

17    Exhibit No. 2 for me, please?

18         MR. ALBANIS:  Exhibit 2, she said.

19         THE WITNESS:  Oh, this one.  Is this --

20         MS. HAQUE:  It may be in this stack.  Here we

21         go.  Thanks, Pete.

22    BY MS. HAQUE:

23         Q.   And can you flip that over to the back of the

24    page?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/12/19 Page 168 of 3246
Case 1:11-cv-22408-MGC Document 262-1 Entered on FLSD Docket 11/4/2019 Page 93 of
117

Confidential - Subject to Further Confidentiality Review

```
1      A.    Exhibit 2.

2      Q.    Yes.  I wanted to get on the record what your

3   monthly payment was for your second mortgage.

4      A.    311.

5      Q.    $311.66?

6      A.    Yes.

7      Q.    And so your total mortgage payment was

8   approximately $1,236 per month?  Does that sound

9   accurate?

10     A.    Yes, somewhere in that neighborhood.

11     Q.    Okay.  I want to next talk about the

12  remediation of your home, so we're going to go ahead and

13  switch topics, so you can set those documents aside.

14        Mrs. Chatmon, has any construction company

15  started the remediation of the Bismarck Palm Drive home

16  yet?

17        MR. ALBANIS:  Before you answer, I'll just go

18     ahead and assert the rolling objection that I've

19     been asserting to any and all questions related to

20     the remediation of Mrs. Chatmon's home.  As counsel

21     is aware, Mrs. Chatmon has been named a priority

22     claimant in this litigation for purposes of

23     nonremediation damages pursuant to Judge Cooke's

24     order from November of 2018.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 169 of 3246
Case 1:14-cv-04048-MGC Document 21-39 Docket 11/2/19 Page 54 of
117
Confidential - Subject to Further Confidentiality Review

```
 1              We object to any and all questions related to

 2         remediation and remediation damages related to the

 3         Bismarck Palm Drive property.

 4              Having said all that, of course we will allow

 5         the questioning to continue.

 6              MS. HAQUE:  And the objection is noted for the

 7         record, and in response we'll say that these

 8         questions have to do with overall categories of

 9         damages and, therefore, are pertinent to this

10         deposition.

11    BY MS. HAQUE:

12         Q.   Mrs. Chatmon, let me go ahead and reask the

13    question for you.  Have any remediation efforts started

14    on the Bismarck Palm Drive home yet?

15         A.   Efforts, yes.

16         Q.   What has happened thus far, and when did

17    they -- let me back up.

18              When did any construction company first start

19    to remediate your home?

20         A.   Well, he's not started to -- he's just starting

21    to renovate, I would say in the past week or so.  I

22    signed papers for it earlier.

23         Q.   Who are you using to remediate your home at

24    Bismarck Palm Drive?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 170 of 3246
Case 1:11-cv-01490-MGC Document 202-1 Entered on FLSD Docket 11/21/2013 Page 95 of
117
Confidential - Subject to Further Confidentiality Review

 1     A.    Staten.

 2     Q.    And what has he --

 3     A.    JJ Staten.

 4     Q.    What has he done so far, to your knowledge?

 5     A.    He's put a lock on the door and he's taking

 6   care of the paperwork that's related to it.

 7     Q.    Have they started removing any drywall yet?

 8     A.    Not to my knowledge.

 9     Q.    Okay.  Mrs. Chatmon, you moved out of your home

10   in 2010; is that right?

11     A.    Correct.

12     Q.    You said April 2010?

13     A.    Yes.

14     Q.    Did you think about remediating the home back

15   then in April of 2010?

16     A.    No.

17     Q.    Why not?

18     A.    Because I wasn't financially able to do it at

19   the time.

20     Q.    And why was that?  What were the reasons

21   preventing you from remediating the home?

22     A.    Money.

23     Q.    Now, you had a monthly mortgage payment of

24   $1,236; correct?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 171 of 3246
Case 1:14-cv-04048 Document 289-1 Filed 05/10/18 Page 171 of 3246
Confidential - Subject to further Confidentiality Review
117

```
 1      A.   Yes.

 2      Q.   Did you receive a pension from the Dougherty

 3   County School District?

 4      A.   Yes.

 5      Q.   How much do you recall was the monthly pension

 6   payment to you?

 7      A.   At that time?

 8      Q.   Correct.

 9      A.   I don't recall exactly the amount.

10      Q.   Was it $500?  More than $500?

11      A.   More.

12      Q.   More than $1,000?

13      A.   Yes.  And let me say this to you:  You asked me

14   about moving out, why did I move out of the house

15   instead of renovating it?

16      Q.   No, just why did you decide not to renovate at

17   that time.

18      A.   Well, another reason is that I needed to get

19   with -- the house was making me sick.  I had gone to

20   doctors and -- a doctor, rather -- and he diagnosed me

21   with asthma and things like that, so I needed to get out

22   of the area at the time, not to try to do anything about

23   it, try to get it fixed.

24      Q.   Understood.  Mrs. Chatmon, you just described
```

Case 2:09-md-02047-EEF-MBN  Document 22363-39  Filed 11/19/19  Page 172 of 3246
Case 1:14-cv-14490-MGEF  Document 02d-1  Confidential Exh 59  Docket 11/20/19  Page 47 of
117
Confidential - Subject to Further Confidentiality Review

 1   some physical ailments.  Are you making a personal

 2   injury claim for this lawsuit?

 3       A.   No.

 4       Q.   Okay.  Now, Mrs. Chatmon, did you receive any

 5   other forms of assistance from the government, Social

 6   Security benefits, or any other payments back in 2010?

 7       A.   I do have Social Security.

 8       Q.   Do you recall how much you received in monthly

 9   payments?

10       A.   Back then?

11       Q.   Back then, yeah.

12       A.   Back then, it -- I don't recall the exact

13   amount, but it was over 1,000.  Around 1,000.

14       Q.   Around 1,000 in Social Security, and you said

15   over 1,000 in pension payments?

16       A.   Much over, yes.

17       Q.   Much over.

18       A.   Yes.

19       Q.   Over 2,000?

20       A.   Yes.

21       Q.   3,000?

22       A.   Yes.

23       Q.   4,000?

24       A.   I would say -- let me see if I can get a

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 173 of 3246
Case 11-1:14-md-MCE-L Document 2047-1 Confidential Subject Document 1 11-K-11-3 Page 48 of
117
Confidential - Subject to Further Confidentiality Review

1    better -- 4,000-something.  Okay.

2        Q.   In monthly pension?

3        A.   Monthly pension, yes.

4        Q.   And then about 1,000 or so in Social Security

5    benefits?

6        A.   Yes.

7        Q.   Now, did you --

8        A.   And I'm hoping that's it.

9        Q.   Okay.  That's fine.  Did you talk to any

10   construction company about remediation back in 2010?

11       A.   No.

12       Q.   Did you ever get an estimate of how much the

13   remediation might have cost back in 2010?

14       A.   No.

15       Q.   How much do you think the total remediation

16   would have cost you?

17       A.   At that time?

18       Q.   At that time, correct.

19       A.   I don't know, but I assume it would have been

20   more, because the price of houses were up at that time,

21   so renovation and even building was more expensive.

22       Q.   Why did you decide to remediate now?

23       A.   I do want to get back in my house.  It's been

24   since I purchased it in 2007, and I want to live in it,

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 174 of 3246
Case 1:11-cv-22408-MGC Document 102-1 Entered on FLSD Docket 11/08/2013 Page 59 of
117
Confidential - Subject to Further Confidentiality Review

1    I want the enjoyment of living in a home that I

2    purchased, spend my senior years in it.

3        Q.    Correct.  Do you have any additional financial

4    assistance available to you now?

5        A.    Other than my retirement and Social Security?

6        Q.    Correct.

7        A.    No.

8        Q.    Okay.  So you are still receiving today about

9    4,000 in retirement pension payments and then about

10   1,000 in Social Security?

11       A.    No, it's gone up.  It's gone up.

12       Q.    Do you recall the difference?  Or how much are

13   you receiving now?

14       A.    5,000 -- in retirement, 5,000, approximately,

15   because I don't have the figures in front of me.

16       Q.    That's okay.

17       A.    5,500 or -600 in retirement and 1100 Social

18   Security.

19            (Chatmon Exhibit No. 8 was marked for

20   identification.)

21   BY MS. HAQUE:

22       Q.    Okay.  We're going to go ahead and show you

23   what has been premarked as Exhibit No. 8.

24            Mrs. Chatmon, what is this document?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 175 of 3246
Case 1:14-cv-09148-GETD Document 202-2 Confidential Subject to further Confidentiality Review
117

```
 1        A.    A contract for remediation.

 2        Q.    And this is a contract with JJ Staten -- that's

 3   S-t-a-t-e-n -- Homes, LLC; correct?

 4        A.    Correct.

 5        Q.    How did you go about choosing JJ Staten?

 6        A.    Well, I did some checking around, Internet,

 7   people who were doing this kind of thing, and I chose

 8   him.

 9        Q.    Okay.  Did you look at any other contractors

10   for the remediation process?

11        A.    Not really.

12        Q.    Did you get any -- I'm sorry.

13              Did you get any competing quotes for the

14   remediation project?

15        A.    No.  I was just ready to get it done.

16        Q.    What factors led you to consider and pick

17   JJ Staten?

18        A.    He'd done this kind of work before.

19        Q.    Do you know if JJ Staten remediated any homes

20   in your neighborhood?

21        A.    I don't know that.  I'm not aware of it.

22        Q.    Now, Mrs. Chatmon, this page shows your

23   signature on October 2, 2018; is that right?

24        A.    Correct.
```

Confidential - Subject to Further Confidentiality Review

```
 1      Q.    And it shows a total contract price of $63,240?

 2      A.    Correct.

 3      Q.    And is that the total price that you're going

 4  to pay JJ Staten?

 5      A.    That's what I'm paying for the renovation.

 6      Q.    And then if you flip the page, it looks like

 7  you're having some additional work done?

 8      A.    Correct, yeah.

 9      Q.    And the total amount of this work is $21,100;

10  is that correct?

11      A.    Correct.

12      Q.    Okay.  And these additional items that you're

13  having done, how did you go about selecting these to be

14  performed by them?

15      A.    How did I go about selecting those things to

16  do?

17      Q.    Yes.

18      A.    Well, I didn't like the fact of the -- I'll

19  start with the most expensive one.  With the flooring --

20      Q.    Okay.

21      A.    -- I would have had to have that done anyway,

22  and I chose to have things done because, since he was in

23  the renovation process, then it would be easier.  It

24  would be less expensive to have things done, you know,
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 177 of 3246
Case 1:11-cv-01395-MGC Document 1 Entered on FLSD Docket 11/18/19 Page 41 of 117
Confidential - Subject to further Confidentiality Review

1   while he was breaking down.

2       Q.   Okay.  Was the kitchen tile floor damaged by

3   Chinese drywall in any way?

4       A.   It was damaged.

5       Q.   Was it damaged by the Chinese drywall?

6       A.   I don't know.

7       Q.   Okay.  What about the front --

8       A.   It's in here to be paid for.

9       Q.   Got it.

10      A.   Yeah.

11      Q.   What about the granite/quartz top of the

12  kitchen?  Was that damaged in any way, whatever the

13  previous kitchen top was?

14      A.   No, it wasn't damaged, to my knowledge.

15      Q.   Got it.  So these are more so upgrades or

16  things that you didn't like about the property that you

17  wanted to go ahead and get changed out now?

18      A.   Yes.

19      Q.   Were any of the items on these two pages

20  damaged by Chinese drywall, to your knowledge?

21      A.   I would think the -- I would say that the

22  insulation was damaged.

23      Q.   How do you know that?

24      A.   Well, if the fumes are affecting everything

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 178 of 3246
Case 2:14-cv-02494-MGC Document 34-1 Entered on FLSD Docket 11/21/19 Page 43 of 117

Confidential - Subject to Further Confidentiality Review

1    else in the house, it's affecting the insulation too.

2    It's in the insulation.

3        Q.    Did JJ Staten confirm that or tell you that

4    there were issues with insulation?

5        A.    No, he didn't tell me.  I just -- the house is

6    supposed to be gutted.  Okay?  I am going back to Judge

7    Fallon's order with the Germano case where he said that

8    the whole house should be gutted and really start over.

9    That whole house included the cabinets and the flooring

10    and everything.

11            I'm not doing that.  I'm only doing some other

12    things.  I'm keeping the cabinets and, really, keeping

13    the granite too, but I'm paying for it cash, so that's

14    not included in this.  And I'm doing -- the floors are

15    not being done by them.  I'm doing the floors.  So there

16    are things in there, and all of the fixtures and all in

17    there are not -- y'all not paying for, they're not done.

18    So, anyway, I would like to make the house as good or as

19    whole as it is for me to live in it.  Okay?

20        Q.    The $63,000 on the front page, what did they

21    say that they would include as part of the $63,000?

22    Like, what would they do to the home other than just

23    remove the drywall?

24        A.    They have to deal with the receptacles in

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 179 of 3246
Case 1:11-cv-01404-MGC Document 204-1 Entered on FLSD Docket 11/20/15 Page 64 of
117

Confidential -- Subject to Further Confidentiality Review

 1    there, they have to deal with the hot water heater, the

 2    appliances, the lighting fixtures, because all of that

 3    is contaminated.

 4        Q.   Okay.

 5        A.   Let's see.  What else?  Any of the electrical

 6    stuff in there is contaminated.  The carpet and all of

 7    that is taken out.

 8        Q.   Okay.  And it says they're going to replace the

 9    alarm system, replace like for like?

10        A.   Yes.

11        Q.   Okay.  And they're going to give you a $3,000

12    allowance for the refrigerator, microwave, stove,

13    dishwasher, washer and dryer?

14        A.   Yes, and some of those things had shut down

15    before I left there, really.

16        Q.   So those are going to be included in the

17    $63,000 price?

18        A.   Yes.

19        Q.   Okay.  And then they're going to remove and

20    replace the hot water heater, the garbage disposal, the

21    breaker panel, and then any and all recessed lighting.

22    Does that sound right to you?  And I'm looking at the

23    very last page of this.

24        A.   Yes.

Confidential - Subject to Further Confidentiality Review

1    Q.   And they're going to remove and reset cabinets,

2    doors, the toilets and bathroom fixtures?

3    A.   If the fixtures are okay.

4    Q.   If there's any pitting or anything to the

5    fixtures, what is the plan for those?

6    A.   They would be replaced if there is

7    contamination in it, and I know I have the mirrors in

8    there, if they are not -- they've been damaged.  I've

9    seen some of the fixtures in there has -- I don't think

10   what kind of material it is, but it has little bubbles

11   on it, so, to me, that's contaminated.  The pipes have

12   to be replaced.

13   Q.   Now, if they -- if JJ Staten notices any of

14   these issues with the fixtures, are they going to go

15   ahead and replace it as part of the contract, or do you

16   have to pay for those out-of-pocket?

17   A.   If it's a part of the contamination, then they

18   pay, he takes care of it.

19   Q.   Okay.  And then they said that they would

20   remove and reset any and all lighting fixtures

21   throughout the interior/exterior, window cells, wire

22   shelving, attic covers, and the trim, the overhead

23   garage door openers and the tracks, all doors and door

24   hardware.  Does that sound accurate to you?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 181 of 3246
Case 1:11-cv-22408-MGC Document 69-1 Entered on FLSD Docket 11/28/11 Page 66 of
117

Confidential - Subject to Further Confidentiality Review

```
 1      A.   Yes.

 2      Q.   Okay.  How long --

 3      A.   I don't know about the door hardware.  I don't

 4   know if it's -- if it's on the inside and it's

 5   contaminated.

 6      Q.   So I'm looking at the last page of the

 7   contract, and it says "remove and reset."  The second

 8   bullet point.  Do you see that in the middle of the

 9   page?

10      A.   Yes, I see it.

11      Q.   It says "all doors and door hardware."

12      A.   Okay.

13      Q.   How many conversations have you had with JJ

14   Staten about the project?

15      A.   Several.

16      Q.   And did they tell you how long the entire

17   remediation would take place?

18      A.   He estimated about three months.

19      Q.   Three months?

20      A.   Yes.

21      Q.   And would you say three months starting from

22   this past week?

23      A.   I can't tell you that.

24      Q.   Other than what's been listed in this document,
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 182 of 3246
Case 1:14-cv-01049-WTL-DML Document 51 Filed 11/18/19 Page 97 of 117
Confidential - Subject to Further Confidentiality Review

 1   are you planning on making any other renovations or

 2   changes to the Bismarck Palm Drive?

 3        A.   Basically, the inside.

 4        Q.   And that's what's listed, right, in this

 5   document?

 6        A.   Uh-huh.  Yes.

 7        Q.   Anything else that we haven't talked about?

 8        A.   No.

 9        Q.   Okay.  And have you paid a deposit for this

10   remediation?

11        A.   Yes.

12        Q.   How much have you paid so far, to your

13   knowledge?

14        A.   If you look at the first page there, he has for

15   the basic renovation a $18,972 deposit.  I paid that.

16        Q.   And you've paid that already?

17        A.   Yes.

18        Q.   Okay.

19        A.   And I've also paid half of the monies for the

20   new upgrades, whatever, if you want to call it that.

21        Q.   And that's right here where it says -- the

22   second -- the third page, I'm sorry, where it says

23   "50 percent deposit due now $10,550"?

24        A.   Yes.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 183 of 3246
Case 1:11-cv-22408-MGC Document 60-7 Entered on FLSD Docket 11/30/11 Page 68 of
117

Confidential - Subject to Further Confidentiality Review

1      Q.    So you've paid that.  Has anyone else

2    contributed to pay for the remediation?

3      A.    No.

4      Q.    You've paid out-of-pocket?

5      A.    Yes.

6      Q.    Okay.  Do you know if anyone has -- we talked

7    earlier today about different inspection companies that

8    have taken samples of the drywall; correct?  I think you

9    said earlier that you saw some of the earlier

10   remediation companies back in 2009/2010 take samples?

11     A.    Yes.  I don't know -- on that, I don't know

12   whether -- I don't think -- I'm pretty sure

13   Morgan & Morgan did not take any drywall samples.

14     Q.    Okay.  Is there a plan during the remediation

15   process, to your knowledge, for someone to take samples

16   of the existing drywall in the home?

17     A.    When the drywall is taken down, there is a

18   person who does come in and inspects and checks through

19   things, and probably -- I'm sure that he will take

20   samples during that time.

21     Q.    And do you know if this person is also going to

22   draft a floor plan of the home to show where the boards

23   have been removed?  Have you discussed that at all yet?

24     A.    I haven't discussed it with the builder,

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 184 of 3246
Case 1:11-cv-22408-MGC Document 202-1 Entered on FLSD Docket 11/9/2019 Page 69 of
117

Confidential - Subject to Further Confidentiality Review

1    Staten.

2        Q.   And then somebody, presumably, will also take

3    photographs?

4        A.   Yes, yes, that will be done.

5        Q.   And you have discussed that part?

6        A.   Yes.

7        Q.   Okay.  Now, earlier today, Mrs. Chatmon, you

8    discussed a home in Georgia, Albany, Georgia, as being

9    your primary residence; is that correct?

10       A.   Uh-huh.

11       Q.   Why do you consider it to be your primary

12   residence?

13       A.   Well, that's where I lived, worked, years, my

14   kids were born, grew up.

15       Q.   When did you move down to Florida?

16       A.   I purchased -- well, I came down in 2005 after

17   my parents passed away.

18       Q.   And what made you more to Florida specifically?

19       A.   I needed to get out of town because I was too

20   close to my parents and just wanted a different scene.

21   I didn't intend to just stay here.  It was to keep both

22   places.

23       Q.   And back in 2005, approximately how much time

24   did you spend in the Georgia home and how much time did

Case 2:09-md-02047-EEF-MBN   Document 22363-39   Filed 11/19/19   Page 185 of 3246
Case 1:11-cv-22408-MGC   Document 234-1   Entered on FLSD Docket 11/20/19   Page 70 of
117

Confidential -- Subject to Further Confidentiality Review

1    you spend in Florida?

2         A.   2005?

3         Q.   Yes, when you first moved down here.

4         A.   Okay.  I was at an apartment complex.  I

5    probably spent more time in Georgia then.  I would say

6    close to half and half.  I'd go and stay months, because

7    I would have things to do to my house there also.

8         Q.   Okay.  Then at that point did you decide to

9    sell the home at any point in Albany?

10        A.   Before I purchased this home?

11        Q.   Correct.

12        A.   I thought about it, but as they say -- I won't

13   say that.  But, anyway, the fact that I ended up

14   purchasing a house that I can't really live in changed

15   my mind.

16        Q.   So back in 2006 -- I should say -- let me

17   clarify that.

18             Back in 2005, when you first moved down here,

19   did you ever decide to sell the Georgia home?

20        A.   Not then, no.

21        Q.   And why was that?

22        A.   Well, I wanted to have a place to go back to.

23   This was more like a second home.

24        Q.   Okay.  Did you --

Confidential - Subject to Further Confidentiality Review

```
 1        A.   I did not want to live with my kids.

 2        Q.   Got it.  Did you ever rent out the Georgia

 3   home?

 4        A.   No.

 5        Q.   Okay.  Did you ever try to find a renter for

 6   the Georgia home at that point?

 7        A.   No.

 8        Q.   Now, let's fast-forward to 2007 when you first

 9   bought the Bismarck Palm Drive home.  Approximately how

10   many months did you live in the Georgia home and how

11   many months you did live in the Bismarck Palm home?

12        A.   I would say close to half and half.

13        Q.   Half and half?

14        A.   Yes, because I -- whenever I go home, which I

15   haven't been going lately because of this situation, but

16   I stay for months.  I stay a few months.

17        Q.   Okay.  What about --

18        A.   At that time.

19        Q.   What about 2008?  Still 50/50?

20        A.   Probably not then.  Make a little bit more here

21   because of issues I had.

22        Q.   Okay.  2009.  What was the breakdown in terms

23   of living in the Georgia home versus living in the

24   Bismarck Palm home?
```

```
 1      A.    More in Georgia, I would say.

 2      Q.    More than six months in Georgia that year?

 3      A.    Yes, I would say so, because I was -- I'll

 4   still say half and half.

 5      Q.    Half and half.  2010, when you moved out, what

 6   month -- you said April of 2010 is when you moved out?

 7      A.    Uh-huh.

 8      Q.    What was the breakdown in terms of living in

 9   the Georgia home versus living --

10      A.    With my daughter?

11      Q.    Yes.

12      A.    Half and half.

13      Q.    Okay.  When you first found out or discovered

14   that there may have been Chinese drywall in the home,

15   you said that was about late 2009?

16      A.    That's when I think I began to pinpoint it,

17   yeah.  Yes.

18      Q.    How did you make the decision to move out in

19   2010?  Can you walk us through, sort of, your process?

20      A.    My health was the main issue, because I was

21   going to the doctor.  My daughter had to take me to the

22   doctor.  I was diagnosed with -- I had a runny nose, no

23   nosebleeds, but headaches, breathing problems and things

24   of that sort, yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 188 of 3246
Case 1:11-cv-22408-MGC Document 201-1 Entered on FLSD Docket 11/4/2019 Page 73 of
117
Confidential - Subject to Further Confidentiality Review

 1      Q.   Did anyone tell you that you needed to move out

 2   of the home?

 3      A.   No, but when I went back to the house I would

 4   get sick all over.  When I left it, I was better.

 5      Q.   In 2010, January 2010, where were you living?

 6   Was that Georgia or here?

 7      A.   January 2010, probably in Georgia at the time,

 8   yeah.

 9      Q.   February?

10      A.   February?

11      Q.   2010.  Were you in Georgia, or were you in

12   Tampa?

13      A.   I can't recall.

14      Q.   Okay.  How did you decide where to move out

15   next once you made the decision, "Okay, I'm going to

16   move out of the Bismarck Palm Drive home"?

17      A.   How did I decide?

18      Q.   Yes.

19      A.   The fumes that I was inhaling --

20      Q.   I mean, like, what options did you consider?

21      A.   Okay.  Whether I was going to go back to

22   Georgia or find a place here?

23      Q.   Uh-huh.

24      A.   I'd had a place here earlier before I purchased

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 189 of 3246
Case 1:14-cv-04049-CDL Document 121-12 Filed 03/04/15 Page 74 of 117
Confidential - Subject to Further Confidentiality Review

 1    this place.  I had an apartment.  My kids convinced me

 2    to stay here so that they could see after me.  My

 3    daughter.  At the time, it was one daughter.

 4         Q.   And what conversations did you have with her?

 5         A.   Well, she said, just said, "Mom, you can come

 6    and live with us until you get your place fixed."

 7         Q.   And did you discuss payments to your daughter

 8    at that time?

 9         A.   Yes.  She didn't want it, but, you know, I pay

10    my way.

11         Q.   And what made you do that?

12         A.   Pay my way?

13         Q.   Yes.

14         A.   Well, I was paying -- I was brought up that

15    way, that you pay your way.  Don't care what, you know,

16    people offer you, you pay your way.  And I was paying a

17    house note, a mortgage note, so...

18         Q.   And, Mrs. Chatmon, are you making a claim in

19    this case for damages related to alternative living

20    expenses?

21         A.   Yes.

22         Q.   And approximately how much are you claiming in

23    damages related to alternative living expenses?

24         A.   From 2010 to, I would say November of 2018, I'm

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 190 of 3246
Case 2:11-cv-01409-MGC Document 1042 Entered on FLSD Docket 11/20/19 Page 75 of
Confidential - Subject to Further Confidentiality Review
117

1    claiming approximately 24,000.

2            (Chatmon Exhibit No. 9 was marked for

3    identification.)

4    BY MS. HAQUE:

5        Q.    Okay.  We're going to show you now what has

6    been premarked as Exhibit No. 9.

7            Ms. Chatmon, have you seen this document

8    before?

9        A.    Oh, yes, I wrote it.

10       Q.    And what is this document?

11       A.    It's alternative living expenses.

12       Q.    Let's talk about the first page.  Can you

13   describe what is calculated here on this first page for

14   us?

15       A.    I moved in with my oldest daughter Sophia at

16   1530 Creekbend, Brandon, April 2010, due to the Chinese

17   drywall found in my residence, and I lived there with

18   her from 2010.  I have what was contributed to her on a

19   monthly basis.  2010 to 2011, December 2011, total of

20   $3,150, and from January 2012 to August 2013, I have

21   4,000 for those 20 months.

22       Q.    And this is what you calculated yourself as

23   wanting to help out your daughter?

24       A.    Yes, what I gave her each month.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 191 of 3246
Case 1:14-cv-04046-MGC Document 202-1 entered on FLSD Docket 11/20/19 Page 76 of
117
Confidential - Subject to Further Confidentiality Review

```
 1        Q.    And did you pay in cash?

 2        A.    Yes, this I did.

 3        Q.    And did you pay every month to your daughter?

 4        A.    Yes.

 5        Q.    Let's flip to the next page.  Can you briefly

 6   describe what you're calculating here?

 7        A.    Alternative living expenses.  I relocated with

 8   my daughter, and it has the amount, which matches what

 9   was on the other page, the previous page.

10        Q.    And this is from September --

11        A.    September, yes.

12        Q.    -- 2013 to June 2014?  And it's about $200 a

13   month in cash?

14        A.    Yes.

15              Wait a minute.  Let me look.

16        Q.    Yeah, take your time.

17        A.    Yes.

18        Q.    And let's go to the third page.  From July 2014

19   to February 2018, you contributed approximately $250 a

20   month?

21        A.    Let me see where you are.

22        Q.    Yes.  This next page right here.

23        A.    Right here.

24        Q.    Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 192 of 3246
Case 1:14-cv-09465-LGS Document 242-1 Filed 05/12/15 Page 47 of 117
Confidential - Subject to Further Confidentiality Review

```
 1        A.   Okay.  Yes.

 2        Q.   And let's finally flip to the next page, the

 3   back of this page.  And here you're adding it all

 4   together?

 5        A.   Yes.

 6        Q.   Okay.  Now, can you flip one more time?  And

 7   you'll see at the top of the page "total paid for rent

 8   July 2014 - present," and you have a note that says

 9   "checks available"?

10        A.   Yes.

11        Q.   So for some of these payments did you switch

12   from cash to paying in checks?

13        A.    I didn't have -- I paid in cash, some of them,

14   yes.  That's denoted on the page before.

15        Q.   Understood.  And then if you flip one more

16   time -- one more -- are these examples of the payments

17   that you made to your daughter?

18        A.   Yes.

19        Q.   So then these are -- these show the different

20   amounts?

21        A.   Yes.

22        Q.   From $300 some months to $450 some months?

23        A.   Yes.

24        Q.   Okay.  Did you also pay for utilities?
```

Confidential - Subject to Further Confidentiality Review

 1      A.    Included.

 2      Q.    Included as part of those payments?

 3      A.    Yes.

 4      Q.    Understood.

 5      A.    Utilities, phone, whatever.

 6      Q.    Okay.  Mrs. Chatmon, have you received any

 7  settlement checks for these alternative living expenses

 8  yet?

 9      A.    I received a settlement check from global

10  settlement, I believe it's from 2013.  It was about

11  16,000 at some point and another $1,500 another, which

12  put it at 17 -- more than 17,000.

13          (Chatmon Exhibit No. 10 was marked for

14  identification.)

15  BY MS. HAQUE:

16      Q.    Ms. Chatmon, I'm going to show you what's been

17  premarked as Exhibit No. 10.  And this is a document

18  that shows your participation in a Chinese Drywall

19  Settlement Program?

20      A.    Yes.

21      Q.    And in the middle of the page, it shows a claim

22  type, preremediation alternative living expenses, and

23  then it has a resolution offer of $7,150?

24      A.    Yes.

```
 1      Q.   And it looks like that may pertain to the

 2   $7,150 from April of 2010 to August of 2013 that you're

 3   claiming?

 4      A.   That was in another settlement through global

 5   settlement.  Part of that 17,000-some dollars, this

 6   should have been in that.

 7      Q.   That should have been part of that?

 8      A.   Yes.

 9           (Chatmon Exhibit No. 11 was marked for

10   identification.)

11   BY MS. HAQUE:

12      Q.   Let's go ahead and show you what's premarked as

13   Exhibit 11.  These are the checks, Ms. Chatmon, that you

14   just were talking about, is that right, as your

15   participation in the global settlement fund, or program?

16      A.   Yes, but these would not be all of them.

17      Q.   So have you received more than these?

18      A.   I don't -- no, no, I'm speaking of that

19   17,000-something.

20      Q.   If you add all of these together, I'm getting a

21   figure of $17,651.88.

22      A.   There's the last one.  Okay, that

23   8,000-something.  Okay, now it makes sense, with the

24   last one.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 195 of 3246
Case 1:14-cv-01492-MGC Document 201 Entered on FLSD Docket 11/10/15 Page 40 of
117

Confidential - Subject to Further Confidentiality Review

1      Q.   And these are the settlement checks you

2   received?

3      A.   Yes.

4      Q.   And some of these have gone -- were paid to you

5   specifically for these alternative living expenses?

6           MR. ALBANIS:  Object to the form, but you may

7       answer if you know, Ms. Chatmon.

8   BY MS. HAQUE:

9      Q.   Do you know the answer to that?

10      A.   No, except that these were part of that global

11   settlement.  That's all I know about it.

12      Q.   Let me bring -- can I turn your attention back

13   to Exhibit 9, please?  And let me flip -- turn your

14   attention to page -- the back of page 1.

15      A.   (Indicating.)

16      Q.   Yes, right there.  And in the statement at the

17   top, can you read that for us, please?

18      A.   "Alternative living expenses.  I, Lillian

19   Chatmon, relocated with family at 150350 Creekbend

20   Drive, Brandon 33510, due to Chinese drywall in my home.

21   I have been compensated $7,150 for that time period."

22      Q.   Thank you.  You can go ahead and set that

23   document aside.

24           Mrs. Chatmon, at any point did you decide to

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 196 of 3246
Case 1:11-cv-22408-MGC Document 304-1 Entered on FLSD Docket 11/20/19 Page 41 of
117

Confidential - Subject to Further Confidentiality Review

1    just go ahead and sell the property at Bismarck Palm

2    Drive?

3        A.    No.

4        Q.    Why not?

5        A.    Well, I still would have a mortgage to pay, and

6    the bank was not being very lenient on people for not

7    paying their mortgages.  I had an intention of

8    renovating because I do want to live in the place.  I

9    like it and I want to spend my last years there, if at

10   all possible.

11       Q.    And you said the bank wasn't being forgiving of

12   people and their mortgages.  Was that because of the

13   recession in Florida at that time?

14       A.    Probably so.

15       Q.    Okay.  Mrs. Chatmon, you are also seeking

16   damages related to the loss of use and enjoyment of your

17   property; correct?

18       A.    (Nodding head.)

19       Q.    And do you recall the amount of damages that

20   you're claiming related to the loss of use and

21   enjoyment?

22       A.    Well, I'm going back to Judge Fallon's case in

23   Louisiana where he specified that, in the Germano case,

24   that the whole place should be torn down and

Case 2:09-md-02047-EEF-MBN  Document 22363-39  Filed 11/19/19  Page 197 of 3246
Case 1:11-cv-11406-MGEF  Document 2012-1  Confidential—Pages 119  Page 42 of
117

1   renovated -- not torn down, but I mean gutted and

2   renovated, including the floors and all this too.  I'm

3   only asking to have my place remediated.  I'm asking for

4   damages, punitive damages.  I'm asking for loss of use

5   all this time.  I have not been able to enjoy it at all,

6   living from place to place with my kids and going back

7   and forth, where I had planned to be here, and the

8   sickness that I've had to incur and all.  I think I

9   deserve more.  I'm sure I deserve more.  But I do want

10  to renovate it and go back and live in it.

11      Q.   I want to ask you specifically about -- you

12  just mentioned loss of use and enjoyment damages.  Do

13  you recall what monetary figure you're claiming just

14  with respect to loss of use and enjoyment?

15      A.   Loss of use and enjoyment?  Well, I want to

16  remediate.  I want to -- I would like to get the -- I'm

17  seeking, rather, the living expenses, I'm seeking the

18  times I've had to pay for the assessments for the

19  property that I haven't been able to live in, and any

20  other damages that I -- that I --

21          (Chatmon Exhibit No. 12 was marked for

22  identification.)

23  BY MS. HAQUE:

24      Q.   Okay.  Let's go ahead and show you what has

Case 2:09-md-02047-EEF-MBN  Document 22363-39  Filed 11/19/18  Page 198 of 3246
Case 1:11-cv-22408-MGC  Document 89-1  Entered on FLSD Docket 11/X/2015  Page 49 of
117

Confidential - Subject to Further Confidentiality Review

1    been premarked as Exhibit 12.

2          Mrs. Chatmon, these are what we have titled

3    here Priority Claimant Lillian Chatmon's Answers to

4    Interrogatories.  Have you seen this document before?

5      A.    Yes.

6      Q.    What is this document to you?

7      A.    Types of damages that I incurred.

8      Q.    Did you provide information to your attorney

9    for this document?

10     A.    Any information pertaining to the amounts and

11    all?

12     Q.    Correct.

13     A.    Yes.

14     Q.    Let me bring your attention to Question No. 1.

15    "Identify all types of damages that you seek in this

16    lawsuit and specify amount sought for each category."

17          Can you read the first sentence, please?

18     A.    "Identify all types" --

19     Q.    I'm sorry.  Of your answer.

20     A.    "I seek alternative living expenses from

21    April 2010 through the present in the amount of $23,940

22    for rent and utilities plus $21,153.58 for assessments

23    at the Chinese drywall property at a minimum, lost

24    equity" -- put that in there -- "lost equity, diminution

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 199 of 3246
Case 1:11-cv-03149-MGC Document 691 Entered on FLSD Docket 11/18/19 Page 91 of 117
Confidential -- Subject to Further Confidentiality Review

1   in value, loss of use and enjoyment, punitive damages,

2   and prejudgment interest."

3        Q.   Thank you.

4        A.   I also need to -- I don't have in here where I

5   have renovations, probably.

6        Q.   The next sentence.

7        A.   "In addition, I seek remediation damages as

8   determined by the court.  Total amount of diminution in

9   value, loss of use and enjoyment, and punitive damages

10  will be determined by the jury and prejudgment interest

11  by the court."

12       Q.   Now, Mrs. Chatmon, before, you had mentioned

13  assessments, and here you're claiming $21,153.58 for

14  assessments?

15       A.   Yes.

16       Q.   What are these assessments?

17       A.   Homeowners fees.

18       Q.   HOA fees?

19       A.   Yes.

20       Q.   And you said you're going to include these as

21  part of your loss of use and enjoyment claim?

22       A.   It's assessments that I had to pay to live

23  there, and I haven't lived there, been able to live

24  there.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 200 of 3246
Case 1:11-cv-22408-MGC Document 602-1 Entered on FLSD Docket 11/20/19 Page 95 of
117

Confidential - Subject to Further Confidentiality Review

```
1        Q.   Correct.  So you're including these as part of

2    your loss of use and enjoyment?

3        A.   Yes.

4             (Chatmon Exhibit No. 13 was marked for

5    identification.)

6    BY MS. HAQUE:

7        Q.   We're going to now show you what is going to be

8    premarked as Exhibit No. 13.

9             MR. ALBANIS:  I'm just going back to read the

10            realtime transcript, and I just want to assert an

11            objection related to the questions about the

12            assessments being included as the loss of use and

13            enjoyment, as part of the loss of use and enjoyment

14            damages.  I believe that that mischaracterizes

15            Mrs. Chatmon's previous testimony.

16            MS. HAQUE:  Let me reask that.

17   BY MS. HAQUE:

18       Q.   Mrs. Chatmon, you're claiming approximately

19   $21,000 in assessments; is that correct?

20       A.   Yes.

21       Q.   And what part of your claim are you including

22   these assessments as part of?

23       A.   You asked me what part of the claim, whether

24   it's under --
```

Case 2:09-md-02047-EEF-MBN  Document 22363-39  Filed 11/19/18  Page 201 of 3246
Case 1:11-cv-01408-MGC  Document 292  Entered on FLSD Docket 11/30/11  Page 96 of
117
Confidential — Subject to Further Confidentiality Review

```
1       Q.   What category is it under?

2       A.   Lost equity or diminution in value, loss of use

3   and enjoyment, punitive damages, prejudgment interest?

4       Q.   Correct.  What category are you putting it

5   under?

6       A.   I haven't thought about it, but...

7            Diminution in value.

8       Q.   How do you --

9       A.   Punitive damages.

10      Q.   So you don't know?

11      A.   I can't answer that.  Okay, I can't answer

12  that.

13      Q.   Let's show you what has been premarked as

14  Exhibit No. 14.  Or are we at 13?  13.  I'm sorry.

15      A.   I got it.

16      Q.   Oh, you got it?  Perfect.

17           Ms. Chatmon, what is this document?

18      A.   Loss of Use/Loss of Enjoyment.

19      Q.   And how are you defining loss of use and

20  enjoyment?

21      A.   I'm not able to stay there and enjoy it and

22  grow old in it.  Or older.

23      Q.   Okay.  And you mentioned here about middle of

24  the page:  "The HVAC system is not working at all."
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 202 of 3246
Case 1:11-cv-22408-MGC Document 209-1 Entered on FLSD Docket 11/20/12 Page 97 of
117

Confidential - Subject to Further Confidentiality Review

```
 1                Are you including HVAC, which is the air

 2   conditioning --

 3        A.   Yes.

 4        Q.   -- repair as a part of your loss of use and

 5   enjoyment?

 6        A.   Yes.

 7        Q.   Are you including fixing some of the appliances

 8   in your home as part of your loss of use and enjoyment?

 9        A.   Yes.

10        Q.   Okay.  You also write here:  "Many upgrades are

11   also damaged."

12                Are you including fixing the upgrades as part

13   of your loss of use and enjoyment claim?

14        A.   Fixing the upgrades includes recess lighting,

15   includes I have molding, crown molding, and all that

16   around the place, that has to be fixed.  The flooring

17   has to be fixed.  Some light fixtures.  That's all I can

18   think of right now.

19        Q.   And you're including these as part of the loss

20   of use and enjoyment claim?

21        A.   The security system.  Okay.

22                MR. ALBANIS:  I'll assert another objection.

23        Mrs. Chatmon is obviously not an attorney, and I

24        believe that a lot of these questions regarding what
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 203 of 3246
Case 1:11-cv-22408-MGC Document 103-1 Entered on FLSD Docket 11/16/2011 Page 48 of
117
Confidential - Subject to Further Confidentiality Review

 1      is and is not included in loss of use and enjoyment

 2      can be perceived asking for legal conclusions,

 3      which, of course, Mrs. Chatmon would not be able to

 4      provide.

 5  BY MS. HAQUE:

 6      Q.   Ms. Chatmon, I'm just asking about, to you as a

 7  priority claimant, what are you claiming as part of loss

 8  of use and enjoyment, in your mind?

 9      A.   All the things that I've said, yes.

10      Q.   And that includes the mortgage payments that

11  you have listed here as well too?

12      A.   Yes.

13      Q.   Okay.

14           MR. ALBANIS:  I'll state further that

15      Exhibit 13 was provided during the global settlement

16      process in MDL 2047 prior to Mrs. Chatmon being

17      named a priority claimant in this lawsuit.

18           (Chatmon Exhibit No. 14 was marked for

19  identification.)

20  BY MS. HAQUE:

21      Q.   Ms. Chatmon, let me show you what has been

22  premarked as Exhibit 14.

23           MR. VERRIER:  We've been going about an hour.

24      Can we take a break?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 204 of 3246
Case 1:11-cv-22408-MGC Document 93-1 Entered on FLSD Docket 11/2019 Page 49 of
117
Confidential – Subject to Further Confidentiality Review

```
1   BY MS. HAQUE:

2       Q.   Actually, Ms. Chatmon, do you want to take a

3   five-minute break before we do this document?

4       A.   Okay, that's fine.  That's fine.

5            (Recess from 10:28 a.m. until 10:35 a.m.)

6            MS. HAQUE:  We can go back on the record.

7            MR. ALBANIS:  Aliyya, going back to Exhibit 6,

8       which is the Amended Plaintiff Profile Form, my

9       staff has located the report that was prepared by

10      Florida Building Engineering & Inspections and their

11      inspector, whose name is Jackie Dwayne Bronson, and

12      we're printing copies of that now so that we can get

13      them to you during the deposition.  And, of course,

14      we will upload the document to the portal.  I think

15      you will quickly realize that there isn't much to

16      that report.

17           MS. HAQUE:  Okay.  We'll take a look at that

18      report and see if we can ask questions of

19      Ms. Chatmon today.  If not, we'll hold the

20      deposition open, but we'll try to handle that today

21      if possible.

22           MR. ALBANIS:  Sure.

23  BY MS. HAQUE:

24      Q.   Ms. Chatmon, before we left for the break we
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 205 of 3246
Case 1:11-cv-22408-MGC Document 102-1 Entered on FLSD Docket 11/20/19 Page 90 of
117

Confidential - Subject to Further Confidentiality Review

```
 1    were looking at Exhibit No. 14.

 2         A.   Yes.

 3         Q.   Have you seen this document before?

 4         A.   Yes.

 5         Q.   And this is the Second Amended Supplemental

 6    Plaintiff Profile Form, and it has your name on it as

 7    well as the Bismarck Palm Drive home.

 8              Can I turn your attention to -- and you

 9    provided information to your attorney to fill this out;

10    correct?

11         A.   Yes.

12         Q.   Okay.  Let me turn your attention to, it's

13    pages 20 and 21, and the section is Section VII, Other

14    Damages.

15              MR. ALBANIS:  Right here.

16              THE WITNESS:  Okay, I see it.

17    BY MS. HAQUE:

18         Q.   And the first question is:  "If you incurred

19    alternative living expenses as a result of Chinese

20    drywall, identify the total moving cost and/or

21    alternative living expense you incurred."

22              And you have that $23,940, and we discussed

23    that today; right?

24         A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 206 of 3246
Case 1:11-cv-01405-MGC Document 102-1 entered on FLSD Docket 11/03/20 Page 91 of 117
Confidential - Subject to Further Confidentiality Review

1    Q.   Let's turn the page.  Yes, you're right there.

2    And it says:  "If you experienced any loss of use and/or

3    loss of enjoyment of the property as a result of Chinese

4    drywall, identify the total amount of such loss."

5         And you have listed there what amount?

6    A.   $375,000.

7    Q.   Now, can you tell us today how you came up with

8    that number of $375,000?

9    A.   That number came from the judge's order from

10   the Germano case, and that if -- this is a figure that

11   if -- it covers everything, loss of use and everything

12   else as far as renovating is concerned.

13   Q.   What do you mean, "everything else"?  Can you

14   tell us what you have in mind there?

15   A.   Loss of enjoyment, punitive damages.  I can

16   read the others too.  Living expenses, diminution of

17   value, all of this should be included under the

18   $375,000.

19   Q.   Thank you.  You can go ahead and put that away.

20        A couple cleanup questions from some of the

21   other topics we talked about today, Mrs. Chatmon.

22        Now, you said back in 2010 you didn't have the

23   financial means to get -- to go about the remediation.

24   Did you ever go to a bank to ask about a loan for the

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 207 of 3246
Case 2:14-cv-00409-MCE-DB Document 247-1 Filed 08/04/15 Page 92 of 117
Confidential – Subject to Further Confidentiality Review

1    remediation at that time?

2        A.  No, because I had a loan for the house, I had a

3    car, paying for it.  No, I didn't want to get a loan.

4    I'd rather try to deal with it myself.

5        Q.  Okay.  And for the remediation, are you -- you

6    have the initial contract of $63,000, approximately?

7        A.  Correct.

8        Q.  And then you have the upgrades for the $21,000;

9    correct?

10       A.  Yes.

11       Q.  Are you seeking damages related to the $63,000

12   only or the full remediation that includes the $63,000

13   plus the $21,000 in upgrades?

14           MR. ALBANIS:  Object to the form, but you may

15       answer if you know, Mrs. Chatmon.

16           THE WITNESS:  Well, the 20-some-thousand

17       dollars is a part of that 370-some that the judge

18       ordered from the Germano case, so it would be

19       included too.

20   BY MS. HAQUE:

21       Q.  Okay.  One more question about the payments you

22   made to your daughter while you were living in the --

23   living with your daughter.

24       A.  Which daughter?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 208 of 3246
Case 1:11-cv-01408-CKK Document 21-1 Filed 05/04/15 Page 93 of 117
Confidential – Subject to Further Confidentiality Review

1      Q.    Oh, I'm sorry.  Let's go back to the document.

2    I want to get this correct.  It is Exhibit No. 9,

3    please.

4      A.    (Indicating.)

5      Q.    Yes, correct.  Now, you have a couple different

6    payments per month that you made, from $200, $150, $250.

7    What was the reason for the different amounts?

8      A.    Expenses.  Things go up.

9      Q.    And so they -- so just expenses in terms of

10   rent/utility that went up over time?

11     A.    That's true, yes.

12     Q.    Okay.  Were there any other external factors

13   that affected that amount?

14     A.    No.  Well, let me say this:  The first daughter

15   I lived with, the rates were different because of her

16   home.  She was in a home, her own home.  This one that

17   I'm with now rents an apartment, and she does pay for a

18   room for me to live there, so I pay my fair share.

19     Q.    So that's why you pay a little bit more with

20   this second daughter?

21     A.    Yes.

22     Q.    Okay.  All right.  If you turn to page 124 of

23   Exhibit No. 9, you'll see that there's some payments of

24   July 2014 of $700 and December 2014 of $800.  Is there a

1    reason why those were so high?

2        A.    Why they're different?

3        Q.    Yes.

4        A.    Well, because my daughter moved into a place.

5    She had no job.  She -- so I had to take up the slack as

6    far as her having somewhere to stay.

7        Q.    Okay.  Did she end up getting a job eventually?

8        A.    She did eventually get a job, yes.

9        Q.    Okay.  And is that why the payments went down

10   $300 back in January of 2015?

11       A.    Yes.

12       Q.    And then the next -- in 2018 -- so it looks

13   like you paid around $300, between 150 and $300 in 2015

14   and 2016, then in 2018 you started paying $450 and $470.

15   Why are you paying that much?

16       A.    Rent went up.  Rent.  Yes.  Expenses, rent.

17       Q.    And that was due to the apartment complex --

18       A.    Apartment complex, yes.

19       Q.    -- raising the rent?

20       A.    And utilities and stuff.

21       Q.    Okay.  Can you tell us, in 2014, how many

22   months were you living in the Georgia home and how many

23   months were you living here in Florida?

24       A.    2014?

Case 2:09-md-02047-EEF-MBN  Document 22363-39  Filed 11/19/18  Page 210 of 3246
Case 1:11-cv-04209-MGC  Document 13-13  Filed 09/09/14  Page 95 of 117
Confidential - Subject to Further Confidentiality Review

 1      Q.   Correct.

 2      A.   I try to keep it half and half just as close as

 3   possible.  Even if I'm not here with my daughters, I

 4   still pay as if I'm here because I'm occupying space in

 5   their home.

 6      Q.   Okay.  In 2014, you said 50/50, so six months

 7   you were in Georgia?

 8      A.   About, you know, give or take.

 9      Q.   A month or two?

10      A.   Yeah.

11      Q.   What about 2015?  Were you still six months in

12   Georgia, give or take a month or two?

13      A.   Give or take, yeah.

14      Q.   2016.  50/50?

15      A.   I've been doing that since I've been down here.

16      Q.   So that 50/50 is --

17      A.   Yes, it's -- yeah, it ends up.  I may not do it

18   in the beginning, but somewhere during the year I come

19   back and I stay longer at another place to make up the

20   time.

21      Q.   Got it.  So since 2005, until about 2018, you

22   would say, give or take a month or so, 50 percent of the

23   time in Georgia, the Albany home, 50 percent of the time

24   you're here?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 211 of 3246
Case 1:11-cv-01405-MGC Document 892-1 Entered on FLSD Docket 11/30/11 Page 96 of 117
Confidential - Subject to further Confidentiality Review

```
 1       A.   Yes.

 2       Q.   Okay, you can go ahead and set that document

 3   aside.

 4            All right.  We talked about your HOA payments

 5   just briefly, so I want to talk about that.  Just a

 6   couple questions on that.

 7            And that is going to be Exhibit 15 now, I want

 8   to say.  Yeah, Exhibit 15.

 9            (Chatmon Exhibit No. 15 was marked for

10   identification.)

11   BY MS. HAQUE:

12       Q.   What are these -- what does this document

13   reflect, Mrs. Chatmon?

14       A.   Homeowners association fee I pay.  Sometimes --

15   they started out being quarterly, and then it goes

16   different.

17       Q.   What is the maintenance fee that it says right

18   at the first page?  There's a maintenance fee of $468?

19       A.   That's what that is, association fees,

20   maintenance, yes.

21       Q.   So that's the quarterly fee?

22       A.   Yes.

23       Q.   And so they switched, in 2017, from quarterly

24   fees to these monthly?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 212 of 3246
Case 1:14-cv-06475-MGC Document 292-1 Confidential - Subject to Further Confidentiality Review Page 97 of 117

Confidential - Subject to Further Confidentiality Review

1      A.    Monthly, yes.

2      Q.    And that's $174 per month?

3      A.    Well, it's gone up now.  It's 185 now in

4    January of -- January of this year.

5      Q.    Because here there are checks from January 2018

6    until November, on this page, and it still shows $174.

7    So did you have to pay an additional fee on top of that?

8      A.    Repeat that, please.

9      Q.    Sure.  If you look on this page, there are

10   dates starting in the middle of the page, January 2018

11   all the way until November 2018, and it's still charging

12   you $174.  So you said the HOA went up?

13     A.    Yes, it went up for 2019.

14     Q.    Oh, 2019.  I understand.  I misheard you.

15   Apologies.

16          Then if you flip the page, these are the

17   quarterly assessments that you had to pay.  Is there a

18   reason it varies from sometimes it's $415, sometimes

19   it's $463, sometimes it's $400?

20     A.    They went up with the assessments.  Increased.

21     Q.    Okay.  And from what date to what date are you

22   going to be claiming these assessment fees?

23     A.    I believe it started out with 2007, I believe

24   it starts -- I see here 3/31/07, on the 119, to present.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 213 of 3246
Case 1:11-cv-01495-MGC Document 6-1 Entered on FLSD Docket 11/20/13 Page 98 of
117
Confidential – Subject to Further Confidentiality Review

1    Q.    So are you -- so you're claiming HOA payments

2    from the time you lived there, not the time you moved

3    out; correct?

4    A.    I still pay.  I still own the place.  I still

5    make mortgage notes.  It is still my property.

6    Q.    So for this claim in this lawsuit, are you

7    claiming damages from when you first moved in, or are

8    you claiming damages from April of 2010 when you moved

9    out of the property until present?

10    A.    I see what you're saying.  Since I was there

11    in --

12    Q.    Correct.

13    A.    The property was still damaged in 2010.  When I

14    purchased it, it was damaged, so it still should be in

15    the lawsuit.

16    Q.    Okay.  So I just wanted to clarify that for the

17    record.

18    A.    Yeah.

19    Q.    Okay.  And you're claiming approximately

20    $21,153.58?

21    A.    Yes.

22    Q.    Mrs. Chatmon, you said that the mortgage

23    payment -- the mortgage when you first took it out back

24    in 2007 was a 15-year term at 6.5 percent and then --

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 214 of 3246
Case 1:11-cv-22408-MGC Document 1 Entered on FLSD Docket 11/21/2011 Page 99 of
117

Confidential - Subject to Further Confidentiality Review

```
 1      A.   The first one was a 15-year, 15, and the other

 2   one was a 30-year.  No, that large one was supposed to

 3   be a 30-year.  I had a refinance.  Now, the other one

 4   was 15-year.

 5      Q.   At 8 percent?

 6      A.   If I -- yes, if I pay it off in 15 years.

 7   Otherwise, it gets refinanced again.

 8      Q.   And when you refinanced the big payment, what

 9   were the terms of the new refinancing?

10      A.   When I refinanced the first one?

11      Q.   Yes.

12      A.   Let's see.  3.25.

13      Q.   Ms. Chatmon, what is the current value of your

14   property, if you know, at Bismarck Palm Drive?

15      A.   Wow.  That's hard to say since it still has not

16   been renovated yet.  I would think, I would say, and I'm

17   not sure -- I don't need to say that.  I won't answer

18   that.

19      Q.   Do you know off the top of your head?

20      A.   I don't know exactly the --

21      Q.   Okay.  Have you ever had your Bismarck Palm

22   Drive property appraised?

23      A.   Yes.  Mr. -- the appraiser in the county, yes,

24   has sent out some information on that, yes.
```

```
 1      Q.   Okay.  Do you recall what he appraised the

 2  property value as?

 3      A.   In the condition it's in now?

 4      Q.   Yes.

 5      A.   8,000.  Right at $8,000.

 6      Q.   Okay.  And you said you did not attempt to sell

 7  the property at any point after finding out it had

 8  Chinese drywall, or any other time?

 9      A.   No.

10      Q.   Okay.  Now, you purchased the property at

11  $169,900?

12      A.   Correct.

13      Q.   And you also shared some other houses that sold

14  recently in the area in your subdivision; correct?

15      A.   I do see that there is some other houses.

16      Q.   If you'd turn back to Exhibit 13 for me and

17  flip all the way back to the last page.

18      A.   Yes.

19      Q.   Are these the homes in your neighborhood that

20  were sold?  I'm not sure when you provided -- these

21  documents don't have a date on them, but I believe you

22  provided this document to us; correct?

23      A.   Yes.

24      Q.   And it looks like the first home, the top home,
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 216 of 3246
Case 1:14-cv-06934-ELD-VMN Document 2641 Entered on FLSD Docket 08/13/2021 Page 491 of
117

Confidential - Subject to Further Confidentiality Review

1    sold for $115,500?

2         A.   Yes, according to the paper, yes.

3         Q.   And then the second home sold for about

4    $114,000; is that right?

5         A.   According to the paper, yes.

6         Q.   And these are in your neighborhood?

7         A.   Yes.

8         Q.   Okay.  So it looks like these homes, the

9    average, I guess, going rate for properties in the

10   neighborhood is maybe between 114,000 and 115,000 or so?

11        A.   No, I won't say that.

12        Q.   Okay.  But it looks like these prices may have

13   been affected by the recession?

14             MR. ALBANIS:  Object to the form, but you may

15        answer if you know, Mrs. Chapman.

16             THE WITNESS:  I can't answer that.  I don't

17        know.

18   BY MS. HAQUE:

19        Q.   Have you heard of homes in the neighborhood

20   being affected by the recession?

21             MR. ALBANIS:  Object to the form, but you can

22        answer if you know.

23             THE WITNESS:  I can't answer that.

24             ///

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 217 of 3246 of
Case 1:11-cv-22408-CMA Document 28-1 Entered on FLSD Docket 08/13/2014 Page 492 of
Confidential - Subject to Further Confidentiality Review
117

```
 1   BY MS. HAQUE:

 2        Q.   Ms. Chatmon, you can go ahead and set that

 3   document aside.

 4             Just a few more questions for you, and then

 5   I'll confer with my colleagues to see if they have any

 6   questions for you.  Okay?

 7             Mrs. Chatmon, are you the sole owner of your

 8   claim in this lawsuit?

 9        A.   Yes.

10        Q.   Ms. Chatmon, what activities in the home were

11   you no longer able to perform because of Chinese

12   drywall?

13        A.   Activities in the home?  Cooking was one.  I

14   didn't want the smell.  Sleeping there, using water and

15   stuff, and the furniture being contaminated.  Sleeping,

16   whatever.

17        Q.   Did anyone tell you not to drink the water in

18   your home as a result of Chinese drywall?

19        A.   No.

20        Q.   And in the Georgia home, are you able to cook

21   and live your life normally, so to speak?

22        A.   Yes.

23             MS. HAQUE:  Let's go off the record for a

24        second.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/10/19 Page 218 of 3246
Case 1:14-cv-22069-UU Document 264 Entered on FLSD Docket 08/17/2015 Page 463 of
117
Confidential - Subject to Further Confidentiality Review

```
 1              (Discussion off the record.)

 2              (Recess from 10:57 a.m. until 11:03 a.m.)

 3              MS. HAQUE:  We can go back on the record.

 4     BY MS. HAQUE:

 5        Q.   Mrs. Chatmon, your attorney provided us with a

 6     copy of the inspection report conducted by Florida

 7     Building Engineering & Inspections, and we believe this

 8     occurred back in 2009, so I have a couple questions to

 9     ask you about this.

10        A.   Okay.  I didn't have access to this.

11        Q.   Actually, I'm sorry, we have a marked copy.

12     This is Exhibit 16.

13              (Chatmon Exhibit No. 16 was marked for

14     identification.)

15     BY MS. HAQUE:

16        Q.   Mrs. Chatmon, can I turn your attention to page

17     4, please?  And the page numbers are located right at

18     the bottom center.

19              This is a page that says:  "Chinese Drywall

20     Inspection Report.  Non-Destructive Visual Inspection.

21     Inspection Date December 2, 2009."

22              That's your address; correct?

23        A.   Correct.

24        Q.   And a picture of your house?
```

Confidential - Subject to Further Confidentiality Review

```
1       A.    Correct.

2       Q.    With a truck blocking it.

3             And that's your name, correct, Lillian Chatmon?

4       A.    Correct.

5       Q.    Okay.  Can you flip with me to page 5?  "Air

6    Conditioning HVAC System.  Photo of the subject

7    residence air handlers noted below.  The air handler

8    evaporator coil and all adjacent copper components were

9    blackened."

10            Did I read that correct?

11      A.    Yes.

12      Q.    Correctly.

13            Let's go down.  "Electrical System.  Residence

14   has copper wiring.  Electrical receptacles and switches

15   we inspected throughout the residence.  Exposed copper

16   wires were found to be normal at all inspection

17   locations."

18            Did I read that correctly?

19      A.    You did.

20      Q.    Okay.  Let's flip the page.  "Plumbing Lines.

21   Lines behind toilet and sinks are copper and are noted

22   to be blackened."

23            Did I read that correctly?

24      A.    Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 220 of 3246
Case 1:14-cv-24583-MGC Document 126-24 Entered on FLSD Docket 03/13/2014 Page 495 of
Confidential - Subject to Further Confidentiality Review
117

```
1        Q.    Let's go down.  "Drywall

2    Label/Stamping/Marking.  Drywall was found to be stamped

3    National Gypsum and Gridmax."

4              Did I read that correctly?

5        A.    Yes.

6        Q.    Ms. Chatmon, you can go ahead and put that

7    document away.

8        A.    May I say something to you?  I want to make a

9    correction of something here.

10       Q.    Sure.

11       A.    Back to the loss of use and loss of

12   enjoyment --

13       Q.    Okay.

14       A.    -- I know I lumped a lot of things in there

15   with that loss of use, like, the renovation and all of

16   that.  I do not want to lump all that in together.  The

17   loss of use is supposed to be for -- that 375,000 I was

18   telling you about, that's the loss of use that I'm

19   concerned about.

20       Q.    And how did you come up with that figure of

21   $375,000?

22       A.    From the Germano case with Judge Fallon.

23       Q.    And how did you come up with that figure?  Is

24   that the figure that they used in that case?
```

Confidential - Subject to further Confidentiality Review

```
 1       A.    Yes.

 2       Q.    Okay.  And what are -- are you including the

 3  assessments of the homeowners association?

 4       A.    I'm not putting that in that, no, that's not

 5  included.

 6       Q.    What are you -- are you including anything else

 7  in that $375,000?

 8       A.    Anything else that's loss of use --

 9       Q.    And how are you defining --

10       A.    -- and enjoyment.

11       Q.    How are you defining loss of use and enjoyment?

12       A.    Not being able to live in it and enjoy it.

13       Q.    Are you including your rental payments to your

14  daughter?

15       A.    No, that's not included.  That's not loss of

16  use.

17       Q.    What about your mortgage payments?

18       A.    Mortgage payments?

19       Q.    Uh-huh.

20       A.    Well, that's a part of the thing there, but I

21  don't think they're included in that.

22       Q.    What are you including the mortgage payments as

23  a part of?

24       A.    That's the payments I have to pay on the house
```

```
 1   only.  That's a given.

 2       Q.   And what are you including that as a part of,

 3   in terms of, are you claiming damages related to the

 4   mortgage?

 5       A.   Not the mortgage payment.

 6       Q.   I'm sorry?

 7       A.   Not the mortgage payment, no.

 8            MS. HAQUE:  Okay.  That is all of the questions

 9       that we have for you, Mrs. Chatmon.  Thank you for

10       being here with us today.  And we pass the witness

11       to Pete Albanis.

12                      CROSS-EXAMINATION

13   BY MR. ALBANIS:

14       Q.   Mrs. Chatmon, could you please look at

15   Exhibit 12?  I just have a couple quick questions.  I'll

16   let you just use my copy.

17       A.   Okay.

18       Q.   Exhibit 12 is Priority Claimant Lillian

19   Chatmon's Answers to Interrogatories.  Do you see that

20   in the middle of the page?

21       A.   Yes.

22       Q.   Interrogatory No. 1 states:  "Identify all

23   types of damages that you seek in this lawsuit (e.g.

24   alternative living expenses, diminution in value, loss
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/10/19 Page 223 of 3246 of
Case 1:17-cv-02436-ELZ Document 26-1 Entered on FLSD Docket 08/17/2021 Page 108 of
117
Confidential - Subject to Further Confidentiality Review

```
 1   of use/enjoyment, etc.) and specify amounts sought for

 2   each recovery."

 3        Do you see Interrogatory No. 1?

 4   A.   Yes.

 5   Q.   Did I read that correctly?

 6   A.   Yes.

 7   Q.   Would you be so kind as to read your answer to

 8   Interrogatory No. 1 in its entirety?

 9   A.   "I seek alternative living expenses from

10   April 2010 through the present in the amount of $23,940

11   for rent and utilities plus $21,153.58 for assessments

12   at the Chinese drywall property at a minimum, lost

13   equity, diminution in value, loss of use and enjoyment,

14   punitive damages, and prejudgment interest.  In

15   addition, I seek remediation damages as determined by

16   the court.  The total amount of diminution in value,

17   loss of use and enjoyment, and punitive damages will be

18   determined by the jury and prejudgment interest by the

19   court as a postjudgment ministerial matter."

20   Q.   Thank you.  Do you still stand by that answer,

21   Mrs. Chatmon?

22   A.   Loss of enjoyment, loss of use.

23   Q.   Do you still stand by that answer that you gave

24   there?
```

```
 1     A.    No, not this answer.

 2     Q.    What would you change in that answer,

 3   Mrs. Chatmon?

 4     A.    Loss of use should not be included in this.

 5     Q.    Earlier when you testified regarding loss of

 6   use and enjoyment, you included a number of different

 7   categories of damages in your $375,000 number.  Do you

 8   remember that?

 9     A.    I remember, yes.

10     Q.    And were you confused when you gave that answer

11   earlier?

12     A.    I was.

13     Q.    And now it is your position that your damages

14   that you are seeking just for loss of use and enjoyment

15   are $375,000; is that correct?

16     A.    Yes, correct.

17           MR. ALBANIS:  That's all we have.  We'll

18       reserve signature.

19           MS. HAQUE:  Pete, we'll put on the record also,

20       if you could get us up-to-date verifications on

21       anything that's missing for the interrogatories or

22       any of the Plaintiff Profile Forms or SPPFs, that

23       would be great.

24           MR. ALBANIS:  We will do that right now while
```

```
 1        Mrs. Chatmon is here in the office and try to upload

 2        those.  Well, no, we will upload those later today

 3        to the BrownGreer portal, and we will upload the

 4        Florida Building inspection report.

 5            MS. HAQUE:  Okay.  Then I think there are no

 6        further questions.  Thank you again, Mrs. Chatmon,

 7        for being here, and have a great rest of the day.

 8            THE WITNESS:  Thank you.

 9            (Whereupon, the deposition concluded at

10     11:13 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 226 of 3246
Case 2:14-cv-02722-MCE-DMN Document 26-1 Filed 05/13/2016 Page 491 of
117
Confidential - Subject to further Confidentiality Review

```
  1                     C E R T I F I C A T E

  2

  3            I, JOAN L. PITT, Registered Merit Reporter,

  4     Certified Realtime Reporter, and Florida Professional

  5     Reporter, do hereby certify that, pursuant to notice,

  6     the deposition of LILLIAN CHATMON was duly taken on

  7     January 14, 2019, at 8:07 a.m., before me.

  8            The said LILLIAN CHATMON was duly sworn by me

  9     according to law to tell the truth, the whole truth, and

 10     nothing but the truth, and thereupon did testify as set

 11     forth in the above transcript of testimony.  The

 12     testimony was taken down stenographically by me.  I do

 13     further certify that the above deposition is full,

 14     complete, and a true record of all the testimony given

 15     by the said witness.

 16

 17     _____

 18          JOAN L. PITT, RMR, CRR, FPR

 19

 20            (The foregoing certification of this transcript

 21     does not apply to any reproduction of the same by any

 22     means, unless under the direct control and/or

 23     supervision of the certifying reporter.)

 24
```

```
1                    INSTRUCTIONS TO WITNESS

2

3

4          Please read your deposition over carefully and

5     make any necessary corrections.  You should state the

6     reason in the appropriate space on the errata sheet for

7     any corrections that are made.

8

9          After doing so, please sign the errata sheet

10    and date it.  It will be attached to your deposition.

11

12         It is imperative that you return the original

13    errata sheet to the deposing attorney within thirty (30)

14    days of receipt of the deposition transcript by you.  If

15    you fail to do so, the deposition transcript may be

16    deemed to be accurate and may be used in court.

17

18

19

20

21

22

23

24
```

```
 1                    - - - - - -

 2                    E R R A T A

 3                    - - - - - -

 4   PAGE    LINE    CHANGE

 5   ____    ____    _____

 6      REASON: _____

 7   ____    ____    _____

 8      REASON: _____

 9   ____    ____    _____

10      REASON: _____

11   ____    ____    _____

12      REASON: _____

13   ____    ____    _____

14      REASON: _____

15   ____    ____    _____

16      REASON: _____

17   ____    ____    _____

18      REASON: _____

19   ____    ____    _____

20      REASON: _____

21   ____    ____    _____

22      REASON: _____

23   ____    ____    _____

24      REASON: _____
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 229 of 3246
Case 1:14-cv-21243-MGC Document 28 Entered on FLSD Docket 08/13/2014 Page 494 of
117
Confidential - Subject to Further Confidentiality Review

```
 1                    ACKNOWLEDGMENT OF DEPONENT

 2

 3          I, _____, do hereby

 4   acknowledge that I have read the foregoing pages and

 5   that the same is a correct transcription of the answers

 6   given by me to the questions therein propounded, except

 7   for the corrections or changes in form or substance, if

 8   any, noted in the attached Errata Sheet.

 9

10

11   _____     _____

12   LILLIAN CHATMON                  DATE

13

14

15

16

17   Subscribed and sworn to before me this

18   ____ day of _____, 20___.

19   My Commission expires: _____

20

21   _____

     Notary Public

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
1                      LAWYER'S NOTES

2   PAGE    LINE

3   _____   _____   _____

4   _____   _____   _____

5   _____   _____   _____

6   _____   _____   _____

7   _____   _____   _____

8   _____   _____   _____

9   _____   _____   _____

10  _____   _____   _____

11  _____   _____   _____

12  _____   _____   _____

13  _____   _____   _____

14  _____   _____   _____

15  _____   _____   _____

16  _____   _____   _____

17  _____   _____   _____

18  _____   _____   _____

19  _____   _____   _____

20  _____   _____   _____

21  _____   _____   _____

22  _____   _____   _____

23  _____   _____   _____

24  _____   _____   _____
```

```
00112
   1                        - - - - -
   2                        E R R A T A
   3                        - - - - -
   4    PAGE   LINE   CHANGE
   5    _108__   1  _ Yes.
         REASON:  _ I was confused when I answered this question
during the deposition.
                  As I stated in my deposition, I am seeking
$375,000 just for loss of use
                  and enjoyment damages.  I am still pursuing those
damages.
   7    _108__   4  _ Nothing.
         REASON:  _ I was confused when I answered this question
during the deposition.
                  As I stated in my deposition, I am seekng loss of
use and enjoyment damages.
   9    ____   ____   _____
  10    REASON: _____
  11    ____   ____   _____
  12    REASON: _____
  13    ____   ____   _____
  14    REASON: _____
  15    ____   ____   _____
  16    REASON: _____
  17    ____   ____   _____
  18    REASON: _____
  19    ____   ____   _____
  20    REASON: _____
  21    ____   ____   _____
  22    REASON: _____
  23    ____   ____   _____
  24    REASON: _____
```

```
00113
   1           ACKNOWLEDGMENT OF DEPONENT
   2
   3        I, Lillian Chatmon, do hereby
   4    acknowledge that I have read the foregoing pages and
   5    that the same is a correct transcription of the answers
   6    given by me to the questions therein propounded, except
   7    for the corrections or changes in form or substance, if
   8    any, noted in the attached Errata Sheet.
   9
  10    Lillian Chatmon            Feb. 5, 2019
  11
  12    LILLIAN CHATMON            DATE
  13
  14
```

```
15
16
17   Subscribed and sworn to before me this
18   5th day of _____ Feb. _____, 20 19.
19   My Commission expires: _____
20
21   _____
     Notary Public
22
23
24
```

JOYCE BLUDSAW
MY COMMISSION # GG 204762
EXPIRES: April 8, 2022

```
00114
1                           LAWYER'S NOTES
2    PAGE   LINE
3    ____   ____   _____
4    ____   ____   _____
5    ____   ____   _____
6    ____   ____   _____
7    ____   ____   _____
8    ____   ____   _____
9    ____   ____   _____
10   ____   ____   _____
11   ____   ____   _____
12   ____   ____   _____
13   ____   ____   _____
14   ____   ____   _____
15   ____   ____   _____
16   ____   ____   _____
17   ____   ____   _____
18   ____   ____   _____
19   ____   ____   _____
20   ____   ____   _____
21   ____   ____   _____
22   ____   ____   _____
23   ____   ____   _____
24   ____   ____   _____
```

EXHIBIT A3

Case 2:09-md-02047-EEF-MBN Document 22368-39 Filed 11/19/19 Page 234 of 3246
Case 1:11-cv-22408-MGC Document 284 Entered on FLSD Docket 08/13/2019 Page 2 of 72
Confidential - Subject to Further Confidentiality Review

```
 1                 UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
 2
     EDUARDO AND CARMEN AMORIN,
 3   et al., individually, and
     on behalf of all others
 4   similarly situated,        Case No. 1:11-CV-22408-MGC
 5      Plaintiffs,
 6   vs.
 7   TAISHAN GYPSUM CO., LTD.,
     F/K/A SHANDONG TAIHE
 8   DONGXIN CO., LTD.; TAIAN
     TAISHAN PLASTERBOARD CO.,
 9   LTD, et al.,
10      Defendants.
11            CONFIDENTIAL - SUBJECT TO FURTHER
                   CONFIDENTIALITY REVIEW
12
                         - - -
13
                    JANUARY 3, 2019
14
                         - - -
15
          Deposition of DAVID DEEG, held at
16   Mrachek Fitzgerald Rose Konopka Thomas & Weiss, PA,
     505 South Flagler Drive, Suite 600, West Palm Beach,
17   Florida 33401, commencing at 8:12 a.m., on the above
     date, before Joan L. Pitt, Registered Merit
18   Reporter, Certified Realtime Reporter, and Florida
     Professional Reporter.
19
                         - - -
20
              GOLKOW LITIGATION SERVICES
21        877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com
22
23
24
```

Case 2:09-md-02047-EEF-MBN Document 22368-39 Filed 11/19/19 Page 235 of 3246
Case 1:11-cv-22408-MGC Document 264 Entered on FLSD Docket 08/13/2013 Page 4 of 72
Confidential - Subject to Further Confidentiality Review

```
 1                         APPEARANCES

 2

 3    Counsel for Plaintiffs:

 4        GREGORY S. WEISS, ESQUIRE
          Mrachek Fitzgerald Rose Konopka Thomas & Weiss, PA
 5        505 South Flagler Drive, Suite 600
          West Palm Beach, Florida 33401
 6        561.355.6993
          gweiss@mrachek-law.com

 7

 8        KEITH J. VERRIER, ESQUIRE
          Levin, Sedran & Berman LLP
 9        510 Walnut Street, Suite 500
          Philadelphia, Pennsylvania 19106
10        215.592.1500
          kverrier@lfsblaw.com

11

12    Counsel for Defendants Taishan Gypsum Co., Ltd., and
      Taian Taishan Plasterboard Co., Ltd.:

13

          MICHAEL J. BARRY, ESQUIRE
14        ASHTON G. CARPENTER, ESQUIRE
          SARAH O'DONOHUE, ESQUIRE
15        Alston & Bird LLP
          One Atlantic Center
16        1201 West Peachtree Street
          Atlanta, Georgia 30309-3424
17        404.881.7000
          mike.barry@alston.com
18        ashton.carpenter@alston.com
          sarah.odonohue@alston.com

19

20    Also present:  Deborah Hooker

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22368-39 Filed 11/19/19 Page 236 of 3246
Case 1:11-cv-02408-MSG Document 291 Entered on FLSD Docket 08/13/2015 Page 4 of 72
Confidential - Subject to Further Confidentiality Review

```
 1                    APPEARANCES CONTINUED

 2

 3    Counsel for Beijing New Building Materials PLC:

 4         DIANA SZEGO FASSBENDER, ESQUIRE
           Orrick, Herrington & Sutcliffe LLP
 5         Columbia Center
           1152 15th Street, Northwest
 6         Washington, DC 20005-1706
           202.339.8533
 7         dszego@orrick.com

 8         ALEX B. ROTHENBERG, ESQUIRE
           Gordon Arata Montgomery Barnett
 9         201 St. Charles Avenue, 40th Floor
           New Orleans, Louisiana 70170-4000
10         504.582.1111
           arothenberg@gamb.law

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22368-30 Filed 11/19/19 Page 237 of 3246
Case 1:11-cv-22408-MGC Document 29-4 Entered on FLSD Docket 08/13/2012 Page 3 of 72
Confidential - Subject to Further Confidentiality Review

```
 1                        - - -

 2                   I N D E X

 3                        - - -

 4   Testimony of:  DAVID DEEG

 5    DIRECT EXAMINATION BY MR. BARRY              6

 6    CROSS-EXAMINATION BY MR. ROTHENBERG         63

 7    CROSS-EXAMINATION BY MR. WEISS              65

 8

 9

10                E X H I B I T   I N D E X

11   DEEG            DESCRIPTION             PAGE

12   No. 1     Special Warranty Deed          14

13             DEEG000027 - DEEG000028

14   No. 2     Contract for Purchase and Sale 15

15             DEEG000029 - DEEG000037

16   No. 3     National Property Inspections Square  21

17             Footage Affidavit

18             DEEG0000005- DEEG0000024

19   No. 4     Plaintiff Profile Form - Residential  23

20             Properties

21             Deeg-Hooker000001 - Deeg-Hooker000096

22   No. 5     Supplemental Plaintiff Profile Form  29

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1   No. 6      Chinese Drywall Screening Report        36

 2              dated 11/9/2010

 3              DEEG000145 - DEEG000178

 4   No. 7      Personal Property Loss                  42

 5              DEEG000058 - DEEG000069

 6   No. 8      Duraclean Restoration & Remediation     50

 7              Estimate dated 3/9/2010

 8              DEEG000070 - DEEG000144

 9   No. 9      Copies of checks                        60

10              DEEG000222 - DEEG000225

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                        - - -

 2           THE COURT REPORTER:  Raise your right hand,

 3      please.  Do you swear or affirm the testimony you

 4      give will be the truth, the whole truth, and nothing

 5      but the truth?

 6           THE WITNESS:  I do.

 7           THE COURT REPORTER:  Thank you.

 8           DAVID DEEG, called as a witness by the

 9   Defendant Taishan Gypsum Co., Ltd., having been first

10   duly sworn, testified as follows:

11                   DIRECT EXAMINATION

12   BY MR. BARRY:

13      Q.   Mr. Deeg, my name is Michael Barry.  Along with

14   my colleagues, Ashton Carpenter and Sarah O'Donohue, we

15   represent Taishan.

16           I appreciate your time here.  I know this is

17   not a pleasant experience going through any of this, and

18   especially sitting for a deposition.  I know you've

19   spent a lot of time with a lawyer, so you know the whole

20   experience of having to deal with that, but I appreciate

21   you being here.

22      A.   No problem.

23      Q.   If you don't mind, state your name for the

24   record, please.
```

```
 1      A.   David R. Deeg.

 2      Q.   And I'm going to go around the room and make

 3   sure that everyone in the room introduces themselves so

 4   you know who everyone here is.

 5           MS. FASSBENDER:  Sure.  Diana Fassbender, with

 6       Orrick, for BNBM.

 7           MR. ROTHENBERG:  Alex Rothenberg, with Gordon

 8       Arata, for BNBM.

 9           MR. VERRIER:  I'm Keith Verrier, with Levin,

10       Sedran & Berman in Philadelphia, on behalf of the

11       plaintiffs.

12           MR. WEISS:  Greg Weiss representing the

13       plaintiff.

14           MR. BARRY:  And, for the record, I know Judge

15       Hooker is in the room.

16           MS. HOOKER:  Deborah.

17           MR. BARRY:  Deborah Hooker.

18   BY MR. BARRY:

19      Q.   So have you ever sat for a deposition before?

20      A.   No.

21      Q.   Have you ever experienced one or watched one or

22   seen one?

23      A.   No.

24      Q.   I know your lawyer's probably gone over all of
```

Confidential - Subject to Further Confidentiality Review

```
 1   this, so I'm just going to go over it briefly, but

 2   there's just a little bit of a cadence to a deposition.

 3          I'm going to be asking you questions.  If you

 4   don't mind just waiting until I finish my question

 5   before answering.  I know sometimes you'll know exactly

 6   what you need to answer right away, but it's just

 7   helpful for our court reporter here.  She'll kick me

 8   under the table if we don't.

 9          Also, make sure that all your answers are

10   audible.  Don't nod your head when you're answering.

11   Say "yes."

12          And if there's ever any issue, if you don't

13   understand my question, if it's not clear to you, please

14   ask me to rephrase it, or if there's anything where you

15   want me to slow down or want to be able to read the

16   document in front of you, don't hesitate to do that.

17       A.   Okay.

18       Q.   There's a few kind of just general questions I

19   need to ask you.  One is, do you understand that you've

20   been sworn and must tell the truth as if you're

21   testifying in court?

22       A.   Yes.

23       Q.   Are you taking any medications that will impair

24   your ability to understand my questions and to answer
```

```
 1    truthfully?

 2         A.   No.

 3         Q.   How did you prepare for this deposition?

 4              MR. WEISS:  Other than talking about the

 5         content of a conversation between you and me, which

 6         would be attorney-client privilege, or you and

 7         Keith, you can tell them what you did to prepare for

 8         the deposition, if anything.

 9              THE WITNESS:  Very little.  I looked up some

10         square footage numbers because it's been a long

11         time, property appraiser and some of the inspection

12         items that we had done years ago.  Other than that,

13         not very much at all.

14    BY MR. BARRY:

15         Q.   And with the caveat that your lawyer gave you,

16    not giving any content of the conversation, did you meet

17    with your lawyer concerning this deposition?

18         A.   We had a phone call.

19         Q.   Okay.  And who was present on that phone call?

20              MR. WEISS:  You can tell him who was on the

21         call.

22    BY MR. BARRY:

23         Q.   Yes.

24         A.   The four of us.  The four parties.
```

Confidential -- Subject to Further Confidentiality Review

```
1      Q.   And can you identify them?

2      A.   Greg, Keith, Deborah, and David.

3      Q.   And how long did that phone call last?  Again,

4   I'm not asking the content of that conversation.

5      A.   Roughly 30 minutes.

6      Q.   And did you speak with anyone else about this

7   deposition?

8      A.   No.

9      Q.   Did you speak to any friends, any family

10  members?

11     A.   No.

12     Q.   And you said you reviewed a few documents, you

13  reviewed, like, the property records and the appraisals.

14  Did you review any of the other documents you produced

15  in this litigation?

16     A.   No.

17     Q.   And if I put, you know, the appraisals in front

18  of you or anything like that and you've reviewed it,

19  you'd recognize that those were the documents you

20  reviewed?

21     A.   To clarify, an appraisal --

22     Q.   Sorry.  Yes.

23     A.   -- I looked at the property appraiser website,

24  and then we had a couple inspection reports that were
```

Confidential - Subject to Further Confidentiality Review

```
 1    done by Banner at one point and somebody else at

 2    another, but I have not looked at an appraisal per se.

 3         Q.   Understood.  But if I put those -- the property

 4    appraiser websites, if I put the documents from there in

 5    front of you, you'd recognize that as something that you

 6    saw?

 7         A.   Yes.

 8         Q.   What did you do to collect documents in this

 9    litigation?

10         A.   I did nothing.

11         Q.   Okay.  Did you do nothing because someone else

12    was collecting the documents for you?

13         A.   Yes.

14         Q.   Okay.  Who was collecting the documents for

15    you?

16         A.   Deborah.

17         Q.   Okay.  I will defer those questions to her.

18              Where are you employed?

19         A.   CenterState Bank.

20         Q.   Okay.  And what do you do at CenterState Bank?

21         A.   I work in the credit department as an

22    underwriter.

23         Q.   And how long have you worked there?

24         A.   13 -- just over 13 years.
```

Confidential - Subject to Further Confidentiality Review

```
1      Q.    And what's your job title there?

2      A.    Commercial loan underwriter.

3      Q.    Okay.  And are you married?

4      A.    No.

5      Q.    Are you -- do you have a significant other or

6   partner?

7      A.    Deborah.

8      Q.    Deborah.  And how long have you and Deborah

9   been together?

10     A.    15 years.

11     Q.    Okay.  And do you have any children?

12     A.    Yes.

13     Q.    How many children do you have?

14     A.    One.

15     Q.    And how old is that child?

16     A.    24.

17     Q.    What's the child's name?

18     A.    Zachary.

19     Q.    Zachary.  Where does Zachary live?

20     A.    Sebastian.

21     Q.    Sebastian.  Where is Sebastian?

22     A.    Florida.

23     Q.    Florida.  Okay.  Have you ever been involved in

24   a lawsuit before this one?
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.   No.

 2        Q.   And I assume then you've never been a class

 3   action plaintiff or anything like that?

 4        A.   No.

 5        Q.   Okay.  What is the address of the property that

 6   you allege has been damaged by Chinese drywall?

 7        A.   516 Southwest Akron Avenue, Stuart, Florida

 8   34994.

 9        Q.   And do you currently own that property?

10        A.   No.

11        Q.   When did you initially buy that property?

12        A.   November of '07.

13        Q.   Okay.  And do you remember from whom you

14   purchased it?

15        A.   The specific name I do not remember.  It was

16   the builder, but the name of the company, the name of

17   the seller, I don't have off the top of my head.

18        Q.   And I'll be able to help you with that.  Now,

19   Mr. Deeg, I'm going to put some documents in front of

20   you.  Before I do, I'm always going to hand them to your

21   counsel first.  He'll have a chance to review it to make

22   sure it's something he's willing to let you see.  After

23   he does, he's going to hand it to the court reporter and

24   she's going to mark it as an exhibit.
```

Confidential - Subject to Further Confidentiality Review

```
1              And I'll represent, for the record, this is

2    Special Warranty Deed that is Bates labeled starting

3    DEEG000027, and we'll mark that as Exhibit 1.

4              (Deeg Exhibit No. 1 was marked for

5    identification.)

6    BY MR. BARRY:

7         Q.   Mr. Deeg, you can take as much time to look

8    through a document beforehand.  You tell me when you're

9    ready.

10        A.   I'm ready.

11        Q.   Does this refresh your memory of who you

12   purchased the property from?

13        A.   It does.

14        Q.   And who was that?

15        A.   Treasurer Coast Communities.

16        Q.   Do you remember how much you paid for the

17   house?

18        A.   $400,500.

19        Q.   And I'm going to hand you another document.

20   And before I do, do you recognize this document?  Have

21   you seen this document before?

22        A.   Yes.

23        Q.   What is your understanding of this document?

24        A.   I don't understand -- or I don't know what my
```

Confidential - Subject to Further Confidentiality Review

```
 1    understanding of the document is.  It's the warranty

 2    deed.

 3         Q.   No, that's fair.

 4         A.   Okay.

 5         Q.   All those type of property documents are

 6    something I just put in a file folder someday, so I get

 7    it.

 8              I'm going to hand you another document, which

 9    I'll first hand to your counsel.

10              (Deeg Exhibit No. 2 was marked for

11    identification.)

12    BY MR. BARRY:

13         Q.   And this is a contract for purchase and sale.

14    It's Bates labeled starting DEEG 29.  And if you want to

15    look through the whole document, you're welcome to, but

16    I'm going to be referring to page 47 on the Bates label,

17    which is that bottom right one.  There's two Bates

18    labels on this, but...

19         A.   Okay.

20         Q.   And is this the purchase price you mentioned,

21    if you see, on line 3?

22         A.   Yes, it is.

23         Q.   Is there any other -- and you believe that's

24    the accurate price that you paid for the house?
```

Confidential - Subject to Further Confidentiality Review

```
 1      A.   Yes.

 2      Q.   Was there any other amount you paid for the

 3   house?  Anything additional?

 4      A.   No.

 5      Q.   Did you do any upgrades to the house?

 6      A.   To clarify, an upgrade, I mean, we put in

 7   plantation shutters, that sort of thing, but an addition

 8   or something like that, no.

 9      Q.   Okay.  There was no -- you know, you didn't add

10   a new room to the house or --

11      A.   No.

12      Q.   -- you didn't redo the floors or anything like

13   that?

14      A.   No.

15      Q.   Okay.  Do you remember if that purchase was

16   financed or through a bank or a lender?

17      A.   It was.

18      Q.   And so was there a mortgage on the property?

19      A.   There was.

20      Q.   And did anyone else have a lien on that

21   property?

22      A.   Other than the bank?

23      Q.   Yeah.

24      A.   No.
```

Confidential - Subject to Further Confidentiality Review

```
 1      Q.   So there's no tax lien or anything like that?

 2      A.   No.

 3      Q.   Do you own any other properties or houses?

 4      A.   No.

 5      Q.   Did you own any properties at the time that you

 6   owned this house?

 7      A.   No.

 8      Q.   Where do you currently live?

 9      A.   Jensen Beach, Florida.

10      Q.   Okay.  What's the address of that house?

11      A.   9 -- 951 -- what the heck's the address there

12   now?

13           MR. WEISS:  She can't answer your question.

14           MR. BARRY:  I'm okay on this one if she wants

15      to.

16           THE WITNESS:  I'm drawing a blank on the --

17           MS. HOOKER:  It's Northwest Fresco Way, Jensen

18      Beach, Florida.

19           THE WITNESS:  Yeah.

20   BY MR. BARRY:

21      Q.   For the record, if you don't mind repeating

22   that.

23      A.   So 941 --

24           MS. HOOKER:  I thought it was 951.
```

Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  951 Fresco Way, Number 202,

 2         Jensen Beach, Florida 34957.

 3    BY MR. BARRY:

 4         Q.   And if we need directions home, we'll let you

 5    know.

 6         A.   That's an apartment.

 7         Q.   I'm just teasing you.

 8              How long have you lived at that property?

 9         A.   Two and a half years.

10         Q.   And did you move from that property -- or did

11    you move to that property from the house that was

12    affected by Chinese drywall?

13         A.   Yes.

14         Q.   When you were living in the house that was

15    affected by Chinese drywall, how many people lived there

16    with you?

17         A.   One.

18         Q.   Just yourself, or Deborah lived with you too?

19         A.   Yes.

20         Q.   And did any -- you said you have a child.  Did

21    the child live with you at any time during that period?

22         A.   Not as a permanent residence, but visited from

23    time to time.

24         Q.   Is there anyone else making a claim for their
```

Confidential - Subject to Further Confidentiality Review

```
 1    time living in the residence?

 2         A.   No.

 3         Q.   Other than, of course, Ms. Hooker?

 4         A.   No.

 5         Q.   And was Ms. Hooker a permanent resident during

 6    that time period?

 7         A.   No.

 8         Q.   Okay.  Where else did she live during that time

 9    period?

10         A.   Okeechobee, Florida.

11         Q.   Okeechobee.  And, you know, just estimating, I

12    know it probably varied, but how much of her time would

13    she spend at the house?

14         A.   I don't know.

15         Q.   Would it be more than 10 percent of the time?

16         A.   I don't know.  It's hard to narrow that down.

17         Q.   Yeah, no, no, I understand.  If there's seven

18    nights in a week, was she spending one night?  Two

19    nights?

20         A.   Two or three.

21         Q.   Okay.  And then the rest of the time was in

22    Okeechobee?

23         A.   (Nodding head.)

24         Q.   And was that pretty consistent throughout the
```

Confidential - Subject to Further Confidentiality Review

```
 1    entire time period?

 2        A.   Yes.

 3        Q.   Okay.  What were the exact dates that you lived

 4    in the house?  From when to when?

 5        A.   Without looking --

 6        Q.   Yes.

 7        A.   -- I couldn't give you the exact date.  I could

 8    tell you, like, the month and the year for each.

 9        Q.   Yeah, month and --

10        A.   So we moved in November of '07, moved out in

11    April of '16.

12        Q.   Okay.  When you moved out, did you -- had you

13    just sold the property?

14        A.   Yes.

15        Q.   Okay.  And did you -- who did you sell the

16    property to?

17        A.   Jay Bashant was the guy's name.  He lived down

18    the street and he was the son of the people that built

19    the home.

20        Q.   And how much did you sell the property for?

21        A.   330.

22        Q.   Okay.  Now, do you know the square footage of

23    your house?

24        A.   Yes.
```

```
 1      Q.    How do you know that square footage?

 2      A.    Property appraiser website, as well as other

 3   inspections that I previously mentioned.  There are

 4   varying numbers on the square footage.

 5      Q.    And do you remember the number?

 6      A.    2,546, to the best of my knowledge.

 7      Q.    I'm going to hand you a document which will

 8   help in that endeavor.  You're close.

 9            (Deeg Exhibit No. 3 was marked for

10   identification.)

11   BY MR. BARRY:

12      Q.    And we'll mark this as Exhibit 3, which is the

13   Square Footage Affidavit prepared by National Property

14   Inspections, and it's Bates labeled starting DEEG 5.

15            Mr. Deeg, do you recognize this document?

16      A.    I do.

17      Q.    And what is the square footage listed here?

18      A.    2,549.

19      Q.    Do you have any reason to believe that number

20   is incorrect?

21      A.    No.

22      Q.    And why did you have this prepared?

23      A.    As part of the process for determining do we

24   have Chinese drywall, and part of, I think, the lawsuit,
```

```
 1    the lawsuit, but I didn't have this ordered, so maybe

 2    I'm speaking out of --

 3            MR. WEISS:  Speak about your knowledge.

 4    BY MR. BARRY:

 5        Q.   Yeah.  What is your understanding of why this

 6    was ordered?

 7        A.   For this, for this particular case.

 8        Q.   Do you know how many bedrooms are in the house,

 9    the property?

10        A.   Yes.

11        Q.   How many bedrooms is that?

12        A.   Three.

13        Q.   And how many bathrooms?

14        A.   Four.

15        Q.   Okay.  And when was the house originally built?

16        A.   I want to say '06, but I'm not positive of the

17    year that it was built, without checking.

18        Q.   And during the time you lived in the house, was

19    there any changes to the square footage?  I know you

20    said there had been no improvements.

21        A.   No.

22        Q.   So your understanding is that the 2,549 is the

23    accurate square footage throughout your entire time

24    living in the house?
```

```
 1      A.   Yes.

 2      Q.   Do you know who installed the drywall?

 3      A.   No.

 4      Q.   If I give you a document, I think that will

 5   help.

 6           (Deeg Exhibit No. 4 was marked for

 7   identification.)

 8   BY MR. BARRY:

 9      Q.   Mr. Deeg, I handed you the Plaintiff Profile

10   Form which was prepared in this litigation.  It is

11   Deeg-Hooker 1.  I'll give you a second to look at it

12   since that's quite large.

13      A.   Okay.

14      Q.   Do you recognize this document?

15      A.   I do not.

16      Q.   Do you have an understanding of what this

17   document is?

18      A.   No.

19      Q.   Okay.  If you look on page 3 --

20      A.   Okay.

21      Q.   -- there's a signature line.  Did you sign this

22   document?

23      A.   Yes.

24      Q.   Okay.  And so you've -- it's dated -- what's
```

1    the date on the document?

2        A.    November 25, 2009.

3        Q.    So at some point you've probably seen this

4    document before?

5        A.    Yes.

6        Q.    Yes.  And if you look on page 3, there's a

7    section on the bottom where it says "drywall installer."

8    It says "D & A Construction Services"?

9        A.    Yes.

10       Q.    And then you see where it says "drywall

11   supplier"?

12       A.    Yes.

13       Q.    Is that your understanding of who were the

14   installers and suppliers of the drywall?

15       A.    Yes.

16       Q.    And so who was the drywall installer?

17       A.    D & A Construction Services.

18       Q.    And then who was the drywall supplier?

19       A.    Banner Supply Company.

20       Q.    And was your house, when you purchased it, a

21   new home?

22       A.    Yes.

23       Q.    And were you at all involved in the

24   construction of that home?

Confidential - Subject to Further Confidentiality Review

1    A.    No.

2    Q.    So did you buy it after it had already been

3  constructed?

4    A.    Yes.

5    Q.    Did the builder make any guarantees to you

6  about the products in the home?

7    A.    No.

8    Q.    So they didn't -- do you know -- they never

9  said anything about the quality of the drywall or

10  anything like that?

11    A.    No.

12    Q.    Where was the drywall installed in the house?

13    A.    Again, to clarify, you're meaning just --

14    Q.    What rooms?  Was it one room?  Was it every

15  room?

16    A.    It was every room, plus some in the garage, but

17  I'm not worried about that in terms of square footage,

18  but the whole house.

19    Q.    And how do you know that it was all throughout

20  the house?

21    A.    From my visual inspection of it.

22    Q.    Okay.  And did you do an inspection?  Did a

23  professional inspector look through the house too?

24    A.    Later on after the fact, again, as part of this

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 259 of 3246
Case 1:14-cv-01491-MGE-EDC Document 234-3 Entered on FLSD Docket 11/30/15 Page 27 of 72
Confidential - Subject to Further Confidentiality Review

1    process, there was, but we didn't have an inspection up

2    front, because we were buying from the builder, and

3    so...

4        Q.   And just to be clear, when I'm saying "the

5    drywall installed throughout the house," I'm talking

6    about the Chinese drywall.  I know there was drywall

7    installed throughout the house and I'm distinguishing

8    between was there Chinese drywall and, you know, regular

9    other drywall.

10       A.   That I don't know.

11       Q.   So when -- I'm asking you, was there Chinese

12   drywall installed throughout the house?  I'm clarifying

13   my question, asking it better.

14       A.   Okay.

15       Q.   Do you know if there was Chinese drywall

16   installed throughout the house?

17       A.   I believe there was.

18       Q.   Okay.  And what is your understanding?  Where

19   did you come to that understanding?

20       A.   Inspections that were done, they drilled holes

21   in the drywall in various rooms, on various floors, and

22   that's what I was told.

23       Q.   Okay.  Understood.  And if there's ever

24   questions like that, you know, make sure I'm asking you

```
 1    something clear, because I'm going to ask bad questions.

 2    If I'm not being clear, please let me know.

 3         A.   Okay.

 4         Q.   When did you first come to suspect that there

 5    was Chinese drywall in your house?

 6         A.   We moved in in November of '07, so best to my

 7    recollection, it was somewhere in that six to nine

 8    months to within that first year things were going

 9    wrong.  So within that first year of being there.

10         Q.   So 2007/2008 is your recollection?

11         A.   Yeah, 2008 was probably a good -- end of 2008,

12    middle of 2008.

13         Q.   And what caused you to suspect that there was

14    drywall, Chinese drywall, in the house?

15         A.   Air conditioning.  The air conditioner broke,

16    and through getting that repaired and all, the coils

17    were going black.  Picture frames were going -- were

18    turning color.  Mirrors were turning color.  Other --

19    anything made of copper was turning black and corroding.

20    And just, like, nicknacky things that were -- anything

21    that was copper turned.  And there was an odor as well.

22    So there were different things that were coming together

23    that told us something wasn't right.

24         Q.   At that time had you heard about Chinese
```

Confidential - Subject to Further Confidentiality Review

```
1    drywall before?

2        A.   Not in the beginning, no.

3        Q.   How did you come to hear about Chinese drywall?

4        A.   You know, specifically, looking back, that

5    first time I couldn't tell you, but it began to pop up

6    in the news, and then, really, probably, for me, Deborah

7    was more involved in talking to the builder and all that

8    sort of thing, so through Deborah.

9        Q.   So was there a period of time where you started

10   noticing there being problems but you didn't know about

11   Chinese drywall?

12       A.   Yes.

13       Q.   And so when we're talking about you noticing

14   the issues in 2008, is that when you started noticing

15   things like the air conditioning corroding, or is that

16   when you knew that there was Chinese drywall in the

17   house?

18       A.   Definitely it's when I saw things going wrong.

19   It would be tough for me to tell you that point where

20   oh, my God, it's Chinese drywall.  I just don't --

21       Q.   Totally understand.  And I'm going to hand you

22   two documents that were produced separately, and I'll

23   give them to your counsel to approve, if I can get them

24   both as one exhibit, but it's the verification attached
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 262 of 3246
Case 1:11-cv-22408-MGC Document 68-5 Entered on FLSD Docket 11/28/2012 Page 49 of 72

Confidential - Subject to Further Confidentiality Review

```
 1    to it.

 2              MR. WEISS:  Do you want to them mark as one

 3       exhibit?

 4              MR. BARRY:  Yes.

 5              (Deeg Exhibit No. 5 was marked for

 6       identification.)

 7    BY MR. BARRY:

 8       Q.   And for the record, this is Exhibit 5, which is

 9    your Supplemental Plaintiff Profile Form, which is not

10    Bates labeled, and it is -- attached to it is the

11    verification signed by Deborah Hooker.

12              Mr. Deeg, have you seen this document before?

13       A.   I don't believe I have.

14       Q.   I understand, and it's signed by Ms. Hooker, so

15    it may be something that you have not seen before.

16              Would you have any reason to believe that

17    Ms. Hooker doesn't have accurate information about this

18    situation of Chinese drywall?

19              MR. WEISS:  Object to the form.  You can

20       answer.

21              THE WITNESS:  No.

22    BY MR. BARRY:

23       Q.   If you can turn to page 2 and Section II.

24       A.   Okay.
```

Confidential - Subject to Further Confidentiality Review

1    Q.   And there's a line that says:  "If you were not

2    aware, at the time you acquired the property, the

3    property contained Chinese drywall, when did you first

4    become aware that the property contained Chinese

5    drywall?"

6         What date is listed there?

7    A.   June of 2009.

8    Q.   Do you have any reason to believe that's an

9    inaccurate --

10   A.   No.

11   Q.   -- representation of when you learned of

12   Chinese drywall?

13        So when did you first see -- and I'm going to

14   reask that question, because that was put on two

15   different lines.

16        Do you have any reason to believe that

17   June 2009, the date on the SPF -- PPF is an inaccurate

18   representation of when you learned of Chinese drywall?

19   A.   No.

20   Q.   So you first said you started seeing blackened

21   electrical wires in 2008, roughly?

22   A.   Blackened AC -- the AC broke.  Part of the

23   repair, that's where the blackening of the copper that

24   we all know is one of the -- was first noticed, and then

 1    the picture frames, mirrors, that sort of thing.  So,

 2    again, to narrow, you know, looking back at the time

 3    frame, exactly when it was, I can't say, but we're in

 4    the time zone of whether it was early '09 or mid '09 or

 5    late '08.  But I don't know if I'm answering your

 6    question properly there.

 7         Q.   Absolutely.  And what did you do when you

 8    started having problems with the air conditioning?

 9         A.   We replaced it.

10         Q.   And how many times did you replace it?

11         A.   I don't know the specific number.  Numerous

12    times.

13         Q.   And in this litigation, are you asking for

14    compensation for the repairs you did to the air

15    conditioning?

16         A.   No.

17         Q.   Did any other appliances have problems?

18         A.   I'm trying to think back.  The refrigerator

19    went out on us later on.  I think that would have been

20    the only other appliance that I can recall having an

21    issue with.

22         Q.   Did you have to repair the refrigerator?

23         A.   Well, we didn't repair.  We bought a new

24    refrigerator.

Confidential - Subject to Further Confidentiality Review

```
1    Q.   Okay.  And why did you buy a new refrigerator?

2    A.   Because the old one wasn't working.

3    Q.   Did they say that it could be repaired?

4    A.   I don't recall what -- yeah, I don't recall.

5    Q.   Did you try to repair it?

6    A.   No.

7    Q.   Okay.

8    A.   Well, to clarify, I think a guy came out,

9    looked at it.  I don't remember what the issue was or

10   why -- and I think we chose not to repair it, not

11   necessarily because it could or couldn't be repaired,

12   but because it didn't seem to make sense to spend the

13   money on it.  So when we bought the newer refrigerator,

14   it went in the garage where I'd hoped it wouldn't be

15   affected as much.

16   Q.   I understand.  And when you moved, did you take

17   that refrigerator with you?

18   A.   The old one, or the replaced?

19   Q.   The new one.

20   A.   The newer one?  I did not.

21   Q.   Okay.  It stayed with the house when you sold

22   it?

23   A.   I'm not sure where that refrigerator ended up.

24   Q.   You said there was an odor in your house.  What
```

Confidential - Subject to Further Confidentiality Review

1    did it smell like?

2        A.   I don't even know how to describe it.  Just

3    sort of a foul smell, for lack of a better term.

4        Q.   Was it worse in certain areas of the house than

5    others?

6        A.   Yes.

7        Q.   What areas of the house was it worse in?

8        A.   I'm thinking back to where, you know, I'm going

9    to say the first floor seemed to have more of a smell.

10   The bathroom on the second floor seemed to have more of

11   a smell.  That's about as much as I could recollect.

12       Q.   And when did you first start noticing those

13   odors?

14       A.   Again, in that first year to year and a half,

15   somewhere up through June of '09, you know, because

16   you're piecing together these things, but there was a

17   smell there, but not necessarily knowing what the smell

18   was caused by, so...

19       Q.   Was it more prevalent at any time of the day?

20       A.   Not that I recall.

21       Q.   Was it more prevalent during any type of

22   weather?

23       A.   Not that I recall, no.

24       Q.   Was it more prevalent at any time of the year?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 267 of 3246
Case 1:14-cv-01040-MGC Document 00:03 Entered on FLSD Docket 04/29/15 Page 45 of
72
Confidential - Subject to Further Confidentiality Review

```
 1      A.   No.

 2      Q.   Did the odor change over time?

 3      A.   No.

 4      Q.   And did any other -- did any visitors to the

 5   house ever notice the odor?

 6      A.   Very few visitors, but I don't recall

 7   anybody -- you know, no.

 8      Q.   I'm sorry.  Just to clarify, do you mean very

 9   few visitors visited the house or very few visitors

10   noticed the smell?

11      A.   Very few visitors to the house and very few

12   visitors noticed the smell.

13      Q.   Understood.  Now, you said that your wife was

14   the one who -- or you said you started learning about

15   Chinese drywall from news stories.  Do you remember

16   roughly when that was?

17      A.   And to clarify, not from my wife, though.

18      Q.   Yeah, no.  I apologize.  I rephrased that.

19      A.   Okay.  It's just it's in that first year to

20   year and a half of being in the house, so it's hard to

21   narrow it down, but --

22      Q.   Sometime in that period you learned about the

23   Chinese drywall?

24      A.   Yes.
```

Confidential - Subject to Further Confidentiality Review

1    Q.   And what did you do after you suspected that

2    your house had Chinese drywall?

3    A.   I didn't do a lot.  Deborah kind of handled

4    more of the talking to people and all.  So, honestly, I

5    didn't do much.

6    Q.   Did you speak with an attorney about Chinese

7    drywall?  Again, not asking the content of those

8    conversations.

9    A.   Eventually we did.

10   Q.   And how soon after learning of Chinese drywall

11   did you speak with an attorney?

12   A.   I don't know what the time frame was on that.

13   Q.   Do you know how long after you learned of

14   Chinese drywall that you filed this lawsuit?

15   A.   Not without looking at documents and stuff.

16   Q.   I understand.  Did you ever suffer any health

17   conditions that you suspect were a result of Chinese

18   drywall?

19   A.   No.

20   Q.   No.  And you understand that this lawsuit does

21   not involve any claims for personal injury and medical

22   conditions?

23   A.   Yes.

24   Q.   Now, you said you had your house inspected for

Confidential - Subject to Further Confidentiality Review

1   Chinese drywall.

2       A.   Yes.

3       Q.   Who performed that inspection?

4       A.   Without looking for a name, I want to say

5   Banner sent people out.

6       Q.   Who is Banner?

7       A.   Banner Supply Company.  They're the ones that

8   supplied the Chinese drywall.

9       Q.   I'm going to hand you a document.

10      A.   And I believe --

11           (Deeg Exhibit No. 6 was marked for

12   identification.)

13  BY MR. BARRY:

14      Q.   Do you recognize this document?

15      A.   I don't recognize it, but --

16      Q.   I understand.  Now, I'll represent for the

17  record this is an inspection report prepared by Chinese

18  Drywall Screening, it's dated November 9, 2010, and it's

19  directed to Attorney Greg Weiss, and we're marking it as

20  Exhibit 6.  It's Bates labeled DEEG 145.

21           Looking at this document, do you now recall who

22  performed the inspection?

23      A.   Well, I don't, unless it's listed here, and I'm

24  not seeing it.

Confidential - Subject to Further Confidentiality Review

```
 1      Q.   I think if you look at the top of it.

 2      A.   Okay.  Chinese Drywall Screening.

 3      Q.   Do you remember who paid for that inspection?

 4      A.   I don't.

 5      Q.   Do you know if you paid for that inspection?

 6      A.   I don't.

 7      Q.   Do you know if your -- Ms. Hooker paid for that

 8  inspection?

 9      A.   I don't.

10      Q.   Were you at home when the inspection was

11  performed?

12      A.   I don't think I was there.

13      Q.   So do you ever recall speaking to the

14  inspector?

15      A.   No.

16      Q.   Now, looking at this report -- earlier you said

17  you believed that drywall was throughout the house --

18  does this report confirm that?

19           MR. WEISS:  Object to the form.  You can

20      answer.

21           THE WITNESS:  Well, I believe it does.

22  BY MR. BARRY:

23      Q.   Okay.  Have you had any other inspections

24  beyond this inspection report?
```

Confidential - Subject to Further Confidentiality Review

```
 1      A.   I think Banner came in first.  I don't know the

 2  date of that, but I believe Banner came in first, then

 3  this was done subsequently as part of this process.

 4      Q.   Do you know if anyone took samples from the

 5  house?

 6      A.   I believe they did.

 7      Q.   Do you know where those samples are?

 8      A.   I don't.

 9      Q.   Do you know how many Chinese drywall boards

10  were in your house?

11      A.   I don't.

12      Q.   And do you know if anyone determined an exact

13  percentage of Chinese drywall in the house?

14      A.   I don't know.

15      Q.   Okay.  I know you said you sold the house.  Is

16  Chinese drywall still in place in the house?

17          MR. WEISS:  Object to the form.  You can

18      answer.

19  BY MR. BARRY:

20      Q.   To the extent you know.

21      A.   They -- I believe there isn't Chinese drywall

22  in the house.  They gutted it and, you know, remediated

23  the whole thing and then sold it again.

24      Q.   Did you ever consider remediating the house?
```

```
1     A.    We talked about it, yes.

2     Q.    Why didn't you remediate?

3     A.    My concern was we didn't really know, if you go

4     through the process, is it remediated, you know, was it

5     truly fixed.  And then from a personal perspective, I

6     just didn't want to go through the -- sort of the stress

7     of the process.

8     Q.    Did you ever get a quote for how much it would

9     cost to remediate the property?

10    A.    If we did, I don't know what the quote was.  I

11    think we probably did, but I don't know.

12    Q.    And so, to be clear, this is one of those dumb

13    questions, but you don't own the home anymore, so you

14    cannot currently remediate the property?

15    A.    Correct.

16    Q.    Now, you said you believe that some samples

17    were taken from the house but you don't recall whether

18    they were or where they are or anything?

19    A.    Yes.

20    Q.    Okay.  So if I asked you questions about those

21    samples, you wouldn't have knowledge of it?

22    A.    No.

23    Q.    Earlier you talked a little bit about corrosion

24    of the metal in the house.  Can you tell me where
```

```
 1    specifically the air conditioning units were in the

 2    house?

 3        A.    There was -- well, yeah, the first floor had a

 4    utility closet with an AC unit there, and then there was

 5    one up in the attic space.

 6        Q.    Did you have problems with both of those air

 7    conditioning units?

 8        A.    Yes.

 9        Q.    And you said earlier that the refrigerator also

10    had issues, and I assume that was in the kitchen?

11        A.    Yes.

12        Q.    When you moved the new refrigerator to the

13    garage, did you have similar issues with that

14    refrigerator?

15        A.    No.

16        Q.    So there was no corrosion once it was in the

17    garage?

18        A.    Correct.

19        Q.    When did you purchase that new refrigerator, do

20    you remember?

21        A.    I don't.

22        Q.    Okay.  Would it be towards the end of your time

23    in your property?

24        A.    It would be, and the reason, the corrosion, it
```

Confidential -- Subject to Further Confidentiality Review

 1   was a much shorter period of time that it was there, so

 2   what would have happened, you know, was a different

 3   thing, but...

 4       Q.   Was there any other damage to the property?

 5       A.   In terms of?

 6       Q.   Did the Chinese drywall create any other damage

 7   to the property?

 8       A.   Well, you know, like, the pipe -- you know, the

 9   plumbing, that kind of thing, I think, if we've covered

10   that, then, you know, the AC, this kind of stuff,

11   mirrors, but no other than what we've kind of seen here.

12       Q.   Did the Chinese drywall damage any of your

13   personal property?

14       A.   Yes.

15       Q.   What personal property was damaged by the

16   Chinese drywall?

17       A.   Numerous TVs went out.  I'm trying to think.

18   Picture frames, all that kind of stuff, stuff that could

19   tarnish or, for lack of a better term, tarnish.  TVs

20   were the big thing.  Talked about the fridge.  I think

21   that's it.

22       Q.   When you say picture frames were damaged, were

23   they -- I guess, were they metal picture frames?

24       A.   Yeah, and they tarnished.  They turned from

Confidential - Subject to Further Confidentiality Review

```
1    kind of like a silver look to black.

2        Q.   Would it affect a wood picture frame, do you

3    remember?

4        A.   I don't believe that it would.

5        Q.   Now, if we look at -- (indicating.)

6            (Deeg Exhibit No. 7 was marked for

7    identification.)

8    BY MR. BARRY:

9        Q.   Mr. Deeg, do you recognize this document?

10       A.   I don't.

11       Q.   Is that because Ms. Hooker prepared this

12   document?

13       A.   Yeah.

14       Q.   I'm going to represent for the record this is a

15   document entitled Personal Property Loss.  It is Bates

16   labeled DEEG 58, and it will be Exhibit 7.

17           Recognizing that you do not recognize this

18   document, do you know what this document is?

19       A.   I believe so.

20       Q.   And what is this document?

21       A.   It looks like items that had been damaged from

22   the exposure to the drywall.

23       Q.   And did you have any involvement in preparing

24   this document?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 276 of 3246
Case 1:14-cv-04396-MGC Document 66-5 Entered on FLSD Docket 11/24/15 Page 161 of
Confidential - Subject to Further Confidentiality Review
72

     1      A.   No, not that I -- if she asked me a question or

     2   something about it, but I don't recall sitting and kind

     3   of doing this, no.

     4      Q.   Understood.  If you can just take a second to

     5   look through this document, and when you review it,

     6   please let me know if you feel like there's --

     7   representing that this is documents [sic] that we've

     8   said have been ruined by Chinese drywall, please let me

     9   know if you look through this and see if there's

    10   anything that you believe might be inaccurate.

    11      A.   Now, these would be things affected by the

    12   Chinese drywall.  It looks to be correct.

    13      Q.   Now, let's just walk through a few of these

    14   items.  I see we have 10 security cameras in the house.

    15   Where were those security cameras located?

    16      A.   They were located around the outside of the

    17   house, different corners of the house, and ran through

    18   the attic and then down into a closet on the -- in the

    19   master bedroom.

    20      Q.   And what was the issue?  How did those security

    21   cameras stop working?

    22      A.   I don't recall.

    23      Q.   Do you recall if the cameras on the outside of

    24   the house were working when you sold the home?

Confidential - Subject to Further Confidentiality Review
72

```
 1         A.    There were issues.  You know, I don't recall.

 2         Q.    When you left the home, could you have taken

 3    those security cameras with you?

 4         A.    No.  I mean, they were attached to the house

 5    and all.  You wouldn't take them out.  Like, could you

 6    have ripped them out?  You know, but you wouldn't.

 7         Q.    As part of your sales contract with your buyer,

 8    could you have removed those security cameras and taken

 9    them with you?

10         A.    I don't know how the contract read, but --

11         Q.    Understood.  So would you consider that those

12    security cameras would be part of the purchase price

13    from the buyer who purchased the house?

14               MR. WEISS:  Object to the form.  You can

15          answer.

16               THE WITNESS:  I wouldn't think so.  It was sort

17          of just left, like, you can have it kind of thing,

18          but I don't think it was built in as part of the

19          purchase price, no.

20    BY MR. BARRY:

21         Q.    But it's fair to say that the buyer was able

22    to -- the buyer obtained the security cameras when you

23    left the house?

24         A.    Yes.
```

Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Now, you said earlier that the TV did not work;

 2   is that correct?

 3        A.    Several TVs broke.

 4        Q.    Were you able to repair any of those TVs?

 5        A.    We didn't attempt to repair.  We replaced.

 6        Q.    When you replaced the TVs, was it for the same

 7   price that you purchased the TVs?

 8        A.    I don't know.

 9        Q.    Do you have receipts of purchasing the

10   replacement TVs?

11        A.    I do not.

12        Q.    Do you know if they have been produced in this

13   litigation?

14        A.    What are these receipts for here?  It looks

15   like there's different receipts here for various -- is

16   there a TV?  I don't want to waste time, but if there's

17   a TV receipt in here, then yes.  If not, then no.

18            MR. WEISS:  Just answer to the extent you have

19       knowledge.

20            THE WITNESS:  Okay.  I don't know.

21   BY MR. BARRY:

22        Q.    In looking through these receipts, do you see a

23   TV receipt?  There's only a handful of receipts, so...

24        A.    Let's see.
```

```
 1      Q.   I'll refer you to page 63.

 2      A.   Yes.

 3      Q.   Is that the receipt for the original TV?  It

 4   says $3,338.99, and that's also the amount that's listed

 5   on the first page.

 6      A.   Where's this -- where's the --

 7      Q.   It's in very, very small lettering.  My eyes

 8   can barely see it.

 9      A.   No, I'm not looking at the right spot then.  Up

10   here.

11           Yeah, what's the question again?  Is this the

12   receipt from the original TV?

13      Q.   Correct.

14      A.   Yeah, I don't know.  I don't know what-- you

15   know, I couldn't tell you what TV that is per se.

16      Q.   Now, going through this list one more time, did

17   every item on this list stop working or stop working

18   properly?

19      A.   I don't know.

20      Q.   Do you recall whether the computer that was in

21   the house, the Compaq Presario, stopped working?

22      A.   I don't.

23      Q.   Whose computer was that?

24      A.   You know, I don't -- I think it was mine.
```

Confidential - Subject to Further Confidentiality Review

72

```
 1    Q.   Okay.  Do you ever remember having computer

 2   problems during that time period?

 3    A.   I did replace a computer.  A couple of

 4   computers.  I didn't attribute it to any particular

 5   reason.  So, you know, they were replaced, yes.

 6    Q.   So it could have been through the normal wear

 7   and tear on a computer?

 8    A.   As far as I know, yes.

 9    Q.   Since you've moved out of the house, have you

10   replaced a computer in that time period?

11    A.   I have.

12    Q.   So it's, you know -- scratch that.

13         For the items that say estimated amounts, are

14   those items that you do not have receipts for?

15    A.   I don't know.  I don't have any receipts.

16    Q.   Okay.  So you do not have an understanding

17   whether receipts have been produced for those documents

18   in this litigation?

19    A.   I don't.

20    Q.   And you don't remember whether you have in your

21   personal possession receipts for those documents or for

22   those items?

23    A.   I definitely don't have in my possession the

24   receipts, if there are receipts somewhere, but --
```

Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Now, if we look at page 2, where it says

 2    "miscellaneous appliance and systems," were these items

 3    that were included in the original purchase of the home?

 4        A.    And we're on No. 6 there?

 5        Q.    Number 7.

 6        A.    Number 7.  Major appliances.  The refrigerator

 7    was with the home.  Yes.  Microwave.  Yes.  Yes.

 8        Q.    Did you have to replace any of these items?

 9        A.    We talked about the refrigerator.  We didn't --

10    it broke.  We didn't replace it.  The range was fine.

11    We had some dishwasher issues that I recall.  I don't

12    think -- I think we had it repaired, not replaced.

13    Microwave.  And the others, no.

14        Q.    So when the buyer purchased --

15        A.    Air conditioning.

16        Q.    I'm sorry.  Just to clarify one thing I think

17    that you said on it, you said you did replace the

18    refrigerator.  I think your answer, you said, "We didn't

19    replace the refrigerator."

20        A.    We didn't repair the refrigerator.  We bought

21    another one and stuck it in the garage.

22        Q.    I understood.  I just wanted to clarify that

23    for the record.

24              And are you asking for damages for any of these
```

```
 1    items that were purchased from the house and then sold

 2    to the buyer?

 3        A.   No.

 4             MR. BARRY:  This might be a good time just to

 5        take a break.

 6             MR. WEISS:  Sure.

 7             (Recess from 9:01 a.m. until 9:21 a.m.)

 8    BY MR. BARRY:

 9        Q.   Now, Mr. Deeg, have you ever filed a homeowners

10    insurance policy claim for any damages in the house?

11        A.   I don't believe so, but -- well, I don't know.

12        Q.   You don't know.  Do you remember if you had

13    homeowners insurance on the house?

14        A.   We did.

15        Q.   Did you ever discuss filing a homeowners

16    insurance claim for damage on the house?

17        A.   I don't know if we did.

18        Q.   You just don't remember one way or the other?

19        A.   Right.

20        Q.   Do you remember how many times you had the HVAC

21    unit serviced, air conditioning units?

22        A.   I couldn't give you the exact number.

23        Q.   Is it more than five times?

24        A.   It was probably about five times, would be my
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 283 of 3246
Case 1:11-cv-22408-MGC Document 94-3 Entered on FLSD Docket 11/10/13 Page 51 of
72
Confidential - Subject to Further Confidentiality Review

```
 1   guess.

 2       Q.   Now, I'm going to hand you a document, and I

 3   want you to keep Exhibit 7 in front of you too.  We're

 4   going to kind of go back and forth on this.

 5           (Deeg Exhibit No. 8 was marked for

 6   identification.)

 7   BY MR. BARRY:

 8       Q.   Do you recognize this document?

 9       A.   I do not.

10       Q.   I'll represent for the record this is a

11   Duraclean Restoration & Remediation report that is dated

12   March 9, 2010, and it is Bates labeled DEEG 70.

13           Have you ever seen this document before?

14       A.   I don't know if I have or not.  It does not

15   look familiar to me at this point, but it's been a long

16   time.

17       Q.   Looking through it, do you have any

18   understanding of what this document is?

19       A.   No, not this quickly, you know, I couldn't tell

20   you exactly what is on here, but...

21       Q.   I will defer these questions to Ms. Hooker, I

22   think probably will be better asked about.  And if she

23   doesn't have knowledge on it, then we might come back to

24   you, if that's okay with your counsel.
```

Confidential - Subject to Further Confidentiality Review

```
 1              MR. WEISS:  That's fine.

 2    BY MR. BARRY:

 3       Q.   But just for the time period I won't ask you

 4    about something that you've never seen before, although

 5    I will represent for the record that I enjoy the fact

 6    that I see some Georgia logos in here.

 7       A.   Oh, yeah.

 8       Q.   I went to Georgia.

 9       A.   Oh, yeah?

10       Q.   I'm a diehard Georgia fan.  I'm currently

11    mourning.

12       A.   Exactly.  I mean --

13       Q.   Are you a Georgia guy?

14       A.   Oh, yeah.

15       Q.   Good.  Glad to hear it.

16       A.   I don't know what went wrong there.

17              MR. WEISS:  Wish I would have known that

18       before.

19              MR. BARRY:  Might want to switch sides.  He's a

20       Florida guy, so...

21              THE WITNESS:  I graduated '89.

22    BY MR. BARRY:

23       Q.   I graduated 2010.

24       A.   We didn't overlap.
```

Confidential – Subject to Further Confidentiality Review
72

```
1       Q.   I just stayed there for a long time.  I was

2   there for 20 years.

3            MR. WEISS:  What fraternity were you?

4            MR. BARRY:  Sigma.

5            THE WITNESS:  Phi Tau.

6            MR. BARRY:  Yeah.  Ashton also went to Georgia.

7            THE WITNESS:  Oh, all right.

8            MR. BARRY:  We did not overlap either.

9   BY MR. BARRY:

10      Q.   So I'm not going to walk you through those

11  receipts, because I'll ask Ms. Hooker, but, again, I'll

12  reserve the right to bring it back up if we -- if

13  Ms. Hooker also does not have knowledge of it.

14           Has the presence of Chinese drywall limited

15  your use of the property, or did the presence of Chinese

16  drywall limit the use of your property?

17      A.   I would say yes in the sense that because of

18  the Chinese drywall I had few visitors, so I would say I

19  didn't use the house the way I would have, but -- so I

20  don't know if that's answering the question.

21           You know, full enjoyment of the home could not

22  be had because of the drywall and my choice not to

23  parade people through with holes and, you know, cut

24  through the walls and that sort of thing, but...
```

Confidential - Subject to Further Confidentiality Review

```
 1      Q.    So because of the Chinese drywall, you did not

 2   invite people to the house?

 3      A.    Yeah.

 4      Q.    Now, if you look back at Exhibit 5 -- and I

 5   applaud you for keeping your pile neater than mine --

 6   and you look at page 6, and it says:  "If you

 7   experienced any loss of use and/or loss of enjoyment of

 8   the property as a result of Chinese drywall, identify

 9   the total amount of such loss."

10           What dollar figure did you represent there?

11      A.    It's blank.

12      Q.    Are you claiming any damages for loss of use

13   and/or loss of enjoyment in this litigation?

14      A.    No.

15      Q.    So you're not seeking any damages?

16      A.    No.

17      Q.    What damages are you seeking in this

18   litigation?

19      A.    Well, I guess we're looking for --

20      Q.    What is your -- and I'll rephrase that, because

21   I know your lawyer probably helped out some there.

22           What is your understanding of the damages

23   you're requesting in this litigation?

24      A.    My understanding would be we're looking for --
```

Confidential - Subject to Further Confidentiality Review

```
 1    we paid X, we sold it for Y, which was less than X, and

 2    probably should have sold it for Z, so the difference

 3    between what we actually sold it for because of the

 4    lower value versus what we could have sold it for.

 5        Q.    And how did you come to the number that you

 6    could have sold it for?

 7        A.    The number we could have sold it -- I kind of

 8    want to say I don't know, but I think I know, but I

 9    don't want to tell you wrong.

10            We know what the home sold for once it was

11    fixed, and I believe we used the sale number, which was

12    530, versus what we sold it for, which was 330, although

13    the public records have an extra $5,300 on the sale

14    price that we're not sure why that's there, but the

15    difference between those two numbers.  What it sold for

16    once it was fixed versus what we sold it for.

17        Q.    And, now, you said on the public records it

18    shows an additional amount of money.  You have no idea

19    why that's there?

20        A.    No.

21        Q.    We noticed that too.

22        A.    No.  We're -- no.

23        Q.    Okay.  When -- did you ever -- during the time

24    before when -- between the time when you purchased the
```

Confidential - Subject to Further Confidentiality Review

```
1    house and when you sold the house, did you ever live

2    anywhere else?

3        A.   No.

4        Q.   So you never went to a hotel because of the

5    smell or anything, any other issues of Chinese drywall?

6        A.   No.

7        Q.   Are you seeking any damages for any of your

8    living expenses outside of the house?

9        A.   No.

10       Q.   Do you know if Ms. Hooker is seeking damages

11   for any of the expenses she incurred living somewhere

12   else?

13       A.   I don't believe that she is.

14       Q.   When -- you said earlier that there was a

15   mortgage on the house.  Do you remember what type?  What

16   type of mortgage was it?  Was it a 30-year mortgage?

17   Was it an ARM?  Was it a fixed rate?

18       A.   I think we started with a first and a second,

19   and then due to rate changes I think we did combine

20   those after the fact, but I believe it was a 30-year

21   mortgage.  I don't know for sure, but that's my -- you

22   know.

23       Q.   Understood.  Were you current on your payments

24   at the time you left the house?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 289 of 3246
Case 1:11-cv-22408-MGC Document 6015 Entered on FLSD Docket 11/05/19 Page 57 of 72
Confidential - Subject to Further Confidentiality Review

```
 1      A.   Yes.

 2      Q.   Do you still owe money on that mortgage?

 3      A.   No.

 4      Q.   Are you seeking any damages related to

 5   foreclosure or lost mortgage payments or anything of

 6   that sort?

 7      A.   No.

 8      Q.   Are you seeking any damages for diminution of

 9   credit or anything of that sort?

10      A.   You mean our credit scores were adverse -- no.

11      Q.   Now, we talked earlier about -- you said you

12   sold the house in 2016; is that correct?

13      A.   Yes.

14      Q.   And what was the amount you sold the house for?

15      A.   330.

16      Q.   And what amount do you believe you should have

17   been able to sell the house for?

18      A.   530.

19      Q.   And at -- and you said earlier that that number

20   came from the amount sold on the next sale; is that

21   correct?

22      A.   The guy that we sold it to sold it, I believe,

23   six months later for 530, so, yes, that's where that

24   number comes from.  Our actual house sold for 530
```

Confidential - Subject to Further Confidentiality Review
72

```
 1    shortly after we sold it for 330.

 2         Q.   Understood.  When you were trying to sell it,

 3    when you sold it for 330, I think it was, you said --

 4         A.   Yes.

 5         Q.   -- did -- did anyone tell you it should have

 6    been selling for more money if it weren't for Chinese

 7    drywall?

 8              MR. WEISS:  Object to the form.  You can

 9         answer.

10              THE WITNESS:  Pardon?

11              MR. WEISS:  You can answer.

12              THE WITNESS:  Oh.  Say it again.

13    BY MR. BARRY:

14         Q.   Did you have a real estate agent or anybody

15    else say that this house would sell for more money if

16    not for the presence of Chinese drywall?

17         A.   Well, I think that -- I mean, I don't remember

18    the -- yes, I mean, clearly the drywall -- yes.

19         Q.   So someone said that to you?

20         A.   Yes.

21         Q.   Who said that to you?

22         A.   We had different people come and look at the

23    house, so it was part of their looking at the house and

24    having conversations, you know, they wanted to pay
```

Confidential – Subject to Further Confidentiality Review
72

1    $200,000 because they knew they had to fix it, so...

2        Q.   Did you receive any other offers for the house

3    other than the $330,000 one?

4        A.   There were no written offers, but, again, a few

5    people that came through would say, "Well, I'd give

6    you," but nothing official.  So I think the only written

7    offer that I know of was the one from Jay Bashant that

8    we sold it to.

9        Q.   Had you tried to market the property before

10   then?

11       A.   Well, yeah, we had it on the market for six,

12   seven, eight months.  I don't recall the exact, but,

13   yeah.

14       Q.   And during that time period, did anyone tell

15   you that they wouldn't buy the house because of Chinese

16   drywall?

17       A.   I don't think so, no.

18       Q.   Do you remember if your neighbors also had

19   Chinese drywall in their house?

20       A.   Yes.

21       Q.   Were they able to sell their property?

22       A.   Yes.

23       Q.   Do you remember what -- do you remember your

24   neighbors saying that they had a similar --

Confidential - Subject to Further Confidentiality Review

 1            Do you remember whether any of your neighbors

 2    had a drop in value because of the Chinese drywall?

 3       A.   I don't know.  We didn't have the conversation,

 4    so I don't know.

 5       Q.   It's not that they didn't, you just don't know

 6    one way or the other?

 7       A.   Right.  That was never said to me by a

 8    neighbor.

 9       Q.   Did you ever try to lease your property?

10       A.   No.

11       Q.   Do you know what the current value of your home

12    is?

13       A.   No.

14       Q.   Now, if we look at -- on Exhibit 5, and look at

15    Section VI, you see where it says "prior payments"?

16       A.   Yes.

17       Q.   Now, recognizing that you said you don't

18    remember seeing this document, are there prior payments

19    listed related to Chinese drywall?

20       A.   Yes.

21       Q.   What are those payments?

22       A.   $15,166.55.

23       Q.   Is there another one too?

24       A.   And $1,873.65.

Confidential - Subject to Further Confidentiality Review

```
 1      Q.   I'm going to provide you with a document.  If

 2   your counsel accepts, we'll mark it as Exhibit 9.

 3           (Deeg Exhibit No. 9 was marked for

 4   identification.)

 5   BY MR. BARRY:

 6      Q.   I'll represent these are four checks dated

 7   11/24/15, 11/24/15, 2/20/18, and 2/20/18, and they're

 8   Bates labeled DEEG 222.  Do you recognize these checks?

 9      A.   I believe I got -- yeah, we got some checks,

10   so, yes.

11      Q.   Are these the amounts that you received in

12   Section VI of Exhibit 5?

13      A.   I believe so, yes.

14      Q.   I won't make you do math.

15      A.   Yes.

16      Q.   Although, you're the credit guy.  You'll

17   probably know more than the lawyers sitting at the

18   table.

19           Now, are you including these amounts as an

20   offset of your damages in this litigation?

21           MR. WEISS:  Object to the form.  You can

22      answer.  I'm sorry.

23           THE WITNESS:  Ask it again.

24           ///
```

Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. BARRY:

 2       Q.   And, actually, let me ask a preceding question

 3   before I get to that.  What is your understanding of

 4   what these payments were made for?

 5       A.   Honestly, I don't know.

 6       Q.   Do you have any understanding that they were

 7   made in relation to the Chinese drywall --

 8       A.   Yes.

 9       Q.   -- litigation?

10       A.   Yes.

11       Q.   Are you using -- to your understanding, are

12   these amounts set off from the total amount you're

13   requesting in this litigation?

14            MR. WEISS:  Object to the form.  You can

15       answer.

16            THE WITNESS:  I don't know.

17   BY MR. BARRY:

18       Q.   Have you received any other payments related to

19   Chinese drywall?

20       A.   No.

21       Q.   Now, if you look at page 3 of Exhibit 5, and if

22   we look at -- it's the section above Section III.

23   There's no section number on this one.

24       A.   Okay.
```

Confidential - Subject to Further Confidentiality Review

```
 1      Q.    And it says:  "If you have sold or transferred

 2  ownership of the property, did you expressly retain a

 3  personal right of action to allow you to pursue

 4  damages?"

 5            And you've answered no; is that correct?

 6      A.    That's what it says, yes.

 7      Q.    So when you sold the property, you did not ask

 8  the buyer to expressly assign you the claim in this

 9  litigation?

10      A.    I don't know.

11      Q.    And answering only for yourself.

12      A.    Yeah, I don't know if we did or not.

13      Q.    Do you know if the buyer acquired the right to

14  pursue the claim in this litigation from you?

15      A.    No, I believe they did not.

16      Q.    Okay.

17      A.    Maybe -- maybe I didn't answer the question

18  before that.

19      Q.    If you don't know one way or the other,

20  that's --

21      A.    My understanding would be this claim goes with

22  us and not with the people that purchased the property,

23  if that's answering the question.

24      Q.    And what is your basis for that understanding?
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.   That we were the ones damaged and he made a

 2   profit after the fact, so...

 3        Q.   Understood.

 4        A.   And before the fact, really, but...

 5             MR. BARRY:  I don't think I'll have any more

 6        questions, but if I can just confer with everybody.

 7             MR. WEISS:  Sure.  Do you want a minute?

 8             MR. BARRY:  Yeah.

 9             (Recess from 9:38 a.m. until 9:47 a.m.)

10             MR. BARRY:  Mr. Deeg, I have no more questions

11        for you unless your counsel asks questions that I

12        need to follow up on, but I will defer to my

13        co-defense counsel here.

14                        CROSS-EXAMINATION

15   BY MR. ROTHENBERG:

16        Q.   Hi.  Good morning.  Alex Rothenberg on behalf

17   of BNBM.  I just have a few short questions.

18             I want to go back to the home sale.  Do you

19   recall what you initially listed the home for?

20        A.   I don't.

21        Q.   Do you know if it was listed at higher for the

22   eventual sale or listed at an amount higher than the

23   eventual sale price?

24        A.   I believe it was.
```

Confidential - Subject to Further Confidentiality Review

```
 1      Q.    Do you know a ballpark?

 2      A.    Honestly, I don't remember what we had

 3   initially put it up for.

 4      Q.    Okay.  Do you know if it was substantially

 5   higher than the 330 or in that area?

 6      A.    I don't know.

 7      Q.    And then you might have touched upon this, but

 8   you mentioned that the person you sold the home to

 9   subsequently sold the house for about $530,000; correct?

10      A.    Yes.

11      Q.    And do you know if they remediated the home,

12   and by that I mean removed --

13      A.    Yes.

14      Q.    And how do you know that?

15      A.    We walked through the home when it was pretty

16   much gutted down to the studs.

17      Q.    Okay.  Did you have any discussions with the

18   buyer discussing the scope of the remediation he did?

19      A.    No.  We were walking through the house and just

20   sort of, "Oh, look at that," but nothing specific.

21            MR. ROTHENBERG:  I have no further questions.

22   Thank you.

23            MR. WEISS:  I'm going to ask one question.

24            MR. BARRY:  Absolutely.
```

Confidential - Subject to Further Confidentiality Review
72

```
 1            MR. WEISS:  I almost never do this with my own

 2       client, but I'll ask.

 3                          CROSS-EXAMINATION

 4  BY MR. WEISS:

 5       Q.   Did you know who the buyer of the home was

 6  prior to the purchase?

 7       A.   Did I know who the buyer of the home was?  Yes.

 8       Q.   Who was the buyer?

 9       A.   Jay Bashant.

10       Q.   Who is Jay Bashant?

11       A.   He was a neighbor.

12       Q.   Other than a neighbor, how did you know him

13  prior to the purchase?

14       A.   He was the son of the -- of one of the guys

15  that sold us the home initially.

16            MR. WEISS:  Okay.  Thank you.  No more.

17            MR. BARRY:  No further questions.

18            (Whereupon, the deposition concluded at

19  9:49 a.m.)

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                   C E R T I F I C A T E

 2

 3              I, JOAN L. PITT, Registered Merit Reporter,

 4      Certified Realtime Reporter, and Florida Professional

 5      Reporter, do hereby certify that, pursuant to notice,

 6      the deposition of DAVID DEEG was duly taken on

 7      January 3, 2019, at 8:12 a.m. before me.

 8              The said DAVID DEEG was duly sworn by me

 9      according to law to tell the truth, the whole truth, and

10      nothing but the truth, and thereupon did testify as set

11      forth in the above transcript of testimony.  The

12      testimony was taken down by me stenographically.  I do

13      further certify that the above deposition is full,

14      complete, and a true record of all the testimony given

15      by the said witness.

16

17      _____

18              JOAN L. PITT, RMR, CRR, FPR

19

20              (The foregoing certification of this transcript

21      does not apply to any reproduction of the same by any

22      means, unless under the direct control and/or

23      supervision of the certifying reporter.)

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4           Please read your deposition over carefully and

 5   make any necessary corrections.  You should state the

 6   reason in the appropriate space on the errata sheet for

 7   any corrections that are made.

 8

 9           After doing so, please sign the errata sheet

10   and date it.  It will be attached to your deposition.

11

12           It is imperative that you return the original

13   errata sheet to the deposing attorney within thirty (30)

14   days of receipt of the deposition transcript by you.  If

15   you fail to do so, the deposition transcript may be

16   deemed to be accurate and may be used in court.

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                      - - - - - -

 2                      E R R A T A

 3                      - - - - - -

 4    PAGE   LINE   CHANGE

 5    _____  _____   _____

 6       REASON:  _____

 7    _____  _____   _____

 8       REASON:  _____

 9    _____  _____   _____

10       REASON:  _____

11    _____  _____   _____

12       REASON:  _____

13    _____  _____   _____

14       REASON:  _____

15    _____  _____   _____

16       REASON:  _____

17    _____  _____   _____

18       REASON:  _____

19    _____  _____   _____

20       REASON:  _____

21    _____  _____   _____

22       REASON:  _____

23    _____  _____   _____

24       REASON:  _____
```

```
 1                   ACKNOWLEDGMENT OF DEPONENT

 2

 3          I, _____, do hereby

 4     acknowledge that I have read the foregoing pages,

 5     1 - 71, and that the same is a correct transcription of

 6     the answers given by me to the questions therein

 7     propounded, except for the corrections or changes in

 8     form or substance, if any, noted in the attached Errata

 9     Sheet.

10

11

12     _____        _____

13     DAVID DEEG                                         DATE

14

15

16

17

18     Subscribed and sworn to before me this

19     _____ day of _____, 20____.

20     My Commission expires: _____

21

22     _____

       Notary Public

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                          LAWYER'S NOTES

 2     PAGE    LINE

 3     _____   _____    _____

 4     _____   _____    _____

 5     _____   _____    _____

 6     _____   _____    _____

 7     _____   _____    _____

 8     _____   _____    _____

 9     _____   _____    _____

10     _____   _____    _____

11     _____   _____    _____

12     _____   _____    _____

13     _____   _____    _____

14     _____   _____    _____

15     _____   _____    _____

16     _____   _____    _____

17     _____   _____    _____

18     _____   _____    _____

19     _____   _____    _____

20     _____   _____    _____

21     _____   _____    _____

22     _____   _____    _____

23     _____   _____    _____

24     _____   _____    _____
```

Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

# EXHIBIT A4

Case 2:09-md-02047-EEF-MBN Document 22368-39 Filed 11/19/19 Page 306 of 3246
Case 1:11-cv-22408-MGC Document 99-4 Entered on FLSD Docket 08/13/2019 Page 2 of 66
Confidential - Subject to Further Confidentiality Review

```
  1                    UNITED STATES DISTRICT COURT
                       SOUTHERN DISTRICT OF FLORIDA
  2

      EDUARDO AND CARMEN AMORIN,
  3   et al., individually, and
      on behalf of all others
  4   similarly situated,        Case No. 1:11-CV-22408-MGC
  5      Plaintiffs,
  6   vs.
  7   TAISHAN GYPSUM CO., LTD.,
      F/K/A SHANDONG TAIHE
  8   DONGXIN CO., LTD.; TAIAN
      TAISHAN PLASTERBOARD CO.,
  9   LTD, et al.,
 10      Defendants.
 11           CONFIDENTIAL - SUBJECT TO FURTHER
                   CONFIDENTIALITY REVIEW
 12
                           - - -
 13
                       JANUARY 3, 2019
 14
                           - - -
 15
          Deposition of DEBORAH HOOKER, held at
 16   Mrachek Fitzgerald Rose Konopka Thomas & Weiss, PA,
      505 South Flagler Drive, Suite 600, West Palm Beach,
 17   Florida 33401 commencing at 9:50 a.m., on the above
      date, before Joan L. Pitt, Registered Merit
 18   Reporter, Certified Realtime Reporter, and Florida
      Professional Reporter.
 19
                           - - -
 20
                  GOLKOW LITIGATION SERVICES
 21        877.370.3377 ph | 917.591.5672 fax
                     deps@golkow.com
 22
 23
 24
```

```
 1                    APPEARANCES

 2

 3    Counsel for Plaintiffs:

 4        GREGORY S. WEISS, ESQUIRE
          Mrachek Fitzgerald Rose Konopka Thomas & Weiss, PA
 5        505 South Flagler Drive, Suite 600
          West Palm Beach, Florida 33401
 6        561.355.6993
          gweiss@mrachek-law.com
 7

 8        KEITH J. VERRIER, ESQUIRE
          Levin, Sedran & Berman LLP
 9        510 Walnut Street, Suite 500
          Philadelphia, Pennsylvania 19106
10        215.592.1500
          kverrier@lfsblaw.com
11

12
      Counsel for Defendants Taishan Gypsum Co., Ltd., and
13    Taian Taishan Plasterboard Co., Ltd.:
14        MICHAEL J. BARRY, ESQUIRE
          ASHTON G. CARPENTER, ESQUIRE
15        SARAH O'DONOHUE, ESQUIRE
          Alston & Bird LLP
16        One Atlantic Center
          1201 West Peachtree Street
17        Atlanta, Georgia 30309-3424
          404.881.7000
18        mike.barry@alston.com
          ashton.carpenter@alston.com
19        sarah.odonohue@alston.com
20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22368-39 Filed 11/19/19 Page 308 of 3246
Case 1:11-cv-22408-MGC Document 294 Entered on FLSD Docket 08/13/2014 Page 4 of 66
Confidential - Subject to Further Confidentiality Review

```
 1                      APPEARANCES CONTINUED

 2

 3    Counsel for Beijing New Building Materials PLC:

 4         DIANA SZEGO FASSBENDER, ESQUIRE

           Orrick, Herrington & Sutcliffe LLP

 5         Columbia Center

           1152 15th Street, Northwest

 6         Washington, DC 20005-1706

           202.339.8533

 7         dszego@orrick.com

 8         ALEX B. ROTHENBERG, ESQUIRE

           Gordon Arata Montgomery Barnett

 9         201 St. Charles Avenue, 40th Floor

           New Orleans, Louisiana 70170-4000

10         504.582.1111

           arothenberg@gamb.law

11

12    Also present:  David Deeg

13

14

15

16

17

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 23368-39 Filed 11/12/18 Page 309 of 3246
Case 1:11-cv-22408-MGC Document 290 Entered on FLSD Docket 08/13/2015 Page 4 of 66
Confidential - Subject to Further Confidentiality Review

```
 1                         - - -

 2                    I N D E X

 3                         - - -

 4   Testimony of:  DEBORAH HOOKER

 5    DIRECT EXAMINATION BY MR. BARRY              5

 6    CROSS-EXAMINATION BY MS. FASSBENDER         56

 7    CROSS-EXAMINATION BY MR. WEISS              56

 8    REDIRECT EXAMINATION BY MR. BARRY           59

 9

10

11                E X H I B I T   I N D E X

12   HOOKER          DESCRIPTION               PAGE

13   No. 10     Letter titled History of Property    25

14   No. 11     Claimant, Deborah Hooker's Unverified  19

                Answers to Defendants'

15              Interrogatories

16   No. 12     Page from Martin County Property      52

                Appraiser Website pertaining to 516

17              SW Akron Avenue, Stuart, Florida

18   No. 13     Page from Martin County Property      52

                Appraiser Website pertaining to 516

19              SW Akron Avenue, Stuart, Florida

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                    - - -

 2          DEBORAH HOOKER, called as a witness by the

 3   Defendant Taishan Gypsum Co., Ltd., having been first

 4   duly sworn, testified as follows:

 5                    DIRECT EXAMINATION

 6   BY MR. BARRY:

 7      Q.   Good morning, Ms. Hooker.  My name is Michael

 8   Barry.  I know we've met before.  I am -- I represent

 9   Taishan alongside my client -- or my colleagues, Ashton

10   Carpenter and Sarah O'Donahue.

11          Do you mind stating your name for the record?

12      A.   Deborah, D-e-b-o-r-a-h, middle initial M, last

13   name Hooker, H-o-o-k-e-r.

14          MR. BARRY:  And if everyone around the table

15      could just introduce themselves for the record,

16      please?

17          MS. FASSBENDER:  Sure.  I'm Diana Fassbender,

18      with Orrick, for BNBM.

19          MR. ROTHENBERG:  Alex Rothenberg for BNBM.

20          MR. VERRIER:  Keith Verrier, from Levin, Sedran

21      & Berman, in Philadelphia, on behalf of the

22      plaintiffs.

23          MR. WEISS:  Greg Weiss on behalf of the

24      plaintiffs.
```

```
1              MR. BARRY:  And representing, for the record,

2        that Mr. Deeg is also in the room.

3              Just a bit of housekeeping that I'm going to

4        mention on the record.  This is immediately

5        following Mr. Deeg's deposition and we've introduced

6        certain exhibits in Mr. Deeg's deposition.  For ease

7        of the court reporter and all of our use, we're

8        going to refer to those exhibits by the number that

9        they were introduced in Mr. Deeg's deposition.  I'm

10       not going to introduce all of those exhibits, so

11       there's going to be certain gaps in exhibits for

12       purposes of Ms. Hooker's deposition, and we'll try

13       to note those gaps at the end of the deposition.

14   BY MR. BARRY:

15       Q.   Now, Ms. Hooker, what is your profession?

16       A.   I am an attorney, but right now I'm a full-time

17   caregiver.

18       Q.   And how long have you been an attorney?

19       A.   Over 27 years.  I was admitted to the bar in

20   1991.

21       Q.   And what type of law did you practice, or do

22   you practice?

23       A.   When asked, I say I'm a probate lawyer.

24       Q.   Do you have experience with litigation?
```

Case 2:09-md-02047-EEF-MBN Document 22368-39 Filed 11/19/19 Page 312 of 3246
Case 1:11-cv-22408-FAM Document 294 Entered on FLSD Docket 08/13/2014 Page 2 of 66

Confidential - Subject to Further Confidentiality Review

```
1    A.    No.  Well, no, I'm not a trial lawyer.  I'll

     stop there.

2    Q.    You say that proudly, and I understand that.
3

4          Have you ever taken a deposition before?

5    A.    Yes.

6    Q.    Have you ever defended a deposition before?

7    A.    Yes.

8    Q.    And have you ever sat for a deposition before?

9    A.    No.

10   Q.    Well, I'm sorry to be on the other side for you

11   there.

12         So I'm going to quickly walk you through the

13   rules of the road.  I know you know all this.  I'm going

14   to ask you a question.  If you don't mind waiting for me

15   to complete the question even if you can anticipate what

16   the answer is going to be.  And then once you hear the

17   question, please answer it.  Of course, your counsel may

18   object and if he's instructing you not to answer we can

19   certainly discuss that.  And I will try not to speak

20   over you.  The court reporter will remind me if I don't.

21   But, please, if I'm speaking over you, I will -- please

22   tell me to stop.  If there's any question you don't

23   understand don't hesitate to let me know.  If you need a

24   break also do not hesitate to let me know.  All I ask is
```

Confidential - Subject to Further Confidentiality Review

```
 1   that you complete the question that's on the table.  And

 2   you know, if you have any -- if you're giving an answer

 3   make sure you're giving the answer audibly.  I'm kind of

 4   laughing saying that to you because I know you know all

 5   this, but I have to say it nonetheless.

 6          Now, I'm also going to laugh when I ask you

 7   these questions too.  Do you understand that you've been

 8   sworn and must tell the truth as if testifying in court

 9   and the judge were sitting right here?

10   A.   Yes.

11   Q.   Are you taking any medications that will impair

12   your ability to understand my questions and to answer

13   truthfully?

14   A.   No.

15   Q.   Now, today were you able to sit through and

16   listen to your -- Mr. Deeg's deposition?

17   A.   And for the record not husband, but.

18   Q.   I slipped there.  I was about to clarify that

19   on the record too.

20   A.   Significant other for over 15 years, but, yes,

21   I listened to his entire testimony.

22   Q.   Was there anything in his deposition, and I

23   hope he's not offended by this, that you believe was

24   inaccurate or incomplete?
```

```
1      A.    The first one that I recall was his very first

2    question about when we purchased the home.  It was

3    October not November.

4      Q.    Okay.

5      A.    It took us a month to move in.  So everybody

6    remembers it as November.

7      Q.    Okay.

8      A.    But it was actually purchased in October.  Of

9    2007.

10     Q.    When you said that was the first one, were

11   there any other answers that he provided that you

12   believe were inaccurate or incomplete?

13     A.    A couple of his estimates.  One of them was how

14   many times the HVAC systems had been serviced or

15   repaired.  He estimated five.  I would have estimated

16   double that.  And maybe -- but, no, nothing else is

17   coming to mind.  Those were pretty much it.

18     Q.    How did you prepare for this deposition?

19     A.    I had a conference call with my attorney, Greg

20   Weiss, and Keith Verrier, who is present, and I spoke

21   with David.  I pulled up as many of the records that I

22   could find that were prepared for this litigation, which

23   are pretty much the same things that you've provided

24   right now.  So thank you.
```

Confidential - Subject to Further Confidentiality Review

```
 1      Q.    Glad to hear it.  Did you speak with anyone

 2   else about this deposition?

 3      A.    No, sir.

 4      Q.    Now, you said you're a full-time caretaker now?

 5      A.    (Nodding head.)

 6      Q.    How long have you been a caretaker?

 7      A.    2011.  Since 2011.

 8      Q.    Okay.  And do you have any children?

 9      A.    No.

10      Q.    So Mr. Deeg's child is not your stepchild?

11      A.    No, I love Zach, but Zach is not my child.

12      Q.    I don't know how you define it.  Have you ever

13   been involved in a lawsuit before this one?

14      A.    No.

15      Q.    So you've never been a plaintiff or a defendant

16   beforehand, before this?

17      A.    Not to my recollection, no.

18      Q.    Who are you a full-time caretaker for?

19      A.    My mother.

20      Q.    Okay.  And do you live at the same property or

21   same address as your mother?

22      A.    Yes, I do.

23      Q.    Does Mr. Deeg also live at that property?

24      A.    No, he does not.
```

Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Where do you currently live?

 2        A.    With my mother.

 3        Q.    What's that address?

 4        A.    1902 Southwest Third Avenue, Okeechobee,

 5   Florida 34974.

 6        Q.    And do you currently own that property?

 7        A.    No, the property is titled in my mother's name.

 8        Q.    Okay.  Now what is the address of the property

 9   that you allege has been damaged by Chinese drywall?

10        A.    516 Southwest Akron Avenue, Stuart, Florida

11   34994.

12        Q.    And, you know, I know I've asked your husband a

13   lot of these questions, so I'm going to try to skip

14   through as many of those that are not really much in

15   dispute.

16              When did you purchase the property?

17        A.    October 10, 2007, was the date of closing on

18   the purchase.

19        Q.    And how much did you pay for that property?

20        A.    $400,500.

21        Q.    And were you living full-time at that property?

22        A.    My understanding is that because my employment

23   was both in Martin County and Okeechobee County, I never

24   lived full-time at this property, the Chinese drywall
```

1    property at 516 Southwest Akron Avenue.  I was there

2    often, I was there a lot, but never only there.

3        Q.    And when you say "a lot," how frequently were

4    you there?

5        A.    David's estimates were good.  Two to three

6    nights, on average, a week in Stuart and the balance, on

7    average, in Okeechobee.

8        Q.    And when Mr. Deeg and you purchased the house,

9    was that something that you purchased jointly?

10       A.    Yes.

11       Q.    Okay.  And when you were living in the house,

12   was it only you and Mr. Deeg living in the home?

13       A.    Yes.

14       Q.    And are you aware of anyone else making any

15   claims on the home?

16       A.    No.

17       Q.    Now, when Mr. Deeg spoke earlier about the

18   square footage, which he said was 2,549, and I'm happy

19   to correct that if it's inaccurate for the record and if

20   you want to you can refer to --

21       A.    It's Exhibit 3.

22       Q.    Thank you.  Mine's a mess.

23       A.    2,549 under air square footage.

24       Q.    Do you have any reason to believe that number

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 318 of 3246
Case 1:11-cv-22408-MGC Document 104 Entered on FLSD Docket 11/18/2019 Page 14 of 66

Confidential - Subject to Further Confidentiality Review

1    is incorrect?

2         A.    No, I believe that number is correct.

3         Q.    And why do you believe that number is correct?

4         A.    I believe that number is correct because I

5    submitted all of the information related to how to

6    calculate under air square footage to national property

7    inspections and they gave -- and we got a written report

8    back confirming the number 2,549 square feet under air.

9         Q.    Now, let's talk a little bit about when you

10   learned of Chinese drywall.  When did you learn that

11   there was Chinese drywall in your home?

12        A.    The first time that I learned that it was

13   Chinese drywall, confirmed Chinese drywall and now I

14   really didn't have any doubts that it wasn't anything

15   else but Chinese drywall, was June 22, 2009.

16        Q.    And if you refer to Exhibit 5, and if you look

17   at page 2 -- and I assume your counsel's okay if I

18   introduce any exhibit that's --

19             MR. WEISS:  Of course.

20   BY MR. BARRY:

21        Q.    In looking at Exhibit 5, have you seen this

22   document before?

23        A.    Yes.

24        Q.    Does it have your signature on it?

Confidential - Subject to Further Confidentiality Review

```
 1        A.   Yes.

 2        Q.   In looking at Section II, where it says the

 3   month and year, which is -- it says 6/2009, it says:

 4   "If you were aware at the time you acquired the property

 5   that the property contained Chinese drywall, when did

 6   you first become aware that the property contained

 7   Chinese drywall?"

 8             Is that your understanding of when it was?

 9        A.   Yes.

10        Q.   Did you have --

11        A.   Well, that says June 2009.  The actual date of

12   the inspection was June 22, 2009.

13        Q.   Understood.

14        A.   Which, of course, you don't get the results

15   right away.  It was actually July of 2009 when I

16   learned, okay, it is Chinese drywall.

17        Q.   For sure.  Understood.  So it was around June

18   or July of 2009?

19        A.   Correct.

20        Q.   Did you have suspicion that Chinese drywall was

21   in the house before then?

22        A.   Yes.

23        Q.   How early did you start -- did that suspicion

24   begin?
```

1    A.   Well, that's a compound question.  I knew there

2    was a problem, but I did not know what was causing the

3    problem or have some kind of confirmation from an

4    outside person until June 22, 2009, or July, when they

5    told us the results.

6    Q.   When did you start suspecting that there was a

7    problem with the house?

8    A.   When I walked into the house and the builder

9    said, "Your air conditioner is not working."  This is

10   after the closing, the first time I walk into the house

11   and he's there, and he tells me, "Deborah, your air

12   conditioning is not working.  We've sent the coils off

13   for inspection."

14        The inspection report comes back in December of

15   2008.  So we've purchased in October, we moved in in

16   November, the coils have gone off, they come back

17   showing corrosion from sulfur, but they don't know why.

18   So I knew then, yes, there was a problem with the house,

19   just didn't know what.

20   Q.   Did the builder offer to do anything during

21   that time period?  Did they offer to fix the house?

22   A.   He absolutely took those coils off for

23   inspection and had those coils replaced.

24   Q.   Did the builder offer to do anything else?

Confidential - Subject to further Confidentiality Review

```
 1      A.   No.

 2      Q.   Did you ask the builder to do anything else?

 3      A.   Yes.

 4      Q.   And what was -- what did you ask the builder to

 5   do?

 6      A.   To correct the problem.

 7      Q.   And what did the builder say to you?

 8      A.   He didn't know what the problem was.  None of

 9   us knew what the problem was.  That didn't happen until

10   June of 2009.

11      Q.   And when you say "none of us," do you mean you

12   and Mr. Deeg and the builder, or do you mean others?

13      A.   Everybody, correct.  Everybody that I spoke to

14   regarding this matter.

15      Q.   Were there other neighbors that were having

16   similar issues?

17      A.   That I do not know.

18      Q.   Okay.  You didn't speak to any neighbors who

19   you knew that also had Chinese drywall in their house or

20   were having similar issues with the air conditioning?

21      A.   At what point in time?  At some point in time

22   I'm pretty sure I talked to everybody, but at the

23   beginning, no.

24      Q.   Between 2007 and 2009.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 322 of 3246
Case 1:11-cv-22408-MGC Document 94 Entered on FLSD Docket 11/29/11 Page 18 of 66
Confidential - Subject to Further Confidentiality Review

```
1              MR. WEISS:  Let him finish his question and

2        give an answer.

3              THE WITNESS:  I apologize.

4    BY MR. BARRY:

5        Q.   Do you mean in 2007?

6        A.   I did not talk to anyone in 2007.

7        Q.   What about 2008?  Any neighbors, that is?

8        A.   Neighbors, no.

9        Q.   How did you first learn about the existence of

10   Chinese drywall, not in your house, but just generally,

11   how did you first learn about Chinese drywall?

12       A.   Combination.  Mostly online research and later,

13   definitely, I want to say it was the air conditioning

14   guy suggested it, but I don't know, because I don't

15   remember the first person to use the word Chinese

16   drywall to me.

17       Q.   Okay.

18       A.   And then I started using that word, but nobody

19   knew what I was talking about for a long time.

20       Q.   What did you do when you first learned that

21   there was Chinese drywall in the house?

22       A.   I wrote letters to everyone.

23       Q.   Who did you write letters to?

24       A.   The builder, the supplier of drywall, the
```

Confidential - Subject to Further Confidentiality Review

```
 1    installer of the drywall, the warranty company, the

 2    homeowners insurance company.  I think that might be

 3    everyone I wrote letters to.

 4         Q.   Let's take that in reverse order.  Who was

 5    your -- so did you have homeowners insurance on the

 6    property?

 7         A.   Yes.

 8         Q.   Who was your insurer?

 9         A.   Edison Insurance Company.

10         Q.   And did you make a claim on that homeowners

11    insurance policy?

12         A.   Yes.

13         Q.   And what happened to that claim?

14         A.   The claim was denied.

15         Q.   Do you know why it was denied?

16         A.   Because Chinese drywall was not covered.

17         Q.   Did you make any challenge to that denial of

18    the claim?

19         A.   No.  If you're saying did I appeal it, no, I

20    didn't pursue it further after the denial.

21         Q.   Now, you also said you made -- you wrote

22    letters to the warranty company.  Is that the warranty

23    from the builder when you purchased the house?

24         A.   Correct.
```

Confidential - Subject to Further Confidentiality Review

```
 1      Q.   What happened when you wrote the letters to the

 2   warranty company?

 3      A.   They denied coverage under the warranty.

 4      Q.   Do you remember what the basis was for their

 5   denial?

 6      A.   Chinese drywall was not covered.

 7      Q.   Did you make any challenge to that warranty

 8   claim?

 9      A.   No, there was no appeal.  There was no lawsuit

10   filed.

11      Q.   And you didn't file a lawsuit against the

12   homeowners insurance company either?

13      A.   No.

14      Q.   Why didn't you file lawsuits against the -- or

15   a lawsuit against the homeowners insurance company?

16      A.   I really, really, really did not want to be a

17   part of any type of litigation.  My work at that time

18   was as a general magistrate for the court system, and I

19   just really wanted no part of anything like that.  I was

20   working as hard as I could to prevent having to be

21   involved in litigation.  I wanted to resolve the entire

22   matter by myself if I could, and I could not.

23      Q.   Understood.  Now, how soon after -- and

24   actually, take a step back.  Do you have copies of those
```

Confidential - Subject to Further Confidentiality Review

```
 1   letters that you wrote?

 2        A.   They're all attached in this.

 3        Q.   They're all attached here?

 4        A.   Yeah.

 5        Q.   And what document are you referring to?

 6        A.   I am referring to Exhibit 4, the plaintiff's

 7   profile form.

 8        Q.   And if you could point me to those letters --

 9        A.   Sure.

10        Q.   -- if you see them.

11        A.   Sure.  The first one is -- it says

12   Deeg-Hooker00052 at the bottom.  That's the letter to

13   the builder and the general contractor.  Then at the

14   bottom of Exhibit 4, Deeg-Hooker, all those zeros, 53,

15   letter to Adam Cook at Adorno & Yoss, who was

16   representing Banner Supply Company and who was actually

17   present when they did the inspection.  And everybody

18   present was the builder, the seller, the drywall

19   subcontractor, and the drywall supplier's

20   representative, on June 22, 2009.  And then on

21   Deeg-Hooker, all those zeros, 54, a letter to the

22   drywall installer David Hatcher.

23        Q.   I represent these look like letters from a

24   lawyer.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/12/19 Page 326 of 3246
Case 2:11-cv-01449-MGC Document 204-1 Entered on FLSD Docket 11/26/13 Page 42 of 66
Confidential - Subject to Further Confidentiality Review

```
 1       A.   Oh, I concede that.

 2       Q.   They're intimidating.

 3       A.   I concede that.  Thank you.

 4       Q.   Let's talk a little bit about the damage to the

 5  house.  Now, you said you believe that someone came out

 6  to service the HVAC system about nine times.  What did

 7  they do when they came out to service the HVAC system?

 8       A.   My recollection is they came to the house, they

 9  would check the system and every time it came back that

10  the coils were -- had corrosion, the copper coils had

11  corrosion, therefore they couldn't hold the coolant or

12  whatever the correct word is for that, I'm not an HVAC

13  person, and so, the coils had to be replaced or gas

14  added if the corrosion wasn't that far along at that

15  point.

16       Q.   And who paid for those repairs?

17       A.   At the time of the purchase I also purchased a

18  client's warranty, so that paid.  We had a deductible,

19  so that actually was how we did it for probably close to

20  the -- until 2011.

21       Q.   Okay.  And --

22       A.   So that first year, the builder, from after the

23  purchase to 2011, through the warranty company, and then

24  that warranty company then excluded it from the policy.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 327 of 3246
Case 1:14-cv-04048-MGL-TER Document 204-1 Filed 01/09/15 Page 73 of 66
Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Understood.

 2        A.    And so after that, if there were going to be

 3   any repairs, then it would have been us, but we did not

 4   repair it after that.

 5        Q.    Okay.  Did the air conditioning work during

 6   that time period?

 7        A.    After what time period?

 8        Q.    After 2011 when they no longer would pay for

 9   the repairs?

10        A.    No, I did not.  I'll let you finish.

11        Q.    I'll reask the question.  After the warranty

12   company no longer would pay for the repairs in 2011, did

13   the air conditioning ever stop working?

14        A.    It stopped working and it never worked again.

15        Q.    So did you not have air conditioning in the

16   house?

17        A.    That is correct.

18        Q.    Now, you said you did pay some out of the

19   deductible for the warranty.  Are you asking for

20   compensation in this litigation for the amounts paid to

21   repair the air conditioning units?

22        A.    No.

23        Q.    Did you have problems with any other

24   appliances?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 328 of 3246
Case 1:11-cv-22408-MGC Document 4 Entered on FLSD Docket 11/21/11 Page 94 of 66

Confidential - Subject to Further Confidentiality Review

```
 1     A.   Yes.

 2     Q.   Which appliances did you have issues with?

 3     A.   The refrigerator, TV, dishwasher, various other

 4   items in the house, but the one that was the worst was

 5   the refrigerator.  It has copper coils and that's how it

 6   works much like an air conditioning system and once

 7   that -- my understanding is once that system was

 8   compromised it could not be repaired.

 9     Q.   And so what did you do when the refrigerator

10   failed?

11     A.   I bought a new one.

12     Q.   Was there an odor in your home?

13     A.   Yes.

14     Q.   What did that odor smell like?

15     A.   It was foul, kind of like rotten eggs.

16     Q.   And was there any part of the house where you

17   noticed it the most?

18     A.   Noticed it the most, probably in the second

19   floor bathroom, but the smell was throughout the home.

20     Q.   Now, if we look back at Exhibit 4 here and page

21   2 of that exhibit, why -- how did you come to know that

22   there was drywall in your house or Chinese drywall in

23   your house?

24     A.   It was built with drywall and the Chinese
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 329 of 3246
Case 1:11-cv-22408-MGC Document 4 Entered on FLSD Docket 11/03/11 Page 95 of
66
Confidential - Subject to Further Confidentiality Review

1    drywall was confirmed as part of that inspection by

2    Banner Supply Company, on June 22, 2009, and they cut

3    out these huge pieces of drywall and it had the markings

4    that later match up to this litigation's markings for

5    Taishan.

6         Q.   And is that -- and is that how you came to

7    understand that there's Taishan drywall in your home?

8         A.   That is exactly how I came to understand that

9    we had Taishan Chinese drywall, corrupted Chinese

10   drywall, throughout the entire home and we didn't have

11   any other type of drywall.

12        Q.   Did you see the drywall boards in the house?

13        A.   Yes.

14        Q.   Did you -- do you know if when they did the

15   inspection whether they took any samples of those

16   drywall boards?

17        A.   Yes, they did.

18        Q.   Do you know where those samples are?

19        A.   I asked Adam from Adorno & Yoss, and his

20   response was they were in storage.

21        Q.   Were they put back into the wall, the samples?

22        A.   The Chinese -- excuse me -- the drywall

23   installer, David Hatcher, at D & A Construction

24   Services, he was the one that actually did the cutting

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 330 of 3246
Case 1:11-cv-22408-MGC Document 294-1 Entered on FLSD Docket 11/20/19 Page 90 of
66
Confidential - Subject to Further Confidentiality Review

```
1    so he had his guy repair it right then so we wouldn't

2    have to live with holes in the walls, but later, thanks

3    to further inspections, that wasn't the case, but this

4    one done by Mr. Hatcher repaired our walls.

5         Q.    Understood.  And have you -- I know you said

6    you believe that the samples were put in storage.  Have

7    you received any further information on it?

8         A.    No.  I was satisfied with Adam's answer.

9         Q.    Now, did any visitors to your house notice the

10   odor?

11        A.    Yes.

12        Q.    What did they say?

13        A.    That it smelled foul, like rotten eggs.

14        Q.    Now, did you suffer any kind of physical

15   effects from the drywall?

16        A.    No.

17        Q.    So did you suffer anything like nosebleeds or

18   anything?

19        A.    No.

20        Q.    Okay.  I'm going to hand you what we're going

21   to introduce as, I think, it's Exhibit 10.  Again,

22   acknowledging the gaps that exist here.

23             (Hooker Exhibit No. 10 was marked for

24   identification.)
```

Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. BARRY:

 2        Q.   Ms. Hooker, do you recognize this document?

 3        A.   No.

 4        Q.   I'll represent for the record that this is

 5   labeled History of Property, and it's a letter from

 6   Leopold Kuvin, lawyers, and the clients are listed as

 7   David Deeg and Deborah Hooker, and it says represented

 8   by Gregory S. Weiss.  I don't see a date on this letter,

 9   unless I'm missing it.

10            If you have a chance to review this letter, I

11   know you said you've never seen it before, do you --

12   would this be something that you submitted in relation

13   to this litigation?

14        A.   Yes.

15            MR. WEISS:  Can we get an objection?  Object to

16       the form.  You can answer.

17            THE WITNESS:  Yes.

18   BY MR. BARRY:

19        Q.   Do you generally review most things that are

20   submitted on your behalf in this litigation?

21        A.   Yes.

22        Q.   Would you think that this is any exception?

23        A.   Any exception to what?

24        Q.   To that rule that you tend to review most
```

Confidential -- Subject to Further Confidentiality Review

```
 1    things that are submitted on your behalf in this

 2    litigation.

 3         A.   No.

 4         Q.   If you read the answer to 1c, we can start on

 5    the second paragraph, which says -- this says:  "The

 6    co-owner, Deborah Hooker, resides in Okeechobee County

 7    but works and travels in both Okeechobee" -- and we can

 8    skip a little further ahead.  "The physical symptoms she

 9    experiences while in the home include irritated, itchy

10    eyes and skin, skin rashes, acne, chest pain and

11    tightness, difficulty breathing, shortness of breath,

12    congestion, sinus irritation, phlegm, cough, runny nose,

13    stuffy nose, sneezing, upper respiratory problems,

14    bronchitis, hoarse voice, sore throat, nausea,

15    dizziness, urinary tract infections, earaches and pain,

16    ear ringing, numbness, tingling in the hands, feet and

17    limbs, headache, fatigue, poor memory, joint, muscle,

18    and body aches and pains."

19         Do you remember suffering those symptoms while

20    you were in the home?

21         A.   Yes.

22         Q.   Earlier I recall you said that you did not

23    believe that you suffered, for example, nosebleeds.

24         A.   I don't think I said anything about nosebleeds,
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 333 of 3246
Case 1:14-cv-01048-MGC Document 204-1 Entered on FLSD Docket 11/4/2019 Page 49 of
66
Confidential – Subject to Further Confidentiality Review

1    sir.

2         Q.   Well --

3         A.   Everything listed there I experienced.

4         Q.   Do you believe that those symptoms were a

5    result of Chinese drywall?

6              MR. WEISS:  Object to the form.  You can

7         answer.

8              THE WITNESS:  Yes.

9    BY MR. BARRY:

10        Q.   Earlier, though, you said that you do not

11   believe you suffered any physical symptoms as a result

12   of Chinese drywall.

13        A.   Right.

14        Q.   So I'm not sure I understand those two

15   statements.

16        A.   Well, I can reconcile it.  I did experience

17   these things, but I'm not pursuing anything related to

18   it, because I did go see a doctor and the doctor said

19   there's no way to connect the two.  So while it

20   happened, I'm not seeking anything related to that.

21        Q.   Okay.  Understood.  I get that distinction.

22             How soon after did you learn of Chinese drywall

23   did you first speak with an attorney about it?

24        A.   I don't recall.

Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Do you know how long after you learned of

 2   Chinese drywall that you filed this lawsuit?

 3        A.   I don't recall.  I would defer to the documents

 4   for it.  The only litigation was this multidistrict

 5   litigation, so whenever that was filed, that's when we

 6   filed.

 7        Q.   Now, I'm going to refer you to Exhibit 6, which

 8   looks like this.  Now, do you recognize this document?

 9        A.   Yes.

10        Q.   And for the record, it is a document from

11   Chinese Drywall Screening dated November 9, 2010, which

12   is an inspection report.  It is Exhibit 6 and it is

13   Bates labeled beginning on Deeg 145.

14             What is this document?

15        A.   This was the inspection that our attorney,

16   Gregory Weiss, had performed as part of filing for the

17   litigation.

18        Q.   So you did not ask for this inspection?

19        A.   No, I didn't call Howard at Chinese Drywall

20   Screening to retain him to do this.

21        Q.   Do you know Howard?

22        A.   I spoke to him many times.

23        Q.   And so what were the content of those

24   conversations you had with Howard?
```

Confidential - Subject to Further Confidentiality Review

```
 1       A.   Okay.  They're all much later.  They're not

 2   related to this.

 3       Q.   Okay.  At the time he was doing this inspection

 4   report, did you speak with Howard while he was doing the

 5   inspection?

 6       A.   No.

 7       Q.   Were you at home when the inspection was

 8   performed?

 9       A.   Yes.

10       Q.   And did you talk with the inspector when they

11   were conducting the inspection?

12       A.   Yes, I did.

13       Q.   What did you say to the inspector?

14       A.   I just simply showed him the house.  There

15   wasn't anything specific.

16       Q.   What did the inspector say to you?

17       A.   It was conversation in terms of what his wife

18   did for a living, things like that.  It really wasn't

19   related to Chinese drywall.

20       Q.   Did the inspector inspect the entire house?

21       A.   Yes, he did.

22       Q.   And what was -- was it -- what did the

23   inspector conclude?  Where did he believe that Chinese

24   drywall was in the house?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 336 of 3246
Case 1:11-cv-22408-MGC Document 604-1 Entered on FLSD Docket 11/8/19 Page 92 of
66

Confidential - Subject to Further Confidentiality Review

```
1        A.   100 percent throughout the entire home.

2        Q.   Did he ever put an entire percentage of how

3   much of the house was Chinese drywall?

4        A.   I'll have to look through here, but I thought

5   it said that.  "Is present in the above referenced

6   property."

7             I do need to clarify, because I just

8   remembered.  The ceilings were determined to be not

9   Chinese drywall.

10       Q.   Earlier we talked about how your air

11  conditioning units had some issues.  I know your husband

12  said there was two air conditioning units in the house.

13  Is that your understanding too?

14       A.   Yes.

15       Q.   Did -- or not your husband.  I apologize.

16  Mr. Deeg.  I keep saying that.  I apologize for doing

17  it.

18            Did any -- do you remember where those air

19  conditioning units were in the house?

20       A.   Yes.

21       Q.   Where were they?

22       A.   On the first floor in the -- it had its own air

23  conditioning closet and on the third floor in the attic.

24       Q.   Do you remember if both air conditioning units
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 337 of 3246
Case 1:14-cv-06428-MGC Document 284-1 Entered on FLSD Docket 11/18/19 Page 98 of
66
Confidential - Subject to Further Confidentiality Review

```
1    suffered from the same defects and same issues?

2        A.    Yes.

3        Q.    Do you recall if either of the units had any

4    worse problems than the other?

5        A.    No.  And answering the other question, the back

6    side, the summary, shows the entire home.

7        Q.    The entire home.

8        A.    Of Taishan except for the ceiling.

9        Q.    Understood.  But there's nothing where it says,

10   like, the exact percentage of home?  It says it's

11   present in every room, but you said, of course, except

12   for the ceiling?

13       A.    It's present throughout the home, except for

14   the ceiling.

15       Q.    Okay.  Do you know if Chinese drywall is still

16   in place in the property?

17       A.    It is not.

18       Q.    Do you still own the property?

19       A.    No, we do not.

20       Q.    When did you sell the property?

21       A.    The closing was on May 2, 2016.

22       Q.    Did you ever consider remediating the property?

23       A.    A lot.  We considered it.

24       Q.    What did you -- did you ever seek quotes on how
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 338 of 3246
Case 11-1-02047 EEF Document 2894 Entered on FLSD Docket 11/19/19 Page 94 of
Confidential -- Subject to Further Confidentiality Review
66

```
 1    much it would cost to remediate the property?

 2        A.    I remember tons and tons of phone calls,

 3    talking to people, general contractors.  Do I remember

 4    written quotes, no.

 5        Q.    What was your understanding of how much it

 6    would cost to remediate the property?

 7        A.    $200,000.

 8        Q.    And why did you decide not to remediate the

 9    property?

10        A.    Because at every point in time when we could

11    have done it, the protocol was not perfect or accepted

12    or even standard, so we were very cautious and thought

13    to ourselves that even if we do all this to correct the

14    problem we have no idea if it's ever going to be okay or

15    resellable.  There were never any guarantees.  You

16    couldn't purchase a guarantee.  So we did not.

17        Q.    Now, when -- and of course this is the dumb

18    question.  Since you do not own the home anymore, can

19    you remediate the property?

20        A.    I cannot remediate the property now.

21        Q.    Is your -- do you know if the property has

22    since been remediated?

23        A.    Yes, I do.

24        Q.    And what is your basis of that understanding?
```

Confidential - Subject to Further Confidentiality Review

```
 1      A.   Personal walk through.  The buyers invited us

 2   to look.

 3      Q.   And so do you know if that remediation was

 4   effective, that it addressed the issue of Chinese

 5   drywall?

 6      A.   I believe it did.

 7      Q.   Okay.  Do you have any specific knowledge of

 8   whether it did or did not?

 9      A.   No.

10      Q.   Now, we talked a little bit earlier about

11   damage to different pieces of appliances.  You said the

12   refrigerator and the air conditioning units.  Were there

13   any other appliances in the house that had issues as a

14   result of Chinese drywall?

15      A.   Pretty much anything in the house that was

16   electronic, especially small items, little alarm clocks,

17   little things with little circuitry that involved copper

18   and silver, they all died due to corrosion.

19      Q.   Was there any nonelectronic personal property

20   that had issues?

21      A.   No, that I recall.

22      Q.   Did every appliance in the house have damage to

23   it?

24      A.   I wouldn't know.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 340 of 3246
Case 1:11-cv-01045-MGC Document 294 Entered on FLSD Docket 11/20/14 Page 96 of 66

Confidential -- Subject to Further Confidentiality Review

```
 1        Q.    Okay.  Did you ever make any effort to have

 2   someone assess whether any appliance in the house had --

 3   any other appliances in the house had damage to it?

 4        A.    No, I didn't have appraisals and inspections of

 5   all the appliances, no, I did not do that.

 6        Q.    Other than the refrigerator and the HVAC

 7   system, did you have to repair any other appliance?

 8        A.    I do recall having to repair the dryer and the

 9   washing machine and the dishwasher.

10        Q.    And are you seeking any damages for the repair

11   of that personal property or appliances?

12        A.    No.

13        Q.    Are you seeking any damages for the replacement

14   of that personal property or appliances?

15        A.    No.

16        Q.    Okay.  So if you don't mind looking with me at

17   Exhibits 7 and 8 together.  And looking first at

18   Exhibit 7, which I'll represent, for the record, is

19   personal property -- is entitled Personal Property Loss,

20   and lists appliances and different items and their

21   estimated cost.  It is Exhibit 7, it's Deeg 58.  Do you

22   recognize this document?

23        A.    Exhibit 7, yes, I do.

24        Q.    Did you prepare this document?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 341 of 3246
Case 1:11-cv-22408-MGC Document 94-1 Entered on FLSD Docket 11/30/11 Page 97 of 66
Confidential - Subject to Further Confidentiality Review

```
 1      A.   Yes, I did.

 2      Q.   What is this document?

 3      A.   It's a summary of personal property damage,

 4   loss, in our home and it was prepared as of January 23,

 5   2011.  Prepared by me.

 6      Q.   Are you seeking damages for the property that

 7   was damaged in the home?

 8      A.   No.

 9      Q.   Then I don't need to ask you any more questions

10   on it.

11           Now, were you -- did the presence of Chinese

12   drywall in your house limit your usage of the property?

13      A.   Yes.

14      Q.   How so?

15      A.   I certainly didn't come and seek time in the

16   home as a refuge to get away from Okeechobee.  If I

17   needed to get away it certainly wasn't to that house.  I

18   didn't invite people over, didn't invite family over,

19   didn't invite friends over because who wants to explain

20   holes in the walls and a portable air conditioning unit?

21   So, yes, it very much limited my use and enjoyment of

22   the home.

23      Q.   Now, in this -- if you refer with me to

24   Exhibit 5.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 342 of 3246
Case 1:11-cv-01408-MGC Document 604-4 Entered on FLSD Docket 11/20/19 Page 98 of
Confidential - Subject to further Confidentiality Review
66

 1      A.   Yes.

 2      Q.   Which is the Supplemental Plaintiff Profile

 3  Form, which you earlier represented you signed and

 4  reviewed, and if you look with me on page 6, which is

 5  Section VII, and if you read, it says:  "If you

 6  experienced any loss of use and/or loss of enjoyment of

 7  the property as a result of Chinese drywall, identify

 8  the total amount of such loss."

 9           Do you know if a dollar figure is listed there?

10      A.   Which question did you read?

11      Q.   I apologize.  Second paragraph.

12      A.   Okay.  Thank you.

13      Q.   If you experienced any loss of use and/or loss

14  of enjoyment of the property as a result of Chinese

15  drywall, identify the total amount of such loss.

16           What is the dollar figure listed there?

17      A.   Nothing, and I'm not seeking any damages for

18  that loss.

19      Q.   Okay.

20      A.   Much like the other part about bronchitis.  Not

21  seeking.  Even if I suspect it's related to it and my

22  loss of enjoyment is related to it, I'm not seeking

23  damages for that.

24      Q.   Okay, understood.  When you owned the home, you

Confidential - Subject to Further Confidentiality Review

1    said you were living at another property too, at the

2    same time?

3        A.    Yes.

4        Q.    Were you paying anything on that home?

5        A.    No.

6        Q.    Did you pay for any alternative living space

7    during the time you were living in the property affected

8    by Chinese drywall?

9        A.    No.

10       Q.    Are you seeking damages for any alternative

11   living expenses for that time?

12       A.    No.

13       Q.    Now, if we look back on page 5 here again -- or

14   page 6, I apologize, on Exhibit 5, a few paragraphs down

15   from the one we just read, I think it's the fourth

16   paragraph here it says:  "If you claim a diminution in

17   value of the property as a result of Chinese drywall,

18   identify the total amount of such diminution of value

19   being claimed."

20             What amount are you claiming?

21       A.    $194,700.

22       Q.    And what is your understanding of how you came

23   to that number?

24       A.    I took the sale price post remediation by the

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 344 of 3246
Case 1:14-cv-21442-MGC Document 4 Entered on FLSD Docket 11/20/14 Page 40 of 66

Confidential - Subject to Further Confidentiality Review

1   buyer and subtracted off what we were paid by the buyer

2   at the sale of the property to the buyer.

3       Q.   Did you consult with any expert who said that's

4   a reliable way to calculate damages?

5       A.   No.

6       Q.   When you were attempting to sell the property,

7   did anyone tell you what the property would sell for, if

8   not for Chinese drywall?

9           MR. WEISS:  Object to the form.  You can

10          answer.

11          THE WITNESS:  If you're asking who I spoke to,

12          no experts, no appraisals, no --

13  BY MR. BARRY:

14      Q.   Did your real estate give you any insight into

15  how much they thought the property would sell for if not

16  for Chinese drywall?

17      A.   I do recall that she may have shown us

18  comparables on the street -- if you come and look at our

19  street all the houses are identical, and so we do know

20  what others sold for.  But, no, no experts.  Just, you

21  know, you knew what the other houses, they all look the

22  same so you knew what they were selling for.  But, no,

23  did I talk to someone and say, yeah, you can get this if

24  your house is remediated, no one is going to give you a

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 345 of 3246
Case 2:14-cv-02440-MCE-DB Document 4 Entered on FLSD Docket 11/20/15 Page 401 of
66
Confidential -- Subject to further Confidentiality Review

1    guarantee like that.

2       Q.   Of course.  Did -- when you first decided --

3    when did you first decide you were going to sell the

4    property?

5       A.   January 2016.

6       Q.   Had you attempted to sell the property before

7    then?

8       A.   No.

9       Q.   And why not?

10      A.   Multiple reasons, but probably the biggest

11   factor was I needed to make sure that the mortgage,

12   which was current, stayed current, was going to stay

13   current, had been paid to a point where a sale would not

14   result in my having to put money towards the sale to pay

15   off that mortgage.  So I needed it to get reduced

16   further until I was comfortable selling it.

17      Q.   And when you sold the home, did you have to pay

18   any money toward the mortgage?

19      A.   No.  No, I did not.

20      Q.   And how long was the house on the market when

21   you decided to sell the home?

22      A.   Four months.

23      Q.   Did you receive any offers during that time

24   period other than the one that you ultimately accepted?

Confidential - Subject to Further Confidentiality Review

```
 1        A.   I do seem to recall the people who looked may

 2   have said, well, I think I could do it for this, but I

 3   don't -- I have no recollection of any written offers

 4   other than the one we ultimately accepted, which wasn't

 5   even an offer.  I'm pretty sure it started with a sales

 6   contract.  You see what I mean?  It was our neighbor.

 7        Q.   Did you -- what was the initial listing price

 8   that you listed the house when you first listed it?

 9        A.   I'd have to guess and I could tell you what I

10   think my guess is, but that's just speculating.  I don't

11   recall specifically.

12        Q.   Do you remember if it was higher than the price

13   it sold for?

14        A.   Yes.

15        Q.   Do you remember by how much, roughly?

16        A.   I do think it was somewhere around 350,

17   $350,000, possibly could have been a little bit more

18   than that, but not much.  It definitely wasn't over 375

19   or $400,000, something like that, no.  We knew we could

20   not get what we paid for the house.  We did not list it

21   for what we paid for the house, which was 400,500.

22        Q.   Now, if you'll indulge me for a second, if you

23   can look at Exhibit 4 and Exhibit 5 at the same time,

24   and actually before we do that let me just ask you, I
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 347 of 3246
Case 1:11-cv-22408-MGC Document 104-1 Entered on FLSD Docket 11/13/14 Page 48 of 66
Confidential - Subject to further Confidentiality Review

1    know earlier your husband said that on the property

2    assessment website that there's -- it looks like you may

3    have sold the home for more than you say you did.  Do

4    you know why that says that?

5          MR. WEISS:  Object to the form.  You can

6       answer.

7          THE WITNESS:  I do not know where the

8       difference came from.  I don't recall and don't even

9       recall questioning it.  We did sell it for $330,000,

10      so why the consideration value on the property

11      appraiser site shows it at $5,300 more, I do not

12      know, but I accept that it's there and it says that,

13      so that's the sale price.

14   BY MR. BARRY:

15      Q.   No, I just want to understand if you have any

16   knowledge why that might be there.

17      A.   I do not.

18      Q.   So now looking at Exhibit 4 and 5 together,

19   Exhibit 4 is the Plaintiff Profile Form and Exhibit 5 is

20   the Supplemental Plaintiff Profile Form, if you don't

21   mind just looking through these and letting me know if

22   there are any items in this document that may have

23   changed between the time when you first -- you completed

24   it in the first instance and then completed the

Confidential -- Subject to Further Confidentiality Review

1    supplemental profile in the second instance.  And take

2    all the time you need on that.  I know I don't need to

3    say that to you.

4        A.    Nothing has changed.

5        Q.    Have you read any of the orders in this

6    litigation?

7        A.    Yes.

8        Q.    Has anything in those orders made you change

9    your answers to any item in this litigation?

10       A.    No.

11       Q.    Now looking again at item 5, or Exhibit 5, if

12   we look at Section VI, which is prior payments.

13       A.    Yes.

14       Q.    And if you want to at the same time we can look

15   at what is -- it's a mess, as it always is.

16       A.    Exhibit 9, the four checks.

17       Q.    Yes, Exhibit 9.  Are the checks in Exhibit 9

18   reflected in Section VI, which is prior payments made to

19   you?

20       A.    Yes.

21       Q.    And what is your understanding of why those

22   payments were made to you?

23            MR. WEISS:  Object to the form.  You can

24       answer.

```
 1              THE WITNESS:  My understanding is that as part

 2          of the multi district litigation, defendants such as

 3          the Banner Company, who had been our supplier, had

 4          basically turned over their insurance proceeds and

 5          then that money was then, through the litigation,

 6          paid to in certain portions, and I didn't have

 7          specifics, but that was, in effect, what I

 8          understood that money came from was some of the

 9          defendants had insurance and that's some of their

10          money.

11  BY MR. BARRY:

12      Q.   Now, that amount and I'm not going to do the

13  math here, but the roughly $15,000 and the roughly

14  $1,800, have you deducted that amount from the total

15  amount you're claiming in this litigation?

16      A.   No.

17      Q.   Why not?

18      A.   Why not?

19              MR. WEISS:  Object to the form.  You can

20          answer.

21              THE WITNESS:  Because that question didn't say

22          minus things that may be appropriate offsets.  It

23          just said what are your damages.  So it wasn't a

24          question about what are your net damages.  You just
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 350 of 3246
Case 1:11-cv-01408-MGC Document 294-1 Filed 08/15/2015 Page 46 of 66
Confidential - Subject to Further Confidentiality Review

1    wanted to know what I thought was my diminution in

2    value.  So I wouldn't then have thought about, okay,

3    let me go ahead and start subtracting things that

4    may or may not be appropriate to subtract.

5  BY MR. BARRY:

6    Q.  Do you believe that amount should be subtracted

7  from the total amount you recover in this litigation?

8       MR. WEISS:  Object to the form.  And to the

9    extent you can answer the question without revealing

10   a conversation with any of your attorneys, you can

11   answer the question.

12      THE WITNESS:  Yes.

13  BY MR. BARRY:

14   Q.  Now, looking back again on lovely Exhibit 5,

15  and if you look at page 3 --

16   A.  Oh, can I clarify before we move on to a

17  different subject?

18   Q.  Of course, please.

19   A.  In the interrogatories, which I do so apologize

20  on the record for being late.

21   Q.  Understood.

22   A.  I do think that the amount that we may have

23  reflected in them didn't include all four checks, it may

24  have only included two of the four checks.  This

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 351 of 3246
Case 1:14-cv-04088-MGC Document 094 Entered on FLSD Docket 11/20/15 Page 47 of
Confidential -- Subject to Further Confidentiality Review
66

```
 1    information that we've discussed right now is accurate.

 2    Those four checks in Exhibit 9 and as represented in

 3    Exhibit 5 are accurate, and if it matches what we put in

 4    the interrogatories, fabulous, but it may not.

 5        Q.    I'm just representing for the record I'm

 6    looking through it just to double-check, but regardless,

 7    if --

 8        A.    The number is the number.

 9        Q.    If you want to amend it, I have no objection to

10    that.

11        A.    Okay.

12        Q.    It looks like, yeah, I think there's maybe one

13    missing, but you certainly --

14        A.    It would have been two.  I would have done two

15    and two and so two would be.  Sorry.

16        Q.    And have you received any other payments

17    related to Chinese drywall being installed in your

18    house?

19        A.    No.

20        Q.    Now, if we look on page -- did you ever seek a

21    reduction of property tax related?

22        A.    No.

23        Q.    No?  Why not?

24        A.    I didn't want to advertise that it was a
```

Confidential - Subject to Further Confidentiality Review

1    Chinese drywall home.

2        Q.    Okay.  Did someone tell you not to go seek a

3    property tax reduction for that reason?

4        A.    No.

5        Q.    Why didn't you want to advertise that it was a

6    Chinese drywall home?

7        A.    Because it's personal, it was private, it was

8    not something that we were discussing with anyone, and I

9    certainly didn't think that we needed to put it out

10   there on the public record that it was a Chinese drywall

11   home.  I was very, very interested in trying to resolve

12   all of this through my letters and my contacts and my

13   phone calls and it was very disappointing when that did

14   not happen, but that was not going -- a reduction in

15   property taxes was not going to provide the funds for

16   the remediation, so I didn't see that as a successful,

17   helpful, or otherwise good maneuver.

18       Q.    Now, earlier you said you didn't remediate

19   because you said you weren't sure it would work.  Was it

20   also because you couldn't afford to pay for the

21   remediation too?

22       A.    No, I could afford it.

23            MR. VERRIER:  Do you mind if we take a quick

24       break?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 353 of 3246
Case 1:11-cv-21496-MGC Document 294 Entered on FLSD Docket 11/20/13 Page 49 of
66
Confidential -- Subject to Further Confidentiality Review

```
 1            MR. BARRY:  Of course.  Understood.

 2            (Recess from 10:42 a.m. until 10:58 a.m.)

 3   BY MR. BARRY:

 4       Q.   I'm going to -- well, actually, let's finish on

 5   Exhibit 5.  On page 3 of Exhibit 5, where it says

 6   Section III -- sorry.  Apologize.  Just above

 7   Section III, it's two paragraphs above Section III, it

 8   says:  "If you've sold or transferred ownership of the

 9   property, did you expressly retain a personal right of

10   action to allow you to pursue damages?"

11       A.   No.

12       Q.   What was your answer?

13       A.   My answer was no, and it's still no.

14       Q.   Why didn't you seek any express right to retain

15   a personal right of action?

16            MR. WEISS:  Object to the form.  You can

17       answer.

18            THE WITNESS:  I don't recall.

19   BY MR. BARRY:

20       Q.   Do you have any understanding of whether

21   anybody else has a claim to pursue damages under the

22   property?

23       A.   My understanding was no one else but David and

24   I have a claim.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 354 of 3246
Case 1:11-cv-22408-MGC Document 64 Entered on FLSD Docket 11/30/11 Page 50 of 66
Confidential - Subject to Further Confidentiality Review

```
 1     Q.   I'm going to hand this exhibit to you, which is
 2  Exhibit 11.
 3          (Hooker Exhibit No. 11 was marked for
 4  identification.)
 5          MR. BARRY:  And I apologize I don't have a ton
 6      of these.  These were the interrogatories that were
 7      provided to us.
 8          MR. WEISS:  It is 11, yes.
 9          MR. BARRY:  Okay.  I will provide to you --  I
10      apologize.  They were all down here.  Can I withdraw
11      that?
12          MR. WEISS:  Sure.
13  BY MR. BARRY:
14     Q.   These are Exhibit 11.  They are Claimant's,
15  Deborah Hooker's Unverified Answers to Defendants'
16  Interrogatories, which you provided us with a
17  verification today.  I assume there are no changes since
18  you've last provided it to us.  If there are, please
19  identify those changes.
20     A.   Let me look.
21     Q.   Of course.
22     A.   I guess just a clarification that just because
23  we're not pursuing claims for these things doesn't mean
24  that I may or may not have experienced problems, but
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 355 of 3246
Case 1:11-cv-22408-MGC Document 309-4 Entered on FLSD Docket 11/26/15 Page 51 of 66
Confidential - Subject to Further Confidentiality Review

 1   we're not pursuing it, so the answer is just no and I

 2   would say no changes.  In answer 1, you've kind of

 3   jogged my memory that I don't -- again, I don't think

 4   that it's up to me to decide what counts as an offset,

 5   so I just want to point that out.  I think that the loss

 6   in equity, the diminution in value, was $200,000.  I on

 7   my own had reduced it by that extra $5,300 that somehow

 8   ended up in the consideration reflected on the property

 9   appraiser site, but, again, it was -- we sold it for 330

10   and then it got sold for 530.  It was a clear and easy

11   $200,000 difference.

12       Q.   In Answer 1 to the interrogatories, it says:

13   "Identify all types of damages that you seek in this

14   lawsuit (e.g. alternative living expenses, diminution in

15   value, loss of use/enjoyment, etc., and specify amounts

16   sought for each category."

17            You've answered:  "Lost equity, diminution in

18   value, and other economic losses."

19            What are those other economic losses that you

20   are claiming in this litigation?

21       A.   It's the $200,000 that incorporates, in my

22   mind, so much more.  It's one of the reasons why I'm not

23   going to sit here and argue about TVs and little items

24   or an alarm clock, because at the end of the day this is

1   the clean and simple.  This is truly how in my opinion

2   the best way to determine the lost equity, the loss in

3   value is to incorporate all of that into just this one

4   figure, and in my opinion it's fair.  It's not a -- it's

5   not like you went out and added and then started bumping

6   it up with all these other things.  This is it.  So in

7   that number, I'm saying that's how we justify.  And it

8   actually should have said and specified the amount would

9   have been $200,000.  The reason I reduced it by $5,300

10  was because that was reflected on the property appraiser

11  site.

12      Q.   And that's the -- and just for my understanding

13  and sake of clarity, that number which you're referring

14  to is around $200,000, is the amount that would be

15  calculated by taking the amount that you -- that the

16  house was sold for in 2017 by the amount that you sold

17  it for in 2016?

18      A.   Correct.

19      Q.   And that's --

20      A.   Again, our house, the same house, not the other

21  houses on the same street that may or may not be

22  identical, that may or may or not have had appraisals

23  and were all sold for higher figures, we're not picking

24  and choosing, we're using our own house.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 357 of 3246
Case 1:11-cv-22408-MGC Document 29-4 Entered on FLSD Docket 11/10/15 Page 53 of 66
Confidential - Subject to Further Confidentiality Review

```
 1      Q.   I'm going to hand you, if your counsel's okay

 2   with it, Exhibit 12 and 13 at the same time.

 3           MR. WEISS:  12 is --

 4           MR. BARRY:  That's 12.  13.

 5           (Hooker Exhibit No. 12 was marked for

 6   identification.)

 7           (Hooker Exhibit No. 13 was marked for

 8   identification.)

 9   BY MR. BARRY:

10      Q.   Now, I'll represent for the record that

11   Exhibit 11 -- Exhibit 12 is a 2015 document generated

12   from a website that looks like a property appraiser

13   website.  Is that a fair, accurate representation of it?

14      A.   Yes.

15      Q.   And Exhibit 13 is also from a property

16   appraiser website, although it looks different, and it's

17   from 2017.  Is this the -- the address listed here, is

18   this the address where -- that was affected by Chinese

19   drywall?

20      A.   Yes.

21      Q.   And in 2015, what was the assessed value of

22   that property?

23           MR. WEISS:  Object to the form.  You can

24      answer.
```

Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. BARRY:

 2       Q.   Based on what's listed on this document in

 3   Exhibit 12, what was the assessed value of the property?

 4       A.   Under assessment information on Exhibit 12, it

 5   reads market total value.  Is that the number?

 6       Q.   Yes.

 7       A.   All right.  That number reads $358,350.

 8       Q.   Did you ever consider using that amount to

 9   decide the value of the home?

10       A.   No, not that I recall.

11       Q.   If you look at Exhibit 13, which is the 2017

12   document, based on what is reflected on this website,

13   what is the assessed value of the home?

14       A.   In Exhibit 13, market total value is listed as

15   $378,600.

16       Q.   Did you ever consider using that value to

17   assess the value of the home?

18       A.   No.

19       Q.   Why not?

20       A.   Well, it's 2017, it's after the sale.

21       Q.   Do you know if the property assessors were

22   aware that there was Chinese drywall in the house?

23           MR. WEISS:  Object to the form.  You can

24       answer.
```

Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  I would have to speculate so the

 2        answer is I don't know.

 3   BY MR. BARRY:

 4        Q.   Okay.  Did you ever have an independent

 5   appraisal of the value of the home?

 6        A.   Right after we purchased it, a year after we

 7   purchased the property, David went into how we started

 8   with a first and -- the initial purchase involved this

 9   first and second mortgage, so a year later,

10   December 2008, so we purchased at the end of 2007 and so

11   it was the end of 2008, I said to David, let's clean

12   this up, we're going to refi, and so in order to refi,

13   the bank did an appraisal, and that appraisal came in at

14   $504,000.  I do not have a copy of that.  I do not have

15   it.  I don't even think the bank gave it to us

16   literally.  I do know the number because in their

17   refinance calculation they did list it, and then to make

18   sure that we were -- and these are -- that we weren't

19   subprime, that we were a regular, everyday, 30-year

20   fixed rate mortgage, normal loan without, you know, in

21   order to accomplish all -- jump through all those hoops

22   to make us not part of that whole 2006 debacle, in order

23   to accomplish that, the refinance did that, and so,

24   therefore, we just had one payment and it was -- it was
```

Confidential - Subject to Further Confidentiality Review

1    a loan to value on that $504,000 value.

2        Q.    After that appraisal, did you have any other

3    subsequent appraisals?

4        A.    No.

5        Q.    Now, looking back at Exhibit 12 and 13, did you

6    or David inform anyone at the appraiser's office of the

7    presence of Chinese drywall in the house?

8        A.    I know we did not inform anyone.

9        Q.    Earlier we talked a little bit about how you

10   spoke with, I think, it was Howard?

11       A.    Yes.

12       Q.    Subsequent after he did the inspection.  What

13   were those conversations about?

14       A.    I actually called him first to help me figure

15   out what under air meant and how to calculate it.

16       Q.    Did you have any other subsequent conversations

17   with him?

18       A.    I don't recall.  No.  The big one was under air

19   and it was kind of funny that I was the one who called

20   him to say how do we do this.  He said, "What are you

21   talking about?"  He may not remember it, but I do.

22           MR. BARRY:  I have no further questions for the

23       witness unless my -- unless Ashton and Sarah want to

24       say anything.  If y'all want to take a moment?

Confidential -- Subject to Further Confidentiality Review

```
 1                      CROSS-EXAMINATION

 2   BY MS. FASSBENDER:

 3       Q.   I have one question.  I'm Diana Fassbender.

 4   Thank you for your time.

 5            When the purchaser, in 2016, purchased the

 6   house, did they have a professional independent

 7   appraisal done or -- start there.

 8       A.   No.  Jay and Nancy, Jay Bashant and Nancy

 9   Lewandowski, the purchasers, were the son and

10   daughter-in-law of the -- one of the three original

11   builders, and they were our neighbor at the end of the

12   street, so they -- he actually told us that he wanted to

13   do a remediation project.

14       Q.   Okay.  And you're not aware of any informal

15   appraisals or anything that they had done at that time?

16       A.   I know he didn't do it.  He would have told us,

17   and he didn't.

18            MS. FASSBENDER:  That's all.  Thank you.

19            THE WITNESS:  Thank you.

20                      CROSS-EXAMINATION

21   BY MR. WEISS:

22       Q.   I have one follow-up, breaking my rule for the

23   second time today.

24            Ms. Hooker, you stated in 2011 you stopped
```

Confidential - Subject to Further Confidentiality Review

```
 1    replacing the AC system coils; correct?

 2    A.    Yes.

 3    Q.    So did you live in the house from 2011 until

 4    you sold it in 2016 without a central air conditioning

 5    system?

 6    A.    Correct, neither the attic or the downstairs

 7    units were ever replaced or repaired or fixed ever

 8    again.

 9    Q.    Can you describe how it was that you were able

10    to live in south Florida without a central AC system?

11    A.    At first we tried to just keep the third floor

12    cool by having a -- the third floor was the two

13    bedrooms, master bedroom, and the guest bedroom, so we

14    would put a portable AC unit at the top of the stairs,

15    which absolutely meant you didn't want anybody coming

16    upstairs or looking up the stairs, because it's the

17    first thing you would see and it would block you from

18    going upstairs, was the portable AC unit.  There was

19    also one in the guest room, and there was also one in

20    the master bedroom.

21          They broke so often and had to be replaced so

22    often that we stopped doing that.  We ultimately had

23    only the one AC just in the master bedroom, which, of

24    course, meant that the master bathroom was horrific.
```

Confidential - Subject to Further Confidentiality Review

```
 1    And for women, you know how horrible it is to try and

 2    get dressed and put on makeup while you're sweating.  It

 3    was horrible.  It was terrible.

 4           The only thing I can say is that at that point

 5    I was no longer working as a magistrate, so that's the

 6    only thing that made it doable was, that I wasn't trying

 7    to get dressed for work.  I don't know how David did it.

 8           And then with regard to the guest room, we

 9    certainly never had any guests after that, because who

10    wants to show the -- we certainly didn't want to talk

11    about it with anyone.  We just stopped using most of

12    your house.  After the same time the -- when the

13    refrigerator broke we left it in place because, of

14    course, it looks fine, it just doesn't work, and so I

15    had to buy a refrigerator that we put in the garage in

16    order to prevent it from getting corroded from the

17    Chinese drywall.  And that's how you would get

18    everything, whether it was water, milk, soda, that was

19    the refrigerator for the house.

20           So we basically used the garage and used the

21    master bedroom.  It didn't take long before we stopped

22    even using any other rooms in the house.  We did have a

23    dehumidifier for a long time on that first floor, but we

24    could not keep up with the water.  We were going through
```

Confidential - Subject to Further Confidentiality Review

```
1    the humidifiers too.  So we just finally stopped.  We

2    couldn't keep up with it.  It was horrible.

3             MR. WEISS:  Thank you.  I have nothing further.

4                      REDIRECT-EXAMINATION

5    BY MR. BARRY:

6        Q.  And I know we spoke a little bit about this

7    earlier, but for all that time when you were having to

8    deal with not -- the air conditioning wasn't working and

9    you were living on the third floor, are you seeking any

10   damages related to the loss of use and enjoyment that

11   you experienced during that time?

12       A.  No, but my clarification would be, I know that

13   that's not -- that I'm a lawyer, you're a lawyer, we're

14   all lawyers, but in my mind, that's part of that overall

15   loss that I think is part of why you would use the --

16   not just a pure sale to purchase separation but actually

17   what it was worth, what it would have been worth had it

18   not had corrosive Chinese drywall in it.

19       Q.  I understand.  Just wanted to clarify.

20       A.  Thank you.

21             MR. BARRY:  Thank you.  And thank you both for

22        your time.  I know this is not fun to deal with, but

23        I appreciate you guys coming in.

24             (Whereupon, the deposition concluded at
```

Confidential - Subject to Further Confidentiality Review

    1    11:14 a.m.)

    2

    3

    4

    5

    6

    7

    8

    9

   10

   11

   12

   13

   14

   15

   16

   17

   18

   19

   20

   21

   22

   23

   24

Confidential - Subject to Further Confidentiality Review

```
 1                    C E R T I F I C A T E

 2

 3            I, JOAN L. PITT, Registered Merit Reporter,

 4     Certified Realtime Reporter, and Florida Professional

 5     Reporter, do hereby certify that, pursuant to notice,

 6     the deposition of DEBORAH HOOKER was duly taken on

 7     January 4, 2019, at 9:50 a.m., before me.

 8            The said DEBORAH HOOKER was duly sworn by me

 9     according to law to tell the truth, the whole truth, and

10     nothing but the truth, and thereupon did testify as set

11     forth in the above transcript of testimony.  The

12     testimony was taken down stenographically by me.  I do

13     further certify that the above deposition is full,

14     complete, and a true record of all the testimony given

15     by the said witness.

16

17     _____

18            JOAN L. PITT, RMR, CRR, FPR

19

20            (The foregoing certification of this transcript

21     does not apply to any reproduction of the same by any

22     means, unless under the direct control and/or

23     supervision of the certifying reporter.)

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 367 of 3246
Case 1:14-cv-21048-MGC Document 694-1 Entered on FLSD Docket 11/12/2019 Page 68 of
66
Confidential - Subject to Further Confidentiality Review

```
  1                      INSTRUCTIONS TO WITNESS

  2

  3

  4           Please read your deposition over carefully and

  5   make any necessary corrections.  You should state the

  6   reason in the appropriate space on the errata sheet for

  7   any corrections that are made.

  8

  9           After doing so, please sign the errata sheet

 10   and date it.  It will be attached to your deposition.

 11

 12           It is imperative that you return the original

 13   errata sheet to the deposing attorney within thirty (30)

 14   days of receipt of the deposition transcript by you.  If

 15   you fail to do so, the deposition transcript may be

 16   deemed to be accurate and may be used in court.

 17

 18

 19

 20

 21

 22

 23

 24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 368 of 3246
Case 1:11-cv-22408-MGC Document 94-1 Entered on FLSD Docket 11/30/15 Page 64 of 66

```
 1                     - - - - - -

 2                    E R R A T A

 3                     - - - - - -

 4   PAGE   LINE   CHANGE

 5   _____  _____  _____

 6     REASON: _____

 7   _____  _____  _____

 8     REASON: _____

 9   _____  _____  _____

10     REASON: _____

11   _____  _____  _____

12     REASON: _____

13   _____  _____  _____

14     REASON: _____

15   _____  _____  _____

16     REASON: _____

17   _____  _____  _____

18     REASON: _____

19   _____  _____  _____

20     REASON: _____

21   _____  _____  _____

22     REASON: _____

23   _____  _____  _____

24     REASON: _____
```

Confidential - Subject to Further Confidentiality Review

```
 1                  ACKNOWLEDGMENT OF DEPONENT

 2

 3           I, _____, do hereby

 4    acknowledge that I have read the foregoing pages and

 5    that the same is a correct transcription of the answers

 6    given by me to the questions therein propounded, except

 7    for the corrections or changes in form or substance, if

 8    any, noted in the attached Errata Sheet.

 9

10

11    _____   _____

12    DEBORAH HOOKER                     DATE

13

14

15

16

17    Subscribed and sworn to before me this

18    ____ day of _____, 20___.

19    My Commission expires: _____

20

21    _____

      Notary Public

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                            LAWYER'S NOTES

 2    PAGE    LINE

 3    _____   _____   _____

 4    _____   _____   _____

 5    _____   _____   _____

 6    _____   _____   _____

 7    _____   _____   _____

 8    _____   _____   _____

 9    _____   _____   _____

10    _____   _____   _____

11    _____   _____   _____

12    _____   _____   _____

13    _____   _____   _____

14    _____   _____   _____

15    _____   _____   _____

16    _____   _____   _____

17    _____   _____   _____

18    _____   _____   _____

19    _____   _____   _____

20    _____   _____   _____

21    _____   _____   _____

22    _____   _____   _____

23    _____   _____   _____

24    _____   _____   _____
```

# EXHIBIT A5

Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2              Case No. 1:11-CV-22408-MGC
 3     -------------------------------§
       EDUARDO AND CARMEN AMORIN et    §
 4     al., individually, and on behalf §
       of all others similarly         §
 5     situated,                        §
                                        §
 6        Plaintiffs,                   §
                                        §
 7     vs.                              §
                                        §
 8     TAISHAN GYPSUM CO., LTD. F/K/A   §
       SHANDONG THAIHE DONGXIN CO.,     §
 9     LTD.; TAIAN TAISHAN PLASTERBOARD §
       CO., LTD., et al,                §
10                                      §
          Defendants.                   §
11     ------------------------------- §
        - - -
12                          - - -
13              FRIDAY, JANUARY 11, 2019
14                        - - -
15          Confidential - Subject to Further
                  Confidentiality Review
16
                          - - -
17
             Deposition of CATHY ETTER, held at Mrachek,
18       Fitzgerald, Rose, Konopka, Thomas & Weiss, P.A.,
         505 South Flagler Drive, Suite 600, West Palm
19       Beach, Florida, commencing at 12:20 p.m., on the
         above date, before Kelly J. Lawton, Registered
20       Professional Reporter, Licensed Court Reporter,
         and Certified Court Reporter.
21
22                        - - -
23              GOLKOW LITIGATION SERVICES
            877.370.3377 ph | 917.591.5672 fax
24                  deps@golkow.com
```

Case 2:09-md-02047-EEF-MBN Document 22368-39 Filed 11/19/19 Page 373 of 3246
Case 1:11-cv-22408-FJC Document 25-1 Entered on FLSD Docket 08/13/2015 Page 4 of 14
Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:

 2        MRACHEK, FITZGERALD, ROSE, KONOPKA, THOMAS & WEISS
          BY:  GREGORY S. WEISS, ESQUIRE
 3        505 South Flagler Drive, Suite 600
          West Palm Beach, Florida 33401
 4        (561) 655-2250
          gweiss@mrachek-law.com
 5        Representing Plaintiff
 6
          LEVIN, SEDRAN & BERMAN, LLP
 7        BY:  KEITH J. VERRIER, ESQUIRE
          510 Walnut Street, Suite 500
 8        Philadelphia, Pennsylvania 19106
          (215) 592-1500
 9        kverrier@lfsblaw.com
          Representing Plaintiff
10
11        ALSTON & BIRD, LLP
          BY:  MATTHEW D. LAWSON, ESQUIRE
12        BY:  METHAWEE MANUPIPATPONG, ESQUIRE
          BY:  LARA TUMEH, ESQUIRE
13        One Atlantic Center
          1201 West Peachtree Street
14        Atlanta, Georgia 30309
          (404) 881-7000
15        matt.lawson@alston.com
          mae.manupipatpong@alston.com
16        lara.tumeh@alston.com
          Representing Taishan Gypsum Co., Ltd. and Tai'an
17        Taishan Plasterboard, Co., Ltd.
18
          GORDON, ARATA, MONTGOMERY, BARNETT
19        BY:  ALEX B. ROTHENBERG, ESQUIRE
          201 St. Charles Avenue, 40th Floor
20        New Orleans, Louisiana 70170
          (504) 582-1111
21        arothenberg@gamb.law
          Representing BNBM PLC
22
23
24
```

Case 2:09-md-02047-EEF-MBN Document 22368-39 Filed 11/19/19 Page 374 of 3246
Case 1:11-cv-22408-MGC Document 294 Entered on FLSD Docket 08/13/2015 Page 49 of 14
Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:

 2        ORRICK, HERRINGTON & SUTCLIFFE, LLP

          BY:  DAN GUERRA, ESQUIRE

 3        The Orrick Building

          405 Howard Street

 4        San Francisco, California 94105

          (415) 773-5545

 5        dguerra@orrick.com

          Representing BNBM PLC

 6

 7    ALSO PRESENT:

 8        Steven Etter

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                          - - -

                          I N D E X

 2                          - - -

 3    Testimony of:  CATHY ETTER

 4        DIRECT EXAMINATION BY MR. LAWSON...............   5

 5

 6

 7                    E X H I B I T S

 8                    (None marked)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                              - - -

 2              THE COURT REPORTER:  Ma'am, would you raise

 3         your right hand.

 4              Do you swear or affirm that the testimony

 5         you're about to give will be the truth, the whole

 6         truth, and nothing but the truth?

 7              THE WITNESS:  Yes.

 8              CATHY ETTER, called as a witness by the

 9    Defendants, having been first duly sworn, testified

10    as follows:

11                         DIRECT EXAMINATION

12    BY MR. LAWSON:

13         Q.   Could you please state your name for the

14    record.

15         A.   Cathy Etter.

16         Q.   Mrs. Etter, thank you for your time today.

17              It's my understanding that you have been

18    sitting in through the entirety of your husband's

19    testimony.  Is that correct?

20         A.   That's correct.

21         Q.   And just like I talked about with your

22    husband, we need to make sure that we don't talk over

23    each other and that we talk slowly enough to make

24    sure that everything can get accurately transcribed
```

1    while we're speaking.

2         Does that make sense?

3    A.    Yes.

4    Q.    Let me know if you need a break at any point,

5    but I don't anticipate that this will be very long.

6    A.    Okay.

7    Q.    I wanted to ask you first:  Having listened

8    to all of your husband's testimony today, if there's

9    anything that you would like to add to or correct

10   that you heard him testify to during today's

11   deposition?

12   A.    There were just probably two, I think, I

13   have, things, and they're pretty minor.

14        When we said that when we moved into -- or,

15   when we bought the house, that there was a house

16   completed in the neighborhood, that was incorrect.

17   They were in the process of building the first house

18   when we bought the property.

19        The second thing was that -- oh, he said -- I

20   think there was a question about when we first

21   suspected something was happening, and he said it was

22   in the first couple of years that the coil went out.

23   The coils went out within the first year.  It was in

24   the first year we were in the house when the first

Confidential - Subject to Further Confidentiality Review

1    air-conditioning coils went out.

2            And those were the only two things that I

3    would correct him on.

4        Q.   There was some discussion during Mr. Etter's

5    deposition about the appliances that were replaced in

6    the home.

7            Do you recall appliances being replaced

8    during the remediation and reconstruction of your

9    home?

10       A.   Yes.  And that was one other thing.  He said

11   the wine cooler.  I think the only thing we replaced

12   was the microwave and the ice machine.

13       Q.   Okay.

14       A.   Those were the only two things that we

15   replaced.  We replaced a fan motor in the

16   refrigerator.  But all the other appliances, I

17   believe, were reinstalled.

18       Q.   So when we were looking at that estimate of

19   costs related to appliances, I think there was an

20   amount of about $36,000.  That would not have

21   included buying new appliances other than a microwave

22   and ice machine?

23           MR. WEISS:  Object to the form.

24           You can answer.

Case 2:09-md-02047-EEF-MBN Document 22368-39 Filed 11/19/19 Page 379 of 3246
Case 1:11-cv-22408-MGC Document 1-5 Entered on FLSD Docket 08/13/2015 Page 49 of 14
Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  Yes.  I -- I was a little

 2        surprised by that number, because I couldn't

 3        really account for that with what I remembered.

 4        I remembered only those two items.

 5   BY MR. LAWSON:

 6        Q.   And ultimately, did you pay for the new ice

 7   machine that was installed in your home?

 8        A.   Yes.

 9        Q.   Did you pay for the new microwave that was

10   installed in your home directly?

11        A.   Yes.

12        Q.   And that was not paid for by

13   Christian Thomas?

14        A.   That's correct.

15             MR. LAWSON:  I don't have anything further at

16        this time.

17             MR. GUERRA:  Neither do we.

18             MR. WEISS:  Okay.  We'll read.

19             (Whereupon, the deposition concluded at

20   12:24 p.m.)

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review
14

```
 1                    C E R T I F I C A T E

 2

 3              I, KELLY J. LAWTON, Registered Professional

 4    Reporter, Licensed Court Reporter, and Certified

 5    Court Reporter, do hereby certify that, pursuant to

 6    notice, the deposition of CATHY ETTER was duly taken

 7    on January 11, 2019, at 12:20 p.m. before me.

 8              The said CATHY ETTER was duly sworn by me

 9    according to law to tell the truth, the whole truth

10    and nothing but the truth and thereupon did testify

11    as set forth in the above transcript of testimony.

12    The testimony was taken down stenographically by me.

13    I do further certify that the above deposition is

14    full, complete, and a true record of all the

15    testimony given by the said witness.

16

17    _____

18              KELLY J. LAWTON, RPR, LCR, CCR

19

20              (The foregoing certification of this

21    transcript does not apply to any reproduction of the

22    same by any means, unless under the direct control

23    and/or supervision of the certifying reporter.)

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 381 of 3246
Case 1:14-cv-24408-MGC Document 2025 Entered on FLSD Docket 11/13/19 Page 41 of 14
Confidential - Subject to Further Confidentiality Review

```
 1                     INSTRUCTIONS TO WITNESS

 2

 3

 4          Please read your deposition over carefully

 5   and make any necessary corrections.  You should state

 6   the reason in the appropriate space on the errata

 7   sheet for any corrections that are made.

 8

 9          After doing so, please sign the errata sheet

10   and date it.  It will be attached to your deposition.

11

12          It is imperative that you return the original

13   errata sheet to the deposing attorney within thirty

14   (30) days of receipt of the deposition transcript by

15   you.  If you fail to do so, the deposition transcript

16   may be deemed to be accurate and may be used in

17   court.

18

19

20

21

22

23

24
```

```
 1                   - - - - - -

 2                   E R R A T A

 3                   - - - - - -

 4    PAGE   LINE   CHANGE

 5    _____  _____  _____

 6      REASON: _____

 7    _____  _____  _____

 8      REASON: _____

 9    _____  _____  _____

10      REASON: _____

11    _____  _____  _____

12      REASON: _____

13    _____  _____  _____

14      REASON: _____

15    _____  _____  _____

16      REASON: _____

17    _____  _____  _____

18      REASON: _____

19    _____  _____  _____

20      REASON: _____

21    _____  _____  _____

22      REASON: _____

23    _____  _____  _____

24      REASON: _____
```

```
 1                    ACKNOWLEDGMENT OF DEPONENT

 2

 3          I, CATHY ETTER, do hereby acknowledge that I

 4     have read the foregoing pages, 1 to 13, and that the

 5     same is a correct transcription of the answers given

 6     by me to the questions therein propounded, except for

 7     the corrections or changes in form or substance, if

 8     any, noted in the attached Errata Sheet.

 9

10

11     _____     _____

12     CATHY ETTER                                       DATE

13

14

15

16

17     Subscribed and sworn to before me this

18     _____ day of _____, 20___.

19     My Commission expires: _____

20

21     _____

       Notary Public

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                        LAWYER'S NOTES

 2     PAGE    LINE

 3     _____   _____   _____

 4     _____   _____   _____

 5     _____   _____   _____

 6     _____   _____   _____

 7     _____   _____   _____

 8     _____   _____   _____

 9     _____   _____   _____

10     _____   _____   _____

11     _____   _____   _____

12     _____   _____   _____

13     _____   _____   _____

14     _____   _____   _____

15     _____   _____   _____

16     _____   _____   _____

17     _____   _____   _____

18     _____   _____   _____

19     _____   _____   _____

20     _____   _____   _____

21     _____   _____   _____

22     _____   _____   _____

23     _____   _____   _____

24     _____   _____   _____
```

# EXHIBIT A6

Confidential - Subject to Further Confidentiality Review

```
1                  UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
2                    Case No. 1:11-CV-22408-MGC
3        -------------------------------§
     EDUARDO AND CARMEN AMORIN et     §
4    al., individually, and on behalf §
     of all others similarly          §
5    situated,                        §
                                      §
6        Plaintiffs,                  §
                                      §
7    vs.                              §
                                      §
8    TAISHAN GYPSUM CO., LTD. F/K/A    §
     SHANDONG THAIHE DONGXIN CO.,     §
9    LTD.; TAIAN TAISHAN PLASTERBOARD §
     CO., LTD., et al,                §
10                                    §
         Defendants.                  §
11       ------------------------------ §
         - - -
12                              - - -
13               FRIDAY, JANUARY 11, 2019
14                              - - -
15           Confidential - Subject to Further
                   Confidentiality Review
16
                              - - -
17
             Deposition of STEVEN ETTER, held at Mrachek,
18       Fitzgerald, Rose, Konopka, Thomas & Weiss, P.A.,
         505 South Flagler Drive, Suite 600, West Palm
19       Beach, Florida, commencing at 8:08 a.m., on the
         above date, before Kelly J. Lawton, Registered
20       Professional Reporter, Licensed Court Reporter,
         and Certified Court Reporter.
21
22                              - - -
23               GOLKOW LITIGATION SERVICES
             877.370.3377 ph | 917.591.5672 fax
24                   deps@golkow.com
```

```
 1    APPEARANCES:

 2    MRACHEK, FITZGERALD, ROSE, KONOPKA, THOMAS & WEISS
      BY:  GREGORY S. WEISS, ESQUIRE
 3    505 South Flagler Drive, Suite 600
      West Palm Beach, Florida 33401
 4    (561) 655-2250
      gweiss@mrachek-law.com
 5    Representing Plaintiff

 6
      LEVIN, SEDRAN & BERMAN, LLP
 7    BY:  KEITH J. VERRIER, ESQUIRE
      510 Walnut Street, Suite 500
 8    Philadelphia, Pennsylvania 19106
      (215) 592-1500
 9    kverrier@lfsblaw.com
      Representing Plaintiff

10
11    ALSTON & BIRD, LLP
      BY:  MATTHEW D. LAWSON, ESQUIRE
12    BY:  METHAWEE MANUPIPATPONG, ESQUIRE
      BY:  LARA TUMEH, ESQUIRE
13    One Atlantic Center
      1201 West Peachtree Street
14    Atlanta, Georgia 30309
      (404) 881-7000
15    matt.lawson@alston.com
      mae.manupipatpong@alston.com
16    lara.tumeh@alston.com
      Representing Taishan Gypsum Co., Ltd. and Tai'an
17    Taishan Plasterboard, Co., Ltd.

18
      GORDON, ARATA, MONTGOMERY, BARNETT
19    BY:  ALEX B. ROTHENBERG, ESQUIRE
      201 St. Charles Avenue, 40th Floor
20    New Orleans, Louisiana 70170
      (504) 582-1111
21    arothenberg@gamb.law
      Representing BNBM PLC

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 388 of 3246
Case 1:14-cv-22447-MGC Document 2038-19 Entered on FLSD Docket 05/30/19 Page 49 of
191
Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES:

 2       ORRICK, HERRINGTON & SUTCLIFFE, LLP

         BY:  DAN GUERRA, ESQUIRE

 3       The Orrick Building

         405 Howard Street

 4       San Francisco, California 94105

         (415) 773-5545

 5       dguerra@orrick.com

         Representing BNBM PLC

 6

 7   ALSO PRESENT:

 8       Cathy Etter

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                        - - -
                     I N D E X
 2                        - - -
 3   Testimony of:  STEVEN ETTER
 4       DIRECT EXAMINATION BY MR. LAWSON...............   6
 5
 6
 7                 E X H I B I T S
 8               (Attached to Transcript)
 9   DEFENDANTS'                                        PAGE
10   Exhibit 1    Special Warranty Deed                  17
11   Exhibit 2    AIA Document A101-1997 - Standard      20
                  Form of Agreement Between Owner and
12                Contracted Where the Basis of
                  Payment is a Stipulated Sum - Bates
13                Numbered Etter000018 to Etter000027
14   Exhibit 3    Seacoast National Bank Loan            26
                  Statement
15
     Exhibit 4    Martin County, Florida - Laurel        28
16                Kelly, C.F.A - Summary
17   Exhibit 5    IMR Test Labs - Analysis of Drywall    53
                  Sample - Bates Numbered
18                CDWINDO1-006020 to CDWINDO1-006023
19   Exhibit 6    Declaration of Correctness of          56
                  Square Footage on Chinese Drywall
20                Client(s) Property for Remediation
                  Damages
21
     Exhibit 7    Floor Plan and Site Plan - Lot 4,      57
22                Emerald Harbour, Martin County,
                  Florida
23
24
```

```
  1                    E X H I B I T S
  2    DEFENDANTS'                                           PAGE
  3    Exhibit 8    Plaintiff Profile Form -          62
                    Residential Properties - Bates
  4                 Numbered Etter 000001 to
                    Etter000035
  5
       Exhibit 9    January 4, 2019 Letter and        66
  6                 September 18, 2012 Settlement
                    Agreement and Release between the
  7                 Etters and United Services
                    Automobile Association
  8
       Exhibit 10   May 8, 2013 Letter, Check, and    71
  9                 Confidential Settlement and General
                    Release Agreement between the
 10                 Etters and J. Helm Construction,
                    Inc. - Bates Numbered ETTER000082
 11                 to ETTER000093
 12    Exhibit 11   Photographs - Bates Numbered      87
                    Taishan000026 to Taishan000029
 13    Exhibit 12   November 5, 2010 Chinese Drywall  91
                    Screening, LLC Report Summary
 14
       Exhibit 13   Chinese Drywall Screening, LLC    99
 15                 Evidence Preservation Report
 16    Exhibit 14   Supplemental Plaintiff Profile Form 106
                    - Residential and Commercial
 17                 Properties (Non-Knauf)
 18    Exhibit 15   Christian Thomas Construction, Inc. 124
                    Remediation Cost of Repairs
 19
       Exhibit 16   Spreadsheets - Total Costs Directly 136
 20                 Related to Chinese Drywall
                    Remediation of the Etter Property
 21
       Exhibit 17   Invoices - Bates Numbered         147
 22                 ETTER000021 to ETTER000081
 23    Exhibit 18   Priority Claimant, Steven Etter's 167
                    Answers to Defendants'
 24                 Interrogatories
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 391 of 3246
Case 1:14-cv-06011-MCE Document 22363-39 filed 11/19/19 Page 391 of 3246 of
191

Confidential - Subject to Further Confidentiality Review

```
 1                        - - -

 2            THE COURT REPORTER:  Sir, would you please

 3        raise your right hand.

 4            Do you swear or affirm that the testimony

 5        you're about to give will be the truth, the whole

 6        truth, and nothing but the truth?

 7            THE WITNESS:  I do.

 8            STEVEN ETTER, called as a witness by the

 9    Defendants, having been first duly sworn, testified

10    as follows:

11                    DIRECT EXAMINATION

12    BY MR. LAWSON:

13        Q.   Good morning.  Could you please state your

14    name for the record?

15        A.   Steven Etter.

16        Q.   Mr. Etter, do you understand that just a

17    moment ago when you raised your right hand that you

18    were swearing to tell the truth as if you were

19    testifying in court in front of a judge today?

20        A.   Yes.

21        Q.   And have you ever been deposed before this?

22        A.   A couple times, I think.  I had a long

23    business career, so . . .

24        Q.   Can you think of what lawsuits you were
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 392 of 3246
Case 1:14-cv-24044-CEF Document 200-4 Entered on FLSD Docket 05/30/2019 Page 9 of 191

Confidential - Subject to Further Confidentiality Review

 1     involved in that led you to be deposed previously?

 2          A.   We had -- one was a personnel issue with a

 3     business, and one was with an insurance company.

 4          Q.   I wanted to --

 5          A.   I think -- I think that was a deposition.  It

 6     might not have been.

 7          Q.   Okay.  Well, you have been through this

 8     before, but it might have been awhile.  I just wanted

 9     to go over some of the rules of the road for today

10     that will make this easier on everyone, especially

11     the court reporter here.

12               She is taking down everything that we are

13     saying, which means that we need to do our best to

14     help her to speak slowly, clearly, and to make sure

15     that we don't talk over each other with my questions

16     and your answers.

17               And usually the best way to do that is to

18     take a beat or a pause in between you finishing your

19     answer, me finishing my question.  That will also

20     allow your attorney to object, if he has any

21     objections.  And if he does object, I would ask that

22     you allow him to complete his objection.  If he does

23     not tell you to not answer the question, then we

24     would ask you to answer the question as completely as

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 393 of 3246
Case 1:14-cv-24049-MGC Document Entered on FLSD Docket 05/30/2019 Page 4 of
191
Confidential - Subject to Further Confidentiality Review

```
 1    you can.  Otherwise, if he tells you not to answer,

 2    then you do not need to answer the question.

 3             Does that make sense?

 4    A.   Sure.

 5    Q.   If at any point today you need to take a

 6    break, please just let me know.  It's really no

 7    problem.  We can go off the record, take a break.

 8    You're the boss of that.  Just let me know at anytime

 9    if that's something that you'd like to do.

10             If any of my questions are not clear to you,

11    please just let me know, and I will rephrase them,

12    try to say them in a different way.  I want to make

13    sure that you understand what I'm asking and what

14    you're answering as we go through today.

15             Did you meet with your lawyer prior to today

16    to prepare for this deposition?

17    A.   Yes.

18    Q.   When?

19    A.   Yesterday.

20    Q.   Okay.  And for about how long did you meet?

21    A.   What was it, an hour?  Maybe a little more.

22    Q.   Is that the only time that you met to prepare

23    for this deposition with your lawyer?

24    A.   For this?  Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 394 of 3246
Case 1:14-cv-02046-MGC Document 298-5 Entered on FLSD Docket 11/18/19 Page 40 of 191
Confidential - Subject to Further Confidentiality Review

```
 1        Q.    And who was present at that meeting other

 2   than your lawyer?

 3        A.    My wife, Cathy.

 4        Q.    And by "your lawyer," I'm referring -- am I

 5   correct to assume that's Mr. Weiss?

 6        A.    Yes, it is.

 7        Q.    And he is seated next to you today?

 8        A.    Yes.

 9        Q.    Did you review any documents during your

10   preparation for this deposition?

11        A.    Partially.  A couple.

12        Q.    And are you aware of any documents that you

13   think are relevant to your claims in this lawsuit

14   that you have not produced to your lawyer?

15             MR. WEISS:  Object to the form.

16             You can answer.

17             THE WITNESS:  Pardon me?

18             MR. WEISS:  I apologize.  I'm going to -- he

19        said this earlier, and we talked about it

20        yesterday.  I'm going to object to the form of

21        some questions.  There's no judge here to rule on

22        evidence.  It's just to preserve the objection

23        for the record.

24             THE WITNESS:  Okay.
```

Case 2:09-md-02047-EEF-MBN  Document 22363-39  Filed 11/19/19  Page 395 of 3246
Case 11-cv-21408-MGC  Document 209-6  Entered on FLSD Docket 11/02/11  Page 41 of
191

Confidential - Subject to Further Confidentiality Review

```
 1              MR. WEISS:  Unless I tell you not to answer a

 2         question, you should go ahead and answer it.

 3              THE WITNESS:  Okay.

 4              MR. WEISS:  I would only direct you not to

 5         answer a question if it invades the

 6         attorney/client privilege, which I doubt that

 7         there will be that type of question today.

 8              THE WITNESS:  All right.

 9              MR. WEISS:  So I was simply objecting to the

10         form, for the record, and saying you can answer

11         the question, if you remember it.

12              THE WITNESS:  All right.  We need the

13         question again.

14              MR. LAWSON:  Yes.  I'll ask it again.

15    BY MR. LAWSON:

16         Q.   Are you aware of any documents that you think

17    are relevant to your claims in this lawsuit that you

18    have not given over to your lawyer?

19              MR. WEISS:  And I object to the form.

20              Go ahead.  You can answer.

21              THE WITNESS:  No.

22    BY MR. LAWSON:

23         Q.   Did you speak with anyone other than your

24    lawyer and your wife in preparing for this
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 396 of 3246
Case 1:11-cv-01408-MGC Document 26315 Entered on FLSD Docket 11/19/18 Page 42 of
191

Confidential - Subject to Further Confidentiality Review

```
1     deposition?

2          A.    No.

3          Q.    Mr. Etter, are you currently employed?

4          A.    Retired.

5          Q.    Okay.  And you talked a little bit earlier

6     about your long business career.  Where did you work?

7          A.    I spent the last 25 years -- I owned a

8     materials testing lab; it was located in Cincinnati.

9     We had an office in Stuart, too, a lab in Stuart.

10         Q.    What type of materials testing did the lab

11    do?

12         A.    It was high-end metallic testing.  Customers

13    were Rolls Royce, GE jet engines, NASA, artificial

14    hips and knees.

15         Q.    And what kind of conditions were the

16    materials put under to test them?

17         A.    They were mechanical machines, and we could

18    heat and cool the specimens.  So we could heat them

19    to 1300 or 3,000 degrees.  We could cool them to

20    minus 300 because of the jet engine NASA

21    requirements.

22         Q.    And what was your role at that company for

23    those 25 years?  Did it change over time?

24         A.    No.  I was the owner and president.
```

Case 2:09-md-02047-EEF-MBN  Document 22363-39  Filed 11/19/19  Page 397 of 3246 of
Case 1:14-md-XXXX-MGC-FD  Document 22363  Entered on FLSD Docket 11/19/19  Page 13 of
191

Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Prior to those 25 years working at your

 2    company, where did you work?

 3        A.    When I got out of grad school, I went to

 4    Boise Cascade in Portland.  And then after two years,

 5    came to Cincinnati and worked for a private company

 6    here.

 7        Q.    And did you ever serve in the military?

 8        A.    Yes.

 9        Q.    And when did you serve?

10        A.    I graduated from the naval academy in '68; I

11    was a pilot.  And got out in '75 when I went back to

12    grad school.

13        Q.    And you may have said this a moment ago, but

14    when you went to graduate school, what did you study?

15        A.    Business.

16        Q.    Are you married?

17        A.    Yes.

18        Q.    And who are you married to?

19        A.    Cathy Etter.

20        Q.    And how long have you been married, about?

21        A.    50 years, a little over.

22        Q.    Do you have any children?

23        A.    Two.

24        Q.    And what are their names?
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.    Todd and Brooke.

 2        Q.    And about how old are they?

 3        A.    One was born in '72, and the other was born

 4   in '78.

 5        Q.    That makes it an easier --

 6        A.    Yes, it does.

 7        Q.    -- than trying to do the math.

 8              You mentioned that there were lawsuits that

 9   involved your company that you worked for previously,

10   that you may have had depositions.  Is that right?

11        A.    Yeah.  Only one.

12        Q.    Only one, the lawsuit?

13        A.    It was brief, yeah.

14        Q.    And it was a personnel issue, you said?

15        A.    Yes.

16        Q.    Okay.  Have you ever been involved in any

17   other lawsuits other than that one before that you

18   can think of?

19        A.    One.  Just one, I think.

20        Q.    Okay.  And what was that?

21        A.    That was back in Cincinnati, and it had to do

22   with a builder.  We moved about 15 times, so it was

23   with a house.

24        Q.    When you say that you moved about 15 times,
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 399 of 3246
Case 1:11-cv-22408-MGC Document 649-6 Entered on FLSD Docket 11/10/11 Page 45 of
191

Confidential -- Subject to Further Confidentiality Review

```
 1    what was the reason that you moved so frequently

 2    throughout your life?

 3         A.   I was in the Navy and in business.  And a

 4    couple of those moves were in the same vicinity, just

 5    different homes.

 6         Q.   If you can think -- and there might be more

 7    than you can recall -- what cities have you lived in

 8    in your life?

 9         A.   In my life?

10         Q.   I guess, let's say, the last 20 years.  How

11    many would you say?

12         A.   In the last 20 years, it's been Cincinnati;

13    Tequesta, Florida.  And it's an Indiana address, but

14    it's a Cincinnati suburb is where we are now.

15         Q.   Okay.  And that's where you live today?

16         A.   Yes.

17         Q.   When did you first move to Florida?

18         A.   2004.

19         Q.   And where did you live when you first moved

20    to Florida in 2004?

21         A.   We rented in the town of Jupiter while we

22    built the home.  I don't remember the name of the

23    area, but . . .

24         Q.   How long did you rent that home?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 400 of 3246
Case 2:11-cv-01408-MGC Document 649-6 Entered on FLSD Docket 11/26/19 Page 16 of
191
Confidential - Subject to Further Confidentiality Review

```
 1       A.    Almost two years, I think.  Give or take two

 2  years.

 3       Q.    Do you remember why you moved to Florida?

 4       A.    Yes.

 5       Q.    Why is that?

 6       A.    Opened a lab in Stuart.  And this is very

 7  technical, and if I were here with all the

 8  electronics, I didn't need to hire another manager.

 9       Q.    How long -- excuse me.

10             You already said you lived there for about

11  two years in the rental home.  Is that right?

12       A.    Right.  While they were building the home,

13  yes.

14       Q.    And that's when you moved into the home in

15  Tequesta, Florida.  Is that right?

16       A.    At the end of two years, yes; 2006.

17       Q.    And is that the property that you allege has

18  been damaged -- was damaged by Chinese drywall that

19  is involved in this lawsuit, the home that you moved

20  into?

21       A.    Yes.

22       Q.    What was the address of that home?

23       A.    I think it was 18 -- it had five --

24  18-something.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 401 of 3246
Case 1:11-cv-22408-MGC Document 64-15 Entered on FLSD Docket 11/21/19 Page 47 of
191

Confidential - Subject to Further Confidentiality Review

```
1              MRS. ETTER:  18894.

2        A.   Yeah, 18894 Southeast Jupiter Inlet Way.

3              MR. WEISS:  And try to resist the temptation

4        to ask Cathy a question.

5              THE WITNESS:  It just slipped my mind, 18894.

6   BY MR. LAWSON:

7        Q.   That's fine.  And I'll do a better job of

8   helping you by putting some documents in front of you

9   so I don't have to test you on things like that.

10             Can you tell me about why you decided to

11  build a home in the community that it was in, in the

12  area that it was it?  What drove you to build a home

13  there?

14       A.   We looked all over the area, you know, from

15  up in Stuart, down south.  I also had to pick the

16  space for the new lab.  So it was a combination of,

17  you know, where I'm going to put that, where I'm

18  going to live.  So it was one of those.

19             The market was hot, and this area where we

20  built has six lots.  And it was right on the

21  Intercoastal; the home wasn't exactly, we were in the

22  backside of the cul-de-sac.  But -- so we bought the

23  lot.  And one of the conditions was that the fella

24  who sold us the lot, he built the home.  So that's
```

```
1    how we found it.
2           (Defendants' Exhibit 1 was marked for
3    identification.)
4    BY MR. LAWSON:
5       Q.   You have been handed a document that's been
6    marked as Exhibit 1.  It's titled at the top as
7    Special Warranty Deed.
8           Do you see that?
9       A.   Yes, I see that.
10      Q.   And the warranty deed is dated at the top as
11   the 8th day of December, 2004.
12          Do you see that?
13      A.   Yes.
14      Q.   Looking at this document, do you have any
15   recollection of what this is?
16      A.    Not really.  It had to do with -- something
17   to do with purchasing the lot.
18      Q.   Does it sound about right that you would have
19   purchased the lot for your home on Jupiter Inlet Way
20   around 2004?
21      A.   Yes.
22      Q.   And the home was built sometime between 2004
23   and 2006 when you moved into it.  Is that right?
24      A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 403 of 3246
Case 1:11-cv-22408-MGC Document 269-5 Entered on FLSD Docket 11/30/19 Page 49 of
191

Confidential - Subject to Further Confidentiality Review

```
1          Q.    A second ago you said that the purchase --
2     the home was purchased from -- excuse me, that the
3     lot was purchased from the same person who built the
4     home.  Is that right?
5          A.    Yes.
6          Q.    And is -- was the home in a neighborhood
7     called Emerald Harbour?  Is that accurate?
8          A.    Yes.
9          Q.    Was that community largely already completed
10    at the time that you built your home, or was it --
11    had a lot of unfinished lots and homes at the time?
12         A.    Unfinished.  Six lots.
13         Q.    There were only six lots in the whole
14    community?
15         A.    (Witness nods.)
16         Q.    And were there any completed homes at the
17    time that you bought this lot, if you can recall?
18         A.    Yes.
19         Q.    Okay.  About how many were completed at that
20    time?
21         A.    I think only one was complete.  They might
22    have been working on a second.
23         Q.    And of the six lots, were the other homes
24    built around the same time as your home?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/12/19 Page 404 of 3246
Case 2:14-cv-02722-MCE-DB Document 248-6 Confidential—Subject to Further Confidentiality Review Page 39 of
191

Confidential - Subject to Further Confidentiality Review

1      A.    When you say "around the same time," not

2      simultaneously at all.  Maybe over a period of three

3      or four years.

4      Q.    Okay.  So within three or four years of your

5      home being built, the other lots were completed and

6      homes were built?

7      A.    I think so.  I'm not sure about the last

8      home.

9      Q.    Okay.  There may have been one lot that

10     wasn't completed in the time frame of three or four

11     years?

12     A.    Right, right.

13     Q.    So after purchasing the lot, what kind of

14     discussions did you have with the homebuilder about

15     the type of home that you wanted built on that lot?

16     Do you recall that?

17     A.    I know we met with him frequently, and we had

18     an architect, so . . .

19     Q.    So you had a design from an architect that

20     you wanted the home built to those specifications?

21     A.    Yes.  With input from everyone though, but,

22     yes.

23     Q.    When you say "input from everyone" --

24     A.    The builder and us.  You know, maybe you want

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 405 of 3246
Case 1:11-cv-01408-MGC Document 6 Entered on FLSD Docket 11/16/19 Page 41 of 191
Confidential - Subject to Further Confidentiality Review

1    to do that versus this, that sort of . . .

2        Q.   Do you remember if you had any conversations

3    with the builder about the materials that the home

4    would be built with before it was built?

5        A.   Yes.  But it was things like what kind of

6    flooring do you want and stuff.  It was nothing to do

7    with the structure.  It was more along those . . .

8        Q.   You never had a discussion with the

9    homebuilder about the drywall that would be used?

10       A.   No, no.

11       Q.   We can set aside that document.

12           (Defendants' Exhibit 2 was marked for

13   identification.)

14   BY MR. LAWSON:

15       Q.   I have handed you a document that's been

16   marked as Exhibit 2.  This document appears to be

17   labeled at the top:  Standard Form of Agreement

18   Between Owner and Contractor.

19           Do you see that?

20       A.   I see it.

21       Q.   Looking at this document, do you recognize

22   it?

23       A.   Only because it's in a stack of documents

24   that I have.

Confidential -- Subject to Further Confidentiality Review

```
 1        Q.   Does it sound right to you that this is the

 2   purchase agreement for your home in Jupiter Way

 3   Inlet -- or, excuse me, Jupiter Inlet Way that is the

 4   subject of this lawsuit?

 5             MR. WEISS:  Object to the form.

 6             You can answer.

 7             THE WITNESS:  Pardon me?

 8             MR. WEISS:  You can answer.

 9             THE WITNESS:  I think so, yeah.  Yes.

10   BY MR. LAWSON:

11        Q.   And that's your name on the first page of the

12   document, along with your wife's name.  Is that

13   right?

14        A.   Yes.

15        Q.   And the contractor that's listed on the first

16   page is J. Helm Construction, doing business as

17   Sundown Development.  Is that right?

18        A.   Yes.

19        Q.   And is that the homebuilder who constructed

20   your home?

21        A.   Yes.

22        Q.   Turning your attention to the seventh page of

23   this document -- and you can see it labeled in the

24   bottom right-hand corner.  There's also a Bates stamp
```

Confidential - Subject to Further Confidentiality Review

```
 1    that reads Etter 000024.  Do you see your signature

 2    on that page?

 3         A.    Which page?  I'm sorry.

 4         Q.    It's the seventh page of the agreement.

 5         A.    Yeah, I see that.

 6         Q.    And in the bottom right-hand corner there's a

 7    Bates stamp that's also Number 24.

 8               Do you see your signature on that page?

 9         A.    I do.

10         Q.    Looking to the third page of this document,

11    at the top of that page, which is also Bates stamped

12    as Number 20, there's an Article 4 titled Contract

13    Sum.

14               Do you see that?

15         A.    Yes.

16         Q.    And that contract sum is listed as $865,716.

17               Do you see that?

18         A.    Yes.

19         Q.    Does that sound about right for the amount

20    that you paid under this contract to the homebuilder

21    to construct your home on Jupiter Way Inlet?

22         A.    No.

23         Q.    Did you pay additional money on top of that?

24         A.    Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 408 of 3246
Case 1:11-cv-22408-MGC Document 68-6 Entered on FLSD Docket 11/30/11 Page 84 of 191

Confidential – Subject to Further Confidentiality Review

```
 1        Q.    Let's turn to the eighth page of the

 2   document.  It's after the signature page that we just

 3   looked at.  And it is a chart on that page, Etter 25,

 4   where the title of it is Emerald Harbour Lot 4 Costs.

 5            Do you see that?

 6        A.    Yes.

 7        Q.    And that continues on to Etter 26 in that

 8   chart.

 9            Do you see that?

10        A.    Yes.

11        Q.    And it appears that you may have initialed it

12   in November of 2004 on Etter 26.

13            Do you see that?

14        A.    Yes.

15        Q.    If you look across this chart, what does this

16   look like to you, this list of costs?

17            MR. WEISS:  Object to the form.

18            You can answer.

19            THE WITNESS:  I can answer?

20            MR. WEISS:  You can, yes.

21            THE WITNESS:  It looks like the initial

22        estimate as to what he would spend on each one of

23        those items.

24   BY MR. LAWSON:
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 409 of 3246
Case 1:11-cv-22408-MGC Document 286-6 Entered on FLSD Docket 11/28/19 Page 95 of
191

Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Okay.  Are these items in addition to what
 2    you were paying in the contract price, or is this a
 3    total list of costs that were estimated by the
 4    homebuilder?
 5             MR. WEISS:  Object to the form.
 6             You can answer.
 7             THE WITNESS:  I can.  All right.
 8             I don't know that it's all of them.  I mean,
 9         this is all that I had to look at when dealing
10         with it.
11    BY MR. LAWSON:
12        Q.   If you look to the total that's listed on the
13    second page of the chart on Etter 26.
14        A.   Right.
15        Q.   Do you see that?
16        A.   Yes.
17        Q.   The amount that's listed is 1,465,716.  Is
18    that in dollars?
19        A.   Yes.
20        Q.   And is that, to your knowledge, the amount of
21    money that you paid to the homebuilder for the
22    construction of your home?
23        A.   No.
24        Q.   Do you know the amount of money that you
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 410 of 3246
Case 2:14-cv-02722-MCE Document 94-6 Confidential 6 Subject to Further Confidentiality Review
191

1    paid?

2        A.    I don't have the exact dollar.  We have all

3    the forms.

4        Q.    Do you think it was more money than what is

5    listed there?

6        A.    Yes.

7        Q.    Looking at this chart, there are items that

8    are bolded in the account number field, which is the

9    first column, and some that are not bolded.  There's

10   also an asterisk next to the bolded items.

11            Do you know what that is?

12       A.    No.

13       Q.    It says in the second page of the chart, next

14   to asterisk, that it denotes an allowance.

15            Do you see that?

16       A.    I see that, yes.

17       Q.    And what does that mean to you?

18       A.    What it would mean, that it's his estimate as

19   to what something in that category should cost.  But

20   it would depend on exactly what we chose.

21       Q.    Okay.  So there could be some variance in the

22   cost on those items?

23       A.    Yeah.  It would have to be.  You wouldn't

24   know.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 411 of 3246
Case 1:11-cv-22408-MGC Document 94-6 Entered on FLSD Docket 11/20/11 Page 97 of
191
Confidential - Subject to Further Confidentiality Review

```
 1      Q.    Looking to the final page of this exhibit,

 2    which is marked as Etter 27, do you see that page

 3    that's titled Amendment to Contract?

 4      A.    Yes.

 5      Q.    And under Line Item 2, it states:  The

 6    purchase price of lot is hereby decreased to 600 --

 7    it says six hundred dollars, but then lists $600,000.

 8            Do you see that?

 9      A.    I see that.

10      Q.    And was that part of the agreement that the

11    amount that you would pay for the lot in this

12    agreement would be reduced based on your purchase of

13    the home?

14      A.    I have no idea about the reduction.  That was

15    just the lot price.

16      Q.    When you purchased this home, did you finance

17    any of that purchase, or did you pay in cash?

18      A.    It was financed.

19            (Defendants' Exhibit 3 was marked for

20    identification.)

21    BY MR. LAWSON:

22      Q.    I have handed you a document that's been

23    marked as Exhibit 3.  It's titled at the top Seacoast

24    National Bank Loan Statement.
```

Confidential - Subject to Further Confidentiality Review

1           Do you see that?

2       A.    I see that.

3       Q.    And do you know what this document is?

4       A.    It's a statement of the outstanding loan, it

5   looks like.

6       Q.    It appears from the statement date that is

7   listed in the upper right-hand corner that this is a

8   statement from November 19th, 2010.

9           Do you see that?

10      A.    Yes.

11      Q.    And as of that date, it appears to list a

12  current balance on this loan of $1,253,000.

13          Do you see that?

14      A.    Yes.

15      Q.    Is it accurate to say that this is the loan

16  that you received to finance the purchase of your

17  home?

18      A.    I think it's the same loan, but it's several

19  years after we moved in.

20      Q.    That's right.  This is in 2010, and you

21  purchased your home many years before that.  Is that

22  right?

23      A.    Right.

24      Q.    So this would not list the amount of money

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 413 of 3246 of
Case 1:11-cv-21485-MGC Document 266-8 Entered on FLSD Docket 11/30/15 Page 49 of
191
Confidential - Subject to Further Confidentiality Review

1   that you originally financed through your -- through

2   a mortgage to be able to purchase the home.  Is that

3   right?

4       A.   That's correct.

5       Q.   But that amount would have likely been in

6   excess of $1.2 million.  Is that right?

7       A.   I think so.

8       Q.   Do you remember how much you put down on the

9   home when you purchased it?

10      A.   Not exactly.

11      Q.   Looking at this document, the amount that is

12  listed as due on Exhibit 3 in this statement is

13  $4,176.67.

14           Do you see that?

15      A.   I see that.

16      Q.   Does that sound consistent with the amount of

17  money that you paid regularly as monthly mortgage

18  payments while you owned this home?

19      A.   It's likely.  I don't remember the exact

20  number.

21           (Defendants' Exhibit 4 was marked for

22  identification.)

23  BY MR. LAWSON:

24      Q.   Mr. Etter, you have been handed a document

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 414 of 3246
Case 1:11-cv-22408-MGC Document 2016 Entered on FLSD Docket 11/20/19 Page 40 of 191
Confidential - Subject to Further Confidentiality Review

```
1     that has been marked as Exhibit 4.  I represent to

2     you that this is a Martin County Florida property

3     record for 18894 Southeast Jupiter Inlet Way in

4     Tequesta, Florida.

5             Do you see that?

6        A.   Yes.

7        Q.   And I would also represent to you that this

8     was printed from the Martin County website around

9     January 2nd of 2019.

10            Do you see that in the upper left-hand

11    corner, that date?

12       A.   Yes.

13       Q.   Looking at this document, does this appear to

14    be a record for the same home that we've been

15    discussing on Jupiter Inlet Way, 18894?

16       A.   Yes.

17       Q.   And it's accurate to say that you do not

18    currently own that home, as you have moved back to

19    Cincinnati; is that right?

20       A.   Yes.

21       Q.   When did you sell the home?

22       A.   It had to be September of '16.

23       Q.   If you look --

24       A.   Approximately, yeah.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 415 of 3246
Case 1:11-cv-22408-MGC Document 49-5 Entered on FLSD Docket 11/22/11 Page 41 of 191
Confidential - Subject to Further Confidentiality Review

```
 1      Q.   I'm sorry.

 2           If you look to the Sale Date field that's

 3    listed on the left side near the top of the first

 4    page, it lists September 28, 2016.

 5           Do you see that?

 6      A.   Yes, I do.

 7      Q.   Does that sound about right for the date that

 8    you sold the home?

 9      A.   Yes.

10      Q.   If you look down, there's a sale price that's

11    listed of $1,580,000.

12           Do you see that?

13      A.   Yes.

14      Q.   And is that the price that you sold the home

15    for in September of 2016?

16      A.   Yes.  That's the price they paid the realtor,

17    right.

18      Q.   Looking down to the Assessment Information

19    field that is at the bottom of this first page, it

20    lists the market total value of the home as

21    $1,225,860.

22           Do you see that?

23      A.   I see that.

24      Q.   What is your understanding of what that
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 416 of 3246
Case 1:14-cv-06002-BMC Document 39-5 Entered on FLSD Docket 11/2019 Page 92 of
191

Confidential - Subject to Further Confidentiality Review

```
 1    Market Total Value field is?

 2         A.   I'm not certain.  I -- it could be something

 3    I think it is, or not.

 4              MR. WEISS:  He's not ask asking you to guess.

 5              THE WITNESS:  I'm not certain what it is.  I

 6         have an idea what it's for.

 7    BY MR. LAWSON:

 8         Q.   What is your idea of what it's for?

 9         A.   It's what the tax assessors use.

10         Q.   So the tax assessors they will take a number

11    of what the assessed value of the home is to

12    determine property taxes.  Is that right?

13         A.   Yes.  And it's normally lower than the

14    selling price.

15         Q.   Right.

16              And here, this number is around $300,000

17    lower than the selling price that you sold the home

18    for in 2016.  Is that right?

19         A.   Yes.

20         Q.   I would like to turn your attention to the

21    fourth page of this document.  It's a page that has a

22    chart titled Assessment History.

23              Do you see that?

24         A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 417 of 3246
Case 1:11-cv-22408-MGC Document 2495 Entered on FLSD Docket 11/30/11 Page 48 of
191
Confidential - Subject to Further Confidentiality Review

```
 1       Q.    And this chart of Assessment History appears

 2    to list years from 2004 through 2018.

 3             Do you see that?

 4       A.    Yes.

 5       Q.    And the assessment for -- the assessment date

 6    for each one of those years appears to occur on

 7    January 1st of the year.

 8             Do you see that?

 9       A.    Yes, yes.

10       Q.    Now, is it accurate to say that your home was

11    built around the year 2006?  Is that right?

12       A.    Finished, yes.

13       Q.    And that home was completed around 2006.  Is

14    that right?

15       A.    Yes, yes.

16       Q.    Looking at the assessment year of 2007, do

17    you see that the market value that is listed on this

18    chart for the home in 2007 on January 1st of that

19    year is $1,168,800?

20       A.    Yes.

21       Q.    Looking to 2009, do you see that the market

22    value is listed as $471,330?

23       A.    Yes.

24       Q.    Do you have any idea why the market value of
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 418 of 3246
Case 1:11-cv-22408-MGC Document 249-6 Entered on FLSD Docket 11/08/19 Page 54 of 191
Confidential - Subject to Further Confidentiality Review

 1    the home dropped so significantly between 2007 and

 2    2009?

 3         A.   Yes.

 4         Q.   And why is that?

 5         A.   They had a special program in Martin County

 6    for victims of Chinese drywall, because you couldn't

 7    sell the home, and a lot of people couldn't live in

 8    it.  So they gave everyone a lower -- you couldn't

 9    sell it.  So it was basically land value.

10         Q.   So if you look in 2009, they list the land

11    value of the home as $432,000.

12              Do you see that?

13         A.   Yes.

14         Q.   And that's only about $40,000 less than the

15    market value that's listed for that year.  Is that

16    right?

17         A.   Right, right.

18         Q.   And the total improvement value for the home

19    in 2009 is listed as $39,330.  Is that right?

20         A.   Right.

21         Q.   So consistent with what you were saying, the

22    County reduced the improvement value, the value of

23    the structure of the home down to almost $40,000.  Is

24    that right?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 419 of 3246
Case 1:11-cv-22408-MGC Document 64-6 Entered on FLSD Docket 12/03/11 Page 45 of
191
Confidential - Subject to Further Confidentiality Review

```
1       A.    I think that's how they did it, yes.

2       Q.    And that reduced your property tax payments

3   during that time.  Is that right?

4       A.    Yes, it did.

5       Q.    Do you know about how much less in property

6   taxes you were paying while that program for people

7   who had suffered from Chinese drywall was going on in

8   the county?

9       A.    No.

10       Q.    Do you remember it to be a significant

11   reduction?

12       A.    Significant?  I --

13       Q.    Was it a difference in thousands of dollars?

14       A.    Maybe a couple.  I don't know.

15       Q.    Do you know if you have any records of the

16   amount of money that you received in tax relief from

17   that program?

18       A.    I'm not sure we have it specifically.

19       Q.    Do you know how many years you received

20   relief from that program?

21       A.    I think it was until it was complete.

22       Q.    And when you say when "it was complete," what

23   do you mean?

24       A.    Well, we had the remediation and the
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 420 of 3246
Case 1:11-cv-22408-MGC Document 284-6 Entered on FLSD Docket 11/2/2011 Page 96 of
191
Confidential - Subject to Further Confidentiality Review

1    rebuilding of the home.  And they're always a year

2    behind.  They come out and look at it.  And so I

3    don't know the dates or anything.

4         Q.   You had to report to the County that you had

5    Chinese drywall in your home to receive this relief.

6    Is that right?

7         A.   Yeah.  I think it was a form.  But I don't

8    recall.

9         Q.   And when you completed the remediation and

10   reconstruction of your home, did you report that the

11   home had been remediated to the County?

12        A.   I'm not sure of the mechanics.  I think

13   there's a form when a builder is complete, he has to

14   complete that to the County that the construction is

15   complete, and that triggers their internal mechanism

16   somehow.  I don't know how that works.

17        Q.   Does it sound about right that you moved back

18   into the home in 2013 after the remediation and

19   reconstruction was completed?

20        A.   Yes.  We did move back in in '13.

21        Q.   Looking to this chart in -- for the year of

22   2014, as of January 1, 2014, the County lists the

23   improvement value of the home as $504,160.

24             Do you see that?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 421 of 3246
Case 1:11-cv-22408-MGC Document 249-6 Entered on FLSD Docket 11/20/13 Page 97 of
191

Confidential - Subject to Further Confidentiality Review

```
1        A.   I see that.

2        Q.   And the total market value was then listed

3   $699,160.

4             Do you see that?

5        A.   I see it.

6        Q.   And is it your understanding at that point

7   that you were no longer receiving the tax relief

8   related to Chinese drywall that we were discussing

9   earlier as of 2014, that tax year?

10            MR. WEISS:  Object to the form.

11            You can answer.

12            THE WITNESS:  I believe so.

13  BY MR. LAWSON:

14       Q.   Looking forward to 2018, the most recent year

15  that is listed, the market value of the home is

16  listed as $1,225,860.  Is that right?

17       A.   Yes.

18       Q.   And that is slightly more than the market

19  value that was listed in 2007 of $1,168,800.  Is that

20  right?

21       A.   Those are the numbers, yes.

22       Q.   So you would agree that the market value has,

23  at this point, recovered back to the levels that it

24  was at in 2007, around the time that the home was
```

Case 2:09-md-02047-EEF-MBN   Document 22363-39   Filed 11/19/18   Page 422 of 3246
Case 1:11-cv-22408-MGC   Document 849-6   Entered on FLSD Docket 11/20/13   Page 98 of
191

Confidential - Subject to Further Confidentiality Review

```
 1   originally constructed, according to this record?

 2           MR. WEISS:  Object to the form.

 3           THE WITNESS:  Yes.  But I had -- this home

 4       was homesteaded.  And I don't know the mechanics,

 5       but what it does is it limits the amount that the

 6       County can increase that number each year, no

 7       matter what the market does.

 8   BY MR. LAWSON:

 9       Q.   And do you know when that homestead exception

10   or homestead designation was placed on the home?

11       A.   Originally when we first bought it.

12       Q.   And has that maintained throughout the time

13   that you owned the home?

14       A.   I don't know if they maintained it during

15   those down years while it was being remediated or

16   they had to reinstitute it.  I don't know.  But it

17   was homesteaded all the time it was finished.

18       Q.   Well, looking back to 2014, the first year

19   after -- the first full year after the home had been

20   reconstructed, the total market value that the County

21   has assessed the home for has nearly doubled.  Is

22   that right?

23       A.   You mean from '14 to '18?

24       Q.   That's right.
```

Confidential - Subject to Further Confidentiality Review

```
 1      A.   The numbers say that, yes.

 2      Q.   Looking to the next page, there's sale

 3   information listed for December 13th, 2004, on this

 4   page.

 5           Do you see that at the bottom?

 6      A.   Yes, yes.

 7      Q.   And that appears to list the $600,000

 8   purchase of the lot that you built the home on around

 9   December of 2004.

10           Do you see that?

11      A.   I see that.

12      Q.   But there's not a sale listed for the

13   purchase of the actual construction of the home.  Is

14   that right?

15           MR. WEISS:  Object to the form.

16           You can answer.

17           THE WITNESS:  Yes.

18   BY MR. LAWSON:

19      Q.   Earlier you said that there was a form or a

20   record showing the exact amount that you paid to

21   purchase your home.  Is that right?

22      A.   I'm not sure.  You're asking -- can you

23   re-ask?

24      Q.   Yeah.
```

1          I think earlier on when we were looking at

2     the purchase agreement, you said that the amount

3     listed on that purchase agreement was not the total

4     amount that you ultimately paid for the construction

5     of your home between 2004 and 2006.  Is that right?

6          A.   That's right.  That's the price of the

7     construction contract, right.

8          Q.   But the total amount, you said, was in excess

9     of the amount that was listed?

10         A.   Oh, yeah.  Yes.

11         Q.   Do you know if there's record of the exact

12    amount that you paid to purchase and -- excuse me,

13    purchase the lot and the construction and the

14    completion of your home when it was originally built?

15         A.   I don't know that it's one document.  We have

16    lots of records of all the expenses, and I don't know

17    if we had a summary document.

18         Q.   And to your knowledge, have you handed over

19    any documents that you have about the price that you

20    paid for the construction and purchase of your home

21    to your attorney at this time?

22         A.   Yes.  I think so, yes.

23         Q.   You are not aware of any other documents that

24    you haven't?

Confidential - Subject to Further Confidentiality Review

```
 1        A.    No.

 2        Q.    Thank you.

 3              Looking at this document, specifically to the

 4   page before, one page before the assessment history

 5   that we were just reviewing, there is a page listing

 6   improvements.

 7              Do you see that?

 8        A.    I see that.

 9        Q.    And they're in shorthand on the left-hand

10   side, but there appears to be a number of improvement

11   codes that are listed in the left-most column on that

12   chart.

13              Do you see those?

14        A.    I see those.

15        Q.    And those appear to list a series of

16   improvements that were built in 2006, and along with

17   another one that was built in 2016.

18              Do you see that?

19              Looking at the Year Built column.

20        A.    Okay.  I see that, yes.

21        Q.    There appears to be a fountain listed.

22              Do you see that?

23        A.    Yes.

24        Q.    Looking at these improvements that are listed
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 426 of 3246
Case 1:14-cv-04391-MGC Document 249-5 Entered on FLSD Docket 11/20/14 Page 42 of 191
Confidential - Subject to Further Confidentiality Review

```
1    in this chart, can you see any of them that were

2    damaged by Chinese drywall in your home during the

3    time that you lived in it?

4         A.    These were all exterior things.  No.

5         Q.    And were you involved in the addition of the

6    boat lift that is listed in 2016 on this document?

7         A.    We had a boat lift from 2005, and it was just

8    improved.  They put new lifts on it, so . . .

9         Q.    But you purchased that boat lift?

10        A.    Yes, yes.

11        Q.    And that was in 2016?

12        A.    Yes.

13        Q.    All right.  So were any of these items that

14   are listed here, these improvements, replaced in the

15   home at -- when the home was remediated and

16   reconstructed?

17        A.    No.  This was used in their assessment for

18   the lot; anything that wasn't the home.

19        Q.    Did you visit the home while it was being

20   constructed?

21        A.    Yes.

22        Q.    How often?

23        A.    When we were in town, one to several times a

24   week, maybe.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/12/18 Page 427 of 3246
Case 1:11-cv-22408-MGC Document 289-1 Entered on FLSD Docket 11/20/13 Page 43 of 191
Confidential - Subject to Further Confidentiality Review

1     Q.   And you were living in Florida at that time,

2   but not in the same town as where the home was being

3   built?

4     A.   We were in Jupiter, but we were out of town a

5   lot while it was being built.

6     Q.   Did you see the interior of the home when the

7   drywall was being hung inside of the home?

8     A.   I don't think -- you are talking about

9   originally or the second time?

10    Q.   Originally.

11    A.   Oh.  I don't remember.  I don't remember if I

12  was there for that or not.

13    Q.   And to clarify, when I have been asking about

14  the construction of the home, I'm talking about the

15  original construction in the period from 2004 to

16  2006.

17    A.   Okay.  It's probable, but I don't remember.

18    Q.   Do you ever remember seeing the markings on

19  the drywall while the home was being constructed?

20    A.   No.

21    Q.   Do you ever remember being told that the home

22  was being constructed with drywall that was

23  manufactured in China?

24    A.   No.

Confidential - Subject to Further Confidentiality Review

```
 1        Q.    When the home was completed, how long after

 2    it was finished did you move into the home?

 3        A.    It was probably coincidental, because they

 4    still had some things to do, and we wanted to stop

 5    paying rent.  For instance, I don't think the garage

 6    was finished.  There may be some other things.  But I

 7    don't remember specifically.  Except they were still

 8    on site.

 9        Q.    By saying that it was "coincidental," you are

10    saying that you moved in around the same time that

11    they finished the construction?

12        A.    Yes.

13        Q.    When you moved into the home at first, did

14    you notice any issues or problems that you now

15    associate with Chinese drywall?

16        A.    Not initially, no.

17        Q.    Did you notice an unusual odor or smell that

18    you now associate with Chinese drywall?

19        A.    Not initially, no.

20        Q.    How long did it take for you to notice an

21    unusual odor or smell, if you did?

22        A.    Without being specific, probably a couple of

23    years.  And it would be especially if we were gone

24    for awhile.  You know, in Florida, you turn
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 429 of 3246
Case 1:14-cv-06018-JBW Document 64-6 Confidential Subject to Further Confidentiality Review
191

1    the temperature up, you come back in.  It turned out

2    the heat and humidity caused it to gas-off more.  So

3    those times especially.

4         Q.   So when the home was maybe not under

5    air-conditioning for awhile while you were gone, it

6    would have a more pronounced smell?

7         A.   It was always air-conditioned, but at a

8    higher temperature.

9         Q.   Right.

10             So the warmer the house was, you noticed the

11   smell more?

12        A.   Yes, yes.

13        Q.   Did the smell change in any way over time

14   that you lived in the house before it was remediated?

15        A.   It was always the same type of smell.

16        Q.   Did it get more intense over time as you

17   lived in the home?

18        A.   It could have.  I don't know.  It's hard to

19   measure.

20        Q.   Was the smell worse in any particular portion

21   of the house compared to others?

22             MR. WEISS:  Do you want to make an appearance

23        on the record?

24             THE WITNESS:  Yes.  Okay.  Yes.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 430 of 3246
Case 1:11-cv-22408-MGC Document 29476 Entered on FLSD Docket 11/20/19 Page 46 of 191

Confidential - Subject to Further Confidentiality Review

```
 1              MR. LAWSON:  For the record, Dan Guerra has

 2       joined us.

 3  BY MR. LAWSON:

 4       Q.   Where was the house -- excuse me.

 5            Where was the smell worse in the house?

 6       A.   Smaller rooms.

 7       Q.   Can you think of any rooms in particular?

 8       A.   Closets or hallways.  Those sorts of things.

 9       Q.   So you said that you didn't perhaps notice

10  the smell until about two years into living in the

11  house?

12       A.   I mean, it could be 18 months.  But I mean,

13  it wasn't when we first moved in.

14       Q.   Were there any other issues in the home that

15  you now associate with Chinese drywall that occurred

16  during those first 18 months or two years?

17       A.   By about two years, somewhere around in

18  there, we were losing air-conditioning coils.  We had

19  two systems, and they were going out with holes in

20  them.  That was the first thing that we noticed.  And

21  then there were other things beyond that.

22       Q.   When you are saying that you were "losing

23  air-conditioning coils," what was happening to them?

24  They had holes, is that what you said?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 431 of 3246
Case 1:11-cv-22408-MGC Document 84-15 Entered on FLSD Docket 11/20/15 Page 47 of 191
Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.  They are copper coils.  They were

 2   turning black and having pitted holes in them.  So

 3   they would lose the refrigerant, stop working.

 4        Q.    And you had them repaired at that time?

 5        A.    Yes.

 6        Q.    How many times did you have them repaired?

 7        A.    About 11.

 8        Q.    Did you replace the air-conditioning units at

 9   any time, or only have them repaired?

10        A.    By repaired, they replaced the coils.

11        Q.    So the coils were replaced perhaps around 11

12   times?

13        A.    Yes.

14        Q.    And by that 11th time, had -- was the next

15   step to remediate and reconstruct the house, or did

16   the air-conditioning stop malfunctioning after the

17   11th time?

18        A.    There were other things that happened

19   beyond -- started to happen.  That was the first.

20   And that was the first and the chronic issue.

21        Q.    What other issues did you have beyond that?

22        A.    We had sliding rheostats, and they were

23   breaking down.  Anything with copper or silver, that

24   broke down.  Our icemaker broke down.  We had
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 432 of 3246
Case 2:11-cv-01454-MGEL Document 269-5 Entered on FLSD Docket 11/10/19 Page 48 of
191

1   problems, I think, with the -- some of the

2   appliances.  We had a fan go out in our Viking

3   refrigerator.  And then we noticed that our silver --

4   let's say a bowl was sitting on the counter.  The

5   bottom of it would still be bright, and the resin

6   would turn completely black, as did my wife's jewelry

7   and our silverware.  So we had all sorts of issues

8   with anything electronic.

9       Q.   Did you replace the refrigerator that had the

10  fan go out?

11      A.   No.  We just replaced the fan.  We replaced

12  the TV.  I mean, there was a number of things that

13  were replaced and repaired.

14      Q.   And for any of those personal property items

15  that you replaced or repaired, have you submitted any

16  receipts for payment of those replacements or repairs

17  to your attorney?

18      A.   There may be some.  We tried to salvage

19  everything we could, so I don't know.

20      Q.   But you think there might be some additional

21  receipts that you have not given to your attorney?

22      A.   I don't think so.  I think . . .

23           MR. LAWSON:  Greg, I'm sure you guys have

24      attempted to find everything.  But, obviously, if

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 433 of 3246
Case 1:11-cv-01408-MGC Document 2486 Entered on FLSD Docket 11/20/13 Page 49 of 191
Confidential - Subject to Further Confidentiality Review

```
 1          there's anything additional, we could ask that it

 2      be produced.

 3              MR. WEISS:  I think you have everything that

 4      exists.

 5              MR. LAWSON:  Thank you.

 6   BY MR. LAWSON:

 7      Q.   Were there any other issues that you

 8   associate with Chinese drywall beyond the ones that

 9   we have discussed already that were occurring in the

10   home before it was remediated and reconstructed?

11      A.   Are you asking if there were damaged products

12   or something?

13      Q.   Well, I wanted to know, I guess, first if,

14   yeah, there were any other damaged items that you can

15   think of in the home beyond the ones that you have

16   told me about.

17      A.   Well, in general, because of the light

18   switches, we would pull plugs and look, and all the

19   copper ground wires were black and had to replace

20   things.  And all of the copper plumbing was turning

21   black.

22      Q.   Did you have issues with the functioning and

23   the operation of the plumbing in the house?

24      A.   No.  Those are thick walls.  But it did turn
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 434 of 3246
Case 2:14-cv-01408-MGC Document 149-6 Entered on FLSD Docket 11/19/19 Page 50 of 191
Confidential - Subject to Further Confidentiality Review

1    black.  I don't know what the inside looked like.

2        Q.   Did you have issues with the operation of the

3    lighting or electricity?

4        A.   Oh, yes.  Yes.

5        Q.   And what were those issues?

6        A.   Switches were failing.  Can lights would

7    fail.  Those sorts of things.

8        Q.   And was that going on throughout the house or

9    in a particular part of it?

10       A.   No.  Throughout the house.

11            But it was, like we said, with the humidity

12   and heat, it was more prevalent in the master

13   bathroom because that would get steamy.  So they

14   would fail more often.  But the others would fail,

15   too.

16       Q.   When would you say that you first suspected

17   that you might have Chinese drywall in your home?

18       A.   In about -- well, didn't know what it was.  I

19   knew -- we had figured out it was sulfur.  And after

20   three or more coils -- CMI was a company that we used

21   and we had signed a contract with to take care of our

22   air-conditioning/heating units.

23            And we were standing in the kitchen, and he

24   called -- I think we had Trane.  It was either Trane

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 435 of 3246
Case 1:11-cv-21451-MGC Document 2049 Entered on FLSD Docket 11/02/19 Page 91 of
191
Confidential - Subject to Further Confidentiality Review

```
 1    or Carrier, but I think it was Trane.  He called the

 2    company while we were sitting there and got one of

 3    their techs on the phone and explained what our

 4    problem is.  And the tech, without hesitance, said,

 5    it's sulfur.  Well, at this point, we had no idea

 6    where it could come from.  So there was that.

 7            Then in the beginning of '09, I took the

 8    Journal, for obvious reason.  And one fella had an

 9    article in January and February and April in the Wall

10    Street Journal about Chinese drywall and the sulfur.

11    And it was sort of like, okay, this is -- this sounds

12    exactly like what we have.

13            In the spring of '09, I had Helm and his

14    installer come out to the house, and they, back in

15    the storage closet, like, cut out a piece and looked

16    at it.  And the installer and Helm said, This is

17    Chinese drywall.

18       Q.   Did Helm tell you that they had encountered

19    Chinese drywall in other homes that they had

20    constructed?

21       A.   He didn't say anything about that.

22       Q.   Is it your understanding now that Helm did

23    have other homes with Chinese drywall in them?

24       A.   Our next door neighbor had it, we found out
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 436 of 3246
Case 1:11-cv-22408-MGC Document 24-5 Entered on FLSD Docket 11/20/19 Page 52 of
191

Confidential - Subject to Further Confidentiality Review

```
 1   later.

 2        Q.   Do you know if any other homes in the six

 3   lots in that community had Chinese drywall?

 4        A.   I don't think so.  Two were built before, and

 5   the others were built after a bit, so . . .

 6        Q.   And your neighbors told you that they had

 7   Chinese drywall?

 8        A.   Oh, yeah, yeah.

 9        Q.   Did they learn before you or after you?

10        A.   After.

11        Q.   Did you tell them about the Chinese drywall

12   in your home, and that led them to find out?

13        A.   No.  I think they came over -- they had a

14   different brand, and it smelled a lot.  So they --

15   for them, it was a different thing.

16        Q.   Had you been inside of their home before?

17        A.   Maybe once or twice.

18        Q.   Did you notice that the smell was different

19   than the smell inside your home?

20        A.   After the fact it was stronger, yeah.

21        Q.   You said they had a different type of Chinese

22   drywall.  Do you know what type they had?

23        A.   Yes.

24        Q.   What was it?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 437 of 3246
Case 1:11-cv-01449-MGC Document 8-9 Entered on FLSD Docket 11/30/11 Page 48 of 191
Confidential – Subject to Further Confidentiality Review

```
 1         A.    Knauf.

 2         Q.    And did you find the smell to be stronger

 3    than the smell that was in your home?

 4         A.    In our case it was.

 5         Q.    After Helm came to your home and told you

 6    that you had Chinese drywall, what steps did you take

 7    after that?

 8         A.    In the summer -- I was in the materials

 9    testing business, but had nothing to do with

10    chemistry.  We were associates -- I mean, we knew of

11    IMR.  It's a lab in Ithaca, New York.  They are

12    Cornell Ph.D.s.  I don't take -- hold that against

13    them.  And they did a lot of chemical testing and

14    other things.  So I bagged some of the drywall that

15    Helm had cut out, I took little pieces and sealed in

16    plastic and sent it off to them.  And as a favor,

17    when they had an opening, they put it through their

18    system.  And you get these charts.  I don't know if

19    you have seen them, but it will spike on certain

20    elements.  And it had a big spike on sulfur.  So that

21    was one.

22              And then we had consultants come in at

23    Mr. Weiss's request.  And I think that was 2010.  And

24    he came in.  Chinese Drywall Screening is the name of
```

Case 2:09-md-02047-EEF-MBN  Document 22363-39  Filed 11/19/19  Page 488 of 3246 of
Case 1:14-cv-09148-MGC  Document 69-5  Entered on FLSD Docket 11/14/2018  Page 54 of
191

Confidential – Subject to Further Confidentiality Review

1    the company.  And they said, yes, you have Chinese

2    drywall.  And they had cameras behind them and took

3    samples, and they identified it as Taishan drywall.

4        Q.   You mentioned that Mr. Weiss came into the

5    picture somewhere in there.  Do you remember when you

6    hired Mr. Weiss?

7        A.   No.

8        Q.   Was it after that you learned that you had

9    Chinese drywall from Helm Construction?

10       A.   It was after our suspicion, yes.  I don't

11   know the date.

12           (Defendants' Exhibit 5 was marked for

13   identification.)

14   BY MR. LAWSON:

15       Q.   I have handed you a document that's been

16   marked as Exhibit 5.  It is titled --

17       A.   Yeah.

18       Q.   It's titled on the first page as an IMR Test

19   Labs Analysis of Drywall Sample.

20           Do you see that?

21       A.   Yes.

22       Q.   And is this the report that you received for

23   the drywall testing in New York that you were

24   mentioning earlier with the Cornell Ph.D.s?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 189 of 3246
Case 1:11-cv-01408-MGC Document 191-1 Entered on FLSD Docket 11/20/19 Page 45 of
191
Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.  And that's Peter Damian, Cornell Ph.D.

 2        Q.    And this -- where did you pull the sample of

 3   drywall from your home, if you recall, for this test?

 4        A.    I think -- there was a closet storage area

 5   underneath the stairwell on the entry, and I think

 6   that Helm and its installer cut a piece out of that.

 7   So it was, like, a storage area.

 8        Q.    Do you know how that drywall was marked or

 9   labeled that the sample was taken from?

10        A.    No.  I don't remember.

11        Q.    And you don't know why they chose that

12   particular board to take a sample from?

13        A.    Yeah.  They didn't want to cut a hole in my

14   dining room or living room.

15        Q.    And the result of this test was a

16   confirmation that there was sulfur-rich corrosion on

17   the copper that they used for the test?

18        A.    Right.

19        Q.    And that's the copper, once exposed to the

20   Chinese drywall, had sulfur-rich erosion?

21        A.    Yeah.  And it looked just like the coils and

22   ground wires.

23        Q.    It blackened the specimen?

24        A.    Right.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 440 of 3246
Case 11-cv-11408-MGC Document 249-5 Entered on FLSD Docket 11/20/19 Page 46 of
191

Confidential - Subject to Further Confidentiality Review

```
 1        Q.   If you look to the page that is marked as

 2   Etter 3, it's also marked as Bates stamp with 6022,

 3   it's the third page of this.

 4        A.   Okay.

 5        Q.   There's a chart that I think you mentioned

 6   earlier that shows a spiked amount --

 7        A.   Yes.

 8        Q.   -- on the graft.

 9             Can you tell me what that is?

10        A.   It's sulfur.

11        Q.   And that shows the sulfur content?

12        A.   Yes.

13        Q.   This test, at least this report was sent to

14   you around July 12th of 2009, according to the first

15   page.

16             Do you see that?

17        A.   Yes.

18        Q.   And I believe you mentioned additional

19   inspections of your home that happened after the

20   J. Helm inspection.  Is that right?

21        A.   Yes.

22        Q.   Do you know who performed those inspections?

23        A.   I think so.  I knew you were going to want

24   these.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 441 of 3246
Case 1:11-cv-22408-MGC Document 246-6 Entered on FLSD Docket 11/20/14 Page 57 of 191

Confidential - Subject to Further Confidentiality Review

```
 1              No, I think it was Chinese drywall CDS in '10

 2     did it.  There might have been someone else who did

 3     an inspection who confirmed it was Chinese drywall,

 4     but I don't recall.

 5        Q.   You can set that document aside, if you

 6     haven't already.

 7        A.   Okay.  Thanks.

 8             (Defendants' Exhibit 6 was marked for

 9     identification.)

10     BY MR. LAWSON:

11        Q.   Mr. Etter, you have been handed a document

12     that's been marked as Exhibit 6.  It's titled

13     Declaration of Correctness of Square Footage on

14     Chinese Drywall Client(s) Property for Remediation

15     Damages.

16             Do you see that?

17        A.   I see that.

18        Q.   And I represent to you that this document was

19     submitted on your behalf by your attorney, and it

20     appears to be signed by Mr. Weiss as of May 17th,

21     2017.

22             Do you see that?

23        A.   I see that.

24        Q.   Have you seen this document before?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 442 of 3246
Case 1:11-cv-22408-MGC Document 69-6 Entered on FLSD Docket 11/20/12 Page 48 of
191

Confidential - Subject to Further Confidentiality Review

```
 1        A.   I don't remember.  I don't know if I have

 2    seen it.

 3        Q.   This document appears to list the verified

 4    under air square footage of the home as 4,389 square

 5    feet.

 6             Do you see that?

 7        A.   I see that.

 8        Q.   And do you know where that number would have

 9    come from?

10        A.   No, I don't.

11        Q.   Have you ever had the under air square

12    footage of your home measured or determined

13    professionally?

14        A.    No.  I mean, we had a very large garage with

15    drywall that wasn't under air that's not a part of

16    this.

17             (Defendants' Exhibit 7 was marked for

18    identification.)

19    BY MR. LAWSON:

20        Q.    You have been handed a document that's been

21    marked Exhibit 7.

22             If you look to the bottom of the first page

23    of this document, it appears to say:  A new residence

24    for Mr. and Mrs. Etter; Lot 4; Emerald Harbour;
```

Confidential - Subject to Further Confidentiality Review

1    Martin County, Florida.

2         Do you see that?

3    A.   Where is it on here?

4    Q.   If you look at the first page, it's at the

5    bottom of the page in larger letters.

6    A.   Okay.  Got it.  Right.

7    Q.   You see that?

8    A.   Yes.

9    Q.   All right.  And at the bottom of the page --

10   it's a little bit covered up -- but it appears to be

11   labeled as Etter000005, and that continues through

12   Bates stamp pages to Number 7.  There's three pages

13   on this.

14   A.   Okay.

15   Q.   Does this appear to be a floor plan of your

16   home that we've been discussing today?

17   A.   It looks like it, yeah.

18   Q.   And are these the specifications to which the

19   home was built originally?

20   A.   When is the date?

21        Yes.  I would -- I can't tell you there was

22   no modifications, but this is what we were building

23   it to.

24   Q.   I would like to turn your attention to the

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 444 of 3246
Case 1:11-cv-22408-MGC Document 69-5 Entered on FLSD Docket 11/28/11 Page 60 of
191

1    third page of the document, which is labeled as

2    Etter 7.  If you look near the top on the right-hand

3    side, there's a field titled Area Calculations.

4        A.   Yes.

5        Q.   Do you see that?

6        A.   Yes.

7        Q.   And if you look to that -- and I apologize

8    for the small type on this -- but the total under --

9    it says "total" and then in paren "U/A area" is

10   listed as 4,389 square feet.

11           Do you see that?

12       A.   I see that.

13       Q.   And is it your understanding that that lists

14   the total under air area of the home?

15       A.   Yeah.  I think that's all the air-conditioned

16   area, yes.

17       Q.   And is that the same number that we looked at

18   on Exhibit 6 on that Declaration of Correctness of

19   Square Footage that Mr. Weiss signed?

20       A.   It looks like it, yes.

21       Q.   A second ago you said you weren't sure if the

22   house was built to exactly these specifications.  Is

23   that right?

24       A.   Yeah.  Always, when one builds a house, they

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 445 of 3246
Case 1:11-cv-22408-MGC Document 68-6 Entered on FLSD Docket 11/28/11 Page 61 of
191

Confidential - Subject to Further Confidentiality Review

1    do something a little different here or there.  But

2    these are the plans, yes.

3        Q.   And other than this document, you don't know

4    of any proof or evidence of the exact square footage

5    of your home when it was constructed?

6        A.   I don't know of any.

7        Q.   When the home was remediated and

8    reconstructed, do you know if the square footage of

9    the home under air changed in any way?

10       A.   I don't think so.  No.

11       Q.   Was the home rebuilt with the same layout

12   that we see in this floor plan in Exhibit 7?

13       A.   No.

14       Q.   The floor plan changed?

15       A.   Slightly, yes.

16       Q.   How did the floor plan change?

17       A.   When -- we eliminated some things.  Do you

18   want to know what we eliminated?

19       Q.   Yes.

20       A.   Okay.  Coming in from the back lanai -- which

21   back in Ohio we call the back porch -- but as you are

22   coming in was a cabana bath.  So that had a commode,

23   a sink, and a shower.  And we were planning to stay

24   there forever.  So what we did is was we took out the

1    shower.  No one had ever used it.  So that was taken

2    out.

3            They -- we also had some arches in the

4    hallway down there.  We replaced those with small

5    tops.  So that saved money.

6            Upstairs in the master bathroom suite, the

7    hallway between the bedroom and where you go back to

8    the closets and the bath had a morning bar, it was

9    called.  So it had a sink, a refrigerator, all that.

10   We replaced that with a blank wall.

11           There was also a niche up there by the door.

12   We replaced that with a blank wall.

13           We -- oh, in the library and the study

14   downstairs, we were able to save almost all of the

15   built-ins.  They were wood.  The others we couldn't

16   save because it was too bad.  So we saved that.

17           We had plantation shutters for all the

18   bedrooms, white ones.  We were able to be careful

19   with those and save those.

20           Saved all the chandeliers.  Couldn't save the

21   can lights because they were corroded.  So we were

22   able to carefully store those and save those.

23           And some appliances we put back in.  So . . .

24       Q.   So for all the things that you just listed,

```
 1    is it fair to say that those are items in the

 2    reconstruction of the home that you either eliminated

 3    compared to the original construction or retained and

 4    saved from the original construction?

 5         A.   Yes, yes.

 6         Q.   Can you think of anything that was added or

 7    upgraded to the home in the reconstruction of the

 8    home that was not there in the original construction?

 9         A.   No.  By that time, there might have been

10    different wallpaper in the commodes or something.

11              Oh, we also eliminated the fireplace.  We had

12    a fireplace originally, and we just walled that over,

13    so . . .

14              But, no, we didn't upgrade, to my knowledge,

15    anything.

16              MR. LAWSON:  I think we've been going on for

17         about an hour.  So let's take a break.

18              (Recess from 9:12 until 9:27 a.m.)

19              (Defendants' Exhibit 8 was marked for

20    identification.)

21    BY MR. LAWSON:

22         Q.   Welcome back, Mr. Etter.

23         A.   Thank you.

24         Q.   You have been handed a document that has been
```

Confidential - Subject to Further Confidentiality Review

1    marked as Exhibit 8.  And I represent to you this is

2    a Plaintiff Profile Form that was submitted on your

3    behalf in the Chinese Manufactured Drywall Products

4    Liability Litigation in the Eastern District of

5    Louisiana in front of Judge Fallon.

6          Do you recognize this document, this form?

7       A.    Not offhand.  But I have seen most of these

8    forms.

9       Q.    So I would like to turn your attention to the

10   third page of the document, which is marked Etter 3.

11         Is that your signature on that page?

12      A.    Yes, it is.

13      Q.    And it appears that you signed it on

14   November 1st, 2009.

15         Do you see that?

16      A.    I see that.

17      Q.    Going back to the first page of this

18   document, for the Property Information field that's

19   listed under Section 1 on the left-hand side --

20      A.    Yes.

21      Q.    -- it lists your name and your wife's name

22   and the property address that we have been discussing

23   today, correct?

24      A.    Yes.

Confidential - Subject to Further Confidentiality Review

 1      Q.    And if you look down to the Section 3,

 2  Claimant Information field, again, your name and your

 3  wife's name are listed, correct?

 4      A.    I see that, yes.

 5      Q.    And it also lists that you moved into the

 6  home on November 7th, 2006.

 7            Do you see that?

 8      A.    Yes.

 9      Q.    Does that sound about right?

10      A.    It's about -- yeah, about right.  I don't

11  remember the date.

12      Q.    Looking over to Section 2, it lists Insurance

13  Information.

14      A.    Yes.

15      Q.    Do you see that?

16      A.    I see that.

17      Q.    And it underlines homeowner insurer on this

18  form, and it lists USAA as the homeowner's insurance.

19            Do you see that?

20      A.    I see that.

21      Q.    Did you have homeowner's insurance with USAA

22  during the time that you lived at the home on

23  Southeast Jupiter Inlet Way?

24      A.    Yes.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 450 of 3246
Case 1:11-cv-22408-MGC Document 2046-1 Entered on FLSD Docket 11/02/15 Page 46 of
191

Confidential - Subject to Further Confidentiality Review

1    Q.    And throughout the entirety of the time that

2    you lived there?

3    A.    Yes.

4    Q.    Now, did you ever file a lawsuit or claim

5    against USAA?

6    A.    Yes.

7    Q.    And was that related to their denial of your

8    claim for coverage for your damages from Chinese

9    drywall?

10    A.    Yes.

11    Q.    Do you remember when you filed a claim

12    against USAA under your homeowner's insurance policy?

13    A.    Not exactly, no.

14    Q.    Was it soon after you found out about the

15    Chinese drywall in your home?

16    A.    I think so.  There were a number of phone

17    calls between -- between us.  And it led up to that.

18    But I don't know what the timing was.

19    Q.    Do you remember what the result of the

20    lawsuit that you filed against USAA was?

21    A.    Yes.

22    Q.    What was that?

23    A.    They denied liability, required

24    confidentiality, came up with a sum for us and our

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 451 of 3246
Case 1:11-cv-22408-MGC Document 240-6 Entered on FLSD Docket 11/20/15 Page 97 of
191
Confidential - Subject to Further Confidentiality Review

```
 1    legal team.

 2         Q.   And did they pay you that money that they

 3    determined?

 4         A.   Yes, yes.

 5         Q.   Prior to receiving that sum of money from

 6    them in settlement, did you receive any money from

 7    USAA for your damages from Chinese drywall?

 8         A.   No.

 9         Q.   Did they deny your claim in its entirety

10    under your homeowner's insurance policy?

11         A.   Yes.

12         (Defendants' Exhibit 9 was marked for

13    identification.)

14    BY MR. LAWSON:

15         Q.   Mr. Etter, you have been handed a document

16    that's been marked as Exhibit 9.  On the first page

17    of this document it has a letter from January 4,

18    2019, from your attorney, Mr. Weiss, to attorneys at

19    Alston & Bird, LLP.

20         Do you see that?

21         A.   Yes.

22         Q.   If you turn to the second page of this

23    document, there is a settlement agreement and release

24    that begins on the second page that's dated
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 452 of 3246
Case 1:14-cv-02494-MGC Document 284-5 Entered on FLSD Docket 11/19/15 Page 68 of
191
Confidential - Subject to Further Confidentiality Review

```
 1    September 18th of 2012.

 2            Do you see that?

 3    A.    Yes.

 4    Q.    And this appears to be a settlement agreement

 5    and release between you and your wife and USAA.  Is

 6    that correct?

 7    A.    Yes.

 8    Q.    Is it your understanding that this is the

 9    settlement agreement that you reached with USAA that

10    paid you the sum of money that you were mentioning

11    earlier?

12    A.    Yes.  I think so, yes.

13    Q.    I would like to turn your attention to the

14    fourth page of this settlement agreement,

15    specifically, under the section titled Payments.

16            Do you see that?

17    A.    Yes.

18    Q.    If you look to Section A of the Payments

19    section, it states:  The sum of three hundred

20    sixty-eight thousand and 69 out of 100 dollars, or

21    $368,203.69, payable to Steven Etter and Cathy Etter

22    and Seacoast National Bank, formerly known as First

23    National Bank and Trust Company of the Treasure

24    Coast.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 453 of 3246
Case 1:11-cv-22408-MGC Document 64-6 Entered on FLSD Docket 11/20/15 Page 69 of
191

Confidential - Subject to Further Confidentiality Review

```
1              Do you see that?

2        A.   I see that.

3        Q.   And is that amount of money, that $368,203.69

4    the amount of money that you received from USAA to

5    settle your claim against them?

6        A.   I think so, yes.

7        Q.   And it's your recollection that you received

8    that full amount of money from them?

9        A.   Yes.

10       Q.   There's also a $250,000 amount that was

11   payable to your attorneys for this matter.  Is that

12   right?

13       A.   Yes.

14       Q.   And is it your understanding that that amount

15   was paid by USAA as well?

16       A.   I think so.  I didn't confirm it.

17       Q.   Did you receive any other money from USAA

18   beyond the amount listed in the settlement agreement?

19       A.   No.

20       Q.   And looking to the second to last page of

21   this document, there is -- and, excuse me, it's

22   marked as Page 7 of 8, do you see your signature on

23   that page?

24       A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 454 of 3246
Case 1:14-cv-04083-MGC Document 240-6 Entered on FLSD Docket 11/20/15 Page 70 of
191
Confidential - Subject to Further Confidentiality Review

```
1        Q.   And that signature is dated September 18th,

2   2012.  Is that right?

3        A.   Yes.

4        Q.   And your wife appears to have signed it on

5   the same date?

6        A.   Yes.

7        Q.   So did you receive the money that we

8   discussed just a moment ago from the settlement

9   agreement around that time of September of 2012?

10       A.   Subsequent to then, yes.

11       Q.   Did you use that money to be able to pay for

12  the remediation and reconstruction of your home?

13            MR. WEISS:  Object to the form.

14            You can answer.

15            THE WITNESS:  Yeah, money is fungible.  I

16       mean, I don't know those dollars or that check,

17       whether it went into an account and -- but over

18       time, yes, that's what it was for.

19  BY MR. LAWSON:

20       Q.   And that money was to compensate you for your

21  damages related to Chinese drywall.  Is that right?

22            MR. WEISS:  Object to the form.

23            You can answer.

24            THE WITNESS:  In my mind, it was.  In their
```

Confidential - Subject to Further Confidentiality Review

```
 1        mind, they kept saying not, so . . .

 2   BY MR. LAWSON:

 3        Q.   In their mind, the money was to settle the

 4   claim that you had filed against them.  Is that

 5   right?

 6        A.   Right.  I'm sure they didn't want anyone else

 7   knowing about it, right.

 8        Q.   But you viewed it as money to compensate you?

 9        A.   That's why it was there, yes.

10        Q.   Let's go back to the Plaintiff Profile Form

11   that we were looking at earlier that is marked as

12   Exhibit 8.

13        A.   Okay.

14        Q.   If you turn to the second page of that

15   document, there is a Section 8 in the right-hand side

16   near the middle of the page that's titled Home

17   Builder/General Contractor/Developer Information.

18            Do you see that?

19        A.   Yes.

20        Q.   And for that field, Sundown Development is

21   listed.

22            Do you see that?

23        A.   Yes.

24        Q.   And it also lists in a note below an arrow
```

Confidential - Subject to Further Confidentiality Review
191

1    that Sundown Development is the front-facing business

2    name of J. Helm Construction.

3              Do you see that?

4         A.    Yes.

5         Q.    So J. Helm Construction and Sundown

6    Development are essentially the same entity; is that

7    right?

8         A.    It was doing business as, right.

9         Q.    Is it true that you also received money in

10   settlement from J. Helm Construction related to your

11   damages from Chinese drywall?

12        A.    Yes.

13        Q.    And did you file a lawsuit against J. Helm

14   Construction at some point?

15        A.    I'm -- I don't remember if it was a

16   negotiation, and we avoided a lawsuit.  I don't -- I

17   never went to court; never got deposed for it,

18   so . . .

19        Q.    But you believe that J. Helm Construction was

20   responsible for the installation of Chinese drywall

21   in your home; is that right?

22        A.    I believe that, yes.

23              (Defendants' Exhibit 10 was marked for

24   identification.)

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 457 of 3246
Case 1:11-cv-22408-MGC Document 264-6 Entered on FLSD Docket 11/10/15 Page 73 of
191

Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. LAWSON:

 2        Q.   You have been handed a document that's been

 3    marked as Exhibit 10.

 4        A.   Yes.

 5        Q.   Do you recognize this document?

 6        A.   Yes.

 7        Q.   What is it?

 8        A.   It's -- it's a part of the settlement

 9    where -- between us and Jim Helm and company for the

10    Chinese drywall.

11        Q.   So the first page of this document is marked

12    as Etter 82.  Do you see that on the bottom

13    right-hand corner?

14        A.   Yes.

15        Q.   And there's a letter from May 8th, 2013, from

16    a Valerie Greenberg to your attorney, Mr. Weiss.

17             Do you see that?

18        A.   Yes.

19        Q.   And that letter states:  Enclosed is a check

20    for $125,000 as full and final settlement of your

21    client's claims against J. Helm Construction,

22    Incorporated for the above-referenced matter, as well

23    as the original of the fully executed confidential

24    settlement and general release agreement for your
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 458 of 3246
Case 1:11-cv-11408-MGE Document 8403-8 Entered on FLSD Docket 12/02/19 Page 174 of
191
Confidential - Subject to Further Confidentiality Review

1    records.

2         Do you see that?

3    A.   I see that, yes.

4    Q.   And if you turn to the second page of this

5    exhibit, which is Etter 83, there is a copy of a

6    check for $125,000 that was paid to you and your

7    wife.

8         Do you see that?

9    A.   I see that.

10   Q.   And that check is from J. Helm Construction,

11   Incorporated?

12        MR. WEISS:  Object to the form.

13        You can answer.

14        THE WITNESS:  Yes.

15   BY MR. LAWSON:

16   Q.   It appears that the check might have been

17   from State Farm Insurance on behalf of their insured,

18   J. Helm Construction.  Is that accurate?

19   A.   That's what it says.

20   Q.   And that check appears to be dated April 25th

21   of 2013.  Is that right?

22   A.   Yes.

23   Q.   Does that sound about right of when you

24   received the money from the settlement?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 459 of 3246
Case 2:14-cv-02722-EEF-JCW Document 24-6 Confidential - Subject to Further Confidentiality Review Page 75 of
191
Confidential -- Subject to Further Confidentiality Review

```
 1        A.   Yes.

 2        Q.   In the pages that follow, Etter 84 through

 3   Etter 93 -- I'm sorry, Etter 84 through Etter 91,

 4   there appears to be a settlement agreement -- a

 5   confidential settlement and general release agreement

 6   between you and J. Helm Construction; is that right?

 7        A.   That's right?

 8        Q.   And this is the same settlement agreement

 9   that paid you the $125,000 that we just saw in that

10   check.  Is that right?

11        A.   Yes.

12        Q.   And specifically, if you look into the first

13   page of the document, it lists the lawsuits where

14   claims were filed against the builder, J. Helm

15   Construction, by you.  Is that right?

16        A.   Yes.

17        Q.   One of those was a lawsuit titled Amorin,

18   et al v. Taishan Gypsum Company, Limited, in the

19   Eastern District of Louisiana.

20             Do you see that?

21        A.   In the third paragraph, yes.

22        Q.   That's right.

23        A.   Right.

24        Q.   And if you turn to the page that is labeled
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 460 of 3246
Case 1:14-cv-02494-MGC Document 20-6 Entered on FLSD Docket 11/20/19 Page 75 of
191

Confidential - Subject to Further Confidentiality Review

1    as Etter 89, is that your signature on this document?

2        A.    Yes.

3        Q.    And your wife's signature follows on

4    Etter 90.  Is that right?

5        A.    Yes.

6        Q.    Did you receive any other money from J. Helm

7    Construction for the settlement of your claims

8    against them other than the $125,000 that's listed in

9    this agreement and on the check we looked at?

10       A.    No.

11       Q.    All right.  I would like you to look over to

12   Etter 92 and Etter 93, which are the pages that

13   follow the settlement agreement that we just looked

14   at.

15       A.    Right.

16       Q.    There appears to be copies of checks from

17   Esquire Bank, and they are titled Chinese Drywall

18   Settlement Program.

19            Do you see those?

20       A.    I see those.

21       Q.    What is your understanding of what these

22   checks are?

23       A.    Separate from damages, they were for

24   temporary housing expenses and living while -- during

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 461 of 3246
Case 1:11-cv-22408-MGC Document 295 Entered on FLSD Docket 11/29/11 Page 47 of
191
Confidential - Subject to Further Confidentiality Review

1    remediation.

2        Q.    If you look to the top of Etter 92, it

3    states:  This check represents payment for the amount

4    due to you from the Chinese Drywall Settlement

5    Program for your Global, Banner, InEx Repair and

6    Relocation Expenses claim.

7        A.    Yes.

8        Q.    So is it your understanding that you filed a

9    claim for your relocation expenses related to the

10   time that you had to move out of your home while it

11   was being remediated and reconstructed?

12       A.    Yes.

13       Q.    And as a result of filing that claim, you

14   received the two checks that are listed on Etter 92.

15   Is that right?

16       A.    Yes.

17       Q.    The first check is dated September 25th,

18   2014, and it is for an amount of $8,909.67.  Is that

19   right?

20       A.    Yes.

21       Q.    And you received that money.  Is that

22   correct?

23       A.    Yes.

24       Q.    If you look down to the second check, it's

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 462 of 3246
Case 1:11-cv-22408-MGC Document 205-3 Entered on FLSD Docket 11/21/2012 Page 78 of
191

Confidential - Subject to Further Confidentiality Review

1    listed for an amount of $13,035.33.

2          Do you see that?

3    A.    Yes.

4    Q.    And you received that money as well.  Is that

5    right?

6    A.    Yes.

7    Q.    If you turn to Etter 93, which is the final

8    page of Exhibit 10, at the top of that page, it

9    states:  This check represents payment for the amount

10   due to you from the Chinese Drywall Settlement

11   Program for your Other Loss claim.

12         Do you see that?

13   A.    Yes.

14   Q.    And it follows with a copy of a check to you

15   for an amount of $19,905.23.

16         Do you see that?

17   A.    I see that.

18   Q.    What is your understanding of what this other

19   loss claim filed by you or on your behalf, what was

20   that for?

21   A.    I'm not certain.  I think I know, but I'm not

22   certain.

23   Q.    What do you think you know?

24   A.    I think that had something to do with Banner,

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 463 of 3246
Case 1:11-149-MGET Document 649-6 Entered on FLSD Docket 11/X/19 Page 79 of
191

Confidential - Subject to Further Confidentiality Review

```
 1    who were the local suppliers.

 2        Q.   So there was a supplier of the Chinese

 3    drywall that was installed in your home?

 4        A.   Right.

 5        Q.   That you believe was Banner Supply.  Is that

 6    right?

 7        A.   Right.

 8             And they were involved in a lawsuit, but we

 9    weren't involved directly with them.

10        Q.   So this money, would you agree, was

11    additional money to compensate you for your damages

12    related to Chinese drywall.  Is that right?

13        A.   I don't know.  I think so.  But I'm not

14    certain.

15        Q.   And you did receive this $19,905.23 that's

16    listed on this check?

17        A.   Yes.

18        Q.   Now, other than the two settlements that

19    we've looked at from USAA and J. Helm and now these

20    three checks that we've looked at, have you receive

21    any other payments or money related to your claims

22    for Chinese drywall in your home?

23        A.   No.  These -- these were being out of the

24    house that we just mentioned, and the others in
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 464 of 3246
Case 1:14-cv-21464-MGC Document 20076 Entered on FLSD Docket 11/20/19 Page 80 of
191
Confidential - Subject to Further Confidentiality Review

 1    general, yes.  That's it.

 2         Q.   When you filed a claim for the money that you

 3    felt you were damaged for for having to relocate

 4    while you were remediating your house, did you offer

 5    the same receipts and proof of payment for those

 6    expenses that you have provided in -- to your

 7    attorney for this lawsuit?

 8              MR. WEISS:  Object to the form.

 9              You can answer.

10              THE WITNESS:  Yes.

11    BY MR. LAWSON:

12         Q.   And when you received the amount of money

13    that's listed on Etter 93, the two checks for -- in

14    excess of $20,000, was that payment related to those

15    same relocation expenses that you are seeking in this

16    lawsuit?

17              MR. WEISS:  Object to the form.

18              You can answer.

19              THE WITNESS:  Yes.  Partial payment.

20         Expenses were more than that.

21    BY MR. LAWSON:

22         Q.   So you believe the amount that you had in

23    relocation expenses was in excess of the amount that

24    you received through the Chinese Drywall Settlement

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 465 of 3246
Case 1:11-cv-22408-MGC Document 249-5 Entered on FLSD Docket 11/21/2015 Page 91 of
191
Confidential - Subject to Further Confidentiality Review

1      Program for relocation expenses, correct?

2          A.    Yes.

3          Q.    And now, are you seeking these same amounts

4      of money that you've already received again or only

5      the amount that is remaining of your expenses that

6      you did not receive from these two checks?

7              MR. WEISS:  Object to the form.

8              You can answer.

9              THE WITNESS:  I don't know the answer to

10         that.  I don't know how it's structured.

11     BY MR. LAWSON:

12         Q.    Did you receive a tax deduction on your

13     federal income taxes related to Chinese drywall at

14     any time?

15         A.    I remember discussing it in '07 or '08.

16             MR. WEISS:  Well, you don't have to reveal

17         any conversation that you had with an accountant,

18         that would be protected by the accountant/client

19         privilege; or a lawyer, that would be protected

20         by the attorney/client privilege.  To the extent

21         you can answer without revealing a communication

22         you had with your own accountant or your lawyer,

23         then answer the question.

24             Otherwise, I would tell you not to answer the

```
 1     question.

 2          So to remind you, the question was:  Did you

 3     claim a deduction?

 4          If you know that answer, then certainly

 5     answer the question.  Whatever you put on your

 6     form, that's discoverable.  But a conversation

 7     you had with your accountant --

 8          THE WITNESS:  Yeah, I'm not sure.  I would

 9     have to check.  Because there was no settlement.

10   BY MR. LAWSON:

11     Q.   Okay.  So do you know if you would have

12   records from those tax years?

13     A.   I'm sure I do.

14          MR. LAWSON:  Okay.  If you -- we would ask

15     that if Mr. Etter did receive a tax deduction or

16     any tax relief on his federal income taxes

17     related to Chinese drywall and those records

18     exist, that they be produced to us, because we do

19     not believe that we have them at this time.

20   BY MR. LAWSON:

21     Q.   Let's go back to that Plaintiff Profile Form

22   that we started looking at a few minutes ago.  It's

23   Exhibit 8.

24     A.   Okay.  Got it.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 467 of 3246
Case 1:14-cv-21452-MGC Document 69-6 Entered on FLSD Docket 11/30/15 Page 49 of
191
Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Specifically, let's go to the second page of

 2   that document.  I'd like to turn your attention to

 3   the Section 4 at the top of the page that's titled

 4   Inspection Information.

 5            Do you see that?

 6        A.    Four?

 7        Q.    Yes.

 8        A.    Okay.  Yes.

 9        Q.    And this asks if you have ever had an

10   inspection conducted into whether there's Chinese

11   drywall in your home, and it's been marked yes.

12            Do you see that?

13        A.    Yes.

14        Q.    And that's consistent with what we discussed

15   earlier; you have had multiple inspections in your

16   home.  Is that right?

17        A.    Yes.

18        Q.    If you look down, it asks you who conducted

19   the inspection.  And here it lists Roger G. Thomas,

20   GC, Incorporated, and then it lists Roger G. Thomas,

21   president.

22            Do you see that?

23        A.    Yes.

24        Q.    And who is that?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 468 of 3246
Case 2:11-cv-01449-MCE Document 2070 Tendered at Trial Dockets 11/20/19 Page 94 of
191

Confidential - Subject to Further Confidentiality Review

1       A.   He owned the -- I guess it's a construction

2   company that did the remediation on the house.

3       Q.   Okay.  So that inspection it lists as being

4   performed on April 1st, 2009.

5            Do you see that?

6       A.   I see that, yes.

7       Q.   Is that accurate?

8       A.   I don't know if the exact date is accurate.

9   I don't know.

10      Q.   If you look --

11      A.   I mean, around that time I was talking to him

12  about remediation, and he came in and did an

13  inspection.  So it's on or about, yes.

14      Q.   When we looked at that IMR Test Lab

15  inspection earlier, the date of that inspection

16  report -- excuse me, that report, testing report that

17  was marked as Exhibit 2, was July 12, 2009.  Do you

18  remember that?

19      A.   I remember the report, yes.

20      Q.   And I represent to you that the date on the

21  report was July 12, 2009.

22      A.   That's the date of the report.

23      Q.   That's right.

24      A.   Which was long after the test.

1        Q.    So the test was sent to them, would you say,

2    months prior to that?

3        A.    Yes.

4        Q.    Was it sent before Mr. Thomas came over to

5    the house?

6        A.    I don't remember.  It could have been.  I

7    mean, it took a long time for them to do it.  But I

8    don't remember.

9        Q.    Section 4 of this Plaintiff Profile Form

10   states that Mr. Thomas made a determination that

11   Chinese drywall was present in the home, and you've

12   also referenced the IMR Test Labs for that

13   determination.  Is that right?

14       A.    Right.

15       Q.    And it says the determination of Chinese

16   drywall being present in your home was made on

17   April 20th, 2009.  Is that accurate?

18       A.    I think so, yes.

19       Q.    That's what it says here.

20       A.    Yeah, that's what it says.

21       Q.    If you look down to Section 5, Drywall

22   Information, do you see that field?

23       A.    Yes.

24       Q.    Under the first column, it's titled Drywall

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 470 of 3246
Case 1:11-cv-01408-MGC Document 604-6 Entered on FLSD Docket 11/25/15 Page 86 of 191
Confidential - Subject to Further Confidentiality Review

 1    Manufacturer.  There's a question mark.

 2            Do you see that?

 3    A.    Yes.

 4    Q.    And then it asks the markings on drywall in

 5    your home.

 6    A.    Yes.

 7    Q.    And it lists 4 x 12 only marks.

 8    A.    Yes.

 9    Q.    Do you see that?

10            What does that mean to you?

11    A.    Well, unlike Knauf, which had it printed on

12    the back, Taishan did not print "Taishan" on it.  You

13    had to look at, evidently, the tape and other areas,

14    which the experts looked at.

15    Q.    Do you know if edge tape was found inside of

16    your home that said "Taishan" or had any Chinese

17    markings on it?

18    A.    I don't know how they did that.  But in

19    discussing it with them, somehow they determined

20    that's what it was.

21    Q.    Do you know who made that determination?

22    A.    Well, in one case it was the Chinese Drywall

23    Screening.  Is that -- whatever that inspection is

24    that we had.

Confidential - Subject to Further Confidentiality Review

1      Q.   So the Chinese Drywall Screening inspection

2    that we'll discuss later on, it's your understanding

3    that they made the determination --

4      A.   Right.

5      Q.   -- that this 4 x 12 drywall was associated

6    with Taishan?

7      A.   Yes.

8      Q.   I would like to turn your attention to the

9    page that's marked as Etter 12 in this exhibit.  It's

10   a photo of drywall sample in front of some

11   insulation.

12        Do you see that?

13     A.   I see that.

14     Q.   And I understand that's a little difficult to

15   read, but does this appear to show a drywall board

16   that is marked as 4 feet x 12 feet?

17     A.   I think it is.

18     Q.   If you look over to Etter 13, it's upside

19   down, but there appears to be another board that is

20   marked as 4 feet x 12 feet x 1/2 inch.

21        Do you see that?

22     A.   Yes.

23     Q.   Is that the 4 feet x 12 feet drywall marking

24   that is referenced on the Plaintiff Profile Form that

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 472 of 3246
Case 1:11-cv-01449-MGC Document 2846-1 Entered on FLSD Docket 11/10/11 Page 48 of
191

Confidential - Subject to Further Confidentiality Review

1    we just looked at?

2        A.    I think so.

3        Q.    Have you ever physically seen this with your

4    own eyes in your home or taken out of your home?

5        A.    Seen the drywall?

6        Q.    Yes.

7        A.    Yes.

8        Q.    When did you see it?

9        A.    When pieces were cut out for samples, it

10    was -- they leaned it up against the wall in my

11    house -- or, somewhere in the house or garage, and I

12    could see it.

13        Q.    Did you see the drywall when the home was

14    being remediated and it was being taken out of the

15    home?

16        A.    Being taken out?  No.  They didn't want you

17    around when that was happening because of the sulfur.

18        Q.    Are you aware if there was Knauf drywall

19    inside of your home?

20        A.    I'm not aware of any.

21            (Defendants' Exhibit 11 was marked for

22    identification.)

23    BY MR. LAWSON:

24        Q.    Mr. Etter, you have been handed a document

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 473 of 3246
Case 2:11-cv-01395-MCA-LDW Document 109-6 Filed on 11/30/16 Page 49 of 191
Confidential - Subject to Further Confidentiality Review

1    that's been marked as Exhibit 11.  It's a series of

2    photographs, four pages, that have been Bates stamped

3    by us as Taishan0000026 through 29.  I represent to

4    you that these are photographs that were found on --

5    in your case file, your claimant file on the

6    BrownGreer online portal that has been established to

7    be able to transfer documents between counsel in the

8    litigation.

9           Do you recognize these photos?

10     A.   I don't remember them, no.

11     Q.   Is there anything about these photos that

12   shows you that they were taken within your home,

13   perhaps on the first page showing the surfaces

14   underneath which the photos of the drywall samples

15   were taken?

16     A.   No.  I mean, I see tile, but . . .  No.  I

17   can't tell where they were taken.

18     Q.   Have you ever seen drywall markings

19   consistent with the ones that you're seeing in these

20   photos inside of your house before it was remediated?

21     A.   I don't specifically remember.

22     Q.   Have you ever seen edge tape that looks like

23   the edge tape that is shown on the edges of the

24   drywall that is blue and yellow across these four

Confidential -- Subject to Further Confidentiality Review

```
 1    photographs?

 2        A.   I just don't remember.  If it was, I did, but

 3    I can't recall the color of the tape on the drywall.

 4        Q.   Do you know if samples of this drywall that's

 5    shown on these photographs have been kept or

 6    maintained anywhere?

 7        A.   I don't know about these.  We maintained

 8    samples for a long period until we were told we

 9    didn't have to.

10        Q.   Okay.  When were those samples destroyed or

11    discarded?

12        A.   Probably within the last couple of years, but

13    I don't have a date.

14        Q.   Do you remember who told you that you could

15    discard or destroy the samples of drywall that you

16    had?

17        A.   It was requested through our attorney through

18    this -- somehow in this system, said we're keeping

19    these things; can we get rid of them.  And the

20    response was yes.

21        Q.   But you don't know if these samples were part

22    of the samples that were discarded?

23        A.   I don't know.  I -- I have no idea.

24        Q.   Do you have any knowledge of whether these
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 475 of 3246
Case 1:11-cv-21408-MGC Document 246-5 Entered on FLSD Docket 11/30/15 Page 91 of
191

Confidential - Subject to Further Confidentiality Review

```
1    photos were taken during the remediation of your

2    home?

3             MR. WEISS:  Object to the form.

4             You can answer.

5             THE WITNESS:  Well, if -- if they're from my

6         home, that's when they would have been taken.

7         But I don't -- I can't tell you where these are

8         from or anything by looking at it.

9    BY MR. LAWSON:

10        Q.   Have you ever been told that you had Knauf

11   drywall inside of your house by anyone?

12        A.   No.

13        Q.   You were aware that your neighbors had Knauf

14   drywall in their home.  Is that right?

15        A.   I think so.  I mean, that -- they told me

16   they were part of a settlement, and Knauf redid the

17   home, which they were very dissatisfied with.  So

18   that's what they told me.  That's as much as I know.

19        Q.   Do you know if you have ever filed a lawsuit

20   against Knauf for your damages related to Chinese

21   drywall?

22        A.   I don't think so, unless it was generic when

23   we first started the process and not knowing who it

24   was.
```

Confidential - Subject to Further Confidentiality Review

```
1        Q.    But it is ultimately your belief that you --

2   scratch that.

3              You can set that document aside.

4              (Defendants' Exhibit 12 was marked for

5   identification.)

6   BY MR. LAWSON:

7        Q.    You have been handed a document that's been

8   marked as Exhibit 12.  On the first page, it is

9   labeled by a stamp for Chinese Drywall Screening,

10  LLC.

11             Do you see that at the top of the page?

12       A.    Yes.

13       Q.    And it appears to be dated November 5th,

14  2010.  And it is a letter to your attorney,

15  Mr. Weiss, from a Howard Ehrsam.

16             Do you see that?

17       A.    Yes.

18       Q.    Do you know what this document is?

19       A.    I think it's a report on an inspection that

20  identifies Chinese drywall in our home.

21       Q.    If you look to the second page of this

22  report, there is a chart that is titled Drywall and

23  Corrosion Summary by Room.

24             Do you see that?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 477 of 3246
Case 3:11-cv-01498-MGL Document 249-5 Entered on FLSD Docket 11/03/15 Page 93 of
191

Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    And if you look, it -- this inspection notes

 3    that the 4 feet x 12 feet by 1/2 inch stamped drywall

 4    was observed in the attic of the home.

 5              Do you see that?

 6        A.    Yes.

 7        Q.    It also notes that drywall from Temple Inland

 8    that was labeled "Underwriter's Laboratories, Inc. -

 9    www.TEMPLE.com" was found in the attic as well.

10              Do you see that?

11        A.    Yes.

12        Q.    And for the drywall that's "4 feet x 12 feet"

13    stamped, it notes that there's white paper edge tape

14    on the interior wall that was observed.

15              Do you see that?

16        A.    Yes.

17        Q.    In the pages that follow in this report,

18    there's a series of photographs that begin on the

19    third page of the document and continue to its

20    conclusion.

21              Do you see those?

22        A.    I'm sorry, what was the question?

23        Q.    Yeah.  Do you see the photographs that goes

24    from the third page to the end --
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 478 of 3246
Case 2:11-cv-01458-MGC Document 5876-1 Entered on FLSD Docket 11/28/19 Page 494 of
191

Confidential - Subject to Further Confidentiality Review

```
 1        A.   Yes.  Numerous photographs, yes.

 2        Q.   On the first page of the document there's a

 3   picture of an exterior of a home with an address of

 4   18894.

 5             Do you see that?

 6        A.   I see that.

 7        Q.   Is that the home that we've been discussing

 8   today?

 9        A.   Yes.

10        Q.   And the photos that follow, can you tell that

11   these photos were taken on the interior of your home?

12        A.   Yes.  I remember, yes.

13        Q.   Were you present for this inspection?

14        A.   I don't remember.  I think I was.

15        Q.   So if you go into this exhibit, eventually

16   there's some pages that are marked, beginning with a

17   Page 1 of 5, and there's some pictures of the

18   interior of your home for those five pages.  They are

19   the last five pages of the exhibit.

20        A.   Okay.

21        Q.   Let me know when you have gotten to that

22   first page, 1 of 5?

23        A.   This page here?

24        Q.   That's correct.  It's marked as Page 1 of 5.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 479 of 3246
Case 1:11-cv-11405-MGP Document 3498-1 Entered on FLSD Docket 11/19/19 Page 95 of
191
Confidential - Subject to Further Confidentiality Review

```
 1                Is this the interior of your home prior to

 2    remediation?

 3         A.   Yes.

 4         Q.   How can you tell that?

 5         A.   Well, looking at the kitchen, if you recall,

 6    we did away with the shower and the cabana, which

 7    looking at the top picture, would have been over on

 8    the right, okay?  So that's why that is angled.  So

 9    when we got rid of the shower, that would have been a

10    right angle in that angle.

11         Q.   Are there any other things that you can tell

12    looking through these five pages of photographs of

13    the interior of your home that are different now --

14    or, excuse me, after remediation, compared to when

15    these photos were taken before remediation?

16         A.   On Page 1 of 5, I think what they put around

17    the island was a dark wood, not that light bead

18    board.  So that would have been a different color.

19                I don't see anything over there.

20                Yeah.  I think we had the draperies cleaned.

21                What you can see on Page 4 of 5 on the far

22    right -- are you -- are you looking at that?

23         Q.   I see that.

24         A.   Okay.  On the far right top picture.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 480 of 3246
Case 2:14-cv-02490-EEF-JCW Document 2046 Confidential Document 11/19/19 Page 96 of 191
Confidential - Subject to Further Confidentiality Review

1      Q.    Yes.

2      A.    They couldn't save those built-ins.  They

3   came apart when they pulled them out.  So they

4   replaced them with something slightly different

5   design that's similar.  And on the bottom page, you

6   can see how they were built.  So they're built

7   similar, not exactly the same design.

8          On Page 5 of 5, top picture and bottom

9   picture, you can see there's a fireplace there that's

10  Italian stone we had brought in.  We did not replace

11  the fireplace.  We put a wall in.

12         There may be some other slight changes.  I

13  don't know.  But that's what I can see.  So that's --

14  and you see the built-ins on that fireplace picture,

15  too.

16     Q.    Do you remember why this inspection was

17  performed on your home?

18     A.    Other than pursuit of, like, these

19  proceedings, to make sure we had an expert testimony

20  as to what was there.

21     Q.    Looking through these photographs, do you see

22  any photographs that show -- or, excuse me.

23         Let's turn to the page of photographs that is

24  on the ninth page of the document.  You will see at

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 481 of 3246
Case 2:11-cv-01408-MGC Document 249-6 Generated under Seal Docket 11/20/19 Page 97 of 191

Confidential - Subject to Further Confidentiality Review

```
 1    the top of that page there is a picture of a drywall

 2    board that has a Post-it note on it that says

 3    "interior wall" at the top of that ninth page of the

 4    document.

 5         A.   Yes.

 6         Q.   And it's a little difficult to see, but below

 7    that Post-it note and to the right, there appears to

 8    be a marking on the drywall board.

 9             Do you see that?

10         A.   In the top picture?

11         Q.   Yeah.  In the top picture of that page.

12         A.   It looks as if there's something there.  I

13    mean, I see some dark markings.

14         Q.   All right.  And you cannot read what that

15    marking says; is that right?

16         A.   No, I can't.

17         Q.   Looking over to the picture below that, there

18    appears to be white edge tape on the corner -- or,

19    the edge, excuse me, of the drywall board that's

20    shown in that photo.

21             Do you see that?

22         A.   I see that, yes.

23         Q.   And there's a Post-it note that's essentially

24    on the white edged tape that says "interior wall."
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 482 of 3246
Case 1:11-cv-22408-MGC Document 249-6 entered on FLSD Docket 11/20/12 Page 98 of 191
Confidential - Subject to Further Confidentiality Review

1          Do you see that?

2     A.   I see that.

3     Q.   And you do not see any writing or other

4     markings on that edge tape other than that; it's

5     white.  Is that right?

6     A.   No.  I think that's edge tape and not a cut

7     piece of drywall.  I couldn't be sure.

8     Q.   When we looked at the chart of drywall and

9     corrosion summary by room that's on the second page

10    of this document --

11    A.   Yes.

12    Q.   -- there was a note on the "4 feet x 12 feet"

13    drywall stamp description that there was white paper

14    edge tape on interior wall.

15         Do you remember seeing that?

16    A.   On the attic?

17    Q.   Yes.

18    A.   Yes, I see that.

19    Q.   And do you believe that that is consistent

20    with the white edge tape that we just saw in the

21    photograph we were describing on the ninth page of

22    this document?

23    A.   I don't know.

24    Q.   Looking through these photographs, you do not

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 483 of 3246
Case 1:11-cv-01077-MGC Document 284-5 Entered on FLSD Docket 11/21/19 Page 49 of
191

Confidential - Subject to Further Confidentiality Review

1    see any markings or edge tape that have any Chinese

2    characters or the name "Taishan" on them; do you?

3        A.   I don't see any.  I don't know if there ever

4    were any.

5        Q.   And there also is not any drywall boards that

6    are shown in these photos that say "Knauf."  Is that

7    correct?

8        A.   That is correct.

9        Q.   At this time in this inspection, these

10   inspectors did not remove all of the drywall boards

11   from the home.  Isn't that right?

12       A.   No.  They looked under a lot.  They were in

13   the attic.  Of course, the attic's got two kinds of

14   drywall; it has to be.

15       Q.   And there was only -- it was only later on

16   that all of the drywall boards were removed from the

17   home and could be viewed.  Is that right?

18       A.   They were all removed during remediation.

19       Q.   Do you know at the time that the drywall

20   boards were removed from remediation if someone was

21   preserving evidence and taking photographs during

22   that time?

23       A.   We have photos after everything was removed,

24   the drywall.  I don't know if anyone was taking them

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 484 of 3246 of
Case 2:14-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 484 of 3246 of
191

1    during the removal.

2         (Defendants' Exhibit 13 was marked for

3    identification.)

4    BY MR. LAWSON:

5       Q.   Mr. Etter, you have been handed a document

6    that's been marked as Exhibit 13.  On the first page

7    of the document it's marked as an Evidence

8    Preservation Report.

9         Do you see that?

10      A.   I do.

11      Q.   And like the report that we just looked at,

12   this appears to be a report from Chinese Drywall

13   Screening, LLC.

14        Do you see that?

15      A.   Yes.

16      Q.   The preservation date that is listed for this

17   report is December 15th, 2012, to December 17th,

18   2012.

19        Do you see that?

20      A.   I do.

21      Q.   And your address on Jupiter Inlet Drive --

22   or, Way is listed here?  Is that right?

23      A.   Yes.

24      Q.   And the property owner, that is listed as

```
 1      you, Steve Etter.  Is that right?

 2          A.   Yes.

 3          Q.   Let's go to the third page of this document.

 4               Do you recall this evidence preservation

 5      occurring in your home?  Were you present for it?

 6          A.   I don't know.  I don't recall.

 7          Q.   And -- but you did say earlier that you

 8      thought someone was taking photographs of the drywall

 9      when it was being removed?

10          A.   No, I didn't.  I don't know if someone was

11      taking photographs when it was being removed.

12          Q.   I apologize.  That's correct.  You did say

13      that.

14               Looking at this chart on the third page, it's

15      titled Preservation of Evidence Inventory Log.

16               Do you see that?

17          A.   I see that.

18          Q.   And it appears to list a series of items,

19      including A/C coils, a refrigerator.

20               Do you see those items being described on the

21      right-hand side of the page?

22          A.   Yes.

23          Q.   Is it your understanding that these are items

24      that were preserved or photographed by Chinese
```

```
 1    Drywall Screening, LLC during the remediation of your

 2    home?

 3         A.   Yeah.  I don't think I have seen this report,

 4    so . . .  But that's what it looks like.

 5             Maybe I have.

 6         Q.   If you look to the second page of this

 7    inventory log -- it's on the fourth page of this

 8    exhibit.

 9         A.   Okay.

10         Q.   Down at the bottom under Item Number 38, it

11    lists that:  Number 9 Knauf Tai'an edge tape and

12    label were found inside of the home.

13             And there is five photographs that are

14    itemized under the Photo ID column for that Item 38.

15             Do you see that?

16         A.   I see that.

17         Q.   I'd like to turn your attention to the final

18    page of this exhibit.  And if you look to that page,

19    there are a number of very small photographs that are

20    shown in an array on that page.

21             Do you see them?

22         A.   I see them.

23         Q.   In the upper left-hand corner, the first

24    photograph is labeled as S Etter Demo 379.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 487 of 3246
Case 2:14-cv-02722-EEF-JCW Document 26-1 Filed on 11/30/18 in TXSD Page 493 of
191
Confidential - Subject to Further Confidentiality Review

```
 1           Do you see that?

 2      A.   Hang on.  I need to find 379.

 3           Okay.  I see that, yes.

 4      Q.   And there's a series of photographs, four in

 5   each row going down, with seven of them in each

 6   column.

 7           Do you see that?

 8      A.   I see that.

 9      Q.   Now, under Item 38 in that evidence inventory

10   log, the Knauf drywall edge tape and label were

11   listed under Photographs 392, 393, 394, 400, and 401.

12           Can you see those numbers identified on this

13   final page of the exhibit with corresponding

14   photographs?

15      A.   I see the numbers, yes.

16      Q.   And do you see blue and yellow edge tape on

17   some of the photograph numbers that I just listed,

18   specifically looking at 394?

19      A.   I see blue and yellow on 394.

20      Q.   And is that consistent with the edge tape

21   that we saw on the photographs that I just showed you

22   a moment ago, the full-sized photographs, the blue

23   and yellow edge tape that we found in your claimant

24   file?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 488 of 3246
Case 2:14-cv-02722-EEF-MBN Document 18-8 Entered on FLSD Docket 05/13/2015 Page 404 of 191

Confidential - Subject to Further Confidentiality Review

```
1        A.    I can say it's blue and yellow.

2        Q.    And specifically, I'm referring to Exhibit 11

3    that we looked at a little bit earlier, if you want

4    to refer to it.

5        A.    It's the same color, yes.

6        Q.    But this is the first time that you are aware

7    that there was what has been identified as Knauf

8    Tai'an edge tape and labels inside of your home?

9        A.    I don't think so.  I don't remember.

10       Q.    Turning to the sixth page of this report,

11   there is another spreadsheet or chart that is labeled

12   as Board Manufacturing ID Label Worksheet.

13       A.    Yes.

14       Q.    Do you see that?

15       A.    Yeah.  One starts with 01; one starts with

16   20.

17       Q.    That's right.

18             And chart appears to continue on for two more

19   pages afterward.

20       A.    Yes.

21       Q.    Do you see that?

22       A.    Yes.

23       Q.    And this appears to list a wall ID across

24   each item number in the spreadsheet.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 489 of 3246 of
Case 2:14-cv-02722-EEF-JCW Document 37-1 Filed 03/13/15 Page 495 of
191
Confidential - Subject to Further Confidentiality Review

 1           Do you see that?

 2      A.   Okay.  The column, yes.

 3      Q.   Now, if you go past that chart in the report

 4   to a page titled Floor Plan Legend.

 5      A.   Yes.

 6      Q.   Do you see that?

 7      A.   Yes, I do.

 8      Q.   And there's a series of color -- different

 9   colored lines that are shown, and there's different

10   names of drywall that are listed next to each one of

11   the different colors of lines.

12           Do you see that?

13      A.   I see that.

14      Q.   Turning to the pages that follow, there

15   appears to be a floor plan of your home.  Is that --

16   does that appear to be accurate, that that's a floor

17   plan of your home that follows?

18      A.   It looks like it, yeah.

19      Q.   It looks like the different walls of the home

20   have labels next to them that are consistent with the

21   wall IDs that we just looked at on the Board ID Label

22   Worksheet that preceded it.

23           Do you see that?

24      A.   Yes.

Confidential – Subject to Further Confidentiality Review

```
1        Q.    Is it your understanding that Chinese Drywall

2    Screening marked where different types of drywall

3    boards were found inside of the home while the home

4    was being remediated across this floor plan?

5        A.    I see that on the document.

6        Q.    You'd agree with me that there were many

7    different types of drywall and edge tape for drywall

8    that were found inside of the home by Chinese Drywall

9    Screening.  Is that right?

10       A.    I'm looking at a page that gives the

11   percentage of each, and he has a list of them, yes.

12       Q.    That's right.

13             If you look to the fifth page of this

14   exhibit, there is a chart at the bottom of that page

15   showing percentages of different drywall types that

16   were found in the home.  Is that right?

17       A.    Yes.

18       Q.    And there was Temple Inland drywall found in

19   the ceiling.  Is that right?

20       A.    The ceiling, by code, has to be 5/8 inch

21   drywall, and this was half inch, the problematic

22   drywall.  So it doesn't matter.  And there was no

23   Chinese drywall that was 5/8 inch thick that I know

24   of.
```

Confidential - Subject to Further Confidentiality Review

```
 1       Q.    Going back to my question --

 2       A.    Okay.

 3       Q.    -- Chinese Drywall Screening found Temple

 4  Inland drywall in the ceiling; is that right?

 5       A.    Yes.

 6       Q.    And there was also USG drywall in the

 7  ceiling; is that right?

 8       A.    Yes.

 9       Q.    There was also National Gypsum drywall in the

10  ceiling, correct?

11       A.    According to this, yes.

12       Q.    And it also notes that there was USG drywall

13  in the walls in some amount; is that right?

14       A.    It could be, yes.

15       Q.    And it notes seven square feet of Knauf

16  drywall in the walls on this chart.  Isn't that

17  right?

18       A.    Yes.  Seven square feet.

19       Q.    And it also notes that there was Temple

20  Inland and green board drywall in the walls as well

21  at the bottom of this chart, correct?

22       A.    It says that, yes.

23             (Defendants' Exhibit 14 was marked for

24  identification.)
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 492 of 3246 of
Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 492 of 3246 of
Confidential – Subject to Further Confidentiality Review
191

```
 1              THE WITNESS:  Are we finished with this one?

 2              MR. LAWSON:  Yes.  You can set the prior

 3         exhibit aside.

 4     BY MR. LAWSON:

 5         Q.   You have been handed an exhibit that has been

 6     marked as Exhibit 14.

 7         A.   Okay.

 8         Q.   I represent to you that this is a

 9     Supplemental Plaintiff Profile Form that was

10     submitted on your behalf in the Chinese Manufactured

11     Drywall Products Liability Litigation in the Eastern

12     District of Louisiana in front of Judge Fallon.

13              Do you recognize this document?

14         A.   I think so, yes.

15         Q.   And have you seen it before, to your

16     knowledge?

17         A.   Yes.

18         Q.   Turning to the seventh page of this document,

19     is that your signature on that page?

20         A.   Yes, it is.

21         Q.   And it appears that you signed it on

22     December 13th of 2018.  Is that right?

23         A.   Yes.

24         Q.   And under the address, it lists your current
```

Confidential - Subject to Further Confidentiality Review

```
 1     address in Indiana.  Is that right?

 2         A.    That is correct.

 3         Q.    And was it your understanding when you signed

 4     this document that your responses in this form were

 5     to be true and correct to the best of your knowledge?

 6         A.    Yes.

 7         Q.    And before I forget, going back to

 8     Exhibit 13, that evidence preservation report that we

 9     were looking at.

10         A.    Yes.

11         Q.    Do you remember how there were small photos

12     in the photo arrays that were on the --

13         A.    Yeah.  A full page of small photos.

14         Q.    That's right.

15               Do you know if there are larger photos that

16     you have in your possession of those photos that were

17     in the small photo array inside of that document in

18     Exhibit 13?

19         A.    I don't know.  I don't -- I don't think I

20     have them.

21         Q.    Do you think that it's possible that Chinese

22     Drywall Screening would have those photographs?

23         A.    Well, to the extent anything is possible,

24     yeah.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/10/19 Page 494 of 3246
Case 1:09-cv-02047-EEF-JCW Document 269 Entered on FLSD Docket 10/13/2011 Page 109 of 191
Confidential - Subject to Further Confidentiality Review

1     Q.   You're not aware --

2     A.   I'm not aware of any, no.

3         MR. LAWSON:  Greg, if those photos do exist,

4     we would like to have them.  But if they do not

5     exist, then we understand we cannot have them.

6     But we would like them.

7  BY MR. LAWSON:

8     Q.   I would like to look to Exhibit 14, the

9  Supplemental Plaintiff Profile Form, specifically to

10  turn your attention to the second page of the

11  document.

12        Here you were asked under Section 2 when the

13  Chinese drywall was installed in your property to the

14  best of your knowledge, and you filled out "February

15  of 2006."

16        Do you see that?

17     A.   Yes.  I mean, I don't know the date they

18  nailed it to the wall, but that's when the house was

19  being built, yes.

20     Q.   And it asks you when you first became aware

21  that the property contained Chinese drywall

22  underneath that line, and you have stated

23  "March 2009."

24        Do you see that?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 495 of 3246
Case 2:14-cv-02722-EEF-DEK Document 26-1 Entered on FLSD Docket 08/13/2014 Page 491 of
191
Confidential - Subject to Further Confidentiality Review

 1      A.   Yes.

 2      Q.   Do you know why you included March 2009 as

 3   the date that you recalled becoming aware of Chinese

 4   drywall being in your property?

 5      A.   I gave you the times that we were looking at

 6   that.  That is March -- okay.  March is -- first time

 7   that's mentioned was when Jim Helm and his installer

 8   came to the house and told me it was Chinese drywall.

 9   That's why that's there.

10      Q.   I'd like to turn to the fourth page of this

11   document under Section 5.  It's titled Already

12   Remediated Property.

13           Do you see that?

14      A.   Hang on a second.

15           Okay.  Yes.

16      Q.   It asks:  Has the property been partially or

17   completely remediated?

18           And you have answered:  "Completed

19   remediated."  Or, I'm guessing completely remediated?

20      A.   Yes.

21      Q.   Is that right?

22      A.   Yes.

23      Q.   So it's your belief that the home was

24   completely remediated through the work that you paid

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 496 of 3246
Case 1:11-cv-02349-EID Document 26-1 Entered on FLSD Docket 03/13/2017 Page 492 of
191

Confidential – Subject to Further Confidentiality Review

1    for at the home.  Is that right?

2         A.    Correct.

3         Q.    It asks you to identify the dates during

4    which the remediation took place, and you have

5    answered:  January 2013 to October 2013.

6               Do you see that?

7         A.    Yes.

8         Q.    And is that accurate?

9         A.    Well, I -- it depends.  They completed the

10   remediation and had someone come in, inspect the home

11   when it was nothing but studs and concrete.  And the

12   inspector said everything's been done according to --

13   is it NASB, whatever that group is -- the builders

14   group, and it was okay.  It had been cleaned and

15   vacuumed and all that.  At that point, they started

16   to rebuild the house.

17              So was the remediation complete?  I don't

18   know the definition:  When the house is completely

19   rebuilt or before they start rebuilding and after

20   they've done everything that needs to be done.  So

21   that's the timing.

22        Q.    Were you happy with the remediation and

23   reconstruction work that was done on your home?

24        A.    By Christian Thomas?

Case 2:09-md-02047-EEF-MBN  Document 22363-39  Filed 11/19/19  Page 497 of 3246
Case 1:14-cv-24245-EDC  Document 269-1  Entered on FLSD Docket 03/12/2019  Page 493 of
191

1     Q.   Yes.

2     A.   Yes, I was pleased.

3     Q.   You thought that they did the work that you

4  asked them to do?

5     A.   Yes.

6     Q.   And you thought that it -- did you find that

7  it removed any of the effects of Chinese drywall that

8  you had -- that you believed you were suffering from

9  prior to the home being remediated?

10    A.   Oh, yes.  All the wiring and copper was

11 removed.

12    Q.   So did you -- and was there any smell to the

13 house that you associated with Chinese drywall after

14 the house was reconstructed?

15    A.   No.

16    Q.   Were there any issues with metallic surfaces

17 corroding or being pitted?

18    A.   No.

19    Q.   Were there any issues with electronics or

20 appliances functioning properly in the home?

21    A.   Improperly?  No.

22    Q.   Were there any issues with the

23 air-conditioning after the house was remediated and

24 reconstructed?

Confidential – Subject to Further Confidentiality Review

```
 1        A.   No.

 2        Q.   How did you find Christian Thomas

 3   Construction?

 4        A.   We had met him somehow just in town, and we

 5   asked around who were good contractors.  During the

 6   height of the building era, some weren't as good as

 7   others.  And he'd been around a long time, we met

 8   him, we liked him.

 9        Q.   Did you interview or speak with any other

10   general contractors when you were looking for someone

11   to remediate and reconstruct your home?

12        A.   Yes.

13        Q.   Who did you speak with?

14        A.   Well, Jim Helm wanted to do it again.  That

15   was one that I remember specifically.  We said no.

16             And I -- I'm sure we -- I don't remember any.

17   I mean, we -- we met this fella, he had good

18   recommendations, he was local, and we used him.  We

19   were very pleased with what he did.

20        Q.   Did you get any quotes from any other general

21   contractors for the work that was done on your home?

22        A.   No, we didn't.  It would have taken a lot of

23   effort to prepare a quote to do this.  So people

24   weren't really willing to spend that time unless they
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 499 of 3246
Case 1:11-cv-00080-MMC Document 26-4 Entered on FLSD Docket 06/14/2011 Page 115 of
191
Confidential – Subject to Further Confidentiality Review

 1    were going to do the project.  That's the

 2    reason . . .

 3         Q.   Did you get a quote from Christian Thomas

 4    Construction before they began work on the project?

 5         A.   Yes.

 6         Q.   And was that quote consistent with the amount

 7    of money that you ultimately paid to them for the

 8    work?

 9         A.   It was incredibly accurate, yeah.  And with

10    everything in it; you know, some goes up, some goes

11    down, but the net number was pretty close.

12         Q.   If you look down in Section 5 on Page 4 of

13    this form, it asks you what the total cost of

14    remediation to date of the property is.

15              Do you see that?

16         A.   Yes.

17         Q.   And it lists an amount of $915,845.45.

18         A.   Right.

19         Q.   Is that the amount that you paid -- or, the

20    total cost for the remediation that you incurred?

21         A.   No.

22         Q.   No.

23              What is -- the amount is different than that

24    amount?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 500 of 3246 of
Case 1:11-cv-22408-FAM Document 26-1 Entered on FLSD Docket 12/19/2011 Page 496 of
191
Confidential - Subject to Further Confidentiality Review

```
 1      A.   Yes.

 2      Q.   So was this accurate to the best of your

 3   knowledge as of December 13th, 2018?

 4      A.   Yes.  He had a spreadsheet where we paid him

 5   monthly.  We've got checks every month, got it all --

 6   and that's what it was.  But there were things that

 7   we bought on our own or had to replace that went into

 8   the house that weren't part of the company's billing

 9   to us.  So this is the number he's got on the

10   contract.

11      Q.   So this is the amount that you paid to him

12   under the contract?

13      A.   Yes.

14      Q.   Is that right?

15      A.   Yes.

16      Q.   And you said that you have checks that show

17   those payments to?

18      A.   Yes.

19      Q.   Have those been submitted to your lawyer?

20      A.   The spreadsheet has.  I don't know.  But, I

21   mean, it's his documentation, his documentation, back

22   and forth.

23      Q.   But you're not sure in the checks that were

24   paid -- or, copies of the checks that were paid to
```

Confidential - Subject to Further Confidentiality Review

```
 1   Christian Thomas Construction have been submitted to

 2   your lawyer?

 3        A.   I don't know that.  They may have been.

 4        Q.   But you believe you still have them in your

 5   possession or could acquire them?

 6        A.   It's probable.

 7             MR. LAWSON:  Greg, I don't believe that we

 8        have those.  If that's accurate -- and we can

 9        discuss later on -- we would like to get them, if

10        possible.

11             MR. WEISS:  Of course.

12   BY MR. LAWSON:

13        Q.   So you said earlier that the amount that you

14   ultimately paid was very close to the amount that was

15   quoted to you by Christian Thomas Construction before

16   the project began; is that right?

17        A.   Yes.

18        Q.   Were you satisfied with the amount that you

19   had to pay -- or, excuse me.  Let me rephrase that.

20        A.   No.

21        Q.   Do you believe that the amount that you had

22   to pay was a fair price for the amount of work that

23   Christian Thomas Construction had to do?

24        A.   What I paid him?  Yes, was fair.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 502 of 3246 of
Case 1:14-cv-21192-ED Document 21 Entered on FLSD Docket 05/13/2019 Page 496 of
191

Confidential - Subject to Further Confidentiality Review

```
 1        Q.    When you went to Christian Thomas

 2    Construction initially, how did you determine the

 3    scope of work that he needed to do to reconstruct and

 4    remediate your home?

 5        A.    We went through the house, and he looked at

 6    everything.  I'm not -- I don't know if he had done

 7    any Chinese drywall work, but he's in Florida, so

 8    they'd had to do a lot of mold work.  And he rightly,

 9    it turns out, determined that there's specific things

10    we need to do, but a lot of it was fairly similar.  I

11    mean, he didn't have the corrosion with mold, but he

12    had to take everything out, clean it up, all that

13    stuff.

14        Q.    Do you know when you first spoke with

15    Christian Thomas Construction?

16        A.    Well, I -- no, I don't remember exactly when

17    it was.

18        Q.    Going back to the Plaintiff Profile Form that

19    we looked at earlier that is Exhibit 8.

20        A.    Yes.

21        Q.    On Page 2 of that document, the Roger G.

22    Thomas, is that the same Thomas from Christian Thomas

23    Construction?

24        A.    Am I looking at -- which page?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 503 of 3246
Confidential – Subject to Further Confidentiality Review

1    Q.   It's Page 2 of that Plaintiff Profile Form.

2    It's marked as EtterS2.  And if you look to the top

3    of the page under Section 4, we are talking about the

4    inspection that was done by Roger Thomas.

5    A.   Yes, yes.  So it was around then when we were

6    determining what it was, right.

7    Q.   Okay.  And that Roger Thomas is associated

8    with Christian Thomas Construction?

9    A.   Yes.  It's his son, and he turned the company

10   over to him.  So it changed from Roger Thomas to

11   Christian Thomas.

12   Q.   Okay.  So the remediation did not take place

13   until January 2013; is that right?

14   A.   Right, right.

15   Q.   But you had had discussions with the Thomas

16   family related to your property going as far back as

17   2009; is that right?

18   A.   Yes, yes.

19   Q.   What was that reason that the remediation did

20   not take place until almost four years after when you

21   discovered there was Chinese drywall in your home?

22   A.   First of all, we knew it was going to be a

23   major, major expense, close to a million bucks, give

24   or take.  We did not have the odor as bad as our

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 504 of 3246
Case 1:14-cv-06016-MBN Document 66-7 Filed 08/13/2019 Page 420 of 191
Confidential - Subject to Further Confidentiality Review

 1    neighbors did.  We kept it turned down.  We were

 2    pretty good.  But we were losing appliances and

 3    others things.

 4            And it came to a point -- and we thought we

 5    were going to be there forever -- where we could

 6    afford to pay to have it done, because we -- we were

 7    waiting on this kind of process, which we would all

 8    agree drags on.

 9            So I -- I had sold my company, and I could

10    afford to have it remediated.  Before that, I really

11    couldn't.

12        Q.    Did you sell your company around 2012?

13        A.    The closing date was January 2012.

14        Q.    And about a year later the remediation

15    started?

16        A.    Yes.

17        Q.    Do you know if you have submitted all of the

18    documents in your possession related to the

19    remediation of your home, to your knowledge?

20        A.    To my knowledge, yes.

21        Q.    Were there any additional change orders that

22    were done on the remediation that you have in your

23    possession that you have not submitted to your

24    attorneys?

Confidential - Subject to Further Confidentiality Review

```
 1        A.   I don't think so.

 2        Q.   Do you know if there were change orders that

 3   were submitted to your general contractor for the

 4   remediation and reconstruction?

 5        A.   In a project like that, I'm sure there was

 6   some things we did differently.  Whether or not they

 7   were change orders, I just don't recall.

 8        Q.   Do you know if the scope of work that was to

 9   be done in the home was ever written down formally

10   and in a document?

11        A.   We have an estimate from him, which you have,

12   and it lists all the things to do to be done.

13        Q.   Did you have an agreement with him that was

14   in writing for the work that was done on the home?

15        A.   I think so.  I don't recall if -- I'm sure we

16   had an estimate.  And I know that there was a

17   document filed beginning construction with the

18   county.  So within those documents there may be one

19   of those.

20        Q.   Do you know if you still have it in your

21   possession?

22        A.   I don't know.

23        Q.   Do you know if you have submitted it to your

24   attorney at any point?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 506 of 3246
Case 1:14-cv-22069-EDoc Menu Document 2534 Entered on FSD Docket 08/13/2019 Page 492 of
191
Confidential - Subject to Further Confidentiality Review

```
1        A.   If I have it in my possession, I have, yes.

2        Q.   Did you request in the scope of work any

3   structural changes to the home, other than the ones

4   that we've discussed already where items were

5   removed --

6        A.   No.

7        Q.   I know you didn't receive written quotes from

8   other general contractors for the remediation and

9   reconstruction, as you said earlier.  But did anyone

10  give you a verbal ballpark or estimate of how much

11  they thought the work would be?

12       A.   I don't recall.  I know I just talked to a

13  couple of guys, and they were not enthusiastic about

14  doing this.  I mean, even removing the drywall,

15  people had to wear masks, and it was a very specific

16  thing you could and couldn't do in disposal.  And

17  they just didn't want to get involved with it.

18       Q.   So no, you did not --

19       A.   No.

20       Q.   -- receive any estimates from anyone else?

21       A.   No.

22       Q.   Did you ever wonder if the amount that you

23  ultimately paid, a little less than a million

24  dollars, was more than what other general contractors
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/10/19 Page 507 of 3246
Case 1:14-cv-06228-MKB-JO Document 26-4 Filed 08/13/2019 Page 423 of 191
Confidential - Subject to Further Confidentiality Review

```
 1     would have charged you for the same work?

 2         A.   No.

 3         Q.   Why not?

 4         A.   Because of what the original cost was, and

 5     this was some years later.  My experience is in

 6     business that if you do the same thing later, it

 7     costs more.  And this was about the same, actually.

 8     So I figured it was pretty fair.

 9         Q.   Do you think that a general contractor that

10     was experienced in remediating homes with Chinese

11     drywall would have been able to do the work for less

12     than what Christian Thomas Construction did it for on

13     your home?

14              MR. WEISS:  Object to the form.

15              You can answer.

16              THE WITNESS:  That presupposes there's

17         someone out there who had done this.  And this

18         was new.  So I think that was a very small

19         sampling.  And I didn't know of any.

20     BY MR. LAWSON:

21         Q.   By 2013, do you think that there were

22     other -- did you know of any other companies that did

23     remediation and reconstruction of Chinese drywall

24     homes?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 508 of 3246
Case 1:14-cv-21244-JEM Document 268-1 Entered on FLSD Docket 08/13/2015 Page 494 of
191

Confidential - Subject to Further Confidentiality Review

```
 1        A.    Not personally.  I heard that some lower-end

 2    homes in big developments, subdivisions, those

 3    contractors came in and almost bulldozed them.  I

 4    knew that type of thing went on.  But I don't know of

 5    any custom homes.

 6        Q.    Did your neighbors, who had Chinese drywall,

 7    have their home remediated and reconstructed?

 8        A.    They did with Knauf, but that was a much

 9    different method.

10        Q.    Understood.

11              Do you know who the company was that did the

12    remediation and reconstruction of their home?

13        A.    No.  To my knowledge, what Knauf did was it

14    subbed out the contracting responsibility to a firm

15    in Las Vegas, I believe, and then they would contract

16    with people in Florida.  And our neighbors wound up

17    having to take legal action against the people who

18    did the remediation, because it wasn't done well.

19    That's their experience.  It had nothing to do with

20    me, but . . .

21        Q.    Do you know when their remediation and

22    reconstruction occurred?

23        A.    During ours.  I think it was actually

24    completed the first time before ours was.  I mean,
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 509 of 3246 of
Case 1:14-cv-08420-LDH-ST Document 269-1 Filed 06/13/16 Page 509 of 3246 of

Confidential – Subject to Further Confidentiality Review

191

        1    they brought herds of people in and attacked it.

        2        Q.   Have you ever heard of Judge Fallon's

        3    protocol for remediating and reconstructing homes?

        4        A.   I think we have that in the file.

        5        Q.   Do you know if Christian Thomas was asked to

        6    follow Judge Fallon's protocol in remediating and

        7    reconstructing your home?

        8        A.   I don't know specifically what he did on a

        9    day-to-day basis, but he had every -- he had the --

       10    there's also something -- but like I said, there's a

       11    procedure for the building code to do it also, in

       12    addition to his.  And there's a thick document that I

       13    have that I -- it's about that thick and tabbed --

       14    and he had all those -- he had all that information,

       15    so . . .

       16        Q.   Do you know how he had that information?  Did

       17    you give it to him?

       18        A.   Most likely.  But I don't know for sure.

       19             (Defendants' Exhibit 15 was marked for

       20    identification.)

       21             MS. MANUPIPATPONG:  I'm sorry, I think I

       22        handed you two copies.

       23             THE WITNESS:  Oh, I think you did.

       24             MS. MANUPIPATPONG:  Thank you.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 510 of 3246 of
Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 510 of 3246 of
191

Confidential – Subject to Further Confidentiality Review

```
 1    BY MR. LAWSON:

 2        Q.   Mr. Etter, you have been handed a document

 3    that's been marked as Exhibit 15.

 4             Do you recognize that document?

 5        A.   I recognize documents such as these, yes.  We

 6    had a lot of them.

 7        Q.   What is this?

 8        A.   It looks like it's Christian Thomas's -- it's

 9    a spreadsheet that he used and then we would pay

10    monthly from, because he did remediation and repairs.

11        Q.   So when he had incurred costs or wanted to

12    invoice you for work that was done on the project at

13    your home, they were put on to these documents and

14    charts that we see across Exhibit 15; is that right?

15        A.   Yes.  I believe so.

16        Q.   And are these a complete set of all of the

17    draws and the progress draw requests that you

18    received from Christian Thomas during the project on

19    your house?

20        A.   When was the last one?

21             I don't know for certain, but it it goes

22    through October -- it was certainly between October

23    and the first of December when he finished.

24        Q.   It appears that the first draw request is
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 511 of 3246
Case 1:09-md-02047-EEF-MBN Document 20-1 Entered on FLSD Docket 08/13/2019 Page 427 of
191
Confidential – Subject to Further Confidentiality Review

1    from December 2012 on the second page of the exhibit.

2        A.    Okay.

3        Q.    And it goes -- and the last one, to

4    September/October of 2013 on the last page of the

5    exhibit.

6             Does that sound consistent with the length of

7    time that you received these?

8        A.    It's close.  It's got to be close.

9        Q.    All right.  Are you aware of any other

10   invoices or draw requests from Christian Thomas other

11   than the ones that are in this exhibit?

12       A.    I'd have to check.  I mean, I can't tell by

13   looking.  I don't have another one.

14       Q.    Do you have any cancelled checks for the

15   payments requested in these draws in your possession?

16       A.    I don't know about cancelled checks.  We have

17   check registers.

18       Q.    Have you submitted those check registers to

19   your attorney at any point?

20       A.    I don't know.  We've submitted piles of

21   material.  Perhaps.

22             MR. LAWSON:  Greg, once again, if those

23       exist, we would ask that they be searched for and

24       produced.  We do not believe that we have them in

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 512 of 3246 of
Case 1:14-cv-02047-EEF-MBN Document 26-1 Filed 08/13/20 Page 512 of
Confidential – Subject to Further Confidentiality Review
191

```
 1        our possession.

 2             MR. WEISS:  Sure.  Maybe when we are done

 3        here, we can go over the list of what it is that

 4        you want us to look for, to include the tax

 5        returns, whether there was a reduction made, and

 6        all of that stuff.

 7             MR. LAWSON:  Yeah.  That's fine.

 8   BY MR. LAWSON:

 9        Q.   You'd agree, looking through these, that they

10   do not indicate whether these amounts were paid; is

11   that right?

12        A.   I think so.  I think this is what he sent us,

13   and then in response, we would pay.

14        Q.   So these documents themselves do not note

15   that they were paid; is that correct?

16        A.   I think that -- for these, yes.

17        Q.   But it's your testimony that you did pay

18   these amounts --

19        A.   Oh, yes.

20        Q.   -- that are listed?

21        A.   Yes.

22        Q.   There does appear to be a note on at least

23   some of the pages where it notes "PD" and then lists

24   a number.  There's a "PD Number 459."  That might be
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 513 of 3246 of
Case 1:11-cv-03626-ELDW-SMG Document 264-1 Entered on FLSD Docket 08/13/2015 Page 429 of
191
Confidential - Subject to Further Confidentiality Review

```
 1    a paid amount and a check number.  It's on draw

 2    number nine that's --

 3         A.   Yeah.  There are a couple of them I see, and

 4    that's paid -- that would be the amount, and it would

 5    be the check number.  And some might be in my writing

 6    or my wife's writing.

 7         Q.   Okay.  So would those indicate the check

 8    numbers that these draws were paid with?

 9         A.   Yes.

10         Q.   And that may assist in finding those checks,

11    I would imagine.

12              So it's your belief that the draw requests

13    here list only the scope of work that you requested

14    to remediate and reconstruct your house and no other

15    work that was done in addition?

16         A.   Yes.

17         Q.   And it was your testimony earlier, I believe,

18    that there were not any upgrades or -- on any

19    finishes or portions of the house beyond what the

20    original construction called for; is that right?

21         A.   No.  Some things had to be replaced, but not

22    an upgrade.

23              MR. WEISS:  Can we take a quick break?

24              MR. LAWSON:  Let me just finish a couple
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 514 of 3246
Case 2:14-cv-02722-MRH Document 284-1 Entered on FLSD Docket 08/17/2019 Page 130 of
191

Confidential – Subject to Further Confidentiality Review

```
 1        questions just to make sure that I don't lose my

 2        place.  And then we can take a break.

 3   BY MR. LAWSON:

 4        Q.   Looking to the January 2013 draw, which is on

 5   the third page -- excuse me, February 2013 draw

 6   that's on the fifth page of the document.

 7        A.   Yes.

 8        Q.   If you can look down to the end of that draw

 9   request on the next page, there's change -- a change

10   order that is listed, a CL-1.  It says:  Change

11   orders complete this period, CL-1.

12             Do you see that near the bottom of the

13   invoice?

14        A.   Yes.

15        Q.   So is it accurate to say that there were

16   change orders that were submitted to Christian Thomas

17   during the construction project?

18        A.   I'm sure there were.  And I'm sure that there

19   were things that happened on the fly, but, yes.

20        Q.   If you look down to the budget section on

21   that same draw request, there is a highlighted note

22   there.  It says:  I have reviewed the budget, and

23   even with the added expenses (the drywall testing,

24   screening, microcleaning, chemical cleaning), and
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 515 of 3246
Case 1:14-cv-06228-RMB-JS Document 269 Entered on FLSD Docket 08/11/2015 Page 491 of
191

Confidential - Subject to Further Confidentiality Review

```
1    taking into consideration the cabinet change order

2    now in place, we are in good shape when reconciling

3    the original budget with the projected cost to

4    complete.  We will continue to keep up with the

5    budget at a minimum, once each month, and more, if

6    required.

7         Do you see that?

8         A.   Yes.

9         Q.   So what -- there was a cabinet change order?

10   Do you recall that?

11        A.   That was the kitchen I was talking about

12   where we had the wall, took out the shower.  Also,

13   when you deal with granite and cabinets, when you

14   take them out, they don't always come out undamaged.

15   But they had to replace those with similar cabinets.

16        Q.   If you look over to the next page, it's the

17   March draw from March 2013.  There's a highlighted

18   section for cabinets (family room) built-in.

19        A.   Yes.

20        Q.   Do you see that?

21        A.   Yes.

22        Q.   Is that what you're referencing?

23        A.   Yes.  Elite did the kitchen and the family

24   room, which I showed you, the ones that were replaced
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 516 of 3246
Case 2:14-cv-02722-EEF-JCW Document 26-4 Filed 05/13/2019 Page 482 of
191
Confidential - Subject to Further Confidentiality Review

 1    by the fireplace there.  So that's one big room;

 2    there's a family place, kitchen, one big room.  They

 3    did the cabinetry.

 4            MR. LAWSON:  We can take a break.

 5            (Recess from 10:46 until 11:04 a.m.)

 6    BY MR. LAWSON:

 7        Q.  Welcome back, Mr. Etter.

 8            Before we left off, we were talking about the

 9    draw itemizations from Christian Thomas Construction;

10    that is Exhibit 15.

11            I'd like to ask you a little bit more about

12    the draw that was for February -- excuse me, March of

13    2013, specifically.

14            We talked about the cabinets that are

15    highlighted on the first page of the March draw.

16            And I wanted to ask you, a little bit below

17    that in that column in the last item, there's a

18    plumbing change order.

19            Do you see that?

20        A.  Yes.

21        Q.  Do you have any recollection of that what

22    plumbing change order was?

23        A.  I don't think so.  One time there was a

24    discussion; believe it or not, there are different

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 517 of 3246

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 493 of
191
Confidential - Subject to Further Confidentiality Review

1    size commodes, okay?  I don't know how tall you are,

2    but I'm six-foot two, and they have taller ones.  And

3    I think we had to change over to the taller ones,

4    which were originally in there.  It was something

5    like -- it might have been a faucet, but that was one

6    of the discussions we had.  So that's a candidate for

7    that change.  I don't know.

8         Q.   Let's go back to the January 2013 draw

9    request that is on the third page of this document.

10        A.   Okay.

11        Q.   If you look to that, it lists a date of

12   contract as October 8th, 2012, on that draw request.

13        Do you see that?

14        A.   Okay.

15        Q.   Does that sound right that you signed a

16   contract with Christian Thomas Construction around

17   October 8th of 2012?

18        A.   It might, because we moved out on or about.

19   It was November or then.  And the reason we moved out

20   was they needed to start construction.  So if we were

21   to sign a contract, it would have been before we

22   moved out.  So given that, give or take, that would

23   make sense.

24        Q.   And I apologize if I asked this earlier but:

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 518 of 3246
Case 2:14-cv-02722-EEF-JCW Document 26-1 Filed 08/13/2019 Page 494 of
Confidential - Subject to Further Confidentiality Review
191

```
 1    Do you know if you still have the contract that you

 2    signed with them?

 3        A.   We probably do, and it's probably in the pile

 4    somewhere.  I can look.

 5        Q.   When you say "the pile somewhere," you mean

 6    the pile at your house?

 7        A.   I mean, this pile.

 8        Q.   Got it.

 9             But if you did have it --

10        A.   I'll look.  I don't know.

11        Q.   Okay.  Yeah, again, I don't believe that we

12    have that in our records.

13        A.   All right.

14        Q.   So to the extent you can find it, we

15    appreciate you producing it to your lawyer.

16             Thank you.

17             So I wanted to ask in this January 2013 draw

18    request, if you look to the -- where it starts to

19    summarize the expenses, there's the Change Orders

20    Complete This Period section.  And there it lists an

21    amount of $29,700.84 for the change order that was

22    completed in this January 2013 period.  Do you know

23    what that was related to?

24        A.   No.
```

Confidential - Subject to further Confidentiality Review

```
 1        Q.   Okay.  But, again, those change orders would

 2    have been written out?

 3        A.   Somewhere.  I don't know where they are, but

 4    I can look.

 5             Yeah.  And some of this stuff, just -- once

 6    they got into it, all the wiring and piping was

 7    hidden behind walls, that sort of thing.  And so he

 8    had to surmise what's back there, how it is.  And so

 9    when we did it actually, it could be something like

10    that that you wouldn't see originally.

11        Q.   Is it accurate to say that all of the drywall

12    from the portions of the house that were not under

13    air was also removed from the home?

14        A.   Yes.  In fact, the garage was probably

15    worse -- or, worse than some, because it, in Florida,

16    it was hot and humid, and that drew off the sulfur,

17    so . . .

18        Q.   I'd like to turn your attention to the

19    August 2013 draw request that's near the end of this

20    document.  It's the second to last draw request.  At

21    the bottom of that there's a handwritten note that

22    states:  Less, dash, Bose speakers, et cetera,

23    $853.30.

24             Do you see that?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 520 of 3246 of
Case 1:11-cv-22408-FAM Document 26 Entered on FLSD Docket 08/13/2012 Page 436 of
191

```
 1        A.   Yes.

 2        Q.   Do you know what that means?

 3        A.   No.  Because I was paying -- we had that Bose

 4   system all wired in, and they had replaced the wires,

 5   but I think I saved all the speakers.  So I don't

 6   know exactly what that was, but . . .

 7        Q.   So you paid to replace the speakers in the

 8   house?

 9        A.   I think so.  I think that was the case.

10        Q.   Looking at this August draw on the first

11   page.

12        A.   Okay.  That -- go ahead.

13        Q.   No, what?  I'm sorry.  So ahead and say what

14   you were going to say.

15        A.   No, it's all right.

16        Q.   If you look to the -- near the bottom of that

17   first page of the August draw, there's an item for

18   gutters for $1,096.

19             Do you see that?

20        A.   Yes.

21        Q.   What is that for?

22        A.   I don't know.  I don't know why they would

23   put gutters up, but . . .

24        Q.   Specifically, that item says:  About seamless
```

Confidential - Subject to Further Confidentiality Review

```
 1    gutters approved, extra.

 2            But you don't know what that means?

 3       A.   No.  If we put new gutters in, then -- I

 4    don't know why we would.  It must mean that we were

 5    paying for it or something.  I don't know.  I don't

 6    know why it's there.

 7            (Defendants' Exhibit 16 was marked for

 8    identification.)

 9    BY MR. LAWSON:

10       Q.   Mr. Etter, you have been handed a document

11    that's been marked as Exhibit 16.

12            Do you recognize this document?

13       A.   Yes.

14       Q.   It's labeled on this first page as a

15    Christian Thomas Construction Billing Statement, it

16    appears?

17       A.   Yes.

18       Q.   What is this document?

19       A.   I think it was an attempt to summarize

20    Christian Thomas's billing for reconstruction and

21    repair.

22       Q.   If you look to the subsequent pages, there

23    appear to be a few more charts listing different

24    expenses.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 522 of 3246
Case 1:14-cv-06228-MKB-JO Document 38-1 Filed 03/13/2015 Page 498 of 191
Confidential - Subject to Further Confidentiality Review

```
 1       A.   Yes.

 2       Q.   What are those?

 3       A.   I was trying to summarize what we were out of

 4  pocket due to Chinese drywall.

 5       Q.   The first chart on the second page lists

 6  "purchases to replace damaged and unusable items in

 7  house paid directly by the Etters", is what it

 8  states.

 9            Do you see that?

10       A.   Yes.

11       Q.   So here you have listed items that you paid

12  out of pocket for outside of the amount that you paid

13  to Christian Thomas?

14       A.   Yes.  Like we needed -- an example was the

15  icemaker.  So we went down to shop ice makers.  We

16  bought the icemaker as a replacement and had it

17  delivered, that sort of thing.

18       Q.   And all of these items were damaged by

19  Chinese drywall or damaged in the reconstruction of

20  your home; is that right?

21       A.   Right, right.  They were -- like, the mirrors

22  would have turned black.  Some of the other things

23  were -- the microwave didn't work.  Some of the other

24  things were damaged when they were removed.  That
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 523 of 3246 of
Case 1:09-md-02047-EEF-MBN Document 2636 Entered on FLSD Docket 03/19/19 Page 499 of
191
Confidential - Subject to further Confidentiality Review

```
1      sort of thing.

2         Q.   And you've listed cost for each one of those

3      items; is that right?

4         A.   Yes.

5         Q.   And you have listed the form of payment for

6      each of them; is that right?

7         A.   Yes, yes.

8         Q.   And do you know if you have submitted any

9      proof of payment that you have in your possession for

10     all of the items listed in this chart on the second

11     page?

12        A.   I don't know for sure.

13        Q.   You don't know if you've submitted all of

14     them?

15        A.   Right.  We put in the right-hand column how

16     it was paid.  So -- but I don't know if we did

17     samples of our American Express, you know, monthly

18     billing or not.  I don't know.

19             MR. LAWSON:  And, again, we would ask if

20        there are -- is any additional proof of payment

21        or receipts showing payment for these items that

22        those be located and produced as soon as

23        possible.  We have discovery deadlines coming up

24        on Monday, so we would have liked to have
```

```
 1          received those before today's deposition.  But we

 2          would like to receive them as soon as possible,

 3          even outside of the scope -- the end of

 4          discovery, if needed.  But we would like to get

 5          them.

 6              MR. WEISS:  No problem.

 7     BY MR. LAWSON:

 8          Q.    Looking down to the next chart on the second

 9     page, it says:  Expenses and Repairs Related to

10     Chinese Drywall Remediation.

11              Do you see that?

12          A.    Yes.

13          Q.    And what is this chart?

14          A.    Let me read it.

15              Well, these were expenses that were incurred

16     for the items listed.

17          Q.    So there are a number of items here that you

18     have listed.  And are these payments that you made

19     that are related to the remediation of your home that

20     were not paid to Christian Thomas?

21          A.    Yes.

22          Q.    And it says "expenses and repairs."  It

23     appears the first item is a moving company that was

24     paid?
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.   Right.  Which is -- we didn't list moving in

 2   the temporary living expenses below.  So we put it up

 3   there.  Maybe we should have put it down there,

 4   but . . .

 5        Q.   And then there's the Chinese Drywall

 6   Screening report that I believe we looked at earlier?

 7        A.   Yes.

 8        Q.   There's also something with Surreal Sound.

 9   Do you know what that is?

10        A.   Yeah.  They had to replace part of the sound

11   system that was corroded.

12        Q.   There's an item for residential elevators?

13        A.   We had an elevator installed, we had an

14   artificial knee replaced, and some other things.  And

15   elevators are licensed, and they have to be protected

16   and inspected.

17        Q.   There's an item for reinstalling drapes in

18   the home?

19        A.   Yes.  The decorator had to come in.  We had

20   drapes that were about 12 feet long on a small bar,

21   and they have to be put in and adjusted each time.

22   So that's what he changed.

23        Q.   A little further below there's an item for

24   reinstalling a security system.
```

1           Do you see that?

2      A.   Yes.

3      Q.   Did you have to buy a new security system

4   when you remediated and reconstructed your home?

5      A.   I think it was the same company, ADT, because

6   I had always used them in business and stuff.  But

7   they had to come in.  All the wiring was shot, so

8   they came in.  And I think that the actual panels

9   were different in 2012 than they were in 2005 when

10  they were installed.

11     Q.   So they installed new panels on the security

12  system?

13     A.   I think they did, yes.

14     Q.   Was the issue that the panels no longer

15  worked or that the wiring no long worked?

16     A.   The wiring was shot.  We had to strip every

17  inch of wire.

18     Q.   Going down to the next page of this document,

19  the third page, there's a chart entitled Temporary

20  Living Expenses that you referenced earlier.

21     A.   Yeah.

22     Q.   Does this reflect the temporary living

23  expenses that you incurred while you were moved out

24  of your house during the remediation and

Confidential - Subject to further Confidentiality Review

```
 1    reconstruction of your home?

 2        A.    Yes.

 3        Q.    Does this include -- is this only for the

 4    time period where you were moved out of the house

 5    during the remediation and reconstruction?

 6        A.    Yes, yes.

 7        Q.    And it appears to go from October of 2012

 8    through September of 2013.

 9              Does that look correct?

10        A.    Yes, yes.

11        Q.    And that's approximately the period of time

12    that you were out of your house; is that right?

13        A.    Yes.

14        Q.    Did you leave the house before the

15    remediation project started?

16        A.    Yes, yes.

17        Q.    How much time before the remediation project

18    started did you leave?

19        A.    Probably less than a month.

20        Q.    When we were looking at the draw request from

21    Christian Thomas, those started in December of 2012.

22    Is that right?

23        A.    Yes.

24        Q.    And does that mean that Christian Thomas
```

1    started work on the house in December of 2012?

2        A.    Probably not.  If that's when we billed it,

3    it probably took place starting, you know, middle of

4    November, early December.

5        Q.    But it's your recollection that you left the

6    house shortly before the work on the home began?

7        A.    Yeah.  I mean, they spent time unattaching

8    things and that before they actually ripped off the

9    drywall.

10       Q.    Where did you move during the time that the

11   remediation and reconstruction of your home was going

12   on?

13       A.    It was in Jupiter, so not very far; maybe

14   three or four miles, five miles, max.  The

15   subdivision was called Paseos.  The street was

16   something like Via Veracruz or something.  Typical

17   Florida name.

18       Q.    Before we discuss the alternative living

19   arrangement that you had during that time, I wanted

20   to ask you about the second chart on the second page

21   of this document about expenses and repairs related

22   to Chinese drywall remediation.

23             Have you submitted to your attorney all of

24   the receipts or proof of payment that you have in

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 529 of 3246 of
Case 2:14-cv-02722-EEF-MBN Document 26-1 filed 11/30/15 Page 195 of
191
Confidential - Subject to Further Confidentiality Review

```
 1   your possession for the items listed in that second

 2   chart?

 3       A.   I don't know.  I may have.

 4            MR. LAWSON:  All right.  Obviously, again,

 5       and this is just an ongoing note that we would

 6       like on the record:  If there are additional

 7       proof of payment or documentation for any items

 8       that are being sought for damages in this

 9       lawsuit, we would like those to be located and

10       produced to us as soon as possible.

11   BY MR. LAWSON:

12       Q.   Let's go down to the Temporary Living

13   Expenses chart on the third page of this exhibit.

14            Did you look -- how many homes did you look

15   at as far as rental homes before you decided on this

16   Via Veracruz home?

17       A.   Oh, I don't know.  I mean, we -- since we

18   lived right there, we drove all around town.  We

19   might have used -- I think we used the same realtor

20   we used when we bought the house originally.  Her

21   first name was Mimi.  I don't recall her last name.

22       Q.   Do you remember about how large the house was

23   that you moved into?

24       A.   Yeah.  It was a little -- roughly speaking,
```

Confidential - Subject to Further Confidentiality Review

```
1     it was a little smaller than the house we had.  It

2     had more rooms, were which smaller.  So we were able

3     to, in terms of personal possessions, store most of

4     the stuff in the house.  So we had a couple bedrooms

5     that were just full of moving boxes that we didn't

6     unpack until we moved back in.  Two-car garage,

7     two-story.

8          Q.   Looking at this list of items, there's

9     Comcast listed for different months, payments.  Is

10    that related to cable or Internet or phone services?

11         A.   Yes.  And that was, being a subdivision,

12    Comcast had that contract for there.

13         Q.   Do you remember what those Comcast payments,

14    what services they were for?

15         A.   I don't know if it was also phone, but it was

16    things like phone, cable, your Internet.  It was

17    all -- they packaged everything together somehow.

18         Q.   Did you continue to pay for those services at

19    the home that was being remediated during the time it

20    was being remediated?

21         A.   No.

22         Q.   Did you normally pay for those kinds of

23    services:  Phone, cable, Internet, at your home on

24    Jupiter Way Inlet?
```

Confidential – Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    But you did not pay for them at the house

 3   during the time --

 4        A.    No.

 5        Q.    -- that you were living in this Via Veracruz

 6   home; is that right?

 7        A.    That is correct.

 8        Q.    Did you pay a similar amount, to your

 9   recollection, when you lived in your house, compared

10   to in this rental house for those services?

11        A.    It seems like, actually, the rental was more.

12   I don't know why.

13        Q.    Do you have any record of or receipts for the

14   payments listed on this temporary living expenses --

15   or, sorry.

16              Have you submitted all of the records of any

17   payment for invoices for these items listed on this

18   Temporary Living Expenses chart to your attorney, to

19   your knowledge?

20        A.    Yes.  I'm sure that some of them are, like

21   the lease payments and others.  I think I have.  But

22   I don't know if they are all submitted.  Because we

23   did have to pay power at the original house, because

24   they were using it.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 532 of 3246 of
Case 1:14-cv-02045-ED_pV Document 626-8 Entered on FLSD Docket 08/13/2019 Page 488 of
Confidential - Subject to Further Confidentiality Review
191

         1              (Defendants' Exhibit 17 was marked for

         2       identification.)

         3       BY MR. LAWSON:

         4          Q.   Mr. Etter, you have been handed a document

         5       that's been marked as Exhibit 17.  I represent to you

         6       that this appears to be a composite exhibit that was

         7       produced to us containing a lot of different

         8       documentation.

         9              I wanted to focus your attention on a few

        10       specific portions of it.  Specifically, I would like

        11       to start by looking at Etter 78, which is near the

        12       conclusion of the exhibit.  You can see that number

        13       on the bottom right-hand corner.

        14          A.   Okay.  I'm almost there.

        15              Okay.  I have it.

        16          Q.   Etter 78 appears to show an estimate from

        17       Christian Thomas Construction, Incorporated for your

        18       home.

        19              Do you see that?

        20          A.   Yes.

        21          Q.   And see how at the top where it lists a

        22       project, it says "Etter residence"?

        23          A.   Uh-huh.

        24          Q.   Is this the estimate that you received from

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 533 of 3246 of
Case 2:14-cv-02722-EEF-MBN Document 234-6 Filed 08/13/2019 Page 149 of
191

Confidential - Subject to Further Confidentiality Review

```
1     Christian Thomas Construction prior to them engaging

2     in work on your home for remediation and

3     reconstruction?

4         A.   Is there a date on this?  I don't --

5         Q.   I do not see a date on it.

6         A.   This looks like what I had.  It looks

7     familiar.  But whether it is the exact one, I

8     couldn't tell you.

9         Q.   Let's look to the conclusion of this

10    estimate.  It's on the third page of the estimate.

11             The total cost to restore the property to

12    preloss condition is listed as $1,166,896.

13             Do you see that?

14        A.   Yes.

15        Q.   And is that your recollection of

16    approximately the amount that was estimated for the

17    project before it started?

18        A.   I remember the sense of shock, but I -- I

19    think it was, yeah.

20        Q.   I think earlier you said something to the

21    effect that the amount seemed consistent with what it

22    cost to build the house; is that right?

23        A.   Right.

24        Q.   But you would agree that the work that
```

Confidential – Subject to Further Confidentiality Review

```
 1    Christian Thomas was doing was different than

 2    building a house, right?  It was not completely

 3    building a new house; is that right?

 4        A.   It was pretty close.  I mean, he didn't have

 5    to do the concrete work and the bricks on the

 6    outside.  But everything inside was just like

 7    building a house.

 8        Q.   Was the framing inside of the house

 9    maintained during the remediation and reconstruction

10    of the house?

11        A.   I think most of it had had metal studs, which

12    I think down here are aluminum, and a couple were

13    bent.  And we changed the wall or got rid of the wall

14    or the fireplace.  But most of them were able to be

15    cleaned and reused.

16        Q.   So the foundation was maintained through the

17    project, correct?

18        A.   That's correct.

19        Q.   And most of the metal framing inside of the

20    house was maintained?

21        A.   I think so, yes.

22        Q.   And can you think of anything else that was

23    maintained in the house through the project?

24        A.   Absent the trim, I don't think they replaced
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 535 of 3246
Case 1:11-cv-22408-MGC Document 261-1 Entered on FLSD Docket 08/13/2013 Page 491 of
191
Confidential - Subject to Further Confidentiality Review

```
1    any windows, and external doors, I think, were still

2    is there.

3         Q.   Let's go to the first page of this estimate.

4              Do you know if there's a reason why your

5    residence is listed as being on Federal Highway?  Is

6    that just an inconsistency or a typo?

7         A.   Before Helm started the -- the whole site

8    where we were, Emerald Harbour, that was the address.

9    There was something else there at that address, and

10   I'm -- it might have been a trailer park.  I don't

11   know.  But he demolished it and put it Emerald

12   Harbour.  So some of the old records have the old

13   original address as being Federal Highway.  Because

14   there wasn't that road that we were on, Jupiter Inlet

15   Way.  That's probably the source of that.

16        Q.   Let's go the last page of the estimate.  It's

17   the third page.  It's marked as Etter 80.

18             At the top, Item 1105, there's an item that

19   states:  Appliances replaced, wiring, and coolant,

20   c-o-p-e-r, bad, it says.

21        A.   Well, it's probably a misspelling of

22   "copper."

23        Q.   I think that's right.

24             What is your understanding of what this item
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 536 of 3246
Case 1:11-cv-00377-CDD-MRW Document 29-1 Entered on FLSD Docket 08/13/2013 Page 492 of 191
Confidential - Subject to Further Confidentiality Review

 1    is?

 2        A.   It's probably repair and replacement of any

 3    appliances, you know, damaged by the sulfur.  Because

 4    we'd had work done and, you know, replacing ice

 5    machines -- or, repairing ice machines,

 6    refrigerators, others.

 7        Q.   So you replaced the ice machine in the house;

 8    isn't that right?

 9        A.   Yes.

10        Q.   And do you know what other appliances were

11    replaced during the remediation?

12        A.   You know, I think the wine cooler was.  I

13    think we were able to salvage the refrigerator.  The

14    microwave was replaced.  I don't -- we had a small

15    refrigerator upstairs that we took out.  We might

16    have put that in the bathroom.  But I don't know what

17    happened to that.  But those sorts of things, yeah.

18        Q.   Looking at the first page of this estimate,

19    it appears that the first cost column in that

20    estimate is for labor.

21             Do you see that?

22        A.   You are talking about Page 1?

23        Q.   Yeah.  Page 1 of the estimate, Etter 78.

24    That column is labeled as Labor.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/10/19 Page 537 of 3246 of
Case 2:14-cv-02722-EEF-MBN Document 25-1 Entered on FLSD Docket 08/13/2019 Page 453 of
191
Confidential - Subject to Further Confidentiality Review

1          Do you see that?

2     A.   I see that.

3     Q.   And then if you look at Item 1105 on the

4   third page, the labor for appliances, replace wiring

5   and coolant, copper bad is listed as $38,400.

6          Do you see that?

7     A.   I see that.

8     Q.   Would that indicate to you that the estimate

9   for the labor for replacing items under this

10  Item 1105 was $38,400?

11    A.   No. I think --

12         MR. WEISS:  Object to the form.

13         You can answer.

14         THE WITNESS:  I can answer?

15         I think it's one of two things:  It's either

16         juxtaposition or the 38 and 36.  That would be my

17         first guess.

18         The second would be, they had to remove and

19         rewire all the wiring.  They took out all the

20         wiring.  And that's a subcontractor.  So that's

21         probably covered over there under electrical in

22         1600.

23         So my guess is that's a juxtaposition.

24   ///

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 538 of 3246
Case 2:14-cv-02722-EEF-JVM Document 26-1 Entered on FLSD Docket 08/13/2019 Page 494 of
191

Confidential – Subject to Further Confidentiality Review

```
 1    BY MR. LAWSON:

 2         Q.   So that perhaps the amount that was paid for

 3    materials was $38,400?

 4         A.   Because that's the estimate, yeah.

 5         Q.   All right.  And that would be consistent, you

 6    think, if the appliances that you described were

 7    replaced, and that was what they were estimating

 8    there?

 9         A.   He was trying to give me an estimate of cost,

10    and perhaps he -- I don't know -- maybe he said,

11    we've got to replace all your appliances because of

12    it.

13         Q.   If you look down to Division 16, Electrical,

14    in this estimate on the third page, Etter 80.

15         A.   Yes.

16         Q.   You were referencing before that there were

17    some items for different electrical items, including

18    the first one, which is listed as Number 1600, which

19    says "electrical"; the second one, which is

20    Item 1610, which is described as "electrical

21    structured wiring"; and then 1625, which is listed as

22    "electrical fixtures and fans."

23              Do you see that?

24         A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 539 of 3246
Case 1:11-cv-22408-MGC Document 18 Entered on FLSD Docket 11/26/19 Page 495 of
191
Confidential - Subject to Further Confidentiality Review

```
 1        Q.    It looked like that the amount for electrical

 2   work was listed here as an estimate of $49,600.

 3            Do you see that?

 4        A.    Yes.

 5        Q.    So would that have encompassed the -- along

 6   with Item 1610, any electrical rewiring or electrical

 7   work that was done on the house?

 8        A.    Yeah.  I think --

 9            MR. WEISS:  Object to the form.

10            You answer.

11            THE WITNESS:  Yeah.  I think that was just to

12        rewire.  Now, I'm not a contractor.  But

13        "structured wiring" may be your heavy-gauge, your

14        coded wires, and that's different from just your

15        normal wires.  But that would have been just

16        to -- they had to take out every inch of wire and

17        put in every inch of wire, including circuit

18        boards and everything else.

19   BY MR. LAWSON:

20        Q.    Item 1650 under this section is listed as

21   "security system."

22            Do you see that?

23        A.    Yes.

24        Q.    And it appears that the amount listed for
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 540 of 3246
Case 1:14-cv-06228-EF-MBN Document 26 Filed 08/13/2019 Page 156 of 191
Confidential — Subject to Further Confidentiality Review

1    that is $9,900.  And that column, if you look, that

2    third cost column is for Subcontractor.

3         Do you see that?

4    A.   Yes.

5    Q.   Was this work done by ADT?  Or can you

6    explain what this is for?

7    A.   It's probably, because what they were able to

8    do with both the sound system and the security

9    system -- before they put up the new drywall,

10   everything was exposed.  So I think they had the

11   people responsibile for certain functional issues put

12   their own wiring in.  I think that's what that is.

13   Q.   So this would have been for new wiring?

14   A.   Well, wiring.  I mean, you've got speakers,

15   you have sensors, whatever -- whatever it is.  I

16   don't know.

17   Q.   Was it for replacing the security system?

18   A.   Yeah.  They had to take everything out.

19   Nothing was reused for security or sound.

20   Q.   The next item is "speakers and volume

21   controls."  That's Item 1660.

22        Do you see that?

23   A.   Yeah.  That would be the same thing.

24   Q.   All right.  What speaker system did you have

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/10/19 Page 541 of 3246
Case 1:14-cv-06192-LDW-AKT Document 264 Entered on FLSD Docket 08/13/2019 Page 497 of
191
Confidential - Subject to Further Confidentiality Review

```
1    in the house before the house was remediated?

2        A.    I had a Bose system, I think.  I think I had

3    one before and after.

4        Q.    And we saw a handwritten item a moment ago on

5    one of the draw requests about a payment for a Bose

6    speaker system for around $800.  Do you remember

7    that?

8        A.    Yeah.  This was the estimate.  I'm not sure

9    if he ever charged for that.  I think I might have

10   paid directly for that.

11       Q.    The amount that you originally paid for the

12   Bose speaker system, does around $1600 sound

13   accurate?

14           MR. WEISS:  Object to the form.

15           You can answer.

16           THE WITNESS:  I'm not certain.

17           And I think we were able to save a box or

18       two.  But, you know, some things we could save;

19       some things we couldn't.

20   BY MR. LAWSON:

21       Q.    It sounds like you might have paid for the

22   speaker system separately than through your general

23   contractor?

24       A.    It's possible.  But I don't recall.
```

1    Q.    Did you pay for security separately than

2    through your general contractor as well?

3    A.    I'm not -- there was a little bit of overlap.

4    There was some things done that didn't need to be

5    done after the fact we had to replace.  Anyhow . . .

6    Q.    What were those?

7    A.    He had a control system -- this is the ADT

8    guy -- who said, this is portable, but we need to

9    build it into the wall.  It turned out he didn't.

10   And the contractor had cut a hole and wired it for

11   him and everything and then had to go back and

12   replace that and smooth it over because he didn't

13   need it.  It was just a case of so many people

14   involved, miscommunication.  So there was some

15   overlap.

16   Q.    I wanted to turn your attention to Etter 81,

17   which is the last page of this exhibit.

18        And it appears to be a Christian Thomas

19   Construction, Incorporated invoice from March 1st,

20   2013.

21        Do you see that?

22   A.    I see that.

23   Q.    On the right side near the top it lists it as

24   Change Order Three.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 543 of 2246 of
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 543 of 2246 of
191
Confidential - Subject to Further Confidentiality Review

```
 1          Do you see that?

 2    A.    Just a second.

 3          At the very top?

 4    Q.    Yes.

 5          Near the top, a little bit below the date of

 6    the invoice, there's an item that's bolded that says

 7    Change Order Three.

 8    A.    Oh, I see that.

 9    Q.    Looking at this invoice, what is this

10    document?

11    A.    Let me read it.

12          I'm not certain, but I think what he did was

13    he tried to separate what he had to do according to

14    the requirements of remediation of Chinese drywall on

15    to one -- one page.  In other words, the cleaning,

16    the sweeping, the removal, all those sorts of things,

17    because, you know, we -- we had -- we had to put

18    plastic over the whole house and put it under

19    pressure and all those things.

20          It appears to me that that's what this is.

21    Q.    So this change order might have been for

22    cleaning the air quality and removing any

23    particulates from the Chinese drywall from the home

24    after the demolition had occurred?
```

```
 1        A.    And there was a lot of delays.  They thought

 2    they could do something, but they had to wait for

 3    someone to come in and inspect it.  In fact, it says

 4    at the bottom there, this caused a 60-day delay to

 5    get all this done in order -- so that if we were ever

 6    in this room, we could tell you we had it done

 7    properly.

 8              So I think that's what that is.

 9        Q.    The total for this change order is listed

10    $141,281.40.

11              Do you see that?

12        A.    I see that.

13        Q.    Are you aware of any other change orders like

14    this one that you have in your possession?

15        A.    That would be for the remediation of Chinese

16    drywall particularly, or --

17        Q.    Yes.  That's right.

18              Or, excuse me, any other change orders with

19    Christian Thomas Construction?

20        A.    I can't think of any.  There may be some, but

21    I can't, off the top of my head, think of any.

22        Q.    If you look down to the line that's titled

23    Logistics in the change order near the bottom of the

24    invoice, it's an item that is listed for $43,505.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 545 of 3246
Case 1:09-md-02047-EEF-MBN Document 26 Entered on FLSD Docket 08/13/2019 Page 481 of
191
Confidential - Subject to Further Confidentiality Review

```
 1              Do you see that?

 2      A.    Am I looking at the same page you are?

 3      Q.    Yeah.

 4              So under Change Order Three, which is the

 5      last page of this exhibit, on the left-hand side,

 6      there's a column called Drywall Screening.  And if

 7      you go to the bottom below Air Scrubbers, it says

 8      Logistics.

 9              Do you see that?

10              And it's near the bottom of the invoice.

11      Along that column on the left-hand side there's --

12      A.    Okay.  I see Logistics.

13      Q.    Yes.

14              And under Logistics, it says:  11 weeks

15      additional project logistics delay in project

16      completion, $3,955 per week.  And the amount totals

17      on the right-hand column to $43,505.

18              Do you see that?

19      A.    Yes.

20      Q.    Can you explain what this logistical delay

21      was in this change order?

22      A.    I'm not certain, no.  I think what it is, is

23      he's running a business and he's got certain assets

24      in the office and in the field assigned to this,
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 546 of 3246
Case 1:11-cv-01363-NGG-JO Document 264 Entered on FLSD Docket 08/13/2019 Page 482 of
191
Confidential - Subject to Further Confidentiality Review

```
 1    rentals of equipment and everything else, and it was

 2    sitting here while we had to get this done.

 3         Q.   If you look --

 4         A.   So it was out of pocket for him.

 5         Q.   I'm sorry to interrupt.

 6              If you look up to the paragraph description

 7    that's near the top of the change order page, it

 8    states in the last couple of sentences:  This

 9    extensive cleaning operation look 11 weeks to

10    accomplish, adding 11 weeks to the job.  The 11-week

11    add is represented by the change for the additional

12    time for the project logistics indicated as the last

13    item on this change order.

14              Do you see that?

15         A.   Yes.

16         Q.   So cleaning the property out after the

17    demolition, according to the items listed in this

18    change order, took about 11 weeks.  Is that what this

19    is saying?

20              MR. WEISS:  Object to the form.

21              THE WITNESS:  Yes.

22              He could not start reconstructing the house

23         until we got it -- everything done and looked at,

24         whatever "looked at" means.
```

```
1    BY MR. LAWSON:

2        Q.    And is it your understanding that he did not

3    contemplate that delay initially when he provided you

4    an estimate for this work before the start of the

5    project?

6        A.    That is correct.

7        Q.    What was it like moving back into your house

8    after it was remediated and reconstructed?

9        A.    Like, in a word?

10       Q.    Sure.

11       A.    Joyful.  We've been living among unopened

12   boxes for almost a year.  We only unpacked what we

13   needed to live with, after we built what we thought

14   was our dream house.  So it was a good feeling.

15       Q.    Did you enjoy living in the house after you

16   moved back into it?

17       A.    Yes.

18       Q.    How did you feel about living in the house

19   before you knew you had Chinese drywall in it?

20       A.    Before we knew, we liked it.

21       Q.    Did you have people over to your house during

22   that time before you knew you had Chinese drywall in

23   it?

24       A.    From time to time.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 548 of 3246
Case 1:11-cv-22408-MGC Document Entered on FLSD Docket 08/13/2013 Page 494 of
191
Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Did anyone ever complain about a smell in the

 2   house or anything when you had them over to your

 3   house?

 4        A.   No one complained.  I think one of our

 5   neighbors -- that we're going to see after we leave

 6   here -- used to say she could smell something.

 7             I'll tell you, we were concerned once we

 8   figured out that it was probably Chinese drywall, was

 9   having our kids visit with their little children,

10   because we didn't know, so . . .

11        Q.   And when you say you "didn't know," what did

12   you feel like you didn't know?

13        A.   We didn't know what -- if there were any

14   harmful effects.

15        Q.   And are you talking about health effects?

16        A.   Yes.

17        Q.   Did you ever suffer from any health effects

18   that you thought were related to Chinese drywall?

19        A.   We had this discussion, and it's hard to

20   prove a negative, because people have colds who live

21   in Alaska, for instance.  But, you know, we had

22   colds.  I did get walking pneumonia one time, which

23   I've never had.  But there's no way to tell the root

24   cause.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 549 of 3246 of
Case 2:11-md-02047-EEF-MBN Document 23-1 Entered on FLSD Docket 08/13/2019 Page 495 of
191
Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Did you ever have a doctor tell you that a

 2   health effect that you were suffering from was

 3   related to Chinese drywall?

 4        A.    I don't think Chinese drywall ever came up

 5   with one of my doctors.

 6        Q.    Is it accurate to say that you are not

 7   pursuing personal injury damages in this lawsuit?

 8        A.    We aren't now, no.

 9        Q.    What was your experience like living in your

10   house once you knew that you had Chinese drywall?

11        A.    A little pensive.  In other words, you kept

12   thinking, you know, can I smell that?  You know, what

13   is it?

14              Along with that is, without knowing where

15   this was headed, what do we do about it?  We probably

16   can't live in it or shouldn't live in it.  Can't sell

17   it.  It's going to be very expensive.  There were all

18   those issues other than just the fact it was Chinese

19   drywall, because of it.

20        Q.    I'd like to go back to the Supplemental

21   Plaintiff Profile Form that we looked at earlier.

22   It's Exhibit 14.  And specifically, I would like to

23   ask you about the sixth page of that document.  I'd

24   like you to look at Section 7.  It's titled Other
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 550 of 3246 of
Case 1:09-md-02047-EEF-Document 2611 Entered on FSD Docket 03/13/2015 Page 486 of
Confidential - Subject to further Confidentiality Review
191

```
1    Damages.

2         Do you see that?

3    A.   Yes.

4    Q.   And here you were asked if you incurred

5    alternative living expenses as a result of Chinese

6    drywall and to identify the total moving cost and/or

7    alternative living expense you incurred.

8         Do you see that?

9    A.   Yes.

10   Q.   And here you have listed $35,996.85 as your

11   living expense.

12   A.   Yes.

13   Q.   And are those living expenses that you

14   incurred during the time that your house was being

15   remediated and reconstructed?

16   A.   Yes.

17   Q.   Are you seeking any other alternative living

18   expenses outside of that time period during the

19   project at your house?

20   A.   No.

21   Q.   Looking down to the next item, it asks if you

22   have experienced any loss of use and/or loss of

23   enjoyment of the property as a result of Chinese

24   drywall and to identify the total amount of that
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 551 of 3246
Case 2:14-cv-02722-EEF-JCW Document 25-4 Filed 05/18/2015 Page 487 of 191

Confidential - Subject to Further Confidentiality Review

```
 1   loss.

 2          Do you see that?

 3     A.   Yes.

 4     Q.   Here you have listed $46,608.43.  And it

 5   appears to say personal -- and maybe beginning to say

 6   personal property.

 7          Do you see that?

 8     A.   Yes.

 9     Q.   Do you know what that means, why it says

10   "personal property"?

11     A.   No.  I mean, somewhere we have that

12   calculation.

13     Q.   So we were looking at that chart a little bit

14   earlier that had the spreadsheet of costs.  It was

15   Exhibit 16 that we looked at a little bit earlier.

16     A.   Yes.

17     Q.   If you want to pull that back up.

18          And on that, you had your temporary living

19   expenses, which were listed in an amount in total of

20   $35,996.85; is that right?

21     A.   That is correct.

22     Q.   And that amount is consistent with the amount

23   that you are asking for in alternative living

24   expenses on the Supplemental Plaintiff Profile Form
```

```
1    in Section 7 that we just looked at it, right?

2         A.   Uh-huh.

3         Q.   And then this personal property amount that's

4    listed on the Supplemental Plaintiff Profile Form is

5    for $46,608.43.

6              Is that consistent with the amounts that are

7    listed on the second page of Exhibit 16 where you are

8    listing amounts for replaced and damaged items and

9    the expenses and repairs?

10        A.   Yeah.  We're just looking, and I was

11   looking -- if you add the -- those two items on

12   Page 2, they add up to exactly this number.  That's

13   where it came from.

14        Q.   And that's what my lawyer math told me as

15   well, but I wanted to make sure, because that's why

16   I'm a lawyer.  I don't know.

17        A.   It's close to engineering math.

18        Q.   So are you seeking any additional amount

19   beyond that amount, $46,608.43 for loss of use and/or

20   loss of enjoyment of the property?

21        A.   I don't think so, no.

22             (Defendants' Exhibit 18 was marked for

23   identification.)

24   ///
```

Confidential – Subject to Further Confidentiality Review

```
 1    BY MR. LAWSON:

 2        Q.   You have been handed a document that's been

 3    marked as Exhibit 18, and it's titled Priority

 4    Claimant, Steven Etter's Answers to Defendants'

 5    Interrogatories.

 6             Do you see that?

 7        A.   Yes.

 8        Q.   And I represent to you that this was produced

 9    to us as your answers to some questions or

10    interrogatories the defendants in this lawsuit sent

11    to you --

12        A.   Right.

13        Q.   -- as part of the discovery in this lawsuit.

14        A.   Right.

15        Q.   Do you recall looking at these

16    interrogatories and questions from the defendants

17    before?

18        A.   I remember looking at them, yes.

19        Q.   And if you go to the second to last page --

20    no, excuse me.  It's the fourth page of this

21    document, there's a verification that's signed by

22    you.

23             Do you see that?

24        A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 554 of 3246 of
Case 2:14-cv-02722-EEF-JCW Document 26-4 Entered 08/13/20 13:30:15 Page 490 of
191

Confidential - Subject to Further Confidentiality Review

```
 1        Q.    And that verification was your verification

 2   that the answers in this document were true and

 3   correct to the best of your knowledge and belief?

 4        A.    Yes.

 5        Q.    Is that right?

 6        A.    Yes.

 7        Q.    Let's go to the first interrogatory.

 8        A.    Yes.

 9        Q.    It asks you to identify all types of damages

10   that you seek in this lawsuit and specify the amounts

11   sought for each category.

12             Do you see that?

13        A.    Yes.

14        Q.    All right.  Looking at the first one, it says

15   "diminution in value" under Section A of that answer.

16        A.    Yes, yes.

17        Q.    The amount that is -- the amounts that are

18   listed are as follows.  There's a cost of effected

19   property, and that is $1,524,843.

20             Do you see that?

21        A.    Yes.

22        Q.    What is that cost?  Where did that number

23   come from?

24        A.    Historic documents that we had, everything
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 555 of 3246
Case 1:14-cv-24036-ELD Document 26-1 Entered on FLSD Docket 08/13/2015 Page 491 of
191
Confidential - Subject to Further Confidentiality Review

```
1    that we spent.

2         Q.   So was that the cost to build your house and

3    buy the lot --

4         A.   It was a cost before we moved in.

5         Q.   So from the time that you moved into this

6    house, that was the cost that it took to get to that

7    moment where you moved into your new house.  Is that

8    right?

9         A.   Yes.  I'm sure there were other things, if

10   you move into a house, but, yes, that was . . .

11        Q.   Okay.  So would you say that that's the cost

12   of the property and the --

13        A.   House, yes.

14        Q.   -- and the house itself, or is it the cost of

15   the house and the land in addition to moving expenses

16   to move into the house, other expenses?

17        A.   There are no moving expenses in that.

18        Q.   Okay.  So this is just the cost of the land

19   and the house?

20        A.   Right.

21        Q.   And that's from back in 2006 or so when you

22   moved in?

23        A.   Right.

24        Q.   The cost of remediation under this section is
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 556 of 3246
Case 1:14-cv-21301-EDC Document 280 Entered on FLSD Docket 08/13/2015 Page 492 of
191
Confidential - Subject to Further Confidentiality Review

```
 1    listed as $915,845.45.

 2            Do you see that?

 3       A.   Yes.

 4       Q.   And that's the amount that was paid to

 5    Christian Thomas Construction for the remediation and

 6    reconstruction, correct?

 7       A.   Right.

 8       Q.   All right.  And you've totalled those

 9    together to be an amount of $2,440,688.45.

10            Do you see that?

11       A.   Yes.

12       Q.   So that is -- what does that represent to

13    you, that $2.4 million number?

14       A.   That is -- just what it says.  That's only

15    the Christian Thomas, without any other expenses,

16    that we paid him to remediate the house.  Obviously,

17    we've gone over a number of other expenses, but

18    that's the Christian Thomas portion of it.

19       Q.   So this category of damages is called

20    Diminution in Value.

21            Do you see that?

22       A.   Yes.

23       Q.   And is it your understanding that that

24    represents a -- the decrease in value of your home as
```

```
 1    a result of your damages related to Chinese drywall?

 2         A.   No.  It -- it's out of pocket, what it cost

 3    me, in other words.  The buyer didn't pay for my

 4    remediation; I paid for that.

 5         Q.   Are you seeking separately from diminution in

 6    value damages the cost of your remediation in this

 7    lawsuit?

 8         A.   In addition to it?

 9         Q.   Yeah.

10              Are you -- as a category of damages, are you

11    seeking the remediation costs that you paid

12    separately from diminution in value?  Are those two

13    different categories of damages that you are seeking?

14         A.   I'm not sure I understand the question.

15         Q.   I would represent to you that some claimants

16    in Chinese drywall litigation are seeking costs of

17    remediation as a category of damages.

18         A.   Yes.

19         Q.   Are you seeking the cost of the remediation

20    through this diminution in value category of damages?

21         A.   I -- I think there's -- I think the property

22    was devalued some by having had this.  It's --

23    because even if it's okay, it taints the reputation

24    of it.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 558 of 3246 of
191
Confidential – Subject to further Confidentiality Review

1          So that's in addition to the fact that we had

2     to pay almost a million dollars to remediate so we

3     had the house where it was.

4          In other words, it was -- they did a survey,

5     it was put on the market for a certain price, they

6     sold it for less.  Why, I don't know.  The market was

7     good at the time.  But all these costs are what it

8     cost us to bring it back to its normal level.

9     Q.   Now, you'd agree though that the value of the

10    home was not increased by $915,845 from the original

11    amount you paid for it by the remediation, correct?

12    A.   The 915 would be an addition to about the

13    $40,000 it was worth to begin with, because it wasn't

14    worth 1.5 million.  It was worth whatever it was when

15    I had Chinese drywall, which establishes a very low

16    number.

17    Q.   But here you haven't added it to that $40,000

18    that the county assessed the value of property for,

19    the home for.  You have added it to the cost that you

20    paid for the house originally when you constructed

21    it.  Is that right?

22    A.   That, to me, represents the dollars out of my

23    pocket to have the house --

24    Q.   Right.

```
1        A.    -- located there.

2        Q.    But the $2.4 million that's listed on the

3   first page of these answers to interrogatories does

4   not represent the value of the house that you think

5   it was valued at after the remediation?

6        A.    No.  It's not listed as value; it's listed as

7   cost.

8        Q.    That's right.

9        A.    So that is the cost.

10       Q.    So that amount, you then have subtracted the

11  net proceeds from the sale of the home.  Is that

12  right?

13       A.    Yes.

14       Q.    And the net proceeds from the sale are listed

15  as $1,458,559.08.

16             Do you see that?

17       A.    Yes.

18       Q.    And you have listed the diminution on the

19  bottom line of this Section A as $1,064,734.70.  Is

20  that right?

21       A.    That's the number there, yes.

22       Q.    So does that represent the amount of money

23  that you think came out of your pocket from the

24  different amounts that you have paid as a result of
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/10/19 Page 560 of 3246
Case 2:14-cv-02021-EEF-MBN Document 28-1 Entered on FLSD Docket 08/13/2015 Page 496 of
191
Confidential - Subject to Further Confidentiality Review

1    Chinese drywall being in your home?

2       A.   I think that number is supposed to represent

3    the cost to remediate the home, including the impact

4    on the selling price.

5       Q.   How do you know what the impact on the

6    selling price was?

7       A.   One doesn't know for sure, but this is a lot

8    less than that, because we had a very experienced

9    realtor who said this should be pretty easy at a

10   certain price, and it sold for less.  It's not a

11   science.

12      Q.   So your house sold for a little less than a

13   hundred thousand dollars less than what you paid for

14   it originally.  Is that right?

15           Originally, you paid a little over

16   $1.5 million.  It then sold for 1.45 million when you

17   sold it.  Is that right?

18      A.   Yes.

19      Q.   Did you ever have the property professionally

20   appraised prior to selling it?

21      A.   The realtor did.

22      Q.   And do you remember what it was appraised at?

23      A.   No.  But, you know, it was used to set the

24   selling price.

```
1       Q.   Do you know what the list price of the home
2   was when you originally listed it?
3       A.   Yeah.  It was 1.78 or 1.79.
4       Q.   And do you think that the professional
5   appraisal of the home found a similar value to what
6   you listed the home at?
7       A.   Yes, yes.
8       Q.   The list price was based on the appraisal
9   price.  Is that right?
10      A.   I'm assuming so.
11      Q.   But ultimately, the house sold for less than
12  that appraisal value?
13      A.   Right, right.
14      Q.   How long did you have it on the market for?
15      A.   I don't know if it was two months or not.  I
16  mean, it was -- it was kind of placed:  The good
17  news, it sold; the bad news, we have nowhere to go
18  kind of thing.
19      Q.   Did you have multiple offers on the house?
20      A.   Well, we had a written -- the person who
21  bought it gave us two offers:  You know, offered
22  once, we said no; he went away, came back and gave us
23  another offer.  In between, someone was really
24  serious, but we never got a written offer.  So three
```

Confidential - Subject to Further Confidentiality Review

1    times, two people, that's how it worked.

2         Q.   Looking at the amount for diminution in value

3    that you have on the bottom line here in Section A,

4    would you agree that that amount is essentially

5    adding together the amount that you paid for the cost

6    of the remediation to Christian Thomas, combined with

7    the difference between your -- the cost that you paid

8    to build the house and buy the property, and the

9    amount that you sold the house for?

10        A.   Yes.  There was other out-of-pocket things,

11   you know, being displaced and buying certain things

12   for the house, but, close.

13        Q.   Would you agree that if you're seeking

14   payment for the remediation costs that you incurred,

15   that this amount would compensate you for the amount

16   that you paid to Christian Thomas, if you received

17   it, this $1,064,734.70?

18        A.   Are you asking would that be acceptable to

19   us, or is that the value you get through computation?

20        Q.   Is that the value you get through the

21   computation there, that the amount that you paid to

22   Christian Thomas would be included in this amount, if

23   you received that diminution in value amount that you

24   are seeking?

Confidential – Subject to Further Confidentiality Review

```
 1        A.   I think so.

 2             MR. WEISS:  Object to the form.

 3             You can answer it.

 4             THE WITNESS:  I think so.  I think so.  But,

 5        you know, this is the kind of thing you need to

 6        sit down and pencil out.

 7   BY MR. LAWSON:

 8        Q.   If you were seeking remediation damages

 9   separately in addition to this diminution in value

10   amount, would you agree that you would be receiving

11   the amount that you paid to Christian Thomas twice?

12        A.   Twice?

13        Q.   If you were seeking that $915,845.45 that you

14   paid to Christian Thomas as a separate category of

15   damages in addition to this million-plus dollars

16   that's shown in diminution in value, would you agree

17   that you would be paying for the Christian Thomas

18   payments twice?

19        A.   You mean if I got nearly $2 million, would I

20   be paid twice?

21        Q.   Yes.

22        A.   I think so.  I don't -- now, the -- I'm not

23   agreeing that the remediation cost was only 915.  I'm

24   saying that's what we paid Christian Thomas.
```

Case 2:09-md-02047-EEF-MBN  Document 22363-39  Filed 11/19/19  Page 564 of 3246
Case 1:11-cv-22408-MGC  Document 269  Entered on FLSD Docket 08/13/2013  Page 180 of
191
Confidential - Subject to Further Confidentiality Review

```
1          Q.    Understood.  And that's why I'm framing it

2    that way, that that's the amount paid to Christian

3    Thomas.

4          A.    Right.

5          Q.    And the reason I'm belaboring this is that I

6    just want to understand what categories of damages

7    are the amounts that you are seeking for each, and I

8    think we have an understanding of where this

9    diminution in value is coming from.  And I can seek

10   further clarification from your counsel on this.

11         A.    Okay.

12         Q.    Let's move on to the next page, on Page 2.

13   Here you've stated:  The sales price of the affected

14   property was lowered by $215,000 from the list price.

15   Our list price had already factored in the history of

16   Chinese drywall.

17               Do you see that?

18         A.    Which paragraph are you talking about?

19         Q.    Yeah.  It's at the top of the page --

20         A.    Oh, top of the page.

21               Right.  That calculation is made different

22   from -- that's the difference between the list price

23   and selling price.

24         Q.    Right.
```

```
 1              So you talked a little bit about the list

 2     price, which you believe might have been based on the

 3     appraisal; is that right?

 4        A.    Yes.

 5        Q.    And this is saying that the difference

 6     between those amounts of the list price and the

 7     actual sales price was $215,000 or so.  Is that

 8     right?

 9        A.    Right.

10        Q.    And you said that the list price factored in

11     the history of Chinese drywall here.  Is that right?

12        A.    Yeah.  It factored in the history of the

13     drywall and the fact that I had a certificate saying

14     that it was remediated.

15        Q.    How was that history factored into the list

16     price that you placed on your home?

17        A.    I don't know.

18        Q.    Did it lower the list price that you placed

19     on the home?

20        A.    I don't know.

21        Q.    If you look down, again, the alternative

22     living expenses, moving, and storage costs are listed

23     here, and they are listed as $46,242.15.

24              Do you see that?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 566 of 3246
Case 2:14-cv-02022-EEF-JCW Document 264-1 Entered on FLSD Docket 08/13/2015 Page 182 of
191
Confidential – Subject to Further Confidentiality Review

```
 1        A.   Yes.

 2        Q.   And then the cost to repair or replace

 3   personal property is listed as $46,608.43.

 4             Do you see that?

 5        A.   Yes.

 6        Q.   And then punitive damages are listed as "to

 7   be determined."

 8             Do you see that?

 9        A.   I see that.

10        Q.   Are you aware of any other damages beyond

11   those that you are seeking in this lawsuit?

12        A.   I don't think so.

13        Q.   Let's go back to Exhibit 16.  And you can

14   keep that answer to interrogatory out as well.

15             Exhibit 16 was the cost spreadsheet that we

16   were looking at a little bit earlier.

17        A.   Right.

18        Q.   And specifically, I want to look at the third

19   page of the document, which lists temporary living

20   expenses.

21        A.   Yes.

22        Q.   Now, this shows an amount of $35,996.85 for

23   the temporary living expenses.

24        A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 567 of 3246
Case 2:14-cv-02722-EEF-JCW Document 234-2 *SEALED* Filed 08/13/2015 Page 183 of
191
Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Correct?

 2              And if you look over to your answers to the

 3     interrogatories that you gave here, the amount that

 4     you have listed for ALE is larger than that amount

 5     that's listed on this cost spreadsheet.

 6              Can you explain the difference between those

 7     two numbers; specifically, the amount that you have

 8     listed as $46,242.15?

 9        A.    Yes.  On that amount, I -- there is not the

10     moving expense.

11        Q.    Right.

12              The moving expenses are listed on the second

13     page of the cost spreadsheet, which is Exhibit 16,

14     and those are in an amount of $10,245.30.  Is that

15     right?

16        A.    That's right.  What appears to be what was

17     added to the 35,996.

18        Q.    That's right.

19              If you combine that moving cost to the

20     expenses that are shown on the third page of the cost

21     spreadsheet for temporary living expenses, it adds up

22     to the amount that is shown in your answer to the

23     first interrogatory in Section B of $46,242.15,

24     correct?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 568 of 3246
Case 1:14-cv-24408-MGC Document 29-1 Entered on FLSD Docket 08/13/2015 Page 184 of
191

```
1        A.    Right.

2        Q.    Mr. Etter, you would agree that you have

3    already received some amount of money to compensate

4    you for the damages that you have suffered from

5    Chinese drywall, correct?

6        A.    You mean Helm and USAA?

7        Q.    Yes.  As well as additional monies from the

8    Chinese Drywall Settlement Program, correct?

9        A.    Yes.

10       Q.    Do you know the total amount of money that

11   you have received offhand from those different

12   payments?

13       A.    Well, I could add it up.  I mean, I know

14   individually how much.  I haven't added it up.

15       Q.    And as we discussed earlier, those are the

16   only payments that you have received so far for your

17   damages?

18       A.    Right, right.

19       Q.    Looking to that cost spreadsheet that we just

20   looked at as Exhibit 16, are those moving expenses

21   included in the amount that you are seeking for

22   personal property expenses in your damages in this

23   lawsuit?

24       A.    I'd have to compare them item by item.  I
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 569 of 3246
Case 1:11-cv-22408-MGC Document 86-9 Entered on FLSD Docket 08/13/2015 Page 485 of
191

Confidential – Subject to Further Confidentiality Review

```
 1    don't think so, but I can't tell you for sure.

 2        Q.   So let's look to those answers to

 3    interrogatories that we were just looking at under

 4    Answer 1.

 5             You have listed the amount of cost to repair

 6    or replace personal property as $46,608.43, correct?

 7        A.   Right.

 8        Q.   And that amount, as we discussed earlier, was

 9    done by adding together the totals for the two

10    different charts on Page 2 of Exhibit 16.  Is the

11    that right?

12        A.   Yes, yes.

13        Q.   As we just discussed, the moving expenses are

14    part of those two charts on Page 2 and part of the

15    $46,000, correct?

16        A.   It appears to be double-counted, is where you

17    are headed, yeah.

18        Q.   So the moving expenses should be removed from

19    the cost to repair or replace personal property

20    that's listed in Section C of your answer to

21    Interrogatory 1, correct?

22        A.   Yeah, I would agree.  I think that's how that

23    happened.

24        Q.   And then they are already a part of the
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 570 of 3246 of
Case 1:11-cv-22408-MGC Document 264-3 Entered on FLSD Docket 03/13/2019 Page 186 of
191
Confidential - Subject to Further Confidentiality Review

```
 1    alternative living expenses, moving, and storage

 2    that's listed in Section B of your answer to

 3    Interrogatory 1?

 4         A.    Yeah.  So that would be 36.

 5         Q.    Well, I mean, depending on how you wanted

 6    to do it, either way, removing --

 7               I'm sorry.

 8         A.    Go ahead.

 9         Q.    One of these two items should have the

10    10,000-plus dollars -- $10,245.30 for moving costs

11    removed from it?

12         A.    Yes.

13               MR. LAWSON:  We can go off the record.

14               (Recess from 12:07 until 12:20 p.m.)

15               MR. LAWSON:  Mr. Etter, thank you for your

16         time today.  I don't have any further questions

17         at this time.

18               MR. GUERRA:  We have no questions, no.

19               (Whereupon, the deposition concluded at

20    12:20 p.m.)

21

22

23

24
```

```
 1                  C E R T I F I C A T E

 2

 3              I, KELLY J. LAWTON, Registered Professional

 4       Reporter, Licensed Court Reporter, and Certified

 5       Court Reporter, do hereby certify that, pursuant to

 6       notice, the deposition of STEVEN ETTER was duly taken

 7       on January 11, 2019, at 8:08 a.m. before me.

 8              The said STEVEN ETTER was duly sworn by me

 9       according to law to tell the truth, the whole truth

10       and nothing but the truth and thereupon did testify

11       as set forth in the above transcript of testimony.

12       The testimony was taken down stenographically by me.

13       I do further certify that the above deposition is

14       full, complete, and a true record of all the

15       testimony given by the said witness.

16

17       _____

18              KELLY J. LAWTON, RPR, LCR, CCR

19

20              (The foregoing certification of this

21       transcript does not apply to any reproduction of the

22       same by any means, unless under the direct control

23       and/or supervision of the certifying reporter.)

24
```

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4          Please read your deposition over carefully

 5     and make any necessary corrections.  You should state

 6     the reason in the appropriate space on the errata

 7     sheet for any corrections that are made.

 8

 9          After doing so, please sign the errata sheet

10     and date it.  It will be attached to your deposition.

11

12          It is imperative that you return the original

13     errata sheet to the deposing attorney within thirty

14     (30) days of receipt of the deposition transcript by

15     you.  If you fail to do so, the deposition transcript

16     may be deemed to be accurate and may be used in

17     court.

18

19

20

21

22

23

24
```

```
 1                    - - - - - -

 2                   E R R A T A

 3                    - - - - - -

 4    PAGE   LINE   CHANGE

 5    ____   ____   _____

 6      REASON: _____

 7    ____   ____   _____

 8      REASON: _____

 9    ____   ____   _____

10      REASON: _____

11    ____   ____   _____

12      REASON: _____

13    ____   ____   _____

14      REASON: _____

15    ____   ____   _____

16      REASON: _____

17    ____   ____   _____

18      REASON: _____

19    ____   ____   _____

20      REASON: _____

21    ____   ____   _____

22      REASON: _____

23    ____   ____   _____

24      REASON: _____
```

```
 1                    ACKNOWLEDGMENT OF DEPONENT

 2

 3          I, STEVEN ETTER, do hereby acknowledge that I

 4     have read the foregoing pages, 1 to 190, and that the

 5     same is a correct transcription of the answers given

 6     by me to the questions therein propounded, except for

 7     the corrections or changes in form or substance, if

 8     any, noted in the attached Errata Sheet.

 9

10

11     _____      _____

12     STEVEN ETTER                                      DATE

13

14

15

16

17     Subscribed and sworn to before me this

18     ____ day of _____, 20___.

19     My Commission expires: _____

20

21     _____

       Notary Public

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 575 of 3246
Case 1:07-cv-09876-EDG Monument 264 Enterprise at ESC Docket 08/14/2019 Page 491 of
191

Confidential - Subject to Further Confidentiality Review

```
1                         LAWYER'S NOTES

2       PAGE    LINE

3       _____   _____   _____

4       _____   _____   _____

5       _____   _____   _____

6       _____   _____   _____

7       _____   _____   _____

8       _____   _____   _____

9       _____   _____   _____

10      _____   _____   _____

11      _____   _____   _____

12      _____   _____   _____

13      _____   _____   _____

14      _____   _____   _____

15      _____   _____   _____

16      _____   _____   _____

17      _____   _____   _____

18      _____   _____   _____

19      _____   _____   _____

20      _____   _____   _____

21      _____   _____   _____

22      _____   _____   _____

23      _____   _____   _____

24      _____   _____   _____
```

# EXHIBIT A7

Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2               Case No. 1:11-CV-22408-MGC
 3   --------------------------------§
     EDUARDO AND CARMEN AMORIN et     §
 4   al., individually, and on behalf §
     of all others similarly          §
 5   situated,                        §
                                      §
 6      Plaintiffs,                   §
                                      §
 7   vs.                              §
                                      §
 8   TAISHAN GYPSUM CO., LTD. F/K/A   §
     SHANDONG THAIHE DONGXIN CO.,     §
 9   LTD.; TAIAN TAISHAN PLASTERBOARD §
     CO., LTD., et al,                §
10                                    §
        Defendants.                   §
11   ------------------------------- §
      - - -
12
                            - - -
13
                THURSDAY, DECEMBER 13, 2018
14
                            - - -
15
             Confidential - Subject to Further
16                 Confidentiality Review
17                          - - -
18        Deposition of ANDREW FELDKAMP, held at Morgan
     & Morgan, 12800 University Drive, Suite 600,
19   Fort Myers, Florida, commencing at 8:08 a.m., on
     the above date, before Kelly J. Lawton,
20   Registered Professional Reporter, Licensed Court
     Reporter, and Certified Court Reporter.
21
                            - - -
22
                GOLKOW LITIGATION SERVICES
23        877.370.3377 ph | 917.591.5672 fax
                    deps@golkow.com
24
```

Case 2:09-md-02047-EEF-MBN  Document 22363-39  Filed 11/19/19  Page 578 of 3246
Case 1:14-cv-24049-CEF Document 320-4  Entered on FLSD Docket 05/30/2019  Page 4 of
164
Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2    MORGAN & MORGAN
      BY:  PANAGIOTIS "PETE" V. ALBANIS, ESQUIRE
 3    12800 University Drive, Suite 600
      Fort Myers, Florida 33907
 4    (239) 433-6880
      palbanis@forthepeople.com
 5    Representing Plaintiff
 6
      LEVIN, SEDRAN & BERMAN, LLP
 7    BY:  KEITH J. VERRIER, ESQUIRE
      510 Walnut Street, Suite 500
 8    Philadelphia, Pennsylvania 19106
      (215) 592-1500
 9    kverrier@lfsblaw.com
      Representing Plaintiff
10
11    ALSTON & BIRD, LLP
      BY:  MATTHEW D. LAWSON, ESQUIRE
12    BY:  METHAWEE MANUPIPATPONG, ESQUIRE
      BY:  LARA TUMEH, ESQUIRE
13    One Atlantic Center
      1201 West Peachtree Street
14    Atlanta, Georgia 30309
      (404) 881-7000
15    matt.lawson@alston.com
      mae.manupipatpong@alston.com
16    lara.tumeh@alston.com
      Representing Taishan Gypsum Co., Ltd. and Tai'an
17    Taishan Plasterboard, Co., Ltd.
18
      GORDON, ARATA, MONTGOMERY, BARNETT
19    BY:  ALEX B. ROTHENBERG, ESQUIRE
      201 St. Charles Avenue, 40th Floor
20    New Orleans, Louisiana 70170
      (504) 582-1111
21    arothenberg@gamb.law
      Representing BNBM PLC
22
23
24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 579 of 3246
Case 1:14-cv-24049-MGC Document 290-1 Entered on FLSD Docket 05/30/2019 Page 49 of
164

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:

 2        ORRICK, HERRINGTON & SUTCLIFFE, LLP

          BY:  HARRY J. MOREN, ESQUIRE

 3        The Orrick Building

          405 Howard Street

 4        San Francisco, California 94105

          (415) 773-5619

 5        hmoren@orrick.com

          Representing BNBM PLC

 6

 7    ALSO PRESENT:

 8        Dawn Feldkamp

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                        - - -
                        I N D E X
 2                        - - -
 3   Testimony of:  ANDREW FELDKAMP
 4       DIRECT EXAMINATION BY MR. LAWSON............... 6
 5
 6
 7                   E X H I B I T S
 8                (Attached to Transcript)
 9   DEFENDANTS'                                      PAGE
10   Exhibit 1    "As Is" Contract for Sale and        19
                  Purchase
11
     Exhibit 2    Lee County Property Appraiser -      23
12                Online Parcel Inquiry - Property
                  Data
13
     Exhibit 3    Plaintiff Profile Form -             28
14                Residential Properties - Bates
                  Numbered Feldkamp,D0001 to
15                Feldkamp,D0023
16   Exhibit 4    Comprehensive Building Consultants   52
                  Confidential Chinese Drywall
17                Inspection Report
18   Exhibit 5    Important Taishan Notice -           58
                  Supplemental Submission of
19                Evidence Demonstrating Class
                  Membership and the Existence of
20                Class Damages for the Taishan
                  Trial Scheduled on April 28, 2015
21
     Exhibit 6    Priority Claimant Andrew             69
22                Feldkamp's First Amended Answers
                  to Interrogatories
23
     Exhibit 7    Air-Conditioning Invoices            72
24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 581 of 3246
Case 1:14-cv-22049-MGC Document 23 Entered on FLSD Docket 05/30/2019 Page 6 of 164
Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S

 2    DEFENDANTS'                                          PAGE

 3    Exhibit 8     First Amended Supplemental        76
                    Plaintiff Profile Form
 4
      Exhibit 9     Suncoast Credit Union             85
 5                  September 21, 2018 Letter and
                    Check Copies
 6
      Exhibit 10    Uniform Borrower Assistance       105
 7
      Exhibit 11    Notice of Lis Pendens             133
 8
      Exhibit 12    Final Judgment of Foreclosure     135
 9
      Exhibit 13    United States Bankruptcy Court    145
10                  Middle District of Florida
                    Voluntary Petition
11
      Exhibit 14    Chapter 13 Standing Trustee's     150
12                  Final Report and Account

13

14

15

16

17

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 582 of 3246
Case 1:14-cv-00600-WCG Document 209-1 Filed 05/13/2019 Page 4 of 164

Confidential - Subject to further confidentiality Review

```
 1                        - - -

 2              THE COURT REPORTER:  Sir, would you please

 3       raise your right hand.

 4              Do you swear or affirm that the testimony

 5       you're about to give will be the truth, the whole

 6       truth, and nothing but the truth?

 7              THE WITNESS:  I do.

 8              ANDREW FELDKAMP, called as a witness by the

 9    Defendants, having been first duly sworn, testified

10    as follows:

11                     DIRECT EXAMINATION

12    BY MR. LAWSON:

13       Q.   Good morning.

14       A.   Good morning.

15       Q.   Could you please state your name for the

16    record?

17       A.   Andrew Feldkamp.

18       Q.   Mr. Feldkamp, my name is Matt Lawson, and I'm

19    an attorney for Taishan Gypsum Company, Limited.  I

20    want to thank you for coming in today.  I wanted to

21    ask you some questions today about the documents that

22    you've produced through your attorneys and your

23    experience of living in your home that you have

24    claimed to be affected by Chinese drywall in this
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 583 of 3246
Case 1:11-cv-22408-MGC Document 230 entered on FLSD Docket 05/04/2015 Page 49 of
164

Confidential - Subject to Further Confidentiality Review

```
 1    lawsuit.

 2          But before we get started, I wanted to go

 3    over a few kind of rules of the road of this

 4    deposition.

 5          First, just a second ago you were sworn in,

 6    and I wanted to know if you understood that that

 7    meant that you needed to tell the truth today during

 8    today's deposition?

 9     A.   Yes.

10     Q.   And do you think you will be able to do that?

11     A.   Yes.

12     Q.   Are you taking any medications or anything

13    that would make it difficult for you to be able to

14    give clear and complete and truthful answers today?

15     A.   No.

16     Q.   Now, as you can tell, we're having everything

17    transcribed by a court reporter, and that means that

18    we need to kind of talk in a different way than we

19    normally would.  We're going to do our best to try to

20    talk slowly and to pause between my questions and

21    your answers.  And that will allow her to be able to

22    transcribe everything that we're saying.

23          Now, if at any point you need clarification

24    on a question that I have asked you, just please let
```

Confidential - Subject to Further Confidentiality Review

1    me know, and I can rephrase it.  If you need a break

2    at any point, please just let me know.

3         And as we're going through everything today,

4    just please let me know if there's any point where

5    something is confusing to you, and I'll be happy to

6    try to clarify.

7         Now, before today, did you meet with your

8    lawyer to prepare for this deposition?

9    A.   Yes.

10   Q.   And how often did you meet?

11   A.   Just once.

12   Q.   Okay.  And how long did you meet for?

13   A.   A couple of hours.

14   Q.   And did you review documents while you met?

15   A.   Yes.

16   Q.   Did you do anything else to prepare for the

17   deposition?

18   A.   Just went over the documents.

19   Q.   Okay.  Have you ever been deposed before?

20   A.   No.

21   Q.   I wanted to also flag for you that at points

22   during today's deposition, your attorney,

23   Mr. Albanis, may object to a question that I have.

24   Now, unless he instructs you not to answer the

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 585 of 3246
Case 1:14-cv-11858-MGM Document 694-1 Filed 11/13/19 Page 40 of
164
Confidential - Subject to Further Confidentiality Review

1    question, then I would ask you to let him complete

2    his objection, and then take a second and then you

3    can answer my question afterward, unless he instructs

4    you not to.  Okay?

5        A.    Okay.

6        Q.    And then the last thing for today is that

7    when we're having everything transcribed, you need to

8    give verbal answers to things.  Nodding won't show up

9    on the transcript; it won't reflect whether you are

10   saying yes or no.  So make sure, as best you can, to

11   be able to give a verbal answer, yeses, noes, so that

12   it's clear what your answer was to the question.

13            Does that make sense?

14       A.    Understood.

15       Q.    Mr. Feldkamp, where are you employed?

16       A.    T-Mobile.

17       Q.    How long have you worked there?

18       A.    Almost eight years.

19       Q.    And what is your job title?

20       A.    Retail store manager.

21       Q.    And what are your job duties as a retail

22   store manager?

23       A.    How much do you want me to list?

24       Q.    Well, just give me the general idea of what

Confidential - Subject to Further Confidentiality Review

```
 1     you do.

 2          A.   It's a retail job, and I am in charge of the

 3     staff and operations of the single store.

 4          Q.   About how many employees do you have at the

 5     store?

 6          A.   Five.

 7          Q.   And where is the store located at?

 8          A.   Gulf Coast Town Center in Fort Myers.

 9          Q.   Okay.  Are you married?

10          A.   Yes.

11          Q.   And who are you married to?

12          A.   Dawn Feldkamp.

13          Q.   And how long have you been married?

14          A.   Eight years.

15          Q.   Sorry.  I keep doing this, and I really

16     shouldn't ask that question to someone who is sitting

17     in front of their wife under oath.  So I'm sorry.

18               Do you have any children?

19          A.   No.

20          Q.   And have you ever been involved in a lawsuit

21     before this one?

22          A.   Aside from this Chinese drywall lawsuit?

23          Q.   Yes.

24          A.   No.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 587 of 3246
Case 1:11-cv-22408-MGC Document 89 Entered on FLSD Docket 11/19/19 Page 42 of
164

Confidential - Subject to Further Confidentiality Review

1    Q.    Have you participated in any kind of

2    class-action lawsuit before?

3    A.    Just this one.

4    Q.    Now, what is that address of the property

5    that you allege has been damaged by Chinese drywall

6    in this lawsuit?

7    A.    5237 Butte Street, Lehigh Acres, Florida

8    33971.

9    Q.    How many bedrooms did that home have when you

10    lived in it?

11    A.    Three.

12    Q.    And how many bathrooms?

13    A.    Two.

14    Q.    Do you know when the home was originally

15    built?

16    A.    2006.

17    Q.    And do you know who it was built by?

18    A.    The Majkowski brothers.

19    Q.    When did you buy the property?

20    A.    2008, in August.

21    Q.    Do you if anyone owned the property before

22    you?

23    A.    I don't know.

24    Q.    Do you know who you bought the property from?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 588 of 3246
Case 1:11-cv-22408-MGC Document 67 Entered on FLSD Docket 11/04/11 Page 13 of 164
Confidential - Subject to further Confidentiality Review

```
 1        A.   It was from a bank.  I don't remember the

 2   name.

 3        Q.   Do you know if your purchase was in a short

 4   sale or a foreclosure sale?

 5        A.   It specifically was not.

 6        Q.   Okay.  Why do you say it specifically was

 7   not?

 8        A.   In the MLS listing it said not a short sale,

 9   one of the first things.

10        Q.   Okay.  So it was -- to your knowledge, it was

11   owned by a bank, the home?

12        A.   Correct.

13        Q.   And you purchased it from that bank?

14        A.   Yes.

15        Q.   And you don't know if anyone lived in the

16   house before you?

17        A.   I don't know.

18        Q.   Okay.  When you moved into the house, did you

19   ever feel like someone had lived in it before?

20        A.   When I moved in, it was like new.

21        Q.   How much did you pay for the house when you

22   bought it?

23        A.   125,000.

24        Q.   And was that purchase financed through a
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 589 of 3246
Case 1:11-cv-22408-MGC Document 104-1 Entered on FLSD Docket 11/28/11 Page 14 of
164

Confidential - Subject to Further Confidentiality Review

```
 1    bank?

 2         A.   Excuse me.  Yes.

 3         Q.   You had a mortgage on the property?

 4         A.   Yes.

 5         Q.   What was the term of that mortgage?  How long

 6    was the mortgage for?

 7         A.   I don't remember.

 8         Q.   Was there any down payment on the home when

 9    you purchased it?

10         A.   Yes.

11         Q.   How much was that?

12         A.   I don't remember.

13         Q.   Did you own or do you own today any other

14    properties or homes?

15         A.   No.

16         Q.   Do you -- where do you live currently?

17         A.   The address?

18         Q.   Yes.

19         A.   5543 Billings Street, Lehigh Acres, 33971.

20         Q.   And have you lived there since you moved out

21    of the home on Butte Street?

22         A.   Yes.

23         Q.   And do you rent that home?

24         A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 590 of 3246
Case 11-cv-21499-MGC Document 99 Entered on FLSD Docket 11/26/19 Page 45 of
164

Confidential - Subject to further Confidentiality Review

1       Q.    So what years did you live at the home at

2    Butte Street?

3       A.    From 2008 until 2012.

4       Q.    And how many people lived in the home while

5    you lived there from 2008 to 2012?

6       A.    My wife and I.

7       Q.    No one else?

8       A.    That's it.

9       Q.    Have you ever -- did you ever, while you

10   owned that home, rent it out to anyone or anything

11   like that?

12      A.    No.

13      Q.    Did you ever renovate or make any

14   improvements to the home or the structure of the home

15   during the time that you lived at it?

16            MR. ALBANIS:  Object to the form.

17            But you may answer, if you know,

18      Mr. Feldkamp.

19            THE WITNESS:  Just landscaping.

20   BY MR. LAWSON:

21      Q.    What landscaping did you add to the home?

22      A.    Additional trees in the front yard, general

23   mulching, improvements all around.

24      Q.    And those are the only improvements to the

```
 1     property that you made while you lived there for

 2     those four years or so?

 3         A.   Yes.

 4              MR. ALBANIS:  Object to the form.

 5              You can answer.

 6     BY MR. LAWSON:

 7         Q.   And that was yes to my question?

 8         A.   Yes.

 9         Q.   Did you do any work that added to the square

10     footage of the home during the time that you lived

11     there?

12         A.   No.

13         Q.   And did you ever remove any drywall from the

14     home while you lived inside of the home?

15         A.   Can you rephrase that?

16         Q.   Yeah.

17              Did you ever take any drywall boards or

18     sheetrock boards out of the home, out of the walls of

19     the home during the period from 2008 to 2012 that you

20     lived there?

21         A.   I removed --

22              MR. ALBANIS:  Object to the form.

23              But you may answer.

24              THE WITNESS:  I removed them from the wall,
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 592 of 3246
Case 1:11-cv-22408-MGC Document 607 Entered on FLSD Docket 11/26/19 Page 47 of
164
Confidential - Subject to further Confidentiality Review

```
 1          but they did not leave the property.

 2     BY MR. LAWSON:

 3          Q.   Okay.  When did you remove them from the

 4     wall?

 5          A.   I don't remember.

 6          Q.   All right.  How many did you take out, do you

 7     think?

 8          A.   One from each primary wall.

 9          Q.   Okay.  And when you say "one from each

10     primary wall," do you mean one from each wall in the

11     different rooms in the house?

12          A.   Each large wall in each room.

13          Q.   So you took one drywall board out of each

14     large wall in each room in the home?

15          A.   Correct.

16          Q.   And what was the reason that you did that?

17          A.   It was requested by my lawyer for pictures of

18     the back of the board.

19          Q.   Okay.  How did you decide where to remove the

20     boards from the wall?

21          A.   The largest section I could get.

22          Q.   And did you take out the entire drywall board

23     when you removed it or just a section of it?

24          A.   A section.
```

Confidential - Subject to Further Confidentiality Review

```
 1        Q.    And what section did you target along the

 2   board to remove?

 3              MR. ALBANIS:  Object to the form.

 4              But you may answer, if you know.

 5              THE WITNESS:  The easiest, you know,

 6        height-level.

 7   BY MR. LAWSON:

 8        Q.    So maybe a lower height on the board, not

 9   above your head, but below it?

10        A.    The top was probably -- the top was around

11   six feet.

12        Q.    Okay.

13        A.    And bottom would have been around four feet.

14        Q.    Did you take photos of those boards when you

15   removed them?

16        A.    Yes.

17        Q.    And you gave them to your lawyer?

18        A.    They have been provided to the lawyer.

19        Q.    Did you ever consider removing all of the

20   Chinese drywall boards from the walls of your home?

21        A.    No.

22        Q.    Why not?

23        A.    It was not requested.

24        Q.    Did you ever consider doing that to remove
```

Confidential - Subject to Further Confidentiality Review

1    the Chinese drywall from your home, even if it wasn't

2    requested?

3            MR. ALBANIS:  Object to the form.

4            But you may answer, if you know.

5            THE WITNESS:  I don't understand the

6        question.

7    BY MR. LAWSON:

8        Q.   Did you ever think about removing or paying

9    someone to have removed all of the Chinese drywall

10   from your home while you lived there?

11       A.   I couldn't afford that.

12       Q.   Did you ever get a quote of how much it would

13   cost to have the Chinese drywall removed from your

14   home?

15       A.   I don't remember.

16       Q.   Did you know anyone else with Chinese drywall

17   in their homes while you lived at Butte Street?

18       A.   No.

19       Q.   You didn't have any neighbors who told you

20   they had Chinese drywall?

21       A.   We informed our neighbor that we had it, but

22   that's all the further that we've ever discussed it

23   with anybody.

24       Q.   So you never heard any of your neighbors say

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 595 of 3246
Case 1:14-cv-06498-MGC Document 82-4 Entered on FLSD Docket 11/02/15 Page 39 of
164

Confidential - Subject to Further Confidentiality Review

1    that they had a similar issue?

2        A.    Nobody came to us telling us.

3            (Defendants' Exhibit 1 was marked for

4    identification.)

5    BY MR. LAWSON:

6        Q.    I have handed you a document that's been

7    marked as Exhibit 1.  And I'll give you a second to

8    review it.

9            Do you recognize this document, Mr. Feldkamp?

10       A.    Yes.

11       Q.    And what is it?

12       A.    It's the contract for sale and purchase.

13       Q.    And this is the contract for sale and

14   purchase of the home at Butte Street.  Is that right?

15       A.    Yes.

16       Q.    This is when you and your wife purchased the

17   home in 2008.  Is that correct?

18       A.    Yes.

19       Q.    And what date, according to this document,

20   did you purchase the home on?

21       A.    August 4th, 2008.

22       Q.    And did you move in soon after that?

23       A.    Yes.

24       Q.    I'm sorry.  I'll just make sure to finish my

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 596 of 3246
Case 1:11-cv-22408-MGC Document 289 Entered on FLSD Docket 11/16/2015 Page 91 of 164

Confidential - Subject to Further Confidentiality Review

1    questions, just so we don't talk over each other.

2            Did you move in soon after your purchase of

3    the home in August of 2008?

4        A.   Yes.

5        Q.   Now, at the top of this document it states

6    that this is an as-is contract for sale and purchase.

7            Do you see that?

8        A.   Yes.

9        Q.   What is your understanding of what that

10   means?

11       A.   I didn't know that there was any other way to

12   purchase a house.  I assumed that that was the only

13   way to purchase a house.  I had -- had this been any

14   different, Chinese drywall, defective drywall was not

15   even being looked for when I purchased the house.

16       Q.   So to go back to my question though:  What

17   does, to your understanding, what does it mean to buy

18   something as-is now that you know what this is, if

19   you do?

20           MR. ALBANIS:  Object to the form.

21           But you can answer.

22           THE WITNESS:  That it doesn't have

23       manufacturer's defects, but the material that

24       it's made of is nontoxic.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 597 of 3246
Case 1:11-cv-22408-MGC Document 88-1 Entered on FLSD Docket 11/21/19 Page 2 of
164

Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. LAWSON:

 2        Q.   Okay.  So when you purchased this home, did

 3    you know that the home had Chinese drywall in the

 4    home?

 5        A.   No.

 6        Q.   Did you know that there were any potential

 7    defects in the construction of the home?

 8        A.   No.

 9        Q.   Did you understand that when you were buying

10    it you were taking it as the home was and were not

11    being given any guarantees as to the quality of the

12    construction of the home?

13             MR. ALBANIS:  Object to the form.

14             But you may answer.

15             THE WITNESS:  I -- can you repeat that?

16             MR. LAWSON:  Yeah.  Let me rephrase that.

17    BY MR. LAWSON:

18        Q.   When you bought the home, did the bank that

19    you bought it from make any guarantees to you about

20    the quality of the construction of the home?

21             MR. ALBANIS:  Object to the form.

22             THE WITNESS:  Only in the listing.

23    BY MR. LAWSON:

24        Q.   What did they say in the listing?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 598 of 3246
Case 1:11-cv-22408-MGC Document 104 Entered on FLSD Docket 11/30/2011 Page 33 of
164
Confidential - Subject to Further Confidentiality Review

```
 1       A.   The house was like new.

 2       Q.   Did you inspect the home before you purchased

 3   it?

 4       A.   No.

 5       Q.   Did you go into the home before you purchased

 6   it?

 7       A.   Yes.

 8       Q.   Okay.  When you went into the home, did you

 9   notice any issues in the home?

10       A.   No.

11       Q.   Did you notice any smells --

12       A.   Yes.

13       Q.   -- inside the home?

14       A.   Sorry.

15       Q.   What smell did you notice when you went into

16   the home?

17       A.   What I would have described it as was stale

18   house smell, something that hadn't been lived in for

19   a length of time.

20       Q.   Did you ask about that smell?

21       A.   The realtor stated the same thing, that it

22   should go away.

23            Once we were living in the house for any

24   length of time, we didn't smell it.  If you were
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 599 of 3246
Case 1:11-cv-22408-MGC Document 864-2 Entered on FLSD Docket 11/20/19 Page 94 of
164

Confidential - Subject to Further Confidentiality Review

 1    there for any length of time, you stopped smelling

 2    it.

 3         Q.   So when you lived in the house, you couldn't

 4    detect that smell anymore?

 5         A.   No.

 6         Q.   Did you notice any other issues with the home

 7    when you visited it before you purchased it?

 8         A.   It was perfect.

 9         Q.   You liked the home?

10         A.   I loved the home.

11              (Defendants' Exhibit 2 was marked for

12    identification.)

13              THE WITNESS:  Do I keep collecting these?

14              MR. LAWSON:  Yes.  If you can keep those

15         documents in front of you.

16    BY MR. LAWSON:

17         Q.   Mr. Feldkamp, I have handed you a document

18    that's been marked as Exhibit 2.  I represent to you

19    this is a Lee County Property Appraiser Online Parcel

20    Inquiry.  It appears to be from 2015.

21              Do you see that at the top of the document?

22         A.   Yes.

23         Q.   Have you ever seen a document like this

24    before?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 600 of 3246
Case 1:11-cv-22408-MGC Document 104-9 Entered on FLSD Docket 11/21/11 Page 95 of
164

```
 1       A.   Yes.

 2       Q.   And when have you seen it?

 3       A.   On their website.

 4       Q.   And is it your understanding that this is a

 5  public record from Lee County?

 6       A.   Yes.

 7       Q.   And looking at the address for the site

 8  address in the top left corner of the document, what

 9  is the address that this records relates to?

10       A.   5237 Butte Street, Lehigh Acres, Florida

11  33971.

12       Q.   And is that the home that we've been

13  discussing that you own?

14       A.   Yes.

15       Q.   Looking at this document, looking to the

16  section that states Attributes on the right side, do

17  you see that?

18       A.   Yes.

19       Q.   Underneath that, there is a section called

20  Total Living Area.

21            Do you see that section?

22       A.   Yes.

23       Q.   And that states 1874; 1,874, do you see that?

24       A.   Yes.
```

Confidential - Subject to further confidentiality review

```
 1        Q.    Is it your understanding that that is the

 2   total living area, square footage of the home,

 3   according to Lee County?

 4        A.    The under air.

 5        Q.    Yes.  The under air square footage of the

 6   home is 1,874 square feet.  Is that right?

 7        A.    Yes.

 8        Q.    Do you have any reason to doubt that number?

 9        A.    No.

10        Q.    I'd like to turn your attention to the second

11   page of this document, specifically to the section

12   called Sales/Transactions.

13              Do you see that?

14        A.    Yes.

15        Q.    If you look into this table of sales and

16   transactions, there's an item from March 15th, 2005.

17              Do you see that?

18        A.    Yes.

19        Q.    And specifically, that lists a -- that item

20   lists a sales price on March 15th, 2005, of $37,000.

21              Do you see that?

22        A.    Yes.

23        Q.    Now, that was before you purchased the home,

24   correct?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 602 of 3246
Case 1:11-cv-22408-MGC Document 31 Entered on FLSD Docket 11/30/11 Page 97 of 164

Confidential - Subject to Further Confidentiality Review

```
 1      A.   Yes.

 2      Q.   And then if you look to the item above from

 3   June 7th, 2006, do you see that?

 4      A.   Yes.

 5      Q.   And there's a sales price of $300,600.

 6           Do you see that?

 7      A.   Yes.

 8      Q.   Now, earlier you said that the home was built

 9   in 2006.  Is that right?

10      A.   Correct.

11      Q.   And this Lee County property record appears

12   to show a sales transaction record in 2006 for a

13   little over $300,000.  Is that right?

14      A.   Yes.

15      Q.   However, when you purchased the home in the

16   item above in August 4th, 2008, the sales price was

17   around $125,000.  Is that right?

18      A.   Yes.

19      Q.   Were you aware that the home was selling for

20   significantly less than it had previously sold for

21   when you purchased it?

22      A.   The entire economy and market had taken a

23   steep decline, and that was the average selling price

24   among houses that were similar.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 603 of 3246
Case 1:11-cv-22408-MGC Document 54 Entered on FLSD Docket 11/21/19 Page 93 of 164

Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Did your realtor tell you that when you

 2   purchased the home?

 3        A.   Yes.

 4        Q.   And, again, you do not know who purchased the

 5   home back in 2006 for $300,000.  Is that right?

 6        A.   No.

 7        Q.   Turning your attention to what is the fourth

 8   page of this document, there's a building footprint

 9   that is shown on the right side of the page.

10             Do you see that?

11        A.   Yes.

12        Q.   Does that look like the footprint or layout

13   of the home?

14        A.   Yes.

15        Q.   And, again, above it, you can see there's a

16   section called Heated/Under Air and then Area Square

17   Footage on the right side.

18             Do you see that?

19        A.   Yes.

20        Q.   And again, that lists 1,874 square feet.  Is

21   that correct?

22        A.   Yes.

23        Q.   Turning your attention back to the first page

24   of the document under Attributes, there's a section
```

Case 2:09-md-02047-EEF-MBN  Document 22363-39  Filed 11/19/19  Page 604 of 3246
Case 1:11-cv-21408-MGC  Document  Entered on FLSD Docket 11/13/19  Page 49 of
164

Confidential - Subject to Further Confidentiality Review

```
 1      that is called First Year Building on Tax Roll.

 2              Do you see that?

 3      A.   Yes.

 4      Q.   And according to that line, it shows 2006 is

 5      the first year that this property was on the tax roll

 6      on the county.  Is that correct?

 7      A.   Yes.

 8      Q.   And that was the same year that, to your

 9      understanding, the home was built.  Is that right?

10      A.   Yes.

11      Q.   You can set that aside.

12              (Defendants' Exhibit 3 was marked for

13      identification.)

14      BY MR. LAWSON:

15      Q.   Mr. Feldkamp, I have handed you a document

16      that's been marked as Exhibit 3.

17              Do you recognize this document?

18      A.   Yes.

19      Q.   Have you seen it before?

20      A.   Yes.

21      Q.   And this is a Plaintiff's Profile Form for

22      your claim in the Chinese manufactured drywall

23      products liability litigation lawsuit.  Is that

24      right?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 605 of 3246
Case 1:11-cv-22408-MGC Document 109 Entered on FLSD Docket 11/21/19 Page 90 of
164

Confidential - Subject to further Confidentiality Review

```
 1        A.   Yes.

 2        Q.   If you turn to the fourth page of this

 3   exhibit marked as Feldkamp,D0004, your signature is

 4   on that page.  Is that correct?

 5        A.   Yes.

 6        Q.   And your wife's signature as well?

 7        A.   Yes.

 8        Q.   And it appears that you signed it on

 9   June 25th of 2012.  Is that correct?

10        A.   Yes.

11        Q.   Now, your signature, as you can see there

12   under that Section 12, was your promise under penalty

13   of perjury that the information contained in this

14   form was true and correct to the best of your

15   knowledge.  Is that right?

16        A.   Yes.

17        Q.   And was this information true and correct at

18   the time that you signed this document?

19        A.   Yes.

20             MR. ALBANIS:  Object to the form.

21             But you may answer, if you know.

22             THE WITNESS:  Yes.

23   BY MR. LAWSON:

24        Q.   And looking through this document today, do
```

Confidential - Subject to Further Confidentiality Review

```
 1    you see any information that you would change now

 2    with the information that you have compared to when

 3    you signed this in 2012?

 4         A.   No.

 5         Q.   No?

 6         A.   No.

 7         Q.   Looking at the first page of this document,

 8    in Section 1 where it states Property Information,

 9    your name and your wife's name are listed as the

10    property owners.  Is that right?

11         A.   Yes.

12         Q.   And that address of affected property is

13    listed as 5237 Butte Street.  Is that right?

14         A.   Yes.

15         Q.   And that is the home that we've been

16    discussing so far today, correct?

17         A.   Yes.

18         Q.   And it's listed that your wife was the person

19    who completed this form, correct?

20         A.   Yes.

21         Q.   Did you review it as well before you signed

22    it?

23         A.   Yes.

24         Q.   And it shows that your mailing address is the
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 607 of 3246
Case 1:11-cv-22408-MGC Document 29 Entered on FLSD Docket 11/21/09 Page 42 of
164

Confidential - Subject to further Confidentiality Review

```
1     home on Billings Street.  Correct?

2          A.    Correct.

3          Q.    So at that time that you had signed this in

4     2012, you had moved into the home on Billings Street,

5     correct?

6          A.    Yes.

7          Q.    In fact, if you look down to Section 3, where

8     it says Claimant Information, there's a section in

9     that table that's listed as Dates Occupied.

10               Do you see that?

11         A.    Yes.

12         Q.    And it says that you moved into the home on

13    Butte Street in August of 2008.  Is that right?

14         A.    Yes.

15         Q.    And that was also when you purchased the

16    home, when we just looked at that as-is sales

17    contract, correct?

18         A.    Yes.

19         Q.    And you left the home in May 2012?

20         A.    Yes.

21         Q.    Is that right?

22               And you never moved back into the home after

23    that date in May 2012?

24         A.    No.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 608 of 3246
Case 1:11-cv-22408-MGC Document 697-1 Entered on FLSD Docket 11/21/11 Page 33 of
164
Confidential - Subject to Further Confidentiality Review

```
1        Q.    Did anyone live in the home after May 2012

2    until the time that it was sold?

3        A.    No.

4        Q.    Did you visit the home during that time from

5    May 2012 until the home was sold?

6        A.    Yes.

7        Q.    Why did you visit the home during that time?

8        A.    To make sure that it wasn't vandalized.

9        Q.    How often would you go back to it?

10       A.    At first every couple weeks and then once a

11   month and then less and less.

12       Q.    When you removed the drywall boards from the

13   home, was that prior to moving out, or after you had

14   moved out of the home, if you can remember?

15       A.    Prior to.

16       Q.    If you look up to Section 2 on the right side

17   of this document on the first page, it asks for

18   insurance information.

19             Do you see that?

20       A.    Yes.

21       Q.    And it asks for homeowner's or renter's

22   insurer for the home, and that's listed as Prepared

23   Insurance Company.  Is that correct?

24       A.    Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 609 of 3246
Case 1:14-cv-02494-MCG-TJM Document 000 confidential Filed 11/19/19 Page 34 of
164

Confidential - Subject to Further Confidentiality Review

```
 1         Q.    That was the homeowner's policy that you had

 2    on the Butte Street home while you lived there?

 3         A.    Yes.

 4         Q.    Is that the only homeowner's insurance that

 5    you had while you lived in the Butte Street home?

 6         A.    Yes.

 7         Q.    If you look to the fifth page of this

 8    document, it's marked as Feldkamp,D0005, there is

 9    premium invoice for Prepared Insurance, it appears,

10    that is submitted to you and your wife at Butte

11    Street.

12               Do you see that?

13         A.    Yes.

14         Q.    And what is this document?

15         A.    A bill.

16         Q.    Is this a bill for your homeowner's

17    insurance?

18         A.    Yes.

19         Q.    And it appears to be a bill that was due on

20    May 16th of 2012.  Is that correct?

21         A.    Yes.

22         Q.    And that was around the time that you moved

23    out of the home?

24         A.    Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 610 of 3246
Case 1:14-cv-24036-MGC Document 14-3 Entered on FLSD Docket 11/20/14 Page 45 of
164

Confidential - Subject to Further Confidentiality Review

```
1        Q.    And your premium that was due at that time

2    was $1,756.  Is that correct?

3        A.    Yes.

4        Q.    Was that a normal monthly amount that was due

5    for the premiums on your homeowner's insurance, or

6    did that include multiple months of premiums in that

7    amount due?

8        A.    Multiple months.

9        Q.    Okay.  Had you stopped paying your

10   homeowner's insurance at that time in May 2012?

11       A.    My bank paid everything for me.

12       Q.    Okay.  So the bank paid the homeowner's

13   insurance on the home during the time that you lived

14   in it?

15       A.    Correct.

16       Q.    Do you know if the bank had stopped paying,

17   or did they do it in quarterly or --

18       A.    I don't know.

19       Q.    You don't know if they did it in quarterly

20   payments or --

21       A.    I don't know.

22       Q.    Going back to the fourth page of this

23   document where your signature line was, it states in

24   a handwritten note in the middle of the page:  We did
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 611 of 3246
Case 1:11-cv-22408-MGC Document 61 Entered on FLSD Docket 11/14/11 Page 36 of
164

Confidential - Subject to further Confidentiality Review

```
1    not have -- have to --

2         A.   Have the home built.

3         Q.   -- have the home built and do not have

4    installation information.

5              Is that right?

6         A.   Yes.

7         Q.   And that's referring to Section 10 that asks

8    for the drywall installer.  Is that right?

9         A.   Yes.

10        Q.   And that's left blank on this form, correct?

11        A.   Yes.

12        Q.   And that means that you did not know who

13   installed the drywall because you did not have the

14   home built yourselves; you bought it two years after

15   it was built, correct?

16             MR. ALBANIS:  Object to the form.

17             But you may answer, if you know.

18             THE WITNESS:  Correct.

19   BY MR. LAWSON:

20        Q.   And as you mentioned before, in Section 9,

21   the home builder is the Majkowski Construction Inc.,

22   is that right, the brothers that you mentioned

23   before?

24        A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 612 of 3246
Case 1:11-cv-01408-MGC Document 1 Confidential ES Docket 11/21/19 Page 97 of
164

Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Okay.  Had you -- were you familiar with them

 2   or their work at the time that you bought the home?

 3        A.    No.

 4        Q.    Okay.  Are you -- do you know anything about

 5   them now?

 6        A.    No.

 7        Q.    Have you ever met anybody from that company?

 8        A.    No.

 9        Q.    And have you ever talked with any of them

10   before?

11        A.    No.

12        Q.    See that the section for Drywall Supplier is

13   also blank.  Is that correct?

14        A.    Yes.

15        Q.    And do you know who supplied the drywall that

16   was installed into your home?

17        A.    No.

18        Q.    Looking to the upper left-hand corner of this

19   fourth page, you list the approximate square footage

20   of the home as 2900 square feet.

21              Do you see that?

22        A.    Yes.

23        Q.    But as we discussed earlier, the under air

24   square footage was significantly less than that.  Is
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 613 of 3246
Case 1:14-cv-14049-MGLT Document 204 Confidential ESI Documents 11/1/19 Page 48 of
164
Confidential - Subject to Further Confidentiality Review

```
1    that right?

2         A.    That doesn't specify under air.

3         Q.    That's right.  This may be total square

4    footage, not under air square footage.  Is that

5    right?

6         A.    Yes.

7         Q.    And as we mentioned before, the Lee County

8    property appraisal showed the square footage to be

9    around 1800 square feet for under air square footage,

10   is that right?

11        A.    Correct.  Around 1900.

12        Q.    Around 1900.  Okay.

13             Did you ever file a homeowner's insurance

14   claim for the issues that you had in your home with

15   Chinese drywall?

16        A.    Yes.

17        Q.    What was the result of that homeowner's

18   insurance claim?

19        A.    Denied.

20        Q.    Did you file multiple claims?

21        A.    I don't remember.

22        Q.    Did you file an appeal when they denied your

23   claim?

24        A.    I don't remember.
```

1      Q.   Do you remember what they told you when they

2    denied the claim?

3      A.   I don't remember.

4      Q.   Did you continue to be covered by the

5    insurance after your claim was denied, or did they

6    cancel your policy?

7      A.   They did not cancel the policy.

8      Q.   Did you continue to have insurance with

9    Prepared Insurance Company for the Butte Street home

10   until you sold the home -- or until the home was

11   sold?

12     A.   Yes.

13     Q.   I would like to turn your attention to the

14   ninth page of this document.  It's marked as

15   Feldkamp,D0009.  And unless you are familiar with

16   this document immediately from looking at it, I'll

17   give you a chance to look at it.  It's a letter from

18   Morgan & Morgan to the Majkowski Construction, Inc.

19     A.   Okay.

20     Q.   Are you familiar with this letter?

21     A.   Yes.

22     Q.   And what is it?

23     A.   It's the notice from our lawyer to the

24   builder that the -- that they can repair the house

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 615 of 3246
Case 1:11-cv-22408-MGC Document 1 Entered on FLSD Docket 11/10/11 Page 40 of 164
Confidential - Subject to Further Confidentiality Review

```
 1    for us.

 2         Q.   It was requesting that the builder repair the

 3    home?

 4         A.   Yes.

 5         Q.   Is that right?

 6              Do you know what, if anything, resulted from

 7    this letter being sent to the builder with this

 8    request?

 9         A.   I don't know.

10         Q.   Did they repair your home?

11         A.   No.

12         Q.   You can set this aside.

13              When do you believe that the Chinese drywall

14    was installed in your house?

15         A.   When the house was built.

16         Q.   And how do you know that?

17         A.   I don't.

18         Q.   Do you know who purchased the Chinese drywall

19    that was installed in your home?

20         A.   No.

21         Q.   When did you first suspect that you had

22    Chinese drywall inside of your home on Butte Street?

23         A.   2012.

24         Q.   So from 2008 when you moved into the home
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 616 of 3246
Case 1:14-cv-04049-MGC Document 667-1 Entered on FLSD Docket 11/16/19 Page 41 of
164

Confidential - Subject to Further Confidentiality Review

```
 1    until 2012, you did not suspect that you had Chinese

 2    drywall inside of your home for those four years or

 3    so?

 4         A.   I feel I was in denial about some of the

 5    writing on the wall.

 6         Q.   What do you mean by that?

 7         A.   I didn't want to believe that the house that

 8    I purchased had such a major issue.  I hadn't heard

 9    of it until the middle of owning it, and I just

10    didn't want to believe that something like that was

11    happening to me.

12         Q.   When you said that you hadn't heard of it

13    until the middle of owning it, when did you first

14    hear about Chinese drywall?

15         A.   2009, 2010, when the news started reporting

16    on others having the issue.

17         Q.   And what did you remember hearing about

18    Chinese drywall when you heard about it first in 2009

19    or 2010?

20         A.   Electrical failures and air-conditioning.

21         Q.   Anything else?

22         A.   To start with, no.

23         Q.   Were you having electrical issues or

24    air-conditioning failure in 2009 and 2010?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 617 of 3246
Case 1:11-cv-21449-MGC Document 106-7 Entered on FLSD Docket 11/21/11 Page 42 of
164

Confidential - Subject to Further Confidentiality Review

```
1        A.   Air-conditioning, yes.  Electrical, no.

2        Q.   When did you first have an air-conditioning

3   failure or issue in your home?

4        A.   Midway through 2008.

5        Q.   So you moved into the home --

6        A.   So --

7        Q.   -- in August of 2008?

8        A.   -- a couple months after moving in.

9        Q.   Okay.  What happened with your

10  air-conditioning at that time?

11       A.   He put freon in the unit, and the unit worked

12  fine.

13       Q.   So the air-conditioning was not working at

14  all or wasn't working that well?  What was the

15  problem that caused you to bring someone in to try to

16  repair it?

17       A.   It wasn't fully cooling.

18       Q.   Okay.  And who did you call to help fix it?

19       A.   Larry's A/C Repair.

20       Q.   Okay.  And was the air-conditioning under

21  warranty at that time?

22       A.   No.

23       Q.   So you paid for the repair to it?

24       A.   Yes.
```

Confidential - Subject to further Confidentiality Review

```
 1        Q.    And he put freon back into the system.  Is

    that right?

 3        A.    From what I understand.

 4        Q.    And did he tell you anything else about what

    was wrong with the air-conditioning unit?

 6        A.    No.

 7        Q.    After that repair, how long was it before you

    had any other issues with the air-conditioning?

 9        A.    I don't remember the exact dates.

10        Q.    But you did have more issues with it after

    that?

12        A.    Yes.

13        Q.    Can you remember what kinds of repairs you

    needed to have done to the air-conditioning system

    when it had issues again?

16        A.    At one point we had the evaporator coil

    replaced, multiple times we had freon put back into

    it because of a freon leak that he couldn't identify,

    and the final time was a separate company came out

    and again the evaporator coil was defective, and that

    is the A/C person that told us to look into the

    bigger issue.

23        Q.    And by "the bigger issue," do you mean

    Chinese drywall?
```

Confidential - Subject to further confidentiality review

```
1       A.   The defective drywall.

2       Q.   And would that have been around 2012?

3       A.   Yes.

4       Q.   And that's when you said that you suspected

5  that you did have Chinese drywall.  Is that right?

6       A.   Yes.

7       Q.   When you said before that you were in denial

8  about it, were there any other issues that were

9  occurring in your home that, looking back, you think

10 were related to Chinese drywall before 2012 other

11 than the air-conditioning?

12      A.   Yes.

13      Q.   What is that?

14      A.   Corrosion on fixtures.

15      Q.   Okay.  Where was that corrosion occurring?

16      A.   Near water.  And I assumed it was from the

17 terrible water in the area.  We're on a well.

18      Q.   Okay.  So you had corrosion, I'm guessing,

19 on, like, bathroom fixtures.  Is that right?

20      A.   Yes.

21      Q.   And you assumed because it was near water

22 that the water in the area from the well was causing

23 the corrosion?

24      A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 620 of 3246
Case 1:14-cv-02045-MGC Document 324 Entered on FLSD Docket 11/16/15 Page 45 of 164

Confidential - Subject to further Confidentiality Review

1    Q.    But now you suspect that it was the Chinese

2    drywall?

3    A.    Yes.

4    Q.    And what items in the home were experiencing

5    corrosion that you can remember?

6    A.    Faucets, chrome fixtures, mirrors.  Mirrors

7    were at the very end of the time that we were there.

8    Q.    Was that largely in the bathrooms then that

9    the corrosion was occurring?

10   A.    Almost exclusively.

11   Q.    Okay.  Do you remember anywhere other than in

12   the bathrooms that you saw corrosion?

13   A.    I don't remember.

14   Q.    Did you have any issues -- and I think you

15   might have said this already -- but did you have any

16   issues with the electrical system in the home?

17   A.    Not that I put together at the time.

18   Q.    Okay.  But looking back now, were there any

19   issues with the electrical system?

20   A.    No.

21   Q.    Can you think of any other issues that you

22   had in the home that you now suspect were related to

23   Chinese drywall other than the corrosion and the

24   air-conditioning issues that we've discussed?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 621 of 3246
Case 1:14-cv-21450-MGC Document 22363-39 Entered on FLSD Docket 11/29/19 Page 46 of
164

Confidential - Subject to Further Confidentiality Review

```
 1        A.   To the home itself --

 2        Q.   Yes?

 3        A.   -- or bodily.

 4        Q.   To the home itself first.

 5        A.   No.

 6        Q.   When you just mentioned bodily issues, what

 7   bodily issues do you associate with Chinese drywall?

 8        A.   I'm an asthmatic and it definitely

 9   exacerbated my asthmatic systems with breathing and

10   coughing.  I also ended up with nose -- like, dry

11   nose and bloody noses.

12        Q.   Did you experience -- you said that it

13   exacerbated based your asthmatic condition.  What

14   kind of issues with asthma did you have before you

15   lived in the home?

16        A.   Chronic asthma.

17        Q.   And what kind of symptoms do you experience

18   as a result of chronic asthma?

19        A.   Occasional tightness of breath.

20        Q.   Do you take any medication for that?

21        A.   Yes.

22        Q.   And what do you take?

23        A.   Albuterol.

24        Q.   Is that as-needed or something that you take
```

Confidential - Subject to Further Confidentiality Review

```
 1    on a regular interval?

 2        A.    It's rescue.

 3        Q.    When you were living in the home, did you

 4    need to take the medication more often?

 5        A.    Yes.

 6        Q.    Okay.  And did you have any other physical

 7    symptoms other than the exacerbation of your

 8    asthmatic condition?

 9        A.    Bloody nose.

10        Q.    When did you have bloody noses?

11        A.    Throughout.

12        Q.    When you mean "throughout," did you have them

13    weekly?

14        A.    No.

15        Q.    Monthly?

16        A.    Monthly.

17        Q.    Maybe once a month?

18        A.    Maybe once a month.

19        Q.    And would you wake up in the morning and have

20    a bloody nose?  When would it often occur?

21        A.    When I'd wake up in the morning and clear my

22    nose, blow my nose in the morning, there would be

23    blood.

24        Q.    Did the home seem especially dry?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 623 of 3246
Case 1:11-cv-22408-MGC Document 204 Entered on FLSD Docket 11/28/13 Page 48 of 164

Confidential - Subject to further Confidentiality Review

1     A.   Yes.

2     Q.   And did you ever install humidifiers or

3     anything like that to attempt to alleviate that

4     condition?

5     A.   Yes.

6     Q.   Yes?

7     A.   Yes.

8     Q.   Did that help?

9     A.   Yes.

10    Q.   And did you not have bloody noses after

11    installing the humidifiers in your bedroom?

12    A.   It could still happen occasionally.

13    Q.   Did you ever go to a doctor to discuss the

14    health conditions that you now associate with Chinese

15    drywall?

16    A.   Can you rephrase that?

17    Q.   Yeah.

18         Did you ever go to a doctor to talk about

19    the -- your asthma that you thought was getting worse

20    or the nosebleeds that you just discussed?

21    A.   I specifically mentioned those same exact

22    things to my primary care doctor.

23    Q.   Okay.  And did that doctor tell you anything

24    how about that might relate to the environmental

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 624 of 3246
Case 1:14-cv-14049-MGC Document 234-1 Entered on FLSD Docket 11/12/14 Page 49 of
164
Confidential -- Subject to further Confidentiality Review

```
 1    conditions in your home?

 2         A.   No.

 3         Q.   Were -- have you ever been told that Chinese

 4    drywall is the reason that you were experiencing

 5    nosebleeds or that your asthma had worsened by a

 6    doctor or anyone else?

 7         A.   My doctor said that there was no studies out

 8    there to show one way or another.

 9         Q.   And to your knowledge, you are not seeking

10    bodily injury or bodily harm damages in this lawsuit.

11    Is that right?

12         A.   Correct.

13         Q.   We talked a little bit about the stale house

14    smell that you said that you noticed when you came to

15    visit the home before you purchased it, correct?

16         A.   Correct.

17         Q.   And you said earlier that you did not notice

18    it once you began to regularly live in the home when

19    you lived there day-to-day.  Is that right?

20         A.   Correct.

21         Q.   Did people who visited the home tell you that

22    they noticed a smell in the home?

23         A.   No one brought it up to us.

24         Q.   Okay.  Afterward, did anyone tell you that,
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 635 of 3246
Case 1:11-cv-21408-MGC Document 339 Entered on FLSD Docket 11/18/2013 Page 49 of
164
Confidential - Subject to further Confidentiality Review

1    after you had moved out of the home?

2         A.   I don't remember.

3         Q.   Do you think that the house smelled any

4    different than any other house, having lived in it,

5    looking back?

6              MR. ALBANIS:  Object to the form.

7              But you may answer, if you know.

8    BY MR. LAWSON:

9         Q.   Do you think that the house smelled different

10   because of Chinese drywall?

11             MR. ALBANIS:  Same objection.

12             THE WITNESS:  Once I lived in it?

13             MR. LAWSON:  Yes.

14             THE WITNESS:  No.

15   BY MR. LAWSON:

16        Q.   Were there any issues other than the ones

17   that we've discussed that you experienced from living

18   in the home that you believe were connected to

19   Chinese drywall?

20             MR. ALBANIS:  Object to the form.

21             But you may answer.

22             THE WITNESS:  I guess the biggest issues

23        would be that I was forced into bankruptcy and,

24        you know, foreclosed on the house that I wanted

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 636 of 3246
Case 1:11-cv-22408-MGC Document 104-1 Entered on FLSD Docket 11/14/2013 Page 51 of
164

Confidential - Subject to Further Confidentiality Review

```
1        to live in.

2    BY MR. LAWSON:

3        Q.    Why do you believe that you were forced into

4    bankruptcy and having the home foreclosed because of

5    Chinese drywall?

6        A.    I reached out to everybody I could

7    potentially ask for help.  We asked for additional

8    loans from the bank and were denied.  We asked for

9    help from the insurance company.  We asked for any

10   which way out, but I couldn't afford to live

11   somewhere else.  I couldn't mentally be in a house

12   that was toxic health-wise, mentally, and I couldn't

13   afford on top of all of that to do anything about

14   fixing it.

15       Q.    How did you decide to move out of the home?

16   What was the decision-making process that you went

17   through?

18       A.    We contacted a lawyer to assist us with --

19   with talking with Fifth Third about the mortgage and

20   about the house itself.

21       Q.    And Fifth Third Bank owned the mortgage on

22   the home.  Is that right?

23       A.    Yes.

24       Q.    When did you first contact an attorney
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/12/19 Page 627 of 3246
Case 2:14-cv-02846-MGC Document 204-1 Entered on FLSD Docket 11/30/17 Page 92 of
164
Confidential - Subject to further Confidentiality Review

1    related to the issues with your home?

2        A.    2012.

3        Q.    And was that before or after you suspected

4    that there was Chinese drywall in your home?

5        A.    After.

6        Q.    Did you have your home inspected in 2012?

7        A.    Yes.

8        Q.    And was that before or after you had hired an

9    attorney in this case -- excuse me, before you had

10   contacted an attorney?

11       A.    I don't remember.

12       Q.    Did you pay for the inspection?

13       A.    Yes.

14       Q.    When you suspected that there was Chinese

15   drywall in your home, did you ever attempt to go try

16   to see if there were any markings on the drywall

17   boards at that time in 2012 that were associated with

18   Chinese drywall?

19       A.    Yes.

20       Q.    How did you do that?

21       A.    We cut large chunks out of the wall.

22       Q.    Is that what we discussed earlier where you

23   cut boards out of the house?

24       A.    Yes.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 628 of 3246
Case 1:11-cv-22408-MGC Document 104 Entered on FLSD Docket 11/21/2013 Page 49 of 164
Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Did you do that before or after you contacted

     an attorney about the issues with your home?

 3        A.    I don't remember.

 4              (Defendants' Exhibit 4 was marked for

 5    identification.)

 6    BY MR. LAWSON:

 7        Q.    I have handed you a document that's been

 8    marked as Exhibit 4.

 9              Do you recognize this document?

10        A.    Yes.

11        Q.    What is it?

12        A.    The inspection itself for the house on Butte

13    Street.

14        Q.    And is this the drywall inspection that you

15    just said that you paid for?

16        A.    Yes.

17        Q.    And when did this inspection occur?

18        A.    March 17th, 2012.

19        Q.    And is that the same time where you believed

20    that for the first time that you had Chinese drywall

21    in your home?

22        A.    Yes.

23        Q.    Before this, you -- you said that you were in

24    denial about that, but this confirmed it for you.  Is
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 629 of 3246
Case 1:11-cv-22408-MGC Document 204 Entered on FLSD Docket 11/28/13 Page 54 of
164

Confidential - Subject to Further Confidentiality Review

1    that right?

2        A.    Yes.

3        Q.    And do you recall that led up to you hiring

4    this company to inspect your home, how you found

5    them?

6        A.    Can you rephrase the question?

7        Q.    Do you remember how you found this company to

8    inspect your home or who referred them to you?

9        A.    One of my wife's co-workers has a husband

10   that is in the building industry who referred us to

11   this company.

12       Q.    Before you had it confirmed for you that

13   there was Chinese drywall in your home, did you enjoy

14   living in your home?

15       A.    Yes.

16       Q.    Was there anything that you could not do in

17   your home that you wished you would be able to do

18   when you lived in it from 2008 to 2012?

19       A.    We used to take a lot of pride in doing the

20   landscaping and just having our house available.  We

21   bought a bigger -- we bought this house specifically

22   because the living room was large, and we liked

23   having parties.  Once all this stuff started to

24   happen, we really felt embarrassed about having

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 630 of 3246
Case 1:11-cv-21449-MGC Document 204 Entered on FLSD Docket 11/20/19 Page 495 of
164
Confidential -- Subject to further Confidentiality Review

 1    anybody over because, you know, like, I don't know if

 2    they already knew and they weren't telling us or if

 3    we were just that ignorant about the situation, but

 4    we just kind of broke down altogether.  We couldn't

 5    have our friends over.

 6         Q.   What was the reason that you felt like you

 7    couldn't have your friends over?  What did you think

 8    that they would think when they came over to your

 9    house?

10         A.   I thought, you know, if they knew anything

11    about it, that they might feel they were going to get

12    sick by being there.  I was just embarrassed

13    altogether that I was ignorant to this fact for so

14    long.  I was sad that -- you know, I don't know what

15    it could or was or is doing to my body, to my

16    animals, to my wife.

17         Q.   And did you feel this way before this

18    inspection?  Because earlier you were telling me that

19    you were in denial about it being Chinese drywall

20    before the inspection, correct?

21         A.   All those feelings went along with the

22    denial.

23         Q.   Okay.  So while you felt like you were in

24    denial about it being Chinese drywall, you also felt

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 631 of 3246
Case 1:11-cv-22408-MGC Document 224-1 Entered on FLSD Docket 11/21/11 Page 96 of 164

Confidential -- Subject to Further Confidentiality Review

1    like you didn't want to have people over to the house

2    during that time.  Is that right?

3        A.   All the little things around the house were

4    starting to change.

5        Q.   Like that?

6        A.   Like the corrosion on the sinks and faucets.

7    It looked like we didn't take care of our house.

8        Q.   Okay.  And that made you embarrassed to have

9    people over because of the corrosion?

10       A.   Yeah.

11       Q.   Were there any other things that -- other

12   than having people over to your house that you

13   couldn't do that you wanted to do while you were

14   living in the home from 2008 to 2012?

15       A.   I wanted to continue to live in the house

16   and, you know, that was the house that we were going

17   to live in, you know, pay off.  That was our first

18   house.  We were really young when we bought it, and,

19   you know, just -- I guess -- I guess our dreams were

20   there, because that's what we missed out on, where

21   we're still behind where we were when we were in our

22   20s and, you know, still years away from being able

23   to put ourselves back to that spot.

24       Q.   Looking at this inspection, do you remember

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 632 of 3246
Case 2:11-cv-04406-MGC Document 69-1 Entered on FLSD Docket 11/20/19 Page 47 of
164
Confidential – Subject to Further Confidentiality Review

1    being present in the home during the inspection?

2         A.    No.

3         Q.    Were you -- was your wife there during the

4    inspection?

5         A.    I don't remember.

6         Q.    You don't remember answering any questions

7    from the inspector while they inspected the home?

8         A.    I don't remember.

9         Q.    And have you looked at this report before?

10        A.    Yes.

11        Q.    I would like to turn your attention to the

12   seventh page of the inspection report.  And looking

13   through the photos that begin on the seventh page and

14   continue on to the next two pages, can you identify

15   that these are pictures that are taken inside of the

16   home on Butte Street?  Do any of them appear to you

17   to be obviously taken inside of your house?

18        A.    Yes.

19        Q.    Okay.  What do you recognize in the photos?

20        A.    The first pictures are the garage with the

21   air conditioner.  The purple picture is the dining

22   room.  I don't know where the white walls are

23   necessarily.  But those are all electric outlets from

24   the house.  Under the toilets, and in both the guest

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 633 of 3246
Case 1:11-cv-22408-MGC Document 164 Entered on FLSD Docket 11/21/13 Page 58 of
164
Confidential - Subject to Further Confidentiality Review

1   and the master bedroom, the fixtures from the guest

2   room.

3       Q.   You'd agree with me looking through these

4   photos that the inspector did not include any photos

5   of drywall boards in this report.  Is that right?

6       A.   Yes.

7       Q.   And to your knowledge, did that inspector cut

8   any holes in the wall?

9       A.   He took core samples.

10      Q.   He took core samples of drywall.  Is that

11  right?

12           Is that right that he took core samples of

13  drywall?

14      A.   Yes.

15      Q.   Do you know if those drywall samples were

16  tested?

17      A.   I don't know.

18      Q.   Do you remember ever receiving a drywall

19  testing report that told you that there was Chinese

20  drywall in your home?

21      A.   I don't remember.

22      Q.   Did you ever have any other inspections other

23  than this one performed on your home?

24      A.   No.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 634 of 3246
Case 1:11-cv-21168-MGC Document 602-1 Entered on FLSD Docket 11/27/14 Page 49 of
164

Confidential - Subject to further Confidentiality Review

```
1      Q.   This is the only inspection?

2      A.   Yes.

3      Q.   Do you remember how much you paid for that

4   inspection?

5      A.   I don't.

6      Q.   You can set that aside.

7           (Defendants' Exhibit 5 was marked for

8   identification.)

9   BY MR. LAWSON:

10     Q.   You have been handed a document that's been

11  marked as Exhibit 5.  It's titled Important Taishan

12  Notice Must Be Completed By April 15, 2015.

13          Do you see that on the first page?

14     A.   Yes.

15     Q.   If you turn to the second page under

16  Property 1, the address 5237 Butte Street in Lehigh

17  Acres is listed.  Is that right?

18     A.   Yes.

19     Q.   And that is the home that we've been

20  discussing, your home that you lived in from 2008

21  through 2012, correct?

22     A.   Yes.

23     Q.   If you turn to the fourth page of the

24  document, your signature is on that page.  Is that
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 635 of 3246
Case 1:11-cv-01408-MGC Document 694-1 Entered on FLSD Docket 11/21/19 Page 49 of
164
Confidential - Subject to Further Confidentiality Review

```
 1    right?

 2        A.    Yes.

 3        Q.    As well as your wife's signature?

 4        A.    Yes.

 5        Q.    And it appears that you both signed this on

 6    April 9th of 2015, correct?

 7        A.    Yes.

 8        Q.    Now, if you look to the pages that follow

 9    your signature, there's a series of photographs that

10    occur throughout the back of this exhibit.  I wanted

11    to ask you about these photos.

12              On the first page of photographs, you can see

13    two images that appear to be of drywall boards.

14              Who took these photographs?

15        A.    Myself and my father.

16        Q.    Okay.  Do you remember when you took them?

17        A.    No.

18        Q.    And was this when you, as you mentioned

19    earlier, removed large sections of drywall board from

20    primary walls in the home?

21        A.    Yes.

22        Q.    And at that time you took photographs of the

23    boards that you removed from the home.  Is that

24    right?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 636 of 3246
Case 1:11-cv-01405-MGC Document 229 Entered on FLSD Docket 11/21/19 Page 41 of
164
Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    And what happened to those drywall boards

 3   after you removed them from the walls?

 4        A.    They were put into the garage.

 5        Q.    And did they stay in the garage for the time

 6   that you still owned the home?

 7        A.    Yes.

 8        Q.    Are these the only photos that were ever

 9   taken of those drywall boards?

10        A.    Yes.

11        Q.    What happened to these drywall boards after

12   the home was sold?

13        A.    I don't know.

14        Q.    Did you take possession of them?

15        A.    No.

16        Q.    Did -- to your knowledge, did your attorney

17   take possession of them?

18        A.    No.

19        Q.    Do you recall where the drywall that is shown

20   in these images on the first page and the second page

21   was found in the home, the first and second page of

22   photographs?

23        A.    Not specifically based on the picture.

24        Q.    Were the drywall boards marked?  Did you
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 637 of 3246
Case 1:11-cv-01408-MGC Document xxx Entered on FLSD Docket 11/XX/19 Page 92 of 164
Confidential - Subject to Further Confidentiality Review

1    write on them, for example, where they had been taken

2    from the home?

3        A.    I don't remember.

4        Q.    Did you create a floor plan or chart showing

5    where the drywall boards had been taken out of the

6    home, out of the walls?

7        A.    No.

8        Q.    And do you recall if there was more drywall

9    board with the marking of any of these particular

10   foremarkings that we're seeing here, or did you find

11   one of each in the walls?

12           MR. ALBANIS:  Object to the form.

13           But you may answer it.

14           THE WITNESS:  I don't remember.

15   BY MR. LAWSON:

16       Q.    Did you pull these four boards out of the

17   wall, or were there more boards than these four?

18       A.    There were more boards.

19       Q.    And are those shown on the images that follow

20   in these photographs on the third and fourth pages of

21   photos?

22       A.    Some of them.

23       Q.    Do you remember how many boards you took out

24   of the wall?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 638 of 3246
Case 1:11-cv-01409-MGC Document 604-14 Filed 11/19/18 Page 9 of 164
Confidential — Subject to Further Confidentiality Review

```
 1        A.   I don't remember.

 2        Q.   Do you remember how many walls that you

 3   pulled boards from?

 4        A.   I don't remember.

 5        Q.   Did you collect any samples of this drywall

 6   that you gave to your attorney?

 7        A.   No.

 8        Q.   Did you cut out smaller sections of it and

 9   give it to your attorney?

10        A.   I don't remember.

11        Q.   Did you cut out smaller sections at all, or

12   did they just stay in the large boards that you cut

13   out of the wall?

14        A.   I don't remember.

15        Q.   Do you have any other photos in your

16   possession that you took on the day that you were

17   working to remove the boards from the walls?

18        A.   I have given everything I have to my

19   attorney.

20             MR. LAWSON:  We can go off the record.

21             (Recess from 9:11 until 9:19 a.m.)

22   BY MR. LAWSON:

23        Q.   Welcome back, Mr. Feldkamp.

24        A.   Thank you.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 639 of 3246
Case 11-cv-1490-MGC Document 604 Entered on FLSD Docket 11/8/2019 Page 164 of 164
Confidential -- Subject to Further Confidentiality Review

1    Q.   I would like to go back to Exhibit 6 that we

2    were just looking at, the inspection photos -- excuse

3    me, the photos that you took that are at the back of

4    that --

5    A.   The back?

6    Q.   Yeah.  The photos that you took of the back

7    of that Taishan --

8         MR. ALBANIS:  It's --

9         THE WITNESS:  I don't have Exhibit 6.

10   BY MR. LAWSON:

11   Q.   Exhibit 5.  I'm sorry.

12        MR. ALBANIS:  Thank you.

13   BY MR. LAWSON:

14   Q.   Exhibit 5 that we were looking at that has

15   the photos at the back of it that you said that you

16   took when you removed sections of drywall from your

17   home.

18        Looking at those drywall photos that are in

19   front of you, there are a few different types of

20   drywall markings that are shown.  Is that right?

21   A.   Yes.

22   Q.   One of the drywall markings that is shown is

23   GridMarX.  Do you see that; it says MarX that you can

24   see upside down on the second page of photographs?

Confidential -- Subject to Further Confidentiality Review

```
 1        A.   Yes.

 2        Q.   And then there's also something that says

 3   National Gypsum on the bottom of that second page of

 4   photographs.  Is that right?

 5        A.   Yes.

 6        Q.   And then if you look onto the first page of

 7   photos -- it's upside down -- but there's something

 8   that says 4 feet x 12 feet x 1/2 on the bottom of the

 9   page.

10             Do you see that?

11        A.   Yes.

12        Q.   And then there's another drywall marking that

13   says 02309330321 at the bottom -- or, excuse me, at

14   the top of the first page of photos.

15             Do you see that?

16        A.   Yes.

17        Q.   So to your recollection, were there any other

18   types of drywall markings that you saw inside the

19   home other than those four when you pulled sections

20   of the drywall out?

21        A.   I don't remember.

22        Q.   And do you remember if one of them was more

23   common than the other when you pulled out different

24   sections of the walls?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 641 of 3246
Case 1:11-cv-22408-MGC Document 108-1 Entered on FLSD Docket 11/16/11 Page 66 of
164
Confidential - Subject to further Confidentiality Review

```
1       A.   I don't remember.

2       Q.   But you --

3            MR. ALBANIS:  For the record, there are a

4       couple more pictures attached to Exhibit 5 with

5       photos of drywall.

6            MR. LAWSON:  That's right.

7  BY MR. LAWSON:

8       Q.   And if you look to the next two pages, we

9  have on the last page an image that also contains

10 that image of 02309330321, the same marking that we

11 had discussed on the first page.

12      A.   That's the first --

13      Q.   It does appear to be the same image, doesn't

14 it?

15      A.   Yes.

16      Q.   And then there's an image that appears to

17 show the 4 feet x 12 feet marking, but just at a

18 distance.

19           Do you agree with that on that third page

20 that that appears to be that marking?

21      A.   Yes.

22      Q.   Okay.  So in total it appears four different

23 types of drywall markings that are shown across the

24 six photographs of drywall that are on Exhibit 5,
```

Confidential - Subject to Further Confidentiality Review

```
1    correct?

2        A.   Yes.

3        Q.   All right.  I'd like to turn your attention

4    back to Exhibit 3, the Plaintiff's Profile Form that

5    we were looking at a little bit earlier, specifically

6    looking at the second page of that document, which is

7    marked as Feldkamp,D0002.  If you could look at

8    Section 5.

9             Under Section 5, it's titled Drywall

10   Information.  Do you see that?

11       A.   Yes.

12       Q.   And specifically there's a column that says

13   Markings on Drywall.  And the only item that is

14   listed is 4 feet x 12 feet x 1/2 inch.  Is that

15   right?

16       A.   Yes.

17       Q.   But you'd agree from what we just looked at

18   in the photographs that you took from the drywall

19   boards that you pulled out of the walls, there were

20   other drywall markings that were on the drywall in

21   your home, correct?

22       A.   Yes.

23       Q.   And if you look next to the 4 feet x 12 feet

24   cell, there is a cell and a column called Location in
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 643 of 3246
Case 1:11-cv-22408-MGC Document 204 Entered on FLSD Docket 11/21/2013 Page 68 of
164

Confidential - Subject to Further Confidentiality Review

```
 1    Home, and for that marking it states "throughout."

 2         Do you see that?

 3    A.   Yes.

 4    Q.   Now, do you know whether that 4 feet x

 5    12 feet x 1/2 inch marking drywall was throughout the

 6    home?

 7    A.   I don't know.

 8    Q.   When you pulled drywall boards out of the

 9    home, did you find that marking on boards throughout

10    the home?

11    A.   In multiple places I did.

12    Q.   Where did you find it?

13    A.   I don't remember.

14    Q.   But you don't recall whether you found it in

15    every wall of the home?

16    A.   I don't remember.

17    Q.   But you would agree that you found other

18    drywall markings on the boards in the home, correct?

19    A.   Yes.

20    Q.   Do you know who made the judgment that the --

21    that drywall marking was found throughout the home?

22    A.   The lawyer.

23    Q.   Your lawyer?

24    A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 644 of 3246
Case 1:11-cv-01408-MGC Document 99-4 Entered on FLSD Docket 11/2019 Page 69 of 164
Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.  You would agree that there was not an

2      inspection done to determine whether any particular

3      drywall marking was found in all of the walls of the

4      home, correct?

5           MR. ALBANIS:  Object to the form.

6           But you may answer.

7           THE WITNESS:  Can you restate that?

8      BY MR. LAWSON:

9      Q.    The drywall inspection report that we looked

10     at didn't show any images of drywall in the home.  Is

11     that right?

12     A.    Correct.

13     Q.    As far as we know, you are the only person

14     who has looked to determine what drywall markings

15     were on the boards in the home, correct?

16     A.    Yes.

17     Q.    And when you looked, you found more than one

18     type of marking on the drywall in the home, correct?

19     A.    Yes.

20     Q.    Do you know whether there might have been

21     other types of drywall markings inside of the home

22     other than the ones that you found on the day that

23     you were pulling sections out of the wall?

24     A.    I don't remember.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 645 of 3246
Case 1:11-cv-22408-MGC Document Entered on FLSD Docket 11/20/13 Page 70 of
164
Confidential - Subject to further Confidentiality Review

1    Q.   Because you didn't look at every single board

2    in the home, correct?

3    A.   Correct.

4    Q.   You didn't pull them all out of the walls?

5    A.   No.

6    Q.   You pulled a section out of each primary

7    wall, right?

8    A.   I pulled a section out of each large wall in

9    the house.

10   Q.   Right.

11        And when you did that, there were sections of

12   drywall that were left untouched, correct?

13   A.   Yes.

14   Q.   And as we established before, there were no

15   other inspections that were performed in the home

16   other than the one that we looked at in the report

17   earlier?

18   A.   Correct.

19   Q.   Okay.  You can set that -- those exhibits

20   aside.

21        (Defendants' Exhibit 6 was marked for

22   identification.)

23   BY MR. LAWSON:

24   Q.   Mr. Feldkamp, you have now actually been

Confidential - Subject to Further Confidentiality Review

1    handed Exhibit 6.  This is a document that is titled

2    Priority Claimant Andrew Feldkamp's First Amended

3    Answers to Interrogatories.

4            Do you see that on the first page?

5            It will be underlined and bolded in the

6    center of the page.

7        A.    Yes.

8        Q.    And I apologize, those legal documents are a

9    little difficult to read sometimes.

10           Do you see that title there?

11       A.    Yes.

12       Q.    Have you seen this document before?

13       A.    Yes.

14       Q.    And when have you seen it before?

15       A.    It was provided to me by my lawyer.

16       Q.    Okay.  Did you review it?

17       A.    Yes.

18       Q.    And did you agree with the statements that

19    were made in it?

20       A.    Yes.

21       Q.    Are they true and correct to your knowledge?

22       A.    Yes.

23           MR. LAWSON:  And I don't believe at this

24    point that we've received a verification for

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 647 of 3246
Case 1:11-cv-01408-MGC Document 60 Entered on FLSD Docket 11/01/19 Page 72 of
164
Confidential - Subject to further Confidentiality Review

1          these interrogatories.  We would ask for one, if

2          one can be provided, and that will be produced to

3          us as soon as you can.

4                MR. ALBANIS:  We will ask the Feldkamps to

5          sign during a break during today's deposition and

6          get those uploaded.

7                MR. LAWSON:  Thank you.

8     BY MR. LAWSON:

9     Q.    I would like to turn your attention to the

10    first page of this document, specifically the first

11    question and answer that are on that page.

12          The first question or interrogatory asks you

13    to:  Identify all types of damages that you seek in

14    this lawsuit and to specify the amounts sought for

15    each category.

16          Do you see that?

17    A.    Yes.

18    Q.    Specifically I would like to point you to

19    your answer where you discuss personal property

20    losses.

21          You state that you have -- you are seeking

22    personal property losses of at least $969.50.

23          Do you see that?

24    A.    Yes.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 648 of 3246
Case 1:11-cv-22408-MGC Document 204 Entered on FLSD Docket 11/18/19 Page 73 of
164
Confidential - Subject to Further Confidentiality Review

1      Q.   Do you know what those $969.50 relate to,

2   what kinds of personal property losses you are

3   seeking damages for that money?

4      A.   I don't remember.

5      Q.   Okay.

6         (Defendants' Exhibit 7 was marked for

7   identification.)

8   BY MR. LAWSON:

9      Q.   You have been handed a document that's been

10   marked as Exhibit 7.  Give you a moment to review it.

11         Have you had a chance to look through it?

12      A.   Yes.

13      Q.   Have you seen these invoices before?

14      A.   Yes.

15      Q.   Can you tell me about them?

16      A.   They are from the air-conditioning people

17   that we have had out at the house.

18      Q.   Okay.  Earlier we were talking about the

19   issues that you had with your air-conditioning system

20   while you lived in the home on Butte Street, correct?

21      A.   Yes.

22      Q.   And you said that you had them come out

23   multiple times to be able to perform service on your

24   air-conditioning because it was not cooling down the

Confidential -- Subject to Further Confidentiality Review

```
 1    house as well as it -- as you expected it to,

 2    correct?

 3         A.    Correct.

 4         Q.    And these show, it appears, five different

 5    services -- kinds of service that were performed --

 6    at least five different invoices that were issued to

 7    you for air-conditioning service.  Is that right?

 8         A.    Yes.

 9         Q.    And looking through these documents, I will

10    represent to you that it appears that they add up to

11    the $969.50 that you are requesting for personal

12    property losses.

13             Does that sound accurate to you, that this

14    would be the personal property losses that you are

15    seeking in this lawsuit?

16         A.    Yes.

17         Q.    Now, I notice that on the invoices on the

18    second, third, fourth, and fifth page there is an

19    item in the lower left corner that shows that the

20    amount on the invoice was paid and it contains a

21    number.

22             Do you see that?

23         A.    Yes.

24         Q.    And there appears to be a check number there.
```

```
 1    Is that what that number is?

 2         A.   Yes.

 3         Q.   And it's your testimony that you did pay

 4    these amounts, and it appears that you paid with a

 5    check to be able to pay for them.  Is that right?

 6         A.   Yes.

 7         Q.   For the first invoice, it states a total

 8    balance of $189.50 in the bottom right corner.

 9              Do you see that?

10         A.   Yes.

11         Q.   And can you let me know, is there anywhere on

12    this invoice that you can see where this particular

13    item was paid?

14         A.   No.

15         Q.   Okay.  And it specifically says

16    Payment/Credits in the bottom right corner $0.  Is

17    that right?

18         A.   Yes.

19         Q.   Do you have any recollection of paying this

20    invoice?

21         A.   I don't remember.

22         Q.   And to your knowledge, have you produced all

23    of the receipts that you have for the

24    air-conditioning services that are shown across this
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 651 of 3246
Case 1:11-cv-22408-MGC Document 1-3 Entered on FLSD Docket 11/24/11 Page 76 of
164
Confidential - Subject to Further Confidentiality Review

```
1    exhibit?

2         A.   Everything I have I have provided to my

3    lawyer.

4         Q.   Do you know if you have any proof of payment

5    for this particular invoice other than the invoice

6    itself stating a balance of $189.50?

7         A.   I have provided everything I have.

8         Q.   When you left the home, was the

9    air-conditioning unit working?

10        A.   I don't remember.

11        Q.   Do you know when the last service was

12   performed on the air conditioner?

13        A.   So the last service was when the air

14   conditioner guy came out and it was the coil again,

15   and he told us to look into defective drywall.  There

16   is no invoice for that because he, out of the

17   goodness of his heart, said that he couldn't take any

18   money from us.

19        Q.   It looks like the latest in time invoice that

20   we have is on the fourth page; it's the August 25th,

21   2011, service that you received, as far as I can

22   tell.  But you believe that there was one after that

23   where you were not charged anything.  Is that right?

24        A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 652 of 3246
Case 1:11-cv-01408-MGC Document 27-1 Filed 01/14/15 Page 47 of
164
Confidential – Subject to Further Confidentiality Review

1      Q.    And do you have any sense of when that

2   occurred?  Sometime after August 25th, 2011; is that

3   right?

4      A.    The first part of 2012.

5      Q.    Because you had the inspection in March of

6   2012.  Isn't that right?

7      A.    This was what led us to do that.

8      Q.    Okay.  So that final service probably

9   occurred sometime before March of 2012?

10     A.    Correct.

11     Q.    You can set that aside.

12        (Defendants' Exhibit 8 was marked for

13   identification.)

14   BY MR. LAWSON:

15     Q.    I have handed you a document that's been

16   marked as Exhibit 8.  It's titled First Amended

17   Supplemental Plaintiff's Profile Form.

18        Do you recognize this document?

19     A.    Yes.

20     Q.    And when have you seen it before?

21     A.    When it was provided to me by my lawyer.

22     Q.    Did you review this document when it was

23   provided to you?

24     A.    Yes.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 653 of 3246
Case 1:11-cv-22408-MGC Document 89 Entered on FLSD Docket 11/14/05 Page 78 of
164
Confidential - Subject to Further Confidentiality Review

 1      Q.   Looking to the last page, Page 7, of this

 2    Supplemental Plaintiff Profile Form, there is date

 3    signed field that is marked as December 5th, 2018.

 4           Do you see that?

 5      A.   Yes.

 6      Q.   And was that around the time that you

 7    reviewed this document?

 8      A.   Yes.

 9      Q.   Now, there's a claimant's signature here that

10    is blank.

11           Do you see that?

12      A.   Yes.

13      Q.   Do you remember signing this document around

14    December 5th, 2018?

15      A.   We reviewed it with our lawyer and gave him

16    approval to submit it on our behalf.

17      Q.   Okay.  So you didn't sign anything at that

18    time when you reviewed it?

19      A.   No.

20      Q.   I'd like to turn your attention to the sixth

21    page, going one page back of this document,

22    specifically to the question where it states:  If you

23    experienced any loss of use and/or loss of enjoyment

24    of the property as a result of Chinese drywall,

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 654 of 3246
Case 1:11-cv-22408-MGC Document 60-1 Entered on FLSD Docket 11/21/11 Page 79 of
164

Confidential - Subject to Further Confidentiality Review

```
 1    identify the total amount of such loss.

 2           Do you see that?

 3    A.    Yes.

 4    Q.    And the amount that you have listed here on

 5    this form is $450,000.  Is that right?

 6    A.    Yes.

 7    Q.    How did you come to determine that you are --

 8    that the amount of your loss for loss of use of

 9    enjoyment of the property is $450,000?

10           MR. ALBANIS:  Object to form.

11           But you may answer.

12           THE WITNESS:  From the best of my knowledge,

13       that comes from a judgment.  A judge has created

14       a formula in which that that's correct number.

15       But to me, there's no such number that's really

16       going to make this right.  I'm behind seven years

17       on my life.  I would love to still be living in

18       that house, regardless of today's numbers.

19    BY MR. LAWSON:

20    Q.    I have heard you say a few times how much you

21    loved the house, you know, that you wish you were

22    still in it, that you didn't -- that you didn't want

23    to move out.  Why did you move out of the house?

24    A.    The Chinese drywall and the effects it was
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/12/19 Page 655 of 3246
Case 1:14-cv-21414-MGC Document 292-4 Entered on FLSD Docket 11/24/15 Page 49 of
164

Confidential - Subject to further Confidentiality Review

```
1    potentially going to have on my health and my life.

2         Q.   So you were in it four years.  And did you

3    enjoy living in the house during that time for those

4    four years?

5         A.   For most of it.

6         Q.   For most of it?

7              When did you stop enjoying it?

8         A.   When it was confirmed that we had a major

9    issue in the house.

10        Q.   So when you knew that it was Chinese drywall,

11   you no longer enjoyed living in the house?

12        A.   We -- yes.

13        Q.   So that was from March 2012 when you had the

14   inspection report, until May 2012 when you moved out

15   of the house.  Is that right?

16        A.   Yes.

17        Q.   And that was the period where you no longer

18   enjoyed living it in because you knew you had Chinese

19   drywall.  Is that correct?

20        A.   We -- not only did we not enjoy living in it,

21   we were unable to live in it, and we, for much longer

22   than that, wished that we continued to live there and

23   had all of the opportunity to stay in that house.  We

24   asked multiple times from multiple people to help us
```

Confidential - Subject to Further Confidentiality Review

1     to try to stay in the house.

2          Q.   Did someone tell you that you could not live

3     in the house anymore?

4          A.   It was a health risk, from what I understood.

5          Q.   Did a doctor tell you that it was a health

6     risk to stay in the house?

7          A.   No.

8          Q.   What made you think that it was a health risk

9     to stay in the house?

10         A.   Fear.

11         Q.   You were afraid of what it could -- what the

12    health risks could be related to the Chinese drywall?

13         A.   Yes.

14         Q.   But no one confirmed for you that you needed

15    to move out of the house.  Is that right?

16              MR. ALBANIS:  Object to the form.

17              But you may answer.

18              THE WITNESS:  The house itself had holes in

19         it and was continuing to deteriorate around us.

20         It was a situation that I wasn't going to risk my

21         health, my wife's health regardless of proof at

22         that point.

23    BY MR. LAWSON:

24         Q.   When you said that it had holes in it, are

1    you referring to the corrosion?

2        A.    I'm referring to the holes that we put in the

3    wall.

4        Q.    The holes that you -- that you put in the

5    wall when you cut the sections of the drywall out?

6        A.    Correct.

7        Q.    So you think that happened before you moved

8    out of the house.  Is that right?

9        A.    What happened?

10       Q.    That you removed sections of the drywall

11   before you moved out?

12       A.    Yes.

13       Q.    Do you think that probably happened around

14   2012, before you moved out or --

15       A.    I don't remember.

16       Q.    I'd like to take you back to Exhibit 8 --

17   excuse me, no.

18            I would like to take you back to Exhibit 6,

19   which is your First Amended Answers to

20   Interrogatories.

21            And to go back to the same answer that we

22   were looking at earlier related to the damages that

23   you are seeking in this lawsuit, you state on that

24   first page:  We seek alternative living expenses from

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 658 of 3246
Case 1:11-cv-22408-MGC Document 69-9 Entered on FLSD Docket 11/20/15 Page 43 of
164
Confidential - Subject to Further Confidentiality Review

1    April 2012 through September 2015 of at least

2    $37,989.

3            Do you see that?

4       A.   Yes.

5       Q.   What does "alternative living expenses" mean

6    to you?

7       A.   A place to live that wasn't the house on

8    Butte Street.

9       Q.   So we were just talking about how you felt

10   when you decided that you needed to move out of your

11   home.  What did you do when you decided that you

12   needed to leave?  Did you look for another place to

13   live?

14      A.   Yes.

15      Q.   And where did you look?

16      A.   In the local area.

17      Q.   So you wanted to stay close to where you were

18   living already.  Is that right?

19      A.   Yes.

20      Q.   That's because you still needed to be able to

21   go to your job, correct?

22      A.   Yes.

23      Q.   And where did you end up finding a place to

24   live?

Confidential - Subject to Further Confidentiality Review

```
1        A.    Within the same subdivision, a few miles

2    away.

3        Q.    You said a little bit earlier that you sought

4    the help of others to be able to stay in your home.

5    Is that right?

6        A.    Yes.

7        Q.    Who did you seek help from?

8        A.    The bank that held our mortgage, the initial

9    builders, and the bank that sold us the house, as

10   well as the insurance company.

11       Q.    Looking to this answer to this interrogatory,

12   you say that you are seeking alternative living

13   expenses from April 2012 through September 2015.

14             Earlier we discussed that you moved out of

15   your home in May 2012.  Do you know why you are

16   seeking expenses beginning in April of that year?

17       A.    I believe that that's when the first check

18   was written.  I know that's when the first check was

19   written.

20       Q.    And when you say "the first check," do you

21   mean the first check for the home that you rented?

22       A.    For the rental home.

23       Q.    You began renting the home in April of 2012;

24   is that right?
```

Confidential - Subject to Further Confidentiality Review

```
1        A.   Yes.

2        Q.   And you continued to rent it through the time

3   in September 2015 that your home on Butte Street was

4   sold.  Is that right?

5        A.   We still live in the same place.

6        Q.   That's right.

7             But you are seeking damages for alternative

8   living expenses from when you first started paying

9   for the rental in April 2012 through September 2015

10  when your home on Butte Street was sold, correct?

11       A.   Yes.

12       Q.   Now, during those months from April 2012

13  through September 2015, how many of those months were

14  you also paying your mortgage payment at the same

15  time?

16       A.   One.

17       Q.   So you paid your mortgage payment in April of

18  2012.  Is that right?

19       A.   Yes.

20       Q.   And then you did not pay it in May of 2012?

21       A.   Correct.

22       Q.   And you did not continue -- continue to not

23  pay the mortgage payment for the Butte Street home

24  through September 2015, correct?
```

Case 2:09-md-02047-EEF-MBN  Document 22363-39  Filed 11/19/19  Page 661 of 3246
Case 1:14-cv-2496-MCG-EL  Document 680  Filed 11/18/15  Page 96 of
164
Confidential - Subject to Further Confidentiality Review

```
1        A.   Correct.

2        Q.   How much less was your rental -- your rent

3    per month at the Billings Street home compared to

4    your mortgage payment at Butte Street?

5        A.   I don't remember.

6        Q.   Do you remember how much a month you were

7    paying for your rental and -- from April 2012 through

8    September 2015 per month?

9        A.   900.

10       Q.   But you don't remember how much your mortgage

11   payment was?

12       A.   I don't remember.  It was auto-drafted.

13       Q.   Do you think it was more than $900?

14       A.   Yes.

15       Q.   So after that first month where you were

16   paying both at the same time, you were paying less

17   for your living expenses than you had been

18   previously.  Isn't that right?

19       A.   Yes.

20       Q.   And you continued to pay less through this

21   period from April 2012 through September 2015,

22   correct?

23       A.   Yes.

24            (Defendants' Exhibit 9 was marked for
```

Confidential - Subject to further Confidentiality Review

```
 1    identification.)

 2    BY MR. LAWSON:

 3         Q.   You have been handed a document that's been

 4    marked as Exhibit 9.

 5              Do you recognize this document?

 6         A.   Yes.

 7         Q.   What is it?

 8         A.   A copy of the checks for rent on the house on

 9    Billings.

10         Q.   To your knowledge, are there any other checks

11    or invoices for different things inside of this

12    exhibit?

13         A.   No.

14         Q.   So these are all the payments that you made

15    for the rental on Billings from the period of

16    April 2012 through September 2015?

17         A.   Yes.

18         Q.   And does this encompass, these payments, all

19    of the money that you are seeking for alternative

20    living expenses in this lawsuit?

21         A.   Yes.

22         Q.   So -- and that totals to $37,000 -- $37,989.

23    Is that right?

24         A.   Yes.
```

```
1        Q.    So looking to the first page -- excuse me,

2   the first page of checks, the second page of the

3   exhibit, there's a check that is dated August 29th,

4   2016.

5              Do you see that?

6        A.    Yes.

7        Q.    Now, that is after the time period that you

8   have listed in your interrogatory response, correct;

9   that only went until September of 2015?

10       A.    Yes.

11       Q.    So there are some additional checks in here

12  outside of that time period, correct?

13       A.    Yes.

14       Q.    If you look to the next page, there's one

15  from July 28, 2016; the page that follows is June 27,

16  2016; and it continues to go back through 2016 as you

17  flip through the pages, correct?

18       A.    Yes.

19       Q.    But you are not seeking money in damages in

20  this lawsuit for alternative living expenses for that

21  time period in 2016, correct?

22       A.    Correct.

23       Q.    Only the time period between when you moved

24  into the rental and when your home sold in September
```

Confidential -- Subject to Further Confidentiality Review

1    of 2015?

2        A.    Yes.

3        Q.    And if you go back to the final page of this

4    exhibit, it shows a check that is dated April 13th,

5    2012.

6             Do you see that?

7        A.    Yes.

8        Q.    And that appears to be a check for an

9    application fee and deposit based on the note in the

10   lower left corner of this exhibit -- excuse me, of

11   this check?

12       A.    Yes.

13       Q.    And if you turn to the page that proceeds

14   that, there's a check on April 26, 2012, for $1,500?

15       A.    Yes.

16       Q.    And that, according to the note on that

17   check, is for the first and last month's rent.  Is

18   that correct?

19       A.    Yes.

20       Q.    If you look to the page before that, there is

21   a deposit -- excuse, a check for a deposit of $450

22   that was signed on April 26, 2012, correct?

23       A.    Yes.

24       Q.    And if you go back to the page before that,

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 665 of 3246 of
164
Confidential - Subject to further Confidentiality Review

```
 1    there's a check for $564 to Premier Realty Solutions,

 2    it looks like, for blinds.  Can you explain what

 3    that's for?

 4        A.    That's for rent, and we purchased blinds and

 5    they took it off of the rent.

 6        Q.    Okay.  So you purchased these items, and then

 7    you were given a credit by them --

 8        A.    Correct.

 9        Q.    -- for it?

10            So this is not an expense that you are

11    seeking in this lawsuit?

12        A.    This is rent --

13        Q.    Okay.

14        A.    -- minus the price of the blinds.

15        Q.    I understand now.

16            So your $900 rent was deducted for the price

17    of the blinds --

18        A.    Correct.

19        Q.    -- that you added to the rental.  They paid

20    you by reducing your rent amount by -- to $564 from

21    900.  Is that right?

22        A.    For that month, yes.

23        Q.    I understand.

24            And that in the checks that follow from 2012
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 666 of 3246
Case 1:11-cv-01395-MGC Document 20-6 Filed 09/05/19 Page 91 of
164

Confidential - Subject to further Confidentiality Review

1    going backward in the exhibit, you can see that they

2    are for $900?

3         A.   Yes.

4         Q.   Is that right?

5              And the $900 amount was consistent throughout

6    this time period from 2012 through 2015?

7         A.   For the entire time period, yes.

8         Q.   Okay.  And you were able to make all of your

9    payments for rent during that time?

10        A.   Yes.

11        Q.   And are you aware of any other checks or

12   receipts that reflect your alternative living

13   expenses from that period from April 2012 through

14   September 2015 that you are seeking damages for in

15   this lawsuit?

16        A.   I have provided everything.

17        Q.   And does this exhibit reflect all of those

18   checks or invoices?

19        A.   Yes.

20        Q.   You would agree with me that you did not ever

21   remove all of the drywall from the walls inside of

22   your home, right; we discussed that earlier?

23        A.   Yes.

24        Q.   And you said earlier as well that you did not

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 667 of 3246
Case 1:14-cv-01492-MGC Document 2022 entered on FLSD Docket 11/12/09 Page 92 of
164
Confidential - Subject to Further Confidentiality Review

```
 1    ever get a quote for how much it would cost for

 2    someone to remove all of the drywall from the home?

 3         A.    Correct.

 4         Q.    Did you ever consider doing that?

 5         A.    Yes.

 6         Q.    Why did you not do it?

 7         A.    The costs that I saw on the Internet were

 8    prohibitive, and I did not have any -- the means to

 9    do so without financial help.

10         Q.    And if you wanted to remediate or repair the

11    home now, would you be able to do that?

12         A.    I no longer own the home.

13         Q.    Right.

14               So to your knowledge, has anyone removed the

15    Chinese drywall from the home?

16         A.    I don't know.

17         Q.    Have you ever been back to the home since it

18    was sold?

19         A.    Can you rephrase that?

20         Q.    Have you been back to the home on Butte

21    Street since it sold in 2015?

22         A.    I have been on the street, but not inside the

23    house.

24         Q.    Do you know anyone who has owned the home
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 668 of 3246
Case 1:11-cv-01408-MGC Document 123-2 Entered on FLSD Docket 11/21/2019 Page 93 of
164
Confidential - Subject to further Confidentiality Review

1    since?

2        A.    No.

3        Q.    And do you have any reason to believe that

4    the home has been remediated or repaired from the

5    Chinese drywall in it since you sold the house?

6        A.    I have no knowledge of that.

7        Q.    Now, it's correct that the home went through

8    a foreclosure.  Isn't that right?

9        A.    Yes.

10       Q.    And when did that occur?  Was it 2015?

11       A.    The final?

12       Q.    Yes.  The final foreclosure --

13       A.    It was September 2015.

14       Q.    September 2015.

15            Your mortgage lender was Fifth Third Bank.

16   Is that correct?

17       A.    Correct.

18       Q.    And you paid your mortgage from when you

19   moved into the home in 2008 until the last month,

20   which we just discussed, of April 2012.  Is that

21   right?

22       A.    Correct.

23       Q.    You never missed any payments during that

24   time?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 669 of 3246
Case 1:11-cv-01494-MGC Document 684 Filed September 11, 2019 Page 94 of 164

Confidential – Subject to further Confidentiality Review

1       A.    No missed payments.

2       Q.    What made you stop paying your mortgage in

3    May of 2012?

4       A.    We had a lawyer for that specific reason

5    advise us to stop paying because Fifth Third would

6    not talk to us in any means prior to missed payment.

7       Q.    And you wanted to seek relief from Fifth

8    Third Bank from your mortgage and your payments, is

9    that right; and you wanted to be able to speak with

10   them about receiving some kind of relief or help from

11   them on having to pay the mortgage payments on your

12   Butte Street home?

13      A.    Yes.  Either relief or help in additional

14   loan amounts.

15      Q.    Do you know if you sought a forbearance on

16   making payments on the mortgage?

17      A.    I'm unfamiliar with that term.

18      Q.    Do you know if you sought from Fifth Third

19   Bank to not have to pay them for the mortgage for

20   some period of time, a year or some period of time?

21   Do you know if you did that?

22      A.    I don't remember.

23      Q.    Okay.  Did you -- do you know if you sought

24   from Fifth Third Bank to reduce the amount of your

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 670 of 3246
Case 1:11-cv-01498-MGC Document... Filed... Document... Page 95 of 164
Confidential - Subject to Further Confidentiality Review

1   payments?

2       A.   I don't remember.

3       Q.   Did you ever explore the idea of trying to

4   sell the home?

5       A.   We sought mediation with Fifth Third, and

6   short sale had been mentioned and was listed.

7       Q.   The home was listed for short sale at some

8   time?

9       A.   For a short period of time.

10      Q.   Okay.  And what was the result of that?  Did

11  the home sell at short sale?

12      A.   No.

13      Q.   Do you know what period of time it was listed

14  for short sale?

15      A.   I don't remember.

16      Q.   Did you ever consider from 2008 through 2012

17  of selling your home?

18      A.   No.

19      Q.   Why is that?

20      A.   That's where we were going to live for the

21  foreseeable future for us.

22      Q.   After you moved out, did you ever talk to a

23  realtor about listing the home?

24      A.   Yes.

Confidential - Subject to further Confidentiality Review
164

```
 1        Q.    What happened with that?

 2        A.    That was our attempt at a short sale from the

 3   same listing agent that found us our rental property.

 4        Q.    Did you make any other attempts other than

 5   that short sale to list the home or discuss listing

 6   the home for sale?

 7        A.    No.

 8        Q.    How did you decide that you would not be able

 9   to pay your mortgage and pay for the rental each

10   month?

11        A.    I didn't make enough money to do that.

12        Q.    You budgeted and determined you wouldn't have

13   enough to be able to do both?

14        A.    Correct.

15        Q.    But when you stopped paying your mortgage,

16   you were able to afford paying for the rental?  Is

17   that right?

18        A.    Yes.

19        Q.    And you were able to make your bills

20   otherwise, other than paying the mortgage, once you

21   stopped paying the mortgage.  Is that right?

22        A.    Correct.

23        Q.    What adverse effects did you have as a result

24   of stopping paying your mortgage on your finances?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 672 of 3246
Case 1:11-cv-01408-MGC Document 202 Entered on FLSD Docket 11/08/2019 Page 497 of
164
Confidential - Subject to Further Confidentiality Review

```
1    Were there any adverse effects to your finances or

2    your credit as a result of not being able to pay your

3    mortgage?

4        A.   My credit was damaged by this long-term.  I

5    was also eventually put into a position where the

6    only way we could see out was through bankruptcy.  I

7    had no other previous debts or other debts that were

8    reflecting on my credit other than the house itself.

9    And long-term my credit is still affected:  I still

10   can't buy a house; I still have a couple years on

11   that; and the bankruptcy itself took several years of

12   time.

13       Q.   Do you know what your credit score was or any

14   of the credit scores that are available to you from

15   different bureaus before the foreclosure?

16       A.   I don't remember.

17       Q.   Okay.  Do you know what it is now?

18       A.   700s.

19       Q.   And you said that you still have a couple of

20   years left on that, I think is what you said a second

21   ago, to not be able to buy a house?

22       A.   Yes.

23       Q.   What did you mean by that?

24       A.   We finished our bankruptcy early because we
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 673 of 3246
Case 1:11-cv-22408-MGC Document 204 Entered on FLSD Docket 11/20/13 Page 98 of 164
Confidential - Subject to Further Confidentiality Review

 1    had only a student loan on the file for that left;

 2    everything else had been paid.  And we have

 3    approached Suncoast Credit Union, and they said it

 4    will be two years after your bankruptcy has been

 5    removed before they will even consider us for a new

 6    mortgage.

 7        Q.   Have you spoken with anyone other than

 8    Suncoast Credit Union about that --

 9        A.   No.

10        Q.   -- about a mortgage?

11        A.   No.

12        Q.   Whose student loans are you talking about

13    when you say that there's student loan debt?  Is that

14    yours or your wife's?

15        A.   Mine.

16        Q.   Yours?

17             And what was that student loan for?  What

18    education were you receiving when you took on that

19    student loan?

20        A.   Master's degree.

21        Q.   Okay.  A master's degree in what?

22        A.   Internet marketing.

23        Q.   Where did you get that degree from or pursue

24    that degree from?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 674 of 3246
Case 1:11-cv-22408-MGC Document [illegible] Entered on FLSD Docket 11/21/03 Page 99 of
164
Confidential - Subject to Further Confidentiality Review

```
1       A.    Full Sail University.

2       Q.    Did you receive a degree?

3       A.    Yes.

4       Q.    And when did you do that?  What year?

5       A.    I don't remember.

6       Q.    Was it before you bought the house?

7       A.    No.  No.

8       Q.    Okay.  Was it while you were living in the

9    house that you were going to school?

10      A.    I was in school during the time that we lived

11   in the house and after we had moved out.

12      Q.    Okay.  So you received your degree probably

13   sometime after 2012?

14      A.    Yes.

15      Q.    Do you remember how much debt you took on

16   through that student loan?

17      A.    I don't remember.

18      Q.    Do you remember when you started going to

19   school?  Would it have been -- it would have been

20   sometime, you were saying, between 2008 and 2012 when

21   you were living in the home on Butte Street?

22      A.    I would say summer of 2010.

23      Q.    Did you have any other student loan debt

24   before the student loan debt associated with that
```

Confidential - Subject to Further Confidentiality Review

```
 1    master's degree?

 2         A.    No.

 3         Q.    Had you ever taken on a loan before that

 4    student loan in your life?

 5         A.    The mortgage and my car.  That's it.

 6         Q.    What car loan did you have?

 7         A.    When?

 8         Q.    Let's see.  What was the first car loan that

 9    you had?

10         A.    It would be my wife's Corolla, Toyota

11    Corolla.

12         Q.    Do you remember when you bought that car?

13         A.    No.

14         Q.    Do you know what year the car is?

15         A.    No.

16         Q.    And what's the second car loan that you took

17    out?

18         A.    My wife's Prius.

19         Q.    Do you remember when you bought that car?

20         A.    After we sold the first one.

21         Q.    Okay.  And so you sold the first one to buy

22    the second one.  Is that right?

23         A.    Traded in, correct.

24         Q.    Traded it in.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 676 of 3246
Case 1:14-md-02543-JMF Document 26 Filed 11/18/2019 Page 491 of 164
Confidential - Subject to Further Confidentiality Review

```
 1              And did you have the Corolla at the time that

 2      you lived at the Butte Street home?

 3      A.   Yes.

 4      Q.   Okay.  Did you have the Corolla when you

 5      moved into the Billings Street home?

 6      A.   No.

 7      Q.   Did you have the Prius when you were in the

 8      Billings Street home?

 9      A.   No, no.

10      Q.   Okay.  Did you have the Prius during the time

11      that you were in the Butte Street home?

12      A.   Yes.

13      Q.   Okay.  So what was the next car after the

14      Prius?

15      A.   The Camry.

16      Q.   Okay.  And when did you buy the Camry?

17      A.   Just prior to filing bankruptcy.

18      Q.   So would that have been in 2015?

19      A.   Yes.

20      Q.   Or maybe 2014, somewhere around there?

21      A.   Yes.

22      Q.   Do you have any other car loans or have had

23      any other car loans in the last decade or so?

24      A.   My Veloster Hyundai.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 677 of 3246 of
Case 1:11-cv-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 677 of 3246 of
164

Confidential - Subject to Further Confidentiality Review

1        Q.    Do you remember when you got that?

2        A.    That was after we moved into the Billings but

3    before the bankruptcy.

4        Q.    And did you have a car before that?

5        A.    Yes.  But it was not on a loan.

6        Q.    Okay.  Have you always had only two cars in

7    your family between you and your wife?

8        A.    I have a third vehicle.

9        Q.    Okay.  Is that the car that was not on a

10   loan?

11       A.    Yes.

12       Q.    All right.  And you have had that car for how

13   many years?

14       A.    2004.

15       Q.    Does that car still work?

16       A.    Yes.

17       Q.    Was there a reason that you wanted to get an

18   additional car beyond that one?

19       A.    More of reason to not get rid of that one.

20   It's my grandfather's car, and it's very sentimental

21   to me.

22       Q.    Got it.

23            So you want to hold on to that car for

24   sentimental value, but you also wanted to have a

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 678 of 3246 of
Case 1:09-md-02047-EEF-JCW Document 264 Entered on FLSD Docket 08/13/2019 Page 103 of
164

```
1    newer one?  Is that right?

2         A.   Yeah.  The car was not a fuel-efficient

3    vehicle, and I needed something that was going to be

4    fuel-efficient.

5         Q.   How far do you drive for your commute to

6    work?

7         A.   Now or then?

8         Q.   Now.

9         A.   Now, about ten miles.

10        Q.   Okay.  And in the past when you were living

11   at Butte Street?

12        A.   About 45 miles each direction.

13        Q.   Okay.  And is that why you felt you needed a

14   fuel-efficient car --

15        A.   Yes.

16        Q.   -- because of that commute?

17        A.   Yes.

18        Q.   Do you feel the same need now that you have

19   been living at Billings Street and you are ten

20   minutes away?  Do you feel like you still do long

21   drives?

22        A.   I still do long drives occasionally for work.

23        Q.   And when is that?

24        A.   Twice a month to Tampa.
```

```
 1       Q.    Okay.   Is that going to, like, corporate

 2   headquarters or something like that?

 3       A.    Yes.

 4       Q.    All right.   Before we get into this document,

 5   I wanted to ask you about something that you said

 6   earlier about your credit.

 7            How, other than not being able to buy a home,

 8   has the effect on your credit impacted your life?

 9       A.    I've also not been able to take advantage of

10   any credit card programs that we have historically.

11   We would purchase most of our Christmas gifts with

12   points from using credit cards, and just the ability

13   to have an emergency credit card has disappeared

14   altogether.

15       Q.    When you have -- have you applied for credit

16   cards since filing for bankruptcy or since when you

17   stopped paying your mortgage?

18       A.    After the bankruptcy was expunged was the

19   first time we applied for new credit cards, because

20   we weren't allowed to have any credit cards or

21   additional debt during the term of the bankruptcy.

22       Q.    And do you now have credit cards?

23       A.    We have one.

24       Q.    Okay.   Have there been any other effects from
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 680 of 3246
Case 1:11-cv-03582-MHC-JPB Document Entered on FLSD Docket 01/13/2016 Page 495 of 164
Confidential - Subject to Further Confidentiality Review

```
 1    your credit being in the state that it was in after

 2    defaulting on your mortgage and the bankruptcy?

 3            MR. ALBANIS:  Object to the form.

 4            But you may answer.

 5            THE WITNESS:  We feel that we can't apply to

 6        live anywhere else other than the place that we

 7        got into before the bankruptcy and foreclosure

 8        started, so we have been at the same place, even

 9        if it isn't our dream house.

10    BY MR. LAWSON:

11        Q.   Have you enjoyed living at the home at

12    Billings Street?

13        A.   It's okay.

14        Q.   What don't you like about it?

15        A.   It's small.  It doesn't have a yard.  That's

16    the size of the property that we lived in before.  It

17    doesn't necessarily lend itself to having additional

18    people there beyond the couple of us.

19        Q.   I forgot to ask this before:  Do you have any

20    pets?

21        A.   Yes.

22        Q.   Did you have pets during the time that you

23    were living at Butte Street?

24        A.   Yes.
```

1    Q.    What pets?

2    A.    Two cats.

3    Q.    Did you notice anything different about the

4    cats or their health during the time that you were

5    living in the Butte Street home?

6    A.    Not at the time, but one of the cats has

7    recently being diagnosed by long-term respiratory

8    issues, and I don't know if it's related or not.

9    Q.    How old is that cat?

10   A.    Seven.

11   Q.    So you would have gotten that cat -- or

12   potentially around the last year or so that you lived

13   at the Butte Street home?

14   A.    That sounds correct.

15   Q.    What about the other cat?  How old is that

16   cat?

17   A.    Ten.

18   Q.    Okay.  So you would have had that cat during

19   most of the time that you lived at Butte Street?

20        (Defendants' Exhibit 10 was marked for

21   identification.)

22   BY MR. LAWSON:

23   Q.    All right.  I would like to turn your

24   attention to the exhibit that I have handed you.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 682 of 3246
Case 1:09-md-02047-EEF-MBN Document 264 Entered on FLSD Docket 05/13/2019 Page 107 of 164
Confidential — Subject to Further Confidentiality Review

```
1    This is Exhibit 10.  It's, on the front of the page,

2    titled Uniform Borrower Assistance.

3              Do you see that?

4    A.   Yes.

5    Q.   Do you recognize this document?

6    A.   Yes.

7    Q.   What is it?

8    A.   It's a request for help from Fifth Third.

9    Q.   Okay.  You mentioned earlier that you had

10   requested help from Fifth Third after you had stopped

11   paying for your mortgage.  Is that right?

12   A.   Yes.

13   Q.   And this is a form that you filled out

14   requesting help or assistance from Fifth Third?

15   A.   Yes.

16   Q.   And that is your name as a co-borrower on the

17   first page on the right side.  Is that right?

18   A.   Yes.

19   Q.   On the second page of this document, there's

20   a section called Hardship Affidavit.

21             Do you see that?  It's in the middle of the

22   page on the second page.

23   A.   Yes.

24   Q.   And that is listed as -- requests a written
```

Confidential - Subject to Further Confidentiality Review

1    explanation with this request describing the specific

2    nature of your hardship.  Is that right?

3        A.   Yes.

4        Q.   And you checked or your wife checked

5    "long-term or permanent hardship greater than

6    12 months."  Is that right?

7        A.   Yes.

8        Q.   And below -- or, excuse me, above that it

9    states:  "I am requesting review of my current

10   financial situation to determine whether I qualify

11   for temporary or permanent mortgage relief options.

12   Date hardship began is" -- and it's filled in to say

13   "March 17th, 2012."

14           Do you see that?

15       A.   Yes.

16       Q.   Is that your understanding of when the

17   hardship began, when you had the inspection that said

18   that there was Chinese drywall in your home?

19       A.   Yes.

20       Q.   And not before that, correct?  Just at the

21   time that you had Chinese drywall confirmed in your

22   home, the hardship began?

23       A.   That's my understanding.

24       Q.   Let's turn to the fourth page of this

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 684 of 3246
Case 2:14-cv-02722-EEF-JCW Document 26-1 Filed 08/17/2016 Page 109 of 164
Confidential - Subject to Further Confidentiality Review

```
 1    document, and it's listed as Page 9 at the bottom of

 2    it.  At the top of it it says, Number of People in

 3    Household and it's marked "two."

 4            Do you see that page?

 5    A.   Yes.

 6    Q.   There's a table here of income -- Monthly

 7    Income, excuse me, Monthly Household Expenses and

 8    Debt, and Household Assets.

 9            Do you see that table?

10    A.   Yes.

11    Q.   And it lists the monthly gross wages at the

12    time that you filled out this form as $4700.  Is that

13    right?

14    A.   Yes.

15    Q.   Now, is that a combination of your income and

16    your wife's income?

17    A.   Yes.

18    Q.   And those are your gross wages at that -- at

19    the time that you filled out this form?

20    A.   Yes.

21    Q.   Now, do you know when you filled out this

22    form?

23    A.   I don't remember.

24    Q.   If you look to the page that's marked at the
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 685 of 3246
Case 1:14-cv-02046-EED Document 284-1 Entered on FLSD Docket 08/13/2019 Page 490 of 164
Confidential - Subject to Further Confidentiality Review

```
 1    bottom as Page 12, do you see your signature on that

 2    page?

 3        A.    Yes.

 4        Q.    And do you see that it looks like you signed

 5    it on December 8th, 2013?

 6        A.    Yes.

 7        Q.    Okay.  So at that point you had been out of

 8    your home on Butte Street for a little less than two

 9    years; is that right?  A little over a year, about a

10    year and a half or a little bit more than that; is

11    that right?

12        A.    Yes.

13        Q.    Do you believe that it was around then in

14    December 2013 that you would have filled out all of

15    this and signed it?

16        A.    Yes.

17        Q.    All right.  So back in 2013 at the end of

18    that year, your monthly gross wages combined with

19    your wife was about $4700, correct?

20        A.    Yes.

21        Q.    And here you list in the second column

22    different monthly household expenses or debts; is

23    that right?

24        A.    Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 686 of 3246
Case 1:14-cv-02043-ELH Document 264 Filed 08/13/2019 Page 91 of 164
Confidential – Subject to Further Confidentiality Review

```
1        Q.    And the first one says First Mortgage

2   Payment.

3              Do you see that?

4        A.    Yes.

5        Q.    And that's listed as $1100.

6              Did I read that correctly?

7        A.    Yet.

8        Q.    So that reflects the amount that you are

9   paying per month for your mortgage on the Butte

10  Street home.  Is that correct?

11       A.    Correct.

12       Q.    So your mortgage payment with Fifth Third for

13  the Butte Street home was about $1100?

14       A.    Yes.

15       Q.    And that was per month?

16       A.    Yes.

17       Q.    But at this time in 2013 you were no longer

18  paying that, correct?

19       A.    Correct.

20       Q.    However, in the second line it lists a second

21  mortgage payment, but that appears to be written over

22  by something that says "rent."  And next to that item

23  it lists the amount of rent as $900.

24             Do you see that?
```

```
1       A.   Yes.

2       Q.   So that's the amount that you are paying for

3   rent for the Billings Street home, correct?

4       A.   Yes.

5       Q.   And we just went through a bunch of checks

6   showing that $900 amount per month that you were

7   paying for Billings Street?

8       A.   Yes.

9       Q.   It also shows renter's insurance on the next

10  line, is that right, for $31 a month?

11      A.   Yes.

12      Q.   Do you know if you were still continuing to

13  pay your homeowner's insurance at the Butte Street

14  home during that time?

15      A.   Fifth Third took care of all that for us.

16      Q.   That's right.  You said before that Fifth

17  Third Bank paid for the homeowner's insurance as part

18  of your mortgage payments.  Is that right?

19      A.   Correct.

20      Q.   There's also an item listed here for a car

21  payment or lease of $675.  Is that right?

22      A.   Yes.

23      Q.   And what is that car payment for?  Is that

24  just one car or multiple cars?
```

```
 1        A.    It was for multiple cars, but I don't
 2   remember which vehicles.
 3        Q.    Okay.  So this would have been in 2013.
 4              Do you know if your wife had the Corolla
 5   or --
 6        A.    It would have been my Veloster and her
 7   Corolla.
 8        Q.    Okay.  So do you think that's the combined
 9   amount across those two car payments, for $675?
10        A.    Yes.
11        Q.    Do you know if you would have been paying a
12   similar amount for your cars in the years prior to
13   that when you -- when your wife had her Prius, or at
14   that time did you not have your car when you lived at
15   Butte Street?
16        A.    At that time I didn't have my car, but she
17   paid more for the Prius.
18        Q.    Okay.  So the Prius cost more than what she
19   was paying for the Corolla, but did it cost more than
20   the $675 combined?
21        A.    I don't remember.
22        Q.    All right.  Do you know if it was a similar
23   amount to that $675?
24        A.    I don't remember.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 689 of 3246
Case 1:11-cv-00836-MC-DLB Document Entered on FLSD Docket 08/13/2014 Page 494 of
164
Confidential - Subject to Further Confidentiality Review

```
1        Q.   All right.  And you also have listed here

2    $301 a month for auto insurance.

3             Now, is that across the three vehicles that

4    you owned?  Do you know?

5        A.   I don't remember.

6        Q.   Do you have a sense of -- scratch that.

7             Have you paid for auto insurance on the older

8    vehicle that you own that was your grandfather's

9    vehicle throughout the length of time that you have

10   owned it?

11       A.   Yes.

12       Q.   And you have monthly food expenses listed as

13   a thousand dollars here as well.  Is that right?

14       A.   Yes.

15       Q.   There's also medical co-pays and monthly

16   expenses of $80 that are listed here.  Is that right?

17       A.   Yes.

18       Q.   And do you know what those monthly expenses

19   for medical were?  Are those prescription medicines?

20       A.   Primarily prescription medicines and regular

21   doctor's visits.

22       Q.   Okay.  And you mentioned that you take an

23   inhaler.  Is that right?

24       A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 690 of 3246
Case 1:11-cv-22408-FAM Document 264 Entered on FLSD Docket 08/13/2019 Page 495 of
164
Confidential – Subject to Further Confidentiality Review

```
1    Q.   There's water, sewer, utilities, and
2    telephone, correct, that's listed for $300?
3    A.   Yes.
4    Q.   Now, do you know if that is across both the
5    Butte Street property and the Billings Street
6    property?
7    A.   There is no water sewer in Lehigh Acres.
8    Q.   Right.  You were on a well.
9    A.   We were on a well.  So the utilities would be
10   for only the Billings, and the telephone would be
11   cellular, which is the same.
12   Q.   So you also have an item here for student
13   loans, and that shows an amount of $300.  Is that
14   right?
15   A.   Yes.
16   Q.   And that is the student loan payment for the
17   loan that you got for your master's degree, correct?
18   A.   Yes.
19   Q.   So you were paying $300 a month at this time
20   in 2013 for your student loans?
21   A.   Yes.  That would have been just after I
22   completed my coursework.
23   Q.   Okay.  So you had just started to pay for the
24   student loans at that time?
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    And do you know if that amount changed over

 3    time in the years that followed from 2013 from that

 4    $300 a month amount?

 5        A.    I don't know.

 6        Q.    So you wouldn't have been paying the student

 7    loan at the time that you stopped paying your

 8    mortgage in May of 2012.  Is that right?

 9        A.    Correct.

10        Q.    That wouldn't have been a part of your

11    monthly expenses?

12        A.    Not at the time of when we stopped paying the

13    mortgage.

14        Q.    Right.

15              So here, looking at this form, your total

16    gross listed is listed at $4700.  Is that right?

17        A.    Yes.

18        Q.    And your total household expenses and

19    payments is listed as $4,787, which is about $87 more

20    than what your total gross wages is, correct?

21        A.    Yes.

22        Q.    And there's also a Household Assets portion

23    of this table on the right-most column.

24              Do you see that?
```

Confidential – Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    And that lists $775 in your checking

 3   accounts.  Is that right?

 4        A.    Yes.

 5        Q.    And $1,045 in your savings account, correct?

 6        A.    Yes.

 7        Q.    So you gave all this information on this

 8   form, and you were requesting assistance from Fifth

 9   Third Bank, correct?

10        A.    Yes.

11        Q.    And do you remember what the result of that

12   request for assistance was?

13        A.    We didn't get assistance.

14        Q.    Do you remember when you were told that you

15   were not going to be receiving assistance from Fifth

16   Third Bank?

17        A.    I don't remember.

18        Q.    All right.  I would like to turn your

19   attention to the next page after this form, and it's

20   a hardship letter that is listed here on the page

21   that follows the borrower assistance form that we

22   just looked at.

23              Can you tell me what this letter is?

24        A.    It's us reaching out to Fifth Third telling
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 693 of 3246
Case 2:14-cv-02722-EEF-MBN Document 28-11 Entered on FLSD Docket 08/13/2019 Page 498 of
164

```
1    our exact circumstances and asking for their

2    assistance in any way possible to continue to live in

3    the house and to pay the mortgage as intended.

4         Q.   The next page shows another form, a form

5    1126, a Borrower Financial Information Form.

6              Do you see that?

7         A.   Yes.

8         Q.   And there's a Freddy Mac logo on the upper

9    left-hand side.

10             Do you see that?

11        A.   Yes.

12        Q.   What is this document?

13        A.   The Borrower Financial Information.

14        Q.   Do you know why you filled out this form?

15        A.   I don't remember.

16        Q.   Your name is on this form, correct?

17        A.   Yes.

18        Q.   Along with your wife's name?

19             Is that right, your wife's name is on this as

20   well?

21        A.   Yes.

22        Q.   At the -- on the first page of this Borrower

23   Financial Information Forms there's a field that is

24   called Involuntary Inability to Pay in the middle of
```

 1    the page.

 2          Do you see that?  It's in all caps in the

 3    center.

 4      A.   Yes.

 5      Q.   If you look down to the last line in that

 6    field, it says:  I want to, colon.  And then the box

 7    is checked for "sell the property."

 8          Do you see that?

 9      A.   Yes.

10      Q.   And if you look to the next page, the

11    document is signed at the bottom by both you and your

12    wife.  Is that right?

13      A.   Yes.

14      Q.   And this appears to be filled out on

15    December 8th of 2013.  Is that correct?

16      A.   Yes.

17      Q.   So at that time you expressed that you wanted

18    to sell the property.  Is that correct?

19      A.   Yes.

20      Q.   And you said that the attempt that you made

21    to do that was to speak to a realtor about a short

22    sale.  Is that right?

23      A.   Yes.

24      Q.   And that it was listed for short sale for

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 695 of 3246 of
Case 1:14-cv-24308-EDH Document 254 Entered on FLSD Docket 08/13/2019 Page 120 of
164
Confidential - Subject to Further Confidentiality Review

```
 1      some period of time?

 2          A.    Yes.

 3          Q.    But it did not sell, correct?

 4          A.    Correct.

 5          Q.    If you look at that second page of this form,

 6      there's again a table that shows monthly income and

 7      monthly expenses.

 8                Do you see that?

 9          A.    Yes.

10          Q.    And it's broken out across both your wife's

11      information and your information, correct?

12          A.    Yes.

13          Q.    And it shows your employer as T-Mobile for

14      two years.  Is that right?

15          A.    Yes.

16          Q.    And your wife's employer, is that Harris

17      Dermatology?

18          A.    Correct.

19          Q.    And she worked there for seven years.  Is

20      that right?

21          A.    Yes.

22          Q.    What does your wife do or what did she do at

23      Harris Dermatology?

24          A.    It's the medical field, so she's done a lot
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 696 of 3246
Case 1:11-cv-22408-MGC Document 269 Entered on FLSD Docket 08/13/2019 Page 421 of
164
Confidential - Subject to Further Confidentiality Review

```
 1    of things there.

 2         Q.   Okay.  Does she still work there today?

 3         A.   Yes.

 4         Q.   Now, this was filled out around the same time

 5    as the previous form that we looked at, the Borrower

 6    Assistance Form; both of them were in December of

 7    2013, I believe, correct?

 8         A.   Yes.

 9         Q.   This form has some -- excuse me, this table

10    that we were just looking at in the Freddie Mac form

11    has some additional information related to assets

12    that I wanted to ask you about; specifically, there's

13    a 401k that is listed for $38,000.

14              Do you see that?

15         A.   Yes.

16         Q.   And was that your 401k, or whose name was

17    that 401k in?

18         A.   I don't know.

19         Q.   Okay.  But at this time in 2013 it had

20    $38,000 in it, according to this form?

21         A.   Yes.  There's only one time that 401k is

22    listed.

23         Q.   Yes.

24              Looking down, there's a car that is listed as
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 697 of 3246
Case 1:09-md-02047-EEF-MBN Document 264 Entered on FLSD Docket 08/13/2019 Page 422 of
164
Confidential - Subject to Further Confidentiality Review

1    an asset for $2,000.  Do you see that in the bottom

2    right corner of the table?

3         A.   Yes.

4         Q.   Is that your older car that you have?

5         A.   Yes.

6         Q.   And I keep referring to it that way, but what

7    kind of car is it?

8         A.   Firebird.

9         Q.   It's a Pontiac Firebird?

10        A.   Correct.

11        Q.   And you put the estimated value of it at

12   $2,000.  Is that right?

13        A.   Yes.

14        Q.   Do you still own that car?

15        A.   Yes.

16        Q.   Did you continue to pay property taxes at the

17   home at Butte Street after you moved out of the home?

18        A.   Everything was set up with Fifth Third to

19   auto-draft.

20        Q.   All right.  So both the property taxes and

21   the homeowner's insurance were paid through Fifth

22   Third Bank through your mortgage payments.  Is that

23   right?

24        A.   Correct.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 698 of 3246
Case 1:14-cv-02403-TDC Document 264 Entered on FLSD Docket 08/14/2019 Page 123 of
164
Confidential – Subject to Further Confidentiality Review

 1       Q.   Did you have any changes to your salary or

 2    wages during the period of time from when you moved

 3    out of the house through the time that you filed for

 4    bankruptcy in 2015?  So from 2012 through 2015, was

 5    there any changes in your salary or wages in your job

 6    at T-Mobile?

 7            MR. ALBANIS:  Object to the form.

 8            But you may answer.

 9            THE WITNESS:  I didn't work for T-Mobile when

10       we left the house.

11    BY MR. LAWSON:

12       Q.   That's right.  You started working at

13    T-Mobile around 2013.  Is that right?

14       A.   Yes.

15       Q.   Because at the time that you filled out this

16    form in 2013, it said that you had been there for two

17    years, correct?

18       A.   Correct.

19       Q.   So, actually, you would have been there in

20    2011.  I'm sorry.  I'm doing my math wrong.

21            You would have been there -- according to

22    this, you would have been at T-Mobile for two years

23    as of the time you filled out in December of 2013.

24    Would that be correct?

```
1       A.    I started at T-Mobile in August of 2012.

2       Q.    Okay.  And where did you work before T-Mobile

3   when you came there in 2012?

4       A.    Burger King.

5       Q.    Burger King.  And how long were you there?

6       A.    About a year.

7       Q.    And did you have a job before that?

8       A.    Yes.

9       Q.    And where was that?

10      A.    Circuit City.

11      Q.    Okay.  And how long were you at Circuit City?

12      A.    Almost two years.

13      Q.    Okay.  And when did you start working at

14  Circuit City, if you can remember?

15      A.    I don't remember.  I can count backwards.

16      Q.    So during the time that you lived in the home

17  at Butte Street, what jobs did you have during that

18  period of time?

19      A.    I primarily worked for Circuit City, and then

20  they went out of business.  And that left me

21  unemployed for a length of time in which time we

22  continued to pay the mortgage, didn't miss any

23  payments, and then I got a job at Burger King.

24      Q.    Do you remember about when that was?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 700 of 3246
Case 2:11-cv-01077-EEF-DEK Document 234 Entered on FLSD Docket 08/13/2013 Page 125 of
164
Confidential - Subject to Further Confidentiality Review

```
 1        A.    Between 2008 and 2010.

 2        Q.    Okay.  So it was during the time that you

 3   lived at Butte Street between 2008 and 2010.  Your

 4   wife was consistently employed during that period of

 5   time.  Is that right?

 6        A.    Yes.

 7        Q.    And how were you able to continue to pay your

 8   mortgage payments while you were in search of a job?

 9        A.    Primarily based on her income, but

10   additionally, I was receiving unemployment because

11   the company went out of business, so I wasn't denied.

12   And that was during an economic downturn, so they

13   continued to extend my benefits because of the lack

14   of jobs available.

15        Q.    So you worked at Burger King for about how

16   long?

17        A.    A little over a year.

18        Q.    A little over a year.

19              And then you got the job at T-Mobile?

20        A.    My grandparents were murdered, and I took a

21   few months away to deal with that.  And when I went

22   back to Burger King, I couldn't walk in the building

23   without crying and just the memory of getting the

24   phone call in that building and having to deal with
```

1    that in the moment didn't allow me to continue

2    working there.  So I sought out another job that was

3    underneath my current position as a manager and

4    worked a part-time job with T-Mobile, because that

5    was about all I could handle monthly.

6         Q.   I'm sorry that you lost your grandparents

7    like that.

8         A.   Thank you.

9         Q.   So you started a part-time job at T-Mobile

10   but eventually became retail store manager?

11        A.   Store manager.

12        Q.   And about when did that happen when you

13   became retail store manager?

14        A.   March 2013, I would say.

15        Q.   Okay.  So it was --

16        A.   About six months after I started.

17        Q.   -- after the time that you had moved out of

18   the Butte Street home but before you had -- but

19   before these forms were filled out in December of

20   2013 that you started working --  that you got the

21   job as a retail store manager at T-Mobile, correct?

22        A.   I believe that's correct.

23        Q.   All right.  So during the period of time that

24   you were living at Butte Street, you had a few

```
1    different jobs.  The period of time where you were

2    working part time at T-Mobile, was that while you

3    were still living at Butte Street?

4        A.   No.  I was at Billings Street by then.

5        Q.   Okay.  So that would have been after March --

6    excuse me, that could have been after May of 2012.

7    And the period of time that you were working at

8    Burger King would have been while you were at Butte

9    Street still, correct?

10       A.   My time at Burger King would have ended

11   around June of 2012.

12       Q.   Okay.  And that was around the time same that

13   you stopped paying your mortgage as well, right?

14   That was May of 2012?

15       A.   That was a couple months after, yes.

16       Q.   Yes.

17            And do you know when you started part time at

18   T-Mobile?

19       A.   August 2012.

20       Q.   Okay.  So later that summer.

21            But there was obviously a lot of transition

22   going on in your employment in that period in 2012,

23   correct?

24       A.   There was one job different; not a lot.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 703 of 3246
Case 1:14-cv-20943-MGC Document 126-1 Entered on FLSD Docket 08/13/2019 Page 428 of
164
Confidential - Subject to Further Confidentiality Review

1     Q.    Well, you went from working at Burger King

2     to -- was there a period where you were not employed,

3     and then you were working part time at T-Mobile?

4     A.    For a about a month.

5     Q.    About a month?

6           If you go back a little bit further into this

7     document, you begin to see some T-Mobile statements,

8     earnings statements.

9           Do you see what I'm looking at?

10    A.    Yes.

11    Q.    All right.  Are these earnings statements

12    from your job at T-Mobile?

13    A.    Yes.

14    Q.    And it looks like on the first page of

15    T-Mobile earnings statements they are from November

16    of 2013.  Is that right?

17    A.    Yes.

18    Q.    And looking at this form, it looks like your

19    gross pay from T-Mobile during that period of time

20    from the period beginning of November 10th, 2013, to

21    November 23rd, 2013, was $2,731.23.

22          Does that look correct?

23    A.    Yes.  That includes commissionable pay.

24    Q.    Okay.  What do you mean by "commissionable

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 704 of 3246
Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 129 of
164

Confidential - Subject to Further Confidentiality Review

```
1    pay"?  Do you receive commission at your job?

2         A.    A portion is salaried and a portion is bonus.

3         Q.    Okay.  And then there's an amount that was

4    deposited to your account of $2,030.43 on this first

5    earnings statement, correct?

6         A.    Yes.

7         Q.    Now, does the amount of commission that you

8    receive vary greatly from month to month?

9         A.    It can.

10        Q.    What's the largest amount of commission that

11   you have received in a month, if you know?

12        A.    I don't know the largest.

13        Q.    What range does it usually vary from?

14        A.    It can vary by about $1,200.

15        Q.    Okay.  So what is an average or normal month

16   of commission that you receive from your job?

17        A.    That would be average, the first one there;

18   the 2700 would be average.

19        Q.    The 2700 in gross pay would be average?

20        A.    Yes.

21        Q.    All right.  If you go past those T-Mobile

22   earnings statements, there appears to be earnings

23   statements for your wife's job at Harris Dermatology.

24             Do you see those?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 705 of 3246
Case 1:11-cv-00620-MC-EDP Document 2654 Entered on FLSD Docket 05/13/2019 Page 490 of
164
Confidential - Subject to Further Confidentiality Review

```
1        A.    Yes.

2        Q.    And these appear to be earnings statements

3    from that same month in November 2013?

4        A.    Yes.

5        Q.    And that -- these appear to show gross

6    earnings -- excuse me, gross pay during that time of

7    $1,328.64.

8              Do you see that?

9        A.    Yes.

10       Q.    Do you know if your wife's earnings and pay

11   have -- or, excuse me, that they varied a lot during

12   that time period around 2012 and 2013, or were they

13   relatively stable?

14       A.    Relatively stable.

15       Q.    Has she earned about that much money per

16   paycheck month to month during the time that she's

17   worked there, or has it changed over time?

18       A.    It's been fairly similar the whole time.

19       Q.    Would you say that you're making -- that you

20   started to make more money once you worked as a

21   T-Mobile retail store manager than you had in the

22   previous positions in the previous jobs that you had?

23       A.    I made more money at Burger King.

24       Q.    You made more money at Burger King than at
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 706 of 3246
Case 1:09-md-02047-EEF-MBN Document 2643 Entered on FLSD Docket 03/13/2019 Page 131 of 164
Confidential - Subject to Further Confidentiality Review

1    T-Mobile?

2        A.    Yes.

3        Q.    What was your job at Burger King?

4        A.    Store manager.

5        Q.    Okay.

6        A.    General manager.  That's what it said.

7        Q.    So your pay reduced from the time that you

8    left your job at Burger King and worked at T-Mobile.

9    Is the that right?

10       A.    Yes.

11       Q.    You received less per month?

12       A.    Yes.

13       Q.    Do you know about how much less per month you

14   would often receive?

15       A.    A couple hundred dollars.  Not a lot.

16       Q.    The last page of this document -- excuse me,

17   the second to last page of this document appears to

18   be a Comcast receipt.

19             Do you see that?

20       A.    Yes.

21       Q.    And the total amount due on that is $79.08,

22   and it's from November 7th of 2013.

23             Do you see that on the page?

24       A.    Yes.

```
 1        Q.    Is this for your TV and Internet at the home

 2   at Billings Street?

 3        A.    Yes.

 4        Q.    And you'd agree with me that you are not

 5   pursuing your Comcast bills or any utility bills from

 6   the Billings Street home as alternative living

 7   expenses in this lawsuit, correct?

 8        A.    No.

 9              MR. ALBANIS:  Object to the form.

10              But you may answer.

11              THE WITNESS:  No.

12   BY MR. LAWSON:

13        Q.    All right.  You can set that aside.

14              MR. LAWSON:  We can go off the record.

15              (Recess from 10:30 until 10:53 a.m.)

16   BY MR. LAWSON:

17        Q.    Welcome back, Mr. Feldkamp.

18              I wanted to ask you a little bit more about

19   what was going on in your life around the time that

20   you moved out of the Butte Street home and moved into

21   the Billings Street home.

22              During that time, did you or your wife have

23   any major or unexpected medical bills that you were

24   paying?
```

```
 1        A.    I don't remember.

 2        Q.    Can you think of any time where you had large

 3   or unexpected medical bills that you had to pay or

 4   that your wife had to pay?

 5        A.    No.

 6        Q.    Do you remember if the amount that you were

 7   paying for your mortgage changed at all around 2012

 8   when you stopped paying for your mortgage payment?

 9        A.    I don't remember.

10        Q.    Did you make any investments of any kind in

11   2012 around the time that you stopped paying your

12   mortgage?

13        A.    No.

14        Q.    And can you think any other debts that you

15   had besides your student loans and your mortgage

16   around that time in 2012?

17        A.    Just the vehicle.

18        Q.    The car loan, right?

19              Anything other than that?

20        A.    No.

21              MR. ALBANIS:  For the record, the Feldkamps

22        filed for bankruptcy, as you well know.  Their

23        bankruptcy filings are a matter of public record,

24        which you could easily pull.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 709 of 3246
Case 1:14-cv-08892-LD-JW Document 26-4 Filed 03/12/2019 Page 494 of
164
Confidential - Subject to Further Confidentiality Review

```
 1              MR. LAWSON:  Absolutely.  And we will review

 2       those.

 3              (Defendants' Exhibit 11 was marked for

 4       identification.)

 5     BY MR. LAWSON:

 6       Q.   I have handed you a document that's been

 7     marked as Exhibit 11.

 8              Have you seen this document before?

 9       A.   Yes.

10       Q.   Do you know what it is?

11       A.   It's a lis pendens, but I don't remember what

12     that term means.

13       Q.   This was Fifth Third Bank filing this notice

14     with the court seeking to foreclose on the mortgage

15     on your home an Butte Street, correct?

16              MR. ALBANIS:  Object to the form.

17       Mr. Feldkamp is not an attorney, and this is a

18       legal document.

19              But you may answer, if you know.

20              THE WITNESS:  I don't know.

21     BY MR. LAWSON:

22       Q.   If you look to the first sentence on the

23     first paragraph in this document, it says:  Notice is

24     hereby given that an action has been instituted by
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 710 of 3246
Case 1:14-md-02047-EEF-MBN Document 22363-39 Filed 08/13/2019 Page 435 of
164
Confidential - Subject to Further Confidentiality Review

1   the above-named plaintiff seeking to foreclose on a

2   mortgage encumbering the following-described property

3   in the county indicated in the below description, to

4   wit.

5           Do you see that?

6   A.   Yes.

7   Q.   And if you look below the description of the

8   property, it says that it's also known as 5237 Butte

9   Street, Lehigh Acres, Florida.  Is that right?

10  A.   Yes.

11  Q.   So would you agree that this was a notice

12  that Fifth Third was seeking to foreclose on the

13  mortgage on your property?

14  A.   Yes.

15  Q.   And that occurred around September 21st of

16  2012.  Is that right?

17  A.   It says 18th.

18  Q.   I'm sorry.  I was looking at the file date.

19  You are correct.

20          On the date that is below with the signature

21  it says September 18th, 2012.  Isn't that right?

22  A.   Yes.

23  Q.   So that would have been about four months

24  after you had stopped paying the mortgage on the

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 711 of 3246
Case 1:14-cv-24245-MGC Document 264 Entered on FLSD Docket 08/13/2019 Page 496 of
164
Confidential - Subject to Further Confidentiality Review

```
 1    home.  Is that right?

 2         A.   Yes.

 3         Q.   And we just looked at your request for

 4    borrower's assistance for the home with Fifth Third

 5    from December of 2013 a little bit ago, right?

 6         A.   Yes.

 7         Q.   So you continued to have a discussion with

 8    Fifth Third Bank about getting assistance for

 9    repayment of your loan into 2013, correct?

10         A.   Yes.

11         Q.   And it's your recollection that the home did

12    not go into foreclosure until 2015, correct?

13         A.   Can you restate that?

14         Q.   The home was not sold in the foreclosure sale

15    until 2015.  Isn't that right?

16         A.   Correct.

17         Q.   You can set that aside.

18              (Defendants' Exhibit 12 was marked for

19    identification.)

20    BY MR. LAWSON:

21         Q.   You have been handed a document that has been

22    marked as Exhibit 12.

23              And have you ever seen this document before?

24         A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 712 of 3246
Case 1:14-cv-20847-FAM Document 26 Entered on FLSD Docket 08/14/2019 Page 497 of
164
Confidential - Subject to Further Confidentiality Review

```
 1        Q.   This is marked as a Final Judgment of

 2    Foreclosure, and it appears to have been filed on

 3    July 24th, 2015.

 4             Do you see that on the first page?

 5        A.   Yes.

 6        Q.   What is your understanding of what this

 7    document is?

 8             MR. ALBANIS:  Object to the form.

 9             But you may answer if you know, Mr. Feldkamp.

10             THE WITNESS:  It's the total amount that is

11        being foreclosed on from Fifth Third.

12    BY MR. LAWSON:

13        Q.   In the second paragraph on the first page of

14    this document it says Amounts Due and Owing, and it

15    states that:  Plaintiff, Fifth Third Mortgage Company

16    is due a principal of $118,705.34.

17             Do you see that?

18        A.   Yes.

19        Q.   It also lists some accrued interest from a

20    period of August 2008 through July of 2015.  Correct?

21        A.   Yes.

22        Q.   And that amount of accrued interest is

23    $26,708.80.  Is that right?

24        A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 713 of 3246
Case 1:14-cv-08030-EEF-MBN Document 204 Entered on FLSD Docket 03/14/2016 Page 138 of

Confidential - Subject to Further Confidentiality Review
164

```
 1        Q.    Now, along with some other taxes, fees, and

 2   insurance, the subtotal that is shown on the second

 3   page of the document appears to be $154,351.44.  Is

 4   that right?

 5        A.    Yes.

 6        Q.    And then the grand total after some

 7   additional costs that is listed on this document is

 8   $167,749.33.  Correct?

 9        A.    Yes.

10        Q.    So it's your understanding that this is the

11   amount that was owed to Fifth Third Bank at the time

12   of this filing in July 24th, 2015?

13        A.    Yes.

14        Q.    I'd like to turn your attention to the third

15   page of the document.  It's actually marked as Page 4

16   within -- at the bottom right corner.  There's a

17   Paragraph Number 5 that's marked as Sale of Property.

18              It states:  If the grand total sum with

19   interest at the rate described in Paragraph 3 and all

20   costs accrued subsequent to this judgment are not

21   paid, the clerk of this court shall sell the property

22   at electronic sale on September 24th, 2015, at 9 a.m.

23   to the highest bidder for cash.

24              Do you see that?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/10/19 Page 714 of 3246
Case 1:14-cv-02043-LDW-ARL Document 101-7 Filed 08/13/2019 Page 499 of 164

Confidential – Subject to Further Confidentiality Review

```
 1       A.   Yes.

 2       Q.   Now, is it your understanding that the house

 3   did sell in a foreclosure sale around that date of

 4   September 24th, 2015?

 5       A.   Yes.

 6       Q.   Do you know how much it sold for?

 7       A.   I do not.

 8       Q.   All right.  I'd like to go back to Exhibit 8

 9   that we looked at a little bit earlier; specifically,

10   I'd like to turn your attention to Page 4 in

11   Exhibit 8.

12            At the top of this page there's a question --

13   or, excuse me, there's a line that states:  If the

14   property was the subject of a foreclosure or short

15   sale, identify the following.

16            And it asks if it's a foreclosure or short

17   sale and it says "foreclosure."

18            Do you see that?

19       A.   Yes.

20       Q.   And the lender's name is listed as Fifth

21   Third Bank on the next line.

22            Do you see that?

23       A.   Yes.

24       Q.   The original loan or mortgage amount is
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 715 of 3246 of
Case 1:11-cv-22408-MGC Document 28-1 Entered on FLSD Docket 13/2017 Page 490 of
164
Confidential - Subject to Further Confidentiality Review

```
1    listed at $125,000.  Correct?

2         A.   Correct.

3         Q.   And if you look down a little bit further,

4    the date of the foreclosure is listed as

5    September 24th, 2016, correct?

6         A.   It's listed that, but that's the incorrect

7    date.

8         Q.   Right.

9              That was actually September 24th, 2015.

10        A.   Correct.

11        Q.   Isn't that right?

12             And that's the date that we see on the

13   Exhibit 12 that we were just looking at, of

14   September 24th, 2015, when the sale was supposed to

15   occur.  Is that right?

16        A.   Yes.

17        Q.   And then if you look at the price that is

18   listed, it's listed as a short sale price.  But I

19   want to ask you:  This amount of $102,700 is the

20   foreclosure sale price.  Is that right?

21        A.   Yes.

22        Q.   So the home, at foreclosure, sold for around

23   23,000 less -- 22,000 and a little bit of change less

24   than what you purchased it for originally in 2008.
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 716 of 3246
Case 1:09-md-02047-EEF-MBN Document 2836-1 Entered on FLSD Docket 03/13/2019 Page 141 of
164

Confidential - Subject to Further Confidentiality Review

```
1    Is that right?

2         A.   Yes.

3         Q.   Did you ever have anyone appraise the home

4    while you lived in it, the home on Butte Street?

5         A.   The only appraisal that was done was done by

6    Fifth Third when we started the mortgage.

7         Q.   Okay.  So you didn't pay for anyone to do an

8    appraisal after that?

9         A.   No.

10        Q.   How much -- did you know that the home

11   would -- did a realtor or anyone else tell you how

12   much you might be able to sell the home for at any

13   time when you owned it?

14        A.   No.

15        Q.   When you discussed a short sale, do you

16   remember how much the home was listed for?

17        A.   No.

18        Q.   After the home was sold at a foreclosure

19   sale, did Fifth Third Bank contact you and request

20   any additional money from you for the amount less

21   from the amount that you owed to them?

22        A.   No.

23        Q.   And why is that?

24        A.   I don't know.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 717 of 3246
Case 1:11-cv-22408-MGC Document 284 Entered on FLSD Docket 08/13/2013 Page 142 of
164
Confidential - Subject to Further Confidentiality Review

    1        Q.    You never received any correspondence from

    2    them asking for you to pay the amount left over

    3    between the amount you owed and the amount they were

    4    able to sell the house for in foreclosure?

    5        A.    All documentation was being provided to our

    6    lawyer by Fifth Third at that point.

    7        Q.    But you aren't aware of them seeking

    8    additional money from you since the foreclosure sale?

    9        A.    No.

   10        Q.    Do you know what damages you are seeking for

   11    the foreclosure of your property in this lawsuit?

   12            MR. ALBANIS:  Object to the form.

   13            But you may answer, if you can, Mr. Feldkamp.

   14            THE WITNESS:  I'm seeking compensation for

   15        rent, as well as for loss of use and enjoyment of

   16        the property.

   17    BY MR. LAWSON:

   18        Q.    Okay.  Beyond those two items, which we have

   19    discussed already, the rent that you paid for

   20    alternative living expenses and the loss of use and

   21    enjoyment of the property of Butte Street, is there

   22    any additional money that -- or costs that you are

   23    seeking reimbursement for related to the foreclosure

   24    specifically?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 718 of 3246
Case 2:14-cv-02046-EEF-DEK Document 26-7 Entered on FLSD Docket 08/13/2016 Page 483 of
164
Confidential - Subject to Further Confidentiality Review

```
 1          MR. ALBANIS:  Object to the form.

 2          But you may answer, if you can.

 3          THE WITNESS:  From what I understand, the

 4     judgment has a formula that, because we're the

 5     one that discovered the Chinese drywall and were

 6     living in the house at the time, that we are

 7     entitled to remediation costs as well.

 8  BY MR. LAWSON:

 9     Q.   Okay.  Now, with remediation, we discussed

10  earlier that you did not remediate or fix the home

11  removing the Chinese drywall, correct?

12     A.   Correct.

13          MR. ALBANIS:  Object to the form.

14          But you may answer.

15          THE WITNESS:  Had I had the finances to do

16     so, I would have liked to have.

17  BY MR. LAWSON:

18     Q.   But ultimately you did not pay anyone to do

19  that or perform the work yourself, correct?

20          MR. ALBANIS:  Object to the form.

21          THE WITNESS:  No.

22  BY MR. LAWSON:

23     Q.   So you don't have any receipts or invoices

24  showing the amounts that you paid to remediate the
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 719 of 3246
Case 1:11-cv-22408-MGC Document 26-1 Entered on FLSD Docket 03/13/2019 Page 494 of
164
Confidential - Subject to Further Confidentiality Review

```
 1    home.  Is that right?

 2        A.    No.

 3        Q.    And if you wanted to remediate the home

 4    today, you don't own the home any longer, correct?

 5            MR. ALBANIS:  Object to the form.

 6            And let me state a lengthier objection, which

 7        I have previously stated during the depositions

 8        this week, since it appears as though you may be

 9        delving into remediation damages at this time.

10            I would like to insert a rolling objection to

11        any and all questions related to remediation

12        damages.  As you well know, Judge Cooke put the

13        Amorin case in Florida on two tracks:  Number

14        one, the remediation track and number two, the

15        nonremediation track.

16            Furthermore, Judge Cooke on November 16,

17        2018, entered her order setting those two tracks

18        and adopting all of Judge Fallon's previous

19        rulings in the multidistrict litigation,

20        including his ruling where he stated that

21        previous homeowners who discovered the defective

22        Chinese drywall in their homes should be entitled

23        to remediation damages.

24            Mr. and Mrs. Feldkamp are presented to you
```

Confidential - Subject to Further Confidentiality Review

```
 1          today as priority claimants on the nonremediation

 2          track.  Therefore, they are here to answer

 3          questions about their nonremediation damages.

 4          They are not here to discuss their remediation

 5          damages.  Those will be dealt with by the special

 6          master and Judge Cooke separately on the

 7          remediation track.

 8              Having said all that, we will allow you to

 9          ask the questions that you would like to ask.

10          But that is a rolling objection to any and all

11          questions related to the remediation of the home

12          and remediation damages as it relates to the

13          Butte property.

14     BY MR. LAWSON:

15       Q.   After the foreclosure had been entered and

16     the foreclosure sale had occurred, you did not pay

17     any additional amounts of money to Fifth Third Bank

18     after that time; did you?

19       A.   No.

20       Q.   Did you pay any additional amounts for the

21     Butte Street home after the property was sold?

22       A.   No.

23       Q.   Around 2015 you filed for bankruptcy,

24     correct?
```

```
1        A.   Correct.

2        Q.   Do you know what bankruptcy chapter you filed

3   under when you filed for bankruptcy?

4        A.   I don't remember.

5        Q.   What led you to filing for bankruptcy?

6        A.   The fact that our home had Chinese drywall,

7   and we felt that we had no other option.

8        Q.   So this occurred before the foreclosure sale

9   had occurred in September of 2015, correct, that you

10  filed for bankruptcy?

11       A.   I don't remember.

12            (Defendants' Exhibit 13 was marked for

13  identification.)

14  BY MR. LAWSON:

15       Q.   You have been handed a document that has been

16  marked as Exhibit 13.  It is a United States

17  Bankruptcy Court of the Middle District of Florida

18  Voluntary Petition for Bankruptcy.

19            Do you see that?

20       A.   Yes.

21       Q.   And the name of the debtor at the top of the

22  document is you, Andrew Feldkamp, correct?

23       A.   Correct.

24       Q.   Along with your wife, Dawn Feldkamp.  Is that
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 722 of 3246
Case 1:14-cv-02047-EEF-MBN Document 263-39 Filed 11/19/19 Page 497 of 164
Confidential - Subject to Further Confidentiality Review

```
 1    right?

 2         A.    Yes.

 3         Q.    If you look at the file date at the top of

 4    this page, it appears to have been filed on

 5    January 8th of 2015.

 6               Do you see that?

 7         A.    Yes.

 8         Q.    Does that sound about right that you would

 9    have filed for bankruptcy initially around January of

10    2015?

11         A.    I don't understand the difference between

12    filing and having it actually be official.

13         Q.    Well, this voluntary petition appears to have

14    been filed around January 8th of 2015.  Is that

15    right?

16         A.    Yes.

17         Q.    Around that time, were there any debts or

18    amounts of money that you were finding yourself

19    unable to pay month to month?

20         A.    The mortgage.

21         Q.    Okay.  And you had not been paying the

22    mortgage since May of 2012.  Is that right?

23         A.    Yes.

24         Q.    And so at this time it had been almost three
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 723 of 3246 of
Case 1:14-cv-24169-EDW Document 26-1 Entered on FLSD Docket 08/13/2019 Page 498 of
164
Confidential - Subject to Further Confidentiality Review

1    years since you had paid the mortgage at the Butte

2    Street home, correct?

3        A.   Yes.

4        Q.   Do you know why you sought relief through

5    bankruptcy at that time in 2015 and filed this

6    voluntary petition?

7        A.   The potential debt that we would have from

8    the house.

9        Q.   You still owed money to Fifth Third Bank at

10   this time in January of 2015, correct?

11       A.   Yes.

12       Q.   The foreclosure sale had not yet occurred,

13   correct?

14       A.   Correct.

15       Q.   And you still had an amount that we just saw

16   around $167,000 at the time that Fifth Third filed

17   that court filing that they said that you owed to

18   them, correct?

19       A.   Yes.

20       Q.   And that included the principal on the

21   mortgage, as well as interest and other costs,

22   correct?

23       A.   Yes.

24       Q.   So it's your testimony that you filed for

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 724 of 3246
Case 1:14-cv-20945-MC Document 264 Entered on FLSD Docket 08/13/2019 Page 499 of
164
Confidential - Subject to Further Confidentiality Review

 1    bankruptcy to be able to help get relief from that

 2    amount of money that you owed from Fifth Third Bank?

 3         A.    Yes.

 4         Q.    Were there any other debts that you were

 5    seeking to get relief from at that time?

 6         A.    No.

 7         Q.    Were you able to pay your bills month to

 8    month at the time other than your mortgage, that you

 9    filed for this -- filed this voluntary petition in

10    January of 2015?

11         A.    Yes.

12         Q.    Would you say that your financial state was

13    better or worse than it had been in 2012 when you had

14    stopped paying your mortgage payments?

15              MR. ALBANIS:  Object to the form.

16              But you may answer, if you know.

17              THE WITNESS:  Worse.  Because we had

18         additional attorneys' fees that we were out for

19         both working with the foreclosure and potential

20         bankruptcy.

21    BY MR. LAWSON:

22         Q.    So you were paying attorneys in the

23    foreclosure case and also for this bankruptcy that

24    you had filed, correct?

Confidential - Subject to Further Confidentiality Review

```
 1      A.   Yes.

 2      Q.   And that was money that you were paying that

 3  you had not been paying back in 2012, correct?

 4      A.   Correct.

 5      Q.   I would like to turn your attention to the

 6  fourth page of this voluntary petition.  It's a

 7  summary of schedules.

 8           Do you see that?

 9      A.   Yes.

10      Q.   And this lists Schedules A through J, and it

11  has different assets and liabilities that are listed

12  in the table.

13           Do you see that?

14      A.   Yes.

15      Q.   And it lists your real property assets as

16  well as personal property assets in the column in the

17  left, correct?

18      A.   Yes.

19      Q.   And those total to $194,362.71.  Is that

20  right?

21      A.   Yes.

22      Q.   And then your liabilities total to an amount

23  of 222,816.93.  Is that right?

24      A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 726 of 3246
Case 1:14-cv-24035-EDM Document 28 Entered on FLSD Docket 08/13/2019 Page 491 of
164
Confidential - Subject to Further Confidentiality Review

 1      Q.   So your liabilities were greater than your

 2   assets, according to this summary of schedules.  Is

 3   that right?

 4      A.   Yes.

 5      Q.   And that amount included the real property

 6   that you owned at that time in the Butte Street

 7   property, correct?

 8      A.   Yes.

 9      Q.   That's the $97,905 in assets that are listed

10   under Schedule A of real property?

11      A.   Yes.

12           (Defendants' Exhibit 14 was marked for

13   identification.)

14   BY MR. LAWSON:

15      Q.   I have handed you a document that has been

16   marked as Exhibit 14.  It's titled Chapter 13

17   Standing Trustee's Final Report and Account.

18           Do you see that?

19      A.   Yes.

20      Q.   Do you see that in the first line it states

21   that the case was filed on January 8th of 2015.  Is

22   that right?

23      A.   Yes.

24      Q.   And then it goes on to state that your -- the

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 727 of 3246
Case 1:14-cv-24000-EEE-MBN Doc-Now 264 Entered on FLSD Docket 08/13/2019 Page 152 of
164

```
1    plan for the bankruptcy was confirmed on

2    September 15th of 2015, correct?

3       A.   Yes.

4       Q.   And it also states that there was a

5    modification of the plan on June 25th of 2018.  Is

6    that right?

7       A.   Yes.

8       Q.   And this filing occurred, if you look at the

9    top of the page, around September 26th of 2018.  Is

10   that right?

11      A.   Yes.

12      Q.   And is it your understanding that around that

13   time, earlier this year, your bankruptcy case was

14   finalized?

15           MR. ALBANIS:  Object to the form.

16           But you may answer, if you can, Mr. Feldkamp.

17           THE WITNESS:  Yes.

18   BY MR. LAWSON:

19      Q.   And what does that mean to you, that your

20   bankruptcy case has been finalized or terminated?

21      A.   I can begin to reestablish my credit and take

22   on additional debts, if the creditor would allow me.

23      Q.   What limitations did you have while your

24   bankruptcy case was pending over the last three
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 728 of 3246
Case 2:14-cv-02722-EEF-JCW Document 33-39 Filed 08/13/2019 Page 453 of 164
Confidential - Subject to further Confidentiality Review

```
 1    years?  Financially what were your limitations that

 2    were created by that bankruptcy filing?

 3        A.   We were unable to take on any kind of

 4    additional debt by rule of the bankruptcy, as well as

 5    we could not own any real property in our name.  We

 6    were not able to refinance anything or get an

 7    additional or new car loan, if need be.

 8        Q.   And what kind of relief did the bankruptcy

 9    give you?  Were there any debts that you no longer

10    have to pay?

11        A.   There was nothing that was forgiven.

12        Q.   Okay.  No debts were forgiven as a result of

13    this bankruptcy; is that right?

14        A.   The only thing that was part of the

15    bankruptcy at any point was my student loan.

16        Q.   Okay.  And you're continuing to pay your

17    student loan debt?

18        A.   Yes.

19        Q.   And do you know how much you pay a month for

20    that?

21        A.   I don't.

22        Q.   Okay.  Is than auto-debit from your account?

23        A.   Yes.

24        Q.   All right.
```

1     A.    It was originally part of the bankruptcy, and

2     the trustee in the case was the one that disbursed

3     those payments.

4     Q.    As a result of this bankruptcy, were any

5     debts discharged from Fifth Third Bank?

6     A.    They were given the opportunity to make claim

7     and never became part of our bankruptcy.

8     Q.    Okay.  So Fifth Third did not make a claim in

9     your bankruptcy for the amount that was still owed to

10    them after the foreclosure sale, correct?

11    A.    Correct.

12    Q.    So that was tens of thousands of dollars that

13    Fifth Third Bank could have pursued but did not.  Is

14    that right?

15    A.    They did not pursue them.

16    Q.    And now you do not owe them that money.  Is

17    that your understanding?

18    A.    From what I understand.

19    Q.    I wanted to ask you:  What costs or damages

20    are you seeking in this lawsuit related to your

21    bankruptcy?  Can you think of any?

22    A.    I don't know.

23    Q.    Are there any receipts or invoices related to

24    your bankruptcy that you have provided to your

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 730 of 3246
Case 1:14-cv-02722-MJG Document 264 Entered on FLSD Docket 08/13/2019 Page 155 of
164
Confidential – Subject to Further Confidentiality Review

```
 1    attorney that are associated with damages for that

 2    bankruptcy?

 3            MR. ALBANIS:  Object to the form.

 4            All documents that the Feldkamps have given

 5        to us, we have produced to the defendants.

 6            But you may answer, if you can.

 7            THE WITNESS:  I'm not claiming to get repaid

 8        for the bankruptcy lawyer, no.

 9    BY MR. LAWSON:

10        Q.   So from when you filed the voluntary petition

11    back in 2015 to now in 2018, would you say that your

12    financial situation is better or worse as a result of

13    having gone through bankruptcy?

14        A.   Worse.

15        Q.   Why is that?

16        A.   Because it damaged my credit history and

17    didn't allow me to gain any equity in any facet

18    whatsoever.

19        Q.   Do you wish that you wouldn't have gone

20    through bankruptcy?

21        A.   I don't have an opinion in my own head about

22    that.

23        Q.   But you think that it's made your financial

24    situation worse?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 731 of 3246
Case 1:14-cv-24803-FAM Document 26-1 Entered on FLSD Docket 08/13/2015 Page 496 of
164
Confidential - Subject to Further Confidentiality Review

```
 1       A.    Yes.

 2       Q.    I'd like to turn your attention back to the

 3   first page of this exhibit.  Under Item 10, there's

 4   an amount of unsecured claims discharged without full

 5   payment for $14,518.46.

 6             Do you see that?

 7       A.    Yes.

 8       Q.    Do you know what that amount that was

 9   discharged without full payment was?

10       A.    No.

11       Q.    Okay.  So there was some unsecured debt that

12   was discharged as a result of your bankruptcy.  Is

13   that right?

14       A.    I don't know.

15       Q.    Have you received any money from settlements

16   in Chinese drywall litigation since you hired a

17   lawyer for your Chinese drywall claims?

18       A.    Yes.

19       Q.    Do you know how much money you have received?

20       A.    Two checks:  One was for about $5800, and one

21   was for about $700.

22       Q.    And you received those around 2014 and

23   another one around 2018.  Is that right?

24       A.    That does not sound right.
```

1    Q.   Okay.  Let's go back to Exhibit 8;

2  specifically look at Page 5, under Section 6, Prior

3  Payments.

4         Do you see that?

5    A.   Yes.

6    Q.   There's a Banner Supply settlement where the

7  amount of payment received by you was $5,844.96.  Is

8  that right?

9    A.   Yes.

10   Q.   And then there was a GBI holdback payment for

11  $711.97.  Does that sound right?

12   A.   Yes.

13   Q.   Do you think you've received any other money

14  through settlement or any other payments related to

15  your Chinese drywall claims other than those two

16  checks?

17   A.   No.

18        MR. LAWSON:  Okay.  We can go off the record.

19        (Recess from 11:22 until 11:32 a.m.)

20  BY MR. LAWSON:

21   Q.   Mr. Feldkamp, I would like to go back to the

22  First Amended Interrogatory Responses that we looked

23  at earlier.  That is Exhibit Number 6.

24        And on the first page of that document we

Confidential - Subject to Further Confidentiality Review

1    have been looking at your answer to the first

2    interrogatory today.  Specifically, I wanted to ask

3    you about a couple of the types of damages that are

4    listed in that interrogatory.

5           You list that you are seeking damages for

6    lost equity in that answer.

7           Do you have a sense of what damages you are

8    seeking for lost equity in this lawsuit?

9           MR. ALBANIS:  Object to the form.

10          Loss of equity damages will be subject to

11     expert testimony.

12          But you may answer, if you know.

13          THE WITNESS:  I don't know.

14   BY MR. LAWSON:

15     Q.   And the same question for diminution in

16   value.  Do you know what values you are seeking for

17   that type of damage?

18          MR. ALBANIS:  Same objection.

19          But you can answer, if you know.

20          THE WITNESS:  I don't know.

21          MR. LAWSON:  Thank you for your testimony

22     today, Mr. Feldkamp.  I have no further questions

23     at this time.

24          THE WITNESS:  Thank you.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 734 of 3246
Case 2:14-cv-02722-MCE-DB Document 26-1 Filed 08/13/2019 Page 159 of 164
Confidential - Subject to Further Confidentiality Review

```
 1              MR. MOREN:  BNBM has no questions.

 2              MR. ALBANIS:  Give us a second, Keith and I.

 3              MR. LAWSON:  We can go off the record.

 4         (Recess from 11:33 until 11:33 a.m.)

 5              MR. ALBANIS:  We have no questions.  And we

 6      reserve signature, please.

 7         (Whereupon, the deposition concluded at

 8   11:38 a.m.)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 735 of 3246 of
Case 1:11-cv-22408-MGC Document 26-1 Entered on FLSD Docket 05/13/2019 Page 480 of
164
Confidential - Subject to Further Confidentiality Review

```
 1              C E R T I F I C A T E

 2

 3              I, KELLY J. LAWTON, Registered Professional

 4    Reporter, Licensed Court Reporter, and Certified

 5    Court Reporter, do hereby certify that, pursuant to

 6    notice, the deposition of ANDREW FELDKAMP was duly

 7    taken on December 13, 2018, at 8:08 a.m. before me.

 8              The said ANDREW FELDKAMP was duly sworn by

 9    me, through an interpreter, according to law to tell

10    the truth, the whole truth and nothing but the truth

11    and thereupon did testify as set forth in the above

12    transcript of testimony.  The testimony was taken

13    down stenographically by me.  I do further certify

14    that the above deposition is full, complete, and a

15    true record of all the testimony given by the said

16    witness.

17

18              _____

19              KELLY J. LAWTON, RPR, LCR, CCR

20

21              (The foregoing certification of this

22    transcript does not apply to any reproduction of the

23    same by any means, unless under the direct control

24    and/or supervision of the certifying reporter.)
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 736 of 3246
Case 1:09-md-02047-EEF-MBN Document 2635 Entered on FLSD Docket 03/20/2019 Page 481 of
164
Confidential - Subject to Further Confidentiality Review

```
 1                      INSTRUCTIONS TO WITNESS

 2

 3

 4          Please read your deposition over carefully

 5    and make any necessary corrections.  You should state

 6    the reason in the appropriate space on the errata

 7    sheet for any corrections that are made.

 8

 9          After doing so, please sign the errata sheet

10    and date it.  It will be attached to your deposition.

11

12          It is imperative that you return the original

13    errata sheet to the deposing attorney within thirty

14    (30) days of receipt of the deposition transcript by

15    you.  If you fail to do so, the deposition transcript

16    may be deemed to be accurate and may be used in

17    court.

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                    - - - - - -

 2                   E R R A T A

 3                    - - - - - -

 4    PAGE    LINE    CHANGE

 5    _____   _____   _____

 6       REASON: _____

 7    _____   _____   _____

 8       REASON: _____

 9    _____   _____   _____

10       REASON: _____

11    _____   _____   _____

12       REASON: _____

13    _____   _____   _____

14       REASON: _____

15    _____   _____   _____

16       REASON: _____

17    _____   _____   _____

18       REASON: _____

19    _____   _____   _____

20       REASON: _____

21    _____   _____   _____

22       REASON: _____

23    _____   _____   _____

24       REASON: _____
```

```
 1                    ACKNOWLEDGMENT OF DEPONENT

 2

 3          I, ANDREW FELDKAMP, do hereby acknowledge

 4    that I have read the foregoing pages, 1 to 163, and

 5    that the same is a correct transcription of the

 6    answers given by me to the questions therein

 7    propounded, except for the corrections or changes in

 8    form or substance, if any, noted in the attached

 9    Errata Sheet.

10

11

12    _____       _____

13    ANDREW FELDKAMP                                      DATE

14

15

16

17

18    Subscribed and sworn to before me this

19    _____ day of _____, 20____.

20    My Commission expires: _____

21

22    _____

      Notary Public

23

24
```

Confidential - Subject to Further Confidentiality Review

```
  1                        LAWYER'S NOTES

  2      PAGE    LINE

  3      _____   _____   _____

  4      _____   _____   _____

  5      _____   _____   _____

  6      _____   _____   _____

  7      _____   _____   _____

  8      _____   _____   _____

  9      _____   _____   _____

 10      _____   _____   _____

 11      _____   _____   _____

 12      _____   _____   _____

 13      _____   _____   _____

 14      _____   _____   _____

 15      _____   _____   _____

 16      _____   _____   _____

 17      _____   _____   _____

 18      _____   _____   _____

 19      _____   _____   _____

 20      _____   _____   _____

 21      _____   _____   _____

 22      _____   _____   _____

 23      _____   _____   _____

 24      _____   _____   _____
```

# EXHIBIT A8

Case 2:09-md-02047-EEF-MBN Document 22368-39 Filed 11/19/19 Page 741 of 3246
Case 1:11-cv-22408-MGC Document 29 Entered on FLSD Docket 08/13/2019 Page 2 of 32
Confidential - Subject to Further Confidentiality Review

```
 1                 UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
 2                 Case No. 1:11-CV-22408-MGC
 3      --------------------------------§
        EDUARDO AND CARMEN AMORIN et     §
 4      al., individually, and on behalf §
        of all others similarly          §
 5      situated,                        §
                                         §
 6         Plaintiffs,                   §
                                         §
 7      vs.                              §
                                         §
 8      TAISHAN GYPSUM CO., LTD. F/K/A    §
        SHANDONG THAIHE DONGXIN CO.,      §
 9      LTD.; TAIAN TAISHAN PLASTERBOARD  §
        CO., LTD., et al,                §
10                                       §
           Defendants.                   §
11      -------------------------------- §
          - - -
12
                                       - - -
13
                      THURSDAY, DECEMBER 13, 2018
14
                                       - - -
15
                   Confidential - Subject to Further
16                     Confidentiality Review
17                             - - -
18           Deposition of DAWN FELDKAMP, held at Morgan &
        Morgan, 12800 University Drive, Suite 600, Fort
19      Myers, Florida, commencing at 11:39 a.m., on the
        above date, before Kelly J. Lawton, Registered
20      Professional Reporter, Licensed Court Reporter,
        and Certified Court Reporter.
21
                                       - - -
22
                      GOLKOW LITIGATION SERVICES
23            877.370.3377 ph | 917.591.5672 fax
                      deps@golkow.com
24
```

Case 2:09-md-02047-EEF-MBN Document 22368-39 Filed 11/19/19 Page 742 of 3246
Case 1:11-cv-22408-MGC Document 52 Entered on FLSD Docket 08/13/2014 Page 49 of 32
Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2    MORGAN & MORGAN
      BY:  PANAGIOTIS "PETE" V. ALBANIS, ESQUIRE
 3    12800 University Drive, Suite 600
      Fort Myers, Florida 33907
 4    (239) 433-6880
      palbanis@forthepeople.com
 5    Representing Plaintiff
 6
      LEVIN, SEDRAN & BERMAN, LLP
 7    BY:  KEITH J. VERRIER, ESQUIRE
      510 Walnut Street, Suite 500
 8    Philadelphia, Pennsylvania 19106
      (215) 592-1500
 9    kverrier@lfsblaw.com
      Representing Plaintiff
10
11    ALSTON & BIRD, LLP
      BY:  MATTHEW D. LAWSON, ESQUIRE
12    BY:  METHAWEE MANUPIPATPONG, ESQUIRE
      BY:  LARA TUMEH, ESQUIRE
13    One Atlantic Center
      1201 West Peachtree Street
14    Atlanta, Georgia 30309
      (404) 881-7000
15    matt.lawson@alston.com
      mae.manupipatpong@alston.com
16    lara.tumeh@alston.com
      Representing Taishan Gypsum Co., Ltd. and Tai'an
17    Taishan Plasterboard, Co., Ltd.
18
      GORDON, ARATA, MONTGOMERY, BARNETT
19    BY:  ALEX B. ROTHENBERG, ESQUIRE
      201 St. Charles Avenue, 40th Floor
20    New Orleans, Louisiana 70170
      (504) 582-1111
21    arothenberg@gamb.law
      Representing BNBM PLC
22
23
24
```

Case 2:09-md-02047-EEF-MBN Document 22368-39 Filed 11/19/19 Page 743 of 3246
Case 1:11-cv-22408-MGC Document 28-4 Entered on FLSD Docket 08/13/2011 Page 4 of 32
Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES:

 2      ORRICK, HERRINGTON & SUTCLIFFE, LLP

        BY:  HARRY J. MOREN, ESQUIRE

 3      The Orrick Building

        405 Howard Street

 4      San Francisco, California 94105

        (415) 773-5619

 5      hmoren@orrick.com

        Representing BNBM PLC

 6

 7   ALSO PRESENT:

 8      Andrew Feldkamp

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                         - - -

                       I N D E X

 2                         - - -

 3    Testimony of:  DAWN FELDKAMP

 4        DIRECT EXAMINATION BY MR. LAWSON...............  5

 5        CROSS-EXAMINATION BY MR. MOREN................. 22

 6        CROSS-EXAMINATION BY MR. ALBANIS.............. 22

 7        RECROSS EXAMINATION BY MR. MOREN.............. 24

 8

 9

10                    E X H I B I T S

11        (Attached to transcript of Andrew Feldkamp)

12    DEFENDANTS'                                      PAGE

13    Exhibit 4    Comprehensive Building Consultants    12

                   Confidential Chinese Drywall

14                 Inspection Report

15    Exhibit 7    Air-Conditioning Invoices            25

16

17

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22368-39 Filed 11/19/19 Page 745 of 3246
Case 1:14-cv-24063-MGC Document 284 Entered on FLSD Docket 08/13/2019 Page 46 of 32
Confidential - Subject to Further Confidentiality Review

```
 1                        - - -

 2            THE COURT REPORTER:  Do you swear or affirm

 3       that the testimony you're about to give will be

 4       the truth, the whole truth, and nothing but the

 5       truth?

 6            THE WITNESS:  Yes.

 7            DAWN FELDKAMP, called as a witness by the

 8   Defendants, having been first duly sworn, testified

 9   as follows:

10                    DIRECT EXAMINATION

11   BY MR. LAWSON:

12       Q.    Good morning.

13       A.    Good morning.

14       Q.    Could you please state your name for the

15   record?

16       A.    Dawn Feldkamp.

17       Q.    Dawn, I wanted to thank you for coming in

18   today and for sitting through the first half of this

19   while your husband was speaking to me.  And I wanted

20   to ask you a few additional questions.

21            But first before we get started, I just

22   wanted to go over a couple of the different things

23   that we talked about with Andrew a second ago.

24            First, I wanted to make sure that you
```

Confidential - Subject to Further Confidentiality Review

```
1    understand that your testimony now is under oath,

2    that you're supposed to give truthful answers.

3             Do you understand that?

4    A.    Yes.

5    Q.    And as we're going through, everything is

6    going to be transcribed, as you know.  We'll just try

7    to make sure not to talk over each other and allow

8    each other to complete what we're saying before we

9    answer.  It usually can help to kind of have a pause

10   before you answer, and I'll pause before I ask a

11   question.

12            Does that make sense?

13   A.    Yes.

14   Q.    And like you've heard before, there may be

15   objections from your attorney.  Let him finish that

16   objection before you speak.  He may ask you or

17   instruct you not to answer the question, and -- but

18   if he does not, then I would ask you to answer my

19   question.  I can say it back to you if you don't

20   remember it.  But just let me know.

21   A.    Okay.

22   Q.    And let me know if you want me to clarify

23   anything or if you need to take a break at any time.

24   I'm happy to do either of those things.
```

```
 1              I would imagine that you met with your

 2     attorney at the same time that your husband said that

 3     he met with your attorney?

 4          A.   Yes.

 5          Q.   Okay.  And you reviewed documents as well

 6     before today's deposition?

 7          A.   Yes.

 8          Q.   You reviewed the same documents as your

 9     husband?

10          A.   Yes.

11          Q.   All right.  We talked a little bit about your

12     employment earlier.  But could you tell me where you

13     work, how long you've worked there, and what kind of

14     roles that you've had?

15          A.   I work at Harris Dermatology; I have been

16     there since 2006.  I started at the front desk and

17     then I moved into the lab and now I help with

18     administrative tasks.  Kind of jack of all trades, do

19     a little bit of everything.

20          Q.   Has your salary or -- changed over time since

21     you've been in those different roles working at

22     Harris Dermatology?

23          A.   Yes.

24          Q.   How has it changed over time?
```

Case 2:09-md-02047-EEF-MBN Document 22368-39 Filed 11/19/19 Page 748 of 3246
Case 1:16-cv-24060-EEF Document 2694 Entered on FLSD Docket 08/13/2018 Page 49 of 32
Confidential - Subject to Further Confidentiality Review

```
 1      A.   Probably two or three years ago they gave me

 2   a few dollars raise because I took on more in the lab

 3   and more -- stepped away from the front desk, which

 4   is a lower rate, pay rate.  So, yeah.

 5      Q.   So they pay you -- excuse me.  Go ahead.

 6      A.   Like, 2014, '15 they bumped me up a few

 7   dollars, so . . .

 8      Q.   They pay you hourly?

 9      A.   Yes.

10      Q.   And they increased it by a few dollars about

11   three or four years ago?

12      A.   Yes.

13      Q.   All right.  So I'm sorry if you said this a

14   second ago, but how long have you worked there?

15      A.   2006.

16      Q.   So about 12 years?

17      A.   Yeah.

18      Q.   All right.  And do you work there Monday

19   through Friday?

20      A.   Yes.

21      Q.   All right.  Have you ever participated in a

22   lawsuit before this one?

23      A.   No.

24      Q.   Okay.  Have you ever been deposed before?
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.    No.

 2        Q.    I wanted to ask you a little bit about your

 3   home on Butte Street.  We talked a little bit earlier

 4   about the -- about the fact that the home was built

 5   in 2006 and that you all bought it in 2008.  Are you

 6   aware of anybody who had lived in your home prior to

 7   when you moved in in 2008?

 8        A.    No.

 9        Q.    Do you know whether or not anyone lived in

10   the home before you lived in it?

11        A.    I don't know.

12        Q.    And when we talked about the contract that

13   you purchased the home under, an as-is contract, did

14   you know what that meant when you bought the home?

15        A.    I assumed it meant that maybe the carpets

16   needed replaced or the air conditioner needed a

17   little attention.  I didn't even imagine that the

18   walls would be poisonous or . . .

19        Q.    You didn't know that there was any issue with

20   the drywall in the home when you purchased it?

21        A.    It looked perfect.

22        Q.    So no, you didn't know that there was any

23   issue with the drywall?

24        A.    No.
```

Confidential - Subject to Further Confidentiality Review

1      Q.    Did you ever hear from anyone that you lived

2   around on Butte Street that they had issues with

3   Chinese drywall?

4      A.    No.

5      Q.    And when did you first suspect that there was

6   Chinese drywall in your home?

7      A.    About 2012 was when.

8      Q.    Your husband was talking earlier about the

9   feeling of being in denial about there being Chinese

10  drywall in the home.  Did you feel that way, or did

11  you feel more strongly that there was Chinese drywall

12  in the home in the years that you lived in it?

13     A.    I was -- I was in denial.

14     Q.    And what did that mean for you?  How -- how

15  were you in denial about it?

16     A.    I heard it on the news.  But then everything

17  seemed to be okay except for the air conditioner,

18  but -- so I figured that was just, you know, we just

19  needed a new air conditioner.

20     Q.    So the only issue that you were noticing at

21  the time that you were seeing Chinese drywall on the

22  news -- I think that we heard that was around 2009 or

23  2010.  Is that right?

24     A.    Correct.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 751 of 3246
Case 1:11-cv-22408-MGC Document 54-8 Entered on FLSD Docket 11/30/15 Page 42 of 32

Confidential - Subject to Further Confidentiality Review

1    Q.   The only issue that you were thinking about

2    in your home around that time that it was in the news

3    in 2009 or 2010 was that the air-conditioning was

4    having issues?

5    A.   Correct.

6    Q.   Right?

7         Otherwise, did you enjoy living in your home

8    during that time?

9    A.   I loved that house.

10   Q.   Do you miss living in it?

11   A.   Yes.

12   Q.   And during that time from 2008 to 2012, was

13   there any time where you did not enjoy living in the

14   home before you knew there was Chinese drywall in it?

15   A.   No.

16   Q.   You enjoyed it the entire time?

17   A.   Yes.

18   Q.   Was there anything that you could not do in

19   your home from 2008 to 2012 before you knew that

20   there was Chinese drywall that you wished you would

21   have been able to do?

22   A.   No.

23   Q.   Is there anything that your husband said a

24   little bit earlier during his deposition that you

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 752 of 3246
Case 2:14-cv-02722-MCE-DB Document 2048 Entered on FLSD Docket 11/10/15 Page 13 of 32
Confidential - Subject to Further Confidentiality Review

```
 1    want to correct or change that you knew that maybe he

 2    misspoke or that was inaccurate?

 3         A.    Just regarding anything?

 4         Q.    Yeah.  Anything that he said that you are

 5    like, oh, no, that's not right; it was different than

 6    that.

 7         A.    I was present during the inspection.

 8         Q.    Okay.

 9         A.    And they did not take core samples.

10         Q.    Okay.  Let's go to that exhibit.

11               That inspection report was Exhibit 4.  That's

12    the March 17th, 2012, inspection report that we

13    looked at a little bit earlier with your husband.  If

14    you can pull that out.

15               Do you have it in front of you?

16         A.    Yes.

17         Q.    All right.  And you were in the home during

18    this inspection.  Is that right?

19         A.    Yes.

20         Q.    Do you remember that day when the inspector

21    came to your house?

22         A.    Yes.

23         Q.    What do you remember about it?

24         A.    I was terrified.  I was so scared that he was
```

```
1    going to tell me what I think I already knew based on

2    the air-conditioning.  I remember he came in and he

3    looked around and he was shaking his head yeah and

4    taking pictures and confirmed it.

5        Q.   Do you remember ever having any electrical

6    issues in the house other than the issues with the

7    air-conditioning that we discussed earlier?

8        A.   No.

9        Q.   Did you ever see the corrosion that your

10   husband was talking about in the bathroom fixtures

11   and other places?

12       A.   Yes.

13       Q.   What did that look like?

14       A.   It looked kind of like rust from the well

15   water or . . .

16       Q.   So your husband had mentioned that he thought

17   that maybe it was related to the water --

18       A.   Yeah.

19       Q.   -- that maybe it was rusting.  And you felt

20   that way, too?

21       A.   Yes.

22       Q.   But you were later told it was corrosion from

23   the Chinese drywall.  Is that right?

24       A.   Yes.
```

Confidential - Subject to Further Confidentiality Review

```
1        Q.    Did you feel like you were embarrassed to

2    have people come over to your house?

3        A.    Yes.

4        Q.    And why was that?

5        A.    I felt like I was, like, duped and had, I

6    guess.  I was very ashamed that we took so long to,

7    like, find out about it, I guess, even though we

8    never really considered it.

9        Q.    And did you feel that way after this

10   March 17th inspection?  Is that what you're talking

11   about?

12       A.    Yeah.

13       Q.    Okay.  And that's when you felt embarrassed

14   to have people over after that inspection in March of

15   2012?

16       A.    Yeah.

17       Q.    So you said a second ago that there were no

18   samples taken during the inspection.  Is that right?

19       A.    Correct.

20       Q.    To your knowledge, were there ever samples of

21   drywall taken from your house?

22       A.    Not -- only what Andrew cut out that he took

23   pictures of.

24       Q.    And is it your recollection that those
```

1    samples of drywall were taken out and then put into

2    the garage?

3        A.    Correct.

4        Q.    But they weren't taken anywhere else, to your

5    knowledge?

6        A.    To my knowledge they were not.

7        Q.    All right.  Did you see those drywall samples

8    or sections that Andrew cut out of the wall?

9        A.    I did not.

10        Q.    Do you remember what kind of questions the

11    inspector asked you during the inspection?

12            MR. ALBANIS:  Object to the form.

13            But you may answer, if you know.

14            THE WITNESS:  I don't remember.

15    BY MR. LAWSON:

16        Q.    Do you remember if the inspector did ask you

17    questions?

18        A.    I don't remember.

19        Q.    You can set that aside.

20            Are you aware of any other receipts or

21    invoices for personal property expenses that you have

22    submitted to your lawyer that we didn't talk through

23    today?

24        A.    No.  I'm not aware of any.

Confidential - Subject to Further Confidentiality Review

1    Q.    And we looked at some air-conditioning

2    service receipts a little bit earlier with Andrew.

3    A.    Yeah.

4    Q.    Do you -- do you remember those services

5    being performed at your house?

6    A.    Yes.

7    Q.    Do you remember paying for those services?

8    A.    Yes.

9    Q.    We talked a little bit about the rent that

10   you paid at the Billings Street house from April of

11   2012 through September of 2015.  Do you remember

12   that?

13   A.    Yes.

14   Q.    And I talked about that with Andrew.

15         Was it your understanding that the rent was

16   $900 a month throughout that entire period?

17   A.    Yes.

18   Q.    And that you paid rent each month throughout

19   that entire period, correct?

20   A.    Yes.

21   Q.    And are you aware of any other alternative

22   living expenses that you are seeking in this lawsuit

23   other than the amount of rent that you paid during

24   those months from April 2012 through September 2015?

Confidential - Subject to Further Confidentiality Review

1    A.    No.

2    Q.    A second ago you corrected what your husband

3    had said about samples being taken during the

4    inspection report.

5        Can you think of any other things that were

6    discussed during his deposition that you disagreed

7    with or that you wanted to correct or that you had a

8    different memory of?

9    A.    No.

10    Q.    Do you remember why you and your husband

11    decided to stop paying your mortgage in May of 2012?

12    A.    When we found out the house had Chinese

13    drywall, we could not afford to fix it, and basically

14    the house was deemed worthless.  So we made the

15    decision to leave.

16    Q.    Do you remember if someone told you that the

17    house was worthless?

18    A.    Just the news stories.

19    Q.    Did you have the house appraised at any time

20    that you remember?

21    A.    No.

22    Q.    Your husband mentioned that the house was put

23    up for short sale for a brief period of time.  Do you

24    remember when that was?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 758 of 3246
Case 1:11-cv-02409-MGC Document 39-8 Entered on FLSD Docket 11/20/18 Page 49 of
32
Confidential - Subject to Further Confidentiality Review

```
1        A.   I don't remember.

2        Q.   Do you remember how much the house was listed

3    for?

4        A.   I don't remember.

5        Q.   Do you remember why you and your husband

6    filed for bankruptcy in 2015?

7        A.   Mostly to protect us from the debt from the

8    foreclosure that we were in default.

9        Q.   And I talked a little bit with Andrew about

10   how he felt about the bankruptcy now that it is over.

11            How do you feel about the bankruptcy now that

12   you've come to the end of that proceeding now in

13   2018?

14       A.   I feel like it was our only option at the

15   time, and I'm glad it's over.  But I'm -- still don't

16   like that it happened and that our credit was ruined,

17   and we're just, like, stuck in this place where we

18   can't buy a house, we can't have a credit card,

19   so . . .

20       Q.   Do you wish that you hadn't filed for

21   bankruptcy?

22       A.   No.  I don't think we had a choice.

23       Q.   What good do you think came from filing for

24   bankruptcy?
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.   We were able to insure that the bank did not

 2   come after us for the foreclosure deficiency.

 3        Q.   Was it stressful for you knowing that the

 4   bank could come back for that foreclosure deficiency

 5   and seek it from you after the foreclosure sale?

 6        A.   Extremely stressful.

 7        Q.   And to your knowledge, the bank never did

 8   come for that money, correct?

 9        A.   Correct.

10        Q.   And now as a result of the bankruptcy, they

11   cannot come after you for that amount.  Is that your

12   understanding?

13        A.   Yes.

14             MR. ALBANIS:  Object to the form.

15             But you may answer, if you know.

16             THE WITNESS:  That's my understanding.

17   BY MR. LAWSON:

18        Q.   So ultimately that was a positive effect of

19   the foreclosure -- excuse me, of the bankruptcy, that

20   you no longer feel stressed about the bank coming for

21   that money.  Is that right?

22             MR. ALBANIS:  Object to the form.

23             But you may answer.

24             THE WITNESS:  Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 760 of 3246
Case 1:14-cv-14490-MGET Document 289-1 Entered on FLSD Docket 11/20/19 Page 21 of
32
Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. LAWSON:

 2        Q.   Thinking back to your finances around 2012

 3    when you stopped paying your mortgage, were you able

 4    to pay your bills once you stopped paying your

 5    mortgage, your other bills outside of your mortgage?

 6        A.   Yes.

 7        Q.   Did you have any issues paying your bills

 8    around that time?

 9        A.   No.

10        Q.   And is that because the amount that you were

11    paying for your mortgage was more than what you ended

12    up paying for your rent at the Billings Street house?

13        A.   I don't understand.

14        Q.   Was the amount that you paid for your

15    mortgage more than what you paid for rent at the

16    Billings Street house?

17        A.   A little bit.

18        Q.   So that was more money that you had than

19    you -- when you were paying your monthly expenses

20    before and paying your mortgage, correct?

21        A.   Correct.  But we had attorney fees and -- for

22    the foreclosure.

23        Q.   The foreclosure proceeding started later on

24    after you stopped paying your mortgage.  Is that
```

Confidential - Subject to Further Confidentiality Review

```
 1    right?

 2        A.   Right.

 3        Q.   In 2015, later on, it was filed by the bank,

 4    correct?

 5        A.   Yes.

 6        Q.   And do you remember about how much a month

 7    you were paying for those attorney's fees that you

 8    just mentioned?

 9        A.   It varied depending on what happened that

10    month.  I don't remember.

11        Q.   Were you always able to pay those bills?

12        A.   We had to.

13        Q.   And did you?

14        A.   Yes, we did.

15             MR. LAWSON:  We can go off the record.

16             (Recess from 11:54 until 11:55 a.m.)

17    BY MR. LAWSON:

18        Q.   When you purchased your home at Butte Street

19    in 2008, do you remember how much money in a down

20    payment that you put down at that time?

21        A.   I don't remember.

22             MR. LAWSON:  I don't have any further

23        questions at this time.

24             MR. ROTHENBERG:  BNBM doesn't have any
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 762 of 3246
Case 1:11-cv-21408-MGC Document 149-8 Entered on FLSD Docket 11/20/2012 Page 43 of
32
Confidential - Subject to Further Confidentiality Review

1        questions at this time.

2             MR. MOREN:  So I just have a follow-up

3        question from what Mr. Lawson asked.

4                         CROSS-EXAMINATION

5   BY MR. MOREN:

6        Q.   When you purchased the house in 2008, do you

7   recall how much was the purchase price of the house?

8        A.   125,000.

9        Q.   And you took out a loan from the bank at that

10  time?

11       A.   Correct.

12       Q.   And do you remember how much was the amount

13  of the loan that you took out from the bank?

14       A.   It was around 125,000.  I do not believe we

15  had a very big down payment.

16            MR. MOREN:  Okay.  No further questions.

17            MR. ALBANIS:  I just have a couple quick

18       follow-ups.

19                         CROSS-EXAMINATION

20  BY MR. ALBANIS:

21       Q.   Could you take out Exhibit 4, please.

22            What is the date of the Confidential Chinese

23  Drywall Inspection Report that has been marked as

24  Exhibit 4?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 763 of 3246
Case 1:11-cv-01408-MGC Document 298 Entered on FLSD Docket 11/13/2013 Page 34 of
32
Confidential - Subject to Further Confidentiality Review

```
 1        A.    March 17th, 2012.

 2        Q.    And was that the date that Comprehensive

 3   Building Consultants inspected your home?

 4        A.    Yes.

 5        Q.    When did you first suspect that you had

 6   defective Chinese drywall in your home?

 7        A.    A few weeks before that when the

 8   air-conditioning person came and recommended we have

 9   it checked out.

10        Q.    Was March 17, 2012, the first time that it

11   was confirmed that you had defective Chinese drywall

12   in your home?

13        A.    Yes.

14        Q.    And you indicated that you were present for

15   the inspection that was conducted by Comprehensive

16   Building Consultants.  Is that correct?

17        A.    Correct.

18        Q.    Okay.

19              MR. ALBANIS:  Thank you.

20              No other questions.

21              MR. LAWSON:  Nothing further.

22              MR. ALBANIS:  We will reserve signature.

23              MR. VERRIER:  Are you guys all set?

24              MR. MOREN:  One question on follow-up.
```

```
 1                      RECROSS EXAMINATION

 2   BY MR. MOREN:

 3        Q.    When -- you had mentioned earlier that at the

 4   time of the March 17th inspection you had feared that

 5   the outcome of the inspection would be confirmation

 6   that you had Chinese drywall in your home.  Is that

 7   correct?

 8        A.    Correct.

 9        Q.    And what was that -- how -- how did you have

10   that fear?  What was that fear based on?

11        A.    When the air conditioner person came to look

12   at it and he told us that he suspected it.  It was a

13   couple -- it was, like, maybe two weeks before the

14   inspection.

15        Q.    Okay.  Thank you.

16              And you had mentioned earlier that you were

17   ashamed that you hadn't found -- that you hadn't

18   received confirmation of the Chinese drywall prior to

19   that time?

20        A.    Yes.

21        Q.    And why did you feel ashamed that you hadn't

22   found out about it earlier?

23        A.    I think once I really -- once I found out, I

24   thought back on the air conditioner, and thought I
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 765 of 3246
Case 1:11-cv-22408-MGC Document 648-1 Entered on FLSD Docket 11/30/15 Page 25 of 32
Confidential - Subject to Further Confidentiality Review

 1    should have known, I should have questioned the air

 2    conditioner coils being corroded.  I should have

 3    questioned it further, and I didn't.

 4        Q.   Those were some of the issues with the air

 5    conditioner dating back to 2008 or 2009?

 6        A.   I'm not -- can I look at the -- I'm not sure

 7    which . . .

 8             MR. MOREN:  Do you remember which exhibit

 9        that is?

10             MR. LAWSON:  It's Exhibit 7.

11             THE WITNESS:  So from 2011.

12    BY MR. MOREN:

13        Q.   So on the fifth page, that is dated from

14    2011.

15             And you said that it was related to some of

16    the issues with evaporator coil?

17        A.   Correct.

18        Q.   Will you turn to the third page of that

19    document.

20             And what was the date of that invoice

21    regarding issues with the evaporator coil?

22        A.   The third page?  I'm not sure what you mean

23    by your question.

24        Q.   Are you looking at Exhibit 7?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 766 of 3246
Case 1:11-cv-22408-MGC Document 608 Entered on FLSD Docket 11/29/19 Page 27 of 32
Confidential - Subject to Further Confidentiality Review

 1      A.   Yes.

 2      Q.   And what is the third page of that exhibit?

 3      A.   From -- from the 8/27/2009?

 4      Q.   Right.

 5      A.   They replaced the evaporator coil.

 6      Q.   Okay.  So that was the type of issue that you

 7   were ashamed about that you hadn't made --

 8      A.   And then when --

 9      Q.   -- hadn't received a confirmation?

10      A.   Yes.  And then when -- two years later, it

11   was already corroded again.  That's when I started

12   questioning it.

13           MR. MOREN:  Thank you.

14           No further questions.

15           MR. ALBANIS:  We'll reserve.

16           (Whereupon, the deposition concluded at

17   12:01 p.m.)

18

19

20

21

22

23

24

Confidential - Subject to Further Confidentiality Review

```
 1                   C E R T I F I C A T E

 2

 3          I, KELLY J. LAWTON, Registered Professional

 4    Reporter, Licensed Court Reporter, and Certified

 5    Court Reporter, do hereby certify that, pursuant to

 6    notice, the deposition of DAWN FELDKAMP was duly

 7    taken on December 13, 2018, at 11:38 a.m. before me.

 8          The said DAWN FELDKAMP was duly sworn by me,

 9    through an interpreter, according to law to tell the

10    truth, the whole truth and nothing but the truth and

11    thereupon did testify as set forth in the above

12    transcript of testimony.  The testimony was taken

13    down stenographically by me.  I do further certify

14    that the above deposition is full, complete, and a

15    true record of all the testimony given by the said

16    witness.

17

18          _____

19          KELLY J. LAWTON, RPR, LCR, CCR

20

21          (The foregoing certification of this

22    transcript does not apply to any reproduction of the

23    same by any means, unless under the direct control

24    and/or supervision of the certifying reporter.)
```

Confidential - Subject to Further Confidentiality Review

```
 1                      INSTRUCTIONS TO WITNESS

 2

 3

 4           Please read your deposition over carefully

 5      and make any necessary corrections.  You should state

 6      the reason in the appropriate space on the errata

 7      sheet for any corrections that are made.

 8

 9           After doing so, please sign the errata sheet

10      and date it.  It will be attached to your deposition.

11

12           It is imperative that you return the original

13      errata sheet to the deposing attorney within thirty

14      (30) days of receipt of the deposition transcript by

15      you.  If you fail to do so, the deposition transcript

16      may be deemed to be accurate and may be used in

17      court.

18

19

20

21

22

23

24
```

Confidential - Subject to further Confidentiality Review

```
 1                        - - - - - -

 2                         E R R A T A

 3                        - - - - - -

 4     PAGE    LINE    CHANGE

 5     _____   _____   _____

 6        REASON: _____

 7     _____   _____   _____

 8        REASON: _____

 9     _____   _____   _____

10        REASON: _____

11     _____   _____   _____

12        REASON: _____

13     _____   _____   _____

14        REASON: _____

15     _____   _____   _____

16        REASON: _____

17     _____   _____   _____

18        REASON: _____

19     _____   _____   _____

20        REASON: _____

21     _____   _____   _____

22        REASON: _____

23     _____   _____   _____

24        REASON: _____
```

```
 1                     ACKNOWLEDGMENT OF DEPONENT

 2

 3            I, DAWN FELDKAMP, do hereby acknowledge that

 4      I have read the foregoing pages, 1 to 31, and that

 5      the same is a correct transcription of the answers

 6      given by me to the questions therein propounded,

 7      except for the corrections or changes in form or

 8      substance, if any, noted in the attached Errata

 9      Sheet.

10

11

12      _____     _____

13      DAWN FELDKAMP                                     DATE

14

15

16

17

18      Subscribed and sworn to before me this

19      _____ day of _____, 20___.

20      My Commission expires: _____

21

22      _____

        Notary Public

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 771 of 3246
Case 1:11-cv-22408-MGC Document 8 Entered on FLSD Docket 11/28/11 Page 32 of
32
Confidential - Subject to Further Confidentiality Review

```
 1                          LAWYER'S NOTES

 2      PAGE    LINE

 3      _____   _____    _____

 4      _____   _____    _____

 5      _____   _____    _____

 6      _____   _____    _____

 7      _____   _____    _____

 8      _____   _____    _____

 9      _____   _____    _____

10      _____   _____    _____

11      _____   _____    _____

12      _____   _____    _____

13      _____   _____    _____

14      _____   _____    _____

15      _____   _____    _____

16      _____   _____    _____

17      _____   _____    _____

18      _____   _____    _____

19      _____   _____    _____

20      _____   _____    _____

21      _____   _____    _____

22      _____   _____    _____

23      _____   _____    _____

24      _____   _____    _____
```

# EXHIBIT A9

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2              Case No. 1:11-CV-22408-MGC
 3    -------------------------------§
      EDUARDO AND CARMEN AMORIN et    §
 4    al., individually, and on behalf §
      of all others similarly         §
 5    situated,                       §
                                      §
 6        Plaintiffs,                 §
                                      §
 7    vs.                             §
                                      §
 8    TAISHAN GYPSUM CO., LTD. F/K/A   §
      SHANDONG THAIHE DONGXIN CO.,     §
 9    LTD.; TAIAN TAISHAN PLASTERBOARD §
      CO., LTD., et al,               §
10                                    §
          Defendants.                 §
11    ------------------------------- §
       - - -
12
                               - - -
13
                    TUESDAY, JANUARY 8, 2019
14
                               - - -
15
               Confidential - Subject to Further
16                  Confidentiality Review
17                          - - -
18
            Deposition of WILLIAM FOSTER, held at Morgan
19      & Morgan, 12800 University Drive, Suite 600, Fort
        Myers, Florida, commencing at 1:03 p.m., on the
20      above date, before Kelly J. Lawton, Registered
        Professional Reporter, Licensed Court Reporter,
21      and Certified Court Reporter.
22                          - - -
23              GOLKOW LITIGATION SERVICES
           877.370.3377 ph | 917.591.5672 fax
24                  deps@golkow.com
```

Case 2:09-md-02047-EEF-MBN Document 22368-39 Filed 11/19/19 Page 374 of 3246
Case 1:11-cv-22408-MGC Document 90-4 Entered on FLSD Docket 08/13/2014 Page 40 of 40
Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2    MORGAN & MORGAN
      BY:  PANAGIOTIS "PETE" V. ALBANIS, ESQUIRE
 3    12800 University Drive, Suite 600
      Fort Myers, Florida 33907
 4    (239) 433-6880
      palbanis@forthepeople.com
 5    Representing Plaintiff
 6
      LEVIN, SEDRAN & BERMAN, LLP
 7    BY:  KEITH J. VERRIER, ESQUIRE (Via Telephone)
      510 Walnut Street, Suite 500
 8    Philadelphia, Pennsylvania 19106
      (215) 592-1500
 9    kverrier@lfsblaw.com
      Representing Plaintiff
10
11    ALSTON & BIRD, LLP
      BY:  ALIYYA Z. HAQUE, ESQUIRE
12    BY:  PATRICK H. HILL, ESQUIRE
      BY:  BOYKIN LUCAS, ESQUIRE
13    One Atlantic Center
      1201 West Peachtree Street
14    Atlanta, Georgia 30309
      (404) 881-7000
15    aliyya.haque@alston.com
      patrick.hill@alston.com
16    boykin.lucas@alston.com
      Representing Taishan Gypsum Co., Ltd. and Tai'an
17    Taishan Plasterboard, Co., Ltd.
18
      ORRICK, HERRINGTON & SUTCLIFFE, LLP
19    BY:  MARC ROBERT SHAPIRO, ESQUIRE
      51 West 52nd Street
20    New York, New York 10019
      (212) 506-3546
21    mrshapiro@orrick.com
      Representing BNBM PLC
22
23    ALSO PRESENT:
24    Vicki Foster
```

```
 1                        - - -

                     I N D E X

 2                        - - -

 3    Testimony of:  WILLIAM FOSTER
```

```
 4        DIRECT EXAMINATION BY MS. HAQUE................  4

 5        CROSS-EXAMINATION BY MR. ALBANIS..............  31

 6        REDIRECT EXAMINATION BY MS. HAQUE..............  33
```

```
 7

 8

 9                   E X H I B I T S

10            (Attached to Transcript)

11    DEFENDANTS'                                     PAGE
```

```
12    Exhibit 1    Housing and Utilities Accumulated   18

                   Due to Having to Return to Work

13                 Because of Unforeseen Costs

                   Stemming from Chinese Drywall -

14                 Bates Numbered F000783 to F000791

15    Exhibit 2    Receipts/Invoices - Re:             30

                   Alternative Living Expenses -

16                 Bates Numbered F000801 to F000904
```

```
17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                         - - -

 2            THE COURT REPORTER:  Sir, would you please

 3       raise your right hand.

 4            Do you swear or affirm that the testimony

 5       you're about to give will be the truth, the whole

 6       truth, and nothing but the truth?

 7            THE WITNESS:  I do.

 8            WILLIAM FOSTER, called as a witness by the

 9  Defendants, having been first duly sworn, testified

10  as follows:

11                    DIRECT EXAMINATION

12  BY MS. HAQUE:

13       Q.   Mr. Foster, good afternoon.

14       A.   Good afternoon.

15       Q.   Thank you for being here today.

16            You sat through your wife's deposition both

17  days, correct?

18       A.   Yes.

19       Q.   So just quickly, my name is Aliyya Haque.

20  I'm one of the attorneys representing Taishan Gypsum,

21  with my colleague here today, and I'm going to ask

22  you some follow-up questions related to your lawsuit

23  in this case.

24       A.   Okay.
```

1      Q.    First, have you ever been deposed before?

2      A.    No.

3      Q.    So as I said to your wife, just some basic

4    ground rules.  The court reporter is taking down all

5    your information.  So just please remember to give a

6    verbal response.

7           If you need to take a break at any time, just

8    let me know.  I will only ask that if I have a

9    question pending, that you go ahead and answer before

10   we take a break.

11     A.    Okay.

12     Q.    Are you taking any medication today that may

13   impair your ability to answer my questions?

14     A.    No, ma'am.

15     Q.    How many times did you meet with your

16   attorney to prepare for the deposition today?

17     A.    I think we met a couple times over the last

18   month or so.  I couldn't remember exact dates or --

19   it wasn't for very long.

20     Q.    Other than your wife and your attorney,

21   Mr. Albanis, was anyone else present at these

22   meetings?

23     A.    I don't recall at this point.  I think Pete

24   might have been at one, maybe not.

Case 2:09-md-02047-EEF-MBN Document 22368-39 Filed 11/19/19 Page 378 of 3246
Case 1:11-cv-22408-MGC Document 29 Entered on FLSD Docket 08/13/2019 Page 249 of 40
Confidential - Subject to Further Confidentiality Review

```
 1              MR. ALBANIS:  Keith.

 2              THE WITNESS:  Keith.  I'm sorry.  That's it.

 3     BY MS. HAQUE:

 4        Q.   Have you spoken with anyone else other than

 5     your wife and your attorneys regarding this claim?

 6        A.   Awhile back we spoke to one of our neighbors,

 7     Candy Gody, about it.

 8        Q.   And what did you talk about?

 9        A.   We talked about how it's been 12 years and

10     Taishan has done nothing and we're still waiting.  I

11     mean, that's kind of the gist of what it is.

12        Q.   And did you review any documents to prepare

13     for this deposition today?

14        A.   Well, the only thing that I have looked at

15     would be the things that we have prepared, and only

16     some of them.

17        Q.   And did you have any additional -- did you

18     bring any additional documents with you today?

19        A.   No, ma'am.

20        Q.   Okay.  Mr. Foster, what is your educational

21     background?

22        A.   I have a master's -- I have a bachelor in

23     industrial technology, and I have a master's in

24     industrial technology.
```

Case 2:09-md-02047-EEF-MBN Document 22368-39 Filed 11/19/19 Page 379 of 3246
Case 1:11-cv-22408-MGC Document 294-1 Entered on FLSD Docket 08/13/2013 Page 9 of 40
Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Are you currently employed?

 2        A.    I'm retired.

 3        Q.    Where were you employed prior to your

 4    retirement?

 5        A.    Ford Motor Company.

 6        Q.    And how long did you work for Ford Motor

 7    Company?

 8        A.    Before I retired the first time, I worked

 9    30 years.  And I retired in -- back in 2007, but I

10    have been back to work twice since then.

11        Q.    And when was the first time you went back to

12    work and how long was that?

13        A.    I went back in March of 2008.  We went back

14    to work.  We were starting -- we'd had problems in

15    the house, as my wife told you in her deposition.

16    She was getting sick.  I had an opportunity to go

17    back.  So I went back with the plan that we would

18    make some money and put it away because we didn't

19    know what was going on with the house and all these

20    issues.  So we had planned on me maybe working a few

21    months or so.  But she kept getting sicker.  We kept

22    having more problems go wrong.  By this time, we'd

23    been in the house over the years, so some of the

24    warranties were gone.  So we ended up deciding that I
```

Confidential - Subject to Further Confidentiality Review

```
 1    would stay.  So I went ahead and worked through 2008.

 2            2009, we assessed our situation again.  It

 3    was getting worse.  So I worked through 2009.

 4            In October of -- or, October of 2009, my wife

 5    moved out of the house.  So costs were only going to

 6    get more because we now had no rent to pay for the

 7    condo.  So we decided I'd work in 2010, and I worked

 8    until August of 2010 at that time.

 9            At that point, I decided -- we decided that I

10    would come home.  We were hoping, because in 2010,

11    Knauf was starting to remediate houses on our street,

12    so we were hoping and praying that Taishan would step

13    up and do the same thing.  So we were wanting to

14    start figuring how to get our stuff out of our house,

15    get it safe.  Just see -- just look at our whole

16    situation.  So I came home in 2010.

17            And then in early 2011, when we still were

18    hoping that Taishan was going to step up and do the

19    right thing and they didn't, so our neighbor down the

20    street, Jack Walsh, had his house remediated by

21    Knauf.  They'd put him up, took care of everything.

22    So since 2010 and 2011, he hadn't had to worry about

23    that.  He tried to sell his house, because his wife

24    refused to move back in there; she didn't want
```

 1    anything to do with the Chinese drywall stigma.  He

 2    couldn't sell it; he couldn't even get anybody to

 3    come look at it.

 4            So we came up with a plan to rent that house

 5    in July '11, at which point once we started renting

 6    that house, then we were able, within a few months or

 7    so, to get a renter in our place, make some money

 8    back from there.  And the more important thing was we

 9    were able to start trying to get some of our property

10    out of our house, try to clean it off, move it down

11    the street.  The problem was we could only put it in

12    the garage or out on a portion of the lanai that was

13    covered.

14            So that took months and months and months.

15    By the time we finally got that done, it was into

16    2012.  At that point we hired Polkow Construction to

17    remediate.  They started remediating.

18            In November of 2012, they still weren't done.

19    But we felt it was enough that we could move in and

20    still -- because we were trying to save some money.

21    Because, I mean, we were paying both places, right?

22    And I wanted to try to get the house completed,

23    because she had done been through enough hell before

24    I went back to work, because I knew I was going to

Confidential - Subject to Further Confidentiality Review

```
 1    have to go back to work because we were on death's

 2    end of money trying to pay the bills across the

 3    board.

 4          So then in -- we finally got the house

 5    completed around June of 2013, and I went back to

 6    work.  I went to Flat Rock, Michigan and worked for

 7    Ford doing some of the similar work that I did before

 8    that was in my expertise, and I worked there until

 9    the end of 2015.

10          And then January of 2016, I went to another

11    Ford plant.  So in reality, I was still employed by

12    Ford as a supplemental employee, because I had

13    already retired.  And I worked there in 2016 and '17.

14    And I left -- the last time I worked there was in

15    December of 2017.

16     Q.   Was this supplemental employee placement, was

17    that also in Flat Rock, Michigan?

18     A.   Yes.  It was actually from March of 2008 when

19    I went back to work, I was supplemental then, too,

20    because I had retired.  So I basically went back two

21    different -- two different retirements, I guess you

22    could say.

23     Q.   Let me ask you a couple follow-up questions

24    on that.
```

Case 2:00-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 783 of 3246
Case 1:11-cv-21489-MGC Document 249-9 Entered on FLSD Docket 11/11/2013 Page 42 of
40

Confidential - Subject to Further Confidentiality Review

```
1        A.    Okay.

2        Q.    Prior to your retirement from Ford Motor

3    Company, was that -- did you work in Florida, or did

4    you work in Michigan for Ford?

5        A.    We bought the house in Florida in February or

6    March of 2007.  I retired in -- and I worked in

7    Louisville, Kentucky until August 1st of 2007.  So

8    for that approximately six-month period, I was in

9    Kentucky; she was in Florida.

10       Q.    And then when you -- the first chunk of time

11   when you went back to work post-retirement, was that

12   in Louisville, Kentucky as well, 2008?

13       A.    In March of 2008, I was in Louisville,

14   Kentucky until August of 2010, yes, ma'am.

15       Q.    And then 2010 to 2013 you were in Florida?

16       A.    From -- I was in Florida from August of 2010

17   until June of 2013.

18       Q.    And then June of 2013 until December 2017,

19   you were in Flat Rock, Michigan?

20       A.    I was in Flat Rock, Michigan from June of

21   2013 through December of 2015.  And then I went back

22   to Louisville, Kentucky in 2016 and 2017 to work and

23   try to make some money to put back in our account for

24   all that we've spent for this.
```

Confidential - Subject to Further Confidentiality Review

```
 1        Q.    What was your job title prior to retirement?

 2        A.    I had many.

 3        Q.    I guess what was --

 4        A.    I can't exactly remember the last one.  I

 5   mean, sorry.

 6        Q.    No problem.

 7              When you went back to work in 2008, what was

 8   your job title and what were your duties in your

 9   profession?

10        A.    I was a manpower launch coordinator.  I

11   helped Ford Motor Company launch new products, and

12   the majority of it was spent -- I placed the people

13   and worked with the UAW to place people to get the

14   training done as quick as we could in the most

15   efficient way to get the product out at the cheapest

16   and best quality that we could safely.

17        Q.    And was that the same type of job that you

18   performed back when you -- I guess when you stopped

19   your second retirement and went back to work in June

20   of 2013?

21        A.    When I went back to work in June of 2013, I

22   did the same type work for approximately a year and a

23   half.  And then they asked me to help negotiate the

24   contract with the UAW, and I did that for one year.
```

```
 1    And then when I went back to Kentucky, Louisville, in

 2    2016, I did launches, manpower launch for them again.

 3         Q.   Got it.  Okay.

 4              Now, Mr. Foster, you're obviously married to

 5    Mrs. Foster.

 6         A.   Yes, ma'am.

 7         Q.   How long have you guys been married?

 8         A.   21 years.

 9         Q.   And do you have any children?

10         A.   Yes, we do.  She has two from a previous

11    marriage and I have one.

12         Q.   And Mrs. Foster testified to their names and

13    ages on the record.

14         A.   Yes.

15         Q.   Okay.  Other than this lawsuit, have you ever

16    participated in a lawsuit yourself?

17         A.   No, ma'am.

18         Q.   Now, Mr. Foster, you sat through both days of

19    your wife's deposition.  Is that right?

20         A.   Yes, ma'am.

21         Q.   Do you disagree with anything your wife

22    testified to?

23         A.   No, I don't disagree with anything.  I do

24    have a couple of items that I would like to clarify.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 786 of 3246
Case 1:11-cv-21404-MGC Document 289-9 entered on FLSD Docket 11/10/2014 Page 79 of
40
Confidential - Subject to Further Confidentiality Review

```
1        Q.   Please go ahead.

2        A.   You had asked her about during the

3    remediation process, did we have any renovations or

4    anything like that that we made, and she told you

5    about all of them that we had that was associated

6    with the remediation.  But we did put on a golf cart

7    garage.  We paid for.  I have all the check stubs to

8    prove that.  None of that cost went into anything to

9    do with remediation or property or any of that other

10   stuff.  So -- but that was added.

11            The second thing, you asked her about -- I'm

12   trying to remember the exact words, and I apologize

13   that I can't -- but you asked her about the loss of

14   use and enjoyment and how that -- how the presence of

15   Chinese drywall affected us for the loss of use and

16   enjoyment.

17            Well, as far as I'm concerned, when we moved

18   there in 2007, we didn't know it, but we had Chinese

19   drywall.  She had the health issues.  We had issues

20   with things going wrong that we had to fix.

21            It's currently 2019.  For 12 years now we've

22   been dealing with Chinese drywall.  We're in our 60s.

23   That's a sixth of our life we have had to deal with

24   Chinese drywall, and nothing's been done.
```

```
 1            We've been married 21 years.  Over 50 percent

 2    of our married life we have been dealing with Chinese

 3    drywall.

 4            Of the 21 years, almost seven years, or a

 5    third of our life, we have been separated.  We

 6    couldn't be together because I had to go somewhere

 7    and work to pay for Chinese drywall.

 8            And during this whole time, we had to sit

 9    there and watch what -- we moved stuff out of our

10    house to try to live somewhere and watch all of your

11    neighbors get -- not all of them, many of them,

12    excuse me -- get their house taken care of by Knauf

13    in 2010 and 2011.  And we went eight and nine years

14    with nothing being done for us.  And it's a travesty.

15    It's a travesty is what's happened.

16            And we sit here and we talk about how much

17    the remediation cost and how much the personal

18    property cost and how much the alternative living

19    was.  You can never give us back those years that you

20    have taken from us.  Those were supposed to be the

21    years that we were able to be together and enjoy our

22    life.  Both of us have a lot more medical issues now

23    because we're older; that's part of life.  But it's

24    getting harder and harder for us to do some things.
```

Confidential - Subject to Further Confidentiality Review

```
 1              And we're still not through this Chinese

 2     drywall thing.  So how much longer is it going to be?

 3     I don't know.

 4              But that, to me, tells the whole story.  The

 5     part of our life that we will never get back is worth

 6     a hell of a lot more -- excuse my language -- than

 7     the other cost all put together.

 8              So that, I wanted to add.

 9              The other thing you had asked her about --

10     and, again, I don't -- I can't recall all the --

11     excuse me.

12        Q.   We have more water right over there.

13        A.   Thank you.  I'll get that.

14              Thank you.

15              The other thing, in the previous deposition

16     that she gave, you had asked about -- and, again, I

17     can't remember all the exact words -- partial versus

18     full remediation.  And how we actually came across

19     that, through the Germano protocol, there was some

20     discussion about tiles need to be taken out.  And

21     once we seen that -- our tile wasn't taken out -- so

22     we got ahold of Pete, and we did tell him to change

23     that to partial, because we had those.  We had some

24     expensive light fixtures, as she has discussed, as
```

1    well as that center aisle that she talked about.  So

2    we did have some things that told us that should be

3    partial, instead of full.

4          And to the best of my recollection,

5    everything else that she covered was, at this minute,

6    accurate to the best of my recollection.

7       Q.   Thank you for that.

8          And I'm going to ask you some more questions

9    kind of hitting on -- I'm not going to go through the

10   entire thing as I did with your wife --

11      A.   Okay.

12      Q.   -- but hitting on some categories.  If at any

13   point something triggers in your mind, please just

14   let me know.

15      A.   Yes, ma'am.

16      Q.   Just to follow up on that, I just want to

17   clarify:  You are not claiming the golf cart garage

18   as part of anything at this point?

19      A.   No.  I just -- I just -- it's there; it

20   wasn't there, you know, back before the remediation,

21   because we did it after.  But I just wanted you to

22   know, because it -- I think you guys are coming to

23   the house.  So you are going to see it.

24      Q.   Sure.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 790 of 3246
Case 1:11-cv-22408-MGC Document 22-9 Entered on FLSD Docket 11/18/2019 Page 49 of
40

Confidential - Subject to Further Confidentiality Review

 1        A.   And if you remember the pictures before, it

 2   wasn't there.

 3        Q.   Got it.

 4        A.   So I thought it only the right thing to do,

 5   to let you know.

 6        Q.   Understood.  Thank you.

 7        A.   And we do have, like I said, the check stubs

 8   for that.

 9        Q.   Mr. Foster, I'm going to show you -- let's go

10   ahead and talk about specifically the alternative

11   living expenses.

12        A.   Yes, ma'am.

13        Q.   So I'm going to show you -- this is a

14   document that you put together.  Again, very helpful

15   for us.  So thank you for that.

16             Mr. Foster, I'm going to show you what's been

17   marked as Defense Exhibit Number 1.

18             (Defendants' Exhibit 1 was marked for

19   identification.)

20   BY MS. HAQUE:

21        Q.   Do you recognize this document?

22        A.   Yes, ma'am.

23        Q.   Did you put together this document?

24        A.   Yes, ma'am.

Confidential -- Subject to Further Confidentiality Review

```
 1        Q.   And, Mr. Foster, can you please state for the

 2   record what this document is?

 3        A.   It's a list of my housing and utilities that

 4   I accumulated stemming from when I had to go back to

 5   work to pay for the Chinese drywall and the Chinese

 6   drywall related issues.

 7        Q.   And you testified a little earlier today --

 8   do you want to take a moment?  Are you okay?

 9        A.   No, I'm okay.  Thank you.

10        Q.   You testified earlier today about the periods

11   of time in which you had to return to work following

12   your retirement.  Does this first page encompass all

13   of the years, months, and locations where you were

14   when you had to go back to work?

15        A.   Yes.  It appears it does.

16        Q.   Okay.  Now, when you made the decision to

17   return to work, what factor led you to go back to

18   Ford, and did you try to find a job in Florida?

19        A.   Well, as I explained earlier what my

20   expertise was, there's not many businesses where you

21   use that type of expertise, and there's nothing

22   around the Florida area of automotive-type jobs like

23   that.  So what would be natural is I went back to --

24   in Louisville, I had worked there.  I never worked in
```

```
1    Flat Rock, but I had worked at Ford.  So it was

2    logical that I go back there, because I knew what I

3    would do, and I knew that they would hire me back to

4    do that.

5        Q.   And can you just briefly explain what your

6    living arrangements were starting in 2008 --

7        A.   Yes, ma'am.

8        Q.   -- just for the record, please.

9        A.   In 2008, I stayed at -- we owned a house in

10   Louisville that was up for sale.  I stayed there all

11   of 2008.  I stayed there through 3/20 of 2009,

12   because we sold the house.  And at that time, I

13   stayed with my mom, my elderly mom, until I quit

14   working in 2010.  Even though it was further from

15   work than I wanted to be, I stayed with her to help

16   her, in 2010.

17            Do you want me to continue going where I

18   stayed?

19       Q.   Yes.  Please go ahead.

20       A.   Okay.  I'm sorry.

21       Q.   No, no, no.  Take your time.

22       A.   In 2013, when I went back to Flat Rock -- and

23   I think it's in here -- the first approximate week or

24   two, the first approximate week or two I stayed in a
```

Confidential -- Subject to Further Confidentiality Review

```
1    hotel while I was working.  And then I found a

2    co-worker who was -- who had an apartment, so I

3    rented his second bedroom.  And I stayed there

4    through the balance of 2013, 2014, and I stayed there

5    all of 2015.

6         But around the second quarter of 2015, he got

7    promoted away from there.  He got promoted away from

8    there, and because the apartment was in his name --

9    he knew I was working until the end of the year -- he

10   told me that I could just make the payments and then

11   pay him, you know, send the money to him for the

12   utility, which I did for the balance of that year.

13        Q.   Okay.

14        A.   Then in 2016, I rented a -- kind of an

15   apartment right around the corner from Ford.  It was

16   in a not desirable area, but it is what it is.  You

17   do what you have to do.  So I rented that apartment

18   for '16 and '17.  And that's where I stayed.

19        Q.   And then there were some average yearly

20   increases in the rental.  And that's just consistent

21   with the property manager?

22        A.   Yeah.  If you see going, you know, that's

23   what -- that's what that is in here.

24        And then in -- of course, in 2015, the last
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 794 of 3246
Case 1:11-cv-22408-MGC Document 9 Entered on FLSD Docket 11/18/2019 Page 93 of
40

Confidential - Subject to Further Confidentiality Review

1    part of 2015, it was more expensive because I had the

2    apartment by myself.

3        Q.    Got it.

4             Now, what other types -- in addition to the

5    rental and in addition to the utilities, what other

6    types of expenses did you incur?

7        A.    Well, I had, of course, my gas, my travel to

8    get there, back and forth to work because I didn't

9    plan that on there, which is not in here -- my food.

10   And you might think, well, you are going to eat

11   anyway.  Well, that is true to an extent.  But when

12   two of you are eating, usually you can make meals

13   cheaper than when you are buying them separately.  So

14   there's some money there.

15            When I lived in Flat Rock in 2013, I bought a

16   small TV for the apartment.  I bought a small

17   sweeper.  I had to buy a bed, a real cheap bed, that

18   by the time I left in '15, it was already broke down.

19   So some basic stuff like that.  Other than that, you

20   know, I lived as meek as I could, because I didn't

21   want to spend the money.

22            In 2016, when I went to the apartment, for

23   those two years, I took an old lounge chair from our

24   house.  And that lounge chair was my living room for

Confidential - Subject to Further Confidentiality Review

 1   two years.  I took the TV that I had bought up in --

 2   years earlier, I took it with me.  Other than that,

 3   from my home, I took plastic little shelves that you

 4   make that I put an old lamp on; I didn't even have a

 5   lamp shade for.  I mean, I lived as meek and as

 6   little as I could.  Some of that stuff is not even in

 7   here.  I mean, you know, I just put in this basically

 8   the rent and the utilities.

 9        Q.   And did Ford give you any type of move-in

10   writeoff or mileage writeoff or anything like that?

11        A.   No, ma'am.

12        Q.   What is the total amount that you are

13   claiming in alternative living expenses?  Do you

14   recall that total amount?

15             And we can bring it out.

16        A.   It's approximately 190,000, 180- to 190,000.

17   I have the sheet here still.

18        Q.   And this encompasses all of the charges --

19   or, all of the expenses that you came to calculate

20   that amount of $190,000?

21        A.   Yes, ma'am.  It's in that 190, yes.  This is

22   in that 190, yes.

23        Q.   Understood.  Okay.

24             Just a couple follow-up questions.

```
 1            You said you sold your house back in March of

 2     2009.  Do you recall how much the total price was for

 3     which you were able to get -- let me rephrase.

 4            How much did you sell the house for back in

 5     2009?

 6        A.    I bought the house for approximately 530, and

 7     I sold it for 480.  So I lost quite a bit.  And those

 8     are approximate.  It might have been 479-9.

 9        Q.    Got it.  Okay.

10            Was anyone living in the house at the time?

11     Did you have a tenant in the Louisville home?

12        A.    No.  In fact, what we had talked about doing

13     before I went back to work, because we were having

14     trouble selling it, was renting it.  But then once we

15     saw the costs start coming, we got a little nervous

16     about -- because we take care of ourself.  We

17     don't -- we're not going to go bankrupt; we're not

18     going to do that garbage.  So once we decided that I

19     was going to go back to work, that's why I made sure

20     I went back to Louisville, because I already had a

21     house there.  I'm going to pay some sum to live there

22     somewhere.

23            In fact, you know, that last year and a half

24     that I spent with my mom, I mean, if I had known I
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 797 of 3246
Case 1:14-cv-14049-MGET Document 289-9 Entered on FLSD Docket 11/21/2017 Page 45 of
40
Confidential - Subject to Further Confidentiality Review

```
 1    was going to be there three years, I wouldn't have

 2    lived with my mom.  I would have rented anyway to

 3    stay close to where I worked.

 4       Q.   Was there still a mortgage on the Louisville

 5    house at that time, or was it paid off?  Do you

 6    remember?

 7       A.   No, there was a mortgage.  And I do not

 8    remember the exact amount.

 9       Q.   Okay.  So essentially, you were still paying

10    the mortgage when you moved to Florida?

11       A.   Yes, ma'am.

12       Q.   Okay.  And so as a part of -- as a part of

13    the amount that you are claiming for alternative

14    living expenses in 2008 -- before you sold your home

15    in March of 2009, are you claiming the mortgage

16    payments as part of the alternative living expenses?

17       A.   That's in the total rent and utilities --

18       Q.   In the total rent and utilities.  Okay.

19       A.   -- that's on that -- under 2008.

20       Q.   Okay.

21       A.   And then 2009, there's more for that portion

22    of the year.

23       Q.   Did you receive any inquiries?

24            Let me back up.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 798 of 3246
Case 1:11-cv-01464-MGC Document 409-9 Entered on FLSD Docket 11/29/19 Page 47 of
40
Confidential - Subject to Further Confidentiality Review

```
 1              Was the house still up for sale at the time
 2     you were living there?
 3        A.   Yup.  I was even trying to have people come
 4     in and looking at it.  I just couldn't get it sold.
 5        Q.   Okay.  What had you been charging for rent on
 6     the Kentucky home?  Had you been charging anything?
 7        A.   I hadn't rented it out yet.
 8        Q.   Okay.
 9        A.   Remember, I left in August of 2007.  Okay?
10     So we had started talking about whether we were going
11     to do that, rent it or what we were going to do.  But
12     with all the issues she'd been having, that's when I
13     decided I was going to go back to work.  So it made
14     no sense to rent that out and then me rent another
15     place.
16        Q.   Right.  Okay.
17              Now, the house -- after the house was
18     remediated, were you involved at any point?  Did you
19     go back and check in?  And -- how -- I guess how
20     involved were you with the remediation process?
21        A.   Well, I was involved with my wife in the
22     remediation process.  I mean, I was there from two
23     thousand -- from August of 2010 until June of 2013.
24     So I was involved with her.  Again, because she had
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 799 of 3246
Case 1:11-cv-01408-MGC Document 204-9 Entered on FLSD Docket 11/30/11 Page 38 of 40
Confidential -- Subject to Further Confidentiality Review

 1    went through most of the issues leading up to that,

 2    she was probably more of a lead, you know, than me,

 3    because, you know, she had been the one that had been

 4    going through it.  But I was involved with some of

 5    the issues, yes.

 6        Q.   Okay.  The cell phone bill that you're

 7    claiming -- because you have some cell phone charges

 8    in here.

 9        A.   In this one?

10        Q.   Yes.  In this exhibit.

11             Did you have to get a new cell phone for

12    work, or was this your pre-existing cell phone?

13        A.   Prior to -- I'm trying to think of the date

14    again.  Prior to March of 2008, had I never owned a

15    cell phone, never.

16             When I was gone those six months before I

17    came home, I called her from the office phone.  I

18    called her from the home phone.  But when I went back

19    to work, I got a cell phone.

20             Today, I'm not working.  I don't have a cell

21    phone.  I never wanted one.  I didn't -- I just never

22    had one.

23        Q.   That is impressive.

24        A.   I don't know if it is or not, but I didn't

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 800 of 3246
Case 2:11-cv-01490-MCE-L Document 69-9 entered on FLSD Docket 11/16/09 Page 29 of
40
Confidential - Subject to Further Confidentiality Review

```
 1    have one.

 2         Q.   And then did you have -- let's see.

 3              A similar question to what I asked your wife

 4    is whether the TV and some of these items that could

 5    be considered personal property, are you considering

 6    or counting them as part of your alternative living

 7    expenses damages, or are you considering them as

 8    personal property damages?

 9         A.   In the -- in the alternative living, there is

10    approximately $60,000 for the condo, approximately

11    $20,000 for Jack Walsh's house, approximately $10,000

12    at the Chinese drywall house for things that you've

13    went through that she had the receipts for, and then

14    the balance is pretty much right here, the other

15    90,000 or so, give or take.  That's what designates

16    the alternative living at this point.

17         Q.   Okay.  Now, just a couple -- I think you can

18    go ahead and set this document aside.

19         A.   Okay.

20         Q.   Now, a couple questions that I had asked your

21    wife, I just want to sort of go over a couple things

22    with you as well.

23         A.   Sure.

24         Q.   When the house was built originally, did you
```

Confidential - Subject to Further Confidentiality Review

```
 1    ever see any of the drywall or anything before it was

 2    installed in the home?

 3         A.   No, ma'am.

 4         Q.   Did any -- did the original homebuilder ever

 5    give you any guarantees as to where the drywall came

 6    from?

 7         A.   No, ma'am.

 8         Q.   And the homebuilder never told you that he

 9    was or she was using international-sourced drywall?

10         A.   I don't recall any of that --

11              MR. ALBANIS:  Object to the form.

12              But you may answer, if you know the answer,

13         Mr. Foster.

14              THE WITNESS:  I don't recall.

15    BY MS. HAQUE:

16         Q.   Do you remember the total cost of the drywall

17    installation?

18         A.   Of just the drywall?

19         Q.   Uh-huh.

20         A.   No, I don't know the total cost of just the

21    drywall.

22         Q.   Okay.

23         A.   Are you talking about the whole remediation

24    or just the drywall?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 802 of 3246
Case 1:11-cv-21407-MGC Document 9 Entered on FLSD Docket 11/21/2011 Page 41 of
Confidential - Subject to Further Confidentiality Review
40

```
 1        Q.   No, no, no.  Back in the original home build.

 2        A.   Oh, no, I don't.  Sorry, I just wanted to

 3   make sure I understood.

 4        Q.   Absolutely.  No, please clarify if you don't

 5   understand any question I have asked.

 6             MS. HAQUE:  Okay.  Let's take a five-minute

 7        break.  And I don't have much left to ask you,

 8        Mr. Foster.  So I don't want to ask you anything

 9        unnecessarily.  So give me five minutes, and then

10        we can speed this up.

11             (Recess from 1:36 until 1:44 p.m.)

12   BY MS. HAQUE:

13        Q.   Mr. Foster, I just want to put on the record

14   another set of documents that you produced with

15   respect to your alternative living expenses.  And

16   that is going to be Exhibit 2 to your deposition.

17        A.   Okay.

18             (Defendants' Exhibit 2 was marked for

19   identification.)

20   BY MS. HAQUE:

21        Q.   Do you recognize this stack of documents?

22        A.   Yeah.  I think this -- I'm looking.  Give me

23   a minute, please.

24        Q.   Yeah.  Take as much time as you need.
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes, ma'am.

 2        Q.    And what is that stack of documents?

 3        A.    It's a copy of some of the costs that I

 4    incurred during my working period.

 5        Q.    And can we say that all of these receipts

 6    pertain to your alternative living expenses claim in

 7    this case?

 8        A.    Yes.

 9              MS. HAQUE:  We can go off the record for one

10       second.

11              (Discussion off the record.)

12              MS. HAQUE:  Mr. Foster, that is all I have

13       for you this afternoon.  Thank you very much for

14       coming down here.

15              And I pass the witness to Mr. Albanis.

16              MR. ALBANIS:  I just have a couple quick

17       follow-up questions.

18                        CROSS-EXAMINATION

19    BY MR. ALBANIS:

20        Q.    Mr. Foster, could you turn to Exhibit

21    Number 1 of Mrs. Foster's deposition from earlier

22    today, which would be Priority Claimant

23    Vicki Foster's Answers to Interrogatories.

24        A.    Okay.
```

Confidential - Subject to Further Confidentiality Review

 1      Q.    On the first page of the Answers to

 2   Interrogatories, Interrogatory Number 1 states:

 3   Identify all types of damages that you seek in this

 4   lawsuit (e.g., alternative living expenses,

 5   diminution in value, loss of use, enjoyment, et

 6   cetera) and specify amounts sought for each category.

 7          Do you see that interrogatory?

 8      A.    Yes, I do.

 9      Q.    Would you please read the first part of the

10   answer to Interrogatory Number 1 into the record,

11   just -- and when I say "first part of the answer," I

12   mean everything before the first comma.

13      A.    Okay.  It says:  We seek alternative living

14   expenses from October 2009 through November 2012 of

15   at least $190,727.01.

16      Q.    Thank you.

17          Is there any part about that statement that

18   you, now, sitting here today and having reviewed all

19   the documents, you would like to change?

20      A.    Yes.  The alternative living expenses, I

21   mean, we put October 2009 through November 2012 down

22   because that's when we were out of the house.  But

23   the expenses are, like, from March 2008 through

24   December of 2017.  But I thought that would be kind

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 805 of 3246
Case 1:14-cv-06428-MGC Document 64-9 Entered on FLSD Docket 11/20/19 Page 41 of
40
Confidential - Subject to Further Confidentiality Review

1    of misleading on the sheet; that's why I didn't put

2    it there.  But, I mean, that's what it should be is

3    from -- from when I first started working until I

4    finished working, because that's part of the 190,000.

5    So you are right, I did have that there.

6         Q.   Okay.  So essentially you are saying that the

7    dates of October 2009 through November of 2012 would

8    need to be changed?

9         A.   Yes, yes.

10        Q.   Would that same change apply to your own

11   answer to interrogatory?

12        A.   Yes, it would.

13        Q.   Thank you.

14             MR. ALBANIS:  That's all that I have.

15             MS. HAQUE:  And just to follow up on that.

16                      REDIRECT EXAMINATION

17   BY MS. HAQUE:

18        Q.   Mr. Foster, could you please work with your

19   attorney to provide us with an updated amended

20   version of this document that reflects the correct

21   information?

22        A.   Yes.

23             MS. HAQUE:  Great.  Thank you.

24             MR. ALBANIS:  Nothing further.  We will

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 806 of 3246
Case 1:14-cv-21484-MGC Document 69-1 Entered on FLSD Docket 11/20/19 Page 35 of 40
Confidential - Subject to Further Confidentiality Review

1          reserve signature.

2                   (Whereupon, the deposition concluded at

3      1:48 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Confidential - Subject to Further Confidentiality Review

```
 1                    C E R T I F I C A T E

 2

 3            I, KELLY J. LAWTON, Registered Professional

 4    Reporter, Licensed Court Reporter, and Certified

 5    Court Reporter, do hereby certify that, pursuant to

 6    notice, the deposition of WILLIAM FOSTER was duly

 7    taken on January 8, 2018, at 1:03 p.m. before me.

 8            The said WILLIAM FOSTER was duly sworn by me

 9    according to law to tell the truth, the whole truth

10    and nothing but the truth and thereupon did testify

11    as set forth in the above transcript of testimony.

12    The testimony was taken down stenographically by me.

13    I do further certify that the above deposition is

14    full, complete, and a true record of all the

15    testimony given by the said witness.

16

17    _____

18            KELLY J. LAWTON, RPR, LCR, CCR

19

20            (The foregoing certification of this

21    transcript does not apply to any reproduction of the

22    same by any means, unless under the direct control

23    and/or supervision of the certifying reporter.)

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 808 of 3246
Case 1:14-cv-14960-MGF Document 2023-9 Entered on FLSD Docket 05/11/2019 Page 47 of
40
Confidential - Subject to Further Confidentiality Review

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4           Please read your deposition over carefully

 5      and make any necessary corrections.  You should state

 6      the reason in the appropriate space on the errata

 7      sheet for any corrections that are made.

 8

 9           After doing so, please sign the errata sheet

10      and date it.  It will be attached to your deposition.

11

12           It is imperative that you return the original

13      errata sheet to the deposing attorney within thirty

14      (30) days of receipt of the deposition transcript by

15      you.  If you fail to do so, the deposition transcript

16      may be deemed to be accurate and may be used in

17      court.

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/18 Page 809 of 3246
Case 1:11-cv-11408-MGEL Document 49-1 Entered on FLSD Docket 11/16/09 Page 38 of
40
Confidential - Subject to Further Confidentiality Review

```
 1              - - - - - -

 2            E R R A T A

 3              - - - - - -

 4   PAGE    LINE    CHANGE

 5   ____    ____    _____

 6     REASON: _____

 7   ____    ____    _____

 8     REASON: _____

 9   ____    ____    _____

10     REASON: _____

11   ____    ____    _____

12     REASON: _____

13   ____    ____    _____

14     REASON: _____

15   ____    ____    _____

16     REASON: _____

17   ____    ____    _____

18     REASON: _____

19   ____    ____    _____

20     REASON: _____

21   ____    ____    _____

22     REASON: _____

23   ____    ____    _____

24     REASON: _____
```

Confidential - Subject to Further Confidentiality Review

1                    ACKNOWLEDGMENT OF DEPONENT

2

3           I, WILLIAM FOSTER, do hereby acknowledge that

4    I have read the foregoing pages, 1 to 39, and that

5    the same is a correct transcription of the answers

6    given by me to the questions therein propounded,

7    except for the corrections or changes in form or

8    substance, if any, noted in the attached Errata

9    Sheet.

10

11

12   _____     _____

13   WILLIAM FOSTER                                    DATE

14

15

16

17

18   Subscribed and sworn to before me this

19   _____ day of _____, 20___.

20   My Commission expires: _____

21

22   _____

     Notary Public

23

24

Confidential - Subject to Further Confidentiality Review

```
 1                        LAWYER'S NOTES

 2      PAGE    LINE

 3      _____   _____    _____

 4      _____   _____    _____

 5      _____   _____    _____

 6      _____   _____    _____

 7      _____   _____    _____

 8      _____   _____    _____

 9      _____   _____    _____

10      _____   _____    _____

11      _____   _____    _____

12      _____   _____    _____

13      _____   _____    _____

14      _____   _____    _____

15      _____   _____    _____

16      _____   _____    _____

17      _____   _____    _____

18      _____   _____    _____

19      _____   _____    _____

20      _____   _____    _____

21      _____   _____    _____

22      _____   _____    _____

23      _____   _____    _____

24      _____   _____    _____
```

# EXHIBIT A10

Case 2:09-md-02047-EEF-MBN  Document 22363-39  Filed 11/19/19  Page 813 of 3246
Case 1:11-cv-22408-MGC Document Entered on FLSD Docket 04/19/2019 Page 2 of
61
Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2               Case No. 1:11-CV-22408-MGC
 3    -------------------------------§
      EDUARDO AND CARMEN AMORIN et     §
 4    al., individually, and on behalf §
      of all others similarly          §
 5    situated,                        §
                                       §
 6       Plaintiffs,                   §
                                       §
 7    vs.                              §
                                       §
 8    TAISHAN GYPSUM CO., LTD. F/K/A    §
      SHANDONG THAIHE DONGXIN CO.,      §
 9    LTD.; TAIAN TAISHAN PLASTERBOARD §
      CO., LTD., et al,                 §
10                                      §
         Defendants.                    §
11    ------------------------------- §
        - - -
12
                                - - -
13
                    TUESDAY, JANUARY 8, 2019
14
                                - - -
15
             Confidential - Subject to Further
16                 Confidentiality Review
17                          - - -
18
            Deposition of VICKI FOSTER, held at Morgan &
19       Morgan, 12800 University Drive, Suite 600, Fort
         Myers, Florida, commencing at 11:32 a.m., on the
20       above date, before Kelly J. Lawton, Registered
         Professional Reporter, Licensed Court Reporter,
21       and Certified Court Reporter.
22                          - - -
23            GOLKOW LITIGATION SERVICES
         877.370.3377 ph | 917.591.5672 fax
24               deps@golkow.com
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:

 2    MORGAN & MORGAN
      BY:  PANAGIOTIS "PETE" V. ALBANIS, ESQUIRE
 3    12800 University Drive, Suite 600
      Fort Myers, Florida 33907
 4    (239) 433-6880
      palbanis@forthepeople.com
 5    Representing Plaintiff

 6
      LEVIN, SEDRAN & BERMAN, LLP
 7    BY:  KEITH J. VERRIER, ESQUIRE (Via Telephone)
      510 Walnut Street, Suite 500
 8    Philadelphia, Pennsylvania 19106
      (215) 592-1500
 9    kverrier@lfsblaw.com
      Representing Plaintiff

10

11    ALSTON & BIRD, LLP
      BY:  ALIYYA Z. HAQUE, ESQUIRE
12    BY:  PATRICK H. HILL, ESQUIRE
      BY:  BOYKIN LUCAS, ESQUIRE
13    One Atlantic Center
      1201 West Peachtree Street
14    Atlanta, Georgia 30309
      (404) 881-7000
15    aliyya.haque@alston.com
      patrick.hill@alston.com
16    boykin.lucas@alston.com
      Representing Taishan Gypsum Co., Ltd. and Tai'an
17    Taishan Plasterboard, Co., Ltd.

18
      ORRICK, HERRINGTON & SUTCLIFFE, LLP
19    BY:  MARC ROBERT SHAPIRO, ESQUIRE
      51 West 52nd Street
20    New York, New York 10019
      (212) 506-3546
21    mrshapiro@orrick.com
      Representing BNBM PLC

22

23    ALSO PRESENT:

24       William Foster
```

Confidential - Subject to Further Confidentiality Review

```
 1                         - - -
                     I N D E X
 2                         - - -
 3   Testimony of:  VICKI FOSTER
 4      DIRECT EXAMINATION BY MS. HAQUE................  4
 5
 6                  E X H I B I T S
 7             (Attached to Transcript)
 8   DEFENDANTS'                                       PAGE
 9   Exhibit 1   Priority Claimant Vicki Foster's       6
                 Answers to Interrogatories
10
     Exhibit 2   Foster, Vicki and William Damages      8
11               Spreadsheet - Personal Property
                 Damages
12
     Exhibit 3   Miscellaneous Claim Form Worksheet -  12
13               Bates Numbered 000076 to 000089
14   Exhibit 4   Receipts - Bates Numbered 00305 to    20
                 000425
15
     Exhibit 5   Receipts - Additional Items Replaced  21
16               When Cost-Effective - Bates Numbered
                 F000905 to F000915
17
     Exhibit 6   Receipts - Golf-Related Items -       32
18               Bates Numbered F000777 to F000782
19   Exhibit 7   Foster, Vicki and William Damages     33
                 Spreadsheet - Discarded but Not
20               Replaced
21   Exhibit 8   Foster, Vicki and William Damages     36
                 Spreadsheet - Items Wanting to be
22               Replaced
23   Exhibit 9   October 19, 2011 Polkow Construction  48
                 Chinese Drywall Remediation Proposal
24               - Bates Numbered 000090 to 000094
```

Confidential - Subject to Further Confidentiality Review

```
 1                    - - -

 2           THE COURT REPORTER:  Ma'am, would you please

 3      raise your right hand.

 4           Do you swear or affirm that the testimony

 5      you're about to give will be the truth, the whole

 6      truth, and nothing but the truth?

 7           THE WITNESS:  Yes, I do.

 8           VICKI FOSTER, called as a witness by the

 9  Defendants, having been first duly sworn, testified

10  as follows:

11                    DIRECT EXAMINATION

12  BY MS. HAQUE:

13      Q.   Mrs. Foster, can you please state your name

14  again for the record?

15      A.   Vicki Foster.

16      Q.   Thank you again for coming in for the second

17  day of your deposition.  We just have some additional

18  questions to ask you specifically related to personal

19  property and just some clean-up questions from last

20  time.

21           Just a reminder, the rules of the road

22  regarding the deposition, please give verbal

23  responses for the court reporter.  If you need to

24  take a break, just let me know.  We will try to take
```

Confidential - Subject to Further Confidentiality Review

```
1    a break every hour or so.

2              And we will go ahead and get started.

3         A.   Okay.

4         Q.   Are you taking any medications today that may

5    impair your ability to understand and answer my

6    questions?

7         A.   No.

8         Q.   Did you meet with your attorney to prepare

9    for this specific deposition?

10        A.   I just met with him briefly when we just got

11   here.

12        Q.   And how long did you meet, approximately?

13        A.   Five minutes, perhaps.

14        Q.   Did you review any additional documents to

15   prepare for this deposition here today?

16        A.   No.

17        Q.   Did you bring any documents to this

18   deposition?

19        A.   No.

20        Q.   And did you do anything else to prepare for

21   this deposition?

22        A.   No.  I looked at pictures, but that was it.

23        Q.   Mrs. Foster, for this deposition, you

24   prepared a series of spreadsheets.  Do you recall
```

```
 1    doing that?

 2        A.   Yes.

 3        Q.   First of all, thank you for doing that.  I

 4    know it probably wasn't fun to go through that

 5    process, but I promise you, it will make this

 6    deposition go a lot smoother.

 7             First I want to show you what we're going to

 8    mark as Exhibit 1 to your deposition.

 9             (Defendants' Exhibit 1 was marked for

10    identification.)

11    BY MS. HAQUE:

12        Q.   Have you seen that document before?

13        A.   Yes.

14        Q.   And what is that document?

15        A.   It is Priority Claimant Vicki Foster's

16    Answers to Interrogatories.

17        Q.   And do you recall signing this document?

18        A.   I have signed a lot of documents.

19        Q.   If you flip to the very back page.

20        A.   Yes, I did.

21        Q.   And you signed this on November 30th, 2018?

22        A.   Correct.

23        Q.   Can I turn your attention to Question

24    Number 1.  The question asks:  Identify all types of
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 819 of 3246
Case 11-cv-1149-MGEL Document 221-4 Filed 13 December 3, 2013 Page 8 of 61
Confidential - Subject to Further Confidentiality Review

1    damages that you seek in this lawsuit (e.g.,

2    alternative living expenses, diminution in value,

3    loss of use/enjoyment, et cetera) and specify amounts

4    sought for each category.

5         Do you mind reading the first sentence of

6    your response out loud?

7         A.   "We seek alternative living expenses from

8    October 2009 through November 2012 of at least

9    $190,727.01, personal property damage expenses of

10   $87,483.50, loss equity, diminution of value, loss of

11   use and enjoyment, punitive damages, and prejudgment

12   interest."

13        Q.   Mrs. Foster, are you still claiming personal

14   property damage expenses of at least $87,483.50?

15        A.   Yes.

16        Q.   Thank you.  You can go ahead and set that

17   down.

18        Mrs. Foster, have you filed any homeowner's

19   or other insurance policy claims for personal

20   property specifically?

21        A.   No.

22        Q.   Other than the personal property items that

23   you gave to your attorney -- and those are items that

24   we were able to examine -- have you kept any of your

1   personal property?

2       A.   Yes.

3       Q.   What items have you kept?

4       A.   I still -- the major items that I still have

5   in the house is the master bedroom suite, I have a

6   grandfather clock, I have lighting fixtures that I

7   put back up, I have a dining room table, I have the

8   office furniture that's there, and then other items

9   as well.

10      Q.   Have you kept in storage or elsewhere any of

11  the items that you have put on your discarded items

12  spreadsheet?

13      A.   No.

14      Q.   The jewelry and other items that you gave to

15  your attorney for our inspection, are those items

16  that you are intending to discard, or do you intend

17  to keep those items?

18      A.   I'm sure I will discard them.

19      Q.   Let's go ahead and -- what we will mark as

20  Exhibit 2.

21           (Defendants' Exhibit 2 was marked for

22  identification.)

23  BY MS. HAQUE:

24      Q.   First of all, thank you again for putting

```
 1   together the spreadsheet.

 2          Did you, yourself, fill in these values?

 3   A.   Yes.

 4   Q.   And does this spreadsheet reflect your full

 5   claim for personal property damages as a result of

 6   damage due to Chinese drywall?

 7   A.   Unfortunately, pertaining to the discarded

 8   items, if I had more time -- when I was going through

 9   the pictures, there's a lot more items on there,

10   and -- that I did not put on the list.  So the amount

11   would be substantially higher.

12   Q.   But as of today, like we saw in your

13   interrogatories, the $87,000 encompasses the amount

14   of damages that you are claiming?

15          MR. ALBANIS:  Object to the form.

16          But you may answer, if you can, Mrs. Foster.

17          THE WITNESS:  Would you repeat the question?

18          MS. HAQUE:  Sure.

19   BY MS. HAQUE:

20   Q.   So in the first document, Exhibit 1, you said

21   you are claiming personal property damages of

22   approximately $87,400.  That -- you still are not

23   changing that amount, correct?

24   A.   That's correct.
```

Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Is that the amount?

 2           Understood.

 3           I have a couple questions related to this

 4    document in particular.

 5           What are the status of receipts on this

 6    document that say that they are "on file"?  And I can

 7    turn your attention to -- it looks like there's two

 8    on this first page.

 9      A.   Right.  I could not find the receipts.  Some

10    of the receipts didn't come clear on the -- when they

11    were copied, so I could not read them.  And I

12    couldn't find the pictures on the document as well.

13      Q.   Do you know if they have been produced to

14    your attorney?

15      A.   It is my understanding that there were some

16    more pictures produced, because when I was going

17    through all these documents trying to line them up, I

18    realized some of the pictures were not on there that

19    should have been there.

20      Q.   So were some of the receipts potentially

21    lost?  Were any of the receipts potentially lost?

22      A.   Not to my knowledge.

23      Q.   Okay.  Are there any duplicate entries on

24    this list?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 823 of 3246
Case 1:09-md-02047-EEF-DDPC Document 226-11 Filed 10/09/15 Page 42 of
61
Confidential - Subject to Further Confidentiality Review

```
 1          MR. ALBANIS:  Before you answer, if I could

 2      just state for the record just so that we're

 3      clear, I believe the pictures that Mrs. Foster

 4      was referring to were the additional photos that

 5      I referenced in my e-mail to defendants' counsel

 6      last week, and all of those photos have now been

 7      produced in the most recent document production

 8      from last week.

 9          MS. HAQUE:  Understood.

10  BY MS. HAQUE:

11      Q.   Mrs. Foster, do you know if there -- to your

12  knowledge, have you produced everything?  Are there

13  any other areas that you need to search for for

14  receipts or anything like that?

15      A.   I have no idea if there's any more receipts.

16      Q.   Okay.  So back to my question:  To your

17  knowledge, do you know if there are any duplicate

18  entries on this list?

19      A.   Not to my knowledge.

20      Q.   Okay.  I have a couple questions to ask you

21  about that, but I'll follow up in a moment.

22          In the fifth column, the Original (Discarded)

23  Item column, how did you go about filling that out?

24      A.   When I was -- when I moved into the condo,
```

Confidential - Subject to Further Confidentiality Review

```
 1    like I said before, I didn't take many items with me,

 2    and there were -- when things came up, then I would

 3    order something or buy something as I went along,

 4    because I knew I had it before, previously; so,

 5    therefore, I would purchase it, as needed.

 6         Q.   And when filling this out, did you remove

 7    items from the list of items that were on the

 8    discarded items spreadsheet that you filled out

 9    before?

10         A.   Would you repeat the question?

11         Q.   Sure.

12              Actually, let me show you.  That might make

13    it a little easier.

14              I'm going to show you what's been marked as

15    Exhibit 3.

16              (Defendants' Exhibit 3 was marked for

17    identification.)

18    BY MS. HAQUE:

19         Q.   Do you recall preparing this document?

20         A.   Yes.

21         Q.   And how does this document factor into this

22    spreadsheet?  Did you use that as sort of a starting

23    point?

24         A.   No.  I -- it's quite possible that I did use
```

Confidential - Subject to Further Confidentiality Review

```
 1    this.  I'm not exactly sure now.  I've been through

 2    so many documents.

 3        Q.   Sure.

 4             Let's turn back to Exhibit Number 2, which is

 5    the spreadsheet.  And then I'm just going to ask you

 6    about a couple of entries.

 7             On Page 3 -- so, sorry, on Page 3 of this

 8    document, towards the middle of the page, you'll see

 9    "Hayneedle, mirror replacement."

10        A.   Correct.

11        Q.   And there are two of those.

12        A.   Correct.

13        Q.   Do you recall how many Hayneedle mirrors in

14    total you had in the house?

15        A.   These mirrors were to replace the mirrors

16    that were above the bathroom [sic].  There should be

17    three, actually, on here, because I replaced three.

18             No, wait a minute.

19             No, two of that one.  That's correct, two.

20    That goes in the bathroom.  It replaced the mirror

21    above the sink.

22        Q.   How many -- can you repeat that?  How many

23    Hayneedle mirrors would you have in total in the

24    house?
```

Confidential - Subject to Further Confidentiality Review

```
 1      A.    It's actually three.

 2      Q.    Three.

 3            And can I turn your attention to the very

 4   last page.  Fifth from the bottom you will see an

 5   entry called "wall mirrors."

 6      A.    Yes.

 7      Q.    And it's for $403.80.  Is that the third

 8   Hayneedle mirror?

 9      A.    It should be.  I'm not -- I know on Page 3

10   there are two.  But they are two different prices.  I

11   do remember that there's three of this one particular

12   mirror in the master bathroom.

13      Q.    Okay.

14      A.    And there should be three of them.

15      Q.    Okay.

16      A.    I don't know.  Maybe it was on sale.  You

17   know, at this -- right now, I don't remember.

18      Q.    And there's one last entry that's on Page 4

19   that says "mirror replacement."  It's all the way at

20   the bottom, and it's the $226.71.

21      A.    It's on Page 4?

22      Q.    Yeah.  The back of Page 2, Page 4.

23      A.    And which entry is that?

24      Q.    The very last one that says "mirror
```

Confidential - Subject to Further Confidentiality Review

```
 1    replacement."

 2            One more page.  Flip it.  Yeah, the back of

 3    this one.

 4        A.   On the very bottom?

 5        Q.   The very bottom.

 6        A.   On the bottom of mine it says "Overstock,

 7    barstools."

 8        Q.   It's a little bit -- I'm sorry.  It's a

 9    little bit -- it's maybe a third of the way up, if

10    you start at the "Overstock, barstools."

11            Do you see that, there's an entry that says

12    "mirror replacement"?

13        A.   Correct.

14        Q.   And that's for $226.71.

15        A.   Correct.

16        Q.   So there are four entries for the mirrors.

17    So you are saying one of them -- were any of those

18    duplicate, or were there four mirrors?

19        A.   There are four mirrors.

20        Q.   Okay.

21        A.   Because one of the mirrors -- I would have to

22    look -- but one of the mirrors goes in the other

23    bathroom.

24        Q.   Okay.
```

Confidential - Subject to Further Confidentiality Review

```
1        A.    There's three in the master bathroom, and

2    there's one in the hall bathroom.

3        Q.    Got it.

4              You also replaced two iPods?

5        A.    Correct.

6        Q.    Now, generally with the electrical equipment

7    that you replaced in this spreadsheet, what was --

8    were -- did you just replace all of the electrical

9    equipment, or were there different ones that actually

10   malfunctioned?

11       A.    The ones that I replaced had malfunctioned.

12       Q.    Do you recall what the problem with them was?

13       A.    They wouldn't come on.

14       Q.    Now, in terms of the other electrical items,

15   for example, there's on the first page a Seiko

16   musical clock, the -- and to save time I think I'm

17   going to ask you questions about group categories of

18   the personal property instead of going line by line.

19             For the electrical items such as, for

20   example, the Seiko musical clock, the Apple computer,

21   the Best Buy computer, were all of these damaged in

22   some way?  Or how did you go about making the

23   decision to replace them?

24       A.    It actually depends on what item you're
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 829 of 3246
Case 1:14-cv-09148-MBN Document 36 Filed 05/18/2018 Page 49 of
61
Confidential – Subject to Further Confidentiality Review

1    asking me about.  When I moved in the condo -- well,

2    when I lived in the Chinese drywall house, I had a

3    computer and printer and so forth.  When I moved into

4    the condo, I was afraid to take that computer with me

5    or any of those other items.  So I had to buy

6    another -- I actually bought a small computer, laptop

7    that I could use in the condo.

8         And that's how those items are.

9    Q.   Is it fair to say that for the electrical

10   items that you're claiming on the personal property

11   spreadsheet:  Some had malfunctioned; others you just

12   weren't sure what was going to happen, so you wanted

13   to buy a new one and not sort of wait for the effects

14   of Chinese drywall?

15        MR. ALBANIS:  Object to the form.

16        But you may answer, if you know, Mrs. Foster.

17        THE WITNESS:  Honestly, I believe it is in a

18        twofold.  When I moved into the condo and I

19        didn't have items that I had, and, therefore, I

20        had to have items in this condo to use, some of

21        the items didn't work and -- well, a lot of those

22        items went into the garbage.  So I was afraid to

23        take hardly anything electrical with me.  And I

24        don't know that I took anything electrical.

Confidential - Subject to Further Confidentiality Review

```
 1    BY MS. HAQUE:

 2        Q.    Got it.

 3              Now, on this first page you have a steamer.

 4        A.    Correct.

 5        Q.    And then on page -- I guess it's the back

 6    of -- the second to last page, there's another

 7    steamer listed with the same price.  Were these two

 8    separate steamers that were bought, or did you only

 9    have one steamer?

10        A.    I would have to look at the receipt.

11              What was -- the first one was on page what?

12        Q.    The first page and it says "Amazon steamer"

13    for $32.22.

14        A.    Well, I do remember buying a steamer.  I

15    don't know at this point right now if there was two.

16        Q.    Okay.  And then on the second -- the back of

17    the first page, the second page, it says "dining

18    kitchen table."

19              Do you see that in the middle of the page?

20        A.    Yes.

21        Q.    For a thousand dollars?

22        A.    Correct.

23        Q.    And then on -- let's see.  This is Page 4, it

24    says "Lenoir Empire Furniture, kitchen table no
```

Confidential - Subject to Further Confidentiality Review

```
1    chairs."

2            Is that the same table, or is that a separate

3    table?

4            Do you see that?  It's, like, maybe a third

5    of the way down.

6        A.   I do.

7            I believe that is a duplicate.

8        Q.   That's a duplicate?  Okay.  Just checking.

9            And then the last one that I see potentially

10   is on the back of -- or, Page 2, there's an entry for

11   a Dyson vacuum.  It's about a third -- two-thirds of

12   the way down, for $332.74.

13       A.   Yes.

14       Q.   And then -- okay.  I found it.  It is Page 5,

15   and it says "Sears, Dyson vacuum cleaner," but it's

16   for $688.99.  It's all the way at the bottom of

17   Page 5.

18       A.   Oh, five.

19            Right.  That's for two different vacuums.

20       Q.   Okay.

21            MR. ALBANIS:  And I'm sorry to interject --

22            MS. HAQUE:  Sure.

23            MR. ALBANIS:  -- Aliyya.  But going back to

24        the dining kitchen table and the Lenoir Empire
```

```
 1          Furniture, kitchen table no chairs, it appears as
 2          though we are referencing two different photos.
 3          For the dining kitchen table entry on Page 2, we
 4          are referencing Document Number 365713, Page 9 of
 5          that; and for the Lenoir Empire Furniture,
 6          kitchen table no chairs, we're referencing
 7          Document Number 124967, Page 101.
 8   BY MS. HAQUE:
 9      Q.    Okay.  Let's just go ahead and take a look at
10   the photos just to make sure that we are clear on the
11   record.  Because I think the $165 difference might be
12   the moving cost.  Does that sound about right, the
13   delivery charge?
14      A.    I do think that that delivery charge was 165.
15      Q.    Okay.
16      A.    But I did buy other Lenoir furniture.  So
17   there's a possibility that could be different, but
18   I'm not a hundred percent sure.
19      Q.    Let's just -- just for the record, let's just
20   go ahead and take a second and look at the photos.
21          And we'll show you what's been marked
22   Exhibit 4.
23          (Defendants' Exhibit 4 was marked for
24   identification.)
```

Confidential - Subject to Further Confidentiality Review

```
 1              MS. HAQUE:  And then here's the Exhibit 5

 2         where it says "Lenoir."

 3              (Defendants' Exhibit 5 was marked for

 4         identification.)

 5         BY MS. HAQUE:

 6         Q.   So the first one is going to be the big

 7    document on Page 4 -- we've put, for the ease of this

 8    deposition, page numbers.  Do you see on the bottom

 9    right-hand corner?

10         A.   Correct.

11         Q.   If you flip to Page 425.  I think it should

12    be way towards the back.  It's the last page.

13         A.   Yes.

14         Q.   And so that represents the first entry of

15    dining kitchen table.  And then if you -- keep that

16    page open.

17              And then on the second document, it is on

18    Page 913, I believe, which is the last page.

19              So it looks to be the same, right?

20         A.   Correct.

21         Q.   And the $165 is going to be the home delivery

22    charge?

23         A.   Correct.

24         Q.   Got it.  Okay.  Great.
```

```
1              You can go ahead and set that aside.

2              Now, on this first page -- let's turn back to

3       Exhibit 2.  Sorry.

4         A.   That's quite all right.

5         Q.   On this first page, all the way at the bottom

6       you have these two charges for Budget blinds.

7         A.   Correct.

8         Q.   We only see the first receipt, but there's

9       not an amount listed, unfortunately.  Do you have any

10      other documentation with these amounts, like, a quote

11      sheet or an estimate or anything like that?

12        A.   Are you talking about the Budget blinds?

13        Q.   Yes.

14        A.   So you have -- if I'm correct, you have the

15      receipt for the first one, the 5,084?

16        Q.   Let's -- I think that's in Exhibit 4.  Let's

17      pull that up.

18             So it doesn't look like there's an amount --

19      there's an amount listed at the bottom, but let's go

20      ahead and take a look at that.  And that is going to

21      be Exhibit 4, Page 078.

22        A.   07 --

23        Q.   I don't think that's right, because that only

24      goes -- that starts at Page --
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.    305.

 2        Q.    -- 305.

 3              So while we wait for a document, let me ask

 4     you a couple more questions regarding the second

 5     spreadsheet.

 6        A.    Sure.

 7        Q.    So we talked about the electronic items.  In

 8     terms of the linens, everything from, you know,

 9     towels, table cloths, things like that, how did you

10     go about making the decision to discard or replace

11     those?

12        A.    In the beginning, I bought towels when I was

13     in the condo.  I didn't take -- like I said, I didn't

14     take anything with me.  So I purchased a few towels

15     while I was there.  And then once we started the

16     remediation, the odor was horrendous.  I bought a

17     chemical called Sniper.  And I tried washing them,

18     but it would take two to three loads to try to get

19     the odor out.  Some of them I just threw away.

20        Q.    Now, when you say "horrendous," are you

21     referring to the smell or the odor that was emanating

22     from these items?

23        A.    Correct.

24        Q.    Now, was that also the same story with
```

 1      respect to your personal clothing?

 2          A.   A lot of the clothing I did throw away.  Some

 3      of them I did replace.  A lot of the clothing, after

 4      they hung out in the garage, got better over time.

 5      But a lot of the clothing was thrown away because

 6      there's zippers on there; there's elastic in there.

 7      The elastic would just -- not disintegrate, but it

 8      would just -- there was no elasticity and buttons and

 9      so forth.

10          Q.   So for your personal clothing you noticed

11      problems with the elastic in some of the clothing

12      items.

13               The buttons, would the buttons just fall off?

14          A.   No, they wouldn't fall off.  They would --

15      you could see, like, pitting on them, corrosion.

16          Q.   And the same with the zippers?

17          A.   On some of the garments, yes.

18          Q.   Okay.  What about your shoes?

19          A.   I had a lot of issues with shoes.  And you --

20      I know you have pictures of some of the shoes, but

21      not all of them.  I didn't -- I had a lot of shoes,

22      and I must have thrown out at least 40 pairs of

23      shoes.

24          Q.   And can you, just for the record, describe

Confidential - Subject to Further Confidentiality Review

```
 1    the problems that you witnessed with the shoes?

 2        A.   Depending on what type of shoe it was, if it

 3    had any metal on it, it would corrode.  I had some

 4    shoes that I would put my foot in, and the whole

 5    lining would just disintegrate.  I had a pair of

 6    shoes that even the backing just cracked.

 7        Q.   Was this true of both your older shoes and

 8    the more newer purchases?

 9        A.   It was both.

10             My husband had a pair of shoes.  He came home

11    once, and we had a function at the club.  He had a

12    pair of brand new shoes in the closet, never been

13    worn.  He put those on, and they literally fell apart

14    while he was at the club.

15        Q.   When -- how long from when you first bought

16    these items did you first notice problems such as the

17    ones you have described with it falling apart?

18        A.   Repeat the question?

19        Q.   Sure.

20             Do you remember how long in time it was from

21    when you first bought these items to when you first

22    started noticing these problems, like, for example,

23    the sole coming apart?

24        A.   It would be very hard to answer that question
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 838 of 3246
Case 1:11-cv-22408-MGC Document 1 Entered on FLSD Docket 05/30/2019 Page 4 of 61

Confidential - Subject to Further Confidentiality Review

    1    because I was so sick at the time, and I don't recall

    2    exactly how long I had them.

    3         Q.   What about your golf shoes?  Because I think

    4    you had some entries on the spreadsheet relating to

    5    your golfing equipment.

    6         A.   Correct.

    7         Q.   What were your problems you had with the golf

    8    shoes?

    9         A.   They did the same thing.  Some of them had

   10    cleats; some of them did not.  I think the major

   11    problem with the golf shoes, the glue that adheres

   12    the shoes together just disintegrated.  And so when I

   13    wore a couple of pairs of those shoes, they just

   14    flopped on me because the glue just separated the

   15    shoe from the sole.

   16         Q.   Do you recall how many pairs of golf shoes

   17    you had at that time?

   18         A.   I don't recall exact, how many.  But I had a

   19    lot.

   20         Q.   Now, did any of your golf shoes have metal in

   21    the cleat part of the shoe?

   22         A.   When we first moved into the home, we had

   23    some shoes with metal.  And then I tried to replace

   24    them with the rubber sole.  So I don't recall how

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 839 of 3246
Case 1:11-cv-22408-MGC Document 269-1 Entered on FLSD Docket 05/30/2019 Page 28 of
61
Confidential - Subject to Further Confidentiality Review

1    many had that.

2        Q.   Okay.  What about the furniture in the home,

3    for example, the dining table and the, you know,

4    chairs and other types of items that would be

5    considered furniture, did you notice any problems

6    with them?

7        A.   I noticed a lot of problems with the

8    furniture.  The dining room table that you saw the

9    receipt that I replaced, that was Hooker furniture.

10   It had -- it was, like, a dinette set, and it had

11   four chairs.  They were made of metal and wood.  The

12   metal literally just peeled off the frame and so

13   forth with -- because I had everything that matched:

14   The dining room table matched, the three bar stools

15   matched, the two end tables in the family room, and

16   then I had a large coffee table.  And it all had the

17   same motif on it, and all of it started just peeling

18   off.

19       Q.   And this was something that you noticed

20   primarily in the dining area, or were there other

21   parts of the house where you noticed maybe more or

22   less of this pitting in the furniture?

23       A.   The master bedroom set, the mirror has, like,

24   the black coming through, the black dots.  The

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 840 of 3246
Case 1:14-cv-08040-CM Document 23-1 Filed 10/08/15 Page 40 of 69
Confidential - Subject to Further Confidentiality Review
61

1    handles, it's like -- it was -- was, like, a gold, a

2    gold-ish color.  That has tarnished and darkened.

3         Q.   So these are metal finishings on the

4    furniture sets that you are referring to?

5         Other than the mirror -- the golden handles

6    and things, those were pieces that were added on to

7    the furniture; is that right?

8         A.   Well, the furniture is -- the bedroom suite

9    is made of wood.

10        Q.   Okay.

11        A.   And, of course, it's put together with screws

12   and bolts and so forth that you can see the corrosion

13   on the handles.

14        And as far as the dining area, the barstools,

15   the end table, the two -- well, the big coffee table,

16   all of that --

17             (Telephone interruption.)

18             THE WITNESS:  Is that my phone?

19             MS. HAQUE:  Don't worry about it.  If you

20        need to check it, go ahead.

21        A.   But that was made -- it was, like, a -- the

22   legs of it was metal, and it had wood around -- like,

23   a parquet wood around the top with glass around the

24   top.  But it was the metal that was just

Confidential - Subject to Further Confidentiality Review

1    deteriorating.

2        Q.    Got it.

3              I think we have the page for the blinds.  It

4    is 376.

5              So we don't see an exact amount on here.  And

6    so I'm wondering if you have any other -- for these

7    two -- on Exhibit 2, you have one entry for $5,084

8    and one entry for $2,450.

9        A.    Correct.

10       Q.    Do you have any quotes or other sort of

11   estimate, maybe, for those amounts?

12       A.    You don't have the one --

13       Q.    No.  That's the only document that we have is

14   this 376.

15       A.    I have a document that shows -- I'm not sure

16   of the amount.

17       Q.    Okay.

18       A.    But, like, on a Discover statement that shows

19   Budget blinds.

20       Q.    Okay.  We'll look for that.

21              We'll take a look.  And if not, we'll talk to

22   your attorney to see if we can get that document.

23       A.    Okay.

24       Q.    Okay.  Thank you.

Confidential - Subject to Further Confidentiality Review

```
 1                In terms of the jewelry that you also have on

 2      the list, was that the pitting that you submitted to

 3      us in terms of the personal property damage?  Is that

 4      what you are describing in terms of problems with the

 5      jewelry?

 6           A.   I submitted that jewelry to show -- give you

 7      an example of what Chinese drywall does to personal

 8      property and jewelry.

 9           Q.   And is that something that you sort of

10      noticed uniformly throughout your jewelry?

11           A.   Absolutely.

12           Q.   In terms of -- there's some items on here

13      that relate to a blood pressure monitor and some

14      other, I guess, health-related items.  What problems

15      did you experience with those?

16           A.   Well, they're electric, and they would stop

17      working.

18           Q.   Okay.

19           A.   I had one blood pressure cuff that was -- had

20      the battery, and it just -- it was pretty bad, the

21      corrosion on the inside of it, with the metal in

22      there.

23           Q.   Okay.  Now, one sort of last thing that I

24      want to ask you about on this document, Exhibit 2, is
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 843 of 3246
Case 1:11-cv-00377-DCN Document 22-6 Filed 05/04/15 Docket 05/04/15 Page 32 of 61
Confidential - Subject to Further Confidentiality Review

```
 1    the Affordable Golf Carts.  And that's on the

 2    first -- Exhibit 2, sorry, this first page.  And it

 3    says you have Affordable Golf Carts -- it's right

 4    towards the top of the page -- $8,650.66.

 5        A.    Correct.

 6        Q.    What were the issues that you experienced

 7    with the golf cart?

 8        A.    The original golf cart we had, we had to keep

 9    replacing the batteries in it.  The batteries

10    wouldn't stay in there very long.  We had issues with

11    the golf charger itself.  In fact, we had replaced

12    the golf charger.

13             And there was other issues that I don't

14    recall at this moment that we had to get somebody out

15    to fix the golf cart.

16        Q.    Do you recall when you first started

17    experiencing problems with the golf cart?

18        A.    I don't recall.

19        Q.    And where did you -- where did you usually

20    store the golf cart when you weren't using it?

21        A.    In the garage.

22        Q.    And approximately how often did you have to

23    change the battery for the golf cart?

24        A.    I don't remember.
```

Confidential - Subject to Further Confidentiality Review

```
1        Q.    Okay.  Let me show you what's been marked as

2   Exhibit 6.

3              (Defendants' Exhibit 6 was marked for

4   identification.)

5   BY MS. HAQUE:

6        Q.    Do you recognize this document?

7        A.    Yes.

8        Q.    And what is this document to you?

9        A.    This is the receipt for the golf cart, the

10  new one that we bought.

11       Q.    And it looks like you bought this back in

12  2013?

13       A.    Correct.

14       Q.    And do you recall having any problems post to

15  this date with any golf cart related issues?

16       A.    We were having issues with the golf cart.  I

17  can't give you the exact date.  But I know we were

18  having issues with the golf cart.

19       Q.    But buying the new one, did that sort of

20  remedy and solve the issues?

21       A.    No.  It doesn't solve the issue because we

22  had to put out more money for a new golf cart that we

23  really didn't want to put out.  And -- and we

24  shouldn't have had to be buying all this other stuff
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 845 of 3246
Case 1:09-md-02047-EEF-JCW Document 23363-39 Filed 11/19/19 Page 945 of 3246
Confidential - Subject to Further Confidentiality Review
61

```
 1    when we had perfectly good furniture when we came to

 2    Florida.

 3        Q.    Did you use the golf cart to move the -- move

 4    furniture or other items from when you sort of had to

 5    leave the house for remediation or whatnot?

 6        A.    When we lived down the street in our

 7    neighbor's house we rented, I do remember on a couple

 8    occasions we had to move a ladder, a tall ladder; so

 9    we strapped it to the back and we moved it down

10    there.  You can't get many items on a golf cart.  We

11    mainly used our bodies, because we would trolly

12    everything down the street on a dolly.

13        Q.    Okay.  I think -- we might have some more

14    questions on the spreadsheet, but I think you can go

15    ahead and set that one aside.

16            Let's go ahead and pull out the second

17    spreadsheet.

18            (Defendants' Exhibit 7 was marked for

19    identification.)

20    BY MS. HAQUE:

21        Q.    Mrs. Foster, do you recognize this document?

22        A.    I do.

23        Q.    And did you put together this document?

24        A.    Yes.
```

```
 1        Q.    And is this a spreadsheet of all of the
 2    property that was discarded but not replaced?
 3        A.    This is not a complete list of everything
 4    that we discarded.  If I had had more time, this
 5    would be even more thorough.
 6        Q.    And did you put together this list yourself?
 7        A.    Yes.
 8        Q.    Is that right?
 9              And for these items, again, I don't want to
10    go through it line by line, but for these same
11    categories of documents that we -- that you responded
12    to in the first spreadsheet, would you say the
13    same -- you experienced the same damage, for example,
14    with the electronic damages, with the linens, with
15    the clothing?
16        A.    Correct.
17        Q.    Now -- well, I guess on the first page
18    there's a Waterpik flosser.
19        A.    Correct.
20        Q.    Did you buy -- there was a replacement,
21    though, for that flosser, right?
22        A.    Correct.  We replaced one.
23        Q.    Okay.  How many did you have in total?
24        A.    Two.
```

1     Q.   So for some -- so that may clear up some of

2     the confusion.  For some of the items on here, you

3     might have had multiple of those items?

4     A.   Correct.

5     Q.   So if you replaced only one, then you put the

6     ones that you did not replace -- or, you kept the

7     ones that you did not replace on the spreadsheet?

8          Let me rephrase that, because I think that

9     was a little confusing.

10         You may have had multiple versions of some of

11    these items, right?

12    A.   Absolutely.

13    Q.   So if you replaced one, that went on this

14    first spreadsheet, right?

15    A.   Correct.

16    Q.   But if you did not replace the item or you

17    only replaced one out of two, for example, you kept

18    it on this spreadsheet?

19    A.   Correct.

20    Q.   Okay.  Because we saw some telephones on this

21    spreadsheet.

22    A.   Correct.

23    Q.   So does that mean that you replaced some

24    telephones but not all of them?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 848 of 3246
Case 1:11-cv-00377-ILRL-LDW Document 26-4 Filed 05/30/2014 Page 37 of 61
Confidential - Subject to Further Confidentiality Review

```
1       A.    I did replace -- like, the whole house

2    phones?  I did replace those.

3       Q.    Okay.  What about the carpet shampooer?  You

4    do have a listing of a carpet shampooer on this

5    spreadsheet.

6       A.    Correct.

7       Q.    Did you replace that or --

8       A.    I have not replaced that to this day.

9       Q.    Okay.

10            Okay.  You can go ahead and set that document

11   aside.

12            And then let's go ahead and look at the third

13   spreadsheet you provided to us.

14            (Defendants' Exhibit 8 was marked for

15   identification.)

16   BY MS. HAQUE:

17      Q.    This is what has been premarked as Exhibit 8.

18            Mrs. Foster, do you recognize this document?

19      A.    Yes.

20      Q.    What is this document?

21      A.    This document is just some of the items that

22   I have in my house that I would like to replace as

23   soon as the funds are available.

24      Q.    And did you create this spreadsheet?
```

```
 1        A.   Yes, I did.

 2        Q.   Is all of this furniture still functional in

 3   your home?

 4        A.   The master bedroom suite is functional as far

 5   as sleeping.  It's not as appealing to look at as it

 6   was when I first bought it.  The mirror has pitting

 7   on it.  And like I said before, the handles are

 8   tarnished.

 9             The office furniture, it has lighting in it,

10   and I don't even have it where the lights will come

11   on because I'm afraid of the electrical components of

12   it.

13             The office chair, the leather chair, I still

14   have that in there.  There's a lot of corrosion on

15   it.

16             And I meant to take the guest bedroom suite

17   off, because . . .

18        Q.   For the fixtures, when you had the

19   remediation contract with -- I believe it was Polkow?

20        A.   Correct.

21        Q.   Did they agree to replace and fix these as

22   part of the contract?

23        A.   No.

24        Q.   Okay.  We can take a look at that a little
```

```
 1    bit later.

 2        A.   He did say he would replace fixtures, but --

 3    that I recall at the moment, but he would not replace

 4    these fixtures.  These fixtures are very expensive.

 5        Q.   Is that why he -- did you ever ask him about

 6    replacing these specific ones, like the chandelier,

 7    et cetera?

 8        A.   He would not replace these.

 9        Q.   And he told you that?

10        A.   Yes.

11        Q.   Okay.  And as of today, you have not

12    purchased any replacements for these specific items?

13        A.   No.  And I'm afraid to turn them on.

14             I did have the one dining room fixture, one

15    of the lights -- because there's different globes on

16    there, it popped, and I called an electrician.  And I

17    don't recall the date that he came out.  But he was

18    able to just rewire that one.  But now I don't -- I

19    don't even want to turn them on.

20        Q.   Did he check the wiring of any of these other

21    fixtures?

22        A.   No.

23        Q.   Did he -- what did he say about using that

24    particular fixture that he replaced the one section
```

1    of wiring?

2        A.    He said at any time, any of that could go

3    out.

4        Q.    Even after he fixed it?

5        A.    He said the whole fixture could go out,

6    because he didn't look at all the wiring at it.

7        Q.    And did he also attribute that problem to

8    Chinese drywall?

9        A.    It is all corroded.

10       Q.    Okay.  I think you can go ahead and set this

11   document aside.

12            I think that is exhibit -- so can I turn your

13   attention back to Exhibit 4 and Page 346.

14            So it looks like you purchased two wall

15   mounts at -- for the television for 49.99 each?

16       A.    Correct.

17       Q.    Is that right?

18            So the total cost is $99.98?

19       A.    For the two --

20       Q.    For the two?

21       A.    -- wall mounts, yes.

22       Q.    Yes.

23            Now, if you turn back to Exhibit Number 2 --

24   which I know there's a lot of paperwork.

Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yeah.  That's okay.

 2        Q.    If you flip with me to the very last page.

 3   You'll see that the amount for wall mount for

 4   television is $215.98.

 5        A.    Correct.  The amount should be 99.98 plus

 6   tax.

 7        Q.    Okay.  I've got it.  I will make the

 8   correction.

 9              Great.  You can put that aside.

10              And then only other one that I want to bring

11   your attention to is on Exhibit 4, Pages 409 and 411,

12   it looks like it's a receipt for Laserlink --

13        A.    Correct.

14        Q.    -- for $259.  And then you received a hundred

15   dollar discount.

16        A.    Oh, yes.

17        Q.    So then on Exhibit 2, on Page 4 -- and if you

18   flip one more page.

19        A.    One more page?

20        Q.    Yeah.

21              Under Laserlink, can we go ahead and make

22   that correction from 259 to 159?

23        A.    Oh, yes.

24        Q.    Great.
```

```
 1          MS. HAQUE:  All right.  I think this is a

 2      good place to take our first morning break.  I'm

 3      pretty -- we're moving really quickly through

 4      these.  So hopefully it's not too much more time

 5      with you, Mrs. Foster.

 6          (Recess from 12:25 until 12:39 p.m.)

 7  BY MS. HAQUE:

 8      Q.   Just a few items to clarify from what we just

 9  discussed a little bit earlier with respect to the

10  electronic items.

11          You were concerned about turning on the

12  electrical items and what could happen as a result of

13  that.  Is that sort of your primary reason for

14  discarding them?

15          MR. ALBANIS:  Object to the form.

16          But you may answer, if you know, Mrs. Foster.

17          THE WITNESS:  It depends on what the item is.

18      Yes, if it is electrical.  But it could have

19      corroded; it could have stopped working; it could

20      have showed tarnish.  I mean, it depends on the

21      item.

22  BY MS. HAQUE:

23      Q.   For the electrical items, did you ever try

24  and get them fixed or call in an electrician to
```

Confidential - Subject to Further Confidentiality Review

```
 1    evaluate the state of them?

 2        A.   I called the electrician in on that one

 3    fixture of mine, because I loved those fixtures when

 4    I bought them, and I saved the money to buy them and

 5    got what I wanted.  I had him to fix that.

 6             As far as the other items, no, I didn't call

 7    an electrician.  They charge too much.

 8        Q.   For some of the portable electronic items

 9    like the laptop and things like that, did you -- were

10    you afraid that those might have some type of problem

11    if you turned them on?

12        A.   I know from experience from living in the

13    Chinese drywall house -- I put four motherboards in

14    one computer alone -- so I knew it was a matter of

15    time because they were going to go out.

16        Q.   For any of these electrical items -- or, any

17    of the items that you put on Exhibit 2, that

18    spreadsheet, were those all discarded, or did you

19    donate any of them to Salvation Army or Goodwill or

20    anybody?

21        A.   I can't honestly say right now if I did

22    because of the frame of mind that I was in.  I know a

23    lot of things went into the garbage.  I couldn't

24    definitively say.
```

```
 1      Q.    For all of the items on Exhibit 2, for

 2   clarification purposes, you are only claiming -- for

 3   all of those items on that list, you are only

 4   claiming personal property damages?

 5            And to back up, we want to make sure that we

 6   are categorizing all of the categories of damages

 7   properly.  So for everything on this list,

 8   Category 2, those are all going into what you are

 9   claiming for personal property damages specifically?

10      A.    These are the items that I replaced from

11   the -- when I had to buy something, I have the

12   receipts for all of these.  All the discarded items,

13   I do not have receipts for.  You're talking about a

14   lifetime of saving items.

15      Q.    Let me turn your attention to your response

16   for -- yeah, Exhibit 1 and sort of your response to

17   Question Number 1.  And you will see you have those

18   different categories of damages listed.

19      A.    Correct.

20      Q.    So is it fair to say that for this

21   spreadsheet we're including them in the personal

22   property damages and not the alternative living

23   expenses damages?

24      A.    Could you repeat the question?
```

Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Sure.

 2             So for this spreadsheet in Exhibit Number 2,

 3    are we -- are you counting that towards the personal

 4    property damages that you have listed in your

 5    response to Question 1, or are some of these also

 6    counted towards where you have the alternative living

 7    expenses listed as $190,000?

 8        A.    I can't answer that question, because I'm not

 9    exactly sure.  I know this adds up to approximately

10    88,000.

11        Q.    Okay.  And that's very close to this personal

12    property damages number of 87,000.

13        A.    Correct.

14        Q.    So do you think it would be fair to say that

15    these go into that bucket of the personal property

16    damages, give or take a little, a small amount of

17    money?

18        A.    I don't recall.

19        Q.    Okay.  Let's turn to -- let's turn back to

20    Exhibit 4.

21             Now, I had asked you about a carpet shampooer

22    a little bit earlier.  Can you turn with me to

23    Page 393.

24        A.    Can I say something?
```

Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Sure.

 2      A.   I do recall buying a shampooer when I was in

 3   the condo.  I believe it was in the condo when I

 4   bought one.

 5      Q.   Yeah, that's what I wanted to clarify for

 6   you -- with you.

 7      A.   Yes.  But there is also another shampooer.

 8   And I don't know if it's on that list or not.  But

 9   it's a portable one, and I don't know if I even put

10   this on there.  But . . .

11      Q.   But just to clarify, that's a separate carpet

12   shampooer --

13      A.   Correct.

14      Q.   -- than Page 393?

15      A.   Right.  I do remember buying that.  And it

16   should have been in, like, 2009.  And it is.

17      Q.   Okay.  That is good to know.

18           Now, you also have a -- if you turn to

19   Exhibit 5.  There's a series of items that you

20   purchased listed.  And at the very bottom you will

21   see a leather couch.

22      A.   Correct.

23      Q.   Now, you also bought a leather couch in the

24   condo, right?  Or you bought from the --
```

Confidential - Subject to Further Confidentiality Review

```
1        A.   I bought used furniture.

2        Q.   Do you still have that leather couch, or did

3   you discard that leather couch?

4        A.   As we talked previously in the first

5   deposition, I do not have that.  That was donated.

6        Q.   Got it.  Good.  Okay.  I just wanted to

7   clarify that.

8             And on Exhibit 5, this is the replacement

9   couch for the Chinese drywall home couch?

10       A.   Correct.  But we didn't buy -- I also had a

11  leather recliner rocking chair.  That was not

12  replaced.  That went with the original leather suite.

13  But when we bought this leather, we did not buy the

14  chair.

15            MS. HAQUE:  Keith, sorry about that.

16            I think he's on mute, too.

17            MR. VERRIER:  I was on mute.

18            MS. HAQUE:  Okay.

19            MR. VERRIER:  Can you hear me now?

20            MS. HAQUE:  Yeah.  Sorry about that.  We

21       started prematurely and forgot to unmute the

22       phone.

23            MR. ALBANIS:  Okay.  All right.  How long

24       have you been going, just for my own notes here?
```

```
 1              MS. HAQUE:  Five, ten minutes.  We're on

 2         Exhibit 5 right now.  I just asked a question

 3         about the leather couch.

 4              MR. VERRIER:  Okay.  Thank you.

 5              MS. HAQUE:  Sorry about that.

 6              MR. VERRIER:  All right.

 7    BY MS. HAQUE:

 8         Q.   So back to the leather couch, this was the

 9    partial replacement for the leather suite that you

10    initially had --

11         A.   Correct.

12         Q.   -- in the Chinese drywall home?

13         A.   Correct.

14         Q.   Were any of these furniture purchases that

15    you had -- actually, let me rephrase.

16              Were all of these furniture purchases in

17    Exhibit 5 replacement furniture purchases?

18         A.   Correct.

19         Q.   And were any upgrades, or were these pretty

20    much the same types of brands that you had previously

21    in the Chinese drywall home?

22         A.   The -- they're comparable except for the

23    leather couch.  This is a downgrade from what we had

24    before.
```

```
1              The -- the dining room table is a downgrade.

2        Q.    The Lenoir dining room table?

3        A.    Yes.

4              I would say the end table is definitely a

5   downgrade.

6        Q.    Do you recall how much -- I know it's a long

7   time ago -- how much you originally paid for the

8   original, I think you said Hooker --

9        A.    Hooker.

10       Q.    -- furniture?

11       A.    I don't recall how much I paid.

12       Q.    You can go ahead and set that document aside.

13             Let's pull out next -- so part of our role is

14  to figure out sort of in which bucket each item falls

15  into, and I want to next talk about some of the

16  lighting and plumbing fixtures and just clarify that

17  for the record.

18             Let me show you -- and we've looked at this

19  before -- what has been marked as Exhibit 9.

20             (Defendants' Exhibit 9 was marked for

21  identification.)

22  BY MS. HAQUE:

23       Q.    Do you recall this document?

24       A.    Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 861 of 3246
Case 1:14-cv-24342-FDB Subject 26 Document 32-18 Docketed 05/02/2010 Page 50 of
Confidential - Subject to Further Confidentiality Review
61

1    Q.    What is this document?

2    A.    It is the remediation proposal.

3    Q.    And if you turn to Page, I think, 91.

4    There's a list of lighting and plumbing fixtures.

5    For the record, can you clarify what Polkow ended up

6    paying for in terms of the fixtures and what they

7    refused to pay for?

8    A.    Well, he refused to put new fixtures in like

9    I have, for one thing.  But he did agree to put --

10   for instance, I did put one up in the bathroom --

11   well, let's see.

12          The lighting fixtures in the foyer, dining

13   room, kitchen, I have a chandelier in the master

14   bedroom, and then I put a lighting fixture that I had

15   previously in the hall bath; he put those back up.

16   So I kept those.

17          The two lighting fixtures that I had in the

18   master bathroom, he did not put those up.  But he did

19   put lights in the ceiling, and he said his budget did

20   not -- he did not have the budget to replace the

21   light fixtures.

22   Q.    I think there was a difference -- I think in

23   this contract he said that he would charge $117,531.

24   And I think that is on Page 92 --

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 862 of 3246
Case 1:09-md-02047-EEF-MBN Document 136 Filed 05/30/2019 Page 51 of 61
Confidential - Subject to Further Confidentiality Review

```
 1         A.    Yes.

 2         Q.    -- all the way at the bottom.

 3               But I think you all ended up claiming a

 4    remediation cost of 127,500-something dollars?

 5         A.    Correct.

 6         Q.    What accounts for that $10,000 difference?

 7    Is it these fixture we're talking about?

 8         A.    No.

 9         Q.    What would be the difference between those

10    two?

11         A.    Well, on here it says -- and he called it to

12    our attention -- let's see -- "prices per square foot

13    may vary due to upgrades existing currently in home

14    and any additional upgrades."

15               But I thought there was something else in

16    there that stated about the price could change, if

17    I'm not mistaken.

18         Q.    So he was the one that changed the price.  It

19    was basically due to his saying there might be some

20    upgrades or things I need to do?

21         A.    First off, I was there by myself.  I was very

22    sick going through all of this.  To be -- I can't

23    tell you what the -- what transpired back in 2012 to

24    make the differential between the two cost.  I just
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 863 of 3246
Case 1:14-cv-02722-EEF-MBN Document 23-1 Filed SD Docket 03/04/10 Page 62 of
61
Confidential - Subject to Further Confidentiality Review

```
 1    know he came to me needing money.  I wrote him a

 2    check.  I wanted to get it done as fast as I could.

 3    I did everything that I could.

 4        Q.   And he was still unwilling to sort of -- let

 5    me back up.

 6             So every fixture that's on Exhibit 2, the

 7    personal property, he was just unwilling to make

 8    those fixtures as part of the contract price?

 9        A.   That was not in the contract for those

10    fixtures.

11        Q.   Okay.

12             Okay.  You can go ahead and set that document

13    aside.

14             Some questions about some of your outdoor

15    living.

16             There was an outdoor lighting system that you

17    had.  I guess it was in the lanai area, maybe?

18        A.   There was a sound system out there.

19        Q.   Was that also damaged as a result of Chinese

20    drywall?

21        A.   You're talking about the lighting?

22        Q.   Yes.  It's on Exhibit 4, Page 389.

23        A.   I'm sorry, what page?

24        Q.   389.
```

```
 1              Oh, sorry.  You were waiting for me.

 2              So this was outdoor lighting that you had,

 3      right?

 4         A.   On the front of the house, yes.

 5         Q.   On the front of the house?

 6         A.   Correct.

 7         Q.   And you have a note here saying "replaced

 8      corroded ones."

 9         A.   Well, they were corroded.

10         Q.   So then you noticed outside of the house

11      different fixtures and items that were damaged as a

12      result of Chinese drywall?

13         A.   It was my impression that these had to be

14      replaced because they were electrical.  The

15      electrical wiring goes through the house.  All the --

16      everything was torn out.

17         Q.   Okay.  And then let me turn your page -- or,

18      turn your attention to Page 380.

19              And this was an outdoor rug?

20         A.   It is an outdoor rug.

21         Q.   And was the original rug damaged as a result

22      of Chinese drywall?

23              Or I guess I should say:  Do you recall where

24      the original rug was located?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 965 of 3246
Case 2:14-cv-02722-EEF-MBN Document 63-39 Filed 05/13/2016 Page 94 of
61
Confidential - Subject to Further Confidentiality Review

```
1        A.    Well, when I first bought this rug, it was in
2    the house.  It is now outside.
3        Q.    Okay.  You can go ahead and set that document
4    aside.
5              Just a couple clean-up questions remain, and
6    then we will be done.
7              Did you receive -- back to the golf cart that
8    you replaced, did you receive a trade-in from the
9    golf cart company for the old golf cart?
10       A.    I don't recall.
11       Q.    And was the new golf cart an upgrade from the
12   old golf cart?  Do you remember?
13       A.    I don't -- I don't know if it would be an
14   upgrade or not.
15       Q.    Let me ask this general question,
16   Mrs. Foster.  For any of the condo move-in and
17   move-out receipts, are you claiming those as
18   alternative living expenses, or are there some items
19   that you are also claiming as personal property
20   damages?
21       A.    Repeat the question.
22       Q.    Sure.
23             For -- you have receipts, and you submitted
24   receipts to us that refer to when you had to move
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 966 of 3246
Case 1:14-cv-02043-EEF-MBN Document 26-11 Filed 05/13/2016 Page 95 of 61
Confidential - Subject to Further Confidentiality Review

1    into the condo.  For those receipts, are you claiming

2    all of those as alternative living expenses damages,

3    or are there some receipts in that stack that you are

4    also claiming as personal property damages?

5       A.   From my understanding, from what I see on

6    these documents, some of the receipts on this new

7    document that was prepared with the pictures, those

8    were expenses for moving into the condo, and then

9    there's replacement items on there.

10      Q.   Okay.  So we just want to make sure that

11   items are not sort of being double-counted.

12           So there's some items on the spreadsheet that

13   you are counting towards the personal property

14   damages, and there might be a handful of items that

15   are going into the condo receipts for the alternative

16   living expenses.  Is that right?

17      A.   I can't really answer that question at this

18   moment.

19           MS. HAQUE:  Okay.  I think we can go off the

20       record for a few moments, see if we have any

21       questions, and then pass the witness.

22           (Recess from 12:59 until 1:03 p.m.)

23           MS. HAQUE:  Mrs. Foster, those are all the

24       questions I have for you this afternoon.  Thank

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 967 of 3246
Case 2:14-cv-02722-MCE-DC Document 25-11 Confidential SD Docket 05/30/19 Page 96 of 61
Confidential – Subject to Further Confidentiality Review

```
1        you again for all your time, as well as all the

2        time it took to prepare these spreadsheets.  I

3        think they really helped us during today's

4        deposition.

5            I pass the witness to your attorney,

6        Mr. Albanis.

7            MR. ALBANIS:  I have no questions.  We

8        reserve signature with respect to the original

9        deposition and today's deposition.

10           (Whereupon, the deposition concluded at

11    1:02 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                   C E R T I F I C A T E

 2

 3           I, KELLY J. LAWTON, Registered Professional

 4      Reporter, Licensed Court Reporter, and Certified

 5      Court Reporter, do hereby certify that, pursuant to

 6      notice, the deposition of VICKI FOSTER was duly taken

 7      on January 9, 2019, at 11:32 a.m. before me.

 8           The said VICKI FOSTER was duly sworn by me

 9      according to law to tell the truth, the whole truth

10      and nothing but the truth and thereupon did testify

11      as set forth in the above transcript of testimony.

12      The testimony was taken down stenographically by me.

13      I do further certify that the above deposition is

14      full, complete, and a true record of all the

15      testimony given by the said witness.

16

17      _____

18           KELLY J. LAWTON, RPR, LCR, CCR

19

20           (The foregoing certification of this

21      transcript does not apply to any reproduction of the

22      same by any means, unless under the direct control

23      and/or supervision of the certifying reporter.)

24
```

```
 1                      INSTRUCTIONS TO WITNESS

 2

 3

 4              Please read your deposition over carefully

 5     and make any necessary corrections.  You should state

 6     the reason in the appropriate space on the errata

 7     sheet for any corrections that are made.

 8

 9              After doing so, please sign the errata sheet

10     and date it.  It will be attached to your deposition.

11

12              It is imperative that you return the original

13     errata sheet to the deposing attorney within thirty

14     (30) days of receipt of the deposition transcript by

15     you.  If you fail to do so, the deposition transcript

16     may be deemed to be accurate and may be used in

17     court.

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                  - - - - - -

 2                E R R A T A

 3                  - - - - - -

 4   PAGE   LINE   CHANGE

 5   _____  _____  _____

 6      REASON: _____

 7   _____  _____  _____

 8      REASON: _____

 9   _____  _____  _____

10      REASON: _____

11   _____  _____  _____

12      REASON: _____

13   _____  _____  _____

14      REASON: _____

15   _____  _____  _____

16      REASON: _____

17   _____  _____  _____

18      REASON: _____

19   _____  _____  _____

20      REASON: _____

21   _____  _____  _____

22      REASON: _____

23   _____  _____  _____

24      REASON: _____
```

```
 1                    ACKNOWLEDGMENT OF DEPONENT

 2

 3           I, VICKI FOSTER, do hereby acknowledge that I

 4      have read the foregoing pages, 1 to 60, and that the

 5      same is a correct transcription of the answers given

 6      by me to the questions therein propounded, except for

 7      the corrections or changes in form or substance, if

 8      any, noted in the attached Errata Sheet.

 9

10

11     _____     _____

12     VICKI FOSTER                                      DATE

13

14

15

16

17     Subscribed and sworn to before me this

18     _____ day of _____, 20___.

19     My Commission expires: _____

20

21     _____

       Notary Public

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 872 of 3246
Case 1:09-md-02047-EEF-MBN Document 2666-1 Filed 10/08/2012 Page 61 of 61
Confidential - Subject to Further Confidentiality Review

```
 1                          LAWYER'S NOTES

 2      PAGE    LINE

 3      _____   _____   _____

 4      _____   _____   _____

 5      _____   _____   _____

 6      _____   _____   _____

 7      _____   _____   _____

 8      _____   _____   _____

 9      _____   _____   _____

10      _____   _____   _____

11      _____   _____   _____

12      _____   _____   _____

13      _____   _____   _____

14      _____   _____   _____

15      _____   _____   _____

16      _____   _____   _____

17      _____   _____   _____

18      _____   _____   _____

19      _____   _____   _____

20      _____   _____   _____

21      _____   _____   _____

22      _____   _____   _____

23      _____   _____   _____

24      _____   _____   _____
```

# EXHIBIT A11

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 874 of 3246
Case 1:11-cv-22408-MGC Document 41 Entered on FLSD Docket 11/6/2019 Page 2 of
189

Confidential - Subject to Further Confidentiality Review

```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2                   Case No. 1:11-CV-22408-MGC
 3      -------------------------------§
        EDUARDO AND CARMEN AMORIN et      §
 4      al., individually, and on behalf §
        of all others similarly          §
 5      situated,                        §
                                         §
 6         Plaintiffs,                   §
                                         §
 7      vs.                              §
                                         §
 8      TAISHAN GYPSUM CO., LTD. F/K/A    §
        SHANDONG THAIHE DONGXIN CO.,      §
 9      LTD.; TAIAN TAISHAN PLASTERBOARD §
        CO., LTD., et al,                §
10                                       §
           Defendants.                   §
11      ------------------------------- §
          - - -
12
                                   - - -
13
                    WEDNESDAY, DECEMBER 12, 2018
14
                                   - - -
15
                 Confidential  - Subject to Further
16                    Confidentiality Review
17                           - - -
18          Deposition of CANDACE GODY, held at Morgan &
        Morgan, 12800 University Drive, Suite 600, Fort
19      Myers, Florida, commencing at 11:33 a.m., on the
        above date, before Kelly J. Lawton, Registered
20      Professional Reporter, Licensed Court Reporter,
        and Certified Court Reporter.
21
                                   - - -
22
                    GOLKOW LITIGATION SERVICES
23          877.370.3377 ph | 917.591.5672 fax
                       deps@golkow.com
24
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2    MORGAN & MORGAN
      BY:  PANAGIOTIS "PETE" V. ALBANIS, ESQUIRE
 3    12800 University Drive, Suite 600
      Fort Myers, Florida 33907
 4    (239) 433-6880
      palbanis@forthepeople.com
 5    Representing Plaintiff
 6
      LEVIN, SEDRAN & BERMAN, LLP
 7    BY:  KEITH J. VERRIER, ESQUIRE
      510 Walnut Street, Suite 500
 8    Philadelphia, Pennsylvania 19106
      (215) 592-1500
 9    kverrier@lfsblaw.com
      Representing Plaintiff
10
11    ALSTON & BIRD, LLP
      BY:  MATTHEW D. LAWSON, ESQUIRE
12    BY:  METHAWEE MANUPIPATPONG, ESQUIRE
      BY:  LARA TUMEH, ESQUIRE
13    One Atlantic Center
      1201 West Peachtree Street
14    Atlanta, Georgia 30309
      (404) 881-7000
15    matt.lawson@alston.com
      mae.manupipatpong@alston.com
16    lara.tumeh@alston.com
      Representing Taishan Gypsum Co., Ltd. and Tai'an
17    Taishan Plasterboard, Co., Ltd.
18
      GORDON, ARATA, MONTGOMERY, BARNETT
19    BY:  ALEX B. ROTHENBERG, ESQUIRE
      201 St. Charles Avenue, 40th Floor
20    New Orleans, Louisiana 70170
      (504) 582-1111
21    arothenberg@gamb.law
      Representing BNBM PLC
22
23
24
```

```
 1    APPEARANCES:

 2        ABALLI MILNE KALIL

          BY:  JOSHUA D. POYER, ESQUIRE

 3        2250 SunTrust International Center

          One Southeast Third Avenue

 4        Miami, Florida 33131

          (305) 373-6600

 5        jpoyer@alalli.com

          Representing BNBM PLC

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                        - - -
                      I N D E X
 2                        - - -
 3   Testimony of:  CANDACE GODY
 4       DIRECT EXAMINATION BY MR. LAWSON...............  6
 5       CROSS-EXAMINATION BY MR. ALBANIS.............. 175
 6
 7
 8                  E X H I B I T S
 9              (Attached to Transcript)
10   DEFENDANTS'                                       PAGE
11       Exhibit 1    Lee County Property Appraiser -   13
                      Property Data
12
         Exhibit 2    Plaintiff Profile Form -          23
13                    Residential Properties - Bates
                      Numbered GodyA00001 to GodyA00026
14
         Exhibit 3    Kross Inspectors - Inspection     49
15                    Report
16       Exhibit 4    Priority Claimant Candace Gody's  54
                      Answers to Interrogatories
17
         Exhibit 5    Receipts for Section III -        60
18                    Personal Property
19       Exhibit 6    Invoices - Wiegod & Sons, Inc. and 62
                      Certified Heating and Cooling
20
         Exhibit 7    Fourth Amended Supplemental       68
21                    Plaintiff Profile Form
22       Exhibit 8    Receipts for Alternative Living -  75
                      Section IV
23
         Exhibit 9    Photographs                       90
24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 878 of 3246
Case 11-cv-1408-MGE Document 11 Entered on FLSD Docket 03/19/2013 Page 6 of 189

Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S

 2    DEFENDANTS'                                      PAGE

 3    Exhibit 10    April 5, 2011 Polkow Construction, 103
                    Inc. Chinese Drywall Remediation
 4                  Proposal

 5    Exhibit 11    June 28, 2011 Polkow Construction, 105
                    Inc. Chinese Drywall Remediation
 6                  Proposal

 7    Exhibit 12    Wells Fargo Checks and Statements   129

 8    Exhibit 13    City of Fort Myers - Letter of      133
                    Completion
 9
      Exhibit 14    Payments Made for Remediation at    145
10                  10842 Tiberio Drive, Fort Myers,
                    Florida 33913
11
      Exhibit 15    Excel Spreadsheet - Expenses        154
12
      Exhibit 16    Intuitive Environmental Solutions,  155
13                  LLC Invoice

14    Exhibit 17    July 8, 2011 Intuitive              159
                    Environmental Solutions, LLC
15                  Report

16    Exhibit 18    August 31, 2011 Intuitive           162
                    Environmental Solutions, LLC
17                  Report

18    Exhibit 19    Supplemental Plaintiff Profile      168
                    Form
19
      Exhibit 20    First Amended Supplemental          171
20                  Plaintiff Profile Form

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
1                       - - -

2            THE COURT REPORTER:  Ma'am, would you please

3       raise your right hand.

4            Do you swear or affirm that the testimony

5       you're about to give will be the truth, the whole

6       truth, and nothing but the truth?

7            THE WITNESS:  I do.

8            CANDACE GODY, called as a witness by the

9    Defendants, having been first duly sworn, testified

10   as follows:

11                   DIRECT EXAMINATION

12   BY MR. LAWSON:

13       Q.   Good morning.  Could you please state your

14   name for the record.

15       A.   It's Candace, middle initial D, last name

16   Gody, G-o-d-y.

17       Q.   Thank you, Ms. Gody, and good morning.  I

18   wanted to introduce myself.  My name is Matt Lawson.

19   I'm an attorney for Taishan Gypsum.  I appreciate you

20   coming in today, and I just wanted to be able to ask

21   a few questions about your claim in this lawsuit.

22            Before we get started, I wanted to make sure

23   that it was your understanding that when you were

24   sworn just now, that you were agreeing to tell the
```

Confidential - Subject to Further Confidentiality Review

1    truth during today's deposition.

2         A.    Yes.

3         Q.    All right.  I wanted to go over a few kind of

4    rules of the road as we are doing this deposition

5    today.

6              As you probably understand, the court

7    reporter here is transcribing everything that we are

8    saying.  That means that we need to be able to talk

9    slowly and to give pauses between each other's

10   questions and answers.

11             And that allows her to be able to transcribe

12   everything, it allows us to be able to hear each

13   other, and it allows your attorney to be able place

14   any objections that he has to the questions that I'm

15   asking you.

16             Now, if there is a question -- excuse me, if

17   there is an objection to one of my questions by

18   Mr. Albanis, then I will allow him to be able to

19   speak.  And unless he instructs you not to answer the

20   question, I would ask that you answer the question as

21   truthfully and completely as you can.

22             Please let me know if at any point you need a

23   break.  You are boss in that regard.  So if at any

24   point you need to take a break, just let me know.

```
 1              And, beyond that, if you need any

 2    clarification on any questions that I'm asking you,

 3    please let me know.  I'm happy to rephrase it, put it

 4    another way, to make sure that you understand what

 5    I'm asking you.

 6              Are you take any medications today that would

 7    impair your ability to answer questions truthfully

 8    and completely?

 9        A.   No.

10        Q.   Did you meet with your lawyer to prepare for

11    today's deposition?

12        A.   Yes.

13        Q.   How often did you meet to prepare for today's

14    deposition?

15        A.   I met with Attorney Albanis several times.

16        Q.   Okay.  Do you know about how many times?

17        A.   Several times.

18        Q.   Would you say it's more than five?

19        A.   No.

20        Q.   All right.  More than three?

21        A.   Four times.

22        Q.   Okay.  And have you met with him in the last

23    week?

24        A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 882 of 3246 of
Case 1:14-cv-24105-EDC Document 26-4 Filed 05/02/2019 Page 490 of
189
Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Did you meet with him yesterday?

 2          A.    No.

 3          Q.    Did you meet with him today, before today's

 4    deposition?

 5          A.    Yes.

 6          Q.    Did you review any documents when you met

 7    with Mr. Albanis?

 8          A.    I don't understand your question.

 9          Q.    Did you review any documents or look at

10    any -- any files or records when you met with him?

11          A.    Are you talking about just this morning or --

12          Q.    Any of the times that you met, the four

13    different times, did you look at documents with

14    Mr. Albanis?

15          A.    Yes.

16          Q.    Do you remember what you looked at?

17          A.    The documents that were presented to me to

18    review.

19          Q.    Okay.  Are you aware of any documents that

20    are in your possession that you haven't -- that are

21    related to your claims in this lawsuit that you

22    haven't given over to Mr. Albanis?

23          A.    No.

24          Q.    You believe you have handed over everything?
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.   Yes.

 2        Q.   Ms. Gody, are you currently employed?

 3        A.   No.

 4        Q.   When was the last time you were employed?

 5        A.   In 1996.

 6        Q.   Okay.  And what was your career when you were

 7   employed back in 1996?

 8        A.   I was a government executive for Federal

 9   Express.

10        Q.   Are you married?

11        A.   Yes.

12        Q.   All right.  Who are you married to?

13        A.   Anthony T. Gody, Sr.

14        Q.   And how long have you been married to

15   Anthony?

16        A.   We will be married 40 years in March.

17        Q.   Oh, wow.  Congratulations.

18             Taking a step back, did you bring any

19   documents with you today to the deposition?

20        A.   No.

21        Q.   Now, have you ever been involved in a lawsuit

22   before this one?

23        A.   Define "lawsuit."

24        Q.   Have you ever been sued before?
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.   No.

 2        Q.   Okay.  Have you ever sued anyone before?

 3        A.   No.

 4        Q.   Have you been deposed before, like today?

 5        A.   Once.

 6        Q.   Okay.  And when was that?

 7        A.   In 1996.

 8        Q.   And was that related to your work at Federal

 9   Express?

10        A.   No.

11        Q.   Have you participated in -- excuse me.

12             Was the lawsuit that you were involved in or

13   that you were deposed in a class-action lawsuit?

14        A.   No.

15        Q.   And what is the address of the property that

16   you allege has been damaged by Chinese drywall?

17        A.   10842 Tiberio Drive, Fort Myers, Florida

18   33913.

19        Q.   And do you currently own that property?

20        A.   Yes.

21        Q.   When did you buy it?

22        A.   In April of 2007.

23        Q.   Where did you live before that?

24        A.   At 682 Catamaran Court in Naples, Florida.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 885 of 3246
Case 1:14-md-02543-EEF-MBN Document 22363-39 Filed 11/19/19 Page 885 of 3246

Confidential - Subject to Further Confidentiality Review
189

```
1        Q.    And why did you move to the property at

2    Tiberio Drive?

3        A.    Could I ask you a question?

4        Q.    Sure.  Yeah.

5        A.    Why is that relative?

6        Q.    I want to be able to get the background of

7    this property and just to be able to understand your

8    claim.  But you can answer as best you can.

9        A.    No.  The reason is, it's a beautiful 55-plus

10   community.  We have a beautiful home overlooking a

11   lake and a golf course.  And we were playing golf,

12   and we thought it would be a great place to live.

13       Q.    Was the home pre-existing when you bought it,

14   or did you build the home on that lot?

15       A.    It was pre-existing.

16       Q.    Okay.  Do you know when it was built

17   originally?

18       A.    In 2006.

19       Q.    And did you contract for the home to be

20   built, or did you buy it after someone else had paid

21   for it to be built?

22       A.    We bought it directly from WCI, the builder.

23       Q.    And did WCI build the homes in that community

24   that you were describing?
```

```
 1       A.   Yes.

 2       Q.   To your understanding, did they build all the

 3  homes in that community?

 4       A.   Yes.

 5       Q.   Do you remember how much you paid for the

 6  house?

 7       A.   $480,000.

 8       Q.   And was that purchase financed, or did you

 9  pay in cash?

10       A.   Half of it was financed and half was cash.

11       Q.   Was there a mortgage on the property?

12            Was there a mortgage on the property?  Did

13  you enter into a mortgage agreement?

14       A.   Yes.

15       Q.   And how long was that -- the term of that

16  mortgage agreement?  Do you recall?

17       A.   Could you rephrase the question?

18       Q.   Yes.  Was it a 30-year mortgage, a 15-year

19  mortgage?  Do you remember the term?

20       A.   Yeah.  It was a 30-year mortgage.

21            (Defendants' Exhibit 1 was marked for

22  identification.)

23  BY MR. LAWSON:

24       Q.   Ms. Gody, I have handed you a document that's
```

```
1    been marked as Exhibit 1.

2            Have you seen a document like this before?

3    A.   No.

4    Q.   I represent to you this is a Lee County

5    property appraiser record.

6    A.   May I take a minute, please, to review this?

7    Q.   Absolutely.  Take your time.

8            MR. ALBANIS:  Matt, while Ms. Gody is

9    reviewing that, here is a copy of the documents

10   you requested earlier.

11           MR. LAWSON:  Thank you.

12           THE WITNESS:  May I ask a question?

13   BY MR. LAWSON:

14   Q.   Yes.

15   A.   What is the comment on here where it has

16   property description, it says, do not use for legal

17   documents.

18   Q.   I do not know what the purpose of that is

19   from the County.

20   A.   Then why are you asking me to review this?

21   Q.   Well, this is a public property record

22   related to your property.  So I wanted to -- from Lee

23   County, and I wanted to -- and it was also produced

24   by your attorneys --
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.    Okay.

 2        Q.    -- for the purposes of this litigation, so I

 3   wanted to ask you about it.

 4              Have you had a chance to review it?

 5        A.    Yes.

 6        Q.    All right.  I'd like to turn your attention

 7   to the sixth page of this exhibit.  It's titled "This

 8   Special Warranty Deed."

 9              Do you see that page?

10        A.    Yes.

11        Q.    Based on your review of this exhibit, does

12   this appear to be the warranty deed for your purchase

13   of the home at 10842 Tiberio Drive in Fort Myers,

14   Florida, on or around the 19th of April in 2007?

15        A.    I don't know.

16        Q.    And you would agree that this document lists

17   your name as well as your husband's name, correct?

18        A.    Yes.

19        Q.    And the date on the document that is

20   highlighted is April 19th of 2007; is that correct?

21        A.    Yes.

22        Q.    And the document refers to the address at

23   10842 Tiberio Drive in Fort Myers, Florida; is that

24   right?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 889 of 3246
Case 1:14-cv-02046-MG3-JDW Document 26-11 Filed SD Docket 05/13/2016 Page 97 of 189
Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    And is that around the time that you

 3   purchased that property?

 4        A.    April 19th was the date of the closing.

 5        Q.    Okay.  So the closing on the property was

 6   April 19th, 2007.  Do you have any reason to believe

 7   this is not the warranty deed for the purchase of

 8   that property?

 9        A.    No.

10        Q.    I'd like to turn to the next page.  I'll

11   represent to you this appears to be a 2018 Lee County

12   property appraiser property record.  I'd like to turn

13   your attention to the top left, the section titled

14   "Owner of Record."

15             I'm sorry, I'm going on to the next page, two

16   pages following the warranty deed.  So there's a

17   warranty deed; that is two pages.  And then the next

18   page is a -- after that is a 2018 property record.

19        A.    What's the page number on this?

20        Q.    It says 1 of 5 on the bottom right corner,

21   and in the upper left corner it says December 5th,

22   2018.  You would see an image of the home on the

23   document, and it is the second page after the

24   warranty deed that we just looked at -- or, excuse
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 890 of 3246 of
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 890 of 3246 of
189

Confidential - Subject to Further Confidentiality Review

1    me, the first page of the warranty deed concludes.

2         Yes, that is the correct page that you are

3    looking at right now.

4         MR. VERRIER:  It says "Property Data."

5         THE WITNESS:  "Property Data."

6    BY MR. LAWSON:

7    Q.   Correct, "Property Data" at the top of the

8    page.  And I apologize, the numbering on these is

9    difficult to be able to communicate.

10        I wanted to first turn your attention to the

11   upper left-hand corner where it states "Owner of

12   Record, Tenants By Entirety."

13        Do you see that?

14   A.   Yes.

15   Q.   And that section states your name and your

16   husband's name, correct?

17   A.   Yes.

18   Q.   And you are owners of record of the property

19   as of today?

20   A.   Yes.

21   Q.   All right.  And the site address is

22   10842 Tiberio Drive in Fort Myers, Florida; is that

23   correct?

24   A.   Correct.

Confidential - Subject to Further Confidentiality Review

```
 1       Q.   If you look down to the "Property Value

 2   History" section -- that is at the conclusion of this

 3   page -- I wanted to ask you about the property values

 4   that this record shows for 2007.

 5            On the just property value, it is listed as

 6   $315,960.

 7            Do you see that?

 8       A.   Yes.

 9       Q.   And then also for the market assessed

10   property value, it is listed at $315,960 as well.

11            Do you see that?

12       A.   Yes.

13       Q.   Now, if you go down to 2018, do you see that

14   the just property value in 2018 for the property is

15   listed at $301,195?

16       A.   I'm sorry, but I do not have 2018.

17       Q.   All right.  So I need you to look at the

18   warranty deed that you were looking at previously.

19            MR. ALBANIS:  Let me find it for you here.

20            Right here.

21            THE WITNESS:  Thank you.

22   BY MR. LAWSON:

23       Q.   So you should now be looking at the 2018 Lee

24   County property appraiser record.  It states
```

```
 1    "Property Data" at the top, and we're referring to

 2    the section titled "Property Value History" at the

 3    bottom of the page, specifically to the row referring

 4    to the 2018 tax year and the property values listed

 5    for that 2018 tax year.

 6            Do you see that?

 7    A.    Yes.

 8    Q.    And the property value for the just property

 9    value in 2018 is listed as $301,195.

10            Do you see that?

11    A.    Yes.

12    Q.    And the market assessed property value is

13    listed as $301,195 as well.

14            Do you see that?

15    A.    Yes.

16    Q.    Have you ever had the value of your property

17    appraised independently?

18    A.    Yes.

19    Q.    And what was the result of that appraisal?

20    A.    Could you please explain "result"?

21    Q.    Well, sure.

22            First, let me ask you:  When did you have

23    that appraisal done?

24    A.    To the best of my knowledge, three to four
```

1    years ago.

2          Q.    Okay.  And at that time did you receive a

3    property appraisal value from the appraiser?

4          A.    Yes.

5          Q.    And do you recall what that value was?

6          A.    No.

7          Q.    Okay.  Was it above $300,000?

8          A.    I don't recall.

9          Q.    How many years did you live at the Tiberio

10   Drive property after you moved into it originally in

11   2007?

12         A.    We moved in in the end of May in 2007, and

13   then we had to leave the house in June of 2010.

14         Q.    And did you move back into the property at

15   any point after that?

16         A.    We moved back into the property in September

17   of 2012.

18         Q.    So you were out of the property for a little

19   over two years?

20         A.    Yes.

21         Q.    Two years and two months?

22         A.    26 months, to be exact.

23         Q.    And do you live at the property today?

24         A.    Yes.

Confidential - Subject to Further Confidentiality Review

```
 1        Q.   And how many people have resided in the house

 2   while you have lived there?  How many people have

 3   lived in the home since -- including you, since 2007

 4   when you moved in?

 5        A.   Two.

 6        Q.   Okay.  So you and your husband?

 7        A.   Yes.

 8        Q.   Have you ever rented out the home for --

 9        A.   No.

10        Q.   I'm sorry.  Just make sure I complete my

11   questions, and then you can complete your answers.

12             Do know the square footage of your home?

13        A.   Under air, 2249 square feet under air.

14        Q.   How do you know that?

15        A.   From the floor plan.

16        Q.   And have you ever had that square footage

17   determined by someone measuring it before?

18        A.   Not that I recall.

19        Q.   How many bedrooms are in the home?

20        A.   Three.

21        Q.   And how many bathrooms?

22        A.   Two and the half.

23        Q.   And has that always been the case since the

24   house was built?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 895 of 3246
Case 1:14-cv-20063-MGC Document 61 Entered on FLSD Docket 05/12/2015 Page 23 of
189
Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    To your knowledge, has there been any change

 3   to the square footage of the home since it was built?

 4        A.    No.

 5        Q.    Looking to the document in front of you, the

 6   2008 Lee County property appraisal that you were

 7   looking at before, do you see the section that is

 8   titled "Current Working Values" that's in the middle

 9   of the page on the left side?

10           MR. ALBANIS:  Matt, I think you said 2008.

11           MR. LAWSON:  Oh, excuse me.  2018.  Lee

12      County property appraisal record.

13           MR. ALBANIS:  The ninth page of Exhibit 1.

14           MR. LAWSON:  That's right.  The one we were

15      looking at for the property values.

16           THE WITNESS:  Yes.

17   BY MR. LAWSON:

18        Q.    Do you see the row that is titled "Total

19   Living Area" in that section?

20        A.    Yes.

21        Q.    And you see that it lists the total living

22   area as 2246 square feet?

23        A.    Yes.

24        Q.    Do you have any reason to doubt that that
```

```
 1    number is accurate?

 2       A.   Excuse me.  We're talking about three square

 3    feet here.

 4       Q.   Yes.  I --

 5       A.   And off of the contract in my floor plan, it

 6    reflected 2249.

 7       Q.   Yes.  I just wanted to understand if you knew

 8    where this number might have come from, this 2246.

 9       A.   Yes.

10       Q.   Where did that number come from?

11       A.   I don't know -- I shouldn't say yes.  Please

12    take that back.  I don't know where that number came

13    from.

14       Q.   Okay.  But the floor plan, it has it at 2249?

15       A.   Nine.

16            (Defendants' Exhibit 2 was marked for

17    identification.)

18    BY MR. LAWSON:

19       Q.   Ms. Gody, you have been handed a document

20    that's been marked as Exhibit 2.

21            I'll give you a moment to be able to review

22    the document, and please let me know when you are

23    done.

24       A.   May I make notes on this?  Can I highlight
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/18/19 Page 897 of 3246
Confidential - Subject to further confidentiality Review
189

```
 1    something on here?

 2         MR. POYER:  Perhaps you could just point it

 3         out to Mr. Lawson what you would like to

 4         highlight verbally to him so he could -- that

 5         might be better than actually marking the exhibit

 6         that's attached to the deposition.

 7         MR. ALBANIS:  Right.  And if you want to

 8         change some of the information that's in here,

 9         you can certainly point that out.

10         THE WITNESS:  Okay.

11    BY MR. LAWSON:

12         Q.   Are you done reviewing the document?

13         A.   Yes.

14         Q.   Focusing on the first page of the document,

15    do you recognize this form, this Plaintiff Profile

16    Form?

17         A.   I don't recall.

18         Q.   Looking to the fifth page of this document,

19    marked as GodyA9005, do you see your signature on

20    that page?

21         A.   Yes, I do.

22         Q.   And you signed this document on October 9th

23    of 2009; is that correct?

24         A.   That's correct.
```

```
 1        Q.   Did you understand when you signed this

 2   document the information contained above the

 3   signature lines saying that you were declaring under

 4   penalty of perjury that the information contained

 5   within it was true to the best of your knowledge?

 6        A.   Yes.

 7        Q.   And do you believe that this information was

 8   true at the time that you signed this document?

 9        A.   Yes.

10        Q.   Going through the document today, did you see

11   any items that you wanted to correct or change based

12   on information that you have now?

13        A.   This was prior to remediation.

14        Q.   It appears this form is from 2009, in

15   October.

16        A.   I'd like to include an additional inspection

17   report.

18        Q.   Okay.  And when was that inspection?

19        A.   On the same day that Allied Home Inspection

20   was done.

21        Q.   And who performed that inspection?

22        A.   That was Radon and Mold Remediators.

23        Q.   Is that the same Radon and Mold that is

24   listed in Section 4 of the form on Page 2 at the top?
```

Confidential – Subject to Further Confidentiality Review

1      A.    Yes.

2      Q.    Did they perform two inspections on the home,

3   or are you referring to the same inspection?

4      A.    May I expand on that and not give you just a

5   yes or no answer?

6      Q.    Oh, sure.  You are always welcome.  I would

7   welcome the most complete answers that you can give.

8      A.    We had contacted WCI because we knew we had a

9   problem.  They sent a representative over who would

10   not confirm that we had a problem, and we waited and

11   waited for their findings, which we never did

12   receive.

13        So after multiple contacts with them and

14   trying to get it, we decided that we would have our

15   own inspections done.  So I researched and found

16   Radon Mold Professional and Allied, and I had them

17   done on the same day.

18      Q.    And what were the results of those

19   inspections performed by Radon and Allied?

20      A.    It was confirmed that there were electrical

21   issues with the darkening of the copper wiring.  With

22   Allied, there were high levels of strontium and

23   sulfuric gasses, and they did two different methods

24   of -- Radon came in and removed all -- with the

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 900 of 3246
Case 1:11-cv-22408-MGC Document 269-1 Entered on FLSD Docket 05/18/2012 Page 28 of
189
Confidential - Subject to Further Confidentiality Review

1  switch plates and things like that.  And the other

2  took readings on the environment in the house.

3      Q.   A moment ago you said that you had contacted

4  WCI because you knew that you had a problem with your

5  house.

6      A.   Yes.

7      Q.   Here in section, I believe, six at the bottom

8  of Page 2, there's an item that says that a notice

9  was sent to WCI Communities, Incorporated around

10  October 15th of 2009.

11          Do you see that?

12     A.   Yes.

13     Q.   What was the result of you contacting WCI to

14  tell them that you had an issue in your house?

15     A.   Denial.

16     Q.   What did they tell you?

17     A.   That they would check into it, they would

18  send somebody over.  And we were also told they would

19  put the house back to exactly the way it was the day

20  we bought it.

21     Q.   And did they do that?

22     A.   No.

23     Q.   What did they do?

24     A.   Two weeks after that, we were totally shut

```
 1    out.

 2         Q.    And what do you mean by that?

 3         A.    When we called, our phone calls were not

 4    answered; and when we inquired, we were told that

 5    they were not allowed to speak of the Chinese drywall

 6    situation.

 7         Q.    Do you remember who it was who told you that

 8    they would -- at WCI who told you that they would put

 9    the house back to the way that it was?

10         A.    Yes.  The warranty department.

11         Q.    Did you ever file a legal claim or have your

12    counsel file a legal claim against WCI?

13              MR. ALBANIS:  Object to the form.

14              But you can answer.

15    BY MR. LAWSON:

16         Q.    To your knowledge.

17         A.    I don't know.

18         Q.    Has WCI ever paid you any money because of

19    the Chinese drywall that is in your home?

20              MR. ALBANIS:  Object to the form.

21              But you can answer.

22              THE WITNESS:  WCI had a trust fund set up.

23         Our distribution after that, after eight years,

24         was $775, in which we got a 1099 and I had to pay
```

```
 1        taxes on.

 2   BY MR. LAWSON:

 3        Q.   Do you know when you got that money?

 4        A.   I believe it was sometime this year, when

 5   they dissolved the trust fund.

 6        Q.   Did you have to sign anything when you

 7   claimed that money from the trust fund?

 8        A.   Receipt that I had received the check.

 9        Q.   WCI didn't make you sign any other kind of

10   agreement?

11        A.   No.

12        Q.   Did WCI ever tell you why you were receiving

13   money from that trust fund?

14        A.   No.

15             MR. ALBANIS:  Object to the form.

16             But you can answer.

17             THE WITNESS:  No.

18   BY MR. LAWSON:

19        Q.   And do you know if other homes in the

20   community that you live in had similar issues with

21   Chinese drywall?

22        A.   Yes.

23        Q.   Do you -- how many homes do you know of in

24   the community?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 903 of 3246
Case 1:09-md-02047-EEF-MBN Document filed Under Seal docket #22010 Page 91 of
189
Confidential – Subject to Further Confidentiality Review

```
1       A.   Twenty-seven out of 31.

2       Q.   And did those -- to your knowledge, did those

3   other homes also receive some amount of money from

4   WCI from the trust fund?

5       A.   I do not know that.

6       Q.   Do you know if WCI ever made any guarantees

7   to you about the quality of the products that they

8   used to construct your home?

9            MR. ALBANIS:  Object to the form.

10           But you can answer.

11           THE WITNESS:  No.

12   BY MR. LAWSON:

13       Q.   No, you don't know; or, no, they didn't?

14       A.   No, they didn't.

15       Q.   Do you know when the Chinese drywall was

16   installed in your home?

17       A.   When the house was built in 2006.

18       Q.   And do you know who WCI bought the Chinese

19   drywall from?

20       A.   Banner Supply.

21       Q.   And how do you know that?

22       A.   From the documents from the global

23   settlement.

24       Q.   Do you know what the Chinese drywall in your
```

Confidential - Subject to Further Confidentiality Review

```
1    home looks like, if it has any identifying markings?

2         A.   I don't recall at this time.

3         Q.   Do you think you have seen it before inside

4    of your home?

5         A.   During remediation.

6         Q.   Were you present during the remediation of

7    your home?

8         A.   Part of it, yes.

9         Q.   And did someone show you drywall and tell you

10   that it was the Chinese drywall that was in your

11   home?

12        A.   I don't recall.

13             MR. ALBANIS:  With respect to that, Matt,

14        Ms. Gody has an evidence -- a bin of evidence

15        which includes drywall samples from the home,

16        which we have produced in this case.

17             Counsel for the defendants reviewed that

18        evidence bin and took pictures of the Chinese

19        drywall samples that were included in that

20        evidence bin at some point last week.  I believe

21        the date was December 5th.

22   BY MR. LAWSON:

23        Q.   Turning to the fourth page of this document

24   marked GodyA0004, do you see that page titled
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 905 of 3246
Case 1:14-cv-24510-EF-MBN Document 18 Entered on FLSD Docket 05/30/2019 Page 93 of 189

Confidential - Subject to Further Confidentiality Review

1    "Section IV Inspection Information --

2        A.   Yes.

3        Q.   -- Continued"?

4            Does this appear to be a list of inspections

5    that were performed at your home on Tiberio Drive?

6        A.   It's not complete.

7        Q.   Yes.  As we discussed before, there was an

8    additional inspection from Radon that was performed

9    the same day as Allied Home?  And I believe there are

10   some others; is that right?

11       A.   Yes.

12       Q.   What other inspections are not on this list

13   that have been performed at your home?

14       A.   Kross Inspectors.

15       Q.   Okay.  What did those cost inspectors do at

16   your home?

17           MR. ALBANIS:  I believe she said Kross.

18           MR. LAWSON:  Oh, I'm sorry.

19           THE WITNESS:  Kross, yes.

20   BY MR. LAWSON:

21       Q.   Okay.  Who are Kross Inspectors?

22       A.   Who?

23       Q.   Yes, or what are Kross Inspectors?

24       A.   They are environmental inspectors,

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 906 of 3246
Case 1:14-cv-09148-EEF-MBN Document 251 Ltr Attachment 10 SD Docket 05/30/2019 Page 34 of
189

Confidential - Subject to further confidentiality review

```
 1    specializing in Chinese drywall.

 2        Q.   And do you know when they performed an

 3    inspection on your home?

 4        A.   Can I have a minute, please?

 5        Q.   Of course.  We can take a break and go off

 6    the record.

 7        A.   No.

 8             I just want to tell you, it was a very

 9    difficult time.  They came in, and here's the house

10    that we bought that we thought we would spend the

11    rest of our time in, a beautiful home, and I had to

12    remove every picture.  They drilled walls -- holes

13    behind all my walls.  They took pieces of drywall

14    out.  My house was turned upside down to find this

15    evidence.

16             And -- and this is all dredging up a lot of

17    very difficult times for me and horrible memories of

18    what we went through.

19             MR. ALBANIS:  We did produce the Kross

20        report.  It is Document Number 365694 for the

21        record.

22    BY MR. LAWSON:

23        Q.   Ms. Gody, I appreciate you taking the time to

24    answer questions today.  And, again, like I said
```

Confidential - Subject to further confidentiality Review

189

```
 1    before, if you want to take a break at any point, if

 2    it becomes difficult to be able to go through all

 3    these questions, I understand.  Please let me know.

 4         I'm going to try to move this along as

 5    quickly as I can.  And I really do appreciate you

 6    answering these questions today.

 7         What I wanted to understand from these

 8    inspection reports and all the different inspections

 9    that occurred is, to your knowledge, why were there

10    so many inspections that were performed in 2009 that

11    we see on this list on Page 4?  Do you know the

12    reason?

13      A.   Yes.  It was the different methods these

14    inspection companies used.  One was visual so that

15    they could take off the light fixtures.  The

16    electrical outlets.

17         The other company did, as I said, measured

18    the air quality in the house.

19         And Kross Inspectors came in, and they are

20    the ones who took samples.  And they knew -- and they

21    asked if they could do it, and I said yes.  And we

22    knew that we were going to be leaving the home, and

23    we wanted to be certain that this is what we were

24    dealing with.
```

```
 1        Q.    As a result of all these inspections, were

 2   you told there was confirmation that your home

 3   contained Chinese drywall?

 4        A.    Yes.

 5        Q.    I'd like to turn your attention to beginning

 6   at Page 6 of this exhibit, marked as GodyA00006.  And

 7   it continues through Page 11 of this document.

 8              Do you see that section?

 9        A.    Yes.

10        Q.    Is this a homeowner's policy from State Farm

11   for you and your house for your home at Tiberio

12   Drive?

13        A.    Yes.

14        Q.    And was this the homeowner's policy that you

15   had at Tiberio Drive when you moved into the home

16   around 2007?

17        A.    Yes.

18        Q.    To your knowledge, did you ever file a

19   homeowner's policy claim with State Farm related to

20   your home from Chinese drywall?

21        A.    No.

22        Q.    Why is that?

23        A.    Because when I inquired, they told me it was

24   not covered.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 909 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 909 of 3246
Confidential - Subject to Further Confidentiality Review
189

```
1        Q.   Did they give you any other reasons why it
2   would not be covered?
3        A.   No.  It wasn't one of the perils when the
4   policy was established.
5        Q.   And did you continue to have your homeowner's
6   policy for this property with State Farm after you
7   were told that the damage in your home would not be
8   covered?
9        A.   Yes.
10       Q.   And do you continue to have that policy with
11  them today?
12       A.   No.
13       Q.   And who is your policy with now?
14       A.   Tower Hill.
15       Q.   I'd like to turn your attention to the
16  fourteenth page of this exhibit.
17            Do you recognize this document?
18       A.   Yes.
19       Q.   And what is it?
20       A.   It's a floor plan of our house.
21       Q.   Is this the floor plan that you were
22  referring to earlier?
23       A.   Yes.
24       Q.   Is this the floor plan for you to buy WCI, to
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 910 of 3246
Case 1:14-cv-01233-LDW Document 26-11 filed on Docket 05/30/2015 Page 91 of 189
Confidential - Subject to Further Confidentiality Review

```
1    your knowledge?

2        A.   Yes.

3        Q.   Does this accurately reflect the floor plan

4    of your house back in 2006 when it was built?

5        A.   Yes.

6        Q.   Is the floor plan for the home the same today

7    as it was back in 2006?

8        A.   Yes, with the exception of the drywall

9    removed.

10       Q.   But the layout of the home --

11       A.   Yes.

12       Q.   -- is the same?

13       A.   Yes, yes.

14       Q.   Looking to Page 15, is this the purchase

15   contract for the home at Tiberio Drive?

16       A.   Yes, it is.

17       Q.   Have you ever been told where the Chinese

18   drywall was installed inside of your home?

19       A.   Yes.

20       Q.   And where were you told it had been

21   installed?

22       A.   If you review our environmental report, it's

23   color-coded, and it will show you exactly where it

24   was.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 911 of 3246
Case 1:14-cv-03169-ELD Document 1, Court Filed to Docket 05/13/2015 Page 89 of 189
Confidential - Subject to further confidentiality review

```
 1          Q.    Do you recall?

 2          A.    Oh, yes, yes.

 3          Q.    Where is it?

 4          A.    We had Chinese drywall in our owner's suite.

 5     We had Chinese drywall in the family room.  We had

 6     Chinese drywall in the dining room and also in the

 7     living room.  We had Chinese drywall in the den, and

 8     we also had it in the garage, around the air handler.

 9          Q.    Do you know if you also had American drywall

10     that was installed in your home at the time that the

11     house was built in 2006?

12          A.    I would have only known from the inspection

13     report, from the environmental report.

14          Q.    But do you know that now, that there was

15     American drywall in the home as well?

16          A.    If that's what's listed on the environmental

17     report, yes.

18          Q.    When did you first suspect that there was

19     Chinese drywall in your home?

20          A.    I knew we had a problem within a year of

21     living there.  I developed nosebleeds, headaches,

22     rashes, bronchitis, insomnia, and went to all my

23     different doctors.

24                In addition to that, my dog was sick, running
```

Confidential - Subject to further confidentiality Review

1    her to the vet all the time.  She was listless,

2    wouldn't eat, lost weight.

3          And then some of the appliances started to

4    fail.  And we -- this was starting to come to light

5    that there could be a problem.

6    Q.   So you said that it was about a year --

7    within a year?  Excuse me,

8    A.   About a year after moving in, yes.  We

9    started to see some signs that -- I mean, within a

10   year of living there, we were both having health

11   issues.

12   Q.   Were you having the health issues throughout

13   that first year or only after about a year had

14   elapsed of living in the home?

15   A.   We had those health issues until we vacated

16   the building.

17   Q.   So you had -- you claimed -- sorry -- excuse

18   me.

19          You had the health issues from the time you

20   moved in until you vacated or about a year in you

21   started having them until you --

22   A.   It was after a year in that we started

23   noticing all the health issues.

24   Q.   Okay.  Did -- and the appliances that you

Confidential - Subject to Further Confidentiality Review

```
 1     mentioned that started to fail --

 2         A.   Yes.

 3         Q.   -- did that also begin about a year into

 4     being in the home?

 5         A.   Within a year to a year and a half, yes.

 6         Q.   You listed a number of health issues that you

 7     started to have about a year into living at the home.

 8     Had you had any of those issues prior to living in

 9     the home?

10         A.   No.

11         Q.   And when you went to the doctor or doctors,

12     as you said, what did they tell you about the health

13     issues that you were having?

14         A.   They could not diagnose why, but the fact

15     that it continued, I was told that it could possibly

16     be environmental.

17         Q.   What health issues did your husband suffer

18     from during the time that you were living in the

19     home?

20         A.   He suffered from some bronchitis.  He

21     suffered from headaches and -- not as severe as I

22     did.

23         Q.   And did he go to the doctor as well?

24         A.   Yes.
```

Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Do you know what he was told by the doctors

 2    about his health issues?

 3        A.    Couldn't pinpoint why it -- why we were

 4    having these problems at that time.

 5        Q.    After you moved out of the home for the

 6    26 months that we discussed earlier, did you continue

 7    to have those same health issues?

 8        A.    No.

 9        Q.    Did all of those health issues go away?

10        A.    Yes, they did.

11        Q.    Once you moved back into the home, did you

12    have any of those health issues again?

13        A.    No.

14        Q.    And have you had them ever since at any time?

15        A.    No.

16        Q.    Other than the health issues that you

17    mentioned, the issues that your dog was having, and

18    the appliances failing in the home, were there any

19    other issues that you noticed in your home when you

20    began living in it in 2007 to the time that you moved

21    out?

22              MR. ALBANIS:  Object to the form.

23              But you can answer, if you can.

24              THE WITNESS:  We had had friends come to
```

```
 1          visit, and they were affected by the drywall

 2          before we knew what it was, tightening of her

 3          throat, couldn't stay in the house.  She would

 4          have to walk in and out, in and out.  So we

 5          figured there was something wrong.

 6               In that time period, we really wouldn't

 7          invite anybody into our home or to stay.

 8      BY MR. LAWSON:

 9          Q.   And can you think of any other issues or

10      problems that arose while you lived in the home from

11      that period of 2007 through 2010?

12               MR. ALBANIS:  You're talking with just

13          respect to the Chinese drywall?

14               MR. LAWSON:  That's right.

15      BY MR. LAWSON:

16          Q.   That you believe is related to the Chinese

17      drywall.

18          A.   Well, we had quite a few appliances fail on

19      us, televisions, computers, replaced two dishwashers,

20      three wine coolers, two refrigerators, two burners on

21      a stove, a microwave totally went out.  We didn't

22      bother replacing that because we knew there was an

23      issue.

24          Q.   And those appliances, did they fail between
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 916 of 3246
Case 1:09-md-02047-EEF-DW Document 26-11 Filed in Docket 05/30/2019 Page 94 of 189
Confidential - Subject to Further Confidentiality Review

```
1    2008 and 2010?

2         A.    Yes.

3         Q.    Did you replace the televisions that you

4    mentioned?

5         A.    Yes.

6         Q.    Did you replace the computers?

7         A.    Yes.

8         Q.    Did you replace the wine coolers?

9         A.    Yes.  The first one failed.  We went back to

10   the -- where we had purchased it, and they couldn't

11   figure out why.  It was under warranty, so we got a

12   second one.  It failed as well.  Went back, and they

13   said we're not manufacturing that anymore so we

14   cannot replace that for you.  And then we bought a

15   third one, a smaller one, and it failed as well.

16        Q.    The burners on the stove, did you have those

17   repaired?

18        A.    No.

19        Q.    And do you know if you have any receipts for

20   the items that you had to replace within the home

21   that you purchased?

22        A.    I do have some receipts -- we do have some

23   receipts.

24        Q.    And have you given those to your attorney?
```

```
1        A.    Yes.

2        Q.    Did you notice any odor in the home when you

3    lived there from 2007 to 2010?

4        A.    Yes.

5        Q.    What did it smell like?

6        A.    Musty, moldy, mildew smell.  Certain areas of

7    the house like burnt matches, rotten egg.

8        Q.    Was the smell different in different parts of

9    the house?

10       A.    Stronger in some areas than others.

11       Q.    Where was it the strongest?

12       A.    I -- I don't recall at this time.

13       Q.    Did the smell get stronger or weaker over

14   time while you lived in the house from 2007 to 2010?

15       A.    Stronger.  We spent the summer of 2009

16   sitting outside for most of the summer and then

17   keeping our dog outside and then getting in the car

18   and taking rides because we couldn't be in the home.

19             And we purchased two air purifiers to put in

20   our bedroom so we could sleep at night, and we kept

21   the doors closed so we wouldn't be exposed to the

22   rest of the house.

23       Q.    Did you notice that the issues that you dealt

24   with that you believe were related to Chinese drywall
```

1    in your home were worse in particular seasons, like

2    the summer?

3        A.   No.

4        Q.   Why was it in the summer of 2009 that you

5    spent most of the time outside compared to the rest

6    of the year?

7        A.   Because of the smell.  And just we didn't

8    want to be exposed anymore.

9        Q.   Was it in 2009 that you knew that you had

10   Chinese drywall in your house?

11       A.   We suspected.

12       Q.   When was the first time where you knew that

13   you had Chinese drywall in your house?

14       A.   When we had the first inspection reports

15   done -- inspections done.

16       Q.   Did you have any issues with your

17   air-conditioning in the home?

18       A.   We replaced three air handlers.  The first

19   company that we engaged was Wiegold & Sons when we

20   were having a problem, and they replaced the air

21   handler because they said it was leaking coolant.

22   And we had a maintenance contract, which we would

23   have them come twice a year.

24            And then we hired Certainty to come, and

```
 1   Certainty Heating and Cooling replaced three air

 2   handlers for us.  And they were done all under

 3   warranty, but we had to pay for the labor to replace

 4   them.

 5          And through their experience as well, they

 6   said, we think you have Chinese drywall.

 7     Q.   Do you know when those replacements of the

 8   air handlers occurred, about?

 9     A.   I have submitted that.  I can't tell you

10   offhand what the exact dates -- I do know, yes,

11   because there are pictures of them.

12          We had one replaced in 2009.  I think in

13   '10 -- there was two of them in 2010.

14     Q.   Do you remember when you first heard about

15   Chinese drywall and that it was in homes in America?

16     A.   Yes.

17     Q.   When was that?

18     A.   I would say toward the end of like 2008,

19   beginning of 2009.

20     Q.   And where -- when -- where did you hear about

21   it first?

22     A.   The news.  The newspapers.  On television and

23   in newspapers.

24     Q.   And when you heard about that, did you
```

Confidential - Subject to Further Confidentiality Review

```
1    suspect that that was what was going on in your home?

2        A.   Yes.

3        Q.   During that time, did you talk to anyone else

4    in the community about whether they were having

5    similar issues to what you were having?

6        A.   Everyone was talking about it.

7        Q.   And what were they saying?

8        A.   They were experiencing the same problems:

9    appliances failures, illnesses.

10       Q.   Do you recall that other people were

11   suffering from the same illnesses or different ones?

12       A.   I don't recall.

13       Q.   Do you remember when you first spoke with an

14   attorney about Chinese drywall in your home?

15       A.   Yes.

16       Q.   And when was that?

17       A.   I believe it was in June of -- it was after

18   we did not get a response from WCI, and we contacted

19   Morgan & Morgan.

20       Q.   Can you think of any other appliances or

21   personal property items that you believe were damaged

22   by Chinese drywall in your home before you moved out

23   of it in 2010?

24       A.   A lot of the frames on our artwork were all
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 921 of 3246 of
Case 1:14-cv-02046-EDK Document 35 Doc Docket 05/30/2017 Page 89 of
189

Confidential - Subject to Further Confidentiality Review

```
 1    being tarnished.

 2        Q.    Were those metal frames?

 3        A.    Metal frames, yes.

 4        Q.    Anything else?

 5        A.    Jewelry, sterling silver.  It was just very

 6    difficult to see all these things happening all at

 7    the same time and trying to make the right decisions

 8    on what to do.

 9        Q.    Do you know if you replaced the metal frames

10    that you were talking about earlier?

11        A.    No.

12        Q.    Did you replace the jewelry?

13        A.    No.

14        Q.    Did you replace the sterling silver?

15        A.    No.  I gave it to my sister.

16        Q.    With the different inspections that you had

17    performed on your home in 2009, do you know if you

18    paid for those inspections or if anyone else paid for

19    them?

20        A.    I paid for Allied and Radon and Mold

21    inspections, and there are receipts to prove it.

22        Q.    And for the other inspections, do you know

23    who paid for them?

24        A.    I know Kross Inspectors were done by Morgan &
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 922 of 3246 of
Case 1:11-cv-22408-MGC Document 26-39 Entered on FLSD Docket 05/30/2014 Page 90 of
189
Confidential - Subject to Further Confidentiality Review

```
1    Morgan.

2           (Defendants' Exhibit 3 was marked for

3    identification.)

4    BY MR. LAWSON:

5        Q.   I have handed you a document that has been

6    marked as Exhibit 3.

7             Do you recognize that document?

8        A.   Yes.

9        Q.   And what is it?

10       A.   It's an inspection report from Kross

11   Inspectors.

12       Q.   And when was that inspection performed?

13       A.   March 2010.

14       Q.   Did Kross Inspectors inspect your home

15   multiple times?

16       A.   No.

17       Q.   Okay.  So this was the one inspection that

18   they performed?

19       A.   Yes.

20       Q.   Were you present when this inspection was

21   performed?

22       A.   Yes.

23       Q.   And was anyone else there?

24       A.   My husband.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 923 of 3246
Case 2:11-cv-01077-EEF-JCW Document 25-1 Filed on SD Docket 05/30/2012 Page 31 of
189

Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Did you answer questions for the inspector

 2    while they were there?

 3        A.    Yes.

 4        Q.    And did you follow the inspector around while

 5    they were doing the inspection?

 6        A.    Yes.

 7        Q.    Do you remember what questions the inspector

 8    asked of you?

 9        A.    May we take a large sample from this wall?

10    Do you mind if we drill in this wall?  Other than

11    that, I -- I don't recall.

12        Q.    Have you ever looked at the photos that were

13    taken during that inspection?  They begin on Page 2.1

14    of this report.

15        A.    Yes.

16        Q.    As best as you can tell, do these photos look

17    like they were taken at your home at Tiberio Drive?

18        A.    Yes.

19        Q.    And have you seen the photos of the drywall

20    markings that are on Page 2.2 before?

21        A.    Not before this report.

22        Q.    But since the report was created, have you --

23    you have seen these in the report before?

24        A.    I've seen them in the report and the
```

1    environmental inspection report.

2        Q.    Have you ever seen -- outside of photos but

3    actually physically seen -- the drywall marking that

4    is shown here that says C&K gypsum board inside of

5    your home?

6            It's in the middle of Page 2.2 on the left

7    side.

8        A.    Only during the time that they were

9    remediating and they tore all the drywall down.

10       Q.    When they tore the drywall out of your home

11   during remediation, you saw boards that said C&K

12   gypsum board?

13       A.    I saw many boards of drywall.

14       Q.    And do you remember seeing ones that said

15   C&K?

16       A.    Yes.

17       Q.    Looking back to Page 1.4, which is a few

18   pages back, there are comments and recommendations

19   from the inspector.

20           Let me know when you are on that page.

21       A.    Page number again, please.

22       Q.    Page 1.4.

23           And I would like to turn your attention to

24   the paragraph at the bottom and the middle of it --

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 925 of 3246
Case 2:14-cv-02722-EEF-JCW Document 15 Filed 05/18/2015 Page 53 of
189
Confidential - Subject to Further Confidentiality Review

```
1        A.    Excuse me, but on Page 1.4, it says "received

2   for services rendered."

3        Q.    There might be multiple pages of 1.4.  In

4   fact, I believe there are.  If you go a couple pages

5   forward in the document, it's just a couple pages

6   back from the photographs that we were looking at a

7   moment ago.

8        A.    Okay.

9        Q.    I apologize.

10             I would like to turn your attention to the

11  bottom paragraph, beginning in the middle of that

12  paragraph, the sentence that starts "in addition."

13             It states:  In addition, the inspector cut

14  multiple holes in interior walls throughout the home.

15  The inspector did identify several manufacturer stamps,

16  4 feet x 12 feet x 1/2 inch and USG that were

17  observed throughout the homes interior walls and

18  attic.

19             The manufacturer stamp C&K gypsum board was

20  observed on the unfinished surface of the garage's

21  attic hatch.

22             Did I read that correctly?

23       A.    Yes.

24       Q.    So the C&K board was found in the garage's
```

Case 2:09-md-02047-EEF-MBN  Document 22363-39  Filed 11/19/19  Page 926 of 3246
Case 1:14-cv-06228-JBW-JO  Document 128-1  Filed 05/13/2014  Page 94 of 189
Confidential - Subject to Further Confidentiality Review

 1    attic hatch by the inspector?  Is that what this

 2    report says?

 3         A.    That's what the report says.

 4         Q.    And do you recall from being at the home when

 5    it was being remediated whether there was C&K gypsum

 6    board found in any other locations in the home?

 7              MR. ALBANIS:  Object to the form.

 8              But you can answer, Ms. Gody, if you know the

 9         answer.

10              THE WITNESS:  I do not recall.

11    BY MR. LAWSON:

12         Q.    Do you recall seeing drywall boards that were

13    marked as 4 feet x 12 feet x 1/2 inch during the

14    remediation of the home?

15         A.    Yes.

16         Q.    And where did you see those boards pulled out

17    of the house?

18         A.    I don't recall.

19         Q.    And do you recall seeing boards that were

20    marked as USG being removed from the home during the

21    remediation?

22         A.    I just remember that the remediator showed me

23    different boards.

24         Q.    I wanted to ask whether since you have moved

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 927 of 3246 of
Case 1:09-cv-02047-EEF-MBN Document 22363-39 Filed 05/03/2019 Page 5 of
Confidential – Subject to Further Confidentiality Review
189

1    back into the home after the home was remediated,

2    whether you have had any appliances that have failed?

3        A.    No.

4        Q.    And have you had -- and have you had any

5    issues with an odor in the house of any kind?

6        A.    No.

7        Q.    Do you have any of the issues that you recall

8    having that you believe were related to the Chinese

9    drywall in your home now that it has been remediated?

10       A.    No.

11             MR. LAWSON:  Okay.  We can go off the record.

12             (Recess from 12:43 until 1:08 p.m.)

13   BY MR. LAWSON:

14       Q.    Welcome back, Ms. Gody.

15             (Defendants' Exhibit 4 was marked for

16   identification.)

17       Q.    You have been handed a document that's been

18   marked as Exhibit 4.

19             This document is titled "Priority Claimant

20   Candace Gody's Answers to Interrogatories."

21             Have you seen this document before?

22       A.    Yes.

23       Q.    And have you reviewed this document before?

24       A.    Yes.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 928 of 3246
Case 1:11-cv-00377-DLI Document 2-11 Filed 05/30/2012 Page 86 of 189
Confidential - Subject to Further Confidentiality Review

1    Q.   I'd like to turn your attention to the first

2    interrogatory that is on Page 1.  It asks you to

3    identify all types of damages that you seek in the

4    lawsuit and specifically amounts sought for each

5    category.

6         Do you see that?

7    A.   Yes.

8    Q.   Within your answer to that interrogatory, you

9    stated that you're seeking personal property damage

10   expenses of at least $7,595.

11        Do you see that?

12   A.   No, I don't.

13   Q.   You don't see that line and that answer?

14   A.   Oh, wait.

15        Yes, I see that line.

16   Q.   So is that correct, that you are seeking --

17   A.   Yes.

18   Q.   -- personal property damage expenses of at

19   least $7,595 in this lawsuit?

20   A.   I do believe that is a revised number.

21   Q.   Okay.

22        MR. ALBANIS:  So, Matt, just for the record,

23        we did produce amended written responses to the

24        discovery requests that we received.  They have

```
 1          been uploaded to the BrownGreer portal and served

 2          upon you previous to today's date.

 3               So that may be why Ms. Gody has some

 4          confusion regarding the initial version of her

 5          answers to interrogatories.

 6               MR. LAWSON:  There seems be some confusion

 7          here, because we received amended answers to the

 8          second set of interrogatories, and we have

 9          received an amended number to the amount of

10          alternative living expenses that are being

11          sought.  However, we did not receive an amendment

12          to the answers to this set of interrogatories,

13          the first set.  This is the latest version that

14          we have in our possession.

15               If you believe that that's incorrect and that

16          we should have been served with a different set,

17          then perhaps we can go off the record and resolve

18          that.

19               But, otherwise, we are going to move forward

20          assuming that this is the latest set of answers

21          to this first set of interrogatories, as opposed

22          to the second.

23               MR. ALBANIS:  Let's go off the record --

24               MR. LAWSON:  All right.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 930 of 3246 of
Case 1:14-md-02543-EEF-MBN Document 2363-39 Filed 05/30/19 Page 98 of
189

Confidential - Subject to Further Confidentiality Review

```
 1            MR. ALBANIS:  -- so I can try to get to the

 2       bottom of this.

 3            MR. LAWSON:  Great.

 4            (Recess from 1:11 until 1:17 p.m.)

 5            MR. ALBANIS:  So I apologize, Matt.  It was a

 6       clerical error on our part.  We intended to

 7       change the Answers to Interrogatories and to

 8       serve First Amended Answers to Interrogatories

 9       with the only change being the amount listed in

10       response to Interrogatory Number 1 for

11       alternative living expenses.

12            We intended to change it from $327,036.70 to

13       the amount that is listed on the Fourth Amended

14       Supplemental Plaintiff Profile Form for

15       alternative living expenses, which I believe is

16       right around $68,000 and change.

17            For formality purposes, I have instructed my

18       staff to go ahead and prepare the First Amended

19       Answers to Interrogatories today.  We will serve

20       those on you today.  I will submit to you that

21       that will be the only change to those answers

22       when we serve those on you.

23            MR. LAWSON:  Thank you.

24            And like yesterday, we would ask as well if
```

Confidential - Subject to Further Confidentiality Review

```
 1        there are any verifications that are forthcoming

 2        for these interrogatories or any supplemental or

 3        amended answers to the discovery responses that

 4        they be submitted as soon as practical for

 5        Ms. Gody or any of your other claimants.

 6             MR. ALBANIS:  I appreciate that, and we will

 7        serve those on you as well.

 8             MR. LAWSON:  Thank you.

 9   BY MR. LAWSON:

10        Q.   Ms. Gody, going back to this document that

11   you are looking at, Exhibit 4, we were discussing the

12   answer that you gave related to personal property

13   damage expenses and whether that figure of at least

14   $7,595 was accurate.

15             Based on what you just heard from your

16   attorney, would you agree that that is the accurate

17   amount of money that you are seeking for personal

18   property damage expenses?

19        A.   No.

20        Q.   Okay.  What amount are you seeking for

21   personal property damage expenses?

22        A.   It's -- this has to be amended as well.  It's

23   around $8,500.

24        Q.   $8,500?
```

```
1       A.   Yes.

2       Q.   And why do you say that this number needs to

3   be amended?  Is there something you know that is not

4   included in that $7,595?

5       A.   In the personal damages, yes.  We had come

6   across another invoice.

7       Q.   Okay.  What is that invoice for?

8       A.   I don't remember at this time.

9       Q.   Okay.  Have you produced that invoice to your

10  attorney?

11      A.   Yes, I have.

12           MR. LAWSON:  Okay.  Pete, obviously, if we

13      have it, please let us know if we can figure out

14      exactly what that is.  But if you know that that

15      has not been produced or you can figure out what

16      it is, please let us know, especially if we are

17      going to be amending this answer further to

18      change the amount to around $8,500.  I just want

19      to make sure we have all the documentation so we

20      can ask Ms. Gody about it.

21           MR. ALBANIS:  Understood, and I will let you

22      know.

23  BY MR. LAWSON:

24      Q.   Ms. Gody, is it correct there is only one
```

Confidential - Subject to Further Confidentiality Review

```
 1    additional invoice that would add to that total to

 2    make it $8,500 that you are requesting for personal

 3    property damage expenses?

 4         A.   I need to review the list that I presented to

 5    the attorney.

 6         Q.   All right.

 7              (Defendants' Exhibit 5 was marked for

 8    identification.)

 9    BY MR. LAWSON:

10         Q.   I've handed you a document that has been

11    marked as Exhibit 5.

12              Do you recognize this document?

13         A.   Yes.

14         Q.   And what is it?

15         A.   I prepared it.

16         Q.   And what is this document that you prepared?

17         A.   It's receipts for personal property.

18         Q.   And is this the list that you mentioned a

19    moment ago that you said that you had given to your

20    counsel?

21         A.   No.

22         Q.   Okay.  Is there a different list that you

23    have given your counsel?

24         A.   Yes.
```

```
 1      Q.   Do you know when you gave him that list?

 2      A.   I don't recall.

 3      Q.   Okay.  Do you know when you created this

 4    list?

 5      A.   I don't recall.

 6      Q.   Is it accurate to say that this list reflects

 7    items that you believe were damaged by the Chinese

 8    drywall in your home?

 9      A.   Yes.

10      Q.   And this list includes at the top HVAC coils

11    for $360; is that right?

12      A.   I need to expound -- expand my statement on

13    this with prior -- with -- there is another list that

14    I presented that I was able to come across going

15    through all my documentation for eight years, and it

16    was a notebook that I kept that had the receipts in

17    it.

18           So there is an additional list of personal

19    property items.

20      Q.   Okay.  And we can get to that.

21           But I want to first address this list, if

22    possible.  And I guess I would like to understand if

23    the additional list that you are talking about also

24    contains these items and others or if this list
```

Confidential - Subject to Further Confidentiality Review

```
 1    includes the items separately.

 2         A.   This isn't included in the other list that I

 3    presented, to the best of my knowledge.

 4              (Defendants' Exhibit 6 was marked for

 5    identification.)

 6    BY MR. LAWSON:

 7         Q.   You have been handed a document that's been

 8    marked as Exhibit 6.

 9              Do you recognize this document?

10         A.   Yes.

11         Q.   And what is this?

12         A.   This is a repair document from Wiegold &

13    Sons.

14         Q.   And have you had a chance to review all of

15    the different invoices and receipts contained within

16    this exhibit?

17         A.   Yes -- give me a minute, please.

18         Q.   No problem.

19         A.   The only duplication on this list and the --

20    and the current list or the newer list I have

21    presented is $169.

22         Q.   Okay.  And do you know what that $169 is for?

23         A.   Yes.

24         Q.   And what is that?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 936 of 3246 of
Case 1:14-cv-02722-MG-ELDW Document 1 Confidential SD Docket 05/30/2019 Page 64 of
189
Confidential - Subject to Further Confidentiality Review

      1        A.    Wiegold.

      2        Q.    Okay.  So there's an additional Wiegold

      3    invoice on the list that you presented more recently?

      4        A.    Yes.

      5        Q.    And it's for $169?

      6              MR. ALBANIS:  I think it may be best if we

      7        took a quick break so we can get to the bottom of

      8        this.

      9              THE WITNESS:  Yes, these receipts.

     10              MR. ALBANIS:  Yes.

     11              MR. LAWSON:  Sure.

     12              MR. ALBANIS:  If that's okay with you, Matt.

     13              THE WITNESS:  And -- can I ask a question

     14        right now?

     15              MR. ALBANIS:  No.  Let's just take a break.

     16              THE WITNESS:  Okay.

     17              MR. ALBANIS:  Thank you.

     18              (Recess from 1:27 until 2:10 p.m.)

     19    BY MR. LAWSON:

     20        Q.    Okay.  We're back on the record.

     21              We have had a break where plaintiff's counsel

     22    and Ms. Gody have had an opportunity to be able to

     23    explore the -- any discrepancy with the receipts

     24    related to personal property expenses that we were

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 937 of 3246
Case 1:14-cv-02083-AT Document 13 Confidential - Subject to Further Confidentiality Review
189

1    discussing before the break.

2         Is there any update on that before we

3    proceed?

4         MR. ALBANIS:  We had an opportunity to speak

5         with Ms. Gody, and we will be sticking with the

6         answer to interrogatory that has already been

7         produced and that you have identified as Exhibit

8         Number 4 with the exception of the change that I

9         mentioned earlier about the changing the

10        alternative living expenses number from $327,000

11        to right around $68,000, which was previously

12        disclosed in the Fourth Amended Supplemental

13        Plaintiff Profile Form.

14             There may be categories of personal property

15        that is -- that has been included within that

16        $68,000 alternative living expenses amount, but

17        all of the backup documentation for that claim,

18        as well as for the $7,595 for personal property

19        damage has been uploaded to the BrownGreer portal

20        and produced to you.

21             So I believe that any questions to Ms. Gody

22        about the total value of her damaged personal

23        property that she can approximate based on the

24        documentation that has been produced are

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 938 of 3246 of
Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 938 of 3246 of
189

Confidential - Subject to Further Confidentiality Review

```
 1         obviously fair game and that she -- she can

 2         respond to.

 3              MR. LAWSON:  Thank you.

 4    BY MR. LAWSON:

 5         Q.  All right.  Ms. Gody, let's go back to

 6    Exhibit 5 that we looked at previously, which is that

 7    list, along with some images of some receipts on the

 8    following pages.

 9              Looking at this list, does this include some

10    of the items that you are seeking compensation for

11    that are personal property expenses that you paid as

12    a result of damage from Chinese drywall?

13         A.  These are receipts that I submitted.

14    However, for the things that I did not have receipts

15    for, I did not submit for personal property because

16    I -- we disposed of three bedrooms worth of

17    furniture, dining room furniture, living room

18    furniture, kitchen furniture, and anything that

19    couldn't be put in a dishwasher or in a washing

20    machine because we were looking at the protocol that

21    had been produced.

22              And because of the health issues and

23    everything that we had, we did not want to have

24    anything to do with it.  We didn't want to take that
```

Confidential - Subject to Further Confidentiality Review

```
 1    anywhere else and be exposed to it.

 2            So my personal loss is much greater than

 3    $7,500, let me tell you.

 4       Q.   Looking at the receipts that are on the pages

 5    that follow this list, are these the receipts for

 6    some of the items that are listed on the first page

 7    of Exhibit 5?

 8       A.   These are all of the receipts.

 9       Q.   Okay.  One of the items on this list is

10    365 -- $365 for HVAC coils from Certified Air.  Just

11    from my understanding, do you see that in the

12    receipts on Exhibit 4 -- excuse me, Exhibit 5, or are

13    they in the receipts that are shown in Exhibit 6?

14       A.   They are in Exhibit 6.

15       Q.   And is that the same for the Wiegold & Sons

16    August 5th, 2008, $169?

17       A.   Yes.

18       Q.   That is present in Exhibit 6 in a receipt; is

19    that right?

20       A.   Yes.

21       Q.   In fact, I think it's an invoice for $169 in

22    Exhibit 6, correct?

23       A.   Yes.

24       Q.   All right.  And you have other Wiegold & Sons
```

```
1    invoices as well?

2         A.   Yes.

3         Q.   And those invoices list a check number on the

4    left-hand side, around the middle of the page,

5    showing payment --

6         A.   Yes.

7         Q.   -- of those invoices?

8              Additionally, there are, in Exhibit 6,

9    invoices from Certified Heating and Cooling; is that

10   right?

11        A.   Yes.

12        Q.   And these are for services provided by that

13   company related to your air-conditioning unit?

14        A.   Yes.

15        Q.   And then if you move on through Exhibit 6,

16   there are checks -- excuse me, invoices showing that

17   those bills with Certified Heating and Cooling have

18   been paid?

19        A.   Yes.

20        Q.   Is that right?

21             Are there, to your knowledge, any other

22   additional receipts that you have in your possession

23   for the $7,500 that you are pursuing in personal

24   property expenses beyond the ones that are shown in
```

```
 1    Exhibits 5 and 6 that we just looked at?

 2            MR. ALBANIS:  Object to the form.

 3            But you can answer, if you can.

 4            THE WITNESS:  Not that I recall.

 5            (Defendants' Exhibit 7 was marked for

 6    identification.)

 7    BY MR. LAWSON:

 8       Q.   Mrs. Gody, I have handed you a document

 9    that's been marked as Exhibit 7.

10            Do you recognize this document?

11       A.   Yes.

12       Q.   And what is it?

13       A.    The Fourth Amended Supplemental Plaintiff

14    Profile Form.

15       Q.   And is this the Fourth Amended Supplemental

16    Plaintiff Profile Form for your claim in the

17    Chinese-manufactured drywalls products liability

18    litigation?

19       A.   Yes.

20       Q.   And do you know about when this document was

21    created?  Specifically, you can look to the eighth

22    page of the document, which is the last page.

23            MR. ALBANIS:  Seven.

24            THE WITNESS:  I have seven.
```

```
 1    BY MR. LAWSON:

 2        Q.   Okay.  Do you not have a signature page or

 3    verification page at the back of your copy of the

 4    exhibit?

 5        A.   Page 7.

 6             MR. LAWSON:  Can we go off the record for a

 7        second.

 8             (Discussion off the record.)

 9    BY MR. LAWSON:

10        Q.   Ms. Gody, I think we have clarified that I

11    had a different copy of the Fourth Amended

12    Supplemental Plaintiff Profile Form, but we have

13    clarified that and I now have the same copy and

14    version that you do.  The pagination was a little bit

15    different.

16             Looking at Page 7 of this document, the date

17    that it was signed, or at least that it was

18    completed, appears to be December 11th, 2018; is that

19    correct?

20        A.   Yes.

21        Q.   And that was a couple of days ago; is that

22    right?

23        A.   Yes.

24        Q.   In fact, yesterday, correct?
```

```
 1        A.    Yes.

 2        Q.    Have you looked at this document before?

 3        A.    Yes.

 4        Q.    And did you assist in filling out this

 5   document or answering the questions in this document?

 6        A.    Yes.

 7        Q.    I'd like to turn your attention to the sixth

 8   page of this document.  At the top of the page, it

 9   states:  If you experience any loss of use and/or

10   loss of enjoyment of the property as a result of

11   Chinese drywall, identify the total amount of such

12   loss.

13              Do you see that?

14        A.    Yes.

15        Q.    And the amount listed is $200,000.

16              Is that what it says?

17        A.    Yes.

18        Q.    Can you tell me how you decided that that was

19   the amount of money that you identified as the --

20   your loss for loss of use of enjoyment of the

21   property?

22              MR. ALBANIS:  Object to the form.

23              But you may answer, if you can.

24              THE WITNESS:  First, no amount of money is
```

```
1          going to put this horrible experience behind me,

2          and I can't stress that enough with you.

3              This amount was based upon a formula that was

4          provided by Judge Fallon.

5     BY MR. LAWSON:

6     Q.   We talked a little bit earlier about the

7     experience that you had in your home from 2007

8     through 2010 while you lived in it.  You told me a

9     little bit about the health effects, the odor, and

10    some of the things that you could not do, like have

11    people over to your house.

12             And I just wanted to give you this

13    opportunity if there were any other things that

14    contributed to your loss of use and enjoyment of the

15    property during that time, if you could explain those

16    to me now.

17    A.   Being in an environment that you knew that

18    was bad for your health and you wouldn't want to have

19    your family or friends to visit because you wouldn't

20    want them to be exposed.

21             And we didn't know what the outcome was going

22    to be.  We could not enjoy the house at all.  To us,

23    it was just a constant reminder of what we were going

24    through, and we didn't know if there was ever going
```

```
 1   to be a resolution to it.

 2         And for all the reasons that we moved there,

 3   we weren't enjoying it for that:  for the social

 4   aspect of it, for the golf, the tennis, everything

 5   that was there.  We were so consumed by everything

 6   that was going on with this that we couldn't enjoy

 7   anything.

 8     Q.   Has that changed since the home was

 9   remediated?

10     A.   Yes.  Because now we feel we are in a safe

11   environment and nothing is going to affect our health

12   as much as this did.

13     Q.   And since you have had the home remediated,

14   has anything limited your use or enjoyment of the

15   property?

16     A.   Are you referring to just the house?

17     Q.   Yes.

18     A.   No.

19     Q.   You feel like you get to fully use and enjoy

20   the home now that it's been remediated?

21     A.   Yes, yes.

22     Q.   I'd like to turn your attention to Page 5 of

23   this exhibit, the section at the bottom titled

24   "Section 7:  Other Damage."
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 946 of 3246
Case 1:11-cv-22408-MGC Document 26-11 Entered on FLSD Docket 05/30/2014 Page 94 of
189
Confidential - Subject to Further Confidentiality Review

1          Do you see that?

2     A.    Yes.

3     Q.    That section states:  If you incurred

4   alternative living expenses as a result of Chinese

5   drywall, identify the total moving costs and/or

6   alternative living expense you incurred.

7          Did I read that correctly?

8     A.    Yes.

9     Q.    And the amount that you have listed on this

10  form is $68,314.48, correct?

11    A.    Correct.

12    Q.    What kind of expenses are included in that

13  number of $68,314.48?

14         MR. ALBANIS:  Object to the form.

15         But you may answer if you can, Ms. Gody.

16         THE WITNESS:  When we vacated the property

17      and moved back to Elizabeth, Pennsylvania, to be

18      around family and also to get out of this toxic

19      environment and living in the house there, I

20      figured out -- I turned this in based upon the

21      46 months that I lived there:  mortgage,

22      utilities, furnishings to be able to live in the

23      house, a security system, taxes, and insurance.

24  ///

Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. LAWSON:

 2        Q.   So that amount includes the mortgage that you

 3    paid and the property in Pennsylvania that you lived

 4    in during the 26 months that you were out of your

 5    home --

 6        A.   Yes.

 7        Q.   -- in --

 8             And so it includes all months of those

 9    mortgage payments for the 26 months?

10        A.   Yes.

11        Q.   And it includes the utilities that you paid

12    at the home during that time as well?

13        A.   Yes.

14        Q.   The home in Pennsylvania?

15        A.   Yes.

16        Q.   Excuse me.

17             And it also includes for a security system at

18    that home in Pennsylvania and monitoring, I would

19    imagine, for the security system?

20        A.   Yes.

21        Q.   And that's for all 26 months as well?

22        A.   Yes.

23        Q.   And also the taxes.  I assume the property

24    taxes you paid in Pennsylvania during that time?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 948 of 3246 of
189
Case 1:14-cv-03264-LDW Document 266-11 Filed 11/19/19 Page 948 of 3246 of
Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    And then also the insurance.  Homeowner's

 3    insurance that you paid --

 4        A.    Yes.

 5        Q.    -- at the home in Pennsylvania?

 6        A.    Yes.

 7        Q.    Any other type of insurance beyond the

 8    homeowner's insurance for the home in Pennsylvania?

 9        A.    No.

10        Q.    So all of those items are for the 26-month

11    period that you were out of your home here in Florida

12    and that you were living in Pennsylvania, correct?

13        A.    Yes.

14        Q.    And you've submitted receipts and proof of

15    payment for those items to your lawyer as well?

16        A.    Yes.

17              MR. ALBANIS:  And we have produced all of

18        that documentation to you.  It has been uploaded

19        to the portal.

20              MR. LAWSON:  Thank you.

21              (Defendants' Exhibit 8 was marked for

22    identification.)

23    BY MR. LAWSON:

24        Q.    I have handed you a document that's been
```

```
 1    marked as Exhibit 8.

 2         A.    Yes.

 3         Q.    Do you recognize this document?

 4         A.    Yes.  I prepared it.

 5         Q.    And what is it?

 6         A.    It is receipts for alternative living.

 7         Q.    And do you remember when you put this

 8    together?

 9         A.    No, I don't recall that.

10         Q.    Now, it's my understanding, based on what you

11    just told me, there may be some items that are not

12    part of the categories of expenses that we just

13    discussed.  But I wanted to go through it to be able

14    to understand what you are seeking compensation for

15    and what you are not, just to be clear on all of

16    that.

17              On the first page here it lists grocery

18    items, food that was paid from the period of -- it

19    looks like in 2010; is that right?

20         A.    Yes, from June 10th to July 14th.

21              The house in Pennsylvania was not ready for

22    us to move in.  We had to get rid of the house

23    because of the living conditions there, and we went

24    and stayed with family in New York.
```

```
 1          And because they wouldn't accept any type of
 2   compensation for us, we just paid for all the
 3   groceries while we were there.
 4      Q.   Okay.  Do you know if those grocery items and
 5   the expenses that are listed on this first page of
 6   the exhibit are included in this $68,314.68 that you
 7   are seeking for alternative living expenses?
 8      A.   I don't know that.
 9      Q.   Okay.  Would you -- would you say that this
10   is groceries that you were paying for for the family
11   that you were staying with, as well as yourself?  Is
12   that right?
13      A.   Yes.
14      Q.   And this was a period where you were staying
15   with them for -- it looks like a little over a month;
16   is that right?
17      A.   Correct.
18      Q.   And in the following pages, the following --
19   it looks like seven pages are receipts for those
20   grocery items that -- and expenses that are listed on
21   the first page; is that right?
22      A.   Correct.
23      Q.   And to your knowledge, are all -- these all
24   of the receipts totaling up to numbers that you see
```

Confidential - Subject to Further Confidentiality Review

1    on the first page of this exhibit?

2        A.    Yes.

3        Q.    Looking to the next page after the grocery

4    receipts, what is this list?

5        A.    This is receipts for alternative living when

6    we moved into the house in Elizabeth, Pennsylvania.

7        Q.    Okay.  When you moved to the house in

8    Elizabeth, Pennsylvania, did you purchase that home?

9        A.    Yes.

10       Q.    And this lists the base cost of that home; is

11   that right?

12       A.    Correct.

13       Q.    And that base cost is $254,400.50; is that

14   correct?

15       A.    Correct.

16       Q.    Now, you are not pursuing, based on the

17   number that we looked at earlier of $68,000-plus,

18   that amount in your alternative living expenses; is

19   that correct?

20             MR. ALBANIS:  Object to the form.

21             But you may answer, if you can.

22             THE WITNESS:  Could you repeat the question,

23       please?

24   ///

Confidential - Subject to Further Confidentiality Review

1    BY MR. LAWSON:

2        Q.    You are pursuing an amount of $68,314.68.

3    Now, the base cost of the home is much more than

4    that.  So I would imagine you are not pursuing the

5    base cost of the home in Pennsylvania in your

6    alternative living expenses damages; is that correct?

7        A.    I am not.  I am only claiming for the

8    26 months that I lived there.

9        Q.    However, there are some other items that are

10   on this list that I wanted to ask you about.  The

11   first item below and under "furnishings" are

12   appliances -- Voss appliances, to be specific, in an

13   amount of $19,588.95.

14          Do you see that there?

15       A.    Yes.

16       Q.    Okay.  Are those appliances for the home in

17   Pennsylvania?

18       A.    Yes.  Could not live there without

19   appliances.

20       Q.    So the appliances that you purchased, that

21   includes kitchen appliances for the home?

22       A.    It included a TV, it included an oven, a

23   warming drawer, a wine cooler, a refrigerator.

24       Q.    And do you know if those expenses for

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 953 of 3246
Case 1:11-cv-02401-MJG Document 254 Filed 05/13/2015 Page 81 of
189

Confidential - Subject to Further Confidentiality Review

```
 1    appliances for the home in Pennsylvania are included

 2    in the $68,000-plus that you are pursuing?

 3         A.   No, they are not.

 4         Q.   Did you sell the home in Pennsylvania after

 5    you lived there at some point?

 6         A.   Yes.

 7         Q.   And did you sell it with the appliances that

 8    you purchased included along with the house to the

 9    new owners?

10         A.   Yes.

11         Q.   The next item is the flooring for the home,

12    an amount of $2,833.  Is that amount included in the

13    amount that you are pursuing for alternative living

14    expenses?

15         A.   No.

16         Q.   Same question for the lighting that's listed

17    below for $5,343.

18         A.   No.

19         Q.   Also the plumbing fixtures that are listed

20    for $1,232.  Are those included in the ALE expenses?

21         A.   No.

22         Q.   And the furniture that is listed for $10,865.

23    Same question.

24         A.   Yes.
```

Confidential - Subject to Further Confidentiality Review

```
 1        Q.    So the furniture included a dining room

 2    table; is that right?

 3        A.    It included a dining room table and six

 4    chairs.

 5        Q.    Any other items that are included --

 6    furniture items that are included in that total of

 7    $10,865?

 8        A.    A sofa and two chairs.

 9        Q.    And did you keep those items with you after

10    you moved back into the home in Florida after it had

11    been remediated?

12        A.    Yes.

13        Q.    And you were not able to bring or did not

14    bring any furniture items from Florida up to

15    Pennsylvania when you moved there, correct?

16        A.    No.  I wouldn't want to contaminate that

17    house, too.

18        Q.    You also included bedding on this list, an

19    amount of $1,931.35.  Is that included in your ALE

20    expenses?

21        A.    Yes.

22        Q.    And did you bring that bedding back with you

23    to Florida after you moved back to the home --

24        A.    Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 955 of 3246
Case 1:09-md-02047-EEF-JCW Document 263 Entered on FLSD Docket 05/30/2019 Page 83 of
189

Confidential - Subject to Further Confidentiality Review

```
1      Q.   -- in Florida?

2           You also have a television from Best Buy for

3      $826.  Is that included in your ALE expenses?

4      A.   Yes.

5      Q.   And did you bring that item back with you to

6      Florida when you moved back?

7      A.   Yes.

8      Q.   The security system from Guardian, is that

9      included in your ALE expenses?

10     A.   Not the physical unit, but the monitoring of

11     it is.

12     Q.   So the money that you paid during the

13     26 months for monitoring your security system with

14     whatever service, I would imagine Guardian --

15     A.   Yes.

16     Q.   -- that you used is included in your ALE

17     expenses?

18     A.   Yes.

19     Q.   The landscaping for $7,562, is that included

20     in your ALE expenses?

21     A.   No.

22     Q.   The irrigation system that is listed from

23     custom turf for $5,569, is that included in your ALE

24     expenses?
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.   No.

 2        Q.   The deck that is listed for $2,352, same

 3   question.

 4        A.   No.

 5        Q.   The cabinets from Canonsburg General

 6   Woodcrafting for $6,386, are those included in your

 7   ALE expenses?

 8        A.   No.

 9        Q.   And the budget blinds for $2,008 that are

10   listed, are they included?

11        A.   No.

12        Q.   Are they included in your ALE expenses?

13        A.   No.

14        Q.   The linens and dishes and other domestic

15   items that are listed under -- for the amount of

16   $2,235, are those included in your ALE expenses?

17        A.   Yes.

18        Q.   And did you bring those back with you to

19   Florida after you moved back into your home?

20        A.   Yes.

21        Q.   There's a computer and a printer from Best

22   Buy that's listed for $965.  Is that included in your

23   ALE expenses?

24        A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 957 of 3246 of
Case 1:07-md-02047-EEF-JCW Document 2297-39 Filed 05/13/2015 Page 85 of
189

Confidential - Subject to Further Confidentiality Review

1       Q.    Did you have a computer or printer in Florida

2       during the time that you lived in the home from 2007

3       to 2010?

4       A.    Yes.

5       Q.    And was it functioning at the time that you

6       moved to Pennsylvania?

7       A.    No.

8       Q.    Did this computer and printer replace a

9       computer and printer that you had in Florida before

10      you moved?

11      A.    Not before I moved.

12      Q.    You said that the computer that you had

13      while --

14      A.    Failed.

15      Q.    It failed.

16            And then this computer was the only computer

17      that you had once you purchased it, and you used it

18      while you were in Pennsylvania; is that right?

19      A.    I purchased it in Pennsylvania when I

20      arrived.

21      Q.    And did you bring it back with you to Florida

22      after?

23      A.    Yes.

24            MR. ALBANIS:  You have to wait for Mr. Lawson

Confidential - Subject to Further Confidentiality Review

1       to finish his questions before you answer, okay?

2       It will be good for the court reporter if you did

3       that.

4   BY MR. LAWSON:

5       Q.   The last item, it says "miscellaneous," and

6   it includes tools and shelving according to the list,

7   and that's $812.  Is that included in your ALE

8   expenses?

9       A.   Yes.

10      Q.   Do you know any other items other than tools

11  and shelving that are included, or does that make up

12  the receipts for that category?

13      A.   To the best of my knowledge, yes.

14      Q.   What was the shelving for in the home?

15      A.   For in the garage.

16      Q.   And the tools that you purchased, do you

17  remember what kind of tools they were?

18      A.   They were shovels and rakes, a Shop-Vac.

19      Q.   And were those items the kind of items that

20  you had back in your home in Florida but decided not

21  to bring with you to Pennsylvania?

22      A.   No.  Excuse me.  Repeat that again.  Sorry.

23      Q.   Did you have those kind of items -- the

24  shovels, rakes, Shop-Vac -- back in your home in

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 959 of 3246
Case 1:14-cv-02046-ELH Document 26-1 Confidential Filed 05/14/2015 Page 87 of
189
Confidential - Subject to Further Confidentiality Review

1    Florida but decided not to bring them to Pennsylvania

2    with you?

3        A.   Yes.

4        Q.   Were the -- was the Shop-Vac functioning in

5    Florida that you had before you moved out of the

6    house?

7        A.   I don't recall.

8        Q.   And do you recall that there were any issues

9    with the tools that you had in Florida that made you

10   not want to bring them with you to Pennsylvania when

11   you moved there?

12       A.   Anything that was in that house, we did not

13   want to take to another environment.

14       Q.   Now, in the pages that follow that list,

15   there's a series of invoices and receipts.  To your

16   knowledge, are these invoices and receipts for the

17   same items that are in the list that we just went

18   through?

19       A.   Yes.

20       Q.   And are there any invoices or receipts for

21   the items on that list that are not included in the

22   pages that follow the list?

23            Are there any missing, to your knowledge?

24            MR. ALBANIS:  Object to the form.

```
1            But you may answer if you can, Ms. Gody.
2            THE WITNESS:  I see one item that I did not
3       include on the list.
4   BY MR. LAWSON:
5       Q.   And what is that?
6       A.   For $326 for a bistro table and two chairs,
7   which we brought back to Florida.
8       Q.   So that is not included?
9       A.   Included in that -- no, it's not.
10      Q.   Just to finish my question, there's a line
11  item for furniture for $10,865.  You don't believe
12  that that table and chairs is included in that
13  amount?
14      A.   To the best of my knowledge, no.
15      Q.   Are there any other items that are included
16  in that list that do not have invoices or receipts in
17  the pages?
18      A.   Could you repeat that question again, please.
19      Q.   Yes.
20           Are there any other items that are included
21  in the list at the front that we just discussed that
22  do not have invoices or receipts on the pages?
23      A.   The best of my knowledge, no.
24      Q.   Okay.  And to your knowledge, are there any
```

```
 1    invoices or receipts that are in those pages that are

 2    not part of the items that are listed on that list at

 3    the front, like the table and chairs that you just

 4    mentioned?  Anything else other than that?

 5         A.   Not to my knowledge.

 6         Q.   All right.  After you get through all of

 7    these receipts in this exhibit for those items that

 8    you just went through, there's a page called "Travel

 9    Expenses" that looks like you are on right now.

10         A.   Yes.

11         Q.   I would like to refer you to that one.

12              Could you tell me about this document?  Did

13    you put it together?

14         A.   Yes.

15         Q.   And what is it?

16         A.   It is our travel expenses that we incurred

17    during our trip -- oh, to begin the remediation at

18    10842 Tiberio Drive.  There is when we were living in

19    Elizabeth to Florida.

20         Q.   So you traveled back to Florida to begin the

21    remediation process?

22         A.   Yes, yes.

23         Q.   And you did that between June 20th and

24    July 27th of 2010?
```

 1      A.   Yes.

 2      Q.   So that was around the time that you were

 3   living with family, is that right, in 2010?

 4      A.   Let me review that a minute, please.

 5      Q.   No problem.

 6      A.   I'm just trying to think back on this date.

 7           I made a mistake.  This should be 2011.

 8      Q.   Okay.  So the travel expenses page should be

 9   June 20th to July 27th of 2011?

10      A.   Yes.

11      Q.   All right.  That makes sense.

12      A.   Yeah.

13      Q.   So these are the expenses that you had during

14   the trip where you had to come back to Florida once

15   the remediation of your home at Tiberio Drive began?

16      A.   Yes, yes.

17      Q.   Are these expenses that are shown in the

18   travel expenses page part of your alternative living

19   expenses that you are seeking in this lawsuit?

20      A.   No.

21      Q.   All right.  I had one question just going

22   back to the food items that we looked at before, just

23   so I could understand.  There's one batch that says

24   "items purchased for new home,"  and it's listed as

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 963 of 3246
Case 1:14-cv-02022-MC Document 269-1 Filed on 05/13/2019 Page 1 of 189
Confidential - Subject to Further Confidentiality Review

```
 1    $284.42.  That's at the beginning of the document on

 2    the first page for the receipts for alternative

 3    living.

 4         A.   Oh.

 5         Q.   Do you see that line?

 6         A.   Yes.

 7         Q.   So those were groceries that were purchased

 8    for your new house, right?

 9         A.   Yes.

10         Q.   To replace food items that you would normally

11    have in your home in Florida but did not have in

12    Pennsylvania?

13         A.   Correct.

14         Q.   Correct?

15              And would that have been in line with the

16    kind of food items that you would have purchased

17    normally while living in Florida?

18         A.   Yes.

19              (Defendants' Exhibit 9 was marked for

20    identification.)

21    BY MR. LAWSON:

22         Q.   I have handed you a document that's been

23    marked as Exhibit 9 if you can take a look at it and

24    let me know if you recognize this exhibit.
```

```
 1          A.    Are we finished with this?

 2          Q.    Yes, we are.  You can set that aside.

 3                Ms. Gody, is it correct that these are photos

 4    of your home at Tiberio Drive before the home was

 5    remediated?

 6          A.    Yes.

 7          Q.    And do you know about when these photos were

 8    taken?

 9          A.    No, I do not.

10          Q.    Did you take these photos, or do you know who

11    did?

12          A.    I don't recall.

13          Q.    So we've discussed that the remediation of

14    your home began sometime around June and July of 2011

15    when you returned from Pennsylvania to Florida to see

16    that process begin.

17                Can you tell me a little bit about what led

18    up to you contracting with someone to remediate the

19    home, how you decided to do that?

20          A.    We knew we had to come back at one point to

21    take care of this.  And since we didn't know how long

22    it was going to take, we just decided just to do it,

23    because this is -- we had been in Florida for awhile,

24    and this was our home and we just wanted to come
```

Confidential - Subject to Further Confidentiality Review

```
 1    back.  So it's where all our resources were, all our

 2    doctors, friends, and we wanted to come back and put

 3    our lives back in order and try to live a normal

 4    life.

 5          This has taken over so much.  This is

 6    one-seventh of my life I have been dealing with this.

 7    I am 71 years old, and I had to deal with all this.

 8    And I'm looking at these pictures, and I see how many

 9    things we had to dispose of, I'm never going to be

10    compensated for.

11          And I'll tell you one right now.  There is a

12    plaque here that was totally corroded that was given

13    to my mother.  She's been gone 39 years.  That was

14    given to my mother as a wedding gift that was

15    hand-painted with gold.  And we couldn't do anything

16    with it so we had to get rid of it.

17          All this furniture you see, with a few

18    exceptions, all went in a dumpster -- three or four

19    dumpsters.  Paintings.  There's pictures here that

20    were all corroded; we couldn't keep.  The backs of

21    them, the paper all curled up and the copper wire

22    that they were hanging on, broke.

23      Q.   Do you remember when you decided to remediate

24    the home?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 966 of 3246
Case 1:09-md-02047-ED-DWL Document 3 Confidential-Subject to Further Confidentiality Review
189

```
1           MR. ALBANIS:  So just so that the record is

2       clear, Ms. Gody, the picture that was given to

3       your mother --

4           THE WITNESS:  Yeah.

5           MR. ALBANIS:  -- is on this page, correct?

6           THE WITNESS:  Yes.

7           MR. ALBANIS:  That is the 16th page of the

8       document.

9           THE WITNESS:  I don't recall the exact date

10      when we decided to do this, but we knew we had to

11      do it.

12   BY MR. LAWSON:

13      Q.   And how did you go about finding someone to

14   be able to remediate the home?

15      A.   There was a family that had already started

16   to remediate down the street from us, and he had

17   interviewed three people.  And he gave us the name of

18   the people that he had interviewed.  So we did the

19   same.

20           And the contractor that we chose -- and we

21   chose him first based upon price, but also he has

22   been doing -- was doing remediation for WCI in

23   Parkland, Florida, and he came to the house with the

24   protocol -- Judge Fallon's protocol and showed us how
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 967 of 3246
Case 1:11-cv-22408-MGC Document 13 Entered on FLSD Docket 05/30/2019 Page 95 of
189
Confidential - Subject to Further Confidentiality Review

 1    he had been following the protocol.

 2         Q.   This contract told you he could follow

 3    Judge Fallon's protocol in remediating your home?

 4         A.   Yes.

 5         Q.   And you ended up deciding to choose that

 6    contractor for your remediation?

 7         A.   Yes.

 8         Q.   And what was the name of that contractor?

 9         A.   Polkow Construction.

10         Q.   Do you know about when they started to work

11    on remediating the home?

12         A.   Yes.  It was in the beginning of July.  It's

13    on the environmental report.  I think it's July 2nd,

14    3rd, or maybe 5th of 6th.

15         MR. ALBANIS:  Before you continue with any

16         further questions, I'd like to assert a rolling

17         objection to any and all questions regarding the

18         remediation and remediation damages.  As you well

19         know, Ms. Gody has been identified as a priority

20         claimant in the nonremediation damages track

21         pursuant to Judge Cooke's November 16, 2018,

22         order.

23         Remediation damages are being addressed by a

24         separate track in this litigation, and,

```
1        therefore, we object to any and all questions

2        related to the remediation of her home or damages

3        associated with the remediation of her home.

4             Having asserted that objection, we will, of

5        course, allow the questioning to continue.

6             And, Ms. Gody, you may answer these questions

7        if you know the answers.

8             MR. LAWSON:  Objection's noted.

9             We believe that the remediation is part of

10       the overall and other damages that are subject to

11       this line of deposition [sic] and that we're

12       going to pursue that inquiry in this deposition

13       and proceed with these questions.

14   BY MR. LAWSON:

15       Q.   Ms. Gody, do you recall what you did while

16   you visited the home when the remediation process

17   began?

18            You said you traveled back to Florida to be

19   there when it started.  Do you recall what you did

20   while that process was ongoing?

21       A.   We rented a villa within Pelican Preserve.

22       Q.   And that's where you lived during that time?

23       A.   Yes.

24       Q.   How long was that?  How long of a time did
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 969 of 3246
Case 1:11-cv-22408-MGC Document 51 Entered on FLSD Docket 05/02/2014 Page 67 of 189
Confidential - Subject to Further Confidentiality Review

```
 1   you live in that villa?

 2       A.   Just give me a second, please.

 3            Contracted in June.  We were there in June of

 4   2011 for approximately five and a half to six weeks.

 5       Q.   And is that five and a half to six weeks the

 6   approximate length of time that it took for the

 7   remediation to complete, or did it take longer than

 8   that?

 9       A.   It took longer than that.

10       Q.   How long did it take?

11       A.   It took approximately a week to take

12   everything out of the house:  all the drywall, the

13   plumbing, the wiring, insulation, and cleanup.

14            Then they had a company come in and power

15   wash all the steel studs and then hand wipe them all

16   down.  Then they brought in equipment --

17   dehumidifiers and air blowers -- negative charged air

18   blowers that was blowing all the air out of the house

19   after that.

20            And that continued on for approximately two

21   weeks after we left.

22       Q.   And after that had completed that process for

23   that two weeks after you left, was that the end of

24   the remediation?
```

Confidential - Subject to Further Confidentiality Review

```
1      A.   Yes.

2      Q.   And when did you move back into the home?

3      A.   Could you just expand on -- what do you mean

4    the end of the remediation?

5      Q.   Well, you said that they had brought in

6    blowers to get the air out of the house, and that

7    that process took about two weeks after you had left

8    Florida, presumably to go back to Pennsylvania.

9           I wanted to understand when you moved back

10   into the house after that.

11     A.   Oh.  We didn't move back into the house until

12   September of 2012.  But prior to that -- three months

13   prior to that, they started the -- I still call it

14   part of the remediation -- the remediation to hang

15   the drywall, to do the wiring, the plumbing, the

16   air-conditioning, replace the cabinets.  Everything

17   it took to put us back in the house.

18     Q.   So the first part of the remediation process

19   was to remove --

20     A.   Yes.

21     Q.   -- all of the items that you described; and

22   then to have blowers and to be able to remove, you

23   know, any matter, I would imagine, that had collected

24   in the home; and then to rebuild the inside of the
```

1    home.

2            Is that right?

3        A.    We didn't start to rebuild the inside of the

4    home until June of the following year.  The house sat

5    vacant for a year.

6        Q.    So from around September of 2011 until

7    September of 2012 the home sat vacant until you moved

8    back in in September of 2012?

9        A.    The house sat vacant from when they finished

10   the remediation, which would have been somewhere

11   around the 15th or so of July.  It sat from there

12   until the following June when they started to put it

13   back together.

14       Q.    And what was the reason for that year that

15   elapsed between when they finished the first phase of

16   removing everything to the phase when they started

17   putting it back together?

18       A.    We wanted to make sure there was not one

19   single trace of toxic drywall left in the house.  So

20   we had it tested, and we had -- and we wanted it to

21   sit as long as possible.

22       Q.    Do you recall when you first had it tested to

23   be able to see if there were any remnants or effects

24   of Chinese drywall in the home after everything had

1    been taken out of it?

2        A.   I don't know the exact date.  It was part of

3    the protocol procedure where the environmental

4    engineer came back in and took samples of concrete

5    block and wood and sent it away for testing to make

6    sure there were no particles left.

7        Q.   And to your knowledge, by the time that you

8    moved back into the home, did tests show that there

9    were any remnants or particulates still from Chinese

10   drywall in your home after you moved back in?

11       A.   No.

12       Q.   I would like to talk you to a little bit

13   about what was taken out of the home when it was

14   remediated.

15           Was all of the drywall in the home removed --

16       A.   Yeah.

17       Q.   -- when the remediation occurred?

18       A.   Yes.

19       Q.   And that included both the Chinese drywall

20   and any American drywall that was in the home?

21       A.   Yes.

22       Q.   Was all of the electrical wiring removed from

23   the home?

24       A.   Yes.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 973 of 3246
Case 1:11-cv-22408-MGC Document 224-1 Entered on FLSD Docket 11/8/2013 Page 101 of 189
Confidential - Subject to Further Confidentiality Review

```
1        Q.    Was any copper plumbing removed from the

2   home?

3        A.    Yes.

4        Q.    Was the HVAC system removed from the home?

5        A.    Yes.

6        Q.    And were any electrical appliances removed

7   from the home?

8        A.    Yes.  And if you look at this picture on the

9   first page of my kitchen, that's a second

10  refrigerator I had, because the first one went.

11            MR. ALBANIS:  You are referring to Exhibit 9?

12            THE WITNESS:  Yeah, Exhibit 9.  I'm sorry.

13      The first page.

14            That is the second refrigerator we had.

15  BY MR. LAWSON:

16       Q.    Because you had to replace the refrigerator?

17       A.    Yes.  The one that was originally with it

18  left.

19       Q.    The second one that was pictured --

20       A.    It was removed.

21       Q.    It was removed from the home?

22       A.    Yes.  Into a dumpster.

23       Q.    Were there any carpets in the home that had

24  to be removed?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 974 of 3246
Case 1:14-cv-11408-MGC Document 69-14 Entered on FLSD Docket 07/28/2015 Page 102 of 189
Confidential - Subject to Further Confidentiality Review

| | | |
|---|---|---|
| 1 | A. | Three bedrooms. |
| 2 | Q. | The bedrooms were carpeted? |
| 3 | A. | Yes. |
| 4 | Q. | And that carpet was taken out? |
| 5 | A. | Yes. |
| 6 | Q. | Were any hardwood floors or vinyl flooring |
| 7 | | removed from the home? |
| 8 | A. | No. |
| 9 | Q. | So was there hardwood flooring in the home? |
| 10 | A. | No. |
| 11 | Q. | Was there tile flooring in the home? |
| 12 | A. | Yes. |
| 13 | Q. | And was the tile flooring replaced or |
| 14 | | removed? |
| 15 | A. | No. |
| 16 | Q. | Excuse me.  Was it removed? |
| 17 | A. | No. |
| 18 | Q. | So it stayed in the home? |
| 19 | A. | Yes. |
| 20 | Q. | Were any cabinets removed from the home? |
| 21 | A. | Yes. |
| 22 | Q. | And were any countertops removed from the |
| 23 | | home? |
| 24 | A. | Yes. |

Confidential - Subject to Further Confidentiality Review

```
1      Q.    Other than the tile flooring, can you think

2   of any things that were not removed from the home?

3      A.    The rafters.  The framing for around the

4   cabinets was not removed.

5      Q.    And do you know why those were not removed?

6      A.    No.

7      Q.    Did you request that they be removed?

8      A.    No.

9      Q.    Do you know if any crown moldings or

10  baseboards were removed from the house?

11     A.    Yes.

12     Q.    Any bathroom fixtures?  Were they removed

13  from the home?

14     A.    Yes.

15     Q.    And was the insulation removed from the home?

16     A.    Yes.

17     Q.    Now, once the remediation was completed, were

18  you satisfied that the contractor that you hired,

19  Polkow, had followed Judge Fallon's protocol to

20  remediate the home?

21         MR. ALBANIS:  Object to the form.

22         But you can answer if you can, Ms. Gody.

23         THE WITNESS:  To the best of my knowledge,

24     the protocol was followed because we demanded it.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 076 of 3246
Case 1:11-cv-22408-MGC Document 103-1 Entered on FLSD Docket 11/9/2019 Page 104 of 189
Confidential - Subject to Further Confidentiality Review

 1          (Defendants' Exhibit 10 was marked for

 2     identification.)

 3     BY MR. LAWSON:

 4          Q.   I have handed you a document that's been

 5     marked as Exhibit 10.

 6               Have you seen this document before?

 7          A.   Yes.

 8          Q.   What is it?

 9          A.   It is the remediation proposal from Polkow

10     Construction.

11          Q.   And what is the date on this document?

12          A.   April 5th, 2011.

13          Q.   Is this the proposal that Polkow gave to you

14     for the remediation of the house in Florida?

15          A.   Yes.

16          Q.   And to your knowledge, is this the plan that

17     they followed or the proposal that they followed when

18     they did remediate your home?

19          A.   May I take a minute to look at this?

20          Q.   Of course.

21          A.   Okay.

22          Q.   Does this look like the proposal that you

23     agreed upon with Polkow for them to remediate your

24     home?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 977 of 3246
Case 1:11-cv-22408-MGC Document 1-13 Entered on FLSD Docket 6/29/2011 Page 105 of 189
Confidential — Subject to Further Confidentiality Review

```
1        A.    Yes.  But I have a few items that I would

2   like to dispute on here that weren't done.

3        Q.    Okay.  What items are those?

4        A.    Are you going to go through all these lists

5   demolition?  Then I can do it --

6        Q.    I would just like to know whatever items that

7   you see on here that you believe were not performed

8   inside of your home.

9        A.    They removed the appliances, and it says "to

10  place in the garage."  We discarded the appliances.

11  We didn't do that.

12       Q.    Okay.

13       A.    We did not reinstall window treatments.

14       Q.    Polkow did not reinstall window treatments?

15       A.    No, we did not.

16       Q.    Did you have to do that at a later date?

17       A.    Yes. Where it says "windows and doors covered

18  for protection," the windows were, but the doors were

19  removed during demolition.

20       A.    Okay.

21       Q.    Do you see any other items that were not

22  performed that are in this proposal?

23       A.    Under Exclusions, even though it is an

24  exclusion, it says "tile or damage due to the work
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 978 of 3246
Case 1:14-cv-01048-MGG Document 294-1 Filed 03 Docket 05/19/2019 Page 106 of 189

Confidential – Subject to Further Confidentiality Review

1    required."  They did not replace damaged tile, nor

2    did they remove the tile that was against the Chinese

3    drywall, which was according to Judge Fallon's

4    protocol in, I believe, the Germano case, when I

5    reviewed that again.  That was not done, and neither

6    was the framing for the cabinets.

7        Q.    Was the tile that -- you said was near the

8    Chinese drywall removed at the later date, not by

9    Polkow, but by someone else?

10       A.    No.

11       Q.    It remained there?

12       A.    Yeah.

13       Q.    And what about the cabinet framing, did that

14   remain there as well?

15       A.    Yes.

16             (Defendants' Exhibit 11 was marked for

17   identification.)

18   BY MR. LAWSON:

19       Q.    I've handed you a document that has been

20   marked as Exhibit 11.  This appears to be another

21   version of the Chinese drywall remediation proposal

22   from Polkow that we just discussed, but there are

23   some notations on it.

24             I'll give you a second to review, but I

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 979 of 3246
Case 1:11-cv-03465-MGC Document 294-1 Entered on FLSD Docket 03/19/2013 Page 107 of 189
Confidential - Subject to Further Confidentiality Review

 1    wanted to ask you about this version of the proposal.

 2        A.   Okay.

 3        Q.   Looking at the first page of this document,

 4    there's a note on it that says:  Total $108,717.

 5             Do you see that?

 6        A.   Yes.

 7        Q.   Do you know who wrote that?

 8        A.   I did.

 9        Q.   Okay.  And what does that mean?

10        A.   I don't remember at this time.  I don't

11    recall.

12        Q.   Is it possible that that was the total amount

13    that Polkow was asking that you pay them for the

14    remediation at that time?

15        A.   It could have been, since he was rather fluid

16    in his presentation and . . .

17        Q.   If you turn to the fourth page of the

18    proposal, near the top, there's an item that says

19    "Total Contact and Payment Terms."  That might be the

20    typo, meaning Total Contract and Payment Terms.

21        A.   Yes.

22        Q.   Do you see that?

23        A.   Yes.

24        Q.   And the total with change orders that's

1    listed in that paragraph is $108,717.

2         Do you see that?

3    A.   Yes, yes.

4    Q.   And that is the same amount that is listed on

5    the front?

6    A.   Yes.

7    Q.   So that might be the total with change orders

8    that was proposed by Polkow?

9    A.   Yes.

10   Q.   Do you recall how much in total that you paid

11   to Polkow for the remediation of your property?

12   A.   Some of the payments were made directly to

13   the subcontractors, not directly to him.

14   Q.   Okay.  So do you know the total amount that

15   you paid for the remediation, regardless of who you

16   paid it to?

17   A.   Yes, I do.

18   Q.   And how much is that?

19   A.   $159,700 -- approximately $159,000.

20   Q.   Okay.  I'd like to turn your attention back

21   to Exhibit 7 that we looked at a little bit earlier.

22   And I apologize to make you go through that stack.

23   A.   That's okay.

24   Q.   It's the Supplemental Plaintiff Profile Form,

```
 1    the fourth amended version that we were looking at a

 2    little bit earlier this afternoon.

 3         And it should be the fourth page that I want

 4    to refer you to under Section 5, "Already Remediated

 5    Property."

 6         And if you look down near the bottom of that

 7    page on Page 4, there is an item that says:  If the

 8    property has been partially or completely remediated,

 9    what was the total cost to date for the remediation

10    of the property.

11         Do you see that question?

12    A.   Yes.

13    Q.   And the amount that is listed is $159,517.

14         Do you see that?

15    A.   Yes.

16    Q.   So that is about what you said, $159,000.

17    That is the total amount that -- the remediation

18    costs that you had to pay; is that right?

19    A.   Yes.

20    Q.   And that's supported by the documentation

21    that you have presented and given to your attorney

22    and he has produced to us; is that right?

23    A.   Correct.

24    Q.   I'd like to turn back to this annotated
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 982 of 3246
Case 1:11-cv-22408-MGC Document 284-1 Entered on FLSD Docket 09/19/2013 Page 110 of 189

Confidential - Subject to Further Confidentiality Review

```
 1    version of the Polkow proposal, which is Exhibit 11.

 2         A.   Eleven.

 3         Q.   And if you can go past the proposal, there's

 4    a page that's titled "Specifications for Remediation,

 5    Tony and Candace Gody."  It should be the seventh

 6    page.

 7              Have you seen this document before?

 8         A.   Yes.

 9         Q.   What is it?

10         A.   It's specifications for remediation.  I

11    prepared this document.

12         Q.   So you created a list of specifications that

13    you wanted Polkow and its subcontractors to follow in

14    remediating your home; is that right?

15         A.   Based upon Judge Fallon's protocol, yes.

16         Q.   So you read Judge Fallon's protocol and

17    created this list based on that; is that right?

18         A.   Correct.

19         Q.   And you -- I think you said earlier you

20    demanded that Polkow and the subcontractors followed

21    Judge Fallon's protocol; is that right?

22         A.   Correct.

23         Q.   So you demanded they follow those items that

24    you listed here in the specifications for remediation
```

```
 1    document, correct?

 2        A.    Correct.

 3        Q.    And to your knowledge, did they follow the

 4    specifications that you listed in this document?

 5        A.    To the best of my knowledge, yes.

 6        Q.    Okay.  I would like to turn your attention to

 7    the punch list from May 19, 2012, that is contained

 8    within Exhibit 11.

 9              Please let me know when you see that

10    document.

11              All right.  What is this document?

12        A.    Once the remediation had started, or putting

13    back the house, we did walk-throughs almost every

14    single day, and these were things that we brought to

15    the contractor's attention.

16        Q.    So these are items that had not been done yet

17    that you --

18        A.    Exactly.

19        Q.    -- wanted to get done?

20        A.    Exactly.  Yes.

21        Q.    In looking through this punch list from

22    May 2012, it looks like there's checkmarks or marks

23    next to the items and items circled.

24              Do you see that?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 984 of 3246
Case 2:14-cv-21410-MGC Document 269-11 Entered on FLSD Docket 07/19/2015 Page 112 of 189
Confidential -- Subject to Further Confidentiality Review

1      A.   Yes.

2      Q.   Okay.  What do those circles or checkmarks

3    indicate to you looking through this list?

4      A.   The checkmarks for what was done, maybe

5    through the first or second -- by the time we did the

6    first or second walk-through.

7           The circles are the ones that still needed to

8    be done.  That's what it was.

9      Q.   To your knowledge, were all of the items

10   completed by the time that Polkow and subcontractors

11   were done working on your home?

12     A.   Yes.

13     Q.   And I imagine you made sure that they were

14   all done; is that right?

15     A.   Yes.

16     Q.   Going to the next page, there appears to be

17   an image -- illustrated image of a kitchen.  Can you

18   tell me a little bit more about this exhibit, if you

19   know what it is?

20     A.   Yes.

21     Q.   And what is it?

22     A.   This was a drawing that a very good friend of

23   ours did for us who was in the kitchen cabinet

24   business in Naples.  And he came up and he took all

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 985 of 3246
Case 1:11-cv-01468-MGC Document 641-1 Entered on FLSD Docket 07/19/2013 Page 113 of 189
Confidential -- Subject to Further Confidentiality Review

```
 1    the measurements even though he wasn't going to do it

 2    because we were using the other contractor.  He did

 3    this for us.

 4           And this is what I presented to the cabinet

 5    people to say this is how I want my kitchen to look.

 6    Q.   Was the attempt to make it look like it had

 7    looked before the home had to be -- you know, all the

 8    cabinets had to be taken out of the home and the

 9    drywall had to be taken out of the home?

10    A.   No.  I wanted it to look different because I

11    didn't want a reminder of what it looked like before.

12    Q.   Okay.  Would you say this was an upgrade on

13    what you had had previously or about similar to

14    finishings to your kitchen before the remediation?

15    A.   Similar.

16    Q.   Was there any part of it that you thought was

17    upgraded or nicer than what you had had before?

18    A.   Yes.

19    Q.   What was that?

20    A.   The middle island.

21    Q.   And what was upgraded about that?

22    A.   It was cut down to be cabinet height.

23    Q.   And previously the island that you had was

24    not cut down to the size?
```

Case 2:09-md-02047-EEF-MBN   Document 22363-39   Filed 11/19/19   Page 986 of 3246
Case 2:14-cv-02949-MGC   Document 11   Entered on FLSD Docket 07/02/2015   Page 114 of 189
Confidential - Subject to Further Confidentiality Review

```
 1        A.    No.  It was raised.

 2        Q.    Was there anything else that was upgraded or

 3    better in your view about the new kitchen?

 4        A.    The appliances.

 5        Q.    How were the appliances upgraded or improved?

 6        A.    Since I had gone through two different

 7    Whirlpool and GE and they both failed, I researched

 8    to find out what were better appliances, and so

 9    that's what I went with.

10        Q.    Do you know what brands you ended up buying

11    for those appliances?

12        A.    Thermador.

13        Q.    So you bought Thermador for the refrigerator?

14        A.    Yes.

15        Q.    And for the stove?

16        A.    Yes.

17        Q.    And the dishwasher?

18        A.    Yes.

19        Q.    And were there any other appliances that were

20    Thermador?

21        A.    The hood.

22        Q.    The hood over the oven?

23        A.    Yes.

24              And the microwave.
```

Case 2:09-md-02047-EEF-MBN   Document 22363-39   Filed 11/19/19   Page 987 of 3246
Case 1:11-cv-22408-MGC   Document 141   Entered on FLSD Docket 07/09/2015   Page 115 of 189
Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Excuse me?

 2        A.   It is a microwave oven warming drawer.  It's

 3   called an appliances tower.

 4        Q.   And that's a Thermador brand?

 5        A.   Yes.

 6        Q.   Turning to the following pages, are these

 7   also illustrations that your friend put together to

 8   be able to show the cabinetry that you wanted for the

 9   kitchen?

10        A.   Yes.

11        Q.   And were they able to meet the specifications

12   of these illustrations when they put your kitchen

13   together?

14        A.   Somewhat.

15        Q.   Was there any way where it didn't meet the

16   specifications or didn't look like the way you had

17   hoped?

18        A.   The quality of the cabinets.

19        Q.   What was wrong with the quality of the

20   cabinets?

21        A.   I'm not pleased with the finish.  I have had

22   them come back to touch up some finishings on them.

23        Q.   Since they touched it up, are you satisfied

24   with it?
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    Looking to the third to last page of this

 3    exhibit, there's an invoice from M & G Best Service.

 4        A.    Yes.

 5        Q.    Do you see that?

 6        A.    Yes.

 7        Q.    This appears to be an invoice for the kitchen

 8    vanity and laundry room cabinets, it appears; is that

 9    right?

10        A.    That's correct.

11        Q.    And it looks like the total amount that is

12    charged on the invoice is $7,450; is that correct?

13        A.    No.  This is not correct.

14        Q.    There's a total amount at the top that says

15    $17,000 for the project.

16        A.    Correct.

17        Q.    But then at the bottom of the invoice it says

18    a total of $7,450.

19              Do you see that?

20        A.    Yes.

21        Q.    Is that because part of it was paid

22    previously, and this was a different amount that was

23    still left over?

24        A.    Because we paid the subcontractor directly.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 989 of 3246
Case 1:11-cv-01408-MGC Document 64-1 Entered on FLSD Docket 05/19/2015 Page 117 of 189
Confidential - Subject to Further Confidentiality Review

1    Q.   Okay.  So you paid the total $17,000 for the

2    kitchen as well as the other items on this list in

3    total, but you paid the subcontractor a lesser amount

4    of that --

5    A.   Yes.

6    Q.   -- directly?

7    A.   Yes.

8    Q.   I'd like to turn your attention to the last

9    page of this document.

10        This appears to be an invoice from Gulf Stone

11   Construction?

12   A.   Yes.

13   Q.   There's an item at the top for demo and

14   install new master bathroom porcelain tile floor.

15        Do you see that?

16   A.   Yes.

17   Q.   Did the tile floor in the master bathroom get

18   replaced?

19   A.   Yes.

20   Q.   Okay.  So previously we talked about how the

21   tile floors remained in the house, but it sounds like

22   at least in the master bathroom, they were removed.

23        Is that correct?

24   A.   Yes.

Case 2:09-md-02047-EEF-MBN  Document 22363-39  Filed 11/19/19  Page 990 of 3246
Case 1:11-cv-11408-MGC  Document 11  Entered on FLSD Docket 07/19/2019  Page 118 of 189
Confidential - Subject to Further Confidentiality Review

```
1        Q.    Do you know why the master bathroom tile

2   floor were removed from the house and replaced?

3        A.    Yes.

4        Q.    Why was that?

5        A.    Because there had been a very large soaker

6   tub in the corner, and when that was taken out, there

7   was no tile and you could not match the existing

8   tile.

9        Q.    So that tile needed to be replaced or added

10  in that room?

11       A.    It was all replaced.

12       Q.    What other items were replaced or removed in

13  the master bathroom to your knowledge?

14       A.    The tub.  That's not on here.  It's a

15  separate invoice.  But the tub, the cabinets, the

16  shower door, of course the tile in the -- within the

17  shower, the light fixtures, the plumbing fixtures,

18  all of that was replaced.  But this is just

19  installing new tile and tiling the shower.

20       Q.    Are you happy with your master bathroom now?

21       A.    Yes.

22             May I go back?

23       Q.    Of course.

24       A.    It's for -- this is for the master bathroom
```

```
 1    and the guest bathroom.  It's both.

 2        Q.   And were similar things done to the guest

 3    bathroom as far as the items that were removed and

 4    replaced?

 5        A.   Yes.

 6        Q.   And did the tile floor in the guest bathroom

 7    also have been to remove or was that only because of

 8    the clawfoot tub or the soaking tub that was in the

 9    other bathroom?

10        A.   The soaking tub was in the master bathroom,

11    and the tile was not replaced in the guest bathroom

12    because we removed a tub in there and put in just a

13    walk-in shower.

14             MR. LAWSON:  We can go off the record.

15             (Recess from 3:28 until 3:46 p.m.)

16    BY MR. LAWSON:

17        Q.   Welcome back, Mrs. Gody.

18             I wanted to turn your attention back to

19    Exhibit 8, which is alternative living expenses that

20    we were discussing earlier.

21             About 14 pages near the back of it, there's a

22    list of upgrades for the home in Elizabeth,

23    Pennsylvania, that I wanted to discuss with you.

24             And I'll give you a moment to find it.  And I
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 993 of 3246
Case 1:11-cv-01408-MGC Document 11-12 entered on FLSD Docket 07/18/2011 Page 120 of 189
Confidential – Subject to Further Confidentiality Review

1    apologize for the lack of numbering in there.

2              The page I'm referring to looks like this.

3              It should be behind the travel expenses, so I

4    think it's further back.  Yes, it should be after the

5    travel expenses.

6         A.   A lot of receipts.

7         Q.   Yes.  I see that.

8              You're very close.

9         A.   Okay.

10        Q.   There we are.

11             Can you tell me what this document is?

12        A.   It's a list of all the upgrades for

13   178 Grouse Drive, Elizabeth, Pennsylvania.

14        Q.   Are these items, the upgrades for that home

15   in Pennsylvania, part of the ALE, or alternative

16   living expenses, that you are seeking in this

17   litigation?  The $68,000 approximately that you are

18   seeking in this litigation?

19        A.   No.

20        Q.   Turning to the next page after that list,

21   there's what I believe might be mortgage payments for

22   the home in Pennsylvania; is that correct?

23        A.   Correct.

24        Q.   And if you go across the next six or so

Confidential -- Subject to Further Confidentiality Review

1    pages, there are additional statements showing

2    mortgage payments from 2010, 2011, and 2012; is that

3    right?

4        A.   Correct.

5        Q.   And are those meant to show the mortgage

6    payments that you paid during the time you lived in

7    the home in Pennsylvania from 2011 to 2012?

8        A.   Yes.

9        Q.   And your mortgage was around $1,270, it looks

10   like, at least --

11       A.   And $0.23.

12       Q.   -- in 2010 --

13            And $0.23, excuse me.

14            Is that right?

15       A.   Yes.

16       Q.   And was that consistent across the time that

17   you lived there from 2010 to 2012 that the amount

18   was 1,270.23?

19       A.   Yes.

20       Q.   If you turn to the next page following the

21   statements of these mortgage payments, there's a

22   Wells Fargo bank report.  It looks like it's taken

23   from the website -- from Wells Fargo's website.

24            Can you tell me what this document is?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 994 of 3246
Case 1:11-cv-01408-MGC Document 2091-1 Entered on FLSD Docket 09/19/2013 Page 122 of 189

Confidential - Subject to Further Confidentiality Review

1    A.    This is the bank statements from Wells Fargo

2    showing the mortgages, the utilities for the time

3    period for the 26 months that we were at the home in

4    Pennsylvania.

5    Q.    And if you look at the first page, the title

6    of the report appears to be PA or Pennsylvania House

7    Payments --

8    A.    Yes.

9    Q.    -- August 1st, 2010, through July 1st, 2013.

10    Did I read that correctly?

11    A.    Yes.

12    Q.    And at the top of that first page, you see

13    first one is Cannonsburg, Gene.

14    Do you see that item?

15    A.    Yes.

16    Q.    Is that Gene Cannonsburg?  Is that what that

17    is?

18    A.    No.

19    Q.    Okay.  What is that?

20    A.    That happens to be a -- it's Cannonsburg

21    Cabinetry, but I -- I can't tell you exactly what

22    that is.

23    Q.    Would that item be part of the your ALE

24    damages?

Confidential - Subject to Further Confidentiality Review

1      A.   No, no.

2      Q.   Going down, there appear to be a series of

3   items for Comcast.

4      A.   Yes.

5      Q.   Can you tell me what those items are?

6      A.   Those items are for telephone and Internet

7   services.

8      Q.   Did you continue to pay for telephone and

9   Internet services at your home here in Florida at the

10  time you had moved out of the home?

11     A.   Yes.

12     Q.   And why did you do that?

13     A.   Up until the time it was remediated.

14     Q.   Right.

15          So you had moved out of the home, and you

16  continued to pay for phone and Internet services

17  until the time it was remediated?  Is that right?

18     A.   I don't recall that.

19     Q.   Okay.  But you did pay for those services in

20  Pennsylvania during that time where you lived in

21  Pennsylvania, correct?

22     A.   Yes.  And you can see they are all

23  documented.  It says:  PA house.

24     Q.   You don't recall whether you paid for those

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 996 of 3246
Case 1:11-cv-22408-FAM Document 104 Entered on FLSD Docket 07/13/2015 Page 124 of 189
Confidential — Subject to Further Confidentiality Review

1    same services, Internet and phone, in Florida during

2    the time you didn't live in the home?

3         A.   Yes.  I had to pay for the cable because it's

4    part of the HOA, and we had to continue to pay that

5    the entire time we were out of the house.

6         Q.   Okay.  So the cable was part of the

7    homeowner's association agreement?

8         A.   Yes, yes.

9         Q.   And is that the same for the phone service as

10   well?

11        A.   No.

12        Q.   Okay.  So the phone service was not required?

13        A.   No.

14        Q.   But do you know if you did pay that during

15   that time in Florida?

16        A.   No, we -- we had no phone service in Florida.

17        Q.   Understood.

18             Next there is a series of items for custom

19   turf.

20             Do you see those?

21        A.   Yes.

22        Q.   Are those payments for landscaping services

23   in Pennsylvania?

24        A.   Yes.

Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Was that monthly service?

 2        A.    Yes.

 3        Q.    Did you continue to have landscaping services

 4   paid for in Florida during the time that you were

 5   moved out of the home?

 6        A.    Yes, through our HOA.

 7        Q.    The ERNS cutting edge items that are below

 8   the custom turf item of the second page of this Wells

 9   Fargo invoice, do you see those?

10        A.    Yes.

11        Q.    What are those?

12        A.    Those are for grass cutting while we were in

13   Pennsylvania.

14        Q.    Okay.  So like the custom turf ones above?

15   Or is that different,  the grass-cutting versus

16   landscaping?

17        A.    They were two different companies that

18   provided two different services.

19        Q.    All right.  And at different times?

20        A.    At different times, yes.

21        Q.    Understood.

22              Moving down to the next items, it says

23   Guardian Home.  Is that related to the security

24   system in the home?
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    Are those amounts paid for through the

 3   monitoring service?

 4        A.    Yes.

 5        Q.    There's additional items on the third page of

 6   the Wells Fargo statement for Nature Scape.

 7              Do you see those?

 8        A.    Yes.

 9        Q.    And what are those?

10        A.    Landscaping.

11        Q.    So the landscaping costs and the

12   grass-cutting costs are all part of your ALE damages

13   that you are seeking in this lawsuit?

14        A.    No.

15        Q.    Okay.  Are you seeking the Comcast items that

16   we discussed earlier in this lawsuit as alternative

17   living expenses?

18        A.    Yes.

19        Q.    And for the trash bills and house electrical

20   bills that were paid on Page 4 of this Wells Fargo

21   statement, are you seeking those items?

22        A.    Yes.

23        Q.    I would imagine that you continued to pay for

24   some electrical bills in Florida while you were moved
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 999 of 3246
Case 1:11-cv-22408-MGC Document 604-11 Entered on FLSD Docket 07/19/2013 Page 127 of 189
Confidential – Subject to Further Confidentiality Review

```
1     out of the house; is that right?

2         A.    Yes.

3         Q.    Did those bills reduce during the time that

4     you were moved out of the home in Florida?

5         A.    Yes.

6         Q.    Do you remember about how much it was a month

7     to pay for the electricity in Florida while you were

8     moved out of the home?

9         A.    When we moved out in 2010, it was just

10    like -- the house was just like we were coming back

11    the next day.  So we had the air-conditioning on,

12    pool pump running, and those electric bills were

13    paid.

14            And then when we had the house remediated or

15    everything taken out of the house, the electric bill

16    dropped because the only thing we had to pay for was

17    the electric on for the pool pump.  That was the only

18    thing that was on.

19        Q.    You kept the pool pump running during that

20    time?

21        A.    Yes.

22        Q.    For the 26 months that you were gone?

23        A.    Yes.

24        Q.    Did you ever consider draining the pool
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1000 of 3246
Case 1:18-cv-02408-NGG Document 11 Entered on FLSD Docket 05/28/2019 Page 128
Confidential - Subject to Further Confidentiality Review
of 189

1    during that time?

2         A.    No.  It could have collapsed.

3         Q.    When you look down to the fifth page,

4    beginning -- at the end of the fourth page, into the

5    fifth page, on the Wells Fargo statement, there's a

6    series of items that say Pennsylvania House Sewage.

7         A.    Yes.

8         Q.    Are you seeking those items in your

9    alternative living expenses damages in this lawsuit?

10        A.    Yes.

11        Q.    And are those for the sewage bills that you

12   received from the City or County in Pennsylvania

13   where you lived?

14        A.    Yes.

15        Q.    Going down further, there's items listed as

16   Pennsylvania House Water.

17              Do you see those items on Page 5?

18        A.    Yes.

19        Q.    Are those items ones that you are seeking

20   damages for the alternative living expenses in this

21   lawsuit?

22        A.    Yes.

23        Q.    And if you look down to the final items on

24   the page, there's a series of gas bills, it appears,

```
 1    that were paid?

 2        A.    Yes.

 3        Q.    Are you seeking those items in this lawsuit?

 4        A.    Yes.

 5        Q.    Did you continue to pay for water and gas

 6    bills in Florida during the time that you were moved

 7    up to Pennsylvania?

 8        A.    Yes.  It was only water.

 9        Q.    You only --

10        A.    We didn't have gas.

11        Q.    You only paid for water?

12        A.    We didn't have gas.

13        Q.    Did your water bills reduce during the time

14    you were -- was it the same because you were

15    continuing to use the pool?

16        A.    They reduced.  However, we had a significant

17    water bill for when they did the remediation and

18    power washed the interior of the house.

19        Q.    Do you remember how significant it was?

20        A.    A lot more than what we had normally paid.

21        Q.    Hundreds of dollars?

22        A.    Yes.

23        Q.    Was it thousands of dollars?

24        A.    No.
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1002 of 3246
Case 1:14-cv-09148-NRB Document 269-11 Entered on FLSD Docket 05/08/2019 Page 630 of 189
Confidential - Subject to Further Confidentiality Review

```
1         Q.    Okay.  You can set that aside.

2               (Defendants' Exhibit 12 was marked for

3     identification.)

4     BY MR. LAWSON:

5         Q.    I've handed you a document that's been marked

6     as Exhibit 12.

7               When you have had a chance to review it, can

8     you let me know what this document is?

9         A.    The first five pages are copies of checks

10    paid to Polkow Construction that I received from

11    Wells Fargo.  However, there are two that are not

12    there because of the date they did -- weren't able to

13    capture them.

14        Q.    Because the date was too far in the past?

15        A.    Too far in the past, yes.

16        Q.    Would those have been maybe sometime in 2011?

17        A.    Yes.

18              The rest of the documents are actually

19    statements -- bank statements that I went through and

20    highlighted all of my mortgage payments for the home

21    in Florida while we were out of the house -- our

22    HOAs, our insurance that we still continued to pay on

23    the house, Comcast, as I mentioned that we had to

24    continue to pay, the electric, pool service for
```

```
1    26 months, the HOA was for our local Tiberio.  We

2    paid Town Center dues, and we paid master HOA dues,

3    and we also had to pay club dues while we were gone.

4    And they are all highlighted in this document.

5         Q.   Are those the only types of expenses that are

6    highlighted in these Wells Fargo statements that I

7    just handed you?

8         A.   To the best of my knowledge, yes.

9         Q.   And are those all expenses that you paid

10   before you moved out of the home but continued to pay

11   afterward?

12        A.   Yes.

13        Q.   So all of them were something that you paid

14   from 2007 through 2010 when you actually lived in the

15   home in Florida; is that right?

16        A.   Yes.

17        Q.   And you paid those expenses or similar ones

18   when you moved back in in 2012, correct?

19        A.   Yes.  These documents only reflect the time

20   from when we left until we returned.

21        Q.   And are you seeking these highlighted

22   expenses in your alternative living expense damages

23   that you are seeking in this lawsuit?

24        A.   No.
```

```
 1        Q.    To your knowledge, are you seeking these
 2    expenses in any form of damages in this lawsuit?
 3              And I'm referring specifically to the Wells
 4    Fargo statement when I ask that, not the checks at
 5    the beginning.
 6        A.    Yeah.
 7              THE WITNESS:  Can we take a break?  Can I
 8        have a break?
 9              MR. LAWSON:  That's fine.
10              (Recess from 4:02 until 4:06 p.m.)
11    BY MR. LAWSON:
12        Q.    Ms. Gody, have you had the opportunity to be
13    able to go through this Wells Fargo report to be able
14    to determine if there are any items in here that you
15    are seeking in your damages in this lawsuit?
16        A.    Yes.  I continued --
17              MR. ALBANIS:  I was just going to object to
18        the form of the question.
19              But you may answer if you can.
20              THE WITNESS:  Okay.
21              I continued to pay the mortgage on the house
22        in Florida while I was also paying a mortgage for
23        my alternative living expense.  And that's what's
24        highlighted here, the expenses that I had to
```

```
1        carry on the house in Florida even though it was

2        unlivable.

3             And then it was totally remediated -- or, I

4        mean, empty for all that time -- but I still paid

5        all the same expenses.

6    BY MR. LAWSON:

7        Q.   So like we discussed earlier, you are

8    seeking, for alternative living expenses, your

9    mortgage payments for the home in Pennsylvania?

10       A.   Yes.

11       Q.   Correct?

12       A.   Yes.

13       Q.   Is it correct that you are not seeking your

14   mortgage payments for your home in Florida which you

15   would have been paying anyway if your home did not

16   have an issue with Chinese drywall?

17       A.   Yes.

18       Q.   And those issues for Florida are reflected in

19   the highlighted items in the Wells Fargo report in

20   this exhibit; is that right?

21       A.   Yes.

22       Q.   But there are the checks at the front of it

23   that relate to payments to Polkow or subcontractors,

24   it appears, related to your remediation of your home
```

```
 1    in Florida?

 2        A.   Yes.

 3        Q.   And you are seeking damages for those

 4    expenses for the remediation; is that right?

 5        A.   Yes.

 6             MR. ALBANIS:  Object in light of

 7        Judge Cooke's November 16, 2018, order and the

 8        plaintiffs' position that that will be handled on

 9        the remediation track.

10             But you may answer, Ms. Gody, if you can.

11             THE WITNESS:  Could you repeat the question?

12    BY MR. LAWSON:

13        Q.   Yeah.

14             Ms. Gody, are you seeking damages for the

15    payments that you made to Polkow and other

16    subcontractors for the remediation of your home in

17    this lawsuit?

18        A.   Yes.

19             MR. ALBANIS:  Same objection.

20             (Defendants' Exhibit 13 was marked for

21    identification.)

22    BY MR. LAWSON:

23        Q.   I have handed you a document that has been

24    marked as Exhibit 13.
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1007 of 3246
Case 1:14-cv-04304-NGG Document 291-11 Entered on FLSD Docket 05/08/2019 Page 135 of 189
Confidential - Subject to Further Confidentiality Review

```
 1                When you have had a chance to review it, can

 2      you let me know what this document is, if you've seen

 3      it before?

 4          A.   Okay.

 5          Q.   I would like to turn your attention to the

 6      first page of this exhibit.  It's a letter of

 7      completion from the City of Fort Myers.

 8                Do you see the one that I'm referring to?

 9          A.   Yes.

10          Q.   And it's dated August 10, 2012; is that

11      correct?

12          A.   Yes.

13          Q.   And it relates to a job address of

14      10842 Tiberio Drive, which is your residence; is that

15      right?

16          A.   Yes.

17          Q.   What is this document?

18          A.   I believe this is closing out the permit that

19      Polkow Construction filed for.

20          Q.   This was notifying you that the City of Fort

21      Myers had found that your remediation had been

22      completed, per the plans and specifications that you

23      had requested; is that right?

24          A.   Yes.
```

```
 1        Q.    In fact, it says in the letter:  This letter

 2   serves as an official notice that all interim

 3   inspections and a final inspection were conducted on

 4   the property referenced above.

 5            These inspections confirm that work performed

 6   by the above-named contractor was accomplished in

 7   accordance with plans and specifications on file in

 8   this office.

 9            Did I read that correctly?

10        A.    Yes.

11        Q.    And that was how you also felt about the

12   remediation, that it was done to the plans and

13   specifications that you had requested; is that right?

14        A.    Yes.

15            MR. ALBANIS:  Object to the form.

16            But you may answer, Ms. Gody, if you can.

17   BY MR. LAWSON:

18        Q.    Was that a yes to my question?

19        A.    Would you please repeat the question.

20        Q.    Sure.

21            You also felt that the remediation was

22   completed to the plans and specifications that you

23   had requested at the beginning of the project; isn't

24   that right?
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1009 of 3246
Case 1:15-cv-02048-NGG Document 1-1 Filed 01-04-19 beke 0548-2009 Page 937 of 189
Confidential - Subject to Further Confidentiality Review

```
 1          MR. ALBANIS:  Same objection.

 2          THE WITNESS:  No.

 3     BY MR. LAWSON:

 4          Q.   And why is that?

 5          A.   Because the contractor didn't complete some

 6     of the things, like replacing the damaged tile, the

 7     tile to the wall, or the framing for the cabinet.

 8          Q.   Did you ever attempt to have those items

 9     completed?

10          A.   With the contractor?

11          Q.   Yes.

12          A.   Yes.

13          Q.   And what happened when you requested that?

14          A.   It wasn't necessary was the answer.

15          Q.   They said it was not necessary?

16          A.   Yes, yes.

17          Q.   Did they tell you that it wasn't necessary

18     under Judge Fallon's protocol?

19          A.   No -- wait.  Let me just say to the best of

20     my recollection, when I asked that question, he said

21     it's not necessary.

22          Q.   Did you ever attempt to have anyone other

23     than Polkow or its subcontractors complete these

24     items, the removing of the tile floor or the cabinet
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1010 of 3246
Case 1:15-cv-02048-WGY Document 1-1 Entered on FLSD Docket 05/08/2010 Page 138 of 189
Confidential - Subject to Further Confidentiality Review

1    framing?

2        A.   Just the tile floor in the bathroom.

3        Q.   You had the tile floor in the bathroom

4    removed?

5        A.   Yes.

6        Q.   But the other tile floor you did not pay

7    anyone or ask anyone else to remove that?

8        A.   No, I did not.

9        Q.   Why not?

10       A.   I don't recall.

11       Q.   Did you ever get a quote for those items to

12   be completed?

13       A.   No.

14       Q.   Were you satisfied with the state of your

15   home when you moved back into it?

16       A.   Yes.

17       Q.   And you'd agree that the City of Fort Myers

18   did send you a letter of completion for the

19   remediation project around August of 2012 that we're

20   looking at here, correct?

21       A.   Yes.

22       Q.   Turning to the next page, do you recognize

23   this document, this owner disclosure affidavit?

24            MR. ALBANIS:  I'll object to the form.

Confidential - Subject to Further Confidentiality Review

```
 1              But you may answer, Ms. Gody, if you can.

 2              It appears that the owner disclosure is a

 3         seven-page document.

 4              MR. LAWSON:  That's correct.

 5    BY MR. LAWSON:

 6         Q.   Going pages 1 through 7 of this document, do

 7    you recognize it?

 8         A.   Yes.

 9         Q.   And to your knowledge, what is it?

10         A.   It's an affidavit provided by Polkow

11    Construction that shows what they had replaced.

12         Q.   If you look to the second page of this

13    document, in the middle of it, there's an item titled

14    "Bathroom Flooring."

15              Do you see that?

16         A.   Yes.

17         Q.   And circled there is the word "replaced."

18              Is that right?

19         A.   Yes.

20         Q.   So Polkow noted that the bathroom flooring

21    was replaced in the home?

22         A.   Yes.

23         Q.   And if you look back to the first page, it

24    also has a line at the bottom titled, "Kitchen
```

Confidential -- Subject to Further Confidentiality Review

```
 1    Cabinets," and it notes that those were replaced as

 2    well, correct?

 3         A.   Correct.

 4         Q.   And there's also a space for a homeowner's

 5    signature on the seventh page of this document,

 6    correct?

 7         A.   Yes.

 8         Q.   And your signature is on that page; is that

 9    right?

10         A.   Yes.

11         Q.   And it looks like it's dated August 20th,

12    2012, correct?

13         A.   Correct.

14         Q.   And you were verifying with your signature

15    that the information in this affidavit was true and

16    correct to the best of your knowledge; is that right?

17         A.   Yes.

18         Q.   The next item appears to be a letter from you

19    to the City of Fort Myers related to a water bill

20    over $200.

21         A.   Yes.

22         Q.   Was that the same water bill that we

23    discussed earlier?

24         A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1013 of 3246
Case 1:14-cv-02494-NG-EFM Document 11 Entered on FLSD Docket 04/13/2015 Page 141 of 189
Confidential - Subject To Further Confidentiality Review

```
 1        Q.    And did you receive an adjustment for that

 2   high water bill?

 3        A.    Yes.

 4        Q.    Going to the next page, the City of Fort

 5   Myers utilities department letter to you.

 6              Is this related to that high water bill?

 7        A.    Yes.

 8        Q.    Looking to the Wells Fargo advisors document

 9   that is on the next page, can you explain what this

10   is?

11        A.    This is the account that we used to remediate

12   the house.  It was my husband's entire IRA money.

13              And I know you have all heard the expression

14   the gift that keeps on giving.  Well, this toxic

15   Chinese drywall situation has.  We had to use my

16   husband's IRA money to repair the house, and when we

17   did that, there's consequences by using IRA money.

18   It's taxed at a higher rate.

19              So I in turn, had to hire a special CPA at a

20   cost of $950 who was familiar with safe harbor

21   exemptions to prepare my taxes that year, because of

22   the year that we remediated the house and paid out

23   the $159,000 and it showed that we had additional

24   income because of this, my Medicare premiums went up
```

Confidential - Subject to Further Confidentiality Review

1    for two years.

2              So, as I said, it just keeps on giving.

3              There were consequences to all of this.

4       Q.   To your knowledge, are you seeking the

5    increases of your Medicare premiums in your damages

6    in this lawsuit?

7       A.   No.

8       Q.   Are you seeking the amount -- the $950 that

9    you had to pay with a CPA to assist with your taxes

10   in this lawsuit?

11      A.   Yes.

12      Q.   Are you seeking any monies from -- related to

13   other fees or expenses related to removing money from

14   your husband's IRA to be able to pay for the

15   remediation?

16              MR. ALBANIS:  Object to the form.

17              But you may answer.

18              THE WITNESS:  I don't recall.

19   BY MR. LAWSON:

20      Q.   How much money did your husband have to

21   remove from his IRA to pay for the remediation?

22      A.   I don't recall the total figure.  It's -- we

23   can add it up, because these are the distributions

24   that were made.

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1015 of 3246
Case 1:14-cv-04381-NGG Document 11 Confidential Subject to Further Confidentiality Review of 189
Confidential - Subject to Further Confidentiality Review

1      Q.   Do you recall if you used any other money,

2  perhaps from a savings account or a checking account,

3  to be able to pay for the remediation of your home?

4          MR. ALBANIS:  Object to the form.

5          But you may answer.

6          THE WITNESS:  We also used money from a line

7      of credit.

8  BY MR. LAWSON:

9      Q.   How much money did you receive in that line

10 of credit?

11     A.   I don't recall at this time.

12     Q.   Have you submitted any statements related to

13 your payments from that line of credit?

14     A.   No.

15     Q.   Has the debt related to the payments from

16 that line of credit been repaid at this time?

17     A.   Yes.

18     Q.   Was it more than $10,000?

19     A.   Yes.

20     Q.   Was it more than $20,000?

21     A.   That, I don't recall.

22     Q.   Do you know if you would be able to find the

23 invoices or statements related to payments from that

24 line of credit if you looked today?

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1016 of 3246
Case 1:15-cv-42408-NGG-JOM Document 11-2 filed in TSD Docket 05/03/2016 Page 144 of 189
Confidential - Subject to Further Confidentiality Review

    1        A.    No.  It was closed out.

    2        Q.    Do you know when it was closed out?

    3        A.    I don't recall right now.

    4        Q.    Was it through Wells Fargo?

    5        A.    Yes.

    6        Q.    I'd like to turn your attention to the

    7   residential central air-conditioning rebates

    8   certificate that is after the IRA statements that we

    9   just discussed.

    10             Do you see that document?

    11       A.    Yes.

    12       Q.    What is this?

    13       A.    This is from Certified Heating and Cooling

    14   that they presented showing what the Florida Power

    15   rebate amount was, and they used that to reduce the

    16   cost of the new air-conditioning system that was put

    17   in the house.

    18       Q.    So this was for the new air-conditioning

    19   system?

    20       A.    Yes, yes.

    21       Q.    And it says there's an installation date of

    22   September 4th, 2012.

    23       A.    Yes.

    24       Q.    And you paid for this?

```
1        A.    This is the date that they presented this to

2    me.  The air-conditioning was installed before

3    September 20th.

4        Q.    But you ultimately paid for the new

5    air-conditioning unit in your home?

6        A.    Yes, yes.

7        Q.    In the pages that follow, there are

8    additional invoices from Certified Heating and

9    Cooling that state "paid" on them.  Are these related

10   to the HVAC system or the air-conditioning unit that

11   was put in the home in Florida after you remediated

12   the home?

13       A.    Yes.

14       Q.    Do you know ultimately how much in taxes that

15   you had to pay on IRA distributions that you

16   conducted to be able to get the money to pay for the

17   remediation?

18       A.    Because we used IRA money and if we would

19   have just done a regular tax return, our penalties

20   would have been $17,000 in additional taxes, and that

21   is why I hired a special CPA to -- who was familiar

22   with the safe harbor exemption which the IRA gave us

23   for two years, which was to deduct 10 percent and

24   then we could expense -- or we could charge off
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1018 of 3246
Case 1:09-md-02047-EEF-MBN Document 1 Entered on FLSD Docket 01/01/2000 Page 846 of 189

Confidential - Subject to Further Confidentiality Review

1    75 percent of what the repairs were.  That reduced

2    our bill by 75 percent.

3        Q.    Okay.  Do you know ultimately how much after

4    that reduction of 75 percent the increase in your

5    taxes was during that year, to your knowledge?

6        A.    I have it, but to my knowledge, I don't know.

7        Q.    Do you know if that amount is part of the

8    damages that you are seeking in this lawsuit?

9        A.    No.

10            (Defendants' Exhibit 14 was marked for

11    identification.)

12            THE WITNESS:  We're finished with this

13        document?

14            MR. LAWSON:  Yes, we're finished with that

15        document, and you can set it aside.

16    BY MR. LAWSON:

17        Q.    I have handed you --

18        A.    Excuse me.  May I make a comment before we go

19    on to the next exhibit, please --

20        Q.    Okay.

21        A.    -- that was part of this?

22            As I have previously stated about how

23    traumatic this whole situation has been, there is a

24    letter in here that was received from ABF Drywall.

```
1     The president came to our house and threatened my

2     husband with bodily harm because he said we had not

3     paid to have the drywall installed in the house.

4           It was a very upsetting situation, and it

5     turned out that it had been paid but Mr. Fernandez's

6     wife who did the bookkeeping did not apply it to the

7     correct house.  So we had to be subjected to somebody

8     coming into our house, using foul language, and

9     threatening my husband with bodily harm.

10          So there are many stories that go along with

11    this whole situation.

12       Q.   And that letter from Mr. Fernandez was from

13    May 16th, 2012; is that right?

14       A.   Yes.

15       Q.   And that was related to the drywall that was

16    installed -- the new drywall that was installed in

17    your house after the remediation?

18       A.   Yes.

19          MR. VERRIER:  And that letter was in

20    Exhibit 13?

21          MR. LAWSON:  In Exhibit 13, that's correct.

22          MR. VERRIER:  Thank you.

23    BY MR. LAWSON:

24       Q.   I would like to turn your attention now to
```

```
 1    Exhibit 14, which has just been handed to you.

 2           Looking at the first page of this document,

 3    do you recognize it?

 4       A.   Yes.

 5       Q.   What is this?

 6       A.   I prepared these payments made for

 7    remediation.

 8       Q.   Are these payments that you paid to Polkow

 9    Construction or other subcontractors for the

10    remediation?

11       A.   Yes.

12       Q.   And these payments go from June of 2011

13    through May of 2012?

14       A.   Yes.

15       Q.   Do you know if this is all the payments that

16    were made to Polkow or subcontractors related to the

17    remediation?

18       A.   To the best of my knowledge.

19       Q.   Earlier we discussed a number that was around

20    $159,000 for the cost of the remediation of your

21    property in Florida.  What is -- what makes up the

22    difference between the $99,321 and the $159,000

23    figure that you're seeking for remediation -- or that

24    you noted as the costs of remediation in the
```

```
 1   documents in this case?

 2       MR. ALBANIS:  Object to the form.  Obviously,

 3   Ms. Gody has a well documented file.  We have

 4   produced all nonprivileged documents that

 5   Ms. Gody has provided to my firm.  They have all

 6   been uploaded to the BrownGreer portal.  And

 7   Ms. Gody testified to what her remediation

 8   damages were, even though she is being deposed

 9   today and has been named a priority claimant in

10   the nonremediation track of this litigation.

11       I suspect that you would be hard-pressed to

12   find any individuals that would be able to

13   clearly identify what additional expenses would

14   have been paid when you have such a

15   well-documented file.

16       So I will instruct my client that she may

17   answer the question if she can.  I just don't

18   know if anybody would actually be able to answer

19   that question.

20       MR. LAWSON:  Your objection is noted.

21       However, I think the witness can answer if

22   she knows of the difference of about $60,000 that

23   we are talking about here.  I want to understand

24   if there are additional payments that aren't on
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1022 of 3246
Case 1:15-cv-02948-NGG Confidential Document 19-1 Entered FLSD Docket 05/11/2017 Page 150 of 189
Confidential -- Subject to Further Confidentiality Review

```
 1        here or where that additional $60,000 was paid or

 2        what it went to.

 3            THE WITNESS:  If you look at the receipts --

 4        and that is an Excel spreadsheet that I did, and

 5        it documents every single check and every single

 6        purchase that was put on to a credit card.  And

 7        that's the difference.

 8            And if you go through the receipts for

 9        appliances, lighting, faucets, sinks, blinds,

10        granite, tile, and all the renovations, you will

11        see.

12    BY MR. LAWSON:

13        Q.    Thank you.

14            The next item is a letter from January 13th,

15    2012, from you to Polkow Construction.

16            Do you see that letter?

17        A.    Yes.

18        Q.    This letter is notifying him of an enclosed

19    check -- excuse me, Kevin of an enclosed check for

20    $7,000 to be applied to the agreed-upon costs of

21    $22,615 for the second phase of completing your

22    house; is that right?

23        A.    Yes.

24        Q.    And then on the next page, there's a similar
```

```
1    letter or note to Kevin from you and your husband

2    from February 8th, 2012, about another enclosed check

3    for $7,000; is that right?

4         A.   Yes.

5         Q.   If you turn to the next page, there's a list

6    that says "Receipts for" -- and then there's a list

7    of various items, including appliances, lighting,

8    faucets, sinks, blinds, granite, tile, and master

9    bath renovations.

10        And there's a note at the bottom that says

11   total -- never mind.  Excuse that.  That's a note on

12   mine. You can scratch that.

13        Are the -- in the images that follow in the

14   pages, are those the receipts that are listed on that

15   list on the page that we just discussed for

16   appliances, lighting, and other items?

17        A.   Yes.

18        Q.   And are these expenses that you paid directly

19   or that were paid by Polkow for those items?

20             MR. ALBANIS:  Object to the form.

21             But you may answer if you know the answer,

22        Ms. Gody.

23             THE WITNESS:  If you would like to go through

24        them, I can tell you.
```

```
1    BY MR. LAWSON:

2        Q.   Well, let me ask you this --

3        A.   If you would look at my Excel spreadsheet,

4    you will see the majority of all of these things on

5    here are what I paid directly.

6        Q.   For any of the items that are listed for

7    these receipts -- appliances, sinks, blinds, granite,

8    tile, and master bath renovations -- can you think of

9    anything in those categories that you thought of as

10   an upgrade over what you previously had in your home

11   when you purchased it?

12       A.   I'll say one thing:  The sinks that were put

13   in were substandard considering that I had had Kohler

14   sinking before.  So that was not an upgrade.

15            I don't know what you would consider an

16   upgrade.

17       Q.   I guess my question is if you consider it an

18   upgrade.  But if there isn't --

19       A.   No.

20       Q.   -- you can tell me that as well.

21            No?

22       A.   No.

23       Q.   Are these items that are listed in these

24   invoices included in the $159,000 that you are
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1025 of 3246
Case 1:19-mi-99999-UNA Document 11-129 Entered on FLSD Docket 05/07/2019 Page 153 of 189
Confidential - Subject to Further Confidentiality Review

1    seeking for remediation damages in this lawsuit?

2        A.   Yes.

3        Q.   Turning past the receipts and invoices --

4             MR. ALBANIS:   I'm going to object to the form

5        of that last question.   I don't believe that that

6        is an accurate characterization of Ms. Gody's

7        prior testimony.

8    BY MR. LAWSON:

9        Q.   Ms. Gody, are these receipts and invoices

10   that we are discussing a part of the $159,000 that

11   you claim to have paid for the remediation of your

12   home to have it remediated?

13       A.   Yes.

14       Q.   Turning past the receipts and invoices for

15   those items, there's a page a little bit further into

16   this that says receipts for furniture, bedding,

17   paint, action door repair, powder room mirror.

18       A.   I have that.

19       Q.   Turning to the next page, there is an invoice

20   from Comcast as well as an installation agreement on

21   the page that follows.

22            If you know, what are these documents?

23       A.   This was to reinstall Internet service in the

24   house.

```
 1        Q.   Are these receipts for furniture items

 2   bedding items that you had to replace inside of the

 3   home when you left the home?

 4        A.   Yes.

 5        Q.   Does this also include repainting the

 6   interior of the home when it says "paint"?

 7        A.   Yes.

 8        Q.   And if you look a little bit into the

 9   receipts, there's receipts for color wheel of paint?

10        A.   Yes.

11        Q.   And are those the paint expenses that -- and

12   receipts that are referred to on that list at the

13   front?

14        A.   Yes.

15        Q.   And was that paint for the interior of the

16   house?

17        A.   Yes.

18        Q.   The exterior of the house didn't need to be

19   repainted; is that right?

20        A.   Correct.

21        Q.   Are all of these receipts items that are

22   included in the $159,000 in remediation costs that

23   you have claimed in this lawsuit?

24        A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1027 of 3246
Case 1:18-cv-00490-NGG Document 269-11 Entered on FLSD Docket 05/18/2012 Page 155 of 189
Confidential - Subject to Further Confidentiality Review

```
 1      Q.    You can set that aside when you're ready to.

 2            (Defendants' Exhibit 15 was marked for

 3      identification.)

 4      BY MR. LAWSON:

 5      Q.    I have handed you a document that has been

 6      marked as Exhibit 15.

 7            Do you recognize this document?

 8      A.    Yes.

 9      Q.    And what is it?

10      A.    It's an Excel spreadsheet that I prepared.

11      Q.    Is this the same Excel spreadsheet of

12      remediation expenses that you were referring to

13      before?

14      A.    Yes.

15      Q.    And does this spreadsheet contain all of the

16      remediation costs of the $159,000 that you have

17      listed as your remediation costs for repairing your

18      home?

19      A.    Yes.  It matches up to all these receipts.

20      Q.    Are there any items that you would want to

21      add to that or remove from it to make it more

22      accurate, or is that an accurate reflection of your

23      costs?

24      A.    That is than accurate reflection of my costs.
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1028 of 3246
Case 1:13-cv-02406-NGG Document 269-11 Entered on FLSD Docket 05/08/2014 Page 156 of 189
Confidential - Subject to Further Confidentiality Review

 1      Q.    When did you create this list?

 2      A.    As the remediation process was being done,

 3    because I wanted to make sure that I captured

 4    everything.

 5      Q.    To your knowledge, have you produced any

 6    invoices and/or receipts for the items listed on this

 7    spreadsheet to your attorney?

 8      A.    Yes.

 9      Q.    Are you aware of any other invoices or

10    receipts for the items listed on the spreadsheet that

11    you haven't produced?

12      A.    No.

13            (Defendants' Exhibit 16 was marked for

14    identification.)

15    BY MR. LAWSON:

16      Q.    I have handed you a document that's been

17    marked as Exhibit 16.

18            Do you recognize this document?

19      A.    Yes.

20      Q.    What is it?

21      A.    It is an invoice From Intuitive Environmental

22    Solutions by Dan Reed, who was the environmental

23    engineer that oversaw the removal of the toxic

24    Chinese drywall.

```
 1        Q.    And what is this invoice for?

 2        A.    For his services and for the preparation of

 3    the evidence box.

 4        Q.    It says "preservation sampling."

 5              Is that the evidence box that you are

 6    discussing?

 7        A.    Yes.

 8        Q.    To your knowledge, did someone collect

 9    samples of the drywall that was removed from your

10    home?

11        A.    Yes.

12        Q.    And was that Intuitive Environmental

13    Solutions?

14        A.    Yes.

15        Q.    Do you know how many samples they collected?

16        A.    Not to my knowledge, no.

17        Q.    Do you know if the samples of drywall were of

18    different markings that were found inside of the

19    house?

20        A.    Not to my knowledge.

21        Q.    Do you know if the samples show the markings

22    that are on the drywall?

23        A.    Yes, or he wouldn't have put them in the

24    evidence box.
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1030 of 3246
Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 30 of 189
Confidential - Subject to Further Confidentiality Review
of 189

```
1        Q.    And the samples have been transferred over to

2    your attorney; is that right?

3        A.    Correct.

4        Q.    And your attorney has had possession of them?

5        A.    Yes.

6        Q.    Do you know if there are any samples of end

7    tape that were on the drywall that were collected?

8              MR. ALBANIS:  Let me just interject here.

9              Counsel, as you know, your colleagues

10         inspected Ms. Gody's evidence box or evidence

11         bin, I should say.  I don't know how you expect

12         Ms. Gody to know what's in there.  Your

13         colleagues know what's in there.  They inspected

14         it, and they took pictures of it.

15             MR. LAWSON:  My question is a little bit

16         different than that since Ms. Gody was around and

17         had personal knowledge of the remediation.  I'm

18         just asking about her knowledge of what was

19         collected if she knows it.  I understand what you

20         now have in your possession, but I have her here

21         today so I need to understand what she knows and

22         what she doesn't know.

23             We did have the opportunity to review that

24         evidence, and we appreciate that.  And I just
```

```
 1          want to be able to understand what she knows

 2          about it as well.

 3               MR. ALBANIS:  I'm sure she would represent to

 4          you that the evidence bin has not been altered in

 5          any way since it was opened last week.

 6               MR. LAWSON:  Well, I will ask her that.  And

 7          I understand that you're feeding that position to

 8          her, but let's have her answer my questions and

 9          then we can go from there.

10               MR. ALBANIS:  That's fine.

11     BY MR. LAWSON:

12          Q.  Did you witness any of the samples of drywall

13     or samples of end tape being collected by the people

14     who conducted your remediation or Intuitive

15     Environmental Solutions?

16          A.  Yes.  I saw Dan Reed put a lot of things in a

17     pile.  I do not know which ones he selected out of

18     that pile.

19          Q.  Did you see someone taking photos of the back

20     of drywall boards when they were removed from the

21     home?

22          A.  Yes.  Dan Reed.

23          Q.  And have you ever seen a floor plan that was

24     drafted of the house showing where different drywall
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1032 of 3246
Case 1:15-cv-00404-NGG Document 99-11 Confidential Filed 05/12/18 Page 460 of 189

Confidential -- Subject to Further Confidentiality Review

```
 1    boards were removed from the house?

 2         A.   Yes.   It's in my environmental report from

 3    Dan Reed.

 4              (Defendants' Exhibit 17 was marked for

 5    identification.)

 6              THE WITNESS:  Before we proceed with this, I

 7         need to make a text back to my professional who

 8         is staying with my husband to let her know we are

 9         still continuing and I will be awhile longer.

10              MR. LAWSON:  Okay.

11              THE WITNESS:  Because I just --

12              MR. ALBANIS:  Any idea how much longer you

13         will be, Matt?

14              MR. LAWSON:  I don't think it will be -- it

15         will be in the next hour that I will be done,

16         probably less than that.

17              THE WITNESS:  I just need to give her an

18         idea, because --

19              MR. ALBANIS:  Take a quick break.

20              MR. LAWSON:  Let's go off the record.

21              (Recess from 4:46 until 4:53 p.m.)

22    BY MR. LAWSON:

23         Q.   Ms. Gody, you have been handed a document

24    that's been marked as Exhibit 17, which appears to be
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1033 of 3246
Case 1:13-cv-02408-NGG Document 11 entered on FLSD Docket 05/04/2023 Page 161 of 189
Confidential - Subject to Further Confidentiality Review

     1     a report from Intuitive Environmental Solutions from

     2     July 8, 2011.

     3              Do you see that?

     4     A.    Yes.

     5     Q.    And this relates to the items that were

     6     preserved by Mr. Reed.  I believe it was --

     7     A.    Yes.

     8     Q.    -- during the remediation of your home; is

     9     that right?

    10     A.    Yes.

    11     Q.    This also contains a floor plan of your home

    12     showing where different types of drywall were removed

    13     from the property.

    14     A.    Yes.

    15     Q.    Is that right?

    16              And that's on Page 5 of the report, correct?

    17     A.    Yes.

    18     Q.    And there are also photos that were taken

    19     during the remediation of the property or the removal

    20     of drywall from the property, correct?

    21     A.    Yes.

    22     Q.    Looking at Page 7, in the bottom left corner,

    23     do you see the drywall marking that says "Drywall"?

    24     A.    Yes.

```
 1          Q.   And do you see how the "Y" in that image on

 2     drywall is a little bit larger than the rest of the

 3     letters, or a little bit more pronounced?

 4          A.   Yes.

 5          Q.   Have you ever seen that marking before, that

 6     particular marking on drywall?

 7          A.   No.

 8               MR. ALBANIS:  I'm going to object to the

 9          form.

10               But you can answer, Ms. Gody, if you can.

11     BY MR. LAWSON:

12          Q.   You have not seen that particular marking on

13     drywall before?

14          A.   No.

15          Q.   To your knowledge, did Mr. Reed follow any

16     protocols or orders that were required of him by the

17     specifications that you had laid out for the people

18     who worked on the remediation in your home?

19               MR. ALBANIS:  Object to the form.

20               But you may answer him, Ms. Gody, if you can.

21               THE WITNESS:  Mr. Reed had the experience

22          because he had done other houses in our

23          neighborhood, and he had a copy of the protocol

24          with him.
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1035 of 3246
Case 1:11-cv-22408-MGC Document 101-1 Entered on FLSD Docket 05/08/2015 Page 163 of 189
Confidential - Subject to Further Confidentiality Review

```
 1     BY MR. LAWSON:

 2          Q.   And to your knowledge, he followed that

 3     protocol; is that right?

 4          A.   Yes.  To the best of my knowledge, yes.

 5               (Defendants' Exhibit 18 was marked for

 6     identification.)

 7     BY MR. LAWSON:

 8          Q.   Ms. Gody, I have handed you a document that

 9     has been marked as Exhibit 18.  This appears to be an

10     Intuitive Environmental Solutions report from

11     August 31, 2011.

12               Do you see that?

13          A.   Yes.

14          Q.   And from what I can tell, this is a final

15     report that you received from Mr. Reed related to his

16     work at your home; is that correct?

17               MR. ALBANIS:  Object to the form.

18               But you may answer.

19               THE WITNESS:  This is not the final report I

20          received from Mr. Reed.

21     BY MR. LAWSON:

22          Q.   Okay.  This is the report that you did

23     receive in August 31, 2011; is that right?

24          A.   Correct.
```

```
1       Q.    If you turn to the second page of the

2   document, there's a paragraph that begins "During the

3   preservation sampling."

4             Do you see that?

5       A.    Yes.

6       Q.    The second sentence in that paragraph states:

7   The overall remediation included the removal of all

8   of the drywall, both defective and suspect

9   nondefective, wood trim, wood interior doors,

10  cabinetry, porous floorings, insulation, electrical

11  components and wiring, vapor barriers, air duct work,

12  air handler, mirrors, and various other building

13  components inside of the home.

14            Did I read that correctly?

15      A.    Yes.

16      Q.    After -- and it goes on to state:  After the

17  completion of the remedial efforts, all that was

18  remaining was the shell of the former residence,

19  including the concrete slab, concrete block exterior

20  walls, metal and wood framing, PVC plumbing, exterior

21  doors, windows, and plywood roof sheaving.

22            Did I read that correctly?

23      A.    Yes.

24      Q.    Is that your understanding of the remediation
```

```
 1    work that was performed on your home?

 2         A.   Yes.

 3         Q.   I would like to turn your attention to the

 4    fifth page of this report.

 5              There's a section that begins with "The

 6    following conclusions are made specifically regarding

 7    the tainted and corrosive drywall."

 8              Do you see that?

 9         A.   Yes.

10         Q.   Looking through that section, this is where

11    Mr. Reed discusses the state of the home after the

12    remediation had occurred; is that right?

13         A.   Yes.

14         Q.   He begins by saying:  In the checklist, all

15    of the tainted and corrosive and nontainted and

16    corrosive drywall and associated wall covers were

17    removed from the Gody residence.

18              Did I read that correctly?

19         A.   Yes.

20         Q.   It said then in the next checklist item it

21    states:  All of the gross debris and particulate

22    matter generated as a result of the remediation of

23    the tainted and corrosive drywall inside of the home

24    has been removed, and all of the horizontal and
```

```
1    vertical surfaces were HEPA vacuumed and power

2    washed/cleaned.

3            Did I read that correctly?

4        A.    Yes.

5        Q.    The next checklist item states:  No residual

6    sulfur-like odors were detected by olfactory sensing

7    inside of the home during the final post-remediation

8    investigation.

9            Did I read that correctly?

10       A.    Yes.

11       Q.    And then it goes on to state:  The quality

12   assurance post remediation, clearance, and

13   verification composite sample that was conducted for

14   this investigation was nondetect by laboratory

15   analysis for the three specific chemical anolytes --

16   hydrogen sulfide, carbon sulfide, and carbon

17   disulfide -- that are related to the off-gassing of

18   tainted and corrosive drywall.

19           Do you see that?

20       A.    Yes.

21       Q.    It also states that the overall remediation

22   and pressure washing treatment of the residence was

23   effective and efficient.

24           Do you see that?
```

```
 1        A.   Yes.

 2        Q.   Is it your understanding that this section of

 3   the report that Mr. Reed is saying that the drywall

 4   remediation effort was successful in removing any

 5   gasses or particulate matter from the Chinese

 6   drywall?

 7        A.   Yes.

 8             MR. ALBANIS:  Object to the form.  Ms. Gody

 9        is not an engineer, a chemist, or a drywall

10        expert by any means.  The report says what it

11        says.

12   BY MR. LAWSON:

13        Q.   Ms. Gody, you have said that when you moved

14   back into the home, you no longer noticed an odor

15   inside of the home; is that right?

16        A.   Correct.

17        Q.   And you didn't have any of the physical

18   ailments that you had when you were in the home?

19        A.   Correct.

20        Q.   You waited an additional time to make sure

21   there was no remnant of the Chinese drywall in home;

22   is that right?

23        A.   Yes.

24        Q.   When you moved back in, in the year since,
```

1    you have been satisfied that there is no remnant of

2    the Chinese drywall in your home; is that correct?

3         A.    To the best of my knowledge.  I hope so.

4         Q.    Ms. Gody, you said earlier that you sold your

5    home in Pennsylvania at some time; is that right?

6         A.    Yes.

7         Q.    Do you remember when you sold it?

8         A.    In 2014.

9         Q.    Do you remember how much you sold it for?

10        A.    $255,000.

11        Q.    And do you remember how much you paid for the

12   home originally?

13        A.    Yeah.  300 and -- I'll give you the exact

14   number.  The base price of the house was 254 plus all

15   of the flooring and -- the base price was 254, but

16   then there was the decisions that we have already

17   gone over.

18        Q.    But as we discussed earlier, you were not

19   seeking the amount that you paid for the Pennsylvania

20   home as part of your damages in this lawsuit,

21   correct?

22             MR. ALBANIS:  Object to the form.

23             But you may answer, Ms. Gody.

24             THE WITNESS:  Only the alternative living

1     expenses for the 26 months that I resided there.

2          (Defendants' Exhibit 19 was marked for

3     identification.)

4     BY MR. LAWSON:

5          Q.   I have handed you a document that's been

6     marked as Exhibit 19, Supplemental Plaintiff Profile

7     Form.

8               Do you recognize this document?

9          A.   Yes.

10         Q.   Were you involved with the creation of this

11    document?

12         A.   Did I type it?  No.

13         Q.   Did you help answer the questions inside of

14    this document?

15         A.   Yes.

16         Q.   And when you signed this document, as you can

17    see on the final page of it, your signature, was your

18    statement that all the information was true and

19    correct to the best of your knowledge; is that right?

20         A.   Correct.

21         Q.   Under penalty of perjury; is that right?

22         A.   Yes.

23         Q.   And you signed this document around March 7th

24    of 2018; correct?

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1042 of 3246
Case 1:14-cv-04048-NGE Document 209-11 Entered on FLSD Docket 05/18/2015 Page 170 of 189
Confidential - Subject to Further Confidentiality Review

```
1       A.    Yes.

2       Q.    Looking to Section 5 under Page 4 of the

3    document, there's a section -- Section 5 that is

4    titled "Already Remediated Property."

5             Do you see that?

6       A.    Yes.

7       Q.    At the top there's a question that states:

8    Has the property been partially or completely

9    remediated?

10            Do you see that?

11      A.    Yes.

12      Q.    And you stated completely remediated?

13      A.    Yes.

14      Q.    Was that true at the time that you signed

15   this document?

16      A.    To the best of my knowledge at that time.

17      Q.    Has anything changed about the remediation

18   that you received at your home since March of 2018?

19      A.    After reviewing the findings from the Germano

20   case and realizing that we did not replace the

21   damaged tile or the tile that was up against the

22   drywall or the framing for the cabinet, I consider

23   that then partly remediated.  And I --

24      Q.    When did you review the Germano order that
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1043 of 3246
Case 1:14-cv-02494-WJG Document 203-11 entered on FLSD Docket 05/08/2013 Page 171 of 189
Confidential - Subject to Further Confidentiality Review

```
 1    you are discussing?

 2        A.   I don't recall.

 3        Q.   Was it in the last month?

 4        A.   I don't recall.

 5        Q.   When you reviewed the order, did you contact

 6    your attorney?

 7        A.   Yes.  I asked a question.

 8        Q.   Do you know when you changed your statement

 9    from completely remediated to partially remediated on

10    this form?

11        A.   I don't recall.  There's been so many

12    documents.

13        Q.   Are you aware of any orders that have been

14    issued by Judge Cooke in the Southern District of

15    Miami related to the Chinese drywall litigation?

16             MR. ALBANIS:  Object to the form.

17             Obviously, she hired Morgan & Morgan to

18        represent her in this case, and she's not an

19        attorney.

20             MR. LAWSON:  If she's looked at it, she can

21        answer the question.

22    BY MR. LAWSON:

23        Q.   Have you looked at or reviewed any orders by

24    Judge Cooke in the Southern District of Florida?
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1044 of 3246
Case 1:19-cv-02408-NGG Document 68-11 entered on FLSD Docket 05/08/2019 Page 172 of 189
Confidential - Subject to Further Confidentiality Review

```
 1              MR. ALBANIS:  Same objection.

 2              THE WITNESS:  I don't recall.  I don't

 3      recall.

 4              (Defendants' Exhibit 20 was marked for

 5      identification.)

 6      BY MR. LAWSON:

 7      Q.   I have handed you a document that has been

 8      marked as Exhibit 20.  This is a First Amended

 9      Supplemental Plaintiff Profile Form.

10              Do you recognize this document?

11      A.   Yes.

12      Q.   Have you seen it before?

13      A.   These documents all look alike.  Yes.

14      Q.   Looking to the seventh page of this document,

15      there's a field on it that says date signed.

16              Do you see that?

17      A.   Yes.

18      Q.   It says November 19th, 2018?

19      A.   Yes.

20      Q.   There is no signature next to that item; is

21      that correct?

22      A.   Correct.

23      Q.   And to your knowledge, have you ever signed a

24      verification for this particular First Amended
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1045 of 3246
Case 1:15-bk-04248-NGH Document 99-11 Entered on FLSD Docket 05/08/2045 Page 873 of 189
Confidential - Subject To Further Confidentiality Review

1    Supplemental Plaintiff Profile Form?

2        A.    I don't recall.

3        Q.    Do you remember if you met with your lawyer

4    in the weeks that preceded this November 19th, 2018,

5    submission of this First Amended Supplemental

6    Plaintiff Profile Form?

7        A.    Yes.

8        Q.    Do you remember when you met with him?

9        A.    I do not remember the exact date.

10        Q.    But did you have an in-person meeting?

11        A.    Yes.

12        Q.    And did you discuss this First Amended

13    Supplemental Plaintiff Profile Form?

14            MR. ALBANIS:  Objection.

15            I'm going to instruct my client not to

16        answer.  That's protected by the attorney-client

17        privilege.

18    BY MR. LAWSON:

19        Q.    Did you sign -- or excuse me, did you review

20    this form in the weeks prior to it being submitted?

21            MR. ALBANIS:  Object to the form.

22            But you may answer if you can, Ms. Gody.

23            THE WITNESS:  I don't recall.

24    ///

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1046 of 3246
Case 2:14-cv-02722-NGG Document 111 Entered on FLSD Docket 09/23/2015 Page 174 of 189
Confidential - Subject to Further Confidentiality Review

```
1    BY MR. LAWSON:

2        Q.   Did you personally change the answer in

3    Section 5 on Page 4 to state that your property was

4    partially remediated?

5            MR. ALBANIS:  Object to the form.

6            But you may answer if you can, Ms. Gody.

7            THE WITNESS:  I don't recall.

8            MR. LAWSON:  We can go off the record.

9            (Recess from 5:10 until 5:13 p.m.)

10   BY MR. LAWSON:

11       Q.   Ms. Gody, what inspired you to read the

12   Germano order when you read it?

13           MR. ALBANIS:  I'm going to object to that.

14       That's protected by the attorney/client

15       privilege, and I'll instruct my client not to

16       answer.

17   BY MR. LAWSON:

18       Q.   Do you recall when you read it?

19       A.   I don't recall.

20       Q.   Did anyone prompt you or instruct you to

21   change your answer to the first question in Section 5

22   about whether your home was partially or completely

23   remediated?

24           MR. ALBANIS:  Objection.  Don't answer that.
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1047 of 3246
Case 1:14-cv-09148-NGG Document 201-11 Confidential FILED DEALS 05/49/2019 Page 475 of 189

confidential - Subject to Further confidentiality Review

1      That is protected by the attorney/client

2      privilege.

3          Counsel, that's directly related to the

4      strategy of this case between client and

5      attorney, and I'm sure you can appreciate that

6      any questions related to strategy are privileged.

7      Those sorts of communications are privileged, and

8      I will instruct Ms. Gody to not answer that

9      question.

10         MR. LAWSON:  That just confirms that it was

11     instructed by you, and that was all that I was

12     curious about.

13         MR. ALBANIS:  No, it doesn't.  No, it

14     doesn't, but you can deduct from that statement

15     whatever you want.

16         MR. POYER:  Respectfully, doesn't the fact of

17     a change of from completely remediated to

18     partially remediated, that goes to not to

19     strategy but the actual facts of the case,

20     doesn't it?

21         MR. ALBANIS:  Oh, it certainly goes to the

22     actual facts of the case, and Ms. Gody has

23     testified there are certain portions of the home,

24     mainly the tiles, that were not remediated

Case 2:09-md-02047-EEF-MBN  Document 22363-29  Filed 11/19/19  Page 1048 of 3246
Case 1:18-cv-02408-WFK  Document 99-11  Entered on FLSD Docket 05/02/2019  Page 176 of 189
Confidential - Subject to Further Confidentiality Review

```
 1        pursuant to the Germano order.

 2             MR. VERRIER:  Whether you want to call it

 3        strategies, facts, whatever you want to call it,

 4        clearly those questions are directed towards

 5        communications that were had with counsel and

 6        client, and that's clearly protected.

 7             MR. POYER:  I mean, I don't --

 8   BY MR. LAWSON:

 9        Q.   Did someone other than your lawyer instruct

10   you to change the answer to whether the property was

11   partially or completed remediated?

12             MR. ALBANIS:  Same objection.  Don't answer

13        that.

14             MR. VERRIER:  Misstates her testimony and

15        certainly assumes facts not in evidence.

16             MR. LAWSON:  I have no further questions at

17        this time.

18             MR. POYER:  Beijing New Building Materials

19        has no questions.

20                       CROSS-EXAMINATION

21   BY MR. ALBANIS:

22        Q.   Ms. Gody, I would like to ask you to look at

23   Exhibits 2, 7 -- I'm sorry, pull out Exhibits 2, 3,

24   7, 17, 19, and 20.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1049 of 3246
Case 1:14-cv-02408-WJM Document 11 Entered on FLSD Docket 05/08/2019 Page 477 of 189
Confidential – Subject to Further Confidentiality Review

```
1        A.    Can we start over?

2        Q.    Two, three --

3        A.    Okay.  Wait one second.  Here's 3 and 2.

4              And?

5              Two, three.

6        Q.    Seven, 17, 19, and 20.

7              Early in the deposition, you discussed an

8     environmental report.  I would just want to confirm

9     that when you were referring to an environmental

10    report, you were referring to reports prepared by

11    Intuitive Environmental Solutions; is that correct?

12       A.    Correct.

13       Q.    And the main representative from the

14    Intuitive Environmental Solutions that you were

15    dealing with, what was his name?

16       A.    Dan Reed.

17       Q.    Was Dan Reed present for the removal of the

18    original drywall that was in this home?

19       A.    Yes.  For three days.

20       Q.    He was present for the tear-down?

21       A.    Yes.

22       Q.    Looking at Exhibit 17, the fifth page of what

23    appears to be the 40-page Intuitive Environmental

24    Solutions report.
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1050 of 3246
Case 1:19-cv-00248-MJT Document 60-1 Confidential Subject to Further Confidentiality Review
of 189
Confidential – Subject to Further Confidentiality Review

```
 1        A.   Yes.

 2        Q.   Is that a floor plan of your home -- or a

 3   rough floor plan, I should say?

 4        A.   Yes.  Yes, it is.

 5        Q.   Does this floor plan identify the different

 6   brands of drywall that were identified in your home

 7   by Dan Reed?

 8        A.   Yes.

 9        Q.   Do you have any reason to believe that this

10   is an inaccurate representation of the brands of

11   drywall that were removed from your home?

12        A.   No.

13        Q.   Leave that out for a second.

14             Let's pick up Exhibit Number 2.

15             Exhibit Number 2 appears to be your Amended

16   Plaintiff Profile Form from the Multiple District

17   Litigation.

18             Do you agree with that?

19        A.   Yes.

20        Q.   Okay.  Does your signature page -- does your

21   signature appear on Page 5 of Exhibit Number 2?

22        A.   Yes.

23        Q.   Okay.  Would you please turn to Page 2 of

24   Exhibit Number 2, Section 5.
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1051 of 3246
Case 1:11-cv-12240-NG Document 09-11 Confidential - Subject to Further confidentiality Review of 189
Confidential -- Subject to Further confidentiality Review

1      A.   Yes.

2      Q.   Mr. Lawson earlier in the deposition asked

3   you to review Exhibit 2 and asked whether you wanted

4   to correct or amend any of the information that was

5   in Exhibit Number 2, and you identified adding an

6   inspection to the list of inspections that had

7   occurred.  And that list is on Page 4.

8      A.   Yes.

9      Q.   But you did not mention any changes to the --

10   to Section 5 of the form, which is on Page 2, which

11   identifies the drywall manufacturers.

12           MR. LAWSON:  Object to the form.  Leading.

13   BY MR. ALBANIS:

14      Q.   Are there any changes to Section 5 that you

15   would now like to make since your home has been

16   remediated and all the defective drywall has been

17   removed from the home?

18           MR. LAWSON:  Objection to form.  Leading.

19   BY MR. ALBANIS:

20      Q.   Let me ask it a different way.

21      A.   Yes.

22      Q.   Look at Exhibit 17, the IES Report Intuitive

23   Environmental Solutions report.

24      A.   Yes.

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1052 of 3246
Case 1:19-cv-12408-NGL Document 11 Entered on FLSD Docket 05/03/2019 Page 180 of 189
Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Dan Reed has identified on Page 5 of that

 2   report --

 3        A.    Yes.

 4        Q.    -- Taishan, U.S. Gypsum, and Georgia-Pacific

 5   DensShield drywall.

 6              Do you see that?

 7        A.    Yes.

 8        Q.    Do you have any reason to believe that that's

 9   an inaccurate composition of the drywall that was

10   originally in your home?

11        A.    No.

12        Q.    Okay.  So now let's look back at Exhibit 2,

13   the Plaintiff profile form, Section 5.

14              What drywall manufacturers would you identify

15   in Exhibit 2, Section 5, if you were to fill out a

16   new plaintiff profile form today?

17              MR. LAWSON:  Object to the form.

18              MR. POYER:  Object to the form.

19              THE WITNESS:  I would put Taishan, United

20         States Gypsum, and Georgia-Pacific.

21   BY MR. ALBANIS:

22        Q.    Thank you, Ms. Gody.

23        A.    I would not include Knauf.

24        Q.    Thank you.
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1053 of 3246
Case 1:13-cv-24408-NGL Document 2081-1 Entered on FLSD Docket 05/03/2019 Page 181 of 189
Confidential - Subject to Further Confidentiality Review

```
 1              Was a representative from Kross Inspectors

 2     present during the tear-down in the old drywall in

 3     the home?

 4          A.   No.

 5          Q.   Was Kross Inspectors affiliated with

 6     Intuitive Environmental Solutions, to your knowledge?

 7          A.   Not to my knowledge.

 8          Q.   When Kross Inspectors conducted its

 9     inspection of your home, your home was not being

10     remediated, correct?

11          A.   Correct.

12          Q.   Over the course of this litigation -- strike

13     that.

14              How long have you been one of my clients,

15     Ms. Gody?

16          A.   It seems like forever.  Since 2009, I believe

17     it was.  2009, I believe.

18          Q.   From 2009 through the present, has my office

19     sent a number of different profile forms and other

20     documents related to this litigation to you for your

21     review?

22          A.   Absolutely.

23          Q.   And each time that we have sent one of those

24     profile forms and other documents to you that related
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1054 of 3246
Case 1:19-cv-12488-NGG Document 20-1 Entered on FLSD Docket 05/08/2019 Page 182 of 189
Confidential - Subject to Further Confidentiality Review

1    the your case for your review, have you reviewed

2    them?

3    A.   Yes.

4    Q.   And each time that you have reviewed a

5    profile form, have you provided approval to our

6    office before we have filed it on your behalf?

7    A.   You have presented me with the document --

8    Q.   Correct.

9    A.   -- and then I either signed it or

10    electronically signed it and sent it back with my

11    approval on it.

12    Is that the question?

13    Q.   Yes.

14    Did you do that?

15    A.   Yes.

16    Q.   And each time that you would do that, you

17    would authorize us to file a profile form on your

18    behalf?

19    A.   Yes.

20    MR. ALBANIS:  Nothing else.  Thanks.

21    THE WITNESS:  Okay.

22    MR. LAWSON:  I have nothing further.

23    MR. POYER:  No questions.

24    (Whereupon, the deposition concluded at

Confidential - Subject to Further Confidentiality Review

1     5:23 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1056 of 3246
Case 1:18-cv-02408-WFK Document 29-1 Confidential Filed 05/12/2019 Page 184 of 189
Confidential - Subject to Further Confidentiality Review

```
 1                  C E R T I F I C A T E

 2

 3          I, KELLY J. LAWTON, Registered Professional

 4   Reporter, Licensed Court Reporter, and Certified

 5   Court Reporter, do hereby certify that, pursuant to

 6   notice, the deposition of CANDACE GODY was duly taken

 7   on December 12, 2018, at 11:33 a.m. before me.

 8          The said CANDACE GODY was duly sworn by me,

 9   through an interpreter, according to law to tell the

10   truth, the whole truth and nothing but the truth and

11   thereupon did testify as set forth in the above

12   transcript of testimony.  The testimony was taken

13   down stenographically by me.  I do further certify

14   that the above deposition is full, complete, and a

15   true record of all the testimony given by the said

16   witness.

17

18          _____

19          KELLY J. LAWTON, RPR, LCR, CCR

20

21          (The foregoing certification of this

22   transcript does not apply to any reproduction of the

23   same by any means, unless under the direct control

24   and/or supervision of the certifying reporter.)
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1057 of 3246
Case 1:19-cv-22408-NGG Document 20911 Confidential Filed 05/18/2019 Page 185 of 189

Confidential - Subject to Further Confidentiality Review

```
 1                      INSTRUCTIONS TO WITNESS

 2

 3

 4            Please read your deposition over carefully

 5    and make any necessary corrections.  You should state

 6    the reason in the appropriate space on the errata

 7    sheet for any corrections that are made.

 8

 9            After doing so, please sign the errata sheet

10    and date it.  It will be attached to your deposition.

11

12            It is imperative that you return the original

13    errata sheet to the deposing attorney within thirty

14    (30) days of receipt of the deposition transcript by

15    you.  If you fail to do so, the deposition transcript

16    may be deemed to be accurate and may be used in

17    court.

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                         - - - - - -

 2                        E R R A T A

 3                         - - - - - -

 4    PAGE    LINE    CHANGE

 5    _____   _____   _____

 6       REASON: _____

 7    _____   _____   _____

 8       REASON: _____

 9    _____   _____   _____

10       REASON: _____

11    _____   _____   _____

12       REASON: _____

13    _____   _____   _____

14       REASON: _____

15    _____   _____   _____

16       REASON: _____

17    _____   _____   _____

18       REASON: _____

19    _____   _____   _____

20       REASON: _____

21    _____   _____   _____

22       REASON: _____

23    _____   _____   _____

24       REASON: _____
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1059 of 3246
Case 1:18-cv-04285-NGG Document 28-11 Entered on FLSD Docket 05/08/2019 Page 187 of 189
Confidential - Subject to further confidentiality Review

```
 1                    ACKNOWLEDGMENT OF DEPONENT

 2

 3          I, CANDACE GODY, do hereby acknowledge that I

 4     have read the foregoing pages, 1 to 187, and that the

 5     same is a correct transcription of the answers given

 6     by me to the questions therein propounded, except for

 7     the corrections or changes in form or substance, if

 8     any, noted in the attached Errata Sheet.

 9

10

11     _____    _____

12     CANDACE GODY                                      DATE

13

14

15

16

17     Subscribed and sworn to before me this

18     _____ day of _____, 20___.

19     My Commission expires: _____

20

21     _____

       Notary Public

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1060 of 3246
Case 1:19-cv-12408-NGG Document 2021-11 Entered on FLSD Docket 05/08/2020 Page 188 of 189
Confidential - Subject to further confidentiality Review

```
 1                          LAWYER'S NOTES

 2     PAGE    LINE

 3     _____   _____    _____

 4     _____   _____    _____

 5     _____   _____    _____

 6     _____   _____    _____

 7     _____   _____    _____

 8     _____   _____    _____

 9     _____   _____    _____

10     _____   _____    _____

11     _____   _____    _____

12     _____   _____    _____

13     _____   _____    _____

14     _____   _____    _____

15     _____   _____    _____

16     _____   _____    _____

17     _____   _____    _____

18     _____   _____    _____

19     _____   _____    _____

20     _____   _____    _____

21     _____   _____    _____

22     _____   _____    _____

23     _____   _____    _____

24     _____   _____    _____
```

```
1            - - - - - -

2            E R R A T A

3            - - - - - -

4    PAGE   LINE   CHANGE

5    45     24     Certainty to Certified

6    REASON:       Certified is the correct name

7    46     1      Certainty to Certified

8    REASON:       Same as above

9    73     21     Change from 46 months to 26 months

10   REASON:       Documentation provided shown receipts for
                   26 months
11   77     6-7    Groceries are not included

12   REASON:       in the alternative living
                   expenses of $68,314.68 because
13   ____   ____   I submitted them previously.

14   REASON:

15   ____   ____

16   REASON:

17   ____   ____

18   REASON:

19   ____   ____

20   REASON:

21   ____   ____

22   REASON:

23   ____   ____

24   REASON:       Cardace D Gody    1/3/2019
```

# EXHIBIT A12

Confidential - Subject to Further Confidentiality Review

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2
      EDUARDO AND CARMEN AMORIN,
 3    et al., individually, and
      on behalf of all others
 4    similarly situated,       Case No. 1:11-CV-22408-MGC
 5        Plaintiffs,
 6    vs.
 7    TAISHAN GYPSUM CO., LTD.,
      F/K/A SHANDONG TAIHE
 8    DONGXIN CO., LTD.; TAIAN
      TAISHAN PLASTERBOARD CO.,
 9    LTD, et al.,
10        Defendants.
11              CONFIDENTIAL - SUBJECT TO FURTHER
                     CONFIDENTIALITY REVIEW
12
                            - - -
13
                      JANUARY 8, 2019
14
                            - - -
15
            Deposition of DAVID GRIFFIN, held at
16      Morgan & Morgan, PA, 515 North Flagler Drive, Suite
        2125, West Palm Beach, Florida 33401, commencing at
17      9:01 a.m., on the above date, before Joan L. Pitt,
        Registered Merit Reporter, Certified Realtime
18      Reporter, and Florida Professional Reporter.
19                          - - -
20              GOLKOW LITIGATION SERVICES
            877.370.3377 ph | 917.591.5672 fax
21                  deps@golkow.com
22
23
24
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1064 of 3246
Case 1:18-cv-09491-NG-ST Document 43-11 Entered on FLSD Docket 05/08/2004 Page 9 of
162
Confidential - Subject to Further Confidentiality Review

```
 1                      APPEARANCES

 2

 3    Counsel for Plaintiffs:

 4        NATALIE M. RICO, ESQUIRE
          Colson Hicks Eidson

 5        255 Alhambra Circle, Penthouse
          Coral Gables, Florida 33134

 6        305.476.7400
          natalie@colson.com

 7
          EMMA KINGSDORF SCHWAB, ESQUIRE

 8        Barrios, Kingsdorf & Casteix, LLP
          701 Poydras Street, Suite 3650

 9        New Orleans, Louisiana 70139-3650
          504.524.3300

10        eschwab@bkc-law.com

11
      Counsel for Defendants Taishan Gypsum Co., Ltd., and

12    Taian Taishan Plasterboard Co., Ltd.:

13        MATTHEW D. LAWSON, ESQUIRE
          LARA TUMEH, ESQUIRE

14        MAE MANUPIPATPONG, ESQUIRE
          Alston & Bird LLP

15        One Atlantic Center
          1201 West Peachtree Street

16        Atlanta, Georgia 30309-3424
          404.881.7000

17        matt.lawson@alston.com
          lara.tumeh@alston.com

18        mae.manupipatpong@alston.com

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1065 of 3246
Case 1:19-mc-00405-NGG Document 1-1 Filed under seal 08/02/2005 Page 49 of 162
Confidential - Subject to Further Confidentiality Review

```
 1                    APPEARANCES CONTINUED

 2

 3     Counsel for Beijing New Building Materials PLC:

 4          DAN GUERRA, ESQUIRE

            Orrick, Herrington & Sutcliffe LLP

 5          The Orrick Building

            405 Howard Street

 6          San Francisco, California 94105-2669

            415.773.5545

 7          dguerra@orrick.com

 8          ALEX B. ROTHENBERG, ESQUIRE

            Gordon Arata Montgomery Barnett

 9          201 St. Charles Avenue, 40th Floor

            New Orleans, Louisiana 70170-4000

10          504.582.1111

            arothenberg@gamb.law

11
       Also present:  Diane Griffin

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1066 of 3246
Case 1:15-cv-02408-NGG-RLM Document 29-11 Filed on 05/04/2016 Pages of
Confidential -- Subject to further confidentiality review
162

```
 1                        - - -

 2                    I N D E X

 3                        - - -

 4   Testimony of:  DAVID GRIFFIN

 5    DIRECT EXAMINATION BY MR. LAWSON           6

 6    CROSS-EXAMINATION BY MS. RICO            147

 7    REDIRECT-EXAMINATION BY MR. LAWSON       154

 8

 9

10              E X H I B I T   I N D E X

11    GRIFFIN          DESCRIPTION           PAGE

12   No. 1    Letter dated 2/3/2005, Purchase and    17
              Sale Agreement

13            DGRIFFIN - 000121 through 000176

14   No. 2    Mortgage                          32
              DGRIFFIN - 000602 through 000632

15
     No. 3    Mortgage                          37

16            DGRIFFIN - 000633 through 00646

17   No. 4    Special Warranty Deed            39
              Book 209481/Page 1426 through Page

18            1431

19   No. 5    Aurora Loan Services Account     48
              Statement

20            DGRIFFIN - 000119 through 000120

21   No. 6    Plaintiff Profile Form - Residential   56
              Properties

22            GriffinD - 000001 through 000003

23   No. 7    Inspection Report dated 05/11/2010    72
              DGRIFFIN - 000199 through 000200

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-20 Filed 11/19/19 Page 1067 of 3246
Case 1:18-cv-11240-NGG Document 29-11 Filed on ESD Docket 05/28/2019 Page 46 of
162
Confidential - Subject to Further Confidentiality Review

| 1 | No. 8 | Photographs | 83 |
| | | DGRIFFIN - 000201 through 000601 | |
| 2 | | | |
| | No. 9 | Palm Beach County Property Appraiser | 87 |
| 3 | | Online Search Information | |
| 4 | No. 10 | Claimants David and Diane Griffin's | 97 |
| | | Amended Answers to Defendant Taishan | |
| 5 | | Gypsum Company, Ltd., Tai'an Taishan | |
| | | Plasterboard Company, Ltd., and BNBM | |
| 6 | | PLC's Interrogatories | |
| 7 | No. 11 | Supplemental Plaintiff Profile Form - | 113 |
| | | Residential and Commercial Properties | |
| 8 | | (Non-Knauf) | |
| 9 | No. 12 | Warranty Deed | 121 |
| | | Book 23976/Page 1784 through 1786 | |
| 10 | | | |
| | No. 13 | Settlement Statement | 122 |
| 11 | | DGRIFFIN - 000179 through 000197 | |
| 12 | No. 14 | Chinese Drywall Settlement Program | 127 |
| | | Foreclosure and Short Sale Claim Form | |
| 13 | | | |
| | No. 15 | Plaintiff Profile Form | 144 |
| 14 | | Griffin, D 0001 through 0006 | |

15

16

17

18

19

20

21

22

23

24

Case 2:09-md-02047-EEF-MBN Document 22363-20 Filed 11/19/19 Page 1068 of 3246
Case 1:18-cv-02408-WFK Document 09-11 Entered on FLSD Docket 05/19/2009 Page 41 of
162
Confidential - Subject to further confidentiality Review

```
 1                          - - -

 2              THE COURT REPORTER:  Raise your right hand,

 3        please.  Do you swear or affirm the testimony you

 4        give will be the truth, the whole truth, and nothing

 5        but the truth?

 6              THE WITNESS:  I do.

 7              THE COURT REPORTER:  Thank you.

 8              DAVID GRIFFIN, called as a witness by the

 9  Defendant Taishan Gypsum Co., Ltd., having been first

10  duly sworn, testified as follows:

11                          DIRECT EXAMINATION

12  BY MR. LAWSON:

13        Q.   Good morning.

14        A.   Good morning.

15        Q.   My name is Matt Lawson.  I'm an attorney for

16  Taishan Gypsum Company, Ltd.  I wanted to thank you for

17  coming in today.

18              Could you please state your name for the

19  record?

20        A.   David Derrick Griffin.

21        Q.   Have you ever been deposed before, Mr. Griffin?

22        A.   I have.

23        Q.   When was that?

24        A.   A couple years ago, I guess.
```

```
 1      Q.   And what was that deposition related to?

 2      A.   About a workmen's comp case.  I have a company,

 3   and one of the people claimed workmen's comp.

 4      Q.   And there was a lawsuit involved with that?

 5      A.   Yeah.

 6      Q.   And you were asked to give deposition testimony

 7   in that case?

 8      A.   Yes.

 9      Q.   Have you been deposed any other times before?

10      A.   Yes.  I think it was a -- it's been a while --

11   another workmen's comp case some time ago.

12      Q.   So you've done this before, but I just wanted

13   to go over --

14      A.   Yes.

15      Q.   -- some of the rules of the road here.  Do you

16   understand that you've been sworn in and --

17      A.   Yeah, I understand that.

18      Q.   And one of the things that we'll need to do

19   today is to make sure that we don't talk over each

20   other, which is natural to do when you're having a

21   conversation with someone --

22      A.   Right.

23      Q.   -- but we'll need to make sure that we don't

24   do --
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1070 of 3246
Case 1:15-cv-12498-NGF Document 209-11 Entered on FLSD Docket 05/09/2017 Page 9 of 162
confidential - Subject to Further confidentiality Review

```
 1      A.   I understand that.

 2      Q.   And we're doing it a little bit already, so I

 3  just want to make sure that I'll complete what I'm

 4  saying, and then we'll pause, and I'll make sure to not

 5  talk over you too, and that way she can take down

 6  everything that we're saying.

 7           So you understand that when you were sworn in,

 8  that was to tell the truth today; correct?

 9      A.   Yes.

10      Q.   And you think you'll be able to do that?

11      A.   Yes.

12      Q.   Can you think of any reason why you wouldn't be

13  able to tell the truth and give complete testimony

14  today?

15      A.   Absolutely not.

16      Q.   All right.  Now, so you understand that

17  everything that we say is being recorded and

18  transcribed; correct?

19      A.   Correct.

20      Q.   And if any of my questions don't seem clear to

21  you, just let me know, and I can rephrase them at any

22  point.

23      A.   Okay.

24      Q.   And when you're giving answers, make sure that
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1071 of 3246
Case 1:09-cv-02047-EEF-MBN Document 22363-39 Filed in Docket 01/19/2017 Page 40 of
162

Confidential - Subject to Further Confidentiality Review

1    they're verbal answers, that you say "yes" or "no,"

2    because if you just nod, then there's nothing to

3    transcribe onto the record.

4        A.   Okay.

5        Q.   If you need a break at any point, let me know.

6    You're welcome to just tell me at any time, "I need to

7    take a break."  We can do that.

8        A.   Okay.

9        Q.   You may hear objections from counsel at points

10   during the deposition.  Allow her to be able to put her

11   objection onto the record, but unless she instructs you

12   not to answer the question, I would ask that after she's

13   given her objection that you give your answer to the

14   best of your ability.

15       A.   Okay.

16       Q.   Did you meet with your lawyer prior to today to

17   prepare for this deposition?

18       A.   I have.

19       Q.   Okay.  How many times?

20       A.   Once.

21       Q.   And when was that?

22       A.   Yesterday.

23       Q.   About how long did you meet?

24       A.   Maybe an hour.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1072 of 3246
Case 1:09-cv-07402-McCaul Document 22363-39 Confidential Subject to 5/19/2012 Page 40 of
162
Confidential - Subject to Further Confidentiality Review

```
1       Q.   And who was present at that meeting?

2       A.   She was, and -- who was the gentleman?

3            MS. RICO:  Patrick.

4            THE WITNESS:  Yes.

5            MS. RICO:  Patrick Montoya.

6  BY MR. LAWSON:

7       Q.   All right.  Was anyone else there?

8       A.   No.

9       Q.   Did you review documents during the time that

10 you were preparing for this deposition?

11      A.   Kind of.  Not very -- not many.  I didn't

12 really read any.

13      Q.   Did you speak with anyone else, other than the

14 people that were in the room with you during the

15 meeting, to prepare?

16      A.   No.

17      Q.   Mr. Griffin, are you currently employed?

18      A.   I am.

19      Q.   Where?

20      A.   I have a company.  It's called Griffin

21 Construction Enterprises.

22      Q.   And that's your company?

23      A.   It's my company.

24      Q.   What is your role at your company?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1073 of 3246
Case 2:09-md-02047-EEF-MBN Document 21641-03 Filed 09/04/19 Page 42 of
162
Confidential – Subject to Further Confidentiality Review

```
1      A.   I'm the owner and general manager of it.  We're

2   a stucco subcontractor.

3      Q.   How long have you owned that business?

4      A.   I'm guessing around 30 years.  I can't tell you

5   for sure.

6      Q.   Is that the only place where you have been

7   employed during that 30-year period?

8      A.   Yes.  I have two other businesses.  That is the

9   general overhead business.  The businesses that oversees

10  the overhead for it is Griffin & Wilson Enterprises,

11  Inc., stucco company, and Griffin & Son Stucco, Inc.,

12  and they do the work.

13     Q.   Other than the workmen's comp lawsuits that we

14  discussed a little bit earlier, have you ever been

15  involved in a lawsuit before?

16     A.   I can't think of one, no.

17     Q.   Have you ever participated in a class action

18  lawsuit before?

19     A.   Yes.  There was a project down in Delray that

20  had some defects, and they sued the builder, and the

21  builder turned around and joined all the subcontractors.

22  And I think the first time they threw it out and now

23  they're going around again.

24          (Telephone interruption.)
```

Case 2:09-md-02047-EEF-MBN  Document 22362-39  Filed 11/19/19  Page 1074 of 3246
Case 1:09-cv-00448-MGC  Document 129-4  Entered on FLSD Docket 05/19/2011  Page 48 of
162
Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  I'm sorry.  I need to turn this

 2      off.

 3              That will be better.

 4      BY MR. LAWSON:

 5      Q.   So this is an ongoing lawsuit involving the

 6      Delray project?

 7      A.   Yes.

 8      Q.   And it's your company that was joined to the

 9      lawsuit as a subcontractor?

10      A.   Yes.  As one of them, yes.

11      Q.   What were the defects, if you know, that were

12      alleged?

13      A.   They had window leaks, and usually when there's

14      window leaks, what happens is they blame not only the

15      window company but every subcontractor who walked on the

16      job, because they -- as you know, probably, they try to

17      get money out of everybody so they don't have to pay the

18      enormous legal expenses.  And so my company was put in

19      there and -- so they could try to get money out of me,

20      as well as everybody else.

21      Q.   Because on a construction project, there's a

22      lot of different companies and people involved in

23      building?

24      A.   Correct.
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1075 of 3246
Case 1:09-md-02047-MGL Document 22362-39 Filed 11/19/19 Docket 05/19/2017 Page 41 of
162
Confidential - Subject to Further Confidentiality Review

```
 1      Q.   And when there's a defect, there usually are

 2   lawsuits where multiple companies are brought in to be

 3   defendants, is that your understanding?

 4          MS. RICO:  Form.

 5          THE WITNESS:  That's correct.

 6   BY MR. LAWSON:

 7      Q.   What is the address of the property that you

 8   allege has been damaged by Chinese drywall that you

 9   owned?

10      A.   I don't really remember.  Do you know remember

11   what it is?

12      Q.   Does 9801 Cobblestone Lakes Court sound

13   correct?

14      A.   Yes, it does.

15      Q.   And when did you own that property from?

16      A.   I don't know the exact dates.  I mean, this has

17   been dragging out now 10 years, so you'll have to

18   forgive my memory if I don't remember a lot of things,

19   because it's not yesterday that I did this.  But I'm

20   guessing for a year or so.

21      Q.   You owned it for about a year is your memory of

22   it, is that what you're saying?

23      A.   Yeah, I'm guessing about a year.

24      Q.   Do you remember when you purchased the
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1076 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 45 of
162
Confidential - Subject to Further Confidentiality Review

```
 1    property?

 2        A.   I don't have the exact date, but I think you

 3    do.

 4        Q.   Okay.  Do you remember how much you paid for

 5    the house, about, when you paid for it?

 6        A.   I don't remember exactly.  750, something like

 7    that.

 8        Q.   Now, going back to when you recall purchasing

 9    the property, do you remember why you bought the

10    property?

11        A.   I do.

12        Q.   Why is that?

13        A.   I was the builder's stucco subcontractor on

14    some previous jobs, very nice gentleman, and told me

15    that he had a new project coming up in Boynton Beach, it

16    was going to be very nice with some lakes.  And it all

17    sounded very nice, and I looked at the plan, and he

18    offered me, before the public was offered anything, my

19    pick of any lot.

20            And so I picked the best lot in there thinking

21    that this might be a really great place for my wife and

22    I to retire one day.  So I picked one that had a huge

23    view of the lake.  It was on kind of a point.  And so it

24    was nice.  And I -- even though, you know, it cost me a
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1077 of 3246
Case 1:07-cv-18048-CAL Document 2091-1 Entered on FLSD Docket 05/19/2017 Page 46 of
162
Confidential - Subject to Further Confidentiality Review

```
 1    lot of money, I thought I got a very good deal, it would

 2    be a good investment.

 3         Q.   Why did you think you got a good deal?

 4         A.   Because he offered me the lot at a reduced

 5    price.  Even though I had to pay a premium for that lot,

 6    because it was probably, if not the nicest lot, one of

 7    the nicest lots in the development, so I had to pay a

 8    premium for that lot, he still give me a good deal on

 9    it.

10         Q.   At the time you bought this property on

11    Cobblestone Lakes Court, what, if any, other properties

12    did you own at that time?

13         A.   Where I lived in Lantana.  And I think that was

14    it at that time.  Oh, and I've got a lot in North

15    Carolina.

16         Q.   Is it an empty lot?

17         A.   Yes.

18         Q.   So you had a home in Lantana at the time?

19         A.   Yes.

20         Q.   And where do you live today?

21         A.   I live at the very south end of West Palm Beach

22    at 100 Seville Road.

23         Q.   Is that the only home that you own?

24         A.   Yes.
```

Case 1:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/10 Page 1078 of 3246
Case 1:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/10 Page 1078 of 3246
Confidential - Subject to Further Confidentiality Review
162

```
 1      Q.   How long have you owned that home?

 2      A.   Three years.

 3      Q.   When did you move from Lantana to that home in

 4   West Palm Beach?

 5      A.   Well, I moved from the one from Lantana and I

 6   rented an apartment for three years, almost three years,

 7   and then I moved to the house in West Palm Beach.

 8      Q.   Where was the apartment that you rented?

 9      A.   It was in Palm Beach.

10      Q.   You mentioned your wife a moment ago.  How long

11   have you been married?

12      A.   Next year will be 50 years.

13      Q.   Congratulations.  Do you have any children?

14      A.   I do.

15      Q.   How many?

16      A.   Two, my son and my daughter.

17      Q.   And how old are they?

18      A.   44 and --

19           MS. GRIFFIN:  41.

20      A.   -- 41.

21      Q.   And did you mention that your son works with

22   you?

23      A.   My son and my daughter both work with me.

24      Q.   And your daughter?
```

```
1      A.   Yes.

2           (Griffin Exhibit No. 1 was marked for

3      identification.)

4      BY MR. LAWSON:

5      Q.   I handed you what's been marked as Exhibit 1.

6      I'll give you a moment to look at it.

7      A.   This is the purchase sale agreement.

8      Q.   So this is the purchase sale agreement --

9      A.   Yes.

10     Q.   -- for the Cobblestone property, Cobblestone

11     Lakes property; is that right?

12     A.   Yes, that's correct.

13     Q.   And this is a purchase and sale agreement that

14     you entered into in 2005; is that correct?

15     A.   Yes.

16     Q.   If you look at the page that is marked as

17     GRIFFIN 0002 in the bold font in the bottom right-hand

18     corner, it's the second page of the exhibit, it lists an

19     estimated completion date, at the bottom of the page, of

20     December 2005 for the home; is that right?

21     A.   Yes.

22     Q.   And does that sound about right, that the home

23     was completed around the end of 2005?

24     A.   I can't tell you exactly.  I remember that this
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1080 of 3246
Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 40 of 162
Confidential - Subject to Further Confidentiality Review

1   was going to be a house that I wouldn't use right away,

2   it would be a few years.  I told them that they could go

3   ahead and -- whenever this came up, they could go ahead

4   and build it at that time.

5           So it wasn't the first house they built.  They

6   built a bunch of houses before this, and then when they

7   got to this street where this was at, then they built

8   this out along with the rest of the street.  So I can't

9   tell you the date that was it actually built.

10      Q.   It lists a total purchase price here of

11  $588,400 --

12      A.   Yes.

13      Q.   -- near the bottom of the page.  Do you see

14  that?

15      A.   Uh-huh.

16      Q.   Now, a moment ago you mentioned that the price

17  was a little bit more than that based on your

18  recollection.  Why -- what's the difference between the

19  amount you said before --

20      A.   Well, I think this was the standard price on a

21  standard lot with no upgrades, and because my wife and I

22  were eventually going to move into this house, we wanted

23  one for us, so we -- I got the upgraded lot, which was

24  significantly more money, it was on a lake and it was

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1081 of 3246
Case 2:09-md-02047-EEF-MBN Document Confidential Subject to Pocket 05/08/2014 Page 20 of
162

Confidential - Subject to Further Confidentiality Review

```
 1    the best lot on the lake, and then we did a whole bunch

 2    of upgrades to the house, not just in finishes, but

 3    there were several things that we did to the house that

 4    cost more money, so it drove the price up more.

 5         Q.   Do you remember the things that were upgrades

 6    or additions that you put onto the property?

 7         A.   Yeah.  I did a loft.  I might have done an

 8    extra bathroom.  We put Saturnia marble on the entire

 9    first floor.  I did that because it was going to be

10    rented and I thought that was very durable and it looked

11    really nice.  I did better cabinets.  I did -- just,

12    basically, I did -- made the house much nicer, and so it

13    cost more money.

14         Q.   So you improved the finishes of the home and

15    the materials used?

16         A.   The finishes, the materials, and some of the

17    structure itself.

18         Q.   When you say you improved the structure, do you

19    mean the loft that was added?

20         A.   Yes, and the bathroom.

21         Q.   You obviously have experience in construction.

22    Did you oversee or witness any of the construction of

23    the home while it was being built?

24         A.   I went by there from time to time.  I'm a State
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1082 of 3246
Case 1:09-md-02047-MCA Document 23363-39 Filed 11/19/19 Page 46 of
162

Confidential - Subject to Further Confidentiality Review

1    Certified General Contractor, so I understand

2    construction.  So I went by there.  They were doing a

3    good job.

4         Q.   You thought they were doing a good job when

5    they were constructing it?

6         A.   Yes, sure.

7         Q.   Did you understand at the time that the home

8    was being built with Chinese drywall?

9         A.   Absolutely not.  If I did, it wouldn't have

10   happened.  Right?

11        Q.   Why is that?

12        A.   Well, when someone said Chinese drywall at

13   first, I didn't know what they meant by it.  It only

14   came to me over a period of time.  When -- I first found

15   out about it when the air conditioning in the house went

16   dead.  And so the air conditioning man went out there

17   and said, "Yeah, there's something really wrong with

18   this air conditioner."  So we replaced the coils and

19   everything.  They had turned black.  So not too long

20   after that it broke again and the mirrors started

21   turning black.  Anything that was copper turned black,

22   and the appliances were going bad.

23             And this was happening to other houses out

24   there.  In fact, my son's best friend bought one of

```
 1    those houses out there, and he too was devastated

 2    because of the Chinese drywall.

 3         So that's how it was -- it was processed over

 4    what people were talking about, what they said.  No one

 5    came to me and explained to me, "We're so sorry, we put

 6    in a defective product in your house and here's what it

 7    is."  And when I talked to the builder about it, the

 8    builder couldn't do anything, unlike Lennar Homes, who

 9    gutted those houses, this builder was smaller, and he

10    had to go bankrupt.

11         So I was left with the fact that here I am,

12    this Chinese drywall was put into my house, and it was

13    upsetting, because the Chinese company knew full well

14    what they were doing, and what were they getting out of

15    it?  Maybe 2 or $300 profit a house on a drywall?  And

16    for that they ruined the lives, they devastated so many

17    people's lives, took away their savings, their dreams,

18    their hopes, for a few hundred bucks a house?

19         It was pretty outrageous.  And I think that's

20    part of it.  It's not just I lost, you know, 2 or

21    $300,000, but they did it knowing what they were doing

22    just for a few hundred dollars a house.  It was

23    outrageous.  And I haven't heard any apologies from this

24    company.  Not one.  Apparently they're not sorry they
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1084 of 3246
Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 29 of 162
Confidential - Subject to Further Confidentiality Review

```
 1   did it.  You know, there was no honor in that company

 2   when they did this to me.

 3           And I could see what it did to my son's best

 4   friend.  He was newly married, they bought this house as

 5   their first house, and they moved into it.  She got

 6   pregnant and they had to move out and live in a little

 7   rental.  And, luckily, his father helped him and he

 8   slowly rebuilt his house.

 9           I didn't have that option.  I couldn't -- I did

10   rent it at first, and I had to give the renters back all

11   their money that they put into it.  I was afraid I'd be

12   sued because of -- by that time people were talking

13   about the possible health effects from it, plus they

14   couldn't live there because the appliances were all

15   going bad, the air conditioners were going bad.  So they

16   just couldn't live there, so I had to give them their

17   money back.

18           And I guess, to make a long story short, this

19   was not just money.  This was somebody doing something

20   to me for a few bucks and knowing that they were doing

21   it all along.  It was outrageous.  And I still get mad

22   from time to time about what was done to me by this

23   drywall company.  They knew what they were doing and

24   they did anyway for a few bucks.  You can't get worse
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1085 of 3246
Case 2:09-md-02047-MCA Document Confidential - Subject to Further Confidentiality Review
Confidential - Subject to Further Confidentiality Review
162

1    than that, can you?

2    Q.    You said at a couple points that the Chinese

3    company knew what they were doing and they did it

4    anyway.

5    A.    Of course.

6    Q.    How do you know that?

7    A.    First of all, I know a little bit about the

8    process of making drywall, and this stuff smells like

9    sulfur just in the house.  Finished with a paper on it

10   and everything, you can't tell me that they don't have

11   geologists and chemists that can tell what they're

12   mining out of the mines, that it's not defective and

13   it's got sulfur or whatever other ingredients were in

14   there that were harmful.  They knew all about it.

15        I know that -- now, you can correct me if I'm

16   wrong -- that Banner was told that -- not to say

17   anything to anybody, to go ahead and get that stuff out

18   of their shop and keep it quiet, and they got a special

19   deal for doing that.  I could be wrong, but that's what

20   I was told by several people.

21        You can't produce this kind of product without

22   knowing it.  It would be totally impossible.  You would

23   smell it in the plant when they're baking the stuff,

24   when they're making it.  Any big company like that, you

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1086 of 3246
Case 1:09-md-02047-EEF-MBN Document 2xxx Confidential Subject to Further Confidentiality Review 162
Confidential - Subject to Further Confidentiality Review

1    know, they have chemists and geologists that know what

2    they're mining in the mines, and they knew that stuff

3    was bad and they kept selling it, all for a few bucks,

4    and every time they did, they were destroying lives and

5    people's futures.  They didn't care, because they kept

6    doing it.

7         Q.   You mentioned Banner.  Are you referring to

8    Banner Supply Company?

9         A.   Yes.

10        Q.   And that was a distributor of Chinese drywall;

11   is that right?

12        A.   That was one of them, I guess.  I don't know

13   all of them, but...

14        Q.   Okay.  And it's your understanding that they

15   were aware that they were selling Chinese drywall that

16   was defective?

17        A.   That's what I understood, yes.

18        Q.   And how do you know that?

19        A.   I don't know who told me that.  I mean, again,

20   you're talking about that the drywall company has drug

21   this out 10 years, putting it off, putting it off, so

22   now it's been 10 years later, so I can't remember all

23   the details.  I remember my feelings of how I felt when

24   this was done to me, but I can't remember all the

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1087 of 3246
Case 1:09-md-02047-EEF-MBN Document Confidential Subject to Further Confidentiality Review
162

1    details and the figures and stuff like that.

2        Q.   So you said a little bit earlier that it would

3    be obvious to anyone that this product was defective,

4    because of the smell; is that right?

5        MS. RICO:  Form.

6        THE WITNESS:  In the -- yeah, in the plant

7        where they were making it, it would be pretty

8        obvious, because it goes through a process and they

9        bake this stuff, make it into the sheets of drywall.

10       So when they were making it, I can't imagine any

11       company producing huge quantities, a big company in

12       China producing huge quantities of this stuff and

13       not knowing what they're doing.  Can you?

14   BY MR. LAWSON:

15       Q.   If you were a company that was storing this

16   drywall, do you think you would be able to smell it?

17       A.   I would say there would be a good chance that

18   you would smell this product, because you could smell it

19   in the houses after it was hung and after it was

20   painted.  And that kind of seals it.  Right?  You know,

21   when the paint goes on, it kind of seals everything up.

22   So a lot of it in a warehouse with no paint, I would

23   imagine you probably could smell it as well.

24       Q.   So a home builder would also be able to smell

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1088 of 3246
Case 1:09-cv-02047-McGALL Document 1 Entered on FLSD Docket 05/05/2019 Page 27 of
162
Confidential - Subject to Further Confidentiality Review

1    it when they were hanging the drywall in the home?

2            MS. RICO:  Form.

3            THE WITNESS:  Not necessarily, you know, when

4        they were hanging.  The hangers make sure that all

5        the windows are kept open, because it's hot, so they

6        open up all the windows, and they're in there, and

7        the people that actually hang it, the hangers

8        themselves, they're just hard workers.  They don't

9        care about anything, they just want to get that

10       stuff hung, and if it smelled a little weird to

11       them, they don't care.  It's just work that day.  So

12       they'll go and they'll hang it and they'll get out.

13           And the same way with the drywall finishers.

14       Those workers will just get in and get out.  I think

15       it takes a while for this stuff to work its evil

16       ways, for the sulfur gas to get out and start

17       reacting with all the metal in the house and the air

18       conditioners and the appliances and the mirrors and

19       everything else.  So it takes a while.  That's my

20       understanding.

21   BY MR. LAWSON:

22       Q.   Is that based on your experience with your

23   home?

24       A.   Yes.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1089 of 3246
Case 1:11-cv-01045-MGC Document 23-14 Entered on FLSD Docket 05/29/11 Page 48 of 162
Confidential - Subject to Further Confidentiality Review

1    Q.   And when was the first time that you noticed a

2  smell in your house, if you did at all?

3    A.   I think it was -- it was after it was vacant,

4  really.  You know, I could see what was going on with

5  everything turning black, but, you know, I wasn't in the

6  house that much.  You know, I bought the house.  I did

7  some walk-throughs.  It was freshly painted.  So of

8  course the fresh paint smells and the fresh carpet

9  smells upstairs, and all the other things that you have

10  in a brand-new house, you know how they have a certain

11  smell, it would have camouflaged anything like that.

12  And I think after the people moved out, then I could

13  smell it somewhat.  Not strong, but there was a certain

14  smell.

15    Q.   When you said "after the people moved out," are

16  you referring to the renters?

17    A.   The renters, yes.

18    Q.   And do you know about how long after you bought

19  the home that renters moved in?

20    A.   I don't remember exactly.  It wasn't that long

21  after, because I closed on it and I was going to go

22  ahead and rent it out, so I rented it out to some nice

23  people, and they gave me first, last, and security.  I

24  don't remember how long they were there.  Maybe a couple

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1090 of 3246
Case 1:09-cv-02045-MGC Document 22363-39 Filed 11/19/19 Page 1090 of 3246
Confidential - Subject to Further Confidentiality Review
162

1   months before everything started going to hell.

2      Q.   Did you know the people that you rented it out

3   to?

4      A.   No, no, they were just...

5      Q.   How did you find them?

6      A.   I don't remember.

7      Q.   Do you remember their names?

8      A.   No.

9      Q.   Did you enter into a written rental agreement

10   with them?

11      A.   I did, but -- and I've tried to find it.  I

12   can't find it.  I wish I could, but I just -- it's been

13   too long.

14      Q.   Do you remember how much a month you rented the

15   home out to them for?

16      A.   Well, I think the mortgage payment was around

17   $4,900.  It would have been in excess of that, because I

18   wanted to cover, you know, the mortgage payment and the

19   taxes and the up -- you know, the things that I had to

20   do to the house while they were there that they were not

21   responsible for.

22      Q.   What things would they have not been

23   responsible for, to your recollection?

24      A.   Well, if the roof needed repair or if there was

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1091 of 3246
Case 1:09-md-02047-MCA Document Confidential Subject Docket 05/08/2019 Page 30 of
162

Confidential - Subject to Further Confidentiality Review

1    a plumbing malfunction or appliance go out or something

2    like that, but they -- you know, they took care of their

3    day-to-day living, like most renters.

4        Q.   Would they pay for utilities?

5        A.   Yes.

6        Q.   Would they pay for upkeep of the landscaping?

7        A.   Yes.

8        Q.   And do you know if anyone else rented the home

9    other than that one family that you discussed?

10       A.   No, that was it.

11       Q.   And they were only there for a short amount of

12   time?

13            MS. RICO:  Form.

14            THE WITNESS:  Yeah, two or three months.

15   BY MR. LAWSON:

16       Q.   Was there a homeowners association in this

17   community?

18       A.   I believe so.  Best I can remember.

19       Q.   Did you pay those fees?

20       A.   I would have if there was one.

21       Q.   I'd like to turn your attention to page

22   GRIFFIN 0017, GRIFFIN 17, in this document.  You can see

23   that bolded in the bottom right corner.

24       A.   Okay.

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/10 Page 1092 of 3246
Case 1:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/10 Page 46 of 162
Confidential - Subject to Further Confidentiality Review

1     Q.   You see there's a Paragraph 17 titled Home

2   Inspection Services in the second column in the middle

3   of the page.  Do you see that?

4     A.   I see it.

5     Q.   Taking a look at this paragraph, is it your

6   understanding that this section permitted you to hire an

7   independent home inspector to inspect the property at

8   your expense?

9     A.   Yes.

10     Q.   Do you remember if you did that before

11   purchasing this property?

12     A.   I don't remember if I did.  I built a lot of

13   homes myself.  I am a home builder.  Not now, but I was.

14   I may have made the inspection myself.  Would I have

15   realized from an inspection that there was Chinese

16   drywall in here?  No.  No.  I would have to wait for it

17   to do its evil deeds, wait for it to take out all the

18   appliances and the air conditioners, turn everything

19   black.

20          That's what you really first see, unless

21   somebody, you know, in the community and the word is

22   spreading that there's Chinese drywall in a bunch of

23   houses, then you have somebody come out and check it

24   just for that, and then that could be tested, but that

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1093 of 3246
Case 1:19-cv-22487-MGC Document 23-1 Entered on FLSD Docket 05/19/2019 Page 42 of
162
Confidential - Subject to Further Confidentiality Review

```
 1    was too early in the game for me.

 2        Q.   You said that you visited the property while

 3    the home was being constructed; correct?

 4        A.   Yeah, maybe a couple, three times.

 5        Q.   Did you visit while the drywall was being hung

 6    in the home?

 7             MS. RICO:  Form.

 8             THE WITNESS:  I don't think so.

 9    BY MR. LAWSON:

10        Q.   You never saw the drywall while it was being

11    installed?

12        A.   No.

13        Q.   Were any guarantees made to you about the

14    quality of the products that were used to construct your

15    home by the home builder?

16        A.   Only that it would be as good as their models.

17    They didn't go specifically each and every single thing

18    through the house and give me a -- they just, you know,

19    it's this quality, unless you upgrade, which I did in

20    many cases.

21        Q.   Do you know if other homes in that community

22    were built using defective Chinese drywall?

23        A.   I know there were others.  I've heard that they

24    were -- not all used Chinese drywall, but some.  I know
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1094 of 3246
Case 1:11-cv-22408-MGC Document 221-1 Entered on FLSD Docket 05/09/2011 Page 48 of
162

Confidential - Subject to Further Confidentiality Review

1    that my son's best friend's was.  But other than that, I

2    don't personally know anybody that had theirs done.  I

3    know there were others.  You hear these things, and

4    that's all I know.

5           MR. LAWSON:  Let's go off the record for a

6       second.

7           (Discussion off the record.)

8           (Griffin Exhibit No. 2 was marked for

9    identification.)

10   BY MR. LAWSON:

11      Q.  You've just been handed a document that is

12   marked as Exhibit 2.  I'll give you a second to review

13   the document.

14      A.  All right.

15      Q.  Do you recognize this document?

16      A.  It's the mortgage.

17      Q.  So this is a mortgage agreement that you

18   entered into for the Cobblestone property in 2006; is

19   that right?

20      A.  It appears so.

21      Q.  And the first page is marked at the bottom as

22   DGRIFFIN - 000602.  Is that what you have there?

23      A.  Yes.

24      Q.  All right.  Turning to the second page of this

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1095 of 3246
Case 1:11-cv-22408-MGC Document 29611 Entered on FLSD Docket 05/19/2015 Page 451 of
162
Confidential - Subject to further confidentiality Review

1    document, it states near the top that the note states

2    that borrower owes lender $585,235.  Do you see that?

3         A.   I see it.

4         Q.   And is that the amount of this mortgage that

5    you entered into with the bank?

6         A.   It appears so.

7         Q.   And the bank that you entered into it with was

8    the Colonial Bank; is that right?

9         A.   It was.

10        Q.   Was this the only mortgage that you entered

11   into for the property when you purchased it?

12        A.   I don't know if this is the total amount that

13   was the mortgage.  I know that the bank, before we

14   closed, wanted to break it up into a first and a second.

15   I still don't understand why they wanted to do that, but

16   it seemed all right, so that's what they did.  Whether

17   this was the total amount for both of them or for one, I

18   just -- I couldn't tell you.

19        Q.   Do you remember how much you put down on the

20   house when you purchased it?

21        A.   I don't remember, but it was a lot.  I just --

22   you know, again, here we go 10 years later, so I can't

23   pull these figures out of my head.  I'm sure that you

24   could quickly figure it out how much I actually put

Case 2:09-md-02047-EEF-MBN   Document 22363-39   Filed 11/19/19   Page 1096 of 3246
Case 1:09-cv-07791-RGC   Document 298-1 Entered on FLSD Docket 09/24/19   Page 95 of
162
Confidential - Subject to further confidentiality Review

```
1    down.  I put down, it was so much for the house, but I

2    remember every time we got an upgrade I had to give them

3    more money and more money and more money, and so it was,

4    you know, toward the end it was a lot of money.

5        Q.   So there was one mortgage that was a large

6    amount and then a second mortgage that was a slightly

7    smaller amount?

8        A.   It was a smaller amount, yes, a little amount.

9        Q.   I'd like to turn your attention to the page

10   that's marked as DGRIFFIN - 00609.  It's probably about

11   seven pages, six or seven pages deep into the document,

12   if you look in the bottom right corner.

13       A.   Okay.

14       Q.   If you look under Occupancy, it's Paragraph 6,

15   do you see that at the top of the page?

16       A.   Yes.

17       Q.   It states:  "Borrower shall occupy, establish,

18   and use the property as borrower's principal residence

19   within 60 days after the execution of the security

20   instrument and shall continue to occupy the property as

21   borrower's principal residence for at least one year

22   after the date of occupancy, unless lender otherwise

23   agrees in writing, which consent shall not be

24   unreasonably withheld or unless extenuating
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1097 of 3246
Case 1:09-cv-02045-MGC Document 23-3 Filed 10/19/09 Docket 09/14/17 Page 36 of
162

Confidential - Subject to Further Confidentiality Review

1    circumstances exist which are beyond borrower's

2    control."

3            Do you see that?

4       A.   I see it.

5       Q.   Now, this was not your principal residence

6    during this -- after you purchased the property; is that

7    right?

8       A.   No.

9       Q.   You continued to live in the home in Lantana?

10      A.   I did.

11      Q.   And you, in fact, rented out the property

12   shortly thereafter; is that right?

13      A.   Yes, I did.

14      Q.   And did you enter into an agreement with the

15   lender for that?

16      A.   I don't know, I might have talked to them about

17   it.  I remember talking to the builder about it.  You

18   know, he and I were -- he was not just a builder.  I

19   knew him personally.  So he knew exactly what I was

20   doing.  No one ever objected.  No neighbors ever

21   objected.  The bank never objected.

22           So, you know, it was just -- you know, they

23   have these stock things that they put out and I'm sure

24   they've got that, you know, in all of them.  I didn't

Case 2:09-md-02047-EEF-MBN   Document 23263-39   Filed 11/19/19   Page 1098 of 3246
Case 1:09-cv-02042-MGC   Document 15   Entered on FLSD Docket 05/18/2011   Page 49 of
162
Confidential - Subject to Further Confidentiality Review

```
1    pay much attention to it.  Everybody knew what I was

2    doing, and no one said I couldn't.

3         Q.   You said that you knew the builder personally;

4    is that right?

5         A.   Yeah.  He wasn't like a personal friend, but I

6    had done some work for him for some time.  And I liked

7    him.  He was just a nice person.  When this all fell

8    through, I wasn't angry at him.  He didn't know about

9    this.  You know, he hired the drywall company to do the

10   work, the drywall company bought the material, and I'm

11   sure the drywall company that bought the material had no

12   idea what was going in there.

13        The only person that I believe knew what was

14   going in there was the drywall supplier in China.  They

15   knew, and then it just took time for this to come out.

16        Q.   What was the name of the home builder that you

17   knew?

18        A.   Scott something.  I don't remember his name

19   now.  Again, it's been a while.  But he was a nice guy,

20   and he talked to me about it, and eventually he

21   couldn't -- he had to go bankrupt, because he was up

22   against the wall, as you could imagine.

23        Q.   And he told you that he didn't know that there

24   was defective drywall installed in the homes?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1099 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 3 of
162
Confidential - Subject to Further Confidentiality Review

```
 1      A.   No, he didn't know.

 2      Q.   Do you know the name of the company that

 3   installed the drywall?

 4      A.   I don't know that, that company's name.  And

 5   they wouldn't have known, because the stuff doesn't come

 6   out of their shop.  A drywall company calls a supplier,

 7   Banner, whoever, and gives them the order, and they go

 8   back in their shop and they take it over there, and

 9   probably the stuff in Banner isn't in there that long,

10   because they've got a turnover, so they get material

11   dropped off in large quantities, and then it just gets

12   pulled out every day as they place the orders.

13      Q.   I'd like to turn your attention to the page

14   marked as DGRIFFIN - 000616.

15      A.   Okay.

16      Q.   On this page, this is your signature and your

17   wife's signature; is that correct?

18      A.   It is.

19      Q.   And this is your agreement to this mortgage?

20      A.   Yes.

21           (Griffin Exhibit No. 3 was marked for

22   identification.)

23   BY MR. LAWSON:

24      Q.   I've handed you a document that has been marked
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1100 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Confidential Subject to further confidentiality Review
162

Confidential – Subject to further confidentiality Review

1    as Exhibit 3.  It is marked on the first page as

2    DGRIFFIN - 000633.  Is that what you have in front of

3    you?

4        A.   Yes.  It looks like the second mortgage.

5        Q.   Okay.  So this is what we were discussing

6    earlier, the second mortgage agreement that you entered

7    into in October 2006 for the Cobblestone property; is

8    that right?

9        A.   Yes.

10       Q.   I'd like to turn your attention to the first

11   page of the document that we were looking at,

12   DGRIFFIN - 000633, and you can see in the middle of that

13   page it states that the borrower is indebted to lender

14   in the principal sum of $73,154.  Do you see that?

15       A.   Yes.

16       Q.   So this amount is obviously significantly

17   smaller than the first mortgage amount that we looked

18   at, which was around 500,000, between 500,000 and

19   $600,000; is that right?

20       A.   Correct.

21       Q.   And you do not know why you were --

22       A.   They never did tell me, and I know it was the

23   house that I wanted to get for my future, and if this is

24   the way the bank wanted to do it, I went along with it.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1101 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 40 of
162
Confidential - Subject to Further Confidentiality Review

```
1        Q.   And if you turn to page DGRIFFIN - 000637, once

2   again you'll see your signature and your wife's

3   signature on that page; is that correct?

4        A.   Yes.

5        Q.   Did you pay these mortgage payments separately

6   or in a joint payment when you paid per month?

7        A.   I don't remember.  Sorry.

8        Q.   Do you remember how much a month you paid for

9   your mortgage during the time that you owned the home?

10       A.   I'm trying to think it was around 4,900.  I

11  could be wrong.  I mean, again, I keep going back to

12  it's 10 years later, so a lot of numbers have gone

13  through my mind since then.

14            (Griffin Exhibit No. 4 was marked for

15  identification.)

16  BY MR. LAWSON:

17       Q.   Mr. Griffin, you've been handed a document

18  that's been marked as Exhibit 4.  It's titled Special

19  Warranty Deed.

20       A.   Yes.

21       Q.   Have you seen this document before?

22       A.   If I did, I don't remember it.

23       Q.   Is it correct to say that this appears to be

24  the warranty deed for your purchase of the Cobblestone
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/20 Page 1102 of 3246
Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/20 Page 1102 of 162
Confidential - Subject to Further Confidentiality Review

1    property?

2        A.   It looks like it.

3        Q.   And if you turn to the second page of this

4    document, it's marked as page 2 of 6 in the bottom right

5    corner, you see the signatures on that page from

6    Northstar Holdings; is that right?

7        A.   Yes.

8        Q.   And witnesses to the sale; is that right?

9        A.   Yes.

10       Q.   I'd like to turn your attention to the third

11   page of this document.  It's labeled as "Exhibit A to

12   deed.  Deed restriction."  Do you see that?

13       A.   Where is it at?

14       Q.   It's page 3.  At the top of the page, it says

15   "Exhibit A to deed."  Do you see that?

16       A.   All right.  Yes.

17       Q.   And it states "minimum holding period and

18   restriction against leasing."  Do you see that?

19       A.   Yes.

20       Q.   And taking a look at this document, is it your

21   understanding that when you purchased the property there

22   was a minimum holding period of one year during which

23   you were not permitted to lease the property out to

24   anyone else?

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/10/10 Page 1103 of 3246 of
Case 1:09-md-02047-EEF-MBN Document 2 Entered on FLSD Docket 11/19/10 Page 42 of
162
Confidential - Subject to Further Confidentiality Review

```
1          MS. RICO:  Form.
2          THE WITNESS:  Yes, agree.  Again, just like
3     last time, I'm sure a lot of -- a lot of things --
4     everybody knew what I was doing.  The builder knew
5     what I was doing.  I think I talked to the bank.
6     The bank just wanted their money every month.  I was
7     going to do this for, I don't know, four or five,
8     six years, whatever, whenever I felt maybe I could
9     retire.  Of course, I can't now.  Now I'm 71.  So
10    this kicked me in the head.
11         So -- but that's what I was going to do.  No
12    one ever objected.  Everybody knew what I was doing.
13    No neighbors objected.  The people that moved in,
14    they were very nice.  So nobody cared.  It was -- to
15    me, it made this document irrelevant.  It was just
16    another document that banks have, they print them
17    up, and you sign them.
18 BY MR. LAWSON:
19    Q.  We were discussing earlier that you don't know
20 when exactly you rented the property out to that family;
21 correct?
22    A.  I don't -- I don't remember exactly.  It was
23 not that long after I closed, but I just don't remember.
24    Q.  And do you know if it was closer to the time
```

Confidential - Subject to further confidentiality Review
162

1    that you sold the property or when you bought the

2    property that you rented it?

3              MS. RICO:  Form.

4              THE WITNESS:  It was probably closer when I

5         bought the property.  I think -- and, again, I can't

6         remember all these details because it's been too

7         long, but I bought the property, everything was

8         great.  When I walked through the house when it was

9         finished, it was beautiful.  I rented the property

10        out.  They were there for a few months.

11             Then we figured out during that time what was

12        going on.  They demanded every penny that I gave

13        them back [sic], and I felt I better do it, because

14        I was afraid I was going to be sued.  I mean, by

15        that time there was talk that this Chinese drywall

16        was giving some people health problems, so I figured

17        let me just give them their money back, it would be

18        the wisest thing to do.

19             And then I wasn't sure what I could do, you

20        know.  You know, I was thinking, you know, what are

21        my options here?  Here I've got a house that I can't

22        rent, and because of this Chinese drywall I can't

23        sell it.  No one's going to buy this house.  I had

24        more -- a mortgage on it for more, and so I can't

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1105 of 3246
Case 1:09-md-02047-MGC Document Confidential Subject to Pseudo 19/19 Page 41 of 162
Confidential - Subject to Further Confidentiality Review

```
 1      rent it, I can't sell it, and I didn't have the

 2      money to gut that house out.  You're talking

 3      tremendous amounts of money.  It wasn't just

 4      replacing the drywall.  You're replacing all the

 5      appliances.  The mirrors all went black.  Everything

 6      was -- you have to -- you have to basically gut it

 7      down to the studs and rebuild the house.  I didn't

 8      have that kind of money, you know.

 9          So, you know, faced with this, and I talked to

10      the bank, I have no option, I'm going to have to go

11      ahead and short-sale the house so that, you know,

12      the bank wouldn't lose everything.  They took a hit

13      and I took a big hit.  Of course, it didn't do

14      wonderful things to my credit, did it?

15          So, I'll go back once again, all because a

16      company in China wanted to make some money, a few

17      bucks off of each of these houses that were

18      drywalled, they destroyed people's futures.  They

19      did.  And I think that's what gets in my gut.  It's

20      the same kind of feeling as if somebody broke into

21      your house and stole all your stuff.  You know, it's

22      not that you just lost stuff.  It's you feel

23      invaded, you feel creeped out, and you're angry, and

24      you can't get rid of it.
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1106 of 3246
Case 1:1-cv-2240-MGC Document 230-1 Entered on FLSD Docket 05/29/2019 Page 45 of
162
Confidential - Subject to further confidentiality Review

```
 1              And that's what that company did to me, and

 2         they did it to my son's best friend and so many

 3         other people, and they didn't care.  It's horrible.

 4         I know you don't want me to say that, but, hey,

 5         listen, I'm not telling you anything you don't

 6         already know, am I?

 7    BY MR. LAWSON:

 8         Q.   Going back to my question about the renters,

 9    when the renters moved in -- excuse me -- moved out of

10    the property, did they sign any kind of release or

11    waiver of claims when you gave them back their money?

12         A.   No.

13         Q.   And did they ever threaten legal action against

14    you?

15         A.   They never threatened it, but I felt that they

16    could if they wanted to because of all the scary stories

17    I was hearing about Chinese drywall, and by that time

18    some people were making claims that it was affecting

19    their health or their child's health or -- you know,

20    you're dealing with unknowns.  This is all something

21    brand-new, and so I just didn't know, so I just didn't

22    want to take the chance.

23              Plus, I felt bad for the people.  Here they

24    are, I rented them a house that was totally defective.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1107 of 3246
Case 1:11-cv-21349-MGC Document 388-1 Entered on FLSD Docket 05/18/2012 Page 46 of
162

Confidential – Subject to Further Confidentiality Review

1    It gave them, you know, huge inconvenience.  You know,

2    the whole deal was bad for everybody.

3        Q.   You mentioned that one of the first signs of

4    problems in the house was the air conditioning.

5        A.   I remember that.  The air conditioner went bad,

6    and it was, you know, like a new air conditioner.

7        Q.   So did that happen soon after the home was

8    built?

9        A.   It happened, I think, within a month or two,

10   and then the second one went bad fairly quickly.  It

11   didn't take that long.  Maybe there was just more

12   accumulation of the sulfur or whatever it was that was

13   destroying stuff in the house, and it just, it turned

14   black.  You can look at the coils, and they were just

15   black.

16       Q.   Were the renters in the home at the time that

17   the air conditioning was going out?

18       A.   Yes, and so they said, you know, "There's

19   something very wrong," and by then the neighbors,

20   everybody, was talking about what was going on, because

21   it was more than just my house that was failing.

22   Simultaneously there were other houses in the community

23   that were failing, and then people talk, and so...

24       Q.   When was the first time that you heard about

Case 2:09-md-02047-EEF-MBN   Document 22363-39   Filed 11/19/19   Page 1108 of 3246
Case 1:09-cv-08104-McGlinchey-Stafford   Document 2398-1   Filed 05/18/2019   Page 47 of 162
Confidential - Subject to Further Confidentiality Review

```
1    Chinese drywall?

2        A.   It was -- I don't remember exactly.  It was

3    around the time the air conditioner failed the second

4    time.  I didn't -- I didn't know about it the first

5    time, the air conditioner failed.  I had no idea what --

6    I thought it was a freaky air conditioner.

7        Q.   And how did you hear about Chinese drywall the

8    first time?

9        A.   I don't know who told me.  Maybe it was the

10   renters said that they heard things from other people or

11   it was -- I'm in the construction industry.  Maybe it

12   got out in the industry and I heard rumors about it.  I

13   just don't remember.

14       Q.   And how long did it take you to confirm that

15   you had Chinese drywall in your home?

16       A.   I think when I went there and I looked at the

17   air conditioner, and that's -- that was the sign of what

18   was wrong.  The air conditioner coils turned black.

19   Anything that was copper turned black.  You could look

20   inside electrical outlets and at the wires, and they

21   were all turning black.  The mirrors started turning

22   black all around the edges and stuff.  It was eating the

23   mirror part right off.  You open up the electrical panel

24   and the wires in there were all going.
```

Confidential - Subject to Further Confidentiality Review

```
 1            So it became apparent what was going on.  You

 2    know, it was like I was -- had a death sentence on that

 3    house when I saw that stuff.

 4       Q.   So you believed that you had Chinese drywall in

 5    the home based on the corrosion that you were seeing on

 6    metal and the air conditioning issues?

 7            MS. RICO:  Form.

 8            THE WITNESS:  Yes.

 9    BY MR. LAWSON:

10       Q.   Did you notice the smell that we discussed

11    earlier at that time?

12       A.   I don't -- I don't remember if I did.  I could

13    have.  You know, at that time I would have been trying

14    to notice it.  Before, without knowing, I don't know.

15    Plus, the new house smells, so I just don't remember.

16       Q.   Did the renters ever complain about a smell?

17       A.   I can't tell you.  I don't remember.

18       Q.   Did they complain about any health issues?

19       A.   I don't know if they were worried about health

20    issues, because by that time, you know, people were

21    talking about some people having health issues.  They

22    may have.  I just don't remember.

23       Q.   Did you have homeowners insurance on the home

24    throughout the length of time that you owned it?
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1110 of 3246
Case 1:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 40 of
162
Confidential - Subject to Further Confidentiality Review

```
 1      A.   I'm sure I did.

 2      Q.   Did you ever file a claim related to the

 3   defective drywall in your home?

 4      A.   No.

 5      Q.   Why not?

 6      A.   It was my understanding that it wouldn't cover

 7   that.

 8      Q.   How is it your understanding?  What gave you

 9   that understanding?

10      A.   I don't -- I don't remember.

11      Q.   But you do know that you never filed a claim?

12      A.   Yes.

13      Q.   Did you ever file a lawsuit against the home

14   builder?

15      A.   No, because he quickly went bankrupt, so it was

16   useless.

17      Q.   Do you know if anyone else filed lawsuits

18   against that home builder?

19      A.   I don't know.  I kind of surmised that they

20   probably did and that's the reason why he went bankrupt,

21   but I just don't know for sure.

22           (Griffin Exhibit No. 5 was marked for

23   identification.)

24           ///
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1141 of 3246
Case 1:09-cv-02047-EEF-MBN Confidential - Subject to Further Confidentiality Review Page 50 of 162
Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. LAWSON:

 2        Q.   Mr. Griffin, I've handed you a document that's

 3    been marked as Exhibit 5.

 4        A.   Yes.

 5        Q.   What does this document appear to be?

 6        A.   As far as I understood, they -- the people that

 7    had the mortgage sold it to Aurora, the mortgages, so it

 8    ended up with them.

 9        Q.   So this is a document that's marked on its

10    first page as DGRIFFIN - 000119.  Do you see that in the

11    bottom right corner?

12        A.   Yes.

13        Q.   And at the top, it's a document from Aurora

14    Loan Services, which I think you were just referring to;

15    is that right?

16        A.   Yes.

17        Q.   And it's your understanding that the loan was

18    sold, the loan services were sold over to this company

19    Aurora at some point during the term of the mortgage

20    that you owned it?

21        A.   Yes.

22        Q.   And I think we were looking at it earlier, but

23    this is a 30-year term mortgage; is that right?

24        A.   As far as I understand.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1112 of 3246
Case 1:1-cv-22408-MGC Document 1 Entered on FLSD Docket 05/30/2011 Page 51 of
162

Confidential - Subject to Further Confidentiality Review

```
 1       Q.   Yes.  So this document has a box at the top

 2   right corner that states "account statement."  Do you

 3   see that?

 4       A.   Yes.

 5       Q.   And the statement date is from January -- is

 6   for January 19, 2010; is that right?

 7       A.   Yes.

 8       Q.   And the property address that the account

 9   relates to is 9801 Cobblestone Lakes Court; correct?

10       A.   Yes.

11       Q.   And it's addressed to you; is that right?

12       A.   Yes.

13       Q.   And at this time it looks like there is a West

14   Palm Beach, Florida, address.  Is this a work address or

15   a home address that's here?

16       A.   That's my office address.

17       Q.   Okay.  So it was sent to you at your office?

18       A.   Yes.

19       Q.   All right.  This document, if you look at

20   account information, it has a principal balance that's

21   listed there of $71,779.80.  Do you see that?

22       A.   Yes, it looks like the smaller mortgage.

23       Q.   That's right.  So this is for the smaller

24   mortgage, the second one that we looked at?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1113 of 3246
Case 2:12-cv-02548-MCA-LDW Document 1 Exhibit 1 on File Under Seal Docket 01/08/2013 Page 52 of 162
Confidential - Subject to further confidentiality review

1    A.   Yes, correct.

2    Q.   And if you look over to amount due -- excuse

3    me.  First let's look at payment summary.  Payment

4    states total a monthly payment of $628.51 in the middle

5    of the page.  Do you see that?

6    A.   Yes.

7    Q.   And if you look over to amount due, it states

8    in the third line under amount due, in the box on the

9    right, past due amounts of $5,028.08.  Do you see that?

10   A.   Yes.

11   Q.   Now, at the time of this account statement, is

12   it correct that there was over $5,000 past due on this

13   second smaller mortgage?

14   A.   Yes, it looks like it.

15   Q.   What was going on at that time that that amount

16   of money was past due?

17   A.   Well, as I remember it, for a while I was using

18   what savings I had to pay it, but it got to the point

19   where there was nothing I could do.  And I was almost

20   frozen.  You know, here you got this house, and I would

21   imagine that if this had happened to you, you might get

22   frozen up, and I just didn't know what to do and I

23   couldn't pay them.  And then eventually, you know, I

24   just talked to them.  I said, "I'm just going to

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 1114 of 3246
Case 1:1-cv-22408-MGC Document 1-120 Entered on FLSD Docket 09/02/2011 Page 53 of
162

Confidential - Subject to Further Confidentiality Review

```
 1   short-sale the house," because I just -- I can't rent it

 2   and I can't sell it and there's no way for me to recoup

 3   this money, and my savings were gone, so that was my

 4   option.

 5        Q.   So you had entered into the mortgage in October

 6   of 2006; is that right?

 7        A.   Okay.

 8        Q.   And this now was about three and a half years

 9   later; is that right?

10        A.   Uh-huh.

11        Q.   So how long do you think at this point the

12   house had been vacant since you had had the renters move

13   out?

14             MS. RICO:  Form.

15             THE WITNESS:  I don't remember.  A couple

16        years.  I paid on it quite a long time trying to

17        figure out what I was going to do, and I kept coming

18        back to there's no answer for this.  I was hoping

19        for a gift from heaven, but I never got that gift.

20   BY MR. LAWSON:

21        Q.   When you purchased this home, the plan for you

22   to be able to pay for the mortgage was always that you

23   were going to rent the property?

24        A.   Correct.
```

Confidential - Subject to Further Confidentiality Review

```
 1       Q.   And you never thought that you would be paying

 2  for the mortgage without some kind of rental income

 3  coming in; is that right?

 4            MS. RICO:  Form.

 5            THE WITNESS:  No.

 6  BY MR. LAWSON:

 7       Q.   Do you know how long between -- or excuse me.

 8            When you purchased the home, you didn't have a

 9  renter lined up at that time; is that right?

10       A.   No.

11       Q.   And you don't recall how you found the family

12  that rented the home?

13            MS. RICO:  Form.

14            THE WITNESS:  I don't.  I just don't remember.

15       It's been a while.

16  BY MR. LAWSON:

17       Q.   Do you know if there were other homes in that

18  community that were rented out to families?

19       A.   I don't know.  I didn't -- you know, whoever

20  else was doing stuff in there, I don't know what they

21  did.  I just knew about what I was doing.

22            MR. LAWSON:  We've been going for about an

23       hour.  We can go off the record and take a break.

24            (Recess from 10:04 a.m. until 10:15 a.m.)
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1116 of 3246
Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1116 of 3246
Confidential - Subject to Further Confidentiality Review
162

```
 1    BY MR. LAWSON:

 2        Q.   Welcome back, Mr. Griffin.  I wanted to ask you

 3    another question about the renters that you had at the

 4    property.  Do you recall, when they entered into the

 5    written lease agreement, was it for a specific length of

 6    time?

 7        A.   I don't remember.  It was probably per year, by

 8    the year.  But, again, and I am going back, this thing

 9    has been pushed out 10 years.  I just don't have the

10    memory for all of the details.

11        Q.   But it was your recollection that it might have

12    been a year; is that right?

13            MS. RICO:  Form.  And I'm going to say this has

14        been asked and answered many, many times, and I'm

15        giving leeway because I know that you need to ask

16        your question, but he said at least a dozen times he

17        doesn't remember.  But go ahead, you can answer.

18            MR. LAWSON:  Well, we just got a detail that we

19        didn't get before, and that's why I'm asking

20        questions.

21            MS. RICO:  I'm just putting that on the record.

22        I've been patient.

23            THE WITNESS:  And those kind of things, when I

24        say that, like, it might have been a year, I'm only
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/10 Page 1117 of 3246
Case 1:11-cv-22408-MGC Document 23363-39 Entered on FLSD Docket 09/09/2011 Page 56 of
162
Confidential - Subject to further confidentiality Review

```
 1          guessing.  I don't remember.  I don't -- I remember

 2          very little about all the details that happened 10

 3          years ago.  Maybe it's just my age, I'm 71, but --

 4          so more of what I have is my feelings.  I don't have

 5          specific dates and specific numbers.  I have what it

 6          did to me.

 7     BY MR. LAWSON:

 8          Q.   And I completely understand this is a long time

 9     ago, and the only reason that I've been asking a lot of

10     different questions is because one of the things that

11     you are seeking in this lawsuit is lost rental

12     damages --

13          A.   Yes.

14          Q.   -- for lost rent, and without any

15     documentation, I need to get your understanding of that

16     to the best of your recollection to be able to

17     understand what you're seeking, because we don't have

18     documents to be able to explore what that lost rent

19     looked like.

20          A.   Right.

21          Q.   So that's the only reason that I'm asking.

22          A.   I understand.

23          Q.   And I appreciate that this is a long time ago

24     and I appreciate you trying to recall what you can.
```

Confidential - Subject to Further Confidentiality Review

```
 1            MS. RICO:  I will say one more thing.  We have

 2       been looking into his banking records to see if we

 3       find anything additional.  Obviously, if we do find

 4       any documentation of the rental, given that we're 10

 5       years out, we will provide it to you.  Regardless of

 6       what the discovery deadline is, we will obviously

 7       provide that information to you.

 8            MR. LAWSON:  Thank you.

 9            (Griffin Exhibit No. 6 was marked for

10  identification.)

11  BY MR. LAWSON:

12       Q.   Mr. Griffin, you've been handed a document

13  that's been marked as Exhibit 6.  It's labeled at the

14  very top in small print Plaintiff Profile Form -

15  Residential Properties.  Do you see that?

16            I apologize for the small print at the top.

17       A.   Where is that?

18       Q.   So it's just below where it says "Document 168"

19  in the center.  It says in very small print "Plaintiff

20  Profile Form - Residential Properties."

21       A.   Yeah, it's kind of printed over.  I didn't

22  quite see it.

23       Q.   That's right.  Is it your name that's listed

24  under Section I of this document, along with your wife?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1119 of 3246
Case 1:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 45 of 162
Confidential - Subject to Further Confidentiality Review

 1     A.   Yes.

 2     Q.   And that's listed as the name of the property

 3   owners?

 4     A.   Correct.

 5     Q.   Have you seen this document before?

 6     A.   No.

 7     Q.   I'll give you a chance to review this document

 8   since you don't recall looking at it.

 9     A.   Okay.

10     Q.   I represent to you this is a profile form that

11   was submitted on your behalf in the Chinese Drywall MDL

12   in the Eastern District of Louisiana, and it just

13   contains some information about your claim that I'd like

14   to ask you about.

15     A.   Okay.

16     Q.   Specifically, if you can look to insurance

17   information, in Section II, it lists an insurance --

18   homeowners insurance policy with Linca, I believe,

19   Insurance Agency.  Do you see that?

20     A.   I'm looking.

21     Q.   It's on the right side of the page under

22   Section II, Insurance Information, and it lists the

23   agent as Linca Insurance Agency?

24     A.   Okay, I see that.  Yes.

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1120 of 3246
Case 1:11-cv-22408-MGC Document 25-41 Entered on FLSD Docket 05/18/2012 Page 45 of
162
Confidential - Subject to Further Confidentiality Review

```
 1      Q.   And does that sound right for the homeowners

 2   insurance policy that you had for the Cobblestone

 3   property?

 4      A.   I'm only guessing because I'm looking at this

 5   paper.  I don't remember.

 6      Q.   Okay.  Now, if you look down to Section III,

 7   Claimant Information, it lists your name and your wife's

 8   name.  Do you see that?

 9           Sorry.  It's at the bottom of the page.

10   Section III.

11      A.   Yes.  Okay.  Yes.

12      Q.   It lists your name and your wife's name?

13      A.   Yes.

14      Q.   As the claimants; is that right?

15      A.   Yes.

16      Q.   And for dates occupied, which is the second

17   column in Section III, it has a move-in and leave

18   column, and those are both blank for you and your wife;

19   is that right?

20      A.   Correct.

21      Q.   That's because you never lived in the property?

22      A.   Correct, yeah.  I'd always -- I was going to

23   live in it eventually.  It was my retirement house.

24      Q.   Right.
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1121 of 3246
Case 1:09-cv-02042-McGill Document 12 Financial Statements Docket 05/18/2011 Page 40 of
162
Confidential - Subject to further confidentiality review

```
 1      A.   But at first it was going to be rented until

 2   then.

 3      Q.   But it's correct to say that at no time did you

 4   actually live in the property at Cobblestone?

 5      A.   I did not.  No, it was -- no.

 6      Q.   Now, under "Are you claiming personal

 7   injuries?" for you it has both "yes" and "no" checked.

 8   Do you know if you were at any point claiming personal

 9   injuries in any lawsuit related to Chinese drywall?

10      A.   Well, not physically.  Emotionally and

11   monetarily, yes, but not physically, because I didn't

12   live there.

13      Q.   Turning to the second page, I'd like to turn

14   your attention to Section V, Drywall Information.  Do

15   you see that?  Section B or Roman Numeral V, Drywall

16   Information?

17      A.   Yes, I see it.

18      Q.   And under drywall manufacturer, it lists Knauf.

19   Do you see that?

20      A.   Yes.

21      Q.   And do you know who Knauf is?

22      A.   No.

23      Q.   All right.

24      A.   I've heard the name before with this whole
```

Confidential - Subject to further Confidentiality Review

```
 1   thing, but I don't --

 2       Q.   Has it ever been your understanding that you

 3   had Knauf drywall inside of your home at Cobblestone?

 4       A.   I only knew it as Chinese drywall, not a

 5   specific manufacturer.  My attorney may know.  I know

 6   they took tests, so...

 7       Q.   You know that tests were taken of samples of

 8   drywall from your home?

 9       A.   Correct.

10       Q.   Have you ever seen those test results before?

11       A.   I've never looked at them.

12       Q.   Do you know when they were taken?

13       A.   I don't remember.

14       Q.   Would it have been after the inspection was

15   done of your home?

16       A.   It would have been after, I believe, the

17   renters moved out and I realized that I had Chinese

18   drywall.

19       Q.   So you realized you had Chinese drywall shortly

20   after or around the time that the renters moved out?

21            MS. RICO:  Form.

22            THE WITNESS:  Yeah, during that time.

23   BY MR. LAWSON:

24       Q.   And did someone come and cut out samples of
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1123 of 3246
Case 1:09-cv-02047-GCC Document 2306-39 Filed 11/19/19 Docket 05/18/2011 Page 62 of
162

Confidential - Subject to Further Confidentiality Review

1    drywall from your home at that time?

2        A.   Well, they eventually did.  I don't remember

3    exactly what time they did.

4        Q.   And how many times did that happen where

5    someone came to the house to cut out samples of drywall?

6        A.   I don't remember.

7        Q.   If you look up to Section IV, it's titled, at

8    the top of the page, it's titled Inspection Information.

9    Do you see that?

10       A.   Where is it at?

11       Q.   Sorry.  It's at the top of the page,

12   Section IV, Inspection Information.

13       A.   I see it.

14       Q.   And if you look in that, it asks you who

15   conducted the inspection of your home, and it lists a

16   Yanes Security & Investigative Services, Inc.  Do you

17   see that?

18       A.   I see it.

19       Q.   Do you know who that company is?

20       A.   No, I just see their name on the paper.  It

21   was -- I would assume it would be somebody that my

22   attorneys hired that would be experts in doing that

23   work, but I don't know.

24       Q.   And it says here that the inspection took place

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1124 of 3246
Case 1:09-cv-07456-LAK Document 26-47 Entitled 1 Sub Docket 05/19/2014 Page 63 of
162

Confidential - Subject to Further Confidentiality Review

1    on May 11, 2010.  Do you see that there?

2         A.   I see it.

3         Q.   Do you remember if you were present for that

4    inspection of your home?

5         A.   I don't remember.

6         Q.   And it says that a determination has been made

7    that there's Chinese-manufactured drywall present in the

8    home, on line 2 of that section.  Do you see that?

9         A.   Yes.

10        Q.   And that that determination was made by this

11   Yanes Security & Investigative Services.  Do you see

12   that?

13        A.   Yeah, they determined it, but I don't think I

14   needed anybody other than the proof that was in the

15   house where everything turned black, but I guess you

16   need some experts to say the obvious.

17        Q.   Turning to Section VI, it says "Home

18   Information."  That's the title of Section VI.  Do you

19   see that on the left side of the page?

20        A.   Yes.

21        Q.   Is lists the approximate square footage of the

22   house as 4,039 square feet.  Do you see that?

23        A.   Yes.

24        Q.   Now, is it your understanding that that is a

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1125 of 3246 of
162
Case 1:09-cv-02047-EEF-JCW Document 22362-39 Filed 11/19/19 Page 461 of
Confidential – Subject to Further Confidentiality Review

1    total square footage of the home?

2         A.    I don't know.  I just -- I don't know.

3         Q.    You do know the difference between under air

4    square footage --

5         A.    Yes, I do.

6         Q.    -- and total square footage; right?

7         A.    Correct.

8         Q.    And sometimes -- well, often the under air

9    square footage of a home is less than the total square

10   footage of the home?

11        A.    The house was a large house.  It even felt

12   bigger than it was because it had big, tall, vaulted

13   ceilings.  It was an impressive house.  It was a really

14   pretty house.  I just -- I was looking forward to living

15   in that house.

16        Q.    Going back to my question, the under air square

17   footage of a home is commonly less than the total square

18   footage of the home because the --

19        A.    Correct.

20        Q.    -- whole home isn't under air; right?

21        A.    Right, yeah, you've got the garage.

22        Q.    Right.  So the square footage of the garage is

23   not under air?

24        A.    Correct.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1126 of 3246
Case 1:09-cv-02047-GLR Document 22363-39 Filed 11/19/19 Page 41126 of 3246
Confidential - Subject to Further Confidentiality Review
162

```
 1       Q.   If you look to Section IX, it's titled Drywall

 2   Installer, and it's in the bottom left corner.  Do you

 3   see that?

 4       A.   Yes.

 5       Q.   It lists Precision Drywall, Incorporated, out

 6   of West Palm Beach.  Do you see that there?

 7       A.   Where is this?

 8       Q.   In the bottom left-hand corner, it says -- the

 9   drywall installer's name is listed as Precision Drywall,

10   Incorporated.  Do you see that?

11       A.   Yes, I see it.

12       Q.   Does that ring any bells for who the drywall

13   installer was of your home?

14       A.   No.  I never knew.

15       Q.   Looking to Section VIII, which is on the

16   right-hand side, it's titled Home Builder/General

17   Contractor/Developer Information.  Do you see that?

18       A.   Yes.

19       Q.   And it lists the home builder as Northstar

20   Homes?

21       A.   Correct.

22       Q.   Is that accurate?

23       A.   It is.

24       Q.   And that was the home-building company of
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 04/19/19 Page 1127 of 3246
Case 2:09-md-02047-MCA Document 23363-39 Filed 05/19/19 Page 35 of
162

Confidential - Subject to further confidentiality review

1    Scott, the home builder that you knew?

2        A.    Yeah, that's the home builder for the project.

3        Q.    Let's go back to Exhibit 1 that we looked at a

4    little bit earlier.

5        A.    I don't know which that is.

6        Q.    Yeah, sorry.  It will be marked as -- it will

7    probably be at the bottom of that stack.  It's the first

8    one that we looked at.

9        A.    All right.

10       Q.    Yeah.  That was the purchase document, the

11   sales agreement, that we looked at a little bit earlier.

12   Specifically in this big document I wanted to point you

13   to GRIFFIN0044.  It's about 44 pages into this.  If you

14   can flip back to that page.

15       A.    Yes.

16       Q.    All right.  So GRIFFIN0044.  It appears to be a

17   floor plan of the home that you purchased; is that

18   right?

19       A.    Yes, correct.

20       Q.    In looking at this, does this appear to be the

21   general floor plan of the Cobblestone property?

22       A.    Yes.

23       Q.    Looking to the bottom right-hand corner, it

24   lists different amounts of square footage.  Do you see

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1128 of 3246
Case 1:09-cv-02047-GCM Document 2001-1 Entry Number 33 Page 105 of 142 Page 67 of
162

Confidential - Subject to further confidentiality Review

1    that?

2        A.    Yes.

3        Q.    And specifically it lists the AC living area

4    square footage of the home as 3,364 square feet.  Do you

5    see that?

6        A.    Yes.

7        Q.    And then it also lists the garage square

8    footage as 463 square feet.  Do you see that?

9        A.    Yes.

10       Q.    The covered porch square footage as 138 square

11   feet?

12       A.    I can only assume all of these are correct,

13   because I just don't know.

14       Q.    But you see that there it lists the covered

15   porch square footage as 138 square feet?

16       A.    Yes, I can see that.

17       Q.    And then, finally, it lists the covered entry

18   square footage as 74 square feet?  Do you see that?

19       A.    I see it.

20       Q.    So the last three items, the garage, the

21   covered porch, and the covered entry, are not under air

22   or part of the AC living area; is that right?

23       A.    Correct.

24       Q.    So like we discussed before, the under air

Confidential - Subject to Further Confidentiality Review

```
 1   square footage of the home is less here than the total

 2   square footage of the home?

 3        A.   Correct.

 4        Q.   And the total square footage of the home is a

 5   little over 4,000 square feet --

 6        A.   Yeah.

 7        Q.   -- like we discussed before; correct?

 8        A.   Other areas would have been drywalled as well.

 9        Q.   That's right.

10        A.   The ceiling and one of the walls in the garage

11   would have been drywalled.  I don't remember the ceiling

12   of the porch.

13        Q.   That's right, but the living area that was part

14   of -- that was air conditioned, or the under air square

15   footage, it was 3,364; right?

16        A.   Yes.

17        Q.   And you don't have any reason to doubt that

18   number?

19             MS. RICO:  Form.

20             THE WITNESS:  No.

21   BY MR. LAWSON:

22        Q.   Have you ever had the square footage of the

23   home measured by anyone?

24        A.   No.  No reason.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1130 of 3246
Case 1:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 1130 of 3246

Confidential - Subject to Further Confidentiality Review
162

```
 1       Q.   Is it correct that the home had five bedrooms

 2   and three bathrooms?  Is that right?

 3       A.   I guess so.  I don't remember, but I guess

 4   there was.

 5       Q.   Why did you have an inspection done on your

 6   house?

 7       A.   When?

 8       Q.   Why.

 9       A.   When?

10       Q.   Oh, sorry.  There was an inspection listed on

11   the Plaintiff Profile Form that we were looking at a

12   moment ago from Yanes Security.  I was wondering why

13   that was done, if you remember.

14       A.   Why it was done is because I felt I was harmed

15   by this company.  By that time, I realized that it was

16   my understanding that the company that made the drywall

17   and Banner knew what they were doing, and so I felt that

18   I should hire an attorney because I was harmed in many

19   ways.  So I hired an attorney, and then they -- I would

20   imagine they were the ones that hired the inspector.

21       Q.   Do you remember when you first hired an

22   attorney related to Chinese drywall?

23       A.   I don't remember.

24       Q.   But it was after you hired an attorney that
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1131 of 3246
Case 1:09-md-02047-EEF-MBN Document Confidential Subject to Docket 05/18/2019 Page 49 of
162
Confidential - Subject to Further Confidentiality Review

```
 1    your home was inspected?

 2        A.   Yeah, they hired the inspector.

 3        Q.   You asked also earlier, when I asked why you

 4    had your home inspected, you asked "when" a few times.

 5        A.   Well, you know, there's different inspections

 6    of the house.

 7        Q.   Okay.  What other inspections do you know of

 8    other than the one that was performed at the direction

 9    of your attorneys?

10        A.   Well, there's multiple inspections during

11    construction, as you know.  They would have never

12    detected Chinese drywall.  They would have just looked

13    if it was installed properly.

14             There was a final inspection of the house by

15    the building officials.  Again, that's just -- it has

16    nothing to do with Chinese drywall.

17             I would have walked through the house when it

18    was finished to make sure everything was -- and it

19    appeared at that time everything was great.  The air

20    conditioner worked.  You know, it was cooling.

21    Everything was fine.  Those would have been the other

22    inspections.

23        Q.   Any other inspections to determine whether

24    Chinese drywall was in the home other than the one that
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1132 of 3246
Case 1:09-cv-02042-MGC Document 129 Filed 05/19/2019 Page 71 of 162
Confidential - Subject to further confidentiality review

1   was listed on that form?

2       A.   No, except for me.  I went around the house,

3   and it was so obvious.  I mean --

4       Q.   What did -- sorry.  Go ahead.

5       A.   Everything with Chinese drywall, it corroded

6   everything.  My wife just remembered when my son's best

7   friend moved into his house, we gave them a silver

8   rattle and another silver thing.  I forgot what it was.

9   They turned black.  They were for the baby.  But they

10  were silver.  So anything that was silver, anything that

11  was copper.  My friend's wife, all her jewelry turned

12  black.

13           I mean, so there was -- there was signs that

14  were so obvious that you knew what was going on.  You

15  didn't need an inspector.  You knew, but the inspector

16  was just to kind of prove what happened in a more

17  scientific way.

18      Q.   When you say you inspected the house, was that

19  a particular time where you looked at it more closely,

20  or was it across multiple occasions where you visited

21  the house?

22      A.   Well, I just -- I casually looked around the

23  house when it was being built.  Everything looked fine.

24  This was just prior to the closing.  Normally the

1    homeowner would -- home buyer would go over there and

2    walk the house and make sure there's -- you know, if

3    there's a punch list, and I probably gave them a punch

4    list of some little odds and ends that I saw that they

5    might have missed and they fixed them all.

6        Q.   So that was before buying the house.  Were

7    there any other times where you would say you inspected

8    the house?

9        A.   No.

10       Q.   Okay.  A second ago you were talking about when

11   you hired an attorney.  Did you hire an attorney as soon

12   as you believed that you had Chinese drywall in your

13   home?

14       A.   I don't know the date.  I don't know if it was

15   just as soon as.  Eventually I did.

16       Q.   When you were looking through the house, did

17   you ever cut out any pieces of drywall yourself to

18   determine whether there were Chinese markings on them?

19       A.   No.  To me, I knew what was going on.  I didn't

20   need to look at -- I didn't know if there was Chinese

21   markings.  I just knew it was Chinese drywall because it

22   made itself so obvious.

23       Q.   Did you go into the attic at any point?

24       A.   No.

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1134 of 3246
Case 1:09-md-02047-EEF-MBN Document 2009-4 Filed 05/19/2011 Page 73 of 162
Confidential - Subject to Further Confidentiality Review

```
 1              (Griffin Exhibit No. 7 was marked for

 2     identification.)

 3     BY MR. LAWSON:

 4        Q.   I've handed you a document that's been marked

 5     as Exhibit 7.  Have you ever seen this document before?

 6        A.   If I have, I don't remember it.

 7        Q.   It's marked at the bottom right corner as

 8     DGRIFFIN - 000199.  Do you see that?

 9        A.   Correct, yes.

10        Q.   And it's a two-page document that is titled

11     Inspection Report, David Griffin, May 11, 2010.  Do you

12     see that?

13        A.   Yes.

14        Q.   Is this the inspection report that corresponds

15     with the inspection that was listed on that form that we

16     were looking at a minute ago?

17              MS. RICO:  Form.

18              THE WITNESS:  I don't know.  I guess.  I don't

19        know.

20     BY MR. LAWSON:

21        Q.   That inspection that we looked at on the form

22     was listed as May 11, 2010, and this inspection report

23     is also listed as May 11, 2010; is that right?

24        A.   Okay.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1135 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 135 of 162
Confidential - Subject to Further Confidentiality Review

1      Q.   Now, are you aware of any other professional

2   inspections that were done to determine whether there

3   was Chinese drywall in your house other than one

4   performed by Yanes?

5      A.   If there was, I don't recall.

6           MS. RICO:  If it makes it easier, we'll

7      stipulate that this is it.

8           THE WITNESS:  Okay.

9   BY MR. LAWSON:

10      Q.   If you look down to the lines at the beginning

11   of the document, it states that you are the client,

12   David Griffin.  Do you see that?

13      A.   Yes.

14      Q.   And that the property address is 9801

15   Cobblestone Lakes Court.  Do you see that?

16      A.   Yes.

17      Q.   It says that evidence was collected from the

18   home during the inspection, including ground wire and

19   drywall samples.

20      A.   Okay.

21      Q.   Now, you were not present during this

22   inspection; is that right?

23      A.   I don't remember.  Could have been.  I just

24   don't remember.

Confidential - Subject to Further Confidentiality Review

1    Q.   Do you remember coming to the home and seeing

2    that pieces of drywall were missing from the walls?

3    A.   I think so, but, again, and I've said this over

4    and over, I just -- I don't remember all of the facts.

5    You'll have to forgive me.  It's been 10 years or

6    longer.  I don't know.

7    Q.   I completely understand, and I apologize for

8    having to dig in on this, but it's really the only way

9    that we can figure out what was going on and get your

10   best recollection of it.

11   A.   Okay.

12   Q.   I'd like to go to the bottom of the page, this

13   first page here, page 199.  It says, in what appears to

14   be highlighted, "Knauf - Tianjin found in the attic.

15   4 feet x 12 feet by 1/2 inch drywall also found in

16   several locations throughout the home."

17        Do you see that?

18   A.   Yeah, that's a standard sheet of drywall, 4

19   foot by 12 foot by 1/2 inch, and that's for the walls.

20   The ceilings would have been 5/8.

21   Q.   So the dimensions that are listed there are

22   standard drywall dimensions for drywall that is on a

23   wall; correct?

24   A.   Correct.

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1137 of 3246
Case 1:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1137 of 3246
Confidential - Subject to Further Confidentiality Review
162

```
1        Q.   And have you ever seen -- we talked about Knauf
2    a little bit earlier, but have you ever heard of
3    Knauf - Tianjin, which is listed there as being found in
4    the attic?
5        A.   I might have.  I don't know.
6        Q.   Did you ever see markings that were labeled as
7    Knauf - Tianjin inside of the home in the attic?
8        A.   If somebody showed them to me, I just don't
9    recall.  I didn't go out looking for them.  I left that
10   up to my attorneys.  You know, I knew what I knew.  It
11   was so obvious to me.  As it happened to my son's best
12   friend and many other people out there, it was obvious.
13   No one had to show me anything, but they had to collect
14   this information so it was more specific, but, you know.
15       Q.   I'd like it turn your attention to the second
16   page.  It's marked as DGRIFFIN - 000200, 200.
17       A.   Yes.
18       Q.   And at the top, it's titled Collection of
19   Evidence, David Griffin, May 15, 2010, and May 17, 2010.
20   Do you see that?
21       A.   Yes.
22       Q.   Again, looking up in the upper left-hand
23   corner, the header on this document is Yanes Security &
24   Investigative Services, Incorporated, and then it says
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1138 of 3246
Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1138 of 3246
Confidential - Subject to Further Confidentiality Review
162

1    "private investigations."  Do you see that?

2        A.   Yes.

3        Q.   So this is -- do you know whether or not this

4    was a private investigation company that conducted this?

5        A.   I don't know anything about them.

6        Q.   If you look down to the page here, it says:

7    "The following collection of evidence was conducted on

8    May 15, 2010, and May 17, 2010."

9             And then it lists evidence collected from your

10   home.  Do you see that?

11       A.   Yes.

12       Q.   And here in the first two lines it says that

13   drywall board samples were collected.  Do you see that?

14       A.   Yes.

15       Q.   And then it lists those drywall board samples

16   as Knauf - Tianjin and 4 feet by 12 feet by 1/2 inch

17   drywall.  Do you see that?

18       A.   That's a standard sheet of drywall.

19       Q.   And I read that correctly?  Those are the

20   drywall board samples that were collected, according to

21   this document?

22       A.   Uh-huh.

23       Q.   And if you look down, it says "collected

24   drywall sample with end tape."  Do you see that?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1139 of 3246
Case 1:11-cv-22408-MGC Document 207 Entered on FLSD Docket 05/18/2012 Page 78 of
162
Confidential - Subject to Further Confidentiality Review

```
1        A.   Yes.

2        Q.   Do you remember ever seeing the end tape that

3    was on the drywall that was collected from the home?

4        A.   No, but when you hang drywall in a house, it

5    has -- it has end tape.  It has -- I'm guessing this is

6    what you were recalling about it.  There's two things.

7    When they finish the board, the paper itself is wrapped

8    around the ends, but, also, when you finish it, you use

9    dry wall tape when the boards meet and you put tape and

10   you put drywall mud.  That could be what they're talking

11   about is the drywall mud over the ends of the board.

12       Q.   Did you ever see any of the evidence that was

13   collected by this inspector during their inspection?

14       A.   I don't remember if I -- if I was there or not.

15   I just -- I don't remember.

16       Q.   Do you know if this evidence is being held

17   anywhere or exists anywhere?

18       A.   You'd have to ask my attorneys.

19       Q.   Did you ever see that switches, electric

20   switches or receptacles, were affected by the drywall?

21       A.   Oh, yeah.

22       Q.   What did they look like?

23       A.   The copper wire had turned black.

24       Q.   Did the electricity in those outlets and
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1140 of 3246 of
Case 1:1-cv-22408-MGC Document 20341 Entered on FLSD Docket 05/19/2011 Page 40 of
162
Confidential - Subject to Further Confidentiality Review

1    switches continue to work during that time that they

2    were blackened?

3         A.   You know, I don't know.  They might have.

4    Whether the circuit breaker board went out, I just -- I

5    don't remember, you know, because it was so many things

6    going wrong with the house, it was just, like, unusable.

7              So I didn't make an inspection of every single

8    thing in the house, but I knew that if it was to be

9    fixed it would all have to be gutted out of there, the

10   drywall, probably the metal framing, because it's metal,

11   the copper wiring, the air conditioning, the electric, a

12   lot of the plumbing.  It's just, you know, it was a

13   deal, it was a real bad deal.

14        Q.   Earlier we talked about the air conditioning

15   going out on a couple of different occasions.  Were

16   there any other appliance or devices that stopped

17   working inside of the home?

18        A.   I think the refrigerator, but I don't remember,

19   because I remember something went on with the

20   refrigerator and it stopped working too.  Of course,

21   it's got a lot of -- it's sort of like an air

22   conditioner.  It's like a mini air conditioner.  So,

23   yeah.

24        Q.   Do you remember replacing the refrigerator?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1141 of 3246
Case 1:19-cv-02047-GER Document 123463-39 Filed 11-25 Docket 03/19/2019 Page 40 of
162
Confidential - Subject to Further Confidentiality Review

```
 1        A.   I don't think I replaced the refrigerator.  I

 2   think toward the end it just, you know, it went and...

 3        Q.   How many times did the air conditioning go out

 4   during the time that you owned the home?

 5        A.   As far as I remember, twice.

 6        Q.   And was it working at the time that you sold

 7   the home?

 8        A.   No.  No.  It had gone out again and I didn't --

 9   you know, what's the sense of repairing it?  It'll just

10   go out again.

11        Q.   Do you know if you have invoices or receipts

12   from the repairs, the previous repairs to the air

13   conditioning unit in the home?

14        A.   No.

15        Q.   Can you think of any other appliances or

16   devices that went out other than, potentially, the

17   refrigerator and the air conditioning unit?

18        A.   I just -- I don't remember.  I'm sorry.

19        Q.   That's okay.  I only ask just to see if you

20   recall.  It's no problem if you don't remember

21   something.

22             Here on this document, at the bottom, it says

23   "collected affected A/C coils and replaced on May 15,

24   2010."  Do you see that?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 142 of 246
Case 1:11-cv-22408-MGC Document 23-7 Entered on FLSD Docket 05/09/2012 Page 81 of 162
Confidential - Subject to Further Confidentiality Review

```
1    A.   Yes.

2    Q.   So when they say that they collected the

3    "affected A/C coils and replaced," do you know what that

4    means?

5    A.   No idea.

6    Q.   Okay.  Do you think that it means that they

7    collected affected AC coils in the air conditioning unit

8    and then put them back, installed them back in at a

9    certain time?

10        MS. RICO:  Form.

11        THE WITNESS:  They could have.  I don't know.

12   You'd have to ask them.

13   BY MR. LAWSON:

14   Q.   On the final line here, it says "home is being

15   sold, not remediated."  Do you see that?

16   A.   I do.

17   Q.   So at the time that this inspection and

18   collection of evidence occurred in May 2010, the home

19   was in the process of being sold; is that right?

20   A.   I don't know.  I don't know why they put that,

21   so I just, you know...

22   Q.   But the home was sold in 2010; isn't that

23   right?

24   A.   I believe so.
```

Confidential - Subject to Further Confidentiality Review

1    Q.    And did you ever consider remediating the

2    property, fixing it?

3    A.    I thought about it.  I thought that if, you

4    know, if by God's grace something wonderful happened to

5    me and I got the money, I could do it.  But, no, it

6    turned out to be an impossibility.  I looked into some

7    of the things that I'd have to do, and it was so

8    overwhelming, it was so extensive, I knew I couldn't do

9    it.  I didn't have the money.

10    Q.    Did you get a quote for it, or did you consider

11    doing it yourself?

12    A.    I think I would probably have done some of it

13    myself.  At one time I was a drywall subcontractor, and

14    so I knew something about the trade, although I had been

15    out of that trade for some time, I didn't know any

16    crews, didn't know any hanging crews, didn't know any

17    finishing crews, but I toyed with it a little bit.

18         But when you start adding up, I mean, just

19    tearing the drywall out of there, and I understood that

20    you just couldn't take this drywall out on the dump, it

21    was -- I don't know if you'd call it infected.  It had

22    this -- it was tainted, so you had to dispose of it

23    another way.  Just tearing that stuff out of the house

24    would be just an overwhelming job, I mean, just the

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1144 of 3246
Case 1:14-cv-02494-CAL Document 24 Entered on FLSD Docket 05/19/2014 Page 45 of 162
Confidential - Subject to Further Confidentiality Review

```
 1    volume of this stuff, and then tearing out the metal

 2    framing and tearing out all the plumbing and the

 3    electric, it was overwhelming.  My mind started to

 4    frazzle just thinking about it.

 5          And, you know, I think I finally decided the

 6    only way to do it is just to hire a contractor to do it,

 7    to try to control it, but I didn't have that kind of

 8    money, so it was out.

 9       Q.   Did you get a quote from a contractor for how

10    much it would cost?

11       A.   No.  I just kind of -- it was overwhelming the

12    amount of money, and I didn't have that kind of money.

13       Q.   What did you think that it would cost you to do

14    it when you looked at it?

15       A.   Several hundred thousand dollars.  Plus, if I

16    did it myself, this house cost me a lot just in time.

17    And I didn't reconstruct the house.  If I had to

18    reconstruct that house, I can't even imagine how much

19    time that would be, and I just didn't have that kind of

20    time.

21       Q.   You said a moment ago that you were a drywall

22    subcontractor.  When was that?

23       A.   That was years before this.

24       Q.   When you say "years before this," years before
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1145 of 3246
Case 1:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 145 of 162
Confidential - Subject to Further Confidentiality Review

1    you bought the home?

2        A.    Yes.  Several years before that.

3        Q.    So maybe in the '90s, early 2000s?

4        A.    Maybe.

5            All those years that I did that, I never heard

6    of Chinese drywall.  It was -- and I guess it was called

7    that because it came from China.  Right?  But I never

8    heard of that before.  Never heard that it could be,

9    exist.

10            (Griffin Exhibit No. 8 was marked for

11    identification.)

12    BY MR. LAWSON:

13        Q.    Mr. Griffin, you've been handed a large

14    document that has been marked as Exhibit 8.  I represent

15    to you that these are photos that were submitted along

16    with the Yanes inspection report that we just looked at

17    from May 2010.

18            To your recollection, have you ever seen these

19    photos before?

20        A.    No, but it looks like the kind of stuff that I

21    found.  I mean, look at the coils in the air

22    conditioner.  They're black.

23        Q.    So the first page of photos is marked as

24    DGRIFFIN - 000201.  Do you see that?

```
 1      A.   Yes.

 2      Q.   And do these appear to be photos inside of the

 3  Cobblestone property that you owned?

 4      A.   Yes.  Great house.  It would have been a great

 5  house.

 6      Q.   A second ago you were mentioning the blackened

 7  wiring --

 8      A.   Yeah.

 9      Q.   -- and that is visible on --

10      A.   205.

11      Q.   Yeah, 205 is an example.  You can see it on 204

12  as well?

13      A.   Yeah.  207.  There was plenty of that.

14      Q.   I'd like to turn your attention to

15  DGRIFFIN - 000228.

16      A.   Okay.

17      Q.   And what does this appear to be to you?

18      A.   Air conditioning coil.

19      Q.   So these are blackened air conditioning coils

20  in the air conditioning unit in the home?

21      A.   Yes.

22      Q.   And did you see these at any point when you

23  owned the home?

24      A.   Yeah, I saw the air conditioning.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1147 of 3246
Case 1:09-cv-07402-ER Document 22363-39 Filed 11/19/19 Page 1147 of 3246
Confidential - Subject to Further Confidentiality Review
162

```
1      Q.   You saw these blackened coils?

2      A.   Yes.

3      Q.   Now I'd like to turn your attention to

4   DGRIFFIN - 000232.

5      A.   A piece of cut-out drywall.

6      Q.   Yeah, so there's a picture here that appears to

7   be of a section of drywall that's been cut out of a wall

8   inside of the home.  Do you see that?

9      A.   Yes.

10     Q.   Do you know, from looking at it, where this is

11  in the home?

12     A.   No idea.

13     Q.   Okay.  But you can see that -- is that

14  carpeting that's --

15     A.   Yeah, so that would have been upstairs.  It

16  could have been in a closet.  I just don't know.

17     Q.   All right.  If you turn to the page that's

18  marked as 233, the next page --

19     A.   Yes.

20     Q.   -- you can see the markings on the drywall.

21  Are those legible to you?  Can you read them?

22     A.   No, I can't.

23     Q.   All right.  Let's turn to page 234, which is

24  the page that's following that.
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1148 of 3246
Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 47 of
162
Confidential - Subject to Further Confidentiality Review

```
 1      A.    Okay.

 2      Q.    You can see on 234 the drywall marking appears

 3   to read "12 feet x 1/2 inch," and then there's the word

 4   "drywall."  Do you see that?

 5      A.    Yes.

 6      Q.    And you see how the "Y" is slightly elevated

 7   above the rest of the word in "drywall"?

 8      A.    I see it.

 9      Q.    Have you ever seen markings like that before?

10      A.    If I have, it would be nothing that I'd have

11   any reason to remember.

12      Q.    If you look down to page 235, the next page,

13   there's another piece of drywall, and this one has

14   written on it "Griffin master bedroom closet May 11,

15   2010 east wall."  Do you see that?

16      A.    I see it.

17      Q.    Now, it was your statement before that you have

18   not seen any of these samples of drywall that were taken

19   from your home.

20      A.    If I did, I don't remember seeing them.

21      Q.    I'd like to turn you to DGRIFFIN - 000238.

22   Looking at that page, the writing is upside down, but do

23   you see that that marking appears to say "Knauf"?

24      A.    I see it.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1149 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 49 of
162

Confidential - Subject to Further Confidentiality Review

```
 1        Q.   And from the looks of this page on 238 and 239,

 2   does this appear to be in the attic of the home?

 3        A.   I couldn't tell you.

 4        Q.   Do you know if anyone ever determined the

 5   percentage of the home that was constructed with Chinese

 6   drywall?

 7        A.   No.  It was enough to destroy the entire home.

 8   Whether it was 50 percent, 80 percent, 100 percent, I

 9   don't know, but the effect was all the same.  It didn't

10   really matter.  If it was enough in there to destroy the

11   home, then the home was destroyed.  It had to be gutted

12   out.  So it's kind of irrelevant, isn't it?

13        Q.   But regardless of the relevance, I just wanted

14   to understand if anyone ever determined if the home was

15   made with both Chinese and non-Chinese drywall.

16        A.   I don't know.

17        Q.   And are you aware of any other markings other

18   than the Knauf markings and the dimension drywall

19   markings that we just looked at?

20        A.   No.

21             (Griffin Exhibit No. 9 was marked for

22   identification.)

23   BY MR. LAWSON:

24        Q.   I've handed you a document that's been marked
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1150 of 3246
Case 1:11-cv-22408-MGC Document 72-11 Entered on FLSD Docket 05/18/2012 Page 39 of 162
Confidential - Subject to Further Confidentiality Review

```
 1    as Exhibit 9, and I represent to you that this is a

 2    property appraiser online record for Palm Beach County,

 3    Florida, that I looked up through public records online.

 4         A.   Okay.

 5         Q.   Have you ever seen a document that looked like

 6    this before?

 7         A.   Sure.

 8         Q.   What is your understanding of what this kind of

 9    document is, what this public record is?

10         A.   It's something the property appraiser makes up

11    so they can tax you.  They're never accurate.  They're

12    almost always really, really, really low, thank God, or

13    else our taxes would be outrageous.  But that's -- you

14    know, this is typical for that, I guess.

15         Q.   So when you're saying that they're usually

16    really low, you're just saying that the value of the

17    home that they appraise it at is usually lower than the

18    value that you could sell it for?

19         A.   Oh, yeah, absolutely.

20         Q.   Because, otherwise, your taxes would be higher?

21         A.   Yeah, everybody knows that.  And why they don't

22    just have lower taxes and make the value accurate, I

23    don't know.  I never -- I never quite understood that

24    one.
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1151 of 3246
Case 2:09-cv-02047-MCA Document 22363-39 Filed 11/19/19 Page 1151 of 3246 of
Confidential - Subject to Further Confidentiality Review
162

 1       Q.   So looking at this document that I've handed

 2   you, this exhibit, the first page, there's a section

 3   called Property Detail at the bottom of the page, and it

 4   lists a location address of 9801 Cobblestone Lakes

 5   Court.  Do you see that?

 6       A.   Yes.

 7       Q.   And that's the same property that you owned

 8   previously that we've been discussing today; right?

 9       A.   Correct.

10       Q.   And this lists a sale date for the home in that

11   same section as July 2010.  Do you see that?

12       A.   Okay.

13       Q.   On the first page of the document, looking into

14   the property detail, the sale date is listed as

15   July 2010.  Do you see that?

16       A.   Yes, I see it.

17       Q.   Does that sound about right for the time that

18   you sold the property?

19       A.   I guess.  I don't remember.

20       Q.   Let's go to the second page of the document.

21   If you look under owner information, it now lists

22   different owners for the property than you; is that

23   right?

24       A.   Yes.  It was a very nice foreign couple.  I

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 152 of 246
Case 1:1-cv-22408-MGC Document 228-1 Entered on FLSD Docket 05/19/2017 Page 91 of
162

Confidential - Subject to Further Confidentiality Review

```
 1    think they were from China, but I'm not really sure.

 2    They were quiet.  I think I only met them once.  Nice

 3    people.

 4         Q.   If you go down to Sales Information, it lists

 5    different sales dates for the property.  Do you see

 6    that?

 7         A.   Yes.

 8         Q.   And there's a sale on July 2010 for $240,000.

 9    Do you see that?

10         A.   I see that.

11         Q.   Does that sound correct for the sale of the

12    property?

13         A.   I think so.

14         Q.   And it says that the owner after that sale was

15    Li Zhongwei, which is the same owner that is listed

16    above currently for the property?

17         A.   Yes.

18         Q.   And, to your recollection, that's the couple --

19    Li Zhongwei is one of the people in the couple that you

20    sold the property to?

21         A.   Yes.

22         Q.   And the property was sold for $240,000?

23         A.   Yes.

24         Q.   And that was through a short sale; is that
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1153 of 3246
Case 1:12-cv-02345-MGC Document 29-11 Entered on FLSD Docket 05/09/2013 Page 92 of 162
Confidential - Subject to further confidentiality Review

1    right?

2        A.    It was.

3        Q.    And you said earlier that you went to the bank

4    and worked that out with them to be able to sell the

5    property as a short sale?

6        A.    Well, we talked.  I let them know.  There

7    was -- I mean, I was pushed into this, something I

8    never, ever wanted to do.  I mean, this was

9    heartbreaking.  Think about it.  If this was you and

10   your dream home, you lost it because of what I ended up

11   with, the Chinese drywall, it was pretty heartbreaking.

12   It's nothing I wanted to do.  It was something that I

13   was forced into doing.

14           So, I mean, they got a great deal.  They

15   probably ended up, after they gutted the house and had

16   it redone, still had a great deal.  I just couldn't

17   afford to do that.  I didn't have the resources to do

18   it.

19       Q.    Let's turn to the third page of this document.

20       A.    Okay.

21       Q.    Looking down at the section titled Appraisals,

22   near the bottom of the page, do you see that?

23       A.    Yes.

24       Q.    There's different tax years listed, from 2008

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1154 of 3246
Case 1:11-cv-22408-MGC Document 285-1 Entered on FLSD Docket 05/09/2012 Page 93 of
162

Confidential - Subject to Further Confidentiality Review

```
 1    back to -- excuse me -- from 2018 to 2009.  Do you see

 2    that?

 3        A.    Yes.

 4        Q.    And they have the improvement value, the land

 5    value, and the total market value listed under that

 6    section.  Do you see that?

 7        A.    Okay.  I see it.

 8        Q.    Going back to 2009, the total market value of

 9    the property was listed as $387,300.  Do you see that?

10        A.    I see it.

11        Q.    And then in 2010 the total market value dropped

12    to $199,000.  Do you see that?

13        A.    I see it.

14        Q.    Why do you believe that the total market value

15    in these appraisals dropped so significantly from 2009

16    to 2010?

17        A.    I'm guessing the Chinese drywall.

18        Q.    So before the Chinese drywall was discovered

19    through that inspection that we just looked at, in 2009

20    the total market value was almost $400,000; is that

21    right?

22        A.    Well, that's what it was appraised for, but as

23    we know, that's always low.  It's not correct.

24        Q.    And that was significantly lower than what you
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 155 of 246
Case 1:1-09-md-0204-EEF-MCED Document Exhibit 39-n Filed SubDocket 05/09/12 Page 94 of 162
Confidential - Subject to Further Confidentiality Review

 1   paid for the property; is that right?

 2      A.   Yeah, of course.

 3      Q.   And you'd agree that around that time, in 2009

 4   and 2010, there was a significant shift in the real

 5   estate market; isn't that right?

 6      A.   Yeah, there was.

 7      Q.   And a lot of properties lost value during that

 8   time; is that right?

 9      A.   Yeah, I think so.  This was a new house.  It

10   was a really nice house.  It may not have lost value

11   like some of the others.  I just don't know.  I know

12   what affected me was the Chinese drywall.  It wasn't the

13   real estate market.

14      Q.   Did you have the home professionally appraised

15   before you sold it?

16      A.   No.  I knew that it didn't matter.  It was

17   irrelevant.  It was something I couldn't afford,

18   something I couldn't sell.  I couldn't redo it.  So, you

19   know, I had to short-sale it.  That's all I really could

20   do.  My back was against the wall.  So there was no

21   reason to appraise it.  It wouldn't have mattered.

22      Q.   Do you know what the value of the home would

23   have been at the time you sold it in 2010 if it did not

24   have Chinese drywall in it?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 156 of 246
Case 1:09-cv-07687-AG-AH Document 1 Entered on FLSD Docket 05/19/2019 Page 96 of
162
Confidential - Subject to Further Confidentiality Review

 1    A.   I would assume it would be worth at least what

 2   I paid for it.  I just don't know, because it just --

 3   you don't keep track of the things that are irrelevant.

 4   I got enough to keep track of.  So it just -- so many

 5   things, a lot of the questions you ask me are

 6   irrelevant.  It just doesn't matter.

 7        What matters was is the house had Chinese

 8   drywall and destroyed my future.  That's what matters.

 9   All these other questions, who cares?  You care, I

10   guess, but it didn't -- I didn't care at the time.

11    Q.   You didn't -- it didn't matter to you what the

12   home was worth at that time?

13    A.   No.  There was nothing I could do about it.  I

14   couldn't change it.

15    Q.   You said that the couple that you sold the home

16   for got a great deal on it.

17    A.   I thought they did.  You know, they got it at a

18   short sale.  Evidently they had the resources to rebuild

19   the house, and I just kind of guessed that, with what

20   they bought it for and how much it would cost to redo

21   the house, they would end up with a good deal.  I don't

22   know for sure.  That's just my feeling.

23    Q.   So you know that that couple has redone the

24   house since the time that you sold it to them?

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 157 of 246
Case 1:1-22-cv-0000-cv Document 1 Entry on FLSD Docket 05/19/2017 Page 95 of
162
Confidential - Subject to further confidentiality Review

```
 1      A.   I don't know.  You know, at the closing I sold

 2   the house to them, and then that was that.  I never

 3   spoke to them again.

 4      Q.   A second ago we saw that the total market value

 5   that the home was appraised at by the county in 2009 was

 6   $387,300.

 7      A.   Okay.

 8      Q.   Looking to 2018, the value, the total market

 9   value appraised by the county for the property is

10   $392,950.  Do you see that?

11      A.   I see it.

12      Q.   So it's roughly within about $5,000 or so of

13   the appraised value from about a decade ago; is that

14   right?

15      A.   Yeah, I can't account for that.  You can't

16   account for the property appraisers.  I've seen them be

17   so off, it's incredible.  So you just -- you know, they

18   go by and they take some square footage and they have

19   some calculations and then out it comes, but it doesn't

20   really mean a whole lot.

21           You know, years and years ago I had a house and

22   I put it up for sale, and I was selling it myself, and I

23   had a lady come in there, and she said, "Well, your

24   house is listed for so much."
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 158 of 246
Case 1:1-cv-22408-MGC Document 285 Entered on FLSD Docket 05/18/2012 Page 49 of
162

Confidential - Subject to Further Confidentiality Review

1      I said, "Well, yes."

2      She says, "You can't do that.  It's not

3  appraised for that amount.  You have to sell it for less

4  than the appraised value."

5      I said, "What are you talking about?  That's

6  irrelevant.  You sell it for what you sell it for.  It's

7  worth a lot more than the appraisal."

8      The appraisers are nuts.  I don't know how they

9  keep their jobs.  It just doesn't make any sense to me

10  how they do things.  But these figures don't really mean

11  a whole lot, not really.

12     Q.   Did you ever put the house up for sale prior to

13  when you sold it in 2010?

14     A.   No, no, it just went on a short sale.  My

15  realtor found these people quick.

16     Q.   Do you know how that amount of $240,000 was

17  negotiated or determined?

18     A.   No, I don't.  I don't know.

19     Q.   Do you know if any other homes in the

20  Cobblestone community were sold around the time that you

21  sold your home?

22     A.   I don't know.

23     Q.   Have you seen any of the prices that homes in

24  that community have been listed at in the last 10 years?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 159 of 246
Case 1:11-cv-22408-MGC Document 28-1 Entered on FLSD Docket 05/18/2012 Page 98 of
162

Confidential - Subject to Further Confidentiality Review

```
 1        A.    No.   I had no reason to look back and see what

 2   was going on.

 3        Q.    But you did say that some of the homes on the

 4   property were not built with Chinese drywall and others

 5   were; is that right?

 6        A.    I don't know.   I don't know how -- what

 7   percentage had Chinese drywall.   I just don't know.   I

 8   know of mine and I know of my son's best friend's.   I

 9   have heard of others, but I just don't know.

10             (Griffin Exhibit No. 10 was marked for

11   identification.)

12   BY MR. LAWSON:

13        Q.    Let's look to this document.   It's marked as

14   Exhibit 10.   Have you ever seen this before?

15        A.    No.

16        Q.    All right.   This document is titled Claimants

17   David and Diane Griffin's Amended Answers to Defendant

18   Taishan Gypsum Company, Ltd, Tai'an Taishan Plasterboard

19   Company, Ltd., and BNBM PLC's Interrogatories.   Do you

20   see that?

21        A.    I see it.

22        Q.    And it's dated December 4, 2018.   Do you see

23   that?

24        A.    Okay.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1160 of 3246
Case 1:09-cv-02048-KGG Document 2-1 Entered on FLSD Docket 05/18/2019 Page 49 of 162
Confidential - Subject to further confidentiality review

1    Q.   And if you look, it's signed by Patrick

2    Montoya.  Do you know who that is?

3    A.   Yes.

4    Q.   And is that one of your attorneys?

5    A.   It is.

6    Q.   I represent to you that this is some questions

7    that were asked by the defendants in this lawsuit to you

8    and your attorneys.

9    A.   Okay.

10   Q.   And this is your answers that were provided to

11   us.

12   A.   Okay.

13   Q.   I'd like to direct your attention to the first

14   question, or interrogatory, which is on the second page

15   of this document.  It asks you to identify all types of

16   damages that you seek in this lawsuit and specify amount

17   sought for each category.  Do you see that?

18   A.   Okay.

19   Q.   And in your answer, you state:  "We are seeking

20   all compensatory damages, including, but not limited to

21   personal property costs, lost rental income, lost equity

22   (including down payment, mortgage payments, and capital

23   improvements to the property), remediation damages as

24   determined by the court, diminution in value, loss of

1    use and enjoyment, punitive damages, and prejudgment

2    interest."

3        A.    Okay.

4        Q.    Did I read that correctly?

5        A.    You did.

6        Q.    I'd like to ask you about some of these areas

7    of damages and what your understanding is of what

8    damages you believe you have suffered under these

9    categories, and I'd like to start first with personal

10   property costs.

11           But before I do that, you said a second ago,

12   did I hear you correctly, that you had not seen this

13   document before?

14       A.    If I -- yeah, I think it was e-mailed to me and

15   then I answered it.  So, you know, I didn't see it on

16   paper.

17       Q.    All right.  Do you know if you've ever signed

18   anything that verifies that these answers are true and

19   correct to your knowledge?

20       A.    Well, I might have.  It's -- you know, I

21   remember going through this thing and answering it the

22   best I could with the memory that I still have.

23       Q.    So looking at personal property costs, which is

24   the first item that you list under compensatory damages

```
 1    in your answer, what personal property costs do you

 2    believe that you are seeking in this lawsuit?

 3        A.    The house.  I lost the house.  I lost a house

 4    because somebody, with full knowledge, for a few bucks,

 5    ruined my property.  I believe I deserve that.  I think

 6    that most reasonable people would believe that I deserve

 7    that, because not only did they do it by accident, they

 8    did it with full knowledge, and that makes it -- to me,

 9    it's worse.  It's just -- and maybe that's just me.

10    Maybe other people would say who cares, but to me, when

11    you do something like this to a person with knowledge

12    and knowing the harm that it would do to those people,

13    it means a lot.

14           It's an emotional thing.  You know, some things

15    are worth more than just a few bucks.  You understand

16    what I mean?  It was worth my dreams.  You can't put a

17    price on that.  But as far as the personal property,

18    it's the house.  That's what I lost.

19        Q.    Is there any other personal property included

20    in that, or just the house?

21        A.    No, it's just the house, you know, the money,

22    the house.

23        Q.    And when you say "the money," what amount of

24    money do you believe that you are owed related to the
```

```
 1   house?

 2          MS. RICO:  Form.

 3          THE WITNESS:  You would have to ask my

 4       attorneys.  They know all the figures of how much

 5       dollars flowed out of my pockets to purchase the

 6       house.

 7   BY MR. LAWSON:

 8       Q.   So we looked a little bit earlier at the amount

 9   that you originally paid for the house; correct?

10       A.   Right.

11       Q.   And that was paid through a mortgage; is that

12   right?

13       A.   Yes.

14       Q.   And then eventually you sold the house through

15   a short sale; correct?

16       A.   Yes.

17       Q.   And when you sold the house through a short

18   sale, was there an amount of money that was left over

19   that you owed to the bank that was not covered by that

20   short sale?

21       A.   Well, the bank took a hit because they knew I

22   couldn't pay them, so they agreed to sell it at the

23   short sale price.

24       Q.   Right.  So after they agreed to pay it for the
```

```
 1   short sale price, you say "they took a hit," what do you

 2   mean by that?

 3       A.   Well, if I owed the bank X amount of dollars

 4   and the property sold for less than that, then the

 5   difference they got hurt.

 6       Q.   They didn't get that money from you or anyone

 7   else?

 8       A.   No, they didn't.

 9       Q.   And you don't owe that money to them today?

10       A.   No.  So more than me got -- I got -- lost my

11   money out of my pocket.  That was the first level.  That

12   was the first step.  So all the money that I put into

13   it, because of the Chinese drywall, I lost that money,

14   and then because I was forced into this short sale, they

15   lost a certain amount of money, understanding that

16   that's the best thing that anybody could do right now.

17   They accepted it.  They said, okay, we get it, we know

18   about the Chinese drywall, let's just get past this

19   thing and move on.

20       Q.   So the amount of money that you paid into the

21   house was the down payment that you put into the house;

22   is that right?

23       A.   It was all the money, the difference between

24   the final cost of the house and the mortgage plus --
```

1    that's how much money I put into it.  Now, of course, I

2    had to give back the renters their money.  You know, I

3    had some upkeep and everything for a bit.  If I had to

4    pay for the air conditioning guy, I just don't remember,

5    but, you know, there was other incidentals, but the big

6    money was up front.

7        Q.    Before we go back to the amount of money paid

8    for the house, you mentioned the upkeep of the house.

9    You would have had to pay for the upkeep of the house

10   regardless; isn't that right?  Since you own the

11   property, you were responsible to upkeep the home, for

12   the upkeep of the home during the time that you owned

13   it?

14       A.    Sure.

15       Q.    So even if the home did not have Chinese

16   drywall, you would have had to pay to keep the house

17   maintained?

18       A.    Yeah.  That wasn't the big deal.  The big deal

19   was the money that I lost and then I think how this

20   affected me and my wife.

21       Q.    So the money that you put in was the difference

22   between the mortgage and the amount of the purchase

23   price of the home that you paid?

24       A.    The final purchase price with all of the extras

1    and everything.

2       Q.   And so that was the amount of money that you

3    paid up front, and then the rest of it was financed

4    through the two mortgages that we looked at?

5       A.   Yeah.

6       Q.   And then you also paid mortgage payments for

7    some amount of time; is that right?

8       A.   Yes.

9       Q.   And those went toward interest and principal of

10   the mortgage?

11      A.   And principal, right.

12      Q.   Do you have record of the amount of mortgage

13   payments that you made during the length of time that

14   you owned the home?

15      A.   No, I don't have any of those records.  It's

16   just been too long ago.

17      Q.   Okay.  So you don't know how much money that

18   you paid in mortgage payments during the time that you

19   owned the home?

20      A.   I don't remember.

21      Q.   But after the home was sold at short sale, you

22   no longer owned the remainder of the mortgage to the

23   bank?

24      A.   That's correct.

1    Q.   So that amount of money is -- was not out of

2    your pocket, it was out of the bank's pocket; is that

3    right?

4    A.   Right.  My money was up front.  All the money

5    that I gave the builder up front, that was the money

6    that was out of my pocket.  That's what I lost and could

7    not recoup.

8    Q.   And that's the money that you're seeking in

9    this lawsuit for personal property costs; is that right?

10   A.   Yeah, that's the -- yes.

11   Q.   Did you furnish the house at any point, or was

12   that done by the renters?

13   A.   That was the renters.  They moved their own

14   furniture in there.

15   Q.   Okay.  So you never purchased any furniture?

16   A.   Furnishings, no, I did not.

17   Q.   Did you purchase the appliances in the home?

18   A.   Yeah, all the appliances, you know, I purchased

19   all the appliances, all the finishes and the carpets,

20   and you name it, and the landscaping.  Everything.

21   Q.   Was that part of the purchase price of the

22   home?

23   A.   Yes.

24   Q.   The appliances, the carpet?

Confidential - Subject to Further Confidentiality Review

```
 1       A.   Yes.

 2       Q.   The next item that I wanted to ask you about

 3   that's listed here is lost rental income.  And we've

 4   talked a little bit about this today, and I don't want

 5   to go over ground that we've already covered, but I did

 6   want to understand, since it's listed here, if there's

 7   an amount of money that you believe that you have lost

 8   that you are owed for lost rental income in this

 9   lawsuit.

10       A.   Well, I think I can probably give you a

11   minimum, because they would have paid in excess of the

12   mortgage payment, because I want to make sure I got the

13   mortgage payment covered and whatever else I had to

14   cover there, and that would have been -- minimum would

15   be 5,000.  I just -- I wish I could remember, I wish I

16   had documents, because I know it would be useful right

17   now, but I don't.  And they gave me first, last, and

18   security.  They were there for a month or two.  I just

19   don't remember how long they were there until this whole

20   thing fell apart.

21            So it would be -- a minimum would be 15,000.

22   It could have been 25,000.  I just don't remember what

23   it all amounted to.  I remember that it really hurt

24   writing that check to them, but I thoroughly understood
```

1    that they should get their money back.  I mean, they

2    were hurt like I was hurt, you know, and so I felt it

3    was the only just thing I should do is to pay them the

4    money back.

5        Q.   So the lost rental income that you're seeking

6    in this lawsuit is the money that you had to pay back to

7    the renters when they moved out?

8            MS. RICO:  Form.

9            THE WITNESS:  Correct, yes.

10   BY MR. LAWSON:

11       Q.   And any other monies outside of the amount that

12   you had to pay back to them that they had originally

13   paid to you to live in the house?

14       A.   Not that I can think of.

15       Q.   You also have listed "lost equity," and in

16   paren it says "including down payment, mortgage

17   payments, and capital improvements to the property."  Do

18   you see that there?

19       A.   Yes.

20       Q.   Now, is that what we just discussed under

21   personal property costs, the down payment, which is the

22   money that you paid up front --

23       A.   Right.

24       Q.   -- mortgage payments, which we just talked

```
1    about --

2    A.    Right.

3    Q.    And capital improvements to the property?

4    A.    Yes.

5    Q.    So that would be -- that would align with the

6    amount that you're seeking for personal property costs?

7    A.    Correct.

8    Q.    What capital improvements did you make to the

9    property beyond what was done by the builders when it

10   was constructed, if any?

11   A.    None, really.  You know, replacing the air

12   conditioner, maybe.  I just don't remember what else

13   went on.

14   Q.    Okay.  So, to your recollection, you cannot

15   think of any other?

16   A.    No.

17   Q.    Okay.  It says "remediation damages as

18   determined by the court."  Do you have an understanding

19   of what remediation damages you would be seeking in this

20   lawsuit?

21   A.    Well, you tell me what it means.

22   Q.    Well, you do not own the property any longer;

23   is that right?

24   A.    I don't.
```

```
 1       Q.    You haven't owned it for about eight years or

 2   so?

 3       A.    Correct.

 4       Q.    And you couldn't remediate the property if you

 5   wanted to at this point; is that right?

 6       A.    I couldn't.

 7       Q.    It may have already been remediated; is that

 8   correct?

 9       A.    Correct.

10       Q.    And since you don't own it, you couldn't go in

11   and start fixing the house or ripping out the Chinese

12   drywall if it was still in the house; correct?

13       A.    No.  I don't own it.  I can't.

14       Q.    So would you -- are you seeking money for

15   fixing the house, or would you like to have money to be

16   able to pay you back for what you put into the house?

17            MS. RICO:  Form.  And I will say that this

18       pertains to a legal argument about damages that the

19       court -- and we're all aware of this -- that the

20       court has stated that former owners are entitled to.

21       And so you can answer the question.

22            THE WITNESS:  I don't know what you mean.  I'm

23       sorry.

24            ///
```

```
 1    BY MR. LAWSON:

 2        Q.   As we discussed earlier, you're seeking money

 3    for the amount of money that you put into the house,

 4    that you paid for the house; is that right?

 5        A.   Yes.

 6        Q.   It's also listed here for diminution in value

 7    of the home.  Do you know how much value that the home

 8    lost?  What is that amount that you're --

 9        A.   I don't know specifically.  I would have had to

10    rebuild the house.  It would have been hundreds of

11    thousands of dollars that was directly caused by the

12    Chinese drywall.  You know, building a house is not

13    cheap.  You can build a shell, and that's only just a

14    part.  It's finishing it is the real deal, you know.

15        Q.   You'd agree with me that you said earlier that

16    the bank is the one who took the hit on the value of the

17    home; is that right?

18             MS. RICO:  Form.

19             THE WITNESS:  I took the hit.  I took the hit

20        because the Chinese drywall company had a defective

21        material in there and caused me to lose my house.  I

22        took the hit.  The bank took a hit later on.  They

23        were a second-level hit, but initially I was the one

24        who lost the most money.  I was the one that had the
```

```
 1        emotional distress.  I took the hit.  My wife took

 2        the hit.  It was disturbing, and it was unnecessary.

 3   BY MR. LAWSON:

 4        Q.    When the home sold, you did not have to pay the

 5   full value that was left on the mortgage, though; isn't

 6   that right?

 7             MS. RICO:  Form.

 8             THE WITNESS:  As we've already said.  But, by

 9        the way, let me just say something real quick.  My

10        wife's mother, who is now nearly 99, has got a

11        doctor's appointment this afternoon.  She cannot

12        miss it.  So if you have questions that are

13        repetitive and drag on and on, we may not be able to

14        finish this thing today.

15             So if it's important to you, of course, let's

16        get those things done and let's get them answered,

17        but to be repetitive about so many things that just

18        don't matter, you know, if we can see your way to

19        push through some of that, it would be helpful, I

20        think.  I'd like to get this over with.

21   BY MR. LAWSON:

22        Q.    Mr. Griffin, we're scheduled today for most of

23   the day and we've only been going for about two hours

24   right now, so I am going to move through the questions
```

 1   as quickly as I can.  And I appreciate your time.  I'm

 2   not trying to repeat.  I'm trying to understand where

 3   these damages are repetitive, and that's why I'm asking

 4   you about them.

 5       A.   Okay.  I understand that, but you have asked

 6   the same question over and over again.  I'm just trying

 7   to say it would be great if we could finish this thing

 8   up today instead of having to come back at a later date.

 9           MS. GRIFFIN:  I do have to be at her home --

10           MS. RICO:  Let's go off the record for this for

11       one quick second.

12           (Discussion off the record.)

13           MS. RICO:  We can go back on.  Thank you.

14           THE WITNESS:  Thank you.

15   BY MR. LAWSON:

16       Q.   I'd like to ask you about the next category of

17   damages that's listed here.  It's loss of use and

18   enjoyment.  What does loss of use and enjoyment mean to

19   you?

20       A.   It means that the house -- I could not move

21   into the house when I retired.  It took all that away

22   from me.  It took away, you know, the equity that I put

23   in the house, the money that I put in the house so that

24   I could have that house waiting for me when I retired.

1    That was the house that I was going to eventually move

2    into when I retired.

3         Q.   When you bought the house, when did you plan to

4    move into it?  When was your plan for retiring?

5         A.   I wasn't really sure.  Just depending on how

6    things went.  Four, five, six years.  I just didn't -- I

7    didn't know.  You know, just depends on when it was

8    right.

9         Q.   So the loss of use and enjoyment is not from

10   actually living in the home, it's from when you would

11   have lived in the home in the future when you retired;

12   is that right?

13        A.   Same thing.

14        Q.   But as we discussed earlier, you didn't live in

15   the home; is that right?

16        A.   No, I didn't live in the home.  It just denied

17   me being able to live in the home.

18        Q.   Do you know what amount of money you would be

19   seeking for loss of use and enjoyment in this lawsuit?

20        A.   I would assume the maximum amount I can

21   receive, because I certainly deserve it, from what was

22   done to me, but I'll leave that up to my lawyers.

23             (Griffin Exhibit No. 11 was marked for

24   identification.)

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 176 of 246
Case 1:14-cv-02494-NGG-LB Document 69-11 entered on FLSD Docket 05/08/2017 Page 115 of 162
Confidential - Subject to Further Confidentiality Review

 1   BY MR. LAWSON:

 2       Q.   Mr. Griffin, you've been handed a document

 3   that's been marked as Exhibit 11, and it's titled at the

 4   top Supplemental Plaintiff Profile Form.  Do you see

 5   that?

 6       A.   Okay.  I see it.

 7       Q.   And taking a look at this document, do you

 8   recognize it?

 9       A.   No.

10       Q.   Do you think you've seen it before?

11       A.   I don't think so.  Could have, but I don't

12   think so.

13       Q.   I'll represent to you that this is a

14   Supplemental Plaintiff Profile Form that was submitted

15   on your behalf in the Chinese Manufactured Drywall

16   Products Liability Litigation in the Eastern District of

17   Louisiana.

18       A.   All right.

19       Q.   With Judge Fallon.

20       A.   Okay.

21       Q.   And if you look to the second page, there's a

22   Section I that's titled Claimant and Property

23   Information.  Do you see that?

24       A.   Yes, I see it.

```
1        Q.    And the name of the claimant listed there is

2   David Griffin, you; is that right?

3        A.    Yes.

4        Q.    And then your wife, Diane Griffin, is also

5   listed as well?

6        A.    Correct.

7        Q.    This is for the property at 9801 Cobblestone

8   Lakes Court?

9        A.    Yes.

10       Q.    Looking down to Section II at the bottom of the

11  second page, it states that you acquired the property on

12  October 5, 2006, which is the date of those mortgage

13  documents that we were looking at earlier.

14       A.    Right, okay.

15       Q.    Do you see that?

16       A.    Yes.

17       Q.    And it also states that when you acquired the

18  property you were not aware that it contained Chinese

19  drywall.  Do you see that?

20       A.    No, I wasn't.  I wouldn't have bought it if I

21  did.

22       Q.    Right.  And the next question asks:  "If you

23  were not aware at the time you acquired the property

24  that the property contained Chinese drywall, when did
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 178 of 3246
Case 1:18-cv-12408-NGEF DWealth Document 22363-39 Entered on FLSD Docket 05/18/2018 Page 117 of 162
Confidential - Subject to Further Confidentiality Review

1   you first become aware that the property contained

2   Chinese drywall?"

3           And the answer that was given here was

4   May 2010.  Do you see that?

5       A.   Yeah, I don't think that's right.

6       Q.   What --

7       A.   Like I said, it was -- it wasn't that long

8   after, when I closed on the property, that I went ahead

9   and rented it.  Now, I don't know how much time lapsed.

10  It wasn't important to me at that time.  And they had

11  been in there for two or three months and then we

12  discovered it.  So it doesn't seem to me that it had

13  been -- taken four years to figure that out.  I could be

14  wrong.

15      Q.   So if it was shortly after you closed, which we

16  just saw was around October of 2006, that the renters

17  came in, perhaps around 2007, do you think 2007 might

18  have been the time that you discovered that there was

19  Chinese drywall in the home?

20          MS. RICO:  Form.

21          THE WITNESS:  The trouble is I just don't know.

22      Probably if you look at the -- those tests that they

23      did, cutting pieces out, that wasn't that long after

24      we discovered it.  I just don't -- the dates, I

```
 1        don't know.

 2    BY MR. LAWSON:

 3        Q.   So those photos that we looked at, in the

 4    inspection report that we looked at, were from May 2010,

 5    which is the date that's listed here on this form.

 6        A.   All right.  Well, it was before that, because,

 7    you know, that happened afterwards, so...

 8        Q.   It was before that that you became aware?

 9        A.   Yeah, I just -- you know, you got all these

10    dates going back and forth.  I don't remember.  I just

11    don't know how else to say it.  I just don't remember

12    all the dates and stuff, because now -- you know, at the

13    time, there was no reason for me to keep all these dates

14    in my mind when it happened, and now 10 years later,

15    here we are, and I can't recall this stuff.  I just know

16    what happened to the house.  You know, there's sure

17    proof of what actually happened to the house.  There's

18    sure proof of how much money I put into the house.

19    That's all the definite things I know.

20        Q.   Let's turn to the fourth page of this document.

21        A.   Okay.

22        Q.   At the top, it asks:  "Do you contend that a

23    foreclosure or short sale occurred as a result of damage

24    to your property from defective Chinese drywall?"
```

```
1               And you marked "yes"?

2       A.   Yeah.

3       Q.   And we talked a little bit earlier about the

4  short sale that you entered into in 2010 for your

5  property?

6       A.   Yeah.

7       Q.   And here you have listed some information about

8  that short sale.  Now, as we discussed earlier, Colonial

9  Bank was the lender for the short sale; is that right?

10      A.   Yeah.

11      Q.   And the date of the foreclosure, it asks --

12 excuse me.  At the date of the short sale, it asks the

13 amount that was owed on the loan or mortgage.  Do you

14 see that?

15      A.   Yeah.

16      Q.   And it lists that amount as $212,586.46.  Do

17 you see that?

18      A.   Yes.  Doesn't make such sense to me.

19      Q.   I'm sorry?

20      A.   That doesn't make such sense to me.

21      Q.   Why is that?

22      A.   Well, unless this is the mortgage that the bank

23 gave the new buyer, because this wasn't my mortgage.  My

24 mortgage was much larger.
```

```
 1        Q.    You believe you owed much more than $212,586?

 2        A.    Of course.  I couldn't have paid the mortgage

 3   down.

 4        Q.    Because the short sale was for more than that,

 5   is that right, $240,000, is what we saw?

 6        A.    Yes, uh-huh.

 7        Q.    And that's, in fact, what it's listed at on

 8   this document, is $240,000 for the short sale price?

 9        A.    Maybe the bank gave the people that bought the

10   house at the short sale that kind of mortgage.  I don't

11   know what that number means.

12        Q.    Okay.  So this number here of $212,586.46 is

13   inaccurate, to your knowledge; is that right?

14        A.    Yes, it doesn't make much sense.

15        Q.    But it does list the date of the short sale as

16   July 27, 2010, which sounds about right; is that right?

17        A.    I guess.

18        Q.    Okay.  I'd like to turn to the sixth page of

19   this document at the top.  It asks you on the third

20   line, "If you experienced any loss of use and/or loss of

21   enjoyment of the property as a result of Chinese

22   drywall," if you did, "to identify the total amount of

23   such loss."

24              And you've listed $100,000.  Do you see that?
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/10/19 Page 1182 of 3246
Case 1:13-cv-04001-NGG Document 269-12 Entered on FLSD Docket 05/08/2013 Page 121 of 162
Confidential - Subject to Further Confidentiality Review

 1      A.   Okay.

 2      Q.   And I read that correctly, that's what's listed

 3   there, $100,000?

 4      A.   Yes.

 5      Q.   And then it asks:  "If you claim a diminution

 6   in value of the property as a result of the Chinese

 7   drywall, identify the total amount of such diminution of

 8   value being claimed."

 9           And it's listed as $345,000.  Do you see that?

10      A.   Okay, I see that.

11      Q.   Do you know where that number $345,000 comes

12   from?

13      A.   I don't remember.

14      Q.   Okay.  Would it be your understanding that

15   that's the amount that you believe, of value, that the

16   property lost as a result of Chinese drywall?

17           MS. RICO:  Form.

18           THE WITNESS:  Yeah, I guess so.

19   BY MR. LAWSON:

20      Q.   All right.  If you turn to the last page of

21   this document, there's a verification of Supplemental

22   Plaintiff Profile Form page.  Do you see that?

23      A.   I see it.

24      Q.   Is that your signature on the last page?

1    A.   It is.

2    Q.   And that was your -- your signature was your

3    acknowledgement that all the information contained

4    within the Supplemental Plaintiff Profile Form was true

5    and correct; is that right?

6    A.   Yeah, to the best of my knowledge.

7    Q.   Right.  Did you see anything that was

8    incorrect, other than the amount that you believe was

9    owed on the property at the time of the short sale?

10   A.   No, not really.

11        (Griffin Exhibit No. 12 was marked for

12   identification.)

13   BY MR. LAWSON:

14   Q.   Mr. Griffin, you've been handed a document

15   that's been marked as Exhibit 12.

16   A.   Okay.

17   Q.   Do you recognize this document?

18   A.   Warranty deed.

19   Q.   Yes, this appears to be a warranty deed for a

20   sale on July 27, 2010, for $240,000.  Do you see that at

21   the top of the page?

22   A.   I see it.

23   Q.   This is a sale by you, David Griffin -- David

24   Derrick Griffin and Diane Griffin, and it is -- appears

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1184 of 3246
Case 1:19-mc-00405-NGG Document 24-1 entered on FLSD Docket 05/29/2019 Page 123 of 162
Confidential - Subject to Further Confidentiality Review

1  to be the property on Cobblestone that we've been

2  discussing today.  Does that sound accurate?

3      A.   It is.

4      Q.   All right.  So this is the short sale that

5  we've been discussing today; correct?

6      A.   Yes.

7           (Griffin Exhibit No. 13 was marked for

8  identification.)

9  BY MR. LAWSON:

10     Q.   You've been handed a document that's been

11  marked as Exhibit 13.  It's marked on the first page as

12  DGRIFFIN - 000179.  Do you see that in the bottom

13  right-hand corner?

14     A.   I see it.

15     Q.   This appears to be a settlement statement from

16  the US Department of Housing and Urban Development, or

17  HUD.  Do you see that?

18     A.   Right, I see that.

19     Q.   All right.  If you look to the -- in the middle

20  of the page, there's a Section E, at the top middle,

21  where it says "name and address of seller," and it lists

22  David Derrick Griffin and Diane Griffin.  Do you see

23  that?

24     A.   Correct.

```
 1      Q.   And then the name of the borrower there is
 2   Zhongwei Li and Fengying Wu, listed as the borrower.  Do
 3   you see that?
 4      A.   Yes.
 5      Q.   This is for a property location, under Section
 6   G, 9801 Cobblestone Lakes Court.  Do you see that?
 7      A.   I see it.
 8      Q.   All right.  So, to your understanding, is this
 9   a settlement statement related to your short sale of the
10   property that we've been discussing today?
11      A.   As far as I know.
12      Q.   All right.  Looking at this document and taking
13   a look through it, you see at the -- under line 101 that
14   the contract sales price is listed as $240,000; is that
15   right?
16      A.   I see it.
17      Q.   And under the Column J that you're looking at
18   there on the left-hand side, it says "summary of
19   borrower's transaction."  Do you see that?
20      A.   Okay.  Yes.
21      Q.   And then under Column K it lists a "summary of
22   seller's transaction" on the right-hand side.  Do you
23   see that?
24      A.   Yes.
```

1    Q.    Let's look at the seller's transaction side.

2  Now, you were the seller in this transaction; is that

3  right?

4    A.    Yes, I was.

5    Q.    All right.  And if you look under line 420, I

6  believe, about in the middle of the page, it says "gross

7  amount due to seller $240,000."  Do you see that?

8    A.    I see it.

9    Q.    And then it lists settlement charges to the

10  seller of $18,365.60.  Do you see that?

11   A.    I see it.

12   Q.    And then on line 504, it lists payoff of first

13  mortgage loan as $212,586.46.  Do you see that?

14   A.    Okay.  I see it.

15   Q.    All right.  Now, looking back to that

16  Supplemental Plaintiff Profile Form, is that the same

17  amount that was listed as the amount that was left owed

18  on your mortgage at the time of the short sale?

19   A.    I owed a lot more than this.  Apparently they

20  discounted it down to get rid of the house.

21   Q.    So -- but this lists the payoff of that first

22  mortgage loan as only $212,586.46?

23   A.    Well, as you know, that wasn't the amount.

24  That must have been the discounted amount to make it

```
 1    work.  It wasn't the amount that I owed.  It's the

 2    amount that they accepted, right, so this would work?

 3        Q.   So if you look down to line 505, it lists

 4    payoff of second mortgage loan.  Do you see that?

 5        A.   Right, I see it.

 6        Q.   There it appears to be, and it's very small

 7    print, but $3,892.  Do you see that?

 8        A.   Right, I see it.

 9        Q.   And then there's some assessments for county

10    taxes on line 511.  Do you see that?

11        A.   Uh-huh.

12        Q.   Let's go down to the bottom lines here.  The

13    total reduction amount due to the seller, that is listed

14    as $259,239.  Do you see that?

15        A.   I see it.

16        Q.   And then it lists the cash from seller, on the

17    bottom line, as $19,239.  Do you see that?

18        A.   Right, I see it.  As I remember, I had to come

19    up with money in this deal to make it work, but I had to

20    do it.  You know, what am I going to do?

21        Q.   So there was some costs that you had to pay to

22    close out this short sale; is that right?

23        A.   Yes, yeah, short of $20,000, but I had to do it

24    to make it work.  Again, I didn't want any of this.  I
```

```
 1    was forced into this, and it was -- so I'm a victim of

 2    the Chinese drywall company, and this is just another

 3    hit that I had to take because of what they did to me.

 4           It's layers and layers and layers of stuff that

 5    was done to me because of the Chinese drywall.  It

 6    wasn't just one thing.  It was layers of it.  This is

 7    another little layer right here.

 8    Q.   Does that amount, that $19,239, sound about the

 9    amount that you had to pay out-of-pocket to close the

10    short sale?

11    A.   Yes.

12    Q.   If you look to the page that's marked as

13    DGRIFFIN - 000181, is that your signature and your

14    wife's signature on that page?

15    A.   It is.

16    Q.   We looked at a mortgage payment invoice that

17    you received back in, I believe, January of 2010 a

18    little bit earlier, and it listed on that second

19    mortgage somewhere around $5,000 or so that was owed at

20    that time.

21    A.   Okay.

22    Q.   Do you know about when you stopped paying your

23    mortgage payments?

24    A.   I don't remember.
```

```
 1                (Griffin Exhibit No. 14 was marked for

 2      identification.)

 3      BY MR. LAWSON:

 4          Q.   Mr. Griffin, you've been handed a document

 5      that's been marked as Exhibit 14.  It's titled Chinese

 6      Drywall Settlement Program Foreclosure and Short Sale

 7      Claim Form.  Do you see that at the top?

 8          A.   I see it.

 9          Q.   Have you ever seen this document before, to

10      your knowledge?

11          A.   Well, if I did, I don't remember it.

12          Q.   Okay.  I'll represent to you that this appears

13      to be a form that was submitted on your behalf by your

14      legal counsel in the Chinese Drywall Settlement Program

15      in the Chinese Drywall MDL in the Eastern District of

16      Louisiana.

17                Specifically, first let's look to line 1.  It

18      lists you and your wife as the claimants that this form

19      relates to.  Do you see that?

20          A.   I see it.

21          Q.   Going on to the second page, it lists, under

22      drywall manufacturer, under Section 10 -- do you see

23      that --

24          A.   Uh-huh.
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 190 of 329
Case 2:09-md-02047-EEF-MBN Document 22363-20 Filed 11/19/19 Page 190 of 329
Confidential -- Subject to Further Confidentiality Review
of 162

 1        Q.   -- it lists Knauf as the drywall manufacturer.

 2   Do you know why it lists Knauf as the drywall

 3   manufacturer for your claim?

 4        A.   I'm guessing they had something to do with

 5   being the manufacturer.

 6        Q.   It then also checks "I am a member of the Knauf

 7   settlement class."  Do you see that?

 8        A.   I see it.

 9        Q.   Do you know if you've ever received money from

10   Knauf for settlement?

11        A.   I did receive a check.  I think it was for

12   10,000, but I could be wrong.  My counsel could say what

13   it was.  It was when I first heard of it, I thought it

14   was a joke, you know, because of the so much money that

15   I lost, but it was explained to me that that's all this

16   company had, maybe, that's all their insurance had or

17   something, there was some reason why it was, you know,

18   so ridiculously low.

19        MS. RICO:  And I'm just going to say -- remind

20        him not to get into the content about any

21        conversation you had with your attorneys.

22        THE WITNESS:  Right.

23   BY MR. LAWSON:

24        Q.   If you go to Section 21 of this document on

1    page 3, it asks you to provide the purchase price at the

2    time you purchased the affected property.  Do you see

3    that?

4        A.   I see it.

5        Q.   It lists the purchase price as $588,400.

6        A.   Okay.

7        Q.   Now, earlier we looked at that purchase

8    agreement with the home builder.  Do you remember that?

9        A.   I do.

10       Q.   And it listed that number, $588,400, but you

11   told me that there were some additional options that you

12   added onto the property that increased the purchase

13   price; is that right?

14       A.   Yeah, I spent a lot of money on extras.

15       Q.   Right.  So the actual purchase price was over

16   $700,000; is that right?

17       A.   Yes.

18       Q.   Moving to Section 22 of this document, which is

19   on page 4, it asks you to provide the appraised value of

20   the affected property at the time you purchased it.

21   Do you see that?

22       A.   I see it.

23       Q.   That is listed as $275,875?

24       A.   Yeah, we went over that.

```
 1        Q.   We went over the appraised value at the time

 2   you purchased it before?

 3        A.   Didn't we?

 4        Q.   I don't know.  But does that sound accurate to

 5   you that the appraised value was around that?

 6        A.   Well, knowing the property appraisers, that

 7   could be right.

 8        Q.   So this would relate to the Palm Beach County

 9   property appraisals that we were looking at earlier?

10        A.   Correct.

11        Q.   Looking down to Section 23, it asks to provide

12   the down payment made at the time of the purchase of the

13   affected property, and that's listed as $58,840.  Do you

14   see that?

15        A.   Okay.

16        Q.   Is that -- does that sound accurate that that's

17   around the amount of money that you paid as a down

18   payment?

19        A.   Yeah, what it was was a down payment, and then

20   every time I got an upgrade, and I got a lot of

21   upgrades, I had to give them a certain amount for that.

22   So that might have been a starting point.  I just don't

23   know.

24        Q.   So every time you added additional options or
```

1    upgrades to the property --

2        A.   I had to give them a check.

3        Q.   For the full amount, or just a down payment on

4    those upgrades?

5        A.   I don't remember.  I think it was a minimum of

6    20 percent, but I just don't remember what it was.  It

7    was a lot.  A lot of money out-of-pocket.

8        Q.   Under line 24, "the monthly mortgage amount of

9    the affected property at the time you purchased it," is

10   listed as $628.51.  Is that accurate?

11       A.   No.

12       Q.   Would that be for the second mortgage that we

13   looked at?

14       A.   That could have been for the second mortgage.

15   I don't know what that -- what that really means.

16       Q.   But you were saying that the monthly mortgage

17   amounts were in the high 4,000s; is that right?

18       A.   Yeah, a little under 5,000, combined, I think,

19   as I remember.

20       Q.   So under Section 25, it asks to provide the tax

21   assessed value of the affected property at the time of

22   the sale, and that, like the appraised value at the time

23   of purchase, is also listed as $275,875.  Do you see

24   that?

```
 1      A.   Yeah.

 2      Q.   Do you know why those amounts are the same?

 3      A.   I have no idea why those numbers are there and

 4  what they mean, and since it's coming from a property

 5  appraiser, they're irrelevant.

 6      Q.   Do you know if the bank ever threatened to

 7  foreclose on your home?

 8      A.   They may have.  That might have been at the

 9  time that I said, "Listen, the best deal we should do

10  here for both of us is to short sale it."  Because I

11  didn't see an option.  You know, I couldn't rebuild it,

12  couldn't rent it, I couldn't do anything with it.

13      Q.   Do you know if there are any letters that you

14  received from the bank related to the negotiations

15  around the foreclosure or short sale?

16      A.   There might have been.  I don't know.

17      Q.   But you don't know if you have them anymore?

18      A.   I don't have any of that stuff anymore.

19      Q.   Were there any changes in your employment

20  leading up to your short sale of the property?

21      A.   No.

22      Q.   You were employed consistently at your business

23  from the time that you purchased the property in 2006

24  until the time you sold it in 2010?
```

```
 1      A.   For the last 30 years.

 2      Q.   Was there any changes in the amount of money

 3   coming into your business around the time of the

 4   recession in 2009?

 5      A.   It probably wasn't as good as it was before.

 6   I've been very fortunate.  We've been -- I'm very

 7   diversified in what we do, so I didn't get hurt like

 8   many other people got hurt.

 9      Q.   And why is that?

10      A.   Because I was diversified.

11      Q.   Across what?

12      A.   I'm a stucco subcontractor, so we do work in

13   commercial, we do work in production work, and we do a

14   lot of custom homes, high end homes, like in Palm Beach.

15   Those homes never slowed down at all.  So I was

16   fortunate that we -- I had a little niche and I had

17   very -- I had builders that wanted me to do the work.

18      Q.   Would you say that your income decreased around

19   2009 when the recession was going on in the United

20   States?

21      A.   I'm sure that it did.

22      Q.   Do you know by about how much it would have

23   gone down around that time?

24      A.   I don't remember.
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 196 of 3246
Case 2:14-cv-02349-NGE Document 91-12 filed 05/08/2018 Page 135 of 162
Confidential – Subject to Further Confidentiality Review

```
1       Q.   Did that impact your ability to be able to pay

2   the mortgage on the Cobblestone property?

3       A.   No, not at all.

4       Q.   If you would have had more money from your --

5   in your income, you would have had more money to be able

6   to pay the mortgage; isn't that right?

7       A.   You only need so much to pay the mortgage, so

8   that was covered.  You know, even if I had lost my

9   tenant for a bit, I could have covered that.  But

10  knowing full well that I would never be able to rent it

11  and never be able to sell it and never be able to fix

12  it, that's what got me in this fix.  So my income was

13  irrelevant.  That was -- the house was fine until the

14  Chinese drywall thing.

15      Q.   You owned the home for around four years, and

16  for some of those years you were able to pay the

17  mortgage payments; correct?

18      A.   Yeah, and that was stupid.  You know, I was

19  grasping on some way to hold onto my home, and I think a

20  lot of people would do that.  They would -- but hoping

21  that I could, and I couldn't.  It was -- it was too hard

22  of a hit.

23      Q.   From that period of 2006 to 2010, did you have

24  any other changes in your monthly expenses, any medical
```

1    costs or debts that came up that were unexpected during

2    that time?

3        A.    Nothing unexpected.  Nothing that would affect

4    this house.  This house kind of stood alone.  It was on

5    its own.  I figured that if I could rent it out, at

6    least, near what it cost me, I would be just fine, but,

7    you know.

8        Q.    Did you make any other large purchases from

9    2006 to 2010 other than buying this house?  Any new

10   cars?

11       A.    Did I buy any new cars?  I don't remember.

12       Q.    Did you buy any other properties during that

13   time?

14       A.    Yeah, I bought one more piece of property.  I

15   don't remember the address.  And, unfortunately, the --

16   I think, the circumstance with this property sucking all

17   my money out hurt me with that property too, but this

18   house, it kind of stood on its own.  It didn't -- that

19   property didn't affect this property.

20       Q.    Where was the property that you're referring to

21   that you purchased?

22       A.    On Woods Landing Drive, I think.

23       Q.    Okay.  And what city is that in?

24       A.    That's in West Palm Beach.

```
1       Q.   Okay.  And was that a single family home?

2       A.   It was.

3       Q.   Were you also planning to use that as a rental

4   property?

5       A.   I was.  A rental property.  And, actually, I

6   bought that for a more short time.  A rental property,

7   and, you know, rented out for a few years and sell it.

8   I was hoping that that would help me with my retirement,

9   but it didn't work out too good.

10      Q.   When you say "it didn't work out too good,"

11  what do you mean?

12      A.   Well, me paying out so much on the house that I

13  could not rent, depleted my funds, and so I really

14  didn't -- I ran out of money and I decided, you know,

15  with that one, I would just go ahead and short-sale it

16  too, because short-selling this house destroyed my

17  credit, so I had nothing to lose.  Why suffer with

18  anything else?  So I just -- I just cleared it out of

19  there and I short-saled it too.

20      Q.   You short-sold that property, the second rental

21  property, after the short sale of the Cobblestone

22  property?

23           MS. RICO:  Form.

24           THE WITNESS:  I don't remember.  I think so.  I
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1199 of 3246
Case 1:13-cv-04048-NGG Document 209-11 Entered on FLSD Docket 05/08/2019 Page 138 of 162
Confidential -- Subject to Further Confidentiality Review

 1      just -- I don't remember, because it was all --

 2   BY MR. LAWSON:

 3      Q.   Did you purchase the second rental property

 4   after you purchased the Cobblestone property?

 5      A.   I think so, but I could be wrong, but I think

 6   so.

 7      Q.   Did anyone ever rent the second rental

 8   property.

 9      A.   Yeah, I think I had a renter in there, but I

10   just -- I just don't remember.  I don't remember.  I'm

11   trying to think who was in there.

12      Q.   Do you know if you were aware that you had

13   Chinese drywall in the Cobblestone property at the time

14   that you purchased the second rental property?

15      A.   No.

16      Q.   Do you have any documents related to your

17   purchase and short sale of the second rental property?

18      A.   I don't know where it would be.

19      Q.   Do you remember the address of it?

20      A.   No.  It was on Woods Landing Drive.  That's the

21   only thing I can remember.

22      Q.   Do you remember how much it sold for at short

23   sale?

24      A.   I don't remember.

```
1      Q.   After that short sale, did you owe any money to

2   the lender for your mortgage on that second rental

3   property?

4      A.   I did.  50,000.

5      Q.   And did you pay that amount of money back to

6   them?

7      A.   I'm still paying it back.

8      Q.   Is it on monthly payments?

9      A.   Yes, an automatic thing.

10     Q.   And how much a month is it?

11     A.   It's, like, 220 bucks, and they don't charge me

12  hardly any interest.  It's just --

13     Q.   You mentioned the effect on your credit from

14  these short sales.  What has been the effect on your

15  credit from them?

16     A.   Well, it made it -- you could imagine what it

17  would do to it.  It just made it terrible.  When you

18  short-sale a house, you don't -- you can't make your

19  payments, it just kills your credit.  It takes a long

20  time.  I finally have good credit now, but it took a

21  long time for that to come back.

22     Q.   You said that after you lived in the home in

23  Lantana that you moved into an apartment?

24     A.   Yeah.
```

Case 2:09-md-02047-EEF-MBN   Document 22363-29   Filed 11/19/19   Page 1201 of 3246
Confidential - Subject to further confidentiality Review
of 162

```
 1      Q.   When did -- do you remember about when you did

 2   that?

 3      A.   Six years ago.

 4           MS. GRIFFIN:  About.

 5           THE WITNESS:  About six years ago.

 6   BY MR. LAWSON:

 7      Q.   What led you to decide to move out of your home

 8   in Lantana, to move into that apartment?

 9      A.   Well, I sold the house in Lantana and I met a

10   realtor who had -- he thought it was a pretty nice

11   apartment, really cheap.  And we looked at it and we

12   said, "Yeah, this will work."  So we liked that.

13      Q.   Do you remember if you sold the home in Lantana

14   while you still owned the Cobblestone property?

15      A.   I don't think so.

16      Q.   You thought you had sold it at that point?

17      A.   I think Cobblestone had been sold.

18      Q.   And you were able to purchase a new home since

19   then, the one that you live in currently?

20      A.   Yeah, I moved in there about three years ago.

21      Q.   All right.  And at that point had your credit

22   recovered to the point that you were able to purchase a

23   home?  Is that accurate?

24      A.   Yeah, uh-huh.
```

```
1       Q.   Yes?

2       A.   Yes.

3            MR. LAWSON:  We can go off the record?

4            (Discussion off the record.)

5            (Recess from 11:59 a.m. until 12:21 p.m.)

6   BY MR. LAWSON:

7       Q.   Welcome back, Mr. Griffin.

8       A.   Glad to be back.

9       Q.   We were discussing the second rental property

10  that you purchased between 2006 and 2010, we thought,

11  and that was also sold in a short sale; is that right?

12      A.   It was.

13      Q.   Now, that short sale, did you sell the property

14  because you owed more on the property than it was worth?

15  Was your mortgage that was remaining -- amount

16  remaining --

17      A.   I think what it was is, the paying out on

18  Cobblestone Lakes for so long, you know, I just had no

19  funds left, and I don't know whether my tenant left that

20  property or not, but I made a decision.  I have nothing

21  to lose now.  I've already lost my credit.  What's the

22  point?  So I decided just to make a clean slate of it

23  and just go ahead and get rid of that too.

24      Q.   So you may or may not have had a tenant at the
```

Confidential -- Subject to Further Confidentiality Review

1  time, or you know you didn't have a tenant at the time

2  that you sold it?

3      A.   I just don't remember.  It's just been too long

4  ago.

5      Q.   But the financial impact of paying the mortgage

6  on the home that you lived in, the Cobblestone mortgage,

7  and the second rental property mortgage, was too much at

8  that time; is that right?

9      A.   I guess.  I mean, I try to keep everything

10 separate, you know, and the one that distressed me the

11 most, of course, was Cobblestone, because that's the one

12 that I eventually wanted to move into.  That was going

13 to be my retirement home.  And so, you know, if I could

14 have covered that one, it would have been fine, but I

15 couldn't rent it.

16     Q.   Do you believe that the recession impacted the

17 value of the second rental property that you purchased?

18          MS. RICO:  Form.

19          THE WITNESS:  I don't know.

20 BY MR. LAWSON:

21     Q.   Did you ever have that property appraised for

22 its value before you sold it?

23     A.   No.

24     Q.   I'd like to go back to Exhibit 2, and I know

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1204 of 3246
Case 2:14-cv-02722-NGG Document 41 Entered on FLSD Docket 05/03/2011 Page 143 of 162
Confidential -- Subject to Further Confidentiality Review

1   you've got a big stack of them there, but it's probably

2   at the bottom of it.  It's the larger mortgage agreement

3   that we looked at toward the beginning of the

4   deposition, and it's marked as DGRIFFIN- 602 on the

5   first page.  So it should be the one right there, yeah,

6   just underneath that.

7        A.   There.  Okay.

8        Q.   Specifically, I'd like to turn you to

9   DGRIFFIN - 625 near the middle of the document.

10       A.   Okay.

11       Q.   All right.  And this gets into some technical

12  mortgage language, but I wanted to refer you to the

13  section titled Interest Rate and Monthly Payment Changes

14  on this page.

15       A.   I see it.

16       Q.   And under Change Dates, which is Section A, it

17  states:  "The interest rate I will pay may change on the

18  first day of November 2011, and on that day, every sixth

19  months thereafter, each date on which my interest rate

20  could change is called a, quote, 'change date.'"

21            Do you see that?

22       A.   Okay.

23       Q.   Did I read that correctly?

24       A.   Yes.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1205 of 3246
Case 1:18-cv-12429-NGG Document 209-11 Entered on FLSD Docket 05/08/2019 Page 144 of 162
Confidential - Subject to Further Confidentiality Review

```
1        Q.   All right.  Now let's go to page 631.  That's

2   DGRIFFIN - 000631, about six pages later.

3        A.   Okay.

4        Q.   And if you look at this, it's a page titled

5   Interest-Only Addendum to Adjustable Rate Rider.  Do you

6   see that?

7        A.   Okay.  Yeah.

8        Q.   Do you know if, for the larger mortgage of the

9   two mortgages that you had, if you were paying only

10  interest at the beginning of the mortgage payments that

11  you were making on it?

12       A.   I don't remember.  I thought it was principal

13  and interest, but I could be wrong.

14       Q.   If you look down to the Section 4 on this page,

15  that's called Interest Rate and Monthly Payment Changes.

16  Do you see that?

17       A.   Yes.

18       Q.   It states in the second paragraph:  "During the

19  interest-only period, the noteholder will then determine

20  the amount of the monthly payment that would be

21  sufficient to repay accrued interest.  This will be the

22  amount of my monthly payment until the earlier of the

23  next change date, or the end of the interest-only

24  period, unless I make a voluntary prepayment of
```

1    principal during such period."

2            Do you see that?

3        A.    Yeah.

4        Q.    And do you remember just a second ago, when we

5    were looking at page 625, that it mentioned that the

6    change date, that defined term, was November 1, 2011?

7        A.    Okay.

8        Q.    So do you -- you don't have any recollection of

9    whether your payments were going toward interest only or

10   toward interest and principal during that time?

11       A.    I just don't remember.

12       Q.    All right.

13           (Griffin Exhibit No. 15 was marked for

14   identification.)

15   BY MR. LAWSON:

16       Q.    You've been handed a document that has been

17   marked as Exhibit 15.  And earlier we looked at one of

18   these Plaintiff Profile Forms, but I represent to you

19   that this is an earlier version of a Plaintiff Profile

20   Form --

21       A.    Okay.

22       Q.    -- that appears to be connected with your claim

23   in the Chinese drywall litigation.

24       A.    Okay.  All right.

1    Q.   Do you see your name on the first page of this

2  document under --

3    A.   I see it.

4    Q.   Yes, and your wife's name as well?

5    A.   Yes.

6    Q.   And, specifically, I'd like to turn your

7  attention to the second page of this document.

8    A.   Okay.

9    Q.   And if you look under Inspection Information,

10  it asks you if you or anyone on your behalf has

11  conducted an inspection into Chinese drywall in your

12  home, under Section IV.  Do you see that?

13       It's at the top of the page, the second page

14  under Section IV, and it asks you if anyone has

15  conducted an inspection in your home?

16    A.   Okay.

17    Q.   And you said "yes."  Do you see that?

18    A.   Yes.

19    Q.   And then it asks when the inspection took

20  place, and it says "August 2009."  Do you see that?

21    A.   Okay.

22    Q.   And then it asks:  "Has a determination been

23  made that Chinese manufactured drywall is present in

24  your home?"

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1208 of 3246
Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1208 of 3247
Confidential - Subject to Further Confidentiality Review
of 162

```
1              That is also marked "yes."  Do you see that?

2      A.   Yes.

3      Q.   If you look down, it asks:  "Who made that

4  determination?"

5              And it says here:  "David Griffin property

6  owner (I am a state certified general contractor)?"

7              Do you see that?

8      A.   I am.

9      Q.   And that's what it reads there?

10      A.   Yes.

11      Q.   And it says that your determination about

12  Chinese drywall being present in the home was around

13  August 2009.

14      A.   Okay.

15      Q.   Is that what it reads there?

16      A.   Yeah.

17      Q.   So earlier when you were talking that you had

18  performed inspections in the home, that's referring to

19  this inspection, August 2009?

20      A.   Must be.

21      Q.   And if you look to the third page of this

22  document, you signed it along with your wife on May 3,

23  2010; is that right?

24      A.   Okay.  Yeah.
```

```
1      Q.   And if you remember from earlier we looked at

2   it an inspection that occurred from a company around

3   May 2010 as well?

4      A.   Right.

5      Q.   So you would have signed this document around

6   that time as well; is that right?

7      A.   I guess.

8      Q.   And your signature here, if you look

9   correctly -- excuse me -- if you look on page 3, your

10  signature was your declaration under penalty of perjury

11  that you were filling out the form to be true and

12  correct to the best of your knowledge?

13     A.   Yes.

14     Q.   Mr. Griffin, thank you for your time today.  I

15  do not have any further questions at this time.

16     A.   You're very welcome.

17          MS. RICO:  I have just a few.

18          MR. LAWSON:  Do we have any from any other

19     counsel?

20          MR. GUERRA:  We don't have any questions.

21          MS. RICO:  Sorry.

22                    CROSS-EXAMINATION

23  BY MS. RICO:

24     Q.   Okay.  So hi.  Counsel was asking you earlier
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 210 of 3246
Case 1:19-md-NIGFL-Deposition of Interior and Filed under Seal 05/02/2019 Page 149 of 162

Confidential - Subject to Further Confidentiality Review
of 162

1   about figures regarding the purchase of your home?

2       A.   Yes.

3       Q.   And you testified throughout that you do not

4   recall specific figures given that it's been so much

5   time?

6       A.   Correct.

7       Q.   Okay.  Could you take a look at Exhibit 1,

8   specifically, DGRIFFIN - 000167?

9       A.   167?

10      Q.   167.

11      A.   Okay.

12      Q.   Okay.  Do you recognize this document?

13      A.   Yes.

14      Q.   Is this the HUD settlement statement for the

15  purchase of your home?

16      A.   Yeah, it appears so.

17      Q.   And given that you do not recall specific

18  figures, would this, to the best of your knowledge,

19  accurately reflect the purchase price of your home, down

20  payment, et cetera?

21      A.   Yes.

22      Q.   Okay.  Thank you.  And on the page right before

23  it, you've been asked several times about upgrades to

24  the home, and you mentioned that you had to pay out

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 211 of 3246
Case 1:14-cv-02494-NGG Document 209-11 Entered on FLSD Docket 05/08/2014 Page 150 of 162
Confidential - Subject to Further Confidentiality Review

1    checks to the builder?

2        A.   Yes.

3        Q.   In the same exhibit, DGRIFFIN - 000166, do

4    those two checks reflect what you mentioned regarding

5    upgrades to your home?

6        A.   Yeah.

7        Q.   Are they an example of it?  I apologize.

8        A.   An example of it.  It would have been part of

9    it anyway.

10        Q.   Okay.  Thank you.  You were also asked earlier

11    about the square footage of your home?

12        A.   Yes.

13        Q.   And counsel entered a page from the property

14    appraiser's website as Exhibit No. 9.

15        A.   Yes.

16        Q.   Could you pull that out, please?

17        A.   Exhibit 9.  Okay.

18        Q.   Could you look at the third page, please?

19        A.   Okay.

20        Q.   The top left where it says "sub area and square

21    footage for Building 1," if you look down for the under

22    air square footage, do you see it, "total area under

23    air?"

24        A.   Yes.

```
 1       Q.   What's the number there?

 2       A.   3670.

 3       Q.   Okay.  And to the best of your knowledge, is

 4   that an accurate number for the under air square footage

 5   of your home?

 6       A.   As far as I know, yeah.

 7       Q.   With regard to the tenants that you had in your

 8   home --

 9       A.   Yes.

10       Q.   -- counsel asked you earlier about the amount

11   that you lost specifically -- specifically regarding the

12   first month, last month, security deposit, and the time

13   that you were there?

14       A.   Correct.

15       Q.   And what number did you give for that?

16       A.   Well, it was a minimum of 15,000.  It could

17   easily be 25,000.

18       Q.   Okay.  And that amount is regarding what you

19   refunded to your tenants?

20       A.   Correct.  It doesn't include what I could have

21   gotten.  You know, they could have rented the place for

22   a long, long time, and others too, so, you know, I

23   couldn't get that either.

24       Q.   Okay.  So that amount is not the total amount
```

```
1    of lost rental you're seeking; is that right?

2         A.   Correct.

3         Q.   Okay.  But it is a lost rental that you

4    refunded to the tenants that you had in the home?

5         A.   That's correct.

6         Q.   Also, could you tell us a little bit -- I know

7    you've mentioned it throughout.  You mentioned that this

8    home was intended as your retirement home?

9         A.   Correct.

10        Q.   Could you tell us a little bit more about that

11   and about what your expectations were regarding this

12   home?

13             MR. LAWSON:  Object to form.

14             THE WITNESS:  Well, it was -- it was just a

15        wonderful home.  First of all, I had the ability to

16        pick out the best lot in the whole development, on

17        this beautiful lake, and I was kind of on a point,

18        so you could see both directions all the way down

19        the lake, so you looked outside and it was just all

20        this water and it was really great.

21             The house was wonderful too.  It was a great

22        floor plan.  I've seen many floor plans.  It was --

23        it felt big and expansive.  And then I finished it

24        exactly the way my wife and I wanted it.  We put in
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1214 of 3246
Case 1:19-cv-12449-NGG Document 21-1 Filed 10 Docket 05/13/2019 Page 153 of 162

Confidential — Subject to Further Confidentiality Review

```
 1              exactly the kind of flooring that we would want, the

 2              cabinets and the countertops we picked out -- we

 3              spent a lot of time picking out all the different

 4              things that went into the house to make it just

 5              right, just ours, so that when I retired and the

 6              lease was up with whoever was in there, we could

 7              move in and have a nice life.  So it didn't happen.

 8              You know, it could have happened, but it didn't

 9              happen.

10      BY MS. RICO:

11           Q.   Okay.  And is there a value that you can place

12      on that loss?

13           A.   There's no -- on the lot?

14           Q.   On the loss.  On the loss.

15           A.   On the loss?  There's no value.  How do you --

16      how do you put a value on somebody's dreams?  You know,

17      this was our dream.  So you can't put a value on

18      someone's dreams.  And how do you put a value on stress

19      when you put somebody through something like this?

20      There's no value you could put on that.

21              There's a lot of things that have to do with

22      the loss of this house that there's no amount of money,

23      there's no value you can actually put on that, and if

24      you were to tell somebody, "Listen, we just put you
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1215 of 3246
Case 2:14-cv-02722-NGG-MBN Document 60-11 entered under seal 08/28/20 Page 154 of 162
Confidential - Subject to Further Confidentiality Review

 1    through this, we can take it all back," you can't put an

 2    amount of money on that, especially because it was done

 3    with knowledge and they did it to make a few bucks.

 4            And I guess that gets me, maybe it gets me more

 5    than it should, but they did this with the knowledge

 6    that they were hurting me and everybody else, for a few

 7    hundred bucks a house, and they would lose everything

 8    that they had dreamed about.  You can't put a dollar

 9    value on that.  That was wrong, and I've yet to hear an

10    apology from anybody, even though they know it was

11    wrong.

12        Q.  I'd like you to look at Exhibit 11.  And so on

13    the same line, counsel showed you on page 6, at the top

14    of page 6, where it says here "any loss for use and

15    enjoyment" and it says $100,000, given what you were

16    just saying, why is that number there?

17        A.  I don't know, it's hard to put a value on it.

18        Q.  So would you say that that's a floor, not a

19    ceiling?

20            MR. LAWSON:  Object to form.

21            THE WITNESS:  That's definitely a floor.  I

22        mean, that would be a minimum amount.  If -- I would

23        pay a lot more than that not to have gone through

24        this.  It's just -- it was not a good experience for

```
 1        my wife and I.  It not only affected us at the time

 2        this happened, but it took away a lot of dreams that

 3        we had for our future.  I'm 71.  I can't make all

 4        this up again.  If I was 30, that would be a

 5        different story, wouldn't it?  But, you know, I

 6        was -- at the time I was what?  61.  You can't start

 7        over when you're 61 so easy.  So, yeah, that would

 8        be an absolute floor.

 9   BY MS. RICO:

10        Q.   Okay.  And just because counsel objected to my

11   question, is that the total amount you're seeking?

12        A.   That would be a minimum amount I'm seeking.  A

13   minimum amount.  There's no amount of money they could

14   pay to repay what they did to me and everybody else.

15   They don't have enough money.  China doesn't have enough

16   money, because you can't put a value on the kinds of

17   things that we're talking about here.  Can you?  You

18   just can't.  You can put dollar amounts on different

19   things that you paid out of your pocket, but overall you

20   can't.

21             MS. RICO:  That's all I have.

22                       REDIRECT-EXAMINATION

23   BY MR. LAWSON:

24        Q.   Mr. Griffin, I'd like to quickly go back to
```

1    Exhibit 9, which you were just looking at, which is the

2    recent online property appraiser for Palm Beach County

3    document for the Cobblestone home.

4         A.    Okay.

5         Q.    Specifically going back to that section on

6    square footage on the third page, counsel was asking you

7    about the total area under air that's listed as 3670.

8         A.    Okay.

9         Q.    You don't know whether or not the new owners of

10   the home have added additional square footage to the

11   home, do you?

12        A.    I've not been back there since I sold it.  It's

13   kind of -- I thought about it, just to see what it

14   looked like, but it was kind of hurtful and I didn't

15   want those feelings drug up, so I just didn't.  I

16   haven't gone by there.

17        Q.    So, no, you don't know if they've added

18   additional square footage?

19        A.    No, I don't know.

20        Q.    And earlier we looked at the floor plan of the

21   home from when you purchased the home; is that right?

22        A.    Right.

23        Q.    And that was the floor plan that -- of the home

24   that you purchased and owned for four years; is that

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1218 of 3246
Case 1:18-cv-02248-NGG Document 269-11 2nd offered on 1-ENT Docket 05/18/2019 Page 157 of 162
Confidential - Subject to Further Confidentiality Review

```
 1   right?

 2        A.   Yes.

 3             MR. LAWSON:  I have no further questions.

 4        However, I would just like to put on the record as

 5        we finish up with Mr. Griffin that if there are

 6        additional documents that would come in --

 7             MS. RICO:  Of course.

 8             MR. LAWSON: -- we would love to get them as

 9        soon as possible.  Obviously, we would reserve the

10        right to reopen the deposition if there's additional

11        documentation that we needed to discuss with

12        Mr. Griffin.

13             MS. RICO:  Of course.

14             MR. LAWSON:  Thank you very much for your time,

15        sir.

16             THE WITNESS:  Thank you very much.

17             (Whereupon, the deposition concluded at

18   12:40 p.m. )

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                  C E R T I F I C A T E

 2

 3         I, JOAN L. PITT, Registered Merit Reporter,

 4    Certified Realtime Reporter, and Florida Professional

 5    Reporter, do hereby certify that, pursuant to notice,

 6    the deposition of DAVID GRIFFIN was duly taken on

 7    January 8, 2019, at 9:01 a.m. before me.

 8         The said DAVID GRIFFIN was duly sworn by me

 9    according to law to tell the truth, the whole truth, and

10    nothing but the truth, and thereupon did testify as set

11    forth in the above transcript of testimony.  The

12    testimony was taken down by me stenographically.  I do

13    further certify that the above deposition is full,

14    complete, and a true record of all the testimony given

15    by the said witness.

16

17         _____

18              JOAN L. PITT, RMR, CRR, FPR

19

20         (The foregoing certification of this transcript

21    does not apply to any reproduction of the same by any

22    means, unless under the direct control and/or

23    supervision of the certifying reporter.)

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1220 of 3246
Case 1:15-cv-12408-NGG Document 69-11 Entered on FLSD Docket 05/02/2040 Page 159
of 162
Confidential - Subject to Further Confidentiality Review

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4            Please read your deposition over carefully and

 5    make any necessary corrections.  You should state the

 6    reason in the appropriate space on the errata sheet for

 7    any corrections that are made.

 8

 9            After doing so, please sign the errata sheet

10    and date it.  It will be attached to your deposition.

11

12            It is imperative that you return the original

13    errata sheet to the deposing attorney within thirty (30)

14    days of receipt of the deposition transcript by you.  If

15    you fail to do so, the deposition transcript may be

16    deemed to be accurate and may be used in court.

17

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1221 of 3246
Case 1:19-mc-00405-NGG Document 20-11 entered on FLSD Docket 05/08/2021 Page 160 of 162
Confidential - Subject to Further Confidentiality Review

```
 1                - - - - - -

 2                E R R A T A

 3                - - - - - -

 4   PAGE   LINE   CHANGE

 5   _____  _____  _____

 6     REASON: _____

 7   _____  _____  _____

 8     REASON: _____

 9   _____  _____  _____

10     REASON: _____

11   _____  _____  _____

12     REASON: _____

13   _____  _____  _____

14     REASON: _____

15   _____  _____  _____

16     REASON: _____

17   _____  _____  _____

18     REASON: _____

19   _____  _____  _____

20     REASON: _____

21   _____  _____  _____

22     REASON: _____

23   _____  _____  _____

24     REASON: _____
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1222 of 3246
Confidential - Subject to further confidentiality Review
of 162

```
 1                    ACKNOWLEDGMENT OF DEPONENT

 2

 3          I, _____, do hereby

 4     acknowledge that I have read the foregoing pages and

 5     that the same is a correct transcription of the answers

 6     given by me to the questions therein propounded, except

 7     for the corrections or changes in form or substance, if

 8     any, noted in the attached Errata Sheet.

 9

10

11     _____    _____

12     DAVID GRIFFIN                       DATE

13

14

15

16

17     Subscribed and sworn to before me this

18     ____ day of _____, 20___.

19     My Commission expires: _____

20

21     _____

       Notary Public

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1223 of 3246
Case 1:18-cv-02408-WFK Document 20-11 Entered on FLSD Docket 05/08/2023 Page 162 of 162
Confidential - Subject to Further Confidentiality Review

```
 1                        LAWYER'S NOTES

 2     PAGE    LINE

 3     _____   _____   _____

 4     _____   _____   _____

 5     _____   _____   _____

 6     _____   _____   _____

 7     _____   _____   _____

 8     _____   _____   _____

 9     _____   _____   _____

10     _____   _____   _____

11     _____   _____   _____

12     _____   _____   _____

13     _____   _____   _____

14     _____   _____   _____

15     _____   _____   _____

16     _____   _____   _____

17     _____   _____   _____

18     _____   _____   _____

19     _____   _____   _____

20     _____   _____   _____

21     _____   _____   _____

22     _____   _____   _____

23     _____   _____   _____

24
```

# EXHIBIT A13

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2
     EDUARDO AND CARMEN AMORIN,
 3   et al., individually, and
     on behalf of all others
 4   similarly situated,        Case No. 1:11-CV-22408-MGC
 5       Plaintiffs,
 6   vs.
 7   TAISHAN GYPSUM CO., LTD.,
     F/K/A SHANDONG TAIHE
 8   DONGXIN CO., LTD.; TAIAN
     TAISHAN PLASTERBOARD CO.,
 9   LTD, et al.,
10       Defendants.
11              CONFIDENTIAL - SUBJECT TO FURTHER
                    CONFIDENTIALITY REVIEW
12
                          - - -
13
                     JANUARY 8, 2019
14
                          - - -
15
           Deposition of DIANE GRIFFIN, held at
16      Morgan & Morgan, PA, 515 North Flagler Drive, Suite
        2125, West Palm Beach, Florida 33401, commencing at
17      12:41 p.m., on the above date, before Joan L. Pitt,
        Registered Merit Reporter, Certified Realtime
18      Reporter, and Florida Professional Reporter.
19                        - - -
20              GOLKOW LITIGATION SERVICES
            877.370.3377 ph | 917.591.5672 fax
21                   deps@golkow.com
22
23
24
```

```
 1                    APPEARANCES
 2
 3   Counsel for Plaintiffs:
 4        NATALIE M. RICO, ESQUIRE
          Colson Hicks Eidson
 5        255 Alhambra Circle, Penthouse
          Coral Gables, Florida 33134
 6        305.476.7400
          natalie@colson.com
 7
          EMMA KINGSDORF SCHWAB, ESQUIRE
 8        Barrios, Kingsdorf & Casteix, LLP
          701 Poydras Street, Suite 3650
 9        New Orleans, Louisiana 70139-3650
          504.524.3300
10        eschwab@bkc-law.com
11
     Counsel for Defendants Taishan Gypsum Co., Ltd., and
12   Taian Taishan Plasterboard Co., Ltd.:
13        MATTHEW D. LAWSON, ESQUIRE
          LARA TUMEH, ESQUIRE
14        MAE MANUPIPATPONG, ESQUIRE
          Alston & Bird LLP
15        One Atlantic Center
          1201 West Peachtree Street
16        Atlanta, Georgia 30309-3424
          404.881.7000
17        matt.lawson@alston.com
          lara.tumeh@alston.com
18        mae.manupipatpong@alston.com
19
20   Also present:  David Griffin
21
22
23
24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1227 of 3246
Case 1:15-cv-02096-NGG Document 269-11 Entered on FLSD Docket 05/08/2017 Page 49 of 14
confidential - Subject to further confidentiality Review

```
 1                 APPEARANCES CONTINUED

 2

 3    Counsel for Beijing New Building Materials PLC:

 4         DAN GUERRA, ESQUIRE
           Orrick, Herrington & Sutcliffe LLP
 5         The Orrick Building
           405 Howard Street
 6         San Francisco, California 94105-2669
           415.773.5545
 7         dguerra@orrick.com

 8         ALEX B. ROTHENBERG, ESQUIRE
           Gordon Arata Montgomery Barnett
 9         201 St. Charles Avenue, 40th Floor
           New Orleans, Louisiana 70170-4000
10         504.582.1111
           arothenberg@gamb.law

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
1                         - - -

2                      I N D E X

3                         - - -

4    Testimony of:  DIANE GRIFFIN

5     DIRECT EXAMINATION BY MR. LAWSON                    5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                         - - -

 2              THE COURT REPORTER:  Raise your right hand,

 3         please.  Do you swear or affirm the testimony you

 4         give will be the truth, the whole truth, and nothing

 5         but the truth?

 6              THE WITNESS:  I do.

 7              THE COURT REPORTER:  Thank you.

 8              DIANE GRIFFIN, called as a witness by the

 9    Defendant Taishan Gypsum Co., Ltd., having been first

10    duly sworn, testified as follows:

11                    DIRECT EXAMINATION

12    BY MR. LAWSON:

13         Q.   Can you please state your name for the record?

14         A.   Diane Griffin.

15         Q.   Ms. Griffin, thank you for your time today in

16    coming in.

17         A.   You're welcome.

18         Q.   It's my understanding that you have been

19    listening and sitting in during the entirety of your

20    husband's testimony today; is that right?

21         A.   Yes.

22         Q.   So you've heard everything that he's discussed

23    with me and the other attorneys today?

24         A.   Yes.
```

confidential - Subject to further confidentiality Review

1     Q.   Is there anything that your husband said that

2   you have a different recollection of or would like to

3   correct or add to from his testimony?

4     A.   No.

5     Q.   What was your involvement in the Cobblestone

6   property during the time that you and your husband owned

7   it?

8     A.   It was pretty minimal.  I mean, we went there,

9   we saw the lot, we decided on which model, and then I

10   went back and we picked out the different finishes, and

11   I walked through it at the end when it was done, and

12   that was about it.

13     Q.   How often did you visit the property during the

14   time that you owned it?

15     A.   Maybe three or four.

16     Q.   Three or four times?

17     A.   (Nodding head.)  While it was under

18   construction.

19     Q.   While it was under construction, you visited it

20   three or four times?

21     A.   (Nodding head.)

22     Q.   How about after it was constructed?

23     A.   As I recall, maybe it was about three times

24   just to walk around and see what everything -- how it

```
1    turned out.

2        Q.   Do you recall when the renters were living in

3    the property on Cobblestone?

4        A.   I really don't.  I don't.

5        Q.   And did you ever notice any odors or smells

6    that were unusual to you in the home?

7        A.   No.

8        Q.   Do you remember the address of the second

9    rental property that we were discussing earlier with

10   your husband?

11       A.   Woods Landing?

12       Q.   Yes.

13       A.   No.

14       Q.   Your husband talked a little bit about what he

15   felt like he lost from not being able to live in that

16   property.  Could you tell me what you feel like you lost

17   from not living in it?

18       A.   I feel like we lost our retirement home.  And I

19   was watching our little granddaughter at the time, and

20   one of the bathrooms I picked out was, like, for her.

21   That was -- had little fishys and things and clear

22   glass, and it was just, you know, just a loss of a home.

23       Q.   Do you plan to continue to live in the home

24   that you live in today going forward, or do you plan to
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1232 of 3246
Case 1:19-cv-00484-WCG Document 20-11 #: 26863 Filed 10/30/19 Page 1232 of 3246

Confidential - Subject to Further Confidentiality Review
14

 1    move at some point?

 2         A.   I think we'll probably stay there.

 3         Q.   Do you like the home that you live in now?

 4         A.   Yes.

 5              MR. LAWSON:  I don't have any further questions

 6    at this time.

 7              MS. RICO:  Thank you.

 8              THE WITNESS:  Thank you.

 9              MR. LAWSON:  Any.

10              MS. RICO:  No.

11              MR. GUERRA:  None from us either.

12              MR. LAWSON:  All right.  I think we are done.

13    Thank you very much.

14              (Whereupon, the deposition concluded at

15    12:44 p.m.)

16

17

18

19

20

21

22

23

24

Confidential - Subject to Further Confidentiality Review

```
 1                    C E R T I F I C A T E

 2

 3           I, JOAN L. PITT, Registered Merit Reporter,

 4     Certified Realtime Reporter, and Florida Professional

 5     Reporter, do hereby certify that, pursuant to notice,

 6     the deposition of DIANE GRIFFIN was duly taken on

 7     January 8, 2019, at 12:41 a.m. before me.

 8           The said DIANE GRIFFIN was duly sworn by me

 9     according to law to tell the truth, the whole truth, and

10     nothing but the truth, and thereupon did testify as set

11     forth in the above transcript of testimony.  The

12     testimony was taken down by me stenographically.  I do

13     further certify that the above deposition is full,

14     complete, and a true record of all the testimony given

15     by the said witness.

16

17           _____

18             JOAN L. PITT, RMR, CRR, FPR

19

20           (The foregoing certification of this transcript

21     does not apply to any reproduction of the same by any

22     means, unless under the direct control and/or

23     supervision of the certifying reporter.)

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1234 of 3246
Case 1:09-cv-08420-MGC Document 20251-1 Confidential Subject to Docket 05/19/2019 Page 41 of
Confidential - Subject to Further Confidentiality Review
14

```
 1                   INSTRUCTIONS TO WITNESS

 2

 3

 4          Please read your deposition over carefully and

 5   make any necessary corrections.  You should state the

 6   reason in the appropriate space on the errata sheet for

 7   any corrections that are made.

 8

 9          After doing so, please sign the errata sheet

10   and date it.  It will be attached to your deposition.

11

12          It is imperative that you return the original

13   errata sheet to the deposing attorney within thirty (30)

14   days of receipt of the deposition transcript by you.  If

15   you fail to do so, the deposition transcript may be

16   deemed to be accurate and may be used in court.

17

18

19

20

21

22

23

24
```

```
 1                    - - - - - -

 2                  E R R A T A

 3                    - - - - - -

 4    PAGE    LINE    CHANGE

 5    _____   _____   _____

 6      REASON: _____

 7    _____   _____   _____

 8      REASON: _____

 9    _____   _____   _____

10      REASON: _____

11    _____   _____   _____

12      REASON: _____

13    _____   _____   _____

14      REASON: _____

15    _____   _____   _____

16      REASON: _____

17    _____   _____   _____

18      REASON: _____

19    _____   _____   _____

20      REASON: _____

21    _____   _____   _____

22      REASON: _____

23    _____   _____   _____

24      REASON: _____
```

Confidential - Subject to Further Confidentiality Review

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3        I, _____, do hereby

 4    acknowledge that I have read the foregoing pages and

 5    that the same is a correct transcription of the answers

 6    given by me to the questions therein propounded, except

 7    for the corrections or changes in form or substance, if

 8    any, noted in the attached Errata Sheet.

 9

10

11    _____    _____

12    DIANE GRIFFIN                   DATE

13

14

15

16

17    Subscribed and sworn to before me this

18    ____ day of _____, 20___.

19    My Commission expires: _____

20

21    _____

      Notary Public

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1237 of 3246
Case 1:19-cv-00240-MCA Document 226-11 Exhibit 41-1 Filed 05/08/2019 Page 91 of 14
Confidential - Subject to Further Confidentiality Review

```
 1                           LAWYER'S NOTES

 2      PAGE    LINE

 3      _____   _____    _____

 4      _____   _____    _____

 5      _____   _____    _____

 6      _____   _____    _____

 7      _____   _____    _____

 8      _____   _____    _____

 9      _____   _____    _____

10      _____   _____    _____

11      _____   _____    _____

12      _____   _____    _____

13      _____   _____    _____

14      _____   _____    _____

15      _____   _____    _____

16      _____   _____    _____

17      _____   _____    _____

18      _____   _____    _____

19      _____   _____    _____

20      _____   _____    _____

21      _____   _____    _____

22      _____   _____    _____

23      _____   _____    _____

24      _____   _____    _____
```

# EXHIBIT A14

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2

    EDUARDO AND CARMEN AMORIN,
 3  et al., individually, and
    on behalf of all others
 4  similarly situated,        Case No. 1:11-CV-22408-MGC
 5       Plaintiffs,
 6  vs.
 7

    TAISHAN GYPSUM CO., LTD.,
 8  F/K/A SHANDONG TAIHE
    DONGXIN CO., LTD.; TAIAN
 9  TAISHAN PLASTERBOARD CO.,
    LTD, et al.,
10
         Defendants.
11                             - - -
               CONFIDENTIAL - SUBJECT TO FURTHER
12                   CONFIDENTIALITY REVIEW
                       DECEMBER 18, 2018
13
                               - - -
14
            Deposition of BETTY HERNANDEZ, held at
15  Morgan & Morgan, PA, One Tampa City Center,
    201 North Franklin Street, 6th Floor, Tampa, Florida
16  33602, commencing at 8:01 a.m., on the above date,
    before Joan L. Pitt, Registered Merit Reporter,
17  Certified Realtime Reporter, and Florida
    Professional Reporter.
18
                               - - -
19
               GOLKOW LITIGATION SERVICES
20        877.370.3377 ph | 917.591.5672 fax
                    deps@golkow.com
21
22
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1                    APPEARANCES

 2

 3    Counsel for Plaintiffs:

 4        HOLLY WERKEMA, ESQUIRE
          Baron & Budd PC
 5        3102 Oak Lawn Avenue, Suite 1100
          Dallas, Texas 75219-4281
 6        214.521.3605
          hwerkema@baronbudd.com
 7
          KEITH J. VERRIER, ESQUIRE
 8        Levin, Sedran & Berman LLP
          510 Walnut Street, Suite 500
 9        Philadelphia, Pennsylvania 19106
          215.592.1500
10        kverrier@lfsblaw.com
11
      Counsel for Defendants Taishan Gypsum Co., Ltd., and
12    Taian Taishan Plasterboard Co., Ltd.:
13        ALIYYA Z. HAQUE, ESQUIRE
          PATRICK H. HILL, ESQUIRE
14        BOYKIN LUCAS, ESQUIRE
          Alston & Bird LLP
15        One Atlantic Center
          1201 West Peachtree Street
16        Atlanta, Georgia 30309-3424
          404.881.700
17        aliyya.haque@alston.com
          patrick.hill@alston.com
18        boykin.lucas@alston.com
19
20
21
22
23
24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1241 of 3246
Case 1:18-cv-12408-NGG Document 29-11 Entered on FLSD Docket 05/08/2019 Page 49 of 134
Confidential - Subject to Further Confidentiality Review

```
 1                    APPEARANCES CONTINUED

 2

 3    Counsel for Beijing New Building Materials PLC:

 4        DAN GUERRA, ESQUIRE

          Orrick, Herrington & Sutcliffe LLP

 5        The Orrick Building

          405 Howard Street

 6        San Francisco, California 94105-2669

          415.773.5545

 7        dguerra@orrick.com

 8        JOSHUA D. POYER, ESQUIRE

          Aballi Milne Kalil, P.A.

 9        2250 SunTrust International Center

          One Southeast Third Avenue

10        Miami, Florida 33131

          305.373.6600

11        jpoyer@aballi.com

12

13    Also present:  John Hernandez

14

15

16

17

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1242 of 3246
Case 1:14-cv-04091-NGG-TLM Document 00-11 Entered on FLSD Docket 05/08/2015 Page 9 of
134
Confidential - Subject to Further Confidentiality Review

```
 1                        - - -

 2                   I N D E X

 3                        - - -

 4   Testimony of:  BETTY HERNANDEZ

 5     DIRECT EXAMINATION BY MS. HAQUE              7

 6     CROSS-EXAMINATION BY MS. WERKEMA           121

 7     REDIRECT-EXAMINATION BY MS. HAQUE          125

 8

 9                E X H I B I T   I N D E X

10   HERNANDEZ            DESCRIPTION             PAGE

11   No. 1     WARRANTY DEED                       14

12   No. 2     US DEPARTMENT OF HOUSING & URBAN    16
               DEVELOPMENT SETTLEMENT STATEMENT
13             DATED 4/1/2008

14   No. 3     ANNUAL ESCROW ACCOUNT DISCLOSURE    18
               STATEMENT PROJECTIONS FOR COMING
15             YEAR; BANK STATEMENT DATED 12/12/2009
               HERNANDEZDEP.0000480 - 0000486
16
     No. 4     WARRANTY DEED DATED 1/11/2017       22
17
     No. 5     HILLSBOROUGH COUNTY PROPERTY        30
18             APPRAISER PROPERTY RECORD CARD
19   No. 6     FLOOR PLAN                          31
               HERNANDEZ.J00007 - 00008
20
     No. 7     CHINESE DRYWALL SCREENING LLC DRYWALL  42
21             INVESTIGATION REPORT DATED 1/25/2010
               HERNANDEZ DEP. 0000008 - 0000021
22
     No. 8     CHINESE DRYWALL SCREENING LLC        53
23             EVIDENCE PRESERVATION REPORT DATED
               10/31/2013
24             HERNANDEZ DEP.0000022 - 0000061
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1243 of 3246
Case 1:17-cv-02408-NGG Document 199-11 Filed 11/21/19 Page 243 of 134
Confidential - Subject to Further Confidentiality Review

```
 1   No. 9      ENVIRONMENTAL CERTIFICATE DATED        65
                12/10/2013
 2
     No. 10     SIERRA CONSTRUCTION & RESTORATION,     69
 3              INC., INVOICES - NO. 7178, DATED
                7/29/2015, NO. 6707, DATED 7/2/2014,
 4              NO. 6925, DATED 12/30/2014;
                CAPRI PRO PAINTERS CONTRACTORS
 5              INVOICE DATED 5/14/2015;
                BORTER GLASS CO., INC., INVOICES -
 6              NO. B0257323, DATED 6/20/2015, NO.
                B0247325, DATED 6/20/2015, NO.
 7              B0257324, DATED 6/20/2015;
                CUSTOM DISTRIBUTORS INVOICE DATED
 8              8/27/2014; TAMPA TILE INVOICES - NO.
                103393-00, DATED 2/20/2015,
 9              103157-00, DATED 2/9/2015;
                CALIFORNIA CLOSETS INVOICES - NO.
10              3082, DATED 3/13/2015, No. 2805,
                DATED 12/16/2014
11              HERNANDEZDEP.0000146 - 0000157
12   No. 11     CHECK STUBS NOS. 4709-4711,           84
                9478-9479, 9482-9488; TD BANK
13              STATEMENT OF ACCOUNT DATED 6/1/2015 -
                6/30/2015; TAMPA TILE INVOICE NO.
14              103393-00, DATED 2/20/15; SUNCOAST
                CREDIT UNION BANK STATEMENTS DATED
15              3/12/2015, 12/12/2014, COPY OF CHECK
                NOS. 4202, 4315, 4453, 4577, 4742,
16              4202-4204; SUNCOAST SCHOOLS FEDERAL
                CREDIT UNION BANK STATEMENT DATED
17              6/12/2013 - 7/11/2013
                000342 - 000355
18
     No. 12     PLAINTIFF BERTHA HERNANDEZ'S FIRST    92
19              AMENDED RESPONSE TO DEFENDANTS'
                INTERROGATORIES
20
     No. 13     SUPPLEMENTAL PLAINTIFF PROFILE FORM   100
21
22
23
24
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1244 of 3246
Case 1:14-cv-02494-NGG Document 69-11 entered on FLSD Docket 05/08/2014 Page 41 of
134
Confidential - Subject to further confidentiality Review

```
 1   No. 14      RESIDENTIAL LEASE, HANDWRITTEN NOTES      106
                 DATED 4/6/15, 6/2/2014, 12/31/2014;
 2               HANDWRITTEN NOTES WITH ILLEGIBLE
                 DATE; NOTICE OF INTENTION TO IMPOSE
 3               CLAIM ON SECURITY DEPOSIT, DATED
                 6/9/2015; PRO CARPET INVOICE 191028,
 4               DATED 8/13/2013; TRIPLE H AIR
                 CONDITIONING WORK ORDER/INVOICE NO.
 5               5388, DATED 8/24/2014
                 HERNANDEZDEP.0000240 - 0000246
 6
     No. 15      WATER BILLS FROM 9/16/2013 TO            110
 7               05/19/2015; TECO ELECTRIC BILLS FROM
                 8/28/2013 TO 5/19/2015
 8               HERNANDEZ DEP.0000198 - 0000239
 9   No. 16      COPIES OF CHECK NOS. 4442, 4502,         112
                 4652; FLORIDA EXECUTIVE PROPERTY
10               SERVICES RECEIPT DATED 6/13/2013;
                 COPY OF CASHIER'S CHECK NO. 513481,
11               SUNCOAST CREDIT UNION STATEMENT DATED
                 6/11/2015; COLEMAN AMERICAN LOCAL
12               MOVE WORK ORDER CONTRACT DATED 5/15/
                 2015; SUNCOAST SCHOOLS FEDERAL CREDIT
13               UNION STATEMENT DATED 9/11/2013
                 000333 - 000341
14
     No. 17      PLAINTIFF BERTHA HERNANDEZ'S RESPONSE    117
15               TO DEFENDANTS' REQUEST FOR PRODUCTION
                 OF DOCUMENTS
16
17
18
19
20
21
22
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1                      - - -

 2              THE COURT REPORTER:  Raise your right hand,

 3       please.  Do you swear or affirm the testimony you

 4       give will be the truth, the whole truth, and nothing

 5       but the truth?

 6              THE WITNESS:  I do.

 7              THE COURT REPORTER:  Thank you.

 8              BETTY HERNANDEZ, called as a witness by the

 9   Defendant Taishan Gypsum, having been first duly sworn,

10   testified as follows:

11                      DIRECT EXAMINATION

12   BY MS. HAQUE:

13       Q.   Could you please state your name for the

14   record?

15       A.   Okay.  My name is Betty Hernandez.

16       Q.   My name is Aliyya Haque.  We just met a few

17   moments ago.  I'm one of the attorneys representing one

18   of the defendants, Taishan Gypsum, in this litigation.

19   I'm going to be asking you some questions here today

20   related to your claims in this lawsuit.

21       A.   Okay.

22       Q.   Have you ever been deposed before?

23       A.   What do you mean, "deposed"?  I don't know

24   what's "deposed."
```

Case 2:09-md-02047-EEF-MBN  Document 22363-20  Filed 11/10/19  Page 1246 of 3246
Case 1:15-cv-12548-NGG  Document 1289-11  Entered on FLSD Docket 05/08/2019  Page 1246 of
134

Confidential - Subject to Further Confidentiality Review

```
1      Q.   I'll rephrase it.  Have you ever had to -- have

2   you ever been asked questions by an attorney in an

3   official setting like this for a lawsuit?

4      A.   No.

5      Q.   I'm going to go ahead and explain some rules

6   for the deposition to go ahead and try to make it go

7   smoothly today.

8           As you know, you have just been sworn under

9   oath.  That's just as if, you know, a judge is sitting

10  in this room.  So do you understand that you must tell

11  the truth as if testifying in court?

12     A.   Okay.

13     Q.   We have a court reporter, who's taking down

14  everything that you're going to be testifying about

15  today, so if you could please speak slowly so that she

16  is able to take down all of your information.

17     A.   Okay.

18     Q.   Please also make sure that you answer all of

19  the questions asked of you today with a verbal response,

20  because the court reporter needs to write everything

21  down, so no head shakes or nods or anything like that.

22     A.   Okay.

23     Q.   Also, if you don't understand any of my

24  questions, please ask me.  Otherwise, I will assume, if
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1247 of 3246
Case 1:1-cv-22408-MGC Document Entered on FLSD Docket 05/19/2011 Page 40 of 134
Confidential - Subject to further confidentiality Review

1    you start answering, that you understand the question

2    being asked.

3            We'll try and take a break every hour or so,

4    but if at any point you need to take a break, just let

5    me know.  I only ask that if I have a question pending

6    that you go ahead and finish the response to the

7    question before we take a break.

8        A.    Okay.

9        Q.    Are you taking any medications today that may

10   impair your ability to understand my questions and

11   respond truthfully?

12       A.    No, I'm not.

13       Q.    Did you meet with your attorney to prepare for

14   this deposition?

15       A.    Only by phone.

16       Q.    How many times did you talk via phone?

17       A.    Just the times I had to give her information

18   about -- that she was asking for.

19       Q.    You don't need to tell me the content of it.  I

20   just sort of want to know generally how many times you

21   spoke with her.

22       A.    Like, two times.

23       Q.    And approximately for how long?

24       A.    I don't recall.  I don't recall exactly how

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1248 of 3246
Case 1:09-cv-07299-LAK Document 159 Filed 05/08/19 Page 41 of 134
Confidential - Subject to further confidentiality review

1    long.

2        Q.   Other than your attorney, was anyone else

3    present on the phone?

4        A.   My husband.

5        Q.   Did you speak with anyone other than your

6    attorney and your husband to prepare for this

7    deposition?

8        A.   No.

9        Q.   Did you review any documents to prepare for

10   this deposition?

11       A.   No.

12       Q.   Did you bring any documents with us -- with you

13   today for this deposition?

14       A.   No.

15       Q.   And did you do anything else to prepare for

16   this deposition?

17       A.   No.

18       Q.   Mrs. Hernandez -- is that -- is that how to

19   pronounce your last name?

20       A.   Yes.

21       Q.   What is your educational background?

22       A.   Just high school in Mexico.  I'm from Mexico.

23       Q.   And are you currently employed?

24       A.   Yeah.  I'm self-employed.

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 1249 of 3246
Case 1:09-md-02047-EEF-MBN Document [illegible] Filed [illegible] Page [illegible]

Confidential – Subject to Further Confidentiality Review
134

1    Q.    And where are you employed?

2    A.    We have a business, dry cleaners business.

3    Q.    And what's the name of the business?

4    A.    River Heights Cleaners.

5    Q.    And is the business still operating today?

6    A.    Yes.

7    Q.    And how long have you worked at River Heights

8    Cleaners?

9    A.    25 years.

10   Q.    And what is your job title?

11   A.    I'm a co-owner and I administrate the books.

12   Q.    So can you describe a little bit of your duties

13   working in River Heights Cleaners?

14   A.    Well, I take care of all the administration of

15   the payments and the money so we able to pay all our

16   bills and control the money.

17   Q.    And what is your work schedule?

18   A.    Worst?

19   Q.    Work schedule.  Do you work Monday through

20   Friday?

21   A.    No, I don't have a -- I don't have a special

22   schedule.  I just -- whatever I can go, I go, and

23   whatever -- I work from my house also.

24   Q.    Okay.  Are you currently -- what is your

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1250 of 3246
Case 1:09-cv-07628-RGA Document 1 Exhibit 1 Sub-Docket 05/08/2019 Page 48 of 134
Confidential – Subject to further confidentiality review

```
 1   current marital status?

 2       A.   I'm married.

 3       Q.   How long have you been married?

 4       A.   30 years.

 5       Q.   And to whom are you married?

 6       A.   To John Hernandez.

 7       Q.   Do you have any children?

 8       A.   Not of my own.

 9       Q.   Do you have any -- have any children ever lived

10   with you at any point?

11       A.   My husband's children.

12       Q.   How many children?

13       A.   He got four.

14       Q.   Do you know their names and ages?

15       A.   Yes.

16       Q.   Can you please tell me the names and ages of

17   the children for the record?

18       A.   Okay.  The first one is Jennifer.  Have to say

19   the last name?

20       Q.   Sure.

21       A.   Jennifer Love.  She's 51.  Then it's John

22   Hernandez Jr.  He's 49.  Then it's Benson Hernandez.

23   He's going to be 48 this year, in December.  And it's

24   Jason Hernandez.  He's 38.
```

```
 1       Q.   Have you ever been involved in a lawsuit other

 2   than this one we're here currently today?

 3       A.   No.

 4       Q.   I'm now going to switch topics and ask you some

 5   questions related to the property that's at issue in

 6   this lawsuit.  What is the address of the property that

 7   you allege has been damaged by Chinese drywall?

 8       A.   3516 North Perry Avenue, Tampa, Florida 33603.

 9       Q.   Do you currently own this property?

10       A.   Yes.

11       Q.   When did you buy this property?

12       A.   Original?  The property?

13       Q.   Yes.

14       A.   Well, we bought the property in 1995, and then

15   later on we decided to upgrade the house, and we did it

16   in 2007, approximately.

17       Q.   So you bought the land for the property in

18   1995?

19       A.   No, we bought -- it was a house in there.

20       Q.   And then when did you decide to do construction

21   on that house?

22       A.   Well, we decided in 2005, and then we started

23   construction in 2006.

24       Q.   Did you use a builder, or did you do the
```

Case 2:09-md-02047-EEF-MBN  Document 22363-39  Filed 11/19/19  Page 1252 of 3246
Case 1:09-cv-07299-MGC  Document 1  Chapman  Filed 01/05/2012  Page 45 of 134
Confidential - Subject to Further Confidentiality Review

 1    construction yourself?

 2         A.   No, we used a builder.

 3              (Hernandez Exhibit No. 1 was marked for

 4    identification.)

 5    BY MS. HAQUE:

 6         Q.   I am going to show you what has been premarked

 7    Exhibit 1.  If you could take a moment to review that

 8    document.

 9         A.   Uh-huh.

10         Q.   Do you recognize that document?

11         A.   Yes.

12         Q.   Have you seen this document before?

13         A.   Yes.

14         Q.   Is your name on this document?

15         A.   No.  No, it's not.

16         Q.   If you look maybe --

17         A.   Oh, yes, yes.

18         Q.   -- an inch down.

19         A.   Yes, I see it.  Okay.  Sorry.

20         Q.   Is that your name?

21         A.   That used to be my name before, because I

22    changed my name when I became American citizen.

23         Q.   From -- and you changed your name from

24    Bertha --

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1253 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 46 of 134
Confidential – Subject to Further Confidentiality Review

```
1      A.    To Betty L. Hernandez.

2      Q.    What is this document?

3      A.    I think this is the document that we got when

4   we bought the house for the first time in 1995.  1995,

5   yeah.

6      Q.    So this is the deed for the land that you

7   bought?

8      A.    Yes, uh-huh.

9      Q.    Do you recall how much you paid to buy this

10  land?

11     A.    Exactly, no.  I think it was 120.  100 and

12  something.  I don't recall exactly.

13     Q.    If you turn to the second page, and it's

14  actually this page right here, yes, if you look at the

15  bottom, there's sales information?

16     A.    Yes.

17     Q.    Under 1996, it says a price, 125,000?

18     A.    Uh-huh.

19     Q.    Would that be the price that you paid for this

20  land?

21     A.    It looks like.

22     Q.    Approximately?

23     A.    Approximately, yeah.

24     Q.    I also want to let you know, whenever I ask
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1254 of 3246
Case 1:09-cv-12240-MGM Document 226-1 Entered on FLSD Docket 05/18/2012 Page 47 of
134

Confidential - Subject to Further Confidentiality Review

```
 1    questions throughout this deposition, if there's

 2    something that you think your husband is better suited

 3    or you don't know, just let me know so then I can ask

 4    your husband instead.

 5         A.    Okay.

 6         Q.    You can go ahead and set that document aside.

 7               (Hernandez Exhibit No. 2 was marked for

 8    identification.)

 9    BY MS. HAQUE:

10         Q.    I'm going to show you what has been marked as

11    Exhibit No. 2.  Do you recognize this document?

12         A.    Yes.

13         Q.    Have you seen this document before?

14         A.    Yes.

15         Q.    And does your name appear on this document?

16         A.    Yes.

17         Q.    Can you describe what this document is?

18         A.    This is the settlement about the new loan that

19    we have because we have the house, so, yeah.

20         Q.    And this document is dated April 1, 2008;

21    correct?

22         A.    Correct.

23         Q.    So was this around the time that you made

24    improvements to the existing property that you
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1255 of 3246
Case 1:17-cv-21394-MGC Document 28-11 Entered on FLSD Docket 05/16/2017 Page 48 of 134
Confidential - Subject to Further Confidentiality Review

```
 1    originally bought in 1996?

 2        A.   Well, we don't make improvements.  We

 3    demolished the old house and we made a new house.  We

 4    made a new house as a new house.

 5        Q.   Got it.  Okay.  And approximately how much did

 6    you pay to build the new house?

 7        A.   I don't recall exactly the amount, but it was

 8    in the 800s.  800 something.

 9        Q.   Okay.  If you look under Item 104 --

10        A.   104, okay.

11        Q.   -- is this the mortgage that you entered into

12    with a lender for the building of this property?

13        A.   Yes.

14        Q.   And approximately how much was this mortgage

15    for?

16        A.   I think that's the amount.

17        Q.   This is the amount for the mortgage, $575,265?

18        A.   Yes.

19        Q.   Okay.

20        A.   This is the amount that we paid, the bank lend

21    us for the construction loan, but we put some personal

22    money to finish the construction.

23        Q.   Approximately how much of personal money did

24    you put down in order to finance the construction?
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1256 of 3246
Case 1:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1256 of 3246
Confidential - Subject to Further Confidentiality Review
134

```
 1      A.   I don't recall exactly, but it was something in

 2   there like 400 or something like that.  A little less.

 3   I don't recall exactly the amount.

 4           (Hernandez Exhibit No. 3 was marked for

 5   identification.)

 6   BY MS. HAQUE:

 7      Q.   Okay.  I'm going to show you now what has been

 8   premarked Exhibit 3.

 9      A.   Okay.

10      Q.   What is this packet of documents?

11      A.   The bank usually sends you every year the --

12   how much money you're going to need to have in escrow so

13   you will be able to pay the property taxes and the

14   insurance, the homeowners insurance and the flood

15   insurance.

16      Q.   And these are the payments that you all had to

17   pay for the house on 3516 North Perry?

18      A.   This is the escrow money that we had to pay for

19   the taxes, the property taxes, and the insurance, and

20   the flood insurance, but this is not the -- this in here

21   does not include, I think, the principal.

22           Oh, it is?  I'm not sure.  No, I don't see it

23   is the principal and the interest.

24      Q.   Do you recall, starting in 2008, approximately
```

Case 2:09-md-02047-EEF-MBN  Document 22363-39  Filed 11/19/19  Page 1257 of 3246
Case 1:09-md-02047-EEF-MBN  Document 23362-39  Filed 11/19/19  Page 1257 of 3246
Confidential – Subject to Further Confidentiality Review
134

1   how much more in monthly mortgage payments you had to

2   pay for this property?

3       A.   In 2008?

4       Q.   Starting in 2008.

5       A.   No, I don't know exactly.

6       Q.   If you look on this first page -- go ahead.

7       A.   These are -- okay.  Where do you want me to

8   look?

9       Q.   If you look on the first page, there is a

10  paragraph that starts:  "Your current monthly mortgage

11  payment is $3,293.67, of which $2,759.03 will be for

12  principal and interest" --

13      A.   Okay.

14      Q.   -- "and $534.64 will go into your escrow

15  account."

16      A.   Okay.

17      Q.   Is that the average monthly payment and escrow

18  amount that you paid for this property at 3516 North

19  Perry Avenue?

20      A.   Well, at that time, yes, but now it's more than

21  that.

22      Q.   And it looks like on every -- on every sheet

23  there's a different amount.

24      A.   Uh-huh.

```
 1      Q.   So I believe that was the amount for 2014.  And

 2   then for 2013, if you'd flip to the second page, at the

 3   bottom --

 4      A.   Yeah, okay.

 5      Q.   -- it says -- go ahead --

 6      A.   Yeah, I remember here, I made a note in here.

 7   That was the amount that we were paying at that time.

 8      Q.   Are all of these handwritten notes from you?

 9      A.   Yes.

10      Q.   Is this your handwriting?

11      A.   Yes.

12      Q.   Okay.  So it looks like the monthly mortgage

13   payment from 2010 to 2014 averaged between $2,400 per

14   month to $2,759, between those years.  Does that sound

15   accurate?

16      A.   Yeah.  Yeah, what I wrote in here is the

17   correct amount.

18      Q.   Do you still have a mortgage on this property?

19      A.   Yes.

20      Q.   Do you know the approximate amount remaining in

21   payments on this property?

22      A.   The approximate amount is 587,000.

23      Q.   587,000.  Okay.  Does anyone else have a lien

24   on the property, a tax lien or anything?
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1259 of 3246
Case 1:09-cv-0200-McGill Document Confidential Subject to Docket 05/19/2017 Page 42 of
134
Confidential – Subject to Further Confidentiality Review

```
1        A.   No.

2        Q.   Do you own any other properties or homes?

3        A.   No.

4        Q.   Do you own the property where your business is

5   located?

6        A.   Yes.

7        Q.   And when did you purchase that property?

8        A.   Well, one of them we purchased in 2003.  2002.

9   I don't remember exactly the days.  2003 is when we

10  built.  Sorry, I don't recall that.  And the other one

11  was in 2010.  We got two properties for the business.

12       Q.   And do you recall how much you paid for each

13  property back when you first purchased them?

14       A.   I think we paid for the land and one of the

15  buildings 75,000, and the other one 175.  We paid for

16  the land 75,000, and then we asked to the bank for a

17  loan for construction.

18       Q.   And so these were not preexisting businesses

19  that you bought?  You actually built your own business?

20       A.   Yes.

21       Q.   Okay.  And the other one, you said,

22  approximately 175,000?

23       A.   (Nodding head.)

24       Q.   Okay.  And do you have both of these businesses
```

Confidential - Subject to Further Confidentiality Review

1    in operation today?

2        A.   Yes.

3        Q.   Do you know the addresses of each?

4        A.   Yeah.  Okay.  One is on 38 -- 3918 North

5    Boulevard, and the other one is on 5405 North Florida

6    Avenue.

7        Q.   And these are both in the Tampa area?

8        A.   Yes.

9             (Hernandez Exhibit No. 4 was marked for

10   identification.)

11   BY MS. HAQUE:

12       Q.   Okay.  I want to show you what's been premarked

13   Exhibit 4.  Do you recognize this document?

14       A.   Yes, I do.

15       Q.   And is that your signature on this document?

16       A.   Yes.

17       Q.   Can you describe what this document is?

18       A.   Okay.

19            MS. WERKEMA:  I'm going to object to the form.

20       It's a legal document.  Ms. Hernandez is not a

21       lawyer.

22   BY MS. HAQUE:

23       Q.   This is a document that you signed; correct?

24       A.   Yes.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1261 of 3246
Case 2:09-cv-02047-MCA-LDW Document 13363-39 Filed 05/18/2019 Page 1 of
134

Confidential - Subject to Further Confidentiality Review

```
1      Q.   And what is this document for?

2      A.   I don't remember if this is -- I think we sold

3   a lot that we have, a very small lot that we have.

4      Q.   Was this lot part of your original parcel at

5   3516 North Perry Avenue?

6      A.   No.

7      Q.   This was just a separate piece of property that

8   you owned?

9      A.   Yeah.

10     Q.   Do you have any other lots of land other than

11  the three you just described, one for your home and then

12  two for your businesses?

13     A.   Yeah, we have another one, but it's a

14  commercial, commercial property.

15     Q.   What is the address for that property?

16     A.   It's on 3618 East Hillsborough.

17     Q.   And is there an existing business on that

18  property?

19     A.   Yes.

20     Q.   And what business is that?

21     A.   That's another cleaners that we have there.

22     Q.   So you have two cleaning businesses?

23     A.   We have two corporations, and the first

24  buildings that I gave you is one corporation and the
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1262 of 3246
Case 1:09-cv-08034-MGC Document 6 Confidential Supplement 09/11/17 Page 45 of
134

Confidential - Subject to Further Confidentiality Review

```
1    other one is another corporation.

2         Q.   And what's the name of the second corporation?

3         A.   BJ Cleaners.

4         Q.   BJ Cleaners.  Okay.  And is there only one

5    location for BJ Cleaners?

6         A.   Well, there's another one, but we rent that

7    one.

8         Q.   And what's the address of that?

9         A.   Of the other one?

10        Q.   Yes.

11        A.   I think it's 306 West Fletcher Avenue.

12        Q.   Do you recall how much in monthly payments you

13   pay to lease that property?

14        A.   2,500, more or less.

15        Q.   Do you have any other businesses?

16        A.   No.

17        Q.   Do you have any other properties that we

18   haven't discussed here today?

19        A.   No.

20        Q.   And the BJ Cleaners, the first business -- or

21   the second business, I'm sorry -- how much did you pay

22   for that piece of land, do you recall?

23        A.   Which one?

24        Q.   The BJ -- the first BJ Cleaners location.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1263 of 3246
Case 1:1-cv-22408-MGC Document 102-7 Entered on FLSD Docket 05/19/2013 Page 46 of
134

Confidential – Subject to Further Confidentiality Review

```
 1        A.   I don't recall the exact amount, but it was in

 2    the 240,000.

 3        Q.   Okay.  And approximately when did you open that

 4    business?

 5        A.   When we opened it, I think it was in 2008.

 6        Q.   Okay.  I'm going to now go back to asking you

 7    some questions related to the 3516 North Perry property.

 8             Have you always lived at that property since

 9    you purchased it in 1996?

10        A.   Yes.

11        Q.   Do you live at that property today?

12        A.   Yes.  Well, I just want to make clear that when

13    we went to the remediation we had to go away from the

14    property and rent a house.

15        Q.   I understand.  We'll -- and I'll ask you some

16    questions related to that a little later today.

17        A.   Okay.

18        Q.   How many people have resided in the house while

19    you have lived there?

20        A.   My husband and I, and my mother-in-law was

21    living with us.

22        Q.   And what is the name of your mother-in-law?

23        A.   Flora LaBarbera.  She's resting in peace now.

24        Q.   Sorry to hear that.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1264 of 3246
Case 1:17-cv-02340-GAL Document 23011 Entered on FLSD Docket 05/19/2017 Page 47 of 134
Confidential - Subject to Further Confidentiality Review

```
 1              Did any of your husband's children ever live in

 2    the property at any point?

 3        A.    No.

 4        Q.    Have you ever charged rent for anyone to live

 5    at the property on 3516 North Perry?

 6        A.    No.

 7        Q.    Other than the -- let me ask it this way:  Have

 8    you renovated or made any improvements on the property

 9    since you have owned it?

10        A.    Before we build the new house, well, yeah, we

11    have a -- we constructed a pool area.

12        Q.    Do you recall when that was built?

13        A.    It was in 2001.

14        Q.    Were there any other improvements made on the

15    property before you knocked it down and rebuilt it?

16        A.    Well, we also had to build my husband's -- John

17    Hernandez Jr., he's paralyzed and he has to come and

18    live with us, so we build in the back of the house, at

19    the beginning, a little cottage for him with all the

20    necessities for his incapacitation, and that's what we

21    did for him.

22        Q.    Is the cottage still there today?

23        A.    No.  We demolished everything.

24        Q.    And where does Mr. Hernandez Jr. live today?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1265 of 3246
Case 1:11-cv-03290-MGC Document 23363-39 Filed 11/19/19 Page 4265 of 3246
Confidential - Subject to further confidentiality review
134

```
 1      A.    Right now he lives in his own house.

 2      Q.    And starting in, I guess, 1996, when did he

 3   first move in with you all?

 4      A.    Well, he used to live with us in another house

 5   that we have before we bought this one, and then when

 6   the accident happened he decided to come and live with

 7   us.  He started living with us in that little house.

 8      Q.    Do you recall what year that was?

 9      A.    The accident was in 1995, and after

10   rehabilitation and everything, he came and lived with us

11   in 1996.

12      Q.    And how long did he stay with you guys before

13   he moved to his own house?

14      A.    Until 2004.

15      Q.    2004.  Okay.  And when did you build the extra

16   cottage for him?

17      A.    In nineteen ninety -- by 1996.  We started in

18   1996.

19      Q.    Okay.  So then in 2007/2008 -- 2008, I'm

20   sorry -- you demolished the existing home and cottage

21   and built a new one?

22      A.    No.  We started thinking about it.  When he

23   moved away, we started thinking about it, to make a

24   bigger house, and then we -- in 2006 is when we started
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1266 of 3246
Case 1:09-cv-02042 McCall Document Exhibit 30 Confidentiality Packet 05/19/2019 Page 49 of 134
Confidential – Subject to Further Confidentiality Review

1    the project.

2        Q.    How long did the total project take?

3        A.    Almost two years.

4        Q.    And do you recall the name of the builder that

5    you used for that project?

6        A.    Mr. Stewart Bridges.  Bridges Company.

7        Q.    Okay.  And so you moved into the home.  Do you

8    recall the date when you moved into the completed home?

9        A.    Well, we moved into the house at the beginning

10   of January 2008.

11       Q.    Okay.  Since January 2008, have you made any

12   further improvements or renovations to the property?

13       A.    No.

14       Q.    Do you recall the approximate cost of the pool

15   and the cottage?

16       A.    Not really, I don't recall.  It's so long ago.

17       Q.    Do you remember if you paid for those

18   out-of-pocket, or did you get financing?

19       A.    I think for the pool we gave money from our

20   savings, and then from John Jr.'s cottage too, and then

21   we get a little loan to finish the pool.

22       Q.    And did you pay off that loan, or is there some

23   amount still remaining?

24       A.    No, we paid everything.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1267 of 3246
Case 1:09-cv-12948-MGC Document 12 Entered on FLSD Docket 05/06/2011 Page 30 of
134
Confidential - Subject to Further Confidentiality Review

```
 1       Q.    And then you stated the -- for the new house

 2   rebuilt, completed in 2008, you said approximately

 3   900,000?

 4       A.    Approximately.  Between 800, something like

 5   that.

 6       Q.    And you did -- we just looked at your mortgage

 7   for that; correct?

 8       A.    Uh-huh.

 9       Q.    Do you know the approximate -- or the actual

10   square footage of your home at 3516 North Perry Avenue?

11       A.    The square footage?  The total square footage?

12       Q.    Yes.  What do you believe the square footage of

13   your home to be?

14       A.    It's a little bit more than 5,000.  I don't

15   know exactly the amount.

16       Q.    Okay.  And how do you know that?

17       A.    Because in the plans of the house, it's cited

18   in there, if I recall.

19       Q.    Okay.  Have you ever measured with a tape

20   measure yourself the square footage of the home?

21       A.    No.

22       Q.    Have you ever asked someone to measure the

23   square footage of the home for you?

24       A.    No.
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1268 of 3246
Case 1:09-cv-07687-MGC Document 59-31 Filed 05/18/2012 Page 61 of
134
Confidential - Subject to Further Confidentiality Review

 1          (Hernandez Exhibit No. 5 was marked for

 2    identification.)

 3    BY MS. HAQUE:

 4        Q.    I'm going to show you what has been marked

 5    Exhibit 5.  Is this the property appraiser for your

 6    home?

 7        A.    Well, I guess it's a document that says

 8    something like that.  It's for the home or for the land.

 9    What year is that?

10        Q.    It looks -- well, if you want to take a moment

11    and just review all the pages.

12        A.    I can see here.  Well, I think this is the

13    appraiser for the land only.

14        Q.    If you flip to the first page, this is your

15    current address, correct, 3516 North Perry Avenue?

16        A.    Yes.

17        Q.    And that's your former name, correct, right

18    above it?

19        A.    Yes.

20        Q.    If you look on the second page, it's actually

21    the back of this, they have a square footage at the

22    bottom.  Sort of the middle of the page right here.

23        A.    At the bottom.  Okay.

24        Q.    It says the gross area 5,846?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1269 of 3246
Case 1:09-cv-07687-GAE Document 22363-39 Confidential Subject to Further Confidentiality Review

Confidential - Subject to further confidentiality Review
134

1    A.    Yeah.

2    Q.    And the heated area 3,613 square feet?

3    A.    Okay.

4    Q.    Is that your recollection of what the square

5    footage of your home is?

6    A.    More or less, yeah, something like that.

7          (Hernandez Exhibit No. 6 was marked for

8    identification.)

9    BY MS. HAQUE:

10   Q.    You can go ahead and set that aside.

11         Now I'm going to show you what has been

12   premarked Exhibit 6.  Do you recognize this document?

13   A.    Yes.

14   Q.    I tried to find a square footage, but the print

15   is very small.

16   A.    Yeah, it is.  Yeah, I can't see either.

17   Q.    Is this the floor plan for your home?

18   A.    The floor plan.  They say the upper level.

19   Upper level, yeah.

20   Q.    And then if you flip the document, on the back,

21   is that the first level?

22   A.    Yeah, lower level, uh-huh.

23   Q.    And is this the existing floor plan, or did you

24   make any changes to this floor plan?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1270 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1270 of 3246
Confidential - Subject to Further Confidentiality Review
134

```
1       A.    No, it's the same.

2       Q.    How many bedrooms are in the home?

3       A.    How many bedrooms, okay.  One, two, three --

4    four bedrooms.

5       Q.    And how many bathrooms are in the home?

6       A.    Counting the -- we got a bathroom in the pool

7    area, so one, two, three -- three and a half.  One,

8    two -- three and a half.  Maybe the information --

9    because I remember somebody say that we have four

10   bathrooms, but, no, it's three bathrooms and a half.

11      Q.    Okay.  Have there been any changes to the

12   square footage of the house since it was built in 2008?

13      A.    No.

14      Q.    So the under air square footage is 3,613 square

15   foot, approximately?

16      A.    Approximately.

17      Q.    Okay.  You can go ahead and set that document

18   down.

19            Mrs. Hernandez, when do you believe that

20   Chinese drywall was installed in your house?

21      A.    When we think it was installed, approximately

22   when they were doing the construction.  It was maybe

23   March 2007.

24      Q.    How did the drywall get installed in the house?
```

Confidential - Subject to Further Confidentiality Review

```
1    A.   How?  With the builder.  By the builder.

2    Q.   Did you -- and the name of the builder?

3    A.   Stewart Bridges.

4    Q.   Did you ever witness them or see them install

5    the drywall yourself?

6    A.   No.

7    Q.   Did you ever see the drywall in pallets or

8    before it was installed in the home?

9    A.   No, I don't remember.

10   Q.   Did you ever see any markings on drywall prior

11   to an inspection?

12   A.   No.

13   Q.   Did you know that the drywall -- where the

14   drywall in your house came from when it was being

15   installed?

16   A.   No, I don't know.

17   Q.   Do you know today who manufactured the drywall

18   that went into your house at 3516 North Perry?

19   A.   Well, it say -- Taihe?  I don't know the name.

20   Taihe -- Taihe Chinese drywall or something.

21   Q.   Do you know what country the drywall in your

22   home came from?

23   A.   I'm not sure.

24   Q.   And you believe the -- what do you think the
```

Case 2:09-md-02047-EEF-MBN Document 23263-39 Filed 11/19/19 Page 1272 of 3246
Case 2:09-md-02047-EEF-MBN Document 21861-3 Filed 08/03/18 Page 45 of 134
Confidential - Subject to Further Confidentiality Review

1    name of the company that manufactured the drywall in

2    your home was called?

3        A.    The name of the company?

4        Q.    Yes.

5        A.    I don't know the name of the company.  I just

6    know that we had that kind of Taihe Chinese drywall.

7        Q.    Do you know if there's any domestic drywall

8    used to build the house back in 2007/2008?

9        A.    Domestic?

10       Q.    US-made drywall.

11       A.    No, I don't know.

12       Q.    Do you know who installed the drywall?

13       A.    No, I don't.

14       Q.    Do you know the name of the supplier who

15   supplied to the builder for the drywall?

16       A.    No.

17       Q.    Did anyone ever tell you or your husband that

18   they were installing drywall made in China before

19   they --

20       A.    No.

21       Q.    Did anyone ever make any guarantees to you

22   about the source of the products in your home?

23       A.    No.

24       Q.    Where do you believe the Chinese drywall was

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1273 of 3246
Case 2:09-cv-02047-EEF-MBN Document 2962-39 Filed 05/19/11 Page 36 of
134

Confidential - Subject to further confidentiality Review

1    installed in your home?

2        A.    Where do I believe?

3        Q.    Yeah.  What rooms?

4        A.    Well, they say that we got it in everywhere of

5    the house.  Exactly, I don't know all the places.

6        Q.    And you were not living in the home, right,

7    when the drywall was being installed?

8        A.    No.

9        Q.    Do you recall the total cost of the drywall

10    installation?

11        A.    No.

12        Q.    Do you know if any other work was being done at

13    the same time as the drywall?  For example, were there

14    appliances being installed, the air conditioning unit?

15        A.    Can you repeat the question?

16        Q.    Sure.  Do you know if there was any other work

17    being done in the home at the same time the drywall was

18    being installed, for example, other appliances?

19        A.    At the same time?

20        Q.    Yes.

21        A.    At the same time, no, I don't know, because we

22    were not in the construction when they were doing it.

23        Q.    Okay.  When did you first suspect that there

24    was Chinese drywall in your home?

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/10 Page 1274 of 3246
Case 1:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/10 Page 1274 of 3246

Confidential - Subject to further confidentiality review
134

```
1      A.    You want to know the day, more or less?

2      Q.    Yeah, why don't you tell the full story.

3      A.    Okay.  Well, the story that I have that I know

4   and we went through is we started having problems with

5   the air conditioner, and we thought at the beginning it

6   was, like, some kind of defect of the air conditioner,

7   and we called different times to the air conditioner

8   person to come and check, the person that installed the

9   air conditioner at the beginning, and they were thinking

10  the same.

11        So they went and applied for a new -- because

12  they say that the coils were bad and the coils -- is

13  impossible the coils go so quick that way, and then they

14  went and get a new coil system, because it was under

15  guarantee, so they went and grabbed it and put it on.

16        And then later on, I don't remember exactly how

17  many months later, we started having the same problem

18  again, and my husband and I decided we had to get

19  another opinion, because it's too much.  And then we

20  decided to go with this other person, and he came by,

21  and more knowledge.  He said, "Oh, my God, maybe" -- he

22  said, "You know, I think that you got this problem,

23  Chinese drywall."

24        So at that time we didn't know whether it was
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1275 of 3246
Case 1:09-md-02047-EEF-MBN Document Confidential Subject to further confidentiality Review Page 38 of
134
Confidential – Subject to further confidentiality Review

1    Chinese drywall and we had to ask him.  He said, "This

2    is what's going on in Florida."  He give us a little

3    explanation, and he say, "I recommend you that you go

4    with this builder, that they know a lot about it, and

5    ask questions, and they can come and check, inspect your

6    house," and that's what we did.

7         Q.   Let me ask you some follow-up questions about

8    that.

9         A.   Okay.

10        Q.   What was the date when you first contacted --

11   when you contacted the first air conditioning

12   maintenance?

13        A.   The first air conditioner?

14        Q.   Yes.

15        A.   Not the person that let us know when it was --

16   there was maybe Chinese drywall in our house?

17        Q.   Let me ask it a different way.  When did you

18   first start experiencing problems with the air

19   conditioning unit?

20        A.   Like, not even a year later.  I think it was in

21   maybe 2009.

22        Q.   Did you ever have any problems with the air

23   conditioning unit before the construction, for example,

24   in the old house starting in 1996?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1276 of 3246
Case 1:12-cv-22408-MGC Document Entered on FLSD Docket 05/19/2016 Page 45 of
134
Confidential - Subject to further confidentiality Review

```
 1       A.   No.

 2       Q.   So you first started experiencing problems with

 3   the air conditioning approximately 2009?

 4       A.   Approximately.

 5       Q.   And how many instances of problems with the AC

 6   unit did you have?

 7       A.   I can't tell you exactly how many, but there

 8   were some, like, I don't know, maybe four or five times

 9   that we called so they can help us with the air

10   conditioner.

11       Q.   And when did you contact the second air

12   conditioning person that said, "Oh, there might be

13   Chinese drywall here"?

14       A.   Well, we asked to get another opinion, it was

15   in January 2010, and from there we started with the

16   process about getting screening for the Chinese drywall.

17       Q.   Between 2009 to January of 2010, how many times

18   did you have problems with the air conditioning?

19       A.   A lot of times.  I cannot tell you specifically

20   how many times, but it was a lot of times.

21       Q.   Was it more than five?

22       A.   I think so.

23       Q.   More than 10?

24       A.   No.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1277 of 3246
Case 1:09-md-02047-EEF-MBN Document 22353-39 Filed 11/19/19 Page 40 of
134
Confidential – Subject to further confidentiality review

1      Q.   So between five and 10?

2      A.   Yes.

3      Q.   Okay.  Did you see any -- did you have any

4  other problems with appliances after you moved into the

5  new house in 2008?

6      A.   Yeah, at the beginning, but we didn't know.  At

7  the beginning we had problems with the refrigerator, and

8  we thought it was something like a defect from the

9  factory, something, that first time we called somebody

10  to come and check the refrigerator, and they came and

11  fixed it.

12      Q.   And when was this?

13      A.   Well, like, six months later that we moved in.

14      Q.   So maybe end of 2008, beginning of 2009?

15      A.   Uh-huh.

16      Q.   And then what happened with the refrigerator?

17      A.   They fixed it and it was okay.

18      Q.   Any other issues with appliances?

19      A.   With the oven also.  Our oven, it was not

20  working properly, but we didn't know.

21      Q.   And what happened with the oven?

22      A.   Well, they came and fixed it, but I never use

23  the oven.  I always use the microwave.

24      Q.   And when did you first experience problems with

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1278 of 3246
Case 1:09-cv-02047-GAL Document 23363-39 Confidential Subject to Further Confidentiality Review
Confidential – Subject to further confidentiality review
134

 1    the oven?

 2        A.   I just used it one time and it was not working.

 3    It was something similar like the refrigerator.  So we

 4    called and said maybe it's another problem, a defect or

 5    something from the factory.

 6        Q.   And this was 2008, you think?

 7        A.   Yeah, like, between -- by the end -- I don't

 8    remember exactly.

 9        Q.   Did you ever complain to the builder?

10        A.   No.

11        Q.   Did you ever see any blackened electrical

12    wiring in the home?

13        A.   No.

14        Q.   When you said earlier that there was -- you

15    think there's Chinese drywall everywhere in the house,

16    who told you that?

17        A.   I think the screening person that came said

18    that, "Probably you're going to have in most of the

19    house."

20        Q.   That was the inspection?

21        A.   Yeah.

22        Q.   And do you recall the name of the company that

23    did the inspection?

24        A.   No, I don't remember the name.  Screening.  I

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1279 of 3246
Case 2:09-cv-02047-MCA Document 2005-1 Exhibit 20152419 Page 42 of
134
Confidential - Subject to Further Confidentiality Review

1    don't remember the name.  It has to be somewhere.

2    Q.   Yeah, we'll look at some documents later on,

3    but I just want to ask you a couple more questions about

4    the time you first suspected there was Chinese drywall.

5         Was there ever an odor in your house?

6    A.   At the beginning when we moved in, I noticed it

7    was an odor, but -- and I asked the builder, and he

8    said, "Maybe it's the wiring of the closets.  In some

9    closets when they put the wiring, they say it smells,

10   but it's going to go away."  And I guess you get used to

11   it and we didn't smell no more.

12   Q.   Can you describe what the smell -- like, what

13   it smelled like?

14   A.   For me, the smell was like something was

15   burning.

16   Q.   Burning?

17   A.   Burning, yeah.

18   Q.   Did you smell it more in certain parts of the

19   home other than -- than others?

20   A.   Yeah.

21   Q.   What parts?

22   A.   Upstairs and some areas in our master bedroom.

23   Q.   Is the master bedroom upstairs?

24   A.   No, downstairs.  And by the closet area.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1280 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 4B of
134
Confidential – Subject to Further Confidentiality Review

1    Q.   Okay.  And when did you first notice it?  As

2    soon as you moved in, you said?

3    A.   Yeah, when we moved in, yeah.

4    Q.   Was the smell stronger at certain times of the

5    day versus the nighttime?

6    A.   Not really.

7    Q.   And was the -- did the smell change over the

8    year?  Was it better during some months, worse during

9    some months?

10    A.   Well, to be honest, I think you get used to,

11    when you live in the house, to the smells, and for me it

12    was like a normal waiting for the time comes that when

13    the builder said, "You're going to settle, you're not

14    going to be able to smell it."  So that's not too much

15    time.

16         (Hernandez Exhibit No. 7 was marked for

17    identification.)

18    BY MS. HAQUE:

19    Q.   I'm going to show you what's been marked

20    Exhibit 7.  Do you recognize this document?

21    A.   Yes.

22    Q.   Do you need to take a moment to review the

23    document?

24    A.   Yeah, I remember this.  Okay.  So you want me

Confidential - Subject to Further Confidentiality Review

```
 1    to go through all this?

 2         Q.   No, no.  Do you feel -- do you recognize and

 3    remember that document?

 4         A.   Yes.

 5         Q.   If you look on the first page, the cover, is

 6    that your address, 3516 Perry Avenue?

 7         A.   Yes.

 8         Q.   It's North Perry Avenue; right?

 9         A.   (Nodding head.)

10         Q.   And then the inspection date is January 2010?

11         A.   Uh-huh.

12         Q.   Do you remember an inspection being done around

13    that time?

14         A.   Yes.

15         Q.   Property owner says John Hernandez?

16         A.   Yes.

17         Q.   Is that your husband?

18         A.   Uh-huh.  Yes.

19         Q.   Were you present when this inspection took

20    place?

21         A.   Yes, we were in the house.

22         Q.   So you remember the inspection?

23         A.   Uh-huh.

24         Q.   Who paid for the inspection?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1282 of 3246
Case 1:09-cv-02047-MCA Document 1 Entered on FLSD Docket 05/19/2012 Page 45 of
134
Confidential - Subject to further confidentiality Review

```
 1      A.   I don't remember if we paid.  I think we did.

 2      Q.   Okay.  Did you talk with the inspector during

 3  the inspection?

 4      A.   Well, he was explaining to us what he was

 5  doing, yeah.

 6      Q.   And what did you guys talk about?

 7      A.   He was explaining what he was going to do, he

 8  was going to get some samples for the -- to prove that

 9  we have the Chinese drywall.

10      Q.   And what were the findings?  What did he find?

11  Did he tell you?

12      A.   Yeah, he said that he found some -- some

13  samples or the drywall say about this Chinese drywall

14  brand, and then he shows the wires that were getting --

15  what is the word?  Sorry about my English.

16      Q.   No, take your time.

17      A.   They were getting like this (indicating).  The

18  wires are getting worse.  I mean, they're getting -- I

19  don't know the name in English, how you say.  Rot.  I

20  call it rot.  And the coils, too, it shows that.  He was

21  explaining what he was doing.

22      Q.   Okay.  Can I turn your attention to page -- it

23  says at the bottom Hernandez Dep.13.

24      A.   Which one?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1283 of 3246
Case 1:09-md-02047-MCR Document 23362-39 Filed 11/19/19 Page 45 of
134
Confidential – Subject to further Confidentiality Review

```
 1    Q.   There's some page numbers at the very bottom.

 2    A.   This one?

 3    Q.   And can you flip to the one that says 13?

 4         Yes, that page right there.

 5    A.   Okay.

 6    Q.   There's some bullets, bullet point findings, on

 7  this page?

 8    A.   Okay.

 9    Q.   It says:  "1st level and 2nd level interior

10  walls:  Tainted drywall is present."

11    A.   Okay.

12    Q.   Do you know what the tainted drywall he's

13  referring to?

14    A.   No.

15    Q.   Okay.  Let's go down to the next bullet.  "2nd

16  level ceiling:  Inconclusive, Palatka, Florida label

17  observed."

18    A.   Okay.

19    Q.   Do you remember that, him showing you that?

20    A.   No.

21    Q.   Okay.  The next bullet point.

22         MS. HAQUE:  And, Holly, just to let you know,

23     just for the ease of this deposition we added these

24     page numbers just to help the deponent find pages.
```

Confidential - Subject to further confidentiality review

```
 1              MS. WERKEMA:  Okay.

 2              MS. HAQUE:  So these are actually not on the

 3         existing documents, just to give you a heads-up.  We

 4         just wanted to not sort of tell her page 5 and she

 5         didn't know what that was.

 6              MS. WERKEMA:  Great.

 7    BY MS. HAQUE:

 8         Q.   So the next bullet point:  "Garage walls:  No

 9    evidence of tainted drywall."

10              And then the last bullet point:  "Garage

11    ceiling:  Inconclusive, LaFarge-North American and

12    Underwriter's Laboratories drywall label observed."

13         A.   Okay.

14         Q.   Do you remember these -- this summary,

15    essentially, from what you talked to with the inspector?

16         A.   No.

17         Q.   Okay.  If you look at this next page -- I'm

18    sorry.  Yes, right there.

19              Is this your air conditioning unit picture?

20         A.   Looks like.

21         Q.   And so this is the color that you were talking

22    about before on the coils?

23         A.   Yes.

24         Q.   Okay.  If you turn to the next page, again,
```

Confidential - Subject to Further Confidentiality Review

1   this is the coloring that you saw on the electrical

2   wiring in the home?

3       A.   Uh-huh.

4       Q.   Okay.  Do you recall seeing -- you can flip the

5   page one more -- these various markings on the drywall

6   pieces that the inspector was seeing?

7       A.   No.

8       Q.   Did the inspector show you sort of his findings

9   about what -- the drywall that he was seeing inside the

10  house?

11      A.   He showed something.  I cannot tell you what's

12  this specifically, but he showed some parts.

13      Q.   Okay.  We can go ahead and set that document

14  aside.

15      A.   Okay.

16      Q.   Was this the only inspection that you had in

17  your home at 3516 North Perry?

18      A.   Uh-huh.  Yes.

19      Q.   Okay.  And then later on you had a company take

20  samples of the drywall in your home; is that right?

21      A.   Well, I'm not sure it's another company or is

22  the same one.

23      Q.   Okay.  Sure.  Had you heard about problems with

24  Chinese drywall before the second air conditioning

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1286 of 3246
Case 1:09-md-02047-MCR-Document Entire Filed Subcase 05/19/2019 Page 40 of
134
Confidential – Subject to Further Confidentiality Review

1    repair person told you there could be issues?

2        A.   No.

3        Q.   Did you hear about Chinese drywall problems on

4    the news, on TV?

5        A.   No.  We hear to him, he explained us, more or

6    less, and that's it.

7        Q.   So then what did you do next after you found

8    out that there may be Chinese drywall in the home?

9        A.   So we get in touch with this builder, Sierra

10   Construction, because we know him because he built our

11   buildings, our commercial properties, and he got some

12   kind of experience fixing houses with -- not fixing, but

13   they were in the process of fixing houses with Chinese

14   drywall, and he give us a little explanation about

15   what's going on in the house and maybe what we're

16   facing.

17       Q.   And what did you do after that?

18       A.   Well, what we did after that, we tried to --

19   well, we went to the drywall inspection, and then after

20   that we didn't know what to do, didn't know what to do,

21   because we find out that there was no insurance that

22   want to take care of it or somebody -- it was going to

23   be hard that somebody was going to take care of what's

24   going on, and the builder, we had to call him and ask

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1287 of 3246
Case 1:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1287 of 3246
Confidential - Subject to Further Confidentiality Review
134

1   him.  He -- by that time, he was in bankruptcy because

2   he got so much problems with the same problem with the

3   Chinese drywall.

4       Q.   This was the first builder that built your

5   house in 2008?

6       A.   Yes.  We say, "Call him to see what he can help

7   you about it," but when we tried to reach him, it was

8   impossible, because we find out that he was -- he left

9   town for Fort Lauderdale, I think so, because he was in

10  a lot of troubles with what's going on.

11      Q.   Do you remember when you reached out to the

12  builder, like, what month and year?

13      A.   About the same, the same year, 2010, because we

14  were looking for information to know what to do, what to

15  do.

16      Q.   Then what did you decide to do after you

17  learned that the builder was in bankruptcy?

18      A.   Well, we asked this other builder to help us,

19  Mr. Sierra, what to do about it, and he said that he can

20  help us, but we're going to need some kind of money.  So

21  at that time we didn't know what to do, because they

22  even said that the banks don't want to lend money on

23  houses that got Chinese drywall because they don't know

24  what's going on or what's happening.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1288 of 3246
Case 1:14-cv-09148-JGK Document 75-71 Filed 05/19/2017 Page 51 of 134
Confidential - Subject to further Confidentiality Review

 1          So we had to wait some kind of years to the

 2     bank accept that we can qualify for the loan.  So we

 3     continued living in the house taking the risk of our

 4     health and even my mother-in-law's health so until we

 5     know for sure that we were able to qualify for this.

 6          Q.   How much, do you recall, did they quote you,

 7     Sierra Construction, to do the repairs of the home?

 8          A.   How much what?

 9          Q.   Do you recall how much they wanted to pay --

10     like, the original cost estimate when you first spoke

11     with Sierra in 2010?

12          A.   Well, he didn't give us a specific amount, but

13     he said it was going to be expensive, because he

14     explained to us more or less what they had to do, and we

15     got a little in shock, because it was going to be a lot

16     of money.

17          Q.   Did he give you, like, an average cost and say

18     it's, you know, 50,000, 100,000, something like that?

19          A.   No, he say -- verbally he say it can cost more

20     than 300,000, but at that time, since we didn't have the

21     money, he can't give us exactly an amount.  We had to

22     wait until we qualify or go and get a loan or money,

23     something, so he can give us a formal proposal.

24          Q.   And then you went back to him in 2013?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1289 of 3246
Case 1:09-md-02047-MGC Document 22363 Confidential Subject to Packet 05/19/19 Page 52 of
134
Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yeah, when the banks -- when we went to the

 2   bank and talked to them about it and they decided to

 3   help us, yeah, we went and talked to him and let him

 4   know that we would like that he help us with the

 5   remediation.

 6        Q.    When you first talked to him back in 2010, what

 7   did he say that you had to do to the house to fix it?

 8        A.    Well, he said so many things.  I just can tell

 9   you what I remember.  He said that, first of all, we had

10   to move out of the house, we had to find another

11   property to live, because they had to completely take

12   everything inside the house, like the walls, the

13   appliances, the plumbing, the electric wires.

14              So they had to almost, not destroy the house,

15   not destroy the house, but inside the house, it has to

16   go, everything has to go, because he explained to us the

17   process that they had to go so they can disinfect the

18   house from this fungus of the Chinese drywall.

19        Q.    Did he say how long the entire process would

20   take?

21        A.    Well, he tells it can take almost a year.

22        Q.    Did he say anything original could stay in the

23   house?

24        A.    I'm sorry?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1290 of 3246
Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 53 of 134
Confidential – Subject to Further Confidentiality Review

1  Q.   Did he say anything that was already in the

2  house could just remain, he doesn't have to take it out?

3  A.   What I remember, he said that he can take just

4  the frames, the wood frames, because they got a process

5  to disinfect with some kind of chemicals, and that's it,

6  everything has to go.

7  Q.   When did you first decide to speak to an

8  attorney about Chinese drywall?

9  A.   As soon as they -- we find out with the

10  investigation report, they recommend us an attorney that

11  knows about it.

12  Q.   This Chinese Drywall Screening company?

13  A.   Yeah.

14  Q.   So around 2010?

15  A.   Yeah.

16  Q.   Do you know how long it was between the

17  first -- when you first spoke to an attorney and then

18  the next lawsuit was filed on your behalf, how long was

19  that period of time?

20  A.   No, I don't remember.

21  Q.   So then I guess the next -- the next time you

22  decided to sort of fix the property was in 2013?

23  A.   Uh-huh.

24  Q.   And did you have another inspection done around

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1291 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 451 of
134
Confidential - Subject to Further Confidentiality Review

1    that time?

2         A.   I don't remember.

3         Q.   Has anyone ever taken samples of drywall from

4    your house?

5         A.   The person that came here to do it.

6         Q.   I have about maybe 10 more minutes on this

7    section, and then you want to take a break?

8         A.   Okay.

9              (Hernandez Exhibit No. 8 was marked for

10   identification.)

11   BY MS. HAQUE:

12        Q.   I'm showing you what has been premarked

13   Exhibit 8.

14        A.   This is the -- this is the remediation report,

15   I guess.  No, remediation -- yeah, I guess Mr. Sierra

16   called these people to do that.

17        Q.   So this is the same company -- so, first of

18   all, this document represents your home, correct, at

19   3516 North Perry Avenue?

20        A.   Yes.

21        Q.   And this was done -- this document -- let me

22   start over.

23              This evidence preservation document was

24   prepared -- or it was conducted on October 2013;

Confidential - Subject to Further Confidentiality Review

1    correct?

2         A.   Okay.

3         Q.   Halloween?

4         A.   Yeah.  This is when I guess they were ready to

5    do the remediation.

6         Q.   Did someone tell you that you needed to

7    preserve or keep evidence of the old drywall?

8         A.   I guess.  I don't remember if they tell us, but

9    I guess, yes, they did.

10        Q.   Okay.  Let me flip to -- if you'd turn with me

11   to page 47.

12        A.   Where it say the page?

13        Q.   If you look at the bottom corner right here, in

14   the right-hand corner, there are page numbers.  So the

15   last two numbers.

16        A.   Oh, okay.

17        Q.   Can you turn to 47?

18        A.   Yeah.

19        Q.   Great.  This is a summary of the findings for

20   this evidence preservation report; correct?

21        A.   Yes.

22        Q.   And this is your address; correct?  3516 North

23   Perry Avenue?

24        A.   Yes.

Confidential - Subject to Further Confidentiality Review

```
 1        Q.   If you look at the bottom, it says "summary of

 2   types observed."  Are these the various types of drywall

 3   that were in your house?

 4        A.   I guess.  I don't know.

 5        Q.   So let's look at the -- so there's a column,

 6   and it says "drywall type."  Do you see that?

 7        A.   Over here?

 8        Q.   On this page.  The first heading says "drywall

 9   type"?

10        A.   Yes.

11        Q.   Okay.  So it says -- the first one says

12   "Lafarge/ceiling."  The next column over says "origin."

13   Then there's a percentage in the next column, and then

14   the final column is square footage.

15        A.   Okay.

16        Q.   So under Lafarge/ceiling, origin, what does

17   that say?

18        A.   US.

19        Q.   Okay.  And the percentage?

20        A.   19.

21        Q.   19.2 percent?

22        A.   Uh-huh.

23        Q.   Okay.  Then the next one, the next line, says

24   "Lafarge/walls"?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1294 of 3246
Case 1:09-cv-06690-NGG Document 22363-39 Filed 11/09/19 Page 47 of 134
Confidential - Subject to further confidentiality review

1      A.   Yes.

2      Q.   And the origin says?

3      A.   2 point percent.

4      Q.   US.  And then the percentage is 2.1 percent;

5   correct?

6      A.   Correct.

7      Q.   Okay.  The next one says "Federal

8   Gypsum/walls," and the origin is?

9      A.   US.

10      Q.   Okay.  And then the percentage?

11      A.   30.9.

12      Q.   Okay.  The next one says "Temple Inland/walls."

13   The origin says what?

14      A.   US.

15      Q.   And the percentage?

16      A.   30.9.

17      Q.   Okay.  Now, the next one says "Taihe/walls."

18   And the origin?

19      A.   China.

20      Q.   And percentage?

21      A.   15.5.

22      Q.   Percent.  Okay.  And the last one says

23   "GreenBoard/walls"?

24      A.   Yes.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1295 of 3246
Case 1:09-cv-02047-MCA Document 2 Certification Sub Packet 05/19/2015 Page 43 of
134
Confidential - Subject to further confidentiality Review

```
 1       Q.   Origin?

 2       A.   USA.

 3       Q.   And a percentage?

 4       A.   1.4.

 5       Q.   Okay.  So from this report, it looks like the

 6   Taihe China accounts for 15.5 percent of the drywall in

 7   the home.  Does that ring a -- do you remember that from

 8   this report?

 9       A.   No.

10       Q.   And then the next pages --

11       A.   I didn't read this report, to be honest with

12   you.

13       Q.   Okay.  Now, did this company collect samples of

14   drywall as it was being removed from the house?

15       A.   Yes.

16       Q.   Do you recall how many samples total they

17   collected?

18       A.   No, I don't.

19       Q.   Do you know if they collected samples with all

20   these different markings?

21       A.   No, I don't, I don't know.

22       Q.   Okay.  Do you know where those samples are

23   today?

24       A.   All of them?
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/10 Page 1296 of 3246
Case 1:09-md-02047-MCA Document 12/page... Filed... Page 45 of
134
Confidential - Subject to Further Confidentiality Review

```
 1      Q.   The ones that were collected.

 2      A.   No, I don't.

 3      Q.   Do you know if any of these samples were given

 4   to your attorneys?

 5      A.   No.  I know they gave us some, but this -- I

 6   don't -- I don't know exactly where they are right now,

 7   because with the moving and everything, I'm pretty sure

 8   they are still packed, because I still got boxes packed.

 9      Q.   Did this company give you the samples to keep?

10      A.   The China.  Only the China.

11      Q.   So you have these in your home somewhere?

12      A.   Somewhere, yeah.

13      Q.   Okay.  Do you know if they also collected end

14   tape?  The tape that was on the drywalls, did they

15   collect samples of those?

16      A.   I'm not sure.

17      Q.   Okay.  Did they take photographs?  Are these

18   all the photographs that were taken by the company?

19      A.   Well, if that's what is in here, but I

20   didn't -- I didn't know about all these.  I mean, I know

21   this report exists, but I never seen it, because I was

22   thinking everything is okay.

23      Q.   Okay.  Did you take any photos yourself?

24      A.   No.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1297 of 3246
Case 1:09-md-02047-CAB Document 2288-1 Exhibition Filed 03/13/2017 Page 50 of 134
Confidential - Subject to Further Confidentiality Review

```
1    Q.   Do you know if anyone else took photographs?

2    A.   No.

3    Q.   Okay.  Let me turn your attention to pages --

4    well, first let me ask you, did someone draft a floor

5    plan of the house that shows where the drywall boards

6    were taken from?

7    A.   I don't know.

8    Q.   If you turn to page 57 and 58 of this

9    document --

10   A.   Okay.

11   Q.   -- is this a floor plan of your house?

12   A.   Yes.

13   Q.   And do you recall whether this company took

14   pieces of drywall from the areas that have been colored

15   in?

16   A.   No, I don't know.

17   Q.   Okay.

18        MS. HAQUE:  We'll formally make a request for

19        all samples in order to perform an evidence

20        inspection.

21        MS. WERKEMA:  No, understood.  They've been

22        looking for the samples, and we'll make them

23        available as soon as they're located.

24        MS. HAQUE:  Sounds good.  Thank you.
```

Case 2:09-md-02047-EEF-MBN  Document 22363-39  Filed 11/19/19  Page 1298 of 3246
Case 1:09-cv-07399-JG-RML  Document 123-39  Filed 11/04/19  Page 61 of 134
Confidential – Subject to Further Confidentiality Review

1   BY MS. HAQUE:

2       Q.   Okay, you can go ahead and set that document

3   aside.

4       A.   Okay.

5       Q.   I think we can go ahead and take our first

6   break for the morning, if that's okay with you.

7       A.   Okay.

8            MS. HAQUE:  So five, 10 minutes is okay?

9       Perfect.

10           (Recess from 9:10 a.m. until 9:28 a.m.)

11           MS. HAQUE:  We can go back on the record.

12       There are just a few housekeeping things that we

13       want to take care of first.  We did receive

14       additional documents yesterday.  We received 20

15       documents in the morning and then seven later in the

16       evening.

17           And, Keith, I don't know, is there a way that

18       we can get informed, you know, if we're -- like, the

19       day before a deposition or something if there are

20       going to be additional documents to be uploaded?

21       Maybe we can talk about that off-line and work out

22       some procedure.

23           MR. VERRIER:  Absolutely.

24           MS. HAQUE:  Because we would appreciate that.

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1299 of 3246
Case 1:09-md-02047-EEF-MBN Document 12703-10 Filed 03/08/2019 Page 62 of
134
Confidential - Subject to further confidentiality Review

1    So just pending the review of these documents

2    and the review of the evidence once we receive the

3    evidence to be inspected, we just reserve the right

4    to hold open the deposition, should it be needed, to

5    engage in any further questioning of the

6    Hernandezes.

7        And one last request.  In Exhibit 8, the

8    evidence inspection report, on pages 57 and 58 there

9    is a --

10       MR. VERRIER:  Before you go back to asking

11   questions, if I can address the first part.

12       MS. HAQUE:  Yes.

13       MR. VERRIER:  If it's 27 documents, I don't

14   know if you -- I mean, I think we can get the

15   questioning in even if we take a break.  If there's

16   questions you can ask about that here, that would be

17   great just from a timing perspective.

18       And, obviously, if there are samples produced,

19   you have more questions, then we'll make them

20   available.

21       We've just got to make sure we can get that

22   done by the 14th, so that was the only thing I want

23   to make sure --

24       MS. HAQUE:  Sure, understood.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1300 of 3246
Case 1:09-cv-07628-JGK Document 23-8 Entered on FLSD Docket 05/19/2019 Page 63 of
134
Confidential - Subject to Further Confidentiality Review

```
 1           MR. VERRIER:  -- we put on there.  So we'll

 2      follow up quickly.  I guess you already have the 27

 3      documents, so if you can follow up quickly, that

 4      would be great, so that we can get dates if we need

 5      to.

 6           MS. HAQUE:  Absolutely.

 7           MR. VERRIER:  Okay.

 8           MS. HAQUE:  And I guess, Holly, if you could

 9      let us know once, you know, the evidence has been

10      located and we can make arrangements for that

11      inspection to get all of this done within the 14th.

12           MS. WERKEMA:  Right, immediately, right.

13           MS. HAQUE:  Absolutely.  So the only other

14      request is, on the evidence inspection report, is

15      there an actual better floor plan with sort of, you

16      know, labeling what the colors signify or anything

17      like that from the evidence preservation team?

18           MS. WERKEMA:  I don't know, but we can get with

19      Chinese Drywall Screening immediately.

20           MS. HAQUE:  That would be fantastic.  Thank

21      you.

22 BY MS. HAQUE:

23      Q.  We can continue with the deposition.  Are you

24 ready, Mrs. Hernandez?
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 1301 of 3246
Case 1:09-cv-02047-EEF-MBN Document 23262-39 Filed 11/19/19 Page 1301 of 3246
Confidential - Subject to further confidentiality Review
134

1       A.   Yes.

2       Q.   So we were talking about you had originally

3    approached a bank about financing the Sierra

4    Construction work back in maybe 2010; is that right?

5       A.   No, it was after.  It was, like, a year after

6    that, because at that time we didn't know -- they tell

7    us the bank was not going to be able to lend us money

8    because the banks didn't know how to deal with the

9    situation.

10      Q.   When did you then talk to the bank next?

11      A.   I don't remember exactly, but maybe by the end

12   of 2011.

13      Q.   Okay.  And what did they tell you?

14      A.   Well, they tell us that they can help us and we

15   had to go for the same -- the procedure to qualify first

16   if we were able to qualify for the amount that we were

17   requiring.

18      Q.   And did you end up qualifying?

19      A.   Yes.

20      Q.   And when was that?

21      A.   I think it was in 2012.

22      Q.   Did you refinance your existing mortgage with

23   this -- with the new loan that you received for the

24   Sierra Construction work?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1302 of 3246
Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 45 of
134
Confidential - Subject to Further Confidentiality Review

```
1     A.    I really don't know if we refinanced or they

2   just put on top of the original mortgage the new amount.

3     Q.    So you think that they just added onto the

4   original mortgage amount the new loan amount?

5     A.    I'm not sure with that.

6     Q.    Okay.  Did you ever also consolidate the loans

7   for the dry cleaning businesses along with it?

8     A.    No, we never mixed nothing with the cleaners, I

9   mean with the businesses.

10    Q.    Okay.  Is there any Chinese drywall still in

11  your house?

12    A.    Not that I know.

13    Q.    Why don't you go ahead and tell me about the

14  removal of the drywall from your house.

15    A.    The removal?

16    Q.    Yes.

17    A.    What do you want me to tell you?

18    Q.    Just describe what happened.

19    A.    Well, I guess the construction people came and

20  do the procedure to remove everything they had to

21  remove.  I really don't know all the details.

22    Q.    When did they come in?  What year and month was

23  it?

24    A.    I don't remember.  I don't remember exactly
```

Case 2:09-md-02047-EEF-MBN Document 23263-39 Filed 11/19/20 Page 1303 of 3246
Case 1:09-md-02047-EEF-MBN Document 23263-39 Filed 05/18/2019 Page 45 of
134
Confidential – Subject to Further Confidentiality Review

1    when they started doing that.  Maybe by the end of 2012.

2        Q.   And you had to move out --

3        A.   No.  I'm sorry.  I really don't remember.

4        Q.   That's okay.  And then you had to move out of

5    the house during this time?

6        A.   Yeah, we moved out of the house in August.

7    August, yeah, I think it's 2013, that we moved out of

8    the house.  So it must be by that time that they started

9    the construction, in August.

10           (Hernandez Exhibit No. 9 was marked for

11   identification.)

12   BY MS. HAQUE:

13       Q.   Okay.  I'm going to show you what has been

14   premarked Exhibit 9.

15       A.   Okay.

16       Q.   And you've seen this document before?

17       A.   No.

18       Q.   Did you ever receive this document?

19       A.   I guess, but I never seen it.

20       Q.   Did your husband receive the document?

21       A.   I don't think -- I mean, I don't know.  I don't

22   know if it came with a package of the remediation, but I

23   never seen it before.

24       Q.   Okay.  If you would read the first line, it

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/10 Page 1304 of 3246
Case 1:09-md-02047-McGT Document Correlation Filed Docket 05/18/2019 Page 57 of
134

Confidential - Subject to Further Confidentiality Review

1    says:  "I certify that I have verified that all reactive

2    drywall has been removed, including all debris and

3    detectable dust."

4         A.   Okay.

5         Q.   Does that sound accurate to you?

6         A.   Yeah.

7         Q.   Okay.  You can go ahead and set that document

8    aside.

9              What does the word "remediation" mean to you?

10        A.   Remediation?  Well, to take care of -- to take

11   care of what happened to our house and put it in the

12   right way so we can be able to go back and live in

13   there.

14        Q.   When I use the word "remediate," I'm referring

15   to the process of removing and replacing the drywall in

16   the house.  Does that work for you?

17        A.   The drywall only, or everything?

18        Q.   The drywall in the house.

19        A.   Okay.

20        Q.   Do you recall how much the remediation portion

21   of your loan from the bank was?

22        A.   The exact amount, no, but it was 285,000,

23   something like that.

24        Q.   Did you pay for part of the remediation by

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1305 of 3246
Case 1:19-cv-01334-JDB-JMW Document 238-2 Filed 05/18/21 Page 5 of 134
Confidential – Subject to further confidentiality Review

1    yourself in cash?

2        A.    In cash, from our savings.

3        Q.    Do you recall approximately how much you paid

4    for in savings yourself?

5            MS. WERKEMA:  I'm going to enter an objection

6        related to remediation damages.  Because this case

7        is on two separate tracks, this deposition really

8        only relates to the nonremediation damages.  That

9        being said, you're able to ask questions and go

10       ahead, and answer what you know.

11           MS. HAQUE:  Understood.  And just to respond to

12       that, we believe that these questions relate to the

13       overall issues of damages, but we note your

14       objection.

15   BY MS. HAQUE:

16       Q.    Do you want me to reask the question?

17       A.    More or less, how much we paid from our

18   personal money?  I don't know, maybe -- maybe, like, 40,

19   50,000 more of the 285.  A little bit more.

20       Q.    Do you recall what the total cost of the

21   remediation was?

22       A.    The total cost, no, but it was in the 300 and

23   something.

24       Q.    Okay.  Who performed the remediation?

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1306 of 3246
Case 2:09-cv-02047-MCA Document 22363-39 Filed 11/19/19 Page 1306 of 3246
Confidential - Subject to Further Confidentiality Review
134

```
1       A.    Paul Sierra Construction.

2       Q.    And do you recall the approximate dates, month

3    and year to month and year?

4       A.    Yeah, I know they started in 2013, in

5    August 2013, and they say they going to finish by

6    December 2014, but we had to wait a little longer,

7    because always something.

8       Q.    And when did you end up eventually moving back

9    to your house?

10      A.    The beginning of May 2018.  I mean '15.  I'm

11   sorry.

12      Q.    That's a long time.  Yeah, 2015.  Okay.

13            So about a year -- two years to do the

14   remediation?

15      A.    Almost.

16      Q.    Okay.  How did you consider Sierra

17   Construction?

18      A.    Very good.  Very professional firm.

19      Q.    Did you consider any other contractor other

20   than Sierra to do the remediation?

21      A.    No, just them.

22      Q.    And why did you pick Sierra Construction,

23   again?

24      A.    Well, because the person that came to inspect
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1307 of 3246
Case 1:09-cv-07402- MCA Document Confidential – Subject to Further Confidentiality Review Page 70 of
134

1   the air conditioner works for him, and in the past

2   Sierra Construction built our buildings, our commercial

3   buildings.

4       Q.   Did you have any conversations with Sierra

5   right before the work started?

6       A.   Just to talk about it's going to be hard on us

7   and going to be very high cost, because the house, it's

8   a big house, something like that.

9       Q.   Did you have any conversations during the

10  remediation with Sierra?

11      A.   Not with Mr. Sierra, but with the person in

12  charge.  I don't recall his name right now, but the

13  person in charge of the construction.

14      Q.   And what did you guys talk about?

15      A.   How the building is coming along, the

16  remediation is coming along.

17      Q.   And were there any issues?

18      A.   Not really.

19      Q.   Okay.  And then did you talk to them after the

20  remediation was completed?  Did you talk to Sierra

21  Construction after the remediation?

22      A.   No, we just paid him and everything was okay.

23           (Hernandez Exhibit No. 10 was marked for

24  identification.)

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1308 of 3246
Case 1:09-cv-02047-ACP Document 23261-39 Entered on FLSD Docket 05/12/2010 Page 49 of
134

```
1    BY MS. HAQUE:

2        Q.   Okay.  I'm going to show you what has been

3    marked Exhibit 10.

4        A.   Okay.  Yeah.  Okay.

5        Q.   Do you recognize this document?

6        A.   Yes.

7        Q.   What is this document?

8        A.   They are some kind of invoices that we paid

9    Mr. Sierra.

10       Q.   And if you look at the first page, this

11   document is dated July 29, 2015?

12       A.   Yes.

13       Q.   And it has total contract amount?

14       A.   Yes.

15       Q.   And it has $350,000?

16       A.   Okay.

17       Q.   Was this the total amount they quoted you or

18   the final cost of the remediation?

19       A.   That's the total contract amount, yeah, and

20   that's what we were paying on the last payment, yeah.

21       Q.   If you flip to the next page, you'll see

22   there's a different contract amount.  This document is

23   dated July 2014, and they have the total contract amount

24   as $325,540?
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1309 of 3246
Case 1:09-cv-02042-MGC Document 135-12 Entered on FLSD Docket 05/19/2017 Page 72 of
134

Confidential – Subject to Further Confidentiality Review

```
 1        A.    Okay.

 2        Q.    Do you know why there's a difference between

 3    the two amounts?

 4        A.    Must be some additional costs of something that

 5    maybe the proposal wasn't in.

 6        Q.    Did you recall asking for anything new or in

 7    addition?

 8        A.    Yeah, I can see here it was -- yeah, they had

 9    to do some kind of -- not remediation.  I guess we took

10    the opportunity to fix something in the bathroom pool

11    that it was in a bad condition.

12        Q.    And do you know how it got into the bad

13    condition?

14        A.    No, I really don't know.  They just told us it

15    was -- the stucco and everything was real bad in there

16    so it was time to change everything.

17        Q.    Was there -- when was the pool built?  The pool

18    bath.  I'm sorry.  When was the pool bath built?

19        A.    2001.

20        Q.    Did you also change that out in -- did you

21    knock it down and demolish it in 2007 or 2008?

22        A.    No.

23        Q.    So it was part of the old home?

24        A.    Yes.
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/10 Page 1310 of 3246
Case 1:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/10 Page 48 of 134
Confidential - Subject to Further Confidentiality Review

```
1    Q.   What is the pigeon screen?

2    A.   I don't know what is that.

3    Q.   Okay.  Can you go to the next page, please?

4    A.   Okay.

5    Q.   And at the very bottom, it says "change order

6    for chandelier lift, roof repair, 2nd floor" -- I'm not

7    sure -- "hose bib and tent fumigation."  Do you recall

8    what these things were?

9    A.   Where is that?

10   Q.   I'm sorry.  Where it says "change order" all

11   the way down.  Right there, yes.

12   A.   Okay.  What is the question?

13   Q.   So this line says "change order for chandelier

14   lift, roof repair, 2nd floor hose bib, and tent

15   fumigation."  What was going on with the chandelier

16   lift?

17   A.   Well, we have two chandeliers, they are very

18   big, and they got a mechanism to lift up and down so in

19   order to be cleaned, and I guess my recollection is that

20   we got some problems with the electric corrosion that

21   was going on in the house and it was -- they were not

22   able to pull the chandelier down, because it was not

23   working because the corrosion, and I think they used

24   something special to lift the chandelier or bring it
```

```
1    down so they can storage that it was not in the original

2    proposal.  They found out that later when they were

3    doing the proposal, and then they found out later, so we

4    had to pay that.

5        Q.   What about the roof repair?  What was wrong

6    with the roof?

7        A.   For some reason my understanding is it was a

8    leak but it was not original leak from the house.  I

9    think this leak was something that when they were fixing

10   something the people did something wrong and it was,

11   like, a leak in there and they had to repair, but it's

12   nothing that was in the house.

13       Q.   How long was the leak happening, going on for?

14       A.   What I remember is that that roof, that repair,

15   was -- they started doing the repair when something

16   happened in the remediation, that they had to repair

17   that roof because maybe they did something wrong with

18   it, the roof, the people that was working in the

19   remediation.

20       Q.   They may have damaged the roof?

21       A.   Yeah, maybe.

22       Q.   Do you know how much total drywall was removed

23   from your home?

24       A.   No.
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 1312 of 3246
Case 1:09-md-02047-EEF-MBN Document 23362-39 Filed 05/19/14 Page 45 of 134
Confidential – Subject to Further Confidentiality Review

```
 1      Q.   Do you know if it was all replaced?

 2      A.   Yes, it was replaced.  My knowledge is it was

 3   replaced, everything, and new.

 4      Q.   Did you complain to the Sierra Construction,

 5   because they damaged the roof, why they charged you for

 6   it?

 7      A.   Well, I really don't remember that part.  I

 8   don't know if my husband maybe talked to them.  I don't

 9   know.

10      Q.   Okay, I'll ask him about that.

11      A.   Okay.

12      Q.   Do you recall if all the ceilings drywall was

13   also removed?

14      A.   No, I don't know if they removed the ceilings.

15      Q.   Okay.  Were the carpeting -- was there

16   carpeting in the house?

17      A.   No.

18      Q.   It was all --

19      A.   It's tile.

20      Q.   Was any of the tile removed or replaced?

21      A.   No.  They put a special cover to protect the

22   tile, but even putting that we got problems with some

23   tiles started getting loose because a lot of traffic

24   going on in the house, coming in and out with some
```

1    machinery there.  And we still got that problem, because

2    even though they removed that, there's still some tile

3    loosing, and the problem that we have is that tile

4    doesn't exist anymore and we don't know what we're going

5    to do in the future, if something happens with those

6    tiles, to replace them.

7        Q.   Did you complain to the builder, Sierra, about

8    the tiles?

9        A.   Yeah, and they fixed some of them.

10       Q.   Did they charge you for it?

11       A.   No.

12       Q.   In that same document, if you'd flip to pages

13   154 and 155.  We can start with 154.

14       A.   154, okay.

15       Q.   This looks like a receipt for Tampa Tile?

16       A.   Yes.

17       Q.   Do you remember what this was for?

18       A.   Yeah.  This is for the splash of the kitchen.

19   We used to have tile in there, and since the drywall has

20   to come down, we lost all the tile, so we had to replace

21   the tile splash, the splash area of the kitchen.

22       Q.   So that was new tile?

23       A.   That was new tile, and we paid from our money

24   because it wasn't included in the proposal.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1314 of 3246
Case 1:09-cv-09488-GAP Document 237 Confidential Pocket 05/09/2017 Page 77 of
134
Confidential - Subject to further confidentiality review

```
 1      Q.   Okay.  Can you turn the page to 155?  Yeah, the

 2   back of this page.

 3      A.   Yeah.

 4      Q.   This is also another receipt from Tampa Tile?

 5      A.   No, this is --

 6      Q.   I'm sorry.  The next page.  Sorry.

 7      A.   Yeah.

 8      Q.   Do you remember what this was for?

 9      A.   Yeah.  It's the same, the same material for the

10   splash, kitchen area.  It's the same tile and materials.

11      Q.   Okay.  And then this page, California Closets,

12   do you remember what this was for?

13      A.   This one, the last one?

14      Q.   Yes.

15      A.   Yeah.  It's for the pantry.  We had to build a

16   pantry there that was not in the proposal of the

17   kitchen.

18      Q.   Do you have an original bid or contract with

19   Sierra Construction?

20      A.   Yes.

21      Q.   And do you have, like, a contract that shows

22   what was included?

23      A.   Yeah, we have a proposal, yeah.

24      Q.   Did you give the proposal to your attorneys?
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 1315 of 3246
Case 1:09-md-02047-MCA-LDD Document 23362-39 Filed 11/19/19 Page 4315 of 3246

Confidential - Subject to further confidentiality review
134

```
 1      A.   No.

 2      Q.   If you could --

 3           MS. HAQUE:  If we could put a request for the

 4      proposal, just so that we can see the original

 5      proposal, that would be great.

 6           MS. WERKEMA:  Sure.

 7   BY MS. HAQUE:

 8      Q.   And the fumigation, the tent fumigation, what

 9   was that for?

10      A.   I don't know exactly, but they said that they

11   have to do that to protect the new building, the new

12   repairs, to be sure that nothing is going to affect the

13   new construction.

14      Q.   Now, the California Closets for the pantry, was

15   there already a pantry in the kitchen, or did they build

16   a new pantry?

17      A.   No, it was a pantry.  Yes, it was a pantry

18   there, but with the new proposal of the kitchen, it was

19   not going to -- we were not going to be able to have

20   that kind of pantry, so we have to do a new pantry.

21      Q.   So they just -- did they move the pantry, or

22   did they -- what do you mean?

23      A.   Yeah, we had to move the pantry, because with

24   the new -- the new kitchen, it was not going to be able
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/10 Page 1316 of 3246
Case 2:09-cv-02047-EEF-JCW Document 22363-39 Filed 05/19/2011 Page 76 of 134
Confidential - Subject to Further Confidentiality Review

1   to be in the same place, so we had to move it to another

2   place and we had to have a new pantry.

3       Q.   So they had to remodel the kitchen a little

4   bit?

5       A.   Not remodel, but the cabinets that used to be

6   there, they were placed -- they were custom cabinets and

7   they were placed in a special way, but when we had to go

8   for the remediation, the cost of the kitchen, it was

9   different and the cabinets were not custom-made anymore,

10  so you're not going to have the same way that we used to

11  have it, so we had to use the space in the kitchen to be

12  able to have a pantry, because with the new kitchen

13  we're not going to have enough space to cover a pantry.

14      Q.   And who told you you had to make these changes?

15      A.   No -- well, I suggest, because I need a pantry,

16  and since we don't have space for the new pantry, I

17  suggest to put it in.  And there's a wall that used to

18  be there.  We just put -- enclosed the pantry.

19      Q.   Okay.  And then you also got new appliances;

20  right?

21      A.   Yeah.

22      Q.   And I think -- is that from Custom

23  Distributors?

24      A.   Yes.

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1317 of 3246
Case 1:09-cv-02047-MCA Document 2265-1 Entered on FLSD Docket 05/19/2011 Page 80 of
134
Confidential - Subject to further confidentiality Review

```
1        Q.   It looks like these are -- I'm sorry.  This is

2   page 153.  And it looks like these are GE brand?

3        A.   Yes.

4        Q.   And then Faber Hood?

5        A.   Yes.

6        Q.   Do you remember the brand of your old

7   appliances?

8        A.   Yeah.  They were the same, GE.

9        Q.   So you liked that brand?

10       A.   Of course.  Well, the other ones were top of

11  the line.  These ones are less expensive.  So we had to

12  adjust the kitchen.

13       Q.   And then you have some receipts for Borter

14  Glass?

15       A.   Yes.

16       Q.   Do you recall what these were for?

17       A.   Yeah.  In our master bedroom, we have mirrors

18  around the -- between the -- like, a splash wall, and we

19  lost everything because the Chinese drywall has to come

20  down, so we had to replace them again.

21       Q.   Did they try to save the mirrors, Sierra

22  Construction?

23       A.   They tried, but they said it was going to be

24  very hard.
```

Confidential – Subject to Further Confidentiality Review

1    Q.    And then you have one more receipt, the very

2    last page, from California Closets?

3    A.    Yes.

4    Q.    What was that from?

5    A.    This is our master bedroom.  We had to redo our

6    master bedroom closets.

7    Q.    And what was the -- can you talk about what the

8    problem was for the master bedroom closets?

9    A.    Well, we lost everything there because we

10   didn't have no -- everything has to come down, so we had

11   to do a new closet.

12   Q.    Did they try to save the existing features

13   within the closet?

14   A.    No, no, we're not going to be able to save

15   that.

16   Q.    Did you -- did the Sierra Construction remodel

17   any of the bathrooms or any of the bedrooms?

18   A.    Well, in the master bedroom they -- sorry --

19   the guest bathroom, because the construction, we lose

20   some tiles in there.  So it was going to be hard to put

21   the same tile in there, so we had to -- besides we had

22   to enclose the new pantry, so we had to upgrade the

23   guest bathroom a little bit and we put new tile in there

24   and we upgrade the space of the bathroom.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1319 of 3246
Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 05/19/19 Page 32 of 134
Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Did you change any of the plumbing in any of

 2   the bathrooms?

 3        A.    The plumbing has to go completely because of

 4   the Chinese drywall, they said.

 5        Q.    So there's new plumbing in all the bathrooms?

 6        A.    Yeah.

 7        Q.    What about the tub, the toilets, the fixtures?

 8        A.    The tub, I don't remember if we had to replace

 9   it, but the toilets, no, we didn't replace the toilets.

10   I mean, we replaced the -- we kept the same toilets.  We

11   had to change only the fixtures, like the faucets and

12   everything, because they said it can be contaminated.

13        Q.    So you did change out the faucets?

14        A.    Yeah.

15        Q.    And the fixtures in the bathroom?

16        A.    Uh-huh.

17        Q.    Do you know what the plumbing was made out of?

18   Was it -- in all the bathrooms?

19        A.    Well, exactly I don't know, but I think it's

20   PVC.  I'm not sure.

21        Q.    PCV pipe?

22        A.    I think so.  I'm not sure.

23        Q.    Was there any copper?

24        A.    There are some copper in some.  I don't know
```

Case 2:09-md-02047-EEF-MBN   Document 23362-39   Filed 11/19/19   Page 1320 of 3246
Case 1:09-md-02047-MCA   Document 23262-39   Filed 11/19/19   Docket 05/29/13   Page 83 of
134
Confidential - Subject to Further Confidentiality Review

1  too much about plumbing, but, yeah.

2      Q.   Okay.  And so you talked about the pantry.  Was

3  anything else moved?  Did you have to change the layout

4  of the kitchen when you moved the pantry?

5      A.   Not really.  We just -- we just added the

6  pantry there and I decided just to make the aisle

7  different than it was before.

8      Q.   The aisle?

9      A.   The --

10     Q.   The island?

11     A.   The island.  I'm sorry.

12     Q.   No problem.  How did you change it?

13     A.   Well, we used to have it like, I don't know,

14  like an L, and then we decided to go (indicating).

15     Q.   A rectangle?

16     A.   Yeah.

17     Q.   Were there any appliances or plumbing put

18  inside the island?

19     A.   No.

20     Q.   Did any of the appliances move around?

21     A.   No, they are in the same area.

22     Q.   Did you have a trash compactor prior to?

23     A.   Yes.

24     Q.   And that was in the same area?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1321 of 3246
Case 2:09-md-02047-EEF-MBN Document 23362-29 Filed 12/10/19 Page 21 of 134
Confidential – Subject to Further Confidentiality Review

```
 1      A.    It was in the -- it was in the island, the

 2   trash compactor.

 3      Q.    And it stayed in the island?

 4      A.    No, we had to -- we moved it.  One little piece

 5   was there for the new kitchen.

 6      Q.    What about the refrigerator?

 7      A.    It's in the same area.

 8      Q.    The oven?

 9      A.    The same.

10      Q.    Microwave?

11      A.    The same.

12      Q.    And dishwasher?

13      A.    The same area.

14      Q.    Did they also take out all of the wiring in the

15   home?

16      A.    I think so.

17      Q.    Okay.  Did you have any new appliances anywhere

18   in the house?

19      A.    New appliances?

20      Q.    That weren't there before.

21      A.    The kitchen, they are new.

22      Q.    Anywhere else in the house?

23      A.    Just the kitchen that I remember.

24      Q.    Okay.  In terms of the fumigation, did Sierra
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1322 of 3246
Case 2:09-md-02047-EEF-MBN Document Entrance File Docket 05/19/2019 Page 85 of
134
Confidential – Subject to Further Confidentiality Review

1    Construction tell you what they were trying to protect

2    against?

3        A.    Termites, I think.  The termites.

4        Q.    So it was for bugs and other things?

5        A.    Yeah.

6        Q.    And did they tell you they needed to do that?

7        A.    That's what they said, that it's better to take

8    care of the opportunity that everything was done, to do

9    it the right way and finish with a tent.

10       Q.    Now, did they basically tell you what needed to

11   be done, or did you work with them and say, "I want this

12   done, I want this done"?

13       A.    They basically said -- the majority they said

14   what to be done and I just suggested some things like

15   the pantry and the bathroom upgrade, the guest bathroom.

16       Q.    Okay.  While we get out the next documents,

17   were the closets -- were the closets upstairs in the

18   bedroom and in the-- I'm sorry -- in the master bedroom,

19   which is downstairs, were there nicer fixtures than what

20   you had in the previous closet?

21       A.    No.  We got better fixtures this time.

22       Q.    So it was better cabinets than you had before?

23       A.    Yeah.

24            (Hernandez Exhibit No. 11 was marked for

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1323 of 3246
Case 1:09-cv-07687-LGS Document 43 Filed Confidential - Subject to Docket 05/09/2013 Page 46 of
134
Confidential - Subject to Further Confidentiality Review

```
1    identification.)

2    BY MS. HAQUE:

3         Q.   I'm going to show you what's been marked

4    Exhibit 11.

5         A.   Okay.

6         Q.   Do you recall what this document is?

7         A.   Yes.  They are checks, couple of the checks

8    that we spend money, some expenses.

9         Q.   Okay.  Can you turn to -- and these are from

10   your personal accounts?

11        A.   Yes.

12        Q.   Can you turn to the second page?  I'm sorry.

13   The back of the page.

14        A.   Okay.

15        Q.   Are these checks from your business?

16        A.   Yes.

17        Q.   And so you did pay -- are these the personal

18   checks from your business that were used to pay for some

19   of the remediation work?

20        A.   Yes.

21        Q.   Do you know approximately how much in business

22   expenses you paid for the remediation work?

23             MR. VERRIER:  Object to form.

24             THE WITNESS:  Just that, just this invoice.  I
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 1334 of 3246
Case 1:19-cv-04044-MCA-MAH Document 8-7 Entered on FLSD Docket 09/04/19 Page 47 of
134
Confidential - Subject to Further Confidentiality Review

 1      think I got the invoice.  I pay -- let me see.  The

 2      Borter.  I can see in the Borter invoice so I can

 3      tell you.  I don't see the invoice.  It's in the

 4      Borter.

 5  BY MS. HAQUE:

 6      Q.   Is this page 344, maybe?

 7      A.   No.  Well, these are the amounts of the checks

 8  that we paid.  I decided to use the business account to

 9  pay these expenses because I didn't have enough money in

10  our personal account to cover it.

11      Q.   Okay.  And do you know exactly what it was paid

12  for?  You said the glass?

13      A.   For the glass, the mirror that goes in the

14  master bedroom, and some -- in the kitchen, we had to

15  put some glasses on the doors of the kitchen, some doors

16  of the kitchen.

17      Q.   Was there glass in these doors before, or was

18  this new glass that was installed?

19      A.   There were glass in the other kitchen before.

20  There were shelves.  That's what we did.

21      Q.   And did you put in the exact same glass type

22  from before?

23      A.   From before, yeah.  It's the same company that

24  did it for us.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1325 of 3246
Case 1:09-md-02047-MC1 Document 2361 Confidential Subject to Protective Order 11/19/19 Page 48 of
134
Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Okay.  Was the air conditioning system also

 2   replaced?

 3      A.   Yes.

 4      Q.   And did you pay for any other parts of the

 5   remediation with business accounts?

 6      A.   No, just those.

 7      Q.   It was just the glass?

 8      A.   Just the glass.

 9      Q.   What about the cabinets?

10      A.   No, we paid from our personal money.

11      Q.   Okay.  Was any of the flooring replaced?

12      A.   The flooring?

13      Q.   Like, hardwood or vinyl floors.

14      A.   Just that area, the bathroom, the guest

15   bathroom, we had to replace the tile because the new --

16   they had to upgrade there and we had to put some kind of

17   tile in there.

18      Q.   But all the original floors remained the same?

19      A.   Yeah, just there, and in the utility room, we

20   had to replace it too.

21      Q.   What did they change out in the utility room?

22      A.   Nothing, just we had to pull some of the tiles

23   that were there to put it in the ones that were -- with

24   the construction, they were damaged, with the
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1326 of 3246
Case 1:09-cv-02494-MCA Document 1234-5 Filed 05/18/2019 Page 49 of 134
Confidential - Subject to Further Confidentiality Review

```
 1   remediation, was damaged, and we had to pull from there,
 2   because usually the utility room is you close the door
 3   and you hide in there so that way they don't see, but
 4   because they don't have -- this tile that we have, they
 5   don't have it anymore.
 6          I mean, so how we going to put some tile in
 7   this part that we needed and with another tile that
 8   don't match?  It don't going to look good in that kind
 9   of house that we have.
10      Q.   Was it a better tile than what you originally
11   had?
12      A.   No.
13      Q.   The same type of tile?
14      A.   No, it was less expensive than what we had.
15      Q.   When you had your home remediated, did you
16   assign to anyone else your right to bring claims for the
17   lawsuit?
18      A.   What you mean by that?
19      Q.   Did you give anybody else a right to bring
20   claims related to the lawsuit?
21      A.   I don't know.
22          MS. WERKEMA:  I object to the form.  She's not
23      a lawyer.
24          THE WITNESS:  No, I don't know.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1327 of 3246
Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 40 of
134
Confidential - Subject to further confidentiality review

1    BY MS. HAQUE:

2        Q.   Did -- Sierra Construction, did you talk to

3    them and did they ever ask you can they also file a

4    lawsuit related to this?

5        A.   No.

6        Q.   Okay.  Have you lived in your house since the

7    remediation was completed?

8        A.   Yes.

9        Q.   Can you describe your reaction to the

10   remediation after you moved back in?

11       A.   The reaction?

12       Q.   Yeah.  How did you feel?

13       A.   We were glad to come back home even though you

14   always know that it's not the same anymore, because we

15   lost some kind of fixtures in there that we used to

16   have, and we had to adapt to the new kitchen, that I

17   don't like it too much.

18       Q.   Why don't you like the new kitchen as much?

19       A.   Well, because the cabinets are not the same

20   quality, they got some things in there that I don't like

21   the way it goes, but we had to adjust to the new

22   proposal, the new budget.

23       Q.   Were you pleased with the construction and the

24   remediation itself?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1328 of 3246
Case 1:09-cv-02048-GAF Document 1 Entered on FLSD Docket 05/19/2011 Page 91 of 134
Confidential - Subject to further confidentiality review

```
1      A.    Yes.

2      Q.    Were there any odors in the house?

3      A.    No.

4      Q.    Did all your appliances run properly?

5      A.    Yes.

6      Q.    Did you see any corroded electrical fixtures or

7  anything like that?

8      A.    No.

9      Q.    How about the air conditioning?  Any problems

10 with the air conditioning unit?

11     A.    No, it's working right.

12     Q.    Okay.  Did the remediation bring your house

13 back to as good as it was before you discovered there

14 was Chinese drywall?

15     A.    Say the question again.

16     Q.    Do you believe your remediation brought your

17 house back to as good as it was back before you thought

18 that there was Chinese drywall?

19     A.    Not 100 percent.

20     Q.    Was there anything you wish had been done in

21 the remediation that wasn't?

22     A.    No, I really don't think so.

23     Q.    Were there any other upgrades done to the house

24 during the remediation?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1329 of 3246
Case 2:09-md-02047-EEF-MBN Document 22380-11 Filed 11/26/19 Page 42 of 134
Confidential - Subject to Further Confidentiality Review

1      A.   No.

2      Q.   Now, in terms of the payment, you took out the

3    mortgage, and then you also paid with your personal

4    finances?

5      A.   Yes.

6      Q.   Did you -- and you also used some of the

7    business accounts to pay?

8      A.   No, just those checks that I mentioned.

9      Q.   Did you pay -- put the money back into the

10    business accounts in terms of repaying for the money

11    used to pay for the glass?

12      A.   No, we used it as a distribution, like another

13    income.

14      Q.   Okay.  So how much total are you claiming in

15    damages related to the remediation?

16      A.   How much total in damages?  I don't remember

17    the total that we said.  I don't know if you can check

18    for me there.  You talking about all, everything?

19      Q.   Yes.

20      A.   Including the enjoyment, the enjoyment of the

21    house?

22      Q.   No, no, just related to the remediation.

23      A.   I don't remember if I -- like, 400,000 or

24    something like that.

Case 2:00-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1330 of 3246
Case 1:09-cv-02047-MGC Document 22363-39 Entered on FLSD Docket 05/19/2019 Page 98 of
134

Confidential - Subject to Further Confidentiality Review

```
 1              (Hernandez Exhibit No. 12 was marked for

 2     identification.)

 3     BY MS. HAQUE:

 4        Q.   I'm going to show you what has been marked

 5     Exhibit 12.

 6        A.   Okay.

 7              MS. HAQUE:  And, Holly, could we ask for

 8         verifications for these?  I don't know if these have

 9         been verified.

10              MS. WERKEMA:  They've been uploaded.  Maybe not

11         the first amended, the first amended maybe hasn't

12         been, but, yeah, we'll get them uploaded as soon as

13         possible.

14              MS. HAQUE:  Great.  Thank you.

15              THE WITNESS:  Okay.

16     BY MS. HAQUE:

17        Q.   Have you seen this document before?

18        A.   No.  Yes, I think so.

19        Q.   Did you provide information to your attorneys

20     for them to put together this document?

21        A.   Yeah.

22        Q.   I want to bring your attention to your --

23     Question No. 1.

24        A.   Okay.
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1331 of 3246
Case 1:11-cv-22408-MGC Document 17 Entered on FLSD Docket 05/09/2011 Page 91 of 134
Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Question No. 1 asks:  "Identify all types of

 2   damages that you seek in this lawsuit (e.g. alternative

 3   living expenses, diminution in value, loss of

 4   use/enjoyment, etc.) and specify amounts sought for each

 5   category."

 6        A.    Okay.

 7        Q.    Now, if you look at the last sentence of this

 8   page, it says:  "Notwithstanding that Plaintiff is

 9   entitled remediation damages in accordance with the

10   remediation formula, to date, Plaintiff has identified

11   and produced documentation of $406,923.31 in actual

12   remediation costs."

13        A.    Yeah, okay.

14        Q.    How did you come up with that number?  It looks

15   like -- we looked at the invoice from Sierra

16   Construction for $350,000?

17        A.    Yes.

18        Q.    How did you come up with the $406,923.31?

19        A.    I think the difference besides Mr. Sierra is

20   the money that we put, our personal money, and the

21   money, the expenses that we had in the rental to go and

22   rent the house and all the expenses that we went

23   through.

24        Q.    So you're including the rental property, the
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1332 of 3246
Case 1:09-cv-07393-LAK Document 1 Entry Filed 05/29/2019 Page 95 of
134
Confidential - Subject to Further Confidentiality Review

```
 1    move-out costs?

 2        A.   Yeah.

 3        Q.   And you're including that as part of your

 4    remediation damages?

 5        A.   Yes.

 6        Q.   Okay.  You're also claiming alternative living

 7    expenses damages too.  If you look at the next line, it

 8    says:  "To date, Plaintiff has identified and produced

 9    documentation of alternative living expense damages of

10    $39,489.85."

11        A.   Okay.  Well, yeah, those are the rental.  I

12    guess the 400 is Mr. Sierra and the money, personal

13    money that we put in.

14        Q.   So did you -- so you paid more than the

15    350,000 --

16        A.   Yeah.

17        Q.   -- to do the full remediation?

18        A.   I think so, yeah.

19        Q.   So do you -- so have you produced all of the

20    invoices for all of the work related to the remediation?

21        A.   The invoices?

22        Q.   Yes.  Because we're having trouble calculating

23    the 406,000 total.  Have you produced all of the

24    documentation for the remediation?  Are there any
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1333 of 3246
Case 1:09-cv-07402-LGS Document 235-9 Filed 11/19/19 Page 96 of
134

Confidential – Subject to Further Confidentiality Review

1    additional receipts?

2        A.    To my knowledge, I produced everything that it

3    was asked me to, so, yeah.

4        Q.    Okay.  So could there be other receipts?  Do

5    you have any folders or maybe some documents on your

6    computer?

7        A.    I'm just trying to remember the 400.

8        Q.    Take your time.

9        A.    Well, I know it was more than 350.  It was

10   350 --

11           MS. WERKEMA:  I'll object that she's already

12       answered the question that she doesn't have any

13       additional documents.

14           MR. GUERRA:  Are you telling her not to answer

15       the question?

16           MR. VERRIER:  No, you can answer.

17           MS. WERKEMA:  No, she can answer the question.

18           THE WITNESS:  I know it was more than 250 that

19       we spent with Mr. Sierra, plus all the additional

20       costs of the appliances and all that we were talking

21       about, so it was kind of --

22   BY MS. HAQUE:

23       Q.    Can you go back to Exhibit -- the one with

24   your -- yeah, it's this one right here.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1334 of 3246
Case 1:09-cv-02048-MCA Document 6 Entered on FLSD Docket 05/19/2019 Page 97 of 134
Confidential - Subject to Further Confidentiality Review

 1      A.   Okay.

 2      Q.   Which of these receipts were not included in

 3   the original 350,000, do you remember?

 4      A.   All of these, yeah.  The closets, the tile, the

 5   appliances, this money that we put personally.

 6      Q.   So that was not included in the 350,000 to

 7   Sierra?

 8      A.   No, that was not included.

 9      Q.   Did you also -- so you're also seeking damages

10   for personal property related to the air conditioning

11   unit; is that correct?

12      A.   For the -- what you mean by that?

13      Q.   Yes.  So if you look at the document you are

14   looking at, it says:  "Other damages:  To date,

15   Plaintiff has identified and produced documentation of

16   other damages in the form of air conditioning repair

17   costs of $2,597.99"?

18      A.   Yeah.  Well, this more or less was the expenses

19   that we have prior that we found out that we have

20   Chinese drywall, the times that these people came and

21   checked our air conditioner.

22      Q.   Okay.  Do you have the invoices for Draws 1 and

23   2 from Sierra?  It looks like we only have 3, 4, and 5

24   in that packet.

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/10 Page 1335 of 3246
Case 1:09-md-02047-MCA Document Confidential Subject to Packet 05/09/19 Page 98 of 134
Confidential – Subject to Further Confidentiality Review

1    A.   I thought I gave everything to my attorney.

2         MS. WERKEMA:  Objection.  She's already stated

3    that she provided all the documents.

4         THE WITNESS:  I think I gave it to her, to my

5    attorney.

6         MS. HAQUE:  Okay.

7         MR. GUERRA:  Can we go off the record for one

8    second?

9         (Discussion off the record.)

10        MS. HAQUE:  We can go back on the record, and

11   we'll just put in a formal request for any

12   additional documents that the deponent,

13   Mrs. Hernandez, has related to the remediation, and

14   that includes invoices, the proposal, the bid from

15   Sierra Construction, and anything else related to

16   the remediation.

17  BY MS. HAQUE:

18   Q.   If you can go back to Exhibit No. 12.

19   A.   Okay.

20   Q.   And turn back to the second page.  You also

21  under -- after "other damages," you also have:  "Loss of

22  use and enjoyment damages.  Plaintiff seeks loss of use

23  and enjoyment damages in an amount to be determined at

24  trial."

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1336 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 50 of 134
Confidential – Subject to Further Confidentiality Review

1    How has the presence of Chinese drywall limited

2    your use of the property?

3    A.   Well, it was very devastating and we were -- we

4    really didn't know what to do, how to fix our house, who

5    was going to help us for the project, and we didn't know

6    if our health was in risk, so it was very damaging in

7    that aspect.  And, also, my mother-in-law was living

8    with us.  We were very concerned about her.  And, also,

9    that was not fair that we were paying so much mortgage

10   without being able to enjoy our house.

11   Q.   What were some of the things that you used to

12   do in the home that you could no longer do because of

13   Chinese drywall?  Was there anything?

14   A.   I don't know.  I don't know what you mean by

15   that.

16   Q.   Was there anything that you could no longer do

17   in the home because of Chinese drywall?

18   A.   Well, we took our time to decorate this house,

19   because it was -- it's a very nice house and I want to

20   do the right things, so I was taking my time and saving

21   some money, so when we discovered that, we had to put

22   everything aside and not able to continue with the

23   decoration of our house.

24   Q.   Was there any other thing that you could no

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 337 of 3246
Case 1:14-cv-02494-NGG Document 20-11 - Interest of ESI Deposit 05/48/2019 Page 100 of 134
Confidential - Subject to Further Confidentiality Review

```
 1    longer do in the house that you attribute to Chinese

 2    drywall?

 3        A.   Not to be happy about it.  Not to feel happy.

 4    Come home and you don't feel like you are at home.  You

 5    feel like going crazy was going on.

 6        Q.   And just to clarify for the record, you have

 7    not yet -- you're not asking for a specific amount yet,

 8    it's an amount to be determined at trial; is that right?

 9        A.   That's what it say in here.

10        Q.   For loss of use and enjoyment damages?

11        A.   That's what it say in here.  Well, I can -- I

12    was trying -- I thought about it, and we discussed it,

13    and we tried to be fair about the situation, and just

14    we're asking for damages, like, we had to pay the

15    mortgage for so many years without enjoying our house,

16    and I made some kind of calculation there and I came out

17    for more than $200,000.

18        Q.   So you're requesting more than $200,000?

19        A.   Uh-huh, a little bit, yeah, what the mortgage

20    that we were paying during that time since we find out

21    that we have Chinese drywall until we moved back.

22            MS. HAQUE:  Let's take a quick -- let's go off

23        the record and take a quick five-minute break.

24            (Recess from 10:22 a.m. until 10:39 a.m.)
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1338 of 3246
Case 1:19-cv-02240-NGG Document 29-14 entered on FLSD Docket 05/08/2019 Page 101 of 134
Confidential - Subject to Further Confidentiality Review

```
 1              MS. HAQUE:  We can go back on the record.

 2    BY MS. HAQUE:

 3         Q.   Mrs. Hernandez, before the break we were

 4    discussing loss of use and enjoyment damages.  Do you

 5    remember that?

 6         A.   Yes.

 7              (Hernandez Exhibit No. 13 was marked for

 8    identification.)

 9    BY MS. HAQUE:

10         Q.   I'm going to show you what has been premarked

11    as Exhibit 14?  13.

12         A.   Okay.

13         Q.   Do you recognize this document?

14         A.   Yes.

15         Q.   If you flip to the very last page, is that your

16    husband's signature?

17         A.   Yes.

18         Q.   And this was dated March of 2018?

19         A.   Yes.

20         Q.   So he verified the answers in this document?

21         A.   Uh-huh.

22         Q.   And this is information that you gave to your

23    attorneys, right, to fill this out?

24         A.   Yes, uh-huh.
```

```
1       Q.    Did you fill out this document yourself?

2       A.    Well, I give it to her on the phone.

3       Q.    You gave her information to fill this out?

4       A.    Yes, uh-huh.

5       Q.    Great.  Can I turn your attention to Section

6    III?

7             Actually, before we go there, I'm sorry, let us

8    go to Section VII, which is on page 5.

9       A.    Okay.

10      Q.    Section VII, other damages.  And you turn the

11   page, and the third line says:  "If you experienced any

12   loss of use and/or loss of enjoyment of the property as

13   a result of Chinese drywall, identify the total amount

14   of such loss."

15            And what is the amount that you have written

16   here?

17      A.    That's the amount that I was explaining you

18   before is the payment of the mortgage of the house since

19   we found out that we have Chinese drywall until we moved

20   back.

21      Q.    What is your definition of loss of use and

22   enjoyment damages?

23            MS. WERKEMA:  Object to form.  Go ahead and

24            answer, though, please.
```

Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  The definition of use the house

 2        and enjoyment, well, like I said, not to be able to

 3        live in our house and enjoy our house and go through

 4        all this stress, emotional stress and economic

 5        stress.  So effect.

 6   BY MS. HAQUE:

 7        Q.   And the $203,860.95, that -- all of that are

 8   your mortgage payments?

 9        A.   Yeah, that we were paying since we find out

10   that we have Chinese drywall until we moved back.

11        Q.   For how many months does this include in the

12   mortgage?

13        A.   Since January 2010 until we moved back.  That

14   was in May 2015.

15        Q.   So this is five years of mortgage payments,

16   five years and five months of mortgage payments?

17        A.   I guess, yeah.

18        Q.   And that's what you believe the loss of use and

19   enjoyment damages refer to?

20        A.   Yes.

21        Q.   Okay.  Can you flip back for me to Section III,

22   product identification and evidence retention?

23              The first question:  "Did you provide evidence

24   of Chinese drywall in the property to the Plaintiffs'
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 341 of 3246
Case 1:15-cv-04048-NGG Document 11-1 Filed 09/03/20 Page 104 of 134
Confidential -- Subject to Further Confidentiality Review

```
 1   Steering Committee to be placed in the PSC FileCloud

 2   Database?"

 3            And you've checked "yes"?

 4   A.    Yes.

 5   Q.    And the next question is:  "If yes, do you have

 6   any additional evidence of Chinese drywall in the

 7   property that you have not provided to the Plaintiffs'

 8   Steering Committee?"

 9            And you checked "yes"; correct?

10   A.    Yes.

11   Q.    Now, we discussed a little bit earlier today

12   that you had a company, Chinese Drywall Screening, go in

13   to collect physical samples?

14   A.    Yeah.

15   Q.    And then they gave you the samples?

16   A.    They gave us some, uh-huh.

17   Q.    Do you have those samples?

18   A.    I know that we have it, but right now, to be

19   honest, I really don't know if we still have it in the

20   house, because we moved back, we moved in, and I really

21   don't know if they're with us.

22   Q.    So you think the samples have been lost?

23   A.    Yes.

24   Q.    How many times did you move back and forth?
```

```
 1      A.   No, we just moved -- we just moved in the

 2   rental property and we moved back.  Two.

 3      Q.   So twice.  So you think during one of those

 4   moves the samples were lost?

 5      A.   Probably.

 6      Q.   Okay.  All right.  You can go ahead and set

 7   that document aside.

 8      A.   Okay.

 9      Q.   Now, Mrs. Hernandez, you are also claiming

10   damages related to alternative living expenses; correct?

11      A.   What is that?  Alternative?

12      Q.   Alternative living expenses.

13      A.   What is that?  The rental?

14      Q.   Well, I want to ask you, what do you believe

15   are the alternative living expenses?  And we can turn to

16   this document that's Exhibit 2.

17      A.   Okay.  Oh, yeah, that was that we had to move

18   out of the house and we had to spend money renting

19   another house.

20      Q.   What is the total amount of alternative living

21   expenses that you're claiming?

22      A.   Let me see there.  39,485 -- I mean 89.

23      Q.   Now, how -- go ahead.  I'm sorry.

24      A.   No, that's okay.
```

```
 1      Q.   How long did you live in your house after you

 2   suspected that the house had Chinese drywall?

 3      A.   How long did we live in the house?

 4      Q.   Yes.

 5      A.   Well, we moved 2010, 2011 -- I think we stayed

 6   three years, because we moved in 2013 out of the house.

 7      Q.   When -- do you recall the exact move-out date?

 8      A.   It was in August, by the end of August.  I

 9   don't recall exactly.

10      Q.   The end of August 2015.  Okay.

11      A.   (Nodding head.)

12      Q.   Okay.  How did you decide where you went to

13   live next?

14      A.   How did we decide?  Well, we had to look up

15   property close to our house and we started looking

16   around.  That's it.

17      Q.   What options did you consider?

18      A.   Just to have a decent house so we can move in

19   and wait for the construction to be done.

20      Q.   Did you ever consider living with family while

21   the construction was being done?

22      A.   No.

23      Q.   How many months total did you live outside of

24   your home at 3516 North Perry?
```

```
 1        A.   I don't know exactly the months, but I know it

 2   was from two thousand -- August 2013 until May 2018.  I

 3   mean '15.  I'm sorry.

 4        Q.   So a little less than two years?

 5        A.   Uh-huh.

 6             (Hernandez Exhibit No. 14 was marked for

 7   identification.)

 8   BY MS. HAQUE:

 9        Q.   Okay.  I want to show you what has been

10   premarked Exhibit 14.

11        A.   Okay.

12        Q.   Do you recognize this document?

13        A.   Yes.

14        Q.   What is this document?

15        A.   It's the lease of the rental house.

16        Q.   It says in this document the term of the lease

17   is June 19, 2013, through June 18, 2014?

18        A.   Yes.

19        Q.   So did you actually move in in June?

20        A.   No, we had to -- it's very hard to find good,

21   decent house close to our house, so we found this one,

22   and we had to go and put a down payment in order to keep

23   the house until we were able to move.

24        Q.   And what was the -- how much in down payment
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1345 of 3246
Case 2:13-cv-02909-NGE Document 209-11 Entered on FLSD Docket 05/08/2015 Page 108 of 134
Confidential - Subject to Further Confidentiality Review

```
 1    did you put down?

 2        A.   $1,500.

 3        Q.   And this was a security deposit?

 4        A.   Yes, and then we prorated the rest of the rent

 5    for that month, for the first month.

 6        Q.   And the prorated rent of June -- from June 19,

 7    2013, through June 30, 2013, was $552.24?

 8        A.   Yes.

 9        Q.   And then did you move in in July 2013?

10        A.   No.  We were not ready to move yet, so we had

11    to wait until August.

12        Q.   And you paid a monthly rent?

13        A.   Yes.

14        Q.   Of $1,400 per month?

15        A.   Yes.

16        Q.   Did this rent ever go up at any time?

17        A.   Yeah, it went up, because at the end of the

18    lease we had to go -- we needed more time, so we talked

19    to the lady verbally, and she said that we don't need to

20    do another agreement, so we just -- she's going to

21    update and upgrade the rent for $75 more until we are

22    able to leave the house.

23        Q.   So from July 2014 through May 2015 when you

24    moved out --
```

Case 2:09-md-02047-EEF-MBN  Document 22363-29  Filed 11/19/19  Page 1346 of 3246
Case 2:14-cv-02419-NGG  Document 269-11  Entered on FLSD Docket 05/08/2019  Page 109 of 134
Confidential - Subject to Further Confidentiality Review

```
 1       A.    Yes.

 2       Q.    -- you paid approximately $1,475 per month?

 3       A.    Yes.

 4       Q.    Okay.  If you can turn in this packet to page

 5   245.

 6       A.    245?

 7       Q.    Yes.

 8       A.    I don't have.

 9       Q.    It says right here, this bottom.

10       A.    Okay.  Sorry.

11       Q.    No problem.

12       A.    Okay.  Yeah.

13       Q.    245.  So the next.

14       A.    I'm sorry.  Okay.

15       Q.    What is this document right here?

16       A.    The claim of the security deposit.

17       Q.    And it looks like they deducted -- the landlord

18   deducted $405 from the security deposit?

19       A.    Yes.

20       Q.    And that was due to professional carpet

21   cleaning?

22       A.    Yeah.  They claimed that, yeah, they had to do

23   that.  We weren't in agree, but okay.

24       Q.    And then $190 for replacement carpet?
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1347 of 3246
Case 1:14-cv-06017-NGG Document 30-14 Filed 05/18/2015 Page 110 of 134
Confidential - Subject to Further Confidentiality Review

```
 1     A.   Yes.

 2     Q.   So they returned to you $1,095?

 3     A.   Yes.

 4     Q.   This next page, what is this document?

 5     A.   Okay.  When we moved in there, it was a very

 6  bad smell when we put the air conditioner, so we decided

 7  to do a deep cleaning and call somebody for the -- to

 8  clean the rugs, the carpets.

 9     Q.   It's hard to read what this says.  Do you know

10  what the amount total was here?

11     A.   I think it was $91, something like that.

12     Q.   91.  Okay.

13     A.   Because it says $35 for three rooms, I guess

14  plus taxes, something like that.

15     Q.   So around $90?

16     A.   Yeah, more or less.

17     Q.   Okay.  What about this document right here?

18     A.   Well, that's what happened.  It still happened.

19  The smell in the house, it was strange, because we knew

20  they had a lot of pets inside the house, so we called

21  somebody to refresh the air conditioner ducts, because

22  they were very dirty and got smell.

23     Q.   And what was the total amount you paid here?

24     A.   256.  $256.
```

```
 1        Q.   Okay.  And the next page?  The last page.

 2        A.   Yeah, one time the air conditioner was broke

 3   and we had to call somebody.  We cannot wait for the

 4   people send us.  She say -- we know somebody, they

 5   called, and then we can replace it and deduct from the

 6   rent.  The lady from the lease.  So that's what we did.

 7   We called this person that we know, and he fixed the air

 8   conditioner, and then we deducted from the rent.

 9        Q.   So you deducted this from the $1,400 that you

10   paid?

11        A.   Yes.

12        Q.   Did you also deduct this --

13        A.   No, we didn't.

14        Q.   What about the Pro Carpet?

15        A.   No, we did not.  It wasn't our home.

16             (Hernandez Exhibit No. 15 was marked for

17   identification.)

18   BY MS. HAQUE:

19        Q.   Okay.  I'll show you what has been marked

20   Exhibit 15.

21        A.   Okay.

22        Q.   Now, what does this packet of documents

23   represent?

24        A.   That's part of the utilities that we paid in
```

```
1    the rental house.

2         Q.   And I don't think we -- I asked you this, but

3    what was the address of the rental house?

4         A.   This one.  708 West Adalee Street.

5         Q.   And Adalee is spelled, for the court reporter,

6    A-d-a-l-e-e?

7         A.   Yes.

8         Q.   Did you turn off the utilities at the house at

9    3516 North Perry Avenue?

10        A.   No, we continued paying it, but I'm not

11   claiming those.

12        Q.   So you're just claiming utilities related to

13   the rental house?

14        A.   From the rental, yeah.

15        Q.   Okay.  On page 198 -- actually, this first

16   page, sorry -- what is this handwritten note right here?

17        A.   It's just the final bill that I paid, with the

18   check number, because it was a misunderstanding, the

19   balance.  We paid it, but they didn't credit, and then

20   they said -- we talked to them and said just pay this

21   amount, $34.63.

22        Q.   Okay, you can go ahead and set that document

23   aside.

24        A.   Okay.
```

Case 2:09-md-02047-EEF-MBN Document 22363-20 Filed 11/19/19 Page 350 of 324613
Case 1:15-cv-12349-NGD Document 111 Confidential Filed 05/28/2019 Page 1 of 134
Confidential – Subject to Further Confidentiality Review
of 134

1               (Hernandez Exhibit No. 16 was marked for

2      identification.)

3      BY MS. HAQUE:

4          Q.   I'll show you what has now been marked

5      Exhibit 16.

6          A.   Yeah, this is the checks of the rent that we

7      paid.  The rental property, some of the checks that we

8      paid for the rent and moving expenses.

9          Q.   Okay.  If you'd turn to page 339.

10         A.   Okay.

11         Q.   Yes.  What is this document?

12         A.   This is an invoice for the moving.

13         Q.   The moving expenses?

14         A.   The moving expenses, yeah.

15         Q.   And this is from the rental home back to --

16         A.   Back to the house.

17         Q.   Okay.  And this was when you think the samples

18     might have been lost?

19         A.   Probably.

20         Q.   Okay.

21         A.   Yeah.

22         Q.   How much total did you pay in moving expenses?

23         A.   I got it here.  This one was the -- the first

24     one was $1,189.56.  That's when we moved in.  And when

```
 1   we moved back, it was these two marked here, 1,518 plus

 2   280 more.  280 more.

 3        Q.   So then the total amount for your alternative

 4   living expenses, you said, is close to $39,000?

 5        A.   Yes.

 6        Q.   And I just want to make sure this is right.

 7   It's about 1,500 in moving expenses?

 8        A.   More or less.

 9        Q.   $405 deducted from the security deposit from

10   your rental property?

11        A.   Uh-huh.  Yes.

12        Q.   $3,962.99 in electrical bills for the alternate

13   property?

14        A.   Uh-huh.  Okay.

15        Q.   $1,524 in water and sewage for the alternate

16   property?

17        A.   Okay.

18        Q.   And approximately $32,000 in rent, which is

19   calculated as 22 months at 1,400, including a prorated

20   month at $552.24, the prorated 16 days in May 2015,

21   which is $722, and then the additional $75 extra that

22   you paid from August -- no -- July 2014 through May of

23   2015?

24        A.   Uh-huh.
```

```
1      Q.   And that's the total of the damages for

2   alternative living expenses; correct?

3      A.   Yes.

4      Q.   You can go ahead and set that document aside.

5           Mrs. Hernandez, we started talking earlier

6   today about the mortgage on your property and that you

7   still have about, you said, $587,000 --

8      A.   More or less.

9      Q.   -- left on the mortgage?

10          More or less.  What are the terms of the

11  mortgage?  Is it a 30-year?  Seven-year ARM?

12     A.   I'm not sure about that.  My husband knows

13  better.

14     Q.   Okay.  Do you still -- what is your monthly

15  mortgage payment?

16     A.   Right now?

17     Q.   Yes.

18     A.   Right now, it's 4,300 and something.

19     Q.   Are you current on the payments?

20     A.   Yes.

21     Q.   Have you ever missed a payment or paid late on

22  the mortgage?

23     A.   No.

24     Q.   Do you have any loans secured by your property?
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1353 of 3246
Case 1:14-cv-02408-NGG Document 11-2 Filed on ESD Docket 05/28/2019 Page 116 of 134
Confidential - Subject to Further Confidentiality Review

```
 1    A.    No.

 2    Q.    What is the current value of your property?

 3    A.    The current, I really don't know.

 4    Q.    Can you pull out Exhibit 1?  Do you have that?

 5    A.    Okay.

 6    Q.    And if you'd turn to the second page.  There is

 7  a market value listed there of approximately $735,952?

 8    A.    Where is that?

 9    Q.    If you look on the -- yeah, this page, right --

10  see that?

11    A.    Oh, okay.  Yeah.  Okay.

12    Q.    Does that value sound accurate to you?

13    A.    Well, that's the asset value by the city, but

14  the market value is much more than that.

15    Q.    What would you estimate the market value to be?

16    A.    I guess more than a million.

17    Q.    Have you ever had an appraisal done on the

18  property?

19    A.    Before the Chinese drywall.

20    Q.    Did the appraisal -- appraiser give you a

21  report?

22    A.    Yes, they did.

23    Q.    How much was that appraisal?

24    A.    Like, a million at that time.
```

```
 1       Q.   We don't have a copy of that appraisal in our

 2   documents.  Did you give that document to your attorney?

 3       A.   They never asked me for that.

 4            MS. HAQUE:  We'll make a request for the

 5       appraisal.

 6   BY MS. HAQUE:

 7       Q.   You said it was done in 2008?

 8       A.   I don't remember the date.

 9            MS. HAQUE:  Okay.  We'll make a request for the

10       appraisal.

11   BY MS. HAQUE:

12       Q.   Since that time, were any other appraisals done

13   on your property?

14       A.   No.

15       Q.   Have you ever objected to a tax assessment of

16   the property?

17       A.   I don't understand what you mean by "objected."

18       Q.   So each year the Hillsborough County tax

19   assessor does a tax assessment on the property; right?

20       A.   Uh-huh.

21       Q.   And they give you an opportunity to dispute

22   what they have assessed.  Have you ever disputed with

23   them what they've assessed on the property?

24       A.   No.
```

```
1      Q.   Have you ever attempted to lease or sell your

2  property since Chinese drywall was in the house?

3      A.   No.

4      Q.   Mrs. Hernandez, are you claiming diminution in

5  value damages related to Chinese drywall?

6      A.   I don't know what is that.

7           (Hernandez Exhibit No. 17 was marked for

8  identification.)

9  BY MS. HAQUE:

10     Q.   I'm going to show you what's been marked as

11 Exhibit 17.

12     A.   Okay.  I really don't know.

13     Q.   Did you provide information to your attorney

14 for this document?

15     A.   I don't -- I don't know.  I don't know what

16 this means, this.

17     Q.   The title of this document is Plaintiff Bertha

18 Hernandez's Response to Defendants' Request For

19 Production of Documents.  And this document is dated

20 December 4, 2008.  2018.  Sorry.

21          Can I direct your attention to Question No. 2?

22     A.   Yeah.

23     Q.   The question is:  "All documents not already

24 produced that relate to diminution in value of the
```

```
 1   property that is related to alleged damage to your

 2   property caused by defective Chinese-manufactured

 3   drywall."

 4            And your response is:  "This request is

 5   inapplicable as plaintiff is not asserting a claim for

 6   diminution in value."

 7            MS. WERKEMA:  Object to form.  You can answer

 8        the question.

 9            THE WITNESS:  I just don't know the -- I just

10        don't understand this.  I don't understand what this

11        means, this.

12   BY MS. HAQUE:

13        Q.   Are you seeking damages related to diminution

14   in value of the property?

15        A.   I don't know.  My attorney can answer for me,

16   because I don't -- I don't know.  I don't know.

17        Q.   So you -- sorry.

18        A.   I don't know what to answer in here.

19        Q.   So is it fair to say as we sit here today you

20   do not know -- or, I guess, in this document you

21   provided answers to your attorney for creation of this

22   document?  Do you remember doing that?

23        A.   I just don't know.  I really don't know.  I

24   don't know if she can help me, because I don't know what
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1357 of 3246
Case 1:14-cv-02494-NGG Document 269-11 Entered on FLSD Docket 05/09/2019 Page 120 of 134
Confidential - Subject to Further Confidentiality Review

```
 1   this means.

 2       Q.   Okay.  You can go ahead and set that down.

 3            Can you take out Exhibit 13 for me, please?

 4   And then can you go to Section -- I think that's

 5   Section VII.

 6       A.   Okay.

 7       Q.   Have you received any payments from anyone in

 8   relation to -- I'm sorry.  Section VI.

 9            Have you received any payments from anyone in

10   relation to Chinese drywall?

11       A.   Yes.

12       Q.   What payments, and from whom?

13       A.   From the attorney, and that's the amount in

14   there.

15       Q.   And you received a check for that amount?

16       A.   First we received a check for 12,000, and then

17   1,000.

18       Q.   So what's the total amount?

19       A.   What it say in there.

20       Q.   Okay.  And can you read out the amount for the

21   record?

22       A.   $13,660.31.

23       Q.   And you just deposited that check into your

24   bank account?
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1358 of 3246
Case 1:14-cv-02494-NGG-VMS Document 111-1 Entered on FLSD Docket 05/48/2019 Page 421 of 134
Confidential - Subject to Further Confidentiality Review

```
 1       A.   Yes.

 2       Q.   And did you pay for anything related to the

 3   house with that money yet?

 4       A.   Well, we just put in our savings and we are

 5   paying expenses.

 6       Q.   Okay.  You can go ahead and put that document

 7   away.

 8            Just a few more questions, and then we'll take

 9   a short break, but I think we're almost done with

10   questioning you.

11       A.   Okay.

12       Q.   Are you the sole owner of the claim for all the

13   damages related to the home?  You and your husband, I

14   mean.

15       A.   Yes.

16       Q.   Okay.  Do you acknowledge and know that between

17   the years of 2007 and 2012 or so there was a housing

18   crisis in Florida and house prices fell during that

19   time?

20       A.   I don't know.

21       Q.   Did you ever hear about a housing crisis in

22   Florida?

23       A.   Yeah, I hear about it.

24       Q.   What did you hear about it?
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1359 of 3246
Case 1:14-cv-02494-NGG Document 23-14 Filed under seal 05/19/2019 Page 122 of 134
Confidential - Subject to Further Confidentiality Review

```
 1        A.   There were people that were not able to pay

 2   their houses and they were losing the houses, something

 3   like that.

 4        Q.   And did you hear that house prices in different

 5   areas also dropped as a result of that?

 6        A.   I guess.  I don't know.

 7             MS. HAQUE:  Okay.  We'll just take maybe a

 8        minute or so to confer to see if we have any more

 9        questions.  We can go off the record.

10             MS. WERKEMA:  All right.

11             (Discussion off the record.)

12             MS. HAQUE:  Actually, we can go back on the

13        record.  Mrs. Hernandez, I have no further questions

14        for you.  I pass the witness.

15             THE WITNESS:  Thank you.

16             MS. WERKEMA:  Let's take a short break.

17             (Recess from 11:10 a.m. until 11:24 a.m.)

18             MS. WERKEMA:  We can go back on the record.

19                       CROSS-EXAMINATION

20   BY MS. WERKEMA:

21        Q.   I just have a few questions for you,

22   Ms. Hernandez.  First of all, did you and I meet

23   previously to discuss the deposition and prepare for the

24   deposition?
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1360 of 3246
Case 1:15-cv-04294-NGG Document 309-14 Entered on FLSD Docket 05/09/2019 Page 123 of 134
Confidential – Subject to Further Confidentiality Review

```
 1      A.   Last night.

 2      Q.   Okay.  And when we met, did we review some of

 3  the documents that you've been asked to look over today?

 4      A.   Yes, some of them.

 5      Q.   Okay.  And I want to turn to Exhibit -- I think

 6  it's Exhibit 15.  No, it's Exhibit 12.

 7           Do you have Exhibit 12?  Can you pull it out?

 8           So you were previously asked some questions

 9  about different damages that have been asserted in this

10  lawsuit and different categories of damages.  Were you

11  confused by the legal discussion about categorization of

12  damages?

13           MR. POYER:  Object to the form.

14           THE WITNESS:  Yes.

15  BY MS. WERKEMA:

16      Q.   So can you review the answer that has been

17  listed for Interrogatory No. 1?  It's on page 1 and 2 of

18  this document.

19      A.   So what do you want me to do?

20      Q.   Just review the answer that's been listed for

21  Interrogatory No. 1.

22           Now, are the damages that are listed here --

23  and don't answer until you're ready, until you've had a

24  chance to review the document.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1361 of 3246
Case 1:18-cv-11248-NGG Document 311-1 Filed 11/18/19 Page 1361 of 3246

Confidential - Subject to Further Confidentiality Review
of 134

```
1              Are the damages that are listed here and the
2     amounts listed here your understanding of the damages
3     that you're seeking in this lawsuit?
4          A.   Yes.
5          Q.   I just want to switch gears and talk a little
6     bit about the remediation that you and your husband had
7     completed on the home.
8              So would you say that, say, like, the cabinet
9     quality, that was put in the home when the home was
10    remediated, would you say that those cabinets were more
11    expensive or less expensive than the cabinets that were
12    originally put into the home?
13         A.   No, less expensive.
14         Q.   And what about, there was some talk about the
15    tile that was done in the bathroom, there was some tile
16    that was replaced in one of the bathrooms.  Was the tile
17    that was put into that bathroom a more expensive brand
18    of tile or a less expensive brand of tile than what was
19    originally in there?
20         A.   No, that was less expensive, and it was no
21    match to the tile that we had in the house, so we had to
22    just --
23         Q.   So why was it that you weren't able to -- why
24    was it that the cabinet quality and some of the other
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1362 of 3246
Case 1:14-cv-09148-NGG Document 81-11 Entered on FLSD Docket 05/02/2016 Page 125 of 134
Confidential - Subject to Further Confidentiality Review

```
 1    fixtures that were put back into the house were not of

 2    the same quality that was initially installed into the

 3    home?

 4         A.   Because they were in the proposal of the

 5    builder and we didn't have no choice, because we didn't

 6    have no more money to get better cabinets.

 7         Q.   Is there anything else in the home that was of

 8    a lesser quality after the remediation was completed

 9    than what was initially done in the home?

10         A.   Basically, just the kitchen cabinets and the

11    tile in the bathroom and the utility room.

12         Q.   So we talked a little bit earlier about some

13    loss of use and enjoyment.  Could you elaborate on some

14    of the things that you were able to do in the home

15    before the Chinese drywall was discovered versus after?

16    Could you just give us some examples of some of the

17    things that you no longer wanted to do in the home once

18    you knew that the home had Chinese drywall in it?

19         A.   Well, we used to have the family getting

20    together for Christmas, so we had to stop doing that.

21    Celebrations, Thanksgiving.  So it was hard not to do it

22    at home with the family.

23         Q.   And is there any other, any other factor that,

24    you know, caused loss of use and enjoyment?  Is there
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1363 of 3246
Case 1:14-cv-02949-NGG Document 269-11 Entered on FLSD Docket 05/12/2015 Page 126 of 134

Confidential - Subject to Further Confidentiality Review

1   any other specific examples that you can provide about

2   not being able to enjoy the home in the same fashion?

3       A.   No, not really.

4       Q.   Was there ever anyone that commented on, like,

5   the smell of the home?

6       A.   I just remember one time one of our stepsons

7   came to the house and he said, "This house smells

8   funny," but we didn't know -- I felt embarrassed but

9   thought it was something going on with domestic problems

10  or something about cleaning.  That's it.

11          MS. WERKEMA:  I have no further questions.

12                  REDIRECT-EXAMINATION

13  BY MS. HAQUE:

14      Q.   Just a few follow-up questions.

15      A.   Okay.

16      Q.   For Exhibit 12, did you review or verify the

17  information contained in that document?

18      A.   I reviewed when?

19      Q.   Did you ever review or verify the information

20  contained in that document?

21      A.   I review here, or where?  I don't understand

22  the question.

23      Q.   Have you ever looked at that document before

24  today?

```
 1        A.   I saw some documents last night, but I don't

 2   know.  I didn't go through all specifically.

 3        Q.   Okay.  Did you ever ask your attorney to

 4   explain what these various categories of damages mean?

 5        A.   I think she's been helpful to me in explaining,

 6   but maybe my language is not 100 percent, so maybe I get

 7   confused about it.

 8        Q.   So on page 2 -- this page right here -- are you

 9   seeking diminution of value damages?

10        A.   I don't understand.  What is value?  The value

11   means?  I don't understand what you're saying.

12        Q.   Do you know what diminution in value damages

13   are?

14        A.   Where is that?

15        Q.   It is --

16             MS. WERKEMA:  (Indicating.)

17        A.   Oh.  Yeah, yeah.  What it said in here, what is

18   determined by the trial.

19        Q.   So we would kindly ask you to work with your

20   attorney to correct your response to Request for

21   Production No. 2, which is Exhibit 17, and provide us

22   all documents related to your diminution in value claim.

23        A.   17?

24        Q.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1365 of 3246
Case 1:13-cv-01246-NGG Document 200-41 Entered on FLSD Docket 05/48/2015 Page 128 of 134
Confidential - Subject to Further Confidentiality Review

```
 1              MS. WERKEMA:  Yeah, we can work with her to

 2       correct that.

 3              MS. HAQUE:  Okay, great.

 4    BY MS. HAQUE:

 5       Q.   Okay, Ms. Hernandez, you can go ahead and put

 6    away that document.

 7              You described the guest bath remodeling during

 8    the remediation as an upgrade.  What exactly did the

 9    upgrade contain and consist of?

10       A.   It's not an upgrade.  It's just, like I said,

11    we lost some of the tiles because the construction and

12    we had to change the tile in that bathroom, and we --

13    since we had to put the pantry there, we had to move a

14    little further the toilet.  That's it.  It's not a big

15    upgrade.

16       Q.   Can you explain that again?  So you had to

17    remodel the bathroom because of the pantry?

18       A.   No, we just put the pantry there and we had to

19    move a little further the toilet area so it don't be in

20    the -- we can have enough space for the new pantry.

21       Q.   So you had to move the toilet area?

22       A.   Yeah.

23       Q.   Basically, expand the bathroom in order to

24    account for the area that was taken out for the pantry?
```

1        A.    What had happened is there was a closet in

2    there, and we destroyed the closet and we moved a little

3    further the toilet where the closet was so we can have a

4    little space for the pantry.

5        Q.    It's because the pantry expanded into the area

6    where the bathroom currently is?

7        A.    I don't understand what you said.

8        Q.    So the pantry, you had to carve out area of the

9    bathroom in order to put the pantry because it went back

10    into that other space?

11        A.    Yeah.

12            MS. HAQUE:  No further questions.  Thank you,

13    Mrs. Hernandez.

14            THE WITNESS:  You're welcome.

15            MS. HAQUE:  We can go off the record.

16            (Whereupon, the deposition concluded at

17    11:34 a.m.)

18

19

20

21

22

23

24

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1367 of 3246
Case 1:13-cv-04484-NGG Document 289-14 Entered on FLSD Docket 05/06/2019 Page 130 of 134

Confidential - Subject to Further Confidentiality Review

```
1                    C E R T I F I C A T E

2

3          I, JOAN L. PITT, Registered Merit Reporter,

4     Certified Realtime Reporter, and Florida Professional

5     Reporter, do hereby certify that, pursuant to notice,

6     the deposition of BETTY HERNANDEZ was duly taken on

7     December 18, 2018, at 8:01 a.m., before me.

8          The said BETTY HERNANDEZ was duly sworn by me

9     according to law to tell the truth, the whole truth, and

10    nothing but the truth, and thereupon did testify as set

11    forth in the above transcript of testimony.  The

12    testimony was taken down stenographically by me.  I do

13    further certify that the above deposition is full,

14    complete, and a true record of all the testimony given

15    by the said witness.

16

17    _____

18          JOAN L. PITT, RMR, CRR, FPR

19

20          (The foregoing certification of this transcript

21    does not apply to any reproduction of the same by any

22    means, unless under the direct control and/or

23    supervision of the certifying reporter.)

24
```

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4          Please read your deposition over carefully and

 5   make any necessary corrections.  You should state the

 6   reason in the appropriate space on the errata sheet for

 7   any corrections that are made.

 8

 9          After doing so, please sign the errata sheet

10   and date it.  It will be attached to your deposition.

11

12          It is imperative that you return the original

13   errata sheet to the deposing attorney within thirty (30)

14   days of receipt of the deposition transcript by you.  If

15   you fail to do so, the deposition transcript may be

16   deemed to be accurate and may be used in court.

17

18

19

20

21

22

23

24
```

```
 1                  - - - - - -

 2                E R R A T A

 3                  - - - - - -

 4   PAGE   LINE   CHANGE

 5   _____  _____  _____

 6      REASON: _____

 7   _____  _____  _____

 8      REASON: _____

 9   _____  _____  _____

10      REASON: _____

11   _____  _____  _____

12      REASON: _____

13   _____  _____  _____

14      REASON: _____

15   _____  _____  _____

16      REASON: _____

17   _____  _____  _____

18      REASON: _____

19   _____  _____  _____

20      REASON: _____

21   _____  _____  _____

22      REASON: _____

23   _____  _____  _____

24      REASON: _____
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1370 of 3246
Case 1:14-cv-04083-NGG Document 28-14 Filed October 05, 2018 Page 3 of 18
Confidential - Subject to Further Confidentiality Review
of 134

```
 1                  ACKNOWLEDGMENT OF DEPONENT

 2

 3          I, _____, do hereby

 4   acknowledge that I have read the foregoing pages,

 5   1 - 133, and that the same is a correct transcription of

 6   the answers given by me to the questions therein

 7   propounded, except for the corrections or changes in

 8   form or substance, if any, noted in the attached Errata

 9   Sheet.

10

11

12   _____   _____

13   BETTY HERNANDEZ                    DATE

14

15

16

17

18   Subscribed and sworn to before me this

19   ____ day of _____, 20___.

20   My Commission expires: _____

21

22   _____

     Notary Public

23

24
```

```
1                        LAWYER'S NOTES

2    PAGE    LINE

3    _____   _____   _____

4    _____   _____   _____

5    _____   _____   _____

6    _____   _____   _____

7    _____   _____   _____

8    _____   _____   _____

9    _____   _____   _____

10   _____   _____   _____

11   _____   _____   _____

12   _____   _____   _____

13   _____   _____   _____

14   _____   _____   _____

15   _____   _____   _____

16   _____   _____   _____

17   _____   _____   _____

18   _____   _____   _____

19   _____   _____   _____

20   _____   _____   _____

21   _____   _____   _____

22   _____   _____   _____

23   _____   _____   _____

24   _____   _____   _____
```

# EXHIBIT A15

CONFIDENTIAL - Subject to Further Confidentiality Review

```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2
    EDUARDO AND CARMEN AMORIN,
 3  et al., individually, and
    on behalf of all others
 4  similarly situated,        Case No. 1:11-CV-22408-MGC
 5       Plaintiffs,
 6  vs.
 7
    TAISHAN GYPSUM CO., LTD.,
 8  F/K/A SHANDONG TAIHE
    DONGXIN CO., LTD.; TAIAN
 9  TAISHAN PLASTERBOARD CO.,
    LTD, et al.,
10
         Defendants.
11                            - - -
              CONFIDENTIAL - SUBJECT TO FURTHER
12                  CONFIDENTIALITY REVIEW
                      DECEMBER 18, 2018
13
                              - - -
14
            Deposition of JOHN HERNANDEZ, held at
15  Morgan & Morgan, PA, One Tampa City Center,
    201 North Franklin Street, 6th Floor, Tampa, Florida
16  33602, commencing at 11:35 a.m., on the above date,
    before Joan L. Pitt, Registered Merit Reporter,
17  Certified Realtime Reporter, and Florida
    Professional Reporter.
18
                              - - -
19
              GOLKOW LITIGATION SERVICES
20        877.370.3377 ph | 917.591.5672 fax
                    deps@golkow.com
21
22
23
24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1374 of 3246
Case 1:14-cv-04091-NGG Document 99-11 Entered on FLSD Docket 05/03/2014 Page 2 of
25
Confidential - Subject to Further Confidentiality Review

```
 1                    APPEARANCES

 2

 3     Counsel for Plaintiffs:

 4         HOLLY WERKEMA, ESQUIRE
           Baron & Budd PC
 5         3102 Oak Lawn Avenue, Suite 1100
           Dallas, Texas 75219-4281
 6         214.521.3605
           hwerkema@baronbudd.com

 7

           KEITH J. VERRIER, ESQUIRE
 8         Levin, Sedran & Berman LLP
           510 Walnut Street, Suite 500
 9         Philadelphia, Pennsylvania 19106
           215.592.1500
10         kverrier@lfsblaw.com

11

12     Counsel for Defendants Taishan Gypsum Co., Ltd., and
       Taian Taishan Plasterboard Co., Ltd.:

13

           ALIYYA Z. HAQUE, ESQUIRE
14         PATRICK H. HILL, ESQUIRE
           BOYKIN LUCAS, ESQUIRE
15         Alston & Bird LLP
           One Atlantic Center
16         1201 West Peachtree Street
           Atlanta, Georgia 30309-3424
17         404.881.700
           aliyya.haque@alston.com
18         patrick.hill@alston.com
           boykin.lucas@alston.com

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN  Document 22363-39  Filed 11/19/19  Page 1375 of 3246
Case 1:11-cv-01408-NGG  Document 20911  Entered on FLSD Docket 05/08/2015  Page 49 of
25
Confidential - Subject to Further Confidentiality Review

```
 1                    APPEARANCES CONTINUED

 2

 3   Counsel for Beijing New Building Materials PLC:

 4        DAN GUERRA, ESQUIRE

          Orrick, Herrington & Sutcliffe LLP

 5        The Orrick Building

          405 Howard Street

 6        San Francisco, California 94105-2669

          415.773.5545

 7        dguerra@orrick.com

 8        JOSHUA D. POYER, ESQUIRE

          Aballi Milne Kalil, P.A.

 9        2250 SunTrust International Center

          One Southeast Third Avenue

10        Miami, Florida 33131

          305.373.6600

11        jpoyer@aballi.com

12

13   Also present:  Betty Hernandez

14

15

16

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
1                           - - -

2                    I N D E X

3                           - - -

4    Testimony of:  JOHN HERNANDEZ

5      DIRECT EXAMINATION BY MS. HAQUE                    5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

confidential - Subject to further confidentiality Review

```
1                            -  -  -

2              THE COURT REPORTER:  Raise your right hand,

3        please.  Do you swear or affirm the testimony you

4        give will be the truth, the whole truth, and nothing

5        but the truth?

6              THE WITNESS:  Yes.

7              THE COURT REPORTER:  Thank you.

8              JOHN HERNANDEZ, called as a witness by the

9    Defendant Taishan Gypsum, having been first duly sworn,

10   testified as follows:

11                       DIRECT EXAMINATION

12   BY MS. HAQUE:

13        Q.   Could you please state your name for the

14   record?

15        A.   John David Hernandez.

16        Q.   My name is Aliyya Haque, we met earlier today.

17   I'm one of the attorneys for Taishan Gypsum, one of the

18   defendants in this lawsuit, and I'll be asking you some

19   questions related to your claims in the lawsuit.

20        A.   Okay.

21        Q.   Have you ever been deposed before?

22        A.   What's "deposed"?

23        Q.   Have you ever been asked questions by an

24   attorney related to a lawsuit?
```

```
 1    A.   No, ma'am.

 2         Can I say something first?  Okay.  I'm under

 3    medication.

 4    Q.   Okay.

 5    A.   Under doctor's care.  I have three stents in my

 6    heart.  I got -- my neck is fused.  Okay?  So I'm going

 7    to give the answers the best of my ability.  My back, I

 8    got two disks that are like that, and I'm going for an

 9    operation in January.

10         So if I don't remember something, it's not I'm

11    trying to hide something.  Okay?  So I just wanted to

12    state that also.

13    Q.   Do you feel comfortable continuing today with

14    the deposition?

15    A.   Yes.  Yes.

16    Q.   Okay, great.  You sat in on the deposition of

17    your wife; correct?

18    A.   Correct.

19    Q.   So you heard some of the rules about the

20    deposition, so I'm just going to remind you very

21    briefly.  If you could please respond with a verbal

22    response --

23    A.   Right.

24    Q.   -- instead of a head shake or a nod so that the
```

```
 1    court reporter can take down your answers.

 2            If you don't understand a question I'm asking,

 3    please ask me.  Otherwise, I'll assume you understand.

 4            And then let me know if you need to take a

 5    break.  I'm not going to go through the entire outline

 6    with you, because we spoke to your wife, but if you do

 7    need to take a break, please let me know.

 8       A.   That's fine.

 9       Q.   All right.  Did you meet with your attorney to

10    prepare for this deposition?

11       A.   The only time I ever met or seen my attorney

12    was last night when she flew in from Texas.

13       Q.   Okay.  How long was the meeting?

14       A.   Half hour, 45 minutes.

15       Q.   Okay.  Was anyone else besides your wife and

16    your attorney present at the meeting?

17       A.   No, ma'am.  Matter of fact, I told my children,

18    "Don't come."  I told everybody, "Stay out," because

19    this was important to us.

20       Q.   Okay.  Did you speak with anyone else other

21    than your attorneys to prepare for this deposition?

22       A.   No, ma'am.

23       Q.   Did you review any documents to prepare for

24    this deposition?
```

```
 1      A.   No, ma'am.

 2      Q.   Did you bring any documents with you today?

 3      A.   No, ma'am.

 4      Q.   Okay.  Did you do anything else to prepare for

 5  this deposition?

 6      A.   No, ma'am.

 7      Q.   Okay.  Just some questions about you.  What is

 8  your educational background?

 9      A.   I went to the 10th grade.  I'm dyslexic.  It's

10  hard for me to read.  I'm not retarded.  Okay?  But now

11  I'm a little hard of hearing, but back then, the way I

12  used to pass in class was by hearing more than reading,

13  because the letters are backwards, things like that.

14      Q.   Are you currently employed?

15      A.   Yes, ma'am.  Self-employed.

16      Q.   Where are you employed?

17      A.   River Heights Cleaners.

18      Q.   And how long have you worked there?

19      A.   Well, in the business, me and my wife been 23

20  years.  23, 25.

21      Q.   And did you work before that?

22      A.   Did I work before that?

23      Q.   Did you have a job -- let me rephrase.

24           Did you have a job prior to working at River
```

Confidential - Subject to Further Confidentiality Review

1    Heights Cleaners?

2        A.   Well, I used to be a plumber.  I'm a barber.

3    I'm not good mechanically, but that's basically what I

4    did.  I was a plumber.

5        Q.   And what's your job title at River Heights

6    Cleaners?

7        A.   The boss's assistant.  Right over there

8    (indicating).

9        Q.   And do you also work at BJ Cleaners?

10       A.   Yes.  It's just two different corporations, but

11   I take it all as one.  Basically, my wife does the books

12   and I handle employees, customers, the verbal things.

13       Q.   Understood.  And what is your work schedule?

14       A.   I don't have a specific work schedule.  I used

15   to work from daylight to sunset.  Now I got a camera in

16   our business that I look.  I got a manager.

17            So we try to manage it from home.  I'm 69,

18   going to be 70, so it's -- I'm up there.

19       Q.   What is your current marital status?

20       A.   Fantastic.

21       Q.   How long have you been married?

22       A.   Fantastic.  30 years.

23       Q.   And is your wife, Mrs. Hernandez, in the room

24   here today?

Confidential - Subject to Further Confidentiality Review

```
1      A.   Yes, ma'am.

2      Q.   And did you listen to her testimony today?

3      A.   I listened the best I could.  I was half

4  asleep.  I didn't --

5      Q.   Is there anything that you disagree with or

6  want to change from your wife's testimony here today?

7      A.   Well -- change?  No.  The only part was about

8  the kitchen.  I know y'all made a specific thing.  Well,

9  before, we sold our beach house, we got all our savings,

10  and we put it into this house.  Okay?  Custom-built the

11  kitchen.  Come from Canada.  Cost us about 80,000.

12          We had a 20-something-thousand-dollar thing

13  that Paul Sierra gave us.  So, I mean, it was no

14  upgrade.  We didn't even expect, after $12,000, we

15  didn't expect we was going to get any money anyway, you

16  know.  So we was careful with our money.  We worked hard

17  for our money.

18          You can't -- the stress was tremendous.  So,

19  basically, I heard what she said, but it's not just

20  dollars and cents.  You know, we went through a lot.

21  Besides my son is paralyzed.  He got hit by a drunk

22  driver in a car accident.  We had to provide for him,

23  his house.  My mother, rest in peace, she passed away.

24  She lived with us.
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1383 of 3246
Case 1:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1383 of 3246
Confidential - Subject to Further Confidentiality Review
25

    1           So besides that stress and all our money

    2    invested, then we find out we got Chinese drywall.

    3    Besides the Chinese drywall, we go through the air

    4    conditioning's broke, the air conditioning's broke.  It

    5    was just one after another.

    6       Q.   Let me ask you some questions about what you

    7    just said.

    8       A.   Okay.

    9       Q.   You had mentioned a beach house.  When did you

   10    buy that property?

   11       A.   When did I buy that property?  I think it was

   12    in ninety -- I'm not good with dates.  '93/'94.

   13       Q.   And when did you sell that property?

   14       A.   When we started building this, the house, we

   15    sold it right before that, because our plans was -- we

   16    never got to go to the beach, very seldom -- we would

   17    rent it out to make the payments for the beach house.

   18    Then we had a small 700-square-foot home, so I said

   19    let's sell that and we can invest it in a home, plus put

   20    our savings in this home.  So I sold it about six months

   21    before we built this home.

   22       Q.   Do you remember how much you sold it for?

   23       A.   About 600,000.

   24       Q.   Okay.  And then you used that to cover a down

Confidential - Subject to Further Confidentiality Review

1    payment and start paying the mortgage; is that right?

2        A.    That's correct.  I mean, the mortgage, we used

3    a lot of it for the inside of the house.  I got columns

4    in the house.  I got gold chandeliers.  Not because I'm

5    bragging.  The house is beautiful.  It's on a river.

6    It's got two floors.  It's got an elevator so my son can

7    get in and go up to the second floor, and if there's

8    lightning or electricity goes out, that elevator can

9    come down.  The elevator at the top, that's, like, the

10   first floor.  It's reversed.  So if we have no

11   electricity, my son can come down.

12       Q.    In terms of the chandelier and the elevator,

13   did they have to take that out and replace it?

14       A.    Yes.  No, they didn't replace it.  Okay?  They

15   put it in a box, because one was 24-karat gold, the

16   other one was made out of glass.  Okay?  They put it in

17   a huge box about half the size of this desk and about

18   6 foot tall, about the size of the chandelier, and they

19   had to lower it, because we had electrical motors that

20   my wife already said went bad and there was no room to

21   get up in an attic or something like that.  They tore

22   everything down, put a new motor in there.

23            The chandelier, they brought it down into the

24   box still assembled, moved it, and then when it was

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1385 of 3246
Case 1:19-cv-02240-MLG Document 1 entered on FLSD Docket 05/19/2019 Page 41 of
25
Confidential - Subject to Further Confidentiality Review

```
 1    finished, put it back so they didn't have to take each

 2    crystal piece apart.

 3        Q.   What about the elevator?  Did they -- do you

 4    have the same elevator in the home?

 5        A.   Yes, ma'am.

 6        Q.   Okay.  What about the appliances in the

 7    kitchen?  What happened to the old appliances?

 8        A.   The same thing she told you.  The refrigerator

 9    went first.  Okay?  We got the same appliances.  Like I

10    stated earlier, everything was coming out-of-pocket.  We

11    didn't expect FEMA, homeowners insurance.  Everybody we

12    tried.  Everybody was losing their home, and we tried to

13    keep ours.

14        Q.   Did they try to fix the appliances at any time,

15    the older appliances?

16        A.   No.

17        Q.   So they just sort of took them out and then the

18    new appliances came in?

19        A.   Yeah.  They were bad.

20        Q.   Your wife had mentioned that the Sierra

21    Construction, the company you guys used, they did a

22    little bit of damage, they maybe damaged the roof?

23        A.   Yes.

24        Q.   Did you talk to them about that?
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 1386 of 3246
Case 1:09-cv-07902-GCL Document 1 entity 1 Filed 06/13/9 Page 45 of
Confidential – Subject to Further Confidentiality Review
25

```
 1       A.   Yes.  This is what happened:  First they had to

 2  spray the inside for -- to pass the inspection with the

 3  city to make sure the house would pass inspection.  They

 4  said, "Let's tent it to get everything out of there,

 5  including if there's termites or not.  Let's tent it."

 6           The people that came and tented the house broke

 7  a bunch of tile on there on the top.  We got the Spanish

 8  tile and they walked around like it's a $25,000 home.

 9  They tore it all up.  So he had to replace the tile.

10       Q.   Did you ever complain to the tent fumigation

11  people that, "Hey, you damaged the tile.  Can you fix

12  it?"

13       A.   No, I complained to Paul Sierra, because he's

14  the one that got them.

15       Q.   What did he say to you?

16       A.   No, they took care of it.

17       Q.   So they paid for the tile replacement and the

18  roof fixes?

19       A.   They brought tile and fixed it.  Whether they

20  charged us or not, I'm not sure, but we paid them a set

21  fee and they're supposed to give us back, basically, our

22  home.

23       Q.   So after you complained to him, he at least

24  verbally told you, "I'm going to cover those charges"?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1387 of 3246
Case 1:09-cv-02047-MCA Document 23361-39 Filed 11/19/19 Page 487 of 3246
Confidential - Subject to Further Confidentiality Review
25

 1    A.    Well, he didn't say nothing about "I'm going to

 2    cover it."

 3          "We're going to fix it.  Don't worry."

 4          And it wasn't him I spoke to directly.  It was

 5    the person he had in charge, which I don't remember his

 6    name.

 7    Q.    Okay.  But you believe in your -- you remember

 8    in your conversation with him that he said they were

 9    going to take care of all the problems?

10    A.    Yes.

11    Q.    And did you talk about payment, whether they

12    were going to charge you extra to fix it?

13    A.    No.  The only time I would say something or

14    complain is when my wife would complain to me.  I'm the

15    one that faces the men.  I'm the one that faces any

16    problems.  When things go good, my wife gets the credit.

17    Okay?  When things go bad, I get the problems.

18    Q.    That's life, I think.

19    A.    No, that's why I'm married 30 years.

20    Q.    Can I ask you, were there any other problems

21    that you remember with the remediation process?

22    A.    Well, I know he broke one of our trees and he

23    asked to pay for it.  I told him, "Don't worry about

24    that."  And the tree lived.  You know, it just grew back

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1388 of 3246
Case 1:09-cv-07628-JGK Document 28968-1 Entered on FLSD Docket 05/09/2012 Page 47 of
25
Confidential - Subject to Further Confidentiality Review

1    and lived.

2        Q.   But it was really just the broken tiles and the

3    roof tiles?

4        A.   Yes.

5        Q.   I asked your wife some questions about the

6    mortgage, and she said to ask you.

7        A.   She said that?

8        Q.   Yes, she did.  Do you recall the terms of the

9    mortgage?

10       A.   Oh, yes, she did say that.  The terms of the

11   mortgage, I think it's 15 years, and it's with Suncoast

12   Teachers Credit Union.  And I'm the one that, basically,

13   talked to them, because everybody was losing their home

14   and, like you said, the economy went up and down.  Well,

15   it was hard to get a loan at that time, so I went and

16   talked to them and I told them, "If you can't fix it,

17   I've got to give it back to you."

18            They don't want a home with Chinese drywall.

19   If I fix this house and I try to sell it, they're going

20   to come and say, "Oh, you had Chinese drywall."  But I

21   got records that fixed it.  If you got kids, would you

22   live in a house that had Chinese drywall?  So it would

23   be hard to sell.

24       Q.   One thing that I did not ask your wife but I

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1389 of 3246 of
Case 1:1-cv-22408-MGC Document 12 Entered on FLSD Docket 05/19/2014 Page 18 of
25
Confidential – Subject to Further Confidentiality Review

1  want to ask you to clarify.  Are you seeking any damages

2  related to personal injury in this lawsuit?

3      A.   No.

4      Q.   Okay.  Now, you had mentioned --

5      A.   Unless you want to say my heart.  No, no.  My

6  fragileness.

7      Q.   Got it.  Now, you had mentioned before, you

8  know, noticing some effects of the economy.  Did you

9  notice any effects of the economy on housing prices in

10 Florida?

11     A.   Well, I knew a lot of people were losing their

12 house.  I knew the banks weren't lending money like

13 before, crazy, to everybody that came.  I knew that

14 part.  I knew my cleaners business went down and people

15 didn't bring as much clothes to dry clean because of the

16 economy.  And we lived through all that.

17         MS. HAQUE:  I think we'll just take another

18     minute or two to see if we have any more questions.

19         (Discussion off the record.)

20 BY MS. HAQUE:

21     Q.   I'm sorry.  Where was the beach house located?

22     A.   Indian Shores/Holiday/Sand Castle.

23     Q.   And where was that?  Is it close by Tampa?

24     A.   Right, close to Clearwater.  It's

Confidential – Subject to Further Confidentiality Review

```
1    St. Pete/Clearwater.  Right in the middle.

2          MS. HAQUE:  Can we go off the record for a

3    second?

4          (Discussion off the record.)

5          MS. HAQUE:  We can go back on the record.

6    Mr. Hernandez, like I said, you got the easiest part

7    of this.  I'm done with my questions for you.  I

8    pass the witness.

9          THE WITNESS:  Thank you.

10         MS. WERKEMA:  I don't have any questions on

11   redirect.

12         MS. HAQUE:  And the only other thing that I

13   want to put on the record is we had stated earlier

14   that there's some additional documents that we're

15   going to be getting from the Hernandezes, including

16   a proposal, and we keep the deposition open subject

17   to whether -- our review of those documents and then

18   whether there's any additional questions.

19         MR. VERRIER:  I'm just going to add, yeah, I

20   wanted to follow up on what you were saying to put

21   this on the record.  We've got the 27 documents, and

22   then I believe there was an appraisal and a proposal

23   that we're going to get to you, and then if there's

24   the samples.  We're going to do one last thorough
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1391 of 3246
Case 1:09-cv-02043-CAP Document 25 Entered on FLSD Docket 05/18/2011 Page 20 of
25
Confidential - Subject to Further Confidentiality Review

```
1        search this week and see if they can find them.

2            Having done all that, they're going to try, I

3        think, and get that to you, whether it's the

4        verifications also of the interrogatories, by the

5        end of the week, and that way if you have any

6        follow-up you want, if we can get that going in the

7        next couple weeks, because I know it's going to

8        be --

9            MS. HAQUE:  Sounds good.

10           MR. VERRIER:  -- jammed.

11           THE WITNESS:  And I'm going to try real hard to

12       find it.

13           MS. HAQUE:  Thank you very much.

14           MR. VERRIER:  Thank you.

15           (Whereupon, the deposition concluded at

16       11:52 a.m.)

17

18

19

20

21

22

23

24
```

Confidential – Subject to Further Confidentiality Review

```
 1                    C E R T I F I C A T E

 2

 3              I, JOAN L. PITT, Registered Merit Reporter,

 4      Certified Realtime Reporter, and Florida Professional

 5      Reporter, do hereby certify that, pursuant to notice,

 6      the deposition of JOHN HERNANDEZ was duly taken on

 7      December 18, 2018, at 11:35 a.m., before me.

 8              The said JOHN HERNANDEZ was duly sworn by me

 9      according to law to tell the truth, the whole truth, and

10      nothing but the truth, and thereupon did testify as set

11      forth in the above transcript of testimony.  The

12      testimony was taken down stenographically by me.  I do

13      further certify that the above deposition is full,

14      complete, and a true record of all the testimony given

15      by the said witness.

16

17              _____

18              JOAN L. PITT, RMR, CRR, FPR

19

20              (The foregoing certification of this transcript

21      does not apply to any reproduction of the same by any

22      means, unless under the direct control and/or

23      supervision of the certifying reporter.)

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1393 of 3246
Case 1:09-cv-02042-MGC Document 24981 Confidential Subject to Docket 05/09/2019 Page 42 of
25

Confidential - Subject to Further Confidentiality Review

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4           Please read your deposition over carefully and

 5    make any necessary corrections.  You should state the

 6    reason in the appropriate space on the errata sheet for

 7    any corrections that are made.

 8

 9           After doing so, please sign the errata sheet

10    and date it.  It will be attached to your deposition.

11

12           It is imperative that you return the original

13    errata sheet to the deposing attorney within thirty (30)

14    days of receipt of the deposition transcript by you.  If

15    you fail to do so, the deposition transcript may be

16    deemed to be accurate and may be used in court.

17

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1394 of 3246
Case 1:14-cv-09148-MCA Document 22363-39 Filed 11/19/19 Page 1394 of 3246
Confidential - Subject to Further Confidentiality Review
25

```
1                         - - - - - -

2                        E R R A T A

3                         - - - - - -

4    PAGE   LINE   CHANGE

5    _____  _____  _____

6      REASON: _____

7    _____  _____  _____

8      REASON: _____

9    _____  _____  _____

10     REASON: _____

11   _____  _____  _____

12     REASON: _____

13   _____  _____  _____

14     REASON: _____

15   _____  _____  _____

16     REASON: _____

17   _____  _____  _____

18     REASON: _____

19   _____  _____  _____

20     REASON: _____

21   _____  _____  _____

22     REASON: _____

23   _____  _____  _____

24     REASON: _____
```

```
 1                    ACKNOWLEDGMENT OF DEPONENT

 2

 3          I, _____, do hereby

 4   acknowledge that I have read the foregoing pages,

 5   1 - 24, and that the same is a correct transcription of

 6   the answers given by me to the questions therein

 7   propounded, except for the corrections or changes in

 8   form or substance, if any, noted in the attached Errata

 9   Sheet.

10

11

12   _____   _____

13   JOHN HERNANDEZ                     DATE

14

15

16

17

18   Subscribed and sworn to before me this

19   ____ day of _____, 20___.

20   My Commission expires: _____

21

22   _____

     Notary Public

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                          LAWYER'S NOTES

 2     PAGE    LINE

 3     _____   _____   _____

 4     _____   _____   _____

 5     _____   _____   _____

 6     _____   _____   _____

 7     _____   _____   _____

 8     _____   _____   _____

 9     _____   _____   _____

10     _____   _____   _____

11     _____   _____   _____

12     _____   _____   _____

13     _____   _____   _____

14     _____   _____   _____

15     _____   _____   _____

16     _____   _____   _____

17     _____   _____   _____

18     _____   _____   _____

19     _____   _____   _____

20     _____   _____   _____

21     _____   _____   _____

22     _____   _____   _____

23     _____   _____   _____

24     _____   _____   _____
```

# EXHIBIT A16

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1398 of 3246
Case 1:11-cv-22408-MGC Document 208-1 Entered on FLSD Docket 05/02/2019 Page 2 of
64
CONFIDENTIAL - Subject to Further Confidentiality Review

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2
     EDUARDO AND CARMEN AMORIN,
 3   et al., individually, and
     on behalf of all others
 4   similarly situated,         Case No. 1:11-CV-22408-MGC
 5       Plaintiffs,
 6   vs.
 7   TAISHAN GYPSUM CO., LTD.,
     F/K/A SHANDONG TAIHE
 8   DONGXIN CO., LTD.; TAIAN
     TAISHAN PLASTERBOARD CO.,
 9   LTD, et al.,
10       Defendants.
11              CONFIDENTIAL - SUBJECT TO FURTHER
                    CONFIDENTIALITY REVIEW
12
                          - - -
13
                       JANUARY 4, 2019
14
                          - - -
15
         Deposition of DEBORAH LALWANI, held at The JG
16   Firm, 1855 Griffin Road, Suite C-470, Dania,
      Florida, commencing at 12:11 p.m., on the above
17   date, before Joan L. Pitt, Registered Merit
     Reporter, Certified Realtime Reporter, and Florida
18   Professional Reporter.
19                        - - -
20              GOLKOW LITIGATION SERVICES
            877.370.3377 ph | 917.591.5672 fax
21                  deps@golkow.com
22
23
24
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1399 of 3246
Case 1:13-cv-00408-NGG Document 44-1 Filed 05/08/2013 Page 2 of
64
Confidential - Subject to Further Confidentiality Review

```
 1                    APPEARANCES

 2

 3    Counsel for Plaintiffs:

 4        ALLISON GRANT, ESQUIRE
          Allison Grant, PA
 5        14 SE 4th Street
          Boca Raton, Florida 33432
 6        561.994.9646
          agrant@allisongrantpa.com
 7
          KEITH J. VERRIER, ESQUIRE
 8        Levin, Sedran & Berman LLP
          510 Walnut Street, Suite 500
 9        Philadelphia, Pennsylvania 19106
          215.592.1500
10        Kverrier@lfsblaw.com
11    Counsel for Defendants Taishan Gypsum Co., Ltd., and
      Taian Taishan Plasterboard Co., Ltd.:
12
          MICHAEL J. BARRY, ESQUIRE
13        ASHTON G. CARPENTER, ESQUIRE
          SARAH O'DONOHUE, ESQUIRE
14        Alston & Bird LLP
          One Atlantic Center
15        1201 West Peachtree Street
          Atlanta, Georgia 30309-3424
16        404.881.7000
          mike.barry@alston.com
17        ashton.carpenter@alston.com
          sarah.odonohue@alston.com
18
19
20
21
22
23
24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1400 of 3246
Case 1:19-cv-00484-WCG Document 269-1 Filed 04/08/2020 Page 246 of 64
Confidential - Subject to Further Confidentiality Review

```
 1                APPEARANCES CONTINUED

 2

 3   Counsel for Beijing New Building Materials PLC:

 4       DIANA SZEGO FASSBENDER, ESQUIRE
         Orrick, Herrington & Sutcliffe LLP
 5       Columbia Center
         1152 15th Street, Northwest
 6       Washington, DC 20005-1706
         202.339.8533
 7       dszego@orrick.com

 8       ALEX B. ROTHENBERG, ESQUIRE
         Gordon Arata Montgomery Barnett
 9       201 St. Charles Avenue, 40th Floor
         New Orleans, Louisiana 70170-4000
10       504.582.1111
         arothenberg@gamb.law

11

12   Also present:  Gul Lalwani

13

14

15

16

17

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-20 Filed 11/19/19 Page 1401 of 3246
Case 2:13-cv-02408-NGE Document 289-11 *SEALED* Filed 08/08/2013 Page 4 of 64
Confidential - Subject to Further Confidentiality Review

```
 1                          - - -

 2                     I N D E X

 3                          - - -

 4   Testimony of:  DEBORAH LALWANI

 5    DIRECT EXAMINATION BY MR. BARRY                    5

 6

 7

 8             E X H I B I T   I N D E X

 9   LALWANI           DESCRIPTION               PAGE

10   No. 15     E-mail string dated 6/15/2010         46

11   No. 16     E-mail string dated 4/18/2010, with   55

                attachments - Knauf Plasterboard

12              (Tianjin) Co. Ltd.'s Proposed

                Findings of Fact and Conclusions of

13              Law, Response to Knauf Proposed

                Findings of Fact and Conclusion of

14              Law

15

16

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                        - - -

 2              THE COURT REPORTER:  Raise your right hand,

 3       please.  Do you swear or affirm the testimony you

 4       give will be the truth, the whole truth, and nothing

 5       but the truth?

 6              THE WITNESS:  I do.

 7              THE COURT REPORTER:  Thank you.

 8              DEBORAH LALWANI, called as a witness by the

 9   Defendant Taishan Gypsum Co., Ltd., having been first

10   duly sworn, testified as follows:

11                        DIRECT EXAMINATION

12   BY MR. BARRY:

13       Q.   Mrs. Lalwani, do you mind stating your name for

14   the record, please?

15       A.   Yes.  It's Deborah Lalwani.  You can call me

16   Deborah.  We've heard enough of Lalwani.

17       Q.   Perfect.  Thank you.

18       A.   Okay.

19       Q.   My name is Mike Barry.

20       A.   Mike.

21       Q.   I represent Taishan, and alongside my

22   colleagues, Sarah O'Donahue and Ashton Carpenter.

23              And I'm just going to ask everyone in the room

24   if they might introduce themselves so you know who's
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1403 of 3246
Case 1:19-cv-00449-LG-RHW Document 200-1 Filed 05/19/2019 Page 41 of 64
Confidential - Subject to Further Confidentiality Review

1   here.  I know you know everyone here, but just so we

2   have it for the record.

3       A.   Okay.

4           MR. ROTHENBERG:  Alex Rothenberg for BNBM.

5           MS. FASSBENDER:  Diana Fassbender for BNBM.

6           MR. VERRIER:  Keith Verrier -- excuse me --

7       Verrier, from Levin, Sedran & Berman, in

8       Philadelphia, on behalf of the plaintiffs.

9           MS. GRANT:  And Allison Grant on behalf of the

10      plaintiffs.

11          MR. BARRY:  Keith's been on this case so long

12      his voice is changing.

13          And I'll represent for the record that

14      Dr. Lalwani is also sitting in the room.

15  BY MR. BARRY:

16      Q.   Ms. Lalwani, I know you've heard me say this to

17  your husband just before.  I'm going to ask you

18  questions, and I ask just, if you don't mind, please

19  waiting until I finish my question, and then you're

20  going to answer it, and I will make sure that I'm not

21  interrupting you.  Every once in a while your counsel is

22  going to say something that will object and she'll tell

23  whether she's instructing you not to answer, but that

24  will be, usually, concerning something privileged.  Most

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1404 of 3246
Case 1:14-cv-04048-NGG Document 009-11 Confidential Filed Deposited 05/22/019 Page 8 of
64
Confidential - Subject to Further Confidentiality Review

1    objections you can continue your answer.

2         If you don't understand one of my questions,

3    please do not hesitate to ask me to rephrase it.

4         Also, if there is any time where you need to

5    take a break, please let me know.  I'm happy to break

6    whenever.  I just ask that whatever question is on the

7    table we can finish it so we make sure we're getting

8    through everything.

9         One other thing, and I know you're probably

10   like me and sometimes just like to nod your head yes or

11   nod your head no, she doesn't know what that means if

12   it's an answer.  You're welcome to go on just doing

13   this, but when you're answering a question you need to

14   make sure that you're answering it fully and audibly so

15   that she can be able to take it down.  She will not

16   write down "nodding head yes."

17        A.    Yes.

18        Q.    Have you ever sat for a deposition before?

19        A.    Yes.

20        Q.    When was that?

21        A.    Oh, back in the '90s.

22        Q.    What was the nature of that case?

23        A.    A car accident.

24        Q.    Were you a victim of a car accident?

```
 1      A.   Yes.

 2      Q.   Were you a plaintiff in that lawsuit?

 3      A.   Yes.

 4      Q.   Did -- have you ever been a plaintiff in a

 5   lawsuit before, other than the car accident case or this

 6   one?

 7      A.   No.

 8      Q.   Have you ever been a defendant in a lawsuit?

 9      A.   No.

10      Q.   Do you understand that you've been sworn and

11   must tell the truth as if testifying in court?

12      A.   Yes.

13      Q.   Are you taking any medications that will impair

14   your ability to understand my questions and to answer

15   truthfully and fully?

16      A.   No.

17      Q.   I know -- I, of course, do not want to know the

18   nature of any medical.  I know you said you just had

19   surgery?

20      A.   Well, recovering.

21      Q.   And I'm glad you're on the recovery side.

22      A.   Thank God.

23      Q.   Are you taking any pain medication related

24   to --
```

```
 1       A.   Not at present.

 2       Q.   Okay.  You're brave.

 3       A.   Well, I've been that route already, so I'm on

 4  aspirin, you know, Motrin.

 5       Q.   Understood.  Are you currently employed,

 6  Deborah?

 7       A.   Retired.

 8       Q.   And what was your employment before you

 9  retired?

10       A.   Licensed Clinical Social Worker.

11       Q.   Okay.  And where did you work?

12       A.   I worked at Camden County Superior Courts.

13       Q.   I know Camden County well.

14       A.   You do?

15       Q.   Yes.  My uncle is a judge there.

16       A.   What's his name?

17       Q.   Gary Wodlinger.  You probably wouldn't think

18  well of me if you heard that.

19       A.   No.

20       Q.   All right.  And are you married?

21       A.   Yes, I am.

22       Q.   To whom?

23       A.   Gul Lalwani.

24       Q.   And how long have you and Dr. Lalwani been
```

Confidential - Subject to Further Confidentiality Review

```
 1   married?

 2      A.   28 years.  I'll set the record straight.

 3      Q.   Now, Ms. Lalwani, I know we've sat through most

 4   of your husband's deposition, and I'm going to try to

 5   streamline things so that we're not asking you the same

 6   questions that he's answered --

 7      A.   Yes.

 8      Q.   -- so I'm going to ask you a broad sweeping

 9   question, which is:  Is there anything that your husband

10   said today that you believe was inaccurate?

11      A.   No.

12      Q.   Is there anything that your husband said today

13   that you believe was incomplete?

14      A.   No.

15      Q.   Is there anything today that your husband did

16   not remember that you may remember?

17      A.   To be honest with you, I can't remember

18   everything that was said here today.

19      Q.   I understand that.

20      A.   It's okay.

21      Q.   So I guess we are going to have to walk through

22   the questions then.  So let's talk a little bit about,

23   when you purchased -- when did you purchase the

24   property?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1408 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 42 of 64
Confidential – Subject to Further Confidentiality Review

```
 1      A.   I don't remember.  It's so long ago.

 2           MS. GRANT:  Mike, can we go off the record for

 3      one second?

 4           MR. BARRY:  What?

 5           MS. GRANT:  Can we go off the record for one

 6      second?

 7           MR. BARRY:  Yes.

 8           (Discussion off the record.)

 9           MR. BARRY:  Going back on the record.

10           MS. GRANT:  Thank you.

11      BY MR. BARRY:

12      Q.   Ms. Lalwani, based on the clarification your

13      attorney provided me off the record, is there anything

14      today that your husband, when answering my questions,

15      said he did not remember that you believe your memory is

16      better suited to answer?

17      A.   No.

18      Q.   So if your husband did not remember something,

19      you probably did not remember it either?

20      A.   Correct.

21      Q.   Okay.  Do you remember when you purchased the

22      property?

23      A.   Geez.  It was early 2004, '05, something.  '06.

24      Something like that.
```

Case 2:09-md-02047-EEF-MBN  Document 22362-39  Filed 11/19/19  Page 1409 of 3246
Case 1:09-cv-02047-EEF-MBN  Document 22362-39  Filed 11/19/19  Page 48 of 64
Confidential - Subject to Further Confidentiality Review

```
 1       Q.   I'm going to refer you to a document that is

 2   entitled First Amended Supplemental Plaintiff Profile

 3   Form that's in front of you.  I do not have an extra

 4   copy, but the copy that -- perhaps your attorney can

 5   help you find it.

 6            MS. GRANT:  Amended, or just the supplement?

 7            MR. BARRY:  The first amended supplemental.

 8            THE WITNESS:  Supplemental plaintiff's?

 9            MR. VERRIER:  It's going to be Exhibit 9?

10            MR. BARRY:  I think that's right.  And just for

11        ease of reference to this, we're going to refer to

12        this as Exhibit 9 because it was Exhibit 9 to

13        Dr. Lalwani's deposition, and we'll make sure we

14         know that there might be some gaps in exhibits,

15        because I'm not going to be showing everything to

16        Mrs. Lalwani.

17   BY MR. BARRY:

18       Q.   Have you ever seen this document before,

19   Ms. Lalwani?

20       A.   I don't remember seeing it.

21       Q.   If you'd turn to page 2 of this document and

22   look at Section II.

23       A.   Section II, yes, I see it.

24       Q.   There's a question that says:  "When did you
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1410 of 3246
Case 1:19-cv-22620-MGC Document 1-39 Entered on FLSD Docket 05/09/2019 Page 41 of 64
Confidential - Subject to Further Confidentiality Review

1   acquire the property?  Month/day/year."  It says

2   October 21, 2006.

3           Do you remember acquiring the property roughly

4   in 2006?

5       A.   I don't remember.

6       Q.   Okay.  Do you own any other properties either

7   with -- alone or with your husband?

8       A.   Yes.

9       Q.   What other properties do you own?

10      A.   Our house in New Jersey and in Delray Beach.

11      Q.   Where is the house in New Jersey?

12      A.   32 Rollingwood Drive.

13      Q.   And when -- do you remember when you purchased

14   the house, roughly?

15      A.   In New Jersey?

16      Q.   Yes.

17      A.   Oh, my God.

18      Q.   Roughly.  You can ballpark it for me.

19      A.   Say 1989, maybe, '90.

20      Q.   Do you remember when you purchased the house in

21   Delray Beach?

22      A.   No.

23      Q.   Was it in 2011?

24      A.   Could be around there.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1441 of 3246
Case 1:09-cv-02047-MGC Document 23861 Entered on FLSD Docket 05/18/2011 Page 45 of
64
Confidential – Subject to Further Confidentiality Review

```
 1        Q.    Did you purchase a house in 2007?

 2        A.    In 2007?  Could that be the Vero Beach house on

 3    Kodiak Drive?

 4        Q.    You tell me.

 5        A.    I don't know.  Yeah, I don't know.  I don't

 6    know.

 7        Q.    You don't remember if you purchased a home in

 8    2007?

 9        A.    Yeah, I don't know.

10        Q.    Ms. Lalwani, when did you start suspecting that

11    there was Chinese drywall in your house?

12        A.    Well, I can never say I suspected Chinese

13    drywall.  I know we had problems with the house.

14        Q.    When did you start -- and understanding that

15    you knew you had problems with the house, when did you

16    start suspecting that those problems were attributed to

17    Chinese drywall?

18        A.    When the inspector came and told me.

19        Q.    Do you remember when that was?

20        A.    It was -- whenever I -- whatever is written on

21    those documents is when I was told.

22        Q.    So if you look at the same section we were just

23    looking at a second ago --

24        A.    First amended supplemental?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1412 of 3246
Case 1:09-cv-07666 Document 22362-39 Filed 05/19/2011 Page 46 of
64
Confidential – Subject to Further Confidentiality Review

1    Q.    Yes, and Section II, which is on page 2.

2    A.    Okay.

3    Q.    It says:  "If you were not aware, at the time

4    you acquired the property, the property contained

5    Chinese drywall, when did you first become aware of the

6    property containing" -- "when did you first become aware

7    that the property contained Chinese drywall?"

8          What date is listed there?

9    A.    Well, that says March 2009.

10   Q.    Is that -- do you believe there's any reason to

11   think that number -- that date is inaccurate for when

12   you learned that Chinese drywall was in the house?

13   A.    I don't know.  I don't know, because I don't

14   remember.  We had an inspection, and that's all I know

15   is that's when I know I had Chinese drywall, through the

16   inspection.

17   Q.    Earlier your husband testified that he did not

18   have a particularly good sense of smell so he wasn't

19   sure whether there was an odor in the house.

20   A.    That's true, he doesn't smell anything.  The

21   house could be on fire.  Yeah.

22   Q.    Did you ever notice that there was an odor in

23   the house?

24   A.    Yes.

Confidential - Subject to Further Confidentiality Review

```
 1       Q.   What did that odor smell like?

 2       A.   Just a faint weird.  Faint.  Just something

 3   wasn't right.  Just something smelled.  You never --

 4   could never figure that out, but it didn't smell right.

 5       Q.   Was there any particular part of the house that

 6   smelled worse than others?

 7       A.   No.  It was an icky feeling in that house.

 8       Q.   How much time did you spend at the house?

 9       A.   Well, we were there off and on a lot through

10   the year, actually.  We were always flying down.

11   Ultimately it would be a place where not only my husband

12   was going to live, my parents were also going to live

13   there, which I had the -- one of the bedrooms amended to

14   have a lot of closets put in so that they'd have their

15   mother-in-law suite.

16       Q.   And what percentage of the year would you say

17   that you were living at this home versus your home in

18   New Jersey?

19       A.   Probably -- maybe close to half and half.

20       Q.   And what -- I think your husband testified

21   earlier that once you learned there was Chinese drywall

22   in the house you really didn't go back to the house

23   after that?

24       A.   Oh, no.  No.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1414 of 3246
Case 1:09-cv-07687-LAK Document 228-11 Exhibit 39 Filed 05/09/2011 Page 48 of
64
Confidential – Subject to Further Confidentiality Review

```
 1      Q.   So after that, it was no longer half and half?

 2      A.   Oh, no.  We didn't even want to go in there

 3   again.

 4      Q.   When did you retire?

 5      A.   Oh, God.  I think that was -- that was the last

 6   job.  My last job, I was adjunct professor at Rowan, so

 7   I believe that was 2006 or 2005, something like that.

 8      Q.   The former Glassboro State?

 9      A.   Yes.

10      Q.   I know that area.

11      A.   Sociology.

12      Q.   My aunt and my cousin both went there.

13      A.   Your family is all over the place.

14      Q.   South Jersey.

15      A.   Yeah.

16      Q.   Did you visit -- when you were staying at the

17   house, you said you were there half and half.

18      A.   Probably.

19      Q.   Was that during a particular time of the year?

20   Was it every month?

21      A.   No, it was sporadic, whenever we were able, we

22   could.  I sometimes was in Florida without my husband.

23      Q.   When did you first start considering -- did you

24   end up selling the house?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1415 of 3246
Case 1:09-cv-02047-MCA Document 2081-01 Enterprise Flora Docket 05/08/2015 Page 40 of
64
Confidential - Subject to Further Confidentiality Review

```
 1      A.    Yes, we sold the house.

 2      Q.    Do you remember when you sold the house?

 3      A.    I'm sure it's in these papers, because I don't

 4   remember the exact dates.

 5      Q.    When did you start thinking about whether to

 6   sell the house?

 7      A.    Well, to be honest with you, it was not a good

 8   feeling, that house, and I can say this, you know, under

 9   oath, I never felt good in that house.  As a matter of

10   fact, I caught -- I had a lot of flus, and I'm not

11   usually sick, but I didn't blame the house.  Why would

12   you blame the house?  You know what I mean?  It's

13   craziness.  But I just never felt good.

14         I had -- I don't know what more to say on that.

15   I didn't have a good feeling inside that house.

16      Q.    Do you remember whether you had decided to sell

17   the house before you found Chinese drywall in the home?

18      A.    Well, actually, I never had this good feeling

19   about that house, so I never -- yeah, I mean, I wasn't

20   happy because I didn't like the feeling I had in the

21   house.  I mean, it's just weird, and I think that maybe

22   some women would probably understand that more than men.

23   It's a very sensing feeling sort of thing that, you

24   know, I just didn't feel good in that house.  It didn't
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1416 of 3246
Case 1:09-md-02047-CAE Document Confidential Subject to Filed 05/19/2017 Page 40 of
Confidential - Subject to Further Confidentiality Review
64

```
 1    give me a good vibe.

 2        Q.   So would it be fair to say that you considered

 3    selling the house before March of 2009?

 4        A.   Probably.  I mean, probably.  I never felt good

 5    in there.  I can't be more honest than that.  I just --

 6        Q.   Was there -- and I know you said it was just a

 7    general feeling.  Could you articulate what that general

 8    feeling was on why you didn't feel right in the house?

 9            MR. VERRIER:  Object.

10            THE WITNESS:  Icky, like, not comfortable.  I

11        don't know how to explain my feeling in there.  It's

12        not where I can say, oh, I had anger or oh, I had

13        happiness or something.  I just -- it was like if

14        you walk into a place and you'd say, "Oh, my God,

15        this place gives me the creeps," you know, kind of

16        thing.  It felt weird or icky, creepy.  I don't know

17        how to really put a feeling on it.

18    BY MR. BARRY:

19        Q.   Did it have anything to do with the odor in the

20    house?

21        A.   Well, it had this little smell, so I didn't

22    know what the heck that was, but, you know.  And my

23    husband didn't smell a thing, so he was, like, "You know

24    you're smelling these things and you're imagining."  I'm
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1417 of 3246
Case 1:09-md-02047-CAL Document confidential Subject to Docket 05/18/2011 Page 46 of
Confidential - Subject to further Confidentiality Review
64

```
 1   not imagining anything, you know, but, you know how men

 2   are, so, you know.

 3       Q.   Let's take a look at that supplemental

 4   plaintiff form that we were looking at just a second

 5   ago.  Let's look at Section VI, which is on page 5.

 6       A.   Yes, I see it.

 7       Q.   Do you recall if there were any other payments

 8   made to you or your husband related to the Chinese

 9   drywall?

10       A.   I don't recall.

11       Q.   Do you have any reason to doubt that the two

12   payments listed there, which are in the amounts of

13   $23,745.31 and $3.14, are incorrect?

14       A.   I don't have any reason to doubt it.

15       Q.   Okay.  Looking at Section VII, which is other

16   damages, the first section says:  "If you incurred

17   alternative living expenses as a result of Chinese

18   drywall, identify the total moving cost and/or

19   alternative living expense you incurred."

20       A.   Okay, I see it.

21       Q.   What is the amount listed there?

22       A.   Estimated 50,000.

23       Q.   I think you're referring to the wrong one.

24       A.   Wrong line?
```

Confidential - Subject to Further Confidentiality Review

```
 1      Q.   On the bottom of page 5, there's a line that I

 2   read.  "If you incurred alternative living" --

 3           MS. GRANT:  Mike, do you mind if I point?

 4           MR. BARRY:  Yeah, please.

 5   BY MR. BARRY:

 6      Q.   "If you incurred alternative living expenses as

 7   a result of Chinese drywall, identify the total moving

 8   costs and/or living expense incurred."

 9      A.   So the answer would be under "attach all

10   receipts and documents"?

11           MS. GRANT:  Next one.

12           THE WITNESS:  "If you experienced any loss or

13       use"?

14           MS. GRANT:  I'm sorry.  Where it says "attach,"

15       that's where the amount is.

16   BY MR. BARRY:

17      Q.   The answer is the page before.  I'm going to

18   represent for the record that this answer is left blank.

19   Are you seeking any damages for alternative living

20   expenses?

21      A.   Well, any damages that, you know, occurred due

22   to the loss of this property I would think is expected,

23   because it's a loss.

24      Q.   Did you have to pay to live somewhere else
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1419 of 3246
Case 1:11-cv-22408-MGC Document 29-41 Entered on FLSD Docket 05/19/2011 Page 48 of
64
Confidential - Subject to Further Confidentiality Review

```
 1   because of the Chinese drywall in this property?

 2       A.   Well, we incurred traveling expenses, yes,

 3   because we had to fly back and forth, and on occasion I

 4   did drive.  I have dogs.

 5       Q.   Were you driving back and forth as a result of

 6   the Chinese drywall being in the house?

 7       A.   Oh, no, that was before I had -- I knew, you

 8   know, it had Chinese drywall.

 9       Q.   So you were not incurring any living expenses

10   directly related to the Chinese drywall being in the

11   house?

12       A.   Well, we were in the house and we didn't know

13   we had Chinese drywall.

14       Q.   Yes, ma'am, and I understand that.  What I'm

15   saying is, did you have to incur any expenses living

16   somewhere other than the house because Chinese drywall

17   was in the house?

18       A.   After I moved out of the house, that's what you

19   mean?

20       Q.   During the time when you were living in the

21   house, was there any expenses incurred for living

22   somewhere else?

23       A.   I'm confused.  While I was living in the house

24   and expenses, I don't understand.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1420 of 3246
Case 1:09-md-02047-EEF-MBN Document 22361-39 Filed 11/Docket 05/19/2019 Page 42 of 64
Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Did you have to go live in a hotel?  Did you

 2   have to go rent another property?  Did you -- while you

 3   owned your house.

 4      A.   After I bought the house and it was finished,

 5   you mean?

 6      Q.   Yes.

 7      A.   And I was living there?

 8      Q.   Yes.

 9      A.   Did I have to go live someplace else?

10      Q.   Yes.

11      A.   No, because we could live in that house.  Silly

12   to live someplace else if I could live there.

13      Q.   So to be clear, you did not incur any living

14   expenses related to living somewhere other than the

15   house during the time you owned the home?

16      A.   When we owned the home, we lived in the home.

17      Q.   I'll move on from there.

18           Let's turn the page, please.  Or you've already

19   turned the page there.  On the top, the second

20   paragraph, it says:  "If you experienced any loss of use

21   and/or loss of enjoyment of the property as a result of

22   Chinese drywall, identify the total amount of such

23   loss."  And you've listed there "estimated $50,000,

24   however, to be determined at trial."
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/10 Page 1421 of 3246
Case 1:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/10 Page 1421 of 3246
Confidential – Subject to Further Confidentiality Review
64

1    Did you lose any use or enjoyment of the

2    property while you owned it?

3    A.    Yes.

4    Q.    How so?

5    A.    Well, while we owned it, I was not happy there.

6    I was unhappy in a home that we spent hundreds of

7    thousands of dollars for that was going to be our future

8    home and it was something not good about it.  It's like

9    if you're walking down the street and you feel there's

10   something behind you but you can't -- you don't --

11   nothing's there, but you have a feeling.

12   It never felt good and I was very unhappy.  It

13   caused, you know, stress between us, because my husband

14   was, like, "Are we crazy?  We just built this house."

15   And I was saying, "No, I'm not, there's issues here and

16   I don't know what they are.  I don't feel good."

17   Q.    And do you have any understanding of why you're

18   claiming that as a result of the loss of use and loss of

19   enjoyment that it is in the amount of $50,000, excluding

20   any conversations you've had with your counsel?

21   A.    I'm going to just defer to my attorney.

22   Q.    So interpreting that, you have no personal

23   understanding outside of the advice your counsel's

24   provided for you of why you're claiming $50,000?

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1422 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1422 of 3246
Confidential - Subject to Further Confidentiality Review
64

```
1        A.    If you're asking me what -- is this after I

2    found out or how I felt?  I mean, I don't know exactly

3    what I'm being asked.

4        Q.    On this document you're saying that --

5        A.    I understand what that's saying, but in order

6    to answer that, is this saying how I felt, what it did

7    to me, or how -- I don't know how to answer it.

8        Q.    My question is:  Do you have any personal

9    knowledge of how you reached this $50,000 that you're

10   requesting in this litigation?

11       A.    Well, I'm going to once again defer to my

12   attorney, because I'm not comfortable with this

13   question.

14       Q.    Well, and, again, the question is a very narrow

15   one.

16       A.    I understand.

17       Q.    It is:  Do you have any personal knowledge

18   outside of your attorney of how you reached this

19   $50,000?

20       A.    I can tell you how I feel and what happened to

21   me, and I became very depressed, traumatized.  I had

22   extreme emotional upset.  I could barely function.  It

23   was like PTSD.  I mean, this was an extreme amount of

24   money that, you know, I'm no Zen Buddhist here that can
```

Confidential - Subject to Further Confidentiality Review

1    say, okay, this is gone and life goes on.  No.  I took

2    this bad, real bad.  I was angry and depressed, upset.

3    I mean, horrible, horrible.

4            To this day, coming here, and this is the God's

5    honest truth, I could cry right now.  It gives me

6    extreme stress to talk about this place, because it was

7    abominable.  My heart is going like this, because it was

8    horrible to have this happen to you after all that

9    you've been through.

10   Q.   And I can only imagine.

11   A.   And you know what?  And it doesn't matter.  The

12   bottom line is, because of that drywall, we lost, and I

13   to this day am traumatized from it, because of that,

14   bottom line, not because of anything else.  You can ask

15   me a million questions, but because of that.

16   Q.   Ms. Lalwani, I understand, and I know you've

17   been through a lot here, and I'm trying to be -- I'm

18   sympathetic to what you've been through.

19   A.   I mean, I don't know how many years it is now,

20   but it's still bad.  It's still really bad.  I mean, I

21   have anger to this day.  I know it's wrong, and I don't

22   want to have that kind of stuff in my heart, but it's --

23   you don't know until you've been in someone's shoes and

24   you've lived through something like that.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1424 of 3246
Case 1:1-cv-22408-MGC Document 234 Entered on FLSD Docket 05/29/2014 Page 28 of
64
Confidential - Subject to Further Confidentiality Review

```
 1              And it's money.  Thank God it's money.  This

 2    issue I have is far more important than that money, but

 3    it's still life, and it's hard-earned money, you know.

 4    And not only the money, it was the dream.  It was I had

 5    elderly parents.  We had a plan.  We had expectations.

 6    I don't know what more to say.

 7       Q.   No, I hear you.

 8       A.   I'm sorry.  I apologize.

 9            MS. GRANT:  Would you like to take a break?

10            THE WITNESS:  No, I'm okay.  No, I don't want

11        to take a break, because we'll be here forever.

12        I'll never get out of here.

13            MR. BARRY:  Let's take a quick break.

14            THE WITNESS:  No, no, I don't want to take a

15        break.  I really don't.  I'm okay.  I'm okay.

16    BY MR. BARRY:

17       Q.   And, Ms. Lalwani, I understand everything

18    you're saying, and --

19       A.   You just brought out the --

20       Q.   And I'm not trying to.

21       A.   I know.  I'm sorry.  I couldn't help it.  I

22    knew it was going to have to come sooner or later.

23       Q.   And all I'm asking here is:  You and your

24    husband have provided information to us.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1425 of 3246
Case 1:1-cv-22408-MGC Document 29-16 Entered on FLSD Docket 05/13/2011 Page 29 of
64
Confidential – Subject to Further Confidentiality Review

 1      A.   Yes.

 2      Q.   And this information comes from somewhere.

 3      A.   Yes.

 4      Q.   And I want to understand the extent of your

 5   understanding of that information.  And whatever your

 6   answer is is your answer, and I'm okay with that.  I'm

 7   not trying to trick you into a question or anything like

 8   that.

 9      A.   If it's the same question, I'm going to defer

10   to my attorney.  Okay?

11      Q.   And I hear what you're saying.

12      A.   I interrupted you.  I'm sorry.

13      Q.   I hear what you're saying.  I'm asking you a

14   very, very narrow question.  And I recognize that you've

15   probably had conversations with your attorney about this

16   damages number, the number that you're saying that's

17   $50,000.  I don't want to know about those.  I recognize

18   that your attorney probably had some influence on that.

19   I don't want to know about that influence.

20           What I personally want to know is your personal

21   knowledge.  Outside of what you know of your attorney,

22   what is your personal knowledge how you reached that

23   $50,000 number?

24      A.   I personally can't even say that that's -- I

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1426 of 3246
Case 2:09-cv-02047-MCG Document 23662-39 Entered on FLSD Docket 05/19/2019 Page 30 of 64

Confidential - Subject to Further Confidentiality Review

1    think that, you know, pain and suffering is far more

2    than that $50,000 that's on that paper.

3        Q.   Okay.  And so I'm taking it that your answer is

4    that that number is not necessarily something you agree

5    with?

6        A.   Ung-ugh.

7        Q.   Okay.  Let's look at the next number down here.

8    It says:  "If you claim a diminution in value of the

9    property as a result of Chinese drywall, identify the

10   total amount of such diminution of value being claimed."

11   And you estimate $545,000, "however, to be determined at

12   trial."

13       My question for you here is:  Outside of any

14   conversations you've had with your attorneys, what is

15   your personal understanding of how you reached the

16   number $545,000 for the diminution of value of the home?

17       A.   Well, that's the loss of our home.  That's the

18   whole loss of our home.  My God.  Why shouldn't it be

19   that?  I mean, it's our walls.  It's the foundation.

20   It's the structure.  I mean, how can you say, "Oh,

21   well" -- of course, I mean, that's --

22       Q.   Do you remember how much you paid for the home?

23       A.   Probably 5, 6, something.  5, 6, something like

24   that.

1    Q.   If you'd look at Exhibit 1 that's in front of

2    you, and your counsel can --

3    A.   So the question?

4    Q.   What is the amount that's listed on there that

5    you paid for the home?

6    A.   Is this what we're talking about, this total

7    package purchase price?

8    Q.   Uh-huh.

9    A.   I think we paid more than that.

10   Q.   My question for you is:  What is the amount

11   listed on the document right there?

12   A.   Well, that's -- listed on this document is

13   501,300.

14   Q.   And what is the basis for your understanding

15   that you paid more for the home than that?

16   A.   Well, I think we added things, but I don't

17   remember exactly, but I feel like we added things.  To

18   my recollection, I thought we had paid more than that,

19   but if this is proof of what we paid, then that's proof

20   of what we paid, but I don't know, because I think we

21   paid more.

22   Q.   Do you remember how much more you paid?

23   A.   From what I recall, I thought we were closer

24   to, like, $600,000, what we paid.  I don't know, because

Confidential – Subject to Further Confidentiality Review

```
 1   it's been so long, but I thought we paid closer to,

 2   like, that amount.

 3       Q.   Do you remember how much you sold the house

 4   for?

 5       A.   Well, yeah, because, yeah, we sold it for

 6   nothing.  We sold it for practically the cost of land.

 7   That's what we sold it for.

 8       Q.   And if you look at the HUD settlement, which I

 9   can't remember which -- it's that document right there.

10       A.   This?

11            MS. GRANT:  May I?

12            THE WITNESS:  Yeah, so --

13            MR. VERRIER:  What exhibit number is that?

14            MR. BARRY:  I don't know.  I can't see it.

15            MS. GRANT:  12.

16            THE WITNESS:  12.  So we sold it for the 174.

17   BY MR. BARRY:

18       Q.   Did you -- so if you're saying you purchased

19   the house for $600,000, roughly, let's assume for

20   argument that it was $600,000 --

21       A.   Everything in there, yeah.

22       Q.   -- I won't contest that number -- and we

23   subtract it by $174,000, which is the amount you sold it

24   for, does that amount equal $545,000?
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 1429 of 3246
Case 2:09-cv-02048-EEF-MBN Document 22363-39 Filed 10/19/19 Page 31 of 64
Confidential – Subject to Further Confidentiality Review

```
 1        A.   I don't know.  I'd have to calculate it.  Math

 2   was never my good subject.

 3        Q.   I understand that.  Could I represent for the

 4   record that that would be $425,000, or $426,000?

 5             MS. GRANT:  You can make a representation as to

 6        the math only.

 7             MR. BARRY:  That I've just said, which was

 8        roughly $600,000 minus $174,000.

 9             MS. GRANT:  But once again, if we're going into

10        how that number was calculated, I'll renew on

11        attorney-client privilege --

12             MR. BARRY:  You're perfectly welcome to object.

13             MS. GRANT:  -- and instruct the client not to

14        answer anything that we've discussed.

15   BY MR. BARRY:

16        Q.   Would it be a fair representation that

17   subtracting $600,000 minus $174,000, for $426,000, is

18   less than $545,000?

19             MR. VERRIER:  Objection.

20             MS. GRANT:  Objection.

21             THE WITNESS:  I defer to my attorney.  It's too

22         many numbers for me.  I can't do this unless --

23   BY MR. BARRY:

24        Q.   If $545,000 --
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1430 of 3246
Case 1:11-cv-22408-MGC Document 29-11 Entered on FLSD Docket 09/27/2012 Page 431 of
64
Confidential - Subject to Further Confidentiality Review

1    A.  Can I say something?

2         MS. GRANT:  Wait for the question, please.

3         THE WITNESS:  Okay.

4  BY MR. BARRY:

5    Q.  We are -- I'm asking one question, which is

6  whether $426,000 is less than $545,000.

7    A.  Yes.

8    Q.  What I'm trying to understand, which is

9  diminution in value, the amount that the property

10 decreased, how we have reached the $545,000 number.

11        MS. GRANT:  And again I'm going to object.  To

12         the extent that it involves our communications,

13         please do not answer.

14 BY MR. BARRY:

15   Q.  You have no understanding other than the

16 conversations you had with your counsel?

17   A.  I defer to my attorney.

18   Q.  And, again, do you mind answering the question

19 directly?  I said:  Do you have any understanding beyond

20 the conversations you've had with your counsel of how

21 that number was reached?

22   A.  I can't answer that.  I don't know.  I don't

23 know.

24   Q.  You either do or you don't.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1431 of 3246
Case 1:09-cv-07628-WGY Document 29-41 Entered on FLSD Docket 05/18/2011 Page 45 of
Confidential - Subject to Further Confidentiality Review
64

```
 1      A.   I don't know.

 2      Q.   You don't know?

 3      A.   I don't know.  I don't know what to say.  Okay?

 4   I don't know what to say to you.  I'm not -- I don't

 5   know what to say.  I defer to my attorney.  I don't know

 6   what to say.

 7      Q.   I believe that answer is not responsive.

 8      A.   Okay.  I'm not trying to be not responsive.

 9      Q.   I'll reflect that for the record that the

10   answer is not responsive.

11           MS. GRANT:  That's fine.

12           MR. VERRIER:  We'll object.  I don't think it

13       was not responsive.

14           MS. GRANT:  I believe it's asked and answered.

15       She says she does not know.

16           MR. VERRIER:  The record is what it is.

17           MR. BARRY:  Yeah.  That's not what she's

18       saying.  She said, "I don't know how to answer that

19       question."

20           THE WITNESS:  I don't know.

21           MR. BARRY:  She's not saying "cannot answer

22       that question."  The record is what it is.

23           THE WITNESS:  You can try asking me again,

24       because I really don't understand what you're trying
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1432 of 3246
Case 1:09-cv-02042-McA Document 234 Entered on FLSD Docket 05/18/2012 Page 36 of
64
Confidential - Subject to Further Confidentiality Review

```
1        to ask me.

2    BY MR. BARRY:

3        Q.   No, you're -- let's take a break.  Let's take a

4    break.

5        A.   I don't need a break.

6        Q.   I would like a break.

7             (Recess from 12:46 p.m. until 12:56 p.m.)

8    BY MR. BARRY:

9        Q.   Ms. Lalwani, we talked earlier that before you

10   learned of Chinese drywall you had engaged a real estate

11   agent to potentially sell the property.  Am I

12   remembering that correctly?

13       A.   What?  Could you repeat that, please?

14       Q.   Before you learned of the presence of Chinese

15   drywall in the house, you had engaged a real estate

16   agent to potentially sell the property; is that correct?

17       A.   We were interested in it.

18       Q.   Had you engaged a real estate agent to

19   potentially sell the property?

20       A.   Yeah, he came and looked at the house and gave

21   us his estimate or whatever.

22       Q.   What did the real estate agent tell you at that

23   time?

24       A.   I don't remember.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1433 of 3246
Case 1:11-cv-22408-MGC Document 288-10 Entered on FLSD Docket 05/18/2013 Page 37 of
64
Confidential - Subject to Further Confidentiality Review

1    Q.   Did you put the house on the market at that

2  time?

3    A.   We put it on, but I don't remember when.

4    Q.   How much -- why were you wanting to sell the

5  house at that time?

6    A.   Well, I mentioned I never was comfortable in

7  that house.  There was a weird feeling in there.  I

8  always had a weird feeling.  It was creepy, icky, I

9  don't know, and it had a little smell, and it just

10  wasn't a comfortable house.  It's like you can walk into

11  a room with somebody with bad energy and you say, "Wow,

12  I can feel this energy in this room."  Well, you know,

13  I'm a very sensitive person, I guess you see that, and I

14  could feel this.  It was an uncomfortable place to be.

15  Icky.

16    Q.   Were you the one who primarily communicated

17  with the realtor?

18    A.   We both communicated.

19    Q.   How did you get connected with the realtor you

20  used to sell the home?

21    A.   I think we just, like, met someone who knew

22  someone and gave us the name and that sort of thing.

23    Q.   Who was that realtor?

24    A.   Vance.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1434 of 3246
Case 1:09-cv-02042-MC-AC Document 21 Entered on FLSD Docket 05/09/2014 Page 58 of 64
Confidential - Subject to Further Confidentiality Review

1    Q.    Vance.  Do you remember his last name?

2    A.    God, no.  Is it in the papers somewhere?

3    Q.    Yeah.  Let's see.  There's a document that's

4    secured by a paper clip somewhere.

5    A.    A picture of the house here?

6         MR. BARRY:  I think it got separated here.

7    Here's the work order report here.

8         MS. GRANT:  Oh, okay.

9         MR. BARRY:  There's the e-mail right there in

10   her hand.

11        THE WITNESS:  My hand?

12        MR. BARRY:  Yeah.

13        THE WITNESS:  Brinkerhoff.  It's not an easy

14   name to remember.

15   BY MR. BARRY:

16   Q.    What exhibit number is that?  You can see at

17   the bottom of the page.

18   A.    13.

19   Q.    So on Exhibit 13, when you were talking to

20   Vance, what's the date listed on that e-mail?

21   A.    Is this from Deborah?  Sent Saturday,

22   December 29, 2018?  Is that it?

23   Q.    No.  I think you need to go a little further

24   down.  I think that's where you were sending it to your

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1435 of 3246
Case 1:1-cv-22408-MGC Document 2361-1 Entered on FLSD Docket 05/19/2015 Page 49 of
64
Confidential - Subject to Further Confidentiality Review

1    attorney.

2           MS. GRANT:  Can I point?

3           MR. BARRY:  You absolutely may point.

4           MS. GRANT:  That's the print date.  The date of

5      the e-mail is right there.

6           THE WITNESS:  Oh, okay.  August 12, 2009.

7    BY MR. BARRY:

8      Q.   And at this time, were you trying to sell the

9    house?

10     A.   I don't remember.  If we have a realtor there,

11   there's obviously something going on, and that's the

12   truth.  Whether we were trying to sell it or not, I

13   don't know.

14     Q.   And, now, the document that's directly under

15   that e-mail --

16     A.   I do want to say this.  Excuse me.  I would

17   never sell a house to somebody and not let them know

18   what was wrong with that house, not what we had done to

19   us.  I would never, while I'm living on this earth, do

20   to somebody what we had done to us.

21     Q.   Directly under this e-mail is a document that

22   was attached to this e-mail, and I represent that it has

23   been attached and separated below you, if you look

24   underneath.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1436 of 3246
Case 1:09-cv-08484-CAL Document 123 Entered on FLSD Docket 05/19/2010 Page 40 of 64
Confidential - Subject to Further Confidentiality Review

```
 1        A.   Here?

 2             MS. GRANT:  (Indicating.)

 3             THE WITNESS:  Oh, the work order.

 4   BY MR. BARRY:

 5        Q.   Have you seen this document before?

 6        A.   I read this when you -- when it was passed to

 7   me down there.

 8        Q.   What is that document?

 9        A.   It says Work Order Report.

10        Q.   Do you know what that document is?

11        A.   I do now, because I read it when I was sitting

12   down there.

13        Q.   And what is it?

14        A.   It's from a construction company that was

15   giving an estimate here to fix the house up.  Am I

16   correct?

17        Q.   I'm asking what your understanding of it is.

18        A.   Well, that's what I'm thinking it is.  That's

19   what I'm thinking it is.

20        Q.   So at this point where you were thinking about

21   fixing the house, were you thinking about fixing the

22   house so that you could continue living in it?

23             MR. BARRY:  With your standing on remediation.

24             MS. GRANT:  No, it's object to form.  That's
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1437 of 3246
Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 05/08/19 Page 41 of
64
Confidential – Subject to Further Confidentiality Review

1      not what she testified, but please go ahead.

2   BY MR. BARRY:

3      Q.   Were you at any point thinking about trying to

4   fix the house so that there was no longer Chinese

5   drywall in the house?

6      A.   We were never going to live there again once we

7   found out there was Chinese drywall.

8      Q.   So --

9      A.   If --

10         MS. GRANT:   Wait.

11  BY MR. BARRY:

12     Q.   Ms. Lalwani, I know you've got a lot you want

13  to say, but I need to make sure that we're asking the

14  questions and that it's going through on the process

15  that we're set up here.   I'm happy to ask you a few

16  open-ended questions so you're welcome to say whatever

17  you need, but I just want to make sure we're focused on

18  the document in front of you.

19         This work order report refers to -- if you look

20  at the first bolded line down, a little bit down the

21  page --

22     A.   Job instructions?

23     Q.   Yeah.   What does it say?

24     A.   "Only drywall that is defective will be

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1438 of 3246
Case 1:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 42 of 64
Confidential - Subject to Further Confidentiality Review

1    replaced."

2        Q.   So is this document discussing whether to

3    replace Chinese drywall or drywall generally?

4            MS. GRANT:   And I'm going to give a rolling

5        objection, because I know I did in Mr. Lalwani's,

6        but I don't know that I did in Mrs. Lalwani's,

7        objecting to any questions regarding remediation.

8        The court has a protocol, and obviously there's a

9        formula, but, Mrs. Lalwani, you can answer to the

10       extent you know.

11           THE WITNESS:   I don't know.

12   BY MR. BARRY:

13       Q.   So you don't know whether you --

14       A.   I don't remember this ever being given to me.

15       Q.   Mrs. Lalwani, please let me finish the

16   question.

17       A.   Yes.   Sorry.

18       Q.   Do you remember ever having any instance where

19   you were seeking quotes on whether to fix the house?

20       A.   I don't remember.

21       Q.   This specific document, do you remember whether

22   you were ever considering fixing the house before

23   selling the property?

24       A.   No.   Since I found out I had Chinese drywall, I

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1439 of 3246
Case 1:09-cv-02047-McGL Document 2363 Entered on FLSD Docket 05/19/2019 Page 48 of 64
Confidential – Subject to Further Confidentiality Review

1    was never going to live there again.

2        Q.   Did you ever consider fixing the house so that

3    you could increase the value and then sell it?

4        A.   Maybe.  Maybe that could have been.

5        Q.   Could this be an example where you were seeking

6    a quote to fix the house to try to increase the value

7    and then sell it?

8        A.   This could be, because -- this could be,

9    because I think that -- I do -- I remember people

10   saying, "We don't know where it is, what it has, how

11   much it has.  We can't prove.  We can't tell you at this

12   point, because it's so new, but we'd have to go through

13   the whole house," whatever.  I said, "I don't want

14   this."  So it could have been that, and that was it.

15       Q.   When you were seeking to sell the house, did

16   you ever have an appraisal done on it?

17       A.   When we were selling the house, you mean when I

18   found out it had Chinese drywall?

19       Q.   At any point when you were trying to sell the

20   house, did you ever have an appraisal done?

21       A.   Well, I think that everybody that sells a house

22   has an appraisal done.  I think it's common knowledge

23   that's what a real estate person does for you.

24       Q.   Okay.  Did you receive any formal appraisal of

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1440 of 3246
Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1440 of 3246
Confidential - Subject to Further Confidentiality Review
64

1    the house?

2        A.    Prior to knowing it had Chinese drywall?

3        Q.    When you were considering whether selling the

4    house, did you ever receive a formal appraisal of the

5    house?

6        A.    Before we knew it had Chinese drywall, we knew

7    it was valued more than what we bought it for.

8        Q.    Did you -- do you have any documents that show

9    the valuation of the house at the time?

10       A.    Maybe they were sent to my attorney, but I

11   supplied everything I had.

12       Q.    After you found out Chinese drywall was in the

13   house, did you ever do a formal appraisal of the home?

14       A.    No.  Why should I?  Who wants it?  Nobody

15   wanted it.  Who would want it?

16       Q.    So do you remember the price at which you

17   listed the home?

18       A.    No, I don't remember.

19       Q.    Do you remember whether it was more than the

20   $174,000 that you sold it for, the listing price?

21       A.    Well, of course.  I mean, that's a silly

22   question.

23       Q.    Again, Mrs. Lalwani, I'm trying to ask you

24   questions and I'm trying to be as polite as possible.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1441 of 3246
Case 1:09-cv-02047-MCA Document 2358-1 Entry.mn.FL-SD-Docket 05/19/11 Page 45 of
Confidential - Subject to Further Confidentiality Review
64

```
 1      A.   Yes.  I'm polite.  I like you.  You're very

 2   nice.

 3      Q.   I don't appreciate being told it's a silly

 4   question.

 5      A.   Oh, well, I'm sorry.

 6      Q.   I have to ask it for the record.

 7      A.   Yeah, okay.  I'm sorry.  I take it back.

 8      Q.   I'm trying to be as polite as possible.

 9      A.   And I didn't mean to be impolite.  I'm sorry.

10   I like you.  You're a very nice person.

11      Q.   I appreciate that.

12      A.   I'm so sorry.  I didn't mean for you to be

13   offended by that.

14      Q.   Yeah, I just want to be clear that I'm trying

15   to ask questions that zero in on what's going on here.

16      A.   Yeah.  People say silly things.  Not you.  Me.

17   I said something silly.  Not you.

18      Q.   So it's fair to say that the listing price was

19   above $174,000 when you initially listed it?

20      A.   Yes.

21      Q.   But you don't remember exactly what that price

22   was?

23      A.   I don't remember, but I could tell you I know

24   it was way -- before Chinese drywall, obviously, very
```

Confidential - Subject to Further Confidentiality Review

1    high listing.

2        Q.   Do you remember when you listed it?

3        A.   No, I don't remember.

4        Q.   Was it after you learned there was Chinese

5    drywall in the house?

6        A.   We were looking at listing because I was

7    unhappy in the house.  There was something wrong with

8    that house.

9        Q.   So did you wait until after you learned there

10   was Chinese drywall in the house to list it?

11       A.   I had a realtor come in prior to knowing I had

12   Chinese drywall.

13       Q.   Do you remember -- when I'm referring to

14   listing, it's the formal listing, something that goes on

15   the FMLD website that people can see the house and go

16   bid on it.

17           Do you remember whether there was some sort of

18   formal listing of the house before you learned of

19   Chinese drywall?

20       A.   I would imagine so.

21       Q.   Okay.  Do you know if there's any evidence of

22   you formally listing the house?

23       A.   Whatever I had and every listing that I have I

24   did give all this paperwork in.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1443 of 3246
Case 1:11-cv-02047-MGC Document 23-31 Entered on FLSD Docket 05/19/2011 Page 47 of
64
Confidential - Subject to Further Confidentiality Review

 1      Q.   Okay.  After Chinese drywall was in the

 2   house --

 3      A.   Here it is.  Here it is right here.

 4      Q.   And just for the record, the document you're

 5   referring to, I'm not sure that's the right one, but

 6   we're happy to --

 7      A.   Okay.

 8      Q.   I'm going to hand you a document, Exhibit 15.

 9           (Lalwani Exhibit No. 15 was marked for

10   identification.)

11   BY MR. BARRY:

12      Q.   This is an e-mail string from June 15, 2010,

13   between debg610@yahoo.com, which I'm guessing is you --

14      A.   Uh-huh.

15      Q.   -- and an e-mail address that is

16   vanco2@msn.com.  The signature line says J. Vance

17   Brinkerhoff, who is a realtor.

18           On the bottom line, it says that:  "The selling

19   price of the house of $300,000 for your type and size of

20   house was the defining moment for our decision to sell

21   the house as is."

22           Did you have a valuation of the house of

23   $300,000?

24      A.   I don't know what you mean.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1444 of 3246
Case 1:11-cv-22408-MGC Document 226-11 Entered on FLSD Docket 05/18/2011 Page 48 of
64
Confidential - Subject to Further Confidentiality Review

```
 1      Q.   You said -- more accurate, I want to know what
 2   you mean in this sentence.  So you say:  "The selling
 3   price of 300,000+ for our type and size of house is the
 4   defining moment for our decision to sell the house as
 5   is."
 6           What does that sentence mean?  What did you
 7   mean when you were saying that?
 8      A.   I don't remember what I meant.  Honest to God,
 9   I don't remember what I meant.
10      Q.   Did you think that you were going to be able to
11   sell the house for $300,000?
12      A.   I was traumatized, so I don't remember what I
13   meant when I said that.  Well, with Chinese drywall in
14   it, I was hoping that, yeah, I mean, to get that house
15   and that property.
16      Q.   Were you learning that other houses in the
17   area, perhaps ones that didn't have Chinese drywall,
18   were selling for $300,000 at the time?
19           MS. GRANT:  Object to form.
20           THE WITNESS:  No.
21           MS. GRANT:  Go ahead.
22           THE WITNESS:  No, I wasn't aware.
23   BY MR. BARRY:
24      Q.   So here you say that you were going to sell the
```

Confidential - Subject to Further Confidentiality Review

```
 1   house as is.  Why did you decide to sell the house as

 2   is?

 3        A.   Because it had Chinese drywall.

 4        Q.   And what was your understanding of what it

 5   meant to sell as is?

 6        A.   With the Chinese drywall, you would be made

 7   aware it has it, and you can buy it if you want.

 8        Q.   And would that mean that you were not going to

 9   do anything to fix or remediate or attempt to fix?

10        A.   Once I knew it had Chinese drywall, I was never

11   going to live there again.

12        Q.   Okay.  Again, would you -- just to make that

13   point a little more granular, when -- did you ever --

14   scratch the question.

15             Do you know how much your neighbors were

16   selling their houses for?

17        A.   No.

18        Q.   Did your realtor ever provide you that

19   information?

20        A.   No.

21        Q.   Did you ever do independent research to figure

22   out how much your neighbors were selling their houses

23   for?

24        A.   Once I had Chinese drywall, I didn't want or
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 1446 of 3246
Case 1:09-cv-02400-MLG Document 23362-39 Filed 11/19/19 Pocket 20519/2019 Page 50 of
64
Confidential - Subject to further confidentiality review

```
1    care.  I wanted out.  I don't care.  Whatever happens

2    happens.  Just get me out of this hell hole that I'm in.

3    If someone wants to buy it as is, they can buy it, but

4    that's all I wanted was to never have to have another

5    day of depression, stress, and everything that I had

6    gone through, you know, through that house.  I'm sorry,

7    you know, because talking about the house bothers me.

8         Q.   And I totally understand.

9         A.   You can see that.

10        Q.   Yeah, no, and I'm absolutely sympathetic.

11             MS. GRANT:  Ms. Lalwani, please just answer the

12        question.

13             THE WITNESS:  I'm sorry.

14   BY MR. BARRY:

15        Q.   And you answered that question.  I appreciate

16   you doing that.

17        A.   I get emotional when I talk about that house.

18        Q.   Totally understand.

19             Did you receive other offers on the house?

20        A.   No.  Not to my knowledge, I didn't.

21        Q.   Do you remember roughly how long the house was

22   on the market?

23        A.   A long time.  Not -- I don't have -- I don't

24   remember how long.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 447 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 51 of 64
Confidential - Subject to Further Confidentiality Review

```
1      Q.   How would you define "long time," roughly?

2      A.   I don't know.  It was a long time.  It was --

3   it seemed like it was a long time.  Maybe years.

4      Q.   So this e-mail was saying here that you're

5   going to try to find an as is buyer, the one that you

6   have in front of you?

7      A.   Yeah.

8      Q.   And it is dated June 15, 2010.

9      A.   Uh-huh.

10     Q.   Do you remember when you sold the property?

11     A.   No, I don't remember.

12     Q.   If we look at that HUD settlement form that we

13  have -- it's right there -- what is the date on that

14  document?  And what exhibit number is that?  I

15  apologize.

16     A.   It's Exhibit 12.

17     Q.   Exhibit 12.  What is the date on Exhibit 12?

18     A.   1/14/09.  Where's the date?  My God.  Where's

19  the date?

20     Q.   Your attorney is welcome to help you find it.

21          THE WITNESS:  Is this the date here?

22          MS. GRANT:  Close enough.

23          THE WITNESS:  March 11, 2011.

24  BY MR. BARRY:
```

Confidential - Subject to Further Confidentiality Review

```
1      Q.   So is it fair to say that the house was on the

2  market for at least six, seven months, based on you

3  sending an e-mail in June 2010 and you selling it in

4  March 2011?

5      A.   I think it was on longer.

6      Q.   But it was on at least six or seven months?

7      A.   Well, I mean, at least, but I think it was

8  longer.

9      Q.   Yes.  I'm not trying to give you the exact

10  number.  I'm just trying to zero in on some time frame

11  how long it was.

12          Did you ever -- do you know, did you ever

13  research how much other houses were selling that had

14  Chinese drywall in it?

15      A.   No.

16      Q.   Did you know if any of your neighbors had

17  Chinese drywall at their house?

18      A.   No.

19      Q.   Did you ever consider using another realtor

20  because you felt that he wasn't getting good enough

21  offers?

22      A.   No.

23      Q.   Did you try to negotiate with the buyer who was

24  buying it?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1449 of 3246
Case 1:11-cv-22408-MGC Document 22363-39 Entered on FLSD Docket 05/19/2014 Page 53 of
64
Confidential - Subject to Further Confidentiality Review

```
 1      A.   No.

 2      Q.   Why did you accept $174,000?

 3      A.   Nobody wanted to touch it.  Nobody wanted to

 4   even come in and look.  Nobody wanted that property.

 5   That was, like, a tainted place.  You know, nobody

 6   wanted it.  Nobody wanted -- couldn't even get anybody,

 7   drag them in.

 8      Q.   What's your basis of knowing that, that no one

 9   wanted to come into the house?

10      A.   Because we never had an offer.

11      Q.   Did you ever -- did people come in and look at

12   the home during that time period?

13      A.   No.  No.  I don't recall how it happened or how

14   it was done and how it was -- how we even tried to find

15   someone.  I don't remember how that happened.  You know,

16   I can't imagine.  "We have a house with Chinese drywall.

17   Want to come see it?"  I don't know how they did it.  I

18   have no idea.

19      Q.   Now, do you recall whether there was an

20   inspection on the house to look at the drywall?

21      A.   Yes.  Yes.

22      Q.   Were you present when that inspection occurred?

23      A.   No, I wasn't.

24      Q.   Did you ever speak with the inspector?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1450 of 3246
Case 1:09-cv-02047-GCL Document 22361 Entered on FLSD Docket 05/06/2019 Page 45 of 64
Confidential - Subject to Further Confidentiality Review

 1       A.    Probably by -- at some point, yes, because we

 2    got a report, which is probably here, yeah.

 3       Q.    Do you remember the conversations you had with

 4    that inspector?

 5       A.    We had Chinese drywall and it was, you know,

 6    bad.

 7       Q.    Did you -- do you remember any discussion with

 8    the inspector about how much of the house had Chinese

 9    drywall in it?

10       A.    Yes.  Basically, the house was shot, you know.

11       Q.    And when you -- by "shot," do you mean it was

12    throughout the entire house?

13       A.    It was in receptacles, it was in all kind of

14    things, and it was in our air conditioning.  It was

15    in -- on the walls.  It was in the -- what do you call

16    it? -- appliances.

17       Q.    Did you ever speak with the buyer when you were

18    trying to sell the house?

19       A.    On the telephone.

20       Q.    What did you talk about with him on the

21    telephone?

22       A.    Said, "Hey, take it as is.  It's full of

23    Chinese drywall.  It's up to you.  Whatever you want."

24             He said, "I'll give you this."

Confidential - Subject to Further Confidentiality Review

```
 1              We said, "Okay."

 2      Q.   Did he ever tell you what he was planning to do

 3   with the house?

 4      A.   No, he didn't.  He didn't really say whether he

 5   was going to -- I mean, he had no -- I know he did say,

 6   "I'm going to put plants in."  He was a gardener.  I

 7   remember him saying that.  He was French and he was from

 8   France.  No, because we didn't have a relationship with

 9   him.

10      Q.   Do you know what he did with the house?

11      A.   No.

12      Q.   Do you know that he sold the house a few years

13   later?

14      A.   I heard, yeah.

15      Q.   And just to be clear, you heard that --

16      A.   I don't know how much he sold it for.

17      Q.   When did you hear that, so to be clear, so it's

18   clear for the record?

19      A.   This was years ago he sold it, wasn't it?

20      Q.   Yeah, but when did you learn that information?

21      A.   Years ago, when he sold it.

22      Q.   I apologize.  We're missing a document that we

23   thought we had.

24      A.   Am I allowed to speak?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1452 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 35 of 64
Confidential - Subject to Further Confidentiality Review

```
 1              MS. GRANT:  No.

 2   BY MR. BARRY:

 3       Q.   No.

 4       A.   Sorry.

 5       Q.   I'm going to provide you a document.  I

 6   apologize I don't have multiple copies right now.  I'll

 7   get one for your --

 8              MS. GRANT:  Hold on one second.

 9              Okay, that's fine.

10              (Lalwani Exhibit No. 16 was marked for

11   identification.)

12              MR. VERRIER:  I have to step out.

13              (Mr. Verrier exited the room.)

14   BY MR. BARRY:

15       Q.   Ms. Lalwani, have you ever seen this document

16   before, this e-mail?

17       A.   Not to my knowledge.

18       Q.   Looking at it, though, did you receive this

19   e-mail, if you look at the forwarded message?

20       A.   Yes, it was forwarded to me.

21       Q.   And who forwarded it to you?

22       A.   Vance Brinkerhoff.

23       Q.   If you look at the blue pages, the second blue

24   page -- so, if you see, there's different blue pages.
```

Confidential – Subject to Further Confidentiality Review

```
 1    They separate the attachments that were to the e-mail.

 2         A.   Oh, I see.  Uh-huh.

 3         Q.   So if you go to the blue page -- you've got it

 4    with your fingers on it right now.  Your fingers are on

 5    it right now.  Other fingers.

 6              MS. GRANT:  It's right here.  You're asking

 7         about the findings.

 8              THE WITNESS:  Okay.

 9    BY MR. BARRY:

10         Q.   I'm representing that this was produced as an

11    attachment to the e-mail that your attorneys provided to

12    us, and it's entitled Response to Knauf's Proposed

13    Findings of Fact and Conclusions of Law.

14              If you look down towards the bottom of the

15    page, it says:  "But in Florida, homeowners are

16    successfully remediating Chinese drywall by removing and

17    replacing with new from 15/square feet to 45/square feet

18    in very high end homes."

19              MR. BARRY:  With your rolling objection, of

20         course.

21              MS. GRANT:  There might be more.  Go ahead.

22         I'm sorry.  I just wanted to stop her from answering

23         before you finished.

24    BY MR. BARRY:
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1454 of 3246
Case 1:11-cv-22408-CMA Document 285-1 Entered on FLSD Docket 05/19/2011 Page 59 of
64
Confidential - Subject to Further Confidentiality Review

```
 1       Q.   Do you remember reading this line in this

 2   document?

 3       A.   No.

 4       Q.   Do you remember anyone communicating to you

 5   that you could remediate the property for between $15 to

 6   $45 a square foot?

 7            MS. GRANT:  Object to form.

 8            THE WITNESS:  I don't remember.

 9   BY MR. BARRY:

10       Q.   Once you learned there was Chinese drywall in

11   the home, would there be any dollar value at which you

12   would have remediated the property?

13       A.   No.

14       Q.   No matter what, you were going to leave the

15   property, even if it could be fixed for $10?

16       A.   Trauma, the stress, there was no money value to

17   that.  That was so abominable.

18       Q.   Considering the relationship between you and

19   your husband, if you were unwilling to use the house,

20   would he have been just as willing to sell the house

21   because you would no longer go there anymore?

22       A.   You'd have to ask him.  We didn't discuss that.

23            MR. BARRY:  Let's take a quick break.  We're

24       just going to chat outside.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1455 of 3246
Case 1:09-cv-07628-MGC Document 29 Entered on FLSD Docket 05/18/2012 Page 45 of 64
Confidential - Subject to Further Confidentiality Review

```
 1              (Recess from 1:22 p.m. until 1:26 p.m.)

 2         MR. BARRY:  No more questions from me, of

 3     course reserving the right to question if you have

 4     more questions.

 5         MS. GRANT:  No, I don't.

 6         MR. BARRY:  And of course reserving the right

 7     if anything gets amended or any more documents are

 8     produced subsequently.

 9         MS. GRANT:  No, I have no questions.

10         MR. BARRY:  Do y'all have any questions?

11         MS. FASSBENDER:  No, we do not.

12         MR. BARRY:  You're free.

13              (Whereupon, the deposition concluded at

14     1:26 p.m.)

15

16

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1              C E R T I F I C A T E

 2

 3         I, JOAN L. PITT, Registered Merit Reporter,

 4    Certified Realtime Reporter, and Florida Professional

 5    Reporter, do hereby certify that, pursuant to notice,

 6    the deposition of DEBORAH LALWANI was duly taken on

 7    January 4, 2019, at 12:11 p.m., before me.

 8         The said DEBORAH LALWANI was duly sworn by me

 9    according to law to tell the truth, the whole truth, and

10    nothing but the truth, and thereupon did testify as set

11    forth in the above transcript of testimony.  The

12    testimony was taken down stenographically by me.  I do

13    further certify that the above deposition is full,

14    complete, and a true record of all the testimony given

15    by the said witness.

16

17         _____

18         JOAN L. PITT, RMR, CRR, FPR

19

20         (The foregoing certification of this transcript

21    does not apply to any reproduction of the same by any

22    means, unless under the direct control and/or

23    supervision of the certifying reporter.)

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1457 of 3246
Case 1:09-cv-02402-MGC Document 228-61 Entered on FLSD Docket 05/19/2017 Page 61 of
64
Confidential - Subject to Further Confidentiality Review

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4            Please read your deposition over carefully and

 5   make any necessary corrections.  You should state the

 6   reason in the appropriate space on the errata sheet for

 7   any corrections that are made.

 8

 9            After doing so, please sign the errata sheet

10   and date it.  It will be attached to your deposition.

11

12            It is imperative that you return the original

13   errata sheet to the deposing attorney within thirty (30)

14   days of receipt of the deposition transcript by you.  If

15   you fail to do so, the deposition transcript may be

16   deemed to be accurate and may be used in court.

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                    - - - - - -

 2                  E R R A T A

 3                    - - - - - -

 4   PAGE   LINE   CHANGE

 5   _____  _____  _____

 6      REASON: _____

 7   _____  _____  _____

 8      REASON: _____

 9   _____  _____  _____

10      REASON: _____

11   _____  _____  _____

12      REASON: _____

13   _____  _____  _____

14      REASON: _____

15   _____  _____  _____

16      REASON: _____

17   _____  _____  _____

18      REASON: _____

19   _____  _____  _____

20      REASON: _____

21   _____  _____  _____

22      REASON: _____

23   _____  _____  _____

24      REASON: _____
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1459 of 3246
Case 1:11-cv-02401-MGC Document 22381 Exhibit 38 on File Docket 05/16/2012 Page 63 of
64

Confidential - Subject to Further Confidentiality Review

```
 1                ACKNOWLEDGMENT OF DEPONENT

 2

 3        I, _____, do hereby

 4   acknowledge that I have read the foregoing pages and

 5   that the same is a correct transcription of the answers

 6   given by me to the questions therein propounded, except

 7   for the corrections or changes in form or substance, if

 8   any, noted in the attached Errata Sheet.

 9

10

11   _____   _____

12   DEBORAH LALWANI                   DATE

13

14

15

16

17   Subscribed and sworn to before me this

18   ____ day of _____, 20___.

19   My Commission expires: _____

20

21   _____

     Notary Public

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
1                          LAWYER'S NOTES

2    PAGE    LINE

3    _____   _____    _____

4    _____   _____    _____

5    _____   _____    _____

6    _____   _____    _____

7    _____   _____    _____

8    _____   _____    _____

9    _____   _____    _____

10   _____   _____    _____

11   _____   _____    _____

12   _____   _____    _____

13   _____   _____    _____

14   _____   _____    _____

15   _____   _____    _____

16   _____   _____    _____

17   _____   _____    _____

18   _____   _____    _____

19   _____   _____    _____

20   _____   _____    _____

21   _____   _____    _____

22   _____   _____    _____

23   _____   _____    _____

24   _____   _____    _____
```

# EXHIBIT A17

Confidential - Subject to Further Confidentiality Review

```
1                   UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
2
    EDUARDO AND CARMEN AMORIN,
3   et al., individually, and
    on behalf of all others
4   similarly situated,          Case No. 1:11-CV-22408-MGC
5        Plaintiffs,
6   vs.
7   TAISHAN GYPSUM CO., LTD.,
    F/K/A SHANDONG TAIHE
8   DONGXIN CO., LTD.; TAIAN
    TAISHAN PLASTERBOARD CO.,
9   LTD, et al.,
10       Defendants.
11            CONFIDENTIAL - SUBJECT TO FURTHER
                   CONFIDENTIALITY REVIEW
12
                            - - -
13
                       JANUARY 4, 2019
14
                            - - -
15
             Deposition of GUL LALWANI, held at The JG Firm,
16   1855 Griffin Road, Suite C-470, Dania, Florida,
     commencing at 10:03 a.m., on the above date, before
17   Joan L. Pitt, Registered Merit Reporter, Certified
     Realtime Reporter, and Florida Professional
18   Reporter.
19                          - - -
20            GOLKOW LITIGATION SERVICES
         877.370.3377 ph | 917.591.5672 fax
21                 deps@golkow.com
22
23
24
25
```

Confidential - Subject to Further Confidentiality Review

```
 1                     APPEARANCES
 2
 3    Counsel for Plaintiffs:
 4        ALLISON GRANT, ESQUIRE
          Allison Grant, PA
 5        14 SE 4th Street
          Boca Raton, Florida 33432
 6        561.994.9646
          agrant@allisongrantpa.com
 7
 8        KEITH J. VERRIER, ESQUIRE
          Levin, Sedran & Berman LLP
 9        510 Walnut Street, Suite 500
          Philadelphia, Pennsylvania 19106
10        215.592.1500
          kverrier@lfsblaw.com
11
12
      Counsel for Defendants Taishan Gypsum Co., Ltd., and
13    Taian Taishan Plasterboard Co., Ltd.:
14        MICHAEL J. BARRY, ESQUIRE
          ASHTON G. CARPENTER, ESQUIRE
15        SARAH O'DONOHUE, ESQUIRE
          Alston & Bird LLP
16        One Atlantic Center
          1201 West Peachtree Street
17        Atlanta, Georgia 30309-3424
          404.881.7000
18        mike.barry@alston.com
          ashton.carpenter@alston.com
19        sarah.odonohue@alston.com
20
21
22
23
24
25
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1464 of 3246
Case 1:19-mc-00405-NGG Document 2-11 *SEALED* Filed 05/09/2019 Page 49 of 84
Confidential - Subject to Further Confidentiality Review

```
 1                    APPEARANCES CONTINUED

 2

 3

 4   Counsel for Beijing New Building Materials PLC:

 5        DIANA SZEGO FASSBENDER, ESQUIRE

          Orrick, Herrington & Sutcliffe LLP

 6        Columbia Center

          1152 15th Street, Northwest

 7        Washington, DC 20005-1706

          202.339.8533

 8        dszego@orrick.com

 9        ALEX B. ROTHENBERG, ESQUIRE

          Gordon Arata Montgomery Barnett

10        201 St. Charles Avenue, 40th Floor

          New Orleans, Louisiana 70170-4000

11        504.582.1111

          arothenberg@gamb.law

12

13   Also present:  Deborah Lalwani

14

15

16

17

18

19

20

21

22

23

24

25
```

Confidential - Subject to Further Confidentiality Review

```
 1                          - - -

 2                       I N D E X

 3                          - - -

 4    Testimony of:  GUL LALWANI

 5      DIRECT EXAMINATION BY MR. BARRY                    6

 6      CROSS-EXAMINATION BY MS. FASSBENDER                77

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1466 of 3246
Case 1:13-cv-02408-NGG Document 00911 2-4 Filed on 05/48/2016 Page 46 of
84
Confidential - Subject to Further Confidentiality Review

```
 1              E X H I B I T   I N D E X

 2   LALWANI           DESCRIPTION                    PAGE

 3   No. 1     New Home Purchase & Construction        13
               Agreement
 4
     No. 2     Letter from GHO Homes dated 9/17/2004   22
 5
     No. 3     Letter dated 7/16/2005                  25
 6
     No. 4     Letter dated 7/19/2005                  27
 7
     No. 5     Memo from John E. Fuchs of GHO Homes    28
 8
     No. 6     Chinese Drywall Settlement Program      35
 9             Global, Banner, Inex Repair and
               relocation expenses claim form, dated
10             9/30/13
11   No. 7     Letter dated 4/1/2009, with attached    37
               Chinese Drywall Screening Property
12             Screen Report dated 3/30/2009
13   No. 8     Chinese Drywall Screening Drywall       40
               Investigation Report, dated
14             11/17/2009
15   No. 9     First Amended Supplemental Plaintiff    53
               Profile Form
16
     No. 10    Supplemental Plaintiff Profile Form     58
17
     No. 11    Letter dated 2/21/2012, with attached   67
18             copies of checks
19   No. 12    HUD-1 Settlement Statement, dated       70
               3/11/2011
20
     No. 13    Forwarded e-mails dated 8/12/2009 and   72
21             8/10/2009
22   No. 14    Information on property at 4590         75
               Kodiak Drive, Vero Beach, Florida
23             32967
24
25
```

Confidential - Subject to Further Confidentiality Review

```
 1                        -  -  -

 2           THE COURT REPORTER:  Raise your right hand,

 3      please.  Do you swear or affirm the testimony you

 4      give will be the truth, the whole truth, and nothing

 5      but the truth?

 6           THE WITNESS:  Yes, I do.

 7           THE COURT REPORTER:  Thank you.

 8           GUL LALWANI, called as a witness by the

 9  Defendant Taishan Gypsum Co., Ltd., having been first

10  duly sworn, testified as follows:

11                    DIRECT EXAMINATION

12  BY MR. BARRY:

13      Q.   Good morning, Mr. Lalwani.  My name is Mike

14  Barry.

15      A.   Good morning.

16      Q.   With my colleagues, Sarah O'Donohue and Ashton

17  Carpenter, we represent Taishan.  I'm going to ask

18  everyone around the room just to introduce themselves so

19  that you know who's here and we also have everybody

20  referenced on record.

21           MR. ROTHENBERG:  Alex Rothenberg on behalf of

22      BNBM.

23           MS. FASSBENDER:  Diana Fassbender on behalf of

24      BNBM.

25           MR. VERRIER:  Keith Verrier, from Levin, Sedran
```

Confidential - Subject to Further Confidentiality Review

```
 1          & Berman in Philadelphia, on behalf of the

 2          plaintiffs.

 3               MS. GRANT:  Allison Grant on behalf of the

 4          plaintiffs.

 5   BY MR. BARRY:

 6        Q.   And for the record, I'll represent that

 7   Mrs. Lalwani is also in the room with you.

 8               I appreciate you coming here.  I appreciate you

 9   spending time with us and talking to us today.  I'll try

10   to make this as quick and painless as possible for you.

11        A.   Thank you.

12        Q.   As part of that, I will just tell you a few

13   things.  And most of this is to try and make it easier

14   on the court reporter.

15               I'm going to ask you questions.  I ask that you

16   please wait until I finish my question.  I know most of

17   the time you'll be able to anticipate what I'm saying,

18   but just so it's clear and she can get everything down,

19   if you don't mind, just wait until I finish.

20               And I'll do the same.  When you're answering a

21   question, I'll make sure you finish your answer before I

22   ask you the next question.  And if I don't, tell me to

23   stop.  More likely than not, your lawyer will tell me to

24   stop, and even more likely than that, she'll tell me to

25   stop.
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1469 of 3246
Case 1:13-cv-02948-WGY Document 604-11 Entered on FLSD Docket 05/08/2019 Page 9 of 84
Confidential - Subject to Further Confidentiality Review

```
 1            If there's anything that you don't understand

 2    that I'm saying, ask me, ask me to rephrase it, say you

 3    don't understand what I'm saying.  Probably I just asked

 4    an unfair question.  Your lawyer's also going to

 5    probably make some objections too.  You know, there are

 6    a few where she'll instruct you not to answer, but for

 7    the most part just make sure she has the opportunity to

 8    object, it's stated on the record, and then you can

 9    answer the question.

10            If you need a break at any point, don't

11    hesitate.  Just ask.  Happy to do breaks.  I'll probably

12    take a break almost every hour.  But if you need one

13    more frequently than that, just let me know.  All I ask

14    is that when I ask a question that you just finish the

15    question.

16       A.    Finish the question.

17       Q.    Exactly.

18       A.    And then run.

19       Q.    Yes, and then run, but not too fast.

20            So I'm going to just ask you a few questions

21    that I have to ask in every deposition.  Do you

22    understand that you have been sworn and must tell the

23    truth as if testifying in court and the judge were

24    sitting right here?

25       A.    Yes.
```

Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Have you ever sat for a deposition before?

 2      A.   Yes.

 3      Q.   When was that?

 4      A.   Probably about 20 years ago.

 5      Q.   Okay.  And what was the nature of that

 6   deposition?

 7      A.   I was an orthodontist, and there was a legal

 8   case involving a mutual patient of mine and the surgeon,

 9   and the lawyers representing the client, who was given

10   the wrong surgery as such, their lawyers wanted to go

11   after the surgeon, you know, so I had to give a

12   deposition of what I knew on that.

13      Q.   Were you a party to that lawsuit?

14      A.   No.

15      Q.   Okay.  Have you ever been party to a lawsuit

16   before?

17      A.   No.

18      Q.   Other than this one, of course.

19      A.   No.

20      Q.   Are you taking any medications that will impair

21   your ability to understand my questions and to answer

22   truthfully?

23      A.   No.

24      Q.   How did you prepare for this deposition?

25      A.   Well, we were given some information through
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1471 of 3246
Case 1:19-cv-00494-WCG Document 1 (redacted) Filed 05/18/2017 Page 46 of 84
Confidential - Subject to Further Confidentiality Review

```
 1    our attorney as to what is going to be required.

 2         Q.   And to be clear, your attorney's about to jump

 3    in here, I'm not asking the content of any conversations

 4    you had with your attorney.

 5         A.   Oh, yeah, yeah, but just simply to fill us in

 6    that you'll be asked certain questions.  It's what you

 7    know, what you remember.  Otherwise, they have all

 8    the --

 9              MS. GRANT:  I'm going to object.  I think that

10         Mr. Barry is asking just more generally, if you

11         don't mind.

12              MR. BARRY:  Yes.

13              MS. GRANT:  You don't need to discuss any of

14         the substance of what we --

15              THE WITNESS:  Okay.

16              MS. GRANT:  Thank you.

17    BY MR. BARRY:

18         Q.   And I'll ask those questions about your lawyer

19    very specifically.  When did you meet with your lawyer?

20         A.   I met yesterday.

21         Q.   Yesterday.  And for how long did you meet?

22         A.   For about an hour and a half.

23         Q.   Was anyone else present during that meeting?

24         A.   No.  My wife and I.

25         Q.   Did you -- outside the presence of your
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1472 of 3246
Case 1:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 12 of 84
Confidential - Subject to Further Confidentiality Review

 1    attorneys, did you do anything else to prepare for this

 2    deposition?

 3         A.   Not really, no.

 4         Q.   Did you review any documents?

 5         A.   I did not.

 6         Q.   Did you speak with anyone other than your

 7    attorney about this deposition?

 8         A.   No.

 9         Q.   Did you speak with your wife about this

10    deposition?

11         A.   No, not really, because it was pretty

12    straightforward.

13         Q.   Understood.  Are you currently employed,

14    Mr. Lalwani?

15         A.   I'm retired.

16         Q.   And I apologize.  Should I refer to you as

17    Dr. Lalwani?  You said you're an orthodontist.

18         A.   Whatever is your fancy.

19         Q.   Dr. Lalwani.  I apologize.  I apologize for not

20    doing that sooner.

21         A.   Not a problem.

22         Q.   Dr. Lalwani, are you now retired?

23         A.   Yes.

24         Q.   And how long have you been retired?

25         A.   Since early 2010.

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1473 of 3246
Case 1:11-cv-22408-MGC Document 230-1 Entered on FLSD Docket 05/09/2013 Page 43 of
84
Confidential - Subject to Further Confidentiality Review

```
 1        Q.   And how long had you been an orthodontist

 2   before then?

 3        A.   For about 38 years.

 4        Q.   And are you married?

 5        A.   Yes.

 6        Q.   And who are you married to?

 7        A.   Deborah Lalwani.

 8        Q.   And how long have you and Mrs. Lalwani been

 9   married?

10        A.   Probably about 26 years.

11        Q.   If you have that wrong, she's coming up next.

12        A.   I know, but the math, I don't -- I don't

13   remember the math.

14             MS. LALWANI:  He does have that wrong.

15             THE WITNESS:  But it's close.  1990 to current

16        is whatever it is.  You know, almost 28 years.

17   BY MR. BARRY:

18        Q.   This is the point where you say, "Honey, you

19   should show up a little late."  Right?

20             Now, let's talk a little bit about what's the

21   subject matter of this case.  What is the address of the

22   property that you allege has been damaged by Chinese

23   drywall?

24        A.   I don't remember exactly, but I remember the

25   name of the street.  Kodiak Drive.
```

```
1      Q.   Okay.  Do you currently own that property?

2      A.   No.

3      Q.   When did you buy that property?

4      A.   I believe we bought it when it finally got

5   supposedly done, but it wasn't.  It was the end of 2006,

6   beginning of 2007, somewhere around there.

7      Q.   So, Dr. Lalwani, I'm going to hand you some

8   documents throughout this litigation -- or throughout

9   this deposition.  When I do so, I'm going to first hand

10  it to your attorney so she can take a look at it and

11  make sure it's okay to put in front of you.  After she

12  does that, she's going to hand it to the court reporter,

13  who's going to mark it as an exhibit, and then she'll

14  give you a copy.

15     A.   Okay.

16     Q.   Anytime I do that, please feel free to take as

17  much time looking through the document as you'd like.

18  Most of these documents I'm not going to ask you about

19  everything and I have very specific questions about it.

20          (Lalwani Exhibit No. 1 was marked for

21  identification.)

22  BY MR. BARRY:

23     Q.   For the record, this is New Home Purchase &

24  Construction Agreement, and it is not Bates labeled, and

25  it is Exhibit 1.
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1475 of 3246
Case 1:09-cv-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1475 of 3246
Confidential - Subject to Further Confidentiality Review
84

```
 1              Dr. Lalwani, do you recognize this?  You can
 2   just take a second to look at it, please.
 3       A.   You want me to take a look at it?
 4       Q.   Yeah, if you'd like to.
 5       A.   I don't see any need, really.  It's pretty much
 6   what I can remember and what I can defer to my attorney,
 7   who has all the papers.
 8       Q.   Well, my goal is to not let you defer to your
 9   attorney.
10       A.   Okay.
11       Q.   So I'm not doing my job if you're doing that.
12   So on this agreement, does this refresh your memory of
13   roughly when you purchased the property?
14       A.   You mean looking at this?
15       Q.   Yes.  So if you look at the top, there's a date
16   on the purchase agreement.
17       A.   The very top?
18       Q.   Yes.
19       A.   Oh.  2004 was the purchase of the land.  It was
20   bare land.  There was nothing there.
21       Q.   But did they agree to build a new home at that
22   time?
23       A.   Yes.
24       Q.   So you made the initial purchase in 2004?
25       A.   Yes.
```

Confidential – Subject to Further Confidentiality Review

1    Q.   And when you did that, you were building a new

2    home on the property; is that correct?

3    A.   Right.

4    Q.   And so is this document an agreement between

5    you and the builder to build the home?

6    A.   Yeah.

7    Q.   What was the total purchase price?

8    A.   I don't remember exactly.  It was --

9    Q.   If you'd look at the bottom of the document.

10        MS. GRANT:  I'm going to object to form.  He

11        can certainly tell you what's on the document, but

12        that doesn't necessarily mean that's the purchase

13        price.

14        MR. BARRY:  Understood.

15        THE WITNESS:  It's more than that, actually.

16        It was more than that, I think, yeah.  What I

17        recall, ultimately there were additives and this was

18        the initial working price, but then more additions

19        were added.

20   BY MR. BARRY:

21   Q.   Understood.  And what -- do you remember off

22   the top of your head what the total purchase price was

23   after you put the additions?

24   A.   It was in the 600s.

25   Q.   In the 600s?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1477 of 3246
Case 1:09-cv-02047-GAF Document 1 Confidential - Subject to Further Confidentiality Review
84
Confidential - Subject to Further Confidentiality Review

```
1       A.    Yeah.

2       Q.    What were those additions that you put into the

3   home?

4       A.    There were upgrades and a fountain for the

5   pool, some -- I think there was some tile.  I don't

6   remember, to be honest with you.  I really don't.

7       Q.    I understand, and I'll put some documents in

8   front of you that will help you remember later on, but

9   I'm just trying to understand what you remember here.

10          When you purchased the home, did you finance

11  the home?

12      A.    Initially, yes.

13      Q.    Yes.  How did you finance the home?

14      A.    It was HomeBanc that gave us a decent mortgage,

15  so we did it for -- until the completion, and I think I

16  may have waited a few months after that and then I soon

17  paid it off.  I don't remember when, but I didn't let it

18  go on too long.

19      Q.    Do you remember how much the total mortgage

20  was?  Was it 50 percent of the property?

21      A.    I don't remember.

22      Q.    You don't remember how much of a loan you took?

23      A.    No, I don't remember any of that.  That's a

24  long time back.

25      Q.    I understand, but I still have to ask you the
```

Confidential - Subject to Further Confidentiality Review

```
 1   questions.

 2        A.   That's okay.  That's okay.

 3        Q.   And do you remember how quickly you paid off

 4   the mortgage?  Was it a year?  Two years?

 5        A.   Pretty quickly.  A short time.

 6        Q.   What was the purpose of purchasing the

 7   property?

 8        A.   Our goal was to move to Florida.

 9        Q.   Okay.  Was this property the home that you were

10   planning to move into?

11        A.   Yes.

12        Q.   Do you own any other properties?

13        A.   We have a property in New Jersey we've had for

14   a long, long time, much longer than that, you know, so

15   we still have it now.

16        Q.   Do you own any other properties other than the

17   home in New Jersey?

18        A.   Well, yes, we have now another property in

19   Florida.

20        Q.   When you owned this home, did you own any other

21   properties in Florida?

22        A.   No.

23        Q.   Did you purchase a home also in 2007?

24        A.   No.

25        Q.   Okay.  Did you purchase a home in 2011?
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1479 of 3246
Case 1:1-cv-22408-MGC Document 21 Entered on FLSD Docket 05/19/2011 Page 40 of
84
Confidential - Subject to Further Confidentiality Review

```
 1      A.    Yes.

 2      Q.    Where was that home?

 3      A.    It's in Delray Beach.

 4      Q.    Okay.  Do you still own that home?

 5      A.    Yes.

 6      Q.    What is the -- is that a home you currently

 7   occupy?

 8      A.    When we are here, we occupy that, but we do go

 9   back to New Jersey for a short visit.

10      Q.    Where exactly do you live in New Jersey?

11      A.    In Voorhees Township, which is next to Cherry

12   Hill, about 25 minutes from Philly.

13      Q.    My mother grew up in Millville, New Jersey, so

14   I know that area decently.

15            And so you had purchased the home to move into

16   eventually.  Did you ever live in the home during the

17   time you owned it?

18      A.    Yes, we did live in it for periods of time to

19   slowly get the furniture and get it set up, but we had

20   to do it in steps.  I was still working full-time, so...

21      Q.    Roughly, how much of -- how much of a

22   percentage of the year were you living in the house?

23      A.    I can't tell you that exactly.

24      Q.    Was it more than 10 percent of the year?

25      A.    Pardon me?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1480 of 3246
Case 1:09-cv-07687-LAK Document 23362-39 Filed 05/19/19 Page 29 of 84
Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Was it more than 10 percent of the year?

 2             MS. GRANT:  Objection.  What period of time?

 3   BY MR. BARRY:

 4        Q.   Any period of time.

 5        A.   Yeah, I honestly don't remember.  It's been too

 6   long.  I don't remember exactly how long we stayed.  We

 7   were going back and forth quite a bit, so a lot of

 8   flights.

 9             And before the home was done we used to come

10   and stay in a hotel.  When the home was done, then we

11   tried to go to the house to stay there and try to build

12   up something inside there to fix it up.

13        Q.   So you were saying you were going back and

14   forth frequently.  How frequently would you say that

15   would be?

16             MS. GRANT:  Objection.  Asked and answered.

17             MR. BARRY:  I didn't hear him say how

18        frequently.

19             MS. GRANT:  You can answer.

20             THE WITNESS:  I don't remember, to be honest

21        with you.  No, I'm serious.  That's impossible.

22        Even now I don't remember how many times I go back

23        and forth.

24   BY MR. BARRY:

25        Q.   No, and that's --
```

```
 1        A.   I mean, I'm talking about the current house.  I
 2   don't remember.
 3        Q.   I understand that.  When you and your wife were
 4   going back and forth to the house, was anyone else
 5   living in the house with you?
 6        A.   Well, her parents came and lived there for a
 7   while.
 8        Q.   And how much time do you remember they were
 9   living in the house?
10        A.   I don't remember.  I mean, I don't know.
11        Q.   Were they a house guest, or were they actually
12   residing there?
13        A.   I think they were more or less like house
14   guests, even though my wife wanted to give them the
15   opportunity to live there on a permanent basis.
16        Q.   And when you say you wanted to give them the
17   opportunity to live there, would they be living there
18   alone or be living there with you and your wife?
19        A.   With us.
20        Q.   Was there anyone else who lived in the house
21   during that time period other than your wife's parents?
22        A.   No.
23        Q.   Are your wife's parents or anyone else making
24   claims in this litigation for --
25        A.   No.
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/10 Page 1482 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/10 Page 42 of 84
Confidential – Subject to Further Confidentiality Review

```
 1      Q.   And I apologize, Dr. Lalwani.  That's an

 2   example of let me make sure I finish the question so

 3   that I can --

 4      A.   Oh, I'm sorry.

 5      Q.   Yeah, no, I totally understand.  You're

 6   speaking like someone who's personable and likes to

 7   actually have a conversation, and this is,

 8   unfortunately, the exact example of something we don't

 9   do.

10      A.   That's okay.  That's okay.

11      Q.   Did you ever try to rent out the house?

12      A.   No.

13      Q.   Why not?

14      A.   We don't like the idea of putting other people

15   in our closets.

16      Q.   I understand that.  So you said before you

17   moved into the house you made some improvements to the

18   house; correct?

19      A.   Uh-huh.

20      Q.   And you were including that in the total

21   purchase price of the home; correct?

22      A.   I believe so, yeah.

23      Q.   Do you remember what year you guys closed on

24   the home?

25      A.   Like I said, it was between late 2006 and early
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1483 of 3246
Case 1:11-cv-22408-MGC Document 29 Entered on FLSD Docket 05/09/2013 Page 48 of 84
Confidential - Subject to Further Confidentiality Review

1    2007, somewhere in there.

2        Q.   I apologize.  I'm grabbing some documents to

3    put in front of you to help you remember some of these

4    improvements.

5            I'm going to hand you a document.  If you don't

6    mind providing it to your attorney first.

7            (Lalwani Exhibit No. 2 was marked for

8    identification.)

9            THE WITNESS:  What am I supposed to look in

10       here for?

11           MS. GRANT:  There's no question.

12           THE WITNESS:  Okay.

13   BY MR. BARRY:

14       Q.   I'm just handing it to you first.

15       A.   Okay.

16           MS. GRANT:  Please wait for Mr. Barry to ask --

17           THE WITNESS:  Yeah, yeah.  I thought there was

18       a question in reference to that.

19   BY MR. BARRY:

20       Q.   So I'll just represent for the record this is a

21   document from GHO Homes.  It's referring to Black Bear

22   Reserve of Vero Beach, 4590 Seminole Place.  Does that

23   refresh your recollection of the address of the home,

24   4590 Seminole?

25       A.   Well, it wasn't Seminole.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1484 of 3246 of
84
Case 1:11-cv-22408-MGC Document 1-1 Entered on FLSD Docket 05/19/2011 Page 61 of
Confidential - Subject to Further Confidentiality Review

1    Q.   No.  Okay.  Do you recognize this document,

2  Dr. Lalwani?

3    A.   You know, honest to God, there's some faded

4  memory.  You know, I'm sure -- I don't see our

5  handwriting on any of this, but I expect that we've

6  probably had a chance to look, review this.

7    Q.   Who is this document provided -- who is this

8  document addressed to?

9    A.   Both my wife and I.

10    Q.   And if you're reading through the document,

11  what does it pertain to?

12    A.   Plans of the home, preconstruction meeting to

13  go over the plans.

14    Q.   So if you'd turn the page to page 4 of the

15  document.

16    A.   Page 2 --

17    Q.   It's the fourth in the actual stapled document,

18  but on the document, where it says labeling, it says

19  page 1 of 3 on the option selections.  You've got it

20  open right there.

21    A.   Is this it?

22    Q.   Yes.  Yes, sir.  Do you recognize -- what are

23  these options?  This is a document labeled Option

24  Selections.  What are these option selections?

25    A.   Well, as I read it, bath tile for the smaller

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1485 of 3246
Case 1:1-09-md-02047 Confidential Document 22363-39 Filed 10/19/19 Page 1485 of 3246
Confidential – Subject to Further Confidentiality Review
84

1    bathroom --

2            MS. GRANT:  Counselor, are you asking him to

3        read each of the items on these several pages of

4        various options?

5            MR. BARRY:  I'm asking what this document is.

6            MS. GRANT:  Generally?

7            MR. BARRY:  Yes.

8            THE WITNESS:  Yeah, this is basically selecting

9        grout color and tile and exterior paint scheme and

10       steel undermount sink.  So it shows the different

11       things we selected.

12   BY MR. BARRY:

13       Q.   Are these the upgrades you were referring to

14   earlier?

15       A.   These are part of that.  I mean, there were a

16   lot more.

17       Q.   And what is the total amount of these upgrades,

18   if you look to the top of the page at the right-hand

19   corner?

20           MS. GRANT:  Object to form.  The document says

21       option selections.  This does not appear to be

22       upgrades.

23           MR. BARRY:  I'm using the language your client

24       referred to.

25           ///

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1486 of 3246
Case 1:09-cv-02047-MCA Document 23263-39 Filed 11/Docket 05/18/2019 Page 25 of
84
Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. BARRY:

 2        Q.   Are these -- what are these upgrades, as you

 3    referred to them earlier?  What is the total price of

 4    these upgrades?

 5        A.   So, according to this figure, it seems like

 6    $44,851.  I don't know, that's what it says.

 7        Q.   So -- and you said this is only part of the

 8    upgrades --

 9        A.   Yeah, there were other things.

10        Q.   -- or options to the house?

11        A.   After the fact, yeah.

12        Q.   And we'll talk more about this a little bit

13    later.  Are these damages you're seeking in this

14    litigation?

15        A.   It's whatever my lawyer has suggested is what

16    we're trying to follow.

17        Q.   So you don't have -- you don't personally know

18    what damages you're seeking?

19        A.   No.  No.  No.

20        Q.   I'm going to introduce another document.

21            MS. GRANT:  I'm just going to stack them.

22            MR. BARRY:  They become unwieldy quickly if you

23        don't stack them.

24            (Lalwani Exhibit No. 3 was marked for

25        identification.)
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 1/19/10 Page 1487 of 3246
Case 1:09-cv-02949-MGC Document 29487 Engrossment Filed Docket 05/19/017 Page 47 of
84
Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. BARRY:

 2       Q.   Dr. Lalwani, this is a document from Stone

 3   Mountain Landscape Design, Inc., dated July 16, 2005.

 4   It's not Bates labeled.

 5            Do you recognize this document?

 6       A.   No, not at all, not even the name of the

 7   people.

 8       Q.   Did you have stone work done on your house

 9   before you moved in?

10       A.   I don't recall the whole pieces that were put

11   in.  You know, it was like at the time of the planning

12   my wife and I talked together, "Well, this will look

13   good."  We don't remember these things, you know, what

14   it was.

15       Q.   Do you remember paying for any stone work

16   before you moved into the house?

17       A.   I don't remember.  That's the honest truth.  I

18   don't remember.

19       Q.   Do you know now or -- do you know now if you're

20   seeking any damages in this litigation for stone work

21   you may or may not have paid for?

22       A.   Again, I defer to my lawyer.

23       Q.   You don't have personal knowledge of whether

24   you are or you aren't?

25       A.   No.
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1488 of 3246
Case 1:09-cv-07687-LGS Document 22362-39 Filed 11/19/19 Page 1488 of 3246
Confidential - Subject to Further Confidentiality Review
84

```
 1              (Discussion off the record.)

 2              MR. BARRY:  There's a sound that we were

 3        talking about.

 4     BY MR. BARRY:

 5        Q.   Dr. Lalwani, I'm going to hand you another

 6     document.

 7              (Lalwani Exhibit No. 4 was marked for

 8     identification.)

 9     BY MR. BARRY:

10        Q.   Dr. Lalwani -- and I'll represent for the

11     record this is Stone Mountain Landscape Design, Inc.,

12     again sending another message, and this is dated

13     July 19, 2005.  This is also about repairs to the stone,

14     gravel.

15              Does this document refresh your recollection

16     of --

17        A.   No.

18        Q.   You can put it aside then.

19        A.   Sorry.

20        Q.   Dr. Lalwani, I'm going to hand you yet another

21     document.

22              MS. GRANT:  Sorry to do it this way.

23              THE WITNESS:  That's okay.

24              MR. BARRY:  Just making sure I'm not pulling a

25        fast one.
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 1489 of 3246
Case 1:09-cv-07402-MGC Document 2365-7 Exhibit 21 Filed 11/19/19 Page 41 of 84
Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  You're in charge.

 2              (Lalwani Exhibit No. 5 was marked for

 3      identification.)

 4      BY MR. BARRY:

 5         Q.   I'll represent for the record this is

 6      Exhibit 5, which is a document labeled "From the Desk of

 7      John Fuchs," and it's undated.

 8              Do you recognize this document?

 9         A.   I'm sorry.  No.  Not at all.  I don't remember

10      these things.

11         Q.   Did you collect documents to produce in this

12      litigation?

13         A.   Whatever documentation we had in our

14      possession, I presented it to the attorneys.

15         Q.   Do you know if this was one of those documents?

16         A.   I don't remember.

17         Q.   Do you know why -- this is a document that you

18      produced to us in this litigation, and so are you

19      unfamiliar with this document?

20         A.   I am, because I took a bunch of stuff and I

21      said, "Here."

22         Q.   And you did not review those documents

23      afterwards?

24         A.   No.  No.  No, no idea.  There's too much that's

25      gone by.
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/10 Page 1490 of 3246
Case 1:1-22-md-2047-EEF-MBN Document Entiflation F-5 Docket 05/18/2019 Page 30 of
84
Confidential – Subject to Further Confidentiality Review

1  Q.   Looking at this document and recognizing that

2  you're not currently familiar with it, if you read

3  through it, do you have an understanding of what it is?

4  A.   It's so specific on different things, and I

5  have a faint recollection that we went into these

6  things, but I don't know exactly what it was.  Sorry.

7  Q.   Were these additions or upgrades that you did

8  to your home?

9  A.   They were.

10  Q.   What type of upgrades were they?

11  A.   Obviously, from what I see, it's something we

12  desired to have in a home in Florida.

13  Q.   Earlier we looked at -- and I can't remember

14  which exhibit number it was.  I think it was Exhibit 2.

15  If you'd refer to Exhibit 2, Dr. Lalwani.

16  A.   Okay.

17  Q.   You remember we looked at page 2 -- or page 4

18  of that exhibit?

19  A.   This one; right?

20  Q.   Yes.  And while looking still at Exhibit 5 too

21  at the same time, are these upgrades that are in

22  addition to the ones that you've already listed over

23  there that were in the amount of roughly $44,000?

24  A.   I can't be sure, but I see that they are in

25  addition to.

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1491 of 3246
Case 1:09-cv-07626-LAK Document 24-3 Filed 05/16/2011 Page 51 of 84
Confidential - Subject to Further Confidentiality Review

```
1        Q.   Are they in addition or are they --

2        A.   They seem like they're in addition.

3        Q.   Okay.  But you're not sure whether that's true

4   or not?

5        A.   Well, I'm not going through every little word,

6   because I don't see the same things here, you know.

7        Q.   So looking through it, there are upgrades that

8   are in addition to the ones that are there?

9        A.   Yes.

10        Q.   So do you remember whether these were additions

11   that you did to the home?

12        A.   I believe we did a lot of that, but I don't

13   remember specifics, you know.

14        Q.   Did you have a larger garage, for example?

15        A.   I don't remember.  I don't remember whether we

16   did that.  We probably did.  You know, we wanted it as

17   best as we could to suit our needs.

18        Q.   In your second bedroom, did you have a walk-in

19   closet?

20        A.   In the second bedroom, was there a walk-in

21   closet?  It's something -- probably.  I don't remember

22   exactly.

23        Q.   Did you have coffered ceiling in your master

24   bedroom?

25        A.   I forget what coffered means.
```

Confidential - Subject to Further Confidentiality Review

1    Q.   I can probably define that, but it would be

2    really ugly on the record.

3         So you're -- and just to be clear, and I know

4    you've answered this, you're just -- you don't presently

5    remember whether you had these upgrades or not?

6    A.   No.  It's too long, yeah, and we were sick and

7    tired of the whole scenario.  Just didn't want to deal

8    with it.

9    Q.   Once you moved into the home, do you remember

10   if you did any renovations to the home?

11   A.   We did a few things, yeah.  I remember one of

12   the things that's outstanding in my head is the fencing

13   all around the 1-acre property, because we had a couple

14   of dogs.  We wanted to make sure they were content, you

15   know.  And I think we added some shrubbery maybe.  That

16   kind of stuff.

17   Q.   Do you know the cost of those improvements to

18   the property?

19   A.   Not really.  You know, it's kind of too far in

20   time.

21   Q.   Do you have any receipts for those, the work

22   you did?

23   A.   I don't believe so.

24   Q.   Are you seeking --

25   A.   Whatever receipts we had, we would have given

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1493 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 93 of 84

Confidential - Subject to Further Confidentiality Review

1    it to Allison Grant.

2        Q.   Yes, sir.  And are you seeking damages in

3    relation to the fencing or the shrubbery that you put

4    into the home?

5        A.   Everything, yeah.

6        Q.   Earlier you said you weren't -- you weren't

7    sure what damages you're claiming.  You believe that

8    is --

9        A.   No, I'm saying everything that we spent money

10   on is part of the damages, which would be obvious.

11       Q.   But those are items where you say you don't

12   have receipts and you're unsure of what the total amount

13   you paid for them are?

14       A.   Yeah, I don't know.  I've gone through these

15   things so many times.  We've had a lot of difficulties

16   with that.

17       Q.   Do you know the square footage of your house?

18       A.   Approximately.  4,000, maybe.

19       Q.   How do you know that number?

20       A.   I knew it was a fairly large house.

21       Q.   We're going to come back to that in a second.

22       A.   Okay.

23       Q.   When do you believe Chinese drywall was

24   installed in your house?

25       A.   It took a few years to find out.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1494 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1494 of 3246
Confidential - Subject to Further Confidentiality Review
84

1    Q.   When did you first learn that there was Chinese

2    drywall in the house?

3    A.   I think there was some -- something going on in

4    the news about Chinese drywall being used in some

5    Florida homes and Louisiana.

6    Q.   And what -- when you learned of it in the news,

7    did you suspect that your house had Chinese drywall in

8    it?

9    A.   Well, yes, yes, possibly.  Possibly.  Our

10   mirrors were turning black frequently.  Like, we'd put a

11   new mirror in.  They'd say, "That's defective."  Put a

12   new mirror in.  Turns black.  Come back again two months

13   later, three months later.  "Your mirrors are terrible."

14   Put -- they did three of them.  They said, "There's

15   something wrong with your house."  So that's when we

16   started to question maybe there is something wrong, you

17   know.

18   Q.   Did you see anything else in the house that

19   made you suspect that there was Chinese drywall?

20   A.   Well, you know, our air conditioning system was

21   going down several times, and my wife had been not

22   feeling well a few times there, so the combination of

23   factors that alerted us that something -- and then, you

24   know, we tried to look for someone that -- maybe an

25   inspector to find out.

Confidential - Subject to Further Confidentiality Review

```
 1        Q.   You said that you had the mirrors replaced a

 2   couple times?

 3        A.   Three times.

 4        Q.   Did you have to pay for those mirrors?

 5        A.   No.  We complained to Woodside.  We called the

 6   corporate office, because the site guy, the manager,

 7   didn't want to pay it.  So we called corporate, and they

 8   told him, "Take care of it."

 9             MR. VERRIER:  Mike, I don't want to interrupt,

10        I know you're in the middle, but she needs to use

11        the restroom.  Can we take a break?

12             MR. BARRY:  Yeah, let's take a break.  Perfect.

13        Totally fine.

14             (Recess from 10:38 a.m. until 10:52 a.m.)

15   BY MR. BARRY:

16        Q.   Dr. Lalwani, we talked earlier about how

17   frequently you came down to the house.  When you were

18   coming to the house, were you driving or flying to the

19   home?

20        A.   Flying.

21        Q.   Do you have any of the records of the flights

22   you took to --

23        A.   Not at all.

24        Q.   Did you look for those records?

25        A.   I know I don't keep them.
```

Confidential - Subject to Further Confidentiality Review

1    Q.   Did you look online to see if they might have

2    been on the --

3    A.   No.  No.

4    Q.   I fly Delta and I can look back and see my

5    flights from a couple years ago.

6    A.   No.

7    Q.   Did you look to see if they were available

8    there?

9    A.   No.

10   Q.   Okay.  We talked also about the square footage

11   of your home, and I've got a document here that will

12   help with that number.

13        (Lalwani Exhibit No. 6 was marked for

14   identification.)

15        MR. VERRIER:  Are we at Exhibit 6?

16        MR. BARRY:  Yes, Exhibit 6.

17        MR. VERRIER:  Thank you.

18   BY MR. BARRY:

19   Q.   This is Exhibit 6, which is Chinese Drywall

20   Settlement Program.  It is a document dated 9/30/13, and

21   it's signed by Allison Grant.  E-signed by Allison

22   Grant.

23        Have you ever seen this document before,

24   Dr. Lalwani?

25   A.   No.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1497 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 147 of 84
Confidential - Subject to Further Confidentiality Review

```
 1      Q.    If you'd look at page 2 and Box 12.

 2      A.    Okay.

 3      Q.    And it says:  "Provide the under air square

 4   footage for the affected property."

 5            What is the under air square footage listed

 6   there?

 7      A.    3552.

 8      Q.    Do you recognize that as the under air square

 9   footage of your home?

10      A.    I don't recall.

11      Q.    Do you have any reason to believe that's an

12   incorrect number?

13      A.    It's possible.  I don't know.

14      Q.    You have no knowledge one way or the other?

15      A.    No.  No.

16      Q.    So we talked earlier about when you started to

17   suspect Chinese drywall was installed in the house.  Do

18   you remember when -- the date of when you first learned

19   that there might be Chinese drywall in your house?

20      A.    No.

21      Q.    When you started to suspect that there was

22   Chinese drywall in the house, what did you do?

23      A.    We -- basically, I defer to my lawyer, because

24   she has all the answers to that.

25      Q.    Well, I'm asking you the question.  When you
```

Confidential - Subject to Further Confidentiality Review

1    suspected that Chinese drywall was in the house, what

2    was the first thing you did?

3          MS. GRANT:  And just -- I think he's talking

4       about communications that we had.  That's why he

5       answered.  They're not asking about communications

6       that we had.  They're asking about things that you

7       personally did outside of our relationship.

8          THE WITNESS:  Well, basically, we wanted to get

9       an inspector to find out.

10   BY MR. BARRY:

11      Q.   Did you get an inspector to find out?

12      A.   Yes.

13          (Lalwani Exhibit No. 7 was marked for

14   identification.)

15   BY MR. BARRY:

16      Q.   Mr. Lalwani, we're going to hand you a document

17   that's labeled Exhibit 7.  Do you recognize this

18   document, Dr. Lalwani?

19      A.   I don't recognize the document, but I do

20   recognize the gentleman's name.

21      Q.   Who is the gentleman you're referring to?

22      A.   Howard Ehrsam.

23      Q.   And who is Howard Ehrsam?

24      A.   He was an inspector who apparently had done

25   some property inspections in this area.  He had the

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1499 of 3246
Case 1:09-md-02047-EEF-MBN Document 2406-1 Original Complaint Docket 05/26/11 Page 39 of
84
Confidential - Subject to Further Confidentiality Review

```
 1    expertise in that.

 2        Q.   And what type of property inspections was he

 3    doing?

 4        A.   Overall determining what has been affected by

 5    Chinese drywall.

 6        Q.   And was he the person who did the inspection of

 7    your home for Chinese drywall?

 8        A.   Yes.  Yes.

 9        Q.   And did you ever receive a copy of this report?

10        A.   I -- we had a copy of his total report, which

11    was an exhaustive report on everything.

12             MS. GRANT:  If you want to just take a moment

13        and look through, not just the cover sheet.

14    BY MR. BARRY:

15        Q.   Yeah, if you want to look through.

16        A.   Yeah, these are --

17             MS. GRANT:  There's no question pending.

18             THE WITNESS:  I looked through this.

19    BY MR. BARRY:

20        Q.   What was the conclusion of the inspection

21    report?

22        A.   Basically, "The remediation process is very

23    extensive."  I'm reading this.  "CDS has the knowledge

24    and experience to oversee the entire process,

25    demolition, installation, and punch list, oversight."
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/10 Page 1500 of 3246
Case 1:1-09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/10 Page 40 of 84
Confidential - Subject to Further Confidentiality Review

 1    All that.  It's all noted here.

 2       Q.   Did they find that there was Chinese drywall

 3    present in the house?

 4       A.   Yes.

 5       Q.   Do you remember where in the house they found

 6    that the Chinese drywall was present?

 7       A.   Not exactly.

 8       Q.   Do you remember if it was in the entire house

 9    or in certain rooms?

10       A.   I'm not sure.

11       Q.   Was this the only inspection report that

12    Mr. Ehrsam did?

13       A.   As far as I remember.  Yeah, as far as I

14    remember.

15       Q.   I'm going to hand you another document.

16    Actually, before I do that, Dr. Lalwani, if you look at

17    the last page of the document, in the first paragraph,

18    it says it was signed by your realtor.  "Please initial

19    here."  "I (Client) hereby request a limited visual

20    screening of the home at the address identified below to

21    be conducted by Chinese Drywall Screening, LLC (CDS).  I

22    read the following agreement carefully and understand

23    that I am bound by the terms of the contract.  Please

24    initial here."

25            There's a signature that's illegible.  And I'm

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1501 of 3246
Case 1:09-md-02047-EEF-MBN Document Confidential Subject Docket 05/19/2019 Page 41 of
84
Confidential - Subject to Further Confidentiality Review

1    not judging that, because mine is usually too.  And then

2    it says "realtor."

3         A.   What's the question?

4         Q.   Do you know why a realtor signed this contract?

5         A.   Because he is the one who basically gave us the

6    referral to him.

7         Q.   So at this time, and this is dated March 30,

8    2009, were you working with a realtor to sell the home?

9         A.   We were considering, of course, yes.

10        Q.   So you had engaged a realtor for exploring

11   whether to --

12        A.   Yeah, if there's a possibility.

13        Q.   Do you remember when you engaged that realtor?

14        A.   No.

15        Q.   Was it in 2008?

16        A.   I don't remember.

17        Q.   You don't remember?

18        A.   No.

19        Q.   I'm going to hand you another document.  We'll

20   call it Exhibit 8.

21             (Lalwani Exhibit No. 8 was marked for

22   identification.)

23   BY MR. BARRY:

24        Q.   So this is Exhibit 8, Drywall Investigation

25   Report, this is by Chinese Drywall Screening, and this

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 1502 of 3246
Case 1:09-cv-02047-GAF Document 25857 Entered on FLSD Docket 05/09/2019 Page 42 of 84

Confidential - Subject to Further Confidentiality Review

1    is dated November 17, 2009.

2           Do you recognize this document, Dr. Lalwani?

3    A.   Not really, no.

4    Q.   Is this an -- and if you turn to -- do you know

5    why there are two different inspection reports?

6    A.   No, I don't remember.

7    Q.   Was there -- do you remember there being

8    anything wrong with the initial inspection?

9    A.   Honestly, no, I don't remember.  I don't know

10   why we had another one.

11   Q.   Were you present when the inspection, either of

12   the two inspections, were done?

13   A.   No.

14   Q.   Were you the one who ordered the inspections?

15   A.   Well, the first one we did.  I don't remember

16   Tim Zorc.  I don't remember this guy.

17   Q.   Did you speak with the inspector?

18   A.   No.

19   Q.   Did you -- did you remember paying for the

20   inspection?

21   A.   For the first one, but I don't remember the

22   second one.

23   Q.   So you remember on the first one personally

24   paying for the inspection?

25   A.   Yes.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1503 of 3246
Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1503 of 3246

Confidential - Subject to Further Confidentiality Review
84

```
 1      Q.   Okay.  What exactly caused you to suspect that

 2   there was Chinese drywall in the house other than the

 3   mirror?  Was there anything else that was signaling to

 4   you?

 5      A.   Air conditioning problems.  More than once.

 6      Q.   Did anyone -- other than those news reports you

 7   cited, did anyone else say to you you might have Chinese

 8   drywall in the house?

 9      A.   No, no, it was until we started questioning it.

10      Q.   Did any neighbors tell you that there might be

11   Chinese drywall in the house?

12      A.   No.

13      Q.   Did the builder tell you there might be Chinese

14   drywall in the house?

15      A.   No.

16      Q.   So did you ever notice an odor in the house?

17      A.   I didn't, but then my sense of smell is not

18   that great.

19      Q.   Did anyone else tell you that they smelled an

20   odor in the house?

21      A.   I don't know.  I mean, no, I don't know of

22   anyone who might have said that.

23      Q.   You don't remember your wife mentioning that

24   there was an odor?

25      A.   I don't remember, but you can ask her if you
```

Confidential - Subject to Further Confidentiality Review

```
1    want.

2         Q.   And, again, not asking the content, but when

3    did you first speak with an attorney about Chinese

4    drywall?

5         A.   When Howard did the inspection, he recommended

6    Allison.

7         Q.   And how soon after that did you file this

8    lawsuit?

9         A.   As soon as.

10        Q.   Did you file any other lawsuits?

11        A.   No.

12        Q.   And understanding you may not remember, do you

13   remember if there was ever any determination of the

14   percentage of your house that had Chinese drywall?

15        A.   No.

16        Q.   Now, did you ever try to remediate the Chinese

17   drywall from the house?

18        A.   No.

19        Q.   Did you ever consider remediating the Chinese

20   drywall from your house?

21        A.   I think we might have had thoughts about it,

22   but then we said we don't want to go through that.

23        Q.   Did you ever try to get quotes on remediation?

24        A.   We might have, but I don't remember exactly.

25        Q.   Why did you decide you just didn't want to go
```

Confidential - Subject to Further Confidentiality Review

1    through that?

2        A.   It's an immense project.  Immense.  With a big

3    question at the end.

4        Q.   And were you living in the house so that

5    remediation would -- would you have had to move out of

6    the house while they remediated?

7        A.   Of course, and we had a home, so we did go and

8    stay there.

9        Q.   And you said there was an immense question

10   mark.  What do you mean by there's an immense question

11   mark at the end?

12       A.   What was the question?

13       Q.   You said that if you were to remediate that

14   there's an immense question mark at the end, and I might

15   be -- you said there was a question mark.

16       A.   Oh, as far as --

17       Q.   What's the question mark?

18            Sorry.  Let me finish the question, I

19   apologize, just so the record is clear.

20            What would be the question mark at the end of

21   the remediation process?

22       A.   Still not sure if everything is done.  You

23   don't know what the people do, you know.

24       Q.   And had you heard anything saying that the

25   remediation process does not work?

Case 2:09-md-02047-EEF-MBN Document 23263-39 Filed 11/19/19 Page 1506 of 3246
Case 1:09-md-02047-EEF-MBN Document 2396-39 Filed 11/19/19 Docket 05/19/2019 Page 46 of
Confidential - Subject to Further Confidentiality Review
84

```
 1      A.   There was not that much done by that time.  It

 2  was early in the game.

 3      Q.   Do you remember how much -- did you have any

 4  idea of how much it would cost to remediate the

 5  property?

 6           MS. GRANT:  Object to form.  He's not an

 7      expert.  If he personally knows.

 8           THE WITNESS:  I don't remember.

 9  BY MR. BARRY:

10      Q.   Do you have any understanding of what the cost

11  to remediate would be?

12      A.   I don't remember, no.

13           MS. GRANT:  And I'm going to just interject an

14      ongoing objection regarding remediation.  Obviously

15      there's a formula in place, but of course you can

16      feel free to ask.

17           MR. BARRY:  Totally understand.

18  BY MR. BARRY:

19      Q.   Now, do you know if anyone ever remediated the

20  drywall in the home?

21      A.   No.

22      Q.   And this will be a dumb question.  You don't

23  own the home, so you cannot currently remediate the

24  property; right?

25      A.   No, we're not.
```

Confidential — Subject to Further Confidentiality Review

```
 1              THE COURT REPORTER:  I'm sorry?

 2              THE WITNESS:  We're not going to remediate.

 3   BY MR. BARRY:

 4       Q.   But currently you could not remediate the

 5   property?

 6       A.   No.

 7       Q.   After you sold it, were you aware whether the

 8   subsequent owner remediated the property?

 9       A.   He said he's going to do minimal.  Minimal.  I

10   don't know what he was going to do.  That's his choice.

11   We sold it.  It's his choice.

12       Q.   At any point when you owned the home, did

13   anyone collect samples of the drywall from the house?

14       A.   He did.

15       Q.   He did.  Who's "he"?

16       A.   The gentleman who took the house.

17       Q.   I'm going to close these doors so we're not

18   bothering her with our noise.

19       A.   It was part of the costs he was going to take.

20       Q.   So the gentleman who purchased the home

21   collected samples from the house?

22       A.   Yes.

23       Q.   Do you know how many samples he collected?

24       A.   No.

25       Q.   Did you -- were you ever aware of who made that
```

1    drywall?

2        A.   No.  No.

3        Q.   Do you have any knowledge whether Taishan made

4    that drywall?

5        A.   Oh, I heard about it after the fact.  During

6    this lawsuit, I heard the word Taishan come up.

7        Q.   And just to clarify, are you saying that you

8    were made aware -- are you saying that you were made

9    aware through this lawsuit that you had Taishan drywall?

10           MS. GRANT:  And I'm going to object to the

11       extent --

12           THE WITNESS:  No.

13           MS. GRANT:  Sir, you've got to wait for me

14       to --

15           THE WITNESS:  Oh, sorry.

16           MS. GRANT:  I was objecting to the extent that

17       any of your knowledge came from conversations that

18       we've had.

19           MR. BARRY:  Yes, absolutely.  I'm not asking

20       for any attorney communications.

21           MS. GRANT:  Please wait.  Go ahead.

22    BY MR. BARRY:

23       Q.   And, sorry, I can reread the question to you

24    subject to the objection.

25           MR. BARRY:  Do you mind rereading the question?

Confidential - Subject to Further Confidentiality Review

```
1                    (The question was read by the reporter.)

2    BY MR. BARRY:

3         Q.   And, of course, subject to the objection by

4    your attorney.

5         A.   So I'm going to defer to her, because she knew

6    everything that was to be done.

7         Q.   So did you have any personal knowledge of

8    Taishan drywall being in your house --

9         A.   Not --

10        Q.   I apologize.  Please let me finish the

11   question.

12             Did you have any personal knowledge of Taishan

13   drywall being in your house from anyone other than your

14   attorney?

15        A.   No.

16        Q.   Do you know where those samples are located

17   today?

18        A.   They've been thrown away.

19        Q.   They've been thrown away?

20        A.   Yeah.

21        Q.   When were they thrown away?

22        A.   When the gentleman sold the house to somebody

23   else.  This was not too long ago.

24        Q.   Where was the gentleman storing those samples?

25        A.   In his house.
```

Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Did he inform you that he was going to throw

 2   away those samples?

 3        A.   Yes.

 4        Q.   And did you consent to him throwing away those

 5   samples?

 6        A.   I did, because so many years later I said, you

 7   know, it seems like nothing is happening, you know.

 8        Q.   Were you aware that there was -- were you aware

 9   that there was an order in this court that said you

10   couldn't destroy samples?

11             MS. GRANT:  Wait.

12             MR. BARRY:  And let's go off the record so we

13        can clarify this.

14             MR. VERRIER:  Object to the question first.

15             MR. BARRY:  Yes.

16             MS. GRANT:  Let me object.  Attorney-client

17        privilege.  Let's go off the record.

18             MR. BARRY:  Yes.

19             (Discussion off the record.)

20   BY MR. BARRY:

21        Q.   Dr. Lalwani, I'm going to withdraw my last

22   question there.

23             Did someone take photos of the drywall before

24   it was destroyed?

25        A.   The gentleman who bought the home did, as far
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/10 Page 1511 of 3246
Case 1:09-cv-00234-MCR Document 22363-39 Filed 11/19/10 Page 451 of
84
Confidential - Subject to Further Confidentiality Review

```
 1    as I know.

 2        Q.   Have you ever had possession of those photos?

 3        A.   No.

 4        Q.   Have you ever asked for those photos?

 5        A.   No.

 6        Q.   Now, we talked a little bit about the corrosion

 7    in your house and you mentioned the mirror having

 8    issues, and I think you said you had to replace it three

 9    times?  Am I remembering that correctly?

10        A.   Yes.

11        Q.   When -- were all three times because of the

12    corrosion?

13        A.   Because they went black.

14        Q.   Was there one time where someone dropped the

15    mirror?

16        A.   No, not during the time they went black.

17        Q.   So there was a fourth time?

18        A.   I don't know.  I don't remember that.

19        Q.   Have any other appliances in your house stopped

20    working?

21        A.   I know the AC conditioner was having problems.

22    We had several times the guy coming back to fix it.

23        Q.   Did you have to have someone repair that AC

24    conditioner?

25        A.   Yeah.
```

Confidential – Subject to Further Confidentiality Review

```
1      Q.   Do you remember how many times someone came to

2   repair the air --

3      A.   I don't remember that.

4      Q.   Do you have any receipts for the --

5      A.   No.

6      Q.   Are you asking for the payment for the repairs

7   that you made to the air conditioning units?

8      A.   I'm going to defer to my lawyer.

9      Q.   You don't personally know whether you are or

10  you aren't asking?

11     A.   No.

12     Q.   Were there any other items in the house that

13  had to be repaired?

14     A.   I don't recall.

15     Q.   Were there any items in the house that you had

16  to replace?

17     A.   I honestly don't recall.

18     Q.   Now, I know you said you weren't living there

19  full-time.  Had you decorated the house?  Had you moved

20  furniture into the home?

21     A.   We did some of all of that.

22     Q.   Was it -- did you put furniture throughout the

23  entire home?

24     A.   Yes.

25     Q.   So would you -- in your opinion, would you say
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1513 of 3246
Case 1:11-cv-22408-MGC Document 109-1 Entered on FLSD Docket 05/18/2013 Page 53 of
84
Confidential - Subject to Further Confidentiality Review

1   it was a fully furnished home?

2      A.   Pretty much, yeah.

3      Q.   Did you ever try to make a claim to your

4   homeowners insurance related to the effects of Chinese

5   drywall?

6      A.   I don't recall.

7      Q.   Did you have homeowners insurance on the

8   property?

9      A.   Yes.

10      Q.   Who was your insurer, do you remember?

11      A.   I don't remember.

12      Q.   Did you ever discuss making a claim on your

13   homeowners insurance with your wife or anybody else?

14          MS. GRANT:  Other than your attorneys.

15          MR. BARRY:  Yes, 100 percent.

16          THE WITNESS:  No, I don't recall any of that.

17   It's too long ago.

18   BY MR. BARRY:

19      Q.   Was any furniture that you put in the house or

20   other personal property damaged by Chinese drywall?

21      A.   I don't recall.

22      Q.   Did Chinese drywall limit your use of the

23   property?

24      A.   Yes.

25      Q.   How so?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1514 of 3246
Case 1:09-cv-02047-CJC Document 22363-39 Filed 11/19/19 Page 451 of 84
Confidential - Subject to Further Confidentiality Review

 1      A.   Well, once we found out, we no longer wanted to

 2   come and stay there.

 3      Q.   Once you found out, did you stay there at all?

 4      A.   I don't think so.  I mean, I don't think so.  I

 5   think we just decided not to go back.

 6      Q.   I'm going to hand you a document --

 7           MR. BARRY:  Which I can't remember which

 8      exhibit we're on.  10?

 9           THE COURT REPORTER:  9.

10           MR. BARRY:  9.

11           (Lalwani Exhibit No. 9 was marked for

12   identification.)

13           MR. BARRY:  Actually, if we can go off the

14      record just for a second.

15           (Discussion off the record.)

16           MR. BARRY:  Let's withdraw that as an exhibit.

17      We'll do this as Exhibit 9.

18   BY MR. BARRY:

19      Q.   Dr. Lalwani, do you recognize this document?

20      A.   No.

21      Q.   Why don't you take a second to look through it.

22           And just for the record, I'll represent this is

23   the First Amended Supplemental Plaintiff Profile Form.

24           MS. GRANT:  It's missing a page, Mike.

25           MR. BARRY:  Is it?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1515 of 3246
Case 1:1-cv-22408-MGC Document 23-1 Entered on FLSD Docket 05/18/2011 Page 45 of 84
Confidential - Subject to Further Confidentiality Review

```
 1              MS. GRANT:  The verification page that goes

 2       with it.

 3              MR. BARRY:  Yeah, I've got it separate.  If you

 4       don't object, we can just attach the verification

 5       page.  It's been produced separately.  I think

 6       that's the most recent verification I have.

 7   BY MR. BARRY:

 8       Q.   Dr. Lalwani, do you recognize this document?

 9       A.   No.

10       Q.   Did you ever review this document?

11       A.   I'm sure I must have, but I don't remember.  I

12   don't recall anything like this.

13       Q.   Can you turn to the last page, Dr. Lalwani?

14       A.   Yeah.

15              MS. GRANT:  I'm sorry to interrupt.  I just

16       want to be clear.  This verification goes with the

17       prior --

18              MR. BARRY:  I don't know if we have the other

19       verification, so -- I'll represent this document has

20       not yet been verified, we've not received a

21       verification.

22              MS. GRANT:  I want to take this just so there's

23       no confusion.

24              MR. BARRY:  Yeah, take this back.

25              MS. GRANT:  Dr. Lalwani, this happens to go
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1516 of 3246
Case 1:19-cv-12959-MGM Document 25 Entered on FLSD Docket 05/18/2019 Page 35 of
84
Confidential - Subject to Further Confidentiality Review

```
 1        with an earlier one.  Same document, but this is an

 2        amendment, that's all.  Is that okay?

 3             MR. BARRY:  I apologize.  Yes.

 4   BY MR. BARRY:

 5        Q.   I'll clarify that for the record.  This

 6   document, which is Exhibit 9, is unverified.  There's a

 7   prior verification that's been produced, and when your

 8   attorney requested the verification, I provided that

 9   one, but that corresponds to a different plaintiff

10   profile form, which my colleague, Ms. O'Donahue,

11   correctly identified, and I did not listen.

12             So looking at this First Amended Supplemental

13   Plaintiff Profile Form, have you ever reviewed this

14   document, Dr. Lalwani?

15        A.   I don't recall this document.

16        Q.   If you look at the last page, do you see it's

17   written in your name?  I know you've not verified it

18   yet, but do you see it's written in your name?

19        A.   Yeah, both my wife and I.

20        Q.   If we look through this document, let's look at

21   Section II.  It's on page 2.

22        A.   Page 2?

23        Q.   Page 2, Section II.

24        A.   This doesn't have a page 2.  Oh, page 1, page

25   2.  Here, okay.  So Section II.
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/10 Page 1517 of 3246
Case 2:09-md-02047-EEF-MBN Document 22862-39 Entered on FLSD Docket 05/19/2019 Page 37 of
84
Confidential - Subject to Further Confidentiality Review

1    Q.   Yes.  So the first line here says:  "When did

2    you acquire the property?  Month/day/year."

3         What's the date listed there?

4    A.   10/21/2006.

5    Q.   Do you recall that being the date you acquired

6    the property?

7    A.   I don't recall it, but I believe that is

8    correct.

9    Q.   Do you have any reason --

10   A.   But they were not finished with the total

11   construction.

12   Q.   Again, I apologize, Dr. Lalwani.  I hate saying

13   this all the time, but do you mind just letting me

14   finish the question so that -- it's just --

15   A.   Yeah, yeah, yeah.

16   Q.   -- very hard for her to do it if we don't.

17   A.   Sure.

18   Q.   You and I can have a conversation in the hall

19   and we'll be able to interrupt each other as much as we

20   want.

21   A.   All right.

22   Q.   Do you have any reason to doubt that you

23   acquired the property on October 21, 2006?

24   A.   I don't remember the date.

25   Q.   Now, looking down a little bit further, there's

Case 2:09-md-02047-EEF-MBN Document 23263-39 Filed 11/19/19 Page 1518 of 3246
Case 1:1-cv-22408-GCD Document 21-67 Entered on FLSD Docket 05/19/2011 Page 53 of 84
Confidential - Subject to Further Confidentiality Review

 1    a line that says:  "If you were not aware at the

 2    time" -- and I apologize, Dr. Lalwani.  Let me go back

 3    on that question.  I think you may have answered a

 4    question different than the one I asked.

 5            I said:  Do you have any reason to doubt that

 6    that date is correct?

 7        A.    I do have a reason to doubt.

 8        Q.    Okay.  Why do you doubt that date is correct?

 9        A.    Well, I thought it was probably November when

10    the feeling was we're going to sign off on it, but they

11    didn't finish the project as yet, so it really wasn't

12    done.

13        Q.    Do you know why October 21, 2006, is listed

14    here?

15        A.    We were pressured to sign, to get it completed.

16        Q.    Who pressured you to sign?

17        A.    Woodside Management.

18        Q.    And what exactly did you sign?

19        A.    Whatever the papers are at that time.

20        Q.    Do you know if that document's been produced to

21    us in this litigation?

22        A.    I'm sorry?

23        Q.    Do you know if that document's been produced to

24    us in this litigation?

25        A.    I don't think so.

Case 2:09-md-02047-EEF-MBN Document 22262-39 Filed 11/19/19 Page 1519 of 3246
Case 1:11-cv-22408-MGC Document 25-1 Entered on FLSD Docket 05/18/2011 Page 45 of
84
Confidential - Subject to Further Confidentiality Review

 1      Q.    Okay.  Dr. Lalwani, if you look down at the

 2   line that says, "If you were not aware, at the time you

 3   acquired the property, that the property contained

 4   Chinese drywall, when did you first become aware that

 5   the property contained Chinese drywall," what's the date

 6   listed there?

 7      A.    It says March 2009.

 8      Q.    Is that when -- looking at this document, is

 9   that when you learned that there was Chinese drywall in

10   the house?

11      A.    I don't remember the date.

12      Q.    Do you have any reason to doubt that date being

13   correct?

14      A.    I have no way of verifying.

15      Q.    Dr. Lalwani, I'm going to provide you a

16   document, and you actually already have it, it's called

17   the Supplemental Plaintiff Profile Form, which I

18   provided you and we initially labeled as Exhibit 9, but

19   we're going to label it as Exhibit 10.

20          Pending your counsel's consent, the

21   verification page that did correspond with that, we're

22   going to --

23          MR. BARRY:  Can we append that as one exhibit?

24          MS. GRANT:  Yes, of course.

25          (Lalwani Exhibit No. 10 was marked for

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1520 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1520 of 3246
Confidential – Subject to Further Confidentiality Review
84

```
 1   identification.)

 2            MR. BARRY:  Is that verification provided?

 3            MS. GRANT:  Yes.

 4   BY MR. BARRY:

 5       Q.   Dr. Lalwani, do you recognize what I've put in

 6   front of you as Exhibit 10?

 7       A.   I don't remember these forms.  I'm sorry.

 8       Q.   No, and that's totally fine.

 9       A.   Yeah.

10       Q.   Looking at Section II, page 2 of this document,

11   does this list the same date, March 2009, as the date

12   when you learned that Chinese drywall was in the house?

13       A.   It's listing the same date.

14       Q.   And this is the date that you earlier said you

15   were not sure is correct --

16       A.   Right, that's correct.

17       Q.   -- you had no idea whether it was correct or

18   not?

19            If you'd look at the last page of this

20   document, which is entitled Verification of Supplemental

21   Plaintiff Profile Form, and it reads:  "I declare under

22   penalty of perjury under the laws of the United States

23   of America and pursuant to 28 USC 1746."

24            And it says that "...the information provided

25   in the Supplemental Plaintiff Profile is true and
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1521 of 3246
Case 1:19-cv-04407-CAP Document 22-1 Entered on FLSD Docket 05/19/2021 Page 46 of
84
Confidential - Subject to Further Confidentiality Review

1    correct to the best of my knowledge, and that I have

2    supplied all of the documents requested in the

3    declaration to the extent that such documents are in my

4    possessions, custody or control."

5          Is that your signature on this document?

6    A.   Yes.

7    Q.   So did you verify this document when you were

8    unaware whether that -- the information was true or not?

9          MS. GRANT:  I'm going to object to form.  That

10         is not what he testified.

11         MR. BARRY:  You can object to form, please.

12   BY MR. BARRY:

13   Q.   You said earlier that you were unsure whether

14   March 2009 was the correct date when you learned of

15   Chinese drywall.  Did you then verify that that date was

16   correct --

17   A.   No.

18   Q.   -- under this verification?

19   A.   No.

20   Q.   So explain that to me then.  Explain why this

21   document is verified that includes this information.

22         MS. GRANT:  And I'm going to object to the

23         extent that that calls for any attorney-client

24         communications.  So you cannot discuss anything that

25         we've -- any privileged communications.

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 1522 of 3246
Case 1:09-cv-02042-MCA-MAH Document 23362-39 Filed 01/06/2011 Page 62 of 84
Confidential - Subject to Further Confidentiality Review

1  BY MR. BARRY:

2      Q.   And I'm not asking for privileged

3  communications.  I'm asking:  When you verified this

4  document, were you aware that March 2009 was the date

5  that you had Chinese drywall, or that you learned

6  Chinese drywall was in the house?

7      A.   I was not aware of the date.

8      Q.   Okay.  So it fair to say that you verified this

9  document when some of the information in it you were

10  unsure whether it was true or not?

11      A.   Right.

12          MS. GRANT:  Again, I'm going to object, renew

13      my objection.

14          MR. BARRY:  Okay.

15  BY MR. BARRY:

16      Q.   Looking at this document -- and let's look back

17  at Exhibit 9, Exhibit 9, which is the -- the one on top.

18      A.   This one.

19      Q.   And just referencing for the record, which I

20  don't think your counsel objected, Exhibit 9 is the

21  amended version of Exhibit 10.

22          MS. GRANT:  Correct.

23  BY MR. BARRY:

24      Q.   So it is the sooner -- the later in time

25  version.

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1523 of 3246
Case 1:09-cv-07840-LGS Document 20-31 Filed 10/18/19 Page 23 of 84
Confidential - Subject to Further Confidentiality Review

```
 1              If you look at page 6 -- actually, let's start

 2    on page 5.  At the bottom of page 5, in the section that

 3    says Section VII, other damages, the line reads:  "If

 4    you incurred alternative living expenses as a result of

 5    Chinese drywall, identify the total moving cost and/or

 6    alternative living expenses you incurred."

 7              What is the dollar figure listed there?

 8        A.   I don't see any dollar value.

 9        Q.   Are you seeking any damages related to

10    alternative living expenses?

11        A.   I defer to my lawyer on that.

12        Q.   Did you have to move because of Chinese

13    drywall?

14        A.   Well, we couldn't use the house, but we didn't

15    have to do anything except for --

16        Q.   Did you have -- were you using the house with

17    Chinese drywall as your primary residence at the time

18    you learned that Chinese drywall was in the house?

19        A.   Not at the time.  We were planning on it.

20        Q.   Did you have to pay rent on any other

21    property --

22        A.   No.

23        Q.   -- during that time period because of Chinese

24    drywall?

25        A.   Only hotel stays.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1524 of 3246
Case 1:12-cv-02047-EEF Document 22363-39 Filed 11/19/19 Page 4524 of 3246 of
84
Confidential - Subject to Further Confidentiality Review

 1     Q.   And are you seeking compensation for the hotel

 2   stays?

 3     A.   Defer to my lawyer for that.

 4     Q.   Do you have any understanding of whether you're

 5   seeking compensation for those --

 6     A.   I have no memory of any of that, no.

 7     Q.   And, again, I apologize.  Do you mind making

 8   sure that I'm finished the question?

 9          So let me reask that.  Do you have any

10   understanding of whether you're seeking compensation for

11   the hotel stays?

12     A.   No.

13     Q.   Do you have any receipts from the hotel stays?

14     A.   No.

15     Q.   And if you turn the page, the second paragraph

16   says:  "If you experienced any loss of use and/or loss

17   of enjoyment of the property as a result of Chinese

18   drywall, identify the total amount of such loss."

19          What's the amount listed there?

20     A.   50,000.

21     Q.   Without talking about any communication you had

22   with your attorneys, how did you come to that number,

23   50,000?

24     A.   Defer to my attorney.

25     Q.   Do you have any understanding of how you

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1525 of 3246
Case 1:09-cv-02048 Document 22363-39 Filed 11/19/19 Docket 09/24/25 Page 45 of 84
Confidential - Subject to Further Confidentiality Review

```
 1   reached the number 50,000?

 2          MS. GRANT:  Objection again.  To the extent it

 3      calls for attorney-client privilege, you're not to

 4      answer that question.

 5          THE WITNESS:  So I won't be answering that

 6      question, you know.

 7   BY MR. BARRY:

 8      Q.   So you have no attorney -- no knowledge

 9   independent of conversations you've had with your

10   attorneys --

11      A.   Right.

12      Q.   -- about how you reached the number $50,000?

13      A.   Right.

14      Q.   What is -- let's move on.

15          If you look two lines down, it says:  "If you

16   claim a diminution in value of the property as a result

17   of Chinese drywall, identify the total amount of such

18   diminution in value being claimed."

19          What's the amount listed there?

20      A.   Let's see.  "Estimated 545."  There isn't a --

21   well, you're saying 545,000, I guess, is what the

22   estimated value is.

23      Q.   And just to clarify for the record, are you

24   saying that the amount listed there is $545,000?

25      A.   That's what it says.
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1526 of 3246
Case 1:11-cv-22408-MGC Document 1 Entered on FLSD Docket 05/09/2012 Page 56 of 84
Confidential – Subject to Further Confidentiality Review

```
1        Q.   Are you seeking, in diminution values related

2   to Chinese drywall, $545,000 in this litigation?

3        A.   I have to defer to my lawyer for that answer.

4        Q.   Do you know how -- again, not disclosing any

5   conversations you've had with your attorneys, do you

6   know how you reached the number $545,000 as the

7   requested diminution value?

8        A.   Defer to my lawyer.

9        Q.   So do you have any personal knowledge of how

10  that number was reached?

11       A.   No.

12       Q.   Do you have any idea of how it was calculated?

13            MS. GRANT:  Objection, asked and answered, and

14       I'm renewing my attorney-client privilege.

15  BY MR. BARRY:

16       Q.   When you say "estimated value," do you believe

17  that is the property value of the house?

18            MS. GRANT:  Objection.  Mike, it doesn't say

19       "estimated value."

20            MR. BARRY:  Go look at line 58 - 5901.  It says

21       "estimated."

22            MS. GRANT:  I apologize.  The answer says

23       "estimated $545,000."

24            MR. BARRY:  Yes, and this is a document that

25       previously was verified; am I correct?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1527 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1527 of 3246

Confidential – Subject to Further Confidentiality Review
84

```
 1            MS. GRANT:  One moment.  I believe your

 2       question said --

 3  BY MR. BARRY:

 4       Q.   Are you reading the document, or are you saying

 5  that personally that you estimated that it's $545,000?

 6       A.   Again, my attorney has more knowledge of that

 7  than I do.

 8       Q.   Dr. Lalwani, if you'd turn back to Section VI,

 9  which is prior payments --

10       A.   Other -- oh, prior payments.  Okay.

11       Q.   Do you -- there's a listing here that says "GBI

12  settlements $23,745.31."  Do you remember receiving

13  compensation from GBI settlements in that amount?

14       A.   I did receive some money close to that.  So,

15  you know, I can't remember the exact figure, so I

16  thought I remember this.

17       Q.   Do you remember receiving -- and there's

18  another listing here that says "Woodside Litigation

19  Trust," and the dollar amount is $3.14.  Do you remember

20  receiving that compensation?

21       A.   I don't remember it.  That's not of any

22  consequence.

23       Q.   I understand that.  I'm going to provide a few

24  documents, and for ease on the record, if your attorney

25  will consent to me introducing them as one total
```

Case 2:09-md-02047-EEF-MBN Document 23262-39 Filed 11/19/20 Page 1528 of 3246
Case 1:09-cv-02047-MGC Document 208-1 Entered on FLSD Docket 08/04/20 Page 8 of 84
Confidential - Subject to Further Confidentiality Review

 1    exhibit.

 2            MS. GRANT:  That's fine.

 3            (Lalwani Exhibit No. 11 was marked for

 4    identification.)

 5            MS. GRANT:  Mike, I'm sorry, I think I messed

 6        up -- how do you want this?

 7            MR. BARRY:  Just put them as one total exhibit.

 8        I was just providing them easy for use and not

 9        having to page through things.

10            MS. GRANT:  We have to separate them out.

11            MR. VERRIER:  This is Exhibit 11?

12            MR. ROTHENBERG:  Exhibit 11.

13    BY MR. BARRY:

14        Q.   Looking at the first document, is this the

15    check -- and if you turn it over on the first document

16    that you have, which I'll represent to you is the FTI

17    Consulting letter addressed to --

18        A.   I don't recall any of that.

19        Q.   You don't recall any of this?

20        A.   No, no, no, no.

21        Q.   Let's look at the second and third documents,

22    the checks from the Chinese Drywall Settlement Program,

23    one dated 2/20/18 and one dated 10/14/14.  The first is

24    in the amount of $1,285.02.  The second is in the amount

25    of $10,549.44.

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1529 of 3246
Case 1:11-cv-22408-MGC Document 72-1 Entered on FLSD Docket 05/09/2012 Page 45 of
84
Confidential - Subject to Further Confidentiality Review

```
 1              Do you remember receiving these checks?

 2      A.   I don't recall, and the amounts are whatever

 3   they are, but I don't recall it, but it's --

 4      Q.   Would it be fair to say that these two checks

 5   together do not add up to the $23,000 that's listed?

 6      A.   Yes.

 7      Q.   Do you remember receiving any other checks in

 8   addition?

 9      A.   No, I don't.

10      Q.   Have you produced copies of those checks in

11   this litigation?

12      A.   I don't know.  My lawyers...

13      Q.   Have you received any other compensation

14   related to Chinese drywall being in your house?

15      A.   No.

16           MR. BARRY:  I think this would be a good place

17      for taking a break.

18           MS. GRANT:  Okay.

19           MR. VERRIER:  Okay.

20           (Recess from 11:38 a.m. until 11:55 a.m.)

21   BY MR. BARRY:

22      Q.   Dr. Lalwani, when you sold the house, did you

23   ever explicitly retain your right to make a claim in

24   this lawsuit?

25      A.   Yes.
```

```
 1      Q.   Did you document that anywhere?

 2      A.   Basically, my attorney would answer that

 3   better.

 4      Q.   Do you know if the owner of the house, the

 5   current owner of the house or the prior owner of the

 6   house -- sorry.  Scratch that.

 7           Do you know if the person to whom you sold the

 8   house has tried to pursue a claim in this litigation?

 9      A.   I don't know.  I'm not sure whether he would do

10   it.

11      Q.   Do you know the buyer of the property?

12      A.   I don't believe I ever met him.  I did talk on

13   the phone.  Yeah, we did -- we didn't even meet at the

14   settlement, as a matter of fact.

15      Q.   Sorry.  You didn't even meet at the settlement,

16   or you did meet?

17      A.   No.

18      Q.   To clarify, you didn't meet at the settlement?

19      A.   I don't remember --

20           MS. GRANT:  Did not.

21           MR. BARRY:  Let him answer.

22           MS. GRANT:  Sorry.

23   BY MR. BARRY:

24      Q.   I'm trying to make sure it's clear for the

25   record, because it's not clear from those questions.
```

Confidential - Subject to Further Confidentiality Review

```
 1     A.   Did not -- I do not remember.  I don't think

 2  so.

 3     Q.   Do you remember how much you sold the home for?

 4     A.   I believe it was 175,000.

 5     Q.   I'm going to hand you a document.

 6     A.   That number seems to stick in my brain because

 7  of the loss.

 8          (Lalwani Exhibit No. 12 was marked for

 9  identification.)

10  BY MR. BARRY:

11     Q.   I've handed you Exhibit 12, which is the U.S.

12  Department of Housing and Urban Development Settlement

13  Statement, and it is dated 3/11/2011.  Was that date the

14  date on which you sold the house?

15     A.   From this document, it appears to be the date.

16     Q.   And how much did you sell the house for?

17     A.   As I said, it's probably 175.

18     Q.   And do you see what value is listed here?

19     A.   164,831.

20     Q.   Just above that, the gross amount due to the

21  seller.

22     A.   174,000.

23     Q.   You said you had spoken with the buyer a few

24  times on the phone.  What did you speak with -- when you

25  spoke to the buyer, what were you speaking to him about?
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1532 of 3246
Case 1:09-cv-02047-GAO Document 22362-39 Filed 11/19/19 Docket 05/18/2019 Page 92 of 84
Confidential – Subject to Further Confidentiality Review

```
 1       A.   Essentially, it was about how to improve the

 2   property.  He was absolutely delighted with the house

 3   and the property.

 4       Q.   What did he say he was going to do to improve

 5   the property?

 6       A.   He's a French guy, so he said putting in all

 7   the gardening stuff, which I never visited.

 8       Q.   Did he say anything about whether he was going

 9   to remediate the property?

10       A.   Yes, to the extent that he felt was needed.

11       Q.   Did he say how much it would cost to remediate

12   the property?

13       A.   Nothing, no, I don't know anything about that.

14       Q.   Did you have any understanding of how much it

15   would cost to remediate the property?

16            MS. GRANT:  Objection.  Asked and answered.

17            MR. BARRY:  You're right.

18   BY MR. BARRY:

19       Q.   Why did you speak to the buyer during that time

20   period?

21       A.   He may have reached out to me after the sale

22   just to say hello and to tell me how much he was working

23   on it.

24       Q.   Did you ever try to sell to anybody else?

25       A.   No.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1533 of 3246
Case 1:09-cv-02047-GAO Document 23263-39 Filed Confidentiality 05/19/2019 Page 73 of
Confidential – Subject to Further Confidentiality Review
84

```
 1      Q.   Were any other offers made on the house?

 2      A.   No.

 3      Q.   Do you remember what the initial listing price

 4   was for the house?

 5      A.   Initial, like, going back many years?

 6      Q.   Yeah.

 7      A.   Or during the time --

 8      Q.   Like, when you were trying to sell the home.

 9      A.   This home with the Chinese drywall?

10      Q.   Yes.

11      A.   I don't remember, to be honest with you.  I

12   don't remember the numbers.

13      Q.   Dr. Lalwani, I'm going to provide you with a

14   document, Exhibit 28 -- sorry -- Exhibit 13.  And I'll

15   represent for the record that this is a document that

16   went to your wife, according to --

17           MS. GRANT:  Just give me one second.  Okay.

18           (Lalwani Exhibit No. 13 was marked for

19   identification.)

20   BY MR. BARRY:

21      Q.   Have you ever seen this e-mail from your --

22      A.   I'm sorry?

23      Q.   Have you ever seen this e-mail?  I recognize

24   it's addressed to your wife.

25      A.   I don't remember it.  I may have seen it, but I
```

Confidential - Subject to Further Confidentiality Review

1    don't remember it.  This is all very old.

2        Q.   If you look at -- there's three documents in

3    this collection.  I'll represent those are attachments

4    to the e-mail.  There's one labeled Work Order Report.

5    It might be easier to take the paper clip off.

6            MS. GRANT:  Mike, before you begin this line of

7        questioning, again I'm just going to restate my

8        objection regarding remediation damages and

9        estimates.

10           MR. BARRY:  Understood.

11   BY MR. BARRY:

12       Q.   It's the third document in the set,

13   Dr. Lalwani.

14       A.   This one?

15       Q.   The third document.  You're on the second one.

16       A.   All right.

17       Q.   And this is a document labeled Work Order

18   Report.  It's Work Order 2009-07-27-2141 from McAlhany

19   Construction Company, Inc.  Have you ever seen this

20   document before?

21       A.   Recall is not there.  I don't remember it.

22   That's all I can say.

23       Q.   And if you just look through this document,

24   does it refresh your recollection that you may have

25   received a quote on what it would cost to remediate the

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 1/10/10 Page 1535 of 3246
Case 1:11-cv-22408-MGC Document 28-27 Entered on FLSD Docket 05/18/2017 Page 45 of 84
Confidential - Subject to Further Confidentiality Review

```
 1   property?

 2            MS. GRANT:  And I'm going to object to the

 3        extent -- your use of the word, also, "remediate,"

 4        what that means.

 5            MR. BARRY:  It's a rolling objection.

 6            MS. GRANT:  It's a little bit different.

 7            THE WITNESS:  Do I answer it?

 8            MS. GRANT:  You can go ahead.

 9            MR. BARRY:  And I just request for the record

10        that you're welcome to state your objection, but

11        please don't do a speaking objection.

12            THE WITNESS:  So, I'm sorry, the question

13        again?

14   BY MR. BARRY:

15        Q.   The question is:  Does this refresh your

16   recollection that you received a quote on what it would

17   cost --

18        A.   Yes.

19        Q.   -- to provide remediation to the property?

20        A.   I recall because of this document.

21        Q.   And the quote that's listed here on page 5 is

22   $126,741.52?

23        A.   Uh-huh.  Yes.

24        Q.   Did you consider that to be too expensive to

25   remediate the property?
```

Case 2:09-md-02047-EEF-MBN Document 23263-39 Filed 11/19/19 Page 1536 of 3246
Case 1:09-md-02047-EEF-MBN Document 23263-39 Filed 11/19/19 Page 1536 of 3246
Confidential – Subject to Further Confidentiality Review
84

```
 1      A.   It was irrelevant, because even though we asked

 2   for an understanding of what it might cost us, after

 3   careful decision between my wife and I, we decided not

 4   to do anything like that but to get out of it, let

 5   somebody do it.

 6      Q.   Do you have -- are you aware whether the

 7   property was sold by the person you -- I know that --

 8   the buyer of the property, the person who you sold the

 9   property to, are you aware whether that person was able

10   to sell the property subsequent to his purchase of it?

11      A.   I am aware.

12      Q.   I'm going to hand you a document, Exhibit 14.

13           (Lalwani Exhibit No. 14 was marked for

14   identification.)

15   BY MR. BARRY:

16      Q.   Dr. Lalwani, have you ever seen this document

17   before?

18      A.   No.

19      Q.   If you look at the -- is this the property that

20   was affected by Chinese drywall?

21      A.   It appears to be, from the picture.

22      Q.   And if you look at the information that says

23   "sales information," it says on February 1, 2011, you

24   sold the house, it says "Lalwani Gul & Deborah," sold

25   for $174,000; is that correct?
```

Confidential - Subject to Further Confidentiality Review

```
1      A.   Where does it say that?

2      Q.   It's on the left side.  It's very small type.

3  Perhaps your attorney can point.

4           MS. GRANT:  May I?

5           THE WITNESS:  Oh, I see.  Okay.  I'm sorry.

6      Yes, I see that.

7  BY MR. BARRY:

8      Q.   Just above it, it says in 2015 the same

9  property sold for $410,000.  Were you aware that the

10 property sold for $410,000 --

11     A.   No.

12     Q.   -- in 2015?

13     A.   No.

14     Q.   Again, please let me finish the question.

15     A.   Okay.  Sorry.  Yeah.

16     Q.   She's going to keep kicking me.  It's happening

17 over and over again.

18          Do you know whether -- I think you may have

19 answered this, and I apologize.  I'm just running my own

20 memory here.  Do you remember whether the property was

21 remediated after you sold it?

22     A.   I knew he was making some changes.  I didn't

23 know to what extent.

24     Q.   Okay.  Is it fair to say that whatever changes

25 he made increased the property value of the house?
```

Case 2:09-md-02047-EEF-MBN Document 23262-39 Filed 11/19/19 Page 1538 of 3246
Case 1:19-cv-22452-MGC Document 26-1 Entered on FLSD Docket 05/08/2019 Page 76 of 84
Confidential - Subject to Further Confidentiality Review

```
 1              MS. GRANT:  I'm going to object.  Object to
 2       form.  He's not an expert.
 3    BY MR. BARRY:
 4       Q.   Is it fair -- you can answer the question.
 5       A.   I wouldn't know that.
 6       Q.   Did the property value increase between 2011
 7    and 2015?
 8              MS. GRANT:  Object to form.
 9              MR. VERRIER:  Objection.
10              THE WITNESS:  I'm sorry?
11    BY MR. BARRY:
12       Q.   She objected.  You can answer.
13              MS. GRANT:  You can answer.
14              THE WITNESS:  All right.  I see it from the
15       numbers, it obviously did.
16              MR. BARRY:  I'm going to defer to my
17       co-defendants if they have any questions.
18              MR. ROTHENBERG:  One moment.
19                        CROSS-EXAMINATION
20    BY MS. FASSBENDER:
21       Q.   I'm Diana Fassbender for BNBM.  One question
22    for you.  Are you aware of any appraisals that were --
23       A.   I'm sorry?
24       Q.   Are you aware of any appraisals of the property
25    following your purchase?
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1539 of 3246
Case 1:19-cv-02485-TJK Document 22362-39 Confidential - Subject to Further Confidentiality Review
84
Confidential - Subject to Further Confidentiality Review

1     A.   No.

2          MS. FASSBENDER:  Okay.  That's all.  Thank you.

3          MR. BARRY:  Do you have any questions?

4          MS. GRANT:  That's it.  You are done.

5          (Whereupon, the deposition concluded at

6  12:09 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1540 of 3246
Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 05/19/21 Page 80 of 84
Confidential - Subject to Further Confidentiality Review

```
 1                    C E R T I F I C A T E

 2

 3          I, JOAN L. PITT, Registered Merit Reporter,

 4   Certified Realtime Reporter, and Florida Professional

 5   Reporter, do hereby certify that, pursuant to notice,

 6   the deposition of GUL LALWANI was duly taken on

 7   January 4, 2019, at 10:03 a.m., before me.

 8          The said GUL LALWANI was duly sworn by me

 9   according to law to tell the truth, the whole truth, and

10   nothing but the truth, and thereupon did testify as set

11   forth in the above transcript of testimony.  The

12   testimony was taken down stenographically by me.  I do

13   further certify that the above deposition is full,

14   complete, and a true record of all the testimony given

15   by the said witness.

16

17          _____

18          JOAN L. PITT, RMR, CRR, FPR

19

20          (The foregoing certification of this transcript

21   does not apply to any reproduction of the same by any

22   means, unless under the direct control and/or

23   supervision of the certifying reporter.)

24

25
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1541 of 3246
Case 1:09-md-02047-MCA Document 22362-39 Filed 11/19/19 Page 46 of 84

Confidential - Subject to Further Confidentiality Review

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4            Please read your deposition over carefully and

 5    make any necessary corrections.  You should state the

 6    reason in the appropriate space on the errata sheet for

 7    any corrections that are made.

 8

 9            After doing so, please sign the errata sheet

10    and date it.  It will be attached to your deposition.

11

12            It is imperative that you return the original

13    errata sheet to the deposing attorney within thirty (30)

14    days of receipt of the deposition transcript by you.  If

15    you fail to do so, the deposition transcript may be

16    deemed to be accurate and may be used in court.

17

18

19

20

21

22

23

24

25
```

Confidential - Subject to Further Confidentiality Review

```
1                        - - - - - -

2                      E  R  R  A  T  A

3                        - - - - - -

4    PAGE    LINE    CHANGE

5    _____   _____   _____

6       REASON: _____

7    _____   _____   _____

8       REASON: _____

9    _____   _____   _____

10      REASON: _____

11   _____   _____   _____

12      REASON: _____

13   _____   _____   _____

14      REASON: _____

15   _____   _____   _____

16      REASON: _____

17   _____   _____   _____

18      REASON: _____

19   _____   _____   _____

20      REASON: _____

21   _____   _____   _____

22      REASON: _____

23   _____   _____   _____

24      REASON: _____

25
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1543 of 3246
Case 1:11-cv-22408-MGC Document 29-11 Entered on FLSD Docket 05/18/2011 Page 48 of 84
Confidential - Subject to Further Confidentiality Review

```
1                    ACKNOWLEDGMENT OF DEPONENT

2

3          I, _____, do hereby

4    acknowledge that I have read the foregoing pages and

5    that the same is a correct transcription of the answers

6    given by me to the questions therein propounded, except

7    for the corrections or changes in form or substance, if

8    any, noted in the attached Errata Sheet.

9

10

11   _____    _____

12   GUL LALWANI                         DATE

13

14

15

16

17   Subscribed and sworn to before me this

18   ____ day of _____, 20___.

19   My Commission expires: _____

20

21   _____

     Notary Public

22

23

24

25
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1544 of 3246
Case 1:19-cv-02406-CAED Document 29-111 Exhibit on File Docket 05/02/2019 Page 46 of 84
Confidential - Subject to Further Confidentiality Review

```
 1                        LAWYER'S NOTES

 2    PAGE    LINE

 3    _____   _____    _____

 4    _____   _____    _____

 5    _____   _____    _____

 6    _____   _____    _____

 7    _____   _____    _____

 8    _____   _____    _____

 9    _____   _____    _____

10    _____   _____    _____

11    _____   _____    _____

12    _____   _____    _____

13    _____   _____    _____

14    _____   _____    _____

15    _____   _____    _____

16    _____   _____    _____

17    _____   _____    _____

18    _____   _____    _____

19    _____   _____    _____

20    _____   _____    _____

21    _____   _____    _____

22    _____   _____    _____

23    _____   _____    _____

24    _____   _____    _____

25
```

# EXHIBIT A18

```
 1                UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2
    EDUARDO AND CARMEN AMORIN,
 3  et al., individually, and
    on behalf of all others
 4  similarly situated,        Case No. 1:11-CV-22408-MGC
 5       Plaintiffs,
 6  vs.
 7  TAISHAN GYPSUM CO., LTD.,
    F/K/A SHANDONG TAIHE
 8  DONGXIN CO., LTD.; TAIAN
    TAISHAN PLASTERBOARD CO.,
 9  LTD, et al.,
10       Defendants.
11          CONFIDENTIAL - SUBJECT TO FURTHER
                CONFIDENTIALITY REVIEW
12
                      - - -
13
                  JANUARY 7, 2019
14
                      - - -
15
         Deposition of CASSANDRA MARIN, held at
16    Morgan & Morgan, PA, 515 North Flagler Drive, Suite
      2125, West Palm Beach, Florida 33401, commencing at
17    10:04 a.m., on the above date, before Joan L. Pitt,
      Registered Merit Reporter, Certified Realtime
18    Reporter, and Florida Professional Reporter.
19                    - - -
20          GOLKOW LITIGATION SERVICES
         877.370.3377 ph | 917.591.5672 fax
21              deps@golkow.com
22
23
24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1547 of 3246
Case 1:18-cv-02408-WMR Document 44-4 Filed 10/08/21 Page 549 of 98
Confidential - Subject to Further Confidentiality Review

```
 1                        APPEARANCES

 2

 3    Counsel for Plaintiffs:

 4        HOLLY R. WERKEMA, ESQUIRE
          Baron & Budd PC

 5        3102 Oak Lawn Avenue, Suite 1100
          Dallas, Texas 75219-4281

 6        214.521.3605
          hwerkema@baronbudd.com

 7
          EMMA KINGSDORF SCHWAB, ESQUIRE

 8        Barrios, Kingsdorf & Casteix, LLP
          701 Poydras Street, Suite 3650

 9        New Orleans, Louisiana 70139-3650
          504.524.3300

10        eschwab@bkc-law.com

11
      Counsel for Defendants Taishan Gypsum Co., Ltd., and

12    Taian Taishan Plasterboard Co., Ltd.:

13        MICHAEL J. BARRY, ESQUIRE
          SARAH O'DONOHUE, ESQUIRE

14        ASHTON G. CARPENTER, ESQUIRE
          Alston & Bird LLP

15        One Atlantic Center
          1201 West Peachtree Street

16        Atlanta, Georgia 30309-3424
          404.881.7000

17        mike.barry@alston.com
          ashton.carpenter@alston.com

18        sarah.odonohue@alston.com

19

20

21

22

23

24
```

```
 1                   APPEARANCES CONTINUED

 2

 3    Counsel for Beijing New Building Materials PLC:

 4         DAN GUERRA, ESQUIRE

           Orrick, Herrington & Sutcliffe LLP

 5         The Orrick Building

           405 Howard Street

 6         San Francisco, California 94105-2669

           415.773.5545

 7         dguerra@orrick.com

 8

           ALEX B. ROTHENBERG, ESQUIRE

 9         Gordon Arata Montgomery Barnett

           201 St. Charles Avenue, 40th Floor

10         New Orleans, Louisiana 70170-4000

           504.582.1111

11         arothenberg@gamb.law

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                        - - -

 2                      I N D E X

 3                        - - -

 4    Testimony of:  CASSANDRA MARIN
```

```
 5     DIRECT EXAMINATION BY MR. BARRY                 6

 6     CROSS-EXAMINATION BY MR. GUERRA               82

 7     CROSS-EXAMINATION BY MS. WERKEMA              85

 8     REDIRECT-EXAMINATION BY MR. BARRY             87

 9     RECROSS-EXAMINATION BY MR. GUERRA             88
```

```
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                 E X H I B I T   I N D E X
 2   Marin                  DESCRIPTION                    PAGE
 3   No. 1    Purchase Agreement                            13
 4   No. 2    Declaration of Correctness of Square          23
              Footage on Chinese Drywall Client(s)
 5            Property for Remediation Damages
              dated 5/19/2017
 6
     No. 3    First Amended Supplemental Plaintiff          26
 7            Profile Form
 8   No. 4    Property Screening Report dated               34
              10/28/2009
 9
     No. 5    Chinese Drywall Screening Report              39
10            dated 6/18/2012
11   No. 6    Addendum Re: 3865 SW Wycoff Street,           46
              Port St. Lucie, FL 34953, signed by
12            Cassandra Marin, and Undated Addendum
              signed by John O. Jones and Linda S.
13            Pauley
14   No. 7    Domestic Air Conditioning, Inc.,             53
              Invoice Nos. 8100, 8155, ProMag
15            Energy Group, Inc., Invoice No.
              012564
16
     No. 8    Copies of checks from Chinese Drywall         62
17            Settlement Program
18   No. 9    Addendum No. 1 to the contract dated          65
              8/20/2009
19
     No. 10   "As Is" Residential Contract for Sale         68
20            and Purchase dated January 16, 2012
21   No. 11   Plaintiff Cassandra Marin's Response          83
              to Defendants' Second Set of
22            Interrogatories
23   No. 12   Verification Page dated 12/4/2018             84
24
```

Confidential - Subject to Further Confidentiality Review

```
 1                        - - -

 2               THE COURT REPORTER:  Raise your right hand,

 3         please.  Do you swear or affirm the testimony you

 4         give will be the truth, the whole truth, and nothing

 5         but the truth?

 6               THE WITNESS:  Yes.

 7               THE COURT REPORTER:  Thank you.

 8               CASSANDRA MARIN, called as a witness by the

 9   Defendant Taishan Gypsum Co., Ltd., having been first

10   duly sworn, testified as follows:

11                     DIRECT EXAMINATION

12   BY MR. BARRY:

13     Q.   Ms. Marin, my name is Michael Barry.  I know we

14   met just a minute ago, but I just want to reintroduce

15   myself.  I represent, along with my colleagues, Sarah

16   O'Donohue and Ashton Carpenter, Taishan.

17               MR. BARRY:  And just for the record, if

18         everyone doesn't mind going around and introducing

19         themselves so Ms. Marin knows who's in the room, but

20         also so we have it for the record.

21               MR. ROTHENBERG:  Alex Rothenberg for BNBM.

22               MR. GUERRA:  Dan Guerra, from Orrick,

23         Herrington & Sutcliffe, also for Beijing New

24         Building Materials.
```

```
 1              MS. WERKEMA:  Holly Werkema, Baron & Budd.  I'm

 2      here representing the plaintiff.

 3              MS. SCHWAB:  Emma Schwab, from Barrios,

 4      Kingsdorf & Casteix, on behalf of plaintiffs.

 5   BY MR. BARRY:

 6      Q.  So, Ms. Marin, I am going to ask you a few

 7   questions throughout this.  There's a little bit of

 8   rules of the road.  This is not like a normal

 9   conversation.  I know your attorney's probably talked to

10   you about some of this.

11              I'm going to ask you a question, and I just ask

12   that you wait for me to finish my question just so that

13   she can make sure she has everything written down

14   properly, and after I finish it, even if you're

15   anticipating and you know exactly what I'm asking, wait

16   until I'm done and then please answer the question.  I

17   will try my best not to speak over you.  I ask that you

18   don't speak over me.

19              Every once in a while your counsel's going to

20   interpose objections.  If she's objecting, make sure

21   you're stopping your answer so that we make sure we have

22   everything clear on the record.

23              If you're answering any of my questions, please

24   make sure to do it audibly.  Don't -- I mean, I know
```

confidential -- Subject to further confidentiality Review

```
1    sometimes you'll just want to nod your head yes or no,

2    but she won't know -- she won't be able to write it down

3    if we can't have an audible answer.

4          Another big part of this is, if anything I say

5    is unclear, if you are unsure what I said, if I asked a

6    poor question, which I will ask many poor questions,

7    please do not hesitate to ask me to clarify it.  I'm

8    happy to reask the question if you don't understand it

9    or it's just unclear.

10         And, also, you know, I'm going to take

11   intermittent breaks probably every hour or so, but if

12   you need a break at any point, don't hesitate to let me

13   know.  All I ask is that you finish whatever question is

14   on the table.

15         So have you ever sat for a deposition before?

16    A.   No.

17    Q.   This is your first time.  Have you ever watched

18   a deposition?  Have you ever seen a deposition other

19   than, like, Law & Order?

20    A.   On TV, right.

21    Q.   So I'll give you a little bit of -- there's --

22   in every deposition there's a little bit of questions

23   that come up, so I have to ask these questions.

24         So do you understand that you've been sworn and
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/20 Page 1554 of 3246
Case 1:09-cv-02047-EEF-MBN Document 22262-39 Filed 11/19/20 Page 41 of 98
Confidential - Subject to Further Confidentiality Review

1    must testify and must tell the truth as if testifying in

2    court and the judge were sitting in the room?

3        A.   Yes.

4        Q.   Are you taking any medications that may impair

5    your ability to understand my questions and to answer

6    truthfully and fully?

7        A.   No.

8        Q.   How did you prepare for this deposition?

9        A.   I had my meeting with my lawyer.

10       Q.   And not asking the content of that meeting, how

11   many times did you meet with your lawyer?

12       A.   Just once.

13       Q.   And how long was that meeting?

14       A.   About an hour, hour and a half.

15       Q.   And when was that meeting?

16       A.   Yesterday.

17       Q.   And was anyone else present for that meeting?

18       A.   Yes.

19       Q.   And by your lawyer, do you mean Ms. Werkema?

20       A.   Yes.

21            MS. WERKEMA:  Werkema.

22            MR. BARRY:  Werkema.  Sorry.  You learn

23       something new.  See, I'm learning something new now.

24            ///

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1555 of 3246
Case 1:09-cv-07687-LAK Document 234-181 Entered on FLSD Docket 05/13/2019 Page 41 of 98
Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. BARRY:

 2        Q.   Did you review any documents to prepare for

 3    this deposition?

 4        A.   Yes.

 5        Q.   Do you know what documents those are?

 6        A.   Not off the top of my head.

 7        Q.   If I put them in front of you, would you be

 8    able to say, "Yes, I looked at that yesterday"?

 9        A.   Yes.

10        Q.   Did you speak with anyone else about this

11    deposition?

12        A.   Just my mother.

13        Q.   What did your mother and you talk about?

14        A.   We talked about me being here today.  She was

15    at the meeting yesterday, so some of the things that we

16    reviewed yesterday she was there for.

17        Q.   Was anyone else present at that meeting?

18        A.   No.

19        Q.   So it was just your lawyer, your mother, and

20    you?

21        A.   Correct.

22        Q.   Okay.  Ms. Marin, where are you employed?

23        A.   Right now I'm not employed.

24        Q.   Okay.  What are you doing right now?
```

Confidential - Subject to Further Confidentiality Review

```
 1      A.    I'm taking care of two newborn twins.

 2      Q.    That's a handful.

 3      A.    It is.

 4      Q.    What are their names?

 5      A.    Their names are Trinity and Serenity.

 6      Q.    Beautiful names.  Where were you employed

 7   before you started taking care of Trinity and Serenity?

 8      A.    Grace Leadership Preparatory Institute.

 9      Q.    And were you a teacher there?

10      A.    Yes.

11      Q.    And how long have you worked at Grace?

12      A.    I started in August, so August, September,

13   October, November.  I stopped at the beginning of

14   November.

15      Q.    And now are you on maternity leave, or are you

16   fully resigned from Grace?

17      A.    It's kind of a gray area right now.

18      Q.    I understand.

19      A.    Yeah.

20      Q.    Are you married?

21      A.    No.

22      Q.    Have you ever been married?

23      A.    Yes.

24      Q.    And who were you married to?
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1557 of 3246
Case 1:09-cv-02240-MGC Document 12902-1 Entered on FLSD Docket 05/18/2012 Page 48 of
98
Confidential - Subject to Further Confidentiality Review

```
 1        A.    I was married to Marlonne Philistin.

 2        Q.    Do you have any other children except for

 3    Trinity and Serenity?

 4        A.    I do.  I have one son.

 5        Q.    And how old is that son?

 6        A.    Four.

 7        Q.    And how long were you and Marlonne married?

 8        A.    On paper, eight years.

 9        Q.    Have you ever been involved in a lawsuit

10    before?

11        A.    Just the one against my ex-husband.

12        Q.    Other than divorce proceedings, have you ever

13    been a -- so you've only been involved in a lawsuit,

14    this one and any divorce proceedings with your

15    ex-husband?

16        A.    Correct.

17        Q.    You've never been a class action plaintiff, not

18    like you get the notice that says --

19        A.    No, ung-ugh.

20        Q.    What is the address of the property that you

21    allege has been damaged by Chinese drywall?

22        A.    3865 Southwest Wycoff Street, Port St. Lucie,

23    Florida.

24        Q.    And do you currently own that property?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1558 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 46 of 98
Confidential - Subject to Further Confidentiality Review

```
 1      A.   No.

 2      Q.   When did you sell that property?

 3      A.   In 2012.

 4      Q.   And when did you initially buy the property?

 5      A.   In two thousand, I believe seven.

 6      Q.   You believe '07.  So throughout this deposition

 7   I'm going to give you some documents.  When I do so, I'm

 8   going to hand them first to Holly, and she's going to

 9   take a look at it just to make sure it's nothing

10   objectionable.

11      A.   Sure.

12      Q.   Once she does and she says it's okay, we're

13   going to hand it to the court reporter, who's going to

14   mark it as an exhibit, and then I'll be able to make

15   sure you get to look at it.  And whenever you do, you're

16   allowed to -- you know, please feel free to take as much

17   time as you want to look through the document, but I

18   probably will not be asking you except for a few things

19   within that document.

20          So I'm going to provide as Exhibit 1, which I

21   will let Holly look at -- and do you mind handing it to

22   the court reporter so she can mark it as Exhibit 1?

23          (Marin Exhibit No. 1 was marked for

24   identification.)
```

Confidential - Subject to Further Confidentiality Review

1    BY MR. BARRY:

2        Q.    I'll represent for the record that this is a

3    purchase agreement, which includes -- that it has signed

4    by Cassandra Marin.  It's not Bates labeled.

5            Have you seen this document before?

6        A.    Yes.

7        Q.    And what is this document?

8        A.    I believe that you just said what it was.  A

9    purchase agreement.

10       Q.    What is your understanding of this document?

11       A.    It's an agreement that documents the purchase

12   of a home.

13       Q.    And is this the home that you allege has been

14   affected by Chinese drywall?

15       A.    Yes.

16       Q.    And who did you purchase this property from?

17       A.    The name evades me at the moment, but I believe

18   it's listed in this document.

19       Q.    On line 1, does it say Jean Blanchard?  It's a

20   little sloppy, so...

21       A.    Yeah, it looks like it says Jean Blackhard, but

22   it could say that as well.

23       Q.    Do you know who Jean is, or her?  Him or her?

24       A.    Yes.

Confidential - Subject to Further Confidentiality Review

```
 1       Q.    Who is Jean?

 2       A.    The purchaser, or the --

 3       Q.    Did you ever meet Jean?

 4       A.    No, I did not.

 5       Q.    Okay.  Did you ever meet Jean at the closing or

 6   anything like that?

 7       A.    No.

 8       Q.    Did Jean ever make a representation to you

 9   about the quality of the house or anything of that sort?

10       A.    Not to me, no.

11       Q.    Okay.  How much did you pay for the house?

12       A.    $270,000.

13       Q.    And do you remember how you financed the house?

14   Did you take a mortgage?  Did you pay in cash?

15       A.    Cash.

16       Q.    Okay.  So you paid $270,000 in cash?

17       A.    Correct.

18       Q.    Do you have any receipts of that payment?

19       A.    Any documentation should have already been

20   submitted to you.

21       Q.    Okay.  Do you remember if you wrote that

22   through a check or through a money order?

23       A.    I do not.

24       Q.    Okay.  Now, did you ever take a mortgage on the
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1561 of 3246
Case 1:1-cv-22408-MGC Document 23892-1 Entered on FLSD Docket 05/18/2019 Page 47 of 98
Confidential - Subject to Further Confidentiality Review

1    property?

2        A.    My mother handled a lot of the ins and outs as

3    it relates to the property, so I'm unsure.

4        Q.    Okay.  You don't have personal knowledge one

5    way or the other whether you took a loan on the house or

6    a mortgage on the house?

7        A.    That's correct.

8        Q.    Did anyone ever have a lien on the property?

9        A.    Again, my mother handled most of the ins and

10   outs, all the ins and outs as it relates to the home, so

11   she would be better prepared to answer that question.

12       Q.    Understood.  And if there's anything that you

13   feel that your mother is better situated to answer,

14   please feel free to tell me that.

15       A.    Yeah.

16       Q.    I may ask you a few questions prodding you

17   after that just to understand what you know about it,

18   but if your mother is better situated, we're happy to

19   talk to your mother about it.

20       A.    Okay.

21       Q.    Would -- you know, I know you said you weren't

22   sure if it was a money order or a check on the $270,000

23   payment, but if it -- let's just say it's a check.

24   Let's say it's a money order.  Would it be out of your

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1562 of 3246
Case 1:1-cv-22408-MGC Document 6 Entered on FLSD Docket 05/08/2012 Page 48 of 98
Confidential – Subject to Further Confidentiality Review

```
1    name?  Like, would it have come out of your bank

2    account?  Would it have come out your mother's bank

3    account or someone else's bank account?

4         A.   Again, my mother would be better suited to

5    answer that question.

6         Q.   Do you remember personally?  I mean, I've never

7    written a check that big, so I--

8         A.   I do not remember.

9         Q.   When you purchased the house in 2007 and you

10   sold it in 2012, did you live in that property the

11   entire time between 2007 and 2012?

12        A.   I was in school at that time.  I -- when I was

13   out of school, I was in the property.  When I wasn't, I

14   was on campus.

15        Q.   Were you in school full-time?

16        A.   Yes.

17        Q.   And by living on campus, did you live in a dorm

18   room on campus or something?

19        A.   Yeah, I lived in a dorm room.

20        Q.   Who else lived in the house with you?

21        A.   My father, my mother, my brother, and my

22   cousin.

23        Q.   Now, why was the house bought in your name?

24        A.   Well, it was easier as far as just, in case
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1563 of 3246
Case 1:09-cv-02047-McGE Document 22361 Christian El Spadaro 05/18/2019 Page 46 of 98
Confidential – Subject to Further Confidentiality Review

```
1    anything happened, assets would be easily transferred.

2       Q.   So it was an estate planning issue?

3       A.   Can you clarify what you mean by that?

4       Q.   Were you doing it so it would be easier for --

5    scratch it.  Don't worry about it.

6            Was -- did you have -- when you were looking to

7    purchase the home, were you involved in looking at what

8    homes to purchase?

9       A.   I did view the home before it was purchased.

10      Q.   Were you the one who ultimately decided to

11   purchase the home?

12      A.   Can you clarify what you mean by that?

13      Q.   Yeah, of course.  You know, when I purchased my

14   house, it was my decision.  Other people looked at the

15   house with me.

16           Was it your decision to purchase the house, or

17   was it your mother's, or was it your father's, or was it

18   someone else's?

19      A.   It was a collective.

20      Q.   Okay.  Was there anyone who was more of the

21   executive decision-maker, like, the buck stops with

22   them, they made the decision?

23      A.   Not that I -- not to my understanding of it,

24   no.
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/10 Page 1564 of 3246
Case 1:1-cv-22408-MGC Document 228-11 Entered on FLSD Docket 05/18/2012 Page 40 of 98
Confidential - Subject to Further Confidentiality Review

```
 1    Q.   Okay.  Do you currently live at that property?

 2    A.   No.

 3    Q.   Okay.  So you said your mother, your father,

 4  you lived at the house.  And, I'm sorry, maybe I missed

 5  it.  Was there anyone else who lived at the house at

 6  that time?

 7    A.   My brother and my cousin.

 8    Q.   And how old is your brother?

 9    A.   Right now, my brother is 35 years old.

10    Q.   Okay.  And how old is your cousin?

11    A.   I'm not sure.

12    Q.   And during that entire time between 2007 and

13  2012, did they -- did they live in the house?

14    A.   I wouldn't be able to say for sure, to be

15  honest.

16    Q.   Would you say that they lived there more than

17  50 percent of the time?

18    A.   Like I said, I was away at school, so my

19  knowledge is not --

20    Q.   Where did you go to school?

21    A.   Florida International University.

22    Q.   And what time period were you in school?

23    A.   I was in school from the summer of 2006 to the

24  spring of 2011.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1565 of 3246
Case 1:11-cv-22408-MGC Document 129-37 Entered on FLSD Docket 03/14/2015 Page 41 of 98
Confidential - Subject to Further Confidentiality Review

```
 1       Q.    Okay.  And during that entire time period, 2007

 2   to 2011, the time period you owned the home but you were

 3   also at school, were you living in a dorm room during

 4   that time period?

 5       A.    Partially, yes.

 6       Q.    And when you say "partially," does that mean

 7   you were coming home and living in the property during

 8   the summer or something like that?

 9       A.    Right.  Right.  There was also a portion of

10   time that I moved off of campus and moved back home.

11       Q.    What was that portion of time?

12       A.    From December of 2010 onward.

13       Q.    During that time period, was the property --

14   and when I say "the property," we're talking about the

15   house that's affected by Chinese drywall.

16             During that time period, would you have

17   considered the property to be your primary residence?

18       A.    Of course.

19       Q.    So if you were, you know, registering to vote

20   or something like that, you were listing the property?

21       A.    Yes.

22       Q.    During that entire time period, 2007 to 2012,

23   did your parents live in the house the entire time?

24       A.    Yes.
```

Confidential - Subject to Further Confidentiality Review

```
1      Q.    They've never lived anywhere else during that

2  time period?

3      A.    Not to my knowledge.

4      Q.    Okay.  Did you ever charge rent or -- to anyone

5  living in the house?

6      A.    No.

7      Q.    So your cousin lived there free, free of

8  charge?

9      A.    Correct.

10     Q.    Okay.  Did you -- during the time you owned the

11 house, did you ever make any renovations to the house?

12     A.    No.

13     Q.    Did you ever make any improvements?  Did you

14 build a new deck or anything like that?

15     A.    There were -- I don't know if you would call

16 this an improvement, but there were things that needed

17 to be fixed or -- I don't know the correct word I'm

18 looking for here.

19     Q.    Repairs or something?

20     A.    Repairs, correct.

21     Q.    What were the repairs you did?

22     A.    Air conditioning.

23     Q.    Okay.  Anything else?

24     A.    That's what I can think of at this moment.
```

Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Okay.  Now, I know this lawsuit's brought in

 2   your name.  Do you know if your mother, father, cousin,

 3   or brother have claims in this lawsuit?

 4        A.   I don't know.

 5        Q.   Do you have any reason to believe that they

 6   also have claims in this lawsuit?

 7        A.   Do I have a reason to believe?

 8        Q.   Yeah.  Like, has anything -- I know you said

 9   you don't know, but is there any kind of -- has your mom

10   intimated that she's also suing Taishan or anything like

11   that?

12        A.   Not to my knowledge.

13        Q.   Do you believe you're the sole owner of the

14   claims related to the property?

15             MS. WERKEMA:  Objection.

16             MS. SCHWAB:  Objection.

17             MS. WERKEMA:  Object to form.

18   BY MR. BARRY:

19        Q.   You can answer.

20        A.   I need you to clarify.

21        Q.   Are you the sole person bringing claims related

22   to the damage that has been done because Chinese drywall

23   was in the property?

24        A.   Well, I'm the sole owner of the home, so...
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1568 of 3246
Case 1:09-md-02047-McCall Document 22881 Confidential Subject to Docket 05/08/2019 Page 41 of 98
Confidential - Subject to Further Confidentiality Review

1    Q.   So is it your understanding that you're the

2    sole owner, the sole person bringing claims related to

3    the property that has Chinese drywall?

4         MS. WERKEMA:  Object to form.  Please go ahead

5         and answer the question.

6         THE WITNESS:  Okay.  Yes.

7    BY MR. BARRY:

8    Q.   Yes, that is your understanding.

9         Do you know the square footage of the house?

10   A.   No, I don't.

11   Q.   And this is one where I'll put a document in

12   front of you so it will be a little easier.

13        (Marin Exhibit No. 2 was marked for

14   identification.)

15   BY MR. BARRY:

16   Q.   Have you seen this document before, Ms. Marin?

17   A.   It's possible.

18   Q.   Do you know what this document is?

19   A.   Yes.

20   Q.   What is it?

21   A.   Declaration Of Correctness of Square Footage on

22   Chinese Drywall.

23   Q.   And where it says "verified under air square

24   footage 2,082," do you have any -- do you know if that

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1569 of 3246
Case 1:09-cv-07687-MGC Document 79-1 Entered on FLSD Docket 05/19/2011 Page 45 of
98
Confidential - Subject to Further Confidentiality Review

```
 1    is the square footage of your home?

 2         A.    Again, I don't know the square footage of the

 3    home.

 4         Q.    Do you have any reason to believe that's

 5    incorrect?

 6         A.    No.

 7         Q.    So you don't know of another number that could

 8    possibly be the square footage of your house?

 9         A.    I do not.

10         Q.    Okay.  And you recognize that this was signed

11    by your attorney?

12         A.    Yes.

13         Q.    Whose name I mispronounced earlier, with

14    apologies.

15         A.    Yes, that's her.

16         Q.    Mine is misspelled, it's not mispronounced.

17               When you signed the purchase agreement to buy

18    the house, had you seen the house before you signed the

19    purchase agreement?

20         A.    Yes.

21         Q.    What was your impression of the state of the

22    house when you purchased it?

23         A.    Well, the house wasn't finished when I saw the

24    house, so...
```

Confidential - Subject to Further Confidentiality Review

```
 1      Q.   And after you signed the agreement, how soon

 2   after was the house finished?

 3      A.   I don't know.

 4      Q.   Was it a month?  Was it a year?

 5      A.   I have no -- I do not know.

 6      Q.   Understood.  It wasn't more than 10 years;

 7   right?

 8      A.   I don't think so.

 9      Q.   When the house was being constructed, did you

10   see drywall in the house?

11      A.   Not that I can recall.

12      Q.   Did anyone make representations to the quality

13   of the house?

14      A.   No.

15      Q.   So it wasn't, you know, the seller or the

16   manufacturer or the builder or anything like that?

17      A.   No.

18      Q.   Okay.  How many bedrooms and bathrooms were in

19   the house?

20      A.   There were three bedrooms, two bathrooms.

21      Q.   Are you sure there weren't four bedrooms?

22      A.   Oh, well, there was -- we used it as an office,

23   so, yes.

24      Q.   Okay.  Yes.  I do that too, so my house has two
```

Confidential - Subject to Further Confidentiality Review

1    bedrooms, but it really has three.

2            Now, when do you believe that Chinese drywall

3    was installed in the house?

4        A.   I do not know.

5        Q.   I'm going to hand you a document.

6            (Marin Exhibit No. 3 was marked for

7    identification.)

8    BY MR. BARRY:

9        Q.   This is Exhibit 3, which I'll represent for the

10   record is First Amended Supplemental Plaintiff Profile

11   Form.

12           Ms. Marin, have you seen this document before?

13       A.   Yes.

14       Q.   Did you review this before your attorneys

15   produced it in this litigation?

16       A.   Yes.

17       Q.   Now, if you turn to the last page here, the

18   little line that has all this language about declaring

19   under penalty of perjury, it is unsigned.  Do you

20   remember if you've signed and verified this document?

21       A.   I don't remember, no.

22           MR. BARRY:  I'll represent for the record I

23       don't believe we have a verification for this one.

24           MS. WERKEMA:  Not for the first amended.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1572 of 3246
Case 1:14-cv-09148-MGC Document (nonsuch) Filed (nonsuch) Page 49 of 98
Confidential - Subject to Further Confidentiality Review

```
1              MR. BARRY:  We have it for the initial one, not

2       for this one.

3              MS. WERKEMA:  Correct.

4    BY MR. BARRY:

5       Q.   There is a prior version of this document where

6    you have verified.  We may bring it up later, we may

7    not.  For now.

8              So if you don't mind turning with me to page 2

9    of this document.  There's a section called Section II.

10   Purchase, Sale, and/or Transfer of Ownership of a

11   Property and Assignments of Claims.

12             And if you see the second line, it says:  "When

13   was Chinese drywall installed in the property (to the

14   best of your knowledge)?"

15             And it says:  "Month/Day/Year."

16             You've listed 2007.  Is 2007 roughly when you

17   believe you learned that there was Chinese drywall in

18   the property?

19             MS. SCHWAB:  Object to form.

20             THE WITNESS:  Again, my mother would be better

21       suited to answer that question.

22   BY MR. BARRY:

23      Q.   I get it.  Do you remember when you first

24   learned of there being Chinese drywall in the property?
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1573 of 3246
Case 1:09-cv-04041-MGC Document 2301-1 entered on FLSD Docket 05/18/2017 Page 43 of 98
Confidential - Subject to Further Confidentiality Review

```
 1      A.   I do remember.

 2      Q.   When was that?

 3      A.   I don't remember the year.  I just remember the

 4   occasion.

 5      Q.   Okay.  What was that occasion?

 6      A.   I received a phone call from my mother.

 7      Q.   Okay.

 8      A.   And she made me aware.

 9      Q.   And what was your reaction when you learned of

10   that?

11      A.   I was devastated.

12      Q.   What did your mother say?  What did your mother

13   say about how she learned about the Chinese drywall?

14      A.   She said that there had been an inspection and

15   that inspection revealed that there was Chinese drywall.

16      Q.   Had you known that inspection was going to

17   occur?

18      A.   Yes.

19      Q.   So had there been some suspicion that there

20   might be something wrong with the house?

21      A.   Not at all.

22      Q.   So why did you order the inspection?

23      A.   The house was to be sold.

24      Q.   Okay.  And so was this an inspection as part of
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1574 of 3246
Case 1:09-cv-02049-MGC Document 23362-39 Filed 11/19/19 Page 45 of 98
Confidential - Subject to Further Confidentiality Review

```
1    the process of sale?

2       A.    To my understanding.

3       Q.    Why were you wanting to sell the house?

4       A.    We wanted to move to another location.

5       Q.    Where did you want to move?

6       A.    West Palm Beach.

7       Q.    Okay.  And why did you guys want to make that

8    move?

9       A.    We had lived there previously and just wanted

10   to return.

11      Q.    Did you move due to any reason with defects to

12   the house or not being happy with the house, or did you

13   want to move?

14      A.    Initially, when we put the house up for sale,

15   we wanted to move.

16      Q.    But was that -- when you initially put the

17   house up for sale, did you want to move at all because

18   you were unhappy with the house or you felt that it was

19   defective?

20      A.    When we -- to my understanding, when we

21   initially put the house up for sale it was because we

22   wanted to move.

23      Q.    And so just, you know, just to clarify, I get

24   that you're saying you wanted to move to West Palm
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1575 of 3246
Case 1:09-cv-07687-McGL Document 29 Enfiration Filed 05/08/2019 Page 46 of
98
Confidential - Subject to Further Confidentiality Review

```
 1    Beach.

 2        A.   Right.

 3        Q.   Was there any other reason for why you were

 4    wanting to move?  Did it have to do with any defect in

 5    the house?

 6        A.   Not to my knowledge.

 7        Q.   Okay.  Do you remember, roughly, when you guys

 8    were trying to sell the house?

 9        A.   I don't.

10        Q.   Okay.  So if there was an inspection, it was

11    pretty far along, there was an offer on the house, I'm

12    guessing, or it was under contract?

13        A.   I believe so.  Again, my mother would be suited

14    to give a more confident response.

15        Q.   Understood.  Do you remember how much you were

16    trying to sell the house for?

17        A.   I do not.

18        Q.   Do you remember how much the person who was

19    running the inspection had made an offer on the house?

20        A.   I do not.

21        Q.   Would your mother know that answer?

22        A.   Yes, she would.

23        Q.   How did -- do you know how the drywall was

24    installed in the house?
```

Confidential - Subject to Further Confidentiality Review

```
1      A.    I do not know.

2      Q.    Did you ever have any conversations with the

3   builder of the house?

4      A.    No.

5      Q.    Do you know who -- I think these are probably

6   questions your mother knows better.

7            Were you at all involved in the inspection of

8   the house for Chinese drywall?

9      A.    When you say "involved" --

10     Q.    Did you have any communications with the

11  inspector?

12     A.    No.

13     Q.    Did you ever read the inspection report?

14     A.    I've seen the inspection report, yes.

15     Q.    After you saw the inspection report, did you

16  ever call the inspector and ask questions about what

17  they had found?

18     A.    No.

19     Q.    Do you know if there were any other

20  inspections?

21     A.    No, I don't know.

22     Q.    Do you know if there was someone who

23  specifically went to inspect the house for Chinese

24  drywall?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1577 of 3246
Case 1:09-md-02047-EEF-MBN Document [illegible] Confidential Subject to Packet [illegible] Page 48 of
98
Confidential - Subject to Further Confidentiality Review

1    A.   My mother would be more suited to answer that

2    question.

3    Q.   You don't know one way or the other if there

4    was some other inspection, a second inspection?

5    A.   My mother.

6    Q.   Well, you personally.  I recognize your mother

7    may be the better answer.  It doesn't mean it didn't

8    happen or did happen.  You just don't personally know;

9    is that right?

10   A.   Do I personally know?

11   Q.   Did you personally know whether there was a

12   second inspection of the house specifically for Chinese

13   drywall?

14   A.   I'm unsure.

15   Q.   Okay.  What was -- when you learned from your

16   mother that there was Chinese drywall in the house, had

17   you heard about Chinese drywall before?

18   A.   No, I had never heard of it.

19   Q.   What did your mother tell you about Chinese

20   drywall?

21   A.   That it was some toxic substance that was being

22   found in people's homes.

23   Q.   Prior to this inspection in relation to a sale,

24   had you guys experienced any issues with the house

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1578 of 3246
Case 1:19-cv-22842-XXXX Document 2 Entered on FLSD Docket 05/09/2019 Page 451 of
98
Confidential - Subject to Further Confidentiality Review

```
 1   before?

 2       A.   When you say "issues" --

 3       Q.   Had you had any problems with the air

 4   conditioner?

 5       A.   Yes.

 6       Q.   What were those problems?

 7       A.   It was constantly breaking.

 8       Q.   Did you have to personally pay for repair of

 9   that air conditioner?

10       A.   Yes.

11       Q.   How many times did you have to pay to repair

12   that air conditioner?

13       A.   I don't recall.

14       Q.   Was it more than twice?

15       A.   I don't recall.

16       Q.   Was -- were there any issues with an odor in

17   the house?

18       A.   Yes.

19       Q.   What was that odor?  What did it smell like?

20       A.   I don't really know how to describe it.

21       Q.   Was it worse in certain areas of the home?

22       A.   I'm not sure.

23       Q.   Was it worse during certain times of the year?

24   I know you were mostly there during the summer, but any
```

Confidential - Subject to Further Confidentiality Review

```
 1    particular time of year that it was worse?

 2         A.   I think my mother would be better suited to

 3    answer that question.

 4         Q.   Understood.  I'm going to hand you a document.

 5    This is Exhibit 4.  For Exhibit 3 there, make sure to

 6    hold onto it, because we'll come back to that a few

 7    times.

 8              (Marin Exhibit No. 4 was marked for

 9    identification.)

10    BY MR. BARRY:

11         Q.   I'll represent this is Priority [sic] Screening

12    Report prepared by Chinese Drywall Screening dated

13    10/28/09.

14              Ms. Marin, do you recognize this document?

15         A.   I'm not sure.

16         Q.   So you don't have any knowledge of having read

17    this before or received this before?

18         A.   I'm not sure.  It's possible.

19         Q.   Okay.  Would your mother have had knowledge of

20    it?

21         A.   Yes.

22         Q.   Does it say that she is the property owner

23    here?  I'm guessing Evette Marin is your mother.

24         A.   Yes, but that's not the correct -- that's not
```

Case 2:09-md-02047-EEF-MBN Document 23263-39 Filed 11/19/19 Page 1580 of 3246
Case 1:09-md-02047-EEF-MBN Document Confidential Subject to Further Confidentiality Review Page 35 of
98
Confidential - Subject to Further Confidentiality Review

1    the spelling of my mother's -- the spelling of my

2    mother's name.

3        Q.   Was your mother ever the property owner?

4        A.   No.

5        Q.   Okay.  So this report would be incorrect in

6    terms of saying who the property owner is?  You were the

7    property owner?

8        A.   I am the property owner.

9        Q.   Okay.  Recognizing that you've never -- you

10   don't remember seeing this document, if you have at all,

11   if you turn to page 3 of the document, where it says

12   "page 3 of 11" down at the bottom, it says:  "Known

13   issues include, but are not limited to, neighborhood is

14   known to have homes containing Chinese drywall."

15           Did you know that other neighbors were having

16   issues with Chinese drywall?

17       A.   No, I did not know.

18       Q.   Did you ever have knowledge that your neighbors

19   were having issues with Chinese drywall?

20       A.   No.

21       Q.   Do you -- so here it says:  "Primary health

22   complaints include, but are not limited to, nosebleeds."

23           Did you ever have nosebleeds related to the

24   Chinese drywall?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1581 of 3246
Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 17 of 98
Confidential - Subject to Further Confidentiality Review

```
 1       A.   No, I did not.

 2       Q.   Do you know who had nosebleeds related to the

 3  Chinese drywall?

 4       A.   I believe my brother.

 5       Q.   Is your brother a party to this lawsuit?

 6       A.   Not to my knowledge.

 7       Q.   So once you learned that there was Chinese

 8  drywall in the house, what did you do?

 9       A.   I took a moment to absorb the information, and

10  then I did some research.

11       Q.   And what happened with that research?

12       A.   I discovered a little bit more about what it

13  was and what the proper steps would be to take.

14       Q.   And what were those proper steps that you

15  learned from online research?  I guess it was online

16  research.  I'm guessing.

17       A.   To find someone to represent me.

18       Q.   And so did you find someone to represent you

19  immediately afterwards?

20       A.   Well, my mother then took over most of those --

21  the following steps.

22       Q.   With your permission, your mother took over

23  communications with the attorneys?

24       A.   Correct.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1582 of 3246
Case 1:09-md-02047-MDL Document 23263-39 Filed in Docket 05/19/2012 Page 38 of
98
Confidential - Subject to Further Confidentiality Review

```
1      Q.   Okay.  How soon -- and without providing any

2  advice that your attorneys -- how soon after did you

3  file a lawsuit that you were -- after you learned of

4  Chinese drywall?

5      A.   My mother would have better knowledge.

6      Q.   Do you know if anyone ever determined where the

7  Chinese drywall was in the house?

8      A.   I believe that information is listed in some

9  documents that were submitted.

10      Q.   Okay.  Do you personally have any knowledge of

11  where the Chinese drywall was in the house?

12      A.   I believe it was found throughout the house.

13      Q.   Okay.  Do you know if there was any area of the

14  house that did not have Chinese drywall?

15      A.   I do not know.

16      Q.   Okay.  Do you know if Chinese drywall is still

17  in place in the house?

18      A.   I do not know.

19      Q.   Did you ever try to repair the Chinese drywall

20  in the house?

21      A.   No, I did not try to repair the Chinese

22  drywall.

23      Q.   Why not?

24      A.   It was just not an option.
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1583 of 3246
Case 1:11-cv-22408-MGC Document 178 Entered on FLSD Docket 05/19/2017 Page 45 of 98
Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Why was it not an option?

 2      A.   Because it wasn't something that I was seeking.

 3      Q.   And just to understand, for what reason?

 4      A.   It just wasn't -- it wasn't something that I

 5   wanted.  I don't know how else you want me to put it,

 6   but it wasn't something -- it wasn't an option for me.

 7   It wasn't, "Hey, let me repair this Chinese drywall."

 8      Q.   Was it because your family didn't want to live

 9   in the house before they had learned of Chinese drywall,

10   that they were already planning to move?

11      A.   Can you -- can you reiterate that for me?

12           MR. BARRY:  Do you mind rereading the question?

13           (The question was read by the reporter.)

14           THE WITNESS:  Like I said, it just wasn't -- it

15      wasn't -- it wasn't something that I wanted to do.

16   BY MR. BARRY:

17      Q.   Did you ever seek any quotes to figure out the

18   price, the amount of the cost to remediate the house?

19      A.   I did not, no.

20      Q.   Do you know how much it would generally cost to

21   remediate the house?

22      A.   I do not know.

23      Q.   I think your attorney's going to put a rolling

24   objection on my use of the word "remediation."
```

Confidential - Subject to Further Confidentiality Review

```
 1                MS. WERKEMA:  Yes.  Anything that -- we object

 2        to anything that deals with remediation damages.

 3                MR. BARRY:  Understood.

 4   BY MR. BARRY:

 5        Q.   I'm going to hand you a document.  This will be

 6   Exhibit 5.

 7                (Marin Exhibit No. 5 was marked for

 8   identification.)

 9   BY MR. BARRY:

10        Q.   Have you seen this document before?

11        A.   It's possible.

12        Q.   Do you know who -- this is addressed to John

13   Jones and Linda Pauley of Pauley Drywall & Construction.

14   Do you know who those people are?

15        A.   I do not.

16        Q.   Who did you sell the house to?

17        A.   My mother would be more suited to answer that

18   question.

19        Q.   You don't personally remember who you sold the

20   house to?

21        A.   No, I don't remember.

22        Q.   Do you know if the people you sold the house to

23   remediated the property?

24        A.   I remember -- my mother would be more suited to
```

Confidential - Subject to Further Confidentiality Review

```
 1    answer that question.

 2         Q.   So you don't have personal knowledge of whether

 3    someone remediated the -- the subsequent buyer

 4    remediated the property?

 5         A.   Yeah, my mother would be a better person to ask

 6    that question to.

 7         Q.   And I understand that.  Do you have any

 8    personal knowledge?  Even if she's the better person to

 9    ask, do you have any personal knowledge?

10         A.   Right.  The reason why I refer to her is

11    because her knowledge is more concrete.  So I may have

12    some sort of knowledge, but I wouldn't feel comfortable

13    speaking upon it in this setting.

14         Q.   And I understand.  I'm still asking you the

15    question.  Even if your mother is the better person to

16    ask and I'm happy to ask her, I still need to know what

17    you know.

18         A.   I understand.

19         Q.   So what do you know about whether the property

20    was remediated?  Even if your mother has more complete

21    answers when we talk to her, I still need to understand

22    what you know.

23         A.   Right, and my response is I'm unsure.

24         Q.   And I think that's a nonresponsive answer.  So
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1586 of 3246
Case 1:09-cv-02047-MGC Document 23263-39 Filed 10/05/2019 Page 42 of 98
Confidential - Subject to Further Confidentiality Review

```
1    if you could tell me what you know, even if it's not --

2    even if you are -- and you can say, "I'm not 100 percent

3    sure, here's my answer," but I need your answer, what

4    you have personal knowledge of.

5         A.   Okay.

6              MR. BARRY:  So could we read back the question?

7              (The following question was read by the

8    reporter:)

9              Q.  So what do you know about whether the

10   property was remediated?

11             THE WITNESS:  I don't know if the property was

12   remediated.

13   BY MR. BARRY:

14        Q.   Perfect.  Did you -- how did you go about

15   trying to sell the property?

16        A.   My mother handled those -- handled it.

17        Q.   Do you know if your mother hired a real estate

18   agent?

19        A.   I believe she did.

20        Q.   Did you ever have any conversations with

21   whoever the real estate agent she hired?

22        A.   I don't remember.

23        Q.   Is it fair to say that you just kind of let

24   your mother handle anything related to the sale of the
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1587 of 3246
Case 1:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1587 of 3246
Confidential - Subject to Further Confidentiality Review
98

1    property?

2        A.    She handled most of the things related to the

3    home.

4        Q.    What things did you handle?

5        A.    What things did I handle?

6        Q.    You said your mother handled most of the things

7    related to the property.

8        A.    Right.

9        Q.    What percentage -- if she handled most, there's

10   a percentage that you handled.  What did you handle?

11       A.    So whatever my mother researched or organized,

12   she then brought that to me, and what I handled was

13   discussing those things and then making decisions based

14   upon what it is she organized related to the home.

15       Q.    Got it.  So it wasn't like you handled paying

16   utility bills or something like that and your mother

17   handled doing house repairs?  You handled stuff in

18   conjunction?  She might be the one doing the lion's

19   share of the work, but you at least were part of the

20   decision-making process?

21       A.    Yes.

22       Q.    Do you remember when you were trying to sell

23   the home whether -- and this is after learning of

24   Chinese drywall.

Confidential - Subject to Further Confidentiality Review

```
 1              After you learned of Chinese drywall, when you

 2    were trying to sell the home, do you remember how many

 3    offers you received on the property?

 4        A.   No.

 5        Q.   Do you remember receiving any offers on the

 6    property?

 7        A.   I remember offers were made.

 8        Q.   Do you remember --

 9        A.   I'm sorry.  You said after Chinese drywall?

10        Q.   Yes.

11        A.   Yes.

12        Q.   Yes, you remember offers being made?

13        A.   I remember, yes.

14        Q.   Do you remember how many offers were made?

15        A.   I don't remember, no.

16        Q.   Do you remember the amount of those offers?

17        A.   No, I don't.

18        Q.   Do you remember how much you sold the property

19    for?

20        A.   80,000.

21        Q.   Do you remember if you received any offers that

22    were more than $80,000?

23        A.   No, I don't remember.

24        Q.   Do you remember why you sold the property for
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1589 of 3246
Case 1:09-cv-02040-McA-ALB Document 22362-39 Filed 11/19/19 Page 45 of 98
Confidential - Subject to Further Confidentiality Review

```
 1   $80,000?

 2      A.   The property had Chinese drywall.

 3      Q.   Was -- do you remember someone telling you that

 4   you could sell it for more than that?

 5      A.   No, I don't remember that.

 6      Q.   Do you know if -- did you ever look at what

 7   your neighbors were selling their properties for?

 8      A.   No, I did not.

 9      Q.   Did you ever look at what neighbors who had

10   Chinese drywall in their house were selling their

11   properties for?

12      A.   No, I did not.

13      Q.   Did -- so we talked a little bit about the fact

14   that you said there were some repairs on the air

15   conditioning.  Were there any other appliances you had

16   to repair?

17      A.   No, not to my knowledge.

18      Q.   But there may have been, your mother may have

19   done it, you just may not know; is that correct?

20      A.   Right.

21      Q.   Did any personal items get damaged?

22      A.   My mother would be better suited to answer that

23   question.

24      Q.   So you don't recall any of your own personal
```

Confidential - Subject to Further Confidentiality Review

1    items that were damaged because of Chinese drywall?

2        A.    Not my personal items.

3        Q.    Are you seeking damages in this lawsuit related

4    to your repairs of the air conditioning, the amount you

5    paid for it?

6            MS. WERKEMA:  Object to form.

7            THE WITNESS:  I believe there's a document that

8        was submitted about what we're seeking.

9    BY MR. BARRY:

10       Q.    And I'll show you that document in a second.

11   Do you have any personal knowledge that you're seeking

12   damages related to the repairs of the air conditioning?

13           MS. WERKEMA:  Object to form.  Please go ahead

14       and answer if you know.

15           THE WITNESS:  Do I have any knowledge?

16   BY MR. BARRY:

17       Q.    Uh-huh.

18       A.    I don't believe so.

19       Q.    Okay.  Did you ever have to replace the HVAC

20   system?  I know you said you repaired it, but did you

21   ever have to replace it?

22       A.    I'm unsure.

23       Q.    Give me just a second.  I'm going to hand you a

24   document.  This will be Exhibit 6.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1591 of 3246
Case 1:09-cv-02042-MGC Document 1 Entered on FLSD Docket 05/18/2011 Page 47 of 98

Confidential – Subject to Further Confidentiality Review

```
1              (Marin Exhibit No. 6 was marked for

2    identification.)

3    BY MR. BARRY:

4        Q.    Have you seen this document before?

5        A.    Yes.

6        Q.    Is that your signature at the bottom?

7        A.    Yes, it is.

8        Q.    And for the record, this is an addendum signed

9    by Cassandra Marin.  It's not dated.  What is this

10   document?

11       A.    It just states information related to the home,

12   the property.

13       Q.    Did you write this?

14       A.    Yes.

15       Q.    Your mother wasn't involved in writing this?

16       A.    My mother saw it and reviewed it, yes.

17       Q.    Later -- midway through this, it says:  "My

18   mother was having a severe migraine, my brother

19   developed allergies all of a sudden."

20             Earlier when we talked about health issues I

21   don't -- did we -- do you remember that your mother was

22   having severe migraines?

23             MS. WERKEMA:  Object to form.  Please answer

24       the question if you know.
```

Confidential - Subject to Further Confidentiality Review

```
1            THE WITNESS:  Do I remember?  Yes.

2   BY MR. BARRY:

3      Q.   Okay.  Now, was there any time period where you

4   were not -- where there was no air conditioning in the

5   house?

6      A.   Yes.

7      Q.   How long was the air conditioning out?

8      A.   I don't remember the exact time.  I believe it

9   was the summer.

10     Q.   If you turn the page, this is another addendum.

11  What is this document?  What is your understanding of

12  this document?

13     A.   An agreement between myself and the buyer of

14  the property.

15     Q.   And is the buyer John Jones and Linda Pauley?

16     A.   Yes.

17     Q.   And what is this agreement?  What's your

18  understanding of what this agreement does?

19     A.   It gives me the exclusive right to bring

20  Chinese drywall-related claims.

21     Q.   Do you know if John Jones and Linda Pauley have

22  made any claims related to the property?

23     A.   I don't know.

24     Q.   Okay.  But it's your understanding that you
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/10 Page 1593 of 3246
Case 1:09-cv-02442-MGC Document 23363-39 Filed 11/19/10 Page 1593 of 3246
Confidential – Subject to Further Confidentiality Review
98

1  have the exclusive right to bring those claims?

2      A.   Correct.

3      Q.   Did you know either John Jones or Linda Pauley

4  outside of this transaction?

5      A.   I did not.

6      Q.   So when did you -- the first page of the

7  addendum, when did you prepare this document?

8      A.   I don't remember.

9      Q.   Was it 2012, when you were selling the house?

10     A.   It's possible.

11     Q.   Why did you prepare this document?

12     A.   To document information related to the

13  property.

14     Q.   Have you talked to Mr. Jones or Ms. Pauley

15  since you sold the house?

16     A.   I haven't, no.

17     Q.   Earlier we talked about that you no longer own

18  the house and that you're unaware whether it has been

19  remediated one way or the other; is that correct?

20     A.   Correct.

21     Q.   Could you currently remediate the property?

22     A.   No.

23     Q.   Do you know if your mom has spoken to Mr. Jones

24  or Ms. Pauley?

Confidential - Subject to Further Confidentiality Review

```
 1      A.    I do not know.

 2      Q.    Now, did anyone collect samples of the drywall?

 3      A.    I believe my mother did.

 4      Q.    Do you know how many samples she collected?

 5      A.    I do not know.

 6      Q.    Do you know whether there were any markings on

 7  those samples?

 8      A.    I don't know.

 9      Q.    Do you know whether -- do you know where those

10  samples are today?

11      A.    I believe there's a sample here today.

12      Q.    Do you know if there are any other samples out

13  there?

14      A.    No, I don't.

15            MR. BARRY:  I think that's a good place for

16      taking a break.

17            MS. WERKEMA:  Okay.

18            (Recess from 10:54 a.m. until 11:13 a.m.)

19            MR. BARRY:  Back on the record.

20  BY MR. BARRY:

21      Q.    So looking at Exhibit 6 here, was this

22  something that you provided to the buyers when they

23  purchased the property?

24      A.    My mother may be more suited to answer that
```

Confidential – Subject to Further Confidentiality Review

1    question.  I personally did not, no.

2        Q.   Okay.  You said you got married in 2010;

3    correct?

4        A.   Yes.

5        Q.   And when you got married, did you live with

6    your husband?

7        A.   I got married in 2011.  I'm sorry.  Yes.

8        Q.   Sorry.  You got married in 2011?

9        A.   Yes.

10       Q.   Where were you and your husband living?

11       A.   We were living separately at first, and then we

12   soon moved in July.

13       Q.   July of 2011?

14       A.   Yes.

15       Q.   And did you move into the property affected by

16   Chinese drywall, or somewhere else?

17       A.   Somewhere else.

18       Q.   Okay.  When you -- from the time you learned

19   that there was Chinese drywall in the house until you

20   sold the property, how much of that time were you living

21   in the house?

22       A.   I would have to calculate the summers, the

23   Christmas breaks, and things like that.

24       Q.   So let's go through it.  You learned of Chinese

Confidential - Subject to Further Confidentiality Review

1    drywall roughly in the summer of 2009; is that right?

2        A.    Roughly.

3        Q.    Were you home for the Christmas break in 2009?

4        A.    I was home for every break.

5        Q.    So what breaks did you have at school?  Was it

6    fall break, Christmas break?

7        A.    Christmas break, spring break, summer break.  I

8    believe those are -- those are all the breaks.

9        Q.    So you would have been there for Christmas

10   break 2009; is that right?

11       A.    Correct.

12       Q.    So spring break 2010?

13       A.    Uh-huh.

14       Q.    Do you remember how long spring break was?

15       A.    I don't remember.

16       Q.    Was it one week?  Two weeks?

17       A.    Anywhere from one to two weeks.

18       Q.    What about summer break 2010, do you know how

19   long that was?

20       A.    No, I don't know.

21       Q.    Did you ever take courses during the summer?

22       A.    Yes.

23       Q.    And so when you were taking those courses, did

24   you end up living at home, or did you live on campus?

```
1        A.   I don't remember verbatim, but at times I went

2    back and forth.

3        Q.   Okay.  So you might be living sometimes in the

4    dorm and sometimes in the -- at home?

5        A.   Right.

6        Q.   Do you remember if you took courses in the

7    summer of 2010?

8        A.   I don't remember, no.

9        Q.   Do you remember if you took courses in the

10   summer of 2011?

11       A.   I graduated in May of 2011.

12       Q.   Okay.  So you wouldn't have been taking courses

13   then?

14       A.   Right.

15       Q.   Did you ever go anywhere else for breaks?  Did

16   you ever go on vacation?  Did you go see family

17   elsewhere?  Did you go see your husband's family?

18       A.   Not that I recall, no.

19       Q.   We talked a little bit earlier about having to

20   do air conditioning repair.  I'm going to hand you a

21   document.  I think we're at Exhibit 7.

22            MR. BARRY:  Right?

23            THE COURT REPORTER:  Yes.

24            MR. BARRY:  I'm doing well here.
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 4598 of 3246 of
Case 1:1-cv-22408-MGC Document 1 Entered on FLSD Docket 05/19/2011 Page 51 of
98
Confidential – Subject to Further Confidentiality Review

1          (Marin Exhibit No. 7 was marked for

2     identification.)

3     BY MR. BARRY:

4          Q.    Have you seen these documents before?

5          A.    Yes.

6          Q.    What are they?

7          A.    Receipts.

8          Q.    Receipts for what?

9          A.    Air conditioning bills.

10         Q.    By "air conditioning bills," do you mean air

11    conditioning repair bills?

12         A.    Correct.

13         Q.    And who's the name listed here?

14         A.    Yvette Marin, my mother.

15         Q.    Earlier I think you said you paid for the air

16    conditioning invoices.  Does this change your

17    recollection of that?

18         A.    You said earlier I --

19         Q.    Said you paid for the air conditioning repair.

20    Does this change your recollection?

21         A.    I don't recall saying that I paid for them.

22         Q.    Okay.

23         A.    But --

24         Q.    Do you remember if your mother paid for the air

Confidential - Subject to Further Confidentiality Review

```
1    conditioning repairs?

2         A.    Yes, my mother paid for them.

3         Q.    Did you ever compensate your mother for those

4    repairs?

5         A.    No.

6         Q.    Do you own any other property?

7         A.    No, I don't.

8         Q.    Have you ever owned any other property?

9         A.    No.

10        Q.    Has anyone owned property in your name?

11        A.    Not to my knowledge.

12        Q.    Did your mother ever purchase property in your

13   name?

14        A.    No.

15        Q.    Where do you live now?

16        A.    The address?

17        Q.    Yes.

18        A.    4402 Lake Tahoe Circle.

19        Q.    And who lives there with you?

20        A.    My mother, my father, and my brother.

21        Q.    And when -- do you own that home?

22        A.    And my children.  Sorry.  I forgot about them.

23        Q.    I was going to say, like, where did they go?

24   It's like one of those TV shows where no one takes care
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1600 of 3246
Case 1:19-cv-22940-MGC Document 1 Entered on FLSD Docket 05/09/2019 Page 45 of 98
Confidential - Subject to Further Confidentiality Review

```
1    of the kids.

2        A.   I'm sorry.  What was your question?

3        Q.   Do you own that home?

4        A.   No, I don't.

5        Q.   Who owns that home?

6        A.   My mother owns that home.

7        Q.   And how did your mother -- do you know how your

8    mother paid for the purchase of that home?

9        A.   I do not.

10       Q.   Did they use money from the sale of the

11   property affected by Chinese drywall?

12       A.   I do not know.

13       Q.   Where did the money that was -- I know you said

14   you paid $270,000 in cash.  When you sold it for roughly

15   $80,000 --

16       A.   Right.

17       Q.   -- where did that money go?

18       A.   My mother would probably be more suited to

19   answer that question.

20       Q.   So when the house that's in your name sold, you

21   don't know where the $80,000 that were the proceeds of

22   that sale went?

23       A.   My mother would be able to answer that

24   question.
```

Confidential - Subject to Further Confidentiality Review

```
1        Q.    Do you not personally know the answer to where

2    that $80,000 went to?

3        A.    No, I don't know the answer.

4        Q.    Did you ever -- did you have homeowners

5    insurance on the property?

6        A.    My mother would be able to answer that

7    question.

8        Q.    Do you know the answer?

9        A.    I don't know the answer.

10       Q.    So you don't know personally whether you filed

11   any homeowners insurance claim for the damage from

12   Chinese drywall?

13       A.    It's possible that my mother may have.

14       Q.    Okay.  But you don't know one way or the other

15   if you did personally?

16       A.    Personally, no, I did not.

17       Q.    Has the presence of Chinese drywall limited

18   your use of the property?

19       A.    By "limited the use," what do you mean?

20       Q.    Did it affect how you were able to use and

21   enjoy the property?

22       A.    Of course.

23       Q.    How so?

24       A.    Well, you know, you don't really invite people
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1602 of 3246
Case 1:11-cv-22408-MGC Document 23-19 Entered on FLSD Docket 05/18/2012 Page 58 of
98
Confidential - Subject to Further Confidentiality Review

```
 1   to a home that's toxic, so, yeah.

 2       Q.   Did it ever prevent you from inviting people to

 3   the home?

 4       A.   Of course.

 5       Q.   Even though you weren't living there the whole

 6   time?

 7       A.   Of course.

 8       Q.   Did -- what things could you not do at the home

 9   because of Chinese drywall?

10       A.   Have peace of mind.

11       Q.   Do you know if you're seeking any money payment

12   related to those limitations?

13       A.   I believe those details are outlined in the

14   document that was submitted.

15       Q.   Yeah, so let's look back at, I think it's

16   Exhibit 4.  I could be wrong about that.

17            MS. WERKEMA:  SPPF?

18            MR. BARRY:  Yeah.

19            MS. WERKEMA:  Exhibit 3.

20   BY MR. BARRY:

21       Q.   Exhibit 3.  Let's turn to page 7 where it says

22   "other damages."

23            Actually, before I get there, I just have a

24   quick question for you.  We talked a little bit about
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1603 of 3246
Case 1:11-cv-22408-MGC Document 122 Entered on FLSD Docket 05/16/2013 Page 45 of
98
Confidential - Subject to Further Confidentiality Review

```
 1    the check with the proceeds from the sale, that $80,000.

 2    Did you ever receive a check related to the sale of the

 3    property?

 4         A.   I don't remember.

 5         Q.   Do you remember ever endorsing a check or

 6    signing over that your mother would receive the proceeds

 7    from the sale?

 8         A.   I don't remember.

 9         Q.   Earlier you said that the property was toxic.

10    Are you making any claims in this lawsuit for personal

11    injury?

12         A.   I'm not making any claims, no.

13         Q.   Okay.  Are you making any claims on behalf of

14    anybody for personal injury?

15              MS. WERKEMA:  Object to form, but please answer

16         if you know.

17              THE WITNESS:  I don't believe so.

18    BY MR. BARRY:

19         Q.   So let's look at page 5, Section VII.  I think

20    you went a little too far there.

21         A.   Page 5.

22         Q.   The first line here says:  "If you incurred

23    alternative living expenses as a result of Chinese

24    drywall, identify the total moving cost and/or
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1604 of 3246
Case 1:09-cv-02047-GC Document 22361 Entered on FLSD Docket 05/19/2011 Page 30 of
98
Confidential - Subject to Further Confidentiality Review

```
 1    alternative living expense you incurred."

 2            Is there any amount listed there?

 3       A.   On the following page, yes.

 4       Q.   Is there any amount listed related to that

 5    exact question?

 6       A.   No, there is no amount listed.

 7       Q.   Are you seeking any damages for alternative

 8    living expenses?

 9            MS. WERKEMA:  Object to form, but please answer

10       if you know.

11            THE WITNESS:  I don't believe so.

12    BY MR. BARRY:

13       Q.   Now, we talked a little bit about you said you

14    weren't able to use the property completely.  If you

15    experienced any -- if you turn to the next page, the

16    second paragraph down:  "If you experienced any loss of

17    use and/or loss of enjoyment of the property as a result

18    of Chinese drywall, identify the total amount of such

19    loss."

20            It says:  "Estimated $100,000, however, to be

21    determined at trial."

22            Do you know how you reached the number 100,000?

23       A.   It's a number that my attorney helped me arrive

24    at.
```

Case 2:09-md-02047-EEF-MBN Document 23263-39 Filed 11/19/19 Page 1605 of 3246
Case 1:09-md-02047-EEF-MBN Document 23263-39 Filed 11/19/19 Page 1605 of 3246
Confidential - Subject to Further Confidentiality Review
98

```
1    Q.   Did you personally come up with that number?

2    A.   It's something that we arrived at, she assisted

3  with.

4    Q.   Did you -- and not revealing any content of

5  conversations, prior to meeting with your attorney, did

6  you have any idea that the loss of use of enjoyment

7  number should be $100,000?

8    A.   Hold on.  Let me take a look at that question.

9    Q.   Yeah.

10        MR. BARRY:  Yeah, if you don't mind reading it

11     back.

12        (The question was read by the reporter.)

13        THE WITNESS:  No, not prior to meeting with my

14     attorney.

15  BY MR. BARRY:

16    Q.   So is it fair to say that the exclusive

17  province of that number is through meetings with your

18  attorney?

19    A.   Correct.

20    Q.   Okay.  Now, just below that, it says:  "If you

21  claim a diminution in value of the property as a result

22  of Chinese drywall, identify the total amount of such

23  diminution of value being claimed."

24        It says: "Estimated $150,000, however, to be
```

Confidential - Subject to Further Confidentiality Review

1    determined at trial."

2         Do you know how you calculated $150,000?

3    A.    With the assistance of my attorney.

4    Q.    And do you know, is it the difference between

5    what you initially paid for the property and what you

6    sold the property for?

7    A.    Yeah, that, among other things, I believe.

8    Q.    What are those other things?

9    A.    I would have to consult my attorney about the

10   different things that were -- were --

11   Q.    And I understand.  The answer has to come from

12   you.

13   A.    I understand, but that's my response.

14   Q.    So you don't personally know or remember right

15   now what goes into that number?

16   A.    Correct.

17   Q.    Now, have you -- if we can turn the page back

18   here and look at Section VI.  Now, this is whether you

19   received any alternate payments or additional payments

20   from -- related to the Chinese drywall litigation.  Here

21   it lists GBI settlements $12,627.66.  Do you remember

22   receiving that amount?

23   A.    I remember -- I don't remember specific

24   amounts, but I do remember receiving a settlement.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1607 of 3246
Case 1:09-md-02047-MCA-L Document 22361-39 Filed 11/19/19 Page 45 of 98
Confidential – Subject to Further Confidentiality Review

```
 1        Q.   Did you personally receive those checks?

 2        A.   Yes.

 3        Q.   Did you personally cash those checks?

 4        A.   I don't believe so.

 5        Q.   So you don't remember personally cashing checks

 6   that would equal about $12,000?

 7        A.   No, I'm not -- I'm not certain.

 8        Q.   I'm going to hand you exhibits, and I'll

 9   represent that these are two separate documents, but I'm

10   putting them together.  These are the two settlement

11   checks that would have been received.

12             MR. BARRY:  If you're okay with me putting them

13        as one exhibit.

14             MS. WERKEMA:  Yes, I am.

15             (Marin Exhibit No. 8 was marked for

16   identification.)

17   BY MR. BARRY:

18        Q.   Do you ever remember receiving these checks?

19        A.   Yes.

20        Q.   And what did you do with them?

21        A.   I don't remember.

22        Q.   Did you endorse them to your mother or your

23   father?

24        A.   It's possible.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1608 of 3246
Case 1:11-cv-22408-MGC Document 285-1 Entered on FLSD Docket 05/18/2012 Page 461 of
98
Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Did you use them -- did you put them in a bank

 2   account for yourself?

 3        A.    I don't remember.

 4        Q.    Have you checked your bank records to determine

 5   what you did with these checks?

 6        A.    No, I haven't checked my bank records.

 7        Q.    Receiving this amount from this litigation,

 8   have you used this amount to set off the amount that

 9   you've -- or that you're claiming in damages?

10        MS. WERKEMA:  Object to form.  I object to the

11        use of the word "setoff."

12   BY MR. BARRY:

13        Q.    To reduce the amount.

14        A.    Have I used these checks to reduce the amount?

15        Q.    I'll rephrase the question.  It's a poor

16   question.

17        A.    Okay.

18        Q.    You received $12,000 in settlement money

19   through this litigation.  Have you used that $12,000 to

20   reduce the total amount you're requesting in this

21   litigation?

22        A.    Have I used it to reduce the amount?

23        Q.    Right.  You've been paid $12,000.

24        A.    Right.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1609 of 3246
Case 1:09-cv-07791-JSR Document 220-31 Confidential Supplement Filed 05/18/2019 Page 45 of
98
Confidential - Subject to Further Confidentiality Review

1    Q.   Does that reduce the total amount you're

2    requesting in this litigation, as if you were

3    requesting, you know, $14,000, now you're only

4    requesting $2,000 because you got paid 12,000?

5    A.   That may be a question better suited for my

6    mother.

7    Q.   Okay.  You don't personally know one way or the

8    other?

9    A.   I'm not really sure what it is you're asking

10   me, to be honest.

11   Q.   So you've already been paid -- if I owe you

12   $14,000, let's say that as a hypothetical, and I pay you

13   $12,000, do I still owe you $14,000, or do I still owe

14   you $2,000?

15   A.   I think that would be a question better

16   answered by my mother.

17   Q.   You don't know, if I owe you $14,000 and I pay

18   you $12,000, if I owe you $2,000?

19   A.   Initially -- my initial response is there's

20   some information missing.  You know, it depends on --

21   there's information missing, but that's neither here nor

22   there.  But, again --

23   Q.   What information do you believe is missing that

24   I would need to fill in that question?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1610 of 3246
Case 1:09-cv-02047-MCA Document 22-22 ... Filed ... Page ... of 98
Confidential - Subject to Further Confidentiality Review

```
 1       A.   I was asking more so towards your hypothetical

 2    question, but towards your actual question, again, my

 3    mom would be able to give you an answer.  I can't.

 4       Q.   You just -- you don't know one way or the

 5    other?

 6       A.   I can't give you an answer.

 7       Q.   You can't, or you don't know the answer?

 8       A.   I don't have an answer for you.

 9       Q.   Okay.  Did you ever -- you said the house was

10    entirely paid off; right?  To your knowledge?

11       A.   It was paid cash.

12       Q.   So you were never late on any mortgage payments

13    related to Chinese drywall?  Chinese drywall didn't

14    prevent you from making mortgage payments?

15       A.   I don't believe there was a mortgage on the

16    house.

17       Q.   Did Chinese drywall -- are you claiming any

18    other financial distress related to Chinese drywall?

19       A.   I believe everything I'm claiming is in that

20    document.

21       Q.   Okay.  Now, you said you sold the house in

22    2012.  I'm going to hand you a document, which is

23    Exhibit 9.

24            (Marin Exhibit No. 9 was marked for
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1611 of 3246
Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1611 of 98
Confidential - Subject to Further Confidentiality Review

 1    identification.)

 2    BY MR. BARRY:

 3        Q.   Do you recognize this document?

 4        A.   Yes.

 5        Q.   What is this?

 6        A.   It's a document stating that the buyer is

 7    cancelling the contract.

 8        Q.   And did you sign this document?

 9        A.   Yes, I did.

10        Q.   And is that -- that is your signature down

11    there?

12        A.   Yes.

13        Q.   And it looks like the buyer cancelled the --

14    the buyer cancelled the contract the same day of the

15    inspection; is that correct?

16        A.   Uh-huh.

17        Q.   Did you try to list the property -- how soon

18    after this property -- or the cancellation of 8/26 did

19    you try to list the property again?

20        A.   That's a question my mother could answer.

21        Q.   Now, did you -- do you have any knowledge of

22    what time period the property was listed, for how long?

23        A.   No.

24        Q.   Was it listed between 2009 and 2012, the entire

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1612 of 3246
Case 1:09-md-02047-MCA Document Confidential Subject to further confidentiality Review 3 of 98
Confidential - Subject to further confidentiality Review

1   time?

2       A.   My mother could answer that question.

3       Q.   You don't know one way or the other?

4       A.   My mother would know.

5       Q.   Do you know whether it was?

6       A.   My mother would be able to answer that

7   question.

8       Q.   And, again, I'm not trying to be difficult,

9   Ms. Marin.  I understand your mother may know, but I

10  also need to know what you know.

11      A.   Right.

12      Q.   So if you don't know, please answer, "I don't

13  know" instead of telling me to ask your mother, because

14  I will ask your mother.  And I appreciate you telling me

15  what she does know better than you, but I also need to

16  know what you know.

17      A.   Okay.

18      Q.   So asking that question again, do you know

19  whether between 2009, when this contract was cancelled,

20  to 2012, when you sold it, what period of time the

21  property was listed?

22      A.   No, I do not know what period of time.

23      Q.   No.  Do you know whether it was listed for most

24  of that time?  Do you know if it was listed in 2010?  Do

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1613 of 3246
Case 1:09-md-02047-MCA Document 22651 Emma on Filed 09/16/2013 Page 40 of
98
Confidential - Subject to Further Confidentiality Review

1   you know if it was listed in 2011?

2       A.   I don't know.

3       Q.   You don't know one way or the other?

4       A.   I don't know.

5       Q.   I'm going to hand you a document, which I will

6   say is admittedly a little difficult to read.

7            (Marin Exhibit No. 10 was marked for

8   identification.)

9   BY MR. BARRY:

10      Q.   It's very difficult to read.  This is

11  Exhibit 10, which is an "As-Is" Residential Contract For

12  Sale and Purchase.

13           Is this the agreement between you and the

14  buyer, John Jones and Pauley drywall?

15      A.   From what I can make out, it looks like it.

16      Q.   And do you know the amount of money that was

17  paid for the property there?  If you look at -- I know

18  it's difficult to read here.  I think it says on 1 --

19  let me see if I can find a document that's a little

20  clearer, because that's not.

21           MS. WERKEMA:  And I can see if we can try to

22      make better resolution when I get to the office.

23           MR. BARRY:  It looks like it was pulled offline

24      or the contract site.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1614 of 3246
Case 1:09-md-02047-EEF-MBN Document entitlement Subject to Packet 2019-091-4 Page 46 of
98
Confidential - Subject to Further Confidentiality Review

```
 1            MS. WERKEMA:  Yeah.

 2            MR. BARRY:  I think the HUD statement is

 3       probably better.

 4   BY MR. BARRY:

 5       Q.   Do you mind just -- we'll get off this document

 6   in a second.  If you can turn to the last page.  It says

 7   that -- do you remember when you entered into the

 8   agreement with the buyers?  The very last page of the

 9   document.

10       A.   You mean when this document was signed?

11       Q.   Yeah.

12       A.   January 16, 2012.

13       Q.   Just let me find one thing here.  I may be just

14   imagining this.

15            If you can look back at Exhibit 6.  Actually,

16   no, forget that.

17            We talked a little bit earlier about your

18   settlement funds and the amount you received, which was

19   about $12,000.  Do you know if you've received any other

20   settlement funds?

21       A.   No, not to my knowledge.

22       Q.   Did you -- when you sold the property and you

23   sold for a difference between, roughly, 270 and 80,000,

24   do you know if you took any loss on your taxes for that?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1615 of 3246
Case 1:09-md-02047-EEF-MBN Document Confidential Subject to Further Confidentiality Review 98
Confidential - Subject to Further Confidentiality Review

```
 1      A.   No, I don't remember.

 2      Q.   You don't remember if in year 2012 you put, "I

 3  lost this much in equity in the house" on your taxes,

 4  took a write-off?

 5      A.   I don't remember.

 6      Q.   Did you review your tax forms in relation to

 7  this litigation?

 8      A.   No.

 9      Q.   Do you prepare your own taxes?

10      A.   No.

11      Q.   Do you know if your mother or father took a

12  write-off on their taxes related to the diminution in

13  sale price?

14      A.   I don't know.

15      Q.   Do you ever look at your parents' tax

16  documents?

17      A.   They're not mine.

18           MR. BARRY:  Let's take a break.  I don't think

19      I have much more.

20           (Recess from 11:41 a.m. until 11:54 a.m.)

21  BY MR. BARRY:

22      Q.   Okay, Ms. Marin, I have just a few more

23  questions for you.

24           We talked a little bit about the -- actually,
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/10 Page 1616 of 3246
Case 1:09-cv-07097-JGK Document 23361-39 Filed 11/19/10 Page 1616 of 98
Confidential – Subject to Further Confidentiality Review

1   just taking a step back, who does prepare your taxes for

2   you?

3        A.   I don't remember the woman's name.

4        Q.   Is it a CPA?

5        A.   I believe so.  What does CPA stand for?

6        Q.   Is it an accountant?  A tax preparer?

7        A.   Yes, a tax preparer.

8        Q.   Do you know how you -- is this the same person

9   who does your parents' taxes, do you know?

10       A.   My parents and I used to -- well, my mother and

11  I used to have the same tax preparer, but I have someone

12  else now.

13       Q.   Okay.  I know we've kind of beaten the horse on

14  this one a little bit, but you received amounts, roughly

15  80,000 and 12,000, and you don't recall whether those

16  went into your bank account; correct?

17       A.   I believe -- I believe what I said was I don't

18  remember.

19       Q.   Okay.

20       A.   Yeah.

21       Q.   But you don't remember one way or the other?

22       A.   I don't remember.

23       Q.   Who do you bank with?

24       A.   Currently, I bank with Wells Fargo.

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1617 of 3246
Case 1:19-cv-22483-MGC Document 29 Entered on FLSD Docket 05/19/2019 Page 73 of
98
Confidential - Subject to Further Confidentiality Review

```
 1      Q.    Who did you bank with before then?

 2      A.    Previously I banked with Chase, and before that

 3   I banked with Bank of America.

 4      Q.    When you made the payment of $270,000 in cash,

 5   how did you make that payment to buy the house?

 6      A.    My mother would be able to answer that

 7   question.

 8      Q.    Do you remember if it came out of your bank

 9   account?

10      A.    I don't remember.

11      Q.    Was it your funds, or was it your mother's

12   funds?

13      A.    My mother would be able to answer that

14   question.

15      Q.    Do you not know if it was your money or your

16   mother's money?

17      A.    I don't -- I don't remember.

18      Q.    Okay.  When -- I'm just doing the math in my

19   head.  You were roughly 18 when you purchased the house

20   in 2007; is that right?

21      A.    2007 was 10, 11 years ago; right?

22      Q.    Is that right?

23      A.    11 years ago, I was 19.

24      Q.    Okay.  19.  Roughly 18, 19, in that area?
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1618 of 3246
Case 1:09-cv-07791-AGT Document 231-11 Entered on FLSD Docket 05/09/2019 Page 71 of
98
Confidential - Subject to further confidentiality review

```
1       A.   Roughly.

2       Q.   How did you have $270,000 as an 18-year-old,

3   19-year-old?

4            MS. WERKEMA:  Object to form.

5            THE WITNESS:  Again, I don't -- I don't

6       remember whether it was my mother or I.

7   BY MR. BARRY:

8       Q.   Did you have a job at the time?

9       A.   When I was 19, I was a freshman in college, and

10  I don't believe I was working at that time.

11      Q.   Had you inherited money?

12      A.   I don't -- I don't recall.

13      Q.   Did you -- does your family share money amongst

14  each other?  Is it collective funds?

15      A.   No.

16      Q.   Okay.  Do you have -- do you know if you've

17  produced your school records in this litigation?

18      A.   Everything -- everything should be submitted,

19  so...

20      Q.   Would your school records show that -- when you

21  were taking classes during the summer?

22      A.   Yeah, it should.

23      Q.   Would you be able to go back and look at those

24  and tell us what summers you were taking?
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1619 of 3246
Case 1:11-cv-22408-MGC Document 231 Entered on FLSD Docket 05/09/2013 Page 75 of
98
Confidential – Subject to Further Confidentiality Review

```
1              MS. WERKEMA:  I'm going to object given that
2         she stated that she's produced the documents that
3         she has already.
4              MR. BARRY:  Understood.
5    BY MR. BARRY:
6         Q.   You can still answer the question.
7         A.   Oh.  Yeah, your transcript definitely shows
8    when you're taking classes.
9         Q.   So that would help us better understand when
10   you were in the house and when you weren't in the house?
11        A.   Not completely, because, like I said, there
12   were times where I went back and forth.  I also took
13   online classes at times.
14        Q.   And you said there was a period of time when
15   you weren't in school, that you had lived at home, I
16   think you said earlier?
17        A.   Well, I was in school.  I was just living at
18   home.
19        Q.   What period was that?
20        A.   I previously stated it was from December of
21   2010 onward.
22        Q.   Okay.  How far is FIU from Port St. Lucie?
23        A.   It depends on what campus you're talking about.
24   There's a campus near Aventura, and then there's a
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 620 of 2446
Case 1:09-cv-07687-GC Document 2 entry Confidential Supplement 05/18/2011 Page 75 of 98
Confidential - Subject to Further Confidentiality Review

 1    campus out in Doral, I believe it is.

 2         Q.   Which campus did you go to?

 3         A.   I attended both campuses.

 4         Q.   Okay.  How far away is that, generally?

 5         A.   If you take the turnpike, I'd give it a solid

 6    hour, hour and maybe 20 minutes.

 7         Q.   Perfect.  Now, earlier we talked about your

 8    mother is not a party to this lawsuit; right?

 9              MS. WERKEMA:  Object to form, but please answer

10         if you know.

11              THE WITNESS:  When you say "party" --

12    BY MR. BARRY:

13         Q.   She's not suing Taishan on her own personal

14    behalf?

15         A.   No, not that I -- not from what I understand.

16         Q.   You're the only person who owns the claim that

17    you know of?

18         A.   Correct.

19         Q.   Does your mother ever -- your mother's not an

20    interpreter for you or anything like that?

21         A.   What do you mean, "interpreter"?

22         Q.   Does she help translate any language barriers?

23         A.   Which language would you be referring to?

24         Q.   Just any language.  I guess, do you have -- you

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1621 of 3246
Case 1:1-cv-22408-MGC Document 100-1 Entered on FLSD Docket 05/19/2011 Page 77 of 98
Confidential - Subject to Further Confidentiality Review

1    speak English fluently; correct?

2        A.    I believe I've been speaking it fluently this

3    entire time.

4        Q.    When you met yesterday with your attorneys and

5    your mother, what did you guys discuss?

6        A.    We discussed various documents that may be

7    presented here today.  We discussed what time.  We

8    discussed breakfast.

9        Q.    What advice did your attorneys provide to you

10   during that time period?

11           MS. WERKEMA:  I'm going to object to that.

12       That's revealing attorney-client privilege.

13           MR. BARRY:  And the privilege was waived

14       because the mother was present.

15           THE WITNESS:  My attorney advised me to be

16       honest and to be myself and to answer the questions

17       to the best of my ability.

18   BY MR. BARRY:

19       Q.    Did she provide you any advice on how to answer

20   any questions?

21       A.    Yes.  She told me to be honest.

22       Q.    Did she provide any advice on specific

23   subjects?

24       A.    Nothing specific, no.  I'd say she -- we

Confidential - Subject to Further Confidentiality Review

```
 1    discussed documents.  That's probably as specific, if

 2    that's what you're --

 3         Q.   Did she tell you that, when it comes to

 4    something related to damages, that you should defer to

 5    her?

 6         A.   She told me to refer to the documents that were

 7    submitted.

 8         Q.   Did she tell you not to reveal any knowledge

 9    you have of how those damage calculations were

10    calculated?

11         A.   No, she didn't tell me not to reveal anything.

12         Q.   Who put together the set of documents for you

13    to review at the prep session?  Was it your attorney?

14         A.   I'm not sure who put them together.

15         Q.   Did your attorney ask you about how you

16    collected documents in this litigation?

17         A.   How I've --

18         Q.   Collected documents, the documents you provided

19    to us, provided to your attorney, did she ask you

20    whether you had any additional documents?

21         A.   Yes, she did, she asked me if I had anything

22    else that I wanted to give to her.

23         Q.   What did she tell you -- what did you tell her?

24         A.   I told her everything that I had was already
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1623 of 3246
Case 1:09-cv-02047-MCA Document 22381 Exhibit 24 Confidential Subject to Packet 05/08/2013 Page 70 of 98
Confidential - Subject to Further Confidentiality Review

```
1   presented.

2       Q.   What did you do to collect documents in this

3   litigation?

4       A.   I searched.

5       Q.   Did you look through your e-mail?

6       A.   Yes.

7       Q.   And did you find any relevant e-mails related

8   to the property?

9       A.   My mother could probably better answer that

10  question.

11      Q.   So did your mother look through your e-mail?

12      A.   My mother and I together looked at -- looked

13  for documents.

14      Q.   So do you remember if you personally found any

15  documents?

16      A.   I don't remember, no.

17      Q.   Did you and your attorneys have any other

18  meetings where your mother attended?

19      A.   No.

20      Q.   So do you know, did you have any phone calls

21  with your attorneys where your mother attended?

22      A.   I don't think you can attend a phone call.

23      Q.   Was your mother also on the phone?

24      A.   No.
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 1624 of 3246
Case 1:1-cv-22408-MGC Document 26-1 Entered on FLSD Docket 05/19/2011 Page 40 of 98
Confidential - Subject to Further Confidentiality Review

 1     Q.    How many other meetings have you had with your

 2   attorneys?

 3     A.    No other physical meetings.

 4     Q.    Has your -- have your attorneys provided you

 5   e-mails where your mother's copied on it?

 6     A.    Not that I can remember.

 7     Q.    Have you reviewed to see if those e-mails

 8   copied your mother on it?

 9     A.    I have not reviewed them, no.

10     Q.    Do you know if your mother e-mailed with your

11   attorneys?

12     A.    She could probably better answer that question.

13     Q.    Did you discuss at the meeting with your

14   attorney yesterday the scope of your knowledge, how much

15   you know about this litigation?

16     A.    Did you discuss at the meeting?

17     Q.    Did you discuss that your mother might be

18   better situated to answer certain questions?

19     A.    I mentioned to my lawyer that my mother has

20   information regarding the property.

21     Q.    Did you decide that your mother was going to be

22   the one who's primarily answering those questions?

23     A.    No, I didn't make that decision.

24     Q.    Did your attorney advise you to make that

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1625 of 3246
Case 1:09-cv-07687-CMR Document 22361 Confidential Filed 11/19/19 Page 1625 of 3246
Confidential - Subject to Further Confidentiality Review
98

```
 1    decision?

 2    A.   Did she --

 3    Q.   Did your attorney advise you that your mother

 4    should be the one primarily answering questions about

 5    the property?

 6    A.   No.

 7    Q.   Did your attorney advise you to defer to your

 8    mother on questions?

 9    A.   My attorney advised me to answer honestly.

10    Q.   Did your attorney say to answer -- tell us

11    everything you remember about the meeting.  Tell us

12    everything that was discussed.

13    A.   Okay.

14         MS. WERKEMA:  I'm going to object again.  I

15         think this entire line of questioning is

16         inappropriate as attorney-client privilege.

17         MR. BARRY:  And I hear your objection, but it's

18         been waived.

19         THE WITNESS:  Okay.  From what I can remember,

20         we discussed various documents, what I could

21         possibly expect.  We discussed that I shouldn't be

22         nervous and that things were cut and dry.  We

23         discussed that -- we talked about my newborns.

24         Those are the things I can remember.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1626 of 3246
Case 1:09-cv-07098-XXX Document XXXXX Exhibition Filed Docket 05/18/2020 Page 82 of
98
Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. BARRY:

 2        Q.   Did your attorneys ever tell you that you need

 3    to be careful about anything, that there's anything you

 4    should be concerned about?

 5        A.   No.

 6        Q.   Was there any discussion about the financing or

 7    purchase funds for the home?

 8        A.   Not that I remember.

 9        Q.   Did your attorneys ever tell you that any of

10    the facts might not be good for you, what to be careful

11    about?

12        A.   No.

13        Q.   Did your attorneys tell you to emphasize any

14    points?

15        A.   No.

16        Q.   Did your attorneys provide you any answers to

17    any questions?

18        A.   No.

19        Q.   Did you do any role-playing, practice

20    questioning?

21        A.   No role-playing.

22             MR. BARRY:  Let's take a quick break and I

23        think we'll be done.

24             THE WITNESS:  Okay.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1627 of 3246
Case 1:1-cv-22408-MGC Document 1 Entered on FLSD Docket 05/19/2011 Page 38 of 98
Confidential - Subject to Further Confidentiality Review

 1            (Recess from 12:10 p.m. until 12:18 p.m.)

 2            MR. BARRY:  I have no further questions.  I

 3      think we may have some questions down there.

 4                      CROSS-EXAMINATION

 5   BY MR. GUERRA:

 6      Q.   I have a couple questions.  Good afternoon,

 7   Ms. Marin.

 8      A.   Good afternoon.

 9      Q.   I'm Dan Guerra.  We met earlier.  I represent a

10   different defendant in this lawsuit, and I just have a

11   couple questions for you.

12      A.   Okay.

13      Q.   Regarding the meeting you had with your

14   attorney where your mom was present, did your attorney

15   have any instructions for your mom?

16      A.   Not that I can recall.

17      Q.   Did your mom -- what did your mom say during

18   the meeting?

19      A.   My mom was pretty quiet during the meeting.  I

20   can't really remember what she said, if she said

21   anything at all.

22      Q.   Okay.  And do you recall your attorney saying

23   anything to your mom at all?

24      A.   I remember most of her correspondences being

Confidential - Subject to Further Confidentiality Review

```
 1    directed at me.

 2        Q.   Okay.  And defendants recently served discovery

 3    on you through your attorney, interrogatories and

 4    requests for production, and you responded to those.  Do

 5    you recall seeing those?

 6        A.   I'm sorry.  You used some language that I

 7    don't -- don't understand.

 8        Q.   I'll put some documents in front of you.

 9        A.   Okay.

10        Q.   It might be easier.

11             MR. BARRY:  I've got them down here.

12             MR. GUERRA:  Do you just want to pull the RFPs

13        and the interrogatories?

14             MS. O'DONOHUE:  The one from December?

15             MR. GUERRA:  Sure.

16             MS. O'DONOHUE:  Here's the whole set.  Sorry.

17    BY MR. GUERRA:

18        Q.   And I'm going to mark for Exhibit 11 what's

19    entitled Plaintiff Cassandra Marin's Response to

20    Defendants' Second Set of Interrogatories.

21             (Marin Exhibit No. 11 was marked for

22        identification.)

23    BY MR. GUERRA:

24        Q.   Take a minute to look at the document.  Do you
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1629 of 3246
Case 1:1-cv-22408-MGC Document 229-81 Entered on FLSD Docket 05/18/2011 Page 85 of 98
Confidential - Subject to Further Confidentiality Review

```
1    recall reviewing this document before today?

2      A.   Yes.

3      Q.   When did you review it?

4      A.   Yesterday.

5      Q.   Did you review it before then?

6      A.   Yes.

7      Q.   Do you know when?

8      A.   I don't.

9      Q.   And did you discuss it with your attorney?

10     A.   I don't know if "discussed" would be the proper

11   word, but it was among the documents that I looked over

12   yesterday.

13     Q.   Okay.  Were you involved in responding to the

14   questions on this document?

15     A.   Yes.

16     Q.   Was your mom at all involved in that process?

17     A.   When you say "involved," what do you mean?

18     Q.   Did she help prepare the answers in this

19   document?

20     A.   If there may have been something I didn't

21   remember, I may have consulted her, but I'm not sure.

22     Q.   And, here, let me just mark for -- mark as

23   Exhibit 12 the verification to these responses.

24          (Marin Exhibit No. 12 was marked for
```

Confidential - Subject to Further Confidentiality Review

```
 1      identification.)

 2   BY MR. GUERRA:

 3      Q.   Is that your signature on the document?

 4      A.   It is.

 5      Q.   Do you recall signing it?

 6      A.   Yes, I do.

 7      Q.   And how did you receive this document to sign?

 8      A.   I received it via e-mail.

 9      Q.   From your attorney?

10      A.   Correct.

11           MR. GUERRA:  That's all I have.

12           MR. BARRY:  Unless you have questions.

13           MS. WERKEMA:  Yeah, I have a few questions.

14                         CROSS-EXAMINATION

15   BY MS. WERKEMA:

16      Q.   So you testified earlier that you were in the

17   process of selling the home when the Chinese drywall was

18   discovered; is that right?

19      A.   That's correct.

20      Q.   When you had decided to sell the home, were you

21   aware of any defects with the property or were you aware

22   of the Chinese drywall when the home was listed?

23      A.   I was not aware of the Chinese drywall before

24   the inspection.
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1631 of 2246
Case 1:09-md-02047-EEF-MBN Document 23363-39 Filed in SD Docket 05/18/2019 Page 97 of 98
Confidential – Subject to Further Confidentiality Review

1    Q.   And after you found out that the home had

2    Chinese drywall, did you still want to sell the

3    property?

4    A.   Yes.

5    Q.   We talked a little bit about the way that the

6    Chinese drywall had impacted your life, and you had made

7    a statement that it prevented you from wanting to have

8    people over to visit you at the home.  To your

9    knowledge, was there anyone else in your family that was

10   prevented from having guests over to the home as well?

11   A.   Yes, definitely.  During that period of time my

12   brother had his firstborn child, and it prevented us

13   from being able to have him over.  You know, I mean, who

14   doesn't want their grandchild or their nephew to spend

15   extended periods of time with them?  And the Chinese

16   drywall really made us paranoid about having him over

17   and just having people over in general and being there

18   ourselves.

19   Q.   Can you just describe how the Chinese drywall

20   in the property affected you emotionally?

21   A.   It was really stressful.  You know, you

22   purchase a home and you expect it to be a sound

23   investment, and not only that, you know, you expect it

24   to be proper shelter for you and your family, and for it

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1632 of 3246
Case 1:09-cv-07687-MGC Document 1 Entered on FLSD Docket 05/19/2011 Page 38 of 98
Confidential - Subject to Further Confidentiality Review

1    to turn out to be the opposite of that was just tragic.

2         And what was supposed to be an investment

3    turned into a burden, and it created lots of anxiety and

4    fear, you know, for our health and for our future, not

5    knowing whether or not we would be able -- what we would

6    do as a result of the Chinese drywall being in our home.

7    It was very difficult for myself, for my family, not

8    knowing what would be the outcome of this situation.

9         MS. WERKEMA:  I don't have any other questions,

10        unless you guys have some follow-up.

11                    REDIRECT-EXAMINATION

12   BY MR. BARRY:

13        Q.   Just a few quick questions.

14             You said your brother's son or daughter was

15   not -- son was not able to live in the house or visit

16   the house?

17        A.   Correct.

18        Q.   Was this the brother who was living with you?

19        A.   Uh-huh.

20        Q.   Was the nephew -- was your nephew living

21   somewhere else during the time period?

22        A.   Correct.

23        Q.   Were you ever trying to -- was the nephew ever

24   intended -- did you ever -- did your brother ever intend

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1633 of 3246
Case 1:11-cv-22408-MGC Document 298-1 Entered on FLSD Docket 05/19/2013 Page 40 of 98
Confidential – Subject to Further Confidentiality Review

```
1    for the nephew to be living full-time at the residence?

2        A.   That would be something I would have to consult

3    him about.

4        Q.   Was the -- was the nephew living with his

5    mother?

6        A.   I believe so.

7        Q.   Did the mother live at the property?

8        A.   No, not to my knowledge.

9        Q.   Is your brother asserting a claim in this case?

10       A.   Not to my knowledge.

11           MR. BARRY:  I have no further questions.

12           MR. GUERRA:  I have one and some cleanup things

13       for the record.

14           MR. BARRY:  I have some stuff for the record

15       too.

16                        RECROSS-EXAMINATION

17   BY MR. GUERRA:

18       Q.   Before you knew about Chinese drywall being in

19   your house, how often did you have guests come over?

20       A.   I wouldn't be able to tell you exactly, but my

21   family, we loved to host guests.  At previous homes, we

22   used to have parties and house out-of-town family and

23   things like -- and things along that line.  So with the

24   Chinese drywall being in our home, it prevented us from
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1634 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 40 of
98
Confidential - Subject to Further Confidentiality Review

1    being able to do the things we had done in the past and

2    that we wanted to do in that moment.

3        Q.    But before you found out, you owned the house

4    for a period of time, how often did you have people

5    over?  When you said housing guests from out of town,

6    was that once a year?  Once a month?

7        A.    I wouldn't -- I wouldn't be able to tell you,

8    but I don't know the exact number of times we had guests

9    and things like that.

10       Q.    And in terms of parties, were they for holidays

11   or birthdays or specific things, or were they just

12   general?

13       A.    Yeah, definitely holidays.  My brother got

14   married during that time.  Special occasions.  Whenever

15   we wanted to.  When I came back in town, friends would

16   come and see me, so...

17       Q.    And this all stopped after you found out there

18   was Chinese drywall in your home?

19       A.    For the most part.

20       Q.    Can you elaborate on when it still happened?

21       A.    I can't.

22       Q.    But you did still have guests over from time to

23   time then?

24       A.    Not to my recollection.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1635 of 3246
Case 1:09-cv-07687-AGS Document 298-11 Confidential Subject to Docket 05/18/2019 Page 91 of
98
Confidential - Subject to Further Confidentiality Review

```
 1          MR. GUERRA:  No further questions.

 2          MR. BARRY:  I just want to state for the record

 3     I have no further questions, but just stating for

 4     the record, before the deposition Holly came to me

 5     and mentioned that your mother may -- Ms. Marin,

 6     Yvette Marin, may have better knowledge of certain

 7     questions.  We're right in the kind of last bit of

 8     discovery.  We would like to take her deposition,

 9     and we reserve the right to reopen Ms. Marin's

10     deposition depending on what her mother says --

11          MS. WERKEMA:  Okay.

12          MR. BARRY:  -- since, obviously, this is late

13     notice that her mother has better knowledge than

14     her, and we hope that we can schedule that as soon

15     as possible.

16          MS. WERKEMA:  Right.  We're available, I think,

17     Wednesday.  I know there's another deposition.  I

18     don't know if it's going to -- planning on being all

19     day, but maybe we can try and work that out and we

20     can discuss that afterward.

21          MR. BARRY:  Absolutely.

22          Thank you.  I know this is not fun to do, but

23     we appreciate you sticking through and working with

24     us through the day.
```

```
1          MR. GUERRA:  So, Holly, I just had a couple

2     requests from you.

3          MS. WERKEMA:  Okay.

4          MR. GUERRA:  I would like to get a copy of

5     Ms. Marin's college transcript so we can figure out

6     when she was taking classes and get a better sense

7     of when she was in the house and when she wasn't in

8     the house.

9          MS. WERKEMA:  Okay.  We might be able to --

10    I'll discuss with counsel and figure out how we want

11    to respond to that request, but it's not something

12    she has.  It's not a document she has.  So it might

13    be an authorization or something like that to allow

14    you all to request it.

15         MR. GUERRA:  Fine.  I'd also like to request

16    that you provide us with a copy of the sales

17    contract from the attempted sale in 2009.

18         MS. WERKEMA:  She doesn't have the contract.

19    She said she's produced all documents that she has

20    to us.  We don't have a copy of that.  It hasn't

21    been produced.

22         MR. GUERRA:  Okay.  And then I'd like to ask

23    for her bank records from the time of the sale and

24    for the settlement payments so we can try and figure
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1637 of 3246
Case 1:09-cv-02047-MGC Document 23082-1 Exhibit on File Docket 09/16/09 Page 48 of
98
Confidential - Subject to Further Confidentiality Review

1    out where the money went.

2         MS. WERKEMA:  Okay.  We'll discuss that request

3    and respond appropriately.

4         MR. GUERRA:  Thank you.

5         (Whereupon, the deposition concluded at

6    12:34 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1638 of 3246
Case 1:19-cv-00484-WCG Document 26-11 Filed 04/10/25 Page 95 of 98
Confidential - Subject to Further Confidentiality Review

```
 1                 C E R T I F I C A T E

 2

 3          I, JOAN L. PITT, Registered Merit Reporter,

 4    Certified Realtime Reporter, and Florida Professional

 5    Reporter, do hereby certify that, pursuant to notice,

 6    the deposition of CASSANDRA MARIN was duly taken on

 7    January 7, 2019, at 10:04 a.m. before me.

 8          The said CASSANDRA MARIN was duly sworn by me

 9    according to law to tell the truth, the whole truth, and

10    nothing but the truth, and thereupon did testify as set

11    forth in the above transcript of testimony.  The

12    testimony was taken down by me stenographically.  I do

13    further certify that the above deposition is full,

14    complete, and a true record of all the testimony given

15    by the said witness.

16

17    _____

18          JOAN L. PITT, RMR, CRR, FPR

19

20          (The foregoing certification of this transcript

21    does not apply to any reproduction of the same by any

22    means, unless under the direct control and/or

23    supervision of the certifying reporter.)

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1639 of 3246
Case 1:09-cv-02047-MCA Document 22631 Certified Copy Filed 05/19/2019 Page 95 of 98
Confidential - Subject to Further Confidentiality Review

```
 1                     INSTRUCTIONS TO WITNESS

 2

 3

 4            Please read your deposition over carefully and

 5    make any necessary corrections.  You should state the

 6    reason in the appropriate space on the errata sheet for

 7    any corrections that are made.

 8

 9            After doing so, please sign the errata sheet

10    and date it.  It will be attached to your deposition.

11

12            It is imperative that you return the original

13    errata sheet to the deposing attorney within thirty (30)

14    days of receipt of the deposition transcript by you.  If

15    you fail to do so, the deposition transcript may be

16    deemed to be accurate and may be used in court.

17

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1640 of 3246
Case 1:19-cv-22842-MGC Document 2 Entered on FLSD Docket 05/09/2019 Page 96 of 98
Confidential - Subject to Further Confidentiality Review

```
 1                      - - - - - -

 2                    E R R A T A

 3                      - - - - - -

 4    PAGE    LINE    CHANGE

 5    _____   _____   _____

 6       REASON: _____

 7    _____   _____   _____

 8       REASON: _____

 9    _____   _____   _____

10       REASON: _____

11    _____   _____   _____

12       REASON: _____

13    _____   _____   _____

14       REASON: _____

15    _____   _____   _____

16       REASON: _____

17    _____   _____   _____

18       REASON: _____

19    _____   _____   _____

20       REASON: _____

21    _____   _____   _____

22       REASON: _____

23    _____   _____   _____

24       REASON: _____
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1641 of 3246
Case 1:1-cv-22408-MGC Document 23531 Entered on FLSD Docket 05/19/2011 Page 97 of
98
Confidential - Subject to Further Confidentiality Review

```
 1                ACKNOWLEDGMENT OF DEPONENT

 2

 3        I, _____, do hereby

 4   acknowledge that I have read the foregoing pages and

 5   that the same is a correct transcription of the answers

 6   given by me to the questions therein propounded, except

 7   for the corrections or changes in form or substance, if

 8   any, noted in the attached Errata Sheet.

 9

10

11   _____   _____

12   CASSANDRA MARIN                     DATE

13

14

15

16

17   Subscribed and sworn to before me this

18   ____ day of _____, 20___.

19   My Commission expires: _____

20

21   _____

     Notary Public

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1642 of 3246
Case 1:09-cv-07687-LAK Document 209-11 Filed 05/09/2011 Page 98 of 98
Confidential - Subject to Further Confidentiality Review

```
 1                        LAWYER'S NOTES

 2     PAGE    LINE

 3     _____   _____   _____

 4     _____   _____   _____

 5     _____   _____   _____

 6     _____   _____   _____

 7     _____   _____   _____

 8     _____   _____   _____

 9     _____   _____   _____

10     _____   _____   _____

11     _____   _____   _____

12     _____   _____   _____

13     _____   _____   _____

14     _____   _____   _____

15     _____   _____   _____

16     _____   _____   _____

17     _____   _____   _____

18     _____   _____   _____

19     _____   _____   _____

20     _____   _____   _____

21     _____   _____   _____

22     _____   _____   _____

23     _____   _____   _____

24     _____   _____   _____
```

# EXHIBIT A19

CONFIDENTIAL - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2

    EDUARDO AND CARMEN AMORIN,
 3  et al., individually, and
    on behalf of all others
 4  similarly situated,      Case No.: 1:11-CV-22408-MGC
 5

       Plaintiffs,
 6
    -vs-
 7

    TAISHAN GYPSUM CO., LTD.,
 8  f/k/a SHANDONG TAIHE
    DONGXIN CO., LTD.; TAIAN
 9  TAISHAN PLASTERBOARD CO.,
    LTD., et al.,
10
       Defendants.
11  _____/
12
                CONFIDENTIAL - SUBJECT TO FURTHER
13                  CONFIDENTIALITY REVIEW
14                       -  -  -
15                  JANUARY 10, 2019
16      Deposition of YVETTE MARIN, held at 515 North
    Flagler Drive, Suite 2125, West Palm Beach, Florida
17  33401, commencing at 2:38 p.m. on the above date before
    Barbie Gallo, Registered Merit Reporter - Certified
18  Realtime Reporter.
                         -  -  -
19
20
21
22
                 Stenographically Reported By:
23                  Barbie Gallo, RMR-CRR
                  GOLKOW TECHNOLOGIES, INC.
24        877.370.3377 ph | 917.591.5672 fax
                    deps@golkow.com
25
```

Case 2:09-md-02047-EEF-MBN  Document 22363-39  Filed 11/19/19  Page 1645 of 3246
Case 1:11-cv-22408-NGG  Document 00-1  Entered on FLSD Docket 05/08/2015  Page 9 of
66
Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:

 2

      On behalf of the Plaintiffs:
 3        ALLISON GRANT, P.A.
          14 Southeast 4th Street
 4        Boca Raton, Florida 33432
          (561)994-9646
 5        BY:  ALLISON GRANT, ESQUIRE
          agrant@allisongrant.com
 6

 7        LEVIN, SEDRAN & BERMAN, LLP
          510 Walnut Street
 8        Suite 500
          Philadelphia, Pennsylvania 19106
 9        (215)592-1500
          BY:  KEITH J. VERRIER, ESQUIRE
10        kverrier@lfsblaw.com

11

12    On behalf of the Defendants Taishan Gypsum Co., Ltd.,
      and Taian Taishan Plasterboard Co., Ltd.:
13        ALSTON & BIRD, LLP
          One Atlantic Center
14        1201 West Peachtree Street
          Atlanta, Georgia 30309-3424
15        (404)882-7000
          BY:  MICHAEL J. BARRY, ESQUIRE
16        mike.barry@alston.com
          (via telephone)
17

18    On behalf of the Defendant Beijing New Building
      Materials PLC:
19        ORRICK, HERRINGTON & SUTCLIFFE, LLP
          The Orrick Building
20        405 Howard Street
          San Francisco, California 94105-2669
21        (415)773-5545
          BY:  DAN GUERRA, ESQUIRE
22        dguerra@orrick.com

23

24

25
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1646 of 3246
Case 1:13-cv-02489-NGG Document 05-11 Attachment FILED UNDER SEAL 05/08/2049 Page 9 of
66
Confidential - Subject to Further Confidentiality Review

```
 1                    INDEX OF PROCEEDINGS
     WITNESS:                                   PAGE
 2
                  E X A M I N A T I O N S
 3
     YVETTE MARIN                                PAGE
 4    DIRECT EXAMINATION                            5
       BY MR. BARRY
 5    CROSS-EXAMINATION                            60
       BY MR. GUERRA
 6   CERTIFICATE OF OATH                           62
     CERTIFICATE OF REPORTER                       63
 7   ERRATA SHEET                                  64
 8
                     E X H I B I T S
 9
     NUMBER              DESCRIPTION             PAGE
10   Exhibit 6      Sale & Purchase Agreement S.W.   14
                    3865 Wycoff $270,000
11   Exhibit 16     Accurate Home Inspections of     21
                    South Florida, Inc. Inspection
12                  Report by Scott Keiper 8/26/09
     Exhibit 19     Domestic Air Conditioning,       25
13                  Inc. Invoices 8100, 8155;
                    ProMag Energy Group Invoice
14                  012564
     Exhibit 27     9/11/13 CRS PowerTool Real       27
15                  Estate Comparative Market
                    Analysis
16   Exhibit 12     10/28/09 Chinese Drywall         37
                    Screening, LLC Property
17                  Screening Report by Tim Zorc
     Exhibit 4      First Amended Supplemental       47
18                  Plaintiff Profile Form
     Exhibit 24     Michelle Franklin, CFA - Saint   53
19                  Lucie County Property
                    Appraiser Property
20                  Identification
     Exhibit 29     Plaintiff Cassandra Marin's      56
21                  Response to Defendants'
                    Interrogatories
22   Exhibit 32     Plaintiff Cassandra Marin's      58
                    Response to Defendants' Second
23                  Set of Interrogatories
24
25
```

```
 1    Thereupon,

 2    the following proceedings began at 2:38 p.m.:

 3                        *   *   *

 4         MR. BARRY:  Ms. Marin, my name is

 5         Michael Barry, and I represent Taishan.  And I

 6         would ask that everybody in the room just

 7         introduce themselves so we know who all is

 8         there, and then we can kind of start along with

 9         this deposition.

10         MR. GUERRA:  My name is Dan Guerra, and I

11         represent a different defendant in this lawsuit,

12         Beijing New Building Materials, public limited

13         company.

14         MS. GRANT:  Allison Grant on behalf of the

15         plaintiff, Cassandra Marin.

16         MR. VERRIER:  Keith Verrier from Levin,

17         Sedran & Berman in Philadelphia on behalf of the

18         plaintiffs.

19         THE COURT REPORTER:  If you would, ma'am,

20         raise your right hand, and I'll swear you in.

21         Do you swear or affirm that the testimony you're

22         about to give in this matter will be the truth,

23         the whole truth and nothing but the truth so

24         help you God?

25         THE WITNESS:  I do.
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1648 of 3246
Case 1:14-cv-02494-NGG Document 299-11 Filed 05/22/2015 Page 46 of 66
Confidential - Subject to Further Confidentiality Review

```
 1              THE COURT REPORTER:  Thank you.

 2   THEREUPON,

 3                   YVETTE MARIN,

 4   Being by me first duly sworn to tell the whole truth,

 5   as hereinafter certified, testified as follows:

 6                   DIRECT EXAMINATION

 7   BY MR. BARRY:

 8       Q.    Ms. Marin, I am going to walk you through a

 9   little bit of the rules of the road of the deposition.

10   I guess my first question for you before we start on

11   that is, have you ever sat for a deposition before?

12       A.    Not that I can recall, no.

13       Q.    Have you ever seen one before?  Did you ever

14   go attend one where someone else is being deposed?

15       A.    No.

16       Q.    Okay.  Well, I know your lawyer has probably

17   talked to you a little about this.  We -- I'm going to

18   ask you questions, and I'm going to try to ask them as

19   clearly and crisply as possible.  It is particularly

20   important, specifically since we're on the phone, that

21   you wait for me to finish the question, even if you

22   know and can anticipate exactly what I'm going to say,

23   which is going to be a lot of the times.  We need to

24   make sure that we have the full question asked so that

25   the court reporter is able to take it down.  After I
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1649 of 3246
Case 1:14-cv-02494-NGG-MDG Document 89-11 Filed 08/08/19 Page 2649 of
66
Confidential - Subject to Further Confidentiality Review

```
 1    finish asking the question I'm going to stop talking

 2    and hope that you answer it.  And I will wait for you

 3    to complete your answer.  It's really important, again,

 4    especially because we're on the phone, that we don't

 5    speak over each other.

 6            It is also important that all of your

 7    answers are audible.  So even though if you can answer

 8    yes or no and want to nod your head "yes" or "no," I

 9    need to make sure that you are answering it in an

10    audible way so that the court reporter can write it

11    down.  She can't write down anything that you do to

12    nod your head or shake your head.

13            Another important part of what we're going

14    to do today is when I'm asking questions, there are

15    going to be certain questions that I ask that are

16    unclear or you're not sure what I'm saying or I'm

17    getting ahead of myself.  Don't hesitate to stop me.

18    Don't hesitate to say, "I don't know what you're

19    saying; I don't understand; could you clarify,"

20    anything like that.  I am perfectly happy to rephrase

21    my question or ask other questions that make it easier

22    to understand what I'm saying.

23            There's also going to be times that --

24    there's also going to be points where your lawyer is

25    going to make objections.  Most of those objections are
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1650 of 3246
Case 1:18-cv-12408-NGG Document 1-4 filed 12/19/18 Page 1650 of 3246
Confidential -- Subject to Further Confidentiality Review
66

1  ones where she's going to be fine with you answering

2  the question -- answering the question, but there are

3  going to be a few times where she's going to instruct

4  you not to answer.  My one request is that if she is

5  making an objection, don't try to speak over her so

6  that we can make sure the court reporter gets

7  everything down.

8          And then the last part of this is I'm going

9  to take breaks once every once in a while.  I want to

10  make sure you take breaks when you need one.  I can't

11  see your face, so I don't know if you're getting tired

12  or anything like that or if you need to run to the

13  restroom or grab a glass of water.  Any time you need

14  to take a break, don't hesitate to let me know that

15  you want to do so, and I'm happy to do so.  The only

16  request I have is that if you could please answer the

17  question on the table so that we make sure nothing is

18  pending before the break.

19          With that, I'm going to start on a few just

20  kind of background questions.  Do you understand that

21  you've been sworn under oath and that you must tell the

22  truth as if you were testifying in court and the judge

23  were sitting right there?

24      A.    Yes.

25      Q.    Ms. Marin, are you taking any medications

```
 1   that might impair your ability to understand my

 2   questions and to answer truthfully and fully?

 3       A.    No.

 4       Q.    Now, where -- how did you prepare for this

 5   deposition?

 6       A.    What exactly do you mean?

 7       Q.    What did you do?  Did you talk to anybody?

 8   Did you meet with anybody?  Did you review any

 9   documents?

10       A.    I spoke to my attorney.

11       Q.    And what did you and your attorney speak

12   about?

13       A.    We --

14             MS. GRANT:  I'm going to object,

15         attorney-client privilege.

16             MR. BARRY:  That privilege was waived at the

17         last deposition.

18             MS. GRANT:  Wait, wait.  I'm not done.  One

19         second.  I'm not done.

20             Yvette Marin is Cassandra Marin's agent and

21         has been privy to confidential communications

22         which were necessary to facilitate and in

23         furtherance of representing Cassandra Marin, so

24         in that respect I'm going to --

25             MR. BARRY:  And I --
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/10 Page 1652 of 3246
Case 1:09-cv-02049-CA Document Lorem Ipsum Sub-Packet 05/09/2012 Page 40 of
66
Confidential - Subject to Further Confidentiality Review

```
 1          MS. GRANT:  Wait, wait.  I'm not done.

 2          MR. BARRY:  And I hear that objection.

 3          MS. GRANT:  Mike, give me a second.

 4          MR. BARRY:  You're not done?

 5          MS. GRANT:  Mike, please give me a second to

 6     finish.

 7          To that extent --

 8          MR. BARRY:  Yeah, absolutely.

 9          MS. GRANT:  -- I'm going to instruct you not

10     to answer.  But beyond that, if there's

11     something else, you are free to answer.

12          THE WITNESS:  Okay.

13          MS. GRANT:  Okay.  Go ahead.

14          MR. BARRY:  Are you still going?

15          MS. GRANT:  No, I'm done.

16          MR. BARRY:  Well, and I appreciate that

17     objection, Allison.  You know, I believe the

18     case law says otherwise on that, and but anyway,

19     at the last deposition Miss Woranga (phonetic)

20     did not instruct the witness not to answer, so

21     regardless of whether that argument is true or

22     not, the witness waived the privilege and that

23     she is -- we are entitled to examine her on her

24     meetings with counsel related to the deposition.

25          MS. GRANT:  I disagree and will instruct
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/10 Page 1653 of 3246
Case 1:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/10 Page 1653 of 3246
Confidential - Subject to Further Confidentiality Review
66

```
 1          Mrs. Yvette Marin not to answer.

 2              You may continue.

 3              MR. BARRY:  Well, we will reserve that for

 4          the end.  We may need to contact the court

 5          because it's a pretty crisp and clear record

 6          that from Ms. Marin, Ms. Cassandra Marin's

 7          deposition that the privilege has been waived.

 8          But we'll come back to that at the end so we can

 9          go through the rest of the deposition.

10  BY MR. BARRY:

11      Q.   Ms. Marin, where are you currently employed?

12      A.   St. Mary's Hospital.

13      Q.   And what's your employment there?

14      A.   I'm a registered nurse.

15      Q.   And how long have you been a registered

16  nurse?

17      A.   About 19 years now.

18      Q.   And what -- do you have any other jobs?  Are

19  you employed doing anything other than being a nurse?

20      A.   I am a real estate agent also.

21      Q.   And how long have you been a real estate

22  agent?

23      A.   Over 20 years.

24      Q.   And do you work independently?  Do you work

25  with any type of real estate agency?
```

Case 2:09-md-02047-EEF-MBN Document 23263-39 Filed 11/19/20 Page 1654 of 3246
Case 1:19-cv-00484-WCG Document 22362-39 Filed 05/08/2024 Page 40 of 66
Confidential – Subject to Further Confidentiality Review

```
 1      A.     As an agent I work under Continental

 2   Properties.

 3      Q.     And what type of properties do you sell?

 4      A.     Mainly residential.

 5      Q.     And do you do that consistently or is that

 6   something you do, you know, every once in a while

 7   that's not a consistent job?

 8      A.     Once in a while.

 9      Q.     Are you married?

10      A.     Yes, I am.

11      Q.     And who are you married to?

12      A.     Carlo Marin.

13      Q.     And do you have any children?

14      A.     Yes, I do.

15      Q.     How many children do you have?

16      A.     Two.

17      Q.     What are your children's names?

18      A.     Karl, K-a-r-l, Marin and Cassandra Marin.

19      Q.     And how old is Karl?

20      A.     35.

21      Q.     Have you ever been involved in a lawsuit

22   before?

23      A.     No.

24      Q.     Have you ever been sued before?

25      A.     No.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1655 of 3246
Case 1:1-md-000xxGxxx Document Caption SSn Filed xxx Docket 05/09/19 Page 46 of
66
Confidential - Subject to Further Confidentiality Review

```
 1      Q.     And you've never, other than this lawsuit,

 2   of course, you've never sued anyone before?

 3      A.     No.

 4      Q.     Now, we are going to be discussing a little

 5   bit about some of the subjects that we talked about

 6   with your daughter, Cassandra Marin, the other day.

 7   And on a lot of occasions Ms. Marin deferred to you,

 8   and I will say Ms. Cassandra Marin deferred to you and

 9   said that you'd have better knowledge of what we're

10   discussing, and so I appreciate you coming in quickly

11   to be able to do that.

12             Now, what is the address that Ms. Cassandra

13   Marin has alleged to be damaged by Chinese drywall?

14      A.     Hang on.  It's been a while.

15             3865 Southwest Wycoff Street, Port St.

16   Lucie, Florida 34953.

17      Q.     And were you an owner of that property?

18      A.     I'm sorry?

19      Q.     Did you own that property?

20      A.     Well, her name was on the property, but it

21   was my money that purchased the property.

22      Q.     Why did you put -- and you said "Her name

23   was on the property."  Was it Ms. Cassandra Marin's

24   name who's on the property?

25      A.     Yes.
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1656 of 3246
Case 1:12-cv-01349-MGC Document 23361-1 Entered on FLSD Docket 05/19/2019 Page 461 of 66
Confidential - Subject to Further Confidentiality Review

1    Q.    And why did you put her name on the

2  property?

3    A.    Well, my husband and I decided to do that.

4  She's our daughter.  Just in case anything happened,

5  then there wouldn't be any issue.  The property would

6  go to her.

7    Q.    Did Ms. Cassandra Marin ever pay any money

8  toward the property?

9    A.    No.

10    Q.    And what was the purchase price of the

11  property?

12    A.    Hold on.

13        MR. GUERRA:  And, Mike, you should know

14      she's referring to documents to answer that

15      question.

16    A.    It was $270,000.

17  BY MR. BARRY:

18    Q.    Yes.  And, Ms. Marin, I know I have

19  documents in front of you, and that's just for the ease

20  of our ability to be able to provide them to you since

21  I'm over the phone.  And I'd ask that you don't review

22  documents unless they've been introduced to you as an

23  Exhibit.  I've, you know -- I will be putting documents

24  in front of you that remind you, but if you don't

25  remember something off the top of your head, which is

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1657 of 3246
Case 1:09-cv-07628-GAD Document 2 Filed 11/01/19 Page 45 of 66
Confidential - Subject to Further Confidentiality Review

 1    fine, please feel free to answer and say, "I don't

 2    remember."  And then that is my obligation to be able

 3    to provide you with a document that might help you

 4    refresh your recollection.

 5        A.    Okay.

 6        Q.    So please do not review those documents that

 7    are directly in front of you.  But on that note, I'm

 8    going to be introducing as Exhibit 1 -- and every time

 9    I'm putting a document in front of you I'm going to be

10    asking that your counsel is okay with the document

11    being put in front of you, so I would ask that your

12    counsel first review the document.  After that, the

13    court reporter will mark it as an Exhibit, at which

14    point I ask that you take as much time as you need to

15    review it.  I'm not going to be asking you about the

16    entire document in most instances.  But I ask that you,

17    you know, make sure that you're comfortable with it so

18    that any questions I ask you you're able to answer.

19    Once I start asking you questions, you're more than

20    welcome to say, "Stop, I need to look over this."

21            I'm going to introduce an Exhibit that is at

22    Tab 6.

23        (Defendant's Exhibit Number 6 for i.d.)

24    BY MR. BARRY:

25        Q.    Do you have Exhibit 6 in front of you?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1658 of 3246
Case 1:11-cv-22408-MGC Document 103 Entered on FLSD Docket 05/09/2012 Page 46 of
66
Confidential - Subject to Further Confidentiality Review

```
 1      A.    Yes.

 2      Q.    And what is the purchase price listed on

 3  Exhibit 6?

 4            MR. GUERRA:  Mike, hold on one second.  Can

 5       we go off the record one second?

 6            MR. BARRY:  Okay.  Yes.

 7       (A discussion was held off the record.)

 8  BY MR. BARRY:

 9      Q.    So Exhibit 6, which is at Tab 6 in your

10  binder, is -- have you seen this document before?

11      A.    Yes.

12      Q.    And what is this document?

13      A.    It's a Purchase Agreement.

14      Q.    And is it a Purchase Agreement for the

15  property that we're discussing --

16      A.    Yes.

17      Q.    -- that's been damaged by Chinese drywall?

18      A.    Oops.

19            Yes.

20      Q.    And earlier you said that the purchase price

21  is $270,000.  Is that reflected on this document?

22      A.    Yes.

23      Q.    And now you said you paid the $270,000.  How

24  did you finance the paying $270,000 for the house?

25      A.    It was purchased cash.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1659 of 3246
Case 1:11-cv-03094-TCB Document 208-1 entered on FLSD Docket 05/18/2019 Page 66 of 66
Confidential - Subject to Further Confidentiality Review

```
 1     Q.    Did you pay that out of your bank account?

 2     A.    Yes.

 3     Q.    Do you currently own that property?

 4     A.    No.

 5     Q.    When did you sell that property?

 6     A.    I believe it was sometime in 2012.  I don't

 7   remember exactly the month.

 8     Q.    Did you -- when you sold the property, do

 9   you recall how much you sold it for?

10     A.    I believe it was $81,000.

11     Q.    And when you received that 81,000, whatever

12   the amount was, was that money transferred to you

13   personally?

14     A.    Yes.

15     Q.    Did you provide any of that money to your

16   daughter?

17     A.    No.

18     Q.    Was your -- when you were deciding to sell

19   the property, was your daughter at all involved in the

20   sale of the property?

21     A.    Well, she had to be since her name was on

22   the property.  She had to sign the sales agreement,

23   yes.

24     Q.    So was her involvement limited to signing

25   the sales agreement?
```

Case 2:09-md-02047-EEF-MBN Document 23263-39 Filed 11/19/19 Page 1660 of 3246
Case 1:19-md-02047-GAO Document 1 confidential Subject to Further Confidentiality Review of 66
Confidential - Subject to Further Confidentiality Review

```
 1      A.    Yes.

 2      Q.    Did she ever speak to the Realtor?

 3      A.    I believe, yes.

 4      Q.    Were you the primary person dealing with the

 5   Realtor?

 6      A.    Yes.

 7      Q.    And I guess, taking a step back on that

 8   question, did you hire a Realtor or did you try to sell

 9   it yourself, since I know you're a real estate agent?

10      A.    I hired someone.

11      Q.    Did you ever take a mortgage on the house or

12   any other type of loan on the house?

13      A.    No.

14      Q.    During the time you -- from the time you

15   purchased the property in, what was it, 2006, 2007 to

16   the time which you sold it in 2012, did you live in the

17   property that entire time?

18            MS. GRANT:  Mike, I'm going to object to the

19         extent that you keep saying "you," you know,

20         when "you" purchased, when "you" sold.  And

21         Ms. Yvette Marin is not the one on the title, so

22         it's just a point of clarification.

23            MR. BARRY:  That is a fair clarification.

24   BY MR. BARRY:

25      Q.    Ms. Marin, during the time at which point
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1661 of 3246
Case 1:07-cv-09803-MGC Document 22363-39 Filed in Docket 05/09/2019 Page 40 of
66
Confidential - Subject to Further Confidentiality Review

```
1    your daughter owned the property, did you live in the

2    property the entire period of time?

3         A.    Yes.

4         Q.    Did anyone else live there with you?

5         A.    Yes, my husband.  My son lived there for a

6    while, and my nephew, I believe, was there on my

7    husband's side.

8         Q.    Did your daughter, Cassandra, live there?

9         A.    At the time, she was away, away in college.

10   She would come home for breaks and stuff, and she did

11   live there for a period of, I believe, maybe seven

12   months when she graduated before she moved away again.

13        Q.    When did -- when did Cassandra Marin

14   graduate?  I don't need the exact date, but, you know,

15   roughly.  Spring of 2011?  Fall of 2010?  Something

16   along those lines?

17        A.    Yeah, 2011, I think.  I don't remember

18   exactly.

19        Q.    And you said she'd come home for breaks.

20   Would she come home for every break?  Did she sometimes

21   go on vacation with friends?

22        A.    I don't know.  I can't remember.  But she --

23        Q.    I understand, ma'am.  Did she come home for

24   summer break?

25        A.    Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1662 of 3246
Case 1:11-cv-22408-MGC Document 236-39 Filed on FLSD Docket 05/09/2017 Page 49 of
66
Confidential - Subject to Further Confidentiality Review

```
 1      Q.      Was there ever a summer where she took

 2   courses instead of coming home?

 3      A.      Took courses how?  I don't understand what

 4   you mean.

 5      Q.      You don't remember?

 6      A.      I'm not sure what you're asking.

 7      Q.      Was there ever a summer like a summer break

 8   at the school where she took courses and did not come

 9   home so she was living on campus?

10      A.      Maybe.  I can't remember.

11      Q.      Okay.  Was -- you said your son lived at the

12   property.  Did he live at the property the entire time

13   in which Ms. -- in which your daughter owned the

14   property?

15      A.      No.  At some point he got married and then

16   he moved out.

17      Q.      Do you remember when he got married and

18   moved out?

19      A.      No.

20      Q.      Did anyone ever rent the house from you?

21      A.      No.

22      Q.      Did your son ever pay rent to you for the

23   house?

24      A.      No.

25      Q.      Do you own any other properties?
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1663 of 3246
Case 1:19-cv-00248-MAC Document 2 Exhibit on File Docket 05/08/2009 Page 46 of
Confidential - Subject to Further Confidentiality Review
66

```
 1      A.    Now?

 2      Q.    Now, yes.

 3      A.    Yes, I do.

 4      Q.    What property is that?

 5      A.    4402 Lake Tahoe Circle, West Palm Beach,

 6   33409.

 7      Q.    And during the time in which Ms. Cassandra

 8   Marin owned the property in question, did you own any

 9   other properties?

10      A.    No, I did not.

11      Q.    Did your husband own any other properties?

12      A.    No.

13      Q.    Did your son own any other properties?

14      A.    No.

15      Q.    Do you know if Ms. Cassandra Marin owned any

16   other properties?

17      A.    No.

18      Q.    During the time you lived in the property,

19   did you make any renovations to it?

20      A.    No.

21      Q.    Now, when you purchased the property, did

22   you know that Chinese drywall was in the house?

23      A.    No.

24      Q.    When did you learn that Chinese drywall was

25   in the house?
```

Confidential - Subject to Further Confidentiality Review

```
 1      A.    I found out when I put the property for sale
 2  and we did a home inspection, and on that inspection
 3  there was evidence there might be Chinese drywall.
 4      Q.    Do you remember when that was?
 5      A.    No.
 6      Q.    What did you do when you learned that there
 7  was Chinese drywall in the house?
 8      A.    I believe I did some research online about
 9  Chinese drywall because I didn't know much about it,
10  and that's when, I think, I came upon the attorney, and
11  then I called them and I spoke to them about it.
12      Q.    Why were you trying to sell the house?
13      A.    I wanted to move back to Palm Beach County.
14      Q.    Was there any other reason that you were
15  trying to sell the house?
16      A.    No.
17      Q.    If you could turn to Tab 16, which we'll
18  mark as Exhibit 16, in light of counsel's acceptance of
19  the Exhibit...
20          MS. GRANT:  Yes.
21      (Defendant's Exhibit Number 16 for i.d.)
22  BY MR. BARRY:
23      Q.    Is this the inspection report that you were
24  referencing earlier?
25      A.    Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1665 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 43 of
66
Confidential - Subject to Further Confidentiality Review

```
 1     Q.    And so if you turn to page 2 of the

 2  document, it says that the date of this is 8-26-2009.

 3  Is that when you learned of Chinese drywall?

 4     A.    Yes.

 5     Q.    And what happened after the potential buyer

 6  learned that Chinese drywall was in the house?

 7     A.    Well, when the selling agent found out, I

 8  guess he or she told the buyer and the buyer canceled

 9  the contract.

10     Q.    I apologize.  I couldn't hear what you said

11  there.  Do you mind repeating yourself?

12     A.    Yes.  I said when the selling agent found

13  out that the property -- there was evidence of Chinese

14  drywall, I guess they told the buyer, and then the

15  contract was canceled.

16     Q.    Okay.  Are you a party to this lawsuit?

17     A.    What does that mean?

18     Q.    Are you trying to sue any of the

19  manufacturers of Chinese drywall?

20     A.    Yes.

21     Q.    Are you?  Are you making a claim in this

22  lawsuit, or is your daughter making a claim in this

23  lawsuit?

24           MS. GRANT:  Object to form.

25
```

Case 2:09-md-02047-EEF-MBN Document 23263-39 Filed 11/19/19 Page 1666 of 3246
Case 1:09-cv-04148-McGL Document 20811 Confidential - Subject to Packet 05/19/19 Page 421 of
Confidential - Subject to Further Confidentiality Review
66

```
 1   BY MR. BARRY:

 2       Q.    Do you have any understanding of whether you

 3   are making a claim in this lawsuit?

 4       A.    Is there a difference?  I don't understand.

 5       Q.    I'm asking of your understand -- if you

 6   don't have an understanding of it one way or the other,

 7   then please let me know that.  Do you have an

 8   understanding of whether you are a plaintiff making a

 9   claim in this lawsuit?

10       A.    Well, from my understanding, my daughter's

11   name is on the property, but I put up the money to buy

12   the property.  I feel like the property is mine,

13   although my name is not on it.  So if you're asking, I

14   guess legally I'm not the claimant you call it, but I

15   feel like the property -- the property is mine because

16   I bought it with my money.  I guess I am.

17       Q.    Okay.  That is your understanding?

18       A.    Yes.

19       Q.    Okay.  Do you know who installed the drywall

20   in the house?

21       A.    I don't remember off the top of my head.

22       Q.    Okay.  Do you know if the drywall was

23   installed before or after you moved into the home?

24       A.    Before.

25       Q.    Before you had learned that there was
```

Confidential - Subject to Further Confidentiality Review

1    Chinese drywall in the house, had you experienced any

2    difficulties that you attribute to Chinese drywall?

3              MS. GRANT:  Object to form.  You can answer.

4    A.    No.

5    BY MR. BARRY:

6    Q.    Had you -- before you learned that there was

7    Chinese drywall in the house, had you smelled any odor

8    in the house?

9    A.    Not that I can recall.

10   Q.    Before you learned that there was Chinese

11   drywall in the house, had any of the electrical

12   appliances in your house had any disrepair?

13   A.    We had some issues with the air condition

14   several times.

15   Q.    What were those issues?

16   A.    It just kept freezing, it kept breaking

17   down.  As far as I know, that was about it, the air

18   condition.

19   Q.    Did you have to repair the air conditioning?

20   A.    Yes.

21   Q.    And when you repaired the air conditioning,

22   were you the one calling the company to come repair it?

23   A.    Yes.

24   Q.    Did you pay the air conditioning repairman?

25   A.    I did.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1668 of 3246
Case 1:09-md-02047-GAO Document 22361-39 Filed 11-19/10 Page 25 of 66
Confidential - Subject to Further Confidentiality Review

```
 1      Q.    Did your daughter, Ms. Cassandra Marin, ever

 2   repay you for the air conditioning repairs?

 3      A.    No.

 4      Q.    Do you remember roughly how many times you

 5   had to repair the air conditioning?

 6      A.    No, I don't.

 7      Q.    Did the air conditioning repairman ever tell

 8   you that the issues were attributable to Chinese

 9   drywall?

10      A.    No.

11      Q.    Now, if you turn to Tab 19, which we'll mark

12   as Exhibit 19, and do you recognize this document,

13   Mrs. Marin?

14      A.    Yes.

15      (Defendant's Exhibit Number 19 for i.d.)

16   BY MR. BARRY:

17      Q.    What is this document?

18      A.    It's an invoice for an air condition

19   company.

20      Q.    Are these the instances in which you had

21   to --

22      A.    Yes.

23      Q.    -- have the air conditioning repaired?

24      A.    Yes.

25      Q.    Were there any other instances?
```

Case 2:09-md-02047-EEF-MBN Document 23263-39 Filed 11/19/19 Page 1669 of 3246
Case 1:09-md-02047-EEF-MBN Document 23263-39 Filed 11/19/19 Page 49 of 66
Confidential - Subject to Further Confidentiality Review

```
 1      A.    I believe there were more.

 2      Q.    Okay.  Do you have receipts for those other

 3   instances?

 4      A.    No.

 5      Q.    Okay.  So we have three receipts, but there

 6   may have been more at times.  You're testifying that

 7   there were other times at which times -- at which point

 8   you repaired the air conditioning; is that correct?

 9      A.    Yes.

10      Q.    Was there ever a point at which you didn't

11   have air conditioning in the house where the air

12   conditioning didn't work entirely?

13      A.    Yes.

14      Q.    And how long were those periods of time?

15      A.    I remember specifically there was a whole

16   weekend when I had family from out of town, and we had

17   no air condition.  I would say a whole weekend, three

18   days.

19      Q.    Was there ever a time where it lasted longer

20   than a week?

21      A.    I can't remember.

22      Q.    Okay.  Did you -- I know you said you didn't

23   notice any odor before you learned that Chinese drywall

24   was in the house.  Did you notice the odor after you

25   learned there was Chinese drywall in the house?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1670 of 3246
Case 1:11-cv-22408-MGC Document 231-1 Entered on FLSD Docket 05/11/2012 Page 48 of
66
Confidential - Subject to Further Confidentiality Review

```
 1      A.    No.

 2      Q.    Did you ever notice an odor in the house?

 3      A.    I -- no.

 4      Q.    Could you turn to Tab 27, which we will mark

 5   as Exhibit 27?

 6      (Defendant's Exhibit Number 27 for i.d.)

 7   BY MR. BARRY:

 8      Q.    And I'll represent this is two pages of

 9   documents that are marked addendum.  Both are titled

10   addendum.  Have you seen this document before,

11   Mrs. Marin?

12      A.    Yes.

13      Q.    What is this document?

14      A.    It's an addendum.

15      Q.    What is it an addendum to?

16      A.    It's -- I guess it's me describing my

17   experience living in the property.

18      Q.    Okay.  Did you sign this addendum?

19      A.    No.

20      Q.    Did you draft this addendum?

21      A.    I did.

22      Q.    Okay.  Who is this addendum signed by?

23      A.    Cassandra Marin.

24      Q.    Now here it says, "My mother was having a

25   severe migraine.  My brother developed allergies all of
```

Case 2:09-md-02047-EEF-MBN Document 23263-39 Filed 11/19/19 Page 1671 of 3246
Case 1:09-cv-02062-MGC Document 1 Entered on FLSD Docket 05/19/2011 Page 46 of 66
Confidential - Subject to Further Confidentiality Review

1   a sudden."

2          Did you ever suffer severe migraines while

3   you were in the house?

4      A.   Yes.

5      Q.   Are you seeking damages for personal injury

6   in this lawsuit?

7      A.   I'll let my attorney answer that.  I don't

8   think so.

9      Q.   Okay.  Okay.  So did you draft this document

10  for your daughter to sign?

11     A.   I did it, yes.

12     Q.   And why did you have your daughter sign this

13  and not you?

14     A.   I think I misunderstood because she was --

15  her name was on the property.  That's why I had her

16  sign it.

17     Q.   No, understood.

18          Now, if you turn to the second page here,

19  what is this document?

20     A.   It states that, "In reference to the sale of

21  the above property, on February 17, the buyer,

22  John O. Jones of Pauley Drywall and Construction, LLC,

23  understands and agrees that the seller,

24  Cassandra Marin, will retain the exclusive right to

25  bring Chinese drywall related claims."

Case 2:09-md-02047-EEF-MBN Document 23263-39 Filed 11/19/19 Page 1672 of 3246
Case 1:09-cv-02348-GLR Document 228 Entered on FLSD Docket 05/09/2012 Page 30 of
66
Confidential - Subject to Further Confidentiality Review

```
 1       Q.    Is it your understanding that

 2   Cassandra Marin has the exclusive right to bring

 3   Chinese drywall related claims?

 4           MS. GRANT:  Object to form and to the extent

 5       that it calls for a legal conclusion.

 6   BY MR. BARRY:

 7       Q.    You can answer.

 8       A.    Yes.

 9       Q.    Do you know if these addenda, these two

10   together were attached to the real estate sales

11   contract in February 2017 -- or 2012?

12       A.    If they were attached?

13           MS. GRANT:  I'm sorry, Mike.  Can you

14       rephrase that or can you state that again?

15           MR. BARRY:  Sure.

16   BY MR. BARRY:

17       Q.    You've -- I'm correct that you sold the

18   property, or Ms. Cassandra Marin sold the property in

19   2012; is that correct?

20       A.    Yes.

21       Q.    When you -- when Ms. Cassandra Marin signed

22   the contract to sell the property, were these

23   addendums, these addenda provided with that contract?

24       A.    I don't think so.

25       Q.    Okay.  Usually addenda are attached to
```

Confidential - Subject to Further Confidentiality Review

```
1    something.  I'm just trying to figure out what these

2    were attached to, whether it was with the contract or

3    if it was just labeled addenda and it's not necessarily

4    attached to anything.

5              MS. GRANT:  And, Mike, I'm going to, again,

6         renew that objection to the extent that we're

7         dealing with, I guess, legal conclusions or

8         characterizations.  Okay?

9              MR. BARRY:  Yeah, no, I'm just trying to

10        understand where this was attached.  That was

11        more my own statement of it.  I'm just trying to

12        understand and explain my question.

13   BY MR. BARRY:

14        Q.    Do you know when your daughter,

15   Cassandra Marin, signed these two addenda?

16        A.    They have no dates on them.  I can't tell

17   you exactly when.

18        Q.    Did you send these to your daughter and ask

19   her to sign them?

20        A.    Did I send them to her?

21        Q.    Yes.

22        A.    She was there when the property -- she had

23   to be there when the property was sold.

24        Q.    Okay.  So you probably -- did you have her

25   sign it when you were selling the property?
```

Confidential - Subject to further confidentiality Review

```
 1     A.    Probably.

 2           MS. GRANT:  And I'm also going --

 3           MR. BARRY:  So --

 4           MS. GRANT:  Wait, Mike.  I'm sorry.  I'm,

 5     again, going to object to the form.  I think

 6     you're assuming that these are the same, that

 7     these were done at the same time and for the

 8     same purpose, and that may not be the case.  I

 9     don't want to testify, but -- and if you were

10     here, we would go off the record, but... they

11     may be for completely different purposes and

12     different times, so go ahead.

13           MR. BARRY:  I'll ask the question

14     separately.

15  BY MR. BARRY:

16     Q.    Do you know if these documents were signed

17  at the same time?

18     A.    I don't think so.

19     Q.    When do you think these documents -- which

20  one do you think was signed first or before the other?

21     A.    I don't know.

22     Q.    So why do you think these documents were not

23  signed at the same time?

24           MS. GRANT:  Object to form.  Renew the same

25     objection.
```

Case 2:09-md-02047-EEF-MBN Document 23263-39 Filed 11/19/19 Page 1675 of 3246
Case 1:14-cv-09148 McAI Document Confidential Subject to Page 05/09/2015 Page 33 of
Confidential – Subject to Further Confidentiality Review
66

1    BY MR. BARRY:

2        Q.    You can answer.

3        A.    Why?

4        Q.    Yeah.

5        A.    Well, actually I don't know, I don't know if

6    they were.

7        Q.    What makes you think these were signed at

8    the same time?

9        A.    I don't know if they were or not.

10       Q.    Sorry.  I apologize.  Do you mind repeating

11   yourself?  I was trying to rephrase my question to help

12   you out, but I couldn't hear you.

13       A.    I said I don't know if they were signed at

14   the same time or not.  I don't know.

15       Q.    Okay.  Understood.

16             How soon after learning of Chinese drywall

17   did you or your daughter hire an attorney?

18       A.    How soon?  I don't know.  A week, two weeks.

19   I can't pinpoint exactly.

20       Q.    That's fine.  That's a good enough timeframe

21   for me.  Once you or your daughter hired an attorney,

22   who was the primary person communicating with your

23   attorney?

24       A.    I was.

25       Q.    Did your daughter ever communicate with your

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1676 of 3246
Case 1:09-cv-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1676 of 3246
Confidential – Subject to Further Confidentiality Review
66

```
 1    attorneys?

 2        A.     Not much.

 3        Q.     How frequently were you communicating with

 4    the attorney?

 5               MS. GRANT:  I'm objecting.  Renewed

 6          objection regarding attorney-client privilege.

 7               MR. BARRY:  Excuse me?

 8               MS. GRANT:  I'm renewing my objection as I

 9          had stated earlier.  It's attorney-client

10          privilege.

11               MR. BARRY:  How frequently you're speaking

12          is not attorney-client privilege.

13               MS. GRANT:  Well, rephrase the question.  I

14          thought you had some substance in there.  Go

15          ahead.

16               MR. BARRY:  I said, "How frequently were you

17          speaking with your attorney?"

18               MS. GRANT:  Okay.  For just that question,

19          that's fine.  And during what -- I'm sorry.  I

20          apologize.  What timeframe are you speaking of,

21          Mike?

22               MR. BARRY:  From the time she hired her

23          attorney to today.

24        A.     Are you saying was it daily, monthly?  I

25    don't know.  Whenever we needed to.
```

Confidential - Subject to Further Confidentiality Review

1    BY MR. BARRY:

2        Q.    Okay.  Would you speak to your attorneys

3    every month?  Would you be speaking to them every week?

4        A.    I don't have a specified time.  It would --

5    it could be once a month if I needed to, two times a

6    month.

7        Q.    Over all, how many times would you say you

8    spoke to your attorneys?

9        A.    I don't know.  I can't --

10       Q.    Was it more than ten times?

11       A.    I can't give you a number.  Might have been.

12   I don't have an exact number to give you.

13       Q.    Was it -- was it more than ten times?

14             MS. GRANT:  Objection.  Asked and answered.

15   BY MR. BARRY:

16       Q.    She said she doesn't know exact number.  I'm

17   asking whether it was more than ten times.

18             MS. GRANT:  No.  I believe she said she

19        didn't know first.  Go ahead.

20       A.    I don't know.

21   BY MR. BARRY:

22       Q.    On the second page of the addendum or the

23   addenda, did you ask a buyer to sell this or sign this

24   addenda?

25             MS. GRANT:  And, Mike, I'm going to object

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1678 of 3246
Case 1:09-cv-02047-CAB Document 1 Confidential Subject to Further Confidentiality Review Page 36 of
66
Confidential – Subject to Further Confidentiality Review

```
 1          again.  I think it's just, you know, semantics,

 2          but the second page of this addenda, if we can

 3          refer to these as two separate documents, that's

 4          what they appear to be.

 5               MR. BARRY:  They were produced as one

 6          document.  If you want to stipulate they're two

 7          separate documents, we can do that.

 8               MS. GRANT:  It doesn't appear -- I don't

 9          want to call it the second page of the addenda.

10               MR. GUERRA:  What if we say the second page

11          of this Exhibit?

12               MS. GRANT:  Perfect.  Thank you.

13     BY MR. BARRY:

14          Q.   Second page of this Exhibit.

15               Did you ask the -- there -- so -- let me

16     take a step back here.  Who is Pauley Drywall and

17     Construction?

18          A.   The buyer.

19          Q.   And who is Linda Pauley?

20          A.   It's on there.  Managing member.  I guess

21     the manager of Pauley Drywall.

22          Q.   And who's John Jones?

23          A.   Must be another member of the corporation.

24     I don't -- I'm not sure.

25          Q.   Did you ever speak to John Jones or
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1679 of 3246
Case 1:09-cv-07666 Document 1 Entered on FLSD Docket 05/19/2017 Page 37 of
66
Confidential - Subject to Further Confidentiality Review

1    Linda Pauley?

2        A.    I spoke to Linda Pauley.

3        Q.    What did you and Linda Pauley speak about?

4        A.    What did we speak about specifically?

5        Q.    Yeah.

6        A.    I'm not sure we spoke about much.  Just to

7    sign the addendum, I guess, or the --

8        Q.    Did you ask Linda Pauley and John Jones to

9    sign the addendum?

10       A.    Yes.

11       Q.    Do you remember if your daughter was present

12   when they signed the addendum?

13       A.    No, I do not.

14       Q.    You don't remember or you -- you don't know

15   or she was not present?

16       A.    I do not remember if she was present.

17       Q.    Okay.  Now we talked a little bit about

18   there having been an inspection on the property, it

19   having failed.  Did you ever do an inspection related

20   to Chinese drywall?

21       A.    Yes.

22       Q.    Why did you do that inspection?

23       A.    After the home inspection was done, it

24   stated that it needed further inspection to determine

25   whether there was Chinese drywall.

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1680 of 3246
Case 1:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 38 of 66
Confidential - Subject to Further Confidentiality Review

```
 1      Q.    Who performed that inspection?

 2      A.    I don't remember the company's name.

 3      Q.    If you turn to Tab 12, which we'll mark as

 4  an Exhibit, do you recognize this document, Ms. Marin?

 5      A.    Yes.

 6      (Defendant's Exhibit Number 12 for i.d.)

 7  BY MR. BARRY:

 8      Q.    Does this help refresh your recollection of

 9  who did the inspection?

10      A.    Yes.

11      Q.    Who did the inspection?

12      A.    Chinese Drywall Screening, LLC.

13      Q.    Do you remember if you paid for that

14  inspection?

15      A.    I don't remember.

16      Q.    Were you at home when the inspection was

17  performed?

18      A.    Yes.

19      Q.    Did you speak to the inspectors while they

20  were conducting the inspection?

21      A.    I'm sure I did.

22      Q.    What did you discuss with the inspectors?

23      A.    This was done in 2009.  How many years is

24  that?  I have no idea.

25      Q.    I understand that.  I know I'm testing your
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/10 Page 1681 of 3246
Case 1:09-cv-07299-McGill Document 23363-39 Filed 11/19/10 Page 1681 of 3246
Confidential - Subject to Further Confidentiality Review
66

1    memory here.  And, you know, if you don't remember,

2    that's totally fine, and I just need the answer that

3    you don't remember.

4        A.    I don't remember.

5        Q.    Do you remember after the inspection was

6    performed if you ever spoke to the inspector again?

7        A.    You mean the day the inspection was done or

8    after that?

9        Q.    Yeah, so it looks like, it says the

10   inspection was done on October 28th, 2009 on this

11   report.  After October 28th, 2009, did you ever have

12   any other conversations with the inspector?

13       A.    I can't remember.

14       Q.    Okay.  Do you know if you've had any other

15   inspections other than this one and the one related to

16   the canceled 2009 sale?

17       A.    No.

18       Q.    No, you don't remember, or, no, you did not

19   have any other?

20       A.    I don't think so.

21       Q.    I apologize.  Do you mind clarifying whether

22   you don't think that there were any other inspections

23   or --

24       A.    I don't remember.

25       Q.    -- or that there -- okay.

Confidential - Subject to Further Confidentiality Review

```
 1              Was your husband at all involved with any of

 2    these issues?  Did he speak to inspectors?  Did he

 3    speak to the attorneys?

 4       A.    No, I did all the speaking.  I'm usually the

 5    one who deals with stuff like that.

 6       Q.    Did anyone ever take samples of the drywall

 7    from your house?

 8       A.    Yes.

 9       Q.    Do you know where those samples are located?

10       A.    I provided -- the sample that I had, I

11    provided it to my attorney.

12       Q.    Okay.  And if you need to review the

13    inspection report to refresh your recollection, do you

14    remember how much of the house had a -- had Chinese

15    drywall in it?

16              MS. GRANT:  Object to form.

17       A.    I don't know.

18    BY MR. BARRY:

19       Q.    Now, you said you sold the house in 2012.

20    Prior to selling it did you ever attempt to remove the

21    Chinese drywall from your house and put in new drywall?

22       A.    No.

23       Q.    Why not?

24       A.    I wanted to get out of it.  I did not want

25    to stay in that property.
```

Case 2:09-md-02047-EEF-MBN  Document 23262-39  Filed 11/19/19  Page 1683 of 3246
Case 1:09-md-02047-EEF-MBN  Document 23262-39  Filed 11/19/19  Page 41 of
Confidential - Subject to Further Confidentiality Review
66

```
 1      Q.     So from 2009 until 2012, were you

 2   continually trying to sell the property?

 3      A.     Yes.

 4      Q.     Was it listed that entire time?

 5      A.     I don't remember.

 6      Q.     Okay.  Was it listed for the majority of

 7   that time?

 8      A.     I can't remember.

 9      Q.     Did you receive any offers on the house

10   before the one that you ultimately accepted in 2012?

11      A.      I believe there might have been a couple

12   lower offers.  I can't remember exactly, but I do think

13   there were a couple other offers that were lower than

14   what I sold it for.

15      Q.     Did you ever seek any quotes to see how much

16   it would cost to remove the Chinese drywall and replace

17   it with other drywall?

18      A.      I don't think so.

19      Q.     Do you know, recognizing that you sold the

20   property in 2012, do you know if there is Chinese

21   drywall still in the house?

22      A.      I don't know.  From what I know, the

23   property --

24      Q.     Sorry.  Go on.  I apologize.

25      A.      From what I know, the property was -- was
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 1684 of 3246
Case 1:19-cv-09319-AKH Document 26-42 Entered on FLSD Docket 05/09/2024 Page 42 of
66
Confidential – Subject to Further Confidentiality Review

```
 1   remediated, and I think it was -- it was sold, from

 2   what I know.

 3      Q.    How do you know that?

 4      A.    Because I drive up there.  When I go up to

 5   Port St. Lucie, I always stop by the property and --

 6      Q.    Do you know what it sold for?

 7      A.    I do not.

 8      Q.    Did you receive any other offers on the

 9   house in 2009?

10      A.    In 2009?

11      Q.    Yeah.

12      A.    I don't know.

13      Q.    Did you receive -- do you remember the

14   amounts of any offers you received between 2009 and

15   2012?

16      A.    No.

17      Q.    Did you receive any offers in excess of

18   $100,000?

19      A.    I don't remember.

20      Q.    Did you receive any offer that exceeded the

21   $81,000 offer you accepted?

22      A.    Well, if I did, I think I would have sold it

23   for the higher offer.  No, I did not.

24      Q.    Understood.  We talked a little bit about

25   how you said there were some issues with the HVAC
```

Confidential - Subject to Further Confidentiality Review

1    system air conditioning.  Were there any other

2    appliances in the house that you had any difficulty

3    with?

4        A.    I don't think so.

5        Q.    When you listed the house in 2009 after you

6    learned that there was Chinese drywall in the house, do

7    you remember what the list price was?

8        A.    No, I don't.

9        Q.    When you were trying to sell the house, do

10   you remember if the list price exceeded the amount of

11   the offer you ultimately accepted?

12       A.    You mean the offer for 81,000?

13       Q.    Yes, ma'am.

14             MR. GUERRA:  Sorry.  To clarify, the 81,000

15         sale was in 2012.  2009 was the sale that was

16         canceled because of the inspection report.

17             MR. BARRY:  Yes.  And let me clarify my

18         question.

19   BY MR. BARRY:

20       Q.    After you learned that Chinese drywall was

21   in the house and you listed the property, was the list

22   price in excess of the amount of the ultimate sale

23   price of $81,000?

24       A.    I believe so.

25       Q.    When you sold the house in 2012, do you

 1   remember if the list price was still in excess of the

 2   offer of -- ultimate accepted offer of $81,000?

 3        A.    Yes.

 4        Q.    Do you know if you have a copy of the

 5   canceled sales contract from 2009?

 6        A.    Canceled sales contract?  There is no such

 7   thing.

 8        Q.    You said in 2009 that you had had a sales

 9   contract with a buyer, they did the inspection, and

10   they canceled the agreement.  Do you have a copy of

11   that agreement?

12        A.    You mean the contract?

13        Q.    Yes, ma'am.

14        A.    I do not.

15        Q.    You testified that in 2012 you believe that

16   the list price exceeded the ultimate accepted offer of

17   $81,000.  Do you remember how much you were listing the

18   property for in 2012?

19        A.    I don't remember.

20        Q.    Do you remember if it was in excess of

21   $100,000?

22        A.    I can't say for sure, but I think so.

23        Q.    Do you have any of the listing documents,

24   pamphlets or any kind of listing of the property?

25        A.    Is that for the 2012 sale?

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1687 of 3246
Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 45 of
Confidential – Subject to Further Confidentiality Review
66

```
 1      Q.      Any time between the time you purchased the

 2  property or the time Ms. Cassandra Marin purchased the

 3  property to the time Ms. Cassandra Marin sold the

 4  property, do you have any evidence of listing it?

 5      A.      No, I do not.

 6      Q.      Looking at this inspection report -- give me

 7  a second to locate the page I'm looking for.  If you

 8  look at page 7 of 11, and this is Exhibit 12, there's a

 9  picture of the refrigerator coils.  Do you remember

10  having an issue with the refrigerator?

11      A.      No, I don't remember.

12      Q.      Did you have homeowner's insurance on this

13  property?

14      A.      I did.

15      Q.      Who was your homeowner's insurance with?

16      A.      I believe it was State Farm.

17      Q.      Did you ever seek to have -- did you make a

18  policy claim with State Farm for any of the damages in

19  your house?

20      A.      Yes, I did.

21      Q.      What happened with that policy claim?

22      A.      It was denied.

23      Q.      Did you pursue any further action against

24  State Farm?

25      A.      No, I didn't.
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1688 of 3246
Case 1:09-md-02047-EEF Document 22362-39 Filed 11/19/19 Page 46 of 66
Confidential – Subject to Further Confidentiality Review

 1     Q.    Do you know why State Farm denied your

 2   policy claim?

 3           MS. GRANT:  I'm going to object to the

 4       extent that you're asking for a legal

 5       conclusion.  But if you know, you can --

 6     A.    I don't know.

 7   BY MR. BARRY:

 8     Q.    Was any of your own property, and by that I

 9   mean like items of furniture or clothing or, you know,

10   decorative items in the house, were any of those

11   personal items damaged by Chinese drywall?

12     A.    No.

13     Q.    Did the presence of Chinese drywall limit

14   the use of your property?

15     A.    I don't understand the question.

16     Q.    Was there anything that you couldn't do in

17   the property because Chinese drywall was there?

18           MS. GRANT:  And, Mike, I'm going to object.

19       Ms. Marin is not claimant and has not asserted a

20       claim for loss -- enjoyment or loss of use.

21           MR. BARRY:  I still want to ask the

22       question.

23           MS. GRANT:  But you can answer the question.

24     A.    Like what?

25

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1689 of 3246
Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1689 of 3246
Confidential - Subject to Further Confidentiality Review
66

```
 1    BY MR. BARRY:
 2        Q.    Were you not able to spend significant time
 3    in the house?  Were you not able to invite guests over?
 4    Were you not able to use the house to run a home
 5    business because of Chinese drywall?
 6        A.    Well, I lived in the property the entire
 7    time, so I was able to do whatever people do in their
 8    homes when they live in the homes.  No.
 9        Q.    So was there anything that you would have
10    done in the home if not for Chinese drywall that you
11    were not able to do because of Chinese drywall?
12        A.    Well, after my first grandson was born, he
13    came to the house for the first time, and he developed
14    some respiratory distress, so my grandkids were not
15    able to come to the house because of that.
16        Q.    And based on what your attorney said there,
17    that you're not a claimant in this lawsuit, are you
18    seeking damages for loss of use of -- loss of use and
19    enjoyment?
20        A.    No.
21        Q.    Between the time period of when your
22    daughter purchased the home in 2007 and when your
23    daughter sold the home in 2012, did you live anywhere
24    else?
25        A.    No.
```

Confidential - Subject to Further Confidentiality Review

```
 1     Q.    Did your husband live anywhere else?

 2     A.    No.

 3     Q.    Did you ever have to rent an apartment or

 4   stay at a hotel because of the effects of Chinese

 5   drywall on the house?

 6     A.    No.

 7     Q.    Did you change how you inhabited your home

 8   after you learned it contained Chinese drywall?

 9     A.    No.

10     Q.    Do you know if you your husband changed the

11   way he inhabited the house --

12     A.    No.

13     Q.    -- after he learned it contained Chinese

14   drywall?

15     A.    No, he didn't.

16     Q.    Ms. Marin, could you turn to Exhibit 4,

17   which is, of course, Tab 4 in your binder

18     (Defendant's Exhibit Number 4 for i.d.)

19   BY MR. BARRY:

20     Q.    Ms. Marin, do you recognize this document?

21     A.    Yes.

22     Q.    How do you recognize this document?

23     A.    How do I recognize it?

24     Q.    Yeah.

25     A.    I believe it was something that was emailed
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1691 of 3246
Case 1:11-cv-22408-MGC Document 236-1 Entered on FLSD Docket 05/19/2011 Page 49 of 66
Confidential - Subject to Further Confidentiality Review

```
 1   to me.
 2       Q.    Was it emailed to you by your daughter's
 3   attorneys?
 4       A.    That's what I think, yes.
 5       Q.    Was it -- now, if you turn to the -- if you
 6   turn to the back here, the last page, it lists
 7   Cassandra Marin on here.  And I'll represent I think
 8   this document has not yet been verified, but I'm sure
 9   Ms. Marin's attorneys are going to have it verified.
10   Do you know if you reviewed this document before it was
11   submitted in this litigation to opposing counsel?
12       A.    Did I review it before the deposition you
13   mean?
14       Q.    So this document has been provided to
15   opposing counsel in this litigation.  And, again, if
16   you don't know whether it has or hasn't been, you know,
17   feel free to answer "I don't know."
18            Do you know if you reviewed this document
19   before it was produced to opposing counsel in this
20   litigation?
21       A.    No, I didn't.
22       Q.    Were you involved in preparing the answers
23   in this document?
24            MS. GRANT:  Mike, I'm going to object to
25        form.  This is the first amended.  And just to
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1692 of 3246
Case 1:09-cv-02042-MGC Document 28-3 Entered on FLSD Docket 05/19/2017 Page 50 of
66
Confidential - Subject to Further Confidentiality Review

```
 1              clarify the record, there's also a supplemental

 2              plaintiff profile form that precedes the first.

 3                   MR. BARRY:  I'm on the first amended one.

 4                   MS. GRANT:  Okay.

 5         A.    What was the question again?

 6                   MR. BARRY:  Would the court reporter please

 7              re-read the question?

 8                   THE COURT REPORTER:  Of course.

 9         (The record was read as requested as follows:)

10                   THE COURT REPORTER:  "Were you involved in

11               preparing the answers in this document?"

12         A.    I can't remember.  I'm not sure.

13    BY MR. BARRY:

14         Q.    Were you involved in preparing the answers

15    to -- scratch that.

16              Now, if you look at page 5 of this document,

17    which is Section 6, it reads, "Have you received any

18    payments, including but not limited to, settlement

19    payments, payments from homebuilders and insurance

20    payments, related to damages you claim to have suffered

21    caused by defective Chinese drywall on this property or

22    relating to any other harm caused by defective Chinese

23    drywall?"

24              Ms. Cassandra Marin answered "yes" and

25    identified the source and the amount as GBI
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 1693 of 3246
Case 1:11-cv-22408-MGC Document 228-2 Entered on FLSD Docket 05/18/2013 Page 51 of 66
Confidential - Subject to Further Confidentiality Review

```
1    settlements, $12,627.66.  Are you familiar with that

2    payment?

3        A.    Yes.

4        Q.    Did you receive that payment?

5        A.    Yes, I did.

6        Q.    Do you remember if it was endorsed to you or

7    your daughter, Cassandra Marin?

8        A.    To Cassandra.

9        Q.    Did Cassandra Marin then endorse the check

10   to you?

11       A.    Yes.

12       Q.    Did you deposit that check into your bank

13   account?

14       A.    Yes.

15       Q.    And I recognize that you probably received

16   multiple checks, not just one, but I used the word

17   "check" there.  Just stipulating that for the record.

18            Ms. Marin, do you understand what damages

19   your daughter is seeking in this litigation?

20       A.    Yes, I think.

21       Q.    How do you understand -- what is your

22   understanding of the damages your daughter is seeking

23   in this litigation?

24            MS. GRANT:  And I'm going to object to the

25            extent that that involves communications with
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1694 of 3246
Case 1:11-cv-22408-MGC Document 12 Entered on FLSD Docket 05/19/2011 Page 52 of
66
Confidential - Subject to Further Confidentiality Review

```
 1            counsel.  If you have personal knowledge outside

 2            of that, you're free to answer, but not if it

 3            involves communications with counsel.

 4               MR. BARRY:  And I'm, of course, saving that

 5            argument until the end, but I'll respect that

 6            objection for now.

 7       A.    I understand she's seeking the loss of -- I

 8   would say the loss of profit.

 9   BY MR. BARRY:

10       Q.    What do you mean by "the loss of profit"?

11       A.    Well, as a result of the Chinese drywall,

12   the property was depreciated to almost nothing.  So

13   whatever --

14       Q.    So is your understanding -- sorry.  Go on,

15   please.  Apologize.

16       A.    So whatever the property was worth, it

17   wasn't sold for what it was worth because it was

18   Chinese drywall.  I believe that's what she's seeking.

19       Q.    So is it your understanding that your

20   daughter is seeking -- your daughter is seeking the

21   difference in the amount she paid for the property

22   versus what the property was sold for?

23               MS. GRANT:  Object to form.  Same objection.

24       A.    Yes.

25
```

Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. BARRY:

 2       Q.    You can answer.

 3       A.    Yes, that's what I believe.

 4             MR. GUERRA:  Hey, Mike, this is Keith.  I

 5          don't want to interrupt your flow, so if you

 6          want to wait a minute you can, but I think we've

 7          been going about an hour and change if you want

 8          to take a break.

 9             MR. BARRY:  Yes, let's take a break.  That's

10          perfect for me.

11             MR. GUERRA:  Okay.

12       (A recess was taken from 3:45 p.m. to 4:00 p.m.)

13   BY MR. BARRY:

14       Q.    Ms. Marin, did you ever have an appraisal

15   done at the house?

16       A.    Would that be after the Chinese drywall was

17   discovered or?

18       Q.    Yes, ma'am, after the Chinese drywall was

19   discovered.

20       A.    No, I didn't.

21       Q.    Did you ever consider asking for an

22   appraisal?

23       A.    No, I don't think so.

24       Q.    Earlier you said that you were aware that

25   the property sold after or -- scratch that.
```

```
1              Earlier it was your testimony that you

2     believed that the buyers of the property who purchased

3     the property from you in 2012 remediated the property;

4     is that correct?

5         A.    Yes.

6         Q.    And it was your testimony that you believed

7     that the buyers of the house sold the property for more

8     than they had initially purchased it, right?

9         A.    No, I did not say for more.

10        Q.    Okay.  What is your understanding of what

11    they sold the property for?

12        A.    I don't know for sure, but it's, you know,

13    it's something I can look up.  It's not -- you know,

14    it's public record, so it wouldn't be hard to find out.

15        Q.    Can you look at Tab 24, which we'll mark as

16    Exhibit 24?

17        (Defendant's Exhibit Number 24 for i.d.)

18    BY MR. BARRY:

19        Q.    Have you seen this document before?

20        A.    I don't think so.

21        Q.    Do you know what this document is?

22        A.    Looks like a tax, tax information on the

23    property.

24        Q.    And at the top it says "Michelle Franklin,

25    CFA, St. Lucie County Property Appraiser."  At the
```

Confidential - Subject to Further Confidentiality Review

1    bottom, it says "Copyright St. Lucie County Property

2    Appraiser."

3        A.    Yes.

4        Q.    As a real estate agent, have you ever seen a

5    document like this before?

6        A.    Something similar here.  Each county has a

7    different one.

8        Q.    Yeah.  Where it says sales history, it says,

9    2-15-2012, the grantor, Cassandra Marin, and it says

10   $81,000.  Is that the amount Ms. Cassandra Marin sold

11   the house for?

12       A.    Yes.

13       Q.    And then in February 14th, 2013

14   Pauley Drywall, as the grantor sold the house for

15   $140,000?

16       A.    Yes.

17       Q.    Are you aware that they sold the home for

18   $140,000?

19           MS. GRANT:  Objection.  Asked and answered

20        several times.  You can answer.

21       A.    No.

22   BY MR. BARRY:

23       Q.    And having testified that you believe they

24   removed the Chinese drywall from the house, do you know

25   of any other reason why the property sold only for

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1698 of 3246
Case 1:09-cv-07299-CI Document 22263-39 Entered on FLSD Docket 05/19/2019 Page 55 of
66
Confidential – Subject to Further Confidentiality Review

1   $140,000 in 2013?

2       A.    No.

3       Q.    When you were trying to sell the house, did

4   you ever speak to your neighbors about whether they

5   were selling their homes?

6       A.    No.

7       Q.    Do you remember ever looking at comparative

8   values of homes in your area?

9       A.    Well, that wouldn't be -- I don't remember.

10  Maybe I did, but that wouldn't be fair, a fair

11  comparison.

12      Q.    I apologize.  I couldn't hear what you said.

13      A.    If I did, that wouldn't be a fair comparison

14  since my property had Chinese drywall and there's -- I

15  don't know if theirs did, so I don't -- I don't think I

16  did.

17      Q.    Do you remember home values in your area had

18  dropped when you were trying to sell your house?

19          MS. GRANT:  Objection.  Ms. Marin testified

20      that she's a Realtor, but I think without laying

21      a foundation on that, I don't know if she's

22      qualified to answer that or not, but you can

23      answer if you know.

24  BY MR. BARRY:

25      Q.    I mean --

Confidential - Subject to Further Confidentiality Review

```
1      A.    I think they did since the market was bad at

2   the time.

3      Q.    Give me one minute.  Did you have an

4   appraisal done on the house before Chinese drywall was

5   discovered?

6      A.    I don't think I did one.

7      Q.    Do you and your daughter have any agreement

8   about how any proceeds from this litigation will be

9   distributed between the two of you?

10     A.    It's my money.

11     Q.    So any amounts awarded to your daughter in

12  this litigation, you will receive?

13     A.    Yes.

14     Q.    Ms. Marin, could you turn to Tab 29?

15  Ms. Marin, have you seen this document before?

16          MS. GRANT:  I'm sorry, Mike.  Are you

17      marking this as an Exhibit?

18          MR. BARRY:  Yes, please.  Let's mark

19      Exhibit 29 or Tab 29 as Exhibit 29.

20     (Defendant's Exhibit Number 29 for i.d.)

21     A.    I don't believe so.  I've seen a lot of

22  documents.  Yes.

23  BY MR. BARRY:

24     Q.    Were you involved in preparing the answers

25  to these interrogatories?
```

Confidential - Subject to Further Confidentiality Review

```
 1      A.    Yes.

 2      Q.    Did your daughter assist you in preparing

 3  the answers to these interrogatories?

 4      A.    You mean was she there when it was discussed

 5  or?

 6      Q.    Do you know -- yeah, was she there when you

 7  discussed the interrogatories?

 8      A.    I'm sure we discussed it because she had to

 9  sign it.

10      Q.    Were you the person, though, who was

11  primarily providing the information to answer these

12  interrogatories?

13      A.    Yes.

14      Q.    Now earlier we talked about home prices.

15  Were you active as a Realtor in 2009 and 2010?

16      A.    At the time the property was listed, I was

17  inactive.

18      Q.    So you were not actively selling homes in

19  2009, 2010?

20      A.    No, no.

21      Q.    Between 2007 to 2012, were you ever active

22  as a Realtor?

23      A.    You said 2007 and 2012?

24      Q.    Yes, between those years, 2007 to 2012, were

25  you ever active as a Realtor?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1701 of 3246
Case 1:19-cv-09623-AT Document 28-1 Filed in FLSD Docket 05/19/2017 Page 59 of 66
Confidential - Subject to Further Confidentiality Review

```
 1     A.    I believe it was inactive.

 2     Q.    Inactive?

 3     A.    Inactive, right.

 4     Q.    Okay.  Now if you could look at Tab 32,

 5   which we'll mark as Exhibit 32,

 6         (Defendant's Exhibit Number 32 for i.d.)

 7   BY MR. BARRY:

 8     Q.    Ms. Marin, have you reviewed -- I apologize.

 9   I couldn't hear what was said there.

10           Have you reviewed this document before?

11     A.    Yes.

12     Q.    Were you involved in preparing the answers

13   for these interrogatories?

14     A.    Yes.

15     Q.    Were you the person who primarily provided

16   the information to answer these interrogatories?

17     A.    Yes.

18     Q.    Was it your daughter who ultimately signed

19   these interrogatories?

20     A.    Yes.

21     Q.    Why wasn't your daughter the person who was

22   primarily providing the information to answer these

23   interrogatories?

24     A.    Because when dealing with anything with the

25   property, I was the one who was mainly involved in
```

1   anything because I'm the one who knew everything about

2   the property.

3       Q.    And is that because you were the one who

4   primarily lived in the property?

5       A.    Yes.

6       Q.    Earlier you said that when you purchased --

7   when Ms. Marin, Ms. Cassandra Marin purchased the

8   property, you put the property, even though you paid

9   your money, in her name just in case anything happened

10  to you.  Would you consider the property a gift to her?

11          MS. GRANT:  Objection to the extent it calls

12      for, you know, legal characterization or legal

13      conclusion.  But go ahead.

14      A.    We put the property in her name, but we know

15  that it was our property.

16  BY MR. BARRY:

17      Q.    Did you ever sign an agreement with your

18  daughter or have any type of written understanding that

19  the property was, even though it was in her name, it

20  was really your property?

21      A.    Nothing in writing, no.

22          MR. BARRY:  I don't think I have any further

23      questions if our -- if my co-counsel, Mr. Guerra

24      has any further questions.

25          MR. GUERRA:  I actually have one question.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1703 of 3246
Case 1:09-cv-02042-XXX Document XXXX Entered on FLSD Docket 05/18/2012 Page 61 of
66
Confidential - Subject to Further Confidentiality Review

```
 1                       CROSS-EXAMINATION

 2    BY MR. GUERRA:

 3         Q.    In 2009 when you put the house up for sale

 4    and you had a buyer make an offer and you're, I

 5    believe, in escrow; is that correct?

 6         A.    Yes.

 7         Q.    But it fell through because the inspection

 8    found Chinese drywall in your home; is that correct?

 9         A.    Yes.

10         Q.    Do you recall what the sales price was you

11    agreed to?

12         A.    No, I do not.  I don't want to give you -- I

13    have a number in my head, but I don't -- I don't want

14    to give you the wrong information.  I don't -- I don't

15    remember.

16         Q.    Can you give us a ballpark?

17         A.    I want to say 185, but I'm not sure.

18               MR. GUERRA:  Okay.  No further questions

19          from me.

20               MS. GRANT:  We can go off the record just

21          for a minute.  I'll just chat with you for one

22          second.  Be right back.

23          (A discussion was held off the record.)

24               MS. GRANT:  We have no questions.

25               MR. GUERRA:  Okay.
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/20 Page 1704 of 3246
Case 1:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/20 Page 62 of 66
Confidential - Subject to Further Confidentiality Review

```
 1           MR. BARRY:  Wonderful.  Well, thank you.

 2      Ms. Marin, I really appreciate you being here,

 3      especially on short notice.  I know this is

 4      never fun to sit for a deposition.  I appreciate

 5      you being patient with me over the phone.

 6           THE WITNESS:  Sure.

 7           THE COURT REPORTER:  Just for my record, do

 8      you need to order this deposition?

 9           MR. GUERRA:  Yes, please.  I think we have a

10      standing order for all these.

11           MR. BARRY:  And we'd like a rough, too, if

12      that's okay.

13           MR. GUERRA:  I think we have, is it a

14      two-day rush or a three-day rush?

15           MR. VERRIER:  Three-day rush.

16           THE COURT REPORTER:  And would you like a

17      copy?

18           MR. VERRIER:  Yes.

19           MS. GRANT:  Yes.  I believe we have a

20      standing order.

21      (Thereupon, the proceedings concluded at 4:17 p.m.)

22      (The witness did not waive signature.)

23

24

25
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1705 of 3246
Case 1:1-cv-22408-MGC Document 20191 Entered on FLSD Docket 05/09/2019 Page 48 of
66
Confidential - Subject to Further Confidentiality Review

```
 1                    CERTIFICATE OF OATH

 2   THE STATE OF FLORIDA )

 3   COUNTY OF PALM BEACH COUNTY)

 4

 5

 6

 7        I, the undersigned authority, certify that

 8

 9   YVETTE MARIN personally appeared before me and was duly

10

11   sworn on the 10th day of January 2019.

12

13   Signed this 12th day of January 2019.

14

15

16

17

18

19

20

21        _____

22        BARBIE GALLO, RMR-CRR

23        Notary Public - State of Florida

24        My Commission No. EE13403

25        My Commission Expires: October 21, 2019
```

Confidential - Subject to Further Confidentiality Review

```
 1                    CERTIFICATE OF REPORTER

 2

 3     THE STATE OF FLORIDA )

 4     COUNTY OF PALM BEACH )

 5

 6         I, Barbie Gallo, RMR-CRR, Registered Merit

 7     Reporter-Certified Realtime Reporter, certify that I

 8     was authorized to and did stenographically report the

 9     deposition of YVETTE MARIN, pages 1 through 64; that a

10     review of the transcript was requested; and that the

11     transcript is a true and complete record of my

12     stenographic notes.

13         I further certify that I am not a relative,

14     employee, attorney, or counsel of any of the parties,

15     nor am I a relative or employee of any of the parties'

16     attorney or counsel connected with the action, nor am I

17     financially interested in the action.

18

19              DATED this 12th day of January 2019.

20

21

22

23

24         _____

25              Barbie Gallo, RMR-CRR
```

Confidential - Subject to Further Confidentiality Review

```
 1                  - - - - - -

                 E R R A T A

 2                  - - - - - -

 3    PAGE  LINE  CHANGE

 4    _____ _____  _____

 5       REASON:  _____

 6    _____ _____  _____

 7       REASON:  _____

 8    _____ _____  _____

 9       REASON:  _____

10    _____ _____  _____

11       REASON:  _____

12    _____ _____  _____

13       REASON:  _____

14    _____ _____  _____

15       REASON:  _____

16    _____ _____  _____

17       REASON:  _____

18    _____ _____  _____

19       REASON:  _____

20    _____ _____  _____

21       REASON:  _____

22    _____ _____  _____

23       REASON:  _____

24    _____ _____  _____

25       REASON:  _____
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1708 of 3246
Case 1:19-cv-22605-MGC Document 2-32 Entered on FLSD Docket 06/26/2019 Page 66 of 66
Confidential - Subject to Further Confidentiality Review

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

                I,_____, do

 3     hereby certify that I have read the

       foregoing pages, and that the same

 4     is a correct transcription of the answers

       given by me to the questions therein

 5     propounded, except for the corrections or

       changes in form or substance, if any,

 6     noted in the attached Errata Sheet.

 7

       _____

 8     YVETTE MARIN                     DATE

 9

10

11

12

13

14

       Subscribed and sworn

15     to before me this

       _____ day of _____, 20____.

16

       My commission expires:_____

17

18     _____

       Notary Public

19

20

21

22

23

24

25
```

# EXHIBIT A20

Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF FLORIDA
 2              Case No. 1:11-CV-22408-MGC
 3    -------------------------------§
      EDUARDO AND CARMEN AMORIN et    §
 4    al., individually, and on behalf §
      of all others similarly         §
 5    situated,                       §
                                      §
 6        Plaintiffs,                 §
                                      §
 7    vs.                             §
                                      §
 8    TAISHAN GYPSUM CO., LTD. F/K/A  §
      SHANDONG THAIHE DONGXIN CO.,    §
 9    LTD.; TAIAN TAISHAN PLASTERBOARD §
      CO., LTD., et al,               §
10                                    §
          Defendants.                 §
11    ------------------------------- §
       - - -
12
                              - - -
13
                    FRIDAY, DECEMBER 14, 2018
14
                              - - -
15
             Confidential - Subject to Further
16                  Confidentiality Review
17                       - - -
18          Deposition of DAILYN MARTINEZ, held at
         Morgan & Morgan, 12800 University Drive,
19       Suite 600, Fort Myers, Florida, commencing at
         7:45 a.m., on the above date, before
20       Kelly J. Lawton, Registered Professional
         Reporter, Licensed Court Reporter, and Certified
21       Court Reporter.
22                       - - -
23             GOLKOW LITIGATION SERVICES
            877.370.3377 ph | 917.591.5672 fax
24                 deps@golkow.com
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1711 of 3246
Case 1:18-cv-02408-WFK Document 129-1 Entered on FLSD Docket 05/09/2011 Page 9 of
162
Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2    MORGAN & MORGAN
      BY:  PANAGIOTIS "PETE" V. ALBANIS, ESQUIRE
 3    12800 University Drive, Suite 600
      Fort Myers, Florida 33907
 4    (239) 433-6880
      palbanis@forthepeople.com
 5    Representing Plaintiff
 6
      LEVIN, SEDRAN & BERMAN, LLP
 7    BY:  KEITH J. VERRIER, ESQUIRE
      510 Walnut Street, Suite 500
 8    Philadelphia, Pennsylvania 19106
      (215) 592-1500
 9    kverrier@lfsblaw.com
      Representing Plaintiff
10
11    ALSTON & BIRD, LLP
      BY:  MATTHEW D. LAWSON, ESQUIRE
12    BY:  METHAWEE MANUPIPATPONG, ESQUIRE
      BY:  LARA TUMEH, ESQUIRE
13    One Atlantic Center
      1201 West Peachtree Street
14    Atlanta, Georgia 30309
      (404) 881-7000
15    matt.lawson@alston.com
      mae.manupipatpong@alston.com
16    lara.tumeh@alston.com
      Representing Taishan Gypsum Co., Ltd. and Tai'an
17    Taishan Plasterboard, Co., Ltd.
18
      GORDON, ARATA, MONTGOMERY, BARNETT
19    BY:  ALEX B. ROTHENBERG, ESQUIRE
      201 St. Charles Avenue, 40th Floor
20    New Orleans, Louisiana 70170
      (504) 582-1111
21    arothenberg@gamb.law
      Representing BNBM PLC
22
23
24
```

```
 1    APPEARANCES:

 2        ORRICK, HERRINGTON & SUTCLIFFE, LLP

          BY:  HARRY J. MOREN, ESQUIRE

 3        The Orrick Building

          405 Howard Street

 4        San Francisco, California 94105

          (415) 773-5619

 5        hmoren@orrick.com

          Representing BNBM PLC

 6

 7    ALSO PRESENT:

 8        Myriam Sauchuk, Spanish Interpreter

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1713 of 3246
Case 1:13-cv-02408-MGE Document 22 of 5 Filed 11/11 Date 05/18/2013 Page 49 of
162
confidential -- Subject to further confidentiality Review

```
 1                      - - -

                      I N D E X

 2                      - - -

 3   Testimony of:  DAILYN MARTINEZ

 4       DIRECT EXAMINATION BY MR. LAWSON...............   7

 5       CROSS-EXAMINATION BY MR. MOREN.................  82

 6       DIRECT EXAMINATION (Continued) BY MR. LAWSON...  83

 7       RECROSS-EXAMINATION BY MR. MOREN.............. 147

 8       CROSS-EXAMINATION BY MR. ALBANIS.............. 149

 9

10

11                E X H I B I T S

12            (Attached to Transcript)

13   DEFENDANTS'                                        PAGE

14   Exhibit 1    Lee County Property Appraiser -        24
                  Online Parcel Inquiry - Property
15                Data

16   Exhibit 2    Plaintiff Profile Form -               29
                  Residential Properties - Bates
17                Numbered MartinezD00001 to
                  MartinezD00013

18
     Exhibit 3    Erickson's Drying Systems - Chinese    46
19                Drywall Inspection

20   Exhibit 4    Chinese Drywall Screening, LLC         65
                  Report

21
     Exhibit 5    Priority Claimant Dailyn Martinez's    74
22                First Amended Answers to
                  Interrogatories

23
     Exhibit 6    Kawasaki Security Agreement, Buyers    78
24                Order, and Photographs
```

1                    E X H I B I T S

2   PLAINTIFF'S                                              PAGE

3   Exhibit 7    AG Mechanical, Inc. HVAC Service      83
                 Order Invoice and Receipt
4
    Exhibit 8    Water Medic of Cape Coral, Inc.        87
5                Invoices
6   Exhibit 9    Miscellaneous Claim Form Worksheet    91
                 and Receipts
7
    Exhibit 10   Chinese Drywall Settlement Program     94
8                Check Copies
9   Exhibit 11   D.E. Foeller Sales, Inc. Invoice -    110
                 RV
10
    Exhibit 12   2011 Northeast 17th Place Rental      120
11               Receipts
12  Exhibit 13   First Amended Supplemental            125
                 Plaintiff Profile Form
13
    Exhibit 14   Chinese Drywall Experts, LLC          132
14               Contract Quote
15  Exhibit 15   Gabisa Construction, Inc. Estimates  138
16

17
    PLAINTIFF'S                                              PAGE
18
    Exhibit 1    Photographs                           150
19
20
21
22
23
24

```
1                    - - -

2          THE COURT REPORTER:  Would you please raise

3    your right hand.

4          Do you solemnly swear or affirm that you will

5    well and truly translate from English to Spanish

6    and Spanish to English the questions asked and

7    the answers given to the best of your knowledge

8    and ability?

9          THE INTERPRETER:  I do.

10          THE COURT REPORTER:  Would you have her raise

11    her right hand, please.

12          Do you swear or affirm that the testimony

13    you're about to give will be the truth, the whole

14    truth, and nothing but the truth?

15          THE WITNESS:  I do.

16          MR. ALBANIS:  By agreement of the parties,

17    because Ms. Martinez's English is very good, we

18    will allow Ms. Martinez to answer questions in

19    English to the extent that she understands the

20    questions that are being asked.  And if she

21    answers in English, we are operating under the

22    assumption that she understands the question and

23    she understands her answer.

24          If she needs the translator's help with
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1716 of 3246
Case 2:15-cv-02408-NGG-MDG Document 69-21 Entered on FLSD Docket 05/09/2016 Page 46 of 162
Confidential — Subject to Further Confidentiality Review

```
 1        certain areas of questioning, she will ask for

 2        help from the translator, who is present.

 3             MR. LAWSON:  That's my understanding.

 4             And we will also have it noted on the

 5        transcript where the translator is assisting,

 6        just to make that clear in the record that we're

 7        making today.

 8             MR. ALBANIS:  Very good.

 9             DAILYN MARTINEZ, called as a witness by the

10   Defendants, having been first duly sworn, testified

11   as follows:

12                  DIRECT EXAMINATION

13   BY MR. LAWSON:

14        Q.   Could you please state your name for the

15   court reporter?

16        A.   Dailyn Martinez.

17        Q.   Thank you for coming in today, Ms. Martinez.

18   We appreciate your time.  My name is Matt Lawson; I'm

19   an attorney for Taishan Gypsum Company, Limited.  I

20   had some questions today about your home and the

21   damages that you are seeking in this lawsuit.

22             I wanted to ask first:  Have you ever been in

23   a deposition like this before?

24        A.   No.
```

Case 2:09-md-02047-EEF-MBN Document 22363-20 Filed 11/19/19 Page 1717 of 3246
Case 1:14-cv-06228-NGG Document 209-21 Entered on FLSD Docket 05/03/2017 Page 49 of
162

Confidential - Subject to further Confidentiality Review

```
1        Q.    Have you ever been involved in a lawsuit

2   before?

3        A.    No.

4        Q.    Now, do you understand that a moment ago you

5   were sworn in to tell the truth during today's

6   deposition?

7        A.    Yes.

8        Q.    And can you think of any reason why you

9   won't -- will not be able to tell the truth today

10  during this deposition?

11       A.    (Translated through interpreter.)  No.  Only

12  the truth.

13       Q.    And do you understand that the court reporter

14  here is writing out everything that we say,

15  transcribing it for us today?

16       A.    Yes.

17       Q.    Now, because she is writing everything down

18  that we say, it's very important that we take our

19  time and pause between my questions and your answers

20  so she has an opportunity to be able to write

21  everything down that we're saying and so we don't

22  talk over each other.

23             Do you understand that?

24       A.    Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1718 of 3246 of
Case 1:1-22-cv-MCA-L Document 290-201 Entered on FLSD Docket 05/19/2019 Page 40 of
Confidential – Subject to Further Confidentiality Review
162

```
 1      Q.   It's also important that any answers that you

 2   give, you give verbally instead of nodding, because

 3   she needs to be able to write down what you say.  If

 4   you nod, she can't say whether you are saying yes or

 5   no to the answers to my questions.

 6      A.   Okay.

 7      Q.   If any of my questions don't seem clear, you

 8   can ask me to rephrase it.  I'm happy to ask it in a

 9   different way.

10      A.   Okay.

11      Q.   And you may at points hear objections from

12   your attorney.  If he's objecting, let him finish and

13   complete his objection.  If he instructs you not to

14   answer, then you do not need to answer.  But if he

15   does not instruct you not to answer, then I would ask

16   that you answer my question to the best of your

17   ability, okay?

18      A.   Okay.

19      Q.   If you need to take a break at any point,

20   please let me know.  We can take a break at any time.

21   Just tell me, I need to take a break.

22      A.   Okay.

23      Q.   Did you meet with your lawyer prior to today

24   to prepare for this deposition?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1719 of 3246
Case 1:09-cv-02047-MCA Document 22201 Exhibit 1 Filed 05/19/2019 Page 49 of
162
Confidential - Subject to Further Confidentiality Review

```
1      A.   Last month and this Monday.

2      Q.   And about for how long did you meet during

3   those meetings, how many hours?

4      A.   A couple hours.

5      Q.   Each time about a couple hours?

6      A.   Yes.

7      Q.   Did you review any documents?

8      A.   Yes.

9      Q.   And do you remember about how many documents

10   you looked at?

11     A.   So many.

12     Q.   And were all of those documents documents

13   that you had given to your lawyer before and -- for

14   this lawsuit?

15          THE INTERPRETER:  I'm sorry.  Can you repeat

16     the question?

17   BY MR. LAWSON:

18     Q.   Were all the documents that you reviewed

19   documents that you had given to your lawyer before?

20     A.   Yes.

21     Q.   And do you believe that you have given your

22   lawyer all of the documents that you have in your

23   possession that you think relate to your lawsuit in

24   this case?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1720 of 3246
Case 2:09-md-02047-EEF-MBN Document 22380-301 Entered on FLSD Docket 05/18/2019 Page 10 of 162
Confidential - Subject to Further Confidentiality Review

```
1       A.    Yes.

2       Q.    Ms. Martinez, where are you employed?

3       A.    I clean houses.

4       Q.    About how many houses do you clean regularly?

5       A.    In a day?

6       Q.    I guess in a month, how many would you say

7    that you work on?

8       A.    About 20 houses in a month.

9       Q.    About how many days a week do you work?

10      A.    Monday to Friday.

11      Q.    Are you going to be working later on this

12   afternoon?

13      A.    (Nodding head.)

14      Q.    And is that the reason we need to stop around

15   noon or so today?

16      A.    Yes.

17      Q.    And I'm sorry.  A second ago when I asked you

18   if you were going to be working later on this

19   afternoon, you nodded but you were saying yes, is

20   that right, that you are working later this

21   afternoon?

22      A.    Yes.

23      Q.    And I only ask that again just because, as we

24   said before, we need to make sure that all of your
```

Confidential - Subject to Further Confidentiality Review

```
 1    answers are verbal, that you say them out loud.

 2            Do you understand that?

 3    A.    Yes.

 4    Q.    Thank you.

 5            It takes a little getting used do.  It's a

 6    strange way to talk, being on the record like this.

 7            Are you married?

 8    A.    Yes.

 9    Q.    And how long have you been married?

10    A.    24 years.

11    Q.    And do you have any children?

12    A.    Yes.

13    Q.    How many?

14    A.    One.

15    Q.    And how old is your child?

16    A.    20 years old.

17    Q.    What is the address of your home that you

18    allege was damaged by Chinese drywall?

19    A.    1624 Northwest 37th Avenue, Cape Coral,

20    Florida 33993.

21    Q.    And do you still own that home today?

22    A.    Yes.

23    Q.    How long have you owned that home?

24    A.    I bought the home in September 2008; 16
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1722 of 3246
Case 2:09-cv-02841-MCA Document 28-9 Filed 04/20/10 Page 4722 of 2246
Confidential – Subject to Further Confidentiality Review
162

```
 1    September 2008.

 2         Q.   So you have owned it for a little over ten

 3    years?

 4         A.   Yes.

 5         Q.   And have you owned it during that entire ten

 6    years?

 7         A.   Yes.

 8         Q.   And who owns it other than you, if anyone?

 9    Does your husband also own the home?

10         A.   No.

11         Q.   You are the sole owner of the home?

12         A.   Yes.

13         Q.   How many bedrooms are in the home?

14         A.   Three.

15         Q.   And how many bathrooms?

16         A.   Two.

17         Q.   Has that changed at any time since you have

18    owned the home?

19         A.   No.

20         Q.   Have you ever done any work to change the

21    size of the home?

22         A.   No.

23         Q.   And can you think of any improvements or

24    additions that you have made to the inside of the
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1723 of 3246
Case 1:1-cv-22408-MGC Document 258-01 Entered on FLSD Docket 05/18/2012 Page 45 of
162

Confidential - Subject to further confidentiality Review

```
1    home other than decorations since you have lived

2    there?

3         A.    (Translated through interpreter.)  Change the

4    air-conditioning, which broke.  Change the dryer,

5    change the washer, the kitchen, the microwave, the

6    water heater, the televisions.

7         Q.    So you have had to replace a number of

8    appliances and electronic devices inside of the home?

9         A.    Yes.

10        Q.    And when did you begin to have to replace or

11   repair appliances and electronic devices in the home?

12        A.    (Translated through interpreter.)  In the

13   last nine years.  I can't remember the dates.  But

14   throughout all these years things have been breaking

15   down, and I have been repairing them.

16        Q.    In this last year in 2018, have you had to

17   repair or replace any electronics or appliances in

18   your home?

19        A.    (Translated through interpreter.)  I can't

20   remember.  I think in 2017, I bought the refrigerator

21   and the stove and the microwave.

22        Q.    Do you think that you've submitted to your

23   lawyer all of the receipts and proof of payment for

24   the items that you have replaced or repaired over the
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1724 of 3246
Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 46 of 162
Confidential - Subject to further confidentiality Review

1    last decade?

2        A.    Yes.

3        Q.    And you can't think of any other ones that

4    you haven't given to your lawyer?

5        A.    No.

6        Q.    Where do you live today?

7        A.    Where I live?

8        Q.    Yes.  Do you live in --

9        A.    In that house.

10       Q.    -- you live in the house that we just

11   discussed?

12       A.    Yes.

13       Q.    In the last decade, how many years have you

14   lived in the home, as opposed to somewhere else?

15       A.    (Translated through interpreter.)  In 2010, I

16   bought an RV, and I put it behind the house.  And we

17   lived for two years in that RV.  In 2012, we moved to

18   another house.  And from 2012 to 2013, we lived in

19   two different houses.  In 2013, we returned, and from

20   then, we continue living in that house until today.

21       Q.    Do you remember how much you paid for your

22   house when you bought it?

23       A.    165.

24       Q.    And you said earlier that you bought it in

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1725 of 3246
Case 2:09-md-02047-EEF-MBN Document 20801 Conditional Subject to Protective Order Page 47 of
162
Confidential - Subject to Further Confidentiality Review

```
1    2008?

2         A.    2008.

3         Q.    Do you remember when the house was built

4    before you bought it?

5         A.    2005.

6         Q.    And between 2005 and when you bought the

7    house in 2008, do you know if anyone else lived in

8    the house?

9         A.    I don't know.

10        Q.    Did any of your neighbors ever tell you that

11   someone had lived in the house before you?

12        A.    Nobody tell me anything.

13        Q.    Do you -- have you ever received mail to your

14   house with someone else's name on it but your

15   address?

16        A.    No.

17        Q.    Do you remember who you bought the house

18   from?

19        A.    Foreclosure, the bank.

20        Q.    So the home -- you purchased the home in a

21   foreclosure sale?

22        A.    Yes.

23        Q.    Did you have an opportunity to go into the

24   house and look at it before you bought it?
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1726 of 3246
Case 1:19-cv-02092-WCG Document 23-01 confidential Subject to further Confidentiality Review
162
Confidential - Subject to further Confidentiality Review

```
1        A.    Yes.

2        Q.    And what did you think of the house when you

3    went into it and looked in it before you bought it?

4        A.    The house, it was beautiful.  I like it.

5    That's why I buy.

6        Q.    Did you notice any issues with the house or

7    problems with the house that you did not like when

8    you looked at it before you bought it?

9        A.    I look some, like, faucets and things like

10   that, they're corrosion, but I thought maybe it's

11   because the house was built in 2005 and I buy in

12   2008, maybe they're -- you know, I need to change.

13   So that's no big deal.  So that's what we do, you

14   know.  When we bought the house, we changed the

15   faucets and things like that, and we thought we

16   resolved the problem, you know.  We looked at

17   and . . .

18       Q.    So you noticed that there was corrosion on

19   the faucets?

20       A.    Yes.

21       Q.    Did you see corrosion anywhere else on the

22   house when you looked at it before you bought it?

23       A.    No.

24       Q.    Just on the faucets?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1727 of 3246
Case 1:11-cv-22408-MGC Document 20-11 Entered on FLSD Docket 05/18/2017 Page 46 of
162
Confidential - Subject to Further Confidentiality Review

```
 1        A.    Just on the faucets.

 2        Q.    And when you moved in, you replaced the

 3   faucets?

 4        A.    Yes.

 5        Q.    And did that corrosion come back on those

 6   faucets?

 7        A.    Yes.

 8        Q.    And did you notice corrosion anywhere else in

 9   the house after that?

10        A.    Yes.

11        Q.    Where?

12        A.    In the air condition, in the outlets for the

13   lights; that's where we found that.

14        Q.    Did you have any issues with the electricity

15   working in the house?

16        A.    No.

17        Q.    All the lights worked?

18        A.    Yes.

19        Q.    But you had issues with the air-conditioning

20   unit.  Is that right?

21        A.    Yeah.  After . . .

22        Q.    After you bought the house?

23        A.    Uh-huh.

24        Q.    When did you first have an issue with the
```

Confidential - Subject to further confidentiality review

```
 1    air-conditioning?

 2         A.   I don't remember.

 3         Q.   When you did have an issue with the

 4    air-conditioning, what happened with the

 5    air-conditioning?

 6         A.   It don't cool the house and it freezing the

 7    coil.

 8         Q.   The coil?

 9         A.   The coil.

10         Q.   And at that time when you had those problems

11    with the air-conditioning, you called someone to fix

12    it?

13         A.   Yes.

14         Q.   Other than you, your husband, and your child,

15    has anyone else lived in the home since you bought it

16    in 2008?

17         A.   No.

18         Q.   During the time you were not living in the

19    home, did anyone else live in the home?

20         A.   No.

21         Q.   Have you ever attempted or someone that you

22    have hired attempted to pull the Chinese drywall out

23    of the house or take it out?

24         A.   No.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1729 of 3246
Case 1:11-cv-22408-MGC Document 239-01 Entered on FLSD Docket 05/19/2015 Page 41 of 162
Confidential - Subject to Further Confidentiality Review

```
1        Q.    Have you gotten a quote from anyone about how

2   much it would cost to remove the Chinese drywall from

3   your house?

4        A.    Yes.

5        Q.    How many times have you done that?

6        A.    Two.

7        Q.    When was the first time, if you remember?

8        A.    2012.

9        Q.    And to your knowledge, when was the second

10  time that you got a quote for someone to remove the

11  Chinese drywall from the house?

12       A.    Yesterday.  This morning I brought.

13       Q.    You did it this morning?

14       A.    Uh-huh.

15       Q.    How did you do it this morning?  Did you call

16  them?

17       A.    I call them, he come and then he send me the

18  estimate this morning.

19       Q.    Okay.  You received the estimate this

20  morning?

21       A.    Yes.

22       Q.    And when did you -- when did they come to

23  your house to look at it to assess how much it would

24  cost to pull the drywall out of the house?
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1730 of 3246
Case 1:17-cv-02403-CGB-RML Document 28-01 Exhibit 1-1 Subdocket-05/18/2019 Page 42 of 162
Confidential – Subject to Further Confidentiality Review

1      A.    For second time?

2      Q.    Yeah.  For the second time this month.

3      A.    Last week.

4      Q.    All right.  They came out to your house last

5    week for about how long to look at the house?

6      A.    A couple hours.

7      Q.    And do you remember what they did when they

8    came over for those couple hours, what they looked

9    at?

10     A.    He looked everything.

11     Q.    Did you call this company to get the quote,

12   or did your lawyer?

13     A.    I called.

14     Q.    And why did you get another quote after

15   getting a quote back in 2012?

16     A.    Because the 2012 is long time ago, and

17   assuming it needs to update another estimate for now,

18   since everything's changed for the price and stuff

19   there's going to be now.

20     Q.    Do you think that the work that needs to be

21   done today in 2018 is any different than what would

22   have needed to be done to your home back in 2012?

23         MR. ALBANIS:  Object to the form.

24         But you may answer, if you can.

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1731 of 3246
Case 1:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1731 of 3246
Confidential – Subject to Further Confidentiality Review
162

 1          THE WITNESS:  (Through the interpreter.)  Can

 2      you ask me the question again?

 3          MR. LAWSON:  Sure.

 4   BY MR. LAWSON:

 5      Q.   Do you think the work that they need to do to

 6   fix your home is different today in 2018 than the

 7   work they would have needed to do back in 2012?

 8          MR. ALBANIS:  Same -- same objection.

 9          But you may answer, if you can.

10          THE WITNESS:  (Translated through

11      interpreter.)  No.  I don't want to answer.  I

12      don't know anything about that work.

13   BY MR. LAWSON:

14      Q.   But you thought that the cost of the work

15   might be different in 2018 than it was back in 2012,

16   since six years have passed.  Is that right?

17      A.   Yeah.  That's what I thought.

18      Q.   And that's why you got a second quote?

19      A.   Uh-huh.

20      Q.   And that's a yes?

21      A.   Yes.

22          MR. ALBANIS:  You have to say "yes" or

23      "no" --

24          THE WITNESS:  Yes.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1732 of 3246
Case 1:19-cv-02047-GAG Document 280-9 Chinese Drywall Docket 05/18/2019 Page 42 of 162
Confidential - Subject to Further Confidentiality Review

```
 1            MR. ALBANIS:  -- as opposed to "uh-huh" or

 2       "uh-uh."

 3            MR. LAWSON:  You are doing very well.  I'm

 4       sorry about our rules that we have to follow

 5       here.

 6            THE WITNESS:  Okay.  No problem.

 7  BY MR. LAWSON:

 8       Q.   Do you believe that you have enough money to

 9  be able to pay for the remediation of your home or

10  fixing your home from Chinese drywall at this time?

11       A.   No.

12            MR. ALBANIS:  Object to the form.

13            But you may answer.

14            THE WITNESS:  No.

15  BY MR. LAWSON:

16       Q.   If you remember from receiving the quote this

17  morning, how much money did the most recent quote

18  from this month tell you it would cost to remediate

19  or fix your home?

20       A.   179-9 something.

21       Q.   We'll look at that quote later on, but I

22  just -- I didn't know if you remembered from talking

23  with them earlier today?

24       A.   Yeah.
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1733 of 3246
Case 1:1-cv-22408-MGC Document 236-20 Entered on FLSD Docket 05/19/2015 Page 25 of
162

Confidential - Subject to Further Confidentiality Review

```
 1              (Plaintiff's Exhibit 1 was marked for

 2      identification.)

 3      BY MR. LAWSON:

 4          Q.   Ms. Martinez, you have been handed a document

 5      that's been marked as Exhibit 1.  This is a Lee

 6      County Property Appraiser Online Parcel Inquiry.

 7              Do you see that at the top of the page?

 8          A.   Yes.

 9          Q.   And if you have any trouble reading the --

10      what I'm pointing to or pointing out on this page,

11      please just let us know.

12              I wanted to ask first if you see your name at

13      the top of this document where it says Owner of

14      Record?

15          A.   Yes.

16          Q.   And you are the owner of the property at

17      1624 Northwest 37th Avenue in Cape Coral, Florida,

18      correct?

19          A.   Yes.

20          Q.   And that's your address there under Site

21      Address.  Is that right?

22          A.   Yes.

23          Q.   And that's a picture of your house, correct?

24          A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1734 of 3246
Case 1:1-cv-22408-CFP Document 268-01 Entered on FLSD Docket 09/26/2017 Page 26 of 162
Confidential – Subject to further confidentiality review

```
 1        Q.   Have you seen a document like this before, a

 2   Lee County property record like this?

 3        A.   Yes.

 4        Q.   I'd like to turn your attention down to the

 5   box that says Current Working Values, just below the

 6   box that we were looking at a moment ago.

 7             Do you see that?

 8        A.   Yes.

 9        Q.   If you look down in that box, there's an item

10   that says Total Living Area, and it lists total

11   living area as 2,259.

12             Do you see that?

13        A.   Yes.

14        Q.   And would you say that it's accurate that

15   that reflects 2,259 square feet of total living area

16   in your home?

17        A.   Yes.

18        Q.   And do you have any reason to doubt that that

19   number of 2,259 square feet is accurate?

20        A.   No.

21        Q.   So that number sounds about right --

22        A.   Yes.

23        Q.   -- for the total living area of your home?

24        A.   It's right.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1735 of 3246
Case 1:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1735 of 3246
Confidential - Subject to Further Confidentiality Review
162

 1          Q.   I'd like to turn your attention to the third

 2     page of this document.  At the top right corner it

 3     says Page 3 of 5.  And there's a box on that page

 4     that says Sales/Transactions.

 5               Do you see that?

 6          A.   No.

 7          Q.   Okay.  In the middle of the page it says at

 8     the top in big letters, Sales/Transactions in the

 9     middle.

10          A.   Yes.

11          Q.   Do you see that there?

12          A.   Yes.

13          Q.   And if you look on that table or list,

14     there's a series of numbers and dates of sales prices

15     and dates.  And I wanted to point out the sales --

16     excuse me, the date of November 28th, 2005.

17               Do you see that there?  There's a sales price

18     of $119,000 next to it, and it's from November 28th,

19     2005.

20          A.   Yes.

21          Q.   And you said before that you thought that the

22     home was built around 2005.  Is that right?

23          A.   Yes.

24          Q.   And this record shows a sale of the property

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1736 of 3246
Case 1:11-cv-22408-MGC Document 261 Entered on FLSD Docket 05/18/2019 Page 48 of
162

Confidential - Subject to Further Confidentiality Review

1    for $119,000 around November 28th of 2005.

2              Do you see that?

3       A.   Yes.

4       Q.   And then if you look above that, there's

5    another sale that shows on September 16th of 2008.

6              Do you see that?  It's 9/16/2008.

7       A.   Yes.

8       Q.   And that is for $165,000.

9       A.   Yes.

10      Q.   And is that when you bought the house?

11      A.   Yes.

12      Q.   Okay.  And to your knowledge, the house has

13   never been sold after you bought it.  You have never

14   sold the house, correct?

15      A.   Never.

16      Q.   Have you ever put the house up for sale at

17   any time since you bought it?

18      A.   Never.

19      Q.   Have you thought about selling the house

20   since you bought it?

21      A.   No.

22      Q.   Do you own any other properties other than

23   your house?

24      A.   No.

Confidential - Subject to further Confidentiality Review

1      Q.    If you look below to Building and

2   Construction Permit Data, it's the next box below

3   Sales and Transactions, there's a few items from

4   2008, 2010, and 2015 about building a fence on the

5   property.

6          Do you see that, or that a permit was given

7   for building a fence?

8      A.    Yes.

9      Q.    Did you build a fence on the property?

10     A.    Yes.

11     Q.    Okay.  When did you do that?

12     A.    The first one is September 18, 2008, and the

13   last one is in November 25, 2015.

14     Q.    Did you build a new fence, or did you repair

15   an old fence?  What happened with the fence?

16     A.    The last one I build the new one, because the

17   older one broke.

18     Q.    When do you believe that Chinese drywall was

19   installed in your house?

20     A.    (Translated through interpreter.)  When the

21   house was built.

22     Q.    Has anyone ever told you that before, that

23   the drywall from China was installed when the house

24   was built?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1738 of 3246
Case 1:11-cv-22408-MGC Document 206-01 Entered on FLSD Docket 05/09/2019 Page 40 of
162
Confidential - Subject to Further Confidentiality Review

```
 1        A.   No.

 2        Q.   But you assumed that that's when it was put

 3   into the house, correct?

 4        A.   Yes.

 5        Q.   Do you know who built your house?

 6        A.   United Builder.  That's the company.

 7        Q.   You can set aside that other document.

 8             (Defendants' Exhibit 2 was marked for

 9   identification.)

10   BY MR. LAWSON:

11        Q.   And you have been handed a document that's

12   been marked as Exhibit 2.

13             Do you recognize this document?  Do you think

14   you have seen it before?

15        A.   Yes.

16        Q.   And what is it, if you know?

17        A.   (Translated through interpreter.)  I don't

18   know what it is.  But I know I have seen this.

19        Q.   Okay.  If you look at the top of the page,

20   it's titled Plaintiff Profile Form - Residential

21   Properties.  And if you look down to Section 1, which

22   is titled Property Information, the name of the

23   property owner is Dailyn Martinez.

24             And that's you, correct?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1739 of 3246
Case 1:09-cv-07666 Document 28-8 Entered on FLSD Docket 05/09/2019 Page 31 of
162
Confidential - Subject to Further Confidentiality Review

```
 1       A.   Yes.

 2       Q.   And that is your address listed below that,

 3   1624 Northwest 37th Avenue.  Is that right?

 4       A.   Yes.

 5       Q.   And if you flip back to the fourth page of

 6   this document -- it's marked as MartinezD00004 -- is

 7   that your signature on that page?

 8       A.   Yes.

 9       Q.   And the date that appears that you signed

10   this was December 8th of 2009.  Is that right?

11       A.   Yes.

12       Q.   And according to this document, when you

13   signed this, you were stating under penalty of

14   perjury that the contents of this form were true or

15   correct to the best of your knowledge.

16            Is that your understanding?

17       A.   Yes.

18       Q.   Do you remember reviewing this form before

19   you signed it back in 2009?

20       A.   (Translated through interpreter.)  I didn't

21   understand.

22       Q.   Did you look at this form before you signed

23   this page on Page 4?

24       A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1740 of 3246
Case 1:11-cv-02952-GEC Document 23263-39 Exhibit 31 Subject to further confidentiality review Page 32 of 162

Confidential - Subject to Further Confidentiality Review

    1       Q.    And looking at it today -- scratch that.

    2             I wanted to ask you about Section 2.  It says

    3    Insurance Information.  That's on the first page of

    4    the document, and it's marked as MartinezD00001.

    5    It's on the right-hand side.  And it asks for the

    6    homeowner or renter's insurer for the home.

    7             And it looks like you have listed Northern

    8    Capital Insurance Company.

    9             Do you see that there?

   10    A.    Yes.

   11       Q.    Was Northern Capital Insurance Company the

   12    company that you had your homeowner's insurance with

   13    back in 2009?

   14    A.    Yes.

   15       Q.    And do you still have your homeowner's

   16    insurance with that company today?

   17    A.    No.

   18       Q.    Okay.  Who do you have as your homeowner's

   19    insurance company now, if you remember?

   20    A.    I don't remember.

   21       Q.    Do you remember if you ever filed an

   22    insurance claim with Northern Capital Insurance for

   23    the damage to your home from Chinese drywall?

   24    A.    No.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1741 of 3246
Case 1:09-cv-06690-GEL Document 2019-01 Confidential Subject to Confidentiality Review Page 33 of
Confidential - Subject to Further Confidentiality Review
162

```
 1        Q.    You did not file a claim?

 2        A.    No.  I don't file a claim.

 3        Q.    Do you know -- did you ever consider or think

 4    about filing a claim?

 5        A.    No.

 6        Q.    Why is that?

 7        A.    Because they're not going to pay me for any

 8    Chinese drywall.

 9        Q.    And why do you think they wouldn't have paid

10    you?

11        A.    It's nothing to do with insurance.

12        Q.    Did someone tell you that, or that is what

13    you thought?

14        A.    No.  That's what I thought.

15        Q.    If you look down to Section 3, it's called

16    Claimant Information.  It lists three different

17    people that live in the home; it appears to be you,

18    your husband, and your son.  Is this right?

19        A.    Yes.

20        Q.    And it said that you all moved in at the same

21    date on September 6th of 2008.  Is that right?

22        A.    Yeah.

23        Q.    And there is no date that is entered for when

24    you left the house, because this is before you left
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1742 of 3246
Case 1:09-md-02047-GAO Document 23201 Confidential - Subject to Further Confidentiality Review Page 461 of 162
Confidential - Subject to Further Confidentiality Review

1   the house to live in the RV.  Is that right?

2       A.   (Translated through interpreter.)  I don't

3   understand the question.

4       Q.   When we looked at the date that you signed

5   this, it was in 2009, right?

6       A.   (Translated through interpreter.)  Yes.

7       Q.   And at that time in 2009, you were still

8   living in your house, right?

9       A.   (Translated through interpreter.)  Yes.

10      Q.   You didn't move out until 2010?

11      A.   (Translated through interpreter.)  I moved

12  to -- I moved in 2010 into the RV in that -- in the

13  house.

14      Q.   And the RV was parked outside of the house.

15  Is that right?

16      A.   In the back to the house.

17      Q.   But at the time that you filled out this

18  form, did you know that you had Chinese drywall in

19  your house?

20      A.   Yes.

21      Q.   And how did you know that?

22      A.   I've been sick, I've been -- find all those

23  corrosion, the Erickson inspection come in 2009 and

24  do the inspection and all the pictures and all that

Confidential - Subject to Further Confidentiality Review

```
 1    stuff and confirm I have Chinese drywall.

 2         Q.   Were you at the house when Erickson's did the

 3    inspection of your home in 2009?

 4         A.   Yes.

 5         Q.   And do you remember what they did while they

 6    were in your house?

 7         A.   So many pictures, so many holes in the wall,

 8    so many things they -- they've been doing.

 9         Q.   If you look to the second page of this

10    document, it's marked as MartinezD0002.  At the top

11    it lists inspection information, and you entered that

12    Erickson's Drying Systems performed an inspection on

13    your house.

14              Do you see that at the top?  It says

15    Erickson's Drying Systems?

16         A.   Yes.

17         Q.   Is that the same Erickson's that you were

18    just telling me about --

19         A.   Yes.

20         Q.   -- that did an inspection?

21              And it looks like you said that the

22    inspection happened on October 20th, 2009.

23              Do you see that?

24         A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1744 of 3246
Case 1:11-cv-22408-MGC Document 239-31 Entered on FLSD Docket 05/08/2014 Page 46 of
162

```
 1      Q.   Does that sound right?

 2      A.   Yes.

 3      Q.   If you look below that, there's a section

 4   called Drywall Information, and it lists drywall

 5   manufacturers.

 6           Do you see that?

 7      A.   Yes.

 8      Q.   And the first drywall manufacturer that's

 9   listed is Knauf, it's K-n-a-u-f.

10           Do you see that?

11      A.   Yes.

12      Q.   And it said that there are markings on

13   drywall from Knauf-Tianjin.

14           Do you see that listed?

15      A.   Yes.

16      Q.   And it says that they're in the attic and the

17   pocket doors in the -- under the column that says

18   Location in Home.

19           Do you see that?

20      A.   Yes.

21      Q.   And also for markings on drywall, there's a

22   marking that is listed as "4 feet x by 12 feet x 1/2

23   inch" and it says "drywall" and then it says

24   "051303056094."
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1745 of 3246
Case 1:09-cv-02047-MCA Document 2365-01 Entragon Filed Subpacket 05/08/2015 Page 37 of
162
Confidential – Subject to further confidentiality Review

```
1              Do you see that?

2      A.    Yes.

3      Q.    And it says the location in the home for that

4   drywall marking is pocket doors.

5              Do you see that there?

6      A.    Yes.

7      Q.    Have you ever seen those drywall markings,

8   either of those that are listed -- or, any of those

9   that are listed, excuse me, in your house?  Have you

10  seen them?

11             MR. ALBANIS:  Object to the form.

12             And I will further state that, Counsel, you

13      have copies of the Erickson's inspection report,

14      as well as subsequent inspection reports, after

15      2009 from this particular property.

16             MR. LAWSON:  Yes.  And we'll get there.  I

17      want to ask her about this.

18  BY MR. LAWSON:

19      Q.    You've seen those markings inside of your

20  house before?

21      A.    Those rounds --

22             (Translated through interpreter.)  The round

23  things that they did in the wall?

24      Q.    They cut out round samples of drywall
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1746 of 3246
Case 1:09-md-02047-GAP Document 20-01 Exhibition Spreadsheet 09/24/19 Page 3B of
162
Confidential - Subject to Further Confidentiality Review

```
 1    markings from the walls in your house.  Is that

 2    right?

 3         A.   Yes.

 4         Q.   And when I say "they," Erickson's Drying

 5    Systems cut out round sections of drywall.  Is that

 6    right?

 7         A.   Yes.

 8         Q.   And did those round sections show drywall

 9    markings on them?

10         A.   Yes.

11         Q.   And do you believe they show the markings

12    that are listed on this form that we just read?

13         A.   Yes.

14         Q.   You said a second ago that United Home

15    Builders built your home.  Is that right?

16         A.   Yes.

17         Q.   How do you know that?

18         A.   I have papers at home.

19         Q.   You have papers that show that they built the

20    house?

21         A.   Yes.

22         Q.   Have you ever talked with anyone at United

23    Home Builders before?

24         A.   No.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1747 of 3246
Case 1:11-cv-22408-CMA Document 284-1 Entered on FLSD Docket 08/24/2012 Page 50 of
162
Confidential - Subject to Further Confidentiality Review

```
1        Q.    Have you ever asked United Home Builders or

2    has your attorney asked United Home Builders to

3    repair your home?

4            MR. ALBANIS:  I'm going to object to the form

5        of that question.

6            Ms. Martinez retained counsel in 2009 to

7        represent her in this matter, and her attorney,

8        in 2009, sent the requisite Section 558 notice to

9        United Home Builders, which is attached to the

10       Plaintiff Profile Form.  Per her agreement at the

11       time with her counsel at the time, that was her

12       counsel's role, and her counsel fulfilled it.

13           Ms. Martinez is not an attorney.  She would

14       not have any information beyond what is attached

15       to this document about the notice that was sent

16       to the builder.

17   BY MR. LAWSON:

18       Q.    Ms. Martinez, going back to my question:  Do

19   you know whether you or an attorney that you have

20   hired has ever asked United Home Builders to repair

21   your home?

22       A.    (Translated through interpreter.)  I think

23   they were contacted, but I think they went into

24   bankruptcy.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1748 of 3246
Case 1:11-cv-22408-MGC Document 226-201 Entered on FLSD Docket 05/08/2013 Page 40 of
162

Confidential - Subject to Further Confidentiality Review

```
1        Q.    I'd like you to turn to Page 8 of this

2    document.  It's marked as MartinezD0008 -- excuse me,

3    MartinezD00008, and also to the ninth page as well --

4    and excuse me, it's the eighth through 11th page

5    where this letter is.  But we can focus first on the

6    eighth page.

7              This appears to be a letter from December 9,

8    2009, from a Webb & Scarmozzino law firm to United

9    Home Builders.

10             Do you see that?

11       A.    Yes.

12       Q.    And is that the law firm that you hired to

13   contact United Home Builders?

14       A.    Yes.

15       Q.    Do you know at -- if United Home Builders

16   ever offered to repair your home?

17       A.    They never do anything, because they went

18   bankruptcy.  They're not . . .

19       Q.    So they never repaired your home or attempted

20   to repair it?

21       A.    Never.

22       Q.    Turning to the 12th page of this document

23   marked as MartinezD00012, it's the first page after

24   this letter, does this look like an image of your
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1749 of 3246
Case 1:09-cv-02047-MCA Document 22361 Confidential Subject to Docket 05/19/2019 Page 41 of
162
Confidential - Subject to Further Confidentiality Review

```
 1    home and the floor plan or footprint of your home?

 2         A.   Yes.

 3         Q.   And looking to the 13th page, there's a

 4    warranty deed.

 5              Do you see that?

 6         A.   Yes.

 7         Q.   Now, this appears to be a warranty deed from

 8    April 2nd, 2010.

 9              Do you see that?

10         A.   Yes.

11         Q.   And it's a warranty deed between a

12    Robert Pike and Jill Pike and you.  Is that right?

13         A.   Yes.

14         Q.   What is this deed for?

15         A.   (Translated through interpreter.)  This is

16    from when I bought the house.

17         Q.   You bought the house in 2008.  Isn't that

18    right?

19         A.   Yes.

20         Q.   And this deed says that it's from 2010.

21              Do you see that at the top?

22         A.   Oh, wait a second.  This is for the extra lot

23    that I bought in the back to the house --

24         Q.   Okay.
```

Case 2:09-md-02047-EEF-MBN Document 23263-39 Filed 11/19/19 Page 1750 of 3246
Case 2:11-cv-02498-GCM Document 23363-39 Entered on FLSD Docket 05/09/2019 Page 42 of
162
Confidential - Subject to Further Confidentiality Review

```
 1      A.   -- for $7,000, yes.

 2      Q.   So you purchased additional land, another lot

 3   that was behind your house?

 4      A.   Yes.

 5      Q.   Okay.  And you purchased it from

 6   Mr. and Mrs. Pike.  Is that right?

 7      A.   Yes.

 8      Q.   All right.  And you did that around 2010?

 9      A.   Yes.

10      Q.   Okay.  You can set that document aside.

11           A little bit earlier you said that you

12   thought you might have Chinese drywall because of the

13   corrosion that you were seeing in the house, correct?

14           MR. ALBANIS:  Object to the form.  It

15      mischaracterizes Ms. Martinez's testimony.

16           But you may answer, if you can.

17           THE INTERPRETER:  Do you want me to translate

18      the question and your objection?

19           MR. ALBANIS:  I think that would be best.

20           THE WITNESS:  (Translated through

21      interpreter.)  No.  I didn't think that it was

22      Chinese drywall when I saw that, because I didn't

23      know.  I -- I saw something strange, but I didn't

24      refer it -- relate it with Chinese drywall.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1751 of 3246
Case 1:09-cv-23480-MGC Document 208-20 Entered on FLSD Docket 05/08/2019 Page 45 of 162
Confidential - Subject to further confidentiality review

1    BY MR. LAWSON:

2        Q.   When did you first hear about Chinese

3    drywall?

4        A.   (Translated through interpreter.)  When

5    Erickson's came and did the inspection.  That's when

6    I found out about Chinese drywall.

7        Q.   Had you heard about other people having

8    Chinese drywall in their homes before Erickson's did

9    the inspection in your home?

10       A.   No.

11       Q.   You had never heard of Chinese drywall before

12   Erickson's told you that you had it?

13       A.   Never.

14       Q.   Why did you have Erickson's come to your

15   house?

16       A.   Because the attorney send them.

17       Q.   So you had hired an attorney already before

18   you knew that you had Chinese drywall.  Is that

19   right?

20       A.   Yes.

21       Q.   And why did you want to hire an attorney at

22   that time?

23       A.   Because I don't know where I do -- I don't

24   know what I'm -- just do anything about that.

```
 1      Q.   What problems were you having in your house

 2   that made you want to go hire an attorney?

 3      A.   Too many problems.  The more problems is the

 4   health problem.  We don't feel good.  We start

 5   getting headache.  We start bleeding by the nose.  We

 6   have respiratory problems.  We have all kinds of

 7   problems that we don't even know, you know, how to --

 8   how do we deal with that?

 9      Q.   And because of those health issues that you

10   were having, that's why you hired an attorney?

11      A.   To try to do what -- to see what they can do.

12      Q.   Back when you bought the house, did you ask

13   the bank or whoever was selling the house about the

14   corrosion that you saw in the house?

15      A.   (Translated through interpreter.)  The bank?

16   No.

17      Q.   Did you ask a realtor or anyone who was

18   showing you the house about the corrosion?

19      A.   (Translated through interpreter.)  I asked

20   the woman who sold me the house who is a friend of

21   me.  She's a realtor.  And she told me she didn't

22   know anything.

23      Q.   Did you have an inspection done of the house

24   before you bought it?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1753 of 3246
Case 1:14-cv-06228-MGC Document 28-01 Exhibit 01-39 Docket 05/08/2019 Page 45 of 162
Confidential - Subject to further confidentiality review

```
 1      A.   No.

 2      Q.   Why not?

 3      A.   (Translated through interpreter.)  Because

 4   nothing was known about Chinese drywall at that time.

 5      Q.   Did you notice any kind of smell or unusual

 6   odor inside of the house when you visited it before

 7   you purchased it?

 8      A.   Yes.

 9      Q.   What was that smell?

10      A.   Like, when your house is closed and no air

11   condition and things, like, get inside to your nose,

12   the -- you have, like, a --

13           (Translated through interpreter.)  Like a

14   strange smell.

15      Q.   Did you ask about that smell with the woman

16   who was showing you the house?

17      A.   No.  Because I thought the house was empty

18   and there be no air condition, nothing in the house,

19   and I thought maybe, you know, it's because nobody

20   live in the house.  So that's that kind of smell.

21      Q.   Did that smell continue to be in the house

22   after you moved in and turned on the

23   air-conditioning?

24      A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1754 of 3246
Case 1:07-cv-09202-GEL Document 30-21 Entered on FLSD Docket 05/09/2017 Page 45 of 162
Confidential - Subject to further confidentiality Review

1       Q.   And did it continue -- does it continue to be

2   in the house today?

3       A.   Yes.

4       Q.   Has it ever changed at all and gotten better

5   or worse?

6       A.   It's better.  Don't smell too much when the

7   air condition is on.  And -- but when I open the

8   windows or turn off the air condition, because it

9   broke, it get worse.

10      Q.   Is it worse in any part of the house compared

11  to the other parts of the house?

12      A.   No.

13      Q.   It's the same?

14      A.   The same.

15      Q.   Can you smell it when you're in the garage of

16  the house?

17      A.   Yes.  Not much when you open the garage.

18      Q.   You said earlier that the company that built

19  your house, United Home Builders, had gone bankrupt.

20  Is that right?

21      A.   Yes.

22      Q.   Do you know if they went bankrupt around the

23  time that you bought the house, or do you know when

24  that occurred?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1755 of 3246
Case 1:09-cv-08249-MGC Document 292-1 Entered on FLSD Docket 08/04/2011 Page 47 of
162
Confidential – Subject to Further Confidentiality Review

```
1              MR. ALBANIS:  Object to the form.

2              But you may answer, if you know,

3         Ms. Martinez.

4              THE WITNESS:  I don't know.

5    BY MR. LAWSON:

6         Q.   You said that you bought the house in a

7    foreclosure sale.  Is that right?

8         A.   Yes.

9         Q.   Do you know if United Home Builders owned the

10   home before you owned the home?

11        A.   I don't know.

12             (Defendants' Exhibit 3 was marked for

13   identification.)

14   BY MR. LAWSON:

15        Q.   You have been handed a document that's been

16   marked as Exhibit 3.

17             Do you recognize this document?

18        A.   Yes.

19        Q.   And what is it?

20        A.   It's the Erickson's inspection they do in my

21   house.

22        Q.   And this is the inspection that was performed

23   on October 20th, 2009.  Is that right?

24        A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1756 of 3246
Case 1:09-md-02047-EEF-MBN Document 23362-30 Filed 11/19/19 Page 1756 of 3246
Confidential - Subject to Further Confidentiality Review
162

```
1       Q.   And when this inspection was performed, that

2    was the first time that you knew that you had Chinese

3    drywall.  Is that right?

4       A.   Yes.

5       Q.   Earlier you told me about corrosion and

6    health issues and problems with your air-conditioning

7    that you were dealing with, as well as a smell inside

8    of the house, correct?

9       A.   Yes.

10      Q.   Were you dealing with all of those issues

11   before this inspection happened in October of 2009?

12      A.   Yes.

13      Q.   Were there any other issues or problems that

14   you had in your house that you think are related to

15   Chinese drywall other than the ones that we just

16   talked about?

17           MR. ALBANIS:  Object to the form.

18           But you may answer, if you know,

19      Ms. Martinez.

20           Are you talking about back in 2009, or are

21      you talking through the present?

22           MR. LAWSON:  Let's first talk before 2009.

23      That's fair.

24   ///
```

Case 2:09-md-02047-EEF-MBN Document 23263-39 Filed 11/19/20 Page 1757 of 3246
Case 1:11-cv-22408-MGC Document 208-1 Entered on FLSD Docket 09/29/2017 Page 49 of
162

Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. LAWSON:

 2        Q.   Did you have any other problems other than

 3    the ones that we just listed before this inspection

 4    in 2009?

 5             MR. ALBANIS:  Object to the form.

 6             But you may answer, Ms. Martinez.

 7             THE WITNESS:  Not that I remember.

 8    BY MR. LAWSON:

 9        Q.   Can you think of any different problems that

10    you had with your home or living in your home because

11    of Chinese drywall after this inspection?

12             MR. ALBANIS:  Object to the form, because of

13        the -- because it's unclear if you are limiting

14        it -- if you are limiting your question to a

15        particular time period.

16    BY MR. LAWSON:

17        Q.   And to clarify, Ms. Martinez, I'm asking

18    about the period after this inspection from 2009

19    until today.

20        A.   (Translated through interpreter.)  The thing

21    is, I don't understand the question.

22        Q.   Are you having the same issues with your home

23    related to corrosion, health issues, air-conditioning

24    problems that -- and the smell in the home from 2009
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1758 of 3246
Case 1:19-cv-00248-MAC Document 23-8 Filed 05/19/2019 Page 50 of 162
Confidential - Subject to Further Confidentiality Review

```
 1    until today that you were having before this

 2    inspection?

 3              MR. ALBANIS:  Object to the form.

 4              But you may answer, Ms. Martinez.

 5              THE WITNESS:  Yes.

 6    BY MR. LAWSON:

 7         Q.    Did you have the health issues that you

 8    discussed during the time that you lived outside of

 9    your home in the RV or in the rental homes that you

10    brought up before?

11         A.    No.

12         Q.    But now that you have moved back into the

13    home, are you having those same issues?

14         A.    Yes.

15         Q.    Has the corrosion issue changed at all today,

16    in 2018?

17         A.    No.

18         Q.    And let's look at this inspection report.

19              You said earlier that you were at your house

20    when this inspection was occurring, correct?

21         A.    Yes.

22         Q.    And if you turn to the second, third, and

23    fourth pages of this document, there's a series of

24    photographs.
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 1759 of 3246
Case 1:11-cv-22408-MGC Document 208-201 Entered on FLSD Docket 05/09/2012 Page 51 of
162
Confidential - Subject to further confidentiality Review

1          Do you see those?

2     A.    Yes.

3     Q.    Looking at these photos, can you tell that

4     they were taken at your home?

5     A.    Yes.

6     Q.    And on the first page of photographs,

7     specifically, that is an image of the address of your

8     home and the exterior of your home, right?

9     A.    Yes.

10     Q.    The images on the first page of photographs

11     of the faucet on the right side, that is the

12     corrosion on the faucet that you were talking about

13     earlier, correct?

14     A.    Yes.

15     Q.    And you recall the inspector cutting out

16     samples of drywall from your house during this

17     inspection?

18     A.    Yes.

19     Q.    Are those the same samples that you brought

20     with you here today?

21     A.    Yes.

22     Q.    When you had another inspection of your home

23     later on, did they also cut out samples from the

24     wall?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1760 of 3246
Case 1:09-cv-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 52 of 162
Confidential - Subject to Further Confidentiality Review

```
1      A.   No.

2           MR. ALBANIS:  Well, it may help to refer her

3      to the inspection that you are referring to.

4           MR. LAWSON:  And we will get there.  I just

5      want to understand her recollection.

6  BY MR. LAWSON:

7      Q.   As a result of this inspection, what did the

8  inspector tell you about your home after they had

9  done the inspection?

10     A.   That I have Chinese drywall Knauf.

11     Q.   That you had Knauf Chinese drywall?

12     A.   Yes.

13     Q.   And are those the images that you can see on

14 the third -- or, the second page of pictures in the

15 upper right corner?

16          Do you see that picture of Knauf drywall?

17     A.   Yes.

18     Q.   And then there's also some additional ones in

19 the third page of photographs on the left-hand side.

20          Are those what you are referring to?

21     A.   Yes.

22          MR. ALBANIS:  So for the record, the pictures

23     of the Knauf drywall are on Page 3, 4, 6, 7, 8 of

24     Exhibit 3.
```

Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. LAWSON:

 2        Q.   Going back to the first page of this report,

 3    there's a chart that discusses different items in the

 4    home, and one of them is personal property.  It's the

 5    second to last item on the chart.

 6             Do you see that?

 7        A.   Yes.

 8        Q.   And it says that "no personal items presented

 9    for observation."

10             Do you see that?

11        A.   Yes.

12        Q.   Do you recall if you showed the inspector any

13    personal property items in your home that you felt

14    had been damaged by Chinese drywall?

15        A.   (Translated through interpreter.)  I can't

16    remember.  This was in 2009.

17        Q.   Do you believe that you have personal items

18    that have been damaged by Chinese drywall?

19        A.   Yes.

20        Q.   What kind of items are -- do you think have

21    been damaged by Chinese drywall in your house?

22        A.   (Translated through interpreter.)

23    Everything.  The stove, the microwave, the

24    refrigerator, the washer, the dryer, the
```

Case 2:09-md-02047-EEF-MBN Document 23263-39 Filed 11/19/19 Page 1762 of 3246
Case 1:11-cv-22408-MGC Document 28-91 Entered on FLSD Docket 05/18/2012 Page 461 of 162
Confidential – Subject to further confidentiality Review

1    air-conditioning, the water heater, the cameras, the

2    televisions, the electric -- the electric pot, the

3    coffee maker, the watch stopped, all of the jewelry

4    that are not gold turned black.  The motorcycle, my

5    husband's motorcycle, all of that is metal, corroded.

6    Thousands of things.

7         Q.   It sounds like the metal or electrical items

8    in the house are the ones that you think have been

9    damaged by Chinese drywall?

10        MR. ALBANIS:  Object to the form.  That

11        mischaracterizes Ms. Martinez's testimony.

12        And I'll state further that we have submitted

13        and produced extensive documentation regarding

14        Ms. Martinez's personal property damage.  This

15        deposition is not a memory test, and she should

16        be referred to that extensive documentation if

17        you are going to ask her about such questions.

18        MR. LAWSON:  Pete, I appreciate that.  But

19        the speaking objections are just trying to inform

20        her of that.  And I'm asking her about her

21        recollection, which while not a memory test, is

22        the reason that we have her here instead of just

23        looking at documents.

24        So I am going to ask her questions, and I

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 4763 of 3246
Case 1:09-md-02047-CA Document 23201 Entered on FLSD Docket 05/19/2017 Page 45 of
162

Confidential - Subject to further confidentiality review

```
1        would appreciate it if we don't try to instruct

2        the witness by referring to speaking objections.

3             MR. ALBANIS:  It is not an instruction at

4        all.  I am not coaching the witness.  I'm merely

5        stating a fact that we have produced extensive

6        documentation regarding Ms. Martinez's personal

7        property damage in this case.

8             THE WITNESS:  (Translated through

9        interpreter.)  What did he say?

10            MR. LAWSON:  You can translate it back for

11       her, if you want.

12            Pete, do you want that to be translated for

13       her?

14            MR. ALBANIS:  I think that would be best.

15            MR. LAWSON:  I would also note for the record

16       that for the first time, I believe just the other

17       day, we received a number, I think it was

18       yesterday, of $59,532.65 for personal property

19       damages that we had not known until the day

20       before this deposition.

21            So I think it is perfectly proper to be

22       asking today if there are any additional items in

23       asking for Ms. Martinez's recollection, because

24       it appears to be a moving target and changing on
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1764 of 3246
Case 2:09-md-02047-EEF-MBN Document 22362-10 Entered on FLSD Docket 05/18/2019 Page 56 of
162

Confidential - Subject to Further Confidentiality Review

1      the eve of the deposition.

2           So we will inquire fully, and we will be

3      asking questions about both the documentation

4      that we have just received and the numbers that

5      we have just received and her recollection of

6      what items she is seeking damages for in this

7      case.

8           MR. ALBANIS:  And, Counsel, as you know, we

9      have an obligation per Rule 26 of the Federal

10     Rules of Civil Procedure to amend our discovery

11     responses if we obtain new information or

12     documentation from our client, and we have

13     provided all of the supporting documentation that

14     supports the $59,000 and change number that you

15     just referenced.

16          MR. MOREN:  I would like to add for the

17     record in view of BNBM that this information was

18     just dumped on us on the eve of the deposition

19     and may not have been proper time for us to

20     review.  If counsel is not fully able to explore

21     these questions at this deposition, we may need

22     to continue at a later date.

23          MR. ALBANIS:  Understood.

24          MR. LAWSON:  Let's go off the record.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1765 of 3246
Case 1:09-cv-02047-GAE Document 23-39 Entered on FLSD Docket 09/04/19 Page 57 of
162

Confidential – Subject to Further Confidentiality Review

```
 1              (Recess from 8:51 until 9:04 a.m.)

 2              MR. ALBANIS:  As I just told you, Matt,

 3         during the break, I had an opportunity to check

 4         with my staff, and I just want to confirm for the

 5         record that what I believed before, which is that

 6         I think it's an unfair characterization to

 7         suggest that we "dumped," to use your word,

 8         Mr. Moren, this new information on you on the eve

 9         of the deposition, we actually produced the

10         following documents on the following dates that

11         support the personal property damages claim:

12         Document Number 150392 was produced on

13         October 13, 2013; Document Number 150393 was

14         produced on October 13, 2013; Document Number

15         136599 was produced on January 30th, 2015;

16         Document Number 365817 was produced on

17         November 30th, 2018; and Document Number 365944

18         was produced on December 4, 2018.

19              MR. LAWSON:  And I would like to clarify for

20         the record that my objection was to the latest

21         interrogatories that we received yesterday

22         evening for Ms. Martinez, which for the first

23         time listed the amount of personal property

24         damages that were actually being pursued by her
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1766 of 3246
Case 1:09-cv-02047-MCA Document 2201 Confidential Subject 05/19/2019 Page 58 of
162
Confidential - Subject to Further Confidentiality Review

```
1      in this lawsuit.

2           As Mr. Albanis just explained, some of the

3      documentation that has been given for personal

4      property dated back to 2013, and there have been

5      claims submitted for that personal property --

6      some of it from 2013 -- in other settlements for

7      other lawsuits in this multidistrict litigation

8      that originated back in 2009.

9           So we received clarification on what was

10     being pursued in this lawsuit for the first time

11     yesterday evening, and want to get clarification

12     on that today, which is why I was asking

13     Ms. Martinez to her recollection which personal

14     property items she believes has been damaged in

15     her house so we can get that clarified and

16     explained in this deposition.

17          MR. ALBANIS:  And in response to that, I will

18     just say that we produced over the course of the

19     past five years numerous documents supporting the

20     $59,000 number.  The receipts that we previously

21     produced, which I identified earlier, support

22     that $59,000 number.

23          I would also point out that the defendants'

24     written discovery requests requested new
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1767 of 3246
Case 1:09-cv-02047-MCA Document 22201 Confidential Subject to Further Confidentiality Review Page 450 of
Confidential - Subject to Further Confidentiality Review
162

1          information that had not already been produced,

2          and as plaintiffs, we were operating with the

3          understanding that documents that had previously

4          been uploaded to the BrownGreer portal did not

5          need to be uploaded again.

6              MR. LAWSON:  We are of the understanding that

7          all the documents in the BrownGreer portal were

8          part of the case file as well.  However, it is

9          not always clear which particular items are being

10         pursued in this action, as opposed to prior

11         actions, since that portal relates to other

12         lawsuits, other settlement programs.  And that is

13         the case here, where there is a claim form from

14         Ms. Martinez for the receipts from 2013 that you

15         have just listed, and there are also a series of

16         disbursements to Ms. Martinez that are in the

17         record showing payment for similar amounts to

18         those receipts.

19             And it was unclear to us until last evening

20         that Ms. Martinez is pursuing those same amounts

21         for those same receipts again against Taishan and

22         other defendants, as opposed to when she pursued

23         them from other defendants in this litigation.

24             MR. ALBANIS:  While she did previously submit

Confidential - Subject to Further Confidentiality Review

```
 1        receipts in regards to the Chinese drywall -- in

 2        regard to the various Chinese drywall

 3        settlements, she was not compensated in full at

 4        the time when she received her compensation from

 5        the Chinese drywall settlements for those claims.

 6            And I'm sure that that's something that you

 7        will get into, Matt, over time, and all of that

 8        is fair game.  And those checks, of course, have

 9        you produced to you.

10            MR. VERRIER:  And I would just add that I

11        object to using the phrase "previous action" she

12        submitted the claim.  There's one Chinese drywall

13        action.  Various settlements that are -- have

14        taken place, you know, may have been -- you know,

15        sought damage caused by the Chinese drywall and

16        gotten some partial compensation does not

17        foreclose her opportunity to get full

18        compensation for those damages.

19            MR. LAWSON:  And I think that is a

20        misstatement of the nature of this litigation.

21        There are hundreds of actions that have been

22        filed into the multidistrict litigation that

23        exists in the Eastern District of Louisiana, and

24        there have been multiple claims filed by
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1769 of 3246
Case 1:11-cv-22408-MGC Document 1 Entered on FLSD Docket 05/09/2011 Page 61 of
162
Confidential - Subject to further confidentiality Review

1      different claimants into different actions

2      against different defendants that do not relate

3      to this particular lawsuit that we are dealing

4      with in the Southern District of Florida now.

5           And that is clear from Ms. Martinez's claim

6      file on the BrownGreer online portal that she

7      pursued other amounts of money from other

8      defendants in the different actions that are in

9      this multidistrict litigation.

10          MR. ALBANIS:  But there's no dispute that she

11     has not been compensated in full for her damages

12     in our view, number one.

13          And I think what Keith was getting at earlier

14     is that the Amorin complaint in the Southern

15     District of Florida and the Chinese drywall

16     multidistrict litigation that was proceeding and

17     continues to proceed in the Eastern District of

18     Louisiana are all under the umbrella of the

19     Chinese drywall litigation.

20          MR. LAWSON:  That's correct.  And we can

21     agree on that.

22          MR. MOREN:  I'll also point out then that

23     you, Keith, said that Ms. Martinez has received

24     partial compensation, and yet in the

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1770 of 3246
Case 1:09-md-02047-GAO Document 201 Entered on FLSD Docket 05/18/2017 Page 62 of 162
Confidential - Subject to further confidentiality review

```
1        interrogatory responses that she submitted last

2        night, she's seeking full compensation for all

3        these damages, which is double-dipping into --

4        with respect to the partial compensation that you

5        acknowledge and agreed.

6            I would also like to make a request for

7        signed responses to these interrogatories.

8            MR. ALBANIS:  We will provide verifications

9        to you as well.

10            MR. VERRIER:  And I would like -- I don't

11        believe you accurately characterized what I said.

12        I was referring to Mr. Lawson's statements

13        regarding the amount of money received in the --

14        that's indicated on the Plaintiff's Supplemental

15        Plaintiff Profile Form that he's about to get

16        into, as he noted; and that to the extent that

17        that's compensation for some damages, personal

18        property that she claimed, it's certainly not, as

19        Mr. Albanis has pointed out, full compensation

20        for damages in that regard, so . . .

21            MR. ALBANIS:  And we disagree with your

22        characterization --

23            MR. MOREN:  Well, I may have misunderstood

24        what you said, Keith.  And I'm certainly not
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1771 of 3246
Case 1:09-cv-02047-CG Document 22363-39 Filed 11/19/19 Page 1771 of 3246
Confidential - Subject to further Confidentiality Review
162

```
1       going to ask you to testify as to what

2       Ms. Martinez wrote in her --

3              MR. VERRIER:  And I would have to go back and

4       read the transcript.  Maybe I misspoke.  But I

5       think we both understand what we are saying now.

6              MR. LAWSON:  All right.  We have all talked

7       enough.  We are going to explore this issue

8       further to be able to see what damages for

9       personal property that Ms. Martinez is pursuing

10      in this lawsuit, and we will go through those

11      receipts and other compensation that she's

12      received.  And we would reserve the right to

13      pursue that line of inquiry in this deposition

14      and will pursue it.

15             MR. ALBANIS:  Great.

16             THE WITNESS:  (Through the interpreter.)  I

17      want to tell him something.  I have heard

18      everything that you have said, because you, the

19      interpreter, have explained it to me.

20             Tell him there's no money in the world

21      that -- the nine years that I have passed that my

22      family and I have suffered because of all of this

23      problem.  I'm a Cuban.  I came in a boat, in a

24      raft three days in the water with the -- with --
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1772 of 3246
Confidential - Subject to further confidentiality review
162

```
 1          MR. ROTHENBERG:  Sharks.

 2          THE WITNESS: (Through the interpreter.)  --

 3     sharks next to me in order to arrive at this

 4     country, this powerful country.  I have worked

 5     very hard.  I bought my house, the American

 6     dream, and look what's happened to us.

 7     Everything for money.  Nine years.  Would anybody

 8     believe that this would happen in this country?

 9     Illnesses, many, many problems that you can't

10     even imagine.  That's what I wanted to tell you.

11          MR. LAWSON:  And, Ms. Martinez, I want you to

12     understand how much I appreciate you coming in

13     today and explaining all of that, and I

14     understand how difficult it must be to go through

15     all of this again.  But I want to give you this

16     opportunity to be able to have the -- to explain

17     to everyone what you have gone through, what you

18     have experienced, and what you believe has been

19     damaged or harmed in your life as a result of the

20     claims that you made in this lawsuit.

21          THE WITNESS:  And I really appreciate you

22     guys listen to me, because I'm waiting for nine

23     years to tell everybody or somebody like

24     Louisiana or -- I asked Pete, can I go to
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1773 of 3246
Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 45 of 162
Confidential - Subject to Further Confidentiality Review

```
 1        Louisiana to talk to the people?  Can I -- listen

 2        to me?  Because nobody understand, because you

 3        are not -- live in the house like that.  When you

 4        don't know, when you don't pass in your --

 5        (Translated through interpreter.)  You don't

 6        live it in your own flesh, what is happening, you

 7        can imagine it, but you don't know.

 8        MR. LAWSON:  Well, I want you to know that we

 9        really want you to have the opportunity to be

10        able to fully explain everything today, and we'll

11        make sure to take the time to give you that

12        chance.

13        And if it's okay, unless you need a break, I

14        just want to keep moving forward because I know

15        you also have a limited amount of time here with

16        us today, and I want to give you the chance to be

17        able to talk through everything.

18        THE WITNESS:  Yeah, it's okay.  We can

19        continue.

20        MR. LAWSON:  Thank you.

21        MR. MOREN:  For the record, BNBM moves to

22        strike.

23        MR. ALBANIS:  Strike what?

24        MR. MOREN:  The discourse as not responsive
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1774 of 3246
Case 1:11-cv-22408-MGC Document 206-01 Entered on FLSD Docket 05/18/2012 Page 46 of
162
Confidential - Subject to Further Confidentiality Review

```
 1      to counsel's question.

 2           MR. ALBANIS:  We object to that.  We disagree

 3      that it's not responsive to the question.  And

 4      that's something that you can raise with the

 5      Court.

 6           MR. MOREN:  Just need to get the objection on

 7      the record, Pete.

 8           (Defendants' Exhibit 4 was marked for

 9      identification.)

10  BY MR. LAWSON:

11      Q.   Ms. Martinez, you have been handed a document

12      that's been marked as Exhibit 4.  This appears to be

13      a report from Chinese Drywall Screening from

14      March 21st, 2012.

15           Does that look correct to you?

16      A.   Yes.

17      Q.   Have you seen this document before?

18      A.   Yes.

19      Q.   And what is it?

20      A.   It's another inspection.  And this one,

21      that's the ones cut the little things; the other

22      ones, they're not doing.  But it's too many things,

23      too many papers, and too many years.  But this one, I

24      remember now the ones who do those, those samples
```

Confidential - Subject to Further Confidentiality Review

```
 1    that I have.

 2         Q.   So during this inspection, they cut circle

 3    samples --

 4         A.   Yes.

 5         Q.   -- of drywall from the walls in your house?

 6         A.   Yes.

 7         Q.   Is that right?

 8              And those are the circle samples that you

 9    brought in a bag with you here today?

10         A.   Yes.

11         Q.   I wanted to ask, it looks like there's five

12    or so of them in there, four or five, and I -- is

13    that all of the samples that were taken, or did you

14    have more of them at your home, or did the inspectors

15    keep them?  Do you know where the others are?

16              MR. ALBANIS:  Object to the form.

17              But you may answer.

18              THE WITNESS:  That's what they give to me.

19              MR. LAWSON:  Okay.

20              THE WITNESS:  That's why I keep it.

21    BY MR. LAWSON:

22         Q.   They gave you those samples?

23         A.   Yes.

24         Q.   And those are the ones you brought here
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1776 of 3246
Case 1:09-md-02047-EEF-MBN Document 22380-1 Exhibition Filed Docket 05/19/2019 Page 48 of
162

Confidential - Subject to Further Confidentiality Review

```
1    today?

2         A.   Yes.

3         Q.   All right.  Looking at this report, this

4    inspection was taken around March 21st of 2012.  Is

5    that right?

6         A.   Yes.

7         Q.   And were you at the home when the inspection

8    took place?

9         A.   Yes.

10        Q.   What do you remember about the inspection

11   that day?

12        A.   I remember they cut those walls.  They take

13   some pictures.  They write numbers on the back,

14   letters.  I'm sure maybe more things, but I don't

15   remember.

16        Q.   Do you remember them asking you any questions

17   during the inspection?

18        A.   No.

19        Q.   Do you remember how many people did the

20   inspection?

21        A.   No.

22        Q.   Do you remember how long they were there?

23        A.   A long time.

24        Q.   Hours?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1777 of 3246
Case 1:09-cv-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 45 of
162

Confidential - Subject to Further Confidentiality Review

```
1        A.    Hours.

2        Q.    And were you told that they were going to

3    test any of the samples of drywall that they took

4    from your house?

5        A.    I don't remember.

6        Q.    Do you ever remember seeing a report showing

7    that they had tested samples of drywall in your house

8    to see if it was Chinese drywall?

9        A.    I don't remember.

10       Q.    I'd like to turn your attention to the fifth

11   page of this report.  It's a photo array, like the

12   ones that we saw in the previous report, and there's

13   an image of what I believe is your house on the

14   outside.

15             Do you see that page?

16       A.    Yes.

17       Q.    Is it correct to say that that is your house

18   that's shown in the image there?

19       A.    Yes.

20       Q.    And that's the third photo on this page,

21   correct, the picture of the exterior of your house?

22       A.    Yes.

23       Q.    And then there are some photos of drywall

24   markings also on this first page of photos, correct?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1778 of 3246
Case 1:09-cv-07628-LGS Document 201 Filed 04/17/20 Page 4778 of 3246
Confidential - Subject to further confidentiality review
162

```
 1      A.   Yes.

 2      Q.   And it appears that one of the drywall

 3   markings that's shown in the bottom left-hand corner,

 4   the fifth photo on this page, has a marking that

 5   reads 4 feet x 12, and then there's an F and an E

 6   that you can see in the image.

 7           Do you see that?

 8      A.   No.

 9      Q.   Okay.  In the bottom left-hand corner --

10      A.   Oh, yes.  I see.

11      Q.   And it says "garage ceiling" on a Post-it

12   note that's on that image?

13      A.   Yes.

14      Q.   And that's a Post-it that's shown in the

15   photograph, not actually a Post-it note on the page.

16           Have you seen that drywall marking inside of

17   your house at any time?

18      A.   Yes.

19      Q.   Where have you seen it?

20      A.   In the garage.

21      Q.   If you look in the upper right-hand corner of

22   that page, there's a picture of a drywall board that

23   has a drywall marking that says the word "drywall."

24   Do you see that, in the upper right on the page, the
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1779 of 3246
Case 1:09-cv-07735-AGG Document 268-201 Exhibit 20 Filed 05/18/2017 Page 71 of
162

Confidential - Subject to Further Confidentiality Review

```
1     second photograph on the page on the --

2         A.   Yes.

3         Q.   And do you see how the drywall marking just

4     says "drywall"?

5         A.   Yes.

6         Q.   Do you know how the Y is a little bit taller

7     than the other letters on the page?

8         A.   (Translated through interpreter.)  Is it this

9     one?

10        Q.   Yeah.  In the upper right-hand corner.  Yes,

11    that is the one that I'm referring to.

12             Do you see how the Y is a little bit taller

13    than the other letters on the page, that it sticks up

14    a little bit?

15        A.   Yes.

16        Q.   And that's the marking that you have seen

17    inside of the garage in your home?

18        A.   Yes.

19        Q.   Turning to the next page of photographs,

20    there are some images on the right-hand side of the

21    page.

22             Do you know what the images on the right side

23    of the page are of?

24        A.   (Translated through interpreter.)  Which one
```

```
1    are you talking about?

2        Q.   There are three pictures going down the right

3    side of the page.  Do you know what those are

4    pictures of?

5        A.   (Translated through interpreter.)  These are

6    the photos of the air conditioner.

7        Q.   And to your knowledge, do they show corrosion

8    on the air conditioner coils?

9        A.   Yes.

10        Q.   I'd like to turn you to the pictures that are

11    on the sixth page of photos.  There are images on

12    this sixth page and also on the seventh page of this,

13    circular samples that were cut out of your walls that

14    we discussed earlier.

15             So if you can turn to the page with those

16    images, yes, of the circular samples.

17             Are these the circular samples that were cut

18    out of the walls in your home --

19        A.   Yes.

20        Q.   -- that we were talking about earlier?

21        A.   Yes.

22        Q.   And you brought some of those samples with

23    you here today.  Is that right?

24        A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1781 of 3246
Case 1:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 178 of
162
Confidential - Subject to Further Confidentiality Review

```
1        Q.    And it appears that the inspector wrote on

2   the samples.  Do you see that, that they wrote

3   something on the samples?

4        A.    Yes.

5        Q.    And it looks like on one of them they wrote

6   "MB-1."  Do you see that on the first circular sample

7   image on the seventh page of the document?  It looks

8   like it was taken --

9        A.    Yes.

10       Q.    -- in the upper right-hand corner?

11             And that might be MB-2.  It's hard to be able

12   to tell.

13             But do you believe that that was taken from

14   the master bedroom or the master bathroom?

15       A.    Yes.  It could be.

16             MR. ALBANIS:  Matt, just a second.  I think a

17       moment ago you said the seventh page of the

18       document.  Just so the record is clear, I don't

19       think it's actually on the seventh page.

20             MR. LAWSON:  I'm sorry.  And let me make sure

21       of which page of photos that we're talking about

22       here.  I believe it's on the sixth page of

23       photos, excuse me.  And that's in the upper

24       right-hand corner of the sixth page of photos
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1782 of 3246
Case 1:09-cv-02047-GAO Document 2009-01 Exhibit 91 Filed 05/18/2012 Page 91 of 162
Confidential – Subject to further Confidentiality Review

1      there's a sample that appears that it has an

2      "MB-1" written on it; also an "M" below that.

3           MR. ALBANIS:  Okay.  So the sixth page of

4      photos would be the tenth page of the document.

5           MR. LAWSON:  That's correct.

6    BY MR. LAWSON:

7      Q.   Ms. Martinez, if you can turn to the last

8    page of the report.  There's a picture at the top of

9    that last page that is of a Knauf drywall board.

10          Do you see that?

11     A.   Yes.

12     Q.   And that's that same marking that we saw on

13   the previous inspection report that was a Knauf

14   marking.  Is that right?

15     A.   Yes.

16     Q.   And to your knowledge, you don't know if the

17   drywall boards and samples that were taken by the

18   inspector were ever tested?

19     A.   (Translated through interpreter.)  Yes.

20   Tests have been done.

21     Q.   When were tests done on the drywall samples?

22     A.   (Translated through interpreter.)  I don't

23   know the date.

24     Q.   How do you know that tests were done?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1783 of 3246
Case 1:11-cv-22408-MGC Document 298-201 Entered on FLSD Docket 05/18/2012 Page 45 of
162
Confidential – Subject to further confidentiality Review

1      A.    (Translated through interpreter.)  Because

2    that was the result of the inspection.

3      Q.    The result of the inspection was that the

4    inspector told you that you had Chinese drywall in

5    your home, correct?

6      A.    Yes.

7      Q.    And do you know if the inspector ever gave

8    you another report other than this one?

9      A.    No.

10      Q.    And do you remember ever receiving a report

11    about tests that were done on the samples of the

12    drywall?

13      A.    (Translated through interpreter.)  I don't

14    remember.  It's a lot of paperwork.

15      Q.    You can set that report aside.

16          (Defendants' Exhibit 5 was marked for

17    identification.)

18    BY MR. LAWSON:

19      Q.    Ms. Martinez, you have been handed a document

20    that's been marked as Exhibit 5.

21          Have you seen this document before?

22      A.    Yes.

23      Q.    And to your knowledge, what is this document?

24      A.    (Translated through interpreter.)  This is --

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1784 of 3246
Case 1:11-cv-22408-MGC Document 201 Entered on FLSD Docket 05/18/2014 Page 46 of
162

Confidential - Subject to Further Confidentiality Review

```
 1     this is all I have given to my attorney, my property;

 2     everything that's been written here is what I have

 3     said; the RV when I bought it, everything that's

 4     happened.

 5          Q.   So I would represent to you that these are a

 6     series of questions or interrogatories that Taishan

 7     Gypsum Company, Limited and other defendants have

 8     served on you and your attorney and asked you to

 9     answer, and it appears that this document also

10     includes your answers to those questions.

11               Is that your understanding of what this

12     document is?

13          A.   Yes.

14          Q.   Looking to the first question that was asked

15     of you on the first page, it's number one; it states:

16     Identify all types of damages that you seek in this

17     lawsuit and specify amounts sought for each category.

18               Do you see that?

19          A.   Yes.

20          Q.   And specifically, within your answer, you

21     said that you are seeking personal property damage of

22     at least $59,532.65.

23               Do you see that?

24          A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1785 of 3246
Case 1:11-cv-22408-FAM Document 22-81 Entered on FLSD Docket 05/18/2012 Page 77 of 162
Confidential – Subject to further Confidentiality Review

```
1        Q.   We're going to get into some of the receipts

2     that you have submitted for personal property damage

3     in this case.  But I wanted to understand it today,

4     if that number is your best understanding of the

5     number that you are seeking for personal property

6     damages in this case?

7            MR. ALBANIS:  Object to the form.  And I

8        think it mischaracterizes what the document says.

9            But you may answer, if you know,

10       Ms. Martinez.

11    BY MR. LAWSON:

12       Q.   Let me actually rephrase the question.

13           Is it your understanding that you are seeking

14    at least $59,532.65 for personal property damages in

15    this lawsuit?

16       A.   (Translated through interpreter.)  To today's

17    date, yes.

18       Q.   Are you aware of any additional personal

19    property damages that are not part of that $59,532.65

20    that you are seeking in this lawsuit?

21           MR. ALBANIS:  Object to form.

22           THE WITNESS:  (Translated through

23       interpreter.)  Explain it to me again.

24    ///
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1786 of 3246
Case 1:09-cv-02048-CA Document 2289-01 Exhibit 01-b Docket 05/18/2019 Page 78 of
162
Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. LAWSON:

 2        Q.   Let me ask it in a different way.

 3             Have you submitted all of the receipts or

 4   proof of payment to your attorney for the personal

 5   property damages that you are seeking in this

 6   lawsuit?

 7        A.   (Translated through interpreter.)  To today's

 8   date, yes.

 9        Q.   And when you say "to today's date," do you

10   believe that there may be more receipts in the future

11   for future purchases or other items that are damaged

12   that you may seek in this lawsuit?

13        A.   (Translated through interpreter.)  It depends

14   on if this is resolved, because things continue to

15   be -- get broken if I don't repair the house.

16        Q.   But as of today's date, you believe you have

17   submitted all of the receipts and proof of payment

18   for the personal property damage that you have

19   suffered so far?

20             MR. ALBANIS:  Object to the form.

21             But you may answer, Ms. Martinez, if you

22        know.

23             THE WITNESS:  Yes.

24   ///
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1787 of 3246
Case 1:09-cv-07687-GBD Document 28-10 Entered on FLSD Docket 05/19/2019 Page 79 of
162

Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. LAWSON:

 2        Q.    You can set that document aside.

 3            (Defendants' Exhibit 6 was marked for

 4    identification.)

 5    BY MR. LAWSON:

 6        Q.    You have been handed a document that's been

 7    marked as Exhibit 6.

 8            Do you recognize this document?

 9        A.    Yes.

10        Q.    And what is it?

11        A.    (Translated through interpreter.)  This is

12    the contract when we bought the motorcycle.

13        Q.    And whose motorcycle is this?

14        A.    My husband's.

15        Q.    And did you purchase this motorcycle around

16    May of 2003?

17        A.    Yes.

18        Q.    Did you pay for it in cash when you purchased

19    it?

20        A.    No.

21        Q.    Did you have a payment plan to pay for the

22    motorcycle?

23        A.    Yes.

24        Q.    Do you remember when the motorcycle had been
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1788 of 3246
Case 1:09-md-02047-EEF-MBN Document 22301 Supp. 1 of Page 05/09/19 Page 30 of
162
Confidential - Subject to further confidentiality Review

```
 1    fully paid for?

 2         A.   (Through the interpreter.)  I don't remember.

 3         Q.   But as of today, has the motorcycle been

 4    fully paid for?

 5         A.   (Translated through interpreter.)  Yes.

 6         Q.   I'd like to turn your attention to the fourth

 7    page of this exhibit.  There's a photo of what

 8    appears to be a Kawasaki motorcycle.

 9              Do you see that photo?

10         A.   Yes.

11         Q.   And then there's another photo of the

12    motorcycle or of a motorcycle on the next page.

13              Do you see that?

14         A.   Yes.

15         Q.   And then it continues on to the pages that

16    follow to show three more images of a motorcycle.  Is

17    that right?

18         A.   Yes.

19         Q.   Are all of these pictures photos of the same

20    motorcycle?

21         A.   Yes.  The same motorcycle.

22         Q.   And these are all your husband's motorcycles.

23    Is that right?

24         A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1789 of 3246
Case 1:19-cv-09439-PKC Document 201 Entered on FLSD Docket 05/19/2017 Page 81 of
162

Confidential – Subject to Further Confidentiality Review

1      Q.    Do you remember when these photos were taken?

2      A.    I don't remember.

3      Q.    What do these photos show on the motorcycle?

4      A.    (Translated through interpreter.)  All the

5   corrosion that it had -- it has in different places.

6      Q.    Does the motorcycle look like this today, the

7   same way that it looks in these photographs?

8      A.    (Translated through interpreter.)  The

9   motorcycle looks worse.

10      Q.    How does it look worse?

11      A.    (Translated through interpreter.)  Because we

12   sold it, and the man, he has it, it's still bad.

13   It's in conditions -- apart from the fact that it's

14   from 2013, it has many years -- 2003.

15      Q.    Do you know when you sold -- or, your husband

16   sold this motorcycle to someone else?

17      A.    (Translated through interpreter.)  I don't

18   remember.

19      Q.    Was it this year?

20      A.    (Translated through interpreter.)  I know

21   that it wasn't this year.

22      Q.    Was it after you had moved back into your

23   house?

24      A.    (Translated through interpreter.)  Yes.  Much

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1790 of 3246
Case 1:09-md-02047-EEF-MBN Document 23262-39 Filed 01/19/2019 Page 42 of
162
Confidential - Subject to Further Confidentiality Review

```
 1    later.

 2         Q.   So maybe in the last three years?

 3         A.   (Translated through interpreter.)  Possible.

 4         Q.   Do you know how much the motorcycle was sold

 5    for?

 6         A.   No.

 7         Q.   And at this time, the motorcycle is around

 8    15 years old.  Is that right?

 9         A.   (Translated through interpreter.)  2003 to

10    2008 -- I'm sorry, correction, 2018.  Probably more

11    than --

12         Q.   Around 15 years?

13         A.   Around 15 years.

14         Q.   Did your husband buy a new motorcycle after

15    selling this one?

16         A.   No.

17         Q.   Was the motorcycle stored in the garage in

18    your home for a period of time?

19         A.   All the time.

20         Q.   So from when you moved in the house in 2008

21    until he sold it, was the motorcycle always stored in

22    the garage in your home?

23         A.   Always.

24         Q.   Did you ever consider storing it somewhere
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1791 of 3246
Case 1:19-cv-00484-WCG Document 72-01 Confidential Subject to Further Confidentiality Review
162

```
1    other than in the garage?

2         A.   No.

3         Q.   Why not?

4         A.   (Through the interpreter.)  I don't have

5    another place in the house.  Where am I going to put

6    it, in the living room?  No.  Just in the garage

7    where things are stored.

8         Q.   Did you ever attempt to have someone repair

9    or -- or to repair the corrosion that was on the

10   motorcycle?

11        A.   No.

12        Q.   Did the motorcycle continue to work for the

13   length of the time that your husband owned it?

14        A.   (Translated through interpreter.)  Yes.

15        Q.   And he was able to drive it?

16        A.   Yes.

17             MR. MOREN:  Matt, are you all done with this

18        document?

19             MR. LAWSON:  I am.

20             MR. MOREN:  I have one follow-up question on

21        it.

22                      CROSS-EXAMINATION

23   BY MR. MOREN:

24        Q.   How much in damages are you seeking with
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1792 of 3246
Case 1:09-cv-08019-GCA Document 3201 Exhibit 39 Filed 05/18/2019 Page 84 of
162
Confidential - Subject to further confidentiality review

1    respect to the motorcycle?

2           MR. ALBANIS:  Object to the form.

3           But you may answer, Ms. Martinez, if you

4      know.

5           THE WITNESS:  (Translated through

6      interpreter.)  I don't know.

7           (Defendants' Exhibit 7 was marked for

8      identification.)

9               DIRECT EXAMINATION (Continued)

10    BY MR. LAWSON:

11      Q.   I have handed you a document that's been

12    marked as Exhibit 7.

13           Do you recognize this document?

14      A.   Yes.

15      Q.   What is it?

16      A.   It's a receipt for one of the times the air

17    condition broke.

18      Q.   And what about the back page, the second page

19    of the document?  What is that?

20      A.   This is a receipt when I buy the other air

21    condition.

22      Q.   You bought a new air-conditioning unit?

23      A.   Yes.

24      Q.   And it appears to show an air conditioner

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1793 of 3246
Case 1:11-cv-22408-MGC Document 201 Entered on FLSD Docket 05/19/2017 Page 45 of
162
Confidential - Subject to Further Confidentiality Review

```
 1     system and an air handler were purchased, on the left

 2     side of the document.

 3             Does that look right?

 4     A.    Yes.

 5     Q.    Do you know when you did this?

 6     A.    I think two years ago.

 7     Q.    And why do you think it was two years ago?

 8     A.    I'm guessing.  But I think it's two years

 9     ago.

10     Q.    And is it correct that you paid $4,100?

11     A.    Yes.

12     Q.    And does it say "paid" at the bottom

13     right-hand corner of that invoice?

14     A.    Yes.

15     Q.    Do you remember how you paid for it?

16     A.    Cash.

17     Q.    So on the first page, that's a different

18     air-conditioning payment, that receipt?

19     A.    Yes.

20     Q.    And it's a payment from 2012.  Is that right?

21     A.    Yes.

22     Q.    And how much money was it for?

23     A.    1,700.

24     Q.    And do you remember what you paid for at that
```

Confidential - Subject to further confidentiality review

```
 1    time?

 2         A.   Do you say cash --

 3         Q.   I'm sorry.

 4              Do you remember what you were paying them for

 5    when you paid them the $1,700 for air-conditioning?

 6    Was it replacing something?  Was it for service?

 7         A.   Yes, replacing.

 8         Q.   What were you replacing?

 9         A.   Stuff outside, I remember; the big unit.

10         Q.   Replacing the outside air-conditioning unit?

11         A.   Yeah.

12         Q.   And you paid $1,700 for that?

13         A.   Yes.

14         Q.   Is that right?

15              Is it your understanding that you are seeking

16    compensation for both the $1,700 payment and this

17    $4,100 payment in your personal property damages in

18    this lawsuit?

19         A.   Yes.  I paid for.

20         Q.   And going back to the motorcycle that we just

21    discussed, when you included that invoice or receipt

22    for the payment of the motorcycle, were you seeking

23    compensation for the amount that you and your husband

24    paid for the motorcycle?
```

Case 2:09-md-02047-EEF-MBN  Document 22363-39  Filed 11/19/19  Page 1795 of 3246
Case 1:09-cv-02048-MGC  Document 26421  Entered on FLSD Docket 05/19/2015  Page 47 of
162
Confidential - Subject to Further Confidentiality Review

```
 1        A.   I don't think it's fair the whole amount,

 2   because it's old; but at least something.  But I

 3   don't know.

 4        Q.   But you do agree that your husband or you

 5   sold that motorcycle at some point, right?

 6        A.   Yes.

 7        Q.   But you don't know how much it was for?

 8        A.   No.

 9        Q.   All right.  You can set both of those -- oh,

10   excuse me.

11             Oh, I wanted to ask you, because we have seen

12   this on some documents.  If you look to the HVAC

13   service order invoice that's on the second page of

14   that document where it says "bill to," your name is

15   listed as Diaz.  Is that your name before you were

16   married?

17        A.   Yes -- no.

18        Q.   No?

19        A.   I'm sorry.  This is my -- when I'm married,

20   and the other ones when I'm not married.  So they --

21   we got some documents, Diaz, other ones Martinez.

22   But it's the same person.

23        Q.   Both are you?

24        A.   Both of me.
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 4796 of 3246
Case 1:11-cv-22408-MGC Document 23363-39 Entered on FLSD Docket 05/18/2190 Page 48 of
162
Confidential - Subject to Further Confidentiality Review

```
 1      Q.    Okay.  Thank you.

 2            All right.  You can set that aside.

 3            (Defendants' Exhibit 8 was marked for

 4      identification.)

 5      BY MR. LAWSON:

 6      Q.    You have been handed a document that's been

 7      marked as Exhibit 8.

 8            Do you recognize this document?

 9      A.    Yes.

10      Q.    What is it?

11      A.    It's a company for -- Water Medic -- whole

12      house reverse osmosis that I have at home.  They have

13      couple times, they have to come and repair.

14      Q.    And is this related to the pool at your home?

15      A.    No.  I don't have a pool.

16      Q.    What is this related to?

17      A.    For the water that I -- I don't have a city

18      water.  I have --

19      Q.    Well water?

20      A.    Well water.

21      Q.    Okay.  And there was an issue with the well

22      at your home?

23      A.    No.  The well -- I have a system.  They're --

24      because you can either use the well -- the home is
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1797 of 3246
Case 1:09-md-02047-MCA Document 23201 Chrispin File Docket 05/19/2017 Page 89 of
162

Confidential - Subject to Further Confidentiality Review

```
1    really bad water.  So this water, this is a filter

2    that we have to cook and things, you know, to use the

3    water, to be able to use the water.

4        Q.   Okay.  So this was service that was performed

5    by Water Medic on the filtration system?

6        A.   Yes.

7        Q.   It looks like a bubbler and a membrane for

8    the system that connects to your well?

9        A.   Yes.

10       Q.   And this service, it appears, was performed

11   in 2018.  So earlier this year?

12       A.   Yes.

13       Q.   And these are two different service times,

14   right?  There's a June 5th, 2018, and a

15   September 11th, 2018?

16       A.   Yes.

17       Q.   And what issues were you having with the

18   water system in your house?

19       A.   There's -- one day come home and no water.

20   So we had called, and they have to change membranes

21   and different kinds of things they have to change to

22   get it to work again and the water come back home.

23       Q.   How do you believe that this issue was

24   connected to the Chinese drywall in your home?
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 4798 of 3246
Case 1:11-cv-22408-MGC Document 28-101 Entered on FLSD Docket 05/08/2013 Page 90 of
162

Confidential - Subject to Further Confidentiality Review

```
 1       A.   Because they have to fix couple things.

 2   They're corrosion, too, so . . .

 3       Q.   Were parts of the system that they were

 4   repairing corroded?

 5       A.   Yes.

 6       Q.   And they told you that, or could you see it?

 7       A.   I can see.

 8       Q.   Okay.  You saw corrosion on the system, and

 9   they replaced the parts that were corroded?

10       A.   Yes.

11       Q.   It looks like for the first service there's

12   an amount that was paid.  It might be $260.  Is that

13   what you see at the bottom of the first invoice?

14       A.   Yes.

15       Q.   And you paid that amount to them?

16       A.   Yes.

17       Q.   Do you see anywhere on this invoice where it

18   says that the invoice was paid?

19       A.   I don't see in here they say it's paid, but I

20   know I pay --

21       Q.   Did you pay --

22       A.   -- because I pay it myself.

23       Q.   Excuse me.  I'm sorry.

24            Did you pay in cash or with a check?
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1799 of 3246
Case 1:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 91 of 162
Confidential - Subject to Further Confidentiality Review

```
1    A.    Cash.

2    Q.    And for the second invoice from September of

3    2018, that appears to be for $660.  Did you pay with

4    cash or check?

5    A.    Yes, cash.

6    Q.    But you believe that you paid it?

7    A.    Yes, I paid.

8    Q.    Do you see how on the item, the second item,

9    the second invoice the words "no charge to you" are

10   circled?

11   A.    This circle here?

12   Q.    Uh-huh.

13   A.    Yeah, I see it.

14   Q.    Was that an indication that they did not

15   charge you for this service?

16   A.    Yeah.  They charged me.  They're -- nobody do

17   nothing for free, so . . .

18   Q.    So this was not covered by warranty when they

19   did this second service in September of 2018?

20   A.    No.

21   Q.    You had to pay the $660?

22   A.    Yes.

23   Q.    Okay.  Do you have a receipt for either of

24   these services other than these invoices?
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1800 of 3246
Case 1:09-cv-09432-GEL Document 28-1 Filed in FLSD Docket 05/18/2017 Page 42 of
162
Confidential – Subject to Further Confidentiality Review

```
 1        A.   No.  I have this -- the originals at home.

          So I give to them, and then they get copies.

 3        Q.   Okay.  And you see how both of these have a

     line for a signature in the bottom left corner.  That

 5   line says:  I hereby acknowledge the satisfactory

     completion of the above work.

 7        Do you see that?

 8        A.   Yes.

 9        Q.   Neither of those have your signature.  Is

10   that right?

11        A.   Yes.

12        Q.   So in this lawsuit, you are seeking

13   compensation for both of these payments, the $660

14   payment and the $260 payment.  Is that right?

15        A.   Yes.

16        Q.   You can set that aside.

17        (Defendants' Exhibit 9 was marked for

18   identification.)

19   BY MR. LAWSON:

20        Q.   Ms. Martinez, you have been handed a document

21   that's been marked as Exhibit 9.  At the top of it

22   it's titled Miscellaneous Claim Form Worksheet.

23        Do you see that?

24        A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1801 of 3246
Case 1:17-cv-00942-GCM Document 24-9 Confidential Subject to Docket 05/18/2018 Page 93 of
162

Confidential – Subject to further confidentiality Review

```
1       Q.    Do you recognize this document?

2       A.    Yes.

3       Q.    What is it?

4       A.    It is all the stuff that are broke and what I

5   buy and the dates and what it is.  I do myself.

6       Q.    So you filled out this form yourself?

7       A.    Yes.

8       Q.    Do you remember what this form was for, why

9   you filled it out?

10      A.    Because it's a claim for the stuff that are

11  being broke and then we have to have it in file all

12  that stuff to -- so I remember all the stuff, because

13  it's been a lot of years, and then you can have

14  everything in your mind.

15      Q.    Did you fill this out so that you could

16  request that someone compensate you for the property

17  that you listed here that was damaged?

18      A.    Yes.

19      Q.    And to your knowledge, did you receive

20  payments for this damaged property?

21      A.    I receive some money, but not enough for the

22  whole entire stuff that be broke, for the other

23  name -- or Banner or something.

24      Q.    So you received some amount of money for the
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1802 of 3246
Case 1:07-cv-21018-MGC Document 208-201 Entered on FLSD Docket 05/08/2012 Page 94 of
162
Confidential – Subject to Further Confidentiality Review

```
 1    property that you listed here, right?

 2        A.   Yes.

 3        Q.   But you are saying it's not enough to cover

 4    all the things that have been damaged?

 5        A.   No, it's not.

 6        Q.   And looking at the dates on here, it appears

 7    that the latest dates that I can see are in 2013.

 8    Does that look right to you, looking through this

 9    document?

10        A.   Yes.

11        Q.   So do you think you filled this out around

12    2013?

13        A.   Probably.

14        Q.   Looking at the second page, there's a

15    signature line that is not filled in.

16             Do you see that?

17        A.   Yes.

18        Q.   Do you know if you ever signed this document?

19        A.   Well, if I don't see my signature here,

20    probably I don't sign this one.  I don't know.

21        Q.   And this Miscellaneous Claim Form Worksheet

22    has different categories of property that it asked

23    you about.  Is that right?  There's HVAC,

24    electronics, appliance, outside/garage, personal
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 1803 of 3246
Case 1:09-cv-02042-CAL Document 228-201 Entrans on FLSD Docket 05/19/2017 Page 45 of
162

Confidential - Subject to further confidentiality Review

```
 1    items, furnishings, and other.  Is that right?

 2        A.   Yes.

 3        Q.   And you've listed all different kinds of

 4    items on this list and put dates next to it.  Is that

 5    right?

 6        A.   Yes.

 7        Q.   And those dates are when the item stopped

 8    working.  Is that right?

 9        A.   Some stuff they're stopped working.  Some

10    stuff they're broke.  Some stuff they have to buy

11    again.  That's all kinds of different situations in

12    here.

13        Q.   Are the dates when you purchased a

14    replacement for those items?

15        A.   I don't remember.  We have too many receipts

16    here that you can see it, and I don't remember.

17             (Defendants' Exhibit 10 was marked for

18    identification.)

19             THE WITNESS:  There's too many papers.

20    BY MR. LAWSON:

21        Q.   You have been handed a document that has been

22    marked as Exhibit 10.

23             Do you recognize this document?

24        A.   Yes.
```

Case 2:09-md-02047-EEF-MBN   Document 23363-39   Filed 11/19/19   Page 1804 of 3246
Case 2:09-md-02047-EEF-MBN   Document 22363-39   Filed 11/19/19   Page 46 of 162
Confidential - Subject to further confidentiality Review

```
1       Q.    What is it?

2       A.    The checks they send me for the Chinese

3    Drywall Settlement Program.  So that's what got

4    received.

5       Q.    So after you submitted your claim form, you

6    received money from the Chinese Drywall Settlement

7    Program?

8       A.    Yes.

9       Q.    And these are the checks that you have

10   received from the Chinese Drywall Settlement Program.

11   Is that right?

12      A.    Yes.

13      Q.    And without asking you to add them up, do you

14   know about how much money that you have received from

15   the Chinese Drywall Settlement Program?

16      A.    About 33,000; around that.

17      Q.    And is it your understanding that the money

18   that you have received is compensating you for the

19   receipts and the payments that you made for the items

20   that we just went through on that miscellaneous claim

21   form?

22            MR. ALBANIS:  Object to the form.

23            And I'll further state that there were

24       numerous settlements within the Chinese Drywall
```

1 Settlement Program.  Ms. Martinez provided

2 documentation to my firm to make claims into the

3 Chinese Drywall Settlement Program that we had a

4 good-faith basis to make.

5  The settlement administrator reviewed the

6 claims and either granted the claim or marked the

7 claim as deficient.  If the claim was marked as

8 deficient, we were given an opportunity to

9 provide additional documentation, and then the

10 settlement administrator made a determination as

11 to the claim and the value of it, if any.

12  I'm just mentioning this because I don't know

13 that Ms. Martinez would fully understand the

14 process for submitting the claims and for their

15 review and payment.

16  Having said all that, Ms. Martinez, you may

17 answer, if you understand the question.

18  THE INTERPRETER:  Can you ask the question

19 again?

20  MR. LAWSON:  Sure.

21 BY MR. LAWSON:

22 Q.  The amounts of money that you received from

23 the Chinese Drywall Settlement Program, those checks,

24 is it your understanding that you were being

```
1    compensated for the payments and receipts that you

2    submitted in the miscellaneous claim form that we

3    were just looking at that listed all of those

4    different items?

5            MR. ALBANIS:  Same objection.

6            THE WITNESS:  (Translated through

7        interpreter.)  I don't really know how they

8        handle that.  I just know that it wasn't enough

9        from all the receipts that I sent.

10   BY MR. LAWSON:

11       Q.   And the receipts that you sent are in

12   Exhibit 9 that we just looked at, that miscellaneous

13   claim form.

14           MR. ALBANIS:  Object to the form.

15           But you may answer.

16           THE WITNESS:  (Translated through

17       interpreter.)  Yes.  They are receipts.

18   BY MR. LAWSON:

19       Q.   And the receipts that are behind the

20   miscellaneous claim form in Exhibit 9 are the

21   receipts for purchases that you made for the items

22   that are listed on the form.  Is that right?

23       A.   (Translated through interpreter.)  There are

24   receipts that are included here.  There are other
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1807 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1807 of 3246
Confidential - Subject to Further Confidentiality Review
162

1    receipts that are not, because it was not asked.

2        Q.    And who did not ask for those receipts?

3        A.    (Translated through interpreter.)  Here, in

4    this.

5        Q.    So are there items on this miscellaneous

6    claim form where you do not have a receipt that is

7    part of this Exhibit 9?

8        A.    (Translated through interpreter.)  Yes.  You

9    didn't understand me.

10            You didn't understand me.  The receipts are

11    here.  It's just that they are not -- it's not being

12    asked for here.

13        Q.    The form doesn't ask for the receipts.  Is

14    that what you are saying?

15        A.    (Translated through interpreter.)  Exactly.

16    Yes.

17        Q.    All right.  So when you look at the top of

18    the page, it says:  Please check all that apply and

19    provide the bill or invoice and proof of payment for

20    each expense you wish to claim.

21            Do you see that?

22        A.    Yes.

23        Q.    So it asks for bills or invoices and proof of

24    payment for each expense that you want to claim on

```
 1    this form.  Is that right?

 2        A.   Yes.

 3        Q.   So you then listed all of these items on the

 4    form, right?

 5        A.   I did list and circle what they ask me here,

 6    and I provide the receipt for stuff in the back.

 7        Q.   Right.

 8             So you listed items that you wanted to claim

 9    on this form, and then you provided the receipts for

10    those items, right?

11        A.   Yes.

12        Q.   And so the items that are listed on here have

13    receipts for them in the pages that follow, right?

14        A.   Yes.

15        Q.   And as a result of filing this form, you

16    received, you said, around $33,000 or so through the

17    Chinese Drywall Settlement Program?

18        A.   Around that, yes.

19        Q.   And you believe that that is not enough money

20    to compensate you for these items that are listed

21    here?

22        A.   Yes.

23        Q.   And is it your understanding that the

24    receipts that are listed in Exhibit 9, if you added
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1809 of 3246
Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 101 of 162
Confidential - Subject to Further Confidentiality Review

1    them up to what you paid for, they would be more than

2    $33,000?

3         A.   Yes.

4         Q.   If they were less than $33,000, would you

5    agree that you had been fully compensated for these

6    items?

7              MR. ALBANIS:  Object to the form.

8              And I'll further state, as I indicated

9         earlier, there were numerous claims that were

10        made on Ms. Martinez's behalf in the Chinese

11        Drywall Settlement Program.  It was not just

12        related to the miscellaneous claim form which

13        would encompass the personal property damage that

14        you are currently discussing with the witness.

15             MR. LAWSON:  And I would like to put on the

16        record that this process would be much easier if

17        we could have both an accounting of which

18        particular items and receipts that Ms. Martinez

19        is pursuing in the $59,532.65 that she is

20        seeking, at least that amount in this lawsuit, as

21        well as which items she has been compensated for

22        previously.  But unfortunately, we don't have

23        that in the case file, and we're doing our best

24        to be able to sort that out with her today during

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1810 of 3246
Case 1:19-mc-00405-NGG Document 2-1 Confidential - Subject to Further Confidentiality Review
of 162
Confidential - Subject to Further Confidentiality Review

```
 1      the deposition.

 2              MR. ALBANIS:  Understood.

 3              And if I can just state further, Matt, we've

 4      encountered a similar issue in the -- in Vicki

 5      and Paul Foster's priority claimants' deposition,

 6      and your colleague, Aliyya Haque, and I are

 7      working on a spreadsheet as well as some

 8      further -- potentially further discovery

 9      questions that Taishan intends to propound on us

10      to address this very issue or a similar issue.

11      So that may be something that we may want to

12      consider in this case.

13              MR. LAWSON:  Great.  Thank you.  And, yeah,

14      that's something that we can discuss after the

15      deposition.

16              I'm not sure if there's a question currently

17      that is being framed to you, so let me ask a new

18      one.

19              MR. VERRIER:  Is this a good time to take a

20      break?

21              MR. LAWSON:  That's fine.  Let's take a

22      break.  Yeah.

23              We can go off the record.

24              (Recess from 10:09 until 10:31 a.m.)
```

Case 2:14-cv-02722-NG-JO Document 20-1 Filed 05/08/2015 Page 403 of 162

```
 1   BY MR. LAWSON:

 2        Q.   Welcome back.

 3             I think before we were looking at Exhibit 9,

 4   which is this miscellaneous claim form.  If you can

 5   pull that back out.  It's the form that you filled

 6   out with different items and dates on it.

 7             We've gone over how there are receipts for

 8   the items that you have listed on this form a little

 9   bit earlier, right?

10        A.   Yes.

11        Q.   Do you know if there are any photographs of

12   the damage to these items that you submitted or that

13   you have in your possession?

14        A.   We have the pictures for the air condition

15   and the motorcycle.  Other than that, I don't think

16   we have more pictures.

17        Q.   Are the -- excuse me.  Is the motorcycle --

18   I'm sorry.  Go ahead.

19        A.   The faucets, we have the pictures for the

20   faucets and . . .

21        Q.   You mentioned the motorcycle.  Is the

22   motorcycle listed on this form anywhere?  I don't

23   know if I saw that.

24        A.   Yes.
```

```
1         Q.   Oh, I do see it.

2         A.   When they say "other," when they say "other."

3         Q.   Yes.  You listed the motorcycle under

4    "other."  I see that.

5              And that was the motorcycle that we looked at

6    earlier in the photographs and the receipt -- or,

7    invoice that you had --

8         A.   Yes.

9         Q.   -- that we discussed.  I believe that was

10   Exhibit 6 that we looked at a little bit earlier.

11        A.   Yes.

12        Q.   Can you -- do you see any items on this

13   miscellaneous claim form that you attempted to repair

14   first before you replaced them?

15        A.   The camera, I replace it, send them.  And

16   they bring me back another one, but the other ones

17   broke, too.  So that one, I'm trying to repair.

18             The microwave, I repair, too.  The washer and

19   dryer.  The TVs.  I don't see here -- I don't know if

20   I put in here the air condition, but I definitely --

21        Q.   It looks like --

22        A.   -- the refrigerator twice.  The A/C coils.

23   See, that's in here.

24        Q.   HVAC is its own section.
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1813 of 3246
Case 1:11-cv-02408-NGG Document 209-21 Entered on FLSD Docket 05/18/2015 Page 405 of 162

Confidential - Subject to Further Confidentiality Review

```
 1       A.   Yeah.

 2       Q.   And that refers to the air-conditioning?

 3       A.   Yes.

 4            Faucets.

 5       Q.   All of those items you tried to repair before

 6   you replaced them?

 7       A.   Yes.

 8       Q.   But you ultimately did replace all of them?

 9       A.   Yes.

10       Q.   And that is what is reflected on this form,

11   all of the items that you have replaced over time?

12       A.   Yes.

13       Q.   What happened with the cell phones that are

14   listed under Electronics?

15       A.   Cell phones?

16       Q.   Yeah.  And maybe I'm wrong, but on the left

17   side of the page it says "cell" and then there are

18   dates.  Does that refer to cell phones?

19       A.   Yes.

20       Q.   What happened with those?

21       A.   They're -- start doing some lines and it

22   broke.

23       Q.   So they just stopped working?

24       A.   Yes.
```

```
 1        Q.   And was that around 2013?

 2        A.   Yes.

 3        Q.   So lines started to appear on the screen, and

 4   then the cell phone stopped working entirely?

 5        A.   Yes.

 6        Q.   And then you bought a new cell phone?

 7        A.   Yes.

 8        Q.   Has your cell phone continued to work since

 9   you replaced the cell phones around 2013?

10        A.   It broke and I buy another one, but I always

11   getting replaced and send other ones.

12        Q.   You have replaced it again since --

13        A.   Yes.

14        Q.   Did you have the same issue happen when you

15   had to replace another cell phone?

16        A.   Different things, like the --

17             (Translated through interpreter.)  Like the

18   speaker.

19             -- speakers don't work in other ones.  So

20   different things.

21        Q.   Different issues with cell phones?

22        A.   Yes.

23        Q.   Different things have broken in them?

24        A.   Yes.
```

```
 1        Q.    And you think that those are related to

 2   Chinese drywall?

 3        A.    Yes.

 4        Q.    Would you say that for all of the items that

 5   are listed on here you believe that they were broken

 6   or damaged by Chinese drywall?

 7        A.    Yes.

 8        Q.    And is that based on you taking them in for

 9   repairs and being told that they were damaged by

10   Chinese drywall or your opinion that they were

11   damaged by Chinese drywall?

12            MR. ALBANIS:  Object to the form.

13            But you may answer, if you know,

14        Ms. Martinez.

15            THE WITNESS:  They really don't know how --

16        what that means, but they -- looks weird.  So

17        when I explain house have Chinese drywall, that's

18        why, you know.  There's something weird.

19   BY MR. LAWSON:

20        Q.    So when you've taken these items to be

21   replaced or had someone look at them, they think that

22   the damage to them is odd or weird?

23        A.    Yes.

24        Q.    And then you explain that you have Chinese
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1816 of 3246
Case 1:15-cv-04290-NGG-PK Document 22-21 Confidential—Filed 05/03/2016 Page 108 of 162
Confidential - Subject to Further Confidentiality Review

1  drywall, and they say that that might be why they are

2  damaged?

3      A.   Yes.

4      Q.   Let's go back to Exhibit 5, which we looked

5  at earlier, which is your answers to interrogatories.

6           We talked a little bit earlier about the at

7  least $59,532.65 that you are seeking in personal

8  property damages.

9           Do you remember that?

10     A.   Yes.

11     Q.   And we've now just looked at receipts and

12  claims that you have previously made for different

13  personal property items.  Is that right?

14     A.   Yes.

15     Q.   Are you aware of any other receipts for

16  personal property items that you have submitted to

17  your lawyer other than the ones that we have looked

18  at today?

19          MR. ALBANIS:  Object to the form.

20          But you may answer, if you know,

21      Ms. Martinez.

22          THE WITNESS:  (Translated through

23      interpreter.)  I don't know if all the receipts I

24      gave them are here.

```
 1   BY MR. LAWSON:

 2       Q.   Can you think of anything that you have not

 3   seen a receipt for or anything that was not listed on

 4   the claim form that we just looked at that you have

 5   submitted a receipt to your attorney for?

 6           MR. ALBANIS:  Same objection.

 7           But you may answer, Ms. Martinez.

 8           THE WITNESS:  (Translated through

 9   interpreter.)  I don't know.

10   BY MR. LAWSON:

11       Q.   If you did encounter additional receipts or

12   invoices for personal property items that you believe

13   were damaged by Chinese drywall, would you submit

14   them to your attorney?

15       A.   Yes.

16       Q.   All right.  I would like to look at the same

17   answer that you gave on the first page of this First

18   Amended Interrogatories, where you say:  We seek

19   alternative living expenses from November 2010

20   through June 2013 of at least $12,199.

21           Do you see that?

22       A.   Yes.

23       Q.   What is your understanding of what

24   "alternative living expenses" means?
```

```
1             MR. ALBANIS:  Object to the form.

2             But you may answer, Ms. Martinez, if you

3        know.

4             THE WITNESS:  (Translated through

5        interpreter.)  The RV is here, which I bought.

6        The rent for all the houses when I left.

7    BY MR. LAWSON:

8        Q.   And that is the amount of money that you're

9    seeking for alternative living expenses in that

10   $12,199?

11            MR. ALBANIS:  Object to the form.

12            But you may answer, Ms. Martinez.

13            THE WITNESS:  (Translated through

14       interpreter.)  To tell you the truth, I don't

15       really know how this was worked out.  What I know

16       is -- I know that what's in here is what I have

17       paid with my money.

18   BY MR. LAWSON:

19       Q.   And you said a little bit ago that you think

20   that this includes the RV that you purchased, that

21   you lived in, as well as the rent that you paid in

22   the rental properties that you mentioned earlier.  Is

23   that right?

24       A.   Yes.
```

Case 2:09-md-02047-EEF-MBN   Document 22363-20   Filed 11/19/19   Page 1819 of 3246
Case 1:14-cv-03451-NGG-VMS   Document 09-21   Entered on FLSD Docket 05/08/2019   Page 161
Confidential - Subject to Further Confidentiality Review
of 162

```
1        Q.   And that's for the period of time from

2    November '10 -- 2010, excuse me, through June 2013.

3    Is that right?

4        A.   Yes.

5             (Defendants' Exhibit 11 was marked for

6    identification.)

7    BY MR. LAWSON:

8        Q.   Ms. Martinez, you have been handed a document

9    that's been marked as Exhibit 11.

10            Do you recognize this document?

11       A.   Yes.

12       Q.   What is it?

13       A.   It's when I bought the RV.

14       Q.   Now, the tables have been turned and now I'm

15   at a disadvantage because a lot of this agreement is

16   written in Spanish.  But this appears to be a bill of

17   sale for the purchase of the RV that you were just

18   discussing.  Is that right?

19       A.   Yes.

20       Q.   And it looks like that you purchased it

21   around November of 2010?

22       A.   Yes.

23       Q.   Is that correct?

24            And just a moment ago we were talking about
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1820 of 3246
Case 1:13-cv-02149-NGH Document 269-21 entered on FLSD Docket 05/19/2014 Page 12 of 162

Confidential - Subject to Further Confidentiality Review

```
 1    that you are seeking alternative living expenses from

 2    November of 2010 until, I believe, June of 2013.  Is

 3    that right?

 4         A.   Yes.

 5         Q.   So you began living in the RV that you

 6    purchased here around the time that you purchased it

 7    in November of 2012?

 8         A.   Yes.

 9         Q.   Is that right?

10              And looking at this, is it correct that you

11    purchased the RV for $4,399?

12         A.   Yes.

13         Q.   And I may be missing it, but I just wanted to

14    know:  Is there any section of this bill of sale

15    where it shows that you paid for the RV and that that

16    amount of money, that $4,399 was paid?

17              Is that the line below the total where it

18    says --

19         A.   Yes.

20         Q.   -- the amount that you have paid?

21         A.   In Spanish.

22         Q.   Yes.

23         A.   (Through the interpreter.)  Balanced to be

24    financed, amount zero.  Because we paid for it.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1821 of 3246
Case 1:14-cv-02094-NGG-HG Document 22 Entered on FLSD Docket 05/08/2014 Page 113 of 162
Confidential - Subject to Further Confidentiality Review

```
 1        Q.    And did you pay for the RV in cash?

 2        A.    Yes.

 3        Q.    And is this part of that amount in

 4   alternative living expenses, this $4,399 that you are

 5   seeking in this lawsuit?

 6        A.    Yes.

 7        Q.    So after you purchased this RV, did you start

 8   living in it immediately?

 9        A.    Yes.

10        Q.    And that would have occurred sometime around

11   November 16th of 2010.  Is that right?

12        A.    Yes.

13        Q.    And was the RV parked behind your house?

14        A.    Yes.  Behind my house.

15        Q.    And how long did you live in the RV after you

16   started to live in it?

17        A.    For two years, to 2012.

18        Q.    How did you decide that you wanted -- that

19   you needed to live in the RV instead of living in

20   your home?

21        A.    Because it's too much headache, too much

22   respiratory problems.  My son started getting worse

23   all the time.  And we decide to do something to try

24   to -- at least a nighttime -- we can breathe better,
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1822 of 3246
Case 1:18-cv-00490-NGG Document 209-1 Entered on FLSD Docket 05/08/2012 Page 14 of 162
Confidential -- Subject to Further Confidentiality Review

```
1    you know.  So that's why we decide to buy the RV and

2    put it in the back to try to live in the RV, sleep in

3    the RV, and come back home, take a shower, cook, and

4    go back to the RV.

5        Q.   So you would sleep in the RV at night.  Is

6    that right?

7        A.   Yes.

8        Q.   And your husband, your son, and you would all

9    sleep there?

10       A.   Yes.

11       Q.   And what else would you do in the RV, as

12   opposed to in your house?

13       A.   That's it.

14       Q.   Just sleep?

15       A.   Just sleep.

16       Q.   Okay.  So when you were cooking, you did that

17   inside of the house?

18       A.   Yes.

19       Q.   And when you -- you showered inside of the

20   house, as you said?

21       A.   Yes.

22       Q.   And you used the rest of the house to do

23   laundry.  Is that right?

24       A.   Yes.
```

```
 1        Q.    Did you keep your clothes inside of the house

 2   still?

 3        A.    Some are in the RV and some are in the house.

 4        Q.    Did you eat inside of the house?

 5        A.    No.

 6        Q.    Did you eat in the RV?

 7        A.    In the lanai.

 8        Q.    Okay.  So out on the lanai is where you --

 9        A.    Yes.

10        Q.    -- you would eat?

11        A.    We trying to get out of the house as much as

12   we can.

13        Q.    Can you think of anything else that you did

14   in the house during that time that you lived in the

15   RV, any other tasks that you performed or things that

16   you did in there?

17        A.    No.

18        Q.    Did you have people over to your house during

19   that time that you lived in the house before you

20   moved into the RV?

21        A.    (Translated through interpreter.)  My mother,

22   my sister, they would come often.

23        Q.    And did you ever have any issues inviting

24   them over?  Did they complain about being in the
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1824 of 3246
Case 1:15-cv-22408-NGG Confidential - Subject to Further Confidentiality Review
of 162

```
1     house?

2            MR. ALBANIS:  Object to the form.

3            But you may answer, Ms. Martinez.

4            THE WITNESS:  (Translated through

5       interpreter.)  They didn't want to come

6       afterwards.  They didn't want to come.  They

7       would get sick.  They would get headaches.  My

8       mother has lupus, so she didn't want to be inside

9       the toxic.

10    BY MR. LAWSON:

11         Q.  So when you said they didn't want to come

12    afterwards, do you mean after you found out that you

13    had Chinese drywall in your house?

14         A.  Yes.

15         Q.  And then they didn't want to come over?

16         A.  Yes.

17         Q.  But they did before that?

18         A.  Yes.

19         Q.  Did they have any issues with the house

20    before you knew that there was Chinese drywall in it?

21         A.  They do, but they don't know what's going on,

22    what's the problems.  Like, people have a headache,

23    oh, I have a headache, you know, but . . .

24         Q.  Since you moved back into the house, do you
```

```
 1    have family members over or friends?

 2         A.   No.

 3         Q.   And for the same reasons?

 4         A.   They prefer me to go to their house because

 5    they won't come.

 6         Q.   A little bit earlier we were looking at a

 7    warranty deed where you bought an additional lot

 8    behind your house.  Was that related to having the RV

 9    behind your house?

10         A.   Yes.

11         Q.   Okay.  Did you buy that lot so you would have

12    room to put the RV there?

13         A.   Yes.  Otherwise, I don't have -- and then I

14    have a lot of problems with the city, either way,

15    with the City of Cape Coral.

16              MR. ALBANIS:  With the City of Cape Coral.

17    BY MR. LAWSON:

18         Q.   Do you remember how much you paid for the lot

19    behind the house?

20         A.   7,000.

21         Q.   $7,000?

22              And that was also in 2010 when you purchased

23    the RV.  Is that right?

24         A.   Yes.
```

```
 1          Q.   Do you still own that lot today?

 2          A.   Yes.

 3          Q.   What does your husband do for work?

 4          A.   He's driving dump trucks, 18 wheels before.

 5   And then dirt --

 6               (Translated through interpreter.)  Dirt

 7   trucks.

 8          Q.   Do you still have the RV that you purchased

 9   in 2010?

10          A.   No.

11          Q.   Did you sell it?

12          A.   Yes.

13          Q.   Do you remember when you sold it?

14          A.   No.

15          Q.   Do you remember who you sold it to?

16          A.   No.

17          Q.   Do you remember how much you sold it for?

18          A.   I think $2,000, something like that.

19          Q.   $2,000?

20          A.   Yeah.

21          Q.   Somewhere around there?

22          A.   Yes.

23          Q.   Do you know if you have any records of that

24   sale, like, of how much you sold it for, a piece of
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1827 of 3246
Case 1:11-cv-22408-MGC Document 201-1 Entered on FLSD Docket 05/19/2014 Page 119 of 162
Confidential - Subject to Further Confidentiality Review

1    paper that shows that?

2         A.    I don't know if I have a record.  I don't

3    know.

4         Q.    Why did you sell the RV?

5         A.    Because I don't live in the RV anymore.

6         Q.    So you sold it after you moved into one of

7    the rentals or after you moved back into the house?

8         A.    After I go to the rentals, I sell it.

9         Q.    So maybe around 2012 or 2013?

10        A.    Probably 2013, probably, yes.  The Cape Coral

11   City give me a lot of hard time and give me a couple

12   years only for stay.  It's not legal to have RV in a

13   residential, so they want me to -- charge me a

14   thousand dollars a day for have it there.

15        Q.    So they gave you a couple years where you did

16   not have to pay that fine, but then they wanted you

17   to start paying to have to have the RV in the back of

18   your house?

19        A.    Or get rid of that, in back to the house.

20        Q.    And is that why you decided to rent a new

21   place to live?

22        A.    Not really.  I wanted renting another place,

23   because my son, he's growing up, and it was very

24   uncomfortable, the RV, very, very uncomfortable.  I

```
 1    have pictures where he's sleeping in that bed.  Like,

 2    he don't even stay in that bed.  So he has to sleep

 3    like this.  And my husband and I, we can't sleep

 4    together; we have to sleep in a bunk bed, one in --

 5    and every time that I get up, I hit my head with that

 6    other bed in the top.  And it's very uncomfortable.

 7    So that's why we decide to -- we have to do

 8    something.  He -- every time he ask me for, Mom, can

 9    we stay when we sleep in a better situation?  So

10    that's why we decide to -- to rent in another house.

11         Q.   A few minutes ago you said that you bought

12    the lot behind your house for around $7,000.  Is that

13    right?

14         A.   Yes.

15         Q.   Have you ever had that lot appraised for what

16    its value is today?

17         A.   No.

18         Q.   Do you know if you are seeking that $7,000 in

19    your damages in this lawsuit?

20         A.   I don't think so.  I don't think I've put it

21    in there, in those papers.  No.

22              MR. ALBANIS:  I can't answer your questions

23         for you.  I'm sorry.

24              THE WITNESS:  No.  I'm sure not.  I'm sure
```

1      not.

2            (Defendants' Exhibit 12 was marked for

3      identification.)

4      BY MR. LAWSON:

5            Q.   You have been handed a document that's been

6      marked as Exhibit 12.

7                 Do you recognize this document?

8            A.   Yes.

9            Q.   What is it?

10           A.   That's a receipt when I buy -- rent places

11     from Melissa Mickey and Mike.

12           Q.   So this is a rental that you had in 2013?

13           A.   Uh-huh.

14           Q.   And there's also receipts for amounts paid in

15     rent for 2012 as well.  Is that right?

16           A.   Yes.

17           Q.   So does this cover the period of time where

18     you were not living in the RV but you were also not

19     living in your home; you were in rental properties?

20     Is that right?

21           A.   Yes.

22           Q.   And it looks like there are about 13

23     different checks in here each for $600.  Is that

24     right?

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1830 of 3246
Case 1:18-cv-09918-RKE Document 269-21 Entered on FLSD Docket 09/29/2019 Page 822 of 162
Confidential - Subject to Further Confidentiality Review

```
1        A.   Yes.

2        Q.   Is it -- does it sound about right to say

3   that you were living in rental properties for around

4   13 months during this time?

5        A.   Yes.

6        Q.   And these amounts that you paid in rent are

7   part of what you are seeking for alternative living

8   expenses in this lawsuit.  Is that right?

9        A.   Yes.

10        Q.   For the period of time from November 2010 to

11   June 2013, correct?

12        A.   Yes.

13        Q.   And it looks like you started living in

14   rental properties around June of 2012.  Is that

15   right?

16        A.   Yes.

17        Q.   And that you continued to live in them until

18   March of -- excuse me, June of 2013?

19        A.   Yes.

20        Q.   Are you aware of any other receipts or

21   amounts of money that you are seeking for alternative

22   living expenses other than the RV and the rent checks

23   that we just reviewed?

24        A.   (Translated through interpreter.)  Not that I
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1831 of 3246
Case 1:15-cv-04946-NGG-TAM Document 210-1 Filed 05/18/2018 Page 123 of 162
Confidential - Subject to Further Confidentiality Review

1    know of.

2         Q.   And I represent to you that -- and I think I

3    have done this math correctly -- that the checks, as

4    well as the $4,399 for the RV, appear to add up to

5    the $12,199 that you listed in your answer to the

6    interrogatories as the amount that you are seeking.

7         A.   Yes.

8         Q.   Why did you decide to move back into your

9    house in June of 2013?

10        A.   Because we can't afford to pay -- continue to

11   pay the mortgage at the house, and we have to pay the

12   rent for those people.  We have to pay electricity in

13   the house; we everybody to pay electricity in our

14   home.  We have to pay everything in both houses.  We

15   can't afford to pay everything at that time.  My

16   husband, he don't got too much job when everything

17   went down.  So everything is when -- like, every

18   time's good times.  So we have to decide to go back.

19   We can't afford to pay both things.  So we have to go

20   back home.  We can't rent in that anymore.

21        Q.   What has your experience been like living in

22   your home since you've moved back?

23        A.   (Translated through interpreter.)  The house

24   is worse.  We can't have a normal life.  My son as a

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1832 of 3246
Case 1:15-cv-02494-NGG Document 22363-39 Filed 11/19/19 Page 1832 of 3246
Confidential - Subject to Further Confidentiality Review
of 162

```
 1    grownup, he can't bring any friends to his house.

 2            I'm sorry.

 3       Q.   No.  Take your time, please.

 4       A.   This is very hard for me.

 5       Q.   I understand.

 6       A.   (Translated through interpreter.)  We've been

 7    sick many times.  My husband has sleep apnea.  He has

 8    to sleep with a machine.

 9            I have a picture in my phone so if you want

10    to look, how he have to sleep.  And I have to have a

11    couple things where respiratory problems, because I

12    have.  So it's been very bad situation when we come

13    back home.

14       Q.   You said that the house is worse since you

15    came back.  Is that right?

16       A.   Yes.

17       Q.   How is it worse?

18       A.   The stuff still broken.  One day we see the

19    TV, and explode, the TV, in front of us.  Other day,

20    we went to the garage, and we see the white smoke,

21    and we look; the water heater is burnt.  We have to

22    shut off all those -- the fuse box.

23            Things like that.  That's how we -- we don't

24    even know every day what we can get.  We afraid one
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1833 of 3246
Case 2:14-cv-02494-NGG Document 09-21 Entered on FLSD Docket 05/08/2019 Page 125 of 162
Confidential -- Subject to Further Confidentiality Review

```
 1    day everything's burnt.

 2           I was cooking, and the cable with the stove

 3    burn.  We have to put tape on it until we can buy a

 4    new stove.

 5           That's -- that's how we do all the time.  We

 6    don't even know the next day what's going to come,

 7    what we're going to do.  What's going to happen.

 8    That's how we live.

 9       Q.   You said a moment ago that you have to take

10    something for respiratory issues?

11       A.   Yes.

12       Q.   Is that an inhaler?

13       A.   Yes.

14       Q.   And are you diagnosed --

15       A.   Two different ones.

16       Q.   I'm sorry.

17           Two different inhalers?

18       A.   Yes.

19       Q.   And you were diagnosed with a respiratory

20    condition by a doctor?

21       A.   Yes.

22       Q.   Do you know what condition that is?

23       A.   Well, I have so many papers with the doctors

24    at home.  I give it to Pete.  So many papers that
```

1    I -- that I have.  That's what they say, respiratory

2    problems.

3        Q.   And have you had those problems throughout

4    the time that you have lived in the house?

5        A.   Yes.

6        Q.   Have they gotten better or worse over time?

7        A.   When I get out of the house for that year, I

8    doing better.  When I have to live in the RV, come

9    back and forth, come back and forth, about -- we

10   doing better when I get out of the house.

11            MR. ALBANIS:  Let's go off the record for a

12       second.

13            (Recess from 11:04 until 11:19 a.m.)

14            (Defendants' Exhibit 13 was marked for

15   identification.)

16   BY MR. LAWSON:

17       Q.   Welcome back, Ms. Martinez.

18            During the break, you were handed a document

19   that was marked as Exhibit 13.

20            Do you see that?

21       A.   Yes.

22       Q.   And what is this document, if you know?

23       A.   (Translated through interpreter.)  This is a

24   document which has all my information, when I bought

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1835 of 3246
Case 1:18-cv-11229-NGK Document 269-21 Confidential Filed under Seal 05/28/2019 Page 127 of 162
Confidential - Subject to Further Confidentiality Review

```
 1    the house, different questions I've been asked.

 2        Q.   If you look at the first page of the

 3    document, it appears to be titled at the top as a

 4    First Amended Supplemental Plaintiff Profile Form.

 5            Do you see that?

 6        A.   Yes.

 7        Q.   And if you turn to the last page of the

 8    document, you can see that there is a signature page.

 9            Do you see that?

10        A.   Yes.

11        Q.   And it has a date signed field that's filled

12    in as December 4th, 2018.

13            Do you see that?

14        A.   Yes.

15        Q.   And that your name is listed below there,

16    along with the address of your home.  Is that right?

17        A.   Yes.

18        Q.   Now, you did not sign this particular form

19    that we are looking at today; did you?

20        A.   No.

21        Q.   And do you know if you have signed a form

22    that looked like this before, a Supplemental

23    Plaintiff Profile Form?

24        A.   I don't remember.
```

```
1        Q.    Okay.  I'd like to turn your attention to the

2   sixth page of this document.  At the top of it

3   there's a question that asks -- and I'll let you get

4   there.

5              It asks:  If you experienced any loss of use

6   and/or loss of enjoyment of the property as a result

7   of Chinese drywall, identify the total amount of such

8   loss.

9              And below that you answered:  $550,000.

10             Do you see that?

11       A.    Yes.

12       Q.    Is that -- can you tell me why you answered

13  that you experienced a loss of $550,000 for loss of

14  use and/or loss of enjoyment of your property?

15       A.    (Through the interpreter.)  According to what

16  Judge Fallon said, the formula.

17       Q.    So that amount is based on a formula from a

18  Judge Fallon.  Is that right?

19       A.    Yes.

20       Q.    And is that your understanding, that you are

21  seeking that amount of money for loss of use and/or

22  loss of enjoyment of your home?

23             MR. ALBANIS:  Object to the form.

24             But you may answer, Ms. Martinez --
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1837 of 3246
Case 1:14-cv-04099-NGG Document 09-12 Filed on ESD Docket 05/02/2019 Page 129 of 162
Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  Yes.

 2              MR. ALBANIS:  -- if you know.

 3    BY MR. LAWSON:

 4        Q.    We've discussed a lot of different ways where

 5    you have had issues with your home or problems living

 6    in your home.  Can you think of any other issues or

 7    problems that have interfered with your use or

 8    enjoyment of your home that we haven't talked about

 9    today?

10        A.    (Through the interpreter.)  Apart from all

11    the problems we've had, the things that worry me the

12    most are the health problems.  Right now I got

13    diagnosed with fibromyalgia because of all the amount

14    of large stress I've had for all these years.  My

15    dream home is not worth it, anything at all.  What

16    else?  What -- what's -- what more worse than that

17    could happen?

18        Q.    The fibromyalgia that you just mentioned, was

19    that diagnosed by a doctor?

20        A.    Yes.

21        Q.    When was that diagnosed?

22        A.    Two weeks ago.

23        Q.    Were you told that it was the result of

24    stress that you now have fibromyalgia?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1838 of 3246
Case 1:14-cv-24049-MGC Document 609-1 Entered on FLSD Docket 05/19/2019 Page 130 of 162
Confidential - Subject to Further Confidentiality Review

```
 1       A.   Yes.

 2       Q.   And you believe that stress is from Chinese

 3   drywall in your home.  Is that right?

 4       A.   Well, yes.  It's part of that.  Life is a

 5   stress, but if you have to deal with all the stuff,

 6   it's been worse.

 7       Q.   And you said that your dream home is worth

 8   very little now or nothing.  Is that what you said?

 9       A.   Yes.

10       Q.   Do you know how much your home is worth now?

11       A.   Well, according to the City, $22,000,

12   something like that.

13       Q.   Have you had the home appraised by anyone in

14   the last few years?

15       A.   Every year they send me, by the City, when

16   you pay taxes, and that's where they discuss how much

17   it cost, the house, by the City.

18       Q.   Anyone other than the City?

19       A.   No.

20       Q.   Have you ever listed the house for sale?

21       A.   Never.

22       Q.   How much do you think your home was worth

23   before -- or, when you purchased it?

24       A.   I buy for one sixty-five.  I think that's the
```

```
 1     right cost of the house.

 2          Q.   Do you think that's what -- knowing that the

 3     house now has Chinese drywall in it, do you think

 4     that the house was worth $165,000 when you brought

 5     it?

 6     A.   No.

 7               MR. ALBANIS:  Object to the form.

 8               But you may answer.

 9               THE WITNESS:  No.

10     BY MR. LAWSON:

11          Q.   You think the house was worth less than

12     $165,000 when you bought it?

13     A.   Yes.

14               MR. ALBANIS:  Object to the form.

15               But you may answer, if you know,

16          Ms. Martinez.

17               THE WITNESS:  (Translated through

18          interpreter.)  When I bought the house, I didn't

19          know that it had Chinese drywall, and I thought I

20          was buying a very good house at a good price.

21     BY MR. LAWSON:

22          Q.   If you would have known that it had Chinese

23     drywall, would you have paid less for it?

24               MR. ALBANIS:  Same objection.
```

Case 2:09-md-02047-EEF-MBN  Document 22363-29  Filed 11/19/19  Page 1840 of 3246
Case 2:14-cv-02494-NGE  Document 2017-2  filtered under seal  Docket 05/08/2019  Page 1832 of 162
Confidential - Subject to Further Confidentiality Review

 1              But you may answer.

 2              THE WITNESS:  (Translated through

 3         interpreter.)  Yes.  I probably would have paid a

 4         lot less.

 5    BY MR. LAWSON:

 6         Q.   And that amount that you just mentioned, that

 7    the City has said is the value of your home, around

 8    $22,000, I believe is what you said, is that about

 9    what you would pay for the house if you would have

10    known that it had Chinese drywall?

11              MR. ALBANIS:  Object to the form.

12              But you may answer, Ms. Martinez, if you

13         know.

14              THE WITNESS:  Probably, yes.

15    BY MR. LAWSON:

16         Q.   You've continued to pay your mortgage

17    payments ever since you bought the house, correct?

18         A.   Yes.

19         Q.   Do you know how much you have paid into the

20    principal of your mortgage since you started making

21    payments on the house?

22         A.   I think it was 600-something I pay in

23    interest.  Principal, 100-something, I believe.  I'm

24    not sure.

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1841 of 3246
Case 1:14-cv-42408 NGAD Meal Document 7 Interfederancestat Debate 05/08/2014 Page 433 of 162
Confidential - Subject to Further Confidentiality Review

```
 1              MR. ALBANIS:  Matt, just for the record, we

 2         have produced mortgage documents that show the

 3         principal payments and I believe also show what

 4         the original amount of the mortgage was, meaning

 5         the total amount that was financed.

 6              MR. LAWSON:  I think that's right.

 7         (Defendants' Exhibit 14 was marked for

 8    identification.)

 9    BY MR. LAWSON:

10         Q.   I have handed you a document that's been

11    marked as Exhibit 14.

12              Do you recognize this document?

13         A.   Yes.

14         Q.   What is it?

15         A.   It's a contractor.  They give me an estimate

16    in 2012 for remediate and reconstruction quote to do

17    my house.

18         Q.   Earlier this morning you were telling me that

19    you had received a quote for the reconstruction or

20    remediation of your home back in 2012.  Is that this

21    quote?

22         A.   No.

23         Q.   Oh, is that a different one from 2012?

24         A.   It's a different one.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1842 of 3246
Case 1:14-cv-02408-NGG Document 201-2 Filed 11/08/19 Page 1842 of 3434
Confidential - Subject to Further Confidentiality Review
of 162

```
 1          Q.   Okay.  So you had one from 2018, just the

 2    other week, is that right, that you received a quote?

 3          A.   Yes.

 4          Q.   And then there's this one, which is from

 5    2012.  Is that right?

 6          A.   Yes.

 7          Q.   And is there a third one beyond that?

 8          A.   No.  There's only two.

 9          Q.   Okay.  So this is the quote that you received

10    in 2012?

11          A.   Yes.

12          Q.   And the quote was from a contractor named

13    Chinese Drywall Experts, LLC.  Is that right?

14          A.   Yes.

15          Q.   And did you contact them back in 2012 to give

16    you a quote on what the remediation and

17    reconstruction of your home would cost?

18               MR. ALBANIS:  And, Matt, I'm just going to

19          assert the same objection I've asserted all week

20          regarding remediation damages; it's a rolling

21          objection.

22               As you know, it is the plaintiff's position

23          that Ms. Martinez has been named as a priority

24          claimant for nonremediation damages.  Remediation
```

```
 1          damages in the Amorin class-action litigation,

 2          which is before Judge Cooke, are to be addressed

 3          on a separate track in the litigation by the

 4          special master and then subsequently by

 5          Judge Cooke, as the judge laid out in her

 6          November 16, 2018, order.

 7               Having said all that, we will, of course,

 8          allow you to ask questions regarding the

 9          remediation damages and the documents that relate

10          to that.

11     BY MR. LAWSON:

12          Q.   Ms. Martinez, this -- did you contact Chinese

13     Drywall Experts, LLC to come out and give you a quote

14     on the remediation and reconstruction of your home?

15          A.   Give me this quote?

16          Q.   Yes.

17          A.   Yes.

18          Q.   You called them?

19          A.   They come and they give me this quote.

20          Q.   Okay.  Did you want to get this quote because

21     you wanted to know how much it would cost to fix your

22     home?

23          A.   Yes.

24          Q.   And did you give them any instructions on
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1844 of 3246
Case 1:14-cv-24049-NLTS Document 289-1 Entered on FLSD Docket 05/08/2015 Page 136 of 162
Confidential - Subject to Further Confidentiality Review

1    what you wanted them to give you a quote for?

2         A.   No.   They know what they're doing.

3    They're -- that's their job, so they're -- they know

4    what they have to deal with Chinese drywall, and

5    that's why all this stuff very clear, what they have

6    to do, they mark in here.  So I don't have to tell

7    them anything.  They know what they're doing.

8         Q.   So you asked them to give you a quote because

9    they had experience fixing homes with Chinese

10   drywall.  Is that right?

11        A.   Yes.

12        Q.   And it was your understanding that they knew

13   how to remediate and reconstruct a home that had

14   Chinese drywall in it, right?

15        A.   Yes.

16        Q.   And you thought they would do a good job?

17        A.   Yes.

18        Q.   How much did they quote you for -- to

19   remediate and reconstruct your home?

20        A.   129,684; subtotal 133,184.

21        Q.   And it looks like they included some

22   potential reconstruction credits that reduce that

23   amount of the $129,684 that you listed.  Is that

24   right?

```
 1         A.   Yes.

 2         Q.   I would like to turn your attention to

 3    Page 12 of this document.

 4              If you look on Page 12, there's a table that

 5    lists options.  Do you see that?  There's an Option

 6    Number 5001 and an Option Number 5002.

 7         A.   Yes.

 8         Q.   Do you see how under Option 5001 it says:

 9    "Add on 240" and it says "SSQ to back of home."

10              Is that referring to adding on 240 square

11    feet to the back of the home?

12         A.   I don't remember.

13         Q.   Do you remember asking them to add square

14    footage to the back of your home as part of this

15    quote?

16         A.   I don't remember.

17         Q.   And for Option 5002, it also lists as an

18    option to "remove and replace 2,283 SQ of tile."

19              Do you see that?

20         A.   Yes.

21         Q.   And do you think that refers to removing and

22    replacing 2,283 squares of tile or square feet of

23    tile?

24         A.   I don't remember.  It is there, but I don't
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1846 of 3246
Case 1:14-cv-4046-NGG Document 09-21 Confidential ESI Under 05/18/2016 Page 138 of 162
Confidential -- Subject to Further Confidentiality Review

```
 1   remember.

 2       Q.   But those are listed as options for this

 3   project.  Is that right?

 4       A.   Yes.

 5       Q.   And the total amount of a price for those

 6   options is listed here as $31,000.  Is that right?

 7       A.   Yes.

 8       Q.   Let's go back to Page 3 that we were looking

 9   at with the total amount of the quote.

10            If you look to the chart on Page 3 where

11   they're listing out the total price for this quote,

12   Options is listed as $31,000.  Is that right?

13       A.   Yes.

14       Q.   And that's the same number that we just

15   looked at for the two options that were on Page 12?

16       A.   Yes.

17       Q.   So that total of $129,684 includes $31,000

18   for the two optional items that we just talked about,

19   right?

20       A.   Yes.

21            MR. ALBANIS:  Object to the form.

22            But you may answer.

23   BY MR. LAWSON:

24       Q.   Without those two options, the total quote
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1847 of 3246
Case 1:19-cv-12408-NGN Document 28-21 entered on FLSD Docket 05/28/2019 Page 4639 of 162
Confidential - Subject to Further Confidentiality Review

1    would have been $31,000 less.  Isn't that right?

2            MR. ALBANIS:  Object to the form.

3            But you may answer.

4            THE WITNESS:  Yes.

5    BY MR. LAWSON:

6        Q.   And you don't recall if you asked Chinese

7    Drywall Experts to either add on 240 square feet to

8    your home or remove and replace the tile in the home;

9    do you?

10           MR. ALBANIS:  Object to the form.

11           THE WITNESS:  I don't remember.

12   BY MR. LAWSON:

13       Q.   But they did list those options on this

14   quote.  Isn't that right?

15       A.   Yes.

16       Q.   And you ultimately did not pay Chinese

17   Drywall Experts to perform this work.  Is that right?

18       A.   (Translated through interpreter.)  Correct.

19       Q.   Is that because of the cost that they were

20   asking for?

21       A.   Yes.

22       Q.   It was too much money?

23       A.   Yes.  I don't have the money to pay.

24           (Defendants' Exhibit 15 was marked for

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1848 of 3246
Case 1:19-cv-02448-NRB Document 209-1 Confidential Filed 03/03/2019 Page 140 of 162
Confidential - Subject to Further Confidentiality Review

```
 1     identification.)

 2     BY MR. LAWSON:

 3         Q.   I have handed you a document that's been

 4     marked as Exhibit 15.

 5             Do you recognize this document?

 6         A.   Yes.

 7         Q.   And is this the quote for remediation and

 8     reconstruction of your home that you received this

 9     month?

10         A.   Yes.

11         Q.   Specifically, did you receive this quote, I

12     believe you said, this morning.  Is that right?

13         A.   Yes.

14         Q.   And you said that -- earlier that you had

15     sought out this quote because it had been some six

16     years since you had received the previous quote.  Is

17     that right?

18         A.   Yes.

19         Q.   And you wanted to see what it would cost in

20     2018 to be able to repair and reconstruct your home?

21         A.   Yes.

22         Q.   Do you know if Chinese Drywall Experts still

23     exists and -- excuse me, if they still exist?  Do you

24     know if that company still exists?
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1849 of 3246
Case 1:14-cv-04048-NGG Document 2001-21 entered on FLSD Docket 05/08/2015 Page 141 of 162
Confidential - Subject to Further Confidentiality Review

1      A.   No.

2      Q.   Did you think about calling them to get a new

3   quote?

4      A.   I don't know.

5      Q.   Do you know why you called this company to

6   get a new quote?

7      A.   I want to get different companies to see

8   how -- how -- how they work with estimates.

9      Q.   Now, looking at this estimate, this is from a

10  Gabisa Construction, Inc.  Do you know how that's

11  pronounced?

12     A.   Gabisa.

13     Q.   Gabisa?

14          Have you ever worked with them before?

15     A.   No.

16     Q.   And how did you find them to ask them to give

17  you a quote?

18     A.   A friend of mine give me this company.

19     Q.   And do you think you are going to ask for

20  quotes from any other companies?

21     A.   I can do.

22     Q.   Do you think you would want to see what

23  Chinese Drywall Experts would quote your house for

24  remediation and reconstruction for?

```
 1              MR. ALBANIS:  Object to the form.

 2              But you may answer, if you know,

 3         Ms. Martinez.

 4              THE WITNESS:  Yeah.  Why not?

 5    BY MR. LAWSON:

 6         Q.   Do you have friends who work for Gabisa

 7    Construction?

 8         A.   Friends?  No.

 9         Q.   But someone you know knows people at Gabisa

10    Construction?

11         A.   Yes.

12         Q.   Do you know if Gabisa Construction has ever

13    remediated and reconstructed a home with Chinese

14    drywall?

15         A.   That's what they do.

16         Q.   Do they do any other kind or work or only

17    work with Chinese drywall homes?

18              MR. ALBANIS:  Object to the form.

19              But you may answer.

20              THE WITNESS:  I don't know.

21    BY MR. LAWSON:

22         Q.   But you were told that they have remediated

23    and reconstructed homes with Chinese drywall before?

24         A.   Yes.
```

```
1        Q.    And looking at this form, Gabisa Construction

2    quoted you a total of $179,520 for the remediation

3    and reconstruction of your home.  Is that right?

4        A.    Yes.

5        Q.    And you would agree that is significantly

6    more than what Chinese Drywall Experts quoted you

7    for.  Is that right?

8        A.    Yes.

9        Q.    Did you ask Gabisa Construction why the cost

10   was more than what you had been quoted in 2012?

11       A.    No.

12       Q.    Do you remember a little bit earlier when we

13   were looking at the square footage that Lee County

14   listed for the living area in your home on that Lee

15   County property record that we looked at earlier?

16       A.    Yes.

17       Q.    And that was Exhibit 1, right?

18       A.    Yes.

19       Q.    And it listed the total square footage of the

20   living area as 2,259 square feet.  Isn't that right?

21       A.    Yes.

22       Q.    Looking back at this Gabisa Construction

23   quote that you received, if you look into the

24   description of the work listed on the first page of
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1852 of 3246
Case 1:15-cv-02403-MGC Document 209-1 Entered on FLSD Docket 05/18/2015 Page 144 of 162
Confidential - Subject to Further Confidentiality Review

1    that quote, it states:  House area where drywall

2    needs to be replaced, 3,264 SF.

3            Do you see that?

4        A.    Yes.

5        Q.    And is it your understanding that this quote

6    is to replace drywall in a house area of 3,264 square

7    feet?

8            MR. ALBANIS:  Object to the form.

9            But you may answer, Ms. Martinez, if you

10       know.

11           THE WITNESS:  In this, that's what I thought

12       he got this number.  In here is the total living

13       area; but in here, I thought he include the

14       garage, like, it is not included in here because

15       they here say total living area.  The garage is

16       not living area, but it have Chinese drywall,

17       too.  I think it's 500-something, the garage.

18       It's three-car garage.

19           So I'm guessing that's how he got those

20       numbers.  I don't adding those numbers together,

21       so I don't know -- so that's what I'm guessing,

22       he had this.

23   BY MR. LAWSON:

24       Q.    So this Gabisa Construction quote is for not

```
 1    just the total living area of the home to be
 2    remediated and reconstructed but also for around a
 3    thousand additional square feet to be remediated and
 4    reconstructed.  Is that right?
 5       A.   Yeah.  He -- I believe he account that --
 6    what have Chinese drywall, too, the garage.
 7       Q.   Does this quote also ask Gabisa Construction
 8    to add additional square footage to the back of your
 9    house?
10       A.   No.  I don't see any -- any square footage
11    extra.
12       Q.   To your knowledge, does this quote ask for
13    Gabisa Construction to remove the tile from the
14    house?
15          MR. ALBANIS:  I'm going to object to the
16       form.
17          But you can answer, if you know,
18       Ms. Martinez.
19          THE WITNESS:  No.  They're not asking for
20       tile.  All carpet flooring -- yeah, they do.
21       Yes.
22    BY MR. LAWSON:
23       Q.   And where does it say that?
24       A.   Where?
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1854 of 3246
Case 2:14-cv-02722-NGG-GRB Confidential – Subject to Further Confidentiality Review
of 162

1    Q.   Yes.

2    A.   All carpet flooring will be removed and

3    replaced new.  Contractor, we remove and replace

4    window sills.  Oh, they're talking about window

5    sills.

6    Q.   So the quote says that they'll remove any

7    carpentry there.  Is that right?

8    A.   Yes.  Carpet flooring.

9    Q.   Well, I think it's saying "carpentry," right?

10   That's the word, "carpentry"?

11        And then in quotes it says:  Interior door,

12   door handles, baseboard, crown moldings, medicine

13   cabinets, mirrors, and install new.

14   A.   Yes.

15   Q.   So this appears to be referring to doors,

16   baseboards, crown moldings, cabinets, things like

17   that.  Is that right?

18   A.   Yes.

19   Q.   Do you have tile flooring in your home?

20   A.   Yes.

21   Q.   And you'd agree with me that you don't see

22   anywhere in this quote where it says that it's

23   removing the tile flooring.  Is that right?

24   A.   Yes.

```
1       Q.   When you spoke with Gabisa Construction, did

2    they tell you that they would be performing this

3    remediation based on any kind of protocol?  Did they

4    use that word "protocol" at any time?

5            MR. ALBANIS:  Object to the form.

6            But you may answer, Ms. Martinez.

7            THE WITNESS:  (Translated through

8       interpreter.)  What does "protocol" mean?

9    BY MR. LAWSON:

10       Q.   Did they tell you that they would follow any

11    particular plan for how a home should be remediated

12    and reconstructed based on a court order?

13            MR. ALBANIS:  Object to the form.

14            But you may answer, Ms. Martinez.

15            THE WITNESS:  They tell me about codes by the

16       City, inspections, permits, all that stuff they

17       require to do when they do the remediation.

18       That's how they tell me.

19    BY MR. LAWSON:

20       Q.   All right.  Did they tell you that there were

21    any other rules or plans that they were going to

22    follow other than the City codes?

23            MR. ALBANIS:  Object to the form.

24            But you may answer, if you know,
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1856 of 3246
Case 1:16-cv-00248-NGG Document 22-21 entered on FLSD Docket 05/18/2019 Page 948 of 162
Confidential -- Subject to Further Confidentiality Review

```
 1        Ms. Martinez.

 2            THE WITNESS:  I don't know.  Say provide City

 3        permits and all that stuff.  There needs to be

 4        required to be legally how do they do it, because

 5        that's their job.  They know what they're doing.

 6   BY MR. LAWSON:

 7        Q.   Do you plan to have Gabisa Construction

 8   remediate and reconstruct your home?

 9        A.   I don't know.

10            MR. LAWSON:  We can go off the record.

11            (Recess from 11:50 until 11:55 a.m.)

12            MR. LAWSON:  Ms. Martinez, thank you for your

13        time today.  I have no further questions at this

14        time.

15            MR. MOREN:  Ms. Martinez, I just have a few

16        quick questions for you.  Hopefully it won't take

17        up much more of your time.

18                     RECROSS-EXAMINATION

19   BY MR. MOREN:

20        Q.   First, when you purchased your house in 2008,

21   the purchase price was 165,000, right?

22        A.   Yes.

23        Q.   And how much -- did you take out a loan from

24   the bank to help pay for that?
```

```
1           A.   I pay $50,000.  And the rest, I make payments

2    every month.

3           Q.   Thank you.

4                Just one more question.  If you can go back

5    to Exhibit Number 5.  And please turn to Page 2.

6                I just want to confirm with you the street

7    addresses of the two homes that you rented, because I

8    think there may be a discrepancy.

9                So in your answer to Question Number 2, it

10   states that the street address of the first home is

11   1718 Southwest 12th Terrace.  Is that accurate?

12          A.   Yes.

13          Q.   And the second home it states the street

14   address is 2011 Northeast, or NE, 18th Place.  Is

15   that correct?

16          A.   Yes.

17          Q.   Okay.  I just want to verify, because I saw

18   elsewhere.  If you can pull out Exhibit 12, please.

19               So on the first page, the address on the

20   first receipt is 2011 Northeast -- it says NE --

21   17th Place.  Is that correct?

22          A.   Yes.

23          Q.   So do you think that one of these addresses

24   is a mistake, between the 17th Place or the
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1858 of 3246
Case 1:19-cv-02488-NGG Document 309-1 entered on FLSD Docket 05/08/2019 Page 150 of 162
Confidential - Subject to Further Confidentiality Review

```
 1    18th Place?

 2        A.    Yes.   This one is mistake.  It's 18th Place.

 3        Q.    18th Place?

 4        A.    Yes.

 5        Q.    Is the correct street?

 6        A.    Yes.

 7        Q.    Thank you.

 8              MR. MOREN:  That's all I have.

 9              MR. ALBANIS:  Nothing else?

10                        CROSS-EXAMINATION

11    BY MR. ALBANIS:

12        Q.    Ms. Martinez, I just have a few follow-up

13    questions.

14              Could you please take out Exhibit 13, the

15    First Amended Supplemental Plaintiff Profile Form.

16        A.    Yes.

17        Q.    Did you authorize my office to file this form

18    on your behalf?

19        A.    Yes.

20        Q.    Before you authorized my office to file this

21    form, did you have an opportunity to review the form?

22        A.    Yes.

23        Q.    Did you agree with all of the information

24    that was provided on the form?
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1859 of 3246
Case 1:15-cv-02248-NGG Document 289-1 Confidential Filed 05/08/2019 Page 151 of 162
Confidential - Subject to Further Confidentiality Review

```
 1        A.   Yes.

 2        Q.   Thank you.

 3             Earlier when Mr. Lawson was asking you

 4   questions about living in the RV, you mentioned some

 5   pictures that you had.  Do you remember that?

 6        A.   Yes.

 7             MR. ALBANIS:  We'll mark this as Plaintiff's

 8        Exhibit Number 1, please.

 9             (Plaintiff's Exhibit 1 was marked for

10        identification.)

11   BY MR. ALBANIS:

12        Q.   Would you please take a moment to flip

13   through these photographs, and let me know after

14   you've looked at all of them.

15             Have you had a chance to look at all the

16   photographs, Ms. Martinez?

17        A.   Yes.

18        Q.   Are these the photographs that you were

19   referencing earlier when you told Mr. Lawson that you

20   had pictures of the time period that you were living

21   in the RV?

22        A.   Yes.

23        Q.   Let's focus on the first page.

24             Is that the RV that we see behind the fence?
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1860 of 3246
Case 1:15-cv-00429-WS-N Document 21 of ... Entered on FLSD Docket 05/08/2015 Page 152 of 162
Confidential - Subject to Further Confidentiality Review

```
 1        A.   Yes.

 2        Q.   And it appears as though there are two homes

 3    in this picture.  Which home is the Chinese drywall

 4    house in this picture?  Is it the home on the left,

 5    which is -- appears to be a yellow color, or is it

 6    the home on the right, which appears to be a brighter

 7    color?

 8        A.   The house in -- your right.

 9        Q.   The house behind the trees?

10        A.   Yes.  Here.

11        Q.   Okay.  Let's turn to the second picture.

12    What is this picture of, Ms. Martinez?

13        A.   That's my son.  He is sleeping in that bed

14    like he can't sleep in that bed.

15        Q.   Is that a picture from the inside of the RV?

16        A.   Yes.

17        Q.   Let's go to the next picture, Ms. Martinez,

18    on Page 3 of the document.

19             What is this picture of?

20        A.   That's his room in the house.

21        Q.   It appears as though he has a Frankenstein

22    pillow on his bed.  Is that true?

23        A.   Yes.

24        Q.   Let's go to the next picture, Ms. Martinez.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1861 of 3246
Case 1:14-cv-02494-NGG Document 30271 Confidential - Subject to Further Confidentiality Review of 162
Confidential - Subject to Further Confidentiality Review

```
 1                  On the fourth page of the document, what is

 2       this picture of, Ms. Martinez?

 3            A.   That's my husband in my bed, the bunk bed.

 4       We have to sleep separate:  One in the top, one in

 5       the bottom.

 6            Q.   Was this picture taken from inside the RV?

 7            A.   Yes.

 8            Q.   Who slept on top and who slept on the bottom?

 9            A.   I slept in here, and he slept in the --

10            Q.   You slept on the bottom?

11            A.   Yes.

12            Q.   And he slept on the top bunk?

13            A.   Yes.

14            Q.   Thank you.

15                 And then the fifth picture, Ms. Martinez,

16       flip to that.  Is that a picture of the RV in your

17       yard?

18            A.   Yes.

19            Q.   Okay.  And then the sixth picture,

20       Ms. Martinez, what is that a picture of?

21            A.   That's my bed.

22            Q.   That's your bed inside your home?

23            A.   Yes.

24            Q.   Does your home still have Chinese drywall in
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1862 of 3246
Case 1:14-cv-09148-NGG Material Subject to Further Confidentiality Review Page 154
Confidential -- Subject to Further Confidentiality Review
of 162

1    it?

2        A.    Yes.

3        Q.    Is it your position that you are continuing

4    to be damaged by the Chinese drywall in your home?

5        A.    Yes.

6        Q.    Will those damages continue in your -- will

7    those damages continue until the house is fixed?

8        A.    Yes.

9            MR. ALBANIS:  We have nothing else.

10           MR. LAWSON:  Before we conclude, I just

11       wanted to put on the record that we have received

12       a lot of documentation in the last 48 and

13       24 hours, including some additional documents

14       this morning.  We have done our best to be able

15       to review and analyze those documents and to be

16       able to discuss them with Ms. Martinez here.

17           But given the nature of those productions and

18       that we just received them and we had to analyze

19       some of them as early as this morning, we would

20       like to keep the deposition record open, pending

21       our review to make sure that there aren't any

22       additional questions.  And we will confer with

23       Mr. Albanis and plaintiff's counsel to be able to

24       determine if there is a need for any additional

```
 1        sessions of this deposition before it concludes.

 2             But with that, I see that we have reached the

 3        time limit that we had for today's deposition,

 4        and we do not have any further questions at this

 5        time.

 6             MR. ALBANIS:  We will reserve signature.

 7             MR. MOREN:  For the reasons that Mr. Lawson

 8        stated, BNBM would also like to keep the

 9        deposition open.

10             MR. VERRIER:  I just want to add on the

11        record that obviously with the judge's kind of

12        tight deadlines, we'll be following up if you

13        think that this is one you want to keep open.  So

14        we will try to have it completed by January 14th;

15        we're all going to be in Florida, and we can try

16        and figure out a time to do that.

17             So we would just ask that if you get a sense

18        you're going to want to redepose or have

19        additional time, just let us know with as much

20        notice as possible so that we can orchestrate the

21        scheduling of it.

22             MR. LAWSON:  We will.

23             THE WITNESS:  Can I say something?

24             MR. ALBANIS:  Let's go off the record.
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1864 of 3246
Case 1:19-cv-04108-WGY Document 29-21 entered on FLSD Docket 08/08/2004 Page 156 of 162
Confidential - Subject to Further Confidentiality Review

```
 1                    (Whereupon, the deposition concluded at

 2        12:06 p.m.)

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1865 of 3246
Case 1:13-cv-12408-NGG Document 291-2 Filed 05/18/2015 Page 157 of 162
Confidential - Subject to Further Confidentiality Review

```
 1                    C E R T I F I C A T E

 2

 3          I, KELLY J. LAWTON, Registered Professional

 4     Reporter, Licensed Court Reporter, and Certified

 5     Court Reporter, do hereby certify that, pursuant to

 6     notice, the deposition of DAILYN MARTINEZ was duly

 7     taken on December 14, 2018, at 7:45 a.m. before me.

 8          The said DAILYN MARTINEZ was duly sworn by

 9     me, through an interpreter, according to law to tell

10     the truth, the whole truth and nothing but the truth

11     and thereupon did testify as set forth in the above

12     transcript of testimony.  The testimony was taken

13     down stenographically by me.  I do further certify

14     that the above deposition is full, complete, and a

15     true record of all the testimony given by the said

16     witness.

17

18     _____

19          KELLY J. LAWTON, RPR, LCR, CCR

20

21          (The foregoing certification of this

22     transcript does not apply to any reproduction of the

23     same by any means, unless under the direct control

24     and/or supervision of the certifying reporter.)
```

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4          Please read your deposition over carefully

 5     and make any necessary corrections.  You should state

 6     the reason in the appropriate space on the errata

 7     sheet for any corrections that are made.

 8

 9          After doing so, please sign the errata sheet

10     and date it.  It will be attached to your deposition.

11

12          It is imperative that you return the original

13     errata sheet to the deposing attorney within thirty

14     (30) days of receipt of the deposition transcript by

15     you.  If you fail to do so, the deposition transcript

16     may be deemed to be accurate and may be used in

17     court.

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1867 of 3246
Case 1:18-cv-04498-NGG Document 269-21 Entered on FLSD Docket 05/08/2009 Page 159 of 162
Confidential - Subject to Further Confidentiality Review

```
 1                    - - - - - -

 2                   E R R A T A

 3                    - - - - - -

 4     PAGE    LINE    CHANGE

 5     _____   _____   _____

 6       REASON: _____

 7     _____   _____   _____

 8       REASON: _____

 9     _____   _____   _____

10       REASON: _____

11     _____   _____   _____

12       REASON: _____

13     _____   _____   _____

14       REASON: _____

15     _____   _____   _____

16       REASON: _____

17     _____   _____   _____

18       REASON: _____

19     _____   _____   _____

20       REASON: _____

21     _____   _____   _____

22       REASON: _____

23     _____   _____   _____

24       REASON: _____
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1868 of 3246
Case 1:14-cv-09148-NGG Document 269-1 Confidential — Subject to Further Confidentiality Review
of 162

```
 1                    ACKNOWLEDGMENT OF DEPONENT

 2

 3            I, DAILYN MARTINEZ, do hereby acknowledge

 4      that I have read the foregoing pages, 1 to 160, and

 5      that the same is a correct transcription of the

 6      answers given by me to the questions therein

 7      propounded, except for the corrections or changes in

 8      form or substance, if any, noted in the attached

 9      Errata Sheet.

10

11

12      _____        _____

13      DAILYN MARTINEZ                                    DATE

14

15

16

17

18      Subscribed and sworn to before me this

19      _____ day of _____, 20____.

20      My Commission expires: _____

21

22      _____

        Notary Public

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1869 of 3246
Case 1:19-cv-02449-NGG Document 209-21 Entered on FLSD Docket 05/08/2009 Page 161 of 162
Confidential - Subject to Further Confidentiality Review

```
 1                        LAWYER'S NOTES

 2     PAGE    LINE

 3     _____   _____    _____

 4     _____   _____    _____

 5     _____   _____    _____

 6     _____   _____    _____

 7     _____   _____    _____

 8     _____   _____    _____

 9     _____   _____    _____

10     _____   _____    _____

11     _____   _____    _____

12     _____   _____    _____

13     _____   _____    _____

14     _____   _____    _____

15     _____   _____    _____

16     _____   _____    _____

17     _____   _____    _____

18     _____   _____    _____

19     _____   _____    _____

20     _____   _____    _____

21     _____   _____    _____

22     _____   _____    _____

23     _____   _____    _____

24     _____   _____    _____
```

Confidential - Subject to Further Confidentiality Review

```
  1                     - - - - -

  2                   E R R A T A

  3                     - - - - -

  4      PAGE   LINE   CHANGE

  5       19    21-24   No, I have not pulled out

  6      REASON: all of the chinese drywall, from

  7      The home. However, in 2017, my husband

  8      REASON: and I removed the Chinese Drywall

  9      From our master bedroom, my son's bedroom,

 10      REASON: a bathroom, and The garage. When

 11      I answered the question during The

 12      REASON: deposition, I thought the Attorney was

 13      asking about remediation of my home.

 14      REASON: I did not remediate my home.

 15      The Chinese Dry wall has not been removed

 16      REASON: From the other rooms in the home.

 17      ____  ____  _____

 18      REASON: _____

 19      ____  ____  _____

 20      REASON: _____

 21      ____  ____  _____

 22      REASON: _____

 23      ____  ____  _____

 24      REASON: _____
```

# EXHIBIT A21

Case 2:09-md-02047-EEF-MBN Document 22363-20 Filed 11/19/19 Page 1872 of 3246
Case 1:11-cv-22408-MGC Document 209-1 Entered on FLSD Docket 05/08/2012 Page 2 of 23
Confidential - Subject to Further Confidentiality Review

```
 1                 UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
 2                 Case No. 1:11-CV-22408-MGC
 3     -------------------------------§
       EDUARDO AND CARMEN AMORIN et    §
 4     al., individually, and on behalf §
       of all others similarly         §
 5     situated,                       §
                                       §
 6        Plaintiffs,                  §
                                       §
 7     vs.                             §
                                       §
 8     TAISHAN GYPSUM CO., LTD. F/K/A   §
       SHANDONG THAIHE DONGXIN CO.,     §
 9     LTD.; TAIAN TAISHAN PLASTERBOARD §
       CO., LTD., et al,               §
10                                     §
          Defendants.                  §
11     ------------------------------- §
        - - -
12
                                  - - -
13
                       THURSDAY, DECEMBER 20, 2018
14
                                  - - -
15
               Confidential - Subject to Further
16                    Confidentiality Review
17                          - - -
18          Deposition of ADELA MIRANDA, held at JG Firm,
       1855 Griffin Road, Suite C-470, Dania, Florida,
19     commencing at 11:48 a.m., on the above date,
       before Kelly J. Lawton, Registered Professional
20     Reporter, Licensed Court Reporter, and Certified
       Court Reporter.
21
                                  - - -
22
                    GOLKOW LITIGATION SERVICES
23            877.370.3377 ph | 917.591.5672 fax
                       deps@golkow.com
24
```

Case 2:09-md-02047-EEF-MBN   Document 22363-20   Filed 11/19/19   Page 1873 of 3246
Case 1:13-cv-12389-NGG   Document 2691-1   Filed on TSD Docket 05/19/2016   Page 4 of
23
Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:

 2         BARON & BUDD, P.C.
           BY:  HOLLY WERKEMA, ESQUIRE
 3         3102 Oak Lawn Avenue, Suite 1100
           Dallas, Texas 75219
 4         (214) 521-3605
           hwerkema@baronbudd.com
 5         Representing Plaintiff

 6
           LEVIN, SEDRAN & BERMAN, LLP
 7         BY:  KEITH J. VERRIER, ESQUIRE
           510 Walnut Street, Suite 500
 8         Philadelphia, Pennsylvania 19106
           (215) 592-1500
 9         kverrier@lfsblaw.com
           Representing Plaintiff

10

11         ALSTON & BIRD, LLP
           BY:  MICHAEL J. BARRY, ESQUIRE
12         BY:  SARAH O'DONOHUE, ESQUIRE
           BY:  ASHTON G. CARPENTER, ESQUIRE
13         One Atlantic Center
           1201 West Peachtree Street
14         Atlanta, Georgia 30309
           (404) 881-7000
15         mike.barry@alston.com
           sarah.odonohue@alston.com
16         ashton.carpenter@alston.com
           Representing Taishan Gypsum Co., Ltd. and Tai'an
17         Taishan Plasterboard, Co., Ltd.

18
           ORRICK, HERRINGTON & SUTCLIFFE, LLP
19         BY:  DAN GUERRA, ESQUIRE
           The Orrick Building
20         405 Howard Street
           San Francisco, California 94105
21         (415) 773-5545
           dguerra@orrick.com
22         Representing BNBM PLC

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1874 of 3246
Case 1:13-cv-02408-NGG Document 289-1 Entered on FLSD Docket 05/08/2014 Page 49 of
23
Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:

 2        ORRICK, HERRINGTON & SUTCLIFFE, LLP

          BY:  HARRY J. MOREN, ESQUIRE

 3        The Orrick Building

          405 Howard Street

 4        San Francisco, California 94105

          (415) 773-5619

 5        hmoren@orrick.com

          Representing BNBM PLC

 6

 7    ALSO PRESENT:

 8        Jose Miranda

 9        Bigida Vallejo, Spanish Interpreter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1875 of 3246
Case 1:14-cv-24061-NGG Document 99-1 Entered on FLSD Docket 05/08/2015 Page 9 of 23
Confidential - Subject to Further Confidentiality Review

```
 1                       - - -

                      I N D E X

 2                       - - -

 3    Testimony of:  ADELA MIRANDA

 4        DIRECT EXAMINATION BY MR. BARRY................  5

 5        CROSS-EXAMINATION BY MR. GUERRA...............  14

 6        CROSS-EXAMINATION BY MR. MOREN................  15

 7

 8

 9                  E X H I B I T S

10              (Attached to Transcript)

11    DEFENDANTS'                                        PAGE

12    Exhibit 1    Plaintiff Jose Miranda's First         10

                   Amended Response to Defendants'

13                 Second Set of Interrogatories

14    Exhibit 2    Property Search Miami-Dade County      10

                   Office of the Property Appraiser

15                 Summary Report

16    Exhibit 3    Third Amended Supplemental             12

                   Plaintiff Profile Form

17

      Exhibit 4    Certificate of Title                   15

18

19

20

21

22

23

24
```

```
 1                         - - -

 2             THE COURT REPORTER:  Do you solemnly swear or

 3        affirm that you will make a true interpretation

 4        of the questions asked and the answers given and

 5        that you will make a true translation into

 6        English of any writing which you are required by

 7        your duties to decipher or translate?

 8             THE INTERPRETER:  Yes, I do.

 9             THE COURT REPORTER:  Would you have her raise

10        her right hand.

11             Do you swear or affirm the testimony you're

12        about to give will be the truth, the whole truth,

13        and nothing but the truth?

14             THE WITNESS:  Yes.

15             ADELA MIRANDA, called as a witness by the

16   Defendants, having been first duly sworn, testified

17   as follows:

18                    DIRECT EXAMINATION

19   BY MR. BARRY:

20        Q.   Mrs. Miranda, do you mind stating your name

21   for the record, please?

22        A.   Adela Miranda.

23        Q.   I appreciate you being here, Mrs. Miranda.  I

24   will try to make this as quick as possible.  You are
```

Confidential - Subject to Further Confidentiality Review

```
 1    not going to sit here as long as your husband has,

 2    and you would have been here for much less time, had

 3    he not deferred some questions to you.  So you can

 4    blame him.

 5           Have you ever sat for a deposition before?

 6    A.    No.

 7    Q.    I'm going to give you a little bit of the

 8    rules of the road.  You have seen a deposition with

 9    your husband here, but I'm going to just tell you a

10    little bit about how we are going to interact.  I'm

11    going to ask you questions, the translator here will

12    translate them into Spanish, and then once you have

13    heard the entirety of the question, you're more than

14    welcome to answer it.  And the big key is that all

15    three of us are not speaking over each other.

16           There is also going to be scenarios where

17    your attorneys object, and we just need to make sure

18    that none of us are speaking over each other, or

19    she's going to kick me.

20           Also, it's important that when we're speaking

21    to each other that we make sure we say things

22    audibly.  I know we like to shake our heads instead

23    of saying yes or no; we can't do that here.  You need

24    to say "yes," you need to say "no," or she's not
```

Confidential - Subject to Further Confidentiality Review

```
1     going to be able to pick it up on the record.

2            And more important than that, if there's ever

3     a question that you don't understand that I've asked,

4     please ask me to clarify it.  If there is ever -- and

5     if you need a break, please let me know.  My only

6     request is that if I have a question on the table

7     that we don't take a break until you answer it.

8            Now, Mrs. Miranda, do you understand that you

9     have been sworn under oath and must tell the truth as

10    if you are testifying in court?

11    A.    Yes.

12    Q.    Are you taking any medications that will

13    impair your ability to understand my questions and to

14    answer it truthfully and fully?

15    A.    No.

16    Q.    Did -- how did you prepare for this

17    deposition?

18    A.    We reviewed the papers, the documents and

19    nothing else.

20    Q.    What documents did you review?

21    A.    The ones we received.

22    Q.    The ones you received from whom?

23    A.    The attorney with my daughter -- through my

24    daughter.
```

Confidential - Subject to Further Confidentiality Review

```
1        Q.    And do you understand that all documents that

2    you have received have been produced in this

3    litigation?

4        A.    Yes.

5        Q.    Did you meet with your attorneys?

6        A.    No.

7        Q.    Did you discuss this with your husband at

8    all, discuss this deposition?

9        A.    No.

10       Q.    Did you discuss this deposition at all with

11   your daughter, Amy?

12       A.    No.  Because we don't have knowledge of what

13   we're going to say.  We don't know what the questions

14   are.

15       Q.    Okay.  Did you discuss this deposition with

16   your employer or with any friends?

17       A.    No.

18       Q.    Mrs. Miranda, are you currently employed?

19       A.    Right now, yes.  I have two months.

20       Q.    What is your current employment?

21       A.    ABC.  It's regarding mail.  It's a part-time.

22       Q.    And what do you do there when you are working

23   part time?

24       A.    Processing mail.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1880 of 3246 of
Case 1:09-md-02047-EEF-MBN Document 12101-39 Filed 10/22/11 Page 40 of
23
Confidential - Subject to Further Confidentiality Review

1     Q.    Okay.  Have you ever been involved in a

2    lawsuit before this one, excluding your foreclosure?

3     A.    No.

4     Q.    I just have a few questions.  Most of these

5    are ones that your husband kicked to you.

6          If you look at exhibit -- whatever exhibit

7    this is.  I think it's Exhibit 12.

8          Now, Mrs. Miranda, what we are referring to

9    is Exhibit 12 to your husband's deposition.  It's the

10   one that you signed.  Is that correct?

11         MS. WERKEMA:  Yeah.

12   BY MR. BARRY:

13    Q.    And so this is -- and I'll represent for the

14   record this is your husband's responses to

15   interrogatories.  I'm just asking you one question

16   from it to jog your memory.

17         So for the record, these are not your

18   responses.  You are not under oath on these.

19         If you can turn to Page 2, plaintiff's

20   response to Interrogatory Number 2, and I'm going to

21   summarize to say this is asking whether there's any

22   other sources of payment related to Chinese drywall.

23         And your husband answered:  "Plaintiff was

24   also granted a temporary reduction of property taxes

Confidential - Subject to Further Confidentiality Review

1    assessed on the home by the Miami-Dade County

2    property appraiser's office."

3        Do you remember receiving a reduction of the

4    property taxes assessed on the home by the Miami-Dade

5    County property appraiser's office?

6        A.   That was included in the mortgage, the taxes.

7    So I don't remember the exact amount.

8        Q.   You don't -- and I wasn't asking for the

9    exact amount.  I'm asking for:  Do you remember that

10   there was some sort of reduction in the property

11   taxes?

12       A.   Yes.  That's why they came annually to

13   make -- to do the inspection.

14       Q.   And I'm going to hand you an exhibit.

15           MR. BARRY:  We'll make this -- we're going to

16       make those interrogatories Exhibit 1 to

17       Mrs. Miranda's deposition.

18           (Defendants' Exhibit 1 was marked for

19   identification.)

20           (Defendants' Exhibit 2 was marked for

21   identification.)

22   BY MR. BARRY:

23       Q.   Mrs. Miranda, do you recognize this document?

24       A.   Yes.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1882 of 3246
Case 1:11-cv-22408-MGC Document 228 Entered on FLSD Docket 05/18/2012 Page 12 of 23
Confidential - Subject to Further Confidentiality Review

1    Q.    When we were talking about that they assessed

2    a temporary reduction of the tax on the property, was

3    that based on the assessed market value of $23,370

4    reflected here?

5    A.    Yes.

6    Q.    And I know you said you don't remember how

7    much that was, and that's fine.  You said it was part

8    of the mortgage.  Is that right?

9    A.    Yes.

10    Q.    Now, your husband told me that you weren't

11    paying on the mortgage.  Were you paying your

12    property taxes?

13    A.    No.

14    Q.    So you weren't paying this reduced tax

15    amount?

16    A.    No.  But I did go to the City to report the

17    Chinese drywall.

18    Q.    Okay.  Is the City trying to collect on the

19    tax payments, unpaid tax payments?

20    A.    No.

21         MR. VERRIER:  Objection.

22    BY MR. BARRY:

23    Q.    Now, your husband testified earlier that he

24    would like you to explain a little bit more of the

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1883 of 3246
Case 1:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1883 of 3246
Confidential - Subject to Further Confidentiality Review
23

```
 1    loss of use and enjoyment for the property, which is

 2    the loss of use and enjoyment while you were owning

 3    and living in the property related to Chinese

 4    drywall.  Could you -- well, let me -- scratch that.

 5    I apologize.

 6           You know you are at the end of the deposition

 7    when you can't find anything.

 8           If we can refer to Exhibit 5; we'll mark this

 9    as Exhibit 3 to your deposition.

10           (Defendants' Exhibit 3 was marked for

11    identification.)

12    BY MR. BARRY:

13       Q.   Mrs. Miranda, have you seen this form before,

14    this document?

15       A.   Yes.

16       Q.   If you turn to Page 6 of this document.

17           Just for ease on the record, I'm going to say

18    "if you experienced" -- I'm referring to this

19    question and answer.

20           "Question:  If you experienced any loss of

21    use and/or loss of enjoyment of the property as a

22    result of Chinese drywall, identify the total amount

23    of such loss.

24           Answer:  Estimated 250,000.  However, to be
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1884 of 3246
Case 1:09-md-02047-MCA Document confidential to Panel Special Master 5/16/19 Page 4 of
23
Confidential – Subject to Further Confidentiality Review

1    determined at trial."

2            You've requested $250,000 in the loss of use

3    and/or loss of enjoyment.  How did you come up with

4    that number of $250,000?

5        A.   I -- I don't know.  I mean, that answer can

6    be given -- better given to you by the attorney.

7        Q.   I'm asking you.  If you don't know the

8    answer, that's fine, but . . .

9        A.   Okay.  I don't know.

10       Q.   Earlier we talked -- and we can look at the

11   same document here.  If you look at Section 6, it

12   says Prior Payments, Page 5.  And it says GBI

13   Settlements paid you $14,182.70.

14           Are those -- are there any other settlement

15   payments that have been paid to you or your husband

16   related to Chinese drywall?

17       A.   No.

18       Q.   Your husband thought maybe there might be

19   more.  But you are not aware of any?

20       A.   No.  Maybe that confused him because there

21   was two checks, and it was that amount added up.

22       Q.   Understood.

23           What were your monthly mortgage payments in

24   2009?  Do you remember?

Confidential – Subject to Further Confidentiality Review

```
1        A.   2,229.

2        Q.   Okay.

3             MR. BARRY:  I have no further questions,

4        unless . . .

5             MR. GUERRA:  I have one question.

6                          CROSS-EXAMINATION

7   BY MR. GUERRA:

8        Q.   So -- good morning.

9             Was the bank paying the property taxes and

10  insurance on the property at 8890 Southwest

11  229th Street?

12       A.   Yes.  It was all included.

13       Q.   Okay.  Thank you.

14            MR. GUERRA:  No further questions.

15            MS. WERKEMA:  We would like to take a quick

16       break before we do redirect.

17            MR. BARRY:  I mean, I would prefer that -- if

18       you guys -- the two of you want to confer, that's

19       perfectly fine.

20            MS. WERKEMA:  Okay.

21            MR. MOREN:  I actually have --

22            MR. BARRY:  Oh, you've got questions?

23            MR. MOREN:  We can take a break first, if you

24       want.  That's fine.
```

Confidential - Subject to Further Confidentiality Review

```
 1              (Recess from 12:05 until 12:12 p.m.)

 2                       CROSS-EXAMINATION

 3   BY MR. MOREN:

 4       Q.   Ms. Miranda, thank you for your time.  I only

 5   have a few more questions for you.  I shouldn't take

 6   up too much longer of your time.

 7            When your home was sold earlier in 2018 at

 8   the foreclosure, do you know who purchased the home?

 9       A.   No.

10            MR. MOREN:  I would just like to pass a

11       document.

12            (Defendants' Exhibit 4 was marked for

13       identification.)

14   BY MR. MOREN:

15       Q.   Ms. Martinez, I would like to take a few

16   moments -- I'm sorry, Ms. Miranda.  Pardon me.  I

17   would like you to take a couple minutes to look over

18   the document.

19            Towards the bottom of the document it states

20   that your property was sold to Pier 18 Developments,

21   LLC.

22            Do you see that?

23       A.   Yes.

24       Q.   Have you heard of Pier 18 Developments, LLC
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1887 of 3246
Case 1:09-cv-02047-MGC Document Entry on Public Docket 09/14/19 Page 47 of
23
Confidential - Subject to Further Confidentiality Review

```
 1    before?

 2    A.    No.

 3          MR. MOREN:  I have no further questions.

 4          MS. WERKEMA:  We have no questions on

 5    redirect.

 6          MR. BARRY:  And obviously no questions then.

 7          Thank you, Ms. Miranda.  We really appreciate

 8    your time, and Mr. Miranda.

 9          One thing we didn't do, for the purpose of

10    the transcript, is we just didn't say who was in

11    the room.  Do you mind if we just go around --

12          MS. WERKEMA:  Sure.

13          MR. BARRY:  -- on the back end?

14          My name is Mike Barry; Sarah O'Donohue and

15    Ashton Carpenter; on behalf of Taishan.

16          MR. GUERRA:  Dan Guerra and Harry Moren from

17    Orrick, Herrington & Sutcliffe on behalf of BNBM,

18    PLC.

19          MR. VERRIER:  Keith Verrier from Levin,

20    Sedran & Berman on behalf of plaintiffs.

21          MS. WERKEMA:  Holly Werkema, Baron & Budd, on

22    behalf of the plaintiffs.

23          MR. BARRY:  And noted for the record that

24    Mr. Miranda is in the room.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1888 of 3246
Case 1:19-cv-22408-MGC Document 26-41 Entered on FLSD Docket 05/19/2019 Page 3 of 23
Confidential - Subject to Further Confidentiality Review

1          And Taishan just reserves the right to reopen

2     this deposition if any documents are subsequently

3     produced, excluding the documents that were

4     produced last night or this morning.

5          MS. WERKEMA:  Okay.

6          MR. BARRY:  Now I can say thank you.

7          MR. GUERRA:  BNBM also reserves the right.

8          (Whereupon, the deposition concluded at

9     12:16 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1889 of 3246
Case 1:19-cv-02484-MCA Document 1 (Exhibit 34) Filed 09/04/19 Page 49 of 23
Confidential - Subject to Further Confidentiality Review

```
 1                     C E R T I F I C A T E

 2

 3          I, KELLY J. LAWTON, Registered Professional

 4     Reporter, Licensed Court Reporter, and Certified

 5     Court Reporter, do hereby certify that, pursuant to

 6     notice, the deposition of ADELA MIRANDA was duly

 7     taken on December 20, 2018, at 11:48 a.m. before me.

 8          The said ADELA MIRANDA was duly sworn by me

 9     through an interpreter according to law to tell the

10     truth, the whole truth and nothing but the truth and

11     thereupon did testify as set forth in the above

12     transcript of testimony.  The testimony was taken

13     down stenographically by me.  I do further certify

14     that the above deposition is full, complete, and a

15     true record of all the testimony given by the said

16     witness.

17

18          _____

19          KELLY J. LAWTON, RPR, LCR, CCR

20

21          (The foregoing certification of this

22     transcript does not apply to any reproduction of the

23     same by any means, unless under the direct control

24     and/or supervision of the certifying reporter.)
```

Case 2:09-md-02047-EEF-MBN  Document 22363-39  Filed 11/19/19  Page 1890 of 3246
Case 1:09-cv-07687-MGC  Document 26-11  Filed 11/09/10  Page 1890 of 3246
Confidential - Subject to Further Confidentiality Review

```
 1                      INSTRUCTIONS TO WITNESS

 2

 3

 4           Please read your deposition over carefully

 5   and make any necessary corrections.  You should state

 6   the reason in the appropriate space on the errata

 7   sheet for any corrections that are made.

 8

 9           After doing so, please sign the errata sheet

10   and date it.  It will be attached to your deposition.

11

12           It is imperative that you return the original

13   errata sheet to the deposing attorney within thirty

14   (30) days of receipt of the deposition transcript by

15   you.  If you fail to do so, the deposition transcript

16   may be deemed to be accurate and may be used in

17   court.

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1891 of 3246
Case 1:1-cv-22408-MGC Document 29-1 Entered on FLSD Docket 05/18/2011 Page 46 of
23
Confidential - Subject to Further Confidentiality Review

```
 1                    - - - - - -

 2                  E R R A T A

 3                    - - - - - -

 4    PAGE    LINE    CHANGE

 5    _____   _____   _____

 6      REASON: _____

 7    _____   _____   _____

 8      REASON: _____

 9    _____   _____   _____

10      REASON: _____

11    _____   _____   _____

12      REASON: _____

13    _____   _____   _____

14      REASON: _____

15    _____   _____   _____

16      REASON: _____

17    _____   _____   _____

18      REASON: _____

19    _____   _____   _____

20      REASON: _____

21    _____   _____   _____

22      REASON: _____

23    _____   _____   _____

24      REASON: _____
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1892 of 3246
Case 1:11-cv-02491-MGC Document 22 Entered on FLSD Docket 05/09/2012 Page 46 of
23
Confidential - Subject to Further Confidentiality Review

```
 1                      ACKNOWLEDGMENT OF DEPONENT

 2

 3            I, ADELA MIRANDA, do hereby acknowledge that

 4      I have read the foregoing pages, 1 to 22, and that

 5      the same is a correct transcription of the answers

 6      given by me to the questions therein propounded,

 7      except for the corrections or changes in form or

 8      substance, if any, noted in the attached Errata

 9      Sheet.

10

11

12      _____          _____

13      ADELA MIRANDA                                   DATE

14

15

16

17

18      Subscribed and sworn to before me this

19      _____ day of _____, 20___.

20      My Commission expires: _____

21

22      _____

        Notary Public

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1893 of 3246
Case 1:19-cv-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1893 of 3246
Confidential - Subject to Further Confidentiality Review
23

```
 1                          LAWYER'S NOTES

 2      PAGE    LINE

 3      _____   _____   _____

 4      _____   _____   _____

 5      _____   _____   _____

 6      _____   _____   _____

 7      _____   _____   _____

 8      _____   _____   _____

 9      _____   _____   _____

10      _____   _____   _____

11      _____   _____   _____

12      _____   _____   _____

13      _____   _____   _____

14      _____   _____   _____

15      _____   _____   _____

16      _____   _____   _____

17      _____   _____   _____

18      _____   _____   _____

19      _____   _____   _____

20      _____   _____   _____

21      _____   _____   _____

22      _____   _____   _____

23      _____   _____   _____

24      _____   _____   _____
```

# EXHIBIT A22

Confidential - Subject to Further Confidentiality Review

```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                   Case No. 1:11-CV-22408-MGC
 3      -------------------------------§
        EDUARDO AND CARMEN AMORIN et     §
 4      al., individually, and on behalf §
        of all others similarly          §
 5      situated,                        §
                                         §
 6         Plaintiffs,                   §
                                         §
 7      vs.                              §
                                         §
 8      TAISHAN GYPSUM CO., LTD. F/K/A    §
        SHANDONG THAIHE DONGXIN CO.,      §
 9      LTD.; TAIAN TAISHAN PLASTERBOARD §
        CO., LTD., et al,                §
10                                       §
           Defendants.                   §
11      ------------------------------- §
          - - -
12
                                      - - -
13
                        THURSDAY, DECEMBER 20, 2018
14
                                      - - -
15
                    Confidential - Subject to Further
16                        Confidentiality Review
17                              - - -
18          Deposition of JOSE MIRANDA, held at JG Firm,
        1855 Griffin Road, Suite C-470, Dania, Florida,
19      commencing at 8:12 a.m., on the above date,
        before Kelly J. Lawton, Registered Professional
20      Reporter, Licensed Court Reporter, and Certified
        Court Reporter.
21
                                      - - -
22
                    GOLKOW LITIGATION SERVICES
23          877.370.3377 ph | 917.591.5672 fax
                        deps@golkow.com
24
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1896 of 3246
Case 1:15-cv-02940-NGG-MDG Document 60-21 Filed 03/01/19 Page 1896 of 95
Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2        BARON & BUDD, P.C.
          BY:  HOLLY WERKEMA, ESQUIRE
 3        3102 Oak Lawn Avenue, Suite 1100
          Dallas, Texas 75219
 4        (214) 521-3605
          hwerkema@baronbudd.com
 5        Representing Plaintiff
 6

          LEVIN, SEDRAN & BERMAN, LLP
 7        BY:  KEITH J. VERRIER, ESQUIRE
          510 Walnut Street, Suite 500
 8        Philadelphia, Pennsylvania 19106
          (215) 592-1500
 9        kverrier@lfsblaw.com
          Representing Plaintiff
10
11        ALSTON & BIRD, LLP
          BY:  MICHAEL J. BARRY, ESQUIRE
12        BY:  SARAH O'DONOHUE, ESQUIRE
          BY:  ASHTON G. CARPENTER, ESQUIRE
13        One Atlantic Center
          1201 West Peachtree Street
14        Atlanta, Georgia 30309
          (404) 881-7000
15        mike.barry@alston.com
          sarah.odonohue@alston.com
16        ashton.carpenter@alston.com
          Representing Taishan Gypsum Co., Ltd. and Tai'an
17        Taishan Plasterboard, Co., Ltd.
18
          ORRICK, HERRINGTON & SUTCLIFFE, LLP
19        BY:  DAN GUERRA, ESQUIRE
          The Orrick Building
20        405 Howard Street
          San Francisco, California 94105
21        (415) 773-5545
          dguerra@orrick.com
22        Representing BNBM PLC
23
24
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1897 of 3246
Case 1:15-cv-02487-NGG Document 269-21 entered on FLSD Docket 05/07/2019 Page 46 of
95
Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:

 2        ORRICK, HERRINGTON & SUTCLIFFE, LLP

          BY:  HARRY J. MOREN, ESQUIRE

 3        The Orrick Building

          405 Howard Street

 4        San Francisco, California 94105

          (415) 773-5619

 5        hmoren@orrick.com

          Representing BNBM PLC

 6

 7    ALSO PRESENT:

 8        Adela Miranda

 9        Bigida Vallejo, Spanish Interpreter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1898 of 3246
Case 1:11-cv-22408-MGC Document 99-1 Entered on FLSD Docket 05/02/2013 Page 9 of 95
confidential -- Subject to further confidentiality Review

```
1                     - - -
                   I N D E X
2                     - - -
3    Testimony of:  JOSE MIRANDA
4        DIRECT EXAMINATION BY MR. BARRY................   6
5        CROSS-EXAMINATION BY MR. GUERRA...............  84
6        CROSS-EXAMINATION BY MS. WERKEMA..............  85
7        RECROSS EXAMINATION BY MR. GUERRA.............  87
8
9
10                   E X H I B I T S
11              (Attached to Transcript)
12   DEFENDANTS'                                        PAGE
13   Exhibit 1    U.S. Department of Housing and        13
                  Urban Development - Settlement
14                Statement
15   Exhibit 2    Trial Loan Document Scan Sheet        15
16   Exhibit 3    Declaration of Correctness of         18
                  Square Footage on Chinese Drywall
17                Client(s) Property for Remediation
                  Damages
18
     Exhibit 4    Property Search Application -         21
19                Miami-Dade County Property
                  Information
20
     Exhibit 5    Third Amended Supplemental           23
21                Plaintiff Profile Form
22   Exhibit 6    Photographs                           29
23   Exhibit 7    January 15, 2010 Chinese Drywall     34
                  Screening, LLC Inspection Reports
24                (3)
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1899 of 3246
Case 1:15-cv-02049-NGG Document 269-21 Entered on FLSD Docket 05/22/2018 Page 46 of
95
Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S

 2    DEFENDANTS'                                      PAGE

 3    Exhibit 8    Chinese Drywall Settlement Program   51
                   Check Copies
 4
      Exhibit 9    June 5, 2010 Letter from Wells       59
 5                 Fargo Home Mortgage

 6    Exhibit 10   Consent Final Judgment of            60
                   Foreclosure
 7
      Exhibit 11   Attorney Engagement Agreement and    63
 8                 Retainer Agreement

 9    Exhibit 12   Plaintiff Jose Miranda's First       64
                   Amended Response to Defendants'
10                 Second Set of Interrogatories

11    Exhibit 13   Plaintiff Jose Miranda's Response    65
                   to Defendants' Interrogatories
12
      Exhibit 14   Verification                         66
13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                         - - -

 2              THE COURT REPORTER:  Do you solemnly swear or

 3         affirm that you will make a true interpretation

 4         of the questions asked and the answers given and

 5         that you will make a true translation into

 6         English of any writing which you are required by

 7         your duties to decipher or translate?

 8              THE INTERPRETER:  Yes, I do.

 9              THE COURT REPORTER:  Would you have him raise

10         her right hand.

11              Do you swear or affirm the testimony you're

12         about to give will be the truth, the whole truth,

13         and nothing but the truth?

14              THE WITNESS:  Yes.

15              JOSE MIRANDA, called as a witness by the

16    Defendants, having been first duly sworn, testified

17    as follows:

18                         DIRECT EXAMINATION

19    BY MR. BARRY:

20         Q.   Mr. Miranda, my name is Michael Barry; with

21    my colleagues, Sarah O'Donohue and Ashton Carpenter,

22    we represent Taishan Gypsum.

23              MR. BARRY:  I'm going to ask everyone at the

24         table just to introduce themselves for the
```

Confidential - Subject to Further Confidentiality Review

```
1       record.

2            MR. GUERRA:  My name is Dan Guerra.

3            THE WITNESS:  Good morning.

4            MR. GUERRA:  Good morning.

5            MR. MOREN:  Harry Moren.

6            MR. VERRIER:  I'm Keith Verrier from Levin,

7       Sedran & Berman on behalf of plaintiffs.

8            MS. WERKEMA:  Holly Werkema, Baron & Budd, on

9       behalf of the plaintiffs.

10           MR. BARRY:  And for the record, Adela Miranda

11      is also in the room.

12  BY MR. BARRY:

13      Q.   Mr. Miranda, could you state your name for

14  the record, please.

15      A.   Jose Fernando Miranda.

16      Q.   Mr. Miranda, have you ever sat for a

17  deposition before?

18      A.   No.

19      Q.   Well, sorry to be your first one.

20           So I'm going to give you a few rules of the

21  road.  These are just basic background things.  I'm

22  sure your counsel has already talked to you about

23  them.  There are a few nuances to depositions,

24  particularly that, you know, I'm going to ask you a
```

```
1    question, you are going to wait for my question to be

2    completely finished.  It's a little bit easier,

3    because we have a translator here.  And then at the

4    end of it --

5         THE INTERPRETER:  If we can cut it down

6       somewhere in between.

7         THE WITNESS:  Fine.

8    BY MR. BARRY:

9       Q.   And once I finish a question, you're free to

10   answer it.  But the most important thing is that we

11   are not speaking over each other at any time so the

12   court reporter can get everything down on the record.

13      A.   Fine.

14      Q.   Also, I know depositions are never easy.  I

15   also know what we are talking about today is not

16   easy.  And so at any time, at any moment as long as

17   there's no question already on the table, please feel

18   free to ask for a break.  You can ask for one

19   whenever you want.  Just let me know.

20      A.   Fine.

21      Q.   So I'm going to ask you a few questions that

22   we have to ask everyone during a deposition.

23           Do you understand that you have been sworn

24   under oath and must tell the truth as if you are
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1903 of 3246
Case 1:09-cv-02047-GAP Document 2881-1 Entered on FLSD Docket 05/18/2013 Page 40 of
95
Confidential - Subject to Further Confidentiality Review

```
 1    testifying in court and that the judge were sitting

 2    right here with us?

 3         A.   Yes.

 4         Q.   Mr. Miranda, are you taking any medications

 5    that might impair your ability to understand my

 6    questions and to answer truthfully and fully?

 7         A.   No.

 8              MR. BARRY:  I was hoping that co-defendants'

 9         counsel was bringing me flowers.

10              MR. MOREN:  They are for Ms. Miranda.

11    BY MR. BARRY:

12         Q.   How did you prepare for this deposition?

13         A.   Very little.  It caught me by surprise, so

14    very little.

15         Q.   And I'm going to ask you:  Did you meet with

16    your lawyers?  But I want to emphasize, I am not

17    asking for the content of any of those conversations

18    with your lawyers.  I'm just asking if you met with

19    them.

20         A.   Yes.

21         Q.   How many times did you meet with your

22    lawyers?

23         A.   Well, I met him today, but we spoke yesterday

24    on the phone.
```

Confidential - Subject to Further Confidentiality Review

```
 1        Q.   How long did you speak with your lawyer on

 2   the phone?

 3        A.   Two hours.

 4        Q.   Was your wife also on the phone with you?

 5        A.   Yes.

 6        Q.   Was anyone else on the phone with you?

 7        A.   No.

 8        Q.   Have you spoken with anyone else about this

 9   deposition?

10        A.   No.

11        Q.   Did you speak with your wife in advance of

12   this deposition?

13        A.   No.

14        Q.   Did you review any documents to prepare for

15   the deposition?

16        A.   No.

17        Q.   Mr. Miranda, where are you employed?

18        A.   Abbingdon Marine.  It's a company in Texas.

19        Q.   How long have you worked there?

20        A.   Nine years, six months.

21        Q.   And what is your job title there?

22        A.   This company has a property that I administer

23   or manage here in Miami.

24        Q.   And what is it that you -- what do you do in
```

Confidential - Subject to Further Confidentiality Review

```
 1    part of your role?  What do you administer?

 2         A.    Maintenance.  He has a house and a boat, and

 3    I do the maintenance on them.

 4         Q.    Mr. Miranda, are you married?

 5         A.    Yes.

 6         Q.    And who are you married to?

 7         A.    Adela Miranda, my wife.

 8         Q.    How long have you all been married?

 9         A.    Exactly 30 years this month --

10         Q.    Congratulations.

11         A.    -- is 30 years.

12         Q.    Do you have any children?

13         A.    Yes.

14         Q.    How many children do you have?

15         A.    Three.

16         Q.    How old are your children?

17         A.    Yelika is 28, Amy is 26, and Isalibeth is 18.

18    They're three girls.

19         Q.    Would you mind stating for the record their

20    full names and where they live?  Not addresses, just

21    the cities that they live in.

22         A.    Yelika Isalibeth Miranda, she lives in

23    Orlando; Amy Isalibeth Miranda also lives in Orlando;

24    Isalibeth Miranda lives with us in Miami.
```

Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Got to keep one at home, right?

 2           Now, where do you currently live?

 3      A.   10710 Northwest 7th Street, Apartment 10,

 4   Miami, Florida 33172.

 5      Q.   How long have you lived at that address?

 6      A.   Six months we have that we've been there.

 7      Q.   Where did you live before that?

 8      A.   In the house that we lost, 8890 Southwest

 9   229th Street.

10      Q.   Have you ever been involved in a lawsuit

11   before this one?

12      A.   No.  Well, at the house we had the

13   foreclosure.  I don't know if you consider that --

14   that it's litigious or a --

15      Q.   I understand.

16      A.   -- or a suit.

17      Q.   Thank you.

18           The address of the property, you said it is

19   8890 Southwest 229th Street?

20      A.   Yes.

21      Q.   Do you currently own that property?

22      A.   No.

23      Q.   When did you originally buy that property?

24      A.   January of 2007.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1907 of 3246 of
Case 11-cv-22408-MGC Document 22021 Entered on FLSD Docket 05/09/2017 Page 461 of
95
Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Now, Mr. Miranda, your counsel probably told

 2   you this, but I'm going to put certain documents in

 3   front of you.  Depending on what your counsel wants

 4   to do, I'm going to first hand it to her, and then

 5   she can decide whether to put it in front of you.

 6   And once she does, you then need to hand it to the

 7   court reporter so she can mark it.

 8            (Defendants' Exhibit 1 was marked for

 9   identification.)

10   BY MR. BARRY:

11        Q.   Mr. Miranda, whenever I put a document in

12   front of you, I'm going to give you a chance to look

13   at it, and you should always feel free to ask me for

14   more time if you want it.

15            MS. WERKEMA:  This is three copies of the

16       same document?

17            MR. BARRY:  Yes.  It's three copies to pass

18       down.

19            THE WITNESS:  That's fine.

20   BY MR. BARRY:

21        Q.   Mr. Miranda, do you recognize this document?

22        A.   If you could give me a minute?

23        Q.   Of course.  As much time as you need.

24            MR. BARRY:  And we may need help translating
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1908 of 3246
Case 1:09-cv-02047-McGCL Document 22343-39 Filed 11/19/19 Page 1908 of 3246
Confidential – Subject to Further Confidentiality Review
95

```
 1        some of that, perhaps.  I don't know.

 2            THE WITNESS:  No.  This is the closing.

 3   BY MR. BARRY:

 4        Q.   And, Mr. Miranda, where it says Section I, do

 5   you see the date -- do you see where it says

 6   Settlement Date?

 7        A.   Section H?

 8        Q.   I.

 9            Is that the date on which you purchased the

10   property?

11        A.   Yes.

12        Q.   And if you look at Section 101, just under J,

13   is that the amount you paid to purchase the house?

14        A.   Yes.

15        Q.   That's all on this document.

16            When did you move into the home?

17        A.   The same month.

18        Q.   In 2007?

19        A.   Yes.

20        Q.   And did you finance the purchase of the

21   house?

22        A.   Yes.

23        Q.   How did you finance the house?

24        A.   I applied, they qualified me, and they gave
```

Confidential - Subject to Further Confidentiality Review

1    me the loan.

2        Q.   Mr. Miranda, I'm going to hand your attorney

3    a document, and I will represent for the record that

4    is the note and mortgage on your property, which we

5    will mark as Exhibit 2.

6            (Defendants' Exhibit 2 was marked for

7    identification.)

8    BY MR. BARRY:

9        Q.   Mr. Miranda, I'm going to say some things

10   like that, and it's just to make sure the record is

11   clear.

12           Do you recognize this document, Mr. Miranda?

13       A.   Yes.

14       Q.   Mr. Miranda, if you could turn to the second

15   page.  And if you look at Section 1, who was the

16   lender on this mortgage?

17       A.   It was Wells Fargo.

18       Q.   And how much did Wells Fargo loan to you?

19       A.   The amount that you're seeing right there.

20       Q.   Do you mind reading it to me so it's on the

21   record?

22       A.   272,511.

23       Q.   And now, Mr. Miranda, what type of loan was

24   this?  Was it a fixed-rate loan?  Was it an

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1910 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 47 of 95
Confidential - Subject to Further Confidentiality Review

1    adjustable-rate mortgage?

2         If you turn to -- if you turn to Section 4 on

3    Page 3, or on Page 2 at the top of it, the title.

4    It's the title.

5         Would you agree that this is an

6    adjustable-rate mortgage?

7         A.    Yes.

8         Q.    And when you signed this, were you aware that

9    your interest rate would stay the same until February

10   of 2014, which you can see on Page 2 or Page 3?

11        A.    Yes.

12        Q.    Thank you, Mr. Miranda.  That's all I have on

13   that.

14        Mr. Miranda, do you own any other properties

15   or houses?

16        A.    Yes.

17        Q.    From the period when you purchased the home

18   until foreclosure, did you live in that property the

19   entire time?

20        A.    Yes.

21        Q.    And, Mr. Miranda, my colleagues down here

22   advised me just to make sure you know that if there's

23   anything your wife is better suited to answer, if she

24   knows it better than you, because I know she probably

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/10 Page 1911 of 3246
Case 1:11-cv-22408-MGC Document 2 entered on FLSD Docket 05/09/2011 Page 46 of 95

Confidential - Subject to Further Confidentiality Review

```
 1    deals with some things, you deal with others, we're

 2    going to be speaking to her later, and I'm happy to

 3    ask her those questions.

 4         A.    Yes.

 5         Q.    While you were living at the house, how many

 6    people lived there with you?

 7         A.    Five.  Us and our three daughters.

 8         Q.    Did the three daughters live there the entire

 9    time?

10         A.    No.

11         Q.    When did each move out?

12         A.    Yelika moved about eight years ago; Amy moved

13    one year ago.

14         Q.    Are any of your daughters making claims in

15    this lawsuit?

16         A.    No.

17         Q.    Have you ever -- while you were living in the

18    house, did you ever charge rent for someone else to

19    stay there?

20         A.    No.

21         Q.    While you owned the property, did you make

22    any improvements on the property?

23         A.    Yes.

24         Q.    What improvements did you make?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1912 of 3246
Case 1:09-cv-02047-MCA Document 22363-39 Enterprise Service 05/19/2019 Page 46 of 95
Confidential - Subject to Further Confidentiality Review

```
1        A.   In the backyard we did a concrete deck.

2    Moldings, we did moldings.  We changed the

3    floorboards.  We did a lot of interior remodeling.

4    We changed the floors inside.

5        Q.   Are you asking for payment for any of those

6    items?

7        A.   No.

8        Q.   Do you know the square footage of your house?

9        A.   Exactly?  No.

10       Q.   I can put a document in front of you that

11   will help with that.

12            Mr. Miranda, I'm going to hand a document to

13   your attorney.

14            MR. BARRY:  This will be Exhibit 3.

15            (Defendants' Exhibit 3 was marked for

16   identification.)

17            MR. BARRY:  And for the record, I'm going to

18       represent that this is a document entitled

19       Declaration of Correctness of Square Footage on

20       Chinese Drywall Client(s) Property for

21       Remediation Damages.

22   BY MR. BARRY:

23       Q.   Mr. Miranda, do you recognize this document?

24       A.   No.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1913 of 3246
Case 1:09-cv-02047-MCA Document 22363-39 Filed 11/19/19 Page 1913 of
95
Confidential - Subject to Further Confidentiality Review

```
1       Q.   Who is this document signed by?

2       A.   It's not my signature.

3       Q.   Understand.

4            Who is it signed by?

5            Hint, she's sitting to your right.

6            And is Ms. Werkema your attorney?

7            THE INTERPRETER:  I'm sorry?

8   BY MR. BARRY:

9       Q.   Is Ms. Werkema your attorney?

10      A.   Yes.

11      Q.   What is the square footage represented on

12  this declaration?

13      A.   1988.

14      Q.   Do you believe that is the square footage of

15  your former home?

16      A.   No.

17      Q.   What is the square footage of your current

18  home -- or, your former home?

19      A.   I think it was a little more.

20      Q.   Okay.  I'm going to put a document in front

21  of you, Mr. Miranda.  This is -- and so just to be

22  clear, that this document that your attorney signed,

23  you believe to be incorrect?

24           MS. WERKEMA:  I'm going to impose an
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1914 of 3246
Case 1:09-cv-02047-GAO Document 22363-21 Exhibit 21 Confidential Subject to Docket 05/18/2011 Page 41 of
95
Confidential - Subject to Further Confidentiality Review

```
 1       objection.  It's a mischaracterization of what

 2       the witness said.

 3            MR. BARRY:  He believes that the number here

 4       is incorrect.

 5            The objection is fine for the record.

 6  BY MR. BARRY:

 7       Q.   Mr. Miranda, do you believe this document is

 8  incorrect?

 9            MR. VERRIER:  I'm just going to object,

10       actually, for the record.  I think there could be

11       a distinction between square footage and under

12       air square footage and other forms of square

13       footage.  So whether or not this document is

14       correct, I'm not sure he fully understands what

15       the document represents.

16            THE WITNESS:  I need the question a little

17       bit clearer.  I understand the square footage

18       is -- I understand it to be under

19       air-conditioning or under the complete lock.  I

20       don't know really what's being asked.

21            MR. BARRY:  Understood.

22            And I'm -- and just for the record, I'm fine

23       with counsel objecting, but please don't testify

24       for the record.
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1915 of 3246
Case 1:09-cv-02047-MCA Document 22362-39 Filed 11/19/19 Page 1915 of 3246
Confidential - Subject to Further Confidentiality Review
95

```
 1              MR. VERRIER:  Yeah, I don't think I was

 2       testifying.

 3              MR. BARRY:  I believe you were, but . . .

 4    BY MR. BARRY:

 5       Q.   I'm going to hand you a new exhibit.

 6            (Defendants' Exhibit 4 was marked for

 7    identification.)

 8              THE INTERPRETER:  He needs his glasses.

 9              MR. BARRY:  Oh, yes.  I totally understand.

10              THE WITNESS:  The letters are too small.

11              MR. BARRY:  I understand that.

12              MR. VERRIER:  I hate to admit it, I have

13       reading glasses that are generic.  Do you want to

14       try them?

15              MR. BARRY:  We can try that.

16            And if not, I'm fine for your attorney

17       reading it to you.

18              MS. WERKEMA:  Okay.

19              THE WITNESS:  Okay.

20    BY MR. BARRY:

21       Q.   Now, Mr. Miranda, do you see where it says

22    that the square footage was 1,988?

23       A.   Okay.  So I -- I was confused.  We have

24    different measurements here.  So the 1988 is the
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1916 of 3246
Case 1:09-md-02047-MCA Document 12762-21 filed 04/26/19 Docket 03/08/2011 Page 22 of 95
Confidential - Subject to Further Confidentiality Review

1    living area, and that's not what was asked.

2        Q.    Thank you.

3              So do you now recognize that 1,988 is the

4    square footage for the living area?

5        A.    Yes.

6        Q.    Have you ever had -- how many bedrooms were

7    in your house?

8        A.    Three.

9        Q.    And how many bathrooms?

10       A.    Two and a half.

11       Q.    And when was the house built?

12       A.    I think the CO was received in 2006.

13       Q.    When did you learn that Chinese drywall was

14   installed in your house?

15       A.    When I found out was in 2010.

16       Q.    Do you remember what month?

17       A.    February.

18       Q.    Okay.  Let's --

19       A.    I don't have an exact -- January?

20       Q.    I'm going to give you a document that will

21   provide that.

22             So I'm going to hand you what is going to be

23   Exhibit 5, which is the Third Amended Supplemental

24   Plaintiff Profile Form.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1917 of 3246
Case 1:09-cv-02047-MGC Document 123213-21 Entered on FLSD Docket 05/19/2011 Page 4 of 95
Confidential - Subject to Further Confidentiality Review

```
 1              (Defendants' Exhibit 5 was marked for

 2     identification.)

 3              MR. BARRY:  And I'm going to represent for

 4        the record that I believe this document has not

 5        yet been verified.

 6              I'll stand corrected by your counsel or my

 7        colleagues if I'm incorrect about that.

 8              MS. WERKEMA:  No.  An amended verification

 9        was not -- or, an amended verification to this

10        document has not been submitted.

11              MR. BARRY:  Understood.

12     BY MR. BARRY:

13        Q.   Now, if you look on Page 2 and Section 2 --

14     sorry.

15              Have you seen this document before?

16        A.   Yes.

17        Q.   Do you know who prepared this document?

18              And you can say generally.  It doesn't need

19     to be a specific person.

20        A.   The attorneys.

21        Q.   And did you review this form after your

22     attorneys prepared it?

23        A.   Yes.

24        Q.   If you could just look through this form and
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 1918 of 3246
Case 1:09-cv-02047-MCA-JHR Document 22361-2 Entered on FLSD Docket 05/19/2011 Page 45 of
95
Confidential - Subject to Further Confidentiality Review

1    let me know if you see anything that's incorrect in

2    it.

3            And, Mr. Miranda, I recognize there's

4    probably a translation problem here with these, so if

5    you want to look at it at a break, and then we can

6    come back and talk about anything that's incorrect

7    afterwards.

8            MS. WERKEMA:  Okay.  We prefer that.  Thank

9       you.

10           THE WITNESS:  Okay.

11   BY MR. BARRY:

12      Q.   Mr. Miranda, in Section 2 on Page 2, there's

13   a question.  I'm going to read it to you to make it

14   easier.

15           And it says:  If you were not aware of

16   Chinese drywall at the time you purchased the

17   property -- and I'm adding from the question before

18   it to make it easier -- at the time you acquired the

19   property that that property contained Chinese

20   drywall, when did you first become aware that the

21   property contained Chinese drywall?

22           And you have listed month, year:  January

23   2010.

24           Is that the correct time when you learned of

Confidential - Subject to Further Confidentiality Review

```
 1    the Chinese drywall being in the house?

 2         A.   2010, yes.

 3         Q.   Is it January 2010?

 4         A.   I'm nervous.

 5         Q.   We can -- if you want to say it's January or

 6    February 2010, we're fine with that.

 7         A.   Okay.

 8         Q.   And would that be your answer, somewhere in

 9    January or February of 2010?

10         A.   Yes.

11         Q.   Do you know how Chinese drywall was installed

12    in the house?  Was it part of the original

13    construction?

14         A.   I don't know.

15         Q.   How did you learn that there was Chinese

16    drywall in the house?

17         A.   The neighbors.  The neighbors told me.  So I

18    found out through the neighbors.

19         Q.   And what did your neighbors tell you?

20         A.   Someone realized there was a bad smell in the

21    house, and they called an inspector.

22         Q.   And you're saying someone realized there was

23    a smell in the house.  Did they realize it was a bad

24    smell in their house?
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1920 of 3246
Case 1:11-cv-22408-MGC Document 88-21 Entered on FLSD Docket 05/18/2012 Page 47 of 95
Confidential – Subject to Further Confidentiality Review

```
 1        A.   Well, I don't -- I don't mean that it was to

 2   their house.  I'm saying that that was their

 3   comments.

 4        Q.   So they were saying there was a bad smell in

 5   your house?

 6        A.   No.

 7        Q.   I'm a bit confused here.

 8             So was your neighbor commenting that they --

 9   at their own home, that they were experiencing a bad

10   smell at their own home?

11        A.   I think I didn't explain myself well.

12        Q.   Please explain yourself.

13        A.   Our neighbors stated that in our area they

14   had realized that there was Chinese drywall.  So we

15   exceeded -- or, had our house checked.

16        Q.   I understand now.  Thank you for clarifying

17   that.

18             When your neighbors made that comment, had

19   you ever experienced a bad smell in your home?

20        A.   Yes.  But we didn't know what it was.

21        Q.   Could you describe that smell for me?

22        A.   Disagreeable.

23        Q.   When did you first notice that smell?

24        A.   I don't remember exactly.  My -- my wife
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1921 of 3246
Case 2:09-md-02047-EEF-MBN Document 20741-1 Filed 05/08/2017 Page 43 of
95
Confidential - Subject to Further Confidentiality Review

```
1    would clean and clean and clean and she would put

2    candles and stuff, and we didn't know what it was.

3         Q.   Did you notice the smell as soon as you moved

4    into the home?

5         A.   No, not immediately.

6         Q.   Was there an area of the house where you

7    noticed the smell the most?

8         A.   Yes.

9         Q.   What area of the home?

10        A.   In the bathrooms.

11        Q.   Was it worse in any specific time of day?

12        A.   In the bathroom, because it was closed.  It

13   was closed-in, and you could smell it stronger

14   because it was closed.

15        Q.   And, sorry, was there a specific time of day

16   at which the smell was worse?

17        A.   I felt it at all times.

18        Q.   Was there a specific time of year?  Like, was

19   it worse during the summer?

20        A.   It was always the same.

21        Q.   Did the odor ever change over time?  Did it

22   get worse?  Did it get better?

23        A.   Well, I mean, once you have been, like, five

24   minutes at the house, you -- you become used to
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1922 of 3246
Case 1:09-cv-02047-GAP Document 1 Confidential - Subject to Docket 05/19/2011 Page 40 of
95
Confidential - Subject to Further Confidentiality Review

```
 1    what's there.  So it becomes normal, a normal smell.

 2         Q.   I understand.

 3              You mentioned it was worse in the bathrooms.

 4    Was it worse in all of the bathrooms, or was there a

 5    specific bathroom that smelled worse than the others?

 6         A.   The same in all.

 7         Q.   All of them?

 8              Did you ever have any issues with electrical

 9    appliances in your house?

10         A.   Yes.

11         Q.   Did you see blackened electrical wires?

12         A.   Yes.

13         Q.   When did you start seeing blackened

14    electrical wires?

15         A.   Well, when we did the inspection in 2010, the

16    cables were already black -- blackened.

17         Q.   Had you noticed them before then?

18         A.   No.

19         Q.   Did you have any problems with your air

20    conditioner?

21         A.   All the time.

22         Q.   When did you start having issues with your

23    air conditioner?

24         A.   In 2011.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1923 of 3246
Case 1:11-cv-02140-GLR Document 27-27 Filed 10/11/19 Page 29 of
95
Confidential - Subject to Further Confidentiality Review

1    Q.    So it was after the inspection?

2          And prior to the inspection you never had

3    issues?

4    A.    Yes, yes.

5    Q.    I'll stop.

6          Prior to the inspection, you had never had

7    issues with the air conditioner before then?

8    A.    No.

9    Q.    I'm going to hand this to your counsel, which

10   will be Exhibit 6.  And these are documents that were

11   produced in this litigation.  And I will represent

12   for the record that these are photographs that you

13   provided to us.

14         (Defendants' Exhibit 6 was marked for

15   identification.)

16   BY MR. BARRY:

17   Q.    Mr. Miranda, do you recognize this document?

18   A.    No.

19   Q.    You have never seen these photographs before?

20       (Witness confering with interpreter.)

21         THE INTERPRETER:  I'm sorry, I wasn't able to

22   understand.

23   BY MR. BARRY:

24   Q.    Recognizing that you have said that you have

```
1    not seen these photographs before, do you know what

2    these photos are of?

3         A.   Can I give you the answer afterwards?

4         Q.   After?  Sorry, I'm not sure I understand.

5              If your wife knows this question better, I'm

6    happy to ask her later.

7         A.   Yes.

8         Q.   Yes.

9              Mr. Miranda, do you know where the

10   air-conditioning units were located in your house?

11        A.   Yes.

12        Q.   Where were they located?

13        A.   On the second floor in a hallway.

14        Q.   Did you -- let's see.

15             Prior to your neighbor mentioning Chinese

16   drywall in the neighborhood, had you ever heard about

17   problems with Chinese drywall before?

18        A.   Yes.  On the news.

19        Q.   Do you remember what you had heard about

20   Chinese drywall before then?

21        A.   That it was a material that was dangerous to

22   your health.

23        Q.   Do you remember the name of the neighbor who

24   told you about Chinese drywall?
```

Confidential - Subject to Further Confidentiality Review

```
1        A.    Yes.

2        Q.    What's your neighbor's name?

3        A.    Argery.

4        Q.    What is your neighbor's last name?

5        A.    I don't know the first last name.  But the

6    second last name is Altamirano.

7              MR. BARRY:  This is probably a good stopping

8        point, if you want to take a break.

9              (Recess from 8:59 until 9:20 a.m.)

10             MS. WERKEMA:  Before we get started, I just

11        want to make a statement regarding some

12        documents.  So earlier this morning before the

13        deposition started, I advised defense counsel

14        that the plaintiff found a folder that contained

15        I believe four additional responsive documents

16        that relate to the foreclosure.  It looks like

17        all of them are public record documents, but in

18        any case, they have been provided to defense

19        counsel at this time.

20             MR. BARRY:  And also to note that plaintiffs'

21        counsel provided us with documents and

22        provided -- last night and provided us copies

23        this morning, which I appreciate.

24    ///
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1936 of 3246
Case 1:09-md-02047-MCA-JAD Document 332261-21 Confidential Subject to Docket 05/19/2012 Page 38 of
95
Confidential – Subject to Further Confidentiality Review

1    BY MR. BARRY:

2        Q.   Mr. Miranda, just a housekeeping thing before

3    we start asking questions again.

4            I want to reiterate, you know, if there's

5    anything you don't understand that I'm not asking

6    clearly -- because frequently I'll ask unclear

7    questions -- or if there's anything you just don't

8    know, you should feel free to say "please clarify

9    that, I don't understand" or "I don't know," or "my

10   wife knows," because I'm going to generally say most

11   people's spouse knows better than the other, and I'm

12   sure there's going to be circumstances where that's

13   true for you.

14       A.   Fine.

15       Q.   Mr. Miranda, when you first learned -- when

16   you learned of Chinese drywall, what did you do?

17       A.   They gave us -- when we found out about the

18   Chinese drywall, we -- we connected with the

19   inspector that was doing the inspections.

20       Q.   And did you hire the inspector to do

21   inspections for you?

22       A.   Yes.

23       Q.   Were you the one who directly hired the

24   inspector?

Confidential - Subject to Further Confidentiality Review

```
 1      A.   No.

 2      Q.   When did you first speak with an attorney

 3   about Chinese drywall?

 4      A.   When the community was involved in -- there

 5   was a meeting at the clubhouse -- and I got confused.

 6      Q.   Okay.  And what happened at the meeting at

 7   the clubhouse?

 8      A.   The attorneys offered to represent us.

 9      Q.   And who were those attorneys?

10           And for the record, do you mind stating who

11   those are?

12      A.   Allison Grant.

13      Q.   And do you know if your attorneys are the

14   ones who hired the inspectors?

15      A.   Yes.

16      Q.   Did you ever pay for the inspectors?

17      A.   No.

18      Q.   I'm going to hand you a few documents, which

19   are the inspection reports.  I'm going to

20   represent -- and your attorney -- and if your

21   attorney is okay with it, I'm going to hand you a

22   couple -- a couple documents at the same time.

23           MR. BARRY:  Are you okay if I hand three at

24      the same time?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1928 of 3246
Case 1:09-md-02047-EEF-MBN Document 22361 Filed 11/19/19 Page 95 of 95

Confidential - Subject to Further Confidentiality Review

 1          MS. WERKEMA:  Yes.

 2          MR. BARRY:  And let's mark these all as

 3     Exhibit 7, if that's okay.

 4          MS. WERKEMA:  Okay.

 5          MR. BARRY:  And actually, do you mind handing

 6     back one of those?  Because I need a copy for

 7     myself.

 8          MS. WERKEMA:  Okay.

 9          MR. BARRY:  Just the top two.  I've got

10     another copy of the other.

11          (Defendants' Exhibit 7 was marked for

12     identification.)

13     BY MR. BARRY:

14     Q.   So, Mr. Miranda, I'm going to represent for

15     the record I have handed you three documents.  The

16     first is a document from Chinese Drywall Screening,

17     and it is called Chinese Drywall Screening Report;

18     it's dated January -- it's handwritten January 15,

19     2010.

20          The second document is also from Chinese

21     Drywall Screening entitled Chinese Drywall Screening

22     Report dated January 15, 2010.

23          And then the third document is also Chinese

24     Drywall Screening.  It is called Chinese Drywall

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1929 of 3246
Case 1:09-md-02047-MCA Document 22021 Exhibition Filed Docket 05/18/2019 Page 36 of 95
Confidential – Subject to Further Confidentiality Review

1    Screening Report, and it is dated January 19th, 2010.

2         Were these the reports that were prepared by

3    your inspector?

4         A.   Yes.

5         Q.   Have you reviewed these reports before?

6         A.   Yes.

7         Q.   Now, could you walk me through each of these?

8    Do you know why we have three inspection reports?

9         And if you need the translator to help read

10   through them . . .

11        And of course, if your wife would know

12   better, then -- but then you are putting her on the

13   hot seat, and you might be in trouble.

14        A.   So three reports with the same date.

15        Q.   So there's two with -- there's two with

16   January 15th, and there's one with January 19th.

17        A.   The one on January 19th is the date that they

18   sent the paper, but it's referencing the same

19   January 15th date.

20        Q.   Okay.  Now, if you just look at the two that

21   are January 15th, and I want you to look at the --

22   where it says, second paragraph:  "Based on our

23   visual observations, coupled with known effects from

24   tainted drywall, Chinese Drywall Screening, LLC is of

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1930 of 3246
Case 1:09-md-02047-MCA Document 23263-39 Entered on FLSD Docket 05/18/2019 Page 49 of
95
Confidential - Subject to Further Confidentiality Review

1    the opinion that tainted drywall is present --

2    underlined, emphasis -- present in the

3    above-referenced property, and the following types of

4    drywall were found."

5          That identical language appears in both of

6    the January 15 letters.

7          The first letter references drywall MDL 2046,

8    Index Number IMT-7.  The second references Number 35,

9    unknown.

10          Do you know why they changed which drywall

11    they found in the house?

12    A.   My attorney can answer that.

13    Q.   So you are deferring to your attorney on that

14    answer?

15          Do you not -- and, Mr. Miranda, you are

16    totally fine saying "I don't know."

17    A.   I don't know.

18    Q.   Okay.  Do you recognize that those are

19    different drywalls mentioned there?

20    A.   Yes.  I'm learning it now.

21    Q.   Would you agree that the third letter is the

22    final inspection report?

23    A.   Yes.

24    Q.   And if you turn the page and just look

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1931 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1931 of 3246
Confidential - Subject to Further Confidentiality Review
95

 1    through these pictures here, is this the electrical

 2    damage that we were referencing earlier?

 3        A.    Yes.

 4        Q.    Did you -- I apologize.  What did you say,

 5    Mr. Miranda?

 6        A.    This was my house.

 7        Q.    Okay.  Were you at home when the inspection

 8    was performed?

 9        A.    Yes.

10        Q.    Did you talk with the inspector while the

11    inspector was there?

12        A.    Yes.

13        Q.    What did the inspector say to you?

14        A.    That the house had a high percentage of

15    Chinese drywall.

16        Q.    Did the inspector say anything else to you?

17        A.    No.

18        Q.    Where did the inspector say the drywall was

19    within the house?

20        A.    In different places.  And 98 percent is the

21    whole house.

22        Q.    Did -- did you have any other inspections of

23    the drywall after that first inspection?

24        A.    Yes.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1932 of 3246
Case 1:11-cv-22408-MGC Document 122 Entered on FLSD Docket 05/09/2012 Page 99 of
95
Confidential - Subject to Further Confidentiality Review

 1      Q.    When did you have other inspections?

 2      A.    The City of Miami did an inspection.  This

 3   was 2010.

 4            In 2011, we went to the City to report that

 5   the house had problems, because of the taxes.  They

 6   sent an inspector.

 7      Q.    And did the City of -- City of Miami -- not

 8   Atlanta, which is where I live -- did the City of

 9   Miami make a tax reduction after reviewing the house?

10      A.    Yes.

11      Q.    How much did they reduce the taxes by?

12      A.    My wife can answer that.

13      Q.    I will ask your wife later.  And if she

14   weren't in the room, I wouldn't tell her that you

15   told me that I have to ask her.

16            Has anyone ever taken samples of drywall from

17   your house?

18      A.    Separate from the inspectors, no one else.

19      Q.    So no one took drywall out of your house?

20      A.    They took --

21      Q.    Okay.

22      A.    -- they took some.

23      Q.    And you don't know of anyone else taking

24   drywall out of your house?

Confidential - Subject to Further Confidentiality Review

```
 1        A.   I don't remember.

 2        Q.   Do you know where the drywall is that has

 3    been taken out of your house?

 4        A.   No.

 5        Q.   You said earlier that the inspector said

 6    98 percent of your house is Chinese drywall.  Is

 7    there anywhere where that is reflected?

 8        A.   He said all of it had Chinese drywall.

 9        Q.   Did the inspector explain why he thought it

10    was everywhere?

11        A.   Well, he did an inspection, and he found that

12    it was everywhere, that the damages were everywhere.

13        Q.   Did the inspector inspect every single wall

14    in the house?

15        A.   Yes.

16        Q.   Did he take samples from one wall?  Two

17    walls?  From multiple locations within the house?

18    Where did he take the samples from?

19        A.   He opened up all of the outlets.

20        Q.   So he took them from the outlets?

21        A.   Yes.

22        Q.   And are you saying he took it from every

23    single outlet or just in certain rooms?

24        A.   From all places.  He moved all the stuff
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1934 of 3246
Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 41 of 95
Confidential - Subject to Further Confidentiality Review

```
 1    around and took from the outlets.

 2         Q.   Now, you mentioned the City inspector.  Did

 3    the City inspector ever issue a report?

 4         A.   Can you clarify that question?

 5         Q.   You said the City inspector came by to look

 6    at the drywall, correct?

 7         A.   Correct.

 8         Q.   When the City inspector came by to look at

 9    the drywall, did they issue anything to you?  Did

10    they give you a report?  Did they give you a letter?

11    Did they give you any document?

12         A.   Yes.

13         Q.   Do you have that report?

14         A.   No, I don't have it.

15         Q.   Why do you not have that report?

16         A.   We -- we threw out everything.  We threw out

17    all of the documents when we moved out of the house.

18         Q.   And when did the City inspector come by to do

19    the report?

20         A.   They used to come annually.  And then the

21    City, they should have a record.

22         Q.   Okay.  Do you remember when they came by and

23    did the tax reduction?  And what year is fine.

24              Defer to your wife?
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1935 of 3246
Case 1:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 42 of 95
Confidential - Subject to Further Confidentiality Review

```
 1      A.   Ask my wife.

 2      Q.   How soon after learning about Chinese drywall

 3  did you hire your attorneys?  What was the date of

 4  that?

 5      A.   Immediately.

 6      Q.   So you learned about it in January or

 7  February 2010.  Is it fair to say that you hired an

 8  attorney around that time?

 9      A.   Yes.

10      Q.   So is -- you said earlier that you own other

11  properties.  What are those properties?

12      A.   One property.

13      Q.   What property is that?

14      A.   It's where I live now, 10710 Northwest

15  7th Street, Unit 10, Miami, Florida 33172.

16      Q.   When did you buy that house?

17      A.   1906.

18      Q.   1906?

19           You have lived a long life, Mr. Miranda.

20           Does 1995 make sense?

21      A.   No.  1996.

22      Q.   Okay.  Do you still have a mortgage on that

23  house?

24      A.   No.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1936 of 3246
Case 1:11-cv-22408-MGC Document 208-21 Entered on FLSD Docket 05/18/2015 Page 18 of 95

Confidential - Subject to Further Confidentiality Review

```
1      Q.   When did you pay off the house?

2      A.   Like, ten -- like, eight years ago.

3      Q.   Okay.  When you lived at the house at

4  8890 Southwest 229th Street, who was living in the

5  house at the address -- that I'm not remembering --

6  at 10710 Northwest 7th Street?

7      A.   I had it rented.

8      Q.   How much were you being paid in rent during

9  that time period?

10     A.   980.

11     Q.   And how -- did you have multiple tenants?

12 Did you have one tenant during that time period?

13     A.   Three families lived there.

14     Q.   Not all at the same time, right?

15     A.   No.

16     Q.   And how long was the lease that you gave to

17 your tenants during that time period?

18     A.   One year.

19     Q.   Okay.  Is -- I know you no longer own the

20 home, but do you -- while you were owning the home,

21 did you ever try to remediate the Chinese drywall

22 from your house?

23     A.   We were trying to resolve the suit.

24     Q.   So you did not try to remediate the Chinese
```

```
 1    drywall in your house?

 2        A.   It was too much money.

 3        Q.   Now, you no longer own the home.  Can you

 4    remediate the Chinese drywall from your house now?

 5        A.   I don't have it.

 6        Q.   So the answer is no?

 7        A.   No.

 8        Q.   Did you ever try to get a contractor to quote

 9    how much it would cost to remediate the property?

10        A.   No.

11        Q.   At the house, did you ever experience metal

12    erosion?

13        A.   I'm not -- the question, I'm not -- I'm not

14    sure.

15        Q.   Were metal appliances in your house corroded,

16    damaged?

17        A.   This ruins copper, jewelry, and destroys it.

18        Q.   Were those -- can you list specific items in

19    your house that were damaged in the way that you just

20    referenced?

21        A.   Yes.  The air condition, the televisions, the

22    refrigerator, the telephones, the computer, all of

23    that would get damaged.

24        Q.   Was there anything else?
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1938 of 3246
Case 1:19-cv-00234-MGC Document 22362-39 Entered on FLSD Docket 05/19/2019 Page 45 of
95
Confidential - Subject to Further Confidentiality Review

```
 1        A.    No.

 2        Q.    What of those items did you have to go

 3    repair?

 4        A.    All of them.

 5        Q.    Have you -- are you asking in this lawsuit

 6    for compensation for repairing those items?

 7        A.    Yes.

 8        Q.    Do you have receipts for any of those items

 9    and the repairs that you have done?

10        A.    No.

11        Q.    Do you have any other evidence of having paid

12    for those repairs or any of the replacement products?

13        A.    No.

14        Q.    Do you have any estimate of how much you have

15    paid in total for repairing or replacing those items?

16        A.    No.  I don't have the exact number, no.

17        Q.    For some of the items that you have mentioned

18    that got damaged, like jewelry, do you still have

19    those items?

20        A.    It's a question for my wife.

21        Q.    Understood.  I'll note that down.

22              Do you have -- did you have homeowner's

23    insurance during that time period?

24        A.    Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1939 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 46 of
95
Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Who was your homeowner's insurance with?

 2        A.    It was included in the mortgage.

 3        Q.    Do you know what the company was that was the

 4   homeowner's insurance?

 5        A.    We had the flood, flood insurance.  Flood

 6   insurance.

 7        Q.    Did you ever try to make a claim on your

 8   homeowner's insurance for the damage to your

 9   property?

10        A.    No.

11        Q.    Why not?

12        A.    I had no idea I could make a claim to the

13   insurance.

14        Q.    Has the presence of Chinese drywall in your

15   house limited your usage of the property?

16        A.    Yes.

17        Q.    How so?

18        A.    It was difficult to have people over because

19   of how it smelled; it smelled bad.  So many -- many a

20   time, we wouldn't have company over because of that.

21        Q.    Were there any other things that you couldn't

22   do in the house because of Chinese drywall?

23        A.    Because of the Chinese drywall, my daughter,

24   Amy, would bleed; her eyes would get irritated and
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1940 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 47 of
95
Confidential - Subject to Further Confidentiality Review

```
 1     dry.  My wife would get a lot of migraines.

 2          Q.   Is there anything else?

 3          A.   And my wife can tell you better.

 4          Q.   Understood.

 5               Mr. Miranda, and if you refer to Exhibit 5,

 6     which is this one.

 7               Before looking at it, Mr. Miranda, do you

 8     know if you are asking for compensation for your loss

 9     of use of the property and enjoyment of the property?

10          A.   I can't enjoy the property.  I have lost it.

11          Q.   Are you asking for compensation for that?

12          A.   Yes.

13          Q.   Do you know how much compensation you are

14     asking for?

15          A.   No idea.

16          Q.   If you look at Exhibit 5 and you turn to

17     Page 6, and for your ease, I'll read this for the

18     record.

19               If you -- "question:  If you experienced any

20     loss of use and/or loss of enjoyment of the property

21     as a result of Chinese drywall, identify the total

22     amount of such loss.

23               Answer:  Estimated 250,000.  However, to be

24     determined at trial."
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1941 of 3246
Case 1:09-cv-02042-GEL Document 24 Filed 01/19/11 Page 48 of
Confidential - Subject to Further Confidentiality Review
95

```
 1              Is that the amount of money that you are

 2    asking for compensation for, for loss of use and of

 3    enjoyment of the property?

 4         A.   Can the attorney answer?

 5         Q.   You need to answer.

 6         A.   I've never -- I haven't talked numbers.

 7         Q.   Okay.  Do you know why on your Supplemental

 8    Plaintiff Form that you said you reviewed that you

 9    list $250,000 here?

10              MR. VERRIER:  Object to the form.

11              THE WITNESS:  Honestly, I don't know exactly

12         about that number.

13    BY MR. BARRY:

14         Q.   Okay.  And I'm guessing since you didn't know

15    about that number that you don't know how that number

16    has been calculated?

17         A.   That question I have to answer, or can the

18    attorney answer?

19         Q.   You need to answer it.

20              If your wife would be better to answer it,

21    that's fine, too.

22         A.   That's fine.  Then my wife.

23         Q.   So you don't personally know?

24         A.   Correct.
```

```
1        Q.    You said you lived in the house after you

2    suspected Chinese drywall for -- until 2017.  Is that

3    correct?

4        A.    2018.  I lived there until 2018.

5        Q.    So when did you move out of the house?

6        A.    June 2018.

7        Q.    Okay.  Did anyone tell you that you needed to

8    move out of the house while you were living there?

9        A.    The foreclosure.  The foreclosure was on

10   April 30th, and I spoke to the new owner of the house

11   asking them to give me the chance to stay until June.

12       Q.    Did -- putting aside the foreclosure, did

13   anyone tell you you needed to leave the house for

14   health reasons or any other reasons?

15       A.    No.

16       Q.    Are you aware that this lawsuit does not

17   involve any -- any personal injuries or any health

18   effects that come from Chinese drywall?

19       A.    Well, my daughter used to bleed.  We did have

20   health effects.

21       Q.    And I understand and I appreciate the fact

22   that there may have been health effects, but this

23   lawsuit does not involve the health effects.

24             MR. VERRIER:  Object to the form.
```

Case 2:09-md-02047-EEF-MBN Document 22262-39 Filed 11/19/19 Page 1943 of 3246
Case 1:09-md-02047-MGA Document 2262-1 Confidential Supplement 05/06/2013 Page 50 of
Confidential - Subject to Further Confidentiality Review
95

```
1                MR. BARRY:  And I'll rephrase that question,

2        recognizing that objection.

3    BY MR. BARRY:

4        Q.   Do you understand that this lawsuit does not

5    involve any claims for damages resulting from

6    personal injury or medical conditions?

7        A.   That's fine.

8        Q.   Is that a yes?

9        A.   Yes.

10       Q.   While -- before the foreclosure, did you ever

11   live anywhere else from the time you learned there

12   was Chinese drywall in the house?

13               That was a terrible question.

14               From the time you learned there was Chinese

15   drywall in the house to the time you left after the

16   foreclosure, did you live anywhere else?

17       A.   No.

18       Q.   Mr. Miranda, could you bring back up

19   Exhibit 5.  And if you look at Page 5 where it says

20   Section 7, Other Damages.

21               And for ease on the record, I'm going to read

22   it to you.

23               If you -- "question:  If you incurred

24   alternative living expenses as a result of Chinese
```

Case 2:09-md-02047-EEF-MBN  Document 22262-39  Filed 11/19/19  Page 1944 of 3246
Case 1:09-cv-09424-GBD  Document 22362-39  Filed 11/19/19  Page 1944 of 3246
Confidential - Subject to Further Confidentiality Review
95

```
 1    drywall, identify the total moving costs and/or

 2    alternative living expenses you incurred.

 3              Answer:"  It's blank.

 4      A.    Fine.  We didn't live in any other place.

 5      Q.    Are you asking for any alternative living

 6    expenses in this lawsuit?

 7      A.    No.

 8      Q.    Are you asking for any payment for the moving

 9    costs when you left the house after the foreclosure?

10      A.    No.

11      Q.    Now, Mr. Miranda, have you received any

12    payments in relation to Chinese drywall?

13      A.    Yes.

14      Q.    What payments did you receive?

15      A.    This amount here -- no.  My wife has the

16    exact number.

17      Q.    Okay.  Looking at Section 6 here where it

18    says you received $14,182.70 from GBI Settlements, do

19    you know what that item is?

20              And I can ask your wife if you know better --

21    she knows better.

22      A.    Yes, yes.

23      Q.    I'll ask your wife about that.

24              Do you know of any other payments you
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1945 of 3246
Case 1:19-cv-02408-MCA Document Entre Inn Jim 95 Nocket 05/19/2019 Page 52 of
95
Confidential - Subject to Further Confidentiality Review

 1    received as a result of drywall?

 2         Again, I'm going to ask your wife these

 3    questions, so . . .

 4         A.   Yes.

 5         Q.   What are those?

 6         A.   Two payments:  This one that we're speaking

 7    about and another one.  My wife has the exact

 8    numbers.

 9         Q.   And if your counsel doesn't mind if I mark

10    something as Exhibit 8.

11         Thank you.

12         (Defendants' Exhibit 8 was marked for

13    identification.)

14         MR. BARRY:  And I'm going to represent on the

15         record that Exhibit 8 consists of two documents:

16         One is a copy of a check with postage, it is a

17         check from Chinese Drywall Settlement Program to

18         Jose Miranda and Adela Miranda in the amount of

19         $12,603.92; and the second document, similarly,

20         is a check from Chinese Drywall Settlement

21         Program in the amount of $1,578.78, and it is

22         made out to Jose Miranda and Adela Miranda.

23    BY MR. BARRY:

24         Q.   Do you recognize these documents?

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1946 of 3246
Case 1:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 53 of 95
Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    Were these the payments that you received in

 3    relation to Chinese drywall?

 4        A.    Yes.

 5        Q.    Do you know of any other payments other than

 6    these?

 7              And recognizing that your wife may know

 8    better than you do . . .

 9        A.    No.

10              MR. BARRY:  Let's take a short break.

11              We can go off the record.

12              (Recess from 10:02 until 10:16 a.m.)

13    BY MR. BARRY:

14        Q.    Mr. Miranda, we talked a little bit about

15    having another property.  While you were living in

16    the house that had Chinese drywall, did you ever

17    consider moving into the other property?

18        A.    No.

19        Q.    Why not?

20        A.    Because I had a lease.

21        Q.    All right.  Didn't you say the leases were

22    one year each?

23        A.    Yes.

24        Q.    So couldn't you have moved into that house
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1947 of 3246
Case 1:09-cv-07666-AGT Document 266-21 Entered on FLSD Docket 05/18/2013 Page 51 of 95
Confidential – Subject to Further Confidentiality Review

```
 1    when the leases expired?

 2        A.    Well, I don't know what -- the idea of moving

 3    didn't really come to us.

 4        Q.    Okay.  Earlier we talked a little bit about

 5    that you -- your house was foreclosed on.  Is that

 6    correct?

 7        A.    Yes.

 8        Q.    You -- when was the -- when did that

 9    foreclosure go through?

10        A.    April 30th of this year, 2018.

11        Q.    When did you stop making payments on your

12    mortgage?

13        A.    January of 2009.

14        Q.    Why did you stop making payments on your

15    mortgage?

16        A.    Because we entered a process for

17    modification.

18        Q.    What happened with that process?

19        A.    It was very long.  And they approved the

20    first modification.  They had us do a payment for

21    three months.  After three months, they told us that

22    they weren't approving the modification because of

23    the problem that there was in the house.

24        Q.    So you started trying to seek a modification
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1948 of 3246
Case 1:09-md-02047-EEF-MBN Document 22021 Confidential Subject to Further Confidentiality Review Page 45 of
95
Confidential – Subject to Further Confidentiality Review

1    in January of 2009.  Is that correct?

2         A.    Yes.

3         Q.    And for three months they -- you tried to

4    negotiate the modification, make payments on a

5    modification.  Is that correct?

6         A.    No.  The three months is a plan that the bank

7    gives you to approve.

8         Q.    So that three months was until April of 2009?

9         A.    In 2009, we started dealing with the bank.

10   But the modification didn't come until 2011.

11        Q.    Okay.  So you made no payments on your

12   mortgage between 2009 and 2011?

13        A.    No.

14        Q.    Did the bank tell you while you were

15   negotiating a modification that you could -- you

16   didn't have to make payments on your mortgage?

17        A.    The invoice for the monthly payment would

18   come, but we didn't make the payment because we were

19   in the process of modifying.

20        Q.    Was the bank -- did the bank say that it was

21   acceptable for you not to make that payment?

22        A.    Well, we lived so many years, so I suppose

23   the bank allowed us to.

24        Q.    And I'm asking:  Did the bank give you

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1949 of 3246
Case 1:09-cv-02047-MCA Document 22362-39 Filed 11/19/19 Page 1949 of 3246
Confidential - Subject to Further Confidentiality Review
95

```
 1    specific authority while you were negotiating the

 2    modification to not pay on your mortgage?

 3         A.    No.  They didn't give me any document.

 4         Q.    So in 2009 when you were not paying on your

 5    mortgage, was the -- was the bank charging you any

 6    penalties or late fees?

 7         A.    Yes.  Letters were coming.

 8         Q.    Were they charging you penalties and late

 9    fees?

10         A.    Yes.

11         Q.    Were you -- so what was the reason that you

12    were seeking a modification?

13         A.    I lost my job, and the new job that I had

14    taken had a less salary.

15         Q.    When did you lose your job?  What year or

16    what month?

17         A.    At the end of 2008.

18         Q.    And what was the difference in salary,

19    roughly, between your former job and your new job?

20         A.    $30,000.

21         Q.    And what -- when did you start your new job?

22         A.    May of 2009.

23         Q.    Okay.  So is it fair to say you were

24    unemployed for roughly five to six months?
```

Case 2:09-md-02047-EEF-MBN Document 22262-39 Filed 11/19/19 Page 1950 of 3246
Case 1:09-cv-02047-MCA-JBL Document 22021 Confidential Subject to further confidentiality Review
95
Confidential - Subject to further confidentiality Review

```
 1        A.    Yes.

 2        Q.    And during that time you were unemployed was

 3    when you stopped making payments on your mortgage?

 4        A.    No.  It was before.

 5        Q.    You stopped making payments on your mortgage

 6    before you were unemployed?

 7        A.    No.  It was then.  It was then.

 8        Q.    So it was during that time -- during the time

 9    period -- just to make it clear for the record:

10    During the time you were unemployed was when you

11    stopped making payments on your mortgage?

12        A.    Yes.

13        Q.    And was that before or after you learned that

14    there was Chinese drywall in your house?

15        A.    Before.

16        Q.    Now, were -- when did the bank start trying

17    to foreclose on the house?

18        A.    I think it was in 2012.

19        Q.    And could you walk me through what happened

20    with that -- during that foreclosure process in 2012?

21        A.    When I initiated in 2009 for the

22    modification, we did it ourselves with the bank.

23    When the bank sent me for foreclosure, we then looked

24    for an attorney.
```

Confidential - Subject to Further Confidentiality Review

```
 1        Q.    And what happened with that foreclosure in

 2    2012?

 3        A.    The attorney represented us, and when it went

 4    to court, the judge ordered it dismissed.

 5        Q.    Okay.  So it was not foreclosed -- your house

 6    was not foreclosed on in 2012?

 7        A.    Correct.

 8        Q.    Were -- after the period when you stopped

 9    making payments on your mortgage in 2009, did you

10    ever make any more payments on your mortgage?

11        A.    No.

12        Q.    Why not?

13        A.    We were trying to get the modification, so we

14    weren't making the payment because we -- we were

15    trying to get the modification.

16        Q.    And so you said they said no to the

17    modification in, what, 2011 or 2012?

18        A.    2011.

19        Q.    And so why after you knew there was not going

20    to be a modification, why didn't you start making

21    payments after that?

22        A.    Because we wanted the modification.

23        Q.    So it was -- could you then afford to make

24    payments on the mortgage?
```

```
 1        A.   With the modification, yes.  With the

 2   mortgage that I had, no.

 3        Q.   Okay.  And was that because of the loss of

 4   income?

 5        A.   Yes.

 6        Q.   So is it fair to say that you stop making

 7   payments on your mortgage because of the loss of

 8   income?

 9        A.   Yes.

10        Q.   Did Wells Fargo ever grant you any

11   forbearance?

12             THE INTERPRETER:  I'm sorry, I don't have --

13        bear with me.

14             MR. VERRIER:  What is the word,

15        "forbearance"?

16             MR. BARRY:  Yeah.  In Spanish.

17             THE INTERPRETER:  He's asking what -- the

18        word that I found is technical, and "what is

19        forbearance?" is his question back.

20   BY MR. BARRY:

21        Q.   A period in which you don't have to pay.

22        A.   No.

23        Q.   I'm going to hand you a document that is

24   Exhibit 9.
```

Confidential - Subject to Further Confidentiality Review

1          (Defendants' Exhibit 9 was marked for

2     identification.)

3     BY MR. BARRY:

4          Q.   Now, if you want to look through this entire

5     document, this is Exhibit 9, which is a letter from

6     Wells Fargo dated June 5th, 2012, to Bruce Steckler

7     of Baron & Budd, P.C.  And it's Re:  Jose F. Miranda,

8     and it references your loan number.

9               And, again, just for ease on the record, this

10    record is seeking certain information from you for a

11    forbearance period.

12              And one sentence says:  "Wells Fargo Home

13    Mortgage shows that Mr. Miranda has been on a special

14    forbearance agreement, and for Mr. Miranda to get

15    reviewed for another forbearance agreement, we will

16    need the following documentation."

17              Now, Mr. Miranda, does that refresh your

18    memory that you may have received a forbearance

19    agreement from Wells Fargo?

20         A.   It was many years, a lot of papers.  It was

21    just not so --

22         Q.   Understood.

23         A.   -- it was not that great.

24         Q.   So you don't remember one way or the other?

```
1       A.   No.

2       Q.   So you would have no understanding of why you

3   were granted a forbearance, if you were granted a

4   forbearance?

5       A.   No.

6       Q.   Okay.

7            MR. BARRY:  And I just want to reflect for

8       the record, just for clarity's sake, that the

9       word "forbearance" is not translating well in

10      Spanish, and he may not be understanding exactly

11      what we are talking about because of that.

12           MS. WERKEMA:  Thank you.

13   BY MR. BARRY:

14      Q.   Now, ultimately though, Wells Fargo did

15   foreclose on the house.  Is that correct?

16      A.   Yes.

17      Q.   Is this the -- and I'm going to pass you a

18   handful . . .

19           (Defendants' Exhibit 10 was marked for

20      identification.)

21           MR. BARRY:  And I'm introducing Exhibit 10,

22      which is the Consent Final Judgement of

23      Foreclosure, which was issued in the Circuit

24      Court of the Eleventh Judicial Circuit in and for
```

Case 2:09-md-02047-EEF-MBN Document 23263-39 Filed 11/19/10 Page 1955 of 3246
Case 1:1-22-cv-MCA-LDW Document 1 Confidential Supplement 05/09/17 Page 62 of 95
Confidential - Subject to Further Confidentiality Review

```
 1          Miami-Dade County, Florida.  And it's Wells Fargo

 2          Bank, NA, Re:  Jose F. Miranda, et al.

 3     BY MR. BARRY:

 4          Q.   Have you seen this document before,

 5     Mr. Miranda?

 6               So this is the Consent Final Judgment of

 7     Foreclosure.  And hopefully your counsel will give me

 8     some leeway on representing what this is.  And this

 9     is the legal document that was the judgment entering

10     the foreclosure.

11               Do you know when this document was entered

12     whether Wells Fargo said you owed any more money

13     after the foreclosure?

14          A.   They didn't let me know.

15          Q.   Have they tried to collect more money from

16     you since you've moved out of the home?

17          A.   No.

18          Q.   On Number 1, on Page 1, it says:  "Amounts

19     due and owing, plaintiff is due" -- which is saying

20     Wells Fargo -- Wells Fargo is the plaintiff --

21     "principal of $272,511.00."

22               Mr. Miranda, is that the amount that -- of

23     the original loan that Wells Fargo issued to you in

24     2011?
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1956 of 3246
Case 1:09-cv-12049-MGM Document 32 Entered on FLSD Docket 05/19/2019 Page 63 of
95
Confidential - Subject to Further Confidentiality Review

1      A.    Yes.

2      Q.    So is it fair to say that between 2007 and

3    2018 when you left the home that you didn't pay any

4    money to principal on the loan?

5           MR. VERRIER:  Objection.

6           MS. WERKEMA:  Object to the form.

7    BY MR. BARRY:

8      Q.    During the time period between 2007 and 2018,

9    did you pay any money to principal on your mortgage?

10     A.    Yes.  We paid from 2007 to 2009.

11     Q.    Do you have any evidence of any amount of

12   that money going to principal?

13     A.    It was going towards interest.

14     Q.    Okay.  Do you have -- you know, we've

15   received a lot of documents from you, and I

16   appreciate that.

17           Do you have any payment records on your

18   mortgage?  I know it was a long time ago, so if you

19   do -- if you asked Wells Fargo, would they have the

20   payment records?

21     A.    I think so, yes.

22     Q.    With your attorney's permission, would you be

23   willing to ask for those records?

24           MS. WERKEMA:  I believe these documents have

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1957 of 3246
Case 1:09-cv-04102-MGC Document 29021 Entered on FLSD Docket 05/19/2017 Page 61 of
95
Confidential - Subject to Further Confidentiality Review

```
 1          already been requested from Wells Fargo by the

 2          plaintiffs.

 3               MR. BARRY:  Okay.  Perfect representation.

 4               Now, we'd just ask that they be produced if

 5          they are obtained.

 6               MS. WERKEMA:  I'm sorry, just to clarify, I

 7          believe Wells Fargo has stated that they have

 8          provided the plaintiffs with what they have, that

 9          they don't have any.

10               MR. BARRY:  Okay.

11     BY MR. BARRY:

12          Q.   Mr. Miranda, I'm going to introduce to you an

13     exhibit -- and if your counsel doesn't mind if I do a

14     combined exhibit here.  Give that to you.

15               (Defendants' Exhibit 11 was marked for

16     identification.)

17     BY MR. BARRY:

18          Q.   Mr. Miranda, I'm going to represent that

19     these are two retainer agreements:  The first dated

20     in 2012 from Pila Law Group, and it relates to the

21     foreclosure lawsuit, Wells Fargo versus Miranda, that

22     we discussed earlier; and the second is with JP Law

23     Firm from 2016, and it's related to Wells Fargo Bank

24     versus Jose Miranda.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1958 of 3246
Case 1:09-cv-02492-MCA Document 2269-1 Confidential Subject to Further Page 35 of
95
Confidential – Subject to Further Confidentiality Review

 1              Was this the law firm that you hired to help

 2     protect you from foreclosure?

 3          A.   Yes.

 4          Q.   And let me clarify for the record, were these

 5     the law firms?  I said "law firm."

 6              And do you mind answering the question?

 7              Were these the law firms that you hired to

 8     help protect you from foreclosure?

 9          A.   Correct, yes.

10          Q.   Mr. Miranda, do you have any payment records

11     from what -- the payments you made to these law

12     firms?

13          A.   No.

14          Q.   Mr. Miranda, if you can turn to Exhibit 5 --

15     well, I handed you the wrong document.  Let me

16     reorganize myself here.

17              Mr. Miranda, I'm going to hand you a

18     document.  I only have two of them.  I apologize.

19              And these are your First Amended Response to

20     Defendants' Second Set of Interrogatories, which was

21     served on us last night.

22              (Defendants' Exhibit 12 was marked for

23     identification.)

24     ///

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1959 of 3246
Case 1:11-cv-01048-MC-L Document 2002-1 Contiana Filed 10/18/19012 Page 35 of
95
Confidential - Subject to Further Confidentiality Review

```
1   BY MR. BARRY:

2       Q.   I apologize.  I introduced the wrong thing,

3   but we'll keep that in there, because it's . . .

4   That's my fault.

5            I'm going to hand you these interrogatories.

6   Sorry, there's a lot of discovery responses.

7            (Defendants' Exhibit 13 was marked for

8   identification.)

9   BY MR. BARRY:

10      Q.   And Exhibit 13 are Plaintiff Jose Miranda's

11  Response to Defendants' Interrogatories.

12           And if you -- do you recognize this document,

13  Mr. Miranda?

14           MR. BARRY:  And if counsel doesn't mind so we

15      don't introduce another exhibit, these were

16      verified, do you stipulate?

17           MS. WERKEMA:  Correct.

18  BY MR. BARRY:

19      Q.   Do you recognize this document, Mr. Miranda?

20      A.   I know it's related to my stuff, but my

21  signature is not on it.

22      Q.   We can do the verification, or your attorney

23  can notify you that you signed it.

24           MS. WERKEMA:  I'll state on the record that
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1960 of 3246
Case 1:1-cv-22408-MGC Document 1 Entered on FLSD Docket 05/09/2019 Page 67 of
95
Confidential - Subject to Further Confidentiality Review

```
 1        English is not his first language; he doesn't

 2        read English well.

 3            MR. BARRY:  Totally understand.  I'm not

 4        trying to --

 5            MS. WERKEMA:  I understand.

 6            MR. BARRY:  While this is not attached to

 7        this document, I'm introducing Exhibit 14.

 8            (Defendants' Exhibit 14 was marked for

 9     identification.)

10     BY MR. BARRY:

11        Q.   This document is a verification signed

12     November 16th, 2018, and it pertains to the foregoing

13     Responses to Defendants' Interrogatories, which were

14     located at Exhibit 13.

15        A.   These two go together, right?

16        Q.   Correct.

17            MS. WERKEMA:  I just want to clarify that it

18        was actually signed on December 13th, 2018.  Just

19        so the record is clear.

20            MR. BARRY:  100 percent correct.

21     BY MR. BARRY:

22        Q.   Do you recognize these documents?

23        A.   Yes.

24        Q.   Did you review these documents before signing
```

1    them?

2        A.    No.

3        Q.    Why didn't you review these documents before

4    signing them?

5        A.    Because these are from my attorney, and I

6    trust her.

7        Q.    So did you review to see if the information

8    in this was true and correct?

9              And, Mr. Miranda, to be clear, when you

10   signed the document -- not now -- did you review to

11   see if this information was true and correct?

12       A.    I recognize this one.

13       Q.    So just to get the answer to my question:

14   When you signed that document in December of 2018 --

15   right -- did you review this information to see if it

16   was true and correct?

17       A.    This is what I received.

18       Q.    Mr. Miranda, I don't mean to be difficult.  I

19   need you to answer the question.

20             When you reviewed these interrogatories --

21   responses, did you review them to see if they were

22   true and correct?

23       A.    I have to answer that right now?

24       Q.    Yes.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1962 of 3246
Case 1:1-cv-22408-MGC Document 23911 Entered on FLSD Docket 05/18/2011 Page 69 of 95
Confidential - Subject to Further Confidentiality Review

```
1        A.    Can my attorney answer?

2        Q.    No.  You need to answer that question.

3        A.    I -- I signed this.

4        Q.    I need you to answer the question I've asked,

5    not whether you have signed it; whether you have

6    reviewed the information to see if it was true and

7    correct?

8        A.    And you're handing me two different things.

9        Q.    Mr. Miranda, you signed a document here that

10   says this document is true under the penalty of

11   perjury.  And I need to know if the answer is --

12            MR. BARRY:  No.  We can't have help here.

13   BY MR. BARRY:

14       Q.    -- I need to know what the answer is.  Did

15   you review this document, whether in English or

16   Spanish, and did you review the answers here and did

17   you understand that the answers here were true and

18   correct?

19            MR. VERRIER:  To be clear, she --

20            MR. BARRY:  No, no.

21            MR. VERRIER:  Hey, listen.  Don't tell me no.

22       She was trying to just point him to the right

23       document --

24            MR. BARRY:  That's fine.  That's fine.
```

Confidential - Subject to Further Confidentiality Review

1      MS. WERKEMA:  This document --

2      MR. BARRY:  I apologize.  I apologize on the

3   record.

4      MR. VERRIER:  Sure.

5      THE WITNESS:  Can I take five minutes to --

6      MR. BARRY:  No.

7      THE WITNESS: -- read it in peace with my

8   daughter?

9   BY MR. BARRY:

10     Q.   You can take -- you can take to review it.

11  But my question is not whether you reviewed it now

12  and recognize whether it's true or correct.

13       My question is whether when you signed it on

14  December 13th, 2018, a week ago, did you review these

15  questions, and did you understand that they were true

16  and correct when you signed a verification under

17  penalty of perjury, under oath, just like we are in

18  this deposition, did you understand these questions

19  to be true and correct?

20     A.   Honestly, I received this.

21     Q.   So you never received a copy of that

22  document?  Your counsel never sent you a copy of that

23  document?

24       MR. BARRY:  And for the record, the witness

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1964 of 3246
Case 2:09-cv-02048-MCA Document 2 Confidential Subject to Further Confidentiality Review
95

Confidential - Subject to Further Confidentiality Review

1          is reviewing the document.

2                  Excuse me?

3                  THE WITNESS:  I recognize the document.

4     BY MR. BARRY:

5          Q.   You recognize the document because you

6     received it?

7          A.   I am recognizing it now.

8          Q.   So for the last ten minutes or so we've been

9     talking, Mr. Miranda, and you did not recognize the

10    document?

11                 MS. WERKEMA:  English is not his first

12             language.  He doesn't read English well.  It's

13             going to be difficult for him to understand one

14             document from another in English when I know he

15             doesn't speak English well or read English well.

16                 MR. BARRY:  I appreciate that.  I have been

17             patient with that throughout this process, and I

18             get it 100 percent.  There's a different issue

19             here.  He has said on the record all he received

20             was that verification.

21                 MS. WERKEMA:  That's --

22                 MR. VERRIER:  I object.  It mischaracterizes

23             his --

24                 MR. BARRY:  If you would like to go through

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1965 of 3246
Case 1:09-md-02047-EEF-MBN Document 2083-21 Entered on FLSD Docket 05/18/2019 Page 72 of 95
Confidential - Subject to Further Confidentiality Review

```
 1        the transcript, we can do that.

 2             MR. VERRIER:  I'm lodging my objection for

 3        the record.

 4             MS. WERKEMA:  And I believe the confusion

 5        lies because of the language barrier.  It's

 6        difficult for him to see -- recognize one

 7        document versus another when they are written in

 8        English.

 9             MR. BARRY:  He is having no trouble

10        recognizing the verification in English --

11                  (Simultaneous speaking.)

12             MR. VERRIER:  Is there a question pending?

13             MR. BARRY:  Yes.

14             MR. VERRIER:  Sorry.  What was the question?

15   BY MR. BARRY:

16        Q.   Did you receive that document before signing

17        that verification?

18             MR. VERRIER:  Objection.

19   BY MR. BARRY:

20        Q.   Mr. Miranda, I would like an answer.  Yes or

21        no?

22             MR. VERRIER:  Objection.

23             THE WITNESS:  Yes.

24        ///
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1966 of 3246
Case 1:11-cv-22408-MGC Document 228-1 Entered on FLSD Docket 05/18/2019 Page 73 of
95
Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. BARRY:

 2         Q.   Okay.  Why did -- before did you say that you

 3    had not?

 4              MR. VERRIER:  Objection.

 5              THE WITNESS:  I was confused.

 6    BY MR. BARRY:

 7         Q.   Okay.  We're going to move past this.

 8              Mr. Miranda, I want you to look at your

 9    response to Interrogatory Number 1.

10              Now, we're going to look through each of

11    these damages here.  In accordance with -- well,

12    let's start with the first category, Remediation

13    Damages.

14              "In accordance with Judge Cooke's

15    November 16, 2018, order, remediation damages will be

16    computed based on the remediation formula set forth

17    in Judge Fallon's findings of fact and conclusions of

18    law related to the June 9th, 2015, damages hearing."

19              Are you seeking remediation damages in this

20    lawsuit?

21         A.   Yes.

22         Q.   Earlier we've discussed that you never

23    attempted to remediated the property.  Is that

24    correct?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1967 of 3246
Case 1:17-cv-02149-MCA-LDW Document 21-1 Entered on FLSD Docket 05/18/2019 Page 491 of 95
Confidential - Subject to Further Confidentiality Review

 1      A.   To fix the property?

 2      Q.   Yes.

 3      A.   To replace?

 4      Q.   The Chinese drywall.

 5      A.   My response was that it costs too much.

 6      Q.   Understood.

 7           We also talked earlier that because you no

 8  longer lived in the house that you can no longer

 9  remediate.  Is that correct?

10      A.   That's correct.

11      Q.   So are you seeking remediation damages?

12           MR. VERRIER:  Objection; asked and answered.

13           You can answer.

14  BY MR. BARRY:

15      Q.   So what is the basis for seeking remediation

16  damages?

17      A.   The fundamental basis that the house was lost

18  is because the house had this problem to such a point

19  that the first modification would -- did not go

20  through because of this problem.

21      Q.   I understand that category of damages.

22           My point though is if you did not pay for

23  remediation and if you cannot currently remediate,

24  how can you have a basis for remediation damages?

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1968 of 3246
Case 1:11-cv-22408-MGC Document 29-7 Entered on FLSD Docket 05/18/2015 Page 75 of
95
Confidential - Subject to Further Confidentiality Review

```
1              MR. VERRIER:  Objection.

2              THE WITNESS:  Can you repeat the question for

3       me, please?

4              MR. BARRY:  Could you just reread the

5       question?

6              THE COURT REPORTER:  "Question:  My point

7              though is if you did not pay for remediation and

8              if you cannot currently remediate, how can you

9              have a basis for remediation damages?"

10             THE WITNESS:  The consequences that we had

11             that we lived through because of the Chinese

12             drywall, what we lost, the stress that we lived

13             through because we couldn't resolve the problem,

14             the suit for the drywall never came through to --

15             we lived through a very difficult time.

16      BY MR. BARRY:

17      Q.   And I understand and appreciate that.

18             Let's turn to Page 2 where it says --- this

19      is the third category.  I'm skipping over the second,

20      because we have spoken about it -- Loss of Equity and

21      Foreclosure Damages:  "Plaintiff seeks damages for

22      his loss of equity in the property in an amount to be

23      determined at trial."

24             MS. WERKEMA:  Is there a question?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1969 of 3246
Case 1:09-cv-02047-MGC Document 2388-21 Entered on FLSD Docket 05/19/2019 Page 76 of
95
Confidential - Subject to Further Confidentiality Review

1          MR. BARRY:  Yes.  I need to get to it.

2     BY MR. BARRY:

3          Q.   What is your basis for seeking loss of equity

4     damages?

5          A.   Can you say it again?

6          Q.   What is your basis for saying that you

7     suffered loss of equity damages because of Chinese

8     drywall?

9          A.   Everything was lost.  But we were scarred

10    because we lost our dream.  That house was our dream

11    for my daughters.  And it was hard and we did fight

12    until the end.  We were trying to keep the house

13    because that's what we wanted.  And the reason that

14    the bank took so long, this -- this long lapse of not

15    paying, because the bank was also trying to see how

16    the suit for the drywall would be resolved.  They

17    were waiting so that this could happen before, not

18    after, the house was lost.

19         Q.   And just so I understand, earlier we spoke

20    that you stopped making payments on the house in

21    January 2009 and that from the time period of 2007

22    until 2018 you never made a payment to principal.

23    Can you help me understand what equity was lost?

24              MR. VERRIER:  Object to the form.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1970 of 3246
Case 2:09-md-02047-EEF-JCW Document 20431-1 Filed on 08/08/19 Page 77 of 95
Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  It's all moral.  We lost our

 2       morale.

 3    BY MR. BARRY:

 4       Q.   So it's all morale damages; that's all you're

 5    asking for?

 6              MR. VERRIER:  Objection.

 7              THE WITNESS:  The morale is more important

 8       than the actual material.

 9    BY MR. BARRY:

10       Q.   Okay.  The next category down is Damage to

11    Credit:  "Plaintiff seeks damages for injury to his

12    credit in an amount to be determined at trial."

13              What is -- how would you characterize the

14    damage to your credit?

15       A.   The damage to my credit is I can't buy.

16       Q.   When did the damage to your credit start?

17       A.   When I stopped paying.

18       Q.   And that was in 2009 before you knew about

19    Chinese drywall, correct?

20       A.   Yes.

21       Q.   Have you provided us any evidence of the

22    damage to your credit?  Have you provided us with

23    credit reports, historical credit reports?

24              MR. VERRIER:  Object to the form.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1971 of 3246
Case 1:1-cv-22408-MGC Document 256-1 Entered on FLSD Docket 05/19/2011 Page 78 of
95
Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  Have I provided?  No.

 2   BY MR. BARRY:

 3      Q.    Okay.  Have you provided us with any loans

 4   that you have applied for that you were rejected for?

 5      A.    No.  I have the knowledge that I can't apply.

 6      Q.    But you have never been told that you would

 7   be rejected for it?

 8      A.    No.  I haven't looked.

 9      Q.    Have you -- and just to be clear, you

10   currently own the home you live in, correct?

11      A.    Yes.

12      Q.    And you own it without -- unencumbered;

13   there's no loan or mortgage on the property, correct?

14      A.    Yes.

15      Q.    And we'll take a break right after this set

16   of questions.

17              Where it says Other Economic Damages:

18   "Plaintiff seeks other economic damages of $5,500 in

19   attorneys' fees paid to JP Law Firm and Pila Law

20   Group, LLC for foreclosure defense."

21              Do you have any evidence of the records of

22   paying $5,500 to those two law firms?

23      A.    No.

24      Q.    Okay.  Other than everything here that we
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 1972 of 3246
Case 1:11-cv-22408-MGC Document 29-12 Entered on FLSD Docket 05/09/2012 Page 70 of 95
Confidential - Subject to Further Confidentiality Review

 1    have talked about, is there any other economic

 2    damages, things that you can put a dollar figure on,

 3    that you are requesting in this lawsuit?

 4         A.   No.

 5              MR. BARRY:  Okay.  We can take a break.

 6              (Recess from 11:09 until 11:25 a.m.)

 7    BY MR. BARRY:

 8         Q.   Mr. Miranda, I just have a few more questions

 9    for you.  I promise it's only going to take about

10    five minutes.  Famous last words, of course.

11              Mr. Miranda, are you and your wife the sole

12    owner of the claims against -- against the defendants

13    here?

14         A.   Yes.  We are the ones that are in the name of

15    the property.

16         Q.   Do you know of anyone else who is making

17    claims against the defendants in this lawsuit based

18    on the Chinese drywall installed in your property?

19         A.   No.

20         Q.   Now, my colleagues told me this just wasn't

21    clear on the record, so I'm just asking it again.

22    And I apologize.

23              During 2007 and 2008 when you were making

24    payments on your mortgage, those were interest-only

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1973 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 49 of 95
Confidential - Subject to Further Confidentiality Review

```
 1    payments, correct?

 2        A.   Yes.

 3        Q.   When you were seeking your modification, what

 4    was your salary?

 5             MR. VERRIER:  Objection.

 6    BY MR. BARRY:

 7        Q.   During the period of 2010 when you were

 8    seeking a modification, when you were able to obtain

 9    employment, what was your salary?  Sorry, 2009.  I

10    apologize.

11             Let me re-ask the question so it's clear on

12    the record.

13             During the period of 2009 when you were

14    seeking a modification, once you were able to obtain

15    employment, what was your salary?

16        A.   Was or is?

17        Q.   During 2009, what was your salary once you

18    were able to obtain employment in May 2009?

19        A.   64,000 a year.

20        Q.   And do you know what your wife's salary was

21    during that time period?

22        A.   She wasn't working.

23        Q.   Do you remember what your mortgage payment

24    was during that time period?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1974 of 3246
Case 1:1-cv-22408-MGC Document 28-21 Entered on FLSD Docket 05/09/2011 Page 41 of
95
Confidential - Subject to Further Confidentiality Review

```
 1       A.   2,280, something like that.  It's here.  It's

 2   here.

 3       Q.   I think it will be in -- if you look at

 4   Exhibit 2, it might be -- if you look at Exhibit 2.

 5            MS. WERKEMA:  It's right here, Exhibit 2.

 6   BY MR. BARRY:

 7       Q.   And if you look at Page 1, Section 3, number

 8   B -- or, letter B, was it $1,476.10 plus interest and

 9   other . . .

10       A.   That's not our mortgage.

11       Q.   Is this not your mortgage?  It has your name

12   on it.  Earlier you said this was your mortgage.  It

13   pertains to the address.  It's January 20th, 2007.

14       A.   My wife can help with this.

15       Q.   Okay.  Regardless, whether you said it was

16   between two thousand -- what was the amount you said

17   earlier, what you thought your mortgage payment was?

18   It was -- hang on.  I want to make a double --

19   $2,280.  Let's say it's $2,280, and you were making

20   $64,000 a year; why weren't you using your salary to

21   pay the mortgage during that time period?

22            MR. VERRIER:  Objection.

23            MR. BARRY:  State the basis for the

24       objection.
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 1975 of 3246
Case 1:11-cv-22408-MGC Document 28-21 Entered on FLSD Docket 05/09/2011 Page 82 of 95
Confidential - Subject to Further Confidentiality Review

```
 1              MR. VERRIER:  Yeah.  Asked and answered.  I

 2         think he talked about this awhile back.

 3    BY MR. BARRY:

 4         Q.   Earlier I did ask you whether you -- why you

 5    didn't pay on your mortgage.  But now I'm asking you

 6    why, when you were making $64,000 a year, you were

 7    unable to use that salary to pay for your mortgage?

 8              MR. VERRIER:  Objection.

 9              THE WITNESS:  We were in the process of

10         modification.  I understand that there was money

11         but not to pay 2280 of mortgage with three kids

12         in the house.

13    BY MR. BARRY:

14         Q.   Okay.  That helps me understand it.

15              When -- and just -- I apologize.  This is

16    just reminding me.  What -- what year did they reject

17    your modification?  Was it 2011?  2012?  I can't

18    remember.

19         A.   2011.

20         Q.   And you answered that earlier.

21              Do you have any evidence of Wells Fargo

22    rejecting your request for a modification in 2011?

23         A.   No.

24         Q.   And you stated earlier that Wells Fargo
```

```
 1    rejected the request for a modification because of

 2    Chinese drywall in the house?

 3         A.   Yes.  But physically, I don't have anything

 4    to prove it because we threw everything out.

 5         Q.   Okay.  So to answer the question, you don't

 6    have evidence of Wells Fargo stating that Chinese

 7    drywall was the basis for denying the modification?

 8              MR. VERRIER:  Objection.

 9              MR. BARRY:  What is the basis for the

10         objection?

11              MR. VERRIER:  The basis of the objection is

12         that you're answering the question.

13              MR. BARRY:  So -- you're right.

14    BY MR. BARRY:

15         Q.   So to ask the question:  You don't have

16    evidence of Wells Fargo stating that Chinese drywall

17    was the basis for denying your modification?

18         A.   Physically, I don't have.  But they sent me a

19    letter -- they did send me a letter to let me know

20    that they did not give me the modification because of

21    the problem that there was in the house.

22         Q.   But you no longer have possession of that

23    letter, correct?

24         A.   No.
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/20 Page 1977 of 3246
Case 1:09-cv-02049-MCA Document 23362-39 Entrance Filed Docket 05/18/2019 Page 84 of 95
Confidential - Subject to Further Confidentiality Review

```
 1        Q.   In 2012, after you'd been denied the

 2   modification, what was your salary?

 3        A.   The same as now.

 4        Q.   Was your wife working in 2012?

 5        A.   No.

 6        Q.   Okay.  In 2013, what was your salary?

 7        A.   The same.

 8        Q.   Was your wife working in 2013?

 9        A.   No.

10        Q.   Just to clean up and do that quickly, between

11   2013 and 2018, did your salary change?

12        A.   No.

13        Q.   So it's always -- between 2009 and 2018, your

14   salary has been 64,000?

15        A.   Yes.

16        Q.   During that same time period, between 2009

17   and 2018, did your wife ever work?  And except

18   spare -- you know, side jobs or spare jobs,

19   little . . .

20        A.   She worked in short periods of time.

21        Q.   What time period was she working?

22        A.   She worked two months in one place, another

23   two months in another place in another year.

24        Q.   How much was she making during those time
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1978 of 3246
Case 1:09-cv-02047-GCM Document 22363-39 Filed 11/19/19 Page 1978 of 3246
Confidential - Subject to Further Confidentiality Review
95

```
 1    periods?

 2         A.   Can she answer that?

 3         Q.   Of course she may.

 4              And between 2009 and 2018, when you moved

 5    into the rental unit that you now currently live in,

 6    was there always a tenant in that unit during that

 7    time period?

 8         A.   Yes.

 9              MR. BARRY:  I have no further questions,

10         depending on -- unless my co-defendants counsel

11         has a few questions.

12              MR. GUERRA:  I actually -- I actually have a

13         couple questions.

14                        CROSS-EXAMINATION

15    BY MR. GUERRA:

16         Q.   Were there any other sources of income from

17    2009 to 2018 that we haven't discussed today?

18         A.   No.

19         Q.   And can you remind me when your daughters

20    moved out?

21         A.   Yelika moved eight years ago; and Amy, one

22    year ago.

23         Q.   Okay.

24              MR. BARRY:  No questions from me --
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1979 of 3246
Case 1:09-cv-07402-JGK Document 291-21 Confidential Subject to Packet 05/18/2017 Page 46 of
95
Confidential - Subject to Further Confidentiality Review

```
 1              MS. WERKEMA:  Okay.  I just have --

 2              MR. BARRY:  -- depending on what you ask, of

 3        course.

 4              MR. VERRIER:  They are still chatting.

 5              MR. GUERRA:  No further questions.

 6              MR. BARRY:  And I, of course, reserve in case

 7        you ask anything.

 8              MS. WERKEMA:  Yeah.

 9                    CROSS-EXAMINATION

10    BY MS. WERKEMA:

11        Q.   Did you have some trouble understanding legal

12    documents that are written in English?

13        A.   Yes.

14        Q.   And when you received documents, for example,

15    from your attorneys, is there anyone in your family

16    that helps you go over the documents?

17        A.   Yes.

18        Q.   And who is that that typically would help you

19    go over a legal document?

20        A.   My daughter, Amy Miranda.

21        Q.   And I'm going to reference Exhibit 13 here.

22    Right here.

23             And when you received this document, did your

24    daughter, Amy, explain this document to you and go
```

Confidential - Subject to Further Confidentiality Review

```
1    over this document with you?

2         A.   Yes.  My daughter, Amy, received the

3    document.  She said, "Daddy, you can sign -- you can

4    sign that."  And she sends me the page that I have to

5    sign.  And she stays with the document.

6         Q.   And did she verbally go over the document

7    with you, what was contained in the document before

8    you signed that, before you signed the Exhibit 14?

9         A.   She explains to us what's in the document.

10   But it's -- but it's not the same to have something

11   explained to you on the phone as to see it

12   physically.  When they explain something on the

13   phone, it's obviously reduced.

14        Q.   I'm going to go back to when we were talking

15   about the inspection, the inspection of your home.

16   And you had -- you had previously stated that there

17   were -- the inspector took some cutouts of the wall.

18   Is that right?

19        A.   Yes.

20        Q.   And after the inspector had taken out those

21   samples, what did he do with them?

22        A.   He took pictures, took numbers of the

23   drywall, and then I -- I fixed -- I fixed it on my

24   own.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1981 of 3246
Case 1:09-md-02047-MCA Document 22363-39 Filed 11/19/19 Docket 05/19/2019 Page 43 of
95
Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Okay.  So what did you -- what did you do

 2    with the physical cutouts of the wall?  Like, how did

 3    you repair the wall?

 4        A.   I can do handyman stuff.

 5        Q.   Okay.  Did you take the cutouts of the wall

 6    and put them back into the same place that they were

 7    removed from in the wall?

 8        A.   Yes.

 9             MS. WERKEMA:  I have no further questions.

10             MR. BARRY:  No further questions from me,

11        unless . . .

12             MR. GUERRA:  I may have another question, but

13        I just need a minute.

14             MR. BARRY:  That's okay.

15                      RECROSS EXAMINATION

16    BY MR. GUERRA:

17        Q.   Mr. Miranda, did you ever ask to have these

18    documents translated to Spanish?

19        A.   No.

20        Q.   And you said you spoke to your daughter, Amy,

21    and she explained the document to you and told you

22    you could sign the verification.  When did that

23    happen?

24        A.   Last week.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1982 of 3246
Case 1:12-cv-02074-MC-1 Document 2024-21 Entered on FLSD Docket 05/08/2017 Page 96 of 95
Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Do you have a date?  Was it Monday?

 2      A.   It's on the document, on the signed document.

 3      Q.   So the date you signed it?

 4      A.   Yes.

 5      Q.   Okay.  So you discussed the document with

 6   your daughter on December 13th --

 7      A.   Yes.

 8      Q.   -- two weeks after your attorney uploaded it

 9   to the BrownGreer portal.  Is that correct?

10           MR. VERRIER:  Objection.

11           THE WITNESS:  Excuse me?

12           MR. GUERRA:  Sorry, what's that basis for

13      your objection?

14           MR. VERRIER:  I think it misstates his

15      testimony generally.  I think he testified as to

16      a general matter and was very clear that he

17      has -- it's a language barrier, that his daughter

18      explained the documents to him.  He's obviously

19      linking the signing of the document to the actual

20      review of the document --

21           MR. GUERRA:  I don't need to you testify.

22           MR. VERRIER:  I'm not testifying.  You asked

23      me to explain the basis of the objection.

24           MR. GUERRA:  So it mischaracterizes.  That's
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1983 of 3246
Case 1:19-cv-02645-VAC-JM Document 3-21 Confidential Subject to Further Confidentiality Review
Confidential – Subject to Further Confidentiality Review
95

```
1        fine.

2   BY MR. GUERRA:

3        Q.   Did you talk to your daughter about this

4   document before December 13th?

5        A.   Yes.

6        Q.   When?

7        A.   The same day that we signed the document.

8        Q.   So that was on December 13th, correct?

9        A.   It may have been a day before, because I took

10  a day to print it out and sign it and send it back.

11            MR. GUERRA:  No further questions.

12            MR. BARRY:  No further questions from me.

13            Thank you, Mr. Miranda.  I appreciate your

14       time here.

15            MS. WERKEMA:  No further questions from me.

16            MR. BARRY:  As we've been doing in all these,

17       we're reserving further questioning if any more

18       documents are produced.  But any of the documents

19       produced yesterday were not -- we've had an

20       opportunity to review them.

21            MS. WERKEMA:  Okay.  I appreciate that.

22            (Whereupon, the deposition concluded at

23       11:47 a.m.)

24
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1984 of 3246
Case 1:09-cv-02047-MCA Document 1 confidential 1 Subject to Further Confidentiality Review
Confidential - Subject to Further Confidentiality Review
95

```
 1                C E R T I F I C A T E

 2

 3          I, KELLY J. LAWTON, Registered Professional

 4     Reporter, Licensed Court Reporter, and Certified

 5     Court Reporter, do hereby certify that, pursuant to

 6     notice, the deposition of JOSE MIRANDA was duly taken

 7     on December 20, 2018, at 8:12 a.m. before me.

 8          The said JOSE MIRANDA was duly sworn by me

 9     through an interpreter according to law to tell the

10     truth, the whole truth and nothing but the truth and

11     thereupon did testify as set forth in the above

12     transcript of testimony.  The testimony was taken

13     down stenographically by me.  I do further certify

14     that the above deposition is full, complete, and a

15     true record of all the testimony given by the said

16     witness.

17

18          _____

19          KELLY J. LAWTON, RPR, LCR, CCR

20

21          (The foregoing certification of this

22     transcript does not apply to any reproduction of the

23     same by any means, unless under the direct control

24     and/or supervision of the certifying reporter.)
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1985 of 3246
Case 2:09-cv-02049-CAC Document 22521 Confidential Subject to Packet 05/08/2019 Page 92 of
95
Confidential - Subject to Further Confidentiality Review

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4          Please read your deposition over carefully

 5   and make any necessary corrections.  You should state

 6   the reason in the appropriate space on the errata

 7   sheet for any corrections that are made.

 8

 9          After doing so, please sign the errata sheet

10   and date it.  It will be attached to your deposition.

11

12          It is imperative that you return the original

13   errata sheet to the deposing attorney within thirty

14   (30) days of receipt of the deposition transcript by

15   you.  If you fail to do so, the deposition transcript

16   may be deemed to be accurate and may be used in

17   court.

18

19

20

21

22

23

24
```

```
 1                    - - - - - -

 2                   E R R A T A

 3                    - - - - - -

 4     PAGE    LINE    CHANGE

 5     _____   _____   _____

 6       REASON: _____

 7     _____   _____   _____

 8       REASON: _____

 9     _____   _____   _____

10       REASON: _____

11     _____   _____   _____

12       REASON: _____

13     _____   _____   _____

14       REASON: _____

15     _____   _____   _____

16       REASON: _____

17     _____   _____   _____

18       REASON: _____

19     _____   _____   _____

20       REASON: _____

21     _____   _____   _____

22       REASON: _____

23     _____   _____   _____

24       REASON: _____
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 1987 of 3246
Case 2:14-cv-02494-CJC Document 22321 Exhibit 39 Packet 05/09/2019 Page 94 of 95
Confidential - Subject to Further Confidentiality Review

```
 1                    ACKNOWLEDGMENT OF DEPONENT

 2

 3          I, JOSE MIRANDA, do hereby acknowledge that I

 4    have read the foregoing pages, 1 to 94, and that the

 5    same is a correct transcription of the answers given

 6    by me to the questions therein propounded, except for

 7    the corrections or changes in form or substance, if

 8    any, noted in the attached Errata Sheet.

 9

10

11    _____        _____

12    JOSE MIRANDA                                        DATE

13

14

15

16

17    Subscribed and sworn to before me this

18    _____ day of _____, 20___.

19    My Commission expires: _____

20

21    _____

      Notary Public

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/10 Page 1988 of 3246
Case 1:09-md-02047-EEF-MBN Document 23362-39 Filed 05/08/2019 Page 95 of 95
Confidential - Subject to Further Confidentiality Review

```
 1                          LAWYER'S NOTES

 2      PAGE    LINE

 3      _____   _____    _____

 4      _____   _____    _____

 5      _____   _____    _____

 6      _____   _____    _____

 7      _____   _____    _____

 8      _____   _____    _____

 9      _____   _____    _____

10      _____   _____    _____

11      _____   _____    _____

12      _____   _____    _____

13      _____   _____    _____

14      _____   _____    _____

15      _____   _____    _____

16      _____   _____    _____

17      _____   _____    _____

18      _____   _____    _____

19      _____   _____    _____

20      _____   _____    _____

21      _____   _____    _____

22      _____   _____    _____

23      _____   _____    _____

24      _____   _____    _____
```

# EXHIBIT A23

```
  1                UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
  2                 Case No. 1:11-CV-22408-MGC
  3      -------------------------------§
         EDUARDO AND CARMEN AMORIN et    §
  4      al., individually, and on behalf §
         of all others similarly         §
  5      situated,                        §
                                          §
  6          Plaintiffs,                  §
                                          §
  7      vs.                              §
                                          §
  8      TAISHAN GYPSUM CO., LTD. F/K/A   §
         SHANDONG THAIHE DONGXIN CO.,     §
  9      LTD.; TAIAN TAISHAN PLASTERBOARD §
         CO., LTD., et al,                §
 10                                       §
             Defendants.                  §
 11      ------------------------------- §
          - - -
 12
                                  - - -
 13
                        TUESDAY, JANUARY 8, 2019
 14
                                  - - -
 15
                   Confidential - Subject to Further
 16                    Confidentiality Review
 17                               - - -
 18
                   Deposition of MAI TUYEN, held at Morgan &
 19        Morgan, 12800 University Drive, Suite 600, Fort
           Myers, Florida, commencing at 8:07 a.m., on the
 20        above date, before Kelly J. Lawton, Registered
           Professional Reporter, Licensed Court Reporter,
 21        and Certified Court Reporter.
 22                               - - -
 23              GOLKOW LITIGATION SERVICES
             877.370.3377 ph | 917.591.5672 fax
 24                   deps@golkow.com
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 1991 of 3246
Case 1:18-cv-11360-IT Document 120-33 Filed 11/04/19 Page 1081 of 3246
Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2    MORGAN & MORGAN
      BY:  PANAGIOTIS "PETE" V. ALBANIS, ESQUIRE
 3    12800 University Drive, Suite 600
      Fort Myers, Florida 33907
 4    (239) 433-6880
      palbanis@forthepeople.com
 5    Representing Plaintiff
 6
      LEVIN, SEDRAN & BERMAN, LLP
 7    BY:  KEITH J. VERRIER, ESQUIRE (Via Telephone)
      510 Walnut Street, Suite 500
 8    Philadelphia, Pennsylvania 19106
      (215) 592-1500
 9    kverrier@lfsblaw.com
      Representing Plaintiff
10
11    ALSTON & BIRD, LLP
      BY:  ALIYYA Z. HAQUE, ESQUIRE
12    BY:  PATRICK H. HILL, ESQUIRE
      BY:  BOYKIN LUCAS, ESQUIRE
13    One Atlantic Center
      1201 West Peachtree Street
14    Atlanta, Georgia 30309
      (404) 881-7000
15    aliyya.haque@alston.com
      patrick.hill@alston.com
16    boykin.lucas@alston.com
      Representing Taishan Gypsum Co., Ltd. and Tai'an
17    Taishan Plasterboard, Co., Ltd.
18
      ORRICK, HERRINGTON & SUTCLIFFE, LLP
19    BY:  MARC ROBERT SHAPIRO, ESQUIRE
      51 West 52nd Street
20    New York, New York 10019
      (212) 506-3546
21    mrshapiro@orrick.com
      Representing BNBM PLC
22
      ALSO PRESENT:
23
      Tracy Nguyen
24    Mai Parker, Vietnamese Interpreter
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1992 of 3246
Case 1:14-cv-24048-NGG Document 200-1 Entered on FLSD Docket 05/08/2018 Page 9 of 54
Confidential - Subject to Further Confidentiality Review

```
 1                     - - -
                   I N D E X
 2                     - - -
 3   Testimony of:  MAI TUYEN
 4       DIRECT EXAMINATION BY MS. HAQUE................  5
 5
 6
 7               E X H I B I T S
 8            (Attached to Transcript)
 9   DEFENDANTS'                                       PAGE
10   Exhibit 1    Unlimited Power of Attorney           17
11   Exhibit 2    General Warranty Deed - Bates         19
                  Numbered MailDepo000263
12
     Exhibit 3    2018 Real Estate Informational        25
13                Notice of Ad Valorem Taxes and
                  Non-Ad Valorem Assessments for Lee
14                County, Florida - Bates Numbered
                  MailDepo000120 to MailDepo000145
15
     Exhibit 4    Estimate and Payments - Re:           31
16                Chinese Drywall Remediation -
                  MailDepo000304 to MailDepo000000332
17
     Exhibit 5    August 23, 2007 Central Aire          33
18                Conditioning Inc. Invoice - Bates
                  Numbered MailDepo000011
19
     Exhibit 6    Handwritten Rent Agreement - Bates    36
20                Numbered MailDepo000013
21   Exhibit 7    Two Handwritten Receipts for Rent -   37
                  Bates Numbered MailDepo000014
22
     Exhibit 8    Special Warranty Deed - Bates         38
23                Numbered MailDepo000333 to
                  MailDepo000335
24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 1993 of 3246
Case 2:14-cv-02728-NGG Document 269-21 Filed 05/08/2015 Page 4 of 54
Confidential - Subject to Further Confidentiality Review

```
 1                        E X H I B I T S
 2    DEFENDANTS'                                          PAGE
 3    Exhibit 9    Settlement Statement (HUD-1) -          38
                   Bates Numbered MailDepo000336 to
 4                 MailDepo000344
 5    Exhibit 10   Plaintiff Profile Form -               41
                   Residential Properties - Bates
 6                 Numbered NguyenT00001 to
                   NguyenT00039
 7
      Exhibit 11   Supplemental Plaintiff Profile Form    42
 8                 - Bates Numbered MailDepo000022 to
                   MailDepo000029
 9
      Exhibit 12   First Amended Supplemental             44
10                 Plaintiff Profile Form - Bates
                   Numbered MailDepo000030 to
11                 MailDepo000036
12    Exhibit 13   Quitclaim Deed                         47
13
14
15
16
17
18
19
20
21
22
23
24
```

Case 2:09-md-02047-EEF-MBN   Document 22363-29   Filed 11/19/19   Page 1994 of 3246
Case 1:03-md-02047-MGH   Document 3921-2   Filed 1 FESI Date 05/14/2019   Page 46 of
54
Confidential - Subject to Further Confidentiality Review

```
 1                      - - -

 2              THE COURT REPORTER:  Do you solemnly swear or

 3         affirm that you will make a true interpretation

 4         of the questions asked and the answers given and

 5         that you will make a true translation into

 6         English of any writing which you are required by

 7         your duties to decipher or translate?

 8              THE INTERPRETER:  Yes, I do.

 9              THE COURT REPORTER:  Would you have her raise

10         her right hand.

11              Do you swear or affirm the testimony you're

12         about to give will be the truth, the whole truth,

13         and nothing but the truth?

14              THE WITNESS:  Yes.

15              MAI TUYEN, called as a witness by the

16    Defendants, having been first duly sworn, testified

17    as follows:

18                      DIRECT EXAMINATION

19    BY MS. HAQUE:

20         Q.   Please state your name for the record.

21         A.   Mai Thanh Tuyen.

22         Q.   My name is Aliyya Haque, and I'm one of the

23    attorneys representing Taishan Gypsum, one of the

24    defendants in this lawsuit.  I'm going to be asking
```

1    you some questions today related to the claims in

2    this lawsuit.

3            Have you ever been deposed before?

4        A.   I don't know.

5        Q.   Have you ever been asked questions by an

6    attorney in a setting like this?

7        A.   Yes.

8        Q.   When was that?

9        A.   I don't remember.

10       Q.   Okay.  I'm going to go ahead and explain some

11   ground rules for the deposition in order to make this

12   go smoothly.

13           As you know, you have been sworn under oath

14   by the court reporter.  Do you understand that you

15   must tell the truth as if you were testifying in

16   court, and the judge was sitting here?

17       A.   Yes.

18       Q.   Now, because there's a court reporter who is

19   taking down all of your responses, please make sure

20   that you respond with a verbal response and not a

21   head shake or a nod so that the court reporter can

22   take down your response.

23       A.   Yes.

24       Q.   And if you don't understand my question,

```
 1    please let me know.  Otherwise, I'll presume if you

 2    start answering, that you understood the question.

 3         A.   Yes.

 4         Q.   We will try and take a break every hour or

 5    so, but if you need to take a break, please let me

 6    know.  I only ask that if I have a question to you

 7    pending that you please respond before taking the

 8    break.

 9         A.   Yes.

10         Q.   Are you taking any medications that will

11    impair your ability to understand my question and to

12    answer?

13         A.   No.

14         Q.   Did you meet with your attorney to prepare

15    for this deposition?

16         A.   No.

17         Q.   So you have never met with Mr. Albanis to

18    talk about issues in this lawsuit?

19         A.   I did meet him, you know, regarding about the

20    document, but didn't say anything about this.

21         Q.   How many times did you meet total?

22         A.   Two times.

23         Q.   Do you remember when these times were?

24         A.   Tuesday and Monday.
```

Case 2:09-md-02047-EEF-MBN Document 22363-20 Filed 11/19/19 Page 1997 of 3246
Case 1:18-cv-00493-NGG-VMS Document 212-2 Filed 05/08/2019 Page 49 of 54
Confidential - Subject to further confidentiality Review

```
 1        Q.    How long was each meeting?

 2        A.    One hour.

 3        Q.    Who was present at the meetings?

 4        A.    Me.

 5        Q.    Was anyone besides you and your attorney

 6   present at the meetings?

 7        A.    My daughter.

 8        Q.    And your daughter's name is Tracy Nguyen?

 9        A.    Yes.

10        Q.    Did you speak with anyone other than your

11   lawyer or Tracy Nguyen to prepare for this

12   deposition?

13        A.    No.

14        Q.    Did you review any documents to prepare for

15   this deposition?

16        A.    No.

17        Q.    Did you bring any documents today to the

18   deposition other than this power of attorney that we

19   received today?

20        A.    No.

21        Q.    Did you do anything else to prepare for this

22   deposition?

23        A.    No.

24        Q.    Now, do you prefer to be called Ms. Tuyen or
```

Confidential - Subject to Further Confidentiality Review

1    Ms. Mai?

2         A.    Whatever you want to call me.

3         Q.    Whatever you are most comfortable with.

4         A.    Most people call me, easy for them, call me

5    Mai.

6         Q.    I will call you Ms. Mai then for this

7    deposition, if that is okay with you?

8         A.    Okay.  Yes.

9         Q.    So, Ms. Mai, last month we deposed your

10   daughter, Tracy Nguyen, and asked her some questions

11   regarding the lawsuit in this case.  We now have some

12   additional questions to ask you related to the same

13   lawsuit.

14        A.    Okay.

15        Q.    But first I want to ask some questions about

16   you.  What is your educational background?

17        A.    I only study, you know, learn how to read and

18   write.  That's all.

19        Q.    Was this high school?

20        A.    No.

21        Q.    Where do you currently live?

22        A.    I live at Pagoda Temple and also at home.

23        Q.    What is the address -- where is the Pagoda

24   Temple located?

Confidential - Subject to Further Confidentiality Review

```
 1        A.    I do not know the address, but it located in

 2   Vietnam.

 3        Q.    And when you say "home," do you mean -- do

 4   you have an address?

 5        A.    Yes.

 6        Q.    What is the address?

 7        A.    925 Southwest Santa Barbara Place.

 8        Q.    For this deposition, I'm going to refer to

 9   your home as the Santa Barbara home.  Is that okay?

10        A.    I -- you know, sometime I live at my house;

11   sometime I'm not living there.  Then what?

12        Q.    How long have you lived at the Santa Barbara

13   house?

14              MR. ALBANIS:  Object to the form.

15              But you may answer, if you can, Ms. Nguyen.

16              THE WITNESS:  I don't remember, you know,

17        when I bought that and I lived there.  But I

18        always travel, you know, so, therefore, I don't

19        remember.

20   BY MS. HAQUE:

21        Q.    Do you -- do you own the house on Santa

22   Barbara Boulevard?  I'm sorry, I meant Santa Barbara

23   Place.

24        A.    Yes.
```

Confidential - Subject to Further Confidentiality Review
54

```
 1        Q.   Do you recall if you bought the house before

 2   the year 2000?

 3        A.   Don't remember.

 4        Q.   Are you a resident of Florida?

 5        A.   Yes.

 6             MR. ALBANIS:  Object to form.

 7             But you may answer, if you know the answer,

 8   Ms. Mai.

 9             THE WITNESS:  Yes.  I'm a resident.

10   BY MS. HAQUE:

11        Q.   How long have you lived in Florida?

12        A.   Don't remember.

13        Q.   Do you -- did you first move to Florida

14   before the year 2000?

15        A.   That, I really don't remember.

16        Q.   Do you -- are you a citizen of the United

17   States?

18        A.   Yes.  Long time ago.

19        Q.   Do you remember when you received your

20   citizenship?

21        A.   1975.

22        Q.   So have you lived in the United States, you

23   think, before 1975?

24        A.   April 1975.
```

Confidential - Subject to Further Confidentiality Review

```
1        Q.    And have you always lived in Florida when

2    you've been in the U.S.?

3        A.    I live in Florida and -- what is the name --

4    Seattle.

5        Q.    Do you remember how long you've lived in

6    Florida?

7        A.    Don't remember.

8        Q.    Now, you said you also spend time at the

9    Pagoda Temple.  When did you first start to be a

10   resident of the Pagoda Temple?

11       A.    Four years ago.

12       Q.    And where in Vietnam is the Pagoda Temple

13   located?

14       A.    What -- well, you know, all of a sudden I

15   cannot remember, but near Saigon.

16       Q.    And how long do you usually stay at the

17   Pagoda Temple when you visit?

18       A.    Six months.

19       Q.    And the other six months, do you live in the

20   United States?

21       A.    Yes.

22       Q.    And in the United States, you live in

23   Florida?

24       A.    Florida.  Sometimes in California.
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2002 of 3246
Case 1:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 42 of 54
Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Ms. Mai, where are you -- are you currently

 2    employed?

 3        A.    No.

 4        Q.    Have you ever been employed?

 5        A.    Yes.  I work.

 6        Q.    And can you describe that work for us?

 7        A.    Work Alaska.

 8        Q.    What do you do in Alaska?

 9        A.    Fishing.

10        Q.    How long did you do that work in Alaska,

11    fishing work?

12        A.    Ten years.

13        Q.    Do you remember the years, what specific

14    years you worked there?

15        A.    I don't remember the years.

16        Q.    Okay.  What did you do after you finished the

17    fishing work in Alaska?

18        A.    Because, you know, I have accident, and then

19    I no longer work.  I stayed home.

20        Q.    And did you also own some nail salons?

21        A.    Yes.

22        Q.    When did you first start the nail business?

23        A.    That, I don't remember.

24        Q.    Do you remember how many nail salons you
```

Confidential – Subject to Further Confidentiality Review

```
 1    owned?

 2         A.   One only.

 3         Q.   Do you remember the name of the nail salon?

 4         A.   Happy Nails.

 5         Q.   And was Happy Nails located in the

 6    Fort Myers, Florida area?

 7         A.   Yes.

 8         Q.   Do you still own Happy Nails?

 9         A.   No.

10         Q.   When did you sell Happy Nails?

11         A.   Don't remember.

12         Q.   Do you remember who you sold it to?

13         A.   No.

14         Q.   Do you currently own any businesses today?

15         A.   No.

16         Q.   Do you recall whether you sold Happy Nails

17    more than ten years ago?

18         A.   Don't remember.

19         Q.   Do you work at the Pagoda Temple in Vietnam?

20         A.   No.  I learn, you know, Buddhist ways.

21         Q.   Do you consider yourself to be a monk or

22    someone who lives at the temple?

23         A.   Okay.  Monk.

24         Q.   Okay.  Ms. Mai, are you married?
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2004 of 3246
Case 1:11-cv-22408-CM Document 23263-39 Filed 05/19/19 Page 46 of 54
Confidential – Subject to Further confidentiality Review

```
 1        A.    No.

 2        Q.    Have you ever been married?

 3        A.    Yes.

 4        Q.    What is -- what was -- what is the name of

 5   your husband?

 6        A.    He passed away.

 7        Q.    How long were you married?

 8        A.    14 years.

 9        Q.    Ms. Mai, do you have any children?

10        A.    Two.

11        Q.    What are their names?

12        A.    Tracy Nguyen and Fon Nguyen, F-o-n

13   N-g-u-y-e-n.

14        Q.    And where does Fon Nguyen live?

15        A.    He live with his uncle.

16        Q.    And where does his uncle live?

17        A.    Boston.

18        Q.    Have you ever been involved in a lawsuit

19   before this one?

20        A.    Yes.  My leg.

21        Q.    What happened with your leg?

22        A.    When I work, I had accident.

23        Q.    And where were you when this accident

24   happened?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2005 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 47 of 54
Confidential - Subject to Further Confidentiality Review

```
 1        A.    At work in Alaska.

 2        Q.    And so you filed a lawsuit against your

 3   employer?

 4        A.    Okay.  It's a very serious accident.  They

 5   have to cut up and put something in there.

 6        Q.    Other than your accident, have you been

 7   involved in any other lawsuits?

 8        A.    No.

 9        Q.    I want to now ask you about the Chinese

10   drywall lawsuit that we're here for today.

11        A.    Yes.

12        Q.    Are you personally pursuing any claims in

13   this lawsuit on your own behalf?

14        A.    No.  My daughter.

15        Q.    Is it your intention to assign your claims in

16   this lawsuit to Tracy Nguyen?

17             MR. ALBANIS:  Object to the form.

18             But you may answer, if you know the answer,

19        Ms. Mai.

20             THE WITNESS:  Okay.  I give her the power of

21        attorney, and she have the right, you know, to do

22        with the lawsuit and besides me.

23   BY MS. HAQUE:

24        Q.    Have you assigned your claims to anyone else?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2006 of 3246
Case 1:1-cv-22408-MGC Document 1 Entered on FLSD Docket 05/18/2011 Page 48 of
54
Confidential – Subject to further confidentiality Review

```
 1      A.    No.

 2      Q.    So have you formally assigned your claims to

 3   Tracy Nguyen?

 4           MR. ALBANIS:  Object to the form.

 5           But you may answer, if you know, Ms. Mai.

 6           THE WITNESS:  I already give her a power of

 7      attorney, so she the one have the right to do,

 8      not me.

 9   BY MS. HAQUE:

10      Q.    Ms. Mai, I'm going to show you what has been

11   marked as Exhibit 1.

12           (Defendants' Exhibit 1 was marked for

13   identification.)

14   BY MS. HAQUE:

15      Q.    Please take a moment to review that document.

16      A.    Can you read this?

17      Q.    The top of this document says Unlimited Power

18   of Attorney.

19      A.    Yes.

20      Q.    And it says "I, Tuyen Thanh Mai."

21      A.    Yes.

22      Q.    And it has your address, as principal, do

23   appoint Tracy Mai Nguyen as my -- and it has her

24   address -- as my attorney-in-fact to act in my name,
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2007 of 3246
Case 2:09-cv-02048-MCE Document 231-1 Confidential Subject to Docket 6617196277 Page 46 of
54
Confidential - Subject to Further Confidentiality Review

1    place, and stead in any way which I myself could do,

2    if I were personally present, with respect to all the

3    following matters to the extent that I am permitted

4    by law to act through an agent.

5        A.    Yes.

6        Q.    Is this your signature on this document?

7        A.    Yes.

8        Q.    And have you reviewed this document before?

9        A.    I read, but some of them I didn't understand.

10       Q.    But do you understand that you're giving

11   power of attorney to your daughter, Tracy Nguyen?

12       A.    Yes.

13       Q.    And that is your intention for this lawsuit?

14       A.    Yes.

15       Q.    Okay.  You can go ahead and put that document

16   aside.

17             Ms. Mai, other than the Santa Barbara home,

18   do you own any other property in the state of

19   Florida?

20       A.    The house that, you know, my daughter live

21   in.

22       Q.    What is that address?

23       A.    I don't remember.  I'm seldom read anything.

24       Q.    Do you own -- other than your home at Santa

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2008 of 3246
Case 1:11-cv-22408-MGC Document 205-21 Entered on FLSD Docket 05/18/2011 Page 40 of 54
Confidential - Subject to Further Confidentiality Review

```
 1     Barbara and your daughter's home, do you own any

 2     other property in Florida?

 3         A.    No.

 4         Q.    I want to ask you questions about the

 5     property at 103 Southeast 16th Place, Cape Coral,

 6     Florida 33990.

 7         A.    That house that my daughter live in.

 8         Q.    And you -- and you own that home as well,

 9     correct?

10         A.    On the mortgage and the deed.

11         Q.    When did you buy that property?

12         A.    Don't remember.

13         Q.    For the purposes of this deposition, I will

14     refer to it as the 16th Place house.

15             THE INTERPRETER:  The interpreter repeat, the

16             address is 16th Place.

17     BY MS. HAQUE:

18         Q.    So the full address is 103 Southeast

19     16th Place, but for the purposes of this deposition,

20     I'll shorten it to 16th Place house.

21         A.    I don't remember what house is that.

22         Q.    I'm going to show you what has been marked as

23     Exhibit 2.

24             (Defendants' Exhibit 2 was marked for
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2009 of 3246
Case 1:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 46 of
Confidential - Subject to Further Confidentiality Review
54

```
 1     identification.)

 2     BY MS. HAQUE:

 3          Q.   This is the general warranty deed for the

 4     16th Place house.  Have you seen this document

 5     before?

 6          A.   I don't remember.

 7          Q.   This document --

 8          A.   Too many, so I don't remember.

 9          Q.   This document says that it was made on

10     June 4th, 2004.  Does that refresh your memory that

11     you bought the house in 16th Place around 2004?

12               MR. ALBANIS:  I'm going to object to the

13          form.

14               But you may answer, if you can, Ms. Mai.

15               THE WITNESS:  I don't remember.

16     BY MS. HAQUE:

17          Q.   Why did you decide to buy the house at

18     16th Place with your daughter?

19               MR. ALBANIS:  I'm going to object to the form

20          again.

21               But you may answer, if you can.

22               I'll just state further they purchased the

23          property in 2004, but the house was constructed

24          thereafter.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2010 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2010 of 3246
Confidential - Subject to Further Confidentiality Review
54

```
1          MS. HAQUE:  Fair enough.

2          THE WITNESS:  Because I wanted to have my

3      daughter have the house so she can live in.

4  BY MS. HAQUE:

5      Q.   Do you remember how much you paid for the

6  land?

7      A.   No.

8      Q.   Do you remember how much you paid for the

9  building of the house?

10     A.   The mortgage, over 200-something.  I don't

11 remember.

12     Q.   Have you ever lived at the 16th Place house?

13     A.   No.

14     Q.   Do you know if anyone other than Tracy Nguyen

15 and her family lived in that house?

16     A.   No.

17     Q.   Have you ever charged rent for anyone to live

18 at the 16th Place house?

19     A.   No.

20     Q.   When did you first hear about Chinese drywall

21 potentially being a problem in Ms. Nguyen's house?

22     A.   Okay.  When my daughter lived in there, the

23 air-conditioning at the house always broken down.  So

24 she called, the technician come over and fix the
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2011 of 3246
Case 1:11-cv-22408-MGC Document 298-31 Entered on FLSD Docket 05/09/2011 Page 48 of
54
Confidential – Subject to Further Confidentiality Review

 1    air-condition there and -- at that time.

 2        Q.   Did you help pay for the repairs to the

 3    air-conditioning?

 4        A.   No.

 5        Q.   Did you ever -- did you ever smell any odors

 6    or anything when you visited the house?

 7        A.   Yes.

 8        Q.   Can you describe what the smell was like?

 9        A.   Okay.  The smell, the odor, it horrible,

10    terrible, you know, was very bad.

11        Q.   Did you smell it more strongly in certain

12    areas of the house than others?

13        A.   No.

14        Q.   Was it -- where did you smell the odors in

15    the house?  What rooms?

16        A.   I do not remember exactly what room.  But

17    when you entered the door, you smell it, the odor

18    already.

19        Q.   Did you personally see the building of the

20    home back in 2006?

21             MR. ALBANIS:  Object to the form.

22             But you may answer, if you know, Ms. Mai.

23             THE WITNESS:  No.

24    ///

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2012 of 3246
Case 1:09-cv-02047-EEF Document 22363-39 Filed 11/19/19 Page 2012 of 3246
Confidential - Subject to Further Confidentiality Review
54

    1    BY MS. HAQUE:

    2        Q.    So you never saw any of the drywall being

    3    installed?

    4        A.    No.

    5        Q.    When you took out the mortgage to build the

    6    home, did you speak with the builder at any point

    7    yourself?

    8        A.    No.

    9        Q.    Do you remember the total cost of the drywall

   10    installation?

   11        A.    No.

   12        Q.    Other than the odor and the problems with the

   13    air-conditioning unit, did you notice any other

   14    problems with the house at 16th Place?

   15        A.    I don't know.  But my daughter know.

   16        Q.    Had you heard about problems with Chinese

   17    drywall before you heard about problems with your

   18    daughter's house?

   19        A.    No.

   20        Q.    Did you ever see anything on the news or on

   21    TV related to Chinese drywall?

   22        A.    No.

   23        Q.    So who first told you about problems with

   24    Chinese drywall?  Was it your daughter?

Case 2:09-md-02047-EEF-MBN   Document 22362-39   Filed 11/19/19   Page 2013 of 3246
Case 1:09-md-02047-MCW Document 2361-39   Confidential Supplement 8/28/2013   Page 26 of 54
Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    And what did you say or do at that time?

 3              MR. ALBANIS:  Object to the form.

 4              But you may answer, if you know, Ms. Mai.

 5              THE WITNESS:  I don't say nothing.

 6   BY MS. HAQUE:

 7        Q.    Ms. Mai, do you know if the 16th Place home

 8   was ever inspected?

 9        A.    My daughter would know that.  I . . .

10        Q.    Okay.  Ms. Mai, now I want to ask you some

11   questions related to the mortgage on the property.

12              Are you currently paying a mortgage on the

13   16th Place property?

14        A.    Yes.

15        Q.    How much per month are you paying?

16        A.    Around 1,100 or 1,200, around that number.

17        Q.    And are you paying the mortgage yourself, or

18   is your daughter paying a portion of the mortgage?

19        A.    My daughter pay a portion.

20        Q.    Approximately how much do you pay and how

21   much does your daughter pay of the -- between 1000

22   and $1,200?

23        A.    My daughter pay about 1,100, and the rest

24   that I pay.  But I don't remember exactly.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2014 of 3246
Case 1:09-md-02047-EEF-MBN Document 23363-39 Confidential - Subject to Further Confidentiality Review Page 45 of
54
Confidential - Subject to Further Confidentiality Review

```
1        Q.   How much left do you have on the mortgage to

2   pay off?

3        A.   Ten more years.

4        Q.   How long was the original mortgage for?  Was

5   it 15 years?  Was it 30 years?

6        A.   The beginning, it 30 years.  After that,

7   refinancing.

8        Q.   And how long after the refinancing?  Did it

9   become 15 years?

10       A.   Yes.

11       Q.   I'm going to show you what's been marked as

12  Exhibit 3.

13            (Defendants' Exhibit 3 was marked for

14  identification.)

15  BY MS. HAQUE:

16       Q.   Can you take a moment to review this

17  document.

18       A.   I need the glasses, because without the

19  glasses, I could not see.  It's a blur.

20       Q.   That's okay.  Do you have your glasses with

21  you?

22       A.   I forgot.

23       Q.   That's okay.

24            If you look, is that your name right here at
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2015 of 3246
Case 1:09-cv-07402-MCA-LDW Document 122-39 Filed 03/18/2019 Page 47 of 54
Confidential - Subject to Further Confidentiality Review

```
 1    the very top of the document, Tuyen, Mai?

 2         A.   Nguyen, Tracy.

 3         Q.   And then the next line?

 4         A.   Tuyen, Mai.

 5         Q.   And then if you turn to the second page, the

 6    back of the first page, this is your name, right,

 7    Mai Tuyen?

 8         A.   Yes.

 9         Q.   And it looks like these are the mortgage

10    statements.

11         A.   Yes.

12         Q.   And this document is dated November 1st,

13    2018, and it looks like the monthly mortgage payment

14    is $2,183.54.

15              Does that sound right to you?

16         A.   I -- I don't know.  My daughter, my daughter.

17         Q.   And it shows about $179,000 is left on the

18    mortgage.

19              Does that sound about right to you?

20         A.   I don't know.  The bank would know this.

21         Q.   Okay.  You can go ahead and put that document

22    aside.

23              Have you always helped your daughter pay her

24    mortgage payments?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2016 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2016 of 3246
Confidential - Subject to Further Confidentiality Review
54

```
1         A.    Yes.

2         Q.    About what percentage do you pay?  Have you

3    always paid about 50 percent of the mortgage?

4         A.    I don't know.  I don't remember.

5         Q.    Did you ever pay any monthly mortgage fully

6    on your own without your daughter paying?

7         A.    No.

8         Q.    Did you always pay the mortgage with one

9    check?

10        A.    My daughter know, okay, because I give her

11   the power of attorney.  She took care.

12        Q.    Before you gave her the power of attorney,

13   did you write checks yourself?

14        A.    No.

15        Q.    Did Tracy Nguyen ever pay you a portion of

16   what she owed for the mortgage in cash?

17        A.    Yes.

18        Q.    Can you describe that for us?

19        A.    When she had the money, she pay.  When she

20   didn't have the money and she didn't pay.

21        Q.    And then you would pay when she wasn't able

22   to pay?

23        A.    Yes.

24        Q.    Did you ever give Ms. Tracy Nguyen a loan?
```

Confidential - Subject to Further Confidentiality Review

```
 1              MR. ALBANIS:  Object to the form.

 2              But you may answer, if you can, Ms. Mai.

 3              THE WITNESS:  Yes.

 4     BY MS. HAQUE:

 5         Q.   Do you recall how much the loan was?

 6         A.   90.

 7         Q.   Do you remember how much Ms. Tracy Nguyen has

 8     paid you back of that 90,000?

 9         A.   Pay around 20.

10         Q.   So she's paid you back about 20,000 of the

11     90,000?

12         A.   Yes.

13         Q.   So she owes you about 70,000 still?

14         A.   Yes.

15         Q.   Why did you give Ms. Tracy Nguyen a loan for

16     90,000?

17         A.   Bought another house, because the house she

18     was living was damaged.

19         Q.   We'll talk about that a little later.

20              But I want to ask you:  How much does

21     Ms. Tracy Nguyen pay you back each month of that

22     loan?

23         A.   I don't know.  I don't remember.

24         Q.   Did you ever fill out a contract with
```

Confidential - Subject to Further Confidentiality Review

```
 1    Ms. Tracy Nguyen for the $90,000?

 2         A.   No.

 3         Q.   It was a verbal agreement?

 4         A.   Yes.

 5         Q.   Do you plan or have you charged interest for

 6    the loan for Ms. Tracy Nguyen?

 7              MR. ALBANIS:  Object to the form.

 8              But you may answer, if you know, Ms. Mai.

 9              THE WITNESS:  No, no interest.  No charge

10         interest.

11    BY MS. HAQUE:

12         Q.   Do you know if the home at 16th Place has

13    ever been appraised?

14         A.   No.

15              MS. HAQUE:  I think this is a good time to

16         take a break for the morning.

17              (Recess from 8:58 until 9:13 a.m.)

18    BY MS. HAQUE:

19         Q.   Ms. Mai, do you know if your daughter's house

20    at 16th Place was ever remediated for Chinese drywall

21    issues?

22              MR. ALBANIS:  And I'm going to go ahead and

23         assert my rolling objection regarding any and all

24         questions about remediation and remediation
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2019 of 3246
Case 1:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 41 of
Confidential - Subject to Further Confidentiality Review
54

```
1          damages as they relate to Chinese drywall.  It is

2          the plaintiff's position that Ms. Nguyen and

3          Ms. Mai and all other priority claimants have

4          been named as priority claimants with respect to

5          nonremediation damages pursuant to Judge Cooke's

6          November 16, 2018, order.

7               Having said all that, of course, we will

8          allow the questioning to proceed.

9               MS. HAQUE:  Go ahead.

10              And in response -- objection is noted -- and

11         defendants will say that we believe these

12         questions pertain to the overall issues of

13         damages in this case.

14    BY MS. HAQUE:

15         Q.   Ms. Mai, do you need me to repeat the

16    question?

17         A.   Yes.

18         Q.   Ms. Mai, do you know if your daughter's house

19    at 16th Place was ever remediated due to issues with

20    Chinese drywall?

21         A.   I don't know.  My daughter know.

22         Q.   When I use the word "remediate," I'm

23    referring to the process of removing and replacing

24    the drywall in the house.
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.   My daughter know.

 2        Q.   Were you involved at all in the decision to

 3   remediate the 16th Street property?

 4        A.   No.

 5        Q.   Did you help pay for any of the remediation

 6   costs?

 7        A.   No.

 8        Q.   I'm going to show you what has been premarked

 9   as Exhibit 4.

10             (Defendants' Exhibit 4 was marked for

11   identification.)

12   BY MS. HAQUE:

13        Q.   Can you take a moment to review this

14   document.

15        A.   I don't have the glasses.  No way I can read.

16        Q.   These are payments that relate to payments

17   for the remediation.  I want to bring your attention

18   to Page 311 at the bottom.

19             Yes.

20             This page shows checks, and these are checks

21   from an account at SunTrust bank.

22             Do you have an account at SunTrust bank?

23        A.   I don't remember.

24        Q.   So this bottom check says Tuyen Thanh Mai,
```

Confidential - Subject to Further Confidentiality Review

```
 1    d/b/a Happy Nails.

 2         A.    Yes.

 3         Q.    And it shows checks from this Happy Nails

 4    account paying for some of these remediation.

 5         A.    Yeah.  I gave my daughter permission to write

 6    the check, to pay whatever in there.  I give her

 7    permission.

 8         Q.    Do you remember how much of the remediation

 9    costs were paid through Happy Nails?

10         A.    I don't know.

11         Q.    Did you also use this Happy Nails account to

12    pay for other personal expenses?

13         A.    I do not know.  My Tracy know.  I give her

14    permit to do.

15         Q.    Did you give Ms. Tracy Nguyen, your daughter,

16    permission to use the Happy Nails account to pay for

17    other expenses?

18         A.    Yes.

19         Q.    Do you remember what types of expenses?

20         A.    No.

21         Q.    Did you ever see the remediation contract

22    that Ms. Tracy Nguyen signed?

23         A.    No.

24         Q.    Did you ever see the 16th Place home after it
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2022 of 3246
Case 1:1-cv-22408-MGC Document 23-1 Entered on FLSD Docket 05/18/2011 Page 41 of
54
Confidential – Subject to Further Confidentiality Review

```
1    was remediated and fixed?

2        A.   No.

3        Q.   So you have not visited the house recently at

4    16th Place?

5        A.   No.

6        Q.   Do you know if there's still an odor or any

7    problems with the house at 16th Place?

8        A.   I don't know.

9        Q.   You can go ahead and put that document aside.

10       A.   What document?

11       Q.   Yes.  That one in front of you.

12       A.   Where you want me to put?

13       Q.   Oh, you can keep it there.  That's fine.

14            Now, I'm going to go on to a different topic.

15            During her deposition, Ms. Tracy Nguyen

16   claimed damages related to the air-conditioning unit.

17            Do you recall Ms. Tracy Nguyen having

18   problems with the A/C unit at her 16th Place house?

19       A.   I don't know.

20       Q.   I'm going to show you what has been marked

21   Exhibit 5.

22            (Defendants' Exhibit 5 was marked for

23   identification.)

24   ///
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2023 of 3246
Case 1:1-cv-22408-MGC Document 1-1 Entered on FLSD Docket 05/19/2011 Page 45 of 54

Confidential - Subject to Further Confidentiality Review

```
 1    BY MS. HAQUE:

 2         Q.    Have you ever seen this document before?

 3         A.    No.

 4         Q.    This is an air-conditioning invoice -- repair

 5    invoice.  Now, the address is 103 Southeast

 6    16th Place, Cape Coral, Florida, but the name on the

 7    invoice says Mr. Mai.

 8              Do you know if that was a mistake?  Was that

 9    supposed to be your name?

10         A.    Yes.

11         Q.    Do you remember paying for repairs related to

12    this invoice?

13         A.    My daughter pay.  I don't pay.

14         Q.    Do you know if she used your account to pay

15    for this invoice?

16         A.    I give her permission to pay whatever, you

17    know, related.  I give her the power to do that.

18         Q.    Now, when Ms. Tracy Nguyen talked to you and

19    said that they were going to fix her house and

20    remediate it, did she ever speak to you about finding

21    a new place to live?

22         A.    Yes.

23         Q.    What did she say?

24         A.    Okay.  She say that the house was damaged.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2024 of 3246
Case 1:09-md-02047-MCA Document 22361-31 Entered on FLSD Docket 09/26/14 Page 36 of
54
Confidential - Subject to Further Confidentiality Review

1    Her husband that -- have an issue right here, you

2    know.

3              THE INTERPRETER:  And the interpreter did not

4         understand.  May I clarify?

5              MS. HAQUE:  Yes.

6              THE WITNESS:  He have hoarse, the voice, it's

7         scratchy.

8    BY MS. HAQUE:

9         Q.   And what did you say?

10        A.   Then I told them, you know, her that -- to

11   move in, to live with me.

12        Q.   So you told her to leave her house and to

13   move in with you?

14        A.   I did not say that, you know, to leave there.

15   But I say that if you live in this house that have a

16   problem and then get sick and you need to find a

17   place to live, then, you know, move in to live with

18   me.

19        Q.   And that's the home at 925 Southwest Santa

20   Barbara Place in Cape Coral?

21        A.   Yes.

22        Q.   Did you charge Ms. Tracy Nguyen and her

23   husband rent to live there?

24        A.   Yes.

Confidential - Subject to Further Confidentiality Review

1       Q.    How much did you charge per month?

2       A.    Whatever that she want to give it to me, she

3    give it to me.

4       Q.    Let me show you what has been marked as

5    Exhibit 6.

6             (Defendants' Exhibit 6 was marked for

7    identification.)

8    BY MS. HAQUE:

9       Q.    This is the rental agreement between you and

10   Ms. Tracy.  Is that right?

11      A.    I don't remember.

12      Q.    Is this your signature at the bottom of the

13   page?

14      A.    Yes.

15      Q.    And it says:  Living in my house from

16   May 18th, 2010, to now, $900 a month.

17      A.    Yes.

18      Q.    When did Tracy Nguyen and her family move

19   into your home at 925 Southwest Santa Barbara?

20      A.    Don't remember.

21      Q.    Do you think it's May 18th, 2010?  Does that

22   sound right to you?

23      A.    Don't remember.

24      Q.    Do you remember when she moved out?

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2026 of 3246
Case 1:1-cv-22408-MGC Document 299-31 Entered on FLSD Docket 05/19/2015 Page 38 of
54
Confidential - Subject to Further Confidentiality Review

```
 1        A.    No.

 2        Q.    Okay.  I'm going to show you now what has

 3    been marked as Exhibit 7.

 4              (Defendants' Exhibit 7 was marked for

 5    identification.)

 6    BY MS. HAQUE:

 7        Q.    Have you seen this document before?

 8        A.    No.

 9        Q.    Are these receipts from Ms. Tracy Nguyen to

10    you showing rent payments?

11        A.    I don't remember.

12        Q.    Do you remember if Ms. Tracy Nguyen gave you

13    payments every month, or was it only when she was

14    able to pay you?

15        A.    Yeah.  She pay, and then she put the money in

16    my account, bank account.  I don't remember.

17        Q.    Do you remember if she paid in cash, or did

18    she give you a check?

19        A.    Don't remember.

20        Q.    And do you know if it was every month or only

21    when she was able to pay?

22        A.    I don't remember.  I do not pay attention.

23        Q.    I'm going to show you now what has been

24    marked as Exhibit 8.
```

Confidential - Subject to further confidentiality Review

```
1              (Defendants' Exhibit 8 was marked for

2      identification.)

3      BY MS. HAQUE:

4          Q.   Have you seen this document before?

5          A.   Don't remember.

6          Q.   This is the deed at 2100 Southwest Santa

7      Barbara Place.

8               Do you recall what that address is?

9          A.   Don't remember.

10         Q.   Do you remember if Tracy Nguyen bought a home

11     at that address in 2011?

12         A.   Don't remember.

13         Q.   Do you recall giving Ms. Tracy Nguyen a

14     $90,000 loan so she could buy a property?

15         A.   Yes.

16         Q.   And it looks like that $90,000 bought this

17     home at 2100 Southwest Santa Barbara.

18              Does that sound right to you?

19         A.   Yes.

20         Q.   I'm going to show you what has been marked

21     Exhibit 9.

22              (Defendants' Exhibit 9 was marked for

23     identification.)

24              THE WITNESS:  Okay.  I cannot -- my eye is
```

Confidential - Subject to Further Confidentiality Review

```
 1        very blur.

 2   BY MS. HAQUE:

 3        Q.   So this is the settlement statement for the

 4   2100 Southwest Santa Barbara Place home, and the name

 5   of the borrower is Tracy Mai Nguyen.

 6             That is your daughter, right?

 7        A.   Yes.

 8        Q.   And at the bottom, it looks like she paid in

 9   cash $89,319.33.

10        A.   Yes.

11        Q.   And this was the loan you gave her?

12        A.   Yes.

13        Q.   And she owes you today about $70,000 left on

14   the loan?

15        A.   Yes.

16        Q.   Have you told her she needs to pay you back

17   by a certain time?

18        A.   No.

19        Q.   Does Tracy Nguyen still own the house at

20   2100 Southwest Santa Barbara Place?

21        A.   I don't know.

22        Q.   Do you know who owns it today?

23        A.   I don't know.

24        Q.   Did you give it to somebody as a gift?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2029 of 3246
Case 1:11-cv-22408-MGC Document 126-21 Entered on FLSD Docket 05/19/2015 Page 41 of
54
Confidential - Subject to Further Confidentiality Review

```
 1        A.   It not my house.  I cannot give.  I don't

 2   know.

 3        Q.   So Ms. Tracy Nguyen said that her

 4   uncle-in-law lives in the house.

 5        A.   I don't know.  Ask her.  I don't know.

 6        Q.   So you never gave the house to her

 7   uncle-in-law or anyone else?

 8        A.   No.

 9        Q.   Did you ever, yourself, live in the house at

10   2100 Southwest Santa Barbara Place?

11        A.   No.

12        Q.   Do you know if anyone other than Tracy Nguyen

13   or her family or her boyfriend or her two sons lived

14   in the home at 2100 Southwest Santa Barbara Place?

15        A.   No.

16        Q.   And so today, you don't know if anyone owns

17   the house at 2100 Southwest Santa Barbara Place?

18             MR. ALBANIS:  Object to the form.

19             But you may answer, if you know, Ms. Mai.

20             THE WITNESS:  No.

21   BY MS. HAQUE:

22        Q.   Okay.  Ms. Mai, have you received any checks

23   from any Chinese Drywall Settlement Program?

24        A.   Me, no.  My daughter.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2030 of 3246
Case 1:09-cv-07628-JGK Document 268-31 Filed 05/26/11 Page 42 of 54
Confidential - Subject to Further Confidentiality Review

```
 1         Q.   Have you personally made any requests for

 2    yourself for any set-off money from these programs?

 3              MR. ALBANIS:  Object to the form.

 4              But you may answer, Ms. Mai, if you know.

 5              THE WITNESS:  No.

 6              MS. HAQUE:  Let's go ahead and take our last

 7         break of the morning.  And I just have a couple

 8         more questions, so we're going to regroup and see

 9         if we have anything left to ask you.

10              (Recess from 9:41 until 9:52 a.m.)

11    BY MS. HAQUE:

12         Q.   Ms. Mai, do you know who Dinis Le is, L-e?

13         A.   No.

14         Q.   Okay.

15         A.   No.

16         Q.   Okay.  I'm going to show you what has been

17    marked Exhibit 10.

18              (Defendants' Exhibit 10 was marked for

19    identification.)

20    BY MS. HAQUE:

21         Q.   Ms. Mai, have you ever filled out what's

22    called a Plaintiff Profile Form?

23              MR. ALBANIS:  Object to the form.

24              But you may answer, if you know, Ms. Mai.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2031 of 3246
Case 1:11-cv-02962-MCA-LDW Document 24-22 Filed 05/09/2011 Page 43 of 54
Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  I don't remember.

 2   BY MS. HAQUE:

 3       Q.    Have you ever seen this document before?

 4       A.    Don't remember.

 5       Q.    If you turn to Page 4.  At the very bottom of

 6   Page 4, is that your signature?

 7       A.    Yes.

 8       Q.    And you filled this out on May 18th, 2010?

 9       A.    Don't remember.

10       Q.    Do you know whether you -- do you understand

11   that this signature is a verification that the

12   information in this form is true?

13              MR. ALBANIS:  Object to the form.

14              But you may answer, if you know, Ms. Mai.

15              THE WITNESS:  I don't know.  I don't

16       remember.

17   BY MS. HAQUE:

18       Q.    Okay.  I'm going to show you now what's been

19   marked as Exhibit 11.

20              (Defendants' Exhibit 11 was marked for

21       identification.)

22   BY MS. HAQUE:

23       Q.    This is a Supplemental Plaintiff Profile

24   Form.
```

Confidential – Subject to Further Confidentiality Review

```
 1              Can you turn to the back page.  This is your

 2      signature, correct?

 3      A.    Yes.

 4      Q.    And you signed this on February 13th, 2018?

 5      A.    '18?  I don't remember.

 6      Q.    Do you remember --

 7      A.    Many.

 8      Q.    Do you remember giving information to your

 9      attorney to fill out this document?

10      A.    My daughter know.  Ask her.

11      Q.    Do you know, what damages are you claiming in

12      this lawsuit?  Do you know?

13      A.    I don't know.  Ask my daughter.  She live in

14      that house.  She know.

15      Q.    Do you know -- are you claiming any

16      remediation damages yourself?

17      A.    No.

18              MR. ALBANIS:  Object to the form.

19              But you may answer, if you know.

20              Also I refer back to my rolling objection

21          regarding remediation damages.

22      BY MS. HAQUE:

23      Q.    In Section 5 of this document on Page 4, it

24      has a question:  Has the property been partially or
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2033 of 3246
Case 1:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2033 of 3246

Confidential - Subject to Further Confidentiality Review
54

```
 1    completely remediated?

 2           And it states "completely remediated."

 3    A.   I don't know.  My daughter -- ask my

 4    daughter.  I don't know.

 5    Q.   Are you claiming any damages related to

 6    alternate living expenses?

 7    A.   Me, no.  My daughter.

 8    Q.   And are you claiming any damages as a result

 9    of loss of use and enjoyment of the 16th Place home?

10    A.   I don't.  But my daughter, my daughter.

11    Q.   And I'm going to show you what's been marked

12    as Exhibit 12.

13           (Defendants' Exhibit 12 was marked for

14    identification.)

15    BY MS. HAQUE:

16    Q.   This is the First Amended Supplemental

17    Plaintiff Profile Form.  On the very last page it has

18    your name on it.

19           Do you see that?

20    A.   Where?

21    Q.   The very last page, Page 7.

22           And this document is dated November 19th,

23    2012.

24           Now, if you turn to Page 4 under Section 5,
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2034 of 3246
Case 1:09-md-02047-MCA-SCM Document 23363-39 Filed 11/19/19 Page 46 of 54
Confidential - Subject to Further Confidentiality Review

1    the question is:  Has the property been partially or

2    completely remediated?

3             And it says "partially remediated."

4             Do you know why this answer was changed from

5    "completely" to "partially remediated"?

6    A.   No.  I don't know.

7    Q.   You did not tell anybody to make that change?

8    A.   No.

9             MS. HAQUE:  Okay.  Let's go off the record

10        for just a couple minutes to see if there's

11        anything remaining.

12             (Discussion off the record.)

13             MS. HAQUE:  Ms. Mai, those are all the

14        questions I have for you today.  Thank you for

15        being here with us.

16             And I pass the witness to your attorney,

17        Mr. Albanis.

18             MR. ALBANIS:  I have no questions.  We will

19        reserve signature.

20             MS. HAQUE:  Pete, just one thing to ask and

21        put on the record is that there's some -- there's

22        still an outstanding question related to

23        ownership of the 2100 Southwest Santa Barbara

24        Place home.  Do you have any -- have you produced

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2035 of 3246
Case 1:09-cv-02047-MGC Document 123 Entered on FLSD Docket 05/18/2017 Page 47 of
54
Confidential - Subject to Further Confidentiality Review

```
1        all documents related to that property?  Just

2        want to put a request on the record for that to

3        the extent there is anything remaining left to

4        produce.

5            MR. ALBANIS:  And in response to that, I

6        believe the answer is yes, we have produced

7        everything.  However, if we could go off the

8        record for a couple minutes so I could confer

9        with my clients?

10           MS. HAQUE:  Sure.

11           MR. ALBANIS:  And then I could come back on

12       and advise you.

13           MS. HAQUE:  Sure.

14           (Recess from 10:03 until 10:10 a.m.)

15           MR. ALBANIS:  I had an opportunity to speak

16       with both Ms. Nguyen and Ms. Mai, and the only

17       document that they have regarding the transfer to

18       Mr. Le of the 2100 property is the quitclaim

19       deed, which is dated the 21st of June, 2016,

20       which we print off copies of, if you would like

21       copies of that today.

22           MS. HAQUE:  Sure.

23           MR. ALBANIS:  I asked my paralegal to check

24       if we have produced this document before.  She's
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2036 of 3246
Case 2:09-cv-02047-EEF-MBN Document 23262-39 Filed 11/19/19 Page 2036 of 3246
Confidential – Subject to Further Confidentiality Review
54

```
 1        in the process of checking that.  If we haven't,

 2        of course, we will upload it to the BrownGreer

 3        portal.

 4             Should we make this an exhibit to the

 5        deposition?

 6             MS. HAQUE:  Sure.  Let's go ahead and do

 7        that.

 8             So the quitclaim deed from Tracy Nguyen to

 9        Denis Le is going to be Exhibit 13.

10             (Defendants' Exhibit 13 was marked for

11    identification.)

12    BY MS. HAQUE:

13        Q.   And, Ms. Mai, you don't know who Dinis Le is,

14    correct?

15        A.   Okay.  This is her uncle, but I do not know

16    the name.

17        Q.   And you were not a part of this transaction,

18    correct?

19        A.   Yes.

20        Q.   You were not part of it, or you were part of

21    the transaction?

22        A.   I don't know nothing about the house.  I

23    don't know.

24             MS. HAQUE:  Okay.  Those are all the
```

Confidential - Subject to Further Confidentiality Review

```
1        questions I have for you, Ms. Mai.  Thank you.

2            MR. ALBANIS:  I do want to state for the

3        record to the extent that we're missing any

4        verification pages on either the Supplemental

5        Plaintiff Profile Form or the Answers to

6        Interrogatories, we are happy to provide

7        Ms. Nguyen's signatures to the extent that those

8        are missing.

9            MS. HAQUE:  Sure.

10            MR. ALBANIS:  I, by no means, want that to

11        complicate the discovery process.  So we will

12        look to see if any of those are missing, and if

13        they are, our intention is to upload them over

14        the next day or so.

15            MS. HAQUE:  Okay.

16            MR. ALBANIS:  But the answers themselves

17        substantively will not change.

18            MS. HAQUE:  Okay.

19            MR. ALBANIS:  Just so we're on the same page

20        about that.

21            MS. HAQUE:  We will take your assurances on

22        that.

23            (Whereupon, the deposition concluded at

24    10:13 a.m.)
```

Confidential - Subject to Further Confidentiality Review

```
 1                      C E R T I F I C A T E

 2

 3           I, KELLY J. LAWTON, Registered Professional

 4      Reporter, Licensed Court Reporter, and Certified

 5      Court Reporter, do hereby certify that, pursuant to

 6      notice, the deposition of MAI TUYEN was duly taken on

 7      January 8, 2019, at 8:07 a.m. before me.

 8           The said MAI TUYEN was duly sworn by me

 9      through an interpreter according to law to tell the

10      truth, the whole truth and nothing but the truth and

11      thereupon did testify as set forth in the above

12      transcript of testimony.  The testimony was taken

13      down stenographically by me.  I do further certify

14      that the above deposition is full, complete, and a

15      true record of all the testimony given by the said

16      witness.

17

18      _____

19           KELLY J. LAWTON, RPR, LCR, CCR

20

21           (The foregoing certification of this

22      transcript does not apply to any reproduction of the

23      same by any means, unless under the direct control

24      and/or supervision of the certifying reporter.)
```

Confidential - Subject to Further Confidentiality Review

```
 1                   INSTRUCTIONS TO WITNESS

 2

 3

 4          Please read your deposition over carefully

 5     and make any necessary corrections.  You should state

 6     the reason in the appropriate space on the errata

 7     sheet for any corrections that are made.

 8

 9          After doing so, please sign the errata sheet

10     and date it.  It will be attached to your deposition.

11

12          It is imperative that you return the original

13     errata sheet to the deposing attorney within thirty

14     (30) days of receipt of the deposition transcript by

15     you.  If you fail to do so, the deposition transcript

16     may be deemed to be accurate and may be used in

17     court.

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                    - - - - - -

 2                   E R R A T A

 3                    - - - - - -

 4    PAGE   LINE   CHANGE

 5    _____  _____  _____

 6      REASON: _____

 7    _____  _____  _____

 8      REASON: _____

 9    _____  _____  _____

10      REASON: _____

11    _____  _____  _____

12      REASON: _____

13    _____  _____  _____

14      REASON: _____

15    _____  _____  _____

16      REASON: _____

17    _____  _____  _____

18      REASON: _____

19    _____  _____  _____

20      REASON: _____

21    _____  _____  _____

22      REASON: _____

23    _____  _____  _____

24      REASON: _____
```

Confidential - Subject to Further Confidentiality Review

```
 1                    ACKNOWLEDGMENT OF DEPONENT

 2

 3          I, MAI TUYEN, do hereby acknowledge that I

 4     have read the foregoing pages, 1 to 53, and that the

 5     same is a correct transcription of the answers given

 6     by me to the questions therein propounded, except for

 7     the corrections or changes in form or substance, if

 8     any, noted in the attached Errata Sheet.

 9

10

11     _____        _____

12     MAI TUYEN                                            DATE

13

14

15

16

17     Subscribed and sworn to before me this

18     _____ day of _____, 20___.

19     My Commission expires: _____

20

21     _____

       Notary Public

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2042 of 3246
Case 1:09-cv-02047-MGC Document 2521-31 Entered on FLSD Docket 05/08/2019 Page 51 of
54
Confidential - Subject to Further Confidentiality Review

```
 1                        LAWYER'S NOTES

 2     PAGE    LINE

 3     _____   _____    _____

 4     _____   _____    _____

 5     _____   _____    _____

 6     _____   _____    _____

 7     _____   _____    _____

 8     _____   _____    _____

 9     _____   _____    _____

10     _____   _____    _____

11     _____   _____    _____

12     _____   _____    _____

13     _____   _____    _____

14     _____   _____    _____

15     _____   _____    _____

16     _____   _____    _____

17     _____   _____    _____

18     _____   _____    _____

19     _____   _____    _____

20     _____   _____    _____

21     _____   _____    _____

22     _____   _____    _____

23     _____   _____    _____

24     _____   _____    _____
```

# EXHIBIT A24

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2044 of 3246
Case 1:11-cv-22408-MGC Document 289-1 Entered on FLSD Docket 05/08/2014 Page 2 of 151
Confidential - Subject to Further Confidentiality Review

```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                   Case No. 1:11-CV-22408-MGC
 3       -------------------------------§
         EDUARDO AND CARMEN AMORIN et      §
 4       al., individually, and on behalf §
         of all others similarly          §
 5       situated,                        §
                                          §
 6          Plaintiffs,                   §
                                          §
 7       vs.                              §
                                          §
 8       TAISHAN GYPSUM CO., LTD. F/K/A    §
         SHANDONG THAIHE DONGXIN CO.,      §
 9       LTD.; TAIAN TAISHAN PLASTERBOARD §
         CO., LTD., et al,                §
10                                        §
            Defendants.                   §
11       ------------------------------- §
12                  CONFIDENTIAL - SUBJECT TO FURTHER
                        CONFIDENTIALITY REVIEW
13                            - - -
14                  THURSDAY, DECEMBER 6, 2018
15                            - - -
16
17           Deposition of TRACY NGUYEN, held at Morgan &
         Morgan, 12800 University Drive, Suite 600, Fort
18       Myers, Florida, commencing at 8:06 a.m., on the
         above date, before Kelly J. Lawton, Registered
19       Professional Reporter, Licensed Court Reporter,
         and Certified Court Reporter.
20
                              - - -
21
                  GOLKOW LITIGATION SERVICES
22           877.370.3377 ph | 917.591.5672 fax
                     deps@golkow.com
23
24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2045 of 3246
Case 1:15-cv-02406-NGG Document 2921-2 Filed under seal 05/09/2045 Page 9 of
151
Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:

 2    MORGAN & MORGAN
      BY:  PANAGIOTIS "PETE" V. ALBANIS, ESQUIRE
 3    12800 University Drive, Suite 600
      Fort Myers, Florida 33907
 4    (239) 433-6880
      palbanis@forthepeople.com
 5    Representing Plaintiff

 6

      LEVIN, SEDRAN & BERMAN, LLP
 7    BY:  KEITH J. VERRIER, ESQUIRE
      510 Walnut Street, Suite 500
 8    Philadelphia, Pennsylvania 19106
      (215) 592-1500
 9    kverrier@lfsblaw.com
      Representing Plaintiff

10

11    ALSTON & BIRD, LLP
      BY:  ALIYYA Z. HAQUE, ESQUIRE
12    BY:  PATRICK H. HILL, ESQUIRE
      BY:  BOYKIN LUCAS, ESQUIRE
13    One Atlantic Center
      1201 West Peachtree Street
14    Atlanta, Georgia 30309
      (404) 881-7000
15    aliyya.haque@alston.com
      patrick.hill@alston.com
16    boykin.lucas@alston.com
      Representing Taishan Gypsum Co., Ltd. and Tai'an
17    Taishan Plasterboard, Co., Ltd.

18

      ORRICK, HERRINGTON & SUTCLIFFE, LLP
19    BY:  MARC R. SHAPIRO, ESQUIRE
      51 West 52nd Street
20    New York, New York 10019
      (212) 506-3546
21    mrshapiro@orrick.com
      Representing BNBM PLC

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2046 of 3246
Case 1:15-cv-02097-NGG Document 28-21 Filed Under Seal Dated 05/08/2019 Page 4 of
151
Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:

 2        ORRICK, HERRINGTON & SUTCLIFFE, LLP

          BY:  DAN GUERRA, ESQUIRE

 3        The Orrick Building

          405 Howard Street

 4        San Francisco, California 94105

          (415) 773-5545

 5        dguerra@orrick.com

          Representing BNBM PLC

 6

 7    ALSO PRESENT:

 8          Mai Parker, Vietnamese Interpreter

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2047 of 3246
Case 1:16-cv-02499-NGG Document 99-21 Hereunder PRESO Docket 05/04/2018 Page 9 of 151

Confidential - Subject to Further Confidentiality Review

```
 1                      - - -

                      I N D E X

 2                      - - -

 3  Testimony of:  TRACY NGUYEN

 4      DIRECT EXAMINATION BY MS. HAQUE...............  6

 5      CROSS-EXAMINATION BY MR. SHAPIRO.............. 103

 6      DIRECT EXAMINATION (Continued) BY MS. HAQUE.... 107

 7      RECROSS-EXAMINATION BY MR. SHAPIRO............ 129

 8      CROSS-EXAMINATION BY MR. ALBANIS.............. 135

 9      FURTHER RECROSS-EXAMINATION BY MR. SHAPIRO..... 139

10      RECROSS-EXAMINATION BY MR. ALBANIS............ 144

11

12                  E X H I B I T S

13              (Attached to Transcript)

14  DEFENDANTS'                                      PAGE

15      Exhibit 1    General Warranty Deed - Bates      15
                     Numbered NguyenT00039

16

        Exhibit 2    Legend Custom Builders, Inc. Change 16
17                   Order

18      Exhibit 3    Mortgage                           24

19      Exhibit 4    2018 Real Estate Informational     28
                     Notice of Ad Valorem Taxes and

20                   Non-Ad Valorem Assessments for Lee
                     County, Florida

21

        Exhibit 5    Handwritten Rent Agreement         32

22

        Exhibit 6    Rent Receipts                      34

23

        Exhibit 7    Settlement Statement (HUD-1)       42

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S

 2   DEFENDANTS'                                       PAGE

 3   Exhibit 8    Central Aire Conditioning Inc.        53
                  Invoice
 4
     Exhibit 9    The Tayler Model Floor Plan           56
 5
     Exhibit 10   Allied Home Inspections Report        68
 6
     Exhibit 11   Estimate - J & A Stucco Drywall       79
 7                Inc.
 8   Exhibit 12   Exhibit B - Environmental             92
                  Certificate
 9
     Exhibit 13   Drywall Installation Certification    93
10
     Exhibit 14   Contractor Certification              94
11
     Exhibit 15   Plaintiff Profile Form -            118
12                Residential Properties - Bates
                  Numbered NguyenT00001 to
13                NguyenT00039
14   Exhibit 16   Supplemental Plaintiff Profile Form  120
15   Exhibit 17   Check Copies - Chinese Drywall       127
                  Settlement Program
16
     Exhibit 18   Check Copies - Chinese Drywall       127
17                Settlement Program
18
19   PLAINTIFF'S                                      PAGE
20   Exhibit 1    Second Amended Supplemental         136
                  Plaintiff Profile Form
21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2049 of 3246
Case 1:18-cv-02408-WFK Document 60-41 Filed 06/25/21 Page 2049 of 3246
confidential - Subject to further confidentiality Review
151

```
1                        -  -  -

2              THE COURT REPORTER:   Do you solemnly swear

3        or affirm that you will make a true

4        interpretation of the questions asked and the

5        answers given and that you will make a true

6        translation into English of any writing which you

7        are required by your duties to decipher or

8        translate?

9              THE INTERPRETER:  Yes, I do.

10             THE COURT REPORTER:  Would you have her raise

11       her right hand.

12             Do you swear or affirm the testimony you're

13       about to give will be the truth, the whole truth,

14       and nothing but the truth?

15             THE WITNESS: I do.

16             TRACY NGUYEN, called as a witness by the

17       Defendants, having been first duly sworn, testified

18       as follows:

19                       DIRECT EXAMINATION

20       BY MS. HAQUE:

21        Q.   Please state your name for the record.

22        A.   Tracy Nguyen.

23        Q.   My name is Aliyya Haque, and I'm one of the

24       attorneys representing Taishan Gypsum, one of the
```

```
 1    defendants in the lawsuit.

 2              THE INTERPRETER:  Your name was?

 3              MS. HAQUE:  Aliyya Haque.

 4    BY MS. HAQUE:

 5         Q.   I'm going to be asking you questions today

 6    related to your claims in this lawsuit.

 7              (Discussion off the record.)

 8    BY MS. HAQUE:

 9         Q.   Ms. Nguyen, am I pronouncing your name

10    correctly?

11         A.   Yes.

12         Q.   Have you ever been deposed before?

13         A.   No.  Not yet.

14         Q.   Okay.  I'm going to go ahead and explain some

15    ground rules to help make the deposition go more

16    smoothly.

17              As you know, you have been sworn under oath.

18    Do you understand that you must tell the truth as if

19    testifying in court and the judge were sitting here?

20         A.   Yes.

21         Q.   And please speak slowly when you are

22    responding to questions, because the interpreter as

23    well as the court reporter need to take down all that

24    information.
```

Case 2:09-md-02047-EEF-MBN  Document 22363-39  Filed 11/19/19  Page 2051 of 3246
Case 1:11-cv-22408-MGC  Document 209-4  Entered on FLSD Docket 05/08/2014  Page 49 of
151
Confidential - Subject to Further Confidentiality Review

1      A.   Yes.

2      Q.   And please also make sure that you respond to

3   questions with a verbal response and that you don't

4   nod or shake your head, because the court reporter

5   needs to take down a verbal response.

6      A.   Yes.

7      Q.   Okay.  And if you don't understand my

8   questions, please let me know.  Otherwise, I will

9   assume that if you respond, that you are

10   understanding my question.

11      A.   Yes.

12      Q.   And we'll try to take a break every hour,

13   hour 15 or so.  But if you need to stop and take a

14   break at any point, please let me know.

15      A.   Yes.

16      Q.   I only ask that if I have a question pending,

17   that you go ahead and respond to the question before

18   taking the break.

19      A.   Yes.

20      Q.   Okay.  Are you taking any medications that

21   would impair your ability to understand my questions

22   and to answer truthfully?

23      A.   No.

24      Q.   Did you meet with your attorneys to prepare

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2052 of 3246
Case 1:09-cv-02047-MGC Document 23262-39 Entered on FLSD Docket 01/08/2019 Page 40 of
151
Confidential - Subject to further confidentiality Review

1    for this deposition?

2         A.    Yes.

3         Q.    When did you meet?

4         A.    Last week.

5         Q.    And for how long did you meet?

6         A.    We talked about regarding -- about

7    documents --

8         Q.    Just for how long did you meet?

9         A.    I don't remember.

10        Q.    Do you remember who was present at the

11   meeting?

12        A.    My lawyer and a secretary.

13             MS. HAQUE:  And just for the record, the

14        deponent is pointing to Attorney Pete Albanis.

15   BY MS. HAQUE:

16        Q.    Did you speak with anyone other than your

17   attorney regarding your deposition today?

18        A.    No, I did not talk to anybody.

19        Q.    Did you review any documents to prepare for

20   this deposition?

21        A.    Yes.

22        Q.    What documents did you review?

23        A.    A lot.

24        Q.    Do you remember the types of documents that

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2053 of 3246
Case 1:09-cv-04049-MGC Document 268-1 Entered on FLSD Docket 01/26/2012 Page 41 of 151
Confidential – Subject to further confidentiality Review

1    you reviewed?

2        A.    Contract to build a house, fix the house, a

3    bill payment -- bill payment and picture fix the

4    house, the paper that inspection -- come inspected

5    the house a lot.

6        Q.    To your knowledge, have all these documents

7    been given to your attorney to produce to us?

8        A.    Yes.

9        Q.    Did you bring any additional documents to us

10   today?

11       A.    No.

12       Q.    Did you do anything else to prepare for this

13   deposition?

14       A.    No.

15       Q.    Ms. Nguyen, where are you employed?

16       A.    Rose Nails.

17       Q.    How long have you worked there?

18       A.    Three years.

19       Q.    What is your job title and duties at Rose

20   Nails?

21       A.    Do nails, something related to nails.

22       Q.    And what is your work schedule?

23       A.    9:30 to 6:30, depend.

24       Q.    I'm sorry.

Case 2:09-md-02047-EEF-MBN Document 23263-39 Filed 11/19/19 Page 2054 of 3246
Case 1:09-cv-02048-MGC Document 23263-39 Entered on FLSD Docket 05/09/2019 Page 42 of 151
Confidential - Subject to Further Confidentiality Review

```
 1              And is that every day?

 2     A.    Monday through Friday.

 3     Q.    Ms. Nguyen, are you married?

 4     A.    Single.

 5     Q.    Do you have any children?

 6     A.    Two.

 7     Q.    How old are they?

 8     A.    Twenty-one and eight.

 9     Q.    Do they live with you?

10     A.    Yes.

11     Q.    Okay.  We'll come back to that.

12              Ms. Nguyen, have you ever been involved in a

13     lawsuit before this one?

14     A.    No.

15     Q.    Have you ever -- and that means you have

16     never participated in a class-action lawsuit,

17     correct?

18     A.    No.

19     Q.    Okay.  Let's talk about the property at issue

20     in this lawsuit now.

21              What is the address of the property that you

22     allege has been damaged by Chinese drywall?

23     A.    103 Southeast 16th Place, Cape Coral, Florida

24     33990.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2055 of 3246
Case 1:09-cv-08010-GAO Document 250431 Entand in H Docket 05/09/2019 Page 13 of
151

Confidential - Subject to Further Confidentiality Review

1          Yes.

2     Q.   Do you currently own that property?

3     A.   Yes.

4     Q.   When did you buy the property?

5     A.   I bought that house -- I build that house in

6     2006.

7     Q.   And when did you buy the property to build

8     the house?

9     A.   The property I bought to build the house in

10    2004.

11    Q.   Do you remember from whom you bought the

12    property?

13    A.   Something realtor investment.  Investment

14    realtor.

15    Q.   Are there any other property owners for the

16    home?

17         THE INTERPRETER:  The interpreter:  Would you

18    please repeat.

19 BY MS. HAQUE:

20    Q.   Are there any other owners of the property in

21    addition to Ms. Nguyen?

22    A.   I have my mom -- June.

23    Q.   And is this individual named Tuyen Mai?

24    A.   Yes.

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2056 of 3246
Case 2:09-md-02047-GAO Document Confidential Subject to Pocket 05/09/2019 Page 4 of
151
Confidential - Subject to Further Confidentiality Review

1      Q.   And just to confirm, Tuyen Mai is your

2   mother?

3      A.   Yes.

4      Q.   What were the circumstances that led you to

5   buy the house together and build the house together?

6      A.   My mom and I, we just bought the house.  But,

7   yeah.  My mom does not live in this house.  She just

8   bought.

9      Q.   Did your mom ever live in the house from 2004

10   anytime until the present?

11      A.   No.

12      Q.   Where does Tuyen Mai, your mom, live now?

13      A.   Okay.  My mom live at 925 Southwest Santa

14   Barbara.  My mom -- but my mom visit Vietnam.  She

15   back and forth.

16      Q.   So right now is your mom in the U.S. or

17   Vietnam?

18      A.   She is in Vietnam visit.

19      Q.   And how long does she stay in the U.S. when

20   she comes back to the U.S.?

21      A.   I don't know.

22      Q.   But just to confirm, she does not stay with

23   you at your house at 103?

24           THE WITNESS:  What do you mean?

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2057 of 3246
Case 1:19-cv-02094-RC Document 25-7 Confidential Subject to Docket 05/18/2017 Page 45 of 151
Confidential - Subject to Further Confidentiality Review

 1          MS. HAQUE:  Could you read the question back?

 2          (The question was read by the reporter.)

 3          THE WITNESS:  Yes.

 4    BY MS. HAGUE:

 5      Q.    Okay.  Does Tuyen Mai speak English?

 6      A.    Yes.

 7      Q.    And does she own any businesses in South

 8    Florida?

 9      A.    No.

10      Q.    Are you familiar with the company called

11    Happy Nails in Fort Myers?

12      A.    Yes.  My mom used to be the owner of that but

13    now no longer.

14      Q.    Do you know who the owner is of Happy Nails

15    now?

16      A.    When my mom sold the business, I knew, but

17    now I forgot.

18      Q.    Okay.  I spoke with your counsel earlier, but

19    I just want to confirm with you that Tuyen Mai is no

20    longer making a claim in this lawsuit.

21      A.    Yes.

22      Q.    And when did your mom sell Happy Nails?

23      A.    Three years -- over three years.

24      Q.    So sometime before 2015?

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 2058 of 3246
Case 1:19-cv-02483-JGK Document 71-10 Filed 01/18/2023 Page 46 of 151
Confidential - Subject to Further Confidentiality Review

```
 1        A.    Something that -- October -- no, October '15.

 2   2015.

 3        Q.    Okay.  I'm going to show you a document.

 4             MS. HAQUE:  And we're going to mark this

 5   Exhibit 1.

 6             (Defendants' Exhibit 1 was marked for

 7   identification.)

 8   BY MS. HAQUE:

 9        Q.    Do you recognize this document?

10        A.    Yes.

11        Q.    What is this document?

12        A.    This is, you know, when I bought the piece of

13   land.

14        Q.    And whose names appear on the document?

15        A.    My mom and me.

16        Q.    And this is dated June 2004, correct?

17        A.    Yes.

18        Q.    Okay.  How much total did you pay for the

19   home?

20        A.    This one, it only for the land.  This come no

21   house.

22        Q.    Correct.

23             So okay.  We can do it this way.  How much

24   did you pay for the plot of land on which you built
```

Confidential - Subject to Further Confidentiality Review

```
 1    the house?

 2         A.   Okay.  This one, I bought at 50,000 -- or,

 3    49,000, 49.

 4         Q.   Okay.  You can set that document down.

 5              MS. HAQUE:  This is what we're going to be

 6         marking as Exhibit Number 2.

 7              (Defendants' Exhibit 2 was marked for

 8    identification.)

 9    BY MS. HAQUE:

10         Q.   Do you recognize this document?

11         A.   Yes.

12         Q.   What is this document?

13         A.   Okay.  This document is the paper to sign the

14    contract to build the house and the -- and the

15    deposit.

16         Q.   And how much --

17         A.   Let me see.

18         Q.   Take your time.  If you want to go and review

19    the document, please go ahead and take time.

20         A.   The 4,000-something right there is when we

21    build the house.  We have to pay extra for the

22    update.  The 5,000 is the deposit.  Okay.  Then

23    700-something here is for the extra when I build the

24    house.  The 5,000 here is for the deposit.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2060 of 3246
Case 1:11-cv-22408-MGC Document Entered on FLSD Docket 05/18/2012 Page 49 of
151
Confidential – Subject to Further Confidentiality Review

1    Q.   So the first page is the 5,000 for the

2    deposit?

3    A.   No.  The first page is only 4,953.  Okay.

4    When I built the house, they asked me to pay extra.

5    Q.   And if you look on the first page, it has

6    description of some options.

7    A.   Okay.  No, this is just like when I add in.

8    Like I want to build something extra, like a pool,

9    then I have to pay extra.

10   Q.   I think this document is reverse

11   chronological order.  So why don't we flip to this

12   page.  It is the back of Page 3.

13        One more.

14        MR. VERRIER:  Are you working from the back

15        to the front?

16        MS. HAQUE:  Yeah.  It looks like the back of

17        Page 3.  It's titled "Legend Custom Builders

18        Custom Agreement."

19        MR. VERRIER:  Yup.

20   BY MS. HAQUE:

21   Q.   Is this document the initial purchase

22   agreement with the builder?

23   A.   Yes.  That is correct, to build the house.

24   Q.   And this was dated June 9th, 2005.  And whose

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2061 of 3246
Case 1:14-cv-03942-MCA Document Confidential Subject Filed to Further Confidentiality Page 40 of
151
Confidential - Subject to Further Confidentiality Review

```
 1    name is on this contract?

 2        A.   Okay.  The secretary of the Legend -- the

 3    realtor work for Legend Builder.

 4        Q.   And Mai Tuyen, that is your mom?

 5        A.   Yes.

 6        Q.   Did you ever sign this contract yourself?

 7        A.   Some of them my mom signed; some of them I

 8    signed, and I let my mom sign.

 9        Q.   On Page 8, this was your mom's signature,

10    correct?

11        A.   This is the only, you know, written down the

12    name, but no signature.  This is a name.

13        Q.   And the initials at the bottom?

14        A.   Yeah.  At that time, they did that.

15        Q.   Did your mom fill this out or did the builder

16    fill this out?

17        A.   This is nine years ago, so I really do not

18    remember who wrote down.

19        Q.   And this is the only agreement that you

20    signed with the builder, correct?

21        A.   Yes.

22        Q.   If you flip to Page 20, I just want to

23    confirm that this signature is your mom's signature

24    and not the contractor just filling it in.
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 2062 of 3246
Case 1:09-cv-07399-MCA Document 2 Entered on FLSD Docket 05/18/2012 Page 40 of
151

Confidential - Subject to Further Confidentiality Review

```
1       A.   This is my mom.  It's not the contractor.

2       Q.   Okay.  Now, can you turn back to this initial

3   page, Page 2?  That's the first page of the purchase

4   agreement.

5            Two more pages.  I'll show you.  Here you go.

6   This page.

7            Can you confirm that the total purchase price

8   was $267,777?

9       A.   Yes.

10      Q.   Now, you had mentioned earlier when we first

11  started looking at this document that you had to pay

12  some additional charges.

13      A.   You know, on the way when we build the house,

14  for example, like a pool right here, then the -- to

15  build a retainer wall.  So then, you know, we have to

16  add the amount, and that is required to do it.

17      Q.   Can I ask:  Is the $4,953 on Page 1 and the

18  $750, were those the extra -- did you pay those in

19  addition to the $267,777?

20      A.   Don't remember.

21      Q.   And on the first page, this is your mom's

22  signature?

23      A.   Yes.

24      Q.   And from paid -- the check is paid from your
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2063 of 3246
Case 1:09-cv-07687-GCH Document 2897-1 Inspection Filed 05/19/2013 Page 42 of
151
Confidential - Subject to further confidentiality Review

```
1    mom's checking account?

2        A.    Yes.   My mom's account.

3        Q.    Okay.   And the second page, this is also your

4    mom's signature?

5        A.    Yes.

6        Q.    But this was -- this check is paid from your

7    personal checking account?

8        A.    Yes.

9        Q.    Okay.   And on the contract, it looks like it

10   was your mom who signed for everything for this

11   build.

12       A.    Okay.   At the time, some that my mom

13   signature, some of my signature.

14       Q.    Can you take maybe a minute to just flip

15   through that document to see if any of those pages

16   contain your signature?   I just want to be clear.

17       A.    Yes.

18       Q.    So those pages all have your mom's signature?

19       A.    Yes.

20       Q.    Okay.   You can set that document aside.

21            Was -- do you remember, was this purchase

22   financed through a bank or another lender?

23       A.    Bank.

24       Q.    Do you remember the name of the bank?
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.    First Bank of America.

 2        Q.    Was there a mortgage on the property?

 3        A.    Yes.

 4        Q.    Let me ask you one question related to this

 5   document before we get into the mortgage.

 6              Do you have any other documents, to your

 7   knowledge, besides this related to the purchase?

 8        A.    Okay.  This is the document, but, you know,

 9   it's one of the contract documents.

10        Q.    So you have more documents related to the

11   purchase other than this?

12        A.    No.

13        Q.    This is the only document?

14        A.    Okay.  There is a document, you know, to

15   build a house, you know, the plan, what the outside

16   there, everything in there.

17        Q.    So you have no more documents at home or in

18   your files related to this purchase?

19        A.    No.

20        Q.    Do you know if your mom has anymore documents

21   related to the sale or is this everything?

22        A.    Okay.  All the documents that -- I'm the one

23   keep it.

24        Q.    Okay.  So this is everything, just to be
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2065 of 3246
Case 1:11-cv-22408-MGC Document 297-2 Entered on FLSD Docket 05/10/2012 Page 28 of
151
Confidential - Subject to Further Confidentiality Review

```
 1    clear?

 2         A.   To build the house, I have more documents

 3    related to build the house, because, you know, they

 4    have, you know, like itemized inside, the tile, the

 5    cabinet.

 6         Q.   So you have more documents?

 7         A.   Yes.  Build the house have more document.

 8         Q.   Okay.  So we're going to request that we get

 9    copies of these documents, but we will work through

10    your attorneys.

11         A.   Yes.

12         Q.   Okay.

13         MR. ALBANIS:  Tracy, have you ever given us

14    those documents?

15         THE WITNESS:  Yes.

16         MR. ALBANIS:  The documents that describe the

17    titles and everything?

18         THE INTERPRETER:  The interpreter could not

19    understand because he's speaking English, but I

20    would not understand.

21         May I ask her to repeat?

22         MS. HAQUE:  Yes.

23         THE WITNESS:  I review documents and give it

24    to the lawyer.
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2066 of 3246
Case 1:1-cv-22408-MGC Document 1 Entered on FLSD Docket 05/19/2010 Page 421 of
151
Confidential - Subject to Further Confidentiality Review

```
 1              MS. HAQUE:  We'll handle this at the break

 2       and double-check.

 3    BY MS. HAQUE:

 4       Q.   Okay.  Let's talk about your mortgage next.

 5            You said that you initially obtained a

 6    mortgage from Bank of America?

 7       A.   Yes.

 8       Q.   Who is paying the mortgage?

 9       A.   Me and my mom.

10       Q.   What portion did your mom pay and what

11    portion did you pay of the mortgage?

12       A.   Okay.  The mortgage is around -- over

13    1,000-something, okay.  But to live in the house at

14    103, I paid the mortgage, 1,100.

15       Q.   You paid that per month?

16       A.   I pay the long payment every month.

17       Q.   So what was the monthly total payment for the

18    mortgage?

19       A.   1,700.

20       Q.   So if you paid the 1,100 per month, did your

21    mom pay the remaining $600 or so?

22       A.   Okay.  Only pay, you know, the house before.

23    But right now I make the payment.

24       Q.   So for how long did you -- did your mom pay
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2067 of 3246
Case 1:19-cv-02042-KBJ Document Exhibit 39 Filed 05/18/2019 Page 45 of 151
Confidential - Subject to Further Confidentiality Review

1    the mortgage?

2        A.    Before.  I don't remember.

3        Q.    From 2005 until 2015?

4        A.    Okay.  But, you know, the money that my mom

5    paid to the mortgage, it just to help me, because my

6    mom does not live in the house.

7        Q.    Okay.  Let me show you what's been marked as

8    Exhibit Number 3.

9            (Defendants' Exhibit 3 was marked for

10    identification.)

11    BY MS. HAQUE:

12        Q.    Can you take a second to flip through that

13    document.

14            Do you recognize it?

15        A.    Yes.

16        Q.    What is that document?

17        A.    Payment house, the loan.

18        Q.    Those are your mortgage payments?

19        A.    Yes.

20        Q.    Okay.

21        A.    Refinance.  This is refinance.

22        Q.    So this is another document that's in reverse

23    chronological order.  So can you start with me at the

24    back and let's -- about maybe halfway through -- I

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2068 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 46 of
151
Confidential – Subject to Further Confidentiality Review

```
 1    wish these were numbered.

 2             Do you mind if I help you turn to this page?

 3             Okay.  We're going to start with this

 4    mortgage.

 5             MR. VERRIER:  What page?

 6             MS. HAQUE:  That is page --

 7             MR. VERRIER:  It says 1 of 10.  Is that --

 8             MS. HAQUE:  It's 1 of 13.  It's the Bank of

 9        America initial mortgage.

10    BY MS. HAQUE:

11        Q.   Is this the first mortgage contract that you

12    signed -- or that you have with Bank of America?

13        A.   Yeah.  That is Bank of America.

14        Q.   If you look at Letter B, it reads:  Borrower

15    is Tuyen Thanh.

16        A.   Yes.

17        Q.   And that's your mom?

18        A.   Yes.

19        Q.   And if you look at Letter D, the note is for

20    $272,641.

21        A.   Yes.

22        Q.   Did you sign this document?

23        A.   No.  It my mom.

24        Q.   Your mom signed the document?
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2069 of 3246
Case 1:11-cv-22408-MGC Document [unclear] Entered on FLSD Docket 05/09/2019 Page 27 of 151
Confidential - Subject to Further Confidentiality Review

```
1      A.    Yeah.

2      Q.    Okay.  Was this -- was this mortgage then

3   assigned to a different bank?

4      A.    Yeah.  A few years later that they sold the

5   market to this one.

6      Q.    So it looks like around 2014 or 2013 the

7   mortgage was assigned --

8      A.    I don't remember.

9      Q.    Let's --

10     A.    When they send me the bill, I pay.

11     Q.    Okay.  Let's flip to the front of the

12  document and turn to the second page.

13           What is this document?

14     A.    This is the refinance of the house --

15           MR. SHAPIRO:  The realtime is down again.

16              (Discussion off the record.)

17  BY MS. HAQUE:

18     Q.    So, Ms. Nguyen, you were explaining this

19  document.  Can you please continue?

20     A.    Yes.

21     Q.    What is this document?

22     A.    Okay.  This is the document for refinance of

23  the house.

24     Q.    Okay.  And under B, it's listed as Mai Tuyen,
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 2070 of 3246
Case 1:14-cv-28149-GAC Document 39-1 Entered on FLSD Docket 05/19/2017 Page 48 of
151
Confidential - Subject to further confidentiality Review

1    a/k/a Tuyen Thanh Mai, a single woman, and Tracy

2    Nguyen, a single woman, as joint tenants with right

3    of survivorship.

4          And then it says Tracy Nguyen signing as

5    attorney in fact for Mai Tuyen.  So you were signing

6    on behalf of your mom in this document?

7        A.    Yes.

8        Q.    And is this your signature on this document?

9        A.    Yes.

10       Q.    And this was refinancing done in 2014?

11       A.    Yes.

12       Q.    After you signed this document, do you know

13   if your mom continued to make any mortgage payments?

14       A.    Yes.

15       Q.    How -- what percent of payments did she make

16   after this point?

17       A.    No.  At this time I lived there, so therefore

18   I pay.

19       Q.    So after November 2014, you continued to make

20   all the mortgage payments?

21       A.    Yes.  I pay.

22             THE INTERPRETER:  The interpreter needs to

23       clarify.

24             THE WITNESS:  I lived in the house.  I pay.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2071 of 3246
Case 1:11-cv-22408-MGC Document 201 Entered on FLSD Docket 05/09/2011 Page 46 of
151

Confidential - Subject to Further Confidentiality Review

```
 1   BY MS. HAQUE:

 2        Q.   And your mom did not pay?

 3        A.   No.

 4        Q.   Okay.  You can set that document aside.

 5             I have a document that we are labelling

 6   Exhibit 4.

 7             (Defendants' Exhibit 4 was marked for

 8   identification.)

 9   BY MS. HAQUE:

10        Q.   What is this document?

11        A.   This is the bill.

12        Q.   Is this your mortgage payment?

13        A.   This is bill.

14        Q.   And what is your current monthly payment for

15   your mortgage?

16        A.   Right now it's 1,700 -- no, 1,900 right now.

17        Q.   This document says the amount due is

18   2,183.54.

19        A.   Because, you know, I have to pay tax and

20   insurance.

21        Q.   So how much total are you paying?

22        A.   Okay.  2,183.

23        Q.   Okay.  And this document is -- was sent to

24   Mai Tuyen?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2072 of 3246
Case 1:09-cv-02047-MCA Document 1 Confidential Subject to Docket 05/08/2017 Page 30 of
151
Confidential - Subject to Further Confidentiality Review

```
 1        A.   Yes.

 2        Q.   And not you?

 3        A.   That my mom name.

 4        Q.   Right.

 5             So --

 6        A.   Because the mortgage is under my mom's name.

 7        Q.   Right.

 8             I just want to confirm that it's you and not

 9   your mom paying this bill even though it's sent to

10   her.

11        A.   Yeah.  I pay right here.

12        Q.   Okay.  How much do you owe still on the

13   mortgage?

14        A.   I don't know.  Okay.  Something is right

15   there, okay, 107-some.  I do not know.

16        Q.   So this is approximately 179,000 is what you

17   still owe, approximately?

18        A.   Yes.

19        Q.   Okay.  We can set that document aside.

20             Okay.  Have you always lived at that property

21   at -- before you purchased it -- after you purchased

22   it?  I'm sorry.

23        A.   No.  I lived there from 2006 to 2010.

24        Q.   And then where did you live in 2010?
```

Confidential - Subject to Further Confidentiality Review

```
1        A.    Okay.  In 2010, I found out that the Chinese

2    drywall, I moved to my mom's house.

3        Q.    And how long did you live there?

4        A.    Okay.  I lived there at 925 for one year.

5    Then my mom, I borrow my mom money, and I bought

6    another house.

7        Q.    What was the address of your mom's house?

8        A.    925 Southwest Santa Barbara Place,

9    Cape Coral, 33990.

10        Q.    Approximately from when -- what month and

11    what year to what month and what year did you live in

12    her house?

13        A.    May 2010 to June 2010 -- no, 2011.

14        Q.    Okay.  Before you bought your house with your

15    mom in -- and they built it in 2006, where did you

16    live?

17        A.    I live in 925.

18        Q.    How long had you been living in 925 Southwest

19    Santa Barbara with your mom?

20        A.    I don't remember how many years.

21        Q.    Did you have to pay a monthly rent to your

22    mom when you lived with her at that time?

23        A.    When?

24        Q.    Prior to 2006.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2074 of 3246
Case 2:09-cv-02348-AG-CW Document 13 Entered on FLSD Docket 10/20/14 Page 32 of
151
Confidential - Subject to further confidentiality review

1      A.   In 2006, I did not live with her.  I lived in

2      the -- you know, the house that I have the problem

3      with the Chinese drywall.

4      Q.   Before 2006.  Before the house was built.

5      A.   I lived with my mom, 925.

6      Q.   When you lived with her, did you have to pay

7      rent to her?

8      A.   No.  I don't know.  Sometime I pay; sometime

9      I don't.  I just share with my mom.

10     Q.   So you didn't have a rental contract with

11     her?

12     A.   No.

13     Q.   Okay.

14     A.   I lived with my mom.

15     Q.   Okay.  Let's go back to -- you're explaining

16     where you lived after 2010.

17          So from May 2010 to June 2011, you lived with

18     your mom at 925.

19          THE INTERPRETER:  One minute, please.  The

20          interpreter need to clarify.

21          THE WITNESS:  Okay.  Okay.  Before I build --

22          we build the house, I lived with my mom.  I paid

23          my mom $900 a month.  I pay.  I pay her, too.

24          Her check, I write it down, but I pay my rent to

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2075 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 43 of 151
Confidential - Subject to Further Confidentiality Review

```
 1        her.

 2   BY MS. HAQUE:

 3        Q.   So let's clarify that.

 4             You moved in with your mom in May 2010.  From

 5   May 2010 until June 2011, you paid your mom a monthly

 6   rental fee?

 7             THE INTERPRETER:  This is interpreter; is

 8        very difficult for me when the client answer in

 9        English and then Vietnamese and she jump in.

10             MS. HAQUE:  It's okay.  We'll take it slow.

11   BY MS. HAQUE:

12        Q.   How much did you pay per month to your mom?

13        A.   900.

14        Q.   You paid $900 every month starting in

15   May 2010 through June 2011?

16        A.   Yes.

17        Q.   Did you have a written contract with your

18   mom?

19        A.   No.

20        Q.   Let me show you what's been marked as Exhibit

21   Number 5.

22             (Defendants' Exhibit 5 was marked for

23   identification.)

24   ///
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2076 of 3246
Case 1:11-cv-22408-MGC Document 26-1 Entered on FLSD Docket 05/19/2015 Page 46 of 151

Confidential - Subject to Further Confidentiality Review

```
 1    BY MS. HAQUE:

 2        Q.   Do you recognize this document?

 3        A.   Okay.  My mom did that, but because I need

 4    the document to do -- for something, because I need a

 5    letter certify I live in the address.  But we do not

 6    say that from what day to what day that I lived

 7    there.  Okay.  This is not the contract between my

 8    mom and me.  We don't need that.  But I pay to my mom

 9    each month $900.

10        Q.   When was this document drafted?

11        A.   Okay.  That, you know, the document about the

12    time that I move to her house and I pay.

13        Q.   So she made this in May 2010?

14        A.   Yeah.  Because, you know, when I move in,

15    then she wrote it.

16        Q.   Whose handwriting is this?

17        A.   Okay.  I wrote it.  My handwriting.  My mom's

18    signature.

19        Q.   And why did she put this -- why did you write

20    this document?

21        A.   Okay.  Because I live there, and I need the

22    paper to train for something that I have to do that.

23    So this is the same, like a contract to pay for the

24    house.
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2077 of 3246
Case 1:09-cv-02048-MCA Document 23-1 Confidential Subject to Further Confidentiality Review 151
Confidential - Subject to Further Confidentiality Review

1     Q.   So you were training for a job and you needed

2   proof of your residence?

3     A.   I don't remember.

4     Q.   Do you have any of your receipts for these

5   rental payments?

6     A.   Yes.  My mom wrote the receipts, some, but I

7   throw it away already.

8     Q.   Let's show you what's been marked as

9   Exhibit 6.

10         (Defendants' Exhibit 6 was marked for

11   identification.)

12   BY MS. HAQUE:

13     Q.   Do you recognize this document?

14     A.   Yes.

15     Q.   What is it?

16     A.   Okay.  The receipt that I pay my mom, you

17   know, the rent.

18     Q.   These receipts are dated -- what is the dates

19   on these receipts?

20     A.   This is the one that, you know, I stay in the

21   house.

22     Q.   You said earlier that you moved out in 2011.

23   So what are these receipts for?

24     A.   I -- I do not know.  I don't remember.  Okay.

Confidential - Subject to Further Confidentiality Review

```
 1    You know, I move out, but -- the house there, but I

 2    move back and forth.

 3         Q.   So from -- okay.  So from 2010 to 2013, where

 4    did you live?  Let's go through it year by year.

 5         A.   In 2010, I lived in my mom's house.

 6         Q.   So from May -- starting in May 2010, you were

 7    living in your mom's house?

 8         A.   Yes.

 9         Q.   Let's go to 2011.  Where did you live in

10    2011?

11         A.   Okay.  In 2011, I bought the house, and I

12    bought -- you know, not a house.  2100.

13         Q.   What is the address of that house?

14         A.   Okay.  2100 Southwest Santa Barbara Place.

15         Q.   Also in Cape Coral?

16         A.   Yes.  Cape Coral.

17              MR. ALBANIS:  I just wanted to chime in here.

18         I'm looking at the translation.  It says 2100

19         Southwest Center Boulevard Place.  I believe's

20         it's Santa Barbara Place, as was the one before

21         that was on the same street.

22              MS. HAQUE:  Thanks, Pete.

23    BY MS. HAQUE:

24         Q.   When did you move into the 2100 Southwest
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 2079 of 3246
Case 1:11-cv-22408-MGC Document 21-1 Entered on FLSD Docket 05/19/2011 Page 37 of 151
Confidential - Subject to Further Confidentiality Review

```
 1    Center Boulevard Place house?

 2         A.    Okay.  I, you know, lived there about one or

 3    two months after -- around 2011.

 4         Q.    How did you come about purchasing that house?

 5         A.    My mom let me.  I borrow money to buy that

 6    house.

 7         Q.    How much did you borrow from your mom?

 8         A.    Almost 90,000.

 9         Q.    Almost 90,000?

10         A.    Yes.  Ninety-something.  I don't remember,

11    but I borrow the money from my mom to buy it.

12         Q.    Okay.  We'll come back to that.

13              So you lived there through -- from

14    approximately June 2011 until what time?

15              THE INTERPRETER:  The interpreter need to

16         clarify.

17              THE WITNESS:  Okay.  Until to build the

18         house, and, you know, the May 2015.

19    BY MS. HAQUE:

20         Q.    Can you clarify?  Did you say you built the

21    house, or did you buy an already existing house?

22         A.    Which one?

23         Q.    The 2100 Southwest Center Boulevard Place.

24         A.    Buy.
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2080 of 3246
Case 1:1-cv-02042-CAG Document 1 compilation Fil Dockel 05/19/2019 Page 38 of
151

Confidential - Subject to Further Confidentiality Review

```
 1       Q.    You bought an existing house?

 2       A.    Yeah.

 3       Q.    Okay.  You said earlier that you moved back

 4   and forth between 2100 Southwest Santa Barbara and

 5   the 925 Southwest.

 6       A.    Okay.  You know, I moved in that.  So 925,

 7   you know, I back and forth because I have to, like,

 8   look after the house.  So I come back with, you know,

 9   like weekend stay there with my mom.

10       Q.    So you didn't actually live at 925?  You just

11   visited your mom?

12       A.    I lived there one year.

13       Q.    Right.

14             So let me back up.

15             So from 2011 to 2015, you only lived in the

16   2100 Southwest Center Boulevard Place house?

17       A.    Okay.  I moved to that house.

18       Q.    And from 2011 to 2015, you visited your mom

19   during weekends and other times at the 925 Southwest

20   Santa Barbara house?

21       A.    Okay.  925.

22       Q.    So you -- so you just visited from 2011 to

23   2015?

24       A.    Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2081 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 39 of 151
Confidential - Subject to Further Confidentiality Review

```
 1       Q.   You did not pay your mom any rent from 2011

 2    to 2015 for anything?

 3       A.   Okay.  I not pay for rent.  But because I

 4    borrow my mom, you know, the money, so I continue to

 5    pay her $900 to pay back the loan that I borrow her.

 6       Q.   So Exhibit 6, which is in front of you, what

 7    are these payments for?

 8       A.   Okay.  This one I believe that I paid to my

 9    mom.

10       Q.   This is for what purpose?  Why did you pay

11    this money to your mom?

12       A.   Okay.  Because I borrow, you know, my mom

13    money.  So I have to pay little by little back to my

14    mom.

15       Q.   So these are your loan repayments for the

16    house on 2100 Southwest Center Boulevard Place?

17       A.   Yeah.  I have to pay her little by little.

18    That house, I do not pay the mortgage because I pay

19    up already.

20       Q.   So the mortgage at the 2100 Southwest Center

21    Boulevard Place is paid off?

22       A.   No mortgage.

23       Q.   You bought it with cash?

24       A.   My mom.
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2082 of 3246
Case 1:09-md-02047-EEF-MBN Document 23363-39 Filed in SD Docket 05/28/2019 Page 40 of
151

Confidential – Subject to further confidentiality Review

```
 1        Q.   Okay.

 2        A.   I do not pay for the mortgage.

 3        Q.   I understand.

 4             Do you still own this house?

 5        A.   No, no.

 6             THE INTERPRETER:  The interpreter didn't

 7    understand.

 8             THE WITNESS:  The house, no mortgage.

 9    BY MS. HAQUE:

10        Q.   No.  Who owns the house today, 2100 Southwest

11    Center Boulevard Place?

12        A.   Dinis Lee.

13        Q.   Can you spell the name?

14        A.   Dinis Lee, D-i-n-i-s.

15        Q.   When did you or your mom sell this house to

16    Dinis Lee?

17        A.   I don't remember.  Two or three years,

18    something.

19        Q.   Do you have the documents?

20        A.   No.

21        Q.   Does your mom have the documents that relate

22    to this house sale?

23        A.   I believe that, you know, when you trade for

24    the title something for sure, you know, they have the
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2083 of 3246
Case 1:09-cv-02047-EEF-MBN Document 22363-39 Filed 05/08/2013 Page 41 of
151
Confidential – Subject to Further Confidentiality Review

```
 1    document to, you know, trade for the house, have

 2    document.

 3         Q.   Do you remember how much you sold the house

 4    for to Dinis Lee?

 5         A.   No.  That house did not sell.  And only, you

 6    know, to sell it to my uncle.

 7         Q.   Okay.  Let's back up.

 8              You sold -- so is Dinis Lee your uncle?

 9         A.   Uncle-in-law.

10         Q.   Uncle-in-law.  So he is related to you?

11         A.   No.  He uncle-in-law.  There is not my

12    family.

13         Q.   Okay.  Did you give the house or let your

14    uncle-in-law stay in this house?

15         A.   Okay.  No.  I didn't give it.  But my name is

16    not on that house anymore.  It sell already.

17         Q.   All right.  So --

18         A.   I sell to him.

19         Q.   How much did you sell the house to him for?

20         A.   You mean sell the house to him?

21         Q.   Yes.

22         A.   Okay.  I bought the house for 90,000, okay.

23    I give it to him -- no, that house, no money.

24         Q.   So how -- did he pay you any money for the
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 2084 of 3246
Case 1:11-cv-22408-MGC Document 230-1 Entered on FLSD Docket 05/18/2014 Page 42 of
151

Confidential - Subject to Further Confidentiality Review

```
 1    house?

 2        A.    Not yet.

 3        Q.    He owes you money for the house?

 4        A.    That house, I owe my mom money to buy it.

 5        Q.    Okay.  Let's back up.

 6              You -- in 2011, you borrowed approximately

 7    $89,000 to buy this house from your mom.

 8        A.    Yes.

 9        Q.    And starting in 2011, you paid approximately

10    $900 every month to your mom as a loan repayment?

11        A.    No.  It not like a, you know, every single

12    month, you know.  When I have the money, then I pay.

13    But not every single month.

14        Q.    Okay.  How much money today do you still owe

15    your mom for this house?

16        A.    Don't remember.  I don't know.

17        Q.    Do you still have to pay this money to your

18    mom?

19        A.    I still owe my mom money, but I am not paying

20    my mom.

21        Q.    And you think in 2015 or 2016 your mom sold

22    the house to your uncle-in-law?

23        A.    Yes.

24        Q.    Do you know how much she sold it for?
```

Confidential - Subject to Further Confidentiality Review

 1      A.    Okay.  That house, you know, at that time,

 2   you know, in the way, like, really not sell it to

 3   him.  But trade for like a gift to him.  Exactly like

 4   that.

 5           MS. HAQUE:  Okay.  Why don't we go ahead and

 6       take about a ten-minute break right now.

 7           (Recess from 9:33 until 9:59 a.m.)

 8   BY MS. HAQUE:

 9      Q.    Ms. Nguyen, I'm going to hand you what we've

10   premarked as Exhibit 7.

11           (Defendants' Exhibit 7 was marked for

12   identification.)

13   BY MS. HAQUE:

14      Q.    Do you recognize this document?

15      A.    Yes.

16      Q.    What is this document?

17      A.    Okay.  This is the document that I bought the

18   house at 2100 Southwest.

19      Q.    And if you look at Number 301, all the way at

20   the bottom of the page, the purchase price is

21   $89,319.

22      A.    Yes.

23      Q.    This was the amount that you borrowed from

24   your mom, right?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2086 of 3246
Case 1:1-md-0nd04oMd-GL Document ny2021- Enrannon FlSpba405r0/5019/2019 Page 41 of 151
Confidential - Subject to Further Confidentiality Review

1      A.    Yes.

2      Q.    How much approximately of the $89,000 do you

3    still owe your mom?

4      A.    I don't remember exactly how much.  Okay.

5    Because, you know, sometime I pay her $900 a month,

6    but sometime I didn't pay.  So I believe that, you

7    know, I still owe her in this amount, around 70,000.

8      Q.    70,000?

9      A.    Yes.

10      Q.    Okay.  Can you go back to Exhibit Number 6,

11    which is -- I think it's the last page here.

12           Are these the only receipts that you have of

13    loan repayments to your mom?

14      A.    Okay.  When I pay my mom for the money, she

15    have, like, you know, the paper.  She wrote it down,

16    the amount of the money that I pay.  She wrote it

17    down.  Okay.  I pay her, and then she the one, okay,

18    to write it down.

19      Q.    Do you have any more of these documents?

20      A.    No.

21      Q.    Does your mother have any of these receipts?

22      A.    I don't know.

23      Q.    Do you have withdrawals from your bank

24    statement showing how much you've withdrawn to give

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2087 of 3246
Case 1:09-cv-02047-EEF Document Confidential on File Docket 05/09/2019 Page 45 of
151
Confidential - Subject to Further Confidentiality Review

 1    to her?

 2         A.    No.

 3         Q.    So you have no other documents other than

 4    these two receipts showing loan repayments to your

 5    mom?

 6         A.    Yeah.

 7         Q.    What about the rent that you paid from

 8    May 2010 to June 2011?  Do you have any documents

 9    that show your rental payments to your mom?

10         A.    I give my mom cash.  Only cash.

11         Q.    Do you have any bank withdrawal statements

12    from that time, May 2010 to June 2011, showing the

13    cash withdrawals for rent?

14         A.    Okay.  The bank document, I did not get,

15    because long time already.  So I throw it away.  The

16    one -- you know, if not important, I did not keep.

17         Q.    So you have no other documents showing the

18    rental payment, just to confirm?

19         A.    Because pay back cash, so no document.  Okay.

20    We only do it, the receipt, when that, you know,

21    somebody need the -- the -- the paperwork or

22    document.

23         Q.    And so just to confirm, these are the only

24    two receipts that you have that reflect either the

Case 2:09-md-02047-EEF-MBN   Document 22363-39   Filed 11/19/19   Page 2088 of 3246
Case 1:11-cv-22408-MGC   Document 127   Entered on FLSD Docket 05/08/2012   Page 46 of
151

Confidential - Subject to Further Confidentiality Review

```
 1    rental payment or the loan repayment for the $89,000

 2    for the 2100 Southwest house?

 3        A.   I don't remember, you know, exactly.  So far,

 4    this is the two I saw here.

 5        Q.   Do you have any other documents that you need

 6    to look through to confirm?

 7        A.   No.

 8        Q.   So you believe that this is everything in

 9    terms of the rental or loan repayment documents?

10        A.   Yes.

11        Q.   Okay.  Just a few questions.  I want to go

12    back and talk about your mortgage, and then we'll

13    talk about another topic, okay?

14        A.   Yes.

15        Q.   Okay.  So you said before that your mom

16    helped you out with paying some part of the mortgage.

17    And this is for the 103 Southeast house?

18        A.   Yes.

19        Q.   Can you estimate for us what percentage of

20    the total mortgage that your mom paid?

21        A.   What do you mean?  The monthly pay or what

22    about the mortgage?

23        Q.   So the mortgage for the 103 Southeast house

24    was approximately $262,000 or so, correct?
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2089 of 3246
Case 1:09-cv-02047-GAD Document Confidential Filed 11/19/19 Page 47 of
151

Confidential - Subject to Further Confidentiality Review

```
1       A.   Okay.  So the 260,000, this is from the

2   original.  Long time ago.

3       Q.   Correct.

4            Do you recall what percentage or how much of

5   that 262,000 that your mom paid to the bank?

6       A.   Okay.  That a long, long, long, long time

7   ago, you know.  I didn't add it up.  So I don't

8   remember.

9       Q.   Do you think it was more than 50 percent or

10  less than 50 percent of that amount?

11      A.   For what?  I don't understand.

12      Q.   For the total mortgage each month, do you

13  recall if your mom paid more than 50 percent of the

14  monthly payment each month or less than 50 percent?

15      A.   103, about 50 percent.

16      Q.   Okay.  So you -- so your mom paid about

17  50 percent, at least, of the mortgage payment?

18      A.   Yes.

19      Q.   Do you have any documents starting in 2005

20  showing all of the mortgage payments and who paid

21  them?

22      A.   Yes.  Payment each month.

23      Q.   Do you have all of those receipts?

24      A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2090 of 3246
Case 1:09-cv-02048-XXX Document (confidential) Filed Docket 05/19/2017 Page 48 of
151
Confidential - Subject to Further Confidentiality Review

```
1        Q.   Did you give your attorney all of these

2   receipts?

3        A.   Yes.

4        Q.   Did you -- do you have any other places you

5   need to look to confirm, or did you give us

6   everything that you have regarding the mortgage

7   receipts?

8        A.   I give everything to my lawyer.

9        Q.   Okay.  One last question on the mortgage

10  payments.  Starting back -- and you have to remember

11  if you can.

12            Starting back in 2006 when you started the

13  mortgage payments, did you pay a portion every month

14  or only when you were able to afford it?

15       A.   Okay.  In 2006, I pay $900 each month.  And

16  after that, then I pay 1,100 after fix the house.

17       Q.   Starting in -- when did you start paying

18  1,100?  In what month and year?

19       A.   2015.

20       Q.   Now, did you pay the $900 for the mortgage on

21  the 103 Southeast home to your mom, or did you make a

22  separate payment of $900 to the bank?

23       A.   I give to mom, mom deposit to the bank, and

24  she wrote one check.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2091 of 3246
Case 1:11-cv-22408-MGC Document 208-1 Entered on FLSD Docket 05/09/2011 Page 49 of 151
Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Okay.  And do you have any documents showing

 2   the $900 that you paid to your mom for the mortgage

 3   or did you pay that in cash?

 4        A.    Cash.

 5        Q.    And you don't have any bank statements

 6   showing the cash withdrawals for the mortgage

 7   payments to your mom?

 8        A.    No.

 9        Q.    But you did pay every month?

10        A.    Yes.

11        Q.    Okay.  All right.  Let's switch topics and

12   now talk about the house in which you currently live.

13             Can you tell us --

14             MR. ALBANIS:  May I just chime in before you

15        move on.

16             To the extent that Ms. Nguyen had documents

17        in her custody or control regarding these

18        mortgages that we have not already produced, we

19        will, of course, review them and produce them if

20        they are responsive.

21             MS. HAQUE:  Thanks, Pete.

22   BY MS. HAQUE:

23        Q.    Can you state for the record again the

24   current address where you live.
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.    Okay.  103 Southeast 16th Place, Cape Coral,

 2    Florida 33990.

 3        Q.    Okay.  Do you currently live at that property

 4    today?

 5        A.    Yes.

 6        Q.    Can you tell us all the years in which you

 7    lived in the house, starting from when it was built?

 8        A.    I live in that house -- start in 2006 to

 9    May 2010.

10        Q.    And then?

11        A.    Then move out.

12        Q.    Okay.  And then?

13        A.    Okay.  Then I live there one year.  Then I

14    move out 2011, then I back in May 2015.

15        Q.    Okay.  And you lived there May 2015 until

16    present?

17        A.    Yes.

18        Q.    Can you go back to, I think, what is Exhibit

19    Number 3.  And this is the document that shows your

20    loan -- yes -- your loan refinance.

21        A.    Yes.

22        Q.    If you turn to the second page, it looks like

23    the refinance occurred in 2014.

24        A.    Yes.
```

Case 2:09-md-02047-EEF-MBN  Document 22363-39  Filed 11/19/19  Page 2093 of 3246
Case 1:1-09-md-02047-EEF-MBN  Document 1 Entered on FLSD Docket 05/18/2019  Page 51 of
151

Confidential - Subject to Further Confidentiality Review

```
1        Q.   So why did you refinance at that time?

2        A.   Because the interest rate lower.  Interest

3   rate lower.

4        Q.   Okay.  The interest rate was lower.

5             But did you live -- start living in the house

6   at 103 Southeast 16th Place --

7        A.   No.  When I refinance, I have not live in

8   that house yet.

9        Q.   Okay.  At the 103 Southeast 16th Place, how

10  many people have ever lived in the home while you

11  owned it?

12       A.   Four.

13       Q.   Can you name these name?

14       A.   Duc Bui, my husband.

15       Q.   So you are married?

16       A.   Duc Bui.  You need to know before about

17  the --

18       Q.   Yes.

19       A.   I am single, but I always say married.  I not

20  have a married certificate.  It's a live-in

21  boyfriend.

22            Kevin Bui.  Tyvinh.

23            THE INTERPRETER:  The interpreter needs to

24       clarify.
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2094 of 3246
Case 1:09-md-02047-MCA Document 23888-1 Confidential Subject to Further Confidentiality Review Page 52 of
151
Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  Tyvinh Bui my son.  Kevin Bui

2      and Tyvinh Bui are my sons.

3  BY MS. HAQUE:

4      Q.   And you said one more person.

5      A.   Duc Bui.

6      Q.   So three people, including you?

7      A.   Including me is four.

8      Q.   Is Duc the father of Kevin and Tyvinh?

9      A.   Yes.

10      Q.   Has Duc paid rent or contributed to the

11  mortgage for 103 Southeast 16th Place?

12      A.   No.

13      Q.   Have you ever charged anyone rent for living

14  in 103 Southeast 16th Place?

15      A.   No.

16      Q.   Have you renovated or made any improvements

17  on the property at 103 Southeast 16th Place since you

18  have owned it?

19          MR. ALBANIS:  Before she responds, I just

20      want to assert a rolling objection to any

21      questions regarding remediation of the property,

22      per Judge Cooke's November 16th, 2018, order.  We

23      are in a nonremediation track for the purposes of

24      this deposition.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2095 of 3246
Case 1:09-cv-02047-McGarry Document Exhibit_IgA Dockereponsetage135 Page 31 of
151

Confidential - Subject to Further Confidentiality Review

```
1              Having said all that, we will, of course,

2         allow you to ask whatever it is that you would

3         like to ask.  But that is a rolling objection

4         regarding any and all questions for the

5         remediation of the Chinese drywall property at

6         16th Place.

7              MS. HAQUE:  Understood.  Thanks.

8    BY MS. HAQUE:

9         Q.  Okay.  So I'll re-ask the question.

10             Have you renovated or made any improvements

11   on the property since you have owned it?

12        A.  Since when?

13        Q.  Since 2006 to present.

14        A.  Not yet.

15        Q.  Okay.  And that includes -- okay.

16        A.  2006 is the time that I just, you know,

17   finished building the house.

18        Q.  Right.

19             So from 2006 all the way until now, you

20   have -- and we'll talk about remediation separately

21   with the drywall -- but have you made any other

22   improvements or additions to the house?

23        A.  Yes.  A/C, air.

24        Q.  Were those financed or did you pay out of
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2096 of 3246
Case 1:11-cv-22408-MGC Document 291-1 Entered on FLSD Docket 05/19/2015 Page 51 of
151

Confidential - Subject to Further Confidentiality Review

```
 1    pocket -- did you pay yourself for those

 2    improvements?

 3        A.   Okay.  At the beginning -- okay.

 4             At the beginning, for the first year, the

 5    air-condition -- it's broken down all the time.  So

 6    they came to fix.  But because it's still under the

 7    warranty, so I did not pay.  But later on, yes.

 8    Yeah.  When there are no longer have warranty, I have

 9    to pay.

10        Q.   How many times did you have to fix or replace

11    the A/C?

12        A.   In 2005, you know, in one year, the A/C, it

13    broken constantly.

14             2005, the house, it not -- you know, I did

15    not live in.  So in the first year, the A/C, it

16    broken down constantly.  Then after that, then -- the

17    next year, then another year in 2007.  2007, they

18    come to, you know, fix again.  In 2008, they changed.

19        Q.   Okay.  I'm going to hand you what's been

20    premarked as Exhibit 8.

21             (Defendants' Exhibit 8 was marked for

22    identification.)

23    BY MS. HAGUE:

24        Q.   Do you recognize this document?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2097 of 3246
Case 1:09-cv-07402-GCM Document 2091 Entered on FLSD Docket 05/18/2019 Page 55 of
151
Confidential - Subject to Further Confidentiality Review

```
1        A.    Yes.

2        Q.    What is it?

3        A.    Air-condition when they come to fix.

4        Q.    Are -- is this -- are these the only invoices

5   that you have for the air-conditioning unit?

6        A.    Okay.  They came many times to fix the

7   air-conditioning, but this is the invoice they come

8   fix the air-conditioning.

9        Q.    Okay.  Do you have any other receipts other

10  than these three?

11       A.    I only keep three.

12       Q.    But were there more than three receipts?

13       A.    Okay.  You know, the A/C, sometime it leak so

14  they came to fix it.  But this is the important, so I

15  kept.

16       Q.    Those other times that the air-conditioning

17  repair service came to the house, were those covered

18  under the warranty, or did you have to pay out of

19  pocket -- pay yourself for those?

20       A.    After, you know, no longer have warranty,

21  then I pay.

22       Q.    Approximately how many times would you

23  estimate that the air-conditioning service had to

24  come to look at -- repair the unit?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2098 of 3246
Case 1:09-md-02047-MCA Document 22363-39 Filed 11/19/19 Page 55 of
151
Confidential - Subject to Further Confidentiality Review

```
 1        A.    Oh, you know, the first year.  And after

 2   year, three times.  So, total, about six, seven

 3   times.

 4        Q.    Six, seven times from what year to what year?

 5        A.    From, you know, 2006 to May, yeah, 2010.

 6        Q.    Now, these three receipts, the -- what is the

 7   name that's listed on here?

 8        A.    What do you mean?

 9        Q.    If you look, it says -- on each of these

10   receipts, it says Mr. Mai.

11        A.    Mai, my mom.

12        Q.    Did your mom pay for these three receipts?

13        A.    I pay.

14        Q.    Do you have a bank statement or anything that

15   shows that you paid for these three receipts?

16        A.    Long time.  No.  I throw away.  I don't

17   remember.

18        Q.    Okay.  So just -- sorry.

19              Okay.  So just to clarify, these are the only

20   documents you have that relate to any work done on

21   the A/C?

22        A.    Yes.

23        Q.    Okay.  You know the square footage of your

24   house at 103 Southeast 16th Place?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2099 of 3246
Case 1:09-cv-07299-MGC Document 67-8 Entered on FLSD Docket 05/18/2011 Page 47 of
151
Confidential - Subject to Further Confidentiality Review

```
 1              THE INTERPRETER:  The interpreter need to

 2       clarify.

 3              THE WITNESS:  Okay.  Almost -- almost 2500,

 4       but it's about -- around 2495 or 2485.  Just say

 5       that, you know, 2400.  200 -- no, 400.

 6    BY MS. HAQUE:

 7       Q.   How do you know that square footage of your

 8    house?

 9       A.   Okay.  Because, you know, when to build a

10    house and you can see that, you know, the square feet

11    is right there.  Oh, no -- yes.  You know, when you

12    pay the tax, you go to the City website, you punch

13    it, you can see the square feet of the house.

14       Q.   Have you ever personally measured the square

15    footage of your house?

16       A.   No.

17       Q.   Have you ever had someone come to your house

18    to measure the square footage?

19       A.   No.

20       Q.   Okay.  I want to hand you what's been

21    premarked as Exhibit 9.

22              (Defendants' Exhibit 9 was marked for

23    identification.)

24    ///
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2100 of 3246
Case 1:09-cv-02047-GEL Document 23362-39 Filed 11/19/19 Page 100 of 3246
Confidential - Subject to further confidentiality review
151

```
1    BY MS. HAQUE:

2        Q.   Do you recognize this document?

3        A.   Yes.

4        Q.   What is the document?

5        A.   A model of the house.

6        Q.   And do you see in the bottom corner of the

7    document it shows the square footage?

8        A.   Yes.

9        Q.   Is that the correct square footage?

10       A.   No.

11       Q.   Why is that incorrect?

12            First, I'm sorry, can you read out what the

13   document says in terms of what the square footage is?

14       A.   2293.

15       Q.   And why do you believe that number is

16   incorrect in terms of the square footage?

17       A.   Okay.  This is the original, when the

18   builder, you know, plans to build.  When they

19   actually come to build the house, I add more.

20       Q.   Okay.  How much more?

21            Okay.  First, when did you request the

22   addition, and how much more square footage did they

23   add?

24       A.   Okay.  The original build the house, you
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2101 of 3246
Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 3101 of 3246
Confidential – Subject to Further Confidentiality Review
151

```
 1    know, it gets right here.  But when they actually --

 2    when they build, you know, they add the, you know,

 3    for the outside here, to add the out here.  So that's

 4    added in.

 5        Q.   Do you have any documents that show what the

 6    correct square footage of your house should be?

 7        A.   Okay.  You go to the city hall, okay, in Lee

 8    County, you punch the button, then they will let you

 9    know how much the -- how much -- the square feet of

10    your house.

11        Q.   Okay.  You had to fill out some documents to

12    send to us as part of this lawsuit called profile

13    forms.

14             Do you remember that?

15        A.   No.

16        Q.   Okay.  We'll come back to that.

17             How many bedrooms are in your house at

18    103 Southeast 16th Place?

19        A.   Three.

20        Q.   Okay.  And how many bathrooms are in the

21    house?

22        A.   Three.

23        Q.   And the change in square footage that you

24    just talked about, that happened in 2006?
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2102 of 3246
Case 1:09-cv-02047-McAC Document Confidential Subject to Docket 05/08/2012 Page 60 of
Confidential - Subject to Further Confidentiality Review
151

```
 1       A.    Yeah.  At the same time when they build the

 2    house.

 3       Q.    Have there been any other increases to the

 4    square footage since then?

 5       A.    No.

 6       Q.    Okay.  When do you believe that Chinese

 7    drywall was installed in the home?

 8       A.    Okay.  In May 2010, when the A/C was broken

 9    down and the gentleman come to fix and he say that he

10    recommend that I check, you know, that they probably

11    because of the Chinese drywall.

12       Q.    I think you may have misunderstand the

13    question.

14             When do you think the Chinese drywall was --

15    was put into your house?

16       A.    I do not know.

17       Q.    Do you think it was part of the original

18    build back in 2006?

19       A.    Yes.

20       Q.    How did the drywall get installed into your

21    home?  Do you know?

22       A.    No.  When they build the house, they did the

23    job.

24       Q.    And who was in charge of the building
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2103 of 3246
Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 41 of 151
Confidential - Subject to further confidentiality review

1    project?

2         A.    Legend Builder.

3         Q.    Do you know if they purchased the Chinese

4    drywall themselves?

5         A.    I don't know.

6         Q.    Okay.  Do you recall or know from which

7    supplier Legend Builders acquired the drywall from?

8         A.    No, I don't know.

9         Q.    Okay.  Did you ever see the drywall before it

10   was installed in your home?

11        A.    No.

12        Q.    So you never saw personally any markings on

13   the drywall?

14        A.    No.

15        Q.    How did you know the drywall was made in

16   China?

17        A.    My lawyer.  I don't know.  When the -- you

18   know, how I had the problem with the Chinese drywall,

19   I do not know.

20        Q.    Did Legend Builder ever tell you they were

21   installing drywall made in China?

22        A.    No, they didn't say it were.

23        Q.    Did Legend Builder ever make any guarantees

24   to you about where the products they used came from?

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2104 of 3246
Case 1:09-md-02047-EEF-MBN Document 23262-39 Filed 11/19/19 Page 2104 of 3246
Confidential - Subject to Further Confidentiality Review
151

```
 1       A.   No.

 2       Q.   Do you know if there was U.S. or domestic

 3   drywall used to build your house?

 4       A.   At the time to build the house, I did not

 5   know anything.

 6       Q.   Okay.  Do you know now if U.S. or domestic

 7   drywall was used in your house?

 8            MR. ALBANIS:  I'm going to object to the form

 9       of that question.

10            But you can answer.

11            THE WITNESS:  Please repeat your question.

12            MS. HAQUE:  Sure.

13   BY MS. HAQUE:

14       Q.   Do you know today whether U.S. or domestic

15   drywall was used to construct your house?

16            MR. ALBANIS:  Same objection.

17            THE WITNESS:  I don't know.  My lawyer know.

18   BY MS. HAQUE:

19       Q.   Okay.  Do you know the name of the company

20   who manufactured what you believe is the Chinese

21   drywall in your house?

22       A.   Ask my lawyer.

23       Q.   Okay.  Where -- I'm sorry.

24            Do you know if there are my markings on the
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2105 of 3246
Case 1:09-cv-02047-EEF Document 22363-39 Filed 11/19/19 Docket 05/08/2019 Page 43 of
151
Confidential - Subject to Further Confidentiality Review

```
1    drywall in your home?

2             MR. ALBANIS:  Object to the form.

3             THE WITNESS:  You mean like at the time of

4        the build, or we fix the house?

5             MS. HAQUE:  Sorry about that.

6    BY MS. HAQUE:

7        Q.   Prior to the remediation, so back in 2006, do

8    you recall any markings on the drywall?

9        A.   I do not know.

10       Q.   Where was the Chinese drywall installed in

11   your home during the original build back in 2006?

12            THE INTERPRETER:  Where, right?

13            MS. HAQUE:  Where.  Which rooms.

14            THE WITNESS:  2006, I really do not know

15       anything.

16   BY MS. HAQUE:

17       Q.   So you don't know which rooms were affected

18   by Chinese drywall?

19       A.   You mean at 2006, right?

20       Q.   Correct.

21       A.   No, I do not know.

22       Q.   Okay.  Do you know what the total cost of the

23   drywall installation was back in 2006?

24       A.   No.  Don't know.
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2106 of 3246
Case 1:11-cv-22408-MGC Document 66-2 Entered on FLSD Docket 05/18/2012 Page 41 of
151

1    Q.   And you were not living in the house,

2    correct, when any part of the drywall was being

3    installed?

4    A.   Correct.

5    Q.   And you did not witness any part of the

6    installation of the drywall?  I just want to clarify.

7    A.   Correct.

8    Q.   Do you know what other work was done

9    during -- at -- was done in your house at the same

10   time the drywall was being installed?

11   A.   No.

12   Q.   Okay.  You started explaining this, but can

13   you say again when did you first suspect that there

14   may be Chinese drywall in your home?

15   A.   May 2010.

16   Q.   And what were the circumstances causing you

17   to suspect that?

18   A.   Okay.  A/C man came to fix, and he recommend

19   that this house have a problem with the Chinese

20   drywall.

21   Q.   Do you recall what he said exactly or more

22   details about what he said?

23   A.   Okay.  He opened the thermostat, then he saw

24   the corner.  It black.  Then he say this house maybe

Confidential - Subject to further confidentiality Review

1    have a Chinese drywall.

2        Q.    So you personally saw blackened wiring --

3    electrical wires inside the thermostat?

4        A.    Okay.  He open it and say this is black.

5        Q.    Where is the thermostat located?  In which

6    room?

7        A.    Dining room.

8        Q.    Okay.  Did you see any other black

9    electrical -- blackened electrical wires anywhere

10   else in the house?

11       A.    Okay.  When the guy came to inspect the

12   house, each electric --

13           THE INTERPRETER:  The interpreter.

14           MS. HAQUE:  Sure.

15           THE WITNESS:  -- the way that you put the

16       electrical in, they open it, and each one of them

17       is black color.

18   BY MS. HAQUE:

19       Q.    Do you remember which rooms these were in?

20       A.    Every room, you know, open electric.

21       Q.    Plug?  Outlet?

22       A.    Outlet, it black.  Every outlet, when he

23   open, it black.

24       Q.    Okay.  Did you have any other problems with

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2108 of 3246
Case 1:09-cv-07582-LAK Document 121 Confidential Supplement 05/18/2019 Page 35 of
151
Confidential - Subject to Further Confidentiality Review

1    any appliances other than the air-conditioning?

2         A.    At the time that, you know, that all.

3         Q.    Was there a smell or an odor inside your

4    house at that time, back in -- between 2006 and 2010?

5         A.    Okay.  You know, when I left, but I did not

6    knew that.  But when the guy came to inspect the

7    house and the friend came to my house and they say

8    that they have odor.  Smell like the rotten egg

9    smell.

10        Q.    Where did they smell the rotten egg smell?

11        A.    When you entered to the house, already have

12   that smell.

13        Q.    When they came to inspect and visit your

14   house, was there already work being done?  Was the

15   wall -- was the A/C unit already being taken out, or

16   was there anything taking place in your house?

17        A.    Okay.  No.  When they go in to do the

18   inspection, then they, you know, that guy go each

19   room and look around the house and inspected.

20        Q.    Okay.  So they smelled an odor prior to

21   starting the inspection?

22        A.    Okay.  You know, you enter to the house, he

23   have the odor smell already.  But I live in this

24   house; I did not.

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/10 Page 2109 of 3246
Case 1:09-md-02047-EEF-MBN Document Confidential Subject to Docket 05/19/2010 Page 47 of
151
Confidential - Subject to Further Confidentiality Review

 1        Q.    After the inspection did you smell an odor,

 2    or was it the same for you?

 3        A.    Because I live in the house, so I get used to

 4    that smell.

 5        Q.    Okay.  So the only issue at that time prior

 6    to 2010 was the A/C unit for you?

 7             MR. ALBANIS:  Object to the form.

 8             THE WITNESS:  Okay.  A year before, you know,

 9        that I have the issue with my hair, you know,

10        like my hair fall out a lot.  Then I have it very

11        dry and I cough.  Before that, I did not really

12        think the cough because of the -- this, the

13        problem with the house.

14    BY MS. HAQUE:

15        Q.    I just want to clarify, because you mentioned

16    some health problems that you experienced.

17             You understand that this lawsuit does not

18    involve any claims for personal injury or medical

19    conditions, right?

20             MR. ALBANIS:  I'm going to object to the form

21        to the extent that you are not talking about

22        damages related to the bodily injury claims.

23             In other words, if you restated the question

24        and just focused on damages, there would be no

1      objection.  But since you made a blanket

2      statement regarding bodily injury, I just wanted

3      to state that objection.

4          MS. HAQUE:  I'll rephrase and re-ask that

5      question focused on damages related to bodily

6      injury claims.

7  BY MS. HAQUE:

8      Q.   Are you claiming any?

9      A.   Now I'm okay.

10     Q.   How did you -- how do you know that the

11  symptoms that you experienced are attributable to

12  Chinese drywall?

13     A.   Okay.  I do not know.  You asked me the

14  question, you know, related at that time, you know,

15  how if -- I'm telling you how I experience at that

16  time.

17     Q.   Okay.  Just to clarify, did you -- you did

18  not go to a doctor or any medical professional that

19  said your hair loss or your dry throat was related to

20  Chinese drywall?

21     A.   No, I did not go see the doctor.

22     Q.   Okay.  Prior to 2010 when the

23  air-conditioning repairman told you, had you ever

24  heard about problems with Chinese drywall in houses?

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2141 of 3246
Case 1:09-md-02047-MCA Document Entryatent Subpacket 05/19/2019 Page 45 of
151
Confidential - Subject to Further Confidentiality Review

```
1       A.   No.  Before that, I did not think my house

2   have the -- that problem.

3       Q.   Did you ever hear about any problems related

4   to Chinese drywall on the TV or with any friends?

5       A.   No.

6       Q.   So let's talk about what happened after the

7   A/C repairman first told you that your house may have

8   Chinese drywall.

9            What did you do next?

10      A.   After the repairman came to fix the A/C,

11  okay, then I had an inspection to come and check the

12  drywall.  He wrote the report, and the conclusion

13  that I might have an issue and problems with the

14  drywall.

15      Q.   All right.  I'm going to show you what's been

16  premarked as Exhibit 10.

17           (Defendants' Exhibit 10 was marked for

18  identification.)

19  BY MS. HAQUE:

20      Q.   So do you recognize this document?

21      A.   Yes.

22      Q.   What is this document?

23      A.   This is the document that he say report of

24  the home inspection.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2112 of 3246
Case 1:09-cv-07095-ER-HBP Document 2 Exhibit 80 Filed 05/08/2012 Page 46 of 151
Confidential – Subject to Further Confidentiality Review

1    Q.    Okay.  One quick question before we get into

2    this document.

3            How soon after you moved in in 2006 did

4    problems with the A/C start?

5    A.    Okay.  Just a few days before the inspection

6    come in May.

7    Q.    Okay.  Sorry.

8            The question I was asking is -- you first

9    moved in the house in 2006, right?

10    A.    Yes.

11    Q.    So when was the first time after you moved in

12    that you had problems with the A/C?

13    A.    Okay.  I move in the house after six or seven

14    months, and they -- the air conditioner had a problem

15    with leaking already.

16    Q.    With leaking?

17    A.    Yes.

18    Q.    But -- but no one said anything to you -- so

19    since that time, you said, I think, that the A/C

20    repairman came to the house maybe six or seven times?

21    A.    You mean after what?

22    Q.    After you move in.

23    A.    Yes.

24    Q.    But the first time the A/C repairman said

Case 2:09-md-02047-EEF-MBN  Document 22362-39  Filed 11/19/19  Page 2113 of 3246
Case 1:09-md-02047-EEF-MBN  Document 22362-39  Filed 11/19/19  Page 2113 of 3246

Confidential - Subject to further confidentiality review
151

1    anything to you about Chinese drywall was May 2010?

2        A.    Okay.  The May 2010 is the last time.

3        Q.    Okay.  And then you said the inspector came a

4    few days later?

5        A.    Yes.

6        Q.    Who paid for the inspector to come to your

7    house?

8        A.    Me.  I pay.

9        Q.    How much did you pay for the inspection?

10       A.    I don't remember.

11       Q.    Do you have any receipts for the inspection?

12       A.    I don't remember.

13       Q.    Were you at home when the inspection was

14   performed?

15       A.    Yes.

16       Q.    Did you talk with the inspector during the

17   inspection?

18       A.    No.

19       Q.    Did the inspector show you anything that he

20   found during the inspection?

21       A.    Yes.

22       Q.    What did he show you?

23       A.    Okay.  He show me when he opened each outlet.

24   Then he cut the drywall, a piece, and then he put the

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2114 of 3246
Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2114 of 3246
Confidential - Subject to Further Confidentiality Review
151

```
 1    camera in and took the pictures.  Okay.  Then he, you

 2    know, showed me under the sink and all the faucet.

 3    He said, yes, this it.  This house have the issue.

 4         Q.   Did he show you any of the drywall pieces?

 5         A.   He took the picture and he wrote the report

 6    and he put that in here.

 7         Q.   Did you see any of the drywall pieces with

 8    any markings on them?

 9         A.   Yeah, when he took the picture.  And then in

10    the picture, I saw it.

11         Q.   Do you know what -- are those pictures all in

12    this report?

13         A.   Yes.

14         Q.   Did you see anything else that's not in this

15    report?

16         A.   I only see this.

17         Q.   Okay.  Do you know how many Chinese drywall

18    boards total were installed in your house?

19         A.   No.

20         Q.   Has anyone determined the percentage of

21    drywall in your house that was made using Chinese

22    drywall?

23         A.   No.

24         Q.   Did the inspector explain what the different
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2115 of 3246
Case 1:11-cv-22408-MGC Document 58-11 Entered on FLSD Docket 05/18/2015 Page 48 of
151
Confidential - Subject to Further Confidentiality Review

```
 1    markings on the drywall in your house meant?

 2        A.   They only told me that my house have an issue

 3    with Chinese drywall.

 4        Q.   Did he tell you that all of these boards that

 5    he put in his report -- that all of these were

 6    examples of Chinese drywall?

 7        A.   Yes.  All the pictures that he took, that he,

 8    you know, printed out, right there.

 9        Q.   So he said everything with this mark, grid

10    mark X, for example, were made with Chinese drywall?

11        A.   Yes.

12        Q.   Did he tell you that there was any -- did he

13    tell you that any of these pieces of drywall were

14    made in the U.S. or were domestic?

15        A.   He didn't say anything about that.

16        Q.   He just said that all of these pieces of

17    drywall in these photos were Chinese drywall?

18        A.   Yes.

19        Q.   Have you had any other inspections done of

20    your house other than this inspection?

21        A.   Okay.  At the time, right here, after that,

22    no.  But few years later, then I ask another

23    inspector.

24        Q.   Did you have -- when was that inspection
```

Case 2:09-md-02047-EEF-MBN   Document 22363-39   Filed 11/19/19   Page 2116 of 3246
Case 1:09-cv-02047-EEF-JCW   Document ... Filed ... Page ... of 151
Confidential - Subject to Further Confidentiality Review

```
 1    done?

 2         A.    The house -- I really don't remember.

 3         Q.    Was it before or after the remediation was

 4    done?

 5         A.    Before to fix the house.

 6         Q.    Did that inspector produce a report?

 7         A.    Yes.  He did say that the house -- the

 8    problem the house is because of Chinese drywall.

 9         Q.    But did he write a report?

10         A.    Yes.

11         Q.    Where is -- do you have a copy of the report?

12         A.    I believe so, yes.

13         Q.    Have you produced that second report to your

14    attorney?  I'm sorry.

15         A.    I don't remember.  I -- I believe so.

16         Q.    Okay.  We'll follow up with your attorney on

17    that.

18               So a total of two inspections were performed

19    of your house prior to the remediation?

20         A.    Yes.

21         Q.    Okay.

22               MR. ALBANIS:  And, Aliyya, to the extent

23         another inspection report exists, we will produce

24         it.  I think there's some confusion.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2117 of 3246
Case 1:09-md-02047-EEF-MBN Document 1 Entered on FLSD Docket 05/18/2019 Page 45 of 151
Confidential – Subject to Further Confidentiality Review

```
 1              MS. HAQUE:  Okay.  Sounds good.

 2   BY MS. HAQUE:

 3       Q.   Okay.  Let's talk about the remediation next.

 4              Is Chinese drywall still in your house?

 5              MR. ALBANIS:  I want to just insert my

 6         rolling objection to the remediation.

 7              MS. HAQUE:  So noted.

 8   BY MS. HAGUE:

 9       Q.   Now, when I use the word "remediation," I'm

10   referring to replacing and removing the drywall in

11   the house.

12              Does that work for you?

13       A.   Yes.

14              MR. VERRIER:  If you're going into a new

15         topic, is this a good time to take a break?

16              MS. HAQUE:  A five-minute break?  Yeah, we

17         can do that.

18              (Recess from 11:14 until 11:33 a.m.)

19              MS. HAQUE:  Pete, go ahead.

20              MR. ALBANIS:  Thank you.

21              Just for the record, we wanted to let defense

22         know that prior to dismissing Ms. Tuyen Mai's

23         claims in this case, our intention is to obtain

24         an assignment from her which assigns all of the
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2118 of 3246
Case 1:09-cv-02047-MCA Document 2736-39 Filed 10/18/2019 Page 76 of
151
Confidential - Subject to Further Confidentiality Review

```
1        claims that she would have to Ms. Nguyen prior to

2        moving to dismiss her claims.

3            So the motion -- the unopposed motion that we

4        circulated earlier today, we do not intend to

5        file.  Of course, we will circulate the

6        assignment if and when we obtain it, and then we

7        will also amend our discovery responses to the

8        extent that we need to, including the SPPF.

9            And that is in light of today's testimony

10       from Ms. Nguyen.

11           MR. SHAPIRO:  And when would Ms. Mai be

12       available for deposition?  Are you trying to make

13       her available?

14           MR. ALBANIS:  It is our understanding from

15       speaking to Ms. Nguyen that she can come back to

16       the States at some point in January.  So we will

17       be able to make her available for deposition.  We

18       can talk about those later.

19           MS. HAQUE:  Okay.

20   BY MS. HAQUE:

21       Q.  All right.  Just before we get into the next

22   topic, just some clean-up questions from some of the

23   topics we talked about before.

24           Just wanted to confirm, do you own -- and you
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2119 of 3246
Case 1:09-cv-09958-MCA Document 1 Entered on FLSD Docket 05/08/2019 Page 47 of 151

Confidential - Subject to Further Confidentiality Review

```
 1   personally, Ms. Nguyen, own any other properties or

 2   houses other than 103 Southeast 16th Place?

 3       A.   Okay.  Only -- I only have 103.

 4       Q.   Okay.  All right.  Now let's talk about the

 5   remediation that occurred at your home at

 6   103 Southeast 16th Place.

 7            You testified earlier that you first found

 8   out about Chinese drywall potentially being in your

 9   home in 2010.

10       A.   Yes.

11       Q.   And when did the remediation begin in your

12   home?

13       A.   January 2015.

14       Q.   Why did you wait five years for the

15   remediation to begin?

16       A.   At the beginning, I had no money to, you

17   know, fix or to do it.  Okay.  Then another thing,

18   you know, because with the Chinese drywall that, you

19   know, I wait and wait to see that, you know, anybody

20   come to check for the house so that I could not, you

21   know, fix anything.

22       Q.   Can you explain that one more time?  You

23   waited for -- who did you wait for to come to the

24   house?
```

Confidential - Subject to Further Confidentiality Review

```
1        A.   Okay.  Because, you know, with this case and
2    I have to wait to see that, you know, regarding about
3    Chinese drywall.  Do they, you know, fix or they do
4    something that reimburse the money or something like
5    that in a way.  And therefore I wait.
6        Q.   Who were you waiting for or what were you
7    waiting for?
8        A.   Okay.  Because with this case.  First of all,
9    I don't have the money to fix.  Second, because with
10   this issue that I have to wait so that they had the
11   evidence in there.  You know, so that they have
12   something to prove because with the Chinese drywall.
13   So I keep, you know, leave it there, leave it there.
14       Q.   How much did the total remediation in 2015
15   cost?
16       A.   About 65,000.
17       Q.   Okay.  When did you first speak with an
18   attorney about Chinese drywall?
19       A.   Okay.  When the inspector came to my house,
20   inspection, and said, yes, your house have the
21   problem with Chinese drywall.
22       Q.   So you reached out to an attorney at that
23   time?
24       A.   Yes.  After this, then I looking for
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2121 of 3246
Case 1:09-md-02047-EEF-MBN Document 19126 Confidential Subject to Further Confidentiality Review
Confidential - Subject to Further Confidentiality Review
151

1    attorney.

2         Q.   How long was it between when you first spoke

3    with an attorney and when a lawsuit was filed?

4         A.   Okay.  No, after this one, immediately, you

5    know.  In June, immediately I saw the lawyer.

6         Q.   So you retained counsel approximately in

7    June -- May or June of 2010?

8         A.   Yes.

9         Q.   And you filed a lawsuit around that time?

10        A.   I took it to the lawyer.

11        Q.   Did anyone tell you that you could not

12   remediate your house in order to preserve evidence?

13        A.   No.

14        Q.   So you just decided -- how did you know to

15   wait?  In your previous explanation you said to wait

16   in order to preserve evidence.

17             How did you know to do that?

18             MR. ALBANIS:  Object to the form.

19             THE WITNESS:  Okay.  Because in my mind, I'm

20        thinking, you know, my house have an

21        issue/problem.  So then maybe Chinese drywall

22        will come to look at that, so therefore that I

23        didn't fix.  Okay.

24             Then another thing, I wait that I'm thinking

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2122 of 3246
Case 2:09-cv-02047-EEF-MBN Document 22163-39 Filed 11/19/19 Page 30 of 151
Confidential – Subject to Further Confidentiality Review

1        maybe the builder is the one, you know, to come

2        and pay.  So because the problem be already, so I

3        keep waiting and waiting.

4    BY MS. HAQUE:

5        Q.   Did you contact the builder about this?

6        A.   Okay.  No.  Because I heard that the builder

7    went out of business, so I did not fix the house.

8        Q.   Okay.  So you -- did you tell anyone other

9    than the attorneys about this issue with the Chinese

10   drywall in your home?

11       A.   No.

12       Q.   Okay.  I have what we've premarked as

13   Exhibit 11.

14           (Defendants' Exhibit 11 was marked for

15   identification.)

16   BY MS. HAQUE:

17       Q.   Do you recognize this document?

18       A.   Yes.

19       Q.   What is this document?

20       A.   Okay.  This is the estimation for the drywall

21   company come to fix the house.

22       Q.   And what is the price that they quoted you?

23       A.   Okay.  They said 40-some.  But after they

24   fix, they add more.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2123 of 3246
Case 1:1-cv-22408-MGC Document 22208-1 Entered on FLSD Docket 05/19/2011 Page 61 of 151
Confidential - Subject to further confidentiality Review

```
 1         Q.    Do you have a final receipt from this

 2    company?

 3         A.    Okay.  I have the paper that, you know, after

 4    they complete or they -- to fix the house, and they

 5    give it to me.  Okay.  This is the paper right here.

 6    Give it to me.

 7         Q.    What page are you looking at?

 8         A.    This is the document right here.  When, you

 9    know, they complete, finish, you know, fix the house.

10         Q.    Right.  This last certificate?

11               Where does it say the final price that you

12    paid?

13         A.    The one that they said pay in full, that I do

14    not owe them any money.

15         Q.    Where does it give you the $65,000 total

16    price?  Is there a document that says that?

17         A.    Okay.  No.  Because I have to pay A/C

18    separate.

19         Q.    Okay.  How much did you pay just for the

20    drywall?  Was that this 43,000?

21         A.    This only for drywall.

22         Q.    Okay.  And the A/C, how much did you pay

23    total for the A/C?  Wasn't it just -- and this is

24    page -- the fourth -- the fourth -- the fourth page
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2124 of 3246
Case 1:09-cv-02048-MCA Document 23363-39 Entered on FLSD Docket 05/18/2019 Page 82 of 151
Confidential - Subject to Further Confidentiality Review

```
 1    from the back.

 2              This document, it's a bid for the

 3    air-conditioning repair, correct?

 4        A.   Yes.

 5        Q.   And on the back it quotes a price as $6,595.

 6        A.   Yes.

 7        Q.   Is this the total bill for this

 8    air-conditioning replacement?

 9        A.   Yes.  This is the one to fix the air

10    conditioner.

11        Q.   Okay.  So we have $43,000 to replace the

12    drywall from J & A Stucco.

13        A.   Yes.  No -- no, you know, but they also add

14    that -- also the amount right here.  Okay.  Then the

15    option right here that I have to pay the difference.

16        Q.   So you took all three of these options?

17        A.   Yes.

18        Q.   Okay.  All right.  Now, in total, you said

19    about -- you spent about 60- or $65,000 for the

20    remediation.

21        A.   Yes.

22        Q.   But you also said back in 2010 you didn't

23    have the money to pay for the remediation.

24        A.   Yeah.  In 2010, when I moved out, I didn't
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 2125 of 3246
Case 1:1-cv-22408-MGC Document 1-1 Entered on FLSD Docket 05/18/2012 Page 83 of 151
Confidential - Subject to Further Confidentiality Review

```
 1    have the money.  In 2010, didn't fix it.

 2         Q.   Okay.  Instead of asking your mom for the

 3    loan for the house at 2100 Southwest Place, did you

 4    ask her for money for the remediation instead?

 5         A.   No.

 6         Q.   Did you talk to your mom at all about the

 7    remediation or costs associated with a potential

 8    remediation?

 9         A.   When I fix the house, I did tell her.

10         Q.   But not back in 2010 or anytime before then?

11         A.   That's correct.

12         Q.   Do you have any receipts for these optional

13    remediation tasks on this list?

14         A.   Everything that's in there, yes.  Okay.  All

15    the cost paid right there.

16         Q.   So all -- so these are all the receipts for

17    the remediation?

18         A.   Yes.  They have many, you know, receipts, but

19    they are here.

20         Q.   Who paid for the remediation?

21         A.   Me.  I pay.

22         Q.   If you turn to Page 3, it's the page that

23    says SunTrust.  This document says that it's from the

24    account of Tuyen Thanh Mai d/b/a Happy Nails.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2126 of 3246
Case 1:19-cv-22620-MGC Document 28-1 Entered on FLSD Docket 05/08/2020 Page 91 of 151
Confidential - Subject to further Confidentiality Review

```
 1        A.    That is my mom's nail shop.

 2        Q.    So did your mom's nail shop pay the cost

 3   for -- some of the cost for the remediation?

 4        A.    Yes.

 5        Q.    So the -- so the business covered some of the

 6   costs for the remediation?

 7        A.    Yes.

 8              MR. ALBANIS:  Object to the form.

 9   BY MS. HAQUE:

10        Q.    In this pack of receipts, we also have bank

11   statements from Mai Tuyen's personal bank account at

12   Bank of America.

13              Did she personally also pay for some of the

14   remediation out of her personal bank account?

15        A.    Yes.

16        Q.    What percentage of the 60,000 that you say

17   you paid for the remediation do you -- did you pay

18   yourself?

19        A.    I believe that half of that.

20        Q.    Half.  Okay.

21              And you said that this is all of the receipts

22   that you have?  You don't have any other documents at

23   your house?

24        A.    No.
```

Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Do you know if your mom has anymore receipts

 2   or documents related to the remediation?

 3        A.    No.

 4        Q.    Okay.  Who performed the remediation?

 5        A.    A & J Stucco Drywall.

 6        Q.    J & A?

 7        A.    J & A.

 8        Q.    How did you decide to have J & A perform --

 9        A.    Some of my friend told me that this guy fix

10   Chinese drywall.

11        Q.    Did you consider any other contractor or did

12   you only consider J & A?

13        A.    Only this.  This one.

14        Q.    How did you choose the air-conditioning

15   contractor, Alex Fite?

16        A.    Okay.  Some of my friend, you know, told me,

17   and they know that this company fix the air

18   conditioner.

19        Q.    And did you consider any other

20   air-conditioning contractor?

21        A.    No.

22        Q.    Okay.  Has all the original drywall back from

23   2006 been removed from your house and replaced?

24        A.    Yes.
```

Confidential - Subject to Further Confidentiality Review

```
 1       Q.   Did you have any conversations with J & A

 2   Stucco Drywall before they performed the remediation?

 3       A.   Yeah.  You know, I called them and come and

 4   sign the contract to fix the house.

 5       Q.   And did you ask them to just replace all of

 6   the drywall in the house?

 7       A.   Yes.

 8       Q.   Did you talk to them while the remediation

 9   was going on?

10       A.   No.

11       Q.   And did you talk to them after the

12   remediation was finished?

13       A.   Yeah.  After finish house, it's done, I

14   talked to them.

15       Q.   What did you talk to them about?

16       A.   Because the house is finished.

17       Q.   And what did they tell you?

18       A.   Okay.  They told me that, you know, they

19   complete the thing.  They give me -- or they show me

20   the inspection that's done.

21       Q.   Did they say there was anything left to be

22   done to fix the house?

23       A.   When they fix the house, they didn't, you

24   know, fix the cabinet because I have to use the
```

Confidential - Subject to Further Confidentiality Review

1    cabinet again.  Okay.  Because at that time, I didn't

2    have the money, you know, to -- to do it anymore, so

3    that I have to keep the cabinets so that I can use.

4    The countertop.  Everything that we keep.

5        Q.   Were there any damages to the countertop or

6    the cabinets due to Chinese drywall?

7             MR. ALBANIS:  Object to the form.

8             You can answer if you can.

9             THE WITNESS:  Okay.  They went in, you know,

10        remove the -- remove and replace the drywall.

11        They told me that have to change the cabinet and

12        that's why -- but I told them that I didn't have

13        the money to do that.  So I tell them that, you

14        know, just to leave it alone or keep it for me.

15   BY MS. HAQUE:

16        Q.   Okay.  In Phase I, if you look at the drywall

17   contract that you have, it says, third line:  Take

18   out everything that is inside the house, including

19   carpet and cabinets.

20             So you're saying they did not take out the

21   cabinets?

22        A.   Okay.  The carpet, they removed, okay.  But

23   the cabinet, that, you know, still there.

24        Q.   So the -- so they took out all the cabinets

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2130 of 3246
Case 1:09-md-02047-MCR Document 2354-1 Exhibit 31 Sub-Docket 109,2619 Page 38 of
151

```
1    except the cabinets in the kitchen; is that right?

2         A.   Okay.  When they fix the house, they remove

3    everything.

4         Q.   Right.

5              So if you look at Phase II here, it says:

6    Reinstall existing interior doors, lights, fans, and

7    cabinets.

8         A.   Yes.

9         Q.   So they -- so they did put the cabinets back?

10        A.   Yes.

11        Q.   Okay.  How long did the total remediation

12   take?

13        A.   Okay.  Something that -- you know, they began

14   January or February, then they finish by May.

15        Q.   Okay.  And all of the drywall was removed?

16        A.   Yes.

17        Q.   Do you know how much replacement drywall was

18   needed?

19        A.   No.

20        Q.   Do you know where the new drywall that they

21   installed in the house came from?

22        A.   They bought the supply.

23        Q.   Do you know from where?

24        A.   No.
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/20 Page 2131 of 3246
Case 1:11-cv-22408-MGC Document 230-1 Entered on FLSD Docket 05/16/2012 Page 45 of
151

Confidential – Subject to further confidentiality Review

```
 1        Q.    Were the ceilings removed and replaced?

 2        A.    Yes.

 3        Q.    Was the carpeting -- was all of the carpeting

 4   removed and replaced?

 5        A.    Yes.

 6        Q.    And just to confirm, all the cabinets were

 7   removed and replaced?

 8        A.    Okay.  They remove, but they put back the old

 9   cabinet in.

10        Q.    Did they replace -- did they -- were there

11   any new cabinets that were installed anywhere in the

12   house?

13        A.    No.

14        Q.    So they were all the existing cabinets?

15        A.    Yes.

16        Q.    Did J & A Stucco tell you that you needed to

17   buy new cabinets?

18        A.    Yeah.  They -- you know, they recommend.  He

19   recommend that.  He said if you want, you should

20   replace it.  But I did not have the money to do it at

21   that time.

22        Q.    So this quote for 43,000 did not include new

23   cabinets?

24        A.    That's correct.
```

Confidential - Subject to Further Confidentiality Review

1      Q.    Are you having any problems with the cabinets

2    now?

3      A.    Okay.  Because, you know, so they pop out and

4    they just not have, like, the original.

5      Q.    So you were having wear and tear over time

6    with the cabinets?

7      A.    Okay.  When, you know, they come in -- when

8    the house have the problem with the drywall, the

9    cabinets have issue already.  It pop up, pop out.  So

10   that reason, you know, the guy there told me that,

11   you know, I need to change.  But I don't have the

12   money.  Yes.

13     Q.    Before -- before J & A Stucco told you about

14   the cabinets, did you have any problems with the

15   cabinets?

16     A.    Yeah.  I saw that, you know, the piece -- pop

17   it out, okay.  The, you know, the piece of wood push

18   it out, pop it out.

19     Q.    And the J & A -- and someone told you that

20   that was due to Chinese drywall?

21     A.    No.  He just recommend to, you know, to

22   replace the new one.

23     Q.    Okay.  Was the wiring in your home -- the

24   electrical wiring removed and replaced?

Case 2:09-md-02047-EEF-MBN  Document 22363-39  Filed 11/19/19  Page 2133 of 3246
Case 1:09-md-02047-EEF-MBN  Document Confidential Subject to Packet 05/03/2013 Page 91 of
151
Confidential - Subject to Further Confidentiality Review

```
1       A.   Yeah.  Electric, yes.

2       Q.   Were -- other than the air-conditioning, were

3   any of the appliances in your house removed and

4   replaced?

5            THE INTERPRETER:  The interpreter need to

6        clarify.

7            THE WITNESS:  The -- the refrigerator because

8        it's old.  So they remove and throw it away.  But

9        the stove, that, you know, we put it back, the

10       older one.

11  BY MS. HAQUE:

12       Q.   Okay.  So the refrigerator, they disposed of

13  it because it was old?

14       A.   Okay.  I do not know that because it old or

15  the Chinese drywall make it so it don't work.  So I

16  don't know.

17       Q.   Were there any problems with the refrigerator

18  that you noticed?

19       A.   It not cold.  Not keep cold.

20       Q.   Did things defrost, or was it just -- can you

21  explain the problems a little bit more?

22       A.   Okay.  It's not cold.

23       Q.   Okay.  Did it prevent you from storing your

24  food?  Were you still able to use the refrigerator?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2134 of 3246
Case 1:09-cv-02048-MCA Document 23363-39 Filed 11/19/19 Docket 0512/2019 Page 92 of
151

Confidential - Subject to further confidentiality Review

```
1       A.    Cannot keep the food.

2       Q.    What -- where did you store the food?

3       A.    Then I have to buy a new one.

4       Q.    So from -- so when did you first start

5   experiencing problems with the refrigerator?

6       A.    I don't remember.

7       Q.    Was the refrigerator cost included in the

8   remediation cost?

9       A.    No.

10      Q.    So did you have to pay extra for the

11  refrigerator?

12      A.    Yes.

13      Q.    Do you have a receipt for that?

14      A.    No.

15      Q.    Okay.  Was any of the plumbing in the house

16  replaced?

17      A.    Yes.

18      Q.    All of it?

19      A.    Yes.

20      Q.    What about bathroom fixtures?

21      A.    We took everything, throw it away.

22      Q.    Okay.  What about was any hardwood or vinyl

23  flooring in the house replaced?

24      A.    No.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2135 of 3246
Case 1:09-md-02047-MCA Document 2391-4 Entered on FLSD Docket 05/09/2019 Page 48 of 151
Confidential – Subject to Further Confidentiality Review

```
 1        Q.    Okay.  I'm going to show you what's been

 2   premarked as Exhibit 12.

 3             (Defendants' Exhibit 12 was marked for

 4   identification.)

 5   BY MS. HAQUE:

 6        Q.    Before we get to Exhibit 12, just one more

 7   thing on Exhibit 11.

 8             If you look at the options only, under

 9   plumbing, which is the second option, it says:

10   Replace copper only.

11        A.    Yes.  Yes.  They change.

12        Q.    But it says:  No toilets, bathtub, et cetera.

13        A.    Okay.  That, we still keep.

14        Q.    So what did they replace in the bathrooms

15   total?

16        A.    Okay.  When they took out the drywall, okay,

17   like in the wall right there, whatever in there, you

18   know, they -- the pipe, the thing that is there, they

19   have to repipe.

20        Q.    Okay.  But all the other fixtures stayed the

21   same?

22        A.    Okay.  They go in, you know, they change the

23   pipe or something like that.  I really do not know.

24   But the top, the sink --
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2136 of 3246
Case 1:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 91 of 151
Confidential - Subject to Further Confidentiality Review

```
1        Q.    And the toilets --

2        A.    Yeah.

3        Q.    -- and the toilets were the same as well?

4        A.    Yes.

5        Q.    Okay.  All right.  Let's look at Exhibit 12.

6              Do you recognize this document?

7        A.    Okay.  This is the guy who, you know, fix my

8    house give this to me.

9        Q.    And did you look at the document when he gave

10   it to you?

11       A.    Yes.

12       Q.    And this is a certification that says that

13   all the drywall has been removed; is that right?

14       A.    Yes.

15       Q.    And if you look at the last sentence, it

16   says:  In addition, the atmosphere in the house was

17   found to be representative of the atmosphere in

18   houses built without problem drywall.

19       A.    Okay.  After they fix the house.

20       Q.    And this statement is accurate, correct?

21       A.    Yes.

22       Q.    Okay.  Now I'm going to show you what's been

23   premarked as Exhibit 13.

24             (Defendants' Exhibit 13 was marked for
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2137 of 3246
Case 1:09-cv-07687-MGC Document 159-2 ... Filed ... Docket ... Page 45 of
151
Confidential - Subject to Further Confidentiality Review

```
 1    identification.)

 2    BY MS. HAQUE:

 3         Q.   And you have seen this document before as

 4    well, right?

 5         A.   Yes.

 6         Q.   And this document says that J & A Stucco has

 7    completed the installation of all new drywall,

 8    correct?

 9         A.   Yes.

10         Q.   And along with this document, J & A Stucco

11    provided photographs of every wall and ceiling in

12    every room in your house showing you drywall has been

13    installed?

14         A.   Yes.

15         Q.   Okay.  You can set that down.

16              And one more.  I'm going to show you what's

17    been premarked as Exhibit 14.

18              (Defendants' Exhibit 14 was marked for

19    identification.)

20    BY MS. HAQUE:

21         Q.   And you've seen this document before too,

22    right?

23         A.   Yes.

24         Q.   And I just want you to confirm the first
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2138 of 3246
Case 1:09-cv-02047-GCM Document 21 Filed on Ent Sub Docket 09/15/2019 Page 96 of 151
Confidential - Subject to Further Confidentiality Review

```
1    sentence, which I will read:  I certify that all

2    drywall, including all debris and visible dust,

3    electrical wiring, fire, safety, and home security

4    equipment, and copper gas lines have been removed in

5    accordance with remediation protocol.

6            And do you believe that to be an accurate

7    statement?

8        A.   Yes.

9        Q.   Okay.  You can set that down.

10           Have you lived in your home since the

11   remediation has been completed?

12       A.   Okay.  During the time that they fix the

13   house, I did not live in the house.  But after they,

14   you know, complete the -- they fix the house, yes.

15       Q.   Okay.  Can you describe your reaction to the

16   remediation after you moved in?

17       A.   Happy and very happy.

18       Q.   Were the odors gone?

19       A.   No.

20       Q.   I mean, you did not smell anything, correct?

21       A.   Okay.  I live in there.  I did not smell.

22       Q.   Did your appliances run properly?

23       A.   Yes.

24       Q.   Did you see any corrosion or problems with
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2139 of 3246
Case 2:09-cv-02047-MCR Document 20911 Confidential Subject to Docket 05/08/2019 Page 47 of
151
Confidential – Subject to Further Confidentiality Review

```
1    the wiring?

2         A.   You mean after the --

3         Q.   Yes.

4         A.   No, I did not see.

5         Q.   Were you pleased with the remediation?

6         A.   Yes.

7         Q.   Did the remediation, in your opinion, bring

8    the house back to as good as it was before you

9    suspected there were problems with Chinese drywall?

10             MR. ALBANIS:  Object to the form.

11             THE WITNESS:  Yes.

12   BY MS. HAQUE:

13        Q.   Was there anything you wished that had been

14   done that hadn't been accomplished during the

15   remediation?

16        A.   No.

17        Q.   Did you take the opportunity to make any

18   other renovations while the remediation was going on?

19        A.   No.

20        Q.   Okay.  Okay.  We're going to slightly change

21   topics now.

22             Ms. Nguyen, we examined examples of drywall

23   that were taken from your home at counsel's office.

24             Who collected those samples?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2140 of 3246
Case 2:09-md-02047-EEF-MBN Document Entered on FLSD Docket 05/19/2014 Page 98 of
151
Confidential - Subject to Further Confidentiality Review

```
 1        A.    Me.

 2        Q.    When were those samples collected?

 3        A.    The day that they removed the drywall.  Okay.

 4   That I stay right there, I told them, cut a piece of

 5   drywall so that I can have it, and I keep it.

 6        Q.    Were those all of the samples you took, or do

 7   you have more?

 8        A.    No.

 9        Q.    And did you purposely take samples with

10   different markings?  Do you remember?

11        A.    Okay.  You know, like, in the house, they

12   have a different room.  So I took one or two room.

13        Q.    And did you also look for the end tape

14   that's commonly with drywall.

15        A.    Okay.  The guy that, you know, to fix the --

16   or remove the drywall, he the one to show me when the

17   drywall still, you know, intact with the thing right

18   there before.  So he show me that.

19        Q.    And you collected those samples for us?

20        A.    Yes.  And I just keep it.

21        Q.    Do you have any other samples of the end tape

22   with you, or did you give them all to your attorney?

23        A.    I give it all to lawyer.

24        Q.    Did you take any photographs of the drywall
```

Case 2:09-md-02047-EEF-MBN   Document 23263-39   Filed 11/19/19   Page 2141 of 3246
Case 1:09-md-02047-EEF-MBN   Document 2089-27   Entered on FLSD Docket 05/10/2019   Page 46 of
151

Confidential - Subject to Further Confidentiality Review

```
 1    that was taken out during the remediation?

 2         A.    Yes.

 3         Q.    Do you have -- did you give those photographs

 4    to your attorney yet?

 5         A.    Yes.

 6         Q.    Okay.  We'll check with your attorney about

 7    those.

 8               Did you take photos of different markings of

 9    the drywall that had been taken out?

10         A.    Some of them have some written in there; some

11    of them don't.  I just have the picture of, you know,

12    like the -- each room.  I just do it that way.

13         Q.    And did you also take photos of the end tape

14    that was used with the drywall that had been taken

15    out?

16         A.    Yes.  Yeah, a few picture.

17         Q.    Okay.  Did J & A Stucco show you or tell you

18    about specific rooms where they took out what they

19    said was Chinese drywall?

20         A.    Yes.

21         Q.    What did they tell you -- or where did they

22    tell you the Chinese drywall was taken out?

23         A.    Okay.  When they remove the drywall, they saw

24    it and they say it.
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2142 of 3246
Case 1:13-cv-12249-NMG Document 289-21 Filed under Seal by order 05/09/2014 Page 100 of 151
Confidential - Subject to Further Confidentiality Review

```
 1        Q.    From which rooms did they say specifically

 2   was the Chinese drywall?

 3        A.    I don't remember.

 4        Q.    Did you take any photographs of the wiring or

 5   the A/C unit or anything personally before it was

 6   taken out?

 7        A.    No.  The air-conditioner unit, I did not have

 8   any.

 9        Q.    Did anyone take photos of any of the corroded

10   or blackened metals in the house?

11        A.    The inspection guy did that only.

12        Q.    Other than the inspection, did anyone else?

13              THE INTERPRETER:  Say that again, please.

14   BY MS. HAQUE:

15        Q.    Other than the inspection, did anyone else

16   take photos of the corroded or blackened metals?

17        A.    No.

18        Q.    Did anyone draft a floor plan of the house

19   that shows where the drywall boards were removed?

20        A.    No.

21        Q.    Do you -- did anyone take any photos of any

22   of the appliances before they were replaced?

23        A.    No.

24        Q.    And so the only two appliances you said you
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2143 of 3246
Case 1:13-cv-01248-NGG Weatherscon-21 Confidential Exhibit Deposition 05/18/2018 Page 601 of 151
Confidential - Subject to Further Confidentiality Review

1    had problems with prior to 2010 were the

2    air-conditioning and the refrigerator?

3              MR. ALBANIS:  Object to the form.

4              THE WITNESS:  Yes.

5    BY MS. HAQUE:

6         Q.   Did you have any other appliances or systems

7    in your house which stopped working?

8         A.   No.

9         Q.   Did you see any other instances of metal

10   corrosion in the house other than what the inspector

11   showed you?

12        A.   Okay.  I saw, you know, the blackened of the

13   parts of the faucet, the one that turn on the water

14   and turn off the water, and the blackened around.

15        Q.   Where was this faucet?

16        A.   Every one.  Each one of the faucet have that

17   problem, the blackening.

18        Q.   And when did you first notice this problem?

19        A.   I saw that before the inspector come in, but

20   I thought because I am the one that, you know, like,

21   did not keep the house clean.  I did not keep the

22   thing clean, so they have, you know, the blackening.

23        Q.   Did you ever try to clean the faucets

24   yourself with any product?

```
1        A.    Okay.  At the beginning, I clean it.  Some of

2   it came out.  Then, you know, they still, you know,

3   like, after that, and still have the blackening spot

4   left.

5        Q.    And when -- what year did you first notice

6   these blackening of the faucets?

7        A.    I don't remember.

8        Q.    Do you recall any -- or are you claiming any

9   damages to any other personal property items?  That

10  means property that's not a fixture of the house.

11       A.    Okay.  I did not live in the house for four

12  years, then I had to buy another house.  Then plus

13  with the rent I have to pay, I already out my pocket

14  about $100,000.

15       Q.    Let's -- we'll come back to that.

16            Did you suffer any damage to personal

17  property like clothes, jewelry, shoes, any -- any

18  other, you know, items that are -- that you consider

19  to be your personal property?

20       A.    Okay.  The personal that I claim for $460.

21       Q.    And for what items does that correspond to?

22       A.    Personal property that belonged to me.

23       Q.    Like what items?

24       A.    Okay.  You know, I really don't know.  But
```

```
 1    the thing that, you know, I have to fix something in

 2    the house, I have to pay.

 3         Q.   Do you have receipts for what you want to

 4    claim for the personal property damages?

 5         A.   No, I don't.

 6         Q.   Did you take any photos of either the

 7    personal property -- what you are trying to claim for

 8    the personal property damages?

 9         A.   So that -- do you count that regarding about

10    fix the air-conditioning and things like that?

11         Q.   Not the air-conditioning.  Personal property.

12    So anything that you consider to be clothes, jewelry,

13    things like that.

14         A.   No, no.

15         Q.   Have you filed any homeowner's insurance

16    policy claims for any damage that you suffered to any

17    of your property?

18         A.   No.

19         Q.   Okay.  Do you want to take a quick break, or

20    can we keep going?  I have about -- well, I don't

21    want to say -- maybe another hour or so.

22              MR. ALBANIS:  Do you guys have questions too?

23              MR. SHAPIRO:  We have just a few questions on

24         this topic, just a couple, if we are switching
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2146 of 3246
Case 1:14-cv-42408-NGET Document 3091-1 Entered on FSD Docket 05/13/2015 Page 104
of 151
Confidential - Subject to Further Confidentiality Review

```
 1        topics.

 2              MR. ALBANIS:  And then maybe we take a break

 3        after these questions?

 4              MS. HAQUE:  Sure.

 5                        CROSS-EXAMINATION

 6   BY MR. SHAPIRO:

 7        Q.   So we had talked about remediation of the

 8   house and about the new house that you purchased.

 9   Did you ever consider remediating the house in 2011

10   instead of buying a new house and leaving the house

11   that needed remediation vacant for five years?

12        A.   At that time, I did not think that to fix the

13   house.  I just leave it right there.

14        Q.   But did you ever consider instead of

15   purchasing a new house, using the money that you were

16   getting for the new house, instead using that money

17   to fix the house?

18        A.   Okay.  At that time, I did not want to fix

19   the house because of the issue.  I just want to leave

20   it like that right there.

21        Q.   Why didn't you want to fix the house?

22        A.   Okay.  At that time, okay, I didn't want to

23   fix the house because I want, you know, to see that

24   if the Chinese drywall company want to come down and
```

1    to see, you know, what is the issue because the issue

2    so they can see.  So I just leave right there in case

3    they come and see.

4        Q.   Okay.  And is there some reason -- I know

5    that we talked about that a little bit before -- is

6    there some reason you thought the company would come

7    down to see?

8        A.   Okay.  Because, you know, the house that they

9    have the issue with, the problem, I have to leave it

10   right there to keep the evidence right there.  So it

11   just leave it like that so in case they come.  If I

12   fix it, when they come, they say where the problem?

13   Because it just happened.  So I just leave it like

14   that.

15       Q.   So then what made you decide when you did in

16   2015 to go ahead and fix the property?

17       A.   Okay.  Because, you know, I waited so long,

18   and then I decided to fix.  Okay.  In that time, you

19   know, then I say that, okay, if I fix it now, I would

20   have the picture.  I will keep the evidence so in

21   case -- in case it open, then I have all of the

22   evidence.

23       Q.   And were you ever told that -- that any court

24   had -- were you ever told that you were legally not

1    allowed to fix it until 2015?

2         MR. ALBANIS:  Objection to the extent that

3      counsel is asking for privileged information.

4         MR. SHAPIRO:  I'll rephrase the question

5      actually.

6         MR. ALBANIS:  Thank you.

7    BY MR. SHAPIRO:

8      Q.   Was it your understanding that there was any

9    court order that prevented you from fixing the house?

10     A.   No.

11     Q.   Were you aware whether there were court

12   orders that allowed you to fix the house?

13     A.   This is my house.  Whenever I want to fix it,

14   I fix it.

15     Q.   We talked a little bit about the remediation.

16   I'm showing you Exhibit 11.

17          Was it your understanding that you were

18   paying for the removal and replacement of all Chinese

19   drywall?

20     A.   Yes.

21     Q.   And just a couple more questions before we

22   break.

23          Talking about the cabinets, you had mentioned

24   that they popped out.

```
 1        A.   Okay.  It just, like, like right here, the

 2    cabinet, then outside the cabinet, they have, you

 3    know, some -- the face, okay.  Then around there, it

 4    pop out, you know, a little bit.

 5        Q.   So it's the face of the cabinet, the hinges

 6    on the side of the cabinet?

 7        A.   Yes, yes.

 8        Q.   Okay.  So it's the face of the cabinet that

 9    was coming off?

10        A.   Yeah.

11        Q.   Okay.  And was that because the hinges on the

12    side were not on securely?

13             MR. ALBANIS:  Object to the form.

14             THE WITNESS:  No, I don't know.

15    BY MR. SHAPIRO:

16        Q.   You don't know why the face of the cabinet

17    was coming off?

18        A.   I believe something, like, the glue when the

19    glue, the --

20             MR. SHAPIRO:  I think we're fine.

21             Take a break.

22             MS. HAQUE:  Just a quick five-minute break

23        and we'll keep going.

24             (Recess from 12:44 until 1:03 p.m.)
```

```
 1              DIRECT EXAMINATION (Continued)

 2   BY MS. HAQUE:

 3       Q.   Ms. Nguyen, I want to change topics now.

 4            How has the presence of Chinese drywall -- or

 5   let me start over.

 6            Has the presence of Chinese drywall in your

 7   home limited the use of your property?

 8       A.   I do not understand.

 9       Q.   Has the presence of Chinese drywall in your

10   home prior to the remediation limited you from using

11   the property in any way?

12       A.   So what you mean is that because, you know,

13   like, the Chinese drywall present in my house so,

14   what you ask, like, do I have feeling or what I think

15   about that before?  Right?

16       Q.   Let me ask it another way.

17            In this case, you were ordered to complete a

18   supplemental plaintiff profile form.

19            Do you remember doing that?

20       A.   What do I need to do?

21       Q.   There was a form that you had filled out and

22   that you had presented to us that have different

23   damages claims that you are -- different damages that

24   you are claiming in this case.
```

```
1        A.    When I realize or I knew what the issue and I

2    seek for the -- you know, for the damage, then I

3    begin identify the thing that is.  So I wrote it down

4    in the document, and I gave that paper to the lawyer.

5        Q.    Okay.  You said that you're claiming loss and

6    enjoyment of the home; is that correct?

7        A.    Yes.

8        Q.    How much money are you claiming for loss of

9    use and enjoyment?

10       A.    I do not know that.  The judge is the one --

11   or order.  I do not know.

12       Q.    In the form, you have written $450,000 for

13   your claim for loss of use and enjoyment.

14       A.    I can request that, but the one that the

15   person --

16       Q.    Why did you write that specific number?  What

17   is your basis for that number?

18       A.    Okay.  Because it just for, you know, the

19   basic of living.  It cost almost $100,000 already.

20   Then I -- you know, loss of the quality of the life,

21   you know, the benefit and the enjoyment, the

22   opportunity to live in that.  And also, you know,

23   for -- to pay for, you know, all the -- fix and

24   replacement.
```

1    Q.   So I'm just asking about loss of use and

2    enjoyment, not repairs and not the alternative living

3    expenses.

4    A.   Okay.  I had a house.  I cannot live in my

5    own house.  I have to, you know, go out and rent the

6    house -- I mean, rent a place to live.  Then I have

7    to buy another house.  It's smaller.  It is not the

8    same, you know, the comfort in my own home.

9    Q.   What were things -- what things could you not

10   do because you had to move out of your home?

11   A.   Because the Chinese drywall.

12   Q.   I think you misinterpreted my question.

13       I'm asking:  What things could you not do

14   anymore that you used to do in your old home?

15       MR. ALBANIS:  Object to the form of that

16       question.

17       THE WITNESS:  Okay.  It just that I build a

18       house.  I was so excited to live in that house.

19       Now all of this I have because of a problem -- I

20       had to move out, and I cannot live in my house.

21       So that is the distress, you know, for that

22       in my part and to, you know, de-stressed and

23       distress.

24   ///

```
 1      BY MS. HAQUE:

 2          Q.    And how did you come to the $450,000 number?

 3          A.    The -- okay.  In the inspection -- and I

 4      really do not -- because, really, the loss.

 5          Q.    I don't think I understand.

 6                How did you come to choose $450,000, not for

 7      repairs, but for loss of use and enjoyment?

 8          A.    That -- I didn't choose the number, that

 9      number.  Okay.  I count everything there, but I did

10      not choose the 400-something.

11          Q.    Do you know who chose that number?

12          A.    I do not know.

13          Q.    Okay.  So this number is on the supplemental

14      plaintiff profile form.  So are you saying you did

15      not fill in that number?

16          A.    No.

17          Q.    Okay.  I want to change topics to the

18      alternative living expenses that you claim in this

19      case.

20                When you found out about the Chinese drywall

21      back in May of 2010, how long did you stay in the

22      house until you -- or how long was that period until

23      you moved out to the new rental property -- I'm

24      sorry -- I meant into your mom's house?
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2154 of 3246
Case 1:15-cv-04961-NGG Document 69-1 Confidential Subject to Further Confidentiality Review
of 151

```
1        A.    When the time that we found out about the

2   Chinese drywall, immediately at that week I move to

3   my mom.

4        Q.    Did anyone tell you that you needed to move

5   out of the house?

6        A.    No.  I decide.

7        Q.    And just to clarify, did you attempt to

8   remove any of the drywall prior to you moving to your

9   mom's place?

10       A.    What did you mean on that?

11       Q.    Did you take out any drywall in the house

12  just as -- as you -- before you left?

13       A.    No.

14       Q.    Okay.  How much money do you believe you have

15  spent for alternative living expenses total?

16       A.    Okay.  You know, in front of me right now,

17  you know, to buy the new -- to buy another house, it

18  cost 90,000.  Okay.  To live in my mom house, just

19  about 10,000.  Yes.

20       Q.    So you're claiming approximately 100,000?

21       A.    Okay.  This is the amount that I, you know,

22  spent out.  The one that I put the claim, I do not

23  know how much they put in the claim.

24       Q.    Okay.  But you -- you think that you spent
```

Case 2:09-md-02047-EEF-MBN  Document 22363-29  Filed 11/19/19  Page 2155 of 3246
Case 1:14-cv-02408-NGG  Document 22-1  Entered on FLSD Docket 05/08/2015  Page 13 of 151
Confidential - Subject to Further Confidentiality Review

 1    about 100,000 in alternative -- $100,000 in

 2    alternative living expenses?

 3        A.   Yes.

 4        Q.   But you told us earlier that you spent

 5    approximately $900 a month that you paid to your mom

 6    from May 2010 through -- it was 2015, until you moved

 7    back into the house, right?

 8            MR. ALBANIS:  Object to the form.

 9            THE WITNESS:  The money that I pay to my mom,

10       it not necessary monthly.  When I had the money,

11       I paid her.  Okay.  That, I'm talking about the

12       loan that I owe her.

13           But the -- during the time that I stay in my

14       mom, monthly, I had to pay her toward the rent.

15    BY MS. HAQUE:

16        Q.   Right.  So let's say that you paid every

17    month both the rent from May 2010 until June 2011,

18    and then you started paying the loan repayment of

19    $900 after June 2011.  Wouldn't the maximum you would

20    have paid have been about $54,000 total, instead of

21    $100,000?

22           MR. ALBANIS:  Object to the form.

23           THE WITNESS:  The money that I borrow from my

24       mom, it's $90,000 so I can buy the house.

```
1    BY MS. HAQUE:

2        Q.   But that wasn't -- you paid -- you borrowed

3    that money as a loan for the house.

4        A.   Yes.

5        Q.   So you're -- one second.

6             So you're claiming that you should receive

7    100,000 total for the $90,000 for the new home at

8    2100 Southwest and $10,000 in rent?

9        A.   Okay.  Not only that, you need to count, you

10   know, the loss of the enjoyment, the, you know, to

11   fix the house and to, you know, to do things -- many,

12   many other thing.

13       Q.   No, so I'm just asking about alternative

14   living expenses.

15            So you're considering the cost of the new

16   home at 2100 Southwest as part of your alternative

17   living expenses damages for this -- for this case?

18       A.   Yes.

19       Q.   Did you ever consider selling this home at

20   2100 Southwest Center Boulevard Place in order to pay

21   your mother back?

22       A.   No, not yet.  I did not pay her yet.

23       Q.   No, I'm asking if you ever considered selling

24   the home at 2100 Southwest Center Boulevard Place
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2157 of 3246
Case 1:14-cv-04091-NGG Materials Subject to Further Confidentiality Review Page 115 of 151
Confidential -- Subject to Further Confidentiality Review

1    because you owed your mother money?  So why not just

2    sell the home and pay her back?

3         A.   Because right now my mom didn't need the

4    money.  When she need it, then we will think that.

5    This time she want to leave it like that.

6         Q.   So she basically gave you the $89,000 as a

7    gift with no fixed payment plan; and it's just when

8    she needs money, she can ask you for money?

9         A.   No.  That's not a gift.  That is the -- still

10   I owe mom that money.  And when mom need the money,

11   then I have to pay her back.

12        Q.   So did you -- why didn't you -- did you ever

13   consider just selling the home in order to pay your

14   mom back?  That way you won't have a loan anymore?

15        A.   Like I told you already, okay, when mom need

16   the money, then I will, you know, sell and pay back.

17   Right now, she didn't need the money, so...

18        Q.   Do you still owe her a loan, though?

19        A.   Yes.

20        Q.   What is the current value of the 2100

21   Southwest Santa Barbara home?

22             THE INTERPRETER:  The interpreter need to

23        clarify.

24   ///

Confidential - Subject to Further Confidentiality Review

```
1    BY MS. HAQUE:

2        Q.   What is the current value of the home of 2100

3    Southwest Center Boulevard Place?

4        A.   I do not know.

5        Q.   Okay.  Before we move on to a new topic, do

6    you have any documents to show the $450,000 that you

7    are claiming for the loss of use and enjoyment?

8            MR. ALBANIS:  Object to the form.  Object to

9        the form.

10           THE WITNESS:  I do not know.

11   BY MS. HAQUE:

12       Q.   Do you not have any documents, or do you not

13   know if you have documents?

14           MR. ALBANIS:  Object to the form.

15           THE WITNESS:  I do not know.

16   BY MS. HAQUE:

17       Q.   Do you not have any documents related to the

18   loss of use and enjoyment?

19           MR. ALBANIS:  Objection.

20           THE WITNESS:  What did you ask me?  I really

21       do not understand.

22   BY MS. HAQUE:

23       Q.   Do you have any documents -- so -- so let's

24   take it step-wise.
```

Case 2:09-md-02047-EEF-MBN Document 22363-20 Filed 11/19/19 Page 2159 of 3246
Case 1:13-cv-01206-WCG Document 209-1 Entered on FLSD Docket 05/08/2019 Page 917 of 151
Confidential -- Subject to Further Confidentiality Review

```
 1              You are claiming -- and we've seen in the

 2    supplemental plaintiff's profile form, you are

 3    claiming damages related to a loss of use and

 4    enjoyment of your home.

 5         A.   I really do not know what the document, you

 6    know, supplemental -- I do not know.

 7         Q.   Okay.

 8              MR. ALBANIS:  It may help if you showed her

 9         the document.

10              MS. HAQUE:  I'm going to get to that in the

11         next section.  We are going to get to that in the

12         next section.

13    BY MS. HAQUE:

14         Q.   So I just have a couple questions left, and

15    then we'll --

16              We talked about your mortgage.  Do you recall

17    the terms of the mortgage?  Is it 30 years,

18    et cetera?

19         A.   Okay.  The original, you know, 2006 is

20    30-year mortgage.  Okay.  Then in 2014, or whatever

21    that year that we refinance it, in 15 years.

22         Q.   Do you have any other liens or loans secured

23    by the property?

24         A.   No.
```

```
1        Q.   Okay.  What is the current value of your

2   property?

3        A.   I don't know.

4        Q.   Okay.  If you go to Exhibit Number 4 --

5        A.   I only know that when you pay the tax and

6   they put the value in there.

7        Q.   Okay.  If you go to Exhibit 4, this is a tax

8   assessment.

9        A.   Yes.

10       Q.   And if you look at the top of the document,

11  it shows the current value of your property as

12  $296,349.

13       A.   Yes.

14       Q.   And do you -- do you have any basis to

15  dispute this number?

16            MR. ALBANIS:  Object to the form.

17            THE WITNESS:  So this is the paper from the

18       County.  You know, they send for the tax.  So

19       that is correct.

20  BY MS. HAQUE:

21       Q.   Okay.

22       A.   You know, but when you -- you know, you try

23  to sell the house -- it's completely different.  I

24  don't know.
```

1    Q.    Have you ever attempted to sell or lease the

2    property at 103 Southeast 16th Place?

3    A.    No.

4    Q.    Have you ever appealed the assessed value of

5    your home from the County?

6    A.    No.

7    Q.    Have you ever had any appraisals done of your

8    property?

9    A.    No.  Okay.  No.  The, you know, when I

10   refinance, the bank did the, you know, appraisal.

11   Q.    Okay.  Do you have a report from them?

12   A.    No.

13   Q.    Do you know how much the bank appraised your

14   home value?

15   A.    No.

16   Q.    Okay.  Have you attempted any other times to

17   refinance your property?

18   A.    No.

19   Q.    Okay.  I want to introduce what's been

20   premarked as Exhibit 15.

21        (Defendants' Exhibit 15 was marked for

22   identification.)

23   BY MS. HAQUE:

24   Q.    Have you seen this document before?

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2162 of 3246
Case 1:18-cv-12408-NGG Document 21-11 Filed 05/18/2018 Page 120 of 151
Confidential - Subject to Further Confidentiality Review

```
 1        A.   Yeah.  This is the paper that the lawyers

 2   sent it.

 3        Q.   Let's turn to page -- it says in the bottom

 4   corner NGUYENT00004.

 5        A.   Okay.

 6        Q.   Is this your signature?

 7        A.   Yes.

 8        Q.   And you understand that your signature was a

 9   verification that the form was true and correct?

10        A.   Yes.

11        Q.   And this is your mother's signature as well?

12        A.   Yes.

13        Q.   Does the information you provided on this

14   form back in 2010 still look correct to you?

15             MR. ALBANIS:  Object to the form.

16             THE WITNESS:  Yes.

17   BY MS. HAQUE:

18        Q.   Okay.  So do you remember filling out a

19   supplemental plaintiff's profile form?

20        A.   Okay.  I only fill out a form from Morgan,

21   yeah, but the other one, I do not know.

22        Q.   Okay.  Let's take a look at that.

23             Okay.  I'm going to show you what's been

24   premarked as Exhibit Number 16.
```

Case 2:09-md-02047-EEF-MBN  Document 22363-29  Filed 11/19/19  Page 2163 of 3246
Case 1:14-cv-02494-NGG-MDG  Document 689-21  Filed on FSD Docket 05/08/2019  Page 421 of 151
Confidential - Subject to further confidentiality review

```
 1              (Defendants' Exhibit 16 was marked for

 2      identification.)

 3      BY MS. HAQUE:

 4          Q.    Can you take a second to just look through

 5      that document.

 6                Have you seen this document before?

 7          A.    Yes.

 8          Q.    If you look at the very back, is this your --

 9      who signed this document?

10          A.    My mom.

11          Q.    Did you have an opportunity to sign this

12      document as well?

13          A.    Okay.  Some of the document -- some of the

14      documents my mom asked me to sign, I sign.  Some that

15      she have her own signature.

16          Q.    So did you look at this -- when did you look

17      at this document?

18          A.    You mean this document?  I just see that now.

19                But the signature, that dated on February.

20          Q.    So this is the first time you have ever seen

21      this document?  Today?

22          A.    No.  You know, at -- this document sign

23      already and given to the attorney.

24          Q.    Your mom signed this document?
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2164 of 3246
Case 1:14-cv-12208-NGC Document 289-1 *Referred to under Seal* 05/08/2014 Page 122 of 151
Confidential - Subject to further confidentiality Review

```
 1        A.    Yes.

 2        Q.    But have you ever seen this document before

 3   today?

 4        A.    Yes.

 5        Q.    So you've reviewed the information in this

 6   document?

 7        A.    Yes.

 8        Q.    And the information in this document is true

 9   and correct?

10        A.    Yes.

11        Q.    Okay.  On Page 4, you're claiming -- oh,

12   wait.

13             If you go to Section 5, you're claiming that

14   the total cost to date for the remediation of the

15   property is $75,000?

16        A.    Yeah.  They fix the house.

17        Q.    You testified earlier that the cost for

18   remediation was closer to $60,000.

19        A.    Okay.  But, you know, when they do it, then

20   we -- to fix the air, and, you know, it's a few more

21   thing in there.  Okay.  So when they remove the

22   cabinet, they throw it away.  Then we put the tile --

23   the tile in.  So when it -- then also we paint the

24   house.  Okay.  We paint the outside.
```

```
 1        Q.    Let's turn back to Exhibit 11.  It's in this

 2   stack.  Yes.

 3              So if you take a look at that, it says that

 4   the total cost is 43,000 plus approximately 18,500

 5   for the options.

 6        A.    Okay.  But in this one, they removed the

 7   cabinets.  But they did not put, you know, the price

 8   that I replace for the tile.

 9        Q.    It says at the bottom:  Remove and install

10   new tile, and it says $6,000.

11        A.    But, you know, they said remove and fix tile.

12   I think that, you know, whatever the amount is right

13   there.  Because it's long time.

14        Q.    Do you have any receipts or other

15   documentation that show whatever extra amount you

16   paid?

17        A.    What -- whatever I have that -- I give it to

18   the attorney.

19        Q.    Okay.  Let's go back to Exhibit 16, and if

20   you turn to Page 6.  At the top of the page, you're

21   claiming this $450,000 for loss of use and enjoyment

22   of the property.

23        A.    This one -- this one, you know, I don't know.

24   This one that they have a signature, I don't know.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2166 of 3246
Case 1:19-mc-00405-MKB Document 7-21 entered on FLSD Docket 05/29/2019 Page 124 of 151
Confidential - Subject to Further Confidentiality Review

```
 1        Q.   So you did not fill this out?

 2        A.   Yes.  I fill out.

 3        Q.   But you --

 4        A.   Okay.  Because they say a lot of thing in

 5    there.  So when the lawyer send it to me, I read the

 6    part that's important.

 7        Q.   So you -- just to confirm, you did not fill

 8    out this Page 6, $450,000?

 9             MR. ALBANIS:  Object to the form.  Object to

10        the form.

11             THE WITNESS:  This is the one that I filled

12        out.  This is mine.

13    BY MS. HAQUE:

14        Q.   But you did not sign that?

15        A.   Okay.  This is my mom's signature.  My mom

16    signed it.

17        Q.   But you filled it out?

18        A.   Yes.  I fill it out.

19        Q.   Okay.  So let's talk about this $450,000.

20        A.   Okay.  Okay.  Whatever -- okay.  Whatever

21    that document from my lawyer sent to me, I just, you

22    know, take a quick look.  And because he my lawyer,

23    so then I sign.

24        Q.   So I want to confirm:  You did not fill this
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2167 of 3246
Case 1:18-cv-12408-NGE Document 269-1 Confidential - ESI Dated 05/08/2019 Page 125 of 151
Confidential - Subject to Further Confidentiality Review

 1    out?  You received it?

 2            MR. ALBANIS:  Object to the form.

 3            THE INTERPRETER:  One minute, please.

 4            THE WITNESS:  Okay.  This is the written

 5      right here.  I did it.

 6    BY MS. HAQUE:

 7      Q.    Turn to Page 2 for me, please.

 8            There's a question that says name of person

 9    completing this form, and it states Tuyen Mai.

10            Is this incorrect?

11      A.    Okay.  This is my mom.  My mom's name, okay?

12    My mom's signature.  I fill it out after they --

13    after the signature.

14      Q.    So your mom signed it, and then you filled

15    out the rest of the form?

16      A.    Okay.  Whatever the document here, my -- the

17    lawyer send it to me, I fill it out, okay.  This

18    part, they already type.

19      Q.    Okay.

20      A.    Okay.  The 400-something, they typed out.  I

21    really don't know.

22            MR. ALBANIS:  May I interject for a second?

23            MS. HAQUE:  Sure.

24            MR. ALBANIS:  Just so that the record is

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2168 of 3246
Case 1:19-mj-02049-NGG Document 009-2-1 Confidential – Subject to Further Confidentiality Review of 151
Confidential – Subject to Further Confidentiality Review

```
1        clear, obviously we have an obligation to

2        supplement discovery.  We did submit an amended

3        SPPF.  It's Document 3449647, and it's been

4        uploaded to the report.

5   BY MS. HAQUE:

6        Q.   Okay.  Are you aware of any supplemental

7   changes to this form?

8        A.   Okay.  Yes.  I have my lawyer and whatever --

9   you know, the lawyer that work with me.

10       Q.   Can you tell me about the changes that were

11  made to the new -- to this form since you have --

12  since this document was signed and verified?

13       A.   This paper didn't have nothing change in

14  there.

15       Q.   So are you aware of any changes being made to

16  this document?

17       A.   No.

18       Q.   And if there were changes made, you did not

19  provide any input on those changes?

20       A.   Okay.  I work with my lawyer, okay?  So

21  whatever they end up, you know, I talk to my lawyer.

22  Lawyer write it down.  But this one, I signed.

23       Q.   But you did not review any -- you personally

24  did not review or make any changes to any -- to this
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2169 of 3246
Case 1:15-cv-02098-NGG Document 00-21 Entered on FLSD Docket 05/08/2019 Page 127 of 151
Confidential — Subject to Further Confidentiality Review

```
 1   document?

 2       A.   I have all the document.  I reviewed the

 3   document.

 4       Q.   So what changes were made?

 5       A.   The paper already done.  I don't need to

 6   change anything.

 7       Q.   So you did not make -- I just want to make

 8   the record clear.

 9            You did not make any changes yourself?

10            MR. ALBANIS:  Object to the form.

11            THE WITNESS:  Yes.

12   BY MS. HAQUE:

13       Q.   Okay.  Okay.  Just a couple more questions,

14   and then I'll be done.

15            On Page 5 of this document, you have listed

16   some payments that you have received.

17       A.   Yes.

18       Q.   Are these all the payments or setoffs that

19   you have received?

20            MR. ALBANIS:  Object to the form.

21            THE WITNESS:  Okay.  I only received the --

22       you know, the amount of the payment that supply,

23       and that it.

24   ///
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2170 of 3246
Case 1:14-mp-00049-NGG Document 6-21 Entered on FLSD Docket 04/18/2019 Page 428
Confidential — Subject to Further Confidentiality Review of 151

```
 1    BY MS. HAQUE:

 2        Q.   Are these all the payments that you have

 3    received from anyone in connection to Chinese

 4    drywall?

 5        A.   Yes.

 6        Q.   Okay.  I want to show you what's been

 7    premarked as Exhibits 17 and 18.

 8            (Defendants' Exhibit 17 was marked for

 9    identification.)

10            (Defendants' Exhibit 18 was marked for

11    identification.)

12            THE WITNESS:  Yes.

13    BY MS. HAGUE:

14        Q.   Is this the same check you have listed -- and

15    here's Number 18.

16        A.   Yes.

17        Q.   Are these the two checks that you have listed

18    on Page 5 of your supplemental plaintiff's profile

19    form?

20        A.   Yes.

21        Q.   What have you done with the money received

22    from these supplemental checks?

23        A.   Okay.  This belong to me, and I really do not

24    know what I spend it.  Sometime I just deposit and
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2171 of 3246
Case 1:11-cv-22408-MGC Document 99-1 Entered on FLSD Docket 05/18/2015 Page 129 of 151
Confidential - Subject to Further Confidentiality Review

```
 1    put it in the bank.

 2         Q.   You have deposited these two checks in your

 3    bank account?

 4         A.   I don't remember.  I don't remember.  I cash

 5    or I deposit.

 6         Q.   You either cashed the checks or you deposited

 7    them; is that right?

 8         A.   One or the other.

 9         Q.   Do you know if you used them for any -- to

10    pay for anything related to your house at

11    103 Southeast 16th Place?

12         A.   Don't remember.

13         Q.   Okay.  Just a few more questions, and then

14    I'm done.

15              Are you the sole owner of the claim for all

16    the damages that you seek in your lawsuit?

17              MR. ALBANIS:  Object to the form.

18              THE WITNESS:  You mean this house?

19    BY MS. HAQUE:

20         Q.   Yes.  Your claims in the lawsuit.

21         A.   Yes.

22         Q.   Okay.  Do you know -- do you acknowledge that

23    after you purchased your home in 2006 that there was

24    a housing recession in Florida?
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2172 of 3246
Case 1:15-cv-02494-NG Document 321-1 Entered on FLSD Docket 05/18/2012 Page 130 of 151
Confidential - Subject to Further Confidentiality Review

```
 1            MR. ALBANIS:  Object to the form.

 2            THE WITNESS:  I don't know.

 3    BY MS. HAQUE:

 4       Q.   Are you aware that during this recession,

 5    housing prices dropped in Florida?

 6            MR. ALBANIS:  Object to the form.

 7            THE WITNESS:  I do not know.  I do not think

 8       of that either.

 9            MS. HAQUE:  Okay.  I think we'll just take

10       five minutes and confer to see if we have any

11       more questions, and if not, we can pass the

12       witness.

13            (Recess from 1:57 until 2:08 p.m.)

14            MS. HAQUE:  No more questions.  I pass the

15       witness to my colleague, Mr. Shapiro.

16                      RECROSS-EXAMINATION

17    BY MR. SHAPIRO:

18       Q.   Just a couple follow-up questions.

19            So referring to the property at 2100, you

20    previously mentioned that that property has been

21    transferred to your uncle-in-law; is that correct?

22       A.   Yes.

23       Q.   Okay.  But then when you were asked more

24    recently about why you haven't -- you didn't sell the
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2173 of 3246
Case 1:19-cv-02092-WGY Document 9-21 Entered on FLSD Docket 08/22/2019 Page 131 of 151
Confidential - Subject to Further Confidentiality Review

```
 1    property, about why you hadn't sold the property

 2    instead of giving it to a relative, you said that

 3    you'll sell it when your mom needs the money.

 4            So I just wanted to --

 5    A.    Okay.  That how the claim for the uncle.

 6    Q.    Okay.  So just to be clear, your uncle-in-law

 7    currently owns the 2100 property; is that correct?

 8    A.    Yes.

 9    Q.    And did you choose to transfer it to him?

10    A.    Yes.

11    Q.    Turning to Exhibit 11, the fourth page,

12    there's a check, and purchaser says SunTrust.  And it

13    says:  Pay to order of Tracy Nguyen.

14    A.    Yes.

15    Q.    Are you saying that this check was used to

16    pay for the remediation costs?

17    A.    Yes.

18    Q.    Is there anything beyond this check that

19    shows that the $10,000 went to J & A Stucco?

20    A.    Okay.  The check, the item note 10,000 or

21    15,000, that paid to the stucco.

22    Q.    Okay.  But is there anything on here that

23    says it was paid to Stucco?

24    A.    This little one right here, on here.
```

```
1         Q.   Okay.  But are there any other -- are there

2    any documents that actually show it went to Stucco?

3         A.   So the bank did write that they pay order of

4    the name right here.

5         Q.   I think she may be looking at the next page.

6              MR. GUERRA:  It's the next page.

7              THE WITNESS:  Okay.  So this one?

8              MR. SHAPIRO:  Yes.

9    BY MR. SHAPIRO:

10        Q.   And, again, it says purchaser, SunTrust?

11        A.   Okay.  The one in here that the bank loan the

12   money to me.  Okay.  I borrow the money from the

13   bank.

14        Q.   For what purpose?

15        A.   Fix the house.

16        Q.   Okay.  And are there any documents showing

17   that this $10,000 went to J & A Stucco?

18        A.   I bought the cashier check.  Okay.  You know,

19   and the bank -- and my account had the money.  So

20   then I bought the cashier check.

21        Q.   Okay.  But the question -- I just want to

22   make sure we are clear what the question is.

23             Is there anything showing that this amount

24   went to J & A Stucco?
```

Confidential - Subject to Further Confidentiality Review

```
 1      A.   No.

 2      Q.   Okay.

 3      A.   This is my money.

 4      Q.   Okay.  Thank you.

 5           Two more questions.

 6           Looking at Exhibits 17 and 18.

 7      A.   So this one?

 8      Q.   No.  The ones with the settlement checks.

 9   They're probably at the bottom of the pile.

10      A.   Right.  Yes.

11      Q.   These checks are all made out to you?

12      A.   Yes.

13      Q.   Do you know if your mother received any

14   checks?

15      A.   No.

16      Q.   Did you meet with your lawyer between

17   November 16th, 2019, and November 19th, 2019 --

18   sorry.  I apologize.

19           Hold on.

20           Sorry.  I said 2019.

21           2018.  I apologize.

22      A.   Yes, I met the lawyer.

23      Q.   Okay.  Between those dates?

24      A.   What day?
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2176 of 3246
Case 1:19-cv-12240-NGED Document 2009-1 (entered under seal) Dated 05/08/2010 Page 134 of 151
Confidential - Subject to further confidentiality Review

```
1          Q.    November 16th, 2018, which is a Friday, and

2    November 19th, 2018, which was a Monday.

3          A.    Yes.

4          Q.    Which day was it?

5          A.    Forgot.

6          Q.    But --

7          A.    I saw --

8          Q.    Sorry.  Say that again.

9          A.    I saw him.

10         Q.    Between those two -- those dates?

11               THE INTERPRETER:  One minute, please.

12               THE WITNESS:  Okay.  I met him because with

13         all the documents, you know, the reading of the

14         document.

15   BY MR. SHAPIRO:

16         Q.    So just to be clear, you met with him

17   between -- sometime between these three days over the

18   weekend?  Do you recall which day it was over the

19   weekend that you met with --

20               MR. ALBANIS:  Object to the form.

21               MR. SHAPIRO:  Sorry.  What's the objection?

22               MR. ALBANIS:  I believe the 19th was a

23         Monday.

24   ///
```

```
1    BY MR. SHAPIRO:

2        Q.   And Monday.  Any of those dates.

3             Which one did you meet with your lawyer on?

4        A.   Last week.

5        Q.   Last week?

6        A.   Okay.  I forget what day, but, you know, I

7    saw him -- last week, I saw him.

8        Q.   Last week.  Okay.

9        A.   Ox.  Last week, this week, or something.

10   Today is December; is that correct?

11       Q.   December?

12       A.   What day is that?

13       Q.   One day in December?

14       A.   What day today?

15       Q.   Today's December 6th.

16       A.   Yes, yes.

17       Q.   Okay.  And so you met with your lawyer

18   sometime in the past couple of weeks?

19       A.   Yes.

20       Q.   And did you meet with your lawyer before --

21   when was the last time you met your lawyer before

22   that?

23       A.   Okay.  Last week that I saw him and he had

24   a -- give me the appointment today, I have to come
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2178 of 3246
Case 1:14-cv-4049-NGG Document 21-1 Filed 11/11/14 Page 2178 of 151
Confidential – Subject to Further Confidentiality Review

```
 1    here.

 2         Q.   Okay.  And before last week, when had you met

 3    with your lawyer before that time?

 4         A.   I don't remember.

 5         Q.   Okay.  Do you remember communicating with

 6    your lawyer before last week -- sorry.

 7              When was the last time you communicated with

 8    your lawyer before last week?

 9         A.   I met him last week and then this week

10    sometime.

11         Q.   And before that?

12         A.   No.

13         Q.   No?  Okay.

14              So last question.  You said you were thrilled

15    with the remediation, and you haven't experienced any

16    problems.  Do you believe that the home has gone

17    down -- has been impacted -- the home value has been

18    impacted by Chinese drywall?

19              MR. ALBANIS:  Object to the form.

20              THE WITNESS:  I do not know.

21              MR. SHAPIRO:  Okay.  That's all that I have.

22                        CROSS-EXAMINATION

23    BY MR. ALBANIS:

24         Q.   Ms. Nguyen, I have some follow-up questions
```

1    for you, okay?

2           Both Ms. Haque and Mr. Shapiro asked you

3    several questions about the remediation that you paid

4    for at 103 Southeast 16th Place.

5           Do you recall that?

6    A.   Yes.

7    Q.   One of the questions that they had asked you

8    was whether you would have done anything differently

9    in the home when you remediated it.

10   A.   You mean at the time they fixed my house?

11   Q.   Correct.

12   A.   Okay.  Okay.  The thing, you know, I want

13   to -- the house right now still have the old

14   countertop, the old cabinet.  And the house actually

15   did not a complete fix 100 percent, and I would like

16   to change the countertop and the old cabinet.

17          MR. ALBANIS:  Okay.  Okay.  Should we mark

18      this Plaintiff's Exhibit 1?  Is that fine?

19          (Plaintiff's Exhibit 1 was marked for

20      identification.)

21   BY MR. ALBANIS:

22   Q.   Could you take a moment to look through this

23   document and let me know when you have reviewed the

24   whole thing, please.

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2180 of 3246
Case 2:14-cv-02494-NGE Document 90-21 entered on FLSD Docket 05/08/2015 Page 138 of 151
Confidential - Subject to Further Confidentiality Review

```
1        A.   Yes.

2        Q.   Okay.  You just testified that your home that

3   has been remediated still had the old cabinets and

4   the old countertops?

5        A.   Yes.

6        Q.   That's correct?

7        A.   Yes.

8        Q.   The countertops and the cabinets were not

9   replaced in the home; is that correct?

10       A.   Okay.  The same old one.

11       Q.   Okay.  Could you please turn to Page 4 of

12  Plaintiff's Exhibit Number 1.  Let me direct you to

13  the middle of the page.  It says Section 5, "Already

14  Remediated Property."

15            Do you see where it says that?

16       A.   This one?

17       Q.   Section 5, "Already Remediated Property."

18            Do you see where it says that?

19       A.   Okay.  They fix the other thing, but the

20  countertop and the other thing, not yet.

21       Q.   Okay.

22       A.   I want to change that now.

23       Q.   The question below that Section 5 states,

24  quote:  Has the property been partially or completed
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2181 of 3246
Case 1:14-cv-04048-NGG-MDG Document 99-2 Filed Under Seal 05/04/2018 Page 139 of 151
Confidential - Subject to Further Confidentiality Review

1    remediated?

2            Your answer says:  Partially remediated.

3            Do you see that?

4    A.    It not completely, you know, 100 percent yes.

5    Q.    I understand that.

6            Do you see on the document where it states:

7    Has the property been partially or completed

8    remediated?

9            And the answer is:  Partially remediated.

10   A.    Yes.

11   Q.    Did you authorize my office to change that

12   answer from "completely remediated" to "partially

13   remediated" at some point in November 2018?

14   A.    Yes.

15   Q.    Why did you authorize us to make that change?

16   A.    Because I did not feel that, you know, the

17   house is completely remediated.

18   Q.    Because of the countertops and the cabinets?

19   A.    Yes.

20           MR. VERRIER:  Give us just one second.

21   BY MR. ALBANIS:

22   Q.    Okay.  Just a couple more questions,

23   Ms. Nguyen.

24           Before we took the most recent break,

Case 2:09-md-02047-EEF-MBN Document 22363-20 Filed 11/10/19 Page 2182 of 3246
Case 1:18-cv-12408-NGC Document 6234-1 Confidential Duchateau 05/08/2018 Page 940
of 151

Confidential - Subject to Further Confidentiality Review

```
 1    Ms. Haque asked you whether you are the sole owner of

 2    the claims you seek in this lawsuit.  And you

 3    answered yes.

 4         Do you remember that?

 5    A.   Yes.

 6    Q.   Okay.  As you sit here today, you intend to

 7    obtain an assignment of your mother's claims to you,

 8    correct?

 9    A.   Yes.

10    Q.   After you obtain that assignment, it's your

11    understanding that you will be the sole owner of the

12    claims in this lawsuit, correct?

13    A.   Yes.

14         MR. SHAPIRO:  I'm going to object to form to

15    that last question.

16         MR. ALBANIS:  Okay.  That's all we have.

17         MR. SHAPIRO:  Two follow-up questions.

18              FURTHER RECROSS-EXAMINATION

19    BY MR. SHAPIRO:

20    Q.   Turning to Exhibit 16, turn to Page 7.  The

21    date there is February 13th, 2018, correct?

22    A.   Yes.

23    Q.   And then turning to Page 4, Section 5, it

24    says:  Has the property been partially or completely
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2183 of 3246
Case 1:18-cv-02408-WFK Document 009-21 Confidential Filed Under Seal 05/06/2019 Page 141 of 151
Confidential - Subject to Further Confidentiality Review

1    remediated?

2          And the answer says:  Completely remediated.

3          Correct?

4     A.   Okay.  Yes, you know, the thing that they fix

5    already.  But the cabinet, not yet.

6     Q.   Okay.  So I just want her to answer the

7    question, the first question I asked, which is:  That

8    says "completely remediated" there under Section 5;

9    is that correct?

10    A.   No, it not complete, you know, remediated

11   100 percent, no.

12    Q.   I'm just asking what it says.

13    A.   Yes, inside there, it says complete.

14    Q.   Okay.  And then I think that you were trying

15   to answer this question, is:  As of that date,

16   February 13th, 2018, the cabinets and the countertops

17   were still your old cabinets and countertops; is that

18   correct?

19    A.   Yeah.  It's still the old one.

20    Q.   Okay.  And then, again, this is referred to

21   as a plaintiff profile form.  We've discussed --

22   we've shown you a few of these.

23    A.   Yes.  I know that, because they have here the

24   judge file, and I know that belong to me.

Case 2:09-md-02047-EEF-MBN Document 22363-20 Filed 11/19/19 Page 2184 of 3246
Case 1:13-cv-02489-NGG Document 22 Entered on FLSD Docket 05/08/2019 Page 142 of 151
Confidential - Subject to further confidentiality Review

```
 1        Q.    Is there any version of this form, of

 2    plaintiff profile form, that you have signed?

 3        A.    Okay.  This is my mom's signature, but

 4    whatever the -- send it to us and have the name, then

 5    we sign.

 6        Q.    But just to be clear, there's no plaintiff

 7    profile form that you know of with your signature?

 8        A.    Okay.  The one that, you know, all the

 9    document that relate to my lawyer, that I am the one

10    to sign it.

11        Q.    Okay.  So I know that you signed the original

12    plaintiff profile form.  These are supplemental

13    plaintiff profile forms.

14              Are you aware of any plaintiff profile form

15    that you have signed?

16        A.    You asked me regarding about this document.

17    That's in my mom.

18        Q.    I think we're just asking if there's a

19    version of that document that you have signed, not

20    your mom.

21        A.    Yes.  Anything related to the one that

22    related to my lawyer, I sign it.

23              MR. SHAPIRO:  Okay.  Maybe we can just

24        stipulate that as of right now, there is no
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2185 of 3246
Case 1:14-cv-09148-NGG Deutsche Bank 14-Interest EsD Deposition 03/28/2019 Page 143 of 151
Confidential - Subject to Further Confidentiality Review

```
1        supplemental profile form with her signature on

2        it?

3              MR. ALBANIS:  What I'll say in response to

4        that is that Ms. Nguyen did provide a

5        verification to her answers to interrogatories

6        which incorporated the supplemental profile form.

7        In addition to that, the most recent one, which

8        was Plaintiff's Exhibit Number 1, included an

9        electronic signature.

10             Having said all that, there is no pen to

11       paper that she has made as supplemental plaintiff

12       profile form.

13             MR. SHAPIRO:  This is the most recent one

14       that was submitted this week?

15             You are saying the electronic was the most

16       recent one?

17             MR. ALBANIS:  The most recent.

18  BY MR. SHAPIRO:

19       Q.   Last question that I have is:  Your lawyer,

20  when he questioned you, you told -- you said that you

21  authorized him to change the profile form from

22  "completely remediated" to "partially remediated."

23             Who initiated that contact?

24             MR. ALBANIS:  I'm going to object to that.
```

```
 1             MR. SHAPIRO:  What is the basis?

 2             MR. ALBANIS:  I'll let her answer.

 3             THE WITNESS:  That is the one -- I am the

 4        one, okay, to -- to ask for that, because I feel

 5        that it my house, and, you know, the cabinets

 6        still old and, you know, countertop is old.  So I

 7        am the one to -- to ask.

 8   BY MR. SHAPIRO:

 9        Q.   Did she call her lawyer or did her lawyer

10   call her?

11        A.   I am the one initiate and the one to tell him

12   because it all -- that still old one in my house.

13        Q.   And when did you tell him that?

14        A.   It just recently.

15        Q.   When?

16        A.   The last week.

17        Q.   And --

18        A.   Oh, a few month before.  Okay.  When, you

19   know, they say that completely remediate, so that I

20   did not feel it complete yet.

21        Q.   And just to be clear, you want new cabinets

22   and new countertops because you say they were damaged

23   by the Chinese drywall; is that correct?

24        A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2187 of 3246
Case 1:19-cv-12940-NGG Memorandum 22363-29 Filed 11/19/19 Page 2187 of 3246
Confidential - Subject to Further Confidentiality Review
of 151

1    Q.   And has anyone told you that they have been

2    damaged by Chinese drywall?

3    A.   Okay.  Only time, when they came to, you

4    know, fix the house, then they recommend me that they

5    change.  But I did not change at that time.

6          MR. SHAPIRO:  And this is just a housekeeping

7          point.  I know we talked about this earlier.  But

8          you will be producing her mother sometime before

9          the close of that discovery in January?

10         MR. ALBANIS:  Yes.

11         MR. SHAPIRO:  That's all we have.

12         MR. ALBANIS:  Let me ask some very quick

13         follow-ups based on that.

14                      RECROSS-EXAMINATION

15   BY MR. ALBANIS:

16   Q.   Tracy, can you please pull Exhibit 16 and

17   Plaintiff's Exhibit Number 1, which I believe you

18   just flipped over.

19         You just flipped over Plaintiff's Exhibit

20   Number 1.  It's the second amended supplemental

21   plaintiff profile form.

22         Okay.  You provided to my office the

23   information that is in these two documents; is that

24   correct?

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2188 of 3246
Case 1:15-cv-04427-NGG Document 209-21 Entered on FLSD Docket 05/08/2018 Page 146 of 151
confidential - Subject to Further confidentiality Review

```
 1        A.    Yes.

 2        Q.    And you authorized my office to file these on

 3    your behalf; is that correct?

 4        A.    Yes.

 5              MR. ALBANIS:  Okay.  No more questions for

 6    us.

 7              MR. SHAPIRO:  We have no questions.

 8              MS. HAQUE:  No questions from defendants.

 9              Can go off the record, or did you want to put

10    something on the record really quickly?

11              THE COURT REPORTER:  You're ordering, and you

12    want a rough draft, correct?

13              MS. HAQUE:  Correct.  Expedited transcript

14    and rough draft.

15              THE COURT REPORTER:  Mr. Shapiro, you want

16    the same?

17              MR. SHAPIRO:  Yes, please.

18              THE COURT REPORTER:  You're getting a rough

19    and expedited?

20              MR. VERRIER:  Yes.

21              MR. ALBANIS:  We'll reserve signature.

22              (Whereupon, the deposition concluded at

23    4:45 p.m.)

24
```

```
 1                    C E R T I F I C A T E

 2

 3           I, KELLY J. LAWTON, Registered Professional

 4     Reporter, Licensed Court Reporter, and Certified

 5     Court Reporter, do hereby certify that, pursuant to

 6     notice, the deposition of TRACY NGUYEN was duly taken

 7     on December 6, 2018, at 8:06 a.m. before me.

 8           The said TRACY NGUYEN was duly sworn by me,

 9     through an interpreter, according to law to tell the

10     truth, the whole truth and nothing but the truth and

11     thereupon did testify as set forth in the above

12     transcript of testimony.  The testimony was taken

13     down stenographically by me.  I do further certify

14     that the above deposition is full, complete, and a

15     true record of all the testimony given by the said

16     witness.

17

18           _____

19           KELLY J. LAWTON, RPR, LCR, CCR

20

21           (The foregoing certification of this

22     transcript does not apply to any reproduction of the

23     same by any means, unless under the direct control

24     and/or supervision of the certifying reporter.)
```

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4           Please read your deposition over carefully

 5   and make any necessary corrections.  You should state

 6   the reason in the appropriate space on the errata

 7   sheet for any corrections that are made.

 8

 9           After doing so, please sign the errata sheet

10   and date it.  It will be attached to your deposition.

11

12           It is imperative that you return the original

13   errata sheet to the deposing attorney within thirty

14   (30) days of receipt of the deposition transcript by

15   you.  If you fail to do so, the deposition transcript

16   may be deemed to be accurate and may be used in

17   court.

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2191 of 3246
Case 1:14-cv-24408-MGC Document 269-1 Entered on FLSD Docket 05/08/2019 Page 149 of 151
Confidential - Subject to Further Confidentiality Review

```
 1                    - - - - - -

 2                   E R R A T A

 3                    - - - - - -

 4    PAGE    LINE    CHANGE

 5    _____   _____   _____

 6       REASON: _____

 7    _____   _____   _____

 8       REASON: _____

 9    _____   _____   _____

10       REASON: _____

11    _____   _____   _____

12       REASON: _____

13    _____   _____   _____

14       REASON: _____

15    _____   _____   _____

16       REASON: _____

17    _____   _____   _____

18       REASON: _____

19    _____   _____   _____

20       REASON: _____

21    _____   _____   _____

22       REASON: _____

23    _____   _____   _____

24       REASON: _____
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2192 of 3246
Case 2:14-cv-02722-NGG Document 269-1 Entered on FLSD Docket 05/08/2018 Page 150 of 151
Confidential - Subject to further confidentiality Review

```
  1                  ACKNOWLEDGMENT OF DEPONENT

  2

  3          I, TRACY NGUYEN, do hereby acknowledge that I

  4     have read the foregoing pages, 1 to 150, and that the

  5     same is a correct transcription of the answers given

  6     by me to the questions therein propounded, except for

  7     the corrections or changes in form or substance, if

  8     any, noted in the attached Errata Sheet.

  9

 10

 11     _____        _____

 12     TRACY NGUYEN                                         DATE

 13

 14

 15

 16

 17     Subscribed and sworn to before me this

 18     _____ day of _____, 20___.

 19     My Commission expires: _____

 20

 21     _____

        Notary Public

 22

 23

 24
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2193 of 3246
Case 1:19-cv-12408-NGN Document 2021-2 Filed under seal Date 05/08/2019 Page 151 of 151
Confidential - Subject to further confidentiality Review

```
 1                        LAWYER'S NOTES

 2    PAGE    LINE

 3    _____   _____    _____

 4    _____   _____    _____

 5    _____   _____    _____

 6    _____   _____    _____

 7    _____   _____    _____

 8    _____   _____    _____

 9    _____   _____    _____

10    _____   _____    _____

11    _____   _____    _____

12    _____   _____    _____

13    _____   _____    _____

14    _____   _____    _____

15    _____   _____    _____

16    _____   _____    _____

17    _____   _____    _____

18    _____   _____    _____

19    _____   _____    _____

20    _____   _____    _____

21    _____   _____    _____

22    _____   _____    _____

23    _____   _____    _____

24    _____   _____    _____
```

# EXHIBIT A25

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2195 of 3246
Case 1:11-cv-22408-MGC Document 2021 Entered on FLSD Docket 05/08/2019 Page 2 of 126
Confidential - Subject to Further Confidentiality Review

```
1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2                    Case No. 1:11-CV-22408-MGC
3       -------------------------------§
        EDUARDO AND CARMEN AMORIN et      §
4       al., individually, and on behalf §
        of all others similarly          §
5       situated,                        §
                                         §
6          Plaintiffs,                   §
                                         §
7       vs.                              §
                                         §
8       TAISHAN GYPSUM CO., LTD. F/K/A    §
        SHANDONG THAIHE DONGXIN CO.,      §
9       LTD.; TAIAN TAISHAN PLASTERBOARD §
        CO., LTD., et al,                §
10                                       §
           Defendants.                   §
11      ------------------------------- §
         - - -
12
                                 - - -
13
                     WEDNESDAY, DECEMBER 19, 2018
14
                                 - - -
15
                  Confidential - Subject to Further
16                      Confidentiality Review
17                               - - -
18          Deposition of JEOVANY NUNEZ, held at JG Firm,
        1855 Griffin Road, Suite C-470, Dania, Florida,
19      commencing at 7:37 a.m., on the above date,
        before Kelly J. Lawton, Registered Professional
20      Reporter, Licensed Court Reporter, and Certified
        Court Reporter.
21
                                 - - -
22
                     GOLKOW LITIGATION SERVICES
23            877.370.3377 ph | 917.591.5672 fax
                        deps@golkow.com
24
```

Confidential - Subject to Further Confidentiality Review

```
 1     APPEARANCES:
 2        ALLISON GRANT, P.A.
          BY:  ALLISON GRANT, ESQUIRE
 3        14 S.E. 4th Street
          Boca Raton, Florida 33432
 4        (561) 994-9646
          agrant@allisongrantpa.com
 5        Representing Plaintiff
 6
          BARON & BUDD, P.C.
 7        BY:  HOLLY WERKEMA, ESQUIRE
          3102 Oak Lawn Avenue, Suite 1100
 8        Dallas, Texas 75219
          (214) 521-3605
 9        hwerkema@baronbudd.com
          Representing Plaintiff
10
11        LEVIN, SEDRAN & BERMAN, LLP
          BY:  KEITH J. VERRIER, ESQUIRE
12        510 Walnut Street, Suite 500
          Philadelphia, Pennsylvania 19106
13        (215) 592-1500
          kverrier@lfsblaw.com
14        Representing Plaintiff
15
          ALSTON & BIRD, LLP
16        BY:  MICHAEL J. BARRY, ESQUIRE
          BY:  SARAH O'DONOHUE, ESQUIRE
17        BY:  ASHTON G. CARPENTER, ESQUIRE
          One Atlantic Center
18        1201 West Peachtree Street
          Atlanta, Georgia 30309
19        (404) 881-7000
          mike.barry@alston.com
20        sarah.odonohue@alston.com
          ashton.carpenter@alston.com
21        Representing Taishan Gypsum Co., Ltd. and Tai'an
          Taishan Plasterboard, Co., Ltd.
22
23
24
```

Case 2:09-md-02047-EEF-MBN Document 22363-20 Filed 11/19/19 Page 2197 of 3246
Case 1:15-cv-02488-NGG Document 8992-1 Entered on FLSD Docket 05/08/2019 Page 9 of
126
Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:

 2        ORRICK, HERRINGTON & SUTCLIFFE, LLP
          BY:  DAN GUERRA, ESQUIRE
 3        The Orrick Building
          405 Howard Street
 4        San Francisco, California 94105
          (415) 773-5545
 5        dguerra@orrick.com
          Representing BNBM PLC
 6

 7        ABALLI MILNE KALIL, P.A.
          BY:  JOSHUA D. POYER, ESQUIRE
 8        2250 SunTrust International Center
          One Southeast Third Avenue
 9        Miami, Florida 33131
          (305) 373-6600
10        jpoyer@alalli.com
          Representing BNBM PLC
11

12

13    ALSO PRESENT:

14        Monica Alba-Nunez

15

16

17

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2198 of 3246
Case 1:14-cv-02494-NGG Document 099-21 Entered on FLSD Docket 05/09/2018 Page 49 of
126
Confidential - Subject to Further Confidentiality Review

```
 1                        - - -

                     I N D E X

 2                        - - -

 3    Testimony of:  JEOVANY NUNEZ

 4        DIRECT EXAMINATION BY MR. BARRY...............  7

 5        CROSS-EXAMINATION BY MR. GUERRA............... 116

 6

 7                   E X H I B I T S

 8              (Attached to Transcript)

 9    DEFENDANTS'                                       PAGE

10    Exhibit 1   Purchase Agreement for Shoma Homes    19
                  Splendido, a Condominium
11

      Exhibit 2   Warranty Deed                         20
12

      Exhibit 3   Declaration of Correctness of Square  27
13                Footage on Chinese Drywall Client(s)
                  Property for Remediation Damages
14

      Exhibit 4   Miami-Dade County Property            28
15                Information Report

16    Exhibit 5   Subcontract Agreement                 30

17    Exhibit 6   Oscar Air Conditioning, Inc.          34
                  Invoices
18

      Exhibit 7   Photographs - Air-Conditioning Unit   38
19

      Exhibit 8   Photographs - Bathroom Faucet Piping  42
20

      Exhibit 9   Chinese Drywall Screening, LLC        49
21                March 26, 2010 Report

22    Exhibit 10  December 22, 2011 Letter from Baron    56
                  & Budd, P.C.  to JP Morgan Chase and
23                Fannie Mae

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-20 Filed 11/19/19 Page 2199 of 3246
Case 1:15-cv-22408-NGG Document 22-1 Entered on FLSD Docket 05/49/2019 Page 7 of 126
Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S

 2    DEFENDANTS'                                           PAGE

 3    Exhibit 11  2012 to 2013 Residential Lease for        73
                  Apartment or Unit in Multi-Family
 4                Rental Housing (other than a Duplex)
                  Including a Mobile Home,
 5                Condominium, or Cooperative

 6    Exhibit 12  2014 to 2015 Residential Lease for        74
                  Apartment or Unit in Multi-Family
 7                Rental Housing (other than a Duplex)
                  Including a Mobile Home,
 8                Condominium, or Cooperative

 9    Exhibit 13  2016 to 2017 Residential Lease for        74
                  Apartment or Unit in Multi-Family
10                Rental Housing (other than a Duplex)
                  Including a Mobile Home,
11                Condominium, or Cooperative

12    Exhibit 14  Bank of America Bank Statements           77

13    Exhibit 15  Chase Mortgage Loan Payment History       85

14    Exhibit 16  First Mortgage                            89

15    Exhibit 17  Second Mortgage                           89

16    Exhibit 18  June 14, 2010 E-mail from Jeovany         94
                  Nunez to Steve Bronzy - Subject:
17                Acct:  5304359424

18    Exhibit 19  January 5, 2010 E-mail from PNMAC -       97
                  Subject:  Online Draft
19
      Exhibit 20  February 2, 2014 E-mail from PNMAC -      98
20                Subject:  Online Draft

21    Exhibit 21  In Rem Final Judgment of Foreclosure      99

22    Exhibit 22  Certificate of Sale                       103

23    Exhibit 23  First Amended Supplemental Plaintiff      104
                  Profile Form
24
```

Case 2:09-md-02047-EEF-MBN Document 22363-20 Filed 11/19/19 Page 2200 of 3246
Case 1:18-cv-12408-NGL Document 2-1 filed confidential Docket 05/08/2000 Page 1 of 126
Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S

 2   DEFENDANTS'                                    PAGE

 3   Exhibit 24  Move For Less Quote                108

 4   Exhibit 25  Plaintiff Jeovany Nunez's Response 109

                 to Defendants' Interrogatories

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                          - - -

 2              THE COURT REPORTER:  Sir, would you please

 3         raise your right hand.

 4              Do you swear or affirm that the testimony

 5         you're about to give will be the truth, the whole

 6         truth, and nothing but the truth?

 7              THE WITNESS:  Yes.

 8              JEOVANY NUNEZ, called as a witness by the

 9    Defendants, having been first duly sworn, testified

10    as follows:

11                     DIRECT EXAMINATION

12    BY MR. BARRY:

13         Q.   Mr. Nunez, we met before.  My name is

14    Michael Barry.  I represent Taishan Gypsum with my

15    colleagues, Sarah O'Donohue and Ashton Carpenter.

16              MR. BARRY:  Do we want to have everyone say

17         their name for the record?  Why don't we do that.

18              MR. GUERRA:  I'm Dan Guerra with Orrick,

19         Herrington & Sutcliffe.  We represent the

20         defendant in this matter, Beijing New Building

21         Materials, Pubic Limited Company.

22              MR. POYER:  Josh Poyer with Aballi, Milne,

23         Kalil; and I also represent Beijing New Building

24         Materials, PLC.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2202 of 3246
Case 1:14-cv-02494-NGG Document 21 Filed 05/13/14 Page 49 of 126
Confidential - Subject to Further Confidentiality Review

```
 1              MR. VERRIER:  Keith Verrier from Levin,

 2       Sedran & Berman in Philadelphia here on behalf of

 3       the plaintiffs.

 4              MS. GRANT:  And Allison Grant on behalf of

 5       Allison Grant, P.A., on behalf of the plaintiffs.

 6              THE WITNESS:  I'm Jeovany Nunez, and

 7       unfortunately, my house has Chinese drywall.

 8  BY MR. BARRY:

 9       Q.   Well, we appreciate you being here,

10  Mr. Nunez -- I know this is not an easy process --

11  and appreciate your time and energy.

12              And, you know, I'm going to go through a

13  little bit of background on the deposition.  And you

14  have probably heard all of this from your lawyer, but

15  I'm going to repeat it.

16              The first thing I will emphasize on all of

17  this is, you know, while we're sitting here taking a

18  deposition, all these people in the room, if you ever

19  need a break, if you have need a moment, you let me

20  know.  Don't hesitate to let me know.  The only thing

21  I ask is if there is a question on the table, just

22  let me finish it, answer the question, and then

23  you're welcome to take a break whenever you need to.

24              A few rules of the road, just more for the
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2203 of 3246
Case 1:09-cv-07299-MGC Document 2231 Entered on FLSD Docket 08/26/19 Page 40 of
126
Confidential - Subject to Further Confidentiality Review

 1    court reporter than anybody.  When I'm asking a

 2    question, please don't start answering it before I

 3    finish.  It's not like a normal conversation.  We're

 4    trying to make sure she can take everything down.

 5            I'm probably going to slip up and ask a

 6    question while you're already making an answer, so

 7    I'm going to do that too; so don't worry if you do

 8    it, too.  I'll probably remind you, you will probably

 9    remind me, or your lawyer will more likely remind me.

10            Make sure all your responses are verbal, say

11    "yes," "no," even if you are nodding your head.  And

12    just make sure that everything we're doing is

13    something that she can write down on the record.

14            So have you ever done a deposition before?

15        A.    No.

16        Q.    So have you ever watched a deposition?

17        A.    No.

18        Q.    And do you understand that everything that is

19    going on in this deposition is sworn and under oath

20    and can -- and it's taken as truth as if you are

21    testifying in court?

22        A.    Yes.

23        Q.    Are you taking any medications that will

24    impair your ability to understand my questions and to

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2204 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 41 of
126

Confidential - Subject to Further Confidentiality Review

```
 1    answer the questions truthfully?

 2         A.    No.

 3         Q.    How did you prepare for this deposition?

 4         A.    Speaking to my attorneys.

 5         Q.    Now, I'm not asking for the content of those

 6    conversations.  How many times did you meet with your

 7    attorneys?

 8         A.    Once.

 9         Q.    Once?  For how long?

10         A.    About three hours.

11         Q.    Did you review any documents?

12         A.    Yes.

13         Q.    What documents did you review?

14         A.    It was a good amount of documents that, you

15    know, I have already provided to her.

16         Q.    And those are all documents that have been

17    produced to us?

18         A.    Yes.

19         Q.    And if I were going through these documents

20    and you saw them, I could probably -- I could ask

21    you, you know, you -- did you -- have you reviewed

22    this document before, and you would be able to

23    answer?

24         A.    For the most part.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2205 of 3246
Case 1:1-cv-2149-GCT Document 235-1 Entered on FLSD Docket 05/19/2015 Page 12 of
126
Confidential - Subject to Further Confidentiality Review

```
1       Q.    Okay.  Was anyone else present at these

2   meetings with your lawyer?

3       A.    Yes.  My wife and Holly, which she stepped

4   out, the other attorney.

5       Q.    And did you meet separately without your wife

6   at all?

7       A.    No.

8       Q.    Did you speak outside of the presence of

9   counsel with your wife about this deposition?

10      A.    Briefly.

11      Q.    Have you spoken to anyone else about it?

12      A.    No.

13      Q.    You didn't speak to any of your friends

14  saying I'm going to do to a deposition?

15      A.    No.

16      Q.    Did you speak to your boss?

17      A.    No.  I happen to be off today.

18      Q.    It's always convenient.

19            Did you do anything else to prepare for this

20  deposition?

21      A.    No.

22      Q.    Now, I'm just going to ask some background

23  questions about you.

24            Where are you employed?
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2206 of 3246
Case 1:11-cv-22408-MGC Document 29-31 Entered on FLSD Docket 05/18/2012 Page 43 of
126

Confidential - Subject to Further Confidentiality Review

```
1        A.    I work for the Department of Homeland

2   Security, TSA.

3        Q.    And how long have you worked there?

4        A.    14 years.

5        Q.    Wow.  What do you do there?

6        A.    I am an expert transportation security

7   officer.

8        Q.    And what does that job entail?

9        A.    Basically I work in the department that we

10  mitigate insider threats throughout the airport in

11  any entrance or any back way that an employee would

12  have access to.

13       Q.    And which airport do you work at?

14       A.    Miami International Airport.

15       Q.    And for the 14 years that you've worked

16  there, has been your role the entire time?

17       A.    No.  I've had other positions there.  When I

18  first started just as a screening officer and moving

19  up into leadership and then ultimately, where I'm at

20  now.

21       Q.    So you have worked your way up the totem

22  pole?

23       A.    Sure.

24       Q.    Right.
```

```
1              What is your work schedule generally like?

2       A.    I work from 4 in the morning until 12:30 in

3    the afternoon.

4       Q.    Okay.  And how many days a week?

5       A.    Two days off, usually during the week.

6       Q.    Okay.  And you said you are married, right?

7       A.    Yes.

8       Q.    What is your wife's name?

9       A.    Monica Alba-Nunez.

10      Q.    And she is also a claimant in this case,

11   correct?

12      A.    Through marriage, but all of the paperwork

13   and all that, it's when I -- I purchase the home

14   prior to getting married.

15      Q.    Okay.  And how long -- and how long have you

16   been married?

17      A.    Since 2010.

18      Q.    Okay.  And were you -- how long were you with

19   your wife before you got married?

20      A.    Good question.

21      Q.    We won't let her review this part of the

22   transcript.

23      A.    2006.  So four years.

24      Q.    And do you have any children?
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2208 of 3246
Case 1:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2208 of 3246
Confidential - Subject to Further Confidentiality Review
126

```
 1        A.    Yes.

 2        Q.    Are the children with your wife?

 3        A.    I have two stepdaughters and then a son that

 4   we have together, yes.

 5        Q.    Okay.  And how old are your children?

 6        A.    Kaila, she's the eldest, she's 21; Madison,

 7   18; and Ethan, 6.

 8        Q.    And so you said stepdaughters.  Are they from

 9   a previous marriage of your wife's?

10        A.    Yes.

11        Q.    Okay.  Have you ever been involved in a

12   lawsuit before this lawsuit?

13        A.    No.

14        Q.    You have never been a plaintiff, never been a

15   defendant, no one's ever sued you?

16        A.    The only thing, I guess, would be a part of,

17   like, a global settlement, which I guess would be the

18   same --

19            MS. GRANT:  This litigation.

20   BY MR. BARRY:

21        Q.    So everything related to Chinese drywall?

22        A.    Sure.  Right.  Right, right, right.

23        Q.    And so that's the only time you have ever

24   participated in a class-action lawsuit or anything
```

Confidential – Subject to Further Confidentiality Review

1    like that?

2        A.    Other than maybe, like, you know how you get

3    those credit cards ones or --

4        Q.    Yeah.  You are a part of the class.

5        A.    Right, right.

6        Q.    Your name is not front and center?

7        A.    Right, right.

8        Q.    Now, what is the address of the property that

9    you are saying has been damaged by Chinese drywall?

10       A.    Okay.  It's been some time since I have been

11   there, but if I recall correctly, it's 8049 West

12   36th Avenue, Unit 4, Hialeah, Florida 33015 [sic].

13       Q.    Do you currently own that property?

14       A.    At the moment, no.

15       Q.    When did you buy that property?

16       A.    We closed in 2007.

17       Q.    Okay.  And who did you buy it from?

18       A.    Shoma Homes.

19       Q.    Okay.  And how much did you pay for the

20   house?

21       A.    Ballpark, 269,000 and some change.

22       Q.    And I'll put documents in front you that help

23   you remember the exact number.  So ballpark is

24   perfectly fine for right now.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2210 of 3246
Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 47 of
126
Confidential - Subject to Further Confidentiality Review

```
1              Do you remember whether you purchased that

2    through a bank, or did you use a lender -- or,

3    another type of lender of some sort?

4         A.   At the moment, I don't recall.  It would

5    probably be in the documents.

6         Q.   Okay.  Do you remember if you took a mortgage

7    on that property?

8         A.   As far as taking a loan out for the purchase

9    of the home?  Yes.

10        Q.   Do you remember if you took one mortgage or

11   two mortgages?

12        A.   It was divided into two.

13        Q.   Okay.  And why did you divide them into two?

14        A.   Not -- that was something the bank just

15   worked out.  I'm not a hundred percent sure why they

16   chose to do that.

17        Q.   So it wasn't something that you specifically

18   asked to do --

19        A.   No, I did not.  Right.  It must have been

20   something that they just worked out rate-wise, I'm

21   assuming.

22        Q.   Do you remember if anyone else, while you had

23   ownership of the property, had a lien on the

24   property, any type of tax lien or a business loan or
```

Case 2:09-md-02047-EEF-MBN  Document 22363-39  Filed 11/19/19  Page 2211 of 3246
Case 1:09-cv-02047-GET  Document 1234230  Filed 05/16/2011  Page 9 of 126
Confidential - Subject to Further Confidentiality Review

```
 1    any other type of encumbrance?

 2         A.   I don't recall.  No.

 3         Q.   Do you own any other properties or houses?

 4         A.   No.

 5         Q.   And from the time you bought the house in

 6    2007 until the time you no longer owned the house,

 7    were you always living there?

 8         A.   Yes.

 9         Q.   So you lived at that house the whole period

10    of time?

11         A.   There was a portion of time that it was

12    probably empty.

13         Q.   Okay.  What was that portion of time?

14         A.   Probably the first -- we closed 2007, so

15    maybe the first few months.

16         Q.   And now, I think I'm missing an important

17    question.  When did you leave the house?

18         A.   It was the end of 2011 when we finally

19    decided to move.

20         Q.   And what happened?  Did you sell the house

21    then?

22         A.   No.

23         Q.   So what was going on at the house from 2011

24    until today?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2212 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 40 of 126
Confidential - Subject to Further Confidentiality Review

```
 1      A.   At that point, the house was vacant, closed.

 2   We were trying to work things out, you know, with the

 3   attorneys, as far as this process and with the

 4   mortgage holder, while we leased somewhere else due

 5   to just health reasons and, you know, obvious issues

 6   with our electronics and the piping in the walls and

 7   the fumes and the smell, things of that nature.  By

 8   that point, we were already aware of, you know, how

 9   big of an issue Chinese drywall was, and just for our

10   sake, we decided to move.

11      Q.   So from 2011 on, were you still in ownership

12   of the house?

13      A.   Yes.

14      Q.   Okay.  And when did your ownership of the

15   house cease?

16      A.   It would have been the last -- we're in 2018,

17   so August of 2017.

18      Q.   And what happened that --

19      A.   Foreclosure.

20      Q.   Foreclosure?

21           I'm going to show you a few documents, if you

22   don't mind.

23           Now, Mr. Nunez, I'm not going to take too

24   long on these documents.  And the way I'm going to do
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2213 of 3246
Case 1:09-md-02047-EEF-MBN Document Confidential Subject to Further Confidentiality Review
126

1    this, I'm going to show it to your counsel first so

2    that she can review it and make sure she's okay with

3    it coming in.  I don't think there should be any

4    problems with these, but . . .

5         (Defendants' Exhibit 1 was marked for

6    identification.)

7         MR. BARRY:  Now, I'm going to enter this as

8      Exhibit 1 to the deposition.

9    BY MR. BARRY:

10     Q.  Mr. Nunez, do you know what this document is?

11         And please take the time to review it, if you

12    would like to.

13     A.  From what I'm reading, it's the purchase

14    agreement.

15     Q.  And was this the purchase agreement when you

16    bought the house in 2007?  Or, it says 2005 here.

17     A.  Well, the home was preconstruction, so that's

18    our -- this is just a contract between myself and the

19    builder, because it wasn't finally built until 2006

20    and we closed 2007.

21     Q.  Okay.  Explain that to me.  So you were --

22    you had entered into a purchase agreement before the

23    house was completed.  Is that right?

24     A.  From what it looks like, yes.  Yeah.  Because

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2214 of 3246
Case 1:07-cv-09227-GEL Document 23362-39 Filed 11/19/19 Page 41 of 126
Confidential - Subject to further confidentiality Review

1    you had to set the property aside, pick your

2    location, what model you wanted.

3        Q.   Now, since you signed up -- you entered into

4    the purchase agreement in 2005.  When did you -- do

5    you recall when you ended up entering the house?

6        A.   I would say -- I'm just going back, it's

7    2007 -- ten, 11 years ago.

8        Q.   Of course.

9        A.   I think prior to closing, I think they had us

10    do, like, a walk-through, due to the fact that the

11    house was preconstruction, so to point out any issues

12    or anything wrong with the construction.  So I would

13    say right before we closed.

14        Q.   And do you remember when closing was?

15        A.   It was January 2007, if I'm not mistaken.

16        Q.   And I'm going to hand you this.  So this will

17    help you remember.

18            MR. BARRY:  And that can be Exhibit 2.

19            (Defendants' Exhibit 2 was marked for

20    identification.)

21    BY MR. BARRY:

22        Q.   And so does this warranty deed confirm that

23    you closed in January 2007?

24        A.   Yes, it does.

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2215 of 3246
Case 1:11-cv-22408-MGC Document 23363-39 on FL Docket 05/18/2015 Page 42 of
126

Confidential - Subject to Further Confidentiality Review

```
 1        Q.    With all the ridiculous language that's at

 2    the top.

 3              So between 2005 and 2007, was your house

 4    being constructed by --

 5        A.    Shoma.

 6        Q.    -- Shoma?

 7        A.    Yes.

 8        Q.    And so Shoma was the entity that was building

 9    your house --

10        A.    Correct.

11        Q.    -- that you had contracted with?

12              Were you at all involved with that

13    construction?

14        A.    No.

15        Q.    So you didn't have any input?

16        A.    None.

17        Q.    Were you allowed to comment on whether there

18    was hardwood floors put in the house or anything like

19    that?

20        A.    When we set the property aside, when we chose

21    the model; you know, if you wanted to do any upgrades

22    and things like that, of course, you can pick the

23    colors or whatever the case was.  But it was pretty

24    standard.  I didn't do any upgrades.
```

Case 2:09-md-02047-EEF-MBN  Document 22363-39  Filed 11/19/19  Page 2216 of 3246
Case 1:1-09-md-02047-EEF-MBN  Document 2001-91 Confidential Subject to Further Confidentiality Review
126

Confidential - Subject to Further Confidentiality Review

```
1        Q.    So the builder would have let you do upgrades

2    if you wanted to, but you decided not to?

3        A.    Right.  I didn't go that route.  But I'm

4    assuming, yeah, they would have let you upgrade the

5    kitchen and things like that.

6        Q.    Mr. Nunez, do you have any experience in

7    construction?  Have you ever --

8        A.    No.

9        Q.    -- worked building houses, or do you know

10   anyone who builds houses?

11            Are you handy?

12       A.    Actually not.

13       Q.    Did you do a walk-through of the house before

14   closing?

15       A.    Yes.

16       Q.    And did you observe any defects when you were

17   walking through the house?

18       A.    I don't recall.  It wouldn't have been

19   anything massive; you know, maybe a scratch, you

20   know, on a floorboard or a scratch on the wall,

21   something minimal.

22       Q.    Did you observe any odor?  Did you smell

23   anything?

24       A.    I don't recall, like, anything that -- at the
```

1    moment other than that, you know, I probably would

2    have associated to new construction.

3        Q.   Okay.  So there was nothing out of the

4    ordinary in your mind?

5        A.   At that moment that I recall.

6        Q.   When you were living in the house, was anyone

7    else living in the house with you?

8        A.   Yes.  Eventually my wife, you know, once we

9    decided to move in together.

10       Q.   Were any of your kids living in the house?

11   And I apologize, I forgot their names.

12       A.   That's okay; that's fine.  Yes.  My

13   stepdaughters eventually.  You know, when we decided

14   to move in together, yes, they were living here.

15       Q.   And, Mr. Nunez, do you mind -- sorry, just

16   for the record, do you mind mentioning your

17   daughters' names and what cities they live in.

18       A.   Sure.

19       Q.   Including your stepdaughters.

20       A.   Yeah.  So it's Kaila.

21            Do you need the last name as well?

22       Q.   Yes.

23       A.   Kaila Fives; currently she lives in Orlando

24   because she goes to USF.

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2218 of 3246
Case 1:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 45 of 126
Confidential – Subject to Further Confidentiality Review

1        Q.    Okay.  Congratulations to her.

2        A.    And then Madison Fives; she lives in Miami,

3    Florida.

4        Q.    And I don't think I need your son's name.

5              And are any of those individuals making a

6    claim, too?  Are your stepdaughters making any claim?

7              Did they ever live in the house?

8        A.    Yes, they lived in the home.

9        Q.    Have you ever charged rent to anyone to stay

10   there?  So when you left the house in 2011, was --

11   did you ever rent it out to anybody?

12       A.    There was a period of time that someone

13   reached out to me as far as -- they noticed the home

14   was empty -- if they can store some property and some

15   of their items in there.  I explained to them why,

16   you know, being that I was leasing and also

17   attempting to pay the mortgage -- because our goal

18   was to initially keep the home, hopefully get it

19   fixed, whatever the case may be.  But, you know, we

20   don't necessarily know how it would turn out at that

21   point.  Yeah, I let someone store some items in

22   there, and it ended up being -- and ended up

23   squatting for some time.

24       Q.    When you let them store items, did you charge

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2219 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2219 of 3246
Confidential - Subject to Further Confidentiality Review
126

```
 1    them rent for storing those items?

 2         A.   Yes, I did.

 3         Q.   How much rent did you ask them --

 4         A.   Off the top of my head, I don't remember.  It

 5    just was, like, a few hundred dollars.

 6         Q.   Do you have any records of the rent you

 7    charged them?

 8              Did they pay you in cash?  Did they pay you

 9    in check?

10         A.   It was in cash.

11         Q.   Did you deposit that cash in the bank or --

12         A.   No.  It was minimal.

13         Q.   So there's no record of that transaction?

14         A.   I would have to look in documents, which I

15    have given everything to them.

16         Q.   What -- total -- total amount, how much do

17    you think they paid you?

18         A.   Overall?

19         Q.   Yeah.

20         A.   In the increments of payments?

21         Q.   Yeah.  Either one.

22         A.   Right.  I would just -- I would guess, you

23    know, for the time being it was maybe, I don't know,

24    at the most maybe a couple thousand dollars.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2220 of 3246
Case 1:11-cv-22408-MGC Document 298-81 Entered on FLSD Docket 05/19/2017 Page 47 of
126

Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Do you know what that person's name is who

 2   was --

 3        A.   I don't recall their full name.

 4        Q.   Do you -- on the break, could you figure out

 5   what their name is?

 6        A.   I can attempt.

 7        Q.   Perfect.

 8             Do you know if any of the items they stored

 9   were damaged at all?

10        A.   No.  I was never informed of that.

11        Q.   Do you know what they were storing there?

12        A.   No.

13        Q.   When you owned the property, did you make any

14   improvements to it?

15        A.   No.

16        Q.   Did -- okay.  So let's just talk a little bit

17   about the actual parameters of the house.

18        A.   Sorry?

19        Q.   The parameters of the house, design.

20             Do you know the square footage of the house?

21        A.   It's in the documents I have given over to

22   them.  I can ballpark it, maybe 1350 square feet.

23        Q.   It looks pretty close.

24             Did -- how do you know that number?
```

```
 1       A.   Based off what information I had from Shoma.

 2       Q.   Did you ever do any kind of independent

 3   measure --

 4       A.   No.

 5       Q.   -- where you measured the square feet?

 6            How many bedrooms were in the house?

 7       A.   Three.

 8       Q.   How many bathrooms?

 9       A.   Two and a half.

10       Q.   And do you know if there were any changes to

11   the square footage?  Was there any additions made to

12   it?

13       A.   No.

14            MR. BARRY:  Now I'm going to introduce this

15       as Exhibit Number 3, which is the Declaration of

16       Correctness of Square Footage on Chinese Drywall

17       Client(s) Property for Remediation Damages.

18            (Defendants' Exhibit 3 was marked for

19   identification.)

20   BY MR. BARRY:

21       Q.   Do you recognize this document, maybe

22   vaguely?

23       A.   Vaguely, yes.

24       Q.   And do you understand what this document is?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2222 of 3246
Case 1:07-cv-09345 McGrath Document temp Confidential - Subject to Further Confidentiality Review Page 46 of
126
Confidential - Subject to Further Confidentiality Review

```
 1              MS. GRANT:  I'm going to object to form.

 2         He's not an attorney.

 3    BY MR. BARRY:

 4         Q.   Okay.  What is your understanding of this

 5    document?

 6         A.   From what it seems like, it's just verifying,

 7    I guess, the square footage, address.

 8         Q.   And what is the square footage listed on this

 9    declaration?

10         A.   From what I see here on the actual

11    declaration, it's 1356 square feet.

12         Q.   And is this signed by you, or is this signed

13    by your attorney?

14         A.   It's signed by my attorney.

15         Q.   And do you have any knowledge of why your

16    attorney would have an incorrect number there?

17         A.   No.

18              MS. GRANT:  Object to form.  It's not what he

19         said.

20              MR. BARRY:  I mean, I'm asking whether -- we

21         can establish it through something else.  No

22         problem.

23              So I'm going to introduce Exhibit 4.

24              (Defendants' Exhibit 4 was marked for
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2223 of 3246
Case 1:09-cv-07628-GEL Document 23-91 Confidential Subject to Further Confidentiality Review
126

Confidential - Subject to Further Confidentiality Review

1    identification.)

2    BY MR. BARRY:

3        Q.    Have you ever seen this document before?

4        A.    Yes.  It seems like it's, like, one of the

5    online county records.

6        Q.    And does this document pertain to the address

7    of the -- your former home?

8        A.    Yes.

9        Q.    And what is the square footage listed on this

10   document?

11       A.    Let's see.  It is -- adjusted -- it says:

12   Adjusted square footage 1356 square feet.

13       Q.    And is that consistent with what you believed

14   the square footage of your home was?

15       A.    Yes.

16       Q.    Do you have any reason to believe that's

17   incorrect?

18       A.    No.

19       Q.    Okay.  So when do you believe that Chinese

20   drywall was installed in your house?

21       A.    During the building process, I would assume

22   in 2006, 2005.

23       Q.    Do you know who installed that drywall in

24   your house?

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2224 of 3246
Case 1:09-cv-02949-CM Document 28 Entered on FLSD Docket 05/18/2011 Page 41 of
126
Confidential - Subject to further confidentiality review

```
1       A.   It would be in the documents.

2       Q.   Do you know if it was Shoma?

3       A.   Well, they were the builder.  I'm not sure

4   who they contracted to do the work.

5       Q.   Who -- do you know who purchased the Chinese

6   drywall?  Was it the --

7       A.   It would be in the documents.

8       Q.   Okay.

9            MR. BARRY:  For the court reporter, I'm going

10       to forget what number I'm on regularly.

11            I'm going to introduce this as Exhibit 5.

12            (Defendants' Exhibit 5 was marked for

13   identification.)

14   BY MR. BARRY:

15       Q.   Do you recognize this document?  It's listed

16   Subcontract Agreement.

17       A.   Not necessarily.  Those are not my initials

18   on there.

19       Q.   Are you aware this is a document that was

20   produced to us by your -- in this litigation?

21       A.   Yes.  I've seen as far as, like, some of this

22   information, but I don't -- I've seen so many

23   documents.  I have provided everything to them, and

24   they -- we've seen everything together.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2225 of 3246
Case 11-cv-02494-CAL Document 261-1 Entered on FLSD Docket 05/18/2015 Page 32 of
126

Confidential - Subject to Further Confidentiality Review

```
1      Q.   So this agreement is between who?

2           MS. GRANT:  Counsel, I'm going to object.

3      Mr. Nunez has testified he doesn't know if he's

4      seen this or not.  I mean, he can read the

5      document --

6           MR. BARRY:  Yeah.  That would be great.  He

7      can read the document.

8           MS. GRANT:  He has no personal knowledge.

9           MR. BARRY:  Understand.

10          MS. GRANT:  And certainly, there are

11     documents that are uploaded that are generated

12     from counsel and some other sources that don't

13     necessary come from the client, and I trust that

14     you understand that.

15          MR. BARRY:  I completely understand that.

16          I stipulate for the record that Mr. Nunez

17     does not know this document and did not generate

18     this document.

19          MS. GRANT:  Thank you.

20          MR. BARRY:  He did produce it in this

21     litigation.

22          THE WITNESS:  So do you want me to read

23     through it?

24          MR. BARRY:  Yeah.
```

Confidential - Subject to Further Confidentiality Review

```
1    BY MR. BARRY:

2        Q.   If you can tell me who this contract is

3    between.

4             And that first line --

5        A.   Right.  As I'm skimming through it, it

6    seems -- it's saying that the contract was between

7    Shoma Homes and Ramos --

8        Q.   Mercado Enterprises, Inc.

9        A.   -- Martinez, architect.

10       Q.   Do you know who Mercado Enterprises, Inc.,

11   is?

12       A.   No.

13       Q.   So you have never heard of them?

14       A.   No.  I'm assuming somebody that, you know,

15   was part of the building process.

16       Q.   Do you have any understanding that they were

17   part of the -- or, installed -- or, subcontracted to

18   install drywall?

19       A.   I don't know.

20       Q.   Okay.  So how did you come to know that there

21   was Chinese drywall in your house?

22       A.   Well, I had multiple issues with the A/C

23   coils.  And the odor at first, you know, I wasn't

24   sure why.  But after some time, I noticed, you know,
```

Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2227 of 3246
Case 1:09-cv-02047-GAJ Document 22363-39 Filed 11/19/19 Page 2227 of 3246
Confidential – Subject to Further Confidentiality Review
126

 1    some of the neighbors were having the same issue.  I

 2    spoke to a neighbor that informed me that we actually

 3    had Chinese drywall throughout the complex.  It was

 4    built -- I guess that Shoma, whatever, worked out and

 5    started the building process.  And then he referred

 6    me over to the attorneys, which then at that point

 7    sent over an inspection team, and they -- that's when

 8    we were able to pinpoint and figure out that there

 9    was drywall -- Chinese drywall, sorry, in the home.

10        Q.   Do you remember who that neighbor was?

11        A.   I don't remember his name.  I know he was the

12    neighbor to the right of me.

13        Q.   And so you are saying that neighbor referred

14    you over to your attorney now, or to a different

15    attorney?

16        A.   It would be the group of attorneys that I

17    have been working with.

18        Q.   Okay.  And do you roughly when that was?

19        A.   Jeez.  No, I don't.

20        Q.   Was it 2008, 2009?

21        A.   I can't give an exact date.

22        Q.   Can you give a -- was it sooner than 2007?

23        A.   No.  It would have been --

24        Q.   Or before 2007?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2228 of 3246
Case 1:19-cv-02492-WCG Document 123 Filed 11-12 Docket 05/16/2019 Page 35 of 126
Confidential – Subject to Further Confidentiality Review

1      A.   --  I would say -- no, it wasn't before 2007.

2    It was probably, like, late 2009 or '10; again,

3    ballparking.  I don't recall the exact date.

4      Q.   When you started noticing the difficulty with

5    the air conditioner, did you get it fix?

6      A.   Yes.  Multiple times.  They actually ended up

7    replacing the coils.  Which that was a new home; a

8    new A/C unit should last you at least six, seven

9    years.  And that wasn't even the case.  After -- we

10   had to replace the coils multiple times.  They were

11   blackened out completely.

12     Q.   So -- and you said "multiple times."  How

13   many times do you think that is?

14     A.   Jeez.  Well, Allison would have all the

15   receipts I have from the A/C company.  But I would

16   say more than three or four times.

17     Q.   So someone that's been lucky enough not to

18   watch depositions, this is the fun delay part where

19   we're trying to find everything.

20          (Defendants' Exhibit 6 was marked for

21   identification.)

22          MR. BARRY:  And this is Exhibit 6.

23   BY MR. BARRY:

24     Q.   Do you recognize these documents?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2229 of 3246
Case 1:11-cv-22408-MGC Document 204-11 Entered on FLSD Docket 05/18/2012 Page 36 of 126
Confidential - Subject to further confidentiality review

 1      A.   Yes.

 2           MR. BARRY:  I tried to pass all three this

 3      time.

 4           MR. VERRIER:  It's a good move.

 5  BY MR. BARRY:

 6      Q.   And so do you recognize these documents?

 7      A.   Yes, I do.

 8      Q.   What are they?

 9      A.   They are the invoices for Oscar Air.  They

10  were the company that would service the air and, you

11  know, at times replace the coil.

12      Q.   So let's go through these.

13           How many times do we have?  I see June 2010

14  on the first one.

15      A.   Okay.

16      Q.   Okay.  So what's the date on the first one?

17      A.   June 29th, 2010.

18      Q.   And what was the service they were doing

19  here?

20      A.   It says replacing the -- I guess it's A/C

21  handler coil.

22      Q.   And for $300.  Is that what that says there?

23      A.   Yeah.

24      Q.   Do you know if this was before or after you

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2230 of 3246
Case 1:13-cv-02046-MCA Document 23363-39 Filed 11/19/19 Page 87 of
Confidential - Subject to Further Confidentiality Review
126

1    learned of Chinese drywall in your home?

2         A.    This would have been after.

3         Q.    It would have been after?

4         A.    Yeah.

5         Q.    Let's look at the next one here, which is

6    2009.

7         A.    Okay.

8         Q.    And this is another air conditioner repair

9    for the amount of $300.

10        A.    Okay.

11        Q.    Do you know if this was before or after you

12   learned of Chinese drywall in your house?

13        A.    This would have been before that we knew.

14        Q.    Okay.  Now, I can represent for the record,

15   and I'm happy to -- how many more are here?  How many

16   more invoices do we have here?

17        A.    There's a total of three more, so four in

18   total.

19        Q.    And are both of the other -- are the other

20   invoices after the 2010 date when you said that you

21   knew Chinese drywall was in the house?

22        A.    One was 2010, one was 2011.  So that would be

23   after.

24        Q.    And do you know if there are any other

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2231 of 3246
Case 1:1-cv-22408-MGC Document 28-81 Entered on FLSD Docket 05/19/2011 Page 38 of
126
Confidential - Subject to Further Confidentiality Review

1    invoices for air-conditioning?

2        A.    Not to my knowledge.

3        Q.    And have you asked for -- do you believe that

4    these are amounts owed by Taishan for damages you

5    have suffered from Chinese drywall?

6        A.    Yeah.  Yes.

7        Q.    So these are included in the amount that you

8    have requested?

9        A.    Yes.

10       Q.    Did you do any other work on the house as a

11   result of Chinese drywall?

12       A.    No.  Not as labor-extensive as this.

13          MS. GRANT:  Counsel, I just wanted to clarify

14       something.  When you said "work," do you mean

15       repairs?

16          MR. BARRY:  Repair work.  Yeah.

17          MS. GRANT:  I apologize.

18          MR. BARRY:  No, that's a great clarification.

19          And my colleague, Sarah is going -- is

20       clarifying one thing, and I don't have the

21       documents here, but you produced two additional

22       invoices yesterday for the air-conditioning.

23       Does that sound correct?

24          MS. GRANT:  Actually, my co-counsel, Holly,

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2232 of 3246
Case 1:09-cv-02042-MGC Document 27-1 Entered on FLSD Docket 05/19/2012 Page 49 of
126
Confidential - Subject to further confidentiality Review

```
1        is handling --

2              MR. BARRY:  Holly.  Okay.

3              MS. GRANT:  So I apologize.  I don't --

4              MR. BARRY:  I just want to make sure that's

5        clear on the record that there are potentially

6        two other ones --

7              THE WITNESS:  Right.  I gave them everything.

8              MR. BARRY:  -- like I was trying to stick you

9        into four when there's six out there.

10             THE WITNESS:  Yeah.  I turned in all

11       documents I have over to them.

12             MR. BARRY:  No, absolutely.  I just want to

13       be clear.

14   BY MR. BARRY:

15       Q.   Now, I'm going to provide you a few photos.

16   I'm going to first start with these, and I'm just

17   going to give them to you as a group.

18             MR. BARRY:  And this will be Exhibit 7.

19       Because I'm making more of a mess for myself over

20       here.

21             (Defendants' Exhibit 7 was marked for

22       identification.)

23   BY MR. BARRY:

24       Q.   Have you seen these photos before?
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 2233 of 3246
Case 1:09-cv-02047-MGC Document 234 Entered on FLSD Docket 05/18/2013 Page 40 of
126
Confidential - Subject to further confidentiality review

```
 1        A.    Yes.

 2        Q.    And what are they of?

 3        A.    They're of the A/C coil.  The first one was a

 4   comparison from the A/C coil that was in the unit,

 5   and the one to the right would be a new coil that's

 6   going to be installed.

 7        Q.    Okay.  And what's -- and now, help me out.

 8   What's the damage here?

 9        A.    Okay.  So the reason the coils had to be

10   replaced, according to the technicians, Oscar Air,

11   what they explained to me, because the A/C unit was

12   not cooling the home.  Once the -- all the piping

13   inside the coil were corroded, at that point the

14   freon, I guess, would leak out, and would not work

15   correctly and cool down the home, which is how we

16   started to notice there was an issue with the A/C.

17             We called at first.  They came and replaced

18   it.  Okay.  It could have been that it was bad, you

19   know.  It happens, right?  But when it started

20   happening often and once we understood the process

21   and how the coil works and why -- all of a sudden

22   it's being defective so quickly when it's something

23   that's supposed to last six to seven years.  That's

24   when we put together, obviously, it was not working
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2234 of 3246
Case 1:09-cv-02047-GEL Document 28931 gmmRa33nnFiR13d0d2/16/2039 PRge41 of
126
Confidential – Subject to Further Confidentiality Review

 1    properly.  And they explained to us was, was that

 2    corrosion was happening.  At that point we knew why,

 3    of course.

 4        Q.   Were you the one who noticed the damage

 5    initially, or was it the Oscar Air Conditioning?

 6        A.   Well, like I said, the home was not cooling.

 7    I called over the company that installed the

 8    air-conditioning unit, I guess, for the builder, and

 9    they were the ones that came out.

10        Q.   And when was that?  When was the first?

11    2009?  I think that's the earliest --

12        A.   Right.

13        Q.   -- invoice we see here.

14        A.   I think so.

15        Q.   And do you know when these photos were taken?

16        A.   Specifically, no.  There might be a date on,

17    you know, the jpeg file.

18        Q.   Okay.

19        A.   But, yeah, I don't know.

20        Q.   So you would represent that whatever the date

21    on the jpeg is probably correct?

22        A.   Right.  I would assume.

23        Q.   Do you know who took these photos?

24        A.   Yes.  These here, I did.

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2235 of 3246
Case 1:1-09-md-02047-MCR Document 23631-39 Filed 11/19/19 Page 42 of
Confidential - Subject to Further Confidentiality Review
126

 1      Q.   Okay.  So you took these photos?

 2      A.   Yes.

 3      Q.   When the A/C tech came out to repair the air

 4   conditioner, did the A/C tech tell you about Chinese

 5   drywall?

 6      A.   No.

 7      Q.   Did the A/C tech explain why they thought the

 8   wires were corroding -- or, the pipes were corroding?

 9      A.   No.  Earlier on, they didn't know why it was

10   happening.  You know, they were just replacing the

11   coil.

12      Q.   Where was the A/C unit located in the house?

13      A.   It was under the stairs in a closet.

14      Q.   Under -- so it was within the house.  It

15   wasn't in a garage or anything like that?

16      A.   No, no.  It was inside.  It was, like, in the

17   center of the home between the stairs, the kitchen,

18   and, like, a laundry closet.

19      Q.   And did you only have one A/C unit?

20      A.   Yes.

21      Q.   And do you recall if there was a warranty on

22   the A/C unit?

23      A.   No.

24      Q.   You don't remember?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2236 of 3246
Case 1:1-2-cv-pag-0cg-GAL Document 12233-39 on Filed 115 Docket 05/15/2017 Page 1 of
Confidential - Subject to Further Confidentiality Review
126

```
 1        A.    Not specifically, like, a date or how long.

 2        Q.    Do you remember applying under the warranty

 3   when you got the repairs?  Did you say, so the

 4   warranty company should be paying for the repairs?

 5        A.    No.  Oscar Air, they replaced -- I'm going

 6   off what I recall.  I believe Oscar Air replaced one

 7   under warranty, I guess, from the -- you know, from

 8   the manufacturer, wherever they got the units from.

 9   And then after that is when we had to pay out every

10   time the coil had to be replaced.  Like I said, it

11   was happening so often throughout the complex that I

12   would assume the company itself had to put an end to

13   it.

14        Q.    And so just generally, the effects of the

15   issues with the air-conditioning is it would -- you

16   would not -- you wouldn't have cold air coming

17   through; you wouldn't have --

18        A.    Right.  That's how we -- that's how first

19   noticed there was something wrong with the unit, or,

20   you know, the air-conditioning itself.  We called

21   them over, and they came and, you know, did the work.

22        Q.    Now, I'm going to hand you another set of

23   photos.

24              (Defendants' Exhibit 8 was marked for
```

```
 1      identification.)

 2              MR. BARRY:  This is Exhibit 7, right?

 3              THE COURT REPORTER:  8.

 4              MR. BARRY:  8.  I'm so bad about that.

 5      BY MR. BARRY:

 6         Q.   Now, what are these photos of?

 7         A.   These photos are of piping under, like,

 8      facets in the bathroom.  This one here is a -- of

 9      a -- like, a waterspout controller from one of the

10      bathrooms.

11         Q.   Did you take these photos, too?

12         A.   Yes.

13         Q.   Do you remember when you took these photos?

14         A.   No.

15         Q.   And did you ever have a plumber come out to

16      repair these?

17         A.   No.  I don't recall having a plumber coming

18      out.

19         Q.   Did you have any issues related to it, or is

20      this just visible damage?

21         A.   Well, the visible damage on the second

22      picture, if you notice where the handle is -- or, the

23      spout, you see the bottom black.  There's, like, a

24      little tray there.  That, you know, was on the
```

1    faucet, on the -- you know, the sink, like, the

2    porcelain part, and there was, like, an adhesive.

3    All that came off and that was loose.  Therefore, I

4    decided, you know, to try to replace it.  And then

5    once we removed it, you know, you can see from the

6    pictures there, all that was corroded.

7         Q.   Did you replace it yourself?

8         A.   This one, yes.

9         Q.   Are there any receipts for when you purchased

10   to replace it?

11        A.   No.  Home Depot.  You know, just -- it was

12   just, like, a basic faucet.

13        Q.   Are you asking for damages related to the

14   damage to the sink in this litigation?

15        A.   Well, anything -- I would have to defer to

16   Allison on that.  She has all that information as far

17   as what we are asking for, and she would have any

18   documents or receipts that I have that I gave to

19   them.

20        Q.   But you're unaware of any receipts

21   specifically --

22        A.   Specifically to this one, I cannot pinpoint,

23   you know, no.

24        Q.   Okay.  Now, you said -- so how did you become

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/10 Page 2239 of 3246
Case 1:09-md-02047-GAO Document 23363-39 Filed 11/19/10 Page 2289 of 3246
Confidential - Subject to further confidentiality Review
126

1    aware of -- that there was Chinese drywall in your

2    house?

3         A.    Once we had --

4         Q.    You said a neighbor, of course.

5         A.    Right.  That's what we were told.  Once we

6    started the process, the inspector came out, and

7    that's when they officially told us yes.

8         Q.    Now, when the inspector came out, where did

9    they say the drywall -- the Chinese drywall was

10   installed in the house?

11        A.    They didn't specifically say.  They took

12   random samples, made a bunch of holes in the

13   property, actually.

14        Q.    Did you look at any of that Chinese drywall?

15        A.    I would see portions and things that they

16   would show me.  From what I remember, they took that.

17   And there's pictures and stuff in the report that you

18   guys have.

19        Q.    Was there any odor in your home at the time?

20        A.    Yes.

21        Q.    What did it smell like?

22        A.    Like a sulfur, like a rotten egg, you know,

23   that type of smell.

24        Q.    Was that different from the initial

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2240 of 3246
Case 1:09-md-02047-MCR-GRJ Document 22363-39 Filed 11/19/19 Page 2240 of 3246
Confidential - Subject to Further Confidentiality Review
126

1    construction smell you smelled in 2007?

2         A.   No.

3         Q.   It was not different?

4         A.   It was the same.

5         Q.   So when you walked in the home in 2007, it

6    smelled exactly like it did when you found out --

7         A.   Right.

8         Q.   -- it was Chinese drywall?

9         A.   That I just correlated with new construction.

10   I figured it was adhesive, drywall, you know, all the

11   supplies that they used.

12        Q.   So the smell never was different from when

13   you did your walk-through?

14        A.   No.

15        Q.   Did it ever get worse?

16        A.   Over time, a little more of it, yeah.

17        Q.   Was it worse in certain parts of the house?

18        A.   I don't recall if, you know, a specific area

19   was stronger than others.  You know, it was just so

20   strong as soon as you'd come in, it'd hit you, you

21   know, overall.  So I don't remember pinpointing,

22   like, say, the kitchen wall is just stronger than,

23   you know, the rest of the home, no.

24        Q.   Was there a certain type of -- time of day

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2241 of 3246
Case 1:09-cv-02047-MCA Document confidential Subject to Further Confidentiality Review Page 48 of
Confidential – Subject to Further Confidentiality Review
126

 1    where it was worse?

 2         A.    Not that I can recall.

 3         Q.    Was there a weather -- type of weather when

 4    it was worse?

 5         A.    Not that I can recall, no.

 6         Q.    Any type of year that it was -- time of year

 7    it was worse?

 8         A.    No.

 9         Q.    Did it ever lessen?

10         A.    No.

11         Q.    Did any visitors to your house notice the

12    odor?

13         A.    Yes.  Which was kind of embarrassing.

14         Q.    What did they say?

15         A.    Oh, what's that smell?  I'm, like, oh, I'm

16    not sure.  I don't know.  You know, it's a new home.

17    You know, we were trying to figure out what it was.

18    You know, once we knew, then, obviously, I can just

19    explain, oh, from what I've been told, it seems like

20    it's this.

21              But over the years, yeah, I multiple

22    complaints.  You know, family comes over.  My

23    sister-in-law had a newborn, and you know, she

24    noticed, you know, once she came over.  And

 1    coincidentally, she happened to mention that to her

 2    pediatrician -- and at that point we kind of had an

 3    idea of what was going on -- and he actually told her

 4    not to bring the child anymore, which was obviously

 5    upsetting for my wife being that she can't have her

 6    niece over.

 7            But, yeah, I had tons of complaints.  You

 8    know, I had people -- I remember joking with, like,

 9    friends or family that would come over, put plug-ins

10    everywhere, you know, open your windows, you know,

11    things of that nature, you know.

12        Q.   Now, when was it that you realized that the

13    odor was something more than just new construction

14    smell?

15        A.   I guess when it wouldn't go away.

16        Q.   Would that be after a month?  After a year?

17        A.   I would say so.  Probably after a few months

18    of being there that it just wouldn't go away.  You

19    know, you're just here at the house --

20            MR. BARRY:  Hold on one second.

21            Do you want to take a few minutes?

22            MS. GRANT:  Yeah.  Can we go off the record

23        just for one second so I can --

24            MR. BARRY:  It might be a good stopping

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2243 of 3246
Case 2:09-md-02047-EEF-MBN Document 22281 Filed 11/01/19 Page 50 of 126
Confidential - Subject to Further Confidentiality Review

```
 1         point, if you want to just take a break.

 2              MS. GRANT:  Okay.  Sure.  Thank you.

 3              (Recess from 8:19 until 8:38 a.m.)

 4    BY MR. BARRY:

 5         Q.   So I'm going to give you a document here, and

 6    if you want to take a look at it.  And I'll represent

 7    to you it's the inspection report.

 8              MR. BARRY:  I think this is Exhibit 9.

 9              (Defendants' Exhibit 9 was marked for

10    identification.)

11    BY MR. BARRY:

12         Q.   If you don't mind taking a look through it.

13              Mr. Nunez, what is your understanding of this

14    document?

15         A.   This was produced after they did the

16    inspection, and it was pointing out where there was

17    corrosion on items such as the A/C unit and the

18    outlets.

19         Q.   And who performed this inspection?

20         A.   This company, Chinese Drywall Screening, LLC.

21         Q.   How soon after you learned that Chinese

22    drywall was in your house did you obtain -- did you

23    retain Chinese Drywall Screening to do the

24    inspection?
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2244 of 3246
Case 2:09-cv-02045-McGM Document Comment Comment Subpocket 2019-31 Page 45 of
Confidential - Subject to further confidentiality review
126

```
 1              MS. GRANT:  Object to form.

 2              I don't think that's what he testified.

 3              Can you restate it?

 4    BY MR. BARRY:

 5       Q.   How long after you learned that -- well, I'll

 6    restate it.  I'll ask it a different way.

 7              How long after you learned that Chinese

 8    drywall was in the house was the -- was the

 9    inspection performed?

10       A.   Soon after.  I mean, you know, I was informed

11    that some of the property in the complex had it, and

12    obviously, I wouldn't be able to confirm it until

13    they did the report.  And I reached out to the

14    attorneys, and then we got this.

15       Q.   And I think the question your attorney was

16    objecting to was:  Was it your attorney or you who

17    retained Chinese Drywall Screening to do an

18    inspection?

19              MS. GRANT:  No.

20              MR. BARRY:  No?

21              MS. GRANT:  That's not what I was objecting

22    to.

23              MR. BARRY:  Okay.

24              THE WITNESS:  Well, I reached over to them,
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2245 of 3246
Case 2:09-md-02047-MCR-JES Document 22363-39 Filed 05/19/2015 Page 52 of 126
Confidential - Subject to Further Confidentiality Review

 1        you know, we started the process, and part of the

 2        process was getting the property screened to

 3        confirm, you know, know if, you know, it does

 4        have -- to confirm that there is drywall before

 5        we can keep moving forward.

 6    BY MR. BARRY:

 7        Q.   Who paid for this inspection?

 8        A.   I would assume it was the company --

 9        Q.   The company --

10        A.   -- that did the drywall screening, you know,

11    who gave me and my attorneys the inspection report.

12        Q.   Did you pay for the inspection?

13        A.   I don't recall.

14        Q.   So you did not pay -- you don't remember if

15    you paid Chinese Drywall Screening?

16        A.   No.

17        Q.   So do you know if your attorneys paid Chinese

18    Drywall Screening?

19        A.   I would assume they did.

20        Q.   Were you at home when the inspection was

21    performed?

22        A.   Yes.

23        Q.   Did you talk with the inspector?

24        A.   Briefly.  Just, you know, some subtleties,

Confidential - Subject to Further Confidentiality Review

1    but nothing specifically about the drywall itself.

2        Q.    Did you walk through with the inspector while

3    they were performing the inspection?

4        A.    Briefly.  You know, I wasn't right behind

5    them.  You know, just throughout the house.

6        Q.    Was the inspector showing you the drywall

7    during the inspection?

8        A.    No.  He was just kind of doing his work,

9    which was just opening a bunch of holes throughout

10   the property, looking through appliances, stuff like

11   that, taking pictures.

12       Q.    Have you done any other inspections of the

13   drywall since that date?

14       A.    No.

15       Q.    Has any drywall been removed from your house?

16       A.    I wouldn't know.  I no longer have possession

17   of --

18       Q.    Up until 2017, had any drywall been removed

19   from your house?

20       A.    No.  Not that I recall.

21       Q.    And did -- do you know if this inspector

22   determined the percentage of your house was

23   constructed with Chinese drywall?

24       A.    No.  Not that I'm aware of.  He didn't tell

Confidential – Subject to Further Confidentiality Review

1    me anything.

2        Q.   Did the inspector remove any -- or, did

3    anyone remove any electrical receptacles from the

4    house after the inspection?

5        A.   Remove?  No.  Not that I'm aware of.  I mean,

6    they obviously -- you can see from the pictures they

7    took them out, took pictures, put them back in.  But,

8    like, specifically remove them and take them out of

9    the property, no.

10       Q.   Did anyone remove any A/C coils?

11       A.   Yes.  Every time they were replaced, they

12   would take the old ones and put a -- you know, put

13   the new system in.

14       Q.   Now, if you can turn to the seventh page.

15            I'm sorry.  One more question on that.  For

16   these A/C coils, when they were removed, were they

17   retained?

18       A.   As far as --

19       Q.   Preserved.

20       A.   -- if I kept them?

21       Q.   Yeah.

22       A.   No.  The -- Oscar Air would take them.

23       Q.   So they didn't reserve them?  To your

24   knowledge, they --

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/10 Page 2248 of 3246
Case 1:09-md-02047-MCAL Document Confidential Subject to Packer 05/08/2019 Page 45 of
126
Confidential – Subject to Further Confidentiality Review

```
1        A.   To my knowledge.  I don't know what they did

2    with them, no.

3        Q.   Okay.

4        A.   Yeah.

5        Q.   Now, do you recognize this -- what is shown

6    here on the seventh here page?

7        A.   It's a picture, I'm assuming, that the

8    inspector took of inside, you know, the holes and

9    stuff they made throughout the property.

10       Q.   Do you know what is written on that drywall

11   there, drywall board?

12       A.   I can read.  It says Knauf, Knauf.

13       Q.   Do you know who Knauf is?

14       A.   I know they're a drywall manufacturer.

15       Q.   Do you understand that there was a settlement

16   with Knauf?

17            MS. GRANT:  I'm going to object to form.

18       He's not an attorney.

19            THE WITNESS:  I wouldn't know.

20   BY MR. BARRY:

21       Q.   Is that your understanding?

22       A.   I would have the defer to Allison.

23       Q.   So you have no personal knowledge of a

24   settlement with Knauf?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2249 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 45 of
126

Confidential - Subject to Further Confidentiality Review

```
1      A.    With them specifically?

2      Q.    Yes.

3            MS. GRANT:  Wait.  Object.

4            Counsel, I'll note -- object -- just for the

5      record, I'm sure you know, this is not the same

6      Knauf that is part of the settlement.

7            MR. BARRY:  Okay.

8            MS. GRANT:  This is a different type of

9      drywall.

10           MR. BARRY:  Okay.

11    BY MR. BARRY:

12     Q.    Were you of any understanding that there was

13    Knauf drywall in your house?

14     A.    After I saw the report.

15           MS. GRANT:  Again, I'm just going to object.

16     Object to the form.

17           Can you give the full name of Knauf?  Because

18     there's several different entities.

19           MR. BARRY:  Okay.  Let's see.  We're going to

20     come back to that in a second.

21    BY MR. BARRY:

22     Q.    So did you ever try to remediate any of the

23    drywall?  Did you ever try to take it out of the

24    house and repair it and put in new drywall?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2250 of 3246
Case 1:09-cv-02042-GJG Document 22341 Confidential Subject to Further Confidentiality Review
126
Confidential - Subject to Further Confidentiality Review

```
1        A.    No.

2        Q.    Why didn't you do that?

3        A.    Cost-wise.  I mean, you have to repair --

4    you'd have to go down to the studs, remove all the

5    drywall and replace the drywall.  It just was so

6    expensive.  I mean, there's no way I could have

7    afforded to have done it.

8        Q.    Did you ever have anyone assess the cost it

9    would be to remediate?

10       A.    No.  Not, like, a report or a professional,

11   per se, to come and measure and tell me, no.

12             MR. BARRY:  Here you are.

13             (Defendants' Exhibit 10 was marked for

14   identification.)

15   BY MR. BARRY:

16       Q.    Do you recognize this letter?

17       A.    I mean, vaguely.  I mean, something that, you

18   know, the attorneys put together, you know, with my

19   authorization as far as explaining, I guess, from --

20   what process would be taken in order to fix the

21   property.

22       Q.    And so who sent this letter?

23       A.    Baron & Budd.

24       Q.    And on that first paragraph it says "at the
```

```
1     request of Mr. and Mr. Nunez."

2          So is this a letter that you authorized your

3     attorneys to send?

4     A.   Yes.

5     Q.   And if we look at that fourth paragraph

6     there, do you mind reading that to me?

7     A.   Sure.

8          "The cost of remediation is usually

9     calculated in dollars per square foot.  At the

10    present time, it is expected the cost to radiate is

11    between $45 to $50 per square foot." [Sic]

12         Is that good?

13    Q.   And so it would be -- I think we said that

14    your house has 1,356 square feet, right?

15    A.   Uh-huh.

16    Q.   Doing my poor lawyer math, would that be

17    about $60,000 for remediation?

18         MS. GRANT:  I'm going to object to the form,

19         actually, as a rolling objection anything

20         relating to remediation.

21         Obviously, we have another part of this case

22         dealing with the remediation formula, and

23         remediation questions here are not relevant.

24         MR. BARRY:  That's fine.
```

Case 2:09-md-02047-EEF-MBN  Document 23363-39  Filed 11/19/10  Page 2252 of 3246
Case 1:09-cv-02047-MGC  Document 1 Entered on FLSD Docket 05/18/2012  Page 40 of 126
Confidential - Subject to Further Confidentiality Review

```
 1              MS. GRANT:  Notwithstanding -- you may

 2         answer, if you know.

 3              MR. BARRY:  And your rolling objection is

 4         recognized for the record.

 5              MS. GRANT:  Thank you.

 6              THE WITNESS:  I'm sorry.  Can you repeat the

 7         question?

 8    BY MR. BARRY:

 9         Q.   So $45 per square foot times 1356 is about

10    $67,000.  Is that right?  Some better lawyer math --

11              MR. VERRIER:  Object to form.

12              MR. BARRY:  If you want to do the math.

13              MS. GRANT:  And I'm going to object to the

14         form again.  You're asking him to do math, not --

15         you have not asked him what it costs to

16         remediate; you're simply asking him, to clarify,

17         to do math.  Is that correct?

18              MR. BARRY:  I'm asking what the cost is in

19         this letter.  It says it's 45 to 50.  He has read

20         that on the record.  And so we're asking the cost

21         to remediate that is listed in this letter, times

22         the square foot, which is what is listed in this

23         letter.

24              MR. VERRIER:  Maybe we can just give him a
```

```
1        calculator.

2              MR. BARRY:  If you have one present --

3              MR. VERRIER:  You can use my phone.

4              MR. BARRY:  Well, I just made a

5        representation based on --

6              MR. VERRIER:  Yeah.  I think if you want to

7        say a rough --

8              MR. BARRY:  I said roughly 67,000.

9              MS. GRANT:  And just to clarify the record,

10       the calculation he's performing is per this

11       letter.  He is not testifying --

12             MR. BARRY:  Correct.

13             MS. GRANT:  -- it actually costs to

14       remediate.

15             MR. BARRY:  Correct.

16             THE WITNESS:  So do you want me to calculate

17       that for you?

18             MR. BARRY:  Yeah.  That would be great.

19             THE WITNESS:  So do you want me to go with 45

20       or the 50?

21             MR. BARRY:  Either one.  You choose which

22       one.

23             THE WITNESS:  Times 1356?

24             MR. BARRY:  Yeah.  Square feet.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2254 of 3246
Case 1:19-cv-02054-MGC Document 20581 Exhibit 31 Filed 04/04/2019 Page 61 of
126
Confidential - Subject to Further Confidentiality Review

 1              THE WITNESS:  It would be $67,800.

 2    BY MR. BARRY:

 3        Q.   And so at this time in 2011, do you know how

 4    your lawyers came to the conclusion that remediation

 5    would be about $45 to $50 per square foot?

 6              MS. GRANT:  Object to the form.

 7              Actually, don't understand that.  That's

 8        attorney/client.

 9    BY MR. BARRY:

10        Q.   Do you know that separate from how your

11    attorneys -- from the acknowledgement that your

12    attorneys provided to you?  Did an inspector provide

13    you that information?

14        A.   No.

15        Q.   So you have no other knowledge of how 45 to

16    $50 per square foot was put on this letter?

17        A.   I trust that they would -- you know, got the

18    information that it's something that's viable.

19        Q.   Did you ever ask anyone to quote how much it

20    would cost to remediate the property?

21        A.   No.  Myself, no.

22        Q.   So do you have any knowledge of what the

23    actual cost to remediate the property would be?

24        A.   No.

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2255 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 32 of 126
Confidential - Subject to Further Confidentiality Review

```
 1        Q.   And did you ever have any knowledge of that?

 2        A.   No.

 3        Q.   So you are no longer in possession of the

 4   house, correct?

 5        A.   Correct.

 6        Q.   So can you remediate the property now?

 7        A.   I wouldn't be able to now.  I fix can't -- I

 8   didn't have access to the property.  I no longer own

 9   it.

10        Q.   Perfect.

11        A.   I would have at the point, if I still owned

12   the property, and I would have gotten remediation and

13   funds, I would have definitely, yes, attempted with

14   the funds, if they were enough to fix the home, yeah.

15   We wanted to stay there.

16        Q.   Did someone collect any samples of the

17   drywall that was removed from the house?

18        A.   Over than the inspection, no.

19        Q.   Do you know how many samples were collected?

20        A.   Off the top of my head, no.

21        Q.   Do you know if there were any samples from

22   the drywall of different markings found in the house?

23        A.   No.

24        Q.   Do the samples show the markings on the
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2256 of 3246
Case 1:09-cv-02047-GEL Document 22363-39 Filed 11/19/19 Page 256 of 3246
Confidential – Subject to Further Confidentiality Review
126

```
 1    drywall?

 2         A.    I wouldn't know.

 3         Q.    How much knowledge do you have of the

 4    samples?

 5         A.    Not much, to be honest with you.  I just let

 6    him come in, do his job, take pictures, send the

 7    report out, and I just --

 8         Q.    I won't go through all that with you.

 9         A.    Right.  Yeah.  I don't know, honestly.

10         Q.    Did you file any homeowner's insurance policy

11    claims for the damages in the house?

12         A.    No.

13         Q.    Did you have homeowner's insurance?  Did you

14    have homeowner's insurance during the time period?

15         A.    Just, I guess, to the exterior, whatever the

16    association required.

17         Q.    So you didn't have any interior --

18         A.    Interior, no.

19         Q.    Why didn't you have homeowner's insurance?

20         A.    It's something we never decided to have.

21         Q.    So has there been any damage to personal

22    property in your house?

23         A.    Yeah.  Electronic items, things of that

24    nature.  Obviously the coils, the piping, you know,
```

```
 1    the handles, like, in the bathroom, stuff like that.

 2         Q.   Do you still have possession of those

 3    personal items that have been damaged?

 4         A.   No, no.

 5         Q.   Okay.  So has the presence of Chinese drywall

 6    limited the use of the property?

 7         A.   Definitely.  We couldn't live in it.

 8         Q.   And how did it happen?  How did it limit the

 9    use of the property?

10         A.   I'm sorry?

11         Q.   How did it limit the use of your property?

12         A.   It was just not pleasant to be in there.  So,

13    you know, being -- you know, the emission of the

14    smell.  You know, once we knew officially that there

15    was Chinese drywall in there and it potentially could

16    harm you, we would try to not be at home as long

17    as -- of course, you have to be home.  But I mean,

18    just in general, you know, we would make it a point

19    to try to be out as much time as we could, you know,

20    out of the home in the park or just out, you know,

21    have dinner, which, obviously, incurs costs, you

22    know, as obviously, we all know, easier to -- cheaper

23    to make dinner at home.

24              But is that what you're kind of referring to?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2258 of 3246
Case 1:09-cv-02047-MGC Document 32363-39 Filed 11/19/19 Page 35 of 126
Confidential - Subject to Further Confidentiality Review

1    Q.    Uh-huh.

2    A.    Yeah.

3    Q.    Are you seeking any money payment in this

4    lawsuit because of those limitations?

5    A.    All that would be set up, I'm assuming, by

6    whatever it is that we're asking for.

7    Q.    So you don't have a personal understanding --

8    A.    No.

9    Q.    -- of what the money damages you're asking in

10   that, for --

11        MS. GRANT:  And, Counsel, to clarify, you've

12        asked him for limited use of the property.  Are

13        you including loss of enjoyment, too?

14        MR. BARRY:  Yes.

15        MS. GRANT:  Okay.  So I don't think that was

16        clear to my client.

17        MR. BARRY:  I apologize.

18   BY MR. BARRY:

19   Q.    Are you asking for money damages for loss of

20   use and enjoyment?

21   A.    Yeah, definitely.

22        Just to kind of elaborate, you know,

23   things -- like we spoke earlier, I work for

24   Department of Homeland Security.  And one of the

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2259 of 3246
Case 1:09-md-02047-EEF-MBN Document 22353 Exhibit 39 Supplemental 9/16/2019 Page 66 of
126
Confidential - Subject to Further Confidentiality Review

1    things that we constantly do is, like, background

2    checks and things like that.  At some point I had to

3    explain why my home, as far as, like, the status of

4    the mortgage payment was behind, was because -- I had

5    to bring in these documents, I had to explain to them

6    Chinese drywall, and things of that nature.  And it

7    kind of hindered security clearances that I had,

8    approval for.  In addition to, let's say, like,

9    credit cards:  Credit cards got denied; other cards

10   weren't renewed once they were expired because of the

11   mortgage affecting my credit.  Car loans, you know,

12   higher interest rate, things of that nature.

13        Q.   And when did -- when did that start?  When

14   you start having credit issues related to Chinese

15   drywall?

16        A.   Once I just could no longer pay the lease and

17   the mortgage at the same time.  You know, we tried as

18   much was we could as long as possible, but at one

19   point, we just couldn't.  And then that, obviously,

20   started reporting on my credit.  Therefore, you know,

21   domino effect, you know, for everything else, like I

22   explained to you as far as for work, and, you know,

23   just credit issues and things of that nature.

24        Q.   Did you have any issues paying the mortgage

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/10 Page 2260 of 3246
Case 1:09-md-02047-EEF-MBN Document Confidential Subject to Packet 05/19/10 Page 37 of
Confidential - Subject to Further Confidentiality Review
126

```
 1    before you moved out of the property?

 2         A.   No.  Not at all.

 3         Q.   What monetary amount do you associate with

 4    that loss of use and enjoyment?

 5         A.   Without, like, alternative living expenses,

 6    you mean?

 7         Q.   Yeah.  Just the loss of use and enjoyment.

 8         A.   I mean, that's something we've kind of

 9    quantified, and they've, you know, added that in the

10    documents and stuff.

11         Q.   So out of -- off the top of your head right

12    now, you don't have an understanding of what that

13    amount is?

14         A.   I mean, I can give you what I would like.

15    You know, because, obviously, going through all that,

16    you know, not having -- not being able to have events

17    at home, have family over.  I mean, you can't put a

18    price on something like that.

19              Do you understand what I mean?

20         Q.   Yes.

21              Did you suffer any type of personal injury or

22    medical conditions as a result of the Chinese

23    drywall -- or, what you believe to be a result of

24    Chinese drywall?
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2261 of 3246
Case 1:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 3 of 126
Confidential - Subject to Further Confidentiality Review

```
 1        A.    I mean, as we all know, you know, there is a
 2   hard time necessarily proving any, like,
 3   scientific/medical evidence.  But, yeah, I would feel
 4   lethargic; I was tired often.  You know, at some
 5   point, like, I was -- you know, I'd consider, like,
 6   you know, am I depressed?  You know, it's just -- I
 7   just felt very, like, gloomy; you know, just very
 8   exhausted often.
 9           And then my wife, she's asthmatic, and, you
10   know, she had issues with her breathing.  My younger
11   stepdaughter had nosebleeds.  We'd seek medical
12   attention.  But, you know, at that point, I'm still
13   so -- I'm sure until today no one could necessarily
14   correlate, you know, Chinese drywall with specific
15   health issues.
16        Q.    And did you understand that this lawsuit does
17   not involve any claims for personal injury or medical
18   conditions?
19        A.    Yes.
20        Q.    So how long did you live in your house after
21   you suspected that the house contained Chinese
22   drywall?
23        A.    Until the end of 2011.
24        Q.    And who else lived in the house with you
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2262 of 3246
Case 1:09-cv-02047-GCM Document 11111 Filed 05/18/2019 Page 69 of
126
Confidential - Subject to Further Confidentiality Review

1    during that time period?

2         A.   My wife and the kids.

3         Q.   And how many of your kids?

4         A.   At that point it was just the two girls.

5         Q.   So the oldest girls -- or, just -- the

6    newborn wasn't born yet?

7         A.   No.  He was born after we moved.

8         Q.   Do you remember the date in which you moved

9    out of your house, roughly?

10        A.   Roughly, yeah.  It was the end of

11   December 2011.

12        Q.   And why exactly did you move out of the

13   house?

14        A.   Due to the damages, the evident issues with

15   the coil.  We just figured health-wise, you know, if

16   it's doing that to metal copper, you know, what is it

17   doing to our insides?  So we were just concerned

18   about our health, and, you know, of course the rest

19   of the items that we still had in damage.

20        Q.   Was there anything that specifically was a

21   breaking point for you that inspired you to leave the

22   house?

23        A.   My wife and I, for a good amount of time, we

24   were trying to conceive, and it just wasn't

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2263 of 3246
Case 1:09-md-02047-MCA Document Confidential Subject to Docket 05/18/2019 Page 70 of
Confidential - Subject to Further Confidentiality Review
126

1    happening.  And we brought it up to, you know, our

2    doctors and things of that nature.  And, you know, we

3    told them that we had this drywall; you know, we

4    suspected that could be an issue.  And, you know,

5    they had suggested, you know, maybe it is.  You know,

6    because we did all sorts of labs and things like

7    that, and things, you know, were fine.  They just

8    couldn't see why, another reason.

9           And we moved at the end of 2011.  My son was

10   born in October 2010 -- I mean, I'm sorry, 2012.  You

11   know, I can't obviously correlate the two.  But do

12   the math, nine months, we moved in January -- that

13   whole time that we weren't in the house.  And,

14   actually, he was born a little earlier.  He should

15   have been born in November, so . . .

16       Q.   Now you're making me do the math.

17       A.   Take out your calculator.  Work that out.

18       Q.   No, no.  I know I'm not good at math.

19           And did your doctor tell you you needed to

20   move out of the house?

21       A.   No.  It's, you know, just his opinion,

22   suggestion.

23       Q.   But he didn't say move out of the house?

24       A.   Right.  He couldn't tell me that.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2264 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 71 of 126
Confidential - Subject to Further Confidentiality Review

1     Q.   Did anyone else tell you to move out of the

2    house?

3     A.   Just in general when you talk to people and

4    you explain to them your situation.  Everybody's

5    like, dude, what are you doing there?  Get out of

6    there.  You're going to die.  You know, like, in that

7    sense, but . . .

8     Q.   Did you -- how did you decide where to live

9    when you moved out of your house?

10     A.   We were just looking for somewhere far away

11    from where we lived, just to get away from there.  We

12    didn't even want to drive by there just because it

13    was, you know, such a pain, you know, the heartache

14    and the work and all the damage.  We just looked for

15    a neighborhood that appealed to us that was, you

16    know, nice for, you know, our standards.  And we

17    chose to go that route.

18     Q.   So I'm not that familiar with this area.

19     A.   Okay.

20     Q.   How far away from where you were previously

21    living did you move?

22     A.   You mean mileage-wise or time?

23     Q.   However you decide to gauge it.

24     A.   It's, like, a 15-, 20-minute drive.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2265 of 3246
Case 1:11-cv-22408-MGC Document 101-3 entered on FLSD Docket 05/18/2015 Page 72 of 126
Confidential - Subject to Further Confidentiality Review

 1      Q.   So it would be fair to say that you moved to

 2   a completely new neighborhood?

 3      A.   Yes.

 4      Q.   Were there any other reasons why you decided

 5   to move out of that neighborhood?

 6      A.   Out that specific neighborhood?

 7      Q.   Uh-huh.

 8      A.   No.  It was just because of the drywall.

 9      Q.   Was the new neighborhood you were living in,

10   did it have a better school district?

11      A.   No, not necessarily.  I think they both had

12   pretty good elementary schools and middle schools.

13      Q.   Did your kids have to change schools?

14      A.   No.

15      Q.   So they stayed at the same school once you

16   moved?

17      A.   Uh-huh.

18      Q.   And was it a further commute for you to work

19   or a closer commute for you?

20      A.   They're both about the same.  They're both

21   about the same distance from the airport.

22      Q.   Did you consider moving in with family?

23      A.   No.

24      Q.   Did you consider any other type of living

Confidential - Subject to Further Confidentiality Review

```
1    situation:  Moving in with friends, anything like

2    that?

3         A.   No, no, no.  It's such a burden on someone,

4    you know, and on us.  I didn't want to go through

5    that.

6         Q.   How many months did you live outside of the

7    house?

8         A.   Meaning?

9         Q.   Like, so let's actually take that a different

10   way.

11             What time period -- when you moved out of the

12   house in 2011 --

13        A.   Yes.

14        Q.   -- how long did you live in the rental

15   property?

16        A.   Until today.

17        Q.   So you're still living --

18        A.   We are still in that same location.

19        Q.   And are you claiming damages for that entire

20   time period?  So from December 2011 when you moved

21   out of the house, I assume you're paying -- well, let

22   me take a step back.

23        A.   Right, right.

24        Q.   How much are you paying for rent on the
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2267 of 3246
Case 1:09-cv-02047-MCA Document 22363-39 Filed 11/19/19 Page 461 of 126
Confidential - Subject to Further Confidentiality Review

1    property?

2        A.   Currently?  We're paying --

3             THE WITNESS:  750, babe?

4        A.   -- yeah, 1750.

5             MR. BARRY:  Show that the witness had to

6        ask -- phone a friend.

7             THE WITNESS:  Yeah.  She's the one that makes

8        the payment.  I just give her the money.

9             MS. GRANT:  And if you don't know, please say

10       you don't know.

11            MR. VERRIER:  She will get her chance.

12            MR. BARRY:  I'm going to give you documents

13       that will help with it.

14            THE WITNESS:  Yeah.  Thanks.

15            MR. BARRY:  If your counsel does not object,

16       I'm going to give all three of the leases at the

17       same time.

18            MS. GRANT:  That's perfectly fine.

19            MR. BARRY:  And we can do Exhibit 11.

20            (Defendants' Exhibit 11 was marked for

21       identification.)

22            MR. BARRY:  Exhibit 12, which is -- so

23       Exhibit 11 is the lease from 2012 to 2013.

24            Exhibit 12 is going to be the lease from 2014

Case 2:09-md-02047-EEF-MBN Document 23263-39 Filed 11/19/10 Page 2268 of 3246
Case 1:11-cv-22408-McALILEY Document 2250-30 Entered on FLSD Docket 05/09/2019 Page 75 of
126
Confidential - Subject to further confidentiality Review

```
 1        to 2015.

 2             (Defendants' Exhibit 12 was marked for

 3        identification.)

 4             THE WITNESS:  Okay.

 5             MR. BARRY:  And then Exhibit 13 is going to

 6        be the lease from 2016 to 2017.

 7             THE WITNESS:  Okay.

 8             (Defendants' Exhibit 13 was marked for

 9        identification.)

10   BY MR. BARRY:

11        Q.   So for the lease that is 2012 to 2013, is

12   this -- do you recognize this document?

13        A.   Yes.

14        Q.   Is this a document that you signed?

15        A.   Yes.

16        Q.   Do you mind letting me know what the lease

17   term is on this?

18        A.   Yes.  For this time frame it was 1450.

19        Q.   I apologize.  Lease term, it's the length of

20   the lease.

21        A.   Oh, I'm sorry.  24 months.

22        Q.   So January 1, 2012, to December 31, 2013.

23             Do you see that on Page 2?

24        A.   Uh-huh.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2269 of 3246
Case 1:09-cv-02448-GLR Document 238-1 Exhibit 37 Subject to Further Confidentiality Review
126
Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Do you -- and so how much was the lease?  How
 2   much did you have to pay per month?
 3        A.    For that time frame it was 1450.
 4        Q.    Okay.  And did -- did this lease last the
 5   entire 24-months?  Did you breach it?  Did --
 6        A.    No.
 7        Q.    -- the landlord breach it?
 8        A.    No.
 9        Q.    And are you asking for damages for the entire
10   1450 a month for 24 months?
11        A.    Yes.
12        Q.    I'm not making you do math on that.
13        A.    Right, right.  Yes, yes.
14        Q.    Then let's look at 2014 to 2015.
15        A.    Okay.
16        Q.    And what's the lease term here?
17        A.    It's also 24 months.
18        Q.    Okay.  And what is the amount of rent?
19        A.    1500.
20        Q.    So did you breach any of that agreement?
21        A.    No.
22        Q.    Did you breach that agreement at all?  Did
23   the landlord breach that agreement?
24        A.    No.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2270 of 3246
Case 1:09-md-02047-GAO Document 22362-39 Filed 11/19/19 Page 47 of 126
Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Do you know if you made all the payments on

 2    the rent?

 3        A.    Yes.

 4        Q.    And now let's look at 2016 through 2017.

 5        A.    Okay.

 6        Q.    And what is the lease term here?

 7        A.    It's also 24 months.

 8        Q.    And what is the total rent -- or, the amount

 9    of rent payment that you need to make per month?

10        A.    1600.

11        Q.    So it increases by an extra hundred from the

12    time --

13        A.    From the previous one, yes.

14        Q.    And are you -- was this lease breached at all

15    by you or the landlord?

16        A.    No.

17        Q.    Do you know if you have made all payments on

18    this lease to date?

19        A.    We have, yes.

20        Q.    Now, do you have -- have you produced

21    evidence of all of the -- of making all of these rent

22    payments?

23        A.    Yeah.

24              THE WITNESS:  The bank statements, Allison.
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2271 of 3246
Case 1:09-cv-07402-AGG Document Confidential Subject to Packet 03/09/2017 Page 78 of
Confidential - Subject to Further Confidentiality Review
126

```
 1              MS. GRANT:  I would have to look.

 2              THE WITNESS:  Yeah, I would have to -- I want

 3         to say bank statements.

 4              MR. BARRY:  I will provide to you -- this is

 5         going to be a fun part.  So I've got your bank

 6         statements that have been produced to us.

 7              THE WITNESS:  Perfect.

 8              (Defendants' Exhibit 14 was marked for

 9    identification.)

10    BY MR. BARRY:

11         Q.   So, Mr. Nunez, I'm going to -- do you

12    recognize these documents generally?

13         A.   Yes.

14         Q.   And if there's anything in here that's stray,

15    let me know.

16              And what are these documents?

17         A.   Checking, bank statements.

18         Q.   Whose name are they in?

19         A.   Monica.

20         Q.   But you would consider these as much part of

21    your own financials as much as hers?

22         A.   Yes.

23         Q.   I'm going to ask you to go through here, and

24    if you don't mind, just looking through the dates and
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2272 of 3246
Case 1:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2272 of 3246
Confidential - Subject to Further Confidentiality Review
126

1    reading them off to me of what bank statements we

2    have here.  And I'm going to note it down.

3        A.    Okay.  So the first one is here from

4    October 23rd, 2015 to November 19th, 2015.

5        Q.    Okay.  So we've got October 2015,

6    November 2015.

7              Let's go to the next one.  I apologize these

8    are not on pages, so it's hard to find it.

9        A.    Right.  So you want me to read -- I'm going

10   to give you the next set of dates.

11       Q.    Yeah.  That would be great --

12       A.    Yeah.  November -- do you need the actual

13   dates --

14       Q.    Yeah.

15       A.    -- or date and month?

16       Q.    You can just give me the month.

17       A.    Okay.

18       Q.    That works.

19       A.    -- 2015 to December 2015.

20       Q.    Perfect.

21       A.    Then we have December 2015 to January 2016;

22   January 2016, February 2016.

23       Q.    Okay.

24       A.    February 2016, March 2016; and then

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/10 Page 2273 of 3246 of
Case 1:1-09-md-02047-EEF-MBN Document Confidential Sub Docket 05/06/2019 Page 80 of
126
Confidential - Subject to Further Confidentiality Review

```
1    March 2016, April 2016; April 2016 to May 2016;

2    May 2016 to June 2016; June 2016 to July 2016;

3    July 2016 to August of 2016; August of 2016 to

4    September of 2016; September of 2016 to October of

5    2016; October of 2016 to November of 2016; November

6    of 2016 to December of 2016; December of 2016 to

7    January of 2017; January of 2017 to February of 2017;

8    February of 2017 to March of 2017; March of 2017 to

9    April 2017; April of 2017 to May of 2017; May of 2017

10   to June 2017; June of 2017 to July of 2017; July of

11   2017 to August of 2017; August of 2017 to September

12   of 2017.

13        Q.   So if my calculation is correct -- is that

14   the completion of the pile?

15        A.   Yeah.  That's the end of the documents.

16        Q.   So my -- if my calculation is correct, we

17   have bank statements from October 2015 to August of

18   2017, right?

19        A.   Yeah.

20        Q.   Am I right about that?  Yes.

21             September 2017.  So October 2015 to

22   September 2017.

23             The lease began -- your first lease was in

24   2013, correct?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2274 of 3246
Case 1:11-cv-22408-FAM Document 23-2 Entered on FLSD Docket 05/18/2011 Page 41 of 126
Confidential - Subject to further confidentiality Review

1      A.   Uh-huh.

2      Q.   Do you have any records -- do you have any

3   records of lease payments before October of 2015?

4      A.   Some documents weren't available online

5   through Bank of America, and I was not able to get

6   anything -- like, basically I downloaded anything

7   that was available online that I could retrieve.

8      Q.   Do you know of any alternative evidence

9   that's been produced in this litigation by you that

10   would show that your lease payments began before

11   October 2015 or that you were paying those lease

12   payments before October 2015?

13      A.   Just the lease agreements.

14      Q.   But nothing that shows that you actually paid

15   those amounts?

16      A.   Yeah, all the documents I was able to

17   download I've handed over to them.  So whatever

18   documents I guess you would have.

19      Q.   Do you know if your landlord keeps records of

20   payments?

21      A.   I wouldn't know.

22      Q.   Have you asked your landlord for those

23   records?

24      A.   No.

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/20 Page 2275 of 3246
Case 1:19-cv-12540-MLW Document 26-38 Filed 06/04/21 Page 32 of 126
Confidential – Subject to Further Confidentiality Review

```
 1      Q.    Are you -- so we've gone up until 2017.

 2            What happened in August 2017?  When was your

 3      house foreclosed on?

 4      A.    Oh, yeah, August of 2017, yes.

 5      Q.    So are we -- is your understanding of why we

 6      have bank records only through August of --

 7      August/September 2017 because you were no longer

 8      paying both the mortgage --

 9      A.    Right.

10      Q.    -- and the lease at the same time?

11      A.    Can you restate that for me?  I'm sorry.

12      Q.    So you were foreclosed on in 2017?

13      A.    Correct.

14      Q.    So you were no longer paying on the mortgage

15      after --

16      A.    Right.  For some time.

17      Q.    And I have bank records here showing that you

18      made lease payments between October 2015 and

19      August 2017.

20      A.    Correct.

21      Q.    Is your understanding of why there are no

22      bank records after --

23      A.    Whatever date.

24      Q.    -- September of 2017 because you were no
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2276 of 3246
Case 1:11-cv-22408-MGC Document 201 Entered on FLSD Docket 05/09/2017 Page 83 of
126

Confidential - Subject to Further Confidentiality Review

```
 1    longer paying both for the mortgage and for the lease

 2    payments?

 3         A.   The mortgage, I had stopped paying in 2014.

 4         Q.   So are you claiming damages for lease

 5    payments that occurred after August 2017?

 6         A.   As far as after the foreclosure?

 7         Q.   Yes.

 8         A.   Whatever documents I had given them, they

 9    have put together.  I'm not sure what they have set

10    up.

11         Q.   What it be your -- what's your understanding

12    of why you're claiming damages for the lease

13    payments?

14              MS. GRANT:  Objection.

15    BY MR. BARRY:

16         Q.   What is your understanding?

17              MS. GRANT:  Asked and answered.

18              And -- I'm sorry, go ahead.

19              MR. BARRY:  I'm not sure I've heard the

20         answer to it.

21              MS. GRANT:  Okay.

22              MR. BARRY:  So if you don't mind --

23              MS. GRANT:  He deferred to counsel.

24              MR. BARRY:  Well, it's a different question.
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2277 of 3246
Case 1:09-cv-02042-MGC Document 123-12 Entered on FLSD Docket 05/18/2011 Page 91 of
126
Confidential – Subject to Further Confidentiality Review

```
 1              MS. GRANT:  Okay.  I'm sorry then.

 2   BY MR. BARRY:

 3       Q.   What is your understanding of why you are

 4   claiming damages for the lease payments?

 5       A.   Alternative living expenses.

 6       Q.   And what is your understanding of what it

 7   means, "alternative living expenses"?

 8       A.   Basically, me having to move out of my home

 9   and pay these lease payments for, what, six, seven

10   years we've been living there, rather than living at

11   my home due to the fact that we had to move because

12   of the damages of the drywall.

13       Q.   And is it your understanding that you're

14   still entitled to damages once those -- you're

15   still -- while you're no longer obligated to make any

16   mortgage payments?

17       A.   Sorry.  Can you --

18       Q.   It was a horrible question.  I just asked

19   that terribly.

20       A.   Right.  It's okay.

21       Q.   No.  And truly, this is another example.  If

22   you don't understand what I'm saying --

23       A.   Right.  I don't.

24       Q.   -- you are more than welcome to stop me and
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2278 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 45 of
126

Confidential - Subject to Further Confidentiality Review

```
 1    say, Mike, you asked a terrible question.

 2            While you were -- is it your understanding

 3    that you are seeking damages for lease payments

 4    occurring after August 2017?

 5        A.    Okay.  I would have to refer --

 6        Q.    So you don't have a personal understanding?

 7        A.    No.  I don't have an actual breakdown or

 8    understanding of how and what they're going, you

 9    know, as far as, like, what they're asking for as far

10    as, like, a breakdown of up until when, I don't --

11        Q.    You're personally unaware?

12        A.    I'm personally not aware, no.

13        Q.    Let's see.

14            So -- was Bank of America your bank before

15    October 2015?

16        A.    Yes.

17        Q.    Okay.  Did you use any other bank to make

18    payments on this lease, do you know?

19        A.    No, no, no.

20        Q.    If you could give me just one second.

21            Mr. Nunez, earlier you represented that you

22    had two mortgages on the house, correct?

23        A.    Yes.

24        Q.    I'm going to hand you a document which I'll
```

Confidential – Subject to Further Confidentiality Review

1    represent is the payment history.

2          (Defendants' Exhibit 15 was marked for

3    identification.)

4    BY MR. BARRY:

5          Q.    Do you recognize this document?

6                MR. BARRY:  And sorry, what exhibit is this?

7          This is Exhibit 14?

8                MR. VERRIER:  15.

9                THE WITNESS:  Yes, I recognize it.

10   BY MR. BARRY:

11         Q.    And if you don't mind taking a look through

12   it, just familiarizing yourself.

13         A.    Sure.

14         Q.    And you said at some point you ended up not

15   being able to pay on the mortgage anymore.  Can you

16   pinpoint that for me?

17         A.    Throughout this statement here on Chase's

18   invoices?

19         Q.    Yes.

20         A.    Let's see.

21         Q.    If you believe that would accurately

22   represent.

23         A.    Well, here it goes from 2007 -- '8, yeah, '8

24   to 2010.  So payments were all made during that time

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2280 of 3246
Case 1:14-cv-02949-MCA Document 28-31 Confidential - Subject to Packet 05/19/2017 Page 97 of
126
Confidential - Subject to Further Confidentiality Review

1    frame.

2        Q.   Now, did you make any payments after that

3    time frame, do you know?  Would that be about the

4    time you stopped paying on the house?

5        A.   I'm trying to think.  There was the two loans

6    with Chase.  I was able to work out a forbearance due

7    to the litigation process; so at some point that

8    kicked in.  It's when that was over that they can no

9    longer establish forbearance for -- you know,

10   whatever reason, they didn't approve it.  That's when

11   I stopped paying it, which that's not on here.

12       Q.   So sometime after --

13       A.   Yeah.  It was sometime after the date that's

14   here.

15       Q.   So sometime after the forbearance you were

16   stopped -- you weren't able to pay on --

17       A.   Right.

18       Q.   Which would also line up with the time when

19   you were living in another location.

20       A.   Yeah.  By that time, yes.

21       Q.   Were there any other financial difficulties

22   you were going through during that time period?

23       A.   No.

24       Q.   Did you -- did you or your wife have any loss

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2281 of 3246
Case 1:14-cv-08175-MCA Document 286-81 Entered on FLSD Docket 05/19/2017 Page 48 of
126

Confidential - Subject to further confidentiality Review

```
 1    of employment?

 2        A.   No.

 3        Q.   Did you -- so you said you asked for a

 4    forbearance?

 5        A.   Correct.

 6        Q.   Do you remember what the terms of that

 7    forbearance were?

 8        A.   It was -- actually, it was very annoying

 9    process, because they would only grant it sometimes

10    for a few months; sometimes it would be, you know,

11    three months.  Sometimes it would be more extensive;

12    you know, they give you a year or nine months,

13    whatever.  So it was kind of like each re-issuance of

14    it was different than the last.  But for the most

15    part it was -- you know, at that time frame, you

16    know, we forbear your payments due to the fact that

17    you are in litigation and trying to deal with this

18    problem.

19        Q.   When did the forbearance period end?  Do you

20    remember?

21        A.   Exactly?  No, I don't.

22        Q.   Did you have any type of accidents or medical

23    conditions during this time period that might have

24    been creating extra costs?
```

Confidential – Subject to Further Confidentiality Review

```
1      A.   No.

2      Q.   Were you -- did any of your members of your

3   family have medical conditions or extra costs that

4   would have added --

5      A.   Just additional, you know, hospital or doctor

6   visits due to, like, my wife's asthma, or like I

7   referred you earlier, the nosebleeds, things of that

8   nature.

9           MR. BARRY:  And let's -- do you mind if we

10       take a quick break?  There's one thing I want to

11       clarify.

12          Is that okay with you?

13          THE WITNESS:  Yeah.

14          (Recess from 9:21 until 9:36 a.m.)

15   BY MR. BARRY:

16      Q.   Okay.  I'm going to walk through these

17   quickly.

18      A.   Sure.

19      Q.   Are we good?

20          I'm going to hand you, and if your counsel's

21   okay with it, two documents at a time.

22          MR. BARRY:  We're at 19, Exhibit 19?

23          THE COURT REPORTER:  16.

24          MR. BARRY:  16.  Gosh, I'm bad at that.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2283 of 3246
Case 1:1-20-cv-02047-MCA Document 22281 entered on FLSD Docket 05/19/2019 Page 90 of
126

Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. BARRY:

 2        Q.   I'll represent to you this is your first

 3    mortgage.

 4             (Defendants' Exhibit 16 was marked for

 5    identification.)

 6    BY MR. BARRY:

 7        Q.   And what is what I understand to be your

 8    second mortgage.

 9             (Defendants' Exhibit 17 was marked for

10    identification.)

11    BY MR. BARRY:

12        Q.   And if you could just take a look through it.

13        A.   Sure.

14        Q.   Familiarize yourself with it.

15             On the first mortgage, do you see a total

16    contract sales price?

17        A.   Yes.

18        Q.   And do you recognize that as the price that

19    you paid for the house?

20        A.   Yes.

21        Q.   Okay.  Do you see the amount of this first

22    mortgage, the amount of money on the first mortgage?

23        A.   The 269?

24        Q.   How much the mortgage was, how much total you
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 2284 of 3246
Case 1:17-cv-02404-FGC Document 1 Confidential - Subject to Further Confidentiality Review
126

Confidential - Subject to Further Confidentiality Review

```
1    have to pay.

2         A.   Right.  The 269,000.

3         Q.   Yes.

4         A.   Is that what you are referring to?  Uh-huh.

5         Q.   So if you turn to page -- if you keep turning

6    through here, you are going to see a document that

7    looks like this.  It says Mortgage.  And I'm going to

8    find the exact number -- it's the eighth page.  It's

9    just this document that says Mortgage.

10        A.   I think on mine it's -- yeah, it's before

11   that.  It's, like, the second or third page on mine.

12             MS. GRANT:  Counsel, also, if I may?

13             MR. BARRY:  Yeah.

14             MS. GRANT:  There's a note that I believe --

15        the promissory note that comes before that --

16        that is the page that Mr. Nunez is on.  The

17        mortgage is two pages later.

18             MR. BARRY:  Oh, got it.

19             MR. VERRIER:  We're still on Exhibit 16,

20        right?

21             MR. BARRY:  Excuse me?

22             MR. VERRIER:  Exhibit 16 we're looking at?

23             MR. BARRY:  Exhibit 16, yes.

24             MS. GRANT:  Oh, we're on the wrong one.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2285 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 92 of 126
Confidential - Subject to Further Confidentiality Review

```
 1              MR. BARRY:  We're looking at the mortgage

 2         here, the note and mortgage.

 3              THE WITNESS:  Oh, okay.  Sorry.  I was

 4         looking at 17.  I'm on 16 now.

 5              So you said Page 8?

 6              MR. BARRY:  Yes.  So Page 8.

 7    BY MR. BARRY:

 8         Q.   And do you see in Paragraph D a note where it

 9    says "note"?

10         A.   So we're on this where it says "mortgage"?

11         Q.   Yes.

12         A.   Okay.

13         Q.   Do you see Paragraph D where it says "note"?

14         A.   Yes.

15         Q.   What is the total amount of the note?

16         A.   It says $215,992.

17         Q.   And is that what you understand to be the

18    amount of your mortgage when you entered into it on

19    the first mortgages?

20         A.   On the first one.

21         Q.   Okay.  So if you look at Exhibit 18 -- is

22    that right?  17.

23         A.   17.

24         Q.   You've got me confused there.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2286 of 3246
Case 1:1-cv-22408-MGC Document 21898 Entered on FLSD Docket 05/18/2019 Page 93 of 126
Confidential - Subject to further confidentiality review

  1            Let me count out what page this is.

  2            So do you recognize this document?

  3    A.    Yes.

  4    Q.    And what is this?

  5    A.    This would be for the second mortgage.

  6    Q.    So let's turn to the -- I want to make sure

  7    I'm right on the record -- the sixth page, which is

  8    the document that says Mortgage.

  9    A.    Yes.

 10    Q.    And do you see the first whereas clause?

 11    A.    Yes.

 12    Q.    Where it says "the principal sum"?

 13    A.    Uh-huh.

 14    Q.    And how much is listed there?

 15    A.    $26,999.

 16    Q.    And do you understand that to be the amount

 17    of the mortgage on your second mortgage?

 18    A.    Correct.

 19    Q.    Do you know if your mortgages -- either of

 20    these two mortgages are paid off?

 21    A.    No.

 22    Q.    Do you still make any payments on this

 23    mortgage?

 24    A.    No.  On neither one.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2287 of 3246
Case 1:11-cv-01080-MGC Document 23 Entered on FLSD Docket 05/18/2011 Page 91 of 126
Confidential – Subject to Further Confidentiality Review

```
 1        Q.    And why is that?

 2        A.    At the moment I currently don't own the

 3    property anymore.

 4        Q.    So the foreclosure took care of the mortgage?

 5        A.    Took care of -- right.

 6        Q.    The bank no longer asks for any payment on

 7    it?  They're not trying to collect anymore amounts on

 8    it?

 9        A.    No.

10        Q.    So I'm going to hand you a document.  This

11    was one of the documents that we received yesterday,

12    so I only have one copy of it.  I'm going to hand it

13    to you, and you can read through it.

14              MR. BARRY:  For everybody on the record, this

15         is an e-mail that is sent from Mr. Nunez to

16         Steve Bronzy at Chase.  And it is:  "We last

17         spoke about a month ago when you informed me

18         about the good news of our forbearance going

19         through."

20              It starts there.

21              THE WITNESS:  Okay.

22              MR. BARRY:  And so this is a June 14th, 2010,

23         e-mail.  Subject:  Account 5304359424.

24              And I hope counsel will indulge me with
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2288 of 3246
Case 1:19-cv-09302-AT Document 1-31 Filed 10/08/19 Page 95 of 126
Confidential – Subject to Further Confidentiality Review

1    testifying a little bit there.

2         And let's mark that as Exhibit 18.

3         (Defendants' Exhibit 18 was marked for

4    identification.)

5    BY MR. BARRY:

6    Q.   Mr. Nunez, do you mind telling me what this

7    document is?

8    A.   Kind of skimming it through quickly, but from

9    what I gather is at that point I guess Steve was the

10   contact as far as setting up the forbearance with

11   Chase, and it must have been that at that point they

12   must have extended the forbearance or granted me the

13   forbearance.

14   Q.   So your first forbearance period was in 2010.

15   Is that your understanding?

16   A.   From what I recall.

17   Q.   Do you ever remember making any payments on

18   your mortgage after 2010?

19   A.    In between the forbearances, I probably did

20   not.  If I did, maybe in between, like, forbearance

21   or up until they approved the next one, if I could

22   have afforded it at a time.  And I don't recall, to

23   be honest with you.

24        MS. GRANT:  I'm sorry to interrupt, Counsel.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2289 of 3246
Case 2:09-md-02047-EEF-MBN Document 21931-21 Filed 11/06/19 Page 96 of
126
Confidential - Subject to Further Confidentiality Review

```
 1              Are we on the first mortgage or the second

 2      mortgage?

 3              MR. BARRY:  Firth mortgage.

 4              MS. GRANT:  Because I mixed them up, too.  I

 5      just want to make sure.

 6              MR. BARRY:  Yes.  That's the first mortgage.

 7              MS. GRANT:  And when we refer to the first

 8      mortgage, that's your Chase?

 9              THE WITNESS:  That's with Chase.

10              MS. GRANT:  Thank you.  If we can --

11              MR. BARRY:  The Chase mortgage.

12              MS. GRANT:  That will help me as well.

13              MR. BARRY:  A hundred percent.

14      BY MR. BARRY:

15         Q.   Now, on this document -- or, sorry, earlier

16      in the deposition we talked a little bit about when

17      you were unable to pay on your mortgage anymore, and

18      you said it was when you were paying your lease

19      payments and paying for the mortgage on the house at

20      the same time.  Is that correct?

21         A.   Yes.

22         Q.   But what -- and maybe I have my timeline out

23      of whack here.

24              You didn't start making lease payments until
```

Confidential - Subject to Further Confidentiality Review

```
 1    the end of 2011.  Is that correct?

 2        A.    Right.  It started 2012.

 3        Q.    But you -- early 2012 --

 4        A.    Right.

 5        Q.    -- late 2011?

 6        A.    January 2012, yeah.

 7        Q.    But you asked for a forbearance and stopped

 8    paying on your mortgage in June of 2010, correct?

 9        A.    Right.  Well, in the sense of stopping, as

10    far as I stopped making payments because of the

11    agreement I had with the forbearance.  I was still

12    paying PNMAC.  I was still paying the association,

13    yes.

14        Q.    Okay.  So -- but you weren't paying your

15    first mortgage, correct?

16        A.    Right.  Because Chase had agreed to stop, you

17    know, while litigation was going through, hoping, you

18    know, it would be quicker.

19        Q.    So would it be accurate to say that you

20    stopped making payments on your first mortgage before

21    you entered into the lease?

22        A.    Due to the forbearance, yes.

23        Q.    Correct.

24        A.    Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2291 of 3246
Case 1:09-cv-08045-GCL Document 2 Confidential Subject to Further Confidentiality Review
126

Confidential – Subject to Further Confidentiality Review

```
1      Q.   What is PNMAC?

2      A.   PNMAC is the other lender that had the

3  smaller loan --

4      Q.   The second mortgage?

5      A.   -- the 25,000 or 26,000 mortgage.

6      Q.   And you were making payments to PNMAC during

7  this time period?

8      A.   Yes, I was.

9      Q.   When did you stop making payments from PNMAC?

10     A.   From what I recall, 2014.

11     Q.   Okay.  I'm going to show you a document which

12  is --

13          Was the PNMAC mortgage paid off?

14     A.   No.

15     Q.   No.

16          I'm going to show you two documents, if your

17  counsel is okay with it.  The first is an e-mail from

18  2010, as -- regarding your PNMAC mortgage.

19     A.   Okay.

20          (Defendants' Exhibit 19 was marked for

21  identification.)

22  BY MR. BARRY:

23     Q.   The second is another e-mail from 2014.  It

24  is also regarding your PNMAC mortgage, which we
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 2292 of 3246
Case 1:09-cv-02048-MGC Document 123362-39 Filed in SD Docket 05/13/2017 Page 90 of
126
Confidential – Subject to Further Confidentiality Review

1    understand to be your second mortgage.

2        (Defendants' Exhibit 20 was marked for

3    identification.)

4    BY MR. BARRY:

5        Q.    Now, what are these e-mails?

6        A.    From what I can see, they're just

7    confirmation e-mails of the payments that I made to

8    the bank.

9        Q.    Do you have any other records of payments

10   made for -- on your second mortgage?

11       A.    No.  All that I have, I turned in already.

12       Q.    Do you have any understanding if there were

13   any other payments made on your second mortgage?

14       A.    After this date?

15       Q.    Well, between 2010 and 2014 --

16       A.    Oh, yeah, yeah, yeah.

17       Q.    -- there were other payments?

18       A.    Yes.  In between.  I just --

19       Q.    We just don't have records?

20       A.    Right, right.  I don't have them.

21       Q.    Okay.  So your representation is that you

22   made mortgages on that PNMAC mortgage during that

23   time period, but we -- you have not produced records

24   that establish that?

Confidential - Subject to Further Confidentiality Review

1      A.    Yes.

2      Q.    Were you -- did you ever try to get a

3   forbearance from PNMAC?

4      A.    I don't recall if I was able to reach

5   somebody.  I think I maybe brought it up, but I don't

6   think anything came of it, to be honest with you.  I

7   guess it was such a small amount maybe they -- you

8   know, it was more in their -- you know, the ball was

9   in their court.  You know, I don't think they

10  necessarily did much for it.

11     Q.    Now, let's just talk a little bit about --

12           I'm going to give you the -- what is entitled

13  the In Rem Final Judgment of Foreclosure.

14     A.    Okay.

15           (Defendants' Exhibit 21 was marked for

16  identification.)

17  BY MR. BARRY:

18     Q.    And have you seen this document before?

19     A.    Yes.

20     Q.    And if you turn to the second page of this

21  document, how much principal is due on the note on

22  which they are foreclosing?

23     A.    It's $209,371.52.

24     Q.    Okay.  Now, when you purchased the property,

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2294 of 3246
Case 1:13-cv-02408-NGG Document 289-21 Entered on FLSD Docket 05/48/2019 Page 101 of 126
Confidential - Subject to Further Confidentiality Review

1    it was purchased for $269,000.  Are you claiming any

2    damages resulting from the foreclosure?

3         A.    I would have to defer.

4         Q.    To counsel?

5         A.    To counsel, yeah.

6         Q.    If you could look back on your first

7    mortgage, this document here.

8         A.    Okay.

9         Q.    I think it's Exhibit 16.

10             Now, the principal that was owed on the

11   initial first mortgage was $215,000, correct?

12        A.    Uh-huh.  Yes.

13        Q.    And then when it was foreclosed, the

14   principal was $209,000?

15        A.    Yes.

16        Q.    So between 2007 and 2017, does that show just

17   a reduction from $215,992 to $209,000?

18        A.    For principal.

19        Q.    Yes.

20             So were you -- would it be fair to say that

21   you didn't pay but $6,000 on principal --

22        A.    On principal.

23        Q.    -- for the life of the loan?

24        A.    Yes.  On principal alone.

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2295 of 3246
Case 1:14-cv-12408-NGG Document 93-1 Confidential Deposition 05/28/2018 Page 102 of 126
Confidential - Subject to Further Confidentiality Review

```
1        Q.    And from your perspective, when you -- the

2    house was sold in foreclosure, did you lose money

3    based on the purchase price of the house?

4        A.    Yes, I did.

5        Q.    What is your understanding of that diminution

6    in the value in the house?

7        A.    Can you restate that?

8        Q.    From the purchase price based on when it was

9    foreclosed on --

10       A.    Right.  The 269,000 --

11       Q.    Yes.

12       A.    -- to --

13       Q.    The 209,000 that was paid for in the

14   foreclosure?

15            MS. GRANT:  And I'm going to object.

16       Mr. Nunez is not an expert; he's not an

17       appraiser.

18            MR. BARRY:  I stipulate.  He's not.

19            MS. GRANT:  Certainly.

20            But you can answer, if you know.

21            THE WITNESS:  I mean, just from my

22       understanding, it would be obviously the balance

23       from whatever payments I was -- you know, were

24       made in that time frame.
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2296 of 3246
Confidential - Subject to further confidentiality Review
of 126

1    BY MR. BARRY:

2        Q.   Did you believe your house was worth more at

3    the home?

4        A.   I honestly don't know as far as, you know,

5    the market value for property and things like that.

6        Q.   Did you ever try to sell your house?

7        A.   No.

8        Q.   So you never contacted a real estate agent

9    and tried to see if you could sell the house?

10        A.   No.

11        Q.   Why not?

12        A.   Because we were happy living there.  We had

13    no intention of moving.

14        Q.   But you had moved out of the house after

15    2012.

16        A.   I'm sorry.  Oh, right, after, yes.  I thought

17    you meant overall.

18        Q.   Yes.

19        A.   No, no.  After the fact, after the drywall

20    and once we moved, is that what you are referring to?

21        Q.   Yes.

22        A.   I'm sorry.

23        Q.   No, I apologize for not being clear.

24        A.   No, no.

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2297 of 3246
Case 2:13-cv-01240-NGG Document 28-21 Entered on FLSD Docket 05/08/2019 Page 404 of 126
Confidential - Subject to Further Confidentiality Review

```
 1              We were just kind of waiting to see what was

 2     going to happen with the litigation process, like,

 3     you know, whether, you know, it was going to get

 4     remediated, if we were going to be to fix the

 5     property.  You know, we -- we really didn't know.  So

 6     we didn't have . . .

 7          Q.   I'm going give you what is Exhibit 22.

 8              (Defendants' Exhibit 22 was marked for

 9     identification.)

10     BY MR. BARRY:

11          Q.   Mr. Nunez, do you know what this document is?

12          A.   It's a Certificate of Sale by, I guess, the

13     lender once I foreclosed.

14          Q.   And what is the amount of the sale price

15     here?

16          A.   It says here $180,000.

17          Q.   And you originally purchased the property for

18     $269,000.

19          A.   Correct.

20          Q.   Correct?  Give or take a dollar or two.

21          A.   Sure.  Yeah.

22          Q.   Are you claiming that the difference between

23     your purchase price and the purchase price on the

24     foreclosure as damages?
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2298 of 3246
Case 1:14-cv-04293-NGG Document 22-21 Confidential ESD Deposition 05/08/2018 Page 105 of 126
Confidential - Subject to Further Confidentiality Review

```
 1              MS. GRANT:  And, again, I'm going to

 2         reiterate the same objection in terms of

 3         Mr. Nunez's expertise.

 4    BY MR. BARRY:

 5         Q.   Is it your understanding that you are

 6    claiming the damages between the purchase price you

 7    made in 2007 and then the foreclosure price?

 8         A.   I would have to defer to counsel.

 9         Q.   So you do not have a personal understanding?

10         A.   No.

11         Q.   I am going to pass to you what is the First

12    Amended Supplemental Plaintiff production -- or,

13    Profile Form.

14              MR. BARRY:  And I will represent to the Court

15         that I believe it has not been verified yet.

16         (Defendants' Exhibit 23 was marked for

17    identification.)

18    BY MR. BARRY:

19         Q.   And let's both look through this a couple

20    times.

21              Take your time.  Let me know when you're done

22    looking through it.

23         A.   Okay.

24         Q.   Do you recognize this document, Mr. Nunez?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2299 of 3246
Case 1:15-cv-02483-NGG Document 9021 Confidential Filed under seal 05/09/2019 Page 106 of 126
Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    And what is it?

 3        A.    It is the plaintiff form that was filled out.

 4        Q.    Did you fill this document out?

 5        A.    My attorneys did.

 6        Q.    Did you review it before it was produced, do

 7   you know?

 8        A.    No.

 9        Q.    Have you reviewed this document before?

10        A.    Yes.

11              MR. BARRY:  Do you want to stipulate for the

12        record that it was probably reviewed before it

13        was produced or --

14              MS. GRANT:  Yes.

15              MR. BARRY:  I think that might have been not

16        clear.  I think you may have answered that

17        differently than you might have wanted to.

18              THE WITNESS:  Oh, okay.

19   BY MR. BARRY:

20        Q.    Did you review this document before your

21   attorney produced it to the opposing counsel, us?

22        A.    Have I reviewed it before they --

23        Q.    Yes.

24        A.    Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2300 of 3246
Case 1:18-cv-02408-WFK Document 21 entered on FLSD Docket 05/28/2020 Page 107 of 126
Confidential – Subject to Further Confidentiality Review

1      Q.    When you looked through it just a second ago,

2    did you see any information that is inaccurate?

3      A.    Not to my knowledge.

4      Q.    Let's see.  So if you turn to Page 5 --

5      A.    Okay.

6      Q.    -- there's Section 6, and it says Prior

7    Payments.

8            Did you receive any payments from -- it says

9    you received a payment of $4,547.04 from GBI

10   Settlements, correct?

11     A.    Yes.  Correct.

12     Q.    What is your understanding of what that

13   payment was?

14     A.    I'm not a hundred percent sure as far as -- I

15   know it was a combination of different organizations

16   after there was a settlement that was for all of us

17   that were involved in the drywall.  But I don't know

18   the specifics.  I would have the defer.

19     Q.    Did you apply for anything?  Did you

20   personally apply for the settlement to receive that

21   money?

22     A.    I would have to defer to counsel.

23     Q.    So you have no understanding of that?

24     A.    No.  I don't know how this was quantified and

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2301 of 3246
Case 1:14-cv-02494-NGG Document 29-21 Entered on FLSD Docket 05/05/2016 Page 108
of 126
Confidential - Subject to Further Confidentiality Review

```
 1    how exactly we fell into the parameters of that

 2    settlement, no.

 3         Q.   Did you ever apply for any other settlements?

 4    Do you know of any other settlements that you are

 5    applying for?  Were you ever denied any settlement?

 6         A.   Not that I'm aware.

 7         Q.   It's not something that is within your

 8    personal knowledge?

 9         A.   No, no.

10         Q.   That would be something that you would defer

11    to counsel?

12              I don't want to put words in your mouth,

13    but . . .  Is that correct?

14         A.   Yes.

15         Q.   On the next page, it says that -- actually,

16    sorry.  Let me take you back -- stay on the page we

17    were on.  I apologize.

18         A.   No problem.

19         Q.   The bottom here it says if you -- could you

20    read the bottom section to me?

21         A.   Sure.

22              "If you incurred alternative expenses as a

23    result of Chinese drywall, identify the total moving

24    costs and/or alternative living expenses you
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2302 of 3246
Case 1:14-cv-02494-NGG Document 209-1 Exhibit 41 filed under seal 05/03/2019 Page 109
of 126
Confidential - Subject to Further Confidentiality Review

1    incurred."

2            For a total of $73,000 even.

3        Q.    Do you know how you came to that amount?

4        A.    Yeah.  Adding up lease payments, moving

5    expenses, things of that nature.

6        Q.    Do you know what time period of lease

7    payments you are including in that 73,000?

8        A.    I would have to defer to counsel.

9        Q.    So I'm going to hand you a document.

10           And keep that exhibit handy.  We're going to

11   come back to it in just a second.

12       A.    Sure.

13           (Defendants' Exhibit 24 was marked for

14   identification.)

15   BY MR. BARRY:

16       Q.    So how much of moving expenses were there on

17   this --

18           What is this document?

19       A.    It is an invoice for moving -- actually, this

20   ended up being the quote.  Now that I look at it, I

21   recall I couldn't find the final invoice, which ended

22   up being more, unfortunately.  But I can't produce

23   it.

24       Q.    Do you know how much more it was?

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2303 of 3246
Case 1:19-cv-02401-NGG Document 09-21 Entered on FLSD Docket 05/08/2019 Page 110 of 126
Confidential - Subject to Further Confidentiality Review

```
 1        A.   I would guess -- I don't have an exact

 2    amount -- but it ended up being about -- close to a

 3    thousand dollars.  It was 800 and something, 900 and

 4    change.  I don't recall.

 5        Q.   Did you ask Move For Less for an invoice, or

 6    did you call them and see if they still have an

 7    invoice available from that time period?

 8        A.   No.  This was a long time ago.

 9        Q.   So you have not --

10        A.   I'm not sure if they are around, to be honest

11    with you.

12        Q.   So you have no evidence of the final number?

13        A.   No.  Right.

14        Q.   Just your recollection --

15        A.   Unfortunately.

16        Q.   -- it was higher?

17        A.   Right.  All I have is this.

18        Q.   Now, I'm going to provide to you your

19    interrogatory responses.  And I have your

20    verification here.

21             MR. BARRY:  Can we just stipulate for the

22        record that they're verified?

23             MS. GRANT:  Of course.

24             (Defendants' Exhibit 25 was marked for
```

```
1    identification.)

2    BY MR. BARRY:

3       Q.   Now, if you want to review these.

4            You are welcome to review this, but I'm

5    really going to be asking only about a couple here.

6       A.   Okay.

7       Q.   So you if look at your response to

8    Interrogatory Number 2.

9       A.   Okay.

10      Q.   If you don't mind just reading through that a

11   little bit closer, I think that will probably get

12   us -- I'm sorry, for Number 1, my apologies.

13           So here you said your moving expense is $700.

14   Is that what you were saying is the higher value, the

15   amount?

16           And that's the -- do you mind saying it

17   audibly for the record?

18      A.   Oh, yeah.  Sorry.  So I think that $700 is

19   most likely what -- you know, I estimated at the

20   time, that we didn't have -- you know, off of that

21   one quote invoice.

22      Q.   And above where you say the alternative

23   living expenses are $107,560, is that the amount that

24   you experienced from paying the rent payments?
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.    Correct.

 2        Q.    Now, if we look back at, I think it's

 3   Exhibit 22, which is the -- your plaintiff form.

 4            MS. GRANT:  I apologize, Counsel.  Your last

 5        question was is that the amount -- you were

 6        asking about alternative living, and then you

 7        asked him was that the amount of rent.  Just to

 8        clarify, alternative living expenses can include

 9        things other than rent.

10            MR. BARRY:  Right.  Rent and other things.

11        So I apologize.

12            MS. GRANT:  I don't want it to be confusing.

13            MR. BARRY:  To clarify -- I'll re-ask the

14        question.

15            MS. GRANT:  Thank you.

16   BY MR. BARRY:

17        Q.    It was lease payments and other expenses that

18   you said earlier --

19        A.    Right.

20        Q.    -- minus the moving expenses which --

21        A.    Yes.

22        Q.    On your Supplemental Plaintiff Profile Form,

23   if you look back at that.

24        A.    Yes.  21 -- no.
```

```
 1        Q.   I think it's 21 or 22.  It looks like this.

 2             MR. VERRIER:  23.

 3             MR. BARRY:  I think you've got it in your

 4        left hand.

 5             THE WITNESS:  Oh, sorry.

 6             MR. BARRY:  One more down.

 7             MS. GRANT:  It's this one.

 8             THE WITNESS:  Gotcha.

 9             MR. VERRIER:  Is he looking at 23?

10             MR. BARRY:  23, yeah.

11             THE WITNESS:  23.

12   BY MR. BARRY:

13        Q.   Now, back on Page 5 where it says the amount

14   of alternative living expenses you incurred.

15        A.   Okay.

16        Q.   It says $73,000.  Correct?

17        A.   Correct.

18        Q.   Over here on the interrogatories, you said

19   107,560 plus the moving expenses of $700.

20        A.   Sure.

21        Q.   What explains that discrepancy?

22        A.   I would have to defer to counsel.

23        Q.   So you have no understanding why in one place

24   it's, you know, 30,000 more than the other place?
```

Case 2:09-md-02047-EEF-MBN   Document 22363-29   Filed 11/19/19   Page 2307 of 3246
Case 1:14-cv-00948-NGG Document 22801-1 Filed on TBD Docket 05/08/2019 Page 14 of 126
Confidential - Subject to further confidentiality Review

```
 1              MS. GRANT:  Asked and answered.

 2    BY MR. BARRY:

 3         Q.   You have no personal understanding of it?

 4         A.   No.

 5         Q.   What would be -- could you think of any other

 6    alternative living expenses other than rent, other

 7    than moving expenses, other than any repair costs,

 8    that would also be included?

 9         A.   No.

10         Q.   So you can't think of anything?

11         A.   No.  I can't think of anything else that

12    would.

13         Q.   If you turn to the next page.

14         A.   On the same plaintiff form?

15         Q.   Yeah.

16              You see that -- if you don't mind reading

17    from the second paragraph of the top of the page.

18         A.   Okay.  On Page 6, correct?

19         Q.   Yes.

20         A.   So "if you experienced any loss," is that

21    what you are referring to?

22         Q.   Uh-huh.

23         A.   "If you experienced any loss of use and/or

24    loss of enjoyment of the property as a result of
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2308 of 3246
Case 2:09-md-02047-EEF-MBN Document 21762-1 Filed 08/16/18 Page 115 of 126
Confidential - Subject to Further Confidentiality Review

```
 1    Chinese drywall, identify the total amount of such

 2    loss.

 3             To an estimated amount of 250,000 or however

 4    to be determined at trial."

 5       Q.   I know your lawyer has added the "to be

 6    determined at trial," but what is your understanding

 7    of how that $250,000 was calculated?

 8       A.   I would have to defer to counsel.

 9       Q.   So you have no personal understanding?

10       A.   No.

11       Q.   So let's look back at your interrogatories.

12    We have a couple other explanations here --

13       A.   Okay.

14       Q.   -- for damages.  So let's start -- we've

15    already talked about moving expenses.

16       A.   Correct.

17       Q.   The next one down is loss of equity and

18    foreclosure damages.

19             Do you know what those damages are?

20       A.   No.

21       Q.   You don't know what those damages are; you

22    have no personal knowledge?

23       A.   No.  No personal knowledge.

24       Q.   Do you know what would evidence those?
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.    No.

 2        Q.    Damage to credit, do you know what those

 3   damages are?

 4        A.    Other than what I've mentioned to you earlier

 5   as far as, like, higher interest rates, credit

 6   denials, credit scores going down.

 7        Q.    Have you tried to quantify that?

 8        A.    No.

 9        Q.    Have you thought about hiring an expert to

10   try to quantify the amount of damage to credit?

11             MS. GRANT:  I'm going to object to that.

12        Attorney/client privilege.

13             MR. BARRY:  Understood.

14             MS. GRANT:  Don't answer.

15             MR. BARRY:  Understood.

16   BY MR. BARRY:

17        Q.    And we've already talked about the other

18   economic damages, which, you know, we didn't add up

19   all those receipts together but we assume --

20        A.    Right.

21        Q.    -- near 1211.

22             Are there any other types of damages that are

23   not listed here that we don't know about?  Are there

24   any other types of damages that you are claiming?
```

```
1       A.    Not to my knowledge.

2             MR. BARRY:  Let's take a quick break.

3             (Recess from 10:10 until 10:21 a.m.)

4             MR. BARRY:  Mr. Nunez, I have some good news.

5       You're not going to have to hear my voice

6       anymore.  I may have a question or two of

7       follow-up, but Mr. Guerra is going to ask a few

8       questions of you.

9             THE WITNESS:  Okay.

10            MR. BARRY:  I probably won't have anything

11      more to ask after that, but I reserve that right.

12                      CROSS-EXAMINATION

13   BY MR. GUERRA:

14      Q.    Good morning, Mr. Nunez.

15      A.    Good morning.  How are you?

16      Q.    Good.  How are you?

17      A.    I'm fine, thank you.

18      Q.    Just a couple questions to clear a few things

19   up.

20            You said you received several forbearances on

21   your first mortgage.  Do you know approximately when

22   they started and when they ended?

23      A.    Unfortunately, no.  I don't have the exact

24   dates.
```

Confidential -- Subject to Further Confidentiality Review

```
 1       Q.   Okay.  Do you know when Chase started the

 2   foreclosure procedure on your house?

 3       A.   I don't have an exact date.

 4       Q.   Can you ballpark it?

 5       A.   No.  I mean, it would be once they didn't

 6   re-up the forbearance.  And then, you know, they

 7   contacted me that they were not going to re-up, you

 8   know, the payments would begin as normal.  You know,

 9   I informed them that I couldn't make the payments due

10   to the fact of the drywall, and I was already living

11   at our current location.  But I don't have

12   anything --

13       Q.   Would that be something we should ask your

14   wife?

15       A.   Maybe she can recall.

16       Q.   Okay.  And then you mentioned earlier that

17   you didn't consider selling your house.  Why didn't

18   you consider selling it?  Was there a particular

19   reason?

20       A.   We wanted to stay there.  We liked it.  We

21   liked the area.  It was spacious.  It was near the

22   highways.  We had no problem living there.  We wanted

23   to fix it, if, you know, the option became available.

24       Q.   Once the foreclosure process had started, did
```

```
1    you ever consider selling at that point?

2        A.   No.  At that point I just dealt with the

3    banks.  I never listed or thought of listing the

4    property or anything like that.  I mean, it -- it had

5    Chinese drywall.  I'm not going to gain anything from

6    that.  You know, I just was working out something

7    with the bank.

8        Q.   Okay.  And then one last question.

9        A.   Sure.

10       Q.   Aside from you and your wife, do you know of

11   anyone else that would have a claim related to

12   Chinese drywall for your property?

13       A.   No.  I mean, other than, like, for example

14   the claim that we currently have?

15       Q.   Correct.

16       A.   Like, another person?

17       Q.   Yes.

18       A.   No.

19            MR. GUERRA:  No further questions.

20            MR. BARRY:  We appreciate your time,

21       Mr. Nunez.  Unless your counsel has any

22       follow-up . . .

23            MS. GRANT:  No.  None.  Thank you.

24            MR. BARRY:  Appreciate your time.  Thank you
```

```
 1           for sitting with us.  I know this is not a fun
 2           experience, and we appreciate your patience.
 3                (Whereupon, the deposition concluded at
 4      10:24 a.m.)
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2314 of 3246
Case 1:18-cv-22408-MGC Document 99-21 Entered on FLSD Docket 05/08/2019 Page 121 of 126
Confidential - Subject to Further Confidentiality Review

```
 1                    C E R T I F I C A T E

 2

 3             I, KELLY J. LAWTON, Registered Professional

 4     Reporter, Licensed Court Reporter, and Certified

 5     Court Reporter, do hereby certify that, pursuant to

 6     notice, the deposition of JEOVANY NUNEZ was duly

 7     taken on December 19, 2018, at 7:37 a.m. before me.

 8             The said JEOVANY NUNEZ was duly sworn by

 9     me according to law to tell the truth, the whole

10     truth and nothing but the truth and thereupon did

11     testify as set forth in the above transcript of

12     testimony.  The testimony was taken down

13     stenographically by me.  I do further certify that

14     the above deposition is full, complete, and a true

15     record of all the testimony given by the said

16     witness.

17

18             _____

19             KELLY J. LAWTON, RPR, LCR, CCR

20

21             (The foregoing certification of this

22     transcript does not apply to any reproduction of the

23     same by any means, unless under the direct control

24     and/or supervision of the certifying reporter.)
```

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4          Please read your deposition over carefully

 5     and make any necessary corrections.  You should state

 6     the reason in the appropriate space on the errata

 7     sheet for any corrections that are made.

 8

 9          After doing so, please sign the errata sheet

10     and date it.  It will be attached to your deposition.

11

12          It is imperative that you return the original

13     errata sheet to the deposing attorney within thirty

14     (30) days of receipt of the deposition transcript by

15     you.  If you fail to do so, the deposition transcript

16     may be deemed to be accurate and may be used in

17     court.

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
1                     - - - - - -

2                   E R R A T A

3                     - - - - - -

4    PAGE   LINE   CHANGE

5    ____   ____   _____

6       REASON: _____

7    ____   ____   _____

8       REASON: _____

9    ____   ____   _____

10      REASON: _____

11   ____   ____   _____

12      REASON: _____

13   ____   ____   _____

14      REASON: _____

15   ____   ____   _____

16      REASON: _____

17   ____   ____   _____

18      REASON: _____

19   ____   ____   _____

20      REASON: _____

21   ____   ____   _____

22      REASON: _____

23   ____   ____   _____

24      REASON: _____
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2317 of 3246
Case 1:19-mc-00405-JGK Document 20-1 Filed under seal 05/28/2019 Page 124 of 126
Confidential -- Subject to Further Confidentiality Review

```
 1                    ACKNOWLEDGMENT OF DEPONENT

 2

 3            I, JEOVANY NUNEZ, do hereby acknowledge that

 4     I have read the foregoing pages, 1 to 124, and that

 5     the same is a correct transcription of the answers

 6     given by me to the questions therein propounded,

 7     except for the corrections or changes in form or

 8     substance, if any, noted in the attached Errata

 9     Sheet.

10

11

12     _____        _____

13     JEOVANY NUNEZ                                      DATE

14

15

16

17

18     Subscribed and sworn to before me this

19     _____ day of _____, 20____.

20     My Commission expires: _____

21

22     _____

       Notary Public

23

24
```

```
 1                        LAWYER'S NOTES

 2      PAGE    LINE

 3      _____   _____    _____

 4      _____   _____    _____

 5      _____   _____    _____

 6      _____   _____    _____

 7      _____   _____    _____

 8      _____   _____    _____

 9      _____   _____    _____

10      _____   _____    _____

11      _____   _____    _____

12      _____   _____    _____

13      _____   _____    _____

14      _____   _____    _____

15      _____   _____    _____

16      _____   _____    _____

17      _____   _____    _____

18      _____   _____    _____

19      _____   _____    _____

20      _____   _____    _____

21      _____   _____    _____

22      _____   _____    _____

23      _____   _____    _____

24      _____   _____    _____
```

```
 1                    - - - - - -

 2                   E R R A T A

 3                    - - - - - -

 4     PAGE    LINE    CHANGE
                       Yes, once we moved in around September of 2008, and until we moved out at
 5     17        8     the end of 2011.
                      _____

 6     REASON:  I misunderstood the question in terms of time frame.
                       The house was vacant for a few months after closing and then it was rented
 7     17       11-15  until around September 2008. I believe the tenants paid about $1,300 per
                       month in rent. Shortly thereafter, Monica and I and her daughters
              her daughters moved in the house and remained until we moved out at the end of 2011.
 8     REASON:  I misunderstood the question in terms of time frame.

 9     25       4-5      I charged  around $1,000 rent.
                       After reading the transcript and thinking about the matter, I realize my
10     REASON:  recollection of the rent amount during the deposition was incorrect.

11     _____   _____   _____

12     REASON:  _____

13     _____   _____   _____

14     REASON:  _____

15     _____   _____   _____

16     REASON:  _____

17     _____   _____   _____

18     REASON:  _____

19     _____   _____   _____

20     REASON:  _____

21     _____   _____   _____

22     REASON:  _____

23     _____   _____   _____

24     REASON:  _____
```

# EXHIBIT A26

Confidential - Subject to Further Confidentiality Review

```
  1                UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
  2                Case No. 1:11-CV-22408-MGC
  3      -------------------------------§
         EDUARDO AND CARMEN AMORIN et    §
  4      al., individually, and on behalf §
         of all others similarly         §
  5      situated,                       §
                                         §
  6          Plaintiffs,                 §
                                         §
  7      vs.                             §
                                         §
  8      TAISHAN GYPSUM CO., LTD. F/K/A   §
         SHANDONG THAIHE DONGXIN CO.,     §
  9      LTD.; TAIAN TAISHAN PLASTERBOARD §
         CO., LTD., et al,               §
 10                                      §
             Defendants.                 §
 11      ------------------------------- §
          - - -
 12
                                   - - -
 13
                       WEDNESDAY, DECEMBER 19, 2018
 14
                                   - - -
 15
                   Confidential - Subject to Further
 16                     Confidentiality Review
 17                           - - -
 18          Deposition of MONICA ALBA-NUNEZ, held at
         JG Firm, 1855 Griffin Road, Suite C-470, Dania,
 19      Florida, commencing at 10:25 a.m., on the above
         date, before Kelly J. Lawton, Registered
 20      Professional Reporter, Licensed Court Reporter,
         and Certified Court Reporter.
 21
                                   - - -
 22
                      GOLKOW LITIGATION SERVICES
 23            877.370.3377 ph | 917.591.5672 fax
                         deps@golkow.com
 24
```

Case 2:09-md-02047-EEF-MBN Document 22363-20 Filed 11/19/19 Page 2322 of 3246
Case 1:11-cv-00498-NGG Document 299-21 Entered on FLSD Docket 05/09/2012 Page 9 of 33
Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:

 2    ALLISON GRANT, P.A.
      BY:  ALLISON GRANT, ESQUIRE
 3    14 S.E. 4th Street
      Boca Raton, Florida 33432
 4    (561) 994-9646
      agrant@allisongrantpa.com
 5    Representing Plaintiff

 6
      BARON & BUDD, P.C.
 7    BY:  HOLLY WERKEMA, ESQUIRE
      3102 Oak Lawn Avenue, Suite 1100
 8    Dallas, Texas 75219
      (214) 521-3605
 9    hwerkema@baronbudd.com
      Representing Plaintiff

10
11    LEVIN, SEDRAN & BERMAN, LLP
      BY:  KEITH J. VERRIER, ESQUIRE
12    510 Walnut Street, Suite 500
      Philadelphia, Pennsylvania 19106
13    (215) 592-1500
      kverrier@lfsblaw.com
14    Representing Plaintiff

15
      ALSTON & BIRD, LLP
16    BY:  MICHAEL J. BARRY, ESQUIRE
      BY:  SARAH O'DONOHUE, ESQUIRE
17    BY:  ASHTON G. CARPENTER, ESQUIRE
      One Atlantic Center
18    1201 West Peachtree Street
      Atlanta, Georgia 30309
19    (404) 881-7000
      mike.barry@alston.com
20    sarah.odonohue@alston.com
      ashton.carpenter@alston.com
21    Representing Taishan Gypsum Co., Ltd. and Tai'an
      Taishan Plasterboard, Co., Ltd.
22
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:

 2        ORRICK, HERRINGTON & SUTCLIFFE, LLP
          BY:  DAN GUERRA, ESQUIRE
 3        The Orrick Building
          405 Howard Street
 4        San Francisco, California 94105
          (415) 773-5545
 5        dguerra@orrick.com
          Representing BNBM PLC
 6

 7        ABALLI MILNE KALIL, P.A.
          BY:  JOSHUA D. POYER, ESQUIRE
 8        2250 SunTrust International Center
          One Southeast Third Avenue
 9        Miami, Florida 33131
          (305) 373-6600
10        jpoyer@alalli.com
          Representing BNBM PLC
11

12

13    ALSO PRESENT:

14        Jeovany Nunez

15

16

17

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2324 of 3246
Case 1:18-mr-02408-MGC Document 23-21 (Reference) Filed 05/03/2021 Page 6 of 33
Confidential - Subject to Further Confidentiality Review

```
1                         - - -

                      I N D E X

2                         - - -

3    Testimony of:  MONICA ALBA-NUNEZ

4         DIRECT EXAMINATION BY MR. BARRY................  5

5         CROSS-EXAMINATION BY MS. GRANT................. 25

6         REDIRECT EXAMINATION BY MR. BARRY............. 27

7

8

9                    E X H I B I T S

10

11   DEFENDANTS'                                      PAGE

12   Exhibit 9      Chinese Drywall Screening, LLC      13

                    March 26, 2010 Report

13

     Exhibit 23     First Amended Supplemental          17

14                  Plaintiff Profile Form

15

16

17

18

19

20

21

22

23

24
```

confidential – Subject to further confidentiality Review

```
1                          - - -

2               THE COURT REPORTER:  Ma'am, would you please

3          raise your right hand.

4               Do you swear or affirm that the testimony

5          you're about to give will be the truth, the whole

6          truth, and nothing but the truth?

7               THE WITNESS:  Yes.

8               MONICA ALBA-NUNEZ, called as a witness by the

9     Defendants, having been first duly sworn, testified

10    as follows:

11                         DIRECT EXAMINATION

12    BY MR. BARRY:

13         Q.   Ms. Nunez, thank you for coming in.

14              Do you mind just stating your full name for

15    the record?

16         A.   Sure.  Monica Alba-Nunez.

17         Q.   Well, I appreciate you being here.  I know

18    this is not a fun process, and I'm hopeful that we

19    can get through this very quickly and I think much

20    quicker than your husband's.  So he should feel the

21    one that got cursed, and you are the lucky one in not

22    having to talk too much.

23              I'm going to give you a little bit of the

24    rules of the road of a deposition.
```

Confidential - Subject to Further Confidentiality Review

```
1              Have you ever sat for a deposition before?

2      A.   No.

3      Q.   This is the first time?

4      A.   Yeah.

5      Q.   Other than watching your husband here, have

6   you ever watched a deposition?

7      A.   No.  Just -- not as impressive as I thought.

8      Q.   It's not like they do it on television.

9      A.   Not on TV, no.

10     Q.   As I said to your husband earlier in the

11  hall, this may convince you you should not have been

12  a lawyer.

13             Just a little bit of the rules of the road.

14  I'm going to ask you a question -- and I'm sure your

15  lawyer has explained all this to you beforehand --

16  you are going to answer it.

17     A.   Okay.

18     Q.   And what we're going to do is just try not to

19  talk over each other.  I know most conversations, we

20  are going to end up kind of having a little bit of

21  back and forth.  This is not a conversation.  So, you

22  know, if I'm asking something, please don't speak

23  over me.  If you are answering something, I will do

24  my best not to speak over you.  Because our court
```

```
 1    reporter needs to be able to have a clear record.

 2           And your counsel may object to certain

 3    things -- she is very good about stopping you to make

 4    sure, to have a clean record -- you may still answer

 5    after some of those objections.  Some of those she

 6    will instruct you not to answer.  But we just want to

 7    make sure it's a clear record so that everything's

 8    out there.

 9           Do you understand that you have been sworn

10    under oath and everything that you -- everything that

11    you're saying you must tell the truth as if

12    testifying in court?

13        A.    Yes.

14        Q.    Are you taking any medications that will

15    impair your ability to understand my questions or to

16    answer truthfully?

17        A.    No.

18        Q.    How did you prepare for this deposition?

19        A.    I got dressed and came here.

20        Q.    Before today, how did you prepare for this

21    deposition?

22        A.    There really wasn't a preparation.  It was

23    just, you know, trying to remember everything,

24    because it's been so long.
```

Case 2:09-md-02047-EEF-MBN Document 22363-20 Filed 11/19/19 Page 2328 of 3246
Case 1:18-cv-12408-NGG Document 22 Interested Persons 05/48/2019 Page 9 of 33

Confidential - Subject to Further Confidentiality Review

1    Q.   Of course.

2         And did you meet with your lawyer beforehand?

3    A.   Yes.

4    Q.   How long did you meet with your lawyer?

5    A.   How long?  Like, the time?

6    Q.   How many times did you meet with your lawyer?

7    A.   Once.

8    Q.   Once?

9         And for how long was that period?

10   A.   I'm not quite sure.  It was after work.

11   Q.   An hour or two hours?

12   A.   Maybe.

13   Q.   Okay.  It wasn't more than five hours?

14   A.   Not more than five hours, definitely not.

15   Q.   And did you speak with anyone else about this

16   deposition before attending it?

17   A.   My mother.

18   Q.   Okay.  What did you and your mother speak

19   about?

20   A.   Take it easy, relax, it's okay.  Everything

21   will be fine.  That kind of thing.

22   Q.   Motherly love.

23   A.   Yes.

24   Q.   Did you speak to any of your friends about

```
 1    this deposition?

 2         A.    Yes.   Actually, co-workers, because I had to

 3    be here, so I had to miss work.

 4         Q.    And what did you say to your co-workers about

 5    this deposition?

 6         A.    I've got to go to a deposition.   For what?

 7    Long story.

 8         Q.    Did you do anything else to prepare for this

 9    deposition?

10         A.    That's it.

11         Q.    Okay.   Did you review any documents to

12    prepare for this deposition?

13         A.    Just now.

14         Q.    Just siting there --

15         A.    Right.

16         Q.    -- you looked at a few documents?

17         A.    Very organized.

18         Q.    And those were the documents that I was

19    introducing as exhibits to your husband's deposition?

20         A.    Yes.

21         Q.    Were you looking at any other documents other

22    than those?

23         A.    No.   That was it.

24         Q.    Now, where are you employed?
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.    Miami-Dade County public schools.

 2        Q.    And what do you do at Miami-Dade public

 3   schools?

 4        A.    I've been a teacher for a Title I school for

 5   15 years.  And as of right now, I'm the math coach

 6   for the whole school.

 7        Q.    Wow.  That's great.

 8              What do you teach?

 9        A.    Math, at the moment, to the entire staff.

10        Q.    And what is your typical work schedule?

11        A.    Oh, wow.  I asked if I could bring -- to do

12   work here while you guys spoke, and that was a no.

13   So that kind of gives me a typical work schedule.  I

14   wake up at 5:30 in the morning, I start doing work at

15   home, then briefly get the kids ready.  Get to work,

16   start working from the minute I get there until 4:45,

17   5:00, pack up work, bring it home, and keep working.

18        Q.    And how long have you been in that job?

19        A.    15 years.

20        Q.    15 years?

21              Have you had any other jobs during that time

22   period?

23        A.    Used to -- in conjunction with.  I used to

24   teach at the college as well, Miami-Dade College.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2331 of 3246 of
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2331 of 33
Confidential – Subject to Further Confidentiality Review

1    Q.    And when were you teaching at Miami-Dade

2  College?

3    A.    From 2004?  I don't know.  It's been a long

4  time -- until Ethan was born, so to 2010.  Maybe 2001

5  to 2010, something like that.

6    Q.    Do you remember how much you were making when

7  you were working at Miami-Dade College?

8    A.    Not exactly.  An exact number, no.  It was --

9    Q.    A ballpark number?

10   A.    Sure.  So ballpark number, I taught -- it had

11  to do with hours for the State of Florida.  So it

12  might have been maybe $2,000 every couple months.  It

13  would depend whenever a class would fill.  So it's

14  not a salary.

15   Q.    So it could be -- would ever earn more than

16  $15,000 in a year for Miami-Dade College?

17   A.    No.

18   Q.    It would be less than $15,000?

19   A.    Yes.

20   Q.    More than 2,000, but less than --

21   A.    Right, right, right.

22   Q.    So somewhere in that range?

23   A.    Yeah.

24   Q.    Are you married?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2332 of 3246
Case 1:09-cv-02042-CEC Document 203-31 Entered on FLSD Docket 05/18/2018 Page 43 of
33
Confidential - Subject to Further Confidentiality Review

```
 1        A.   Yes.

 2        Q.   Who are you married to?

 3        A.   I am married to Jeovany Nunez.

 4        Q.   And now we're going to have to test your

 5   husband.  When did you get married?

 6        A.   Well, that's more of a test for me, believe

 7   it or not.  The roles are a little bit reversed.

 8   April, I want to say, 17th, 2010.

 9        Q.   He totally had that right.

10        A.   Oh, he's very good.  I'm the one that's a

11   little . . .

12        Q.   Do you have any children?

13        A.   We do.

14        Q.   How many children do you have?

15        A.   I have a total of three.  Together we have

16   one.

17        Q.   And have you ever been involved in a lawsuit

18   before?

19        A.   No.

20        Q.   So this is -- so you have never been a

21   plaintiff in a lawsuit or a defendant in a lawsuit?

22        A.   No.

23        Q.   Have you ever been in a class-action lawsuit

24   before?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2333 of 3246
Case 1:09-cv-02042-GAD Document Entration FileSocket0598/2019 Page 41 of 33
Confidential - Subject to Further Confidentiality Review

```
1        A.    No.  Oh, except the ones you get in the mail.

2        Q.    Right.

3        A.    That's it.

4        Q.    Your husband said the exact same thing.

5        A.    Yeah.  I remember that.  You get, like, these

6    little postcards.

7        Q.    That's not what I'm asking about.

8        A.    Okay.  Yeah.

9        Q.    I appreciate you being forthcoming.

10       A.    Yeah.

11       Q.    So I'm going to ask you only a few quick

12   questions.

13       A.    Okay.

14       Q.    And your husband represented on the record

15   earlier that everything that is -- you know, been

16   discussed is in his name:  The house is in his name,

17   the mortgage is in his name.

18       A.    Right.

19       Q.    And that any of those damages that he is

20   having is something that you are sharing with him.

21             Are there any other damages in this

22   litigation that you are claiming as your own?

23       A.    Oh, yeah.

24       Q.    Okay.  So what are those?
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.    Ready?

 2        Q.    Yes.

 3        A.    Okay.  So if you take a look at -- I believe

 4    it's Exhibit 9.  And I'll give you the page number.

 5    Let me find it.

 6              Oh, you didn't write exhibits on these.

 7              MR. NUNEZ:  Yeah.  The little stickers on it.

 8              MR. BARRY:  There's stickers on the bottom.

 9              MS. GRANT:  They are on the bottom.

10              THE WITNESS:  Oh, okay.  There we go.

11              MS. GRANT:  So if you go backwards,

12        hopefully . . .

13              THE WITNESS:  Backwards.  Okay.

14              I think it's Exhibit 9.  Yeah, Exhibit 9.

15    BY MR. BARRY:

16        Q.    If you could tell me what the document -- oh,

17    it's the inspection report?

18        A.    Yeah.  It's this one.

19              If you turn to the page -- at the bottom it

20    says 205, but clearly it's not 205; it's multiple

21    pages.  But it's the one that has the little pink

22    walls in the back with the flowers, that one.

23        Q.    Okay.

24        A.    So that pink wall with the flowers was the
```

Confidential - Subject to Further Confidentiality Review

```
1    room of my middle child, my daughter.

2         Q.    Okay.

3         A.    We had a humongous problem with her when we

4    were living there after a couple months.  She stopped

5    growing.  She suffered from failure to thrive.

6              I wasn't going to cry.

7              So that was her room.  And anything we put --

8    we didn't know at the time, but everything we put in

9    that room, for some reason, stopped working.  So,

10   like, computers and the lamps, those little flower

11   lamps stopped working.  So that was loss.

12             The time that we lost there to get her help

13   was lost.  The amount of money we had to spend for

14   doctors for her were lost.

15             And then while we were there, we got married.

16   We were really looking forward to having a second --

17   or, a child of our own.  I did specify I wanted a son

18   specifically, by the way.  We had two girls.

19        Q.    I'm glad you got a son.

20        A.    Yeah, yeah, yeah.  It was going to happen.

21             We couldn't conceive.  And one of the losses

22   that we did suffer is when we went to the doctor,

23   everything was supposedly fine until they did, like

24   a -- they do this when you can't conceive, they do
```

Confidential - Subject to Further Confidentiality Review

1    sperm counts.  And when they looked at Jeo's sperm,

2    it was misshaped.  And even so, we were able to

3    conceive while we were there.  It took a long time.

4    And late in the pregnancy -- we have twins -- we

5    miscarried.  And one of them was because it was an

6    ectopic pregnancy.  So that was a personal loss.

7           So we covered the doctors.  We covered

8    Madison not being able to grow.  All the things that

9    we had to throw out in her room constantly, which we

10   had no idea for awhile.

11          And then the long-term effects of that, which

12   is my personal loss is I can't still -- I don't have

13   a house.  So, like, the little -- in this house,

14   which we wanted to keep -- and it's funny, is you

15   don't -- you put -- it's been a long time, so we put

16   it away; you put it away in the back of your mind so

17   you continue moving forward in your life.  But we had

18   a wall in the laundry room where we measured the

19   kids.  We don't have that anymore.  We don't have the

20   kids -- that memory or, you know, that they could

21   bring their kids back and say, look, this is where

22   Mom measured us.  We don't have that.

23          Our son would love a dog.  Can't because

24   we're in a condo.  Why?  Because we still can't

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2337 of 3246
Case 1:09-cv-02047-McGal Document 22361 Entered on FLSD Docket 05/19/2019 Page 48 of
33
Confidential - Subject to Further Confidentiality Review

1    purchase anything.  Why?  Because we had to go

2    through this foreclosure with the Chinese drywall.

3           It's things that we're still suffering and

4    will suffer for the rest of your life because you

5    can't get that time back.  You can't undue the damage

6    that was done emotionally, physically.  So you will

7    suffer that the rest of your life because the memory

8    is there.

9           The girls, their father, when he found out

10   that we were living in a house with toxic drywall in

11   it, threatened to take me to court to take custody

12   away from the kids because he didn't want them living

13   there.  So then you have to choose between do we ruin

14   our entire credit, our chances of ever being able to

15   be a homeowner, or do I let my kids go?  We can't

16   afford to fix the house.  We can't afford custody

17   battles with my ex-husband.  We can't afford -- so,

18   yeah, all of those things were a personal loss to me.

19       Q.   And I know this is difficult, ma'am, and I'm

20   so sorry that --

21       A.   I had put it away for a long time.  It didn't

22   come up until last night.

23       Q.   And you take the time you need.  And if you

24   need a break, we're fine with --

Confidential – Subject to Further Confidentiality Review

```
 1      A.   I'm fine.

 2      Q.   -- I'm happy to do that.

 3           If you don't mind, could you turn to what

 4   this is; I think it's Exhibit 23.

 5      A.   I lost it in the mess I made.

 6           Yes.

 7      Q.   And if you don't mind just looking through

 8   it.  I know you probably got a chance to --

 9      A.   I did.  Yeah, I did while --

10      Q.   If you want to do it again, let me know.

11      A.   I'm good.

12      Q.   And if you turn to Page 5.

13      A.   Okay.

14      Q.   Actually, let's turn to Page 6.

15      A.   Okay.

16           MS. GRANT:  Do you want to take a couple

17      minute break?

18           THE WITNESS:  I'm okay.

19           MR. BARRY:  And, please, if you are okay

20      with -- we've got the time.  Don't -- if you need

21      a break, we're happy to take a break.

22           THE WITNESS:  Maybe a second.

23           MR. BARRY:  Yeah.  Let's do that.

24           Let's go off the record.
```

```
 1              (Recess from 10:37 until 10:48 a.m.)

 2    BY MR. BARRY:

 3        Q.   So I just have a few quick questions.

 4        A.   Okay.

 5        Q.   You mentioned earlier that there were a few

 6    items that you had to throw out, whether it was TVs

 7    or wall decorations.  Do you have any receipts?  Are

 8    you claiming damages for any of those items?

 9        A.   I don't know.  Whatever we had, we turned in

10    to the attorneys.

11        Q.   Okay.

12        A.   Yeah.

13        Q.   So you don't know -- you don't know for sure

14    one way or another?

15        A.   No.

16        Q.   But if you turned it in, we would have it?

17        A.   Right.

18        Q.   When you were sitting through your husband's

19    deposition, was there anything you heard that he said

20    that you thought was inaccurate?

21        A.   Yes.

22        Q.   Okay.  What was that?

23        A.   The damages.

24        Q.   Okay.
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.   Those were inaccurate, because he failed to

 2   mention that -- I mean, at least to my understanding,

 3   the fact that we are making rent payments now and

 4   will be making rent payments for a few more years

 5   instead of making mortgage payments toward the

 6   ownership of our house.  Those are, to me, considered

 7   damages.

 8        Q.   So your understanding is that you and your

 9   husband are claiming damages for the rent payments

10   you're currently paying now?

11        A.   And will be paying until we're able to get

12   approved for a loan to purchase a house.

13        Q.   Okay.  Was there anything else that you heard

14   that he said that was inaccurate?

15        A.   Yes.  Let me think.  I'm still a little shook

16   up.

17        Q.   Of course.  Take your time.

18        A.   So we threw out a bunch of stuff.  We --

19   which, you know, like, mattresses and things,

20   anything that smelled, because the smell was just

21   attached to everything.  We had to get rid of even

22   some clothing because we noticed that when we washed

23   it, it took multiple washes to get the smell out.

24   You don't notice it until you're not there -- I mean,
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2341 of 3246
Case 1:11-cv-22408-MGC Document 201 entered on FLSD Docket 05/18/2011 Page 42 of 33
Confidential – Subject to Further Confidentiality Review

```
1    you notice it when you are in the house, and you

2    notice it because anybody that comes into the house

3    says, "what is that smell," like, my mother-in-law.

4    And I'd say, "I cleaned."  She's, like, "did you try

5    bleach?"  "Yes."  So things like that we had to throw

6    out.  Those were considered damages.

7            I know also -- doctors' bills I got.

8            Yeah, so, like, now that I'm 15 years into my

9    career -- something that you would consider a

10   damage -- the amount of time that you have to take

11   off in the school system, that accrues, right?  So if

12   you don't take the time off, you're able to use that

13   toward your retirement.  So you can actually retire

14   earlier and cash them in at the end.

15           The amount of time that we had to take off

16   because of the kids being sick, because we had

17   somebody coming to the house to take a chunk of the

18   drywall out, because -- all of those days are days

19   lost that I no longer have banked.  So those, to me,

20   personally, are considered damages.

21       Q.   Have you provided any documents that evidence

22   the days you missed because of the drywall?

23       A.   I don't believe so.  But I could be wrong.

24   It's been nine years.
```

Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Have you provided any documents that evidence

 2    the clothes you had to throw out or replace?

 3        A.    No.  I don't believe so.  But, again, it's

 4    been nine years.

 5        Q.    What about the mattresses that you had to

 6    throw out or replace?  Did you provide any receipts

 7    or any kind of documents --

 8        A.    No.

 9        Q.    -- that evidence that?

10        A.    Well, maybe.  I'm not sure.

11        Q.    Okay.  But your belief would be that your

12    attorney would have whatever records --

13        A.    Right.  Exactly.

14        Q.    Now, if you look at your supplemental

15    plaintiff form, which is this here, and if you look

16    at -- starting on Page 5, you see the alternative

17    living expenses of $73,000.  And then on the next

18    page, you see the loss of use and enjoyment is equal

19    to $250,000.

20            All the damages we have discussed today that

21    was not -- were not mentioned by your husband, do you

22    believe those are reflected within those numbers?

23        A.    Absolutely not.  I think that you can't

24    quantify everything I've just mentioned.
```

Confidential - Subject to Further Confidentiality Review

```
 1      Q.   So are you -- you're claiming -- sorry, I

 2   apologize.  You finish your answer.

 3      A.   Sorry.  No, it's okay.

 4           You can't quantify.  No.  I believe -- I

 5   don't know, how much -- how much are two babies

 6   worth?

 7      Q.   Do you believe that you were asking now for

 8   more damages than what's listed here?

 9      A.   I am asking whatever my attorney, in

10   conversation with the attorneys, they've put on

11   paper.

12      Q.   Okay.  So you are deferring to your attorney

13   on this?

14      A.   Yes.

15      Q.   Is there anything else your husband said

16   today that you felt was inaccurate, incomplete, or

17   you want to add more to?

18      A.   I don't know if it's appropriate.  This is

19   the first time I've done this.  But, like, when you

20   talk about, you know -- I don't know where it falls

21   under, the embarrassment of not being able to have

22   friends over or the embarrassment and arguments with

23   family that they refuse to come over because being in

24   the house could affect them or could affect the
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2344 of 3246
Case 1:11-cv-22408-MGC Document 206-201 Entered on FLSD Docket 05/18/2014 Page 45 of
33
Confidential - Subject to Further Confidentiality Review

```
 1    newborn baby, my niece at the time.  That -- that was

 2    huge to us.

 3            The embarrassment of having to go through a

 4    foreclosure, which I would have never thought would

 5    have happened to us.  We're, like, very on top of

 6    everything.

 7            The embarrassment of still renting.  I'm 42.

 8    I would love to have had a house by now that we're

 9    paying that's ours.

10            All of that I think was kind of left out.  It

11    was not quite -- you know, like, our parents are

12    getting older, and we don't have a place for them to

13    come stay because we're all shoved into a condo until

14    all this gets sorted out.

15            So I think all of those things were not taken

16    into consideration when my husband was talking.

17            MR. BARRY:  Ms. Nunez, I have no more

18        questions for you.  And I appreciate your time

19        and thank you for being with me.

20            THE WITNESS:  Thank you.

21            MR. BARRY:  I'm going to defer to my

22        colleagues down at the end of the table if they

23        have anything to ask.

24            If not, thank you for coming.  I appreciate
```

Confidential - Subject to Further Confidentiality Review

1       you sharing.

2               THE WITNESS:  Thanks.

3               MS. GRANT:  Can we have just a couple

4       minutes?  Do you mind?

5               MR. BARRY:  Of course.  And I may have

6       follow-up depending on what you guys ask.

7               MS. GRANT:  Of course.

8               (Recess from 10:55 until 11:04 a.m.)

9                       CROSS-EXAMINATION

10      BY MS. GRANT:

11          Q.   Mrs. Nunez, I don't recall if you were in the

12      room when your husband had testified about the air

13      condition coils and things that were breaking in the

14      home.

15              But besides the air-conditioning coils, can

16      you give us some examples of things in the home that

17      either were broken and had to be repaired, things of

18      that nature?

19          A.   Sure.

20              So some of things that had been mentioned

21      were things like the TVs, the lamps.  Watches, for

22      some reason, not a single watch worked in the house;

23      it constantly had to be replaced with the batteries.

24              But in addition to that, something that I

Confidential - Subject to Further Confidentiality Review

```
 1    didn't mention was having to -- and it didn't seem

 2    that big of a deal at that time; I thought that's

 3    what home ownership was like -- we had to constantly

 4    repair silly things that just accumulated.

 5          For example, inside the toilets, the part

 6    inside the tank, anything that was submerged in the

 7    water, all of the pieces had to be repaired every

 8    three to four months.  So, like, the rubber parts

 9    were completely eaten away.  So the toilets would

10    just run and run and run.

11          We had three bathrooms.  So once we got one

12    fixed -- and you don't realize it until you get one

13    fixed, and then the one downstairs is broken, and

14    then you have to the fix that one.  Then the one in

15    the hall is broken, and you have to fix that one.

16    And it was, like, constant.

17          The microwave hood should stay attached --

18    it's a new house -- it fell out completely.  The

19    bottom of the refrigerator -- things that were, like,

20    adhesive-based, all that had to be refixed

21    constantly.

22          Then, of course, the other things, like

23    the -- some plugs wouldn't work; some light fixtures

24    wouldn't work.  Things like that that were just a
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2347 of 3246
Case 1:19-cv-22483-MGC Document 28-201 Entered on FLSD Docket 05/08/2019 Page 48 of
33
Confidential - Subject to Further Confidentiality Review

```
 1      constant expense.

 2          Q.    Okay.

 3              MS. GRANT:  Thank you.

 4              That's all.

 5              MR. BARRY:  And just one follow-up question

 6      on that.

 7              THE WITNESS:  No problem.

 8                     REDIRECT EXAMINATION

 9    BY MR. BARRY:

10          Q.    For all of those items you have mentioned, do

11      you know if you have submitted receipts to your

12      attorney that she has produced to us?

13          A.    No.  Not that I know of.  We don't have any

14      receipts, no.

15              MR. BARRY:  I have no more questions.

16              We do reserve the right to reopen her

17          deposition if more documents are produced.

18          Otherwise, we have no further questions.

19              MS. GRANT:  All right.  Thank you very much.

20              MR. BARRY:  Thank you to you both.

21              (Whereupon, the deposition concluded at

22      11:06 a.m.)

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2348 of 3246
Case 1:19-cv-00449-MCJC Document 1-281 (Exhibit 21) Filed 10/25/19 Page 45 of 33

Confidential - Subject to Further Confidentiality Review

```
 1                    C E R T I F I C A T E

 2

 3           I, KELLY J. LAWTON, Registered Professional

 4     Reporter, Licensed Court Reporter, and Certified

 5     Court Reporter, do hereby certify that, pursuant to

 6     notice, the deposition of MONICA ALBA-NUNEZ was duly

 7     taken on December 19, 2018, at 10:25 a.m. before me.

 8           The said MONICA ALBA-NUNEZ was duly sworn by

 9     me according to law to tell the truth, the whole

10     truth and nothing but the truth and thereupon did

11     testify as set forth in the above transcript of

12     testimony.  The testimony was taken down

13     stenographically by me.  I do further certify that

14     the above deposition is full, complete, and a true

15     record of all the testimony given by the said

16     witness.

17

18           _____

19           KELLY J. LAWTON, RPR, LCR, CCR

20

21           (The foregoing certification of this

22     transcript does not apply to any reproduction of the

23     same by any means, unless under the direct control

24     and/or supervision of the certifying reporter.)
```

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4          Please read your deposition over carefully

 5   and make any necessary corrections.  You should state

 6   the reason in the appropriate space on the errata

 7   sheet for any corrections that are made.

 8

 9          After doing so, please sign the errata sheet

10   and date it.  It will be attached to your deposition.

11

12          It is imperative that you return the original

13   errata sheet to the deposing attorney within thirty

14   (30) days of receipt of the deposition transcript by

15   you.  If you fail to do so, the deposition transcript

16   may be deemed to be accurate and may be used in

17   court.

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2350 of 3246
Case 1:09-md-02047-MCA Document 2931 Entered on FLSD Docket 05/09/2019 Page 46 of
33
Confidential - Subject to Further Confidentiality Review

```
 1                    - - - - - -

 2                   E R R A T A

 3                    - - - - - -

 4     PAGE    LINE    CHANGE

 5     ____    ____    _____

 6       REASON: _____

 7     ____    ____    _____

 8       REASON: _____

 9     ____    ____    _____

10       REASON: _____

11     ____    ____    _____

12       REASON: _____

13     ____    ____    _____

14       REASON: _____

15     ____    ____    _____

16       REASON: _____

17     ____    ____    _____

18       REASON: _____

19     ____    ____    _____

20       REASON: _____

21     ____    ____    _____

22       REASON: _____

23     ____    ____    _____

24       REASON: _____
```

Confidential - Subject to Further Confidentiality Review

```
1                     ACKNOWLEDGMENT OF DEPONENT

2

3           I, MONICA ALBA-NUNEZ, do hereby acknowledge

4      that I have read the foregoing pages, 1 to 32, and

5      that the same is a correct transcription of the

6      answers given by me to the questions therein

7      propounded, except for the corrections or changes in

8      form or substance, if any, noted in the attached

9      Errata Sheet.

10

11

12     _____      _____

13     MONICA ALBA-NUNEZ                                    DATE

14

15

16

17

18     Subscribed and sworn to before me this

19     _____ day of _____, 20____.

20     My Commission expires: _____

21

22     _____

       Notary Public

23

24
```

```
 1                          LAWYER'S NOTES

 2     PAGE    LINE

 3     _____   _____    _____

 4     _____   _____    _____

 5     _____   _____    _____

 6     _____   _____    _____

 7     _____   _____    _____

 8     _____   _____    _____

 9     _____   _____    _____

10     _____   _____    _____

11     _____   _____    _____

12     _____   _____    _____

13     _____   _____    _____

14     _____   _____    _____

15     _____   _____    _____

16     _____   _____    _____

17     _____   _____    _____

18     _____   _____    _____

19     _____   _____    _____

20     _____   _____    _____

21     _____   _____    _____

22     _____   _____    _____

23     _____   _____    _____

24     _____   _____    _____
```

# EXHIBIT A27

Case 1:09-md-02047-EEF-MBN Document 22363-20 Filed 11/19/19 Page 2354 of 3246
Case 1:11-cv-22408-MGC Document 1 Entered on FLSD Docket 05/08/2015 Page 2 of 47
Confidential - Subject to Further Confidentiality Review

1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2

     EDUARDO AND CARMEN AMORIN,
3    et al., individually, and
     on behalf of all others
4    similarly situated,         Case No. 1:11-CV-22408-MGC
5        Plaintiffs,
6    vs.
7    TAISHAN GYPSUM CO., LTD.,
     F/K/A SHANDONG TAIHE
8    DONGXIN CO., LTD.; TAIAN
     TAISHAN PLASTERBOARD CO.,
9    LTD, et al.,
10       Defendants.
                              - - -
11              Confidential - Subject to Further
                    Confidentiality Review
12
                     DECEMBER 17, 2018
13                            - - -
14         Deposition of KELLY O'BRIEN, held at
        Morgan & Morgan, PA, One Tampa City Center,
15      201 North Franklin Street, 6th Floor, Tampa, Florida
        33602, commencing at 4:00 p.m., on the above date,
16      before Joan L. Pitt, Registered Merit Reporter,
        Certified Realtime Reporter, and Florida
17      Professional Reporter.
18                            - - -
19              GOLKOW LITIGATION SERVICES
            877.370.3377 ph | 917.591.5672 fax
20                  deps@golkow.com
21
22
23
24

confidential - Subject to Further Confidentiality Review

```
 1                    APPEARANCES

 2

 3   Counsel for Plaintiffs:

 4        PANAGIOTIS "PETE" V. ALBANIS, ESQUIRE
          Morgan & Morgan
 5        12800 University Drive, Suite 600
          Fort Myers, Florida 33907
 6        239.433.6880
          palbanis@forthepeople.com

 7

          KEITH J. VERRIER, ESQUIRE
 8        Levin, Sedran & Berman LLP
          510 Walnut Street, Suite 500
 9        Philadelphia, Pennsylvania 19106
          215.592.1500
10        kverrier@lfsblaw.com

11

12   Counsel for Defendants Taishan Gypsum Co., Ltd., and
     Taian Taishan Plasterboard Co., Ltd.:

13

          ALIYYA Z. HAQUE, ESQUIRE
14        PATRICK H. HILL, ESQUIRE
          BOYKIN LUCAS, ESQUIRE
15        Alston & Bird LLP
          One Atlantic Center
16        1201 West Peachtree Street
          Atlanta, Georgia 30309-3424
17        404.881.700
          aliyya.haque@alston.com
18        patrick.hill@alston.com
          boykin.lucas@alston.com

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2356 of 3246
Case 1:11-cv-22408-MGC Document 69-1 Entered on FLSD Docket 05/18/2012 Page 49 of
47
Confidential - Subject to Further Confidentiality Review

```
 1              APPEARANCES CONTINUED

 2   Counsel for Beijing New Building Materials PLC:

 3        DAN GUERRA, ESQUIRE

          Orrick, Herrington & Sutcliffe LLP

 4        The Orrick Building

          405 Howard Street

 5        San Francisco, California 94105-2669

          415.773.5545

 6        dguerra@orrick.com

 7        JOSHUA D. POYER, ESQUIRE

          Aballi Milne Kalil

 8        2250 SunTrust International Center

          One Southeast Third Avenue

 9        Miami, Florida 33131

          305.373.6600

10        jpoyer@aballi.com

11

12   Also present:  Lori O'Brien

13

14

15

16

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                        - - -

 2                    I N D E X

 3                        - - -

 4   Testimony of:  KELLY O'BRIEN

 5    DIRECT EXAMINATION BY MS. HAQUE              5

 6    CROSS-EXAMINATION BY MR. ALBANIS            38

 7    REDIRECT-EXAMINATION BY MS. HAQUE           40

 8

 9

10              E X H I B I T   I N D E X

11   O'BRIEN            DESCRIPTION             PAGE

12   No. 24     PRIORITY CLAIMANT KELLY O'BRIEN'S    32

                ANSWERS TO INTERROGATORIES

13              OBRIENDEPO000364 - OBRIENDEPO000368

14

15

16

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                         - - -

 2              THE COURT REPORTER:  Raise your right hand,

 3      please.  Do you swear or affirm the testimony you

 4      give will be the truth, the whole truth, and nothing

 5      but the truth?

 6              THE WITNESS:  I do.

 7              THE COURT REPORTER:  Thank you.

 8              KELLY O'BRIEN, called as a witness by the

 9      Defendant Taishan Gypsum Co., Ltd., having been first

10      duly sworn, testified as follows:

11                         DIRECT EXAMINATION

12      BY MS. HAQUE:

13      Q.    Could you please state your name for the

14      record?

15      A.    Kelly O'Brien.

16      Q.    Mr. O'Brien, my name is Aliyya Haque.  We met

17      earlier this afternoon.  I'm one of the attorneys for

18      Defendant Taishan Gypsum, and I'll be asking you some

19      questions here today.

20              You just sat through the deposition of your

21      wife -- of Mrs. O'Brien.

22      A.    Uh-huh.

23      Q.    I'm not going to run through the entire outline

24      with you.
```

```
 1      A.    Right.

 2      Q.    There's some areas where she testified that you

 3   had more knowledge, and so I'm going to focus on those

 4   areas.

 5      A.    Okay.

 6      Q.    Just a few preliminaries before we get started.

 7   Just some reminders.  When you answer, please speak

 8   slowly.  Please use verbal responses.  Don't shake your

 9   head or nod or anything like that.

10      A.    Okay.

11      Q.    And if you don't understand my questions or

12   need to take a break, please let me know.

13      A.    Okay.

14      Q.    Are you taking any medications today that will

15   impair your ability to understand my questions and to

16   answer truthfully and fully?

17      A.    No.

18      Q.    And do you understand that you must tell the

19   truth as if you're testifying in court and the judge

20   were sitting right here?

21      A.    Yes.

22      Q.    Okay.  Did you meet with your attorneys to

23   prepare for this deposition?

24      A.    Yes.
```

```
1       Q.   How many times?

2       A.   Over the phone, a couple, and then in person

3    for a couple hours.

4       Q.   Did you meet with your attorneys at any point

5    when Mrs. O'Brien was not present?

6       A.   No.

7       Q.   Did you review any documents to prepare for

8    this deposition?

9       A.   Yes.  Most of the documents, all the documents,

10   that were presented today.

11      Q.   Did you bring any additional documents today to

12   the deposition?

13      A.   No.

14      Q.   Did you do anything else to prepare for this

15   deposition?

16      A.   No.

17      Q.   Mr. O'Brien, I want to talk to you about some

18   of the inspections that took place.

19      A.   Okay.

20      Q.   To your knowledge, did any official company

21   other than Allied Home Inspections perform an inspection

22   on the home at 3120 West Wallcraft?

23           MR. ALBANIS:  Object to the form, but you may

24           answer if you can, Mr. O'Brien.
```

```
 1              THE WITNESS:  Okay.  As an official company,

 2         they were the only official Chinese drywall

 3         inspection company.  There also was an inspection

 4         done by the property appraiser in 2009, maybe in

 5         October or September of 2009, shortly after we

 6         discovered that we had Chinese drywall, because that

 7         was one of the recommendations was to follow up with

 8         the Hillsborough County Property Appraiser's Office.

 9              Called them up on the phone.  They immediately

10         reduced the value and they followed up with an

11         inspection for that year.

12    BY MS. HAQUE:

13         Q.   Do you have a copy of that report?

14         A.   I do not.  Any copies of anything I have have

15    already been given to Pete.

16         Q.   Do you know if the Hillsborough County

17    inspector produced a report?

18         A.   Not to me.  I don't believe that they do.  They

19    basically came out, inspected, ensured that we had

20    Chinese drywall, and they verbally told me that the

21    means by which they handle the depreciation in value of

22    the land and the property is to take away the home value

23    in its entirety and only have -- base the taxes on the

24    land value.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2362 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 46 of 47
Confidential – Subject to Further Confidentiality Review

1    Q.   Did they -- were you present during this

2    inspection?

3    A.   Yes.

4    Q.   Did they take any pieces of drywall or bore any

5    holes to examine the drywall?

6    A.   I don't believe they did, because I believe

7    that the inspection through Allied already they took

8    boards down and had exposed areas that said "made in

9    China," "meets or exceeds," et cetera, and so you could

10   see that.  And that was -- he took pictures of that and

11   of some of the other evidence that was similar to the

12   evidence Allied had.

13   Q.   Mr. O'Brien, did you listen to Mrs. O'Brien's

14   testimony today during her deposition?

15   A.   Yes.

16   Q.   Do you disagree with any portions of

17   Mrs. O'Brien's testimony?

18   A.   Minor details.  For instance, it's a

19   four-bedroom, three-bath.

20   Q.   Okay.

21   A.   It's a 3300-square-foot house.  Some of the

22   other documentation may have rough figures, but I think

23   they're in error.  The tax documents.  We've been paying

24   taxes on the property being 3300 square feet in its

Confidential - Subject to Further Confidentiality Review

1    entirety.

2         And there was one part where they talked about

3    did we do any inspection.  After -- when the home was

4    being remediated, after we had sold it, we both went

5    into the home and we saw they were tearing out drywall

6    and remediating the home.  We took video footage -- I

7    provided it to Pete -- extensive video footage as

8    documentation notation, and I also have the drywall

9    samples from each one of the rooms, and that's how those

10   pictures that you referenced in one of the other items

11   were produced.

12        The video footage shows some of the more

13   distinctive markings, and one of the major things that

14   the video footage does show that I don't think came

15   across clearly was that in various rooms throughout the

16   house they had -- you could see through the back wall of

17   one room and still see the drywall sitting on the wall

18   of the other room that says "meets or exceeds," "made in

19   China."  So it was predominantly throughout the house.

20        Q.   Do you recall what percentage of the house?

21        A.   We never calculated the percentage.  I would

22   say through most of the house, and if I was to guess, I

23   would say a high percentage.

24        Q.   Okay.  In terms of the samples that you

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2364 of 3246
Case 1:09-md-02047-MGL Document 12362-39 Filed 11/19/19 Page 2364 of 3246
Confidential – Subject to Further Confidentiality Review
47

```
 1   collected, do you recall the time frame in which you

 2   collected those samples?

 3       A.   They would have been in 2012 shortly after we

 4   sold the house.

 5       Q.   And can you describe the process by which you

 6   went to the house and collected the samples?

 7       A.   Well, they -- I was notified by -- we have

 8   friends that live down the street -- that they were in

 9   the process of remediating.  We stopped by the house.

10   They were in the process of remediating.  They had just

11   started.

12           And I brought a video camera.  We have the

13   addendum that said we have the right to collect evidence

14   and so on and so forth, so we went in there and

15   collected all the -- the drywall samples that I gave to

16   Pete also at that time.

17       Q.   So the drywall had already been taken out at

18   that point?

19       A.   Some of it had been taken off and was in piles

20   in each room and some of it was still on the wall that I

21   pulled off.  I can't tell you which sample I did which.

22   Some of the samples are distinctive because in certain

23   rooms were painted certain colors, and so I knew what

24   room that was in.  And I walked from room to room, I
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2365 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2365 of 3246
Confidential – Subject to Further Confidentiality Review
47

1   think, in the footage, and I notate what I see in each

2   room.

3       Q.   And did you also note the presence of domestic

4   and/or Argentinian drywall samples?

5       A.   The only -- I mean, the Argentinian drywall

6   samples I saw were what was noted in the Allied report.

7   Other than that, I didn't see any.  I didn't go to every

8   single, you know, board and verify that absolutely every

9   single board was Chinese drywall, but all the boards

10  looked very similar and there wasn't like a brown board

11  and a white board or something like that to say, oh,

12  this one's different.

13      Q.   And did you see any end tape or other markings?

14      A.   Yes.  I denoted that in the video and in the

15  camera footage.  You have a document here of the camera

16  footage.  It doesn't show all the end tape markings that

17  I have in the video footage or in the samples that I

18  gave to Pete.

19      Q.   And what were the -- can you describe for us

20  what types of markings that you noticed then?

21      A.   They were the "meets or exceeds," "made in

22  China," with the teletype -- or the type print that at

23  some point in time has been associated with Taishan, and

24  also light blue and dark blue writing on the end tape

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2366 of 3246
Case 2:09-cv-02046-MCG Document 22363-39 Filed 11/19/19 Page 3246 of
Confidential - Subject to Further Confidentiality Review
47

1    that, again, has been associated with Taishan.

2       Q.  Let's go back to 2009.  Can you tell your

3    recollection of when you first found out about Chinese

4    drywall?

5       A.  I was kind of devastated, but what happened is

6    we were having the air conditioning coils replaced, and,

7    as she had stated earlier, we had gone through -- you

8    know, right from the beginning we'd had air conditioning

9    problems.  I think a few months into living in the house

10   we had a motor replaced.

11          And we kept having problem after problem after

12   problem, and so working with our air conditioning guy,

13   he kept going back to the manufacturer and dealing with

14   warranty issues, and he had had the coils replaced, I

15   don't know how many times, and different parts replaced

16   under warranty, and at some point they wanted to inspect

17   the coils or see the coils or see a picture of the

18   coils, I don't remember which, and they said that they

19   suspected we may have Chinese drywall.  I guess it was a

20   thing that was coming up at that time.

21          So as soon as he said that to me, I went onto

22   the Internet and I looked up Chinese drywall, what was

23   Chinese drywall, and they said the first thing you look

24   for is corrosive wiring.  So I pulled out outlets, and

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2367 of 3246
Case 1:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 45 of 47
Confidential - Subject to Further Confidentiality Review

 1    sure enough, the ground wires were corroded.  You know,

 2    the coils were blackened.  Anything that was copper gets

 3    blackened by this.  So that was the first kind of

 4    indication.

 5         So the very first thing I did was contact, I

 6    think -- and I don't know what order this was in, but we

 7    contacted our property insurance.  We contacted our

 8    builder.  We contacted -- you know, he contacted his

 9    insurance.  And I also went out to Home Depot and got a

10    borescope and started trying to look in the walls

11    myself, in outlets, trying to look up there.  A

12    borescope is a camera that you can -- in-wall camera.

13         I looked -- I finally found in a pocket door, I

14    slipped it in behind the door, and saw in the bathroom

15    downstairs, it's in the Allied report, the "made in

16    China," "meets and exceeds."

17    Q.   Are you okay?  Do you need to take a moment?

18    A.   No.

19    Q.   Do you recall how soon or the time frame it was

20    when you sort of took all these steps?

21    A.   It was -- it was pretty immediate, I mean,

22    right after, one after another, because I think from the

23    time we went to discovering was right around that August

24    day that you said the air coils were replaced to, you

```
 1    know, you saw the tax appraiser gave us the discount by
 2    November.  So I contacted them between August and
 3    November, and I contacted -- I had started looking into
 4    an attorney in November.  I had contacted an attorney
 5    that I know.  He referred me to somebody else, and
 6    eventually I said, "What do you think about these guys?"
 7    And he thought it was good.  Anyway, I went and got them
 8    I think around February.
 9         Q.   February 2010?
10         A.   Correct.
11         Q.   What did the builder or supplier tell you when
12    you contacted --
13         A.   I never contacted the supplier or the installer
14    directly.  I contacted the builder.  He's the one that
15    gave me the information.  He had been -- at that point
16    he had told me we were probably the fourth house and he
17    suspected that he had seven or eight houses that were
18    doing this.
19              He was doing his own investigations.  He was
20    trying to determine was there a remediation that could
21    be done, is this something as simple as putting in an
22    air filter, applying a paint, something of that nature.
23    He was attending seminars to see what could be done
24    about it, and he was also contacting his insurance,
```

Case 2:09-md-02047-EEF-MBN Document 23263-39 Filed 11/19/19 Page 2369 of 3246
Case 1:09-md-02047-EEF-MBN Document ... Filed ... Page ... of 47
Confidential - Subject to Further Confidentiality Review

 1   which he then told me that at some point he said, "It

 2   looks like the only way to get my insurance to cover me

 3   is if I'm confronted with a lawsuit."

 4        And so that's -- and at the same time we had

 5   gotten a rejection from our own property insurance, so

 6   at that point we contacted Pete.

 7        Q.   Is your builder, do you know, is he still in

 8   business?

 9        A.   Yes.

10        Q.   Has he filed for bankruptcy?

11        A.   I don't believe he's filed for bankruptcy.  I

12   don't know.  He is still in business, and we have talked

13   to him from time to time, but not regarding this.

14        Q.   Do you know if his insurance would be willing

15   to or is able to reimburse?

16        A.   I believe that what we found out through my

17   attorney is that they have -- they're trying -- they

18   have -- did try to send letters to all of that.  I think

19   that they were all -- I don't know.  I don't know what

20   the formal status of that was ultimately, although I

21   suspect that pollution exclusions and product liability

22   exclusions and so forth seem to be the common theme that

23   we had issues with with the insurance companies.

24        Q.   But at this point the builder has not sort of

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2370 of 3246 of
Case 1:09-cv-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 48 of
Confidential - Subject to further Confidentiality Review
47

1   refused or said he cannot give you any money resulting

2   from --

3       A.   He has refused.  I mean, he can't.  He

4   basically said, "You have to sue me" and --

5       Q.   Okay.  Did you ever see the drywall before it

6   was installed?

7       A.   I don't recall ever seeing it stacked up.  I

8   recall coming there and them installing it.  There was a

9   crew of a whole bunch of people, maybe 20 people, and

10  they were all over the house, and they installed the

11  drywall in a very short period of time.

12      Q.   Do you recall the duration?

13      A.   I want to say they installed it entirely in one

14  day.

15      Q.   Did anyone ever inform you that they were

16  installing drywall manufactured in China?

17      A.   No.

18      Q.   Did anyone, and by "anyone" I mean the builder,

19  supplier, installer, make any guarantees to you about

20  the products they used in the home?

21      A.   No, not explicitly.

22      Q.   Did you ever sue the builder, the supplier, or

23  the installer, especially after the builder said, "You

24  have to sue me"?

Case 2:09-md-02047-EEF-MBN   Document 22363-39   Filed 11/19/19   Page 2371 of 3246
Case 1:09-cv-08118-AGC   Document 19-1   Entered on FLSD Docket 05/19/2011   Page 49 of
47
Confidential - Subject to Further Confidentiality Review

```
 1        A.   Pete has all the legal material that has been

 2   processed so far.

 3        Q.   Okay.  So you just don't know whether a lawsuit

 4   has been filed on your behalf against the builder at

 5   this -- as we sit here today?

 6             MR. ALBANIS:  Object to the form, but you may

 7        answer if you can.

 8             THE WITNESS:  I'd have to refer to the

 9        documents that were already provided to determine

10        that.

11   BY MS. HAQUE:

12        Q.   Okay.  Mr. O'Brien, I had asked your wife some

13   questions regarding remediation, and I just want to ask

14   you really quickly, did you spend any money personally

15   to remediate the home at 3120 West Wallcraft?

16             MR. ALBANIS:  I'll assert the same rolling

17        objection as I had before regarding remediation

18        damages.  Having said that, you may answer if you

19        know.

20             MS. HAQUE:  And I'll just quickly put on the

21        record that we believe these questions are related

22        to the overall issue of damages in the case.

23             THE WITNESS:  Okay.  We did not attempt to

24        remediate the home as such.  We did go out and buy
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/10/10 Page 2372 of 3246
Case 1:09-cv-02949-MGC Document 123363-39 Entered on FLSD Docket 05/18/2012 Page 46 of 47
Confidential - Subject to Further Confidentiality Review

```
1        some fairly expensive air purifiers to try and see

2        if we could live in the house longer or if it would

3        help prevent further air conditioning damage.  We

4        did, they did not, and we have not added those into

5        the expenses.

6   BY MS. HAQUE:

7        Q.   How long was -- did you try this remedy?

8        A.   With the remainder of the time that we were

9   living there, and I think we left them there.

10            THE COURT REPORTER:  I'm sorry, I didn't hear

11       what you said.

12       A.   I said, for the remainder of the time that we

13  were living there, and we left them there behind while

14  we weren't living there thinking that maybe it might

15  keep it from deteriorating further, until we sold the

16  property.

17       Q.   Is it your contention that you are seeking

18  remediation damages in this case?

19       A.   Yes.

20       Q.   Do you have an amount or do you have a basis

21  for remediation damages?

22            MR. ALBANIS:  Object to the form, but you may

23       answer if you can.

24            THE WITNESS:  I think we're looking for the
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2373 of 3246
Case 1:09-md-02047-MCR Document ... entered on FLSD Docket 05/18/2019 Page 46 of
47
Confidential - Subject to Further Confidentiality Review

```
 1         jury in this case to come up with a remediation

 2         settlement based on our retaining the rights to

 3         remediation.

 4    BY MS. HAQUE:

 5         Q.   So at this -- so you don't have right now as we

 6    sit here today a specific basis on which you're claiming

 7    the remediation damages?

 8              MR. ALBANIS:  Object to the form.  Judge Cooke

 9         has entered her order on November 16, 2018, adopting

10         all of Judge Fallon's rulings, including the recent

11         order in which he indicated that previous homeowners

12         are entitled to remediation damages pursuant to the

13         formula that Judge Fallon found back in April of

14         2017 was appropriate for remediation damages.

15              We will, of course, be relying on all of those

16         rulings as we proceed in the remediation track of

17         this litigation, which is a separate track than the

18         reasons that Mr. and Mrs. O'Brien are here today for

19         their deposition.

20              Having said that, I don't even remember what

21         the question was, but you may answer it if you know.

22              THE WITNESS:  I don't have the exact amount off

23         the top of my head.

24              ///
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2374 of 3246
Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2374 of 3246
Confidential - Subject to Further Confidentiality Review
47

```
 1   BY MS. HAQUE:

 2       Q.   Okay.  Mr. O'Brien, do you recall what the sale

 3   price was of the McElroy home?  And this is the home

 4   that was purchased in 2010; is that accurate?

 5       A.   I believe it was purchased in 2010, and I do

 6   not recall the sale price.  I'm sure it's documented.

 7       Q.   Okay.  When you sold the home at 3120 West

 8   Wallcraft, do you recall how much you had left on your

 9   mortgage?

10       A.   I believe we had 148,000 or so.

11       Q.   And you sold the home for approximately

12   340,000; is that correct?

13       A.   Correct.

14       Q.   So you did not engage in a short sale of your

15   home based off of that; correct?

16       A.   I view short sale as a technical term with two

17   parts.  There's the concept of short sale where I

18   believe that I did short-sale the home and that I lost a

19   ton of equity in the home.  We're looking at a house

20   that was valued at 635,000 before we had Chinese drywall

21   prior to -- just prior to building it, that's what the

22   bank loaned the money on, and we sold the house for

23   $340,000.

24            So, yes, I view it as a short sale.  Now, did
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2375 of 3246
Case 1:09-md-02047-MCA Document 23363-39 Enteron FLSD Docket 03/18/2015 Page 23 of
47
Confidential - Subject to Further Confidentiality Review

1    we end up having a technical short sale with the

2    mortgage company?  No.

3        Q.   Did you ever fall behind on your mortgage

4    payments or make late payments on the 3120 West

5    Wallcraft home?

6        A.   No.

7        Q.   Did you ever fall behind or have trouble making

8    mortgage payments on the McElroy home?

9        A.   No.

10           MS. HAQUE:  Can we go off the record a moment?

11           (Discussion off the record.)

12           (Recess from 4:21 p.m. until 4:30 p.m.)

13   BY MS. HAQUE:

14       Q.   Mr. O'Brien, you bought the home at McElroy for

15   approximately $87,000; is that correct?

16       A.   Correct.

17       Q.   And you sold it in approximately June or July

18   of 2012?

19       A.   I believe so.

20       Q.   And we went on the tax assessor's -- looked up

21   that information, and I'm going to represent to you that

22   they're saying that the home sold for approximately

23   $135,000.  Is that --

24       A.   Okay.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2376 of 3246
Case 1:09-md-02047-CAL Document 19888-1 Confidential Subject to Docket 05/19/2019 Page 41 of
47
Confidential - Subject to Further Confidentiality Review

1    Q.  Would that be a fair assessment based on your

2  recollection?

3    A.  Yes.

4      MR. ALBANIS:  Just a remainder to let Aliyya

5    finish her question before you answer.

6      THE WITNESS:  I'm sorry.

7      MS. HAQUE:  No problem.

8      MR. ALBANIS:  To make the court reporter's life

9    a little bit easier.

10  BY MS. HAQUE:

11    Q.  I'm going to now show you what has been

12  premarked as Exhibit 14.  If you wouldn't mind flipping

13  through that stack.

14    A.  Okay.

15    Q.  Could you turn with me to page 3?  It's labeled

16  OBrienDepo200.

17    A.  Uh-huh.

18    Q.  And this is the assessment from 2009; correct?

19    A.  Yes.

20    Q.  Okay.  And the assessed value is for $269,931?

21    A.  Correct.

22    Q.  And if you'd go to the next page.  Oh, I'm

23  sorry, the page right before it.  It is the assessment

24  from 2008.

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/10 Page 2377 of 3246
Case 1:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/10 Page 2377 of 3246
Confidential - Subject to Further Confidentiality Review
47

```
 1      A.    Okay.

 2      Q.    And the assessment is for $486,277?

 3      A.    Correct.

 4      Q.    What was the reason for that drop in price?

 5      A.    I -- the reason was because of the Chinese

 6   drywall being assessed by the property appraiser at that

 7   time.  I had called him, or the property appraiser's

 8   office, shortly after finding out about Chinese drywall

 9   around about August sometime, after the last coils were

10   replaced, August or September, and they had immediately

11   adjusted the tax assessment at that time pending them

12   coming out and investigating.

13      Q.    And that was prior to the Allied home

14   inspection; correct?

15      A.    No, it was -- they came out and inspected after

16   the Allied inspection.

17      Q.    Can you pull out Exhibit 5 for me, please?

18      A.    Uh-huh.  Now, I talked to them before the

19   Allied inspection, but they may have come out --

20      Q.    In that stack.

21      A.    -- after the Allied inspection.  Okay.

22      Q.    The date on the Allied inspection is

23   February 2010.

24      A.    Okay.
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 2378 of 3246
Case 1:09-cv-02047-MGC Document 23463-39 Filed 11/19/19 Page 2378 of 3246
Confidential - Subject to Further Confidentiality Review
47

```
 1      Q.   So then the tax assessors came out after

 2   February 2010; correct?

 3      A.   Well, that was the date this report was

 4   written.  I don't know what date they came out here.

 5   But, yes, I remember because they took pictures of this

 6   (indicating.)  Now, I do believe that the tax assessor's

 7   office was going based on you turn it in first and then

 8   they follow up later with an investigation.

 9      Q.   Do you know when Allied Home Inspections came

10   to the property?

11      A.   I do not.  I mean, I have to assume it was

12   around February or they completed the inspection around

13   February, but I do not know the exact date when they

14   came out.

15      Q.   So this drop in price from 486,277 to 269,931

16   was not based off of the inspection from the tax

17   assessors yet?

18      A.   No, it was.  Well, it wasn't based on the

19   inspection.  It was based on the phone call that I made

20   to the property appraiser's office, and they made the

21   assumption that it had Chinese drywall at that time.

22      Q.   And that's your belief for why there is this

23   drop in price?

24      A.   Correct.
```

```
1      Q.   Was the phone call that you gave them?

2      A.   Correct, because that put into play them

3   scheduling an inspector to come out.

4      Q.   And that inspection took place somewhere after

5   February 2010, most likely?

6      A.   Correct.  It probably was around February or

7   whatever time that -- time frame they came out.

8      Q.   Okay.  If you turn -- go back to Exhibit 14 for

9   me, please.  If you pull -- turn to what's been labeled

10   OBrienDepo201.  And this is a report from 2010; correct?

11      A.   Yes.

12      Q.   And the assessed value is $98,800?

13      A.   Correct.

14      Q.   And what is your belief for this drop in price

15   from $269,931 to $98,800?

16      A.   I can't speculate on what the drop in price is.

17      Q.   Okay.  You can go ahead and set that aside.

18           Mr. O'Brien, when you first decided to -- well,

19   let me ask you this:  If you have Exhibit 9 in front of

20   you, do you recall petitioning this company for a

21   request for remediation?

22      A.   Charter Bay?  I certainly do.

23      Q.   And why did you decide not to remediate the

24   home?
```

Confidential - Subject to Further Confidentiality Review

```
 1      A.   Because at that time there was no, and to my

 2  knowledge there really still isn't, a really good,

 3  complete understanding of, one, if you remediate Chinese

 4  drywall, what are you left with?  You're left with a

 5  house that still has a tag of Chinese drywall on it.

 6  You're required to disclose it whenever you sell the

 7  property, Chinese drywall.  And if you had the choice of

 8  buying a property that had Chinese drywall and one that

 9  didn't, obviously a buyer's going to go to the one that

10  doesn't.

11          So you take -- in my opinion, you take a

12  significant loss, not only in market value, but in

13  saleability in general, because your audience is just

14  greatly reduced.  So I guess that's -- that's one of the

15  reasons.

16          The other reason was because the expense of it.

17  Do you invest -- you know you're looking at this house

18  being -- we're starting to go the other direction.  What

19  happened, when we bought this property in 2004 and we

20  had the house built in 2006 to 2007, that's a three- ,

21  four-year process that we went through trying to build

22  the home that we wanted to be our final home, our dream

23  home and whatnot.  We put a lot of time and effort into

24  that, and so -- and we had greatly paid down the
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2381 of 3246
Case 1:09-cv-02047-MGC Document 22363-39 Entered on FLSD Docket 05/19/2011 Page 47 of 47
Confidential - Subject to Further Confidentiality Review

1    mortgage, because our attempt was to not have a mortgage

2    anymore.

3         When we looked at remediating, we had to look

4    at do we sink more investment in a sinking ship, and we

5    really couldn't -- we were -- you know, and with the

6    health concerns that my wife had with the kids and so

7    forth living there, even after remediating, and

8    wondering every time, you know, a fish dies in your fish

9    tank is that because of Chinese drywall, is it because

10   of this, is it because of that, not fully understanding

11   what the complete remediation is going to leave you

12   with, it just -- simply, to us, I don't think it was

13   worth the risk.

14        Q.   And so you decided to sell the home in the late

15   half of 2011?

16        A.   Yes.

17        Q.   And how did you come up with the sale price?

18        A.   We consulted -- the real estate company that we

19   had consulted with had had some experience with valuing

20   and selling Chinese drywall properties.  They had had

21   other clients.  They actually knew of a few investment

22   companies that might be interested in doing, you know,

23   buying a Chinese drywall house and, as you say, flipping

24   it.  So they were the ones that came up with the initial

1    price of 375 and then finally settling on 340.

2        Q.   And did you factor in, when you were discussing

3    this with the realtor, market conditions, the housing

4    crisis in Florida at that time when you came up with the

5    price?

6        A.   I think you have to kind of discount housing

7    conditions and market conditions when you have a house

8    with Chinese drywall, because immediately when you have

9    Chinese drywall, that throws the other factors right out

10   the window and it's no longer comparing apples and

11   apples.  It's comparing, you know, apples with rotten

12   apples.  And when you can buy a good apple, who wants a

13   rotten apple?

14           So I don't think that any kind of, you know,

15   so-called depression in the housing market or whatever

16   really had any effect on the price that we sold it for.

17   Furthermore, I think that had -- the whole reason we

18   were selling it was because we had Chinese drywall.  If

19   we never had Chinese drywall, we would never have sold

20   the property, thereby never realizing any kind of loss

21   due to any kind of market variability.

22       Q.   Do you know if either your realtor or the

23   investment company factored in the market conditions

24   when they came up with the price?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2383 of 3246
Case 1:1-22-md-01234-ABC-McGee Document 2367-1 Confidential Subject 05/19/2019 Page 41 of
Confidential - Subject to Further Confidentiality Review
47

```
 1        A.   I don't believe that they did, but I can't say.

 2        Q.   Did your realtor or the investment group ever

 3   discuss market conditions with you?

 4        A.   No.

 5        Q.   Okay.  When you discussed the assessment that

 6   was done, did the value of the underlying land also

 7   decrease along -- between 2009 and 2010?

 8             MR. ALBANIS:  Object to the form, but you may

 9        answer if you know, Mr. O'Brien.

10             THE WITNESS:  I do not know if the underlying

11        land would have decreased, simply because there's

12        already a house built on the property.  And what are

13        you going to do?  Are you going to tear it down?

14   BY MS. HAQUE:

15        Q.   Do you know if the assessor factors that in?

16        A.   I do not know.

17        Q.   And just to get a clean response on the record,

18   I just want to reask this question:  Do you have a basis

19   for the claim of remediation damages?

20             MR. ALBANIS:  Object to the form.  Also

21        referring back to my rolling objection regarding

22        remediation damages.  But you may answer,

23        Mr. O'Brien, if you know.

24             THE WITNESS:  I think that we're looking at
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2384 of 3246
Case 1:09-cv-02042-XXXX Document 1 Confidential Subject to Docket 05/19/2014 Page 32 of
47
Confidential - Subject to Further Confidentiality Review

```
 1          remediation damages, again, because we retain the

 2          rights for remediation damages, and I think any

 3          calculation to come up with the remediation value

 4          has to be based on, you know, what has been settled

 5          in any of the upcoming cases.

 6     BY MS. HAQUE:

 7          Q.   Okay.  But as of today, you don't have a

 8     specific basis for the claim of remediation damages?

 9               MR. ALBANIS:  Object to the form.  I think that

10          that mischaracterizes Mr. O'Brien's testimony, but

11          you may answer if you can.

12               THE WITNESS:  I think we speculated based on

13          3300 square foot and what -- what ballpark

14          remediation costs might be.

15     BY MS. HAQUE:

16          Q.   And just to be clear, as of today, you're not

17     putting a specific dollar amount as to remediation

18     damages?

19          A.   I don't recall a specific dollar amount.  I'm

20     sure that I've discussed it.

21               MR. ALBANIS:  Stated further, obviously,

22          Mr. O'Brien is not an attorney, and to the extent

23          that there are different categories of damages, he

24          may not be aware about certain categories of damages
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2385 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 05/18/2019 Page 38 of 47
Confidential - Subject to Further Confidentiality Review

```
 1        because of that.

 2   BY MS. HAQUE:

 3        Q.   I think we're on Exhibit 24?

 4        A.   I believe that -- can I state that I believe

 5   that we had factored in a number of $415,000 for

 6   remediation damages.  I'm trying to --

 7             (O'Brien Exhibit No. 24 was marked for

 8   identification.)

 9   BY MS. HAQUE:

10        Q.   I'm going to show you what's been premarked as

11   Exhibit 24.

12        A.   Okay.

13        Q.   Do you recognize this document?

14        A.   Yes.

15        Q.   Have you seen this document before?

16        A.   Yes.

17        Q.   What is this document?

18        A.   I can't discern the name for the document, but

19   it's the answers to interrogations, my answers to

20   interrogations.

21        Q.   Did you provide information to your attorney

22   for this document to be filled out?

23        A.   Yes.

24        Q.   Okay.  Can I direct your attention to Question
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2386 of 3246
Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2386 of 3246
Confidential - Subject to Further Confidentiality Review
47

```
 1    No. 1?

 2         A.    Okay.

 3         Q.    Can you read the question asked?

 4         A.    "Identify all types of damages that you seek in

 5    this lawsuit (alternate living expenses, diminution in

 6    value, loss of use/enjoyment) and specify amounts sought

 7    for each category."

 8         Q.    Okay.  If you scroll down, you state in this,

 9    still on page 1:  "In addition, I seek remediation

10    damages as determined by the Court."

11               Do you see that?

12         A.    Yes.

13         Q.    And you're not -- you do not have listed here a

14    specific monetary value; is that correct?

15         A.    Correct.

16         Q.    Okay.  You can go ahead and put that away.

17               Mr. O'Brien, what does the word "remediation"

18    mean to you?

19         A.    Remediation, to me, means making the situation

20    as if it has never occurred, which, to be honest, might

21    never be able to fully compensate for that fact, because

22    there are certain life situations that are a result,

23    personal life situations that are a result of having a

24    house with Chinese drywall and dealing with all the
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2387 of 3246
Case 1:14-cv-22692-MGC Document 65-3 Entered on FLSD Docket 05/18/2017 Page 45 of
47
Confidential - Subject to Further Confidentiality Review

 1    issues that we had with the Chinese drywall.

 2         That being said, if the court comes up with a

 3    number for, you know, physical remediation of a

 4    property, I think we would be fairly, you know -- I

 5    can't think of the name -- we should be compensated for

 6    that, and as it states here, for loss of use and

 7    enjoyment, we should be compensated for that as well.

 8       Q.   And you're aware that there are various types

 9    of damages that constitute your claim?

10       A.   Correct.

11       Q.   And for remediation specifically, what do you

12    believe would need to be done in order to meet your

13    definition of what you're entitled to for remediation

14    damages?

15         MR. ALBANIS:  Object to the form, but you may

16       answer if you can answer that.

17         THE WITNESS:  I can't answer that specifically

18       right now.

19    BY MS. HAQUE:

20       Q.   Okay.  And you're aware that the court has its

21    own determination of what remediation means and what

22    these various categories of damages refer to?

23       A.   Correct.

24       Q.   Okay.

Case 2:09-md-02047-EEF-MBN Document 23263-39 Filed 11/19/10 Page 2388 of 3246
Case 1:09-md-02047-MCA Document 23263-39 Exhibit on File Docket 05/18/2019 Page 36 of
47
Confidential – Subject to Further Confidentiality Review

```
 1              MS. HAQUE:  If we can go off the record for one

 2       second.

 3              (Discussion off the record.)

 4              MS. HAQUE:  We can go back on the record.

 5   BY MS. HAQUE:

 6       Q.   Mr. O'Brien, do you acknowledge that there was

 7   a housing crisis in which housing prices fell in Florida

 8   from the years 2007 to 2012?

 9              MR. ALBANIS:  Object to the form, but you may

10       answer if you know, Mr. O'Brien.

11              THE WITNESS:  I have no knowledge specifically.

12       We were kind of not interested in the housing

13       crisis.  We were kind of going through our own

14       crisis at that point in time.

15   BY MS. HAQUE:

16       Q.   Mr. O'Brien, where are you currently employed?

17       A.   AT & T.

18       Q.   And how long have you worked there?

19       A.   I've worked there since 1999 for AT & T.  They

20   bought out IBM, so I worked there several years prior to

21   that.

22       Q.   And what is your job title and duties?

23       A.   Software engineer development.  Development

24   team lead.
```

Case 2:09-md-02047-EEF-MBN   Document 22363-39   Filed 11/19/19   Page 2389 of 3246
Case 1:09-md-02047-EEF-MBN   Document 22363-39   Filed 11/19/19   Page 37 of 47
Confidential - Subject to Further Confidentiality Review

```
 1      Q.   And can you briefly describe what that means?

 2      A.   I'm a programmer.  I write and develop systems

 3   for Internet security, for communications, virtual

 4   private network, security, those types of things.

 5      Q.   And what is your work schedule?

 6      A.   Well, pretty much anytime they need me.

 7   However, officially it is probably 8:00 in the morning

 8   until 6:00 at night.

 9      Q.   Monday through Friday?

10      A.   Yes, but I'm always on call, and even on

11   vacation I'm on call.

12      Q.   What is your current marital status?

13      A.   I'm single.

14      Q.   Other than your divorce, have you ever been

15   involved in a lawsuit -- and this case at issue -- have

16   you ever been -- let me rephrase that.

17           Other than your divorce and this current case

18   involving the property at 3120 West Wallcraft, have you

19   ever been involved in a lawsuit?

20      A.   Yes, recently, due to an auto accident, but

21   that was not me specifically.  My son was in an auto

22   accident, and so, as a minor child, they went after my

23   insurance.

24           MS. HAQUE:  Let's go off the record and take a
```

Confidential - Subject to Further Confidentiality Review

```
 1        short break just to see if we have any other

 2        questions, and then we can wrap for the day.

 3            (Recess from 4:51 p.m. until 5:00 p.m.)

 4            MS. HAQUE:  We can go back on the record.

 5   BY MS. HAQUE:

 6        Q.   Mr. O'Brien, what is your educational

 7   background?

 8        A.   I went to -- I graduated college with a

 9   bachelor in engineering technology, basically, it's a

10   computer programming degree, from USF, and that's

11   basically -- basically it.

12        Q.   And that's the University of South Florida, but

13   here in Tampa?

14        A.   Yes.

15        Q.   Mr. O'Brien, do you recall when the paperwork

16   was first filed for your divorce from Mrs. O'Brien?

17        A.   No, I do not.  I do not recall the date.

18        Q.   Was it post 2012 or before 2012, do you

19   remember?

20        A.   I'd have to say it was probably prior to 2012.

21            MS. HAQUE:  Okay.  Those are all the questions

22   I have for you, Mr. O'Brien, today.  Thank you.

23            I pass the witness.

24            MR. GUERRA:  We have no questions.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2391 of 3246 of
Case 1:09-md-02047 McGal Document 23261-1 Confidential Subject to Filed 05/16/2019 Page 30 of
Confidential - Subject to Further Confidentiality Review
47

```
 1            MR. ALBANIS:  We should get on the record our

 2       discussion about the e-mails.

 3            MS. HAQUE:  Yes.  Like the deposition of

 4       Mrs. O'Brien, I want to put on the record that your

 5       attorney notified us of the presence of additional

 6       documents that he is going to produce to us.  He

 7       needs time to review those documents, and so,

 8       therefore, we hold open the deposition of

 9       Mr. O'Brien pending the review of those documents,

10       whether it is even necessary.

11            MR. ALBANIS:  And to state further, by

12       agreement, we will, of course, produce the e-mails

13       that are responsive to your document requests that

14       are not privileged, and if we need to continue the

15       deposition at a later time, by January 14, 2019, we

16       will, of course, do so.

17            I would like to ask a couple follow-up

18       questions of Mr. O'Brien.

19                      CROSS-EXAMINATION

20  BY MR. ALBANIS:

21       Q.   Mr. O'Brien, did you make any improvements to

22  the McElroy home before you sold it?

23       A.   Absolutely.  Before we moved into it, even.

24       Q.   What sort of improvements did you make to the
```

Confidential - Subject to Further Confidentiality Review

1    McElroy home?

2        A.    We put new siding on the entire house.  We

3    painted the entire house.  We renovated one of the

4    bathrooms.  Not complete renovation, but had to fix some

5    things with the toilet and so forth.  We put new windows

6    in the house.  We did -- the back room had significant

7    issues with leaking and stuff like that, so we had to,

8    you know -- we actually had the drywall torn out in that

9    room and all the ceiling texture in the entire house

10   removed and then retextured.

11           We had a new fence put up.  We had a new slab

12   poured for the back patio, sidewalk, and driveway.  Put

13   new baseboards.  Painted inside.  Bought a new oven.

14   Replaced the water heater, albeit with another used one,

15   because it was worn out.  And to the best of my

16   knowledge right now, I believe that is it.

17       Q.    All of those improvements that you just

18   described, were they included in the sale of the McElroy

19   home when you sold it?

20       A.    Yes.

21       Q.    Did you make any money on the sale when you

22   sold the McElroy home?

23       A.    I do not believe we made any significant money

24   after the sale when you consider the cost of buying and

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2393 of 3246
Case 1:09-cv-07687-MGC Document 26-1 Entered on FLSD Docket 03/19/2019 Page 41 of
47
Confidential - Subject to Further Confidentiality Review

 1    selling and the cost of the renovations.

 2          MR. ALBANIS:  Thank you.  That's all I have.

 3                  REDIRECT-EXAMINATION

 4    BY MS. HAQUE:

 5    Q.   Just two questions to follow up on that.  Do

 6    you recall, Mr. O'Brien, what the total cost of the

 7    improvements of the McElroy home was?

 8    A.   I do not at this point in time.

 9    Q.   As to the improvements to the McElroy home, do

10    you have any receipts showing the work and the

11    appliances that were added to the McElroy home?

12    A.   I cannot say that I do and I cannot say that I

13    do not.

14    Q.   We will make a formal request to your attorney

15    to go ahead and provide any documentation related to

16    improvements to the McElroy home to the extent that any

17    exists.

18    A.   Okay.

19          MR. POYER:  Also, interrogatory verifications,

20       to the extent that they're not already in here, will

21       be provided; right?

22          MR. ALBANIS:  Yes.  I actually think that they

23       are already verified for both Mr. and Mrs. O'Brien,

24       but if they are not, we will certainly provide

Confidential - Subject to Further Confidentiality Review

1     those, yes.

2            MS. HAQUE:  No further questions.

3            MR. ALBANIS:  We will reserve signature.  Thank

4     you.

5            MS. HAQUE:  Great.  Thanks, everybody.

6            (Whereupon, the deposition concluded at

7     5:05 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2395 of 3246 of
Case 1:1-cv-22408-MGC Document 20 Entered on FLSD Docket 05/18/2015 Page 48 of
47
Confidential - Subject to Further Confidentiality Review

```
 1                   C E R T I F I C A T E

 2

 3           I, JOAN L. PITT, Registered Merit Reporter,

 4   Certified Realtime Reporter, and Florida Professional

 5   Reporter, do hereby certify that, pursuant to notice,

 6   the deposition of KELLY O'BRIEN was duly taken on

 7   December 17, 2018, at 4:00 p.m., before me.

 8           The said KELLY O'BRIEN was duly sworn by me

 9   according to law to tell the truth, the whole truth, and

10   nothing but the truth, and thereupon did testify as set

11   forth in the above transcript of testimony.  The

12   testimony was taken down stenographically by me.  I do

13   further certify that the above deposition is full,

14   complete, and a true record of all the testimony given

15   by the said witness.

16

17           _____

18               JOAN L. PITT, RMR, CRR, FPR

19

20           (The foregoing certification of this transcript

21   does not apply to any reproduction of the same by any

22   means, unless under the direct control and/or

23   supervision of the certifying reporter.)

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2396 of 3246
Case 1:09-cv-02047-MGC Document 26611 Exhibit on File Under Seal Docket 05/09/2019 Page 41 of
47
Confidential - Subject to Further Confidentiality Review

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4          Please read your deposition over carefully and

 5   make any necessary corrections.  You should state the

 6   reason in the appropriate space on the errata sheet for

 7   any corrections that are made.

 8

 9          After doing so, please sign the errata sheet

10   and date it.  It will be attached to your deposition.

11

12          It is imperative that you return the original

13   errata sheet to the deposing attorney within thirty (30)

14   days of receipt of the deposition transcript by you.  If

15   you fail to do so, the deposition transcript may be

16   deemed to be accurate and may be used in court.

17

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2397 of 3246
Case 1:19-cv-02045-MGC Document 22363-39 Filed 11/19/19 Page 2397 of 3246
Confidential - Subject to Further Confidentiality Review
47

```
 1                      - - - - - -

 2                      E R R A T A

 3                      - - - - - -

 4     PAGE    LINE    CHANGE

 5     _____   _____   _____

 6       REASON: _____

 7     _____   _____   _____

 8       REASON: _____

 9     _____   _____   _____

10       REASON: _____

11     _____   _____   _____

12       REASON: _____

13     _____   _____   _____

14       REASON: _____

15     _____   _____   _____

16       REASON: _____

17     _____   _____   _____

18       REASON: _____

19     _____   _____   _____

20       REASON: _____

21     _____   _____   _____

22       REASON: _____

23     _____   _____   _____

24       REASON: _____
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2398 of 3246
Case 2:11-cv-02349-MCE Document 29-11 Filed 11/19/19 Page 2398 of 3246
Confidential - Subject to Further Confidentiality Review
47

```
1                    ACKNOWLEDGMENT OF DEPONENT

2

3           I, _____, do hereby

4     acknowledge that I have read the foregoing pages,

5     1 - 46, and that the same is a correct transcription of

6     the answers given by me to the questions therein

7     propounded, except for the corrections or changes in

8     form or substance, if any, noted in the attached Errata

9     Sheet.

10

11

12     _____   _____

13     KELLY O'BRIEN                       DATE

14

15

16

17

18     Subscribed and sworn to before me this

19     ____ day of _____, 20___.

20     My Commission expires: _____

21

22     _____

       Notary Public

23

24
```

Confidential - Subject to Further Confidentiality Review

```
  1                          LAWYER'S NOTES

  2     PAGE    LINE

  3     _____   _____    _____

  4     _____   _____    _____

  5     _____   _____    _____

  6     _____   _____    _____

  7     _____   _____    _____

  8     _____   _____    _____

  9     _____   _____    _____

 10     _____   _____    _____

 11     _____   _____    _____

 12     _____   _____    _____

 13     _____   _____    _____

 14     _____   _____    _____

 15     _____   _____    _____

 16     _____   _____    _____

 17     _____   _____    _____

 18     _____   _____    _____

 19     _____   _____    _____

 20     _____   _____    _____

 21     _____   _____    _____

 22     _____   _____    _____

 23     _____   _____    _____

 24     _____   _____    _____
```

# EXHIBIT A28

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2401 of 3246
Case 1:11-cv-22408-MGC Document 289-1 Entered on FLSD Docket 05/18/2018 Page 2 of
118

Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2

    EDUARDO AND CARMEN AMORIN,
 3  et al., individually, and
    on behalf of all others
 4  similarly situated,       Case No. 1:11-CV-22408-MGC
 5      Plaintiffs,
 6  vs.
 7

    TAISHAN GYPSUM CO., LTD.,
 8  F/K/A SHANDONG TAIHE
    DONGXIN CO., LTD.; TAIAN
 9  TAISHAN PLASTERBOARD CO.,
    LTD, et al.,
10
        Defendants.
11
                         - - -
12
                    DECEMBER 17, 2018
13
                         - - -
14
         Deposition of LORI O'BRIEN, held at
15  Morgan & Morgan, One Tampa City Center,
    201 North Franklin Street, 6th Floor, Tampa, Florida
16  33602, commencing at 1:05 p.m., on the above date,
    before Joan L. Pitt, Registered Merit Reporter,
17  Certified Realtime Reporter, and Florida
    Professional Reporter.
18
                         - - -
19
              GOLKOW LITIGATION SERVICE
20       877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com
21
22
23
24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2402 of 3246
Case 1:15-cv-04206-WHP Document 291-1 Entered on FLSD Docket 05/09/2019 Page 9 of
118

Confidential - Subject to Further Confidentiality Review

```
 1                    APPEARANCES

 2

 3    Counsel for Plaintiffs:

 4        PANAGIOTIS "PETE" V. ALBANIS, ESQUIRE
          Morgan & Morgan

 5        12800 University Drive, Suite 600
          Fort Myers, Florida 33907

 6        239.433.6880
          palbanis@forthepeople.com

 7

          KEITH J. VERRIER, ESQUIRE

 8        Levin, Sedran & Berman LLP
          510 Walnut Street, Suite 500

 9        Philadelphia, Pennsylvania 19106
          215.592.1500

10        kverrier@lfsblaw.com

11

12    Counsel for Defendants Taishan Gypsum Co., Ltd., and
      Taian Taishan Plasterboard Co., Ltd.:

13

          ALIYYA Z. HAQUE, ESQUIRE

14        PATRICK H. HILL, ESQUIRE
          BOYKIN LUCAS, ESQUIRE

15        Alston & Bird LLP
          One Atlantic Center

16        1201 West Peachtree Street
          Atlanta, Georgia 30309-3424

17        404.881.700
          aliyya.haque@alston.com

18        patrick.hill@alston.com
          boykin.lucas@alston.com

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2403 of 3246
Case 1:13-cv-06326-TPG Document 699-21 Entered on FLSD Docket 05/08/2003 Page 4 of
118
Confidential - Subject to Further Confidentiality Review

```
 1                 APPEARANCES CONTINUED

 2

 3    Counsel for Beijing New Building Materials PLC:

 4         DAN GUERRA, ESQUIRE

           Orrick, Herrington & Sutcliffe LLP

 5         The Orrick Building

           405 Howard Street

 6         San Francisco, California 94105-2669

           415.773.5545

 7         dguerra@orrick.com

 8         JOSHUA D. POYER, ESQUIRE

           Aballi Milne Kalil

 9         2250 SunTrust International Center

           One Southeast Third Avenue

10         Miami, Florida 33131

           305.373.6600

11         jpoyer@aballi.com

12

      Also present:  Kelly O'Brien

13

14

15

16

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                     - - -

 2                 I N D E X

 3                     - - -

 4   Testimony of:  LORI O'BRIEN

 5    DIRECT EXAMINATION BY MS. HAQUE                7

 6

 7               E X H I B I T   I N D E X

 8   O'BRIEN            DESCRIPTION                PAGE

 9   No. 1     PLAINTIFF PROFILE FORM - RESIDENTIAL   14
               PROPERTIES

10             OBRIENK00001 - OBRIENK00021

11   No. 2     PURCHASE DOCUMENTS                     15
               OBRIENDEPO000049 - OBRIENDEPO000071

12

     No. 3     FINAL STATEMENT FROM STEVE R. CARTER,  18

13             INC., DATED 3/23/2007
               OBRIENDEPO000319

14

     No. 4     MORTGAGE                               20

15             OBRIENDEPO000080 - OBRIENDEPO000087

16   No. 5     ALLIED HOME INSPECTIONS REPORT DATED   34
               2/20/2010

17             OBRIENDEPO000029 - OBRIENDEPO000035

18   No. 6     SPREADSHEET OF AIR CONDITIONING        41
               PROBLEMS, INVOICES

19             OBRIENDEPO000036 - OBRIENDEPO000047

20   No. 7     PHOTOGRAPHS                            52
               OBRIENDEPO000167 - OBRIENDEPO000183

21

     No. 8     AFFIDAVIT OF DONALD MCDERMOTT SUPPORT  56

22             CLAIM OF KELLY O'BRIEN
               OBRIENDEPO000121

23

24
```

| 1 | No. 9 | CHINESE DRYWALL REMEDIATION AND RECONSTRUCTION PROPOSAL PREPARED BY | 58 |
| 2 | | ERIC STOCKLAND DATED 9/1/2011 | |
| 3 | No. 10 | PRIORITY CLAIMANT LORI O'BRIEN'S ANSWERS TO INTERROGATORIES | 61 |
| 4 | | OBRIENDEPO000373 - OBRIENDEPO000377 | |
| 5 | No. 11 | NOTE DATED 11/3/2010 AND BANK STATEMENT DATED 2/14/2011 | 68 |
| 6 | | OBRIENDEPO000076 - OBRIENDEPO000079 | |
| 7 | No. 12 | BANK STATEMENT DATED 2/14/2011; NOTE DATED 11/3/2010; 3 GUYS MOVING | 70 |
| 8 | | RECEIPT DATED 1/8/2011 OBRIENDEPO000148 - OBRIENDEPO000153 | |
| 9 | | | |
| | No. 13 | UNIFORM RESIDENTIAL APPRAISAL REPORT | 72 |
| 10 | | AND INVOICE NO. 06-9433 DATED 1/26/2006 | |
| 11 | | OBRIENDEPO000154 - OBRIENDEPO000166 | |
| 12 | No. 14 | 2007 NOTICE OF AD VALOREM TAXES AND NON-AD VALOREM ASSESSMENT | 73 |
| 13 | | OBRIENDEPO000198 - OBRIENDEPO000202 | |
| 14 | No. 15 | MY FLORIDA REGIONAL MLS/ BROKER SYNOPSIS REPORT | 77 |
| 15 | | OBRIENDEPO000113 | |
| 16 | No. 16 | CHINESE DRYWALL SETTLEMENT PROGRAM FORECLOSURE AND SHORT SALE CLAIM FORM | 79 |
| 17 | | OBRIENDEPO000004 - OBRIENDEPO000088 | |
| 18 | No. 17 | AFFIDAVIT OF LORI D. O'BRIEN DATED 10/24/2013 OBRIENDEPO000048 | 82 |
| 19 | | | |
| | No. 18 | US DEPARTMENT OF HOUSING AND URBAN | 83 |
| 20 | | DEVELOPMENT SETTLEMENT STATEMENT DATED 2/17/2012 | |
| 21 | | OBRIENDEPO000072 - OBRIENDEPO000075 | |
| 22 | No. 19 | SPREADSHEET | 89 |
| | | OBRIENDEPO000320 - OBRIENDEPO000331 | |
| 23 | | | |
| | No. 20 | SPREADSHEET | 92 |
| 24 | | OBRIENDEPO000332 - OBRIENDEPO000343 | |

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2406 of 3246
Case 1:14-cv-02494-NGG Document 209-2 Filed 08/16/18 Docket 05/08/2018 Page 17 of 118
Confidential - Subject to Further Confidentiality Review

```
 1   No. 21    SUPPLEMENTAL PLAINTIFF PROFILE FORM        96

               OBRIENDEPO000188 - OBRIENDEPO000195

 2

     No. 22    FIRST AMENDED SUPPLEMENTAL PLAINTIFF       99

 3             PROFILE FORM

               OBRIENDEPO000407 - OBRIENDEPO000413

 4

     No. 23    ADDENDUM TO SALES AGREEMENT DATED         109

 5             12/28/2013

               OBRIENDEPO000147

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2407 of 3246
Case 1:13-cv-02408-NGG Document 12 Filed on TLSD on Date 05/08/2018 Page 9 of
118
Confidential - Subject to Further Confidentiality Review

1                         - - -

2               THE COURT REPORTER:  Raise your right hand,

3          please.  Do you swear or affirm the testimony you

4          give will be the truth, the whole truth, and nothing

5          but the truth?

6               THE WITNESS:  I do.

7               THE COURT REPORTER:  Thank you.

8               LORI O'BRIEN, called as a witness by the

9     Defendant Taishan Gypsum Co., Ltd., having been first

10    duly sworn, testified as follows:

11                    DIRECT EXAMINATION

12    BY MS. HAQUE:

13         Q.   Would you please state your name for the

14    record?

15         A.   Yeah.  Lori O'Brien.

16         Q.   My name is Aliyya Haque, we just met a few

17    moments ago, and I represent Taishan Gypsum, one of the

18    defendants in this lawsuit.

19               I'm going to be asking you some questions here

20    today, and then I may be passing it on to my colleagues,

21    who may be asking you some additional questions.

22         A.   Okay.

23         Q.   Have you ever been deposed before?

24         A.   Yes.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2408 of 3246
Case 2:14-cv-02722-NGE Document 269-1 Entered on FLSD Docket 05/18/2018 Page 9 of 118

Confidential - Subject to Further Confidentiality Review

 1      Q.   And what was that in connection with?

 2      A.   My divorce.

 3      Q.   I'm going to go ahead and just remind you of

 4   some ground rules so that we just make this go very

 5   smoothly.

 6      A.   Sure.

 7      Q.   As you know, you have been sworn under oath.

 8   That's just like a judge was sitting in this room.  So

 9   do you know that -- do you understand that you must tell

10   the truth as if --

11      A.   Yes.

12      Q.   -- a judge was here?

13      A.   Yes.

14      Q.   If you wouldn't mind speaking slowly for the

15   court reporter, as she's taking down all of your

16   answers, and I'll also try to do the same.

17      A.   Okay.

18      Q.   If you could please be sure to respond with

19   verbal responses instead of a head shake or a nod,

20   because she needs to write down the verbal response.

21      A.   Right.

22      Q.   Also, if you don't understand any of my

23   questions, please let me know.

24      A.   Okay.

Case 2:09-md-02047-EEF-MBN Document 23263-39 Filed 11/19/19 Page 2409 of 3246
Case 1:09-cv-07299-NG Document 281 Entered on FLSD Docket 05/08/2019 Page 40 of
Confidential - Subject to Further Confidentiality Review
118

```
 1        Q.   Otherwise, I will just assume that you -- if

 2   you respond, that you were understanding my question.

 3        A.   Okay.

 4        Q.   We'll try and take a break every hour or so.

 5   If you do need to take a break and we haven't taken a

 6   break yet, please just let me know.  I only ask that if

 7   I have asked a question that you go ahead and answer the

 8   question before we go ahead and take the break.

 9        A.   Okay.

10        Q.   Are you taking any medications that will impair

11   your ability to understand my questions or to answer

12   truthfully?

13        A.   No.

14        Q.   Did you meet with your lawyer to prepare for

15   this deposition?

16        A.   Yes.

17        Q.   How many times did you meet?

18        A.   Once.

19        Q.   And when was that?

20        A.   Last night.

21        Q.   Who was present at that meeting?

22        A.   Myself, Pete, and Kelly O'Brien.

23        Q.   Did you speak with anyone else other than your

24   attorney or Mr. O'Brien to prepare for this deposition?
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.    No.

 2        Q.    Did you review any documents in preparation for

 3    this deposition?

 4        A.    Yes.

 5        Q.    What did you review?

 6        A.    Documents relating to the Chinese drywall

 7    house.

 8        Q.    Were these all documents that you gave to your

 9    attorney to produce in this case?

10        A.    Yes.

11        Q.    Did you bring any documents with you today for

12    this deposition?

13        A.    No.

14        Q.    Did you do anything else to prepare for this

15    deposition?

16        A.    We spoke on the phone with Pete a couple other

17    times in the last couple weeks.

18        Q.    Approximately how many times did you speak with

19    your attorney on the phone?

20        A.    Two or three.

21        Q.    And approximately how long were the

22    conversations?

23        A.    Less than a half an hour.

24        Q.    And was anyone else on the phone besides
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/10 Page 2411 of 3246
Case 1:09-md-02047 Document 1 transaction FL Docket 05/08/2011 Page 40 of 118
Confidential - Subject to Further Confidentiality Review

1    Mr. O'Brien or your attorney?

2        A.   No.

3        Q.   Mrs. -- do you still go by O'Brien as your last

4    name?

5        A.   Yes, I do.

6        Q.   Where are you employed?

7        A.   AT & T.

8        Q.   How long have you worked there?

9        A.   Since 1999.

10       Q.   What is your job title and your duties?

11       A.   Software engineer.  And what did you say?

12       Q.   And your duties in your job.

13       A.   Oh, duties.  Basically, I provide IT support

14   for several customers.

15       Q.   What is your work schedule?

16       A.   I normally work Monday through Friday.

17   Flexible hours.  I just get my hours in.  And a lot of

18   times during the month I work at 1:00 a.m. on Sunday

19   mornings.

20       Q.   What is your current marital status?

21       A.   Single.

22       Q.   Do you have any children?

23       A.   Yes.

24       Q.   How many?

Confidential - Subject to further Confidentiality Review

```
 1      A.    Two.

 2      Q.    What are their ages?

 3      A.    19 and 16.

 4      Q.    And what are their names?

 5      A.    Liam and Aedin.

 6      Q.    And could you spell those for the court

 7  reporter?

 8      A.    Yes.  Liam is L-i-a-m and Aedin is A-e-d-i-n.

 9      Q.    Other than your divorce, have you been involved

10  in any lawsuit before this one?

11      A.    Yes.

12      Q.    Are you able to give any details related to

13  that lawsuit?

14      A.    Sure.  Yes.

15      Q.    What was the subject of that lawsuit?

16      A.    It was a car accident.

17      Q.    Have you ever participated in a class action

18  before?

19      A.    Yes, the kind that comes in the mail, you know,

20  they notify you.

21      Q.    Did you give a deposition or go to court for

22  that?

23      A.    No.

24      Q.    So that was simply you opt in if you want to be
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2413 of 3246
Case 2:09-md-02047-EEF-MBN Document 23863-39 Filed 05/18/2019 Page 41 of 118
Confidential - Subject to Further Confidentiality Review

1   a part of this and you get a check?

2       A.   Exactly.

3       Q.   I'm going to now ask you some questions related

4   to the property that is at issue in this lawsuit.

5       A.   Okay.

6       Q.   What is the address of the property that you

7   allege has been damaged by the Chinese drywall?

8       A.   3120 West Wallcraft Avenue, Tampa, Florida

9   33611.

10      Q.   Do you currently own that property?

11      A.   No.

12      Q.   Do you know who currently owns that property?

13      A.   I believe so.  Well, through property records.

14      Q.   I should have said this at the outset of the

15  deposition, but I'm going to be asking you -- I'm going

16  to be asking you a series of questions related to the

17  lawsuit and the property at issue.

18      A.   Okay.

19      Q.   If there are certain areas that are better --

20  that you don't know the answer or you believe

21  Mr. O'Brien is the proper party, just let me know, and

22  then I don't have to --

23      A.   Oh, okay.  Sounds good.

24      Q.   Okay.  When did you buy the property at 3120

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2414 of 3246
Case 1:09-cv-07628-MGC Document 221-2 Filed in TXSD on 05/30/2014 Page 45 of
118
Confidential – Subject to Further Confidentiality Review

1   West Wallcraft?

2        A.    Well, we originally bought it in 2004, but it

3   was a vacant lot at the time.

4        Q.    From whom did you buy the property?

5        A.    I don't remember the name.  Maybe Kelly does.

6             MS. HAQUE:  And I want to put on the record,

7        for the ease of this deposition we have gone ahead

8        and put page numbers on some of the documents.

9        These page numbers were not part of the original

10       document, but where there was not a Bates number we

11       went ahead, just to help out the witness, and put

12       page numbers.

13            MR. ALBANIS:  No problem.  Thanks.

14            (O'Brien Exhibit No. 1 was marked for

15   identification.)

16   BY MS. HAQUE:

17       Q.    I'm going to be showing you what has been

18   marked Exhibit 1.

19       A.    Okay.

20       Q.    Can you please take a moment and just

21   refresh -- or review that document?

22       A.    Can I get my reading glasses?

23       Q.    Absolutely.  And I want to direct your

24   attention specifically to where it says O'BrienK

Confidential - Subject to Further Confidentiality Review

```
 1    Number 20.

 2         A.    Okay.

 3         Q.    Then we don't have to read everything word for

 4    word at this moment.

 5         A.    Gotcha.  Okey-doke.

 6         Q.    But at any point if you need time to review a

 7    document, just let me know.

 8         A.    Okay.

 9         Q.    Ms. O'Brien, do you recognize this document?

10         A.    Yes.

11         Q.    What is this document?

12         A.    This is the deed to the Chinese drywall house.

13         Q.    And this -- does this document represent the

14    sale of the land for purchase?

15         A.    Let me see.  Is there a date on here?

16               Oh, 2004.  Yes.  6/17.  Yes, it does.

17         Q.    All right.  You can go ahead and set that aside

18    for now.

19         A.    Okay.

20         Q.    We'll come back to that one.

21         A.    Okay.

22               (O'Brien Exhibit No. 2 was marked for

23    identification.)

24               ///
```

Confidential – Subject to further confidentiality Review

1   BY MS. HAQUE:

2       Q.   And now I'm going to show you what has been

3   premarked as Exhibit No. 2.  Can you please take a

4   moment to review that document?

5       A.   Okay.

6            MR. ALBANIS:  Can we go off the record for a

7       quick second?

8            MS. HAQUE:  Sure.

9            (Recess from 1:14 p.m. until 1:15 p.m.)

10  BY MS. HAQUE:

11      Q.   Ms. O'Brien, do you recognize this document?

12      A.   Yes.

13      Q.   Does your name appear on the first page under

14  Letter D?

15      A.   Yes.

16      Q.   And what is this document?

17      A.   This is the document for the purpose of the

18  land.  You're talking about the first one; right?

19      Q.   How much did you pay for the land?

20      A.   $185,000.

21      Q.   And how much did you pay to build the home?

22      A.   When it was all said and done, I believe it was

23  3 -- around approximately 365,000.  Our agreement's a

24  little lower because we added things and change orders.

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2417 of 3246 of
Case 1:19-cv-00484-GAC Document 2-28 Entered on FLSD Docket 05/13/2019 Page 40 of
118

Confidential – Subject to Further Confidentiality Review

```
1       Q.    Can you turn to page, it's OBrienDepo55 --

2       A.    Okay.

3       Q.    -- in the bottom right-hand corner.

4             If you look in the second paragraph, can you

5    read that out for me?

6       A.    "The price for your new home, including the

7    work specified below, is $352,416.00."

8       Q.    Is that the amount that you paid to build the

9    house?

10      A.    That was our original agreement.

11      Q.    And what were the -- what were the changes that

12   led to a higher price?

13      A.    I believe we upgraded the windows.  We -- I'm

14   trying to remember everything we did.  I don't know if

15   we paid extra for tile.  We -- or upgraded the granite.

16   I don't -- I'm not sure offhand all the upgrades.  I

17   would have to go through the list from the builder.

18      Q.    Sure.  And I just have a clarification question

19   for you.  If you look on the first page of this

20   document, you'll see the first highlight, it says 3116

21   Wallcraft Avenue, and I believe you said on the record

22   earlier that the address is 3120?

23      A.    Yes.

24      Q.    Was this just a mistake or --
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2418 of 3246
Case 1:09-cv-02042-AGF Document 26181 Confidential Subject to Further Confidentiality Page 46 of
118
Confidential – Subject to Further Confidentiality Review

```
 1      A.    Yes.  Well, originally I believe we were 3118,

 2  and then we got -- the city came and readdressed us.

 3      Q.    So these are all pertaining to the same parcel

 4  of land?

 5      A.    Yes, it is.

 6      Q.    Was this home and land purchased -- or financed

 7  through a lender, or did you pay in cash?

 8      A.    We paid in cash for the land, and then for

 9  the -- we got a construction loan for the building of

10  the house, through a lender.

11      Q.    And the 185,000 that you paid for the land,

12  that was in addition to the approximately 360,000 for

13  the property?

14      A.    Yes.

15      Q.    For the house, I should say.

16      A.    Right.

17            (O'Brien Exhibit No. 3 was marked for

18  identification.)

19  BY MS. HAQUE:

20      Q.    Now I want to show you what has been premarked

21  as Exhibit 3, so you can go ahead and just set that

22  aside for the moment.

23            Can you please take a moment to review that

24  document?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2419 of 3246
Case 1:09-cv-07628 Document 261-31 Confidential Subject to Further Confidentiality Review
118
Confidential - Subject to Further Confidentiality Review

```
1      A.    Okay.

2      Q.    Do you recognize this document?

3      A.    Yes, I do.

4      Q.    What is this document?

5      A.    This is the documentation on our allowances for

6   what we were granted from the builder and what we

7   actually -- what it cost to put in, and the differences,

8   so -- and what the change orders were.

9      Q.    All the way at the bottom you'll see a total

10  project cost.

11     A.    Yes.

12     Q.    Was this the final price that you paid for the

13  home?

14     A.    Yes, I believe it was.

15     Q.    Okay, you can go ahead and set that aside.

16     A.    Okay.

17     Q.    Was there a mortgage on the property?

18     A.    Yes.

19     Q.    Do you recall the details of your mortgage?

20     A.    What do you mean?  The amount?

21     Q.    Correct.  And for how long?  Was it a fixed

22  term?  30 years?

23     A.    Yes, it was fixed term for 30 years.  The

24  mortgage on it was approximately 170,000.  There might
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2420 of 3246
Case 1:09-md-02047-EEF-MBN Document 22381 Filed 10/19/2019 Page 41 of 118
Confidential – Subject to Further Confidentiality Review

1    have been some extra there.  I'm not exact.

2            (O'Brien Exhibit No. 4 was marked for

3    identification.)

4    BY MS. HAQUE:

5        Q.   Let's go ahead and just take a look at the

6    mortgage.  I'm going to show you what has been premarked

7    as Exhibit 4.  If you could take a second to review

8    this.

9        A.   Okay.

10       Q.   Or as long as you need.

11       A.   Yes.

12       Q.   Is this the agreement -- I know there's a

13   number of pages here --

14       A.   Right.

15       Q.   -- but is this your mortgage agreement?

16       A.   Yes.

17       Q.   And it looks like, if you turn to OBrienDepo82,

18   it looks like the mortgage was -- in the middle of the

19   page, I'm going to direct your attention -- $359,000?

20       A.   Uh-huh.

21       Q.   Was that the -- to your recollection, was that

22   the total amount?

23       A.   Yes, I believe so.

24       Q.   For the construction loan?

Case 2:09-md-02047-EEF-MBN Document 23263-39 Filed 11/19/19 Page 2421 of 3246
Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 21 of 118
Confidential - Subject to Further Confidentiality Review

1    A.   Yes.

2    Q.   And you said that this was a 30-year term?

3    A.   Yes.  Well, I'm not sure -- I'm not sure if the

4    construction was -- is really deemed as a 30-year, but

5    the modification to that, when we're done, is.

6    Q.   Okay.  If you turn to -- turn back to the first

7    page at OBrienDepo80.  What was the agreement for the

8    modification or extension, to your recollection, or why

9    did you enter into a modification of the original loan?

10   A.   That's what -- as far as I remember, that's

11   what you need to -- we need to do for a construction

12   loan, you modify at the end, and at that point we put

13   more cash down, and then what was left was our mortgage.

14   Q.   So you made a one-time payment of, it looks

15   like, $184,945?

16   A.   Yes.

17   Q.   So after -- and it looks like this modification

18   was in May of 2007?

19   A.   Yes.

20   Q.   Is that accurate?

21   A.   That is.

22   Q.   So after this agreement for modification, it

23   looks like you still owed about $174,055?

24   A.   Yes.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2422 of 3246
Case 1:09-md-02047-EEF-MBN Document Comptant Subject Docket 2001/2017 Page 23 of
Confidential - Subject to Further Confidentiality Review
118

```
1     Q.   Do you recall what your monthly payments were?

2     A.   Yes.  It looks right on here.  $1,081.03.

3     Q.   Did you ever miss any mortgage payments or make

4    any late payments?

5     A.   No.

6     Q.   Were you having trouble making mortgage

7    payments on time, financially speaking?

8     A.   No.

9     Q.   Did anyone else have a lien on the property, to

10   your knowledge?

11    A.   No.

12    Q.   Did you own any other properties or homes at

13   that time?

14    A.   No.

15    Q.   Since you purchased the property in 2004, when

16   was the home actually built?

17    A.   We moved in April 2007.

18    Q.   And when was construction -- when did

19   construction begin on the property, to your

20   recollection?

21    A.   Early 2006, approximately.

22    Q.   From April of 2007 when you first moved in, did

23   you live there consecutively until you moved out of the

24   home in 2012 or so, or you sold the home?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2423 of 3246
Case 1:19-cv-02442-WMR Document 1281 Entered on FLSD Docket 05/06/2022 Page 42 of 118
Confidential - Subject to further confidentiality review

 1      A.   No.

 2      Q.   Can you -- from -- starting in 2007, can you

 3   just give us a summary of where you lived?

 4      A.   Yes.  In November 2009, we purchased a second

 5   home and we moved in there in January of 2010.

 6           No, I'm sorry, I'm wrong.  We bought it in

 7   November 2010 and moved in in January 2011.

 8      Q.   And who lived in the property at 3120 West

 9   Wallcraft starting in November of 2010 or so?

10      A.   No one.

11      Q.   And do you remember when you sold the property

12   at 3120 West Wallcraft?

13      A.   Yes.  February 17, 2012.

14      Q.   And do you know who currently lives in the

15   property today at 3120 West Wallcraft?

16      A.   I don't know them personally.

17      Q.   And what is your current address?

18      A.   3310 West Iowa Avenue, Tampa, Florida 33611.

19      Q.   And how long have you lived at that address?

20      A.   I've lived at that address for -- let's see --

21   almost five and a half years.

22      Q.   So you -- when did you first move into that

23   address?

24      A.   I moved in in July of 2013.

Confidential - Subject to further confidentiality Review

1   Q.   Now, going back to the house at 3120 West

2   Wallcraft, since you moved in in April 2007, who are all

3   the individuals who have ever lived in that house

4   from -- starting in April of 2007?

5   A.   Myself, Mr. O'Brien, and our two kids, Liam and

6   Aedin.

7   Q.   Has anyone other than the other four people

8   that you just identified ever lived in the property

9   between 2007 until when you sold the house in 2012?

10   A.   No.

11   Q.   Have you ever charged rent for anyone to ever

12   stay at the 3120 West Wallcraft house?

13   A.   No.

14   Q.   Have you ever renovated or made improvements to

15   the property at 3120 West Wallcraft between the years

16   2007 and 2012 until when you sold it?

17       MR. ALBANIS:  Object to the form, but you can

18       answer if you know, Ms. O'Brien.

19       THE WITNESS:  What would you consider

20       renovation, or what are you really asking?

21   BY MS. HAQUE:

22   Q.   Really, any modifications to the home after the

23   current state in April 2007, so anything that was

24   changed in the home.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2425 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2425 of 3246
Confidential - Subject to Further Confidentiality Review
118

```
1      A.   We might have made cosmetic improvements, hung

2   decorations.  Maybe Kelly, Mr. O'Brien, can think of

3   other things, but nothing major.

4      Q.   Any pool or deck --

5      A.   No.

6      Q.   -- or shed or anything like that?

7      A.   We might have put a shed up, but I can't

8   remember when.

9      Q.   Did you ever remodel the kitchen or the

10  bathrooms or any of the other rooms?

11     A.   No.

12     Q.   Did you ever do anything to change around the

13  electrical wiring of the home --

14     A.   No.

15     Q.   -- or maybe the plumbing?

16     A.   No.

17     Q.   Do you know or remember what the square footage

18  of the home at 3120 West Wallcraft was?

19     A.   Yes.  3300.

20     Q.   Okay.  I am going to -- actually, if you'd turn

21  back to Exhibit 1.

22     A.   Okay.  Got it.

23     Q.   And I want to direct your attention to page 3.

24  It's O'BrienK00003.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2426 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 7 of 118
Confidential - Subject to Further Confidentiality Review

```
 1      A.   Okay.

 2      Q.   And at the very top left-hand corner you see

 3   Section VII, home information?

 4      A.   Yes.

 5      Q.   And it's listed as the approximate square

 6   footage of the home.  Do you see that?

 7      A.   Yes, I do.

 8      Q.   What's listed there?

 9      A.   3200.

10      Q.   Is that consistent with your recollection?

11      A.   I'm not positive where this number came from,

12   but I know on Hillsborough County property records it

13   shows it as 3300.

14      Q.   3300?

15      A.   Yes.

16      Q.   Okay.  And can you say again how you know that

17   number?

18      A.   From the Hillsborough County Property Appraiser

19   website.

20      Q.   Did you ever personally measure the square

21   footage of your home?

22      A.   No.

23      Q.   Have you ever had anyone come to the home to

24   measure the square footage?
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2427 of 3246
Case 1:09-cv-07402-AGK Document 28-51 Exhibit 41 Filed 05/08/2013 Page 3 of
118

```
 1      A.    Yes.

 2      Q.    And who was that?

 3      A.    I believe it was when we sold it, the realtor,

 4  I think I remember someone coming in to measure it.

 5      Q.    And did this person provide any written

 6  documentation as to the measurements?

 7      A.    I don't remember.

 8      Q.    I just want to direct your attention to the

 9  same document.

10      A.    Okay.

11      Q.    Page 10.  What does this document show?

12      A.    This is showing the floor plan for the house at

13  Wallcraft.

14      Q.    Is this consistent with what you recall the

15  floor plan to be, or did you make any modifications to

16  this?

17      A.    No, this is correct.

18      Q.    Do you know if you -- if you see, it looks like

19  this document is cut off.

20      A.    Yes.

21      Q.    There's the area, and then it kind of -- in the

22  very top part of the document?

23      A.    Yes.

24      Q.    Do you have -- do you know if you have a
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/10 Page 2428 of 3246
Case 1:09-md-02047-EEF-MBN Document 2261.81 Confidential Subject to Further Confidentiality Review
118
Confidential – Subject to Further Confidentiality Review

```
1    complete floor plan or one that --

2        A.   Yes, I do.

3        Q.   Okay.  So we'll just confer with your attorney

4    about that.

5        A.   Sure.

6            MR. ALBANIS:  No problem.

7    BY MS. HAQUE:

8        Q.   How many bedrooms were in this property at 3120

9    West Wallcraft?

10       A.   It was a four-bedroom.

11       Q.   And how many bathrooms were in the property?

12       A.   Let me think.  One, two -- should have been

13   three.

14       Q.   And you stated earlier that the --

15       A.   Oh, wait.  No, it was a five-bedroom.  Sorry

16   about that, because I was thinking the bedroom on the

17   bottom floor didn't have a closet, but it did.

18       Q.   Not a problem.  So there were five bedrooms in

19   the property?

20       A.   Yes.

21       Q.   And how many bathrooms total?

22       A.   Three.

23       Q.   And you said the house --

24       A.   No, no, no, no.  I was trying to -- yeah,
```

Confidential – Subject to Further Confidentiality Review

```
 1    three.  Sorry.  It's been a while.

 2        Q.   Take all the time you need.  No problem.

 3             And you said the house was originally finished

 4    in April of 2007?

 5        A.   April of 2007, yes.

 6        Q.   To your recollection, have there been any

 7    changes to the square footage of the home since it was

 8    built in April of 2007?

 9        A.   No.

10        Q.   All right.  I'm going to go ahead and change

11    topics now.  Are you doing okay?

12        A.   Yeah, I'm fine.

13        Q.   When do you believe that Chinese drywall was

14    installed in your house at 3120 West Wallcraft?

15        A.   When it was originally built.

16        Q.   How -- and how did that -- how was the drywall

17    installed?

18             MR. ALBANIS:  Objection.  Go ahead.

19    BY MS. HAQUE:

20        Q.   I'll rephrase.  Strike that and I'll rephrase.

21             Who was in charge of building your home?

22        A.   Our builder was Steven Carter, Inc.

23        Q.   And who was supplying the drywall?  Do you

24    remember a name or company?
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/10 Page 2430 of 3246
Case 2:11-cv-03094-MCE Document 23363-31 Filed 03/14/10 Docket 03/19/2019 Page 45 of 118
Confidential - Subject to Further Confidentiality Review

```
 1        A.    I believe it was -- who was installing it or

 2   the supplier?  What are you asking?

 3        Q.    The supplier.

 4        A.    The supplier was, I believe, Black Bear Gypsum.

 5        Q.    And I'll direct your attention back to

 6   Exhibit 1 just to get on the record.  If you turn to

 7   page 3 again, I want to direct your attention to

 8   Section IX --

 9        A.    Okay.

10        Q.    -- where it says homebuilder/general

11   contractor/developer information.

12        A.    Yes.

13        Q.    What is written under the name of your home

14   builder for this property?

15        A.    Steven R. Carter, Inc.

16        Q.    And is that, to your recollection, the name of

17   the company that built the property at 3120 West

18   Wallcraft?

19        A.    Yes.

20        Q.    And I want to direct your attention to just the

21   next box down, Section XI, drywall supplier.

22        A.    Yes.

23        Q.    What's written under drywall supplier's name?

24        A.    Black Bear Gypsum, LLC.
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2431 of 3246
Case 2:09-md-02047-EEF-JCW Document 20858-1 Exhibit 39 Filed 05/18/2017 Page 32 of
118

Confidential - Subject to Further Confidentiality Review

```
 1      Q.   To your recollection, was this the company that

 2   supplied the drywall?

 3      A.   Yes.

 4      Q.   I want to direct your attention next to page 11

 5   of the same document.  Do you recognize this document?

 6      A.   Yes.

 7      Q.   What is this document?

 8      A.   It's our construction agreement with our

 9   builder.

10      Q.   And just to correct for the record, it states

11   3118 --

12      A.   Right.

13      Q.   -- but for the purposes of the record, it was

14   actually 3120?

15      A.   Yes.

16      Q.   Who paid for the home?  Who was paying the

17   builder for the home?

18      A.   Well, we were paying, but we took out a

19   construction loan.

20      Q.   Did you receive any payments from anyone else

21   during this time for the home?

22      A.   No.

23      Q.   Did you ever see the drywall before it was

24   installed in the home?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2432 of 3246
Case 1:11-cv-02349-MGC Document 21-31 Entered on FLSD Docket 05/19/2012 Page 48 of
118
Confidential - Subject to further confidentiality Review

 1      A.    I believe -- I used to go by the house a lot.

 2    I believe I saw it, you know, them installing it, but,

 3    you know, in pallets, you know, just sitting there, you

 4    know, as they were putting it up.

 5      Q.    Did you ever personally see any markings on the

 6    drywall?

 7      A.    No.

 8      Q.    Can you describe what you saw?  Did you see the

 9    drywall in the house, or did you see just the pallets of

10    the drywall?

11      A.    No, they were actually in the process of

12    nailing it up or whatever they do.

13      Q.    How do you know that the drywall was

14    manufactured in China?

15      A.    Because we have samples.

16      Q.    Do you know the name of the company that

17    manufactured the drywall?

18      A.    Yeah.   Taishan.

19      Q.    And how do you know that?

20      A.    Because it has some markings indicating that.

21      Q.    Who installed the drywall during this process?

22      A.    Talmadge, I think you pronounce it.

23      Q.    And that's also on the same page?

24      A.    Right, uh-huh.

Confidential - Subject to Further Confidentiality Review

```
 1       Q.   Page 3?

 2       A.   Yes.  William Talmadge Drywall.

 3       Q.   And just to confirm, that's the name of the

 4  person who installed the drywall?

 5            MR. ALBANIS:  Object to the form, but you may

 6       answer.

 7            THE WITNESS:  Yes.

 8  BY MS. HAQUE:

 9       Q.   For the record, who installed the drywall?

10       A.   William Talmadge Drywall.

11       Q.   Did anyone ever inform you that the drywall

12  that they were installing was made in China?

13       A.   No.

14       Q.   Did anyone tell you about the source of the

15  drywall that they were installing in your home at 3120

16  West Wallcraft?

17       A.   No.

18       Q.   Did anyone, either the homebuilder, the

19  supplier, or the installer, ever make any guarantees to

20  you about the products they used in your home?

21            MR. ALBANIS:  Object to the form, but you can

22       answer if you know, Ms. O'Brien.

23            THE WITNESS:  I don't recall that they did.

24            ///
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2434 of 3246
Case 1:09-md-02047-EEF-MBN Document 23652-81 Filed 11-19-20 Pocket 09/28/2013 Page 35 of
Confidential – Subject to further confidentiality review
118

 1   BY MS. HAQUE:

 2       Q.   Did anyone ever tell you that there were

 3   domestic sources of drywall used in the home at 3120

 4   West Wallcraft?

 5       A.   No.

 6       Q.   Where was, to your recollection, the Chinese

 7   drywall installed in the home?

 8       A.   In all the rooms.

 9            (O'Brien Exhibit No. 5 was marked for

10   identification.)

11   BY MS. HAQUE:

12       Q.   I'm going to show you next what has been

13   premarked as Exhibit 5.  Can you take a moment to review

14   this document?

15            Have you seen this document before?

16       A.   Yes.

17       Q.   Is your name -- does your name appear on this

18   document?

19       A.   Yes.

20       Q.   What is this document?

21       A.   This is the inspection that was done, the

22   Chinese drywall inspection.

23       Q.   And when was it dated?

24       A.   It was dated February 20, 2010.

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2435 of 3246
Case 1:09-cv-08071-CJC Document 1 Confidential Subject to Further Confidentiality Review
118

Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Okay.  Can I direct your attention to sort of

 2   in the middle of the page?

 3        A.   Yes.

 4        Q.   And can you read that first line that's

 5   underlined, please?

 6        A.   "Drywall labeling that was found:  Bathroom -

 7   Made in China, Meets Or Exceeds."

 8        Q.   So based on this report, was there drywall made

 9   in China found in the bathroom of your home?

10        A.   Yes.

11        Q.   Do you recall which bathroom this refers to?

12        A.   I don't recall.

13        Q.   And can you read the next underlined line,

14   please?

15        A.   "The master bedroom attic hatch area labeling

16   found - 06 16:41 1/2".  TE ST - IMD Argentina."

17        Q.   Did this inspection also find, I guess,

18   Argentinian drywall in your home?

19        A.   Yes.

20        Q.   Do you mind flipping to the next page?  Were

21   these wirings that you see here?

22        A.   Yes.

23        Q.   Did you notice any blackening or -- with the

24   wirings during this inspection?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2436 of 3246
Case 2:09-md-02047-EEF-MBN Document 22281 Filed 11/01/19 Page 2436 of 3246
Confidential - Subject to further confidentiality Review
118

```
 1        A.   Yes.

 2        Q.   Do you recall where these photos are taken in

 3   the home?  It doesn't look like it's listed on this

 4   page.

 5        A.   I recognize the top one.  Let me -- I'm not

 6   positive about the middle one.  I do recognize the

 7   bottom one.

 8        Q.   Where is the top photos taken?  Or where were

 9   they taken?

10        A.   The top photo is in the family room.

11        Q.   And the bottom photos, where were those taken?

12        A.   That was in the upstairs loft area.

13        Q.   Can you go to the next page, please?

14        A.   Sure.

15        Q.   What are these photos of?

16        A.   The AC coils, I believe.  Yeah.

17        Q.   Where -- go ahead.  I'm sorry.

18        A.   No.  Yeah.

19        Q.   Where was the AC unit in your home located?

20        A.   The garage, I believe.  I'm trying to remember.

21   Maybe Kelly knows more about that, because we had two

22   units.

23        Q.   You had two air conditioning units?

24        A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2437 of 3246
Case 2:09-md-02047-EEF-MBN Document 23063-81 Filed 06/06/2011 Page 38 of
118
Confidential – Subject to further confidentiality review

1    Q.   Do you recall where the locations of both units

2    are, or were?

3    A.   I was thinking the downstairs was in the

4    garage, but I'm not recalling where the upstairs one was

5    at the moment.

6    Q.   Okay.  Can you go ahead and turn to the next

7    page?  And the very bottom line, can you read that

8    underlining, please?

9    A.   "The bathroom interior hole that was inspected.

10   Labeling found - Made in China."

11   Q.   So this is the bathroom that was referred to on

12   the same -- on the first page?  Or was this a different

13   bathroom?

14   A.   I don't know if it was the same bathroom.  I

15   can't tell by the first page.  There's no picture.

16   Q.   Okay.  Let's go to the next page, and the very

17   bottom line.

18   A.   "The master bedroom attic hatch air labeling

19   found -- 16:41 1/2".  TE ST - IMD Argentina."

20   Q.   So this is another type of drywall that the

21   inspector found in the home?

22   A.   Yes.

23   Q.   Okay.  Let's go to the next page.  I think this

24   is the same -- the same two set of photos refer to the

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2438 of 3246
Case 2:09-cv-02048-MCA Document 2468-81 entry 181 Filed Superdate 05/19/2019 Page 40 of
118

1    master bedroom attic hatch.  And then can you look at

2    the very last line?

3        A.    "View of interior hole inspected in the closet.

4    No labeling was found."

5        Q.    And this is -- do you recall which closet this

6    refers to or what bedroom this closet was in?

7        A.    No, I don't recall which one.

8        Q.    Okay.  And if you go to the next page, can you

9    read that first underlined line?

10       A.    "View of interior hole inspected in the

11   interior room.  No labeling was found."

12       Q.    And what is the interior room?

13       A.    I believe this may be a reference to the area

14   under the stairs.

15       Q.    Okay.

16       A.    Storage area.

17       Q.    Okay.  And then can you read the very last line

18   on this page?

19       A.    "View of hole inspected in the bedroom closet.

20   No labeling was found."

21       Q.    Okay.  So it looks like this report -- or let

22   me rephrase that.

23            This inspector, Allied Home Inspections, found

24   Chinese drywall in the bathroom of the home; is that

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2439 of 3246
Case 1:09-cv-07791 Document 201-81 Entered on FLSD Docket 05/19/2017 Page 40 of
118

Confidential - Subject to further confidentiality Review

```
1   right?

2       A.   Yes.

3       Q.   And they found Argentinian drywall and then

4   other drywall without any markings in other parts of the

5   home?

6       A.   Yes.

7       Q.   Okay, you can go ahead and set that aside.

8       A.   Okay.

9       Q.   Now, you said earlier that you saw the pallets

10  of drywall?

11      A.   Yes.

12      Q.   Did you ever see anyone, Mr. Talmadge or his

13  company, actually install the drywall?

14      A.   Yes.  They had a crew there.

15      Q.   And so you saw them actually put up the

16  drywall?

17      A.   I went by when they were working at one point,

18  yes.

19      Q.   Did you ever speak to anyone about what they

20  were doing?

21      A.   No.

22      Q.   Do you know what the total cost of the drywall

23  installation itself was?

24      A.   No, I don't.
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2440 of 3246
Case 1:11-cv-22408-MGC Document 29-31 Entered on FLSD Docket 05/18/2011 Page 41 of
118
Confidential - Subject to Further Confidentiality Review

```
1      Q.    Did you notice any other work being done in the

2   home at the same time the drywall was going up?

3      A.    No.

4      Q.    Do you know if the HVAC, the AC unit was being

5   put in, wiring, anything of that sort?

6      A.    I don't recall the order, but I don't

7   remember -- there was nobody else there doing work at

8   the time that I went by.

9      Q.    Okay.  When did you first suspect that there

10  may be Chinese drywall in your home?

11     A.    Basically, November 2009ish.

12     Q.    And what caused you to suspect that?

13     A.    We had already replaced the AC coils numerous

14  times upstairs and downstairs, and our AC guy, in trying

15  to get another set of coils, because he was trying to

16  get it under warranty, they asked him if the home had

17  Chinese drywall, the coils were black, and he said yes,

18  and so then he came to us and said the coils are black.

19  So he brought it up to us.

20     Q.    Let's talk about the AC repairs.  Do you recall

21  when the first, ever since you moved in the home, when

22  the first AC repair was?

23     A.    I believe so, because I believe the first one

24  failed -- I had a spreadsheet on it.  I think the first
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2441 of 3246
Case 1:11-cv-22408-MGC Document 226-81 Entered on FLSD Docket 05/18/2011 Page 42 of
118

Confidential ⚬ Subject to further confidentiality review

1    one failed about 15 to 18 months in.

2        Q.   Okay.

3        A.   So whatever that is.  Sometime in 2008, I

4    believe.

5        Q.   Okay.  Approximately how many times since you

6    moved in, from about April 2007 to November 2009, did

7    you have issues with the AC?

8        A.   How many times?

9        Q.   Total, yeah.

10       A.   With just the coils or --

11       Q.   Any issues with the AC.

12       A.   Oh.  I don't recall the exact number.

13       Q.   Did you produce the spreadsheet to your

14   attorneys?

15       A.   Yes.

16       Q.   Okay.  And we'll go and a little later on look

17   at those invoices.

18       A.   Okay.

19            (O'Brien Exhibit No. 6 was marked for

20   identification.)

21   BY MS. HAQUE:

22       Q.   Let me show you what's been premarked as

23   Exhibit -- I think we're on 6?

24       A.   Yeah.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2442 of 3246
Case 1:09-md-02047-EEF-MBN Confidential Subject to Further Confidentiality Review
118

```
 1       Q.    Here you go.  Is this the spreadsheet that you

 2   were referring to earlier?

 3       A.    Yes.

 4       Q.    Do you recognize this document?

 5       A.    Yes.

 6       Q.    Did you make this document?

 7       A.    Yes, I did.

 8       Q.    Let's look at the first top half of this page.

 9   What does this table represent?

10       A.    This table represents a summary of the

11   receipt -- air conditioning receipts that we paid for.

12       Q.    Were these all the, I guess, issues that you

13   had with the AC --

14       A.    Yes.

15       Q.    -- between when you moved in until, it looks

16   like, June of 2010?

17       A.    Yes.

18       Q.    Did you have any other issues with the AC unit

19   that are not captured in this table, to your knowledge?

20       A.    No, I don't believe so.  I kept all the

21   receipts.

22       Q.    Okay.  And this bottom part --

23       A.    Yes.

24       Q.    -- this -- what does this table represent?
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2443 of 3246 of
Case 1:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 44 of
118
Confidential - Subject to Further Confidentiality Review

```
 1      A.   This table represents when the coils were

 2   replaced.

 3      Q.   And it looks like four sets total of coils were

 4   replaced?

 5      A.   The first set started.  We replaced.  Two,

 6   three.  I believe we replaced, actually, three sets.

 7      Q.   Okay.

 8      A.   But I labeled it four, because I think we, you

 9   know, we sold -- we got -- I don't know, you know, once

10   we moved out of it, so...

11      Q.   So this last set -- I understand.  Okay.

12      A.   Yeah.

13      Q.   Got it.  Let's go back to November of 2009

14   when -- it was the AC unit man that you were talking

15   with?

16      A.   Yes.

17      Q.   Can you describe that conversation and what

18   exactly he told you?

19      A.   Well, I don't really recall.  I believe it was

20   probably Kelly that spoke to him.

21      Q.   Okay.  Did you notice any blackened electrical

22   wires in the home prior to the AC man telling you that

23   there might be Chinese drywall in the home?

24      A.   No.
```

Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Did you ever have any issues with any other

 2   appliances other than the AC in the home?

 3        A.   Nothing is really jumping out at me that I

 4   recall, so...

 5        Q.   Did you ever smell an odor in your home?

 6        A.   Yes.

 7        Q.   When did you first smell an odor?

 8        A.   I don't really recall.  It was more pronounced

 9   when we would leave and come back in after being gone a

10   certain amount of time.

11        Q.   What did it smell like?

12        A.   It's hard to describe.  How do you describe a

13   smell?  It just -- I really don't even know how to

14   describe it.  It wasn't totally a rotten egg smell or

15   anything.  It was like more of just a -- I don't know if

16   it's musty or like a -- I don't know.  I can't --

17        Q.   Was the smell that you're describing worse in

18   certain parts of the home more so than others?

19        A.   Living there the whole time, I think I was used

20   to it so I didn't really smell it, you know, per se

21   stronger anywhere.

22        Q.   Do you recall when you first started noticing

23   this smell?

24        A.   I have to believe it was, you know, it was,
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2445 of 3246
Case 1:09-md-02047-EEF-MBN Document [illegible] Filed [illegible] Page 46 of 118
Confidential - Subject to Further Confidentiality Review

1    like, when we first moved into the house, because, you

2    know, it had a certain smell to it and I just figured it

3    was our house smell, you know.

4        Q.   What made you think that -- what led you to

5    believe that it wasn't like a new house smell?

6        A.   Well, actually, our friends live two doors

7    down, and once they realized, you know, we have this, we

8    told them, they were like, "Oh, that's why every time

9    when we'd walk into your house, we'd smell that smell,"

10   you know, because they thought also that that's just how

11   our, you know, new house, but their house smelled a bit

12   different than ours did.

13       Q.   When do you recall that your friend -- you

14   first had a question -- a conversation with your friend

15   where they said, "Oh, this might be Chinese drywall

16   smell?"

17       A.   Well, it was close to November 2009 when we

18   first learned of it, because she was a good friend, and

19   I'm like, "Oh, my gosh, can you believe we might have

20   this?"

21       Q.   So I don't see November 2009 exactly on this

22   spreadsheet on -- this is Exhibit 6.  Do you think it

23   was maybe earlier or later than November of 2009?

24       A.   Oh, but -- oh.  Well, there's '09 there, 8 --

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2446 of 3246
Case 1:11-cv-22408-MGC Document 289-31 Entered on FLSD Docket 05/06/2015 Page 47 of
118
Confidential – Subject to Further Confidentiality Review

1    oh, maybe it was more -- oh, maybe it was earlier.

2    Maybe it wasn't November.

3           Yeah, it had to have been when we were

4    replacing that coil, those coils, in 2009, unless I have

5    a typo on my spreadsheet and didn't transfer the -- it

6    must have been that time frame.

7        Q.    Okay.  Yeah, it looks like, if you turn to page

8    43 of this same exhibit, No. 6, it looks like -- if you

9    see the date at the very top of this page --

10       A.    Yes.  8/10/2009.  Okay.

11       Q.    So would it have been closer to August, in and

12   around August 2009?

13       A.    I believe so.  Let me look at a couple of these

14   pages here.

15       Q.    Sure.

16       A.    Yes, I believe it was closer to August with

17   those -- that coil, because the other one is just freon.

18       Q.    So you learned about -- so we think now you

19   learned about Chinese drywall closer to August of 2009?

20       A.    I -- yeah.

21       Q.    When did you make this document?

22       A.    I really don't remember.  It was -- I know it's

23   probably after we replaced the coils a couple times,

24   because we were getting really annoyed, figuring why are

Confidential - Subject to Further Confidentiality Review

1    these coils failing on us?  I thought there was a defect

2    in the coils they were providing us, so I wanted to keep

3    documentation on, you know, how often we were having to

4    spend this money.

5        Q.   So is it fair to say that you made this summary

6    page sort of contemporaneously with each problem that

7    came up?

8        A.   Yeah, I created it and then started filling in

9    things as they started -- you know, they continued to

10   happen.

11       Q.   Okay.

12       A.   So I don't remember what year, you know,

13   which -- what time frame, really, it was.  I don't.

14       Q.   So it wasn't created for this litigation, this

15   was just a document that you kept for your own records?

16       A.   Yeah, I originally kept it for my own records.

17       Q.   Okay.  When did you -- going back to when we

18   were talking about sort of the odor in the home --

19       A.   Yes.

20       Q.   -- was it more prevalent at certain times of

21   the day or certain times of the year where you just

22   smelled it more?

23       A.   Not that I noticed.

24       Q.   Okay.  When did you recall you ever first heard

Confidential - Subject to Further Confidentiality Review

```
 1    problems related to Chinese drywall?

 2         A.    Really, it was when the AC guy brought it up to

 3    us about, you know, him being asked by whoever he was

 4    trying to get the coils from, so...

 5         Q.    Did you ever hear anything on the news or on

 6    TV?

 7         A.    Not until after we had it and I started

 8    watching.

 9         Q.    And what did you learn after that?

10         A.    I learned that there were a few people in Tampa

11    that had -- because, actually, when we spoke to the

12    builder, we learned that every house he built at that

13    time had it.

14         Q.    When did you speak to the builder about that?

15         A.    It was either toward the end of 2009 -- you

16    know, it was sometime between when we found out about it

17    from the AC guy and early 2010.  Within those months.

18         Q.    Let me ask you:  What did you do after you

19    spoke to the AC guy and he said, "Hey, you guys might

20    have Chinese drywall in your home"?  What were the next

21    steps that you guys did?

22         A.    Let me think.  Well, we started researching

23    trying to figure out what it was, any, you know, effects

24    and whatever.  We also got in touch with the builder,
```

1    you know, about his insurance and trying to get this

2    covered.  So those were the first few steps we took.

3        Q.    And what did the builder tell you?

4        A.    Basically, after checking with his insurance,

5    they told us they weren't going to cover it, but

6    Mr. O'Brien did more of the communication with the

7    builder, so he might have more insight to that.

8        Q.    Sure.  Did you ever reach out to the drywall

9    supplier, Black Bear Gypsum, or the installer, William

10   Talmadge?

11       A.    I didn't, but Mr. O'Brien may have.  I don't

12   remember.

13       Q.    Okay.  When did you first speak with an

14   attorney about Chinese drywall?

15       A.    I can't remember if that was November 2009 or

16   January '10.  I don't recall the exact time, but it was

17   in that time frame.

18       Q.    And how did you know to go ahead and speak to

19   an attorney at that point?  Or what led you to go ahead

20   and contact an attorney?

21       A.    Well, thinking back, it was probably after we

22   learned that the insurance wasn't going to help us fix

23   it, so we wanted to see what our recourse was, so that's

24   why we spoke to an attorney, like, what are our options?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2450 of 3246
Case 1:09-cv-07687-MGC Document 208-31 Entered on FLSD Docket 05/19/2017 Page 51 of
118

Confidential – Subject to Further Confidentiality Review

```
 1        Q.   Do you know how long it was between first

 2   speaking with an attorney and when the lawsuit was

 3   filed?

 4        A.   No, I don't -- I don't remember how long.

 5        Q.   Okay.  We looked at an inspection report

 6   earlier today.

 7        A.   Yes.

 8        Q.   Was that the only inspection that you've ever

 9   had for Chinese drywall?

10             MR. ALBANIS:  Object to the form, but you can

11        answer if you know, Ms. O'Brien.

12             THE WITNESS:  It was the only formal

13        inspection.  We also did some inspection our own

14        selves.  Mr. O'Brien did.

15   BY MS. HAQUE:

16        Q.   And by "we," just you or Mr. O'Brien?

17        A.   Yes.

18        Q.   Did you have anyone with you while you were

19   doing the other inspection?

20        A.   I don't believe so.

21        Q.   Who paid for the inspection by Allied Home

22   Inspections?

23        A.   I don't remember, actually.

24        Q.   If you'd turn to page 29 of that document.
```

```
 1      A.    Oh, 29.  It's the front page.

 2      Q.    Sorry.  I should have said the front page.

 3   That would have been easier.

 4            If you see, at the very top it says "Morgan

 5   Report"?

 6      A.    Yes.

 7      Q.    Does that -- do you know if that refers to your

 8   attorneys, Morgan & Morgan?

 9      A.    Yes.

10      Q.    Did they pay for the inspection?

11      A.    I believe they paid and had -- to have it done.

12      Q.    Were you home when Allied came to do the

13   inspection?

14      A.    I don't remember if I was home or not.

15      Q.    Do you recall speaking with an inspector?

16      A.    I don't.

17      Q.    And other than Allied and your -- and the

18   inspections that you or your -- Mr. O'Brien have done,

19   were there any other inspections?

20      A.    Not that I recall, no.

21      Q.    Has anyone ever taken samples of drywall from

22   the home?

23      A.    From the house?

24      Q.    Yes.
```

Case 2:09-md-02047-EEF-MBN  Document 23363-39  Filed 11/19/10  Page 2452 of 3246
Case 1:09-md-02047-EEF-MBN  Document 23363-81  Entered on FLSD Docket 05/18/2017  Page 53 of
118
Confidential - Subject to Further Confidentiality Review

```
 1       A.   Yes.

 2       Q.   And just for the record, the house at 3120 West

 3  Wallcraft.

 4       A.   Okay.

 5       Q.   And for the record, we were given access to

 6  samples from your home.  To the best of your knowledge,

 7  were those the samples that you or Mr. O'Brien had taken

 8  from the home?

 9       A.   Yes.

10       Q.   You gave all the samples to your attorneys?

11       A.   I believe so, but Mr. O'Brien would know if he

12  has any more.

13       Q.   Did you or Mr. O'Brien document or take any

14  notes when you did your informal inspections?

15            MR. ALBANIS:  Object to the form, but you can

16       answer if you know, Ms. O'Brien.

17            THE WITNESS:  I'm trying to recall, going back

18       to.  Yes, we wrote things down, from what I

19       remember.

20            (O'Brien Exhibit No. 7 was marked for

21  identification.)

22  BY MS. HAQUE:

23       Q.   I'm going to show you what has been marked

24  Exhibit 7.  Do you recognize this document?
```

Confidential - Subject to further confidentiality Review

1    A.    Yes.

2    Q.    What is this document?

3    A.    This is pictures of the AC coil boxes, all the

4    drywall samples that we collected.

5    Q.    Who took these photographs?

6    A.    Mr. O'Brien took them.

7    Q.    Were you present at the time that these

8    photographs were taken?

9    A.    No, I don't believe so.

10    Q.    Do you know if Mr. -- did you or Mr. O'Brien

11    physically remove the drywall pieces in these

12    photographs --

13    A.    Yes.

14    Q.    -- or did you have another company come and do

15    it for you?

16    A.    No, mostly -- it was Mr. O'Brien.

17    Q.    Do you know how many -- or what percentage of

18    Chinese drywall is in the home at 3120 West Wallcraft?

19    A.    No, I do not.

20    Q.    Do you know if anyone has ever tried to

21    determine what percentage of the drywall in the home was

22    constructed with Chinese drywall?

23    A.    No, I don't believe so.

24    Q.    Before we switch topics, and maybe we can take

Confidential - Subject to Further Confidentiality Review

```
 1   a break in a few minutes, just for the record --

 2        MS. HAQUE:  Actually, you know what?  We'll do

 3      that later.  So we can go ahead and take maybe a

 4      five, 10-minute break.

 5        MR. ALBANIS:  Just for the record, before we

 6      take a break, in regards to the drywall samples, we

 7      did produce a DVD to your office on Friday,

 8      December 14, that includes several videos from the

 9      remediation of the home.  The DVD is narrated by

10      Mr. O'Brien himself.

11        MR. GUERRA:  And, Pete, can we get a copy of

12      that DVD?

13        MR. ALBANIS:  Absolutely, yes.

14        MS. HAQUE:  All right.  We can go off the

15      record.

16        (Recess from 2:03 p.m. until 2:14 p.m.)

17   BY MS. HAQUE:

18      Q.   Now, before we change topics, just one more

19   question regarding the inspection that you did.  Did you

20   take notes during your own inspection?

21      A.   Yes.

22      Q.   Did you produce those notes to your attorney?

23      A.   I gave him everything I had.

24        MS. HAQUE:  We'll just follow up with you
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2455 of 3246
Case 1:09-cv-04017-GC Document 2016-31 Confidential Subject to Docket 05/04/2012 Page 46 of 118
Confidential - Subject to Further Confidentiality Review

```
 1      regarding that, because I don't think --

 2          MR. ALBANIS:  Obviously, you have the notes

 3      that are in the photos of Exhibit 7.

 4          THE WITNESS:  Right.

 5   BY MS. HAQUE:

 6      Q.  Let me ask you this:  Other than the notes that

 7   are in the photos, do you know if you have any

 8   additional notes?

 9      A.  I don't believe so.  I gave the attorneys

10   everything I had.

11      Q.  Okay.  All right.  Did you remediate your home

12   after learning that the home potentially had Chinese

13   drywall?

14      A.  No.

15      Q.  Why did you not make the decision to remediate?

16      A.  Cost.  We -- the effects, you know.  Even

17   remediation stigma after.

18      Q.  Can you speak to what you mean by remediation

19   stigma?

20          MR. ALBANIS:  Object to the form, but you may

21      answer.

22   BY MS. HAQUE:

23      Q.  Let me rephrase.  What do you mean by

24   remediation stigma?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2456 of 3246
Case 2:09-cv-02048-GAF Document 23881 entered on FLSD Docket 05/18/2010 Page 57 of
118
Confidential – Subject to further confidentiality Review

```
 1              MR. ALBANIS:  Object to the form, but you can

 2         answer if you can.

 3              THE WITNESS:  I really mean Chinese drywall

 4         stigma even though it was remediated.  It all -- it

 5         had it at one point.

 6    BY MS. HAQUE:

 7         Q.   In your belief, is it difficult to sell homes

 8    if there is Chinese drywall in the home?  Is that what

 9    you mean by stigma?

10         A.   Well, I'm not a real estate expert, but --

11    so...

12              (O'Brien Exhibit No. 8 was marked for

13    identification.)

14    BY MS. HAQUE:

15         Q.   I am going to show you what has been marked

16    as -- I guess we're on Exhibit 8.  Ms. O'Brien, have you

17    ever seen this document before?

18         A.   Yes.

19         Q.   What is this document?

20         A.   It's an affidavit supporting the claim of Kelly

21    O'Brien.

22         Q.   Can you read -- and does this affidavit also

23    support your claim in this lawsuit?

24         A.   This document supports Kelly O'Brien.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2457 of 3246
Case 1:09-md-02047-EEF-MBN Confidential - Subject to further Confidentiality Review Page 3 of
118

Confidential - Subject to further Confidentiality Review

```
 1      Q.   Let me go ahead and set this aside.  I think

 2   I'll ask your husband about this one.

 3          MR. ALBANIS:  For the record, this affidavit,

 4          Exhibit 8, was submitted for purposes of the

 5          O'Briens' claims into the Chinese drywall settlement

 6          program, and pursuant to BrownGreer's policies at

 7          that time, if there -- at that time you could only

 8          file claims on behalf of one homeowner per property.

 9          Therefore, while this document just references Kelly

10          O'Brien, it also applies to Ms. O'Brien's claims as

11          well, but that is the reason that the document only

12          references Kelly O'Brien.

13          MS. HAQUE:  Thanks for that clarification.

14   BY MS. HAQUE:

15      Q.   Let me ask you, Mrs. O'Brien, can you read line

16   No. 4?

17      A.   "I also understand that the proper remediation

18   of a Chinese Drywall property costs approximately $50 to

19   $55 a square foot of under air space."

20      Q.   And can you tell us again what the approximate

21   square footage of your home was?

22      A.   Yeah, approximately 3300 square feet.

23      Q.   So if you multiply that out, about $180,000

24   would be the financial cost to remediate the home?
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2458 of 3246
Case 1:09-cv-07628-KAM Document 28-81 Entered on FLSD Docket 05/18/2012 Page 59 of 118
Confidential – Subject to further confidentiality Review

1      A.   Yes, if you use that.

2           MR. ALBANIS:  Object to the form, but you can

3      answer if you know, Ms. O'Brien.

4           THE WITNESS:  With that calculation.  I don't

5      have a calculator.

6    BY MS. HAQUE:

7      Q.   Okay, you can go ahead and set that aside.

8      A.   Okay.

9      Q.   Ms. O'Brien, we received some documents from

10   your attorney yesterday.  One of the documents was this

11   right here, which -- I'm sorry.  We didn't mark that

12   yet.  And this is No. 9?

13     A.   9.

14     Q.   Thank you for keeping track.

15          (O'Brien Exhibit No. 9 was marked for

16   identification.)

17   BY MS. HAQUE:

18     Q.   Do you recall what this document is?  Or have

19   you seen this document before?

20     A.   Yes.

21     Q.   What is this document?

22          MR. ALBANIS:  I'm going to go ahead and object

23     to the form and also state further that we will be

24     asserting a rolling objection, as we have in the

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2459 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 60 of 118
Confidential - Subject to Further Confidentiality Review

1    previous priority claimant depositions, with respect

2    to any request questions regarding remediation

3    damages or the remediation of the property on

4    Wallcraft, which is the subject property at issue in

5    this particular case.

6         As you know, Judge Cooke has set the Chinese

7    drywall Amorin case on two separate tracks pursuant

8    to her November 16, 2018, order.  The first track is

9    the remediation track, the second track is the

10   nonremediation track, and Mr. and Mrs. O'Brien have

11   been named as priority claimants with respect to the

12   nonremediation track.

13        Therefore, we believe that these questions

14   regarding remediation are not relevant for the

15   reasons that we are here today because they are on

16   the nonremediation track.

17        Having stated all that, of course we will allow

18   you to ask the questions that you would like to ask.

19        MS. HAQUE:  And I'll just put on the record

20   that in our view all of these questions pertain to

21   the overall issue of damages in the case.

22   BY MS. HAQUE:

23   Q.   Mrs. O'Brien, do you recall asking this company

24   that's listed at the top of the page for a quote as to

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2460 of 3246
Case 1:1-cv-22408-MGC Document 28081 Entered on FLSD Docket 09/26/11 Page 61 of
118
Confidential - Subject to Further Confidentiality Review

```
 1    remediation at the home at 3120 West Wallcraft?

 2        A.    Yes.

 3        Q.    And is this the quote that you received from

 4    the company?

 5        A.    Yes.

 6        Q.    And how much did this company quote you or

 7    the -- you and Mr. O'Brien for the remediation of the

 8    home?

 9        A.    $162,400.

10        Q.    And did you recall ever asking any other

11    companies for remediation quotes?

12        A.    I don't recall.

13        Q.    Okay, you can go ahead and set that document

14    aside.

15            MR. GUERRA:  Can we go off the record for just

16        one second?

17            (Discussion off the record.)

18            MR. GUERRA:  We can go back on the record.  I'd

19        like to note for the record that counsel for BNBM

20        have not received the document, I believe it's

21        Exhibit No. 9, but we talked to the plaintiffs'

22        attorney off record.

23            MR. ALBANIS:  That's correct.

24            ///
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2461 of 3246
Case 1:09-md-02047-MC Document 22121 Eutmitted Filed 05/Docket 05/06/19 Page 62 of
118

Confidential – Subject to Further Confidentiality Review

```
1    BY MS. HAQUE:

2        Q.   We're going to ahead and switch topics.

3    Ms. O'Brien, you're also claiming some damages related

4    to personal property; is that right?

5        A.   Yes.

6        Q.   And those include the AC repair receipts?

7        A.   Yes.

8        Q.   Do you recall the total cost that you're

9    claiming?

10       A.   Approximately $6,100.

11       Q.   Okay.  And you're also claiming damages related

12   to a mattress?

13       A.   Yes.

14       Q.   Do you recall how much you're claiming in

15   damages related to a mattress?

16       A.   I believe it's approximately $3,900.

17       Q.   I'm going to show you what has been --

18            (O'Brien Exhibit No. 10 was marked for

19   identification.)

20   BY MS. HAQUE:

21       Q.   I'm going to show you what's been premarked as

22   Exhibit 10, and I'll direct your attention to Question

23   No. 1 and your answer to No. 1.

24            Ms. O'Brien, what is this document?
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2462 of 3246
Case 1:09-cv-07791-CAS Document 7891-81 Confidential - Subject to Further Confidentiality Review
118
Confidential - Subject to Further Confidentiality Review

1    A.    This is the -- my answers to the

2    interrogatories.

3    Q.    And you provided these answers to your attorney

4    in order to fill out this document; is that correct?

5    A.    Provided the information.

6    Q.    Okay.  If you see in the middle of your answer

7    to Question No. 1, you're requesting damages of "damaged

8    personal property of $3,492.16 (mattress replacement)"?

9    A.    Yes.

10    Q.    Is that how -- is that the correct amount that

11    you're claiming, $3,492.16?

12    A.    Yes.

13    Q.    Do you have any receipts related to this

14    mattress replacement?

15    A.    I've given everything to my attorney.

16    Q.    Can you describe the reasons for purchasing a

17    new mattress?  Or let me strike that.

18        When was the mattress that you had in your home

19    first purchased?

20    A.    I don't recall when it was first purchased.

21    Q.    Why did you decide to buy a replacement?

22    A.    Because we weren't sure of the effects that

23    were done to the mattresses in the Wallcraft house and

24    we were moving to a different house, so we wanted a

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2463 of 3246
Case 1:09-md-02047-EEF-MBN Document 23363-39 Entered on FLSD Docket 05/19/2019 Page 464 of 118
Confidential - Subject to Further Confidentiality Review

1    new -- new mattresses for everyone.

2        Q.    How many mattresses total did you purchase?

3        A.    Three.

4        Q.    And were the mattresses for you, Mr. O'Brien,

5    and your two children?

6        A.    Yes.

7        Q.    Were any of the old mattresses under warranty?

8        A.    No.

9        Q.    Did you ever attempt to have the mattresses

10   aired out or repaired in any way?

11       A.    No.

12       Q.    Also, I just want to put on the record before

13   we move on, are you bringing any personal injury claims

14   related to Chinese drywall in this lawsuit?

15       A.    No.

16       Q.    You can go ahead and set that aside.

17       A.    Okay.

18       Q.    Ms. O'Brien, are you claiming loss of use and

19   enjoyment damages for the property at 3120 West

20   Wallcraft?

21       A.    Yes.

22       Q.    How much in damages are you claiming?

23       A.    Well, based on the calculations from the

24   Germano case, it would amount to about $250,000, but,

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2464 of 3246
Case 2:09-cv-02049-GAC Document 22101 Confidential Supplease 05/09/2019 Page 46 of
118
Confidential - Subject to further confidentiality Review

```
 1   you know, we can't put a price on loss of enjoyment

 2   or --

 3        Q.   How did you arrive at that amount?

 4        A.   The calculation from the Germano case was, I

 5   believe, $25,000 per person that owned the house for the

 6   number of years.

 7        Q.   And so you extrapolated out using that formula?

 8        A.   Yes.

 9        Q.   How has the presence of Chinese drywall limited

10   the use of the property?

11        A.   Well, we didn't know the effects of it.  There

12   was no mention of anything -- you know, no precedent,

13   so, you know, we didn't know.  We had two small kids

14   that were -- we didn't know what was going to happen to

15   them.  And we had a dog that died shortly after we moved

16   in as well, you know, looking back at it.

17             It was really what it was going to do to us,

18   you know, and not being able to entertain.  You know, it

19   was going to be our dream home, our final home.  All

20   that.

21        Q.   Do you want to take a moment?  Do you need,

22   maybe, to compose yourself?  Do you want to take a

23   break?

24        A.   Okay.
```

Case 2:09-md-02047-EEF-MBN Document 23263-39 Filed 11/19/19 Page 2465 of 3246
Case 1:09-md-02047-EEF-MBN Document 23263-39 Filed 11/19/19 Page 2465 of 3246
Confidential - Subject to further confidentiality Review
118

```
 1      Q.    Take all the time you need.  Are you okay to

 2   continue?

 3      A.    Yeah.

 4      Q.    Okay.  You started talking about this a little

 5   bit, but what were the things that you used to do in the

 6   home that you could no longer do because of the Chinese

 7   drywall?

 8      A.    Our kids couldn't have sleep-overs, birthday

 9   parties, family over, you know, entertain whatever we

10   want.  We had friends that were down the street.  You

11   know, being able to feel comfortable having anyone come

12   over.

13      Q.    When you first learned about the Chinese

14   drywall, and I think we said around August of 2009 --

15      A.    Yes.

16      Q.    -- when did you first start, basically,

17   changing the lifestyle, not having people over?

18      A.    You know, it was, I would say, after we'd done

19   some research and just the unknown of it, it was pretty

20   soon after, and trying to figure out how we were going

21   to deal with it ourselves.

22      Q.    That leads me to my next category of damages

23   and some questions related to it, which are alternative

24   living expenses.  Are you also claiming alternative
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2466 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 41 of 118
Confidential – Subject to Further Confidentiality Review

```
 1    living expenses damages in this case?

 2        A.   Yes.

 3        Q.   Did you -- how much in damages for alternative

 4    living expenses are you calculating?

 5        A.   $7,941.28.

 6        Q.   And how did you arrive at that amount?

 7        A.   That was our monthly mortgage payments while we

 8    owned the alternate living house.

 9        Q.   Do you recall the address of the alternate

10    living house?

11        A.   3503 West McElroy Avenue, Tampa 33611.

12        Q.   For the purposes of this deposition, I'll refer

13    to it as the McElroy home.  Is that okay?

14        A.   Yes.

15        Q.   When did you first decide that you wanted to

16    move out of the home at 3120 West Wallcraft and into the

17    McElroy house?

18        A.   I don't remember the exact date, but it was in

19    2010.

20        Q.   And how did you go about finding that property?

21        A.   We called a real estate agent and, you know,

22    looked ourselves online or had her provide us with

23    homes.

24        Q.   And when did you first move into this property?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2467 of 3246
Case 1:09-cv-07875-MCA Document 1 Confidential Subject to further Confidentiality Review
118

```
1       A.    January of 2011.

2       Q.    And how much did you pay for the property, the

3   McElroy home?

4       A.    Let me think.  Approximately $90,000.  I'm --

5       Q.    And --

6       A.    No, I'm sorry.

7       Q.    No, go ahead.

8       A.    I don't recall an exact figure.

9       Q.    Okay.  We'll look at some documents to

10  determine that, but how long did you live in the home at

11  3120 West Wallcraft from when you found out about

12  potential Chinese drywall until when you moved out?

13  What was that time period?

14      A.    Approximately a little over a year.

15      Q.    Did you try to --

16      A.    A year and a couple months.

17      Q.    Sorry.

18            Did you try to sell the home during that time

19  period at all?

20      A.    No.

21      Q.    And why not?

22      A.    Trying to figure out what we were going to do.

23      Q.    Did anyone ever tell you that you needed to

24  move out of the home at 3120 West Wallcraft?
```

Case 2:09-md-02047-EEF-MBN  Document 22362-39  Filed 11/19/19  Page 2468 of 3246
Case 1:11-cv-22408-MGC  Document 281  Entered on FLSD Docket 05/19/2017  Page 69 of
118
Confidential - Subject to Further Confidentiality Review

```
 1      A.   No.

 2      Q.   Did you attempt to ever remove any of the

 3 drywall from that home at 3120 West Wallcraft before you

 4 moved out?

 5      A.   No.

 6      Q.   Other than looking -- contacting the realtor

 7 and looking online, what other options did you evaluate

 8 during this one-year period?

 9           MR. ALBANIS:  Object to the form, but you can

10      answer if you can, Ms. O'Brien.

11           THE WITNESS:  I believe we looked for some

12      rental prices as well, you know, rental properties,

13      but decided to purchase a house.

14 BY MS. HAQUE:

15      Q.   Did you live with family or anyone else?

16      A.   No.

17           (O'Brien Exhibit No. 11 was marked for

18 identification.)

19 BY MS. HAQUE:

20      Q.   Okay.  I'm going to show you what has been

21 premarked as Exhibit No. 11.  What is this document?

22      A.   This is the note for the purchase of the

23 McElroy home.

24      Q.   Have you seen this document before?
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2469 of 3246
Case 1:11-cv-22408-MGC Document 299-281 Entered on FLSD Docket 05/09/2012 Page 70 of 118
Confidential - Subject to further confidentiality Review

```
1      A.   Yes.

2      Q.   And is your name on this document?

3      A.   Yes, it is.

4      Q.   Is that your signature on page 78 of the

5   document?

6      A.   Yes.

7      Q.   How much did you pay for the property at the

8   McElroy home?

9      A.   $87,200.

10      Q.   And what was your monthly -- and you said you

11   took out a mortgage on this property?

12      A.   Yes.

13      Q.   And what was the monthly payment on the

14   mortgage?

15      A.   $467.58.

16      Q.   Did you also pay -- continue to pay the

17   mortgage at the 3120 West Wallcraft house?

18      A.   Yes.

19      Q.   From when to -- when was the last time you

20   stopped paying the mortgage at the West Wallcraft house?

21      A.   When we closed on it and sold it.

22      Q.   And when was that?

23      A.   That was February of 2012.

24      Q.   Okay.  Now, you said earlier today that you're
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2470 of 3246
Case 1:09-cv-02047-EEF-MBN Document 2361 Confidential Subject to Packet 05/08/2470 Page 70 of
118
Confidential - Subject to Further Confidentiality Review

```
 1    claiming $7,941.28 in alternative living expenses.  How

 2    did you come up with that number?

 3        A.    That was determined by the amount of time we

 4    owned McElroy.

 5        Q.    And that was about 16 months?

 6        A.    Yes.

 7        Q.    And so that is 16 months times the $467.58 --

 8        A.    Yes.

 9        Q.    -- approximately?

10        A.    Yes.

11        Q.    And are you also factoring in moving expenses

12    into that figure?  And the reason I'm asking is because

13    if you multiply $467.58 times 16, you get $7,481.28.

14            (O'Brien Exhibit No. 12 was marked for

15    identification.)

16    BY MS. HAQUE:

17        Q.    And I will show you what has been -- I'll show

18    you what has been premarked Exhibit 12.

19        A.    Okay.

20        Q.    And I really want you to please take as much

21    time as you need to review that document, but I really

22    want to focus your attention to the very last page.  Or

23    the back of the last page, I should say.

24        A.    Okay.  Right.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2471 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2471 of 3246
Confidential - Subject to Further Confidentiality Review
118

```
 1      Q.   And what is that document?

 2      A.   That is the receipt for our move into the

 3   McElroy house from the Wallcraft house.

 4      Q.   And what is the total of the move?

 5      A.   $460.

 6      Q.   And is it fair to say if you add $460 to the

 7   mortgage payments times 16 you get $7,941.28?

 8      A.   Yes, I believe so.

 9      Q.   Okay.  So your alternative living expenses

10   damages, just for the record, it's 16 months plus moving

11   expenses?

12      A.   Yes.

13      Q.   Okay.  You can go ahead and set that document

14   aside.

15      A.   Okay.

16           MR. ALBANIS:  I like how you did that.  That

17      was good.

18           MS. HAQUE:  Good.

19   BY MS. HAQUE:

20      Q.   I don't mean to make you do all this math.

21      A.   I know.  I'm, like, if you say so.

22      Q.   All right.  When you purchased -- when you, I

23   guess, sold -- purchased the property back in 2004 and

24   built the home in 2006, do you know what the current
```

Confidential – Subject to Further Confidentiality Review

```
 1    home value was of the property at 3120 West Wallcraft?

 2         A.   No.  I'm not a real estate...

 3         Q.   Did you ever get an appraisal done?

 4         A.   Yes.

 5              (O'Brien Exhibit No. 13 was marked for

 6    identification.)

 7    BY MS. HAQUE:

 8         Q.   Okay.  I want to show you what has been

 9    premarked as Exhibit 13.  Do you recognize this

10    document?

11         A.   Yes.

12         Q.   Have you seen this document before?

13         A.   Yes.

14         Q.   What is this document?

15         A.   This is the appraisal for the home.

16         Q.   And this was the appraisal that you had back

17    when the home was first built in 2006?

18         A.   Before it was built, based on the plans.

19         Q.   Okay.  Just because I want to clear this up on

20    the record, if you look all -- it's kind of hard to see,

21    because the print is very small, but right maybe --

22         A.   Square footage?

23         Q.   Yeah, the square footage.

24         A.   I see it.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2473 of 3246
Case 1:09-md-02047-EEF-MBN Document 20681-1 Filed in Docket 05/12/2017 Page 491 of
118

```
 1      Q.   What is the square footage on this document?

 2      A.   On this document, it says it's 3,241.

 3      Q.   Is that accurate, to the best of your

 4  knowledge?

 5      A.   To the best of my knowledge.

 6      Q.   Okay.  What was the home appraised for back in

 7  2006?

 8      A.   I was looking for that.

 9      Q.   Look at the back of the second page.  Or the

10  back of the first page.

11      A.   Gotcha.

12      Q.   Right at the very bottom.

13      A.   635,000.

14      Q.   Is that accurate, to the best of your

15  knowledge?

16      A.   Yes.

17           (O'Brien Exhibit No. 14 was marked for

18  identification.)

19  BY MS. HAQUE:

20      Q.   Okay.  Now I'm going to show you what's been

21  premarked as Exhibit 14.  Do you recognize this

22  document?

23      A.   Yes.

24      Q.   What is this document?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2474 of 3246
Case 1:07-cv-02482-AS Document 1221 Confidential Subject to Further Confidentiality Review
118

Confidential - Subject to Further Confidentiality Review

```
 1      A.   These are the property taxes for the years on

 2  the Wallcraft house.

 3      Q.   Have you seen these documents before?

 4      A.   Yes.

 5      Q.   I want to direct your attention to the first

 6  page, which at the bottom it says OBrienDepo198.

 7      A.   Yes.

 8      Q.   These tax documents have an assessed home

 9  value?

10      A.   Yes.

11      Q.   What is the assessed home value for the year

12  2007?

13      A.   202,800.

14      Q.   Okay.  Let's flip to the next page.  What is

15  the date of this document?

16      A.   It's November 2008.

17      Q.   Okay.  And what is the assessed value?

18      A.   486,277.

19      Q.   Okay.  Let's go to the next page.  And this is

20  for the year 2009?

21      A.   Yes.

22      Q.   What is the assessed value?

23      A.   269,931.

24      Q.   Do you know why there was a difference, a drop,
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2475 of 3246
Case 1:09-cv-07628-LGS Document 231 Confidential Subject to Further Confidentiality Review
118

```
 1   between the year 2008 and 2009?

 2       A.    I believe they gave us a break for the Chinese

 3   drywall, or part of it, for that year.

 4       Q.    Did the county come to inspect your home at any

 5   point during these years?

 6       A.    Yes, I believe so.

 7       Q.    Do you recall when they came to inspect?

 8       A.    I don't recall.

 9       Q.    Do you know if you had the home appraised at

10   any point during this time?

11       A.    I don't recall that it was.

12       Q.    Okay.  Do you know if housing prices in the

13   area where you lived dropped during that time between

14   2008 and 2009?

15       A.    I'm not a realtor, but I don't know that they

16   did.

17       Q.    Okay.  Can you flip to the next page?  And this

18   is for the year 2010?

19       A.    Yes.

20       Q.    And what is the assessed value?

21       A.    98,800.

22       Q.    And what was the reason for the drop between

23   2009 and 2010, if you know?

24       A.    I'm not positive.  From what I recall, I
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/10 Page 2476 of 3246
Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/10 Page 2476 of 3246
Confidential - Subject to Further Confidentiality Review
118

 1    believe they -- they just taxed us on the land value.

 2        Q.   Okay.  And did you ever -- let's just finish

 3    this document.  Can you go to the next page?  And this

 4    is for the year 2011?

 5        A.   Yes.

 6        Q.   And what is the assessed value?

 7        A.   93,600.

 8        Q.   Okay.  Did you ever go to the county tax

 9    assessor and dispute their assessments or ask for a

10    difference in the taxes?

11        A.   No.

12        Q.   Okay.  And then you listed the home at 3120

13    West Wallcraft for sale after -- at some point in 2011?

14        A.   The end of 2011.

15        Q.   Did you ever attempt to lease the property

16    before then?

17        A.   No.

18        Q.   Or, I'm sorry, rent out the property?

19        A.   No.

20        Q.   Was this the first time you attempted to sell

21    the property?

22        A.   Yes.

23        Q.   Let's get out what will be premarked as

24    Exhibit 15.  And while we wait for that, you had no

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2477 of 3246
Case 1:11-cv-08307-AGD Document 200-101 Confidential - Subject to Docket 05/08/2019 Page 78 of
Confidential - Subject to Further Confidentiality Review
118

```
 1   other appraisals done after the initial appraisal in

 2   2006; correct?

 3        A.   Correct.

 4             (O'Brien Exhibit No. 15 was marked for

 5   identification.)

 6   BY MS. HAQUE:

 7        Q.   Do you recognize this document?

 8        A.   Yes.

 9        Q.   Have you seen this document before?

10        A.   Yes.

11        Q.   Is that your signature at the very bottom of

12   the document?

13        A.   Yes.

14        Q.   Okay.  And what is this document?

15        A.   This is the MLS listing for the Wallcraft

16   house.

17        Q.   And how much did you list it for?

18        A.   375,000.

19        Q.   Was this the original list price of the home?

20        A.   Yes.

21        Q.   And you listed it for sale as is?

22        A.   Yes.

23        Q.   And why did you do that?

24        A.   Because of the Chinese drywall.
```

1    Q.   Who was your real estate agent?

2    A.   Karen and Ashley Gajdosz.

3    Q.   And how did you decide what the original list

4  price would be?

5    A.   I don't recall how we came up with that number.

6    Q.   Did you engage in any other marketing tactics

7  in order to sell the home?

8        MR. ALBANIS:  Object to the form, but you can

9        answer if you know, Ms. O'Brien.

10        THE WITNESS:  No.

11  BY MS. HAQUE:

12    Q.   How long was the listing up before you sold the

13  home?

14    A.   List date 11/18/2011, so -- so we closed on it

15  three months later.

16    Q.   Do you remember how many people inquired about

17  the property?

18    A.   No, I don't recall.

19    Q.   Do you believe the property was competitively

20  priced?

21        MR. ALBANIS:  Object to the form, but you may

22        answer if you know, Ms. O'Brien.

23        THE WITNESS:  I do not know.

24        ///

Confidential - Subject to Further Confidentiality Review

```
 1    BY MS. HAQUE:

 2        Q.   Are you aware of any other property sales in

 3    the area for that price?

 4        A.   I was not aware of any.

 5        Q.   During this time, did you ever attempt to

 6    refinance the property at any other point?

 7        A.   No.

 8        Q.   Ms. O'Brien, was the sale of the home a short

 9    sale?

10        A.   I'm not sure if it was considered a short sale.

11        Q.   In your -- some of the documents that you

12    filled out for the attorneys, you were not -- you've

13    stated that you're not claiming that the home was a

14    short sale.

15        A.   Okay.  Sorry.  No.

16        Q.   So initially, I think when the lawsuit was

17    still formed, we have -- filed -- we have what will be

18    premarked Exhibit 16.

19        A.   Okay.

20             (O'Brien Exhibit No. 16 was marked for

21    identification.)

22    BY MS. HAQUE:

23        Q.   Do you recognize this document?

24        A.   I don't recall seeing it.
```

1      Q.   I will represent to you that this is a document

2   that we received from your attorney.

3      A.   Okay.

4      Q.   And it has his name -- signature -- electronic

5   signature --

6      A.   Okay.

7      Q.   -- on the very last page, page No. 8.

8      A.   Okay.

9      Q.   If you turn to page 3, it's also, in the bottom

10   corner, OBrienDepo6.

11      A.   Yes.

12      Q.   Under short sale, it's basically listed as a

13   short sale, but I just want to clear up for the record.

14   To your knowledge, to your belief as we sit here today,

15   you are no longer claiming that the house was sold on a

16   short sale?

17          MR. ALBANIS:  I'm going to object to the form

18      and state a further objection that this document is

19      the foreclosure and short sale claim form from the

20      Chinese Drywall Settlement Program, which was

21      submitted on behalf of Mr. and Mrs. O'Brien by my

22      office back in 2013.

23          All of the information that was provided on

24      this form came from my clients.  My clients provided

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2481 of 3246
Case 2:09-md-02047-EEF-MBN Document 22381-1 Filed in Supp. Docket 05/18/2019 Page 82 of
118
Confidential - Subject to Further Confidentiality Review

1    the information and we put this form together.  When

2    I say "we," I mean my firm put this form together.

3    My clients would -- there's a very real possibility,

4    in light of how the Chinese Drywall Settlement

5    Program was handled by BrownGreer, the settlement

6    administrator, that this is the first time that my

7    clients are seeing this document.

8         MS. HAQUE:  Okay.

9         MR. ALBANIS:  Because my firm put it together.

10   BY MS. HAQUE:

11   Q.   Mrs. O'Brien, just to make the record clear,

12   are you claiming any damages related to the short sale

13   of your home?

14   A.   I'm not sure if I understand what kind of

15   damages you mean by that.

16   Q.   Do you -- let me rephrase it.  Do you believe

17   that -- or is it your understanding that your home was

18   sold during the normal course of how a home should be

19   sold?

20        MR. ALBANIS:  Object to the form, but you may

21        answer if you know, Ms. O'Brien.

22        THE WITNESS:  I'm really not understanding your

23        question.

24        ///

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2482 of 3246
Case 1:09-md-02047-EEF-MBN Document 12345-3 Filed 11/19/19 Page 48 of 118
Confidential - Subject to further confidentiality Review

1    BY MS. HAQUE:

2        Q.   Let me ask it this way:  Did you ever receive

3    any type of foreclosure notice or notice from the bank

4    related to your home?

5        A.   No.

6        Q.   Did you ever fall behind on any mortgage

7    payments?

8        A.   No.

9        Q.   And did you ever pay any late mortgage

10   payments?

11       A.   No.

12       Q.   You can go ahead and set that document aside.

13       A.   Okay.

14       Q.   Ms. O'Brien, are you claiming any damages

15   related to lost equity in the home as a result of

16   Chinese drywall?

17       A.   Yes.

18            (O'Brien Exhibit No. 17 was marked for

19   identification.)

20   BY MS. HAQUE:

21       Q.   And this is -- we're showing you what has been

22   premarked Exhibit No. 17.  Do you recognize this

23   document?

24       A.   Yes.

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/10 Page 2483 of 3246 of
Case 1:1-09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/10 Page 2483 of 3246 of
118

Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Is that your signature on this document?

 2      A.   Yes.

 3      Q.   And have you seen this document before?

 4      A.   Yes.

 5      Q.   What is this document?

 6      A.   It's an affidavit by me saying that I believe

 7  we had a loss of equity due to the Chinese drywall.

 8      Q.   And you testified earlier today that you

 9  purchased the land for approximately $185,000?

10      A.   Yes.

11      Q.   You paid on top of that approximately $364,000

12  for the home?

13      A.   Yes.

14      Q.   So that's about $540,000 in total?

15      A.   Yes.

16      Q.   Okay.  And then how much did you sell the

17  Wallcraft home for?

18      A.   340,000.

19           (O'Brien Exhibit No. 18 was marked for

20  identification.)

21  BY MS. HAQUE:

22      Q.   I'll show you what has been premarked

23  Exhibit 18.  Do you recognize this document?

24      A.   Yes.
```

Confidential - Subject to further confidentiality Review

```
1      Q.   Have you seen this document before?

2      A.   Yes.

3      Q.   What is it?

4      A.   It's the closing settlement statement for our

5  sale of Wallcraft.

6      Q.   And what was the total price for which you sold

7  the home for?

8      A.   $340,000.

9      Q.   And you received how much in cash for the sale

10  of this document [sic]?

11      A.   Cash from buyer is $340,117.

12      Q.   Okay.  And then did some of that money go --

13      A.   Oh, cash to seller.

14      Q.   That's okay.  Let me ask it this way:  Did some

15  of the money for the sale go to pay off your first

16  mortgage?

17      A.   Yes.

18      Q.   And approximately how much was that?

19      A.   Approximately it was $143,416.78.

20      Q.   And so how much did you receive in cash?

21      A.   $176,652.34.

22      Q.   Who did you sell the 3120 West Wallcraft

23  property to?

24      A.   John Merrill Investments, Inc.
```

Confidential - Subject to Further Confidentiality Review

1    Q.    And do you know who John Merrill Investments,

2    Inc., is?

3    A.    Yes.

4    Q.    What is that company or entity?

5    A.    As far as I understood, it was a drywall

6    company.

7    Q.    Okay.  And by "drywall company," do you mean an

8    investment --

9    A.    Well, they're an investment company, from what

10   I understand.

11   Q.    And do they buy houses that have been affected

12   by Chinese drywall and flip them?

13   A.    I don't know.

14        MS. HAQUE:  Okay.  While we wait for that,

15        Pete, I have about maybe 20, 30 minutes more with

16        Ms. O'Brien, and then we can confer to see if these

17        guys have any questions.

18        Do you want me to go ahead and finish?  Do you

19        want to take a break and then finish?

20        THE WITNESS:  I'm good.

21        MS. HAQUE:  Okay.  Then we'll go ahead and try

22        to finish Ms. O'Brien and then we can take a break?

23        MR. ALBANIS:  Sounds good.

24        MS. HAQUE:  Great.

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2486 of 3246
Case 1:09-md-02047-EEF-MBN Document Confidential Subject to Docket 05/06/19 Page 87 of
118

Confidential - Subject to Further Confidentiality Review

1          MR. ALBANIS:  You should also put on the record

2     at some point the discussion that we had before the

3     deposition started.

4          MS. HAQUE:  I will do that at the very end, if

5     that works with you.

6          MR. ALBANIS:  Sounds good.  Thanks.

7  BY MS. HAQUE:

8     Q.   Actually, sorry about that.  So we -- it's

9  actually buried in another document, Exhibit 12.

10         And if you'd turn to what's been marked as

11  OBrienDepo152.  Do you recognize this document?

12    A.   Yes.

13    Q.   Have you seen this document before?

14    A.   Yes.

15    Q.   And does your name appear on this document?

16    A.   Yes.

17    Q.   And what is this document?

18    A.   This was the note where we purchased the

19  McElroy house.

20    Q.   Okay.  And did the lender release your mortgage

21  after you sold the home?

22    A.   Yes.

23    Q.   And is this document a release of that

24  mortgage?

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2487 of 3246
Case 1:09-cv-07402-AGC Document 2361-81 entered on FLSD Docket 05/02/2019 Page 88 of
118
Confidential - Subject to further confidentiality Review

```
1     A.    Oh, let me read it.

2           MR. ALBANIS:  Object to the form, but you may

3     answer if you know, Ms. O'Brien.

4           THE WITNESS:  Oh, 152.  I was looking at the

5     wrong page.  I'm sorry.

6  BY MS. HAQUE:

7     Q.    Sorry.

8     A.    I'm sorry.

9     Q.    Let me ask that again.

10    A.    Okay.

11    Q.    Have you seen this particular document before?

12    A.    Yes.

13    Q.    And do you recognize this document?

14    A.    Yes.

15    Q.    And does your name appear on this document?  In

16 bold right in the middle.

17    A.    Oh, thank you.  Yes, it does.

18    Q.    Okay.  Is this document a release of the

19 mortgage?

20    A.    Yes.

21    Q.    And this was after the -- this relates to the

22 McElroy home; correct?

23    A.    Correct.

24    Q.    How much total in equity damages are you
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2488 of 3246
Case 2:09-md-02047-EEF-MBN Document 22383-1 Filed 11/19/19 Page 2488 of 3246
Confidential - Subject to Further Confidentiality Review
118

```
 1    claiming as a loss as a result of the Chinese drywall?

 2         MR. ALBANIS:  Object to the form, but you may

 3         answer if you know, Ms. O'Brien.

 4         THE WITNESS:  Approximately $415,000, based on

 5         expert, but that would be based on expert testimony.

 6    BY MS. HAQUE:

 7         Q.   Okay.  And are you claiming diminution of value

 8    of the home?

 9         A.   Yes.

10         Q.   And how much in diminution of value are you

11    claiming?

12         A.   Approximately 295,000, based on, again, expert

13    testimony.

14         Q.   How did you arrive at that amount?

15         A.   I don't recall.

16         Q.   Did you speak with any -- did you speak with

17    someone other than your attorneys about coming up with

18    those two amounts?

19         A.   No.

20         Q.   Did you have the property appraised at the time

21    you sold it?

22         A.   No.

23         Q.   How did you determine, I guess, what the home

24    was worth when you sold it?  I think we saw in the
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2489 of 3246
Case 1:11-cv-22408-MGC Document 208-31 Entered on FLSD Docket 05/19/2013 Page 90 of
118
Confidential - Subject to Further Confidentiality Review

1    Exhibit 14, in the very last page, the assessed value in

2    2011 was $93,600?

3        A.   Yes.

4        Q.   And your last appraisal was back in 2006;

5    correct?

6        A.   Yes.

7        Q.   Did you have your property appraised at any

8    time between 2006 and 2011?

9        A.   No.

10        Q.   And was your property value at all affected by

11    the housing recession that hit Florida around that time

12    period, do you know?

13        A.   I would not know.  I'm not in the real estate

14    field.

15            (O'Brien Exhibit No. 19 was marked for

16    identification.)

17    BY MS. HAQUE:

18        Q.   Okay.  Let's show you what has been premarked,

19    I guess we're on Exhibit 19 now.

20        A.   Uh-huh.

21        Q.   Do you recognize this document?

22        A.   Yes.

23        Q.   Have you seen this document before?

24        A.   Yes.

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2490 of 3246
Case 1:09-md-02047-MCR Document 23381 Entered on FLSD Docket 05/19/2015 Page 91 of
118
Confidential - Subject to Further Confidentiality Review

```
 1      Q.   What is this document?

 2      A.   This lists houses that were sold in the same

 3  ZIP code as Wallcraft at around the time we were trying

 4  to sell our house.

 5      Q.   Who created this document?

 6      A.   I ran a report from the property appraiser

 7  website.

 8      Q.   When did you create this document?

 9      A.   I created this document -- let's see -- I

10  believe in November of 2018.

11      Q.   And this document -- sorry.  The way we've

12  printed it, it sort of runs on different pages --

13      A.   Right.

14      Q.   -- but it looks like you pulled a total of six

15  homes; is that right?

16      A.   Yes.

17      Q.   And how did you go about picking the homes to

18  include on this spreadsheet?

19      A.   I searched for homes that were for sale

20  between, I believe I selected November 2011 through

21  March 2012, with a similar square footage.

22      Q.   Okay.  And it looks like, if you look at

23  columns -- I guess we're in the double-letter columns.

24  These are on pages OBrienDepo326 and 327.
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2491 of 3246
Case 1:09-md-02047-MCA-L Document 22381 Confidential Subject to Filed 05/08/2019 Page 92 of
118
Confidential - Subject to further confidentiality Review

 1     A.   Right.

 2     Q.   Columns AB, the just value, range from, you

 3   know, around 500,000 to about $700,000; is that

 4   accurate?

 5     A.   Yes, through 722,000, yes.

 6     Q.   And if you turn to the page and you look at the

 7   assessed value, Column AC, these range from 116,000 to

 8   719,000?

 9     A.   Yes.

10     Q.   And that's the assessed value?

11     A.   Yes.

12     Q.   Okay.  And we looked at the -- back on

13   Exhibit 14 -- before you look at that, let me just ask

14   you:  For what years did you pull these home values?

15   Was this in 2011?

16     A.   I believe it was -- the report I ran was

17   between November 2011 and March 2012.

18     Q.   Okay.  And that's represented in Column -- it

19   looks like Column I, what the sale date is?

20     A.   Yes.  Yes.

21     Q.   And in Column J is the sale price?

22     A.   Yes.

23     Q.   And so these homes sold from between 530,000 to

24   about 690,000?

Confidential - Subject to further confidentiality Review

```
 1        A.    Yes.

 2        Q.    Okay.  And then if you'd look at the assessment

 3   form, I think that's Exhibit 14.

 4        A.    Yes.

 5        Q.    And then what is the assessed value of the home

 6   in 2011 of the Wallcraft home?

 7        A.    93,600.

 8        Q.    And all of these values were conducted by the

 9   Hillsborough County Tax Assessment Office?

10        A.    Property Appraiser website.

11        Q.    Property Appraiser website; is that correct?

12        A.    Yes.

13        Q.    Do you know if any of these homes contain

14   Chinese drywall?

15              MR. ALBANIS:  You're talking about Exhibit 19?

16              MS. HAQUE:  Exhibit 19, yes.

17              THE WITNESS:  I don't know.

18   BY MS. HAQUE:

19        Q.    Okay.  You also gave us a similar spreadsheet.

20   It's going to be Exhibit 20.

21        A.    20.

22              (O'Brien Exhibit No. 20 was marked for

23   identification.)

24              ///
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2493 of 3246
Case 1:1-md-02047-EEF-MBN Document 22362-39 Filed 05/09/19 Page 94 of 118
Confidential – Subject to Further Confidentiality Review

1    BY MS. HAQUE:

2        Q.    Did you also create this document?

3        A.    Yes.

4        Q.    And did you create it in the same way as

5    Exhibit 19?

6        A.    With one difference.

7        Q.    What's the difference?

8        A.    The ZIP code was a neighboring ZIP code and not

9    the same one as Wallcraft.

10       Q.    What is the ZIP code for Exhibit 20?

11       A.    This one -- let me see.  It is --

12       Q.    I believe it's --

13       A.    -- 33629.

14       Q.    Where is this located, this ZIP code?

15       A.    It's in south Tampa.

16       Q.    In proximity to the Wallcraft home?

17       A.    It's a little -- it's -- it contains an area --

18   well, I don't know where the exact cutoff is, but north

19   and west of this -- the other ZIP code, approximately.

20       Q.    Do you know approximately the mileage in

21   between the two ZIP codes?

22       A.    You could drive a mile or, you know, be in

23   different ZIP codes.  I mean --

24       Q.    Sure.  Could you turn with me to page

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2494 of 3246
Case 1:09-cv-02047-MGC Document 2 entered on FLSD Docket 05/19/2015 Page 95 of
118

Confidential - Subject to Further Confidentiality Review

1    OBrienDepo339?

2        A.    Okay.

3        Q.    If you look at Column AC, that's assessed

4    value?

5        A.    Yes.

6        Q.    Were these values also taken from the

7    Hillsborough Property Appraiser?

8        A.    I ran the report from the Property Appraiser

9    website.

10       Q.    So these were the -- what the -- basically,

11   what the tax assessor in Hillsborough County would have

12   inputted into the website?

13       A.    Yes.  Sure.

14       Q.    And these values range from approximately

15   476,000 to about $708,000?

16       A.    Yes.

17       Q.    And these assessments were conducted in 2011?

18       A.    Yes.  Same time period as the other report.

19       Q.    2011/2012?

20       A.    Yes.

21       Q.    Got it.  Why did you choose the 33629 ZIP code?

22       A.    Because it's a comparable area in south Tampa.

23       Q.    And by that, do you mean the types of homes

24   that were built, the neighborhood, demographics?

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/10 Page 2495 of 3246
Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 03/08/11 Page 96 of
Confidential - Subject to further confidentiality Review
118

1    A.    Yes, the neighborhood, the types of homes, yes.

2    Q.    Why do you believe that Chinese drywall was the

3    cause of the lost equity?

4    A.    I'm trying to think how to answer this

5    question.  Well, based on what similar houses were

6    selling for and what we could sell ours for without

7    remediation, that's why.

8    Q.    Did you consider paying the cost of remediation

9    and then selling the home for fair market value?

10        MR. ALBANIS:  Object to the form, but you may

11        answer if you can, Ms. O'Brien.

12        THE WITNESS:  It was a consideration.

13   BY MS. HAQUE:

14   Q.    And why did you decide not to go that route?

15        MR. ALBANIS:  Same objection.  That assumes

16        that the home would have fair market value if it

17        were remediated.

18        THE WITNESS:  We didn't feel that it would have

19        the same value anyway.

20        MS. HAQUE:  Okay.  Maybe about five more

21        minutes on me, and then I think I'll pass it on to

22        Dan or Josh, but let me -- we'll confer, but let me

23        just go ahead and go.

24        ///

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2496 of 3246
Case 1:09-md-02047-EEF-MBN Document 22362-39 Entered on FLSD Docket 05/09/2019 Page 97 of 118
Confidential - Subject to Further Confidentiality Review

1   BY MS. HAQUE:

2       Q.   All right, you can go ahead and set that

3   document aside.

4            Ms. O'Brien, have you received any payments

5   from anyone in relation to Chinese drywall?

6       A.   Yes.

7       Q.   What payments, and from whom?

8       A.   I don't know the -- what they were actually

9   for.  My attorney has that information.

10           (O'Brien Exhibit No. 21 was marked for

11   identification.)

12  BY MS. HAQUE:

13      Q.   Okay.  I'm going to show you what's been marked

14   as Exhibit No. 21.  Actually, let's -- now, earlier we

15   looked at Exhibit 2, and I want you to put the two side

16   by side.

17           I'm sorry.  Exhibit 1, I believe it was, maybe.

18   The Plaintiff Profile Form.  Yes.  And I'm showing you

19   what's been marked as Exhibit 21.

20      A.   Oh, okay.

21      Q.   Do you recognize this document?

22      A.   Yes.

23      Q.   Have you seen this document before?

24      A.   Yes.

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/10 Page 2497 of 3246
Case 1:09-md-02047-EEF-MBN Document 23362-39 Filed 05/18/2019 Page 98 of 118
Confidential - Subject to Further Confidentiality Review

```
 1      Q.    What is this document?

 2      A.    It's a Supplemental Plaintiff Profile Form.

 3      Q.    Did you ever sign this document?

 4      A.    I don't believe so.

 5      Q.    Did only Mr. O'Brien -- go ahead.

 6      A.    I don't recall.

 7      Q.    If you look at Exhibit No. 1, which was the

 8  first Plaintiff Profile Form, correct, it looks like you

 9  did -- if you'd turn to page 4.

10      A.    Yes.

11      Q.    Is this your signature on this document?

12      A.    Yes.

13      Q.    And you signed this document in 2010; correct?

14      A.    Yes.

15      Q.    Okay.  If you'd go back to Exhibit No. 21.

16      A.    Yes.

17      Q.    Although you did not sign this, it looks like

18  Mr. O'Brien signed this document; is that accurate?

19      A.    I don't see a signature.

20      Q.    On the back.

21      A.    Oh, I'm sorry.  Oh.  Yes.

22      Q.    And is it your understanding that all of the

23  information contained in this document is accurate?

24      A.    Yes.
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 2498 of 3246
Case 1:11-cv-22408-MGC Document 128-1 Entered on FLSD Docket 09/26/2013 Page 70 of
118
Confidential – Subject to Further Confidentiality Review

```
 1      Q.   Okay.  If you can turn to page 5 of this

 2   verified Supplemental Plaintiff Profile Form and go to

 3   the Section VI, prior payments.

 4      A.   Okay.

 5      Q.   Are these payments that you received in

 6   connection with Chinese drywall?

 7      A.   Yes.

 8      Q.   And you received these checks from the CDW

 9   Settlement Program of $30,287?

10      A.   Yes.

11      Q.   And you also received a payment from GBI,

12   holdback payment of $2,228.03?

13      A.   Yes.

14      Q.   What did you do with these payments?

15      A.   Deposited them.

16      Q.   Did they go towards the home at 3120 West

17   Wallcraft in any way?

18      A.   No.  We had sold the home.

19      Q.   Did they go towards covering any other damages

20   that you're claiming, alternative living expenses, for

21   example?

22           MR. ALBANIS:  Object to the form, but you can

23      answer if you know, Ms. O'Brien.

24           And I'll state further, because I'm looking at
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2499 of 3246
Case 1:18-cv-11926-NGG Document 22 filed on FLSD Docket 05/08/2019 Page 400 of 118
Confidential - Subject to further confidentiality Review

```
 1        this as you're asking these questions, Aliyya, it

 2        appears as though we submitted a First Amended

 3        Supplemental Plaintiff Form.  Mr. and Mrs. O'Brien

 4        received an additional holdback payment, it appears,

 5        after we submitted the original Supplemental

 6        Plaintiff Profile Form on their behalf, in February

 7        of 2018, and the additional holdback payment that

 8        they did receive appears to be approximately 800 or

 9        so dollars.

10   BY MS. HAQUE:

11        Q.   Ms. O'Brien, I'll ask you this:  Was that, to

12   your knowledge, the only change that you or Mr. O'Brien

13   ever made to these profile forms was that additional

14   payment that you received from the settlement program?

15        A.   Yes, I believe so.

16             MS. HAQUE:  Okay.  Just to make the record

17        clear, we can go ahead and make that Exhibit 22.

18             MR. ALBANIS:  Thanks.

19             (O'Brien Exhibit No. 22 was marked for

20        identification.)

21             MR. ALBANIS:  And to the extent that we need to

22        submit verification pages with signatures for either

23        Mr. O'Brien or Ms. O'Brien, we're happy to do so.

24             MS. HAQUE:  Understood.
```

Confidential - Subject to Further Confidentiality Review

1   BY MS. HAQUE:

2       Q.   Have you seen this document before, and do you

3   recognize it, Mrs. O'Brien?

4       A.   Some of the documents are looking similar.

5   I've reviewed so many that, you know, I think I have,

6   but I don't want to lie --

7       Q.   Sure.

8       A.   -- because they look similar.

9            MR. ALBANIS:  (Indicating.)

10  BY MS. HAQUE:

11      Q.   Let me ask you this:  Did you ever tell your

12  attorney to make any changes or say this information is

13  wrong at any point with respect to this document?

14           MR. ALBANIS:  Object to the form, but you may

15      answer.

16           THE WITNESS:  No, not that I recall.  He -- my

17      attorney handled it on my behalf.

18  BY MS. HAQUE:

19      Q.   Other than the additional payment, is it your

20  belief that everything in this document is true and

21  accurate to the best of your ability?

22      A.   I believe so.

23      Q.   Okay.  Have you ever read any orders or legal

24  documents from Judge Cooke in this litigation?

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2501 of 3246
Case 1:19-cv-01248-NGG Document 22363-29 Filed 11/19/19 Page 2501 of 3246
Confidential - Subject to Further Confidentiality Review
of 118

1    A.   I believe I've seen things in the past passed

2    on from my attorney.

3    Q.   Okay.  All right.  Just a few more questions

4    and I'll be done.

5    A.   Okay.

6    Q.   Are you and Mr. O'Brien the sole owners of all

7    the -- of all the -- for all the claimed damages related

8    to the home at 3120 West Wallcraft?

9    A.   Yes.

10   Q.   Did you ever assign out any of the damages

11   claims to the investment group that bought the home at

12   West Wallcraft?

13   A.   No.

14   Q.   And do you acknowledge that during the time

15   period from 2007 to 2012 that Florida went through a

16   housing recession and that certain housing prices fell?

17        MR. ALBANIS:  Object to the form, but you may

18        answer if you know.

19        THE WITNESS:  I'm not positive.

20   BY MS. HAQUE:

21   Q.   Have you heard of a housing recession hitting

22   South Florida in the Tampa area sometime between the

23   years of 2007 to 2012?

24   A.   I've heard of the recession.  I'm not clear on

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2502 of 3246
Case 2:14-cv-02494-NGG Document 289-11 Filed Under Seal 05/08/2017 Page 403 of 118
Confidential -- Subject to Further Confidentiality Review

1    which years they were exactly.

2        MS. HAQUE:  Okay.  And then I'm just going to

3    put on the record that your attorney, Mr. Pete

4    Albanis, disclosed the presence of additional

5    records that will need to be reviewed and then

6    produced to defendants, and because of that, we hold

7    and reserve all rights to reopening this deposition

8    upon review of those documents.

9        MR. ALBANIS:  And if I may add to that, the

10    documents that Ms. Haque is referring to are

11    e-mails, primarily from 2004 to 2007, regarding the

12    construction of the property on Wallcraft, as well

13    as some e-mails regarding the sale of the property

14    on Wallcraft and the purchase of the property on

15    McElroy.

16        The reason that we feel that we need -- we may

17    need to produce some of the documents is out of an

18    abundance of caution, because the defendants'

19    document requests were broad to the extent that they

20    ask for all documents related to the construction of

21    the property on Wallcraft.

22        But we will endeavor to review those e-mails

23    this week and to produce the responsive e-mails by

24    the end of this week, and if defendants would like

Case 2:09-md-02047-EEF-MBN Document 22363-20 Filed 11/19/19 Page 2503 of 3246
Case 1:19-mc-02408-WCG Document 2-2 Filed 06/18/2003 Page 104 of 118
Confidential -- Subject to Further Confidentiality Review

1      to redepose Mr. and Mrs. O'Brien to ask questions

2      about those specific e-mails, we will work out a

3      date to do so at a convenient time for all parties.

4          MS. HAQUE:  Mrs. O'Brien, those are all the

5      questions I have for you.

6          MR. VERRIER:  Can I add one comment?

7          MS. HAQUE:  Please.

8          MR. VERRIER:  Pete probably just forgot to say

9      it, but in terms of working out the date, obviously

10     we're constrained by Judge Cooke's rather

11     expeditious discovery schedule, and January 14, I

12     think, is the end of the fact depositions, and we

13     will -- or some of us will be in Tampa that day for

14     a deposition of a separate priority claimant, and I

15     believe that that date would be a good one to maybe

16     tack a little bit of time on if you need it, but

17     other days prior to that time may also work as well.

18     Whatever works best.

19         MS. HAQUE:  Thanks for that.  And we will work

20     with plaintiffs' counsel should the need for an

21     additional deposition arise.

22         MR. ALBANIS:  Thank you.

23         MS. HAQUE:  Thank you, Mrs. O'Brien.  Those are

24     all the questions that I have for you today.  I pass

Case 2:09-md-02047-EEF-MBN  Document 22363-29  Filed 11/19/19  Page 2504 of 3246
Case 1:13-cv-01458-NGG  Document 22021  Confidential - Subject to Further Confidentiality Review
Confidential - Subject to Further Confidentiality Review
of 118

1    the witness to my codefendants.

2         MR. GUERRA:  If we can go off record.

3         (Recess from 3:26 p.m. until 3:39 p.m.)

4         MS. HAQUE:  We can go back on the record.

5    BY MS. HAQUE:

6         Q.  Ms. O'Brien, just a few things to clarify for

7    the record before we wrap for the day with your

8    deposition.

9         A.  Okay.

10        Q.  Are you seeking any remediation damages in this

11   case?

12             MR. ALBANIS:  Object to the form, but you may

13        answer if you can, Ms. O'Brien.

14             THE WITNESS:  We -- that is -- yeah.  Well, I'm

15        trying to remember what we -- I know we're in the

16        nonremediation track, but I'm not sure how that will

17        be determined.

18   BY MS. HAQUE:

19        Q.  If you'd take a look at Exhibit 16.  Or 10.

20   I'm sorry.

21        A.  Exhibit 10?  Okay.

22             Oh.  Yes, we were seeking that based on what

23   will be determined by the jury.

24        Q.  Did you ever remediate the home at 3120 West

1    Wallcraft?

2        A.    No.

3        Q.    What is the basis for seeking remediation

4    damages?

5            MR. ALBANIS:  Object to the form, but you may

6        answer if you can, Ms. O'Brien.

7            THE WITNESS:  I -- I can't answer that.

8    BY MS. HAQUE:

9        Q.    And can you flip to the back of that page?

10       A.    Okay.

11       Q.    And this is your signed verification of this

12   document; correct?

13       A.    Yes.

14           MS. HAQUE:  Okay.  Pete, just to put on the

15       record, just in case any of the interrogatories or

16       requests for production don't have verifications,

17       could you also please provide verification pages for

18       those?

19           MR. ALBANIS:  Yes, with respect to the

20       interrogatories.  I don't believe that the responses

21       to the document requests require verification.

22           MS. HAQUE:  Thank you.

23           MR. ALBANIS:  Sure.

24           ///

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/10/19 Page 2506 of 3246
Case 1:18-cv-12408-NGG Document 20921-1 Confidential Filed 05/08/2020 Page 107 of 118
Confidential - Subject to Further Confidentiality Review

1  BY MS. HAQUE:

2      Q.   Ms. O'Brien, could you put that document aside

3  and flip to Exhibit 21?

4      A.   Okay.

5      Q.   Could you go to Section III for me?  It's on

6  page 3.

7      A.   Okay.

8      Q.   If you go to the second question, could you

9  read that out, please?

10     A.   "If yes, do you have any additional evidence of

11 Chinese drywall in the property that you have not

12 provided to the Plaintiffs' Steering Committee?"

13     Q.   And you've checked "yes"?

14     A.   Yes.

15     Q.   This document was verified by Mr. O'Brien on

16 February 2018?

17     A.   Yes.

18     Q.   To your knowledge, are there any additional

19 pieces, just to make the record clear?

20     A.   Not at this time.

21     Q.   Okay.  So you have no other documents or --

22 other than the e-mails that your attorney discussed on

23 the record?

24     A.   No.  My attorney has everything.

```
 1        Q.   All right.  Can we turn back to Exhibit 14?

 2   And if you flip to the last page, and then -- I'm sorry.

 3   The 2009 assessment, which is, I believe --

 4        A.   Okay, yeah, uh-huh.

 5        Q.   It looks like the assessment was due -- or was

 6   issued on November 30, 2009; is that correct?

 7        A.   Yes.

 8        Q.   And do you recall when information for the tax

 9   assessment has to be turned in?  It had to be sometime

10   prior to November of 2009; correct?

11        A.   Yes.

12        Q.   So the -- and you found out about the Chinese

13   drywall between August and November, sometime around

14   there, of 2009?

15        A.   Yes.

16        Q.   So then was this specific change in assessment

17   price, is it fair to say that this specific change in

18   assessment price could not have been due to Chinese

19   drywall because it was around the time that you -- it

20   was before you had found out or around the time that you

21   found out?

22             MR. ALBANIS:  Object to the form.  Ms. O'Brien

23        is not a tax professional nor an expert regarding

24        Hillsborough County property values.
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2508 of 3246
Case 1:18-cv-02408-WFK-RML Document 200-11 entered on FLSD Docket 05/08/2008 Page 109 of 118
Confidential - Subject to Further Confidentiality Review

 1          Having said all that, you may answer if you

 2     can, Ms. O'Brien.

 3          THE WITNESS:  Yes, I'm not -- yeah, I can't

 4     claim how the property appraisers came up with their

 5     value.

 6   BY MS. HAQUE:

 7     Q.   But it's fair to say that you found out about

 8   Chinese drywall between August/September of 2009?

 9     A.   Yes.

10     Q.   Okay.  You can go ahead and set that document

11   aside.

12          Just a few more questions.  What did the

13   McElroy home sell for, do you recall?

14     A.   Approximately 130,000 --

15     Q.   Do you have --

16     A.   -- I believe.

17     Q.   I'm sorry.  Go ahead.

18     A.   No.

19     Q.   Do you have a document with that information on

20   it?  I don't think we have the sale, what that sale

21   price is.

22     A.   I believe Pete has all the documents in regard

23   to that.

24     Q.   Okay.  We'll follow up with your attorney

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2509 of 3246
Case 1:14-cv-02494-NGG Confidential - Subject to Further Confidentiality Review
of 118

1    regarding that, but you think approximately 130,000?

2        A.   I believe so, yes.

3        Q.   And you bought the house in --

4        A.   Or wait.  I don't know.  You know what?  I

5    don't recall for sure.

6        Q.   Okay.

7        A.   Okay?

8        Q.   Do you think Mr. O'Brien would know?

9        A.   He might remember that, yes.

10       Q.   Okay.  I will ask him then.

11       A.   Because some other number popped in my head and

12   I'm not -- now I'm not -- I don't want to say something

13   I'm not positive about.

14       Q.   Sure.  Absolutely.

15           (O'Brien Exhibit No. 23 was marked for

16   identification.)

17   BY MS. HAQUE:

18       Q.   Let me show you what has been premarked

19   Exhibit 23.

20       A.   Okay.

21       Q.   Do you recognize this document?

22       A.   Yes.

23       Q.   Have you seen this document before?

24       A.   Yes.

1    Q.   Is that your signature on this document?

2    A.   Yes.

3    Q.   And what is this document?

4    A.   This is to fully disclose that the Wallcraft

5    house had Chinese drywall and that they're not going to

6    come back at us for anything because of it and that they

7    were going to work with us in -- if we wanted samples

8    and --

9    Q.   Okay.  You sold -- you listed the house back in

10   November of 2011; is that accurate?

11   A.   Yes.

12   Q.   And so you went into escrow about a month later

13   or so, you basically issued this document?

14   A.   Yes.

15   Q.   And you initially listed the house for

16   approximately $375,000; is that correct?

17   A.   Yes.

18   Q.   What was the reason for the drop from $375,000

19   to $340,000 within a month or so?

20   A.   I believe that was the offer that -- that that

21   was the negotiated price between us and the buyer.

22   Q.   So the investment group --

23   A.   The investment group, yes.

24   Q.   -- offered the 340?

```
 1        A.   I don't recall what their original offer was,

 2   but we negotiated to 340 in the end.

 3        Q.   So you did not of your own accord drop the

 4   price?

 5        A.   No.

 6        Q.   In terms of setting the 375,000, was that

 7   something you had discussed with the realtors, do you

 8   recall?

 9        A.   Of course.

10        Q.   And did they give you any recommendations about

11   the price listing amount?

12        A.   We discussed it between us what we thought we

13   might be able to sell it for based on other things,

14   but --

15        Q.   Did any of these conversations discuss market

16   conditions or the market housing condition in South

17   Florida?  Is this South Florida?  Mid Florida?

18        A.   West Central Florida.

19        Q.   Central Florida?

20        A.   No, not that I recall.

21        Q.   Okay.

22        A.   You know, we relied on her as a real estate

23   person.

24        Q.   But the initial offering of 375,000, was that
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2512 of 3246
Case 1:18-cv-12408-NGG Document 99-21 entered on FLSD Docket 05/07/2012 Page 513 of 118
Confidential - Subject to Further Confidentiality Review

```
 1    something that you and Mr. O'Brien came up with?

 2        A.   In talking to the realtor, we all came up with

 3    that.

 4        Q.   Okay.  You can go ahead and set that document

 5    aside.

 6             Ms. O'Brien, when did you initially -- when was

 7    the paperwork for your divorce initially filed?

 8        A.   I don't recall the date it was filed.

 9        Q.   Do you recall when it was finalized?

10        A.   I believe it was around the end of 2012.

11             MS. HAQUE:  Okay.  Those are all the questions

12        I have for you this afternoon.  Thank you.

13             THE WITNESS:  Okay.

14             MS. HAQUE:  Can we take a five-minute?

15             Go ahead.

16             MR. ALBANIS:  We don't have any questions.  We

17        reserve signature.

18             MS. HAQUE:  Thank you.

19             (Whereupon, the deposition concluded at

20    3:51 p.m.)

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2513 of 3246
Case 1:19-cv-02488-NGG Document 20-21 Confidential Filed 05/08/2013 Page 414 of 118
Confidential - Subject to further confidentiality Review

```
 1                    C E R T I F I C A T E

 2

 3            I, JOAN L. PITT, Registered Merit Reporter,

 4      Certified Realtime Reporter, and Florida Professional

 5      Reporter, do hereby certify that, pursuant to notice,

 6      the deposition of LORI O'BRIEN was duly taken on

 7      December 17, 2018, at 1:05 p.m., before me.

 8            The said LORI O'BRIEN was duly sworn by me

 9      according to law to tell the truth, the whole truth, and

10      nothing but the truth, and thereupon did testify as set

11      forth in the above transcript of testimony.  The

12      testimony was taken down stenographically by me.  I do

13      further certify that the above deposition is full,

14      complete, and a true record of all the testimony given

15      by the said witness.

16

17            _____

18            JOAN L. PITT, RMR, CRR, FPR

19

20            (The foregoing certification of this transcript

21      does not apply to any reproduction of the same by any

22      means, unless under the direct control and/or

23      supervision of the certifying reporter.)

24
```

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4           Please read your deposition over carefully and

 5    make any necessary corrections.  You should state the

 6    reason in the appropriate space on the errata sheet for

 7    any corrections that are made.

 8

 9           After doing so, please sign the errata sheet

10    and date it.  It will be attached to your deposition.

11

12           It is imperative that you return the original

13    errata sheet to the deposing attorney within thirty (30)

14    days of receipt of the deposition transcript by you.  If

15    you fail to do so, the deposition transcript may be

16    deemed to be accurate and may be used in court.

17

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2515 of 3246
Case 1:14-cv-24000-NGG Document 2021 Entered on FLSD Docket 05/08/2015 Page 116 of 118
Confidential - Subject to Further Confidentiality Review

```
 1                    - - - - - -

 2                   E R R A T A

 3                    - - - - - -

 4   PAGE   LINE   CHANGE

 5   ____   ____   _____

 6     REASON: _____

 7   ____   ____   _____

 8     REASON: _____

 9   ____   ____   _____

10     REASON: _____

11   ____   ____   _____

12     REASON: _____

13   ____   ____   _____

14     REASON: _____

15   ____   ____   _____

16     REASON: _____

17   ____   ____   _____

18     REASON: _____

19   ____   ____   _____

20     REASON: _____

21   ____   ____   _____

22     REASON: _____

23   ____   ____   _____

24     REASON: _____
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2516 of 3246
Case 1:19-cv-04340-NGG Document 22-21 Filed under Seal 05/08/2020 Page 117 of 118
Confidential - Subject to further confidentiality Review

```
 1                    ACKNOWLEDGMENT OF DEPONENT

 2

 3           I, _____, do hereby

 4    acknowledge that I have read the foregoing pages,

 5    1 - 117, and that the same is a correct transcription of

 6    the answers given by me to the questions therein

 7    propounded, except for the corrections or changes in

 8    form or substance, if any, noted in the attached Errata

 9    Sheet.

10

11

12    _____   _____

13    LORI O'BRIEN                       DATE

14

15

16

17

18    Subscribed and sworn to before me this

19    _____ day of _____, 20____.

20    My Commission expires: _____

21

22    _____

      Notary Public

23

24
```

```
 1                    LAWYER'S NOTES

 2     PAGE    LINE

 3     _____   _____   _____

 4     _____   _____   _____

 5     _____   _____   _____

 6     _____   _____   _____

 7     _____   _____   _____

 8     _____   _____   _____

 9     _____   _____   _____

10     _____   _____   _____

11     _____   _____   _____

12     _____   _____   _____

13     _____   _____   _____

14     _____   _____   _____

15     _____   _____   _____

16     _____   _____   _____

17     _____   _____   _____

18     _____   _____   _____

19     _____   _____   _____

20     _____   _____   _____

21     _____   _____   _____

22     _____   _____   _____

23     _____   _____   _____

24     _____   _____   _____
```

# EXHIBIT A29

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2519 of 3246
Case 1:11-cv-22408-MGC Document 289-1 Entered on FLSD Docket 05/03/2013 Page 2 of
108
Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2               Case No. 1:11-CV-22408-MGC
 3    -------------------------------§
      EDUARDO AND CARMEN AMORIN et    §
 4    al., individually, and on behalf §
      of all others similarly         §
 5    situated,                       §
                                      §
 6        Plaintiffs,                 §
                                      §
 7    vs.                             §
                                      §
 8    TAISHAN GYPSUM CO., LTD. F/K/A   §
      SHANDONG THAIHE DONGXIN CO.,     §
 9    LTD.; TAIAN TAISHAN PLASTERBOARD §
      CO., LTD., et al,               §
10                                    §
          Defendants.                 §
11    ------------------------------- §
       - - -
12
                                - - -
13
                    WEDNESDAY, DECEMBER 19, 2018
14
                                - - -
15
                Confidential - Subject to Further
16                   Confidentiality Review
17                        - - -
18         Deposition of KEVIN ROSEN, held at JG Firm,
      1855 Griffin Road, Suite C-470, Dania, Florida,
19    commencing at 1:08 p.m., on the above date,
      before Kelly J. Lawton, Registered Professional
20    Reporter, Licensed Court Reporter, and Certified
      Court Reporter.
21
                                - - -
22
                   GOLKOW LITIGATION SERVICES
23         877.370.3377 ph | 917.591.5672 fax
                      deps@golkow.com
24
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2520 of 3246
Case 1:15-cv-04923-NGG Document 209-21 Entered on FLSD Docket 05/08/2020 Page 9 of
108
Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2         COLSON, HICKS, EIDSON
           BY:  PATRICK S. MONTOYA, ESQUIRE
 3         BY:  NATALIE M. RICO, ESQUIRE
           255 Alhambra Circle, Penthouse
 4         Coral Gables, Florida
           (305) 476-7400
 5         patrick@colson.com
           natalie@colson.com
 6         Representing Plaintiff
 7
           LEVIN, SEDRAN & BERMAN, LLP
 8         BY:  KEITH J. VERRIER, ESQUIRE
           510 Walnut Street, Suite 500
 9         Philadelphia, Pennsylvania 19106
           (215) 592-1500
10         kverrier@lfsblaw.com
           Representing Plaintiff
11
12         ALSTON & BIRD, LLP
           BY:  MICHAEL J. BARRY, ESQUIRE
13         BY:  SARAH O'DONOHUE, ESQUIRE
           BY:  ASHTON G. CARPENTER, ESQUIRE
14         One Atlantic Center
           1201 West Peachtree Street
15         Atlanta, Georgia 30309
           (404) 881-7000
16         mike.barry@alston.com
           sarah.odonohue@alston.com
17         ashton.carpenter@alston.com
           Representing Taishan Gypsum Co., Ltd. and Tai'an
18         Taishan Plasterboard, Co., Ltd.
19
           ORRICK, HERRINGTON & SUTCLIFFE, LLP
20         BY:  DAN GUERRA, ESQUIRE
           The Orrick Building
21         405 Howard Street
           San Francisco, California 94105
22         (415) 773-5545
           dguerra@orrick.com
23         Representing BNBM PLC
24
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2521 of 3246
Case 1:18-cv-02408-WFK Document 200-1 Entered on FLSD Docket 05/08/2021 Page 49 of
108

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:

 2       ABALLI MILNE KALIL, P.A.

         BY:  JOSHUA D. POYER, ESQUIRE

 3       2250 SunTrust International Center

         One Southeast Third Avenue

 4       Miami, Florida 33131

         (305) 373-6600

 5       jpoyer@alalli.com

         Representing BNBM PLC

 6

 7    ALSO PRESENT:

 8       Stacey Rosen

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2522 of 3246
Case 1:14-cv-12408-NGE-T Document 20092-1 Entered on FLSD Docket 05/04/2021 Page 9 of
108
Confidential - Subject to Further Confidentiality Review

```
 1                    - - -
                   I N D E X
 2                    - - -
 3   Testimony of:  KEVIN ROSEN
 4       DIRECT EXAMINATION BY MR. BARRY................  6
 5       CROSS-EXAMINATION BY MR. POYER.................  99
 6
 7
 8              E X H I B I T S
 9            (Attached to transcript)
10   DEFENDANTS'                                    PAGE
11       Exhibit 1   Mortgage - Bates Numbered         15
                     KROSEN-000061 to KROSEN-000134
12
         Exhibit 2   The Oaks at Boca Raton Agreement   15
13                   for Purchase and Sale - Bates
                     Numbered KROSEN-000005 to
14                   KROSEN-000054
15       Exhibit 3   Claimant Kevin Rosen's Answers to  20
                     Defendants Taishan Gypsum Company,
16                   Ltd., Tai'an Taishan Plasterboard
                     Company, Ltd.'s and BNBM PLC's
17                   Interrogatories
18       Exhibit 4   Uniform Residential Appraisal      26
                     Report
19
         Exhibit 5   Residential Full Report - Bates    27
20                   Numbered KROSEN-000055 to
                     KROSEN-000058
21
         Exhibit 6   Declaration of Correctness of      29
22                   Square Footage on Chinese Drywall
                     Client(s) Property for Remediation
23                   Damages
24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2523 of 3246
Case 1:18-cv-02408-NGG Document 99-21 *Confidential* Entered 05/08/2023 Page 46 of
Confidential - Subject to Further Confidentiality Review
108

```
 1                          E X H I B I T S

 2     DEFENDANTS'                                           PAGE

 3     Exhibit 7      Inspection Report - Product ID          36
                      09/15/2009 - Bates Numbered
 4                    KROSEN-000566 to KROSEN-000568

 5     Exhibit 8      Supplemental Plaintiff Profile Form     44

 6     Exhibit 9      June 24, 2009 Letter from Vincent       54
                      Altino and Lease Agreement - Bates
 7                    Numbered KROSEN-000135 to
                      KROSEN-000144

 8
       Exhibit 10     Out-of-Pocket Expenses - Bates          55
 9                    Numbered KROSEN-000145 to
                      KROSEN-000393

10
       Exhibit 11     Claimant Affidavit of Chinese           61
11                    Drywall Economic Damages

12     Exhibit 12     (Inadvertently not marked - no
                      exhibit)

13
       Exhibit 13     August 15, 2018 Chinese Drywall         73
14                    Settlement Program Check Copy

15     Exhibit 14     US Individual Income Tax Return         74
                      2009 - Bates Numbered KROSEN-000500
16                    to KROSEN-000565

17     Exhibit 15     Warranty Deed - Bates Numbered          82
                      KROSEN-000001 to KROSEN-000004

18
       Exhibit 16     December 23, 2009 Agreement Between     84
19                    Florida Campbell Real Estate
                      Holdings, Inc., and Kevin and
20                    Stacey Rosen - Bates Numbered
                      KROSEN-0000978

21
       Exhibit 17     August 2, 2016 Chinese Drywall        100
22                    Settlement Program Check Copy

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-20 Filed 11/19/19 Page 2524 of 3246
Case 1:19-cv-12408-NGEI Document 99-1 Entered on FSD Docket 05/08/2021 Page 41 of
108

Confidential - Subject to Further Confidentiality Review

```
 1                        - - -

 2             THE COURT REPORTER:  Sir, would you please

 3        raise your right hand.

 4             Do you swear or affirm that the testimony

 5        you're about to give will be the truth, the whole

 6        truth, and nothing but the truth?

 7             THE WITNESS:  I do.

 8             KEVIN ROSEN, called as a witness by the

 9   Defendants, having been first duly sworn, testified

10   as follows:

11                   DIRECT EXAMINATION

12   BY MR. BARRY:

13        Q.   Mr. Rosen, we met just a minute ago.  My name

14   is Mike Barry, and I represent Taishan, along with my

15   colleagues, Ashton Carpenter and Sarah O'Donohue.

16             MR. BARRY:  We might as well as go around the

17        room and make the introductions.

18             MR. POYER:  Joshua Poyer of Aballi, Milne,

19        Kalil on behalf of Beijing New Building

20        Materials, PLC.

21             MR. GUERRA:  Dan Guerra from Orrick,

22        Herrington & Sutcliffe, also for BNBM, PLC.

23             MR. VERRIER:  Keith Verrier from Levin,

24        Sedran & Berman in Philadelphia here on behalf of
```

Confidential - Subject to Further Confidentiality Review

```
 1        the plaintiffs.

 2              MR. MONTOYA:  And Patrick Montoya and

 3        Natalie Rico on behalf of Kevin and Stacey Rosen.

 4              MR. POYER:  And also in the room is

 5        Stacey Rosen.

 6     BY MR. BARRY:

 7        Q.   Mr. Rosen, I know that you're an attorney, so

 8     a lot of this spiel will be stuff that you heard more

 9     than you've probably wanted to hear in your life, and

10     I'm sure you're hoping that you were never having to

11     hear it on this side.  But I appreciate you taking

12     the time and energy to be with us today and spending

13     time speaking with us.

14              Have you ever sat for a deposition before?

15        A.   Yes, I have.

16        Q.   Okay.  How many times have you sat for a

17     deposition?

18        A.   Once or twice in my life.

19        Q.   Do you remember when that was?

20        A.   15 years ago.

21        Q.   15 years ago?

22              And do you remember what the nature of that

23     deposition was?

24        A.   Yes.  I was a witness in a civil action that
```

Confidential - Subject to Further Confidentiality Review

```
 1    was filed against Stacey's father.

 2         Q.   Okay.  Would there -- would you have a record

 3    of that transcript in your possession?

 4         A.   No, I don't.

 5         Q.   After this, on a break, would you be able to

 6    tell us the name of that case?

 7         A.   I don't know the name of the plaintiff.

 8         Q.   After this, would you be able to find it out?

 9         A.   Possibly.

10         Q.   Okay.  And have you ever taken a deposition?

11         A.   Yes, I have.

12         Q.   And have you ever defended a deposition?

13         A.   Yes.

14         Q.   So you are well-familiar with all the rules

15    of the road I'm about to go through.

16         A.   I believe so.

17         Q.   So obviously, when we're -- I'm asking a

18    question and when you are answering, we'll try not to

19    speak over each other.  Everything needs to be a

20    verbal "yes" or "no."  And if there's ever anything

21    that you're unsure of, because I will ask some very

22    unclear questions, please feel free to ask me to

23    rephrase it or stop.  I'm sure Mr. Montoya will jump

24    in well before you do.  But please feel free to ask
```

Confidential – Subject to Further Confidentiality Review

```
 1    me to rephrase.

 2            And if you ever need a break, just let me

 3    know.

 4            So do you understand that you have been sworn

 5    in to tell the truth as if you are testifying in

 6    court?

 7       A.   Yes.

 8       Q.   Are you taking any medications that will

 9    impair your ability to understand my questions --

10       A.   No.

11       Q.   -- and answer them truthfully?

12            How did you prepare for this deposition?

13       A.   I met with my attorneys.  I reviewed

14    documents.

15       Q.   When did you meet with your attorneys?

16       A.   A few days ago.

17       Q.   And I'm not asking for the content of those

18    conversations, of course.

19            How many times did you meet with your

20    attorneys?

21       A.   In preparation for today?

22       Q.   Yes.

23       A.   We had two meetings.

24       Q.   Okay.  And how long did those meetings last?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2528 of 3246
Case 1:1-cv-22408-MGC Document 23 Entered on FLSD Docket 05/19/2011 Page 41 of
108

Confidential - Subject to Further Confidentiality Review

```
 1        A.    Approximately an hour.

 2        Q.    Each meeting?

 3        A.    The first meeting was approximately an hour;

 4   the second was maybe 90 minutes.

 5        Q.    Okay.  Was it just you and your lawyers at

 6   the meeting, or was anyone else in attendance?

 7        A.    My wife was there.

 8        Q.    Did you have -- was your wife at both

 9   meetings?

10        A.    Yes.

11        Q.    Did you speak with anyone else about this

12   deposition?

13        A.    No.

14        Q.    Did you speak with any friends about it?

15        A.    No.

16        Q.    Did you speak with any other family members?

17        A.    Not about the deposition, no.

18        Q.    Did you speak about the deposition with any

19   of your colleagues?

20        A.    No.

21        Q.    Okay.  When you were meeting with your

22   attorneys or before this deposition at all, did you

23   review any documents?

24        A.    Yes, I did.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2529 of 3246
Case 1:11-cv-22408-FAM Document 12 Entered on FLSD Docket 05/18/2012 Page 42 of 108
Confidential – Subject to Further Confidentiality Review

```
 1        Q.    What documents did you review?

 2        A.    I saw photos of my house.  I reviewed my

 3    purchase and sale contract.  I saw receipts in

 4    connection with the expenses we incurred relocating,

 5    documents related to the construction of the house.

 6    That's what I recall.

 7        Q.    And have all those documents been produced in

 8    this litigation, to your knowledge, other than, of

 9    course, the ones that just were produced today?

10        A.    Yes.

11        Q.    Mr. Rosen, where you currently employed?

12        A.    Shutts & Bowen.

13        Q.    And what is Shutts & Bowen?

14        A.    A law firm.

15        Q.    And are you a lawyer?

16        A.    I am.

17        Q.    How long have you worked at Shutts & Bowen?

18        A.    Two years.

19        Q.    Okay.  And what is your current job title?

20        A.    Partner.

21        Q.    And where were you before Shutts & Bowen?

22        A.    I was with FINRA, the Financial Industry

23    Regulatory Authority.

24        Q.    And what was your role at FINRA?
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2530 of 3246
Case 1:09-cv-02047-CGA-MBN Document 22362-39 Filed 05/19/2019 Page 43 of 108
Confidential – Subject to further confidentiality Review

```
1        A.    I was a senior enforcement lawyer.

2        Q.    And how long were you at FINRA?

3        A.    16 and a half years.

4        Q.    Okay.  And so during the time when you owned

5    the house in question, you were working at FINRA?

6        A.    Yes, I was.

7        Q.    Okay.  Are you married?

8        A.    Yes, I am.

9        Q.    And who are you married to?

10       A.    My lovely wife, Stacey.

11       Q.    And how long have you and Stacey been

12   married?

13       A.    2001.

14       Q.    Congratulations.

15             Do you have any children?

16       A.    Yes, I do.

17       Q.    And how many children do you have?

18       A.    Two.

19       Q.    Two?

20             How old are they?

21       A.    13 and 11.

22       Q.    Okay.  Are they your and Stacey's children,

23   or are they children from a prior marriage?

24       A.    They're ours.
```

Confidential - Subject to Further Confidentiality Review

```
 1       Q.    And were you married before marrying Stacey?

 2       A.    No.

 3       Q.    Have you ever been involved in a lawsuit

 4    before this one, other than as an attorney

 5    representing a client?  Have you ever been personally

 6    involved in a lawsuit?

 7       A.    No.

 8       Q.    So you have never been a plaintiff or a

 9    defendant in a lawsuit?

10       A.    Not that I recall.

11       Q.    So I take it that you've never been a

12    class-action plaintiff before?

13       A.    Over the years I've received numerous --

14       Q.    Excluding being part of a class.

15       A.    Right.  I'll just finish my answer.

16       Q.    Yes.  I apologize.

17       A.    Over the years I have received notices in the

18    mail regarding class-action lawsuits that I didn't

19    have any personal involvement with.

20       Q.    But you've never been a named plaintiff in a

21    class-action?

22       A.    No.

23       Q.    So what is the address of the property that

24    you allege has been damaged by Chinese drywall?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2532 of 3246
Case 1:09-cv-02042-GEL Document 228-21 Confidential Subject to further confidentiality Review Page 45 of
Confidential - Subject to further confidentiality Review
108

```
 1        A.    17830 Monte Vista Drive, Boca Raton, Florida.

 2        Q.    Do you currently own that property?

 3        A.    No.

 4        Q.    When did you originally buy that property?

 5        A.    I went into contract to build the home in

 6    2004.

 7        Q.    Okay.  And when did you close on the

 8    property?

 9        A.    Summer of 2006.

10        Q.    Okay.  And who were you buying the property

11    from?

12        A.    Albanese Popkin Development Group.

13        Q.    And was that a new home when you were

14    purchasing it?

15        A.    New construction.

16        Q.    New construction?

17              And I'm guessing when you went under a

18    contract, that was the period in which the builder

19    was building it, correct?

20        A.    Yes.

21        Q.    Okay.  Do you recall how much you paid for

22    the house?

23              And I'll put a document in front of you, if

24    you want precision.
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes, I would like to see the document.

 2              But I can tell you the contract price was

 3    $1,050,000 plus financing fees, carrying costs,

 4    upgrades that we paid during the course of the

 5    construction, closing costs.

 6        Q.    I'm going to put a document in front of you.

 7              MR. BARRY:  If we can mark that Exhibit 1.

 8              (Defendants' Exhibit 1 was marked for

 9    identification.)

10    BY MR. BARRY:

11        Q.    Give you a chance to review the document, if

12    you would like to.

13              I'm also going to hand you what I'll

14    represent is Exhibit 2, which is the purchase

15    agreement for the house, and that is KROSEN-5 through

16    KROSEN-54.

17              (Defendants' Exhibit 2 was marked for

18    identification.)

19    BY MR. BARRY:

20        Q.    Now, looking first at Exhibit 2, was that the

21    accurate purchase price for the property?  You said

22    earlier it was 1 million 50 dollars -- or, $50,000?

23        A.    That was the contract price for the -- for

24    the house.
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 2534 of 3246
Case 1:09-cv-02047-GEL Document 23362-39 Impart on Filed 11/19/19 Page 2534 of 3246
Confidential – Subject to further confidentiality review
108

 1      Q.    Okay.

 2      A.    The starting point.

 3      Q.    And so when you say "the starting point,"

 4   what are the additions that added extra costs to it?

 5      A.    There were charges from the

 6   building/developer for carrying costs and finance

 7   fees, I think totaling three and a half percent based

 8   on the contract price of 1 million 50.

 9      Q.    Okay.

10      A.    Plus we paid directly to the builder and

11   their landscape subcontractor and their security

12   company during the course of construction for

13   upgrades prior to CO of the house.

14      Q.    Okay.  Is that it as far as you know?

15      A.    I think that that's it.

16      Q.    And would that price be reflected in these

17   documents?

18      A.    No.

19      Q.    Or would that be somewhere else?

20            And if you can't find it right now, that's

21   totally fine.  We can move on.

22      A.    Well, okay, here we go.  So in Exhibit 2 --

23      Q.    I see some costs on the back there that

24   says --

```
1       A.    I'm looking -- do you want me to read off the

2   Bates number on the bottom?

3       Q.    That would be great.

4       A.    All right.  On Exhibit 2, KROSEN-6, Payment

5   Options, Item D, there's a carrying charge due at

6   closing of 21,000.

7       Q.    Okay.

8       A.    I believe on the HUD statement there's also

9   another line item for another fee.  I believe the

10  developer charged us two percent and one and a half

11  percent fees in addition to the 1 million 50.

12      Q.    Okay.

13      A.    As far as the moneys that were paid during

14  the course of construction as upgrades, that is the

15  spreadsheet and all of the documents here, these are

16  all the change orders with copies of all the checks

17  that I paid the developer during the course of

18  construction, and there's a spreadsheet itemizing

19  that.

20            That would not have been reflected on the

21  closing statement because these were cash payments we

22  made that upgraded the home during the course of

23  construction, and the developer required us to pay

24  during the course of construction for those upgrades.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2536 of 3246
Case 1:09-cv-07457-LGS Document 1467-11 Filed 05/13/13 Page 40 of
108
Confidential – Subject to Further Confidentiality Review

1    They were not financed.

2        Q.   And when you refer to "this," you're

3    referring to the redwell that you brought today?

4        A.   Right.  The redwell that I brought today are

5    the work orders, the change orders during the course

6    of construction, which includes my approvals of

7    those, copies of the checks, and a summary sheet here

8    of the upgrades, which is roughly $115,000.  None of

9    that is going to be reflected on the contract because

10   these work orders were not produced by the builder

11   until we got to those milestones during construction.

12       Q.   Totally understand.

13           And just so I'm a hundred percent clear,

14   these were all upgrades that you did before you moved

15   into the house; this is during the construction

16   period?

17       A.   That is correct.

18       Q.   Okay.  So it wasn't that you moved into the

19   house and then hired someone to do additional

20   upgrades?

21       A.   No.  The upgrades range from -- my approval

22   dates starting with the first work order was March of

23   2005, and the last was in June of 2006.  So these

24   were post-contract signing, pre-closing cash that my

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2537 of 3246
Case 1:09-cv-07402-GEL Document 201591 Exhibit 90 Filed 05/18/2012 Page 10 of 108

Confidential – Subject to further confidentiality Review

1    wife and I paid directly to the builder and a few of

2    their subcontractors to build the house, the dream

3    home that we set out to build.

4        Q.   I understand.

5             Was the purchase financed through a bank or

6    any lender?

7        A.   A small portion of the -- of the home was

8    subject to a first mortgage at closing.

9        Q.   Okay.

10       A.   The construction itself was not.  We paid

11   cash from day one up until the point of closing.  And

12   then we had about 80 percent-plus equity in the

13   house, and we took a first mortgage out with Wachovia

14   Mortgage, I believe, for $175,000 at the time of

15   closing.

16       Q.   And is that mortgage what is in front of you

17   as Exhibit 1?

18            Does this look familiar?  This is the second

19   mortgage?

20       A.   No.  Exhibit 1, Page -- KROSEN-61 is actually

21   the refinance.

22       Q.   This is the refinance?

23       A.   Right.

24            MR. MONTOYA:  Mike, if it helps at all -- I

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2538 of 3246
Case 1:11-cv-08196-MGC Document 201-91 Confidential Subject to Further Confidentiality Review Page 41 of
108
Confidential – Subject to Further Confidentiality Review

```
1        don't want to interrupt your question -- the rog

2        answers kind of walk you through that, if that

3        would speed it up at all and detail what you did

4        there in terms of the dollar amount.

5            MR. BARRY:  As long as we are stipulating to

6        the admissibility of these items, I'm happy to

7        walk him through, and put them in.

8            MR. MONTOYA:  Whatever you need to do.

9            MR. BARRY:  As long as these items are

10       stipulated to as admissible, I'm fine walking

11       through the rogs.

12           So to be clear, the mortgage, the first --

13           MR. MONTOYA:  That's fine.

14       (Defendants' Exhibit 3 was marked for

15   identification.)

16           MR. BARRY:  This will be Exhibit 3, which for

17       the record is Kevin Rosen's Answers to Defendant

18       Taishan Gypsum Company and Tai'an Taishan

19       Plasterboard Company, Ltd.'s and BNBM PLC's

20       Interrogatories.

21   BY MR. BARRY:

22       Q.   So if we're looking at Question 1 here -- or,

23   Interrogatory Number 1, your answer, you walk through

24   the different prices that you refer to as lost
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2539 of 3246
Case 1:11-cv-22408-MGC Document 294-291 Entered on FLSD Docket 05/19/2019 Page 42 of
108
Confidential – Subject to further confidentiality Review

```
 1      equity, I think is the damage you generally say.

 2             So we've talked about the down payment.  You

 3      have mentioned that cost.

 4             $115,631.67, is that what we are referring to

 5      as the repairs?

 6      A.    No.

 7      Q.    Or, sorry, not the repairs, the upgrades that

 8      you did?

 9      A.    That's right.

10      Q.    And that comes out to the total investment,

11      which is -- what's the value there, with the capital

12      improvements and the --

13      A.    The total sum number here in my answer is

14      $1,076,336.23.

15      Q.    And the 105,000 payment at permitting, what

16      was that payment?

17      A.    We were required to pay ten percent of the

18      purchase price of the home in order for the builder

19      to apply for a permit to begin construction.

20      Q.    And the 698,353.76 was down payment at

21      closing, what was that payment?

22      A.    Those were the funds, cash to close, we

23      required to close on the house, other than the

24      mortgage we were taking out.
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2540 of 3246
Case 1:1-cv-22408-MGC Document 208-81 Entered on FLSD Docket 05/19/2014 Page 48 of
108
Confidential - Subject to Further Confidentiality Review

```
1        Q.    And then the 27,300 in capital improvements?

2        A.    That's a whole home generator that I

3    installed shortly after we moved into the house.

4        Q.    And then the 25,050 payment toward principal

5    and mortgage was just principal payments, I'm

6    guessing?

7        A.    That's right.

8        Q.    Now, if we look back at Exhibit 1, which is

9    the refinance -- am I correct on that, or is that --

10       A.    Exhibit 1, KROSEN-61 --

11       Q.    Yes.

12       A.    -- that's the refinance mortgage.

13       Q.    And why did you do a refinance?

14       A.    When my wife and I took out our first

15   mortgage at closing, the rate on the mortgage was

16   6.75 percent, and it was a 30-year term.  Interest

17   rates became more favorable, and in 2008, we were

18   successful in refinancing the property.  We got a

19   lower interest rate, 5.25 percent, and we were able

20   to shorten the term of our mortgage to 15 years.

21           So from a financial standpoint, we decided to

22   refinance the property.  And the mortgage was

23   substantially the same.  We didn't pull any money out

24   of the house.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2541 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Confidential Subject to Further Confidentiality Review
Confidential - Subject to Further Confidentiality Review
108

```
1     Q.    Do you own any other properties?

2     A.    I don't.

3     Q.    Does your wife own any other properties?

4     A.    No.

5     Q.    How long did you live at the property in

6     question?  Between what time period?

7     A.    From closing to when we moved out, probably

8     almost three years.

9     Q.    And do you remember when you moved out?

10    A.    It would have been July or August of 2009.

11    Q.    How many people resided at the house while

12    you were there?

13    A.    Four.

14    Q.    Are any of the individuals other than your

15    wife making any claim related to the drywall?

16    A.    No.

17    Q.    When you left the house in August of -- July

18    or August of 2009, what was the nature of you leaving

19    the house?  Did you sell it?

20    A.    The house was not sold when I relocated my

21    family to a rental property.

22    Q.    When was it sold?

23    A.    December of 2009 it closed.

24    Q.    Between the period of July or August of 2009
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2542 of 3246
Case 1:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 2542 of 3246
Confidential – Subject to further confidentiality Review
108

```
 1    to December of 2009 when you sold it, was anyone

 2    occupying the house?

 3         A.   No.

 4         Q.   Did you try to rent it out?

 5         A.   No.

 6         Q.   Why not?

 7         A.   It was an environmental disaster.  It was

 8    inhabitable.  I didn't want to put someone else in

 9    that house and have them get sick.  Under no

10    circumstance did the feel the house could be occupied

11    by anybody.

12         Q.   Other than the capital improvements you made

13    the pre -- the during construction repairs and then

14    the other putting in the generator, did you make any

15    other improvements to the property?

16         A.   Yes, we did.

17         Q.   What did you do?

18         A.   We painted the inside of the house.  We put

19    in Venetian plaster.  We upgraded the carpeting in

20    the home.  There were a variety of things we did to a

21    vanilla house that we had purchased.  From the

22    builder, we did some of the upgrades during

23    construction; others, we did after.

24         Q.   And we'll walk through these receipts later.
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2543 of 3246
Case 1:09-cv-02048-KGA Document 22359-1 Entered on FLSD Docket 05/09/2014 Page 46 of
108
Confidential - Subject to further confidentiality Review

```
 1              Are those all items that you have documented
 2    and put in the record?
 3       A.   No, I haven't.
 4       Q.   Are you claiming damages based on those
 5    capital improvements?
 6       A.   No.
 7       Q.   Did you ever do any work to add or remove
 8    Chinese drywall to the house?
 9       A.   No.  I had drywall replaced in the house when
10    I lived there, but not Chinese drywall that I was
11    aware of.
12       Q.   Did you ever do anything to remediate the
13    drywall in the house?
14       A.   No.
15       Q.   Now, for the house -- for your house, do you
16    know what the square footage of the house is?
17       A.   4,604 square feet under air.
18       Q.   How do you know that?
19       A.   It's in the contract that I purchased the
20    home.  It's in the appraisal when I financed the
21    property.  I just know it to be true.
22       Q.   Did you ever measure it?
23       A.   No.  I relied on experts.
24       Q.   And do you know who those experts were that
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/10 Page 2544 of 3246
Case 1:11-cv-22408-MGC Document 28-1 Entered on FLSD Docket 05/19/2011 Page 47 of
108
Confidential - Subject to Further Confidentiality Review

```
 1    assessed the square footage?

 2        A.   Whoever appraised the house, the certified

 3    appraisal that the bank used.  The builder, in the

 4    contract, represented the house to be that size.

 5    They sold my model and similar models in the

 6    neighborhood.

 7        Q.   Do you know how many bedrooms there were in

 8    the house?

 9        A.   It was classified as a four-bedroom house,

10    but there was also a den office on the first floor

11    that could be considered a fifth.

12        Q.   And how many bathrooms?

13        A.   Seven in total.

14        Q.   At any point while you were living in the

15    house, was there any change to the square footage?

16        A.   No.

17        Q.   So you didn't make any additions that would

18    have added more square footage to the house?

19        A.   No.

20        Q.   Mr. Rosen, I'm going to hand you an

21    appraisal.

22             (Defendants' Exhibit 4 was marked for

23    identification.)

24             MR. BARRY:  And this is Exhibit 4.
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2545 of 3246
Case 1:09-md-02047-MCA Document 23363-39 Filed 11/19/19 Page 29 of
108
Confidential - Subject to further confidentiality Review

1    BY MR. BARRY:

2        Q.    I'm going to try my best to find -- so on

3    Page 3, which is -- this is not Bates stamped, but --

4    is this one of the appraisals you were referencing

5    that would have square footage, you would think?

6             And I can point you to where it shows square

7    footage in very small --

8        A.    Yes.

9        Q.    -- type that is very difficult to read.

10       A.    You are on Page 3, it says Dwelling,

11   4,640 square feet.

12       Q.    And earlier you said it was 4,604.  This says

13   4,640.  Do you know why you think it might be 4,604

14   versus 4,640?

15       A.    I don't know why the appraiser wrote 4640.

16       Q.    But you believe it's 4604?

17       A.    I believe it.  That's what was in the

18   contract from the builder who built my house.  Maybe

19   he's off 36 feet.

20       Q.    And if I can hand you another exhibit, which

21   is Exhibit 5.

22            (Defendants' Exhibit 5 was marked for

23   identification.)

24            THE WITNESS:  Okay.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2546 of 3246
Case 1:11-cv-22408-MGC Document 29-1 Entered on FLSD Docket 05/08/2014 Page 20 of 108
Confidential – Subject to further confidentiality review

```
 1    BY MR. BARRY:

 2         Q.   Now, this says 4,604 on this one, correct --

 3         A.   Yes.

 4         Q.   -- if you look at the -- under where it says

 5    Master Bedroom.

 6              So to your understanding, the appraisal that

 7    was in Exhibit 4 that said 4,640 is incorrect?

 8         A.   Look, either the builder or the appraiser,

 9    one of them is off 36 feet.  My realtor, I don't know

10    if he got the 4604 from the public records.  So I

11    can't answer your question one way or another.  But

12    my belief, the house is 4,604 square feet under air.

13         Q.   I will provide you Exhibit 6, which is your

14    declaration of the correctness of the square footage.

15              MR. MONTOYA:  We're willing to --

16              MR. BARRY:  Stipulate?

17              MR. MONTOYA:  -- 4604.

18              MR. BARRY:  You don't want to fight for those

19         30 feet?

20              MR. MONTOYA:  No.  Not today.

21              MR. BARRY:  Okay.  As long as we are

22         stipulating to that, that's fine.  We'll put the

23         exhibit in the record, but I won't ask any

24         questions on it.
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2547 of 3246
Case 1:09-cv-02047-MGC Document 22291 Emmanual Source 05/09/2014 Page 30 of
108

Confidential – Subject to Further Confidentiality Review

1          I'll just represent that it's the Declaration

2     of Correctness of Square Footage on Chinese

3     Drywall signed by Mr. Montoya.

4          (Defendants' Exhibit 6 was marked for

5     identification.)

6     BY MR. BARRY:

7     Q.    Mr. Rosen, when do you believe that Chinese

8     drywall was installed in the house?

9     A.    During the course of construction.

10     Q.    Do you know how Chinese drywall was installed

11     in the house?

12     A.    Sure.  The builder has a subcontractor, who

13     put drywall in my home.

14     Q.    Do you know who that subcontractor is?

15     A.    Ocean Coast Drywall, I believe.

16     Q.    Did you ever see that drywall before it was

17     installed?

18     A.    No.

19     Q.    And not just walking through the house or

20     something where you actually laid eyes on it?

21     A.    No.  Not in any specificity, sir.  I mean, I

22     was present here and there during the course of the

23     house being built, including the framing and during

24     the time that it was being drywalled, but I did not

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2548 of 3246
Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 46 of 108
Confidential - Subject to Further Confidentiality Review

```
 1    inspect or look at the drywall.

 2        Q.   So you weren't aware that Chinese drywall was

 3    being installed in the house at the time?

 4        A.   Absolutely not.

 5        Q.   Do you know the markings of the Chinese

 6    drywall in your house?

 7        A.   No.

 8        Q.   Did the builders make any guarantees to you

 9    about the products they used in the house?

10        A.   They were -- the guarantee was they were

11    going to deliver me a habitable home, which would

12    have included having drywall that wasn't off-gassing

13    and destroying my house, making me sick, and running

14    my family out.

15        Q.   What parts of the house -- where in the house

16    was the drywall installed?

17        A.   First floor, second floor, the whole home.

18        Q.   It was throughout the entire home?

19        A.   The whole house has drywall in it.

20        Q.   Was it Chinese drywall throughout the entire

21    house?

22        A.   I can't answer that.

23        Q.   Do you -- did you ever have an inspector come

24    out to assess whether Chinese drywall was throughout
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2549 of 3246
Case 1:11-cv-22408-MGC Document 28-1 Entered on FLSD Docket 05/08/2012 Page 52 of 108
Confidential - Subject to Further Confidentiality Review

```
1    the entire house?

2         A.   Mr. Montoya's law firm did an inspection.

3         Q.   And do you know what the result of that

4    inspection was?

5         A.   They found Chinese drywall in my house.

6         Q.   Do you know where in the house they found

7    Chinese drywall?

8         A.   Yeah.  Upstairs, downstairs.

9         Q.   Okay.  How did you first become suspicious

10   that there was Chinese drywall in your house?

11        A.   There was a house on our street that was

12   moving to closing and the closing failed.  And then

13   it spread around the neighborhood that Albanese

14   Popkins homes -- that home had Chinese drywall in it.

15        Q.   Had you ever had suspicion before then that

16   there was Chinese drywall in the house?

17        A.   No.

18        Q.   Okay.  Did you see any blackened electrical

19   wires in the house before that?

20        A.   No.  I didn't look though.

21        Q.   Did you ever have a problem with the

22   air-conditioning before then?

23        A.   Yes.

24        Q.   What were the problems with the
```

Confidential – Subject to Further Confidentiality Review

```
1    air-conditioning?

2         A.    We had four units in that house.  At least

3    one failed -- perhaps it was two.  We had issues with

4    the coils.

5         Q.    Did someone come out to repair them?

6         A.    Yes.

7         Q.    And what did the repairman say?

8         A.    Warranty, we'll replace it.  They pulled it

9    out and they replaced it.

10        Q.    Did they ever suggest that there might be --

11   it might be a result of Chinese drywall?

12        A.    Not at the time, no.  I don't think people

13   were aware of it.

14        Q.    Did you have any issues of other appliances

15   in your house?

16        A.    Absolutely.

17        Q.    What were the other appliances you had issues

18   with?

19        A.    Our microwave in our kitchen failed.  The

20   dishwasher in our kitchen failed at least once,

21   perhaps twice.  The central vac system, the motor

22   caught on fire.  We had two TVs in the house, 50-inch

23   Samsung TVs, DLPs, those failed.  Air conditioners

24   failed.  We had a gas leak in the kitchen, which --
```

 1    those are just to name a few.

 2        Q.   And it is your belief that all of those are

 3    attributable to Chinese drywall?

 4        A.   It is absolutely.  All these were appliances

 5    from different companies, brand new, installed in a

 6    brand new house that were failing systematically

 7    across my home.  And I couldn't understand living in

 8    the home how it is that so many things would be

 9    failing and breaking in the house.  And then when we

10    found out we had Chinese drywall in the house, we

11    realized why.

12        Q.   Was there an odor in your house?

13        A.   Yes.

14        Q.   And what did it smell like?

15        A.   Rotten eggs.  The house smelled like a

16    garbage dump.

17        Q.   When did you first notice the odor?

18        A.   It became noticeable to me once the

19    destructive testing in the house occurred and a hole

20    in the drywall was punched.

21        Q.   So did you smell it before that hole was

22    punched?  Had you smelled anything before then?

23        A.   No.

24        Q.   So you didn't -- you know, when you first

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2552 of 3246
Case 1:07-cv-09488-GAD Document 1 confidential Subject to Further Confidentiality Review
108

Confidential – Subject to Further Confidentiality Review

```
 1    moved into the house, there was no odor that you

 2    could necessarily discern?

 3        A.    Correct.

 4        Q.    Once you did start smelling that odor, was it

 5    worse in certain areas of the house?

 6        A.    It was horrible.  The whole house wreaked.

 7    It was so bad you could walk up to the front entrance

 8    door and before you opened the door, your eyes would

 9    start tearing.  It was disgusting.  And it was

10    everywhere once the walls were opened up.  It was

11    like plumes of gas came out and that was it.

12        Q.    So there was no area of the house that was

13    just necessarily worse than the rest of it?

14        A.    No.

15        Q.    In your mind, it was all equally bad?

16        A.    It's an open floor plan, sir.  I mean, all

17    the rooms are open.  The doors were open.  And once

18    the gas came out of the cavities of the wall, it

19    traveled throughout the whole house.

20        Q.    Was there any type of -- time of day at which

21    the odor was worse than the other?

22        A.    No.

23        Q.    Was there any time of year where it was

24    worse?
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2553 of 3246
Case 1:09-cv-06690-AGM-GWG Document 100-1 Entered on FLSD Docket 06/09/2023 Page 96 of
108
Confidential – Subject to Further Confidentiality Review

```
1      A.   As I said, towards the time when we did the
2  destructive testing on the house, that's when it
3  became unbearable.
4      Q.   Did any visitors to your house notice the
5  odor?
6      A.   Of course.
7      Q.   And what would they say?
8      A.   They didn't want to go in the house.
9      Q.   Prior to learning about the neighbor's house
10 who failed to close, had you ever heard about Chinese
11 drywall before?
12     A.   I may have heard about it beforehand with
13 Parkland with WCI.  I think they had a significant
14 drywall problem.
15     Q.   What did you do once you learned that you had
16 Chinese drywall in the house?
17     A.   We hired -- well, I had already hired Colson
18 Hicks, and they did the testing on the house and
19 confirmed that my house had the contaminated drywall.
20 So I moved my family out.
21     Q.   How soon after learning you had the
22 contaminated drywall did you move your family out?
23     A.   Fairly quickly.  I had to find a rental
24 suitable for my wife and my kids.  It took us a
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2554 of 3246
Case 1:09-cv-07666-ALC Document 22363-39 Filed 11/19/19 Pkt. 93621 Page 47 of
108
Confidential - Subject to Further Confidentiality Review

1    little time to find, a townhouse, and I moved.  I got

2    my belongings and left.

3        Q.   How soon after speaking to your attorney did

4    you file a lawsuit?

5        A.   I don't know.

6        Q.   So we're going to look at the inspection

7    report that you submitted.

8        A.   Okay.

9        Q.   We're just finding it right now.

10        MR. BARRY:  We'll mark this as Exhibit 7.

11        (Defendants' Exhibit 7 was marked for

12   identification.)

13        MR. BARRY:  And this is the Inspection

14        Report, Product I.D. 9/15/2009, KROSEN-566

15        through 568.

16   BY MR. BARRY:

17        Q.   And if you want to take a second to look at

18   it.

19        A.   Okay.

20        Q.   So you said earlier that Mr. Montoya's firm

21   is the one who hired the inspector, correct?

22        A.   Yes.

23        Q.   Do you know if Mr. Montoya's firm is the one

24   who paid for the inspector?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2555 of 3246
Case 1:09-cv-08260-MGC Document 2011 Entered on FLSD Docket 05/19/2019 Page 98 of 108

Confidential - Subject to further Confidentiality Review

```
 1        A.   I don't know.

 2        Q.   Did you pay for the inspector?

 3        A.   I did not.

 4        Q.   Were you at home when the inspection was

 5   performed?

 6        A.   This, no.

 7        Q.   Did you talk with the inspector at all?

 8        A.   Not during this inspection.  I wasn't there.

 9        Q.   Have you had any other inspections?

10        A.   Mr. Montoya's inspector was out to my house

11   once before, yes.

12        Q.   Did he produce an inspection report when he

13   did that inspection?

14        A.   I don't know.

15        Q.   Okay.  Has anyone ever taken samples of the

16   drywall from your house?

17        A.   I saw photos of that, yes.

18        Q.   So your understanding is yes?

19        A.   Oh, yes.

20        Q.   Has any drywall been removed from your house?

21        A.   Yes.

22        Q.   And if so, where is that located?

23        A.   I don't know.

24        Q.   Do you ever -- did you ever have knowledge of
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 2556 of 3246
Case 1:09-md-02047-EEF-MBN Document 18928-1 Entered on FLSD Docket 05/18/2019 Page 40 of
108

Confidential — Subject to Further Confidentiality Review

```
1    how many Chinese drywall boards were in your house?

2         A.   No.

3         Q.   Do you know if anyone determined the

4    percentage of your home that was built with Chinese

5    drywall?

6         A.   I do not know.

7         Q.   Okay.  I know you are no longer living in the

8    house.  Did you ever remediate the Chinese drywall?

9         A.   No.  I sold the house as-is.

10        Q.   Did you ever consider remediating?

11        A.   I did.

12        Q.   Why didn't you?

13        A.   There was no protocol established for

14   remediation at the time I sold the house and --

15        Q.   Sorry.  Go on.  I apologize.

16        A.   Thank you.

17        Q.   I didn't mean to interrupt.

18        A.   It would have cost hundreds of thousands of

19   dollars to attempt to repair the home.  We would not

20   have been able to get a construction loan on the

21   house under the condition it was in.  And we did the

22   only prudent thing we could, sir, which was we sold

23   the house in a reasonable manner for the best price

24   we could get.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2557 of 3246 of
Case 1:09-cv-02047-McGil-Document Temptation Filed Subpoena 05/19/2012 Page 40
108
Confidential – Subject to further confidentiality review

1    Q.   I understand.

2         Just to be clear, today sitting here, there's

3    no way you could go back and remediate the house,

4    correct?

5    A.   There is no way.  I don't own it.

6    Q.   Just one clean-up question here.

7         MR. BARRY:  I understand.

8         MR. MONTOYA:  I get it.

9         MR. BARRY:  We're all lawyers here, right?

10   BY MR. BARRY:

11   Q.   Where were the air-conditioning units located

12   in your house?  And I might be stretching your memory

13   here.

14   A.   My best recollection is two up and two down.

15   Q.   Two up.  And by "up," do you mean attic or

16   roof or --

17   A.   Okay.  Well, air conditioners have a

18   compressor, they have a handler.  They were inside

19   the house.  One was in the attic, two may have been

20   in a closet.  My recollection is at least three of

21   those were within the confines of the interior of the

22   home, and one in the attic above the garage.

23   Q.   Okay.  Do you remember if any one of those

24   air-conditioning units had more issues than the

Confidential - Subject to Further Confidentiality Review

```
 1    other?

 2        A.    I don't have an independent recollection.

 3        Q.    Okay.  When -- I might actually skip those.

 4              Did -- and I'm going to guess you are going

 5    to have a pretty long answer on this one.

 6              Did the presence of Chinese drywall in the

 7    house limit your use of the property?

 8        A.    It absolutely did.  It absolutely did.

 9              My wife and I were married in 2001.  It was

10    our intention to build a beautiful life together,

11    have children, and build a dream home.  And that is

12    what we set out to do in 2004.  We went to contract

13    to build a beautiful home in a lovely gated community

14    from the ground up.  We designed that house from the

15    cabinets to the finishings, down to the hardware and

16    the knobs in that house.  We put 80 to 85 percent

17    equity into this home.

18              We were fortunate and blessed to have a baby

19    in 2005.  And then we moved into the house in 2006.

20    And we were blessed to have another baby in 2007.

21    This house was supposed to be our safe house to raise

22    our family and enjoy life.  It was not a spec home.

23    It was our residence.

24              The money that went into this house was money
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2559 of 3246
Case 1:09-cv-02047-MGC Document 1 Entered on FLSD Docket 05/19/2017 Page 42 of
108

Confidential – Subject to Further Confidentiality Review

```
 1    that my wife inherited due to her mom being murdered,

 2    and that money was my wife's security and her safety.

 3    And that house was in her mother's name in memory of

 4    her, and that money was always meant to be protected.

 5    We moved into that house.  We did a very conservative

 6    thing:  We had a very small mortgage; we had State

 7    Farm Insurance to protect it.  We had two beautiful

 8    children.

 9           And despite all our desires to just live the

10    dream, things in this house started breaking left and

11    right.  One air conditioner after the next, one

12    appliance after the next.

13           And during the course of while all this was

14    going down and we were living in the house dealing

15    with repair, after repair, after repair, after

16    repair, I became sick living in that house.  I

17    developed ulcerative colitis.  I couldn't sleep.  I

18    had insomnia.  I had upper respiratory infections,

19    one after the next.  And I was a healthy man in my

20    prime of my life, dealing with a wife who just

21    recovered from thyroid cancer in 2005, recovering

22    from a murder, building a home, which isn't easy,

23    raising two babies, and then finding out my house was

24    falling apart for reasons that finally made sense --
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2560 of 3246
Case 1:11-cv-22408-MGC Document 261-1 Entered on FLSD Docket 05/16/2014 Page 48 of
108

Confidential - Subject to Further Confidentiality Review

```
1    your client's drywall destroyed our house -- and then

2    to wind up living through this nightmare where we had

3    to leave our home, throw out our personal property,

4    me being sick, moving us into a rental, and doing the

5    honorable thing, which is selling the house in the

6    best way we could to get the few dollars we could out

7    of that house, my wife's inheritance, so we could get

8    on with our life, we did what we had to do.  And I

9    can tell you this, I enjoyed none of it.

10         All those memories that we should have had in

11   there were robbed, and we were ripped off.  And it is

12   a horrible, horrible tragedy.  And unlike your

13   client, who, for nine years hasn't stepped up to help

14   us, I paid and my wife paid our obligations all

15   through this process.  When we lived in the house,

16   even when we found out about the drywall and on the

17   way out the door, I paid my HOA fees, I paid my bank,

18   I sold this house with full disclosure, and scraped

19   together the dollars we had to carry my family on to

20   another place.

21         And it was rotten.  And our lifestyle, from

22   that day forward, has never recovered.  And we moved

23   into another house, thankfully; smaller, with a

24   bigger mortgage to get on with our life.  But even
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 2561 of 3246
Case 1:1-22-vg-MCG Document 2662-13 Filed 03/02/21 Page 41 of
Confidential - Subject to Further Confidentiality Review
108

1    through today, we're still dealing with this

2    nightmare.

3         If you have children, like we do, there's no

4    way on earth, as a father, you would ever want your

5    two-year-old or three-year-old child in a house

6    inhaling this gas that was poisonous enough to

7    destroy the coils in my air conditioner, blacken and

8    sooten my electric outlets, create a gas leak in my

9    home, smell and breathe and be sick from this, it's a

10   nightmare I will never get over and a worry I'll

11   never give up like asbestos and other diseases people

12   get when they get exposed to this.

13        So, yeah, we moved in, and we had plans to

14   enjoy our home and live a good life.  Unfortunately,

15   that never happened.

16   Q.   And I appreciate you, Mr. Rosen, answering

17   these questions that I know are difficult.

18        How are you choosing to quantify what --

19   everything that you just described in terms of the

20   loss of use and enjoyment of the home?

21   A.   I think ultimately a jury needs to decide on

22   what that number is.  But I have full faith in

23   reasonable people looking at what your clients did to

24   us and how our family was harmed, and I can't imagine

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2562 of 3246
Case 1:11-cv-22408-MGC Document 25-1 Entered on FLSD Docket 05/19/2011 Page 45 of
108

Confidential – Subject to Further Confidentiality Review

```
 1    a jury not awarding us substantial damages for the

 2    loss of use, the inability to enjoy our home.  It's

 3    going to be hundreds of thousands, if not over a

 4    million dollars.  I'm not here to give you a number.

 5    I don't know what that number is going to be.  But

 6    it's going to be big.  I truly think so.

 7        Q.   And I appreciate that.  This is a decision of

 8    the jury.  I'm just trying to understand the number

 9    that we have been give.

10            And I'm handing you what is I believe to be

11    Exhibit 8.

12            (Defendants' Exhibit 8 was marked for

13    identification.)

14            MR. BARRY:  And so I don't have to put in

15        another exhibit, can we stipulate that this one

16        is verified?

17            MR. MONTOYA:  Absolutely.

18            MR. BARRY:  Perfect.

19    BY MR. BARRY:

20        Q.   Mr. Rosen, do you recognize this document?

21        A.   I do.

22        Q.   What is it?

23        A.   It's titled Supplemental Plaintiff Profile

24    Form.
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2563 of 3246
Case 1:09-cv-08401-CJ Document 23-91 Entered on FLSD Docket 05/19/2011 Page 46 of 108
Confidential - Subject to Further Confidentiality Review

```
 1        Q.    And what do you understand this document to

 2   be?

 3        A.    As a plaintiff in a mass litigation, we were

 4   required to fill out information for the Court.

 5        Q.    Do you know who created this document for

 6   you?

 7        A.    My law firm.

 8        Q.    Your law firm did?

 9        A.    Yes.

10        Q.    Did you review it before it was served?

11        A.    Yes.

12        Q.    Did you -- so anything in here you would

13   believe to be accurate, correct?

14        A.    Yes.

15        Q.    Okay.  If you would turn with me to Page 6,

16   which I'll represent -- on Section 7, Other Damages.

17   In the second paragraph, Page 6.

18             The second paragraph begins with "if you

19   experienced any loss."  Do you mind reading that to

20   me?

21        A.    "If you experienced any loss of use and/or

22   loss of enjoyment of the property as a result of

23   Chinese drywall, identify the total amount of such

24   loss.
```

```
 1                $792,292.84."

 2       Q.    Do you know how you quantified that number?

 3       A.    We had to put a number in on the profile

 4    form, so the number there was matching my

 5    out-of-pocket loss.

 6       Q.    Okay.  So it was just matching what -- the

 7    numbers of the expenses and everything like that?

 8       A.    That's my understanding, yes.

 9       Q.    And I know you mentioned some health effects

10    here.  You understand that this lawsuit does not

11    involve any claims for personal injury or medical

12    conditions?

13       A.    I understand.

14             MR. BARRY:  I think that might be a good

15       stopping point, because I think we're going to be

16       awhile for -- between the next one, if you want

17       to take a break.

18             MR. MONTOYA:  What do you mean for the

19    next --

20             MR. BARRY:  The next series of questions.

21             MR. MONTOYA:  Okay.  Sure.

22             (Recess from 1:58 until 2:12 p.m.)

23    BY MR. BARRY:

24       Q.    So let's stick with your profile form here.
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 2565 of 3246
Case 1:17-cv-00487-JCG Document 1 filed 1 (redacted) Supplement 05/18/2017 Page 48 of
Confidential – Subject to Further Confidentiality Review
108

```
1    And let's look at Section 6, which is Prior Payments.

2        A.    Okay.

3        Q.    Are there any prior payments listed here?

4        A.    There are.

5        Q.    What is that payment?

6        A.    CDW Settlement Program $340,974.34.

7        Q.    And what is that payment?

8        A.    That was a payment that my wife and I

9    received from the BrownGreer settlement administrator

10   in connection with the Chinese drywall mass

11   litigation.

12       Q.    What is your understanding of where that

13   money came from?

14       A.    A pool of funds or pools of funds were

15   amassed together from a variety of defendants, and

16   there was a claims settlement process.  And a special

17   master made an award to us, and that's the amount

18   that we received; not the amount awarded.  This is

19   substantially less than the amount that we were --

20   the special master determined we were entitled to

21   under our claim.

22       Q.    Do you remember how much that was?

23             Let me clarify for the record.

24             Do you remember how much you were awarded?
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2566 of 3246
Case 1:11-cv-22408-MGC Document 123-1 Entered on FLSD Docket 05/18/2017 Page 40 of
108
Confidential - Subject to Further Confidentiality Review

```
 1        A.    I think it was around $796,000, 798,000.

 2        Q.    In your view, is this $340,974.34 reflected

 3   in the total amount you are requesting from Taishan

 4   in this litigation generally?

 5        A.    No, it is not.

 6        Q.    So you did not offset the amount by that

 7   340,000 --

 8        A.    I don't believe so.

 9        Q.    Okay.  So the 340,000 that you received,

10   everything you are asking for is in addition to that?

11        A.    That's right.

12        Q.    Did you make any homeowner's insurance claims

13   on any of the property you claim to have lost because

14   of Chinese drywall?

15        A.    I did.

16        Q.    And you said you had State Farm Insurance?

17        A.    I did.

18        Q.    They're a great insurer.

19              What happened with them?

20        A.    Well, I filed a claim.  The adjustor came to

21   my house, expressed his condolences to us and denied

22   coverage.  Felt very empathetic for our situation but

23   said that this was not a covered loss under our

24   policy.
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2567 of 3246
Case 1:09-cv-02047-GAG Document 22362-39 Filed 11/19/19 Page 2567 of 3246

Confidential - Subject to Further Confidentiality Review
108

```
 1              And I believe that's State Farm position as a

 2      matter of policy across all the drywall homes I'm

 3      aware of.

 4         Q.   Did you try to challenge that conclusion?

 5         A.   I did try.

 6         Q.   What did you do to challenge it?

 7         A.   I escalated my concerns with State Farm.  It

 8      went up a couple levels within -- internally within

 9      State Farm.  Managers above the adjustor contacted

10      me, and once again expressed their empathy of our

11      situation but said that it was a policy and

12      interpretation that they would not cover the drywall

13      loss in our home.

14         Q.   Did you ever consider filing a lawsuit to --

15      a bad-faith claim?

16         A.   I did consider filing a lawsuit.

17         Q.   Why didn't you?

18         A.   Upon advice of counsel, I didn't pursue it.

19         Q.   Now, just for the record I'm going to put

20      this in here.  We'll talk about it a little bit more

21      later.

22         A.   And I do need to clarify --

23         Q.   Yeah.

24         A.   -- my answer.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2568 of 3246
Case 1:09-cv-07957-CA Document 229191 Exhibit 39 In Suppl Docket 05182019 Page 51 of
Confidential – Subject to Further Confidentiality Review
108

```
 1              I'm not sure I was exclusively looking at

 2      bringing a bad-faith claim, but I was looking at a

 3      way to recover from State Farm for our losses,

 4      whatever legal avenue there would be.

 5         Q.    Okay.  So you looked at other types of

 6      lawsuits or any type of --

 7         A.    I relied on my law firm to explore whether or

 8      not we could bring a claim against State Farm or not,

 9      and ultimately the decision was not to file a civil

10      action.

11              MR. BARRY:  Okay.  I'm going to ask that no

12         one ever show that I said "why didn't you sue

13         State Farm," please.  If we can make that

14         confidential, that would be great.

15      BY MR. BARRY:

16         Q.    In Section 7 that says Other Damages, where

17      it says "if you incurred alternative living expenses

18      as a result of Chinese drywall, identify the total

19      moving cost and/or alternative living expenses you

20      incurred," what is that total amount?

21              Sorry.  No, my fault.  I wasn't clear enough.

22         A.    $54,831.07.

23         Q.    Do you believe that is the amount you are

24      requesting in alternative living expenses?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2569 of 3246
Case 1:11-cv-22408-MGC Document 269-31 Entered on FLSD Docket 05/19/2011 Page 52 of
108

Confidential – Subject to further confidentiality Review

```
 1        A.   And moving costs, yes.

 2        Q.   Yes.

 3        A.   Yes.

 4        Q.   Yes.

 5             We've already talked about the loss of use

 6   and enjoyment.

 7             And then the claim of diminution and value

 8   for property as a result of Chinese drywall total

 9   amount of such diminution, what is the amount listed

10   there?

11        A.   $792,292.84.

12        Q.   And is that the amount you are claiming?

13        A.   Yes.

14        Q.   And we can go through that in more detail.

15   I'm sure you don't want to hear that, but . . .

16             Let's talk a little bit about your

17   alternative living expenses.

18        A.   Okay.

19        Q.   You said you moved out of the house in July

20   of 2010; am I right about that?

21        A.   No.  I believe it was July 2009.

22        Q.   Okay.

23        A.   Or August of 2009.

24        Q.   Perfect.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2570 of 3246
Case 1:14-cv-02514-MGC Document 201-1 Entered on FLSD Docket 05/09/2019 Page 53 of
108

Confidential - Subject to further confidentiality Review

 1          And, Mr. Rosen, while we are pulling those

 2    documents together, do you mind just taking a look at

 3    Exhibit 3, which is your interrogatories.

 4          I think that's one that Patrick put in there

 5    for you.

 6      A.   Oh, thank you.  Okay.

 7      Q.   So if we look at Interrogatory Number 2 and

 8    if we look at Answer A, did you -- is this an

 9    accurate period of time which you leased the property

10    because of Chinese drywall?

11      A.   It is accurate.

12      Q.   During that time while you were living there,

13    did you continue to pay on the mortgage until you

14    sold?

15      A.   And to expand on my prior answer, my wife and

16    I resided in this home that we leased beyond December

17    of 2009.

18      Q.   Okay.

19      A.   We lived there for at least a year.  We were

20    out of our home.

21          The reason this is July through December is I

22    have limited the time frame of my alternative living

23    expenses to the period when I was living -- not

24    living in the Chinese drywall house, until I sold it.

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2571 of 3246 of
Case 1:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 251 of
108
Confidential - Subject to further confidentiality Review

```
 1      Q.    Okay.

 2      A.    I'm not overreaching here asking for rent

 3   after we sold the house in The Oaks.  So this is the

 4   window of time that I had to pay the mortgage to

 5   Wachovia on my house in The Oaks, and I also had to

 6   pay rent to relocating my family into a hometown.

 7      Q.    So you are not asking for rent from

 8   January 2010 on.  Anything past December 2009 you are

 9   not asking for that as part of alternative living

10   expenses?

11      A.    No, I'm not.

12      Q.    How did you decide to live at this -- and you

13   said it was a townhome, correct?

14      A.    Yes.

15      Q.    How did you come to decide to live at this

16   specific townhome?

17      A.    It was a very difficult process.  I was

18   trying to find a suitable home that I could bring two

19   children and my wife into.  This was a privately

20   owned townhome in a community, and a realtor

21   identified it for us on MLS.  We went, we looked at

22   it.  We thought it would be a suitable place for us

23   to be as a bridge from one house, hopefully, to the

24   second.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2572 of 3246
Case 1:11-cv-22408-MGC Document 201-1 Entered on FLSD Docket 05/16/2012 Page 55 of
108

Confidential - Subject to Further Confidentiality Review

```
 1        Q.   I'm going to provide you with what is

 2   Exhibit 9.

 3             (Defendants' Exhibit 9 was marked for

 4   identification.)

 5   BY MR. BARRY:

 6        Q.   Mr. Rosen, do you recognize this document?

 7        A.   Yes, I do.

 8        Q.   And what is this document?

 9        A.   This is a lease for the house -- for the

10   townhouse that we moved into.

11        Q.   And if we're looking at this lease, do you

12   see where the total monthly rent payments are --

13        A.   Yes, I do.

14        Q.   -- if you look on Page 3.

15             And how much are those?

16        A.   $39,600.

17        Q.   Does that say 3900 or 3300?

18        A.   You asked me the total amount.  The total

19   rent for the duration --

20        Q.   Yes.  I apologize.  You are right.

21        A.   -- is $39,600.

22             I think you are asking me the monthly?

23        Q.   Yes.  The monthly rent payment.

24        A.   3300 per month.
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2573 of 3246
Case 1:09-cv-02042-MCA Document 22362-39 Confidential Subject to Docket 05/10/2019 Page 26 of 108
Confidential - Subject to Further Confidentiality Review

```
 1        Q.   And I distinguished those because I know you

 2   said you were asking only from August 2009 to

 3   December of 2009.

 4        A.   That is correct.

 5        Q.   Did you have any moving expenses when you

 6   were moving out of the house?

 7        A.   Yes.

 8        Q.   I am going to provide to you this large

 9   exhibit, which I'm very appreciative that you have

10   Bates stamped, Exhibit 10.

11             (Defendants' Exhibit 10 was marked for

12   identification.)

13   BY MR. BARRY:

14        Q.   Mr. Rosen, is this your out-of-pocket

15   expenses that you are claiming as damages in this

16   case?

17        A.   Yes.

18        Q.   Is this the most up-to-date version of this

19   document?  Do you know?

20        A.   I don't.

21        Q.   On this -- let's look through this, I think

22   it's ROSEN-145 through ROSEN-148.  What are the

23   expenses here that you contend are related to your

24   moving expenses?
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2574 of 3246
Case 1:09-cv-02489-CAB Document 229-291 Exhibit 291 Filed 05/19/2014 Page 57 of 108
Confidential - Subject to further confidentiality review

1      A.    The moving?

2      Q.    Yeah.  When you were moving, for alternative

3    living expenses.

4      A.    All right.  Townhouse and HOA application,

5    July 28th, 2009.

6      Q.    Okay.

7      A.    Okay.  I'm going to ask you to clarify.  When

8    you say "moving expenses," are you asking me about

9    all of the expenses associated with relocating to the

10   new residence --

11     Q.    Well, let me ask you this --

12     A.    -- or are you talking about the mover that

13   physically moved my furniture?

14     Q.    Well, let me ask you this, Mr. Rosen.  When

15   you are considering alternative living expenses, what

16   does that consist of in your mind?  When you are

17   requesting in this litigation damages of alternative

18   living expenses, what does that consist of?  I think

19   we said --

20     A.    It would be the out-of-pockets that I paid to

21   relocate my family and move into the townhouse during

22   the dependency of the sale of the home.

23     Q.    And not to put words in your mouth, I think

24   we agreed that it was -- the amount on your profile

Confidential - Subject to further confidentiality review

1    form was $54,831.07?

2        A.    I think that is right.

3        Q.    Are there any items on here that are included

4    within that $54,831?

5        A.    I'm sure there are.

6        Q.    And do you mind identifying them for me?

7        A.    I can't identify every one.

8        Q.    We don't need to be comprehensive.  If there

9    are ones that you believe that you could look at and

10   say are --

11       A.    Sure.

12       Q.    -- part of that.  Let's identify those.

13       A.    Townhouse rent, phone service townhouse, FPU

14   gas deposit townhouse, Home Depot townhouse, toilet

15   parts, FedEx, rent and security to landlord, moving

16   company, cargo van, gasoline, City Mattress box

17   springs and frame, cleaning supplies as some examples

18   of costs that I incurred as a result of the move.

19       Q.    Do you believe any of these are also

20   reflected in any other part of your damages?  Would

21   they be reflected in your diminution and value or

22   your loss of equity in the home, out-of-pocket

23   expenses related to those?

24       A.    I don't believe so.  I think the list here

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2576 of 3246
Case 2:09-md-02047-EEF-MBN Document 22367-19 Filed 11/19/19 Page 40 of 108
Confidential – Subject to Further Confidentiality Review

 1    is -- it represents the moneys that we expended in

 2    connection with the move away from our Chinese

 3    drywall house and living in our townhouse during the

 4    fourth quarter of 2009 and storage fees.

 5         Q.    So if I'm looking at this then, and let's

 6    kind of put a break at -- where the first time we see

 7    "townhouse" at the top there on Page 1.

 8         A.    Right.

 9         Q.    A lot of things thereafter generally

10    referring to townhouse.  Is that a fair statement --

11    or, expenses related to your townhouse?

12         A.    That's a fair statement.

13         Q.    Storage?

14         A.    Right.

15         Q.    Relocating fitness equipment, those kind of

16    expenses?

17         A.    Yes.

18         Q.    And at the bottom here when we get through

19    the total amount, we've got $90,523.77, right?

20         A.    Yes.

21         Q.    And then that is added on when we get down

22    there, we've got a loss of equity -- and we'll talk

23    about loss of equity later -- but just -- it says

24    591,643.50, right?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2577 of 3246
Case 1:19-cv-02408-WCG Document 235-1 Exhibit 41 Supp 05-19-2017 Page 60 of
108
Confidential – Subject to further confidentiality review

1     A.    Right.

2     Q.    And those are added together for 682,167.27?

3     A.    Right.

4     Q.    And that's our total out-of-pocket damages,

5   right?

6     A.    Yes.

7     Q.    So if we're looking at the amount where we

8   kind of shoehorned was probably related to your

9   moving costs and alternative living expenses, we've

10   got $90,523, right?

11        What -- why is that different from the

12   alternative living expenses at $54,831.07?

13     A.    I would have to look at the other

14   spreadsheet.  I think I have it.

15     Q.    And my colleague, Ashton, said there is a

16   more recent itemization that should have been

17   provided.

18     A.    That might explain it.

19        MR. MONTOYA:  Does it help if I say that

20     we're not trying to double-dip?  If it's an

21     alternative housing that's rent and moving and

22     that's the number -- and it's other out-of-pocket

23     expenses to the extent it's listed in Exhibit 10,

24     that's -- yeah, we're not --

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2578 of 3246
Case 1:09-cv-02047-GEC Document 22363-39 Confidential - Subject to Further Confidentiality Page 61 of
108
Confidential - Subject to Further Confidentiality Review

```
 1          MR. BARRY:  We can stipulate, if it's

 2     double-dipped, we'll --

 3          MR. MONTOYA:  And then there's supplemental

 4     claims after that as well.

 5          MR. BARRY:  What are you stipulating is the

 6     most accurate version?

 7          MS. RICO:  I'd say this one.

 8          MR. BARRY:  Do you mind telling me which

 9     document that is?

10          MS. RICO:  I don't see a Bates number on our

11     copy.  It's a Claimant Affidavit of Chinese

12     Drywall.  It's in the portal.

13          MR. BARRY:  Yeah.  Just trying to make sure.

14          MS. RICO:  It was dated 2/7/16 -- oh, no, I'm

15     sorry.  It's dated -- sorry.

16          MR. MONTOYA:  December 13th, 2016.

17          MS. RICO:  Yeah.

18          MR. BARRY:  Would you mind taking a look and

19     letting me know if this is it so we don't put

20     another exhibit in?

21          MS. RICO:  Yes.  That is the one I was

22     referencing.

23          MR. BARRY:  Thank you.

24     ///
```

Confidential – Subject to Further Confidentiality Review

```
1    BY MR. BARRY:

2         Q.   Mr. Rosen, I'm going to hand you this

3    affidavit.

4              (Defendants' Exhibit 11 was marked for

5    identification.)

6    BY MR. BARRY:

7         Q.   And I think, Mr. Rosen -- and you take as

8    much time as what you want -- but Exhibit B is

9    probably what I'm questioning here.

10        A.   Okay.  Thank you.

11        Q.   Now, looking at this, the alternative living

12   expenses out-of-pocket expenses which is reflected

13   here, does this reflect that $54,831.07 value?

14        A.   Yes.

15        Q.   And that is calculated by calculating

16   out-of-pocket expenses and rent for alternative

17   living?

18        A.   Yes.

19        Q.   I appreciate you walking me through that.

20        A.   You're welcome.

21        Q.   I messed that up on the record there.

22             MR. MONTOYA:  It's Exhibit 11?

23             MR. BARRY:  Yeah.  11.

24             MR. GUERRA:  Can we go off the record for one
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2580 of 3246
Case 1:1-cv-22408-MGC Document 91-21 Entered on FLSD Docket 05/19/2019 Page 63 of
108
Confidential – Subject to Further Confidentiality Review

```
 1      second?

 2            MR. MONTOYA:  Yes.

 3            MR. BARRY:  Yes.

 4                (Discussion off the record.)

 5   BY MR. BARRY:

 6      Q.   Okay.  We're going to move on to talk a

 7   little bit about this loss of equity form that you're

 8   referencing, equity loss damage.  And I just want to

 9   go through each of these items so I can understand

10   them.  We kind of talked about them in brief, but I

11   just want to understand the full calculation you have

12   here.

13            Let me just take one second just to make

14   sure.

15            MR. BARRY:  Let's go off the record.  I

16       apologize.  I just want to make sure I'm asking

17       this correctly so we don't go down that rabbit

18       hole.

19                (Recess from 2:37 until 2:43 p.m.)

20   BY MR. BARRY:

21      Q.   So, Mr. Rosen, if we're going to look back at

22   the most recent exhibit Kelly put out there, the

23   Claimant Affidavit.

24      A.   Exhibit 11?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2581 of 3246
Case 1:11-cv-02349-GAL Document 22363-39 Filed 11/19/19 Page 2581 of
Confidential - Subject to further confidentiality Review
108

```
 1        Q.   Yes.

 2             And if we look at Exhibit B to Exhibit 11.

 3    And the first thing, which is out-of-pocket

 4    expenses -- and I'm going to give you -- the good

 5    news is I'm not going to go through each of these

 6    receipts as long as we stipulate that they are all

 7    admissible and --

 8             MR. MONTOYA:  Absolutely.

 9    BY MR. BARRY:

10        Q.   So I'm going to go through a few of these

11    items, and I believe the exhibits are reflected in

12    Exhibit 10 -- or, the receipts are reflected in

13    Exhibit 10.

14             Do you have any receipts for evidence for the

15    pricing of the two 50-inch Samsung DLP projection TVs

16    that were damaged?

17        A.   No.  I didn't keep those.

18        Q.   So then how did you reach the $3500 amount?

19        A.   Because I remember I paid $3500 for the TVs.

20        Q.   But there's no -- you know, you didn't go

21    online and try to find some pricing from that time

22    period, or you didn't go back through your credit

23    card and see if there was a charge for that amount?

24        A.   I don't have a record of it.
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 2582 of 3246
Case 1:09-cv-07687-RGK Document 228-291 Entered on FLSD Docket 05/18/2012 Page 65 of
108
Confidential – Subject to Further Confidentiality Review

1       Q.    Okay.   So currently we do not have any

2    evidence of that.

3            What about what was probably a very nice

4    Christmas gift, the FAO Schwarz collectible stuffed

5    animals, do you have a receipt for those?

6       A.    No.

7       Q.    How did you come to the $2500 value?

8       A.    Well, I remember what I paid for these

9    animals.   FAO Schwarz had a beautiful store in City

10   Place, West Palm Beach, and it was fortunately going

11   out of business, they were closing.   My wife and I

12   were there and we saw these magnificent -- you may

13   have seen them on Fifth Avenue -- they're the

14   beautiful four-foot tall giraffes, and they had a

15   whole collection, a speciality collection of the

16   Muppets from Jim Henson.   These were specialities,

17   large stuffed animals.   I know you have photos of

18   what we had.   Patrick the puppy, these

19   oversized . . .

20           So we bought these for our kids to give them

21   a beautiful babyhood, and we surrounded them with

22   these in our house.   When I purchased them, I

23   remember spending $2500 over the course of probably

24   six months to a year buying a lot of these at FAO

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2583 of 3246
Case 1:1-cv-22408-JAL Document 1 Entered on FLSD Docket 05/19/2013 Page 35 of
108
Confidential – Subject to further confidentiality Review

```
 1    Schwarz at that bankruptcy sale and other places.

 2           So I think they were more than this.  I

 3    really do.  These were very expensive stuffed

 4    animals, not stuff you get at Walmart or Target.  And

 5    I used my best effort to keep this number at a floor

 6    and not overreach on this.

 7           But I know you have photos, and you have to

 8    have seen them by now; we had dozens and dozens and

 9    dozens of these.  And they all wound up in the

10    dumpster because of the drywall gasses they were

11    exposed to.

12       Q.   Now -- and this is for my exchange for not

13    asking on every single one of these items -- if

14    something is listed here, does that mean that it

15    was -- something like the mattress, or the mattress

16    damaged and discarded up here -- does that mean that

17    those items were thrown out, that you no longer have

18    them in your possession?

19       A.   That's right.  The mattresses -- and we have

20    given you the receipts for those.

21       Q.   Yes.

22       A.   City Mattress, we paid over $5,000 for our --

23       Q.   Well, did you have receipts for the 2006

24    mattress?
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2584 of 3246
Case 1:09-cv-02042-WCG Document 123-1 filed 05/05/11 Page 67 of 108
Confidential - Subject to further confidentiality Review

1      A.    Yes.  That was a very expensive mattress we

2    bought, top of the line.  City Mattress, I think it

3    was their second -- I think it was there second most

4    expensive mattress they sold, and it was a mattress

5    that was designed with, like, space-aged foam.

6           And there was no way we could remediate the

7    mattress.  It was impossible to clean or even have

8    any assurance that it wasn't going to be contaminated

9    by transporting it out of our house to our townhouse.

10   So we discarded it, and it wound up in the dumpster.

11     Q.    For any of these items like these mattresses,

12   did you consider any type of diminution in value or

13   replacement value in how much you purchased a new

14   mattress for?

15     A.    No.  I'm claiming what I paid for these

16   items.  I mean, I spent $5,000 on a mattress, sir, in

17   a brand new house.  We bought it, the mattress, when

18   I closed on the house; you could see that.  And it

19   was relatively new and unused, and it wound up in the

20   dumpster because of your client's drywall.

21     Q.    Is there any item on here -- pre-move items

22   that you were able to preserve and keep?

23     A.    On here?

24     Q.    Yeah.  On this list.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2585 of 3246
Case 1:11-cv-22408-MGC Document 12 Entered on FLSD Docket 05/19/2017 Page 48 of 108
Confidential – Subject to further confidentiality Review

```
1        A.    No.  The items here that are on the list are

2    items that we had to discard because they were -- we

3    had no assurance there was any way to remediate or

4    clean them so they were safe to take to our rental.

5        Q.    And I understand that, Mr. Rosen.  I'm just

6    trying to clarify for the record.

7        A.    Did I clarify?

8        Q.    Yes.  I appreciate you doing that.

9        A.    Sure.

10            I mean, Counselor, there's no way as a father

11   I would let my baby or my children sleep on a

12   mattress that was exposed to Chinese drywall after

13   seeing the corrosive damage that it did to my house.

14   I had no way to clean it, I had no assurance that it

15   was safe, and the only thing I could do as a

16   responsible human being was throw it in the trash

17   can.

18       Q.    And, again, I hear you, Mr. Rosen.  I'm just

19   trying to make sure I understand where all these

20   items went.

21       A.    Sure.

22       Q.    And that's all I need to know and --

23       A.    And I think earlier you asked me about

24   electronic devices that were damaged, and I mentioned
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/10 Page 2586 of 3246 of
Case 1:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/10 Page 2586 of 3246 of
108

Confidential - Subject to Further Confidentiality Review

```
1     these two TVs to you.

2          Q.    Yes.

3                And all I'm asking is if you go through this

4     list, if there was anything that was preserved, just

5     let me know.  And I can give you time to look through

6     it.

7                Obviously, I know that after you moved out of

8     the house, those are different types of items.  So

9     I'm saying in the pre-August 2009 period or probably

10    pre-September 2009 period.

11         A.    The vast majority of items on this

12    out-of-pocket list are hard expenses we incurred

13    moving out of the house and relocating and living in

14    the rental during the three-month period until I sold

15    my house.  The remaining items on here, it was

16    property that was destroyed, that we threw out for

17    the safety of my family.

18         Q.    On this list there's an Italian imported

19    custom-carved wall unit.  It was $5,000.  It says you

20    abandoned that.

21               Did you -- place it in storage is what it

22    says?

23         A.    It was impossible to move; it was so big.  It

24    was in an office.  And I think you have a photo of it
```

Confidential - Subject to Further Confidentiality Review

```
 1   in the collection of materials we sent you.  It was

 2   so tall and so big.  I had no way of reasonably

 3   relocating it into storage with the few things that I

 4   could take with me.

 5        So it was -- it was so heavy and so huge it

 6   was almost like a built-in.

 7        Q.   Did you consider trying to sell it?

 8        A.   I did.

 9        Q.   Why didn't you?

10        A.   Sir, I was in a situation where my family --

11   I had a broken wife who was emotionally destroyed

12   trying to take care of two young children.  I was

13   working full time as a lawyer in my career.  I'm

14   dealing with a house that we suddenly found out was

15   uninhabitable; that we've been exposed to an

16   environmental disaster; finding out that my wife's

17   inheritance, blood money from her mom being murdered

18   was in jeopardy and likely gone.  And I was doing

19   everything I could within reason to move my family

20   out, get them into a safe place, save whatever I

21   could possibly save that was our property.  The

22   things we bought for that house were beautiful,

23   special things that we planned to keep for a very,

24   very long time.
```

```
1            And I'm trying to sell the house, and I'm

2    having extraordinary difficulties getting anybody to

3    buy it at a discount.  My money's gone.  We're on the

4    run trying to leave this house and do all this on top

5    of trying to sell a piece of furniture.

6            Imagine being in my shoes for that time

7    period.  And I don't think anybody else could have

8    done any better.

9        Q.   And I know it was difficult.  I'm just asking

10   what -- so if I'm -- if I'm hearing you correctly,

11   you didn't sell it because other things were top of

12   mind?

13       A.   I wouldn't agree with that statement.

14           I did everything I could to try to minimize

15   the financial damage we had suffered because of your

16   client's drywall.  This was one thing I couldn't fix.

17       Q.   Okay.

18       A.   Amongst many other things I couldn't fix.

19       Q.   Do you have any -- and I can't remember, were

20   there any receipts for that carved unit?

21       A.   I think I provided that to you.

22       Q.   And if you did -- my colleague, Ashton, is

23   saying there were no receipts for that.  And we don't

24   need to do it right here; we don't have to go look
```

Case 2:09-md-02047-EEF-MBN  Document 22363-39  Filed 11/19/19  Page 2589 of 3246
Case 1:09-cv-02047-MGC  Document [illegible] Confidential Subject to [illegible] Page 72 of
108

Confidential - Subject to Further Confidentiality Review

```
 1    through it but --

 2        A.   So if I didn't provide it to you it's because

 3    I no longer had the receipt.

 4        Q.   Okay.

 5        A.   But it was a very expensive piece of

 6    furniture that I bought with my wife at I believe it

 7    was Baer's Furniture.  And if you look at that piece

 8    of furniture, it was Italian hand-carved wood.  I can

 9    assure you it was worth at least $5,000, and I paid

10    at least $5,000 for it.  And I'm -- I have every

11    reason to believe that that claim for damages is

12    accurate and perhaps less than what it would cost for

13    me to go and buy that same piece of furniture today.

14        Q.   So we talked earlier about the -- I think it

15    was roughly $300,000 payment from the Chinese drywall

16    settlement.  Did you receive any other payments

17    related to the Chinese drywall settlement?

18        A.   No.

19        Q.   Have you applied for any other Chinese

20    drywall settlements?

21        A.   No.

22             Oh, let me clarify my last answer.

23        Q.   Yeah.

24        A.   I just received fairly recently another check
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2590 of 3246
Case 1:09-cv-02442-HGC Document 221 Entered on FLSD Docket 05/05/2011 Page 73 of
108
Confidential - Subject to further confidentiality review

1    from the settlement administrator for $21,000.

2        Q.    Okay.

3        A.    And that was a -- I guess the final

4    distribution from the BrownGreer settlement fund.  I

5    think they closed the claim fund out now.

6            So that check came in, I'm going to say

7    within the last six months.

8        Q.    Okay.  Have you -- do you know if you have

9    provided that to your attorney to produce in this

10   litigation?

11       A.    I think the attorney provided it to us.  But

12   if I have it, I can give it to you.

13           MR. MONTOYA:  I don't frankly know if that is

14       reflected in that amount.

15           MR. BARRY:  If you don't mind just providing

16       it.

17           MS. RICO:  Yeah.

18           THE WITNESS:  That check -- bear with me.

19           MR. BARRY:  Got it right here?

20           THE WITNESS:  How did I know you were going

21       to ask?

22           I'll show it to Mr. Montoya first.

23           MR. BARRY:  And I'm not going to take a check

24       from you.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2591 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2591 of 3246
Confidential - Subject to Further Confidentiality Review
108

```
 1            THE WITNESS:  It's already cashed.

 2   BY MR. BARRY:

 3       Q.   And you said this is already cashed.  If we-

 4   made copies of this?

 5       A.   You can make a copy of it, absolutely.

 6            MR. BARRY:  I'm going to introduce it as an

 7            exhibit, if that's okay, and we can make the

 8            copies afterwards, is that all right, on a break?

 9            THE WITNESS:  And just for the record, that

10            check came to me way after this exhibit was put

11            together.

12            MR. BARRY:  I totally understand.  I get that

13            there's a lot of different pieces, and we're all

14            putting it together.

15            (Defendants' Exhibit 13 was marked for

16   identification.)

17   BY MR. BARRY:

18       Q.   And so this is -- what we've marked as

19   Exhibit 13 is what you were describing as the recent

20   settlement check, around 21,000, you received?

21       A.   Yes.

22       Q.   Have you received any other settlement

23   checks?

24       A.   No.
```

Case 2:09-md-02047-EEF-MBN  Document 22363-39  Filed 11/19/19  Page 2592 of 3246
Case 1:09-md-02047-EEF-MBN  Document Exhibit 35 Docket Sub-Packet 09-6690  Page 45 of
108
Confidential - Subject to further confidentiality Review

1       Q.   Have you applied for any other settlement

2   funds?  And I apologize if I have asked that question

3   already.

4       A.   No.

5       Q.   Now, did you claim any tax deductions related

6   to Chinese drywall?

7       A.   I did.

8       Q.   What tax deduction did you claim related to

9   Chinese drywall?

10      A.   A casualty loss.

11      Q.   And what was that casualty loss?

12           I'm handing Exhibit 14, which is your 2009

13   joint tax return with your wife, Stacey Rosen.

14           And if you want to take a second to look

15   through that so you can identify that.

16           I'm only asking you about the casualty loss

17   related to this.

18           (Defendants' Exhibit 14 was marked for

19   identification.)

20           MS. CARPENTER:  Bates stamp 502.

21           MR. BARRY:  502 and, I guess, 509; am I

22      right?

23   BY MR. BARRY:

24      Q.   Okay.  So you took a deduction of $584,520

Case 2:09-md-02047-EEF-MBN  Document 22363-39  Filed 11/19/19  Page 2593 of 3246
Case 1:09-md-02047-EEF-MBN  Document Confidential  Filed  Docket  Page 70 of
108
Confidential - Subject to Further Confidentiality Review

```
 1    related to Chinese drywall -- I'm sorry, $553,000 and

 2    400? [Sic]

 3        A.   Correct.

 4        Q.   What does that number reflect?

 5        A.   That's the allowance under the calculations

 6    reflected on Form 4684 that was incorporated into my

 7    1040.

 8        Q.   And what does that calculation consist of?

 9             MR. MONTOYA:  Objection to the extent that it

10        calls for an expert opinion.

11             MR. BARRY:  Understood.

12    BY MR. BARRY:

13        Q.   What is your understanding of what that

14    amount consists of?

15        A.   My nonexpert understanding is the calculation

16    was based on the cost basis of the property, which

17    was $1,050,000.  That was the contract price of the

18    house, minus what I sold it for, with some

19    adjustments required here by the IRS to get to the

20    net figure.

21        Q.   And do you consider that amount that you

22    received in a tax deduction a -- do you consider that

23    an offset to the total amount you are asking for in

24    this litigation?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2594 of 3246
Case 1:11-cv-22408-MGC Document 203-1 Entered on FLSD Docket 09/26/2014 Page 77 of
108
Confidential – Subject to further confidentiality review

```
 1              MR. MONTOYA:  Objection to the extent it

 2         calls for a legal conclusion.  You can answer.

 3              THE WITNESS:  No.

 4    BY MR. BARRY:

 5         Q.   Do you consider what you're asking in this

 6    litigation to be in addition to that tax deduction?

 7         A.   Yes.

 8         Q.   Did you receive that tax deduction?

 9         A.   I did.

10         Q.   Did the IRS challenge on you it?

11         A.   I did receive it.  The IRS did not challenge

12    it.

13         Q.   Congratulations on not getting challenged by

14    the IRS.  Kidding.

15         A.   It's not funny.  It's not funny at all.  I

16    had to pay -- I had to pay taxes on the settlement

17    funds that I got from BrownGreer.  So the 340,000 and

18    $21,000 we were paid -- which I'm sure I will wind up

19    paying my income taxes on the 21,000 -- those are not

20    proceeds for us.  The IRS took maybe 39 percent of my

21    recovery that I received from the drywall.

22         Q.   I understand.  And I apologize if it sounded

23    like I was trying to make light of that.  I was not

24    trying to do that, Mr. Rosen.
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 2595 of 3246
Case 1:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 78 of
Confidential - Subject to Further Confidentiality Review
108

```
 1              You said you sold your home in December of

 2       2009.  Can you walk me a little bit through that

 3       process of selling your home?

 4          A.    Sure.

 5              So in The Oaks where we lived, the

 6       neighborhood was on fire.  Every other home on my

 7       street was built by Albanese Popkin, my builder.

 8       Every other home on the street as far as I know

 9       talking to neighbors and others had Chinese drywall.

10       That became -- that became very damaging to the

11       families living in The Oaks.  People were scared to

12       live in The Oaks.  People were frightened to even

13       come to our house or come into our homes.  The

14       realtors in the marketplace, everybody knew what was

15       going on in The Oaks.  Neighbors were crying,

16       families were being forced out of their home.  It was

17       an absolute nightmare.

18              I hired two brokers, father and son, David

19       and Ryan Greenblatt, highly experienced realtors,

20       experts in the marketplace in West Boca, experts in

21       The Oaks, experts in luxury homes working for one of

22       the top realtor brokers in the South Florida

23       marketplace to make every effort to sell my home for

24       the best value it could be sold for.
```

```
1              In no way, shape, or form was this a fire

2      sale.  Unlike most of my neighbors who did not have

3      substantial equity in the house, my wife and I were

4      in a position to sell the house without having bank

5      approval because the home had 80 percent-plus equity

6      in it.  So whatever we were willing to sell was money

7      that we were -- we had lost anyways, because the

8      house was destroyed.

9              And we had to come to terms with that, sir.

10             Made a difficult decision, put the house on

11     the market.  I had no confidence I could fix the

12     house in any way, and it would be safe for me or my

13     family to know whether or not a contractor would even

14     know what to do to remediate a house with this type

15     of exposure, when nobody had any idea what to do with

16     it and everybody was guessing.  Well, replace this,

17     replace that, don't replace this, don't replace that.

18     Not knowing even if we tried to fix the house if it

19     would ever be marketable or it would have stigmatized

20     losses to it, which I believe it would.  People would

21     always view that house:  Why would we want that house

22     when we can buy the same model up the street?  We're

23     going to take a discount.

24             So with everything going on, I and my wife
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2597 of 3246
Case 1:11-cv-22408-MGC Document 205-1 Entered on FLSD Docket 05/29/2015 Page 80 of
108
Confidential - Subject to further confidentiality review

```
1    retained Ryan and David Greenblatt, who were terrific

2    brokers.  They have relationships with builders in

3    the community; they have relationships with many

4    brokers around Florida and even out of the country.

5    They listed the house.  We fully disclosed it had

6    Chinese drywall, no monkey business.  I didn't want

7    anybody buying this house not knowing they were

8    walking into a house that had your client's defective

9    drywall.

10          I knew I couldn't list the house for what it

11   was worth.  There's nobody who would buy it for fair

12   market value pre-Chinese drywall; that's obvious.  So

13   putting our heads together, looking at the market,

14   trying to make our first best effort to list a house,

15   we put a haircut on the price and listed it for 839.

16          We figured it would be hundreds and hundreds

17   of thousands of dollars for somebody to even take a

18   shot at ripping out the drywall with all the upgrades

19   and expensive finishings in the house.

20          We put the house on the market.  Ryan and his

21   father pulled out their Rolodex.  They called

22   everybody they could.  They called other builders,

23   builders who built in The Oaks.  Nobody wanted the

24   house.  Nobody was interested.
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2598 of 3246
Case 1:1-19-cv-00449-GMS Document 23363-39 Enhanced Copy Docket 05/03/2019 Page 41 of 108
Confidential - Subject to further confidentiality Review

```
 1            Then as this fire and cancer was spreading

 2     around the neighborhood, others started to list their

 3     house, which created a price pressure, too.  There

 4     were other plaintiffs that are suing Taishan that

 5     were from The Oaks.

 6            They showed the house maybe -- I think they

 7     had 40 or 45 showings at a house, real people

 8     interest; and it turned out most of them were just --

 9     just wanted to see it.  They wanted to smell it.

10     They heard about it.  It was like an amusement park.

11     Most of these people weren't even serious in buying

12     the house.

13            My brokers kept going at it.  And I tried

14     every which way to sell this house.  I even called an

15     auction company, reached out to auction companies,

16     and they said to me, we don't know what to do with

17     your house, Kevin.  We have sold houses with murders

18     before; at least we can figure out where that might

19     land.  You put this house up for an absolute auction,

20     you might wind up with nothing.  Not a risk I thought

21     I could take.

22            Based on the little feedback they were

23     getting as they listed the house for 839, in

24     consulting my wife about what was going on, I said,
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 2599 of 3246
Case 1:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 2599 of 3246

Confidential - Subject to Further Confidentiality Review
108

 1    we have to lower the price; we have to figure out

 2    what the market is willing to pay for the house.  So

 3    we dropped the price down maybe $100,000.

 4           Still nothing.

 5           Weeks go by, showings are going on, settling

 6    my family into their rental home.  Some clown offers

 7    us $300,000 for the house, which is what the dirt of

 8    the house is worth.  We keep looking, trying.  I'm on

 9    the phone with Ryan and David.  I bit the bullet and

10    I said, we have to lower the price down I think to

11    599.  We took a house that was worth over -- easily

12    over a million dollars, and it's on the market for

13    599?  And it's our money.  It's my wife's blood money

14    inheritance.

15           Ryan couldn't believe I had the strength to

16    deal with this.  I said, look, I have to.  We have to

17    sell the house, if we can.

18           Finally, we got, I think, another offer for

19    400,000; and then a third, I think it was in the

20    mid-fours.  But Ryan was successful in negotiating

21    that up to five; the magic number, 501.  Somehow he

22    said, I got to get you at least five for the house.

23    He pushed.  It was an investor from Canada, I

24    believe, that bought the house through his company,

Case 2:09-md-02047-EEF-MBN Document 23262-39 Filed 11/19/10 Page 2600 of 3246
Case 1:09-md-02047-EEF-MBN Document 23262-39 Filed 11/19/10 Page 2600 of 3246
Confidential - Subject to Further Confidentiality Review
108

```
 1   Campbell Holdings.

 2            We spent months trying to sell this house.

 3   501 was the best offer I could get, short of letting

 4   the house go into foreclosures or just keep paying

 5   the mortgage in perpetuity without being able to

 6   repair it.

 7            Signed a contract with my wife; we closed on

 8   the house in December of 2009.  And I made sure when

 9   I closed that I had that buyer sign a document that

10   said clear on its face that he has -- he and his

11   company have zero rights to this litigation or any

12   litigation or any claim perspectively,

13   retrospectively for this house.  You're buying that

14   house for 501, he owns it as-is, defective,

15   unhabitable; and that the Rosens retain their right

16   to recover if they ever see a dime going forward, a

17   copy of the document I know you have.  Okay?

18       Q.   I'm going to give you a copy of what is the

19   warranty deed.

20            MR. BARRY:  This is Exhibit 14, I believe --

21       15.

22            (Defendants' Exhibit 15 was marked for

23   identification.)

24   ///
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2601 of 3246
Case 1:1-cv-22408-MGC Document 23-1 Entered on FLSD Docket 05/18/2011 Page 41 of
108

Confidential - Subject to Further Confidentiality Review

```
1    BY MR. BARRY:

2        Q.   And on Page 2 of this very small type, does

3    this reflect that purchase price that you mentioned,

4    503?

5        A.   Yes.  It was the sales price of the house not

6    including the real estate fees that I paid to my

7    broker to sell it and closing costs.  So we didn't

8    pocket 501,000.  We netted significantly less than

9    that.  We paid, what, $42,592 in settlement fees,

10   closing costs on the transaction.  And paid off my

11   first mortgage.

12       Q.   At the time you were selling this house, were

13   you aware of any other market pressures besides

14   Chinese drywall?

15       A.   No.

16       Q.   So the housing prices were the same as when

17   you bought them in 2006, 2007?  There wasn't any type

18   of reduction in housing prices during that time

19   period?

20       A.   Yes.  The market was lower from 2006 to 2008.

21   But my house was valued -- I could have sold that

22   house like a snap before this Chinese drywall all day

23   long for $1.1 million, no questions asked.

24            At the time that I found out this house had
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2602 of 3246
Case 1:11-cv-22408-MGC Document 208-1 Entered on FLSD Docket 05/19/2017 Page 85 of
108
Confidential - Subject to Further Confidentiality Review

1    Chinese drywall, this is the end result, $501,000.

2    That's what the market was at the time.  My realtor

3    has told you that -- and you have that in your

4    file -- the same.  And the comps in the neighborhood

5    all bear that out.

6           So it's incorrect to assume or imply that the

7    house was worth less than it was.  Yes, it wasn't

8    worth $1.4 million -- perhaps it was in 2006 -- no,

9    I'm not saying that.  It wasn't worth $501,000

10   pre-Chinese drywall.  There's never been a house sold

11   in The Oaks as far as I know since I sold this house

12   that has any new construction at all, anywhere near

13   close to $500,000.  They don't build houses in The

14   Oaks for $500,000.  Nobody can buy a house in The

15   Oaks for $500,000 with a builder in there.  It's a

16   million dollar-plus luxury gated community, sir.  It

17   was then and it still is today.

18       Q.   Mr. Rosen, you referred to the agreement you

19   entered into with the buyers that allows you to

20   obtain your . . .

21          (Defendants' Exhibit 16 was marked for

22   identification.)

23   BY MR. BARRY:

24       Q.   Is this that agreement, Exhibit 16?

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2603 of 3246
Case 1:11-cv-22408-MGC Document 236-1 Entered on FLSD Docket 05/19/2013 Page 36 of
108
Confidential - Subject to further confidentiality Review

1    A.   Yes, it is.

2    Q.   Do you know of anyone else who has any right

3    to any claim against Taishan right now, or is it just

4    you?

5    A.   In connection with my former house?

6    Q.   Yes.

7    A.   I know of nobody that's made a claim

8    regarding the house.

9    Q.   So to your understanding, you're the -- you

10   and your wife are the only ones making a claim on

11   your house?

12   A.   That's right.

13   Q.   Do you know what your neighbors, who had

14   Chinese drywall, sold their house for during that

15   same time period?  You said there was a fire sale.

16   A.   No, I didn't say it was a fire sale.  I said

17   the neighborhood was on fire.

18   Q.   The neighborhood was on fire.

19   A.   It's a metaphor.

20   Q.   Yes.  Understood.

21   A.   You can appreciate that, right?

22   Q.   Uh-huh.

23   A.   Okay.  There was another home that sold in

24   and around the time period, it was, I believe, for

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2604 of 3246
Case 1:1-22-md-MCAL Document 22261 Confidential SubjectoFurther Page 47 of
Confidential — Subject to further confidentiality Review
108

1    839,000.  It was an Oaks Albanese Popkin house,

2    another homeowner with the same last name, the

3    Rosens, unrelated.  Their house was significantly

4    larger, to my understanding.

5         I don't -- see, as I said earlier, I think

6    most homeowners in The Oaks, if not the substantial

7    majority, had some equity in their house and a

8    mortgage, which is pretty typical.  And I think we

9    were having atypical homeowners having 80-percent

10   plus cash equity in a home of that caliber.

11        So I don't think there were too many victims

12   living in the neighborhood that where in the position

13   to actually list their home and sell it without a

14   bank approval, which put us in a unique position to

15   actually sell the house in a reasonable manner under

16   the circumstances without having the bank weighing in

17   on blocking our ability to sell the house.

18        So there weren't a lot of houses in on the

19   market in The Oaks with this problems for those

20   reasons, I believe.

21    Q.   Did you ever do an appraisal of your house

22   during that time period?

23    A.   We had an appraisal pulled when we refinanced

24   the house, and we had an appraisal pulled in the

Case 2:09-md-02047-EEF-MBN  Document 22363-39  Filed 11/19/19  Page 2605 of 3246
Case 1:1-cv-22408-MGC  Document 291-5  Entered on FLSD Docket 05/18/2015  Page 48 of
108
Confidential – Subject to further Confidentiality Review

```
 1    summer.

 2        Q.   Do you recall what the appraisal was when you

 3    refinanced?

 4        A.   In 2008, probably $1.2 million.  I'm

 5    estimating.

 6        MR. BARRY:  I'm not sure we have that 2008

 7        one, if it exists, Pat.  And I could be wrong.

 8        But I'm not sure if we have it.  If it exists, do

 9        you mind producing it?

10        MS. RICO:  I will check for you, yeah.

11        THE WITNESS:  If my lawyers don't have it and

12        I have it in my records, I will absolutely

13        produce it.  I would expect there would be an

14        appraisal, since it was a bank refi, and it's a

15        requirement of it.

16        MR. BARRY:  And that was part of why I was

17        asking, because there was a refinance.

18        THE WITNESS:  Yeah, there was.  And as I said

19        earlier, when we initially closed on the house,

20        we had a 30-year mortgage at six and

21        three-quarters percent, and two years later, we

22        refi'ed the house due to a favorable interest

23        rate of five and a quarter, and we shortened the

24        maturity term to 15 years.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2606 of 3246
Case 1:11-cv-22408-MGC Document 1 Entered on FLSD Docket 05/19/2000 Page 46 of
Confidential - Subject to further confidentiality Review
108

1    BY MR. BARRY:

2        Q.   Mr. Rosen, I want to backtrack a little bit

3    on -- this is taking us way back to the inspection

4    period.

5            How did you come to understand that the

6    drywall in your house was Taishan drywall?

7        A.   My counsel, their law firm.  They did their

8    analysis on the drywall boards that were removed

9    through destructive testing, and through their

10   investigation made their determination that the

11   drywall boards in my house were Taishan, which is

12   consistent with the other homeowners who I -- who

13   also had houses built by Albanese.  We're not the one

14   off-house.

15       Q.   So do you have any other knowledge that the

16   drywall in your house was Taishan other than from

17   what you learned from your counsel?

18       A.   No, sir.

19           MR. BARRY:  What I would suggest for the

20       record is we take a little bit of a break so we

21       can review those documents and if we have any

22       questions on it.  Would that be okay?

23           MR. MONTOYA:  Sure.

24           And for the record, we produced probably, I'm

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2607 of 3246
Case 1:09-cv-07402-CGM Document 23621 Confidential Subject 05/26/17 Page 40 of
108
Confidential - Subject to further confidentiality Review

```
 1        guessing, about two inches of documents that

 2        represent Mr. Rosen's backup on the capital

 3        investment for the property throughout -- during

 4        the purchase time.  He has also produced a

 5        spreadsheet detailing the numbers behind each

 6        one.  We offered it up at the beginning of the

 7        deposition.  You are free to question him on it

 8        as you see fit.

 9            MR. BARRY:  Yeah.  And I'm saying to conserve

10        Mr. Rosen's time -- and I know you probably don't

11        want to come back.  If you don't mind giving us a

12        little bit of time so we can just look through

13        it, and then if there's any questions --

14            THE WITNESS:  Absolutely.  Please do.

15            MR. BARRY:  And if you prefer a different set

16        of circumstances, let me know.

17            THE WITNESS:  No.

18            And just so you know, I have made my best

19        efforts to put this in good order for you.  The

20        work orders are in date order from beginning to

21        the end of the project.  You will see in there

22        that I had the same protocol with the builder.

23        They sent me a work order -- or, a change order.

24        I signed it, I faxed it back to them.
```

Case 2:09-md-02047-EEF-MBN Document 23263-39 Filed 11/19/19 Page 2608 of 3246
Case 1:09-md-02047-CA Document Temporary 21 Subject to Docket 05/19/2019 Page 91 of
Confidential – Subject to further confidentiality Review
108

1           And in the back-up documentation, with a few

2       exceptions, you are going to see the check with

3       the work order.  In some instances, the check was

4       mailed, and then I sent them a copy of it after.

5           And then I compiled the spreadsheet, which

6       you now have, which lays out the date that I

7       signed each work order, a description of what it

8       was that I was paying for, and the amounts.  And

9       it's all summarized on there for you.

10          MR. BARRY:  I very much appreciate it.

11          MR. MONTOYA:  To make it easier for you.

12          MR. BARRY:  I very much appreciate it.

13          THE WITNESS:  Thank you.

14          MR. BARRY:  We can go off the record.

15          (Recess from 3:18 until 4:07 p.m.)

16          MR. BARRY:  Mr. Rosen, I appreciate your

17      time, and I'm hopeful I won't take much more of

18      it.

19          We reviewed the documents that were produced

20      to us today.  A lot of them look in order, but we

21      want to be able to make sure -- we saw a few

22      discrepancies.  We just want to make sure we

23      understand it.

24          As I told Mr. Montoya, my goal is to not have

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2609 of 3246
Case 2:09-md-02047-EEF-MBN Document 18776-5 Filed 05/13/19 Page 92 of 108
Confidential – Subject to Further Confidentiality Review

```
1          to bring you back for any of this.  So hopefully,

2          if there's any discrepancies -- and I don't think

3          anything is going to be controversial -- and we

4          can work it out among counsel.

5              So we reserve the right.  But I will tell

6          you, I'm going to do everything I can to make

7          sure that that right does not have to be

8          exercised.

9              THE WITNESS:  I understand.  And thank you

10         for that.

11             MR. MONTOYA:  To the extent you all want to

12         keep the depo open as to those documents, we

13         don't have a problem with it at all, but as to

14         anything else, I don't want him coming back.

15             MR. BARRY:  Certainly understand.

16             And we're going to keep it open to any

17         documents that were subsequently produced but on

18         topics that -- yeah, we're in agreement.

19             MR. MONTOYA:  And I know Kevin had something

20         he wanted to clarify as well.

21             MR. VERRIER:  I just want to say one thing

22         about that point also.  Just keep in mind as you

23         go through those documents that we have that very

24         light deadline for turning around any additional
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2610 of 3246
Case 1:09-cv-02047-MGC Document 8 Entered on FLSD Docket 03/28/19 Page 43 of
108
Confidential - Subject to Further Confidentiality Review

```
1        depositions.  You know, we've got to get that

2        scheduled as soon as possible, if after your

3        review you think you need something.

4             MR. BARRY:  I certainly understand.

5             What we're going to do is to we're going to

6        leave these documents in the possession of

7        Mr. Montoya so that they can go through and

8        produce it through the proper means.  And then we

9        will review it, and we will try to get back to

10       you as soon as we can.

11            MR. MONTOYA:  Thank you.

12            MR. BARRY:  Obviously, with the holidays,

13       that complicates everything.

14            MR. MONTOYA:  We don't celebrate holidays.

15            MR. BARRY:  The associates don't; the

16       partners do.  They have to sign off on our work.

17            I just had -- yes, if you would like to

18       clarify now, that's --

19            THE WITNESS:  Yes.  I believe at the very

20       onset of my deposition you asked about whether or

21       not I brought any litigation or been a plaintiff

22       in a case, or you asked questions around that.

23            MR. BARRY:  Yeah.

24            THE WITNESS:  And so on the break I did
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2611 of 3246
Case 1:11-cv-22408-MGC Document 236-31 Entered on FLSD Docket 05/18/2011 Page 94 of
108

Confidential - Subject to Further Confidentiality Review

```
 1          recollect that I had brought a small claims

 2          action, probably around 2006 or '7 involving a

 3          person that was painting the front entry door to

 4          my house in The Oaks.  And the paint was peeling

 5          off.

 6               MR. BARRY:  Okay.

 7               THE WITNESS:  So we asked the lady to refund

 8          our money and she said no.  So I brought her to

 9          small claims court, and we settled the matter.

10          It was maybe $100,000.

11               But in full disclosure, now that I

12          recollected that, I wanted to bring that to your

13          attention.

14               MR. BARRY:  I appreciate your honesty.

15     BY MR. BARRY:

16          Q.   Did you give any testimony under oath during

17     that period?

18          A.   No.

19          Q.   Did you sign any affidavits?

20          A.   No.  It was a small claims case.

21          Q.   Did you provide any verified complaints or

22     answers or anything of that sort?

23          A.   Nothing under oath.  It was a small claims

24     complaint and then a stipulation that may have been
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2612 of 3246
Case 1:09-md-02047-EEF-MBN Document 12 Entered on FLSD Docket 01/29/2019 Page 95 of
108
Confidential - Subject to Further Confidentiality Review

```
 1    adopted by the Court and a dismissal with a check.

 2        Q.   Okay.  Understood.  And I appreciate you

 3    being forthcoming about that.

 4        A.   Sure.

 5        Q.   I have a few last quick questions, and you're

 6    going hate what they're about.

 7             So if we can turn to Exhibit 11, which is the

 8    plaintiff affidavit.

 9             MR. BARRY:  Oh, and the court reporter will

10        be upset with me if I don't say this on the

11        record:  Exhibit 12 was skipped, and so there

12        will be no Exhibit 12.  And if we are looking for

13        it, it will be blank in the transcript.

14    BY MR. BARRY:

15        Q.   And if you turn to Exhibit B, to the claimant

16    form -- or, affidavit.

17             Now, we were talking earlier about some of

18    the items that don't have receipt back-up.  And I

19    recognize -- let's take a look at the stuffed animals

20    which you described in detail earlier.  They are

21    dated August 1st, 2009, is that correct, on here?

22        A.   Yes.

23        Q.   Do you recall when you purchased those?  I

24    assume that is just the date you wrote them off?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2613 of 3246
Case 1:11-cv-22408-MGC Document 239 Entered on FLSD Docket 05/18/2013 Page 96 of
108
Confidential - Subject to further confidentiality review

1      A.    I purchased them after we moved into The

2   Oaks.  I don't remember the exact time frame.

3      Q.    Do you remember if you bought them by cash,

4   credit card, check?

5      A.    I don't recall.

6      Q.    Did you go and look at any of your credit

7   cards or bank accounts during that time period to see

8   if they might recreate how much you spent on those

9   stuffed animals?

10      A.    No.

11      Q.    And same line of questions for the

12   televisions.  When did you buy those TVs?

13      A.    I can't be certain if I had purchased them

14   shortly before I moved into the house with Stacey or

15   it was after.  But they were -- they were fairly new

16   TVs.  At the time DLP projection was state of the

17   art.

18      Q.    Absolutely.

19         Do you remember if you purchased them using

20   your credit card, check, debit card, cash, anything?

21      A.    I don't.

22      Q.    Did you review any of your accounts to see if

23   there was any type of receipt or indication of your

24   purchase?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2614 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2614 of 3246
Confidential - Subject to further confidentiality Review
108

```
 1        A.    I may have.  I don't recall.

 2        Q.    Okay.

 3        A.    And this is going back years ago.

 4        Q.    Of course.

 5        A.    I made every effort to gather receipts to

 6   support the expenses that I'm claiming in this

 7   litigation.  And if I was able to identify a charge

 8   on a credit card and match it up to the purchase of

 9   the TV, I believe I would have, you know, flagged

10   that and included it in the package for you.  It just

11   may simply be that I bought other items the day I

12   bought the TV and just can't figure it out on a

13   credit card receipt, specifically this amount is for

14   two TVs, plus a DVD player, a VCR, and a bunch of

15   other stuff.

16        So I can testify and tell you I made every

17   reasonable effort to identify the receipts for the

18   items that I'm claiming for, and I think you have the

19   vast majority of those documented here.

20        Q.    I would agree with that.  I'm only asking

21   about three items, and the third being the Italian

22   unit.

23        Do you remember how you paid for the Italian

24   imported custom-carved wall unit?
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 2615 of 3246
Case 1:09-cv-04346-GAO Document 23362-39 Filed 11/19/19 Page 2615 of 3246
108

Confidential – Subject to Further Confidentiality Review

```
1        A.    That would have been by credit card, I'm

2    almost certain.

3        Q.    And did you go back through your credit card

4    accounts and check to see if --

5        A.    I don't know if I have the statements

6    anymore.

7        Q.    Okay.  Did you check online to see if they

8    were available online?

9        A.    I don't recall if I did.

10       Q.    Okay.  Have you closed any credit card

11   accounts in the last 15 years, ten, 15 years?

12       A.    Yes, I have.

13       Q.    This is a shot-in-the-dark memory:  Would you

14   think that this would be an account that you would

15   have used a credit card, an account that's still open

16   today?

17       A.    I don't know the answer.  I mean, we may have

18   taken out a line of credit at Baer's; I believe

19   that's the store we purchased it at.  And if we did,

20   it could have been an account opened just to buy that

21   furniture, and when it was paid off, it was closed.

22   It could have been a credit card I had at the time

23   that's closed.  I just don't know.  If I had the

24   records at my disposal, sir, I would certainly have
```

Case 2:09-md-02047-EEF-MBN Document 23263-39 Filed 11/19/19 Page 2616 of 3246
Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 46 of 108
Confidential - Subject to further confidentiality Review

```
 1    given them to you.

 2         Q.   And I understand, and I appreciate your

 3    efforts today.

 4              Are there any more records in your possession

 5    that are relevant to this litigation?  I know we have

 6    had a few things produced today.  Is there anything

 7    else you can think of that might need to be produced?

 8         A.   No.  I think I've provided the documents that

 9    are relevant to the case and substantiate our

10    damages.

11         Q.   How do you generally store your records?  Are

12    you someone who stores records hard copy?  Do you

13    keep them electronically?

14         A.   Well, a combination of both.  I'm much more

15    electronic-driven these days -- as I think the world

16    has evolved in that direction -- with online

17    statements, online bill pay.  Years ago back in 2008

18    and 2009, I think less so.  Paper files was more of

19    my practice.  And I think that's the vast majority of

20    the way I conducted business for my family.

21              MR. BARRY:  I have no more questions for you.

22         I will defer to my co-counsel -- or,

23         co-defendants counsel here, and if they have any

24         questions for you.
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2617 of 3246
Case 1:18-cv-00490-WCG Document 209-1 Confidential filed 05/04/2019 Page 100 of 108
Confidential - Subject to Further Confidentiality Review

```
 1                     CROSS-EXAMINATION

 2   BY MR. POYER:

 3        Q.   Hi, Mr. Rosen.  My name is Joshua Poyer.  We

 4   met earlier.  I represent Beijing New Building

 5   Materials, PLC.  I just have just a few follow-up

 6   questions.

 7             Regarding your electronic files, have you --

 8   have you reviewed those documents that are stored

 9   electronically for any documents that might be

10   relevant to this litigation?

11        A.   I don't have -- I don't have any electronic

12   documents at this point, to my knowledge, other than

13   what I have scanned into PDFs and sent to Mr. Montoya

14   and Colson Hicks.

15        Q.   That would be my follow-up question:  Have

16   you provided all of those documents to your

17   attorneys?

18        A.   I have provided them everything that I had.

19   And then today I brought in the documents you looked

20   at over the break just to ensure that you had the

21   receipts with regards to the capital improvements

22   during construction.

23        Q.   And just to be clear, I apologize if this

24   answer -- if you've already answered this.  Do you
```

```
 1    have any more documents with you today that you

 2    haven't produced here?

 3         A.   Yes, I do.  Do you want to know what they

 4    are?

 5         Q.   Yes, please.

 6         A.   Okay.  So you have a copy -- and it's marked

 7    Exhibit 13 -- my drywall settlement check for

 8    21,326.60; that is in the record.  I have brought the

 9    letter I have from Mr. Montoya and Mr. Gonzalez with

10    a copy of the initial settlement check of 340,974.34

11    here.  And then I brought with me my affidavit of

12    Chinese drywall economic damages, a copy of which

13    we've gone over.  That's it.

14         Q.   So just for the record, the only document of

15    those that you have in your hand that haven't been

16    marked for identification is the letter from

17    Mr. Montoya to you?

18         A.   Plus a copy of the $340,000 settlement check.

19              MR. POYER:  Would it be possible to get a

20         copy of that marked into evidence, Mr. Montoya?

21              MR. MONTOYA:  Sure.

22              (Defendants' Exhibit 17 was marked for

23         identification.)

24    ///
```

```
1    BY MR. POYER:

2        Q.   And just for the record, what did we mark in

3    evidence, and what did we not mark into evidence?

4        A.   All right.  So what you've -- what's been

5    marked as Exhibit 17 is a copy of the Chinese Drywall

6    Settlement Program Check 104077 dated

7    August 2nd, 2016, payable to Kevin Rosen in the

8    amount of $340,97434.

9             What has not been marked in evidence is the

10   brief one -- two-sentence cover letter transmittal

11   letter from Colson Hicks, along with the shipping

12   label from FedEx.  If you want that, I'm happy to

13   produce those as well.

14             MR. BARRY:  There's the answer to the case.

15             MR. POYER:  May I very briefly review

16        Exhibit 17?

17             MR. MONTOYA:  Sure.

18             MR. POYER:  Just because I haven't seen it

19        before.  I apologize.

20             THE WITNESS:  Sure.

21             MR. POYER:  Thank you very much.  I

22        appreciate it.

23             That's all the questions we have.  Thank you.

24        And thank you again for your time, Mr. Rosen.
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2620 of 3246
Case 1:14-cv-24091-NGG Document 209-1 Entered on FLSD Docket 05/08/2020 Page 103 of 108
Confidential - Subject to Further Confidentiality Review

```
 1            THE WITNESS:  Thank you.

 2            MR. BARRY:  Mr. Montoya, if you want to ask

 3      questions?

 4            MR. MONTOYA:  I don't.  We'll read.

 5            And then we're going to transition over

 6      Stacey's.

 7            MR. BARRY:  Okay.  And for the record, I

 8      reserve, if there are any further documents

 9      produced and also in relation to these documents

10      that are produced today.  Again with those

11      documents, we'll try to work it out amongst

12      counsel.

13            (Whereupon, the deposition concluded at

14      4:20 p.m.)

15

16

17

18

19

20

21

22

23

24
```

```
 1                 C E R T I F I C A T E

 2

 3            I, KELLY J. LAWTON, Registered Professional

 4    Reporter, Licensed Court Reporter, and Certified

 5    Court Reporter, do hereby certify that, pursuant to

 6    notice, the deposition of KEVIN ROSEN was duly taken

 7    on December 19, 2018, at 1:08 p.m. before me.

 8            The said KEVIN ROSEN was duly sworn by me

 9    according to law to tell the truth, the whole truth

10    and nothing but the truth and thereupon did testify

11    as set forth in the above transcript of testimony.

12    The testimony was taken down stenographically by me.

13    I do further certify that the above deposition is

14    full, complete, and a true record of all the

15    testimony given by the said witness.

16

17    _____

18            KELLY J. LAWTON, RPR, LCR, CCR

19

20            (The foregoing certification of this

21    transcript does not apply to any reproduction of the

22    same by any means, unless under the direct control

23    and/or supervision of the certifying reporter.)

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2622 of 3246
Case 2:14-cv-02722-NGET Document 5-1 Entered on FLSD Docket 05/08/2014 Page 105 of 108
Confidential - Subject to Further Confidentiality Review

```
 1                     INSTRUCTIONS TO WITNESS

 2

 3

 4          Please read your deposition over carefully

 5     and make any necessary corrections.  You should state

 6     the reason in the appropriate space on the errata

 7     sheet for any corrections that are made.

 8

 9          After doing so, please sign the errata sheet

10     and date it.  It will be attached to your deposition.

11

12          It is imperative that you return the original

13     errata sheet to the deposing attorney within thirty

14     (30) days of receipt of the deposition transcript by

15     you.  If you fail to do so, the deposition transcript

16     may be deemed to be accurate and may be used in

17     court.

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                      - - - - - -

 2                     E R R A T A

 3                      - - - - - -

 4     PAGE    LINE    CHANGE

 5     _____   _____   _____

 6        REASON: _____

 7     _____   _____   _____

 8        REASON: _____

 9     _____   _____   _____

10        REASON: _____

11     _____   _____   _____

12        REASON: _____

13     _____   _____   _____

14        REASON: _____

15     _____   _____   _____

16        REASON: _____

17     _____   _____   _____

18        REASON: _____

19     _____   _____   _____

20        REASON: _____

21     _____   _____   _____

22        REASON: _____

23     _____   _____   _____

24        REASON: _____
```

```
 1                    ACKNOWLEDGMENT OF DEPONENT

 2

 3           I, KEVIN ROSEN, do hereby acknowledge that I

 4      have read the foregoing pages, 1 to 107, and that the

 5      same is a correct transcription of the answers given

 6      by me to the questions therein propounded, except for

 7      the corrections or changes in form or substance, if

 8      any, noted in the attached Errata Sheet.

 9

10

11      _____    _____

12      KEVIN ROSEN                                      DATE

13

14

15

16

17      Subscribed and sworn to before me this

18      _____ day of _____, 20___.

19      My Commission expires: _____

20

21      _____

        Notary Public

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                        LAWYER'S NOTES

 2     PAGE     LINE

 3     _____    _____    _____

 4     _____    _____    _____

 5     _____    _____    _____

 6     _____    _____    _____

 7     _____    _____    _____

 8     _____    _____    _____

 9     _____    _____    _____

10     _____    _____    _____

11     _____    _____    _____

12     _____    _____    _____

13     _____    _____    _____

14     _____    _____    _____

15     _____    _____    _____

16     _____    _____    _____

17     _____    _____    _____

18     _____    _____    _____

19     _____    _____    _____

20     _____    _____    _____

21     _____    _____    _____

22     _____    _____    _____

23     _____    _____    _____

24     _____    _____    _____
```

# EXHIBIT A30

Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2               Case No. 1:11-CV-22408-MGC
 3      -------------------------------§
        EDUARDO AND CARMEN AMORIN et    §
 4      al., individually, and on behalf §
        of all others similarly         §
 5      situated,                       §
                                        §
 6        Plaintiffs,                   §
                                        §
 7      vs.                             §
                                        §
 8      TAISHAN GYPSUM CO., LTD. F/K/A   §
        SHANDONG THAIHE DONGXIN CO.,     §
 9      LTD.; TAIAN TAISHAN PLASTERBOARD §
        CO., LTD., et al,               §
10                                      §
           Defendants.                  §
11      ------------------------------- §
         - - -
12
                                   - - -
13
                    WEDNESDAY, DECEMBER 19, 2018
14
                                   - - -
15
                  Confidential - Subject to Further
16                     Confidentiality Review
17                          - - -
18          Deposition of STACEY ROSEN, held at JG Firm,
        1855 Griffin Road, Suite C-470, Dania, Florida,
19      commencing at 4:22 p.m., on the above date,
        before Kelly J. Lawton, Registered Professional
20      Reporter, Licensed Court Reporter, and Certified
        Court Reporter.
21
                                   - - -
22
                     GOLKOW LITIGATION SERVICES
23          877.370.3377 ph | 917.591.5672 fax
                        deps@golkow.com
24
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2628 of 3246
Case 1:13-cv-06452-WHP Document 691-1 Confidential Filed 05/08/2020 Page 9 of
Confidential - Subject to Further Confidentiality Review
15

```
 1    APPEARANCES:
 2    COLSON, HICKS, EIDSON
      BY:  PATRICK S. MONTOYA, ESQUIRE
 3    BY:  NATALIE M. RICO, ESQUIRE
      255 Alhambra Circle, Penthouse
 4    Coral Gables, Florida 33134
      (305) 476-7400
 5    patrick@colson.com
      natalie@colson.com
 6    Representing Plaintiff
 7
      LEVIN, SEDRAN & BERMAN, LLP
 8    BY:  KEITH J. VERRIER, ESQUIRE
      510 Walnut Street, Suite 500
 9    Philadelphia, Pennsylvania 19106
      (215) 592-1500
10    kverrier@lfsblaw.com
      Representing Plaintiff
11
12    ALSTON & BIRD, LLP
      BY:  MICHAEL J. BARRY, ESQUIRE
13    BY:  SARAH O'DONOHUE, ESQUIRE
      BY:  ASHTON G. CARPENTER, ESQUIRE
14    One Atlantic Center
      1201 West Peachtree Street
15    Atlanta, Georgia 30309
      (404) 881-7000
16    mike.barry@alston.com
      sarah.odonohue@alston.com
17    ashton.carpenter@alston.com
      Representing Taishan Gypsum Co., Ltd. and Tai'an
18    Taishan Plasterboard, Co., Ltd.
19
      ORRICK, HERRINGTON & SUTCLIFFE, LLP
20    BY:  DAN GUERRA, ESQUIRE
      The Orrick Building
21    405 Howard Street
      San Francisco, California 94105
22    (415) 773-5545
      dguerra@orrick.com
23    Representing BNBM PLC
24
```

Case 2:09-md-02047-EEF-MBN Document 22363-30 Filed 11/19/19 Page 2629 of 3246
Case 1:18-cv-12408-NGG Document 299-31 Entered on FLSD Docket 05/08/2019 Page 49 of
15
Confidential - Subject to further confidentiality Review

```
 1    APPEARANCES:

 2        ABALLI MILNE KALIL, P.A.

          BY:  JOSHUA D. POYER, ESQUIRE

 3        2250 SunTrust International Center

          One Southeast Third Avenue

 4        Miami, Florida 33131

          (305) 373-6600

 5        jpoyer@alalli.com

          Representing BNBM PLC

 6

 7    ALSO PRESENT:

 8        Kevin Rosen

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2630 of 3246
Case 2:14-cv-02722-NGG Document 269-31 Entered on FLSD Docket 05/08/2019 Page 9 of 15
Confidential - Subject to further Confidentiality Review

```
 1                    - - -

                   I N D E X

 2                    - - -

 3    Testimony of:  STACEY ROSEN

 4        DIRECT EXAMINATION BY MR. BARRY...............  5

 5

 6

 7                 E X H I B I T S

 8                    (None)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2631 of 3246
Case 1:15-cv-02248-NGG Document 301-1 Filed 11/19/19 Page 2631 of 3246

Confidential – Subject to Further Confidentiality Review
15

```
  1                        -  -  -

  2              THE COURT REPORTER:  Ma'am, would you please

  3         raise your right hand.

  4              Do you swear or affirm that the testimony

  5         you're about to give will be the truth, the whole

  6         truth, and nothing but the truth?

  7              THE WITNESS:  Yes.

  8              STACEY ROSEN, called as a witness by the

  9    Defendants, having been first duly sworn, testified

 10    as follows:

 11                        DIRECT EXAMINATION

 12    BY MR. BARRY:

 13         Q.   Mrs. Rosen, do you mind stating your full

 14    name for the record?

 15         A.   Stacey Ann Rosen.

 16         Q.   My name is Mike Barry, and I represent

 17    Taishan.  You have been listening to me for a period

 18    of time, so I know you know that.  But I'm

 19    reintroducing myself on the record.  I represent

 20    Taishan with my colleagues, Ashton Carpenter and

 21    Sarah O'Donohue.

 22              MR. BARRY:  We can do the full introductions,

 23         or we can skip it since --

 24              MR. POYER:  Joshua Poyer on behalf of Beijing
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2632 of 3246
Case 1:18-cv-12408-NGG Document 90-31 *SEALED* Filed 05/08/2019 Page 41 of
confidential - Subject to further confidentiality Review
15

```
 1        New Building Materials, PLC.

 2            MR. GUERRA:  Dan Guerra, also on behalf of

 3        BNBM, PLC.

 4            MR. VERRIER:  Keith Verrier, Levin, Sedran &

 5        Berman on behalf of the plaintiffs.

 6            MR. MONTOYA:  Patrick Montoya and

 7        Natalie Rios on behalf of the plaintiffs.

 8            MR. BARRY:  And Kevin Rosen is also in the

 9        room here, too.

10    BY MR. BARRY:

11        Q.   I will make this as short as possible.  I

12    appreciate you being here.  I know this is not fun or

13    enjoyable, and I appreciate your time and spending as

14    much time on this as I know you are.  And again, I

15    will make this as quick and painless as possible.

16    You will not be getting the number of questions that

17    I have given to your husband.  He bore the brunt of

18    that.

19            I have a few -- have you ever sat for a

20    deposition before?  Other than being married to a

21    lawyer; I know that is a deposition.

22        A.   I fought for ten years for my mom, civilly

23    and criminally, but that is it.

24        Q.   Did you ever testify under oath during that
```

Confidential - Subject to Further Confidentiality Review

```
 1    time period?

 2         A.   I believe I did.

 3         Q.   Okay.  Do you understand that you have been

 4    sworn in under oath and that you must tell the truth

 5    as if you are testifying in court?

 6         A.   Yes.

 7         Q.   Are you taking any medications that may

 8    impair your ability to understand my questions?

 9         A.   No.

10         Q.   How did you prepare for this deposition?

11         A.   I lived it.  I mean, I didn't prepare.

12         Q.   Did you meet with your lawyer at all?

13         A.   I only remember one time meeting.

14              No, after it happened, ten -- all those years

15    ago, we met with a bunch of other families; and then

16    the other day.

17         Q.   And I recognize you may have had other

18    meetings.  Just --

19         A.   That's all I know.

20         Q.   -- in preparation for this deposition, that's

21    all I'm concerned with.

22         A.   I only recall one.

23         Q.   Okay.  Caught Mr. Rosen in a lie.  No, I'm

24    kidding.
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.    No, I only recall two.

 2        Q.    Do you know how long those meetings -- do you

 3   know how long that meeting lasted?

 4        A.    Time flies.

 5        Q.    One hour, two hours?

 6        A.    Yeah, it was not long.

 7        Q.    Do you recall who was present at that

 8   meeting?

 9        A.    Natalie, Kevin, and I.

10        Q.    And did you speak to anybody else about this

11   deposition beforehand?

12        A.    My family.

13        Q.    What did you tell your family about this

14   deposition?

15        A.    That it's still going on and we are -- just

16   have to talk about it again and that it was -- just

17   that we have to talk about it.

18        Q.    I'm only going to ask you one more question,

19   which is:  You've sat through your husband's entire

20   deposition; is there anything that he said that you

21   believe is inaccurate or incomplete?

22        A.    No, no.

23        Q.    There's nothing you would like to add to his

24   testimony?
```

Confidential - Subject to Further Confidentiality Review

```
1        A.   No.

2             MR. BARRY:  Okay.  That's all I have for you.

3             THE WITNESS:  Okay.

4             MR. BARRY:  Thank you.

5             MR. GUERRA:  We don't have any questions.

6             (Whereupon, the deposition concluded at

7    4:25 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                    C E R T I F I C A T E

 2

 3            I, KELLY J. LAWTON, Registered Professional

 4     Reporter, Licensed Court Reporter, and Certified

 5     Court Reporter, do hereby certify that, pursuant to

 6     notice, the deposition of STACEY ROSEN was duly taken

 7     on December 19, 2018, at 4:25 p.m. before me.

 8            The said STACEY ROSEN was duly sworn by me

 9     according to law to tell the truth, the whole truth

10     and nothing but the truth and thereupon did testify

11     as set forth in the above transcript of testimony.

12     The testimony was taken down stenographically by me.

13     I do further certify that the above deposition is

14     full, complete, and a true record of all the

15     testimony given by the said witness.

16

17     _____

18            KELLY J. LAWTON, RPR, LCR, CCR

19

20            (The foregoing certification of this

21     transcript does not apply to any reproduction of the

22     same by any means, unless under the direct control

23     and/or supervision of the certifying reporter.)

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2637 of 3246
Case 1:09-cv-07687-GJ Document 268-30 Confidential Subject to Dkt 05/09/2019 Page 42
Confidential - Subject to Further Confidentiality Review
15

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4          Please read your deposition over carefully

 5   and make any necessary corrections.  You should state

 6   the reason in the appropriate space on the errata

 7   sheet for any corrections that are made.

 8

 9          After doing so, please sign the errata sheet

10   and date it.  It will be attached to your deposition.

11

12          It is imperative that you return the original

13   errata sheet to the deposing attorney within thirty

14   (30) days of receipt of the deposition transcript by

15   you.  If you fail to do so, the deposition transcript

16   may be deemed to be accurate and may be used in

17   court.

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                    - - - - - -

 2                   E R R A T A

 3                    - - - - - -

 4   PAGE    LINE    CHANGE

 5   _____   _____   _____

 6      REASON: _____

 7   _____   _____   _____

 8      REASON: _____

 9   _____   _____   _____

10      REASON: _____

11   _____   _____   _____

12      REASON: _____

13   _____   _____   _____

14      REASON: _____

15   _____   _____   _____

16      REASON: _____

17   _____   _____   _____

18      REASON: _____

19   _____   _____   _____

20      REASON: _____

21   _____   _____   _____

22      REASON: _____

23   _____   _____   _____

24      REASON: _____
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2639 of 3246
Case 1:09-cv-07687-MGC Document 290-301 Exhibit n Filed 05/18/2011 Page 46 of
Confidential – Subject to Further Confidentiality Review
15

```
 1                    ACKNOWLEDGMENT OF DEPONENT

 2

 3          I, STACEY ROSEN, do hereby acknowledge that I

 4     have read the foregoing pages, 1 to 14, and that the

 5     same is a correct transcription of the answers given

 6     by me to the questions therein propounded, except for

 7     the corrections or changes in form or substance, if

 8     any, noted in the attached Errata Sheet.

 9

10

11     _____    _____

12     STACEY ROSEN                                    DATE

13

14

15

16

17     Subscribed and sworn to before me this

18     _____ day of _____, 20___.

19     My Commission expires: _____

20

21     _____

       Notary Public

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                          LAWYER'S NOTES

 2     PAGE    LINE

 3     _____   _____    _____

 4     _____   _____    _____

 5     _____   _____    _____

 6     _____   _____    _____

 7     _____   _____    _____

 8     _____   _____    _____

 9     _____   _____    _____

10     _____   _____    _____

11     _____   _____    _____

12     _____   _____    _____

13     _____   _____    _____

14     _____   _____    _____

15     _____   _____    _____

16     _____   _____    _____

17     _____   _____    _____

18     _____   _____    _____

19     _____   _____    _____

20     _____   _____    _____

21     _____   _____    _____

22     _____   _____    _____

23     _____   _____    _____

24     _____   _____    _____
```

# EXHIBIT A31

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2642 of 3246
Case 1:11-cv-22408-MGC Document 209-31 Entered on FLSD Docket 05/08/2019 Page 2 of
165
Confidential - Subject to Further Confidentiality Review

```
 1                UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA
 2
     EDUARDO AND CARMEN AMORIN,
 3   et al., individually, and
     on behalf of all others
 4   similarly situated,        Case No. 1:11-CV-22408-MGC
 5       Plaintiffs,
 6   vs.
 7   TAISHAN GYPSUM CO., LTD.,
     F/K/A SHANDONG TAIHE
 8   DONGXIN CO., LTD.; TAIAN
     TAISHAN PLASTERBOARD CO.,
 9   LTD, et al.,
10       Defendants.
11            CONFIDENTIAL - SUBJECT TO FURTHER
                  CONFIDENTIALITY REVIEW
12
                         - - -
13
                    JANUARY 9, 2019
14
                         - - -
15
         Deposition of MICHAEL ROSEN, held at
16   Morgan & Morgan, PA, 515 North Flagler Drive, Suite
     2125, West Palm Beach, Florida 33401, commencing at
17   12:08 p.m., on the above date, before Joan L. Pitt,
     Registered Merit Reporter, Certified Realtime
18   Reporter, and Florida Professional Reporter.
19                       - - -
20            GOLKOW LITIGATION SERVICES
          877.370.3377 ph | 917.591.5672 fax
21                 deps@golkow.com
22
23
24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2643 of 3246
Case 1:14-cv-24467-NGG Document 93-31 Entered on FLSD Docket 05/28/2015 Page 9 of
165
confidential - Subject to further confidentiality Review

```
 1                    APPEARANCES

 2

 3    Counsel for Plaintiffs:

 4        NATALIE M. RICO, ESQUIRE
          PATRICK MONTOYA, ESQUIRE
 5        Colson Hicks Eidson
          255 Alhambra Circle, Penthouse
 6        Coral Gables, Florida 33134
          305.476.7400
 7        natalie@colson.com
          patrick@colson.com

 8

          KEITH J. VERRIER, ESQUIRE
 9        Levin, Sedran & Berman LLP
          510 Walnut Street, Suite 500
10        Philadelphia, Pennsylvania 19106
          215.592.1500
11        kverrier@lfsblaw.com

12

13    Counsel for Defendants Taishan Gypsum Co., Ltd., and
      Taian Taishan Plasterboard Co., Ltd.:

14

          MATTHEW D. LAWSON, ESQUIRE
15        LARA TUMEH, ESQUIRE
          MAE MANUPIPATPONG, ESQUIRE
16        Alston & Bird LLP
          One Atlantic Center
17        1201 West Peachtree Street
          Atlanta, Georgia 30309-3424
18        404.881.7000
          matt.lawson@alston.com
19        lara.tumeh@alston.com
          mae.manupipatpong@alston.com

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
1                    APPEARANCES CONTINUED

2

3    Counsel for Beijing New Building Materials PLC:

4         DAN GUERRA, ESQUIRE

          Orrick, Herrington & Sutcliffe LLP

5         The Orrick Building

          405 Howard Street

6         San Francisco, California 94105-2669

          415.773.5545

7         dguerra@orrick.com

8         ALEX B. ROTHENBERG, ESQUIRE

          Gordon Arata Montgomery Barnett

9         201 St. Charles Avenue, 40th Floor

          New Orleans, Louisiana 70170-4000

10        504.582.1111

          arothenberg@gamb.law

11

12   Also present:  Robyn Rosen

13

14

15

16

17

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-20 Filed 11/19/19 Page 2645 of 3246
Case 1:14-cv-09148-NGG Document 09931 -2 Filed 06/18/15 Page 2645 of 165
Confidential - Subject to Further Confidentiality Review

```
 1                    - - -
 2              I N D E X
 3                    - - -
 4   Testimony of:  MICHAEL ROSEN
 5    DIRECT EXAMINATION BY MR. LAWSON              6
 6    CROSS-EXAMINATION BY MR. GUERRA             155
 7    CROSS-EXAMINATION BY MS. RICO               156
 8    RECROSS-EXAMINATION BY MS. RICO             159
 9
10
11              E X H I B I T   I N D E X
12   ROSEN            DESCRIPTION              PAGE
13   No. 1     Special Warranty Deed Book 21066/Page     12
               1743, Palm Beach County Property
14             Appraiser Record, and Warranty Deed
               Book 23588/Page 101 through 102
15
     No. 2     US Department of Housing & Urban          19
16             Development Settlement Statement
               dated 11/6/2006
17             MROSEN - 000001 through 000032
18   No. 3     Chase Detailed Transaction History        50
               dated 9/5/2013
19             MROSEN - 000041 through 000046
20   No. 4     Palm Beach County Property Appraiser      57
               Public Records
21
     No. 5     Plaintiff Profile Form - Residential      69
22             Properties
               ROSEN M 000001 through 000010
23
     No. 6     Supplemental Plaintiff Profile Form       81
24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2646 of 3246
Case 1:18-cv-11402-NGG Document 60-31 Entered on FLSD Docket 05/08/2019 Page 46 of
165
Confidential - Subject to Further Confidentiality Review

|    |         |                                             |     |
|----|---------|---------------------------------------------|-----|
| 1  | No. 7   | Chinese Drywall Settlement Program          | 90  |
|    |         | Foreclosure or Short Sale Affidavit         |     |
| 2  |         |                                             |     |
|    | No. 8   | Michael Rosen Photos of Inspection          | 101 |
| 3  |         | 08/30/09 and Inspection Report              |     |
|    |         | 08/30/2009                                  |     |
| 4  |         | ROSEN, M 0001 through 0079                  |     |
| 5  | No. 9   | Collection of Evidence Michael Rosen        | 109 |
|    |         | 12/03/2009                                  |     |
| 6  |         | MROSEN - 000235                             |     |
| 7  | No. 10  | Claimants Michael and Robyn Rosen's         | 111 |
|    |         | Answers to Defendants Taishan Gypsum        |     |
| 8  |         | Company, Ltd., Tai'an Taishan               |     |
|    |         | Plasterboard Company, Ltd. and BNBM         |     |
| 9  |         | PLC's Interrogatories                       |     |
| 10 | No. 11  | Michael and Robin [sic] Rosen's             | 114 |
|    |         | Chinese Drywall Damages Chart               |     |
| 11 |         |                                             |     |
|    | No. 12  | Receipts and Invoices                       | 117 |
| 12 |         | ROSEN, M(OLF) - 000050 through 000191       |     |
| 13 | No. 13  | Copies of checks                            | 136 |
|    |         | ROSEN, M(OLF) - 000035 through 000040       |     |
| 14 |         |                                             |     |
|    | No. 14  | Residential Sale and Purchase               | 140 |
| 15 |         | Contract                                    |     |
|    |         | MROSEN - 000192 through 000202              |     |
| 16 |         |                                             |     |
|    | No. 15  | Mutual Release dated 12/4/2009              | 143 |
| 17 |         | MROSEN - 000213 through 000221              |     |

18
19
20
21
22
23
24

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2647 of 3246
Case 1:14-cv-02408-NGG Document 31-1 Filed 05/08/2017 Page 71 of 165

Confidential - Subject to Further Confidentiality Review

```
 1                        - - -

 2            THE COURT REPORTER:  Raise your right hand,

 3       please.  Do you swear or affirm the testimony you

 4       give will be the truth, the whole truth, and nothing

 5       but the truth?

 6            THE WITNESS:  I do.

 7            THE COURT REPORTER:  Thank you.

 8            MS. RICO:  Briefly, sorry, I wanted to tell you

 9       before we got started --

10            MR. LAWSON:  Do you want to go off the record?

11            MS. RICO:  No, that's fine.  There is an error

12       in the answers to the interrogatories in terms of

13       the initial mortgage amount.  I think it was put as

14       the one at the time of closing.  So we'll just let

15       him testify and correct that, but I just wanted to

16       let you know.

17            MR. LAWSON:  Okay.  We can address that when we

18       get to it.  Thank you.

19            MICHAEL ROSEN, called as a witness by the

20  Defendant Taishan Gypsum Co., Ltd., having been first

21  duly sworn, testified as follows:

22                      DIRECT EXAMINATION

23  BY MR. LAWSON:

24       Q.  Could you please state your name for the
```

Confidential - Subject to Further Confidentiality Review

1    record?

2    A.   Michael Rosen.

3    Q.   Mr. Rosen, thank you for coming in today taking

4    the time to answer my questions.  My name is Matt

5    Lawson, I'm an attorney, I'm with Alston & Bird,

6    representing our client, Taishan Gypsum Co., Ltd.

7         Have you ever been deposed before?

8    A.   No.

9    Q.   So I wanted to go over some of the kind of

10   rules of the road just to help this move smoothly and

11   quickly as we go along today.

12        Now, just a second ago you were sworn in.  Do

13   you understand that that was your agreement to tell the

14   truth today during this deposition?

15   A.   Yes.

16   Q.   And that being sworn in was like you testifying

17   in front of the court today?

18   A.   Correct, yes.

19   Q.   Because we have a court reporter today,

20   everything that we say is being transcribed as we're

21   talking, so that means a few things.  We want to make

22   sure that we speak slowly and clearly, loud enough to be

23   heard, and that we also pause in between each other's

24   questions and answers.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2649 of 3246
Case 1:18-cv-12408-NGG Document 1-21 filed 08/08/18 USDC Page 2649 of 3246
Confidential - Subject to Further Confidentiality Review
165

```
 1              That allows a few things.  You might have

 2   objections that come from your counsel during today's

 3   deposition, and you want to make sure that you allow

 4   them to be able to state those objections and then

 5   answer the question if they do not instruct you to not

 6   answer.  So even if they object but they do not say, "Do

 7   not answer," then I would still ask you to give the best

 8   answer that you can to my question.

 9              Do you understand that?

10   A.   Yes.

11   Q.   If you need a break at any point, please let me

12   know.  I'm happy to go off the record and take a break.

13   You're the boss of that.  So just let me know if you

14   need a break at any point.

15              If any of my questions aren't clear to you,

16   please let me know and I can rephrase them.

17              Are you taking any medications today or is

18   there any reason why you wouldn't be able to give

19   truthful and complete testimony today?

20   A.   No.

21   Q.   All right.  Did you meet with your lawyer prior

22   to today's deposition to prepare?

23   A.   Yes.

24   Q.   All right.  And how often did you meet?
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2650 of 3246
Case 1:09-md-02047-EEF-MBN Document 22361 Filed 11/19/19 Page 2650 of 3246
Confidential - Subject to Further Confidentiality Review
165

1     A.   I met once yesterday, and then we -- prior to

2   this we sat and talked.

3     Q.   So two times to prepare for the deposition?

4     A.   Yes.

5     Q.   All right.  For about how long did you meet

6   across those two meetings?

7     A.   Yesterday was about an hour and 15 minutes, and

8   today was about an hour.

9     Q.   Did you speak with anyone other than your

10  lawyers to prepare for today's deposition?

11    A.   No.

12    Q.   And did you review documents during the

13  meetings with your lawyers?

14    A.   Yes.

15    Q.   Are there any documents that you have reviewed

16  with your lawyers for today's deposition that you're

17  aware of have not been produced to the defendants in

18  this litigation?

19    A.   No.

20    Q.   And are there any documents that you're aware

21  of that are relevant to your claims in this lawsuit that

22  you haven't handed over to your lawyers?

23    A.   No.

24    Q.   Mr. Rosen, where are you employed?

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2651 of 3246
Case 1:19-cv-09319-AKH Document 1-31 Entered on FLSD Docket 05/08/2019 Page 41 of 165
Confidential - Subject to Further Confidentiality Review

```
 1      A.   I'm self-employed.

 2      Q.   Okay.  What do you do?

 3      A.   I sell pharmaceuticals and medical surgical

 4   supplies.

 5      Q.   And how long have you been doing that?

 6      A.   All in all, since probably 2002/2003, which ran

 7   congruently with another business that I was involved

 8   in.

 9      Q.   So do you have your own business?

10      A.   Yes.

11      Q.   And do you employ any employees?

12      A.   Yes.

13      Q.   How many?

14      A.   Currently, six.

15      Q.   What is your job title at your company?

16      A.   President.

17      Q.   And are you married?

18      A.   Yes.

19      Q.   And who are you married to?

20      A.   Robyn Rosen, down there.

21      Q.   Do you have any children?

22      A.   Yes.

23      Q.   How many?

24      A.   Three.
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/10 Page 2652 of 3246
Case 1:09-cv-08088-MGC Document 2001-1 Entered on FLSD Docket 05/19/2011 Page 49 of 165
Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  How old are they?

2    A.    15, 13, and 8.

3    Q.    Have you ever been involved in a lawsuit before

4    this one?

5    A.    No.

6    Q.    And can you think of if you've ever

7    participated in a class action lawsuit before?

8    A.    I have never.

9    Q.    What is the address of the property that you

10   allege was damaged by Chinese drywall in this lawsuit?

11   A.    16538 Middlebrook Way, Boca Raton, Florida.

12   Q.    And you do not currently own that property;

13   correct?

14   A.    No.

15   Q.    Just so we can make sure that we keep a clean

16   record, let's make sure that we have pauses just between

17   my questions and your answers --

18   A.    Okay.  Sure.

19   Q.    -- because it's very easy for us to talk over

20   each other and kind of start interspersing it.  That's

21   what we do in normal conversation.  This is a very

22   abnormal conversation.

23   A.    I'm trying.

24   Q.    No, I get it.  I get it.  I wasn't trying to

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2653 of 3246
Case 1:1-29-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2653 of 3246
Confidential - Subject to Further Confidentiality Review
165

1    chastise you, but it's just something that is easy to do

2    in normal conversation because you try to make it move

3    along quickly, but we need to make sure we get a clean

4    record today.

5         When did you buy the property that's involved

6    in this lawsuit?

7         A.   October of '06.

8         Q.   And how long did you own it for?

9         A.   It's 10 years, so we wound up selling it in

10   '09, so roughly three years.

11        (Rosen Exhibit No. 1 was marked for

12   identification.)

13   BY MR. LAWSON:

14        Q.   Mr. Rosen, you've been handed a document that

15   has been marked as Exhibit 1.  Do you recognize this

16   document?

17        A.   Yes.

18        Q.   It's titled Specialty Warranty Deed, and if you

19   look at the top, it states that it's a warranty deed

20   that was made on the 6th day of November of 2006.  Do

21   you see that?

22        A.   Yes.

23        Q.   And then also it lists you and your wife as the

24   recipients of the property listed on the warranty deed.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2654 of 3246
Case 1:11-cv-22408-MGC Document 206-31 Entered on FLSD Docket 05/18/2012 Page 41 of
165

Confidential - Subject to Further Confidentiality Review

1   Do you see that?

2        A.    Yes.

3        Q.    Based on this warranty deed, who did you

4   purchase the property from?

5        A.    Albanese-Popkin.

6        Q.    Is that a development --

7        A.    Yep.

8        Q.    -- homebuilder company?

9        A.    Correct.

10        Q.    So was this home built in a community based on

11   your specifications?

12        A.    This house was built halfway as a spec by the

13   builder, the development company, and we purchased it

14   halfway through, which gave us the ability to make

15   certain changes.  So it was about halfway done.

16        Q.    So you did get to customize it at least halfway

17   through?

18        A.    Correct.

19        Q.    So no one owned this home prior to you owning

20   it; is that correct?

21        A.    To my knowledge, yes.

22        Q.    Looking to the second page of this document,

23   passing the warranty deed, there appears to be a Palm

24   Beach County Property Appraiser record.  Do you see

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2655 of 3246
Case 1:1-cv-22408-MGC Document 28-31 Entered on FLSD Docket 05/18/2012 Page 46 of
165
Confidential - Subject to Further Confidentiality Review

```
1   that?

2       A.   Yes.

3       Q.   And is the location address listed at the top

4   of that property appraiser record the same address

5   that -- of the home that we have been discussing so far

6   today?

7       A.   Yes.

8       Q.   It's 17538 Middlebrook Way?

9       A.   Correct.

10      Q.   Now, this record appears to show at least

11  transactions as recent as 2016.  Do you see that on the

12  document?  A sale date of August 2016?

13      A.   Yes.

14      Q.   And that reflects more recent purchases of the

15  home since you owned it; is that right?

16      A.   Correct.

17      Q.   And it looks like that the home is currently

18  owned by Anna and Phillip Kim.  Do you see that

19  highlighted on the document?

20      A.   Yes.

21      Q.   And if you look down to in the middle of the

22  page, there's a field with different sales listed, and

23  in November 2006 there's a sale for $1.6 million.  Do

24  you see that?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2656 of 3246
Case 1:09-md-02047-EEF-MBN Document 22361 Confidential Subject Pocket 09/16/19 Page 46 of
Confidential - Subject to Further Confidentiality Review
165

1      A.    Yes.

2      Q.    And the owner from that sale, after that sale,

3    is listed as you; is that right?

4      A.    Yes.

5      Q.    So that's the sale that we just looked at in

6    the warranty deed.  You purchased the home for around

7    $1.6 million; is that right?

8      A.    That's what is recorded, yes.

9      Q.    Is the sale price different than that, to your

10   knowledge?

11     A.    Well, for some -- I'm sorry.  I cut you off a

12   little bit.

13     Q.    That's okay.

14     A.    What it is is that the -- it actually was

15   1,825,000 but the builder allows you to put the 225 as

16   upgrades as opposed to into the purchase price for tax

17   purposes down the road, potentially.

18     Q.    All right.  So there were the $225,000 in

19   upgrades that were part of your purchase of the home

20   when you originally purchased it; is that right?

21     A.    Yes.

22     Q.    But the sale price is listed without those

23   upgrades as $1.6 million?

24     A.    Correct.

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2657 of 3246
Case 1:11-cv-22408-MGC Document 234-31 Entered on FLSD Docket 05/19/2012 Page 17 of 165
Confidential - Subject to Further Confidentiality Review

```
 1        Q.   But when you moved into the home, those

 2   upgrades were already part of the house; is that right?

 3        A.   Yes.

 4        Q.   If you look to December 2009, there's a

 5   highlighted sale on this document for $876,000.  Do you

 6   see that?

 7        A.   Yes.

 8        Q.   Does this reflect you selling the property to

 9   subsequent owners of the property on December -- in

10   December of 2009?

11        A.   Yes.

12        Q.   And that was to the -- and, excuse me, I don't

13   know how to pronounce this -- the Shukows?  Do you know

14   how they --

15        A.   Shukow.

16        Q.   Shukow.  All right.  The Shukows purchased the

17   home from you in December of 2009; is that right?

18        A.   Yes.

19        Q.   Did you know the Shukows when you sold them the

20   home?

21        A.   I did not know them.

22        Q.   You met them in the process of selling the

23   home?

24        A.   Correct.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2658 of 3246
Case 1:1-09-md-02047-EEF-MBN Document 2361 Confidential Subject to 05/19/2019 Page 48 of
165
Confidential - Subject to Further Confidentiality Review

```
 1      Q.   And have you come to know them or interacted

 2   with them since you sold them the home?

 3      A.   No.

 4      Q.   Have you been in the home since you sold it?

 5      A.   No.

 6      Q.   And do you have any knowledge of what the

 7   Shukows have done with the home since they sold it as

 8   far as repairing it, changing it in any way?

 9      A.   I believe they remediated it to live in.

10      Q.   How are you aware of that?

11      A.   I just have knowledge of the -- the community

12   talks, I guess.

13      Q.   So the people who lived in that Fox Hill

14   Estates community have told you that the home was

15   remediated or repaired since you moved out?

16      A.   Correct.  We still have friends there.

17           By the way, it's not called Fox Hill Estates.

18   That's the old -- it's really The Oaks, but the Fox Hill

19   was the original developer.

20      Q.   Got it.  So the community is called The Oaks?

21      A.   Yes.

22      Q.   Was it always called The Oaks during the time

23   that you lived there?

24      A.   Yes.
```

```
1      Q.   And it's still called that today?

2      A.   Yes.

3      Q.   If you look to the third page of this document,

4   there's another warranty deed.  Do you see that?

5      A.   Yes.

6      Q.   And this warranty deed appears to be for a date

7   of December 4, 2009; is that correct?

8      A.   Yes.

9      Q.   And this is -- appears to be a warranty deed

10  for the sale, from you and your wife, of the home to the

11  Shukows on December 4, 2009.  Does that look right?

12     A.   Yes.

13     Q.   If you look up to the upper right-hand corner,

14  just like it was in the property appraiser's record, the

15  amount appears to be listed as $876,000.  Do you see

16  that?

17     A.   Yes.

18     Q.   And is that an accurate reflection of the price

19  that you sold the property to the Shukows for?

20     A.   Yes.

21     Q.   If you look to the final page of the document,

22  is that your signature on the final page of the warranty

23  deed?

24     A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2660 of 3246
Case 1:1-cv-22408-MGC Document 208-31 Entered on FLSD Docket 05/19/2019 Page 40 of
165

Confidential - Subject to Further Confidentiality Review

```
 1      Q.   And also your wife's signature?

 2      A.   Yes.

 3           (Rosen Exhibit No. 2 was marked for

 4   identification.)

 5           THE WITNESS:  Glad I brought my glasses.

 6   BY MR. LAWSON:

 7      Q.   Mr. Rosen, I apologize for the small print

 8   here.  This is how we got this, so we'll have to squint

 9   a little bit.

10           But you've been handed a document that's been

11   marked as Exhibit 2.  On the first page, it's been

12   stamped as MROSEN - 000001.  Do you see that?

13      A.   Yes.

14      Q.   This is a fairly lengthy document.  If you want

15   to take the chance to look through it.  I'm not sure if

16   you have seen this before.

17      A.   I have.

18      Q.   Okay.  Are you familiar with this document?

19      A.   I've looked at it.

20      Q.   All right.  What, to your knowledge, is this

21   document?

22      A.   This is the closing statement.

23      Q.   Okay.  And this is the closing statement for

24   your original purchase of the home?
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2661 of 3246
Case 1:09-md-02047-MCA Document 2661 Confidential Subject to Further Confidentiality Review Page 41 of
165
Confidential - Subject to Further Confidentiality Review

1    A.   Yes.

2    Q.   All right.  So this is when you bought the home

3    in 2006; is that correct?

4    A.   Yes.

5    Q.   And looking at this document, or based on your

6    knowledge, how much of a down payment did you put on the

7    home when you purchased it originally?

8    A.   As memory recalls, I can only go back just to

9    know what my first mortgage was at the time, so I paid

10   1,825,000 for the house, and by the time I was done my

11   mortgage was $600,000.  So roughly 1,200,000 put down on

12   the house.

13   Q.   Okay.  And you said your first mortgage.  Did

14   you also take out a second mortgage on the home at some

15   point?

16   A.   The day that I found out I had Chinese drywall,

17   I took the money out of my equi line because I knew that

18   I was going to incur a massive amount of expenses for

19   moving, buying new clothes for my kids, and et cetera,

20   et cetera, so I knew that -- and I was told that as soon

21   as the bank knows that you're going to have Chinese

22   drywall, if you have an equi line, they're going to pull

23   it back because they won't want to get stuck.  So that's

24   why at the time of closing it was 600 plus my equi line,

Confidential - Subject to Further Confidentiality Review

1   which equalled the 876.

2       Q.   So you had a home equity line of credit already

3   established at the time and you took money out of that

4   at that time when you found out you had Chinese drywall;

5   is that right?

6       A.   Correct.  Sorry.  I keep on stepping on you

7   just because it's force of habit.

8       Q.   No, I understand.  We'll try to slow down.  I

9   talk too fast myself.

10          And looking back to what you said there, the --

11  so you had the amount that you owed after the down

12  payment on the home, and then on top of that you took

13  out about how much for the equity line of credit?

14      A.   You know, I'm trying to recall.  What I believe

15  is, using round numbers, I believe it was $600,000 as a

16  first mortgage, about 200 in equi line, and then I'm --

17  what happened was is I had to actually bring cash to

18  closing because they weren't giving me enough between

19  the two mortgages and what they were paying, so I

20  believe I had to bring $72,000 to the closing.

21      Q.   And that cash for closing was for your sale of

22  the home to the Shukows?

23      A.   Correct.

24      Q.   All right.  So if you look down in this

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2663 of 3246
Case 1:1-cv-04148-MCA Document 1 Entrante Filed on Docket 05/18/2019 Page 23 of
165

Confidential - Subject to Further Confidentiality Review

1    document to -- let's see -- line 202 on the first page

2    of this settlement statement, you see that it says

3    "principal amount of new loan" in the Column J, which is

4    the first column, line 202?

5        A.    Yes.

6        Q.    And it lists it as $600,000, which I think is

7    what you just said was the first mortgage?

8        A.    Yes.

9        Q.    And if you look down to line 303, it lists the

10   cash from borrower, which is you, as a little over

11   $1 million.  $1,052,377.44.  So $1,052,377.44.  Do you

12   see that?

13       A.    I see that.

14       Q.    And does that sound about right of the amount

15   that you would have paid at that time?

16       A.    It doesn't sound right based on the way my

17   mortgage is, but I can't -- I don't know, maybe there

18   are other facts and figures surrounding that that would

19   have eaten up some of that cash.

20       Q.    So your recollection, though, was that you

21   received a mortgage, you financed about $600,000 of the

22   1.8 million purchase?

23       A.    Yes.

24       Q.    And then you had about -- so you had that

1    additional money of the $1.2 million that was not

2    accounted for by the mortgage; correct?

3         So if you paid --

4    A.   I'm using simple mathematics, but I'm not

5    taking into consideration there are certain closing

6    costs and things like that that might have absorbed

7    beyond the purchase price, you know, title insurance and

8    all that kind of stuff.  All I know is that if I

9    extrapolate the numbers and using simple math, I'm

10   probably out about 1,200,000.

11   Q.   All right.  Let's look to the third page of

12   this document.  It's marked as MROSEN 3.  This is --

13   appears to be a purchase agreement for the home.  Do you

14   see that at the top?

15   A.   Yes.

16   Q.   And this lists your purchase of this home from

17   The Oaks at Boca Raton with the total purchase price of

18   $1.6 million that we discussed earlier; correct?

19   A.   Yes.

20   Q.   And that is without the upgrades, as we

21   discussed before; correct?

22   A.   Yes.

23   Q.   And it lists a total balance due at closing,

24   under Item C, at the bottom of the page, as

Case 2:09-md-02047-EEF-MBN  Document 22363-39  Filed 11/19/19  Page 2665 of 3246
Case 1:09-cv-02042-MGC  Document 236-31  Entered on FLSD Docket 05/08/2015  Page 45 of
165

Confidential - Subject to Further Confidentiality Review

```
 1   $1.44 million.  Do you see that?

 2       A.   Yes.

 3       Q.   And it lists a $160,000 payment upon execution

 4   of this purchase agreement, that's what reduced that

 5   amount from 1.6 million.  Do you see that?

 6       A.   Yes.

 7       Q.   What was that $160,000?

 8       A.   That was the down payment to the builder to

 9   execute the contract so they knew that we were real,

10   because they wouldn't -- they wouldn't even enter into

11   this contract unless you could come up with 10 percent

12   of the purchase price.

13       Q.   If you go to MROSEN 14, which is the 12th page

14   of this agreement -- oh, excuse me.

15            Let's go to MROSEN 13, which is the 11th page

16   of the agreement.  Your signature is on that page, if

17   you look at MROSEN 13?

18       A.   13?

19       Q.   Yeah, it should be MROSEN00013.  It's in the

20   bottom right-hand corner.  And I apologize.  There's

21   multiple numbers on the page.

22       A.   Okay.  Yes, that's my signature.

23       Q.   And so this was the purchase agreement with The

24   Oaks at Boca Raton, and it was executed on May 9, 2006;
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2666 of 3246
Case 1:09-cv-07626-RGK Document 000 Confidential - Subject to 05/19/2019 Page 25 of
165
Confidential - Subject to Further Confidentiality Review

1    is that right?

2        A.   Yes.

3        Q.   And you didn't purchase the home officially

4    until later on that year?

5        A.   Yes.  November.  Yes.

6        Q.   But this was an agreement with them where you

7    gave an initial 10 percent payment to show that you were

8    serious about it, like you said earlier; right?

9        A.   Yes.

10       Q.   Did you visit the home before you purchased it?

11       A.   Yes.

12       Q.   About how often did you go there?

13       A.   Going back 10 years, we looked at it more than

14   once.  Probably a few times.

15       Q.   And were you looking at it during different

16   phases of its construction?

17       A.   Yes.

18       Q.   So did you ever see the drywall being installed

19   in the home while it was being constructed?

20       A.   No.

21       Q.   Had that already occurred at the time that you

22   first looked at the home?

23       A.   I believe so.

24       Q.   So did you ever at any point see the markings

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/10 Page 2667 of 3246
Case 1:09-cv-02047-MGC Document 28131 Exhibit on File Docket 05/08/2009 Page 47 of
Confidential - Subject to Further Confidentiality Review
165

```
 1   on the drywall or anything that was written on the

 2   drywall while the home was being constructed?

 3       A.   No.

 4       Q.   Did anyone ever tell you that the home had been

 5   constructed using drywall from China?

 6       A.   No.

 7       Q.   And do you know if the homebuilders ever made

 8   any guarantees to you about the quality of the products

 9   that they were using to construct the home?

10       A.   No.

11       Q.   You don't know if they did, or they did not?

12       A.   They did not do that at the time of buying it

13   or -- until there was a question about the house where

14   they gave me certain warranties verbally that were

15   completely false and made up.

16       Q.   So they didn't make any warranties or

17   guarantees to you until the Chinese drywall was

18   discovered in the home; is that right?

19       A.   Yes.

20       Q.   And what did they say to you that was a

21   warranty?

22       A.   Well, when I say "warranty," we said, "We have

23   some concerns," and they said, "Oh, there's no way."

24   You know, "You guys don't have it.  You guys don't have
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/10 Page 2668 of 3246
Case 1:09-cv-02047-MGC Document 23031 Entered on FLSD Docket 05/18/2019 Page 48 of
165
Confidential - Subject to Further Confidentiality Review

```
 1   it."  And to the point where they sent someone over to

 2   look at it and tell me that I didn't have it, which they

 3   were obviously not telling me the truth.

 4        Q.   Do you know about when that happened?

 5        A.   I would assume it's probably a couple months

 6   prior to us moving out of the house, which I don't know

 7   the exact date.

 8        Q.   Okay.  So maybe sometime in 2009?

 9        A.   Yes.

10        Q.   And the homebuilder sent a person over to the

11   house telling you that they were going to look to see if

12   you had Chinese drywall?

13        A.   Correct, or to look at the symptoms to see if

14   there were symptoms of having Chinese drywall.

15        Q.   Do you know who they sent when they did that?

16        A.   He worked for Albanese.  His name was Gavin.

17        Q.   Had you met him before?

18        A.   I had.

19        Q.   Did you receive any kind of report from that

20   visit from Gavin?

21        A.   It was more of just he did a visual inspection

22   and kind of said, "No, you're fine," kind of.

23        Q.   So he gave a verbal report?

24        A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2669 of 3246
Case 1:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Docket 05/02/17 Page 46 of
Confidential - Subject to Further Confidentiality Review
165

```
 1    Q.   Do you know what he looked at when he came in

 2  the house?

 3    A.   At the time -- I don't know.  You know, I know

 4  now what to look for, because I actually saw that there

 5  were issues, what you would call symptoms, but at that

 6  time he was just walking around.  I had no idea what he

 7  was even looking for.

 8    Q.   And you were present at the house when he came

 9  by; is that right?

10    A.   Yes.

11    Q.   Was your wife present as well?

12    A.   I don't recall.

13    Q.   What were you aware of at the time that you

14  thought were symptoms of having Chinese drywall that

15  caused you to call the homebuilder?

16    A.   What made us -- well --

17    Q.   Yeah.

18    A.   Okay.  So I'm trying to recall the timeline.

19  Well, at that time we were trying to sell our house, and

20  there were certain comments made to us about the house

21  when people were looking at it.  One of the comments

22  were, one of the people said that they thought there was

23  a weird smell in the house.

24         And so we started thinking about it, and so we
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 2670 of 3246
Case 1:09-cv-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 50 of 165
Confidential - Subject to Further Confidentiality Review

1    called -- that's when we started saying maybe there is

2    something wrong, and this is when all the Chinese

3    drywall on the streets surrounding us were starting to

4    come to fruition.  So that's why we called him in, and,

5    of course, he said there was no problem, and just

6    something didn't seem right.

7         And we -- I eventually started going through

8    where they say the symptoms are.  Where the air handlers

9    are, you're supposed to look at the copper wiring for

10   black, you know, and all those things, and I went

11   through one of them and I noticed there was a lot of

12   blackening on the copper wires next to one of the air

13   handlers, and because we were -- I just felt like we

14   weren't getting the truth from Albanese at that point,

15   we called in our people, and they cut holes in the wall

16   and they found Chinese drywall.

17        Q.   Who did you call in, when you say you called in

18   your own people?

19        A.   We called a builder.

20        Q.   I'm sorry.  Who did you call to cut holes in

21   the wall?

22        A.   A builder.

23        Q.   Oh, a builder?

24        A.   Yes.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2671 of 3246
Case 2:09-cv-20472-MCA Document 2621 Confidential Subject to Docket 05/19/2011 Page 31 of
Confidential – Subject to Further Confidentiality Review
165

```
 1      Q.    Not the builder of your home --

 2      A.    No.

 3      Q.    -- but a different homebuilder; right?

 4      A.    No.

 5      Q.    Do you know, what was the name of the

 6   homebuilder that you called in?

 7      A.    AK Building & Design.

 8      Q.    And had you had a previous relationship with

 9   them or know someone there?

10      A.    I had a current relationship with him because

11   he was subsequently building a new house for me.

12      Q.    So a second ago you said that at the time

13   people were telling you there was an odd smell in the

14   house, you were hearing that because you were trying to

15   sell the house?

16      A.    Correct.

17      Q.    Had you listed it for sale at that time?

18      A.    Yes.

19      Q.    Do you remember what you listed the home for at

20   that time?

21      A.    I believe it was 2.3 or $2.4 million.

22      Q.    And do you know when you had first listed it

23   for sale?

24      A.    I don't know.  I don't recall.
```

Confidential – Subject to Further Confidentiality Review

1    Q.   Would that have been sometime in 2009?

2    A.   Yes.

3    Q.   Had you ever noticed a smell that was odd or

4    unusual inside of the house during the time that you

5    lived in it?

6    A.   I didn't feel -- I didn't detect a smell that I

7    thought was odd.  I felt like I didn't feel well,

8    because I have breathing problems.  So there wasn't a

9    smell, but from the time I moved in I had issues.

10   Q.   Had you ever had breathing problems before you

11   moved into the house?

12   A.   Yes, but not that -- to that degree.

13   Q.   What kind of breathing problems did you have

14   before you moved into the house?

15   A.   I've had allergy-induced asthma my whole life,

16   and when I get sick everything settles in my lungs, but

17   since living in that house I've been on Advair since,

18   which is a steroid that I have to breathe in in the

19   morning.

20   Q.   And that's alleviated those symptoms?

21   A.   To some degree.  I'm still -- I still have

22   issues with a tremendous amount of mucus buildup and --

23   not to make everyone, you know.  It has been an issue.

24   It has been an issue.

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/10 Page 2673 of 3246
Case 1:09-md-02047-GAO Document 23362-39 Filed 11/19/10 Page 2673 of 3246
Confidential – Subject to Further Confidentiality Review
165

```
1        Q.    Were you on Advair during the time that you

2   lived in this house?

3        A.    No.

4        Q.    And that only started after you moved out?

5        A.    Correct.

6        Q.    Were you on any medications for your breathing

7   issues when you lived in this house?

8        A.    You know, Singulair or Allegra, just an allergy

9   medication, like a pill, over-the-counter.

10       Q.    What kind of breathing issues did you have

11  specifically when you lived in the house?

12       A.    Shortness of breath, a lot of coughing, a lot

13  of mucus buildup.  I'm a runner, so when I'm running I

14  can tell that I don't feel good, and I definitely had a

15  lot more shortness of breath, which I've never

16  experienced.

17       Q.    Did that change once you moved out of the

18  house?

19       A.    It seems -- well, like I said, I'm on Advair

20  now and I've been on it since, so I can't -- all I know

21  is I feel better with the Advair and when I don't take

22  the Advair I don't feel -- I don't feel good.  I have

23  shortness of breath.  So definitely, to me, it seems to

24  be a correlation between those time points.
```

```
 1    Q.   If you don't take the Advair now, you still

 2   feel shortness of breath; is that right?

 3    A.   Correct.  Yes.

 4    Q.   And that's something that you did not

 5   experience before you lived in the house?

 6    A.   Correct.

 7    Q.   Have you gone to a doctor to discuss those

 8   respiratory issues that you're telling me about?

 9    A.   Well, the Advair is a prescription drug, so

10   they won't give me a refill unless I go there, so I have

11   to go, you know, and, you know, re-up my prescription

12   all the time.

13    Q.   Would you agree that you're not seeking

14   personal injury damages in this lawsuit related to

15   Chinese drywall?

16    A.   I would agree to that.

17    Q.   Now, you said that you did not notice a smell

18   per se in the house that was odd or unusual; is that

19   right?

20    A.   Correct.

21    Q.   Did you notice it after people started telling

22   you that there was a smell that was odd or unusual?

23    A.   Definitely.

24    Q.   So at the point that someone said that to you
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2675 of 3246
Case 1:19-cv-00484-WCG Document 26-1 Filed 11/19/19 Page 45 of 165

Confidential - Subject to Further Confidentiality Review

1  while you were selling the house, that's when you

2  noticed it?

3      A.   You know, I think that when you're living in a

4  house for two or three years you just come -- it's like

5  I have a cat, so I have kitty litter, you just become

6  immune to that smell, but once someone pointed it out,

7  just as a -- one of the people that were looking at the

8  house, they made two comments, and I know this sounds

9  funny, but they said, "Those people must smoke a lot of

10  pot, because there's some weird smell in that house,"

11  which I can tell you right now we're not pot smokers,

12  and then the other thing that someone else said was,

13  "What kind of chemicals are they using to clean the

14  house?  Because it smells very odd to us."

15          And until someone started saying all those

16  things, we never sort of thought about it, and then once

17  they said it, wait, there is some kind of smell.

18      Q.   Was the smell different in different parts of

19  the house?

20      A.   It was definitely stronger in the kitchen.

21      Q.   Was that where -- I'm sorry.  Finish.

22      A.   And then where the kitchen air handler was,

23  went down in the laundry room, it had a distinct smell,

24  and that's where the blackening of the wires were.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2676 of 3246
Case 1:09-cv-02042-MGC Document 298-31 Entered on FLSD Docket 05/19/2010 Page 45 of
165

Confidential - Subject to Further Confidentiality Review

```
 1       Q.   So prior to selling the house, other than you

 2   not noticing the smell, did anyone in your family ever

 3   comment on the smell before that period in 2009 when you

 4   started to have people coming in to look at the house?

 5       A.   No.

 6       Q.   Did you have any friends or people who visited

 7   the house tell you that there was a smell before that

 8   period in 2009 where you were selling the house?

 9       A.   No.

10       Q.   Did others in your family experience any

11   respiratory issues during the time that they lived in

12   the house?

13       A.   Our small dog developed a lot of wheezing and

14   coughing, and we took her to the vet, and the doctor

15   said, "There's something not right with her and she's

16   going to pass away within a year or two," and she died

17   within a year or two.  There was something -- and she --

18   there was nothing wrong with her up until that point.

19       Q.   Do you remember about when the issues with the

20   dog started?

21       A.   When we moved in the house.

22       Q.   And the dog died within one or two years or so?

23       A.   Two years.  Two years.

24       Q.   Two years.  So maybe around 2008 or 2009,
```

Case 2:09-md-02047-EEF-MBN  Document 23263-39  Filed 11/19/19  Page 2677 of 3246
Case 1:11-cv-22408-MGC  Document 231-31  Entered on FLSD Docket 05/19/2017  Page 37 of
165

Confidential - Subject to Further Confidentiality Review

```
1    somewhere in there?  It's okay if you don't remember.

2        A.   I don't recall.  I mean, I feel as though it

3    was by the time we moved out, once we realized what was

4    going on, we took her to the vet, and they said, "She'll

5    last another year or two," and that's when -- I'm

6    thinking from 2009 it was a year or two.

7        Q.   Understood.  So the issues with the dog began

8    around the time that you moved in; is that right?

9        A.   Correct.

10       Q.   You took the dog to the doctor around the time

11   that you moved out of the house?

12       A.   Correct.

13       Q.   And then within one or two years after you

14   moved out of the house -- or two years, excuse me -- the

15   dog had passed away?

16       A.   Yes.

17       Q.   How old was your dog at the time that it passed

18   away?

19       A.   13.

20       Q.   What kind of dog was it?

21       A.   Shih Tzu.

22       Q.   Was that the only pet that you had in the

23   house?

24       A.   At that time -- we have three dogs and a cat
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2678 of 3246
Case 1:11-cv-22408-MGC Document 128-11 Entered on FLSD Docket 05/19/2014 Page 38 of
165
Confidential - Subject to Further Confidentiality Review

1    now.  I'm trying to think of the timeline.  We had

2    another dog at that time.

3         Q.   Did that dog have any respiratory issues?

4         A.   I'm sorry.  That dog, we didn't get that dog

5    until we moved into our next house, so that was the only

6    dog in that house.

7         Q.   Were there any other pets in that house that

8    you can think of?

9         A.   No.

10        Q.   What about your children?  Did they have any

11   health issues or respiratory issues that you think may

12   have been associated with the drywall in the house?

13        A.   I don't know.

14        Q.   You don't know?

15        A.   My kids had issues.  I can't tell you where

16   they came from.  You know, my kids -- one of my kids has

17   ADD.  I don't know if that's from it.  One of my kids

18   has, like, markings on his skin that I don't know where

19   that came from.

20        Q.   Can you think of any respiratory issues that

21   your children had during the time that they lived in the

22   house?

23        A.   My oldest son had a lot of sinus problems to

24   the point where he had to have his adenoids out.  So I

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2679 of 3246
Case 1:09-cv-07299-MGC Document 226-31 Entered on FLSD Docket 05/18/2011 Page 40 of
165

Confidential - Subject to Further Confidentiality Review

```
 1   don't -- it could be directly related to that.  I don't
 2   know.
 3       Q.   Do you know if your son had any sinus issues
 4   prior to living in the house?
 5       A.   No.
 6       Q.   Can you think of any other respiratory issues
 7   that your children had during that time where you lived
 8   in the house?
 9       A.   No.
10       Q.   What was your experience like living in this
11   house?  Did you have a positive overall experience?
12       A.   Before or after knowing?
13       Q.   Before knowing.
14       A.   Pretty positive.
15       Q.   Was there anything about it that was negative?
16       A.   Well, whenever you buy a house and it's a
17   custom-built house and all that, there's always issues
18   with the house, but as far as our regular enjoyment, no,
19   until the Chinese drywall happened.
20       Q.   What changed about your enjoyment of the house
21   once you knew that there was Chinese drywall in the
22   house?
23       A.   Well, once I knew that, because we have --
24   because we're in a community where other people had
```

Confidential - Subject to Further Confidentiality Review

1    that, that issue, I knew that the majority of the money

2    that I put into that house was lost, which is my kids'

3    money, and that's why I'm sitting with a very large

4    mortgage on my current house.

5            So, you know, the monetary damages is

6    incredible, the loss of use, you know, the expenses that

7    aren't even listed in here, because, you know, when we

8    started thinking about it yesterday, there's six figures

9    aren't even recorded in there because what about all our

10   wedding gifts that were thrown out, all our silver

11   sterling tea services that I don't have a receipt for,

12   so I can't put them in the book?

13           But there's so many things that aren't in

14   there.  All the clothes that we threw out.  Everything

15   that we had to throw out and re-buy again is not in

16   there.  So how do I feel?  I feel awful about it.  You

17   know, I mean, the time wasted, and it's 10 years.  10

18   years.  I mean, it's -- and it's all there in black and

19   white.

20   Q.   You moved out of the home soon after you found

21   out that you had Chinese drywall?

22   A.   Yes.

23   Q.   So would you agree that the impact that you

24   felt was ultimately a financial one on you for having to

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2681 of 3246
Case 1:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 41 of
165

Confidential - Subject to Further Confidentiality Review

```
 1    move your life to a new home and to buy things that you

 2    had to throw away?

 3        A.   When you're short money, there's -- you're

 4    short money, but there's also an emotional impact to

 5    that, because it's stressful, so it's part and parcel.

 6        Q.   I wanted to ask you about you putting the home

 7    up for sale in 2009.  Why had you decided in 2009 to put

 8    the home up for sale and build a new home?

 9        A.   We wanted to live in a country club for golf

10    and tennis.

11        Q.   And the new home that you were going to build

12    was in a country club community?

13        A.   Yes.

14        Q.   Did you enter into an agreement or any kind of

15    letter of understanding for the purchase of that new

16    home?

17        A.   Yes.

18        Q.   And did you put down any money toward that?

19        A.   Yes.

20        Q.   Do you remember how much money you put down?

21        A.   I do not.

22        Q.   Were you able to get that money back when -- or

23    did you end up buying that home?

24        A.   I did, I did wind up buying that home and
```

Confidential - Subject to Further Confidentiality Review

```
 1    building a new house.

 2         Q.   So what happened with your home that we were

 3    discussing today with Chinese drywall did not prevent

 4    you from buying the new house that you ultimately bought

 5    in the country club community?

 6         A.   Let's just say it wasn't easy.

 7         Q.   What did you have to do differently to be able

 8    to afford to buy that new house in the country club that

 9    you wouldn't have had to have done if your home did not

10    have Chinese drywall?

11         A.   Well, first of all, my mortgage would have been

12    a fraction of what it is.  So at the time I was still

13    supporting the house on Middlebrook Way, my rental, and

14    the building of a new house.  So needless to say I was

15    bleeding money, but I made sure, unlike most of the

16    people in The Oaks, I paid the HOA, I paid my mortgage,

17    I didn't let anything go into arrears.  And it was a

18    struggle, but I made it through it.  And, you know, I

19    actually feel good about that part of it, that I wasn't

20    about to let my credit go to crap and not pay my bills.

21         Q.   Where was the new home located that was in the

22    country club community?

23         A.   In Woodfield Country Club in the Hamptons

24    subdivision.
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2683 of 3246
Case 1:11-cv-22408-MGC Document 29831 Entered on FLSD Docket 05/09/2023 Page 48 of
165

Confidential - Subject to Further Confidentiality Review

```
 1      Q.   And do you still live there today?

 2      A.   I do not.

 3      Q.   Okay.  When did you move into that home?  We'll

 4   start with that.

 5      A.   I believe in 2011.  I could be wrong.  It could

 6   be 2010 or 2011.

 7      Q.   Was that the first place that you lived after

 8   you had lived in the rental home that you had -- that

 9   you were renting after moving out of the home that we're

10   discussing today that had Chinese drywall?

11      A.   Yes.

12      Q.   So you went from that rental home to this home

13   once it had been completed?

14      A.   Yes.

15      Q.   And how long did you live there from when you

16   moved into it?

17      A.   Three years.

18      Q.   Okay.  And where did you move after that?

19      A.   I wound up building a house on the same street

20   across the street.  Another house.

21      Q.   And why did you do that?

22      A.   We built a very nice, beautiful house,

23   professionally decorated, and a realtor of ours, a

24   friend, called us and said, "Someone would like to look
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2684 of 3246
Case 1:1-cv-22408-MGC Document 23261 Entered on FLSD Docket 05/19/2014 Page 41 of 165

Confidential - Subject to Further Confidentiality Review

1    at your house just to see what new construction in the

2    club would look like," and walked through our house, and

3    at the end of the little tour we gave them, they go, "We

4    want to buy your house."

5            And so I said, "It's really not for sale."

6            And so they demanded I throw a number at them,

7    and I threw a number at them, and they wound up giving

8    us an offer on the house, and it just made financial

9    sense at the time to do.

10   Q.    So once you moved into the house across the

11   street, is that the home that you currently live in

12   today?

13   A.    Yes.

14   Q.    You told me a little bit earlier that there

15   were other people living in The Oaks who had issues with

16   the Chinese drywall, other homes; is that right?

17   A.    Yes.

18   Q.    Do you remember when you first heard about

19   Chinese drywall?  Was it from someone in The Oaks?

20   A.    Yes.

21   Q.    Do you remember when that was or who it was who

22   told you that?

23   A.    I'm not sure.

24   Q.    But you had neighbors who told you, "We have

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2685 of 3246
Case 2:09-md-02047-EEF-MBN Document 23263-39 Filed 11/19/19 Page 2685 of 3246
Confidential - Subject to Further Confidentiality Review
165

1    Chinese drywall in our house"?

2        A.    Yes.

3        Q.    What did they tell you about that?

4        A.    That it was defective product that was brought

5    over from -- from China that was installed and it gives

6    off gases that damage the house, the electronics, the,

7    you know, copper, all kind of different stuff in the

8    house.

9        Q.    Did you have any issues with damaged

10   electronics in your home while you lived there?

11       A.    Yes.

12       Q.    What issues did you have?

13       A.    We had TVs that for some reason were always

14   problematic.

15       Q.    When you say "problematic," what do you mean?

16       A.    Pictures skipping, you know, not turning on,

17   you know, lines through the coloring and all that.

18       Q.    Were these recently purchased televisions?

19       A.    Yes.

20       Q.    And did you replace any of them while you lived

21   in the house?

22       A.    I don't recall.

23       Q.    Do you remember if you moved with those

24   televisions to the rental home that you lived in?

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2686 of 3246
Case 2:09-cv-02049-GAG Document 22361 Exhibit 39 Filed 11/05/19 Page 46 of 165
Confidential - Subject to Further Confidentiality Review

```
 1      A.    No, they went in the garbage.

 2      Q.    So when you moved out, you threw them away?

 3      A.    Yes.

 4      Q.    Did you have any other electronics or

 5   appliances that had issues in your house other than

 6   televisions?

 7      A.    There were others.  I'm trying to recall.  It's

 8   probably a better question for my wife.  We did have

 9   other issues.

10      Q.    Did you have any issues with your air

11   conditioning while you lived in the house?

12      A.    I don't recall.

13      Q.    Do you remember ever having anyone come to

14   repair the air conditioning while you lived there?

15      A.    Yes.

16      Q.    Do you know why you had to have someone come to

17   repair the air conditioning?

18      A.    I just don't recall the exact issue, but I know

19   we did have air conditioning people at the house.

20      Q.    When did you first hire an attorney for your

21   issues related to Chinese drywall?

22      A.    I don't remember the exact date, but I would

23   say it was, you know, in 2009, obviously right after --

24   there was sort of, I guess, an explosion of people that
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2687 of 3246
Case 1:1-cv-22408-MGC Document 1591 Entered on FLSD Docket 05/08/2017 Page 47 of
165
Confidential - Subject to Further Confidentiality Review

 1    started finding out that they had Chinese drywall, and

 2    then we all as a group got together as homeowners and

 3    said who are we going to, you know, and we were referred

 4    to Colson Hicks, because they seemed to have a very good

 5    handle on it.

 6         Q.   So in 2009 while you still lived in the house,

 7    you got together with other people who had issues with

 8    the Chinese drywall?

 9         A.   Well, once we all knew that -- what we were

10    dealing with.

11         Q.   And this was before you moved out; is that

12    right?

13         A.   Correct.

14         Q.   When you sold the house, did you inform the

15    Shukows about the issue with Chinese drywall?

16         A.   It's in the closing statement.

17         Q.   So you told them that there was Chinese drywall

18    in the house?

19         A.   Correct.

20         Q.   And did they tell you that they planned to fix

21    the house when they bought it?

22         A.   They said that they were going to remediate it

23    themselves, yes.

24         Q.   Did you ever consider remediating the house?

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2688 of 3246
Case 1:09-md-02047-EEF-MBN Document 22351 Confidential - Subject to Further Confidentiality Review Page 48 of 165
Confidential - Subject to Further Confidentiality Review

1      A.    No.

2      Q.    Why not?

3      A.    I just wanted to sell it and be done with it.

4      Q.    You wanted to get out of it as soon as you

5  could?

6      A.    Correct.

7      Q.    And was that because you wanted to move into

8  the new house that you had already planned to move into?

9      A.    Well, I wanted to get it off my books as far as

10  more payments that I had to make, because I had the HOA,

11  all the electric, all the normal expenses and the

12  mortgage of a house I wasn't living in, so I just wanted

13  to be done with it.

14      Q.    Because at that point that you sold the house,

15  had you already moved into the rental house that we've

16  been discussing?

17      A.    Yes.  Yes.

18      Q.    About how long before you sold the house did

19  you live in the rental home, if you remember?

20      A.    I don't recall.

21      Q.    But it was sometime in 2009 that you were in

22  the rental home?  And we can go over it later.

23      A.    Yeah, I don't recall the -- we -- I can say

24  this:  As soon as we found out about the Chinese

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/10 Page 2689 of 3246
Case 1:09-cv-07628-MGC Document 93831 Confidential - Subject to Further Confidentiality Review
165

Confidential - Subject to Further Confidentiality Review

1    drywall, we found a rental as quickly as we can and got

2    out of the house, because we felt as though there could

3    be health issues.

4        Q.   The reason that you wanted to move out

5    immediately was concerns about health effects?

6        A.   Correct.

7        Q.   Did anyone tell you that there were potential

8    health effects from Chinese drywall?

9        A.   Yes.

10       Q.   Who told you that?

11       A.   People living in the community that said they

12   were experiencing breathing problems.  Our attorneys

13   warned us that there could be issues.  You know, listen,

14   in that development there were a ton of people that had

15   it and everyone was -- there was -- you know, we knew

16   people that -- one of the girls was having terrible

17   blotches all over her skin, and as soon as they moved

18   out, it was alleviated completely.

19       Q.   Before you found out that you had Chinese

20   drywall, did you plan to live in the house that you

21   owned until the new house was completed?

22       A.   Correct.

23       Q.   So there was never a plan to move to a rental

24   house?

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/10 Page 2690 of 3246
Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/10 Page 50 of
165

Confidential - Subject to Further Confidentiality Review

```
1        A.   No.

2        Q.   But you did have the home listed for sale;

3   isn't that right?

4        A.   Yes.

5        Q.   So if the house had sold before you knew that

6   there was Chinese drywall, would you have had to move

7   into a rental house until the home in the country club

8   was completed?

9        A.   What I probably would have done, my first

10  choice would have been to schedule a closing 120 days

11  down the road to where the house would have been

12  completed, or what I would have done is done one of

13  those temporary rentals where you can rent, like, a

14  four-bedroom condo that's completely furnished and they

15  rent it by the -- they rent it by the month so you're

16  not tied to a long-term lease.

17       Q.   Did you get tied to a long-term lease when you

18  moved into the rental home?

19       A.   We were pretty lucky.  The guy was very

20  amenable.  He says, "Just go month to month."  I think

21  we were there for six or seven months, something like

22  that.

23       Q.   And was that rental home furnished?

24       A.   Yeah -- yes.
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2691 of 3246
Case 2:11-cv-01843-MCA Document 2851 Entrance in Support Docket 0178021911 Page 51 of
Confidential - Subject to Further Confidentiality Review
165

1    Q.   Did you move some of the belongings that you

2  had from the home with Chinese drywall to the rental

3  home?

4    A.   Anything that we could take that could be

5  dry-cleaned and we felt would be okay we brought in.

6  Everything else was garbage.

7    Q.   So some clothes were dry-cleaned; is that

8  right?

9    A.   Yes.  The bills are in there.

10    Q.   And was some furniture dry-cleaned as well?

11    A.   We did dry-clean.  We had them come in the

12  driveway and dry-clean the furniture.

13         (Rosen Exhibit No. 3 was marked for

14  identification.)

15  BY MR. LAWSON:

16    Q.   Mr. Rosen, you've been handed a document that's

17  been marked as Exhibit 3.  Have you seen this document

18  before?

19    A.   Yes.

20    Q.   This appears to be a Chase account statement,

21  Chase Bank account statement, that shows certain

22  payments that were made from 2007 going through 2009; is

23  that accurate?

24    A.   Yes.

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/10 Page 2692 of 3246
Case 1:1-2-cv-22408 McGill Document Exhibit 39 in Filed Supp Docket 05/18/2019 Page 52 of
165

Confidential - Subject to further confidentiality review

```
 1         Q.   And what are these payments that are shown on

 2    this statement?

 3         A.   It looks like my mortgage payment.

 4         Q.   Okay.  So these are the mortgage payments that

 5    you paid, it appears, from the beginning of 2007 through

 6    the end of 2009; is that correct?

 7         A.   Yes.  Yes.

 8         Q.   And is it your understanding that these are all

 9    the mortgage payments that you made on the property on

10    Middlebrook Way, to the best of your knowledge?

11         A.   For my first mortgage, yes.

12         Q.   Okay.  And then there were also payments for

13    the second mortgage, the equity -- home equity mortgage

14    that we discussed earlier; correct?

15         A.   Correct.

16         Q.   And those are not reflected on this statement;

17    is that right?

18         A.   I don't believe so, no.

19         Q.   Okay.  Do you know about how much a month the

20    payments for the second mortgage were?

21         A.   I don't recall.

22         Q.   Was the second mortgage paid off through the

23    sale of your home on Middlebrook Way at the end of 2009?

24         A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2693 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 48 of 165
Confidential - Subject to Further Confidentiality Review

1    Q.   And was the first mortgage paid off as well?

2    A.   Yes.

3    Q.   Are you aware of any other statements or

4    invoices showing the mortgage payments that you made

5    during this time period on the Middlebrook Way home

6    other than the payments shown on this statement?  Do you

7    have any invoices or statements from those mortgage

8    payments?

9    A.   Do you mean from the equity line that I don't

10   have?

11   Q.   I'm sorry.  Let's first talk about the first

12   mortgage.  Is there any other record of the mortgage

13   payments other than this record that we're looking at

14   here that you're aware of?

15   A.   No, this is it.

16   Q.   And for the second mortgage, are you aware of

17   any records showing payments for that second equity line

18   mortgage?

19   A.   I don't know where the records would be on

20   that.

21   Q.   Have you looked for the bank records to show

22   your payments of the second mortgage?

23   A.   Well, you only keep records for five years, so

24   I -- you know.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2694 of 3246
Case 1:09-cv-02047-GEL Document 22331 Entered on FLSD Docket 11/19/2019 Page 54 of 165
Confidential - Subject to Further Confidentiality Review

1    Q.   If you look up to the date in the top right

2    corner of this document on the page that's marked as

3    MROSEN 41, the date that is listed is September 5, 2013.

4    Do you see that?

5    A.   So the back page?

6    Q.   I'm sorry.  The first page of the document is

7    MROSEN 41.  Do you see that?

8    A.   Okay.  Yes.

9    Q.   And in the upper right-hand corner, there is a

10   date that says September 5, 2013.  Do you see that?

11   A.   Uh-huh.

12   Q.   Is it your understanding that that's the date

13   that this transaction history was collected?

14   A.   I guess so.

15   Q.   And it goes back to 2007, the transaction

16   history; is that right?

17   A.   Uh-huh.

18   Q.   The activity for -- excuse me.  The period that

19   the transaction activity was searched for appears to be

20   in the middle of the page, and it lists October 1, 2006,

21   through January 31, 2010.  Do you see that?

22   A.   Yes.

23   Q.   So at this time in 2013 it appears that you

24   were able to search back until at least 2007,

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2695 of 3246
Case 1:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 45 of 165
Confidential - Subject to Further Confidentiality Review

1  potentially 2006, for payments?  Does that sound

2  accurate?

3      A.   Yes.

4      Q.   But you're not aware of -- you are not aware of

5  any records in your possession for payments for the

6  second mortgage; is that right?

7      A.   I don't recall.  I mean, the only thing I can

8  fathom is that the equi line was at my -- at my bank

9  where I do my regular checking and savings so it was

10  just automatically pulled out of my account, so there

11  was no transaction record like this other than, you

12  know, my regular checking statement.

13      Q.   Looking at these payments on the first page,

14  there appears to be a principal amount and an interest

15  amount that are listed in the second and third columns

16  for each transaction.  Do you see what I'm talking

17  about?

18      A.   Yes.

19      Q.   And does that appear to reflect the amount of

20  principal that was paid on the mortgage payment and the

21  amount of interest that was paid on the mortgage

22  payment?

23      A.   It would -- it would seem to, yes.

24      Q.   Let's look at reference number 6, reference

Case 2:09-md-02047-EEF-MBN  Document 23263-39  Filed 11/19/19  Page 2696 of 3246
Case 1:1-cv-22408-MGC  Document 1-4  Entered on FLSD Docket 05/19/2011  Page 46 of
165
Confidential - Subject to Further Confidentiality Review

```
1    line number 6.  It's at the top of the first page.  It

2    looks like it's for a payment on June 1, 2007.  Do you

3    see that?

4         A.   Uh-huh.

5         Q.   And that payment amount was $3,694.31.  Did I

6    read that correctly?

7         A.   Yes.

8         Q.   And if you look, the principal amount that was

9    paid, the amount of principal, excuse me, that was paid

10   for that payment was $584.29; is that right?

11        A.   Yes.

12        Q.   And then the interest amount was about

13   $3,110.02; is that correct?

14        A.   Yes.

15        Q.   So at least for these payments that were seen

16   on the first page it appears that a large portion of the

17   payments that were made in 2007 was going toward

18   interest; is that right?

19        A.   Well, on a 30-year amortized mortgage, that's

20   how it -- unfortunately, that's how it goes.

21        Q.   That's right.  At the beginning of a 30-year

22   term mortgage, you're paying a lot of interest, and that

23   occurs for a number of years into the mortgage; is that

24   right?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2697 of 3246
Case 1:09-cv-02949-GHK Document 1001 Filed 11/01/19 Page 55 of 165
Confidential - Subject to Further Confidentiality Review

```
 1       A.   Yes.

 2       Q.   So looking across this document, that is

 3  largely consistent, where for the majority of the

 4  payments -- excuse me -- for the large payments that are

 5  made, the payments in excess of $3,000 that were made on

 6  the mortgage, a large amount of it is going toward

 7  interest, over $3,000 for many of them; is that right?

 8       A.   Yes.

 9       Q.   So at the time that you sold your home, do you

10  know how much you had paid toward the principal of the

11  home at that time?

12       A.   I don't know.  I thought it might be in the

13  records as part of the damages.

14       Q.   Yeah, we can look through that a little bit

15  later, but would you agree that a large amount of the

16  money that you had paid in your mortgage payments had

17  gone to interest at that stage?

18       A.   Absolutely.

19       Q.   Because you had only been in the home for

20  around three years at that time; is that right?

21       A.   Yes.

22            MR. MONTOYA:  Are you at a stopping point?

23            MR. LAWSON:  Yeah.  I was just about to say

24       it's a good time for a break.
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/10/19 Page 2698 of 3246
Case 1:11-cv-22408-MGC Document 205-31 Entered on FLSD Docket 05/18/2018 Page 45 of
165

Confidential - Subject to Further Confidentiality Review

```
1              MR. MONTOYA:  Thank you.

2              MR. LAWSON:  We can go off the record.

3         (Recess from 1:02 p.m. until 1:16 p.m.)

4         (Rosen Exhibit No. 4 was marked for

5    identification.)

6    BY MR. LAWSON:

7         Q.   Welcome back, Mr. Rosen.

8              I wanted to direct your attention to the

9    exhibit that you've just been handed.  It's been marked

10   as Exhibit 4.  I represent to you that this is a 2018,

11   by now I guess a 2019, because I pulled it this morning,

12   a property appraiser record from Palm Beach County taken

13   from their online database.

14             Have you seen a document like this before?

15        A.   Yes.

16        Q.   And looking to the location address that is

17   listed on this document, is that the address of the home

18   that is at issue in this lawsuit?

19        A.   Yes.

20        Q.   I'd like to turn your attention to the third

21   page of this document.  If you look in the upper

22   left-hand corner, there's different areas of square

23   footage that are listed for the home.  Do you see that?

24        A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2699 of 3246
Case 1:1-cv-22408-MGC Document 28831 Entered on FLSD Docket 05/08/2019 Page 49 of
165

Confidential – Subject to Further Confidentiality Review

```
1        Q.   And on that page, it lists at the bottom of

2   that square footage column a total area under air.  Do

3   you see that?

4        A.   Yes.

5        Q.   And are you aware of what under air square

6   footage is?

7        A.   Yes.

8        Q.   That's the area of the home that is affected by

9   or covered by the air conditioning and, if there is

10  heating, heating in the home; is that right?

11       A.   Yes.

12       Q.   And that's usually less than the total square

13  footage of the home; correct?

14       A.   Yes.

15       Q.   Because there are often areas that are not

16  under air, like the garage, for example?

17       A.   Yes.

18       Q.   Here the total area under air of the home at

19  issue in this lawsuit is listed as 5,935 square feet.

20  Do you see that?

21       A.   Yes.

22       Q.   Do you have any reason to doubt that number

23  that's listed on this document?

24       A.   No.
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 2700 of 3246
Case 1:09-md-02047-EEF-MBN Document 23261 Confidential - Subject to Further Confidentiality Review Page 60 of 165

Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Have you ever had the square footage of the

 2   home at issue in this lawsuit measured for its square

 3   footage?

 4      A.   Not to my knowledge.

 5      Q.   Quickly I'd like to ask you about the

 6   appraisals section that's listed at the bottom of this

 7   document.

 8      A.   Okay.

 9      Q.   If you look to the section here, it has tax

10   years going from 2018 through 2009 and showing

11   improvement values, land values, and total market values

12   for this property.  Do you see that?

13      A.   Yes.

14      Q.   And have you ever looked at the total market

15   values that are -- that have been appraised by the

16   county for your previous home on Middlebrook Way before?

17      A.   No.

18      Q.   If you look back to 2009, the total market

19   value of the home was listed as $371,466.  Do you see

20   that?

21      A.   Yes.

22      Q.   And the improvement value of the home was

23   listed as $961,971.  Did I read that correctly?

24      A.   Yes.
```

Confidential - Subject to Further Confidentiality Review

1    Q.   Do you understand why there would be such a

2    large discrepancy between the market value and the

3    improvement value of the home at that time in 2009?

4    A.   Yes.

5    Q.   Why is that?

6    A.   Because one is the land value.

7    Q.   I'm sorry.  I was referring to the improvement

8    value versus the total market value of the two.

9    A.   Oh.

10   Q.   Do you see that the improvement value is listed

11   as $961,971 in 2009?

12   A.   Yes.

13   Q.   And do you see that the total market value is

14   listed as $371,466 in 2009?

15   A.   I see that.  Okay.

16   Q.   Do you understand why there might be -- there

17   appears to be about a $600,000 difference between the

18   improvement value of the home and the total market value

19   of the home?

20   A.   Well, this is the first time I've looked at it.

21   I'm assuming it's because at 2009, where the Chinese

22   drywall happened, that the market value went down.

23   Q.   Do you know if the Chinese drywall in the home

24   was reported to the county at any point?

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/10 Page 2702 of 3246
Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/10 Page 2702 of 3246
Confidential - Subject to Further Confidentiality Review
165

```
 1     A.   I don't believe so.  I don't know.  Not to my

 2   knowledge.

 3     Q.   Did you receive any offers on your home when it

 4   was first listed in 2009 before you learned that there

 5   was Chinese drywall?

 6     A.   Written offers, no, I don't think so.

 7     Q.   Did you have any verbal offers?

 8     A.   I think there were some verbal offers.

 9     Q.   Do you remember how much those verbal offers

10   were?

11     A.   I don't.

12     Q.   Were they near your asking price?

13     A.   I don't recall.

14     Q.   You had said earlier that the list price was

15   north of $2 million or so; is that right?

16     A.   Yes.

17     Q.   If you look down to the bolded statement below

18   in the appraisals section, it says:  "All values are as

19   of January 1st each year."  Do you see that?

20     A.   Yes.

21     Q.   So, for instance, the value that is shown for

22   2009 then would be for January 1, 2009.  Do you agree

23   with that?

24     A.   Okay, yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2703 of 3246
Case 1:11-cv-22408-MGC Document 129 Entered on FLSD Docket 09/26/2013 Page 63 of
165
Confidential - Subject to Further Confidentiality Review

1    Q.    So this would have been the county's assessment

2    of the value of the total market value of the home as of

3    January 1, 2009, according to this document; is that

4    right?

5    A.    Yes.

6    Q.    And that total market value as of January 1,

7    2009, as we just went over, was $371,466; correct?

8    A.    Yes.

9    Q.    And January 1, 2009, would have been before you

10   discovered there was Chinese drywall in your home;

11   correct?

12   A.    Yes.

13   Q.    At the time that you sold your home in 2009,

14   did you have concern about the issues in the United

15   States real estate market that had started because of

16   the recession around that time?

17   A.    No.

18   Q.    Did you think that that would affect the price

19   that you would receive for your home?

20   A.    Prior to finding out about Chinese drywall?

21   Q.    Yes.

22   A.    I did not think it would.

23   Q.    Why is that?

24   A.    In my experience in real estate, even in a bad

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2704 of 3246
Case 1:09-md-02047-MCA Document 2061 Entered on FLSD Docket 05/18/2019 Page 61 of
165
Confidential - Subject to Further Confidentiality Review

 1    market the very low end sells very well and the very

 2    high end, because there's always that discriminating

 3    grouping.  The middle of the road is always where the

 4    problem exists.

 5        Q.  So you thought because of the high-end value of

 6    the home that it would not be impacted by any dip in the

 7    real estate market related to the recession?

 8        A.  Well, the dip that was related to,

 9    unfortunately, is because that community, after one

10    house and then multiple houses got Chinese drywall there

11    was a stigma attached to that.  And as an example, that

12    community has recently sold out, which has been going on

13    since 2005 or '03 or something like that, so it's 15

14    years.  There are communities around there that have

15    been sold out in a year, recently.  So it's -- the

16    Chinese drywall hurt the community as far as resales

17    very, very badly, not the impact of the bad stock market

18    and all that other stuff.

19        Q.  In 2009, had that stigma, to your knowledge,

20    attached to the community that it was affecting the

21    prices that people were selling homes for in The Oaks?

22        A.  Absolutely.

23        Q.  Yes?

24        A.  Yes.

Case 2:09-md-02047-EEF-MBN Document 23263-39 Filed 11/19/19 Page 2705 of 3246
Case 2:09-cv-02048-McGa Document 226-31 Entered on FLSD Docket 01/19/2019 Page 65 of
165
Confidential - Subject to Further Confidentiality Review

1    Q.   Were you concerned that that stigma would

2    affect the price that you could sell your home for

3    before you knew you had Chinese drywall?

4    A.   I had some concerns, but, you know, per our

5    builder coming -- the builder who built the house said,

6    "We assure you there's no problems with your house,"

7    when he obviously didn't check it out.

8    Q.   You -- and you said a second ago, just to

9    clarify, that you did not receive any written offers for

10   your home before you learned that there was Chinese

11   drywall?

12   A.   You may -- I have to be honest with you, that

13   my wife was more on the front line of all that kind of

14   stuff, because I work, you know, 8:00 to 6:00 every day.

15   So I don't recall.  You can ask her the question.  She

16   may have better knowledge.

17   Q.   Great, thank you.  And if there's anything like

18   that at any point, since we'll also have the opportunity

19   to speak with your wife today, if you have anything

20   where you think that she might know better, feel free to

21   say that.  I would ask for your best recollection, if

22   you have it, but I appreciate knowing that, because it

23   makes it easier to be able to refer to her.

24   A.   If anyone's married, they'll know that my

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 1/19/10 Page 2706 of 3246
Case 1:10-cv-01499-CAP Document 22-29 *SEALED* Docket 01/18/2019 Page 65 of
165
Confidential - Subject to Further Confidentiality Review

 1    wife's probably going to contradict most of what I say.

 2        Q.    You have the unenvious position of going first

 3    here and answering these questions.

 4        A.    Yeah, she's sitting down there like --

 5        Q.    Did you own any other properties or homes at

 6    the time that you owned this home on Middlebrook Way?

 7        A.    I don't recall.

 8        Q.    Do you own any other homes than the one that

 9    you live in today?

10        A.    We own a condo in Boca West.

11        Q.    Do you remember when you purchased that?

12        A.    Five or six years ago.

13        Q.    When you lived at the home in Middlebrook Way,

14    did anyone live there other than your immediate family,

15    your wife and your children?

16        A.    We had a housekeeper/nanny.

17        Q.    And she lived in the home as well?

18        A.    Correct.

19        Q.    Did she experience any respiratory issues while

20    she lived in the home that she told you about?

21        A.    I don't recall.

22        Q.    Do you remember her ever complaining about the

23    smell of the home or any issues that she had with the

24    home that you think are relating to Chinese drywall?

Case 2:09-md-02047-EEF-MBN Document 23263-39 Filed 11/19/19 Page 2707 of 3246
Case 1:09-md-02047-MGC Document 11331-01 Entered on FLSD Docket 05/19/2019 Page 67 of
165
Confidential - Subject to Further Confidentiality Review

1      A.    I don't recall that.  Again, my wife is

2   probably better suited, because she was there 90 percent

3   of the time.

4      Q.    From when you moved into the home until when

5   you moved out into the rental home, did you live

6   anywhere else?  Did your family live anywhere else

7   during that time, or were you strictly at Middlebrook

8   Way?

9      A.    Say it again.

10     Q.    I would imagine that you lived in the home from

11  the time that the home -- you moved in originally until

12  you moved out to the rental home.  Is that correct, that

13  there was no other --

14     A.    Well, the day we found out was a Friday, and

15  when my wife called me at the office, I said, "Pack a

16  bag, go to the Boca resort and get us a room until we

17  find a rental," and we moved out, and that was it.

18     Q.    And that Friday was the day that the

19  homebuilder that you had had come over to inspect the

20  house told you you have Chinese drywall?

21     A.    Yeah.

22     Q.    And you moved out immediately after that?

23     A.    Yes.

24     Q.    Did you renovate or make any improvements to

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2708 of 3246
Case 1:09-cv-02047-MCA Document 22362-39 Entered on FLSD Docket 05/18/2019 Page 38 of
165

Confidential – Subject to Further Confidentiality Review

1    the home between the time that you moved into it

2    originally and by the time you moved out?

3        A.   Well, aside from what we paid for the

4    1,825,000, you'll see in the documents it's reflective,

5    we had a professional decorator decorate the entire

6    house, and there's a listing with receipts of all the

7    different improvements, whether window treatments and --

8    you know, all kinds of different stuff.  I mean, it's

9    almost $200,000.

10       Q.   Did you have to discard of all of those items

11   that you've included receipts for when you moved out of

12   the home?

13       A.   Yes.  You couldn't take window treatments that

14   are custom-made for that house.  Most of the stuff was

15   custom.  The entire office was all custom-made woods

16   that were built into that -- into those walls and

17   beautiful.  You know, couldn't -- you know, it was

18   garbage.  All thrown out.

19       Q.   All of it was thrown away?

20       A.   All of it.  If it was custom-made for that

21   house, you couldn't bring it somewhere else or reattach

22   it.  Plus, you couldn't -- you didn't want to because of

23   the smell of Chinese drywall.

24       Q.   Right.  So when the new people moved in, you

Case 2:09-md-02047-EEF-MBN Document 23263-39 Filed 11/19/10 Page 2709 of 3246
Case 1:09-md-02047-EEF-MBN Document 23161 Confidential - Subject to Further Confidentiality Review Page 45 of
165

Confidential - Subject to Further Confidentiality Review

1    took all of that stuff and threw it away?

2        A.    Yeah, they disposed of it.

3        Q.    They didn't want it, as far as you know?

4        A.    Would you want your house to smell like that?

5        Q.    So no?

6        A.    No.

7        Q.    Did you ever get a quote what it would cost to

8    remove the Chinese drywall from your home?

9        A.    I never got a written quote.  We started

10   inquiring just out of curiosity.

11       Q.    And what did you hear when you made those

12   informal inquiries?

13       A.    4- or $500,000, based on the square footage.

14            MR. VERRIER:  Matt, I'm going to assert a

15       rolling objection.  Did you ask him about the

16       remediation?

17            MR. LAWSON:  I asked him if he got a quote for

18       it.

19            MR. VERRIER:  Just a rolling objection.  You

20       know, our position would be, in that there's two

21       tracks, this is a remediation track, this is a

22       nonremediation deposition.  But you can ask the

23       questions.

24            MR. LAWSON:  Thank you.

Confidential – Subject to Further Confidentiality Review

```
1    BY MR. LAWSON:

2        Q.   Do you know if there were any changes to the

3    square footage of the home from the time that you moved

4    into it to the time that you moved out?

5        A.   I have no idea.

6        Q.   Did you add any new rooms that were under air

7    to the home from the time that you moved in to the time

8    that you moved out?

9        A.   No.

10            MS. RICO:  If it's helpful, we'll stipulate to

11       the square footage in the property appraiser's.

12            MR. LAWSON:  No, I understand.  I just want to

13       make sure that that is reflective -- of what time

14       period that's reflective of, at the time that the

15       home was built or if it was at the time that they

16       moved out.

17            (Rosen Exhibit No. 5 was marked for

18   identification.)

19   BY MR. LAWSON:

20       Q.   Mr. Rosen, you've been handed a document that's

21   been marked as Exhibit 5.  I represent to you that this

22   is a Plaintiff Profile Form that was submitted on your

23   behalf in the Chinese Manufactured Drywall Products

24   Liability Litigation in the Eastern District of
```

1    Louisiana with Judge Fallon.  Have you ever seen this

2    document before?

3         A.    Yes.

4         Q.    Okay.  Do you remember reviewing this document

5    before it was submitted?

6         A.    It was a long time ago, but I do recall it.

7         Q.    The first page of this document is marked as

8    ROSEN M 1.  Do you see that?

9         A.    Yes.

10        Q.    If you can turn to the third page -- and I

11   apologize.  I think this might be the quality of the

12   copying, I don't know where it lost its integrity along

13   the way, but it appears that there might have been

14   signatures here.  Would it sound accurate to say that

15   you probably signed this document?

16        A.    Probably, yes.

17        Q.    Looking back to the first page of the document,

18   is that your name and your wife's name that's listed

19   under Section I for name of property owner?

20        A.    Yes.

21        Q.    And that is the -- under "address of affected

22   property," it's 17538 Middlebrook Way?

23        A.    Yes.

24        Q.    And that's the same property that we've been

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2712 of 3246
Case 1:09-md-02047-EEF-MBN Document 23631 Exhibit on File under Seal Page 72 of 165
Confidential - Subject to Further Confidentiality Review

1    discussing today; correct?

2    A.  Yes.

3    Q.  If you look down to the Section III at the

4    bottom of this first page, there's a section titled

5    Claimant Information.  Do you see that?

6    A.  Yes.

7    Q.  And if you look to it, there's "name of

8    claimant," and it lists four different people there, you

9    and two of your children; is that right -- and your wife

10   and two of your children?

11   A.  Yes.

12   Q.  There's a "dates occupied" field that is listed

13   on the second column in Section III, and there's a

14   move-in and leave date that's listed next to each one of

15   those people that we just discussed.  Do you see that?

16   A.  Yes.

17   Q.  And it states that everyone moved in on

18   November 6, 2006, and left the property on August 12,

19   2009; is that right?

20   A.  Yes.

21   Q.  And does that sound about right for the date

22   that your family moved out of the home?

23   A.  Yes.

24   Q.  So you left the home in August of 2009 and sold

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/10 Page 2713 of 3246 of
Case 1:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/10 Page 2713 of 3246 of
Confidential - Subject to Further Confidentiality Review
165

 1    it somewhere around December of 2009; is that correct?

 2        A.    Yes.

 3        Q.    Looking up to Section II on the right-hand side

 4    of the first page, it lists homeowners insurance with

 5    United Property and Casualty Insurance.  Do you see

 6    that?

 7        A.    Yes.

 8        Q.    Is that the company that you had homeowners

 9    insurance with while you lived at the home on

10    Middlebrook Way?

11        A.    Yes.

12        Q.    Did you ever file a homeowners claim with that

13    company after you learned that there was Chinese drywall

14    in your home?

15        A.    We attempted to contact them, but they said

16    that they had no responsibility for it.

17        Q.    Okay.  You asked them whether that might be

18    something that would be covered, and they said no?

19        A.    Correct.

20        Q.    So you did not ultimately file a claim after

21    that conversation?

22        A.    No.

23        Q.    Earlier we discussed the homebuilder who built

24    this home on Middlebrook Way, and you said that

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2714 of 3246
Case 1:09-md-02047-GAP Document 22831 Entered on FLSD Docket 05/19/2014 Page 4 of 165
Confidential - Subject to Further Confidentiality Review

```
 1    initially they sent over someone to take a look at the

 2    home and that person did come by; is that right?

 3        A.   Yes.

 4        Q.   What conversations did you have with them after

 5    that person came by and told you that you did not have

 6    Chinese drywall?

 7        A.   After I learned that I had it or just after he

 8    inspected it?

 9        Q.   After he inspected, what conversations, if any,

10    did you have with them?

11        A.   I don't recall.

12        Q.   After you learned that you had Chinese drywall,

13    what conversations did you have with them?

14        A.   Very heated.

15        Q.   And did you initiate those conversations?

16        A.   Yes.

17        Q.   And what did you tell them?

18        A.   Well, I told him that he needs to "get over to

19    my house ASAP, because what you told me was not the

20    truth and I now can show you where the evidence is

21    that'll show you that you're completely wrong or you're

22    completely making it up."

23        Q.   And what did he say?

24        A.   I think this was -- when he had come to my
```

Confidential - Subject to Further Confidentiality Review

```
1    house, they were in the throes of a lot of people

2    discovering the same thing, and so he had been yelled at

3    and tortured by a bunch of people, and so he was sort

4    of, I wouldn't say aloof, but he was sort of not

5    really -- he had already heard all the -- all the

6    bitching and moaning, I guess, you know, want to say.

7         Q.   Do you know what his name was?

8         A.   Gavin.  I don't recall his last name.  My wife

9    would probably remember.

10        Q.   So this is the same guy that came by your

11   house?

12        A.   Yes.  Yes.

13        Q.   And did you have any conversations with him

14   after that one?

15        A.   I don't recall if I did.

16        Q.   Do you know if you ever threatened legal action

17   against him, by you doing it or through your attorney?

18        A.   Me personally, I don't -- I didn't -- I didn't

19   threaten anyone with anything other than going through

20   the normal channels of, you know.

21        Q.   Do you know if you ever filed a lawsuit against

22   the homebuilder?

23        A.   That's a question for my attorney.

24        Q.   Do you know if anyone else in the community
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2716 of 3246
Case 1:09-cv-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 376 of 165
Confidential – Subject to Further Confidentiality Review

1   filed lawsuits against the homebuilder?

2       A.   Wouldn't surprise me, but I don't know.

3       Q.   Did the homebuilder ever offer to help repair

4   anyone's homes?

5       A.   Nothing.

6       Q.   The homebuilder did not offer any kind of

7   relief?

8       A.   No.

9       Q.   Do you know if that homebuilder continued to

10  operate after that?

11      A.   He operates under a new tax ID number, which we

12  just got an advertisement via e-mail saying he does home

13  remodeling.  And it obviously wasn't a very good

14  response on my part.  You know, why would we use someone

15  that basically abandoned, you know, all the homeowners

16  that had the terrible problem?

17      Q.   Looking to the second page of this document,

18  there's a Section IV that is titled Inspection

19  Information at the top.  Do you see that?

20      A.   Yes.

21      Q.   And the first question asks:  "Have you, or has

22  anyone on your behalf, conducted an inspection into

23  whether Chinese-manufactured drywall is present in your

24  home?"

```
 1              And it looks like you have marked "yes."  Do

 2    you see that?

 3        A.    Yes.

 4        Q.    And that's accurate; correct --

 5        A.    Yes.

 6        Q.    -- that there have been inspections of the home

 7    for Chinese-manufactured drywall?

 8        A.    Yes.

 9        Q.    If you look to line 1.1 in that section, it

10    says:  "If "yes" to Question 1.0, Section IV, who

11    conducted the inspection?"

12              And there are two different inspections listed

13    here.  It's Yanes Security & Investigative Service and a

14    Catherine Pascale, LLC, microbiological.  Do you see

15    that?  Or microbiologist.  Excuse me.

16        A.    Yes.

17        Q.    And those are -- neither of those are the

18    inspections that we discussed earlier that you had done

19    by the homebuilder who was building your home in the

20    country club; correct?

21        A.    Correct.

22        Q.    These are different inspections than that?

23        A.    Yes.

24        Q.    And it asks in Section 1.2 -- excuse me -- line
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2718 of 3246
Case 2:09-cv-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2718 of 3246
Confidential - Subject to Further Confidentiality Review
165

1   1.2:  "When did the inspection take place?"

2          And the two dates that are listed are

3   August 30, 2009, and July 27, 2009.  Is that accurate?

4       A.   Yes.

5       Q.   So you were living in the home for the July

6   inspection but had moved out by the time of the

7   August 30 inspection, based on the date that we looked

8   at on the first page?

9       A.   Correct.

10      Q.   Were you present for either of those

11  inspections of your home, at the home when they were

12  inspected?

13      A.   I don't -- no, I was not.

14      Q.   Do you know if your wife was present?

15      A.   I believe she was.

16      Q.   And do you know why there were two different

17  inspections that were performed on the home within about

18  a month of each other in the summer of 2009?

19      A.   I do not.

20      Q.   Do you know what was done at the home during

21  those inspections?

22      A.   As far as I can remember, there was air samples

23  taken, there was, you know, samples from the wallboard

24  that was discovered that was made in China, that kind of

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2719 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2719 of 3246

Confidential - Subject to Further Confidentiality Review

165

```
 1   thing.

 2        Q.   So samples of drywall were cut out of the wall;

 3   is that right?

 4        A.   Correct.

 5        Q.   Looking at line 2.0 within Section IV, it

 6   states:  "Has a determination been made that

 7   Chinese-manufactured drywall is present in your home?"

 8             And "yes" is checked.  Do you see that?

 9        A.   Yes.

10        Q.   I'd like to go down to Section V, Drywall

11   Information.  If you look under that section, the

12   drywall manufacturer that is listed is Knauf.  Do you

13   see that?

14        A.   Yes.

15        Q.   Is it your understanding that there was Knauf

16   drywall inside of your home?

17        A.   I don't know the manufacturer.

18        Q.   You don't know the manufacturer of the Chinese

19   drywall that was in your home?

20        A.   All I know is I was told it was Knauf and

21   Taishan and they had samples from both.

22        Q.   So that there were maybe two different

23   manufacturers of the drywall in the home?

24        A.   Potentially.
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 3720 of 3246 of
Case 1:11-cv-22408-MGC Document 23361 Entered on FLSD Docket 05/19/2017 Page 80 of
165

```
 1      Q.   And were you aware of whether there was any

 2   American drywall that was in the home as well?

 3      A.   I don't know.

 4      Q.   Has anyone ever told you what percentage of

 5   Knauf drywall there was in the home relative to other

 6   manufacturer types?

 7      A.   No.

 8      Q.   Do you know if you've ever received money from

 9   Knauf in settlement for your damages related to Chinese

10   drywall in your home?

11      A.   I've only received from the -- any monies I

12   received was part of the class action lawsuit.  Is that

13   correct?  I've only received from the class action.  I

14   don't know who it came from.

15      Q.   You received a payment of over $300,000 from

16   the Chinese Drywall Settlement Program; is that right?

17      A.   Yes.

18      Q.   And is it your understanding that that money

19   was related to the sale and mitigation that you had on

20   your home?

21      A.   I don't know how they come to the number.  I

22   thought it was a pool and a percentage.

23      Q.   Do you know specifically what your claim was

24   with them, what kind of damages you were asking to be
```

Case 2:09-md-02047-EEF-MBN Document 23262-39 Filed 11/19/19 Page 2721 of 3246
Case 1:11-cv-22408-MGC Document 208-31 Entered on FLSD Docket 05/19/2012 Page 46 of
165
Confidential - Subject to Further Confidentiality Review

```
 1   relieved from when you asked for that money?

 2        A.   I don't know the exact number.

 3        Q.   Okay.  If you look down to the bottom left-hand

 4   corner of this document, there's a Section IX that's

 5   titled Drywall Installer.  Do you see that?

 6        A.   Yes.

 7        Q.   The company that's listed for the drywall

 8   installer is Ocean Coast Drywall of South Florida.  Do

 9   you see that?

10        A.   Yes.

11        Q.   Do you have any knowledge of who that company

12   is or have you heard of them before?

13        A.   My only knowledge is they're a subcontractor

14   that worked for Albanese.

15        Q.   And, otherwise, have you ever interacted with

16   them?

17        A.   No.

18        Q.   Going to the fourth and fifth pages of this

19   document that are marked as ROSEN M 4 and 5, there

20   appears to be a slightly faded floor plan for the first

21   floor and the second floor of what appears to be the

22   home on Middlebrook Way; is that accurate?

23        A.   Yes.

24        Q.   And if you go to the page that's marked as
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/20 Page 2722 of 3246
Case 1:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/20 Page 42 of 165
Confidential - Subject to Further Confidentiality Review

1    ROSEN M 6, and that goes through ROSEN M 10, it appears

2    to be a homeowners declaration for a policy with United

3    Property & Casualty Insurance Company.  Do you see that?

4        A.   Yes.

5        Q.   And this is the homeowners insurance that we

6    were discussing earlier that you had --

7        A.   Yes.

8        Q.   -- on the home while you lived there; correct?

9        A.   Yes.

10           (Rosen Exhibit No. 6 was marked for

11    identification.)

12    BY MR. LAWSON:

13        Q.   The name of the document that has been marked

14    as Exhibit 6, if you look on the first page of this

15    document, it's marked as a Supplemental Plaintiff

16    Profile Form.  Does that look correct?

17        A.   Yes.

18        Q.   Have you seen this document before?

19        A.   I believe so.

20        Q.   If you look to the last page of this exhibit,

21    it's marked as page 8, there's a signature on the final

22    page.  Is that your signature?

23        A.   It is.

24        Q.   And it appears that you signed this on

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2723 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2723 of 3246
Confidential - Subject to Further Confidentiality Review
165

1    March 19, 2018.  Is that what it says?

2        A.    Yes.

3        Q.    Now, your signature on this document was your

4    promise that you were telling the truth to your

5    knowledge in this document; is that right?

6        A.    Yes.

7        Q.    I'd like to go to the second page of the

8    document.  Here, under Section I, it lists your name

9    along with the address of the property that we've been

10   discussing today that had Chinese drywall; correct?

11       A.    Yes.

12       Q.    And if you go onto the second page, there is

13   a -- at the top of the page some questions related to

14   assignments.  I wanted to ask you specifically if you

15   are aware of whether this -- that section was -- why

16   that section was not filled out.

17            There does not appear, at the top of the page,

18   for that first question, to be an answer to the yes or

19   no question that's given.  Do you know why that section

20   is not filled out?

21       A.    So you're talking about Section II on page 2?

22       Q.    Yeah.  Sorry.  If you go to page 3, at the top

23   of the page there's a question that states:  "If you

24   acquired the property knowing that the property

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2724 of 3246
Case 2:09-cv-02047-GAF Document 22303-31 Confidential Subject to Further Confidentiality Review Page 461 of
165
Confidential - Subject to Further Confidentiality Review

1    contained Chinese drywall, have you expressly acquired

2    an assignment?"

3           Was that not filled out because you did not

4    acquire the property with knowledge that it contained

5    Chinese drywall?

6    A.   I don't know why that wasn't filled.

7    Everything else was filled out.

8    Q.   Did you -- after selling the home, did you

9    expressly retain a right of action to pursue damages for

10   your alleged damages from owning the property after you

11   sold it to the Shukows?

12   A.   Yes.

13   Q.   And was that contained within your sale,

14   written in the sale agreement with the Shukows?

15   A.   I believe so.

16   Q.   You did also enter into a release with them

17   where they released any claims against you related to

18   Chinese drywall; is that right?

19   A.   Yes.

20   Q.   Going down a little bit in this page to the

21   section just below the one we were discussing, there's a

22   few more fields that were not filled out.

23          The question that's included here is:  "If you

24   have sold or transferred ownership of the property, did

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2725 of 3246
Case 1:09-md-02047-EEF-MBN Document 22361 Filed 11/19/19 Page 45 of
165
Confidential - Subject to Further Confidentiality Review

1    you at the time of sale assign to anyone any right of

2    action for damages relating to the property?"

3          And it's not checked yes or no.  Do you know

4    why that answer was not completed?

5    A.   I do not.

6    Q.   When you sold the property to the Shukows, did

7    you assign your right of action to damages to them so

8    that they could pursue damages for the property?

9    A.   No.

10   Q.   Are you aware of whether they did pursue

11   damages related to the Chinese drywall in the property

12   after you sold them the home?

13   A.   They attempted to.

14   Q.   And do you know if they were successful or not?

15   A.   They were not successful.

16   Q.   What is your understanding of the damages that

17   they pursued unsuccessfully?

18   A.   Well, in -- as a layperson, basically, they

19   were trying to commit insurance fraud.  They were trying

20   to hop onto a class action lawsuit to get their house

21   remediated for free when they clearly bought the house

22   at a steep discount, as is, and they were just trying to

23   hop on the bandwagon and get something for free.

24   Q.   So when you sold them the property, you sold it

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2726 of 3246
Case 1:11-cv-22408-MGC Document 288-31 Entered on FLSD Docket 09/19/2012 Page 86 of
165

Confidential - Subject to Further Confidentiality Review

1    to them as is; is that right?

2        A.   Correct, yes, with full knowledge and

3    disclosure.

4        Q.   That's right.  You disclosed to them that it

5    had Chinese drywall when you sold it to them?

6        A.   Yes.

7        Q.   Your belief was that they were getting it at a

8    steep discount for that reason?

9        A.   Correct.

10       Q.   And it's also your understanding that after

11   that they tried to have their remediation paid for in a

12   class action lawsuit after they acquired the property

13   from you?

14       A.   Yes.

15       Q.   But they were not able to acquire any money for

16   that in that attempt?

17       A.   That's what I was -- I've been told.

18       Q.   I'd like to turn your attention to the fourth

19   page of the document.  At the top, there's a section

20   related to foreclosure or short sale?

21       A.   Yes.

22       Q.   Now, it's my understanding from looking through

23   the documentation that you did not engage in a short

24   sale of the property that we're discussing today; is

1    that right?

2        A.    Correct.

3        Q.    You've referred to it as a sale in mitigation;

4    is that right?  Something like that?

5        A.    Well, I consider that there was no foreclosure,

6    no short sale.  I came to the closing with the money to

7    cover both mortgages and closing costs.

8        Q.    Taking a step back to the Shukows' attempt to

9    get money for their remediation of the property, who

10   told you that they had attempted to do that?

11       A.    My attorneys.

12       Q.    I wanted to ask you about the information on

13   this document related to your sale of the property.

14   You've indicated here that the lender for the property

15   was Chase Mortgage Bank; correct?

16       A.    Yes.

17       Q.    And we looked a little bit earlier at that

18   Chase statement, correct, that was for the same

19   mortgage; is that right?

20       A.    Yes.

21       Q.    And were both the first and second mortgage

22   with Chase Bank?

23       A.    I don't recall.

24       Q.    Okay.  The purchase price that is listed here

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2728 of 3246
Case 1:1-cv-22408-MGC Document 29831 Entered on FLSD Docket 05/19/2019 Page 88 of 165
Confidential – Subject to Further Confidentiality Review

1    on the fourth page is the $1.825 million that we

2    discussed earlier; is that right?

3        A.   Yes.

4        Q.   And then it says that you put down

5    $1.2 million?

6        A.   Yes.

7        Q.   And is that accurate that you put down

8    $1.2 million on the home when you purchased it?

9        A.   I would say, you know, with closing costs and,

10   you know, fees, that it's probably a good number to use.

11       Q.   Now, going down a little bit further, it asks

12   at the date of the foreclosure or short sale, the amount

13   owed on the loan or mortgage, and here you've listed

14   first and second mortgages of $879,820.21.  Did I read

15   that correctly?

16       A.   Yes.

17       Q.   So at the date of the sale of the home, you

18   owed across the two mortgages that amount of money; is

19   that right?

20       A.   Yes.

21       Q.   If you look down to the short sale price that

22   is listed, it lists the price of the short sale at the

23   amount that we discussed earlier on the warranty deed of

24   $876,000; correct?

Case 2:09-md-02047-EEF-MBN Document 23263-39 Filed 11/19/19 Page 2729 of 3246
Case 1:1-29-md-02047-EEF-MBN Document 23263-39 Filed 11/19/19 Page 29 of 165
Confidential - Subject to Further Confidentiality Review

1    A.   Yes.

2    Q.   And it states "seller additionally paid

3    $73,465.67"; is that accurate?

4    A.   Correct.

5    Q.   So you paid that additional amount on top of

6    the amount of money that you paid back on the mortgage

7    at the time?

8    A.   Yeah, well, if you look at the sales price of

9    876, and I owed 879, so there's a difference there of a

10   few bucks, but then in, like, Palm Beach County, the

11   seller has to pay the doc stamps, and there's certain

12   fees that I was responsible for that wouldn't have

13   covered the closing, you know, at 876, so I had to bring

14   those monies to the table to close.

15   Q.   And you did pay that money at that time?

16   A.   Yes.  I mean, it's listed here as a short sale,

17   but it wasn't a short sale.  I don't know why it's

18   listed like that, but...

19   Q.   I understand that.  I think that's reflected in

20   the other documents that we have.

21        I wanted to ask you, and I think we've

22   clarified this already, but just to be clear, you did

23   not remediate the property, the subsequent owners

24   remediated the property; correct?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2730 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Confidential Subject to Docket-05192019 Page 40 of
Confidential - Subject to Further Confidentiality Review
165

```
 1      A.   Correct.

 2      Q.   Now, going on to Section VI that you can see

 3  here on the fifth page, there's a section called Prior

 4  Payments.  Do you see that?

 5      A.   Yes.

 6      Q.   And a little bit earlier we were talking about

 7  an amount of money that you received from the Chinese

 8  Drywall Settlement Program, and here that's listed as an

 9  amount of $323,430.05.  Is that what it lists on the

10  document?

11      A.   Yes.

12      Q.   Is it your understanding that that is the

13  amount that you received from the Chinese Drywall

14  Settlement Program?

15      A.   Yes, and subsequent to that there was

16  additional monies that were paid of $20,000.

17      Q.   So you received an additional payment of

18  $20,000 on top of the amount that's listed here?

19      A.   Yes.

20      Q.   And was that also from the Chinese Drywall

21  Settlement Program?

22      A.   Yes.

23      Q.   And do you have documentation of that $20,000

24  amount that you received as well?
```

Confidential - Subject to Further Confidentiality Review

 1      A.   I don't, but I'm sure my attorneys do.  It was,

 2   basically, I guess when they disbursed all the money

 3   they found that they hadn't allocated it correctly

 4   percentage-wise so there was monies left over.

 5      Q.   Did you receive that money some length of time

 6   after the original payment?

 7      A.   Yeah.

 8      Q.   Was that more recently that you received the

 9   $20,000?

10      A.   Yeah, I don't remember the exact date, but it

11   was definitely, you know, months after receiving that

12   payment.

13           (Rosen Exhibit No. 7 was marked for

14   identification.)

15   BY MR. LAWSON:

16      Q.   You've been handed a document that's been

17   marked as Exhibit 7.  It's labeled as a Chinese Drywall

18   Settlement Program Foreclosure Or Short Sale Affidavit

19   at the top of the page.  Do you see that?

20      A.   Yes.

21      Q.   Are you familiar with this document?

22      A.   Yes.

23      Q.   Do you know if you filled this document out

24   personally?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2732 of 3246
Case 1:09-cv-07299-HGD Document 20581 Exhibit 38 Supplement 10 (9/2019) Page 92 of 165
Confidential – Subject to Further Confidentiality Review

```
 1      A.    It is not my handwriting.  I believe I just

 2   reviewed it with my attorneys and signed it.

 3      Q.    So you've looked at this document before?

 4      A.    Yes.

 5      Q.    And what is your understanding of what this is?

 6      A.    I haven't looked at it in a very long time, so

 7   I'd have to read back and go through what it is.  I'm

 8   assuming it's just -- it has the ID numbers, my name,

 9   the address of the property, all that kind of stuff.

10   How much it was sold for.

11      Q.    Was it your understanding that you were

12   submitting this document to receive money to compensate

13   you for losses related to your sale of the property?

14      A.    Not specifically to my -- well, yeah, I guess

15   so.

16      Q.    Going to the second page, at the top there's a

17   section where you're asked to check all items that

18   apply, and it appears that you've checked Item No. 10,

19   and you state:  "I do not have documentary evidence of

20   the appraised value of the affected property at the time

21   of the short sale.  The estimate appraised value is."

22            And you've written $875,000.  Do you see that?

23      A.    Yes.

24      Q.    Is that estimated appraised value something
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2733 of 3246
Case 2:14-cv-02722-MGC Document 29811 Entered on FLSD Docket 05/19/2017 Page 93 of
165

Confidential - Subject to Further Confidentiality Review

1    that you estimated, or was it estimated by someone else?

2        A.    I believe it was -- it was a decision based on

3    the highest price that we could be paid, that someone

4    was willing to pay for it.  That was probably the

5    appraised value at that time, so they used that as the

6    number.

7        Q.    And when you say that that was the amount that

8    was appraised at the time, do you know who did that

9    appraisal?

10       A.    I'm not saying it was appraised.  I'm saying

11   that someone paid me 876 for it, so they used that as

12   the bar.

13       Q.    Got it.  So it's an amount that is slightly

14   less but almost equivalent to the amount that you

15   received in the sale of your property in 2009?

16       A.    Correct.

17       Q.    Going down to No. 11, it says:  "I do not have

18   documentary evidence of the tax assessed value for the

19   affected property at the time of the short sale.  The

20   estimate tax assessed value is $782,216."

21            Do you see that?

22       A.    Yes.

23       Q.    Now, when we looked at the county's assessment

24   and appraisal of the property, the amount was in the

Confidential – Subject to Further Confidentiality Review

1    300,000s for the total market value.  Do you remember

2    that?

3         A.   Yes.

4         Q.   Where did this tax assessed value, estimated

5    tax assessed value, come from, to your knowledge?

6         A.   I don't know.

7         Q.   If you look, there's some handwritten notes,

8    and the first one says:  "Appraised value based on

9    actual sales price.  No formal appraisal available."

10            Do you see that?

11        A.   Back to where I pointed where we came up with

12   the 875; right?

13        Q.   Right?

14        A.   Yes.

15        Q.   And this is what you were telling me earlier,

16   that there wasn't actually a formal appraisal but that

17   that estimated appraised value is based on the sales

18   price?

19        A.   Correct.

20        Q.   And then it says, "Assessed value based on

21   actual tax records," and that's attached.  Do you see

22   that?

23        A.   Yes.

24        Q.   All right.  I'd like to turn your attention a

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2735 of 3246
Case 1:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 95 of 165
Confidential - Subject to Further Confidentiality Review

```
1    couple pages forward in this document.  There appears to
2    be a Palm Peach County record with some red text.  Do
3    you see that?
4        A.   Yes.
5        Q.   And this is on the fourth page of this exhibit.
6    If you look to the 2013 Values column, in parentheses it
7    says "current."  Do you see that?
8        A.   Yes.
9        Q.   It's on the left-hand side, and under that it
10   shows taxable value, and that's listed as $782,216.  Do
11   you see that?
12       A.   Uh-huh.
13       Q.   Now, going back to that second page, under
14   Question 11, or Item 11 that's in that second page, it
15   says:  "I do not have documentary evidence of the tax
16   assessed value for the affected property at the time of
17   the short sale.  The estimated tax assessed value is
18   $782,216."
19            Now, Mr. Rosen, what we just looked at on that
20   Palm Beach County record is a 2013 taxable value; isn't
21   that right?
22       A.   Yes.
23       Q.   That's not the taxable value at the time of the
24   sale of the property; correct?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2736 of 3246
Case 1:09-cv-06690 Document 23321 Entry Number 9 Docket 03/09/2019 Page 96 of 165
Confidential – Subject to Further Confidentiality Review

 1      A.   You mean from the prior documents?

 2      Q.   Yeah.  That's not a 2009 taxable value;

 3  correct?

 4      A.   Correct.

 5      Q.   And 2009 is when the sale occurred?

 6      A.   Yes.

 7      Q.   Not in 2013; correct?

 8      A.   Yes.

 9      Q.   Did you receive any kind of tax relief or

10  deduction related to Chinese drywall at any point for

11  the year of 2009?

12      A.   Yes.

13      Q.   And where did that deduction come from?  Was

14  that on state taxes or federal taxes?

15      A.   Federal taxes.

16      Q.   Do you know how much relief you received

17  through that Chinese drywall deduction on your taxes?

18      A.   I would have to look, but I believe it's

19  $425,000.

20      Q.   Do you know if you have any record of that

21  deduction?

22      A.   Yes.

23      Q.   Do you know if you've submitted that to your

24  attorneys?

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 2737 of 3246
Case 1:09-cv-23341 Document 2583-1 Entered on FLSD Docket 05/18/2017 Page 97 of
165
Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    And was that for the tax year of 2009 that you

 3   received that deduction?

 4        A.    Yes.

 5        Q.    Did you receive a deduction in any other years

 6   other than 2009?

 7        A.    No.   I actually paid taxes, because any money I

 8   get going beyond that is all taxed at the highest

 9   bracket.

10        Q.    Going back to the first page of this exhibit,

11   if you look to the very first page it at the top states:

12   "Pursuant to the court approved settlement agreement

13   regarding other lost fund benefits, any previous

14   residential or commercial owner seeking compensation for

15   foreclosure or short sale allegedly attributable to

16   Chinese drywall must submit an affidavit (i) in support

17   of the claim, and (ii) attesting that all supporting

18   documentation has been produced pursuant to

19   Section 4.7.1.3 to Section 4.7.1.4."

20             Do you see that?

21        A.    Uh-huh.

22        Q.    So you were submitting this claim form to

23   receive compensation for the sale of your home and, I'm

24   guessing, the loss of value from that sale that you
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2738 of 3246
Case 2:09-cv-02042-GEL Document 12 Entered on FLSD Docket 05/18/2019 Page 98 of
165
Confidential - Subject to Further Confidentiality Review

 1    attributed to Chinese drywall; is that right?

 2        A.   Loss of value, loss of possessions, loss of

 3    time, money, you know, yes.

 4        Q.   But specifically you -- this was a claim in an

 5    affidavit that was submitted related to the loss of

 6    value from the sale of the home; is that right?

 7        A.   Correct.

 8        Q.   And ultimately you received the amount that we

 9    just looked at on that Supplemental Plaintiff Profile

10    Form of about $323,000 as a result of submitting this

11    claim; is that right?

12        A.   Yes.

13        Q.   And then received an additional $20,000 at some

14    time later because of a recalculation or something to

15    that effect?

16        A.   Yes.

17        Q.   Do you feel that that fully compensates you for

18    the loss in value of the home that can be attributed to

19    Chinese drywall?

20        A.   Not at all.

21        Q.   How much money do you believe is still owed to

22    you strictly related to the loss of value in the sale of

23    your home?

24        A.   I don't think you can quantify it like that.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2739 of 3246
Case 2:09-md-02047-EEF-MBN Document 13566-31 Filed 10/19/19 Page 99 of
165
Confidential - Subject to Further Confidentiality Review

```
 1    There's no way to quantify that.

 2        Q.   Why do you think there's no way to quantify it?

 3        A.   Well, look at the $400,000 and the back page of

 4    receipts I have of stuff that was in my house that's

 5    garbage now.  The cost of moving, the cost of rental,

 6    the utilities I was paying for two houses.  So when you

 7    ask that question, it's preposterous.  It makes no

 8    sense.

 9        Q.   So separating all of those things that you just

10    said and just talking about how much you could have sold

11    your home for if it did not have Chinese drywall versus

12    how much you sold it for because it had Chinese

13    drywall --

14        A.   I believe the house was worth $2.2 million

15    without Chinese drywall, with nothing else considered.

16        Q.   And you ultimately sold it for about 876 -- or

17    sold it for 876,000?

18        A.   Yes.

19        Q.   And you've received around $343,000 so far from

20    this Chinese Drywall Settlement Program related to your

21    loss from the sale of the home; correct?

22        A.   Less 40 percent on capital gains.

23        Q.   Explain that to me.

24        A.   So when I received that $323,000, because I've
```

1    already taken a tax credit for the catastrophic loss,

2    I'm paying the -- you know, I'm paying 40 percent in

3    taxes on any money that I receive.  So if I receive any

4    money from this, the lawyers get the first 40 percent,

5    and then after that I'm paying another 40 -- or

6    39 percent on that.

7        Q.   So you believe that the lost value from the

8    sale is the amount of $2.2 million subtracting the

9    amount that you sold it for and subtracting the money

10   that you received from the Chinese Drywall Settlement

11   Program?

12            MS. RICO:  Objection.  Mischaracterizes

13       testimony.  Go ahead.

14   BY MR. LAWSON:

15       Q.   But is that accurate?

16       A.   Say it again.

17       Q.   Do you believe that the amount that you are

18   owed for the loss in value from the sale of your home is

19   $2.2 million, the amount that you just said that the

20   home was worth without Chinese drywall, subtracting the

21   amount that you received, the $876,000, and the 343,000

22   or so dollars that you've received in the Chinese

23   Drywall Settlement Program?

24       A.   I don't think it's a simple math equation like

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2741 of 3246
Case 1:18-cv-01440-NGG Document 31-1 Filed 11/09/18 Page 2041 of 601
Confidential -- Subject to Further Confidentiality Review
of 165

 1   that, because there's a time value of money, there's all

 2   the other things that factor in, because you keep on

 3   going back to that, but I can't categorize it like that,

 4   because there's a whole part of it.

 5          So, you know, I spent 60- or $70,000 in rental

 6   fees.  So you keep on saying that, but that's -- all my

 7   damages are all my damages.

 8      Q.   Right, and I understand that there's other

 9   damages that you're pursuing, and we'll talk about those

10   as well.  I'm just trying to isolate down to the sale.

11          But there isn't a specific amount that you have

12   in mind that you believe you're entitled to for the loss

13   of sale, you think that's something that needs to be

14   calculated separately; is that right?

15      A.   I think that it's part of the whole puzzle.  I

16   don't think you can extrapolate one from the other.

17          MR. VERRIER:  Matt, is this a good time?

18          MR. LAWSON:  Sure, we can take a break.

19          MR. VERRIER:  If you're still in the middle of

20      this document, we can wait.

21          MR. LAWSON:  So I'm done with this document, so

22      we can go off the record and take a break.

23          (Recess from 2:06 p.m. until 2:22 p.m.)

24          MR. LAWSON:  Welcome back, Mr. Rosen.

```
 1          Before we get back started, I just wanted to

 2      put onto the record that we are not aware of any tax

 3      records that we have that have been produced to us,

 4      so if you at all have in your possession something

 5      related to the tax deduction that we were just

 6      discussing before the break, we would ask that that

 7      be produced to be able to show the deduction that

 8      was received related to Chinese drywall that

 9      Mr. Rosen was telling us about.

10          MS. RICO:  Okay.  We do have the tax return.

11      It was my understanding that it was produced.  I

12      will double-check.  If it was not, we'll get that to

13      you right away.

14          MR. LAWSON:  Great.  We understand there's a

15      lot of documents floating around here, but if you

16      can track that down, we would greatly appreciate it.

17  BY MR. LAWSON:

18      Q.   Okay.  You can set aside that document that we

19  just looked at.

20      A.   I haven't done this much reading since college.

21          (Rosen Exhibit No. 8 was marked for

22  identification.)

23  BY MR. LAWSON:

24      Q.   So you've been handed a document that has been
```

1    marked as Exhibit 8.  On the first page, it's titled

2    Michael Rosen Photos of Inspection August 30, 2009,

3    17538 Middlebrook Way, Boca Raton, Florida.  Do you see

4    that?

5        A.   Yes.

6        Q.   And earlier we were talking about the different

7    inspections that had occurred at your property before

8    you sold it, and one of them was from a company with the

9    name Yanes?  Do you remember that?

10       A.   Yes.

11       Q.   And it appears to be a Javier Yanes that's

12   listed on the front of this inspection report.  Do you

13   see that?

14       A.   Yes.

15       Q.   Have you ever seen this report before?

16       A.   Yes.

17       Q.   And if you look to the second page

18   specifically, there's an inspection report that's dated

19   August 30, 2009.  Do you see that?

20       A.   Yes.

21       Q.   A little bit earlier we were talking about that

22   you discovered that there was Chinese drywall in your

23   house from an inspection that was done by the

24   homebuilder who built your subsequent home, and that

```
 1   occurred around August 12, 2009, the date that you moved

 2   out of the house; is that right?

 3        A.   Yes.

 4        Q.   And so this inspection occurred a few weeks

 5   after that, a couple weeks later, at the end of August;

 6   is that right?

 7        A.   Yes.

 8        Q.   Do you know why this inspection was performed

 9   on the home?

10        A.   By Yanes?

11        Q.   Yes.

12        A.   This is more of an expert in this field.  They

13   have a microbiologist that comes in and takes samples

14   and all that stuff, whereas mine was more of a builder

15   that was able to recognize that there was indeed a

16   problem and then you should go to the next level.

17        Q.   So if you look to this inspection report, it's

18   on a page that's marked as ROSEN,M 1, the second page of

19   the exhibit --

20        A.   Yes.

21        Q.   -- there's -- in the middle of the page,

22   there's a highlighted sentence that says "evidence

23   collected - ground wire and drywall samples."

24             Was it your understanding that drywall samples
```

```
 1    were collected by this inspector during this inspection?

 2         A.   Yes.

 3         Q.   And there's also a highlight -- excuse me -- an

 4    underlined sentence that states "evidence of

 5    contaminated drywall found in residence."  Do you see

 6    that?

 7         A.   Yes.

 8         Q.   Below that, it says "A/C coils black"; correct?

 9         A.   Yes.

10         Q.   Did you see after this inspection was done that

11    there were holes in the drywall where the samples had

12    been collected?

13         A.   Yes.

14         Q.   And did you see the blackened AC coils at any

15    point while you lived in the home?

16         A.   Once I was told what to look for, I did, yes.

17         Q.   It notes here that a sulfur odor was "only on

18    first floor."  Do you see that line?

19         A.   Yes.

20         Q.   And after you were told that there was a smell

21    in the home, did you notice that the sulfur smell was

22    only on the first floor of the home and not the second

23    floor?

24         A.   I don't recall.  After being told there was
```

Confidential - Subject to Further Confidentiality Review

1    Chinese drywall, you start smelling it and, you know,

2    permeates and goes up the stairs and all that kind of

3    stuff.  It travels through the air handlers also.

4         Q.   It says that there were "over 40 holes opened

5    in different walls throughout the home" on this page.

6    Do you see that?

7         A.   Yes.

8         Q.   Does that sound accurate, that there were

9    dozens of holes in the walls?

10        A.   Yes.

11        Q.   And, to your knowledge, were those holes

12   replaced after that was done, or were they left there

13   when you sold the home?

14        A.   They were left there.

15        Q.   Was that because the subsequent owners were

16   planning to remediate the home?

17        A.   Yes.

18        Q.   Looking down to the final section of this

19   second page, the inspection report, there's a line that

20   says "found the following boards on the first floor,"

21   and the first one listed is Knauf.  Do you see that?

22        A.   Yes.

23        Q.   And it says that Knauf drywall was "found in

24   the first floor guest bathroom wall behind sink."  Do

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2747 of 3246
Case 1:19-cv-04246-NGG Document 269-31 Entered on FLSD Docket 05/08/2019 Page 107 of 165
Confidential — Subject to Further Confidentiality Review

1    you see that?

2        A.    Uh-huh.

3        Q.    Did you ever see Knauf drywall or markings that

4    said "Knauf" on drywall in the home before you moved

5    out?

6        A.    No, because the markings are all facing in

7    towards the studs, so there's paint or wallpaper, so no.

8        Q.    And you didn't see when they were collecting

9    the samples yourself?

10       A.    I was not there.

11       Q.    Because you were not there.

12             Then on the second line, there's also a marking

13   that's listed as "drywall 4 feet x 12 feet x 1/2 inch."

14   Do you see that?

15       A.    Yes.

16       Q.    And it says:  "This board was found in several

17   locations mixed in with National Gypsum GridMarX."  Do

18   you see that?

19       A.    Uh-huh.

20       Q.    And, similarly, have you ever seen drywall

21   boards in person that carry those markings?

22       A.    No.

23       Q.    Have you seen photos of them?

24       A.    No.

Confidential -- Subject to Further Confidentiality Review

```
1        Q.   So I'd like to turn into the photograph section

2   of this exhibit.  Specifically, I'd like to turn your

3   attention to ROSEN,M 0036, which is --

4        A.   3?

5        Q.   -- about in the middle, yeah, about in the

6   middle.  The photograph is listed as ROSEN,M 0036.

7        A.   Okay.

8        Q.   And you see here there's a photo that says

9   "drywall," and it appears to be a marking on the drywall

10  that says the word "drywall."  Do you see that?

11       A.   Yes.

12       Q.   And looking through these photos, do these

13  appear to be photos that were taken inside of the home

14  on Middlebrook Way?

15       A.   Yes.

16       Q.   And how can you tell that?

17       A.   Well, if you start, I remember the front of my

18  house, and there's certain -- you know, obviously

19  there's -- based on the mailbox with the address on

20  there, it kind of, you know, stands to reason.

21            But, I mean, that's definitely my house, and I

22  can see -- you know, you can see all this discoloration.

23  These are things that I actually went and found after

24  learning that it wasn't the truth of what was really
```

Confidential - Subject to Further Confidentiality Review

1    going on.

2         And then if you look here, I remember clear

3    as -- that was an air handler in a closet in my room off

4    the kitchen where you can see all the coils on that air

5    handler are completely black.  That picture right there,

6    which is ROSEN,M 0015, is -- that's it right there.

7    It's all black, showing that there's Chinese drywall.

8         And then if you look after that, you can see

9    all that black and all these coils, which is completely

10   related to Chinese drywall throughout the house.

11        Q.  Did you notice that metal objects that were

12   in -- on the inside of the house were experiencing any

13   kind of corrosion or pitting?

14        A.  Absolutely.

15        Q.  Did you notice that while you lived in the

16   house?

17        A.  We noticed it, but we didn't realize it.  Back

18   to two hours ago when I said we had a Tiffany tea set

19   that someone gave us for our wedding, that my wife said,

20   "What is wrong with this?" and sent it back to Tiffany,

21   and they couldn't clean it, and they go, "We don't know

22   what's wrong with it."  So that's a very big example,

23   and it wound up going in the garbage, because we could

24   not get the black off of that.

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2750 of 3246
Case 1:13-cv-02499-NGG Document 289-31 Entered on FLSD Docket 05/08/2019 Page 10 of 165
Confidential – Subject to Further Confidentiality Review

```
 1      Q.   It was blackened on the tea set?

 2      A.   Blackened, just like this.  Just like this.

 3      Q.   So was it in spots, or was it the entire --

 4      A.   The whole thing was blackened.  And then there

 5   were other things, candlestick holders, and so on and so

 6   forth.

 7      Q.   Did you notice fixtures, like, in the bathroom

 8   had any kind of blackening, corrosion?

 9      A.   That I don't recall.

10      Q.   How soon after you moved in did you start to

11   notice that objects like that tea set were experiencing

12   the blackening that you were discussing?

13      A.   I don't recall.

14      Q.   But by the time that you had moved out, you did

15   notice it; is that right?

16      A.   Yes.

17           (Rosen Exhibit No. 9 was marked for

18   identification.)

19   BY MR. LAWSON:

20      Q.   You've been handed a document that has been

21   marked as Exhibit 9.  It is titled Collection of

22   Evidence Michael Rosen December 3, 2009, and it's

23   stamped in the bottom right-hand corner as

24   MROSEN-00235.  Do you see that?
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2751 of 3246
Case 1:13-cv-02449-NGG Document 269-31 Confidential Filed 05/18/2015 Page 111 of 165

Confidential - Subject to Further Confidentiality Review

```
 1      A.   Yes.

 2      Q.   This appears to be additional evidence

 3 collection that was done by Javier Yanes after the

 4 initial rounds of inspection that we saw in August; is

 5 that right?

 6      A.   Yes.

 7      Q.   Do you remember this occurring in December

 8 around the time that you sold the house?

 9      A.   Vaguely.

10      Q.   Do you know if you were present at the time

11 that this evidence collection occurred?

12      A.   I was not.

13      Q.   Do you know why that Mr. Yanes came back to

14 collect additional evidence from the house?

15      A.   I don't recall.  The only thing I can fathom is

16 everything had to be left intact for the closing and

17 they -- at a certain point they agreed to let them come

18 back and take whatever we needed as evidence.

19      Q.   Because this was around the time of the

20 closing; isn't that right?

21      A.   Correct, yes.

22      Q.   Do you know who paid for these inspections and

23 evidence collections by Mr. Yanes?

24      A.   I don't recall.
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2752 of 3246
Case 1:18-cv-11249-NGG Document 200-31 Entered on FLSD Docket 05/08/2019 Page 412 of 165
Confidential - Subject to further confidentiality Review

1    Q.   Do you know if there were any inspections other

2    than the ones that we've discussed so far?

3    A.   No.

4    Q.   Do you know if anyone else collected samples of

5    drywall from the house while you owned it other than

6    Mr. Yanes?

7    A.   Not to my knowledge.

8    Q.   You can set that document aside.

9         (Rosen Exhibit No. 10 was marked for

10   identification.)

11   BY MR. LAWSON:

12   Q.   You've been handed a document that's been

13   marked as Exhibit 10.  It's titled Claimants Michael and

14   Robyn Rosen's Answers to Defendants Taishan Gypsum

15   Company, Ltd., Tai'an Taishan Plasterboard Company,

16   Ltd., and BNBM PLC's Interrogatories.  Do you see that?

17   A.   Yes.

18   Q.   It's dated on that first page December 4, 2018,

19   and it's signed by a Mr. Patrick S. Montoya.  Do you see

20   that?

21   A.   Yes.

22   Q.   Have you seen this document before?

23   A.   Yes, I have.

24   Q.   And did you review it prior to it being

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2753 of 3246
Case 1:14-cv-02494-NGG Document 295-1 Entered on FLSD Docket 05/08/2015 Page 913 of 165
Confidential - Subject to Further Confidentiality Review

1    submitted on December 4?

2        A.   I did.

3        Q.   I'd represent to you that this was your answers

4    to interrogatories that were submitted by the defendants

5    that I just listed.  Based on your review of this

6    document, were all of your answers accurate at the time

7    that you made them?

8        A.   Yes.

9        Q.   I'd like to turn your attention --

10           MS. RICO:  Quickly, I'm sorry, I would just

11       mention what was mentioned in the beginning, which

12       is, there is an error to the answer in Interrogatory

13       No. 5, which he's corrected throughout his testimony

14       today, and so subject to that, that was disclosed at

15       the beginning.

16           THE WITNESS:  Was that the first and second

17       mortgage?

18           MS. RICO:  Yes.  Subject to that, which we will

19       amend to correct it.

20   BY MR. LAWSON:

21       Q.   All right.  And that was not intended to be a

22   trap in me asking you if it was accurate at the time

23   that you submitted it.  Let's clean that up now.

24           And we can look over to Interrogatory 5.  It

```
 1    begins on page 4 and then continues in the answer onto

 2    page 5.  Specifically, this deals with the sale of your

 3    property and asks you information about that sale.

 4         We've gone over some of this information

 5    before, but specifically there's the original

 6    loan/mortgage amount that is listed there, and here the

 7    answer, under line iii under Section A of your answer,

 8    was $802,500?

 9    A.   Yes.

10    Q.   The original loan/mortgage amount was different

11    than that; correct?

12    A.   Correct.

13    Q.   Okay.  And we talked about that original -- the

14    first mortgage loan amount being about $600,000; is that

15    right?

16    A.   Yes.

17    Q.   Let's turn back to the second page,

18    specifically looking at Interrogatory No. 1.  That

19    interrogatory states:  "Identify all types of damages

20    that you seek in this lawsuit (e.g. alternative living

21    expenses, diminution in value, loss of use and

22    enjoyment, etc.) and specify amount sought for each

23    category."

24         Do you see that?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2755 of 3246
Case 1:11-cv-22408-MGC Document 209-31 Entered on FLSD Docket 05/08/2015 Page 115 of 165
Confidential - Subject to Further Confidentiality Review

1    A.   Yes.

2    Q.   Here in your answer you've listed different

3  categories or types of damages that you're seeking in

4  this lawsuit.  Is that your understanding of your

5  answer?

6    A.   Yes.

7    Q.   One of the items that you seek for compensatory

8  damages is personal property costs.  Do you see that?

9    A.   Yes.

10   Q.   And is it your understanding that those

11 personal property costs relate to items that you had

12 to -- that were damaged by Chinese drywall, according to

13 you, and that you had to discard or throw away that we

14 discussed earlier on today?

15   A.   Yes.

16   Q.   And you've submitted invoices and receipts for

17 many of those items; correct?

18   A.   Correct.

19        (Rosen Exhibit No. 11 was marked for

20 identification.)

21 BY MR. LAWSON:

22   Q.   Mr. Rosen, you've been handed a document that

23 has been marked as Exhibit 11.  It's titled Michael and

24 Robin [sic] Rosen's Chinese Drywall Damages Chart.  Do

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2756 of 3246
Case 1:14-cv-02949-NGG Document 269-31 Entered on FLSD Docket 05/08/2019 Page 116 of 165
Confidential - Subject to Further Confidentiality Review

```
 1      you see that?

 2      A.   Yes.

 3      Q.   And who created this document?

 4      A.   I gave my attorneys all the necessary receipts

 5  and amounts and they created the Excel spreadsheet, I

 6  guess.

 7      Q.   So this is a chart of the receipts and payment

 8  amounts for different items that you're seeking damages

 9  for in this lawsuit; correct?

10      A.   Correct.

11      Q.   And when your answer to that interrogatory said

12  personal property costs, those items for personal

13  property costs are included somewhere in this chart; is

14  that right?

15      A.   Yes.

16      Q.   And it's your understanding that there are

17  corresponding receipts and invoices for the different

18  amounts that are listed here that you've provided to

19  your attorneys; is that right?

20      A.   Correct.

21      Q.   Is there anything, looking at this list, that

22  is not included that you believe you have submitted

23  receipts and invoices for, just looking at it?

24      A.   Is there anything that I --
```

```
 1      Q.   That you think that you submitted receipts or

 2   invoices for to your attorneys that you're seeking

 3   damages for that is not listed here on this chart.

 4      A.   No, it would be the opposite.  There were

 5   things that I didn't put on the list that I specifically

 6   didn't have receipts for because they were gifts or, you

 7   know -- you know, do you save every receipt, you know,

 8   for everything you buy?  Obviously not, so...

 9      Q.   Right.  So there are some items that you

10   discussed earlier that you've looked for receipts for or

11   you just know that you do not have them for that are not

12   on this chart; is that right?

13      A.   Correct.

14      Q.   And you're not seeking those items -- damages

15   for those items in this lawsuit because you do not have

16   receipts for them; is that correct?

17      A.   I couldn't quantify them.  So they're not

18   black-and-white.  You know, I mean, I had a silver tea

19   set from Tiffany's that went in the garbage.  I don't

20   have a receipt for it, but we could depose the person

21   that gave it to me, I guess, for my wedding and ask if

22   they have a receipt for it.

23      Q.   But is it your understanding that you do not

24   have those receipts in your possession?
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2758 of 3246
Case 1:18-cv-01248-NGG Document 200-31 entered only Desk Docket 05/28/2019 Page 118 of 165
Confidential - Subject to Further Confidentiality Review

 1      A.    Correct, I do not.

 2      Q.    You haven't submitted them to your attorneys?

 3      A.    No.

 4      Q.    But the receipts that you do have are on this

 5   chart?

 6      A.    Yes.  Receipts or cancelled checks, like, when

 7   I look at the rental things.

 8            (Rosen Exhibit No. 12 was marked for

 9   identification.)

10   BY MR. LAWSON:

11      Q.    You've been handed a large set of documents

12   that have been labeled as Exhibit 12.  The first page of

13   the set of documents is stamps as Rosen, M(OLF) -

14   000050.  Do you see that?

15      A.    Yes.

16      Q.    And are these the receipts that correspond with

17   the chart that we've just looked at as Exhibit 11?

18      A.    Yes.

19      Q.    Looking specifically back at that chart that's

20   Exhibit 11, the first item on the chart is Home Depot,

21   and it describes it as capital improvements, $8.38; is

22   that right?

23      A.    Yes.

24      Q.    And if you look to the first receipt on the

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2759 of 3246
Case 1:14-cv-12249-NGE Document 69-31 Confidential ESI Docket 05/08/2015 Page 119 of 165
Confidential - Subject to further confidentiality Review

```
 1    first page of Exhibit 12, it's a Home Depot receipt for

 2    the amount of $8.38; is that accurate?

 3         A.   Yes.

 4         Q.   Similarly, if you look to the second item on

 5    the chart that is Exhibit 11, it is for Salty's Plumbing

 6    and in an amount of $441; is that right?

 7         A.   Yes.

 8         Q.   And then if you look to the receipt on the

 9    right-hand side of Exhibit 12 on the first page, it is a

10    receipt for Salty's Plumbing of $441; correct?

11         A.   Yes.

12         Q.   Now, are you aware of any receipts that are

13    missing for the items that are included in the chart on

14    Exhibit 11?

15         A.   I am not aware of any.

16         Q.   And it's accurate to say that this set of

17    receipts are all of the receipts that you have submitted

18    to your attorneys for the items that are listed on the

19    chart; correct?

20         A.   Correct.

21         Q.   And you said that there are also some cancelled

22    checks related to your payment of rent for the rental

23    property that you moved into; correct?

24         A.   Yes.
```

1    Q.   And I represent to you that I think those are

2    separate from these.

3    A.   They are, yeah.

4    Q.   So looking to the chart, you list capital

5    improvements for the first Home Depot receipt.

6    Specifically looking at that receipt, do you know what

7    that capital improvement was?

8    A.   It's $8.38, so I'm going to try not to -- I

9    can't really tell what it is.  It just -- it says "cut

10   to fit floor."  I'm not sure what it is, but it's --

11   Q.   Okay.  And do you see a date on that receipt?

12   A.   Yeah.  8/15/09.

13   Q.   So this would have been around -- after you had

14   moved out of the house; is that right?

15   A.   Yeah.

16   Q.   So you had moved out of the house on the 12th

17   of August, 2009, and this is about three days later;

18   correct?

19   A.   Yes.

20   Q.   But you're not exactly sure what this receipt

21   is for; is that right?

22   A.   It obviously relates to something that I had to

23   do in the house when we moved out.  I don't know what a

24   cut to fit -- I'm assuming that's floor.  I'm not sure

1    what it is.

2        Q.   Looking lack to Exhibit 11, there's also a

3    capital improvement that is listed for Kinderguard pool

4    fence.  Do you see that in the middle of that chart?

5        A.   Yes.

6        Q.   What is that?

7        A.   So do you live in Florida?

8        Q.   I do not, no.

9        A.   Okay.  So in Florida you have to either have a

10    pool fence or a pool alarm.  So in this house we

11    actually had both, but -- so it's a custom-made pool

12    fence that goes around the house that's made for that

13    pool, so when you can't, you know, use it anymore, it's

14    money down the -- you know, it's garbage.  Which is a

15    capital improvement.

16        Q.   So with that fence, when you say that it was

17    "garbage," did you discard of the fence when you moved

18    out?

19        A.   What I'm saying is that when I moved, I didn't

20    throw that out, but when I moved out, that money that I

21    spent is lost money because I can't use that and enjoy

22    my pool anymore.

23        Q.   Right, because you're selling the pool along

24    with the house --

Confidential - Subject to Further Confidentiality Review

```
 1      A.    Correct.

 2      Q.    -- to the subsequent owners; right?

 3      A.    Yes.

 4      Q.    But the subsequent owners are paying for --

 5   technically paying for that fence as part of their

 6   acquisition of the property; correct?

 7      A.    Yes.

 8      Q.    I mean, it was still at the house at the time

 9   that the new owners moved in; correct?

10      A.    Yes.

11      Q.    And you obviously don't know what they did with

12   it after that; correct?

13      A.    (Shaking head.)

14      Q.    But you didn't remove it when you moved out;

15   right?

16      A.    We did not remove it, although I will say that

17   if it was stored in the garage it probably was thrown in

18   the garbage, because there was Chinese drywall fumes in

19   there, and it's metal posts.  So maybe that's why.

20      Q.    But you did not -- you do not know if it was

21   thrown away?

22      A.    I don't recall.

23      Q.    Going down to Potomac Garage Solutions, it's a

24   capital improvement that's listed near the bottom of the
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2763 of 3246
Case 1:14-cv-02494-NGH Document 99-1 Entered on FLSD Docket 05/45/2019 Page 423 of 165

Confidential — Subject to Further Confidentiality Review

1    page, can you tell me what that is?

2        A.    That's a whole garage floor and system with --

3    you know, they put down a floor, they put down

4    custom-made cabinets for the garage, and because, again,

5    that's -- all the Chinese drywall is attaching itself to

6    all that metal, it was rendered useless, in the garbage.

7        Q.    Did you discard of it before you left the

8    house?

9        A.    We did not.

10       Q.    So that was intact at the time that you sold

11   the house to the Shukows?

12       A.    Correct.

13       Q.    Do you know if they discarded of it?

14       A.    I cannot say definitively, but I'm assuming

15   they did, because it was made of metal.

16       Q.    Do you know when that was installed in the

17   house?

18       A.    Previous to us moving in.

19       Q.    Was that part of the purchase price of the

20   home?

21       A.    No.

22       Q.    So you paid for that separately before you

23   moved into the house?

24       A.    That's why it's listed separately.

```
1      Q.   So that's a yes?

2      A.   Yes.

3      Q.   The closet systems that are listed as a capital

4  improvement below that item that we just discussed, can

5  you tell me about that?

6      A.   Those are all custom-made closets that were

7  made specifically for my wife, myself, my kids' rooms,

8  where, you know, you have someone come in and measure

9  and make all custom-made shelving and all that kind of

10 stuff.  It's all made of wood, so it's all going in the

11 garbage.

12     Q.   Did you discard of it before you moved out of

13 the house?

14     A.   No.

15     Q.   And they were not metal closet systems,

16 correct, they were wooden ones?

17     A.   They were wooden, correct.  The shelving --

18 obviously, the thing you hang stuff on is a metal tube,

19 but everything else is wood.

20     Q.   There's next an item that's labeled as

21 Turkell & Gervis Design.  Do you see that?

22     A.   Yes.

23     Q.   What is that?

24     A.   That's our interior designer, and so that's a
```

1    total of all the receipts.  If you look starting, I

2    don't know, about a third of the way through, rather

3    than listing every single line item out -- it starts

4    right here -- it's just quantified into one number, but

5    you could break it out and you could see every -- you

6    know, everything that they, you know, put into that

7    house, and it was all custom to that house.

8         Q.   When you're saying that "it starts right here,"

9    what is the page number in the bottom right corner?

10        A.   Well, that page number would be 1, but on

11   yours, it would be -- let's see --

12        Q.   I'm sorry.  There's page numbers that are

13   labeled ROSEN, M on each page.

14        A.   No, no.  So it would be the one after 000084.

15   So if you go all the way there, then you'll start

16   picking that up --

17        Q.   Beginning on ROSEN, M(OLF) --

18        A.   Yeah, it's 85.

19        Q.   -- 85.

20        A.   Yeah.  So then you can see everything is broken

21   out.  There's a chandelier for $2,900, and, you know,

22   there's a light for $1,200, there's the installation of

23   wallpaper, you know, and on and on it goes.  But in the

24   list, on the Excel list, it's all listed as one number

1    as opposed to breaking these hundreds of items out into

2    one, into several pages.

3        Q.   And those continue on until the end of

4    Exhibit 12 to page 191, ROSEN, M(OLF) - 191?

5        A.   Correct.

6        Q.   It looks like these purchases are -- these are

7    proposals that are made for the different items that

8    you're describing; is that right?

9        A.   Well, they're proposals, and then once my wife

10   said, "We'll take it," that's why they were put into our

11   book.  So what happens is, at the end of the job you get

12   a book with everything you purchased from her.

13       Q.   And is this that book that you're talking

14   about?

15       A.   Yes.

16       Q.   Okay.  So they gave you --

17       A.   Yes.

18       Q.   -- at the end all of these different sheets

19   that show each item; is that right?

20       A.   Correct.  Yes.

21       Q.   And it says the amount of money that it will

22   cost for each one of the items on each page; is that

23   right?

24       A.   Yes.

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2767 of 3246
Case 1:18-cv-09491 Document 1-31 Entered on FLSD Docket 05/08/2019 Page 127 of 165
Confidential -- Subject to further confidentiality Review

```
 1        Q.    Now, do any of these show that the payments

 2   were received for these, or receipts or cancelled checks

 3   related to payments made for these items?

 4        A.    I don't believe there's cancelled checks

 5   attached to these.

 6        Q.    So is there anywhere on these where it shows

 7   that the amounts were paid for these different items?

 8        A.    Well, I wasn't sued by her and she put it in

 9   the house, so, you know, ask a silly question and you

10   get a silly answer.

11        Q.    So, no, there are not receipts --

12        A.    No.

13        Q.    -- or proof of payment for these items?

14        A.    I mean, potentially she could be deposed under

15   oath and she probably could come up with it.  In her

16   business, she probably has receipts going back, you

17   know, probably further than this, but, yes.

18        Q.    But you have not acquired those receipts or

19   submitted them to your attorneys; is that right?

20        A.    No.  It's after five years.

21        Q.    Have you attempted to?

22        A.    No.

23        Q.    Going back to the chart, there's a lease

24   payment that's listed for Rance Masheck --
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2768 of 3246
Case 1:18-cv-12408-NGG Document 069-31 Confidential Subject to Further Confidentiality Review of 165
Confidential - Subject to Further Confidentiality Review

```
1       A.    Yes.

2       Q.    -- of $41,600.  Do you see that?

3       A.    Yes.

4       Q.    And is that the payments for the rental home?

5       A.    Yes.

6       Q.    And that's the rental home that you moved into

7   around August 2009?

8       A.    Correct.

9       Q.    How long did you live in that rental home?

10      A.    I believe it was nine months.

11      Q.    And that was -- at the end of that nine months,

12  was that the time that the -- your new home in the

13  country club was completed and ready?

14      A.    Yes.

15      Q.    Did you move into it immediately upon its

16  completion?

17      A.    Yes.

18      Q.    And you've also listed Chase Bank mortgage

19  payments in the amount of $147,760.  Are those the same

20  payments that we discussed earlier in the transaction

21  statement?

22      A.    Yes.

23      Q.    And those are all mortgage payments for the

24  Middlebrook property; correct?
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/10/19 Page 2769 of 3246
Case 1:14-cv-04046-NGG Document 29-31 Entered on FLSD Docket 05/08/2019 Page 129 of 165
Confidential - Subject to Further Confidentiality Review

```
 1      A.   Yes.

 2      Q.   The Best Buy item, replacement of damaged

 3   electronics that's listed, and there's two different

 4   amounts of $1,907.99 and then another one of $1,889.99,

 5   are those related to items that you believe were damaged

 6   and needed to be replaced because of Chinese drywall?

 7      A.   Yes.  Those are televisions.

 8      Q.   So when we were talking about the televisions

 9   that were having issues earlier, you replaced those; is

10   that right?

11      A.   Correct.

12      Q.   Did you move the televisions that were in your

13   home on Middlebrook to your rental home when you moved

14   there?

15      A.   No.

16      Q.   No?

17      A.   (Shaking head.)

18      Q.   So did you purchase the new televisions from

19   Best Buy before you moved into the new home or after?

20      A.   When you say "the new home," you mean my rental

21   home?

22      Q.   Excuse me.  Yes.  Did you buy those new

23   televisions before you moved into the rental home or

24   after you moved into the rental home?
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2770 of 3246
Case 1:15-cv-02498-NGG Document 269-31 Entered on FLSD Docket 05/08/2010 Page 130 of 165
Confidential - Subject to Further Confidentiality Review

```
 1      A.   I don't recall.

 2      Q.   Let's look to ROSEN, M(OLF) - 70 in the receipt

 3   exhibit, Exhibit 12.

 4           MS. RICO:  I'm sorry.  Could you say that

 5      number again?

 6           MR. LAWSON:  Yeah.  It's page 70 --

 7           MS. RICO:  Thank you.

 8           MR. LAWSON:  -- in the Exhibit 12, receipt

 9      exhibit.

10   BY MR. LAWSON:

11      Q.   Looking at this page, it shows a Samsung

12   55-inch television was purchased around February 18,

13   2010.  Does that look correct?

14      A.   Yes.

15      Q.   So you would have purchased the television

16   after you moved into the rental home; is that right?

17      A.   Yes.

18      Q.   So from August, when you moved into the rental

19   home, until February of 2010, did you not have

20   televisions in the home?

21      A.   As I recall, there were TVs in the house, but I

22   think we had to buy a couple for other areas that they

23   needed them that we couldn't bring the other TVs, you

24   know, from the other house.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2771 of 3246
Case 1:14-cv-12249-NGG Document 31-1 Confidential Document 05/29/2014 Page 131 of 165
Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Okay.  So the home was furnished and did have

 2    televisions when you moved into it?

 3        A.    Yeah.

 4        Q.    But you hadn't moved the old televisions that

 5    you had in the Middlebrook home with you; is that right?

 6        A.    Correct.

 7        Q.    If you look to the previous page, it shows the

 8    other Best Buy purchase.  This is page 69 of Exhibit 12.

 9    On the right-hand side, there's a Best Buy receipt also

10    on February 18, 2010, for another 55-inch television; is

11    that right?

12        A.    Yes.

13        Q.    So those were purchased on the same day?

14        A.    Yes.

15        Q.    Let's go to page 52, the stamped page 52 of

16    Exhibit 12, near the front of the document.  This

17    appears to be an estimated cost of services with a

18    moving company.  Do you see that?

19        A.    Yes.

20        Q.    Is this related to your move from the

21    Middlebrook home to the rental home?

22        A.    Correct.

23        Q.    If you look at the handwritten notes that are

24    on the left-hand side of the page, there's a note about
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2772 of 3246
Case 1:14-cv-09148-NGG Document 269-31 Entered on FLSD Docket 05/19/2016 Page 132 of 165
Confidential -- Subject to Further Confidentiality Review

```
 1    a "wall mount TV plasma" and in paren it says "several

 2    big flat," I believe is what it says there.  Do you know

 3    what that refers to?

 4        A.   I do not.

 5        Q.   If you look down to the bottom right-hand

 6    corner of the document, there's also a note that says

 7    "pack" -- what I believe -- "wall mount or plasma TVs."

 8    Do you see that?

 9        A.   Yes.

10        Q.   Okay.  Does this refresh your recollection that

11    TVs were moved from the house?

12        A.   I don't really recall.  I know we had problems

13    with two TVs in the house.

14        Q.   Do you know how many TVs you had in the house

15    before you moved?

16        A.   Four or five.

17        Q.   And you replaced two of them, at least,

18    according to those Best Buy receipts; correct?

19        A.   Yes.

20        Q.   And maybe moved some of the others?

21        A.   Yes.

22        Q.   Let's look to the next page, which is marked as

23    53, along with 54.  These appear to be carpet care

24    invoices?
```

 1      A.   Yes.

 2      Q.   Can you tell me about the work that this

 3   company, X-Pert Carpet Care, did?

 4      A.   Well, what they did was they came to the house

 5   and pulled everything out into the driveway and

 6   steam-cleaned everything.  And that's basically it.  So

 7   we were able to save this -- these -- this stuff.

 8      Q.   Did you move all these items to the rental home

 9   after they were cleaned?

10      A.   I don't recall.

11      Q.   But that was the intention of doing this;

12   correct?

13      A.   The intention, yes.

14      Q.   Going back to the invoices that you had from

15   Turkell & Gervis Design, do you know why some of the

16   items are checked on the invoices next to the quantity

17   and others are not?

18      A.   I have no idea.

19      Q.   Okay.  You don't know if that reflects that

20   those items were actually purchased, or do you know that

21   all of these items were eventually purchased and put in

22   your home?

23      A.   All these items were purchased.

24      Q.   Okay.  They all ended up in your house?

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2774 of 3246
Case 1:14-cv-02494-NGN Document 31-12 filed LESD Date 03/19/2019 Page 434 of 165
Confidential -- Subject to Further Confidentiality Review

```
 1        A.   Every single one.

 2        Q.   Let's go back to Exhibit 10.  It's listed as

 3   it's the amended responses -- excuse me -- it's the

 4   responses to the first interrogatories from the

 5   defendants that we looked at a little bit earlier.

 6        A.   So is that back in this pile?

 7        Q.   Yeah, it's the court document.

 8        A.   Okay.

 9        Q.   It's Exhibit 10.  If you look to the second

10   page in your answer to the first interrogatories, you

11   also state that you're seeking alternative living

12   expenses?

13        A.   Yes.

14        Q.   Is that related to your move from your home on

15   Middlebrook Way to the rental home that we've been

16   discussing today?

17        A.   Yes.

18        Q.   And, specifically, when you're seeking

19   alternative living expenses, are you referring to the

20   amount that you paid in rent during that time at the

21   home on Middlebrook Way?

22        A.   And moving expenses also.

23        Q.   Excuse me.  I misspoke there.  The expenses for

24   rent that you paid at the rental home, that's what
```

1    you're seeking on top of moving expenses there?

2        A.    Correct.

3        Q.    During the time that you were living in the

4    rental home, were you paying less in rent for the home

5    than what you had been paying for your mortgage, or

6    more?

7        A.    More.

8        Q.    And it would have been about a little over

9    $1,000 more between -- less than 2,000, maybe around

10   $1,600, if I'm remembering correctly?

11       A.    It was 1,600, yes, about right.

12       Q.    Because you were paying in the 3,000s or so in

13   your mortgage payments; correct?

14       A.    I think it was $3,600, roughly, and then

15   $5,200.

16       Q.    That's right.  So about $1,600 more?

17       A.    Correct.

18       Q.    Why did you pick that particular rental home to

19   live in?

20       A.    I had two children.  I needed a big enough

21   house to, you know, live in.

22       Q.    How big was the rental home?

23       A.    Maybe 4,000 square feet.

24       Q.    And how many bedrooms?

```
 1      A.   I don't recall.  Probably four, but I don't

 2   recall.

 3      Q.   And where was it located?

 4      A.   In Bristol Pointe.

 5      Q.   Did you consider any other options other than

 6   that rental home?

 7      A.   We looked at several options.

 8      Q.   What else did you consider?

 9      A.   I don't recall the exact places, but, you know,

10   we -- before we decided to move into some place for at

11   least half a year, it wounded up being nine months, we,

12   you know, looked around.

13      Q.   Do you know how long you looked around, how

14   many days, weeks it was?

15      A.   I don't recall.

16      Q.   When you moved out on August 12, where did you

17   go immediately when you moved out on that date?

18      A.   Was that -- I'm not sure if that's the day we

19   moved in there or we just left our place and went to a

20   hotel.

21      Q.   How long did you live in a hotel for, do you

22   remember?

23      A.   I don't recall.

24      Q.   The moving expenses that you're seeking for
```

```
 1   alternative living expenses were the invoices that we

 2   just saw in the receipts; correct?

 3       A.   Uh-huh.

 4       Q.   Those are the moving expenses?  Yes?

 5       A.   Yes.

 6            (Rosen Exhibit No. 13 was marked for

 7   identification.)

 8   BY MR. LAWSON:

 9       Q.   Before I forget, when we were looking at the

10   interior design book a second ago --

11       A.   Yes.

12       Q.   -- were any of those items salvaged or kept

13   when you moved out of the house?  Did you bring them

14   with you?

15       A.   Anything that was metal didn't come with us.

16   Anything that was a window treatment or a wallpaper

17   didn't come with us.  Anything that was attached to the

18   house, meaning.  So I don't recall specifically if

19   anything came, but anything that was metal didn't come

20   and anything attached to the house didn't come.

21       Q.   Were those items left in the house?

22       A.   Yes.

23       Q.   You didn't throw them away?

24       A.   No.
```

```
 1        Q.   Did you clean or steam-clean any of the

 2   furniture items that were listed in that design book?

 3        A.   You'd have to match it up.  Potentially.

 4        Q.   Part of that design book was furniture;

 5   correct?

 6        A.   Yes.

 7        Q.   And that was the furniture that you furnished

 8   the house with in a lot of the rooms; is that right?

 9        A.   Yes.

10        Q.   And when you steam-cleaned things, a lot of

11   those items were furniture items; is that right?

12        A.   Correct.

13        Q.   And those were items that you steam-cleaned

14   with the intention of bringing along with you; correct?

15        A.   Correct.

16        Q.   Let's look at the exhibit that you were just

17   handed.  This is Exhibit 13.  It's marked as ROSEN,

18   M(OLF)- 000035 in the bottom right-hand corner.  Do you

19   see that?

20        A.   Yes.

21        Q.   There's a handwritten note at the top that says

22   "lease payments made."  Do you see that at the top?

23        A.   Yes.

24        Q.   So then there appears to be a series of check
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2779 of 3246
Case 1:14-cv-22408-NGG Document 31-1 Entered on FLSD Docket 05/18/2018 Page 39 of 165

Confidential -- Subject to Further Confidentiality Review

1    images that are included across the pages of this

2    exhibit.  Do you see those?

3        A.  Yes.

4        Q.  Now, looking at this, there appear to be five

5    different checks that are shown here, and then there's

6    also a cancelled check image at the back as well?

7        A.  Yes.

8        Q.  Now, you were saying before that you had lived

9    in the rental home for somewhere around nine months; is

10   that right?

11       A.  Yes.

12       Q.  And that was -- so it was from a period of time

13   that was longer than the checks that are shown here;

14   correct?

15       A.  Correct.

16       Q.  So here we have a check for January 12, 2010,

17   on the first page, page 35; right?

18       A.  Yes.

19       Q.  Then there's, on page 36, a check from

20   September of 2009; is that right?

21       A.  Yes.

22       Q.  And then there's a check on September 15, 2009,

23   on the third page; correct?

24       A.  Yes.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2780 of 3246
Case 1:18-cv-12408-NGG Document 09-31 Confidential Filed 05/49/2019 Page 140 of 165
Confidential - Subject to Further Confidentiality Review

1    Q.    And that page is marked as No. 37.

2    A.    Yes.

3    Q.    Then there is a check for November 20, 2009,

4    that is on the stamped page 38; is that right?

5    A.    Yes.

6    Q.    And then a check for December 10, 2009, on the

7    stamped page 39; is that right?

8    A.    Yes.

9    Q.    And then there is a cancelled check on the --

10   carbon copy image of a check on the last page, which is

11   stamped 40, for $5,200, where I cannot read the date,

12   but it appears to say "deposit" in the left-hand corner

13   in a handwritten note?

14   A.    Yes.

15   Q.    Do you know what this is?

16   A.    I don't pay the bills in my house.

17   Q.    Would your wife maybe know what this is?

18   A.    Potentially.

19   Q.    Do you know if there are additional checks for

20   the rent payments that you made at the rental home

21   during the time, other than these?

22   A.    I don't know where they are, but I know we

23   stayed there longer than -- I don't know if we put down

24   first, last, and security in a wire.  Wrong person to

Case 2:09-md-02047-EEF-MBN Document 22363-20 Filed 11/19/19 Page 2781 of 3246
Case 1:13-cv-12450-NGG Document 261-31 Entered on FLSD Docket 05/08/2018 Page 141 of 165
Confidential — Subject to Further Confidentiality Review

```
 1   ask.

 2        Q.   Do you know if you received any money back when

 3   you moved out of the rental house for a security deposit

 4   or anything like that?

 5        A.   I don't recall.

 6        Q.   But you're not aware of any additional proof of

 7   payment for rent from the -- for the period of time that

 8   you lived in this home; correct?

 9        A.   Like I said, I don't pay the bills, so I

10   wouldn't know.

11        Q.   Okay.  Other than the moving expense invoices

12   and the checks that we just looked at, are there any

13   other items, proof of payment for items that are related

14   to alternative living expenses that you're seeking in

15   this lawsuit?

16        A.   I mean, when I stayed at a hotel, I probably

17   could go back to American Express from 10 years ago and

18   probably pull the records if I had to.

19        Q.   Have you pulled those records?

20        A.   No.

21        Q.   And you haven't provided them to your attorney?

22        A.   No.

23             (Rosen Exhibit No. 14 was marked for

24   identification.)
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2782 of 3246
Case 1:14-cv-09148-NRB Document 81-1 Entered on FLSD Docket 05/29/2018 Page 142 of 165
Confidential - Subject to Further Confidentiality Review

1

2    BY MR. LAWSON:

3        Q.   Mr. Rosen, you've been handed a document that's

4    been marked as Exhibit 14.  It appears to be titled

5    Residential Sale and Purchase Contract at the top, and

6    it has a stamp at the bottom right-hand corner that says

7    MROSEN - 000192.  Do you see that?

8        A.   Yes.

9        Q.   Have you seen this document before?

10       A.   Yes.

11       Q.   What is it?

12       A.   It's a purchase and sale contract.

13       Q.   And is it a purchase and sale contract for your

14   sale of your home on Middlebrook Way to the subsequent

15   owners of that property?

16       A.   Yes.

17       Q.   And this is the sale for $876,000 that we

18   discussed earlier?

19       A.   Yes.

20       Q.   Now, earlier I asked you about whether you

21   expressly retained a private -- or a right of action to

22   pursue damages for your property and for the Chinese

23   drywall in your property, and you said that you did; is

24   that right?

1      A.   Yes.

2      Q.   And I think we talked about that being in the

3  sales agreement or the sales contract.  Is that right?

4      A.   Yeah, I believe so.

5      Q.   Okay.  And I understand this is a long

6  document, but are you aware of anywhere in this document

7  where you retained the right to pursue damages for

8  Chinese drywall or for your time living in the house?

9      A.   I'd have to read through the whole document.  I

10  know that all I did in this document that I'm sure of is

11  that I gave them no right to go forward with any.  And

12  they tried to, the Shukows, but that's all I know, that

13  I believe, by telling them they didn't have any right, I

14  retained the right as the original owners.

15      Q.   Got it.  So it was your understanding that by

16  telling them that they could not pursue any claims --

17      A.   Yes.

18      Q.   -- against you -- sorry.  Let me finish out and

19  you can answer.

20          It was your understanding that by them agreeing

21  to not pursue any claims against you that you retained

22  the right to pursue damages for Chinese drywall for that

23  property; is that right?

24      A.   Yes.

Case 2:09-md-02047-EEF-MBN  Document 22363-29  Filed 11/19/19  Page 2784 of 3246
Case 1:15-cv-09408-NG-ST  Document 269-31  Entered on FLSD Docket 05/05/2019  Page 144
of 165

Confidential -- Subject to Further Confidentiality Review

```
1       Q.   But, to your knowledge, there isn't anywhere in

2    that agreement that you're aware of where it expressly

3    says that you have -- maintain the right to bring a

4    lawsuit for damages related to Chinese drywall; is that

5    right?

6              MR. VERRIER:   Objection.

7              THE WITNESS:   Again, I would have to read it,

8        but I don't know.

9    BY MR. LAWSON:

10      Q.   If you want to take a look through the

11   document, you're welcome to.

12      A.   I think it's more of a question for my

13   attorney.

14      Q.   Okay.

15           (Rosen Exhibit No. 15 was marked for

16   identification.)

17   BY MR. LAWSON:

18      Q.   You've been handed a document that's been

19   marked as Exhibit 15.  It's titled Mutual Release, and

20   there is a stamp at the bottom that says MROSEN -

21   000213.  Do you see that?

22      A.   Yes.

23      Q.   Have you seen this document before?

24      A.   Yes.
```

```
 1       Q.    What is this document?

 2       A.    I haven't seen it in almost 10 years, so,

 3   again, I would have to read it.

 4       Q.    Is it your understanding that this is your -- a

 5   release for any claims that you and the Shukows -- by

 6   "you," I mean your wife and yourself -- and the Shukows

 7   would have against each other related to the Chinese

 8   drywall on the property?

 9       A.    I believe that's what it is.

10       Q.    And I believe it releases any claims --

11       A.    Yes.

12       Q.    -- whatsoever against each other.

13       A.    Okay.

14       Q.    Is that right?

15       A.    Yes.

16       Q.    And this is -- when we were discussing the

17   agreement that you reached with the Shukows, this is the

18   one that you were talking about, you think?

19            MS. RICO:  Objection.  Mischaracterizes

20       testimony.

21            THE WITNESS:  Yes.

22   BY MR. LAWSON:

23       Q.    Can you see anywhere in this document, looking

24   at this first page, where it says that you retain the
```

```
1    right to pursue damages against other parties for

2    Chinese drywall?

3       A.   If you want to take two minutes and let me read

4    through it, I'll be happy to do that.

5       Q.   Absolutely.  Go ahead.

6       A.   So this is between the Shukows and I, that they

7    have no litigation rights against me.  It has nothing to

8    do with my rights going after the manufacturer of the

9    Chinese drywall.

10          See, I didn't need to go to law school after

11   all.

12      Q.   It's just a big racket that we're running.  You

13   can do all this yourself.

14      A.   I couldn't agree more.

15      Q.   You have excellent counsel.  Keep them.

16          All right.  I'd like to go back to Exhibit 14

17   and specifically look at -- that's the purchase

18   agreement -- and look at page 198, if you look in the

19   bottom right-hand corner of that document.

20          MS. RICO:  What page?

21          MR. LAWSON:  198 is the page that we're looking

22      at.  It's MROSEN - 000198.

23   BY MR. LAWSON:

24      Q.   Now, if you look to the kind of last full
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2787 of 3246
Case 1:14-cv-02949-NGG Document 269-31 Entered on FLSD Docket 05/22/2017 Page 147 of 165
Confidential - Subject to Further Confidentiality Review

```
 1   paragraph there that begins with "the seller shall have

 2   the right to remove," do you see that?

 3        A.   Yes.

 4        Q.   It says:  "The seller shall have the right to

 5   remove all the appliances from the kitchen and laundry

 6   room prior to closing.  The seller shall have the right

 7   to remove the kitchen and butler's pantry cabinets and

 8   countertops.  The seller shall have the right to remove

 9   all of the wood trim in the house - this includes all

10   moldings and wood wall treatments - crown - baseboard -

11   door trims, etc.  The seller may take any of the

12   children's room fabric valances and drapes.  The seller

13   is responsible for ensuring that the window treatments,

14   windows, flooring, and studs are not damaged in this

15   process."

16            Do you see that?

17        A.   Yes.

18        Q.   Did you end up removing any of the items that

19   you retained a right to remove in this agreement?

20        A.   No.

21        Q.   Did you ask for that to be included, or was

22   that just included within the standard terms?

23        A.   Standard terms.  I think it was also for

24   evidence purposes down the road, we wanted that
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2788 of 3246
Case 1:19-cv-02499-NGG Document 1-21 Filed 04/29/2019 Page 149 of 165
Confidential - Subject to Further Confidentiality Review

```
 1    included.

 2         Q.   And if you look to the Additional Terms

 3    section, 21, that begins near the top of the page, it

 4    says at the top:  "Buyer and seller acknowledge that the

 5    subject property has 'Chinese Drywall Syndrome' and the

 6    house will have to be gutted and rebuilt inside."

 7              Do you see that?

 8         A.   Uh-huh.

 9         Q.   So this was the acknowledgement that the

10    parties came to that the house did have Chinese drywall;

11    is that right?

12         A.   Yes.

13         Q.   Now, going back to the Exhibit 15 that we were

14    looking at, the release with the Shukows, they did not

15    agree in this to not pursue damages against Chinese

16    drywall manufacturers either; is that right?

17              MS. RICO:  Objection.

18    BY MR. LAWSON:

19         Q.   This was just -- they did not agree to not

20    pursue damages against other Chinese drywall

21    manufacturers in this agreement?

22         A.   I believe this agreement is just between the

23    Shukows and I.

24         Q.   That's right, this is an agreement just between
```

1    the two of you to not sue each other, to your

2    understanding; correct?

3        A.    Yes.

4        Q.    Do you believe that you and your wife are the

5    only people that are entitled to bring claims related to

6    Chinese drywall for the Middlebrook Way property?

7        A.    Can you be a little more specific?

8        Q.    So the Shukows attempted to pursue damages for

9    the Middlebrook Way property related to Chinese drywall;

10   correct?

11       A.    Yes.

12       Q.    Is it your understanding that you and your wife

13   are the only people who are entitled to do that?

14       A.    At the price that I sold it, and I disclosed

15   it, absolutely.

16       Q.    And I know -- I think we might have already

17   covered this, but I just want to confirm.  Do you have

18   any -- do you know of anywhere in writing where you had

19   the Shukows agree that only you could bring actions or

20   lawsuits related to Chinese drywall damages for the

21   home?

22            MR. VERRIER:  Objection.

23            THE WITNESS:  Well, I --

24   BY MR. LAWSON:

```
 1      Q.   You can answer the question.

 2           MR. VERRIER:  You can answer.

 3           THE WITNESS:  Answer?

 4           MS. RICO:  Yeah, you can answer, it's fine.

 5           THE WITNESS:  Again, it's redundant.  I've

 6      disclosed that the house had Chinese drywall.  I

 7      sold it at, basically, from what I furnished it and

 8      what I sold it for and all the things it cost me, a

 9      third of what I paid for it.

10           So it stands to reason that they acknowledged

11      that it had it, they bought it as is with the

12      knowledge of that it had Chinese drywall, so I think

13      it's assumed that they had no right to go after

14      anyone for -- to have it remediated for free.  You

15      know, they were basically trying to -- you know,

16      after the fact we found out they were trying to scam

17      everyone and be included in the class action.

18 BY MR. LAWSON:

19      Q.   Let's go back to the responses to

20 interrogatories that we were looking at a little bit

21 earlier.  That's Exhibit 10.  Specifically turning back

22 to that first answer on the second page, you also state

23 that a type of damage that you're seeking is "lost

24 equity (including down payments, mortgage payments and
```

```
 1    capital improvements)"?

 2           MR. VERRIER:  Matt, before you get to your

 3       question, do you have to take a call?

 4           MS. ROSEN:  My son is calling.

 5           MR. VERRIER:  Could we take a break now?

 6           MR. LAWSON:  We can go off the record.  That's

 7       fine.

 8           (Recess from 3:18 p.m. until 3:26 p.m.)

 9    BY MR. LAWSON:

10       Q.  Welcome back, Mr. Rosen.

11           Before we left off we were discussing the

12    interrogatory responses, specifically the first

13    interrogatory response that you have here.  I was asking

14    you about the item of damages that's listed as "lost

15    equity (including down payments, mortgage payments and

16    capital improvements)."  Do you see that?

17       A.  Yes.

18       Q.  We've talked a little bit about that before.

19    So this includes the amount of money that you put down

20    on the house; correct?

21       A.  Yes.

22       Q.  And we discussed that earlier as being -- did

23    you say around --

24       A.  1.2.
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2792 of 3246
Case 1:14-cv-11949-NGG Document 31-1 Filed under Seal Date 05/12/2017 Page 152 of 165
Confidential - Subject To Further Confidentiality Review

 1    Q.   $1.2 million.  The mortgage payments, which we

 2   went over a little bit earlier.

 3        Would you agree that the mortgage payments that

 4   we're discussing are the payments that you made toward

 5   the principal on the home?

 6    A.   Well, it's both.

 7    Q.   So the lost equity would relate to the payments

 8   that you made towards the principal, though; correct?

 9    A.   No, the lost payments of everything I paid to

10   the bank.

11    Q.   Well, so the equity is gained in the home by

12   paying down the principal of the mortgage; correct?

13    A.   But all the money that I paid, whether it

14   was -- whether it was interest or principal, is lost

15   money because -- okay?  So I can't agree with you there.

16    Q.   Well, I understand that, but when we're talking

17   about lost equity, equity is gained when you pay the

18   principal.  Can we agree there?

19        MS. RICO:  Objection.  Asked and answered.  Go

20    ahead.

21   BY MR. LAWSON:

22    Q.   Can we agree that equity is gained when you pay

23   the principal of a loan; is that right?

24    A.   As a definition, yes.

Confidential - Subject to Further Confidentiality Review

```
 1      Q.   And you've also listed "capital improvements"

 2   here, and we discussed those in the different receipts

 3   and invoices that you had?

 4      A.   Yes.

 5      Q.   There's also listed here "remediation damages

 6   as determined by the court."  Do you see that?

 7      A.   Yes.

 8      Q.   And just to clarify, you could not remediate

 9   the home today if you wanted to; correct?

10      A.   No.

11      Q.   It's your understanding that it has been

12   remediated?

13      A.   Correct.

14      Q.   And that was done by the subsequent purchasers

15   of the home; is that right?

16      A.   Yes.

17      Q.   And it's your belief that they paid less for

18   the home than they would have otherwise because of the

19   Chinese drywall that was in the home?

20      A.   100 percent.

21      Q.   The diminution in value that is listed as the

22   next item, what is your understanding of what that means

23   to you?  It says "diminution in value."  Is that

24   diminution in value of the property?
```

```
 1        A.   It's based on what I paid for the house, what I

 2   spent on the house, what the Chinese drywall drove the

 3   price down to, the stigma attached to the neighborhood

 4   because of the Chinese drywall.  That's what I think it

 5   is.

 6        Q.   Do you know how much value your home lost as a

 7   result of having Chinese drywall in it?

 8        A.   I can only -- I can only say what I put into it

 9   and what I sold it for, because no one will really know

10   the true market value.

11        Q.   Did you have an appraisal done professionally

12   at any point while you owned the home?

13        A.   No.

14        Q.   You've also listed "loss of use and enjoyment"

15   of the home, and I think we've talked a little bit about

16   that, but do you know the amount of money that you would

17   seek for loss of use and enjoyment of the property?

18        A.   I don't have a set figure.

19        Q.   What do you feel that you lost as a result of

20   Chinese drywall being in your home as far as your use of

21   the property?

22        A.   Well, all the aspirations and dreams that we

23   had of building this beautiful house, for my children to

24   play in that beautiful pool, and the hundreds of hours
```

1    that my wife spent furnishing it, working with the

2    decorators, and having this magnificent house was blown

3    to garbage.

4        Q.   So you lived in the home for three years before

5    you moved out, or around that; right?

6        A.   Yeah.

7        Q.   And at the time that you found out that there

8    was Chinese drywall in the home, you were already

9    planning to move out; is that right?

10       A.   Correct.

11       Q.   Did you enjoy living in the home for the three

12   years when you lived there before you learned there was

13   Chinese drywall?

14       A.   Yes.

15       Q.   Are you aware of any other documents that are

16   related to your Chinese drywall claims that you have not

17   produced to your lawyers?

18       A.   No.

19            MR. LAWSON:  I don't have any further questions

20       at this time.

21            MS. RICO:  Anyone else?  Nobody?

22            MR. GUERRA:  I think I have a couple.

23

24            ///

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2796 of 3246
Case 1:19-cv-12240-NGG Document 29-31 Confidential FSD Deposition 05/28/2018 Page 156 of 165
Confidential - Subject to Further Confidentiality Review

```
 1                   CROSS-EXAMINATION

 2   BY MR. GUERRA:

 3       Q.   Good afternoon, Mr. Rosen.

 4       A.   Hi.

 5       Q.   We met earlier.  My name is Dan Guerra.  I'm

 6   from Orrick, Herrington & Sutcliffe, and I represent

 7   another defendant in this lawsuit, Beijing New Building

 8   Materials, Public Limited Company.  I just have a couple

 9   quick questions.

10            If we could turn to Exhibit 11, please.  It's

11   the spreadsheet of the damages.  And let's see here.

12   The tenth item on that list is the Kinderguard pool

13   fence?

14       A.   Yes.

15       Q.   And when you listed the home for sale in 2009,

16   were you intending to sell the fence along with the rest

17   of the home?

18       A.   Yes.

19       Q.   And to the extent you had those built-in items

20   that your wife had decorated the home with, were those

21   going to be sold as well with the house in 2009?

22       A.   Anything that's attached to the house, meaning,

23   you know, custom-made, you know, wall treatments and

24   things like that, could not be, but I'm assuming there
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2797 of 3246
Case 1:14-cv-02408-WGC Document 269-31 entered on FLSD Docket 05/03/2019 Page 157 of 165
Confidential -- Subject to Further Confidentiality Review

```
 1   were things she was planning on taking.

 2       Q.   Were you going to take the closet systems with

 3   you?

 4       A.   No.  Those are all custom to the home, just

 5   like the garage system.

 6       Q.   So they would be included in your valuation of

 7   the home and the loss of diminution in value of the

 8   home?

 9            MR. VERRIER:  Objection.

10            THE WITNESS:  Yes.

11            MR. GUERRA:  Nothing further.

12            THE WITNESS:  Let me just say, that pool fence,

13       I never thought it was such a big deal.

14                      CROSS-EXAMINATION

15   BY MS. RICO:

16       Q.   I have a couple questions.

17            I'm going to -- could you pull out Exhibit 4.

18   It's the property appraiser's --

19       A.   Yes.

20       Q.   You were asked about this document before.

21   It's a document from the property appraiser.  It lists

22   assessed value for the home.  Do you remember?

23       A.   Yes.

24       Q.   Did you prepare this document?
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2798 of 3246
Case 2:09-md-02047-EEF-MBN Document 20813-1 entered on FLSD Docket 05/03/2019 Page 158 of 165

Confidential - Subject to Further Confidentiality Review

```
 1        A.    No.

 2        Q.    Do you know who prepared this document?

 3        A.    No.

 4        Q.    Do you know where they obtained the information

 5   that went into this document?

 6        A.    No.

 7        Q.    When you look at the assessed values on the

 8   third page, it's got the assessed values, improvement,

 9   land values, total market value for 2009 through 2018;

10   is that correct?

11        A.    Yes.

12        Q.    And before, you were asked a question about the

13   language in bold at the bottom that says: "All values

14   are as of January 1st each year."  Is that correct?

15        A.    Yes.

16        Q.    Do you happen to have any knowledge of whether

17   or not they retroactively include information regarding

18   the assessed value?

19        A.    I have no idea.

20        Q.    You said before -- strike that.

21              Do you recall if you ever reported Chinese

22   drywall to the county?

23        A.    No.

24        Q.    You don't recall?
```

```
 1        A.    I never did.

 2        Q.    You never did?  Okay.  Do you know if anyone

 3   else did?

 4        A.    I'm unaware.  Not to my knowledge.

 5        Q.    Do you know if the county was aware of Chinese

 6   drywall in the neighborhood?

 7        A.    They were.

 8        Q.    Okay.  Thank you.

 9              You said earlier that you listed the home

10   before you found out that there was Chinese drywall in

11   the home; correct?

12        A.    Correct.

13        Q.    Did you list the home before you knew there was

14   Chinese drywall in the community?

15        A.    I don't recall that.

16        Q.    When you listed the home, you said you listed

17   the home for 2.3 to 2.4 million; is that right?

18        A.    Yes.

19        Q.    Was that price a reflection of what you

20   believed the market value of your home to be at the

21   time?

22        A.    Yes.

23        MS. RICO:  Thank you.  I have no further

24        questions.
```

```
 1              MR. LAWSON:  I don't have anything further at

 2      this time.

 3              MR. GUERRA:  I just have one question.

 4                      RECROSS-EXAMINATION

 5   BY MS. RICO:

 6      Q.   With respect to when you listed the home for,

 7   you believe the value was worth 2.34 million; correct?

 8      A.   Yes.

 9      Q.   What was your basis for that belief?

10      A.   The custom furnishings in my house, the --

11   everything about it, and the rest of the market.  The

12   comparables to the rest of the market.

13      Q.   Did you come to that number on your own?

14      A.   No.  We listed with a realtor that came up with

15   that number.

16              MR. GUERRA:  No further questions.

17              (Whereupon, the deposition concluded at

18      3:37 p.m.)

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2801 of 3246
Case 1:19-cv-12448-NGT Document 20313 Entered on FLSD Docket 05/28/2001 Page 161 of 165
Confidential - Subject to Further Confidentiality Review

```
 1                    C E R T I F I C A T E

 2

 3           I, JOAN L. PITT, Registered Merit Reporter,

 4    Certified Realtime Reporter, and Florida Professional

 5    Reporter, do hereby certify that, pursuant to notice,

 6    the deposition of MICHAEL ROSEN was duly taken on

 7    January 9, 2019, at 12:08 p.m., before me.

 8           The said MICHAEL ROSEN was duly sworn by me

 9    according to law to tell the truth, the whole truth, and

10    nothing but the truth, and thereupon did testify as set

11    forth in the above transcript of testimony.  The

12    testimony was taken down stenographically by me.  I do

13    further certify that the above deposition is full,

14    complete, and a true record of all the testimony given

15    by the said witness.

16

17    _____

18           JOAN L. PITT, RMR, CRR, FPR

19

20           (The foregoing certification of this transcript

21    does not apply to any reproduction of the same by any

22    means, unless under the direct control and/or

23    supervision of the certifying reporter.)

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2802 of 3246
Case 1:15-cv-22408-MGC Document 46-31 Entered on FLSD Docket 05/08/2015 Page 162 of 165
Confidential - Subject to Further Confidentiality Review

```
1                    INSTRUCTIONS TO WITNESS

2

3

4            Please read your deposition over carefully and

5    make any necessary corrections.  You should state the

6    reason in the appropriate space on the errata sheet for

7    any corrections that are made.

8

9            After doing so, please sign the errata sheet

10   and date it.  It will be attached to your deposition.

11

12           It is imperative that you return the original

13   errata sheet to the deposing attorney within thirty (30)

14   days of receipt of the deposition transcript by you.  If

15   you fail to do so, the deposition transcript may be

16   deemed to be accurate and may be used in court.

17

18

19

20

21

22

23

24
```

Confidential - Subject to further confidentiality Review

```
 1                    - - - - - -

 2                   E R R A T A

 3                    - - - - - -

 4    PAGE    LINE    CHANGE

 5    _____   _____   _____

 6      REASON:  _____

 7    _____   _____   _____

 8      REASON:  _____

 9    _____   _____   _____

10      REASON:  _____

11    _____   _____   _____

12      REASON:  _____

13    _____   _____   _____

14      REASON:  _____

15    _____   _____   _____

16      REASON:  _____

17    _____   _____   _____

18      REASON:  _____

19    _____   _____   _____

20      REASON:  _____

21    _____   _____   _____

22      REASON:  _____

23    _____   _____   _____

24      REASON:  _____
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2804 of 3246
Confidential - Subject to further confidentiality Review
of 165

```
 1                    ACKNOWLEDGMENT OF DEPONENT

 2

 3         I, _____, do hereby

 4   acknowledge that I have read the foregoing pages and

 5   that the same is a correct transcription of the answers

 6   given by me to the questions therein propounded, except

 7   for the corrections or changes in form or substance, if

 8   any, noted in the attached Errata Sheet.

 9

10

11   _____    _____

12   MICHAEL ROSEN                   DATE

13

14

15

16

17   Subscribed and sworn to before me this

18   ____ day of _____, 20___.

19   My Commission expires: _____

20

21   _____

     Notary Public

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                        LAWYER'S NOTES

 2    PAGE    LINE

 3    _____   _____    _____

 4    _____   _____    _____

 5    _____   _____    _____

 6    _____   _____    _____

 7    _____   _____    _____

 8    _____   _____    _____

 9    _____   _____    _____

10    _____   _____    _____

11    _____   _____    _____

12    _____   _____    _____

13    _____   _____    _____

14    _____   _____    _____

15    _____   _____    _____

16    _____   _____    _____

17    _____   _____    _____

18    _____   _____    _____

19    _____   _____    _____

20    _____   _____    _____

21    _____   _____    _____

22    _____   _____    _____

23    _____   _____    _____

24    _____   _____    _____
```

# EXHIBIT A32

Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2
    EDUARDO AND CARMEN AMORIN,
 3  et al., individually, and
    on behalf of all others
 4  similarly situated,      Case No. 1:11-CV-22408-MGC
 5      Plaintiffs,
 6  vs.
 7  TAISHAN GYPSUM CO., LTD.,
    F/K/A SHANDONG TAIHE
 8  DONGXIN CO., LTD.; TAIAN
    TAISHAN PLASTERBOARD CO.,
 9  LTD, et al.,
10      Defendants.
11          CONFIDENTIAL - SUBJECT TO FURTHER
                CONFIDENTIALITY REVIEW
12
                        - - -
13
                    JANUARY 9, 2019
14
                        - - -
15
            Deposition of ROBYN ROSEN, held at
16  Morgan & Morgan, PA, 515 North Flagler Drive, Suite
    2125, West Palm Beach, Florida 33401, commencing at
17  3:38 p.m., on the above date, before Joan L. Pitt,
    Registered Merit Reporter, Certified Realtime
18  Reporter, and Florida Professional Reporter.
19                      - - -
20          GOLKOW LITIGATION SERVICES
         877.370.3377 ph | 917.591.5672 fax
21              deps@golkow.com
22
23
24
25
```

```
 1                    APPEARANCES

 2

 3    Counsel for Plaintiffs:

 4        NATALIE M. RICO, ESQUIRE
          Colson Hicks Eidson
 5        255 Alhambra Circle, Penthouse
          Coral Gables, Florida 33134
 6        305.476.7400
          natalie@colson.com
 7

          KEITH J. VERRIER, ESQUIRE
 8        Levin, Sedran & Berman LLP
          510 Walnut Street, Suite 500
 9        Philadelphia, Pennsylvania 19106
          215.592.1500
10        kverrier@lfsblaw.com

11

12    Counsel for Defendants Taishan Gypsum Co., Ltd., and
      Taian Taishan Plasterboard Co., Ltd.:

13

          MATTHEW D. LAWSON, ESQUIRE
14        LARA TUMEH, ESQUIRE
          MAE MANUPIPATPONG, ESQUIRE
15        Alston & Bird LLP
          One Atlantic Center
16        1201 West Peachtree Street
          Atlanta, Georgia 30309-3424
17        404.881.7000
          matt.lawson@alston.com
18        lara.tumeh@alston.com
          mae.manupipatpong@alston.com

19

20

21

22

23

24

25
```

Case 2:09-md-02047-EEF-MBN Document 22363-20 Filed 11/19/19 Page 2809 of 3246
Case 1:19-mc-00405-NGG Document 2-31 Entered on FLSD Docket 05/08/2009 Page 49 of 32
Confidential - Subject to Further Confidentiality Review

```
 1                    APPEARANCES CONTINUED

 2

 3    Counsel for Beijing New Building Materials PLC:

 4         DAN GUERRA, ESQUIRE

           Orrick, Herrington & Sutcliffe LLP

 5         The Orrick Building

           405 Howard Street

 6         San Francisco, California 94105-2669

           415.773.5545

 7         dguerra@orrick.com

 8         ALEX B. ROTHENBERG, ESQUIRE

           Gordon Arata Montgomery Barnett

 9         201 St. Charles Avenue, 40th Floor

           New Orleans, Louisiana 70170-4000

10         504.582.1111

           arothenberg@gamb.law

11

12    Also present:  Michael Rosen

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Confidential - Subject to Further Confidentiality Review

```
   1                           - - -

   2                        I N D E X

   3                           - - -

   4    Testimony of:  ROBYN ROSEN

   5      DIRECT EXAMINATION BY MR. LAWSON                    5

   6

   7

   8

   9

  10

  11

  12

  13

  14

  15

  16

  17

  18

  19

  20

  21

  22

  23

  24

  25
```

```
 1                         - - -

 2              THE COURT REPORTER:  Raise your right hand,

 3        please.  Do you swear or affirm the testimony you

 4        give will be the truth, the whole truth, and nothing

 5        but the truth?

 6              THE WITNESS:  Yes.

 7              THE COURT REPORTER:  Thank you.

 8              ROBYN ROSEN, called as a witness by the

 9    Defendant Taishan Gypsum Co., Ltd., having been first

10    duly sworn, testified as follows:

11                    DIRECT EXAMINATION

12    BY MR. LAWSON:

13        Q.    Please state your name for the record.

14        A.    Robyn Rosen.

15        Q.    Ms. Rosen, thank you for your time today in

16    coming in.  It's my understanding that you've been here,

17    and I've seen you here, throughout your husband's

18    testimony, is that correct, that you heard all of his

19    testimony?

20        A.    Yes.

21        Q.    So like I was telling your husband a little bit

22    earlier, there are certain things we have to remember

23    while we're talking to make sure that we get a clean

24    record.  We'll try not to talk over each other, try to

25    pause in between each other's questions and answers.
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2812 of 3246
Case 1:14-cv-21064-NGG Document 31-1 Filed 11/19/19 Page 2812 of 3246
Confidential - Subject to Further Confidentiality Review
32

```
 1            Like you've heard, there may be objections from

 2    counsel during the questions.  Please allow them to

 3    complete their objections before you answer.  Unless

 4    they tell you not to answer, I would ask that you give a

 5    full and complete answer once they're done objecting.

 6            Let me know if you need a break at any point,

 7    but I do anticipate that this will be shorter than your

 8    husband's testimony.

 9       A.   Awesome.  Looking forward to it.

10       Q.   Since you did listen in on all of your

11    husband's testimony, I wanted to ask if there were any

12    things that you can think of that he said that you

13    wanted to correct or add to or change, based on your

14    recollections, as opposed to what he said.

15       A.   Well, one thing I did notice is that you were

16    asking him a lot of questions about the cleaning and the

17    removal of the furniture, and I was in charge of that,

18    and so anything that he didn't know is because he went

19    to work to support three homes that we were in the midst

20    of.

21            So we did hire this man to clean a lot of that

22    stuff, in which we didn't end up using at the end.  So

23    the receipt will reflect a child's valance that we might

24    have taken, but at the end we decided not to put it in a

25    brand-new home.  We didn't want you to think -- so there
```

```
 1   was no piece of Chinese drywall item that moved into our

 2   final home at all.

 3          So I want you to be clear that even though it

 4   says that we cleaned some of the cloth items that the

 5   decorator -- that we purchased, we did not actually

 6   bring them into the final home because we were worried

 7   of what -- we don't know what -- we still don't know

 8   what kind of ramifications us breathing it in, so we

 9   didn't want any of that.

10          So even though we did put in a receipt to clean

11   those items, we did, we paid for it, but we did not

12   actually use them.  We tried.  We thought we could.  We

13   didn't know -- we didn't know.  Nobody knew.  So we

14   didn't know.  Can you clean it once?  Do you clean it

15   twice?  Do you go over it 13 times?  Like, so I want you

16   to know the receipt is there because we paid for someone

17   to clean it, but we didn't necessarily use it.

18      Q.   So let's look to that receipt for the cleaner

19   just so we can get this pinned down.  That's Exhibit 12.

20   And if you look in -- let's find the exact page.

21      A.   Here we go.  55 and 56.

22      Q.   That's right.  So on pages 55 and 56 -- excuse

23   me.  I think it starts at 53.  There's 53, 54, 55, and

24   56.  There's four different invoices from X-Pert Carpet

25   Care.
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2814 of 3246
Case 2:14-cv-02494-NGDL Document 681-32 Filed 10/30/2015 Page 9 of 32
Confidential - Subject to Further Confidentiality Review

```
 1        A.   Yes.  So, like, those rugs we threw in the

 2   garbage, like, the first two items.  Like, I know for a

 3   fact we did not take one piece of rug.  We had them try

 4   to clean it, and then it literally went in the trash

 5   can, did not -- we didn't -- I know for a fact there was

 6   no rugs.  We just tried.  Because look at the date on

 7   it.  We were so nervous we just didn't want to be around

 8   anything with the -- people were, like, "Don't bring all

 9   your stuffed animals."  We were in mass chaos mode.  So

10   we didn't know, so we started cleaning everything,

11   thinking just cleaning it will do the trick.  So that's

12   what -- that's really all I wanted to tell you.

13        So, like, it says two cornices, $15, we tried

14   to clean it and at the end of the day we decided we were

15   scared that we were going to be breathing it in the rest

16   of the our lives, so we didn't want our children to

17   breath it in.  You know, why shouldn't we recover the

18   costs of cleaning it?  It smelled horrible.  Once you

19   move it out and then you take a sniff outside, you're

20   like, "Oh, my God, I can't believe I didn't smell this

21   the whole time."

22        Q.   When you were referring to the date that you

23   were doing these cleanings on, the date that's listed in

24   the upper right-hand corner is August 12, 2009?

25        A.   August 10.  Oh, August 12, yes, the date of the
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2815 of 3246
Case 1:09-cv-02047-MCA Document 2001-21 Entered on FLSD Docket 05/19/2011 Page 40 of
32
Confidential - Subject to Further Confidentiality Review

 1    move, because we were going to move over to the new

 2    house, the rental.

 3        Q.    And I think we saw earlier that that was the

 4    date that you all moved out of the house?

 5        A.    Yes.

 6        Q.    So the cleaning was occurring around the same

 7    time?

 8        A.    Well, someone had told us if you put it outside

 9    in your garage, so he cleaned it, like, outside the

10    garage, bring it outside.  This carpet cleaner was

11    cleaning on the driveway, and then we were trying to

12    think, like, if it stopped smelling once he cleaned it.

13    We didn't know.  Nobody really knew.  We were just

14    trying to figure out a way to salvage something.

15        Q.    Can you see any items, going through these four

16    invoices, that you ultimately kept after the cleaning?

17        A.    I can't even read what some of this says.  I

18    don't know what a lot of it says.  One white bathroom

19    something.  One white blue -- no.  That's it.  None of

20    this went into our home.

21        Q.    You don't see any items listed here that went

22    into your rental home or your new home at the country

23    club?

24        A.    Definitely not -- some of this, like I said, I

25    don't even understand what some of these are.

Case 2:09-md-02047-EEF-MBN Document 22263-39 Filed 11/19/19 Page 2816 of 3246
Case 1:09-cv-02047-EEF-MBN Document 22263-21 Filed 11/19/19 Page 2816 of 32
Confidential – Subject to Further Confidentiality Review

1    Definitely not one rug went in.  The sofa didn't.

2            And then the other thing that I wanted to tell

3    you was, the checkmarks, I made those checkmarks on

4    those receipts.  That's my handwriting, so I wanted to

5    just -- that was the two things.  I checked them as they

6    came into the warehouse, but then the final delivery of

7    all the things that weren't checked was because they

8    came at the end.  So as they were delivered, I checked

9    them to make sure I got everything because there was so

10   much there that I was trying to keep a handle on.

11           So, like, for instance, if you see a check

12   here, two tobacco leather sofas, when that was

13   delivered, I checked that off.  So the last things that

14   weren't checked is because they came all at the end, and

15   then by that time I knew there was nothing missing.

16      Q.   Let's get to those in a second.  I wanted to

17   ask you about the other cleaning receipts that are in

18   here beginning on the stamped page 64.  It's

19   ROSEN,M (OLF) - 00064.

20      A.   These are all clothes.

21      Q.   That's right.  These are dry-cleaning for

22   clothes; is that right?

23      A.   Uh-huh.

24      Q.   And I think, if you look at the handwritten

25   note on page 66, it says that there are also some

Case 2:09-md-02047-EEF-MBN  Document 22363-39  Filed 11/19/19  Page 2817 of 3246
Case 1:1-2-cv-XXXXXXXXXX Document 29821 Entered on FLSD Docket 05/19/2017 Page 47 of
32
Confidential - Subject to Further Confidentiality Review

```
 1   pillows?

 2        A.   Okay.  Maybe.  I don't recall.

 3        Q.   Did you end up keeping the clothes that were

 4   dry-cleaned and the pillows perhaps that were

 5   dry-cleaned from these different invoices and receipts?

 6        A.   I don't recall.  However, I'll say some of the

 7   stuff, like, it doesn't really tell you what they are,

 8   so I can't tell you exactly.  "One black leather."  I

 9   don't know.  None of this makes any sense to me 10 years

10   later.

11        Q.   I had some discussion with your husband about

12   the televisions that were replaced and purchased.  Do

13   you have any thoughts on what happened with all of

14   those?

15        A.   Yeah.  I just think we only have two receipts

16   because two of them didn't work.

17        Q.   How many televisions did you have in the

18   Middlebrook Way home?

19        A.   I think we kept two or three and we discarded

20   two and asked for two.  We didn't ask for anything that

21   we didn't -- if we kept it, we didn't ask you for it.

22        Q.   Completely understand.  I just wanted to

23   clarify.

24        A.   Right, I know, but that makes sense; correct?

25   Two and -- we only -- two didn't work, so two we
```

Confidential – Subject to Further Confidentiality Review

1    replaced.

2       Q.   So the receipts that we see for Best Buy are

3    the two replacement televisions that you bought?

4       A.   Yes.

5       Q.   Let's go to the interior design book that we

6    were looking at earlier.  You were telling me about the

7    checkmarks.

8       A.   Yes.

9       Q.   I wanted to ask you specifically about which

10   items, if any, you brought with you to the homes that

11   you lived in subsequently across these different

12   invoices.

13      A.   Okay.

14      Q.   That begins on the stamped page 85 and goes, I

15   believe, all the way to the end of the exhibit.

16      A.   Okay.  Oh, God.  The chandelier was left in.

17      Q.   I'm sorry.  Can you say that again?

18      A.   The first page.  The chandelier was left there.

19   Do you want to go through every single page?

20      Q.   I think it would be good to get some

21   clarification on it.

22      A.   Okay.  Go ahead.

23      Q.   So the chandelier was left at the house; is

24   that right?

25      A.   Uh-huh.

Confidential - Subject to Further Confidentiality Review

```
 1        Q.   That's on page 85?

 2        A.   Yes.

 3        Q.   On page 86, there's wallpaper listed.  Was that

 4   left at the house?

 5        A.   Yes.

 6        Q.   Going on to page 87, there's bronze hardware

 7   for living room, linens, unlined side panels.  Do you

 8   see that first item?  Do you know what that is?

 9        A.   Yes.  Those are window treatments.  They were

10   left.  Yes.

11        Q.   The next one also appears to be window

12   treatments?

13        A.   Yes.

14        Q.   And that was for $1,872?

15        A.   Yes.  I'm going to say this clear.  All the

16   window treatments, all the wallpaper definitely were

17   left, so the past two pages, and the next one, the

18   carpeting was thrown out in the garbage can.

19        Q.   So the carpeting on page 88 was thrown out; is

20   that right?

21        A.   Yes.  89.  Thrown out.

22        Q.   Maybe, to make this easier to create a cleaner

23   record for it, if you can look through the remaining

24   pages and tell me which items, if any, you took with

25   you --
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/10 Page 2820 of 3246
Case 2:09-cv-02047-MCA-LDW Document 3121 Entered on FLSD Docket 05/18/2010 Page 45 of 32
Confidential – Subject to Further Confidentiality Review

```
 1      A.    Sure.

 2      Q.    -- and that way we can make this easier.

 3      A.    Makes me sick to my stomach.

 4            Place mats.  We took the 12 place mats on page

 5      107.

 6            When you were talking about pitted, these

 7      light -- remember the lamps on either side of our bed

 8      were completely pitted?  So there were things that were

 9      pitted from the -- I just saw that and that reminded me

10      of that.

11      Q.    Which page are you looking at?

12      A.    On page 132.  All the lamps, though, all the

13      silver lamps were pitted and were thrown out.

14            We have this in the garage.  That martini table

15      on page 181, it's still sitting in my garage.  We never

16      used it.  You want it back?  You can have it.  It's a

17      hundred and -- there's two of them.  They're sitting

18      both in my garage.

19            This sideboard we tried to keep, and then

20      there's another receipt for silver hardware.  It just

21      couldn't -- then the screws looked like it had Chinese

22      drywall and we had to get rid of it.  But there's

23      another receipt for Turkell & Gervis, and it says

24      "silver hardware" on that page 14 -- where's that

25      other -- this one.
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2821 of 3246
Case 2:09-cv-09040-EEF-MBN Document 20731-21 Filed 05/06/19 Page 16 of 32
Confidential - Subject to Further Confidentiality Review

```
 1      Q.   You're looking at Exhibit 11.

 2      A.   "Replacement of sideboard due to" -- this one,

 3   this is the silver hardware.  We tried to fix this, and

 4   we couldn't.  So it got delivered to our rental, but we

 5   couldn't get the -- the actual hinges they couldn't

 6   replace, they only could replace the handles, so the

 7   hard -- the actual hinges were still black and now the

 8   new handles were silver.  So we bought new hardware, but

 9   we couldn't get the piece of furniture to look right.

10   So that's that one.

11      Q.   So you were referring to --

12      A.   183.

13      Q.   -- page 183 when you were talking about the

14   sideboard, and then we went back to Exhibit 11, there

15   was an item on there for repair.

16      A.   We tried to repair it.

17      Q.   And that was for an item for $199.13 for that

18   repair on the chart on Exhibit 11.

19      A.   10 years later, it's all coming back to me.  I

20   was wondering what that was.  It just came to me.

21           Okay.  That's it.

22      Q.   So you didn't see any other items that you took

23   with you in --

24      A.   No.  We tried, and then it just didn't work,

25   like I said.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2822 of 3246
Case 2:09-md-02047-EEF-MBN Document 21641-21 Filed 09/04/18 Page 49 of 32
Confidential - Subject to Further Confidentiality Review

1      Q.   So otherwise the items were --

2      A.   We left it out there, because people pilfered

3  and took stuff off the street, but we did leave it out.

4      Q.   So some items you left out on the street --

5      A.   Uh-huh.

6      Q.   -- and people might have taken them?

7      A.   I just want you to know we were distraught.

8  Okay?  Two children living in that house.  We still

9  don't know what the ramifications are.  I couldn't get

10  pregnant in that house.  I got pregnant two months after

11  I moved out of that house.  Okay?  It was a very

12  distraught time in our lives.

13      Q.   We talked a little bit earlier about the smell

14  in the house.  Did you ever notice the smell in the

15  house?

16      A.   You know, the only time I noticed it is if we

17  went away for a long period of time, like on a vacation,

18  and the day we'd come back, because we turned the air

19  up.  When it got warmer in there, you smelled it.  So

20  then we'd come home and put down the air because we were

21  home, and you'd forget about it, but I definitely --

22  every time we'd go away and turn up the air, I'd smell

23  something, but I never would say anything, because I

24  just thought I was crazy.

25      Q.   Did you ever have any respiratory issues while

```
 1   you lived in the house?

 2        A.   I don't, and I don't have respiratory issues,

 3   but like I said, I had -- I definitely feel like I

 4   couldn't get pregnant in that house, I had a miscarriage

 5   in that house, but two months after I moved out I was

 6   pregnant, and I have a daughter, who's eight, to prove

 7   it.

 8        Q.   Did you ever have a doctor tell you that the

 9   environment you were living in might be contributing to

10   that?

11        A.   He said he didn't know.  He thought it was

12   definitely interesting that, you know, both my boys were

13   conceived before that home as well.

14        Q.   Did your children have any health issues that

15   you think were associated with Chinese drywall?

16        A.   One of my sons had some skin irritations, which

17   left him scarred, but besides that, that's the only

18   thing we have.

19        Q.   So you had skin irritation that started when

20   you lived in the house?

21        A.   Yes.

22        Q.   And there's still scarring from that?

23        A.   Uh-huh.

24        Q.   And he didn't have the scarring -- excuse me.

25   He didn't have the irritation before?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2824 of 3246
Case 1:1-cv-22408-MGC Document 306-21 Entered on FLSD Docket 05/08/2014 Page 40 of 32

Confidential - Subject to Further Confidentiality Review

```
1        A.    No.

2        Q.    Have you ever had a doctor tell you that they

3    thought that that was related to Chinese drywall?

4        A.    Our pediatrician just said it was some form of

5    eczema.

6        Q.    Have any of your other children had eczema?

7        A.    No, but we know other family members that

8    have -- friends that have Chinese drywall who had very

9    bad eczema from the drywall as well.

10       Q.    Do you know when the homebuilder that built the

11   home on Middlebrook Way sent someone out to inspect the

12   home, that Gavin came out to inspect the home?

13       A.    What I remember is they sent out a letter to

14   every homeowner and said "if you think you have it."  So

15   they wouldn't tell you.  They said you could call.  So

16   the original -- originally we called and we said we'd

17   like someone to come out, and Gavin came out and said we

18   didn't have it.

19             And then -- and our house -- but our house was

20   already for sale before those letters came out.  To be

21   clear, we weren't selling our house because we thought

22   we had Chinese drywall.  We were selling our house

23   because we wanted to move into a country club community,

24   which we thought we didn't want and then we decided we

25   wanted.
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2825 of 3246
Case 1:11-cv-22408-MGC Document 208-321 Entered on FLSD Docket 05/16/2012 Page 40 of 32
Confidential - Subject to Further Confidentiality Review

1          And when he came out, he said we didn't have

2    it, and we just wanted -- we hired a company to prove

3    that we didn't so we had it on the table if someone came

4    to look at our house, it was to say, "Hey, we're free

5    and clear.  If you want to live in The Oaks because it

6    has a school district and because it's this, here, you

7    don't need to pay for it.  We paid for it."  But when

8    they came, it was inconclusive, and that's what

9    happened.  They came in and said, "You definitely have

10   it."

11       Q.   When you had the homebuilder who built your

12   subsequent home come out to inspect, they said it was

13   inconclusive or they said that you had it?

14       A.   No, he said it was inconclusive, and then when

15   that other company came, they confirmed it.

16       Q.   When you said the "other company," was that the

17   Yanes?

18       A.   Yanes.

19       Q.   Yeah, whatever that name was.  Yeah, okay.  And

20   that would be an inspection?

21       A.   And they did air samples as well.

22       Q.   Got it.  So that Yanes company confirmed that

23   you had Chinese drywall?

24       A.   Yes.

25       Q.   What other, if any, appliance issues did you

Confidential - Subject to Further Confidentiality Review

1    have in the house?

2        A.    We had air conditioning.  I feel as though we

3    had issues where one was compensating for another so we

4    kept on having, like, overheating, like, where it would

5    leak because the pan would get full and such.

6        Q.    So the air conditioning had issues that you had

7    to have repaired; correct?

8        A.    Yes.  I think there was one -- we listed one,

9    Tech Air.

10       Q.    Yes, there are some air conditioning receipts

11   for repair.  Were there any other appliances that had

12   issues while you lived in the house that you think were

13   related to Chinese drywall?

14       A.    We might have had a dryer.  I think the dryer

15   definitely was -- pieces were replaced from the dryer,

16   because the dryer was the closest to the air handler as

17   well.  I didn't put that -- we didn't have -- like my

18   husband said, there's plenty of things that I could sit

19   here -- I didn't have receipts for.  I didn't know.

20       Q.    And we talked about the televisions.

21       A.    Yes.

22       Q.    Were there any other electronic items that you

23   think were damaged by Chinese drywall?

24       A.    I definitely remember -- actually, you're going

25   to -- we had an audio system, and I remember in the

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2827 of 3246 of
Case 1:11-cv-22408-MGC Document 236-21 Entered on FLSD Docket 05/06/2013 Page 29 of
32
Confidential - Subject to Further Confidentiality Review

```
 1    family room, it would always go on the blink.  Right?

 2    It would just turn on randomly, turn off.  So at the

 3    time, if you go back and think about weird things that

 4    happened, the audio system was always, like, on the

 5    fritz.  Like, it would randomly -- like, the TV wouldn't

 6    be on, but the TV would turn on underneath, like, the

 7    audio.  It was underneath in a console.  So, yeah, and

 8    we didn't bring any of that with us either.

 9        Q.   Did you enjoy living in your home before you

10    knew that there was Chinese drywall in it?

11        A.   Yes.  I put my heart and soul in that house.

12    It's, like, my first real house we built.  Put

13    wallpaper.  Brought my children home to that home.  So,

14    yes, I definitely did, and I wanted someone else to

15    enjoy it.  You know, when we sold the house before that,

16    we left champagne for them and we were, like, "Enjoy

17    this house as much" -- we moved into The Oaks because of

18    the school district.  We wanted that school and we

19    thought it would be a nice -- where we were living was

20    like a D-rated school.  We moved there before we had

21    kids, so we didn't look into the schools.  So we moved

22    into The Oaks because of the A-rated schools.

23            And we wanted -- when we were moving out, we

24    were just, like, someone else is going to enjoy it as

25    much as us, but we're going to move to where I play
```

```
 1    tennis three or four days a week and we wanted a

 2    different lifestyle.  Like, I didn't want it to end up

 3    this way.

 4        Q.   Was the new home that you were having built in

 5    the country club in the same school district?

 6        A.   Well, what -- no.  Yeah, yeah.  Yes.  Sorry.

 7    Yes.

 8        Q.   And you had decided to move there because it

 9    was in a country club community where you could play

10    tennis and golf; is that right?

11        A.   Yes.

12        Q.   Do you know if you ever received a written

13    offer for your home when it was put up for sale before

14    you knew there was Chinese drywall?

15        A.   No, we never did.

16        Q.   Did you own any other properties at the time

17    that you owned the Middlebrook Way home?

18        A.   No.

19        Q.   Do you know when you bought the condo that your

20    husband was discussing earlier?

21        A.   Yes.  We bought it.  My mother lives in it.

22    It's for my mother.  We were living -- we were living in

23    our last house, because I remember I was sitting down

24    with my mother.  My mother was in financial distress,

25    and we didn't know, so that's why I bought her that, and
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2829 of 3246
Case 2:14-cv-02722-MCA Document 25-21 Filed 03/21/21 Page 40 of 32
Confidential - Subject to Further Confidentiality Review

1    I bought it in my trust.

2        Q.   Do you know when that was?

3        A.   2010, maybe, 2011.  And I bought it with money

4    from my father's passing.

5        Q.   We talked a little bit about the rental

6    payments that you made on the rental home that you moved

7    into after you moved out of the Middlebrook Way house.

8    Do you know if there are any other receipts or proof of

9    payment for the payments that you made while you lived

10   in that house that have not been submitted to your

11   attorneys?

12       A.   I don't know.

13       Q.   Do you know when you first listed your house on

14   Middlebrook Way for sale in 2009?

15       A.   It's so long ago.  Sorry.

16       Q.   Do you know about for how long it was listed?

17   If you don't know when, do you know about how many

18   months it was listed for before you found out there was

19   Chinese drywall?

20       A.   A few, couple, just because I'm thinking about

21   the time frame of when we bought the land that we built

22   the house in Woodfield.  So we bought the house, the

23   land, land, maybe six months before that.  So -- because

24   the house was ready eight months after that.  I think

25   the house was up for sale maybe three months before the

Case 2:09-md-02047-EEF-MBN Document 23263-39 Filed 11/19/19 Page 2830 of 3246
Case 2:09-md-02047-EEF-MBN Document 23263-21 Entered on FLSD Docket 05/09/2019 Page 46 of
32
Confidential – Subject to Further Confidentiality Review

1    Chinese drywall, four.

2        Q.   We talked a little bit earlier about your dog

3    that passed away.  Do you remember the timeline of when

4    that happened?

5        A.   She passed away August 2010 I know for a -- I

6    know that's when she died.

7        Q.   So that was a year after you moved out of the

8    house?

9        A.   Right.  She was sick from, like, six months

10   after we moved in there, and they couldn't figure it

11   out, and then finally they said it was respiratory and

12   congestive heart failure from breathing.

13       Q.   Do you recall whether you paid a security

14   deposit on the rental home that you lived in?

15       A.   It says it right here on the back page.

16   "Deposit."

17       Q.   That's right.  So if you look at Exhibit 15, on

18   the last page there's a carbon copy that has "deposit"

19   listed on the final page of that exhibit; is that right?

20       A.   Yep.

21       Q.   And the amount of that deposit was how much?

22       A.   $5,200.

23       Q.   And was that the amount that you paid to them

24   for the security deposit on the home?

25       A.   Yes.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2831 of 3246
Case 1:1-md-02047-EEF-MBN Document 21821 Entered on FLSD Docket 05/13/2019 Page 29 of
32
Confidential - Subject to Further Confidentiality Review

```
 1      Q.   And did you get that money back?

 2      A.   No.

 3      Q.   Why did you not get the money back?

 4      A.   Because I think -- don't -- don't quote me, I

 5   was going to say, but I think it was the last month's

 6   rent.  I think he let us give it to him as the last

 7   month after we -- I think that's what we agreed to.

 8      Q.   So that paid the last month that you lived in

 9   the house?

10      A.   I think so.

11      Q.   So you lived in the rental home from --

12      A.   I think it's eight months.  I feel like we

13   moved out in April and my daughter was due in May.  I

14   was pregnant.  I was pregnant in that house and I

15   moved -- and I brought the baby home in the new house.

16      Q.   So you think you might have moved in around

17   August 2009; right?

18      A.   August to September, September to October,

19   October to November -- eight months.  I think it was

20   eight months.  So would that make sense with these

21   payments?

22      Q.   Well, we were discussing earlier there are some

23   months where there doesn't appear to be a payment, but I

24   just wanted to understand the timeline.

25      A.   Hold on.
```

```
 1          MR. GUERRA:  While she's reviewing it, for the

 2      record, we are looking at Exhibit 13, not 15; is

 3      that right?

 4          THE WITNESS:  Yes, 13.

 5  BY MR. LAWSON:

 6      Q.   That's right, it's Exhibit 13.

 7      A.   So we're missing February, March, and April.

 8  Right?  So I think that could have been April.  We're

 9  missing two payments.

10      Q.   You believe you lived in the rental house in

11  February of 2010 and March of 2010?

12      A.   Yeah, and moved out April.

13          MR. LAWSON:  I don't think I have anything

14      further at this time.

15          MS. RICO:  Anybody?

16          MR. GUERRA:  Nothing here.

17          MS. RICO:  Nothing.

18          (Whereupon, the deposition concluded at

19   4:10 p.m.)

20

21

22

23

24

25
```

```
 1                    C E R T I F I C A T E

 2

 3          I, JOAN L. PITT, Registered Merit Reporter,

 4    Certified Realtime Reporter, and Florida Professional

 5    Reporter, do hereby certify that, pursuant to notice,

 6    the deposition of ROBYN ROSEN was duly taken on

 7    January 9, 2019, at 3:38 p.m., before me.

 8          The said ROBYN ROSEN was duly sworn by me

 9    according to law to tell the truth, the whole truth, and

10    nothing but the truth, and thereupon did testify as set

11    forth in the above transcript of testimony.  The

12    testimony was taken down stenographically by me.  I do

13    further certify that the above deposition is full,

14    complete, and a true record of all the testimony given

15    by the said witness.

16

17    _____

18          JOAN L. PITT, RMR, CRR, FPR

19

20          (The foregoing certification of this transcript

21    does not apply to any reproduction of the same by any

22    means, unless under the direct control and/or

23    supervision of the certifying reporter.)

24

25
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2834 of 3246
Case 1:09-cv-02047-MCA Document 2021 entering on FS docket 05/08/2019 Page 49 of
32
Confidential - Subject to Further Confidentiality Review

```
 1                      INSTRUCTIONS TO WITNESS

 2

 3

 4           Please read your deposition over carefully and

 5    make any necessary corrections.  You should state the

 6    reason in the appropriate space on the errata sheet for

 7    any corrections that are made.

 8

 9           After doing so, please sign the errata sheet

10    and date it.  It will be attached to your deposition.

11

12           It is imperative that you return the original

13    errata sheet to the deposing attorney within thirty (30)

14    days of receipt of the deposition transcript by you.  If

15    you fail to do so, the deposition transcript may be

16    deemed to be accurate and may be used in court.

17

18

19

20

21

22

23

24

25
```

Confidential - Subject to Further Confidentiality Review

```
 1                        - - - - - -

 2                      E R R A T A

 3                        - - - - - -

 4      PAGE    LINE     CHANGE

 5      _____   _____    _____

 6         REASON: _____

 7      _____   _____    _____

 8         REASON: _____

 9      _____   _____    _____

10         REASON: _____

11      _____   _____    _____

12         REASON: _____

13      _____   _____    _____

14         REASON: _____

15      _____   _____    _____

16         REASON: _____

17      _____   _____    _____

18         REASON: _____

19      _____   _____    _____

20         REASON: _____

21      _____   _____    _____

22         REASON: _____

23      _____   _____    _____

24         REASON: _____

25
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2836 of 3246
Case 1:1-cv-22408-MGC Document 26-21 Entered on FLSD Docket 05/09/2019 Page 41 of
32
Confidential - Subject to Further Confidentiality Review

```
1              ACKNOWLEDGMENT OF DEPONENT

2

3        I, _____, do hereby

   acknowledge that I have read the foregoing pages and

5  that the same is a correct transcription of the answers

6  given by me to the questions therein propounded, except

7  for the corrections or changes in form or substance, if

8  any, noted in the attached Errata Sheet.

9

10

11  _____  _____

12  ROBYN ROSEN                            DATE

13

14

15

16

17  Subscribed and sworn to before me this

18  _____ day of _____, 20____.

19  My Commission expires: _____

20

21  _____

    Notary Public

22

23

24

25
```

```
 1                          LAWYER'S NOTES

 2      PAGE    LINE

 3      _____   _____   _____

 4      _____   _____   _____

 5      _____   _____   _____

 6      _____   _____   _____

 7      _____   _____   _____

 8      _____   _____   _____

 9      _____   _____   _____

10      _____   _____   _____

11      _____   _____   _____

12      _____   _____   _____

13      _____   _____   _____

14      _____   _____   _____

15      _____   _____   _____

16      _____   _____   _____

17      _____   _____   _____

18      _____   _____   _____

19      _____   _____   _____

20      _____   _____   _____

21      _____   _____   _____

22      _____   _____   _____

23      _____   _____   _____

24      _____   _____   _____

25
```

# EXHIBIT A33

Case 2:09-md-02047-EEF-MBN Document 22363-20 Filed 11/19/19 Page 2839 of 3246
Case 1:11-cv-22408-MGC Document 209-31 entered on FLSD Docket 05/30/2019 Page 2 of
181
Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2              Case No. 1:11-CV-22408-MGC
 3    -------------------------------§
      EDUARDO AND CARMEN AMORIN et      §
 4    al., individually, and on behalf §
      of all others similarly          §
 5    situated,                        §
                                       §
 6       Plaintiffs,                   §
                                       §
 7    vs.                              §
                                       §
 8    TAISHAN GYPSUM CO., LTD. F/K/A    §
      SHANDONG THAIHE DONGXIN CO.,      §
 9    LTD.; TAIAN TAISHAN PLASTERBOARD §
      CO., LTD., et al,                §
10                                     §
         Defendants.                   §
11    ------------------------------- §
       - - -
12

                                  - - -
13
                       TUESDAY, DECEMBER 11, 2018
14
                                  - - -
15
                  Confidential - Subject to Further
16                     Confidentiality Review
17                          - - -
18         Deposition of LARRY WALLS, held at Morgan &
      Morgan, 12800 University Drive, Suite 600, Fort
19    Myers, Florida, commencing at 9:37 a.m., on the
      above date, before Kelly J. Lawton, Registered
20    Professional Reporter, Licensed Court Reporter,
      and Certified Court Reporter.
21
                                  - - -
22
                  GOLKOW LITIGATION SERVICES
23         877.370.3377 ph | 917.591.5672 fax
                     deps@golkow.com
24
```

Case 2:09-md-02047-EEF-MBN Document 22363-20 Filed 11/19/19 Page 2840 of 3246
Case 1:13-cv-06452 Document 293-1 Entered on FLSD Docket 05/08/2019 Page 9 of 181
Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2    MORGAN & MORGAN
      BY:  PANAGIOTIS "PETE" V. ALBANIS, ESQUIRE
 3    12800 University Drive, Suite 600
      Fort Myers, Florida 33907
 4    (239) 433-6880
      palbanis@forthepeople.com
 5    Representing Plaintiff
 6
      LEVIN, SEDRAN & BERMAN, LLP
 7    BY:  KEITH J. VERRIER, ESQUIRE
      510 Walnut Street, Suite 500
 8    Philadelphia, Pennsylvania 19106
      (215) 592-1500
 9    kverrier@lfsblaw.com
      Representing Plaintiff
10
11    ALSTON & BIRD, LLP
      BY:  MATTHEW D. LAWSON, ESQUIRE
12    BY:  METHAWEE MANUPIPATPONG, ESQUIRE
      BY:  LARA TUMEH, ESQUIRE
13    One Atlantic Center
      1201 West Peachtree Street
14    Atlanta, Georgia 30309
      (404) 881-7000
15    matt.lawson@alston.com
      mae.manupipatpong@alston.com
16    lara.tumeh@alston.com
      Representing Taishan Gypsum Co., Ltd. and Tai'an
17    Taishan Plasterboard, Co., Ltd.
18
      GORDON, ARATA, MONTGOMERY, BARNETT
19    BY:  ALEX B. ROTHENBERG, ESQUIRE
      201 St. Charles Avenue, 40th Floor
20    New Orleans, Louisiana 70170
      (504) 582-1111
21    arothenberg@gamb.law
      Representing BNBM PLC
22
23
24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2841 of 3246
Case 1:13-cv-02408-NGG Document 189-31 Entered on FLSD Docket 05/07/2015 Page 4 of 181
Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:

 2        ABALLI MILNE KALIL

          BY:  JOSHUA D. POYER, ESQUIRE

 3        2250 SunTrust International Center

          One Southeast Third Avenue

 4        Miami, Florida 33131

          (305) 373-6600

 5        jpoyer@alalli.com

          Representing BNBM PLC

 6

 7    ALSO PRESENT:

 8        Rosalee Walls

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2842 of 3246
Case 1:18-cv-02408-WFK Document 28-1 Entered on FLSD Docket 05/08/2015 Page 5 of
181

Confidential - Subject to further confidentiality Review

```
 1                      - - -
                   I N D E X
 2                      - - -
 3   Testimony of:  LARRY WALLS
 4       DIRECT EXAMINATION BY MR. LAWSON...............
 4                                                        6
 5       CROSS-EXAMINATION BY MR. ALBANIS.............. 169
 6       CROSS-EXAMINATION BY MR. POYER................ 173
 7
 8
 9                   E X H I B I T S
10               (Attached to Transcript)
11   DEFENDANTS'                                      PAGE
12   Exhibit 1    Lee County Appraiser - Online        22
                  Parcel Inquiry - Property Data
13
     Exhibit 2    Warranty Deed                         27
14
     Exhibit 3    Aranda Homes, Inc. - Floor Plan       29
15
     Exhibit 4    Plaintiff Profile Form -              30
16                Residential Properties - Bates
                  Numbered Walls,L00001
17
     Exhibit 5    Supplemental Plaintiff Profile Form   63
18                - Residential and Commercial
                  Properties (Non-Knauf)
19
     Exhibit 6    Liberty Mutual Fire Insurance         82
20                Company - Residence Damage
                  Evaluation
21
     Exhibit 7    AirQuest Environmental, Inc. Report   93
22                - Bates Numbered ARI 01170 to ARI
                  01197
23
     Exhibit 8    Benchmark Remediation Group -         96
24                Report
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2843 of 3246
Case 1:13-cv-02408-NGG Document 28-31 Entered on FLSD Docket 05/28/2013 Page 46 of
181

Confidential - Subject to Further Confidentiality Review

```
 1                     E X H I B I T S

 2    DEFENDANTS'                                       PAGE

 3    Exhibit 9    Priority Claimant Larry Walls'        100
                   First Amended Answers to
 4                 Interrogatories

 5    Exhibit 10   Chinese Drywall Settlement Program    106
                   Miscellaneous Claim Form
 6
      Exhibit 11   Receipts and Photographs of           110
 7                 Miscellaneous Items

 8    Exhibit 12   Alternative Living Expenses           129

 9    Exhibit 13   American Home Mortgage Servicing      154
                   D.I.P. - Monthly Billing Statement
10                 and Check Copies

11    Exhibit 14   September 29, 2010 Letter from        157
                   Morgan & Morgan to American Home
12                 Mortgage Servicing, Inc.

13    Exhibit 15   October 18, 2010 Letter from Moss     158
                   Codilis, LLP to Larry and Rosalee
14                 Walls and Notice of Proposed
                   Property Taxes
15
      Exhibit 16   Final Judgment in Mortgage            161
16                 Foreclosure

17

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2844 of 3246
Case 1:14-cv-02408-NGG Document 3 Entered on FLSD Docket 05/02/2014 Page 41 of
181

Confidential - Subject to Further Confidentiality Review

1                         - - -

2              THE COURT REPORTER:  Sir, would you please

3          raise your right hand.

4              Do you swear or affirm that the testimony

5          you're about to give will be the truth, the whole

6          truth, and nothing but the truth?

7              THE WITNESS:  I do.

8              LARRY WALLS, called as a witness by the

9      Defendants, having been first duly sworn, testified

10     as follows:

11                     DIRECT EXAMINATION

12     BY MR. LAWSON:

13         Q.   Good morning.  Could you state your name for

14     the record.

15         A.   Larry Walls.

16         Q.   Mr. Walls, my name is Matt Lawson.  I'm an

17     attorney for Taishan Gypsum.  I want to thank you for

18     coming in today and answering some of my questions.

19             I just want to let you know at any time if

20     you need to take a break, please just let me know.

21         A.   Okay.

22         Q.   You are the boss here.  Let me know if at any

23     point you want to take a few minutes.

24             Now, do you understand you have been sworn to

Case 2:09-md-02047-EEF-MBN Document 22363-20 Filed 11/19/19 Page 2845 of 3246
Case 2:14-cv-02094-NGEI Document 00514 Interested Filed Uncutar 0540/2045 Page 19 of
181

1    tell the truth?

2        A.    Yeah.  I have nothing to lie about.

3        Q.    And just kind of as the rules of the road, so

4    that our court reporter here can transcribe our

5    statements, everything that I'm asking you,

6    everything that you're answering, let's make sure

7    that we don't talk over each other.  It makes it hard

8    for her to be able to type it all out.

9        A.    Okay.

10        Q.    So I will make sure to pause to let you

11    answer if you can also pause to let me finish my

12    questions.

13            And as we're going through today, let me know

14    if you don't understand the question that I'm asking

15    you.  I can rephrase it.  If anything isn't clear,

16    please just let me know.

17            You may hear objections from your attorney at

18    any point during the deposition.  If you do, please

19    wait to give your answer.  Unless he instructs you

20    not to answer a question, then I would ask you to

21    please answer the question as truthfully and as

22    completely as you can.

23            If -- is there any reason today that you

24    won't be able to answer questions?  Are you taking

Confidential - Subject to Further Confidentiality Review

```
 1    any medications or anything like that?

 2         A.    No, no.

 3         Q.    Did you meet with your lawyer prior to taking

 4    this deposition?

 5         A.    Yes, we did.

 6         Q.    And when did you meet?

 7         A.    Sunday.

 8         Q.    For about how long did you meet?

 9         A.    An hour, hour and a half.

10         Q.    And who was present at that meeting?

11         A.    Just me, my lawyer, and my wife.

12         Q.    And did you review any documents during that

13    time?

14         A.    Just documents, yeah.

15         Q.    Okay.  And to your knowledge, are there any

16    other documents that you have looked at that you know

17    have not been produced to defendants' counsel?

18         A.    As far as I know, my lawyer has all my

19    documents.  That's what I know.

20         Q.    All right.  Mr. Walls, are you currently

21    employed?

22         A.    Yes.

23         Q.    Where do you work?

24         A.    A & S Transportation.
```

Confidential - Subject to Further Confidentiality Review

```
 1        Q.    And can you tell me about that?

 2        A.    I drive the school bus.  I drive -- I pick up

 3    the smart kids up here at Northwest and take them to

 4    college over here.

 5        Q.    How long have you done that?

 6        A.    That job, probably about a year and a half.

 7        Q.    And what did you do prior to that?

 8        A.    I drove a school bus with my wife.

 9        Q.    And how long did you do that?

10        A.    A couple years.

11        Q.    Okay.  Have you had any other jobs during

12    your life?

13        A.    Railroad.

14        Q.    Okay.  What did you do at the railroad?

15        A.    I did repair, worked on cars, did car

16    inspections and all that.

17        Q.    All right.  Are you -- so how long have you

18    been married to your wife?

19        A.    I'm trying to think now.

20        Q.    Sorry to put you on the spot in a deposition.

21        A.    Fifteen years.

22        Q.    That's wonderful.  Congratulations.

23              And do you have any children?

24        A.    I have two.  Two sons.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2848 of 3246
Case 1:09-cv-07439-MGC Document 200-31 Entered on FLSD Docket 05/19/2017 Page 41 of
181

Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.  How old are they?

2      A.    47 and 45, I think.

3      Q.    That will conclude the test portion of today,

4    and I won't tell anybody about that.  I apologize.

5            Have you ever been involved in a lawsuit

6    before this one?

7      A.    Lawsuit?  Explain what you mean.

8      Q.    Yeah.  Have you ever had a legal claim filed

9    on your behalf?

10     A.    Yes.

11     Q.    Where -- what is that?

12     A.    I was injured at the railroad.

13     Q.    Okay.  And when was that?

14     A.    I forget.  I don't remember now.

15     Q.    Okay.

16     A.    2000 -- let's see.  1990-something.  '96,

17   '98.

18     Q.    And what was the result of that lawsuit?

19     A.    I won the case.

20     Q.    Okay.  And did you receive money for your

21   injuries?

22     A.    Yes.

23     Q.    What injury did you suffer?

24     A.    My shoulder.  They put me out of work.  A

Case 2:09-md-02047-EEF-MBN Document 23263-39 Filed 11/19/10 Page 2849 of 3246
Case 1:09-md-02047-EEF-MBN Document 23263-39 Filed 11/19/10 Page 42 of
181

Confidential - Subject to Further Confidentiality Review

```
 1    Canadian company bought us out, said draw your rail

 2    retirement.  So I got to go to another lawyer, and I

 3    got damages for it.  I got a settlement for it.

 4         Q.   Have you ever been in a deposition before?

 5         A.   Yes.

 6         Q.   Okay.  Was it related to that railroad case?

 7         A.   Yes, it was.

 8         Q.   Have you ever been involved in any other

 9    lawsuits or legal claims other than this one?

10         A.   No, no.

11         Q.   What is the address of the property that you

12    allege has been damaged by Chinese drywall in this

13    case?

14         A.   2510 Van Buren.

15         Q.   And how many bedrooms are in that property?

16         A.   There are four bedrooms.

17         Q.   And how many bathrooms?

18         A.   Three bathrooms.

19         Q.   When did you first purchase that property?

20         A.   2006.  My wife owned the property before

21    that.

22         Q.   Was there a new home built on the property at

23    that time in 2006?

24         A.   We had a new home built.
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2850 of 3246
Case 1:11-cv-22408-MGC Document 239-31 Entered on FLSD Docket 05/19/2015 Page 43 of
181
Confidential - Subject to Further Confidentiality Review

```
1    Q.   Okay.  So was the property empty prior to
2    2006?
3    A.   Yes, it was.
4    Q.   Okay.  So your wife purchased the property
5    prior to 2006?
6    A.   Yes, she did.
7    Q.   But around 2006, a home was built on the
8    property?
9    A.   That is correct.
10   Q.   And I'm sorry, just so we don't talk over
11   each other, if we can just have a pause when I ask
12   you things.
13        Who did you work with to build the
14   property -- to build the home on your property?
15   A.   Aranda Homes.
16   Q.   Okay.  And do you know where they are
17   located?
18   A.   I'm trying to remember.  It was in
19   Cape Coral.  I don't remember the address for the
20   office.
21   Q.   That's fine.
22        How much did you pay for Aranda Homes to
23   build the home on your property?
24   A.   It was 305 -- $305,000.
```

Confidential - Subject to Further Confidentiality Review

```
 1        Q.    And did you finance that purchase?

 2        A.    My wife, yeah.

 3        Q.    Your wife did?

 4        A.    My wife started the home before I got with

 5    her.  She got the house.  She started the house being

 6    built.

 7        Q.    Okay.  And do you know if there was a

 8    mortgage on that property?

 9        A.    I don't know.

10        Q.    Okay.  Do you own any other properties or

11    homes?

12        A.    Yes.  We own a condo.

13        Q.    Okay.  And where is that condo located?

14              North Fort Myers.

15        Q.    What is the address?

16        A.    14 -- let me think -- 1415 -- I'm trying to

17    think.  Don't remember.

18        Q.    That's okay.

19              Do you live there currently?

20        A.    No, no.

21        Q.    Okay.  Where do you live?

22        A.    I live at 1206 Northwest 37th Place,

23    Cape Coral, Florida 33993.

24        Q.    And do you own that property?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2852 of 3246
Case 1:09-cv-09049-GEL Document 23183-1 entered on FLSD Docket 05/09/2012 Page 45 of
181

Confidential - Subject to Further Confidentiality Review

```
 1        A.   We own the property, yes, we do.

 2        Q.   Is that a home?

 3        A.   It's a home.

 4        Q.   So the condo that you own that you were

 5   discussing in Fort Myers, how long have you owned

 6   that property?

 7        A.   My wife's owned it for -- I don't remember

 8   when she said she bought it.  I don't know.

 9        Q.   Have you ever lived there?

10        A.   No.

11        Q.   Do you rent out that condo?

12        A.   Yes.

13        Q.   Okay.  How long have you rented it out?

14        A.   It's been rented before.  The guy was renting

15   it died.  Now there's somebody else in there now.

16        Q.   Okay.  Do you have any idea of how long that

17   you've rented it out?

18        A.   You would have to ask my wife about that.

19        Q.   Has anyone else lived in the property at

20   Van Buren Parkway since the home was built in 2006

21   other than you and your wife?

22        A.   Just me and the wife.

23        Q.   Okay.  No one else?

24        A.   Nobody else is with us, no.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2853 of 3246
Case 1:11-cv-02349-GLR Document 26931 Unredacted Subject to further Confidentiality Review Page 46 of
181
Confidential – Subject to Further Confidentiality Review

1      Q.    What about the home that you currently live

2    in, has anyone else lived in that home since you have

3    owned it?

4      A.    Well, before -- her other husband lived with

5    her.

6      Q.    Okay.  And have you ever rented out that home

7    that you currently live in?

8      A.    Yes, it was rented.

9      Q.    How long was it rented for?

10     A.    I really don't know.

11     Q.    Okay.  Would you say more than a year?

12     A.    Yeah.  Yes.

13     Q.    More than three years?

14     A.    Maybe.

15     Q.    All right.  And when did you move into the

16   home that you're currently living in?

17     A.    It was 2010.

18     Q.    And you moved out of the Van Buren Parkway

19   home into the 37th Place home?

20     A.    Correct.

21     Q.    Is that right?

22           And do you remember exactly what month it was

23   in 2010 when you made that move?

24     A.    I'm thinking August.  I'm pretty sure August.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2854 of 3246
Case 1:11-cv-22408-MGC Document 206-31 Entered on FLSD Docket 05/09/2012 Page 47 of
181
Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Do you remember why you made that move at

 2   that time?

 3        A.   We had to.  We couldn't stay there no more.

 4        Q.   Why was that?

 5        A.   It got too bad.  Issues got too bad in the

 6   house.  We couldn't stay.  We wanted to stay.  We

 7   even thought about putting a tent out on the lanai

 8   and living in a tent.  But we just -- we just had to

 9   get out.

10        Q.   You were living in a tent outside of --

11        A.   We did not -- no, we didn't.

12        Q.   Oh, sorry.  I heard you wrong.

13             What did you say about a tent?

14        A.   We thought about it.

15        Q.   You thought about living in a tent?

16        A.   We thought about putting a tent up.

17        Q.   You lived in the home at Van Buren Parkway

18   from 2006 until 2010, maybe sometime around August;

19   is that right?

20        A.   I believe so, yeah.

21        Q.   Okay.  So for about four years?

22        A.   Yeah, about that time.

23        Q.   And did you live in the home for that entire

24   period of time without living anywhere else from 2006
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2855 of 3246
Case 1:09-cv-02042-HGD Document 298-31 Entered on FLSD Docket 05/19/2015 Page 18 of
181

Confidential - Subject to Further Confidentiality Review

```
 1    to 2010?

 2         A.   No.

 3         Q.   Did you live anywhere other than that at

 4    Van Buren Parkway?

 5         A.   No.

 6         Q.   Why didn't you move out of the home before

 7    2010?

 8         A.   Well, we had renters, for one thing, and we

 9    didn't want to leave the home.  We didn't want to

10    leave our home.  But it got to the point, we had to

11    leave our home.

12         Q.   Was there a change in the condition of the

13    home from 2006 to 2010 that made you want to leave

14    the home?

15         A.   Yes.

16         Q.   And what was that?

17         A.   We couldn't stand the smell.

18         Q.   Did the smell change from 2006 to 2010?

19         A.   Got stronger.

20         Q.   Okay.  And when did you notice that the smell

21    was getting stronger?

22         A.   You could tell.  It was getting stronger.  My

23    wife got sick.  The dog was getting sick.  The dog

24    died.  Took the dog to the vet.  That was about the
```

Confidential - Subject to Further Confidentiality Review

```
 1    first dog she had from Chinese -- that lived in a

 2    Chinese drywall house.

 3         Q.   When did you know you had Chinese drywall in

 4    your house?

 5         A.   I expected it before.  The house was

 6    inspected -- I'm trying to think -- about August in

 7    2009, it was confirmed we had Chinese drywall.

 8         Q.   What made you get the house inspected in

 9    2009?

10         A.   Because the smell.  It was on TV.

11         Q.   What was on TV?

12         A.   About Chinese drywall.

13         Q.   You saw a commercial about Chinese drywall?

14         A.   It was on the news.

15         Q.   And what did you see on the news about

16    Chinese drywall?

17         A.   How it was making people sick, leaving their

18    homes.

19         Q.   Was that the first that you had heard about

20    Chinese drywall?

21         A.   Yeah.  I didn't know.  At one time it said go

22    up to the attic and look.  I didn't see anything

23    about Chinese -- China -- you know, all the drywall

24    wasn't China.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2857 of 3246
Case 1:09-cv-02047-MGC Document 2081831 Entered on FLSD Docket 09/2019 Page 40 of
181
Confidential - Subject to Further Confidentiality Review

1      Q.   Prior to seeing that commercial on TV, had

2   you ever heard of Chinese drywall before that?

3            MR. ALBANIS:  Objection.  I think you

4        misstated his previous testimony.

5            But you can answer if you can.

6            THE WITNESS:  Not really.  I heard things

7        about it, but I never thought about it.

8   BY MR. LAWSON:

9      Q.   Did you ever have anyone come to your home

10   prior to 2009 to look into the issues that you were

11   having with the smell in your home?

12      A.   No.

13      Q.   What did you suspect that the smell was prior

14   to that?

15      A.   We always pull into the garage, and we have

16   well water out where we lived at.  We have it right

17   now where we live at.  We always went through the

18   laundry room.  My wife says, I smell sulfur.  I said,

19   it's probably the sprinkler system still, you know,

20   because when it goes off, it smells like sulfur.

21      Q.   During those years before you had your home

22   inspected, did you have any other issues in the home

23   other than the smell?

24      A.   Not really.  Just getting worse and worse,

Confidential – Subject to Further Confidentiality Review

1    and my wife was getting sick.  She would lay around,

2    says I don't feel good.

3           And finally we left the home for about a

4    month.  I forget what year that was.  Around 2009 or

5    so, I believe, or '08.  I don't remember.  Went to

6    Ohio.  We were gone for about a month and a half, and

7    we felt great.

8           Come back, been there for about a week, smell

9    the stuff, she's getting sick again.  I knew

10   something was wrong.  I was getting sick.  I felt

11   like I had allergies.  It was bad.

12      Q.   Did you or your wife ever go to a doctor

13   about the issues that your --

14      A.   I believe she -- I don't know for sure.  She

15   was sicker than I was.

16      Q.   Did you go to the doctor?

17      A.   No.  No, I didn't go, no.

18           MR. ALBANIS:  Larry, you have to wait for

19      Mr. Lawson to finish stating his question before

20      answering.  It will make the court reporter's

21      life much easier.

22           Sorry, Matt.

23           MR. LAWSON:  No problem.

24   ///

Case 2:09-md-02047-EEF-MBN Document 23263-39 Filed 11/19/10 Page 2859 of 3246
Case 1:09-md-02047-EEF-MBN Document 23263-39 Filed 11/19/10 Page 32 of 181
Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. LAWSON:

 2        Q.   This is a strange environment, asking

 3    questions with someone transcribing everything, so I

 4    understand.  But, yeah, if we can go slower, it would

 5    benefit everybody.

 6        A.   I'll try to slow down.

 7        Q.   I have to slow down, too, so it's okay.

 8             Did you ever consider removing the Chinese

 9    drywall from the home?

10        A.   I couldn't afford it.

11        Q.   Did you ever get a quote about how much it

12    would cost --

13        A.   I've heard --

14        Q.   I'm sorry, can I finish?

15             Did you ever get a quote to see how much it

16    would cost to remove the Chinese drywall from the

17    home?

18        A.   I think we did.  I don't remember.  I don't

19    remember.

20        Q.   But you think you did?

21        A.   I didn't really get a quote.  Just by talking

22    with different people.

23        Q.   And you felt that you could not afford it?

24        A.   No.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2860 of 3246
Case 1:19-cv-02346-XXX Document 28331 Exhibit 31-1 Sub-docket 20-1862 (19-0448) Page 2 of
181

1    Q.   Did you ever make any improvements to the

2    home on Van Buren Parkway before the 2010 expansions

3    to the home?

4    A.   No.

5    Q.   Okay.

6         (Defendants' Exhibit 1 was marked for

7    identification.)

8    BY MR. LAWSON:

9    Q.   Mr. Walls, you have been handed what has been

10   marked as Exhibit 1.

11        Have you ever seen this document before?

12   A.   It's the same house, but they painted it.

13   Q.   When you say "it's the same house," what do

14   you mean?

15   A.   It's the same house, but it's been painted

16   and looks, you know . . .

17   Q.   I'm sorry.  This is the Van Buren Parkway

18   home that you owned previously; is that right?

19   A.   I'm trying to see.  Yeah.

20   Q.   So, Mr. Walls, I represent that this is a Lee

21   County property appraiser online parcel inquiry from

22   the Lee County website.

23        Do you see that?

24   A.   Yeah.

Confidential - Subject to Further Confidentiality Review

```
 1        Q.   And this document contains data and

 2   information about a property at 2510 Van Buren

 3   Parkway.

 4             Do you see that highlighted at the first page

 5   of the document?

 6        A.   Up here?

 7        Q.   Yes.

 8             And have you looked at one of these parcel

 9   inquiry documents before --

10        A.   No.

11        Q.   -- from the County?

12        A.   No.

13        Q.   Okay.  I'd like to turn your attention to the

14   third page of this document, specifically looking at

15   the highlighted portions on the third page in the

16   middle.

17             Do you see those?

18        A.   Okay.

19        Q.   Do you see them?

20        A.   Yeah.

21        Q.   On the lowest line, the final one that is

22   highlighted, shows a sale price of $25,000.

23             Do you see that line?

24        A.   Okay.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2862 of 3246
Case 1:09-md-02047-EEF-MBN Document 23038-1 Exhibit on File by Docket 02/16/2012 Page 45 of
181

Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Is that a yes?  Do you see that line?

 2      A.   Yeah.

 3      Q.   And it shows the date of March 11th, 2002.

 4           Do you see that?

 5      A.   Okay.

 6      Q.   Is it -- does it sound right to you that your

 7  wife may have purchased the land for the Van Buren

 8  Parkway home around March of 2002?

 9      A.   Yeah.

10      Q.   Okay.  And for around $25,000?

11      A.   Probably, yeah.

12      Q.   All right.  Moving up to the next line,

13  there's $0 sale price from October of 2004.

14           Do you see that line?

15      A.   Okay.

16      Q.   Do you have any sense of what that might be

17  about?

18      A.   No.

19      Q.   All right.  Moving up, there's a $100 sale

20  price in November of 2006 on the line above.

21           Do you see that?

22      A.   Yes.

23      Q.   Do you have any idea what that might be

24  about?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2863 of 3246
Case 1:09-md-02047-MCAL Document 25831 Entered on FLSD Docket 05/06/2019 Page 45 of
181

Confidential - Subject to Further Confidentiality Review

```
1        A.   No.

2        Q.   All right.  And then looking at the final

3   highlighted line, there's a sale price of $112,000 on

4   October of 2014.

5             Do you see that?

6        A.   Yeah.

7        Q.   And is that the foreclosure sale on the home

8   in October of 2014?

9        A.   It must -- it was, yeah.

10       Q.   Now, looking back down to the line with the

11  $100 sale price, it says:  Sales disqualified as a

12  price of examination of the deed.

13            Do you see that?

14       A.   Yeah.

15       Q.   Did you or your wife attempt to sell the

16  property around 2006?

17       A.   No.

18       Q.   Okay.  And that was around the time that you

19  moved into the property, right?

20       A.   Yeah.

21       Q.   Okay.  And you would have moved in around

22  October/November, sometime in the fall or so of 2006?

23       A.   Yes.

24       Q.   All right.  I'd like to turn your attention
```

```
1    to the sixth page of this document.  At the top of it

2    it says General Warranty Deed.

3              Do you see that?

4       A.    Yeah.

5       Q.    Does it look correct to you that this would

6    be the sale of the land to your wife around March of

7    2002 for the Van Buren Parkway home?

8       A.    Probably, yes.

9       Q.    Okay.  And turning your attention to the next

10   page, it's titled Certificate of Title with the date

11   of October 28th, 2014.

12             Do you see that page?

13      A.    Okay.

14      Q.    Does it look correct to you that this would

15   be a document showing the transfer of the title of

16   the Van Buren Parkway to Deutsche Bank National Trust

17   Company on October 28, 2014?

18             MR. ALBANIS:  Object to form.

19             But you can answer.

20             THE WITNESS:  Yeah.

21   BY MR. LAWSON:

22      Q.    And that was as a result of the foreclosure

23   proceeding; is that correct?

24      A.    Yeah.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2865 of 3246
Case 1:09-cv-07687-CRC Document 20-131 Emphasized Supp. Decker 05/09/2019 Page 48 of
181

1      Q.   So around October of 2014 you no longer owned

2   the home on Van Buren Parkway; is that right?

3      A.   Yeah.

4      Q.   And during that time, you were living at the

5   home at -- is it 37th Place?  Is that right?

6      A.   That's correct.

7      Q.   And you had lived there for around four years

8   prior to that?

9      A.   Probably, yes.

10      Q.   Okay.

11         (Defendants' Exhibit 2 was marked for

12   identification.)

13   BY MR. LAWSON:

14      Q.   Mr. Walls, you have been handed a document

15   that's marked as Exhibit 2.

16         Let me know when you have had a chance to

17   review that document.

18         MR. ALBANIS:  There's also Page 2 on the

19      back.

20         MR. LAWSON:  That's correct.  It's

21      double-sided, so there's a second page behind it.

22   BY MR. LAWSON:

23      Q.   Mr. Walls, do you think you have seen this

24   document before?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2866 of 3246
Case 2:09-md-02047-EEF-MBN Document 20831 Confidential - Subject to Further Confidentiality Review
181

Confidential - Subject to Further Confidentiality Review

```
1      A.   I don't remember.

2      Q.   Okay.  Do you recognize what it is today

3  after reviewing it?

4      A.   No.  Not really, no.

5      Q.   Okay.  Does it look correct to you that this

6  is a warranty deed for the home at -- excuse me, for

7  the property at Van Buren Parkway?

8      A.   It should be.

9      Q.   And would -- would it sound correct to you

10  this would have been a transfer of the ownership of

11  the property from your wife to both you and your wife

12  around 2006 when you moved into the property at

13  Van Buren Parkway?

14      A.   It could be.

15      Q.   It could be; is that right?

16      A.   It could be, yeah.

17      Q.   So does it sound right to you that your wife

18  owned that property before 2006, but around 2006, you

19  jointly owned the property together?

20      A.   Yeah.

21      Q.   Okay.  Do you know the square footage of your

22  home?

23      A.   I don't remember.

24      Q.   Okay.  And I'm referring to the home on
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2867 of 3246
Case 2:09-cv-02098-MCA Document 26831 Entry 2831 Filed 10/04/10 Page 2867 of 3246
Confidential – Subject to Further Confidentiality Review
181

```
1    Van Buren Parkway --

2         A.    Yeah.

3         Q.    -- when I ask that.

4         A.    I don't remember, no.

5         Q.    Did you ever have anyone measure the square

6    footage of the home?

7         A.    I don't -- I can't recall.

8         Q.    Okay.  Do you know if there were ever any

9    changes to the square footage of the home from the

10   time that the home was built in 2006 until the time

11   that you sold the property?

12        A.    There was never no changes.

13        Q.    Okay.

14             (Defendants' Exhibit 3 was marked for

15   identification.)

16   BY MR. LAWSON:

17        Q.    Mr. Walls, you have been handed a document

18   that's been marked as Exhibit 3.

19             Have you ever seen this document before?

20        A.    Yeah.

21        Q.    Okay.  What is it?

22        A.    It's the floor plans of the house.

23        Q.    Is this the floor plan of the house that you

24   owned on Van Buren Parkway?
```

Case 2:09-md-02047-EEF-MBN  Document 22263-39  Filed 11/19/19  Page 2868 of 3246
Case 1:09-cv-02040-MGC  Document 43831 Entered on FLSD Docket 05/18/2012  Page 41 of
181

Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yeah.

 2        Q.    Does it look to be the floor plan of the

 3   house you lived in?

 4        A.    Yes.

 5        Q.    Do you know when you had reviewed this

 6   document or looked at it previously?

 7        A.    I think it was when it was being built.

 8        Q.    These are the specifications of the floor

 9   plan of that home on Van Buren Parkway?

10        A.    Yeah.

11        Q.    Looking in the right-hand corner of that

12   document, does the document state the living area,

13   square footage of the home?

14        A.    Yeah.  2,248.

15        Q.    So the living area square footage of the

16   floor plan is 2,248 square feet; is that right?

17        A.    That's correct.

18        Q.    Do you have any reason to doubt that number?

19        A.    No.

20        Q.    But you would agree that you have not, to

21   your recollection, ever had the home measured for the

22   square footage inside of it?

23        A.    No.

24              (Defendants' Exhibit 4 was marked for
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2869 of 3246
Case 1:09-cv-07790-MGC Document 259-31 Entered on FLSD Docket 05/08/2019 Page 32 of 181
Confidential – Subject to Further Confidentiality Review

```
 1    identification.)

 2    BY MR. LAWSON:

 3        Q.   Mr. Walls, you have been handed a document

 4    that's been marked as Exhibit 4.  I represent to you

 5    that that is labeled as a Plaintiff Profile Form.

 6             Have you ever seen this document before?

 7        A.   No, I don't recall.

 8        Q.   Okay.  I'll give you a moment to look through

 9    this document since it sounds like you have not

10    looked at it before.

11             Have you had a chance to look through the

12    document?

13        A.   Yes.

14        Q.   I'm sorry?

15        A.   I seen the back of that before, most of it.

16        Q.   You have seen the back of it before?

17        A.   Yeah.

18        Q.   Turning to Page 3 of this document, it's

19    marked as Walls,L00003.  Do you see your signature at

20    the bottom of that page in Section 12?

21        A.   Yes.

22        Q.   I'm sorry, let me finish my question.

23             Do you see your signature at the bottom in

24    Section 12?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2870 of 3246
Case 1:09-cv-02047-EEF-MBN Document 20131 Confidential - Subject to Further Confidentiality Review Page 33 of 181
Confidential - Subject to Further Confidentiality Review

```
 1      A.   Yes.

 2      Q.   Okay.  And it looks like you signed it around

 3   November 11th of 2010; is that correct?

 4      A.   Correct.

 5      Q.   Looking through this document, did the

 6   information within this document look accurate?

 7           MR. ALBANIS:  I'm going to object to the

 8      form.

 9           But you can answer, Mr. Walls, if you can.

10           THE WITNESS:  I can't remember.  I don't

11      know.

12   BY MR. LAWSON:

13      Q.   Do you notice any information contained

14   within this document that looked inaccurate to you?

15      A.   Well, the bedrooms was three.  There wasn't

16   three bedrooms.

17           It looks -- yeah.

18      Q.   Okay.  And it was your understanding when you

19   signed this you did so under penalty of perjury; is

20   that right?

21      A.   Yeah.

22      Q.   I'd like to go through a few of the items

23   that are contained within this document.

24           Let's go back to the first page.  Now, under
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2871 of 3246
Case 1:09-cv-02042-GAL Document 23831 Entitment 91-Document 05/08/2011 Page 81 of 181
Confidential - Subject to further confidentiality Review

```
 1     Section 1, it's titled Property Information.

 2            Do you see that box?

 3     A.   Yeah.

 4     Q.   And it states around the top of that box that

 5     the name of the person completing the form is

 6     Larry Walls.

 7            And that is you; correct?

 8     A.   That's a right.

 9     Q.   And it states that 2510 Van Buren Parkway was

10     your primary residence; is that right?

11     A.   That's correct.

12     Q.   And it lists the policy -- the homeowner's

13     policy under Liberty Mutual; is that correct?

14     A.   Yes.

15     Q.   And that's in Section 2.

16            Now, did you have a homeowner's policy with

17     Liberty Mutual for the Van Buren Parkway home around

18     2010?

19     A.   Yes.

20     Q.   And did you have to file a homeowner's claim

21     with Liberty Mutual related to the issues you had in

22     your home?

23     A.   We had them out to the house, and they found

24     out we had Chinese drywall and they just cancelled us
```

Case 2:09-md-02047-EEF-MBN  Document 22363-39  Filed 11/19/19  Page 2872 of 3246
Case 1:11-cv-22408-MGC  Document 98-31  Entered on FLSD Docket 05/09/2012  Page 95 of
181

Confidential - Subject to Further Confidentiality Review

```
 1     out.

 2          Q.    They cancelled your policy?

 3          A.    Uh-huh.

 4          Q.    Did you --

 5          A.    They said due to hurricanes, your -- yeah.

 6     It wasn't that.  It was the Chinese drywall.

 7          Q.    So did someone come out to your home from

 8     Liberty Mutual or hired by Liberty Mutual to see what

 9     the issue with the home was?

10          A.    Yes.

11          Q.    And they told you that it was Chinese

12     drywall?

13          A.    (Nodding head.)

14          Q.    Do you remember when that was?

15          A.    No.

16          Q.    Okay.  But you did not receive any money from

17     Liberty Mutual related to your --

18          A.    Nothing.

19          Q.    -- homeowner's policy?

20          A.    Nothing.

21          Q.    It states in Section 3 the dates that the

22     home was occupied.  It looks like a move-in date

23     around November of 2006 for both you and your wife;

24     is that correct?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2873 of 3246
Case 1:1-cv-22408-MGC Document 28831 Entered on FLSD Docket 05/06/2013 Page 46 of
181
Confidential - Subject to Further Confidentiality Review

```
1        A.    Yeah.  Yes.

2        Q.    And it says leave for the date that you left,

3    it's not applicable or N/A.

4              Is that what it says there?

5        A.    Where is that at?

6        Q.    There's a Date Occupied column under

7    Section 3.

8              MR. ALBANIS:  It's on Page 1.

9    BY MR. LAWSON:

10       Q.    It's on Page 1.  I apologize.

11             MR. ALBANIS:  There you go.  That's Page 1.

12   BY MR. LAWSON:

13       Q.    Looking at Page 1, under Section 3 at the

14   bottom of the page, there's a column called Dates

15   Occupied.  And it says that you moved in around

16   November of 2006 and that for the date that you left,

17   it says not applicable or N/A; is that right?

18       A.    I guess, yeah.

19       Q.    So would that be correct that by November of

20   2010 when you signed this you had not yet moved out

21   of the home at Van Buren Parkway?

22       A.    It must be later than that, yeah.

23       Q.    Okay.  Turning to the second page, this is

24   marked as Walls,L00002.  At the top, there's a
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2874 of 3246
Case 1:09-md-02047-MCA Document 265-31 Entatenon Filed Subdocket 09-1061 Page 47 of 181

Confidential © Subject to Further Confidentiality Review

```
1    Section IV, Roman numeral IV, and it says Inspection

2    Information.

3             Do you see that box?

4    A.    Yes.

5    Q.    And it states that an Erickson's Drying

6    Systems conducted an inspection of the home around

7    October 14th of 2009.

8             Do you see that?

9    A.    Yeah.

10   Q.    Do you remember why that inspection was

11   conducted around October of 2009?

12   A.    I don't -- we must have called them in to

13   have it inspected, yes.

14   Q.    Do you know why you hired Erickson's Drying

15   System to inspect the home?

16   A.    We were getting sick -- sicker.

17   Q.    And do you know what they did during that

18   inspection to inspect the home?

19   A.    I don't remember.

20   Q.    Okay.  Looking down to Section 5, Drywall

21   Information, do you see that box?

22   A.    Yeah.

23   Q.    It states Drywall Manufacturer in the first

24   column, and there are two different names of drywall
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2875 of 3246
Case 1:11-cv-01490-MGC Document 283-31 Entered on FLSD Docket 05/29/2015 Page 38 of
181

Confidential - Subject to Further Confidentiality Review

 1    manufacturers.

 2          Do you see that?

 3    A.    Yes.

 4    Q.    And one of them is GridMarX.

 5          Do you see that name?

 6    A.    Yes.

 7    Q.    And then the second one is Taishan.

 8          Do you see that?

 9    A.    Yes.

10    Q.    Now, have you ever seen the drywall inside of

11    your home that is allegedly manufactured by GridMarX

12    or Taishan?

13    A.    I didn't see -- they put cameras down the

14    wall.  I didn't see anything.

15    Q.    You haven't personally seen the drywall?

16    A.    No.

17    Q.    Do you know who GridMarX is?

18    A.    No.

19    Q.    It says under the second column, Markings on

20    Drywall.

21          Do you see that column?

22    A.    Yeah.

23    Q.    The first row says GridMarX National Gypsum,

24    1606-15-06.

Case 2:09-md-02047-EEF-MBN  Document 22363-39  Filed 11/19/19  Page 2876 of 3246
Case 1:11-cv-22408-MGC  Document 256-31  Entered on FLSD Docket 05/19/2014  Page 39 of
181
Confidential - Subject to Further Confidentiality Review

```
1              Do you see that?

2       A.    Yes.

3       Q.    It says that drywall -- do you see that that

4   drywall is located, according to this form, in the

5   garage of the home?

6       A.    Yes.

7       Q.    Looking down to the second row where it lists

8   the manufacturer as Taishan, the marking is listed as

9   4 feet by 12 FEE.

10             Do you see that?

11      A.    Yes.

12      Q.    Have you ever seen that marking in any

13  pictures that were taken inside of your home?

14      A.    Just inspections.  I didn't -- I didn't see

15  it.  I had no camera to go in the walls.

16      Q.    And it says that that drywall is located

17  inside of the kitchen of the home.

18             Do you see that?

19      A.    Uh-huh.

20      Q.    Have you ever been told that the drywall is

21  located anywhere other than the kitchen in your home?

22             MR. ALBANIS:  Object to form.

23             But you can answer.

24             THE WITNESS:  I don't know.
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2877 of 3246
Case 1:09-md-02047-EEF-MBN Document 23363-39 Confidential Filed in... Page 40 of
181
Confidential - Subject to Further Confidentiality Review

 1   BY MR. LAWSON:

 2       Q.   Okay.  Do you have any reason to believe that

 3   that Taishan drywall -- or, excuse me, that drywall

 4   with marking 4 feet by 12 is located anywhere other

 5   than the kitchen?

 6       A.   No.

 7       Q.   Okay.  Have you ever filed a lawsuit against

 8   Aranda Homes for the manufacturing of -- or excuse

 9   me -- build of your home?

10           MR. ALBANIS:  I'm going to objet to the form.

11       Obviously Mr. Walls is not an attorney, and he

12       hired a law firm to pursue the Chinese drywall

13       claims on his behalf.  And we named a number of

14       different parties in the omnibus complaints that

15       were filed in the multidistrict litigation as

16       well as in the Amorin complaint, which is

17       currently -- for which this deposition is

18       currently being taken.

19           Having said all that, Mr. Walls, if you can

20       answer Mr. Lawson's question, please go ahead and

21       do so or you can ask him to rephrase it if you

22       don't remember the question.

23           THE WITNESS:  My lawyer's handling it.  I

24       don't know.

Confidential - Subject to Further Confidentiality Review

```
1    BY MR. LAWSON:

2        Q.   You don't know if you filed a suit against

3    Aranda Homes?

4        A.   No.

5        Q.   Do you know if any letters have ever been

6    sent to Aranda Homes asking for them to repair your

7    home?

8        A.   No, I don't know.

9        Q.   Have you ever spoken with anyone at Aranda

10   Homes before since your home was built?

11       A.   Personally, I have not, no.

12       Q.   Do you know if your wife has?

13       A.   I don't think so.  I don't know.

14       Q.   Okay.  I'd like to turn your attention to the

15   third page of Walls,L00003.  And if you look in the

16   upper left corner, it says Home Information.

17            Do you see that?

18       A.   Yes.

19       Q.   Under that section, it says the approximate

20   square footage of the house is 2,243 square feet.

21            Do you see that?

22       A.   Yes.

23       Q.   Earlier, we look at a document that said that

24   the property square footage for the living area was
```

Confidential - Subject to Further Confidentiality Review

```
 1    2,248 square feet.

 2            Do you remember that?

 3       A.   Yes.

 4       Q.   Do you know why this is listed as

 5    2,243 square feet?

 6       A.   I have no idea.  I don't know.

 7       Q.   Do you have any reason to doubt that number

 8    of 2,243 square feet?

 9       A.   No.

10       Q.   And this lists the number of bedrooms as

11    three bedrooms; the number of bathrooms as three

12    bathrooms.

13            Is that accurate?

14       A.   Yes.

15       Q.   It says that, and that is the number of

16    bedrooms and bathrooms?

17       A.   Yes.

18       Q.   I'd like to turn your attention down to the

19    next section, which just below that, that says

20    Plumbing System.

21            Do you see that?

22       A.   Yes.

23       Q.   Now, it asks for it -- different types of

24    plumbing fixtures and piping whether there's
```

Case 2:09-md-02047-EEF-MBN  Document 22363-39  Filed 11/19/19  Page 2880 of 3246
Case 1:09-md-02047-GCP  Document 2013-1  Entered on FLSD Docket 05/28/2019  Page 43 of 181
Confidential - Subject to Further Confidentiality Review

 1    blackening or corrosion.

 2         Do you see that?

 3    A.    Yes.

 4    Q.    And it states that for PVC, CPVC, or plastic

 5    piping, that there is blackening or corrosion.

 6         Do you see that?

 7    A.    Yes.

 8    Q.    Have you seen blackening or corrosion on

 9    plastic or PVC piping in the Van Buren Parkway home?

10    A.    Not that I can recall.

11    Q.    But it does say that there is such blackening

12    or corrosion on this document, doesn't it?

13    A.    Yes.

14    Q.    But you haven't seen it?

15    A.    I don't remember.

16    Q.    Okay.  For copper piping, it also says, yes,

17    there is blackening or corrosion.

18         Do you see that?

19    A.    Yes.

20    Q.    Have you ever seen blackening or corrosion in

21    the Van Buren Parkway home for copper piping?

22    A.    Copper piping, copper wire, yes.

23    Q.    And it says there was also blackening or

24    corrosion for copper fixtures?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2881 of 3246
Case 1:09-md-02047-EEF-MBN Confidential Subject to Further Confidentiality Review
181

Confidential - Subject to Further Confidentiality Review

```
 1        A.   Yes.

 2        Q.   Have you seen that before?

 3        A.   I have seen it.

 4        Q.   And where did you see that in the home?

 5        A.   In the home.

 6        Q.   Do you remember where?

 7        A.   I seen it in the living room.  I seen it in

 8   the fans.  I seen it in the refrigerator.  I seen it

 9   in the air-conditioning.

10        Q.   Okay.  It asks a little bit below that were

11   repairs made to the plumbing system, and the answer

12   here on the form is no.

13             Is that accurate that there were no repairs

14   to the plumbing system?

15        A.   No.

16        Q.   Did you ever need to repair the plumbing

17   system?

18        A.   No.

19        Q.   And you didn't have any issues with the

20   plumbing?

21        A.   No.

22        Q.   I'd like to go down to electrical system,

23   which is the next section below plumbing.

24             Do you see that?
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2882 of 3246
Case 1:09-cv-02484-GEL Document 31631 Confidential Subject to Further Confidentiality Review
181
Confidential - Subject to Further Confidentiality Review

1      A.    Okay.

2      Q.    Again, there are questions asking if there's

3   blackening or corrosion for different items related

4   to the electrical system.  The first one is

5   receptacles, and it says, yes, that there

6   is blackening or corrosion.

7           Do you see that?

8      A.    Yes.

9      Q.    Did you ever see blackening or corrosion for

10  the receptacles in the home?

11     A.    Yes.

12     Q.    It also says that for the switches, the main

13  panel, and the second panel in the home there was

14  also blackening or corrosion.

15          Do you see that?

16     A.    Yes.

17     Q.    And did you see the blackening or corrosion

18  to these items in the home when you lived in it?

19     A.    Yeah.

20     Q.    When did you first notice blackening or

21  corrosion for electrical wiring and systems in the

22  home?

23     A.    I can't remember.

24     Q.    Earlier when we talked about the time that

Confidential - Subject to Further Confidentiality Review

```
 1    you lived in the house from 2006 to 2010, you said

 2    that the issues you had in the home related to the

 3    smell and how you felt in the home; is that right?

 4         A.   Yes.

 5         Q.   Did you have any issues with the electrical

 6    system while you were living in the home?

 7         A.   Yes.

 8         Q.   Okay.  But you didn't mention that before

 9    when I asked you about that; is that right?

10         A.   Well, yeah.  I guess no.  Yeah.

11         Q.   What issues did you have with the electrical

12    system while you lived in the home?

13         A.   In the dining room, turn on the light, the

14    switch would get hot, so we had to quit using that.

15         Q.   The switch in the dining room?

16         A.   The light switch for the -- for the

17    chandelier up there.  The switch would get hot.

18         Q.   So the light switch would be hot to the

19    touch?

20         A.   Yes.

21         Q.   Okay.  And it would turn off and on, but it

22    would be hot; is that right?

23         A.   If you left it on very long, it would stay

24    hot.
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2884 of 3246
Case 2:09-cv-02048 McG... Document 22031 Confidential Subject to further confidentiality Page 47 of
181

Confidential - Subject to Further Confidentiality Review

1    Q.    So you stopped using it entirely?

2    A.    We turned it off, yes.

3    Q.    Did you ever have someone come out to look at

4    that issue in the home?

5    A.    No.

6    Q.    Okay.  You just stopped using it?

7    A.    Quit using it.

8    Q.    And you never replaced it?

9    A.    No.

10   Q.    Did you have any other issues with the

11   electrical system while you lived in the home?

12         MR. ALBANIS:  You mean other than the ones

13         that they've identified in the Plaintiff Profile

14         Form?

15         MR. LAWSON:  I'm asking him what he recalls

16         about it because earlier we had a discussion

17         about what issues there were in the home, and now

18         I'm just trying to get his recollection.

19         I understand what the form says, but I want

20         him to have his recollection of it.

21         THE WITNESS:  I don't recall.

22   BY MR. LAWSON:

23   Q.    Okay.  So other than the light switch in the

24   home being hot to the touch, you don't recall any

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2885 of 3246
Case 1:09-cv-02047-MGC Document 22381 entry-filed Subject to Docket 05/18/2015 Page 48 of
181

Confidential - Subject to Further Confidentiality Review

```
1    issues with the electrical system from the time that

2    you lived in the home?

3        A.   Nothing -- nothing that I can remember.

4        Q.   Okay.  And you didn't have any issues with

5    the plumbing system while you lived in the home?

6        A.   No.

7        Q.   Did you have any issues with your

8    air-conditioning while you lived in the home?

9        A.   Yes.

10       Q.   What were the issues with the

11   air-conditioning?

12       A.   The handler out in the garage.  It kept going

13   out.  We had it -- we had them come out and refill

14   it.  It kept leaking out.  Then we had it -- they had

15   changed it, I think, two or -- two or three times.

16   I'm not for sure.  It might have just been two times

17   we changed the handler out.

18       Q.   And were there any other issues with the

19   air-conditioning other than the two times that the

20   handler was replaced?

21       A.   Just the handler.  You know, ate it up.  Ate

22   the copper right off it.  Ate it up.

23       Q.   After the second time that the handler was

24   replaced, did you have any issues with the
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2886 of 3246
Case 1:09-cv-02042-MCA Document 20-31 Entered on FLSD Docket 05/19/2019 Page 40 of 181
Confidential - Subject to Further Confidentiality Review

```
 1    air-conditioning?

 2            MR. ALBANIS:  I'll just object to form.

 3            But you can answer if you can.

 4            THE WITNESS:  I don't remember.

 5    BY MR. LAWSON:

 6        Q.   Did the air-conditioning continue to work

 7    during the time that you lived in the home from 2006

 8    to 2010?

 9        A.   It worked.

10        Q.   Okay.  And when I say 2010 -- without knowing

11    the exact date that you moved out, from the time that

12    you moved into the home to the time that you moved

13    out of the home, did you have any issues with the

14    air-conditioning system?

15        A.   Yes.

16        Q.   Did it continue to work during that entire

17    time and cool the home?

18        A.   After we had the handler changed twice.

19        Q.   It did work after you had it changed twice?

20        A.   It worked, and that one got ate out.  It went

21    out.  I had it replaced.  By then, we were getting

22    ready to leave.

23        Q.   Did you have a gas furnace in the home?

24        A.   No.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2887 of 3246
Case 1:09-cv-07628-MGC Document 289-31 Entered on FLSD Docket 05/19/2017 Page 50 of
181

Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Did you have any heating system in the home?

 2      A.   Just like off the air-conditioning, how it

 3   heats, you know.

 4      Q.   Did you have any issue with the heating

 5   system?

 6      A.   No.

 7      Q.   Looking to Section 11, it states Drywall

 8   Supplier on the right side of the page.

 9           Do you see that section?

10      A.   Yeah.

11      Q.   It lists the drywall supplier's name as

12   Banner Supply Company Fort Myers, LLC.

13           Do you see that?

14      A.   Okay.

15      Q.   Have you ever seen that name before?

16      A.   Banner?  Yes.

17      Q.   Do you know who that is?

18      A.   They supplied the drywall.

19      Q.   And how do you know that?

20      A.   I just do.

21      Q.   Has anyone told you that before?

22      A.   I just -- you know, Banner Supply.  That's --

23   I don't remember who told me, but they are the one

24   that supplied the drywall.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2888 of 3246
Case 1:09-cv-02042-GCL Document 261-31 Confidential Subject to Docket 03/19/2010 Page 51 of
181
Confidential – Subject to Further Confidentiality Review

 1     Q.   To your knowledge, did Aranda Homes purchase

 2   the drywall from Banner Supply?

 3     A.   They must have.

 4     Q.   You didn't personally purchase --

 5     A.   No, no, no.

 6     Q.   Sorry.  Let me finish.

 7          You didn't personally purchase the drywall

 8   from Banner Supply Company, did you?

 9     A.   No.

10     Q.   Who installed the drywall that -- inside of

11   your home when the home was built in 2006?

12     A.   I don't know.

13     Q.   Okay.  Would it likely have been someone from

14   Aranda Homes?

15     A.   It must have been.

16     Q.   Or someone that they contracted with?

17     A.   It must have been.

18     Q.   Did you witness the drywall being installed

19   when it was built in the home?

20     A.   No.

21     Q.   Did you see the drywall before it was

22   installed in the home?

23     A.   No.

24     Q.   Did anyone tell you that drywall manufactured

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2889 of 3246
Case 1:09-cv-02042-MGC Document 206-31 Entered on FLSD Docket 05/19/2011 Page 52 of
181

Confidential - Subject to Further Confidentiality Review

```
1    in China was being installed in your home before it

2    was installed?

3         A.   No.

4         Q.   Was there ever a discussion about the

5    materials, including the drywall, that would be

6    installed in the home --

7         A.   No.

8         Q.   -- when you contracted with Aranda Homes?

9         A.   No.

10        Q.   Did Aranda Homes make any warranties or

11   guarantees to you about the products that they would

12   use to manufacture the home?

13             MR. ALBANIS:  Object to the form.  Object to

14        the form.

15             But you can answer if you know.

16             THE WITNESS:  I don't recall.

17             MR. LAWSON:  Okay.  All right.  Let's take a

18        short break.  Five minutes.

19             MR. ALBANIS:  Sure.

20             (Recess from 10:25 until 10:37 a.m.)

21   BY MR. LAWSON:

22        Q.   Welcome back, Mr. Walls.

23             I would like to turn your attention to Page 7

24   of the document that we were just looking at, which I
```

Confidential - Subject to Further Confidentiality Review

1    believe was Exhibit 4.  It's marked Walls,L00007 on

2    the bottom right corner.

3         A.   What page is it?

4         Q.   It's going to be the seventh page of this

5    exhibit.  And you can look in the bottom right corner

6    where it's Number 7.

7              All right.  I'll give you a second to take a

8    look at this document.

9              Have you had a chance to look at it?

10        A.   Yeah.

11        Q.   What -- what is this document, to your

12   knowledge?

13             MR. ALBANIS:  Objection to the form.

14             You can answer if you know, Mr. Walls.

15             THE WITNESS:  I don't know.  I can't

16        remember.

17   BY MR. LAWSON:

18        Q.   Does it look like that this is a letter from

19   your attorneys at Morgan & Morgan to Aranda Homes?

20        A.   Yeah.

21        Q.   And it's -- it appears to be a notice -- an

22   opportunity to repair, notice of request of insurance

23   policies in the title of the letter.

24             Do you see that?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2891 of 3246
Case 2:09-md-02047-EEF-MBN Document 20831 Confidential Subject to Ho Page 51 of
181

Confidential - Subject to Further Confidentiality Review

```
 1        A.   Yes.

 2        Q.   And this is -- this letter appears to be

 3   notifying Aranda Homes of the drywall issue inside of

 4   the home on Van Buren Parkway; is that right?

 5        A.   Yes.

 6        Q.   Okay.  Now, to your knowledge, did Aranda

 7   Homes respond to this letter?

 8        A.   I don't remember.

 9        Q.   Have you ever seen a letter in response from

10   Aranda Homes to this letter?

11        A.   I can't remember.

12        Q.   Okay.  I'd like to turn your attention to the

13   15th page of this document.  It's marked

14   Walls,L00015.

15             Mr. Walls, this appears to be a building

16   agreement.

17             Do you see that at the top of the page?

18        A.   Yes.

19        Q.   And this appears to be a building agreement

20   to build the property on Van Buren Parkway; is that

21   correct?

22        A.   Yes.

23        Q.   It looks like the contract price for the home

24   on Van Buren Parkway was $248,795; is that right?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2892 of 3246
Case 1:09-cv-02442-HGD Document 43-31 Entered on FLSD Docket 05/16/2013 Page 55 of
181

Confidential - Subject to Further Confidentiality Review

1        A.    That's what it says.

2        Q.    This agreement was signed on the 17th page of

3    this document, it appears, by your wife; is that

4    correct?

5        A.    Yes.

6        Q.    Do you know if there's any version of this

7    agreement that you signed?

8        A.    I don't know.

9        Q.    And this agreement was reached on the 27th of

10   April of 2005; is that right?

11       A.    Yeah.  That's what it says.

12       Q.    Okay.  And after this agreement was entered

13   into, the home was built by Aranda Homes on Van Buren

14   Parkway, correct?

15       A.    Correct.

16       Q.    Now, there was a pool on the property; is

17   that right?

18       A.    That's right.

19       Q.    Okay.  And that was built when the home was

20   built in 2006, correct?

21       A.    That's -- yes, it was.

22       Q.    Okay.  And turning to the 21st page of this

23   document, Walls,L000021.

24             Do you see that document?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2893 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Docket 05/26/19 Page 46 of 181
Confidential - Subject to Further Confidentiality Review

```
 1        A.   Yes, I do.

 2        Q.   And this appears to be an agreement related

 3   to the construction of the pool; is that correct?

 4        A.   Yes.

 5        Q.   And it appears that the pool cost $33,600; is

 6   that right?

 7        A.   That's right.

 8        Q.   And this agreement was signed by your wife;

 9   is that right?

10        A.   Yes.

11        Q.   And that was back in June of 2005, correct?

12        A.   Yes.

13        Q.   All right.  I'd like to turn to the 23rd page

14   of this document.

15             Do you recognize this document, Mr. Walls?

16        A.   Yes.

17        Q.   What is it?

18        A.   It's a home inspection.  Allied Home

19   Inspection.

20        Q.   Okay.  Who is Allied Home Inspections?

21        A.   I don't recall -- I don't remember where I --

22   we had them -- I don't know the company.

23        Q.   If you look to the middle of the first page,

24   there's a date that says August 22nd, 2009.
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2894 of 3246
Case 2:09-cv-02047-MCA Document 20031 Confidential – Subject to Docket 05/19/2019 Page 57 of
181
Confidential – Subject to Further Confidentiality Review

1          Do you see that?

2          I'm sorry, on the first page there.

3     There's -- you're on it.  It's Walls,L00023.

4     A.   Yeah, yeah.

5     Q.   There's a date listed as August 22nd, 2009,

6     right under the first paragraph on that page.

7          Do you see that?

8     A.   Yeah.

9     Q.   Does that sound about right, that the

10    inspection occurred around August 2009?

11    A.   Yes.

12    Q.   Okay.  Was this the first inspection you had

13    of the home?

14    A.   Rephrase that now.

15    Q.   Was this the first inspection that you had of

16    the home when you suspected that there was Chinese

17    drywall in the home?

18    A.   I believe -- I believe so.

19    Q.   Okay.  And earlier when we were looking at

20    the Plaintiff Profile Form, there was also an

21    inspection by Erickson's Drywall System, correct?

22    A.   Correct.

23    Q.   And that took place around October of 2009.

24         Do you remember that?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2895 of 3246
Case 1:09-cv-07628-JG Document 1-19 Entered on FLSD Docket 05/09/2019 Page 43 of 181
Confidential – Subject to Further Confidentiality Review

1        A.   I can't remember.

2        Q.   Okay.  Well, let's take a look back over to

3    the second page of this document that we looked at

4    previously.  That's Walls,L00002.

5             And go back to the second page of the

6    exhibit.

7        A.   Oh, the second page?

8        Q.   Yeah.

9             MR. ALBANIS:  Right here.

10   BY MR. LAWSON:

11       Q.   Looking at the top section, Section 4 of that

12   page, it lists an inspection by Erickson's Drying

13   System on October 14th, 2009.

14            Do you see that?

15       A.   Yes.

16       Q.   Okay.  Does that sound correct to you that it

17   would have been in the fall of 2009 that Erickson's

18   Drying Systems would have inspected your home?

19       A.   Yeah.

20       Q.   So you also had an inspection a couple months

21   prior to that by Allied Home Inspections in August of

22   2009; is that right?

23       A.   That's right.

24       Q.   Do you know why you had two inspections so

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2896 of 3246
Case 2:09-cv-02048-MCA-LDW Document 239-31 Confidential Subject to Further Confidentiality Review
181
Confidential – Subject to Further Confidentiality Review

1    close to each other?

2       A.   I don't remember.  I think one was Liberty

3    Mutual.  The other one was -- I don't remember.

4       Q.   Okay.  Going back to Page 23, the Allied Home

5    Inspections' report, were you present when the

6    inspection was conducted on your home?

7       A.   Yes.

8       Q.   What do you remember about the inspection?

9       A.   I don't remember.  Just the pictures.

10      Q.   I'd like to turn your attention to Page 26 of

11   this exhibit.  It's Walls,L00026.  And this is listed

12   as an Allied Home Inspection Pro, LLC Chinese drywall

13   inspection checklist.

14           Do you see that at the top of the page?

15      A.   Yes.

16      Q.   And it states in the first row that the home

17   inspected was 2510 Van Buren Parkway.

18           Do you see that?

19      A.   Yes.

20      Q.   And that was your home on Van Buren Parkway,

21   correct?

22      A.   Correct.

23      Q.   Okay.  If you look down to the second row, it

24   states:  Have any electrical appliances failed to

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2897 of 3246
Case 2:09-md-02047-EEF-MBN Document 20831 Entered on FLSD Docket 05/04/2019 Page 60 of
181
Confidential - Subject to further confidentiality review

1    operate or have they needed regular repair or

2    replacement before the typical life expectancy (ask

3    resident)?

4          Do you see that.

5    A.    Yes.

6    Q.    And "no" is checked for that row.

7          Do you see that?

8    A.    Yes.

9    Q.    Okay.  At the time of this inspection in

10   2009, had any electrical appliances failed to operate

11   or needed regular repair or replacement?

12   A.    Don't remember.

13   Q.    Okay.  But you were present during this

14   inspection when it occurred; is that right?

15   A.    Yes.

16   Q.    If you look down to the final row, it states:

17   Does the drywall show manufacturer marking in the

18   attic spaces and/or inside wall cavities?

19         And then it says:  Markings seen.  Circle if

20   found.

21         Do you see that?

22   A.    Uh-huh.

23   Q.    And then it lists different names of

24   markings, it appears.

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2898 of 3246
Case 1:09-md-02047-EEF-MBN Document 23031 Continuation Filed 05/19/2019 Page 61 of
181
Confidential - Subject to Further Confidentiality Review

```
 1              Do you see that?

 2      A.    Yes.

 3      Q.    And that checklist box is marked as no?

 4      A.    Yeah.

 5      Q.    Were you told that there was no evidence of

 6   drywall markings inside of the house during this

 7   inspection?

 8      A.    I don't -- I don't remember.

 9      Q.    Okay.  Turning your attention to Page 27 of

10   this exhibit, Walls,L00027.

11              Do you see that page?

12      A.    Yes.

13      Q.    All right.  What does this look like to you?

14      A.    Inspection.

15      Q.    Is this the Erickson's Drying System

16   inspection that we discussed earlier?

17      A.    Yes.

18      Q.    If you look to the second column near the top

19   of the page, there's an inspection date of

20   October 14th, 2009.

21              Do you see that?

22      A.    Okay.

23      Q.    Does that sound about right to you when that

24   inspection occurred?
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 1/19/10 Page 2899 of 3246 of
Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed Supplemental Expert Report Page 62 of
181

Confidential - Subject to Further Confidentiality Review

```
1       A.   Yes.

2       Q.   Do you remember being present in the home

3   when the inspection was performed by Erickson's

4   Drying Systems?

5       A.   Yes.

6       Q.   Do you remember anything about that

7   inspection?

8       A.   Not really.  I don't remember, no.

9       Q.   It states in the final row of the chart or

10  the table, excuse me, Page 27, under Manufacturer

11  GridMarX National Gypsum that drywall was removed in

12  the wall of the garage, per owner's approval.

13           Do you see that?

14      A.   Yes.

15      Q.   Do you remember drywall being removed from

16  your home in the garage during an inspection?

17      A.   I don't remember, no.

18      Q.   Okay.  Do you remember drywall ever being

19  removed from your home during the time that you lived

20  in it?

21      A.   They cut holes behind the door to run the

22  cameras down.  That's all I remember.

23      Q.   So you remember holes being cut out so

24  cameras could be put into the walls; is that right?
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2900 of 3246
Case 1:11-cv-22408-MGC Document 103-31 Entered on FLSD Docket 05/19/2011 Page 43 of
181
Confidential - Subject to Further Confidentiality Review

```
 1        A.    Uh-huh.

 2        Q.    But you don't remember sections of drywall

 3    being taken away for any reason?

 4        A.    No.

 5        Q.    Do you remember ever being told that samples

 6    of your drywall were going to be tested?

 7        A.    No, I don't remember.

 8        Q.    Okay.  This states under that same row that

 9    we were just discussing that the owner also stated

10    vehicle parked in garage has received three new

11    starters due to corrosion of electrical system.

12              Do you see that?

13        A.    Yes.

14        Q.    Can you tell me about that?

15        A.    I remember that, yeah.

16        Q.    What was happening?

17        A.    The starter kept going out in my car all the

18    time.

19        Q.    And did you have them replaced?

20        A.    I had them replaced, yes.

21        Q.    Okay.  And after the starter was replaced

22    three times, did you ever have to replace it again

23    after that?

24        A.    I don't remember.
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2901 of 3246
Case 1:11-cv-02401-MGC Document 283-1 Entered on FLSD Docket 05/16/2019 Page 61 of
181

Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Okay.  Did you have any other issues with

 2   your car that was parked in that garage other than

 3   the starter needed to be replaced?

 4        A.   I don't remember, no.

 5        Q.   I'd like to turn your attention to the 30th

 6   page of this document, which is the last page.

 7   There's a photo.  This is Walls,L00030.

 8             Do you see that page?

 9        A.   Yes.

10        Q.   Okay.  Have you ever seen this photo before?

11        A.   I don't remember seeing it.

12        Q.   The photo appears to show what looks like a

13   piece of drywall with a marking that reads 4 feet X

14   12.

15             Do you see that?

16        A.   Yes.

17        Q.   Have you ever seen that marking on any

18   drywall inside of your home?

19             MR. ALBANIS:  Object to the form.

20             THE WITNESS:  I don't know.

21             (Defendants' Exhibit 5 was marked for

22   identification.)

23   BY MR. LAWSON:

24        Q.   Mr. Walls, you have been handed a document
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2902 of 3246
Case 2:09-md-02047-EEF-MBN Document 20881 Ethridge Filed 05/18/2017 Page 45 of
181

Confidential - Subject to Further Confidentiality Review

```
 1    that's been marked as Exhibit 5.  I believe that this

 2    is a third amended Supplemental Plaintiff Profile

 3    Form.

 4          Do you see that?

 5    A.    Yes.

 6    Q.    Have you ever seen this document before?

 7    A.    I don't remember.

 8    Q.    I'll give you a moment to review the

 9    document.  Please let me know when you have had a

10    chance to look at it.

11          Have you had a chance to review the document?

12    A.    Yeah.

13    Q.    I'd like to turn your attention to the last

14    page of the SPPF, or Supplemental Plaintiff Profile

15    Form.

16          Oh, Mr. Walls, there's one more page if you

17    can turn -- flip that over.  So that's Page 8 you can

18    see at the bottom there.

19          See this Section 9 is titled Verification of

20    Supplemental Plaintiff Profile Form.

21          Do you see that?

22          And, again, it states at the top:  I declare

23    under penalty of perjury under the law of the United

24    States of America and pursuant to 28 USC Section 1746
```

```
 1    that I am the claimant identified in this

 2    Supplemental Plaintiff Profile Form and that all the

 3    information provided in this Supplemental Plaintiff

 4    Profile Form is true and correct to the best of my

 5    knowledge and that I have supplied all the documents

 6    requested in the declaration to the extent that such

 7    documents are in my possession, custody, or control.

 8            Did I read that correctly?

 9    A.    Uh-huh.

10    Q.    It also states:  I further declare under

11    penalty of perjury under the laws of the United

12    States of America and pursuant to 28 USC Section 1746

13    that all information previously provided by me in my

14    original Plaintiff Profile Form continues to be true

15    and correct and has been updated to the best of my

16    knowledge.

17            Did I read that correctly?

18    A.    That's right.

19    Q.    Now, on this particular document, there is no

20    signature under claimant's signature; is that

21    correct?

22    A.    That's correct.

23    Q.    Do you remember previously signing a

24    verification of a Supplemental Plaintiff Profile
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2904 of 3246
Case 1:1-09-md-02047-MCA Document 25831 Confidential Subject to Docket 05/18/2019 Page 47 of
181
Confidential - Subject to Further Confidentiality Review

```
1    Form?

2        A.   I don't remember.

3        Q.   Okay.  This document that I represent to you

4    that we received yesterday was signed as of

5    December 10th, 2018, it says under Date Signed.

6             Do you see that?

7        A.   Okay.

8        Q.   Do you see that?

9        A.   Yes.

10       Q.   And did you sign a form that looked like this

11   yesterday, a verification?

12            MR. ALBANIS:  I'm going to object to form.

13       Mr. and Mrs. Walls did sign verification to the

14       Supplemental Plaintiff Profile Form, which was

15       uploaded to the portal, it looks like on

16       April 16, 2018.  It's Document Number 361732.

17   BY MR. LAWSON:

18       Q.   So, Mr. Walls, does it sound accurate that

19   you signed a Supplemental Plaintiff Profile Form back

20   in April or so?

21       A.   It must have been.

22       Q.   Okay.  And have you signed another one since

23   then?

24       A.   No.
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2905 of 3246
Case 1:19-cv-01848-CARAME Document 26831 Sample on Filed Docket 05/09/2019 Page 13 of
181
Confidential - Subject to Further Confidentiality Review

```
 1        Q.   And you didn't sign this particular form; is
 2   that correct?
 3             MR. ALBANIS:  Object to the form.
 4             Go ahead.
 5   BY MR. LAWSON:
 6        Q.   Is that a no?
 7        A.   I don't remember signing it.
 8        Q.   Did you review this form yesterday before it
 9   was -- did you review the form yesterday, on
10   December 10th, 2018?
11             MR. ALBANIS:  Why don't you flip through the
12        whole document, Larry, so that you know what this
13        is.
14             THE WITNESS:  Okay.  Now I see -- okay.
15        Yeah.  Okay.
16   BY MR. LAWSON:
17        Q.   Mr. Walls, did you review this form
18   yesterday?
19        A.   Yes, yes.
20        Q.   But you did not sign it yesterday; is that
21   correct?
22        A.   No.
23        Q.   Do you verify that the information contained
24   in this form is correct?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2906 of 3246
Case 2:09-md-02047-EEF-MBN Document 23361 Entered on FLSD Docket 05/16/19 Page 46 of 181
Confidential - Subject to Further Confidentiality Review

 1      A.   Yes.

 2      Q.   Do you see any information in this form that

 3   is incorrect?

 4      A.   Not to my knowledge.

 5           MR. ALBANIS:  Well, flip through the whole

 6      thing -- it's eight pages long -- before you

 7      respond.

 8           THE WITNESS:  Okay.  Well, it says "acquire

 9      the property."  My wife acquired the property in

10      2002.

11   BY MR. LAWSON:

12      Q.   Mr. Walls, what section are you looking at

13   right now?

14      A.   Section --

15      Q.   Is this section --

16      A.   Section 2.

17      Q.   -- 2?

18           And it says:  When did you acquire the

19   property?  And the answer is:  September 1st, 2006.

20      A.   Yeah.

21      Q.   Is that correct?

22      A.   My wife bought the property in 2002.

23      Q.   Was the home acquired around September 1st of

24   2006?

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2907 of 3246
Case 1:09-md-02047-EEF-MBN Document 22361 Entered on FLSD Docket 10/28/19 Page 40 of
181

Confidential - Subject to Further Confidentiality Review

```
 1       A.   Yes.  Yes.

 2       Q.   But the property was purchased around 2002?

 3       A.   Correct.

 4       Q.   Please take the time to review it and let me

 5   know if you see any other items that may be

 6   inaccurate.

 7       A.   Okay.

 8       Q.   Did you see any other items in this form that

 9   you want to correct or change?

10       A.   I don't think so.

11       Q.   So to your knowledge the information

12   contained within this form is accurate?

13       A.   Yes.

14       Q.   Let's turn to Section 2 of the form that we

15   were looking at just a moment ago, Page 2.

16            There's a question that states:  When you

17   acquired the property, were you aware that it

18   contained Chinese drywall?

19            And the answer marked here is no.

20            Is that accurate?

21       A.   Yes.

22       Q.   However, it says that you became aware that

23   the property contained Chinese drywall around August

24   of 2009 under the next question; is that right?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2908 of 3246
Case 1:19-cv-21040-MGC Document 20-831 Entered on FLSD Docket 05/19/2019 Page 70 of 181
Confidential - Subject to Further Confidentiality Review

```
1        A.    That's what we thought, yeah.

2        Q.    A moment ago we looked at an inspection

3   report from August 2009 that said there was signs of

4   Chinese drywall in the home.

5              Do you remember that?

6        A.    Yes.

7        Q.    And would that have been the first time that

8   you were -- became aware that your home had Chinese

9   drywall?

10       A.    Probably.  It was a long time ago.  So I

11  don't remember exactly.  That was 2009.

12       Q.    If you look a little bit further down,

13  there's an item that says:  If you believe Chinese

14  drywall is installed after you acquired the property

15  that -- excuse me.  Scratch that.

16             If you look a little bit further down,

17  there's an item that says:  Have you sold or

18  transferred ownership of the property since you

19  acquired it?

20             And you said yes.

21             And that the date of that sale or transfer

22  was July 18th of 2014.

23             Did I read that correctly?

24       A.    Yes.
```

```
 1      Q.   That transfer was related to a foreclosure

 2   sale on the property; is that right?

 3      A.   Yes.

 4      Q.   So ownership of the property transferred

 5   around July 18th of 2014?

 6      A.   Correct.

 7      Q.   At that time you were living at the property

 8   on 37th Place; is that right?

 9      A.   Yes.

10      Q.   Now, a little bit earlier, I recall you were

11   telling me about a condo that you and your wife own

12   in North Fort Myers; is that right?

13      A.   Yes.

14      Q.   Do you recall when you acquired that condo,

15   when you purchased it?

16      A.   I didn't purchase it.  My wife purchased it.

17      Q.   Do you remember when your wife purchased it?

18      A.   No.

19      Q.   Have you ever lived there?

20      A.   No.

21      Q.   Do you -- did you ever consider living there

22   during that time that you were dealing with the

23   issues in your home on Van Buren Parkway?

24           MR. ALBANIS:  Object to the form.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2910 of 3246
Case 1:11-cv-22408-MGC Document 291-31 Entered on FLSD Docket 05/18/2011 Page 98 of
181
Confidential – Subject to further Confidentiality Review

 1              But you can answer.

 2              THE WITNESS:  No, I don't remember.

 3      BY MR. LAWSON:

 4          Q.   And you may have said this earlier, but I

 5      don't recall.  Have you rented out the condo in North

 6      Fort Myers to anyone?

 7          A.   Yes.

 8          Q.   Okay.  And for as long as you have known

 9      about that condo, has that been rented out?

10          A.   As far as -- I don't know.  I don't know.

11          Q.   Okay.  Do you or your wife own any other

12      properties or have you owned any other properties

13      since 2006 other than the three that we've discussed

14      today?

15          A.   My wife and her son own a property.

16          Q.   And where is that?

17          A.   It's in Cape Coral.

18          Q.   Okay.  And --

19          A.   1534 37th Place, I believe.

20          Q.   And is that a home?

21          A.   Yes.

22          Q.   A single-family home?

23          A.   (Nodding head.)

24          Q.   Is that also used as a rental property?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2911 of 3246
Case 1:09-md-02047-GAB Document 2881 Entrant on FLSB Docket 05/09/2011 Page 76 of
181
Confidential - Subject to further Confidentiality Review

```
1        A.    It's her and her son's.  I don't know.

2        Q.    Have you ever lived there?

3        A.    Nope.

4        Q.    Under Section 4 of this document on Page 3,

5    it's titled Bankruptcy Foreclosure or Short Sale.

6              Do you see that section?

7        A.    Yes.

8        Q.    The first question asks:  Do you contend that

9    you entered personal bankruptcy as a result of damage

10   to your property as a result of Chinese drywall.

11             Do you study that?

12       A.    Yes.

13       Q.    And the answer marked is no?

14       A.    Yes.

15       Q.    Did you or your wife ever consider filing for

16   bankruptcy over the last decade?

17       A.    We talked about it.

18       Q.    Okay.  Why did you decide not to file for

19   bankruptcy?

20       A.    Just didn't file.  We didn't want to.  I

21   don't know.

22       Q.    So you never have filed for bankruptcy?

23       A.    We was going to file it, and we changed our

24   minds.
```

Case 2:09-md-02047-EEF-MBN Document 23263-39 Filed 11/19/19 Page 2912 of 3246
Case 1:09-cv-09410-JGK Document 20-31 Confidential Subject to Further Confidentiality Review
181
Confidential - Subject to Further Confidentiality Review

1    Q.   Okay.  Do you remember about when that was?

2    A.   No.

3    Q.   Would it have been after you moved out of

4    your home on Van Buren Parkway?

5    A.   Yes.

6    Q.   Okay.  Would it have been before or after the

7    home was foreclosed upon?

8    A.   I don't remember.

9    Q.   It's accurate to say that you never attempted

10   to or did remediate the property on Van Buren Parkway

11   by removing the Chinese drywall, correct?

12        MR. ALBANIS:  I'm going to object to the

13        form.

14        But you can answer, Mr. Walls, if you

15        understand the question.

16        THE WITNESS:  I don't remember.

17   BY MR. LAWSON:

18   Q.   You don't remember if you ever attempted to

19   remove the drywall from the home?

20   A.   No.  Me?

21   Q.   You or anyone you hired.

22   A.   No.

23   Q.   No; is that right?

24   A.   No.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2913 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Entered on FLSD Docket 05/19/2011 Page 76 of
181
Confidential - Subject to further Confidentiality Review

1      Q.   Okay.  So you don't recall you or anyone else

2      attempting to remove all the Chinese drywall from the

3      home?

4           MR. ALBANIS:  Same objection.

5           THE WITNESS:  I don't recall.

6      BY MR. LAWSON:

7      Q.   I'd like to turn your attention to Section 6

8      of this form.  It's on Page 5.

9           It's asking you about prior payments that you

10     have received related to your alleged damages for

11     defective Chinese drywall in your property.

12          Do you see that?

13     A.   Yes.

14     Q.   Have you received money from other parties

15     related to your damages for the defective drywall in

16     your home?

17          MR. ALBANIS:  Object to the form.  It's -- I

18          don't believe that Mr. Walls would understand

19          what the term "other parties" means.

20     BY MR. LAWSON:

21     Q.   Well, let me clarify the question.

22          Have you received money from other people or

23     companies related to the damages that you say you

24     have suffered as a result of defective Chinese

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2914 of 3246
Case 1:11-cv-22408-MGC Document 288-31 Entered on FLSD Docket 05/19/2014 Page 97 of 181
Confidential - Subject to Further Confidentiality Review

1    drywall in your home?

2          MR. ALBANIS:  Same objection.

3          But you can answer if you can, Mr. Walls.

4          THE WITNESS:  I don't remember what we

5      received or when.  I don't remember.

6    BY MR. LAWSON:

7      Q.   You don't remember receiving $27,647.75?

8      A.   I don't remember.

9      Q.   Okay.  Does that sound -- does it sound like

10   you -- something that you would have received in the

11   last few years related to this lawsuit?

12     A.   I don't remember.

13     Q.   Do you remember filing any paperwork to make

14   a claim for that money?

15     A.   I don't recall.

16     Q.   Okay.  Do you remember asking your lawyers --

17   or excuse me.

18          Do you remember being asked for documentation

19   for your expenses that you have paid or costs that

20   you incurred in the past few years by your lawyers?

21     A.   I don't remember that, no.

22     Q.   Okay.  So we just discussed the first item

23   that's listed for prior payments, and that was from a

24   CDW settle program for $27,647.75.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2915 of 3246
Case 1:1-cv-02042-CA Document 234-31 Entered on FLSD Docket 05/16/2011 Page 78 of
181

Confidential - Subject to Further Confidentiality Review

```
 1              And do you see that there at the bottom of

 2    the Page 5?

 3         A.   Yes.

 4         Q.   But you don't have any recollection of that

 5    payment?

 6         A.   I don't remember nothing about it.

 7         Q.   And then if you look to the top of Page 6, on

 8    the next page of the document, there's a GBI holdback

 9    payment in the amount of $2,411.11 listed there.

10              Do you see that?

11         A.   Yes.

12         Q.   Do you have any recollection of receiving

13    that payment?

14         A.   No.

15         Q.   Looking down to Section 7, it lists Other

16    Damages.

17              Do you see that?

18         A.   Yes.

19         Q.   And it states:  If you incurred alternative

20    living expenses as a result of Chinese drywall,

21    identify the total moving costs and/or alternative

22    living expense you incurred.

23              Did I read that correctly?

24         A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 2916 of 3246
Confidential – Subject to further confidentiality Review
181

```
 1        Q.   And the amount listed here is $88,640.96.

 2             Do you see that?

 3        A.   I see that.

 4        Q.   Can you tell me about why that amount is

 5   listed for alternative living expenses that --

 6        A.   That's all in my lawyer's documents.  You

 7   know, all the information in the documents we give

 8   him.

 9        Q.   Can you tell me about the expenses that you

10   believe that you have incurred for alternative living

11   expenses since you moved out of the Van Buren Parkway

12   home?

13        A.   Phrase that again now.

14        Q.   Yeah.  When you moved out of the Van Buren

15   Parkway home, did you have to pay any amounts of

16   money that -- or that you didn't have to pay

17   previously when you lived at Van Buren Parkway to

18   live somewhere else?

19        A.   We had -- we moved out.  We had to get all

20   new furniture to move back into our other house.

21   Everything.

22        Q.   Why did you have to get new furniture?

23        A.   Couldn't take it with us.  I set stuff out on

24   the curb.  People come to get it.  Chinese drywall.
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/10 Page 2917 of 3246
Case 1:09-md-02047-MCA-Document 23831 Entered on FLSD Docket 03/12/2011 Page 80 of
181

Confidential - Subject to Further Confidentiality Review

```
 1    They took it any way.  People we knew would come and

 2    take it out of our house.  I wasn't taking that stuff

 3    with me.

 4         Q.   Why is that?

 5         A.   Because it stank so bad and it was horrible.

 6    It wasn't going to put it in our house again.

 7         Q.   Did you ever attempt to have any of the

 8    furniture cleaned?

 9         A.   No.  How are you going to clean that junk?

10         Q.   So, no, you didn't attempt to have it

11    cleaned?

12         A.   No.

13         Q.   Instead you said that you left it out and

14    people took it from the curb?

15         A.   Yeah.

16         Q.   Okay.  So you replaced those items with

17    different items for the home that you moved into --

18         A.   Yes.

19         Q.   -- on 37th Place?

20         A.   Yes.

21         MR. ALBANIS:  Just wait for him to finish his

22    question before you answer.

23         Sorry, Matt.

24    ///
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 2918 of 3246
Case 1:09-cv-02489-MCA Document 831 Entered on FLSD Docket 05/19/2019 Page 41 of 181
Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. LAWSON:

 2         Q.    What other expenses did you incur after you

 3    moved out of the Van Buren Parkway home to go live in

 4    the 37th Place home, to move your life over to that

 5    other house?

 6         A.    Clothing.  We threw clothes away.  Clothing.

 7    All new furniture, clocks, dishes.  Everything.

 8         Q.    Do you know if you have receipts for the

 9    clothing, the furniture?

10         A.    No.

11         Q.    No, you do not have receipts for these items

12    you just listed?

13         A.    No.

14         Q.    But you were able to move into another home,

15    the home on 37th Place, when you moved out of the

16    Van Buren Parkway home; is that right?

17         A.    We had renters there.  We had to get them

18    out.

19         Q.    How did you get them out?

20         A.    We gave them notice they had to leave.

21         Q.    You ended their lease --

22         A.    Ended their lease.

23         Q.    -- so you could move in; is that right?

24         A.    Uh-huh.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2919 of 3246
Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2919 of 3246
181

Confidential - Subject to Further Confidentiality Review

```
 1          Q.    And what expenses did you have at the

 2   Van Buren Parkway home after you moved out of it, if

 3   any?

 4          A.    I don't remember.

 5          Q.    Do you -- can you think of anything that you

 6   continued to pay for at the Van Buren Parkway home

 7   after you moved out?

 8          A.    I don't remember, no.

 9          Q.    Where were you living at that time that that

10   home was being built around 2006?

11          A.    We were living on Van Buren -- I mean the

12   house on 1206.

13          Q.    1206 37th Place?

14          A.    Yeah.  We were living there.

15          Q.    Okay.  So you lived in that home before the

16   home on Van Buren Parkway was built for how many

17   years?

18          A.    I don't remember.

19          Q.    Okay.  Do you remember when you first spoke

20   with an attorney about Chinese drywall in your home?

21          A.    No, I don't.

22          Q.    Was it you or your wife that would have

23   spoken to an attorney first?

24          A.    I don't remember.
```

Case 2:09-md-02047-EEF-MBN Document 23263-39 Filed 11/19/19 Page 2920 of 3246
Case 1:11-cv-22408-MGC Document 28831 Entered on FLSD Docket 05/18/2013 Page 83 of
181

Confidential - Subject to Further Confidentiality Review

```
 1              (Defendants' Exhibit 6 was marked for

 2      identification.)

 3      BY MR. LAWSON:

 4          Q.   Mr. Walls, we have looked at a couple of

 5      inspection reports for your home on Van Buren Parkway

 6      already today, right?

 7          A.   Yes.

 8          Q.   Do you remember who paid for the inspections,

 9      the Erickson's inspection and the Allied Homes

10      inspection that we looked at earlier?

11          A.   I don't remember.  If I paid for them, I

12      don't remember.

13          Q.   You have just been handed a document that's

14      been marked as Exhibit 6.

15              Do you recognize this document?

16          A.   Liberty Mutual, yes.

17          Q.   I'll give you a second to take a look at it.

18              MR. ALBANIS:  It's 63 pages long so take a

19          few moments.

20              THE WITNESS:  I don't remember.  It's been so

21          long.

22              Yeah.

23      BY MR. LAWSON:

24          Q.   Have you had a chance to review the document?
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 2921 of 3246
Case 1:09-md-02047-MCA Document 2958-1 Confidential Supplement 05/18/2018 Page 91 of
181
Confidential - Subject to Further Confidentiality Review

```
 1        A.   Yes.

 2        Q.   Okay.  Have you seen this before?

 3        A.   Yes.

 4        Q.   Okay.  When do you remember seeing this

 5   document?

 6        A.   I don't remember, but I have seen it.  I

 7   don't know when.

 8        Q.   Does it sound accurate this was an inspection

 9   done related to your homeowner's information policy

10   with Liberty Mutual?

11        A.   Yes.

12        Q.   And at that time were you pursuing a claim

13   from -- under that homeowner's insurance policy?

14        A.   At that time, if we could have, we would

15   have, yes.

16        Q.   Looking to the -- it's the second page of

17   this exhibit, but it's marked as Page 1 at the bottom

18   of it.  The title of the page is Project Summary.

19             Do you see that?

20        A.   Yeah.

21        Q.   If you look at the top of the page under

22   Project Assignment, it says -- states:  On

23   December 3, 2010, SEA Limited was contacted regarding

24   reported damage to the Walls' residence located at
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2922 of 3246
Case 1:1-cv-22408-MGC Document 29-31 Entered on FLSD Docket 05/18/2012 Page 85 of
181
Confidential - Subject to Further Confidentiality Review

1    2510 Van Buren Parkway, Cape Coral, Florida.

2         Did I read that correctly?

3    A.   Yes.

4    Q.   So this inspection occurred in December of

5    2010; is that right?

6    A.   Yes.

7    Q.   And previously we looked at two inspections

8    that were done in 2009?

9    A.   Yes.

10   Q.   To your knowledge, did you have any other

11   inspections done after this one of your property?

12   A.   I -- I don't think so, no.

13   Q.   Do you remember this inspection occurring?

14   Were you present for it?

15   A.   Yes.

16   Q.   You were at the home when the inspection was

17   done?

18   A.   Yes.

19   Q.   Okay.  Did you answer questions for the

20   inspectors?

21   A.   I don't remember.

22   Q.   I'd like to turn your attention to Page 3 at

23   the bottom.  You can see there, it's the fourth page

24   of the exhibit.

Case 2:09-md-02047-EEF-MBN  Document 23263-39  Filed 11/19/10  Page 2923 of 3246
Case 1:09-md-02047-EEF-MBN  Document 23231  Filed 11/19/10  Page 46 of 181
Confidential - Subject to Further Confidentiality Review

```
1              In the Section 3, titled Discussion, there's

2      a Background Information section.

3              Do you see that?

4      A.   Yes.

5      Q.   It states in the final paragraph on that page

6      that:  Mr. Walls said he and his wife have always

7      noticed an odor in the laundry room but assumed it

8      was from fertilizer in the adjacent garage.

9              Did I read that correctly?

10     A.   Yes.

11     Q.   So back in 2010, was it correct that the

12     smell that you noticed in the house was in the

13     laundry room of the house?

14     A.   As soon as you walked in, you got a sulfur

15     smell.  I thought laundry room, you know, walk in the

16     house -- you know.  The whole house stink.

17     Q.   Was the laundry room located at the entrance

18     to the home?

19     A.   Garage.

20     Q.   When you came in the garage, you were in the

21     laundry room?

22     A.   Uh-huh.

23     Q.   And that's when you would notice the smell

24     when you walked in?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2924 of 3246
Case 1:11-cv-22408-MGC Document 208-31 Entered on FLSD Docket 05/19/2014 Page 87 of
181

Confidential - Subject to Further Confidentiality Review

1       A.    Uh-huh.

2       Q.    And what was the reason that you said that

3    you and your wife had always noticed an odor in the

4    laundry room?  Was the smell greater in the laundry

5    room?

6             MR. ALBANIS:  Object to the form.

7             But can answer, Mr. Walls, if you know.

8             THE WITNESS:  I don't remember.  I don't.

9    BY MR. LAWSON:

10      Q.    Okay.  Was the smell more pronounced in a

11   certain part of the home than it was in another?  Was

12   there a part of it where you could smell it more?

13      A.    Not really, because you could smell it all

14   through the house.

15      Q.    It goes on to state:  He stated the

16   air-conditioning system failed approximately one year

17   after purchase of the residence and it was

18   subsequently repaired.

19            Did I read that correctly?

20      A.    Yes.

21      Q.    And this is what we talked about earlier,

22   right, with the handler and the air-conditioning

23   unit; is that right?

24      A.    Yes.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2925 of 3246
Case 2:09-cv-02048-MCE Document 23081 Confidential Subject to Docket 05/19/2011 Page 5 of
181
Confidential – Subject to Further Confidentiality Review

1    Q.   And was that -- the handler was the only

2    repair that was done on the air-conditioning unit?

3    A.   Yes.

4    Q.   It goes on to say:  It failed again in

5    September 2009 and has not been repaired.

6         Did I read that correctly?

7    A.   Yes.

8    Q.   Now, did -- was the air-conditioning unit

9    repaired at any other point after this report was

10   written in 2010, or was that the last repair of the

11   air-conditioning unit?

12   A.   I don't remember.

13   Q.   It goes on to state:  Mr. Walls stated the

14   lights occasionally flicker, the dryer's making

15   unusual noises when it is operated, and the smoke

16   alarms in the kitchen and the living room have

17   sounded.

18        Did I read that correctly?

19   A.   Yes.

20   Q.   For the first item, the lights occasionally

21   flickering, where did that occur in the home?

22   A.   The dining room.

23   Q.   And that was where the light switch was hot

24   to touch?

Confidential – Subject to Further Confidentiality Review

```
 1      A.   The dining room was here.  The laundry room

 2  was between the dining room.  And there was another

 3  bedroom on the other side of the laundry room.  Then

 4  the garage.

 5      Q.   So the lights would flicker in the dining

 6  room where the light switch was hot to the touch?

 7      A.   Yes.

 8      Q.   It says the dryer is making unusual noises

 9  when it is operated.

10           Can you tell me about that?

11      A.   I don't remember what it sounded like.  My

12  wife might know more about that.  I don't know.

13      Q.   Did you ever have to replace the dryer?

14      A.   I don't remember.  I don't think so.  I don't

15  remember.

16      Q.   Do you remember if it ever stopped working?

17      A.   I don't remember.  I don't.

18      Q.   That sentence also says the smoke alarms in

19  the kitchen and the living room have sounded.

20           Can you tell me about that?

21      A.   I remember them going off, yes.

22      Q.   How often would that happen?

23      A.   Oh, I don't know.

24      Q.   Would they go off until they were turned off?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2927 of 3246
Case 1:09-cv-02047-GAP Document 2001-31 Entered on FLSD Docket 05/19/2017 Page 90 of
181
Confidential - Subject to Further Confidentiality Review

```
 1       A.   I don't -- I remember them going off.  That's

 2   all I remember.

 3       Q.   So at some point the smoke alarms in the

 4   kitchen and living room sounded or went out?

 5       A.   Yes.

 6       Q.   Did you have to replace them?

 7       A.   I can't remember if I disconnected them or

 8   what I did.  I don't remember now.

 9       Q.   If you go on to the fourth page at the top of

10   the page, it states:  Mr. Walls said that Morgan &

11   Morgan retained Erickson's, a consulting firm, to

12   evaluate the drywall.  Erickson's inspected the

13   residence in October 2009, removing a section of

14   drywall from the garage, inspecting the back of the

15   drywall in the garage attic for identifying markings,

16   and placing a scope into the wall cavities to detect

17   identifying markings.

18            Did I read that correctly?

19       A.   Yes.

20       Q.   And that was the Erickson's Drying System

21   inspection from 2009 that we looked at earlier,

22   right?

23       A.   Yes.

24       Q.   Do you remember ever seeing a report on any
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2928 of 3246
Case 1:11-cv-22408-MGC Document 205-31 Entered on FLSD Docket 05/18/2012 Page 91 of 181
Confidential - Subject to Further Confidentiality Review

 1    testing done for the drywall that was removed?

 2         A.    I don't remember that, no.

 3         Q.    If you go down to the final paragraph on that

 4    fourth page, it states:  Mr. Walls related that the

 5    ceramic floor tile in the dining room began to debond

 6    approximately one year ago.  The debonding has spread

 7    through much of the residence and the exterior patio.

 8              Did I read that correctly?

 9         A.    Yes.

10         Q.    Can you tell me about what happened with your

11    ceramic floor tile?

12         A.    It just popped up, and finally we just moved

13    out.

14         Q.    I'm sorry?

15         A.    We left the house.

16         Q.    You left the house when the tile started --

17         A.    Popping back, yeah.

18         Q.    Where was the tile debonding from the floor?

19         A.    Everywhere.  It doesn't -- that had nothing

20    to do with Chinese drywall.  That was a bad tile job.

21         Q.    Okay.  So the tile floor was, in your

22    opinion, not related to the Chinese drywall?

23         A.    No, no.

24         Q.    Who did the tile work in your home?

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2929 of 3246
Case 2:09-md-02047-EEF-MBN Document 20838-1 Entered on FLSD Docket 05/19/2017 Page 92 of
181

Confidential - Subject to Further Confidentiality Review

```
 1        A.   I don't remember.  It's a funny name.  I
 2   forgot.  My wife knows.
 3        Q.   It states in the last sentence:  Mr. Albino
 4   related that the tile debonding is a result of
 5   exposure to the drywall.
 6        A.   Well --
 7             MR. ALBANIS:  I have been called many things
 8        in my life.  I'm not sure if I've ever been
 9        called that.
10             MR. LAWSON:  I'm guessing this refers to
11        Mr. Albanis?
12             THE WITNESS:  I had no idea, but I don't
13        know.
14             MR. LAWSON:  Maybe that is an auto correct.
15             MR. ALBANIS:  I'm sure it was.  Usually they
16        get Mr. Albania, but here it is Mr. Albino.
17   BY MR. LAWSON:
18        Q.   But as you said, you believed that the
19   ceramic tile issue was related to --
20        A.   It could have, but I don't know.  I have no
21   idea.  I just -- I don't think so, but who knows.
22   The house was so bad, who knows.
23        Q.   Do you remember what the result of this
24   inspection with the company that Liberty Mutual sent
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2930 of 3246
Case 1:11-cv-22408-MGC Document 91-31 Entered on FLSD Docket 05/19/2011 Page 93 of
181

Confidential – Subject to Further Confidentiality Review

```
1    was?  Do you remember what happened after that?

2        A.   I don't remember.  They cancelled us out.

3        Q.   Yeah.  They cancelled your homeowner's

4    insurance policy after this inspection?

5        A.   After this, yeah.

6        Q.   And did you have another homeowner's policy

7    after this, or did you move out of the home?

8        A.   We had to get homeowner's, I believe, but I

9    don't remember who.

10        Q.   So you still had a homeowner's policy on the

11    home after you moved out of it?

12        A.   Yeah, we had to.  Have to.  We had to.

13        Q.   But it was not with Liberty Mutual?

14        A.   No.

15        Q.   Is that right?

16        A.   No, no.

17        Q.   Let's look at Page 59 of this report.

18    There's a header that states Effect of Drywall

19    Off-Gassing on Floor Tile.

20            Do you see that?

21        A.   Yes.

22        Q.   It says:  SEA considered whether off-gassing

23    from the drywall caused the tile bonding failure, as

24    theorized by Mr. Albanis.  Had this been the case,
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2931 of 3246
Case 1:11-cv-22408-MGC Document 280-31 Entered on FLSD Docket 05/28/2014 Page 91 of
181
Confidential - Subject to Further Confidentiality Review

 1    SEA would expect the floor tile debonding failure to

 2    be limited to the interior of the residence where

 3    exposure to the drywall would occur.  This is not the

 4    case since the floor tile is debonding on the pool

 5    deck as well as inside the residence.

 6           In addition, there's no known mechanism by

 7    which off-gassing from drywall would affect the

 8    physical and chemical bond between the floor slab,

 9    thin set, and floor tile?

10           Accordingly, SEA concluded that floor tile

11    bonding failure cannot reasonably be attributed to

12    exposure to problematic drywall.

13           Did I read that correctly?

14    A.   That's right.

15    Q.   So SEA came to the conclusion that there was

16    no connection between the Chinese drywall and the

17    tile debonding that was occurring at the home; is

18    that right?

19    A.   That's right.

20           (Defendants' Exhibit 7 was marked for

21    identification.)

22    BY MR. LAWSON:

23    Q.   Mr. Walls, I have handed you a document that

24    has been marked as Exhibit 7.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2932 of 3246
Case 1:09-cv-07666-CJC Document 26831 Entered on FLSD Docket 05/19/2017 Page 95 of
181

Confidential - Subject to Further Confidentiality Review

```
1              Have you seen this document before?

2         A.   I don't remember this, no.

3         Q.   This appears to be at the top a letter from

4    AirQuest Environmental Incorporated.

5              Do you see that?

6         A.   Uh-huh.

7         Q.   I'll give you a second to review the

8    document.

9              Have you had a chance to review this

10   document?

11        A.   Yes.

12        Q.   All right.  So this letter discusses another

13   inspection of your home on Van Buren Parkway that I

14   would -- that I would imagine occurred sometime

15   around the time of this letter on September 14th,

16   2010.

17             Do you recall that?

18        A.   I don't recall this one.  No, I don't.

19        Q.   If you look to the paragraph that has a

20   header called Introduction, it states:  AirQuest

21   project manager Paul LeBlanc conducted the site

22   inspection on August 17, 2010.  The homeowners and

23   the homeowners' attorney, Mr. Albanis, were present

24   during the site inspection.
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2933 of 3246
Case 1:09-cv-02047-EEF-MBN Document 22381 Exhibit 39 Filed 05/19/2017 Page 96 of
181
Confidential - Subject to Further Confidentiality Review

 1              Did I read that correctly?

 2      A.    Yes.

 3      Q.    So it looks like around August 17th of 2010

 4   you were present --

 5      A.    Yes.

 6      Q.    -- at the home for this inspection, along

 7   with Mr. Albanis?

 8      A.    I remember this inspection now.

 9      Q.    What do you remember about it?

10      A.    I remember them being there and Mr. Albanis

11   there and --

12      Q.    Do you remember why another inspection of

13   your home was performed?

14      A.    I don't remember.

15      Q.    Okay.  And this one was performed in August,

16   which is a little -- a few months before the

17   December 2010 inspection that we just looked at from

18   SEA for Liberty Mutual; is that right?

19      A.    That's right.

20      Q.    And you said just a second ago that you don't

21   recall anything specific about this inspection?

22      A.    I remember the inspection.  I don't recall.

23      Q.    Were you living in the home at the time that

24   this inspection occurred?

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2934 of 3246
Case 1:11-cv-22408-MGC Document 230-31 Entered on FLSD Docket 05/16/2013 Page 97 of
181

Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    And were you living in the home at the time

 3   that the SEA inspection occurred in December of 2010?

 4        A.    I don't remember if we were.

 5        Q.    Did you answer any questions for the

 6   inspectors during the inspection when it was

 7   performed?

 8        A.    I don't remember.

 9              (Defendants' Exhibit 8 was marked for

10   identification.)

11              MR. ALBANIS:  Can we take a quick break,

12        Matt?  Mrs. Walls isn't feeling well.

13              MR. LAWSON:  No problem.  As long as you

14        need.

15              (Recess from 11:34 until 11:46 a.m.)

16   BY MR. LAWSON:

17        Q.    Welcome back, Mr. Walls.

18              Before we took a break, we were looking at

19   what has been marked as Exhibit 8.

20              Have you had a chance to look at this

21   document?

22        A.    Just briefly here.

23        Q.    Go ahead and take a second to look at it if

24   you haven't seen it before.
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 2935 of 3246
Case 2:09-cv-02049-MCA Document 2931-31 Confidential Subject to Further Confidentiality Review
181
Confidential – Subject to Further Confidentiality Review

```
 1              Have you had a chance to look through the

 2   document?

 3       A.   Yes.

 4       Q.   Do you remember this inspection?

 5       A.   No, I don't.

 6       Q.   Okay.  And this looks like an inspection

 7   report from Benchmark Remediation Group; is that

 8   right?

 9       A.   Yes.

10       Q.   And the letter at the top on the first page

11   is from May 12, 2011; is that correct?

12       A.   Yes.

13       Q.   And if you look to the second page of the

14   document, under General Information, you see a date

15   and time of May 12, 2011; do you see that?

16       A.   Yes.

17       Q.   Do you have any reason to think that that is

18   not the date of the inspection that occurred here?

19              MR. ALBANIS:  Object to form.

20              But you can answer.

21              THE WITNESS:  I don't -- I don't know.

22   BY MR. LAWSON:

23       Q.   Does it sound right that there might have

24   been an inspection in your home in 2011, maybe around
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 2936 of 3246
Case 2:09-cv-02047-MGAL Document 2601-31 Confidential Subject to Further Confidentiality Review
181
Confidential - Subject to Further Confidentiality Review

1    May?

2        A.    Could have been.

3        Q.    Do you remember if you were living at the

4    home at the time of this inspection?

5        A.    No, I don't remember.  I don't think so, but

6    I don't remember.

7        Q.    And you don't recall being present for this

8    inspection; is that right?

9        A.    No.

10        Q.    If you look back to the first page, in the

11    second paragraph, it states:  The purpose of this

12    phase was to identify contaminated drywall within the

13    home, identify whether the home had any KPT drywall,

14    and identify whether the plumbing, electrical, and

15    HVAC had any corrosion.

16            As a summary, we have identified corrosion of

17    the copper wiring throughout the home.  In addition,

18    we did not discover the existence of Knauf drywall in

19    the home.  We have determined that the home does not

20    have copper plumbing?

21            Please see our detailed report for further

22    information or contact me should you have any

23    questions.

24            Did I read that correctly?

Confidential - Subject to Further Confidentiality Review

```
 1        A.   Yes.

 2        Q.   So the home had PVC plumbing, correct, not

 3    copper plumbing?

 4        A.   Yes.

 5        Q.   And at the time that this inspection occurred

 6    in 2011, the air-conditioning unit was working; is

 7    that correct?

 8        A.   I -- I don't know.  I have no idea.  I don't

 9    remember.

10        Q.   Do you know if you have had any inspections

11    of the home since May of 2011?

12        A.   I don't think.

13        Q.   Do you know who paid for this inspection --

14        A.   No, I don't.

15        Q.   -- in May of 2011?

16             Do you remember any drywall being removed

17    from the home during this inspection of May 2011?

18        A.   No, I don't remember the inspection.  I don't

19    know.

20        Q.   Has anyone ever told you how many Chinese

21    drywall boards are contained in the Van Buren

22    Parkway --

23        A.   No.

24        Q.   -- home?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2938 of 3246
Case 1:15-cv-22408-MGC Document 60-31 Entered on FLSD Docket 05/31/2016 Page 101 of 181
Confidential - Subject to Further Confidentiality Review

```
 1        A.   No.

 2        Q.   Has anyone ever told you the percentage of

 3   the home that is Chinese drywall?

 4        A.   No.

 5             MR. LAWSON:  We can go off the record.

 6                  (Discussion off the record.)

 7          (Recess from 11:50 a.m. until 12:50 p.m.)

 8   BY MR. LAWSON:

 9        Q.   Welcome back, Mr. Walls.

10             (Defendants' Exhibit 9 was marked for

11   identification.)

12   BY MR. LAWSON:

13        Q.   Mr. Walls, I've handed you a document that

14   has been marked as Exhibit 9.

15             I want you to turn your attention to the

16   first page of that document, but please feel free to

17   review the document if you haven't looked at it

18   before?

19        A.   Okay.

20        Q.   Have you had a chance to look at it?

21        A.   Yes.

22        Q.   Have you seen this before today?

23        A.   I've seen it, yeah, a little bit, yeah.

24        Q.   All right.  I'd like to first turn your
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2939 of 3246
Case 1:14-cv-02494-NGG Document 209-1 Entered on FLSD Docket 05/08/2019 Page 102 of 181
Confidential -- Subject to Further Confidentiality Review

```
1    attention to the Interrogatory Number 1 which

2    requests that you identify all types of damages that

3    you seek in this lawsuit.  Example:  Alternative

4    living expenses, diminution in value, loss of use and

5    enjoyment, et cetera, and specify amount sought for

6    each category.

7           Do you see that?

8    A.    Yes.

9    Q.    And in the answer that you have given here,

10   you state:  We seek alternative living expenses from

11   June 2010 through July 2014 of at least $88,640.96

12   and personal property damage expenses of at least

13   $73,000, lost equity, diminution in value, loss of

14   use and enjoyment, punitive damage, and prejudgment

15   interest.

16          Did I read that correctly?

17   A.    Yes.

18   Q.    Mr. Walls, we talked a little bit about

19   alternative living expenses earlier, and I'll have

20   some more questions for you about that later on.

21          But I wanted to first ask you about the

22   personal property damage expenses that are mentioned

23   here.

24          Now, it lists $73,000 -- excuse me -- at
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2940 of 3246
Case 1:14-cv-04048-NG-CLP Document 200-31 Entered on FLSD Docket 05/09/2019 Page 103 of 181
Confidential - Subject to further confidentiality Review

1    least $73,000 in personal property damages expenses.

2            Can you explain to me what personal property

3    damage you are referring to when you are requesting

4    $73,000?

5        A.   Yes.  My lawyer has all the documents for

6    that.

7        Q.   Okay.  Do you -- can you tell me about what

8    personal property items that you believe were damaged

9    by Chinese drywall that you're requesting money for?

10       A.   Personal items?  Well, we lost the TV sets.

11   We lost her jewelry.  Everything.  Almost everything

12   in the house was damaged by Chinese drywall.

13       Q.   Okay.  So you've listed televisions and

14   jewelry.

15       A.   Clocks.

16       Q.   Okay.  Now, did you replace any televisions

17   during the time that you lived --

18       A.   No.

19       Q.   I'm sorry.  Let me finish my question.

20            Did you replace any televisions during the

21   time you lived at the Van Buren Parkway home?

22       A.   No.

23       Q.   And is it only one television?

24       A.   Two.

```
 1        Q.    Two televisions.

 2              And have you -- do you have receipts for your

 3     purchases of those televisions?

 4        A.    No.

 5        Q.    You mentioned jewelry items of your wife's.

 6              Do you have receipts for those jewelry items?

 7        A.    No, I don't.  That was jewelry she had before

 8     me, a lot of it.

 9        Q.    You mentioned clocks.  Do you have receipts

10     for the clocks that you believe were damaged?

11        A.    I have no receipts of nothing like that, no.

12        Q.    Are there any other personal property items

13     that you can think of that were damaged by Chinese

14     drywall in your home?

15        A.    Offhand right now, I -- I can't right now.

16              MR. ALBANIS:  For the record, we did produce

17        receipts for a number of items that have been

18        uploaded to the BrownGreer portal that are --

19        that form a portion of the personal property

20        damages claim that the -- that Mr. and Mrs. Walls

21        are asserted.

22              MR. LAWSON:  And, Pete, I understand that,

23        but I would request and put on the record that if

24        there are any additional documentation for
```

Case 2:09-md-02047-EEF-MBN  Document 22363-29  Filed 11/19/19  Page 2942 of 3246
Case 1:14-cv-42408-NG-LB  Document 269-31  Entered on FLSD Docket 05/08/2015  Page 405 of 181
Confidential - Subject to Further Confidentiality Review

```
 1        personal property damages, since you just said

 2        that it was a portion of the amount, we would

 3        request them to be produced immediately since we

 4        are in the midst of fact discovery and would have

 5        liked to be able to question Mr. and Mrs. Walls

 6        about those today during today's deposition.

 7             MR. ALBANIS:  We have produced all of the

 8        receipts that they have regarding this portion of

 9        the claim.

10   BY MR. LAWSON:

11        Q.   Mr. Walls, have you had anyone come to your

12   home to tell you that the personal property items

13   that you've mentioned were damaged by Chinese

14   drywall?

15        A.   No.

16        Q.   No one told you that your televisions were

17   damaged by Chinese drywall?

18        A.   If you lived there, you would know what

19   damages what.

20        Q.   Okay.  But no one inspected the television?

21        A.   No.  Didn't have to.

22        Q.   Did anyone attempt to repair the television?

23        A.   No.

24        Q.   Did anyone attempt to repair the jewelry?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2943 of 3246
Case 1:11-cv-00804-NGG Document 269-31 Confidential Filed 05/09/2013 Page 106 of 181
Confidential - Subject to Further Confidentiality Review

```
 1        A.   No.

 2        Q.   Okay.  Did anyone attempt to repair the

 3   clocks?

 4        A.   No.

 5        Q.   To your knowledge, have you had anyone

 6   attempt to repair any items, other than the

 7   air-conditioning unit, in the home?

 8        A.   No, I don't remember that.

 9        Q.   Do you believe that you have any receipts or

10   invoices for repairs of personal property items in

11   your home?

12        A.   I -- no.  I don't know.  I don't know.

13        Q.   Mr. Walls, looking at that document.  Is that

14   document true and correct to your knowledge?

15        A.   To my knowledge, it's correct.

16        Q.   Okay.  And you'd agree that you did not

17   personally sign that document, correct?

18        A.   I didn't sign it, no.

19        Q.   But it is correct, to your knowledge, looking

20   through it?

21        A.   (Nodding head.)

22        Q.   Is that a yes?

23        A.   Yes.

24        Q.   Thank you.
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2944 of 3246
Case 1:14-cv-02494-NGG Document 391 Entered FLSD Docket 05/08/2019 Page 107 of 181
Confidential - Subject to Further Confidentiality Review

```
 1              MR. ALBANIS:  My office will go ahead and

 2        upload the verifications that we have for the

 3        answers to interrogatories.

 4              MR. LAWSON:  Thank you.

 5              (Defendants' Exhibit 10 was marked for

 6        identification.)

 7    BY MR. LAWSON:

 8        Q.   Mr. Walls, I have handed you a document that

 9    has been marked as Exhibit 10.  I'll give you a

10    moment to look through it.

11              Please let me know when you have had a minute

12    to review the document.

13        A.   Okay.

14        Q.   Have you seen this before?

15        A.   I think I remember this, I think, yes.

16        Q.   Is that your handwriting or your wife's

17    handwriting?

18        A.   No, it must be my wife's.

19        Q.   Okay.  This document is titled Chinese

20    Drywall Settlement Program Miscellaneous Claim form.

21              Do you see that at the top?

22        A.   Yes.

23        Q.   Now, if you turn -- excuse me.

24              If you look at this first page, there is a
```

1    list of 16 different items that appears -- that are

2    on this list.

3            Do you see that?

4        A.   Uh-huh.

5        Q.   What are these items?

6        A.   These are items we had in our house.

7        Q.   Okay.  And was it your belief that these

8    items were damaged by Chinese drywall in your home?

9        A.   Absolutely.

10       Q.   And for each item, there's a dollar figure

11   next to the item; is that right?

12       A.   Yes.  I see the figure, yes.

13       Q.   Okay.  What do those dollar items mean?

14       A.   It's what my wife paid for the stuff, I

15   believe.  I don't know.

16       Q.   Does it sound correct that you are pursuing a

17   claim through the Chinese Drywall Settlement Program

18   for these items and the dollar amounts listed here on

19   these items?

20       A.   Yes.

21       Q.   Okay.  And earlier we discussed that on your

22   Supplemental Plaintiff Profile Form you listed

23   receiving in excess of $20,000 from the Chinese

24   Drywall Settlement Program; is that right?

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2946 of 3246
Case 2:14-cv-02494-NGG Document 269-31 Entered on FLSD Docket 05/18/2018 Page 109 of 181
Confidential - Subject to Further Confidentiality Review

```
 1        A.   Okay.  Yeah.

 2        Q.   That's yes?

 3        A.   (Nodding head.)

 4        Q.   Yes?

 5        A.   Yes.

 6        Q.   Sorry.

 7             MR. ALBANIS:  You have to give verbal

 8        answers.  You can't just shake your head.

 9   BY MR. LAWSON:

10        Q.   To your knowledge, did you receive

11   compensation for your claim here for the 16 items

12   listed on this document?

13        A.   I don't know.

14        Q.   This -- under Item 11, there are two

15   televisions listed.

16             Do you see that?

17        A.   Yes.

18        Q.   Are these the same two televisions that you

19   were mentioning before as personal property that

20   was --

21        A.   Yes.

22        Q.   -- destroyed in your home?

23             Okay.  There are also rugs listed in Items 12

24   through 15; is that correct?
```

1    A.    Yes.

2    Q.    Now, earlier you said that you left -- took

3    items out to the street when you moved out of the

4    home; is that right?

5    A.    That's right.

6    Q.    Are some of these items the items that you

7    took out to the street when you moved out of the

8    home?

9    A.    I don't remember now.  It's been so long.

10   Q.    Specifically, you know, there's a chest

11   listed in Item 4, a cabinet listed in Item 5.

12         Are those the kinds of things that you would

13   have taken out to the street when you moved out of

14   the home?

15   A.    I didn't want nothing in the house.

16   Probably, yes.  I didn't want nothing in there.

17   Q.    So if it was in the home, if it was like a

18   furniture item in the home, you took it out of the

19   house and got rid of it; is that right?

20   A.    Or somebody else took it out and took it home

21   with them or it went out in the street -- someone

22   hauled it into the street and it was gone.  I don't

23   know.

24   Q.    Do you have any reason to believe that these

```
 1    dollar items -- the dollar entries listed for each of

 2    these items are incorrect?

 3        A.   It's correct.  It was expensive stuff we had,

 4    yes.

 5        Q.   And it's your understanding this is the

 6    amount that you paid for these different items?

 7        A.   That's right.

 8            (Defendants' Exhibit 11 was marked for

 9    identification.)

10    BY MR. LAWSON:

11        Q.   I've handed you a document that's been marked

12    as Exhibit 11.  I represent to you that these are

13    photos and images of items that were uploaded to the

14    BrownGreer online portal by your counsel.

15            I'll give you a chance to look through them.

16            Mr. Walls, have you had a chance to look at

17    this document?

18        A.   Yes.

19        Q.   All right.  I'd like to take your attention

20    to the first and second pages of this exhibit.

21            This shows, it looks like, a palm tree -- an

22    artificial palm tree inside of -- the image of it

23    inside of a home on the first page, along with an

24    invoice for delivery of that item to the home on
```

```
 1      Van Buren Parkway.

 2             Do you see that?

 3      A.   Yes.

 4      Q.   And then you if you look to the second page,

 5   it looks like there's an invoice and a receipt for

 6   purchase of that same item, that palm tree; is that

 7   correct?

 8      A.   That's correct.

 9      Q.   And if you look down to the totals in the

10   bottom right corners on the invoice on the second

11   page, it lists the total as $590.42; is that right?

12      A.   That's right.

13      Q.   And looking back to Exhibit 10 that we just

14   looked at, that list of miscellaneous items, if you

15   can look back to Item No. 1 on that list, on

16   Exhibit 10, you'd agree that it lists that same palm

17   tree for $590.42?

18      A.   Yes.

19      Q.   So these -- so these images and invoices are

20   the support for the claims that you have listed in

21   these 16 items on Exhibit 10; is that right?

22             MR. ALBANIS:  Object to the form to the

23        extent that there could be additional items in

24        Exhibit 11 that are not identified in Exhibit 10
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2950 of 3246
Case 2:14-cv-02949-NGE Document 208-31 Entered on FLSD Docket 05/28/2019 Page 113 of 181
Confidential – Subject to Further Confidentiality Review

```
 1          and vice versa.  You have only covered the first

 2          item.

 3     BY MR. LAWSON:

 4          Q.   At the very least, the first item that we

 5     have listed here is the same first item on Exhibit 11

 6     with the image on the invoices and receipts; is that

 7     right?

 8          A.   That's right.

 9          Q.   Now, if you look to the next item, there

10     appears to be an invoice here from National Home

11     Furnishing Center; is that correct?

12          A.   Yes.

13          Q.   And it looks like it's for a total of $4,802;

14     is that right?

15          A.   Okay.

16               MR. ALBANIS:  Right here.

17     BY MR. LAWSON:

18          Q.   On the bottom right corner.  I apologize.

19               This is the third page of Exhibit 11.  If you

20     look in the bottom right corner of that invoice,

21     there's a total of $4,802.

22               Do you see that?

23          A.   Yes, I see it.  Yes.

24          Q.   And looking at the items that are listed in
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2951 of 3246
Case 2:14-cv-02248-NGG-MDG Confidential - Subject to Further Confidentiality Review
of 181

1    the description, if you can read that, it appears to

2    be a table and chairs, perhaps a dining room set.

3            Do you see that?

4        A.    Yes.

5        Q.    And looking back to Exhibit 10, you can also

6    see that Item No. 2 is a dining room set for $4,802;

7    is that correct?

8        A.    Okay.  That's correct.

9        Q.    All right.  So, again, this invoice appears

10   to be in your request for compensation on the claim

11   form in Exhibit 10; is that right?

12       A.    That's right.

13       Q.    All right.  If you go to the next couple of

14   pages, those are images of the dining room set on the

15   next two pages; is that right?

16       A.    Yes.

17       Q.    And do you remember having those items in

18   your home?

19       A.    That's right here, next to it at the bottom,

20   a picture of it.

21       Q.    All right.  So on the fourth page -- excuse

22   me, the fifth page of this exhibit, there -- the

23   image on the bottom right is the image of the dining

24   room set in your home?

```
 1        A.    In the Van Buren home, yes.

 2        Q.    Do you have a receipt for the payment for

 3   this dining room set?

 4        A.    I don't --

 5        Q.    I ask because I see the invoice for the

 6   amount that is due, and I just wanted to understand

 7   if I was missing that there was also a receipt.

 8        A.    Yeah.  Yes.

 9        Q.    Okay.  Where is the receipt?

10        A.    I don't see a receipt for it.

11        Q.    Mr. Walls, is it your understanding that

12   you're pursuing money for the same personal property

13   items listed on this claim form in Exhibit 10 in this

14   current lawsuit?

15        A.    Yes.

16        Q.    Okay.  Do you know whether or not you were

17   already compensated for those forms -- or excuse me,

18   for those items previously in the Chinese Drywall

19   Settlement Program?

20        A.    No.

21              MR. ALBANIS:  Object to the form.  The

22        Chinese Drywall Settlement Program involved

23        numerous different claims, and homeowners would

24        authorize their attorneys to file claims into the
```

```
1           program for numerous different types of claims.

2               Mr. and Mrs. Walls have -- Mr. Walls has

3           testified, and on their Supplemental Plaintiff

4           Profile Form, they have identified approximately

5           $27,000 worth of payments that they have received

6           from the Chinese Drywall Settlement Program for

7           numerous different claims.

8               I would venture to say that most homeowners

9           do not know what categories of claims they

10          received compensation for, just so that you are

11          aware how the settlement program operated back in

12          2013, 2014, and 2015.

13              MR. LAWSON:  And I appreciate that, and I do

14          have a personal understanding of that.  I wanted

15          to understand Mr. Walls' understanding of this

16          since, you know, this was requested, it sounds

17          like, by Mrs. Walls to list out these items.  So

18          I just wanted to have an understanding whether

19          they have previously been compensated for the

20          items here on Exhibit 10.

21      BY MR. LAWSON:

22          Q.   So if you can answer that question, I would

23      appreciate it, to the best of your knowledge.

24          A.   I don't know.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2954 of 3246
Case 1:15-cv-02048-NGG Document 31-4 filed 08/04/16 USDC page 69 of 617
Confidential - Subject to Further Confidentiality Review
of 181

1    Q.   Okay.  But you have -- and we have previously

2    established, and Mr. Albanis said -- you have

3    received upwards of $27,000 or so from the Chinese

4    Drywall Settlement Program for your claims related to

5    damages for Chinese drywall; is that right?

6    A.   I received that, yes.

7    Q.   And you would agree that this lists thousands

8    of dollars of personal property damages on

9    Exhibit 10, correct?

10    A.   What was that now?

11    Q.   You would agree that Exhibit 10, this

12    miscellaneous claim form, lists thousands of dollars

13    of personal property damages?

14    A.   That's just part of it, yeah.

15    Q.   And I would represent to you that, having

16    added this up, it's somewhere around $30,000 in

17    personal property damages that are listed on this

18    form.  Does that sound about right to you for the

19    amount that you see here?

20    A.   I don't know.

21    Q.   Okay.  Now, looking through Exhibit 11, the

22    images and invoices that we have, do you see any --

23    are there any items -- personal property items that

24    you believe were damaged by Chinese drywall in your

```
 1      home that do not appear in Exhibit 11?

 2              And please take your time to look through it.

 3      I want to understand if there are any other items

 4      that are not shown in this set.

 5              MR. ALBANIS:  While Mr. Walls is looking

 6          through that, I just want to state for the

 7          record, Page 3 of Exhibit 11 does identify two

 8          check numbers down at the bottom, Check Number

 9          3316 and Check Number 3318.

10              So while the Wallses may not have receipts,

11          certainly, this National Home Furnishings Center,

12          Incorporated did identify in this form two check

13          numbers which presumably would mean that they did

14          pay using checks.

15              MR. LAWSON:  I appreciate that, and I would

16          ask, then, if there are checks and images that

17          could be obtained for those items that they be

18          produced.

19              And we would also just like to have an

20          understanding if that these are the actual

21          personal property items that are being pursued.

22          This is a document that was placed on the

23          BrownGreer portal a long time ago.  So if you

24          could -- at some point; it doesn't need to be
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/10/19 Page 2956 of 3246
Case 2:14-cv-02722-NGG Document 931-2 Filed on 11/15/21 in TXSD Page 1 of 181
Confidential -- Subject to Further Confidentiality Review

```
 1          today -- but to verify what personal property

 2          items are actually being pursued and whether

 3          these are the ones, that that would be very

 4          helpful.

 5              MR. ALBANIS:  Well, isn't that what today's

 6          deposition is for?

 7              MR. LAWSON:  Well, unfortunately, Mr. Walls

 8          is not able to tell me that, and I need to be

 9          able to understand it -- to be able to understand

10          what you-all are pursuing.

11              This appears to be an old claim that was

12          filed in a separate settlement program, and we

13          are making an assumption that it might be

14          something that you are pursuing here today.

15              But there have been no representations as to

16          what personal property items are part of the

17          total that you have listed in your discovery

18          responses, and we need to be able to have an

19          understanding of that to be able to defend

20          against these claims.

21              So we would like clarification on that as

22          soon as possible to be able to understand exactly

23          what you are requesting in your personal property

24          damages.
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2957 of 3246
Case 1:14-cv-02494-NGG Confidential Document 269-31 - Entered on FLSD Docket 05/18/2015 Page 120 of 181
Confidential - Subject to Further Confidentiality Review

```
1          MR. ALBANIS:  I would say that

2      Mr. and Mrs. Walls have stated that they are

3      seeking $73,000 in personal property damage, and

4      you can certainly ask them where that figure came

5      from, which is what I think you are in the

6      process of asking him about.

7          MR. LAWSON:  I agree that's what I've done,

8      and we have also identified that some of the

9      items that have been listed were already listed

10     here.  So we're trying to -- I'm trying to

11     understand whether we're seeking recovery again

12     for the same items or not, but he doesn't seem to

13     have an understanding of that, which is

14     understandable, because this is an old set of

15     documents.

16         But if we can get some verification from you

17     on exactly what items -- or if there are more

18     than these, because this is all that we were able

19     to find in the portal for personal property.

20         THE WITNESS:  That's what he decided, Judge

21     Fallon.

22 BY MR. LAWSON:

23     Q.   So, Mr. Walls, going back to my question.

24         Do you see any personal property items other
```

```
 1    than the ones that are shown and listed in invoices

 2    in Exhibit 11 that have been damaged by Chinese

 3    drywall in your home on Van Buren Parkway?

 4         A.   All these, I'm looking at them?

 5         Q.   Okay.

 6         A.   All this is what I'm looking at?

 7         Q.   Yes.

 8         A.   It was all damaged.  Rugs, everything.

 9         Q.   My question is do you see -- is there

10    anything other than these items that you can think of

11    that has been damaged by Chinese drywall?

12         A.   I don't know.

13         Q.   Would anyone else know?

14         A.   I don't know.  Maybe my wife.  I don't know.

15         Q.   To your knowledge, are there any other photos

16    of personal property or receipts or invoices for

17    property that you claim was damaged in your home by

18    Chinese drywall that you have in your records or that

19    you have given over to your attorneys other than

20    what's here in Exhibit 11?

21         A.   I don't know.

22         Q.   Looking through the items in Exhibit 11, does

23    this look like an accurate reflection of items that

24    you believe were damaged by Chinese drywall in your
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2959 of 3246
Case 1:14-cv-06428-NG-JO Document 200-31 Entered on FLSD Docket 05/14/2019 Page 122 of 181
Confidential - Subject to Further Confidentiality Review

1    home?

2        A.   Absolutely.

3        Q.   I'd like to go back to Exhibit 9, which I

4    believe was the interrogatory responses, the Court

5    document that you were looking at a little bit

6    earlier.

7             Can you pull that back out?

8             Now, under that first interrogatory response

9    on the first page, the answer states that you are

10   seeking damages for loss of use and enjoyment of your

11   property.

12            Is that correct?

13       A.   That's correct.

14       Q.   All right.  Now, how has -- how has the

15   presence of -- how did the presence of Chinese

16   drywall limit your use of the property on Van Buren

17   Parkway?  How did it change your ability to use it?

18       A.   We couldn't enjoy our home no more.  We loved

19   that house.  My wife loved the house.  I loved the

20   house.  Mentally and her health and stuff, it ruined

21   us.  It just ruined us.

22            She drives a school bus.  She goes by that

23   damn house.  She has a spot down the street -- two

24   houses down from that house.  She sees that house

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2960 of 3246
Case 1:14-cv-04049-NGG Deutsche Bank National Trust Company Subject to Further Confidentiality Review of 181
Confidential - Subject to Further Confidentiality Review

```
1    every day.  When school is going on, twice a day she

2    sees that house.  She comes home crying, all messed

3    up.  And I got to live with that?  Still mentally

4    live with that stuff.  It's the way I feel.

5        Q.   Has it been harder since you have moved out

6    of the home than when it was when you lived in it?

7        A.   It still bothers us.  Mentally, it bothers us

8    bad.

9        Q.   How did it affect you when you were living in

10   the home?

11       A.   You don't know.  You don't know how bad it

12   was.

13       Q.   That's why I'm asking because I want to

14   understand.

15       A.   It was horrible.

16       Q.   Can you tell me more about that?

17       A.   It was horrible.

18            We didn't want to leave.  I was going to put

19   a tent up out on the lanai and live in a tent.  We

20   just couldn't stay there no more.  We just could not

21   stay there no more.

22       Q.   What were --

23       A.   The dog woke me up screaming.  It sounded

24   like a woman screaming at night.  I go in the
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2961 of 3246
Case 1:15-cv-24049-NGG Document 31 Entered on FLSD Docket 05/09/2016 Page 424 of 181
Confidential -- Subject to Further Confidentiality Review

```
 1    bathroom, dog's screaming.  Died.  Lung cancer.  The

 2    vet told me that's the fourth dog they found that

 3    come out of a Chinese drywall house with lung cancer.

 4        Q.   How old was your dog?

 5        A.   Eight.

 6        Q.   And what kind of a dog was it?

 7        A.   What was it?  I can't even think now.  What

 8    it?

 9             Schnauzer.  Schnauzer.  Schnauzer.

10        Q.   I'm sorry that your dog died.

11             During the time that you lived in the home

12    from 2006 until you left sometime in 2010, did -- was

13    there any point where you felt like you could live in

14    the house, that it was tolerable, and that it got

15    worse; or was it always just as bad throughout the

16    entire --

17        A.   It just got worse and worse all the time.

18        Q.   Okay.  And why did it get worse?

19        A.   I don't know.  I'm not a scientist.  I don't

20    know.

21        Q.   But what about it was worse?

22        A.   The odor.  The odor and everything else.  It

23    was bad.

24        Q.   Okay.  You have explained the odor before.
```

```
 1        A.   And the lights.  The refrigerator started to

 2   go out.

 3        Q.   Okay.  Can you tell me about that?

 4        A.   It started leaking.  It started getting, you

 5   know, warm.  And she did -- and I didn't realize, the

 6   dryer was fixed twice for something.  I don't

 7   remember what, but it was fixed twice.

 8        Q.   Did you ever have the refrigerator repaired?

 9        A.   I don't remember.

10        Q.   Okay.

11        A.   I think we used the one that was in the

12   garage.  We had two refrigerators.

13        Q.   Okay.  Did both of them have issues?

14        A.   The one finally went through, the one in the

15   garage.  It finally went.

16        Q.   The one in the garage went out?

17        A.   Yeah.

18        Q.   How long had you had that refrigerator?

19        A.   Right -- about a couple years after we moved

20   in, I believe.

21        Q.   Okay.  So you would have had it around 2008

22   or so, after you moved in?

23        A.   After we left that house, somebody else got

24   the refrigerator.  A friend of ours needed a
```

```
 1    refrigerator.  I told him it had been in a Chinese

 2    drywall house.  They took it to their house, and

 3    it -- finally, it quit.

 4        Q.   Do you know how much money that you are

 5    seeking for loss of use and enjoyment of your home?

 6        A.   What my judge -- from my judge's formula,

 7    $350,000.

 8        Q.   350,000 for loss of use and enjoyment?

 9        A.   Uh-huh.

10        Q.   Why is that the number that you are seeking?

11        A.   That's what my judge determined.

12        Q.   So that -- are you talking about Judge --

13        A.   My judge's formula.

14        Q.   -- Judge Fallon in Louisiana?

15        A.   Yeah.

16        Q.   You are saying that the formula determined

17    that you would get $350,000 --

18        A.   That's correct.

19        Q.   -- for loss of use and enjoyment?

20        A.   And really, that's not enough for what we

21    went through.  It's not enough.

22        Q.   I would like to ask you a little bit about

23    the figure you have for alternative living expenses

24    in this interrogatory response.  It says at least
```

Confidential - Subject to Further Confidentiality Review

```
 1    $88,640.96.

 2          Do you see that?

 3    A.    Yes.

 4    Q.    And that's for alternative living expenses

 5    from June 2010 through July 2014; is that right?

 6    A.    Okay.

 7    Q.    Is that what it says?  This is referring to

 8    Exhibit 9 that we were looking at a little bit

 9    earlier.

10    A.    Yeah.

11    Q.    And it says that you are seeking alternative

12    living expenses from June 2010 through July 2014 of

13    at least $88,640.96.

14    A.    That's correct.

15    Q.    What does "alternative living expenses" mean

16    to you?

17    A.    Explain that to me.

18    Q.    Yeah.  So when you are asking for this money

19    from June 2010 through July 2014, is that the period

20    of time where you had moved out -- where you still

21    owned the property -- the Van Buren Parkway home but

22    you had moved into the home at 37th Place?

23    A.    Okay.

24    Q.    Is that right?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2965 of 3246
Case 1:18-cv-02408-WFK Document 31 entered on FLSD Docket 05/08/2005 Page 128 of 181
Confidential -- Subject to Further Confidentiality Review

```
 1        A.    Yeah, probably.

 2        Q.    Okay.  You think that's probably the time

 3   frame --

 4        A.    It was close.

 5        Q.    -- when you moved out?

 6        A.    In that area, yeah.

 7        Q.    And you're seeking $88,000 -- $88,640.96 for

 8   that time period for living somewhere other than in

 9   your home on Van Buren Parkway?

10        A.    That's correct.

11        Q.    Okay.  And is that your understanding of what

12   you're seeking that money for?

13        A.    Yeah.

14        Q.    Okay.  What -- what expenses are included in

15   that figure of $88,640.96?  What amount of money did

16   you have to pay to be able to live somewhere other

17   than your home during that time?

18        A.    I don't understand.  Tell me what you mean.

19        Q.    So you're asking for that amount of money

20   right there?

21        A.    Yeah.

22        Q.    That $88,640 -- $88,640.96 for alternative

23   living expenses for alternative living expenses, for

24   having to live somewhere other than in your home on
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2966 of 3246
Case 2:14-cv-02722-NGG Confidential - Subject to Further Confidentiality Review
of 181

```
 1     Van Buren Parkway.

 2          A.    Yes.

 3          Q.    And I want to understand what -- what things

 4     you paid for that are a part of that dollar figure to

 5     be able to live somewhere other than on Van Buren

 6     Parkway.  Why is that the amount of money that you

 7     are seeking?

 8          A.    That's what -- the money we lost there, too.

 9     It's like, you know, my wife paid -- 120 -- we were

10     offered $150,000 for what?

11          Q.    You were offered $150,000 --

12          A.    My wife, before she built the house on that,

13     was offered $150,000 for that lot.

14          Q.    Okay.

15          A.    But the judge ruling -- it's what he

16     determined anyway, $88,000 for me.

17          Q.    Okay.  So it's your understanding that the

18     judge approved that --

19          A.    Yeah.

20          Q.    -- that amount of money?

21          A.    Yeah.  The judge approved that, yes.

22          Q.    And were you told that or how -- how did you

23     come to that conclusion that the judge had --

24          A.    That's what I read.
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2967 of 3246
Case 1:14-cv-24245-MGC Document 91-31 Entered on FLSD Docket 05/18/2016 Page 130 of 181
Confidential -- Subject to Further Confidentiality Review

1    Q.   Okay.  And do you know where you read that?

2    A.   Pardon me?

3    Q.   Do you know where you read that, that --

4    A.   I don't remember right now.

5         (Defendants' Exhibit 12 was marked for

6    identification.)

7    BY MR. LAWSON:

8    Q.   Mr. Walls, you've been handed a document

9    that's been marked as Exhibit 12.

10        I'll give you a second to look through that

11   document so you can get familiar with it.

12   A.   It's what we lost.

13   Q.   Mr. Walls, have you finished looking through

14   the entire exhibit?

15   A.   Yes, yes.

16   Q.   And not just the first lease portion.  I'm

17   going to ask you about the entirety of the document,

18   so I just wanted to give you a chance to be able to

19   review it before we go through.

20        Okay.  Have you had a chance to look at it?

21   A.   Yeah.

22   Q.   Starting at the first page, this appears to

23   be a residential lease for the home at 1206 Northwest

24   37th Place.

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2968 of 3246
Case 1:13-cv-02419-NGG Document 1991-1 Confidential - Subject to Further Confidentiality Review of 181
Confidential - Subject to Further Confidentiality Review

```
 1        A.    That's right.

 2        Q.    And this is the home that you rented out

 3   prior to moving out of the Van Buren Parkway home and

 4   then moved into beginning around 2010 or so; is that

 5   right?

 6        A.    That's right.

 7        Q.    Now, this is the lease beginning around June

 8   of 2008 for the renters that you had in the 37th

 9   Place home; is that correct?

10        A.    That's right.

11        Q.    And are these the same people that you had to

12   kick out of the home or, you know, move -- end their

13   lease --

14        A.    Yeah.  We had to end the lease.

15        Q.    -- so you could move in?

16              And this lease was for $1,300 a month; is

17   that right?

18        A.    That's right.

19        Q.    Okay.  Was that the same amount that you had

20   charged previously when you had rented out the home,

21   or was this first time?

22        A.    This is the first time we rented it out for

23   rent.  We rented it out seasonally.  As a seasonal,

24   you know, rental.
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2969 of 3246
Case 1:14-cv-02494-NGG Document 00 81 confidential Entered on FLSD Docket 05/08/2019 Page 132 of 181
Confidential - Subject to Further Confidentiality Review

```
1       Q.    You had done a seasonal rental of the home?

2       A.    Before these people came out.

3       Q.    And how much did you rent it out?

4       A.    We got like $3,000 a month.

5       Q.    $3,000 for a seasonal rental of the home?

6       A.    Uh-huh.

7       Q.    And do you know if you have any of the rental

8   agreements or leases that you had entered into --

9       A.    No.

10      Q.    Let me finish.

11            Do you have any records of the rental

12  agreements or leases that you entered into --

13      A.    No.

14      Q.    -- for those seasonal rentals?

15      A.    We lost all this rent, too, because of this.

16      Q.    I wanted to ask you about that.

17            So you were receiving $1,300 a month from the

18  Kegleys under this lease; is that right?

19      A.    That's right.

20      Q.    Now, what expenses were the Kegleys expected

21  to cover at the home during the time that they were

22  leasing it?  Do you recall?

23      A.    Well, they -- their electric expenses.  And

24  we maintained the yard for them.  That's about it.
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2970 of 3246
Case 1:15-cv-02409-NGG Deutsche Post-21 Confidential-21 10 Docket 05/18/2010 Page 133 of 181
Confidential -- Subject to Further Confidentiality Review

```
 1     The pool -- we did the pool.

 2          Q.   So they paid their utilities; is that right?

 3          A.   That's right.

 4          Q.   Did you pay the taxes on the property during

 5     the time?

 6          A.   Yeah.

 7          Q.   Okay.  And you continued to pay the taxes

 8     after you moved into the home; is that right?

 9          A.   I believe.

10          Q.   And you paid for the mortgage on the

11     property, if there was one; is that right?

12          A.   Yeah.

13          Q.   Okay.  And were there any other -- other than

14     doing yard work or taking care of the lawn, were

15     there any other things you did for the renters while

16     they were inside of the 37th Place home?

17          A.   Made some repairs for them.

18          Q.   Looking to the third page of this exhibit,

19     there's a handwritten note here at the top of it.

20     Appears to say June 10 to June 2013.  I think that

21     might be June 2010 to June 2013.

22               Does that sound accurate to you if that's

23     what that means?

24          A.   Yeah.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2971 of 3246
Case 1:18-cv-12408-NGG Document 1-18 Filed on 10/10/19 Page 38 of 181
Confidential - Subject to Further Confidentiality Review

```
1        Q.   Do you know who wrote this?

2        A.   My wife.

3        Q.   Okay.  And what does this appear to be to

4   you?

5        A.   It's what they charged for a year for grass

6   cutting and all that.  Grass cutting, yeah.

7        Q.   Does it sound right that this would be a list

8   of expenses that you had for the Van Buren Parkway

9   home --

10       A.   Yeah, probably.

11       Q.   -- Van Buren during the three years --

12       A.   I don't remember this.

13       Q.   Well, let me ask you:  It lists grass cutting

14   for $65 a month.

15            Do you see that?

16       A.   Yes.

17       Q.   Were you getting the grass cut at the

18   property before you moved out of it in 2010?

19       A.   Yes.

20       Q.   And you continued to do that after you moved

21   out of the home?

22       A.   I don't know how long we kept it cut.  I

23   don't know.

24       Q.   Okay.  But this seems to state for a
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2072 of 3246
Case 1:19-bk-00887-NGH Doc 801-31 entered 12/01/21 Page 0498 2016. Page 635
of 181

Confidential - Subject to Further Confidentiality Review

```
1    three-year period that grass cutting at $65 a month

2    totaled to $2,340.

3             Do you see that on the right side?

4        A.   I see that, yes.

5        Q.   So if you were paying that, that's what this

6    note lists as the cost of that grass cutting for

7    three years; correct?

8        A.   Yes.

9        Q.   But you would agree that that's something

10   that you were doing already before you moved out of

11   the home?

12       A.   Yes.

13       Q.   Is that right?

14       A.   I didn't write this.  I don't remember this.

15       Q.   Well, to the best of your knowledge, if you

16   were having someone cut the grass, you were paying

17   them to cut the grass before you moved out of the

18   home?

19       A.   Yes.

20       Q.   It also lists LCEC, $27 a month.

21            Is that an electrical bill?

22       A.   Yes.

23       Q.   And the three-year total for that is $972; is

24   that right?
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2973 of 3246
Case 1:14-cv-02494-NGG Document 91-4 Filed under Seal Date 05/08/2015 Page 436 of 181
Confidential - Subject to Further Confidentiality Review

    1        A.   That's what it says.

    2        Q.   All right.  So that's the electrical bill

    3    during the time that no one was living in the home;

    4    is that right?

    5        A.   I assume.  I don't know.

    6        Q.   Okay.  But no one was living in the home from

    7    when you moved out in 2010 through when this states

    8    in June of 2013; is that right?

    9        A.   No.

   10        Q.   No one was living there?  Okay.

   11             And you would have been paying for

   12    electricity at the home during that time at Van Buren

   13    Parkway if you lived there; is that right?

   14        A.   That's right.

   15        Q.   For pool maintenance, it lists below for $55

   16    a month.

   17             Is that accurate?

   18        A.   That's what it says.

   19        Q.   Do you remember paying for pool maintenance

   20    while you lived at Van Buren Parkway?

   21        A.   We had pool maintenance, yes.

   22        Q.   Does $55 sound about right?

   23        A.   It says $55.

   24        Q.   This lists -- let's see -- a three-year total

```
 1       of $1,980 on the right.

 2            Do you see that?

 3       A.   Yeah.

 4       Q.   Now, did you continue to maintain the pool

 5   and keep it open after you moved out of the home?

 6       A.   I did for a period.  I don't remember how

 7   long.

 8       Q.   Do you know why you did that?

 9       A.   I don't know.  Get it back.

10       Q.   Did you use the pool during that time?

11       A.   No.

12       Q.   Okay.  But you -- you kept it open and

13   maintained for the three-year period from when you

14   moved out until at least 2013 here?

15       A.   That's what it says.  I have no -- I don't

16   remember.

17       Q.   And to your knowledge, no one used the pool

18   during that time?

19       A.   I had my own pool.  Why should I go back

20   there?  We have our own pool.

21       Q.   You have a pool at 37th Place?

22       A.   Yes.

23       Q.   So you didn't need to use the pool at

24   Van Buren Parkway?
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2975 of 3246
Case 1:15-cv-02405-NGG Document 289-31 Entered on FLSD Docket 05/09/2015 Page 138 of 181
Confidential - Subject to Further Confidentiality Review

```
1        A.   No.

2        Q.   So this lists the total of those three

3    different expenses that we just talked through for

4    this three-year period.

5             Do you see that?

6        A.   I see that.

7        Q.   Okay.  Are these the same kinds of

8    expenses -- the grass cutting, the electric bill, and

9    the pool maintenance -- that you are seeking to

10   recover in that $88,000-plus that we just talked

11   about for alternative living expenses?

12            MR. ALBANIS:  Object to the form.

13            But you can answer if you know.

14            THE WITNESS:  I don't know.  I don't know.

15   BY MR. LAWSON:

16       Q.   You would agree that none of these items are

17   related to you living at 37th Place, correct?  None

18   of these are for the maintenance or utilities with

19   the 37th Place?

20            MR. ALBANIS:  Object to the form.

21            But you can answer, Mr. Walls.

22            THE WITNESS:  I don't know, really.  I don't

23       know.

24   ///
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2976 of 3246
Case 1:14-cv-04091-NGG Document 20-31 entered on FLSD Docket 05/08/2020 Page 139 of 181
Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. LAWSON:

 2        Q.    But this is grass cutting for Van Buren

 3    Parkway.

 4        A.    It says grass cutting but -- we had the grass

 5    cut.

 6        Q.    You said that you cut the grass yourself for

 7    the renters --

 8        A.    No.

 9        Q.    -- at 37th Place?

10        A.    No.

11        Q.    Or someone cut the grass for them at 37th

12    Place?

13        A.    Yeah.

14        Q.    All right.  I would like to turn your

15    attention to the seventh page of the document.

16              There's a Cape Coral, Florida logo on the

17    first side, and the top of it says City of Cape Coral

18    Fire Assessment Bill.

19              Do you see that document?

20        A.    Uh-huh.

21        Q.    And the site address underneath that

22    Cape Coral logo says 1206 Northwest 37th Place; is

23    that right?

24        A.    That's right.
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2977 of 3246
Case 1:14-cv-02494-NGG Document 123-31 Confidential Filed 05/08/2017 Page 140 of 181
Confidential - Subject to Further Confidentiality Review

```
1        Q.    And that's the home that you currently live

2    in; is that right?

3        A.    Yes.

4        Q.    And that is the home you moved into when you

5    moved out of Van Buren Parkway; is that right?

6        A.    Yeah.

7        Q.    So this is a fire assessment bill for the

8    37th Place home; is that right?

9        A.    Yes.

10       Q.    Now, do you know how often you have to do a

11   fire assessment at a home that you own --

12       A.    No.

13       Q.    -- in Cape Coral?

14       A.    I don't know.

15       Q.    Is this something that you had done

16   previously at the 37th Place property?

17       A.    No.

18       Q.    It's not?

19       A.    I don't know.  I don't know, you know . . .

20       Q.    If you look at the invoice date, the invoice

21   is dated March 18th, 2014; is that right?

22       A.    Okay.  Yes.

23       Q.    And the total amount due that is listed a

24   little bit below that is $100.36; is that correct?
```

```
 1        A.    Okay.

 2        Q.    Do you see that?

 3        A.    Yes.

 4        Q.    So this is a fire assessment not for the

 5   Van Buren Parkway home but, again, for the 37th Place

 6   home; is that right?

 7        A.    Yes.

 8        Q.    Would -- if this is something that needed to

 9   be done when you were renting the property, would you

10   have paid for this to be done at the home?

11        A.    This is a bill you get every year.

12        Q.    Okay.  So this is an annual bill from the

13   City?

14        A.    Yes.

15        Q.    And you would have needed to pay this for the

16   home at 37th Place every year since you have owned

17   the home, right?

18        A.    That's right.

19        Q.    Okay.  And that didn't change just because

20   you started living in the home; isn't that right?

21        A.    Yes.

22        Q.    Even if you -- no one lived in it, someone

23   would have to pay that bill, correct?

24        A.    That's correct.  That's correct.
```

Confidential -- Subject to Further Confidentiality Review

```
 1      Q.    All right.  If you can turn to the next page.

 2            This is an LCEC invoice or bill; is that

 3      right?

 4      A.    That's right.  Yeah.

 5      Q.    And the service address for this bill is at

 6      1206 Northwest 37th Place in Cape Coral; is that

 7      right?

 8      A.    That's right.

 9      Q.    It looks like this is a bill that was due on

10      January 29th of 2014; is that correct?

11      A.    Yes.

12      Q.    Now, this is paying the electricity at

13      37th Place for that month, from December into

14      January; is that correct?

15      A.    That's correct.

16      Q.    You were paying for electricity at your home

17      at Van Buren Parkway before, correct?

18      A.    Yes.

19      Q.    And to your recollection, that electricity

20      bill went down when you moved out of Van Buren

21      Parkway and were no longer living in it, correct?

22      A.    Yes.

23            MR. ALBANIS:  Object to the form.

24            THE WITNESS:  I assume.
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2980 of 3246
Case 1:14-cv-02494-WJM Document 200-31 entered on FLSD Docket 05/24/2016 Page 143 of 181
Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. LAWSON:

 2         Q.   You were no longer paying as much for

 3    electricity?

 4         A.   If nobody was living there, yes, it shouldn't

 5    be that much electricity.

 6         Q.   You then began paying for more electricity at

 7    37th Place when you moved into that home; is that

 8    right?

 9         A.   Yes.

10         Q.   Because you went from having the renters pay

11    for the electricity in the home to you paying for it;

12    is that right?

13         A.   Yes.

14         Q.   So you went from paying a larger bill at

15    Van Buren Parkway to paying a larger bill at the

16    37th Place property, correct?

17         A.   Yes.

18         Q.   If you turn to the next page, this appears to

19    be a Lee County Tax Collector's website statement, an

20    image from that website; do you see that?

21         A.   Yes.

22         Q.   And if you look to the physical address that

23    is listed, this is for 1206 Northwest 37th Place; is

24    that right?
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.    Okay.

 2        Q.    And it lists --

 3        A.    Yeah.

 4        Q.    -- for tax year 2010 an amount paid of

 5   $3,383.64; is that right?

 6        A.    That's right.

 7        Q.    So this is the taxes that were paid for the

 8   37th Place property in the tax year of 2010; is that

 9   right?

10        A.    That's right.  That's what it says.

11        Q.    Now, earlier you told me that you paid the

12   taxes for the 37th Place property as the owners of

13   the property even when you rented it; is that right?

14        A.    Yes.

15        Q.    So you were paying these taxes before you

16   moved into the 37th Place home; is that correct?

17        A.    Yes.

18        Q.    And you paid them after you moved into the

19   37th Place home?

20        A.    Yes.

21        Q.    And if you look through the next set of

22   pages, there are -- let's see, one, two, three, four,

23   five, six -- seven pages, it appears, of tax

24   statements for the 37th Place property.
```

Confidential -- Subject to Further Confidentiality Review

```
 1              Can you look at those pages and tell me if

 2    that's correct that it's tax statements for the 37th

 3    property?

 4         A.   Yes.  Yes, that's correct.

 5         Q.   And you paid your taxes for that property

 6    across all of these invoice; is that right?

 7         A.   That's right.

 8         Q.   Did you continue to pay your taxes at the

 9    Van Buren Parkway property from 2010 through 2014?

10         A.   I don't remember.

11         Q.   Taking a step back, do you know if you have

12    payment stubs or proof of payment receipts for the

13    electrical bills that you paid at the various

14    properties from 2010 through 2014?

15              Because I see here you have this LCEC

16    invoice, and it lists the current charges and the

17    total amount due.  But I was wondering if you know if

18    you have proof of payment for those electrical bills,

19    this one, or other ones.

20         A.   It's automatically paid out of our account.

21    I don't know.  That's all I know.

22         Q.   Okay.  So you have auto payment for --

23         A.   Yes, yes.

24         Q.   And you have -- did you have that for both
```

```
 1    the 37th Place property and the Van Buren Parkway

 2    property?

 3        A.   I believe so.  I believe so.

 4        Q.   Going back to the lease agreement with the

 5    Kegleys, that was just for a year, is that right, for

 6    the lease agreement with them?

 7        A.   I believe so.

 8        Q.   And you didn't have an agreement with them to

 9    continue to rent the property after that year, did

10    you?

11        A.   I don't remember.

12        Q.   Okay.  Did you at any time have an agreement

13    with anyone else other than the Kegleys to rent the

14    property at 37th Place?

15        A.   No.

16             MR. LAWSON:  All right.  I think this is a

17        good time for just a short break.  Five minutes.

18             (Recess from 1:44 until 2:04 p.m.)

19    BY MR. LAWSON:

20        Q.   Welcome back, Mr. Walls.

21             I would like to turn your attention back to

22    Exhibit 9, which are these interrogatory responses

23    that we have been looking at this afternoon.

24             Can you pull that document out.
```

```
 1              On the first page that we looked at

 2    previously, the answer to the first interrogatory in

 3    that bottom paragraph, the answer states:  In

 4    addition, we seek remediation damages as determined

 5    by the Court.

 6              Do you see that line in the middle of the

 7    paragraph?

 8         A.   Yes.

 9         Q.   What is your understanding of what

10    remediation damages are?

11              MR. ALBANIS:  I'm going to go ahead and

12         insert a rolling objection to any and all

13         questions, including this one, regarding

14         remediation and remediation damages in this case.

15              As you know, Judge Cooke entered her order on

16         November 16, 2018, adopting all of Judge Fallon's

17         previous rulings, including his ruling earlier

18         this year where he indicated that previous

19         homeowners are members of the certified class in

20         this litigation.

21              Furthermore, Mr. and Mrs. Walls have been

22         identified as priority claimants in the

23         nonremediation damages track of this litigation,

24         which is the reason that we are here today.
```

```
 1              So I would just like to state that rolling

 2         objection to all questions regarding remediation

 3         or remediation damages.

 4              MR. LAWSON:  All right.  Your objection is

 5         noted.

 6              We would -- we would argue that the

 7         remediation damages are related and impossible to

 8         disconnect from the other damages claims included

 9         within the claim for the Walls family.  So we

10         would -- we will be pursuing this line of

11         questioning.

12    BY MR. LAWSON:

13         Q.   So, Mr. Walls, I want to ask you what your

14    understanding of remediation damages was.

15         A.   Tell me.  I don't know.

16         Q.   Okay.  Do you -- did you -- we talked a

17    little bit earlier about the idea of trying to remove

18    the drywall from the home at Van Buren.

19              Do you remember that?

20         A.   Yes.

21         Q.   And you said that you didn't do that?

22         A.   No.

23         Q.   Is that right?

24         A.   That's right.
```

```
 1        Q.   So you never attempted to remove the drywall

 2    from the home?

 3        A.   No, I didn't.

 4        Q.   Okay.  And if you wanted to remove it today,

 5    you would agree that you couldn't remove it because

 6    you don't own that property anymore; is that right?

 7             MR. ALBANIS:  Object to the form.

 8             THE WITNESS:  That's right.

 9    BY MR. LAWSON:

10        Q.   So if someone gave you money to remediate the

11    home on Van Buren Parkway, could you go and remediate

12    that home?

13        A.   No.  But . . .

14        Q.   I would like to ask you a little bit about

15    the item of lost equity in the home.

16             You mentioned in this answer on Page 1 of the

17    interrogatory responses that you're seeking damages

18    for lost equity.

19             What equity do you believe you lost in the

20    Van Buren Parkway home?

21        A.   Well, we lost equity.  We lost all the money

22    we put into it.  My wife had put her deposit into it,

23    everything.  The lot, everything.

24        Q.   Do you know the amount of lost equity that
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2987 of 3246
Case 2:14-cv-02046-NJB-MBN Document 31-7 Filed 05/18/2016 Page 150 of 181
Confidential -- Subject to Further Confidentiality Review

```
1    you lost as a result of your damages in this case?

2        A.   84,000 -- $84,640.

3        Q.   And that is referring to the alternative

4    living expenses?

5        A.   That's what my judge -- yeah.  That's right.

6        Q.   You also list diminution in value or loss of

7    value in the property at Van Buren.

8             Do you know what amount of value was lost in

9    the home that you allege as a result of Chinese

10   drywall?

11       A.   In value?

12       Q.   Yes.  The value of the home.  Do you know

13   what diminution in value there was to the home as a

14   result of Chinese drywall that you are alleging?

15       A.   I don't know, no.

16       Q.   Do you know anyone who does know?

17            MR. ALBANIS:  Object to the form.

18   BY MR. LAWSON:

19       Q.   Have you ever hired anyone to look at how

20   much value was lost in the home as a result of it

21   having Chinese drywall in it?

22       A.   No.

23       Q.   I'd like to turn your attention to the second

24   page of this document, Exhibit 9.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2088 of 3246
Case 1:15-cv-02488-NGG Document 31 Entered on FLSD Docket 05/03/2008 Page 151 of 181
Confidential - Subject to Further Confidentiality Review

```
 1              In the answer to Number 2, at the bottom, it
 2     states:  We have requested a forbearance from our
 3     bank for the Van Buren Parkway property and were
 4     denied our request.  We stopped paying our mortgage
 5     payments shortly after moving out of the property
 6     into our rental property.
 7              Do you see that?  Do you see those lines?
 8     A.    Yeah.
 9     Q.    So is that accurate?
10     A.    Yeah.
11     Q.    So you requested a forbearance on your --
12     from the Van Buren Parkway property but were denied
13     that request; is that right?
14     A.    Yes.
15     Q.    Do you remember about when you did that, when
16     you requested that forbearance?
17     A.    I can't remember.
18     Q.    And do you remember exactly when you stopped
19     paying your mortgage payments on your -- or on your
20     Van Buren Parkway property?
21     A.    I can't remember that item.
22     Q.    Do you know why you decided to stop paying
23     those mortgage payments?
24     A.    I can't remember why.  I don't know.
```

Case 2:09-md-02047-EEF-MBN  Document 22363-29  Filed 11/19/19  Page 2989 of 3246
Case 2:14-cv-02498-NGE  Document 209-31  Entered on FLSD Docket 05/49/2019  Page 152 of 181
Confidential -- Subject to Further Confidentiality Review

1    Q.   Could you afford to pay them at the time that

2    you stopped?

3    A.   No.

4    Q.   How did you determine that you could not

5    afford to pay for those --

6    A.   We lost the rental.  We were getting ready to

7    lose the rental -- money from the rental, you know.

8    That paid for itself.  I couldn't afford two

9    mortgages.

10   Q.   At the time that you stopped paying mortgage

11   payments on the Van Buren Parkway property and you

12   moved into the 37th Place property, which sounds like

13   it was around 2010, did you and/or your wife own the

14   condo that we have discussed earlier in North Fort

15   Myers?

16   A.   Yes.

17   Q.   Did you ever consider selling that property?

18   A.   No.  There was a renter in there.

19   Q.   That was a renter in that property?  So you

20   were making rental -- you were making money from that

21   rental at that time?

22   A.   She didn't make much money on that property.

23   What money she made kept the place going.  And she

24   still has it.

Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Did you ever consider selling it?

 2        A.    Thought about it.  Not back then, but we have

 3   thought about it.

 4        Q.    You did not think about selling it back then?

 5        A.    No.  It's -- no.

 6        Q.    Did you ever consider selling the Van Buren

 7   Parkway home when you lived in it from 2006 to 2010?

 8        A.    No.

 9        Q.    Did you ever consider selling the 37th Place

10   property?

11        A.    You know, like I said, she owned the house

12   before I moved there.  I couldn't tell her to sell

13   her house.

14        Q.    I understand.

15              But do you know if you or your wife ever

16   considered --

17        A.    No.

18        Q.    -- or did --

19        A.    Not that I know of, no.

20        Q.    So, no, you did not consider selling the

21   37th Place property?

22              Sorry, is that a no?

23        A.    Like I said, selling 37th Place, I had no,

24   you know, control of that.
```

Case 2:09-md-02047-EEF-MBN Document 22363-20 Filed 11/19/19 Page 2091 of 3246
Case 1:15-cv-22466-NGG Document 391-1 Entered on FLSD Docket 05/08/2019 Page 154 of 181
Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  Do you know if your wife did put the

2    37th Place property up for sale at any point --

3    A.    No.

4    Q.    -- or consider it?

5    A.    No, she did not.

6    Q.    I'd like to turn your attention to the fourth

7    page of this exhibit, Exhibit 9, to the answer

8    related to the foreclosure on the property.

9         It states:  The property was the subject of a

10   foreclosure.  Deutsche Bank National Trust Company,

11   trustee for American Home Mortgage Servicing, Inc.,

12   was the lender, and the loan number was 0031475114.

13   Cost of home was $432,810.  Original loan/mortgage

14   amount is $285,500 on June 14th, 2005.  $335,000 --

15   $335,084.73 was the remaining amount for the

16   mortgage.  See documents produced.

17        Do you see that answer there?

18   A.    Yes.

19   Q.    Does that all look correct to you?

20   A.    Yes.

21   Q.    So you stopped paying your mortgage payments

22   sometime around when you left the home and moved into

23   37th Place in 2010, correct?

24   A.    Correct.

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2092 of 3246
Case 2:14-cv-02418-NGG-ST Document 288-31 Entered on FLSD Docket 05/48/2018 Page 155 of 181

confidential – Subject to Further Confidentiality Review

```
 1        Q.    And the foreclosure occurred sometime in

 2    2014; is that right?

 3        A.    That's right.

 4              (Defendants' Exhibit 13 was marked for

 5    identification.)

 6    BY MR. LAWSON:

 7        Q.    Handing you a document that's been marked as

 8    Exhibit 13.

 9              Do you recognize this document?

10        A.    It's been so long, I don't remember.

11        Q.    This appears to be a monthly billing

12    statement from American Home Mortgage Servicing.

13        A.    Okay.

14        Q.    Do you see that?

15        A.    Yes.

16        Q.    And it's addressed to Larry Walls and Rosalie

17    Walls at 2510 Van Buren Parkway.

18              Do you see that?

19        A.    Yes.

20        Q.    It looks like this is a statement from

21    October 2007 if you look in the upper right-hand

22    corner.

23        A.    Okay.

24        Q.    Do you see that?
```

```
 1       A.    Uh-huh.

 2       Q.    Yes?

 3       A.    Yes, yes.

 4       Q.    And the total payment that is requested for

 5    this monthly billing statement is $763.63; is that

 6    correct?

 7       A.    That's correct.

 8       Q.    And it looks like there's -- what might be a

 9    Check Number 3755 that's handwritten onto --

10       A.    Yes.

11       Q.    -- that document.

12             Does that look correct?

13       A.    That's correct, yes.

14       Q.    And there's a date that says October 29,

15    2009, next to that check number.

16       A.    That's correct.

17       Q.    So this looks like an invoice for your

18    mortgage payment from October of 2007, correct?

19       A.    Correct.

20       Q.    So that was about a year after you had moved

21    into the home, somewhere around that; is that right?

22       A.    That's correct.

23       Q.    So you were still paying the mortgage at that

24    point?
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2994 of 3246
Case 2:14-cv-02949-NGE Document 109-31 entered on FLSD Docket 05/08/2019 Page 157 of 181
Confidential - Subject to Further Confidentiality Review

```
1       A.   Yes.

2       Q.   Correct?

3       A.   Yes.

4       Q.   And the mortgage payment was -- the total

5    payment was around $763; is that right?

6       A.   That's correct.

7       Q.   If you turn to the other side of this

8    exhibit, the second page, it looks like there's the

9    carbon copy across three different checks from -- it

10   appears 2009.  It's a little difficult to read the

11   middle one.

12           Do you see that?

13      A.   Yes, I do.

14      Q.   And it looks like that these are payments to

15   HMSI -- excuse me, AHMSI, which I'm guessing is

16   American Home Mortgage Service, Inc.?

17      A.   Yes.

18      Q.   So would you agree these look like checks

19   that were made out to pay your mortgage payments --

20      A.   Yes.

21      Q.   -- to AHMSI?

22      A.   Yes.

23      Q.   And it looks like "Van Buren" is written on

24   the middle check; is that right?
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 2995 of 3246
Case 1:18-cv-12408-NGE Document 289-31 entered on FLSD Docket 05/29/2019 Page 158 of 181
Confidential - Subject to Further Confidentiality Review

```
 1        A.   Yes.

 2        Q.   Is it your -- to your best understanding that

 3   these are payments for the mortgage at the Van Buren

 4   Parkway --

 5        A.   Yes.

 6        Q.   -- property?

 7             So you were paying your mortgage payments at

 8   least into 2009; is that right?

 9        A.   We paid as long as we could.

10        Q.   And you stopped potentially sometime in 2010?

11        A.   I don't know.

12        Q.   I'd like to --

13             (Defendants' Exhibit 14 was marked for

14   identification.)

15   BY MR. LAWSON:

16        Q.   I'd like to turn your attention to what has

17   been marked as Exhibit 14.  I'll give you a second to

18   review it.

19             You're welcome to look at the whole document,

20   but I want to ask you specifically about the letter

21   on the front.

22        A.   Okay.

23        Q.   All right.  Mr. Walls, this looks like a

24   letter from September 29th, 2010, from Mr. Albanis on
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2996 of 3246
Case 1:15-cv-01240-NGG Document 91-2 entered on FLSD Docket 05/18/2016 Page 159 of 181
Confidential - Subject to Further Confidentiality Review

```
1    behalf of you and your wife related to payment of

2    your mortgage, and it is sent to American Home

3    Mortgage Servicing, Inc.

4            Do you agree with that?

5        A.   I agree.

6        Q.   And if you look at the conclusion of the

7    letter on the second page, it states in the second to

8    last paragraph:  Mr. and Mrs. Walls request a

9    forbearance agreement with American Home Mortgage

10   Servicing, Inc. at this time because they are not in

11   a position to make both the mortgage payments and

12   rent another home at the same time.

13           Do you see that?

14       A.   Yes, I see that.

15       Q.   Okay.  So you requested a forbearance from

16   your mortgage servicer around September 29th of 2010,

17   somewhere around there?

18       A.   Somewhere.

19       Q.   And it was your understanding that that

20   request was denied, correct?

21       A.   Yes.

22           (Defendants' Exhibit 15 was marked for

23   identification.)

24   ///
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 2997 of 3246
Case 1:15-cv-14498-NGL Document 81-1 Filed under Seal March 05 492 2019 Page 160 of 181
Confidential - Subject to Further Confidentiality Review

```
1    BY MR. LAWSON:

2        Q.   I have handed you a document that's been

3    marked as Exhibit 15.

4            Let me know when you have had a chance to

5    look at it.

6        A.   I'm ready.

7        Q.   Okay.  Mr. Walls, if you look down to the

8    second paragraph -- excuse me, the third paragraph --

9    it's hard to tell because there is an indentation --

10   but it begins with "This letter serves as further

11   notice."  It's about the seventh line down or so.

12           "This letter serves as further notice that

13   American Home Mortgage Servicing, Inc. intend to

14   enforce the provisions of the note and security

15   instrument.  You must pay the full amount of the

16   default on this loan by the 35th day from the date of

17   this letter, which is November 22, 2010; or if said

18   date falls on a Saturday, Sunday, or legal holiday,

19   then on the first business day thereafter.

20           "If you do not pay the full amount of the

21   default, our client shall accelerate the entire sum

22   of both principal and interest due and payable and

23   above any remedies provided for in the note and

24   security instrument, including but not limited to the
```

```
1    foreclosure sale of the property."

2           Did I read that correctly?

3    A.   Yes.  Yes.

4    Q.   So this was the notice that you received that

5    American Home Mortgage Servicing intended to default

6    on this --

7    A.   Yes.

8    Q.   -- that intended for to -- to place the loan

9    into default if you did not pay the outstanding

10   balance immediately; is that correct?

11   A.   That's correct.

12   Q.   If you look a little bit below it, it says --

13   I think it's probably about a dozen lines down with

14   some bolded text where it says:  As of October 18,

15   2010, the amount of the debt --

16   A.   Yeah.

17   Q.   -- we are seeking to collect is $2,070.50.

18   This includes the sum of payments that have come due

19   on and after the date of default, September 1st,

20   2010.

21          Did I read that correctly?

22   A.   Yes.

23   Q.   So it looks like from this document that the

24   date of default, according to the bank and that your
```

```
 1    mortgage servicer was September 1st, 2010.  And they

 2    were seeking to collect a debt of a little over

 3    $2,000; is that right?

 4         A.   That's right.

 5         Q.   And, as you have said, that you were not able

 6    at that time to pay that amount of $2,070.50; is that

 7    correct?

 8         A.   That's right.

 9         Q.   Did you make any attempts to change your

10    finances or your budget to be able to afford to be

11    able to pay for both the Van Buren property and the

12    37th Place property at the same time?

13              MR. ALBANIS:  Object to the form.

14              But you can answer, Mr. Walls, if you know.

15              THE WITNESS:  I don't know.

16    BY MR. LAWSON:

17         Q.   Okay.  Do you know if you paid the amount

18    that they were seeking in this letter, the $2,070.50?

19         A.   No.

20         Q.   No, you didn't; or no, you do not know?

21         A.   No.

22         Q.   No, you did not pay it?

23         A.   No.

24              (Defendants' Exhibit 16 was marked for
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 3000 of 3246
Case 1:14-cv-08148-NGG Document 29-31 Entered on FLSD Docket 05/07/2020 Page 163 of 181
Confidential - Subject to Further Confidentiality Review

```
 1    identification.)

 2    BY MR. LAWSON:

 3        Q.   Handed you a document that's been marked as

 4    Exhibit 17.

 5            Please let me know when you have had a chance

 6    to review?

 7            MR. ALBANIS:  I don't think we're that high,

 8        Matt.

 9            MR. LAWSON:  Oh, I'm sorry.  I was looking at

10        the -- I'm sorry.  Exhibit 16.  My mistake.

11    BY MR. LAWSON:

12        Q.   Have you had a chance to review this

13    document?

14        A.   Yes, yes.

15        Q.   Do you recognize this?

16        A.   Yes.

17        Q.   Have you seen it before?

18        A.   Yes.

19        Q.   What is it?

20        A.   It looks like foreclosure on the house.

21        Q.   So this is entitled Final Judgment and

22    Mortgage Foreclosure; is that right?

23        A.   Yeah.

24        Q.   And it's -- it looks like it was filed on the
```

Confidential - Subject to Further Confidentiality Review

```
 1    date of July 18th, 2014, in Lee County, Florida, in

 2    the circuit court there; is that right?

 3        A.    Yeah.

 4        Q.    And this is related to the foreclosure on the

 5    Van Buren Parkway home, correct?

 6        A.    Correct.

 7        Q.    Now, what was your understanding of the

 8    result of this foreclosure process?  What happened as

 9    a result of this judgment of foreclosure?

10        A.    We lost our house.

11        Q.    So the bank took over ownership of the home?

12        A.    That's right.

13        Q.    And did they sell the home?

14        A.    I don't know what happened to it.

15        Q.    Okay.  If you can turn to the second page of

16    this document and look at Item No. 3.

17              It states:  If the total sum with interest at

18    the rate described in Paragraph 1 and all costs

19    accrued subsequent to this judgment are not paid, the

20    clerk of this court shall sell the property at public

21    sale on October 16th, 2014, to the highest bidder for

22    cash.

23              Did I read that correctly?

24        A.    Yes, you did.
```

Confidential - Subject to further confidentiality Review

```
1        Q.   Okay.  So as of July 18th, 2014, you no

2    longer owned the home at Van Buren Parkway; is that

3    right?

4        A.   That's correct.

5        Q.   And as a result of this foreclosure, did you

6    have any further debt to Deutsche Bank or American

7    Home Servicing?

8        A.   No.

9        Q.   Have you made any more payments to them --

10       A.   No.

11       Q.   -- since this judgment was entered?

12       A.   No.

13       Q.   And is it your understanding that they agreed

14   to waive any deficiency that you would have owed

15   between the amount owed on the home and what they

16   sold the home for?

17            MR. ALBANIS:  Object to the form.

18            THE WITNESS:  I don't know.

19   BY MR. LAWSON:

20       Q.   Okay.  But they haven't pursued any amount of

21   money from you in any proceeding or asked for any

22   additional money from you since this judgment was

23   entered; is that right?

24       A.   That's correct.
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 3003 of 3246
Case 1:15-cv-02498-NGG Document 31-2 Filed 05/19/2003 Page 166 of 181
Confidential - Subject to Further Confidentiality Review

1    Q.   Okay.  And if you look to Item No. 9, it's --

2  that's on the fourth -- or the third page,

3  Paragraph 9.

4         It's states:  Defendants -- and it lists your

5  name and your wife's name -- consent to final

6  judgment of mortgage foreclosure in favor of

7  plaintiff.  Plaintiff agrees to waive deficiency

8  rights against said defendants.  Plaintiff also

9  agrees to a foreclosure sale date no sooner than 90

10  days from this final judgment.

11        Is that correct?

12   A.   That's correct.

13   Q.   So as a result of this Court's judgment, you

14  did not owe any further money to either Deutsche Bank

15  or American Home Servicing, correct?

16        MR. ALBANIS:  Object to the form.

17        This is a Court order.  The document speaks

18     for itself.  It's part of the public record, and

19     it was signed off by a circuit judge in Lee

20     County.

21        I don't know how you'd expect Mr. Walls to

22     know the answers to these questions, Matt.

23        MR. LAWSON:  Well, he's been able to answer

24     them so far, so I would ask him to answer if he

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 3004 of 3246
Case 1:18-cv-02408-NGG-LB Document 269-31 Entered on FLSD Docket 05/12/2014 Page 167 of 181
Confidential - Subject to Further Confidentiality Review

1      can.

2            MR. ALBANIS:  Well, I would object to the

3      form for those reasons.

4            But you can answer if you can, Mr. Walls.

5   BY MR. LAWSON:

6      Q.   To your understanding did you owe any more

7   money --

8      A.   Not that I'm aware of, no.

9      Q.   In 2010, when you stopped paying mortgage

10   payments on the Van Buren Parkway property, had you

11   had any changes in your employment around that time?

12      A.   No.

13      Q.   Okay.  Were you employed at that time?

14      A.   2010?  No.

15      Q.   No?

16            Was your wife employed at that time?

17      A.   Yes.

18      Q.   Okay.  Where did she work?

19      A.   Lee County Schools.

20      Q.   Okay.  And had she been working at that job

21   for years prior to 2010?

22      A.   Sixteen -- I don't know, 15, 16 years or

23   more.

24      Q.   But there were no changes to either of your

1    employment status at the time you stopped paying the

2    mortgage payments?

3         A.   No.

4         Q.   She was working and you were not?

5         A.   That's right.

6         Q.   Were there any changes to your wages or

7    salary at that time or were they about the same?

8         A.   I don't remember.

9         Q.   Okay.  Were either -- did either of you

10   suffer any accidents or be diagnosed with any new --

11             MR. ALBANIS:  Object to the form.

12             THE WITNESS:  I don't know.

13   BY MR. LAWSON:

14        Q.   Did you have any outstanding medical bills at

15   the time you stopped making your mortgage payments?

16        A.   Not that I'm aware of.

17        Q.   Did your house payments or interest rate on

18   the mortgage change around that time in 2010?

19        A.   I don't remember.

20        Q.   Did you ever file for disability at any time?

21        A.   No.  No, I did not.

22        Q.   Did you make any major purchases around that

23   time?

24             MR. ALBANIS:  Object to the form.

```
 1                THE WITNESS:  I don't know.

 2     BY MR. LAWSON:

 3         Q.   Did you buy a new car?

 4         A.   I don't know.

 5         Q.   Did you buy any new properties?

 6         A.   No.

 7         Q.   You don't know if you bought a car around

 8     2010?

 9         A.   I don't know.  We might have.

10         Q.   When is the last time you bought a new car?

11         A.   New car?

12         Q.   Uh-huh.  Or a car.

13         A.   A couple years ago, I guess.

14         Q.   Okay.  And what car did that replace, or was

15     it just an additional car?

16         A.   A Kia.

17         Q.   It replaced a Kia?

18         A.   Yeah.

19         Q.   And do you remember when you bought the Kia?

20         A.   No, I don't.

21         Q.   Did you make any investments around 2010 or

22     in the years prior?

23         A.   I don't think so.

24         Q.   Did you have any debts other than your
```

1    mortgage and your mortgage at the property at the

2    37th Place property around 2010?

3        A.   I don't remember.

4        Q.   All right.  I think we can go off the record.

5             (Discussion off the record.)

6          (Recess from 2:33 until 2:41 p.m.)

7             MR. LAWSON:  Thank you, Mr. Walls.  I don't

8        have any further questions at this time.

9             THE WITNESS:  Okay.

10            MR. POYER:  Beijing New Building Materials

11       doesn't have any questions.

12            MR. ALBANIS:  I just have a few quick

13       follow-up questions, Mr. Walls.

14                        CROSS-EXAMINATION

15   BY MR. ALBANIS:

16       Q.   Earlier you testified that you had

17   approximately $84,000 in lost equity damages.

18       A.   Yeah.

19       Q.   Do you recall that?

20       A.   Yes.

21       Q.   Would you please pull out Exhibit Number 9,

22   which are the First Amended Answers to

23   Interrogatories.  Exhibit Number 9.

24            Would you please look at Interrogatory

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 3008 of 3246
Case 1:18-cv-09491-NGG Document 693-31 Entered on FLSD Docket 05/07/2020 Page 171 of 181
Confidential - Subject to Further Confidentiality Review

```
 1    Number 1 and your answer to answer to Interrogatory

 2    Number 1 and let me know after you've reviewed that.

 3         A.   The $88,600 personal property damages?

 4         Q.   All I'm asking you to do is to review

 5    Interrogatory Number 1 and your entire answer to

 6    Interrogatory Number 1.

 7         A.   Okay.

 8         Q.   And just tell me when you have done that.

 9         A.   Okay.

10         Q.   So earlier you testified that you were

11    entitled to approximately $84,000 in lost equity?

12         A.   Yes.

13         Q.   Do you recall testifying to that?

14         A.   Yeah.

15         Q.   Were you confused when you testified to that?

16         A.   Yes, I was.

17         Q.   Is there a specific amount of lost equity

18    that you are pursuing at this time?

19         A.   Well, we had -- probably -- we had my

20    house -- our house payment, mortgage and taxes,

21    electric bills, you know, all included into this.

22         Q.   Okay.  Mr. Walls, I think you are confused.

23              That is a different category of damages.  I'm

24    talking about lost equity.
```

Case 2:09-md-02047-EEF-MBN Document 22363-20 Filed 11/19/19 Page 3009 of 3246
Case 1:13-cv-12408-NGE Document 283-1 *SEALED* Filed 05/08/2009 Page 172 of 181
Confidential - Subject to Further Confidentiality Review

1        A.    Oh, lost equity.

2        Q.    Lost equity damages.

3        A.    Okay.

4        Q.    Does the answer to Interrogatory Number 1

5    provide a specific amount for lost equity?

6              MR. LAWSON:  Object to form.  Leading.

7              THE WITNESS:  Yeah.

8              You are talking about this here?

9    BY MR. ALBANIS:

10       Q.    Right.

11             Do you know the amount of lost equity damages

12   that you are seeking?

13       A.    $73,000.

14       Q.    I think you are misreading the document.

15       A.    Can you show me here?

16       Q.    Mr. Walls, why don't you go ahead and read

17   the answer to Interrogatory Number 1 into the record.

18   Just read it.  "We seek alternative living expenses,"

19   read that whole paragraph.

20       A.    Yeah.

21       Q.    You read it out loud.

22       A.    Okay.

23             We seek alternative living expenses from

24   June 10th through July 14th, 2014, for $88,000 --

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 3010 of 3246
Case 1:14-cv-12408-NGG Document 5-91 Entered on FLSD Docket 05/08/2010 Page 173 of 181
Confidential — Subject to Further Confidentiality Review

1    $88,640.96.  Personal property damages expenses for

2    at least $73,000 of lost equity, loss of enjoyment,

3    diminution of the value and loss of enjoyment,

4    alternative damages, and prejudgment interest.

5            In addition, we are seeking remediation --

6        Q.   Remediation.

7        A.   -- remediation determined by the Court.

8            The total amount of diminution value of loss

9    and enjoyment and punitive damages will be determined

10   by the jury and prejudgment interest by the Court as

11   a post-judgment matter.

12       Q.   Do you still stand by that answer, sir?

13       A.   Yes.

14       Q.   Thank you.

15           Earlier you testified that your alternative

16   living expenses were based on your understanding of

17   the judge's formula.

18           Do you remember that?

19       A.   Yes.

20       Q.   Were you confused when you made that answer?

21       A.   Yeah.  Yes, I was.

22       Q.   What is your alternative living expenses

23   based on, sir?

24       A.   My house value -- the house mortgage and the

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 3011 of 3246
Case 2:15-cv-04248-NGE Document 1-1 Entered on FLSD Docket 05/12/2011 Page 874 of 181
Confidential - Subject to Further Confidentiality Review

```
 1    taxes I paid, electric bill and -- I can't remember

 2    anything else.

 3         Q.   And that is for the property that you are

 4    staying in now?

 5         A.   Yes.

 6         Q.   Which is on what street?

 7         A.   1206 37th Place -- Northwest 37th Place,

 8    Cape Coral, Florida.

 9              MR. ALBANIS:  Okay.  Nothing else.  Thank

10         you, Mr. Walls.

11              THE WITNESS:  Okay.

12              MR. LAWSON:  Nothing further.

13              MR. POYER:  Can I ask a couple quick

14         follow-ups?

15                        CROSS-EXAMINATION

16    BY MR. POYER:

17         Q.   My name is Joshua Poyer.  I represent Beijing

18    New Building Materials, PLC.  Thank you for being

19    here today.  We really appreciate your time, and I'm

20    not going to take up too much more of it, I promise.

21              The reason we are here today, we want to get

22    your understanding of the facts of your case and the

23    claims that you are pursuing in your case, the relief

24    that you are requesting.
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 3012 of 3246
Case 1:14-cv-04083-NGG Document 20-31 Entered on FLSD Docket 05/18/2011 Page 175 of 181
Confidential - Subject to Further Confidentiality Review

 1               Do you understand that?

 2       A.    Yes.

 3       Q.    So, you know, with that in mind, what I think

 4    or Mr. Lawson thinks about the terms that we're using

 5    here, it's really largely irrelevant.

 6               What I want to ask you is:  To you,

 7    Mr. Walls, as you are sitting here today, what does

 8    the phrase "alternative living expenses" mean to you?

 9       A.    Alternative -- that's what it costs me to

10    rent the house.  I lost that.  I lost income.  The

11    house we're in right now, I lost income from that

12    house and -- you know what I'm saying?

13               And I'm -- right now, I'm paying mortgage

14    there and my taxes there and -- I could have had that

15    money from the rent, paid all that, and still been in

16    Van Buren.  The Chinese drywall just ruined my life

17    and her life.

18       Q.    What does -- what does the phrase

19    "remediation damages" mean to you?

20       A.    Remediation damages?  If I would have had --

21    to redo the house, right?  Redo the house I lost.

22       Q.    To redo -- I'm sorry, go ahead.

23       A.    At Van Buren, right?

24       Q.    But you didn't redo any portion of the house

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 3013 of 3246
Case 1:14-cv-24509-MGC Document 209-1 Entered on FLSD Docket 05/08/2015 Page 176 of 181
Confidential - Subject to Further Confidentiality Review

```
 1    on Van Buren, did you?

 2         A.   If I would have had the money, I would have

 3    redone the house.

 4         Q.   But you didn't redo the house?  Is that --

 5         A.   I didn't.  If I had the money, I would have

 6    redone the house.

 7              MR. POYER:  Okay.  Thank you.  No further

 8         questions.

 9              (Whereupon, the deposition concluded at

10    2:48 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 3014 of 3246
Case 1:19-mc-00405-NGG Document 2-31 Confidential Filed 05/28/2019 Page 977 of 181
Confidential - Subject to Further Confidentiality Review

```
 1                  C E R T I F I C A T E

 2

 3          I, KELLY J. LAWTON, Registered Professional

 4     Reporter, Licensed Court Reporter, and Certified

 5     Court Reporter, do hereby certify that, pursuant to

 6     notice, the deposition of LARRY WALLS was duly taken

 7     on December 11, 2018, at 9:37 a.m. before me.

 8          The said LARRY WALLS was duly sworn by me

 9     according to law to tell the truth, the whole truth

10     and nothing but the truth and thereupon did testify

11     as set forth in the above transcript of testimony.

12     The testimony was taken down stenographically by me.

13     I do further certify that the above deposition is

14     full, complete, and a true record of all the

15     testimony given by the said witness.

16

17     _____

18          KELLY J. LAWTON, RPR, LCR, CCR

19

20          (The foregoing certification of this

21     transcript does not apply to any reproduction of the

22     same by any means, unless under the direct control

23     and/or supervision of the certifying reporter.)

24
```

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4          Please read your deposition over carefully

 5   and make any necessary corrections.  You should state

 6   the reason in the appropriate space on the errata

 7   sheet for any corrections that are made.

 8

 9          After doing so, please sign the errata sheet

10   and date it.  It will be attached to your deposition.

11

12          It is imperative that you return the original

13   errata sheet to the deposing attorney within thirty

14   (30) days of receipt of the deposition transcript by

15   you.  If you fail to do so, the deposition transcript

16   may be deemed to be accurate and may be used in

17   court.

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 3016 of 3246
Case 1:18-cv-11048-NGG Document 289-31 Entered on FLSD Docket 05/08/2019 Page 179 of 181
Confidential - Subject to Further Confidentiality Review

```
 1                          - - - - - -

 2                        E R R A T A

 3                          - - - - - -

 4    PAGE    LINE     CHANGE

 5    _____   _____    _____

 6      REASON:  _____

 7    _____   _____    _____

 8      REASON:  _____

 9    _____   _____    _____

10      REASON:  _____

11    _____   _____    _____

12      REASON:  _____

13    _____   _____    _____

14      REASON:  _____

15    _____   _____    _____

16      REASON:  _____

17    _____   _____    _____

18      REASON:  _____

19    _____   _____    _____

20      REASON:  _____

21    _____   _____    _____

22      REASON:  _____

23    _____   _____    _____

24      REASON:  _____
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 3017 of 3246
Case 1:14-cv-02408-NGG Document 295-31 *filed under seal* Date: 05/08/2017 Page 180 of 181

Confidential - Subject to Further Confidentiality Review

```
  1                     ACKNOWLEDGMENT OF DEPONENT

  2

  3          I, LARRY WALLS, do hereby acknowledge that I

  4     have read the foregoing pages, 1 to 180, and that the

  5     same is a correct transcription of the answers given

  6     by me to the questions therein propounded, except for

  7     the corrections or changes in form or substance, if

  8     any, noted in the attached Errata Sheet.

  9

 10

 11     _____     _____

 12     LARRY WALLS                                         DATE

 13

 14

 15

 16

 17     Subscribed and sworn to before me this

 18     _____ day of _____, 20___.

 19     My Commission expires: _____

 20

 21     _____

        Notary Public

 22

 23

 24
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 3018 of 3246
Case 1:19-cv-12408-NGG Document 209-31 Entered on FLSD Docket 05/08/2018 Page 181 of 181
Confidential - Subject to Further Confidentiality Review

```
 1                          LAWYER'S NOTES

 2    PAGE    LINE

 3    _____   _____   _____

 4    _____   _____   _____

 5    _____   _____   _____

 6    _____   _____   _____

 7    _____   _____   _____

 8    _____   _____   _____

 9    _____   _____   _____

10    _____   _____   _____

11    _____   _____   _____

12    _____   _____   _____

13    _____   _____   _____

14    _____   _____   _____

15    _____   _____   _____

16    _____   _____   _____

17    _____   _____   _____

18    _____   _____   _____

19    _____   _____   _____

20    _____   _____   _____

21    _____   _____   _____

22    _____   _____   _____

23    _____   _____   _____

24    _____   _____   _____
```

# EXHIBIT A34

Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2              Case No. 1:11-CV-22408-MGC
 3      -------------------------------§
        EDUARDO AND CARMEN AMORIN et    §
 4      al., individually, and on behalf §
        of all others similarly         §
 5      situated,                       §
                                        §
 6         Plaintiffs,                  §
                                        §
 7      vs.                             §
                                        §
 8      TAISHAN GYPSUM CO., LTD. F/K/A   §
        SHANDONG THAIHE DONGXIN CO.,     §
 9      LTD.; TAIAN TAISHAN PLASTERBOARD §
        CO., LTD., et al,               §
10                                      §
           Defendants.                  §
11      ------------------------------- §
         - - -
12
                              - - -
13
                     TUESDAY, DECEMBER 11, 2018
14
                              - - -
15
                Confidential - Subject to Further
16                   Confidentiality Review
17                          - - -
18
                Deposition of ROSALEE WALLS, held at Morgan &
19         Morgan, 12800 University Drive, Suite 600, Fort
           Myers, Florida, commencing at 2:49 p.m., on the
20         above date, before Kelly J. Lawton, Registered
           Professional Reporter, Licensed Court Reporter,
21         and Certified Court Reporter.
22                          - - -
23              GOLKOW LITIGATION SERVICES
           877.370.3377 ph | 917.591.5672 fax
24                   deps@golkow.com
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 3021 of 3246
Case 1:19-mc-00410-NGG Document 22-41 Filed 12/16/19 Page 105 of 130 PageID #:
26
Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2    MORGAN & MORGAN
      BY:  PANAGIOTIS "PETE" V. ALBANIS, ESQUIRE
 3    12800 University Drive, Suite 600
      Fort Myers, Florida 33907
 4    (239) 433-6880
      palbanis@forthepeople.com
 5    Representing Plaintiff
 6
      LEVIN, SEDRAN & BERMAN, LLP
 7    BY:  KEITH J. VERRIER, ESQUIRE
      510 Walnut Street, Suite 500
 8    Philadelphia, Pennsylvania 19106
      (215) 592-1500
 9    kverrier@lfsblaw.com
      Representing Plaintiff
10
11    ALSTON & BIRD, LLP
      BY:  MATTHEW D. LAWSON, ESQUIRE
12    BY:  METHAWEE MANUPIPATPONG, ESQUIRE
      BY:  LARA TUMEH, ESQUIRE
13    One Atlantic Center
      1201 West Peachtree Street
14    Atlanta, Georgia 30309
      (404) 881-7000
15    matt.lawson@alston.com
      mae.manupipatpong@alston.com
16    lara.tumeh@alston.com
      Representing Taishan Gypsum Co., Ltd. and Tai'an
17    Taishan Plasterboard, Co., Ltd.
18
      GORDON, ARATA, MONTGOMERY, BARNETT
19    BY:  ALEX B. ROTHENBERG, ESQUIRE
      201 St. Charles Avenue, Suite 4000
20    New Orleans, Louisiana 70170
      (504) 582-1111
21    arothenberg@gamb.law
      Representing BNBM PLC
22
23
24
```

Confidential - Subject to Further Confidentiality Review

```
1    APPEARANCES:

2       ABALLI MILNE KALIL

        BY:  JOSHUA D. POYER, ESQUIRE

3       2250 SunTrust International Center

        One Southeast Third Avenue

4       Miami, Florida 33131

        (305) 373-6600

5       jpoyer@alalli.com

        Representing BNBM PLC

6

7    ALSO PRESENT:

8        Larry Walls

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                    - - -

                  I N D E X

 2                    - - -

 3   Testimony of:  ROSALEE WALLS

 4        DIRECT EXAMINATION BY MR. LAWSON...............   5

 5

 6                 E X H I B I T S

 7                    (None)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                          - - -

 2              THE COURT REPORTER:  Ma'am, would you please

 3         raise your right hand.

 4              Do you swear or affirm that the testimony

 5         you're about to give will be the truth, the whole

 6         truth, and nothing but the truth?

 7              THE WITNESS:  I do.

 8              ROSALEE WALLS, called as a witness by the

 9    Defendants, having been first duly sworn, testified

10    as follows:

11                       DIRECT EXAMINATION

12    BY MR. LAWSON:

13         Q.   Good afternoon.  Can you state your name for

14    the record?

15         A.   Rosalee Walls.

16         Q.   Ms. Walls, thank you for coming in today.  I

17    know it's been a long day before, so I will try to

18    make this brief.  I wanted to follow up on a few

19    things and to get your opinion on a few matters that

20    we have discussed already with your husband.

21              First, I just wanted to cover some of the

22    same kind of rules of the road that we went over with

23    your husband a little bit earlier on.

24              We'll make sure that we try not to talk over
```

```
 1    each other, that we pause in between our questions

 2    and answers.

 3            If you need a break, please let me know.

 4    It's really no problem at any time.

 5            If you need me to clarify any of my

 6    questions, just tell he.  I'm happy to do that.

 7            Is there anything, after listening to your

 8    husband's testimony today, that you want to clarify

 9    or want to correct or you have a different opinion or

10    understanding of than what he said today?

11            MR. ALBANIS:  Object to the form.

12            But you can answer, Ms. Walls.

13            THE WITNESS:  He left out a few things, like

14       the light fixtures, things like that, like -- I

15       have a bad throat.  I'm sorry.

16    BY MR. LAWSON:

17       Q.   No, it's fine.

18       A.   Basically everything he said.

19            After, I was so sick in there.  I had two

20    heart attacks, and after -- I can't remember things

21    too.  I'll be 82 next month, and I just don't

22    remember too much.  And I still work every day.

23       Q.   With the light fixtures that you mentioned,

24    just so I understand, you're saying that light
```

```
 1    fixtures were damaged --

 2         A.   Yes.

 3         Q.   -- in the home?

 4         A.   Yes.  Like the chandelier that he bought that

 5    I wanted so badly.  And then when you turn it on, you

 6    burn your hand, and it started going like that.

 7              So after we took it down to check it out, the

 8    wires were burned in there, and that's what destroyed

 9    it.  There was a lot of small things like that that

10    do add up, like the window treatments and stuff that

11    we had specially made.  The plantation shutters, all

12    of that.  You know, a lot of things like that

13    that . . .

14              A leather coat I had.  A fur coat I bought.

15    I didn't need it here, but I had had it up north.

16              So just a lot of things that we just had to

17    dump.

18         Q.   The light fixture, the chandelier, that you

19    were discussing, did you replace it, or did you end

20    up throwing it away?

21         A.   We just ended up throwing it away because

22    just -- just brings back bad memories.

23         Q.   The clothing items, did you throw them away,

24    donate them, what did you do with them?
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 3027 of 3246
Case 1:11-cv-01279-NGG Document 9984-1 Entered on FLSD Docket 05/13/2016 Page 49 of
26
Confidential - Subject to further confidentiality Review

```
 1       A.    Mostly I put them out in bags and people
 2    stopped.  People always stopped, picking up things.
 3    And so . . .
 4          And then our neighbors, they knew, getting
 5    rid of this or that.  I said we're getting rid of the
 6    furniture because of the Chinese drywall.  Then they
 7    told friends of theirs, different people.  Can we
 8    take it?
 9          Take it, but if you get sick, it's on you,
10    not on us.  We warned you.
11       Q.    Did you ever try taking the stuff out of the
12    house for awhile, put it somewhere else, and see if
13    that helped it to not smell or anything like that?
14       A.    See, we went to several meetings on this, and
15    one person said that they were told not to take
16    things with them, not even their clothes.  So after
17    we had been sick and the dog died -- it was
18    terrible -- we just didn't want to take the chance
19    with anything else.
20          And I have grandkids that come down and visit
21    and everything, and I wouldn't even let them come
22    down and visit in that house until we got out of
23    there.
24       Q.    Did you ever have a doctor or anyone tell you
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 3028 of 3246
Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 40 of 26
Confidential – Subject to Further Confidentiality Review

1    that you needed to move out of the house?

2        A.    Well, the doctor said -- I kept going, having

3    this headache, my throat bad and everything.  So

4    after, he said, well, I didn't realize that maybe

5    that was what was causing it.  He kept blaming it on

6    sinus problems and things.  So he said, well, all I

7    can tell you is you probably should move out.

8        Q.    Okay.  So you were having the same issues

9    that you were coming to the doctor with over and

10   over; is that right?

11       A.    Uh-huh.

12       Q.    And the doctor said that maybe you should

13   move out?

14       A.    Well, at last.  You know, we found out we had

15   Chinese drywall, and he said, well, maybe that's

16   what's been causing some of these problems you have.

17   And my throat really -- my voice hasn't been good

18   since then.  Right now, it gets bad from time to

19   time, especially with this whatever it is right now

20   going on in the water around here.

21       Q.    Have you -- you said your voice is -- hasn't

22   been the same.  Is there anything else that hasn't

23   been the same since you moved out of the house as far

24   as your health?

Confidential - Subject to Further Confidentiality Review

```
 1        A.   I don't think good.

 2        Q.   Your memory is an issue?

 3        A.   (Nodding head.)

 4        Q.   And that's been consistent since you left the

 5   house?

 6        A.   (Nodding head.)

 7        Q.   Was that going on when you were in the house

 8   too?

 9        A.   It started.  It seems like it just gradually

10   got worse.  Because I would come home, I would just

11   have to lay down.  I couldn't even walk around.

12             So we went away at summer, up to visit my

13   children, and it went away.  I felt great.  We came

14   back.  Within two weeks, or about a week and a half,

15   I was right back to where I was.  A lot of times, I

16   would go out on the lanai and just sleep in a chaise

17   lounge at night.

18        Q.   And since you have no longer lived in the

19   home, has it been the same where you don't feel --

20   you feel great?  You feel -- other than the issues we

21   talked about with your voice and your memory?

22        A.   Yeah, I feel a lot better.  That green tide

23   or whatever it is down here now, that algae, it's not

24   doing any good either.  And that's just a lot of
```

Confidential - Subject to Further Confidentiality Review

```
1    people are having problems with it.

2         Q.   I wanted to ask you about the timeline of the

3    purchase of the property and the transfers of the

4    property that we were getting into a little bit

5    earlier.

6              It sounds like you might have purchased the

7    land that the Van Buren home was on around 2002; is

8    that right?

9         A.   Uh-huh.

10        Q.   And then sometime around 2005, you entered

11   into an agreement with Aranda Homes to build the

12   home; right?

13        A.   Uh-huh.  Right.

14        Q.   And then in 2006, you moved into the home; is

15   that right?

16        A.   (Nodding head.)

17        Q.   And the home was in both your name and your

18   husband's name; is that right?

19        A.   Yes.

20        Q.   And at that time in 2006, did you also own

21   the house at 37th Place?

22        A.   I had that built in '88.

23        Q.   So that home was built in '88, and you owned

24   it from 1988 until today; right?
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 3031 of 3246
Case 1:11-cv-01077-GEL Document 2241 Entrant on FLSD Docket 05/16/2013 Page 43 of
Confidential - Subject to further confidentiality Review
26

```
 1      A.   Uh-huh.

 2      Q.   Okay.  So you've lived there at different

 3   points from 1988 until today?

 4      A.   I lived there all the time until we moved

 5   into Van Buren, and then we moved back.

 6      Q.   Okay.  We talked a little bit about a couple

 7   of other properties.  There was a condo in North Fort

 8   Myers --

 9      A.   Yes.

10      Q.   -- and then there was a property that it

11   sounded like you and your son --

12      A.   We bought that together.

13      Q.   Okay.  Can you tell me when you purchased the

14   condo unit?

15      A.   2000 -- I think it was 2000 or 2001.

16      Q.   Okay.  And you have never lived in that home?

17      A.   No.

18      Q.   Right?

19      A.   No.  I didn't buy it for that reason.

20      Q.   You bought it as a rental property; is that

21   right?

22      A.   My sister is very sick.  She had to quit her

23   job.  And I had some money, some jewelry and some

24   stuff.  I bought it so she would have a place to
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 3032 of 3246
Case 1:1?-mdl-02047-MCB Documents Exhibit on File Subject to Protective Order Page 41 of
Confidential – Subject to Further Confidentiality Review
26

 1    live.  And she died.  My sister died.

 2            So then a distant relative of mine, he moved

 3    in there, and he lived there until he died about

 4    three years ago.  And I gave him a break on the house

 5    because it was older.

 6            But after you pay the condo fees, the flood

 7    insurance, the homeowner's insurance, you were lucky

 8    to clear $100, and then there was always something

 9    you needed to fix.

10        Q.   What about the property that you owned with

11    your son?  Where is that located?

12        A.   In Cape Coral, on the Coral Oaks Golf Course,

13    across the golf course from where we had our house

14    built.

15        Q.   Oh, okay.  And when did you purchase that?

16        A.   In the '80s.  I'm trying to think when.

17    Maybe -- it could be '87 to '89.  I can't tell you

18    exactly.

19        Q.   And do you still own it today?

20        A.   The two of us.

21        Q.   Who lives there?

22        A.   We have renters that come down from Ohio at

23    different times, and sometimes my granddaughter and

24    her kids, they come sometimes to visit.  Usually in

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 3033 of 3246
Case 2:09-md-02047-EEF-MBN Document 22262-39 Filed 11/19/19 Page 3033 of 3246
Confidential – Subject to Further Confidentiality Review
26

1    the wintertime, we have people stay there off and on.

2        Q.   I forgot to ask you a moment ago with the

3    condo.  At this time, does anyone live it in?

4        A.   Uh-huh.

5        Q.   Okay.  Is it still rented to distant family,

6    or is it someone different that is renting the condo

7    now?

8        A.   It's someone different now.

9        Q.   So you are making rental income from the

10   condo property --

11       A.   It's only -- I get probably -- if there's

12   nothing happens, clear about $220 a month on it.  But

13   there's always something.

14       Q.   And you're making seasonal rental -- or

15   seasonal lease income from the home on the golf

16   course in Cape Coral; right?

17       A.   (Nodding head.)

18            Not -- I split that with my son, because it's

19   our house together.

20       Q.   Did you ever consider selling any of your

21   other properties -- the condo or the home on the golf

22   course that you own with your son -- in the past, you

23   know, decade or so?

24       A.   No.  For the simple reason, when my husband

Confidential - Subject to Further Confidentiality Review

```
1     died, I married Larry.  And then I felt like -- and

2     he felt like -- those properties should stay with me

3     for my children, because I -- my husband and I bought

4     those.  And he said I shouldn't sell it because it

5     should go to them.  And that's the reason.

6          Q.   I wanted to ask you about when you stopped

7     paying mortgage payments on the Van Buren home.

8          Do you remember what the decision-making

9     process was with stopping these payments, it sounds

10    like, around September of 2010?

11         A.   Well, we paid them after we moved out for

12    awhile, and then we thought -- finally, he called and

13    tried to get them no payments for a year.  And we

14    would try to get a ^listen --

15         Because someone gave us a price about

16    $190,000 to redo it, and it's quite a bit of money.

17    So I didn't have that much income.  I drive a school

18    bus.  How much money can you make?  So you just have

19    to -- it isn't easy.

20         Q.   So you got a quote from someone --

21         A.   Yes.

22         Q.   -- to see how much it would cost --

23         A.   Yes.

24         Q.   -- to fix the home --
```

```
1        A.    Yeah.

2        Q.    -- at Van Buren?

3        A.    And replace the appliances and have to

4    replace everything.

5        Q.    And they quoted you around $190,000; is that

6    right?

7        A.    (Witness nods.)

8        Q.    Yes?

9        A.    Yes.

10        Q.    Did you ever get another quote, or is that

11    the only quote?

12        A.    That was it.  That was just -- and I had

13    grandkids going to college at the time.  I was

14    helping them go to college.  And I was working, like,

15    three jobs, so . . .

16              I guess I'm still working.

17        Q.    So you stopped the payments a little bit --

18    you paid them -- excuse me.

19              You paid the payments a little bit after you

20    moved out of the Van Buren Parkway, then stopped.

21    You sought a forbearance on the payments for a year,

22    it sounds like?

23        A.    My husband called before we even moved out,

24    if we could move someplace else and we wouldn't have
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 3036 of 3246
Case 1:14-cv-09148-JFK Document 298-21 Confidential Supplement 05/29/2019 Page 18 of 26
Confidential - Subject to Further Confidentiality Review

 1    to pay a payment -- any payments for a year and maybe

 2    we could get a loan and do it.  But they didn't want

 3    to work with us.

 4        Q.   So there was a period from 2010 when they

 5    said no to the forbearance until 2014 when the actual

 6    foreclosure occurred; is that right?

 7        A.   Yeah.  I think.  Now . . .

 8        Q.   What -- do you remember what happened during

 9    that time?  Was there more negotiation with the bank?

10    Did you attempt to get back into the home at any

11    point?  Do you remember what happened?

12            MR. ALBANIS:  Object to the form.

13            But you can answer, Ms. Walls, if you can.

14            THE WITNESS:  I don't remember.  I mean, it

15        wouldn't be fair to answer you if I couldn't give

16        you a right answer.

17    BY MR. LAWSON:

18        Q.   So as a result of the foreclosure, the bank

19    sold your home at a public sale; is that right?

20        A.   Uh-huh.

21        Q.   Yes?

22        A.   (Nodding head.)

23        Q.   That's a yes?

24        A.   Yes.  Sorry.

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 3037 of 3246
Case 1:09-cv-02047-CAT Document 23363-39 Filed 11/19/19 Page 3037 of 3246
Confidential - Subject to Further Confidentiality Review
26

1    Q.    And that sale occurred sometime around

2    October of 2014?

3    A.    I guess.  I don't know.

4    Q.    After that time in 2014 when the foreclosure

5    was done, to your knowledge, did you -- do you owe

6    any more money to Deutsche Bank or American Home

7    Services?

8          MR. ALBANIS:  Object to the form.

9          But you can answer.

10          THE WITNESS:  I don't know.

11    BY MR. LAWSON:

12    Q.    Do you -- have you made any payments to

13    either of those companies?

14    A.    No, I don't think so.

15    Q.    So from 2010, when you stopped making

16    mortgage payments, through 2014, you didn't pay them

17    any money on your mortgage; correct?  There was no

18    additional payments you made to them during that

19    time?

20    A.    I don't remember.

21    Q.    Okay.  You stopped paying in 2010; is that

22    right?

23    A.    I really can't tell you for sure.

24    Q.    All right.

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 3038 of 3246
Case 1:11-cv-03094-MGC Document 29-21 Entered on FLSD Docket 05/18/2015 Page 40 of
26
Confidential - Subject to Further Confidentiality Review

```
1        A.    And all of our records we had -- during the

2    hurricane last year, some shingles came off the roof.

3    And we had boxes in the attic stored with all these

4    papers in them.  Some of them were just thrown out

5    because they were full of water.  We have really had

6    it.

7        Q.    Which property was that at?

8        A.    37th Place.

9        Q.    At 37th Place.

10       A.    We stored all the boxes with all the papers

11   in there.  What a mess.

12       Q.    Did the Van Buren Parkway sit empty for the

13   four years in between when you moved out and when it

14   was sold?

15       A.    I guess.  I couldn't stand to drive by there.

16       Q.    You didn't go back there?

17       A.    No.  I go by it on the bus, but I just go to

18   the corner and pick up kids.  And the house is three

19   doors down, and I don't look down there.

20            MR. LAWSON:  Thank you, Ms. Walls.  I don't

21       think I have any further questions at this time.

22            MR. POYER:  Beijing New Building Materials

23       has no questions.  Thank you.

24            MR. ALBANIS:  We have nothing.  We will
```

Confidential - Subject to Further Confidentiality Review

```
1              reserve signature for both witnesses.

2                   (Whereupon, the deposition concluded at

3        3:05 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 3040 of 3246
Case 1:09-cv-07687-MGC Document 281 Entered on FLSD Docket 05/18/2011 Page 42 of
26
Confidential - Subject to Further Confidentiality Review

```
 1                    C E R T I F I C A T E

 2

 3           I, KELLY J. LAWTON, Registered Professional

 4    Reporter, Licensed Court Reporter, and Certified

 5    Court Reporter, do hereby certify that, pursuant to

 6    notice, the deposition of ROSALEE WALLS was duly

 7    taken on December 11, 2018, at 2:49 p.m. before me.

 8           The said ROSALEE WALLS was duly sworn by me

 9    according to law to tell the truth, the whole truth

10    and nothing but the truth and thereupon did testify

11    as set forth in the above transcript of testimony.

12    The testimony was taken down stenographically by me.

13    I do further certify that the above deposition is

14    full, complete, and a true record of all the

15    testimony given by the said witness.

16

17           _____

18           KELLY J. LAWTON, RPR, LCR, CCR

19

20           (The foregoing certification of this

21    transcript does not apply to any reproduction of the

22    same by any means, unless under the direct control

23    and/or supervision of the certifying reporter.)

24
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 3041 of 3246
Case 2:09-cv-02048-MCA Document 22363-39 Confidential - Subject to Docket 05/09/2011 Page 2 of
26
Confidential - Subject to Further Confidentiality Review

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4          Please read your deposition over carefully

 5   and make any necessary corrections.  You should state

 6   the reason in the appropriate space on the errata

 7   sheet for any corrections that are made.

 8

 9          After doing so, please sign the errata sheet

10   and date it.  It will be attached to your deposition.

11

12          It is imperative that you return the original

13   errata sheet to the deposing attorney within thirty

14   (30) days of receipt of the deposition transcript by

15   you.  If you fail to do so, the deposition transcript

16   may be deemed to be accurate and may be used in

17   court.

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                    - - - - - -

 2                   E R R A T A

 3                    - - - - - -

 4   PAGE    LINE    CHANGE

 5   _____   _____   _____

 6      REASON: _____

 7   _____   _____   _____

 8      REASON: _____

 9   _____   _____   _____

10      REASON: _____

11   _____   _____   _____

12      REASON: _____

13   _____   _____   _____

14      REASON: _____

15   _____   _____   _____

16      REASON: _____

17   _____   _____   _____

18      REASON: _____

19   _____   _____   _____

20      REASON: _____

21   _____   _____   _____

22      REASON: _____

23   _____   _____   _____

24      REASON: _____
```

Confidential - Subject to Further Confidentiality Review

```
1                    ACKNOWLEDGMENT OF DEPONENT

2

3             I, ROSALEE WALLS, do hereby acknowledge that

4    I have read the foregoing pages, 1 to 25, and that

5    the same is a correct transcription of the answers

6    given by me to the questions therein propounded,

7    except for the corrections or changes in form or

8    substance, if any, noted in the attached Errata

9    Sheet.

10

11

12   _____     _____

13   ROSALEE WALLS                                      DATE

14

15

16

17

18   Subscribed and sworn to before me this

19   _____ day of _____, 20____.

20   My Commission expires: _____

21

22   _____

     Notary Public

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                              LAWYER'S NOTES

 2        PAGE      LINE

 3        _____    _____    _____

 4        _____    _____    _____

 5        _____    _____    _____

 6        _____    _____    _____

 7        _____    _____    _____

 8        _____    _____    _____

 9        _____    _____    _____

10        _____    _____    _____

11        _____    _____    _____

12        _____    _____    _____

13        _____    _____    _____

14        _____    _____    _____

15        _____    _____    _____

16        _____    _____    _____

17        _____    _____    _____

18        _____    _____    _____

19        _____    _____    _____

20        _____    _____    _____

21        _____    _____    _____

22        _____    _____    _____

23        _____    _____    _____

24        _____    _____    _____
```

# EXHIBIT A35

Confidential - Subject to Further Confidentiality Review

```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2
     EDUARDO AND CARMEN AMORIN,
 3   et al., individually, and
     on behalf of all others
 4   similarly situated,        Case No. 1:11-CV-22408-MGC
 5       Plaintiffs,
 6   vs.
 7   TAISHAN GYPSUM CO., LTD.,
     F/K/A SHANDONG TAIHE
 8   DONGXIN CO., LTD.; TAIAN
     TAISHAN PLASTERBOARD CO.,
 9   LTD, et al.,
10       Defendants.
11              CONFIDENTIAL - SUBJECT TO FURTHER
                    CONFIDENTIALITY REVIEW
12
                          - - -
13
                     JANUARY 10, 2019
14
                          - - -
15
         Deposition of JENNIFER WITES, held at
16   Akerman, LLP, 350 Las Olas Boulevard, Suite 1600,
     Fort Lauderdale, Florida, commencing at 2:24 p.m.,
17   on the above date, before Joan L. Pitt, Registered
     Merit Reporter, Certified Realtime Reporter, and
18   Florida Professional Reporter.
19                        - - -
20             GOLKOW LITIGATION SERVICES
          877.370.3377 ph | 917.591.5672 fax
21                  deps@golkow.com
22
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1                      APPEARANCES
 2
 3    Counsel for Plaintiffs:
 4         PATRICK S. MONTOYA, ESQUIRE
           NATALIE M. RICO, ESQUIRE
 5         Colson Hicks Eidson
           255 Alhambra Circle, Penthouse
 6         Coral Gables, Florida 33134
           305.476.7400
 7         patrick@colson.com
           natalie@colson.com
 8
 9    Counsel for Defendants Taishan Gypsum Co., Ltd., and
      Taian Taishan Plasterboard Co., Ltd.:
10
           MATTHEW D. LAWSON, ESQUIRE
11         LARA TUMEH, ESQUIRE
           MAE MANUPIPATPONG, ESQUIRE
12         Alston & Bird LLP
           One Atlantic Center
13         1201 West Peachtree Street
           Atlanta, Georgia 30309-3424
14         404.881.7000
           matt.lawson@alston.com
15         lara.tumeh@alston.com
           mae.manupipatpong@alston.com
16
17
18
19
20
21
22
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1                     APPEARANCES CONTINUED

 2

 3   Counsel for Beijing New Building Materials PLC:

 4        ALEX B. ROTHENBERG, ESQUIRE

          Gordon Arata Montgomery Barnett

 5        201 St. Charles Avenue, 40th Floor

          New Orleans, Louisiana 70170-4000

 6        504.582.1111

          arothenberg@gamb.law

 7

 8   Also present:  Marc Wites

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

confidential -- Subject to further confidentiality Review

```
1                        - - -

2                    I N D E X

3                        - - -

4    Testimony of:  JENNIFER WITES

5     DIRECT EXAMINATION BY MR. LAWSON               5

6     CROSS-EXAMINATION BY MR. MONTOYA              13

7     REDIRECT-EXAMINATION BY MR. LAWSON            14

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                         -  -  -

 2              THE COURT REPORTER:  Raise your right hand,

 3         please.  Do you swear or affirm the testimony you

 4         give will be the truth, the whole truth, and nothing

 5         but the truth?

 6              THE WITNESS:  Yes.

 7              THE COURT REPORTER:  Thank you.

 8              JENNIFER WITES, called as a witness by the

 9    Defendant Taishan Gypsum Co., Ltd., having been first

10    duly sworn, testified as follows:

11                      DIRECT EXAMINATION

12    BY MR. LAWSON:

13         Q.   Could you please state your name for the

14    record?

15         A.   Jennifer Wites.

16         Q.   Mrs. Wites, I wanted to thank you for your time

17    today.  It's my understanding that you've been sitting

18    in on your husband's deposition throughout his

19    testimony.  Is that accurate?

20         A.   Yes.

21         Q.   And you've heard everything that he said so far

22    today?

23         A.   Yes.

24         Q.   As well as the questions that were asked of
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 3051 of 3246
Case 1:18-cv-12408-NGBN Document 234262 Entered on FLSD Docket 05/19/2020 Page 7 of
22

Confidential - Subject to Further Confidentiality Review

1    him?

2         A.   Correct.

3         Q.   Do you have anything that comes to mind that

4    you would like to correct or add to that your husband

5    said today during his deposition?

6         A.   The only thing I wanted, which I believe was

7    just clarified, is that we didn't upgrade any of the

8    finishes when we put the house back together.  We

9    actually tried to reuse as much as possible of what we

10   had.

11             And other than that, the question about who

12   referred us to Marc Brett, or B4 & After -- excuse me --

13   Construction, I was under the impression it was our

14   neighbor, because they had a friend who had used him to

15   remodel an entire house and we were able to go see that

16   house so felt more comfortable when we could actually

17   see the work.

18             We also had a friend in common with the -- we

19   had a friend in common with the contractor, so I'm not

20   sure exactly who.  There was two connections.  I'm not

21   sure which one of them referred us to him.

22        Q.   Were you ultimately satisfied with the work

23   that B4 & After did on the remediation project on your

24   house?

Confidential - Subject to Further Confidentiality Review

```
1      A.   Meaning the quality of the work?

2      Q.   Yes, the quality of the remediation project.

3      A.   Yes.

4      Q.   There's been some discussion about your

5  husband's experience and your family's experience with

6  living in the house, both before you knew you had

7  Chinese drywall and after you knew you had Chinese

8  drywall.

9           I wanted to talk to you first about your

10  experience of picking this house.  Do you remember why

11  you bought this house?

12      A.   Because I walked in the door and I loved it.

13      Q.   What did you love about it?

14      A.   It was a two-story house.  I grew up in a

15  two-story house, so I had some memories of my childhood.

16  It's a hard feeling to explain, but when you walk in and

17  you know it's the one, it was the one.  I loved the

18  kitchen.  I loved everything they picked.  I loved the

19  floors.  I loved, really, the layout.  Everything that

20  they -- the people that built the house, the items that

21  they chose for the house, it was all my taste.  I

22  just -- I loved it.

23      Q.   Before you knew that you had Chinese drywall in

24  the house, what was your experience like living in the
```

1    house?

2         A.    It was pleasurable, it was a good experience, I

3    would say.  You know, like Marc said, we -- I didn't

4    grow up in a house that size.  I did not ever think I

5    would live in such a great house and a nice house and

6    was proud that we were able to buy it, and we enjoyed

7    it.  And the kids -- my kids were little.  They had fun.

8    It was a good experience.

9         Q.    And when you found out that you did have

10   Chinese drywall in your house, what was that like for

11   you?

12        A.    I felt like I was at the top of a roller

13   coaster and the roller coaster went down and my stomach

14   stayed at the top.  It's like the bottom fell out.  I

15   remember where I was sitting on the couch when Marc took

16   the plates, the switches, off the wall and when he

17   looked at the air conditioning coil like it was

18   yesterday.  I remember that feeling when he sat down and

19   said, "We have it."  And it was awful.  I don't know how

20   else to say it, but like the bottom fell out.

21        Q.    So you had to move out of your house to allow

22   the remediation project to occur; correct?

23        A.    Yes.

24        Q.    What was it like having to live in a rental

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 3054 of 3246
Case 2:09-md-02047-EEF-MBN Document 20831-1 Filed 11/05/19 Page 40 of 22
Confidential - Subject to Further Confidentiality Review

1    house during that time?

2      A.    The rental house, first of all, it was not easy

3    to find.  We had to find a house that was convenient

4    to -- we wanted to stay close to the school, because my

5    older son was in kindergarten at the time, and also not

6    that far from the house in The Oaks, because it required

7    a lot of back and forth.

8          We did find a house.  It was significantly

9    smaller than our house, so -- it was unfurnished, so we

10   had to, basically, send half of our things into storage

11   and half of our things into the rental house, so that

12   required trying to divvy up what we needed in the rental

13   house and what we didn't need, and what we could store.

14   And, ultimately, stuff that was supposed to go into

15   storage ended up in the rental house.  Stuff that we

16   needed ended up in storage.

17         I had a -- at the time -- let's see.  2009 I

18   had a four-year-old and a five-year-old.  So my kids are

19   17 months apart.  And for anyone that has kids that age,

20   it's a lot of work.  So I was trying to move, make all

21   these decisions, pack boxes, unpack boxes, and deal with

22   my two children, and moving into, you know, a

23   significantly smaller house, which was like -- the

24   entire time we lived there was almost like moving the

Confidential - Subject to Further Confidentiality Review

```
 1    entire time.  We had boxes that we never unpacked

 2    because they were supposed to be in storage.  And it was

 3    a stressful time.  It was not enjoyable.

 4        Q.   When the remediation and reconstruction of your

 5    house was completed and you moved back in, what was it

 6    like moving back into your house?

 7        A.   I wish I could say that I felt good about it,

 8    but it was never the same feeling of being back in the

 9    house.  I was happy that we weren't paying a mortgage

10    and a rent, but other than that, I had no positive

11    feeling about being back in the house.

12        Q.   Why is that?

13        A.   Because of the loss that we suffered

14    financially, emotionally, the stress it created on the

15    family, on our marriage, on the kids.  It took -- you

16    know, it was like my job for a year of my life just

17    managing the construction project, the house, the kids.

18    It just -- thinking about all our savings that we had

19    lost, and it was all related to this house, so I could

20    not have, for all those reasons, a good feeling about

21    moving back into the house.

22        Q.   Do you think you'll always have those feelings

23    with you, bothering you, for the rest of your life?

24        A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 3056 of 3246
Case 2:09-cv-02048-CAB Document 2831 Enterment in FLSD Docket 05/18/2012 Page 42 of
22
Confidential - Subject to Further Confidentiality Review

1    Q.   Do you think it would change at all if you

2    moved out of the house, that you would have those

3    feelings, or not, anymore?

4    A.   Like Marc had said, it's hard to get past it,

5    because it constantly -- it was so pervasive that I

6    will -- I don't think that I'll ever get over it.

7    Q.   Have you ever thought about or wanted to sell

8    your house?

9    A.   I mean, everybody thinks about it, but when we

10   sell our house we're going to recognize another loss,

11   and I'm just -- I have not to this point been ready to

12   deal with that.

13   Q.   Do you think you ever will sell it?

14   A.   I can't -- I don't know.

15   Q.   If you knew that you were going to get an

16   amount of money that you thought was fair for your

17   house, would you sell it?

18        MR. MONTOYA:  Objection to the extent it calls

19        for speculation.

20   BY MR. LAWSON:

21   Q.   I'm asking, in your opinion, a price that you

22   think would be a fair value for the house, a price you'd

23   be happy to sell it for, would you want to sell your

24   house then?

```
 1              MR. MONTOYA:  Improper hypothetical.  You can

 2       answer.

 3              THE WITNESS:  Do you want me to guess?  I have

 4       no emotional attachment to the house, so I have no

 5       problem -- I mean, you want me to guess.  Would I

 6       be -- I'm not happy about the house.  We still lost

 7       what we lost.  So I wouldn't say I'm going to be

 8       happy.  Would I want to sell it?  I mean, at some

 9       point I'm sure -- I don't even know how to answer

10       the question.  Can you ask it again?

11  BY MR. LAWSON:

12       Q.   Yeah.  I think that you expressed earlier that

13  you were concerned that if you sold the house you'd have

14  to take another loss?

15       A.   I'm not concerned about that.  I know that.

16       Q.   Right.  You think that if you sold the house it

17  would sell for less, and that's a concern for you;

18  correct?

19       A.   I know it would sell for less, and, yes, it's a

20  concern.

21       Q.   If that were not the case and it did not sell

22  for less than you think it should, would you want to

23  sell the house and live somewhere else?

24              MR. MONTOYA:  Objection.  It's vague and
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 3058 of 3246
Case 1:09-cv-02042-GC Document 2643-31 Entered on FLSD Docket 05/09/2019 Page 41 of
22
Confidential - Subject to Further Confidentiality Review

```
 1          improper hypothetical.  You can answer.

 2              THE WITNESS:  Right now?

 3   BY MR. LAWSON:

 4      Q.   Yes.

 5      A.   Today?  For reasons that have to do with our

 6   life, we are kind of in the middle of deciding what --

 7   where our son is -- what our son is going to do next

 8   year, so I would not sell it right -- today or tomorrow

 9   just because of family reasons of where we would go,

10   so...

11              MR. LAWSON:  I don't have anything further at

12      this time.

13              MR. ROTHENBERG:  I have no questions.

14                      CROSS-EXAMINATION

15   BY MR. MONTOYA:

16      Q.   Ma'am, did you have any concerns for your

17   health when you found out that you were living in a home

18   with Chinese drywall?

19      A.   Of course.

20      Q.   Did you have any concerns for Marc's health

21   when you found out you were living in a Chinese drywall

22   home?

23      A.   Of course.

24      Q.   Did you have any concerns for your children's
```

Confidential - Subject to Further Confidentiality Review

```
 1    health when you found out you were living in a Chinese

 2    drywall home?

 3        A.   Definitely, probably more so, more than Marc

 4    and I, because they were young and still developing.

 5             MR. MONTOYA:   Thank you.

 6                     REDIRECT-EXAMINATION

 7    BY MR. LAWSON:

 8        Q.   Do you have any health effects that you think

 9    you suffered as a result of Chinese drywall?

10        A.   Me personally?

11        Q.   Yes.

12        A.   I would say I'm not aware of any right now, but

13    I don't think anybody really knows the long-term

14    implications.

15        Q.   Do you believe your children have ever suffered

16    from any health effects that you believe are related to

17    Chinese drywall?

18        A.   My younger son, when we moved into the rental

19    house, developed pneumonia.  He had to be nebulized

20    probably, periodically, for several years after that.  I

21    don't know if that was from the Chinese drywall.

22        Q.   Have you worked and been employed throughout

23    the entire time that -- from when you lived -- excuse

24    me -- from when you moved into this house on Middlebrook
```

```
 1    Way until today?

 2        A.    No.

 3        Q.    Did you go back to work at some point?

 4        A.    Yes.

 5        Q.    When was that?

 6        A.    I believe it was September of 2012, but I'd

 7    have to check to be 100 percent sure.

 8        Q.    So from when you moved into the house until

 9    September of 2012, did you work?

10        A.    No.

11        Q.    And where do you work today?

12        A.    I work at Bristol-Myers Squibb.

13        Q.    And is that where you began working in 2012?

14        A.    Correct.

15        Q.    What do you do?

16        A.    I just want to make a caveat.  I was part of a

17    contract salesforce for Bristol-Myers Squibb, so my

18    employer was actually the contract firm, and then I

19    became a full-time employee for Bristol-Myers Squibb

20    in two thousand and -- I think it was about two years

21    later.  I'd have to check the date.  But I -- so

22    originally when I started I was technically a contractor

23    for Bristol-Myers Squibb.

24        Q.    What's your title today?
```

```
1       A.    Institutional tumor specialist.

2       Q.    Why did you go back to work in 2012?

3       A.    For financial reasons.

4             MR. LAWSON:  I don't have any further

5       questions.

6             MR. ROTHENBERG:  I have no questions.

7             MR. MONTOYA:  Nothing here.  She'll read too.

8       Thank you.

9             (Whereupon, the deposition concluded at

10      2:38 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 3062 of 3246
Case 1:1-cv-22408-MGC Document 208-81 Entered on FLSD Docket 05/18/2017 Page 46 of
22
Confidential - Subject to Further Confidentiality Review

```
 1                  C E R T I F I C A T E

 2

 3          I, JOAN L. PITT, Registered Merit Reporter,

 4   Certified Realtime Reporter, and Florida Professional

 5   Reporter, do hereby certify that, pursuant to notice,

 6   the deposition of JENNIFER WITES was duly taken on

 7   January 10, 2019, at 2:24 p.m., before me.

 8          The said JENNIFER WITES was duly sworn by me

 9   according to law to tell the truth, the whole truth, and

10   nothing but the truth, and thereupon did testify as set

11   forth in the above transcript of testimony.  The

12   testimony was taken down stenographically by me.  I do

13   further certify that the above deposition is full,

14   complete, and a true record of all the testimony given

15   by the said witness.

16

17          _____

18              JOAN L. PITT, RMR, CRR, FPR

19

20          (The foregoing certification of this transcript

21   does not apply to any reproduction of the same by any

22   means, unless under the direct control and/or

23   supervision of the certifying reporter.)

24
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 3063 of 3246 of
Case 2:09-md-02047-MCA Document 26831 Confidential Sealed 05/18/2012 Page 49 of
22

Confidential - Subject to Further Confidentiality Review

```
 1                      INSTRUCTIONS TO WITNESS

 2

 3

 4          Please read your deposition over carefully and

 5   make any necessary corrections.  You should state the

 6   reason in the appropriate space on the errata sheet for

 7   any corrections that are made.

 8

 9          After doing so, please sign the errata sheet

10   and date it.  It will be attached to your deposition.

11

12          It is imperative that you return the original

13   errata sheet to the deposing attorney within thirty (30)

14   days of receipt of the deposition transcript by you.  If

15   you fail to do so, the deposition transcript may be

16   deemed to be accurate and may be used in court.

17

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 3064 of 3246
Case 1:11-cv-02453-MGC Document 269-381 Entered on FLSD Docket 05/18/2017 Page 46 of 22
Confidential - Subject to Further Confidentiality Review

```
 1                         - - - - - -

 2                        E R R A T A

 3                         - - - - - -

 4      PAGE    LINE    CHANGE

 5      _____   _____   _____

 6         REASON: _____

 7      _____   _____   _____

 8         REASON: _____

 9      _____   _____   _____

10         REASON: _____

11      _____   _____   _____

12         REASON: _____

13      _____   _____   _____

14         REASON: _____

15      _____   _____   _____

16         REASON: _____

17      _____   _____   _____

18         REASON: _____

19      _____   _____   _____

20         REASON: _____

21      _____   _____   _____

22         REASON: _____

23      _____   _____   _____

24         REASON: _____
```

Confidential - Subject to Further Confidentiality Review

```
1                    ACKNOWLEDGMENT OF DEPONENT

2

3          I, _____, do hereby

4     acknowledge that I have read the foregoing pages and

5     that the same is a correct transcription of the answers

6     given by me to the questions therein propounded, except

7     for the corrections or changes in form or substance, if

8     any, noted in the attached Errata Sheet.

9

10

11    _____    _____

12    JENNIFER WITES                      DATE

13

14

15

16

17    Subscribed and sworn to before me this

18    ____ day of _____, 20___.

19    My Commission expires: _____

20

21    _____

      Notary Public

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 3066 of 3246
Case 1:09-cv-02047-MCA Document 23051 Exhibit 39 Filed Dockets 05/09/2019 Page 42 of 22
Confidential - Subject to Further Confidentiality Review

```
 1                          LAWYER'S NOTES

 2     PAGE    LINE

 3     _____   _____   _____

 4     _____   _____   _____

 5     _____   _____   _____

 6     _____   _____   _____

 7     _____   _____   _____

 8     _____   _____   _____

 9     _____   _____   _____

10     _____   _____   _____

11     _____   _____   _____

12     _____   _____   _____

13     _____   _____   _____

14     _____   _____   _____

15     _____   _____   _____

16     _____   _____   _____

17     _____   _____   _____

18     _____   _____   _____

19     _____   _____   _____

20     _____   _____   _____

21     _____   _____   _____

22     _____   _____   _____

23     _____   _____   _____

24     _____   _____   _____
```

# EXHIBIT A36

Case 2:09-md-02047-EEF-MBN Document 22363-20 Filed 11/19/19 Page 3068 of 3246
Case 1:11-cv-22408-MGC Document 299-31 Entered on FLSD Docket 05/08/2019 Page 2 of 180
Confidential - Subject to Further Confidentiality Review

```
 1                   UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2
     EDUARDO AND CARMEN AMORIN,
 3   et al., individually, and
     on behalf of all others
 4   similarly situated,        Case No. 1:11-CV-22408-MGC
 5       Plaintiffs,
 6   vs.
 7   TAISHAN GYPSUM CO., LTD.,
     F/K/A SHANDONG TAIHE
 8   DONGXIN CO., LTD.; TAIAN
     TAISHAN PLASTERBOARD CO.,
 9   LTD, et al.,
10       Defendants.
11              CONFIDENTIAL - SUBJECT TO FURTHER
                    CONFIDENTIALITY REVIEW
12
                            - - -
13
                      JANUARY 10, 2019
14
                            - - -
15
             Deposition of MARC WITES, held at
16       Akerman, LLP, 350 Las Olas Boulevard, Suite 1600,
         Fort Lauderdale, Florida, commencing at 9:05 a.m.,
17       on the above date, before Joan L. Pitt, Registered
         Merit Reporter, Certified Realtime Reporter, and
18       Florida Professional Reporter.
19                          - - -
20              GOLKOW LITIGATION SERVICES
             877.370.3377 ph | 917.591.5672 fax
21                   deps@golkow.com
22
23
24
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 3069 of 3246
Case 1:18-cv-12408-NGG Document 63-1 Filed 05/03/2019 Page 2 of 180
Confidential - Subject to Further Confidentiality Review

```
 1                          APPEARANCES

 2

 3    Counsel for Plaintiffs:

 4         PATRICK S. MONTOYA, ESQUIRE
           NATALIE M. RICO, ESQUIRE
 5         Colson Hicks Eidson
           255 Alhambra Circle, Penthouse
 6         Coral Gables, Florida 33134
           305.476.7400
 7         patrick@colson.com
           natalie@colson.com
 8
           KEITH J. VERRIER, ESQUIRE
 9         Levin, Sedran & Berman LLP
           510 Walnut Street, Suite 500
10         Philadelphia, Pennsylvania 19106
           215.592.1500
11         kverrier@lfsblaw.com

12

13    Counsel for Defendants Taishan Gypsum Co., Ltd., and
      Taian Taishan Plasterboard Co., Ltd.:

14
           MATTHEW D. LAWSON, ESQUIRE
15         LARA TUMEH, ESQUIRE
           MAE MANUPIPATPONG, ESQUIRE
16         Alston & Bird LLP
           One Atlantic Center
17         1201 West Peachtree Street
           Atlanta, Georgia 30309-3424
18         404.881.7000
           matt.lawson@alston.com
19         lara.tumeh@alston.com
           mae.manupipatpong@alston.com

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 3070 of 3246
Case 1:18-cv-12408-NGG Document 28-31 Entered on FLSD Docket 05/08/2020 Page 249 of 180
Confidential - Subject to Further Confidentiality Review

```
 1                    APPEARANCES CONTINUED

 2

 3    Counsel for Beijing New Building Materials PLC:

 4         DAN GUERRA, ESQUIRE

           Orrick, Herrington & Sutcliffe LLP

 5         The Orrick Building

           405 Howard Street

 6         San Francisco, California 94105-2669

           415.773.5545

 7         dguerra@orrick.com

 8         ALEX B. ROTHENBERG, ESQUIRE

           Gordon Arata Montgomery Barnett

 9         201 St. Charles Avenue, 40th Floor

           New Orleans, Louisiana 70170-4000

10         504.582.1111

           arothenberg@gamb.law

11

12    Also present:  Jennifer Wites

13

14

15

16

17

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 3071 of 3246
Case 1:18-cv-12408-NGG Document 093 30 Entered on FLSD Docket 05/09/2016 Page 9 of
180
Confidential - Subject to Further Confidentiality Review

```
 1                          - - -

 2                    I N D E X

 3                          - - -

 4    Testimony of:  MARC WITES

 5      DIRECT EXAMINATION BY MR. LAWSON              6

 6      CROSS-EXAMINATION BY MR. ROTHENBERG         157

 7      CROSS-EXAMINATION BY MR. MONTOYA            170

 8

 9

10                 E X H I B I T    I N D E X

11    WITES            DESCRIPTION              PAGE

12    No. 1    Warranty Deed Book 21844/Page 1881     52
                 through 1882

13

      No. 2    Palm Beach County Property Appraiser   54

14               Public Records

15    No. 3    Plaintiff Profile Form - Residential   67
                 Properties

16               WITES, M 000001 through 000008

17    No. 4    Inspection Report 08/30/2009           77
                 MWITES - 000082

18

      No. 5    Supplemental Plaintiff Profile Form    88

19

      No. 6    Marc and Jennifer Wites Damages       110

20               Summary

21    No. 7    A1A Document A105 - 2007              117
                 Standard Form of Agreement Between

22               Owner and Contractor for a
                 Residential or Small Commercial

23               Project

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 3072 of 3246
Case 1:14-cv-02408-NGG Document 23891 24 Greater Drywall Docket 05/09/2022 Page 46 of
Confidential - Subject to Further Confidentiality Review
180

| 1 | No. 8 | Chart of Expenses Deductible Pursuant | 119 |
|  |  | to IRS Bulletin on Chinese Drywall |  |
| 2 |  | MWITES - 000001 through 000103 |  |
| 3 | No. 9 | Photographs | 149 |
|  |  | WITES, M - 000208 through 000269 |  |
| 4 |  |  |  |
|  | No. 10 | Photographs | 151 |
| 5 |  | Taishan-Wites000001 through 000062 |  |
| 6 | No. 11 | Remediation Estimates | 155 |
| 7 | No. 12 | Documents Regarding Chapter 558 | 155 |
|  |  | Construction Defect Notice |  |
| 8 |  |  |  |
|  | No. 13 | Documents Regarding Credit Inquiries | 156 |
| 9 |  |  |  |
|  | No. 14 | Documents Regarding Palm Beach County | 156 |
| 10 |  | Property Taxes |  |
| 11 | No. 15 | Documents Regarding Building Permits | 156 |

12
13
14
15
16
17
18
19
20
21
22
23
24

Confidential - Subject to Further Confidentiality Review

```
  1                         - - -

  2              THE COURT REPORTER:  Raise your right hand,

  3         please.  Do you swear or affirm the testimony you

  4         give will be the truth, the whole truth, and nothing

  5         but the truth?

  6              THE WITNESS:  I do.

  7              THE COURT REPORTER:  Thank you.

  8              MARC WITES, called as a witness by the

  9    Defendant Taishan Gypsum Co., Ltd., having been first

 10    duly sworn, testified as follows:

 11                    DIRECT EXAMINATION

 12    BY MR. LAWSON:

 13         Q.    Could you please state your name for the

 14    record?

 15         A.    Marc Wites.

 16         Q.    Marc, my name is Matt Lawson.  I'm an attorney

 17    from Alston & Bird.  I represent Taishan Gypsum Co.,

 18    Ltd., in this lawsuit.  Thank you for your time today

 19    coming in, along with your wife, for this deposition.

 20    We appreciate you taking the time out of your day to do

 21    this.

 22              I wanted to get started by first just asking

 23    you, you understand that you've sworn to tell the truth

 24    today during this deposition?
```

Case 2:09-md-02047-EEF-MBN Document 22363-20 Filed 11/19/19 Page 3074 of 3246
Case 1:18-cv-12408-NGT Document 099-31 entered on FLSD docket 05/08/2010 Page 8 of
180
confidential -- subject to further confidentiality review

```
 1        A.    I do.

 2        Q.    And you understand how a deposition works

 3   because you're an attorney yourself; correct?

 4        A.    I do.

 5        Q.    And you are an attorney?

 6        A.    And I am.

 7        Q.    You've probably sat in on a number of

 8   depositions yourself; is that right?

 9        A.    Yes.

10        Q.    And I probably don't have to go over the rules

11   of the road for a deposition with you, I would imagine,

12   you know how it works; is that right?

13        A.    I do.

14        Q.    Okay.  Please let me know at any point if you

15   want to take a break.  You're the boss of that.  So at

16   any point, if you need to, just let me know and we can

17   definitely do that.

18              How long -- excuse me.  Let me ask that

19   differently.  Did you meet with your lawyer prior to

20   today to prepare for this deposition?

21        A.    I did.

22        Q.    And when did you meet?

23        A.    A few days ago.

24        Q.    Do you remember what day it was?
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 3075 of 3246
Case 1:14-cv-02949-NGG-MDG Document 801-21 Filed 09/08/17 Docket 05492015 Page 49 of
180

confidential - subject to further confidentiality Review

```
 1     A.    I believe it was Monday.

 2     Q.    How long did you meet?

 3     A.    An hour.

 4     Q.    And did you meet any other times other than

 5  that?

 6     A.    No.

 7     Q.    Who did you meet with during that meeting?  Who

 8  was there?

 9     A.    Patrick and Natalie and my wife.

10     Q.    Now, did you speak with anyone other than the

11  people that you just mentioned to prepare for this

12  deposition?

13     A.    No.

14     Q.    And did you review documents while you were

15  preparing for the deposition?

16     A.    Yes.

17     Q.    Are there any documents that you can think of

18  that you have -- that you believe are relevant to your

19  claims in this lawsuit that you have not given to your

20  attorneys?

21     A.    Not that I'm aware of.

22           MR. LAWSON:  Now, I'd just like to put onto the

23     record that before we got started today we had a

24     number of documents that have been produced to us
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 3076 of 3246 of
Case 1:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 40 of
180
Confidential - Subject to further confidentiality Review

```
 1    just this morning.  We are doing our best to be able

 2    to review them and we will try to ask the witness

 3    about them today, but I would like to put on the

 4    record that we would reserve to -- the opportunity

 5    to continue this deposition, as needed, to be able

 6    to properly review those documents and question the

 7    witness about them at a later date.

 8         MR. MONTOYA:  Let me jump in on that just --

 9    the documents that have been produced are, in

10    general, the first category is estimates for

11    remediation that Marc was going to do and that he

12    gathered before the home was remediated, the second

13    category are when he appealed to the Property Tax

14    Value Adjustment Board for a reduction in his

15    property taxes, and the third category is issues

16    with his credit reporting that he made.

17         So there's three exhibits.  We do have a full

18    copy.  To make the deposition record clear, it can

19    be marked as Exhibits 1, 2, 3.  That way you know

20    what's been produced, and if you want to start with

21    your next exhibit that's 4, or if you want to do

22    plaintiff's or defendant's, I don't care, doesn't

23    matter to me, but I'd like to get those marked so

24    it's clear what's been produced.  And the bulk of
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 3077 of 3246
Case 1:11-cv-22408-MGC Document 336-1 Entered on FLSD Docket 05/08/2017 Page 41 of
180

Confidential - Subject to further confidentiality Review

```
1        the documents we did send out last night.

2              MR. LAWSON:  And I appreciate that.  We'll mark

3        them as -- once we have an opportunity to actually

4        look at them.  I want to make sure that they're

5        properly categorized across those three exhibits

6        that you were discussing.  So we'll mark them once

7        we receive them.  We should have them, coming out of

8        the next break.  So we'll get them in the record in

9        the order that follows from the deposition exhibits

10       that we do at the beginning of this first session.

11             MR. MONTOYA:  That's fine.

12  BY MR. LAWSON:

13       Q.   Where are you currently employed?

14       A.   The Wites Law Firm.

15       Q.   And is that your law firm?

16       A.   Yes.

17       Q.   How long have you worked at your own law firm?

18       A.   I've had my own law firm, been a shareholder in

19  a law firm, since 2001.

20       Q.   And the current iteration, The Wites Law Firm,

21  how long has this existed?

22       A.   Probably somewhere between -- approximately a

23  year.

24       Q.   Are you the sole shareholder in that firm?
```

Confidential - Subject to further confidentiality Review

```
1       A.    I am.

2       Q.    How many people do you employ?

3       A.    Approximately 10.  I don't know exactly.

4       Q.    What is your responsibilities or job role in

5   that law firm?

6       A.    I run the firm.

7       Q.    And do you operate in your own practice as well

8   on top of running the firm?

9       A.    Do I operate?

10      Q.    Yeah.  Do you practice as a lawyer currently in

11  your law firm?

12      A.    I do.

13      Q.    What is your practice?

14      A.    Representing plaintiffs in personal injury and

15  wrongful death cases, class actions, insurance claims,

16  and other tort claims.

17      Q.    Are you married?

18      A.    I am.

19      Q.    And who are you married to?

20      A.    Jennifer Wites.

21      Q.    And how long have you been married?

22      A.    Since 2001.

23      Q.    And do you have any children?

24      A.    We do.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 3079 of 3246
Case 1:11-cv-22408-MGC Document 208-301 Entered on FLSD Docket 05/08/2017 Page 43 of
180

Confidential - Subject to further confidentiality review

```
 1      Q.   How many?

 2      A.   Two.

 3      Q.   And what are their names?

 4      A.   Asher, A-s-h-e-r, and Leo, L-e-o.

 5      Q.   And how old are they?

 6      A.   They are 13 and 14.

 7      Q.   Have you ever been a plaintiff in a lawsuit

 8 before this one?

 9      A.   Yes.

10      Q.   And what lawsuits have you been a plaintiff in

11 prior to this one before?

12      A.   I have been a plaintiff in a case against the

13 homeowners association where we reside.  And that may be

14 it.  That's what I can recall at the moment.

15      Q.   What was that homeowners association lawsuit

16 about?

17      A.   The failure of the association to provide

18 adequate security for the community.

19      Q.   And when was that lawsuit filed?

20      A.   I'd say approximately four years ago, give or

21 take.

22      Q.   Was that in state court?

23      A.   Palm Beach County Circuit Court.

24      Q.   What was the result of that lawsuit?
```

Case 2:09-md-02047-EEF-MBN  Document 22363-39  Filed 11/19/19  Page 3080 of 3246 of
Case 1:1-cv-22408-MGC  Document 236-301  Entered on FLSD Docket 05/08/2019  Page 41 of
180
Confidential - Subject to Further Confidentiality Review

```
 1        A.    The association agreed to upgrade their

 2  security system.

 3        Q.    Have you participated in a class action lawsuit

 4  before as a plaintiff?

 5        A.    As a plaintiff?

 6        Q.    As a named plaintiff in a class action lawsuit.

 7        A.    I have not been a named plaintiff in a class

 8  action lawsuit.

 9        Q.    Have you received funds from a class action

10  lawsuit before as a claimant?

11        A.    Yes, I think so.

12        Q.    What class action lawsuits have you received

13  funds as a claimant in that you can think of?

14        A.    I believe I received funds in the Intel class

15  action lawsuit that involved LED television screens and

16  computer screens a few years ago.  It's possible over

17  the years that we've submitted claims in others, but I

18  can't recall at the moment.

19        Q.    What is the address of the property that you

20  allege has been damaged by Chinese drywall?

21        A.    The address is 17625 Middlebrook Way, Boca

22  Raton 33496.  And it's not an allegation, it's a fact.

23        Q.    Do you currently own that property?

24        A.    With my wife.
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 3081 of 3246
Case 1:11-cv-22408-MGC Document 381 Entered on FLSD Docket 05/08/2012 Page 45 of
180

Confidential - Subject to Further Confidentiality Review

```
 1      Q.   And have you owned that property since you

 2   originally purchased it to today?

 3      A.   Yes.

 4      Q.   Do you remember when you purchased the

 5   property?

 6      A.   I believe it was June of 2007.

 7      Q.   And do you remember who you bought it from?

 8      A.   A family whose last name was Pech, P-e-c-h.

 9      Q.   Did you know them before you bought the house

10   from them?

11      A.   No.

12      Q.   How did you find this house?

13      A.   Through a realtor.

14      Q.   And did you live in Florida at the time that

15   you purchased the house?

16      A.   Yes.

17      Q.   Where did you live before you purchased this

18   house?

19      A.   In Parkland, Florida.

20      Q.   And what made you want to buy this house in

21   particular, the Middlebrook Way house?

22      A.   We wanted to move to a neighborhood that had

23   families with young children where we could purchase a

24   house that we would live in forever or indefinitely that
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 3082 of 3246
Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 46 of 180
Confidential - Subject to Further Confidentiality Review

```
1    was in a neighborhood with good schools, and we were

2    basically looking for our dream house.

3        Q.   Now, at that time, in 2007, your children would

4    have been very young; is that right?

5        A.   Correct.  They were about -- yes.

6        Q.   One and two years old, something like that?

7        A.   Yes.  They were a little bit older, but, yes.

8        Q.   Maybe two or three.

9             Do you remember if the Pechs that you mentioned

10   had lived in the house prior to you purchasing it from

11   them?

12       A.   They never lived in the house.

13       Q.   And how did you know that?

14       A.   It was the realtor who represented the seller,

15   which was them, told us that, and it was evident from

16   looking at the house that it had never been lived in.

17            And I'm fairly certain that that was

18   probably -- those are the two main reasons.  I mean, in

19   recollection, I think probably the builder may have told

20   us that after we had purchased it, or the neighbors may

21   have told us that after we had purchased it, but the two

22   things that I can recall for certain at the moment is

23   that the realtor told us that and it was clear when you

24   walked into the house that it had never been lived in.
```

Confidential - Subject to further confidentiality review

```
 1      Q.    Do you know who owned the house prior to the

 2   Pechs owning it?

 3      A.    Nobody.  I mean, when I say "nobody," the

 4   developer had built the house and the Pechs bought it

 5   from the developer.

 6      Q.    Do you know if the house had been built to the

 7   Pechs' specifications or if it had been built before and

 8   constructed before the Pechs purchased it?

 9      A.    I believe it was built to the Pechs'

10   specifications.

11      Q.    And do you know why they never lived in the

12   house?

13      A.    Yes.

14      Q.    And why is that?

15      A.    We were told by their realtor that they had

16   built the house to be their dream house, and for reasons

17   that were never told to us, they decided that they were

18   not going to move to Florida, they were from New York,

19   and as a result they built their dream house and never

20   moved in.  And, I guess, in retrospect, they were the

21   lucky ones.

22      Q.    Did you visit the house before you purchased

23   it?

24      A.    Yes.
```

Confidential - Subject to further confidentiality review

```
 1       Q.   How often?

 2       A.   At least twice.

 3       Q.   And when you visited the house, did you look

 4  through the entire house?

 5       A.   Yes.

 6       Q.   Did you have the house inspected before you

 7  purchased it?

 8       A.   Yes.

 9       Q.   And who inspected the house?

10       A.   The inspector's name was Peter Romano, and the

11  name of his company was something like Hawkeye Home

12  Inspections.

13       Q.   Do you know if you have any record of that

14  inspection?

15       A.   I don't have the answer to that as I sit here

16  today.

17       Q.   Was there anything that came out of that

18  inspection that concerned you about the house?

19       A.   No, but at that point in time nobody knew

20  anything about Chinese drywall.

21       Q.   When you went into the house, did you notice

22  any kind of smell or odor that you found to be unusual?

23       A.   Not at that time.

24       Q.   Did you at a later time notice a smell that was
```

Confidential - Subject to Further Confidentiality Review

```
 1    unusual?

 2         A.   Yes.

 3         Q.   And when did you first notice it?

 4         A.   I would say within six months to a year within

 5    moving in.

 6         Q.   What was the smell like?

 7         A.   In the beginning, the smell was hard to

 8    describe.  I always attribute -- or described it as, you

 9    know, it was a smell that was unique to the house.  Some

10    homes have a smell.  If people have a cat, their house

11    smells like cats.  If you have a dog that's not a

12    hypoallergenic dog like a Goldendoodle or a Labradoodle,

13    your house will smell like dogs.  Some people cook

14    certain types of food and the house smells like the food

15    that you cook.

16         Our house had an odor that in the beginning I

17    didn't really know what to attribute it to.  So it's

18    hard for me to describe it beyond that, with the

19    exception that over the course of time the strength of

20    the odor and the odor itself got stronger and more

21    offensive.

22         Q.   You said that you noticed it first about six

23    months to a year into living there; is that right?

24         A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 3086 of 3246
Case 1:09-md-02047-MCA Document 9381 entered on FLSD Docket 05/18/2012 Page 40 of
180

Confidential - Subject to Further Confidentiality Review

```
 1      Q.   And you just said that it strengthened or got

 2  worse over time.  Was it worse in particular places in

 3  the house?

 4      A.   Not that I recall.  It was everywhere.

 5      Q.   Do you know when the house was constructed?

 6      A.   I believe it was in 2006, but you have records

 7  that show that information.

 8      Q.   So it's possible that the house had been built

 9  about a year or more before you moved into it; is that

10  right?

11      A.   It's possible.

12      Q.   When did you first believe that you had Chinese

13  drywall in your house?

14      A.   Define the word "believe."

15      Q.   Well, when did you first hear about Chinese

16  drywall?

17      A.   It was probably in late 2008 or early 2009.

18      Q.   And how did you hear about it?

19      A.   Just through people in the neighborhood and the

20  legal community.

21      Q.   Did you hear from other people in your

22  neighborhood that they had Chinese drywall in their

23  homes?

24      A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 3087 of 3246
Case 1:09-md-02047-EEF-MBN Document 23801 Confidential Subject to further confidentiality review Page 41 of
180

Confidential - Subject to Further Confidentiality Review

1    Q.   And was it at that time, in late 2008/early

2  2009, that you started hearing from people that they had

3  Chinese drywall in their homes in your neighborhood?

4    A.   Yes.

5    Q.   Did you think at that time when you first

6  started hearing about Chinese drywall in late 2008/early

7  2009 that you might have Chinese drywall in your house?

8    A.   We became concerned about it, but at that point

9  in time we didn't know for certain that we had it.

10    Q.   Why were you concerned about it?

11    A.   Wouldn't you be concerned if you had bought a

12  house with Chinese drywall?

13    Q.   Well, let me ask my question again.  Was there

14  a particular reason why you thought your specific house

15  would have Chinese drywall when you started hearing

16  about the problem that other people were having?

17    A.   Well, A, it was built at the time period when

18  homes that were constructed with Chinese drywall were

19  built.  B, it was a house built by a developer that had

20  other homes that ended up with Chinese drywall.  C, it

21  was occurring with that developer in our neighborhood.

22    Q.   Were there any other signs that you noticed in

23  your house that you thought were consistent with Chinese

24  drywall other than the smell that we were discussing

Case 2:09-md-02047-EEF-MBN Document 23263-39 Filed 11/19/10 Page 3088 of 3246
Case 1:11-cv-22408-MGC Document 5801 Entered on FLSD Docket 05/18/2012 Page 92 of
180
Confidential – Subject to further confidentiality Review

```
 1    earlier that made you believe you might have Chinese

 2    drywall in your house?

 3        A.   When in time are you talking about?

 4        Q.   Well, I'm talking about before you had it

 5    confirmed that you had Chinese drywall in your house

 6    through inspection.

 7        A.   Well, at that point in time we didn't attribute

 8    anything that was going on in the house to anything

 9    specific because we didn't have reason to have a

10    confirmed belief that we had it and we were actually

11    told that we did not, even though that was a lie.

12        Q.   And who told you that?

13        A.   A gentleman named Gavin, who worked for

14    Albanese.

15        Q.   Albanese was the home developer for your

16    neighborhood?

17        A.   Not for the neighborhood in total, but Albanese

18    was one of the several developers that developed and

19    sold homes in The Oaks at that point in time.

20        Q.   And they had developed your home, constructed

21    it; is that right?

22        A.   Yes.

23        Q.   And do you remember when Gavin told you that

24    you did not have Chinese drywall in your house?
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 3089 of 3246
Case 1:1-md-02047-GAP-LS Document 2663-301 Entered on FLSD Docket 05/18/2012 Page 43 of
180

Confidential - Subject to further Confidentiality Review

1    A.    I don't remember the exact date, but it was

2   approximately several months prior to July of 2009, and

3   some period of time after Albanese sent a letter to

4   homeowners in The Oaks advising them that they were

5   aware that there were homes in The Oaks with Chinese

6   drywall and offering to inspect them.

7    Q.    And is that -- did that letter come out after

8   he came to your home or before he came to your home?

9    A.    Before.

10   Q.    And you took him up on that offer to come over

11  to inspect the house?

12   A.    We did.

13   Q.    And I think a second ago you said that he lied

14  or that you were lied to about that.

15   A.    Correct.

16   Q.    Are you aware that they knew there was Chinese

17  drywall in your home when he told you that there was

18  not?

19   A.    It's my belief that by the time he inspected my

20  home that he and/or those for whom he worked knew which

21  homes had Chinese drywall, knew what the telltale signs

22  were of Chinese drywall, and they knew it was in our

23  house either by virtue of those facts and the documents

24  that they had that would have showed who the supplier

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 3090 of 3246
Case 2:09-md-02047-EEF-MBN Document 23863 1 Entered on Docket 11/19/19 Page 42 of 180

1    was and the manufacturer was, and that they confirmed it

2    when they walked through our house and saw the

3    indications of the house that were crystal clear that it

4    was Chinese drywall.

5         At that point in time, when the inspection

6    occurred, I didn't know what those telltale signs were,

7    but I later learned what they were, and those things

8    were going on in the house when he was there and prior.

9    Q.   What are those signs that you're now aware of

10   of Chinese drywall being present in a house?

11   A.   They include, but are probably not limited to

12   the odor, the blackening of electrical wires in light

13   switches and outlets, the failure of air conditioning

14   systems, the pitting and decay of fixtures and personal

15   property, and the potential harm to health and

16   happiness.

17   Q.   And what do you mean by "the potential harm to

18   health and happiness"?

19   A.   Well, it has been reported that people have

20   suffered ill health effects from living in homes with

21   Chinese drywall similar to homes that have mold.  It is

22   an unknown, to my knowledge, as to whether or not there

23   could be long-term effects from having lived in an

24   environment that had off-gassing from Chinese drywall,

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 3091 of 3246
Case 1:14-cv-00123-AGD Document 260-31 Entered on FLSD Docket 05/19/2017 Page 45 of
180
Confidential - Subject to Further Confidentiality Review

```
 1    and it's a concern that we live with to this day.

 2    Q.   And when you were saying effects on happiness,

 3    what did you mean by that?

 4    A.   Well, your client destroyed our dream and has

 5    inflicted damage upon us financially and emotionally

 6    from which we'll never recover.  It'll always be the

 7    house that had Chinese drywall.  We'll never forget what

 8    we had to go through.  It's a constant reminder every

 9    time I pull into my driveway.

10         And I'm sure that, as a lawyer, you have some

11    idea how hard you would have to work to save $300,000 in

12    after-tax money to basically buy your house for a second

13    time.

14    Q.   When you said a second ago that Chinese drywall

15    destroyed your dream, what do you mean by that?

16    A.   We bought that house as our dream house, as a

17    place where we wanted to raise our children and make

18    memories in, and of course we've continued to live there

19    after it was remediated, but I don't like the house.  I

20    have no affection towards the house.  I have no affinity

21    towards the house.  It's a physical place where we live.

22         But you just don't get over or forget about

23    what we had to endure financially and emotionally living

24    there, the uncertainty, moving out, moving back in,
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 3092 of 3246
Case 1:09-cv-02047-MCA Document 22361 Entered on FLSD Docket 05/26/2011 Page 25 of 180
Confidential - Subject to Further Confidentiality Review

```
 1   dealing with contractors, seeing your house ripped down

 2   to the metal frame, so -- and having it be a constant

 3   reminder when people, who are otherwise thinking they're

 4   wishing you well and trying to be considerate, saying,

 5   "What's going on with your house?"  How did it work out?

 6   Oh, my gosh, you had to pay for it?  That's horrible.

 7   What?  The Chinese drywall manufacturer isn't honoring

 8   their warranty?  They're evading and playing with the

 9   American judicial system?  They're still allowed to do

10   business in this country but they won't show up in

11   court?"

12          To this day, I get those questions from people

13   who maybe I haven't seen them in a few years.  "Oh, what

14   happened with your house?"  So it's a constant reminder

15   of what happened to us and how it impacted our family

16   and our life.

17      Q.   Did you enjoy living in the house before you

18   knew about Chinese drywall?

19      A.   We did.

20      Q.   What did you enjoy about it?

21      A.   We enjoyed the home, having parties in the

22   home, having family events in the house, having our dog

23   in the house.  You know, my wife lived in a house for

24   most of her childhood.  I lived in the same house for
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/10 Page 3093 of 3246
Case 1:11-cv-22408-MGC Document 301 Entered on FLSD Docket 05/18/2012 Page 42 of
180

Confidential - Subject to further confidentiality Review

 1    most of my childhood.  You know, we both have memories

 2    of good times in the house, that the house is really

 3    larger than it was.  My wife laughs when I bring her by

 4    my house that I grew up in, because I have these grand

 5    memories of how big the pool was and the backyard and

 6    the bedrooms, and in retrospect, it was much smaller.

 7           But the point is you view the house that you

 8    grew up in or where you raise your children in a certain

 9    way, and, you know, while we are very fortunate people

10    to have been able to purchase a house like that and

11    remain in a house like the one that we have, you never

12    view the house the same way once you've had to buy it

13    twice.

14    Q.   What's different about living in the house now

15    that it's been repaired from when you first moved into

16    it?

17    A.   Because we had to spend $300,000 of our

18    after-tax savings, which was earmarked for retirement,

19    to pay for it.  Because my wife went back to work as a

20    result of having lost that money.  Because we had to

21    give away our dog because we had to move out of the

22    house for a year in order to remediate it.  Because the

23    odds that we will ever be able to sell it for what it

24    would otherwise be worth are nil.  Because if you and

Confidential – Subject to Further Confidentiality Review

1    your family were looking at houses in our neighborhood

2    and you could choose between two or three or four houses

3    that are basically all similar but one had Chinese

4    drywall, I don't know about you, but I'd never buy the

5    house that had Chinese drywall.  I'm always going to buy

6    the other one.  Why risk it?  So it's something from

7    which we'll never recover.

8         Q.   Is there an odor in the house any longer?

9         A.   No.

10        Q.   Are there any remnants of Chinese drywall in

11   the house, as far as you know?

12        A.   There are none.

13        Q.   Does the house look different than it did

14   before you moved into it?

15        A.   Yes.

16        Q.   And how does it look different?

17        A.   Well, I mean, that's a -- that's a very broad

18   question, so I'll give you examples.  I mean, it could

19   range from anything that the walls have been painted a

20   different color, the furniture is different.  When we

21   remediated the house, we made some, relatively small,

22   but a few modifications to the layout of the house.

23             In general, the house is the same in terms of

24   the layout and how it looks, but it does not look

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 3095 of 3246 of
Case 1:09-cv-02047-EEF-MBN Document 22381 Entered on FLSD Docket 05/19/2015 Page 40 of
180

Confidential - Subject to further confidentiality Review

1    exactly the same as it did before we moved out of it for

2    the renovation, or the remediation.

3        Q.   Do you have people over for parties and things

4    like that now that the house has been repaired?

5        A.   Not very often, no.

6        Q.   Why is that?

7        A.   Largely because of our schedule.

8        Q.   Are you proud of your house now?

9        A.   No.

10       Q.   Are you embarrassed about your house?

11       A.   No.

12       Q.   Why are you not proud of the house in the state

13   that it's in now?

14       A.   My wife and I are proud of what we have been

15   able to accomplish in our lives.  I mean, when we got

16   married, the only -- we had no assets.  Zero.  The only

17   thing we had was debt.  Neither one of us are trust fund

18   babies.  We didn't have wealthy parents that paid one

19   cent towards the purchase of any home that we've ever

20   owned.

21           So we certainly are proud of ourselves that we

22   were able to afford such a home, but in terms of -- we

23   don't have any type of affinity or love for the house.

24   We love our family, we like our neighbors, we like the

1    neighborhood, but the house is a house.  So when you're

2    asking if I'm proud of the house, I'm not proud of the

3    physical structure, but we live there.

4         Q.   Were you proud of it before you knew it had

5    Chinese drywall in it?

6         A.   Again, I was happy to live in the house, and we

7    bought the house because my wife loved the house.  You

8    know what they say.  Happy wife, happy life.  And I love

9    the house too, but we bought the house because after

10   looking at houses and looking at houses we found a house

11   that my wife loved and it's the one that we bought.

12        Q.   Since you repaired the house, have you

13   considered selling it?

14        A.   We have considered it, sure.

15        Q.   Have you ever listed it for sale?

16        A.   No.

17        Q.   Have you ever had it professionally appraised

18   for its value?

19        A.   No.

20        Q.   Why have you not put the house up for sale?

21        A.   In part because we don't want to relocate our

22   kids, in part because we are continuing to wait to see

23   how the real estate market treats homes that had Chinese

24   drywall.

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 3097 of 3246
Case 1:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 31 of 180
Confidential - Subject to Further Confidentiality Review

```
 1              And I don't think that a house that ever had

 2    Chinese drywall will ever bring the same price as an

 3    identical or nearly identical house that did not, but I

 4    think that it's -- you know, whenever we've discussed it

 5    we've just concluded that it was too close in time to

 6    the event to ever get fair market value for the house,

 7    because, as I said, if you're the potential buyer, which

 8    house are you going to choose?

 9         Q.   Now, your neighborhood is called The Oaks; is

10    that right?

11         A.   Correct.

12         Q.   And about how many homes are in that

13    neighborhood?

14         A.   My guess is that there are approximately 390

15    completed homes in the neighborhood.

16         Q.   Do you -- have you ever been told how many of

17    those homes had Chinese drywall in them?

18         A.   I recall hearing or learning over the years

19    that it was approximately 20 to 30 homes.

20         Q.   I would imagine that in the last over a decade

21    that some of those homes have been sold maybe multiple

22    times.  Is that right, that homes have been sold in the

23    neighborhood?

24         A.   Well, is your question have homes been sold in
```

Confidential - Subject to further confidentiality review

```
 1    the neighborhood, or is your question have homes that

 2    had Chinese drywall been sold in the neighborhood?

 3         Q.   Well, this question was just if homes have been

 4    sold in the neighborhood.

 5         A.   Of course.

 6         Q.   And have you monitored the sales prices of

 7    those sales that have gone on inside of your

 8    neighborhood or seen the sales prices for some of those

 9    homes?

10         A.   Of all of the homes in general?

11         Q.   Some of them.  Have you seen any?

12         A.   Again, are you asking about homes that were

13    built with Chinese drywall, or are you asking about the

14    totality of homes in The Oaks?

15         Q.   Like I said before, just all the homes in The

16    Oaks.

17         A.   Yeah, from time to time I look, sure.

18         Q.   And have you had the impression that those

19    homes are selling for what you think is a fair value

20    based on your knowledge of the homes in the neighborhood

21    that they're in?

22         A.   The homes in general, yes.  The homes that have

23    Chinese drywall, or had Chinese drywall, no.

24         Q.   So you've seen some homes with Chinese drywall
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 3099 of 3246
Case 1:11-cv-22408-MGC Document 298-301 Entered on FLSD Docket 05/19/2015 Page 43 of
180

Confidential - Subject to Further Confidentiality Review

```
 1    in your neighborhood that have been sold since Chinese

 2    drywall was discovered in them; is that right?

 3        A.    Homes have been sold in the neighborhood since

 4    Chinese drywall was discovered, and they sold for a

 5    fraction of what they were worth.

 6        Q.    Now, first I want to ask you about homes that

 7    had Chinese drywall that had not been repaired or

 8    remediated.  Have you seen those sold?

 9        A.    Yes.

10        Q.    And did those sell for far less than what you

11    think was the value of the home if it did not have

12    Chinese drywall?

13        A.    Again, it's not a question of belief.  It's a

14    fact.  They sold for a small fraction of what they would

15    have been worth.

16        Q.    And you've also seen homes that have been

17    repaired or remediated, like yours, sold; is that right?

18        A.    I'm aware that there are homes that have been

19    sold subsequent to their being remediated.

20        Q.    And it's your belief that those homes have sold

21    for less than their worth as well?

22        A.    Yeah, because I know from realtors that

23    potential buyers are always asking which of these houses

24    had Chinese drywall.  There's a house in my neighborhood
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 3100 of 3246
Case 1:1-21-cv-01229-CAL Document 28981 Entrance for EL Docket 05/18/2019 Page 31 of
180

Confidential - Subject to Further Confidentiality Review

1   on my block that was built at the same time as our house

2   by the same builder that had the same upgrades that's

3   sitting on the market right now and hasn't sold.  It

4   could be because if they're choosing between that house

5   and the 10 or 15 other houses in the neighborhood that

6   are the identical model and the 390 houses in the

7   neighborhood that are all relatively similar, if it was

8   you and your wife and your children, which house would

9   you choose?

10       Q.   Have your children enjoyed living in the home?

11       A.   I hope so, but you'd have to ask them.

12       Q.   We talked a little bit about health effects

13   earlier that some people have reported from living in

14   homes with Chinese drywall.  Did, to your knowledge,

15   anyone in your family, including you, suffer from those

16   health effects?

17       A.   Possibly.

18       Q.   Why do you say "possibly"?

19       A.   Our older son Asher had issues with his nose

20   and sort of, like, dry mucus in his nose.  And, yes, all

21   children at some point in their life, or not all, but

22   most, tend to pick their nose, but for him it seemed to

23   be a little bit out of the ordinary, and that stopped

24   when we left the house.

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 3101 of 3246
Case 1:09-cv-02047-EEF-MBN Document 230-31 Entered on FLSD Docket 05/19/2019 Page 35 of
180

Confidential - Subject to Further Confidentiality Review

```
 1              Even one of his teachers pointed that out to my

 2    wife and seemed to notice that his behavior all of a

 3    sudden changed very abruptly, and because I think,

 4    you'll have to ask my wife, that the teacher was aware

 5    that we had lived in a house with Chinese drywall and

 6    had moved out, that even the teacher commented to my

 7    wife that perhaps that was the reason.

 8         Q.   Can you think of any other health effects that

 9    might have been related to Chinese drywall that anyone

10    in your family suffered from?

11         A.   I don't know what I don't know.  So if you're

12    asking me what I know today, that's all I know today,

13    but, you know, we'll live the rest of our lives not

14    knowing what the effects might be.

15         Q.   Have any of you gone to the doctor and been

16    told that you're suffering from health effects related

17    to Chinese drywall?

18         A.   No.

19         Q.   And is it your understanding that you are not

20    pursuing personal injury damages in this lawsuit?

21         A.   Correct, we are not.

22         Q.   A second ago we were talking a little bit about

23    your belief that homes that have been repaired from

24    Chinese drywall are selling for less than their value.
```

Confidential - Subject to Further Confidentiality Review

1    What do you base that opinion on?

2        A.    Well, A, that's an opinion that I'm going to

3    rely on an expert witness for.  I'm a lawyer.  I'm not a

4    realtor.  I'm not an appraiser.  I have not done a

5    market analysis of neighborhoods in The Oaks or in South

6    Florida or other parts of the country that have been

7    built with Chinese drywall, but, again, it just sort of

8    makes common sense that if you can choose among 400

9    homes, because that's supposedly the number that will

10   ultimately be in the neighborhood when all the lots are

11   finished, and you can choose between a house that had or

12   has Chinese drywall and one that did not, at least some

13   people are going to pick the ones that did not, and,

14   therefore, it's going to warrant -- and those people

15   that do or are willing to buy a house that had Chinese

16   drywall are going to come to that seller and say, "I'll

17   buy your house, but you're going to need to take a

18   discount."  I don't know what that is.  20 percent?  30

19   percent?  10 percent?  Who knows?  You'll have to have

20   an expert testify to that, which I believe that we will.

21         But, to me, it's sort of a common sense

22   analysis.  I mean, I hate to make this comparison,

23   because as horrific as Chinese drywall is, of course

24   it's not the equivalent of losing a child in a massacre,

```
 1    but, you know, people in South Florida have been talking

 2    about, well, what will the impact be on home values in

 3    Parkland as a result of the massacre at Stoneman Douglas

 4    High School, and I've heard people say that there have

 5    been real estate studies done on home values in

 6    Columbine, and they sell for less.  It doesn't take a

 7    lot for a family to have a reason why they might want

 8    one house over the other.

 9        Q.   Do you think that your house was remediated and

10    repaired as best as it could have been?

11        A.   Our house was remediated in accordance with the

12    guidelines from Judge Fallon and the CPSC, so the answer

13    to the question is yes.

14        Q.   Do you know if other homes that have been

15    remediated or repaired in your neighborhood were also

16    remediated following Judge Fallon's protocol?

17        A.   Yes.

18        Q.   And you know that they were?

19        A.   Well, if you're asking if I have firsthand

20    knowledge, was I physically present in all the homes

21    during the entirety of the remediation, the answer is

22    no.  But do I have general knowledge about it?  The

23    answer would be yes.

24        Q.   And how do you -- how did you acquire that
```

Confidential - Subject to Further Confidentiality Review

```
 1    general knowledge about it?

 2        A.   Well, the house that I probably know the most

 3    about is the one that was owned by Robyn and -- I

 4    believe it's Mike, or Michael -- Rosen that was on our

 5    block, is on our block, that was built at the same time

 6    by the same developer that had, from what I can recall,

 7    virtually the same upgrades, A, because we knew them, B,

 8    because I interviewed their general contractor and their

 9    industrial hygienist, C, because I was physically

10    present in the house while they were doing the

11    remediation, and based on that, I believe I can say

12    that, to my knowledge, their house was remediated by the

13    subsequent owner, because they sold their house for a

14    fraction of what it was worth, in accordance with the

15    protocol.  As it relates to other people in the

16    neighborhood, I don't know what they did.

17        Q.   Do you think that the quality of the

18    remediation could affect the price that a person could

19    get for their home if they sold it?

20        A.   I think that your question has so many unknowns

21    and variables in it that it's impossible to answer,

22    because I can't speak to what happened in any particular

23    home and whether or not that general contractor or that

24    industrial hygienist and that family followed
```

Confidential - Subject to Further Confidentiality Review

```
1    100 percent, 98 percent, 50 percent of the remediation,

2    but to me it's sort of an all or nothing proposition.

3    Either the house had Chinese drywall or it didn't, and

4    if it had it, if it had Chinese drywall in the past, it

5    will always be an issue in the resale value of the home.

6    Always.

7         Q.   Do you think that your house benefitted from

8    having a remediation that followed the protocol

9    completely?

10        A.   Benefitted?  I don't think anything related to

11   this case is a benefit in any way, so I can't agree to

12   answer that question "yes" based on the way you phrased

13   it.

14        Q.   You were asked -- you were saying before that

15   you -- if someone were to offer you a house that had

16   Chinese drywall previously or did not have Chinese

17   drywall previously, that you would want to buy the one

18   that did not have Chinese drywall previously if

19   everything else was equal; correct?

20        A.   Correct.

21        Q.   If everything else were equal and two homes had

22   Chinese drywall and one was remediated following the

23   protocol and one was not remediated -- was remediated

24   not following the protocol, which one would you want to
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 3106 of 3246
Case 1:09-cv-07040-GEL Document 268-361 Entered on FLSD Docket 05/18/2019 Page 40 of
180

Confidential - Subject to Further Confidentiality Review

1   buy?

2       A.   Neither.

3       Q.   Just between the two choices, which one?

4       A.   I would choose neither.  So would you and your

5   wife.

6       Q.   So you don't think that there was any benefit

7   of following the protocol for your house?

8           MR. MONTOYA:  Objection.  Asked and answered.

9       You can answer.

10          THE WITNESS:  Yeah, again, I can't agree that

11      there's any benefit to me or my wife or our family

12      from any single thing that happened as relates to

13      Chinese drywall and the fact that nine years or

14      eight years after we filed this lawsuit your

15      client's finally getting around to taking my

16      deposition.

17          So did we do the appropriate thing by following

18      the protocol?  Yes.  Is it a benefit?  I don't think

19      so.

20  BY MR. LAWSON:

21      Q.   Was your house improved by remediating it?

22      A.   Again, was it improved in the general sense

23  like my wife and I bought a house and we decided to put

24  on an addition?  No.  Was it improved because we bought

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 3107 of 3246
Case 1:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 3107 of 3246
Confidential - Subject to Further Confidentiality Review
180

```
 1    a house that your client sold with a defective product

 2    inside of it and we removed it?  You could, I guess,

 3    call that an improvement because it was an untenable,

 4    unlivable situation, but "improved" is not a word I can

 5    really agree with you on.

 6         Q.   Do you know when you first had issues with your

 7    air conditioning in your home?

 8         A.   Within six months of living there.

 9         Q.   What issues did you have?

10         A.   The air conditioning unit in the master bedroom

11    failed.  It stopped working.

12         Q.   Did you have someone come out and repair it at

13    that time?

14         A.   We did.

15         Q.   Did that repair fix the problem?

16         A.   Well, they replaced it.

17         Q.   And they replaced the unit entirely in your

18    bedroom?

19         A.   To my knowledge, yes.

20         Q.   And did that replacement unit continue to work?

21         A.   Well, I would say that it continued to work,

22    but I doubt it worked at the proper efficiency, because

23    all of the air conditioning units in the house became

24    covered with the black of Chinese drywall that causes
```

Case 1:12-cv-02361-GSA Document 28-81 Exhibit 1-36 Docket 05/09/2019 Page 42 of 180

```
 1    tiny holes to form in the coils and decreases the

 2    efficiency of the units and ultimately causes them to

 3    fail.  So that's the best answer I can give to your

 4    question.

 5         Q.   So the master bedroom had its own air

 6    conditioning unit; is that correct?

 7         A.   Yes.

 8         Q.   And did the house also have central air as

 9    well?

10         A.   No.

11         Q.   Did each bedroom have its own individual air

12    conditioning unit?

13         A.   No.

14         Q.   How did the air conditioning system in the home

15    work?

16         A.   There are four air conditioning units in the

17    house, each of which covers various parts of the house.

18         Q.   And the other air conditioning units outside of

19    the one in the master bedroom that we discussed, did

20    those have issues before you remediated the house that

21    you were aware of?

22         A.   I believe so, yes.

23         Q.   What issues were those?

24         A.   So first let me just say that in response to
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 3109 of 3246 of
Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 48 of
180
Confidential - Subject to Further Confidentiality Review

1    this question and many of the questions that you're

2    asking that I gave a deposition, for which you've been

3    given a transcript, back in 2011 where I answered many

4    of these questions and I'm sure many of the questions

5    that you're going to ask.

6          So to the extent that eight years later my

7    memory is not the same as it was back then, a more

8    specific answer or a more detailed answer is going to be

9    found in that transcript where I gave truthful testimony

10   in response to questions about the same issues.

11         As we sit here today, my recollection is that

12   there is -- there was another unit in the house that

13   also failed prior to the time that we moved out, and I

14   believe it was a unit that was also on the second floor.

15         And, again, as I said, once the inspection

16   started occurring in my house as it related to the

17   investigation to determine if there was Chinese drywall,

18   and then all of the subsequent inspections, we learned

19   from visual inspections that all of the units had coils

20   that were covered in the black substance and tar and

21   presumably were all beginning to fail or weaken in their

22   efficiency because of the Chinese drywall.

23         So you can imagine what that feels like when

24   you have people going through your house and you're

```
1    finding all of this damage to your property that you

2    worked so hard to pay for.

3        Q.   A second ago you mentioned a deposition

4    transcript from a deposition in 2011.  That was --

5    involved a lawsuit with State Farm; is that correct?

6        A.   Correct.

7        Q.   And you had sued State Farm for failure to

8    cover your damages?

9        A.   Can you give me one moment, please?

10           MR. LAWSON:  We can go off the record.

11           (Discussion off the record.)

12           MR. LAWSON:  We can go back on.

13   BY MR. LAWSON:

14       Q.   Is it correct that you had sued State Farm for

15   failure to cover your damages related to Chinese drywall

16   in your homeowners insurance policy?

17       A.   Yes.

18       Q.   That transcript, that was from 2011, as we just

19   established.  Have you had that in your possession since

20   2011 when the deposition occurred?

21       A.   I believe so, but I don't think you ever sent

22   the discovery request that specifically asked for it,

23   but we gave it to you anyway.

24       Q.   Now, it's correct that you gave it to us last
```

Case 2:09-md-02047-EEF-MBN Document 23262-39 Filed 11/19/19 Page 3141 of 3246 of
Case 1:1-09-md-02047-EEF-MBN Document 23263-39 Filed 11/19/19 Page 3141 of 3246 of
180
Confidential - Subject to further confidentiality review

1    evening; is that right?  Do you know that?

2        A.   I don't have personal knowledge as to when it

3    was produced to you.

4        Q.   Okay.  When did you produce it to your lawyers?

5            MR. MONTOYA:  Object on attorney-client

6        privilege.  Instructing the witness not to answer

7        the question.

8    BY MR. LAWSON:

9        Q.   How long have you had that document in your

10    possession?

11       A.   Probably since shortly after the deposition.  I

12    don't remember exactly.

13       Q.   And it was just your testimony a second ago

14    that that would contain a more complete and accurate

15    record of your recollection of these events because it

16    was closer in time to them; is that right?

17       A.   It is possible that as to some questions that

18    you have asked or may ask in the balance of this

19    deposition that the answers that I gave there may be

20    more detailed because it was closer in time to the

21    events at issue in the case.

22       Q.   Do you remember when you received the discovery

23    request in this lawsuit from the defendants?

24       A.   I remember -- well, I mean, the answer to that

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 3112 of 3246
Case 1:11-cv-02048-MGC Document 289-301 Entered on FLSD Docket 05/09/2012 Page 46 of
180
Confidential - Subject to Further Confidentiality Review

1    question is generally, yes.

2        Q.    Does November sound about right?

3        A.    Yeah.

4        Q.    And have you produced additional information to

5    your attorneys since November when you received those

6    discovery requests?

7        A.    The answer is I don't know.  It's maybe.  I

8    have endeavored to give my lawyers anything and

9    everything that they've asked for.  So whether or not I

10   produced something for the first time or for the second

11   or third time, because I have always tried to be very

12   diligent in giving them anything that would support the

13   claim, I don't know, but, you know, there's been so many

14   lapses in this case where years went by where your

15   client was choosing not to participate that it's kind of

16   hard to remember everything that has happened.

17       Q.    What was the outcome of the lawsuit against

18   State Farm that we were just discussing?

19       A.    It was -- it was settled for a -- for an

20   exceedingly nominal amount of money, because -- it was

21   settled.

22       Q.    How much money was it settled for?

23             MR. MONTOYA:  Are you allowed to divulge?

24             Confidentiality?  I'm not giving you a hard time on

```
1        it, but if we can't, then we need an order, we can

2        get that, but --

3           THE WITNESS:  Well, A, I don't remember what

4        the agreement says.  B, I would think that -- do you

5        want to take a break?

6           MR. MONTOYA:  Yeah, sure, if you don't mind,

7        because I don't want to trip you up on it, but if it

8        requires a court order or get the agreement, or I

9        would think the consent of State Farm to give you

10       the number, then I don't have a problem with it, but

11       I just want to discuss it with him, if it violates

12       any confidentiality.

13          MR. LAWSON:  We would, obviously, like to know

14       the number and have you produce to us whatever you

15       have on that.  Appreciate being given the

16       deposition, even though it was last night, and we

17       would like to have you sort that out, so we can take

18       a break and we can figure that out.

19          MR. MONTOYA:  Sure.

20          MR. LAWSON:  Let's go off the record.

21          (Recess from 9:56 a.m. until 10:10 a.m.)

22   BY MR. LAWSON:

23      Q.   How much money did you ultimately receive from

24   State Farm in settlement of that lawsuit that we were
```

Confidential - Subject to Further Confidentiality Review

```
 1    discussing before the break?

 2         MR. MONTOYA:  And let me say, if this ever

 3         becomes an issue, if there was a confidentiality

 4         clause in the settlement agreement and releases

 5         State Farm, we're in the process of litigation, we

 6         believe there's a confidentiality order that would

 7         cover any disclosure in that agreement in this

 8         litigation, so please feel free to answer.

 9         THE WITNESS:  My recollection is that the

10         amount was either $500 or $5,000, and we will

11         confirm the number and get you the information, but

12         it was either, for certain, without going back to

13         look at a record, it was -- I'm virtually positive

14         it was $5,000 in total or $500.  That was the gross

15         amount.

16    BY MR. LAWSON:

17         Q.   For the 2011 transcript that we were discussing

18    earlier, there were also exhibits to that deposition.

19    Do you still have those in your possession?

20         A.   I never had them.

21         Q.   Okay.  And it looked like your wife may have

22    also been deposed in that litigation; is that accurate?

23         A.   Yes.

24         Q.   Do you know if you still have the transcript of
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 3115 of 3246
Case 1:09-md-02047-EEF-MBN Document 23551 Filed 05/... Page 46 of
180
Confidential - Subject to further confidentiality review

```
1   her testimony?

2       A.   I do not have her transcript, and -- I'll break

3   the client rule by giving you information that you

4   didn't ask for in this question just to tell you that,

5   yes, she was deposed, much like today, she was the

6   second person deposed, and my recollection was that her

7   deposition was exceedingly short because they asked me

8   the majority of the questions.

9            But to go back to your original question, yes,

10  she was deposed in that case, and we don't have the

11  transcript.

12      Q.   Now, I'm not asking you to divulge any

13  communications with your counsel or any strategic

14  considerations, but I do want to understand when you

15  gave that deposition transcript over to your attorneys

16  prior to it being disclosed to defense counsel.  Do you

17  remember when that was?

18      A.   No.

19      Q.   You don't know when you did?

20      A.   No.

21      Q.   Was it this year?

22           MR. MONTOYA:  I've still got an attorney-client

23      objection.  He can't answer the question.  It's an

24      attorney-client communication.
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 3116 of 3246
Case 1:11-cv-22408-MGC Document 239-301 Entered on FLSD Docket 05/19/2014 Page 50 of
180
Confidential – Subject to further confidentiality Review

```
 1            MR. LAWSON:  Can you articulate that, because

 2      I'm failing to understand what the grounds are?

 3            MR. MONTOYA:  If he sends it to me, that's a

 4      communication between my client and I in furtherance

 5      of the legal services.  It's attorney-client

 6      privilege.

 7            MR. LAWSON:  Earlier I asked him --

 8            MR. MONTOYA:  I will tell you as a lawyer to a

 9      lawyer, that when we got it, we gave it to you, and

10      that I'm happy to tell anybody.

11            MR. LAWSON:  The reason that I'm asking is that

12      the fact of when it occurred, just like the fact of

13      when you met to prepare for this deposition, I think

14      that's outside the bounds of that communication, but

15      I understand your position now, and if he doesn't

16      know when he did it, we can move on.

17 BY MR. LAWSON:

18      Q.   So we talked a little bit about potential

19 health effects that your family might have gone through,

20 we talked a little bit about air conditioning issues

21 that might have been going on and some of the blackening

22 of coils for the air conditioning units that occurred.

23            Were there any issues with the electrical

24 wiring or the electrical systems in the house, the
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 3117 of 3246
Case 1:09-cv-02047-GCA Document 289801 Exhibit 39 Filed 05/08/2017 Page 51 of 180
Confidential - Subject to further confidentiality Review

```
1    lighting?

2         A.    Yes.

3         Q.    What issues were those?

4         A.    The wiring inside the light switches and

5    electrical outlets turned black.  Fixtures, like

6    lighting fixtures in the house, were pitting and turning

7    black as well.

8         Q.    Did you have any issues turning the lights on

9    or off, or did they flicker?  Were there any issues with

10   the lighting in the home maintaining when you turned it

11   on?

12        A.    Not to my recollection.

13        Q.    Can you think of any electronics in the home

14   that had issues during the time that Chinese drywall was

15   in your home?

16        A.    Not to my recollection.

17        Q.    Can you think of any other items in the home

18   that you believe were damaged by Chinese drywall other

19   than what we have discussed so far?

20        A.    Yes.  So the first thing I would say is that my

21   wife may have a better or different recollection because

22   she just may have paid more attention to certain items

23   of personal property than I did.  Second, our clothing

24   reeked of the odor of Chinese drywall, and an example of
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 3118 of 3246
Case 1:11-cv-22408-MGC Document 206-301 Entered on FLSD Docket 05/19/2014 Page 52 of
180

Confidential - Subject to further confidentiality review

```
1    how that was evident to us is there was, I think, two

2    issues.  I mean, one was, I think there was a vacation

3    that we were on and we opened up the suitcase and

4    everything in the suitcase smelled like the house, and

5    not just an odor of the house but an odor of the

6    offensive nature of Chinese drywall, which we also

7    experienced when we moved out of the house for the

8    remediation and moved into the rental home.

9         So when you're talking about damage, I mean,

10   the items of clothing, some of it may have been thrown

11   out.  Jennifer may remember better than me.  But

12   certainly a lot of money was spent on dry-cleaning and

13   cleaning that was directly related to trying to remove

14   that smell.

15        I believe the smell had also infiltrated window

16   treatments, draperies, and things of that nature, that

17   either money was spent on to be cleaned and/or they were

18   destroyed and thrown away because we couldn't get rid of

19   the smell.

20        And as a result of having to do the

21   remediation, things in the home were damaged, because

22   despite the best possible efforts of any general

23   contractor and their subcontractors and movers and

24   people that run storage facilities, I would say it's
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 3119 of 3246
Case 1:09-cv-02047-MCA Document 23363-39 Filed 11/19/19 Page 3119 of 3246
Confidential - Subject to Further Confidentiality Review
180

```
1   virtually impossible to take apart all of the cabinets
2   and fixtures in any home, regardless of the size or
3   quality of the fixtures that are in them and personal
4   property that's in them, and pack them up and move them
5   to storage, into the truck, out of the truck, into the
6   storage unit, out of the storage unit, either to the
7   rental home or to the storage unit and back to the house
8   without them being damaged or tarnished in some way.
9   And I believe that to the extent that we had itemized
10  those or delineated those that they may be on the
11  damages summary that was provided to you.
12       There were also mirrors and picture frames in
13  the house that were damaged because they were pitted and
14  decayed from the effects of the Chinese drywall.  So
15  whether that be faucets, shower heads, or things of that
16  nature that -- I guess that's technically part of the
17  dwelling or the structure as opposed to personal
18  property, depending upon what definition you're using.
19  Those things were damaged and/or destroyed, if you will,
20  as well.
21       (Wites Exhibit No. 1 was marked for
22  identification.)
23  BY MR. LAWSON:
24       Q.   You've been handed a document that has been
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 3120 of 3246 of
Case 1:1-cv-22408-CMA Document 280-301 Entered on FLSD Docket 05/18/2011 Page 51 of
180
Confidential - Subject to Further Confidentiality Review

```
 1   marked as Exhibit 1.  It's titled Warranty Deed at the

 2   top.  Do you see that?

 3        A.   I do.

 4        Q.   Have you ever seen this document before?

 5        A.   Yes.

 6        Q.   What is it, to your recollection?

 7        A.   It is the deed that was executed in connection

 8   with our purchase of the house.

 9        Q.   And this is your purchase of the home on

10   Middlebrook Way on June 8, 2007, from the Pechs; is that

11   right?

12        A.   Correct.

13        Q.   If you look up to the upper right-hand corner,

14   there's a notation on here for an amount of

15   $1.6 million.  Do you see that?

16        A.   I do.

17        Q.   Is that the amount of money that you paid for

18   the home at the time that you purchased it?

19        A.   It must be.  I don't know why I have a

20   recollection that if you look in the website for the

21   Palm Beach County -- I don't know if it's the property

22   appraiser or some taxing authority -- that it shows a

23   slightly different amount, but I can't recall if that

24   amount is one five seven-fifty.  So I don't know the
```

Confidential – Subject to Further Confidentiality Review

1    answer to that question.  I mean, generally, yes, that's

2    what we paid for the house, but I believe there may be a

3    public record that shows a slightly different amount.

4        Q.   At the very least, on this warranty deed the

5    amount listed as $1.6 million; is that right?

6        A.   Correct.

7             (Wites Exhibit No. 2 was marked for

8    identification.)

9    BY MR. LAWSON:

10       Q.   You've been handed a document that has been

11   marked as Exhibit 2.  I represent to you that this is

12   both a -- these are two different Palm Beach County

13   Property Appraiser public records that have been printed

14   from the Palm Beach County website.  One of them, I

15   believe, was produced by you, and one of them is a more

16   recent version that I believe was printed on January 3,

17   2019.

18       A.   Right.

19       Q.   Have you seen records like this before?

20       A.   Yes.

21       Q.   And you're aware that they're publicly

22   available through the Palm Beach County Property's

23   Appraiser website?

24       A.   Yes.

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/10 Page 3122 of 3246
Case 1:11-cv-22408-MGC Document 288-301 Entered on FLSD Docket 05/18/2012 Page 45 of
180

Confidential - Subject to Further Confidentiality Review

```
 1      Q.    And specifically what are these documents?

 2      A.    They are the records from the website.

 3      Q.    So this is the Palm Beach County Property

 4    Appraiser's record for your home at 17625 Middlebrook

 5    Way; is that right?

 6      A.    Yes.

 7      Q.    Let's take a look at the first page of

 8    Exhibit 2.  If you look, your address is listed at the

 9    top as the location address, and it's highlighted on

10    that page; is that right?

11      A.    Yes.

12      Q.    And then if you look down, the owners of the

13    property are listed as you and your wife; is that right?

14      A.    Yes.

15      Q.    And going down, there's a chart with different

16    sales dates.  Do you see that in the middle of the page?

17    They're listed with a highlighted sale in June of 2007

18    for $1.6 million.  Do you see that?

19      A.    Yes.

20      Q.    Is that your purchase of the home for

21    $1.6 million?

22      A.    Yes.

23      Q.    And you're listed as the owner after that sale;

24    is that right?  That's highlighted on the page?
```

Confidential - Subject to further confidentiality Review

```
1        A.   Yes.

2        Q.   But both you and your wife purchased the home

3   together; is that right?

4        A.   Yeah.  I mean, obviously, it just didn't --

5   there wasn't enough character space, because Mr. Pech, I

6   believe, owned the house with his wife, and I owned the

7   house jointly with my wife.

8        Q.   That's right.  If you look below the purchase

9   that you made, there's a purchase in September 2006 by

10  Mr. Pech.  Do you see that?

11       A.   Yes.

12       Q.   And that purchase was for $1,525,500.  Do you

13  see that?

14       A.   Yes.

15       Q.   And I think you were mentioning that there was

16  a sale for around 1.5 something.  Do you think that

17  might have been what you were recalling, that Mr. Pech

18  purchased the home for slightly less than what you did?

19       A.   No.

20       Q.   Okay.  But that is what the record states; is

21  that right?

22       A.   Correct.

23       Q.   If you look back to the previous ownership of

24  the property, Albanese-Popkin Development Group is
```

Case 2:09-md-02047-EEF-MBN   Document 23263-39   Filed 11/19/19   Page 3124 of 3246
Case 1:11-cv-22408-MGC   Document 238-31   Entered on FLSD Docket 05/16/2014   Page 58 of
180
Confidential - Subject to further confidentiality Review

```
1    listed as the owner of the house previously.  Is that

2    the developer for the construction of the home?

3         A.   Unfortunately, yes.

4         Q.   I'd like to turn your attention to the

5    record -- the more recent 2019 records, which is on the

6    second page of this exhibit.  As you can see, at the top

7    it lists that this is a record from the Palm Beach

8    County Property Appraiser.  Do you see that?

9         A.   Yes.

10        Q.   And specifically, for the location address, it

11   once again lists 17625 Middlebrook Way, which is your

12   home; is that right?

13        A.   Yes.

14        Q.   Taking a look at the second page of this

15   record, once again it lists the same sales that we just

16   discussed in the previous record, including the most

17   recent sale, which is your purchase for $1.6 million; is

18   that right?

19        A.   Yes.

20        Q.   And, obviously, the house has not been sold

21   since then, that was the last purchase of the home;

22   correct?

23        A.   Correct.

24        Q.   Looking over to the third page of the
```

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 3125 of 3246
Case 1:1-cv-22408-MGC Document 228-301 Entered on FLSD Docket 09/19/2017 Page 59 of 180
Confidential -- Subject to Further Confidentiality Review

 1    document -- excuse me -- the third page of this 2019

 2    record, the fourth page of the exhibit, there is a, in

 3    the upper left-hand corner, a field for square footage

 4    that is listed in the upper left-hand corner.  Do you

 5    see that?

 6        A.   No.  I'm confused by your saying the fourth

 7    page of the document.  I know there's -- some of them

 8    are double-sided, so maybe you can be more specific.  In

 9    the bottom right corner, there are page numbers, so

10    which one are you referring to?

11        Q.   Absolutely.  In the 2019 record, it's the third

12    page of four, and you can see in the upper left-hand

13    corner that there's square footage that is listed.

14        A.   Yes, I see it.

15        Q.   All right.  Looking to the square footage, do

16    you see where it lists the total area under air for

17    square footage at the bottom of that field?

18        A.   Yes.

19        Q.   And the amount that is listed for total area

20    under air is 5,935 square feet.  Do you see that?

21        A.   I do.

22        Q.   Do you have any reason to doubt that the total

23    under air square footage of your home is 5,935 square

24    feet?

1      A.    Yes.

2      Q.    And why is that?

3      A.    My belief, based on my recollection of other

4   documents I've seen related to the home, is that the

5   total area under air is greater than 5,935 but less than

6   6,000.  It's possible that I -- I don't know -- I don't

7   know where the recollection is coming from, so it's

8   possible that 5,935 is correct.  I have always operated

9   under the assumption that the house was 5,900-plus

10  square feet.  I just have a recollection that it was

11  somewhere closer to 5,999 as opposed to 5,935, but

12  generally that information here listed as 5,935 is

13  correct.

14     Q.    Do you have any knowledge of where these square

15  footage numbers have come from?

16     A.    I'm sure they came from Albanese-Popkin.

17     Q.    So --

18     A.    When I say "I'm sure," that would be my guess.

19     Q.    Perhaps they came from the floor plans from

20  Albanese-Popkin for the construction of the home?

21     A.    I would imagine that Albanese-Popkin -- I

22  wouldn't imagine.  I know just from general knowledge

23  that a builder has to submit plans in order to get

24  permits and approvals, so I am sure that documents were

Confidential – Subject to Further Confidentiality Review

```
 1   submitted by the builder in connection with the

 2   development of the community and the building of the

 3   specific house, from which that information is taken.

 4       Q.   And those records would be submitted to Palm

 5   Beach County in this instance; is that right?

 6       A.   That would be my understanding.

 7       Q.   But you have not had your home measured for its

 8   square footage or its under air square footage at any

 9   time that you're aware of?

10       A.   Not that I'm aware of, no.

11       Q.   I'd like to look down to the appraisals

12   section, which is at the bottom of the page.  Do you see

13   that?

14       A.   I do.

15       Q.   Again, we're looking at the third page out of

16   four of this 2019 record.  I'd like to direct your

17   attention to the row titled Tax Year that you see across

18   that Appraisals field.  It goes from 2018 back to 2009.

19   Do you see that?

20       A.   I do.

21       Q.   And this is showing the improvement value, land

22   value, and total market value of the property according

23   to Palm Beach County, from 2009 to 2018; is that your

24   understanding?
```

Confidential - Subject to further confidentiality Review

```
 1      A.   It's my understanding that those are the values

 2   according to whatever formulas Palm Beach County applies

 3   for tax purposes, yes.

 4      Q.   So these are the numbers that Palm Beach County

 5   uses to be able to determine the property tax amount

 6   that is applied to the property; is that right?

 7      A.   I believe so.

 8      Q.   Going back to 2009, if you look to the Total

 9   Market Value column, it lists the total market value of

10   the property as $364,707.  Do you see that?

11      A.   I do.

12      Q.   Now, going down to the bottom, just below that

13   field, it says:  "All values are as of January 1st each

14   year."  Do you see that?

15      A.   I do.

16      Q.   And would that mean that the value for 2009

17   would be as of January 1, 2009, according to what it's

18   saying here?

19           MR. MONTOYA:  Objection to the extent it calls

20      for speculation.  It's outside of this witness's

21      knowledge.  You can answer.

22           THE WITNESS:  I would assume so, but I don't

23      really know what the definitions are according to

24      the Palm Beach County Property Appraiser of any of
```

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 3129 of 3246
Case 1:11-cv-22408-MGC Document 298-30 Entered on FLSD Docket 05/18/2012 Page 43 of
180

Confidential - Subject to Further Confidentiality Review

```
 1       the terms in here.  I'm just surmising based on my

 2       general knowledge and experience.

 3   BY MR. LAWSON:

 4       Q.   As of January 1, 2009, you did not have

 5   confirmation that your home had Chinese drywall in it,

 6   did you?

 7       A.   I did not.

 8       Q.   That didn't occur until later on that year; is

 9   that right?

10       A.   Correct.

11       Q.   Would the county have had any reason to know

12   that your home had Chinese drywall in it as of

13   January 1, 2009, to your knowledge?

14           MR. MONTOYA:  Objection to the extent it calls

15       for speculation.  You can answer.

16           THE WITNESS:  My guess and speculation is that,

17       yeah, the county would have reason to know.  Who

18       specifically knew, or what they knew, or if they

19       knew, I have no idea.

20   BY MR. LAWSON:

21       Q.   So on January 1, 2009, at that time would you

22   have reported to Palm Beach County that you had Chinese

23   drywall in your home?

24       A.   As of January 1, 2009, we had not reported to
```

Confidential - Subject to Further Confidentiality Review

1    Palm Beach County that the home had Chinese drywall.

2        Q.    That's because you didn't know that at that

3    time; is that right?

4        A.    Correct.

5        Q.    But at some point in the future you did report

6    that to the county?

7        A.    Well, when you use the word "report," I mean,

8    the county was made aware of it through what I recall

9    was a -- some type of submittal or application we

10   submitted for a reduction in property taxes due to the

11   Chinese drywall.  When you use the term did we "report"

12   it, I don't know if it's specifically reporting it, but

13   they would have learned of it from us.

14       Q.    So by 2010 the improvement value of the

15   property had gone from $960,689, in 2009, down to $0,

16   according to this record, in 2010.  Do you see that?

17       A.    I see that's what the document says, yes.

18       Q.    Do you know why that would be reported in this

19   document as $0 for the improvement value in 2010?

20       A.    I do not know.  You'd have to ask somebody from

21   Palm Beach County.

22       Q.    At that time had you requested the tax

23   deduction that you were just discussing from the county

24   related to Chinese drywall?

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 3131 of 3246
Case 1:09-cv-02047-CAL Document 23363-39 Enterprise Filed 11/19/19 Page 45 of
180
Confidential – Subject to further Confidentiality Review

```
1        A.   I believe so, but I can't say for certain

2   without seeing documents.

3        Q.   And the total market value in 2010 is listed as

4   $232,875.  Is that what it says on the document?

5        A.   The document says that, yes.

6        Q.   Now, you remediated the home beginning in 2010;

7   is that right?

8        A.   Yes.

9        Q.   And that remediation was completed in 2011; is

10  that right?

11       A.   Yes.

12       Q.   Now, by 2012, the total market value listed for

13  the home on this property record is listed as $983,887;

14  is that right?

15       A.   Yes.

16       Q.   So it had increased significantly from the

17  prior three years; is that correct?

18       A.   Well, I would not agree with your

19  characterization of the question.  I would just say that

20  Palm Beach County determined to place that value there.

21       Q.   And the value that Palm Beach County determined

22  to place there was around $600,000 more than the

23  previous year in 2011, is that right, for the total

24  market value?
```

Confidential – Subject to further confidentiality Review

```
 1    A.    That is what Palm Beach County determined, yes.

 2    Q.    Excuse me.  Almost $700,000; is that right?

 3    A.    That's what the document says.

 4    Q.    And that year 2012 was the first year where

 5    the -- first entire year where your home had been

 6    remediated; is that right?  It was not completed in

 7    remediation for all of 2011?

 8    A.    Correct.

 9    Q.    Looking to 2018, the total market value listed

10    by the county is $1,044,025.  Do you see that?

11    A.    I see that that's what the document says, yes.

12    Q.    Did you receive the tax relief that you

13    requested from the county when you applied for it?

14    A.    I believe that we did.

15    Q.    And do you have record of that?

16          MR. MONTOYA:  We've produced it here today.

17          MR. LAWSON:  Is that part of the records that

18          was produced today?

19          MR. MONTOYA:  Yeah, and to be clear, what we've

20          produced today, I believe, is the appeal.  In terms

21          of the adjustment values and what adjustment was

22          made, that's part of the public record that you're

23          showing us today.

24          ///
```

1    BY MR. LAWSON:

2        Q.    Have you received any other kind of tax

3    deduction or tax relief related to Chinese drywall since

4    you purchased your home?

5        A.    Yes.

6        Q.    And what was that?

7        A.    We, for the tax year 2010, I believe, included

8    in our tax return a deduction based on the bulletin that

9    was issued by the IRS that was specific to homes that

10   had been constructed with Chinese drywall.

11       Q.    And you received that deduction on your taxes?

12       A.    The deduction was part of the calculation for

13   our taxes, yes.

14       Q.    Do you know the amount of money that that

15   deduction was for?

16       A.    Yes.

17       Q.    What was it?

18       A.    Again, without seeing documents, my general

19   recollection was that the gross amount of the deduction

20   was somewhere around 140- or $150,000.  There was a

21   specific formula that the IRS required that you follow.

22       Q.    Can you think of any other tax deduction or tax

23   relief that you've received related to Chinese drywall

24   other than those two that we've just discussed?

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 3134 of 3246
Case 1:19-cv-02943-GLR Document 280-31 Entered on FLSD Docket 05/06/2024 Page 33 of 180
Confidential - Subject to further confidentiality review

```
 1        A.   Well, the first thing that I just want to make

 2   sure that the record is clear is that the deduction is

 3   not the amount of the actual value to us or the amount

 4   by which it reduced our taxes, and second, apart from

 5   the reduction in our property taxes and in our federal

 6   income tax for that one specific year, I don't recall

 7   any other deduction that we were able to take.

 8        Q.   Are you aware of any changes to the square

 9   footage of your home since the remediation of the

10   property occurred?  Did that change the square footage,

11   to your knowledge?

12        A.   It did not.

13        Q.   So the square footage should be the same as it

14   was when the home was built, to your knowledge?

15        A.   Yes.

16        Q.   You can set that document aside.

17             (Wites Exhibit No. 3 was marked for

18   identification.)

19   BY MR. LAWSON:

20        Q.   You've been handed a document that's been

21   marked as Exhibit 3.  I would represent to you that this

22   is a Plaintiff Profile Form that was submitted on your

23   behalf in the Chinese Manufactured Drywall Liability

24   Litigation in the Eastern District of Louisiana in front
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 3135 of 3246
Case 1:1-md-02047-MCA Document 2861 Confidential Subject to Docket 05/16/2019 Page 40 of
180

1    of Judge Fallon.  Do you recognize this document?

2       A.   I have a general recollection of this document,

3    which is now nine and a half years old.

4            I'm not too old after all.

5       Q.   To make sure we have the same copy, what is the

6    Bates stamp on the first page of your version that you

7    have?

8       A.   Excluding the leading zeroes, it's 01 through

9    and including 08.

10      Q.   Looking to the third page of this exhibit, is

11   that your signature on the third page of the document?

12      A.   It is.

13      Q.   And is that your wife's signature as well?

14      A.   It is.

15      Q.   And this was signed, as you were referring to

16   earlier, a little less than 10 years ago, on August 30,

17   2009; is that right?

18      A.   Yeah, I think this was from a time when my wife

19   and I were participating in the lawsuit but your client

20   was not.

21      Q.   If you look to the first page, both your name

22   and your wife's name are listed along with your property

23   address on the first page; is that right?  Under

24   Section I, for property information?

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 3136 of 3246
Case 1:09-cv-02047-GCM Document 288-301 Exhibit 1 Appeal Supplement 0519/2019 Page 70 of
180

1      A.   Yes.

2      Q.   And if you look to Section II, it lists

3   insurance information and specifically a homeowners

4   insurance policy with State Farm Insurance; is that

5   right?

6      A.   Yeah.

7      Q.   And we discussed earlier that you did file a

8   lawsuit against State Farm Insurance related to their

9   failure to cover your damages related to Chinese drywall

10   under your homeowners insurance policy; is that right?

11      A.   Correct.

12      Q.   Other than the settlement amount that we

13   discussed earlier, did they provide any funds to you

14   under that policy for your claim for Chinese drywall?

15      A.   None.

16      Q.   I'd like to turn to the second page of the

17   document, specifically at the top, Section IV,

18   Inspection Information.  Do you see that?

19      A.   Yes.

20      Q.   The first question asks whether you have had an

21   inspection conducted into whether Chinese drywall is

22   present in your home, and you marked "yes."  Do you see

23   that?

24      A.   I see where it was marked, yes.  I don't recall

Confidential – Subject to Further Confidentiality Review

1    placing that mark there, but I see where it's marked

2    that way.

3        Q.    You or someone on your behalf marked "yes" for

4    that the inspection was conducted?

5        A.    Right.

6        Q.    Looking to line 1.1, it asks:  "Who conducted

7    the inspection?"

8              And it says "Yanes Security & Investigative

9    Services Incorporated"; is that right?  That's what's

10   listed there; is that right?

11       A.    It's correct that that's what's listed there.

12       Q.    Do you remember that company coming to inspect

13   your home?

14       A.    I do.

15       Q.    And were you present when that inspection

16   occurred?

17       A.    I was.

18       Q.    It lists that the inspection took place on

19   August 30, 2009.  Does that sound accurate to you?

20       A.    I'm sure it is.

21       Q.    And it states on line 2.0 that a determination

22   was made that Chinese-manufactured drywall was present

23   in the home.  Do you see that?

24       A.    I do.

Confidential - Subject to Further Confidentiality Review

1    Q.   So that determination was made by Yanes

2   Security & Investigative Services, Incorporated, during

3   this inspection on August 30, 2009?

4    A.   That appears to be the date when that person or

5   entity made that determination.

6    Q.   Would you say that that was the first time

7   where it was confirmed for you that you had Chinese

8   drywall in your home?

9    A.   No.

10    Q.   When was it first confirmed in your mind that

11   you had Chinese drywall in your home?

12    A.   July 14 of 2009.

13    Q.   And why do you remember that specific date?

14   Was there something that occurred then?

15    A.   Yes.

16    Q.   What was it?

17    A.   So on that specific date, I believe, Robyn

18   Rosen called my wife and conveyed to her that it had

19   just been determined that their home had been

20   constructed with Chinese drywall.  Robyn was aware that

21   her home and our home were nearly identical, built at

22   the same time, by the same developer, with the same

23   upgrades.  She and her husband were the original owners.

24        So they were, to my recollection they had told

Case 2:09-md-02047-EEF-MBN Document 23262-39 Filed 11/19/19 Page 3139 of 3246
Case 1:11-cv-22408-MGC Document 301 Entered on FLSD Docket 05/08/2013 Page 73 of 180
Confidential - Subject to Further Confidentiality Review

1    us, constantly in the neighborhood during the

2    construction of their home, watching the construction of

3    their home, and I guess by virtue of their presence in

4    the neighborhood they knew or saw our house going up at

5    the same time as their house.

6            Their home was determined to have Chinese

7    drywall in connection with their effort to sell the home

8    as part of, I guess, a -- I don't know what term they

9    use in the real estate industry, but as part of the

10   closing or contractual process, the home was inspected.

11   It was determined that their home, the Rosen home, had

12   drywall.  Robyn called my wife and, to my understanding,

13   said something to the effect of, "Our home has drywall.

14   Your home must have it too."

15           As a result of that, that evening I went to the

16   website for the first time for the Florida Department of

17   Health, I believe, and reviewed the information about

18   Chinese drywall that was being provided by the State,

19   and the exemplar photographs that were being provided by

20   the State, and took out a screwdriver and started going

21   through the outlets and switches in my house and

22   observed and determined that they looked identical to

23   the exemplars of those that were on the Florida

24   Department of Health website for homes that were

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 3140 of 3246
Case 1:09-md-02047-EEF-MBN Document 23631 Entered on FLSD Docket 05/13/2019 Page 41 of 180
Confidential - Subject to Further Confidentiality Review

1    constructed with Chinese drywall.

2            And between that and the odor and the failure

3    of the air conditioning systems and then putting two and

4    two together with the pitting and blackening on mirrors

5    and fixtures in the home, my wife and I made the

6    determination that we believed, as of that evening, that

7    our home had been constructed with Chinese drywall.

8        Q.   Did you hire an attorney soon after that for

9    your issues with Chinese drywall?

10       A.   Yes.

11       Q.   Do you remember how soon after that date when

12   you did that self-inspection you hired your attorney?

13       A.   I don't remember the exact date, no.

14       Q.   But you believe it was soon after; is that

15   right?

16       A.   It was soon after, yes.

17       Q.   Other than the self-inspection that you just

18   described and the inspection from August 30, 2009, by

19   Yanes that's listed on this Plaintiff Profile Form, have

20   there been any other inspections of your home that have

21   been conducted?

22       A.   Yes.

23       Q.   Were those inspections related to the

24   remediation that was performed on your home?

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 3141 of 3246
Case 1:11-cv-22408-MGC Document 285-30 Entered on FLSD Docket 05/18/2011 Page 75 of
180

Confidential - Subject to further confidentiality review

```
1      A.    Some of them.

2      Q.    Other than the inspections related to the

3   remediation, what other inspections have occurred?

4      A.    Well, first there was the inspection by Gavin,

5   from Albanese, where he inspected the home, and I

6   remember knowing as of July 2009 and remember as I sit

7   here today that everything that I observed in July of

8   2009 was present and visible when Gavin inspected the

9   house a few months before that when he, in my opinion,

10  lied to us and told us, quote, "We dodged a bullet," end

11  quote.  So that was the first inspection that I can

12  recall, and I'm certain it was the first inspection I

13  believe related to Chinese drywall.

14          There were subsequent inspections done by

15  persons on behalf of Colson Hicks, our lawyers.  There

16  were inspections, I believe, that were conducted by --

17  well, I know there were inspections conducted by people

18  sent on behalf of State Farm, field adjusters or

19  independent adjusters that were done on behalf of State

20  Farm.

21          And I also believe that there may have been

22  inspections conducted by other defendants, specifically

23  the suppliers or -- in connection with other Chinese

24  drywall litigation, but that I'm not positive of.
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 3142 of 3246 of
180
Confidential - Subject to further confidentiality review

1    Q.   For any of those other inspections, the one by

2    Gavin, the one at -- the other ones that potentially

3    were done at the direction of your counsel, the

4    inspections performed by State Farm, or any potential

5    inspections performed by suppliers or other defendants,

6    did you receive written reports for those inspections or

7    have them at any time?

8    A.   No.

9    Q.   Do you know if written reports were created

10   from them?

11   A.   Well, based on my experience as a lawyer, I

12   would assume that work product reports would have been

13   created by Colson Hicks.  I'm sure that work product

14   reports were created by State Farm, which I would not

15   have access to and never had access to.  I'm sure, based

16   on my experience as a lawyer, that verbal reports were

17   given by all of those inspectors.  And that's really

18   the -- I think the answer to your question.

19   Q.   You didn't receive the inspection reports done

20   by State Farm during discovery of the litigation that we

21   were discussing earlier?

22   A.   I do not recall personally receiving them, but

23   there was never a dispute in the State Farm case that

24   the house was constructed with Chinese drywall.  I can

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 3143 of 3246
Case 1:11-cv-22408-MGC Document 238-31 Entered on FLSD Docket 05/19/2015 Page 77 of
180

Confidential - Subject to Further Confidentiality Review

1    specifically remember the State Farm inspectors walking

2    into my home and within 10 or 15 seconds of being

3    present in the home telling me, "I can already tell that

4    you have Chinese drywall based on the odor."

5         So whether or not -- I have no specific

6    recollection of having personally received any reports,

7    I don't have any recollection of our counsel having

8    received reports, but I don't know for certain if they

9    did or did not, but I doubt it, because I can't imagine

10   that State Farm would have ever produced those.  They

11   would have claimed they were privileged, I'm sure, and

12   it was never a dispute in the case in any event.

13        MR. LAWSON:  Patrick, absent it being work

14      product, and I understand you would not be producing

15      those, if there are any inspection reports other

16      than the Yanes report, which we did receive, that

17      you all have that have had conducted on the home, we

18      would just ask that those be produced, but I'm not

19      entirely sure from the testimony whether there are

20      any.  I just want to put that on the record.

21        THE WITNESS:  Right, and let's be clear --

22      well, go ahead, Patrick.  I don't want --

23        MR. MONTOYA:  State Farm, we do not have them.

24      The Yanes inspection that we do have, you have the

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 3144 of 3246
Case 1:09-cv-08818-McI... Document 29130 Confidential Subject to further confidentiality Review
180

Confidential - Subject to further confidentiality Review

```
 1        report and the photos, et cetera.

 2            MS. RICO:  Just to be clear, there are two

 3        Yanes reports.

 4            MR. LAWSON:  That's right.

 5            MS. RICO:  Okay.

 6            THE WITNESS:  Right, and I'm not suggesting

 7        that there is other reports.  I don't have any

 8        knowledge of any other reports.  I'm just guessing,

 9        again, based on my experience as a lawyer, that when

10        you send an expert out to do an inspection they

11        submit a report of some kind and you as the lawyer

12        do your own internal report.  That would be

13        protected by the work product privilege, but that is

14        all largely -- I don't want to say it's a guess,

15        because I think it's more than a guess, but I don't

16        have any knowledge of anything specific.

17            (Wites Exhibit No. 4 was marked for

18    identification.)

19    BY MR. LAWSON:

20        Q.   You've been handed a document that has been

21    marked as Exhibit 4.  It's titled at the top as

22    Inspection Report and it's Bates stamped in the bottom

23    right-hand corner of the first page as No. 82.  Do you

24    see that?
```

Confidential - Subject to Further Confidentiality Review

```
1       A.   I do.

2       Q.   Do you have any recollection of seeing this

3  document before?

4       A.   I believe I have seen this in the past.

5       Q.   As you were saying, this is an inspection

6  report from August 30, 2009.  And I understand that the

7  image quality that we received here is a little spotty,

8  so I'll do my best to try to read through it, but at the

9  top of the page it appears to have your name and your

10 wife's name as the clients for this inspection report.

11 Do you see that?

12      A.   I do.

13      Q.   And it lists your address as well; is that

14 right?

15      A.   It does.

16      Q.   In here, in this inspection report, at the

17 bottom, and it's slightly faded out, but it appears to

18 say "Yanes" at the bottom of the page.  Do you see that?

19      A.   I do.

20      Q.   And would you say that this is the Yanes

21 inspection report from August 30, 2009, that we had just

22 seen listed on the Plaintiff Profile Form that we looked

23 at as Exhibit 3?

24      A.   It would seem that way.
```

Confidential - Subject to Further Confidentiality Review

1    Q.   It's noted in here that the inspection was

2  photographed.  Do you see that?

3    A.   Yes.

4    Q.   Were you present at the home during this

5  inspection?

6    A.   Yes.

7    Q.   And do you remember what the inspector did

8  while they were at the home?

9    A.   Yes.

10   Q.   Generally, can you tell me what the inspector

11  did while they were inspecting your home?

12   A.   I believe they smelled the home, which is part

13  of an inspection.  I believe they visually inspected the

14  drywall both by looking at the exterior of it and by

15  drilling holds in the walls and using some type of a

16  scope to look at the interior or other side or back side

17  of it.  I believe they took samples of the drywall.  I

18  think that they took photographs, as is indicated here,

19  of the drywall and of the home in general.

20        They -- I recall, as is listed here, them

21  looking at the air conditioning units and the electrical

22  outlets, and the electrical switches, and the faucets,

23  and the mirrors.  And that's what I can at this time

24  recall observing of their inspection.

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 3147 of 3246
Case 2:09-cv-07628-EEF-MBN Document 301 Entered on FLSD Docket 05/18/2019 Page 81 of 180
Confidential - Subject to further confidentiality review

1    Q.   If you look down toward the bottom of this

2    page, it states -- and I'm trying to read through the

3    quality of the copy here -- it says:  "Over 40," I

4    believe, "holes opened in different walls throughout the

5    home.  Found National Gypsum GridMarX in five different

6    walls.  All other walls had no markings."

7         Do you see that?

8    A.   I do.

9    Q.   Did you ever see drywall with the marking

10   "National Gypsum GridMarX" inside of your home?

11   A.   Probably, yes.  I mean, I can't as I sit here

12   today remember any of the markings that I saw at that

13   time, but I do remember them showing me what they were

14   finding at that time.

15   Q.   I'd like to jump back to Exhibit 3, that

16   Plaintiff Profile Form that we were just looking at, and

17   specifically I wanted to ask you about, on page 2

18   there's a section that is titled Drywall Information.

19   Do you see that?  It's Section V.

20        It's near the top of the page.  It's Section V,

21   or Section V, roman numeral V, Drywall Information.

22   A.   I do, yeah.

23   Q.   For drywall manufacturer, it states "unknown."

24   Do you see that?

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 3148 of 3246
Case 1:11-cv-22408-MGC Document 288-11 Entered on FLSD Docket 05/18/2015 Page 42 of 180
Confidential - Subject to Further Confidentiality Review

1       A.   I do.

2       Q.   And then for markings on drywall, it lists

3   "4 feet by 12 feet by 1/2 inch."  Do you see that?

4       A.   I do.

5       Q.   And it says that that is -- that marking of

6   drywall is located throughout the home.  Do you see

7   that?

8       A.   I do.

9       Q.   Have you ever seen markings on the drywall from

10  your home that said "4 feet by 12 feet by 1/2 inch"?

11      A.   Yes.

12      Q.   And would you say that it's accurate, based on

13  your understanding, that that was found throughout your

14  home when it was remediated?

15      A.   Based on what I was told, yes.

16      Q.   And there was also markings, according to the

17  Yanes inspection, that said National Gypsum GridMarX; is

18  that right?

19      A.   Yeah, that's correct, but once you have Chinese

20  drywall in the house, the fact that there may have been

21  some small portion or any portion that was American-made

22  or other drywall doesn't really change the fact that the

23  drywall that your client manufactured is what caused the

24  damage in my home.

Confidential - Subject to Further Confidentiality Review

```
1      Q.    Just going back to my question, there was, yes,

2  National Gypsum GridMarX drywall found in the Yanes

3  inspection; is that right?

4      A.    The answer is yes, and it's a "so what?"

5      Q.    Do you know if there were any other drywall

6  markings other than those two that we just discussed

7  that were found in your home when the home was

8  remediated?

9      A.    I don't know, but the inspectors would have

10  more knowledge of that than me.

11      Q.    Were you ever told that there was Knauf

12  drywall, K-n-a-u-f drywall, found in your home?

13      A.    I wish, because that company did the right

14  thing.

15      Q.    So is that a no, there was not Knauf drywall in

16  your home?

17      A.    There was not.  So those people won a better

18  lottery than us.  I tell people that my wife and I had

19  the unfortunate result of having not only won the

20  Chinese drywall lottery in having purchased a house with

21  Chinese drywall but we won the lottery of having

22  purchased a house made with Chinese drywall by a

23  manufacturer that for nine-plus years has been

24  attempting to evade and game the US legal system.
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 3150 of 3246
Case 2:09-md-02047-EEF-MBN Document 20581 Filed 01/08/17 Page 151 of 180
Confidential - Subject to further confidentiality Review

1    So I wish that we had purchased a house having

2    won that lottery with drywall that was made by Knauf as

3    opposed to your client.  Nothing personal to you.

4    Q.   Now, you've said at a few points "drywall made

5    by your client."  What is your understanding of what

6    drywall was made by Taishan Gypsum Co., Ltd. that was in

7    your house?

8    A.   The drywall that Judge Fallon has ruled and

9    determined was made by your client.  It's not subject to

10   dispute anymore.

11   Q.   What ruling are you aware of that Judge Fallon

12   has made that drywall with that marking that we just

13   discussed, that dimension marking, was made specifically

14   by Taishan Gypsum Co., Ltd.?

15   A.   It's my understanding, in general, that that

16   was a determination made.  I can't cite you to a

17   specific order or ruling, but my understanding that it

18   is -- that there's really not much at issue in this case

19   at all.  We can have a debate about loss of use of

20   enjoyment and diminution in market value of the house,

21   things which I also don't think are subject to debate,

22   although one can argue about the value of the amount,

23   but I'm not an engineer or an expert, nor am I counsel

24   in this case, thank God, but my understanding is it's

1    not something that's subject to dispute.

2        Q.    Are you aware of any edge tape from the drywall

3    that was found in your home that had any Chinese

4    characters or names of Chinese companies on it?

5        A.    What do you mean by "edge tape"?

6        Q.    So drywall, when it is manufactured, has edge

7    tape that's placed around the outside of it to protect

8    the edges of it in transport.

9            Are you aware of any edge tape that was found

10   in your home that had Chinese characters or the names of

11   any Chinese companies on it?

12       A.    Are you aware of any edge tape that suggests

13   that the drywall in my house was made by a Chinese

14   drywall manufacturer other than your client?

15       Q.    I'd like to go back to my question.  And I

16   appreciate that --

17       A.    I know you don't have an answer to my question.

18       Q.    I'm not being deposed today.

19       A.    Right.  You haven't Fabre'd in another

20   defendant, you haven't cross-partied in another

21   defendant or made a third claim for indemnification or

22   contribution, because your client made the drywall.

23           To answer your question in addition, I can't as

24   I sit here today recall what was on the edge tape or

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 3152 of 3246
Case 1:11-cv-22408-MGC Document 208-31 Entered on FLSD Docket 05/19/2017 Page 86 of
180
Confidential - Subject to further confidentiality Review

```
1    board of the drywall in my house other than what I

2    generally recall and what I told you so far.

3        Q.   Do you know if any was collected during the

4    remediation of your home, any edge tape?

5        A.   Again, you're using the term "edge tape," which

6    I don't really know what that means beyond a reasonable

7    doubt what you've just told me.  I do recall samples of

8    the drywall being taken from my home.

9        Q.   Do you know where those samples are today

10   from -- excuse me.  Let me ask first, were those samples

11   taken during the remediation of your home or during this

12   Yanes inspection that we just looked at?

13       A.   I think the answer is both, because I believe

14   that there were multiple inspections.  Unfortunately,

15   your client may or may not know, because, again, this is

16   when they were purposefully choosing to ignore the legal

17   process.

18            MR. MONTOYA:  And just so we don't belabor this

19       point, your clients have seen what we have on hand.

20       You've actually viewed the evidence that was

21       collected from his home, so I don't want you to be

22       under any misunderstanding about what's there.

23            MR. LAWSON:  Yeah, I just wanted to clarify it

24       today on the record about whether there is any
```

Confidential – Subject to further confidentiality Review

```
1       additional samples or evidence beyond what we've

2       already viewed, and we do appreciate the opportunity

3       to view what you have in your possession.

4            THE WITNESS:  Right, and so to the extent that

5       was a question, you're going to have to ask my

6       counsel, because they have more information about

7       that than I would.

8  BY MR. LAWSON:

9       Q.   Thank you.  I appreciate that.  And I

10  understand how long this process has gone for you and I

11  appreciate that answering all these questions is

12  probably annoying.  If we can -- I want to make this

13  move quickly for you, because I'm sure you don't want to

14  be here all day, and we're going to depose your wife as

15  well --

16      A.   Listen, I've waited nine years.  I have as much

17  time as you want and I want to make sure your client

18  understands the full extent of what happened.  You know,

19  I would say to you, and all of you, it's nothing

20  personal.  I understand you're just doing your jobs.  I

21  personally would never have taken on a client that chose

22  to do what your client is doing -- I understand

23  everybody's entitled a lawyer -- nor would I assist a

24  client in evading the US legal system while they're
```

```
1    simultaneously engaging in business in our country, but

2    my point is it's nothing personal.  It's far, far, far

3    greater than annoying and I have as much time as you

4    want.

5        Q.   In that light, I would say that we can all

6    serve each other's interests by helping to move your

7    case forward by just answering the questions that are

8    put in front of you.

9        A.   I am.

10       Q.   And if you want to have a discussion about

11   anything else beyond that, we can do it off the record,

12   but let's try to move this deposition along about the

13   questions that are put in front of you.

14       A.   Right.  And so I will answer your questions in

15   the way I am interpreting them, which I have done so far

16   and I will continue to do.  I'm ready to answer the next

17   one.

18       Q.   So looking back to the inspection report that

19   we were just looking at, which is marked as Exhibit 4,

20   this is the Yanes inspection report --

21       A.   Yes.

22       Q.   -- the Yanes inspection does not state that it

23   found any markings with the drywall dimensions that were

24   listed on the Plaintiff Profile Form; is that accurate?
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 3155 of 3246
Case 1:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 30 of
180
Confidential - Subject to Further Confidentiality Review

1    That's not listed on this report?

2        A.    The document says whatever it says and doesn't

3    say or omits whatever it omits or doesn't state, so, you

4    know, I don't think at this point in time it was

5    necessarily known or had been determined what the

6    manufacturer was, but, again, you'd have to ask my

7    counsel and/or our expert those questions.

8        Q.    Are you aware of any other markings other than

9    the "National Gypsum GridMarX" and the dimension

10    markings that we've discussed that were found inside of

11    your house?

12        A.    So, again, based on my memory, no, but I would

13    point out that you haven't shown me any photographs of

14    any of the drywall from my home.  So without the aid of

15    documents or photographs, that's what I can remember

16    now, you know, nine and a half years later.

17            Excuse me.  This is my son --

18        Q.    Take your time.

19        A.    -- texting me about his ice hockey career.

20            Yes.

21            (Wites Exhibit No. 5 was marked for

22    identification.)

23    BY MR. LAWSON:

24        Q.    The name of the document that's been marked as

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 3156 of 3246
Case 1:19-cv-00449-JCG Document 189-301 Entered on FLSD Docket 03/19/2019 Page 90 of
180

Confidential - Subject to Further Confidentiality Review

 1    Exhibit 5, I represent to you that this is a

 2    Supplemental Plaintiff Profile Form that was submitted

 3    on your behalf in the Chinese-Manufactured Drywall

 4    Products Liability Litigation.  Do you recognize this

 5    document?

 6         A.   I do.

 7         Q.   And if you look to the last page of this

 8    exhibit, is that your signature on the final page?

 9         A.   It is.

10         Q.   And you signed this on March 19 of 2018; is

11    that right?

12         A.   Yes.

13         Q.   And your signature on that page was your

14    indication that the information contained within the

15    document was true and correct to your knowledge; is that

16    right?

17         A.   To the best of my knowledge, yes.

18         Q.   I'd like to turn to the fourth page of this

19    exhibit, under Section V, Already Remediated Property.

20    It's in the middle of the page.  Do you see that?

21         A.   I do.

22         Q.   Here it asks:  "Has the property been partially

23    or completely remediated?"

24              And it lists here that the property was

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 3157 of 3246
Case 1:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 41 of
180
Confidential – Subject to Further Confidentiality Review

```
 1   completely remediated.  Do you see that?

 2        A.   I see that.

 3        Q.   And is that accurate that the home has been

 4   completely remediated at this time?

 5        A.   Yes.

 6        Q.   And as you said earlier it's been completely

 7   remediated according to the protocol established by

 8   Judge Fallon in the Chinese Drywall MDL; is that right?

 9        A.   Yes.

10        Q.   Going down, it asks you to identify the dates

11   during which the remediation took place, and it's listed

12   as June 2010 through February 2011.  Is that accurate?

13        A.   Yes.

14        Q.   That's both what it states there and actually

15   when the remediation occurred?

16        A.   The remediation definitely took place from

17   June 2010 through and including February 2011.  It is

18   possible that there may have been some punch list items

19   and other things that continued on into March, but I

20   believe that the vast majority, if not the totality, of

21   the remediation was completed in that time frame, and if

22   there were any other small items, it was only within a

23   few weeks thereafter.

24        Q.   I wanted to understand the timeline from when
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 3158 of 3246
Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 32 of 180
Confidential - Subject to Further Confidentiality Review

1    you discovered and confirmed that you had Chinese

2    drywall to when the remediation was started.  That

3    appears to be a period from around the summer of 2009

4    until the summer of 2010.  When did you first decide

5    that you wanted to remediate your home?

6        A.    It's difficult, if not impossible.  First of

7    all, I can't give you a specific day, month, and year.

8    I can tell you generally that sometime after the

9    discovery we determined, probably very soon after the

10   discovery, that we would do whatever we had to in order

11   to fix our home, because, you know, I -- I would just

12   say that it was probably made within a few weeks or a

13   few months that we would remediate the home.  It was

14   just an open question of how and when.

15       Q.    Did you start getting quotes soon after you

16   confirmed that you had Chinese drywall in your home?

17       A.    We started to get quotes, but not soon after.

18       Q.    Okay.  Months after?

19       A.    Well, it was definitely months after, because

20   we know it was less than a year, right, because the

21   discovery was in July and we moved out in the following

22   June.  But the timeline, I believe, without looking at

23   documents, is that we were waiting for a protocol to be

24   issued so that we could determine what was required and

Case 2:09-md-02047-EEF-MBN Document 23362-39 Filed 11/19/19 Page 3159 of 3246 of
Case 1:11-cv-22408-McCaC Document 25301 Entered on FLSD Docket 05/18/2017 Page 48 of
180
Confidential - Subject to Further Confidentiality Review

 1   then go out and get quotes to do that work.

 2      Q.   When you went out to get quotes, what were you

 3   looking for in the company that was going to perform

 4   your remediation?  What was important to you?

 5      A.   What was most important to us was hiring a

 6   contractor who was reputable and who would stand behind

 7   their work.  You know, I think that next to lawyers and

 8   used car salesmen general contractors probably have as

 9   bad as a reputation, especially here in Florida.  They

10   have a worse reputation, I think, on the whole than they

11   do up north in terms of standing behind their work.

12           So we were trying to find somebody who did good

13   work, and who was well-established, and who had

14   references, and who would stand behind the work.

15      Q.   Were there any other qualities in the

16   contractor or the quote or the price that mattered to

17   you when you were looking at quotes?

18      A.   Well, I mean, if I was Patrick, I'd probably

19   object on the grounds of being compound, but to answer

20   your question --

21           MR. MONTOYA:  I've been so instructed.

22           THE WITNESS:  To answer your question, there

23      were many other factors.  Obviously we wanted

24      somebody who was licensed, who was insured, who was

Case 2:09-md-02047-EEF-MBN Document 22362-39 Filed 11/19/19 Page 3160 of 3246
Case 1:1-09-md-02047-EEF-MBN Document 23361 Confidential Subject Filed 05/19/2019 Page 41 of
180

Confidential - Subject to Further Confidentiality Review

```
 1        experienced.  We were definitely trying to negotiate

 2        the best possible price, because the last thing that

 3        we ever planned for in our life was to, as I have

 4        used in this deposition and more times than I can

 5        count since 2009, we were buying our house for the

 6        second time.  That's the way we looked at it.  So

 7        every penny was important to us.  So price was

 8        definitely a factor, not at the expense of the other

 9        factors.

10            So the answer is yes, there were many other

11        factors:  Price, insurance, being licensed, the time

12        that the contractor would have available, in other

13        words, when they could start, how much time could

14        they devote to the project, how many other projects

15        did they have going at that time.  So yes.

16   BY MR. LAWSON:

17        Q.   Ultimately you went with before B4 -- and it's

18   "B4" -- & After General Contractors?

19        A.   I'm listening.  Yes, the answer to the question

20   is yes.

21        Q.   Had you been referred to them?

22        A.   Yes.

23        Q.   Who referred you to them?

24        A.   I believe that we were referred by Josh and
```

Case 2:09-md-02047-EEF-MBN Document 22363-39 Filed 11/19/19 Page 3161 of 3246
Case 1:19-cv-22303-XXXX Document 381 Entered on FLSD Docket 05/18/2019 Page 95 of
180
Confidential - Subject to Further Confidentiality Review

1   Kara Bock, although my wife is shaking her head, so it's

2   possible it was somebody else.

3        Q.   I can always ask her.

4        A.   But I know that Josh and Kara Bock had

5   previously used B4 & After Contractors.  They may not

6   have been who referred us.

7        Q.   You list on the Supplemental Plaintiff Profile

8   Form, on page 4, under Section V, that the total amount

9   of the remediation cost that you incurred was $297,266.

10  Do you see that?

11       A.   I do.

12       Q.   And it goes on to state that $252,537 was the

13  amount paid to the contractor.  Can you explain to me

14  what the difference is between that total amount and the

15  amount that was paid to the contractor?

16       A.   You can look on the damages summary that was

17  provided to you.  It's listed there.  I mean, I'm not

18  going to guess at it without specifically looking at the

19  document that you have.  I will just tell you in general

20  that there were other expenses that were incurred, like

21  paying for a rental home, and a mover, and storage, and

22  insurance.  So that's generally the difference.

23       Q.   Now, you're also seeking alternative living

24  expenses; is that right?

Confidential - Subject to Further Confidentiality Review

1      A.   Yes.

2      Q.   And some of those items that you just

3   mentioned, like paying for a rental home and moving

4   things, and storing them, would you say that those are

5   alternative living expenses?

6      A.   Well, I mean, first of all, I mean, you're

7   using a term that's typically used in the context of

8   insurance policies, so I don't think it's specifically

9   applicable here.  So I'm not really sure exactly what

10  you're asking.

11          I would simply say that in my opinion, and in

12  my wife's opinion and our opinion, that having to live

13  in another place while our home was being remediated is

14  part -- an integral part of the remediation, because our

15  home was demoed on the metal frames, so we couldn't

16  exactly live there.  I'm not really sure what you're

17  asking.

18     Q.   Well, you just pushed back on the idea of

19  alternative living expenses.  Is it your understanding

20  that you're not pursuing something called alternative

21  living expenses?

22     A.   We are.

23          MR. MONTOYA:  Object to the extent it calls for

24     a legal conclusion.  It's a term of art.  That's

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 3163 of 3246
Case 1:09-cv-02047-MCA Document 23-33 Confidential Subject to Docket 05/08/2019 Page 97 of
Confidential – Subject to Further Confidentiality Review
180

```
1      what he's struggling with.  Yes, he's asking for

2      alternative living expenses.

3          THE WITNESS:  Use whatever term you want:

4      Alternative living expenses, ALE, rental home,

5      reimbursement.  Part of our damages in this case

6      include having to pay for someplace else to live

7      while our home was being remediated because it

8      was -- we couldn't live there.

9  BY MR. LAWSON:

10     Q.   I understand.

11     A.   Yeah.

12     Q.   So you're saying those expenses that you

13 incurred to have to live somewhere else during the

14 remediation are part of your remediation costs in this

15 lawsuit?

16     A.   I think so, yes.

17     Q.   After the home had been remediated, how soon

18 after February 2011, as is listed here on this form, did

19 you move back into the house?

20     A.   At or about that time.  It may have been in

21 March.  Without looking at documents, which you have but

22 haven't shown to me, I believe that the lease in the

23 rental property may have continued until March, and

24 moving back into the home was a multiweek process, to my
```

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 3164 of 3246
Case 2:14-cv-02722-MCA-LDW Document 230-301 Entered on FLSD Docket 07/18/2017 Page 98 of 180
Confidential - Subject to further confidentiality Review

1    recollection.  So sometime in February 2011 or March of

2    2011 we moved back into the house, but without seeing

3    documents, I can't be more specific than that.

4        Q.    How was the house changed from the layout and

5    finishes from when you had first moved into it until

6    after the remediation?

7        A.    So in terms of finishes, we changed things

8    like -- well, we had no choice but to change things like

9    tiling, like backsplashes in the kitchen, and tiling in

10   the bathrooms, because they had to be ripped out and

11   destroyed.

12            In regard to other finishes, I think Jennifer

13   could probably give you a more specific answer in terms

14   of countertops and things like that, but those are the

15   finishes that jump out at me, as I sit here today

16   without looking at documents, that were changed.

17            In terms of the layout of the house, there were

18   two things that I immediately recall.  One was that

19   there was a -- I believe the builder called it a loft --

20   that was on the second floor between -- so I think that

21   on the -- on the document that's Bates stamped with 0007

22   there's an area that says "exercise," and in that area,

23   which is part of, like, what I guess they call the

24   master bedroom suite, we made the -- we changed the

Case 2:09-md-02047-EEF-MBN Document 23363-39 Filed 11/19/19 Page 3165 of 3246
Case 1:12-cv-02348-MGC Document 2301 Entered on FLSD Docket 05/18/2015 Page 96 of
180
Confidential - Subject to Further Confidentiality Review

```
 1    configuration on the closets in the master bedroom and

 2    eliminated that exercise area to make the master bedroom

 3    a little larger, and I possibly changed the size of the

 4    closets.

 5          The second thing that we did was that there was

 6    a loft, which I think I may have originally been

 7    referring to, between what shows up in 00007 as the

 8    Bedroom 3 and Bedroom 2, and we eliminated the loft.  We

 9    made Bedroom 2 slightly bigger and we made Bedroom 3

10    slightly bigger.  So that just involved -- those changes

11    and the ones in the master bedroom suite were largely

12    just, since we had to remove all the walls, and all of

13    the drywall, and all of the insulation, and all of the

14    plumbing, and all of the electric, and the entire HVAC

15    system, we made these changes to the placement of walls.

16          And then as it relates to Bedroom No. 3, as

17    depicted on 0007, we moved the -- well, I guess I would

18    say we changed the entryway and exit of that bathroom,

19    or the doorway of that bathroom that now is depicted as

20    Bath 3, so that is part of Bedroom 5.  So Bedroom 3 no

21    longer has its own bathroom.

22          I can't recall at the moment any other changes

23    that were made as a result of the -- or in connection

24    with doing the remediation.
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 3166 of 3246
Case 2:14-cv-02494-NGG Document 31-4 Filed 05/15/2019 Page 100 of 180

Confidential - Subject to Further Confidentiality Review

1    Q.  I think you just said something to the effect

2    of that, you know, while you were having to remove all

3    of the drywall from the home that it made sense to make

4    those changes at that time?  Is that right, that it was

5    a choice, because you were already removing all the

6    drywall, to change the layout because it was something

7    that you could do more easily at that time?

8    A.  Well, to the extent that you are suggesting or

9    asking if we had ever thought to make those changes

10   before, the answer is no.  To the extent you're asking

11   if we would have ever spent the money to make those

12   changes, the answer is -- I can only say it's my opinion

13   that we never would have otherwise done it, because

14   there was nothing that would have caused us to do that.

15        And I can't recall the specifics without

16   looking at the documents, but because the house was

17   completely taken apart, I don't recall that there was

18   any additional cost or meaningful cost that was added to

19   the remediation as a result of doing that, but it's not

20   a situation where we had these plans to alter the design

21   or layout of our house and said, "Oh, guess what.  Now

22   we can makes those changes because we're stuck with this

23   Chinese drywall problem."

24        So, yes, we did it as part of the remediation,

```
 1    but, no, we had no plans, inklings, thoughts of any kind

 2    of doing those things until the remediation was underway

 3    or being planned.

 4        Q.   Can you think of any changes that were made

 5    during the remediation that added to the cost of the

 6    remediation that were not necessary for the purpose of

 7    remediating the house from Chinese drywall?

 8        A.   Well, I mean, to me, there's at least two

 9    distinct parts of that process.  I mean, remediating the

10    home is removing everything that Judge Fallon and the

11    CPSC determined had to be removed, and cleaning the air,

12    and conducting tests with an industrial hygienist to

13    determine that the house was again inhabitable.  So

14    that, to me, is remediating.

15        The reconstruction of the house is obviously

16    caused by and a necessary result of the remediation, but

17    I don't view making changes to the layout of the house

18    as being part of the remediation aspect as it relates to

19    removing the Chinese drywall, the systems that were

20    damaged by the Chinese drywall, and having to replace

21    them.

22        I'm not trying to avoid answering your

23    question, but I'm just having a hard time distinguishing

24    between those two in my mind.
```

1     Q.   No, that make perfect sense.  We'll refer to

2     the remediation as the process of removing the parts of

3     the home that are called for in the protocol and we can

4     talk about reconstruction of the home as the process

5     that occurred after the remediation.

6     A.   Well, it's part of the remediation.  I mean,

7     obviously, Judge Fallon's order contemplated you remove,

8     you do air quality remediating and testing, and then you

9     reconstruct, which you would never be doing were you not

10    remediating in the first place.  So, you know, they're

11    inextricably tied together.

12         And now that I've been talking about it for a

13    while, I can't really even remember your initial

14    question, so if you could repeat it for me or ask me a

15    different one so I can try to at least answer the

16    question that you want me to answer.

17    Q.   Sure.  I wanted to understand first, is it your

18    understanding that the protocol does not include moving

19    walls or changing entry points within a home as part of

20    the necessary parts of the protocol?

21    A.   Yes.  I do -- I agree with your statement.  I

22    do not believe that the protocol calls for or requires

23    somebody to change the layout of their home.

24    Q.   And can you think of any items other than the

1    relocating of walls and entry points that were done

2    during the remediation or reconstruction that were not

3    part of the protocol that was called for by Judge

4    Fallon?

5         A.   Can you repeat that?

6         Q.   Yeah.  Can you think of anything else that was

7    done in this process by B4 & After that was not part of

8    the protocol that you had them perform at your

9    direction, something extra beyond what was called for in

10   the protocol?

11        A.   So as part of the reconstruction of the home,

12   the only other thing that was done to the house is that

13   when we combined the loft on the second floor partly

14   with Bedroom No. 2 and partly with Bedroom No. 3, as I

15   previously explained, that we constructed a home theatre

16   in what was previously Bedroom No. 3.  But that's all

17   that I can -- the only other thing that I can recall at

18   the moment that I didn't previously testify to.

19        Q.   That home theatre, the cost of constructing it,

20   is that part of the total amount that was paid to the

21   contractor that's listed here?

22        A.   No, it's not.

23        Q.   So that $252,537 does not include the

24   construction of the home theatre?

```
 1        A.   No, and we actually did that -- and Jennifer

 2   can confirm, but that was done -- now that we're talking

 3   about it, we created the room as part of the

 4   reconstruction.  In other words, we had the loft

 5   eliminated.  We walled off that area.  Part of it became

 6   part of Bedroom No. 2 and part of it became Bedroom No.

 7   3, but we did not do any of the work related to the home

 8   theatre until after we had moved back into the house.

 9   It was sometime -- sometime well after we had moved back

10   in.

11        Q.   But the relocating of the walls and the changes

12   to the layout of the home are part of the work that

13   B4 & After did do for you; is that right?

14             MR. MONTOYA:  I'm going to object to the extent

15        it's vague.  If you're asking him -- I think what

16        you're getting at -- and you can tell me otherwise,

17        I won't do your questions for you -- but if you're

18        asking whether or not the modifications to the home

19        that were to the entranceways, et cetera, are

20        included in the contract price, if that's your

21        question --

22             MR. LAWSON:  That I haven't asked, no.  I'm

23        just asking if that was work that was done by

24        B4 & After, the relocating of the entry points.
```

Confidential - Subject to Further Confidentiality Review

```
 1              MR. MONTOYA:  At what time?

 2   BY MR. LAWSON:

 3       Q.   During the period that you listed on the

 4   Supplemental Plaintiff Profile Form June 2010 through

 5   February 2011.  Is that work that B4 & After performed

 6   for you?

 7       A.   Yes, B4 & After did that work.

 8       Q.   And was the labor and work that they did part

 9   of the $252,537 that was paid to them?

10              MR. MONTOYA:  For what?

11   BY MR. LAWSON:

12       Q.   That is listed on this form.  The work that

13   they did to relocate -- excuse me -- to move the walls

14   and entry points in the home.

15       A.   I don't recall without looking at the

16   documents, but my recollection is that there was no --

17   whether we had put it back exactly the way it was or we

18   had moved those walls, I don't recall that requiring any

19   additional charge whatsoever, because the home was

20   gutted, and putting it back together, whether we had put

21   it back together exactly the way it was or we had moved

22   these few walls, didn't require any additional cost,

23   because -- I just don't recall that being the case.  I

24   believe that the work to the contractor was the same.
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 3172 of 3246
Case 1:14-cv-09391-NGG-DMF Document 131-1 Entered on FLSD Docket 05/13/2016 Page 106 of 180
Confidential - Subject to further confidentiality Review

1    And we basically had an empty shell, so -- and I know

2    you have photographs of that -- so that's what I

3    remember about that.

4        Q.   But setting aside how much it cost, that was

5    part -- the work that they did to set up the walls and

6    the rooms the way that you wanted was part of what you

7    paid them for when you paid them $252,537; is that

8    right?

9           MR. MONTOYA:  Objection.  Asked and answered.

10       Vague.

11          THE WITNESS:  Again, the setting up of the

12       walls was no different there than it was in any

13       other part of the house, because it was a concrete

14       shell with metal frame.  So, again, I know you're

15       trying to establish that somehow we benefitted or

16       improved our house, or whatever term you want to put

17       on it, as a result of having won the Chinese drywall

18       lottery, but it did not in any way increase the cost

19       of the remediation project, to my recollection,

20       which could be confirmed with the documents, because

21       the house had to be ripped down to the metal studs

22       so it just didn't make any difference.

23    BY MR. LAWSON:

24       Q.   And that's why I was framing my question saying

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 3173 of 3246
Case 1:13-cv-02408-NGE Document 999-31 Filed 11/04/10 Page 55 of 180
Confidential – Subject to Further Confidentiality Review

1   not worrying about the cost, whether it cost more, less,

2   or the same.

3        A.   I understand.

4        Q.   I just wanted to understand if that was part of

5   the work that you paid them for, even if it cost the

6   same as them not doing it.  Is that true, that that was

7   part of the work you paid them for for this remediation

8   that's listed on this form?

9             MR. MONTOYA:  Same objection.  Go ahead.

10            THE WITNESS:  Yeah, again, my answer is the

11       same.  We paid them to put the house back together,

12       and in putting the house back together a few walls

13       were put back in a different place than they were

14       before, because, one, they've demoed the house,

15       there were no walls or anything else inside except

16       the floor, and the windows, and the concrete

17       exterior walls.

18   BY MR. LAWSON:

19        Q.   Would you agree that if something did cost more

20   money to -- for B4 & After to have performed and it was

21   not necessary under the protocol that you are not

22   seeking damages for those costs in this lawsuit?

23        A.   Well, I mean, I think your question is asking

24   two different things.  You know, one, your question

```
 1    could be interpreted to mean was there anything extra

 2    done as part of the remediation and removing Chinese

 3    drywall and the effects of it from the house, and the

 4    second part would be whether or not there was work done

 5    on the house in terms of reconstructing it.

 6              And, you know, for example, if -- I'm going to

 7    try to think of an example.  You know, when we put the

 8    house back together, there was a room that had carpet

 9    and we chose to put back in tile.  So I'm not aware of

10    anything being done as it relates to the protocol.  I'm

11    aware, and it was my instructions and my understanding,

12    that we did everything that was required by the

13    protocol.

14              And as it relates to reconstructing the house,

15    I don't believe or recall that anything that we did -- I

16    know that there were change orders that I recall in the

17    contract, and I know that we specifically tried to

18    exclude anything that we didn't think was attributable,

19    and I also recall that during -- I know that during the

20    entirety of these questions you've been asking them of

21    me without giving me the benefit of the damages summary

22    or the GC contract or anything else to look at, and I

23    don't think it's fair that you're trying to subject me

24    to some type of memory test in order to answer your
```

```
 1    questions when you know very well that my recollection

 2    might be refreshed by having the benefit of those

 3    documents.  So, respectfully, I think that that's

 4    unfair.

 5           But if in some way there was something added to

 6    the house that wasn't there before, and I don't consider

 7    moving one wall 5 feet in either direction something

 8    being added, but if we had carpet in a room that cost

 9    $1,000 and we chose to instead -- which we didn't do, by

10    the way, but I'm just using it as an example -- chose to

11    put in a marble floor that cost $10,000, that would not

12    be part of our damages if something like that occurred.

13      Q.    That was ultimately my question, if something

14    was not attributable to the Chinese drywall or necessary

15    under the protocol, if you would include it.  I wasn't

16    trying to subject you to a memory test.

17      A.    But you are, because you're asking me these

18    questions without giving me the benefit of the documents

19    that have the answers in them.  You're entitled to do

20    that.  There's no rule against it.  I just want the

21    record to be clear that you're asking me these questions

22    without the benefit of the documents.  That's all I'm

23    saying.  I'm not suggesting that you broke a rule of

24    depositions other than that lawyers ask questions of
```

```
 1   witnesses all the time without giving them the

 2   documents, for various reasons, and I want the record to

 3   reflect that that's what you're doing.

 4        Q.   You are welcome at any time, as you know, to

 5   say if you don't recall something, and if you want to

 6   look at something to refresh your recollection, we will

 7   get there.  I'm not trying to test you or to put you in

 8   a bad position, and I apologize if you feel that you

 9   have been put in that way.  If you don't recall

10   something, you can just say that, and it's perfectly

11   understandable if you don't, so please don't be afraid

12   to tell me.

13        You've been able to answer a lot of things very

14   well, and I'm impressed with your memory.  I don't think

15   that's been an issue today.  So I apologize that you're

16   frustrated about that, and we'll move forward.

17        A.   This is, unfortunately, a hard thing to forget.

18   I've tried.

19        Q.   I appreciate your time today, I really do.  I

20   understand that, and I'm not trying to make this any

21   longer than it has to be.

22        I wanted to ask you --

23        MR. VERRIER:  Matt, if I can interject.  We've

24        been going for an hour and a half.  It seems like a
```

Case 2:09-md-02047-EEF-MBN Document 22363-20 Filed 11/19/19 Page 3177 of 3246
Case 1:14-cv-09148-NGG Document 69-31 filed under LSD Debate 05/4822012/ Page 91
Confidential - Subject to Further Confidentiality Review
of 180

```
 1       good time.

 2              MR. LAWSON:  It seems like it.  Let's take a

 3       break.

 4              (Recess from 11:36 a.m. until 11:57 a.m.)

 5              (Wites Exhibit No. 6 was marked for

 6       identification.)

 7   BY MR. LAWSON:

 8       Q.   You've been handed a document that has been

 9   marked as Exhibit 6.  It's labeled as a damages summary.

10   Do you see that at the top of the page?

11       A.   I do.

12       Q.   All right.  Is this the damages summary that we

13   were discussing before the break?

14       A.   Yes.

15       Q.   And who put this together?

16       A.   I believe it was my counsel.

17       Q.   You didn't personally put this together; is

18   that right?

19       A.   No.

20       Q.   And can you tell me, to your understanding,

21   what this document is?

22       A.   It is an itemization of our out-of-pocket

23   damages with a four-column chart that includes a brief

24   description of an identification of the item, a
```

```
 1    description of the item, a column that directs you to

 2    the documents that provide that information, and a

 3    listing of the amount that we spent.

 4         Q.   Now, there's a footnote at the bottom of this

 5    page that notes that this summary does not include your

 6    damages for diminution in value, loss of use and

 7    enjoyment, pre- and postjudgment interest, attorneys'

 8    fees, costs, and punitive damages.  Do you see that?

 9         A.   I do.

10         Q.   And is that accurate that those damages are not

11    reflected in the chart here?

12         A.   As it says, those damages are not reflected in

13    the chart.

14         Q.   And accounting for those damages that are not

15    included, can you think of any additional items that are

16    not included on this chart that you are pursuing for the

17    types of damages that are covered in this chart?

18         A.   I would have to defer to my counsel as to what

19    other damages might be available based on the claims

20    that have been asserted, so...

21             MR. MONTOYA:  And so I know I'm testifying, but

22         we provided that as a way to expedite the

23         deposition.  There may be stuff that is not in

24         there.  It was to the best of our ability at this
```

```
 1        time.  So I'm asking you to use it as a guide and

 2        not a total lock-in.

 3             MR. LAWSON:  I appreciate that, and I

 4        appreciate you providing this.  It is helpful.  I

 5        just wanted to understand if the witness saw

 6        anything in the document that might be missing, just

 7        to offer knowledge, but I understand you might not

 8        know.

 9   BY MR. LAWSON:

10        Q.    All right.  I'd like to start to first discuss

11   the first item on this summary.  It says "GC contract,"

12   and it's listed in the description as a "contract for

13   Chinese Drywall Remediation project."

14             Is this the amount of money -- that's listed

15   here, $241,050 -- that was paid on the contract to B4 &

16   After Construction?

17        A.    Yes.

18        Q.    And if you look below that, there's an item

19   titled "GC change orders," and the description

20   includes -- says that it "includes additional repair

21   remediation items that were either (a) discovered after

22   the demolition of the house or (b) not included in the

23   GC contract."

24             Do you see that?
```

```
 1          A.   I do.

 2          Q.   So these were the additional change orders that

 3     you were discussing earlier that were added on to what

 4     was in the scope of work in the original contract; is

 5     that right?

 6          A.   Correct.

 7          Q.   And that might have included things like

 8     relocating the walls and entry points?

 9          A.   No.  No.

10          Q.   Were those included in the GC contract?

11               And I'm not referring to costs when I say this.

12     I want to understand for the scope of work.  Even if it

13     didn't cost more, I'm not trying to trap you in that, I

14     just want to understand, was the scope of work for the

15     GC contract inclusive of moving the walls and entry

16     points in the home like we discussed before the break?

17          A.   So the answer to your question is yes and no,

18     because, I mean, as I've said before, the GC contract,

19     we did not add anything or upgrade anything or include

20     in our request for damages in this case anything that

21     was not a cost of remediating and reconstructing the

22     house just the way it was.

23               Your question imbeds with it moving walls,

24     which suggests that there was a wall that was taken down
```

Confidential – Subject to Further Confidentiality Review

```
 1    and moved for the sole purpose of doing that.  You may

 2    not have been intending it that way, but your question

 3    could be interpreted that way.  When there is no wall

 4    and you choose to put a wall at one part of a house

 5    versus the other, the cost is the same.

 6           So included within the GC contract was the cost

 7    to reconstruct the house just the way it was and there

 8    was no additional charge for putting up a wall in one

 9    place versus another.  I hope that answers your

10    question.

11        Q.   So you're saying that the cost of

12    reconstructing the home was included in the GC contract;

13    is that right?

14        A.   Correct.

15        Q.   And however they reconstructed it, whether it

16    was with the same layout or a different one, the cost of

17    doing that work was included in the GC contract; is that

18    right?

19        A.   The cost of doing that work was the same,

20    that's what I'm saying.

21        Q.   And it was the same and included in the GC

22    contract; is that right?

23        A.   Yes.

24        Q.   When the home was remediated and drywall was
```

1    removed, was all the framing removed from the inside of

2    the house?

3        A.   I don't -- I think the framing, the metal

4    framing, remained.  I'd have to see the pictures, but I

5    believe that the metal framing remained.

6        Q.   To change the layout, though, you would have

7    had to move some of the metal framing; isn't that right?

8        A.   Yes, but as I've said, it was all done at no

9    additional cost.

10       Q.   And I'm not asking you about the cost.

11       A.   You are.  You're dancing on the head of a pin.

12       Q.   I'm asking direct questions just about the

13   work.  I don't care about the cost.  I'm not asking you

14   about it.  And I understand that's where you're

15   concerned this is going, and I just want to understand

16   what work was done, so I'm going to ask that question

17   again.

18            When you had them reconstruct the house, they

19   had to move the metal framing to move where the walls --

20   to put the walls in the places where you wanted them; is

21   that right?

22            MR. MONTOYA:  Objection.  Asked and answered.

23       Go ahead.

24            THE WITNESS:  Yes.

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 3183 of 3246
Case 1:14-cv-02408-NGG Document 34 Entered on FLSD Docket 05/08/2019 Page 117 of 180
Confidential - Subject to Further Confidentiality Review

```
 1  BY MR. LAWSON:

 2      Q.   Okay.  And that took labor on their part to

 3  move the metal framing; is that right?

 4           MR. MONTOYA:  To the extent you know, you can

 5      answer.

 6           THE WITNESS:  It required -- everything that

 7      they did required labor, including that, yes.

 8  BY MR. LAWSON:

 9      Q.   And you paid them for that labor; is that

10  right?

11           MR. MONTOYA:  Objection.  Mischaracterizes the

12      testimony.  You can answer.

13           THE WITNESS:  When this is all you have to work

14      with, you have to ask these kinds of questions.

15           Can you read back his question, please?

16           (The question was read by the reporter.)

17           MR. MONTOYA:  Asked and answered.  Calls for

18      speculation.

19           THE WITNESS:  They were paid for all the labor

20      that was undertaken in the house.

21  BY MR. LAWSON:

22      Q.   Do you know if there was a change order for

23  moving the metal framing in the home?

24      A.   I don't recall.
```

Confidential - Subject to Further Confidentiality Review of 180

1          (Wites Exhibit No. 7 was marked for

2   identification.)

3   BY MR. LAWSON:

4      Q.   You've been handed a document that's been

5   marked as Exhibit 7.  Do you recognize this document?

6      A.   I do.

7      Q.   What is it?

8      A.   It's the contract from B4 & After Construction.

9      Q.   This is the contract for the remediation and

10  reconstruction of your home that we've been discussing

11  today; is that right?

12     A.   Correct.

13     Q.   Turning to the last page of this document, this

14  is an unexecuted version of this agreement; is that

15  right?  It's page 11.

16     A.   Correct.

17     Q.   You did sign this agreement; is that right?

18     A.   I believe so.

19     Q.   And to clarify for the record, we received this

20  version of the document from your counsel just during

21  the break and just now because it is a clearer version

22  of the document.  The version that we had received, I

23  think, had perhaps been copied a few too many times, was

24  difficult to read.  I would note for the record that the

```
 1    version we received previously was a signed and executed

 2    version that your counsel provided to us.  I'm only

 3    showing you this version to make it a little easier for

 4    us to discuss the terms that are in the agreement.

 5          I'd like to turn your attention to the third

 6    page of the document.  Here, under Article 3 at the

 7    bottom of the page, it lists a contract sum of $242,250

 8    in a handwritten note.  Do you see that?

 9    A.    I do.

10    Q.    Now, that is different than the amount that is

11    on the damages summary that we just looked at where it

12    lists it as $241,050; is that right?

13    A.    Yes.

14    Q.    Do you know the reason for that discrepancy?

15    A.    I don't.  I can only guess that that was --

16    that while the contract amount is $242,250, that I was

17    only billed for $241,050.

18    Q.    You don't know why it would have been a little

19    bit less, ultimately, that you were billed for?

20    A.    Well, presumably, some minuscule amount of work

21    that was thought would be required or some fee or cost

22    was not actually expended, but I'm guessing.  That would

23    seem to make sense.

24    Q.    But you still felt that B4 & After fully
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 3186 of 3246
Confidential - Subject to further confidentiality Review
of 180

```
 1    performed what you had asked them to do in remediating

 2    and reconstructing your house; is that right?

 3        A.   Correct.

 4        Q.   You had no issues with their performance under

 5    this contract and the change orders?

 6        A.   No, we did not have any issues.

 7        Q.   And you were satisfied with the remediation

 8    work that they did on your home?

 9        A.   I was satisfied with the work that they did,

10    yes.

11             (Wites Exhibit No. 8 was marked for

12    identification.)

13    BY MR. LAWSON:

14        Q.   I've handed you a document that's been marked

15    as Exhibit 8.  It's titled Chart of Expenses Deductible

16    Pursuant to IRS Bulletin on Chinese Drywall.  Do you see

17    that?

18        A.   I do.

19        Q.   And the first page is Bates stamped as No. 1

20    and the document goes to Bates Stamp No. 103 at the

21    conclusion.  Do you see that?

22        A.   Yeah.

23        Q.   What is this document, if you know?

24        A.   Presumably, this is a document that was
```

Confidential -- Subject to Further Confidentiality Review

1    prepared in connection with the deduction that we took

2    on the federal income tax return, but since you're

3    presenting it to me in isolation, I can't say with

4    100 percent certainty that that's what it's for, but

5    based on the title and based on my recollection, this

6    was prepared and given to my CPA for purposes of taking

7    that deduction.

8        Q.   And I'd represent to you that this is how it

9    was produced to us, so I'm not trying to pull a fast one

10   on you.

11       A.   I understand, yeah.

12       Q.   Looking back to the damages summary chart that

13   we looked at as Exhibit 6, there are some Bates labels

14   that are listed next to -- in the GC contract row?

15       A.   Right.

16       Q.   Specifically, there's a 45 through 58.  I

17   wanted to ask you if those Bates labels aligned with 45

18   through 58 in Exhibit 8, which I've just handed you, if

19   those are the same documents that the chart is referring

20   to.  So if you could turn to page 45 of Exhibit 8 and

21   look at that.

22       A.   So, I mean, I will do that; however, I did not

23   create that column of the chart, so I can only answer

24   your question based on now reviewing the documents and

1    asking if it appears that they correspond, and it

2    appears that they do.

3         Q.   And I understand that you did not create this.

4    I'm just trying to use this as a shortcut and a guide to

5    be able to help us get through a lot of documents that

6    there are for the remediation of your home.

7              So if you look at the second row of the damages

8    summary for GC change orders, it says that the

9    documentation for those change orders is from Bates

10   label 45 through 58 and then 59 through 73.  So it

11   sounds like that that refers to the pages found in those

12   corresponding Bates labels on Exhibit 8, so I wanted to

13   ask you about those change orders that are listed on

14   those pages.

15             Specifically looking at the first page, 45, of

16   the change orders, can you tell me what this document

17   is?  It says "additional" at the top.  Do you see that?

18        A.   I do.

19        Q.   Are these additional items that you requested

20   through change orders on top of what was in the GC

21   contract?

22        A.   I believe so.

23        Q.   Looking at this list, can you tell me which

24   items you are seeking as part of your remediation claim

Confidential -- Subject to Further Confidentiality Review

1   in this lawsuit and which you are not seeking as part of

2   your remediation claim in this lawsuit?  And I'm

3   referring to the list that goes from page 45 on to page

4   46 of Exhibit 8.

5       A.   So, one, we're not seeking in this lawsuit any

6   money for any work that was done that was a cost in

7   addition to simply reconstructing the house the way that

8   it was.  So that is the baseline answer to your

9   question.

10          My recollection, without counting up and

11  calculating the amount of the checks, is that the items

12  that are included in 45 and 46 are things that were done

13  in addition that are not part of the $241,050.

14          And, again, as I said before, to the extent

15  that we added something, we're not asking for, nor do we

16  expect your client to pay for it.  That's the best

17  answer I can give you sitting here looking at these

18  documents right now.

19      Q.   You said that they're not part of the $241,050,

20  and I understand that, because that --

21      A.   I said that they may not be.  My belief is that

22  they are not part of it, that they're things that were

23  done in addition.

24      Q.   And there's a --

Confidential -- Subject to Further Confidentiality Review

```
1        A.   Like, for example -- I didn't mean to interrupt
2   you, but, like, for example -- and Jennifer will
3   probably know more about this than me -- actually --
4   like, for example, I don't think that the house had a
5   pot filler in it before the remediation.  I know it's a
6   small amount of money I'm using as an example, but I'm
7   just using it as an example, that if the house didn't
8   have a pot filler in it before the remediation and we
9   asked the general contractor to add one, it's not part
10  of the damages that we're seeking in this case.
11       And my recollection, without looking at all the
12  checks and adding up all the money that we paid to
13  B4 & After Contractors, that if this document depicts
14  things that were added that were not in the house before
15  the remediation started, they're not part of the 241 and
16  not something that we're asking for.
17       Q.   On the damages summary, for GC change orders it
18  lists an amount of $11,487, and I wanted to be able to
19  understand what items were included in that amount of
20  money, because if you look on 45 and 46, the total due
21  is in excess of $64,000 as listed on page 46.  So
22  there's a large discrepancy between the amount that is
23  requested in the damages summary for change orders and
24  then the amount that's listed on this page, but it may
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 3191 of 3246
Case 1:14-cv-04206-NGG-SJB Document 289-91 Entered on FLSD Docket 05/08/2019 Page 125 of 180
Confidential -- Subject to Further Confidentiality Review

1    seem to include some of them, and that's what I wanted

2    to understand.

3         A.   Right.

4              MR. MONTOYA:  Can I have a minute with him?

5              MR. LAWSON:  Sure, that's fine.  Let's go off

6         the record.

7              (Discussion off the record.)

8    BY MR. LAWSON:

9         Q.   So I was asking before we went into break about

10   the items, if there are any, on 45 and 46 that are part

11   of the $11,487 for GC change orders that are listed on

12   the damages summary that is Exhibit 6.

13        A.   So I believe that, you know, if you look at the

14   description for GC change orders in Exhibit 6, it talks

15   about additional repair and remediation items that were

16   discovered after the demolition of the house or were not

17   originally included in the contract, and then it

18   references "includes bolded items on GC quote marked

19   'additional'".  So I would assume that that means that

20   if you add up the 6,000 for demo showers, the 3366 for

21   tile for bathrooms, the remove and replace three curbs,

22   which I'm not sure what that means, that you get to that

23   number.

24             And I believe that it may not have originally

1   been anticipated that it would be necessary to demo the

2   showers and take up the tile there but that it was

3   determined that in order to properly do the remediation

4   it was necessary to do that, and those items were added

5   and included as part of the GC change orders, and that's

6   where the 11,487 should come from.

7        Q.   So, to the best of your knowledge, the 11,487

8   accounts for the additional items that were necessary to

9   perform in this project; is that right?

10       A.   They were necessary to perform as part of

11  following the protocol issued by Judge Fallon and the

12  CPSC.

13       Q.   Looking down this damages summary, there's a

14  few additional items, including payment for a new alarm

15  system.  It states "old system removed from home per new

16  protocol."  This is looking back at Exhibit 6, the

17  damages summary.

18       A.   Yeah, uh-huh.

19       Q.   So you removed the alarm system that you had in

20  the home before the remediation and replaced it with a

21  new one, and that amount was $1,868; is that right?

22       A.   Not before the remediation.  As part of the

23  remediation, we had to remove the alarm system, because

24  we had to remove everything from the house except for

1    the flooring and the metal frames.  So as part of the

2    remediation, the alarm system was removed, and it was

3    required to replace it.  That was not something that was

4    performed by the GC.  That was separately done by ADT.

5    That's why that amount is there, because we only had to

6    replace the alarm system because we had to remediate the

7    house.

8        Q.   I'm sorry.  I meant that the old alarm system

9    was in the house before the remediation, and that's why

10   you needed to change it out with the new one?

11       A.   Yes.

12       Q.   All right.  Looking down to the next item, it

13   says "Brenner Architecture."  It says "copy of original

14   plans required for repair and remediation," and it

15   refers to a page 80.  Turning to page 80 in Exhibit 8,

16   what is this invoice for?

17       A.   It appears to be an invoice for the cost to

18   print the plans or the blueprints for the house.

19       Q.   And this was done in April of 2010, according

20   to the invoice; is that right?

21       A.   Yes.

22       Q.   And what blueprints were these for the house?

23   It says it was a request -- at a request by you.  Were

24   they the blueprints -- you can scratch my previous

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/18/19 Page 3194 of 3246
Case 2:14-cv-02494-NGG Document 269-31 Entered on FLSD Docket 05/48/2019 Page 228 of 180
Confidential - Subject to Further Confidentiality Review

1    question.

2         Were these blueprints for how you wanted the

3    house to be laid out after the reconstruction was

4    completed?

5    A.    No.

6    Q.    Were they printouts of how -- of the floor plan

7    or blueprint of the house as it was originally

8    constructed?

9    A.    Yes.

10   Q.    And why did you need those, just so I

11   understand?

12   A.    So at this point in time, in April of 2010, we

13   must have still been in the process of interviewing

14   general contractors to determine who was going to do the

15   work, which general contractor we would hire.  I believe

16   that I spoke to four or five and received quotes from

17   several, and in order for them to quote the job, they

18   needed a complete set of the plans, and not just like,

19   you know, a floor plan that appears on the last page of

20   Exhibit 3, but they needed the entirety of the plans.

21        So in order to do that, I had to get -- or ask

22   Albanese for those documents in order to get multiple

23   sets to provide to the multiple contractors who we had

24   bid on the project.

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 3195 of 3246
Case 1:14-cv-09148-NGG Document 91-34 Filed 05/19/20 Page 129 of 180
Confidential - Subject to Further Confidentiality Review
of 180

```
1        Q.    Looking down to the next item on the damages

2    summary, it says "permit fees to EZ Permits."  Can you

3    tell me what that is?

4        A.    EZ permits is a -- I think they're called a

5    permit expediter, and that money was paid to them in

6    connection with securing the permits that were necessary

7    to do the work.  When I say "the work," it's the

8    remediation project.

9        Q.    Here a Bates labeled page is not listed on this

10   chart.  Do you know if you have a copy of this check

11   number, No. 250, that's listed in the description for

12   this item?

13       A.    If it's not included, then I can only say the

14   answer is maybe, because I certainly would have

15   endeavored to give that to counsel, my counsel, our

16   counsel, referring to my wife and I.  And so the answer

17   to your question is, as I'm sitting here today, I don't

18   know if I have a copy of that check.

19       Q.    Looking at the next item, it states "Hawkeye

20   Home Inspection," and the description is "inspection of

21   GC work (see check and invoice)."  Was this an

22   inspection that was performed after the remediation and

23   reconstruction were completed?

24             Specifically, it refers to pages 34 and 35 and
```

```
 1    74, if you want to refer to those.

 2         A.   Right.  So just to back up to your last

 3    question, if you look at Bates 000073, there is a

 4    printout from the account that I had at that time at

 5    Oppenheimer that shows a journal entry for the $140.34.

 6    I know that's not a copy of the physical check, but that

 7    is there at least so you have that record.

 8              In regard to the inspections by Hawkeye and the

 9    reference to 34, 35, and 74, so 34 and 35 appear to be

10    the same document, and that, based on the date, appears

11    to be for the inspection that was done following the

12    remediation, and 74 shows the journal entry on our

13    account for the payment of that money, and that's why

14    it's handwritten on that page, which is 74, "home

15    inspection after construction."

16         Q.   Do you remember receiving a written report from

17    Hawkeye Home Inspections for this inspection?

18         A.   No.

19         Q.   Was it just a verbal report that they gave to

20    you?

21         A.   It was, to my recollection, a verbal report.  I

22    can't recall there being an inspection report.  Again,

23    it's now eight or so years ago.  But home inspections

24    for most any size home, but certainly of a home of our
```

```
 1   size, would cost considerably more than $495, and we

 2   were trying to -- I know this is more than you're

 3   asking, but forgive me for explaining the answer.

 4           Our goal and what we did was follow the

 5   protocol, but we did not seek to spend any more money

 6   than we had to.  So in connection with Hawkeye Home

 7   Inspection, my recollection was that I asked him to come

 8   back and look at the work but I did not want to pay for

 9   a written report, which I didn't need because this was

10   not done in connection with an inspection for the sale

11   of the house.

12       Q.   What did he tell you in his verbal report after

13   the inspection?

14       A.   That everything was fine, that the work by

15   B4 & After Construction was done properly.

16       Q.   And was that an evaluation of the construction

17   quality and a determination about whether there were any

18   remnants of Chinese drywall, or just of the construction

19   quality?

20       A.   So my recollection is that he -- well, so my

21   recollection is that he did perform a visual inspection

22   of the Chinese drywall -- excuse me -- of the drywall,

23   not the Chinese drywall, because by then it was all

24   gone, but he opened up outlets and switches, but I know
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 3198 of 3246
Case 1:14-cv-02494-NGG Document 269-31 Entered on FLSD Docket 05/08/2015 Page 132 of 180
Confidential -- Subject to Further Confidentiality Review

 1    that I would have told him that there was no Chinese

 2    drywall, which I knew because I personally inspected all

 3    of the drywall that was delivered to my house before a

 4    single board was put up to make sure that they had a

 5    label on them that said "Made in the USA."

 6           So, yes, he did look at that issue, but that

 7    was really not the purpose of his inspection, because I

 8    already knew that to be the case, meaning that there was

 9    no Chinese drywall used in the remediation and

10    reconstruction of the house.

11    Q.    Looking to the final item on the first page of

12    the damages summary, it's an item for Light Bulbs

13    Unlimited, and it says "replacement of lighting damaged

14    by Chinese drywall."  Do you see that?

15    A.    I do.

16    Q.    Now, I wanted to ask you, going down from that

17    item through the item that says "Boca Raton Decorating

18    Center," this appears to be replacement for lighting,

19    and plumbing, and faucets, and paint that were done at

20    various points.

21           Is it true that those items were not included

22    in the work that was paid for through your contract and

23    change orders with B4 & after?

24    A.    Right.  Again, Jennifer -- the answer is yes.

1    Jennifer can probably answer move specifics on these

2    better than me, but there were certain fixtures or items

3    that Marc Brett must have said to us or to Jennifer, you

4    know, "Go out and get that yourself," and we did, and

5    that's why they're separately itemized and they were not

6    part of or included within the GC contract.

7         Q.   So I'd like to go back to Exhibit 5, which is

8    that Supplemental Plaintiff Profile Form that we were

9    looking at a little bit earlier today, and specifically

10   to turn your attention to page 5 of that form.

11        A.   Okay.

12        Q.   If you could look to the bottom of the page,

13   there's a Section VII that's titled Other Damages.  Do

14   you see that?  It's at the bottom of the page.

15        A.   I do.

16        Q.   And it asks you if you have incurred

17   alternative living expenses as a result of Chinese

18   drywall and to identify the total moving costs and/or

19   alternative living expense you've incurred, and you've

20   listed $36,931.  Do you see that?

21        A.   Yes.

22        Q.   Now, going back to the damages chart on the

23   second page, you have a few different items at the

24   bottom of the chart on the second page.  The first one

Confidential - Subject to Further Confidentiality Review

```
 1    is titled "Elite Relocation Moving and Storage."  Do you

 2    see that?

 3        A.   I do.

 4        Q.   And this is for removing furniture, cabinets,

 5    appliances, the contents of your home, before the

 6    remediation occurred; is that right?

 7        A.   It is.

 8        Q.   And the amount that you have listed here is

 9    $7,928; is that right?

10        A.   Yes.

11        Q.   And then you also have "rental home" listed and

12    there's a series of check numbers that are listed in the

13    description.  Is this the amount that you paid to rent a

14    home to live in while you were unable to live in your

15    home because it was being remediated?

16        A.   Yes.

17        Q.   And the amount listed is $25,600; is that

18    right?

19        A.   Yes.

20        Q.   And, finally, there's "rental insurance" which

21    is listed, for $717.  That's a renter's insurance policy

22    that you paid for for that rental home while you lived

23    in it?

24        A.   Yes.
```

Confidential – Subject to Further Confidentiality Review

1    Q.    And then there's a water bill for the rental

2    house for $682.27.  Is that the amount of money that you

3    paid for water while you lived in the rental home?

4    A.    I believe so, yes.

5    Q.    And then the last item is "FPL" for the rental

6    house in an amount of $2,004.70.  Can you tell me what

7    that is?

8    A.    Electricity.  It's Florida Power and Light.

9    Q.    So that's the amount you paid for your electric

10   bills at the rental property during the time that you

11   lived there; is that right?

12   A.    Yes.

13   Q.    And is it your understanding that, after going

14   through this damages summary, that all of the receipts

15   and evidence that you have in your possession for these

16   items have been handed over to your attorneys at this

17   point?

18   A.    To the best of my knowledge.

19   Q.    And now that we've gone through it, can you

20   think of any additional items related to your

21   alternative living expenses or the remediation of your

22   home that are not included on this chart that you're

23   seeking damages for in this litigation?

24   A.    My recollection is that the damages chart

```
 1    includes an itemization all of the out-of-pocket or

 2    compensatory damages that we are seeking but does not

 3    include the damages delineated or identified in the

 4    footnote on Exhibit 6.

 5        Q.   Let's look back to the Supplemental Plaintiff

 6    Profile Form.  Continuing on on page 5 that we were just

 7    looking at, and this is Exhibit 5, there's a Section VI

 8    that's titled Prior Payments.  Do you see that?

 9        A.   I do.

10        Q.   All right.  If you look down, it asks you to

11    list any source of payments that you've received related

12    to your claims about Chinese drywall and your property,

13    and there's two different items listed there.  Do you

14    see that?

15        A.   Yes.

16        Q.   The first one is an amount of payment of

17    $35,467.95 from the Chinese Drywall Settlement Program.

18    Can you tell me what that amount of money was for?

19        A.   I believe that was from the settlement with

20    Banner Supply.

21        Q.   And Banner Supply was the company that supplied

22    the drywall that was installed in your house; is that

23    right?

24        A.   Banner Supply was the company that somehow
```

Confidential – Subject to Further Confidentiality Review

1    obtained the drywall from your client and supplied it to

2    or on behalf of Albanese-Popkin in our house.

3        Q.   There's an additional amount that's listed here

4    of $4,381.65 for a GBI holdback payment.  Is that an

5    additional amount that you received from the settlement

6    involving Banner that was paid to you at a later date,

7    or is that a different item?  Can you tell me what that

8    item is, I guess, is a better way to put it?

9        A.   I can't.

10       Q.   Okay.  Did you receive both of those amounts of

11   money at some time, the $4,381.65 and the 35,000-plus

12   dollars that we discussed earlier?

13       A.   So I assume that we did.  I specifically

14   remember getting money that I recall as being part of

15   the Banner settlement.  I don't have a specific

16   recollection of the $4,381.65.  I'm sure that if it was

17   due to us and is listed it's something that we received.

18   It's just that as we sit here today I can't specifically

19   recall if my memory is of those two items in global or

20   one or the other, but I'm sure, if it was included here

21   by my counsel, then I don't have any doubt that we

22   received it.

23       Q.   We talked a little bit earlier about the money

24   that you received from State Farm in settlement, either

1    500 or $5,000, somewhere around there, and we've just

2    talked about these two other settlement payments.  Can

3    you think of any other payments that you have received

4    related to your damages from Chinese drywall?

5         A.   So one thing that I would just want to add is

6    that you did accurately repeat what I testified to,

7    which is that the amount is $500 or 5,000.  I can't

8    recall which, but I will get you that information.  And

9    I also can't recall which -- at the moment whether or

10   not we got that amount in total or there was something

11   for fees or costs that came out of that, but whatever

12   the amount was, whatever the de minimus amount was that

13   we got from the State Farm case and the monies listed on

14   page 5 of Exhibit 5, we did not receive any other

15   payments that I can -- no, we did not receive any other

16   payments.

17        Q.   So I wanted to clarify something that we talked

18   about a little bit earlier, and it's on page 4 of this

19   SPPF.  It was about the difference between the total

20   amount of $297,266 that is related to remediation costs

21   and the amount that was paid to the contractor that's

22   listed of $252,537.  When we talked about that earlier,

23   you said that the amount of money in addition to the

24   amount paid to the contractor that's included in that

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 3205 of 3246
Case 1:13-cv-02468-NGG Document 22-29 Filed 11/19/19 Page 3205 of 3246
Confidential -- Subject to Further Confidentiality Review
of 180

 1    totals was the amount for you having to relocate your

 2    family to a rental house; is that accurate?

 3         MR. MONTOYA:  Can you repeat that?  I'm sorry.

 4    BY MR. LAWSON:

 5    Q.    There's a disparity between the two amounts.

 6    The total amount is $297,266 for remediation costs, but

 7    it says that the amount paid to the contractor was

 8    $252,537, and when we talked about that earlier you said

 9    that -- and I asked you what the other amount was, and

10    we talked about how that was the amount of money that

11    you had to pay to relocate your family and put them in a

12    rental house, and we just went over some of those

13    expenses, and I just wanted to understand if that's

14    accurate, that the additional amount in the remediation

15    costs was for the relocation of your family.

16    A.    Okay.  So my recollection of when in time

17    during this deposition you asked me those questions was

18    before you showed me Exhibit 6 and Exhibit 8, and so

19    without the benefit of those documents I gave whatever

20    testimony I gave.

21         If you look at Exhibit 6 and you add 241,050

22    plus 11,487, you get $252,537, which is the amount that

23    is listed on page 4 of Exhibit No. 5.  That -- so

24    Exhibit 5 also lists the total that is on Exhibit 6 of

```
1    $297,266.  So the difference between the two is

2    everything else that's listed on Exhibit 6.

3        Q.   That's right.  So I just wanted to clarify

4    because those amounts are listed in different places on

5    this form.  There's, on page 5, $36,971 for alternative

6    living expenses, and I just wanted to confirm that

7    that's included in the remediation cost amount of

8    $297,266 that's listed on page 4.

9        A.   It would seem so.

10       Q.   Okay.  And you're not seeking that amount

11   twice, it's just included in that total amount that we

12   just discussed; is that right?

13       A.   We're not seeking anything twice and we're not

14   seeking anything that we're not entitled to.  You know,

15   there was -- I recall that there was language in Judge

16   Fallon's order about the replacement of cabinets and

17   countertops, which, you know, we did not try to pull one

18   over or seek anything -- pull one over on anybody or

19   seek anything that we're not entitled to.  We took the

20   cabinets out of our house, we took the countertops out

21   of our house, and we put them back in, and they did not

22   come back in the same exact condition that they left,

23   but we didn't try to include them here to seek something

24   that we thought was inappropriate or that we're not
```

Confidential - Subject to Further Confidentiality Review

1    entitled to.

2        Q.   One of the items that you have listed as not

3    being included in this summary is loss of use and

4    enjoyment of your property, and I'd like to turn your

5    attention to page 6 of this Supplemental Plaintiff

6    Profile Form at the top of the page where it asks you to

7    identify the total amount of any loss that you've

8    suffered for loss of use and/or loss of enjoyment of

9    your property.  Do you see that?

10       A.   I do.

11       Q.   And the amount that's listed there is $480,000.

12   Do you see that?

13       A.   I do.

14       Q.   How did you come to that figure and place it on

15   this form?

16       A.   Well, I came up with that figure at that time

17   based on our understanding that this was asking for loss

18   of use and enjoyment through the time period of the

19   conclusion of the remediation.  So this encompasses the

20   purchase of the house through and including

21   February 2011 or March of 2011, and I believe that the

22   figure is based on $15,000 a month during the time

23   period that we could not live in the house, which I

24   believe was a fair approximation of the rental value of

1   the house at that time, and then $7,500 per month for

2   the time period from the purchase of the house until the

3   time that we moved out.  I believe, if you do that math,

4   it will come to 480.

5        It does not include, which we will also seek at

6   trial, the loss of use and enjoyment that -- well, I

7   guess it's really the loss of enjoyment that occurred

8   from the time we moved back into the house to whatever

9   date this case finally goes to trial.

10       Q.   I wanted to ask you about the $15,000 per month

11  that you said was, I believe, an estimated rental value

12  of the home; is that right?  Is that what you --

13       A.   Well, yes, my -- I believe that the reason, the

14  way that we came up with that number, which I think is a

15  fair number independent of that, is that the rental

16  value of a house like ours at that period of time was

17  approximately $15,000.  I think that there are homes --

18  similar homes in our community that did not have Chinese

19  drywall that have rented for more and some that may have

20  rented for less and that that was a fair approximation

21  of a number that we chose.

22       Q.   And was that based on looking at how much

23  people had rented homes in The Oaks community?

24       A.   Yes.

Confidential - Subject to Further Confidentiality Review

```
1      Q.   And do you know if those records of those

2   rentals were public records that you were able to find?

3      A.   So the answer to the question is there are

4   definitely public records about rental values, about

5   rentals in The Oaks that could be obtained from the

6   Multiple Listing Service or from Realtor.com.  I don't

7   know whether or not that data is available on a

8   historical basis, but having lived in the community for

9   as long as we have, having a mother who has been in the

10  real estate business for 45-plus years, who I have

11  helped out or talked to from time to time over family

12  dinners about her work, I have a general understanding

13  of what the rental value of a house like ours, absent

14  Chinese drywall, would otherwise be, and that's how I

15  came up with that number.

16       I know that that's more than what you just

17  asked, but there are, I'm sure, documents that could be

18  obtained that have that number, but it's not as though I

19  necessarily at that time did a search or research and

20  looked up homes, because I just -- I knew because I had

21  gathered that information over the course of years.

22      Q.   It was based on knowledge and experience that

23  you had acquired over some time that allowed you to come

24  up with that figure; is that right?
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 3210 of 3246
Case 1:18-cv-00049-NGG Document 9-3 Entered on FLSD Docket 05/02/2019 Page 144 of 180
confidential -- subject to further confidentiality review

```
1     A.   Yes.

2     Q.   And that 15,000 per month you were attributing

3  to the period of time where you were outside of the

4  house entirely; is that right?

5     A.   Correct.

6     Q.   And for the months where you were living in the

7  house before it was remediated, you assigned a value of

8  $7,500 per month to that time; is that right?

9     A.   Correct.

10    Q.   How did you come up with that figure, which is

11 half of the $15,000 amount that we just discussed?

12    A.   I would say it is --

13         MR. MONTOYA:  Let me jump in for a second.  I

14    know the question's here, but I'm objecting to the

15    extent it calls for a legal conclusion and a

16    question that calls for the jury's determination as

17    to the loss of use and enjoyment both.  Obviously,

18    you've answered this question, you can answer it,

19    but I just want to put my objection.  Go ahead.

20         THE WITNESS:  The figure was derived by trying

21    to determine what we thought was an appropriate

22    number, no different than how a plaintiff or their

23    counsel in any case involving noneconomic damages

24    would say or ask a jury to award something that was
```

```
 1          requested or allow the jury to determine to award

 2          that, or something more, or something less, which we

 3          will likely do in this case at that point in time.

 4               So, you know, there was no exact science or

 5          measurement.  Clearly 7,500 is half of 15,000, but

 6          it was simply our attempt to come up with something

 7          that we thought was appropriate given the loss of

 8          enjoyment that we suffered and continue to suffer to

 9          this day as a result of having unknowingly purchased

10          a house with Chinese drywall.

11   BY MR. LAWSON:

12          Q.   Like you said, you unknowingly purchased it

13   with Chinese drywall, and you said earlier that you

14   didn't know that you had Chinese drywall until the

15   self-inspection that you conducted in July of 2009 after

16   hearing from the Rosen family; is that right?

17          A.   Yes, but prior to that time there were

18   symptoms, if you will, of Chinese drywall in the house,

19   we just didn't know it was coming from the Chinese

20   drywall, like the smell in the house.  The house did not

21   smell normal and the smell got worse over time, but the

22   smell was present before July of 2009.

23          Q.   Now, I think you said earlier that before you

24   knew you had Chinese drywall you had people over to your
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 3212 of 3246
Confidential - Subject to further confidentiality Review
of 180

1    house and you, you know, you had parties, you enjoyed

2    living in your house.  Is that accurate, that before you

3    knew you had Chinese drywall you enjoyed the house?

4        A.   Yes.

5        Q.   But that changed once you knew you had Chinese

6    drywall; is that right?

7        A.   Yes.  Once we learned that we had Chinese

8    drywall, and over time as the smell increased, and as we

9    began to have to deplete our retirement savings in order

10   to remediate our house, the enjoyment of the house

11   decreased substantially.

12       Q.   But the amount that you're seeking for that

13   time that you lived in the house before it was

14   remediated is a consistent $7,500 per month; is that

15   right?

16       A.   Whether you look at it on a monthly basis or in

17   totality, it's simply an amount that we determined to be

18   a fair figure to represent those damages that are not

19   subject to a specific formula, as I think the jury

20   instruction says.

21       Q.   Going down to the next item that's listed on

22   the Supplemental Plaintiff Profile Form below that

23   figure for loss of use and/or loss of enjoyment, there's

24   a question about diminution in value, and it asks you to

1    identify the total amount of such diminution of value

2    being claimed, and the amount that you've listed there

3    is the word "unknown."  Can you explain that to me?

4         MR. MONTOYA:  My objection is to the extent it

5         calls for expert testimony from a lay witness.  You

6         can answer.

7         THE WITNESS:  So I'm not a realtor or an

8         appraiser, nor have I conducted an analysis of the

9         impact of this issue on the resale value of homes,

10        so it is my belief and my opinion that it has

11        impacted the value of the house and that's an answer

12        that was at that time unknown to me and remains

13        unknown to me and on which I will rely on counsel

14        and an expert to determine that number for trial.

15   BY MR. LAWSON:

16        Q.   I'd like to go to page 5 of the Supplemental

17   Plaintiff Profile Form.  There's a section near the top

18   of the page.  It's the third section at the top of page

19   5, and it starts with the question:  "Have you

20   photographed the back side of each Chinese-manufactured

21   drywall board?"  Do you see that?

22        A.   I do.

23        Q.   So this asks a series of questions about

24   evidence that was preserved during the remediation of

Confidential -- Subject to Further Confidentiality Review

```
 1    your home, and you have marked that you have performed

 2    all of these different actions that are listed on this

 3    form.  The first one is asking you if you had

 4    "photographed the backside of each Chinese-manufactured

 5    drywall board removed from the property immediately

 6    after it was removed, and have you documented on a floor

 7    plan or other similar diagram the location of each full

 8    or partial Chinese-manufactured drywall board and its

 9    photograph."  Do you see that?

10         A.   I see that on the form, yes.

11         Q.   Yeah.  And you or your counsel on your behalf

12    has marked "yes" to that.  Do you see that?

13         A.   I see where it's been marked "yes."

14         Q.   Are you aware of a floor plan or diagram that

15    shows the location of where each Chinese-manufactured

16    drywall board was located in your home?

17              MR. MONTOYA:  Let me jump in to the extent it

18         calls for attorney-client communications.  And I

19         will tell you I don't think there is a diagram at

20         all, but what we were discussing during the break is

21         there are videos, and I don't know -- frankly, I

22         don't know if y'all have videos of the home, because

23         I don't think -- I don't know if they were uploaded

24         to the portal.  And I know for my clients who
```

```
 1      remediated, there's videos, and I don't know if you
 2      guys have them.  And if you don't, I will certainly
 3      hand them over to you, but I think that's what that
 4      was intended to do, that answer.
 5          So I'm interrupting your questioning, but I
 6      don't want you guys to be surprised.
 7          MR. LAWSON:  We have a sound recording that was
 8      uploaded, but we do not have video, so I don't know
 9      if it's the video --
10          MS. RICO:  So the BrownGreer portal, the way
11      that we did videos is that we sent -- and this was a
12      long time ago -- we sent all the videos to
13      BrownGreer and, they were supposed to upload them.
14      I don't know that the portal had the capability to
15      handle an uploaded video, so that might be the issue
16      and maybe just the sound got on there.  But we can
17      send you a DVD overnight, right away.  It's not an
18      issue.
19          MR. LAWSON:  That would be good, because the
20      sound of the drilling is probably not as
21      instructive.
22  BY MR. LAWSON:
23      Q.   All right.  So --
24      A.   I can answer your question, the one that's
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 3216 of 3246
Case 1:15-cv-12046-NGD Document 203-1 *SEALED* Filed 05/27/20 Page 150 of 180
Confidential - Subject to Further Confidentiality Review

1    pending or, you can ask me another one.

2        Q.   No, we can go back to the floor plan and

3    diagram, if you're aware of that existing.

4        A.   Right.  So subject to my counsel's instruction,

5    I'm aware that photographs and video were taken.  Beyond

6    that, these markings were -- on the Exhibit 5 were made

7    by counsel on my behalf.  I don't have any knowledge,

8    personal knowledge, beyond knowledge that the

9    photographs and video were taken, and relying on

10   whatever counsel did on my behalf, and that would

11   pertain to the entirety of what is within these -- this

12   last part of Section 5 of Exhibit 5.

13       Q.   Going down to the next portion, it asks if you

14   photographed the HVAC coil and at least one plumbing

15   component and three electrical components, and you said

16   that, yes, that was done; is that right?  Is that what

17   it says on the form?

18       A.   Yeah.  So I know that that was done personally

19   because I remember it being done, I know that over the

20   years I have seen those photographs, and I have relied

21   upon counsel to answer that question and make them

22   available in the course of discovery in this case.

23            (Wites Exhibit No. 9 was marked for

24   identification.)

Confidential - Subject to Further Confidentiality Review

```
1              MR. LAWSON:  Actually, before we get started,

2         let's take a quick break.

3              (Lunch recess from 12:58 p.m. until 1:46 p.m.)

4    BY MR. LAWSON:

5         Q.   Welcome back.

6              Right before we took a break we had Exhibit 9

7    marked, which I'd like you to take a look at.

8         A.   Sure.

9         Q.   I represent to you that these are photos that

10   were produced to us, and if you look on the first page

11   of the exhibit, the first photo has a Bates stamp of

12   WITES, M - 000208, it appears, and it goes all the way

13   to page 269 in the stamp in the bottom corner.

14        A.   Okay.

15        Q.   Do you know what these photos are of?

16        A.   Yes.

17        Q.   What are they of?

18        A.   They are photographs of the interior of our

19   home taken after the house was gutted and during the

20   time that the industrial hygienist was running the

21   machinery in the house to clean the air and remove the

22   remnants that remained or confirm that there were no

23   further remnants of the Chinese drywall.

24        Q.   Do you know if a similar set of photos was
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 3218 of 3246
Case 1:15-cv-04260-NGG Document 37 Filed 11/19/19 Page 3218 of 3246
Confidential -- Subject to Further Confidentiality Review
of 180

```
 1    taken at the time that the remediation was occurring and

 2    the drywall was being ripped out of the house, or was

 3    there only video taken during that time?

 4        A.   I don't remember.

 5        Q.   Do you know if samples of the drywall were

 6    taken from the house before the drywall was discarded?

 7        A.   Yes.

 8        Q.   Was that performed by Mr. Yanes, who did the

 9    inspection earlier on your house that we looked at from

10    August of 2009?

11        A.   I believe so, yes.

12             (Wites Exhibit No. 10 was marked for

13    identification.)

14    BY MR. LAWSON:

15        Q.   I handed you a set of photos that I represent

16    to you were taken on December 18 of 2018.  The first

17    page is listed -- is stamped, excuse me, in the bottom

18    corner as Taishan-Wites000001, and it goes all the way

19    to 62.  There appears to be 62 photos in this set.

20             If you look on the first page, there's a label

21    that is shown on there, and it shows your name and your

22    wife's name and your address; is that right?  On the

23    first page?

24        A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 3219 of 3246
Case 1:15-cv-04294-NGG-MDG Document 289-1 Entered on FLSD Docket 05/28/2019 Page 153 of 180
Confidential – Subject to Further Confidentiality Review

1      Q.   And it lists a date of June 14, 2010.  Do you

2   see that?

3      A.   I do.

4      Q.   And this appears to be a sample -- a bag with a

5   sample of a receptacle from your house?  Does that sound

6   right?

7      A.   It does.

8      Q.   And the location is written in by hand on here.

9   It appears to say "living room north wall."  Do you see

10   that?

11      A.   I do.

12      Q.   And at the bottom, it says "by Javier Yanes,"

13   and it also says "evidence collected."  Do you see that?

14      A.   Yes.

15      Q.   Okay.  So is it accurate to say that Mr. Yanes

16   came around June 14, 2010, to collect evidence from your

17   house perhaps around the time that the remediation

18   project started?

19      A.   Yes.

20      Q.   And looking through these photos, it appears

21   that Mr. Yanes collected electrical receptacles and

22   samples of drywall.  Specifically, if you look to page 7

23   in this exhibit, there appears to be an image of a

24   sample of a drywall board.  Do you see that?

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 3220 of 3246
Case 1:15-cv-04032-NGG Document 209-31 Entered on FLSD Docket 05/18/2018 Page 454 of 180
Confidential - Subject to Further Confidentiality Review

```
 1     A.   Yes.

 2     Q.   And that drywall board says "4 feet x 12 feet,"

 3   and then there's another "x" where the drywall sample

 4   cuts off.  Do you see that?

 5     A.   Yes.

 6     Q.   Had you ever seen those drywall markings inside

 7   of your house before your home was remediated?

 8     A.   I saw drywall markings in my house before it

 9   was remediated, but absent a photograph, I can't recall

10   which specific marks I saw.

11     Q.   Let's look down to No. 14, page 14 of this

12   exhibit, and on that page there appears to be a drywall

13   board with the word "GridMarX," with an X, on it.  Do

14   you see that?

15     A.   I do.

16     Q.   And it also says "National Gypsum Properties

17   LLC"; is that right?

18     A.   Yes.

19     Q.   Is this a drywall marking that you recall

20   seeing inside of your house before the drywall was

21   removed?

22     A.   I recall seeing drywall in my house before it

23   was removed, and I cannot independently recollect the

24   markings that were on any of the drywall, but I don't
```

1    have any reason to doubt that any of the photographs in

2    this exhibit with the corresponding labels from Javier

3    Yanes are correct and accurate.

4        Q.   Other than the samples collected by Mr. Yanes

5    that are shown in these photographs, do you know if any

6    other samples of drywall or electrical components or

7    other materials from your home that were removed during

8    the remediation are being kept somewhere other than what

9    has been photographed here?

10       A.   I don't know.

11       Q.   Are you aware if anyone took a photograph of

12   the markings on each piece of drywall as it was being

13   removed from the house during the remediation project?

14       A.   You'd have to ask my counsel that question.  I

15   don't know.

16           MR. LAWSON:  I don't have anything further at

17       this time for Mr. Wites, but I wanted to put on the

18       record that we discussed earlier the additional

19       documents that were produced this morning.  We have

20       not, unfortunately, had time to review all of them,

21       because of the volume.  As I said at the top of the

22       deposition, we reserve the right to continue the

23       deposition, as needed, if we find that additional

24       time would be beneficial to be able to review those

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 3222 of 3246
Case 1:19-mc-02408-NGG Document 2-3 Filed 11/19/19 Page 3222 of 3246
Confidential -- Subject to Further Confidentiality Review
of 180

```
 1      documents with the witnesses.

 2          And because of the pending nature of the close

 3      of discovery, which I believe closes on Monday, we

 4      would ask if -- that as long as we can let you know

 5      whether or not we need it by Monday, if it would be

 6      possible to be able to have any continuation, if

 7      necessary, go beyond the close of discovery.

 8          MR. MONTOYA:  Yeah, I don't have a problem with

 9      the continuation so long as it's limited to the

10      documents that are produced.  And to that end, I'd

11      like to go ahead and mark them so we don't have any

12      question later about what's been produced and what

13      hasn't.

14          We're up to Exhibit 11.  Composite Exhibit 11,

15      which was produced today, which is, in general, the

16      estimates that Mr. Wites received in the process of

17      remediating his home.

18          (Wites Exhibit No. 11 was marked for

19   identification.)

20          MR. MONTOYA:  Exhibit 12 is the copy of the

21      558, Chapter 558 construction defect notice that was

22      sent out.

23          (Wites Exhibit No. 12 was marked for

24   identification.)
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 3223 of 3246
Case 1:18-cv-12408-NLH Document 20 Filed 09-11 date 05-48-2019 Page 157 of 180
Confidential - Subject to Further Confidentiality Review

 1              MR. MONTOYA:  Exhibit 13 are documents related

 2         to the Wites inquiries about their credit.

 3              (Wites Exhibit No. 13 was marked for

 4    identification.)

 5              MR. MONTOYA:  Exhibit 14, Composite Exhibit 14,

 6         is the PL and information about the property taxes

 7         with Palm Beach County.

 8              (Wites Exhibit No. 14 was marked for

 9    identification.)

10              MR. MONTOYA:  And I think that is almost it.

11              Exhibit 15, Composite Exhibit 15, is, I

12         believe, permitting for the initial building of the

13         home.

14              (Wites Exhibit No. 15 was marked for

15    identification.)

16              MR. MONTOYA:  And correct me if I'm wrong.

17         Feel free.

18              THE WITNESS:  Well, I would just -- if we want

19         to take a break for a minute.  We've got to take a

20         break for just a quick minute before your

21         questioning closes.

22              MR. MONTOYA:  Sure.

23              (Recess from 1:55 p.m. until 1:57 p.m.)

24              MR. MONTOYA:  And the remediation of your home

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/10/19 Page 3224 of 3246
Case 1:14-cv-02494-NGG Confidential Document 269-3 Confidential Filed 05/08/2024 Page 158 of 180
Confidential - Subject to Further Confidentiality Review

```
 1        as a result of Chinese drywall, did you upgrade --

 2             MR. ROTHENBERG:  Excuse me.  I have a couple

 3        questions.

 4             MR. MONTOYA:  Great.

 5                       CROSS-EXAMINATION

 6   BY MR. ROTHENBERG:

 7        Q.   Hi, Mr. Wites.  My name is Alex Rothenberg.  I

 8   represent a different defendant in this case.  I'll be

 9   fairly brief.

10        A.   Which defendant?

11        Q.   BNBM.

12        A.   Okay.

13        Q.   If I can refer you to Exhibit 5 and

14   specifically page 6.

15        A.   Okay.

16        Q.   We looked at this a little bit before, but for

17   loss of use and enjoyment you listed $480,000.  And just

18   to be clear, that number that you seek is up until

19   remediation; is that correct --

20        A.   No.

21        Q.   -- for loss of use and enjoyment?

22        A.   No, the number that I put here only encompasses

23   through the date of the completion of the remediation.

24   It does not include the totality of what we will seek at
```

Confidential - Subject to Further Confidentiality Review

1    trial.

2        Q.   Correct.

3        A.   Correct.

4        Q.   And that number, you claim that you began to

5    experience loss of use or loss of enjoyment from the

6    date of purchase; is that correct?

7        A.   Yes.

8        Q.   Okay.  And before you discovered that your home

9    had Chinese drywall in it, can you explain what loss of

10   use or loss of enjoyment you experienced?

11       A.   The house smelled, as I testified to earlier,

12   the air conditioning units failed, the mirrors and

13   fixtures were pitting, and over that period of time, as

14   the smell was increasing, we then in the several-month

15   period leading up to July of 2009 were engaged in this

16   period of first -- as more and more news was coming out

17   about Chinese drywall, this uncertainty, first a

18   suspicion that we had it, and then certainty that we had

19   it, the builder coming and telling us, "Oh, you dodged a

20   bullet, you don't have it."

21            And, you know, when you have -- you know,

22   listen, the price of the house is no secret.  My wife

23   and I thought that we were doing the conservative,

24   prudent thing by putting a 50 percent down payment on

1    the house, which, as I testified to earlier, was money

2    that we saved from the time we had gotten married.  We

3    did not have any of that money prior to our marriage.

4    The prospect of having sunk that much money into a house

5    that was now subject to this problem was distressing, to

6    say the least.

7        Q.    With regard to the odor, is it correct that

8    earlier you testified you didn't notice an odor until

9    maybe six months or a year after moving in?

10       A.    Approximately, yes.

11       Q.    And the other issues you mentioned, the pitting

12   or the AC, when did you first start experiencing those

13   incidents when you -- after you moved into the home?

14       A.    So the first --

15            MR. MONTOYA:  To the extent it calls for expert

16       witness testimony, you can answer.

17            THE WITNESS:  So, obviously, there is a

18       distinction between when the home first started to

19       evidence the destruction caused by Chinese drywall

20       versus when we first started to perceive it, or see

21       it, or observe it.  You know, the pitting on mirrors

22       and picture frames were things that we were

23       conscious of within a relatively short period of

24       time after moving into the house.  We just didn't

1       necessarily know what to attribute it to.

2            And I'm not sure if I've fully answered your

3       question, so if you want to ask it again, that's

4       okay.

5   MR. ROTHENBERG:

6       Q.   I think you -- but could you put -- I know

7   perhaps not exactly, but maybe several months after

8   moving out?  A year?  When did you first --

9       A.   Well, listen --

10      Q.   -- believe to perceive issues that you now

11  connect?

12      A.   I can't say exactly, but understand that we

13  placed a number for loss of use and enjoyment from the

14  date of purchase through the date of the completion of

15  remediation as a number to represent the entirety of

16  that time period, not necessarily -- which you could add

17  up in the way that we've added up, but at the same time,

18  you know, it's kind of like you're trying a tort case

19  and you say to the jury, you know, "You can give the

20  plaintiff $10 a day for the rest of their life for

21  future pain and suffering, or you can think about this

22  number as X," and we're not here to say to you or the

23  jury that on day one of living in the house or day 14 of

24  living in the house that the loss of use and enjoyment

Confidential -- Subject To Further Confidentiality Review

1    had begun, because it's very difficult to say all these

2    years later exactly by month or by day when it happened.

3         So it's a figure that represents the entirety

4    of the time period that you could calculate or come to

5    in many different ways, and, you know, when trying to

6    answer that question when you're a lawyer, sometimes

7    it's difficult to take the lawyer hat off.  And, you

8    know, having tried a lot of cases where you have to ask

9    a jury for past and future pain and suffering and having

10   it engrained in my head what the jury instruction says,

11   we tried to come up with a number that we thought was

12   fair and appropriate and a number that ordinarily I

13   would never come up with or put down on a piece of paper

14   or counsel my own client to do so until we were actually

15   at the trial.

16        So I understand where I think, in any event,

17   where you're going with your question.  I don't know if

18   that helps you in obtaining an answer that you want for

19   yourself and to report back to your client, but, you

20   know, that's really the best explanation based on the

21   questions you've asked so far or the best explanation I

22   think I could ever give about how we came up with the

23   $480,000.

24   Q.   Thank you.  Now, moving away from that $480,000

1    figure, I think you indicated earlier that's not the

2    only loss of enjoyment damages that you seek?

3        A.    Correct.

4        Q.    I think earlier with Mr. Lawson you made a

5    distinction it's not -- it's loss of enjoyment, not loss

6    of use anymore, and that's post remediation that you

7    seek; is that correct?

8        A.    So there's not an exact answer to your

9    question.  It's a multipart answer.  You know, I think

10   that, you know, there's no specific definition.  You

11   know, jury instructions attempt to define loss of use or

12   loss of enjoyment, noneconomic damages.  You know, as

13   that language as phrased here, you could interpret loss

14   of use to mean occupancy, or you could interpret loss of

15   use to mean the way that you use your home, versus loss

16   of enjoyment seems to be in some senses something

17   distinct.

18           So if I was going to separate or

19   compartmentalize the two, obviously, if we were to say

20   loss of use is occupancy, well, then clearly after we

21   moved back into the house we occupied it, but in regard

22   to loss of enjoyment, and if you want to call loss of

23   use a diminishment in the way that you might choose to

24   use your house, or how you feel about the house, or if

Confidential -- Subject to Further Confidentiality Review

1   you want to lump those two terms together, that aspect

2   of our damages continues.

3       Q.   Sure.  I'm not trying to be semantic.

4       A.   No, no, no, I know you're not, but I just want

5   you to understand why I gave the answer that way.

6       Q.   Yeah, and I understand the -- what you're

7   saying.

8            Do you have a figure, to your understanding, of

9   what you're seeking for however we want to word it, the

10  postremediation damages you claim?

11           MR. MONTOYA:  I'm going to object to the extent

12       it calls for -- it's a jury determination.  You can

13       answer if you're comfortable.

14           THE WITNESS:  I don't have a specific figure

15       yet.

16  BY MR. ROTHENBERG:

17       Q.   I think you testified earlier that part of the

18  loss of enjoyment is what you had to go through in this

19  ordeal; is that accurate?  That it permanently reduced

20  your enjoyment of the property?

21       A.   I would agree with both of those statements,

22  yes, but it's not the totality.

23       Q.   And so do you claim that you continue to incur

24  those damages?

```
 1        A.   Absolutely.

 2        Q.   So there's no limit on it?

 3        A.   Really, it's -- there is -- in terms of the

 4   time period for which they are occurring, which,

 5   obviously, the longer -- there's not -- no, I don't

 6   really think there is a limit, and I'll give you a for

 7   example to illustrate the answer.

 8             You know, if we have a party at the house and,

 9   whatever, it's our personal friends, parents from the

10   kids' school, parents from the kids' hockey team, many

11   of whom -- you know, Jennifer and I are very lucky.  We

12   have a lot of friends that we've had for a long time.

13   They come into our house, and it's almost at every

14   single event we ever have at the house, whether somebody

15   specifically asks, "Oh, whatever became of your Chinese

16   drywall situation?" or they come and they comment, "Your

17   house is so beautiful, you're so lucky to live here,"

18   either one of those statements immediately brings both

19   of us back to the money we lost, and having to move out,

20   and the stress on our personal life.

21             And so it's -- it is an ongoing event that even

22   after we leave the house we will continue to experience,

23   because inevitably well-wishing people will comment on

24   it wanting to know how it all came out or how we felt,
```

Confidential - Subject to Further Confidentiality Review

1    and every time somebody asks about it, it brings you

2    right back to the fact that the ordeal continues.

3        Q.   Would living in a -- do you believe that living

4    in a property that had not experienced issues related to

5    Chinese drywall would reduce the kind of issues you were

6    just talking about?

7        A.   It -- they might, but moving is not always such

8    an easy thing, and even if we did, it's not -- every

9    time I look at my bank account I think about how much

10   that $300,000 would be worth today, whether I had put it

11   in a CD or had it conservatively invested, and how much

12   that $300,000 would be worth as I'm turning 50 next

13   month, how much it would be worth when I was 60 or 65 or

14   70 or 75 or 80.  You know, it's a lot of money, and so

15   every -- so to go back to your question, I don't know

16   that it would reduce it any measurable way, because

17   there's so many aspects of our life that this permeates,

18   whether it's, you know, we have a son that wants to go

19   off to boarding school next year.  Where are we getting

20   the money to pay for that?

21           And my wife is working full-time.  How long is

22   she going to continue to work?  How long am I going to

23   continue to work?  I mean, we were -- you know, listen,

24   all of us -- no disrespect to the court reporter,

Confidential -- Subject to Further Confidentiality Review

1    ma'am -- but all the lawyers in the room, we're all very

2    fortunate, we make a lot of money.  My wife is very

3    successful at her job, she makes a lot of money.  But to

4    have saved that much money at the age that we were at,

5    to have to give it up, it's -- it just doesn't go away.

6        Q.   So would it be fair to say that the loss of

7    enjoyment you're claiming has less to do with actually

8    living in the home, the day to day of how the home feels

9    or operates, and more to do with the memory of the

10   ordeal that you've been through?

11       A.   I can't say that it's less, I can only say that

12   both things are a part of it, because we don't have this

13   feeling that we bought our dream house.  Our next-door

14   neighbors, who also bought a house, it's also an

15   Albanese-built house, that's exceedingly similar to

16   ours, they didn't win the Chinese drywall lottery, and

17   they have three young children, and I'm sure they have a

18   different feeling about, a warmth and a love, of where

19   they live and their house.

20            And, you know, like I said, we're very lucky to

21   have been able to buy it and to be able to continue to

22   maintain it and pay the mortgage and all those things.

23   I'm not here to suggest otherwise.  But going back to

24   your question, I don't think it's really a less of

```
 1    situation, because I can't tell you that it's every day,

 2    but I can say with certainty that it's at least once a

 3    week that there's some thing that comes up because of

 4    some issue, whether it's a comment somebody makes, or

 5    just pulling into my driveway, or talking about our

 6    financial health or our financial future for our family,

 7    where, whether it's spoken or unspoken, it's there.

 8            This is not like I bought a defective car that

 9    cost 10- or $15,000, or 20, or 30, or 40, or 50.  I

10    mean, this was hundreds of thousands of dollars that

11    took me years to earn and save.  And I shouldn't say

12    "me."  It was my wife and I.

13        Q.   But post remediation, the house has functioned

14    as it was intended to; correct?  There was no odor, the

15    HVAC issues that you were discussing before didn't

16    occur; is that correct?

17        A.   Yes to both of your questions.

18        Q.   Okay.  Did you ever consider moving at any time

19    after you found out that there was Chinese drywall in

20    your home?

21        A.   So just so I can answer your question, you mean

22    from July of 2009 to the present?  Do you mean July 2009

23    to before the remediation?  You're entitled to ask the

24    question again, I guess, because I know we talked about
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 3235 of 3246
Case 1:13-cv-02840-NGG-JO Document 91-2 Filed 05/13/2019 Page 169 of 180
Confidential - Subject to Further Confidentiality Review

1   this earlier, but if you could give me a time frame,

2   I'll answer your question.

3       Q.   Let's talk about post remediation.

4       A.   So as I testified to earlier, we -- I can't

5   tell you that we've never considered it, but we've sort

6   of always felt that it's not -- it's eight years away,

7   it's not eight years in the past, it's not 18 or 25, and

8   we never really thought that we would be able to get the

9   fair market value of the house.  So in a way we kind of

10  feel like -- we kind of felt like we were stuck there.

11          I mean, listen, you could sell anything at a

12  price that somebody's willing to pay, so I'm not here to

13  say that it would have been impossible for us to sell

14  it, but having already lost $300,000, we were not in a

15  position to suffer what I would quantify as another loss

16  if, for example, you know, the house is worth -- let's

17  just assume that the house is worth today, if it never

18  had Chinese drywall, $1.6 million, but somebody's only

19  willing to give me 1.2, or a million, or even a million

20  five or a million five-fifty, whatever the number is.

21  It's just a recognition of another loss that, frankly,

22  we didn't have the stomach to deal with.

23      Q.   You never put the house on the market post

24  remediation; is that correct?

Confidential — Subject to Further Confidentiality Review

```
 1        A.   Never.

 2        Q.   And did you ever have any conversations with a

 3   realtor or someone else that spoke about perhaps the

 4   lingering effects of a Chinese drywall stigma or

 5   something like that?

 6        A.   So I'm sure I've had those conversations.

 7   After the passage of this much time, it's hard for me to

 8   say with who, but the answer to your question is yes.  I

 9   just can't specifically remember with who.

10        Q.   And can you recall any specific homes that had

11   Chinese drywall in them and were remediated, and what

12   they sold for, and if you believe it was fair market

13   value or some kind of reduced value?

14        A.   I am aware that homes in The Oaks have been

15   sold post their remediation.  I presume that it's

16   happened in other neighborhoods and cities and states as

17   well, but I know that it's happened in The Oaks.  I

18   don't have any knowledge and never at the time did any

19   analysis to determine what they sold for and what they

20   could have or should have sold for, because I just --

21   you know, it kind of is a situation where you just

22   don't -- the only thing I would have accomplished by

23   studying that would have been making myself and my wife

24   very upset, so we just -- it's kind of like this case.
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 3237 of 3246
Case 1:14-cv-02494-NGG-WP Document 269-31 Entered on FLSD Docket 05/03/2018 Page 171 of 180
Confidential - Subject to Further Confidentiality Review

1   I've tried very hard to be the client and not the

2   lawyer, because as much as I like Patrick and Natalie, I

3   don't really like -- I try to limit the amount of stress

4   and distress that this causes to my family.

5           MR. ROTHENBERG:  Thank you very much.  I have

6       no further questions.

7           MR. MONTOYA:  Follow-up?

8           MR. LAWSON:  I don't have anything further for

9       him.

10                      CROSS-EXAMINATION

11  BY MR. MONTOYA:

12      Q.   What's your understanding of whether or not you

13  have a duty to disclose the fact that your home had

14  Chinese drywall if you go to sell the property?

15      A.   There's no question it would have to be listed

16  on the seller's disclosure when you list a house for

17  sale.

18      Q.   In terms of the exhibits that we produced

19  today, what do those consist of, in your mind?  I'm

20  looking in particular at Exhibit 11, which is the, my

21  understanding, is the estimates that you got for

22  remediation.  Can you tell us what's in there?

23      A.   So Exhibit 11 are -- is documents related to

24  the remediation and reconstruction of our house.  There

Case 2:09-md-02047-EEF-MBN Document 22363-20 Filed 11/19/19 Page 3238 of 3246
Case 1:14-cv-24690-MGC Document 1-1 Entered on FLSD Docket 05/08/2019 Page 172 of 180
Confidential -- Subject to Further Confidentiality Review

 1    are quotes that we got from other builders, or other

 2    general contractors, I should say, to do the work,

 3    because we made an effort to find a firm or general

 4    contractor that would follow the protocol that satisfied

 5    all the other factors that we talked about earlier in

 6    the deposition for the least price, because nobody was

 7    paying for this except for us.

 8             So that's all that's in here.  There's the

 9    contract between us and EE&G IAQ Services, which was the

10    industrial hygienist, whose name is Jay Sall.  And

11    that's what's here.

12        Q.   And what's in Exhibit 15?

13        A.   Exhibit 15 is just permits.  They're not really

14    documents that I -- it's not that "they're not really."

15    They're not documents that I authored.  They're just

16    permits that were submitted, I believe, in connection

17    with the work -- well, permits for the -- dating back to

18    when the house was built, it looks like, which I have no

19    personal knowledge of.

20        Q.   Can you tell us what Exhibit 14 is?

21        A.   Everything in Exhibit 15, to my knowledge,

22    looks to be documents that predate our purchase of the

23    house.

24             Exhibit 14 -- excuse me.  Is that 14?

1    Q.   14.

2    A.   Exhibit 14 is just the submission that we made

3    to the Palm Beach County Property Appraiser, because

4    back at that time the county was allowing homeowners to

5    apply for a reduction in their property taxes based on

6    the diminished value of the homes.

7    Q.   Which you were questioned about today?

8    A.   Yes.

9    Q.   And Exhibit 13, can you tell us what that is?

10   A.   So Exhibit 13 concerns issues that we had with

11   our mortgage.  Which a lot of people that had Chinese

12   drywall decided not to pay.  A lot of them decided not

13   to pay their HOA fees.  Some of them gave the keys to

14   their house back to the bank.  We tried to do the right

15   thing.  We continued to pay the HOA.

16       I believe the chronology is that we originally

17   sought permission from the bank to not pay the mortgage

18   just during the time we were not living in the house,

19   and although they told us we could, they then posted a

20   sign on our door that we were delinquent in paying the

21   mortgage and negatively reported that to the credit

22   reporting agencies.

23       And after we fixed that, we just decided it was

24   not worth it and we paid the mortgage while we weren't

1    living in the house.  So Exhibit 13 are just the

2    compilation of e-mails and letters which CitiMortgage

3    concerning that issue.

4        Q.   Tell us what Exhibit 12 is, please.

5        A.   So Exhibit 12 is the statutory notice that we

6    gave to Albanese-Popkin and Ocean Coast Drywall

7    regarding Chapter 558 to cover his construction defects.

8    As I've told to more people than I'll ever be able to

9    remember or count, not only did we win the lottery of

10   buying a house with Chinese drywall from the

11   manufacturer that wouldn't participate in the legal

12   system or otherwise do the right thing, we also had a

13   developer that, unlike GL Homes and WCI, was not willing

14   to do anything at all for the homeowners either.

15            But the letter, to answer your question more

16   specifically, is just the statutory notice required by

17   558 for a claim against the drywall supplier and the

18   developer.

19       Q.   In the repair and remediation of your home, did

20   you upgrade any of the finishes?

21       A.   No, we couldn't -- no, we didn't.

22            MR. MONTOYA:  I don't have anything further,

23       sir.  Thank you.  Anybody else?

24            MR. LAWSON:  Nothing further for him from me.

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 3241 of 3246
Case 1:19-mc-00405-NGG Document 29-31 Filed on 11/12/2019 Page 175 of 180
Confidential - Subject to further confidentiality Review

```
  1                 MR. ROTHENBERG:  No questions.

  2                 (Whereupon, the deposition concluded at

  3      2:24 p.m.)

  4

  5

  6

  7

  8

  9

 10

 11

 12

 13

 14

 15

 16

 17

 18

 19

 20

 21

 22

 23

 24
```

```
 1                      C E R T I F I C A T E

 2

 3            I, JOAN L. PITT, Registered Merit Reporter,

 4      Certified Realtime Reporter, and Florida Professional

 5      Reporter, do hereby certify that, pursuant to notice,

 6      the deposition of MARC WITES was duly taken on

 7      January 10, 2019, at 9:05 a.m., before me.

 8            The said MARC WITES was duly sworn by me

 9      according to law to tell the truth, the whole truth, and

10      nothing but the truth, and thereupon did testify as set

11      forth in the above transcript of testimony.  The

12      testimony was taken down stenographically by me.  I do

13      further certify that the above deposition is full,

14      complete, and a true record of all the testimony given

15      by the said witness.

16

17      _____

18            JOAN L. PITT, RMR, CRR, FPR

19

20            (The foregoing certification of this transcript

21      does not apply to any reproduction of the same by any

22      means, unless under the direct control and/or

23      supervision of the certifying reporter.)

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4          Please read your deposition over carefully and

 5   make any necessary corrections.  You should state the

 6   reason in the appropriate space on the errata sheet for

 7   any corrections that are made.

 8

 9          After doing so, please sign the errata sheet

10   and date it.  It will be attached to your deposition.

11

12          It is imperative that you return the original

13   errata sheet to the deposing attorney within thirty (30)

14   days of receipt of the deposition transcript by you.  If

15   you fail to do so, the deposition transcript may be

16   deemed to be accurate and may be used in court.

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                    - - - - - -

 2                  E R R A T A

 3                    - - - - - -

 4    PAGE   LINE   CHANGE

 5    ____   ____   _____

 6       REASON:  _____

 7    ____   ____   _____

 8       REASON:  _____

 9    ____   ____   _____

10       REASON:  _____

11    ____   ____   _____

12       REASON:  _____

13    ____   ____   _____

14       REASON:  _____

15    ____   ____   _____

16       REASON:  _____

17    ____   ____   _____

18       REASON:  _____

19    ____   ____   _____

20       REASON:  _____

21    ____   ____   _____

22       REASON:  _____

23    ____   ____   _____

24       REASON:  _____
```

```
 1                  ACKNOWLEDGMENT OF DEPONENT

 2

 3          I, _____, do hereby

 4   acknowledge that I have read the foregoing pages and

 5   that the same is a correct transcription of the answers

 6   given by me to the questions therein propounded, except

 7   for the corrections or changes in form or substance, if

 8   any, noted in the attached Errata Sheet.

 9

10

11   _____   _____

12   MARC WITES                    DATE

13

14

15

16

17   Subscribed and sworn to before me this

18   ____ day of _____, 20___.

19   My Commission expires: _____

20

21   _____

     Notary Public

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-29 Filed 11/19/19 Page 3246 of 3246
Case 1:19-cv-12408-NIGNIC Document 289-31 Entered on FLSD Docket 05/08/2020 Page 180 of 180
Confidential - Subject to Further Confidentiality Review

```
 1                        LAWYER'S NOTES

 2      PAGE    LINE

 3      _____   _____    _____

 4      _____   _____    _____

 5      _____   _____    _____

 6      _____   _____    _____

 7      _____   _____    _____

 8      _____   _____    _____

 9      _____   _____    _____

10      _____   _____    _____

11      _____   _____    _____

12      _____   _____    _____

13      _____   _____    _____

14      _____   _____    _____

15      _____   _____    _____

16      _____   _____    _____

17      _____   _____    _____

18      _____   _____    _____

19      _____   _____    _____

20      _____   _____    _____

21      _____   _____    _____

22      _____   _____    _____

23      _____   _____    _____

24      _____   _____    _____
```